# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D., | Civil Action No. 2:22-cv-00184-184-LCB  Hon. Liles C. Burke |
| *Plaintiffs*, | |
| v. | |
| KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County, | |
| *Defendants*. | |

# MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR TEMPORARY
## <u>RESTRAINING ORDER & PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF FACTS ....................................................................2

   A. The Act Prevents the Parent Plaintiffs from Receiving the Support
      They Need to Make Important Medical Decisions for their Children's
      Health and Well-Being. ...................................................................2

   1. Reverend Paul Eknes-Tucker...........................................................2

   2. Brianna Boe and Her Son Michael Boe ...........................................2

   3. Megan Poe and Her Daughter Allison Poe.......................................4

   4. James Zoe and His Son Zachary Zoe ...............................................6

   5. Kathy Noe and Her Son Christopher Noe.........................................7

   6. Dr. Jane Moe ....................................................................................9

   7. Dr. Rachel Koe ...............................................................................10

   B. Transition Is the Established Course of Care for Gender Dysphoria.............12

   C. The Alabama Vulnerable Child Compassion and Protection Act.................17

III. ARGUMENT .....................................................................................18

   A. Plaintiffs Will Likely Succeed on the Merits of Their Claims Because
      the Act Is Unconstitutional. ...........................................................19

   1. The Act Infringes on Parental Autonomy by Preventing Parents from
      Obtaining Essential Medical Care for their Children (Count I). ......................19

   2. The Act Violates Equal Protection by Barring Medical Treatments for
      Transgender Minors (Count II). .....................................................22

      a. The Act is Subject to Heightened Scrutiny Under
         Well-Established Precedent.........................................................22

i

b.  Defendants Cannot Establish the State's Asserted Interest Serves Important Governmental Objectives or the Act Is Substantially Related to the Achievement of those Objectives.............26

i.   The treatments are effective and well-established............................27

ii.  The treatments are necessary. ...............................................................28

iii. The treatments are safe.........................................................................30

iv.  Minors who stop taking puberty blocking medication or hormone therapy will resume puberty in their birth sex. .................34

3.  Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim (Count IV). ...................................................................35

4.  The Act Is Unconstitutionally Vague (Count V). ..................................39

B.  The Affordable Care Act Preempts the Act Because the Act Mandates Sex Discrimination by Healthcare Providers (Count III). ............................41

IV. The Act Will Cause Immediate, Irreparable Harm to Plaintiffs........................44

V.  Injuries to Plaintiffs Outweigh Any Damage to the State, Which Has No Interest in Enforcing an Unconstitutional Law.....................................................48

VI. CONCLUSION ......................................................................................................50

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015) ..............................................25

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015).........................................................................41

*Bendiburg v. Dempsey*,
909 F.2d 463 (11th Cir. 1990) ...................................................20, 21

*Board of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of
Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) .............................................24

*Bostock v. Clayton Cty.*,
140 S. Ct. 1731 (2020).................................................................24, 42

*Bowen v. City of New York*,
476 U.S. 467 (1986).........................................................................45

*Brandt v. Rutledge*,
551 F. Supp. 3d 882 (E.D. Ark. 2021), *appeal docketed*, No. 21-
2875 (8th Cir. Apr. 19, 2022) ...................................................*passim*

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993).........................................................................23

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011).........................................................................38

*Campbell v. Kallas*,
No. 16-CV-261-JDP, 2020 WL 7230235 (W.D. Wis. Dec. 8, 2020) ...............47

*Cate v. Oldham*,
707 F.2d 1176 (11th Cir. 1983) .......................................................48

*Christian Legal Soc'y v. Martinez*,
561 U.S. 661 (2010).........................................................................23

*City of Chi. v. Morales*,
   527 U.S. 41 (1999)..........................................................................40

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) .......................................................37

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972).......................................................................33

*Elrod v. Burns*,
   427 U.S. 347 (1976)................................................................18, 48

*F.V. v. Barron*,
   286 F. Supp. 3d 1131 (D. Idaho 2018) ........................................24

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) ...................................................41

*Flack v. Wis. Dep't of Health Servs.*,
   331 F.R.D. 361 (W.D. Wis. 2019)...............................................45

*Fresenius Med. Care Holdings, Inc. v. Tucker*,
   704 F.3d 935 (11th Cir. 2013) .....................................................42

*Frontiero v. Richardson*,
   411 U.S. 677 (1973).......................................................................24

*Gayle v. Meade*,
   -- F.Supp.3d --, No. 20-21553-CIV, 2020 WL 3041326
   (S.D. Fla. June 6, 2020) ...............................................................45

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ..........................................24, 25, 43

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
   551 F. Supp. 3d 567 (D. Md. 2021)..............................................43

*Ingram v. Ault*,
   50 F.3d 898 (11th Cir. 1995) .......................................................19

*Jolley v. Riverwoods Behav. Health, LLC*,
   No. 1:21-CV-00561-WMR, 2021 WL 6752161
   (N.D. Ga. Aug. 30, 2021) .............................................................43

*Jones v. Governor of Fla.*,
　950 F.3d 795 (11th Cir. 2020) .......................................................................18

*Karnoski v. Trump*,
　No. C17-1297-MJP, 2017 WL 6311305
　(W.D. Wash. Dec. 11, 2017) ...........................................................................46

*KH Outdoor, LLC v. City of Trussville*,
　458 F.3d 1261 (11th Cir. 2006) .....................................................................49

*King v. Burwell*,
　576 U.S. 473 (2015)........................................................................................44

*Kolender v. Lawson*,
　461 U.S. 352 (1983).........................................................................................39

*Lanzetta v. New Jersey*,
　306 U.S. 451 (1939).........................................................................................41

*Lawrence v. Texas*,
　539 U.S. 558 (2003).........................................................................................23

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
　358 F.3d 804 (11th Cir. 2004) .......................................................................20

*M.A.B. v. Bd. of Educ. of Talbot Cty.*,
　286 F. Supp. 3d 704 (D. Md. 2018).................................................................24

*May v. Anderson*,
　345 U.S. 528 (1953).........................................................................................20

*McCullen v. Coakley*,
　573 U.S. 464 (2014)....................................................................................36, 38

*Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*,
　896 F.2d 1283 (11th Cir. 1990) .....................................................................48

*Nken v. Holder*,
　556 U.S. 418 (2009).........................................................................................49

*Norsworthy v. Beard*,
　87 F. Supp. 3d 1104 (N.D. Cal. 2015)............................................................25

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ............................................................49

*Papachristou v. City of Jacksonville*,
   405 U.S. 156 (1972)............................................................................39

*Parham v. J.R.*,
   442 U.S. 584 (1979)............................................................................20

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
   268 U.S. 510 (1925)............................................................................20

*Planned Parenthood Se., Inc. v. Bentley*,
   951 F. Supp. 2d 1280 (M.D. Ala. 2013)..............................................19

*Prince v. Massachusetts*,
   321 U.S. 158 (1944)............................................................................20

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992)............................................................................36

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)......................................................................36, 37

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017)........................................................................25

*Smith v. City of Salem*,
   378 F.3d 566 (6th Cir. 2004) ..............................................................24

*Stone v. Trump*,
   400 F. Supp. 3d 317 (D. Md. 2019).....................................................24

*Taylor v. Polhill*,
   964 F.3d 975 (11th Cir. 2020) ............................................................41

*Toomey v. Arizona*,
   No. CV-19-00035-TUC-RM, 2019 WL 7172144
   (D. Ariz. Dec. 23, 2019) .....................................................................24

*Troxel v. Granville*,
   530 U.S. 57 (2000)..............................................................................20

*United States v. Eckhardt*,
　466 F.3d 938 (11th Cir. 2006) ....................................................................40

*United States v. Playboy Ent. Grp., Inc.*,
　529 U.S. 803 (2000)...................................................................................37

*United States v. Virginia*,
　518 U.S. 515 (1996)...................................................................................25

*W. Ala. Women's Ctr. v. Williamson*,
　120 F. Supp. 3d 1296 (M.D. Ala. 2015)......................................................18

*Whitaker v. Kenosha Unified Sch. Dist. No. 1*,
　858 F. 3d 1034 (7th Cir. 2017) ...................................................................24

*Wollschlaeger v. Governor*,
　848 F.3d 1293 (11th Cir. 2017) ........................................................36, 38, 39

## Statutes

20 U.S.C. § 1682.............................................................................................43

Affordable Care Act, 42 U.S.C. § 18001, *et seq.* (2010)..........................................19

Ala. Code §§ 13A-5-6, 13A-5-11 ....................................................................18

Ala. Code § 22-8-4 .........................................................................................34

## Other Authorities

U.S. Const. Amend. I .........................................................................*passim*

U.S. Const. Amend. XIV ................................................................................19

"Cause," Black's Law Dictionary (11th ed. 2019)...............................................40

Letter from Kristen Clarke, Assistant Attorney General at U.S. Dep't
　of Justice Civil Rights Div., to State Attorneys General (Mar. 31,
　2022), *available at* https://www.justice.gov/opa/press-
　release/file/1489066/download..................................................................44

## I.    INTRODUCTION

Plaintiffs are a church pastor, parents, and healthcare providers who seek to ensure that the Plaintiff children in this case receive necessary medical care. The Reverend Paul Eknes-Tucker is the Senior Pastor at a Birmingham church who has provided pastoral counseling to congregants and community members who are parents of transgender children. Brianna Boe, James Zoe, Megan Poe, and Kathy Noe (together, "Parent Plaintiffs") are parents of children who are currently receiving medical care for gender dysphoria; they are suing individually and on behalf of their children. Michael Boe, Zachary Zoe, Allison Poe, and Christopher Noe (together, "Transgender Plaintiffs") are transgender minors whose medical care will be halted or precluded by the Act. Dr. Jane Moe and Dr. Rachel Koe (together, "Healthcare Provider Plaintiffs") are healthcare providers who will be subjected to felony arrest and potential imprisonment for providing recommended medical care to their patients—care recognized as medically appropriate and necessary by every major expert medical association—if the Alabama Vulnerable Child Compassion and Protection Act (the "Act") goes into effect on May 8, 2022.

