# EXHIBIT A

# Supplemental Declaration of Rachel Koe, MD

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D., <br><br> *Plaintiffs*, <br><br> v. <br><br> KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County, <br><br> *Defendants*. | Civil Action No. 2:22-cv-184-LCB-SRW <br><br> **DECLARATION OF RACHEL KOE, MD, IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO PROCEED PSEUDONYMOUSLY** |

1

I, Rachel Koe, declare as follows:

1. I will not be able to proceed as a Plaintiff in this litigation without the protections afforded me by the pseudonym Dr. Rachel Koe because of my fears for my safety and that of my family and for the safety and privacy of my transgender patients.

2. I live and work in rural southeast Alabama. Some people in my community have very strong negative views of the transgender community and oppose the provision of medically necessary treatment to transgender youth. I have heard local community members express these strongly negative views not only in the local news and on social media but also in personal conversations while out in public, for example, in the local grocery store near where I live. The passage of the Act has increased public attention on this issue and intensified the strong feelings held by those who agree with the Act and believe that health care providers who provide medical treatments to these children are committing a crime and should be punished.

3. And, as a pediatrician providing medical care to children in a rural part of Alabama, I have had parents and others in the local community approach me in a combative manner to state their opposition to doctors providing medical treatment for transgender young people even before the Act was passed and signed. At times, they have asked me directly how I would treat a transgender young person if I were

to encounter such a patient in my medical practice. I have answered this question in very broad terms because I fear for my safety and that of my family if I disclose that, where appropriate, I refer parents of transgender children to specialists who provide needed medical care.

4. I have recently experienced how quickly a hostile community reaction can escalate when I was invited to speak at a public meeting about mask wearing to slow the spread of COVID-19. The debate at the meeting became very heated. I faced physical threats because of the position I took in favor of masking, and a uniformed police officer had to escort me out of the meeting, to protect me from likely physical violence.

5. Following my comments at the meeting, someone in my neighborhood posted personal information about my children on social media, encouraging others to taunt and harass my children for my comments regarding public health and masks. While thankfully we were able to get the post removed, the threats were real and frightened us. This experience has left me keenly aware of how disagreements about a politically sensitive medical issue can result in harassment, threats, and the potential for serious violence.

6. Because of those prior experiences and the very sensitive nature of the issues involved in this case, I believe that if the public learned my identity, it would jeopardize my and my family's physical safety.

7. I also feel responsible for the safety of the nurses and administrative staff my practice employs. We do not currently have security at our medical practice and do not have the financial capacity to maintain a security presence. I believe based on the experiences, it is likely that a member of the community who learns about my involvement in the case and disagrees with my position may enter my practice and try to harm me, my pediatric patients, or others on the staff.

8. Moreover, I have previously experienced harassment relating to our practice group's recommendation of vaccinations of children, another politically charged issue in the community where I practice. On numerous occasions, community members who have learned that my practice group recommends that parents vaccinate their children have posted false, negative reviews of our practice– falsely claiming to be patients—to intentionally harm our professional reputation.

9. People have equally strong views about the issues at the heart of this case. I am concerned that my involvement in the case will draw significant negative attention from our local community and—given the reach of social media—will likely be noticed by a far wider audience geographically. Responding to fabricated negative reviews or other negative reactions—whether from members of my community or from those outside of it—will require me to divert significant resources, financial and otherwise, from my medical practice, which will take away

the time I have to care for my pediatric patients and, potentially, could escalate to a point that jeopardizes the ability of the practice to remain in business.

10.  I am also concerned that this inevitable publicity would result in violence or threats of violence against me, my family, staff, and patients at my practice.  Given how strongly some people in my local community feel about this issue and how easily a practice like mine—located in a relatively small rural community—can be highlighted online and become the target of nationwide negative attention, I cannot proceed in this case as a plaintiff unless I can protect my identity while doing so.

11.  Finally, I believe hostile public attention will also threaten the privacy of all my patients, whether or not they are transgender, and will simultaneously threaten my livelihood.  I currently have a very busy medical practice and very few of my patients know that I have and treat transgender young people in my practice, due to our strict patient privacy protocols.  If that information became widely known, public surveillance of our premises is likely.  Community members opposed to my participation in this lawsuit may attempt to discern the identities of my transgender patients or their parents, threatening the privacy of all my patients.

12.  I am also concerned about the potential criminal exposure I may face under this Act. Because of the vague nature of the law, it is not clear to me what actions of mine may be considered criminal under the Act.  For example, if I discuss

5

the treatments available for transgender children with a parent or parents, and they subsequently obtain those treatments for their children, it is not clear to me whether such conduct would violate the Act. Similarly, if I refer parents of transgender children to providers in other states, it is not clear to me whether I am violating the Act. Although I have no intention to violate the Act should it go into effect, I am worried that I may unwittingly engage in criminal conduct or admit to criminal conduct as part of this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __28__ th day of April, 2022.

_____
Rachel Koe, MD