## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on
behalf of her minor son, MICHAEL BOE;
JAMES ZOE, individually and on behalf
of his minor son, ZACHARY ZOE;
MEGAN POE, individually and on behalf
of her minor daughter, ALLISON POE;
KATHY NOE, individually and on behalf
of her minor son, CHRISTOPHER NOE;
JANE MOE, Ph.D.; and RACHEL KOE,
M.D.

      Plaintiffs,

and

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

   v.

STATE OF ALABAMA; KAY IVEY, in
her official capacity as Governor of the
State of Alabama; STEVE MARSHALL,
in his official capacity as Attorney General
of the State of Alabama; DARYL D.
BAILEY, in his official capacity as
District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her
official capacity as District Attorney for
Lee County; TOM ANDERSON, in his
official capacity as District Attorney for

Case No.
2:22-cv-184-LCB-SRW

Honorable Liles C. Burke

the 12th Judicial Circuit; and DANNY
CARR, in his official capacity as District
Attorney for Jefferson County.

Defendants.

# MEMORANDUM IN SUPPORT OF PLAINTIFF-INTERVENOR UNITED STATES' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................. 2

    I.    Transgender Youth and Their Need for Medically Necessary and
Appropriate Gender-Affirming Care................................................ 2

    II.   The Legislative Debate Regarding Senate Bill 184 ............................ 6

    III.  Senate Bill 184 ................................................................. 8

ARGUMENT ..................................................................... 10

    I.    The United States is Likely to Succeed on the Merits of its
Equal Protection Claim ....................................................... 10

        A.   S.B. 184's Ban on Gender-Affirming Medical Care
Warrants Heightened Scrutiny Under the Equal
Protection Clause .................................................... 10

            1.   S.B. 184's Ban on Gender-Affirming Care
Discriminates on the Basis of Sex and Therefore
Triggers Intermediate Scrutiny ..................................... 11

            2.   S. B. 184's Ban on Gender-Affirming Medical
Care Discriminates Against Transgender
Individuals, And Therefore Triggers Intermediate
Scrutiny ......................................................... 13

        B.   S.B. 184 Fails Heightened Scrutiny Because it is Not
Substantially Related to Achieving Alabama's
Articulated Governmental Interests ......................................... 16

            1.   Alabama's Stated Interest of Protecting Children
is Pretextual ...................................................... 18

            2.   S.B. 184 is Not Substantially Related to Protecting
Children from "Harmful" Effects of Gender-
Affirming Care.................................................... 19

# TABLE OF CONTENTS

**TABLE OF CONTENTS (continued):**                                    **PAGE**

          3.    S.B. 184's Ban on Gender-Affirming Care Fails
               Even Rational Basis Review........................................... 24

  II.    S.B. 184 Will Cause Irreparable Harm Absent an Injunction............ 25

  III.   The Balance of the Equities and the Public Interest Both
        Weigh in the United States' Favor ...................................... 27

CONCLUSION ....................................................................... 28

CERTIFICATION OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE**

*Adkins v. City of New York*,
      143 F. Supp. 3d 134 (S.D.N.Y. 2015) ....................................................14, 15

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*,
      208 F. Supp. 3d 850 (S.D. Ohio 2016)....................................................14, 15

*Blaine v. North Brevard County Hospital District*,
       312 F. Supp. 3d 1295 (M.D. Fla. 2018) ......................................................26

*Brandt v. Rutledge*,
      551 F. Supp. 3d 882 (E.D. Ark. 2021) ........................................................26

*Bray v. Alexandria Women's Health Clinic*,
      506 U.S. 263 (1993)....................................................................................13

*Bostock v. Clayton County, Ga.*,
      140 S. Ct. 1731 (2020)..........................................................................11, 13

*Bowen v. Gilliard*,
      483 U.S. 587 (1987)..............................................................................14, 15

*Cent. Alabama Fair Hous. Ctr. v. Magee*,
      No. 2:11-cv-982-MHT, 2011 WL 5878363 (M.D. Ala. Nov. 23, 2011) ......26

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
      508 U.S. 520 (1993)....................................................................................19

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
      473 U.S. 432 (1985)..............................................................................14, 25

*City of El Cenizo v. Texas*,
      264 F. Supp. 3d 744 (W.D. Tex. 2017) ......................................................27

*City of Richmond v. J.A. Croson Co.*,
      488 U.S. 469 (1989)....................................................................................17

**CASES (continued)**                                                  **PAGE**

*Craig v. Boren*,
429 U.S. 190 (1976) ................................................................................. 16

*Corbitt v. Taylor*,
513 F. Supp. 3d 1309 (M.D. Ala. 2021) .................................................. 16

*Dep't of Agriculture v. Moreno*,
413 U.S. 528 (1973) ......................................................................... 18, 25

*D.T. v. Christ*,
552 F. Supp. 3d 888 (D. Ariz. 2021) .................................................. 11, 14

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017) ................................................ 14, 15

*Flack v. Wisconsin Dep't of Health Servs.*,
328 F. Supp. 3d 931 (W.D. Wis. 2018) ............................................. 11, 14

*F.V. v. Barron*,
286 F. Supp. 3d 1131 (D. Idaho 2018),
*decision clarified sub nom. F.V. v. Jeppesen*, 477 F. Supp. 3d 1144
(D. Idaho 2020) ....................................................................................... 14

*Georgia Latino All. for Hum. Rts. v. Deal*,
793 F. Supp. 2d 1317 (N.D. Ga. 2011),
*Aff'd in part, rev'd in part and remanded sub nom. Georgia Latino
All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250 (11th Cir.
2012) ...................................................................................................... 25

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ................................................. 11, 13, 17

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ............ 11, 14, 15

*Heller v. Doe*,
509 U.S. 312 (1993) ............................................................................... 24

iv

**CASES (continued)**                                                    **PAGE**

*Karnoski v. Trump,*
  926 F.3d 1180 (9th Cir. 2019) ........................................................14

*KH Outdoor, LLC v. City of Trussville,*
  458 F.3d 1261 (11th Cir. 2006) ....................................................28

*Kirchberg v. Feenstra,*
  609 F.2d 727 (5th Cir. 1979) ...................................................20, 24

