IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PAUL A EKNES-TUCKER, *et al.*,                                       PLAINTIFFS,

v.                                No. 2:22CV000184-LCB

KAY IVEY, *et al.*,                                       DEFENDANTS.

BRIEF OF ARKANSAS, ALASKA, ARIZONA, GEORGIA, INDIANA, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, TEXAS, UTAH, AND WEST VIRGINIA AS AMICI CURIAE IN SUPPORT OF DEFENDANTS

### TABLE OF CONTENTS

Table of Authorities ................................................................................................ 3

Identity and Interest of Amici and Summary of Argument ......................................... 1

Argument ................................................................................................................. 2

    I.    Plaintiffs shockingly pretend the boiling international controversy doesn't exist, even as it continuously spills out into the news media. ...................................... 2

    II.   Plaintiffs and their allies are motivated by politics, not an objective assessment of what is best for vulnerable young people. ...................................................... 7

    III.  Contemporary best practices and multiple systematic reviews of the evidence contradict Plaintiffs' claims. ................................................................... 12

    IV.  Plaintiffs wrongly invoke the specter of suicide. ............................................... 16

Conclusion .............................................................................................................. 19

Additional Counsel .................................................................................................. 2

Certificate of Service ............................................................................................... 3

**TABLE OF AUTHORITIES**

**Cases**                                                                 **Page**

*Bellotti v. Baird,*
  443 U.S. 622 (1979) ............................................................................................11

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.,*
  462 U.S. 416 (1983) ............................................................................................11

*EMW Women's Surgical Ctr., P.S.C. v. Beshear,*
  920 F.3d 421 (6th Cir. 2019) ............................................................................12

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ............................................................................................11

*Miller v. Alabama,*
  567 U.S. 460 (2012) ..............................................................................................8

*Reno v. Am. C.L. Union,*
  521 U.S. 844 (1997) ............................................................................................11

*Roper v. Simmons,*
  543 U.S. 551 (2005) ..............................................................................................8

*Sable Commc'ns of Cal., Inc. v. F.C.C.,*
  492 U.S. 115 (1989) ............................................................................................11

*Stenberg v. Carhart,*
  530 U.S. 914 (2000) ............................................................................................12

### IDENTITY AND INTEREST OF AMICI AND SUMMARY OF ARGUMENT

Amici are the States of Arkansas, Alaska, Arizona, Georgia, Indiana, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia.

The Amici States, like Alabama, are deeply concerned by the sudden recent surge of gender-related psychological issues among adolescents (especially teenage girls) and the corresponding rush by some practitioners to supply these vulnerable young people with life-altering drugs and surgical treatment. Indeed, at many facilities, hormones are provided on demand to children who merely identify as transgender, with no requirement that threshold diagnostic criteria for "Gender Dysphoria" be satisfied or that a psychological assessment be completed. Alabama's legislation is a commonsense response to that troubling surge in unnecessary intervention.

Nor is Alabama alone in recognizing the danger posed by this unregulated industry and the rush toward life-altering intervention. To the contrary, systematic reviews from multiple European nations—where similar interventions have been studied—have shocked those nations' medical professionals and led to greater restrictions on the kind of intervention that Plaintiffs argue should be unregulated. Yet Plaintiffs and their allies simply ignore those facts. Instead, they fraudulently trot out debunked claims that chemical and surgical interventions lower suicide rates and lead to better overall health outcomes. But that is hardly surprising given that Plaintiffs and their allies are more concerned with politics than making an objective assessment of what is best for Alabama's vulnerable young people.

Therefore, it is no wonder that States like Alabama have been forced to step in to protect vulnerable kids from the practitioners who would subject them to dangerous, life-altering procedures. The Amici States submit this brief in hearty support of Alabama's right to exercise its historic power to do that here.

## Argument

**I.    Plaintiffs shockingly pretend the boiling international controversy doesn't exist, even as it continuously spills out into the news media.**

There is a raging controversy in the international medical community concerning the safety and effectiveness of using pharmaceutical products and surgeries to address gender-related psychological issues in still-maturing adolescents.  But one would never guess that from Plaintiffs' briefing.  It is as if they are urging a crowd of concerned spectators, "Move on!  Nothing to see here!" against a background of spectacular explosions and pyrotechnics.  It would be humorous except that the consequences of diminishing the devastating, lifelong harms to children are shockingly serious.

This intensely boiling medical controversy is continuously spilling out into the news media.  On May 13, 2021, for example, *The Economist* published an article titled, "Doubts Are Growing about Therapy for Gender-dysphoric Children."[1]  Reporting that "[d]rug treatments seem to do little good, and may be harmful," the weekly newsmagazine explained that:

> Last June, . . . Finland revised its guidelines to prefer psychological treatment to drugs.  In September Britain launched a top-down review of the field.  In December the High Court of England and Wales ruled that under-16s were unlikely to be able to consent meaningfully to taking puberty blockers, leading [the gender clinic] to suspend new referrals, though a subsequent ruling held that parents could consent on their children's behalf.  On April 6th Arkansas passed laws that make prescribing puberty blockers and cross-sex hormones to children illegal.  Also in April the Astrid Lindgren Children's Hospital in Stockholm, a part of the Karolinska Institute, announced that it would stop prescribing puberty blockers and cross-sex hormones to those under 18, except in clinical trials.

