## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| REV. PAUL A. EKNES-TUCKER, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 2:22-cv-184-LCB |
| KAY IVEY, in her official capacity as Governor of Alabama, *et al.*, | ) ) ) | |
| *Defendants*. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DOC. 7)

# TABLE OF CONTENTS

Table of Contents ................................................................................. i

Table of Authorities ............................................................................ iv

Introduction ......................................................................................... 1

Background .......................................................................................... 8

    A.   Sex, Gender, and Gender Discordance .................................. 11

    B.   Gender Dysphoria ................................................................. 16

        1.   Childhood-Onset Gender Dysphoria ........................... 16

        2.   Adult-Onset Gender Dysphoria .................................. 20

        3.   Adolescent-Onset Gender Dysphoria ......................... 21

        4.   Models of treatment .................................................... 24

    C.   The Dutch Protocol and Beyond ......................................... 27

        1.   The Dutch Study ......................................................... 28

        2.   Beyond the Dutch Protocol ......................................... 33

    D.   Affirmation Treatment's Lack of Proven Benefits and Its
        Risks of Long-term Harms ................................................... 39

        1.   Puberty Blockers ........................................................ 39

        2.   Cross-Sex Hormones .................................................. 42

        3.   Surgical Interventions ................................................. 44

        4.   Effect on Suicide Rates ............................................... 46

    E.   The Problem of Informed Consent ...................................... 49

F.    An International Reckoning............................................................58

    1.    Sweden.................................................................................58

    2.    United Kingdom ..................................................................59

    3.    Finland ...............................................................................61

    4.    Australia and New Zealand ................................................62

    5.    France .................................................................................63

G.    The Alabama Vulnerable Child Compassion and Protection Act.......................................................................................64

Legal Standard .....................................................................................68

Argument................................................................................................69

I.    Plaintiffs Have Not Shown That Their Equal Protection Claims Are Likely To Succeed. ................................................................74

    A.    The Vulnerable Child Compassion and Protection Act is Subject Only to Rational-Basis Review. ..........................................74

        1.    The Act Does Not Discriminate Based on Sex or Transgender Status. .....................................................75

        2.    Even Assuming a Distinction Based on Transgender Status, Rational Basis Review Still Applies. ..........................................79

            a.  The Act is Based on Biological Differences............................79

            b.  Transgender Status is Not a Suspect or Quasi-Suspect Classification. ...........................................85

    B.    The Act Satisfies Any Level of Scrutiny.........................................91

II.     Parents Have No Substantive Due Process Right To Obtain
        Experimental Medical Procedures For Gender Transition
        Purposes. ...................................................................................102

        A.     No Substantive Due Process Right Exists to Access
               Experimental Medical Procedures. ..................................103

        B.     Parents Have No Substantive Due Process Right to Obtain
               Experimental Gender Transition Procedures for Their
               Children. ...........................................................................106

III.    The Law Is Not Void For Vagueness. .................................................111

IV.     Criminal Conduct Is Not Protected By The First Amendment. ..........117

V.      Plaintiffs' Preemption Claim Fails. ....................................................121

VI.     Plaintiffs' Challenge To The Entire Act Cannot Succeed. .................127

VII.    The Other Preliminary Relief Factors Favor The State. ....................129

        A.     Plaintiffs' Inequitable Conduct Bars Preliminary Relief. .............130

               1.     Plaintiffs Engaged in Dilatory, Manipulative
                      Judge-Shopping. .........................................................131

               2.     Plaintiffs' Misconduct Precludes Equitable Relief. .................135

        B.     The Other Injunction Factors Are in the State's Favor. ................136

VIII.   Plaintiffs Are Not Entitled To A Universal  Injunction......................140

IX.     A Bond Would Be Required Under Rule 65. .......................................141

Conclusion .................................................................................................142

Certificate of Service ................................................................................144

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)......................................................................91

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
    495 F.3d 695 (D.C. Cir. 2007)............................................... 105, 106

*Adams v. Sch. Bd. of St. Johns Cnty.*,
    3 F.4th 1299 (11th Cir. 2021)..................................................... 78, 124

*Alvarado v. Bank of Am., N.A.*,
    No. 08-cv-2862, 2009 WL 720875 (E.D. Cal. Mar. 17, 2009).........................135

*Andino v. Middleton*,
    141 S. Ct. 9 (2020)........................................................... 69, 102

*Armstrong v. Exceptional Child Ctr.*,
    575 U.S. 320 (2015) ........................................................122

*Bankshot Billiards, Inc. v. City of Ocala*,
    634 F.3d 1340 (11th Cir. 2011)...............................................112

*Barragan v. Clarity Servs., Inc.*,
    No. 22-cv-876, 2021 WL 1226537 (D. Nev. Mar. 31, 2021) ...........................132

*Bd. of Trustees of Univ. of Alabama v. Garrett*,
    531 U.S. 356 (2001) .........................................................88

*Bendiburg v. Dempsey*
    909 F.2d 463 (11th Cir. 1990).................................................111

*Bell v. Tavistock & Portman Nat'l Health Serv. Found. Tr.*
    [2020] EWHC (Admin) 3274 .................................................56

*Bell v. Tavistock & Portman NHS Found. Tr.*
    [2021] EWCA (Civ) 1363....................................................58

*Bellotti v. Baird*,
   443 U.S. 622 (1979) ........................................................................92

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
   297 F.R.D. 633 (N.D. Ala. 2014) ....................................................142

*Bostock v. Clayton Cnty., Georgia*,
   140 S. Ct. 1731 (2020).................................................... passim

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark. 2021) ............................................120

*Brandt v. Rutledge*,
   No. 21-2875 (8th Cir. docketed Aug. 23, 2021)................................90

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) .................................................... 78, 79

*Cannon v. Univ. of Chicago*,
   441 U.S. 677 (1979) ......................................................................122

*Cheng Ke Chen v. Holder*,
   783 F. Supp. 2d 1183 (N.D. Ala. 2011) ..........................................69

*Cheshire Bridge Holdings, LLC v. City of Atlanta*,
   15 F.4th 1362 (11th Cir. 2021)......................................................120

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
   636 F.2d 1084 (5th Cir. Unit B 1981) ............................................142

*Clark v. Jeter*,
   486 U.S. 456 (1988) ........................................................................75

*Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) .................................................... passim

*Cleburne Living Ctr. v. Cleburne*,
   726 F.2d 191 (5th Cir. 1984)..........................................................86

*CNA Fin. Corp. v. Brown*,
    162 F.3d 1334 (11th Cir. 1998)...............................................................131

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002)...............................................................118

*Coral Springs St. Sys., Inc. v. City of Sunrise*,
    371 F.3d 1320 (11th Cir. 2004)...............................................................131

*Cummings v. Premier Rehab Keller, PLLC*,
    No. 20-219, 2022 WL 1243658 (April 28, 2022) ..................................... 125, 126

*Doe 2 v. Shanahan*,
    917 F.3d 694 (D.C. Cir. 2019)...............................................................75

*Doe By & Through Doe v. Pub. Health Tr. of Dade Cty.*,
    696 F.2d 901 (11th Cir. 1983)...............................................................103

*Doe v. Moore*,
    410 F.3d 1337 (11th Cir. 2005)............................................................. 104, 109

*Echols v. Lawton*,
    913 F.3d 1313 (11th Cir. 2019)...............................................................103

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ...............................................................94

*Fla. E. Coast Ry. Co. v. City of W. Palm Beach*,
    266 F.3d 1324 (11th Cir. 2001)............................................................. 124, 126

*Ga. Advoc. Off. v. Jackson*,
    4 F.4th 1200 (11th Cir. 2021)...............................................................141

*Gen. Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976) ...............................................................78

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) ...............................................................118

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ................................................................... 81, 87

*Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*,
    503 U.S. 653 (1992) ............................................................................... 131, 136

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ........................................................... 71, 92, 95, 115, 116

*Graham v. R.J. Reynolds Tobacco Co.*,
    857 F.3d 1169 (11th Cir. 2017) ............................................................. 124, 125

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ......................................................................................74

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ................................................................. 123, 124

*Hand v. Scott*,
    888 F.3d 1206 (11th Cir. 2018) ...................................................................139

*Heller v. Doe ex rel. Doe*,
    509 U.S. 312 (1993) ......................................................................................92

*Hill v. McDonough*,
    547 U.S. 573 (2006) ....................................................................................131

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ....................................................................... 114, 115, 116

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ......................................................................142

*In re BellSouth Corp.*,
    334 F.3d 941 (11th Cir. 2003) ............................................................... 130, 136

*In re Fieger*,
    191 F.3d 451 (6th Cir. 1999) .......................................................................132

*Kansas v. Hendricks*,
    521 U.S. 346 (1997) ...................................................................95

*Ladinsky v. Ivey*,
    No. 5:22-cv-447-LCB (N.D. Ala. 2022) ....................................6, 7

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*,
    558 F.3d 1301 (11th Cir. 2009) ................................................91

*Little v. Strange*,
    796 F. Supp. 2d 1314 (M.D. Ala. 2011) .................................119

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
    358 F.3d 804 (11th Cir. 2004) .............................. 94, 108, 109

*Lyng v. Castillo*,
    477 U.S. 635 (1986) ...................................................................85

*Maryland v. King*,
    567 U.S. 1301 (2012) .............................................................139

*Massachusetts Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976) ....................................................... 87, 88

*McGuire v. Strange*,
    83 F. Supp. 3d 1231 (M.D. Ala. 2015)................................ 127, 128

*Miller v. Albright*,
    523 U.S. 420 (1998) ...................................................................85

*Morrissey v. United States*,
    871 F.3d 1260 (11th Cir. 2017)...................................... 103, 105, 110

*Murray v. Sevier*,
    No. 92-1073-K, 1992 WL 75212 (D. Kan. Mar. 13, 1992) ..............132

*Myers v. TooJay's Mgmt. Corp.*,
    640 F.3d 1278 (11th Cir. 2011)...........................................126

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    138 S. Ct. 2361 (2018) ........................................................................119

*Nat'l Treasury Emps. Union v. IRS,*
    765 F.2d 1174 (D.C. Cir. 1985) ..........................................................134

*New York v. Ferber,*
    458 U.S. 747 (1982) ..............................................................................92

*Nguyen v. I.N.S.,*
    533 U.S. 53 (2001) ............................................................... 83, 84, 101

*NLRB v. SW Gen., Inc.,*
    137 S. Ct. 929 (2017) ............................................................................94

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) ..............................................................................94

*Otto v. City of Boca Raton, Fla.,*
    981 F.3d 854 (11th Cir. 2020) ..............................................................92

*Oxbow Energy, Inc. v. Koch Indus., Inc.,*
    686 F. Supp. 278 (D. Kan. 1988) .......................................................135

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ..............................................................................77

*Planned Parenthood of Blue Ridge v. Camblos,*
    116 F.3d 707 (4th Cir. 1997) ..............................................................140

*Prince v. Massachusetts,*
    321 U.S. 158 (1944) ................................................................. 108, 109

*Raich v. Gonzales,*
    500 F.3d 850 (9th Cir. 2007) ..............................................................106

*Reno v. Flores,*
    507 U.S. 292 (1993) ............................................................................105

*Romeo v. Youngberg*,
    644 F.2d 147 (3d Cir. 1980) ...................................................................86

*Rose v. Locke*,
    423 U.S. 48 (1975) ...........................................................................114

*Rutherford v. United States*,
    616 F.2d 455 (10th Cir. 1980) ...........................................................106

*Sable Commc'ns of Cal., Inc. v. FCC*,
    492 U.S. 115 (1989) ...........................................................................92

*San Antonio Indep. School Dist. v. Rodriguez*,
    411 U.S. 193 (1973) ...........................................................................86

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ................................................. 69, 139

*South Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ........................................................................70

*Stardust, 3007 LLC v. City of Brookhaven*,
    899 F.3d 1164 (11th Cir. 2018) ..........................................................112

*Suntrust Bank v. Houghton Mifflin Co.*,
    252 F.3d 1165 (11th Cir. 2001) ...........................................................69

*Swain v. Junior*,
    958 F.3d 1081 (11th Cir. 2020) ..........................................................139

*Telesco v. Telesco Fuel & Masons' Materials, Inc.*,
    765 F.2d 356 (2d Cir. 1985) ...............................................................134

*United States v. Fleury*,
    20 F.4th 1353 (11th Cir. 2021) ................................................. 118, 120

*United States v. Jefferson County*,
    720 F.2d 1511 (11th Cir. 1983) ..........................................................137

*United States v. Lambert*,
　　695 F.2d 536 (11th Cir. 1983) ...............................................................69

*United States v. Matus-Leva*,
　　311 F.3d 1214 (9th Cir. 2002) ...............................................................115

*United States v. Rabinowich*,
　　238 U.S. 78 (1915) ...............................................................................113

*United States v. Salerno*,
　　481 U.S. 739 (1987) .............................................................................128

*United States v. Virginia*,
　　518 U.S. 515 (1996) ...............................................................................75

*United States v. Williams*,
　　553 U.S. 285 (2008) ............................................... 111, 114, 155, 117

*Vaqueria Tres Monjitas, Inc. v. Rivera Cubano*,
　　230 F.R.D. 278 (D.P.R. 2005) ..............................................................135

*Vill. of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*,
　　455 U.S. 489 (1982) .............................................................................112

*Villarreal v. R.J. Reynolds Tobacco Co.*,
　　839 F.3d 958 (11th Cir. 2016) ...............................................................127

*Virginia v. Black*,
　　538 U.S. 343 (2003) .............................................................................118

*Walker v. Marshall*,
　　No. 5:22-cv-480-LCB (N.D. Ala. 2022) ...........................................6, 7

*Wash. State Grange v. Wash. State Republican Party*,
　　552 U.S. 442 (2008) .............................................................................128

*Washington v. Glucksberg*,
　　521 U.S. 702 (1997) ...............................................................................93

*Whalen v. Roe*,
  429 U.S. 589 (1977) .......................................................................107

*Williams v. Allen*,
  496 F.3d 1210 (11th Cir. 2007)........................................................130

*Williams v. Att'y Gen. of Ala.*,
  378 F.3d 1232 (11th Cir. 2004)............................................. 104, 109

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016).......................................................136

*Younger v. Harris*,
  401 U.S. 37 (1971) .........................................................................137

**Statutes**

20 U.S.C. § 1681 .............................................................................121

42 U.S.C. § 1557 ........................................................................ passim

42 U.S.C. § 1557(a) .........................................................................122

42 U.S.C. § 18041(d) ............................................................. 125, 127

42 U.S.C. § 18116(a) ............................................... 121, 122, 125

Ala. Code § 13A-2-4(b) ........................................................ 72, 115

Ala. Code § 13A-2-5(a) ........................................................ 72, 115

Ala. Code § 13A-2-23 ......................................................................116

Ala. Code § 13A-2-24 ......................................................................116

Ala. Code § 13A-4-3 ........................................................................113

Ala. Code § 13A-4-4 ........................................................................116

Ala. Code § 20-2-190.......................................................................108

Ala. Code § 33-5-51 ..............................................................109

**Rules**

Fed. R. Civ. P. 15(a) ............................................................135

Fed. R. Civ. P. 20(a) ............................................................135

**Other Authorities**

11A Wright & Miller, *Federal Practice & Procedure* § 2954 (3d ed.) ................142

Académie Nationale de Médecine, *Medicine and Gender Transidentity in Children and Adolescents* (Feb. 25, 2022), *available at* https://www.academie-medecine.fr/wp-content/uploads/2022/03/22.2.25-Communique-PCRA-19-Gender-identity-ENG.pdf .................................... 10, 63

Aditi Bhargava et al., *Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement*, ENDOCRINE REVIEWS 10 (2021) .............................................................12

Alabama House Judiciary Committee, Mar. 2, 2022, 1:34:28 PM, https://vimeo.com/683940881/4edaeefda2 ....................................93

American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) ...............................................16

Anes Wold, *Gender-Corrective Surgery Promoting Mental Health in Persons With Gender Dysphoria Not Supported by Data Presented in Article*, 177 AM. J. PSYCHIATRY 768 (Aug. 2020) ...........................................49

Anna Hutchinson et al., *In Support of Research Into Rapid-Onset Gender Dysphoria*, 48 ARCHIVES OF SEXUAL BEHAVIOR 79 (2020) ..............................22

Annelou de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. OF SEXUAL MEDICINE No. 8, 2276 (Aug. 2011) .......................................................27

Annelou de Vries et al., *Young Adult Psychological Outcome After
 Puberty Suppression and Gender Reassignment*, 130 PEDIATRICS,
 No. 4, 696 (Oct. 2014) ......................................................................... 11, 28, 30

*Correction to Bränström & Pachankis*, 177 AM. J. PSYCH, No. 8, 734 (2020)........49

Daniella Diaz & Annie Grayer, *House passes Equality Act aimed at
 ending discrimination based on sexual orientation and gender identity*,
 CNN (March 16, 2021), https://www.cnn.com/2021/02/25/politics/equality-
 act-passes-house/index.html ...............................................................................89

*Decision Memo for Gender Dysphoria and Gender Reassignment Surgery*
 (CAG-00446N) (Aug. 30, 2016), *available at* https://www.cms.gov/
 medicare-coverage-database/details/nca-decision-memo.aspx?NCAId
 =282. ....................................................................................................... 11, 45

Devita Singh et al., *A Follow-Up Study of Boys with Gender Identity Disorder*,
 12 FRONTIERS IN PSYCHIATRY 14 (Mar. 2021),
 *available at* https://doi.org/10.3389/fpsyt.2021.632784 ...................................26

Elie Vandenbussche, *Detransition-Related Needs and Support:
 A Cross-Sectional Online Survey*, JOURNAL OF HOMOSEXUALITY (Apr. 30,
 2021), *available at* https://doi.org/10.1080/00918369.2021.1919479 ..............11

*Evidence review: Gender-affirming hormones for children and adolescents with
 gender dysphoria*, Nat'l Inst. for Health & Care Excellence (released Mar. 11,
 2021), *available at* https://arms.nice.org.uk/resources/hub/1070871/attachment..
 ....................................................................................................................10

*Evidence review: Gondotrophin releasing hormone analogues for children and
 adolescents with gender dysphoria*, Nat'l Inst. for Health & Care Excellence
 (released Mar. 11, 2021), *available at*
  https://arms.nice.org.uk/resources/hub/1070905/attachment ............................10

*Fact Sheet: Biden-Harris Administration Advances Equality and Visibility for
 Transgender Americans*, The White House (Mar. 31, 2022),
 https://perma.cc/UY2S-RCLD..............................................................................89

Finland's Council for Choices in Healthcare Policy Statement, Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland)* unofficial translation by Society for Evidence Based Medicine *available (in English) at* https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial%20Translation.pdf ....................................................... 10, 61

*Gender Multispeciality Service (GeMS)*, Boston Children's Hosp., https://www.childrenshospital.org/programs/ .................................................... 34

*Interactive Map: Clinical Care Programs for Gender-Expansive Children and Adolescents*, Hum. Rights Council, https://www.hrc.org/resources/interactive-map-clinical-care-programs-for-gender-nonconforming-childr (last visited April 28, 2022) .............................. 34

Jiska Ristori & Thomas D. Steensma, *Gender Dysphoria in Childhood*, 28 Int'l Rev. of Psychiatry No. 1, 18 (2016) ................................................. 24

Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, Archives of Sexual Behavior 48:1984 (2019), *available at* https://doi.org/10.1007/s10508-019-01518-8 ........................ passim

Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25 Child & Adolescent Mental Health No. 1, 36 (May 2019) .................. 27

Kenneth J. Zucker, *The DSM-5 Diagnostic Criteria for Gender Dysphoria*, in Management of Gender Dysphoria: A Multidisciplinary Approach 33 (eds. C. Trombetta et al. 2015), *available at* https://bit.ly/3LJvaaM ............ 16

L. Littman, *Parent Reports of Adolescents & Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*, PLos ONE 13(8): e0202330 ............................................................................................ 11, 14, 22

Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, Washington Post (Nov. 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/ .................................................................................................. 2, 36

Nat'l Inst. of Health, Office of Research on Women's Health, *How Sex and Gender Influence Health and Disease*, *available at* https://perma.cc/9EP5-MXK8 ..................................................................................12

Paul Gattis, *Lawsuits Seeking to Overturn New Alabama Transgender Law Dropped, Could be Refiled*, AL.COM (Apr. 16, 2022, 5:43 p.m.), https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html........................................... 7, 133

Planned Parenthood, *Gender Affirming Hormone Therapy*, https://www.plannedparenthood.org/planned-parenthood-mar-monte/patient-resources/gender-affirming-care (last visited Apr. 28, 2022) ...........................34

Polly Carmichael et al., *Short-term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16 PLos ONE No. 2, 18 (Feb. 2021), *available at* https://doi.org/10.1371/journal.pone.0243894 ...................................................39

Richard Bränström and John E. Pachankis, *Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-affirming Surgeries: A Total Population Study*, 177 AM. J. OF PSYCHIATRY 727 (2020)....................48

Richard Bränström and John E. Pachankis, *Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender-Affirming Care and Transgender Individuals' Mental Health: Response to Letters*, 177 AM. J. PSYCH., No. 8, 772 (Aug. 2020), table 1...........................................49

Robert D'Angelo et al., *One Size Does Not Fit All: In Support of Psychotherapy forGender Dysphoria*, ARCHIVES OF SEXUAL BEHAVIOR No. 50 12 (2021), *available at* https://perma.cc/9Y2V-EVWX ......................................................25

Stephen B. Levine, E. Abbruzzese & Julia M. Mason, *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, J. OF SEX & MARITAL THERAPY (Mar. 17, 2022)................................................10

Stephen Rosenthal, *Approach to the Patient: Transgender Youth: Endocrine Considerations*, 99 J. OF CLINICAL ENDOCRINOLOGY & METABOLISM No. 12, 4379 (2014)...........................................................................................13

Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* (2022), a*vailable at* https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf ..................... 10, 59, 99

Tamara Syrek Jensen, et al., *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (CAG-00446N) (Aug. 30, 2016), *available at* https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282 ............................................................................ 11, 45

*The Cass Review: Independent Review of Gender Identity Services for Children and Young People: Interim Report* (Feb. 2022), *available at* https://cass.independent-review.uk/publications/interim-report/ .......................60

The Royal Australian & New Zealand College of Psychiatrists, *Recognising and Addressing the Mental Health Needs of People Experiencing Gender Dysphoria / Gender Incongruence*, Position Statement 103 (Aug. 2021), *available at* https://perma.cc/LR94-73ZU .............................................................................11

Tony Perkins, *Wes Allen Discusses Upcoming Alabama Senate Vote on Vulnerable Child Compassion and Protection Act*, YouTube (Feb. 15, 2021), https://www.youtube.com/watch?v=E9Q_b22cUWw .......................................94

What a Day Podcast, Defending Trans Youth in Alabama, https://podcasts.apple.com/us/podcast/defending-trans-youth-in-alabama/id1483692776?i=1000557682349 (April 15, 2022) .........................132

*Women of the Year*, USA Today (Mar. 13, 2022), https://perma.cc/2PUS-P72U ..........................................................................90

# INTRODUCTION

The Alabama Vulnerable Child Compassion and Protection Act is aptly named. *See* Ex. 1. Minors with gender dysphoria and other forms of gender-related psychological distress are suffering greatly. They have higher rates of depression and suicide than other minors do. They are likely to struggle with an array of other psychological ailments. They represent, at disproportionately high rates, some of the most vulnerable groups of young people: those with mental developmental disabilities, autism spectrum disorder (at a rate more than 7x the general population), ADHD, and prior histories of psychiatric illness or trauma. They deserve compassion, protection, and help.

What they too often receive is rushed medical experimentation. As the number of gender clinics have exploded across America, traditional safeguards have been tossed aside in favor of unproven medical interventions with long-term, irreversible consequences and little, if any, proven benefit. Minors are told that they have been born in the wrong body and that the only solution is to physically transition to appear as the other sex. They are told that this pathway of "gender affirmation"—consisting of social transition, the administration of puberty blockers and cross-sex hormones, and surgical interventions—will offer them healing. And though these treatments have never been approved by the Food and Drug Administration for treating gender dysphoria, they are told that these treatments are based on solid scientific evidence.

Parents often "consent" to the treatments after being threatened with a stark alternative: Would they "rather have a dead child or a trans one?"[1]

The shock is that the scientific literature supports none of this. In a field in which so much is unsettled and still unstudied (remarkably so), that much is clear. What evidence does exist, though, shows that most cases—somewhere between 61% and 94%—of childhood gender dysphoria resolve naturally. Because there is no medical diagnosis that can tell whose dysphoria will persist into adulthood and whose won't, some form of "watchful waiting" is traditionally the preferred model of care. It allows clinicians to support children as they go through puberty, offer counseling as they come to terms with their sexual identities (most gender dysphoric youth will identify as gay or lesbian as adults), and provide treatment for other psychological comorbidities that are usually present. Once they are adults, if the dysphoria persists, they can make an informed decision about whether physical transition could be worth pursuing.

If, instead, minors are started on puberty blockers in early adolescence, the evidence suggests that the intervention will set them on a lifelong clinical pathway of cross-sex hormones and reassignment surgeries. These are major medical

---

[1] Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, WASHINGTON POST (Nov. 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/; *see also* Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, ARCHIVES OF SEXUAL BEHAVIOR 48:1984 (2019), *available at* https://doi.org/10.1007/s10508-019-01518-8 (collecting examples).

procedures that carry with them substantial risks of long-lasting harm. To say nothing of the problems caused by double mastectomies and irreversible "bottom" surgeries, minors taking puberty blockers and cross-sex hormones risk permanent sterility, loss of sexual function, increased risk of heart attack and stroke, bone-density problems, risk of altered brain development, and psycho-social harms from delayed puberty.

And for what? What are the outcomes for the children who undergo this course of treatment? Or for the rising tide of adolescent girls who appear to be presenting with a new form of socially influenced gender distress? Incredibly, no one really knows. The evidence is distressingly thin. But contrary to Plaintiffs' claims, the best evidence available does not show that the interventions improve mental health or reduce suicide rates in the long term. Some research even suggests that transition may be associated with an *increased* risk of suicide.

