# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D.<br><br>    *Plaintiffs*,<br><br>v.<br><br>KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County.<br><br>    *Defendants*. | Civil Action No. 2:22-cv-184-LCB<br><br>**DECLARATION OF MORISSA J. LADINSKY, MD, FAAP, IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION** |



PLAINTIFFS' EX. 006

I, Morissa J. Ladinsky, declare as follows:

1. I am an Associate Professor of Pediatrics at the University of Alabama at Birmingham ("UAB") School of Medicine.

2. I am a practicing physician and a member of the medical staff at the Children's Hospital of Alabama and UAB Hospital, both in Birmingham. I am co-lead of the multi-disciplinary gender clinic at UAB Hospital.

3. I obtained a bachelor's degree (magna cum laude) in Human Biology from Brown University in 1985. I obtained my medical degree (with honors) from Baylor University in 1990.

4. I was certified by the American Board of Pediatrics in 1993. I am licensed to practice medicine in Alabama. I have past licensure in Ohio, Maryland, and Texas when I previously practiced and resided in these states.

5. For the last 31 years, I have dedicated my practice to the medical care of young people. Throughout my career, my patients included transgender young people. Presently, those transgender patients live in Alabama, Mississippi, Florida, and Georgia.

6. Since starting at the gender clinic at UAB, I have treated approximately 250 transgender young people for gender dysphoria.

7. The treatment of gender dysphoria is well-established in the medical profession. This is not a pioneering or experimental area of medicine. There are comprehensive standards of care governing the treatment of gender dysphoria that were developed by the World Professional Association for Transgender Health (WPATH), founded in 1979, and Endocrine Society, in collaboration with the Pediatric Endocrine Society. These guidelines are recognized as the prevailing standard of care by the major associations of medical professionals, including the American Medical Association, American Academy of Pediatrics, and the Society for Adolescent Health and Medicine, to name a few. The current version of the WPATH standards of care have been in place for more than a decade.

8. The treatment of gender dysphoria is also part of medical school curricula across the country and world. In fact, this subject is taught as part of the endocrine module to all students at the UAB School of Medicine. The broader topic of transgender medicine is also found on every state board medical exam, including in Alabama.

9. Incorporated within the standards of care is a process each patient must follow before beginning any treatment for gender dysphoria. And, as with any treatment, we also follow a protocol for obtaining informed consent as part of that process. Standard protocol requires that medical treatment for gender dysphoria is

3

not prescribed until a patient meets the rigorous requirements outlined in the standards of care and consistent with an informed-consent process.

10. The informed consent procedures used by the gender clinic at UAB are very comprehensive. Patients at the clinic begin that process with their primary care provider and often community based mental health provider before they even have an initial appointment with a doctor like me. The patient's mental health provider thoroughly assesses the patient's mental health, maturity, presence and acuity of dysphoria and if indicated, ultimate readiness to undergo medical treatment for gender dysphoria. Using those assessments as our baseline, our multidisciplinary team begins its evaluation. We meet with the patient and their parents/legal guardians, review the risks, benefits, and alternatives of treatment, as medical and mental health providers do for all treatments. After that initial meeting, we meet with our patients at regular intervals for follow up, allowing us to monitor the patient's gender dysphoria as well as their overall physical and mental health over time. The team also provides families with materials to review and community-based supports and resources to connect with in the time between appointments.

11. Most of our patients are in the care of the gender clinic for one to three years before initiating medical treatment for gender dysphoria, depending on when they first come to the clinic and their individual healthcare needs. Even after that extended observation and assessment period, we will not prescribe any treatment

unless the full multidisciplinary team agrees that treatment is appropriate, and the patient and the patient's parents fully understand, have the capacity to consent, and sign the informed-consent forms. This process is intentionally set up to ensure all involved are making an informed, measured decision, from the healthcare providers to the patients and their parents.

12. Throughout this evaluation information-sharing process, patients are encouraged to avail themselves of the various services offered as part of our multidisciplinary clinic, including pastoral care. The purpose of these services is to get a full picture of a patient's health, wellbeing, household support, and functioning. Each of those data points help determine whether a potential treatment option may be appropriate for any given patient.

13. Once a patient begins medical treatment, their progress is monitored at regular intervals, typically every six months, to assess the efficacy of the prescribed treatment through a physical examination or laboratory tests. This ongoing monitoring also ensures ongoing evaluation of a patient's mental health and the chance to address any questions the patient or their parents may have.

14. I understand that Governor Ivey signed the Vulnerable Child Compassion and Protection Act (the "Act"). My understanding is that the Act expressly prohibits physicians, and others, from doing or saying anything that could cause a transgender young person, under age 19, in Alabama to undergo medical

treatment for gender dysphoria. I further understand that violating the Act exposes Alabama healthcare providers and others to criminal prosecution, which could result in a prison sentence or substantial fine.

15. Puberty-blocking medication and hormone-replacement therapy have greatly improved the physical and mental health and wellbeing of my patients. Denying my patients access to these well-established medical treatments will cause the mental health of many of my patients to regress, including increasing their suicidality and likelihood of attempting suicide. To cease ongoing care, without a medical basis, would violate my professional, ethical, and legal obligations by forcing me to harm my patient.

16. In the days since the Act was signed into law, I have met with numerous patients who are experiencing significant psychological distress due to the prospect of the Act going into effect. One teenage patient was visibly trembling in fear. Parents are regularly calling the clinic in tears. The uncertainty weighs heavily on the minds of my patients and their parents. And, for some, their worst fears have already started to materialize: several of my patients have reported to me that their pharmacies are refusing to fill prescriptions relating to the treatment of their gender dysphoria, including for menstrual suppression medications which are supposedly not criminalized by the Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 th day of April, 2022.

_____
Morissa J. Ladinsky, MD, FAAP

7