**VIEWPOINT**

# Legislation to Criminalize Gender-Affirming Medical Care for Transgender Youth

**Jack L. Turban, MD, MHS**
Division of Child & Adolescent Psychiatry, Stanford University School of Medicine, Stanford, California.

**Katherine L. Kraschel, JD**
Solomon Center for Health Law & Policy, Yale Law School, New Haven, Connecticut.

**I. Glenn Cohen, JD**
Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics, Harvard Law School, Boston, Massachusetts.

Supplemental content

**Legislation** seeking to criminalize or otherwise prevent the provision of gender-affirming care for transgender adolescents is on the rise. This Viewpoint describes these laws and explains why they are harmful and potentially unlawful.

## Caring for Transgender Youth

Transgender adolescents are those whose gender identity (ie, their psychological sense of their own gender) is incongruent with their sex assigned at birth.[1] According to a 2017 study from the Centers for Disease Control and Prevention, 1.8% of 118 803 surveyed adolescents in the United States identified as transgender.[2] In this same study, approximately 35% of transgender adolescents reported having attempted suicide, highlighting the importance of the mental health concerns affecting this population.[2]

Affirmation of an adolescent's transgender identity is associated with favorable mental health outcomes.[1,3,4] Major medical organizations have outlined best practices for supporting transgender adolescents.[1,3,4] These include facilitation of a social transition (ie, taking on the name, pronouns, and other elements of gender expression that match the adolescent's gender identity), consideration of pubertal suppression (ie, gonadotropin-releasing hormone analogues that temporarily and reversibly pause puberty to prevent the development of secondary sex characteristics that often cause psychological distress for transgender youth), and consideration of gender-affirming hormones (ie, medications including estradiol and testosterone that induce physical feminization or masculinization, respectively, that align with the adolescent's gender identity). Although research has not established that these interventions cause infertility, guidelines recommend that adolescents be offered fertility preservation options prior to treatment with gender-affirming hormones, given the theoretical risk that these medications may impair fertility.[1,3,4] Although gender-affirming genital surgery is generally not recommended until adulthood, these guidelines note that some transmasculine adolescents may benefit from masculinizing chest surgery to lessen chest dysphoria.[1,3,4]

## Laws Restricting Physician Autonomy and Expertise

Medical professionals, using their training and autonomy and working with patients and families, are best positioned to determine when gender-affirming medical or surgical care is warranted. Yet despite opposition from major medical organizations, including the American Medical Association, the American Academy of Pediatrics, and the American Psychiatric Association (**Table**), legislators in several US states have introduced legislation to criminalize the provision of such care (for a summary of proposed legislation see eTable 1 in the Supplement). Arkansas recently became the first state to have such a bill become law, after the state legislature overturned the governor's veto. Physicians and public health experts should be aware of these legislative initiatives and their likelihood to cause serious harm to transgender adolescents and their families.

The bills that have been introduced in state legislatures are diverse, but all have the central aim of removing access to gender-affirming medical care, surgical care, or both for transgender youth. For example, Alabama House Bill 1 (HB1) classified the provision of pubertal suppression or gender-affirming hormones as a class C felony and included potential punishment of physicians with up to 10 years in prison for prescribing these medications. If passed, this bill would have also forced teachers to reveal transgender students' gender identities to their parents without their consent. This could result in some youth becoming homeless or experiencing physical or emotional abuse from unaccepting families.[5]

These bills also represent an assault on key tenets of the medical profession—that physicians are best equipped to determine, both through clinical practice

Table. Statements Opposing Legislation to Limit Gender-Affirming Medical Care for Transgender Youth[a]

| Organization | Policy statement title |
| --- | --- |
| American Medical Association | AMA fights to protect health care for transgender patients |
| American College of Physicians, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Osteopathic Association, and others | Frontline physicians oppose legislation that interferes in or criminalizes patient care |
| American Psychiatric Association | Position statement on treatment of transgender (trans) and gender diverse youth |
| American Academy of Pediatrics | American Academy of Pediatrics speaks out against bills harming transgender youth |
| American Academy of Child and Adolescent Psychiatry | AACAP statement responding to efforts to ban evidence-based care for transgender and gender diverse youth |
| The Endocrine Society and The Pediatric Endocrine Society | Discriminatory policies threaten care for transgender, gender diverse individuals |
| World Professional Association for Transgender Health & US Professional Association for Transgender Health | Statement in response to proposed legislation denying evidence-based care for transgender people under 18 years of age and to penalize professionals who provide medical care |

[a] Links to the statements are available in eTable 2 in the Supplement.


PLAINTIFFS' EX. 029

**Corresponding Author:** Jack L. Turban, MD, MHS, 401 Quarry Rd, Palo Alto, CA 94304 (jturban@stanford.edu).

© 2021 American Medical Association. All rights reserved.

guidelines and other forms of professional self-regulation, what care will promote the health of individual patients. While the practice of medicine is not wholly without state regulation—licensure requirements, tort liability, etc—for the most part the existing legal, ethical, and cultural superstructure trusts medical professionals to exercise their discretion and act as a medical fiduciary. The use of criminal penalties, in particular, should be of substantial concern for physicians. These bills could transform their fiduciary care for patients into criminal acts.

