



Neutral Citation Number: [2021] EWCA Civ 1363

Appeal No. C1/2020/2142
Case No: CO/60/2020

IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
ADMINISTRATIVE COURT
Dame Victoria Sharp DBE, President of the Queen's Bench Division, Lewis LJ and Lieven J

Royal Courts of Justice
Strand
London WC2A 2LL

Date: 17/09/2021

Before:

**THE LORD BURNETT OF MALDON**
**LORD CHIEF JUSTICE OF ENGLAND AND WALES**
**SIR GEOFFREY VOS, MASTER OF THE ROLLS**
and
**LADY JUSTICE KING**

**BETWEEN:**

(1) **QUINCY BELL**
(2) **MRS A**

Claimants/Respondents

-and-

**THE TAVISTOCK AND PORTMAN**
**NHS FOUNDATION TRUST**

Defendant/Appellant

-and-

**NHS ENGLAND**

Interested Party

-and-

(1) **UNIVERSITY COLLEGE LONDON HOSPITALS NHS FOUNDATION**
**TRUST**
(2) **LEEDS TEACHING HOSPITALS NHS TRUST**
(3) **TRANSGENDER TREND LTD**
(4) **BROOK**
(5) **GENDERED INTELLIGENCE**
(6) **THE ENDOCRINE SOCIETY**

**(7) DR DAVID BELL**
**(8) THE ASSOCIATION OF LAWYERS FOR CHILDREN**
**(9) LIBERTY**

**Interveners**

- - - - - - - - - - - - - - - - - - - - -

**Ms Fenella Morris QC** and **Ms Nicola Kohn** (instructed by **DAC Beachcroft**) appeared on behalf of the **Appellant** ("Tavistock")
**Mr Jeremy Hyam QC, Mr Alasdair Henderson**, and **Mr Darragh Coffey** (instructed by **Sinclairslaw**) appeared on behalf of the **Respondents** (the "Respondents")
**The Interested Party** did not appear and was not represented
**Mr John McKendrick QC** (instructed by **Hempsons**) appeared on behalf of the **first and second Interveners**
**Mr Paul Skinner** and **Mr Aidan Wills** (instructed by **AI Law**) appeared on behalf of the **third Intervener**
The remaining **Interveners** made written submissions

Hearing dates: 23 and 24 June 2021
- - - - - - - - - - - - - - - - - - - - -

# JUDGMENT

"Covid-19 Protocol:
This judgment was handed down remotely by circulation to the parties' representatives by email, release to BAILII and publication on the Courts and Tribunals Judiciary website. The date and time for hand-down is deemed to be 2:00pm, Friday 17 September 2021."

**The Lord Burnett of Maldon CJ**:

Introduction

1.      This is the judgment of the court to which we have all contributed.

2.      Since 1989, The Tavistock and Portman NHS Foundation Trust ("Tavistock") has operated a Gender Identity Development Service (GIDS) for patients up to the age of 18 suffering from gender dysphoria. We shall refer to both those aged under 16 and those aged 16 and 17 as "children" in this judgment. Gender dysphoria is a complex condition that occurs in both children and adults. It involves, in the simplest terms, a strong desire to be and to be treated as being of the gender other than their natal sex at birth. Those diagnosed with it suffer associated significant distress or impairment in function. A range of clinical interventions may be prescribed.

3.      The treatment of children for gender dysphoria is controversial. Medical opinion is far from unanimous about the wisdom of embarking on treatment before adulthood. The question raises not only clinical medical issues but also moral and ethical issues, all of which are the subject of intense professional and public debate. Such debate, when it spills into legal proceedings, is apt to obscure the role of the courts in deciding discrete legal issues. The present proceedings do not require the courts to determine whether the treatment for gender dysphoria is a wise or unwise course or whether it should be available through medical facilities in England and Wales. Such policy decisions are for the National Health Service, the medical profession and its regulators and Government and Parliament. The treatment of children for gender dysphoria is lawful in this jurisdiction. It was no part of the claim advanced before the Divisional Court that the prescription of puberty blockers and then cross-sex hormones (two common steps in treatment for gender dysphoria in children) was in itself unlawful. Instead, the claim advanced was that the sanction of the court should always be obtained before they were prescribed.

4.      The first claimant in the underlying judicial review proceedings is a former patient of Tavistock who was treated with puberty blockers as a 16-year old, progressed to cross-sex hormones and began surgical intervention as an adult to transition from female to male. She terminated her treatment having changed her mind and regrets having embarked upon the treatment pathway. The second claimant is the mother of a child who suffers from gender dysphoria and has been referred to Tavistock, but has not yet had an appointment. As the Divisional Court noted in para [89] of its judgment, her interest in these proceedings is "largely theoretical". The amended claim form challenged "the continuing practice of [Tavistock] through its [GIDS], to prescribe puberty-suppressing hormone blockers to children under the age of 18 who experience gender dysphoria". It was described as a "continuing activity or policy". The relief sought was a declaration that Tavistock's "current practice of prescribing … hormone blocking treatment to children which is anticipatory of, and inextricably linked to, … cross-sex hormone treatment, absent an order from the Court in its welfare jurisdiction that the treatment is in the child's best interest, is unlawful." The aim of the litigation was to require, as a matter of law, the involvement of the court before anyone under the age of 18 was prescribed puberty blockers thus denying the opportunity of consent to such treatment either individually or with the support of their parents or legal guardians. The argument was that those under 18 were not capable in law of giving valid consent to the treatment.

5.      There is an odd feature of the claim.  Contrary to its underlying premise, Tavistock does
        not prescribe puberty blockers.  Patients with gender dysphoria are referred to Tavistock
        from all over the country for assessment.  There is usually a wait of between 22 and 24
        months before they can be seen for a series of assessment appointments.  If, following
        assessment, Tavistock is satisfied that it is medically appropriate to do so, the patient is
        referred to the paediatric endocrinologists at either University College London
        Hospitals NHS Foundation Trust ("UCH") or Leeds Teaching Hospitals NHS Trust
        ("Leeds") (together the "Trusts").  A referral takes place only if Tavistock assesses that
        the child would benefit from treatment and is capable of giving consent to puberty
        blockers (the first step in any such treatment).  Referral requires the consent of the child
        and of the parents.  Each Trust thereafter, independently of Tavistock, makes its own
        clinical assessment and prescribes puberty blockers only after deciding that to be the
        proper medical course and after obtaining what each considers to be valid consent from
        the child.  Consent is obtained not only from the child in question but also the parents
        of the child.  It was not suggested that there was any criticism of the consent-taking
        process at either of the Trusts.  Neither Trust was joined by the claimants as a defendant
        or interested party in these proceedings but instead intervened because it was their
        actions in prescribing puberty blockers that were under attack.  The puberty blocking
        drug treatment at issue in this case is gonadotropin-releasing hormone agonists.  They
        suppress the physical developments that would otherwise occur during puberty.  The
        next step in treatment, for which UCH and Leeds obtain further informed consent from
        child and parents, is to prescribe cross-sex hormones and then, in adulthood,
        consideration of surgery.

6.      As Mr Jeremy Hyam QC for the claimants readily accepted, the Divisional Court (Sharp
        P, Lewis LJ and Lieven J) found no illegality in the policy or practice of Tavistock or
        of UCH or Leeds.  It considered the competence of persons under 16 to consent to the
        administration of puberty blockers on the basis of the decision of the House of Lords in
        *Gillick v. West Norfolk and Wisbech Health Authority* [1986] AC 112 ("*Gillick*").  In
        relation to 16 and 17 year olds, the court considered the impact of section 8 of the
        Family Law Reform Act 1969 ("the 1969 Act"), which provides that the consent of a
        minor over 16 "to any surgical [or] medical treatment … shall be as effective as it would
        be if he were of full age".  In answer to the central question before the court, which it
        identified at [7] of its judgment as "whether informed consent in the legal sense can be
        given by such children and young persons" it rejected the claim and said "yes"; but it
        did so in qualified terms.

