


PLAINTIFFS' EX.

039

**Covid-19 Protocol:  This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii.  The date and time for hand-down is deemed to be 10.30am on 26 March 2021**

Neutral Citation Number: [2021] EWHC 741 (Fam)

Case No: FD21P00063

**IN THE HIGH COURT OF JUSTICE**
**FAMILY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 26/03/2021

Before :

**MRS JUSTICE LIEVEN**

- - - - - - - - - - - - - - - - - - - - -

Between :

**AB**

**Applicant**

and

**CD**

**First Respondent**

and

**THE TAVISTOCK AND PORTMAN**
**NHS FOUNDATION TRUST**

**Second Respondent**

and

**UNIVERSITY COLLEGE LONDON**
**NHS FOUNDATION TRUST**

**Third Respondent**

and

**XY**

**Fourth Respondent**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr David Lock QC and Ms Ceri White** (instructed by **Rook Irwin Sweeney LLP**) for the **Applicant**

**CD** (the **First Respondent**) represented himself

**Ms Fenella Morris QC and Ms Nicola Kohn** (instructed by **DAC Beachcroft**) for the **Second Respondent**

**Mr John McKendrick QC and Mr Andrew Powell** (instructed by **Hempsons**) for the **Third Respondent**

**Ms Alison Grief QC, Ms Rebecca Foulkes and Mr Harry Langford** (instructed by **Freemans Solicitors**) for the **Fourth Respondent**

**Ms Victoria Butler-Cole QC, Mr Alex Ruck Keene and Ms Katherine Apps** represented **Cafcass** as **Advocate to the Court**

Hearing dates: **1 - 3 March 2021**

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

..............................

MRS JUSTICE LIEVEN

This judgment was delivered in private.   The judge has given leave for this version of the judgment to be published on condition that (irrespective of what is contained in the judgment) in any published version of the judgment the anonymity of the children and members of their family must be strictly preserved.   All persons, including representatives of the media, must ensure that this condition is strictly complied with.   Failure to do so will be a contempt of court.

**Mrs Justice Lieven DBE :**

1. This is an application by AB, the mother of XY, for a declaration that she and CD (the father of XY) have the ability in law to consent on behalf of XY to the administration of hormone treatment to suppress puberty, known as puberty blockers ("PBs"). The application is made in the light of the Divisional Court decision in *Bell v The Tavistock and Portman NHS Foundation Trust & Ors* [2020] EWHC 3274 (Admin) ("*Bell*"). The issue in broad terms is whether XY's parents can consent to the treatment or whether the decision as to whether XY should be prescribed PBs should come before the Court, either as a matter of legal requirement or as a matter of good practice.

2. The Second Respondent is the Tavistock and Portman NHS Foundation Trust, which is home to the Gender Identity Development Service ("GIDS"), a multi-disciplinary service commissioned by NHS England in order to provide specialist assessment, consultation and care for children and young people to reduce the distress of a mismatch between their birth-assigned sex and their gender identity, referred to below as Gender Dysphoria.

3. The Third Respondent is University College London Hospital NHS Trust ("UCLH") which works with GIDS to provide paediatric and adolescent endocrinology services to treat patients with Gender Dysphoria.

4. AB was represented before me by Mr Lock QC and Ceri White; CD represented himself; the Tavistock and Portman NHS Trust was represented by Fenella Morris QC and Nicola Kohn; University College London Hospital NHS Trust was represented by John McKendrick QC and Andrew Powell; XY was represented by Alison Grief QC, Rebecca Foulkes and Harry Langford; and Cafcass, which appeared to assist the Court, was represented by Victoria Butler-Cole QC, Alex Ruck Keene and Katherine Apps.

5. The background to the services provided at GIDS, the process of taking consent and the nature and effect of puberty blockers is set out in the judgment in *Bell*. I do not intend to repeat the analysis set out therein. *Bell* is currently awaiting a hearing on appeal in the Court of Appeal. Ms Butler-Cole raised the possibility that I should adjourn this case pending the decision of the Court of Appeal in *Bell*. None of the parties asked me to adjourn, and indeed all urged me to proceed to hear the case.

6. The legal issues in this case are different from *Bell* because, as was said at [47] in *Bell*, the question of whether parents could consent to the treatment was not considered in the judgment. On the basis of the submissions in *Bell* from the current Second and Third Respondents, it appeared that the administration of PBs would not continue on the basis of parental consent alone. It was not suggested to the Divisional Court that GPs could, and in some cases would, proceed with the administration solely on the basis of parental consent.

7. However, the Second and Third Respondents say that for those patients currently receiving treatment with PBs, as opposed to new patients, given that a stay has been granted in respect of [138] of *Bell* and the extreme distress these children and young persons would suffer if the treatment was not continued, treatment should continue on the basis of parental consent alone as long as the patient continues to want the treatment. Therefore, the issue of the scope of parental consent and the role of the Court has become a live one.

8.     *Bell* is of very great relevance to the present case because the Divisional Court's consideration of the nature of PBs, and in particular their experimental nature, the issues around reversibility, and the lifelong and life-changing nature of the treatment pathway that the child has entered upon, see in particular [134] to [137], are highly relevant to the issues that arise in the present case.

9.     All parties agreed that if I proceeded to hear this case then I was in effect bound by *Bell*, and that they were not seeking to argue before me that any part of it was wrong, although the Second and Third Respondents would do so in the Court of Appeal. I should be entirely clear that even if I was not in effect bound by *Bell,* I self-evidently entirely agree with its analysis and conclusions having been one member of the Divisional Court. Nothing that is said below is intended to depart, to even the smallest extent, from anything that was said in *Bell*.

10.    There was some suggestion that if I found that the parents could not consent, I should carry out a best interests analysis of whether or not it was in XY's best interests to receive the PBs. I took the view that this was not an appropriate course to follow. Although I could have heard oral evidence from Professor Butler, Consultant Endocrinologist at the Second Respondent, who had interviewed XY, I had no independent evidence from Cafcass as to XY's best interests, Cafcass not having been invited by the Court to act as Guardian for XY. I therefore did not consider that I was in a proper position to carry out a best interests assessment.

## XY's facts

11.    XY was born a boy and is now aged 15. I have witness statements from both parents and from XY, and XY wrote me a letter.  The parents are separated but live close to each other and XY spends considerable time with both parents. I have not heard oral evidence, but I have no reason not to fully accept what is said in the written statements and I rely on those statements in the summary of the facts I set out below.

12.    XY came out to her parents as transgender when she was 10 years old in Year 5. According to AB, XY had always only been interested in girls' toys and clothes. When at primary school she, for a period, tried to conform to a more "male" stereotype but she was utterly miserable, became very withdrawn, and was shy and unhappy, particularly at school.

13.    She came out to her parents about being transgender after reading a book where one of the main characters was transgender. According to her mother, once she started going to school as a girl her confidence grew, and she became much happier. The parents first made contact with the GIDS Unit when XY was 10 years old. XY has now fully transitioned socially in all aspects of her life including legal paperwork. She changed her name by deed poll in 2016.

14.    XY has never been diagnosed as having an unresolved mental health issue and there is no suggestion that she is on the Autistic Spectrum.

15.    In August 2016 XY was referred to GIDS. She was assessed over the course of seven appointments with a clinical psychologist and a child psychotherapist. During those sessions XY and her parents met the clinicians both together and separately.

16.   XY could have started on PBs in 2018 but her parents felt she should wait until puberty commenced because they were concerned that she should not be on medication unnecessarily. AB sets out in her witness statement that she did extensive research on PBs before XY started taking them. She says that she was fully aware of the potential side effects and she knew that the treatment was very new. It does appear from AB's witness statement that she and CD have been careful and cautious in their approach to the treatment, have tried to become as well informed as possible, and have sought at various stages to take matters slowly.

17.   XY was referred by GIDS to UCLH and first attended in February 2018. Her treatment was delayed on two occasions because puberty had not commenced. She was seen by Professor Butler in April 2019 when she was 13. Professor Butler noted: *"[XY] has been declared competent to consent and has signed consent forms voluntarily."* Her parents had also signed the relevant form.

18.   I note at this point that Professor Butler plainly proceeded on the basis that XY could give legal consent. He noted that XY *"understands all about the treatment and has been able to sign the informed consent form supported by her parents."* I make no comment on UCLH's processes in this regard, but I note that the form produced in this Court was the same, or very similar to, the forms shown to the Court in *Bell*. This form does not test whether the child, here XY, understands the issues set out at [138] of *Bell*. I make no further comment on the degree to which either the Second or Third Respondent's processes test out *Gillick* competence (*Gillick v West Norfolk and Wisbech Health Authority* [1986] AC 112).

