GOVERNMENT
EXHIBIT

7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER, et al., | |
| Plaintiffs, | Case No. 2:22-cv-184-LCB-SRW |
| and | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Intervenor, | |
| v. | |
| KAY IVEY, in her official capacity as Governor of Alabama, et al. | |
| Defendants. | |

**EXPERT DECLARATION OF ARMAND H. ANTOMMARIA,
MD, PhD, FAAP, HEC-C**

1.      Counsel for the United States have retained me as an expert in connection with the above-captioned litigation.

2.      2022 Alabama Senate Bill 184 (SB 184) singles out for anomalous treatment certain medical interventions when these interventions are used for the purpose of gender transition, which I will refer to as gender-affirming medical care, criminalizing healthcare professionals who provide minors gender-affirming medical care or who refer minors for such care.

3.      The legislative findings in SB 184 do not provide a sound medical or ethical basis for criminalizing the provision of gender-affirming medical care to minors with gender dysphoria nor could they because a sound medical or ethical basis for criminalizing such care does not exist.

4.      I have actual knowledge of the matters stated in this declaration.  In preparing this declaration, I reviewed the materials listed in the attached Bibliography (Exhibit A), as well as  SB 184.  I may rely on those documents as additional support for my opinions.  I have also relied on my years of research and relevant experience, as set out in my curriculum vitae (Exhibit B), and on the materials listed therein.   The materials I have relied upon in preparing this declaration are the same types of materials that experts in medicine and bioethics regularly rely upon when forming opinions on the subject.  I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications, or in response to statements and issues that may arise in my area of expertise.

## BACKGROUND AND QUALIFICATIONS

5.      I hold the following positions at Cincinnati Children's Hospital Medical Center:  Director of the Ethics Center, Lee Ault Carter Chair of Pediatric Ethics, and Attending Physician in the Division of Hospital Medicine.  I am also a

Professor in the Departments of Pediatrics and Surgery at the University of Cincinnati College of Medicine.

6.     In 2000, I received both my medical degree from Washington University School of Medicine in St. Louis, Missouri and my PhD in Religious Ethics from The University of Chicago Divinity School.  I completed my Pediatrics residency at the University of Utah in 2003.

7.     I have been licensed to practice medicine since 2001 and am currently licensed to practice medicine in Ohio.  I have been Board Certified in General Pediatrics since 2004 and in Pediatric Hospital Medicine since the inception of this certification in 2019.  I have been certified as a Healthcare Ethics Consultant since the inception of this certification in 2019.

8.     I have extensive experience as a practicing pediatrician.  I have been in clinical practice since 2003 and approximately 30 percent of my current work is dedicated to caring for hospitalized patients.

9.     I also have extensive experience as a bioethicist.  Bioethicists examine the ethical issues that arise in medicine and the life sciences.  I was Chair of the Ethics Committee at Primary Children's Medical Center in Salt Lake City, Utah from 2005 to 2012 and have been Director of the Ethics Center at Cincinnati Children's Hospital Medical Center since 2012.  I consult on patients in the Transgender Health Clinic at Cincinnati Children's Hospital Medical Center whose

care presents unique ethical issues and participate in the Clinic's monthly multidisciplinary team meetings. I remain current with the medical and bioethics literature regarding the treatment of minors with gender dysphoria. I am also part of Cincinnati Children's Hospital Medical Center team that cares for patients born with intersex traits, also known as differences or disorders of sex development (DSD). I am also the Chair of Cincinnati Children's Hospital Medical Center Fetal Care Center's Oversight Committee, which provides the Center with recommendations regarding innovation and research.

10.    I am a member of the American Academy of Pediatrics (AAP), the American Society for Bioethics and Humanities (ASBH), the Association of Bioethics Program Directors, and the Society for Pediatric Research. I was a member of the AAP's Committee on Bioethics from 2005 to 2011. I served as a member of the ASBH's Clinical Ethics Consultation Affairs Committee from 2009 to 2014 and currently serve on its Healthcare Ethics Consultant Certification Commission.

