## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on behalf
of her minor son, MICHAEL BOE; JAMES
ZOE, individually and on behalf of his minor
son, ZACHARY ZOE; MEGAN POE,
individually and on behalf of her minor
daughter, ALLISON POE; KATHY NOE,
individually and on behalf of her minor son,
CHRISTOPHER NOE; JANE MOE, Ph.D.;
and RACHEL KOE, M.D.,

     *Plaintiffs*,

v.

KAY IVEY, in her official capacity as
Governor of the State of Alabama; STEVE
MARSHALL, in his official capacity as
Attorney General of the State of Alabama;
DARYL D. BAILEY, in his official capacity
as District Attorney for Montgomery County;
C. WILSON BAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her official
capacity as District Attorney for Lee County;
TOM ANDERSON, in his official capacity as
District Attorney for the 12th Judicial Circuit;
and DANNY CARR, in his official capacity
as District Attorney for Jefferson County,

    *Defendants*.

Civil Action No.
2:22-cv-00184- LCB

Hon. Liles C. Burke

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER AND
## <u>PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  ARGUMENT ........................................................................................2

    **A.**   The Parent Plaintiffs Are Likely To Succeed on Their Due
    Process Claim ...................................................................................2

    **B.**   Plaintiffs Are Likely To Succeed on Their Equal Protection
    Claim. ..............................................................................................8

        1.   The Act Is Subject to Heightened Scrutiny Because It
        Creates a Sex-Based and Transgender Classification. ....................8

            a.   The Act Discriminates Against Transgender Minors ..............8

            b.   Transgender Status Is a Suspect Classification
            Warranting Heightened Scrutiny ...........................................11

        2.   The State's Justifications Fail Heightened Review. ......................14

            a.   Defendants Fail to Justify a Ban on Medical Treatments
            for Transgender Minors in the Face of a Widespread
            Medical Consensus Supporting the Treatments. ....................14

            b.   Defendants' Arguments Concerning Instances of
            Treatment that Did Not Follow the Accepted Standards
            of Care Does Not Justify a Categorical Ban on
            Treatments. ............................................................................16

            c.   Gender Dysphoria Does Not Resolve Without
            Treatment in the Vast Majority of Cases. ..............................18

            d.   There Is No Reliable Evidence To Support Defendants'
            Argument Regarding "Social Contagion." .............................20

            e.   Defendants' Attack on Longstanding and Authoritative
            Medical Protocols Rests on Misstatements About
            Medical Evidence. ................................................................23

f.   Any So-Called "International Reckoning" Relating to the Provision of Puberty Blockers and Hormones for Adolescents Cuts Against a Ban on Medical Care.................24

g.   Alabama Cannot Justify the Ban by Concerns About So-Called Rush to Treatment for Transgender Minors..........25

C.   The Affordable Care Act Preempts the Act Because a Genuine Conflict Arises with Compliance by Healthcare Providers..................28

D.   Plaintiffs Are Likely To Succeed on the Merits of Their First Amendment Claim. ...................................................................33

E.   The Act is Unconstitutionally Vague. ....................................37

F.   The Other Factors Weigh in Favor of a Preliminary Injunction...........45

1.   Plaintiffs Have Diligently Pursued a Preliminary Injunction. .......45

2.   Plaintiffs Have Shown Irreparable Harm......................................47

G.   The Court Should Not Require a Bond....................................49

III.   CONCLUSION ...............................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC Charters, Inc. v. Bronson*,
  591 F. Supp. 2d 1272 (S.D. Fla. 2008)..............................................47

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) (en banc).........................................4, 6

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)..................................................................28, 29

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)........................................................................35

*Auburn Univ. v. Moody*,
  No. 3:08cv796-CSC (WO), 2008 WL 4767721 (M.D. Ala. Oct. 30, 2008) ...........................................................................................53

*Bell v. Tavistock & Portman NHS Found. Trust*, [2021] EWCA (Civ) 1363 (Eng.& Wales) .............................................................24, 25, 26

*Bendiburg v. Dempsey*,
  909 F.2d 463 (11th Cir. 1990) .......................................................4, 5

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020)..........................................................10, 29, 30

*Boyden v. Conlin*,
  341 F. Supp. 3d 979 (W.D. Wis. 2018) ...............................................30

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*,
  536 F. Supp. 3d 791 (W.D. Wash. 2021) .............................................30

*California Fed. Sav. & Loan Ass'n v. Guerra*,
  479 U.S. 272 (1987)........................................................................29

*Carter v. Montgomery Hous. Auth.*,
    No. 2:09-cv-971-MEF-CSC, 2009 WL 3711565 (M.D. Ala. Nov.
    3, 2009) ......................................................................................................51

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)........................................................................................43

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)......................................................................................12

*Coates v. Cincinnati*,
    402 U.S. 611 (1971)......................................................................................44

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) .......................................................................36

*Corrigan Dispatch Co. v. Casa Guzman, S. A.*,
    569 F.2d 300 (5th Cir. 1978) .......................................................................49

*Craig v. Boren*,
    429 U.S. 190 (1976)........................................................................................9

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011) .....................................................................51

*Entertainment Ventures, Inc. v. Brewer*,
    306 F. Supp. 802 (M.D. Ala. 1969).............................................................42

*Flack v. Wis. Dep't of Health Servs.*,
    395 F. Supp. 3d 1001 (W.D. Wis. 2019) .....................................................30

*Frese v. MacDonald*,
    425 F. Supp. 3d 64 (D.N.H. 2019)...............................................................41

*Friends of the Earth, Inc. v. Brinegar*,
    518 F.2d 322 (9th Cir. 1975) .......................................................................53

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)......................................................................................11

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)......................................................................................39

*Grimm v Gloucester County Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ...........................................................12, 13, 14, 30

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ............................................................................52

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)............................................................................................42, 43

*International Controls Corp. v. Vesco*,
    490 F.2d 1334 (2d Cir. 1974) ...........................................................................52

*Johnson v. United States*,
    576 U.S. 591 (2015)...........................................................................................40

*Jones v. Governor of Fla.*,
    975 F.3d 1016 (11th Cir. 2020) .........................................................................39

*Kanuszewski v. Mich. Dep't of Health & Human Serv's*,
    927 F.3d 396 (6th Cir. 2019) ..........................................................................2, 4

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ...........................................................................10

*Kolender v. Lawson*,
    461 U.S. 352 (1983)............................................................................................43

*Lipsett v. Univ. of Puerto Rico*,
    864 F.2d 881 (1st Cir. 1988)...............................................................................30

*Maloney v. Soc. Sec. Admin.*,
    517 F.3d 70 (2d Cir. 2008) .................................................................................30

*Murray v. New York Univ. Coll. of Dentistry*,
    57 F.3d 243 (2d Cir. 1995) .................................................................................29

*Nguyen v. I.N.S.*,
    533 U.S. 53 (2001)..............................................................................................11

*O'Connor v. Peru State Coll.*,
    781 F.2d 632 (8th Cir. 1986) .............................................................................30

*Obergefell v. Hodges*,
   576 U.S. 644 (2015)................................................................30

*Olmstead v. L.C. ex rel. Zimring*,
   527 U.S. 581 (1999)................................................................30

*Papachristou v. City of Jacksonville*,
   405 U.S. 156 (1972)................................................................43

*Parham v. J.R.*,
   442 U.S. 584 (1979)................................................................4, 7

*Phillips v. Martin Marietta Corp.*,
   400 U.S. 542 (1971)................................................................10

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925)................................................................4

*Posters 'N' Things v. U.S.*,
   511 U.S. 513 (1994)................................................................41

*Prescott v. Rady Children's Hosp.-San Diego*,
   265 F. Supp. 3d 1090 (S.D. Cal. 2017)..................................30

*R.J.D. v. Vaughan Clinic, P.C.*,
   572 So. 2d 1225 (Ala. 1990)...................................................5

*Robinson v. Marshall*,
   415 F. Supp. 3d 1053 (M.D. Ala. 2019)..................................51

*Robinson v. Marshall*,
   454 F. Supp. 3d 1188 (M.D. Ala. 2020)..................................50

*Ron Group, LLC v. Azar*, No.
   2:20-cv-1038-ECM, 2021 WL 5576616 (M.D. Ala. Nov. 29, 2021) ...............50

*San Antonio Independent School Dist. v. Rodriquez*,
   411 U.S. 1 (1973)..................................................................3

*SCM Corp. v. Xerox Corp.*,
   76 F.R.D. 214 (D. Conn. 1977) .............................................30

*Scott v. St. Louis Univ. Hosp.*,
No. 21-cv-1270, 2022 U.S. Dist. LEXIS 74691 (E.D. Mo. Apr. 25, 2022) ................................................................................................30

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018) ...................................................................39

*Smith v. City of Jackson*,
544 U.S. 228 (2005) ........................................................................30

*Smith v. Goguen*,
415 U.S. 566 (1974) .................................................................41, 43

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ........................................................................34

*State v. Hodges*,
457 P.2d 491 (Ore. 1969) ...............................................................42

*Summit Med. Ctr. of Ala., Inc. v. Siegelman*,
227 F. Supp. 2d 1194 (M.D. Ala. 2002) .........................................52

*Temple Univ. v. White*,
941 F.2d 201 (3d Cir. 1991) ...........................................................51

*Tokyo Gwinnett, LLC v. Gwinnett County, Ga.*,
940 F.3d 1254 (11th Cir. 2019) ......................................................47

*Tovar v. Essentia Health*,
342 F. Supp. 3d 947 (D. Minn. 2018)..............................................30

*Troxel v. Granville*,
530 U.S. 57 (2000).............................................................................2

*United States v. Matus-Leva*,
311 F.3d 1214 (9th Cir. 2002) ........................................................43

*United States v. Stevens*,
559 U.S. 460 (2010)..............................................................35, 37, 38

*United States v. Williams*,
553 U.S. 285 (2008).................................................................35, 39

*Verizon Emp. Benefits Comm. v. Respress*,
   No. 1:14-cv-155-MEF, 2014 WL 2275504 (M.D. Ala. Mar. 24,
   2014) ........................................................................................................50

*Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982)..................................................................................40

*Whalen v. Roe*,
   429 U.S. 589 (1977).....................................................................................3

*Wollschlaeger v. Governor of Florida*,
   848 F.3d 1293 (11th Cir. 2017) .............................................................34

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) .............................................................45

*Younger v. Harris*,
   401 U.S. 37 (1971)....................................................................................47

**Statutes**

42 U.S.C. § 18041(d) ....................................................................................31

42 U.S.C. § 18116(a) ....................................................................................33

Affordable Care Act 42 U.S.C. § 18001, et seq. (2010).........................28

ALA. CODE § 13A-2-4(b) ...........................................................................41

ALA. CODE § 27-1-10.1(c)(1).....................................................................23

Alabama Vulnerable Child Compassion and Protection Act ....................1

**Other Authorities**

U.S. Const, Amend. I ..........................................................................*passim*

45 C.F.R. § 80.13(f) .....................................................................................32

Fed. Rule Civ. P 65(c)............................................................................49, 52

Black's Law Dictionary (11th ed. 2019) ...................................................38

New Shorter Oxford English Dictionary, Vol I (ed. 1993) ................38, 42

## I.    INTRODUCTION

No other state has ever passed a law like the Alabama Vulnerable Child Compassion and Protection Act (the Act), and for good reason. The Act takes the unprecedented step of taking away the opportunity for parents to obtain well-established medical care for their children. Youth who suffer from gender dysphoria experience debilitating distress due to the mismatch between their birth sex and their deep-seated internal sense of being male or female. This case is about ensuring that those parents who wish to do so can obtain a particular course of treatment that can be effective for many children who suffer from this medical condition.

Plaintiffs do not seek to impose this treatment on all parents, but rather simply to ensure that parents can consult with medical providers about the full range of options for their children's medical needs. The State, against the great weight of medical authority, seeks to demonstrate that medical care that has been available for decades and is widely regarded as safe and effective by experts in this field is in fact of such questionable value that it should be not only banned but criminalized. Given how widely accepted these treatments are, and their broad endorsement by major U.S. medical professional associations, Defendants point to the recent tightening of eligibility standards for treating minors with gender dysphoria in European countries, all of which continue to allow minors in appropriate circumstances to get the care that is banned by the Act. Defendants also rest their defense of the Act on

speculative, hypothetical, and non-evidence-based arguments, none of which justifies the criminalization of this care.

Plaintiffs seek a preliminary injunction to ensure that minor children who are receiving and benefitting from this care are not harmed by the immediate cessation of their medical treatment and that their parents and providers are not criminally prosecuted for providing it.

## II.    ARGUMENT

### A.    The Parent Plaintiffs Are Likely To Succeed on Their Due Process Claim.

The right to seek medical care for one's child is an established aspect of parents' fundamental interest "in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Kanuszewski v. Mich. Dep't of Health & Human Serv's*, 927 F.3d 396, 419 (6th Cir. 2019) ("[P]arents' substantive due process right to make decisions concerning the care, custody, and control of their children includes the right to direct their children's medical care."). As Plaintiffs have shown, the Act burdens this fundamental right in a particularly heavy-handed way—by criminalizing parents who seek medically accepted treatments for their transgender children. Plaintiffs are likely to prevail on this claim because the Act's sweeping ban on transition-related care is not rationally related, much less narrowly tailored, to serve its stated goal of protecting youth.

2

Defendants' attempts to rebut this claim have no merit. Contrary to Defendants' argument, Plaintiffs do not assert this fundamental right as third parties or surrogates on behalf of their children, nor is the right "derivative" of an underlying claim on behalf their children. Opp. (Doc. 74) at 107. Defendants cite *Whalen v. Roe*, 429 U.S. 589 (1977), for the proposition that "[t]he parent's parental-rights claim is 'derivative from, and therefore no stronger than' the child's claim," Opp. at 107, but the cited language in *Whalen* refers to a doctor seeking to vindicate not his own rights, but those of his patients to medical privacy. *Whalen,* 429 U.S. at 604. For that reason, the Court held that the doctor's claim was "derivative from, and therefore no stronger than, the patients.'" *Id*. In contrast, the Parent Plaintiffs assert *their own* fundamental rights as parents to seek medical care for their children.

Defendants argue that no such independent right exists, and that Plaintiffs' parental rights claim implicitly—and erroneously—presumes that their children have an underlying right to specific medical treatments. Opp. at 104–06. In fact, however, parents' fundamental right to seek medical care for their children stands on its own. By way of analogy, the U.S. Supreme Court has held that children do not have a fundamental constitutional right to a public education under the Fourteenth Amendment's Due Process Clause. *San Antonio Independent School Dist. v. Rodriquez*, 411 U.S. 1 (1973). Nonetheless, the Court has held that parents have a fundamental right to determine whether their child attends a public or private school.

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925). Similarly, as Defendants note, some lower federal courts have rejected the argument that children or adults have a substantive due process right to specific treatments. *See, e.g.*, *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710 n.18 (D.C. Cir. 2007) (en banc). Nonetheless, both the Supreme Court and the Eleventh Circuit, as well as other federal courts, have held that parents have a fundamental right to seek medical care for their children. *Parham v. J.R.*, 442 U.S. 584 (1979); *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990); *Kanuszewski,* 927 F.3d at 419. In these cases, a parent's fundamental right to make decisions about a child's education or medical care exists regardless of whether the child has a fundamental right to education or medical treatment.

In *Parham*, the U.S. Supreme Court held that parents have a fundamental right to make decisions about their children's medical care. 442 U.S. at 602. Contrary to Defendants' claim, *Parham* is both a substantive and procedural due process case. As the Court stated, "parents generally 'have the right,' coupled with the high duty, to recognize and prepare [their children] for additional obligations" including "a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id*. (citing *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923)); *see also Parham*, 442 U.S. at 604 (stating that parents

generally have "plenary authority to seek . . . care for their children, subject to a physician's independent examination and medical judgment").

Similarly, the Eleventh Circuit has recognized "the right of parents to generally make decisions concerning the treatment to be given to their children." *Bendiburg*, 909 F.2d at 470. That right is deeply rooted in our nation's history and culture, which have long recognized that parents, not the state, have the primary duty and authority to provide medical care for their children. That right was embedded in the common law and is now reflected in the statutory and constitutional law of Alabama and other states. *See, e.g.*, *R.J.D. v. Vaughan Clinic, P.C.*, 572 So. 2d 1225, 1227 (Ala. 1990) ("Alabama has long recognized the principle that parents are, by the common law, under the legal duty of providing medical attention for their children," and "[i]t is ordinarily for the parent in the first instance to decide . . . what is actually necessary for the protection and preservation of the life and health of his child[.]").

Defendants' attempt to recast Plaintiffs' claim as an asserted right to access "experimental medical procedures," Opp. at 107, fails. Defendants do not, and cannot, dispute that the treatments banned by the Act are accepted and recommended by every leading medical and mental health organization in this country, from the American Medical Association to the American Academy of Pediatrics. Rosenthal Decl., Doc. 8-3 ¶ 30. Defendants may disagree with that mainstream medical

consensus, but their disagreement does not alter its existence or transform these treatments, by fiat, into "experimental procedures." When parents consent to transition-related care for a transgender child, they are consenting to established care supported by the same level of evidence as many other widely-accepted treatments for minors. Pls.' Mem. at 13, 26; Antommaria Decl., Doc. No. 62-2 ¶¶ 17, 23–39. There is no reasonable definition of "experimental" that encompasses these treatments, and Defendants have not offered one.

This case is not like *Abigail Alliance for Better Access to Developmental Drugs*, where plaintiffs sought an exception to safety regulations that limited access to experimental medications. 495 F.3d 695. Here, Plaintiffs are seeking care that has been provided for many years, regarded as safe and effective by both specialists in the field and the nation's leading medical and mental health organizations. Plaintiff Parents seek these treatments because they have witnessed their children suffering from gender dysphoria, and the Plaintiffs whose children have received the treatments have seen the relief these treatments provide. They have observed their children change from being withdrawn, anxious, depressed, and even suicidal to being happy, sociable, and able to function well at school and in everyday life. Not only do they have direct experience of the benefits these treatments provide; they know the harm their children will suffer if they are cut off from this care. Stripping

these parents of their ability to seek out and follow the medical advice of experts in this field is a severe intrusion on their parental rights.

As a matter of constitutional law, parents are presumed to be acting in the best interest of their children. *Parham*, 442 U.S. at 602. The parents in this case—like any other parents—are entitled to that constitutional presumption. They are loving, responsible, and committed to their children's health and wellbeing. Defendants fail to demonstrate otherwise, and any assumption that these parents are *uniquely unable* to make informed, rational decisions about what is best for their children in consultation with their health care providers is unfounded.

Contrary to Defendants' assertions, Plaintiffs do not claim an unlimited right to parental autonomy that gives parents "a right over everything bearing on a child's care, custody, and control." Opp. at 108. Indeed, Plaintiffs have explicitly acknowledged that a state may limit a parent's right to seek medical care for their children if the law passes strict scrutiny. Pls.' Mem. at 19–22; *see also Parham*, 442 U.S. at 603 ("[A] state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized.").

Because the Act infringes on a fundamental right, strict scrutiny is required. *Glucksberg*, 521 U.S. at 719–20. Defendants have not shown that the Act serves the stated goal of protecting Alabama's children, much less that it is narrowly tailored to do so. Defendants acknowledge that transgender children exist. Opp. 12–15. They

acknowledge that gender dysphoria is a serious medical condition that can cause severe suffering and harm. *Id.* at 1, 46–47. They concede that determining the best course of treatment for a particular child depends on a careful evaluation of that child's unique circumstances, experiences, and needs. *Id.* at 25–26. Even their own proffered experts admit that some children benefit from the treatments they seek to ban. *Id.* at 137–138. If the Act takes effect, however, it will ban all transgender adolescents in Alabama from being evaluated for or receiving transition-related care, regardless of their individual circumstances and medical needs. Moreover, adolescents who are currently receiving such care will be immediately required to stop treatments, with no regard for their continued safety, well-being, or related harms. Such an approach—which prohibits an individualized approach to care and the best interests of the adolescent—belies any assertion that the Act is narrowly tailored to achieve its goals. Plaintiffs are therefore likely to succeed on the merits of their due process claim.

