# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D.<br><br>                      Plaintiffs,<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>    Plaintiff-Intervenor,<br><br>      v.<br><br>KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BLAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th | Case No. 2:22-cv-184-LCB-SRW<br><br>Honorable Liles C. Burke |

1

Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County.

                Defendants.

## AMENDED COMPLAINT IN INTERVENTION

Plaintiff-Intervenor, the United States of America ("United States"), alleges:

## PRELIMINARY STATEMENT

1. This lawsuit challenges a state statute that denies necessary medical care to children based solely on who they are.

2. All people, including transgender youth, deserve to be treated with dignity and respect. And the Fourteenth Amendment demands that Alabama not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

3. The United States accordingly files this complaint in intervention to enforce the Constitution's guarantee of equal protection, and to challenge Section 4 of Act No. 2022-289, Senate Bill ("S.B.") 184 (2022), the "Alabama Vulnerable Child Compassion and Protection Act."

4. S.B. 184 criminalizes certain forms of medically necessary care for transgender minors. Specifically, S.B. 184 makes it a felony to "engage in or cause" specified types of medical care for minors, if performed for "the purpose of

attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent" with sex assigned at birth.

5. S.B. 184 thus allows a minor to receive certain medical procedures or treatment only if they will be used to affirm the sex that the minor was assigned at birth.

6. The law discriminates against transgender minors by unjustifiably denying them access to certain forms of medically necessary care.

7. While criminalizing certain forms of medically necessary gender-affirming care for transgender minors, S.B. 184 permits all other minors to access the same procedures and treatments.

8. As a result of S.B. 184, medical professionals, parents, and minors old enough to make their own medical decisions are forced to choose between forgoing medically necessary procedures and treatments or facing criminal prosecution.

9. S.B. 184's felony ban on various forms of medically necessary gender-affirming care for transgender minors discriminates on the basis of both sex and transgender status in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

11. The United States is authorized to intervene in this action pursuant to 42 U.S.C. § 2000h-2. The Attorney General of the United States has certified that this case is of general public importance.

12. Venue is proper pursuant to 28 U.S.C. §§ 81(b) and 1391(b).

13. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14. Plaintiff-Intervenor is the United States of America.

15. Defendant Kay Ivey is the Governor of the State of Alabama. Governor Ivey is sued in her official capacity.

16. Defendant Steve Marshall is the Attorney General of the State of Alabama. Attorney General Marshall is sued in his official capacity.

17. Defendant Daryl D. Bailey is the Montgomery County District Attorney. Mr. Bailey is sued in his official capacity.

18. Defendant C. Wilson Blaylock is the District Attorney for the 32nd Judicial Circuit, which oversees Cullman County. Mr. Blaylock is sued in his

official capacity.

19. Defendant Jessica Ventiere is the Lee County District Attorney. Ms. Ventiere is sued in her official capacity.

20. Defendant Tom Anderson is the District Attorney for the 12th Judicial Circuit, which oversees Coffee County and Pike County. Mr. Anderson is sued in his official capacity.

21. Defendant Danny Carr is the Jefferson County District Attorney. Mr. Carr is sued in his official capacity.

## FACTUAL ALLEGATIONS

22. Transgender people are individuals whose gender identity does not conform with the sex they were assigned at birth.

23. The American Psychiatric Association has stated "[b]eing transgender or gender diverse implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."

**A. Standard of Care for Treating Transgender Youth**

24. According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V"), an authoritative source for psychiatric conditions, "Gender Dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to

them at birth.

25. As the DSM-V explains, to be diagnosed with gender dysphoria, the individual must experience the incongruence for at least six months and experience clinically significant distress or impairment in social, occupational, or other important areas of functioning.

26. The American Psychiatric Association recognizes that not all transgender persons have gender dysphoria. A diagnosis of gender dysphoria is currently required in order to receive many forms of gender-affirming care, including hormone therapy and surgery.

27. The DSM-V notes that medical treatment for gender dysphoria addresses the clinically significant distress created by gender dysphoria by helping people who are transgender live in alignment with their gender identity.

28. The precise treatment for gender dysphoria depends on each person's individual needs. According to clinical guidelines from the World Professional Association for Transgender Health ("WPATH"), the number and type of interventions to treat gender dysphoria may differ from person to person. The medical standards of care differ depending on whether the treatment is for a pre-pubertal child, an adolescent (i.e., minors who have entered puberty), or an adult.

29. The American Academy of Pediatrics agrees that gender-affirming care is safe, effective, and medically necessary treatment for the health and

wellbeing of some children and adolescents suffering from gender dysphoria.

30. Before puberty, the American Academy of Pediatrics recommends treatment for gender dysphoria that does not include any pharmaceutical or surgical intervention and is limited to "social transition," which means allowing a transgender child to live and express themselves in ways consistent with their gender identity.

