```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF ALABAMA
 2                         NORTHERN DIVISION

 3

 4      REV. PAUL A. EKNES-TUCKER,    *
        et al.,                       *
 5                                    *
                Plaintiffs,           *   2:22-cv-00184-LCB
 6                                    *   April 22, 2022
        vs.                           *   Montgomery, Alabama
 7                                    *   10:00 a.m.
        KAY IVEY, in her official     *
 8      capacity as Governor of the   *
        State of Alabama, et al.,     *
 9                                    *
                Defendants.           *
10      ****************************

11

12

13                 TRANSCRIPT OF STATUS CONFERENCE
                  BEFORE THE HONORABLE LILES C. BURKE
14                    UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
        pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
24       and Procedures Vol. VI, Chapter III, D.2.  Transcript
                    produced by computerized stenotype.
25
```

CHRISTINA K. DECKER, RMR, CRR
Federal Official Court Reporter
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                                 <u>APPEARANCES</u>

2

      <u>FOR THE PLAINTIFFS</u>:
3     Melody Eagan, Esq.
      Amie Vague, Esq.
4     Jeffrey P. Doss, Esq.
      LIGHTFOOT, FRANKLIN & WHITE, LLC
5     The Clark Building
      400 20th Street North
6     Birmingham, Alabama 35203

7     Diego Soto, Esq.
      SOUTHERN POVERTY LAW CENTER
8     400 Washington Avenue
      Montgomery, Alabaama 36104
9     (334) 604-1414

10

      <u>FOR THE DEFENDANT</u>:
11    James W. Davis, Esq.
      Edmund LaCour, Esq.
12    Barrett Bowdre, Esq.
      Benjamin Seiss, Esq.
13    OFFICE OF THE ATTORNEY GENERAL
      501 Washington Avenue
14    P.O. Box 300152
      Montgomery, Alabama 36130-0152
15    (334) 242-7300

16

17    <u>COURTROOM DEPUTY</u>:  Deena Harris

18

19    <u>COURT REPORTER</u>:  Christina K. Decker, RMR, CRR

20

21

22

23

24

25

**P R O C E E D I N G S**

1
2          (In open court.)
3          THE COURT:  Good morning.  Please take your seats.
4     All right.  Court calls Eknes-Tucker vs. Ivey.
5     I will ask the plaintiffs am I pronouncing your client's
6  name correctly?
7          MS. EAGAN:  Yes, Your Honor.
8          THE COURT:  All right.  I would ask the attorneys
9  please to identify themselves for the record.
10          MS. EAGAN:  Your Honor, Melody Eagan for the
11  plaintiffs.
12          MR. DOSS:  Jeff Doss for the plaintiffs.
13          MS. VAGUE:  Your Honor, Amie Vague here for the
14  plaintiffs.
15          MR. SOTO:  Diego Soto for the plaintiffs.
16          MR. DAVIS:  Good morning, Judge.  Jim Davis for the
17  defendants.
18          MR. BOWDRE:  Barrett Bowdre for the defendants.
19          MR. LACOUR:  Edmund LaCour for the defendants.
20          MR. SEISS:  Benjamin Seiss for the defendants.
21          THE COURT:  All right.  So I really just viewed today
22  as let's get a roadmap of where we're headed.  I'm guessing the
23  T.R.O. is not an issue, and we're just down to a preliminary
24  injunction, or am I incorrect about that?
25          MS. EAGAN:  Your Honor, we have filed a motion for

```
 1   preliminary injunction, or, in the alternative, T.R.O.

 2        As Your Honor knows, this law is set to go into effect

 3   May 8th unless enjoined.  If a ruling on the preliminary

 4   injunction could be had in a hearing before the law goes into

 5   effect, then a preliminary injunction would be the remedy.

 6        If the Court needs more time to determine the outcome of

 7   the preliminary injunction request, then we would request a

 8   T.R.O.

 9             THE COURT:  Well, depending on the time that we think

10   that this hearing might last, it would be my belief that we

11   could conduct such a hearing within the time that we need to.

12        So, then, that would be my question to you.  On your end,

13   how do you see this, as far as time?  Are you going to call

14   witnesses?  If so, how many?  What are we looking at?

15             MS. EAGAN:  Your Honor, we were under -- we assumed

16   that there would be some type of evidentiary hearing where

17   there would be some calling of witnesses.  The number of

18   witnesses that would be called could depend -- may depend on

19   certain rulings that Your Honor makes, such as the issue of the

20   pseudonyms that some of the plaintiffs are seeking to travel

21   under in this case because of privacy concerns.  But I would

22   anticipate -- if you may -- hold on a second.

23        Our best estimate would be a hearing would likely be a day

24   or two, possibly into a second day.

25             THE COURT:  Day and a half?
```

