1          IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF ALABAMA
2                      NORTHERN DIVISION

3

4    REV. PAUL A. EKNES-TUCKER,   *
     et al.,                       *
5                                  *
            Plaintiffs,            *   2:22-cv-00184-LCB
6                                  *   May 4, 2022
     vs.                           *   Montgomery, Alabama
7                                  *   1:15 p.m.
     KAY IVEY, in her official     *
8    capacity as Governor of the   *
     State of Alabama, et al.,     *
9                                  *
            Defendants.            *
10   ****************************

11

12

                     TRANSCRIPT OF HEARING
13         BEFORE THE HONORABLE LILES C. BURKE
              UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19

20

21

22

     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
23   pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
        and Procedures Vol. VI, Chapter III, D.2.  Transcript
24              produced by computerized stenotype.

25

CHRISTINA K. DECKER, RMR, CRR
                   Federal Official Court Reporter
               256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                          <u>APPEARANCES</u>

2

          <u>FOR THE PLAINTIFFS</u>:
3         Melody Eagan, Esq.
          Jeffrey P. Doss, Esq.
4         LIGHTFOOT, FRANKLIN & WHITE, LLC
          The Clark Building
5         400 20th Street North
          Birmingham, Alabama 35203

6

7         Jason R. Cheek, Esq.
          US ATTORNEYS OFFICE, NDAL
8         1801 Fourth Avenue North
          Birmingham, Alabama 35203

9

10        John Michael Powers, Esq.
          DOJ-Crt
11        Civil Rights Division
          950 Pennsylvania Avenue
12        Washington, DC  20530

13

14        <u>FOR THE DEFENDANTS</u>:
          James W. Davis, Esq.
15        Edmund LaCour, Esq.
          Barrett Bowdre, Esq.
16        Benjamin Seiss, Esq.
          OFFICE OF THE ATTORNEY GENERAL
17        501 Washington Avenue
          P.O. Box 300152
18        Montgomery, Alabama 36130-0152
          (334) 242-7300

19

20

21        <u>COURTROOM DEPUTY</u>:  Kelli Fuller

22

23        <u>COURT REPORTER</u>:  Christina K. Decker, RMR, CRR

24

25

1                    **P R O C E E D I N G S**

2              (In open court.)

3         THE COURT:  Please take your seats.

4      All right.  Court calls Eknes-Tucker vs. Ivey.  And I'd

5 ask counsel who are going to participate in today's hearings to

6 identify themselves for the record.

7         MR. CHEEK:  Good afternoon, Your Honor.  Jason Cheek

8 from the Northern District of Alabama on behalf of the United

9 States.  I would like to introduce my colleague, John Powers,

10 from the Civil Rights Division.

11        MR. LACOUR:  Good afternoon, Your Honor.  Edmund

12 LaCour on behalf of defendants.

13     And I can't promise it will just be me.  It will probably

14 just be me, but if you have some questions that one of my

15 colleagues knows the answer to, I may tap out briefly.

16        THE COURT:  All right.  Nobody else is going to

17 participate; is that correct?

18        MR. DOSS:  Jeff Doss for the plaintiffs, Your Honor.

19        MS. EAGAN:  Melody Eagan for the plaintiffs.

20        THE COURT:  All right.  All right.

21     Well, why don't we jump straight to this motion to

22 intervene.  I see that the State is at least in partial

23 agreement with that, but not in total.  Have the two of you

24 talked and fleshed out any of the disagreement, or no?

25        MR. LACOUR:  No, Your Honor.  We have not.

```
 1         Our position is still that the federal government should
 2   not be able to participate in the upcoming preliminary
 3   injunction proceedings.  And we firmly position that they can
 4   not intervene to sue the State of Alabama directly both because
 5   that would extend the relief beyond the relief that it is that
 6   the plaintiffs are seeking, which is only against certain
 7   officials, not the State qua State.
 8         And also when anyone is intervening, they need to show
 9   standing if they are seeking some additional relief as the
10   federal government is trying to do here.  They do not have
11   standing to sue the State of Alabama because they do not have
12   any Equal Protection Clause rights that have been violated.
13         THE COURT:  So as I understand this, Mr. LaCour, your
14   position is they can intervene, they can step into the shoes of
15   the plaintiffs, but you don't want them participating in the
16   hearing, and they can't assert a separate cause of action?
17         MR. LACOUR:  That's correct, Your Honor.
18         THE COURT:  All right.  All right.  Well, then, why
19   don't I let you briefly respond to that, and then we will just
20   launch into the motion itself.
21         MR. POWERS:  Thank you, Your Honor.
22      I will start by -- actually, can I use the podium?
23         THE COURT:  I would prefer that you do.
24         MR. POWERS:  Thank you, Your Honor.  Unless you have a
25   preference, I will start by talking about the State of Alabama
```

1  as a defendant argument, and then...

2          THE COURT:  It's your motion.

3          MR. POWERS:  Your Honor, the State's objection here is

4  misplaced.  First, as a functional matter, the United States is

5  seeking the same relief as the private plaintiffs.  The

6  addition of the State as a defendant from which there is

7  precedent ensures that all officers and agents of the State are

8  bound by any relief and other orders from the Court.  And in

9  short, with respect to participating at the hearing, the State

10  objects on the grounds there's not sufficient time.

11      To the contrary, there is plainly sufficient time.  The

12  United States filed our preliminary injunction papers six days

13  before the hearing.  The United States is prepared to present

14  our opening statement at the end of its argument.

15      Our P.I. motion is limited to the equal protection claim

16  that the private plaintiffs have already brought and to which

17  the State has replied in its opposition papers.  The United

18  States plans on offering only one witness at the hearing who

19  will be subject to cross-examination.  So that's the overview.

20      I'd be happy to drill down a little deeper on both those

21  points.

22          THE COURT:  I would certainly like you to drill down

23  on Section 902 and on the availability of the State as a party.

24          MR. POWERS:  Yes, Your Honor.  As Your Honor is aware,

25  the last sentence of 42 U.S.C. 2000 h-2 says that the United

1 States shall be entitled to the same relief as if it had

2 instituted the action.  And that's exactly what's the case

3 here.  The United States isn't seeking any relief beyond that

4 sought by the private plaintiffs.

5        Second, Your Honor, it is the position of the United

6 States that it can intervene in cases under 42 U.S.C. 2000h-2

7 and add parties and claims in appropriate circumstances.  In

8 fact, there is no rule or statute that prohibits the United

9 States from adding a defendant, provided it would not violate a

10 court order, setting a deadline for adding parties where the

11 rules for joinder of the parties under Federal Rules 19 or 20.

12        As Your Honor knows, Rule 24(c) requires the intervenor to

13 file a pleading setting forth our claims.  The intervenor is

14 not prohibited by Rule 24 or any other rule from adding parties

15 to the proposed complaint.

16             THE COURT:  I don't feel like we're hitting this head

17 on.  Can you give me a little more argument and directly

18 address what the State is asserting?  I feel like you're kind

19 of giving me the basics, but I am not hearing any case law.  I

20 am not hearing any definitive rules.  And from our end, it

21 doesn't look like there was a whole lot of case law out there

22 on this, but can you hit this a little harder?

23             MR. POWERS:  Yeah.  Yeah.

24        There are cases in which the United States has intervened

25 on -- under 42 U.S.C. 2000h-2 and added parties and claims.

1  I'm happy to run through some of the cites and discuss those

2  cases, if that would be helpful.

3           THE COURT:  Please.  That's what I'm looking for.

4           MR. POWERS:  Spangler vs. United States.  It's 415

5  F.2d 1242.  It's a Ninth Circuit case in which the Ninth

6  Circuit allowed the United States to significantly broaden the

7  scope of a school desegregation case from three schools to an

8  entire school system.

9      There are a couple more district court cases, one of which

10  is Gates vs. Collier from the Northern District of Mississippi.

11  That's 249 F. Supp. 881.  And Battle vs. Anderson, which is 376

12  F. Supp. 402.  In those cases the United States added, for

13  example, in Battle, the original complaint intervention was

14  limited to equal protection claims based on race, but then the

15  United States later amended its complaint intervention to

16  include allegations of due process and Eighth Amendment

17  violations.

18           THE COURT:  Let me ask you a question.

19      I guess I'm thinking about the practical effect here.

20  Forget whether you participate in the preliminary injunction,

21  just whether you intervene or not.  Does it really affect your

22  case in any way whether the State is added as a party, or

23  whether you have an independent cause of action, or whether you

24  just fly under the existing equal protection claim of the

25  plaintiffs?  Is there a difference in procedure or substance

1  here that matters to this case as to what you would present or

2  what relief you're looking for?

3         MR. POWERS:  I understand, Your Honor.

4    Our position is functionally that there is no substantial

5  difference.  The only difference is that if the Court orders

6  relief in this case, the State's agents and officers would be

7  so bound.

8         THE COURT:  All right.  Well, let's back up just for a

9  minute to the factor test, the factor test that we've got in

10  weighing whether you come in or not.  Obviously, there's some

11  of these factors that are in your favor, but, you know, the

12  biggest question I have here is, you know, I am just looking

13  procedurally at how we got here, you know?  We got -- this is

14  the third lawsuit at least involving some counsel and interest,

15  you know, had two voluntarily dismissed, and then we wind up

16  back here again.

17    I set this for a hearing.  I hear from all the parties.

18  And then Friday night after the clerk's office is closed before

19  the hearing I've set, the federal government comes in and says,

20  hey, we want to be a part of this.  You know, from your side,

21  I'm hearing this is an emergency, we have irreparable harm.

22  And by the way, if the facts as you set out to prove are true,

23  then we do have an emergency.  And yet if I were trying to

24  delay a case or delay a judgment, this is what I would do.

25  This is kind of like the fire department on the way to a house

1  fire and they go through the McDonald's drive through on the
2  way.

3       Tell me why y'all are waiting so long to act.

4       MR. POWERS:  Your Honor, I assure you that the United
5  States moved as expeditiously as it could to intervene in these
6  proceedings.  There were certainly unique circumstances in this
7  case that provided some challenge.

8       As you know, the Attorney General needs to certify that
9  this is a case of public importance before being able to
10 intervene under the statute.  That was one issue.  Another
11 issue frankly involved government bureaucratic challenges
12 related to the retaining of expert witnesses.  But I do assure
13 you that the United States moved as quickly as it possibly
14 could in good faith and by no means intends to delay these
15 proceedings.

16      THE COURT:  Would it be correct to say -- and you tell
17 me.  I don't know the answer to this.  Would it be correct to
18 say that the United States has been in contact with counsel for
19 the original plaintiffs and has been coordinating to some
20 degree with them?

21      MR. POWERS:  Your Honor, I don't want to go too far,
22 in terms of internal deliberations, but, of course, we have
23 been in touch with the counsel for the plaintiffs and as well
24 as --

25      THE COURT:  I mean, these factors of delay directly

1  weigh whether you get to intervene in this lawsuit.  And so

2  that's why I'm asking those questions.

3       I think -- I need you to help me understand why we have

4  such a delay.  The State points out that, you know, the White

5  House is issuing a statement about this weeks ago.  But yet

6  there's only action taken on Friday.  So I just need you to

7  help me to understand your position a little bit more than just

8  saying we have bureaucratic red tape.

9            MR. POWERS:  Your Honor, I totally understand that,

10  and unfortunately there are certain limitations in terms of

11  what I can say in terms of --

12            THE COURT:  I am not asking you to give me any

13  privileged information, but I do need you to -- I obviously

14  have a duty to weigh these factors.  And I need you to address

15  those head-on in the best way you can.

16            MR. POWERS:  Again, Your Honor, the United States, you

17  know, as soon as possible, even, you know -- and I understand

18  that this case is a complex procedural history, but really from

19  the inception April, you know, April 8th, moved as quickly as

20  it could to intervene in this case.  And then it required

21  factual development, contacting witnesses.

22            THE COURT:  Let me boil this down a little bit for

23  you.  You are sort of giving me conclusions.  We moved as fast

24  as we could.  We did this.

25       Tell me what steps you took to move as fast as you could.

1  Tell me here's what we did and this shows that we meet this

2  test to come in.  Here are the things that we did to move

3  expeditiously.

4         MR. POWERS:  Your Honor, that certainly includes

5  coordinating both internally within the government, internally

6  with U.S. attorney partners, certainly contacting counsel for

7  the plaintiffs.

8         THE COURT:  Can you give me a timeline that these

9  things started happening?

10         MR. POWERS:  Your Honor, can I confer with counsel?

11         THE COURT:  Absolutely.  No.  No.  Confer with

12  counsel.

13      Let's take a five-minute recess, and we will come back in,

14  in five minutes.

15         MR. POWERS:  Thank you, Your Honor.

16         (Recess.)

17         THE COURT:  Let's pick back up.

18      So as I understand it, United States vs. Jefferson County

19  from the Eleventh Circuit Court of Appeals, give me four

20  factors that I need to evaluate to determine whether you can

21  intervene in this case.

22      Number one, the length of time during which the movant

23  knew or reasonably should have known of its interest in the

24  case before seeking leave to intervene.