## II.   STATEMENT OF FACTS

### A.   The Act Prevents the Parent Plaintiffs from Receiving the Support They Need to Make Important Medical Decisions for their Children's Health and Well-Being.

#### 1.   *Reverend Paul Eknes-Tucker*

Rev. Paul Eknes-Tucker is the Senior Pastor at Pilgrim Church in Birmingham, Alabama where he has served for seven years. (*See* Declaration of Rev. Paul Eknes-Tucker ("Rev. Eknes-Tucker Decl.") ¶ 1.) A core tenet of his faith is love, respect, and support for all persons. (*Id.* ¶ 4.) In his pastoral role, he has provided counseling to congregants and community members who are the parents of transgender children. (*Id.* ¶ 5.) In those discussions, parents are often uncertain about what guidance their faith can provide as they figure out how to support their child. (*Id.*) Parents often share with Rev. Eknes-Tucker their worries and fears as well as hopes and aspirations for their transgender child's future. (*Id.* ¶ 6.) His religious faith compels him to support parents in accepting their transgender children. (*Id.*) This includes counseling parents to get help from medical and mental health professionals, when needed, to assist and care for their children and to embrace who they are. (*Id.*)

#### 2.   *Brianna Boe and Her Son Michael Boe*

Michael Boe is a twelve-year-old transgender boy who resides with his mother, Brianna, in Montgomery County, Alabama. (*See* Declaration of Brianna Boe ("Boe Decl.") ¶¶ 1-2.) In his early years, Michael was a happy, outgoing child.

(*Id.* ¶ 3.) At nine years old, however, Michael became depressed and anxious. (*Id.*) Michael also started struggling academically and socially. (*Id.*) Michael eventually confided in his mother that he felt as though he was not like other girls and was worried about being judged by his classmates. (*Id.* ¶ 4.) He also reported that he was being bullied in school. (*Id.*) Brianna placed Michael in a new school for the following school year and brought him to a therapist to help him with his depression. (*Id.* ¶ 5.)

Michael began to talk with his mother about his male gender identity and the distress and discomfort he was experiencing as he entered puberty and his body began to develop in ways that were inconsistent with his sense of self. (*Id.* ¶¶ 5-6.) In June 2021, Michael told his mother that he is transgender. (*Id.* ¶ 7.) With support from his family and a mental health provider experienced in working with transgender youth, Michael began to socially transition, including adopting a male name and pronouns and generally living as a boy in all aspects of his life. (*Id.* ¶¶ 7-9.)

Since Michael began to socially transition, his mood has improved greatly. (*Id.* ¶ 9.) His therapist recently recommended that Michael be evaluated for additional medical treatment to address the distress he continues to experience due to the mismatch between his body and his gender identity. (*Id.* ¶¶ 9-12.)

In February 2022, Brianna made an initial appointment for Michael at the Children's Hospital of Alabama. (*Id.* ¶ 14.) If this law goes into effect, that

appointment will be cancelled, and Michael cannot be assessed for critical medical care. (*Id.* ¶¶ 14-15.) In addition, he will continue to experience the effects of female puberty which will cause him to develop additional physical traits inconsistent with his identity as a boy and will severely exacerbate his distress. (*Id.* ¶¶ 9-12, 15.)

### 3.    *Megan Poe and Her Daughter Allison Poe*

Allison Poe is a fifteen-year-old transgender girl who resides with her mother, Megan Poe, in Cullman County, Alabama. (*See* Declaration of Megan Poe ("Poe Decl.") ¶¶ 1-3.) As a young child, Allison showed interest in girls' toys and clothing. (*Id.* ¶ 4.) Thinking this was a phase, her parents initially refused to buy Allison any girl toys. (*Id.*) Without asking, Allison's grandmother bought Allison a Barbie doll. (*Id.*) Allison was so happy and carried it everywhere. (*Id.*)

When the family returned to the United States from her father's deployment abroad, Allison would become very upset when her mother refused to buy her girls' clothes. (*Id.* ¶ 5.) As a compromise and remembering Allison's response to the grandmother buying her a doll, Megan bought Allison a few girls' toys, again providing Allison some short-term relief from the despair she was experiencing. (*Id.*) When Allison was around nine years old, her personality began to change significantly. (*Id.* ¶ 9.) She became withdrawn and quiet, showed signs of depression, and regularly commented that she wanted to die. (*Id.*) Allison's actions became so worrisome to Megan that she consulted with a pediatrician. (*Id.* ¶ 10.)

The pediatrician suggested that Allison may be transgender and referred them to the gender clinic at the University of Alabama at Birmingham ("UAB") Hospital. (*Id.*)

After evaluating Allison, a team of clinicians educated Megan about what Allison was experiencing and gave her professional advice about how to support Allison. (*Id.* ¶¶ 11-12.) That visit was a turning point for Megan. (*Id.* ¶ 13.) Having a better understanding of what Allison was experiencing and receiving guidance about how to support her child's ability to thrive, Megan helped Allison redecorate her room and began buying girls' clothes for her. (*Id.* ¶ 14.) The first time Allison emerged from her room in girls' clothes she was beaming with joy. (*Id.*)

During fifth grade, in anticipation of her starting puberty, Allison was evaluated for puberty-blocking medication, which she started taking at the end of sixth grade. (*Id.* ¶¶ 18-19.) About seven months ago, just as Allison was beginning high school, she was evaluated for and eventually started on estrogen. (*Id.* ¶ 21.) Her mental health has improved dramatically; she is confident, social, and doing well in school. (*Id.* ¶ 22.) If the Act is allowed to go into effect, Allison's medical care will be disrupted, which will cause her body to start producing male hormones resulting in changes to her body inconsistent with her female identity. (*Id.* ¶ 23.) Should that happen, Allison will again experience severe distress and anxiety. (*Id.*)

5

### 4.   *James Zoe and His Son Zachary Zoe*

James Zoe lives with his wife and son Zachary in Jefferson County, Alabama. (*See* Declaration of James Zoe ("Zoe Decl.") ¶¶ 1-2.) He is the parent of Zachary Zoe, a thirteen-year-old transgender boy who is currently in the seventh grade. (*Id.* ¶ 2.) Zachary lives part-time with his father and stepmother in Jefferson County, and part-time with his mother and stepfather in St. Clair County. (*Id.* ¶ 5.) Zachary is a bright boy with a close group of friends who is interested in video games and art. (*Id.*)

Zachary was assigned female at birth. (*Id.* ¶ 6.) As a young child, Zachary was shy and reserved. (*Id.*) Around the age of eight, Zachary began to express his dislike of wearing dresses and bright clothing. (*Id.*) Over time, Zachary started dressing in more masculine attire and became upset if people identified him as a girl. (*Id.*)

As Zachary entered puberty, the physical changes he started to experience, including breast development and menstruation, caused him to become distressed and withdrawn. (*Id.* ¶ 7.) When Zachary was eleven years old, he began referring to himself using "he" and "him" pronouns. (*Id.* ¶ 8.) As his friends began to refer to him in this way, he experienced relief from the distress he had been experiencing as well as a greater sense of self-awareness and self-acceptance. (*Id.*) Both sets of parents supported him in socially transitioning to live as a boy. (*Id.*) Since he came

out as transgender and received support from friends and family, Zachary has blossomed into a happier and more outgoing child. (*Id*. ¶ 9.)

In October 2021, after completing appropriate mental health evaluations, and with the support of his pediatrician and both sets of parents, Zachary began puberty-blockers. (*Id*. ¶ 10.) He recently had an appointment to be assessed for hormone therapy at Children's Hospital of Alabama at Birmingham. (*Id*.)

If the Act is enforced, Zachary's parents will no longer be able to rely on—or follow—the advice of qualified and trusted healthcare providers to make decisions that keep Zachary healthy and safe. (*Id*. ¶ 11.) Zachary's life will also be disrupted, and his physical and mental health will suffer. (*Id*. ¶ 13.) If he cannot remain on puberty blocking medication, Zachary's body will begin to develop in ways that are inconsistent with his identity as a boy, which will cause him severe distress. (*Id.*) It will also mean that he may have to take more serious steps in the future as an adult to treat his gender dysphoria, including, for example, having to undergo otherwise avoidable surgery. (*Id.*)

### 5.   *Kathy Noe and Her Son Christopher Noe*

Christopher Noe is a seventeen-year-old transgender boy who resides with his mother, Kathy Noe, in Lee County, Alabama. (*See* Declaration of Kathy Noe ("Noe Decl.") ¶¶ 1-2.) Christopher and Kathy moved to Alabama when Christopher was

three years old. (*Id*. ¶¶ 3-4.) Kathy is former active-duty military, while Christopher's father is still active-duty military and is deployed abroad. (*Id*. ¶ 3.)