*Lyng v. Castillo,*
  477 U.S. 635 (1986)..............................................................14, 15

*M.A.B. v. Bd. of Educ. of Talbot Cnty.,*
  286 F. Supp. 3d 704 (D. Md. 2018)...........................................14, 15

*Mississippi Univ. for Women v. Hogan,*
  458 U.S. 718 (1982)........................................................16, 17, 19

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,*
  491 U.S. 350 (1989).................................................................26

*Nken v. Holder,*
  556 U.S. 418 (2009).................................................................27

*Norsworthy v. Beard,*
  87 F. Supp. 3d 1104 (N.D. Cal. 2015)......................................14, 15

*Palmore v. Sidoti,*
  466 U.S. 429 (1984).................................................................18

*Planned Parenthood Southeast, Inc. v. Bentley,*
  951 F. Supp. 2d 1280 (N.D. Ala. 2013) ..................................26, 27

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
  831 F.3d 500 (D.C. Cir. 2016).....................................................27

*Romer v. Evans,*
  517 U.S. 620 (1996)..............................................................24, 25

**CASES (continued)**                                                                    **PAGE**

*SmithKline Beecham Corp. v. Abbott Labs.*,
       740 F.3d 471 (9th Cir. 2014) ........................................................17

*United States v. Alabama*,
       691 F.3d 1269 (11th Cir. 2012) ...........................................10, 28

*United States v. Arizona*,
       641 F.3d 339 (9th Cir. 2011) ........................................................26

*United States v. Virginia*,
       518 U.S. 515 (1996)................................................................*passim*

*United States v. Windsor*,
       570 U.S. 744 (2013)......................................................................17

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
       858 F.3d 1034 (7th Cir. 2017) ...........................................11, 14

**STATUTES**

Ala. Crim. Code § 13-A-5-6(a)(3) .........................................................9, 25

Ala. Crim. Code § 13A-5-11(a)(3) ........................................................9, 25

Ala. Crim. Code § 26-1-1(a) ........................................................................9

Ala. Code § 22-171A-2(a) ............................................................................8

S.B. 184 (Ala. 2022) ..........................................................................*passim*

**MISCELLANEOUS**

Alabama House Judiciary Committee,
       *House Judy Committee – 3/2/2022, 1:34:28 PM*, Vimeo (Mar. 2,
       2022), https://vimeo.com/683940881/4edaeefda2 .........................7

Alabama House of Representatives,
       *House Part 1 – 4/7/2022, 9:32:05 AM*, Vimeo (April 7, 2022),
       https://vimeo.com/697000650/59a642f5d4................................8

**MISCELLANEOUS (continued)**                                              **PAGE**

American Psychiatric Association,
   *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition,
   Text Revision (2022), https://perma.cc/FM78-QMZ2 ...................................2

APA Assembly and Board of Trustees,
   *Position Statement on Discrimination Against Transgender and
   Gender Diverse Individuals* (2012, 2018),
   https://perma.cc/ES7D-YVG2 ......................................................................15

Department of Health & Human Servs., Office of Population Affairs,
   *Gender Affirming Care and Young People*, https://go.usa.gov/xuR8E .........20

Jason Rafferty,
   *Ensuring Comprehensive Care and Support for Transgender and
   Gender-Diverse Children and Adolescents*, American Academy of
   Pediatrics Policy Statement (Oct. 1, 2018),
   https://perma.cc/D4R6-GP6C....................................................................4, 20

Kiara Alfonseca,
   *Alabama Governor Signs 'Don't Say Gay,' Trans Care, and
   Bathroom Ban Bills*, ABC News (Apr. 8, 2022),
   https://perma.cc/6ESP-A8E9................................................................7, 8, 16

Sandy E. James et al., Nat'l Ctr. for Transgender Equal.,
   *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016),
   https://perma.cc/5CL3-RG9E ......................................................................14

The Trevor Project,
   *Research Brief: LGBTQ Youth in the Workplace* (Mar. 30, 2021),
   https://perma.cc/TG7W-E4J3 ......................................................................15

Tony Perkins,
   *Wes Allen Discusses Upcoming Alabama Senate Vote on Vulnerable
   Child Compassion and Protection Act*, YouTube (Feb. 15, 2021),
   https://www.youtube.com/watch?v=E9Q_b22cUWw ....................................7

**MISCELLANEOUS (continued)**          **PAGE**

Letter from Kristen Clarke, Assistant Attorney General for Civil Rights,
U.S. Dep't of Justice, to State Attorneys General (March 31, 2022),
https://go.usa.gov/xuR8w ............................................................................27

Wylie Hembree, Peggy Cohen-Kettenis, & Louis Gooren et al.,
*Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent*
*Persons: An Endocrine Society Clinical Practice Guideline*, The
Journal of Clinical Endocrinology & Metabolism 3869-3903, Vol. 102,
Issue 11 (Nov. 2017), https://perma.cc/8R3P-6NQY......................................6

**INTRODUCTION**

This lawsuit challenges a state statute that denies necessary medical care to children based solely on who they are. The "Alabama Vulnerable Child Compassion and Protection Act," No. 2022-289, Senate Bill ("S.B.") 184 (2022), conditions whether a minor can receive certain forms of medical care on the sex that young person was assigned at birth. Section 4 of S.B. 184 makes it a felony for any person to "engage in or cause" medically necessary gender-affirming procedures and treatments for transgender minors, while leaving other minors free to receive the same procedures and treatments.

By denying transgender minors—and only transgender minors—access to gender-affirming care, S.B. 184 violates the Equal Protection Clause of the Fourteenth Amendment. The law unjustifiably prohibits transgender minors from accessing medically necessary and appropriate care, while imposing no such limitation on cisgender minors. S.B. 184 discriminates on the basis of both sex and transgender status, and it fails intermediate scrutiny. The law's ban on medically necessary gender-affirming care for transgender minors is not substantially related to serving an important government objective. To the contrary: the law actually harms the health of transgender youth. And it reflects a bias against transgender individuals that can never provide a legitimate basis for legislation. Indeed, S.B. 184 would not even survive rational-basis review.

Implementation of S.B. 184 will have immediate, drastic, and often traumatic physical and psychological impacts on vulnerable transgender children and will cause irreparable harm to medical professionals, parents and caregivers, transgender minors, and the interests of the United States. The balance of the equities and the public interest also justify preliminary relief. Therefore, the United States respectfully requests that this Court grant this motion.