---

[1] Doubts are Growing About Therapy for Gender-dysphoric Children, *The Economist* (May 15, 2021), https://www.economist.com/science-and-technology/2021/05/13/doubts-are-growing-about-therapy-for-gender-dysphoric-children.

*The New York Times* recently covered the controversy in an article titled, "Doctors Debate Whether Trans Teens Need Therapy Before Hormones."[2]  Discussing new draft guidelines from the World Professional Association for Transgender Health (WPATH), the *Times* explains that "experts in transgender health are divided on these adolescent recommendations, reflecting a fraught debate over how to weigh conflicting risks for young people, who typically can't give full legal consent until they are 18 and who may be in emotional distress or more vulnerable to peer influence than adults are."[3]

Indeed, we've reached the tipping point where even clinicians at the center of efforts to provide pharmaceutical and surgical treatments for gender-related psychiatric issues have begun sounding the alarm.[4]  *Medscape* reports that child and adolescent psychiatrist Angela Sämfjord, MD, who started the Lundstrom Gender Clinic in Sweden resigned "because of her own fears about the lack of evidence for hormonal and surgical treatments."[5]  Further, "many of the staff at UK GIDS have now left that service," including Sue Evans, "a psychotherapist who resigned from GIDS because she felt 'deeply concerned' about the fast-tracking of young people into medical treatment."[6]

---

[2] A. Ghorayshi, Doctors Debate Whether Trans Teens Need Therapy Before Hormones, New York Times (January 13, 2022), https://www.nytimes.com/2022/01/13/health/transgender-teens-hormones.html

[3] *Id.*

[4] *See* Anatomy of a Scandal: Opinion on the Use of Puberty Blockers in America is Turning, *The Economist* (October 16, 2021), https://www.economist.com/united-states/2021/10/16/opinion-on-the-use-of-puberty-blockers-in-america-is-turning ("too few teens undergo crucial mental-health assessments before starting treatment."); Becky McCall and Lisa Nainggolan, Transgender Teens: Is the Tide Starting to Turn?, *Medscape* (April 26, 2021), https://www.medscape.com/viewarticle/949842.

[5] Becky McCall and Lisa Nainggolan, Transgender Teens: Is the Tide Starting to Turn?, *Medscape* (April 26, 2021), https://www.medscape.com/viewarticle/949842.

[6] *Id.*

The *Washington Post* recently published an essay entitled "The Mental Health Establishment is Failing Trans Kids."[7]  The authors of that piece were none other than Dr. Laura Edwards-Leeper, founder of the first pediatric transgender clinic in the United States and Dr. Erica Anderson, a clinical psychologist and former WPATH president.  They highlighted clinician reports of "the rising numbers of detransitioners" who regret receiving pharmaceutical and surgical treatments as adolescents.[8]  They note the absence of "[l]onger-term longitudinal studies [that] are needed to better understand the role of medical interventions on lifetime psychological health . . . .  Research is needed to help determine whether quick medical treatment or a more cautious approach is best in these cases."[9]  They point out that *three quarters* of detransitioners do not tell their doctors that they have reversed their transitions, and they warn that "we may be harming some of the young people we strive to support."[10]

Current WPATH president and vaginoplasty specialist Dr. Marci Bowers has joined Dr. Anderson to decry the "sloppy healthcare work" of gender clinics."[11]  This includes "[r]ushing people through the medicalization . . . and failure—*abject* failure—to evaluate the mental health of someone historically in current time, and to prepare them for making such a life-changing de-

---

[7] L. Edwards-Leeper and E. Anderson, The Mental Health Establishment is Failing Trans Kids, *The Washington Post* (November 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/; *see* L. Littman (2021) Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners, *Archives of Sexual Behavior* 50(8), doi: 10.1007/s10508-021-02163-w

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] A. Shrier, Top Trans Doctors Blow the Whistle on "Sloppy" Care, *Common Sense with Bari Weiss* (October 4, 2021), https://bariweiss.substack.com/p/top-trans-doctors-blow-the-whistle

cision."  "In my over 40 years as a psychologist," Dr. Anderson explains, "I've seen psychother-apeutic phenomena come and go.  Eating disorders, multiple personality disorders and repressed memory syndrome have in retrospect spread through subgroups of adolescents and the profes-sionals who have treated them."  She continues: "This spread is like wildfire through vulnerable underbrush, clearly borne in an environment of contagion.  Why is this phenomenon distinctly different than previous ones?"[12]  It's not.