Other countries are taking note. In just the past few years, healthcare authorities or hospital systems in the United Kingdom, Finland, Sweden, France, Australia, and New Zealand have all conducted literature reviews regarding affirmation treatment. The result? Every one of them urged increased caution. Some put the brakes on completely. They recognize the low quality of the studies, the important questions left unanswered by existing research, the significant long-term risks associated with affirmation interventions, the unexplained explosion in gender discordance among

young people, the inability to medically diagnose the minority of patients whose gender dysphoria will persist, the dramatic (though largely unstudied) increase in the number of patients who regret their transitions, and the abject unfairness of asking a 12-year-old girl to "consent" to an experimental course of treatment that will radically change her body, leave her permanently sterile, and in all likelihood fail to bring her long-term psychological relief.

Plaintiffs mention none of this. Proclaiming a false consensus and a degree of medical certainty that does not exist, they ask this Court to override the State's policymakers and impose on Alabama's children a medical regime that is experimental at best and comes with significant risks of lifelong harms. But nothing in the Constitution or federal law prohibits Alabama from protecting its most vulnerable youth in the face of scientific uncertainty. All medical regulation is based on a balance of risk and benefit, and, after extensive study, the Alabama Legislature reasonably determined that the evidence that exists right now does not prove that the benefits of puberty blockers, cross-sex hormones, and surgical interventions to treat gender dysphoric children outweigh the risks. Federal courts have neither the authority nor the competence to second-guess that determination. With the stakes so high, the harms so great, and the known benefits so paltry, the Alabama Legislature did not have to embrace an experimental path in lieu of the one that has served the medical profession so well for so long: First, do no harm.

Plaintiffs' claims thus fail on the merits. The Equal Protection Clause does not prohibit a State from banning unproven and potentially dangerous medical interventions on children—particularly when, as here, the State bans them for *everyone¸* boys and girls alike, and regardless of transgender status. Accounting for the reality that certain treatments depend on sex does not present an Equal Protection problem. For example, it is not unlawful discrimination to offer testicular exams only to boys or pap smears only to girls. Similarly, implanting a fertilized egg in a woman is a treatment for infertility; implanting it in a man is something quite different. Likewise, it is not unlawful discrimination to provide natural amounts of testosterone to a boy with a testosterone deficiency while declining to provide unnatural amounts of testosterone to a girl seeking to transition. Providing a girl with a boy's level of testosterone would be a different treatment altogether. Such commonsense, medically necessary distinctions are not barred by the Constitution.

Nor does the State's requirement that children wait until they become adults to permanently change their bodies discriminate on the basis of transgender status (which is not a protected class in any event). Among other things, the fact that most gender dysphoric youth will *not* identify as transgender as adults proves as much.

As for Plaintiffs' lead argument, the Due Process Clause simply does not forbid States from regulating medical treatments. Courts are in one accord that there is no personal substantive due process right to obtain experimental medical treatments.

It necessarily follows that parents do not have a right to obtain experimental medical procedures for their children. Plaintiffs do not even attempt to show that any such carefully defined right is deeply rooted in our history and traditions.

Plaintiffs' vagueness and First Amendment challenges are likewise meritless. Plaintiffs argue that the word "cause" is unconstitutionally vague, but if that were true, much of the criminal code would need to be enjoined. And though they present myriad hypotheticals that could present close questions in the abstract, what is not a close question is whether the conduct Plaintiffs want to engage in is forbidden. Providing puberty blockers or cross-sex hormones to a minor for the purpose of gender transition is clearly outlawed. Plaintiffs' vagueness challenge thus fails. So does their First Amendment claim: speech that "causes" a crime—such as writing a prescription for an illegal use of a drug—has no First Amendment protection.

Plaintiffs also lose on the equities because they intentionally delayed bringing this lawsuit. Governor Ivey signed the Act into law on April 8, 2022, and it takes effect on May 8. Yet while Plaintiffs claim they need emergency injunctive relief from this Court, they waited until April 21 to seek emergency relief. Doc. 7. Why? It has something to do with a previous lawsuit brought by Plaintiffs' attorneys: *Ladinsky v. Ivey*, No. 5:22-cv-447-LCB (N.D. Ala. 2022), which they filed on April 8. That case and another nearly identical one, *Walker v. Marshall*, No. 5:22-cv-480-LCB (N.D. Ala. 2022), were assigned to this Court on April 15. As soon as that

assignment happened, both sets of Plaintiffs voluntarily dismissed their claims within nine minutes of each other.[2] Lead counsel for the *Ladinsky* Plaintiffs—who is lead counsel for Plaintiffs here—quickly told the media that they "plan[ned] to refile imminently."[3] So they did. With a set of new plaintiffs (and the old lead plaintiff moved to "expert"), the 17 *Ladinsky* lawyers re-filed suit a few days later bringing the same claims (mostly) and using the same language (mostly) from their original complaint. As the Court pointed out, "Plaintiffs' course of conduct could give the appearance of judge shopping," "a practice that has the propensity to create the appearance of impropriety in the judicial system."[4] Plaintiffs' inequitable, manipulative conduct disqualifies them from equitable relief.

Just as pressing, Plaintiffs' misconduct also shows that they are not truly facing the emergency they proclaim. If they were—if time really were of the essence—their lawyers would not have dismissed a prior suit to play procedural games.

Finally, the People have the strongest interest in an Act adopted by their representatives to protect the most vulnerable among us. If the Court enjoins this Act, Alabama children face irreversible damage from unproven, sterilizing, and

---

[2] *See* Notice of Dismissal, *Walker v. Marshall*, No. 5:22-cv-480-LCB (N.D. Ala. Apr. 15, 2022), Doc. 23; Notice of Dismissal, *Ladinsky v. Ivey*, No. 5:22-cv-447-LCB (N.D. Ala. Apr. 15, 2022), Doc. 15.

[3] Paul Gattis, *Lawsuits Seeking to Overturn New Alabama Transgender Law Dropped, Could be Refiled*, AL.COM (Apr. 16, 2022, 5:43 p.m.), https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html; *see* Order, *Walker*, No. 5:22-cv-480-LCB (N.D. Ala. Apr. 18, 2022), Doc. 24 at 3.

[4] Order, *Walker*, No. 5:22-cv-480-LCB (N.D. Ala. Apr. 18, 2022), Doc. 24 at 3.

permanently scarring medical interventions pushed by ideological interest groups. The Court should deny Plaintiffs' belated request for preliminary relief.

## BACKGROUND

To properly evaluate Plaintiffs' claims, it is important to understand the history, terminology, and state of the science for treating minors suffering from gender dysphoria and other forms of gender-related distress. An overview follows, but more extensive treatments are found in the submitted expert declarations by Dr. James Cantor, Ph.D., a clinical psychologist and Director of the Toronto Sexuality Centre in Canada, Ex. 2; Dr. Michael K. Laidlaw, M.D., an endocrinologist in private practice in Rocklin, California, Ex. 3; Dr. Quentin L. Van Meter, M.D., a pediatric endocrinologist in private practice in Atlanta, Georgia, and Associate Professor of Pediatrics at Emory University School of Medicine and Morehouse College of Medicine, Ex. 4; Dr. Paul W. Hruz, M.D., Ph.D., Associate Professor of Pediatrics in the Division of Pediatric Endocrinology and Diabetes at Washington University School of Medicine, Ex. 5; Dr. Patrick Hunter, M.D., a pediatrician, bioethicist, and former chair of the pediatric department at Scotland Memorial Hospital, Ex. 6; and Dr. Dianna Kenny, Ph.D., a psychotherapist and former Professor of Psychology at the University of Sydney, Australia, Ex. 7. *See* Docs. 69-1 through 69-7.

Though these experts tried their best to respond to the claims made by Plaintiffs and their experts (particularly given the time constraints—they've had no time

*at all* to review the federal government's proposed expert report), it is worth noting that they had limited material to work with. As Dr. Cantor noted, Plaintiffs' preliminary injunction "motion and all three experts asserted very many very bold claims, but vanishingly little citation of any objective science at all. Of the many hundred relevant, peer-reviewed research articles on this topic, Dr. Hawkins cited three, Dr. Ladinsky cited none at all, and Dr. Rosenthal cited eight, four of which were from the same research team, also cited by Dr. Hawkins.… [T]hat small set of articles represents a highly cherry-picked misrepresentation of the relevant body of science, failing to reflect the consensus of the research literature." Cantor Decl. ¶ 10.

Also included are declarations from parents of gender dysphoric youth and from individuals who once suffered from gender dysphoria, received the transitioning treatments at issue, and later determined that they had not been mature enough to give informed consent to these drastic medical interventions. These stories are important because they show that a rising number of young people are actively harmed by the experimental treatments Plaintiffs say are constitutionally required. *See* Ex. 26, Decl. of Corinna Cohn; Ex. 27, Decl. of Sydney Wright; Ex. 28, Decl. of Carol Frietas; Ex. 29, Decl. of Barbara F.; Ex. 30, Declaration of John Doe; Ex. 31, Decl. of John Roe; Ex. 32, Decl. of Kristine W.; Ex. 33, Decl. of Yaacov Sheinfeld; Ex. 34, Decl. of Martha S.; Ex. 35, Decl. of KathyGrace Duncan; Ex. 36, Decl

of Jeanne Crowley; Ex. 37, Decl. of Ted H. Halley; Ex. 38, Decl. of Kellie C.; Ex.

39, Decl. Gary Warner. *See* Docs. 69-26 through 69-39.

Finally, a limited number of important primary documents are submitted.

These include important studies that are repeatedly referenced in the literature and

the expert reports, as well as statements and comprehensive literature reviews from

healthcare authorities across the globe. These statements show that Plaintiffs' claim

of widespread consensus as to the efficacy, safety, and necessity of using puberty

blockers, cross-sex hormones, and surgical interventions to treat gender dysphoria

in children is simply not true.[5]

---

[5] *See* Ex. 8, Stephen B. Levine, E. Abbruzzese & Julia M. Mason, *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, J. OF SEX & MARITAL THERAPY (Mar. 17, 2022) [hereafter "Levine et al., *Reconsidering Informed Consent*"]; Ex. 9, *Evidence Review: Gonadotropin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria*, Nat'l Inst. for Health & Care Excellence (NICE) (released Mar. 11, 2021), *available at* https://arms.nice.org.uk/resources/hub/1070905/attachment [hereafter "NICE Puberty Blocker Evidence Review"]; Ex. 10, *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria*, Nat'l Inst. for Health & Care Excellence (NICE) (released Mar. 11, 2021), *available at* https://arms.nice.org.uk/resources/hub/1070871/attachment [hereafter "NICE Cross-Sex Hormone Evidence Review"]; Ex. 11, Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* (2022), *available at* https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf [hereafter "Sweden Policy Statement"]; Ex. 12, Finland's Council for Choices in Healthcare Policy Statement, Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland)* unofficial translation by Society for Evidence Based Medicine available (in English) at https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial%20Translation.pdf [hereafter "Finland Policy Statement"]; Ex. 13, Académie Nationale de Médecine, *Medicine and Gender Transidentity in Children and Adolescents* (Feb. 25, 2022), *available at* https://www.academie-medecine.fr/wp-content/uploads/2022/03/22.2.25-Communique-PCRA-19-Gender-identity-ENG.pdf [hereafter "France Policy Statement"]; Ex. 14, The Royal Australian & New Zealand College of Psychiatrists, *Recognising and Addressing the Mental Health Needs of People Experiencing Gender Dysphoria / Gender Incongruence*, Position Statement 103 (Aug.

## A.      Sex, Gender, and Gender Discordance

While Plaintiffs prefer the term "sex assigned at birth," the more precise term

is simply "sex" or "biological sex." Laidlaw Decl. at 6-7; Hruz Decl. ¶ 28. A child's

sex is determined at conception, depending on whether a sperm's X or Y chromo-

some fertilizes the egg. Van Meter Decl. at 2-3. A person's sex is encoded in every

cell of her body. According to the National Institutes of Health, "[s]ex is a biological

2021), *available at* https://perma.cc/LR94-73ZU [hereafter "Royal Australian & New Zealand College of Psychiatrists Statement"]; Ex. 15, *Bell v. Tavistock & Portman Nat'l Health Serv. Found. Tr.* [2020] EWHC (Admin) 3274; Ex. 16, Centers for Medicare & Medicaid Services, Tamara Syrek Jensen et al., *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (CAG-00446N) (Aug. 30, 2016), *available at* https://perma.cc/9CQN-938N; Ex. 17, Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013) (excerpts) [hereafter "DSM-5"]; Ex. 18, World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* (7th Version) (2012) [hereafter "WPATH Standards"]; Ex. 19, Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guidelines*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017) [hereafter "Endocrine Society Guidelines"]; Ex. 20, Lisa Littman, *Parent Reports of Adolescents & Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*, PLOS ONE 13(8):e0202330 [hereafter "Littman, *Rapid-Onset Gender Dysphoria*"]; Ex. 21, Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR No. 50, 3353 (Oct. 2021) [hereafter "Littman Survey"]; Ex. 22, Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, JOURNAL OF HOMOSEXUALITY (Apr. 30, 2021), *available at* https://doi.org/10.1080/00918369.2021.1919479; Ex. 23, Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 130 PEDIATRICS, No. 4, 696-704 (Oct. 2014); Ex. 24, Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 Pediatrics no. 4 (Oct. 2018), *available at* https://perma.cc/EE6U-PN66 [hereafter "AAP Statement"]; Ex. 25, Am. Psych. Ass'n, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832 (Dec. 2015), *available at* https://www.apa.org/practice/guidelines/transgender.pdf (emphasis added) [hereafter "APA Guidelines"]. *See* Docs. 69-8 through 69-25.

classification, encoded in our DNA. Males have XY chromosomes, and females have XX chromosomes."[6]

Sex and gender are distinct. Sex is biological. Van Meter Decl. at 2-4; Hruz Decl. ¶ 21. Gender is psychological and sociological—"the psychological and cultural characteristics associated with biological sex." Van Meter Decl. at 5. Gender identity, then, "refer[s] to an individual's mental and emotional sense of being male or female." *Id.* According to a recent paper published by the Endocrine Society, while "[s]ex is an essential part of vertebrate biology," "gender is a human phenomenon; sex often influences gender, *but gender cannot influence sex*."[7] Thus, "*sex differences* are those caused by biological factors, whereas *gender differences* reflect a complex interplay of psychological, environmental, cultural, and biological factors."[8] Gender identity and biological sex are both distinct from sexual identity or sexual orientation, which "refer[] to the group of persons to whom an individual is sexually attracted."[9]

How a child's gender identity is formed is not fully understood. Most children—traditionally more than 99%—identify with their biological sex. Van Meter

---

[6] Nat'l Inst. of Health, Office of Research on Women's Health, *How Sex and Gender Influence Health and Disease*, *available at* https://perma.cc/9EP5-MXK8.
[7] Aditi Bhargava et al., *Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement*, Endocrine Reviews 10 (2021) (emphasis added), *available at* doi:10.1210/endrev/bnaa034.
[8] *Id.* at 8.
[9] *Id.* at 9; *see also* Hruz Decl. ¶¶ 23-24.

Decl. at 5. A very small minority do not; their gender is said to be "incongruent" with their sex. *Id.* It is likely that biology, psychosocial, environmental, and various cultural factors all play a role in this formation. "[W]hile associations between gender identity, neuroanatomic, genetic, and hormone levels exist, a clear causative biological underpinning of gender identity remains to be demonstrated."[10] It is clear, however, that "gender is strongly influenced by environmental and cultural forces."[11] As Plaintiffs' expert Dr. Rosenthal has put it, gender identity "likely reflects a complex interplay of biological, environmental, and cultural factors." Hunter Decl. ¶ 33 (quoting Stephen Rosenthal, *Approach to the Patient: Transgender Youth: Endocrine Considerations*, 99 J. OF CLINICAL ENDOCRINOLOGY & METABOLISM No. 12, 4379-89 (2014)); *see also* Van Meter Decl. at 6-8 (discussing brain matter studies); Hruz Decl. ¶ 46 (discussing twin studies).

Accounting for social and cultural factors has only grown in importance in recent years. "While the incidence [of gender identity variations] in youth had not been officially estimated, in adults it was 2-14 per 100,000." Levine et al., *Reconsidering Informed Consent* at 2. "However, around 2006, the incidence among youth began to rise, with a dramatic increase observed in 2015." *Id.* (citations omitted). "Currently, 2-9% of U.S. high school students now identify as transgender, while in

---

[10] Bhargava, *supra*, at 8.
[11] *Id.*

colleges, 3% of males and 5% of females identify as gender-diverse." *Id.* (citations omitted); *see* Hruz Decl. ¶ 72. "Along with this increase in transgender patients and identifiers[] has come a radical and recent transformation of the patient population from early onset males to rapid onset adolescent girls." Hruz Decl. ¶ 72. Currently, "the majority of new patients with sex-gender discordance are not males with a long, stable history of gender dysphoria since early childhood—as they were for dec-ades—but instead adolescent females with no documented long-term history of gen-der dysphoria." *Id.* Some researchers have labeled the phenomenon "Rapid Onset Gender Dysphoria." *See generally* Littman, *Rapid-Onset Gender Dysphoria*. Con-cerningly, the majority of these cases "appear to occur within clusters of peers and in association with increased social media use and especially among people with autism or other neurodevelopmental or mental health issues." Cantor Decl. ¶ 71.

There are a number of ways to speak about individuals experiencing gender incongruence. Most broadly is "gender incongruent," "gender discordant," or "gen-der nonconformant," all of which broadly "refer[] to the extent to which a person's gender identity, role, or expression differs from cultural norms prescribed for people of a particular sex." WPATH Standards at 5. "Transgender" has a similarly broad meaning. The World Professional Association for Transgender Health (WPATH)—the organization Plaintiffs rely on the most—uses "transgender" to "describe a di-verse group of individuals who cross or transcend culturally defined categories of

gender" and have gender identities that "differ[] to varying degrees from the sex they were assigned at birth." *Id.* at 97. The Endocrine Society's definition is similarly far-reaching: "transgender" is "an umbrella term for people whose gender identity and/or gender expression differs from what is typically associated with their sex designated at birth." Endocrine Society Guidelines at 3875.

As the American Academy of Pediatrics (AAP) points out, "transgender" is "not [a] diagnos[i]s," but a "personal" and "dynamic way[] of describing one's own gender experience." AAP Statement at 3. According to the AAP, "gender identity can be fluid, shifting in different contexts." *Id.* at 2 The American Psychological Association (APA) even reports that some people "experience their gender identity *as* fluid." APA Guidelines at 836. There are also those who seek to "redefine gender" or who "decline to define themselves as gendered altogether"—who "think of themselves as both man and woman (bigender, pangender, androgyne); neither man nor woman (genderless, gender neutral, neutrois, agender); moving between genders (genderfluid); or embodying a third gender."[12] These individuals consider themselves to be "non-binary," a category that now may encompass most transgender-identifying youth, Hunter Decl. ¶ 79.

---

[12] APA Guidelines at 862 (noting that a "recent study reported that the majority of transgender-identifying youth (63%) now have a non-binary identity").

### B.   Gender Dysphoria

Unlike "transgender," "gender dysphoria" is a medical diagnosis.[13] According to the current edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), individuals with gender dysphoria (1) "have a marked incongruence" between their biological sex "and their experienced/expressed gender," and (2) experience clinical levels of "distress about this incongruence." DSM-5 at 452. The DSM-5 separates gender dysphoria into "early-onset"—childhood—and "late onset"—adolescence or adulthood. *Id.* at 452-53.

### 1.   Childhood-Onset Gender Dysphoria

"The large majority of childhood onset cases of gender dysphoria occur in biological males, with clinics reporting 2-6 biological male children to each female." Cantor Decl. ¶ 34. Many, if not most, gender dysphoric children also suffer from "significant comorbid mental health disorders, have neurocognitive difficulties such as ADHD or autism[,] or have a history of trauma." Levine et al., *Reconsidering Informed Consent* at 3. For instance, "[a] formal analysis of children (ages 4–11) undergoing assessment at the Dutch child gender clinic showed 52% fulfilled criteria for a DSM axis-I disorder." Cantor Decl. ¶ 69. Another study of Canadian and Dutch

---

[13] Older terms for the same or very similar diagnosis include "gender identity disorder of childhood" (for children) and "transsexualism" (for adolescents and adults). *See* Kenneth J. Zucker, *The DSM-5 Diagnostic Criteria for Gender Dysphoria*, in MANAGEMENT OF GENDER DYSPHORIA: A MULTIDISCIPLINARY APPROACH 33 (eds. C. Trombetta et al. 2015), *available at* https://bit.ly/3LJvaaM.

clinics showed that, "among 6–11 year-olds, 61.7% of the Canadian and 62.1% of the Dutch sample were in the clinical range" rather than the "healthy range" when assessed on the Child Behavior Check List. *Id.* The rate of ADHD among children with gender dysphoria ranges between 8.3% and 11%. *Id.* ¶ 70. And "data from children (ages 6-18) with Autism Spectrum Disorders (ASDs) show they are more than seven times more likely to have parent-reported 'gender variance.'" *Id.*

If not given medical interventions to transition—and that is an important "if"—most children with gender dysphoria will grow up to identify as gay or lesbian and will not suffer from gender dysphoria as adults. Hunter Decl. ¶ 39; DSM-5 at 455. This fact of desistance—that "[g]ender dysphoria during childhood does not inevitably continue into adulthood," as the WPATH Standards put it (at 11)—is well established in the medical literature, and all of the "standards" Plaintiffs rely on recognize this fact. The DSM-5 reports that rates of persistence (i.e., non-desistance) for biological males range "from 2.2% to 30%" and from "12% to 50%" for biological females. DSM-5 at 455. This means that between 97.8% and 70% of boys and between 88% and 50% of girls suffering from gender dysphoria will have their dysphoria resolve by the time they reach adulthood.

WPATH reports similar numbers: "[I]n follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6–23% of children." WPATH

17

Standards at 11. "New studies, also including girls, showed a 12–27% persistence rate of gender dysphoria into adulthood." *Id.*

The Endocrine Society agrees: "In most children diagnosed with GD/gender incongruence, it did not persist into adolescence. The percentages differed among studies, probably dependent on which version of the DSM clinicians used, the patient's age, the recruitment criteria, and perhaps cultural factors. However, the large majority (about 85%) of prepubertal children with a childhood diagnosis did not remain GD/gender incongruent in adolescence." Endocrine Society Guidelines at 3879 (citations omitted).

Thus, in contrast to Plaintiffs' extraordinary claim that "the likelihood of [gender dysphoric youth] 'outgrowing' their transgender identity in adolescence or adulthood is virtually nil," Br., Doc. 8 at 37, a comprehensive survey of the literature shows that, "despite coming from a variety of countries, conducted by a variety of labs, using a variety of methods, all spanning four decades, every study without exception has come to the identical conclusion: Among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty—ranging from 61–88% desistance across the large, prospective studies." Cantor Decl. ¶ 36.

The corollary consideration to high rates of desistance is whether a clinician can accurately predict whose gender dysphoria will persist into adulthood and whose

will not. The answer is that "[t]here is currently no way to predict who will desist and who will remain dysphoric." Laidlaw Decl. at 6 (citation omitted); *see* Hunter Decl. ¶ 66 ("[N]o clinician can reliably predict which young person will desist from their transgender identification vs. who will persist."); Cantor Decl. ¶ 41 (The "research has not yet identified any reliable procedure for discerning which children who present with gender dysphoria will persist, as against the majority who will desist, absent transition and 'affirmation.'"). Nor are there any "laboratory, imaging, or other objective tests to diagnose a 'true transgender' child." Laidlaw Decl. at 4 (citation omitted).

In fact, contrary to Plaintiffs' claim that the group of gender dysphoric youth whose dysphoria will persist into adulthood is "clearly identifiable," Br., Doc. 8 at 37, the Endocrine Society itself acknowledges that, "[w]ith current knowledge, we cannot predict the psychosexual outcome for any specific child," Endocrine Society Guidelines at 3876. As Dr. Cantor explains, while "[m]ultiple research teams have reported that, on average, groups of persisters are somewhat more gender non-conforming than desisters," the differences are not so stark "as to usefully predict the course of a particular child." Cantor Decl. ¶ 41. And while one single research team (the Olson group that Plaintiffs' experts rely on) has claimed that they had developed a model of distinguishing persisters from desisters, in fact the data showed that the

"model does not distinguish likely from unlikely to transition," but only "unlikely from even less likely to transition." *Id.* ¶ 42.

### 2.  Adult-Onset Gender Dysphoria

In contrast to childhood-onset gender dysphoria, "[p]eople with adult-onset gender dysphoria typically attend clinics requesting transition services in mid-adulthood, usually in their 30s or 40s. Such individuals are nearly exclusively male." *Id.* ¶ 28. It is widely understood that patients presenting with adult-onset gender dysphoria are likely to have other psychological ailments, or comorbidities, that clinics have traditionally sought to diagnose and treat *before* providing transition treatment. Clinics thus "performed 'gate-keeping' procedures, disqualifying from medical services people with mental health or other contraindications." *Id.* ¶ 30. Once screened, adults "who underwent complete transition (*i.e.*, social, plus hormonal, plus surgical transition)" have self-reported low rates of regret and a generally improved mental condition. *Id.* ¶ 29. There are some important caveats, though.

First, the fact "that rates of mental health issues among [gender dysphoric adults] are highly elevated both before and after transition," but "that rates were less elevated among those who completed transition" could simply be an effect of the gate-keeping function performed by the gender clinics. *Id.* ¶ 31. That is, "[t]he side-effect of removing [patients with mental health issues] from the samples of transitioners is that if a researcher compared the average mental health of individuals

coming into the clinic with the average mental health of individuals going through medical transition, then the post-transition group would appear to show a substantial improvement, even though transition had *no effect at all*: The removal of people with poorer mental health created the statistical illusion of improvement among the remaining people." *Id.* ¶ 32.

Second, many of the studies of adult transitioners had very high attrition rates, with "more than 40% of patients becoming 'lost to follow-up.'" *Id.* ¶ 31. "The very high 'lost to follow-up' rate leaves open the possibility of considerably more negative results overall." *Id.* Tragically, since suicide rates for people who transition are generally elevated—as discussed more below—that is in fact likely to be the case. *See id.* ¶¶ 80-86.