These bills also propagate a range of factual inaccuracies about transgender youth. Alabama HB1, for example, falsely asserted that gender-affirming medical interventions increase risk of mental illness and suicide, despite research showing that access to these interventions is associated with improved mental health outcomes.[1,3,4]

### Legality

Although these bills represent a wide range of provisions affecting medical care, each of which may raise different legal issues, there are good arguments that many of these laws may violate the Affordable Care Act (ACA) and perhaps the US Constitution, state constitutions, or the Americans with Disabilities Act.

To understand the legal challenges affected transgender people might bring should these bills become law, consider *Kadel v Fowell* (446 F Supp 3d 1, [MDNC 2020]), a case currently being litigated in federal district court. In *Kadel*, transgender employees of the University of North Carolina and North Carolina State University sued their respective employers whose insurance plan "denies coverage for medically necessary treatment if the need stems from gender dysphoria, as opposed to some other condition." The plaintiffs alleged that the plan would cover medically necessary mastectomies for either sex but not if the need was related to gender affirmation. They brought claims that the insurance plan violated 2 provisions of federal law—antidiscrimination protections in Title IX and the ACA—as well as the Equal Protection Clause of the Fourteenth Amendment of the US Constitution. A recent opinion in the case denying the universities' motion to dismiss the case and allowing each of the plaintiffs' claims to move forward, illustrates why some of the challenges to these new state laws appear likely to succeed.

The *Kadel* court determined that the insurance plan violates Title IX, because it constituted discrimination "on the basis of sex" within the meaning of Title IX (20 USC §1681[a]). Notably, the US Supreme Court has reached a similar conclusion regarding the interpretation of "because of such individual's…sex" as to Title VII, governing employment, in *Bostock v Clayton County* (140 SCt 1731, 1741 [2020]). It appears likely other courts will interpret language like this, which forms the backbone of most antidiscrimination law, in the same way. Similarly, the *Kadel* court allowed the plaintiffs' claims that the plan violates section 1557 of the ACA to move forward. Section 1557 makes it illegal for any health program or activity receiving federal financial assistance (which the defendant universities are) to discriminate "on the basis of sex" or other prohibited grounds (42 USC § 18116[a]). In addition, the *Kadel* court signaled that the policy might violate the equal protection clause of the US Constitution's Fourteenth Amendment. The court wrote that the plan's exclusion discriminates on the basis of gender and thus the state must show that the exclusion of gender dysphoria serves "important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives," what it called a "demanding standard," to be constitutional. To be clear, the US Supreme Court has not yet reached this constitutional question and given the change in the Court's composition since its last decision in favor of transgender rights and the differences between constitutional and statutory interpretation, a similar ruling on this point is not assured.

Beyond the arguments raised in *Kadel,* other challenges might be brought to these bills. In states that have equal protection clauses in their state constitutions, plaintiffs could bring similar equal protection claims in state court. Other litigants have also argued that individuals with gender dysphoria qualify as disabled within the meaning of the Americans with Disabilities Act and the Rehabilitation Act.[6] These challenges have thus far had a mixed track record in terms of success, but some transgender individuals may challenge these laws on the disability theory in addition to the ACA section 1557 theory.

While it appears all these arguments have merit, the uncertainty over success heightens the need for advocacy now, to keep proposed legislation from becoming law.

### Conclusions

Some parents of transgender youth have highlighted the high stakes involved in these legislative debates, "This could mean death for my child."[7] Physicians and mental health experts in states considering these bills should consider contacting their state representatives to provide them with evidence-based information about transgender youth, their medical care, and how physicians can best support these patients.

**ARTICLE INFORMATION**

**Published Online:** May 24, 2021.
doi:10.1001/jama.2021.7764

**Correction:** This article was corrected on June 4, 2021, to add a financial disclosure that was inadvertently omitted during editing.

**Conflict of Interest Disclosures:** Dr Turban reported receiving textbook royalties from Springer Nature, a pilot research award for general psychiatry residents from the American Academy of Child & Adolescent Psychiatry, supported by industry donors (Pfizer and Arbor), and serving as an expert witness on behalf of the American Civil Liberties Union and Cooley LLP. No other disclosures were reported.

**REFERENCES**

1. Rafferty J; Committee on Psychosocial Aspects of Child and Family Health; Committee on Adolescence; Section on Lesbian, Gay, Bisexual, and Transgender Health And Wellness. Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*. 2018;142(4): e20182162. doi:10.1542/peds.2018-2162

2. Johns MM, Lowry R, Andrzejewski J, et al. Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students. *MMWR Morb Mortal Wkly Rep*. 2019;68(3):67-71. doi:10.15585/mmwr.mm6803a3

3. Coleman E, Bockting W, Botzer M, et al Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgend Health*. 2012;13(4):165-232. doi:10.1080/15532739.2011.700873

4. Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658

5. Choi SK, Wilson BD, Shelton J, Gates GJ. *Serving Our Youth 2015: The Needs and Experiences of Lesbian, Gay, Bisexual, Transgender, and Questioning Youth Experiencing Homelessness*. Williams Institute; 2015.

6. Szemanski A. When trans rights are disability rights. *Harv J Law Gend*. 2020;43:137-168.

7. Kidd KM, Sequeira GM, Paglisotti T, et al. "This could mean death for my child." *J Adolesc Health*. Published online October 13, 2020. doi:10.1016/j.jadohealth.2020.09.010

© 2021 American Medical Association. All rights reserved.