7.      The Divisional Court also rejected a subsidiary claim "that the information provided by
        [Tavistock] and the Trusts is inadequate to form the basis of informed consent."  The
        court found "no problem" with the information given but expressed concern about the
        ability of children to understand and weigh it: para [150].

8.      Rather than dismissing the claim for judicial review as Ms Fenella Morris QC for
        Tavistock supported by Mr John McKendrick QC for UCH and Leeds submitted was
        the correct course, the Divisional Court made a declaration specifying precisely what
        informed consent would require in these circumstances.   It also gave extensive
        "guidance".  The declaration was in these terms:

                "It is declared that the relevant information that a child under the
                age of 16 would have to understand, retain and weigh up in order
                to have competence to consent to the administration of puberty

blocking drugs is that set out in paragraph 138 of the judgment handed down in this case on 1 December 2020."

That paragraph reads:

> "It follows that to achieve *Gillick* competence the child or young person would have to understand not simply the implications of taking [puberty blockers] but those of progressing to cross-sex hormones. The relevant information therefore that a child would have to understand, retain and weigh up in order to have the requisite competence in relation to [puberty blockers], would be as follows: (i) the immediate consequences of the treatment in physical and psychological terms; (ii) the fact that the vast majority of patients taking [puberty blockers] go on to [cross-sex hormones] and therefore that s/he is on a pathway to much greater medical interventions; (iii) the relationship between taking [cross-sex hormones] and subsequent surgery, with the implications of such surgery; (iv) the fact that [cross-sex hormones] may well lead to a loss of fertility; (v) the impact of [cross-sex hormones] on sexual function; (vi) the impact that taking this step on this treatment pathway may have on future and life-long relationships; (vii) the unknown physical consequences of taking [puberty blockers]; and (viii) the fact that the evidence base for this treatment is as yet highly uncertain."

9. The declaration affects only those under 16, although para [138] did cover those aged 16 and 17. The guidance went much wider. It covered children of all ages and recommended that the sanction of the court should be sought before prescribing puberty blockers albeit that there was no legal requirement to do so. The guidance, which does not have the effect of declaring the law, followed an extensive discussion in the judgment (starting at [139]) of some of the difficulties that a child would have in understanding the implications of loss of fertility and full sexual function if the further steps beyond puberty blockers were taken. The Divisional Court stated in para [145] that:

> "the conclusion we have reached is that it is *highly unlikely* that a child aged 13 or under would ever be *Gillick* competent to give consent to being treated with [puberty blockers]. In respect of children aged 14 or 15 we are also *very doubtful* that a child of this age could understand the long-term risks and consequences of treatment in such a way as to have sufficient understanding to give consent" (emphasis added).

10. In para [146] the Divisional Court recognised the legal force of section 8 of the 1969 Act but observed that the court could still intervene to protect a child. It continued by saying that "in the light of the evidence that has emerged, and the terms of this judgment, clinicians may well consider that it is not appropriate to move to treatment, such as [puberty blockers] or [cross-sex hormones] without the involvement of the court." Although couched in terms of "may well consider it appropriate" this part of the judgment has been understood by clinicians, and understandably so, as suggesting that an application to the court (by the child, the parents or the Trust in question) should

be the norm.  That is indeed what the court was suggesting given its factual conclusion that under 14s were "highly unlikely" to give valid consent and that it was improbable that 14 or 15 year olds could do so.  The court continued by indicating that even in respect of 16 and 17 year olds an application to the court would be appropriate if there were any doubt about the long-term best interests of the child in question.

11.     We inquired of counsel about the circumstances in which the guidance came to be given by the court.  It was not the subject of submissions below but Mr Paul Skinner, who appears for the Third Intervener, Transgender Trend Ltd, drew our attention to the transcript where he said, "in so far as the court finds against the claimant, then it would be useful … to give some guidance as to the … salient factors which ought to be considered in the consent process."

12.     Tavistock appeal against the declaration and submit that the guidance given by the Divisional Court was wrong in law. There are eight grounds of appeal clarified in Tavistock's skeleton argument.  Grounds one and two are that the court misapplied the law in *Gillick.*  Ground three is that the court's conclusions were inconsistent with the 1969 Act.  Grounds four and five challenge the court's factual conclusion that the prescription of puberty blockers for gender dysphoria is "experimental" and that their effects are "lifelong" and "life-changing".  Grounds six and seven challenge the court's reliance on expert evidence adduced by the claimants without permission, which contradicted the evidence of Tavistock and the Trusts; and making findings of fact upon it and relying on it to resolve clinical differences of opinion.  Ground 8 contends that that the approach of the court discriminates against children with gender dysphoria which cannot be justified and therefore breaches article 14 of the European Convention on Human Rights.

The practice and policy under challenge

13.     The "practice" challenged was referring children to the Trusts and the Trusts then prescribing puberty blockers without the intervention of the court exercising its powers to protect children.  In reality, it was a challenge to the policy of the National Health Service regarding treatment of children for gender dysphoria.  The Divisional Court noted in paras [13] and [14] that GIDS is provided as part of the NHS Standard Contract and commissioned by the NHS Commissioning Board in accordance with a service specification.  The referral process conducted by Tavistock is carried out under the auspices of that service specification.  This was agreed before us as "the document encompassing the decision which was the subject of the judicial review" although it was not mentioned in the claimants' amended grounds.  The service specification comprises 61 pages of detailed provisions, including in para 3.2.5 and appendix 6 provisions about informed consent.  It required the GIDS service to be delivered in accordance with relevant national and international guidelines for the care of children and adolescents with gender dysphoria, such as the World Professional Association for Transgender Health ("WPATH") *Standards of Care for the Health of Transsexual, Transgender and Gender Nonconforming people* and the Endocrine Society's Clinical Guidelines, as well as the UK National Institute for Health and Care Excellence guidelines (the "NICE Guidelines") specific to the treatment of mental and emotional health and wellbeing.

14.     The Divisional Court also referred to Tavistock's Standard Operating Procedure ("SOP") dated 31 January 2020 that had taken two years to develop.  It formed part of

the written material which contained the policy challenged in these proceedings. It incorporated guidance and documentation in relation to consent for referral to UCH's and Leeds's endocrine liaison clinics "for consideration of [puberty blockers]". Mr Hyam suggested that the court's judgment must have implicitly determined that the procedure was inadequate, at least in relation to its expressed views that the vast majority of patients taking puberty blockers go on to cross-sex hormones and that the evidence base for puberty blockers was highly uncertain. There was no analysis of these documents in the claimants' materials before the court nor in the judgment. Indeed, it is clear that the court below did not have the benefit of the focus on these documents that we have had. In particular, Mr Hyam placed an emphasis on the service specification that was absent before the Divisional Court.

The factual background in more detail

15.     Tavistock employs specialist staff including child psychologists, psychotherapists, psychiatrists, social workers, family therapists and nurses. Section 3B of the NHS Act 2006 requires NHS England to arrange such services as might be prescribed by regulations. Regulation 11 of the National Health Service Commissioning Board and Clinical Commissioning Groups (Responsibilities and Standing Rules) Regulations 2012/2296 concerns services for rare and very rare conditions, which included GIDS for children and adolescents. The service specification provides that the purpose of the treatment is to "help reduce the distressing feelings of a mismatch between their natal (assigned) sex and their gender identity."

16.     GIDS recognises three stages of physical intervention that may be appropriate in cases of gender dysphoria. Stage 1 is the administration of puberty blockers, which is clinically appropriate for children who have reached Tanner stage 2 of puberty and above. Tanner stage 2 is marked in natal females by the start of breast development, and in natal males by the enlargement of the testicles and the scrotum. Stage 2 of the intervention is the administration of cross-sex hormones which can only be prescribed from around the age of 16. Stage 3 is gender reassignment surgery which is only available via adult services to people aged over 18.

17.     At the end of the assessment period at Tavistock the clinicians will agree a care plan with the patient and their family. Where the patient fulfils the criteria in the service specification, they will be referred to UCH or Leeds for consultation and physical assessment by endocrinologists with a view to being prescribed puberty blockers.