19.   XY had four appointments at UCLH and Professor Butler requested XY's GP to prescribe and administer PBs. XY started on PBs in July 2019. She was initially on a drug that is given every 4 weeks but has now moved to a 10 week cycle. Her next prescription is due in April 2021.

20.   XY and her parents did consider whether to undergo fertility preservation treatment before she started on PBs and decided not to do so. She was advised that she would not be able to have treatment for fertility preservation until September 2019 and by July 2019 the pubertal changes to her body were progressing at considerable speed and causing her distress. AB sets out the parents' consideration in some detail in her statement. XY says in her statement:

> *"I agree with everything my mum says about our efforts for me to undergo fertility preservation treatment before I started on puberty blockers and the race against time. The visible and irreversible onset of male puberty was very and most distressing for me. It also meant that my life wouldn't be my life anymore and normal, where everyone knew and accepted me as female. I had to make a very difficult choice. I have already explained in my letter how I felt about developing any additional male characteristics and especially as they could not be reversed. I would have been devastated.*
>
> *My parents and I talked about everything, they have been hugely supportive and understanding…."*

21.     XY could decide at any point before she starts on cross-sex hormones ("CSH"), assuming that she does so, to stop taking PBs for a period of at least 6 months and then preserve sperm. However, this course would entail developing male secondary sexual characteristics which she says she would find devastating. The impact of the loss of fertility and the ability of a child of XY's age to understand those impacts is a matter that is dealt with in *Bell*.

22.     Since commencing PBs, XY and her family, whether individually or together, have attended a further 10 meetings with their GIDS clinicians for further support and advice.

23.     The background to the Second and Third Respondent's practice and processes in respect of the prescription of PBs is set out in *Bell* and I will not repeat.

24.     Shortly after the judgment in *Bell* was delivered, NHS England ("NHSE") issued an amendment to the Service Specification for GIDS requiring that each patient currently receiving treatment should be assessed and a "best interests" application should be made to the Court in the event that the clinical review determined that the patient should continue with PBs. The Second Respondent applied for permission to appeal the judgment and was granted a stay but only in respect of [138] of the judgment.

25.     The Second Respondent has indicated that it will take a considerable time to carry out the clinical reviews and it will be at least 3 months before XY's review is completed. Dr Carmichael in her statement sets out that in her view it continues to be in XY's best interests to have the PBs and she would not recommend XY stopping the treatment pending her clinical review.  Professor Butler has also indicated that he continues to support XY's treatment. Therefore, there is unanimity between the clinicians, the parents and XY that she should continue to be prescribed PBs.

26.     In the light of the *Bell* judgment, the Third Respondent wrote to XY's GP setting out its understanding of the legal position. XY's GP was sent a copy of this letter on 17 December 2020. The letter stated inter alia: *"We have let patients know that they will continue to receive their medication until the outcome of this application to the Court is known* [an individual best interest application]. *This has been agreed with NHS England and we are seeking a further stay on the judgement to cover this specific cohort of patients for this specific purpose. It is expected that GPs will continue to prescribe to this cohort. If you have any questions about this, please contact us directly."*

27.     GPs are not parties to the contracts between NHSE and the NHS Trusts which contain the Service Specification and are thus not contractually bound by its terms. Therefore, GPs are entitled to prescribe medications without following the procedures set out by NHSE. XY's GP has continued to prescribe PBs although it is not clear how long she will continue to do so. XY's GP was informed of these proceedings and asked whether she wished to participate but she has declined to do so.

28.     The position as explained to me by Mr McKendrick, on behalf of the Third Respondent, is that some GPs, including XY's, have agreed to continue prescribing PBs, but others have not. I was shown a number of letters from GPs who had declined to prescribe. Mr McKendrick said that his client would, before *Bell*, do the prescriptions themselves if the GP declined. However, it was not clear whether that would continue to happen post *Bell*. In any event, it is not wholly clear whose consent is being relied upon to make the administration of PBs lawful post *Bell*.

29.     It is by reason of the uncertainty on the lawfulness of parental consent, and the concern that XY's GP might decline to agree to further prescribe, that AB decided to make this application. The Third Respondent takes the view that clarity is needed on this issue for the medical practitioners concerned.

30.     Dr Carmichael, the Director of GIDS, sets out the Second Respondent's position in the light of the judgment as follows:

> *"In relation to referral from GIDS to the endocrine team, the Tavistock would only proceed to refer for treatment where i) it is the clear wish of the young person to be referred for assessment by the endocrinologist and that they understand the nature of the referral (even if their level of understanding falls short of the requirements for 'Gillick Competence' as delineated in the Divisional Court's judgment in Bell); ii) with the agreement and support of the child or young person's parent(s)/carer(s); and iii) with the agreement and recommendation from the clinicians working with the child or young person."*

31.     All parties agree that ceasing to take the PBs would have significant physical consequences for XY as her male puberty would recommence. She would quickly develop male secondary characteristics, such as facial hair and her voice breaking, which would to a degree at least, be irreversible.  It is very clear from XY's witness statement and letter, and her parents' evidence, that she would find this deeply distressing.

32.     The Applicant issued this application on 29 January 2021 seeking a declaration as set out above. The case was initially referred to Sir James Munby who gave an interlocutory judgment on 5 February 2021. He invited Cafcass to appear as Advocate to the Court, and very helpfully Ms Butler-Cole QC, Mr Ruck Keene and Ms Apps were appointed in that role and have appeared before me.

33.     There has been correspondence between Ms Bell's solicitors and the Third Respondent concerning any application that might be made to this Court concerning parental consent. Ms Bell's solicitors requested that they be given 14 days notice of any application. The Third Respondent did not give any undertaking in this regard and plainly AB was neither asked nor gave any such undertaking. When the matter came before Sir James Munby he requested Cafcass act as Advocate to the Court but he did not order that Ms Bell's representatives be informed of the proceedings. I note that it would have been very difficult to allow Ms Bell's representatives or any other third party to participate in the hearing given the highly personal facts concerning XY and her family. There was an application, which I refused, for another case to be joined with XY's case at the hearing. I refused that application, in part because it would have made the hearing much more complicated in terms of ensuring there was no wider knowledge of XY's factual position.

## **The Issues**

34.     Sir James Munby in his interlocutory judgment set out the following questions:

  a.   Do the parents retain the legal ability to consent to the treatment ?

    b.   Does the administration of PBs fall into a "special category" of medical treatment by which either:

        i.    An application must be made to the Court before they can be prescribed ?

        ii.   As a matter of good practice an application should be made to the Court ?"

35.     I agree these are the issues for the Court, and I will deal with them in that order below.

**The judgment in Bell and the role of Puberty Blockers**

36.     As I have referred to above, _Bell_ is being appealed to the Court of Appeal and is listed for hearing in June 2021. The judgment sets out in some detail the use of PBs in respect of children and young people suffering from Gender Dysphoria and the issues that arise in respect of that treatment.

37.     There are a number of aspects of the treatment, as referred to in _Bell_, which are relevant to the issues before me: the effect of PBs [48]-[59]; reversibility [60]–[68]; the evidence base and whether PBs are "experimental" treatment [69]-[74]; and the persistence of the symptomology [75]-[77].