11.    I am the author of 38 peer-reviewed journal articles, 11 non-peer-reviewed journal articles, 6 book chapters, and 26 commentaries. My peer-reviewed journal articles have been published in high-impact journals, including the *Journal of the American Medical Association* and *Annals of Internal Medicine.* I am also an

author of 17 policy statements and technical reports, including 4 as lead author, by the AAP.

12.     I am a member of the Executive Editorial Board and the Associate Editor for Ethics Rounds of *Pediatrics*. *Peditrics* is the AAP's flagship journal and Ethics Rounds is a type of article in which commentators analyze cases that raise ethical issues. I am an active peer reviewer for many medical journals, including the *American Journal of Bioethics* and the *Journal of Pediatrics*. I also review abstracts for meetings of professional organizations, including the Pediatric Academic Societies and ABSH. I was previously a member of the editorial boards of the *Journal of Clinical Ethics* and the *Journal of Medical Humanities*.

13.     I have prepared declarations as an expert witness in the following cases involving the provision of gender-affirming medical care to adolescents with gender dysphoria: *Brant v. Rutledge*, Case No. 4:21CV450-JM (E.D. Ark.), *Doe v. Abbott*, No. D-1-GN-22-000977, 2022 WL 628912 (Tex. Dist. 353rd Judicial District, March 2, 2022), and *Walker v. Marshall*, No. 2:22-cv-167-ECM-SMD (M.D. Ala.). In *Doe v. Abbott*, I testified in court as an expert witness. I am being compensated at an hourly rate of $250 per hour for preparation of expert declarations and reports, and $400 per hour for time spent preparing for or giving deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

**GENDER-AFFIRMING MEDICAL CARE IS CLINICAL CARE**

14.     The SB 184 legislative findings claim that the use of gonadotrophin releasing hormone (GnRH) agonists, colloquially known as puberty blockers, to treat gender dysphoria[1] are experimental and not approved by the U.S. Food and Drug Administration (FDA). These claims are inaccurate and irrelevant, respectively.

15.     Clinical practice and research are distinguished by their goals and methods.  The goal of clinical practice is to benefit individual patients, and its method is individualized decision-making. The goal of research is to contribute to generalizable knowledge, and its method uses formal protocols that describe the research study's objectives and procedures.  *See* National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research.* The Commission; 1978.

16.     The clinical use of puberty blockers to treat gender dysphoria is not research or experimentation.  The same is true for gender-affirming hormone treatment and mastectomies on transgender males (individuals assigned female at birth who identify as male) referred to at chest surgery.  When administering these

---

[1] Gender dysphoria is "a marked incongruence between one's experienced/expressed gender and their assigned gender" which is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."  American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders.* 5th ed. American Psychiatric Publishing; 2013.

treatments, clinicians seek to benefit individual patients and adjust the treatment based on individual patients' responses.

17.    To the extent the legislative findings use the term "experimental" to convey an absence of evidence for gender affirming medical care, that suggestion is baseless.  Gender affirming medical care is supported by clinical studies, evidence comparable to many other treatments in pediatrics, as detailed below.

18.    SB 184 not only criminalizes gender-affirming medical care as clinical care, but also criminalizes the provision of these interventions as research.  Such research is necessary, as it is in every area of medicine, to continue to advance treatment.

19.    The suggestion that because puberty blockers and gender-affirming hormone treatment are not approved by the FDA for the treatment of gender dysphoria they are therefore experimental or unsafe is misleading.  Off-label use of FDA-approved medications is legal, common, and often evidence-based.

20.    FDA approval is not required for all uses of a medication.  Once the FDA has approved a medication for one indication,[2] thereby agreeing that it is safe

---

[2] According to the FDA, an indication includes a number of factors:  the particular disease or condition or the manifestation or symptoms of the disease or condition for which the drug is approved; whether the drug is approved for treatment, prevention, mitigation, cure, or diagnosis; and the population, including age group, for which the drug is safe and effective.  Center for Drug Evaluation and Research and Center for Biologics Evaluation and Research, Food and Drug Administration,

(*i.e.*, its benefits outweigh its potential risks) and effective for this intended use, as is the case with the medications at issue here, prescribers are generally free to prescribe it for other indications.  U.S. Food & Drug Administration. Understanding unapproved use of approved drugs "off label." February 5, 2018. Accessed March 23, 2022.  https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label.      The American Academy of Pediatrics (AAP) Committee on Drugs states, "[i]t is important to note that the term 'off-label' does not imply an improper, illegal, contraindicated, or investigational use" and "[t]he administration of an approved drug for a use that is not approved by the FDA is not considered research and does not warrant special consent or review if it is deemed to be in the individual patient's best interest."