### B.   Plaintiffs Are Likely To Succeed on Their Equal Protection Claim.

#### 1.   *The Act Is Subject to Heightened Scrutiny Because It Creates a Sex-Based and Transgender Classification.*

##### a.   The Act Discriminates Against Transgender Minors.

The Act discriminates against transgender minors, and Defendants' convoluted arguments to the contrary have no basis in either the text of the statute or the relevant equal protection case law. The clear purpose of the Act is to prevent

8

parents, healthcare providers, or anyone else from causing a transgender minor to receive transition-related medical care. The Act achieves that goal by expressly targeting transgender minors, and it does so with precision. On its face, the Act bans treatments only when they are used by a minor whose "perception of his or her gender or sex … is inconsistent with the minor's sex" at birth—*i.e.*, only when used by a transgender minor. There is no mystery or ambiguity about the class of minors for whom the Act's "protections" were enacted: it is intended to—and does— prohibit certain treatments only when used by transgender minors (those whose self-perception as male or female differs from their birth sex). As such, Defendants' claim that the Act does not classify based on transgender status has no merit.

It is true, as Defendants note, that the Act *also* draws a classification based on age. But that no more negates the Act's facial discrimination against transgender people than the insertion of an age limit in a law that facially discriminates against people of a particular sex, race, or religion would immunize such a law against heightened review. To the contrary, is well-settled that when a law facially discriminates on a suspect basis, it is subject to heightened scrutiny even if the law applies only to a subset of the targeted group. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 192 (1976) (analyzing a law prohibiting the sale of 3.2% beer to males under the age of 21 and to females under the age of 18 as a "gender-based" classification, even though the law also classified based on age).

9

For similar reasons, Defendants' argument that the Act does not discriminate against transgender people because not every transgender person seeks the treatments that it bans has no merit. Simply put, a law that classifies on a suspect or quasi-suspect basis need not target every member of a group to trigger heightened scrutiny. For example, in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543–44 (1971) (per curiam), the Supreme Court held that a workplace policy that applied only to women with children discriminated based on sex, even though not all women have children, and some men have children.

Defendants' argument that the Act targets procedures rather than transgender people is equally unavailing. Where a law targets treatments that only transgender people undergo, it discriminates based on transgender status. *See, e.g.*, *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (holding that a policy banning individuals who have undergone "gender transition" from open military service discriminates based on transgender status even though not all transgender people have or will undergo gender transition).

Finally, there is no merit to Defendants' argument that the Act does not discriminate because it "focuses on meaningful and unavoidable biological differences between sexes." Opp. at 81. Defendants argue that the reasoning of cases such as *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), does not apply because unlike employment, medical care is "unavoidably tied" to biological differences

10

between sexes. Opp. at 81. While biological differences between the sexes may in certain circumstances offer a justification for sex-based classifications, *see, e.g.*, *Nguyen v. I.N.S.,* 533 U.S. 53, 62 (2001), that does not mean that classifications based on such distinctions are always permissible. For the reasons discussed below and in Plaintiffs' opening memorandum, the purported governmental interests Defendants offer in support of the Act, whether based on claimed "biological differences" or on other justifications, cannot justify the Act's facial discrimination against transgender minors.

        b.     <u>Transgender Status Is a Suspect Classification Warranting Heightened Scrutiny.</u>

Defendants' argument that discrimination based on transgender status does not warrant heightened scrutiny is without merit.

To be considered a suspect class, a group must demonstrate the following: (1) a history of discrimination; (2) a distinguishing characteristic that bears no relation to a person's ability to contribute to society; (3) a discrete group defined by obvious, immutable, or distinguishing characteristics; and (4) a lack of political power. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). Because transgender people satisfy each of these criteria, laws that discriminate based on transgender status must survive heightened scrutiny.

First, "[t]here is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates

of violence and discrimination in education, employment, housing, and healthcare access." *Grimm*, 972 F.3d at 611 (quoting *Grimm v. Gloucester Cty. Sch. Bd*., 302 F. Supp. 3d 730, 749 (E.D. Va. 2018) (collecting cases)). According to the National Transgender Discrimination Survey, transgender individuals "are twice as likely as the general population to have experienced unemployment" and 97% "report[] experiencing some form of mistreatment at work" or having to "hid[e] their gender transition to avoid such treatment." *Id.* at 611-12 (internal quotation marks and citation omitted). "Transgender people frequently experience harassment in places such as schools (78%), medical settings (28%), and retail stores (37%), and they also experience physical assault in places such as schools (35%) and places of public accommodation (8%)," and "are more likely to be the victim of violent crimes." *Id*. at 612. For all these reasons, "one would be hard-pressed to identify a class of people more discriminated against historically . . . than transgender people." *Id*. at 610 (quoting *Flack*, 328 F. Supp. 3d at 953).

Second, there is no question that transgender individuals have a defining characteristic that "bears no relation to ability to perform or contribute to society." *See City of Cleburne, Tex. v. Cleburne Living Ctr*., 473 U.S. 432, 441 (1985). "Seventeen of our foremost medical, mental health, and public health organizations agree that being transgender implies no impairment on judgment, stability,

reliability, or general social or vocational abilities." *Grimm*, 972 F.3d at 612 (internal quotation marks omitted).

Third, "transgender people constitute a discrete group with immutable characteristics." *Id*. at 612-13 (explaining "that gender identity is formulated for most people at a very early age," and that "being transgender is not a choice," but "is as natural and immutable as being cisgender"). The fact that transgender people may use different terms to describe themselves, *see* Opp. at 88, does not negate that reality.

As Drs. Rosenthal and Hawkins note in their declarations, gender identity is a core component of a person's identity. Rosenthal Decl. ¶¶ 21-22; Hawkins Decl. ¶¶ 15-18. Attempting to change a person's gender identity—regardless of whether the person is transgender—is harmful, dangerous, and unethical. Rosenthal Decl. ¶ 22; Hawkins Decl. ¶ 18. "A transgender person's awareness of themselves as male or female is no less foundational to their essential personhood and sense of self than it is for those [who are not transgender]. History demonstrates that this self-conception is unshakeable indeed." *Grimm*, 972 F.3d at 624 (Wynn, J., concurring).

Finally, "transgender people constitute a minority lacking political power." *Id*. at 613. Transgender individuals comprise less than 1% of the adult population in the United States and "are underrepresented in every branch of government." *Id*. As the patterns of discrimination described above make plain, "[t]ransgender people

constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process." *Id*.

## 2.   *The State's Justifications Fail Heightened Review.*

### a.   Defendants Fail to Justify a Ban on Medical Treatments for Transgender Minors in the Face of a Widespread Medical Consensus Supporting the Treatments.

There is a remarkably high degree of scientific consensus on the medical treatment for transgender children and youth. The major medical organizations representing every relevant scientific and medical discipline—gender medicine, psychology, psychiatry, endocrinology, and pediatrics—all have endorsed guidelines that agree on both the substance and process for treating youth and adolescents with gender dysphoria. *See* WPATH (2012); Boulware, et al. (2022) (attached as Ex. 19 to Plaintiffs' Exhibit List (Doc. 78-19)), at 7–10, 13 (citing protocols published by the American Psychological Association, the American Academy of Child and Adolescent Psychiatry, the American Academy of Pediatrics, and the Endocrine Society). Despite their longstanding existence, rigorous review, and acceptance throughout the medical profession, the Defendants dismiss these authoritative and long-standing protocols as "unproven medical interventions." Opp. at 1.

In sharp contrast to defendants' claims, there is no rush to treatment under established guidelines for the care and treatment of transgender youth and

adolescents. The accepted protocols do not support a lockstep march through stages of treatment without serious review and reconsideration at each step. Defendants are wrong to argue that once a minor initiates social transition, they are on a runaway train to puberty blockers and hormones. As Plaintiffs previously noted, no protocols authorize genital surgery before the age of majority, and none permit any drug treatment before puberty. Boulware, et al. (2022), at 8-11. All of the standards of care that guide what the Provider Plaintiffs prescribe for transgender minors require a tailored approach to medical care based on an individual patient's treatment needs. *See id.*, at 10-11.

Further, these authoritative protocols require informed parental consent and the participation of a multidisciplinary team to (1) ensure that treatment is medically necessary and appropriate to the individual, and that (2) any "co-existing psychological, medical, or social problems" have been addressed.  Doc. 78-17 at 14–15.

Defendants' experts attack these authoritative and longstanding protocols by making unsubstantiated claims that read like conspiracy theories. Dr. Van Meter, for instance, claims, without foundation or citation, that "[t]he guidelines published by WPATH, the Endocrine Society, the American Academy of Pediatrics, and the Pediatric Endocrine Society are solely the opinions of like-minded practitioners who excluded any contrary opinion." Van Meter Decl. at 12. Dr. Hruz repeatedly claims,

without evidence, that there is a shadowy "gender transition industry" that has launched a campaign to mislead the public. *See, e.g.*, Hruz Decl. at 18–19, 37–39. No evidence supports these claims that ring hollow in light of the widespread adoption of established protocols and their existence in medical school curricula throughout the country, including in Alabama. Ladinsky Decl., Doc. 8-2 ¶ 8.

> b.    Defendants' Arguments Concerning Instances of Treatment that Did Not Follow the Accepted Standards of Care Does Not Justify a Categorical Ban on Treatments.

Defendants and their proffered experts construct an elaborate straw man, claiming that patients "too often receive [] rushed medical experimentation" and that patients later regret their choices. Opp. at 1. But Defendants' arguments do not support Alabama's ban on medical care for transgender youth. If some medical providers fail to follow the authoritative medical guidelines, the result may be poor outcomes for their patients. The proper remedy lies potentially in medical malpractice laws, or even tightening of the guardrails in place to ensure proper identification of patients. It is not a blanket ban on long-established, science-based medical care.