31. As transgender youth reach puberty, puberty delaying therapy may become medically necessary and appropriate for some minors according to the Endocrine Society's clinical practice guidelines.

32. According to the American Academy of Pediatrics, gender dysphoria may emerge or worsen with the onset of puberty. For many transgender adolescents, going through puberty in accordance with the sex assigned to them at birth, can cause extreme distress.

33. According to WPATH, refusing timely and necessary medical interventions for adolescents may prolong gender dysphoria and lead to an appearance that provokes abuse and stigmatization; such gender-related abuse is in turn associated with psychiatric distress.

34. The Endocrine Society's clinical guidelines recognize that puberty delaying hormone treatment (also referred to as puberty blockers or puberty suppressing treatment) allows transgender youth to avoid experiencing heightened

gender dysphoria and permanent physical changes that puberty would cause. Before providing such therapy, pediatric endocrinologists work in close consultation with qualified mental health professionals experienced in diagnosing and treating gender dysphoria.

35. Under the Endocrine Society's clinical guidelines, transgender adolescents may be eligible for puberty-blocking hormone therapy only if the following steps have been taken:

- A qualified mental health professional confirms the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria, gender dysphoria worsened with the onset of puberty, and any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment;

- The adolescent has sufficient mental capacity to give informed consent to this treatment, has been informed of the effects and side effects of treatment (including potential loss of fertility) and options to preserve fertility; and has given informed consent and the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process; and

- A pediatric endocrinologist or other clinician experienced in pubertal assessment agrees with the indication for treatment, has confirmed that puberty has started in the adolescent, and has confirmed that there are no medical contraindications to treatment.

36. According to WPATH, during puberty suppression, an adolescent's physical development should be carefully monitored, preferably by a pediatric endocrinologist, so that any necessary interventions can occur.

8

37. WPATH also recognizes that for some transgender adolescents, it may be medically necessary and appropriate to provide hormone therapy to initiate puberty consistent with gender identity.

38. Under WPATH's clinical guidelines, adolescents who are transgender may receive medically necessary chest reconstructive surgeries prior to the age of majority if they have severe gender dysphoria, provided they have been living consistent with their gender identity for a significant period of time.

39. According to WPATH, while some transgender individuals find comfort with their gender identity without surgery, for others surgery is essential and medically necessary to alleviate gender dysphoria. Surgery is often the last and most considered step in treatment for gender dysphoria.

**B.     Senate Bill 184**

   **1.     Bill Text**

40. S.B. 184 was signed into law by Governor Kay Ivey on April 8, 2022. The law will become effective on May 8, 2022.

41. Section 2 of the bill includes various legislative findings suggesting that sex is an immutable characteristic that cannot be changed. The findings reject the need for interventions to treat gender dysphoria, describing such treatments as "unproven" and "experimental" and causing "numerous harmful effects." The findings characterize a "discordance between sex and identity" as a state that

resolves itself over time in most cases.

42. Section 3 of the bill defines "sex" as the "biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles."

43. Section 4 of the bill identifies a set of medical practices, including administering puberty blockers, administering hormone therapy, and surgical interventions (including the removal of "any healthy or non-diseased body part or tissue, except for a male circumcision"). It further provides that "no person shall engage in or cause any of" these practices to be performed on a minor for "the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent" with sex assigned at birth.

44. Section 4 contains an exception for procedures "undertaken to treat a minor born with a medically verifiable disorder of sex development."

45. By its terms, the prohibition in S.B. 184 necessarily implicates parents of transgender minors as well as health care providers and other medical professionals. And because S.B. 184 prohibits any person from causing the prohibited treatment, a transgender minor may face prosecution for seeking out their own medically necessary care. *See* Ala. Code § 22-8-4 ("Any minor who is 14 years of age or older, or has graduated from high school, or is married, or

having been married is divorced or is pregnant may give effective consent to any legally authorized medical, dental, health or mental health services for himself or herself, and the consent of no other person shall be necessary.").

46. Violation of Section 4 of S.B. 184 is a Class C felony, which is punishable by up to 10 years of imprisonment and a fine of up to $15,000. *See* Ala. Crim. Code §§ 13-A-5-6(a)(3), 13A-5-11(a)(3).

### 2. Impact of S.B. 184

47. S.B. 184's felony ban on various forms of gender-affirming care prohibits transgender minors from accessing certain medical procedures or treatment if they will be used to affirm a gender identity inconsistent with the sex assigned at birth.

48. The law discriminates against transgender minors by unjustifiably denying them access to certain forms of medically necessary care. S.B. 184 prohibits transgender minors from obtaining care that is well recognized within the medical community as medically appropriate and necessary, while imposing no comparable limitation on medically necessary care by cisgender minors.