1          MS. EAGAN:  I think that's probably fair.  I'm not

2    sure what the AG's office would be doing, or, you know, in that

3    regard, how many witnesses they would be calling.  But I would

4    think that would likely be sufficient time.

5          THE COURT:  All right.  So I know we have a huge

6    number of attorneys who have made appearances on your side.

7    Tell me who is actually going to be carrying the water.

8          MS. EAGAN:  (Indicating.)

9          THE COURT:  Just you?

10         MS. EAGAN:  No.

11         THE COURT:  All right.

12         MS. EAGAN:  I've got my trusted colleague here, Jeff

13   Doss, who I know has been before Your Honor.  We would be lead

14   counsel in the case at Lightfoot.  But there will be other

15   counsel who will be admitted pro hac vice, but we would

16   anticipate that we would be taking the lead.

17         THE COURT:  Okay.

18      All right.  The pseudonym issue.  I know we have got

19   some -- I know I have got that request sitting there.  Is the

20   State prepared to touch on that today, or is that something

21   that you'd need some time on?

22         MR. DAVIS:  Your Honor, we do need some time on that.

23   We could be prepared to brief that for you within the week.

24         THE COURT:  All right.

25         MR. DAVIS:  If we could have a week to brief that and

1  let you know our position, we would appreciate it.

2          THE COURT:  All right.  So let me ask that same

3  question from the other side.

4      They say they need a day and a half.  And, Ms. Eagan, are

5  you just including your own time in that?  Or are you including

6  what you think we might get from the other side?

7          MS. EAGAN:  Your Honor, I would think that would be

8  likely our time, if there's cross-examinations, and things like

9  that.

10          THE COURT:  All right.  It wouldn't include whoever

11  they call if they happen to call an evidentiary witness, or

12  something like that.

13          MS. EAGAN:  That's my best estimate, it would be a day

14  to a day and a half for our case.

15          THE COURT:  All right.  Mr. Davis, what are your

16  thoughts on that from the State's side?

17          MR. DAVIS:  Judge, from the State's side, if we have

18  any live witnesses, it would likely be no more than one or two.

19  We will likely be relying primarily on expert declarations.

20          THE COURT:  All right.  And how many of those do we

21  think we will have?

22          MR. DAVIS:  That's in flux.  It depends on our

23  schedule and how much time you give us to respond to the new

24  P.I. motion that we got yesterday.

25          THE COURT:  Okay.  And I have no idea if you have

```
 1  talked about this or if this is even an issue, but is anybody
 2  going to desire to put up a witness who is not live, or, as you
 3  have said, or, you know, are we going to get into any of that?
 4              MR. DAVIS:  Judge, the witnesses we are likely to
 5  bring would probably be out of state.  And it just depends on
 6  the schedule as to whether or not they would be able to get
 7  here.
 8              THE COURT:  Okay.
 9              MR. DAVIS:  So Your Honor may not allow it, which we
10  understand.  That's fine.  If allowed, we may have one or two
11  witnesses who would testify by Zoom, if the Court is open to
12  that.  If not, we would be relying on declarations.
13              THE COURT:  I will say that my preference is a live
14  witness.  I feel like you would get a better result that way,
15  both for the attorneys and for the case.
16              MR. DAVIS:  It's ours, too.  I'm thinking of medical
17  doctors who -- we will work on that.
18              THE COURT:  Got it.  Got it.  Got it.
19         Okay.  So maybe a half a day on your side?
20              MR. DAVIS:  Maybe, yes.
21              THE COURT:  Maybe on the less side or maybe on
22  the more side?
23              MR. DAVIS:  Maybe on the less side.
24              THE COURT:  Okay.
25              MR. DAVIS:  We will be primarily relying on legal
```

1  argument and declarations.