25      Two, the extent of prejudice that the existing parties to

```
 1   the litigation may suffer as a result of the movant's failure
 2   to apply for intervention as soon as it knew or reasonably
 3   should have known of its interest in the case.
 4        Three, the extent of the prejudice the movant may suffer
 5   if the intervention petition is denied.
 6        And, four, any unusual circumstances militating for or
 7   against the determination of whether that application is
 8   timely.
 9        So I guess what I would say to both the United States and
10   to the State of Alabama is does everybody agree that that is
11   the test that I should use from the Eleventh Circuit?
12             MR. POWERS:  Yes, Your Honor.
13             MR. LACOUR:  Yes, Your Honor.
14             THE COURT:  Okay.  Then I need you to directly address
15   those factors with facts and details to back them up.
16             MR. POWERS:  Thank you, Your Honor.
17        And I will start with the length of time since I think
18   that's probably -- it's the issue we were focusing on.
19        The United States did start analyzing Senate Bill 184 and
20   started investigating before the statute was signed into law by
21   the governor.  I don't have the precise date.  But before the
22   law was enacted, the United States had begun reaching out to --
23   to groups who had spoken out in opposition to the law and had
24   started considering what options there might be.  That
25   investigation, you know, involved numerous pieces, as I
```

```
 1   mentioned, not only trying to assess whether there were
 2   individuals who we could reach out to who they and their
 3   families might be impacted, included beginning the process of
 4   reaching out to potential experts.  So that was one piece.
 5        And I should add too, Your Honor, that this was a
 6   multi-component investigation and inquiry.  It's not just --
 7   involves both the Civil Rights Division of the Department of
 8   Justice and involves the Civil Division the United States
 9   Attorney's offices.  So, you know, it's involved a lot of
10   coordination and getting folks together.
11        There were also very complicated legal issues that needed
12   to be resolved that we hadn't resolved at the time the law was
13   enacted.  And the first -- well, the first lawsuit brought by
14   the plaintiffs -- private plaintiffs was filed.  You know,
15   there's a question of a proper basis, you know, either for
16   bringing an independent lawsuit or intervening in an existing
17   action.  And, obviously, there's a complex procedural history
18   once the private plaintiffs' lawsuits got started.
19        But, frankly, attorneys for the United States were working
20   around the clock during that entire time, you know,
21   coordinating with folks not only in the Middle District, but in
22   the Northern District, obviously a jurisdiction.
23             THE COURT:  Is this yourself included?  Yourself
24   included in these?
25             MR. POWERS:  Yes.  Absolutely.
```

1              THE COURT:  Okay.

2              MR. POWERS:  By the time the bill was enacted, you

3    know, trying to figure out which district, you know, who was

4    going to be involved and, you know, once the initial cases were

5    dismissed, you know, thinking through, okay, are we going to

6    file an independent, you know, think through filing an

7    independent action.  So there was a lot going on both from the

8    legal side and the factual side.

9         And as I'm sure Your Honor can appreciate, once the

10   lawsuit was filed, we didn't want to file a second, you know,

11   essentially pile on duplicating the same -- the same kinds of

12   witnesses, the same kinds of experts.

13        As reflected in our papers, we tried to narrow our

14   contribution to, you know, what would be a really valuable

15   addition to the Court and not merely piling on.

16        So there was a lot of work that, you know, I think goes

17   far beyond even what's -- or, you know, isn't necessarily

18   easily observable from, you know, just what's in the papers

19   themselves.  And then coordinating not, you know, as -- and I

20   should mention here.

21        You had mentioned the -- you know, the statement from the

22   White House.  You know, the Department of Justice did not

23   coordinate with the White House.  We can't do that and did not

24   do it here.

25        But once we developed appropriate facts, came to a legal

1  basis for intervention that we thought was sound.  Then going

2  up through the approval process, and as I said, obtaining the

3  Attorney General's certification.  He's very busy, a lot going

4  on there.

5      There's a lot of different pieces that I think makes it --

6  made it challenging for the United States to come in as quickly

7  as, you know, we might have liked in a perfect world, but it

8  certainly wasn't due to a lack of diligence or amount of time

9  put in by the attorneys and not just -- not just here, but you

10 know, throughout various sections and divisions of the

11 government.

12         THE COURT:  Anything else you want to say?

13         MR. POWERS:  Your Honor, I could touch on prejudice

14 and, you know, some of the other factors.

15         THE COURT:  Okay.

16         MR. POWERS:  First, with respect to the State's

17 assertion that it will be prejudiced by the United States'

18 participation, you know, we note first that the State's very

19 thorough opposition brief did respond in fact to several of the

20 arguments raised by the United States in its papers.

21     The United States isn't expanding proceedings.  It's

22 bringing the same -- one of the equal protection claims brought

23 by the private plaintiffs.  And also with respect to the United

24 States's expert bioethicist, the State does have an expert who

25 holds himself out as a bioethicist, as well.  So the State has

1  arguments on that point and should be able to cross-examine the

2  United States' proffered witness.

3      For those reasons, we don't think there's any prejudice to

4  the State.  And also we do think again, based on the schedule,

5  it's possible to introduce the expert without unduly impacting

6  the schedule or preventing all the parties from getting through

7  the hearing within, you know, by the end of Friday afternoon.

8          THE COURT:  All right.  So I do have one other

9  question regarding adding the State of Alabama itself as a

10  party.  Obviously, we have the Governor.  We have got DAs who

11  it has represented, you know, were in all the jurisdictions

12  where the parties are.  And we have the chief law enforcement

13  official of the State, who is representing these parties.

14      So who else would we be seeking to enjoin by naming the

15  State as a defendant that is currently not in this lawsuit?

16          MR. POWERS:  Your Honor, I might defer to my

17  colleagues on that.

18      I do note that the private plaintiffs did bring suit

19  against some of the District Attorneys, but not all of them.

20  For example, I do want to add for Your Honor that if Your Honor

21  does decide that the State of Alabama is not a necessary party,

22  the U.S. would be willing to re-file its complaint without

23  naming the State of Alabama.

24          THE COURT:  All right.  Well, are you offering to do

25  that?  Or do you want me to rule on that at some point?  I'm

```
 1   hearing from you that it really doesn't affect your case in any
 2   substantive way whether the State is a party.  Am I correct?
 3             MR. POWERS:  That's right.  As a functional matter, we
 4   don't believe that there's a difference, in terms of the relief
 5   being sought by the United States.
 6             THE COURT:  All right.  Well, are you asking me for
 7   leave to do that right now?  Or do you want me to rule on that
 8   and then you will make your decision?
 9             MR. POWERS:  Hold on a second.
10       Your Honor, we're willing to do it ourselves.
11             THE COURT:  All right.  Before I do anything
12   substantive, I do want to give the State another opportunity to
13   be heard.  I know we heard a lot said.
14       Mr. LaCour, there may be some things you want to address.
15             MR. LACOUR:  Absolutely.  Thank you, Your Honor.
16       A few points in response.  As we noted before, we don't
17   oppose them coming into the case to the extent they're not
18   seeking more relief.  It sounds like maybe they will not be
19   seeking more relief shortly, but adding the State of Alabama,
20   as my friend just noted, could extend the relief to other
21   officials beyond just these law enforcement officers and the
22   Governor who are currently in the case.
23       Certainly, if the private plaintiffs had sued the State of
24   Alabama directly, we would have raised a sovereign immunity
25   argument, and we think that would have been an ironclad
```

1    argument to get the State of Alabama out of the case.

2         Also, when the State is named and haled into court, there

3    are dignitary harms that come from that, but there are also

4    discovery implications.  If the State is a party to the case,

5    there are many arms of the State.  And obviously seeking

6    discovery from a party is very different from seeking

7    third-party discovery.

8         So for all those reasons, we do strongly oppose the State

9    being added.  We don't think the federal government has

10   standing to raise an equal protection claim against the State.

11        I don't think they cite any case law.  I certainly didn't

12   see anything in their very short reply brief suggesting

13   otherwise.  And there was actually a lot of very hard-fought

14   litigation over that question in the SB 8 litigation out of

15   Texas, where the United States tried to come in and sue Texas

16   qua Texas, and the Supreme Court ultimately never ruled on

17   that.  But it's not an open and shut issue.  So it certainly

18   would need to at least brief it before they could come in suing

19   the State directly.

20        So -- and then even when it comes to relief against

21   officials, this gets to the timing point.  We do think there

22   would be prejudice for allowing them in.  We don't think that

23   their intervention is timely.  So again, they could come into

24   the case, that's not an unconditional right to come in for

25   every purpose.

1          And when they file a preliminary injunction motion and

2    brief at 11:46 p.m. the business day before our response is due

3    with new expert testimony, that does prejudice us.  We were

4    able to respond to a lot of legal arguments through a lot of

5    hard work over the weekend.  But there has not been time for

6    our bioethicist to go through carefully and look at the

7    citations in this report from Dr. Antommaria and really

8    determine whether he is accurately representing everything that

9    he says in this report.

10          THE COURT:  You may be headed this way, but, you know,

11   I would want to hear from you concretely the same thing that I

12   just asked the government, which is, you know, to the extent

13   that you are prejudiced, I need to know specifically how the

14   State is prejudiced and how they could not be ready to try this

15   case as scheduled on this injunction.

16          MR. LACOUR:  So, yes, Your Honor.

17      Our bioethicist has not had time to dig into this

18   late-breaking report.  He also is not going to be able to

19   attend the hearing because it has come with very little notice

20   in part because of the procedural irregularities my friend was

21   talking about that maybe are not the fault of the Department of

22   Justice, but I do think fall at the feet of some of the current

23   and/or past plaintiffs and their counsel who filed the initial

24   lawsuits in early April only to drop them four days later after

25   they were both transferred to Your Honor.

1     And I don't think, to the extent there's been
2  judge-shopping by the private plaintiffs, that they can launder
3  that through DOJ.  It may not be DOJ's fault, but I don't think
4  that gives them the ability to come in and sandbag us like
5  this.  It's still inequitable however this is going on.
6     To return to the timing point, we had a letter from the
7  Department of Justice on March 31st that went to all state AGs
8  warning them against enacting laws like Alabama's law.  We had
9  the White House press secretary a week later on April 7th,
10  before the law was even inked, stating the United States
11  government would respond if Alabama passed this law, calling
12  Alabama out specifically.
13     And this is something we only just discovered last night
14  on YouTube while preparing for cross-examinations before Your
15  Honor ordered the opening statements for this afternoon.
16        THE COURT:  And, incidentally, just so everybody knows
17  this, when we conclude these preliminary matters, I will tell
18  you what I am looking for, and I also will give y'all a lengthy
19  break.  So I am not going to back you up too hard against the
20  wall to roll straight into that.
21        MR. LACOUR:  Thank you, Your Honor.
22     So on April 8th, the Human Rights Campaign had a press
23  conference of sorts over YouTube and over Zoom that had
24  attorneys, including an attorney named Shannon Mentor who is
25  with the National Center for Lesbian Rights, one of the public

1  interest law firms that represents the private plaintiffs in

2  this case and that represented the private plaintiffs in

3  Dr. Ladinsky's case that was initially filed and assigned to

4  Judge Axon in the Northern District several weeks ago.

5       And what Mr. Mentor represented was -- this is on YouTube,

6  and I can give you the link afterwards.  I apologize I haven't

7  been able to do so to this point.  Stated that if, quote,

8  Alabama does the unthinkable, closed quote, and, quote, puts

9  this law into effect, we will have the full support of the

10 United States Department of Justice.  That was on April 8th,

11 2022, the day Governor Ivey signed the bill.

12      Another interesting thing I discovered in that video that

13 day, another speaker was Dr. Morissa Ladinsky of Ladinsky v.

14 Ivey Fame.  She spoke about the lawsuit that was coming, and

15 then introduced the father of one of her patients, none other

16 than Jeff Walker, who, of course, filed the Walker vs. Marshall

17 case with the help of the ALCU in the Middle District.  That

18 was the case that got assigned to Your Honor.  And then when

19 Dr. Ladinsky's case was assigned to Your Honor, as well,

20 Dr. Ladinsky and her patient's father, Mr. Walker, dropped the

21 cases inexplicably and almost simultaneously.

22      So, I mean, all of this raises serious concerns as this

23 Court has already recognized.  We think -- not to preview too

24 much of the argument on the P.I. motion, but we do think these

25 are equitable considerations for the Court to consider on

```
 1    anyone's preliminary injunction motion.  We also think this is
 2    good reason to keep the United States out of these proceedings
 3    altogether.
 4        Another point, they stated in their motion to intervene
 5    that there will not be prejudice because their motion for
 6    preliminary injunction, quote, does not raise new claims or
 7    arguments, closed quotes.  If that's the same, I don't see how
 8    the United States is prejudiced by not being able to
 9    participate.
10        There are very capable lawyers representing the private
11    plaintiffs who are raising these same claims and arguments.
12    They will be able to do so when they examine and cross-examine
13    witnesses, but adding another set of lawyers will slow things
14    down.  Having just been through consolidated redistricting
15    proceedings with four sets of lawyers, I can tell you it can
16    slow things down a little bit.
17        And for what?  And for what good cause do they have to be
18    here at this moment?  I think the potential benefits are
19    minimal for their participation.  The potential risks to us, I
20    think, are great because, as Your Honor noted, we had the
21    status conference on April 22nd.  There was a lawyer from the
22    Department of Justice at that status conference sitting in the
23    gallery, sitting quietly in the gallery.  Defendants
24    represented how much time we thought we would need to put on
25    our case.
```

1             THE COURT:  Who was that attorney?

2             MR. LACOUR:  We are not certain, Your Honor.  One of

3    the lawyers from the State of Alabama who is not counsel of

4    record in this case was there to observe the proceedings.  As

5    he was going through security, he overheard discussions between

6    this particular attorney and a security guard.  The attorney

7    asked, Does an assistant United States attorney from another

8    district not the Middle District need to go through security?