Since Christopher was a toddler, he resisted anyone's attempts to dress him as a girl. (*Id*. ¶¶ 5-6.) He even refused to attend his sixth-grade graduation because doing so meant he would have to wear a dress. (*Id*. ¶ 6.) As Christopher began to enter puberty, his distress at the changes his body was undergoing and at being made to present as female intensified. (*Id*. ¶ 12.) When Christopher was fourteen, he told his mother he is transgender. (*Id*. ¶ 8.) Kathy found Christopher a therapist experienced in working with transgender young people. (*Id*. ¶ 9.) The therapist helped both Christopher and Kathy navigate the beginning stages of Christopher's transition. (*Id*.)

About a year later, Christopher came out to his father as transgender. (*Id*. ¶ 10.) Christopher's father struggled initially, but because of his love for Christopher, his father began to accept Christopher for who he is. (*Id*.) With his father's support, Kathy took Christopher to a physician to begin the evaluation for hormone therapy. (*Id*. ¶¶ 10, 14.) Because Kathy and Christopher live close to the Alabama-Georgia state line, Christopher's doctors are in Columbus, Georgia. (*Id*. ¶ 16.) Christopher's prescriptions, however, are filled in Alabama, and Kathy gives Christopher his hormone injections at home. (*Id.* ¶¶ 15-16.)

Christopher began hormone therapy in March 2022. (*Id.* ¶ 15.) Since then, Christopher has been noticeably happier. (*Id.* ¶ 17.) He is more outgoing and confident at work and around other people. (*Id.*) If the Act is allowed to go into effect, Christopher's medical care will be disrupted, which will have devastating and irreversible physical and psychological consequences. (*Id.* ¶ 18.)

### 6.   *Dr. Jane Moe*

Dr. Jane Moe is a licensed clinical psychologist who has been practicing in Alabama for twenty years and works in a hospital setting within the UAB system providing direct mental health care to children and adolescents. (*See* Declaration of Dr. Jane Moe ("Moe Decl.") ¶¶ 1-4.) For the past two years, Dr. Moe has treated approximately forty transgender young people, ranging in age from five to nineteen. (*Id.* ¶ 4.)

She follows the standard of care developed by the World Professional Association for Transgender Health ("WPATH") and a comprehensive informed-consent protocol. (*Id.* ¶ 5.) Her assessment of transgender youth involves parents as well as the patient. (*Id.* ¶¶ 5-6.) The process requires a minimum of three to four visits, which typically take place over the course of two to three months. (*Id.* ¶ 6.) The assessment is comprehensive and involves many different methods of gathering information on the patient, including discussions with the parents, to determine whether they meet the diagnostic criteria for gender dysphoria. (*Id.* ¶¶ 7-8.)

Dr. Moe also reviews with the patient and the patient's parents the risks, benefits, and ranges of medical treatment available and appropriate for treating any patient's condition. (*Id*. ¶ 9.) Dr. Moe then writes a letter to the patient's doctor detailing the results of her assessment and recommendations for continued care. (*Id*. ¶¶ 9, 11.)

For Dr. Moe, the Act means that she must either abandon her professional and ethical obligations when treating transgender patients or risk criminal penalty for providing mental health care consistent with the prevailing standards of care. (*Id*. ¶ 14.) She is deeply concerned about the effects this law will have on her patients' mental health, many of whom already experience bullying and harassment in their schools and communities. (*Id*. ¶ 15.) She is concerned that if healthcare providers are required to comply with the Act, transgender youth will be denied essential care. (*Id*. ¶ 13.) Their mental health will deteriorate, impairing their ability to function in their day-to-day lives. (*Id*. ¶ 16.) That decline in mental health will cause a cascade of negative health outcomes, including exacerbating co-occurring mental health issues, increased reliance on maladaptive coping mechanisms (*e.g.*, cutting, substance abuse), and suicidality. (*Id*.)

### 7. *Dr. Rachel Koe*

Dr. Rachel Koe is a board-certified pediatrician in southeast Alabama. (*See* Declaration of Dr. Rachel Koe ("Koe Decl.") ¶¶ 1-3.) Over the past decade, Dr. Koe

has treated a handful of transgender patients, including one current patient for whom she provides primary care. (*Id.* ¶¶ 4, 9-10.) Depending on need, Dr. Koe has referred transgender patients and their parents to local mental health providers as well as the gender clinic at UAB Hospital. (*Id.* ¶¶ 5, 9.) Even after referral, Dr. Koe remains involved with her transgender patients' care, as she does for other patients referred for specialty treatments. (*Id.* ¶¶ 6, 9.) For example, Dr. Koe's office draws blood for their transgender patient's regular blood work in advance of appointments with the gender clinic. (*Id.*) Additionally, she and her staff provide support to patients who need assistance in self-administering injectable hormone medications like testosterone. (*Id.*)

If the Act goes into effect, Dr. Koe will be forced to choose between complying with the Act and providing for the medical needs of her current and any future transgender patients. (*Id.* ¶¶ 11-13.) She knows that if she does not provide the medical treatments they need, her transgender patients' mental and physical health will deteriorate. (*Id.* ¶ 11.) Because of the Act, Dr. Koe will also be required to curtail her speech as she will no longer be allowed to provide accurate and comprehensive information to parents of transgender children and will be prohibited from making appropriate referrals. (*Id.* ¶ 12.) Changing her practice in these ways would also put Dr. Koe in jeopardy of violating her legal obligation as a Medicaid

provider not to discriminate in the provision of medical care to her transgender patients. (*Id.* ¶ 13.)

### B.    Transition Is the Established Course of Care for Gender Dysphoria.

Gender dysphoria is a serious medical condition that has been recognized for decades (*See* Declaration of Dr. Linda Hawkins ("Hawkins Decl.") ¶ 25; Declaration of Dr. Stephen Rosenthal ("Rosenthal Decl.") ¶¶ 23-24.) The diagnosis describes the clinical distress a transgender person feels from being made to live without any way to resolve the conflict between their assigned sex and their gender identity. (Hawkins Decl. ¶ 24; Rosenthal Decl. ¶¶ 26-27.) Gender dysphoria is a rare condition that can be experienced by both adults and youth. (Rosenthal Decl. ¶ 24.) If untreated, gender dysphoria leads to serious negative health outcomes including anxiety, severe distress, thoughts or attempts at self-harm, and in many cases, suicide. (Hawkins Decl. ¶ 39; Rosenthal Decl. ¶¶ 26, 45, 55.)

Gender dysphoria, however, is highly treatable. (Rosenthal Decl. ¶ 26.) When individuals with gender dysphoria are diagnosed and medically treated so they live consistent with their gender identity, they can survive and thrive. (Hawkins Decl. ¶ 26; Rosenthal Decl. ¶ 36.) The overall course of treatment that allows a transgender person to live consistent with their gender identity is called transition. (Rosenthal Decl. ¶ 32.) While few minors experience gender dysphoria, for those who do, being

able to transition and to receive appropriate medical care is lifesaving. (Hawkins Decl. ¶ 41; Rosenthal Decl. ¶ 45.)

For more than four decades, medical organizations have studied and created an evidence-based standard for the medical treatment of transgender patients. (*See* Declaration of Dr. Morissa Ladinsky ("Ladinsky Decl.") ¶ 7; Rosenthal Decl. ¶¶ 2-24, 27-31.) This standard confirms that transition, including puberty blockers and hormone therapy where appropriate, is the only safe and effective treatment for gender dysphoria. (Hawkins Decl. ¶ 38; Rosenthal Decl. ¶ 23.)

The specific components of a patient's transition and treatment plan are based on that individual's medical and mental health needs after comprehensive evaluation by a multidisciplinary team. (Ladinsky Decl. ¶¶ 10-12; Rosenthal Decl. ¶¶ 5, 33, 46.) Qualified professionals manage these treatments, often in a multidisciplinary setting with endocrinologists, pediatricians, and clinical psychologists. (Hawkins Decl. ¶ 29; Ladinsky Decl. ¶ 10; Rosenthal Decl. ¶¶ 5, 47-48.) The American Academy of Pediatrics has adopted this treatment protocol as safe and effective for the health and wellbeing of children and adolescents suffering from gender dysphoria. (Hawkins Decl. ¶ 25; Ladinsky Decl. ¶ 7; Rosenthal Decl. ¶ 30.)

Before a minor begins any treatment for gender dysphoria, health care providers undertake a rigorous informed consent process. (Hawkins Decl. ¶ 36; Ladinsky Decl. ¶¶ 9-10; Rosenthal Decl. ¶¶ 48-51.) Once informed consent is

obtained, there is also a great deal of parent education, counseling of parents, and communication among physicians in the treatment of transgender adolescents. (Hawkins Decl. ¶¶ 36-37; Ladinsky Decl. ¶¶ 10-12; Rosenthal Decl. ¶ 47.)