## BACKGROUND

I. **Transgender Youth and Their Need for Medically Necessary and Appropriate Gender-Affirming Care**

Transgender people are individuals whose gender identity does not conform with the sex they were assigned at birth. A transgender boy is a child or youth who was assigned a female sex at birth but whose gender identity is male; a transgender girl is a child or youth who was assigned a male sex at birth but whose gender identity is female. By contrast, a cisgender child has a gender identity that corresponds with the sex the child was assigned at birth. A person's gender identity is innate.

According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders,[1] "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant

---

[1] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition, Text Revision (2022), https://perma.cc/FM78-QMZ2.

distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth. Declaration of Dr. Stephen Rosenthal, MD, in Support of Plaintiffs' Motion for a Temporary Restraining Order & Preliminary Injunction, Dkt. 8-3 ("Rosenthal Decl.") ¶¶ 24-25; Declaration of Dr. Linda A. Hawkins, Ph.D., LPC, in Support of Plaintiffs' Motion for a Temporary Restraining Order & Preliminary Injunction, Dkt. 8-1 ("Hawkins Decl.") ¶ 25.

To be diagnosed with gender dysphoria, the incongruence between sex assigned at birth and gender identity must persist for at least six months and be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning. Rosenthal Decl. ¶ 25. The inability of transgender youth to live consistent with their gender identity due to irreversible physical changes in their bodies has significant negative impacts on their overall health and well-being. *See* Hawkins Decl. ¶¶ 45-46. The delay or denial of medically necessary treatment for gender dysphoria causes many transgender minors to develop serious co-occurring mental health conditions, such as anxiety, depression, and suicidality. Rosenthal Decl. ¶¶ 26, 55; *see also* Hawkins Decl. ¶ 41.

Gender dysphoria is highly treatable with the use of medical treatments that address the clinically significant distress by helping people who are transgender live in alignment with their gender identity. *See* Rosenthal Decl. ¶¶ 23, 26. The

precise treatments for gender dysphoria depend on each person's individualized needs. *Id*. ¶ 23; Hawkins Decl. ¶¶ 32-37. The types of treatments provided differ depending on the patient's age. Rosenthal Decl. ¶ 33.

Medical treatment standards for gender dysphoria, including for minors, are well-established. Declaration of Dr. Armand Antommaria in Support of Plaintiff-Intervenor United States' Motion for a Temporary Restraining Order and a Preliminary Injunction ("Antommaria Decl."), attached hereto as Exhibit 1, ¶¶ 17, 23-38. The American Academy of Pediatrics agrees that gender-affirming care is safe, effective, and necessary for the health and wellbeing of minors suffering from gender dysphoria.[2] *Id*. ¶¶ 34-35. Before puberty, treatment for gender dysphoria does not include pharmaceutical or surgical intervention and is limited to "social transition." Hawkins Decl. ¶ 27. Social transition refers to allowing a transgender child to live and express themselves in ways consistent with their gender identity. *See id*. ¶¶ 27-29.

The Endocrine Society's clinical practice guidelines recognize that as transgender youth reach puberty, puberty-delaying hormone therapy may become medically necessary and appropriate. *See* Antommaria Decl. ¶¶ 27, 35. This treatment allows transgender youth to avoid going through endogenous puberty

---

[2] Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, American Academy of Pediatrics Policy Statement (Oct. 1, 2018), https://perma.cc/D4R6-GP6C.

and the heightened gender dysphoria and permanent physical changes that puberty would cause. *See* Rosenthal Decl. ¶¶ 36-37. This treatment is not experimental: medications that delay the onset of puberty have been used for decades to treat early onset or "precocious puberty" for cisgender adolescents. Antommaria Decl. ¶¶ 23, 33.

Interventions such as prescribing puberty-blocking medication and hormone replacement therapy require substantial planning and consultation with medical and mental health providers. *See id.* ¶¶ 16, 42; Rosenthal Decl. ¶ 47. Under the Endocrine Society's clinical guidelines, transgender adolescents may be eligible for puberty-blocking hormone therapy only if the following steps have been taken:

- A qualified mental health professional confirms the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria, gender dysphoria worsened with the onset of puberty, and any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed, such that the patient's situation and functioning are stable enough to start treatment;

- The adolescent has sufficient mental capacity to give informed consent to this treatment, has been informed of the effects and side effects of treatment (including potential loss of fertility) and options to preserve fertility; and has given informed consent and the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process; and

- A pediatric endocrinologist or other clinician experienced in pubertal assessment agrees with the indication for treatment, has confirmed that puberty has started in the adolescent, and has confirmed that there are no medical contraindications to treatment.

*See* Antommaria Decl. ¶¶ 41-42.[3]

For some transgender adolescents, it may also be medically necessary and appropriate to provide hormone therapy to initiate puberty consistent with their gender identity. *Id*. ¶¶ 28, 35. Evaluation for this treatment generally occurs starting around age 14; transgender adolescents are only eligible for hormone therapy if the steps above are satisfied. *Id*. ¶ 42. Under the World Professional Association for Transgender Health clinical guidelines, adolescents who are transgender may receive chest reconstructive surgery prior to the age of majority if they have severe gender dysphoria, provided they have been living consistent with their gender identity for a significant period of time. *See id*. ¶ 42. Other types of surgical interventions, including genital surgery, are not recommended until a patient has reached the age of majority. *Id*. ¶ 35.

## II.    **The Legislative Debate Regarding Senate Bill 184**

The process that produced S.B. 184 is replete with expressions of skepticism about and hostility to the needs of transgender youth. In 2021 statement, for example, Representative Wes Allen, a sponsor of S.B. 184, explained that a motivation behind legislation banning gender-affirming care for transgender youth

---

[3] Wylie Hembree, Peggy Cohen-Kettenis, & Louis Gooren et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, The Journal of Clinical Endocrinology & Metabolism 3869-3903, Vol. 102, Issue 11 (Nov. 2017), https://perma.cc/8R3P-6NQY.

is to affirm that if children "are born male, that they're a male and if they're born female, they're a female."[4]

During legislative debates, proponents of S.B. 184, including Representative Allen[5] and another bill sponsor, Senator Shay Shelnutt,[6] referred to gender-affirming care, when provided to transgender youths as "child abuse" without explaining why gender-affirming care for all other youth is entirely appropriate.