*CBS News*'s Lesley Stahl covered the growing phenomenon of detransitioner regret in a high-profile *60 Minutes* episode.[13]  Other reports highlight a recent study of one hundred detran-sitioners who informed researchers of discoveries that their gender dysphoria was caused by un-derlying trauma, abuse, or a mental-health condition for which they did not receive adequate psy-chiatric treatment.[14]  A woman named Carol who took testosterone and transitioned to living as a man, for example, discovered to her dismay that "I needed the antidepressants; I didn't need to transition."[15]

Medicalizing adolescents' gender-related psychological issues invests these young people in a treatment pathway that leads to more consequential interventions over time, resulting in even greater losses.  Writing in the *Washington Post*, Corinna Cohn writes that when he had sex-reas-signment surgery at age 19, "[t]he callow young man who was obsessed with transitioning to

---

[12] E. Anderson, When it Comes to Trans Youth, We're in Danger of Losing Our Way, *San Francisco Examiner* (January 4, 2022), https://www.sfexaminer.com/opinion/are-we-seeing-a-phenomenon-of-trans-youth-social-contagion/ (omitting paragraph break).

[13] *See* Keith Zuborw, Inside the 60 Minutes Report on Transgender Health Care Issues, *CBS News* (May 23, 2021), https://www.cbsnews.com/news/transgender-health-care-60-minutes-2021-05-23/.

[14] Portrait of a Detransitioner as a Young Woman, *The Economist* (November 6, 2021), https://www.economist.com/united-states/2021/11/06/portrait-of-a-detransitioner-as-a-young-woman.

[15] *Id.*

womanhood could not have imagined reaching middle age . . . yet that was the person who committed me to a lifetime set apart from my peers."[16]  "From the day of my surgery," he says, "I became a medical patient and will remain one for the rest of my life."[17]  Pursuing what he deemed then as "wholeness," he knows now that "[he] wasn't old enough to make that decision."[18]  He never experienced intercourse before his surgery, which thereafter deprived him of the ability to experience it with any pleasure.  "When I tell friends, they're saddened by the loss, but it's abstract to me," he says, finding it difficult to "grieve the absence of a thing I never had."[19]  Further, Cohn's teenage self "was repelled by the thought of having biological children."[20]  He says that "[t]he sacrifices I made seemed irrelevant to the teenager I was," but "[y]ears later, I was surprised by the pangs I felt as my friends and younger sister started families of their own."[21]

As a teen in the 1990s, Cohn found "an inexhaustible source of validation and acceptance" participating in Internet Relay Chat, a "rudimentary online form" that allowed him to meet "like-minded strangers."[22]  He "shutter[s] to think of how distorting today's social media is for confused teenagers.[23]  Indeed, given the iPhone's ubiquity, teens today hardly need to go

---

[16] Corinna Cohn, What I Wish I'd Known When I was 19 and had Sex Reassignment Surgery, *Washington Post* (April 11, 2022), https://www.washingtonpost.com/opinions/2022/04/11/i-was-too-young-to-decide-about-transgender-surgery-at-nineteen/.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

looking for information about cross-sex hormones or even gender-transition surgeries, which are aggressively marketed by surgeons themselves using viral *TikTok* videos.[24]

Finally, writing in the *New York Times*, Ross Douthat notes the "increasingly vigorous debate around adolescent medical interventions" and "widespread doubts that they are actually supported by the data."[25]  He predicts that "Within not too short a span of time, not only conservatives but most liberals will recognize that we have been running an experiment on trans-identifying youth without good or certain evidence, inspired by ideological motives rather than scientific rigor, in a way that future generations will regard as a grave medical-political scandal."[26]

## II.   Plaintiffs and their allies are motivated by politics, not an objective assessment of what is best for vulnerable young people.

Plaintiffs rely on a purported "consensus" of statements published by American professional and advocacy organizations, including the American Medical Association (AMA).  But these organizations are demonstrably motivated by politics, not science or the best interests of young people.  In an April 26, 2021 letter to the National Governors Association (NGA), for example, the AMA wrote to urge the NGA to "oppose state legislation that would prohibit the provision of . . . gender transition-related care to minor patients."[27]  But this statement is flatly inconsistent with the position the AMA has taken concerning adolescents' abilities in contexts

---

[24] Lisa Selin Davis, Yes, Kids are Getting Gender Surgeries, *Broadview with Lisa Selin Davis* (April 19, 2022); *see* Dr. Sidhbh Gallagher, *TikTok*, https://www.tiktok.com/@gendersurgeon?lang=en.

[25] Ross Douthat, How to Make Sense of the New L.G.B.T.Q. Culture War, *New York Times* (April 13, 2022), https://www.nytimes.com/2022/04/13/opinion/transgender-culture-war.html

[26] *Id.*

[27] *See* AMA to States: Stop Interfering in Health Care of Transgender Children, *American Medical Association* (April 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children.

where the political calculus was different.  For example, in 2005, the AMA and other amici

waded into a case before the U.S. Supreme Court concerning capital punishment for crimes com-

mitted by minors.  Br. of the Am. Med. Ass'n, Am. Psychiatric Ass'n, et al., *Roper v. Simmons*,

543 U.S. 551 (2005), (No. 03-633), 2004 WL 1633549.  The organizations asserted there that

"[a]dolescents' behavioral immaturity mirrors the anatomical immaturity of their brains.  To a

degree never before understood, scientists can now demonstrate that adolescents are immature

not only to the observer's naked eye, but in the very fibers of their brains."  *Id.* at 10.  "[T]he re-

gions of the brain associated with impulse control, risk assessment, and moral reasoning develop

last, after late adolescence."  *Id.* at 11.