### 3. Adolescent-Onset Gender Dysphoria

Although the DSM-5 lumped adult-onset and adolescent-onset gender dysphoria together, a distinct "third profile has recently begun to present to clinicians or socially, characteristically distinct from the previously identified ones." *Id.* ¶ 71. According to clinicians throughout the world, this is a new clinical phenomenon. *See* Hunter Decl. ¶¶ 79-88 (collecting examples).

"Unlike adult-onset gender dysphoria and unlike childhood-onset, this group is predominately biologically female. This group first presents in adolescence, but lacks the history of cross-gender behavior in childhood like the childhood-onset

cases have." Cantor Decl. ¶ 71. "It is this feature which led to the term Rapid Onset Gender Dysphoria (ROGD)." *Id.*; *see* Littman, *Rapid-Onset Gender Dysphoria*. As noted, "[t]he majority of cases appear to occur within clusters of peers and in association with increased social media use and especially among people with autism or other neurodevelopmental or mental health issues." Cantor Decl. ¶ 71 (footnotes and citations omitted).

It is not well understood, or even well studied at this point, why adolescent females are presenting in record numbers with self-described gender incongruence. *See generally* Kenny Decl. at 3-34.[14] But given that cases are appearing in clusters—which was not the case with traditional gender dysphoria—at least one researcher has hypothesized a peer-contagion aspect, meaning there could be at play a "process where an individual and peer mutually influence each other in a way that promotes emotions and behaviors that can potentially have negative effects on their development." Littman, *Rapid-Onset Gender Dysphoria* at 4. "Peer contagion has been associated with depressive symptoms, disordered eating, aggression, bullying, and drug use." *Id.* Thus, while "[i]t is unlikely that friends and the internet can make people transgender," "it is plausible that the following can be initiated, magnified, spread, and maintained via the mechanisms of social and peer contagion: (1) the

---

[14] *See also* Anna Hutchinson et al., *In Support of Research Into Rapid-Onset Gender Dysphoria*, 48 ARCHIVES OF SEXUAL BEHAVIOR 79-80 (2020).

*belief* that non-specific symptoms (including the symptoms associated with trauma, symptoms of psychiatric problems, and symptoms that are part of normal puberty) should be perceived as gender dysphoria and their presence as proof of being transgender; (2) the *belief* that the only path to happiness is transition; and (3) the *belief* that anyone who disagrees with the self-assessment of being transgender or the plan for transition is transphobic, abusive, and should be cut out of one's life." *Id.* at 33; *see also* Kenny Decl. at 3-34; Hruz Decl. ¶ 45; Cantor Decl. ¶ 71.

Regardless of its cause, the phenomenon has been felt across the globe. Hunter Decl. ¶¶ 66-88.[15] Whereas traditionally the ratios of gender dysphoric youth weighted heavily in favor of biological males, gender clinics are now seeing mostly gender dysphoric females. "In the UK … the number of adolescent girls seeking sex transitioning exploded over **4,000%** in the last decade." Hruz Decl. ¶ 72 (emphasis added). Sweden reported a **1,500%** increase in the same time period. Kenny Decl. at 16-17 (emphasis added). At a Toronto clinic, "the male-to-female sex ratio for the years 1999-2005 was 2.11:1, whereas for the years 2006-2013 it was 1:1.76."[16] Similar or more extreme trends have been observed elsewhere: a clinic in Hamburg,

---

[15] *See also* Zucker, *Adolescents With Gender Dysphoria*, *supra*, at 1983-84 (surveying analyses of gender dysphoric youth in the UK, Canada, Netherlands, Germany, Finland, and United States).
[16] Zucker, *Adolescents With Gender Dysphoria*, *supra*, at 1984.

Germany, has a male-female ratio of 1:4.29, while one in Helsinki, Finland has a ratio of 1:6.83.[17]

### 4.    Models of treatment

Because desistance is probable, though not inevitable, for most gender dysphoric youth, "the 'watchful waiting' method became the standard approach." Cantor Decl. ¶ 39. "Watchful waiting does not mean do nothing but passively observe the child"; rather, it includes providing the child—and other family members as appropriate—therapy to resolve other issues which may be present and which "may be exacerbating psychological stress or dysphoria." *Id.* ¶ 50. Counseling may "include interventions that focus on the co-existing problems of the child and/or the family; helping parents and the child to bear the uncertainty of the child's psychosexual outcome; and providing psycho-education to help the child and the family to make balanced decisions regarding topics such as the child's coming out, early social transitioning, and/or how to handle peer rejection or social ostracism."[18]

Providing therapy during this time is important to allow space for the child to explore his or her gender and sexual identities without being locked into a specific pathway. *See* Kenny Decl. at 35-55. For example, given that the majority of gender dysphoric youth will have their dysphoria resolve and thereafter identify as gay or

---

[17] *Id.*

[18] Jiska Ristori & Thomas D. Steensma, *Gender Dysphoria in Childhood*, 28 INT'L REV. OF PSYCHIATRY No. 1, 18 (2016).

lesbian, a number of therapists have noted that, "[w]hen a dysphoric same-sex at-tracted young person in the midst of [his or her] developmental process presents for mental health care, a clinician overtly affirming the patient's cross-sex gender iden-tity would be failing this patient by not addressing the patient's struggle with same-sex attraction and/or internalized homophobia."[19] "Several case reports indicate that the distress of young people with [gender dysphoria] can lessen or resolve with ap-propriate psychotherapeutic interventions that address the central issues."[20] Dr. Kenny, a psychotherapist who treats many gender dysphoric youth, provides a num-ber of such vignettes in her expert report. *See* Kenny Decl. at 35-55.

The watchful waiting paradigm thus recognizes that "[t]he balance of poten-tial risks to potential benefits is very different for groups likely to desist versus groups unlikely to desist: If a child is very likely to persist, then taking on the risks of medical transition might be more worthwhile than if that child is very likely to desist in transgender feelings." Cantor Decl. ¶ 39. But because there is no diagnostic tool to determine whose gender dysphoria will persist into adulthood and whose will not—and because we know that most cases *will* desist—watchful waiting provides

---

[19] Robert D'Angelo et al., *One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria*, Archives of Sexual Behavior No. 50, at 12 (2021), *available at* https://perma.cc/9Y2V-EVWX.
[20] *Id.* (citations omitted).

treatment to a gender dysphoric minor while waiting to see whether the dysphoria will persist before experimenting with irreversible and unproven interventions.

Plaintiffs oppose watchful waiting and instead support a second, more experimental—and far mor riskier—approach called "affirmation therapy" or "gender affirming care." Though Plaintiffs and their experts rely on the WPATH Standards and the Endocrine Society Guidelines as establishing "gender affirming care" as the accepted "standard of care," Br., Doc. 8 at 16 (citing expert reports), in fact these proposed treatment guidelines from various professional societies and interest groups simply reflect "increasingly divergent" views for "how to approach the management of gender dysphoria in youth," Hunter Decl. ¶89. They are not "standards of care" in the traditional sense.

"Gender affirming care" "is focused on affirming the child's (trans)gender identification" and supports the child "in transitioning to the desired/experienced gender role."[21] Notably, affirming a minor's perceived (and likely transitory) gender identity is not a neutral intervention. That is obviously true of surgical interventions and—as discussed in greater detail below—cross-sex hormones and puberty blockers. But it is also true of social transition. Partial or complete gender social transition prior to puberty is considered a "unique predictor of persistence," disrupting the

_____

[21] Ristori & Steensma, *supra*, at 17.

natural path of desistance.[22] This is particularly true for boys, who traditionally composed the majority of childhood gender dysphoria cases.[23] As one prominent clinician concluded: "A gender social transition in prepubertal children is a form of psychosocial treatment that aims to reduce gender dysphoria, but with the likely consequence of subsequent (lifelong) biomedical treatments…. Gender social transition of prepubertal children will increase dramatically the rate of gender dysphoria persistence when compared to follow-up studies of children with gender dysphoria who did not receive this type of psychosocial intervention and, oddly enough, might be characterized as" *causing* the persistent dysphoria.[24]

## C.    The Dutch Protocol and Beyond

Affirmation treatment has in recent years moved beyond mere therapeutic affirmation and social transition to include medically transitioning minors using puberty blockers, cross-sex hormones, and surgical interventions. The basis for doing so "stems from a single Dutch proof of concept study, the outcomes of which were documented in two studies" published in 2011 and 2014. Levine et al., *Reconsidering Informed Consent* at 9; *see* Cantor Decl. ¶¶ 44-51; Hunter Decl. ¶ 69. The first

---

[22] Devita Singh et al., *A Follow-Up Study of Boys with Gender Identity Disorder*, 12 FRONTIERS IN PSYCHIATRY 14 (Mar. 2021), *available at* https://doi.org/10.3389/fpsyt.2021.632784.

[23] *See id.* at 14-15; Hruz Decl. ¶ 47; Cantor Decl. ¶ 41.

[24] Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25 CHILD & ADOLESCENT MENTAL HEALTH No. 1, 36-37 (May 2019). This observation is consistent with the robust studies showing desistance in most gender dysphoric youth, most of whom "were receiving professional psychosocial support across the study period aimed not at affirming cross-gender identification, but at resolving stressors and issues potentially interfering with desistance." Cantor Decl. ¶ 37.

study looked at puberty suppression.[25] The second looked at a subset of patients that completed transition surgery.[26] Plaintiffs' experts rely heavily on this study to proclaim that "medical treatment for Gender Dysphoria offers significant psychological benefit to transgender young people." Hawkins Decl., Doc. 8-1 at 17; *see* Rosenthal Decl., Doc. 8-3 at 18. Understanding the study—what it did, and what it didn't do—is thus key to understanding modern treatment options.

## 1.    The Dutch Study

The problem the Dutch study sought to solve was the observation that adult gender transitions frequently led to disappointing cosmetic outcomes, particularly for biological males. "In the mid 1990s, a team of Dutch researchers hypothesized that by carefully selecting a subset of gender dysphoric children who would likely to be transgender-identified for the rest of their lives, and by medically intervening before puberty left an irreversible mark on their bodies, the cosmetic outcomes would be improved—and as a result, mental health outcomes might be improved." Levine et al., *Reconsidering Informed Consent* at 9-10; *see* Cantor Decl. ¶ 45.

The protocol the Dutch study followed was to use watchful waiting, without any social transition, for gender dysphoric youth before age 12; to allow puberty blockers once puberty began but not before age 12 (the average age of intervention

---

[25] *See* Annelou de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. of Sexual Medicine No. 8, 2276-83 (Aug. 2011).
[26] *See* Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 130 PEDIATRICS, No. 4, 696-704 (Oct. 2014).

was 13.6 years old); to allow cross-sex hormones only after age 16 (average age of intervention: 16.7); and cross-sex surgeries after age 18 (average age of intervention: 20.7 years). Cantor Decl. ¶¶ 46-47. Notably, "[t]he age cut-offs of the Dutch Approach authors were not based on any research demonstrating their superiority over other potential age cut-offs," but instead were "chosen to correspond to ages of consent to medical procedures under Dutch law." *Id.* ¶ 48.

The participants for the study were chosen carefully. "From the 196 adolescents initially referred, 111 were considered eligible to start puberty blockers, and of this group, only the 70 most mature and mentally stable who proceeded to cross-sex hormones were included in the study." Levine et al., *Reconsidering Informed Consent* at 12. All were provided extensive mental health assessments and support, including clinical interviews, formal psychological testing with validated psychometric instruments, and multiple counseling sessions with the child and the child's parents. Cantor Decl. ¶ 50. All participants were cross-sex identified, "with no cases of non-binary identities." Levine et al., *Reconsidering Informed Consent* at 12. Of the 70 children who formed the starting cohort, only 55 completed the study and participated in an assessment a year after surgery. One participant died from the surgical intervention; four refused further participation; three became ineligible for treatment due to complications such as obesity and diabetes; and six had surgery within a year and were ineligible to complete the questionnaire. The outcomes for

these patients were thus not included in the study's results. Nor did all of the 55 remaining subjects participate in every aspect of the follow-up assessment. Only 32 provided answers regarding their psychological functioning for all three time periods studied—at intake, while on puberty suppression, and after gender reassignment surgery. *See* Hunter Decl. ¶¶ 69-78. [27]

The authors of the study reported that the youth given puberty blockers had improved on several variables upon follow-up as compared to pre-suppression measurement, including depressive symptoms and general functioning. But "[n]o changes were detected in feelings of anxiety or anger or in gender dysphoria as a result of puberty suppression; however, natal females using puberty suppression suffered *increased* body dissatisfaction both with their secondary sex characteristics and with nonsexual characteristics." Cantor Decl. ¶ 54. As for the 55 participants who went on to have surgery and participated in an assessment a year afterward, the authors reported two main findings. One, gender dysphoria had resolved for the participants when they were surveyed a year after surgery.[28] Two, a year after surgery the participants reported psychological well-being outcomes "comparable to same-age peers"[29]—just as they had *before* transition, Hunter Decl. ¶ 71.

---

[27] *See also* de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, *supra*, at 696-700; Levine et al., *Reconsidering Informed Consent* at 12.

[28] de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, *supra*, at 701.

[29] *Id.* at 702.

There are several limitations to the Dutch study. First, because there was no control group—another group of adolescents matching the first group, but not receiving medical or social support—it is impossible to tell the source of the improvements. That is, while "[t]he inclusion of psychotherapy and support during the watchful waiting period" was, clinically, "a great benefit to the gender dysphoric children and their parents," it poses a scientific complication because it "becomes difficult to know to what extent the outcomes of these cases might be related to receiving psychotherapy," receiving other medical interventions, or simply experiencing "'spontaneous' desistance.'" Cantor Decl. ¶ 51. As a result, "any conclusion that puberty blockers" or the other interventions "improved the mental health of the treated children is not justified by the data." *Id.* ¶ 55. Indeed, the authors of the study themselves noted that other factors such as psychological support "'may have contributed to the psychological well-being of these gender dysphoric adolescents,'" and thus "*cautiously* conclude[d] that puberty suppression *may be* a valuable *element* in clinical management of adolescent gender dysphoria.'" *Id.* ¶ 55-56 (emphasis by Dr. Cantor) (citation omitted).

Second, given that the study completed about a year-and-a-half after participants underwent surgery, we do not know the participants' long-term outcomes. Nor is there any knowledge of the fate of the 126 patients who were referred to the clinic but were not selected to participate. One study has reported on "14 adolescents who

sought gender reassignment in the same clinic, but were disqualified from treatment due to 'psychological or environmental problems.'" Levine et al., *Reconsidering Informed Consent* at 12. That "study found that at follow-up 1-7 years after the original application, 11 of the 14 no longer wished to transition, and 2 others only slightly regretted not transitioning." *Id.* There is also one case study of a female-to-male patient treated by the Dutch team in the 1990s. At age 33, he reported that he did not regret transition, but did report "struggling with significant shame related to the appearance of his genitals and to his inability to sexually function; had problems maintaining long-term relationships; and experienced depressive symptoms." *Id.* "Notably, these problems had not yet emerged when the same patient was assessed at the age of 20, when he reported high levels of satisfaction in general.…" *Id.*

Third, there are many unanswered questions about the reported reduction in feelings of gender dysphoria and "the lack of meaningful changes in psychological function." *Id.* It could be, for instance, that there is simply no correlation between psychological functioning and the use of the Utrecht Gender Dysphoria scale which the study used. *Id.* at 10-11. Or it could be that the high psychological functioning of the screened participants at baseline meant that there was not much room for improvement. *Id.* at 10-11. Or it could be that the use of different "male" and "female" gender dysphoria scales skewed the results, particularly since biological males were given the "male" scale up to their surgeries and then were switched over to the

"female" scale. *Id.* The study itself cannot answer these questions. *See* Hunter Decl. ¶¶ 71-76.

Fourth, there are myriad other unanswered questions. Would the outcomes have been any different if the participants were not, on average, already in the healthy psychological range before they began treatment? How did the 13% of the initial cohort who did not or could not participate in the final survey fare? What were the participants' long-term physical health outcomes? Did the puberty blockers, cross-sex hormones, and surgical procedures cause any physical problems for the participants down the line (other than to the non-reported participant who died because of the surgery)? Would the results be similar for youths whose gender-related distress began in adolescence rather than childhood? And most importantly, how do gender dysphoric youth fare if they do not receive the experimental gender transition procedures, and how would that control group compare to the study's experimental cohort? Again, the study provided no answers to these questions.

### 2.    Beyond the Dutch Protocol

The Dutch study was important. Its report of partial success "called for additional research, both to confirm those results and to search for ways to maximize beneficial results and minimize negative outcomes." Cantor Decl. ¶ 58. "Instead," as Dr. Cantor reports—and as Plaintiffs' expert reports themselves show by their unbridled reliance on the study—"many other clinics and clinicians proceeded on

the basis of the positives only, broadened the range of people beyond those represented in the research findings, and removed the protections applied in the procedures that led to those outcomes." *Id.*

The Gender Multispecialty Service at Boston Children's Hospital was the first transgender clinic for children in the United States.[30] It opened in 2007. Since then, at least 64 other specialty clinics have joined the mix.[31] *See* Kenny Decl. at 28-29 (showing map). And that number does not include general practice physicians or places like Planned Parenthood that also administer "gender affirming hormone therapy."[32]

The dramatic increase in providers and patients, combined with the political zeitgeist, has led to a sharp departure from the Dutch protocol. "Many clinics and individual clinicians have reduced the minimum age for transition to 10 instead of 12." Cantor Decl. ¶ 58. "While the Dutch Protocol involves interdisciplinary teams of clinicians, many clinics now rely on a single assessor, in some cases one without adequate professional training in childhood and adolescent mental health. Comprehensive, longitudinal assessments (*e.g.*, one and a half *years*) became approvals after

---

[30] *Gender Multispeciality Service (GeMS)*, BOSTON CHILDREN'S HOSP., https://www.childrenshospital.org/programs/gender-multispecialty-service (last visited April 28, 2022).

[31] *See Interactive Map: Clinical Care Programs for Gender-Expansive Children and Adolescents*, Hum. Rights Council, https://www.hrc.org/resources/interactive-map-clinical-care-programs-for-gender-nonconforming-childr (last visited April 28, 2022).

[32] *E.g.*, Planned Parenthood, *Gender Affirming Hormone Therapy*, https://www.plannedparenthood.org/planned-parenthood-mar-monte/patient-resources/gender-affirming-care (last visited Apr. 28, 2022).

one or two assessment sessions." *Id.* "Validated, objective measures of youths' psychological functioning were replaced with clinicians' subjective (and first) opinions, often reflecting only the clients' own self-report. Systematic recordings of outcomes, so as to allow for detection and correction of clinical deficiencies, were eliminated." *Id.*

Moreover, whereas "[t]he average age of initiating puberty blockade in the Dutch study was around 15," the Endocrine Society now recommends starting puberty blockers when a child enters Tanner stage II of puberty, "which can occur as early as 8-9 years."[33] That is before a person become fertile, meaning that "[i]f puberty is blocked before reaching [Tanner stage 3 or 4] the sex glands will be locked in a premature state and incapable of fertility." Laidlaw Decl. at 9. And "[i]rreversible cross-sex hormones, initiated in the Dutch study at the average age of nearly 17, are currently commonly prescribed to 14-year-olds." Levine et al., *Reconsidering Informed Consent* at 13; *cf.* Poe Decl., Doc. 8-7 ¶ 21 (noting that 15-year-old Allison started taking estrogen "approximately seven months ago"). "The fact that children are transitioned before their identity is tested against the biological reality and before natural resolution of gender dysphoria has had a chance to occur is a major deviation from the original Dutch protocol." Levine et al., *Reconsidering Informed Consent* at

---

[33] Levine et al., *Reconsidering Informed Consent* at 13; *see* Endocrine Society Guidelines at 3870 ("We recommend treating gender-dysphoric/gender-incongruent adolescents who have entered puberty at Tanner Stage G2/B2 by suppression with gonadotropin-releasing hormone agonists.").

13; *see* Hunter Decl. ¶ 105 ("Procedures viewed as 'medically necessary' by some of the proponents of 'gender-affirmative care' for minors now include the suppression of puberty indefinitely in order to present as an ambiguous sex, mastectomy on youth as young as 13 years of age, and 'non-binary' surgeries that preserve a feminine appearance while changing the placement of the nipples to be more reminiscent of a male chest, should the minor's identity reside somewhere along the 'male to female spectrum.'" (footnotes omitted)).

Even assuming that the Dutch studies could be replicated (which, as explained below, they haven't been), these departures cause significant harm. As the founding psychologist at the Boston clinic and another WPATH leader recently wrote in the *Washington Post*: "A flood of referrals to mental health providers and gender medical clinics, combined with a political climate that sees the treatment of each individual patient as a litmus test of social tolerance, is spurring many providers into sloppy, dangerous care."[34] They continued:

> Most [gender clinics] have a single social worker who completes a brief "intake," relying instead on other mental health clinicians in the community to assess patients and offer their conclusions. Frequently, those community clinicians, just like the parents, assume that a more comprehensive assessment will occur in the gender specialty clinic. But in our experience, and based on what our colleagues share, this is rarely the case. Most clinics appear to assume that a referral means a mental

---

[34] Edwards-Leeper & Anderson, *The Mental Health Establishment is Failing Trans Kids*, *supra*.

health provider in the community has diagnosed gender dysphoria and thereby given the green light for medical intervention.[35]

Such has certainly been the experience of many parents who turned to gender clinics for help caring for their gender dysphoric children. They found that in-depth psychological help was not offered; that gender clinicians ignored psychological comorbidities and urged transition as a cure-all; and that the specter of suicide was often raised *in front of the child* to coerce treatment:

- "We saw a psychologist at the gender clinic who after one visit with M. and filling out some questionnaires said that she would recommend that M. see the endocrinologist to be prescribed hormones." Martha S. Decl. ¶ 8 (mother of son with diagnosed psychiatric comorbidities who started to identify as transgender as an adolescent).

- "During a family therapy session, the therapist ignored J.'s other comorbidities [OCD, anxiety, depression, and ADHD] and focused solely on gender dysphoria.… *With J. present*, the therapist told me and my wife that kids are more likely to attempt suicide and run away from home if they are not affirmed in their chosen identity." John Roe Decl. ¶¶ 10, 12 (father of son who suddenly identified as transgender in 8th grade and was facilitated in socially transitioning by his school without the parents' knowledge).

- "Shortly after B announced that she identified as a boy [at age 11], I acted on the advice of our family physician and took B to a gender clinic. I naively believed that I would have an opportunity to seek a psychological evaluation and psychological counseling for B. and discuss her sudden identification as a boy prior to any interventions aimed at 'affirming' her choice. However, when my daughter and I arrived at the clinic the staff psychologist did an evaluation, but said she did not have time to see

---

[35] *Id.*

37

B. regularly to give more in depth psychological help." Barbara F. Decl. ¶¶ 6-7.

- "At age 13, S. suddenly declared, in a manner which sounded scripted, that she believed she was a boy and wanted to use a male name. When I spoke to her caregivers, they focused on S. wanting to go by a male name and pronouns. I asked them to address S.'s self-harm, anxiety and bulimia, but they refused…. During one visit, with S present, the caregivers stated that 'trans' people are more likely to commit suicide if not affirmed.… Following the psychiatric treatment, S. returned to seeing psychiatrists and counselors that she had previously been seeing. Her medication was adjusted, she stopped self-harming and her tics were better controlled." Kristine W. Decl. ¶¶ 5-7 (mother of daughter with OCD, Tourette's Syndrome, and bulimia, who identified as transgender after spending "copious amounts of time online during the pandemic lockdown").

Ironically, as the political and medical establishment in America has cherrypicked what they wanted from the Dutch study and then swiftly moved beyond its protocol,[36] the Dutch researchers themselves have urged caution. As Dr. Cantor reports, "Dr. Thomas Steensma, central researcher of the Dutch clinic, has decried other clinics for 'blindly adopting our research' despite the indication that those results may not actually apply: 'We don't know whether studies we have done in the past are still applicable to today. Many more children are registering, and also a different type.'" Cantor Decl. ¶ 59 (citation omitted).

---

[36] Plaintiffs' expert Dr. Hawkins, for instance, relies solely on the 2014 Dutch study for her claim that "[s]cientific literature and clinical experience consistently find that, like social transition, medical treatment for Gender Dysphoria offers significant psychological benefit to transgender young people." *See* Hawkins Decl., Doc. 8-1 at 17.

D.     **Affirmation Treatment's Lack of Proven Benefits and Its Risks of Long-term Harms**

In the decade-or-so since the Dutch studies were published, some research has been done to try to answer some of the questions they left unanswered. But not nearly as much as one might think. In fact, "[t]he latter phases of the Dutch protocol (following puberty blockers with cross-sex hormones and surgery) have never been attempted to be replicated." Hunter Decl. ¶ 70. And recent attempts to replicate the moderately positive results of the first study on puberty blockers have failed. *Id.*[37] Given Plaintiffs' mantra that these treatments are safe, effective, and necessary, it is worth examining them in a bit of detail.

1.     **Puberty Blockers**

Puberty blockers—gonadotrophin releasing hormone (GnRH) agonists—work by causing the pituitary gland to lower the release of the luteinizing hormone (LH) and follicle stimulating hormone (FSH) that are responsible for sex hormone production and fertility. Laidlaw Decl. at 12. "The result is a blockage of the signaling of the pituitary to the testicles or ovaries and therefore underproduction of the sex hormones." *Id.* At 12-13.

GnRH agonists are used to treat a number of conditions. Lupron, for instance, was developed to treat prostate cancer by lowering testosterone in adult males. The

---

[37]*E.g.*, Polly Carmichael et al., *Short-term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16 PLos ONE No. 2, 18-19 (Feb. 2021), *available at* https://doi.org/10.1371/journal.pone.0243894.