18.     Dr Polly Carmichael, the director of GIDS, Professor Gary Butler, consultant in paediatric endocrinology at UCH, and Dr Nurus-Sabah Alvi, consultant in paediatric endocrinology at Leeds, described in their detailed evidence the process that patients go through.

19.     Puberty blockers were first prescribed at UCH in 2012 for a cohort of 12 to 15 year olds with established and persistent gender dysphoria under an approved research study: the *Early Intervention Study*. A pre-print version was placed online on the day the judgment of the Divisional Court was handed down; the paper itself was published in February 2021.

20.     In 2019/2020, 161 children under 16 were referred by GIDS to the Trusts for puberty blockers, of whom three were aged 10 or 11, thirteen were aged 12, ten were aged 13,

twenty four  were aged 14, forty five were aged 15, fifty one were aged 16, and fifteen were aged 17 or 18.   The number of referrals to GIDS has increased from 97 in 2009 to 2,519 in 2019.  It is important to keep in mind the difference between the number of children referred to GIDS and the number who are eventually referred after assessment by Tavistock to the Trusts for evaluation for treatment.  We have noted the delay of up to two years between referral to GIDS and subsequent assessment which precedes an onward referral to the Trusts.  It follows that the comparison between 2,519 referrals to GIDS and 161 onward referrals does not relate precisely to the same group of children.  Yet it illuminates the reality that only a fraction of those who come to GIDS are referred on for possible treatment.  Evidence from 2019/20 (see [26] below) put the figure at about 16% based on a random sample selection.

21.    Patients of GIDS give their consent for referral to Tavistock in the first place. They then give their consent to referral on to UCH or Leeds for consideration of the prescription of puberty blockers.  The service specification says that "[a]ll efforts will be made to ensure that clients are aware of the longer term consequences of the endocrine treatments, including implications for fertility, and the decision of the competence of the client will be jointly made by the endocrine and psychological members of the Service's integrated team", and that "[t]he current context of treatment decisions about [cross-sex hormones] in adolescence is that there is limited scientific evidence for the long-term benefits versus the potential harms of the intervention. There are also concerns that it is uncertain whether or not a young person will continue to identify as transgender in the future, given that some subsequently identify in a different way." The SOP also deals with consent.

22.    Dr Carmichael and Professor Butler provided evidence about the way in which the risks of loss of fertility, sexual function and the effect of puberty blockers on relationships were explained to patients within the consent process.  We do not set out the evidence in as much detail as did the Divisional Court for two reasons: (i) a court hearing a judicial review will generally accept the evidence of the public authority: and will not normally decide contested issues of fact: see, for example, *R v. Board of Visitors of Hull Prison ex p St. Germain (No. 2)* [1979] 1 WLR 1401 at page 1410H and *R (Watkins-Smith) v. Aberdare Girls High School* [2008] EWHC 1865 (Admin), [2008] FCR 203 at para [135]; and (ii) the court did not hold that the policies and practice themselves were unlawful or that the information provided by Tavistock and the Trusts was misleading.  Dr Carmichael summarised the steps taken by Tavistock before referral to the Trusts and described some of the written materials used by the Trusts with those referred.  Professor Butler also did so.  This passage from Professor Butler's evidence dealing with fertility and sexual relationships, quoted by the Divisional Court at paras [42] and [43], bears repetition:

>  "It is also relevant for the consultation purposes that matters of fertility are discussed and counselling by the team takes place, and the option of meeting a fertility specialist is offered, and often taken up.   The options of fertility preservation are discussed with all the young people and it is requirement of the consent process that they fully understand this at an appropriate level.  This understanding must include that they are unable to have the typical sexual relationship of their identified gender with another person on account of their biological sex organ

> development, and that other surgical procedures may be
> necessary later on to achieve that possibility. ... It is an absolute
> requirement before starting any treatment that a young person
> can fully understand this effect on fertility and sexual
> functioning according to their age and level of maturation."

23. The Divisional Court expressed itself as either surprised or concerned by the lack of data year on year of the number of patients referred for puberty blockers [28], the number of GIDS patients suffering from autism (of those referred to GIDS a disproportionate number are autistic) [34], the numbers and percentages of patients progressing from puberty blockers to cross-sex hormones [59], and the (apparently low) number of patients not considered *Gillick* competent to make a decision [44]. In that latter connection, the court referred to expert evidence produced by the claimants from Professor Scott, the director of University College London's Institute of Cognitive Neuroscience, expressing significant doubts about the ability of under-18s adequately to weigh and appreciate the significant consequences that will result from the decision to accept puberty blockers for gender dysphoria.

24. Puberty blockers have been used for many years to stop precocious puberty and are discontinued when the child reaches the normal biological age for the onset of puberty. Their withdrawal does not interfere with the onset of puberty or with the normal development of pubertal changes through adolescence.

25. The first use of puberty blockers to treat gender dysphoria was in the late 1990s at a Dutch gender clinic. It published the *Dutch protocol* in the European Journal of Endocrinology in 2006 suggesting commencement of puberty suppression at age 12 after a diagnosis of gender dysphoria. Dr Carmichael said that the primary purpose of puberty blockers was to give the patient time to think about gender identity. There are other views expressed by other experts. The evidence from Tavistock, UCH and Leeds was that treatment with puberty blockers was separate from later treatment with cross-sex hormones. UCH and Leeds go through a distinct consent process before prescribing those. The median ages at which puberty blockers and cross-sex hormones are prescribed are about 14 and 17 respectively.

26. There were limited data of how many GIDS patients proceeded from puberty blockers to cross-sex hormones. Dr de Vries, who filed evidence on behalf of Tavistock describing international practice, is a member of WPATH's Committee on Children and Adolescents and was its Chair between 2010 and 2016 and said that, of the adolescents who started puberty suppression, only 1.9 per cent stopped the treatment and did not proceed to cross-sex hormones. Dr Carmichael said that of a random sample of 312 of 1648 patients discharged from GIDS between March 2019 and March 2020, 16% of patients (49 individuals) had accessed the endocrinology service during their time with GIDS. Of those 49 children and young people, only 55% (27 individuals) were subsequently approved for or accessed cross-sex hormones during their time with GIDS. Of the 49 patients referred to endocrinology for puberty blockers whilst at GIDS, two did not commence treatment and a further five were discharged without being referred on to another gender service.

27. These judicial review proceedings were directed at the policy and practice of Tavistock and the Trusts. The evidence ranged widely, indeed much more widely than necessary to determine the legal issues. The statements from clinicians and extracts from learned

journals are peppered with statistics. Even from within the evidence filed on behalf of Tavistock, there is an apparent disconnect between the international experience that 1.6% of children who started puberty blockers did not go on to cross-sex hormones and the figures which arose from the random sample, namely that of 49 referred to the Trusts only 27 were approved for or accessed cross-sex hormones. This is one example of the difficulty in drawing conclusions from statistics which are not fully explained or explored in an evidential context where they were peripheral to the legal dispute before the Divisional Court and where any apparent differences were not capable of being tested forensically.

28. No empirical data are available which explain the reasons why most children who are referred to GIDS are not referred on to UCH and Leeds. We note that in its guidelines WPATH says that gender dysphoria disappears in many before or during early puberty. The Endocrine Society similarly says that it does not persist into adolescence in the large majority (85%) of pre-pubertal children diagnosed with it. There is no evidence of the proportion of those who are thought to have gender dysphoria by general practitioners and other agencies who can refer to GIDS who are not in fact referred.

29. Professor Butler, Dr Alvi, WPATH and the Endocrine Society described puberty blockers as a safe reversible treatment although WPATH notes in its guidance that neither puberty suppression nor allowing puberty to occur can be regarded as a neutral act. There was some debate before the Divisional Court about what was meant by "reversible". WPATH said that long term effects can only be determined when the earliest treated patients reach an appropriate age.