38.     The Court's conclusions relevant to this part of the case are at [134]-[137] and state:

> "134. The starting point is to consider the nature of the treatment proposed. The administration of PBs to people going through puberty is a very unusual treatment for the following reasons. Firstly, there is real uncertainty over the short and long-term consequences of the treatment with very limited evidence as to its efficacy, or indeed quite what it is seeking to achieve. This means it is, in our view, properly described as experimental treatment. Secondly, there is a lack of clarity over the purpose of the treatment: in particular, whether it provides a "pause to think" in a "hormone neutral" state or is a treatment to limit the effects of puberty, and thus the need for greater surgical and chemical intervention later, as referred to in the Health Research Authority report. Thirdly, the consequences of the treatment are highly complex and potentially lifelong and life changing in the most fundamental way imaginable. The treatment goes to the heart of an individual's identity, and is thus, quite possibly, unique as a medical treatment.
>
> 135.  Furthermore, the nature and the purpose of the medical intervention must be considered. The condition being treated, GD, has no direct physical manifestation. In contrast, the treatment provided for that condition has direct physical consequences, as the medication is intended to and does prevent the physical changes that would otherwise occur within the body, in particular by stopping the biological and physical development that would otherwise take place at that age. There is also an issue as to whether GD is properly categorised as a psychological condition, as the DSM-5 appears to do, although we recognise there are those who would not wish to see the condition categorised in that way. Be that as it may, in our judgment for the reasons already identified, the clinical intervention we are concerned with here is different in kind to

*other treatments or clinical interventions. In other cases, medical treatment is used to remedy, or alleviate the symptoms of, a diagnosed physical or mental condition, and the effects of that treatment are direct and usually apparent. The position in relation to puberty blockers would not seem to reflect that description.*

*136.  Indeed the consequences which flow from taking PBs for GD and which must be considered in the context of informed consent, fall into two (interlinking) categories. Those that are a direct result of taking the PBs themselves, and those that follow on from progression to Stage 2, that is taking cross-sex hormones. The defendant and the Trusts argue that Stage 1 and 2 are entirely separate; a child can stop taking PBs at any time and that Stage 1 is fully reversible. It is said therefore the child needs only to understand the implications of taking PBs alone to be Gillick competent. In our view this does not reflect the reality. The evidence shows that the vast majority of children who take PBs move on to take cross-sex hormones, that Stages 1 and 2 are two stages of one clinical pathway and once on that pathway it is extremely rare for a child to get off it.*

*137.  The defendant argues that PBs give the child "time to think", that is, to decide whether or not to proceed to cross-sex hormones or to revert to development in the natal sex. But the use of puberty blockers is not itself a neutral process by which time stands still for the child on PBs, whether physically or psychologically. PBs prevent the child going through puberty in the normal biological process. As a minimum it seems to us that this means that the child is not undergoing the physical and consequential psychological changes which would contribute to the understanding of a person's identity. There is an argument that for some children at least, this may confirm the child's chosen gender identity at the time they begin the use of puberty blockers and to that extent, confirm their GD and increase the likelihood of some children moving on to cross-sex hormones. Indeed, the statistical correlation between the use of puberty blockers and cross-sex hormones supports the case that it is appropriate to view PBs as a stepping stone to cross-sex hormones."*

## Issue One - Do XY's parents retain the legal ability to consent to treatment with Puberty Blockers ?

### The role of parents

39.     The central, fundamental and critical role of parents in their children's lives, and decision making about their lives, hardly needs to be stated. It is set out in the clearest terms in the Children Act 1989 ("CA 89").

40.     Section 2(1) CA 89 provides:

> *"Where a child's father and mother were married to, or civil partners of, each other at the time of his birth, they shall each have parental responsibility for the child."*

41.     Section 3(1) CA 89 provides:

> *"In this Act "parental responsibility" means all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property."*

42.     The scope of parental responsibility extends to granting consent for medical treatment, see Ward LJ in *In Re Z (A Minor) (Freedom of Publication)* [1997] Fam 1 at p.25:

> *"Giving consent to medical treatment of a child is a clear incident of parental responsibility arising from the duty to protect the child…"*

43.     Parents can be asked by doctors to make the most serious of all decisions about the medical treatment on behalf of their children. The decision making structure where the Court is not involved was considered by Hedley J in *Portsmouth NHS Trust v Wyatt* [2005] 1 FLR 652 at [30]-[32] and does not need to be repeated.

44.     The caselaw is replete with judicial statements about not merely the centrality of parents in decisions about their children, but also as to why the Courts should in the vast majority of situations respect and uphold the parents' views and decision making about their children.

45.     Just one of these numerous statements was made by Baker J (as he then was) in *Re Ashya King* [2014] EWHC 2964 (Fam) which sets out the parental role in the context of serious medical treatment of a child:

> *"31. Thirdly, it is a fundamental principle of family law in this jurisdiction that responsibility for making decisions about a child rest with his parents. In most cases, the parents are the best people to make decisions about a child and the State – whether it be the court, or any other public authority – has no business interfering with the exercise of parental responsibility unless the child is suffering or is likely to suffer significant harm as a result of the care given to the child not being what it would be reasonable to expect a parent to give."*

46.     The then President of the Family Division, Sir James Munby said in *In the matter of E (A Child) (Medical Treatment)* [2016] EWHC 2267 at §35:

> *"Judges do not necessarily know best. Usually a child's long-term carers, whether parents, adoptive parents or long-term foster carers are much better placed than a judge to decide what should happen to their child. In the realm of private law – and this issue, despite the public law context in which it happens to arise, is in truth one in the private law realm – the court, the State, usually becomes involved only because the child's parents or carers have been unable to resolve the difficulty themselves, either because they cannot agree or, as sometimes happens in medical treatment cases, because they prefer to leave a particularly agonising decision to a judge: see, on the latter point, In re Jake (A Child) [2015] EWHC 2442 (Fam) , para 46."*

47.     The importance of protecting parents' rights and duties is set out in article 5 of the United Nations Convention on the Rights of the Child ("UNCRC"):

> *"States Parties shall respect the responsibilities, rights and duties of parents or, where applicable, the members of the extended family or community as provided for by local custom, legal guardians or other persons legally responsible for the child, to provide, in a manner consistent with the evolving capabilities of the child, appropriate direction and guidance in the exercise by the child of the rights recognized in the present Convention."*

48.     Further, parents' rights are part of family life to which protection is given by article 8 European Convention on Human Rights ("ECHR") under the Human Rights Act 1998 ("HRA"). I do not need to set out further detail and caselaw on either the UNCRC or article 8 because in my view these protections are fully reflected in the caselaw which is referred to above, and article 8 does not alter the analysis in that caselaw.

<u>Parental power to consent to medical treatment</u>

49.     The issue here is whether the parents have a continuing right to consent even if XY is <u>*Gillick*</u> competent. This was referred to by the parties as the parents having a "concurrent right to consent". Both the Second and Third Respondent proceeded before <u>*Bell*</u> on the basis that XY was <u>*Gillick*</u> competent in respect to the decision to take PBs and therefore it was not necessary to ask whether the parents could also consent. However, that view has been cast into doubt by the judgment in <u>*Bell*</u> and in particular [138]. No fresh assessment of XY's competence has been made since the judgment although XY herself unsurprisingly thinks she is competent to make the decision.

50.     In <u>*Bell*</u> the Court said:

> *"138. It follows that to achieve Gillick competence the child or young person would have to understand not simply the implications of taking PBs but those of progressing to cross-sex hormones. The relevant information therefore that a child would have to understand, retain and weigh up in order to have the requisite competence in relation to PBs, would be as follows: (i) the immediate consequences of the treatment in physical and psychological terms; (ii) the fact that the vast majority of patients taking PBs go on to CSH and therefore that s/he is on a pathway to much greater medical interventions; (iii) the relationship between taking CSH and subsequent surgery, with the implications of such surgery; (iv) the fact that CSH may well lead to a loss of fertility; (v) the impact of CSH on sexual function; (vi) the impact that taking this step on this treatment pathway may have on future and life-long relationships; (vii) the unknown physical consequences of taking PBs; and (viii) the fact that the evidence base for this treatment is as yet highly uncertain."*

51.     As is set out above, XY has not been subject to any fresh consideration since <u>*Bell*</u> of her competence to consent. It therefore cannot be established with certainty whether she is, or is not, <u>*Gillick*</u> competent.  In those circumstances, I am going to consider the matter on two alternative bases; either that she is not <u>*Gillick*</u> competent, or that she is <u>*Gillick*</u> competent, but it remains relevant whether her parents can also give operative

consent to the treatment. As Mr McKendrick explained, the position of clinicians, both GPs and his client, is that they are very uncertain at the moment on what basis, if any, they can continue to prescribe.

52.     The debate before this Court turned on two decisions of Lord Donaldson MR; _Re R (A Minor) (Wardship Consent to Treatment)_ [1992] Fam 11 and _Re W (A Minor) Medical Treatment Courts Jurisdiction)_ [1993] Fam 64. In those cases Lord Donaldson cast doubt upon precisely what Lord Scarman had meant in _Gillick v West Norfolk and Wisbech Health Authority_ [1986] AC 112, and the degree to which parental right to consent to treatment continued even when the child was _Gillick_ competent. These cases have recently been considered by Sir James Munby in _Re X (no 2)_ [2021] EWHC 65.