21.     The AAP Committee on Drugs further states "in no way does a lack of labeling signify that therapy is unsupported by clinical experience or data in children." Frattarelli DA, Galinkin JL, Green TP, et al. Off-label use of drugs in

---

U.S. Department of Health and Human Services. Inidcations and Usage Section of Labeling for Human Prescription Drug and Biological Products—Content and Format: Guidance for Industry. July 2018. Accessed April 29, 2022.  Available at https://www.fda.gov/files/drugs/published/Indications-and-Usage-Section-of-Labeling-for-Human-Prescription-Drug-and-Biological-Products-%E2%80%94-Content-and-Format-Guidance-for-Industry.pdf.  A medication approved for the treatment of asthma in adults whould, for example, be prescribed off label if used to treat a different disease, like pneumonia, or a different age group, like children.

children. *Pediatrics*. 2014;133(3):563-567.  Among the reasons for this is that, even if there is substantial evidence of safety and efficacy for a new indication, a sponsor may not seek FDA approval for it because doing so is not economically beneficial. Wittich CM, Burkle CM, Lanier WL. Ten common questions (and their answers) about off-label drug use. *Mayo Clin Proc*. 2012;87(10):982-990.

22.    "Off-label" use of drugs is common in many areas of medicine, including pediatrics.  For example, nafcillin, an antibiotic commonly used to treat children with invasive staphylococcal infections, such as lung or joint infections, lacks FDA approval in individuals under 18 years of age.  *See* Nafcillin Injection, USP.    February    2007.    Accessed    April    5,    2022.    Available    at https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/050655s017lbl.pdf.  A recent study of children's hospitals found that in 28.1% of encounters, at least one off-label drug was prescribed.  *See* Yackey K, Stukus K, Cohen D, Kline D, Zhao S, Stanley R. Off-label medication prescribing patterns in pediatrics: An update. *Hosp Pediatr*. 2019;9(3):186-193.  Examples of medications used off-label in this study included: albuterol, which is used to treat asthma; morphine, which is used to treat pain; and lansoprazole (Prevacid®), which is used to treat gastrointestinal reflux. The rate of off-label use may be significantly higher in certain age groups, categories of drugs, and clinical settings.

## THE SAFETY AND EFFICACY OF GENDER-AFFIRMING MEDICAL CARE IS SUPPORTED BY EVIDENCE

23.     The SB 184 legislative findings also incorrectly characterize gender-affirming medical treatment as new, unproven, and poorly studied.   Gender-affirming medical care is not new.  Hormone treatment for gender dysphoria began soon after estrogen and testosterone became commercially available in the 1930's. Stryker S. *Transgender History*. 2nd ed. Seal Press; 2017.  The use of puberty blockers to treat gender dysphoria in adolescents, while more recent, is not new.  The first reference to this treatment in the medical literature was in 1998, over twenty years ago.  Cohen-Kettenis PT, van Goozen SH. Pubertal delay as an aid in diagnosis and treatment of a transsexual adolescent. *Eur Child Adolesc Psychiatry*. 1998;7(4):246-248.  Prospective observational trials of puberty blockers began recruiting participants in 2000. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *J Sex Med*. 2011;8(8):2276-2283

24.     Gender-affirming medical care of adolescents with gender dysphoria is also neither poorly studied nor unproven.  The major categories of studies used to evaluate innovative treatments are observational studies, which include cross-sectional and longitudinal studies, and randomized trials.  In cross-sectional studies, investigators collect data at a single point in time.  Cross-sectional design permits investigators to examine potential associations between factors, but it cannot prove

one factor caused the other.  In longitudinal studies, researchers follow individuals over time, making continuous or repeated measures.  In a randomized trial, participants are randomly assigned to a treatment or a comparison group.  Neither the investigators nor the participants know to which group the participant is assigned.  The major benefit of a randomized trial is that it decreases the likelihood that any differences in the outcomes between the groups is the result of baseline differences between the groups rather than the result of the intervention.  Guyatt G, Rennie D, Meade MO, et al., eds. *Users' Guide to the Medical Literature: A Manual for Evidence-Based Clinical Practice*. 3rd ed. McGraw Hill Education; 2015; Perry-Parrish C, Dodge R. Research and statistics: Validity hierarchy for study design and study type. *Pediatr Rev*. 2010;31(1):27-29.