Defendants' Response relies on the declarations of patients who declare that they were given faulty medical advice that did not adequately address their individual situation. *See* Wright Decl.; Freitas Decl. Wright, for example, reports that her therapist did not inquire into past trauma or underlying mental distress "but

simply asked some questions and diagnosed me with gender dysphoria and gave me a recommendation to a physician for testosterone treatment within five weeks of our first meeting." Wright Decl. at 3. Frietas reports that, as an adult over age 20, she "went to Planned Parenthood for testosterone and was given it right away, with no information" about possible side effects. Frietas Decl. at 3–4. These histories, while sad, provide no justification for banning medical care, including puberty blockers and hormone therapy, for all Alabama transgender minors. Even accepting the facts alleged in the declarations as true, they prove nothing more than that the medical providers involved apparently failed to follow standard treatment guidelines. A doctor's failure to meet an established standard of care with a patient may provide grounds for a civil lawsuit, but not a basis for a wholesale ban for all medical providers and their patients.

The defendants quote an op-ed in the Washington Post as evidence that "sloppy, dangerous care" is widespread. Opp. at 36. This self-reported, anecdotal evidence shows, at most, that some medical providers do not follow medical guidelines. In contrast, gender clinics, including the one at UAB, expressly follow the guidelines published by WPATH (2012), the Endocrine Society, and other major, reputable medical organizations. *See* Boulware, et al. (2022), at 7-8.

The declarations made by two parents (Barbara F. and John Doe) have no probative value in justifying the Alabama ban on medical care. Assuming that the

facts alleged are true, both cases involve a conflict between parents about the proper course of medical care for their child. The problem of parental estrangement and miscommunication is not confined to transgender children and their medical treatment. While such a dispute may appropriately lie in family court, a ban on gender-affirming medical care is not a tailored solution.

> c.   Gender Dysphoria Does Not Resolve Without Treatment in the Vast Majority of Cases.

Simply put, gender dysphoria does not resolve without treatment for the vast majority of transgender adolescents without appropriate medical care. Alabama's statement to the opposite effect is based on misstatements and misuse of the scientific evidence about prepubertal children.

To bolster their claim that medical treatment for gender dysphoria is unnecessary, Defendants contend that "most cases—somewhere between 61% and 94%—of childhood gender dysphoria resolve naturally." Opp. at 2; *see also id.* at 16-18, 24. Defendants' argument, however, misstates the scientific evidence and ultimately casts no doubt on the medical treatment of transgender adolescents.

First, Defendants' claim about so-called "desistance" in gender dysphoria diagnosed in young children rests on a shaky empirical foundation. Defendants and their experts rely on older studies that include children with relatively mild gender-nonconforming behavior – many of whom unsurprisingly reported a non-transgender identity as adolescents. *See* Boulware, et al. (2022), at 18-19. Newer

evidence suggests that when children are diagnosed according to stricter, modern criteria, the children are highly likely to persist in their transgender identity. *See id.*

Moreover, Defendants' claims about preadolescent children provide no basis to support Alabama's ban on medical treatment because medical protocols do not authorize any medication for prepubertal children. Instead, the medical standards permit drug therapies (blockers and hormones) only for adolescents who have demonstrated intense gender dysphoria that worsened with the onset of puberty. *See* WPATH (2012), at 18-20 (requiring a demonstration of emergence or worsening of dysphoria with onset of puberty before prescribing medications and stating that "[b]efore any physical interventions are considered for adolescents, extensive exploration of psychological, family, and social issues should be undertaken"). *See also* Table 5 of Endocrine Guidelines.

Similarly, Alabama is wrong to raise the specter of social transition causing children to either become or persist in being transgender. Both WPATH SOC and the Endocrine Guidelines expressly require multiple, staged assessments and reassessments before moving patients from one step in medical treatment to the next. It is far from a foregone conclusion that any child who goes through social transition will end up on blockers or hormones as an adolescent. Each patient is assessed step-wise throughout the process. *See* WPATH (2012) at 18-20; Endocrine Guidance, Table 5.

The applicable guidelines ensure that medical treatment is limited to those patients who have gender dysphoria that will likely persist without medical treatment. Alabama medical providers utilize a multidisciplinary approach for monitoring and assessment of transgender youth patients to determine if and what medical care is essential at each stage of adolescence.

        d.    <u>There Is No Reliable Evidence To Support Defendants'<br>Argument Regarding "Social Contagion."</u>

Defendants and their experts devote a great deal of space to their claim that there is a "new clinical phenomenon" of "rapid onset gender dysphoria." Opp. at 21–22. But their evidence dissolves under closer examination.

First, Defendants and their experts misuse data to imply that a large percentage of teenagers are seeking and receiving gender-affirming medical care. *See, e.g.,* Opp. at 13-14 (stating that 2 to 9% of teenagers identify as transgender). In fact, the data show that only 1.8% claim a transgender identity. *See* Boulware, et al. (2022), at 20. The specific study cited by Defendants in support of their 9% data point (who cite Hruz Decl. ¶ 72) intentionally measured an expansive category that included youth with "gender diverse" attitudes and identification. *See* Kidd, et al. (2021) (cited by Hruz Decl. ¶ 72). The study's authors did not identify who within that broad category were either transgender or suffered from gender dysphoria. Accordingly, the cited study provides no foundation for Defendants' claim that up

to 9% of adolescents have gender dysphoria, are seeking medical treatment, or would qualify for such treatment.

Second, rather than addressing raw numbers, Defendants and their experts rely on figures and graphs in an attempt to show a large increase in the number of adolescents seeking medical care over time. *See* Opp. at 23 (quoting Hruz Decl. ¶ 72 ("the number of adolescent girls seeking sex transitioning [in the U.K.] exploded over 4,000% in the last decade.")). Yet, the Hruz declaration provides no citation for the 4000% figure, and Hruz paragraph 45 (page 51) reports a lower figure of 2000%. Nevertheless, both figures are misleading because they use percentage calculations to hide low absolute numbers. Taking Hruz's own numbers at face value, there were 94 teens referred to the UK Gender Identity Service in 2009/2010 and 1,986 in 2016/2017, close to 10 years later. The absolute number is still under 2,000 for the entire nation of Great Britain and represents a very low percentage (.01%) of the British adolescent population.

Whatever factors contributed to the raw increase in numbers, the overall total – less than .01% of British adolescents – bears no hallmark of social contagion. Moreover, Defendants' figures do not represent the number of children diagnosed with gender dysphoria or receiving treatment. Instead, they are simply numbers of medical referrals, i.e., patients seeking a consultation. *See* Boulware, et al. (2022), at 20.

21

Third, Defendants and their proffered experts rest their claims on a thoroughly discredited study by Lisa Littman. Opp. at 14, 21–23. Littman's 2018 study initially claimed to have discovered a new disorder, which Littman called "rapid-onset gender dysphoria." Littman's claims attracted a great deal of attention in the popular press but have wilted under scientific scrutiny. The journal of publication required Littman to make major post-publication revisions, a process that is undertaken only when a paper is found to be seriously flawed. Boulware, et al. (2022), at 21. Defendants and their experts do not acknowledge the correction process, nor do they address the many critiques of Littman's study. Among its many flaws were the use of parent reports and a biased sample. Defendants and their proffered experts also fail to acknowledge the extensive, peer-reviewed critiques of Littman's work and the failure of later studies to replicate the findings. Boulware, et al. (2022), at 20-21.

Fourth, Defendants' assertions about rapid-onset gender dysphoria consist primarily of speculation. Indeed, their primary expert on social contagion admits as much. The Kenny declaration offers a lengthy discussion of social contagion in marijuana use and risky behavior (among other topics) without any evidence that social contagion has caused a wave of gender dysphoria. When the declaration finally turns to the subject of transgender identity, Kenny himself acknowledges that there is no evidence: "[t]he field is too young to have attracted researchers to undertake social network analyses." Kenny Decl. at 19. The Kenny declaration cites

only Littman and a popular magazine article that uncritically repeats Littman's claims. *Id.* at 18–19.

> e.   Defendants' Attack on Longstanding and Authoritative Medical Protocols Rests on Misstatements About Medical Evidence.

Defendants repeatedly claim that established medical protocols are "unproven medical interventions with long-term, irreversible consequences and little, if any, proven benefit." Opp. at 1; *see also id.* at 4 (characterizing standard medical care as an "experimental course of treatment"). This characterization is at odds with the weight of medical authority. *See* Boulware, et al. (2022), at 11–21.

Defendants and their proffered experts make several misleading claims about scientific research in medicine. First, they state that the use of puberty blockers is not FDA authorized. Opp. at 40. This point is irrelevant to puberty blockers, which are widely recognized as safe, effective, and reversible. Boulware, et al. (2022), at 21-23. It is well-known in medicine that so-called "off-label" use is common and widely accepted, including in pediatric practice. *Id.* at 23–24. And off-label use is specifically authorized in Alabama. Ala. Code § 27-1-10.1(c)(1).

Defendants also claim that a decision memo by the Centers for Medicare and Medicaid Services found no evidence of benefit from gender transition-related medical care. *See* Opp. at 45-46. Defendants notably fail to point out that the CMS study (1) acknowledged the substantial benefits of treatment and (2) authorized

treatment on a case-by-case basis. The CMS justified case-by-case approvals because the Medicare population is primarily elderly and—unlike healthy adolescents—has many medical contraindications for surgery. *See* Boulware, et al. (2022), at 16. Tellingly, none of the research or study upon which the CMS rested focused on adolescents.

    f. <u>Any So-Called "International Reckoning" Relating to the Provision of Puberty Blockers and Hormones for Adolescents Cuts Against a Ban on Medical Care.</u>

  Defendants' discussion of a so-called "international reckoning" supports Plaintiffs' challenge to the Act. None of the countries to which Defendants point— Sweden, the United Kingdom, Finland, Australia, New Zealand, or France—ban either puberty blockers or hormones for adolescents, by Defendants' own admissions. *See* Opp. at 59, 61, 63. While some of the government reports cited by Defendants argue in favor of appropriate guardrails to ensure that the right youth receive treatment, none propose a ban. *See id*. Moreover, not one of the reports critiques the current WPATH or Pediatric Endocrine Guidance on determining to whom and how to provide care.