49. In addition, the law allows children to access the exact same medical procedures or treatment if they will be used to reinforce the gender they were assigned at birth.

50. With respect to medical care, S.B. 184 permits a doctor, for example, to prescribe testosterone for a cisgender male minor suffering from delayed pubertal development or a condition such as hypogonadism, but the law makes it a felony for the same doctor to prescribe the same testosterone to a transgender male youth to affirm his gender identity.

51. With respect to surgical procedures, for example, the law permits a cisgender girl to undergo a voluntary non-cancer related breast augmentation procedure to make her feel more accepting of her body, but forbids a transgender girl from receiving the same procedure even when recommended as medically appropriate by her physician. The law also permits a cisgender boy with gynecomastia to have excess breast tissue surgically removed to give him a more "male" physique, but does not permit a transgender boy to obtain the same treatment.

52. In other words, the sex a minor was assigned at birth determines the legality and availability of medically necessary treatments.

53. In restricting who may receive medically prescribed care based on the individual's sex assigned at birth, S.B. 184 threatens health care providers with criminal sanctions for exercising their independent medical judgment and expertise and threatens parents and others with criminal sanctions for acting on their judgment of what is in their child's best interest.

54. Further, the law prevents transgender minors from accessing gender-affirming care that is widely recognized within the medical community as the only effective treatment for some individuals diagnosed with gender dysphoria. S.B. 184 prevents healthcare providers from considering the recognized standard of care for gender dysphoria and from providing medically necessary gender-affirming care for improving the physical and mental health of their patients.

## CAUSE OF ACTION

### COUNT ONE
### Violation of Equal Protection
### U.S. Constitution, Amendment XIV
### Plaintiff-Intervenor United States against All Defendants

55. The United States re-alleges and re-pleads all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporates them herein by reference.

56. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits state and local governments from denying to any person within their jurisdiction the equal protection of the laws.

57. Section 4 of S.B. 184 discriminates both on the basis of sex and on the basis of transgender status, each in violation of the Equal Protection Clause.

58. Under the Equal Protection Clause, government classifications based on sex or on transgender status are subject to heightened scrutiny and are presumptively unconstitutional.

59. Section 4 of S.B. 184 cannot survive heightened scrutiny because it is not substantially related to achieving Alabama's articulated important governmental interests.

60. In the alternative, Section 4 of the statute could not survive any level of scrutiny because it is not rationally related to a legitimate government interest.

61. The above conduct of Defendants has been taken under color of state and local law.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

a. Enter a judgment declaring that Section 4 of S.B. 184 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

b. Temporarily restrain, and issue a preliminary and permanent injunction restraining, Defendants from enforcing Section 4 of S.B. 184; and

c. Grant such additional relief as the needs of justice may require.

| | |
|---|---|
| Dated: May 4, 2022 | Respectfully submitted, |
| SANDRA J. STEWART<br>United States Attorney<br>Middle District of Alabama | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| PRIM F. ESCALONA<br>United States Attorney<br>Northern District of Alabama | JOHN POWERS (DC Bar No. 1024831)<br>Counsel to the Assistant Attorney General<br>Civil Rights Division |
| LANE H. WOODKE<br>Chief, Civil Division<br>Northern District of Alabama | CHRISTINE STONEMAN<br>Chief, Federal Coordination and<br>Compliance Section |
| JASON R. CHEEK<br>Deputy Chief, Civil Division<br>U.S. Attorney's Office<br>Northern District of Alabama<br>1801 Fourth Avenue North<br>Birmingham, Alabama 35203<br>Tel.: (205) 244-2104<br>Jason.Cheek@usdoj.gov | COTY MONTAG (DC Bar No. 498357)<br>Deputy Chief, Federal Coordination and<br>Compliance Section<br><br>*s/Alyssa C. Lareau*<br>ALYSSA C. LAREAU (DC Bar No. 494881)<br>RENEE WILLIAMS (CA Bar No. 284855)<br>KAITLIN TOYAMA (CA Bar No. 318993)<br>Trial Attorneys |
| STEPHEN D. WADSWORTH<br>Assistant United States Attorney<br>U.S. Attorney's Office<br>Middle District of Alabama<br>Post Office Box 197<br>Montgomery, Alabama 36101-0197<br>Tel.: (334) 223-7280<br>Stephen.Wadsworth@usdoj.gov | United States Department of Justice<br>Civil Rights Division<br>Federal Coordination and Compliance<br>Section<br>950 Pennsylvania Avenue NW - 4CON<br>Washington, DC 20530<br>Tel.: (202) 305-2994<br>Alyssa.Lareau@usdoj.gov<br>Renee.Williams3@usdoj.gov<br>Kaitlin.Toyama@usdoj.gov<br><br>*Attorneys for Plaintiff-Intervenor United States of America* |