2          THE COURT:  So we need to set aside two days.

3      All right.  Then let me ask -- I will go back to the

4  plaintiffs' side.  Tell me this:  When would you be ready for

5  such a hearing?  And let me say I think next week is just out.

6  Everybody has to have a chance to respond and get ready, that

7  sort of thing.

8          MS. EAGAN:  Sure.  And I assume that the State would

9  want to have time to brief their opposition, and then we would

10 like to have maybe 48 hours to file a reply to their

11 opposition, if Your Honor would allow.

12     So as I was looking at my calendar last night, maybe look

13 to do the hearing, if the Court -- if this is acceptable to the

14 Court, around May 4th, 5th, sometime, you know, middle of the

15 week next week, which would give the parties time to do

16 adequate briefing and to be prepared.

17         THE COURT:  Let me look at my calendar real quick.

18         MS. EAGAN:  Judge, another option would be May 3rd and

19 4th, which would I think give time for briefing and would give

20 Your Honor a couple of weekdays before the law would go in

21 effect.

22         THE COURT:  I don't think those days would work for

23 me, at least one of those.

24     Let me ask the State:  If we -- and I say this

25 tentatively -- if we tentatively looked at Thursday, May

1  the 5th, and Friday, May the 6th, does that work for the State?

2         MR. DAVIS:  Your Honor, we can make it work.  But we

3  don't think that gives us adequate time to reply.

4      The dismissal and re-filing of the lawsuit has caused a

5  delay that has prejudiced us in our ability to respond.  We

6  have a brand new P.I. motion that we just got yesterday.

7      We think it fair -- we could have been ready to respond

8  had the original P.I. motion still been in effect.  We would

9  have three weeks to brief it, and we could have gotten this

10 done before the law goes into effect.

11     But our experts have just gotten this.  They're working on

12 it.  If we have to respond in time for a hearing before May the

13 8th, we're going to be limited in what we're able to get to

14 you.

15     We can brief the equities, we can touch on the merits,

16 maybe get a portion of one of our expert reports.  But we ask

17 that we have until May the 12th to respond to the P.I. motion.

18 That's three weeks after we got the new P.I. motion.  The Court

19 could have a hearing the week of May the 16th.

20     I recognize it's after the law goes into effect, but I

21 think it would only be in effect for a couple of weeks.  And I

22 don't think the plaintiffs have shown you anything that there

23 will be irreparable harm in such a brief period.

24     So we think we need at least until May 12th.  That gives

25 us a fair opportunity to reply.  And the delay we don't think

1   should come out of our pocket.

2          THE COURT:  Okay.  So question then.  What do you

3   anticipate -- what do your filings look like on your side?

4          MR. DAVIS:  Our filings --

5          THE COURT:  Are you just going to be filing a brief?

6   Are you going to have some other motions?  What's it going to

7   look like on the State's side?

8          MR. DAVIS:  Well, we can reply to other things before

9   then.  Like the motion to proceed pseudonymously.  We will get

10  that out of the way next week.

11      If you want us to brief the equities earlier, we can do

12  that as early as Monday or Tuesday.

13      But to brief likelihood of success on the merits, we would

14  file a brief in opposition to the P.I. motion, and we would

15  provide you expert reports that we think would give the Court

16  the tools to assess whether plaintiffs are likely to succeed on

17  the merits.

18          THE COURT:  All right.  And tell me why we would need

19  until -- give me the nuts and bolts of why we would need until

20  May the 12th to do that.

21          MR. DAVIS:  Judge, these are doctors, for the most

22  part, with practices, with patients.  They're working.  They

23  have been spinning their wheels responding to expert reports

24  that have now been, I guess, withdrawn, that they're not

25  relying on them anymore.  So we are starting over a little bit.

1       A lot of the work they've done.  Some of the work at least
2  that they've done is still applicable.  But they've wasted time
3  because they have been looking at things that are no -- that
4  plaintiffs are no longer relying on.

5       But they need to address these studies.  They need to
6  write to you -- give you their expert opinions on the
7  treatments that are at issue in this law, the studies that
8  these -- the new experts cite, in terms of suicide rates.