9    And then mentioned the Northern District.

10       So I guess we do not know for absolute certain -- although

11   I suspect someone in this courtroom might know for certain

12   whether there was a representative of the Department of Justice

13   at the hearing of April 22nd.  But all that evidence strongly

14   suggested to us that there was a representative from DOJ there

15   at the hearing.  Mr. Cheek might know.  Someone else from the

16   Department of Justice might know.

17       In any event, plaintiffs discussed in detail how much time

18   they would need -- day, day and a half.  Defendants said about

19   half a day probably.  That was also contingent on us having to

20   cross-examine only one side's witnesses, not intervenors'

21   witnesses, as well.  Also contingent on the idea that there's

22   only going to be one set of direct and one set of cross.  And

23   then this Court entered the order setting the hearing for

24   two days and saying you are going to hold the parties strictly

25   to the representations we made that day.  When we had no idea

```
 1  this was coming.  No one -- they had reached out to plaintiffs,
 2  obviously.  They had not reached out to us.
 3       And neither United States nor the plaintiffs saw fit to
 4  mention that to the judge when you were scheduling the hearing.
 5       So we do think this is prejudicial.  I do think there
 6  is -- there are equitable considerations here for Your Honor to
 7  take into account.  And we don't think there is going to be
 8  prejudice to the United States if they get engaged in the case,
 9  come next week.  There will be plenty of time to litigate these
10  matters to final judgment.
11       And if the Court is inclined let them in and let them
12  participate at the preliminary injunction hearing, we think you
13  would need to put some very tight limitations on that, either
14  require them to go last.  If there is time, then they can put
15  on their witness at the end of the day Friday, or require them
16  and the plaintiffs to have a hard stop by we think 10:00 a.m.
17  Friday morning on their last direct examination, which would
18  give us an hour to cross-examine whoever that final witness is,
19  them a little bit of time for redirect.  We could take a quick
20  lunch break, and defendants can come back and present their
21  entire case to the Court.
22       But without those sorts of protections, I do think there
23  is a substantial risk of harm to the State that the State
24  should not have to bear because none of this is our fault.
25            THE COURT:  So let me ask you this:  It would seem to
```

1 | me that, you know, in the interest of justice, to the extent
2 | that the Attorney General wants to intervene in this and has a
3 | statutory right in whatever fashion, that they should be
4 | allowed to intervene.  Would you agree with that or not?

5 | MR. LACOUR:  In the case, yes.  But, for example, if
6 | they file their motion to intervene tonight or they filed it
7 | Thursday in the middle -- in open court, I don't think they
8 | would be entitled to participate in the preliminary injunction
9 | proceedings at that time.

10 | If they showed up with a brand new witness during the
11 | lunch break on Thursday, I don't think Your Honor would be
12 | bound to let them in.  Rule 24 and timeliness and prejudice
13 | considerations are still fully applicable.

14 | THE COURT:  So let me ask you this question:  So what
15 | I just heard from the government was that they no longer seek
16 | to add the State of Alabama as a party.  I'm not clear on this
17 | whether they -- whether this changed or not, but what I did
18 | hear him say was, you know, substantively it makes no
19 | difference to them whether they have their own cause of action
20 | or whether they ride on the claim of the original plaintiffs.

21 | In the event -- and I think one of those factors is
22 | already gone, which is we don't have to have the State as a
23 | defendant anymore.  But in the event the government said, look,
24 | we don't have to have a separate cause of action, we just want
25 | to join with the plaintiffs' only existing claim, does that not

```
 1  weigh prejudice the other way in their favor?
 2          MR. LACOUR:  I think at that point, the prejudice is
 3  still just the timing issue, both with regard to allowing the
 4  State enough time to put on the evidence to defend its law, and
 5  also the prejudice of being sandbagged with a late-breaking
 6  declaration, which I will note looks very similar to the
 7  declaration that the Walker plaintiffs had filed when they
 8  sought a T.R.O. in the Middle District, same expert, very
 9  similar declaration.  So...
10          THE COURT:  Let me interrupt one second to ask
11  Mr. Powers.  Mr. Powers, you are telling me you only have one
12  other witness; is that correct?
13          MR. POWERS:  Yes, Your Honor.
14          THE COURT:  In addition to the witnesses that we would
15  already have, so you have one witness?
16          MR. POWERS:  Yes, Your Honor.  Just Dr. Antommaria, no
17  one else.
18          THE COURT:  Tell me what that would consist of and how
19  long.
20          MR. POWERS:  Dr. Antommaria is an expert witness in
21  bioethics.  He will address ethical issues related to providing
22  this care.  I can't tell you exactly the length of his direct,
23  but I would be surprised --
24          THE COURT:  Make a wild guess.
25          MR. POWERS:  The wild guess would be about half an
```

```
 1  hour.
 2            THE COURT:  All right.  Back to you, Mr. LaCour.
 3            MR. LACOUR:  If we can hold them to half an hour, then
 4  that sounds like we could probably cross-examine him pretty
 5  quickly, too.  If we want to tack him on at the end of the day
 6  Friday, that would diminish the prejudice.
 7       I still think it's unfair -- our experts are not going to
 8  have time to really dig through everything that he said.  We'll
 9  have Dr. Cantor here.  He is a clinical psychologist and expert
10  in research design, and he will be able to generally address
11  some of the claims that are made by Dr. Antommaria, but...
12            THE COURT:  How much additional time would you need if
13  I allowed you to file a supplemental?  Could you get something
14  filed over the weekend?
15            MR. LACOUR:  Let me confer with my colleagues.
16            THE COURT:  Take all the time you need.  I gave them
17  five minutes.  You can take a few minutes if you need it.
18            MR. LACOUR:  Your Honor, at the moment, we don't know.
19  We would have to confer with Dr. Hunter.  He sees patients.  I
20  mean, he is a physician, as well as a bioethicist.  So it may
21  be he would be able to put the time in on nights and weekends
22  and get something together.
23            THE COURT:  And, look, the Court is sympathetic to
24  your position.  We're, you know -- and let me say this:  You
25  know, obviously, we all know what the time constraints were
```

```
 1  when this action was filed and what we had to do to have a
 2  hearing, to get out an order that properly and legally
 3  addressed the arguments.
 4      I will be very honest.  I have very little inclination in
 5  this case to rule from the bench.  I think that I need to do a
 6  proper analysis of the facts and the law.  And so I will do my
 7  utmost to make a decision as fast as I can, but I hope
 8  everybody appreciates where we are in this.  And so I will
 9  leave it at that.
10      Anything else you want to tell me, Mr. LaCour?
11          MR. LACOUR:  That's it from the defendants, Your
12  Honor.
13          THE COURT:  All right.  Mr. Doss?
14          MR. DOSS:  Yes, Your Honor.
15          THE COURT:  Can I invite you to the podium?
16          MR. DOSS:  Absolutely.
17          THE COURT:  All right.  And I think I know what you
18  are going to say from what you have previously filed, but maybe
19  you could give me a one-minute thumbnail of if I let the
20  Department of Justice and the Attorney General come into this
21  case, how we would manage time in a way that minimized
22  prejudice to the State of Alabama.
23          MR. DOSS:  Absolutely, Your Honor.
24      We have been working to streamline our presentation of the
25  evidence.  We are cautiously optimistic that we can present our
```

1  evidence by the close of the day tomorrow, assuming all the

2  stars align.

3      It may spill over a little bit into Friday morning, but we

4  are presenting two experts.  We are presenting one of our

5  pseudonymous parent plaintiffs, and we are presenting our

6  pseudonymous doctor plaintiff, and then the pastor, as well.

7      We have tried to -- as we're getting ready for this, to

8  streamline, streamline, streamline.  So in that regard, Your

9  Honor, with an additional 30-minute witness direct, we will --

10  I think it will not add too much time to the presentation of

11  the evidence.  Certainly we will avoid duplication on

12  cross-examination, Your Honor.  I would assume we would have

13  the first opportunity at cross-examination.

14          THE COURT:  Can they neatly fit within your one-day

15  allocation that you have just represented?

16          MR. DOSS:  Not the one-day allocation, Your Honor.

17          THE COURT:  I heard him say he has got a 30-minute

18  witness.

19          MR. DOSS:  I am cautiously optimistic as to the one

20  day.  Again, assuming all the stars align.

21      I am not sure how long the cross-examinations of certain

22  witnesses will take, but we are certainly aiming to be as

23  direct and efficient as possible with the direct testimony that

24  we present.

25      So in that regard, Your Honor, I don't think it's going to

1    bump up against the two-day window in any stretch.  As I

2    understand, the State is presenting two live witnesses.  I

3    don't anticipate those lasting very long, nor do I anticipate

4    the cross-examinations of those witnesses lasting very long.

5         And so in that regard, I think the addition of a 30-minute

6    witness, making sure that we are being as efficient as possible

7    on examinations, and we are not doubling up efforts, I think

8    that we can get this done in two days.

9         THE COURT:  All right.  Then let me take Mr. Powers

10   one more time.

11        If I let you come in, what can you do time-wise to keep us

12   on the same track and not prejudice the other parties that are

13   already in here?

14        MR. POWERS:  Yes, Your Honor.

15        I think we can agree to, you know, certainly -- many of

16   the suggestions that my colleague raised, for example, with

17   respect to not duplicating cross-examinations of witnesses, you

18   know, one horse, one rider.

19        You had mentioned, you know, possibly moving back our

20   expert to the end of the proceeding to give the State a little

21   more time to prepare.  You know, we'd certainly be willing to

22   do that.

23        And, you know, certainly with respect to, you know,

24   argument and really in every way we participate, we will keep

25   it as tight and streamlined as possible to not burden the Court

 1  or cause us to bump up against the two-day window.

 2          THE COURT:  So -- and I have not heard you state a

 3  time, but I'm -- would you need -- if you are not going to

 4  duplicate anything that the original plaintiffs do on cross or

 5  direct, you would only be doing something different, would you

 6  need more than 45 minutes of additional time to do those things

 7  in addition to your 30-minute witness?

 8          MR. POWERS:  I am very confident we could do it in

 9  less than that, Your Honor.

10          THE COURT:  All right.  All right.

11      And then final question:  Obviously I have given you leave

12  to amend regarding the State of Alabama.

13      What is your current position on whether you absolutely

14  have to have an independent cause of action, or whether you can

15  fly under the current original plaintiffs' cause?  I do think

16  that, to some degree, probably also affects that factor.

17          MR. POWERS:  Yes, Your Honor.

18      We consider our cause to be the same as the claim brought

19  by the private plaintiffs.  So from our perspective, it's a

20  distinction without a difference.  Riding on the private

21  plaintiffs' cause of action is functionally the same thing.

22          THE COURT:  And not currently seeking and would not be

23  seeking any different relief than they're already asking?

24          MR. POWERS:  Correct.  And, in fact, the relief we're

25  seeking is narrower than that sought by the private plaintiffs.

 1          THE COURT:  Okay.  Let's say just a little bit about

 2   openings.

 3       So, obviously, I would give everybody 25 minutes.  If

 4   somebody thinks they're going to need more than that, you can

 5   tell me that.  I would -- I am getting a head nod no from the

 6   original plaintiffs.

 7       If they need more, I will consider it, but not much more.

 8   I'm assuming, then, Mr. Powers, you would fly under that same

 9   rule that in your opening you wouldn't duplicate anything that

10   the original plaintiffs had said, or no?

11          MR. CHEEK:  If I may, Your Honor.  Jason Cheek.

12       The intention is not to duplicate anything that the

13   plaintiffs say.  If there's some minor overlap, it would not be

14   intentional.

15          THE COURT:  Mr. Doss?

16          MR. DOSS:  My plan, Your Honor, is to touch equal

17   protection very briefly and allow the United States to present

18   its argument on equal protection, if Your Honor is inclined to

19   allow the United States to proceed.

20          THE COURT:  No, no.  I certainly am.

21       Something that will help me a lot -- and, again, I am

22   going to take a break right now, and we will come back in

23   30 minutes, and I would consider a little longer if anybody

24   needs it.

25       Something that would be very helpful to me in road mapping

```
1   this case would be if, number one, as we go through these five
2   issues, and you make your arguments on all of them, give me
3   your best two cases.  Judge, I win on this issue because of
4   case A and case B.  Give me your best two cases that stand for
5   your proposition.
6       Second, as we go through those arguments, cite me by
7   chapter and verse to your best evidence.  I think these one,
8   two, three, four, five things that you can find in the record
9   at X, this is my best evidence.
10      That does not mean that I am not going to consider all of
11  the evidence obviously that each side puts in.  But tell me
12  bottom line up front:  Here are my best cases, here are my best
13  two cases or my best one case on this issue, and here are my
14  best facts on this issue.
15      Is that something we can accomplish if I take a 30-minute
16  break?  Or do we think we might need a little longer?
17          MR. CHEEK:  Certainly make our best effort, Your
18  Honor.
19          MR. DOSS:  May I be a spoiler and ask for 45 minutes,
20  Your Honor?
21          THE COURT:  What say you, Mr. LaCour?
22          MR. LACOUR:  Fellow attorney never turns down an
23  extension, Your Honor.
24          THE COURT:  All right.  He really needed 45, too, and
25  he is just making you be the bad guy.
```

 1        All right.  I will see you in 45 minutes, and we will
 2   knock this out.
 3           (Recess.)
 4           THE COURT:  All right.  Has everybody had adequate
 5   time?
 6           MR. DOSS:  Yes, Your Honor.
 7           THE COURT:  All right.  I guess we will start with our
 8   original plaintiffs.
 9        And just to keep my record clean, on motion and assertion
10   of the United States, they're granted leave to file an amended
11   complaint, deleting the State of Alabama from the complaint,
12   and traveling under the original cause of action of the
13   plaintiffs, as opposed to an independent one.
14        All right.  Go ahead, Mr. Doss.
15           MR. DOSS:  Thank you, Your Honor.
16        May it please the Court.  The right of a parent to make
17   personal medical judgments concerning that parent's child, in
18   consultation with medical doctors and free from government
19   intrusion, is among the most sacred freedoms.  It is a freedom
20   that has been consistently recognized and safeguarded by our
21   elected officials and by our courts.  And that freedom is
22   fundamental.
23        Over 40 years ago, the U.S. Supreme Court in Parham v.
24   J.R. wrote that the pages of human experience teach that
25   parents generally do act in the child's best interest.  The

 1  Court went on, the statist notion that governmental power

 2  should supersede parental authority in all cases because some

 3  parents abuse and neglect children is repugnant to American

 4  tradition.

 5       Sharpening that point, the Court observed, simply because

 6  the decision of a parent because it involves risks does not

 7  automatically transfer the power to make that decision from the

 8  parents to some state agency or officer of the state.

 9       Until it passed the Alabama Vulnerable Child Compassion

10  and Protection Act, Alabama subscribed to and fully supported

11  those propositions.  When asked about school mask mandates,

12  Governor Ivey responded, As a former teacher, I know well that

13  parents should be in charge of making the best decisions for

14  their kids, not government.

15       When asked about COVID vaccinations for minors, Governor

16  Ivey's press secretary said, Governor Ivey encourages

17  Alabamians who are eligible to receive the vaccine to talk to

18  their doctor to make the best decision.  She went on, In the

19  case of a minor, parents not only have a right to be involved

20  in decisions affecting their child's health, but should be.