The standard of care for the treatment of gender dysphoria in minors consists of social transition and related medical interventions that allow transgender youth to live comfortably consistent with their gender identity. (Hawkins Decl. ¶¶ 27-29; Rosenthal Decl. ¶ 32.) A young person's social transition can include adopting a new name and pronouns, changing clothes and physical appearance, and correcting identity documents. (Hawkins Decl. ¶¶ 27-29; Rosenthal Decl. ¶ 32.) Medical interventions, which may be pursued concurrently with a social transition, can involve the use of puberty-blocking medication, and for older adolescents, hormone therapy. (Hawkins Decl. ¶ 29; Rosenthal Decl. ¶¶ 35-41.) Although transgender adults may pursue surgical treatment, surgery is rarely indicated for transgender minors. (Rosenthal Decl. ¶ 46.)

After the onset of puberty, minors diagnosed with gender dysphoria may be prescribed puberty-blocking medications to prevent them from continuing to undergo puberty in their birth sex and developing permanent physical characteristics that conflict with their gender identity. (*Id*. ¶¶ 35-38.) Puberty-blocking medications work by pausing endogenous puberty at whatever stage it is when the treatment begins, limiting the influence of a person's endogenous hormones on their body.

(*Id.* ¶ 36.) For example, a transgender girl on puberty-blocking medications would not experience the physical changes caused by testosterone, including facial and body hair, male muscular development, an Adam's apple, or masculinized facial structures. (*Id.*) Similarly, a transgender boy would not experience breast development, menstruation, or widening of the hips. (*Id.*)

Treatment with puberty-blocking medications is reversible, meaning that if a minor stops taking the medication, puberty in the minor's birth sex resumes. (*Id.* ¶¶ 38-39.) In addition to alleviating gender dysphoria and supporting a child's social transition, puberty-blocking medications may eliminate the need for future surgical treatments to treat ongoing gender dysphoria as an adult, such as male chest reconstruction surgery, electrolysis of facial and body hair, and feminizing facial surgeries. (*Id.* ¶¶ 36-37, 44.) Banning puberty-blocking medications for these youth may require them to undergo future surgeries as adults that they could otherwise avoid. (*Id.*).

Later in adolescence, a transgender young person may be prescribed hormone therapy when doing so is medically indicated. (*Id.* ¶ 39.) Before such therapy begins, a mental health professional must: (1) confirm the persistence of gender dysphoria; (2) assess any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed and the minor's situation and functioning are stable enough to start treatment; and (3) verify that the minor has

sufficient mental capacity to understand the consequences of the treatment. (*Id.* ¶¶ 48-51; Hawkins Decl. ¶ 36; Ladinsky Decl. ¶¶ 9-11.) A pediatric endocrinologist or other medical doctor must also consent to and monitor the treatment plan. (Ladinsky Decl. ¶ 13.) With this treatment, a transgender minor would have the same typical levels of testosterone/estrogen as a non-transgender peer. (Rosenthal Decl. ¶ 39.)

The World Professional Association for Transgender Health developed the standard of care, which represents an expert consensus based on the best available science, on transgender healthcare. (Ladinsky Decl. ¶ 7; Rosenthal Decl. ¶¶ 28-29.) The American Medical Association, American Academy of Pediatrics, American Psychiatric Association, American Psychological Association, Pediatric Endocrine Society, and the Endocrine Society all follow the World Professional Association for Transgender Health Standards of Care. (Ladinsky Decl. ¶ 7; Dr. Rosenthal Decl. ¶ 30.)

The diagnosis and treatment of gender dysphoria is an established part of the curriculum in medical schools across the United States. (Ladinsky Decl. ¶ 8.) Alabama, for example, requires all physicians to be knowledgeable about transgender medicine to pass medical board exams. (*Id.*)

**C.    The Alabama Vulnerable Child Compassion and Protection Act**

On April 8, 2022, Defendant Governor Kay Ivey signed the Alabama Vulnerable Child Compassion and Protection Act (the "Act") into law. The Act prohibits any person, including a parent or a doctor, from obtaining or providing medical treatments consistent with the current medical standard of care, for a transgender minor. Unless enjoined, the Act will become effective on May 8, 2022.

The Act states in relevant part:

Section 4. (a) Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that perception is inconsistent with the minor's sex as defined in this act:

> (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.

> (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.

> (3) Prescribing or administering supraphysiologic doses of estrogen to males.

> (4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

> (5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's biological sex, including metoidioplasty, phalloplasty, and vaginoplasty.

> (6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

Ala. Vulnerable Child Compassion and Protection Act, S.B. 184, No. 2022-289, § 4(a) (Ala. 2022). A violation of this provision is a Class C felony punishable by up to 10 years imprisonment and fines up to $15,000. *Id.* § 4(c); ALA. CODE §§ 13A-5-6, 13A-5-11.

## III.   ARGUMENT

To obtain a preliminary injunction, a movant must show: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). "[A]ll of the well-pleaded allegations of [the] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

A temporary restraining order may be imposed "to preserve the court's ability to make a meaningful ruling on the merits," which "often requires preserving the status quo." *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1320 (M.D. Ala. 2015). To obtain a temporary restraining order, the movant must show: "(1) a substantial likelihood of ultimate success on the merits; (2) the TRO is necessary to

prevent irreparable injury; (3) the threatened injury outweighs the harm the TRO would inflict on the non-movant; and (4) the TRO would serve the public interest." *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995).

These factors strongly support entry of a preliminary injunction in this case. In the event that the Court is unable to make a ruling on the merits of Plaintiffs' preliminary injunction motion before the May 8, 2022 effective date of the Act, these factors also warrant entry of a temporary restraining order because "it is in the public interest to preserve the status quo and give the court an opportunity to evaluate fully the lawfulness of [the Act] without subjecting the plaintiffs, their patients, or the public at large to any of its potential harms." *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1290 (M.D. Ala. 2013).

### A.     Plaintiffs Will Likely Succeed on the Merits of Their Claims Because the Act Is Unconstitutional.

Plaintiffs have a substantial likelihood of success on the merits of their claims. The Act infringes upon their constitutional rights to parental autonomy and equal protection, violates the right to freedom of speech, and is void for vagueness. It also conflicts with the Affordable Care Act ("ACA"), 42 U.S.C. § 18001, *et seq*. (2010).

### 1.     *The Act Infringes on Parental Autonomy by Preventing Parents from Obtaining Essential Medical Care for their Children (Count I).*

The Act violates the fundamental right of the Parent Plaintiffs to obtain essential medical care for their children. The Fourteenth Amendment to the United

States Constitution protects parents' rights to make decisions "concerning the care, custody, and control of their children," based on a "presumption" that "fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 68-69 (2000). This right is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* at 65; *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (collecting cases to demonstrate that the Court has long recognized the importance of parental rights, including *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), *and Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925)); *May v. Anderson*, 345 U.S. 528, 533 (1953) (recognizing that parental rights are "far more precious . . . than property rights"). Because this right is fundamental, any substantial infringement of parental autonomy is subject to strict scrutiny. *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004); *see also Troxel*, 530 U.S. at 80 (Thomas, J., concurring).

A parent's ability to seek and obtain appropriate medical treatment to ensure the health and wellbeing of their child is a core aspect of this fundamental right. The Eleventh Circuit has explained that the Due Process Clause prohibits a state, "concerned for the medical needs of a child," from "willfully disregard[ing] the right of parents to generally make decisions concerning the treatment to be given to their children." *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990). "[P]arents have the right to decide free from unjustified governmental interference in matters

20

concerning the growth, development and upbringing of their children." *Id.* (quoting *Arnold v. Bd. of Educ. of Escambia Cty.*, 880 F.2d 305, 313 (11th Cir. 1989)).

The Act fails constitutional review because it negates, without justification, parents' fundamental right to seek established medical care for their transgender children. Indeed, the Act criminalizes medical care: (1) recommended to the Parent Plaintiffs as appropriate for their children by their medical providers, and (2) recognized by the American Medical Association, American Academy of Pediatrics, American Psychiatric Association, American Psychological Association, Pediatric Endocrine Society, and the Endocrine Society as the only effective treatment for their children. *See Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), *appeal docketed*, No. 21-2875 (8th Cir. Apr. 19, 2022) (finding that "Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary"). The Act prevents parents even from *seeking* expert medical advice by imposing criminal penalties on anyone who "causes" the proscribed treatments to be performed on a transgender minor—language that would encompass consultations with healthcare providers who recommend transition if doing so results in a parent obtaining medical care for their child. SB 184 § 4(a). This categorical, sweeping ban—like any ban on

parents' ability to seek established medical care for a serious medical condition—is unconstitutional.

As set forth below, none of the State's asserted justifications for this intrusion on parental rights has merit. Contrary to the State's assertion, the Act jeopardizes children's health and safety; it does not protect it. *Brandt*, 551 F. Supp. 3d at 893 (holding that a similar Arkansas law likely violated "a fundamental parental right" and likely would fail strict scrutiny because the State could not show that the law served the stated goal of protecting children).