Furthermore, during a March 2, 2022 House Judiciary Committee hearing held on Alabama House Bill 266 (a companion bill to S.B. 184), Representative Allen compared gender-affirming medical care to "vaping," "dealing with cigarettes," and "dealing with drinking"—each of them a form of voluntary activity that he characterized as antisocial.[7] Representative Allen also compared prescribing medications in the context of gender-affirming care to giving "anabolic steroids" to young boys who believe they are a "Division I athlete" or a "professional athlete."[8] And later, during debate on April 7, 2022, Representative Allen not only analogized gender-affirming care to another often-criticized practice

---

[4] Tony Perkins, *Wes Allen Discusses Upcoming Alabama Senate Vote on Vulnerable Child Compassion and Protection Act*, YouTube (Feb. 15, 2021), https://www.youtube.com/watch?v=E9Q_b22cUWw.

[5] Alabama House Judiciary Committee, *House Judy Committee – 3/2/2022, 1:34:28 PM*, Vimeo (Mar. 2, 2022), https://vimeo.com/683940881/4edaeefda2.

[6] Kiara Alfonseca, *Alabama Governor Signs 'Don't Say Gay,' Trans Care, and Bathroom Ban Bills*, ABC News (Apr. 8, 2022), https://perma.cc/6ESP-A8E9.

[7] Alabama House Judiciary Committee, *supra* note 5.

[8] *Id*.

but criticized parents who seek it for their children, stating, "We do not allow children to get tattoos even with parental permission. And why not? Because we do not allow parents to permanently alter the bodies of their children."[9] Even on its own terms, this statement is inaccurate; in fact, Alabama law does permit minors to obtain a tattoo with prior written informed consent of the parent or legal guardian. Ala. Code § 22-17A-2(a).

In signing S.B. 184 into law, Governor Kay Ivey also expressed moral disapproval of gender-affirming care for transgender youth: "I believe very strongly that if the Good Lord made you a boy, you are a boy, and if He made you a girl, you are a girl . . . [L]et us all focus on helping them to properly develop into the adults God intended them to be."[10]

## III.   <u>Senate Bill 184</u>

Governor Ivey signed S.B. 184 into law on April 8, 2022. The law becomes effective on May 8, 2022. *See* S.B. 184, § 11.

Section 3 of the bill defines "sex" as the "biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." *Id.* at § 3(3). S.B. 184's legislative findings reject the need for interventions to treat gender dysphoria, describing such treatments as "unproven"

---

[9] Alabama House of Representatives, *House Part 1 – 4/7/2022, 9:32:05 AM*, Vimeo (April 7, 2022), https://vimeo.com/697000650/59a642f5d4.
[10] Alfonseca, *supra* note 6.

and "experimental" and causing "numerous harmful effects." *Id*. at § 2(11). The findings characterize a "discordance between their sex and identity" as a phase that resolves itself over time in most cases. *Id*. at § 2(4)-(5).

Section 4 of S.B. 184 states that "no person shall engage in or cause" specified types of medical care to be performed on a minor[11] with "the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent" with their sex assigned at birth. *Id*. at § 4(a). The practices prohibited by Section 4 of S.B. 184 include administering puberty blockers, administering hormone therapy, and surgical interventions (including the removal of "any healthy or non-diseased body part or tissue, except for a male circumcision"). *Id.* at § 4(a)(1)-(6). Notably, there is an exception for procedures "undertaken to treat a minor born with a medically verifiable disorder of sex development." *Id.* at § 4(b).

A violation of Section 4 of S.B. 184 is a Class C felony, *id.* at § 4(c), which is punishable by up to 10 years of imprisonment and a fine of up to $15,000. *See* Ala. Crim. Code §§ 13-A-5-6(a)(3), 13A-5-11(a)(3).

By its very terms, Section 4 of S.B. 184 means that parents of transgender youth, transgender minors old enough to make their own medial decisions, health

---

[11] In Alabama, the age of majority is nineteen. Ala Crim. Code § 26-1-1(a).

care professionals, and others are forced to choose between forgoing medically necessary procedures and treatments or facing criminal prosecution.

## ARGUMENT

For a court to issue a preliminary injunction, the plaintiff must establish the following: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). Each of these factors is satisfied here.

## I.   The United States is Likely to Succeed on the Merits of its Equal Protection Claim

The United States is likely to succeed on the merits because Section 4 of S.B. 184 violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against transgender minors on the basis of their sex and their membership in a quasi-suspect class. Not only does Section 4 fail the heightened scrutiny applicable to such laws; it would fail even rationality review.

### A. S.B. 184's Ban on Gender-Affirming Medical Care Warrants Heightened Scrutiny Under the Equal Protection Clause

Section 4 of S.B. 184 is subject to heightened scrutiny because, in forbidding transgender youth to obtain medically necessary gender-affirming care while

leaving all other minors eligible for such care, it discriminates on the basis of sex and transgender status.

### 1. S.B. 184's Ban on Gender-Affirming Care Discriminates on the Basis of Sex and Therefore Triggers Intermediate Scrutiny

S.B. 184 bans gender-affirming care only when that care is being provided to transgender individuals. As the Supreme Court instructed, treating an individual differently because that person is transgender "unavoidably" constitutes sex discrimination because it rests on a person's having "one sex identified at birth" but identifying with a different sex or gender "today." *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731, 1746 (2020). Similarly, the Eleventh Circuit has held that differential treatment based on "gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011). Other circuits have held the same. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608-10 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (school policy requiring students to use bathroom in accordance with the sex on the student's birth certificate "is inherently based upon a sex-classification"); *D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Ariz. 2021); *Flack v. Wisconsin Dep't of Health Servs.*, 328 F. Supp. 3d 931, 948 (W.D. Wis. 2018).

Section 4 of S.B. 184 discriminates against transgender minors by

unjustifiably denying them access to certain forms of medically necessary care. The law prohibits transgender minors from obtaining care that has been well established as medically appropriate and necessary, while imposing no comparable limitation on cisgender minors for obtaining the same forms of care.