In a 2012 brief similarly concerning mandatory life sentencing for minors, the American

Psychological Association and other amici recognized that minors are "less capable of mature

judgment than adults" and "more vulnerable to negative external influences."  Br. for the Am.

Psych. Ass'n, Am. Psychiatric Ass'n, and Nat'l Ass'n of Social Workers ("APA Br."), *Miller v.*

*Alabama*, 567 U.S. 460 (2012) (Nos. 10-9646, 10-9647), 2012 WL 174239, at 7, 15.  "Sound

judgment requires both cognitive and psychosocial skills" that minors lack because "the brain

continues to develop throughout adolescence and young adulthood in precisely the areas and sys-

tems that are regarded as most involved in impulse control, planning, and self-regulation."  *Id.* at

10, 14.

Plaintiffs' allies have recognized that adolescents use a "risk-reward calculus" that under-

values risks, *id.* at 10, and "overvalue[s] short-term benefits and rewards."  Br. for the Am. Med.

Ass'n and the Am. Acad. Of Child and Adol. Psychiatry ("*Miller* AMA Br."), *Miller*, 567 U.S.

460 (Nos. 10-9646, 10-9647), 2012 WL 121237, at 2.  "[A]dolescents are less able than adults to

envision and plan for the future, a capacity still developing during adolescence."  APA Br. at 12.

Therefore, they have less "ability to foresee and take into account the consequences of their be-havior." *Id.* Further, "adolescents have less life experience on which to draw, making it less likely that they will fully apprehend the potential negative consequences of their actions." *Id.* "In short," the amici concluded, "the average adolescent cannot be expected to act with the same control or foresight as a mature adult." *Miller* AMA Br. at 3.

When it comes to criminal activity, Plaintiffs' allies have no problem recognizing that minors struggled to navigate peer pressure, weigh costs and benefits of life-altering decisions, or make clear-headed judgments about their adult lives. But when it comes to adolescents' deci-sions concerning dangerous and life-altering gender-related therapies, those concerns become politically inconvenient and are swept under the rug.

If more evidence were needed, the activities of the AMA further illustrate that politics, not science, often dictate the positions these professional organizations take on controversial is-sues. Among the largest spenders on political lobbying in the United States over the past two decades, the AMA takes fourth place.[28] The organization's efforts to influence policy have been linked historically to its financial connections to pharmaceutical and even tobacco manufactur-ers.[29] Further, as the organization's membership has recently skewed "younger and less con-servative," the AMA has leaned into the culture wars. Thus, although in a previous generation

---

[28] Top Spenders, *Open Secrets*, https://www.opensecrets.org/federal-lobbying/topspend-ers?cycle=a.

[29] *See generally* Julia Lurie, The Untold Story of Purdue Pharma's Cozy Relationship with the American Medical Association, *Mother Jones* (Aug. 5, 2021), https://www.moth-erjones.com/politics/2021/08/purdue-pharma-american-medicalassociation-relationship-opioid-crisis-public-health/.

"the AMA led the fight to outlaw abortion," it now files amicus briefs on behalf of abortion providers.[30]  The AMA has also recently published a language guide for "advancing health equity."[31]  According to that guide, physicians should employ "equity-focused language."[32]  Thus, the guide suggests, instead of saying, "Factors such as our race, ethnicity or socioeconomic status should not play a role in our health," a physician should say, "Social injustices including racism or class exploitation, e.g., social exclusion and marginalization, should be confronted directly, so that they do not influence health outcomes."[33]  Like the AMA's language guide, its statement on medical transition treatments for minors is clearly a work of politics, not medicine.

Although the AMA frequently purports to speak for "substantially all physicians, residents, and medical students," that is hardly the case.  *See, e.g.*, Brief of Am. Acad. of Pediatrics and Add'l Orgs., *Brandt v. Rutledge*, No. 4:21CV00450-JM, ECF 30 (E.D. Ark. June 24, 2021), at 23.  After suffering a precipitous decline in membership since the 1970s, even with subsidized student memberships still only 12.6% of physicians belong to the organization.[34]  Nor should it be assumed that Plaintiffs' allies speak with the backing of even the majority of their membership.  In March 2021, for example, a proposed resolution was submitted to the American Academy of Pediatrics (AAP), asking that it "re-evaluate its commitment to affirmative care in light

---

[30] Julie Rovner, American Medical Association Wades into Abortion Debate with Lawsuit, *National Public Radio* (July 2, 2019), https://www.npr.org/sections/health-shots/2019/07/02/738100166/american-medical-association-wades-into-abortiondebate-with-lawsuit.

[31] Am. Med. Ass'n and Ass'n of Am. Med. Colleges, Advancing Health Equity: A Guide to Language, Narrative and Concepts (2021), http://ama-assn.org/equity-guide.