FDA has approved this use of Lupron. *Id.* at 13. "Another labeled use of GnRH agonist medication is for the treatment of central precocious puberty," which is when "pituitary signaling is activated at an abnormally young age, say age four, to begin pubertal development." *Id.* A GnRH agonist may thus be used to halt puberty until a normal time for pubertal development; the medication is then stopped and puberty is allowed to proceed. "The end result is to restore normal sex gland function and timing of puberty." *Id.*

The FDA has not approved the use of puberty blockers to treat gender dysphoria. But when they are used for this treatment, it is not like treating a child with precocious puberty. Rather, the intervention is used to *impose* a diseased state (hypogonadotropic hypogonadism) and disrupt the healthy functioning of the pituitary gland and sex organs. *Id.* at 13. And whereas treating precocious puberty with puberty blockers delays puberty until a natural time, using them to treat gender dysphoria will permanently disrupt natural puberty if cross-sex hormones are then used (which is almost always the case). Laidlaw Decl. at 13-15; *see* Van Meter Decl. at 11 (noting that comparing the use of puberty blockers to treat precocious puberty vs. gender dysphoria is "comparing apples to oranges"); *contra* U.S. Br., Doc. 62-1 at 15 (asserting that the treatments here are "not experimental" because "medications … have been used for decades to treat … 'precocious puberty'").

The use of puberty blockers to treat gender dysphoria has significant, lasting effects. Here are four. First, "[t]he child will continue their chronological age progression toward adulthood and yet remain with undeveloped genitalia. This will lead to sexual dysfunction including potential erectile dysfunction and inability to ejaculate and orgasm for the male. For the female with undeveloped genitalia potential sexual dysfunction may include painful intercourse and impairment of orgasm." Laidlaw Decl. at 14.

Second, if puberty blockers are used at Tanner Stage 2 of puberty, as the Endocrine Society suggests, then "the gonads will remain in an immature, undeveloped state," and permanent sterility will likely result. *Id.* at 14; *see also* Hruz Decl. ¶¶ 61-63.

Third, puberty is important for brain development, and going through puberty with one's peers is important for psychosocial development. Laidlaw Decl. at 15. The long-term effects of not going through natural puberty are not well understood, but could be—and likely are—harmful. *Id.*; Hruz Decl. ¶¶ 61-67.

Fourth, "[c]hildren placed on puberty blockers have slower rates of growth in height, and an elevated risk of low bone-mineral density." Hruz Decl. ¶ 67. This could lead to future risk of osteoporosis and the potential for debilitating spine and hip fractures. Laidlaw Decl. at 14-15; Van Meter Decl. at 11-12. The Endocrine Society itself warns that pubertal suppression "may include adverse effects on bone

mineralization …, compromised fertility if the person subsequently is treated with sex hormones, and unknown effects on brain development." Endocrine Society Guidelines at 3882. Then the Guidelines note: "Few data are available on the effect of GnRH analogs on [bone mineral density] in adolescents with GD/gender incongruence." *Id.*; *see also* Van Meter Decl. at 12.

In 2020, Britain's National Institute for Health and Care Excellence (NICE) conducted an extensive literature review of studies concerning the use of puberty blockers to treat gender dysphoria in children and adolescents. *See* NICE Puberty Blocker Evidence Review. The researchers found that "[a] key limitation to identifying the effectiveness and safety of GnRH analogues for children and adolescents with gender dysphoria is the lack of reliable comparative studies." *Id.* at 12. The review concluded that "the studies that reported impact on the critical outcomes of gender dysphoria and mental health (depression, anger and anxiety), and the important outcomes of body image and psychosocial impact (global and psychosocial functioning), in children and adolescents with gender dysphoria are of very low certainty using modified GRADE … [and] suggest little change with GnRH analogues from baseline to follow-up." *Id.*

### 2.    Cross-Sex Hormones

Using cross-sex hormones to treat gender dysphoria means to provide unnatural (or supraphysiologic) levels of testosterone to females—"anywhere from 6 to

100 times higher than native female testosterone levels"—and unnatural levels of estrogen to males—"vary[ing] from two to eight or more times higher than normal adult male levels." Laidlaw Decl. at 17-19. Because the use of cross-sex hormones to "treat" gender dysphoria in children is so new, "long-term outcomes are unknown." Hruz Decl. ¶ 62.

The amount of testosterone given to females raises the level of testosterone in the body to "the same order as dangerous endocrine tumors." Laidlaw Decl. at 17. The intervention is associated with multiple health risks. *Id.* at 17-18. For instance, "[s]tudies of transgender males taking testosterone have shown up to a nearly 5-fold increased risk of myocardial infarction relative to females not receiving testosterone." *Id.* at 17. Other likely effects include irreversible changes to the vocal cords, polycystic ovaries, atrophy of the lining of the uterus, increase in fibrous breast tissue, decrease in normal glandular tissue, and an increased risk of ovarian and breast cancers. *Id.* at 17-18. Then there are the side effects of the drugs themselves that occur regardless of sex—mood disorders, psychosis, and psychiatric disorders, to name but a few. *Id.*

As for biological males taking supraphysiologic doses of estrogen, effects include gynecomastia (the abnormal growth of breast tissue that is typically corrected by medication or surgery); an increased risk of myocardial infarction, cardiovascular disease, and thromboembolism (a blood clot that develops in a deep vein); and an

increased risk (to the tune of 46 times higher) of developing breast cancer. *Id.* at 18-19.

As it did for puberty blockers, the UK's NICE evidence review for cross-sex hormones concluded that the state of the science regarding cross-sex hormones is still largely undeveloped. It thus urged significant caution: "Any potential benefits of gender-affirming hormones must be weighed against the largely unknown long-term safety profile of these treatments in children and adolescents with gender dysphoria." NICE Cross-Sex Hormone Evidence Review at 14.

### 3. Surgical Interventions

The use of puberty blockers and cross-sex hormones to treat pediatric gender dysphoria sets children on a pathway that often leads to surgical interventions. There are a variety of "gender affirming" surgeries, including mastectomies, metoidioplasty, phalloplasty, and vaginoplasty. Laidlaw Decl. at 19-21. Mastectomies are the surgical removal of the breasts; the procedure "cannot be reversed." *Id.* at 20. "The female will never regain healthy breasts capable of producing milk to feed a child." *Id.* "Other types of surgery for females include those of the genitalia and reproductive tract," many of which cause permanent sterilization. *Id.* at 20-21.

"Gender affirming" treatments for male "include removal of the testicles alone to permanently lower testosterone levels." *Id.* at 21. "Further surgeries may be done in an attempt to create a pseudo-vagina which is called vaginoplasty. In this

procedure, the penis is surgically opened and the erectile tissue is removed. The skin is then closed and inverted into a newly created cavity in order to simulate a vagina." *Id.* As Dr. Laidlaw notes, "[i]t is important to understand that the use of puberty blockers for the male makes the vaginoplasty procedure even more complicated" because the "surgeon has a limited length of penile skin to work with." *Id.* "In these cases a technique is employed whereby a segment of the large bowel (colon) is surgically excised … then connected to the short, inverted penile skin." *Id.*

As mentioned, the primary study examining the effects of surgical interventions to treat gender dysphoria in minors was the Dutch study, and its period of follow-up was less than 2 years post-surgery. The study has never been replicated. Hunter Decl. ¶ 70.

In 2016, the Centers for Medicare & Medicaid Services released its national coverage analysis for gender dysphoria and gender reassignment surgery.[38] The analysis looked at whether the data supported using surgical interventions to treat gender dysphoria in the Medicare population. The conclusion? "[T]here is not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients

---

[38] *See* Tamara Syrek Jensen, et al., *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (CAG-00446N) (Aug. 30, 2016), *available at* https://perma.cc/9CQN-938N.

most likely to benefit from these types of surgical intervention can be identified pro-spectively."[39]

To be sure, the CMS analysis determined only whether surgical interventions were medically necessary for the Medicare population, not children. But the lessons are obvious: There is no reason to think that the Constitution requires Alabama to allow experimental transitional surgeries *on children* when the CMS found the evidence did not support performing the surgeries on adults.

### 4.   Effect on Suicide Rates

Throughout their briefing, Plaintiffs focus on the specter of suicide to claim that puberty blockers and cross-sex hormones are necessary medical interventions. *See* Br., Doc. 8 at 18, 20, 34, 36. The truth is that, while suicide rates are unfortunately generally elevated for persons suffering from gender dysphoria, transition interventions have not been shown to reduce the rate of suicide.

First, "[t]he notion that trans-identified youth are at alarmingly high risk of suicide usually stems from biased online samples that rely on self-report, and frequently conflates suicidal thoughts and non-suicidal self-harm with serious suicide attempts and completed suicides." Levine et al., *Reconsidering Informed Consent* at 8. While both suicide and suicidal ideation are cause for concern and warrant treatment, they are different phenomena: suicide "refers to completed suicides and the

[39] *Id.*

sincere intent to die," while suicidality "refers to parasuicidal behaviors, including suicidal ideation, threats, and gestures" and typically "represent cries for help rather than an intent to die." Cantor Decl. ¶ 81. Both are "inextricably linked" to mental illness. *Id.* ¶ 82. For instance, "suicidality is a well-documented symptom of Border-line Personality Disorder (as are chronic identity issues), and personality disorders are highly elevated among transgender populations, especially adolescent-onset. Thus, the elevations of suicidality among gender dysphoric adolescents may not be a result of anything related to transition (or lack of transition), but to the overlap with mental illness of which suicidality is a substantial part." *Id.*

Second, to the extent a gender dysphoric young person is suffering from suicidal ideation, the "gender affirming" treatment protocols agree that this mental health issue should be treated and resolved *before* the person pursues transition. Indeed, "[a] primary criterion for readiness for transition used by the clinics demonstrating successful transition is the absence or resolution of other mental health concerns, such as suicidality." *Id.* ¶ 83.

Third, while suicide rates are tragically elevated for people suffering from gender dysphoria (as they are for people suffering from other mental illnesses), "[u]ntil recently, little was known about the actual rate of suicide of trans-identified youth." Levine et al., *Reconsidering Informed Consent* at 8. "However, a recent analysis of data from the biggest pediatric gender clinic in the world, the UK's Tavistock,

found the rate of completed youth suicides to be 0.03% over a 10-year period, which translates into the annual rate of 13 per 100,000. While this rate is significantly elevated compared to the general population of teens, it is far from the epidemic of trans suicides portrayed by the media"—or by Plaintiffs. *Id.* (citation omitted).

Fourth, it is not the case that data show that transitioning reduces suicide rates over the long-term, or even over the short-term. Data from the Tavistock clinic, for instance, "did not show a statistically significant different between completed suicides in the 'waitlist' vs. the 'treated' groups." *Id.* at 9. And suicide rates remain unfortunately "elevated even after complete transition, as shown by a comprehensive review of 19 studies of suicidality in gender dysphoria." Cantor Decl. ¶ 84; *see also* WPATH Standards at 108.

The most comprehensive review available was published in 2020 in the *American Journal of Psychiatry* by Richard Bränström and John E. Pachankis.[40] It initially reported long-term improvement in mental health that the authors attributed to gender-transition procedures. But after the report was published, over a dozen scientists wrote to the *Journal* to identify serious methodological problems with the study. Among other things, they pointed out that the data actually revealed that "the risk of being hospitalized for a suicide attempt was 2.4 times *higher* if [patients] had

---

[40] Richard Bränström and John E. Pachankis, *Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-affirming Surgeries: A Total Population Study*, 177 AM. J. OF PSYCHIATRY 727 (2020).

undergone gender-corrective surgery than if they had not."[41] This observation, though clinically concerning, turned out not to be statistically significant. But another one was: As the authors of the original review noted in a correction they issued, "individuals diagnosed with gender incongruence who had received gender-affirming surgery were *more likely* to be treated for anxiety disorders compared with individuals diagnosed with gender incongruence who had not received gender-affirming surgery."[42] In the end, the *Journal* published a correction explaining that the study "demonstrated no advantage of surgery in relation to subsequent mood or anxiety disorder-related health care visits or prescriptions or hospitalizations following suicide attempts."[43] *See* Cantor Decl. ¶ 52; Van Meter Decl. at 12-13; Hruz Decl. ¶ 12.

## E.   The Problem of Informed Consent

So far, it is clear that: (1) the majority of cases of gender dysphoria in youth will resolve naturally by adulthood, (2) it is impossible to tell on a case-by-case basis whose dysphoria will persist and whose will not, (3) even if one could identify the small minority of persisters, the state of the science supporting the use of puberty blockers and cross-sex hormones is undeveloped and uncertain at best, (4) the use

---

[41] Anes Wold, *Gender-Corrective Surgery Promoting Mental Health in Persons With Gender Dysphoria Not Supported by Data Presented in Article*, 177 AM. J. PSYCHIATRY 768, 768 (Aug. 2020); *see also* Richard Bränström and John E. Pachankis, *Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender-Affirming Care and Transgender Individuals' Mental Health: Response to Letters*, 177 AM. J. PSYCH., No. 8, 772 (Aug. 2020), table 1 (emphasis added).

[42] Bränström & Pachankis, *Toward Rigorous Methodologies*, *supra*, at 768 (emphasis added).

[43] *Correction to Bränström & Pachankis*, 177 AM. J. PSYCH, No. 8, 734 (2020).

of puberty blockers and cross-sex hormones come with significant risks of long-term harms, and (5) the hormones and surgical interventions do not lead to decreased suicide rates or improved psychological outcomes. Yet Plaintiffs and their experts assure the Court that healthcare providers "undertake a rigorous informed consent process." Br., Doc. 8 at 13.

It is difficult to fathom how this could possibly be true—how a child, or her parents, could ever provide informed consent to set forth on such an experimental pathway. There is very little reason to think that a child in early adolescence can properly weigh these lifetime risks, particularly when the popular narrative and many doctors so distort what the evidence shows regarding the possible benefits of puberty blockers, cross-sex hormones, and surgical interventions. *E.g.*, Crowley Decl. at 4-5 (parent of gender dysphoric child with psychological comorbidities recounting the lack of adequate information given to her by the gender clinic doctors who prescribed puberty blockers and cross-sex hormones); Frietas Decl. ¶ 6 ("I went to a gender therapist who diagnosed me with gender dysphoria and told me that transition was the only treatment that would alleviate my discomfort and anxiety.… I believe that healthcare providers did not ask me about mental health issues because they believed that those issues were caused by gender dysphoria and that transitioning would fix the problem. In fact, the opposite was true.").

As the Endocrine Society Guidelines recognize, there are not even "formally evaluated decision aids available to assist in the discussion and decision regarding the future fertility of adolescents or adults beginning gender-affirming treatment." Endocrine Society Guidelines at 3879. How is an 11-year-old girl feeling uncomfortable in her body to weigh the probabilities that her gender-based distress will resolve without hormonal or surgical intervention? How is she to know whether she will want to have children in twenty years? Whether she will want to breastfeed them? Whether she will come to regret her deepened voice and irreversible mastectomy? What it would have been like to develop and go through puberty with her peers? Whether it would all be worth it? These are tough questions for anyone. They are unfair questions to ask a child. Hunter Decl. ¶¶ 114-19; Laidlaw Decl. at 22-23.

It is little wonder, then, that at least some children who are asked to answer these questions feel betrayed by the adults they turned to for help. Because the evidence in this entire field is so poor, no one really knows how many patients come to regret their transition, but the number is not insignificant. "A recent study from a UK adult gender clinic showed that over 10% of young people treated with gender-affirmative interventions detransitioned within 16 months of staring treatment," while "[a]nother 22% of patients disengaged from the clinic without completing their treatment plans." Hunter Decl. ¶ 61. "Another clinic population study found that over 12% of those who had started hormonal treatments either detransitioned or

documented regret, while 20% stopped the treatments for a wider range of reasons." *Id.* ¶ 62.

There are now many online support groups for people who feel betrayed by the medical establishment and the predominant narrative that transitioning is medically required to treat gender dysphoria.[44] As more and more young people are learning, that was not the case for them.

Corinna Cohn, for instance, suffered from gender dysphoria as a boy. At age 18, after seeing a psychologist, Cohn started cross-sex hormones and underwent complete sex reassignment surgery at 19. The surgery was successful, but ultimately unsatisfying:

> After healing from my sex change surgery I thought that my transition journey was over. I discontinued therapy, and I began focusing on my career. I found it was easier to socialize and make new friends with my new confidence and feelings of being my authentic self. As I reached my late twenties, my friends began pairing off and starting families. I discovered that it was very difficult to find a partner who wanted to do the same with me.

> Although I was in denial for several years, I eventually realized that my depression and anxiety related to my gender identity had not resolved. It was not unusual for me to spend entire weekends in my room crying and entertaining thoughts of suicide.…

> I wish I could persuade other boys who wish to become women that the changes they seek are only superficial. Hormones and surgery are unable to reveal an authentic self, and anyone who promises otherwise is, in my opinion, deliberately misleading young people to follow

---

[44] *See* Littman Survey at 3353-54 (documenting "massive change" over last eight years in awareness about detransitioners).

a one-way track to a lifetime of medicalization. Although some people may choose to transition, and may even enjoy a higher quality of life, there is no reason why this irreversible decision needs to be made in adolescence. Adults who advocate for adolescent transition do so without understanding what tradeoffs early transition entails, which includes the loss of fertility, the likelihood of sexual dysfunction, and the likelihood of surgical complication inflicted at an early age from elective procedures. Unfortunately, I do understand some of these tradeoffs.

Cohn Decl. at 2-3.

Other have similar stories. Here's Sydney Wright's—an Alabamian who was prescribed testosterone for her gender dysphoria when she was 18:

My frame of mind at the time, at age 18, was that I believed I might have been "born in the wrong body" and needed to correct it. But I was also unsure, confused, and in need of guidance.…

[After] I stopped taking testosterone and resumed living as a female[,] [m]y physical and mental health have improved, but I continue to suffer adverse effects from the treatments, including a deepened voice and digestive issues that I've been told will be permanent. I also suffer extreme regret for the choices I made as a teenager. I trusted the doctors' advice. They were the experts, who was I as a confused and scared 18 year old not to listen to them?

But telling an 18-year-old girl that mega-doses of testosterone would fix her mental health problems? They didn't even talk to me about other treatment options! No doctor or therapist suggested I give myself time to grow up, or suggested counseling for what was causing my feelings – no doctor or therapist told me most young people outgrow their feelings of wanting to be the opposite sex. The only advice I got was to take mega-doses of testosterone.

Wright Decl. ¶¶ 11, 20-22.

And KathyGrace Duncan's, who transitioned at age 19 and detransitioned 11 years later:

After 11 years passing as a man and living what I thought was a relatively "happy" and stable live (which included having a number of girlfriends), I realized that I was living a lie built upon years of repressed pain and abuse. Hormones and surgery had not helped me resolved underlying issues of rejection, abuse, and sexual assault. I came to understand that my desire to live as a man was a symptom of deeper unmet needs.

Duncan Decl. ¶ 9.

And Carol Frietas's, who transitioned as an adult and later detransitioned after finally getting the mental health care she needed from the beginning:

I went to Planned Parenthood for testosterone and was given it right away, with no information. I was not given any information on uterine atrophy, vaginal atrophy, or other effects of testosterone and the staff did not talk about any of my emotional or mental health issues. Four months after starting testosterone, I went to a plastic surgeon for a mastectomy. I needed a letter from a therapist and received one from the therapist who had affirmed me and originally recommended transition. As was true with testosterone, I was not given any information about the procedure. Instead I had a consultation with the surgeon, who said "this is what we are going to do," drew on my chest, took pictures and asked me what I wanted out of the surgery. He said "we'll create a masculine looking chest, you'll look great." …

[After several months,] I went to a psychiatrist to specifically deal with the depression and I was provided with an anti-depressant that really worked. I felt mentally stable and able to address the trauma that led to my transition. Within a month of starting the anti-depressant, I realized that I had not needed to transition. It was the biggest mistake I had ever made. I did not detransition for a year because I couldn't believe that it was so easy, *i.e.*, that anti-depressants alleviated my depression and enabled me think clearly and reason better. This allowed me [to] address my internalized homophobia and childhood abuse through therapeutic means.

Frietas Decl. ¶¶ 9-10, 12-13.

54

The explosion of detransitioners—like the explosion of gender incongruent youth—is a relatively recent phenomenon. But there have been two recent surveys that tell us a bit about them. Hunter Decl. ¶¶ 60, 117, 137. In one, the author surveyed 237 participants who had detransitioned back to their natal gender. Vandenbussche, *supra*, at 4.[45] Seventy percent of the participants reported that they detransitioned because they "realized that [their] gender dysphoria was related to other issues"; half reported that "[t]ransition did not help with [their] dysphoria"; and over a third reported that their "[d]yspohria resolved itself over time." *Id.* at 6. Only 13% reported that a lack of support from social surroundings contributed to their detransition. *Id.* Most participants reported needing help with "learning to cope with feelings of regret." *Id.* at 12.

In the second, the author surveyed 100 individuals who "experienced gender dysphoria, chose to undergo medical and/or surgical transition and then detransitioned by discontinuing medications, having surgery to reverse the effects of transition, or both." Littman Survey at 3354. The average age the participants first experienced gender dysphoria was age 11. *Id.* at 3358. The reasons the participants gave for wanting to transition included: "wanting to be perceived as the target gender (77.0%); believing that transitioning was their only option to feel better (71.0%); the

---

[45] The survey included participants who had transitioned both socially and medically (65%) and those who had transitioned only socially (31%). Most of the participants were females in their twenties.

sensation that their body felt wrong the way it was (71.0%); and not wanting to be associated with their natal sex (70.0%). Most participants believed that transitioning would eliminate (65.0%) or decrease (63.0%) their gender dysphoria and that with transitioning they would become their true selves (64.0%)." *Id.* at 3358. Participants were on average 21.9 years old when they started transitioning, and the average time the participants remained transitioned was 3.9 years. *Id.* at 3360.

"The most frequently endorsed reason for detransitioning was that the respondent's personal definition of male and female changed and they became comfortable identifying with their natal sex (60.0%). Other commonly endorsed reasons were concerns about potential medical complications (49.0%); transition did not improve their mental health (42.0%); dissatisfaction with the physical results of transition (40.0%); and discovering that something specific like trauma or a mental health condition caused their gender dysphoria (38.0%)." *Id.* at 3361. "The majority of respondents were dissatisfied with their decision to transition (69.7%) and satisfied with their decision to detransition (84.7%)." *Id.* at 3363. Notably—though understandably—"[o]nly 24.0% of participants had informed the doctor or clinic that facilitated their transitions that they had detransitioned." *Id.* at 3363.

In 2020, courts in the U.K. examined whether a minor could ever consent to taking puberty blockers for gender dysphoria. *See Bell v. Tavistock & Portman Nat'l Health Serv. Found. Tr.* [2020] EWHC (Admin) 3274. In concluding that it is

"highly unlikely that a child aged 13 or under would be competent to give consent to the administration of puberty blockers," and "doubtful that a child aged 14 or 15 could understand and weight the long-term risks and consequences of the administration of puberty blockers," the court made a number of pertinent findings:

- "[T]he use of puberty blockers is not itself a neutral process by which time stands still for the child on PBs, whether physically or psychologically. PBs prevent the child going through puberty in the normal biological process.… Indeed, the statistical correlation between the use of puberty blockers and cross-sex hormones supports the case that it is appropriate to view PBs as a stepping stone to cross-sex hormones." ¶ 137.

- "Although a child may understand the concept of the loss of fertility for example, this is not the same as understanding how this will affect their adult life. A child's attitude to having biological children and their understanding of what this really means, is likely to change between childhood and adulthood." ¶ 139.

- "The difficulty of achieving informed consent in these circumstances is further exacerbated by the lack of evidence as to the efficacy of PBs in treating GD and the long-term outcomes of taking it.… [T]he combination here of lifelong and life changing treatment being given to children, with very limited knowledge of the degree to which it will or will not benefit them, is one that gives significant grounds for concern." ¶ 143.

- "[T]he clinical interventions involve significant, long-term and, in part, potentially irreversible long-term physical, and psychological consequences for young persons. The treatment involved is truly life changing, going as it does to the very heart of an individual's identity. Secondly, at present, it is right to call the treatment experimental or innovative in the sense that there are currently limIted studies/evidence of the efficacy or long-term effects of the treatment." ¶ 148.

The court concluded: "We do not think that the answer to this case is simply to give the child more, and more detailed, information. The issue in our view is that in many cases, however much information the child is given as to long-term consequences, s/he will not be able to weigh up the implications of the treatment to a sufficient degree. There is no age appropriate way to explain to many of these children what losing their fertility or full sexual function may mean to them in later years." ¶ 144.[46] Indeed there isn't.

## F.    An International Reckoning

As organizations like the American Medical Association and the American Academy of Pediatrics continue to follow the popular zeitgeist when it comes to unproven gender-affirming interventions, other countries are responding to the science and urging caution. Hruz Decl. ¶ 12; Cantor Decl. ¶¶ 128-35.

### 1.    Sweden

In February 2022, following an extensive literature review, Sweden's National Board of Health and Welfare issued a national policy severely restricting the

---

[46] On appeal, the Court of Appeal ultimately set this decision aside, concluding that the lower court had erred procedurally by weighing the evidence rather than accepting only the evidence presented by the clinic. *See Bell v. Tavistock & Portman NHS Found. Tr.* [2021] EWCA (Civ) 1363, *available at* https://www.judiciary.uk/wp-content/uploads/2021/09/Bell-v-Tavistock-judgment-170921.pdf. But even the higher court agreed that "there are strongly held contrary views" to the WPATH and Endocrine Society's guidelines. *Id.* ¶ 75. It also acknowledged that whether to give children puberty blockers to treat gender dysphoria "raises not only clinical medical issues but also moral and ethical issues, all of which are the subject of intense professional and public debate," and that "[m]edical opinion is far from unanimous about the wisdom of embarking on treatment before adulthood." *Id.* ¶ 3.

administration of puberty blockers and cross-sex hormones to treat gender dysphoric youth. *See* Sweden Policy Statement. The Board concluded: "For adolescents with gender incongruence, the [Board] deems that the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits, and that the treatments should be offered only in exceptional cases. This judgment is based mainly on three factors: the continued lack of reliable scientific evidence concerning the efficacy and the safety of both treatments, the knowledge that detransition occurs among young adults, and the uncertainty that follows from the yet unexplained increase in the number of care seekers, an increase particularly large among adolescents registered as females at birth." *Id.* at 3. Going forward, puberty blockers and cross-sex hormones may be used to treat gender dysphoric youth in Sweden only in strictly controlled research settings or in very "exceptional cases." *Id.* at 4; *see* Cantor Decl. ¶¶ 132-33.