30. Other experts relied upon by the claimants pointed to uncertainty about the effect of puberty blockers on bone density, fertility, and brain development. GIDS set out the benefits and risks of puberty blockers. The benefits include feeling less worried about growing up in the wrong body and giving more time and space to think about gender identity. The risks include hot flushes, headache, nausea and weight gain. Uncertainty is expressed about how puberty blockers affect bone strength, the development of sexual organs, body shape, final adult height, fertility, memory, concentration and the likelihood of a change of mind about gender identity. The Divisional Court pointed to other evidence relied upon by the claimants from Professor Levine (Clinical Professor of Psychiatry at Western Reserve University, Ohio) and Professor Hruz (Associate Professor of Paediatrics, Endocrinology and Diabetes at Washington University, St Louis) that patients on puberty blockers will have missed a period of normal biological, psychological and social experience through adolescence, which can never truly be reversed.

The Divisional Court's decision

*The approach to the evidence*

31. In dealing with factual issues, the Divisional Court said repeatedly (for example at paras [9], [70] and [74]) that it was not the "court's role to judge the weight to be given to various different experts" and "not for this court to determine clinical disagreements between experts about the efficacy of a treatment." "[M]ore important [was] the evidence from [Tavistock] and the evidence base *it* relies upon for the use of puberty blockers." Clinical disagreements about efficacy were for the relevant NHS and regulatory bodies to decide.

32.    The Divisional Court explained at para [9] that "[t]he court is not deciding on the benefits or disbenefits of treating children with [gender dysphoria] with [puberty blockers], whether in the long or short term. The court has been given a great deal of evidence about the nature of [gender dysphoria] and the treatments that may or may not be appropriate. That is not a matter for us." We agree. Despite these expressions of intent, we accept Ms Morris's submission that the court did make factual findings, some on the basis of impression and some on the basis of disputed evidence. The more important examples follow.

33.    At para [44], the Divisional Court recorded its request for information about those who Tavistock, UCH or Leeds had "assessed to be suitable for [puberty blockers] but who were *not* prescribed them because the young person was considered not to be *Gillick* competent." It said that it had "gained the strong impression … that it was extremely unusual for either GIDS [or UCH or Leeds] to refuse to give [puberty blockers] on the ground that the young person was not competent to give consent. The approach adopted [appeared] to be to continue giving the child more information and to have more discussions until s/he is considered *Gillick* competent or is discharged."

34.    At para [56], the Divisional Court determined on the evidence that "practically all children/young people who start [puberty blockers] progress on to [cross-sex hormones]." At para [68], it determined that "a very high proportion of those who start [puberty blockers] move on to [cross-sex hormones] and thus in statistical terms once a child or young person starts on [puberty blockers] they are on a very clear clinical pathway to [cross-sex hormones]."

35.    At para [134], the Divisional Court concluded that "[t]he administration of [puberty blockers] to people going through puberty [was] a very unusual treatment" and was "properly described as experimental" because there was "real uncertainty over the short and long-term consequences of the treatment with very limited evidence as to its efficacy, or indeed quite what it [was] seeking to achieve."  In addition, there was a lack of clarity over the purpose of the treatment, and the consequences of the treatment were "highly complex and potentially lifelong and life changing in the most fundamental way imaginable. The treatment goes to the heart of an individual's identity, and [was] thus, quite possibly, unique as a medical treatment." It made these findings, having said at para [74] that "the degree to which the treatment is experimental and has, as yet, an unknown impact, does go to the critical issue of whether a young person can have sufficient understanding of the risks and benefits to be able lawfully to consent to that treatment." The court cited at various places in its judgment from the disputed evidence of expert witnesses relied upon by the claimants. As it recorded at para [69], the claimants relied on "witness statements from a number of undoubted experts in various relevant fields and from academic institutions in the United Kingdom, the USA, Sweden and Australia who refer to the controversial nature of the treatment and its limited evidential support" in support of it being an experimental and highly controversial treatment with a very limited evidence base.

36.    At para [77], the Divisional Court repeated that it was not its "role to adjudicate on the reasons for persistence or otherwise of [gender dysphoria]", before determining that the "treatment may be supporting the persistence of [gender dysphoria] in circumstances in which it is at least possible that without that treatment, [it] would resolve itself."

37.     The Divisional Court cited Professor Hruz in relation to the treatment of gender dysphoria at paras [49] to [51], the neurological and psychological changes induced by puberty blockers at para [64] and the persistence of gender dysphoria at para [76]. Professor Levine is cited in relation to neurological and psychological changes at [64]. This body of evidence appears to have informed the court's conclusion that the treatment was "experimental" in the sense that its long-term consequences remain unclear.  Professor Scott was cited at para [45] to [46] in connection with the ability of teenagers to make rational decisions in this context which underpinned the court's conclusion that it was highly unlikely that a child under 14 could give valid consent to puberty blockers and improbable that a child aged 14 or 15 could do so.

38.     The claimants made no application for permission to rely upon the expert evidence they produced.  Although some expert evidence was served with the claim the majority was served shortly before skeleton arguments were due to be lodged. None of it complied with the rules regarding expert evidence and a good deal of it is argumentative and adversarial.  Tavistock sought to exclude the expert evidence on the grounds that it was inadmissible because it was not necessary to resolve the legal issue before the court; and also because it comprehensively failed to comply with the rules regarding expert evidence in any event.   The issue was not resolved.   Much of it was adduced to contradict the evidence given by Tavistock and the Trusts.  Such evidence is rarely admitted but a particular difficulty here was that there was no way of resolving evidential disputes.   The court supported the guidance it gave "in the light of the evidence as it has emerged": see para [147].  It would have been preferable for the status of the claimants' expert evidence to be resolved.  It was controversial and would not, as we have said, ordinarily be preferred over that of a defendant in judicial review proceedings.

*The Divisional Court's treatment of the law*

39.     Between paras [105] and [124], the Divisional Court reviewed authorities starting with *Gillick.*  It cited from the speeches of Lord Fraser of Tullybelton and Lord Scarman.

40.     In connection with section 8 of the 1969 Act it noted that in *Re W (a Minor) (Medical Treatment: Court's Jurisdiction)* [1993] Fam 64, Lord Donaldson MR held in the context of a 16 or 17 year old child refusing treatment for anorexia nervosa that "[n]o minor of whatever age has power by refusing consent to treatment to override a consent to treatment by someone who has parental responsibility for the minor and *a fortiori* a consent by the court."  Balcombe LJ agreed that the parents of a child aged 16 or 17 could consent to treatment on his or her behalf even if the child had refused it and affirmed the court's inherent jurisdiction to do so.  Nolan LJ expressed no view about the parents' ability to override a child's refusal to consent but expressly agreed that the court had power to do so.

41.     The Divisional Court referred to *Re S (A Child) (Child Parent: Adoption Consent)* [2019] 2 Fam 177 (*Re S*).  Cobb J considered the competence of a mother under the age of 16 to consent to her baby being placed for adoption.  He held that it was appropriate and helpful in determining *Gillick* competence to read across and borrow from the relevant concepts and language in the Mental Capacity Act 2005, concluding: "It follows that in order to satisfy the *Gillick* test in this context the child parent should be able to demonstrate "sufficient" understanding of the "salient" facts around adoption;

she should understand the essential "nature and quality of the transaction" … and should not need to be concerned with the peripheral."

42.     The Divisional Court also had regard to *Montgomery v. Lancashire Health* Board [2015] AC 1430 where, in an action for negligence brought by a mother on behalf of her child, Lord Kerr set out the requirements placed on a doctor in providing information on risks of injury from treatment in the following terms at para [87]:

> "An adult person of sound mind is entitled to decide which, if any, of the available forms of treatment to undergo, and her consent must be obtained before treatment interfering with her bodily integrity is undertaken. The doctor is therefore under a duty to take reasonable care to ensure that the patient is aware of any material risks involved in any recommended treatment, and of any reasonable alternative or variant treatments. The test of materiality is whether, in the circumstances of the particular case, a reasonable person in the patient's position would be likely to attach significance to the risk, or the doctor is or should reasonably be aware that the particular patient would be likely to attach significance to it."