53.     In _Re R_ the Court of Appeal was considering a 15 year old girl in the care of a local authority, who was detained under s.2 of the Mental Health Act 1983, and whether she should be treated with anti-psychotic medication. The local authority had consented on her behalf to the treatment, but when she indicated in a "lucid moment" that she would refuse the treatment, the local authority withdrew its consent. The judge at first instance held that he could not override the decision of a competent minor, and therefore the treatment could not be given. The Official Solicitor appealed. The Court of Appeal held that the Court, in the exercise of its wardship jurisdiction, could override a minor's decision. It can therefore be seen that Lord Donaldson's comments about whether the parents of a _Gillick_ competent child could consent to treatment on her behalf were obiter. However, Lord Donaldson's comments have become highly important in subsequent caselaw.

54.     The argument put forward by Mr Munby QC on behalf of the Official Solicitor in _Re R_, that the parents' right to consent to medical treatment terminated on the competence of the child to consent, was dismissed, Lord Donaldson holding:

> "What Mr. Munby's argument overlooks is that Lord Scarman was discussing the parents' right "to determine whether or not their minor child below the age of 16 will have medical treatment" (my emphasis) and this is the "parental right" to which he was referring at p. 186D. A right of determination is wider than a right to consent. The parents can only have a right of determination if either the child has no right to consent, that is, is not a keyholder, or the parents hold a master key which could nullify the child's consent. I do not understand Lord Scarman to be saying that, if a child was "Gillick competent," to adopt the convenient phrase used in argument, the parents ceased to have an independent right of consent as contrasted with ceasing to have a right of determination, that is, a veto. In a case in which the "Gillick competent" child refuses treatment, but the parents consent, that consent enables treatment to be undertaken lawfully, but in no way determines that the child shall be so treated. In a case in which the positions are reversed, it is the child's consent which is the enabling factor and again the parents' refusal of consent is not determinative. If Lord Scarman intended to go further than this and to say that in the case of a "Gillick competent" child, a parent has no right either to consent or to refuse consent, his remarks were obiter, because the only question in issue was Mrs. Gillick's alleged right of veto. Furthermore I consider that they would have been wrong. [Re R 23E-H] (emphasis added)."

55.    Lord Donaldson went on:

> *"The failure or refusal of the 'Gillick competent' child is a very important factor in the doctor's decision whether or not to treat, but does not prevent the necessary consent being obtained from another competent source."* [24H-25A].

56.    This position was summarised at [26F]:

> *"...There can be concurrent powers to consent. If more than one body or person has a power to consent, only a failure to, or refusal of, consent by all having that power will create a veto."*

> *"...A 'Gillick competent' child or one over the age of 16 will have a power to consent, but this will be concurrent with that of a parent or guardian."*

57.    Lord Donaldson considered the matter further in the subsequent judgment in <u>Re W</u>. That case concerned a young woman of 16, who was therefore within the ambit of s.8 Family Law Reform Act 1969.  Lord Donaldson said first that he doubted whether "*Lord Scarman* [in <u>Gillick</u>] *meant more than that the exclusive right of parents to consent to treatment terminated [on the achievement of competence by their children]"* [76D]. He further expanded:

> *"On reflection I regret my use in In Re R. (A Minor) (Wardship: Consent to Treatment) [1992] Fam. 11, 22, of the key holder analogy because keys can lock as well as unlock. I now prefer the analogy of the legal "flak jacket" which protects the doctor from claims by the litigious whether he acquires it from his patient who may be a minor over the age of 16, or a "Gillick competent" child under that age or from another person having parental responsibilities which include a right to consent to treatment of the minor. Anyone who gives him a flak jacket (that is, consent) may take it back, but the doctor only needs one and so long as he continues to have one he has the legal right to proceed." [78D-E]*

58.    The scope of Lord Donaldson's comments was recently considered by Sir James Munby in <u>Re X (no 2).</u> That case again concerned whether the Court could override a refusal of consent by a 15 year old Jehovah's Witness who was refusing a blood transfusion. The ratio of the case was that the Court can override such a refusal, and that the principle in <u>Re R</u> and <u>Re W</u> in this regard had withstood the HRA and the UNCRC and those cases remained good law in this regard.

59.    However, <u>Re X (no 2)</u> did not actually concern concurrent, let alone conflictual, parental ability to consent where the child was <u>Gillick</u> competent. Therefore, on the issue before this Court, <u>Re X (no 2)</u> takes the analysis no further forward.

60.    To the degree that Lord Donaldson was seeking to find that a parent retains the right to consent to treatment which a <u>Gillick</u> competent child has refused, in my view that analysis does not fit with what the House of Lords, and in particular Lord Scarman, said in <u>Gillick.</u> It would now also be very difficult to accept in the light of article 8 of the ECHR.

61.     The issue in <u>*Gillick*</u> was whether GPs could give contraceptive advice and treatment to girls under 16 without their parents being informed. The conclusion of the House of Lords was that Department of Health advice that said that the GPs could provide such advice and treatment was lawful. <u>*Gillick*</u> is relevant to the present case because it sets the framework for all the subsequent caselaw on the legal position of a child vis-à-vis her parent when the child is competent to make a decision.

62.     Lord Scarman started at 176D by saying that parental rights and duties had not been undermined but it *"may not be as extensive or as long lasting as she* [Mrs Gillick] *believes it to be."*

63.     At 184B-C he said:

> *"The principle of the law, as I shall endeavour to show, is that parental rights are derived from parental duty and exist only so long as they are needed for the protection of the person and property of the child. The principle has been subjected to certain age limits set by statute for certain purposes: and in some cases the courts have declared an age of discretion at which a child acquires before the age of majority the right to make his (or her) own decision. But these limitations in no way undermine the principle of the law, and should not be allowed to obscure it."*

64.     At 186D Lord Scarman said:

> *"The underlying principle of the law was exposed by Blackstone and can be seen to have been acknowledged in the case law. It is that parental right yields to the child's right to make his own decisions when he reaches a sufficient understanding and intelligence to be capable of making up his own mind on the matter requiring decision."*

65.     Lord Scarman then referred to Lord Denning M.R. capturing the spirit and principle of the law in <u>*Hewer v Bryant*</u> [1970] 1 QB 357, 369 by saying that the parental right *"is a dwindling right which the courts will hesitate to enforce against the wishes of the child."* Interestingly, <u>*Hewer v Bryant*</u> was a deprivation of liberty case (although the issue was not then phrased in that terminology) which shows that there is overlap between the caselaw on parental right to consent to a child's deprivation of liberty and that on consent to medical treatment.

66.     At 188H- 189B Lord Scarman said:

> *"In the light of the foregoing I would hold that as a matter of law the parental right to determine whether or not their minor child below the age of 16 will have medical treatment terminates if and when the child achieves a sufficient understanding and intelligence to enable him or her to understand fully what is proposed. It will be a question of fact whether a child seeking advice has sufficient understanding of what is involved to give a consent valid in law. Until the child achieves the capacity to consent, the parental right to make the decision continues save only in exceptional circumstances."*

67.    Although there is some difference in nuance between the speeches in _Gillick_, it is accepted that Lord Scarman reflects the view of the Committee. The very essence of _Gillick_ is, in my view, that a parent's right to consent or "determine" treatment cannot trump or overbear the decision of the child. Therefore, the doctors could lawfully advise and treat the child without her mother's knowledge or consent. In _Gillick_, the parent did not have the right to know that the treatment was being given, so it makes little sense to assume that the parent could act to stop the child's decision being operative on whether the treatment takes place or not. I cannot accept that Lord Scarman was drawing the distinction between the child making the decision and the parent being able to give legally operative consent that Lord Donaldson seems to have drawn in _Re R_. Mrs Gillick was asserting a right to "decide" whether her daughter could be given advice and treatment without her knowledge, and thus without her consent. Therefore, the distinction that Lord Donaldson seeks to draw between the parent retaining a right to consent, but not being in a position to determine the treatment, does not accord with the issue in _Gillick_.

68.    However, in the present case, the parent and the child are in agreement. Therefore, the issue here is whether the parents' ability to consent disappears once the child achieves _Gillick_ competence in respect of the specific decision even where both the parents and child agree. In my view it does not. The parents retain parental responsibility in law and the rights and duties that go with that. One of those duties is to make a decision as to consent in medical treatment cases where the child cannot do so. The parent cannot use that right to "trump" the child's decision, so much follows from _Gillick_, but if the child fails to make a decision then the parent's ability to do so continues. At the heart of the issue is that the parents' "right" to consent is always for the purpose of ensuring the child's best interests. If the child does not, for whatever reason, make the relevant decision then the parents continue to have the responsibility (and thus the right) to give valid consent.