25.    While randomized controlled trials are described in the medical literature as "high quality" evidence and observational studies as "low quality" evidence, randomized controlled trials may not be feasible or ethical, may have intrinsic methodological limitations, or may be unavailable in some contexts.  "Low quality" evidence can be sufficient to justify treatment recommendations.  *See* Swiglo BA, Murad MH, Schunemann HJ, et al. A case for clarity, consistency, and helpfulness: State-of-the-art clinical practice guidelines in endocrinology using the Grading of Recommendations, Assessment, Development, and Evaluation System. *J Clin Endocrinol Metab*. 2008;93(3):666-673.  For example, the Endocrine Society

recommends that "clinicians prescribe and support the reduction of inactivity and also a minimum of 20 minutes of moderate to vigorous physical activity daily, with a goal of 60 minutes, all in the context of a calorie-controlled diet" to treat obesity. This recommendation is based on "low quality" evidence. Styne DM, Arslanian SA, Connor EL, et al. Pediatric obesity-assessment, treatment, and prevention: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(3):709-757.

26.     It may, at times, be unethical to conduct randomized trials. For randomized trials to be ethical, clinical equipoise must exist; that is, there must be uncertainty about whether the efficacy of the intervention or the control is greater. It would be unethical to knowingly expose some trial participants to an inferior intervention.   Trials must also be feasible.   It would be unethical to expose individuals to the risks of trial participation without the benefit of the trial generating generalizable knowledge.  A randomized trial that is unlikely to find enough people to participate because they believe they might be randomized to an inferior intervention would be unethical because it could not generate generalizable knowledge due to an inadequate sample size.  *See* Emanuel EJ, Wendler D, Grady C. What makes clinical research ethical? *JAMA*. 2000;283(20):2701-2711.

27.     The use of puberty blockers to treat gender dysphoria is supported by prospective observational trials including: Delemarre-van de Waal HA, Cohen-

Kettenis PT. Clinical management of gender identity disorder in adolescents: A protocol on psychological and pediatric endocrinology aspects. *Eur J Endocrinol.* 2006;155(suppl 1):S131–S137; de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *J Sex Med.* 2011;8(8):2276-2283; and de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics.* 2014;134(4):696-704.

28.     Gender-affirming hormone therapy to treat gender dysphoria is also supported by prospective observational trails.  These trials include de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics. 2014;134(4):696-704.

29.     There are also ongoing federally funded prospective observational trials of gender-affirming healthcare for adolescents with gender dysphoria in the U.S., trials that SB 184 would criminalize in Alabama.  *See* National Institutes of Health RePORTER, The impact of early medical treatment in transgender youth. Accessed January                                    21,                                        2022. https://reporter.nih.gov/search/lGJnh68uokiic97N2X00kA/project-details/8965408; Olson-Kennedy J, Chan YM, Garofalo R, et al. Impact of early

medical treatment for transgender youth: Protocol for the longitudinal, observational trans youth care study. *JMIR Res Protoc*. 2019;8(7):e14434.

30.     Under the applicable ethical standards, randomized, placebo-controlled trials (trials that compare pharmacological treatment to no pharmacological treatment) in gender dysphoria are currently unethical.  Potential investigators do not have equipoise between pharmacological treatment and no pharmacological treatment; they believe that pharmacological treatment is superior.  It is also highly unlikely that enough participants would enroll in randomized controlled trials for them to be informative.  *See* Chew D, Anderson J, Williams K, May T, Pang K. Hormonal treatment in young people with gender dysphoria: A systematic review. *Pediatrics*. 2018;141(4):e20173742; Reisner SL, Deutsch MB, Bhasin S, et al. Advancing methods for US transgender health research. *Curr Opin Endocrinol Diabetes Obes*. 2016;23(2):198-207.