  In Sweden, for example, the adopted changes do not ban such care for transgender adolescents, but instead seek to ensure that adolescents who receive care are also part of clinical trials to improve patient care over time. Defendants' reliance on the conclusions of a UK court's decision in *Tavistock* to support their claims

about "inefficacy" are misplaced, as the challenged procedure simply involved judicial sign-off for care—not a ban—and has since been overturned. *Bell v. Tavistock & Portman NHS Found. Trust*, [2021] EWCA (Civ) 1363. Importantly, the appellate court held that the lower court should not have made "controversial factual findings" and specifically rejected the idea that "the prescription of puberty blockers was in a special category of medical intervention" requiring a departure from typical consent practices. *Id.* at ¶¶ 48, 62–64.

All of the European countries mentioned by Defendants permit parents of transgender adolescents to consider puberty blockers and hormone therapy as part of the range of care for their transgender children, when appropriate. Not one bans them, in sharp contrast to Alabama's law.

> g.   Alabama Cannot Justify the Ban by Concerns About So-
>      Called Rush to Treatment for Transgender Minors.

Defendants' experts suggest that gender-transition medical care should be categorically banned because doctors rush to treat minors without thoroughly evaluating their patients, screening for and addressing other mental health conditions, and adequately informing patients and their parents of the potential risks and benefits of the treatment. This description is entirely inconsistent with the protocols for assessing and treating gender dysphoria in adolescents and the rigorous requirements that must be met before the initiation of care as set forth by UAB protocols to which Dr. Landinsky has attested and as set forth by the WPATH

Standards of Care and the Endocrine Society Guidelines. *See* Ladinsky Decl., Doc. 8-2 ¶¶ 9-11.

To be diagnosed with gender dysphoria, the incongruence between a person's gender identity and sex assigned at birth must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning. *See* Doc. 78-17. The Endocrine Society Guidelines have extensive requirements before the initiation of pubertal suppression or hormone therapy to ensure that: (1) the treatment is needed to address lasting and intense gender dysphoria that worsened with the onset of puberty; (2) that "any coexisting psychological, medical, or social problems" have been addressed; (3) that the patient and their family are informed of the risks with hormone treatment, "including potential loss of fertility" and options to preserve fertility, and have given informed consent; (4) that puberty has started (verified by a pediatric endocrinologist or similar clinician); and (5) that there are no medical contraindications to treatment. *See* Doc. 78-14.

For hormone therapy, the Endocrine Society Guidelines have additional requirements that the adolescent "has sufficient mental capacity" to understand the consequences of treatment, weigh the benefits and risks, and give informed consent to the treatment. *See id.* at 2.

Defendants' proffered experts' characterization of the work of doctors who treat youth with gender dysphoria is at odds with the accepted protocols and the experience of doctors like Drs. Hawkins and Ladinsky. Community providers, like Dr. Koe, intentionally refer patients to doctors like Drs. Hawkins and Ladinsky to ensure patients are appropriately evaluated and parents and youth are properly informed of the risk/benefit analysis. Patients are treated by a multidisciplinary team including behavioral and physical health specialists. There is an extensive informed consent process going through every potential side effect and risk both verbally and in writing.

The WPATH guidelines have extensive requirements for evaluating patients and require that "before any physical interventions are considered for adolescents, extensive exploration of psychological, family, and social issues should be undertaken." Doc. 78-17 at 18. Defendants offer no evidence that failure to comply with the protocols for evaluation and informed consent is happening systematically. Even if it were, these failures could be responded to, consistent with the countries cited by Defendants, through the development of guardrails to ensure the right patients receive care and patients and families are well-informed. The purported failures do not justify banning care for the small set of patients for whom it is essential.

C.    **The Affordable Care Act Preempts the Act Because a Genuine Conflict Arises with Compliance by Healthcare Providers.**

The Act prohibits medical and healthcare providers in Alabama from providing gender-affirming care to transgender minors, while Section 1557 requires healthcare providers to provide such care. Defendants' convoluted attempts to argue around the Act's discriminatory provisions and their reliance on dissenting opinions cannot escape this circumstance where there is clear federal preemption based on conflict.

At the outset, Defendants are incorrect in arguing that Plaintiffs may not seek relief in this Court because Section 1557 does not expressly create a cause of action for preemption of a conflicting state law. In *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015), the Supreme Court made clear that federal courts may "grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id.* at 326. Such suits do not depend on Congress creating a cause of action for preemption but are a "judge-made remedy" reflecting the principle that "in a proper case, relief may be given in a court of equity ... to prevent an injurious act by a public officer." *Id.* at 327 (citation and internal quotation marks omitted).

As *Armstrong* recognized, federal courts have jurisdiction over equitable suits seeking to enjoin officials from enforcing state laws that conflict with federal law unless Congress has enacted "express [or] implied statutory limitations" precluding such preemption suits. *Id.* No such express or implied limitations are present here.

28

Congress has not delegated enforcement of Section 1557 exclusively to federal officials; in fact, private enforcement is one of the principal methods for its enforcement. Moreover, Section 1557's requirements are not "judicially unadministrable." *Armstrong,* 575 U.S. at 328. Federal courts enforce the provisions of Section 1557 daily, and interpretation of its requirements lies at the core of the judicial function. Simply stated, there is no reasonable basis to conclude that through Section 1557, Congress intended to strip federal courts of their traditional equitable powers to enjoin state officials from enforcing state laws that conflict with federal law. Indeed, in the analogous context of Title VII, the Supreme Court previously has considered and decided affirmative suits brought by employers seeking to prevent enforcement of state laws on the ground that they are preempted. *See California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 292 (1987).

With respect to the merits of Plaintiffs' preemption claim, even though *Bostock* involved Title VII claims, both Title VII and Title IX prohibit discrimination on the basis of sex using nearly identical language. This parallel prohibition on sex discrimination has allowed courts to consistently follow Title VII precedents in analyzing Title IX claims. *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) ("[I]n a Title IX suit for gender discrimination based on sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title

VII.").[1] Notably, *Bostock* has been applied to Title IX to invalidate discriminatory policies against transgender students. *Grimm v Gloucester County Sch. Bd.,* 972 F.3d 586, 616–617 (4th Cir. 2020) (as amended Aug. 28, 2020), cert. denied, 141 S. Ct. 2878 (2021). It follows that the prohibition against sex discrimination based on gender identity as held in *Bostock* also applies to Section 1557, which incorporates Title IX's sex discrimination prohibition. In fact, numerous courts have determined that Section 1557 prohibits discrimination against transgender people. *Scott v. St. Louis Univ. Hosp.*, No. 21-cv-1270, 2022 U.S. Dist. LEXIS 74691, at *17-18 (E.D. Mo. Apr. 25, 2022).[2]

Defendants argue that the Act is not discriminatory based on sex because it applies to both boys and girls, but that argument has been repeatedly rejected by the Supreme Court. *See. e.g., Bostock*, 140 S. Ct. at 1740–42; *Obergefell v. Hodges*, 576

---

[1] *See, e.g., Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX of the Education Amendments of 1972.") (Thomas, J., dissenting); *O'Connor v. Peru State Coll*., 781 F.2d 632, 642 n.8 (8th Cir. 1986); *Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 896–897 (1st Cir. 1988). Because Title VII and Title IX both "share similar text and legislative histories, it is reasonable to interpret one in a manner consistent with the other." *Maloney v. Soc. Sec. Admin.*, 517 F.3d 70, 75 (2d Cir. 2008); *see Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."); *SCM Corp. v. Xerox Corp*., 76 F.R.D. 214, 215 (D. Conn. 1977) ("[I]nconsistent interpretations of virtually identical phrases in different provisions of the federal rules should be avoided . . .").

[2] *See e.g.*, *C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, 536 F. Supp. 3d 791, 796 (W.D. Wash. 2021); *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997, 1002–03 (W.D. Wis. 2018); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017).

U.S. 644 (2015). Defendants further misread the law in positing that the Act does not discriminate based on gender identity when in fact its language prohibits the provision of medical treatment to affirm a minor's perception of their "gender or sex." There can be no dispute that only transgender minors would seek gender-affirming care. Simultaneously, the same ban does not apply to treatment for minors with disorders of sex development.

Next, Defendants miss the crux of conflict preemption, which seeks to avoid conflict between federal and state laws. Defendants attempt to argue that the ACA expressly prohibits interference with state regulatory authority, albeit as it specifically relates to healthcare exchanges and navigators, while simultaneously misinterpreting the clause. 42 U.S.C. § 18041(d). The clause states that, "Nothing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title." *Id.* (emphasis added). Thus, this clause expressly provides that a State law that "prevent[s] application" of ACA *does* result in conflict preemption.

Defendants do not deny the fundamental reality that doctors practicing medicine in Alabama cannot both comply with Section 1557 and comply with the Act. Specifically, it is impossible for in-state doctors who receive federal funding to refrain from discriminating against transgender minors in the provision of critical treatment, as Section 1557 requires, without incurring criminal liability under the

Act. That is a conflict. Defendants' suggestion that medical providers can easily forgo federal financial assistance in favor of compliance with the Act is an unworkable one. Federal financial assistance is defined broadly and is widely received by medical and healthcare programs and providers.[3] As such, medical providers often are not in a position to reject federal financial assistance. Medical providers are frequently employed by health care entities that accept federal funds. To reject federal financial assistance likely would result in job loss, would result in the denial of care to a broad swath of people who are reliant on federal benefit programs like Medicaid and Medicare, and may seriously jeopardize the financial well-being of the program.