9       There's just a lot to go over.  And it's an expert
10 issue -- the likelihood of success on the merits I think
11 depends on expert testimony.

12      They can't -- we have been in touch to make sure this is
13 the case.  They're not going to be able to get us reports by
14 next week.  But they can get them if we have until May
15 the 12th.

16      And then I think the Court will have the tools to decide
17 these issues.

18          THE COURT:  All right.  Ms. Eagan, do you want to
19 address those issues?

20          MS. EAGAN:  Yes, Your Honor.  I will say this.  I
21 mean, if the State will agree that the Act will not be enforced
22 until a hearing is heard and Your Honor rules on it, if it's
23 after May the 8th, we're fine with more time.

24      I do want to, though, state something to make the record
25 clear.  Mr. Davis said, you know, that they filed a prior P.I.

 1  motion, now I guess the experts have changed.

 2       Your Honor, we were counsel in the Ladinsky matter in the

 3  northern district.  We did not have any motion for a

 4  preliminary injunction or T.R.O. filed in our case, which was

 5  in the northern district.

 6       I know that -- and I'm happy to address this as to why

 7  we've dismissed that case and why we have filed this new case.

 8  And I'm happy to address that if the Court would like for me

 9  to.

10       But the simple fact is we didn't -- we don't have other

11  expert reports that were out there that we have withdrawn.  We

12  never filed a preliminary injunction motion in the Ladinsky

13  matter.

14            THE COURT:  Well, I understand that.  I guess what I

15  am asking is, you know, I hear the State saying, well, you

16  know, if we went a week over, that's really not going to be any

17  prejudice to the plaintiffs.  Is that the case?

18            MS. EAGAN:  No, Your Honor.

19       If they enforce the law, we have -- we have doctors who

20  treat patients, utilizing the treatments that are considered a

21  felony under this Act.  We have parents who are wanting to have

22  their children continue these treatments that they believe is

23  in the best interest of their children and that their doctors

24  believe are in the best interest of their children.  We have

25  children that, if these medications are ceased, that there will

1  be physical, as well as mental impact from that.

2      But the fact is if the law can start being enforced on

3  May the 8th, then the State would be at liberty to prosecute

4  our clients with felonies.  And so we are gravely injured if

5  this is --

6      If the State will agree not to enforce the law until Your

7  Honor makes a ruling on this, then it's fine to go over the

8  8th.  But if the law goes into effect on the 8th, and we don't

9  have a hearing and a ruling until weeks later, or even one week

10  later --

11          THE COURT:  What day was this Act -- when did the

12  Governor sign it and it went into effect?

13          MS. EAGAN:  April the 8th, I believe.  It was a

14  Friday.  I do remember that.  It was April the 8th that

15  Governor Ivey signed the Act into law.

16          THE COURT:  I think I can predict your response, but

17  what's the position of the State on delaying the implementation

18  of the law for a week?

19          MR. DAVIS:  We can't, Judge.  We have to follow the

20  law.

21      But we see no reason why people can't adjust their

22  behavior, take a timeout for two weeks in order for the State

23  to have time to respond to -- if this is a brand new motion,

24  fine.  We've had it for less than 24 -- for about 24 hours now.

25  We need more than a week to respond to all these expert reports

1   and medical testimony.

2           THE COURT:  All right.  Well, the Court will consider

3   all these things, and I will get a schedule out on how we're

4   going to handle this.  We have so many lawyers that I don't

5   think it's much use for me to just compare dates with everybody

6   on what day is good for a trial.  We will just set it and hope

7   everybody can work that out.

8       All right.  Well, let's move along to one other issue.

9   Ms. Eagan, you have got five minutes to tell me why you think

10  you win this case.

11          MS. EAGAN:  Your Honor, I believe many of the grounds

12  are outlined in our motion for preliminary injunction.  But

13  this is a law that makes it a felony for a doctor to provide

14  medical treatment to a pediatric patient that is considered to

15  be accepted in the standard of care by every major medical

16  association, and it makes it a crime for a doctor to treat a

17  patient utilizing those -- that care that a doctor considers to

18  be medically necessary for a child.  So that is ground one.