21       Our Attorney General agreed with those principles.  In

22  response to a memo from Merrick Garland directing investigation

23  of harassment school staff by parents, our Attorney General

24  signed off on a letter in which he wrote, The primary role of

25  the parents in the upbringing of their children is now

1  established beyond debate as an enduring American tradition.

2       Our Attorney General, citing the Supreme Court decision of

3  Troxel vs. Granville, which in the State's briefing here, the

4  State has attempted to diminish, our Attorney General wrote, In

5  light of this extensive precedent, it cannot now be doubted

6  that the due process clause of the Fourteenth Amendment

7  protects the fundamental right of parents to make decisions

8  concerning the care, custody, and control of their children.

9       The Attorney General expressed grave concern that the

10  federal government was purportedly attempting to criminally

11  investigate parents, who, in his view, were trying to do what

12  was best for their children.

13       But here we are now.  Those values, those rules of law

14  have been displaced.  Now, when it comes to parents of a small

15  politically powerless group who have faced a well-documented

16  history of moral scorn, the State submits that a different set

17  of rules should apply.

18       This act violates federal law, and we will prove it.

19       I'm proud to represent my clients here today, Your Honor.

20  I represent four parents and their kids.  These are normal

21  families from across Alabama.  It just so happens that each of

22  these kids has been diagnosed with gender dysphoria.

23       The evidence will show, Your Honor, that gender dysphoria

24  is a recognized medical condition.  It has been recognized in

25  the medical community for decades.  The diagnosis describes the

1   clinical distress a transgender person feels from being made to

2   live without any way to resolve the conflict between their

3   assigned at-birth sex and their gender identity.

4       If untreated, gender dysphoria leads to serious negative

5   health outcomes.  They include anxiety, severe stress, thoughts

6   or attempts at self-harm, and in some cases, unfortunately,

7   suicide.  It is a serious medical condition that requires

8   serious medical attention.

9       Through live testimony and declarations, you will hear

10  that these parents love their children.  They love them

11  unconditionally and will do anything to protect them, to do

12  anything that would allow them to flourish.  And their children

13  have.

14      The medical treatments that the State dubs risky and

15  experimental and uncertain, those are just labels.  They are

16  labels divorced from these real human experiences that Your

17  Honor will hear about.

18      If the Act is enforced and these children are deprived of

19  these treatments, my clients have extraordinary concern about

20  what might happen with their kids.  The State's solution?  Get

21  the kids counseling.  Deprive them of medical intervention.

22  Let them wait it out until they're 19 years old.

23      I suspect over the next two days the common refrain from

24  the State will be the riskiness of these current treatments.  I

25  submit, Your Honor, the far riskier option is the State's

1  untested proposal:  Deprivation of demonstrably beneficial
2  medical intervention in favor of simple counseling until a
3  child is 19 years old.

4      But I do want to be clear about what this case is not
5  about.  This is not an FDA approval process.  This is not a
6  science summit.  Your Honor is not being asked to determine
7  which side is right or wrong ultimately on the scientific
8  claims.

9      We acknowledge, as does every doctor who works in this
10  field, that these treatments, like any medical treatment,
11  carries risks.  Before having wisdom teeth removed, a
12  tonsillectomy, or some other routine surgery, we are confronted
13  with a host of risks by our doctors.  Some less likely than
14  others ranging from disfigurement to death.

15      Last night I looked at a bottle of Aleve, a common
16  over-the-counter pain reliever.  Here is what I found on the
17  bottle:  Allergic reaction, hives, facial swelling, asthma,
18  shock, skin reddening, rash, blisters, stomach bleeding, heart
19  attack, stroke.  And it even includes the telephone number for
20  the Poison Control Center in the case of an overdose or a
21  child's use.

22      Risks of medical treatment are common.  That doesn't
23  distinguish these treatments.  And they certainly don't justify
24  the abolition of a treatment.  They merit careful warning and
25  doctor oversight.

1        The issue in this case, Your Honor, is not whether a

2   medical treatment has a risk.  The answer to that question will

3   decide no constitutional dispute before the Court.  The State

4   has cited no case, and we are aware of none where the mere risk

5   of a medical intervention was sufficient to override and

6   supplant parental autonomy.

7        That principle is true for any constitutional freedom.

8   Simply because a constitutional freedom can be exercised in a

9   way that is deemed undesirable by the majority, is never

10  justification for the wholesale obliteration of that right.

11       The issue in this case, Your Honor, as to our count

12  regarding the substantive due process claims of our parent

13  clients is who should weigh the medical risks?  A parent who

14  knows his or her child better than anyone in the world, who is

15  working with a team of trained medical professionals following

16  widely accepted standards of care, and who is presumed

17  constitutionally to act in the child's best interest, or a

18  state legislature, who chooses to disregard physician advice,

19  who undisputedly knows nothing about the particular facts and

20  circumstances of a particular child.

21       Under the State's view, parents of transgender minors are

22  presumed incapable of weighing the risks.  Under the State's

23  view, transgender minors are presumed incapable of

24  participating in that process.  And under the State's view,

25  Your Honor, the Legislature, not the parents, the Legislature

1  becomes in the best position to decide what's best for a child.

2      Two points before I move on.  None of our plaintiffs are

3  eligible for or seeking surgical intervention.  Among other

4  treatments, the Act bans surgical intervention as to minors.

5  Because we don't have a plaintiff who is eligible for such

6  treatment, because we don't have a plaintiff who is seeking

7  such treatment, we are not challenging that aspect of the Act.

8      So to the extent the Act bans surgical intervention, Your

9  Honor, that's off the table, from our perspective.  We make no

10 claim concerning that piece of the Act.  It's focusing solely

11 on the medical intervention -- the puberty blockers, the

12 hormone treatment, the medication, that piece of the Act, and

13 that aspect of it, Your Honor.

14     Second, related to this issue of parental freedom, it's

15 critical to emphasize just how broadly this Act is written.

16 The Act does not just criminalize a doctor from prescribing

17 medications to minors diagnosed with gender dysphoria.  It goes

18 a critical and terrifying step further.  It criminalizes anyone

19 who causes a minor to obtain these medications for purposes of

20 addressing gender dysphoria.  We need not imagine a

21 hypothetical to understand this danger.

22     Our client Kathy Noe and her transgender son Christopher

23 Noe reside in Phenix City.  Christopher seeks medical treatment

24 across the Alabama-Georgia line in Georgia, where these

25 treatments are lawful.  Under this Act, though, Your Honor, by

1   merely driving her son across state lines to continue

2   treatment, Kathy has arguably caused -- that's the key word in

3   the Act -- caused her son to obtain the forbidden treatments.

4        Not only then does this Act override --

5            THE COURT:  Is that based on the 13A definition of

6   cause?

7            MR. DOSS:  I think our point, Your Honor, is that it's

8   not necessarily defined to exclude that.  You're causing it.

9   You're acting as an inciting factor, which would result in the

10  obtaining those sorts of treatments.  And by driving across the

11  state lines, you are causing the child to receive the

12  treatments.

13       Not only then does this Act override parental choice, it

14  holds parents hostage.  Even seeking treatment out of state

15  where it is lawful exposes these parents to criminal

16  prosecution.

17       The State's defense of this Act, as far as parental choice

18  goes, erodes the sacred obligation of a parent to make medical

19  decisions in consultation with trained medical physicians

20  regarding the best interests of his or her child.  But it does

21  more than erode.  As our evidence will show, it criminalizes

22  parents' love for their children.

23       Your Honor will hear no evidence that our families have

24  done anything but carefully weigh their options, listen to

25  their doctors, and watch their children thrive while treated.

1        So what does the State say?  The State engages in

2   sophistry, that by abolishing the treatment it has solved the

3   parental choice problem.  We say these requirements are illegal

4   and thus parents are deprived of nothing.

5        Two problems:  First, imagine a scenario, Your Honor,

6   where the State passed a different law, one that places the

7   decision to administer these treatments with a State review

8   board.  Further imagine that such a review board has final say

9   over treatment without any parental input.  No doubt such a law

10  would violate parental choice.  And I doubt the State would

11  even contest that.

12       But the State has done exactly that.  The only difference

13  being the level of degree.  The State has placed the future of

14  these treatments with a State review board:  The Legislature.

15  And stamped denied on every application submitted after

16  May 8th.

17       The second problem with the State's response is that its

18  proposed approach that parental choice isn't implicated so long

19  as the State deems a practice illegal would create an exception

20  that would swallow the rule.

21       According to the State, so long as it deems something

22  illegal, then parental choice is never an issue.  If the State

23  is correct, though, Your Honor, then the decades of precedent

24  from the Supreme Court precedent that acknowledges that the

25  State has gone too far would be meaningless.

1          On that point, Your Honor, to your request that we

2     identify the two key cases and the two pieces of evidence

3     related to each claim, as to the parental autonomy due --

4     substantive due process claim of the parents, we note Parham

5     vs. J.R., 422 U.S. 584, Supreme Court 1979.  And Troxel vs.

6     Granville.

7               THE COURT:  You don't have to give me a cite.  I think

8     we have got most of these by -- I appreciate you offering, but

9     if you will give me the names.  I just want to know -- it helps

10    me to know what you think is the most important to your case,

11    as opposed to what we may conjure.

12              MR. DOSS:  Yes, Your Honor.

13         In terms of the evidence, I don't mean to paint with a

14    broad brushstroke, but I think there are really two categories.

15    One is the testimony of our parents.  And you will hear from

16    one of our plaintiffs live.  Our other plaintiff parents will

17    be testifying via declaration.

18         The other category is the testimony of the doctors,

19    including our plaintiffs and our experts, who will discuss with

20    Your Honor the standard of care that these treatments are

21    widely accepted, these treatments represent the standard of

22    care in Alabama and have been -- has been the standard of care

23    for years.

24         And so together --

25              THE COURT:  So I would say this:  Again, I know that

```
 1   all these are important in the broad evidentiary showing you
 2   want to give me.  I guess what I would like to know is -- give
 3   me the one or two that you think these knock it out of the park
 4   for us, this is powerful.
 5           MR. DOSS:  I am highly persuaded by Dr. Ladinsky.  She
 6   is a local doctor.  She practices out of Birmingham.  She's
 7   been in this area for many, many years.  She's treated hundreds
 8   of patients who have suffered from gender dysphoria, and she's
 9   administered these treatments and have been involved in a
10   multi-disciplinary approach.  She will be testifying live.
11      She has already submitted a declaration.  I think it shows
12   what the standard of care is in Alabama, and it shows what's
13   being taken away from these parents.
14      Most -- I think all four of our parents -- all four of our
15   plaintiffs have been treated at some point by Dr. Ladinsky.
16   And so I think she's an important witness here.
17           THE COURT:  I heard you mention parent testimony.  Is
18   there one that you think this -- they're all -- they all help
19   us, but this one right here.
20           MR. DOSS:  Let me make sure I get the right pseudonym.
21           THE COURT:  Okay.
22           MR. DOSS:  Megan Poe, Your Honor.  She submitted a
23   declaration.  And she will be testifying live, as well.
24           THE COURT:  And, hey, let me say this.  And I probably
25   didn't make this clear, so I will say this to all sides.  So
```

1   when I mean give me your two best cases and give me your one,

2   two, three, four, however many you think there are of your best

3   facts, what I am really talking about is if you were writing an

4   order for the Court, which obviously I am not suggesting -- and

5   I don't need anybody to write me an order.  I can write my own

6   order.

7        But, you know, these would be the things that you would

8   expect to see in the order.  This case is so important the

9   Court cited it.  This fact is so important the Court actually

10  cited it in its order.

11       So that's really what I am looking for.  They're that

12  important to you.

13       All right.  Go ahead.

14          MR. DOSS:  I would mention these two witnesses, Your

15  Honor.  I think they tell a compelling story together, and they

16  emphasize the key themes, with respect to the substantive due

17  process claim on behalf of the parents.

18          THE COURT:  All right.

19          MR. DOSS:  What's important to remember, though, Your

20  Honor, over the next two days, is the State did not ban these

21  treatments for everyone.  Just transgender children.

22       Under the Act, children can still take puberty blockers.

23  Biological males can still take estrogen.  Biological females

24  can still take testosterone.

25       It's not as though the State deemed these treatments

1  categorically risky, only risky when used with transgender

2  youth.

3      This treatments remain available just out of reach for

4  these parents.  The State's claim that this in no way

5  implicates parental choice is a red herring.

6      Your Honor will also hear evidence and argument concerning

7  the Equal Protection Clause.  As I mentioned earlier, I

8  understand the United States' argument will focus on equal

9  protection.  I am going to hit it very briefly, Your Honor.

10      In terms of the critical cases we see for purposes of the

11  equal protection claim, the first is Glenn vs. Brumby,

12  B-R-U-M-B-Y.  That's an Eleventh Circuit decision.  The second,

13  Bostock vs. Clayton County.  It's a 2020 Supreme Court

14  decision.

15      In terms of the best evidence, Plaintiffs' Exhibit 19 we

16  think is very helpful on this point, Your Honor.  It's a

17  recently released Yale article that goes point by point as to

18  the State' stated justifications for this law and why science

19  doesn't back them up and cites to a variety of studies.

20      I am not going to belabor the equal protection argument,

21  Your Honor, only to say this law clearly discriminates against

22  transgender children.  It's subject to a more exacting

23  scrutiny, and the State cannot meet that standard.

24      In addition to the two families, I represent two doctors.

25  These doctors provide medical care to transgender children who

1   have been and may be diagnosed with gender dysphoria.  Through

2   declaration and live testimony, Your Honor, you will hear their

3   experiences in treating transgender youth who experience gender

4   dysphoria.

5        And most critically, Your Honor, you will hear how this

6   law places these doctors in an impossible catch-22.  Either

7   one, they comply with federal law, the Affordable Care Act,

8   which commands doctors not to discriminate on the basis of sex;

9   or, two, they comply with state law and they be subject to

10  criminal prosecution.