### 2. *The Act Violates Equal Protection by Barring Medical Treatments for Transgender Minors (Count II).*

The Act singles out transgender minors in order to deny them medical care, including denying them the very same medications available to non-transgender minors. Because the Act discriminates on the basis of transgender status and sex, heightened scrutiny is required. Because the State's asserted rationales for the ban lack merit, Plaintiffs have a substantial likelihood of proving that the Act violates the Equal Protection Clause.

#### a. The Act is Subject to Heightened Scrutiny Under Well-Established Precedent.

The Act's discrimination against transgender people is apparent on its face. The Act bans medical care for minors whose "perception of [their] gender or sex . . . is inconsistent with the minor's sex" at birth—*i.e.*, for minors who are transgender.

SB 184 § 4(a). Elsewhere the Act refers to "individuals, including minors, who experience discordance between their sex and their internal sense of identity." *Id.* § 2(2)-(4). The Act's description of its targeted group—those whose perception or internal sense of their sex differs from their sex at birth—coincides exactly with the definition of a transgender person. It matters not that the Act does not use the word "transgender," any more than it would matter if a law criminalizing same-sex intimacy did not use the word "lesbian" or "gay." Under settled law, a statute that classifies based on conduct or characteristics that either define or are closely correlated with a particular group facially discriminates against that group. *See, e.g.*, *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010) (holding that a club's exclusion of people because they engaged in same-sex conduct was discrimination based on sexual orientation); *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination . . . ."); *id.* at 583 (O'Connor, J., concurring in judgment) (stating that a law targeting conduct "closely correlated with being homosexual" is "directed toward gay persons as a class"); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

By discriminating against transgender people, the Act also discriminates based on sex. Without question, the Act singles out transgender minors for disparate

treatment. Both the Supreme Court and the Eleventh Circuit have held that discrimination because a person is transgender is based on sex. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020) (holding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex"); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (holding that "discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause").

Because the Act discriminates based on transgender status and sex, it is subject to heightened scrutiny under the Equal Protection Clause. Federal courts across the country have held that discrimination based on transgender status warrants heightened scrutiny, as it meets the criteria for suspect classification established in *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973): transgender people have suffered a history of discrimination; being transgender is an immutable trait and one that is unrelated to a person's ability to participate in or contribute to society; and transgender people lack the political power to achieve full equality through the political process.[1]

---

[1] *See, e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F. 3d 1034, 1051 (7th Cir. 2017); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004); *Toomey v. Arizona*, No. CV-19-00035-TUC-RM, 2019 WL 7172144, at *5 (D. Ariz. Dec. 23, 2019); *Stone v. Trump*, 400 F. Supp. 3d 317, 355 (D. Md. 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704 (D. Md. 2018); *Board of Educ. of the Highland*

In *Brumby*, the Eleventh Circuit held that discrimination because a person is transgender is discrimination based on sex and warrants heightened scrutiny for that reason. As the court explained: "A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." 663. F.3d at 1316. Accordingly, "discrimination on this basis is a form of sex-based discrimination that is subject to heightened scrutiny under the Equal Protection Clause." *Id*. at 1319.

Whether the Act is analyzed as discrimination based on transgender status or sex, the State, at a minimum, "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 516 (1996) (quotations omitted) (modifications in original). The justification must be "exceedingly persuasive." *Id*. The "burden of justification is demanding, and it rests entirely on the State." *Id*. Neither the State's asserted interest nor the alleged relationship between the interest and the discriminatory classification may "rely on overbroad generalizations." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689, 1692 (2017). Nor may the State "hypothesiz[e] or inven[t]" its interests "*post hoc* in response to litigation"—they

---

*Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

must be the actual goals the policy was intended to advance at the time it was created. *Id.* at 1696–97 (quoting *Virginia*, 518 U.S. at 533).

              b.    <u>Defendants Cannot Establish the State's Asserted Interest Serves Important Governmental Objectives or the Act Is Substantially Related to the Achievement of those Objectives.</u>

The Act prohibits parents from obtaining treatments for their children that are the standard of care for gender dysphoria. Decades of evidence support the safety and efficacy of transition, including the use of puberty-blocking medication and hormone therapy, for treating gender dysphoria in adolescents. (Hawkins Decl. ¶ 25; Ladinsky Decl. ¶ 7; Rosenthal Decl. ¶¶ 17, 27-31.) Barring those treatments for transgender youth deprives them of medically necessary care and puts them at serious risk of mental health issues, self-harm, and suicide. *See Brandt*, 551 F. Supp. 3d at 891-92 (finding similar bill banning medical treatment for transgender adolescents did not meet heightened scrutiny review, and "would not even withstand rational basis scrutiny" because "[g]ender-affirming treatment is supported by medical evidence that has been subject to rigorous study" and "[e]very major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people"); *see also* Hawkins Decl. ¶ 46; Ladinsky Decl. ¶ 15; Rosenthal Decl. ¶¶ 45, 55, 57. The Act also increases the likelihood that transgender adolescents will eventually require major surgeries to

reverse bodily changes that could have been avoided by the well-established non-surgical treatments the Act criminalizes. (Rosenthal Decl. ¶ 37.)

The Act purports to advance the objective of protecting transgender minors. Nevertheless, the State's asserted justifications for the Act have no basis in medical science and undermine, rather than advance, the Act's purported goals. They cannot survive even a cursory review, much less the demanding scrutiny required by this case.

> ### i.   *The treatments are effective and well-established.*

Contrary to the Act's assertion, the treatments provided to transgender adolescents with gender dysphoria are effective and based on an established standard of care. As the Act recognizes, there are youth who "experience discordance between their sex and their internal sense of identity," and who, as a result, "experience severe psychological distress," known as "gender dysphoria." SB 184 § 2(2). As the Act also acknowledges, there is an established course of care and treatment for these young people that includes social transition and, where appropriate, puberty blocking medication and hormone therapy. *Id.* § 2(7)-(8).

The Act claims that these treatments are ineffective, but that is incorrect. The Act cites unnamed "studies" that purportedly show that "hormonal and surgical interventions often do not resolve the underlying psychological issues affecting the individual." *Id.* § 2(14). In fact, decades of substantial scientific evidence show that

treatment dramatically improves mental health outcomes for transgender youth, including reducing rates of suicidal ideation and suicide attempts, which are significantly higher among transgender adolescents when compared to their non-transgender peers. (Hawkins Decl. ¶¶ 38, 41; Ladinsky Decl. ¶ 15; Rosenthal Decl. ¶¶ 26, 53-55.)

Transition, including puberty blocking medication and hormone therapy where appropriate, is the standard of care for treating gender dysphoria and has been endorsed by the mainstream medical community in the United States, including the American Medical Association, the American Academy of Pediatrics, and the Endocrine Society, all of which have determined that the care is safe and effective. (Ladinsky Decl. ¶ 7; Rosenthal Decl. ¶ 30.) The Act's assertions that the treatment is "unproven," "poorly studied," and "experimental," SB 184 § 2(11), are unfounded. (Hawkins Decl. ¶¶ 38, 41; Ladinsky Decl. ¶¶ 7-8; Rosenthal Decl. ¶¶ 26, 53-55.)

ii.   *The treatments are necessary.*

The Act's claim that most adolescents with gender dysphoria will "outgrow" their transgender identities is incorrect. *Id.* § 2(4). In contrast, the evidence overwhelmingly shows that transgender adolescents who are appropriately identified, diagnosed, and prescribed treatment continue to live consistent with their gender identity as adults and lead happy and fulfilling lives. (Hawkins Decl. ¶ 26;

28

Rosenthal Decl. ¶¶ 53-54, 36; Moe Decl. ¶ 16; Koe Decl. ¶¶ 5-7.) In the past, research tracking a wide range of gender-nonconforming children (including tomboyish girls and feminine boys) found that many of these children grew up to identify as lesbian or gay rather than transgender. (Hawkins Decl. ¶ 22.) However, none of these older studies focused on the much smaller, discrete, and clearly identifiable group of children with gender dysphoria whose persistent, insistent, and consistent cross-gender identification continues into adolescence. (*Id.*) More recent research has focused on this specific group of children and found that the likelihood of this group "outgrowing" their transgender identity in adolescence or adulthood is virtually nil. (*Id.*)

The Act also asserts that "[t]he cause of the individual's impression of a discordance between sex and identity is unknown," SB 184 § 2(3), but that is incorrect. In fact, substantial evidence has shown that gender identity has a strong biological foundation and is impervious to external factors. (Rosenthal Decl. ¶ 15.)

Contrary to the Act's assertion, doctors take great care in making a diagnosis of gender dysphoria and follow detailed procedures for both confirming the diagnosis and prescribing a treatment plan, taking a multidisciplinary approach that includes both medical and mental health specialists. The Act incorrectly states that the diagnosis is based "exclusively on the individual's self-report of feelings and beliefs." SB 184 § 2(3). In fact, mental health providers who diagnose youth with

29

gender dysphoria do so based on a comprehensive evaluation. (Ladinsky Decl. ¶ 10; Rosenthal Decl. ¶ 48; Moe Decl. ¶¶ 6-8.) Any prescribed treatments, including puberty blocking medication and hormone therapy, are undertaken only after thorough assessment and discussion with parents and youth patients, and only after ensuring that all persons involved understand the need for treatment along with any attendant risks, just as in other medical situations where medication may be required to treat a condition. (Ladinsky Decl. ¶¶ 9-11; Rosenthal Decl. ¶¶ 48-51.)