In addition, Section 4 of S.B. 184 expressly discriminates on the basis of sex because the medical treatments available to an Alabama minor under S.B. 184 depend on the sex that minor was assigned at birth based on "the individual's sex organs, chromosomes, and endogenous hormone profiles." S.B. 184, § 3. Under S.B. 184, if a minor was assigned male at birth, that minor cannot receive any of the treatments or procedures identified in Section 4 that would "alter the appearance of" the minor in a way that is "inconsistent" with being male or that would "affirm" the minor's "perception" of being female. *See* S.B. 184, § 4(a). Similarly, if a minor was assigned female at birth, that minor cannot receive any of the treatments or procedures identified in Section 4 that would "alter the appearance of" the minor in a way that is "inconsistent" with being female or that would "affirm" the minor's "perception" of being male. *See id* at § 4(a). By contrast, all other minors can access the covered treatments because those treatments are, for them, consistent with the sex the minor was assigned at birth. *See id.* at § 4(a). S.B. 184 also discriminates on the basis of sex because it conditions the availability of particular medical procedures on a sex stereotype:

12

that an individual's gender identity should match the sex that individual was assigned at birth. *See Glenn*, 663 F.3d at 1316, 1319-20; *see also United States v. Virginia*, 518 U.S. 515, 549-50 (1996).

Sex-based classifications like S.B. 184 are subject to heightened constitutional scrutiny, specifically intermediate scrutiny. *Virginia*, 518 U.S. at 555; *Glenn*, 663 F.3d at 1315-16 (citations and quotations omitted).

### 2. S.B. 184's Ban on Gender-Affirming Medical Care Discriminates Against Transgender Individuals, And Therefore Triggers Intermediate Scrutiny

S.B. 184 also warrants heightened scrutiny because it discriminates on the basis of transgender status. Its legislative findings reflect an intent to target transgender minors—and only transgender minors—by expressing a commitment to preventing medical care that addresses youth who experience "discordance between their sex and their internal sense of identity" and "reveal signs of gender nonconformity," including those designated with "gender dysphoria." *Compare* S.B. 184 § 2(2), 2(5), *with* Antommaria Decl. ¶¶ 43-45.[12]

A law that criminalizes access to particular medical treatments based on

---

[12] It does not matter that S.B. 184 never expressly uses the word "transgender," since it is clear beyond doubt that transgender minors are the focus on the bill. "Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *see also Bostock*, 140 S. Ct. at 1741 (noting that it is "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex"); *Christ*, 552 F. Supp. 3d at 895-96.

individuals' transgender status demands heightened scrutiny because transgender

people are a quasi-suspect class, as the two circuits to have squarely addressed the

question have held. *See Grimm*, 972 F.3d at 611; *Karnoski v. Trump*, 926 F.3d

1180, 1200 (9th Cir. 2019). Several district courts have concluded the same.[13]

An analysis of the factors used by the Supreme Court confirms that

classifications based on transgender status warrant heightened scrutiny.[14] First,

transgender people, as a class, have historically been subject to discrimination and

continue to "face discrimination, harassment, and violence because of their gender

identity." *Whitaker*, 858 F.3d at 1051; *see also Grimm*, 972 F.3d at 611-12; *Flack*,

328 F. Supp. 3d at 953; *M.A.B.*, 286 F. Supp. 3d at 720; *Evancho*, 237 F. Supp. 3d

at 288; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F. Supp. 3d at 139.[15]

---

[13] *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018), *decision clarified sub nom. F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020); *Flack*, 328 F. Supp. 3d at 951-53; *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 873-74 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-140 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015).

[14] Those factors include whether the class (1) has historically been subjected to discrimination, *see Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986); (2) has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-441 (1985); (3) has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) is a minority lacking political power, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).

[15] Ample evidence indicates that transgender people experience higher levels of physical and sexual violence, harassment, and discrimination in the workplace, housing, healthcare, and school than their non-transgender counterparts. Nearly half (47%) of respondents to the 2015 U.S. Transgender Survey reported being sexually assaulted. Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016), https://perma.cc/5CL3-RG9E (hereinafter USTS Report). Over 77% of respondents to the 2015

Second, no "data or argument suggest[s] that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society." *Adkins*, 143 F. Supp. 3d at 139.[16] The American Psychiatric Association has concluded that "[b]eing transgender or gender diverse implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[17]

Third, transgender individuals share "obvious, immutable, *or* distinguishing characteristics that define them as a discrete group." *Bowen*, 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638) (emphasis added). Specifically, transgender individuals' "gender identity does not align with the gender they were assigned at birth." *M.A.B.*, 286 F. Supp. 3d at 721. Multiple courts have held that transgender status is immutable, and "being transgender is not a choice[,] [r]ather, it is as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612-613.[18]

Fourth, people who are transgender lack political power. *See id*. at 613. While the number of openly transgender elected officials is growing, they still

---

U.S. Transgender Survey who were out or perceived as transgender in kindergarten through twelfth grade reported having one or more negative experiences (such as verbal harassment or physical attacks) in K-12 because people thought they were transgender. *Id*. at 132, 133. Another recent study found 61% of employed transgender respondents between the ages of thirteen to twenty-four reported experiencing discrimination in the workplace. The Trevor Project, *Research Brief: LGBTQ Youth in the Workplace* (Mar. 30, 2021), https://perma.cc/TG7W-E4J3.

[16] *Accord Grimm*, 972 F.3d at 612; *M.A.B.*, 286 F. Supp. 3d at 720; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Norsworthy*, 87 F. Supp. 3d at 1119 n.8.

[17] APA Assembly and Board of Trustees, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2012, 2018), https://perma.cc/ES7D-YVG2.

[18] *See also M.A.B.*, 286 F. Supp. 3d at 720-721; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Norsworthy*, 87 F. Supp. 3d at 1119 n.8; *Adkins*, 143 F. Supp. 3d at 139-40.

represent a fraction of office holders. *Id*. The proliferation of enacted legislation

aimed at restricting the rights of transgender individuals, particularly transgender

minors, is further evidence of the limited political power of the transgender

community.[19]

Because Section 4 of S.B. 184 discriminates against transgender persons and

they constitute a quasi-suspect class, the statute is subject to intermediate scrutiny.