[32] *Id.* at 20.

[33] *Id.*

[34] Miriam J. Laugesen, How the American Medical Association's Rent-Seeking Strategy Compensated for Its Loss of Members, 44 *J. of Health Politics, Policy, & Law* 67-85 (2019), https://doi.org/10.1215/03616878-7206731.

of the growing international skepticism about this treatment protocol for children and adoles-cents."[35]  Even though 80% of responding pediatricians voted in support of the resolution, the AAP's leadership took no action.[36]  Instead, it continues to misrepresent the evidence and gloss over dissenting views in its own ranks.

In our system of government, States serve as a necessary safeguard to protect the public, and especially young people, from the dangers of medical practices advocated on the basis of politics or ideology rather than evidence.  States like Alabama have a "compelling interest in protecting the physical and psychological well-being of minors."  *Reno v. Am. C.L. Union*, 521 U.S. 844, 869 (1997) (quoting *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)).  Legislating to protect these young people is especially justified given both their "pecu-liar vulnerability" and "their inability to make critical decisions in an informed, mature manner." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979).  This compelling interest in protecting young people is independent of, but overlaps with, Alabama's important interest deriving from the State's "sig-nificant role" in "regulating the medical profession."  *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007).

Indeed, where, as here, "there is medical and scientific uncertainty," the Court has properly given States—not practitioners or professional and advocacy organizations—"wide dis-cretion" to regulate the practice of medicine.  *Id.* at 163.  Nothing requires Alabama to defer to the views of Plaintiffs' amici.  *See City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 456 (1983) (O'Connor, J., dissenting) (criticizing rule requiring courts "to revise [their]

---

[35] Abigail Shrier, A Pediatric Association Stifles Debate on Gender Dysphoria, *Wall Street Journal* (August 9, 2021), https://www.wsj.com/articles/pediatric-association-gender-dysphoria-children-transgender-cancel-culture-11628540553.

[36] *Id.*

standards every time the American College of Obstetricians and Gynecologists (ACOG) or [a] similar group revises its views about what is and what is not appropriate"); *Stenberg v. Carhart*, 530 U.S. 914, 1018 (2000) (Thomas, J., dissenting) (same). States get to make their own policy judgments about appropriate medical care. *Gonzales*, 550 U.S. at 163. And the Court itself has rejected positions taken by such organizations. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 438 (6th Cir. 2019) (recounting how *Casey* and *Gonzales* upheld laws that "conflicted with official positions of ACOG").

### III.   Contemporary best practices and multiple systematic reviews of the evidence contradict Plaintiffs' claims.

Despite the raging international controversy over the known and unknown dangers of giving teens cross-sex hormones and performing life-altering surgical procedures on them, Plaintiffs and their allies urge that there is, simply, "Nothing to see here!" We have been here before: Not many years ago, "pain management" was advocated as a "fundamental human right," with some physicians dismissing as "opioidphobic" other physicians' concern that "raising pain treatment to a 'patient's rights' issue could lead to overreliance on opioids."[37] Experts created new consensus-based standards and assured doctors that prescribing more opioids was largely risk free. "However, no large national studies were conducted to examine whether the standards improved pain assessment or control."[38] The U.S. opioid epidemic, with its continuing fallout for millions of shattered lives, was the tragic result.[39]

---

[37] David W. Baker, The Joint Commission's Pain Standards: Origins and Evolution, 4, 9 (May 5, 2017), https://perma.cc/RZ42-YNRC.

[38] *Id.*

[39] *See* U.S. Health & Human Servs., What is the U.S. Opiod Epidemic? (October 27, 2021), https://www.hhs.gov/opioids/about-the-epidemic/index.html.

Plaintiffs similarly rely on a purported "consensus" of statements published by American professional and advocacy organizations.  Certainly, there was a time—four decades ago—when recommending medical treatment based on mere consensus was considered a best practice.  But "[i]n the 1990s, the rise of evidence-based medicine cast doubt on the reliability of expert consensus.  Since then, medicine has increasingly relied on systematic reviews, as developed by the evidence-based medicine movement."[40]  And the systematic reviews show that Plaintiffs' claims of safety and effectiveness (to say nothing of "medical necessity") is unsupported by the scientific literature:[41]

- The Endocrine Society commissioned two systematic reviews for its 2017 guidelines and evaluated evidence quality using the GRADE system.[42]  Relying on the single Dutch study discussed above, it recognized that there is only "very low-quality" or, at best, "low quality" evidence supporting the use either of puberty blockers or cross-sex hormones.[43]  As a result, the guidelines could only "suggest"—not "recommend"—using puberty blockers, indicating skepticism concerning whether those "who receive [them] . . . derive, on average, more benefit than harm."[44]

---

[40] K. Kendler and M. Solomon (2016), Expert Consensus v. Evidence-based Approaches in the Revision of the DSM, *Psychological Medicine* 46, doi:10.1017/S003329171600074X; *see id.* at 2258 ("Evidence hierarchies typically rank expert consensus at the bottom.").