### 2. United Kingdom

Some of the events in the UK have already been mentioned—the NICE literature reviews and the whistleblower suit coming from the Tavistock gender clinic. The literature reviews are being used as part of a systematic evaluation of England's pediatric gender identity services led by Dr. Hillary Cass. In February of this year,

Dr. Cass and her team released an interim report.[47] The report noted that the "affirmative care" model is associated with the United States, but had been embraced by many clinicians at the Tavistock clinic.[48] The specialist gender-related service there "ha[d] not been subjected to some of the usual control measures that are typically applied when new or innovative treatments are introduced," and the reporters noted that "[m]any of the challenges and knowledge gaps … are echoed internationally."[49]

Combined with a "rapid change in epidemiology," a dramatic increase in the number of referrals, and patients presenting with "a wide range of psychosocial and mental health needs," the embrace of the "affirmative, non-exploratory approach" led to conflict at the clinic and elsewhere.[50] The report noted a "lack of consensus" about whether the affirmative care model was proper, but that "[p]rimary and secondary care staff … feel under pressure to adopt an unquestioning affirmative approach."[51] Physicians outside the clinic felt similar pressure, with some doctors telling the authors that they were "afraid of the consequences" if they did not bow to the "pressure to take a purely affirmative approach."[52] And the report acknowledged that "disagreement and polarization is heightened when potentially irreversible

---

[47] *See The Cass Review: Independent Review of Gender Identity Services for Children and Young People: Interim Report* (Feb. 2022), *available at* https://cass.independent-review.uk/publications/interim-report/.
[48] *Id.* at 14-15, 78.
[49] *Id.* at 15.
[50] *Id.* at 14-17.
[51] *Id.* at 17.
[52] *Id.* at 48.

treatments are given to children and young people, when the evidence base underlying the treatments is inconclusive, and when there is uncertainty about whether, for any particular child or young person, medical intervention is the best way of resolving gender-related distress."[53] The report did not make a final recommendation on the use of puberty blockers and cross-sex hormones in minors "due to gaps in the evidence base."[54] *See* Cantor Decl. ¶¶ 128-29.

### 3.    Finland

In June 2020, Finland's Council for Choices in Healthcare suggested changes to its treatment protocols. Cantor Decl. ¶¶ 130-31; Finland Policy Statement. Though allowing for some hormonal interventions under certain conditions, the Council lamented the lack of evidence in the area and urged caution in light of the severe risks associated with medical intervention:

- "Potential risks of GnRH therapy include disruption in bone mineralization and the as yet unknown effects on the central nervous system. In trans girls, early pubertal suppression inhibits penile growth, requiring the use of alternative sources of tissue grafts for a potential future vaginoplasty. *The effect of pubertal suppression and cross-sex hormones on fertility is not yet known*." *Id.* (emphasis added).

- "In cases of children and adolescents, ethical issues are concerned with the natural process of adolescent identity development, and the possibility that medical interventions may interfere with this process. It has been suggested that hormone therapy (e.g., pubertal suppression) alters the course of gender identity development; i.e., it may consolidate a gender identity that would have otherwise changed in some of the treated adolescents. *The reliability of*

---

[53] *Id.* at 13, 28.
[54] *Id.* at 15.

*the existing studies with no control groups is highly uncertain, and because of this uncertainty, no decisions should be made that can permanently alter a still-maturing minor's mental and physical development.*" *Id.* (emphasis added).

- "Professionals, for their part, consider it important to ensure that irreversible interventions, which may also have significant adverse effects, both physical and mental, are only performed on individuals who are able to understand the permanence of the changes and the potential for harm, and who are unlikely to regret such interventions. *It is not known how the hormonal suppression of puberty affects young people's judgement and decision-making.*" *Id.* (emphasis added).

The Council thus concluded: "Information about the potential harms of hormone therapies is accumulating slowly and is not systematically reported. It is critical to obtain information on the benefits and risks of these treatments in rigorous research settings." *Id.*

### 4. Australia and New Zealand

In August 2021, the Royal Australian & New Zealand College of Psychiatrists issued a position statement recognizing the "paucity of quality evidence on the outcomes of those presenting with Gender Dysphoria" and the "need for better evidence in relation to outcomes for children and young people." *See* Royal Australian & New Zealand College of Psychiatrists Statement. It urged caution and humility:

- "There are polarized views and mixed evidence regarding treatment options for people presenting with gender identity concerns, especially children and young people." *Id.*

- Psychiatrists should "be aware there are multiple perspectives and views," and while "[t]here is some evidence to suggest positive psychosocial outcomes for those who are supported in their

gender identity," "evidence and professional opinion is divided
as to whether an affirmative approach should be taken in relation
to treatment of transgender children or whether other approaches
are more appropriate." *Id.*

## 5.  France

On February 25, 2022, France's Académie Nationale de Médecine issued a

similar statement urging "great medical caution" when treating gender dysphoric

youth "given the vulnerability, particularly psychological, of this population and the

many undesirable effects, and even serious complications, that some of the available

therapies can cause." *See* France Policy Statement. The Académie was particularly

concerned about the unexplained rise in gender incongruent youth, noting that, ac-

cording to a recent study of a high schools in Pittsburgh, "10% of students declared

themselves to be transgender or non-binary or of uncertain gender." *Id.* "Whatever

the mechanisms involved," the Académie observed, the phenomenon was a "primar-

ily social problem" given that the "epidemic-like phenomenon results in the appear-

ance of cases or even clusters in the immediate surroundings." *Id.*

Citing the rise in cases, the Académie also recognized that "the risk of over-

diagnosis is real, as shown by the increasing number of transgender young adults

wishing to 'detransition.'" *Id.* It thus lamented that "[n]o genetic predisposition has

been found" and that "there is no test to distinguish a 'structural' gender dysphoria

from transient dysphoria in adolescence." *Id.* While the Académie did not ban the

administration of puberty blockers or cross-sex hormones, it concluded that "the

greatest reserve is required in their use, given the side effects such as impact on growth, bone fragility, risk of sterility, emotional and intellectual consequences and, for girls, symptoms reminiscent of menopause." *Id.*

### G. The Alabama Vulnerable Child Compassion and Protection Act

On April 8, 2022, Alabama added its voice to the chorus and enacted the Alabama Vulnerable Child Compassion and Protection Act. As can be seen, the legislative findings are fully supported by the literature and accord with a growing international consensus:

The Legislature finds and declares the following:

(1) The sex of a person is the biological state of being female or male, based on sex organs, chromosomes, and endogenous hormone profiles, and is genetically encoded into a person at the moment of conception, and it cannot be changed.

(2) Some individuals, including minors, may experience discordance between their sex and their internal sense of identity, and individuals who experience severe psychological distress as a result of this discordance may be diagnosed with gender dysphoria.

(3) The cause of the individual's impression of discordance between sex and identity is unknown, and the diagnosis is based exclusively on the individual's self-report of feelings and beliefs.

(4) This internal sense of discordance is not permanent or fixed, but to the contrary, numerous studies have shown that a substantial majority of children who experience discordance between their sex and identity will outgrow the discordance once they go through puberty and will eventually have an identity that aligns with their sex.

(5) As a result, taking a wait-and-see approach to children who reveal signs of gender nonconformity results in a large majority of those

children resolving to an identity congruent with their sex by late adolescence.

(6) Some in the medical community are aggressively pushing for interventions on minors that medically alter the child's hormonal balance and remove healthy external and internal sex organs when the child expresses a desire to appear as a sex different from his or her own.

(7) This course of treatment for minors commonly begins with encouraging and assisting the child to socially transition to dressing and presenting as the opposite sex. In the case of prepubertal children, as puberty begins, doctors then administer long-acting GnRH agonist (puberty blockers) that suppress the pubertal development of the child. This use of puberty blockers for gender nonconforming children is experimental and not FDA-approved.

(8) After puberty blockade, the child is later administered "cross-sex" hormonal treatments that induce the development of secondary sex characteristics of the other sex, such as causing the development of breasts and wider hips in male children taking estrogen and greater muscle bass, bone density, body hair, and a deeper voice in female children taking testosterone. Some children are administered these hormones independent of any prior pubertal blockade.

(9) The final phase of treatment is for the individual to undergo cosmetic and other surgical procedures, often to create an appearance similar to that of the opposite sex. These surgical procedures may include a mastectomy to remove a female adolescent's breasts and "bottom surgery" that removes a minor's health[y] reproductive organs and creates an artificial form aiming to approximate the appearance of the genitals of the opposite sex.

(10) For minors who are placed on puberty blockers that inhibit their bodies from experiencing the natural process of sexual development, the overwhelming majority will continue down a path toward cross-sex hormones and cosmetic surgery.

(11) This unproven, poorly studied series of interventions results in numerous harmful effects for minors, as well as risks of effects simply unknown due to the new and experimental nature of these interventions.

65

(12) Among the known harms from puberty blockers is diminished bone density; the full effect of puberty blockers on brain development and cognition are yet unknown, though reason for concern is now present. There is no research on the long-term risks to minors of persistent exposure to puberty blockers. With the administration of cross-sex hormones comes increased risks of cardiovascular disease, thromboembolic stroke, asthma, COPD, and cancer.

(13) Puberty blockers prevent gonadal maturation and thus render patients taking these drugs infertile. Introducing cross-sex hormones to children with immature gonads as a direct result of pubertal blockade is expected to cause irreversible sterility. Sterilization is also permanent for those who undergo surgery to remove reproductive organs, and such persons are likely to suffer through a lifetime of complications from the surgery, infections, and other difficulties requiring yet more medical intervention.

(14) Several studies demonstrate that hormonal and surgical interventions often do not resolve the underlying psychological issues affecting the individual. For example, individuals who undergo cross-sex cosmetic surgical procedures have been found to suffer from elevated mortality rates higher than the general population. They experience significantly higher rates of substance abuse, depression, and psychiatric hospitalizations.

(15) Minors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications, including permanent sterility, that result from the use of puberty blockers. cross-sex hormones, and surgical procedures.

(16) For these reasons, the decision to pursue a course of hormonal and surgical interventions to address a discordance between the individual's sex and sense of identity should not be presented to or determined for minors who are incapable of comprehending the negative implications and life-course difficulties attending to these interventions.

Act § 2.

Given the medical uncertainties and the risks of severe harm from the medical interventions, the Legislature chose to prohibit the administration of certain treatments for minors:

> [N]o person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's [biological sex]:
>
> > (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.
> >
> > (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.
> >
> > (3) Prescribing or administering supraphysiologic doses of estrogen to males.
> >
> > (4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.
> >
> > (5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.
> >
> > (6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

Act § 4. A violation is a Class C felony. *Id.*

There are some exceptions: the prohibition does not apply "to a procedure undertaken to treat a minor born with a medically verifiable disorder of sex development," including an individual both with irresolvable ambiguous external sex characteristics and an individual who has been diagnosed with a "disorder of sexual

development." *Id.* And the Legislature expressly noted that, except as specifically provided in §4, "nothing in this act shall be construed as limiting or preventing psychologists, psychological technicians, and master's level licensed mental health professionals from rendering the services for which they are qualified." *Id.* § 6.

Governor Ivey signed the bill into law on April 8, 2022. The Act is set to become effective on May 8, 2022. Plaintiffs brought this (latest) lawsuit on April 19, Doc. 1, and sought emergency injunctive relief on April 21, Doc. 7. The United States belatedly moved to intervene on April 29, Doc. 58, filing a proposed preliminary injunction motion, brief, and expert report late the business day before this response is due, Doc. 62. Particularly because of the federal government's dilatory conduct, the State reserves the right to file a separate opposition to the proposed brief should intervention be granted, after its own experts have the opportunity to review and respond to the government's new papers. Nonetheless, recognizing the time-sensitive issues before the Court, the State has offered responses here to the government's primary points where possible.

## LEGAL STANDARD

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party;

and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). A preliminary injunction or a temporary restraining order "is an extraordinary and drastic remedy that should not be granted unless the movant *clearly* carries its burden of persuasion on each of these prerequisites." *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001) (emphasis added). Accordingly, "[f]ailure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). "Because a TRO or preliminary injunction is an extraordinary and drastic remedy, its grant is the exception rather than the rule." *Cheng Ke Chen v. Holder*, 783 F. Supp. 2d 1183, 1186 (N.D. Ala. 2011) (cleaned up) (quoting *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983)).

## ARGUMENT

This case is about whether Alabama has the power to regulate risky, experimental, unproven medical interventions on children. The answer is clearly yes. Accordingly, Plaintiffs have not clearly established any of the prerequisites to obtaining the extraordinary remedy of a preliminary injunction against enforcement of the Act.

First, their claims are unlikely to succeed. "[T]he Constitution 'principally entrusts the safety and the health of the people to the politically accountable officials of the States.'" *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring) (quoting *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613,

1613-1614 (2020) (Roberts, C.J., concurring)). "When those officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." *Id.* (cleaned up). A State legislature's scientific judgment "ordinarily should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* (cleaned up).

All of Plaintiffs' varied legal theories come down to one demand: for this Court to elevate Plaintiffs' ideologically driven reading of highly contested scientific evidence over the findings and policy views of the Alabama Legislature. Nothing in the Constitution or federal law sanctions this demand.

Plaintiffs' Equal Protection claim fails at the outset because the Act regulates certain experimental medical procedures and does not discriminate based on sex or gender identity. Neither boys nor girls may be subjected to these experimental procedures. The United States responds with the biology-defying contention that there is no meaningful difference between the sexes. In its view, giving a boy with a testosterone deficiency enough testosterone to bring him to a natural level is the same as providing a girl testosterone that raises her to unnatural (and unhealthy) levels, and thus equality demands that the treatment be made available to both. That facile logic fails, however, because the biological differences between males and females mean that the former and latter interventions are different treatments altogether. To

borrow from another context, implanting a fertilized egg in a woman can be a treatment for infertility; doing the same to a man is something very different indeed.

Nor is there an identity between the Act's regulations and transgender status. Many who identify as transgender do not seek these experimental procedures, and some who are not actually transgender *do* seek them.

In any event, the Act would easily pass even heightened scrutiny. The State's interest in protecting children is among the most compelling government interests. And a State has "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). As shown above, this area is defined by uncertainty. After weighing the demonstrated risks and unproven benefits, the Legislature drew a careful regulation that prevents experimental procedures that have (1) irreversible consequences, and (2) no discernible mental-health benefits. The Act permits proven treatments for gender dysphoria that do not inflict long-term harm. Both the Act's findings and the evidence discussed above justify the Act's closely drawn proscriptions.

Plaintiffs' remaining legal theories are even more tenuous. Though they invoke general parental rights, there is no substantive due process right for a parent to obtain experimental medical procedures for gender-transition purposes. Indeed, all federal courts of appeals to address the issue have held that no substantive due

process right exists to access experimental medical treatments. Plaintiffs' claimed right—a derivative right of a parent to obtain such treatments—necessarily fails.

Plaintiffs' void for vagueness argument rests on the proposition that the term "engage in or cause"—especially "cause"—cannot be understood or consistently applied. If basic causation requirements are void for vagueness, most of American law is void. Similar formulations litter the law, and Plaintiffs cite no court holding the term to be vague. To the contrary, courts find that causation requirements *eliminate* undue vagueness. And that is especially true here, given that Alabama law specifically articulates the "modified but-for" causation test that applies (and imposes a default *mens rea* requirement). *See* Ala. Code §§ 13A-2-5(a), 13A-2-4(b). Alabama law also speaks to Plaintiffs' other hypotheticals, which either misunderstand the causation requirement or are simply consequences of the law that Plaintiffs do not like. That does not make the law vague.

Moving even farther afield, the Act proscribes only certain conduct, and the First Amendment does not protect criminal conduct. Simply because conduct might be carried out through speech—say, hiring a hitman, or writing a prescription—does not give it First Amendment protection. Any suggestion that the Act prevents seeking medical advice misapprehends the Act's terms and settled causation rules.

Nor is the Act preempted by the ACA. The Act does not discriminate based on sex, so Section 1557 is irrelevant. And regardless, the ACA contains an express

savings clause preserving state regulation, and federal funding conditions do not confer on recipients a *right* to that funding with which state regulation could interfere. In any event, the Private Plaintiffs lack a cause of action to bring this claim against Defendants, and the federal government does not press this claim.

Finally, the other injunction factors weigh against preliminary relief. Plaintiffs' earlier judge-shopping alone forecloses their demand for equitable relief, for not only does their conduct cast the appearance of impropriety on our judicial system, but it significantly delayed this litigation. Plaintiffs cannot now claim an irreparable harm when their actions show that they were more interested in judge-shopping than in obtaining a timely adjudication. And Plaintiffs have not shown that continuing to subject minors to experimental procedures would help rather than harm them. Minors will continue to have access to necessary medical care, including treatments for tapering off their chemical gender transitions and accepted treatments for gender dysphoria.

Enjoining the Act would lead to some untold number of Alabama children being subjected to experimental procedures that could forever destroy their abilities to procreate, enjoy intimate relations, and care for children of their own. The public interest is to protect the children of this State from unproven, ideologically driven procedures. The Court should deny Plaintiffs' and the federal government's motions.

I.   **Plaintiffs Have Not Shown That Their Equal Protection Claims Are Likely To Succeed.**

Plaintiffs' Equal Protection claim will fail. The most obvious reason it will fail is that the Act does not discriminate based on sex or gender identity. No male or female can be subjected to the regulated experimental procedures. Nor are these discrete and defined procedures a proxy for transgender status: many transgender youth do not seek them, and youth who are *not* actually transgender have been subjected to them. Regardless, transgender status is not a suspect or quasi-suspect classification, particularly in the context of medical treatments that are tied to inherent biological realities. Absent a suspect classification, the Act need only pass rational basis review, and its classifications based on age and procedures advance the State's compelling interest in protecting children from experimental treatments. Even if heightened scrutiny applied, the State's interest is of the utmost importance, and the Act is narrowly tailored to protect the children of Alabama from unproven procedures with no demonstrated benefits and irreversible harms.

A.   **The Vulnerable Child Compassion and Protection Act is Subject Only to Rational-Basis Review.**

On its face, the Act draws distinctions on two bases: age and procedure. Neither is among the suspect classifications that courts have identified for Equal Protection purposes. *See Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991); *Clark v. Jeter*,

486 U.S. 456, 461 (1988). Plaintiffs deceptively edit the Act to make it appear that its restrictions are based on sex or transgender status. Br., Doc. 8 at 30. They are not.

### 1.   The Act Does Not Discriminate Based on Sex or Transgender Status.

First, the Act does not discriminate based on sex. No minor, regardless of sex, can obtain the covered experimental procedures. The Act therefore draws no "gender-based classification[]" that would "warrant heightened scrutiny." *United States v. Virginia,* 518 U.S. 515, 555 (1996) (quotation marks omitted). Plaintiffs do not appear to dispute that point.

Instead, Plaintiffs argue that "[b]y discriminating against transgender people," the Act "discriminates based on sex." Br., Doc. 8 at 31. But the Act does not discriminate based on transgender status. Under the Act, two categories exist: The first category is minors who seek certain experimental procedures "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex." Act § 4(a). The second category is all other minors.

Importantly, transgender individuals may be in either category. As even Plaintiffs and their experts recognize, there are both transgender people and non-transgender people who choose not to undergo experimental gender transition procedures. *See, e.g.*, Compl., Doc. 1 ¶ 34; Rosenthal Decl. ¶¶ 32-33, 46; *see also* Doe *2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J, concurring in the

result) ("[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)."). The DSM-5 recognizes that only *some* transgender people suffer from gender dysphoria because not all transgender people experience clinical levels of distress caused by their gender incongruence. DSM-5 at 452-53. And according to WPATH, some individuals who suffer from gender dysphoria "do not feel the need to feminize or masculinize their body" and find that "changes in gender role and expression are sufficient to alleviate gender dysphoria." WPATH Guidelines at 8-9. Accordingly, the Act's regulation of experimental procedures is not a proxy for transgender status.

This conclusion is bolstered by the fact that non-transgender individuals may be in either category, too. As noted above, many—perhaps most—children that may seek the experimental procedures will likely turn out *not* to be transgender. Indeed, in a field where so much is unknown, that fact is well established: the vast majority of youth suffering from gender dysphoria will not identify as transgender as adults. *See* Cantor Decl. ¶ 36; WPATH Standards at 11; Endocrine Society Guidelines at 3879; DSM-5 at 455. And because there is no way to accurately predict whose dysphoria will persist and whose will not (another fact well established by the literature), there is no way to separate the "true" transgender children from those whose transgender identification is simply passing. Cantor Decl. ¶ 42 (noting that, at best,

clinicians can only distinguish "unlikely from even less likely to transition"); Endo-crine Society Guidelines at 3876. Thus, in all likelihood, *more* "truly" non-transgender children than transgender children seek the medical interventions, una-ware that their gender dysphoria will resolve over time if they would but let it. *Cf.* U.S. Br., Doc. 62-1 at 12 (asserting that "[a] person's gender identity is innate"). And given that "transgender" refers merely to "[a] subset of gender-diverse youth," AAP Statement at 2, persons other than those who identify as transgender may seek the experimental procedures, too. None of that is relevant to the Act, which regulates procedures and is not based on transgender status.

Because the two categories created by the Act both include transgender and non-transgender minors, the Act does not discriminate based on transgender status. This understanding of how equal protection principles apply to the Act is compelled by precedent. The Supreme Court has repeatedly rejected the uneven-impact analy-sis on which Plaintiffs' transgender-discrimination-by-proxy theory rests. *See Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 271-72 (1979) ("[M]any [laws] affect cer-tain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law.").

Take the Supreme Court's decision in *Geduldig v. Aiello*, 417 U.S. 484 (1974). There, the Court held that a state insurance policy that excluded coverage for pregnancies did not classify on the basis of sex. *Id.* at 495-97. It explained that

the classification at issue created two groups: pregnant and nonpregnant people. *Id.* at 496 n.20. Although "the first group is exclusively female," the Court explained, "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.*; *see also Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136 (1976) ("[A]n exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all.").

The Court has applied the same analysis in the context of abortion regulations, explaining that "'[w]omen seeking abortion' is not a qualifying class." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993). The Court rejected the proposition "that since voluntary abortion is an activity engaged in only by women, to disfavor it is *ipso facto* to discriminate invidiously against women as a class." *Id.* at 271. The Court emphasized that "the characteristic that formed the basis of the targeting here was not womanhood, but the seeking of abortion." *Id.* at 273.

Likewise, the Act protects against certain experimental procedures, regardless of who is subjected to them. And just as some women were in the nonpregnant class in *Geduldig* and some women did not seek abortions in *Bray*, some transgender minors do not seek these experimental procedures. There is thus a "lack of identity" between the Act's medical-procedure distinction and transgender status. *Adams v. Sch. Bd. of St. Johns Cnty.,* 3 F.4th 1299, 1331-32 (11th Cir. 2021) (Pryor, C.J., dissenting) (applying *Geduldig* to law that "does not facially classify on the basis of

transgender status"), *vacated pending reh'g en banc,* 9 F.4th 1369.[55] Contrary to Plaintiffs' extraordinary claim, seeking experimental procedures does not "define" being transgender. Br., Doc. 8 at 23; *see id.* (comparing children seeking experimental procedures to Jews wearing yarmulkes); U.S. Br., Doc. 62-1 at 23 n.12 (similar). Plus, the identity between regulated practice and class is even more detached here because not all children seeking these interventions are transgender. So it makes even less sense to say that this Act discriminates based on transgender status than it would to say that the laws in *Geduldig* and *Bray* discriminated based on sex. The Act does not discriminate based on sex or transgender status.

### 2. Even Assuming a Distinction Based on Transgender Status, Rational Basis Review Still Applies.

Even if the Act *did* discriminate based on transgender status, it would not be subject to heightened scrutiny. That is so for two reasons. First, any such discrimination would not be equivalent to discrimination based on sex, because the Act focuses on meaningful and unavoidable biological differences between sexes. Second, transgender status is not a quasi-suspect classification.

### a. The Act is Based on Biological Differences.

According to Plaintiffs, "[b]oth the Supreme Court and the Eleventh Circuit have held that discrimination because a person is transgender is based on sex." Br.,

---

[55] En banc argument was held in this case on February 22, 2022, and the decision is pending.

Doc. 8 at 24 (citing *Bostock* and *Brumby*); U.S. Br., Doc. 62-1 at 11 (similar). But the cited decisions are more limited in scope than Plaintiffs suggest, and they do not govern situations where the law's classifications are tied to actual biological differences between the sexes. "The only question" in *Bostock* was "whether an employer who fires someone simply for being … transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex'" under "Title VII." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1753 (2020). *Bostock* did not resolve the construction of any other statute, much less the Equal Protection Clause, and it expressly reserved "[w]hether other policies and practices might or might not qualify as unlawful discrimination." *Id.*

*Bostock* focused on Title VII, reading that statute's core "message" to be that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 1741. The Court said that "[t]o 'discriminate against' a person" "mean[s] treating that individual worse than others who are *similarly situated*." *Id.* at 1740 (emphasis added); *see also Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause … is essentially a direction that all persons similarly situated should be treated alike."). And for employment purposes, employees are similarly situated to each other, regardless of "sex," "homosexuality," or "transgender status." *Bostock*, 140 S. Ct. at 1741. In this context, the Court considered gender identity to be inherently linked to sex; the core of *Bostock*'s reasoning

on this issue was that an employer that "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" discriminates based on sex under Title VII. *Id.* at 1741. The Eleventh Circuit's decision in *Brumby* similarly subjected to intermediate scrutiny governmental employment decisions "based upon gender stereotypes," stating that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group." *Glenn v. Brumby*, 663 F.3d 1312, 1316, 1320 (11th Cir. 2011) (cleaned up).