*The Divisional Court's conclusions*

43.     We have foreshadowed the central conclusions of the Divisional Court (paras [6] to [10] above) and some of its factual conclusions (paras [31] to [38]).  The court was particularly concerned with difficulties it thought that under-16s would have in understanding and weighing up information.  At para [139] it said:

> "[a]lthough a child may understand the concept of the loss of fertility for example, this is not the same as understanding how this will affect their adult life. A child's attitude to having biological children and their understanding of what this really means, is likely to change between childhood and adulthood. For many children, certainly younger children, and some as young as 10 and just entering puberty, it will not be possible to conceptualise what not being able to give birth to children (or conceive children with their own sperm) would mean in adult life. Similarly, the meaning of sexual fulfilment, and what the implications of treatment may be for this in the future, will be impossible for many children to comprehend."

44.     It recognised that the cohort of children treated at GIDS suffered from psychological distress by reason of their gender dysphoria and were highly vulnerable.  It considered that the difficulty of achieving informed consent was further exacerbated by the lack of evidence as to the efficacy of puberty blockers in treating gender dysphoria and the long-term outcomes of taking them.   Although the fact that a treatment was experimental, or that the long-term outcomes were not yet known, did not of itself prevent informed consent being given, "the combination here of lifelong and life-changing treatment being given to children, with very limited knowledge of the degree to which it will or will not benefit them, is one that gives significant grounds for concern."

45.     At para [144], the Divisional Court concluded that it was not an answer "to give the child more, and more detailed, information", because "in many cases, however much information the child is given as to long-term consequences, s/he will not be able to weigh up the implications of the treatment to a sufficient degree. There is no age-appropriate way to explain to many of these children what losing their fertility or full sexual function may mean to them in later years."

46.     It was for these reasons that the Divisional Court gave guidance about the application of the *Gillick* test to the treatment and the cohort of children in question:

> "[t]he decisions in respect of [puberty blockers] have lifelong and life-changing consequences for the children.  Apart perhaps from life-saving treatment, there will be no more profound medical decisions for children than whether to start on this treatment pathway.  In those circumstances we consider that it is appropriate that the court should determine whether it is in the child's best interests to take [puberty blockers].  There is a real benefit in the court, almost certainly with a child's guardian appointed, having oversight over the decision… ." [149]

*Parental consent*

47.     The Divisional Court considered the issue of parental consent at para [47] and noted that "the normal position in law would be that someone with parental responsibility could consent on their behalf." Mr Hyam for the claimants had originally been disposed to argue that parental consent would be inadequate without court intervention in circumstances where the child was incapable of giving informed consent.  But as the court noted in the same paragraph, the service specification requires the informed consent of the child themself before puberty blockers can be prescribed.  The evidence from Tavistock and the Trusts was that there could be no question of prescribing puberty blockers on the say so of parents without the informed consent of the child. This was a concern which did not arise in these judicial review proceedings.

48.     Lieven J has recently decided in *AB v. CD* [2021] EWHC 741 (Fam) that, unless the parents were overriding the wishes of the child, the parents of a child patient could consent to puberty blockers on their child's behalf, notwithstanding the court's decision in this case, without the need for a "best interests" application to the court. She rejected the suggestion that the prescription of puberty blockers was in a special category of medical intervention which always required the sanction of the court, despite the controversial nature of the treatment.   We respectfully agree.

49.     Lieven J cited the judgment of Lady Black in *An NHS Trust v. Y* [2018] UKSC 46, [2019] AC 978 and expressed herself wary of "becoming too involved in highly complex moral and ethical issues on a generalised, rather than case specific basis."

50.     That case was concerned with the issue whether an application need always be made to the court for approval to discontinue clinically assisted nutrition and hydration keeping a person with prolonged disorder of consciousness alive.  The Supreme Court concluded that it was not necessary when the medical professionals and families agreed about withdrawal.

51.     Lieven J accepted the uncontroversial proposition that whatever may be the difficulties in children understanding the consequences of medical treatment for gender dysphoria the same was not so of their parents. They "know their child best, and care for them most, [and] will be in a position to reach a fully informed decision." She added that the use of puberty blockers for gender dysphoria raised "controversial ethical issues" with a division of clinical and ethical views which have "become highly polarised." She continued "these are precisely the type of matters which are best assessed in a regulatory and academic setting and not through litigation" (paras [121] and [122]).

*Gillick*

52.     *Gillick* was a challenge to the Department of Health and Social Security guidance to health authorities on family planning services. It included a section on contraceptive advice and treatment for young people. It stated that such advice and treatment should be available for people of all ages, but that for children under the age of 16 attempts would be made to persuade them to involve their parent or guardian at the earliest stage of consultation and that it would be most unusual to provide such advice or treatment without parental consent. However, it noted that to abandon the principle of confidentiality between doctor and patient in respect of children under 16 might cause them not to seek professional advice at all, thereby exposing them to risks such as pregnancy and sexually transmitted diseases. Thus, the guidance in *Gillick* noted that in exceptional cases it was for a doctor exercising his clinical judgement to decide whether to prescribe contraception without parental involvement. The claimant, the mother of girls under 16, objected and wrote to her area health authority seeking an assurance that no contraceptive advice or treatment would be given to her daughters while under 16 without her knowledge and consent. The health authority refused to give such an assurance. It stated that in accordance with the guidance the final decision must be for the doctor's clinical judgement. The claimant brought proceedings for a declaration that the guidance gave advice which was unlawful. The claim failed at first instance but succeeded in the Court of Appeal on the grounds that a girl under 16 was incapable either of consenting to treatment or of validly requiring a doctor not to seek the consent of her parents; and that the guidance was contrary to law in that any doctor who treated a girl under 16 without the consent of her parent or guardian, other than in an emergency, would be infringing their parental rights. By a majority (Lord Fraser of Tullybelton, Lord Scarman and Lord Bridge of Harwich; Lord Brandon of Oakbrook and Lord Templeman dissenting), the House of Lords allowed the appeal.

53.     The Appellate Committee decided the approach to be adopted in a judicial review of a policy statement. Lord Scarman identified the question in the appeal in this way at (page 181F):

> "It is only if the guidance permits or encourages unlawful conduct in the provision of contraceptive services that it can be set aside as being the exercise of a statutory discretionary power in an unreasonable way."

54.     In *Regina (Bayer plc) v. NHS Darlington Clinical Commissioning Group* [2020] EWCA Civ 449 the Court of Appeal explained that "permitting" unlawful conduct meant "sanctioning" it, and that a policy that left open the possibility of implementation by unlawful means would not itself be unlawful (see Underhill LJ at paras [199] to [200] and Rose LJ at para [214]). That approach was recently approved in the Supreme

Court in *R (A) v. Secretary of State for the Home Department* [2021] UKSC 37 at para [44] and summarised at para [84]: "a policy will be unlawful if it misdirects officials as to their legal obligations."  As Mr Hyam accepts, neither the service specification (and national and international guidance it refers to) nor the SOP were unlawful if his original argument (that an application to the court should always be made) were rejected.  Mr Hyam's criticism was that the written materials should have been more prescriptive in the factors that clinicians should consider.  But the role of the court is not to draft policy documents.  It is to test their lawfulness.  The argument that, as a matter of law, there should always be an application to the court before puberty blockers are prescribed and that the policy documents were unlawful in failing to recognise that, was not pursued by cross appeal; and rightly so.

55. In *Gillick*, the House of Lords made clear that it was for the clinician to decide whether a child under 16 could give informed consent to the prescription of contraceptives.  Lord Fraser said at page 174B-C that:

> "[t]he only practicable course is to entrust the doctor with a discretion to act in accordance with his view of what is best in the interests of the girl who is his patient."