69.    This might arise if the child is unable to make the decision, for example is unconscious. However, it could also arise if the child declines to make the decision, perhaps because although _Gillick_ competent she finds the whole situation too overwhelming and would rather her parents make the decision on her behalf. In the present case, in the light of the decision in _Bell_, and the particular issues around _Gillick_ competence explained in that judgment, it has not been possible to ascertain whether the child is competent. In this case, there are two options. If the child is _Gillick_ competent, she has not objected to her parent giving consent on her behalf. As such, a doctor can rely on the consent given by her parents. Alternatively, the child is not _Gillick_ competent. In that case, her parents can consent on her behalf. It is not necessary for me or a doctor to investigate which route applies to give the parents authority to give consent. Therefore, in my view, whether or not XY is _Gillick_ competent to make the decision about PBs, her parents retain the parental right to consent to that treatment.

70.    This approach protects the rights both of the child and the parents. As set out above, the parents' rights and responsibilities are given under s.3 of the Children Act ultimately to protect and further the child's welfare. Further, the parents' rights under article 8 ECHR and the UNCRC are appropriately balanced against the child's rights to assert their own decisions, when competent to do so.

**Issue Two - Is there a special category of medical treatment requiring court authorisation, and do puberty blockers fall within it ?**

71.  The second issue in the case is whether there is a special category of medical treatment where either there is a common law rule that cases must be brought to Court for the Court to make the decision or, as a matter of good practice, such cases should be brought before the Court. If there is such a special category does treatment with PBs of children and young people suffering from Gender Dysphoria fall within it?  The first sub-issue is therefore the existence and/or scope of any "special category", and the second sub-issue is whether PBs should fall within such a category. The basis for PBs being in a special category of treatment would be the matters considered in *Bell* at [134] to [137] set out above.

72.  There are two preliminary points to raise in respect of this issue. Firstly, the judgments concerning medical treatment decisions that should be brought to court are sometimes less than clear as to whether they are referring to a legal requirement or merely to good practice. However, it is in most cases probably a distinction without much difference. If it is good practice to apply to the Court, then if a clinician does not do so s/he is at risk of considerable criticism and possibly disciplinary action by the professional body. Therefore, a principle of good practice may have a very similar effect to a legal requirement.

73.  Secondly, this is an aspect of the case where I am acutely conscious that all the parties are arguing the same position, namely that even if there is some limited "special category", it is very limited and PBs do not fall within it. However, it is very apparent from *Bell* that there could be a strong counter argument. Ms Butler Cole took me to the relevant legal material, but it was not her role to put that counter argument. As I explained below, in reality the "special category" to the degree it exists at all, is extremely limited.

74.  The argument that there is a special category of medical treatment, which only the court can authorise, rests on a series of decisions concerning sterilisation of girls and women, some of which involve under 16 year olds. *Re D (A Minor) (Wardship Sterilisation)* [1976] 1 All ER 326 concerned an 11 year old girl who was described as having some impairment of mental function, certain aggressive tendencies and some medical complications. Her mother was very concerned that she would become pregnant and wished her to be sterilised and a doctor agreed to carry out the operation. An educational psychologist, as well as some other professionals, were very concerned about this decision and applied to the Court for D to be made a Ward of Court.

75.  Heilbron J held that the proposed operation involved the deprivation of a basic human right and was being carried out for "non-therapeutic" reasons. She found that it was appropriate to make D a Ward of Court and that this was the type of case where the court should *"throw some care around this child"* [333b-c].

76.  *Re B (A Minor) (Wardship Sterilisation)* [1987] 2 All ER 206 concerned a mentally handicapped girl of 17 with the mental age of a 5/6 year old. The local authority applied for her to be made a Ward of Court and for the Court to authorise a sterilisation. On the facts, it appeared that other alternative treatment, such as long-term contraception, was not clinically appropriate in her case. The High Court (Bush J) granted the application

and the Official Solicitor, who opposed the application, appealed ultimately to the House of Lords.

77.     The ratio in the House of Lords was that, as a Ward of Court, the paramount issue was the girl's welfare and best interests. Sterilisation was, on the facts of the case, found to be in her best interests. However, their Lordships made various comments on the circumstances in which such applications should come to Court.  Lord Templeman said:

> "In my opinion sterilisation of a girl under 18 should only be carried out with the leave of a High Court judge. A doctor performing a sterilisation operation with the consent of the parents might still be liable in criminal, civil or professional proceedings. A court exercising the wardship jurisdiction emanating from the Crown is the only authority which is empowered to authorise such a drastic step as sterilisation after a full and informed investigation. The girl will be represented by the Official Solicitor or some other appropriate guardian; the parents will be made parties if they wish to appear and where appropriate the local authority will also appear. Expert evidence will be adduced setting out the reasons for the application, the history, conditions, circumstances and foreseeable future of the girl, the risks and consequences of pregnancy, the risks and consequences of sterilisation, the practicability of alternative precautions against pregnancy and any other relevant information. The judge may order additional evidence to be obtained. In my opinion, a decision should only be made by a High Court judge. In the Family Division a judge is selected for his or her experience, ability and compassion. No one has suggested a more satisfactory tribunal or a more satisfactory method of reaching a decision which vitally concerns an individual but also involves principles of law, ethics and medical practice. Applications for sterilisation will be rare. Sometimes the judge will conclude that a sufficiently overwhelming case has not been established to justify interference with the fundamental right of a girl to bear a child; this was the case in In Re D. (A Minor) (Wardship: Sterilisation) [1976] Fam. 185 . But in the present case the judge was satisfied that it would be cruel to expose the girl to an unacceptable risk of pregnancy which could only be obviated by sterilisation in order to prevent child bearing and childbirth in circumstances of uncomprehending fear and pain and risk of physical injury. In such a case the judge was under a duty and had the courage to authorise sterilisation."

78.     This passage is the high point of the caselaw supporting an argument that there is a special category of case which must always come to Court. The other judges did not expressly agree with Lord Templeman, although they all agreed with the outcome. Lord Hailsham distinguished _Re D_ on the basis that B would never be able to exercise an informed choice as to the treatment, given her mental incapacity,  whereas D would in all probability have been able to do so once she reached the age of 18. Further, Lord Hailsham said that the distinction drawn between therapeutic and non-therapeutic sterilisations was not in his view a helpful one, see p.213 a-c.

79.     _F v West Berkshire Health Authority_ [1990] 2 AC 1 concerned a 36 year old woman with a serious mental disability. She had formed a sexual relationship and there was medical evidence that it would be disastrous for her if she became pregnant. Further,

ordinary methods of contraception were not appropriate for her and the clinicians thought she should have a sterilisation. The issue for the Court was whether such an operation would be lawful given that she could not give consent and the parens patriae jurisdiction in respect of adults lacking mental capacity no longer existed because of the coming into force of the Mental Health Act 1959 and the relevant revocation by warrant, see Lord Brandon at [552h]. The Official Solicitor, instructing Mr Munby QC, argued that sterilisation of an adult mental patient who was unable to give her consent could never be lawful.

80.     The Court held that it did have jurisdiction to give the authorisation under the doctrine of necessity. Their Lordships struggled somewhat to establish where their jurisdiction came from, Lord Goff finding support in the law of shipping. To a considerable degree the case is now of historical interest because of the Mental Capacity Act 2005. However, it is important for the purposes of the present case because of what their Lordships said about the circumstances in which such applications had to be brought to Court.