31.     Even if randomized, placebo-controlled trials of gender-affirming health care were ethical, they would provide a lower quality of evidence because of intrinsic limitations in their design.  For example, it would be impossible to "blind" the investigators or the participants to whether the participants were receiving the active treatment or a placebo.  They would know if they were in the intervention or control arm of the study due to the physical changes in their bodies, or the lack thereof, over time.  This might bias their perception of the outcomes.  Atkins D, Best

D, Briss PA, et al. Grading quality of evidence and strength of recommendations. *BMJ*. 2004;328(7454):1490.

32.     In the field of pediatrics, parents and their children often must make decisions about medical care without the benefit of randomized trials.   Clinical research focusing on children is less likely to use randomized trials than is clinical research for adults.   Reasons for this disparity include the low prevalence of childhood disease or conditions, small market share for therapeutic agents in children, low level of National Institutes of Health funding, and difficulty enrolling children in research.   *See* Martinez-Castaldi C, Silverstein M, Baucher H. Child versus adult research: The gap in high-quality study design. *Pediatrics*. 2008;122(1):52-57.

33.     One directly relevant example of a widely accepted treatment based on prospective observational trials is the use of puberty blockers to treat central precocious puberty.   Central precocious puberty is the premature initiation of puberty, before age 8 in people assigned female at birth and before age 9 in people assigned male, by the central nervous system.   Its negative effects include impairment of final adult height as well as antisocial behavior and lower academic achievement.   There are no randomized trials evaluating the adult height of treated and untreated individuals.   Most studies are observational and compare pretreatment predicted and actual final height.   These studies have additional limitations including

small sample sizes.  This "low quality" evidence is nonetheless sufficiently strong to support the use of GnRH agonists as the standard of care for treatment of central precocious puberty.  *See* Mul D, Hughes IA. The use of GnRH agonists in precocious puberty. *Eur J Endocrinol*. 2008;159(Suppl 1):S3-8.

34.    Professional medical organizations develop evidence-based clinical practice guidelines to provide clinicians with helpful, evidence-based recommendations and improve patient care and outcomes.  Organizations develop guidelines using systematic processes to select and review scientific evidence. Guidelines typically rate the quality of the evidence and grade the strength of recommendations.  American Academy of Pediatrics Steering Committee on Quality Improvement and Management. Classifying recommendations for clinical practice guidelines. *Pediatrics*. 2004;114(3):874-877; Atkins D, Best D, Briss PA, et al. Grading quality of evidence and strength of recommendations, *BMJ*. 2004;328(7454):1490.

35.    The Endocrine Society, an international medical organization of over 18,000 endocrinology researchers and clinicians, has published a clinical practice guideline for the treatment of gender-dysphoric (GD)/gender-incongruent persons, which may include pubertal suppression, gender-affirming hormone therapy, and gender-affirming surgery.  The guideline both rates the quality of the supporting evidence and grades the strength of its recommendations.  It recommends both the

use of puberty blockers and gender-affirming hormone therapy to treat gender dysphoria in adolescents based on the best available evidence. The guideline recommends delaying gender-affirming genital surgery that removes the testicles, ovaries, and/or uterus until adulthood. *See* Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903; *see also* World Professional Organization for Transgender Health. *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, Version 7. World Professional Association for Transgender Health (WPATH); 2012.

36.    Recommendations for pediatric care made by professional associations in guidelines are seldom based on well-designed and conducted randomized controlled trials due to their rarity and are frequently based on observational studies or, if such studies are unavailable, expert opinion. The medical use of the term "expert opinion" in this context differs from what I understand to be the use of this term in legal contexts. It refers to the consensus of experts in the field when studies are not available.

37.    For example, none of the Endocrine Society's 84 recommendations in two of its other guidelines that focus on the pediatric population—guidelines on pediatric obesity and congenital adrenal hyperplasia—is based on "high quality"

evidence.  Twenty-four (29%) of the recommendations are based on "moderate," and 49 (58%) on "low" or "very low quality" evidence.  The remaining recommendations (11, 13%) are Ungraded Good Practice Statements.  Table 1 (Exhibit C).  See Speiser PW, Arlt W, Auchus RJ, et al. Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2018;103(11):4043-88; Styne DM, Arslanian SA, Connor EL, et al. Pediatric obesity-assessment, treatment, and prevention: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(3):709-757.