This point alone makes this case distinguishable from *Graham v. R.J. Reynolds Tobacco Co.*, where cigarette manufacturers argued for conflict preemption based on only "a handful" of federal requirements. 857 F.3d 1169, 1186, 1191 (11th Cir. 2017) (en banc). Importantly, Defendants do not mention that the federal laws in *Graham* either imposed "no significant requirements on cigarette manufacturers" or "only [the] requirement [of a] warning label." *Id.* at 1187–88.

---

[3] Title VI regulations define the term "federal financial assistance" broadly to include: (1) grants and loans of federal funds; (2) the grant or donation of federal property and interests in property; (3) the detail of federal personnel; (4) the sale and lease of, and permission to use federal property or interest in such property without consideration or at a nominal consideration; and (5) any federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance. 45 C.F.R. § 80.13(f).

32

Notably, the Eleventh Circuit found that "[f]ederal law [was] silent both by its terms and by its operation" about tort liability for cigarettes. *Id.* at 1188.

By contrast to *Graham*, Section 1557 can hardly be said to be "silent" or impose "no significant requirements." Rather, Section 1557 expressly prohibits discrimination, exclusion, or denial of benefits on the basis of sex under "any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Section 1557 thus conditions extensive federal financial assistance on non-discrimination compliance and imposes concrete liability for funding recipients who violate Section 1557. *Graham* is factually distinct from this issue before the Court and does not offer appropriate guidance.

In sum, the Act criminalizes a healthcare provider for providing care to transgender minors that non-transgender minors can receive. Discriminating against transgender minors in this manner would cause providers to violate Section 1557. There cannot be a clearer example of conflict preemption that warrants injunctive relief.

### D.    Plaintiffs Are Likely To Succeed on the Merits of Their First Amendment Claim.

As Plaintiffs demonstrated in their opening memorandum, the Act on its face criminalizes a vast range of constitutionally protected speech—including a doctor's recommendation or referral to obtain gender-affirming care, a parent or religious counselor's support or encouragement of such care, and even transgender

adolescents themselves discussing such care with a medical professional—if a prosecutor deems such speech to be a "cause" of the minor obtaining treatment.

Although Defendants argue that the Act proscribes only speech that is "incidental" to the prohibited medical treatments, it is clear from these examples that the Act criminalizes a great deal of speech beyond that involved in administering, prescribing, or receiving those treatments. In so doing, the Act creates "more than an incidental burden on protected expression"; it "imposes a burden based on the content of speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (holding that statute prohibiting pharmacies from selling, licensing, exchanging, or "permitting the use" of certain information for marketing purposes was an unconstitutional content-based speech regulation, not a conduct regulation). In attempting to characterize the speech outlawed by the Act as speech that is merely incidental to criminal conduct, or alternatively, as speech incidental to professional conduct, Defendants invite the Court to engage in what the Eleventh Circuit has described as "a dubious constitutional enterprise." *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1309 (11th Cir. 2017).

While certain criminal prohibitions such as those against conspiracy, incitement, and solicitation are among a very few categories of speech (including defamation, incitement, obscenity, and child pornography) that may be regulated without running afoul of the First Amendment, the government does not possess

"freewheeling authority to declare new categories of speech outside the scope of the First Amendment" simply by declaring such speech to be part of a course of criminal conduct. *United States v. Stevens*, 559 U.S. 460, 472 (2010).

In order to avoid constitutional scrutiny, the First Amendment requires solicitation, conspiracy, and similar statutes to be carefully limited to actual "[o]ffers to engage in illegal transactions." *United States v. Williams*, 553 U.S. 285, 297 (2008). The state may not go beyond these strict requirements and punish speech that constitutes advice, opinion, or advocacy merely because the state has deemed the conduct that is the subject of such advice or advocacy to be criminal. "[T]here remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality." *Id.* at 298–299. "The government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.'" *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973)).

The Act punishes exactly such speech. Its text is not limited to solicitation, aiding and abetting, nor conspiracy to engage in illegal activity—all of which have specific and well-defined requirements such as criminal intent and the commission of an overt act. Instead, the Act broadly prohibits any "person" from engaging in speech that the state deems to have led to a minor to obtain a prohibited treatment. Contrary to Defendants' characterization, the language of the Act is not limited to

conduct such as "writing a prescription for an illegal use of a drug." Opp. at 117.
Had Alabama intended to outlaw only the actual prescription or administration of
specific treatments, it could have done so expressly. It did not. And had Alabama
intended that only offenses such as aiding and abetting and conspiracy be punishable
under the statute, it could have relied on those existing offenses rather that enacting
a new and undefined prohibition on speech that "causes" a minor to obtain treatment.
Instead, Alabama chose to criminalize "the dispensing of information, not [just] the
dispensing of controlled substances." *Conant v. Walters*, 309 F.3d 629, 635 (9th Cir.
2002) (internal quotation marks omitted). The First Amendment does not allow such
restrictions.

Although Defendants argue that "most" of the speech criminalized by the Act
is that of medical professionals, Opp. at 119, there can be no dispute that the Act's
prohibitions apply to any "person" and are not limited to licensed professionals.
Accordingly, cases addressing regulation of professional conduct are of no
assistance to Defendants. Nor can the Act's content- and viewpoint-based speech
restrictions be saved by Act's provision stating that it does not prevent psychologists
and other mental health professionals from "rendering the services for which they
are qualified." Act, § 6. That provision offers no protection to physicians,
pharmacists, parents, ministers, or anyone else who is not among the listed
categories of mental health providers. And even as to the designated categories of

mental health providers, it does not purport to exempt them from criminal liability if their advice or counsel is deemed a "cause" of a minor obtaining treatment. Any advocacy, counsel, advice, or discussion of the prohibited topics, by anyone, is criminalized if treatment is obtained as a result.

Defendants argue that the Act is not overbroad, but overbreadth analysis is unnecessary because, as Plaintiffs have shown, the Act, on its face, punishes constitutionally protected speech because of its content and viewpoint. Moreover, even if overbreadth analysis were required, the examples cited above of the Act's facial regulation of constitutionally protected speech, along with many others that are readily apparent from the text of the Act, demonstrate that the Act imposes "a criminal prohibition of alarming breadth" and that "the presumptively impermissible applications of [the Act] far outnumber any permissible ones." *Stevens*, 559 U.S. at 474, 481. Had the State wished to enact a prohibition that was narrowly tailored to prescribing prohibited medications or administering prohibited medical treatments, it could have done so explicitly, with a statute narrowly tailored to that conduct. Instead, it enacted a broad, open-ended criminal prohibition that targets a vast array of core constitutionally-protected speech.

### E.   The Act is Unconstitutionally Vague.

In seeking to dismiss Count V (Vagueness), the Defendants make a series of scattershot arguments while ignoring the substance of Plaintiffs' argument.

Defendants are correct that Plaintiffs do not challenge the Act—on vagueness grounds—insofar as it creates criminal liability for one to "engage in" the performance of certain "practices to be performed upon a minor." Act, § 4(a). However, Plaintiffs do challenge as unconstitutionally vague the distinct, alternative basis for criminal liability under the Act—something other than "engaging in" the prohibited practices that "causes" the performance of the prohibited practices. *Id.*

As to that specific challenge, Defendants say little—perhaps because it is difficult to respond. As noted in Plaintiffs' opening brief, "cause" has an expansive definition: "[t]o bring about or effect." Black's Law Dictionary (11th ed. 2019); The New Shorter Oxford English Dictionary, Vol I, at 355–356 (ed. 1993) ("Be the cause of, effect, bring about, occasion, produce, induce, make ... bring it about that.").

In short, what are the limits of "cause" in the specific context of this criminal statute? The statute offers no guidance. As the old adage says, the flapping of a butterfly's wings in the Amazon can cause a tornado in Texas. It is impossible to know what might be considered a "cause" of the performance of one of the prohibited practices: a simple encouraging conversation between a pastor and a parent about a child's care? A recommendation to someone to think about a course of treatment? Mentioning the name of a doctor in a conversation among friends? Driving a minor to a doctor's or a therapist's appointment? Who can say?

It is precisely in situations like this—where (1) the incriminating fact—did a particular act or set of acts "cause" this—is so indeterminate as to fail to provide adequate notice, and (2) deciding to arrest and/or prosecute is a matter of absolute discretion and subjective judgment, opening the door for arbitrary enforcement— that the vagueness doctrine must do its work to insure that Due Process is satisfied, particularly where the chilling of protected speech is clearly implicated. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972) (setting out standards of adequate notice and fair warning; explicit standards to avoid arbitrary and discriminatory enforcement; and, in the areas of First Amendment freedoms, protections against inhibiting the exercise of those freedoms); *Williams*, 553 U.S. at 306 (question is not whether the incriminating fact has been proved but the "indeterminacy of precisely what that fact is")*; Jones v. Governor of Fla*., 975 F.3d 1016, 1047 (11th Cir. 2020) (a law is vague when "it is unclear as to what fact must be proved") (quoting *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012)); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1232 (2018) (Gorsuch, J., concurring) (provision is unconstitutionally vague; "No amount of staring at the statute's text, structure, or history will yield a clue").

Rather than tackle this question, Defendants respond with a random series of technical arguments which supposedly—but do not—defeat Plaintiffs' claim of vagueness.

First, Defendants assert that Plaintiffs cannot raise vagueness in this pre-enforcement challenge. Opp. at 112. However, as Defendants acknowledge by citing and quoting *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340 (11th Cir. 2011), such a vagueness claim is proper when, as here, individuals are being "chilled from engaging in constitutional activity." *Id.* at 1350. "Pre-enforcement review provides law-abiding citizens with a middle road between facing prosecution and refraining from otherwise constitutional conduct. *Id.* Chilling of free speech and innocent conduct is precisely the gravamen of Plaintiffs' vagueness challenge.

Second, Defendants argue that Plaintiffs must, but cannot, show that the Act is unconstitutional in all its applications, quoting *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982). Opp. at 112. *Village of Hoffman*, however, no longer reflects the state of the law. In *Johnson v. United States*, 576 U.S. 591 (2015), the Court stated, "our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls with the provision's grasp." *Id.* at 602. The Court went on: "[i]t seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications . . . ." *Id.* at 603.[4]

---

[4]    Related to their "all applications" argument, Defendants assert that a vagueness argument is not available to Plaintiffs because Plaintiffs' conduct is clearly proscribed. Opp. at 112-113.