19      It denies their due process rights, as we have outlined.

20  It impacts freedom of speech because of the fact that it

21  prohibits them from doing anything that might cause the child

22  to get a treatment.

23          THE COURT:  I know you think you win on all the

24  issues.  But tell me what you think your best issue is.

25          MS. EAGAN:  Judge, we believe that -- if I may

 1    confer -- Judge, I think our strongest issues are equal
 2    protection, as well as parental choice, the right to make
 3    decisions for their children in consultation with doctors that
 4    they believe to be in their child's best interest.
 5              THE COURT:  Go on with what you were saying.
 6              MS. EAGAN:  Well, so there's also, Your Honor, a
 7    freedom of speech count in our complaint that is alleged by all
 8    of the plaintiffs, including Rev. Eknes-Tucker, that is because
 9    the law makes it a crime for any act that causes a child to
10    undergo one of these treatments.
11         And so with the reverend, he counsels families with
12    transgender children about the struggles that children are
13    going through, about the parents in making choices that they
14    believe are in the best interest of their child, and talking to
15    them about various choices and let -- and counseling them as
16    parents decide what's in the best interest of their child.
17         If he counsels a parent, and then a parent chooses to take
18    a child -- if these are banned in Alabama, and a parent decides
19    to take a child to Georgia where the treatments are legal, and
20    doctors administer these, then that puts both the reverend as
21    well as the parent potentially liable for a felony under the
22    way that the Act is worded.  So it prescribes freedom of speech
23    based on the content of the speech.  And so that is another
24    argument that we are making.
25         We also make a void for vagueness argument because of the

```
 1  grounds that I have just talked about with the language of
 2  cause.
 3           THE COURT:  Why don't you expand on that vagueness
 4  argument a little bit.
 5           MS. EAGAN:  Well, Your Honor, under the cases that we
 6  have cited in our brief, a law can be held void for vagueness
 7  when it is not clear as to what is made criminal.  And it could
 8  lead to arbitrary enforcement, which is, we believe, this law
 9  is here.  That is one of our later arguments in our motion, but
10  it is a ground that we have raised to the Court.
11           THE COURT:  Anything else?
12           MS. EAGAN:  We also, Your Honor, have a preemption
13  argument because of the discriminatory nature of the law, that
14  we believe that it violates the provisions of the ACA relating
15  to that a doctor cannot discriminate in care.
16       And so that is also another ground that we have raised is
17  that that is -- that the State's law is preempted by federal
18  law.  That is also briefed in our papers.
19           THE COURT:  All right.  Thank you.
20       All right.  Mr. Davis, do you want to address those issues
21  real quick and maybe outline for me the State's end of this?
22           MR. DAVIS:  Judge, our main argument is going to be
23  that these treatments that the law addresses, we expect to
24  prove to you that these are dangerous treatments for children.
25  That they're irreversible.  They're not based on sound medical
```

 1   evidence.

 2        We will go through our experts, given the opportunity, we

 3   will go through the studies and address that for you.

 4        The legislative findings are correct.  It's true that a

 5   lot of children are troubled with gender dysphoria, at least

 6   some are.  They need help.  But a lot of -- the vast majority

 7   of those children, if left alone, if taking a wait-and-see

 8   approach, if they're given counseling, will end up desisting

 9   from gender dysphoria.  They will become comfortable with their

10   biological sex.

11        What's going on instead is they're being pushed into these

12   treatments which are not reversible.  They cause permanent harm

13   to their bodies.  And many come to regret it later in life.

14        And with that as the foundation, we think each of the

15   plaintiffs' claims fail.

16             THE COURT:  All right.  So why don't you touch a

17   little bit and expand on what exactly your argument at this

18   hearing is going to be regarding the State's interest.

19             MR. DAVIS:  That the State's interest is in protecting

20   children.  And that these treatments -- I'm not sure I

21   understand, Judge.

22        That is our arguments.  And we can go through how they --

23   Mr. Bowdre might be able to help go through how they relate to

24   specific claims that the plaintiffs are raising.  But that

25   these treatments are dangerous.