11       That impossible decision paradigmatically calls for a

12  finding of preemption.  The supremacy clause of our

13  constitution insures that no state with pass any law that

14  interferes like this one with federal law.

15       As to this claim, Your Honor, I would note Armstrong vs.

16  Exceptional Child Center, Inc., Supreme Court opinion from

17  2015.  And Jolly vs. Riverwoods Behavioral Health, LLC, a

18  Northern District of Georgia decision from 2021.  And I may

19  have said Armstrong was 2021.  I meant 2015 if I said that

20  incorrectly.

21       And in terms of the evidence, Your Honor will hear from

22  our client Rachel Koe, MD.  And because the preemption question

23  is primarily a question of law, in terms of the evidence or

24  what might be cited in a discussion of this, it really would be

25  Section 1557 of the Affordable Care Act, Your Honor, in light

1 of this particular Act.

2          THE COURT:  So do you want to address any of the

3 State's counterpoints on preemption?

4          MR. DOSS:  Your Honor, I will note the State has

5 argued that -- I guess a couple of points here.  The first

6 point is, as we have cited, with respect to the Northern

7 District of Georgia case, we think that's an instructive one.

8 It's on all fours.  It recognized -- it denied a motion to

9 dismiss that's asserting very similar claim to what we're

10 asserting here, in terms of transgender status.

11      In terms of preemption, we have here doctors who are

12 receiving federal funding.  We have the Act telling them that

13 they cannot discriminate on the basis of sex.  We have Supreme

14 Court precedent acknowledging that discriminating against

15 transgender youth is, in fact, discrimination on the basis of

16 sex.  And then they have an act under state law which tells

17 them that if you, in fact, encourage or cause these children to

18 obtain these treatments, you will be criminally prosecuted.

19      And so we think it does, in fact, create a preemption

20 problem.  There's no way that a doctor can comply with both of

21 those standards under the way this law is written as it is,

22 which is a call for preemption, Your Honor.  And it allows for

23 somebody to challenge it under these circumstances.  Again, we

24 cite to the Jolly case that acknowledges or denies a motion to

25 dismiss based on very similar arguments we're making here in

1  the transgender context.

2      Finally, Your Honor, I represent a pastor, Reverend Paul

3  Eknes-Tucker of Birmingham.  Reverend Eknes-Tucker has a long

4  history of counseling families, particularly, including

5  families of transgender youth.  As Your Honor might imagine,

6  some families may struggle with squaring these issues with

7  their faith.

8      Reverend Eknes-Tucker for decades has provided thoughtful

9  counseling, making sure that parents and families are aware

10 that there are extraordinary doctors out there who can help.

11 But for the doctors and others in this state, including

12 Reverend Eknes-Tucker, but also including pediatricians, such

13 as Rachel Koe, who make referrals of their patients to

14 specialists such as Dr. Ladinsky, the Act criminalizes their

15 mere expression of available options.

16     When I was thinking about this Act and the First Amendment

17 claim, Your Honor, I was remind of President Reagan, who was

18 fond of jokes about the Soviet Union.  And the jokes often

19 captured the absurdity of Soviet doublethink and doublespeak.

20     A couple came to mind as I was thinking about this case

21 and what the Act -- what the State is saying regarding First

22 Amendment freedom of speech.

23     A person asked a Soviet, What is the difference between

24 the constitutions of the United States and the Soviet Union?

25 Is both of them guaranteed freedom of speech?  The Soviet

1    answered, Yes, but the Constitution of the United States also
2    guarantees freedom after the speech.  Person asked the Soviet,
3    Is it true that there's freedom of speech in the Soviet Union
4    just like in the United States?  The Soviet responds, Yes, of
5    course.  In the United States you can stand in front of the
6    White House and yell "Down with Ronald Reagan," and you will
7    not be punished.  Equally you can stand in Red Square in Moscow
8    and yell "Down with Ronald Reagan," and you will also not be
9    punished.
10        The State's defense of this law applies the Soviet style
11   logic.  According to the State, there is no First Amendment
12   violation because you remain perfectly free to recommend
13   counseling to those with gender dysphoria.  Your Honor, that is
14   classic content-based and worse viewpoint-based discrimination.
15   There is no freedom of speech if the State first decides what
16   you're free to speak.
17        Courts ordinarily apply strict scrutiny when analyzing the
18   constitutionality of content or viewpoint-based restrictions on
19   speech.
20        Content-based laws target speech based on its content.
21   Content-based regulations are presumptively invalid.  This Act
22   prohibits parents, health-care providers, and others from
23   engaging in constitutionally protected speech advising people
24   as to what their medical options are.
25        By categorically restricting and criminalizing anyone from

 1  causing any child with gender dysphoria to obtain these

 2  treatments, the Act necessarily captures speech.

 3       Take a pediatrician such as Rachel Koe.  When Rachel Koe

 4  is presented with a patient who has potentially gender

 5  dysphoria, the second Dr. Koe refers that patient to a

 6  specialist, arguably under the Act, Dr. Koe has caused someone

 7  to obtain the treatment.  It's speech-based regulation, Your

 8  Honor.

 9       And only if the content-based restrictions -- am I --

10            THE COURT:  You have run out of time, but I will spot

11  you just a little bit more.

12            MR. DOSS:  Thank you, Your Honor.

13       Only if the State shows a compelling interest in narrow

14  tailoring do these laws survive First Amendment scrutiny.

15            THE COURT:  You said you were going to come in under

16  time.

17            MR. DOSS:  You know, I'm terrible at estimating this,

18  Your Honor.

19            THE COURT:  All right.  So let's make fast work, then.

20  Give me your best evidence, best cases.

21            MR. DOSS:  Yes, Your Honor.  I think from our

22  plaintiffs you will hear from Rachel Koe and Pastor

23  Eknes-Tucker who will explain the issues of speaking to

24  patients and how that could arguably run afoul of the First

25  Amendment.

```
 1        In terms of the cases, there's Wollschlaeger --

 2   W-O-L-L-S-C-H-L-A-E-G-E-R -- vs. Governor, and that's an

 3   Eleventh Circuit case from 2017.  And Conart -- C-O-N-A-R-T --

 4   vs. Walters, a Ninth Circuit opinion from 2002.

 5        And I will be remiss, Your Honor.  I wanted to mention one

 6   other case, which applies I think to all of these claims or

 7   most of them.  There is a court that has considered these

 8   issues already, and that is the Eastern District of Arkansas in

 9   the Brandt vs. Rutledge case.

10        THE COURT:  I promise you we have all read through

11   that transcript and that opinion.

12        MR. DOSS:  Okay.  We do think that's helpful.

13        So in conclusion, Your Honor, and I am going to sit down,

14   we think the evidence shows that these claims violate the

15   Constitution in federal law, and we ask that Your Honor will

16   issue either temporary restraining order based on the

17   additional time perhaps needed to consider these issues, and

18   ultimately the preliminary injunction.

19        Thank you, Your Honor.

20        THE COURT:  All right.  How long does the United

21   States need?

22        MR. CHEEK:  Not 25 minutes, Your Honor.

23        THE COURT:  All right.

24        MR. CHEEK:  So to 15.

25        THE COURT:  I will say proportionally to the issues
```

 1 | that you have would be a good standard.

 2 |          MR. CHEEK:  May it please the Court.

 3 |      The United States is here today because Alabama grossly

 4 | overreached when it enacted Senate Bill 184 and made medically

 5 | necessary treatment for transgender youth a felony.

 6 |      The issue before the Court, as far as the United States is

 7 | concerned --

 8 |          THE COURT:  I think it might be more fair to you if we

 9 | take a pause for a minute and see if we can quit testing all

10 | the air raid sirens in Montgomery.

11 |          MR. CHEEK:  I have to admit, Your Honor, this is a

12 | first for me.

13 |          THE COURT:  Let's give this about a minute.

14 |      Let's just take a two-minute personal break, and we will

15 | come back.

16 |          (Recess.)

17 |          MR. CHEEK:  Your Honor, the United States is here

18 | today because Alabama grossly overreached when it enacted

19 | Senate Bill 184 and made medically necessary treatment for

20 | transgender youth a felony.

21 |      The issue before this Court, as far as the United States

22 | is concerned, can be distilled into a simple question:  Does

23 | criminalizing certain medical treatments for transgender youth

24 | and only for transgender youth constitute a form of

25 | discrimination that's barred by the Equal Protection Clause?

```
 1   The Eleventh Circuit has squarely held that it does in Glenn
 2   vs. Brumby.
 3       And the Supreme Court's reasoning in Bostock applies here.
 4   There, the Court said, quote, Discrimination based on
 5   transgender status necessarily entails discrimination based on
 6   sex.  The first cannot happen without the second, end quote.
 7       And that's precisely what SB -- Senate Bill 184 does.
 8   Only it takes it a step further.  It makes it a felony for
 9   doctors to provide care based on their patient's sex.  In other
10   words, anyone in Alabama can have care that supports their
11   gender unless they are transgender.
12       As we stand here today, youth all across this state are
13   taking a range of medications or undergoing procedures that
14   affect their development into adulthood.
15       Some who were determined to be male at birth are taking
16   testosterone perhaps because their puberty was delayed.  Some
17   who were determined to be female at birth are taking estrogen.
18   Some minors have started puberty early and they are taking the
19   puberty blockers.
20       And, yes, there are youth in this state who do not
21   identify with the sex that they were assigned at birth.  And
22   some of them are taking these very same treatments.
23       Now, I want to address some misconceptions, if I could,
24   about when these treatments are permitted for transgender
25   youth.
```

```
 1        First, the treatments are provided to transgender youth
 2   who suffer significant distress related to their gender
 3   identity.  As Mr. Doss mentioned, it is a condition known as
 4   gender dysphoria.  And that condition is treated only after
 5   consultation with a parent and a team of doctors.
 6        These treatments, in the form of medications, are provided
 7   if and only if that youth experiences a number of predefined
 8   symptoms consistently over the course of at least six months.
 9        Now, today, Your Honor --
10            THE COURT:  So tell me what that regimen of treatment
11   would look like practically.
12            MR. CHEEK:  I'm sorry.  I didn't hear the last part.
13            THE COURT:  Tell me practically what that regimen of
14   treatment would look like.
15            MR. CHEEK:  So the first step would be provide a
16   puberty blocker if there is -- that's my understanding is
17   that's the most common first step.
18        And what that does --
19            THE COURT:  It's just a prescription you fill at the
20   pharmacy?
21            MR. CHEEK:  That's my understanding, yes, sir.
22            THE COURT:  Okay.
23            MR. CHEEK:  It effectively buys time for the family,
24   the child, and a team of doctors to determine whether gender
25   dysphoria is going to be prolonged, is going to last.  Maybe to
```

1   analyze and look into whether this distress is caused by

2   something else.

3        And then if there is a consensus among the team of

4   physicians -- and, again, after that six -- at least six-month

5   period occurs -- it sounds as if Dr. Ladinsky is going to

6   testify that, practically speaking, the period is much more --

7   much longer in Alabama, but then and only then can you talk

8   about prescribing hormones.

9        Now, today these people are all treated the same.  But

10  beginning on Monday, this landscape will change dramatically if

11  this Court does not grant a T.R.O. or a preliminary injunction.

12       On Monday these youth will be placed into two metaphorical

13  buckets.  And the only reason these people will be treated

14  differently is because of their birth sex.

15       In the first bucket, you are going to have a group of

16  children whose sex assigned at birth matches their identity.

17  And for those children nothing changes.

18       In the second bucket, if a person's gender identity does

19  not match the sex assigned at birth, a whole lot changes.

20       On Monday this state criminalizes medical care for these

21  transgender persons.  On Monday parents will have to choose

22  between committing a felony and deciding what they believe is

23  in their child's best interest.  And on Monday doctors will

24  have to choose between committing a felony or breaching the

25  standard of care in treating their patients.

 1        Now, one question that Your Honor may have is why is the
 2   United States here?  Much of our interest aligns with the
 3   private plaintiffs.  But there are some additional interests
 4   that explains the United States' presence.
 5        First, the United States has an interest in ensuring that
 6   all provisions of the Constitution are enforced for all
 7   citizens.
 8        Second, the federal government sends hundreds of millions,
 9   if not billions of dollars each year to the states for
10   health-care purposes.  And it's in its interest to see that
11   that money is spent in a nondiscriminatory fashion.
12        If I could now turn to the four elements necessary for a
13   preliminary injunction.
14        The first element is the likelihood of success on the
15   merits.
16        And before I get there, Your Honor, let me touch on the
17   level of scrutiny that this question invokes.  Because
18   Alabama's SB 184 is a sex-based discrimination, intermediate
19   scrutiny applies.  And under that scrutiny, the statute will
20   survive if it is substantially related to achieving an
21   important government objective.
22        So why is there a likelihood of success on the merits?
23   First, SB 184 criminalizes medical care that is safe and
24   effective and necessary.  And our best citations for that at
25   this point, Your Honor, are ECF 8-1, the Hawkins declaration,

 1  paragraphs 28 through 31; ECF 62-2, the Antommaria declaration,

 2  paragraphs 27 through 28, and 34 through 35; and ECF 80-2,

 3  publication from the American Academy of Pediatrics on pages 5

 4  and 10.

 5      The State, of course, will disagree and will prevent

 6  countervailing opinions, at least I expect them to.  Those

 7  opinions are not supported by long reputable medical

 8  organizations like the American Medical Association, The

 9  Endocrine Society, the American Academy of Pediatrics.

10      Now, the State agrees that gender dysphoria is a

11  legitimate medical condition, but it criminalizes most of the

12  care available to treat that condition.  Under the State's path

13  forward, counseling and counseling alone is how gender

14  dysphoria is treated.

15      I want to talk a little bit about -- back to intermediate

16  scrutiny -- success on the merits.  It's very much intertwined

17  with is the State advancing an important government objective.

18  My understanding is the State will say that the statute was

19  necessary for the protection of children.

20      There's evidence to suggest that that is pretext.  It's

21  not helping children.  It's actually harming them in limiting

22  the treatments that are available to them.