In sum, the Act's claim that the banned treatments are not necessary for the affected children ignores the consensus of medical experts and overwhelming evidence to the contrary. It is inappropriate for the legislature to look at the entire gender-nonconforming youth population, many of whom do not and will never experience gender dysphoria, and bar a medically discrete subset of them from receiving essential medical care. Doing so is like denying life-saving brain cancer treatment recommended by the medical community because most headaches resolve with aspirin. For adolescent patients properly identified as being transgender, a "wait-and-see approach" is harmful and may even be lethal. (Hawkins Decl. ¶ 41; Rosenthal Decl. ¶ 55.)

### iii. *The treatments are safe.*

The Act incorrectly claims that the treatments it bans are unsafe and that transgender adolescents and their parents are unable to assess their risks and benefits.

First, the State's assertion that the treatments are unsafe because they involve off-label use of medications approved by the Food and Drug Administration ("FDA") is unfounded. In fact, many established medical treatments involve off-label uses of FDA-approved medications. (Rosenthal Decl. ¶ 49.) "Off-label" refers to use of medication that has been FDA approved, but not for all condition for which it may be effective. [2] The off-label use of medications for children is quite common and sometimes necessary, because an "overwhelming number of [FDA-approved] drugs" have no FDA-approved instructions for use in pediatric patients.[3]

The American Academy of Pediatrics specifically approves the off-label use of drugs:

> The purpose of off-label use is to benefit the individual patient. Practitioners use their professional judgment to determine these uses. As such, the term "off-label" does not imply an improper, illegal, contraindicated, or investigational use. Therapeutic decision-making must always rely on the best available evidence and the importance of the benefit for the individual patient.[4]

This asserted rationale for the ban also conflicts with the established public policy of this State. On April 1, 2021, the Alabama Senate passed a resolution endorsing the widespread practice of prescribing FDA-approved medications for

---

[2] *See* Am. Acad. Pediatrics Comm. Drugs, Off-Label Use of Drugs in Children, 133 Pediatrics 563-67 (2014).

[3] *Id*.

[4] *Id.*

off-label uses to treat COVID-19. In contrast to the alleged justifications for the Act, the Senate Resolution states: "we hereby recognize the sanctity of the physician/patient relationship and that a duly licensed physician should be allowed to prescribe any FDA approved medication for any condition that the physician and patient agree would be beneficial for treatment of the patient without interference by government or private parties." AL SJR 82 (2021). This policy affirms the ability of medical providers to prescribe FDA-approved mediation for "any condition." There is no legitimate reason, much less an important one, to adopt a different rule for medications used to treat transgender patients.

Second, contrary to the Act's assertion, the medications used to treat gender dysphoria, including puberty blockers and hormones, are safe. (Rosenthal Decl. ¶¶ 23, 31, 55.) Puberty-blocking medication has been used for decades to treat a medical condition known as "precocious puberty." (*Id.* ¶ 42.) Hormone therapy is often used to treat medical conditions experienced by adolescents including painful menstruation, amenorrhea, and even serious acne conditions. As the Act itself acknowledges, puberty blocking medication is also used to treat "verified disorder[s] of sexual developments," SB 184 § 4(b)(2), often referred to as intersex conditions. Although no medication can be shown to have zero risks, puberty blocking medication and hormones are considered very safe and well within acceptable risk factors for approved medication for minors. (Rosenthal Decl. ¶¶ 23. 31, 55.)

To the extent there are low-level risks, as there are with any medication, Alabama can offer no justification why puberty blocking medication and hormone therapy should be banned for use by transgender minors as "unsafe" but permitted for treatment of minors with other medical conditions. If the State believed these treatments to be unsafe, it would have banned them for all minors, not just the Transgender Plaintiffs. As the Eastern District of Arkansas found in *Brandt*, this insistency strongly suggests that the State's "goal in passing [the Act] was not to ban a treatment" but rather "to ban an outcome [the provision of supportive care to transgender minors] that the State deems undesirable." *Brandt*, 551 F. Supp. 3d at 891. The Act violates the Equal Protection clause under even the lowest standard of review. *Id.* (finding Arkansas' "health concerns regarding the risks of gender transition procedures . . . pretextual" because Arkansas did not prohibit the same procedures "for all patients under 18 regardless of gender identity"); *Eisenstadt v. Baird*, 405 U.S. 438, 454-55 (1972) (holding law that barred prescription of contraceptives to unmarried people violated the Equal Protection Clause because the law provided "dissimilar treatment for married and unmarried persons who are similarly situated").

The Act's claim that transgender adolescents and their parents are unable to assess the risks of these treatments, *see* SB 184 § 2(10), is similarly arbitrary and without support. As discussed previously, doctors who prescribe puberty blocking

medication or hormone therapy do so only after ensuring that the young person and their parents understand both the risks and benefits of the treatments and are able to make an informed choice, as doctors do when they prescribe any medication. (Hawkins ¶ 36; Ladinsky ¶¶ 9-10; Rosenthal Decl. ¶¶ 47-51.) Alabama law acknowledges that minors fourteen and older are generally able to consent to medical treatment. ALA. CODE § 22-8-4. There is no reason to impose a different rule simply because the minors are transgender.

> iv.   *Minors who stop taking puberty blocking medication or hormone therapy will resume puberty in their birth sex.*

The Act also mischaracterizes the effects of puberty blocking medication and hormone therapy. Contrary to the unsupported assertion in the findings, if an adolescent stops taking puberty blocking medication or hormone therapy, the production of endogenous hormones and puberty in the child's birth sex will resume. (Rosenthal Decl. ¶¶ 38, 40.). That is a primary reason why the Plaintiffs are so distressed about the law: Without the treatment they need, their physical development will revert to that associated with their birth sex.

To be sure, promoting the health and safety of minors is an important governmental interest. The Act, however, undermines, rather than promotes, that goal. Barring transgender minors from safe, effective, and established medical care determined to be necessary by their medical providers will destroy lives, including

those of the minor Plaintiffs in this case. Alabama cannot demonstrate that the Act promotes health and safety in even a rational, much less a substantial, way. Accordingly, the Plaintiffs are likely to prevail on their claim that the Act violates the Equal Protection Clause.

### 3. *Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim (Count IV).*

The Act also violates the First Amendment by prohibiting any "person," including physicians, healthcare professionals, or even parents, from engaging in speech that would "cause" a transgender minor to receive medical treatment for gender dysphoria. By the Act's plain terms, prohibited speech would include, among many other things: (1) a doctor detailing the benefits of medical treatment for gender dysphoria or expressing the professional opinion that a young person would likely benefit from such treatment, if such discussions result in the minor obtaining treatment; (2) a doctor or therapist referring a patient to an out-of-state provider who can offer medical care; (3) a parent facilitating or expressing support for their child's transition, or any other speech by a parent that results in a minor obtaining medical treatment, such as consenting to treatment; (4) a transgender adolescent engaging in discussions or receiving information that leads them to undergo transition-related care; and (5) a minister or religious counselor engaging in speech that leads to the minor obtaining care. By barring such speech, the Act prevents any person in the State of Alabama from speaking about medically accepted treatments for gender

dysphoria based on the content of those conversations. As a content-based and viewpoint discriminatory regulation of speech, the Act is subject to strict scrutiny, which it fails.

Courts ordinarily apply strict scrutiny when analyzing the constitutionality of content or viewpoint-based restrictions on speech. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015); *Wollschlaeger v. Governor*, 848 F.3d 1293, 1308 (11th Cir. 2017). Content-based laws "target speech based on its communicative content." *Reed*, 576 U.S. at 163. If enforcement authorities must "examine the content of the message that is conveyed" to know whether the law has been violated, a restriction is content-based. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014). "Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

Prohibiting parents, healthcare providers, and others from engaging in speech that would "cause" a transgender young person to receive medical treatment for gender dysphoria is a content-based regulation, as the content of the speech— support of medical care—drives whether it was the "cause" of a minor obtaining treatment. It is also a viewpoint-based restriction because only speech that encourages medical care for the minor is targeted; speech that forbids or expresses disapproval of such medical care is not punished. *Brandt*, 551 F. Supp. 3d at 893 (finding that similar Arkansas statute was "a content and viewpoint-based regulation

because it restricts healthcare professionals only from making referrals for 'gender transition procedures,' not for other purposes"); *see also Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (invalidating policy that punished doctor-patient discussions concerning medical marijuana and holding that "the policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient"). Such speech regulations require application of strict scrutiny, which the Act cannot withstand.

To survive First Amendment review, content-based restrictions on speech must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 818 (2000).