### B. S.B. 184 Fails Heightened Scrutiny Because it is Not Substantially Related to Achieving Alabama's Articulated Governmental Interests

To survive heightened scrutiny, the State must show that Section 4 of S.B.

184 "serves important governmental objectives" and that the "discriminatory

means employed are substantially related to achievement of those objectives." *See*

*Virginia*, 518 U.S. at 524 (quoting *Mississippi Univ. for Women v. Hogan*, 458

U.S. 718, 724 (1982)); *see also Craig v. Boren*, 429 U.S. 190, 197 (1976). "The

burden of justification is demanding and it rests entirely on the State." *Virginia*,

518 U.S. at 533 (quoting *Mississippi Univ. for Women*, 458 U.S. at 724).

Heightened scrutiny requires that the justification proffered be "exceedingly

---

[19] The very same day Governor Ivey signed S.B. 184 into law, she also signed H.B. 322 into law. Alfonseca, *supra* note 6. H.B. 322 requires students in public K-12 schools to only use bathrooms and locker rooms that correspond with the sex listed on their original birth certificate; it also bans classroom instruction regarding sexual orientation and gender identity that is not age or developmentally "appropriate." Alabama has also issued Policy Order 63, which requires transgender individuals to undergo "gender reassignment surgery" before they may amend the sex designation on their driver's licenses. *See Corbitt v. Taylor*, 513 F. Supp. 3d 1309 (M.D. Ala. 2021).

persuasive." *Id*. at 531. The required inquiry provides an enhanced measure of protection in circumstances where there is a greater danger that the legal classification results from impermissible prejudice or stereotypes. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion).

Moreover, when intermediate scrutiny applies, the "justification must be genuine, not hypothesized or invented post hoc in response to litigation," and "must not rely on overbroad generalizations." *Virginia*, 518 U.S. at 533; *see also Glenn*, 663 F.3d at 1321; *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 482 (9th Cir. 2014) (noting that the court must examine the law's "actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.") (citing *United States v. Windsor*, 570 U.S. 744 (2013)). A classification does not withstand heightened scrutiny when "the alleged objective" of the classification differs from the "actual purpose." *Mississippi Univ. for Women*, 458 U.S. at 730.

S.B. 184's ban on medically necessary gender-affirming care for transgender youth does not survive the rigorous analysis that heightened scrutiny demands for two reasons. First, the State's articulated objectives are pretextual justifications that mask the true purpose of the law: to express moral disapproval of a vulnerable and unpopular group. That desire is not legitimate, let alone important or

17

exceedingly persuasive. Second, even assuming the State's asserted interest of protecting children is genuine, S.B. 184 is not substantially related to that interest because S.B. 184's ban on various forms of gender-affirming care is harmful, not beneficial, to children.

### 1.  Alabama's Stated Interest of Protecting Children is Pretextual

S.B. 184's stated purpose is to protect youth. The legislation's text and its legislative history, however, belie the State's stated purpose. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean" that the desire to express moral disapproval of "a politically unpopular group cannot constitute a legitimate governmental interest." *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973); *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). Unfortunately, S.B. 184's real purpose is that forbidden desire.

The text and legislative history of S.B. 184 are marbled with expressions of moral disapproval of transgender status. So, too, its suggestion that transgender minors will "outgrow" their gender identity. S.B. 184, § 2(4).

Furthermore, S.B. 184's legislative history, including statements from Governor Ivey and co-sponsor Representative Allen, *see* pp. 7-8, *supra*, reflect profound disapproval of people whose gender identity is inconsistent with the sex they were assigned at birth.

S.B. 184 bans particular treatments and procedures only when they are being

used to affirm a gender identity that is "inconsistent with the minor's sex" as assigned at birth. S.B. 184, § 4. As such, S.B. 184 singles out transgender minors for discriminatory treatment. Those same procedures that S.B. 184 prohibits for transgender minors, remain as permissible as before for all other purposes, including gender-affirming care for anyone who is not transgender. Puberty blockers and surgical treatments can have "life implications," S.B. 184, § 2(15), for cisgender and intersex minors too, and yet Alabama leaves the decisions whether to obtain such treatments to treating physicians, parents, and minors. The law's selective concern undercuts the state's profession of a legitimate purpose. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (a state undermines its stated interest "when it leaves appreciable damage to that supposedly vital interest unprohibited.") (cleaned up).

### 2. S.B. 184 is Not Substantially Related to Protecting Children from "Harmful" Effects of Gender-Affirming Care

But even if the State's asserted interest of protecting children were genuine, S.B. 184's felony ban on certain forms of gender-affirming care would violate the Equal Protection Clause because the ban is not "substantially related" to achieving that objective. *Virginia*, 518 U.S. at 533 (quoting *Mississippi Univ. for Women*, 458 U.S. at 724) (internal quotations omitted). Quite the opposite: banning the forms of gender-affirming care criminalized by S.B. 184 will have devastating effects on many transgender youths while providing no countervailing benefit to

them or anyone else. *See Kirchberg v. Feenstra*, 609 F.2d 727, 734 (5th Cir. 1979)

(courts must "weigh[] the state interest sought to be furthered against the character

of the discrimination caused by the statutory classification").

The empirical propositions upon which S.B. 184 rests are in fact untrue.

First, gender-affirming care for gender dysphoria is safe and effective.

Contrary to the State's assertion that gender-affirming care for transgender youth

has "numerous harmful effects," *see* S.B. 184 § 11, the overwhelming weight of

medical evidence confirms that the medical care that S.B. 184 forbids is safe,

effective, and medically necessary treatment for the health and wellbeing of

children and adolescents suffering from gender dysphoria. Antommaria Decl. ¶¶

34-35; Rosenthal Decl. ¶¶ 23, 27-30; *see generally* pp. 4, 21-22, *supra*.[20]

Moreover, delaying or denying gender-affirming care to transgender youth

experiencing gender dysphoria can result in numerous harms, including depression,

anxiety, and suicidality. *See* Hawkins Decl. ¶¶ 41, 45-46.[21] The medical evidence

shows that trying to "cure" a transgender individual with a gender dysphoria

diagnosis by forcing them to live in alignment with their sex assigned at birth, and

---

[20] Rafferty, *supra* note 2.