[41] In addition to the reviews described below, under the Obama Administration, the Centers for Medicare & Medicaid Services conducted a 2016 review that concluded, "[b]ased on an extensive assessment of the clinical evidence . . . there is not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively."  T. Jensen, J. Chin, J. Rollins, E. Koller, L. Gousis, and K. Szarama, Gender Dysphoria and Gender Reassignment Surgery, Centers for Medicare & Medicaid Services (August 13, 2016), https://www.cms.gov/medicare-coverage-data-base/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282.

[42] *See* G.H. Guyatt, et al., GRADE: An Emerging Consensus on Rating Quality of Evidence and Strength of Recommendations, 336 British Md. J. 924 (2008).

[43] Wylie C. Hembree, et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. Clinical Endocrinology & Metabolism 3869, 3872 (November 2017).

[44] *Id.* at 3879; *see id.* at 3872 (explaining strength and quality-of-evidence indicators)).

- Sweden's December 2019 systematic review of the literature found a lack of evidence that medical interventions reduce gender distress.[45]  Its updated February 2022 National Board of Health and Welfare guideline based on that review declares that "for those under 18," the risks of puberty blockers and cross-sex hormones "currently outweigh the possible benefits" and should be used only in research settings for exceptional cases of patients who have reached age 16 with long-lasting, prepubertal-onset gender dysphoria and have no significant mental-health comorbidities.[46]

- In June 2020, Finland conducted a systematic review and published new guidelines that broke with WPATH, stating that, "[a]s far as minors are concerned, there are no medical treatment[s] that can be considered evidence-based."[47]  It recognized that for adolescents with gender dysphoria, "[t]he first-line treatment . . . is psychosocial support and, as necessary, psychotherapy and treatment of possible comorbid psychiatric disorders."  It concluded that because "reduction of psychiatric symptoms cannot be achieved with hormonal and surgical interventions, it is not a valid justification for gender reassignment."[48]

- In October 2020, the UK National Institute for Health and Care Excellence (NICE) published two systematic reviews of the evidence, finding that the studies supporting the use of puberty blockers and hormone therapy were "either of questionable clinical value" or otherwise "not reliable," and in any case showed little effect on gender dysphoria or mental health.[49]

---

[45] Swedish Agency for Health Tech. Assessment and Assessment of Soc'l Servs., Gender Dysphoria in Children and Adolescents: An Inventory of the Literature, https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-theliterature/.

[46] Updated Recommendations for Hormone Therapy for Gender Dysphoria in Young People, *Swedish National Board for Health and Welfare* (February 22, 2022), https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/uppdaterade-rekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/; *see* SEGM Summary of Key Recommendations from the Swedish National Board of Health and Welfare (Socialstyrelsen/NBHW), *Society for Evidence Based Gender Medicine* (February 27, 2022), https://www.segm.org/segm-summary-sweden-prioritizes-therapy-curbs-hormones-for-gender-dysphoric-youth.

[47] Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland)*, https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial%20Translation.pdf.

[48] *Id.*

[49] National Institute of Health & Care Excellence, Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria, at 13 (Mar. 11, 2021), https://www.evidence.nhs.uk/document?id=2334888&returnUrl=search%3fq%3dtransgender%26s%3dDate; National Institute of Health & Care Excellence, Evidence Review: Gender-affirming Hormones for Children and Adolescents with Gender Dysphoria, at 47 (Mar. 11, 2021), https://www.evidence.nhs.uk/document?id=2334889&returnUrl=search%3ffrom%3d2021-03-10%26q%3dEvidence%2bReview%26to%3d2021-04-01.

- In November 2020, the international research network Cochrane published a systematic review "aimed to assess the efficacy and safety of hormone therapy" for male-to-female transitioners.[50]  Reviewing 1057 studies, it concluded that "[d]espite more than four decades of ongoing efforts to improve the quality of hormone therapy, . . . no [randomized controlled trials] or suitable cohort studies have yet been conducted to investigate the efficacy and safety of hormonal treatment approaches."  It agreed with the "repeatedly emphasized" problem of "a gap between current clinical practice and clinical research."[51]

- In April 2021, the *British Medical Journal Open* published a systematic review analyzing guidelines for treatment of blood-borne infections and medical interventions for gender dysphoria.[52]  It found that guidelines recommending hormonal interventions for gender dysphoria (including the WPATH guidelines) were "lower quality," "lack[ing] methodological rigor," and "linked to a weak evidence base."[53]

Note that these are not single studies with limitations but independent, comprehensive reviews of the scientific literature *at large*.[54]  Each systematic review provides an objective evaluation concluding that using pharmaceuticals and surgeries to address adolescents' gender-related psychological issues is not an evidence-based practice.[55]

---

[50] Claudia Haupt, et al., Antiandrogen or Estradiol Treatment or Both during Hormone Therapy in Transitioning Transgender Women, *Cochrane Database of Systematic Reviews* (November 28, 2020).

[51] *Id.* at 10.