But that reasoning does not translate to the medical context when males and females are *not* similarly situated. Take for example in vitro fertilization. A fertility clinic would not discriminate on the basis of sex by deciding to implant fertilized eggs only in females. There would no inequality in that policy because implanting the egg in a male would be a different procedure. The medical procedures at issue here are likewise unavoidably tied to meaningful biological differences in the sexes. Ramping up a young boy's estrogen levels to that of a healthy girl is not the same treatment as ensuring a young girl has estrogen levels within a normal range. To put it in *Bostock*'s terms, it is *not* true that but for a child's sex could he or she be "prescribe[ed] or administer[ed] supraphysiologic doses" of a sex hormone "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance of perception is inconsistent with the minor's

sex as defined in this act." While a boy may be prescribed testosterone to treat his delayed puberty, the prescription is not "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex." As discussed above, the two treatments are not at all the same—because biological males are not the same as biological females.[56]

Take another example: a male who cannot be subject to castration for the purpose of transitioning gender. *Bostock* "directs us to change [the person's sex] and see if the outcome changes." 140 S. Ct. at 1739. That direction might make sense in the employment context, where an individual's "sex is not relevant to the selection, evaluation, or compensation of employees." *Id.* at 1741 (cleaned up). But it makes no sense in medical contexts where sex makes all the difference. To return to the example, a male who can't be castrated simply cannot be compared to a female, because a female could *never* be castrated.

---

[56] For this reason, the federal government's citation-less assertion that the Act permits "cisgender minors" to "obtain[] the same forms of care" (Br., Doc. 62-1 at 22) is wrong. Even putting aside that the Act bars persons who may not be transgender from obtaining these procedures, the treatment for a condition like precocious puberty is not the "same" as an experimental procedure used for gender dysphoria, even if similar medications might be used. Nor are biological realities "sex stereotype[s]." U.S. Br., Doc. 62-1 at 22. The United States is unable to articulate what "sex stereotype" it thinks is at play here, other than the red herring that "an individual's gender identity should match the sex that individual was assigned at birth." *Id.* at 23. The Act does not regulate an "individual's gender identity," and it expressly protects (proven and safe) treatments for gender dysphoria. What the Act regulates are unproven treatments that are tied to biological facts—facts that the United States does not appear to dispute. To say that the relationship of genitalia to sex is merely a harmful "stereotype" is like saying that having a spinal column is merely "stereotypical" of vertebrates.

Laws premised on such biological differences are "consistent with the constitutional guarantee of equal protection." *Nguyen v. I.N.S.*, 533 U.S. 53, 59 (2001). In *Nguyen*, for example, the Court confronted a law that "impose[d] different requirements for the child's acquisition of citizenship depending upon whether the citizen parent is the mother or the father." *Id.* at 56-57. The Court upheld the law, emphasizing that "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." *Id.* at 63. The Court explained that "gender specific terms can mark a permissible distinction." *Id.* at 64. "The equal protection question is whether the distinction is lawful," and where "the use of gender specific terms takes into account a biological difference between the parents," "[t]he differential treatment is inherent in a sensible statutory scheme." *Id.* Thus, the Court concluded that "[t]he imposition of a different set of rules for making that legal determination with respect to fathers and mothers is neither surprising nor troublesome from a constitutional perspective." *Id.* at 63. "The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific to each gender." *Id.* at 73. "Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real." *Id.*

Though the Court in *Nguyen* applied heightened scrutiny, its teachings are relevant here to show that where there are biological differences between males and

females, *Bostock*'s equivalence between transgender distinctions and sex discrimination does not hold. While "[a]n individual's homosexuality or transgender status is not relevant to employment decisions," *Bostock*, 140 S. Ct. at 1741, an individual's sex is often critically relevant to medical treatments. Screening women for ovarian cancer while screening men for testicular cancer is not discrimination.

Thus, the *Bostock* syllogism for employees—where biological differences did not matter—does not apply here. The Act properly recognizes and accounts for the scientific reality that "[t]he two sexes are not fungible." *Virginia*, 518 U.S. at 533. To the extent that the range of experimental medical procedures regulated by the Act discriminate in any way, it is only "as a matter of biological inevitability." *Nguyen*, 533 U.S. at 65. "To fail to acknowledge even our most basic biological differences … risks making the guarantee of equal protection superficial, and so disserving it." *Id.* at 73. "The distinction embodied in the statutory scheme here at issue is not marked by misconception and prejudice, nor does it show disrespect for either class. "The difference between" girls and boys "is a real one, and the principle of equal protection does not forbid [a State] to address the problem at hand in a manner specific to each gender." *Id.*; *see also Virginia*, 518 U.S. at 533 ("The heightened review standard our precedent establishes does not make sex a proscribed classification…. Physical differences between men and women … are enduring"); *Miller v. Albright*,

523 U.S. 420, 445 (1998) (plurality opinion) ("The biological differences between single men and single women provide a relevant basis for differing rules….") .

The experimental procedures at issue here do not rely on an impermissible classification. Puberty blockers are FDA-approved to treat, for example, precocious puberty, where they temporarily delay an abnormally early puberty with the goal of allowing a child to begin puberty normally. Laidlaw Decl. at 13. Gender-transition practitioners, by contrast, use puberty blockers to indefinitely stop natural puberty, a use for which they are not FDA-approved. *Id.* Same for hormone therapies that might be approved to initiate delayed puberty but not to disrupt normal development and transition genders. These are not the same procedures, any more than raising abnormally low testosterone levels is the same as providing the hormone to a Tour de France cyclist seeking a yellow jersey. Different purposes make these different procedures.

      **b.**      **Transgender Status is Not a Suspect or Quasi-Suspect Classification.**

Second, transgender status is neither a suspect nor quasi-suspect classification. Receiving suspect-classification status is a high hurdle, requiring a clear showing that the group (1) has "been subjected to discrimination" "[a]s a historical matter," (2) exhibits "immutable" "characteristics that define them as a discrete group," and (3) is "politically powerless." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). These

factors must be analyzed "closely," with a "definitive description of the classifying facts." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 193, 19 (1973).

Nearly 40 years ago, the Supreme Court held that "mental retardation," though often spurring discrimination, was not a "quasi-suspect classification calling for a more exacting standard of judicial review." *Cleburne*, 473 U.S. at 442. The Court so held despite evidence that mentally handicapped individuals had been "subjected to … grotesque mistreatment," including, among other things, exclusion from public schools and compulsory sterilization in at least 32 states. *Cleburne Living Ctr. v. Cleburne*, 726 F.2d 191, 197 (5th Cir. 1984), *aff'd in part, vacated in part sub nom. Cleburne*, 473 U.S. 432; *see also Romeo v. Youngberg*, 644 F.2d 147, 163 (3d Cir. 1980) ("The mentally retarded … [could] not vote in most states and, with few community ties, sponsors or friends, have minimal impact on the political process."), *vacated and remanded on other grounds*, 457 U.S. 307 (1982).

Yet Plaintiffs urge this Court to identify a new suspect classification for transgender individuals without identifying any evidence at all. Instead of providing evidence (or even substantive factual allegations) to support the claim that "transgender status" "meets the criteria for suspect classification," they simply assert that "transgender people have suffered a history of discrimination," that "being transgender" is "immutable," and that "transgender people lack the political power to achieve full equality." Br., Doc. 8 at 32. This is just a restatement of the legal

framework for determining suspect classification. Neither the Eleventh Circuit nor the Supreme Court has ever treated transgender individuals as a suspect class.[57] Plaintiffs offer no reason to break new ground here.

*First*, Plaintiffs have not established that "transgender people have suffered a history of discrimination." Br., Doc. 8 at 32. For this factor, it is not enough that "the treatment of [transgender individuals] has not been wholly free of discrimination." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976). Instead, Plaintiffs must *show* that transgender individuals "have experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereo-typed characteristics not truly indicative of their abilities." *Id.* Plaintiffs have not attempted to meet this burden. *Cf. Rodriguez*, 411 U.S. at 26 (explaining that plain-tiffs must provide "proof … to support their allegations" on this issue).[58]

*Second*, transgender status is not "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). The recent explosion in individuals who identify as transgender makes this clear.

---

[57] Plaintiffs' reliance on *Glenn*, 663 F.3d 1312, is misplaced. There, "[t]he question" was "whether discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause." *Id.* at 1316. As explained above, the Act applies equally to all and discriminates against no one. And regardless, the *Glenn* inquiry is distinct from whether transgender individuals constitute a "suspect class" in the first instance.

[58] The United States, meanwhile, relies only on self-reports involving, for example, respondents who said they had "one or more negative experiences" "in K-12." Br., Doc. 62-1 at 25 n.15.

Likewise, that many individuals who identify as transgender later do *not* identify as transgender (*see supra* at pp. 16-20) proves the point.

It is not even clear that those who identify as transgender share "distinguishing characteristics." *Cleburne*, 473 U.S. at 441. While some guidelines note that not all "gender diverse" people identify as "transgender," AAP Statement at 2, others use "transgender" as "an umbrella term" that includes "a diverse group of individuals," Endocrine Society Guidelines at 3875; *see* WPATH Guidelines at 97. Depending on who you ask, the term covers people who identify with any of the following gender identities: "boygirl," "girlboy," "genderqueer," "eunuch," "bigender," "pangender," "androgyne," "genderless," "gender neutral," "neutrois," "agender," "genderfluid," and "third gender," and many others. WPATH Guidelines at 96; APA Guidelines at 862; Endocrine Society Guidelines at 3875. It is hard to define a class that appears to be undefinable, and it appears that at least some individuals who identify as "transgender" at times identify with a gender that matches their biological sex.

*Third*, the assertion that transgender individuals lack "political power" (Br., Doc. 8 at 32) does not square with reality. "[S]ome degree of prejudice from at least part of the public at large" is not enough. *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 (2001). The question is whether transgender individuals are "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Murgia*, 427 U.S. at 313.

They are not. Even assuming that those who favor hormonal and surgical interventions are advancing the interests of transgender individuals, their voices are amply heard. The President recently "recognize[d] Transgender Day of Visibility, an annual celebration of the resilience, achievements, and joy of transgender people in the United States and around the world."[59] The Biden Administration weighed in on the exact issue in this litigation, stating that the President believes in "the positive impact" of the procedures regulated here.[60] (And after an unexplained delay, the Administration intervened here.) Last year, the "Equality Act," "which would amend the 1964 Civil Rights Act to protect people from being discriminated based on sexual orientation and gender identity in employment, housing and other services," was passed by the House of Representatives and remains a presidential priority.[61] These actions bely any suggestion that transgender individuals lack political power. *Cf. Cleburne*, 473 U.S. at 445 (not "quasi-suspect" class in part because supportive "legislative response" "could hardly have occurred and survived without public support," thus "negat[ing] any claim that the mentally retarded are politically powerless in the sense that they have no ability to attract the attention of the lawmakers").

---

[59] *Fact Sheet: Biden-Harris Administration Advances Equality and Visibility for Transgender Americans*, The White House (Mar. 31, 2022), https://perma.cc/UY2S-RCLD.

[60] *Id.*

[61] Daniella Diaz & Annie Grayer, *House passes Equality Act aimed at ending discrimination based on sexual orientation and gender identity*, CNN (March 16, 2021), https://www.cnn.com/2021/02/25/politics/equality-act-passes-house/index.html.

Moreover, support for Plaintiffs' approach goes beyond the halls of government. The signature block on Plaintiffs' complaint (Doc. 1), for instance, suggests that transgender individuals have little trouble courting assistance from prominent counsel. And the extensive list of pro-plaintiff amicus briefs in a similar, pending Eighth Circuit case, *Brandt v. Rutledge*, No. 21-2875 (8th Cir. docketed Aug. 23, 2021), confirms that the interventionist approach to gender dysphoria is being heard. Standing out among the deluge of pro-plaintiff amici in *Brandt* are the United States government and almost half the States—who join hands with corporate interests and dozens of nonprofits. And media powers are responsive to transgender interests. USA Today, for example, recently named Rachel Levine, "the nation's highest-ranking openly transgender official," one of its "Women of the Year."[62]

The proposition that transgender Americans today are further from "full equality" than "the mentally retarded" were in 1985—a group that suffered "eugenic marriage and sterilization laws" and whose treatment "paralleled[] the worst excesses of Jim Crow"—is self-refuting. *Cleburne*, 473 U.S. at 461-64 (Marshall, J., concurring in the judgment in part and dissenting in part). Transgender individuals receive support in numerous aspects of public and private life; they are not a suspect or quasi-suspect class.

---

[62] *Women of the Year*, USA TODAY (Mar. 13, 2022), https://perma.cc/2PUS-P72U.

### B.     The Act Satisfies Any Level of Scrutiny.

Because no suspect classification is at issue, Plaintiffs' "equal protection claim is subject only to rational basis review." *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). "The rational basis test asks (1) whether the government has the power or authority to regulate the particular area in question, and (2) whether there is a rational relationship between the government's objective and the means it has chosen to achieve it." *Id.* "This standard is easily met": the "statute is presumed constitutional," "a state has no obligation to produce evidence to sustain the rationality of a statutory classification," and "the burden is on the one attacking the law to negate every conceivable basis that might support it, even if that basis has no foundation in the record." *Id.* (cleaned up).

Here, Plaintiffs do not carry their burden to rebut "the presumption of legislative good faith." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). As amply demonstrated above and by the Act's findings, the Legislature reasonably chose to protect children from unproven medical procedures pushed by ideological groups. "The only direct evidence" is that the "Legislature's intent was legitimate," given the focus in the legislative findings on safety concerns. *Id*. at 2327. And the Act "appl[ies] evenhandedly to all" children, protecting them from harmful experimentation. *Vacco*, 521 U.S. at 800. It thus singles out no one and satisfies rational-basis review.

Even if heightened scrutiny applied, the Act would easily survive. As with any other law, the Act "is accorded a strong presumption of validity." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319 (1993). Under the intermediate scrutiny applicable to classifications based on sex, a law is constitutional if it is "substantially related" to an "important governmental objective." *Virginia*, 518 U.S. at 524. Multiple, significant government objectives are at stake.

The most important is Alabama's interest in protecting vulnerable children. "It is indisputable 'that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling.'" *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756-57 (1982)); *see, e.g.*, *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors."). "States validly may limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences." *Bellotti v. Baird*, 443 U.S. 622, 635 (1979). That is because "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." *Id.* The State also has an interest in regulating medicine and experimental medical treatments on minors in Alabama. *See Gonzalez*, 550 U.S. at 157

(recognizing that States have "a significant role to play in regulating the medical profession"); *see also Washington v. Glucksberg*, 521 U.S. 702, 731 (1997) (same).

The federal government's suggestion that these interests are "pretextual" (Br., Doc. 62-1 at 28) lacks any foundation. The United States has nothing to say about the Act's extensive findings, other than the unexplained comment that any "suggestion that transgender minors will 'outgrow' their gender identity" amounts to "moral disapproval." *Id.* But Plaintiffs' experts contend only that the treatments should be made available to children suffering from gender dysphoria—*not* every child who identifies as transgender. *E.g.,* Rosenthal Decl., Doc. 8-3 at 9. Nor does the United States contest the overwhelming evidence that most cases of gender dysphoria *do* desist, so its aspersions on this (correct) finding are difficult to understand. Does the United States really prefer that children *not* outgrow their gender dysphoria?

The federal government's cherry-picked, out-of-context quotes[63] from two individuals (at least one given in the context of another bill) warrant little discussion.

---

[63] For instance, as an example of alleged pre-text and animus, the government accuses Representative Allen of referring "to gender-affirming care, when provided to transgender youths as 'child abuse.'" U.S. Br. 62-1 at 17. He explained why: "In my opinion, administering these powerful medications to minors whose mind is not made up and is not developed enough to make these long-term decisions about how it affects their body, it is not good for these children. Yes, I consider it child abuse." Alabama House Judiciary Committee, Mar. 2, 2022, 1:34:28 PM, https://vimeo.com/683940881/4edaeefda2. Likewise, the government says that Representative Allen's motivation for sponsoring the bill was because he thought that "if children 'are born male, that they're a male." U.S. Br. 62-1 at 16. Again, the context provides a fuller picture. In response to a radio host's request in a previous legislative term to respond to the argument "that you are primarily motivated by bigotry," Representative Allen explained: "That is the furthest thing from the truth. We just want to protect kids, and, you know, I don't believe we're protecting children

*See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("Judicial investigation of legislative history has a tendency to become … an exercise in looking over a crowd and picking out your friends." (cleaned up)); *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). The idea that "sex" "refer[s] only to biological distinctions between male and female" was assumed by the Supreme Court in *Bostock*, 140 S. Ct. at 1739, and "long has been held—and continues to be held—in good faith by reasonable and sincere people here and throughout the world," *Obergefell v. Hodges*, 576 U.S. 644, 657 (2015). Likewise, recognizing both that sex is different from gender identity and that sex usually aligns with gender identity does not imply "profound disapproval." U.S. Br., Doc. 62-1 at 28; *see Bostock*, 140 S. Ct. at 1746-47 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

Finally, the federal government has no account for why this supposedly hateful statute is carefully tailored to *minors* and certain experimental procedures. *Cf. Lofton*, 358 F.3d at 826 (rejecting a similar animus argument because the

---

when we allow them to take these powerful drugs that are used off-label that blocks puberty because puberty is not a disease.… [W]e need to be protecting these kids and showing them compassion, but at the same time affirming that if they are born male, that they're male, if they're born female, they're female. And we don't need to be allowing the prescription of these powerful drugs that we don't know the long-term ramifications of." Tony Perkins, *Wes Allen Discusses Upcoming Alabama Senate Vote on Vulnerable Child Compassion and Protection Act*, YouTube (Feb. 15, 2021), https://www.youtube.com/watch?v=E9Q_b22cUWw.

"classification is limited to [a] narrow and discrete context" with "a plausible connection with the state's asserted interest"). Only one governmental entity here has elevated moral ideology above scientific fact, and it is not Alabama.

Next, the Act is closely related to Alabama's important government interests in protecting children and regulating the medical profession. As an initial matter, this Court's review of the Act's means must be deferential. A State has "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163. In fact, the legislature's role is particularly important when the science is unsettled or varying factions disagree about the best course of treatment, and "it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes." *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997).

Such is the case here. Gender-transition procedures for children are fraught with medical and scientific uncertainty. Though not much is known in this field, that much is. Yet Plaintiffs' theory relies entirely on this Court second-guessing the Legislature's determination that the treatments Plaintiffs seek have *not* been proven to be safe and effective for treating children with gender dysphoria. That is why they over and over must refer to the interventions as "established" (at 21), "the only safe and effective treatment for gender dysphoria" (at 13), the "standard of care" (at 26) supported by "the consensus of medical experts and overwhelming evidence" (at

30). *See also* U.S. Br., Doc. 62-1 at 30 ("the overwhelming weight of medical evidence"). If any of these characterizations are off, Plaintiffs' case falls apart.

And the characterizations *are* off. As shown above, to the extent there is an emerging consensus, it's one of increasing humility. Cantor Decl. ¶ 15 ("Public healthcare systems throughout the world have … been withdrawing their earlier support for childhood transition, responding to the increasingly recognized risks associated with hormonal interventions and the now clear lack of evidence that medical transition was benefitting most children, as opposed to the mental health counseling accompanying transition."). We just don't know very much about the procedures Plaintiffs are pushing.

Start with diagnosis. While a doctor can determine whether a child reports to be in distress due to the incongruence he feels between his biological sex and his still-forming gender identity, the doctor cannot determine whether the child's dysphoria or his gender incongruence will persist into adulthood. *Id.* ¶ 43; Laidlaw Decl. at 6 ("Because there is no physical marker to diagnose gender identity and because it is not possible to predict which child or adolescent will desist it is not possible to know which young person will remain transgender identified as adults."); Endocrine Society Guidelines at 3876 ("With current knowledge, we cannot predict the psychosexual outcome for any specific child.") Thus, even if the treatments at issue were beneficial to youth whose gender dysphoria persisted into adulthood, the

Legislature would still have every reason to ban them because there is no way to tell who those children are—and guessing wrong would be catastrophic.

But it's worse than that. Not only is there no way to accurately predict persistence, but we know that the majority of gender dysphoric youth will *not* persist. *See* Cantor Decl. ¶ 36 ("[D]espite coming from a variety of countries, conducted by a variety of labs, using a variety of methods, all spanning four decades, every study without exception has come to the identical conclusion: Among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender of the course of puberty—ranging from 61-88% desistance across the large, prospective studies."); DSM-5 at 455 (recognizing that between 97.8% and 70% of gender dysphoric boys and 88% and 50% of gender dysphoric girls will have their dysphoria desist by adulthood); WPATH Standards at 11 (similar); Endocrine Society Guidelines at 3879 (similar). So it is more likely that a clinician will guess *wrong* and provide transitioning interventions to a child whose dysphoria would otherwise desist than that she will guess *right* and correctly pick out the persister from the crowd of desisters. Again, if this is all the Legislature knew, it would have every reason to ban interventions that rely on roulette-like odds.

Worse, that's for the traditional patient profile that we know the most about— the childhood-onset gender dysphoria that occurs most often in boys. That world exists no longer. Today, adolescent girls have become the default patient. *See* Hunter

Decl. ¶¶ 66-88. No one knows why, but it is concerning that—unlike with the traditional diagnosis—the "majority of cases appear to occur within clusters of peers and in association with increased social media use and especially among people with autism or other neurodevelopmental or mental health issues." Cantor Decl. ¶ 71; Kenny Decl. at 3-35. Given these significant differences, until more research occurs, "one cannot apply findings from the other types of gender dysphoria to this type." Cantor Decl. ¶ 72. Thus, the Legislature could determine that the risks of treatment outweigh their benefits given that the best evidence Plaintiffs can point to did *not* provide medical interventions to these sorts of patients.

It gets worse still. Not only is it impossible to tell who would benefit from the interventions if they worked the way Plaintiffs say, but the evidence does not even show that the treatments offer long-term benefits even when they are administered under the most conservative conditions. The initial promise of the Dutch experiments has not borne fruit, as efforts to replicate their moderate success have not succeeded. Cantor Decl. ¶¶ 60-66. And the evidentiary basis for using puberty blockers or cross-sex hormones has not grown otherwise. *E.g.*, NICE Puberty Blocker Evidence Review at 12; NICE Cross-Sex Hormone Evidence Review at 14. Here again, the Legislature could reasonably determine that "[t]he failure of other clinics to repeat the already very qualified success of the Dutch clinic demonstrates the need

for still greater caution before endorsing transition and the greater need to resolve potential mental health obstacles before doing so." Cantor Decl. ¶ 66.

So much for the benefits. Turning to the risk part of the analysis, expansive reviews of the literature show great unknowns (because puberty blockers and hormones used in this way have not been well studied) and significant risks of irreversible harm. The risks of puberty blockers, for instance, include permanent sterility, loss of sexual function, and loss of bone density. *See* Laidlaw Decl. at 12-19. Cross-sex hormones add more to the mix. Females taking testosterone face higher risks of myocardial infarction and cardiovascular disease, irreversible changes to the vocal cords, polycystic ovary syndrome and atrophy of the lining of the uterus, and a number of mood and psychiatric disorders. *Id.* Males taking supraphysiologic doses of estrogen may develop hyperestrogenemia, the consequences of which "include increased risk of myocardial infarction and death due to cardiovascular disease." *Id.* at 19. Surgeries pose even more obvious harms, which is likely why Plaintiffs don't talk about them—though the clinical pathway started by puberty blockers and cross-sex hormones as a child often end in surgical transitions by adulthood (or before). *Id.* at 19-22. Weighing the costs and benefits, the Legislature could reasonably determine, as Sweden's National Board of Health and Welfare did, that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." Sweden Statement at 3.

Then there is the problem of informed consent—another issue Plaintiffs don't dwell on. But the rising tide of detransitioners who say the "consent" they gave when they were younger was *not* informed shows that the Legislature did not have to ignore the common-sense notion that children are not very good at determining their future needs and desires.. As Corrina Cohn put it powerfully: "Adults who advocate for adolescent transition do so without understanding what tradeoffs early transition entails, which includes the loss of fertility, the likelihood of sexual dysfunction, and the likelihood of surgical complication inflicted at an early age from elective procedures. Unfortunately, I do understand some of these tradeoffs." Cohn Decl. at 4.

In short, the procedures regulated here are experimental at best and significantly harmful at worst. The Legislature considered the limited evidence and made express findings explaining its reasoning. *See* Act § 2. Then it concluded that the risks of these experimental procedures outweighed their benefits, and that "the decision to pursue a course of hormonal and surgical interventions to address a discordance between the individual's sex and sense of identity should not be presented to or determined for minors who are incapable of comprehending the negative implications and life-course difficulties attending to these interventions." *Id.* § 2(16).

Alabama's regulation of certain experimental medical procedures—puberty blockers, cross-sex hormones, and transition surgical interventions—on gender incongruent youth is thus directly related, and narrowly tailored, to the State's interest

in protecting children from harmful and experimental medical procedures. Notably, given the State's particular interest in protecting children, the State did *not* ban the procedures for consenting adults (though it could have done that, too, given the medical uncertainties and harms involved). Nor did it restrict other, safer, and more effective treatments for treating gender dysphoric, such as exploratory psychotherapy; instead, it expressly protected those treatments. *See* Act § 6. Finally, the Act carefully exempts minors born with certain "medically verifiable disorder[s] of sex development," recognizing that these unique cases may involve different treatment considerations. Act § 4(b).

For these reasons, the Act is, at minimum, "substantially related to the achievement of" the State's important interests in protecting children and regulating the medical profession. *Nguyen*, 533 U.S. at 60 (cleaned up); *see id.* at 70 (emphasizing that under intermediate scrutiny, a statute need not "be capable of achieving its ultimate objective in every instance"). The Act does not discriminate based on sex or gender identity, but even if it were read to, such "discrimination" would be explained by the fact that boys and girls "are not similarly situated with regard to" the experimental procedures here. *Id.* at 63. Because "a biological difference" would underlie any "imposition of a different set of rules," those rules would be "neither surprising nor troublesome from a constitutional perspective." *Id.* at 63-64. Especially in a field like this, "fraught with medical and scientific uncertainties," the

State's "latitude must be especially broad." *Andino*, 141 S. Ct. at 10 (2020) (Kavanaugh, J., concurring). The Act easily passes even heightened scrutiny.

## II. Parents Have No Substantive Due Process Right To Obtain Experimental Medical Procedures For Gender Transition Purposes.