He continued that:

> "the doctor will … be justified in proceeding without the parents' consent or even knowledge provided he is satisfied on the following matters: (1) that the girl (although under 16 years of age) will understand his advice; (2) that he cannot persuade her to inform her parents …; (3) that she is very likely to begin or to continue having sexual intercourse with or without contraceptive treatment; (4) that unless she receives contraceptive advice or treatment her physical or mental health or both are likely to suffer; (5) that her best interests require him to give her contraceptive advice, treatment or both without the parental consent."

56. Lord Scarman said at page 186A to C:

> "Certainty is always an advantage in the law, and in some branches a necessity.  But it brings with it an inflexibility and a rigidity which is some branches of the law can obstruct justice, impede the law's development, and stamp upon the law the mark of obsolescence where what is needed is capacity for development.  The law relating to parent and child is concerned with the problems of the growth and maturity of the human personality. If the law should impose upon the process of "growing up" fixed limits where nature knows only a continuous process, the price would be artificiality and a lack of realism in an area where the law must be sensitive to human development and social change. If certainty be thought desirable, it is better that the rigid demarcations necessary to achieve it should be laid down by legislation after a full consideration of all the relevant factors than by the courts confined as they are by the forensic

> process to the evidence adduced by the parties and to whatever may properly fall within the judicial notice of judges."

At page 188B he added:

> "The modern law governing parental right and a child's capacity to make his own decisions was considered in Reg. v. D [1984] AC 77. The House must, in my view, be understood as having in that case accepted that, save where statute otherwise provides, a minor's capacity to make his or her own decision depends upon the minor having sufficient understanding and intelligence to make the decision and is not to be determined by reference to any judicially fixed age limit."

57.    Lord Scarman observed at page 184B, "nor has our law ever treated the child as other than a person with capabilities and rights recognised by law" and continued at page 189C-E:

> "When applying these conclusions to contraceptive advice and treatment it has to be borne in mind that there is much that has to be understood by a girl under the age of 16 if she is to have legal capacity to consent to such treatment. It is not enough that she should understand the nature of the advice which is being given: she must also have a sufficient maturity to understand what is involved. There are moral and family questions, especially her relationship with her parents; long-term problems associated with the emotional impact of pregnancy and its termination; and there are the risks to health of sexual intercourse at her age, risks which contraception may diminish but cannot eliminate. It follows that a doctor will have to satisfy himself that she is able to appraise these factors before he can safely proceed upon the basis that she has at law capacity to consent to contraceptive treatment. and it further follows that ordinarily the proper course will be for him, as the guidance lays down, first to seek to persuade the girl to bring her parents into consultation, and if she refuses, not to prescribe contraceptive treatment unless he is satisfied that her circumstances are such that he ought to proceed without parental knowledge and consent."

He said at page 191B-C:

> "It can be said by way of criticism of this view of the law that it will result in uncertainty and leave the law in the hands of the doctors. The uncertainty is the price which has to be paid to keep the law in line with social experience, which is that many girls are fully able to make sensible decisions about many matters before they reach the age of 16. I accept that great responsibilities will lie on the medical profession. It is, however, a learned and highly trained profession regulated by statute and governed by a strict ethical code which is vigorously enforced. Abuse of the power to prescribe contraceptive treatment for girls under the age of 16 would render a doctor liable to severe professional penalty. The truth may well be that the rights of parents and children in this sensitive area are better protected by

the professional standards of the medical profession than by "a priori" legal lines of division between capacity and lack of capacity to consent since any such general dividing line is sure to produce in some cases injustice, hardship, and injury to health."

## The issues before the Court of Appeal

58.   The Divisional Court accepted that children under 16 and young people aged between 16 and 18 could, upon a proper interpretation of *Gillick*, consent to embarking on a course of puberty blockers. It was lawful for Tavistock to refer such patients to UCH or Leeds and for those Trusts to prescribe puberty blockers following informed consent from the child. There was no legal obligation to seek a "best interests" ruling from the court.

59.   Mr Hyam accepts that the only real question before us is whether the Divisional Court, not having held that Tavistock's (and the Trusts') policies and practices were unlawful, was right to make the declaration and give the guidance it did.

60.   The arguments we have heard about the court's approach to the evidence provide the background to these two questions. We will address that issue first, before turning to whether the court was right to make the declaration and to give the guidance.

## Did the Divisional Court approach the evidence appropriately?

61.   We have considered that Divisional Court's approach to aspects of the evidence at paras [31] to [38] above.

62.   The correct approach was not in dispute. It was not for the court hearing a judicial review to decide disputed issues of fact or expert evidence (see paras [9], [70] and [74]). That principle is only subject to exceptions that are not relevant to this case. The question is whether, notwithstanding its acceptance of the principle, the Divisional Court placed reliance on the contested and untested expert evidence of claimants as Tavistock and the Trusts contend. The claimants submit that the salient facts decided by the court were taken from Tavistock's own evidence so that they were effectively common ground.

63.   This dispute applies most significantly to the two findings to the effect that treatment of gender dysphoria with puberty blockers was "experimental" (see paras [28], [74], [93], and [134]), and that the vast majority of patients taking puberty blockers go on to cross-sex hormones and are on a pathway to much greater medical interventions (see paras [68] and [138]). The Divisional Court recorded at para [70] that Professor Butler had "explained that it is very common for paediatric medicines to be used off-label and that this factor does not render the treatment in any sense experimental." It nonetheless concluded at para [134] that the treatment was experimental in the sense it explained in that paragraph (real uncertainty over the short and long-term consequences of the treatment with very limited evidence as to its efficacy). The argument may, in one sense, be semantic, but, respectfully, we think that it would have been better to avoid controversial factual findings.

64.     The same points apply to the finding that the vast majority of patients taking puberty blockers go on to cross-sex hormones and are on a pathway to much greater medical interventions.  The evidence filed by Tavistock indicated that more than half of those who embark upon a course of puberty blockers go on to cross-sex hormones.  For the Divisional Court to have reached with confidence the conclusion set out at [138] that the "vast majority of patients taking [puberty blockers] go on to [cross-sex hormones] and therefore that s/he is on a pathway to much greater medical interventions", it would, we think, have been necessary not only to look at the limited data provided by Dr de Vries and Dr Carmichael, but also to evaluate evidence as to how patients were chosen for puberty blockers, the progression of the treatment, and multiple issues affecting progression between treatment pathways, including the consent processes for subsequent treatment stages.  Tavistock and the Trusts argue that the Divisional Court failed to appreciate the difference between a causal connection and an association, whatever the proportion of those who move from one treatment to another.  The correlation may be the result of effective selection of those for puberty blockers and information sharing at the consent stage.  The point, however, is that these judicial review proceedings did not provide a forum for the resolution of contested issues of fact, causation and clinical judgement.

65.     As will appear from what we say in the next section of this judgment, we have concluded that the declaration implied factual findings that the Divisional Court was not equipped to make.

<u>Was the Divisional Court right to have made the declaration?</u>

66.     At the heart of Tavistock's appeal is the submission that, in making the declaration, the Divisional Court departed from *Gillick*, which had established that children under 16 could make their own decisions if assessed individually as competent to do so by their treating clinician.  Tavistock submits that the court "intruded into the realm of decisions agreed upon by doctors, patients and their parents, where the court had not previously gone."  That submission is made in respect of both the declaration and the guidance.  Tavistock submitted that the Divisional Court erred by deciding between the evidence of competing experts, without that evidence having been properly admitted or tested in cross-examination.

67.     Mr Hyam submitted that the Divisional Court was justified in making the declaration and giving the guidance even where (a) the claimants failed to make their case on illegality, therefore no coercive order was appropriate, and (b) the court was concerned with the future.

68.     He relied on para 18-038 of De Smith's Judicial Review, 8th edition: "[i]n many situations all that is required is for the legal position to be clearly set out in a declaration for a dispute of considerable public importance to be resolved", and that such declarations are "increasingly being used to pronounce upon the legality of a future situation and in that way the occurrence of illegal action is avoided."