81.     Lord Brandon at p.551j-552b said:

> *"That is not the end of the matter, however, for there remains a further question to be considered. That question is whether, in the case of an operation for the sterilisation of an adult woman of child-bearing age, who is mentally disabled from giving or refusing her consent to it, although involvement of the court is not strictly necessary as a matter of law, it is nevertheless highly desirable as a matter of good practice. In considering that question, it is necessary to have regard to the special features of such an operation. These features are: first, the operation will in most cases be irreversible; secondly, by reason of the general irreversibility of the operation, the almost certain result of it will be to deprive the woman concerned of what is widely, and as I think rightly, regarded as one of the fundamental rights of a woman, namely, the right to bear children; thirdly, the deprivation of that right gives rise to moral and emotional considerations to which many people attach great importance; fourthly, if the question whether the operation is in the best interests of the woman is left to be decided without the involvement of the court, there may be a greater risk of it being decided wrongly, or at least of it being thought to have been decided wrongly; fifthly, if there is no involvement of the court, there is a risk of the operation being carried out for improper reasons or with improper motives; and, sixthly, involvement of the court in the decision to operate, if that is the decision reached, should serve to protect the doctor or doctors who perform the operation, and any others who may be concerned in it, from subsequent adverse criticisms or claims."*

82.     The six factors set out by Lord Brandon could be used as touchstone tests by which to decide whether a particular medical treatment should be brought to Court. However, it is important to bear closely in mind that <u>Re F</u> concerned an adult without capacity and not a child with parents who were capable of, and prima facie entitled to, exercise parental responsibility.

83.    In *Re E (A Minor) (Medical Treatment)* [1991] 2 FLR 585 Sir Stephen Brown P was
       dealing with a severely mentally handicapped 17 year old girl who suffered from a
       menstrual condition for which the only effective treatment was a hysterectomy. Her
       parents were prepared to consent to the proposed treatment, but she was made a Ward
       of Court and the Official Solicitor acted on her behalf. It appears that the case was
       brought to Court because, although all parties considered such an application was
       unnecessary, the clinicians were very concerned about the legality of their position.

84.    The judge considered *Re F* and drew a distinction between therapeutic and non-
       therapeutic sterilisations. He held that the consent of the Court was not required because
       the operation was for therapeutic reasons, and the parents had the power to give consent.
       As I read *Re E*, given that *Re F* also concerned a "therapeutic" sterilisation, the critical
       difference between the two cases that Sir Stephen was referring to was the fact that *Re
       E* concerned a young person whose parents were in a position to consent to the
       treatment. He says at p.587: *"I think that J's parents are in a position to give a valid
       consent to the proposed operation. I am not dealing in this instance with the case of an
       adult: I am dealing with the case of a minor…"*

85.    In *Re GF (Medical Treatment)* [1992] 1 FLR 293 Sir Stephen Brown considered an
       application for a declaration that a hysterectomy on a mentally handicapped 29 year old
       woman was lawful. The judge held that no declaration was needed because the
       operation was for therapeutic purposes and was in GF's best interests. At p.294 the
       judge said:

            *"In a case where the operation is necessary in order to treat the condition
            in question, it may be lawfully carried out even though it may have the
            incidental effect of sterilisation … I take the view that no application for
            leave to carry out such an operation need be made in cases where  two
            medical practitioners are satisfied that the operation is: (1) necessary for
            therapeutic purposes, (2) in the best interests of the patient, and (3) that
            there is no practicable, less intrusive means of treating the condition."*

86.    In *Re S (Sterilisation Patient's Best Interests)* [2000] 2 FLR 389 the Court of Appeal
       was considering a 29 year old woman with a severe learning difficulty whose mother
       wanted her to have a hysterectomy. The Official Solicitor opposed the application
       arguing that there was an alternative less intrusive medical procedure available, namely
       the insertion of an intra-uterine device. The judge approved the proposed treatment and
       the Official Solicitor appealed. The Court of Appeal held that if the clinicians put
       forward more than one acceptable medical opinion then the Court had to go on to
       consider which treatment was in the best interests of the patient.

87.    Dame Elizabeth Butler-Sloss P said at p.401:

            *"I would just add that all three requirements set out by Sir Stephen Brown
            P in Re GF (Medical Treatment) [set out above] are necessary. The
            criteria ought to be cautiously interpreted and applied. Rightly, in my
            view, in the present case, it was considered appropriate to make the
            application for a declaration. I have considerable sympathy for the mother
            in this case. She has the responsibility for her daughter and she is doing
            her best to make the best provision for S's future having regard to the fact
            that she will not be able to look after her for much longer. The decision of*

> *this court will be disappointing for her but, since I have no doubt that the surgery is premature, I would allow the appeal and set aside the declarations and invite the medical advisers to insert the Mirena coil as has been recommended."*

88.    Thorpe LJ agreed with the President but added:

> *"The purpose of the President's ruling* [in GF] *was to set a boundary to enable professionals to determine whether or not it was their responsibility to refer an issue concerning the treatment of an adult lacking capacity to the court for a ruling. In other words, it seeks to define what is and what is not the business of the courts. Although this appeal does not raise that question directly, we have heard argument on the point and I would wish to state this opinion. The President's test was necessarily expressed in broad terms. Anything so stated offers a margin to whoever interprets and applies it. In my opinion, any interpretation and application should incline towards the strict and avoid the liberal. The courts are not overburdened with applications in this field. Indeed they are rare. In view of the importance of the subject, if a particular case lies anywhere near the boundary line it should be referred to the court by way of application for a declaration of lawfulness."*

89.    It is not absolutely clear whether the President and Thorpe LJ were saying that applications had to be made to Court as a matter of law. However, in my view, a fair reading of their judgments suggests that was their position, or at the very least they were not drawing a distinction between a legal requirement and best practice of bringing these difficult cases to Court.

90.    Mr Lock points out that in this line of cases only *Re D* and *Re E* are about children under the age of 16. I agree that this is highly relevant because in the case of children, their parents will generally be able to give consent on their behalf. The critical difference between cases concerning children with consenting parents and those concerning incapacitated adults was highlighted by Sir Stephen Brown in *Re E*, as referred to above. There are, of course, many cases which have come to Court because parents and clinicians disagree, but that is not the situation that arises here. *Re D* (Heilbron J) is in my view a somewhat exceptional case. It is very hard to imagine a clinician approving the treatment in question now without at least seeking the authorisation of the Court. This may be an example of clinical regulation and oversight having improved since 1976.

91.    There is a line of cases, culminating in the Supreme Court decision in *NHS Trust v Y (Intensive Care Society Intervening)* [2019] AC 978, about whether decisions to withdraw Clinically Assisted Nutrition and Hydration ("CANH") have to be brought to Court. It is the necessary consequence of such decisions that the patient will die. After the House of Lords judgment in *Airedale NHS Trust v Bland* [1993] AC 789 such decisions had routinely been brought to Court. The Supreme Court in *NHS Trust v Y* held that the common law did not require that an application be made to Court in every such case.

92.     Lady Black at [12-17] considered *Re F*. She explained that their Lordships had expressed their view that as a matter of good practice the Court's view should be obtained, but not as a matter of legal requirement. She said at [17]:

> "*Lord Griffiths would have been minded to make it a legal requirement to obtain the sanction of the High Court in all cases, and considered that the common law could be adapted to introduce such a requirement. However, he recognised that he would be making new law, and that the other members of the House considered that it was not open to them to take that course. He therefore accepted what Lord Brandon had proposed, but as second best: p 71.*"

93.     She said at [21] that in *Bland* the view of the House of Lords had been that "the guidance" of the court should be sought. At [115] Lady Black sounded a note of caution to judges in these cases of intense social and ethical complexity, and I would add in the present context medical complexity:

> "*In so doing, it is necessary to exercise the restraint that is required of a court when it ventures into areas of social and ethical uncertainty, and especially when it does so in the abstract, setting out views which will be of general application (as is necessarily so in this case) rather than resolving a clearly defined issue of law or fact that has arisen between the litigants appearing before it.*"

94.     In conclusion at [125] her Ladyship said:

> "*If, at the end of the medical process, it is apparent that the way forward is finely balanced, or there is a difference of medical opinion, or a lack of agreement to a proposed course of action from those with an interest in the patients welfare, a court application can and should be made. As the decisions of the European court underline, this possibility of approaching a court in the event of doubts as to the best interests of the patient is an essential part of the protection of human rights. The assessments, evaluations and opinions assembled as part of the medical process will then form the core of the material available to the judge, together with such further expert and other evidence as may need to be placed before the court at that stage.*"

95.     In January 2020 Mr Justice Hayden, Vice President of the Court of Protection, produced guidance concerning when applications relating to medical treatment should be made to the Court. The most relevant paragraphs are 8, 10 and 11:

> "*8. If, at the conclusion of the medical decision-making process, there remain concerns that the way forward in any case is: (a) finely balanced, or (b) there is a difference of medical opinion, or (c) a lack of agreement as to a proposed course of action from those with an interest in the person's welfare, or (d) there is a potential conflict of interest on the part of those involved in the decision-making process (not an exhaustive list) Then it is highly probable that an application to the Court of Protection is appropriate. In such an event consideration must always be given as to whether an application to the Court of Protection is required.*

...