38.    Guidelines issued by other professional associations concerning pediatric medical care are similar.  For example, of the 130 recommendations in the American Heart Association's guideline for Pediatric Basic and Advanced Life Support, only 1 (1%) is based on "high-quality evidence from more than 1 [randomized clinical trial]" and 3 (3%) on "moderate-quality evidence from 1 or more [randomized clinical trials]."  The remainder of the recommendations were based on lower quality evidence.  Topjian AA, Raymond TT, Atkins D, et al. Part 4: Pediatric basic and advanced life support: 2020 American Heart Association guidelines for cardiopulmonary resuscitation and emergency cardiovascular care. *Circulation*. 2020;142(16_suppl_2):S469-S523.    As reflected in medical professional associations' guidelines, medical treatment in pediatrics is infrequently

based on "high" quality evidence and commonly based on lower quality evidence, including observational studies.

## PARENTS AND LEGAL GUARDIANS ARE CAPABLE OF PROVIDING INFORMED CONSENT FOR GENDER-AFFIRMING MEDICAL CARE

39.     SB 184 also incorrectly asserts that minors and their parents are unable to comprehend and fully appreciate the risks and life implications of gender-affirming health care.

40.     First and foremost, parents or legal guardians generally must provide informed consent for medical treatment for minors, including gender-affirming medical care.  There is no evidence cited in support of the assertion that parents of adolescents with gender dysphoria are unable to comprehend and fully appreciate the implications of gender-affirming medical care.  Parents or legal guardians are frequently asked to consent to medical treatments for minors with comparable risks, uncertainty, or levels of evidence.  Limitations in adults' ability to predict what will contribute to satisfaction in the future, called affective forecasting, is not unique to decisions regarding gender-affirming medical care.   And there are approaches healthcare providers use to improve affective forecasting.  Wilson TD, Gilbert DT. Affective forecasting: Knowing what to want. *Curr Dir Psychol Sci.* 2005;14(3):131-134;  Halpern J, Arnold RM.  Affective forecasting:  An unrecognized challenge in making serious health decisions. *J Gen Intern Med*. 2008;23(10):1708-1712.

41.     Adolescents generally possess comparable medical decision-making capacity to adults.  Louis A. Weithorn and Susan B. Campbell, for example, found that 14-year-olds performed similarly to adults with respect to their ability to understand and reason about treatment information.  Weithorn LA, Campbell SB. The competency of children and adolescents to make informed treatment decisions. *Child Dev*. 1982;53(6):1589-1598.  There is evidence that most adolescents with gender dysphoria have sufficient medical decision-making capacity to make decisions regarding puberty blockers.  Vrouenraets L, de Vries ALC, de Vries MC, van der Miesen AIR, Hein IM. Assessing medical decision-making competence in transgender youth. *Pediatrics*. 2021;148(6): e2020049643. Similar to the aforementioned approaches to improve adult's affective forecasting, there are steps that healthcare providers take to promote adolescents' decision-making capacity. Katz AL, Webb SA, Committee on Bioethics. Informed consent in decision-making in pediatric practice. *Pediatrics*. 2016;138(2):e20161485.

42.     The current standard of care for treating gender dysphoria in minors is consistent with general ethical principles instantiated in the practices of informed consent and shared decision-making.  The Endocrine Society clinical practice guideline extensively discusses the potential benefits, risks, and alternatives to gender-affirming medical care, and its recommendations regarding the timing of interventions are based in part on the treatment's potential risks and the adolescent's

decision-making capacity.  The guideline recommends that informed consent for pubertal blockers and gender-affirming hormones include a discussion of the implications for fertility and options for fertility preservation.  The Endocrine Society clinical guideline also advises delaying gender-affirming hormone treatment, which results in partly irreversible physical changes until an adolescent has has developed sufficient medical decision-making capacity.  The guideline states clinicians should individualize decision-making for breast or chest surgery in transgender males and that chest surgery may be considered in individuals under 18 years old.  *See* Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