Third, Defendants submit that the Act has a scienter requirement by virtue of Ala. Code § 13A-2-4(b). Assuming for the sake of argument that Defendants' argument is correct, it does not "undermine any vagueness challenge." Opp. at 115–16. Scienter "may mitigate a law's vagueness, especially with respect to the adequacy of notice…," *Posters 'N' Things v. U.S.,* 511 U.S. 513, 526 (1994) (quoting *Hoffman Estates,* 455 U.S. at 499); but it does not make the statute constitutional. *Smith v. Goguen*, 415 U.S. 566, 580 (1974) (statute banned treating the flag contemptuously; limiting statute to intentional conduct "still does not clarify what constitutes contempt, whether intentional or inadvertent"); *Frese v. MacDonald,* 425 F. Supp. 3d 64, 78 (D.N.H. 2019) (although scienter may mitigate vagueness, court was not persuaded "that the vagueness concerns raised in the complaint are so mitigated such that dismissal is warranted at the outset of the lawsuit"). Moreover, there is no indication that scienter mitigates vagueness with respect to the independent aspect of the vagueness doctrine relating to minimum standards of enforcement.

Fourth, Defendants chastise Plaintiffs for presenting no argument as to why the phrase "engage in or cause" is vague. Opp. at 113. Most fundamentally, that is

---

That proscribed conduct is alleged to be seeking "the right for their doctors to violate the law's core prohibition ..." *Id.* Defendants' assertion misses the mark. The vagueness claim relates to individuals not knowing what might subject them to the law's penalties, not how they hope others will be able to act.

not Plaintiffs' claim. Rather, the Plaintiffs submit that the "cause" element of the Act is distinct from the "engage" element of the Act. To avoid treating it as superfluous, "cause" must mean something other than "engage," which rather clearly means to "[e]nter upon or occupy oneself in an activity, interest, etc." *See* The New Shorter Oxford English Dictionary, Vol I, at 820 (ed. 1993).[5]

Fifth, Defendants claim to believe that Plaintiffs are simply worrying about "close cases" that "can be imagined under virtually any statute," quoting *Williams*, 553 U.S. at 305–306. Opp. at 113–114. However, that is not so. Plaintiffs submit that the Act is unconstitutionally vague under the precise test of *Williams—i.e.*, that the use of "cause" creates the "indeterminacy of precisely what that [incriminating] fact is." *Id*. at 306. Contrary to Defendants' suggestion, Opp. at 114, Plaintiffs submit that "cause" in the context of the Act is exactly like "annoying" or "indecent" which the Supreme Court has found unconstitutionally vague. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010). And one could add "credible and

---

[5]     Defendants point to the use of "engage in or cause" in the Alabama criminal conspiracy law without indicating exactly what that proves. They point to no litigation or case law indicating that the use of "cause" in that statute has survived a vagueness challenge. In addition, Plaintiffs submit that the entirety of a statute and its purposes matter when addressing vagueness such that one statute does not invariably the cure the vagueness concerns in a different statute. However, to the extent that the analysis of one statute is relevant to another with respect to vagueness, courts have found the term "cause" to be unconstitutionally vague when it fails to provide the necessary guidance. *See, e.g., Entertainment Ventures, Inc. v. Brewer,* 306 F. Supp. 802, 819 (M.D. Ala. 1969) ("Phrases, such as 'to cause any child to become delinquent' ... , cannot meet the strict standard of specificity required in a criminal statute affecting expression protected by the first amendment"); *State v. Hodges,* 457 P.2d 491, 492 (Ore. 1969) ("does any act which manifestly tends to cause any child to become a delinquent child" is unconstitutionally vague).

reliable" in *Kolender v. Lawson*, 461 U.S. 352, 354 (1983); "no apparent purpose" in *City of Chicago v. Morales*, 527 U.S. 41, 55–57 (1999); "vagrants" in *Papachristou v. City of Jacksonville*, 405 U.S. 156, 161–162 (1972); and "contemptuous" in *Smith v. Goguen*, 415 U.S. at 574.

In each of these cases, as in the present case with respect to the "cause" element of the Act, enforcement of the law is open to "wholly subjective judgments." *Holder*, 561 U.S. at 20.

Sixth, Defendants suggest that there can be no problem with the use of "cause" as an element of the crime in the Act because Alabama law "answers which form of causation matters," citing Ala. Code § 13A-2-5(a). Opp. at 114–115. However, § 13A-2-5 speaks to establishing a causal link between a person's specific conduct and a result that occurred. The question before the Court on this vagueness challenge is wholly different. It is the use of "cause" as an element to define and trigger criminal liability.[6]

---

[6]     For the reasons stated in the text, Defendants' citation to *United States v. Matus-Leva,* 311 F.3d 1214 (9th Cir. 2002) is inapposite to the issue before the court. Moreover, it is worth noting that Defendants overread *Matus-Leva* in arguing broadly that causation requirements eliminate vagueness problems. Opp. at 115. In *Matus-Leva,* the precise question was whether the absence of a scienter requirement as to the "resulting in death" provision in a federal statute criminalizing the smuggling of "aliens" rendered the statute unconstitutionally vague because it arguably could be applied to a death that had nothing to do with smuggling. The court rejected the vagueness challenge because "resulting" made it clear that the death must have occurred in the course of and related to the smuggling. That was enough to give notice of the criminal consequences if a death occurred. The court's analysis has nothing to do with the question before this Court.

Finally, Defendants assert that the Act establishes minimal guidelines for law enforcement. Opp. at 116-117. More particularly, they maintain that "law enforcement is used to applying basic causation tests." *Id.* at 116. However, that is not the issue. The issue is that law enforcement here has free rein to make the determination that somehow, in some fashion, in whatever context, a person has said or done something that—in their subjective judgment—has led to the performance of a prohibited practice under the Act. And, again, scienter does not limit that discretion.

Defendants also state that arguments about arbitrary enforcement are speculative in this pre-enforcement context. Opp. at 116–117. But that is beside the point. In determining vagueness, the court looks to the language of the statute. If that language is indeterminate (as it is here), then there are no adequate standards for enforcement, regardless of whether one is looking at it before or during enforcement. No one would suggest, for example, that when the Supreme Court held that "annoying to any person passing by" was unconstitutionally vague in *Coates v. Cincinnati*, 402 U.S. 611 (1971), that it was relevant at what point in time the Court was considering the indeterminacy of the words in issue.

Defendants have failed to demonstrate that Act is constitutional insofar as it criminalizes the causing of any of the practices prohibited under the Act.

### F.   The Other Factors Weigh in Favor of a Preliminary Injunction.

Defendants contend that Plaintiffs have not "pursu[ed] timely adjudication," Opp. at 129, and "have not shown a likelihood of irreparable injury," Opp. at 136. Defendants' contentions are without merit for several reasons.

### 1.   Plaintiffs Have Diligently Pursued a Preliminary Injunction.

Plaintiffs have not "fail[ed] to act with speed or urgency" in challenging SB184, as Defendants contend. Opp. at 136. Plaintiffs filed this lawsuit on April 19, 2022, just nine days after Governor Ivey signed SB184 into law and some nineteen days *before* SB184 was set to take effect. Plaintiffs then filed their preliminary injunction motion just two days later. In the sole case Defendants cite, *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016), the plaintiff waited five months after filing a trademark infringement lawsuit before seeking a preliminary injunction motion. *Id.* at 1248–49. Plainly, waiting five months after filing a lawsuit to seek a preliminary injunction is vastly different than filing a motion seeking to preliminarily enjoin a law weeks before the law is set to take effect. For this reason alone, Defendants' contention fails.

Defendants also contend that Plaintiffs' counsel's supposedly "dilatory" conduct in filing a prior lawsuit on behalf of different Plaintiffs challenging SB 184 (the *Ladinsky* case), and subsequently dismissing that lawsuit after it was consolidated with a separate case (the *Walker* case), somehow disentitles the

45

Plaintiffs in this case—who were not parties to either *Ladinsky* or *Walker*—to injunctive relief. *See* Opp. at 131-35. But Defendants ignore the fact that the Plaintiffs here have diligently pursued their claims and promptly sought a preliminary injunction. Indeed, just three days after the Complaint was filed, lead Plaintiffs' counsel appeared at a status conference before this Court, announced that Plaintiffs were ready to proceed, and asked the Court to set a date for a preliminary injunction hearing as soon as practicable, before SB184 was set to take effect on May 8. It was Defendants—not Plaintiffs—who sought to delay the hearing, claiming that the State's experts needed more time to prepare. Despite this claim, however, Defendants were able to submit six expert declarations, 14 fact witness declarations, and a 142-page brief. Moreover, since the status conference, both Plaintiffs and Defendants have met every deadline set by the Court, and Plaintiffs stand ready to proceed with the hearing as scheduled. Thus, Defendants' complaints that Plaintiffs' counsel have somehow caused delay are not well-founded.[7]

---

[7] In an attempt to bolster its argument that Plaintiffs' counsel somehow engaged in improper conduct, Defendants' opposition brief cites statements and decisions made by counsel in the *Walker* case. Such statements and decisions are irrelevant, as the undersigned counsel was not counsel of record in *Walker* and has never represented any of the plaintiffs in *Walker*. Moreover, Defendants' accusations of "judge shopping" are spurious. Since filing the Complaint, Plaintiffs have not taken any action to seek assignment of this case to another judge.