1      And the Legislature -- there is at least medical

2  uncertainty.  Even if you don't agree with us that these

3  treatments are dangerous and unproven, there is at least

4  medical uncertainty which gives the Alabama Legislature room

5  and the need to regulate these treatments.

6           THE COURT:  I saw the light go on in Mr. Bowdre's

7  eyes.  Mr. Bowdre, do you want to say anything?

8           MR. BOWDRE:  Your Honor, just that I agree that -- I

9  mean, this is an area of medical uncertainty as we know from

10  many other countries.

11      The UK has done, in the last couple of years, a very

12  extensive medical review of what is happening in this realm of

13  medicine, and has very much curtailed the treatments that

14  plaintiffs say are required under the Constitution.

15      Finland, Sweden, Australia, New Zealand, all these

16  countries have taken a hard look at these medical procedures

17  and said, well, the evidence doesn't support this, let's slow

18  things down.

19      This is an area of medical uncertainty.  The State

20  certainly has an interest --

21           THE COURT:  Have all of those countries stopped this

22  type treatment?  Is what you're saying?

23           MR. BOWDRE:  All those countries have curtailed or

24  limited the treatments.  They have not stopped --

25           THE COURT:  In what ways have they curtailed or

1   limited it?

2           MR. BOWDRE:  It depends on the country.  But some of

3   the --

4           THE COURT:  Just give me an example or two.

5           MR. BOWDRE:  Sweden, I believe, for instance, has said

6   these treatments can only be done in very controlled

7   experimental procedures.  Like, you know, they're conducting an

8   experiment to see what happens.  And currently there are none

9   actually going on, is my understanding.

10      The UK, there was a decision in Tavistock vs. Bell, which

11  is still ongoing, but there was an intermediate court that held

12  that the presumptions that parents and their children cannot

13  consent to these treatments because they're -- because of the

14  medical uncertainty and because of the long-lasting effects

15  that they have.

16      All of these things show that the State has an interest in

17  regulating this area of medical uncertainty and protecting

18  minors, to allow them time to seek counseling, to come to terms

19  with their -- with their identities.  And then if the

20  dysphoria -- if the gender dysphoria continues into once

21  they're 18 or 19, then at that time they can seek to

22  transition.

23      But the medical testimony that we will present to the

24  Court shows that -- that no harm will come from that period of

25  waiting, and that great benefits for the vast majority of

1  people whose gender dysphoria will desist will accrue.

2        Because of that, I mean, I can go through each of the

3  claims briefly, if that would help Your Honor.

4        But because of this medical uncertainty, and because of

5  the specifics of these treatments, I don't think it's true, for

6  instance, that this discriminates on the basis of sex or

7  transgender status, even if that were a protected class.

8        There is -- I mean, you know, to have cross-sex hormones

9  for the purpose of transitioning is simply not the same as

10  providing, you know, a boy who lacks testosterone, enough

11  testosterone to come up to the same natural levels that he

12  would have had.  There's separate treatments.  And so they're

13  not comparable.  And so it is not true that it discriminates on

14  the basis of sex or transgender status.

15        Due process, I don't think that the Constitution affords

16  parents the right to subject their children to medically

17  uncertain treatments.  I mean, the Supreme Court is pretty

18  clear on this, that there's no fundamental due process right to

19  suicide, or to have experimental medical treatments have not

20  been subjected to testing or have not been FDA approved.

21  That's just not in the Constitution.

22        The void for vagueness, the causation analysis is the same

23  in any criminal law.  I mean, the word "cause" is in lots and

24  lots and lots of criminal statutes, but those are not void for

25  vagueness.  It depends on the circumstances and the facts of

1   the case.

2       And so if a defendant wants to raise that in an as-applied

3   challenge, you know, they can do that if they are prosecuted.

4   But I don't think the due process clause has anything to say

5   about that.

6       Preemption.  Title IX prohibits discrimination on the

7   basis of sex.  So for the same reasons that their equal

8   protection claims fail, so do their Title IX claims.

9       And then First Amendment, this is a new claim that I only

10  saw yesterday.  But I don't see how this prohibits the pastor

11  or anyone else from encouraging people to seek medical

12  treatment.  In fact, I think the State would encourage people

13  to go seek treatment and counseling.  It's just the State has

14  limited the experimental medical procedures that have long-term

15  lasting harms from being considered.