23      This is, again, a recognized medical treatment, medical

24  condition that can be treated.

25      In addition, the State -- in addition to SB 184, the State

1  has enacted other laws banning transgender people from

2  participating in various aspects of society.

3       In 2001, HB 391 was passed, effectively banning

4  transgender males from participating on female sports team in K

5  through 12 schools.  And earlier this year HB 322 was enacted,

6  and it requires that persons use the restroom based on their

7  biological sex in K through 12 schools.

8            THE COURT:  How much longer do you think you have?

9            MR. CHEEK:  I can be quick, if Your Honor desires.

10            THE COURT:  I would say be quick, because the

11  government is really just here on one issue.  Mr. Doss had to

12  pack several into one, so...

13            MR. CHEEK:  Fair.

14       Secondly, I do want to talk about the second piece of the

15  intermediate scrutiny.  Is the statute substantially related to

16  protecting children?  And on this piece, the statute is based

17  on several faulty factual findings.

18       And intermediate scrutiny, if it means anything, it means

19  these findings have to be supported.

20       First, in Section 2-6 of SB 184, it indicates that some in

21  the medical community are aggressively pushing to remove

22  healthy external and internal sex organs when the child

23  expresses a desire to appear as a sex different from his or her

24  own.

25       Current medical protocols do not allow for surgery or drug

1  therapy for prepubertal children, and specifically state that

2  genital surgery should not be carried out before patients reach

3  the legal age of majority.

4       There are a couple of citations that support that

5  proposition.  WPATH guidelines, which I think all three parties

6  have submitted into evidence, at page 21.  And the Endocrine

7  Society article at page 38-72.

8       SB 184 also says that a substantial majority of children

9  who experience discordance between their sex and identity will

10 outgrow the discordance once they go through puberty.

11      The Endocrine Society at page 38-76 says that -- they

12 suggest clinicians delay performing genital surgery until the

13 patient is at least 18 years of age.

14      And then the last point on this piece, Your Honor, is SB

15 184 at Section 213 says puberty blockers prevent gonadal

16 maturation and thus render patients taking these patients

17 infertile.

18      We have an article that is submitted into evidence called

19 bioscience at page 25, says there's substantial evidence of

20 reversibility of the fertility effects of hormone therapy.

21      Lastly, I just want to note that we're dealing with a

22 constitutional right in this context, Your Honor.  And a number

23 of courts commonly rule that a temporary loss outweighs any

24 harm to a defendant, and that a preliminary injunction should

25 issue in this context.

1    Allen vs. Williams, 254 F.Supp.2d 614, supports that

2  proposition.  The Fornem (phonetic) case, 593 F.Supp.2d 1000,

3  does, as well.

4    And so at the end of the day, Your Honor, we ask that the

5  Court issue either a temporary restraining order or a

6  preliminary injunction.

7    Thank you.

8         THE COURT:  All right.  Mr. LaCour -- and if for some

9  reason you need a little more than 25 minutes, I will give it

10  to you, because I have given the combined plaintiffs a fair

11  amount of time in addition to that.

12         MR. LACOUR:  I will try to be brief, Your Honor.

13         THE COURT:  And I am really looking -- I know you are

14  going to get me the meat of the case and the evidence.  I'm

15  really looking for each issue -- here's my strongest cases,

16  here are my strongest points, and a little argument.

17         MR. LACOUR:  Okay.  Well, I have got a little

18  argument.  I feel like I have cut some of it, hopefully enough

19  to spend enough time on for the main claims with the cases and

20  citations.

21    Thank you, Your Honor.

22    Everyone here agrees that children with gender dysphoria

23  need help.  But after studying this issue and considering the

24  current evidence, the Alabama Legislature determined that the

25  heavily medicalized approach of blocking natural puberty and

1  providing massive doses of cross-sex hormones to kids is simply

2  too risky to allow.

3      In doing so, the State aligned itself with numerous

4  countries in Europe and elsewhere that have recently reviewed

5  the evidence for a medicalized approach to gender dysphoria in

6  kids and have found that evidence sorely lacking.

7      Indeed -- and this is Defense Exhibit 11, at page 3, it's

8  quoted in our brief, but I will cite here again.  This is from

9  Sweden's National Board of Health and Welfare.  Just this last

10  February they issued a national policy stating, quote, For

11  adolescents with gender incongruence, the board deems that the

12  risk of puberty-suppressing treatment with puberty blockers and

13  gender-affirming hormonal treatment currently outweigh the

14  possible benefits, and that the treatments should be offered

15  only in exceptional cases.

16      This judgment is based mainly on three factors:  The

17  continued lack of reliable scientific evidence concerning the

18  efficacy and safety of both treatments, the knowledge that

19  detransition occurs among young adults, and the uncertainty

20  that follows from the yet unexplained increase in the number of

21  care seekers, an increase partly -- particularly large among

22  adolescents registered as female at birth.

23      Now, while Sweden has left the door open for experimental

24  trials of these treatments, we are unaware of any experiments

25  currently being run in the country.  In any event, it is

 1    emphatically not the case that a parent can simply take their

 2    child to a gender clinic like the ones here in Alabama or the

 3    one at UAB and obtain these interventions.  That's because

 4    these risks are severe.  They include cardiovascular damage,

 5    liver damage, fertility, sexual dysfunction, things that can

 6    last a lifetime.

 7        You are going to hear from Sydney Wright, who is a young

 8    woman, who at the age of, I believe, 18, did go see one of

 9    these clinicians, and was transitioned very quickly, given

10    major doses of testosterone.  Spent a year living as a

11    transgender man before realizing her issues were really

12    something much deeper.

13        There were other mental health concerns and traumas in her

14    life that she needed to address, and that she thought she could

15    address through transitioning.

16        And her story is not uncommon.  Indeed, even in some of

17    the evidence from plaintiffs' societies at WPATH suggest that

18    the rate of mental illness and trauma among children suffering

19    from gender dysphoria is very great, which makes it even harder

20    for them to weigh the risks and the rewards of going through

21    this treatment that can irreversibly and permanently alter

22    their lives.

23        Now, the alternative in Sweden and the alternative here in

24    Alabama is not simply to do nothing for these kids.  It's the

25    watchful waiting approach that has served gender dysphoric

1  children well, long before this recent heavily American trend

2  of medicalizing these kids.

3      Watchful waiting is not just waiting.  There's a major

4  emphasis on the watchful.  It's providing therapy and support

5  to give that child space to explore his or her identity until

6  that identity is more stable upon reaching adulthood.

7      And the studies are pretty uniform, that most of these

8  children suffering from dysphoria, if they are not put on the

9  pathway of puberty blockers and cross-sex hormones will later

10  realize that they are, in the case of boys, that they are gay,

11  and in the case of girls, that they are lesbian.

12      When you are a child, before you have hit adolescence, you

13  don't know what to make of these feelings.  And you are going

14  to hear evidence to that effect of from Dr. Cantor, who is

15  going to testify.

16      The kids just know they're different.  Before they even

17  have the language with which to sort of explain these things of

18  sexual attraction, because it's before they reach sexual

19  maturity, they're put on this pause.  And this pause is not

20  nearly as anodyne or harmless as my friends have suggested it

21  is.

22      There are many risks that are not well understood yet, but

23  that are documented.  Particularly Dr. Laidlaw in his report --

24  that's Defense Exhibit 3, 6 through 21, where he really lays

25  out the harms of many of these treatments, both the puberty

 1  blockers and the hormones.

 2       I have heard today from the private plaintiffs that they

 3  are not challenging the surgery ban.  I suppose they don't have

 4  standing to do so.  But to the extent they think that that is

 5  okay, I'm curious what their distinction really is.

 6       I mean, if it's gender-affirming surgery, why not provide

 7  that to the child and the parent, as well, as an option.  And

 8  the reason is there's potential for permanent irreversible

 9  damage.

10       And the same is true --

11            THE COURT:  So the position of the State would be

12  there never ever would be a time that these procedures would be

13  medically necessary to a minor?

14            MR. LACOUR:  Your Honor, I don't think we need -- I

15  don't think that's the standard we need to meet, Your Honor.

16            THE COURT:  I'm just asking you what your position is.

17            MR. LACOUR:  Your Honor, I think our position is that

18  there simply isn't evidence across the board.

19       And that's another key fact that you are going to hear

20  from Dr. Cantor that's present in his report.

21            THE COURT:  Okay.  So then --

22            MR. LACOUR:  We don't know --

23            THE COURT:  So you're saying that there would be times

24  that this could be medically necessary in a minor?

25            MR. LACOUR:  I don't believe it is necessary, because

1  when they reach adulthood, there's still time at that point if

2  they're still dealing with dysphoria for them to make the

3  change.

4       But even if you could hypothesize a child, and who -- for

5  whom this is absolutely necessary to start on these powerful

6  medications, we don't know who they are.  We don't.

7       We do know that the majority of kids, and perhaps the

8  large majority of kids who are suffering from gender dysphoria

9  will later desist.  That means they will later come to terms

10  and identify with their biological sex.  And that's incredibly

11  important.

12       The plaintiffs say the odds with their new identification

13  techniques -- they say in their opening brief, the odds that

14  they're going to misidentify a true transgender kid -- and by

15  true transgender, I mean someone whose gender incongruence is

16  likely to last for a lifetime.  And so the odds of

17  misidentifying that person are virtually nil.  That is a widely

18  irresponsible and completely evidentiary baseless statement for

19  them to make.

20            THE COURT:  So you say a majority of kids will --

21            MR. LACOUR:  Later identify with their birth sex.

22            THE COURT:  What do you mean a majority?  What is that

23  number?  Give me a --

24            MR. LACOUR:  It's somewhere between 50 and 90 percent,

25  Your Honor.  And that's not just our experts.  That's coming

1  from WPATH and Endocrine Society, who we are just hearing so

2  much about from the plaintiffs.  We are not making this up.

3      And that's why you are seeing this caution that is

4  sweeping across Europe right now, where it's not doctor-run

5  medical organizations who have a financial interest and

6  potential an idealogical interest in making sure these

7  treatments are available.

8      These are government entities who are more objective and

9  are potentially more objective in looking at these things, and

10  that they have done extensive literature reviews, which are

11  present in the record, as well.  And they are finding that the

12  evidence is just not there.

13      The benefits -- the evidence to back up the benefits is

14  very much lacking.  And the evidence of the harms is very

15  concerning.

16      And so they've all said we need to hit pause on pausing

17  these kids' natural development and send them on a different

18  path until we understand this more.  Because there's really one

19  study -- and we have addressed this extensively in our brief --

20  the Dutch protocol, which was an experiment run on gender

21  dysphoric youth in the Netherlands in the 2000s that resulted

22  in two studies on puberty blockers, cross-sex hormones, and

23  transition surgeries.

24      And the study is really the basis of, like any claim that

25  there's a benefit.  And, as Dr. Cantor explained, as we

1  explained extensively in the brief, there are many problems

2  with drawing lessons from the Dutch study, including -- I mean,

3  even one of the leaders of the Dutch study has come out and

4  said, like there are plenty of clinicians now in the United

5  States who are taking just the positives of our study and

6  really running with it.

7      I mean, in the Netherlands, they were starting kids on

8  puberty blockers at the average age of 15.  The Endocrine

9  Society says you can start them as early as eight or nine, the

10  Tanner Stage 2 of puberty development.

11      They were starting them on cross hormones much later in

12  the Netherlands than they are starting kids on those hormones

13  here.

14      I mean, there are other deeper problems that Dr. Cantor is

15  going to explain, including the fact that every kid who went

16  through the Dutch protocol had extensive mental health support.

17  And extensive mental health analyses going on throughout that

18  entire process.

19      And what that means is -- I mean, that is a variable that

20  really makes it hard to determine that the medical treatments

21  were actually doing anything.  It could just as easily have

22  been the psychotherapy that was causing any potential benefits.

23  And that probably explains why attempts to replicate the Dutch

24  study have all failed so far.

25      Again, this is the cornerstone of the affirmative care

1  movement in the U.S.  And we think it is incredibly weak.  And

2  we didn't hear anything to the contrary in the reply brief from

3  our friends.

4      I mean, before going deeper into -- they're talking more

5  about the science.  I mean, the legal framework, I think there

6  are a couple that are real important to recognize.  Of course,

7  the first is this is a preliminary injunction.  That is an

8  extraordinary remedy.  The burden remains on the plaintiff

9  throughout to come forward with the evidence.

10     But second, I think even more critically, the State -- and

11  this is a quote from Gonzales vs. Carhart -- the State has,

12  quote, wide discretion to pass legislation in areas where

13  there's medical and scientific uncertainty, closed quote.

14     Now, I think this raises the bar even higher for the

15  plaintiffs because they need to prove the absence of medical

16  and scientific uncertainty, and they simply cannot.  I mean, a

17  few statements from doctors' groups, and them saying over and

18  over again that this is safe, effective, medically necessary is

19  not enough to make a consensus.

20     So I do think we have presented more than enough evidence

21  to suggest that the benefits are not here.  The risks are too

22  great.  The uncertainty is too great.

23     I mean, we have got declarations from six experts who have

24  done extensive research and practice in the fields of

25  endocrinology, pediatrics, and psychology.  Rather than simply

1  point to a few statements from these doctor-run groups, they

2  explain the state of the evidence both for and against those

3  recommendations, and they explain why that evidence is so

4  lacking.

5       Noticeably, in the numerous studies in the record,

6  including the literature reviews from the UK, Sweden, Finland,

7  France, Australia, and New Zealand that have similarly found

8  the evidence in support of these treatments to be frighteningly

9  thin.

10      And we have the declarations from 14 individuals.  I mean,

11 some of these are detransitioners.  These are kids who -- or

12 these are young people who, at a very early age, were sent down

13 this pathway without some of the precautions that plaintiffs

14 assure us are present at least in their clinic.

15      Well, I mean, we didn't pass this law just to address

16 their clinic.  We passed it to address the entire state.  And I

17 mean, these were people who are confused and in need of real

18 guidance.  And the adults in the room failed them.  The medical

19 industry failed them.  And these are the kids who this law was

20 passed to help.