The Act cannot satisfy this demanding test. First, preventing individuals from speaking, and minors from discussing or hearing about medically necessary care does not advance Alabama's stated interest in health and safety. The Act claims to further an interest in protecting minors, yet disregards the long-standing and well-established treatment of gender dysphoria recommended by every major medical association. No court has ever held that a state advances a compelling interest by denying minors—a vulnerable group—medical treatment that is deemed necessary, safe, and effective under the relevant medical standard of care. The State's claimed

37

interests collapse under strict scrutiny. *See Wollschlaeger*, 848 F.3d at 1317 (holding that state's asserted interest in protecting public health by prohibiting doctors from asking patients about firearm ownership could not satisfy heightened scrutiny where "the applicable standard of care encourages doctors to ask questions about firearms").

Second, the Act is not "narrowly tailored" to advance any asserted interest in health and safety. It prohibits speaking about certain treatments only with respect to transgender youth with gender dysphoria while allowing discussion or recommendations of the same or similar treatments for non-transgender youth for any other purpose or medical condition. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

Third, the Act cannot withstand strict scrutiny because it is not the "least restrictive means of achieving a compelling state interest." *McCullen*, 573 U.S. at 478. Banning every "person" in Alabama from engaging in an entire category of protected speech—speech that is consistent with established standards of medical care and with the Parent Plaintiffs' view of what is best for their own children's health and wellbeing—is not a constitutionally permissible means of protecting health and safety. The State cannot show that its enactment of "provisions broadly

38

restricting truthful speech based on content" are the least restrictive means available to achieve a compelling need. *Wollschlaeger*, 848 F.3d at 1316.

Lacking a narrowly tailored means to achieve any compelling or even legitimate interest, the Act's restrictions on speech cannot satisfy even rational basis review, much less strict scrutiny. Plaintiffs have a substantial likelihood of prevailing on their free speech claim.

### 4.     The Act Is Unconstitutionally Vague (Count V).

Under the Due Process Clause, a criminal statute like the Act is void for vagueness if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" and encourages "arbitrary and discriminatory enforcement" by the government. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (holding all persons "are entitled to be informed as to what the State commands or forbids") (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)).

Section 4(a) of the Act states that "no person shall . . . cause any of the following practices to be performed upon a minor" and criminalizes any such act as a felony. Yet, the Act fails to provide *any* standard to determine what an individual must do to "cause" a treatment "to be performed upon a minor." *See Kolender*, 461 U.S. at 358.

"Cause" has an incredibly broad definition: "To bring about or effect." Black's Law Dictionary (11th ed. 2019); *cf. United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006) (directing courts to consider, among other things, "dictionaries" and the "common and generally accepted meaning" of words when considering vagueness of a statute).

Therefore, the Act, as worded, could subject anyone who is aware of, refers to, discusses, talks about, recommends, or expresses an opinion about a transgender minor's healthcare to a class C felony and up to ten years imprisonment, no matter how indirect the involvement, so long as the speech or behavior has *any* effect on a minor taking a prohibited medication to treat gender dysphoria. For example, the Act could impose criminal liability on a doctor or therapist in Alabama who recommends that a transgender adolescent start or continue puberty blocking medication or hormones. It could impose criminal liability on a pastor, like Rev. Eknes-Tucker, who counsels parents to seek medical care supporting their transgender children. It could impose criminal liability on a school nurse who dispenses a puberty-blocking medication to an adolescent, or a pharmacist who fills a prescription for estrogen or testosterone for a minor—even if the nurse or pharmacist did not know the child was taking the medication to treat gender dysphoria. *See City of Chi. v. Morales*, 527 U.S. 41, 55 (1999) (finding criminal

statute that "contains no *mens rea* requirement" and "infringes on constitutionally protected rights" to be "subject to facial attack" for vagueness).

Due to this vagueness, the Act encourages arbitrary enforcement and fails to describe what one must do to avoid criminal liability. *See Lanzetta*, 306 U.S. at 453 ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.").

### B. The Affordable Care Act Preempts the Act Because the Act Mandates Sex Discrimination by Healthcare Providers (Count III).

The Act is preempted by Section 1557 of the ACA. When a federal law and a state law conflict, the state law is preempted. *See, e.g.*, *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020) (citing *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985)). For example, states may not impose criminal penalties or "hold a civil defendant liable under state law for conduct federal law requires." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). Federal courts are empowered to "issue an injunction upon finding the state regulatory actions preempted." *Id.*

Federal courts recognize three categories of preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption. *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008). This case involves the third category, conflict preemption. "Conflict preemption . . . arises in instances

where (1) 'compliance with both federal and state regulations is a physical impossibility,' or (2) 'the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 (11th Cir. 2013) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citations and internal quotation marks omitted)). The Act is preempted because compliance would force covered health care providers to violate Section 1557. Because compliance with both statutes is impossible, and because enforcement of the Act would thwart the fundamental purpose of Congress in prohibiting sex discrimination by covered healthcare providers, federal law preempts the Act.

The Act prohibits Alabama doctors from providing medical care to transgender minors. But Section 1557 of the ACA prohibits such sex discrimination by health care providers receiving federal funds, including plaintiff doctors and other providers from whom plaintiff children receive their care. Section 1557 provides that no individual shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" on the basis of sex. 42 U.S.C. § 18116(a). As explained above, the Act's ban and criminalization of medications and surgeries only when provided to a transgender individual is discrimination based on sex. *See Bostock,*

42

140 S. Ct. at 1741; *Brumby*, 663 F.3d at 1316. Violators of Section 1557 risk losing federal funding, civil enforcement proceedings brought by the federal government, civil lawsuits, debarment from doing business with the federal government, False Claims Act lawsuits, and criminal penalties. *See*, *e.g.*, 20 U.S.C. § 1682; *see also Jolley v. Riverwoods Behav. Health, LLC*, No. 1:21-CV-00561-WMR, 2021 WL 6752161, at *5-6 (N.D. Ga. Aug. 30, 2021) (slip op.) (denying motion to dismiss private claim of Section 1557 ACA discrimination based on transgender status); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 592 (D. Md. 2021) (finding plaintiff pled Section 1557 discrimination where hospital refused to perform hysterectomy to treat gender dysphoria).

The Transgender Plaintiffs receive their medical care from providers who receive federal financial assistance and funding and who are subject to the non-discrimination provisions of Section 1557 of the ACA. *See* 42 U.S.C. § 18116(a). (*See also* Koe Decl ¶ 13.) In addition, the Healthcare Provider Plaintiffs are subject to Section 1557 of the ACA because they receive federal financial assistance as providers of medical care for transgender beneficiaries of Alabama Medicaid. (*See id.* ¶ 13.)

Healthcare Provider Plaintiffs cannot comply with both Section 1557 of the ACA and the Act. They are put in the impossible position of complying with Section 1557 by providing medical care to transgender minors consistent with the standard

Case 2:22-cv-00184-LCB-SRW   Document 8   Filed 04/21/22   Page 52 of 63

of care, and risking criminal penalties under the Act, or complying with the Act and being subject to federal enforcement proceedings and private lawsuits for discrimination under Section 1557. *See* Letter from Kristen Clarke, Assistant Attorney General at U.S. Dep't of Justice Civil Rights Div., to State Attorneys General (Mar. 31, 2022), *available at* https://www.justice.gov/opa/press-release/file/1489066/download (reminding state attorneys general that Section 1557 of the Affordable Care Act prohibits state laws that discriminate against transgender people). As such, the ACA preempts the Act's requirement that healthcare providers must deny certain types of medical care to transgender minors based on their transgender status. The Act puts healthcare providers in an impossible position and also contravenes the overall goal of the ACA—to broaden access to healthcare in the United States—as well as the specific purpose of Section 1557 to prevent discrimination in the provision of healthcare. *See King v. Burwell*, 576 U.S. 473, 478-79 (2015). Because the Act conflicts with the ACA, it is preempted by federal law and may not be enforced.

## IV.    The Act Will Cause Immediate, Irreparable Harm to Plaintiffs.

Without the injunctive relief sought, the Act will cause Plaintiffs to suffer serious irreparable harms.

First, if the Act is not enjoined, the Parent Plaintiffs will be forced to helplessly watch the harm to their children unfold because the Act deprives them of

the fundamental constitutional right to obtain essential medical care for their children. *See Brandt*, 551 F. Supp. 3d at 892-93 (finding parent plaintiffs demonstrated irreparable harm where act banning transition-related care for minors infringed on their fundamental right to parent their children). Like other parents, these Parent Plaintiffs want to be able to care for their children—to get their children the medical care doctors have told them, and they have seen for themselves, is essential to their children's ability to thrive. The Act inflicts serious, irreparable harm by barring the Parent Plaintiffs from acting in the best interests of their children in an area that lies at the heart of parental responsibilities and rights.