[21] *See* Dep't of Health & Human Servs., Office of Population Affairs, *Gender Affirming Care and Young People*, at 1, https://go.usa.gov/xuR8E ("Medical and psychosocial gender affirming healthcare practices have been demonstrated to yield lower rates of adverse mental health outcomes, build self-esteem, and improve overall quality of life for transgender and gender diverse youth.").

not their gender identity, is severely harmful and ineffective. *See* Antommaria Decl. ¶ 47; Rosenthal Decl. ¶ 22.

Second, the medical research supporting gender-affirming care is substantial. Alabama is simply mistaken when it asserts that gender-affirming medical treatment for patients experiencing gender dysphoria is new, unproven, and poorly studied. *See* S.B. 184 § 2(11). To the contrary. Antommaria Decl. ¶ 23. Leading medical associations, including the American Psychiatric Association, the World Professional Association for Transgender Health, the American Academy of Pediatrics, and the Endocrine Society, have all recognized that gender-affirming care is safe, effective, and medically necessary treatment for the health and wellbeing of some children and adolescents suffering from gender dysphoria. *Id.* ¶ 35. Hormone treatment for gender dysphoria began soon after estrogen and testosterone became commercially available in the 1930s and puberty blockers have been in use for over 20 years. *Id.* ¶ 23.

The assertions in S.B. 184's legislative findings that the use of puberty blockers for youths experiencing gender dysphoria is "experimental" and not "FDA-approved," *see* S.B. 184 § 2(7), is misleading. Antommaria Decl. ¶¶ 17, 19. There have been ample observational studies, including federally funded trials, supporting the use of puberty blockers and other gender-affirming hormone therapy for adolescents. *Id.* ¶¶ 27-29.

The safety and effectiveness of the treatments and procedures used to treat minors experiencing gender dysphoria is not undermined because there have not been randomized, placebo-based trials for those treatments and procedures. *Id*. ¶¶ 24-30. And the absence of such trials does not render them "experimental." *Id*. ¶¶ 14, 17, 23-30. In fact, such trials would be unethical because insufficient participants are likely to enroll, and investigators and participants cannot be "blind" since they would know if they were receiving the active treatment or a placebo due to changes in their bodies or the absence thereof. *Id*. ¶¶ 30-31. The lack of randomized trials is common for pediatrics. *Id*. ¶¶ 31-32. Relevant here, there is the same absence of randomized trials supporting the use of puberty blockers to treat precocious puberty (the premature initiation of puberty), *id*. ¶ 31, a practice Alabama law continues to permit. There is no medical or research basis for distinguishing the use of puberty blockers to treat precocious puberty from using them to treat gender dysphoria. *Id*. ¶¶ 3, 47.

Likewise, lack of FDA approval for a specific use does not bear on a treatment's efficacy. FDA approval is not required for all uses of a medication and off-label use is in fact common in many areas of medicine, including pediatrics. *Id*. ¶¶ 20, 22. Once the FDA has approved a medication for one indication, thereby agreeing that it is safe (*i.e.*, its benefits outweigh its potential risks) and effective for this intended use, prescribers are generally free to prescribe it for other

indications. *Id*. ¶ 21. For example, nafcillin, an antibiotic commonly used to treat lung or joint infections, lacks a pediatric indication. *Id*. ¶ 22. There are many reasons, wholly unrelated to a drug's safety or efficacy why its manufacturer might not seek FDA approval for an additional use or patient group; it may already be approved for adults but not for minors even though studies indicate it is safe when used by both groups. *Id*. ¶¶ 20 & n.2, 21.

Third, parents and many minors are able to comprehend the risks involved. S.B. 184's legislative findings assert that minors and their parents "are unable to comprehend and fully appreciate the risk and life implications" of the treatments banned by Section 4. S.B. 184 § 2(15). This is incorrect. Antommaria Decl. ¶ 39. To begin, parental consent is required before providing gender-affirming care to minors, as it is before medical providers render treatments with comparable risks, uncertainty, and levels of evidence. *Id*. ¶ 40. For example, the evidence indicates that most adolescents with gender dysphoria "have sufficient medical decision-making capacity to make decisions regarding puberty blockers." *Id*. ¶ 41. And minors must be informed about all potential effects, including implications for fertility and options for fertility preservation, as a predicate step. *Id*. ¶ 42.

Moreover, S.B. 184 operates under the faulty presumption that parents, in consultation with their medical providers, cannot make reasoned, informed decisions about appropriate care for their children. In fact, parents "are frequently

asked to consent to medical treatments for minors with comparable risks, uncertainty, and levels of evidence." *Id*. ¶¶ 40, 47. S.B. 184's legislative findings offer no compelling reason why parents would be unable to do so only when these treatments are being provided to transgender youths.

Because the medical evidence demonstrates that S.B. 184's prohibition on transgender youth who experience gender dysphoria receiving the specified forms of care when their physicians and parents agree that such care is appropriate simply does not substantially achieve the interest of protecting children, the statute violates the Equal Protection Clause. *See Feenstra*, 609 F.2d at 734.

### 3. S.B. 184's Ban on Gender-Affirming Care Fails Even Rational Basis Review

Even if this Court were to apply only rational-basis review, S.B. 184's ban on gender-affirming medical care could not survive. The ban lacks even a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). By requiring that the "classification bear a rational relationship to an independent and legitimate legislative end," courts ensure that "classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633 (1996).

As explained above, *see* pp. 18-19, *supra*, S.B. 184 in fact reflects a desire to express moral disapproval of transgender status. Given the law's targeting of

transgender minors, its passage indeed "seems inexplicable by anything but animus toward" transgender people. *See id.* S.B. 184 is "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests . . . ." *Romer*, 517 U.S. at 635. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean" that the desire to express moral disapproval of "a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534. S.B. 184 is motivated by prejudice toward a particular group, transgender individuals, bearing no rational relationship to the law's stated purpose and thus cannot survive even the lowest level of review. *See Cleburne*, 473 U.S. at 450.

Thus, the United States is likely to succeed on the merits of its equal protection claim regardless of the level of scrutiny applied.