[52] Dahlen, S., Connolly, D., Arif, I., Junejo, M. H., Bewley, S., & Meads, C. (2021). International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment. *BMJ Open*, 11(4), e048943. https://doi.org/10.1136/bmjopen-2021-048943

[53] *Id.*

[54] Relatedly, in February 2022, the independent Cass Review submitted its interim report to the U.K. National Health Service, in which it stated that "the clinical approach and overall service design" in the U.K. "has not been subjected to some of the normal quality controls that are typically applied when new or innovative treatments are introduced," and that "there are major gaps in the research base underpinning the clinical management of children and young people with gender incongruence and gender dysphoria, including the appropriate approaches to assessment and treatment."  Independent Review of Gender-Identity Services for Children and Young People: Interim Report, *The Cass Review* (February 2022), https://cass.independent-review.uk/publications/interim-report/.  Further, the review noted that there is a "lack of an agreed consensus" whether gender-related distress calls for medical intervention "or whether it may be a manifestation of other causes of distress."  *Id.*

[55] Also of note is that in February 2022, the National Academy of Medicine, France, similarly adopted a statement advising "great medical caution must be taken in children and adoles-

Since the 1990s, it has been recognized that actual *evidence* is what matters.  If Plaintiffs' purported consensus of statements by American professional and advocacy organizations (where not evidence but political forces hold sway) conflicts with multiple independent and objective reviews of the evidence, then so much the worse for that wayward consensus.  Because the use of pharmaceuticals and surgeries to address adolescents' gender-related psychological issues is not evidence-based, practitioners lack a proper basis for believing that they will provide these young people more benefit than harm.  And that is precisely where the State of Alabama's important—even compelling—interests in protecting children and regulating the practice of medicine becomes all-important.

## IV.    Plaintiffs wrongly invoke the specter of suicide.

Plaintiffs repeatedly invoke the specter of suicide, claiming that medical procedures to change teenagers' bodies are the only way to address the tragically high rate of suicide among those who identify as transgender.  But there is no good evidence for those claims.  Instead, insofar as the procedures affect patients' suicide rates, the evidence is mounting that the procedures at issue here actually *increase* suicide risks.  The best data come from a follow-up study of a group who had completely transitioned, including surgically.  This study demonstrated that the risk of completed suicide increased *significantly* after full transition.[56]

---

cents, given the vulnerability, particularly psychological, of this population and the many undesirable effects and even serious complications that can be caused by some of the therapies available."  Medical Care of Children and Adolescents with Transgender Identity, *National Academy of Medicine, France* (February 28, 2022), translated into English by the Society for Evidence-based Gender Medicine (March 2, 2022), https://segm.org/sites/default/files/English%20Translation_22.2.25-Communique-PCRA-19-Medecine-et-transidentite-genre.pdf.  It further warned of "the addictive role of excessive engagement with social media, which is . . . responsible for a very significant part of the growing sense of gender incongruence."  *Id.*

[56] *See* Cecilia Dhejne, et al., Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden, 6 *PLoS ONE* (February 2011), at 1, 7 ("This study found substantially higher rates of overall mortality, death from cardiovascular disease and

In an effort to rectify the complete absence of evidence in support of these procedures, two researchers, Richard Bränström and John E. Pachankis, published the first long-term treatment-outcome study in the *American Journal of Psychiatry*.[57] The authors presented their data as supporting claims that the procedures improve long-term mental-health outcomes.[58] But the data were not as the authors had presented them. The study's methodological blunders prompted multiple devastating letters from prominent researchers to the editor of the *American Journal of Psychiatry* that highlighted its shortcomings. Besides coding errors that excluded lithium and other antipsychotic medications from (but included antihistamines in) the category of treatments for mood disorders,[59] the study excluded cases in which the subjects *actually* committed suicide, attempted suicide without being hospitalized, had health care visits for other psychological issues, and more.[60] Letters noted that the data in fact showed "a spike in suicide attempts" in the year after surgery.[61] Another explained that "the data also could be interpreted as showing that

---

suicide, suicide attempts, and psychiatric hospitalisations in sex-reassigned transsexual individuals compared to a healthy control population.").

[57] Richard Bränström and John E. Pachankis, Reduction in Mental Health Treatment Utilization among Transgender Individuals after Gender-affirming Surgeries: A Total Population Study, 177 Am. J. of Psychiatry 727 (2020).

[58] *See id.* (falsely claiming, "In this first total population study of transgender individuals with a gender incongruence diagnosis, the longitudinal association between gender-affirming surgery and reduced likelihood of mental health treatment lends support to the decision to provide gender-affirming surgeries to transgender individuals who seek them.").

[59] Henrik Anckarsäter and Christopher Gillberg, *Methodological Shortcomings Undercut Statement in Support of Gender-Affirming Surgery*, 177 Am. J. Psychiatry 764, 765 (Aug. 2020).

[60] Andre Van Mol, et al., *Gender-Affirmation Surgery Conclusion Lacks Evidence*, 177 Am. J. Psychiatry 765, 765 (Aug. 2020).