Plaintiffs' lead argument is that the Act "violates the fundamental right of the Parent Plaintiffs to obtain essential medical care for their children." Br., Doc. 8 at 19. But the medical interventions Plaintiffs label "essential" are experimental at best and outright harmful at worst. And even assuming the interventions could be beneficial when applied correctly (something Plaintiffs cannot establish), there is currently no way for doctors—or the children themselves, or the children's parents—to predict with any degree of accuracy who would be a good candidate for the treatments. We know, however, that the majority of gender dysphoric youth are *not* good candidates since their dysphoria will resolve by the time they reach adulthood. Plaintiffs' desire for experimental treatments cannot outweigh the Legislature's determination that, for now at least, there is insufficient evidence to conclude that the benefits of the treatments outweigh the long-term risk they pose to vulnerable children. That policy determination is due deference from this Court, particularly since the Act implicates no recognized substantive due process right.

Indeed, courts of appeals have universally rejected claims—even by terminally ill patients—that there is a substantive-due-process right to experimental medical procedures. There is thus no question that the children here have no substantive

due process right to experimental gender-transition procedures. Instead, Plaintiffs claim that *parents* have a substantive due process fundamental right to access experimental gender-transition procedures for their children. Because there is no right of affirmative access to experimental gender-transition procedures in the first place, parents have no right to access experimental gender-transition procedures for their children. *See Doe By & Through Doe v. Pub. Health Tr. of Dade Cty.*, 696 F.2d 901, 903 (11th Cir. 1983) (holding that the parent's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself").

In any event, Plaintiffs identify no history or tradition remotely like this right, instead relying on a few decades-old cases mainly involving the ability of parents to choose how to educate their children. Subjecting every government regulation of experimental childhood medicine to strict scrutiny is nothing like that. There is no fundamental liberty interest in obtaining specific medical procedures for children—and especially not experimental ones used for gender transition purposes.

### A. No Substantive Due Process Right Exists to Access Experimental Medical Procedures.

"A fundamental right is one that is explicitly or implicitly guaranteed by the Constitution." *Morrissey v. United States*, 871 F.3d 1260, 1268 (11th Cir. 2017) (cleaned up). "[O]n its face," "the Due Process Clause guarantees no substantive rights, but only (as it says) process." *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (cleaned up). "For that reason, the Supreme Court has been reluctant to

expand the concept of substantive due process." *Id*. Courts must "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of" the judiciary. *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005) (cleaned up).

Courts "analyze a substantive due process claim by first crafting a careful description of the asserted right." *Id.* (cleaned up). "[A] careful description of the fundamental interest at issue here allows [courts] to narrowly frame the specific facts before us so that we do not stray into broader constitutional vistas than are called for by the facts of the case at hand." *Id.* at 1344. Once the right has been carefully defined, courts analyze whether the claimed right is "(1) 'objectively, deeply rooted in this Nation's history and tradition' and (2) 'implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed.'" *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1242 (11th Cir. 2004) (quoting *Glucksberg*, 521 U.S. at 721).

As just shown, the procedures regulated here are experimental. Plaintiffs do not argue that a child has a personal substantive due process right to experimental gender-transition procedures. There is no such right. "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it; the alleged right certainly cannot be considered so rooted in the traditions and conscience of our

people as to be ranked as fundamental." *Reno v. Flores*, 507 U.S. 292, 303 (1993) (cleaned up). Federal courts of appeal have spoken with one voice in rejecting claims of affirmative access to medical procedures and treatments. *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710 n. 18 (D.C. Cir. 2007) (en banc) ("No circuit court has acceded to an affirmative access claim.").

For instance, the Eleventh Circuit rejected the assertion of "a fundamental right to father a child through the use of advanced IVF procedures." *Morrissey*, 871 F.3d at 1269. The court first rejected the plaintiff's effort to describe the right as a "fundamental right to reproduce." *Id.* at 1268. "The pertinent question," according to the court, "is not whether the Constitution protects a right to 'procreation' generally," "but rather, more specifically, whether a man has a fundamental right to procreate via an IVF process that necessarily entails the participation of an unrelated third-party egg donor and a gestational surrogate." *Id.* at 1269.

The court emphasized that the procedures are "decidedly modem phenomena," for "it wasn't until the mid to late 1980s that doctors began to use gestational surrogates in conjunction with IVF procedures." *Id.* Thus, these procedures lacked a "deep rooting" in "this Nation's history and tradition." *Id.* (cleaned up). "Particularly in view of the ethical issues" and "ongoing political dialogue about those issues," the court declined to recognize a new fundamental right that would "place the matter outside the arena of public debate and legislative action." *Id.* at 1270 (cleaned up).

All other circuits to reach the issue agree that there is no affirmative right to particular medical treatments. The en banc D.C. Circuit has held that there is not "a right to procure and use experimental drugs that is deeply rooted in our Nation's history and traditions." *Abigail All.*, 495 F.3d at 711. The Constitution does not afford even "terminally ill patients a right of access to experimental drugs that have passed limited safety trials but have not been proven safe and effective." *Id.* at 697; *see also Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007) (Despite a "long history of use," medical marijuana was not "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty."); *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980) (rejecting terminally ill cancer patients' claim for the right "to take whatever treatment they wished regardless of whether the FDA regarded the medication as 'effective' or 'safe.'").

In sum, no fundamental right to access particular medical procedures exists. A "claim of a right of access to experimental drugs [and surgeries] is subject only to rational basis scrutiny." *Abigail All.*, 495 F.3d at 712.

## B.    Parents Have No Substantive Due Process Right to Obtain Experimental Gender Transition Procedures for Their Children.

Seeking to avoid the above precedent, Plaintiffs say that their asserted right is not the child's but instead "the fundamental right of the Parent Plaintiffs to obtain essential medical care for their children" Br., Doc. 8 at 27. But parents cannot have a stronger right to obtain experimental medical procedures than their children would

have to access those procedures. And both the Supreme Court and the Eleventh Circuit demand that the relevant right be "carefully defined." Plaintiffs here do not come close to offering such a careful definition, much less show that any carefully defined right is deeply rooted in history or tradition.

First, a right on the parent's part could exist only if the child has a right to access experimental medical interventions. The parent's parental-rights claim is "derivative from, and therefore no stronger than" the child's claim. *Whalen v. Roe*, 429 U.S. 589, 604 (1977). As shown above, there is no individual fundamental right to access experimental gender-transition procedures. And the Eleventh Circuit has squarely held in the medical decision-making context that the parent's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself." *Doe*, 696 F.2d at 903. Because neither parent nor child has the right to access particular medical procedures, a parent does not have the right to obtain that treatment for the child.[64]

Second, Plaintiffs make no effort to carefully define their novel right or show that the right is deeply rooted in history and tradition. "Although the text of the

---

[64] At one point, Plaintiffs suggest that their novel parental right is limited to instances when the parent's decision is "recommended to the Parent Plaintiffs as appropriate for their children by their medical providers" and recognized by an assortment of cherry-picked medical groups. Br., Doc. 8 at 29. The arbitrary nature of these limitations is illustrated by Plaintiffs' omission of any limitation based on the child's own wishes. And the need for a court applying this unprecedented right to investigate the views of (certain) medical providers and various interest groups as to the appropriate procedures in a particular case counsels against the right. Nor do Plaintiffs explain why a cherry-picked doctor's advice is given weight while the government's findings are not.

Constitution contains no reference to familial or parental rights," "Supreme Court precedent" has long recognized that parents have a fundamental right to make certain "decisions concerning the care, custody, and control of their children." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 816 (11th Cir. 2004) (cleaned up). Though "care, custody, and control" is a convenient shorthand, parents do not have a right over everything bearing on a child's care, custody, and control.

Rather, the Supreme Court has made clear that "rights of parenthood" are "not beyond regulation in the public interest." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). "[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare." *Id.* at 167. "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers, within a broad range of selection." *Id.* at 168. Though parental consent "may lessen the likelihood that some evils the legislation seeks to avert will occur," consent "cannot forestall all of them. *Id.* at 169. States may proscribe activities for children—even without including exceptions for parental consent—that they could not proscribe for adults. *See id.*

Along these lines, Alabama prohibits minors from participating in many potentially harmful activities that not even parental consent can render legally permissible, from purchasing ephedrine (Ala. Code § 20-2-190) to renting watercraft before

age 12 (Ala. Code § 33-5-51) to betting on horse and dog races (Ala. Code § 11-65-44). Even a parent who thinks it would be better for the child to do some of these things has no legal right to decide that the child can do them. In short, especially where "psychological or physical injury" may be involved, "[p]arents may be free to become martyrs themselves"—"[b]ut it does not follow they are free, in identical circumstances, to make martyrs of their children." *Prince*, 321 U.S. at 170.

Under circuit precedent, courts must be "very reluctant to expand substantive due process by recognizing new fundamental rights." *Doe*, 410 F.3d at 1343. The Eleventh Circuit has repeatedly refused to recognize new "alleged parental liberty interests" in "the murky area of unenumerated constitutional rights." *Robertson*, 420 F.3d at 1256. *Robertson* refused to recognize "a right to companionship with an adult child." *Id.* at 1258. In *Lofton*, the Eleventh Circuit "decline[d] appellants' invitation to recognize a new fundamental right to family integrity for groups of individuals": "Such an expansion of the venerable right of parental control would well exceed our judicial mandate as a lower federal court." 358 F.3d at 815.

Plaintiffs do not even bother to articulate any carefully defined right. "[T]he scope of the liberty interest at stake here must be defined in reference to the scope of the Alabama statute." *Williams*, 378 F.3d at 1241. The Act prohibits certain medical interventions on children for transitioning genders. The carefully defined right

then, as claimed by Plaintiffs, is for a parent to obtain for a child experimental medical procedures for transitioning that child's gender.

The next question is whether Plaintiffs have shown that such a right is *both* "objectively, deeply rooted in this Nation's history and tradition" *and* "implicit in the concept of ordered liberty." *Id.* at 1242. Asking the question answers it. Obtaining gender-transition procedures is not deeply rooted in America's traditions or required for the functioning of a just society, and Plaintiffs make no effort show otherwise. Among other things, like the IVF procedures in *Morrissey*, these procedures are "decidedly modern phenomena." 871 F.3d at 1269; *see* Compl., Doc. 1 ¶ 29. That is particularly true when it comes to their application to *children*—something that is still being studied, and hotly debated, around the world. *See supra* at pp. 39-49, 58-64. "Particularly in view of the ethical issues" and "ongoing political dialogue about those issues," this Court should not recognize a new fundamental right that would "place the matter outside the arena of public debate and legislative action." *Morrissey*, 871 F.3d at 1270.

Plaintiffs assert that "[a] parent's ability to seek and obtain appropriate medical treatment to ensure the health and wellbeing of their child is a … fundamental right." Br., Doc. 8 at 28. Putting aside that this is not a careful description of the claimed right and says nothing about history or tradition, the only case Plaintiffs cite for this proposition only supports the State's argument. In *Bendiburg v. Dempsey*,

the Eleventh Circuit made clear that "[p]arental autonomy may be limited when pa-

rental decisions jeopardize the health or safety of a child, and the state can intercede

on the child's behalf." 909 F.2d 463, 470 (11th Cir. 1990). Here, as shown above,

Alabama's law seeks to protect children from experimental medical procedures. The

Parent Plaintiffs are unlikely to succeed on their substantive due process claim.[65]

### III.   The Law Is Not Void For Vagueness.

Plaintiffs' vagueness challenge rests on the claim that the word "causes" lacks

"sufficient definiteness." Compl., Doc. 1 ¶ 131. Plaintiffs argue that "the Act fails to

provide *any* standard to determine what an individual must do to 'cause'" a particular

result. Br., Doc. 8 at 47; *see id.* at 48 ("'Cause' has an incredibly broad definition.").

If basic causation requirements are void for vagueness, then much of American law

is unconstitutionally vague.

Vagueness arises when a law either "fails to provide a person of ordinary in-

telligence fair notice of what is prohibited" or "is so standardless that it authorizes

or even encourages seriously discriminatory enforcement." *United States v. Wil-

liams*, 553 U.S. 285, 304 (2008). The Act here provides that, absent exception, "no

person shall engage in or cause any of the following practices to be performed upon

a minor if the practice is performed for the purpose of attempting to alter the

---

[65] Plaintiffs' meritless suggestion that the law bars "*seeking* expert medical advice" (Br., Doc. 8 at 29) is addressed below. The law, like many criminal laws, only implicates conduct that causes a crime.

appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex." § 4. Covered practices are "[p]rescribing or administering" various drugs, "[p]erforming" certain "surgeries," and "[r]emoving any healthy or non-diseased body part or tissue." *Id.*

Plaintiffs challenge only the word "cause." This challenge fails, for multiple reasons. *First*, a vagueness challenge may be raised only "as a defense during an actual prosecution" or if an individual is being "chilled from engaging in constitutional activity." *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349–50 (11th Cir. 2011). As shown above, neither is true here.

*Second*, "[t]o succeed on a claim that an ordinance is void for vagueness, 'the complainant must demonstrate that the law is impermissibly vague in all of its applications.'" *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982)). A "corollary of this rule is that '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* (quoting *Hoffman Ests.*, 455 U.S. at 495) (alteration in original). Here, there is no question that Plaintiffs seek the right for their doctors to violate the law's core prohibition on prescribing puberty suppressors and hormones for the purpose of changing gender. *See, e.g.*, Compl., Doc. 1 ¶¶ 58 ("Continuing to receive puberty-blockers … is essential for Zachary's mental

112

health"), 65-66 (plaintiff's estrogen "will be disrupted"), 73-74 (plaintiff's "hor-

mone replacement therapy" "will be disrupted"); 76 ("[Dr. Koe] and her staff pro-

vide support to patients who need assistance in self-administering injectable medi-

cations like testosterone."). This is the heartland conduct prohibited by the law, so

Plaintiffs' vagueness claims fails at the outset.

*Third*, there is no impermissible vagueness in the term "engage in or cause."

The same phrase litters American criminal codes—and has for centuries. Take Ala-

bama's criminal conspiracy statute: "A person is guilty of criminal conspiracy if,

with the intent that conduct constituting an offense be performed, he agrees with one

or more persons *to engage in or cause* the performance of such conduct." Ala. Code

§ 13A-4-3 (emphasis added); *see also, e.g.*, *United States v. Rabinowich*, 238 U.S.

78, 88 (1915) (common law definition, "[f]or two or more to confederate and com-

bine together to commit or cause to be committed a breach of the criminal laws").

The State is unaware of any decision suggesting that this term is so vague that every

criminal statute using it is unconstitutional.

Plaintiffs present no actual argument about why this term is vague. Instead,

they ignore the first half of the term ("engage in") and then provide a laundry list of

hypotheticals that are supposedly challenging. Br., Doc. 8 at 48; *see id.* at 43. As

shown next, Alabama law speaks to their hypotheticals. But more fundamentally,

Plaintiffs' "basic mistake"—explained by their own case—"lies in the belief that the

mere fact that close cases can be envisioned renders a statute vague." *Williams*, 553 U.S. at 305. "That is not so. Close cases can be imagined under virtually any statute." *Id.* at 305-06. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* at 306.

For instance, courts have "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010). And courts have upheld phrases like "crimes against nature," holding that phrase "no more vague than many other terms used to describe criminal offenses at common law and now codified in state and federal penal codes." *Rose v. Locke*, 423 U.S. 48, 50 (1975).

Plaintiffs appear to concede that the statute clearly defines what practices are prohibited. Whether a person "engages in" those practices "for the purpose" of transitioning a child's gender is a "clear question[] of fact," "a true-or-false determination." *Williams*, 553 U.S. at 306.

Plaintiffs' primary complaint is about "cause," and their hypotheticals are founded on first-year law school musings about causation. But the Alabama Code answers which form of causation matters: "A person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently

114

with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient." Ala. Code § 13A-2-5(a). This modified but-for test is the same used in "other modern criminal codes." *Id.* Commentary. "To be sure, it may be difficult in some cases to determine whether" this test has "been met." *Williams*, 553 U.S. at 306. "But courts and juries every day pass upon" causation. *Id.*; *id.* at 304 ("[P]erfect clarity and precise guidance have never been required."). Indeed, courts consider "causation requirement[s]" as *eliminating* any vagueness problem by adequately "put[ting] persons of ordinary intelligence on notice" of the possibility of criminal sanctions. *United States v. Matus-Leva*, 311 F.3d 1214, 1219 (9th Cir. 2002). This law is not void for vagueness.[66]

Moreover, under Alabama law, "[a] statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, states a crime of mental culpability." Ala. Code § 13A-2-4(b); *contra* Br., Doc. 8 at 49 (suggesting "no *mens rea* requirement"). The Supreme Court "has made clear that scienter requirements alleviate vagueness concerns." *Gonzales*, 550 U.S. at 149-50. When "a doctor" performing a practice "will not face criminal liability if he or she" engages in the practice "by mistake, the [law] cannot be described as a trap for those who act in good faith." *Id.* (cleaned up). Thus, the culpability required by this law, in addition to the

---

[66] Tellingly, "[P]laintiffs themselves have repeatedly used the term[]" "cause" without apparent confusion as to its meaning. *Holder*, 561 U.S. at 22; *see* Compl., Doc. 1 ¶¶ 27, 29, 54, 66, 87; Br., Doc. 8 at 12, 13, 14, 15, 18, 23, 52 (Heading IV), 53, 54, 62 (Certificate of Service).

law's limitation based on "the purpose" for which the prohibited conduct was performed, further undermine any vagueness challenge.

The Alabama Code speaks to the Plaintiffs' other hypotheticals too. Again, Plaintiffs may not *like* what Alabama law says, and they may not *like* its "broad" scope (Br., Doc. 8 at 29), but that does not make it indeterminate. "It is apparent with respect to these [hypotheticals] that gradations of fact or charge would make a difference as to criminal liability, and so adjudication of the reach and constitutionality of the statute must await a concrete fact situation." *Holder*, 561 U.S. at 25 (cleaned up). Regardless, Alabama law speaks to out-of-state conduct. Ala. Code § 13A-4-4. It speaks to aiding-and-abetting liability. Ala. Code § 13A-2-23. And it speaks to the absurd suggestion that the victim (a vulnerable child) would be prosecuted (Br., Doc. 8 at 43): "a person shall not be legally accountable for behavior of another constituting a criminal offense if" "[h]e is a victim of that offense." Ala. Code § 13A-2-24.

The Act thus also "establish[es] minimal guidelines to govern law enforcement." *Gonzales*, 550 U.S. at 150. Like the judiciary, law enforcement is used to applying basic causation tests. And "scienter requirements narrow the scope of the Act's prohibition and limit prosecutorial discretion." *Id.* Plaintiffs' "arguments concerning arbitrary enforcement, furthermore, are … speculative": "This is a preenforcement challenge, where no evidence has been, or could be, introduced to indicate

whether the Act has been enforced in a discriminatory manner or with the aim of inhibiting constitutionally protected conduct." *Id.* (cleaned up).

In sum, one could substitute any other crime as the substantive core of Plaintiffs' hypotheticals and have the same questions. And Plaintiffs do not challenge this law's substantive core—the prohibited practices spelled out by the text. Unless most of American law is void for vagueness, the Act is not either.

## IV.   Criminal Conduct Is Not Protected By The First Amendment.

Plaintiffs' thinly argued First Amendment claim is meritless for related reasons. According to Plaintiffs, the Act "prohibit[s]" a person "from engaging in speech." Br., Doc. 8 at 43. But on its face, the Act makes it a crime for any person to "engage in or cause any of [several practices]" for the purpose of gender transitioning a minor. § 4(a). As Plaintiffs appear to concede (Br., Doc. 8 at 44), the only "speech" that would be criminalized is speech that "causes" a crime—for example, writing a prescription for an illegal use of a drug. *See* Act § 4(a)(1)-(3). Such speech has no First Amendment protection. "Many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298. "[S]peech integral to criminal conduct" is one of the "long recognized," "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any

Constitutional problem." *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021). "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

Again, this law prohibits certain practices. The only speech incidentally criminalized is speech that "causes"—as understood by well-established principles of causation—those criminal practices. To say this law is "content-based" (Br., Doc. 8 at 44) underscores the point: "It is precisely because" "the content of [the] speech" causes a crime that the speech is unprotected. *Fleury*, 20 F.4th at 1364. "Content-based restrictions are permitted when they are confined to [this] categor[y] of speech." *Id.* at 1365; *see Virginia v. Black*, 538 U.S. 343, 361-62 (2003) ("When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." (cleaned up)).

As the Ninth Circuit explained, and by contrast, "[h]olding doctors responsible for whatever conduct the doctor could anticipate a patient *might* engage in after leaving the doctor's office is simply beyond the scope of either conspiracy or aiding and abetting." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) (Br., Doc. 8 at 45). As discussed above, "engage in or cause" is a common formulation in

conspiracy or aiding-and-abetting statutes. And the Act expressly provides that "nothing in this act shall be construed as limiting or preventing psychologists, psychological technicians, and master's level licensed mental health professionals from rendering the services for which they are qualified by training or experience involving the application of recognized principles, methods, and procedures of the science and profession of psychology and counseling." § 6. In the course of treating children with gender dysphoria, practitioners remain free to pursue any model of treatment except the experimental procedures barred by § 4. Even Plaintiff Koe understands that, consistent with the Act, she could "refer[] [patients] to counseling and a psychiatrist." Koe Decl., Doc. 8-10 ¶ 11. *A fortiori*, a minister's counsel "to seek medical care" (Br., Doc. 8 at 48) is even farther from the Act's sweep.[67]

Moreover, most of Plaintiffs' parade of horribles come from the professional context. Br., Doc. 8 at 43. But state authority to regulate professional speech—even speech that is not criminal conduct—is well-established: "The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech, and professionals are no exception to this rule." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (cleaned up). State

---

[67] For that reason, Reverend Eknes-Tucker likely lacks standing. *See Little v. Strange*, 796 F. Supp. 2d 1314, 1329 (M.D. Ala. 2011) ("[I]f no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes, and a litigant's subjective fear will not be held to constitute an injury for standing purposes." (cleaned up)).

law may regulate speech "as part of the practice of medicine," which is "subject to reasonable licensing and regulation by the State." *Id.*[68]

Finally, Plaintiffs are unlikely to succeed on their First Amendment claim because they do not even try to show that the Act is substantially overbroad. "Overbreadth is 'strong medicine' that courts should employ sparingly and only as a last resort." *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1370 (11th Cir. 2021) (cleaned up). An overbreadth plaintiff must "show that the overbreadth of the challenged provisions is substantial, not only in an absolute sense, but also relative to their plainly legitimate sweep." *Id.* (cleaned up). Plaintiffs "bear the burden of demonstrating from the text of the challenged provisions and from actual fact that a substantial number of instances exist in which the provisions cannot be applied constitutionally." *Id.* at 1370-71 (cleaned up). "The mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Fleury*, 20 F.4th at 1362 (cleaned up). "Perfection is not required to survive an overbreadth challenge—a law that shields most protected activity is permissible." *Cheshire Bridge*, 15 F.4th at 1378

Here, "the statute does not target speech; rather, it targets conduct." *Fleury*, 20 F.4th at 1363. In that circumstance, courts generally "decline[] to employ the

---

[68] In *Brandt v. Rutledge*, the district court focused on a provision expressly prohibiting referrals. 551 F. Supp. 3d 882, 893 (E.D. Ark. 2021). The law here has no such provision.

'strong medicine' of overbreadth." *Id.* Plaintiffs do not *mention* the overbreadth doctrine, much less try to carry their burden of showing overbreadth. Their examples (Br., Doc. 8 at 43) either misunderstand the Act's causation requirement or involve unprotected speech that causes criminal conduct. In other words, they have not identified a *single* unconstitutional application, much less a substantial number. Plaintiffs are not likely to succeed on their First Amendment claim.

## V.   Plaintiffs' Preemption Claim Fails.

Section 1557 of the ACA provides that "an individual shall not, on the ground prohibited under" various civil rights statutes "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance…." 42 U.S.C. § 18116(a). The only incorporated statute relevant here is Title IX, which generally prohibits educational programs from discriminating "on the basis of sex." 20 U.S.C. § 1681. Plaintiffs contend that Alabama's Act will cause healthcare providers to violate Section 1557, and that the federal law thus preempts the Act. But this argument fails several times over because (1) Plaintiffs have no cause of action by which to raise it, (2) the Act does not require unlawful discrimination, and (3) even if it did, there is still no preemption. Indeed, Plaintiffs have cited no case in which a court has found preemption based on either Section 1557 or the non-discrimination funding provisions it cross-references.

First, this claim fails because Congress never gave Plaintiffs a right to raise it. Plaintiffs purport to state a "Preemption" claim, Compl., Doc. 1 at 30, presumably invoking the Constitution's Supremacy Clause. But "the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 324-25 (2015) (internal quotation marks and citations omitted). Thus, Plaintiffs must look to Section 1557 itself. But while Section 1557(a) provides that "[t]he enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of" Section 1557's nondiscrimination bar, 42 U.S.C. § 18116(a), that provision does not authorize this suit. Title IX provides only an implied cause of action, and when the Supreme Court recognized that cause of action, it spoke only of a "private cause of action for victims of the prohibited discrimination." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979). Thus, Title IX's private cause of action allows a victim of discrimination in education to sue the government actor that discriminated, and Section 1557 (at most) allows a patient to sue a healthcare provider that discriminates in the provision of healthcare. But there is no reason to think that Section 1557 gives patients, much less healthcare providers, the right to sue law enforcement officials like the Defendants here, who do not operate the "health program or activity" from which patients fear they will be excluded. 42 U.S.C. § 18116(a).

122

Second, Plaintiffs' argument hinges on their claim that the Act constitutes "discrimination based on sex." Br., Doc. 8 at 50. As shown above, that is wrong. The Act does not discriminate based on sex or transgender status. It regulates certain experimental procedures used for transitioning a child's gender. Both males and females may or may not seek those procedures. And both those who identify as transgender and those who do not may or may not seek those procedures. Because the Act does not discriminate based on sex or transgender status, Plaintiffs' preemption argument fails out of the gate.