69.     A declaration may be sought in private law proceedings to resolve a legal dispute.  It binds the parties and those privy to the proceedings.  In public law proceedings for judicial review a declaration is a common alternative to coercive relief following a finding that the defendant public authority has, or proposes, to act unlawfully.  That is the effect of the passage from De Smith just quoted.  That is the "dispute" referred to

para 18-08.  The dispute identified in these proceedings was whether an application to the court was always needed before the prescription of puberty blockers because no child under the age of 18 could give valid consent.  Had the claimants' case succeeded on that issue, declaratory relief would inevitably have been granted.  No example of a declaration being granted in judicial review proceedings in which a clear legal challenge has failed was drawn to our attention.  We recognise that the broad discretionary power to grant declaratory relief found in section 31(2) of the Senior Courts Act 1981 enables the court to make an advisory declaration in appropriate cases.  Yet this was not a claim for an advisory opinion or declaration from the court.  It was a failed claim for a declaration that the law required the intervention of the court exercising its "best interests" jurisdiction before puberty blockers could be prescribed.  The "illegality" relied upon was the absence of such a step in the relevant written guidance and practice of Tavistock.

70.  The declaration is in terms which not only states the law but also identifies an exhaustive list of the factual circumstances that must be evaluated in seeking consent from a child and specifies some matters as conclusive facts.  It comes close to providing a checklist or script that clinicians are required to adopt for the indefinite future in language which is not capable of clear and uniform interpretation and in respect of which there were evidential conflicts.  Some of the factors identified in the declaration are simple statements of fact.  Others beg questions to which different clinicians would give different answers.

71.  In argument, Lady Justice King asked Mr Hyam which of the eight factors in the declaration were not covered in appendix B to the SOP, which dealt with *Guidance for Clinicians: assessing readiness for referral to endocrinology for consideration of hormone blockers.*  He submitted that the third factor namely "the fact that the vast majority of patients taking [puberty blockers] go on to [cross-sex hormones] and therefore that s/he is on a pathway to much greater medical interventions" was not covered as Tavistock did not accept it to be the case.  The fifth and sixth factors were only partially or insufficiently covered, namely "the impact of [cross-sex hormones] on sexual function" and "the impact that taking this step on this treatment pathway may have on future and life-long relationships".  The seventh and eighth factors were not covered properly because they were disputed, namely "the unknown physical consequences of taking [puberty blockers]" and "the fact that the evidence base for this treatment is as yet highly uncertain".

72.  These answers emphasise the extent to which the declaration covered areas of disputed fact, expert evidence and medical opinion.

73.  The claimants argue that the Divisional Court was justified in setting out the legal position in a declaration in a dispute of considerable public importance, pronouncing upon the legality of a future situation to avoid future illegality.  Mr Hyam pointed to the language of Lord Scarman at page 189C-E (see [57] above), where he summarised what "has to be understood by a girl under the age of 16 if she is to have legal capacity to consent to such treatment."  In stating the factors, he said that doctors would have to satisfy themselves (an important qualification recognising the primacy of clinical judgement in this area emphasised also by Lord Fraser at page 174B-C) that the patient was able to appraise these factors before they could safely proceed upon the basis that she had at law capacity to consent to contraceptive treatment.  These factors included an understanding of what was involved, moral and family questions, especially her

relationship with her parents, long-term problems associated with the emotional impact of pregnancy and its termination, the risks to health of sexual intercourse at her age, the risks which contraception might diminish but could not eliminate.

74.    In our judgment, re-stating the factors mentioned by Lord Scarman, in the context of refusing in *Gillick* to grant the declaratory relief sought or any declaratory relief, demonstrates clearly how different they are from the factors stated by the Divisional Court in this case.  Each of the factors stated by Lord Scarman was an area for evaluation, rather than a conclusory statement of fact or medical opinion.  We accept that some of the court's factors in para [138] were of a similar nature, for example, the first factor, namely "the immediate consequences of the treatment in physical and psychological terms" and to a certain extent the factors dealing with the risks of loss of fertility, the impact on sexual function and on future relationships, albeit that both factors call for a clinical judgement tailored to the child in question.  But the second factor namely "the fact that the vast majority of patients taking [puberty blockers] go on to [cross-sex hormones] and therefore that s/he is on a pathway to much greater medical interventions" was, as we have said, a matter of contested fact, and begs the important question "why" (see [64] above); and the seventh and eight factors were also disputed, namely the unknown physical consequences of taking puberty blockers and the fact that the evidence base was as yet highly uncertain.

75.    The evidence of Tavistock and the Trusts was that the treatment was safe, internationally endorsed, reversible and subject to a rigorous assessment process at each stage.  It was supported by the service specification, the WPATH guidelines, the Endocrine Society Clinical Guidelines and explained in the witness statements of Dr Carmichael and Dr Alvi.  As we have seen, and as these proceedings have illuminated, there are strongly held contrary views.  The declaration would require the clinicians to suspend or at least to temper their clinical judgement and defer to what amounts to the clinical judgement of the court on which key features should inform an assessment of *Gillick* competence, influenced by the views of other clinicians who take a different view and in circumstances where Mr Hyam accepts that the service specification, which sets out criteria for referring a child for puberty blockers, is not unlawful.

76.    The *ratio decidendi* of *Gillick* was that it was for doctors and not judges to decide on the capacity of a person under 16 to consent to medical treatment. Nothing about the nature or implications of the treatment with puberty blockers allows for a real distinction to be made between the consideration of contraception in *Gillick* and of puberty blockers in this case bearing in mind that, when *Gillick* was decided 35 years ago, the issues it raised in respect of contraception for the under 16s were highly controversial in a way that is now hard to imagine.  A similar conclusion was reached by Silber J in connection with abortion in *R (Axon) v. Secretary of State for Health* [2006] QB 539 at para [86].

77.    In *R (Burke) v. General Medical Council* [2005] EWCA Civ 1003, [2006] QB 273 this court dealt with an appeal in judicial review proceedings which had been brought by a man who suffered from a degenerative brain condition which at some stage in the future (assuming he did not die first) would require him to be given artificial nutrition and hydration ("ANH").  His concern was that others might decide to withdraw it against his wish for his life to be sustained until he died of natural causes.  At first instance a wide range of declarations was sought relating to NHS guidance and to the claimant's personal position should the issue he identified arise.  The judge at first instance not

only granted declarations but also in his judgment covered a wide range of circumstances of general application in the arena of end-of-life treatment. Lord Phillips of Worth Matravers MR, giving the judgment of the court, said:

> "21. There are great dangers in a court grappling with issues … when these are divorced from a factual context that requires their determination. The court should not be used as a general advice centre. The danger is that the court will enunciate propositions of principle without full appreciation of the implications that these will have in practice, throwing into confusion those who feel obliged to attempt to apply those principles in practice. This danger is particularly acute where the issues raised involve ethical questions that any court should be reluctant to address, unless driven to do so by the need to resolve a practical problem that requires the court's intervention. We would commend, in relation to the Guidance, the wise advice given by Lord Bridge of Harwich in *Gillick v West Norfolk and Wisbech Area Health Authority* [1986] AC 112, 193-4:
>
>> "… the occasions of a departmental non-statutory publication raising … a clearly defined issue of law, unclouded by political, social or moral overtones, will be rare. In cases where any proposition of law implicit in a departmental advisory document is interwoven with questions of social and ethical controversy, the court should, in my opinion, exercise its jurisdiction with the utmost restraint, confine itself to deciding whether the proposition of law is erroneous and avoid either expressing *ex cathedra* opinions in areas of social and ethical controversy in which it has no claim to speak with authority or proffering answers to hypothetical questions of law which do not strictly arise for decision.""

78. At [22] Lord Phillips was critical of some of the declarations which "did not purport to resolve any issues between the parties, but appeared to be intended to lay down propositions of law binding on the world."

79. The legal issue before the Divisional Court was not a general inquiry into the content of information and understanding needed to secure the informed consent of a child, although we have great sympathy with the Divisional Court given the large volumes of materials which informed that clinical issue. The declaration which the Divisional Court made does not sit happily with the observations of Lord Phillips.