> *10. In any case which is not about the provision of life-sustaining treatment, but involves the serious interference with the person's rights under the ECHR, it is "highly probable that, in most, if not all, cases, professionals faced with a decision whether to take that step will conclude that it is appropriate to apply to the court to facilitate a comprehensive analysis of [capacity and] best interests, with [the person] having the benefit of legal representation and independent expert advice." 5 This will be so even where there is agreement between all those with an interest in the person's welfare.*

> *11. Examples of cases which may fall into paragraph 10 above will include, but are not limited to: a. where a medical procedure or treatment is for the primary purpose of sterilisation; b. where a medical procedure is proposed to be performed on a person who lacks capacity to consent to it, where the procedure is for the purpose of a donation of an organ, bone marrow, stem cells, tissue or bodily fluid to another person; c. a procedure for the covert insertion of a contraceptive device or other means of contraception; d. where it is proposed that an experimental or innovative treatment to be carried out; e. a case involving a significant ethical question in an untested or controversial area of medicine."*

96. It is easy to see that arguments might be raised that paragraphs 11(d) and (e) would apply to the administration of PBs for Gender Dysphoria and that therefore the principles applicable to adults lacking capacity should be extended to children.

97. Mr Lock and Ms Morris rely on caselaw relating to experimental treatment being given to children for the proposition that, even in that type of treatment, parental consent can be given, see *Simms v Simms* [2002] Fam 83 and *UCLH v KG* [2018] EWCOP 29. However, I do not find this line of caselaw particularly helpful. If the child, or incapacitated adult, has a condition for which there is only one possible treatment, particularly if the condition is fatal, then it is easy to see that experimental treatment would generally not require Court approval. The factual, clinical and ethical issues surrounding PBs are different, as is explained at length in *Bell*. In particular, the child is not facing a terminal illness, and the treatment has life-changing and life-long consequences, the implications of which are not fully understood.

98. Mr McKendrick referred to two cases where judges had urged against general rules that classes of case had to come to Court where the individual facts did not justify that approach. In *Briggs* [2017] EWCA Civ 1169 King LJ said in the context of the removal of artificial nutrition and hydration:

> *26. "In reality virtually all of these traumatic decisions are made by agreement between the families and the treating teams of the person involved. To suggest that every case should go before a judge (even where all concerned are in accord as to what was in the best interests of the patient) would not only be an unnecessary pressure on the overstretched resources of the NHS Trusts and add to the burden on the courts but, most importantly, would greatly add to the strain on the families having to face these unimaginably distressing decisions. In my judgment, the Practice*

> *Direction provides valuable procedural guidance but should not be interpreted as introducing a requirement that all cases where a decision is to be made about the withdrawal of CANH must come before a court."*

99.     Peter Jackson J made similar comments in <u>M v A Hospital</u> [2018] EWCOP 19. There are particular issues in relation to PBs and there may well be justification for clinicians taking a very cautious approach in individual cases and erring on the side of having Court consideration and authorisation. However, the need for caution in imposing blanket rules, even for the most difficult categories of case, is important to have closely in mind.

## The Australian cases

100.    The Court's attention was directed to two Australian cases where the issue of the prescription of PBs to children has arisen. In <u>Re Jamie</u> [2013] Fam CAFC 110 the Family Court of Australia considered whether the parents could consent to an 11 year old child being given PBs. The court considered the nature of PBs, and it is correct to note that its approach was somewhat different to that taken by the Divisional Court in <u>Bell</u>. The court concluded that here was no reason to place PBs in a special category where the Court's approval was required. However, for Stage 2 treatment, i.e. cross-sex hormones, Court approval was required because of the irreversibility of that treatment.

101.    However, in <u>Re Kelvin</u> [2017] CAFC 258 the Court revisited the issue of Stage 2 treatment. It cited with approval a decision called <u>Sam and Terry (Gender Dysphoria)</u> [2013] 49 Fam LR 417 where the Court said:

> *"...a decision that court authorisation is necessary can be seen to intrude upon the lives of loving, caring and committed parents who live daily their children's difficulties, who are intimately aware of the day-to-day difficulties confronted by their children and who deal with the numerous (serious) concerns on a daily basis. Those exceptionally difficult day to day tasks are accompanied by a miscellany of difficult day to day decisions and those decisions fall upon them, not others. I also accept that parents who fit that description can legitimately say that they know their children better than anyone, much less than a court, ever will. There is real legitimacy to a position adopted by parents who fit that description that it is them, and not the court, who, together with appropriately qualified expert clinicians, are best placed to decide what is right for their children. I am also not unaware that cost and stress will attend court authorisation. ...It would be sad if the courtroom was to replace a caring, holistic environment within which an approach by parents and doctors alike could deal with difficult decisions."*

102.    I place some weight on these Australian authorities because they were dealing with precisely the same treatment and the same legal issue, namely the ability of parents to consent to their children receiving that treatment. However, I am also conscious of the somewhat different approach taken to PBs from the analysis set out in <u>Bell.</u>

**The Regulatory Framework**

103. Mr Lock and the Respondents rely on the existence of an extensive regulatory and oversight framework within which the clinical decision to prescribe PBs is made. In particular, that framework has safeguards to ensure that PBs are only prescribed in appropriate cases; that parental consent is fully informed and properly given; and that all ethical issues about the treatment are fully considered. The Respondents argue that this broad framework is the more appropriate mechanism for ensuring best practice, and full safeguards for the child, rather than placing PBs into a special category which requires Court authorisation and thus removes the power of parents to consent.

104. There are a number of layers to this regulatory framework covering institutional oversight of the Second and Third Respondents, individual regulation of clinicians, and ethical oversight of clinical decision making.

105. The services provided by the Second Respondent are commissioned by NHS England and are subject to a Service Specification, the document which has been amended in the light of the _Bell_ judgment. As is clear from this, NHSE can change the Service Specification and put particular requirements upon the Second and Third Respondents if it considers that to be appropriate. NHSE has set up an independent review, chaired by Dr Hilary Cass ("the Cass Review") into various aspects of the service provided by GIDS and the reference to the specialist endocrine service provided by the Third Respondent and Leeds Teaching Hospital. The terms of the Cass Review are as follows:

> _"The independent review, led by Dr Cass, will be wide ranging in scope and will conduct extensive engagement with all interested stakeholders. The review is expected to set out findings and make recommendations in relation to:_
>
> i. _Pathways of care into local services, including clinical management approaches for individuals with less complex expressions of gender incongruence who do not need specialist gender identity services;_
>
> ii. _Pathways of care into specialist gender identity services, including referral criteria into a specialist gender identity service; and referral criteria into other appropriate specialist services;_
>
> iii. _Clinical models and clinical management approaches at each point of the specialised pathway of care from assessment to discharge, including a description of objectives, expected benefits and expected outcomes for each clinical intervention in the pathway;_
>
> iv. _Best clinical approach for individuals with other complex presentations;_
>
> v. _The use of gonadotropin-releasing hormone analogues and gender affirming drugs, supported by a review of the available evidence by the National Institute for Health and Care Excellence; any treatment recommendations will include a description of treatment objectives, expected benefits and expected outcomes, and potential risks, harms and effects to the individual;_

MRS JUSTICE LIEVEN
Approved Judgment

FD21P00063

    vi.    *Ongoing clinical audit, long term follow-up, data reporting and future research priorities;*

    vii.    *Current and future workforce requirements;*

    viii.    *Exploration of the reasons for the increase in referrals and why the increase has disproportionately been of natal females, and the implications of these matters; and*

    ix.    *Any other relevant matters that arise during the course of the review."*

106.    I have set these terms of reference out in full because in my view they give the opportunity for significant safeguards to be put in place in order to ensure that parents and children are given full and objective advice as to the benefits and disbenefits of PBs, to which I will refer below. The Cass Review is intended to report in 2021.

107.    The Second and Third Respondents are subject to regulatory oversight by the Care Quality Commission ("CQC") which has produced reports in respect of services to children suffering from Gender Dysphoria. The report in respect of GIDS sets out various improvements which need to be made by that Service.