## SB 184 SINGLES OUT GENDER-AFFIRMING MEDICAL CARE FOR ANOMALOUS TREATMENT

43.    SB 184's legislative findings do not provide a sufficient basis for criminalizing and singling out for anamolous treatment the provision of gender-affirming healthcare to adolescents with gender dysphoria.  For example, as previously mentioned, SB 184 permits the use of puberty blockers to treat central precocious puberty, but criminalizes the use of puberty blockers to treat gender dysphoria, even though using puberty blockers in connection with both conditions has comparable risks and is supported by comparable types of evidence.

44.     Additionally, while SB 184 would prohibit chest surgery on transgender males, minors are permitted to undergo many comparable surgeries, such as those for gynecomastia, pectus excavatum or carinatum, and breast reconstruction.  Gynecomastia is the proliferation of ductal or glandular breast tissue, as opposed to adipose tissue or fat, in individuals whose sex assigned at birth is male.  Pectus excavatum and carinatum are chest wall anomalies in which the sternum is depressed or protrudes, respectively.  While surgeries to treat these conditions, as well as breast reduction and augmentation for individuals whose sex assigned at birth and gender identity are female, may at times be performed to lessen physical symptoms, such as pain or exercise intolerance, they are commonly performed to reduce psychosocial distress.  Gynecomastia and breast augmentation surgery affirm patients' gender identity, that is, to respectively help someone assigned male at birth feel more typically masculine and someone assigned female at birth feel more typically feminine.  Risks of these procedures include bleeding, infection, scarring and poor cosmetic outcome, loss of sensation, and impaired breast/chest feeding.  Some surgeries have unique risks such as catastrophic perforations of the heart or lungs in some forms of pectus repair, or capsule formation around a breast implant causing hardening and pain.  *See* Buziashvili D, Gopman JM, Weissler H, et al. An evidence-based approach to management of pectus excavatum and carinatum. *Ann Plast Surg.* 2019;82(3):352-358; Nordt CA,

DiVasta AD. Gynecomastia in adolescents. *Curr Opin Pediatr*. 2008;20(4):375-382; Zuckerman D, Abraham A. Teenagers and cosmetic surgery: Focus on breast augmentation and liposuction. *J Adolesc Health*. 2008;43(4):318-324.

45.    As these examples of chest surgeries in adolescents illustrate, surgeries for minors can require weighing short- and long-term effects, benefits, and risks in the face of uncertainty.  Individual needs shape these evaluations and, therefore, the adolescents' participation is essential.  There is nothing unique about chest surgery for gender dysphoria that justifies singling out this and other medical treatments for gender dysphoria for a criminal prohibition based on a concern for adolescents' inability to assent or parents or guardians' inability to consent.  As with other medical decisions for adolescents, medical decisions regarding treatment for gender dysphoria should continue to be left to the discretion of transgender adolescents, their parents or guardians, and their healthcare providers.

46.    Ironically, while SB 184 criminalizes gender-affirming medical care for youth with gender dysphoria in the name of protecting vulnerable children, the statute expressly allows doctors to perform irreversible surgeries on infants and children with intersex conditions or differences or disorders of sex development (DSD) at ages when they are unable to meaningfully participate in medical decision making.  Such surgeries are highly controversial when performed at such an early age and can result in life-long complications and side effects.  *See* Frader J, Alderson

P, Asch A, et al. Health care professionals and intersex conditions, *Arch Pediatr Adolesc Med*. 2004;158(5):426-428.

## CONCLUSIONS

47.     The Endocrine Society's recommendations for treating  adolescents with gender dysphoria with pubertal suppression, gender-affirming hormones, and chest surgery are well within the range of other decisions that adolescents and their parents or guardians in Alabama have the discretion to make.  Based on my research and experience as a pediatrician and bioethicist, there is no sound medical or ethical basis to criminalize this care.  Doing so puts clinicians in the untenable position of having to either follow state law and knowingly harm their patients, or face penalties including imprisonment and loss of their medical licenses.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed: April 29, 2022     ARMAND H. MATHENY ANTOMMARIA, MD, PhD