## 2.   *Plaintiffs Have Shown Irreparable Harm.*

Defendants cite to *Younger v. Harris*, 401 U.S. 37 (1971), for the proposition that the threat of felony prosecution is insufficient to establish irreparable harm. But *Younger* is inapposite. *Younger* stands for the principle that federal courts should abstain from interfering with criminal prosecutions that have already been instituted in state courts. It has no bearing on whether federal courts can issue prospective injunctive relief to prevent state officials from enforcing a law in the future that would deprive an individual of his or her constitutional rights where, as here, no state court proceeding is already pending. As the Eleventh Circuit has explained, "*Younger* abstention applies only in three exceptional circumstances: (1) ongoing state criminal prosecutions; (2) certain civil enforcement proceedings, and (3) civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Tokyo Gwinnett, LLC v. Gwinnett County, Ga.*, 940 F.3d 1254, 1267 (11th Cir. 2019) (citing *Sprint Comms., Inc. v. Jacobs*, 571 U.S. 69, 78 (2013)). None of these "exceptional circumstances" is present here, nor does *Younger* somehow warrant a finding of no irreparable harm. To the contrary, as other courts have concluded, the threat of a felony prosecution for exercising one's constitutional rights is sufficient to show irreparable harm justifying a preliminary injunction. *See, e.g.*, *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1309 (S.D. Fla. 2008).

47

Setting that aside, Defendants' opposition entirely ignores the evidence that the Transgender Plaintiffs will suffer irreparable harm if a preliminary injunction is not granted. Defendants argue that "even assuming gender-transition procedures could theoretically benefit *some* child, practitioners have no way of knowing *ex ante* whether gender-transition procedures will benefit a *particular* child experiencing gender incongruity." But Defendants' focus on children in the abstract fails to address the undisputed declarations submitted by the Parent Plaintiffs detailing the harm their children will face if SB184 is allowed to take effect. *See, e.g.*, Boe Decl., Doc. 8-5 ¶ 15 (describing Plaintiff Brianna Boe's concerns about her son's well-being if SB184 were to take effect, including because of her son's "history of cutting and prior suicidal ideation"); Zoe Decl., Doc. 8-6 ¶ 13 (explaining that if SB184 were to take effect, Plaintiff Zachary Zoe would "experience severe, unnecessary distress" and would "develop irreversible physical traits that are inconsistent with his male identity," which would have "a lasting negative effect on Zachary's future and irreparably jeopardize his chance to lead a healthy, happy life as an adult"); Poe Decl., Doc. 8-7 ¶ 25 (explaining that if Plaintiff Allison Poe were forced to stop or delay medical treatments for her gender dysphoria as a result of SB184 going into effect, it would be "devastating to her overall health and wellbeing" and may require "in-patient psychiatric care to prevent [Allison] from harming herself or worse").

Finally, Defendants' argument that denying a preliminary injunction would preserve the status quo, Opp. at 140, defies logic. As Plaintiffs' declarations establish, healthcare providers in Alabama are currently providing safe, effective, and medically necessary treatments to youth with gender dysphoria. The Parent Plaintiffs, in consultation with their children's medical providers, have determined that continuing these treatments is in their children's best interests. If SB 184 were to take effect, Plaintiffs would face potential prosecution and conviction for a felony, punishable by up to ten years imprisonment, for continuing to provide these treatments, regardless of what consequences abruptly ceasing to provide them might have. Far from preserving the status quo, allowing SB 184 to take effect would destroy it.

### G.     The Court Should Not Require a Bond.

No security is necessary or proper here because Defendants would not sustain any costs or damages from being wrongfully enjoined or restrained, and they have not argued that they would be. Rule 65(c) provides in full that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages *sustained by any party* found to have been wrongfully enjoined or restrained." (emphasis added). "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v.*

*Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978). Defendants—Alabama's Attorney General and district attorneys for five of the State's counties—have not even suggested how they, as the parties to be enjoined from enforcing the Act, would sustain any costs or damages from having been enjoined or restrained during the pendency of this case. That is because there are no such costs or damages to them, and therefore, no security would be proper. *See, e.g.*, *Verizon Emp. Benefits Comm. v. Respress*, No. 1:14-cv-155-MEF, 2014 WL 2275504, at *1 (M.D. Ala. Mar. 24, 2014) (waiving bond requirement when preliminarily enjoining defendants "from dissipating, transferring, pledging, spending, disposing of, or encumbering the $55,997.59 remaining in" plaintiff's retirement account because court "determined that no costs or damages will be incurred by Defendants during the pendency of this Preliminary Injunction Order").

This Court routinely waives the bond requirement when granting a preliminary injunction based on the plaintiff's likelihood of success on a constitutional claim. *Ron Group, LLC v. Azar*, No. 2:20-cv-1038-ECM, 2021 WL 5576616, at *7–8 (M.D. Ala. Nov. 29, 2021) (exercising discretion to waive bond requirement when preliminarily enjoining Commissioner of Alabama Medicaid Agency from recouping plaintiff's Medicaid claims, at rate of $143,306.72 per month, based on plaintiff's likelihood of success on constitutional claim). *See, e.g.*, *Robinson v. Marshall*, 454 F. Supp. 3d 1188, 1206 (M.D. Ala. 2020) (waiving bond

requirement when preliminarily enjoining Alabama State Health Officer and Alabama Attorney General from enforcing certain medical restrictions based on plaintiff's likelihood of success on constitutional claim); *Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1060 (M.D. Ala. 2019) (waiving bond requirement when preliminarily enjoining Alabama Attorney General from enforcing Alabama criminal statute based on plaintiff's likelihood of success on constitutional claim); *Carter v. Montgomery Hous. Auth.*, No. 2:09-cv-971-MEF-CSC, 2009 WL 3711565, at *2 (M.D. Ala. Nov. 3, 2009) (exercising discretion to waive bond requirement when preliminary enjoining Housing Authority of City of Montgomery to reinstate and maintain Section 9 benefits to indigent plaintiffs based on likelihood of success on constitutional claim because plaintiffs are indigent). Other courts are in accord. *See, e.g.*, *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (affirming district court's decision not to require bond to enjoin Arizona officials from terminating eligibility for health-care benefits of state employees' same-sex partners); *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991) (adopting rule that "[a] district court should consider the impact that a bond requirement would have on enforcement of such a [federal] right, in order to prevent undue restriction of it" and affirming district court's waiver of bond requirement in part because plaintiff "sued to enforce the rights granted to it under the federal Medicaid statute").

Although Defendants do not claim that they would incur costs or damages themselves, they instead argue that their being preliminarily enjoined from prosecuting the Provider Plaintiffs under the Act would somehow, under some supposedly "straightforward" but undisclosed "calculation," "unjustly enrich[]" each Provider Plaintiff in the ballpark of $1 million. Opp. at 142. Defendants cite no case in which a court has required security because a plaintiff supposedly would be unjustly enriched by a wrongful injunction. The only case Defendants cite mentioning unjust enrichment in the context of Rule 65(c) securities, *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999), did not require a bond for possible unjust enrichment; instead, the Fourth Circuit remanded to the district court to apply Rule 65(c) because the district court had ignored the rule altogether and, in a footnote, the Fourth Circuit merely quoted the same language Defendants quote from Wright & Miller's *Federal Practice & Procedure* and cited *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974), in which the Second Circuit reiterated that "the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined." *Hoechst* does not support Defendants' request.

Even if the Court were to consider some security proper, Defendants' proposed $1 million per Provider Plaintiff is grossly disproportionate to the bonds required by this Court in cases similar to this one. *See, e.g.*, *Summit Med. Ctr. of*

*Ala., Inc. v. Siegelman*, 227 F. Supp. 2d 1194, 1205–06 (M.D. Ala. 2002) (requiring only $10,000 bond of "group of health care facilities and physicians" to preliminarily enjoin "the Governor of the State of Alabama, the Attorney General, the State Health Officer, and a class of prosecuting attorneys" from enforcing statute with criminal penalties). It is similarly disproportionate to cases, unlike this one, where actual monetary loss is at stake. *See, e.g.*, *Auburn Univ. v. Moody*, No. 3:08cv796-CSC (WO), 2008 WL 4767721, at *2 (M.D. Ala. Oct. 30, 2008) (requiring only $5,000 bond of Auburn University to preliminarily enjoin sale of souvenirs infringing on university's trademark). *Accord Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322 (9th Cir. 1975) (reversing district court's requiring $4.5 million bond "to protect the City of San Francisco against losses" from injunction of airport expansion).

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a temporary restraining order and preliminary injunction.

Respectfully submitted this 4th day of May, 2022.

*/s/ Melody H. Eagan*
Melody H. Eagan (ASB-9780-D38M)
Jeffrey P. Doss (ASB-4212-R62D)
Amie A. Vague (ASB-4113-Q46I)
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
205.581.0700

meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt (ASB-3507-J56P)
Misty L. Peterson (GA Bar No. 243715) (*pro hac vice*)
Adam Reinke (GA Bar No. 510426) (*pro hac vice*)
Gilbert Oladeinbo (GA Bar No. 669340) (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
404.572.4600
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com
goladeinbo@kslaw.com

Brent P. Ray (IL Bar No. 6291911) (*pro hac vice*)
Abigail Hoverman Terry (IL Bar No. 6327057) (*pro hac vice*)
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
312.995.6333
bray@kslaw.com
ahoverman@kslaw.com

Michael B. Shortnacy (CA Bar No. 277035) (*pro hac vice*)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
213.443.4355

mshortnacy@kslaw.com

Asaf Orr (CA Bar No. 261650) (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
aorr@nclrights.org

Jennifer L. Levi (MA Bar No. 562298) (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org

Scott D. McCoy (FL Bar No. 1004965) (*pro hac vice*)
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33101
334.224.4309
scott.mccoy@splcenter.org

Diego A. Soto (ASB-3626-Y61S)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
334.604.1414
diego.soto@splcenter.org

Jessica L. Stone (GA Bar No. 275567) (*pro hac vice*)
SOUTHERN POVERTY LAW CENTER

150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
404.221.5837
jessica.stone@splcenter.org

Sarah Warbelow (MI Bar No. P66690) (*pro hac vice*)
Cynthia Weaver (NY Bar No. 5091848) (*pro hac vice*)
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
202.628.4160
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 4th, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF filing system, which will provide notice of such filing to all counsel of record.

*/s/ Melody H. Eagan* _____
*Attorney for Plaintiffs*