16      But everything else, I mean, we would very much encourage

17  children who are having problems and need care, they need to go

18  seek care and they need counseling.  But they don't need these

19  experimental treatments that can cause lasting harm.

20          THE COURT:  Mr. Doss knows this because he has

21  practiced before me.  I will let everybody have multiple bites

22  at the apple.

23      So, Ms. Eagan, anything that you would like to say in

24  response to that?

25          MS. EAGAN:  Your Honor, I am actually going to allow

1    Mr. Doss to respond, if that's okay.

2              THE COURT:  Okay.

3              MR. DOSS:  Yes, Your Honor.  And there is one point

4    that I want to clarify.

5         Under this Act, it's not saying that these medications are

6    henceforth illegal in the state of Alabama for all children.

7    This Act is saying these medications are illegal in the state

8    of Alabama for a certain group of children.

9         I didn't know about this condition before this case, but

10   there's apparently a condition known as precocious puberty,

11   where a child as young as eight years old can go into puberty.

12   That condition is treated with a puberty blocker, which is the

13   exact same type of medication that the children affected by

14   this law are prescribed as treatment for gender dysphoria.

15        If the State's concerned with this medication as

16   significant as they're saying, we would have seen a total ban

17   of this supposedly experimental drug and experimental

18   medication.  Instead, what the State is doing is prohibiting

19   doctors from prescribing the drug to only a certain group of

20   children.  And that's why the Equal Protection Clause is

21   violated.

22        This Act distinguishes between people based on whether

23   they are a transgender youth or a non-transgender youth.  Under

24   this law, non-transgender youth are free to receive puberty

25   blockers.  They're free to receive hormones.  But transgender

1  youth in treatment concerning a recognized medical diagnosis,

2  they are prohibited.

3       In fact, the doctors by even prescribing it are subject to

4  criminal prosecution.  The parents, by driving their children

5  to a doctor's appointment, are subject to criminal prosecution.

6       That's what implicates the Equal Protection Clause.

7  That's what implicates the preemption argument under the ACA.

8       The Supreme Court has recognized that gender-related

9  matters can be discrimination on the basis of sex.  We think

10  those cases apply with equal force here.

11       The ACA prevents doctors who receive federal financial

12  assistance from discriminating on the basis of sex.  And this

13  law puts the doctors in an impossible choice.  Either I comply

14  with the federal mandate that I don't discriminate on the basis

15  of sex, or I comply with this Act, which puts me at risk of

16  criminal prosecution.

17       That's why it's preempted, Your Honor.  That's why it

18  violates the Equal Protection Clause.

19       And as to the argument that freedom of speech is not

20  implicated, it's absolutely implicated.  It's telling doctors,

21  parents, counselors, pastors, every citizen in the state of

22  Alabama you're free to tell these children that they can seek

23  this particular type of medical treatment, but you are

24  prohibited from telling them about another medical treatment.