21      And so another broader point -- touched on this a moment

22 ago.  They seem to take -- plaintiffs seem to take the position

23 that -- and their experts, as well, that you have medication or

24 nothing.  But as I was noting, the evidence behind

25 psychotherapy, which has been studied and has shown to help

1  address gender dysphoria in children, is there, and doesn't

2  carry those risks of medicalizing these kids.

3      I think it's helpful to imagine, like a different context.

4  Imagine there's a new pill that's been developed to treat

5  childhood depression.  And there's been one study done that

6  suggests it might help a little bit, but every kid in the study

7  also was getting a lot psychotherapy.  And that also that pill

8  causes cardiovascular, liver damage, and a 5 to 10 percent

9  chance of sterility in the child.

10      Of course, Alabama could say, no, this needs to be studied

11  more.  I mean, every court that has looked at medically -- at

12  sort of access to care claims under the substantive due process

13  clause has come out that same way.

14      We have multiple cases in the briefing where you had a

15  terminally ill patient who sued saying they had a right to an

16  experimental treatment.  And they lost each time.  They said --

17  the government has looked at this and said, this is too risky

18  right now.

19      Even if that person was a hundred percent convinced -- and

20  this is an adult who has better capacity to weigh risks and

21  rewards than a child does.  And even then the Court said the

22  State gets to regulate in this space.  The government gets to

23  regulate in this space.

24      So I do think -- I mean, the evidence is going to show --

25  and, again, the burden is not on us to prove that we have

1    absolutely gotten it right.  But I do think the evidence is

2    quite indisputable that the majority of cases of gender

3    dysphoria in youth will resolve naturally by adulthood.  It is

4    impossible to tell on a case-by-case basis whose dysphoria will

5    persist and whose will not.

6        And a brief aside, that shows why this is not transgender

7    discrimination.  They assume they know each kid who is going to

8    persist for a lifetime, that they assume they can identify the

9    kids.

10       If we're defining transgender, which is somewhat difficult

11   to do, because the WPATH and some of the other organizations

12   that they rely on have differing and very broad views of what

13   it means to be transgender.

14       But if it's defined as someone who is going to persist in

15   gender incongruence for their life, we don't know who these

16   people are.  And so, for that reason, the ban on these

17   experimental treatments does not just apply to transgender

18   persons.  It applies to those persons who would seek the

19   treatment who later would find out that they might be pretty

20   glad they didn't get it.  When they later -- when their

21   dysphoria later desists and they once again are more at ease

22   with their biological sex.

23       I think the third point, even if one could identify the

24   small minority of persisters, the state of the science

25   supporting the use of puberty blockers and cross-sex hormones

1   is very much undeveloped and uncertain.

2        Fourth, the use of puberty blockers and cross-sex hormones

3   come with significant risks of long-term harms.

4        And, five, the hormones and surgical interventions do not

5   lead to decreased suicide rates or improve psychological

6   outcomes.

7        When all of this is considered, the notion that a child

8   could consent to any of this, when there's still so much

9   uncertainty as it stands, is incredibly troubling.

10       I mean, how is an 11-year-old girl supposed to know when

11  she's experiencing great internal turmoil whether she's going

12  to want to be able to have kids 20 years down the road, whether

13  she is going to want to breastfeed those children.  I mean, how

14  to really weigh these issues.

15       Those are unfair questions to put to a child.  And we

16  don't think the parents even have enough information to make

17  those decisions for the child.

18       So turning to what you asked for.  I will walk through the

19  claims.

20       Substantive due process, which is the lead claim pressed

21  by the plaintiffs.  Best cases.  I mean, Bendiburg vs. Dempsey,

22  that is -- stands for the proposition that, quote, parental

23  autonomy may be limited when parental decisions jeopardize the

24  health or safety of the child and the State can intercede on

25  the child's behalf.  That's from the Eleventh Circuit 1990.

1          Next we have Morrissey vs. United States.  This is more of

2     a sort of substantive due process case along the lines I was

3     mentioning about the access to care cases.

4          Another Eleventh Circuit case where you had man who was

5     claiming, quote, a fundamental right to father a child through

6     the use of advanced IVF procedures.  The Court rejected this

7     claim.  Plaintiff tried to frame this as a fundamental right to

8     reproduce.

9          And I think here you've got plaintiff saying we have a

10    fundamental right to parent our children.  But the pertinent

11    question the Court said is not whether the Constitution

12    protects a right to procreation generally, but rather more

13    specifically whether a man has a fundamental right to procreate

14    via an IVF process that necessarily entails participation of an

15    unrelated third-party egg donor and gestational surrogate.

16    They define the right narrowly.

17         And I think the right that actually is being pressed here

18    is a right for parents to access experimental care for their

19    kids.  And they cite no such case for suggest -- that suggests

20    that there is some deeply rooted right in our history and

21    tradition for parents to get access to risky experimental

22    treatments.

23         In terms of evidence, I pointed you already to Defense

24    Exhibit 11, the statement out of Sweden.

25         Dr. Cantor is Defense Exhibit 2, pages 14 through 30.  He

 1 really breaks down there the lack of any, like, good studies

 2 that document the benefits of any of these treatments.

 3        Dr. Laidlaw, on the other hand, Defense Exhibit 3, that's

 4 6 through 21, he lays out the harms of these treatments.

 5        And if I may offer one more.  We have heard a lot about

 6 the AAP today.  Dr. Cantor, this is attached to his

 7 declaration.  So ECF 69-2, ECF page numbers 100 through 106 is

 8 through a point-by-point takedown he did of the AAP's approach

 9 to gender-affirming care.

10        We're still waiting to hear from the AAP on what their

11 response is.  They have been asked.  They have declined to

12 respond.  I don't think they have an answer.

13        So then turning to the equal protection claim.  The best

14 cases I think we have here would be the Geduldig vs. Aiello

15 case.  That is a U.S. Supreme Court decision from 1974.

16        This was a case that involved a state insurance policy

17 that excluded coverage for pregnancies.  The Supreme Court

18 said -- and the plaintiffs challenged under equal protection.

19 And they said only women can become pregnant, therefore this is

20 discrimination on the basis of sex.  And the Court said, no,

21 no, no.  This is discrimination based on, like, on pregnancy.

22 And they said the first group, those who can become pregnant

23 may be exclusively female, but the second group includes

24 members of both sexes.  So there is a lack of identity between

25 pregnancy and sex.

1        Of course, that's the same thing here.  There are plenty

2    of transgender kids who don't seek these treatments.

3        And I think, as Dr. Cantor shows, there are plenty of kids

4    who are not transgender who end up taking these treatments, as

5    well.  So I think Geduldig is on all fours of this case and

6    answers the Equal Protection Clause.

7            THE COURT:  So touch on that just a little bit.  So

8    the plaintiffs allege, and the Arkansas judge who ruled last

9    year in a case like this found that, hey, because -- he just

10   said you're treating transgender children differently than

11   non-transgender children.

12       So touch on that a little bit as to why you -- elaborate

13   on why you don't make that distinction.

14           MR. LACOUR:  I don't think it does, because, one,

15   there are plenty of transgender kids who do not seek this care.

16       You can look at the informed consent form that plaintiffs

17   have included from the UAB gender clinic.  And it states the

18   same thing.  Here at the bottom it says, some transgender kids

19   decide not to seek hormone treatment, not to seek puberty

20   blockers.  So we think that is an indisputable fact.

21       The very fact that there are desisters, people who it

22   turns out are not transgender who seek these treatments, as

23   well, shows that there's not that identity of interest.

24   Indeed, our case is even stronger than the case that was

25   presented in Geduldig.

```
1          And so I think that's sort of settles that particular
2     issue there.
3               THE COURT:  Elaborate on the distinction that has been
4     alleged that the drug is being used differently in transgender
5     children than it's being used in non-transgender children.
6               MR. LACOUR:  Well, first that assumes that plaintiffs
7     know who transgender children are, which is the point I was
8     making before.  But even beyond that -- and we have evidence --
9               THE COURT:  I mean like for different purposes.
10              MR. LACOUR:  Correct.
11         I think we have made this point in the brief and with a
12    couple of different examples.  But when you use a particular
13    drug for different purposes, it can be a different treatment.
14         I think there is a dramatic difference between using a
15    puberty blocker on a child who has precocious puberty to sort
16    of move them into the normal range, and using that same drug on
17    a child who has a normal -- normal development to push him out
18    of that normal range.
19         Just like it's very different to provide testosterone to
20    perhaps a man who's just recently recovered from testicular
21    cancer, move him into the normal range, and to prescribe that
22    same testosterone to Lance Armstrong so he can win a yellow
23    jersey in the Tour de France.  Those are different treatments.
24         And to really work sex into the example, the example we
25    gave a couple of times in the brief, IVF treatment, where you
```

1    implant a fertilized egg in a woman, that can be a legitimate
2    fertility for a woman.  If you try to perform the same
3    treatment on a man, it's not the same treatment.  That's
4    obvious.

5        And I think that's the same thing we are dealing with
6    here.  It is a very different thing to try to bring a child
7    into a healthy range than it is to try to push them out of the
8    natural range and natural development.

9        I think that analogy is clever, but facile that the
10   plaintiffs and the United States have put forward.

11       And we do have evidence to back all this up on the fact
12   that these are just simply different treatments.  And that's
13   the Laidlaw declaration I was referring to before, specifically
14   pages 12 through 23 of Defense Exhibit -- of Defense Exhibit 3.

15       Returning to -- I believe I covered the Morrissey vs.
16   United States case, about the IVF treatment.  Again, stands for
17   the proposition you need to construe this substantive right
18   narrowly.  I think they are construing it far too broadly.  And
19   for that reason, their claim fails on that ground.

20       Equal protection.  There's been some suggestion that
21   transgender individuals are a suspect class.  We extensively
22   discussed Cleburne vs. Cleburne Living Center case from the
23   Supreme Court 1985.

24       That was when you had a group of plaintiffs alleging that
25   the intellectually disabled were a suspect class.  And the

1   Court rejected that.

2       And there is a far more extensive record of discrimination

3   in the 1980s against intellectually disabled, at least that was

4   put forward in the Cleburne case than anything we have from the

5   plaintiffs as to transgender individuals in 2022 in this case.

6       So I don't think -- and then there are additional

7   problems.  For example, the inability to identify children who

8   are actually transgender who are going to persist in that

9   identity for their lives further suggests that we don't have

10  that immutability that you need for any particular -- to find a

11  suspect class.  And we certainly don't have the evidence from

12  them to back that up.

13      Moving on to void for vagueness.  We will get the Stardust

14  case from the Eleventh Circuit 2018.  This directly says -- I

15  mean, to succeed on a claim that an ordinance is void for

16  vagueness, the complainant must demonstrate that the law is

17  impermissibly vague in all its applications.  That's a 2018

18  decision.

19      I believe they cited a case in the reply brief from 2014

20  or '15 suggesting that this is no longer good law.  This came

21  later in the Eleventh Circuit.  It is still good law.

22      And, obviously, it's not vague as applied to some of the

23  heartland activities that the doctors want to engage in, in

24  this case.

25      U.S. vs. Williams, another --

1          THE COURT:  If this law goes into effect -- you work

2    for the Attorney General.  How do you envision your

3    prosecutorial discretion under this law?  Who is the first

4    person you indict?

5          MR. LACOUR:  Your Honor, I -- I think --

6          THE COURT:  Is it the doctor?  Is it the parent?

7          MR. LACOUR:  I think the most obvious defendant would

8    be a doctor who would be flagrantly violating this.  And I

9    think at that point most of the benefits, or the, like the

10   purposes of the law would be met if these clinics again stop

11   prescribing these particular medications that we know have

12   tremendous risks, and we know have very little basis to suggest

13   that they have benefits.

14         THE COURT:  So do I hear you saying that doctors,

15   that's really -- that would really be the limit of who you

16   would consider for the felony indictment?  Or would that reach

17   to others?

18         MR. LACOUR:  Your Honor, well, two points I'll note.

19   We briefed this, as well.

20      And Alabama Code 13 A-2-5(a) deals with the word cause.

21   It gives it some meat on the bones, so to speak.

22      And 13A-2-4(b) addresses scienter.  There needs to be some

23   scienter.  So the notion that a pharmacist who's filling a

24   prescription has no idea what it's for, what it's going to be

25   treating could be caught up in this law is fanciful because of

1  the scienter requirements.

2       So I was going to address Williams.  And Williams stands

3  for the proposition that -- I mean, there may be some cases as

4  a matter of proof that are difficult to determine.  Those edge

5  cases, that's going to be true for any criminal law.  That does

6  mean that a statute would be vague.

7       So you would look to Alabama Code.  You would look to the

8  causation requirements.  You look to the scienter requirement.

9  And then you'd look to the text of the statute.

10      And when it comes to evidence in support of our vagueness

11 claim, I would point to Defense Exhibit 1, which is the text of

12 the statute.

13      Turning to the First Amendment claim, responding to a

14 couple of points from the plaintiff.  There's no right to

15 commit a crime through speech.

16      So, I mean, for example, if you're a doctor and you write

17 an opioid script knowing that it is going to be for an improper

18 purpose, you are writing it down, or you're calling the

19 pharmacy, you're engaging in speech, you can still be

20 prosecuted for that.  That's not content-based discrimination

21 because they are getting you for writing the opioid, as opposed

22 to saying don't give him the opioids.  It's just committing a

23 crime.

24      The fact that you are doing it through speech does not

25 mean that you have some license to do it.  It's just not a

1  First Amendment issue at all.

2       THE COURT:  What of their argument that that means a

3  doctor can't recommend or consult with another doctor or refer?

4  They say you know that's not an act, that's speech.  What do

5  you say to that?

6       MR. LACOUR:  I think you would have to look down to

7  the scienter causation requirements.  I think that's -- again,

8  would be a much tougher case at that point.  And --

9       THE COURT:  So Doctor A refers Child B to another

10 doctor.  I think you need to go see this doctor for XY reasons.

11 Is than an act or is that speech?

12      MR. LACOUR:  Well, Your Honor, it could be both,

13 right?  I mean conspiracies are often executed through speech.