Second, the Act also inflicts irreparable harm by depriving the Transgender Plaintiffs of necessary medical care for a serious medical condition. This denial will cause irreversible and harmful physical changes and irreparable mental harm, including the reemergence of gender dysphoria which untreated will predictably cause them to suffer anxiety, depression, and severe psychological distress. Denial of medically necessary medical care is sufficient to show immediate and irreparable harm. *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483-84 (1986) (finding denial of benefits caused irreparable injury by exposing plaintiffs to "severe medical setback[s]" or hospitalization); *Gayle v. Meade*, -- F.Supp.3d --, No. 20-21553-CIV, 2020 WL 3041326, at *20-21 (S.D. Fla. June 6, 2020) (holding that increased likelihood of serious illness constitutes an irreparable injury); *Flack v. Wis. Dep't of*

*Health Servs.*, 331 F.R.D. 361, 373 (W.D. Wis. 2019) (denying coverage for medical treatment for gender dysphoria is irreparable harm); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *9 (W.D. Wash. Dec. 11, 2017) (finding that denial of "transition-related medical care" constituted irreparable harm).

Without the essential treatment Zachary needs, he will resume going through an unwanted female puberty that conflicts with his male identity, and he will suffer devastating and irreversible physical and psychological consequences as a result. (Zoe Decl. ¶¶ 11-13.) Michael, whose mental health providers have recommended that he be assessed for medical treatment of gender dysphoria, will be unable to obtain that care, which will exacerbate his gender dysphoria and force him to undergo harmful and unwanted physical changes that will be devastating to his physical and mental health. (Boe Decl. ¶¶ 9, 15.) Christopher and Allison, who both are currently on hormone therapy and thriving as a result, will be cut off from this essential care. (Noe Decl. ¶¶ 15, 17-18; Poe Decl. ¶¶ 21-22.) Their bodies will undergo extremely distressing and unwanted physical changes that will cause them to suffer severe emotional and psychological distress. (*See* Noe Decl. ¶¶ 12, 18; Poe Decl. ¶¶ 23-25.) These harms are serious, irreparable, and potentially life-threatening. (Ladinsky Decl. ¶¶ 15-16; Rosenthal Decl. ¶¶ 37, 44-45, 55, 57; *see also* Moe. Decl. ¶¶ 15-16.)

As the district court found in *Brandt* when enjoining a similar Arkansas law, barring transgender youth from essential medical care forces them to "undergo endogenous puberty," causing them to "live with physical characteristics that do not conform to their gender identity, putting them at high risk of gender dysphoria and lifelong physical and emotional pain." 551 F. Supp. 3d at 892; *see also Campbell v. Kallas*, No. 16-CV-261-JDP, 2020 WL 7230235, at *8 (W.D. Wis. Dec. 8, 2020) (slip op.) (finding plaintiff demonstrated "irreparable injury" required for an injunction where plaintiff "continues to suffer from gender dysphoria, which causes her anguish and puts her at risk of self-harm or suicide").

Third, enforcement of the Act will also inflict irreparable harm on Drs. Koe and Moe, who will face the ever-present threat of criminal prosecution and penalties if they continue to provide medically necessary and appropriate referrals and treatments to their minor transgender patients, and who will be put to the untenable choice of either risking arrest or harming their patients. *See Brandt*, 551 F. Supp. 3d at 891-92 (finding healthcare provider plaintiffs proved irreparable harm when Arkansas medical ban would force them to "choos[e] between breaking the law and providing appropriate guidance and interventions for their transgender patients").

And finally, enforcement of the Act will irreparably harm Rev. Eknes-Tucker by criminalizing his pastoral speech. "The loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

As the Eleventh Circuit has explained, constitutional violations constitute irreparable harm when they cannot "be compensated for by monetary damages." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Cate v. Oldham,* 707 F.2d 1176, 1189 (11th Cir. 1983) (holding that the directly penalizing free speech constitutes irreparable injury for purposes of a preliminary injunction). No amount of money can compensate for the Act's infringement on a parents' right to seek and obtain essential medical care for their child. Nor can money compensate for the imposition of criminal penalties on parents' First Amendment right to seek information and recommendations from healthcare providers, on doctors' constitutionally protected freedom to share their opinions and expertise with their patients, or on a pastor's rights to counsel families consistent with his faith-based beliefs. The enforcement of the Act in violation of these fundamental rights inflicts irreparable harm and warrants entry of a preliminary injunction.

## V.   Injuries to Plaintiffs Outweigh Any Damage to the State, Which Has No Interest in Enforcing an Unconstitutional Law.

The serious irreparable harms that Plaintiffs will experience if the Act takes effect outweigh any countervailing government interest. When "the nonmovant is the government, . . . the third and fourth requirements [for an injunction]—'damage

to the opposing party' and 'public interest'—can be consolidated." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (same). Moreover, there is no "legitimate interest in enforcing an unconstitutional ordinance." *Otto*, 981 F.3d at 870; *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

The balance of the equities strongly favors an injunction here. On the one side, the State is seeking to enforce an injurious, unconstitutional, and discriminatory law. In sharp contrast, the Act will impose significant irreparable harms on transgender young people, their parents, healthcare providers, and faith leaders like Rev. Eknes-Tucker. Plaintiffs will be forced to watch their children suffer the harm of losing the medical care they need and of experiencing the mental anguish and pain of untreated gender dysphoria. The Transgender Plaintiffs will abruptly lose essential medical care, be forced to undergo irreversible physical changes, and suffer intense suffering and distress. The Healthcare Provider Plaintiffs will be forced to choose between imprisonment and inflicting harm on vulnerable patients, as they cannot provide the medical care consistent with the recognized standard of care that they believe to be in their patients' best interest.

To be sure, the balance of the equities strongly favors an injunction here. An injunction would maintain the status quo while Plaintiffs pursue their claims. Plaintiffs can continue to meet their children's medical needs, transgender young

people can continue to receive recommended, medically necessary treatment for their gender dysphoria, healthcare providers can continue to treat their patients without fear of prosecution, and faith leaders can continue to counsel families consistent with their religious beliefs while this case is litigated.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin the State from implementing Act while this lawsuit is pending. Plaintiffs further request the Court to enter a temporary restraining order if the Court is unable to rule on Plaintiffs' preliminary injunction motion before May 8, 2022, when the law is scheduled to go into effect.

Respectfully submitted this 21st day of April, 2022.

*/s/ Melody H. Eagan*
Melody H. Eagan (ASB-9780-D38M)
Jeffrey P. Doss (ASB-4212-R62D)
Amie A. Vague (ASB-4113-Q46I)
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
205.581.0700
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt (ASB-3507-J56P)

Misty L. Peterson (GA Bar No. 243715) (*pro hac vice* application forthcoming)
Adam Reinke (GA Bar No. 510426) (*pro hac vice* application forthcoming)
Gilbert Oladeinbo (GA Bar No. 669340) (*pro hac vice* application forthcoming)
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
404.572.4600
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com
goladeinbo@kslaw.com

Brent P. Ray (IL Bar No. 6291911) (*pro hac vice* application forthcoming)
Abigail Hoverman Terry (IL Bar No. 6327057) (*pro hac vice* application forthcoming)
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
312.995.6333
bray@kslaw.com
ahoverman@kslaw.com

Michael B. Shortnacy (CA Bar No. 277035) (*pro hac vice* application forthcoming)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
213.443.4355
mshortnacy@kslaw.com

Asaf Orr (CA Bar No. 261650) (*pro hac vice* application forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
aorr@nclrights.org

Jennifer L. Levi (MA Bar No. 562298) (*pro hac vice* application forthcoming)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org

Scott D. McCoy (FL Bar No. 1004965) (*pro hac vice* application forthcoming)
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33101
334.224.4309
scott.mccoy@splcenter.org

Diego A. Soto (ASB-3626-Y61S)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
334.604.1414
diego.soto@splcenter.org

Jessica L. Stone (GA Bar No. 275567) (*pro hac vice* application forthcoming)
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340

Decatur, GA 30030
404.221.5837
jessica.stone@splcenter.org

Sarah Warbelow (MI Bar No. P66690) (*pro hac vice* application forthcoming)
Cynthia Weaver (NY Bar No. 5091848) (*pro hac vice* application forthcoming)
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
202.628.4160
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

## CERTIFICATE OF SERVICE

I certify that on this 21st day of April, 2022, I filed the foregoing with the

Clerk of Court. I further certify that I will cause a copy of this Memorandum and

accompanying Motion and Exhibits to be served along with a copy of the Summons

and Complaint by delivering a copy to the following Defendants, or to their

respective agents who are authorized by law to receive service of process, pursuant

to Fed. R. Civ. P. 4:

> Kay Ivey
> The Office of Alabama Governor
> 600 Dexter Avenue
> Montgomery, Alabama 36130
>
> C. Wilson Baylock
> District Attorney for Cullman County
> 500 2nd Avenue SW
> Cullman, Alabama 35055
>
> Daryl D. Bailey
> District Attorney for Montgomery County
> 251 South Lawrence Street
> Montgomery, Alabama 36014
>
> Steve Marshall
> Attorney General, State of Alabama
> 501 Washington Avenue
> Montgomery, Alabama 36104
>
> Jessica Venitere
> District Attorney for Lee County
> 2311 Gateway Drive #111
> Opelika, Alabama 36801

Tom Anderson
District Attorney for 12th Judicial Circuit
1065 E. McKinnon Street
New Brockton, Alabama 36351

Danny Carr
District Attorney for Jefferson County
810 Richard Arrington, Jr. Blvd. N., Suite 105
Birmingham, AL 35203

*/s/ Melody H. Eagan*
*Attorney for Plaintiffs*

2