## II.     S.B. 184 Will Cause Irreparable Harm Absent an Injunction

If Section 4 of S.B. 184 is permitted to go into effect, the provision of certain types of medically necessary gender-affirming care to transgender minors will constitute a felony, punishable by up to 10 years in prison and a fine of up to $15,000. S.B. 184 § 4(c); *see also* Ala. Crim. Code §§ 13-A-5-6(a)(3), 13A-5-11(a)(3). Courts have repeatedly recognized that the risk of criminal penalties constitutes an immediate and irreparable harm. *See, e.g.*, *Georgia Latino All. for Hum. Rts. v. Deal*, 793 F. Supp. 2d 1317, 1340 (N.D. Ga. 2011), *aff'd in relevant*

*part*, *Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250

(11th Cir. 2012); *Planned Parenthood Southeast, Inc. v. Bentley*, 951 F. Supp. 2d

1280, 1288-89 (N.D. Ala. 2013); *Cent. Alabama Fair Hous. Ctr. v. Magee*, No.

2:11-cv-982-MHT, 2011 WL 5878363, at *3 (M.D. Ala. Nov. 23, 2011).

That is especially true given the court of action S.B. 184 compels individuals

to forgo. S.B. 184 will cause immense and irreparable physical and psychological

harm to many transgender minors by terminating their access to necessary medical

treatment and impose severe harm on their parents and medical providers. *See*

Antommaria Decl. ¶ 47; Hawkins Decl. ¶¶ 45-47; Rosenthal Decl. ¶¶ 56-57. As

one district court explained, the following forms of irreparable harm can ensue: (1)

transgender youths face "high risk of gender dysphoria and lifelong physical and

emotional pain," (2) parents must choose between watching their children suffer or

uprooting their familiar to move to another state, and (3) physicians must choose

between breaking the law and providing appropriate medical care. *Brandt v.*

*Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021); *see also Blaine v. North*

*Brevard County Hospital District*, 312 F. Supp. 3d 1295, 1306 (M.D. Fla. 2018).[22]

---

[22] The Supreme Court and other courts have held that irreparable harm results from the
enforcement of a state law that violates the Constitution. *See New Orleans Pub. Serv., Inc. v.*
*Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (assuming that irreparable injury
may be established "by a showing that the challenged state statute is flagrantly and patently
violative of . . . the express constitutional prescription of the Supremacy Clause") (citation and
internal quotation marks omitted); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011)
("We have 'stated that an alleged constitutional infringement will often alone constitute

## III.   The Balance of the Equities and the Public Interest Both Weigh in the United States' Favor

The final two factors governing the issuance of preliminary relief—the balance of equities and the public interest—merge where the federal government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (Government's "harm and the public interest are one and the same, because the government's interest is the public interest"). Here, these factors manifestly favor the United States. The United States has a strong and legitimate interest in ensuring that states respect their obligations under the Constitution, and in fulfilling the United States' responsibilities under Federal law.[23] If this Court does not grant preliminary relief, the lives of many transgender youth in Alabama and their families will be upended while the court continues to evaluate the lawfulness of S.B. 184 during the pendency of the litigation. *See Planned Parenthood Southeast, Inc.*, 951 F. Supp. 2d at 1290.

By contrast, Alabama will suffer no harm if the preliminary relief sought by the United States is granted; as discussed above, S.B. 184 fails to protect the health of minors notwithstanding its purported motivations. *See* pp. 19-20, *supra*.

---

irreparable harm.'"); *see also City of El Cenizo v. Texas*, 264 F. Supp. 3d 744, 809 (W.D. Tex. 2017).

[23] *See* Letter from Kristen Clarke, Assistant Attorney General for Civil Rights, U.S. Dep't of Justice, to State Attorneys General (March 31, 2022), https://go.usa.gov/xuR8w.

Moreover, because the United States has demonstrated that it is likely to prevail on the merits, an injunction preventing the enforcement of the unconstitutional legislation poses no harm. *Alabama*, 691 F.3d at 1301 ("Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation."); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) ("the city has no legitimate interest in enforcing an unconstitutional ordinance."). In sum, the balance of the equities and the public interest weigh in the United States' favor.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for a temporary restraining order and a preliminary injunction.

Dated: April 29, 2022                    Respectfully submitted,

SANDRA J. STEWART                    KRISTEN CLARKE
United States Attorney                    Assistant Attorney General
Middle District of Alabama                    Civil Rights Division

PRIM F. ESCALONA                    JOHN POWERS (DC Bar No. 1024831)
United States Attorney                    Counsel to the Assistant Attorney General
Northern District of Alabama                    Civil Rights Division

LANE H. WOODKE                    CHRISTINE STONEMAN
Chief, Civil Division                    Chief, Federal Coordination and
Northern District of Alabama                    Compliance Section

JASON R. CHEEK                    COTY MONTAG (DC Bar No. 498357)
Deputy Chief, Civil Division                    Deputy Chief, Federal Coordination and
U.S. Attorney's Office                    Compliance Section
Northern District of Alabama

28

1801 Fourth Avenue North
Birmingham, Alabama 35203
Tel.: (205) 244-2104
Jason.Cheek@usdoj.gov

STEPHEN D. WADSWORTH
Assistant United States Attorney
U.S. Attorney's Office
Middle District of Alabama
Post Office Box 197
Montgomery, Alabama 36101-0197
Tel.: (334) 223-7280
Stephen.Wadsworth@usdoj.gov

*s/Alyssa C. Lareau*
ALYSSA C. LAREAU (DC Bar No. 494881)
RENEE WILLIAMS (CA Bar No. 284855)
KAITLIN TOYAMA (CA Bar No. 318993)
Trial Attorneys
United States Department of Justice
Civil Rights Division
Federal Coordination and Compliance
Section
950 Pennsylvania Avenue NW - 4CON
Washington, DC 20530
Tel.: (202) 305-2994
Alyssa.Lareau@usdoj.gov
Renee.Williams3@usdoj.gov
Kaitlin.Toyama@usdoj.gov

*Attorneys for Plaintiff-Intervenor United States of America*

29

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, in accordance with Rules 24(c) and 5(b)(2)(E).

Respectfully submitted,

<u>s/ *Jason R. Cheek*</u>
Jason R. Cheek
Assistant U.S. Attorney