[61] David Curtis, *Study of Transgender Patients: Conclusions Are Not Supported by Findings*, 177 Am. J. Psychiatry 766, 766 (Aug. 2020); see Mikael Landén, *The Effect of Gender-Affirming Treatment on Psychiatric Morbidity Is Still Undecided*, 177 Am. J. Psychiatry 767 (Aug. 2020).

masculinizing or feminizing surgeries were the actual cause of increased mental health utiliza-tion."[62]  In fact, "the risk of being hospitalized for a suicide attempt was 2.4 times higher if they had undergone . . . surgery than if they had not."[63]

An extraordinary comment published by the *Journal*'s editor explained that after receiv-ing the letters, the *Journal* enlisted two statistical experts to review the letters and the original article.[64]  It published a "Correction to Bränström and Pachankis," which explained that "the re-sults demonstrated *no* advantage of surgery in relation to subsequent mood or anxiety disorder-related health care visits or prescriptions or hospitalizations following suicide attempts in that comparison."[65]  The *Journal* also published a statement from Bränström and Pachankis in which the authors admitted that "individuals diagnosed with gender incongruence who had received gender-affirming surgery were *more* likely to be treated for anxiety disorders compared with in-dividuals diagnosed with gender incongruence who had not received gender-affirming sur-

---

[62] William J. Malone and Sven Roman, *Calling Into Question Whether Gender-Affirming Surgery Relieves Psychological Distress*, 177 Am. J. Psychiatry 766, 766 (Aug. 2020).

[63] Agnes Wold, *Gender-Corrective Surgery Promoting Mental Health in Persons With Gen-der Dysphoria Not Supported by Data Presented in Article*, 177 Am. J. Psychiatry 768, 768 (Aug. 2020).  In addition to the letters already cited, see Avi Ring and William J. Malone, *Con-founding Ef-fects on Mental Health Observations After Sex Reassignment Surgery*, 177 Am. J. Psychiatry 768 (Aug. 2020).

[64] Ned H. Kalin, *Reassessing Mental Health Treatment Utilization Reduction in Transgender Individuals After Gender-Affirming Surgeries: A Comment by the Editor on the Process*, 177 Am. J. Psychiatry 764, 764 (Aug. 2020), https://ajp.psychiatryonline.org/doi/10.1176/ appi.ajp.2020.20060803.

[65] *Correction to Bränström and Pachankis*, 177 Am. J. Psychiatry 734 (Aug. 2020), https://ajp.psychiatryonline.org/doi/10.1176/appi.ajp.2020.1778correction (emphasis added).

gery."[66]  Consequently, the only long-term treatment-outcome study of these procedures demonstrates, if anything, actual harm to the mental health of persons undergoing surgery.

## CONCLUSION

Plaintiffs and their allies are demonstrably motivated by politics—not objective assessment of the evidence concerning what is best for Alabama's vulnerable young people.  Plaintiffs can close their eyes and plug their ears to the reality of what is plainly recognized by physicians and researchers in Sweden, Finland, the United Kingdom, and France; by many here in the United States; and by the news media.  But the State of Alabama, with its responsibility to protect its young people, cannot ignore the truth.  It must take action to protect kids from the practitioners who would foist these harmful procedures upon them with the empty promise of wholeness and wellbeing.  Indeed, by enacting the Alabama Vulnerable Child Compassion and Protection Act, it has done precisely that.  For these reasons, the Amici States respectfully ask that the Court deny Plaintiffs' motion for a preliminary injunction.

May 2, 2022

Respectfully Submitted,

*/s/ Mark D. Wilkerson*
Mark D. Wilkerson (ASB-6957-039m)
WILKERSON & BRYAN, P.C.
405 South Hull Street
Montgomery, AL  36104
Telephone: 334-265-1500
Facsimile: 334-265-0319
Email:  mark@wilkersonbryan.com

---

[66] Richard Bränström and John E. Pachankis, *Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender Affirming Care and Transgender Individuals' Mental Health: Response to Letters*, 177 Am. J. of Psychiatry 769, 771 (Aug. 2020) (emphasis added).

/s/ *Michael A. Cantrell*

LESLIE RUTLEDGE
  Arkansas Attorney General

Michael A. Cantrell*
  Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Michael.Cantrell@arkansasag.gov

*Counsel for Amici Curiae*

*Pending Admission Pro Hac Vice*

**ADDITIONAL COUNSEL**

TREG R. TAYLOR
Alaska Attorney General

MARK BRNOVICH
Arizona Attorney General

CHRIS CARR
Georgia Attorney General

TODD ROKITA
Indiana Attorney General

JEFF LANDRY
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

ERIC SCHMITT
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

DOUG PETERSON
Nebraska Attorney General

JOHN M. O'CONNOR
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

KEN PAXTON
Texas Attorney General

SEAN D. REYES
Utah Attorney General

PATRICK MORRISEY
West Virginia Attorney General

**CERTIFICATE OF SERVICE**

I certify that on May 2, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Mark D. Wilkerson*
Mark D. Wilkerson