Third, the Act does not discriminate based on sex as that term is used in Title IX for an independent reason: Title IX's prohibition on sex discrimination does not apply to discrimination based on transgender status. At the time of enactment, Title IX's reference to "sex" was universally "understood as referring to the traditional biological indicators that distinguish a male from a female, not the person's internal sense of being male or female, or their outward presentation of that internally felt sense." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020) (Niemeyer, J., dissenting); *see Bostock*, 140 S. Ct. at 1738 (focusing on "the ordinary public meaning of [a statute's] terms at the time of its enactment"). "[T]hat the word 'sex' in Title IX refers to biological characteristics, not gender identity, becomes all the more plain when one considers the privacy concerns that explain why, in the first place, Title IX and its regulations allow schools to provide separate living facilities,

restrooms, locker rooms, and shower facilities 'on the basis of sex.'" *Grimm*, 972 F.3d at 633 (Niemeyer, J., dissenting); *Adams*, 3 F.4th at 1321 (Pryor, C.J., dissenting) ("[C]ontext matters"). Just like Alabama's Act, then, Title IX recognizes that there are biological differences between the sexes. It would turn Title IX upside down to say that gender identity is equivalent to the sex discrimination it forbids. Title IX cannot mean that states must turn a blind eye to biological realities.

Last, in any event, Plaintiffs misunderstand preemption law. They assert only "conflict preemption" but fail to acknowledge that "[a] party asserting conflict preemption faces a high bar": "In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied"—like health and safety—courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017) (en banc). That is because "[s]tate governments retain their historic police powers to protect public health." *Id.* at 1190.

"Thus, if the statute's terms can be read sensibly not to have a pre-emptive effect, the presumption controls and no pre-emption may be inferred." *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1328 (11th Cir. 2001) (cleaned up). And "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that

provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation." *Graham*, 857 F.3d at 1189.

Here, Congress expressly provided in the ACA a statement of its preemptive intent, entitled "No interference with State regulatory authority": "Nothing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title." 42 U.S.C. § 18041(d).

Both this express admonition and the default presumption against preemption shed light on Section 1557. That section places conditions on "Federal financial assistance" for "any health program or activity." 42 U.S.C. § 18116(a); *see Cummings v. Premier Rehab Keller, PLLC*, No. 20-219, 2022 WL 1243658, at *3 (U.S. Apr. 28, 2022) (explaining that Section 1557 "prohibit[s] recipients of federal financial assistance from discriminating based on" certain grounds). But Section 1557 does not create a federal *right* to those funds if the conditions are followed. Plaintiffs' various phrasings of the supposed conflict elide this point. For instance, they say that "states may not impose criminal penalties or hold a civil defendant liable under state law for conduct federal law requires." Br., Doc. 8 at 49 (cleaned up). But federal law does not *require* them or give them a *right* to receive federal monies.

By analogy, consider the Eleventh Circuit's en banc decision in *Graham*. There, cigarette manufacturers argued for preemption of state law based on their

125

cigarettes' compliance with "a handful of federal labeling requirements." *Id.* at 1191. The court rejected this argument, distinguishing between "a rule that requires a certain label when and if cigarettes are sold" and "Congress establish[ing] a *right* to sell cigarettes." *Id.* at 1188, 1191 (emphasis added). States could impose limitations on cigarette labels—or even "mak[e] it a crime to sell cigarettes"—notwithstanding compliance with federal labeling law. *Id.* at 1190.

The same analysis applies here. Section 1557 does not give the Doctor Plaintiffs any rights at all. It merely imposes "a condition on the grant of federal moneys." *Cummings*, 2022 WL 1243658, at *5. A state law regulating Plaintiffs cannot impede a federal right that they do not have. Because "the statute's terms can be read sensibly not to have a pre-emptive effect, the presumption [against preemption] controls and no pre-emption may be inferred." *Fla. E. Coast Ry. Co.*, 266 F.3d at 1328.

Ignoring this text, Plaintiffs seek refuge in their claim that "the overall goal of the ACA" is "to broaden access to healthcare in the United States." Br., Doc. 8 at 52. But "[a]s the Supreme Court and [the Eleventh Circuit] have explained, purpose-driven statutory interpretation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action." *Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1286 (11th Cir. 2011) (cleaned up). Like every piece of legislation, the ACA is a compromise. It does not give healthcare providers who comply with its conditions on federal

funding an unfettered right to operate free of state regulation. In fact, its statutory command is the opposite. 42 U.S.C. § 18041(d) ("No interference with State regulatory authority"). And the Court's "job is to follow the text even if doing so will supposedly undercut a basic objective of the statute." *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 969 (11th Cir. 2016) (cleaned up). Thus, for this and the other reasons above, Plaintiffs are not likely to succeed on their preemption claim.

## VI.   Plaintiffs' Challenge To The Entire Act Cannot Succeed.

Plaintiffs apparently demand "that this Court enjoin the State from implementing Act [sic]" *in toto*. Br., Doc. 8 at 58. This demand suffers from numerous flaws.

First, they make no argument whatsoever as to Section 5, which regulates educators. Their complaint is silent on the provision, and none of the Plaintiffs has established standing to challenge that provision. Nor does any Private Plaintiff appear to challenge (or establish standing to challenge) the Act's regulation of gender-transition surgeries. *See* Act § 4(a)(4)-(6).

Next, the Act requires every aspect of the Act to stand if any other "part, section, or subsection" "is held invalid." Act § 8. "Severability is a matter of state law," and "Alabama directs courts to strive to uphold acts of the legislature." *McGuire v. Strange*, 83 F. Supp. 3d 1231, 1270 (M.D. Ala. 2015) (cleaned up). Here, "the Alabama Legislature expressed its intention that [the Act's provisions be severable

through the inclusion of a severability clause." *Id*. Both Section 5 and the surgery

regulations "can be given effect" alone, so they must "remain[] intact and in force."

*McGuire*, 83 F. Supp. 3d at 1270 (cleaned up).

Last, Plaintiffs' facial challenge is unlikely to succeed. Despite focusing on

the Act's application to a handful of individuals, Plaintiffs apparently seek facial

invalidation. *See* Br., Doc. 8 at 58; Compl. Request for Relief, Doc. 1. But "[a] facial

challenge to a legislative Act is, of course, the most difficult challenge to mount

successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). To succeed, Plain-

tiffs must show "that the law is unconstitutional in *all* of its applications." *Wash.*

*State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

Plaintiffs have not even attempted to meet this high bar. As shown above,

Alabama has a compelling interest in promoting child safety, *e.g.*, *Ferber*, 458 U.S.

at 756-57, and Plaintiffs' limited evidence about a handful of minors says nothing

about the circumstances and appropriate treatments for all children in Alabama.

Moreover, Plaintiffs focus on the supposed "safety and efficacy" of these experi-

mental procedures "for treating gender dysphoria *in adolescents,*" Br., Doc. 8 at 34

(emphasis added), but the Act applies to and protects younger children too. And

Plaintiffs' claims about adolescents depend on "appropriate[] identifi[cation], diag-

nos[is], and prescribed treatment." *Id.* At 28. So even on Plaintiffs' view, the Act

would be constitutional in at least some applications—especially procedures

performed outside the alleged "protocols" hyped by Plaintiffs. For example, none of Plaintiffs' evidence supports giving cross-sex hormones to a 16-year-old girl who has not been diagnosed with gender dysphoria "for the [sole] purpose of attempting to alter [her] appearance of … her gender or sex." Act § 4(a). Because, at minimum, there are numerous constitutional applications of the Act, Plaintiffs cannot successfully mount a facial challenge.

## VII.   The Other Preliminary Relief Factors Favor The State.

Even if Plaintiffs could show a likelihood of success on the merits, they are not entitled to an injunction. First, Plaintiffs' inequitable conduct in shopping for judges instead of pursuing timely adjudication bars equitable relief. A temporary restraining order or preliminary injunction is extraordinary relief that cannot be granted in equity to parties who have abused the judicial process. Here, as detailed below, it would blink reality to pretend that Plaintiffs' counsel's conduct—filing duplicative lawsuits, agreeing to consolidation, then immediately dismissing the suits after assignment to this Court and telling the media they planned to "refile imminently"—is anything other than blatant manipulation of the judicial process. Those who engage in such misconduct are disentitled to equitable relief.

In any event, Plaintiffs have failed to clearly show that the other injunction factors are in their favor. Plaintiffs' delay in bringing suit undermines any claim of irreparable harm. The Doctor Plaintiffs certainly face no irreparable harm, merely a

potential loss of profits. Though Plaintiffs claim that minors will face distress if the Act's regulations go into effect, that claim ignores the evidence that not only do the prohibited procedures have no proven benefit, they inflict significant and potentially irreversible harm. The Act permits and indeed encourages other, widely accepted treatments for gender dysphoria. Should the Act be enjoined, untold numbers of children face lasting harm and irreversible damage to their bodies. This Court should not second-guess the Legislature's determination that these harms justify the Act.

### A.    Plaintiffs' Inequitable Conduct Bars Preliminary Relief.

This Court may deny preliminary relief based solely on Plaintiffs' inequitable conduct. A "contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice." *In re BellSouth Corp.*, 334 F.3d 941, 959 (11th Cir. 2003). Plaintiffs' attorneys have been consumed by one goal from the outset, and it is *not* obtaining a timely adjudication of their motion to enjoin a duly enacted State law. It is shopping for the judge they want. Given their delay in moving for preliminary relief while they tried to manipulate the judicial assignment process, it is evident that they prefer no adjudication to a timely adjudication before this Court. That conduct forecloses preliminary equitable relief.

"Injunctive relief is an equitable remedy that is not available as a matter of right." *Williams v. Allen*, 496 F.3d 1210, 1212 (11th Cir. 2007). Rather, "[t]he grant of equitable relief, such as an injunction, is a matter of judicial discretion." *CNA Fin.*

*Corp. v. Brown*, 162 F.3d 1334, 1337 (11th Cir. 1998). In exercising that discretion, "[i]t is a bedrock principle of courts of equity that they may impose the substantive remedy of injunctive relief *only* when fundamental fairness and justice demand it." *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1340 (11th Cir. 2004).

Thus, "[e]quity must take into consideration" both "the State's strong interest in" enforcing its law and "attempts to manipulate the judicial process." *Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992). A court's equitable powers "can never be exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage." *Coral Springs*, 371 F.3d at 1341. There is a "strong presumption against the grant of dilatory equitable relief." *Grayson*, 491 F.3d at 1326. "[F]ederal courts can and should protect States from dilatory or speculative suits." *Hill v. McDonough*, 547 U.S. 573, 584-85 (2006).

### 1.    Plaintiffs Engaged in Dilatory, Manipulative Judge-Shopping.

The primary goal of Plaintiffs' counsel has not been a timely adjudication of their claims. It has been to manipulate the assignment process in an effort to find a judge they prefer. The first step in Plaintiffs' judge-shopping was to file in federal court. Kaitlin Welborn, an ACLU Alabama attorney who signed the parallel *Walker* complaint, gave a podcast interview on April 15 in which she was asked whether

litigation in Alabama "specifically presents" any "challenges."[69] She was blunt: "We can't go through the Alabama state courts. We can only go through federal court. In Alabama, where you have people, the likes of Roy Moore, who used to be on Alabama Supreme Court, that's really just not an option for us."[70]

The next step was to file near-identical complaints in two districts, enabling them to drop whichever one was assigned to a judge they disliked. *See Ladinsky v. Ivey*, No. 5:22-cv-447 (N.D. Ala. 2022 filed April 8, 2022); *Walker v. Marshall*, No. 22-cv-480 (M.D. Ala. filed April 11, 2022). This is a common judge-shopping tactic. *See, e.g.*, *In re Fieger*, 191 F.3d 451 (6th Cir. 1999) (table op.) (involving similar manipulation); *Barragan v. Clarity Servs., Inc.*, No. 22-cv-876, 2021 WL 1226537, at *7 (D. Nev. Mar. 31, 2021) (same); *Murray v. Sevier*, No. 92-1073-K, 1992 WL 75212, at *1 (D. Kan. Mar. 13, 1992) (same).

In a further effort to game the assignment process, the attorneys in the *Walker* case claimed it was "related" to an unrelated (closed) case presided over by Judge Thompson. *See Walker* Doc. 1-1. The Middle District's clerk office assigned the case to Chief Judge Marks. So before even moving for a TRO and preliminary injunction, the attorneys filed an extraordinary motion to reassign *Walker* to Judge

---

[69] What a Day Podcast, Defending Trans Youth in Alabama, https://podcasts.apple.com/us/podcast/defending-trans-youth-in-alabama/id1483692776?i=1000557682349 (April 15, 2022).
[70] *Id.*

Thompson, invoking the same closed case about Alabama's procedures for changing the sex designation on a driver's license. *Walker* Doc. 8; *see Walker* Doc. 17 at 1.

Chief Judge Marks ordered the parties to show cause why *Walker* should not be transferred to the Northern District, where *Ladinsky* had already been filed. *Walker* Doc. 3. The *Walker* Plaintiffs consented to the transfer and withdrew their motion to reassign the case to Judge Thompson. *Walker* Doc. 18. At 4:20 pm on April 15, all Plaintiffs consented to consolidation of the cases in the Northern District, where Judge Axon had been assigned *Ladinsky*. *See* Ex. 40, Decl. of Edmund G. LaCour Jr. at 3. *Ladinsky* Docs. 2, 11. Twenty-one minutes later, the consolidated cases were reassigned to Judge Burke. *Ladinsky* Doc. 16. Within two hours, each set of Plaintiffs' attorneys voluntarily dismissed their suit, the *Walker* Plaintiffs at 6:24 pm and the *Ladinsky* Plaintiffs 9 minutes later. *See Walker* Doc. 24 at 2-3.

Plaintiffs' lead attorney here quickly reassured the media: "We do plan to re-file imminently."[71] Sure enough, a few days later, the last step of Plaintiffs' judge-shopping finally arrived: refiling in the Middle District in an attempt to obtain a new judge. All 17 attorneys listed are the same as on the *Ladinsky* complaint. The complaint is nearly identical, other than apparently new plaintiffs, adding the throwaway

---

[71] Paul Gattis, *Lawsuits seeking to overturn new Alabama transgender law dropped, could be re-filed*, AL.com, https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html?outputType=amp (April 16, 2022).

First Amendment claim, and moving the lead plaintiff to a role as expert.[72] Plaintiffs' attorneys did not ask for preliminary relief until April 21.

Plaintiffs and their attorneys obviously engaged in judge-shopping. They were prepared to proceed with both cases and had agreed to consolidation, then suddenly decided to drop both lawsuits when the case was assigned to this Court. They then told the media that they would "refile imminently." As this Court explained, "At the risk of stating the obvious, Plaintiffs' course of conduct could give the appearance of judge shopping—'a particularly pernicious form of forum shopping'—a practice that has the propensity to create the appearance of impropriety in the judicial system." *Walker* Doc. 24 at 3; *cf. Nat'l Treasury Emps. Union v. IRS*, 765 F.2d 1174, 1177 (D.C. Cir. 1985) ("The semblance of judge shopping … is also a concern when a litigant discontinues a fray, only to start over again on another day."); *Telesco v. Telesco Fuel & Masons' Materials, Inc.*, 765 F.2d 356, 360 n.4 (2d Cir. 1985) ("When [plaintiffs] see a storm brewing in the first court, they may try to weigh anchor and set sail for the hopefully more favorable waters of another district.").

Plaintiffs might invoke the excuse of additional plaintiffs and a new claim. As an initial matter, one wonders whether Plaintiffs' attorneys and counsel for the *Walker* Plaintiffs received a flood of new plaintiffs (or refusals to proceed from

---

[72] Likewise, the *Walker* plaintiffs handed off their expert to proposed intervenor United States. *Compare* Doc. 62-2, *with Walker* Doc. 10-3.

existing plaintiffs) on April 15 between 4:20 pm (when they consented to consolidation) and 6:24 pm (when they dismissed after assignment to this Court). Regardless, Plaintiffs had several easier and more obvious routes to add or change plaintiffs. They had already taken one such route: filing another lawsuit, which could then be consolidated as appropriate with existing lawsuits; or joinder, *see* Fed. R. Civ. P. 20(a); or amending their complaint, *see* Fed. R. Civ. P. 15(a).

Thus, dismissal and refiling contradicts Plaintiffs' professed goal of obtaining immediate injunctive relief, for it inevitably delays adjudication. Only one explanation exists for their conduct: judge-shopping. "[T]o ignore the probability that the attorneys' actions in voluntarily withdrawing the case and instantly refiling were directed at obtaining a different judge" "would be to blink reality." *Vaqueria Tres Monjitas, Inc. v. Rivera Cubano*, 230 F.R.D. 278, 279 (D.P.R. 2005) (cleaned up); *cf. Alvarado v. Bank of Am., N.A.*, No. 08-cv-2862, 2009 WL 720875, at *4 (E.D. Cal. Mar. 17, 2009) (same); *Oxbow Energy, Inc. v. Koch Indus., Inc.*, 686 F. Supp. 278, 283 (D. Kan. 1988) (finding "at least some indication that the new plaintiffs here chose to stay out of the [earlier] action solely in order to provide an opportunity to bring a new action").

## 2.   Plaintiffs' Misconduct Precludes Equitable Relief.

To preserve the integrity of the federal judiciary, this Court must not let pass Plaintiffs' counsel's sustained effort at judge-shopping. "[P]ermitting such

manipulation would bring the judicial system itself into disrepute and would permit unscrupulous litigants and lawyers to thwart our system of judicial administration." *BellSouth*, 334 F.3d at 959-60 (cleaned up). As shown, Plaintiffs have not only engaged in dilatory conduct, the goal of the conduct was "to manipulate the judicial process." *Gomez*, 503 U.S. at 654. "Such conduct is the very antithesis of the equitable, diligent, good-faith, vigilant conduct required of a litigant seeking equitable relief." *Arthur*, 574 F. Supp. 2d at 1256. Any irreparable harm "is harm of [Plaintiffs' counsel's] own creation." *Id*. Thus, Plaintiffs are not entitled to preliminary equitable relief, regardless of any other factor.

**B.      The Other Injunction Factors Are in the State's Favor.**

Plaintiffs' motion also fails because they have not shown a likelihood of irreparable injury. "[A] party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). As shown, instead of timely seeking relief, Plaintiffs dallied, playing at judge-shopping instead of seeking adjudication of their claims. Even if that misconduct is not alone enough to deny Plaintiffs' motion, it weighs heavily against any finding of irreparable harm.

The Doctor Plaintiffs say they will be irreparably harmed because they may be subject to "criminal prosecution and penalties." Br., Doc. 8 at 55. But "the cost, anxiety, and inconvenience of having to defend against a single criminal

prosecution" is not "considered 'irreparable.'" *Younger v. Harris*, 401 U.S. 37, 46 (1971). "No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts." *Id.* The Doctor Plaintiffs claim no injury "other than that incidental to every criminal proceeding." *Id.* at 47. Their loss of profits from performing experimental procedures is not an irreparable harm. *See United States v. Jefferson County*, 720 F.2d 1511, 1520 (11th Cir. 1983).

Plaintiffs say that the minors here will be irreparably harmed because they cannot receive "necessary medical care," without which they will allegedly "suffer anxiety, depression, and severe psychological distress" (and their parents will allegedly suffer similarly). Br., Doc. 8 at 53. The problem with this argument is that it presumes gender-transition procedures would relieve any distress experienced by these children. But as shown exhaustively above, there is no evidence that this is true. For one thing, there is scientifically valid evidence suggesting just the opposite: that gender-transition procedures can lead to more significant distress and other mental-health problems. *Supra* at pp. 33-49. And because practitioners cannot distinguish those children whose transgender identity will desist from that those whose will persist, there is no way to assess the costs or supposed benefits of gender-transition procedures for any particular child. Cantor ¶¶ 39-41. In other words, even assuming gender-transition procedures could theoretically benefit *some* child,

practitioners have no way of knowing *ex ante* whether gender-transition procedures will benefit a *particular* child experiencing gender incongruity.

Further, to the extent that Plaintiffs are concerned about "abrupt" shifts in medicine dosage (Br., Doc. 8 at 57), the Act permits appropriate and necessary medical care, as long as the purpose of the procedure is not "to alter the appearance of or affirm the minor's perception of his or her gender or sex." Act § 4(a). Thus, prescribing medications to safely *end* a gender-transition procedure does not fall within the Act's prohibition.

Plaintiffs say that they may "resume" normal puberty absent the experimental procedures regulated here. Br., Doc. 8 at 54. But Plaintiffs cite no authority for the proposition that a law irreparably harms children by ensuring their sexual and reproductive development proceeds biologically. Nor do they cite any authority supporting the idea that biological pubertal development is so harmful that it outweighs the consequences of a preliminary injunction: subjecting Alabama children to ideologically driven procedures that could inflict irreversible damage on their bodies. Beyond that, data indicates that gender-transition procedures could actually increase the risk of suicide. *See supra* at pp. 46-49.

For related reasons, the last two factors—balance of equities and public interest—are in the State's favor. "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain*

*v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). First, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) (cleaned up); *see Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (holding that State "would be harmed if it could not apply its own laws"). Plaintiffs claim that this Court can disregard this interest because they've argued that the Act is unconstitutional. Br., Doc. 8 at 57. But that approach would make the harm inquiry irrelevant whenever a party seeks to preliminarily enjoin a state law on constitutional grounds, because the likelihood-of-success inquiry would always decisively resolve the irreparable-harm inquiry. The Eleventh Circuit has squarely rejected the proposition that claimed Equal Protection violations "always constitute[] irreparable harm." *Siegel*, 234 F.3d at 1177; *id.* at 1177-78.

Second, for all the reasons given above justifying this Act, a failure to allow it to take effect would harm children. Granting a preliminary injunction will mean that more children in Alabama will undergo gender-transition procedures. More children will begin taking puberty blockers and experience the loss of bone density and the associated potential for permanently immature sex organs. And more children will go on cross-sex hormones and become permanently sterile. A preliminary injunction will irreparably damage those children's lives.

Finally, the purpose of a preliminary injunction—preservation of the status quo—supports the State. Whenever a plaintiff seeks to enjoin duly enacted legislation, "the status quo is that which the People have wrought, not that which unaccountable federal judges impose upon them." *Planned Parenthood of Blue Ridge v. Camblos*, 116 F.3d 707, 721 (4th Cir. 1997) (Luttig, J., staying injunction in published, single-judge order).

In the face of medical uncertainty, the prudent path is to allow the State's law to take effect, given the irreversible consequences of allowing practitioners to perform experimental gender-transition procedures on Alabama's children. Allowing the Act to take effect would not mean that children "will be unable to obtain" "medical treatment of gender dysphoria." Br., Doc. 8 at 54. Alabama has not prohibited treatment of gender dysphoria in minors. Scientifically valid evidence supports other treatment models, including the so-called "watchful waiting" model and the use of psychotherapy to address other mental-health problems. The Act allows such treatment. This Court is not in a position to "second-guess" the "legislative judgment" that children of our State face irreparable harm from the alternative unproven, experimental medical procedures proscribed by the Act. *Ferber*, 458 U.S. at 758.

## VIII.   Plaintiffs Are Not Entitled To A Universal Injunction.

Plaintiffs appear to demand that the Court issue a universal injunction preventing "the State from implementing Act [sic]" against both Plaintiffs and non-

parties. Br., Doc. 8 at 58. But this is not a class action, and Plaintiffs offer no justi-

fication for the Court to depart from its narrow authority to adjudicate an Article III

"case or controversy." "The fundamental principle of equity guiding the court" when

it issues an injunction "is that injunctive relief should be limited in scope to the ex-

tent necessary to protect the interests *of the parties*." *Ga. Advoc. Off. v. Jackson,* 4

F.4th 1200, 1209 (11th Cir. 2021) (cleaned up, emphasis added). "When a district

court fails to follow this principle and drafts an unnecessarily broad injunction, the

district court abuses its discretion." *Id*. Thus, if the Court were to find that these

Plaintiffs have proven their entitlement to a preliminary injunction, only these Plain-

tiffs should receive relief.

Any other course would be inequitable, especially since it would benefit non-

parties like Morissa Ladinsky. Dr. Ladinsky appears to have strategically abandoned

her own suit and changed her label to "expert" in furtherance of judge-shopping

maneuvers. Because she and her former co-plaintiffs strategically abandoned their

case, they should receive no equitable relief from this one.

## IX.    A Bond Would Be Required Under Rule 65.

Last, if this Court provides preliminary relief of any form, the Physician Plain-

tiffs should be required to post a bond. The plain text of Rule 65(c) provides that

"[t]he court may issue a preliminary injunction or a temporary restraining order only

if the movant gives security in an amount that the court considers proper." "[T]he

bond is treated by most courts as a contract by which the amount posted is the consideration or 'price' paid for a wrongful injunction." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 297 F.R.D. 633, 635 (N.D. Ala. 2014). "Accordingly, the judge usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained." 11A Wright & Miller, *Federal Practice & Procedure* § 2954 (3d ed.); *e.g.*, *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

Here, the most straightforward calculation is the amount by which the Physician Plaintiffs will be unjustly enriched should they be allowed to administer profitable (and illegal) medical procedures to kids. The State proposes an amount of $1 million per Physician Plaintiff. If they object to this amount, discovery is warranted before an amount is decided or an injunction contingent on the bond issued.[73]

## CONCLUSION

This Court should deny the motion for preliminary relief.

---

[73] Plaintiffs' case (*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. Unit B 1981), Mot., Doc. 7 at 4) is irrelevant, and not just because the Doctor Plaintiffs have a pecuniary interest in this litigation. As Judge Acker explained, *City of Atlanta* involved a "technical shortcoming" that was "innocuous" because "the TRO would be in effect for only eight more days." *Black Warrior Riverkeeper*, 297 F.R.D. at 636 (cleaned up).

Respectfully submitted,

Steve Marshall
  *Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

Christopher Mills
(SC Bar No.
101050)
 (*pro hac vice* motion pending)

SPERO LAW LLC
557 East Bay St.
#22251
Charleston, SC
29451
Telephone: (843)
606-0640
cmills@spero.law

A. Barrett Bowdre (ASB-2087-K29V)
Thomas A. Wilson (ASB-1494-D25C)
  *Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

***Counsel for Defendants***

MAY 2, 2022

143

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF

system on May 2, 2022, which will serve all counsel of record.


s/ Edmund G. LaCour Jr.
*Counsel for Defendants*