80. A formal declaration states the law. In so far as it specifies facts as part of the law (itself a difficult concept) they remain the law. There is a great deal of difference between the declaration originally sought in these proceedings ("no prescription of puberty blockers without court approval") or in *Gillick* ("no contraceptives without parental consent") and the declaration made here. It turns expressions of judicial opinion into a statement of law itself. In addition, it states facts as law which are both controversial and capable of change. Both Lords Fraser and Scarman in *Gillick* expressed views about the matters which a clinician would have to explore with a patient, without being prescriptive and recognising that it was for the clinicians to

satisfy themselves, in their own way.  No declaration was contemplated to capture the essence of that thinking.  It would have been inconsistent with the *ratio* of the case that clinicians must be trusted to make the decisions for the court effectively to give them a manual about how to do so.  It is instructive to consider the language of Lord Scarman on the main issue in *Gillick* at pages 188H to 189A:

> "I would hold that as a matter of law the parental right to determine whether or not their minor child below the age of 16 will have medical treatment terminates if and when the child achieves a sufficient understanding and intelligence to enable him or her to understand fully what is proposed.  It will be a question of fact whether a child seeking advice has sufficient understanding of what is involved to give consent valid in law."

81.    His conclusion on the law is found in the first sentence but the second recognises that the question whether valid consent is given in any case is a question of fact.  That depends upon the individual circumstances of any child and the surrounding circumstances of the clinical issues.  Both he and Lord Fraser identified at a high level what they could expect a clinician to take into account in making a clinical decision. Turning their observations into formal declarations (all the more so if they included immutable facts) would have been inappropriate.  It is a matter of clinical judgement, tailored to the patient in question, how to explain matters to ensure that the giving or refusal of consent is properly informed.  As Lord Fraser observed at page 174F, medical professionals who do not discharge their responsibilities properly would be liable to disciplinary sanction.  The law of informed consent culminating in *Montgomery* also exposes the vulnerability of clinicians to civil action from someone they have treated who shows that they did so without first obtaining informed consent.

82.    In the circumstances, we would wish to make no comment on the comparisons that were drawn between this case and the quite different situation in which the court is asked to approve life-saving treatment for under-18s to which they or their parents are unable or unwilling to consent.

83.    The policy and practice under consideration in this case requires the informed consent of both child and parents before Tavistock refers to the Trusts, again before either Trust prescribes puberty blockers and once more before prescription of cross-sex hormones. This case is not concerned with a child who lacks capacity to make the decision for the purposes of the Mental Capacity Act 2005.  Such a child would not be treated through GIDS because informed consent is always required from the child before any treatment is given.  We do not think that a comparison between the exercise of assessing *Gillick* competence and the process envisaged under the Mental Capacity Act 2005 (see *Re X (A child)(No 2)* [2021] 4 WLR 11 at para [72]) assists in this case. Moreover, since the declaration formally concerns those under 16 it is not concerned with children covered by section 8 of the 1969 Act.

84.    In respectful disagreement with the Divisional Court we conclude that the declaration should not have been granted.

Was the Divisional Court right to have given the guidance?

85.   We recognise that the guidance stemmed from the understandable concern of the Divisional Court for the welfare of children suffering from gender dysphoria who, it is common ground, are deeply distressed and highly vulnerable.   In our judgment, however, the court was not in a position to generalise about the capability of persons of different ages to understand what is necessary for them to be competent to consent to the administration of puberty blockers.  The court was not deciding any specific case and fell into the error identified by Lord Phillips in *Burke.*

86.   Moreover, the effect of the guidance was to require applications to the court in circumstances where the Divisional Court itself had recognised that there was no legal obligation to do so.  It placed patients, parents and clinicians in a very difficult position.  In practice the guidance would have the effect of denying treatment in many circumstances for want of resources to make such an application coupled with inevitable delay through court involvement.    Furthermore, the guidance that there should be an application to the court in circumstances where child, parents and clinicians all consider the treatment to be in the best interests of the child would be inconsistent with the conclusion of the Supreme Court in *An NHS Trust* (discussed at [49] above).

87.   As we have already said, the principle enunciated in *Gillick* was that it was for clinicians rather than the court to decide on competence.

88.   The guidance did not take account of Lord Scarman's *dictum* in *Gillick* itself at page 188B that it was settled law following *R v. D* that "save where statute otherwise provides, a minor's capacity to make his or her own decision depends upon the minor having sufficient understanding and intelligence to make the decision and is not to be determined by reference to any judicially fixed age limit" or his earlier observation at page 186C that "rigid demarcations necessary to achieve [certainty] should be laid down by legislation after a full consideration of all the relevant factors [rather] than by the courts confined as they are by the forensic process … ."  Finally, as appears from *AB*, the guidance was insufficiently sensitive to the role of parents in giving consent.

89.   We conclude that it was inappropriate for the Divisional Court to give the guidance concerning when a court application will be appropriate and to reach general age-related conclusions about the likelihood or probability of different cohorts of children being capable of giving consent.  That is not to say that such an application will never be appropriate.  There may be circumstances where there are disputes between one or more of clinicians, patients and parents where an application will be necessary, even if they are difficult to envisage under the service specification and SOP with which this case is concerned.

90.   In the light of the conclusion we have reached on both the declaration and guidance it is unnecessary to consider the arguments we heard by reference to the Human Rights Act 1998.

Conclusions

91.   We allow Tavistock's appeal and set aside the declaration.  In addition, we hold that it was inappropriate for the Divisional Court to provide the guidance.  The Divisional Court concluded that Tavistock's policies and practices (as expressed in the service

specification and the SOP) were not unlawful and rejected the legal criticism of its materials.  In those circumstances, the claim for judicial review is dismissed.

92.     We should not finish this judgment without recognising the difficulties and complexities associated with the question of whether children are competent to consent to the prescription of puberty blockers and cross-sex hormones.  They raise all the deep issues identified in *Gillick*, and more.  Clinicians will inevitably take great care before recommending treatment to a child and be astute to ensure that the consent obtained from both child and parents is properly informed by the advantages and disadvantages of the proposed course of treatment and in the light of developing research and understanding of the implications and long-term consequences of such treatment.  Great care is needed to ensure that the necessary consents are properly obtained.  As *Gillick* itself made clear, clinicians will be alive to the possibility of regulatory or civil action where, in individual cases, the issue can be tested.

93.     The service specification and SOP provide much guidance to the multi-disciplinary teams of clinicians.  Those clinicians must satisfy themselves that the child and parents appreciate the short and long-term implications of the treatment upon which the child is embarking.  So much is uncontroversial.  But it is for the clinicians to exercise their judgement knowing how important it is that consent is properly obtained according to the particular individual circumstances, as envisaged by *Gillick* itself, and by reference to developing understanding in this difficult and controversial area.  The clinicians are subject to professional regulation and oversight.  The parties showed us an example of a Care Quality Commission report in January 2021 critical of GIDS, including in relation to aspects of obtaining consent before referral by Tavistock, which illustrate that.  The fact that the report concluded that Tavistock had, in certain respects, fallen short of the standard expected in its application of the service specification does not affect the lawfulness of that specification; and it would not entitle a court to take on the task of the clinician in determining whether a child is or is not *Gillick* competent to be referred on to the Trusts or prescribed puberty blockers by the Trusts.

94.     Once it was conceded by the claimants that the Divisional Court had made no findings of illegality, the focus of this appeal was squarely on *Gillick* and whether, by making the declaration accompanied by guidance requiring (probably frequent) court intervention, the Divisional Court had placed an improper restriction on the *Gillick* test of competence.  In our judgment, whilst driven by the very best of intentions, the Divisional Court imposed such a restriction through the terms of the declaration itself, by the utilisation of age criteria and by the requirement to make applications to the court.  As we have said, applications to the court may well be appropriate in specific difficult cases, but it was not appropriate to give guidance as to when such circumstances might arise.