108.    Further, all the clinical professionals are subject to regulation and oversight by their own professional bodies. These bodies are in a position to produce guidance as to clinical best practice in respect of the use of PBs and best practice in respect of the treatment of Gender Dysphoria in children and young people as they think appropriate.

109.    Ms Morris emphasises that the practice at GIDS is in accordance with World Professional Association for Transgender Health ("WPATH") guidance and I assume that if it departed from that guidance then that is a matter that could be raised with regulatory bodies.

110.    Mr Lock also points to the ability of a doctor to refer matters of concern to an appropriate clinical ethics committee, or to apply to the Court if they are concerned about the treatment being proposed. I place limited weight on these safeguards given the risk of a unanimity of view within the clinical group in this very particular and unusual field, leading to no reference being made. I note that despite the intensely difficult issues raised neither the Second nor Third Respondents have ever felt it necessary or appropriate to apply to the Court for approval of the prescription of PBs to children, even when those children are well below the age of 16. However, these safeguards do exist, and might in some circumstances be useful.

## Discrimination and the Equality Act 2010

111.    Mr Lock advances an argument that to place PBs into a special category of treatment that would require Court authorisation would amount to direct discrimination under the Equality Act 2010 and would therefore be incapable in law of justification. He submits that for this reason any requirement (or presumably practice) of needing Court authorisation for PBs would not be "in accordance with law" for the purposes of article 14 and thus would be discrimination under the Human Rights Act 1998. The

Respondents adopt this argument. Ms Morris also argues that it would amount to discrimination contrary to article 8 and 14 and thus the Human Rights Act.

112.    I asked Ms Butler-Cole to produce a note on this issue and I am very grateful to her for the two detailed notes that she (together with Mr Ruck Keene and Ms Apps) produced and have filed with the Court. It is apparent from the written submissions that I have received that this argument raises complex issues of discrimination law both under the Equality Act 2010 and the Human Rights Act 1998. It also appears to me that a very similar argument might be raised in the *Bell* appeal.

113.    Given that, for the reasons set out below, I have decided that there is no requirement or best practice obligation to seek Court authorisation where parental consent is given to PBs, anything that I say on the discrimination arguments would necessarily be obiter. Further, the issue has not been fully argued out before me in oral submissions. In those circumstances, I have decided it is best if I do not address the issue in this judgment.

**Conclusions**

114.    For the reasons set out above, I conclude that the parents' right to consent to treatment on behalf of the child continues even when the child is *Gillick* competent to make the decision, save where the parents are seeking to override the decision of the child.

115.    On the issue of whether PBs fall within a special category of treatment which requires the decision to come to Court, I will deal firstly with any legal requirement and then what good practice may require.

116.    The analysis of the caselaw shows that the cases supporting a special category of treatment of children which require Court approval are very limited. In fact, the only case where the Court has found a legal requirement to come to Court in respect of treatment of a child, where both parents consent, is Heilbron J in *Re D*, the case of a "non-therapeutic" sterilisation of an 11 year old. In all other contexts, including where the parental decision will lead to the child's life ending, the Court has imposed no such requirement. There are a range of cases where there does have to be Court approval, but this is where there is a clinical disagreement; possible alternative treatment of the medical condition in issue; or the decision is, in the opinion of clinicians, finely balanced. These are fact specific instances rather than examples of any special category of treatment where the Court's role is required simply because of the nature of the treatment.

117.    There is a much wider category of case concerning incapacitated adults, which is now encapsulated in the 2020 Court of Protection Guidance, but that merely exposes the critical difference between incapacitated adults and children. For children, their parents would normally be in a legal position to consent to treatment on their behalf. For incapacitated adults there is no such person and therefore the State has a protective function and the Court has a different legal role. The Court is not displacing some other person, namely the parents, with statutory and moral rights and duties.

118.    I rely heavily on the dicta set out above from many senior and highly eminent judges about the central role that parents must and should play in their children's lives and the fact that parents will, in the vast majority of cases, be the people who know their children best and who are best placed to make decisions about them. I agree with the

view expressed that judges do not necessarily know best, and that judges should be slow to displace the decision making role of committed and loving parents. That is not to say that there are not cases where the Court, acting in an independent way, may not be in a better position to make a decision than the parents. However, such cases will, as I set out below, arise in individual cases, not simply on the category of prescribing PBs to children.

119. It might be argued that in the light of the Divisional Court's analysis in *Bell,* PBs are sufficiently different from other forms of treatment to be treated differently. I accept that I am somewhat hampered by the fact that no party was putting this argument. The factors from *Bell* which would be relied upon in this regard would, I assume, be the poor evidence base for PBs; the lack of full and long term testing; the fact their use is highly controversial, including within the medical community; and the lifelong and life-changing consequences of the treatment, which in some ways are irreversible. The ratio of *Bell* is that a child is very unlikely to be in a position to understand and weigh up these factors.

120. However, the key difference from *Bell* is that parents are, in general, in a position to understand and weigh up these matters and consider what is in the long and short term best interests of their child. They are adults with full capacity and as the people who know their child best, and care for them the most, will be in a position to reach a fully informed decision. The evidence strongly suggests that XY's parents have fully considered these matters and come to a careful and informed decision.

121. In my view, the factors identified in *Bell*, which I fully agree with, do not justify removing the parental right to consent. The gravity of the decision to consent to PBs is very great, but it is no more enormous than consenting to a child being allowed to die. Equally, the essentially experimental nature of PBs should give any parent pause for thought, but parents can and do routinely consent on their child's behalf to experimental treatment, sometimes with considerable, including life-changing, potential side-effects. It is apparent from *Bell* that PBs raise unique ethical issues. However, adopting Lady Black in *NHS v Y*, I am wary of the Court becoming too involved in highly complex moral and ethical issues on a generalised, rather than case specific, basis.

122. I do have two points of particular concern about parents giving consent for PBs for children with Gender Dysphoria. The use of PBs for children with Gender Dysphoria raises unique and highly controversial ethical issues. The division of clinical and ethical views has become highly polarised. I have read the evidence of Professor Graham who refers to the studies supporting their use, but those studies themselves come from a very small group of institutions and it is not possible for me to assess the degree to which they have been peer reviewed or attract a consensus of support amongst the clinical and academic community. These are precisely the type of matters which are best assessed in a regulatory and academic setting and not through litigation.

123. This context for PBs gives rise to the two concerns. The first is that within the structure of the Second and Third Respondents, it may be that clinical difference and disagreement will not necessarily be fully exposed. The taking of strong, and perhaps fixed, positions as to the appropriateness of the use of PBs may make it difficult for a parent to be given a truly independent second opinion. However, in my view this is a matter for the various regulatory bodies, NHS England and the Care Quality

Commission, to address when imposing standards and good practice on the Second and Third Respondents.

124. It may well be that, given the particular issues involved, additional safeguards should be built into the clinical decision making, for example by a requirement for an independent second opinion. Any such requirement is a matter for the regulatory and oversight bodies and may be a matter considered by the Cass Review. My view is that this is likely to be a better safeguard for the very vulnerable children concerned rather than removing the ability in law of the parents giving consent. The clinical expert who gave the second opinion could then have a role in advising whether or not the particular case should be brought to Court.

125. My second particular concern is that of the pressure that may be placed by the children in issue upon their parents. Where a child has Gender Dysphoria and is convinced that s/he should be prescribed PBs, it is likely to be very hard for parents to refuse to consent. One does not have to be a child psychologist to appreciate the tensions that may arise within a family in this situation. I would describe this as "reverse pressure" and, although I have no evidence about it, it seems obvious that the problem could arise and the Second and Third Respondents are plainly alive to the issue.

126. However, the evidence in this case does not support any such finding in respect of XY's family. The Applicant and First Respondent have plainly thought long and hard about what is best for XY. There is no evidence that they feel forced to give consent, somewhat reluctantly, because XY has placed undue pressure upon them.

127. The pressure on parents to give consent is something that all the clinicians concerned are likely to be fully alive to. Ms Morris submitted that GIDS was very much aware of the issue, and that considerable efforts were made to ensure that there was a family-based range of consultations and that parents saw clinicians in private as well as with their children. If the clinicians, or indeed any one of them, is concerned that the parents are being pressured to give consent, then I have no doubt such a case should be brought to Court.

128. Equally, if the clinicians consider the case to be finely balanced, or there is disagreement between the clinicians, then the case should be brought to Court. However, I do not consider that these issues justify a general rule that PBs should be placed in a special category by which parents are unable in law to give consent.