25       It is the most insidious form of First Amendment

```
 1   violation.  This is content-based discrimination.  It is
 2   regulating the content of expression.  And it triggers the
 3   highest levels of scrutiny by the Court.
 4        It is not saying that all experimental drugs are off the
 5   table.  Doctors can't talk to -- about their patients about any
 6   experimental drug.  It's saying under these narrow
 7   circumstances, for this particular type of medication, for this
 8   particular type of diagnosis, for this particular class of
 9   people, you can't talk about this.  That's a First Amendment
10   violation.
11             THE COURT:  So you heard Mr. Bowdre talk about -- he
12   listed a group of countries -- and I can't recall all of them.
13   But that he says have curtailed some of these treatments.  Do
14   you want to touch on that?  Tell me what your position would be
15   on that real quickly.
16             MR. DOSS:  Your Honor, we have submitted expert
17   declarations from folks who are preeminent in this field who
18   know what the standard of care is, who can talk about the
19   American Medical Association, who can talk about what the
20   standard of care is in this country.
21        What other countries are doing does not affect the
22   constitutionality of this law.  The science in this country is
23   generally accepted that these are safe treatments, recognized
24   treatments for recognized medical diagnoses.
25        And we can get into the granular details of whether it's
```

```
 1  reversible, or whether's it not reversible, or that sort of
 2  thing.  I'm not going to portend to speak on behalf of the
 3  doctors for that.  They know the details and ins and outs
 4  better than I could.  My understanding is they are reversible
 5  by and large.
 6      But we will be presenting evidence from the experts in
 7  this field who can talk about what that standard of care is.
 8  And that it is safe, it is tested, it is understood.
 9      But even still, even if it is experimental, that may give
10  the State an interest, but that's not a trump card for the
11  State.  It is not a trump card for the State to violate equal
12  protection or the First Amendment simply because it's dealing
13  with some sort of experimental drug.
14          THE COURT:  Mr. Davis, does the State want to take
15  another bite?
16          MR. BOWDRE:  If I may, Your Honor, may I respond just
17  briefly to a few of these arguments?
18      I think I heard the words science in this country.  I
19  mean, the thing about science is that it is true like no matter
20  where you are.  And so the -- I mean, the literature reviews in
21  the UK and Sweden, Finland, France, I mean, a lot of different
22  countries, those are equally applicable here.
23      In fact, the science here, the medical standards that
24  plaintiffs rely on were created in the Netherlands.  I mean,
25  all of this goes back to a Dutch study in the '90s and 2000s
```

1  that was published in 2011 and 2014.

2       And so this is an international -- and WPATH is the -- I

3  mean, it is an international body.  These are international

4  problems.  And other countries are responding to it in the same

5  way or similar ways that Alabama is responding to it.

6       As for precocious puberty, there is a huge difference

7  between, you know, a seven-year-old girl who starts puberty

8  early and is put on puberty blockers for two years, versus a,

9  you know, an eleven-year old boy who's put on puberty blockers

10 to prevent puberty for the rest of his life.  Those are not the

11 same medical treatments.

12      Again, cross-sex hormones, it's the same thing.  Bringing

13 someone's testosterone up to natural levels is very different

14 from providing testosterone to a biological female to provide

15 the amount of testosterone that a biological male would have.

16 And to require that medical treatment for the rest of one's

17 life.

18      Those do have lasting and irreversible side effects.  I

19 will grant that some of the puberty blockers don't have -- once

20 you stop the puberty blockers, your body will naturally enter

21 puberty at that time.  But that it still has psychological

22 effects that are irreversible.  The person never goes through

23 puberty along with his or her peers.

24      And the studies shows it is puberty that is hugely

25 important in figuring out someone's gender identity.  And so

1   that is a major purpose of this law is to allow people time to

2   figure out their gender identity.

3        We know from the studies that at the bare minimum, around

4   55 percent and up to 95 percent of children who have gender

5   dysphoria, the dysphoria will desist by the time that they are

6   adults.

7        And so we don't even know when they're children who will

8   have lasting identity as someone who is transgender or not.

9   That's a major question.  That's the reason for this law is to

10  allow that natural time for people to come to that and see if

11  the dysphoria desists or not.  And whether the dysphorias

12  desist, that has a huge implication of what medical treatments

13  are necessary.

14       I guess one other thing, though, the Supreme Court has

15  recognized that states can take into account differences in

16  biological males and females.  I mean, Nguyen vs. INS is one of

17  these cases.  And we will get into this a whole lot.  But that

18  the State has an interest in -- or identifies people as

19  biological males or biological females, that by itself does not

20  violate the Equal Protection Clause.  It does not discriminate

21  on the basis of race or -- excuse me -- on sex.

22       And then the question is, you know, whether there's

23  actually negative treatment.  And here, the State is trying to

24  prevent the negative treatment and safeguard children who have

25  gender dysphoria and allow them time to see if the gender

1  dysphoria desists while providing them the care that they

2  actually need.

3          THE COURT:  All right.  I think I have heard what I

4  need to today, enough to roadmap this.

5      I will get an order out just as quickly as I can.  I thank

6  all counsel for their arguments.

7      We're adjourned.

8          (Whereupon, the above proceedings were concluded at

9      10:42 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                            CERTIFICATE

2

3

4          I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11   _Christina K Decker_                    05-02-2022

12   Christina K. Decker, RMR, CRR                Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25