14     And so if there is a conspiracy to shovel kids out of

15 state to get them treatments that we know cannot be done in the

16 state, I do believe the Alabama Code's conspiracy statute would

17 suggest that actions taken in the state could potentially cover

18 that.

19     But, I mean, I think the reverend who brings his claim, I

20 don't think he's alleged any sort of conduct that would

21 potentially run afoul of the statute merely saying, I'm here

22 for you, I'm praying for you, you should go see a doctor.

23     I mean, that's all the notion that that's causing anything

24 on the back end that would be foreseeable is -- I don't think

25 would be supported by the statute, it would be something that

 1  would be prosecuted.

 2       So we have the U.S. vs. Fleury case.  It's an Eleventh

 3  Circuit case from 2021.  Fleury is F-L-E-U-R-Y.  Which stands

 4  for that basic it's not content-based discrimination to punish

 5  someone for committing a crime through speech.

 6       And then the National Institute of Family and Life

 7  Advocates vs. Becerra, a U.S. Supreme Court case from 2018.

 8  Really focusing on regulating commerce or conduct, that there

 9  may be some incidental burdens on speech, but professionals are

10  no exception to the rule, that there can be these prohibitions

11  even if they do sometimes implicate speech.

12       Finally, turning to preemption.  We do think a lot of the

13  reasons why the equal protection claims fail -- also fail in

14  this context.  It just simply is not discrimination on the

15  basis of sex, nor discrimination on the basis of transgender

16  status for the reasons I was referring to earlier.

17       We think -- and if you are looking to Title IX, in

18  particular on what the language means there, Judge Pryor's

19  dissent in the Adams case, which this Court has taken -- the

20  Eleventh Circuit has taken en banc.  And I think the argument

21  was back in February there, really lays out why sex in that

22  statute has to mean biological sex and not gender identity or

23  transgender status.  So this is an open question in the

24  Eleventh Circuit.  Bostock did not decide that question.

25       But, I mean, on the matter of Bostock, I mean, I do think

1  it's really critical, again, to recognize it was interpreting

2  Title VII --

3           THE COURT:  Mr. Doss, what's the Fourth Circuit case

4  that was cert denied at the Supreme Court?

5           MR. LACOUR:  That was Grimm, Your Honor.

6           THE COURT:  Grimm.

7           MR. DOSS:  Yes, Your Honor.

8           THE COURT:  Talk about Grimm a little bit.

9           MR. LACOUR:  We're bigger fans of Judge Niemeyer's

10  dissent than we are of the reasoning in that case.

11      And, I mean, in any event, I don't think, even if you

12  accept the decision as correct, it doesn't map on here.  You

13  could argue that which bathroom you send someone into isn't so

14  relevant that it's fair to discriminate on the basis of sex.

15      You've got two rooms with toilets in them.  And you're

16  sending someone to that one because they're biological male,

17  and someone to that one because they're biological female, or

18  based on their gender identity, or whatnot.

19      But to return to the example of the IVF treatment, it is

20  just not possible to give an IVF treatment to a man.  It is not

21  possible to give a female a -- to castrate a female, for

22  example.  These are just sheer impossibilities that I think

23  take this outside of that context.

24      And I mean, if you look at Bostock and the language there,

25  I mean, the Court recognized that -- try to find the key

1  language.  But, I mean, Title VII was based on the whole idea

2  that sex was completely irrelevant to employment decisions.

3      And when it comes to medical decisions, it is obviously

4  relevant in certain contexts.  We would submit in these

5  contexts, as well.

6      Giving testosterone to a boy to get his T levels up to a

7  normal level is very different from giving testosterone to a

8  girl to get her levels up to a boy's natural level.  It has

9  very different effects on the body and very different risk

10 factors as a result.

11     So if you look at Bostock, I mean the Court says, quote,

12 directs us to change the person's sex and see if the outcome

13 changes.  And as we said, that direction might make sense in

14 the employment context where, to quote Bostock, sex is not

15 relevant to the selection, evaluation, or compensation of

16 employees.  But that same analysis makes no sense in the

17 medical context where sex can make all the difference.

18     So, if anything, we think Bostock is our case and not

19 their case.

20     When it comes to preemption in general, we have the Graham

21 decision from 2017.  There is a strong presumption against

22 finding preemption.

23     There's no federal requirement that these defendants

24 receive federal funding.  So they could comply with the state

25 law without running afoul because federal law does not require

1 | them to take these dollars in the first place.

2 |     Finally, we touched on this a little bit during the

3 | argument about the motion to intervene.  But we think the

4 | equities are very much against the plaintiffs here for reasons

5 | I won't belabor too much.

6 |     But if you look at the Grayson decision, that's an

7 | Eleventh Circuit decision, 491 F.3d at 1326.  There's, quote, a

8 | strong presumption against the grant of dilatory equitable

9 | relief.  And I do believe we have inequitable delay on behalf

10 | of the plaintiffs here.

11 |     I just heard from my colleague who represents the

12 | plaintiffs that every one of the doctor -- or every one of the

13 | patients or their parents in this case that they've brought,

14 | this third case, are patients of Dr. Ladinsky.  Dr. Ladinsky

15 | was the lead plaintiff in the first case that the SPLC and

16 | Lightfoot brought.

17 |     She has now transitioned over to become the expert in this

18 | case.  So she's still here, still engaged in this case.  I

19 | think that raises some potential privity issues.

20 |     And also to suggest -- we know what happened here.

21 | Nothing changed between 4:20 on Friday April 15th and two hours

22 | later when they -- when the parties all simultaneously

23 | dismissed their case.

24 |     And there's a footnote in the reply brief that I read this

25 | morning very briefly.  And it said any claim of -- any

1   allegation of judge-shopping is spurious.  Plaintiffs, since

2   filing this complaint, have taken no steps to judge-shop, which

3   almost feels a little bit damning in what they haven't said.

4       And I mean, perhaps we will learn more when we have a

5   chance to question some of the witnesses as why they, after

6   planning to file this lawsuit, decided to drop it in this

7   two-hour window.

8       But turning to the public interest here.  We have

9   declarations from Corinna Cohn.  That's Defense Exhibit 26.

10  From Sydney Wright, Defense Exhibit 27.  These are both young

11  people who in a moment of need were failed by the medical

12  establishment, were given powerful drugs that changed their

13  lives forever.

14      Corinna Cohn ended up having full surgery and has -- and

15  regrets it, wants to go back to his original sex and cannot

16  now.  The time is too late.  And has taken to warning other

17  people and warning the medical establishment, and trying to

18  raise awareness of these issues.

19      The word has gotten out in many other countries.  The word

20  has finally reached the United States and states like Arkansas

21  and states like Alabama.  And nothing stops us from acting in

22  the space to defend kids from these risky unproven and

23  potentially very damaging treatments.  And I think for that

24  reason we do think that the preliminary injunction motion

25  should be denied.

1              THE COURT:  All right.

2        I do have a few questions around Mr. Doss.  I think your

3    vagueness argument kind of was -- seemed to be a subpart of

4    your parental control argument.  Was there anything

5    specifically you wanted to address on that?

6              MR. DOSS:  No, Your Honor.

7        And I can't remember if toward the end I noted our key

8    cases on that one.  But I would just note Grayned vs. City of

9    Rockford, 1972 Supreme Court opinion.  And Bankshot Billiards,

10   Inc., vs. City of Ocala, Eleventh Circuit 2011 opinion.

11       Other than that, Your Honor, we have nothing further to

12   add on the void for vagueness claim.

13             THE COURT:  I asked the government this question, I am

14   going to ask you this question, too.  And I know some of this

15   is covered by your declarations, as well as what will be the

16   testimony of your doctors.

17       But give me a thumbnail of what puberty-blocking treatment

18   looks like.

19             MR. DOSS:  My understanding, Your Honor -- and I'm

20   learning more and more every day --

21             THE COURT:  Do you mind coming around to the podium?

22             MR. DOSS:  Oh, yes, sir.

23       My understanding, Your Honor, is that the idea of pausing

24   is perhaps correct.  I mean, you would take the medication and

25   it would delay the onset of puberty.

1         Once you're already in the midst -- I am looking back at

2   my colleague, because she's been working really closely on

3   these issues, as well.  Would it be possible if she

4   addressed --

5              THE COURT:  Uh-huh.  Absolutely.

6              MR. DOSS:  Thank you, Judge.

7              MS. EAGAN:  May it please the Court.

8         Judge, with the puberty-blocking piece, here is what

9   happens.  For example, with Dr. Ladinsky's practice at UAB,

10  which is a specialized practice.

11        Most of her patients come as referrals from pediatricians

12  or mental health providers from across the state and even in

13  other states, such as Mississippi.  And what happens is when

14  they believe that the child -- that a child or an adolescent

15  has gender dysphoria, then they often will refer --

16             THE COURT:  I guess I wasn't clear on my question.  I

17  guess what I really mean is, okay, so you get a prescription,

18  you go to the pharmacy, you get a 30, 60, 90-day prescription.

19  You take X amount, X tablets a day?  Or is it administered

20  another way?  How does that work?

21             MS. EAGAN:  There's an important piece that I think

22  that maybe was not clear from when the government was speaking.

23  And that is that there is an extensive assessment and analysis

24  with these children --

25             THE COURT:  And I got that.  I got that.  I'm

```
 1  really --
 2          MS. EAGAN:  It's not where they go to Dr. Ladinsky and
 3  then they get some pills.
 4          THE COURT:  I got all that.  I'm just talking about
 5  the treatment regimen.  Once that begins.
 6          MS. EAGAN:  I believe, Your Honor, that it is
 7  administered, I believe -- Dr. Ladinsky can answer this
 8  better -- but I believe it is -- can be administered through an
 9  injection.
10          THE COURT:  Okay.
11          MS. EAGAN:  But, again --
12          THE COURT:  Which is daily?  Weekly?  Monthly?
13          MS. EAGAN:  Judge, I am not able to answer that.  I
14  will have to have Dr. Ladinsky or Dr. Hawkins answer that.
15          THE COURT:  Can the government answer that?
16          MR. CHEEK:  We don't know the specifics, Your Honor.
17          MS. EAGAN:  But I do know that --
18          THE COURT:  Can anybody on your side answer that
19  question?  That seems like a pretty important question.
20          MR. CHEEK:  No one from the government, Your Honor.
21          THE COURT:  Okay.
22          MR. DOSS:  We can get an answer to that quickly,
23  Judge.
24          THE COURT:  All right.  I'd like to know the answer to
25  that tomorrow.
```

1          MR. DOSS:  Will do.

2          MS. EAGAN:  You will absolutely know it first thing

3   tomorrow, Judge.

4          THE COURT:  Okay.  All right.  I think that's all I

5   have.  I thank you for your arguments.  I will see you all at

6   9:00 in the morning.  Let's run a really -- let's run a really

7   tight ship.

8       I would like your case to be finished on by the end of the

9   day tomorrow, if possible.  So let's really -- let's sharpen

10   that up.

11       I noticed the Arkansas hearing was three hours total.  I'm

12   not quite sure how in the world they got it all in.  I am not

13   running that tight a ship.  But we definitely are going to be

14   done by Friday.

15       Because I have let the United States into this, I feel

16   like I need to give the State more time than they had

17   originally said they needed.  And I see that that may be

18   necessary just by the length of the openings here.

19       So to the extent that, you know, you can finish tomorrow

20   will be great.  You know, worst-case scenario, if you run a

21   tiny bit over, I would rather not do that, but I get it.  But

22   let's really -- let's stay on target.

23          MR. DOSS:  Yeah, Your Honor.

24          MS. EAGAN:  Yes, Your Honor.

25          THE COURT:  All right.

1          MS. EAGAN:  Your Honor, there are a couple of

2   procedural motions that have been filed relating to how, for

3   example, the witnesses that are under -- or the plaintiffs that

4   are under a pseudonym and having them come testify live.  Would

5   you like to just take those up first thing in the morning?

6          THE COURT:  I think that's probably the easiest thing.

7   If you want to give -- I guess I probably need to hear very

8   quickly, Mr. LaCour, what is the State's position on closing

9   those examinations or sealing them?

10          MR. LACOUR:  Your Honor, we have no opposition to

11   having those particular examinations happening behind -- back

12   in chambers, or wherever it would be convenient.

13          THE COURT:  All right.  Well, that problem is solved

14   then.

15       Do we have anything else that is sitting out there?

16          MR. CHEEK:  Your Honor, just one question from the

17   United States.  Would you prefer our expert witness to appear

18   tomorrow or Friday?

19          THE COURT:  I am going to let the State decide that

20   because they're the ones who can suffer prejudice.

21          MR. CHEEK:  Is it okay if we can work it out amongst

22   ourselves?

23          THE COURT:  Perfectly fine.  That would be the

24   preferred way.

25          MR. CHEEK:  Okay.  Thank you.

1          THE COURT:  Absolutely.

2      Any other things that we ought to take up right now?

3          MR. DOSS:  No, Your Honor.

4          THE COURT:  All right.  All right.

5      Okay.  Well, let's lead in the morning with an explanation

6  of how that works, you know.

7          MS. EAGAN:  Yes, Your Honor.

8          THE COURT:  And let me be very honest.  I mean, I am

9  working under a time constraint here that is not of my making,

10  and but it is what it is.  And so, you know, the issue is,

11  regardless of how I rule, can I get an order out by May

12  the 8th?  I don't know how in the heck I can, except I can try.

13      But, you know, it has to be -- it has to be a good order,

14  too, that does a fair analysis for both sides.

15      So, you know, I want to know, regardless of which way I

16  go, you know, if this by necessity just has to stretch a few

17  days, if that is going to make a significant difference or not.

18          MS. EAGAN:  Yes, Your Honor.

19          THE COURT:  All right.  I will see you all at 9:00

20  o'clock in the morning.  And I hope you have a pleasant

21  evening.

22          (Whereupon, the above proceedings were concluded at

23      4:42 p.m.)

24

25

<u>CERTIFICATE</u>

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.




<u>05-11-2022</u>

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255