```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF ALABAMA
 2                        NORTHERN DIVISION

 3

 4     REV. PAUL A. EKNES-TUCKER,    *
       et al.,                       *
 5                                   *
               Plaintiffs,           *  2:22-cv-00184-LCB
 6                                   *  May 5, 2022
       vs.                           *  Montgomery, Alabama
 7                                   *  9:00 a.m.
       KAY IVEY, in her official     *
 8     capacity as Governor of the   *
       State of Alabama, et al.,     *
 9             Defendant.            *
       *****************************

10

11

12        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                           VOLUME I
13          BEFORE THE HONORABLE LILES C. BURKE
                UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
           and Procedures Vol. VI, Chapter III, D.2.  Transcript
24               produced by computerized stenotype.

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                         APPEARANCES

 2
         FOR THE PLAINTIFFS:
 3       Melody Eagan, Esq.
         Jeff Doss, Esq.
 4       LIGHTFOOT, FRANKLIN & WHITE, LLC
         The Clark Building
 5       400 20th Street North
         Birmingham, Alabama 35203
 6
         Brent Ray, Esq.
 7       KING & SPALDING
         353 N. Clark Street
 8       12th Floor
         Chicago, Illinois 60654
 9
         Michael Shortnacy, Esq.
10       KING & SPALDING
         633 W. Fifth Street
11       Suite 1600
         Los Angeles, California 90071
12
         Jason R. Cheek, Esq.
13       US ATTORNEYS OFFICE, NDAL
         1801 Fourth Avenue North
14       Birmingham, Alabama 35203
15       John Michael Powers, Esq.
         DOJ-Crt
16       Civil Rights Division
         950 Pennsylvania Avenue
17       Washington, DC  20530
18
19       FOR THE DEFENDANTS:
         James W. Davis, Esq.
20       Edmund LaCour, Esq.
         Barrett Bowdre, Esq.
21       Benjamin Seiss, Esq.
         Christopher Mills, Esq.
22       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Avenue
23       P.O. Box 300152
         Montgomery, Alabama 36130-0152
24       (334) 242-7300
25
```

1

2          COURTROOM DEPUTY:  Deena Harris

3

4          COURT REPORTER:  Christina K. Decker, RMR, CRR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3     LINDA HAWKINS, MD
      DIRECT EXAMINATION
      BY MS. EAGAN
4     CROSS-EXAMINATION
      BY MR. BOWDRE
5     REDIRECT EXAMINATION
      BY MS. EAGAN

6

7     MORISSA LADINSKY, MD
      DIRECT EXAMINATION
8     BY MS. EAGAN
      CROSS-EXAMINATION
9     BY MR. LACOUR

10

      MEGAN POE
11    DIRECT EXAMINATION
      BY MR. DOSS
12    CROSS-EXAMINATION
      BY MR. SEISS

13

14    RACHEL KOE, MD
      DIRECT EXAMINATION
15    BY MR. RAY
      CROSS-EXAMINATION
16    BY MR. MILLS

17

      PAUL EKNES-TUCKER
18    DIRECT EXAMINATION
      BY MR. DOSS
19    CROSS-EXAMINATION
      BY MR. MILLS

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                      **P R O C E E D I N G S**

2                   (In open court.)

3            THE COURT:  Good morning.  Please be seated.

4       All right.  Who is going to proceed on behalf of the

5  plaintiffs today?

6            MS. EAGAN:  Your Honor, I will be questioning the

7  first two witnesses.

8            THE COURT:  All right.  Why don't you road map this

9  for me today so I know how this day is going to go?

10           MS. EAGAN:  Sure.  So the first witness will be

11  Dr. Linda Hawkins.

12       Our second live witness will be Dr. Morissa Ladinsky.  And

13  I will be doing the examination of those witnesses.

14       The third will be plaintiff Megan Poe.  My colleague

15  Mr. Doss will be questioning that witness.

16       Our fourth witness will be Rachel Koe, MD, and Brent Ray,

17  who do I not believe that you have met from King & Spaulding,

18  will be asking questions of that witness.

19       And then our fifth will be Reverend Eknes-Tucker, and he

20  will be our last witness, and Mr. Doss will be conducting the

21  examination of that witness.

22           THE COURT:  All right.  So how many of these witnesses

23  can we get in before lunch?

24           MS. EAGAN:  My hope, Your Honor, is that we could get

25  Dr. Hawkins on and, depending on how long defendants' cross is,

```
 1   I would hope we could get at least Dr. Ladinsky's direct on
 2   before lunch.
 3           THE COURT:  Are we on target that you believe you will
 4   finish today?
 5           MS. EAGAN:  Yes, sir.  I believe we will.
 6           THE COURT:  All right.  All right.
 7           MS. EAGAN:  That certainly is our goal, and we are
 8   going to be as efficient as we can to achieve that.
 9           THE COURT:  All right.  All right.  So State, road map
10   tomorrow for me.
11           MR. LACOUR:  Good morning, Your Honor.  I believe we
12   will lead with Dr. Cantor, who is our expert witness, and then
13   we have Sydney Wright, fact witness, who will be testifying
14   after Dr. Cantor.
15           THE COURT:  All right.  And what does that time look
16   like?
17           MR. DAVIS:  Your Honor, we are confident that we can
18   get those two done in half a day.
19           THE COURT:  Still half a day?
20           MR. DAVIS:  Yes.
21           THE COURT:  Okay.  We're really on target.  Okay.  I
22   looked back at that Arkansas hearing, and I was wrong.  That
23   entire preliminary injunction hearing was two hours and
24   53 minutes, so y'all are all way ahead of the game here.
25           Okay.  The floor is yours.
```

1          MS. EAGAN:  Your Honor, if I may approach.

2      First, I would like to take up an administrative matter.

3      Plaintiffs' Exhibits 1 through 44 for this hearing have

4  been previously filed into the Court record as Document 78.  It

5  was filed on May the 3rd.  And we have conferred with defense

6  counsel, and if permissible from Your Honor's perspective, we

7  would go ahead and offer Plaintiffs' Exhibit 1 through 44 into

8  evidence for the hearing so that we're not having to do it with

9  each witness.

10          THE COURT:  By agreement?

11          MR. DAVIS:  By agreement.  We don't object, and we

12  likewise move to admit Defendants' Exhibits 1 through 41.

13          MS. EAGAN:  We agree to that.

14          THE COURT:  Excellent.  Excellent.  Any other

15  administrative issues?  I know we still have -- I think there

16  is still a motion hanging out there to remove Governor Ivey

17  from this action.

18          MS. EAGAN:  Yes, sir.  We have conferred with counsel

19  for defendants, and to streamline the case, and considering the

20  stipulations that the defendants have made in regards to that,

21  Governor Ivey will be bound by whatever injunction or decision

22  Your Honor makes, and then also, of course, by appeal, whatever

23  the outcome of that, if appeal happens.  In light of that

24  stipulation, we have agreed and filed a joint motion to dismiss

25  Governor Ivey without prejudice.

1         THE COURT:  Somebody enlighten me.  What is the

2    thought process -- I'm imperfectly fine and we'll do that.  But

3    enlighten me as to why that's happening.

4         MS. EAGAN:  My understanding, Your Honor, is that when

5    I conferred -- when the defendants first filed their answer,

6    and they indicated that they plan to file a motion to dismiss

7    on behalf of Governor Ivey, I conferred with defense counsel,

8    and he explained to me that they would take the position that

9    Governor Ivey would not have any independent authority --

10   enforcement authority over this Act.  And maybe defense counsel

11   could better explain the grounds, but after we conferred, and

12   in light of the stipulations that we have reached, we have

13   agreed to streamline the case and dismiss Governor Ivey.

14        THE COURT:  Mr. Davis, do you want to chime in on

15   that?

16        MR. DAVIS:  Judge, she is not a prosecutor.  The

17   Governor doesn't prosecute.  They're challenging a criminal

18   law.  She is not needed.  We just wanted to simplify the case.

19        THE COURT:  No problem.  All right.  Well, that motion

20   is granted.  And so it's yours again, Ms. Eagan.

21        MS. EAGAN:  All right.  Your Honor, Mr. Doss has one

22   matter, as well.

23        MR. DOSS:  With respect to our two plaintiffs who are

24   testifying under a pseudonym, we have filed a motion to either

25   have their examination in camera or in the courtroom, but clear

1  the courtroom.

2      I mean, it would seem -- we're happy to do whatever would

3  be easiest for Your Honor, but we wanted to go ahead and ask

4  about that so we know logistically what we should do with the

5  witness.

6          THE COURT:  So I know there was an agreement, correct,

7  Mr. Davis, for that to either be sealed or whatnot.  Have you

8  conferred?

9          MR. DAVIS:  We have talked, Judge.  We are okay with

10  however the Court wishes to handle that.  As long as we can

11  cross the witness, whatever means or place you want to do it is

12  okay with us.

13          THE COURT:  So your two choices are in camera or clear

14  the courtroom?

15          MR. DOSS:  Yes, Your Honor.

16          THE COURT:  Doesn't matter to me.  Whatever the two

17  parties agree on, I will be happy with.

18          MR. DOSS:  I'm okay with an in-camera examination, if

19  that works for the State.

20          THE COURT:  In camera will be easier logistically.

21          MR. DAVIS:  Will there be room for more than one

22  lawyer from each side to come?  We probably don't have to bring

23  everybody.

24          THE COURT:  Absolutely.  I think we will just go to

25  the conference room.

 1          MR. DOSS:  Where should we have the witness go in the

 2   courtroom or in the courthouse to get to where the witness

 3   needs to be?

 4          THE COURT:  Deena, could somebody maybe meet the

 5   witness and the attorneys right there at that outer door before

 6   you go in the judge's conference room?

 7          THE COURTROOM DEPUTY CLERK:  Yes, sir.  I can get a

 8   marshal or...

 9          THE COURT:  That's probably the easiest way to do it.

10   When the time comes, give me 20 minutes' notice.

11          MR. DOSS:  Yes, Your Honor.  Thank you.

12          THE COURT:  All right.  Go ahead.

13          MS. EAGAN:  Your Honor, plaintiffs are ready to

14   proceed, if Your Honor is.

15          THE COURT:  Go ahead.

16          MS. EAGAN:  Your Honor, the plaintiffs call Linda --

17   Dr. Linda Hawkins.

18                         LINDA HAWKINS, MD,

19   having been first duly sworn by the courtroom deputy clerk, was

20   examined and testified as follows:

21                         DIRECT EXAMINATION

22   BY MS. EAGAN:

23   Q    Good morning, Dr. Hawkins.

24   A    Good morning.

25   Q    Could you please introduce yourself?

1    A    Yes.  My name is Linda Aline Hawkins.

2    Q    Dr. Hawkins, what do you do for a living?

3    A    I am the director of the Gender and Sexuality Development

4    Clinic at the Children's Hospital of Philadelphia.

5    Q    And what is -- are you a licensed professional counselor?

6    A    I am.

7    Q    Tell us a little bit about your educational background,

8    please, Dr. Hawkins.

9    A    My background includes Bachelor's of Science in speech and

10   hearing science from the University of Washington.  I have a

11   master's in psychological services from the University of

12   Pennsylvania, and a Ph.D. from Widener University in human

13   sexuality and human development.

14   Q    And, Dr. Hawkins, what is your area of specialty?

15   A    My broader -- my broad area of specialty is LGBT children,

16   youth, and their families, and more specifically, transgender

17   children, youth, and their families.

18   Q    And in your practice, do you actually work with children

19   and adolescents who are experiencing gender dysphoria and their

20   families?

21   A    I do.  I see anywhere from 10 to 15 families a week.

22   Q    Could you please elaborate in your experience supporting

23   the LGBT youth and their families?

24   A    In my role as a mental health provider, I often am working

25   with young people who are experiencing anxiety, depression,

1  coming to understand their identities, and also supporting the

2  families that are part of that young person's system.  Often

3  there are young people who are experiencing profound mental

4  illness in addition to their LGBT identities.  So for trans

5  children and youth, it is an important job to have a strong

6  mental health background.

7  Q     How long are have you been working in that area,

8  Dr. Hawkins?

9  A     About 22 years.

10  Q     Okay.  And what are the settings in which you have

11  provided this support and counseling to youth?

12  A     The majority of my time has been in the Children's

13  Hospital of Philadelphia.  So outpatient setting that is part

14  of a specialty care center.

15       I've also had a private practice, where I saw transgender

16  children, youth, and their parents, as well as mental health

17  through a community mental health center in Philadelphia.

18  Q     Over the 20-plus years that you have been doing this, how

19  many transgender children and adolescents have you worked with

20  over that time frame?

21  A     Specifically transgender, over 4,000.  If we look at LGBTQ

22  and gender-exploring children, many more thousand.

23  Q     Dr. Hawkins, up there with you, you should have a binder

24  that are plaintiffs' exhibits that have been admitted into

25  evidence.

 1       If you could please turn to Plaintiffs' Exhibit Number 3.
 2  A    Yes.
 3  Q    Dr. Hawkins, what is Plaintiffs' Exhibit Number 3?
 4  A    My declaration.
 5  Q    Okay.  And by your declaration, was this something -- was
 6  this under oath when you provided this and signed this?
 7  A    Yes.
 8  Q    Okay.  And Exhibit A, if you could turn to Exhibit A of
 9  Plaintiffs' Exhibit 3.
10  A    Yes.
11  Q    What is this document?
12  A    This is my updated curriculum vitae.
13  Q    Does your curriculum vitae provide a detailed overview of
14  your education, training, and experience in the area of
15  transgender care of youth and adolescents?
16  A    Yes, it does.
17  Q    Dr. Hawkins, you mentioned that you work with the gender
18  and sexuality development program at Children's.  What is your
19  role there?
20  A    My role is to develop and oversee the entire program.  We
21  have two clinics -- one in Philadelphia, and one in Voorhees,
22  New Jersey -- where we're currently supporting about 3,000
23  families.  And that involves overseeing the mental health and
24  medical care and choreography with all specialists who are part
25  of this care, which involves eight to ten different

```
 1  subspecialties.  And then as I said earlier, I see -- I
 2  actually see families every week to provide the expert
 3  assessments.
 4  Q    When was the gender and sexuality development program
 5  opened at Children's in Philadelphia?
 6  A    We opened our doors in January of 2014.  And prior to that
 7  date, specialists had been providing the work in different
 8  departments and different divisions.  But in January of 2014,
 9  we all came under one umbrella for ease of patients and
10  families to find our care.
11  Q    And when you opened your doors in 2014, how many pediatric
12  gender clinics were in the nation at that point?
13  A    We were the fourth pediatric gender clinic to open in a
14  major pediatric academic hospital.
15  Q    Okay.  Have you served as a director at any other gender
16  clinics other than the one at Children's in Philadelphia?
17  A    Yes.  One thing that I'm able to do is travel to other
18  children's hospitals and assist in their development of gender
19  programs based on the exceptional style of work that we do and
20  the standard of care that we've created at Children's Hospital
21  of Philadelphia.
22      I spent two years at Rady Children's in San Diego helping
23  to build up and improve their program with the methods that we
24  use, as well as two years at John's Hopkins All Children's
25  Hospital in St. Pete, Florida.  I've also consulted with
```

```
 1  Children's Denver and Children's Seattle to make sure everybody
 2  is doing the best work possible.
 3  Q    Dr. Hawkins, do you actually train other therapists to
 4  support transgender youth with gender dysphoria?
 5  A    Yes.  In 2018, I founded a -- with colleagues, I founded a
 6  training program, a one-year training program for therapists to
 7  be able to learn how to better support and serve transgender
 8  individuals across the life span.  My focus was children and
 9  youth and families.  Other specialists focused on older
10  transgender people.
11  Q    Have you authored any peer-reviewed publications relating
12  to transgender health issues?
13  A    I have.  I have collaborated on the publication from
14  studies that were done by our medical fellows.
15  Q    And are those publications, are those included in the
16  publications that you have authored that are outlined on pages
17  5 through 9 of your curriculum vitae?
18  A    Yes, they are.
19  Q    And do these articles re -- do those articles include ones
20  relating to the treatment of gender dysphoria in transgender
21  youth?
22  A    Yes.
23  Q    Dr. Hawkins, do you belong to any professional
24  organizations or associations that relate to the care of
25  transgender children and adolescents?
```

1  A     I do.  I am a member of the World Professional Association

2  for Transgender Health, often called WPATH.  I'm also a member

3  of USPATH, which is the U.S. version of that organization, as

4  well as the mental health organizations that oversee my

5  licensure.

6            MS. EAGAN:  Your Honor, we would tender Dr. Hawkins as

7  a mental health and counseling expert in the field of

8  transgender health, including the treatment of gender dysphoria

9  in children and adolescents.

10           MR. BOWDRE:  No objection, Your Honor.

11           THE COURT:  Be admitted for that purpose.

12  BY MS. EAGAN:

13  Q    All right.  Dr. Hawkins, let's take a step back.  And I

14  would like to talk about some terms that we're going to be

15  using a lot over the next couple of days.

16           First, what is gender identity?

17  A    Gender identity is the internal authentic hardwired sense

18  of one's self as male or female.  Every human has a gender

19  identity.  It's truly how we identify ourselves in our head, in

20  our heart internally.

21  Q    Is gender identity something that we as humans choose?

22  A    No.  It's hardwired.  In opportunities to see where

23  children are encouraged to try to be some -- like the opposite

24  gender and that's not who they are, we see that that is not

25  possible.  It is not a choice.  It is who somebody is.

1  Q    When do children typically become aware of their gender

2  identity?

3  A    Typical gender development among all young people, given

4  the opportunity to have a healthy developmental period in

5  childhood usually occurs between the ages of three and

6  five years old.  Prior to three years old, children are

7  absorbing lots of cues and rules and understandings about how

8  gender works around them.

9      By three -- around three to five years old is when young

10 people start to have the synapsis fusing in their brain to have

11 them truly imagine and understand their gender identity.  We

12 don't always hear from three to five years old about

13 differences in gender identity, but for some, we do.

14     That developmental period of time for gender identity is

15 often when we see young people across the board having

16 normative gender exploration or play, such as somebody who is a

17 boy putting on a tutu at preschool, or a girl putting on a suit

18 and tie and pretending to have imaginative play of being daddy.

19     So the majority of humans have gender play in childhood.

20 The difference with somebody who has a long-lasting sense of

21 that is where we move into a diagnostic level.

22 Q    In most children, does their gender identity align with

23 their birth sex?

24 A    Yes.  The majority of children go through a period of

25 gender exploration or gender play.  And it goes away.  It --

1  the young person will feel and identify that they are aligned

2  with their sex assigned at birth, so their gender identity

3  matches what they were told in the hospital about who they are.

4  And that's a term we use, cisgender.  So somebody whose gender

5  is on the same side of their sex assigned at birth.  The

6  majority of children will fall into that category.

7  Q    Okay.  As a mental health provider, how do you

8  differentiate between nontrans children who may have gender

9  nonconforming behaviors and then transgender children?  How do

10  you draw that distinction?

11  A    That distinction really comes from the American

12  Psychiatric Association's diagnostic manual that gives us

13  criteria with which we follow to understand when somebody

14  reaches a diagnostic threshold of gender dysphoria.  Gender

15  dysphoria is that distinct feeling of not -- not having a body

16  that fits with your gender identity.

17      The diagnostic criteria for childhood clearly states that

18  the feelings are significant of distress and that there's a

19  specific duration of time that exceeds what would be typical in

20  the average child exploring gender.

21      So the duration of time that's required is consecutive

22  six months.  Not just a few weeks of putting on a tutu, not

23  just a month or two of putting on a tie.  It's a long-term

24  consecutive six months' minimum with identifiable clinical

25  distress.

1    Q    Is that time threshold different for adolescents than

2    adults?

3    A    That time -- the threshold is longer for adolescents and

4    adults because that is a period of time where the treatment

5    recommendation moves beyond just social support for the child

6    and family, and psychological support to assess and assure that

7    the young person is truly transgender.

8         The third component of care when you get into adolescents

9    and adulthood includes medical care, which requires a more

10   rigorous assessment and duration of time and evidence of

11   distress.

12   Q    Okay.  Has there been advancements made in your area with

13   the ability to differentiate between children or adolescents

14   who have nonconforming gender behavior and then transgender

15   children?

16   A    Yes.  We're always evolving as humanity is evolving.  And

17   the criteria continues to require that we look at, you know,

18   higher levels of distress, different types of trauma that our

19   young people are experiencing, to be able to assure that

20   certain traumas, certain mental health conditions that are

21   becoming more prevalent amongst teenagers and even amongst

22   children are not falsely having us perceive a child as

23   transgender when there's really something else going on.  So

24   we're always refining and expanding our assessment process to

25   be as thorough as possible.

1  Q    Okay.  You touched on this a minute ago, but just to go
2  back to this, what is gender dysphoria?
3  A    Gender dysphoria is a diagnostic term that is given to us
4  through the American Psychiatric Association, the American
5  Psychological Association.
6       And it is -- it defines the distinct distress that an
7  individual would feel between how -- their gender identity,
8  their internal hardwired authentic sense of self differs from
9  their sex assigned at birth.  And specifically, the secondary
10 sex characteristics that their body has produced as a result of
11 that sex assigned at birth.
12 Q    If gender dysphoria is not properly treated, what are the
13 results in transgender children?
14 A    The -- the effects of not -- the outcomes -- sorry -- of
15 not treating young people and adults who have been diagnosed
16 adequately with gender dysphoria, we see higher rates of
17 depression, anxiety, suicidality, eating disorders, substance
18 use and abuse, and other comorbid conditions that result from
19 significant internalized distress.
20 Q    When can gender dysphoria manifest itself in children and
21 adolescents?
22 A    I mentioned the first time of three to five years old,
23 when there is the natural and typical onset of understanding
24 one's gendered self, and that some young people share with us
25 with their words, with their behaviors, with their actions.

1  Behaviors being anger, anxiety, actions, wanting to have hair
2  cut short, wanting to have different clothing.
3      In adolescence or preadolescence is also a time where we
4  will see young people who previously may have been seen as a
5  tomboy or a more feminine boy and accepted in that type of
6  identity start to exhibit significant distress as puberty is
7  about to begin.
8      So there are really two -- two times in childhood and
9  adolescence where we tend to see an increase in young people
10 sharing distress, letting their parents know, and then coming
11 to a clinic like mine.
12 Q    And as far as puberty, what is -- why is it that that is a
13 triggering event in transgender children with gender dysphoria?
14 A    Because gender dysphoria is connected to the difference --
15 the incongruence is the diagnostic word.  The incongruence
16 between somebody's internal gender identity and their body and
17 secondary sex characteristics, the diagnosis of gender
18 dysphoria in adolescents and adults very clearly states that
19 there is the added level of distress that occurs as body
20 development begins.
21     So if somebody has spent from two to ten years old
22 identifying as a male and being able to understand that they
23 are male and have other people understand them as a male, the
24 onset of breast development is devastating.  The onset of
25 menstruation monthly is devastating.

1  Q    As a mental health counselor at Children's in

2  Philadelphia, are you, Dr. Hawkins, involved with assessing

3  children and adolescents for gender dysphoria?

4  A    I am.

5  Q    Could you please describe the assessment process?

6  A    The assessment process is -- involves multiple visits and

7  multiple professionals who are trained in this care.

8       The first portion of the assessment is all mental health

9  and functioning.  So developmental specialists, mental health

10 specialists, including psychologists and psychiatrists, social

11 workers get involved to look at school and community and home

12 performance.  And we call it a 360 assessment.  So the -- we

13 spend significant amounts of time with the young person alone,

14 the young person with their family, parents alone.

15      Once we get outside of the family system, we look at all

16 of the other systems that are part of a child's life.  So that

17 could include meeting with teachers, getting input from

18 teachers about the amount of time and how they're presenting

19 and behaving at school, feedback from the pediatrician,

20 feedback from any community-based therapist, psychiatrist, or

21 any systems that have been part of the child -- of the child's

22 life.

23      At minimum, this takes a duration of several months.  And

24 for some children, it goes across years to really assure that

25 we're providing the right care to the right kids.

1  Q     In the assessment, are the potential of other -- or mental

2  health issues analyzed?  Is that part of the assessment?

3  A     100 percent.  That's usually where we start.  We want to

4  really make sure -- we want to understand where these thoughts

5  and feelings are coming from.  And if there are any current

6  mental health struggles or significant chronic mental health

7  conditions that the child or youth has, that we're very clear

8  that the distress with the body and the identity, their gender

9  identity is not somehow a symptom of something else, or

10  something else masking has gender dysphoria.

11      Oftentimes, that's where we start, to make sure that we

12  don't move a child down the road of assessment into gender care

13  when that's really not the right care.

14  Q     What about trauma?  If the child's had some trauma in

15  their life, is that also part of the assessment?

16  A     Absolutely.  And that's within that first portion of

17  potential for mental health distress or diagnosis is trauma.

18  We look very closely at trauma, neurological development, our

19  kids with autism or ASD, any type of childhood or youth mental

20  health or neurological condition that could have them not

21  really understanding who they are because of that trauma or

22  mental health.

23  Q     Dr. Hawkins, what are the potential outcomes of this

24  assessment?

25  A     In my work, we see that there is three typical outcomes.

1   And I like to simplify things, so I like three categories.

2        The first is the kid doesn't have -- the young person

3   doesn't have gender dysphoria.  There's something else going

4   on.  And for those kids, we move them into a treatment plan

5   that's really going to focus on that concern or that issue.

6        And some of those young people are actually exploring

7   gender.  They may have come to a gender clinic because they've

8   been sharing some gender exploration, but they don't meet

9   criteria for gender dysphoria.  They may benefit from other

10  resources and services, but they're not going to go down the

11  road of medical care.

12       The second category of young person is maybe somebody

13  who's experienced trauma.  So there's too much going on in the

14  moment for us to make a really quick -- it's never quick, but a

15  clear, like decision about how somebody is identifying that

16  would lead to a medical care plan.  Those young people have an

17  extended assessment period to really carefully look further

18  into what's going on.

19       If there's been a trauma, we would want to make sure that

20  there's been sufficient unpacking mental health-wise through

21  therapy, through potentially psychiatric medications, to assure

22  that if we are moving a young person into the next group I will

23  describe, that we have ruled out that the trauma could be

24  causing the distress, and that it is truly just gender

25  dysphoria.

1          The third category would be someone who after rigorous

2   multiperson mental health assessment with the family and all

3   the systems I described would be referring to our medical

4   experts who would then begin their assessment.  In younger

5   years, it's nothing.  There would never be a move to medical

6   care.

7          As an adolescents moves into distress with puberty, that

8   would be meeting with endocrinologists, fertility specialists,

9   pediatricians, and trained experts who would then begin their

10  assessment to ensure the best medical plan.

11  Q    If the child is assessed and medical care is appropriate,

12  are puberty blockers and hormones accepted, hormone treatments

13  accepted to be too well-established, effective medications to

14  be provided to transgender adolescents?

15  A    Yes, they are, based on the guidelines from the leading

16  mental health and medical experts.

17  Q    And just to be clear, before a child enters puberty, do

18  they -- are they given any of these types of medications?

19  A    No.

20  Q    Okay.  Even if an adolescent is placed on puberty blockers

21  or on hormones, does a mental health care provider still stay

22  involved in their care?

23  A    100 percent.  We're constantly assessing and reassessing

24  the appropriateness of every treatment plan.

25          When transgender kids and youth have dysphoria, they

1  benefit from long-term support, whether that's helping their

2  school be more supportive or helping parents and family members

3  understand how to continue to support them in their

4  communities.

5       So it is a constant assessment reassessment to assure that

6  we're in the right category and on the right path.

7  Q    The assessment process and then the potential use of

8  medications such as puberty blockers and hormone treatments, if

9  appropriate in an adolescent, do you believe that that is the

10 appropriate care for gender dysphoria?

11 A    When gender dysphoria is diagnosed very clearly, yes.

12 Q    And why?

13 A    Because the -- having been in this work for 22 years,

14 prior to there being the addition of medical care for children

15 and youth -- well, for youth, sorry.  It doesn't apply to

16 children.

17      Mental health providers were just trying to keep kids

18 alive until they became older to get the access to those

19 medications.  And now what we're seeing is the opportunity for

20 children and youth to not only survive, but thrive.  And the

21 fact that we are able to see more kids going to college and

22 we're going to fewer funerals, and the recommendations are

23 supported by all of the leading local and mental health leaders

24 gives us the guidance that the medication is an important

25 addition to the treatment plans.

1  Q    Let's talk about the guidance by the medical leaders.

2      If you -- who are the organizations who have issued

3  guidelines outlining that this is -- the regime that you have

4  talked about is the appropriate care for adolescents and

5  children with gender dysphoria?

6  A    To name a few, the American Academy of Pediatrics, the

7  American Medical Association, the American Psychiatric

8  Association, American Psychological Association, just to name a

9  few.

10 Q    Okay.  And are there -- if you could please turn in the

11 notebook that you have in front of you --

12 A    Uh-huh.

13 Q    -- to page -- to Plaintiffs' Exhibit 17, Dr. Hawkins.

14 A    Yes.

15 Q    What is this document?

16 A    This is the World Professional Association for Transgender

17 Health Standards of Care for Health of Transsexual Transgender

18 and Gender Nonconforming People published in 2012.

19 Q    How does this interplay with the care regime that you have

20 described as appropriate and accepted?

21 A    Commonly called the WPATH standards of care.  This

22 provides a set of guidelines, recommendations for comprehensive

23 care for transgender individuals.  It outlines expectations of

24 people who are considered gender experts, like myself, the

25 training that we should have, as well as ways in which we may

```
1  best be able to support transgender folks across the life span.
2  Q    I am going to direct your attention to Plaintiffs'
3  Exhibits 14 through 29.  And have you reviewed those exhibits
4  before coming here today?
5  A    I'm sorry.
6  Q    Plaintiffs' Exhibits 14 through 29.  And if you would
7  like, there's actually a listing at the front of that book that
8  may help you that's just got the articles or the different
9  exhibits listed.
10         THE COURT:  While she is looking at that, it occurs to
11  me that nobody has invoked the rule.  That may not be
12  necessary.  Does anybody want the rule or no?
13         MS. EAGAN:  We do not.
14         THE COURT:  Okay.
15         MR. LACOUR:  We do not, Your Honor.
16         THE COURT:  Okay.  Just checking.  Go ahead.
17         THE WITNESS:  Yes.  These are position statements and
18  guidelines from nationally recognized and respected
19  organizations that oversee the care of -- the mental health and
20  medical care for children and youth and adults.  Sorry.
21  BY MS. EAGAN:
22  Q    All right.  And do those organizations -- if you could
23  just kind of -- let me ask you this:  Do those organizations
24  include the Endocrine Society, the American Academy of Child
25  and Adolescents Psychiatry, the Pediatric Endocrine Society,
```

```
 1   WPATH, the United States Professional Association for
 2   Transgender Health, the American Medical Association, the
 3   American Psychiatric Association, the American Psychological
 4   Association, and the American Academy of Pediatrics?  Are those
 5   all included in the composite exhibits?
 6   A    Yes.  I have seen them all.
 7   Q    And are all of those exhibits different endorsements of or
 8   support for the type of care that you provide to transgender
 9   children and adolescents, as well as the medical treatments if
10   you refer the child out?
11   A    Yes, they are.
12   Q    Dr. Hawkins, I don't know if you have defendants'
13   exhibits.
14           MS. EAGAN:  May I approach, Your Honor?
15           THE COURT:  Yes.
16           MS. EAGAN:  I have a defense exhibit I would like to
17   show the witness.
18           THE WITNESS:  Thank you.
19   BY MS. EAGAN:
20   Q    Dr. Hawkins, I have handed to you what has been marked as
21   Defendants' Exhibit Number 2, the declaration of James Cantor.
22       Have you reviewed this declaration before?
23   A    Yes, I have.
24   Q    And if you'd turn to page -- excuse me -- paragraph 36 of
25   his declaration.  You'll see that Dr. Cantor states in this, he
```

```
1  asserts that with prepubescent children -- and those are
2  children before they go into puberty, correct?
3  A     Yes.
4  Q     With prepubescent children who feel gender dysphoric, he
5  says, the majority cease to want to be the other gender over
6  the course of puberty, ranging from 61 to 88 percent desistance
7  across large prospective studies.
8         How does that reconcile with the -- how does that data
9  reconcile, if it does, with your clinical experience and what
10 you know about studies?
11 A     When -- when a study offers this elevated rate of what we
12 call -- what's being termed as a desister or somebody who goes
13 from gender behaviors, gender exploration that is opposite to
14 their sex assigned at birth, what we tend to find is that the
15 initial cohort that was given the diagnosis of gender dysphoria
16 is actually false.  And that is elevated.
17        So when I said earlier there is a very typical amount of
18 gender exploration that is part of childhood and even
19 adolescence, not all of those individuals should have been
20 termed gender dysphoric or having gender dysphoria.
21        So what we see in general, once young people are coming to
22 a clinic, some are still experiencing gender exploration, which
23 is why we need a very thorough assessment.  But if you go back
24 to the preschool room with five year olds who are all exploring
25 gender, that cohort would be a large group of kids who are
```

 1   really not gender dysphoric and should not have been diagnosed

 2   with gender dysphoria.

 3        So in natural -- yes, 80 percent of kids who put on a tutu

 4   are not transgender.

 5   Q    So I want to focus on once the child is not prepubescent,

 6   but when they actually have entered puberty, when they are

 7   adolescents, okay?  Based upon your clinical experience,

 8   research, and expertise, do transgender adolescents, after

 9   they've reached puberty, usually grow out of their gender

10   dysphoria?

11   A    Not if they truly have gender dysphoria.

12   Q    Okay.  And do they generally grow out of their -- or does

13   mere counseling, is that sufficient generally with youth who

14   are -- adolescents, once they've reached puberty?

15   A    If they truly have gender dysphoria and have been

16   diagnosed as such from a major -- a comprehensive assessment,

17   mental health support is only going to go so far.

18        Because the distress is specific to body changes, that is

19   why the recommendations across the board for mental health and

20   medical experts includes the three pieces -- social support,

21   psychological support, and medical support.

22   Q    In Dr. Cantor's declaration, going back to that,

23   Dr. Cantor notes some recent findings that have been made in

24   certain organizations -- in the UK and Finland and Sweden and

25   France -- related to medical care for transgender youth.

1         Let me ask you this question:  Have any of those countries
2    banned the use of puberty blockers or hormones for gender
3    dysphoria in transgender youth?
4    A    No, they have not.
5    Q    If you could also turn to paragraph 47 of Dr. Cantor's
6    affidavit -- excuse me -- declaration.
7         I apologize.  I wrote down the wrong number.
8         Let me ask you this:  Are you familiar with Dr. Cantor's
9    critiques in his affidavit about studies using observational
10   data to prove the efficacy of transgender medical treatment?
11   Are you familiar with his critiques of that?
12   A    I am.
13   Q    First of all, what does observational data mean?
14   A    So the only way to study human behavior is by observation.
15   It is how we assess for mental health concerns.  It's how we
16   assess for developmental and sometimes neurological
17   assessments.
18        And so the only opportunity we have to assess -- we can't
19   do a blood test right now or a brain scan right now to identify
20   someone as transgender, so we have to rely on observational
21   data.
22        And in particular, because the treatment of transgender
23   children who have this gender dysphoria includes mental health
24   and medical care, we can't do things like double blind studies
25   and say, this kid is just not going to get this medication, or

1  this kid is not going to get this mental health care, and we

2  will watch to see how poorly they do.  That's unethical.

3      So what we do is observational studies to look at how do

4  young people do when they are able to get the three pieces of

5  care in a way that is best for them based on the assessment.

6  And also we can look at what happens to kids that are waiting

7  to get that care for some reason.

8      One addition I would make is that while the critique is

9  about the rightness or validity of observational studies in

10 human behavior, which that is the most appropriate, the

11 majority, if not all of these studies include measured

12 psychometric tests, which are also an objective way of looking

13 at behavior.

14     So an example would be something like the CBCL or the

15 Children's Behavior Checklist.  That is done by the child, by

16 the parent, and oftentimes by a teacher.  So we are looking at

17 multiple inputs.

18     And again, the psychometric measures that were utilized in

19 these studies add another layer to the validity of the

20 observations.

21 Q   Dr. Hawkins, switching gears a little bit.  Is mental

22 health counseling to adolescents with gender dysphoria that

23 encourages them to live in their birth sex, is that helpful to

24 the child or youth -- excuse me -- the adolescent, or is that

25 harmful?

 1   A     The history that we have of that type of therapy and

 2   counseling being utilized in the past and -- we can see the

 3   detriment that that type of therapy has caused.  And in my --

 4   even in my day-to-day work now, I see young people who are

 5   coming in who have experienced that for two months, two years

 6   prior to coming into our center.  And it's not -- it's been

 7   proven to be detrimental to individuals.  It's sometimes

 8   referred to as conversion therapy or reparative therapy.

 9         Trying to convince somebody to live in a way that is not

10   authentic to their identity is dangerous, if not unethical --

11   well, it has been determined unethical by most medical and

12   mental health organizations.

13   Q     Now, I want to turn to SB 184, which is the law that we're

14   here about today.  Are you familiar with that law?

15   A     I am.

16   Q     Dr. Hawkins, what impact psychosocially will the denial of

17   medical treatment, a blanket prohibition of puberty blockers

18   and hormone treatments, what impact will that have on

19   transgender youth in Alabama who are currently receiving these

20   treatments?

21   A     It will be devastating.  The benefit that young people are

22   receiving from the medical care, medical and mental health care

23   that has been identified as ideal for that patient would be

24   like removing somebody's cancer treatment and just expecting

25   them to be okay.  This would be devastating.

```
 1  Q    What impact psychosocially will this law going into effect
 2  have on transgender youth in Alabama who may not yet be
 3  receiving these treatments, but suffer from gender dysphoria?
 4  What impact will it have on them?
 5  A    Having worked in Philadelphia and taken care of young
 6  people where that was the case just because we did not have
 7  medical providers under 18 -- our age of consent is 18 -- adult
 8  care is 18 -- I was seeing young people who were desperately
 9  waiting to a birth date to get the care that they needed.
10       And the number of young people who had suicide attempts,
11  had exacerbated mental health distress, which results in
12  inability to attend school, inability to have functioning
13  healthy relationships with their peers and their family, it
14  literally becomes a daily suicide watch that devastates people
15  and families.
16            MS. EAGAN:  Your Honor, may I consult with my
17  colleagues?
18            THE COURT:  Yes.
19            MS. EAGAN:  Thank you, Dr. Hawkins.  I have nothing
20  further.
21            THE COURT:  How long does the State believe their
22  cross will be?
23            MR. BOWDRE:  Probably about an hour.  I will try to
24  keep to it an hour.
25            THE COURT:  All right.  I suspect sometime in the
```

```
 1  middle of that we will probably need to take a break, but go
 2  ahead.  We will knock out some time.
 3          MR. BOWDRE:  Thank you.
 4                      CROSS-EXAMINATION
 5  BY MR. BOWDRE:
 6  Q   Good morning, Dr. Hawkins.  My name is Barrett Bowdre.  I
 7  represent the State defendants.
 8  A   Good morning.
 9  Q   Thank you for being here.
10      I might jump around a little bit in my questions, but let
11  me know if things get confusing.  I will try and rephrase.  If
12  you don't understand the question -- I will admit I am a little
13  sleep deprived, so I might not make all the most sense, so just
14  let me know.
15  A   We will work together.
16          THE COURT:  Speak up just a little bit, Mr. Bowdre.
17  BY MR. BOWDRE:
18  Q   One question I'm curious about.  You mentioned in your
19  report, and I think this is at paragraph 15, you say, because a
20  person's gender identity is unknowable at birth, doctors assign
21  sex based on the appearance of a newborn's external genitalia.
22      I guess my question is:  Do you think that if a doctor did
23  know the child's gender identity at birth, that the biological
24  sex would therefore not -- would become irrelevant?
25  A   In cases where there are medically unclear -- there's
```

```
 1   visibly unclear genitalia or there is evidence of some other
 2   medical condition going on, medical providers do take pause.
 3   Q    I guess -- sorry.  To clarify, I'm not really asking about
 4   the disorders and those sorts of things.  I'm talking simply
 5   about gender identity.  And in the vast majority of cases,
 6   either people align with their sex or they don't; is that
 7   right?
 8   A    Yes.
 9   Q    And you say that it is because we don't know the gender
10   identity that we have to rely on external genitalia to
11   determine the person's sex; is that right?
12   A    Correct.
13   Q    Okay.  So if we did know the person's gender identity at
14   birth, would sex become irrelevant?
15   A    I think sex would be -- the sex assigned at birth
16   meaning -- can you clarify what you mean by sex assigned at
17   birth, specifically their genitalia and body?
18   Q    Right.  The biological sex that is -- I mean, let me ask
19   you:  Can you define what is your definition of sex?
20   A    Sex is a bi -- for in my definition, sex is a
21   biologically-based term that is achieved and understood by a
22   combination of observed body parts and then additional
23   assessment of chromosomes by -- that's the top of my medical
24   knowledge in that.
25   Q    And so would you agree that sex is binary?  Biological
```

 1  sex, not gender identity, biological sex, is sex binary?

 2  A    That's stepping outside of my medical purview.

 3  Q    Okay.  I will move on.

 4       In preparing -- I will admit I was having a little bit of

 5  trouble preparing to ask you in-depth questions, because as far

 6  as I could tell, you cite maybe five studies in your report.

 7  And I am just wondering why do you not cite many studies in

 8  your report to -- I mean, you make all these claims.  Why do

 9  you not cite those studies to back up these claims?

10  A    Given the opportunity to comment and meet and talk, I

11  cited what I did at the time.

12  Q    Okay.  You testified earlier about that you are familiar

13  with the international literature reviews; is that correct?

14  A    Yes.

15  Q    Have you reviewed them?

16  A    Have I reviewed every single?

17  Q    Let me be more specific.  Have you reviewed the UK's

18  literature reviews from the National Institute for Childhood

19  Excellence, whatever NICE means?  Are you familiar with that?

20  A    Can you point to that in the --

21  Q    Yes.  Let's go to Defendants' Exhibit 9.  Do you have a

22  set of the defendants' exhibits?

23  A    I am on 9, if you're wondering.

24  Q    Okay.  Sorry.  Is that defendants or plaintiffs?  Are you

25  looking at --

```
 1  A    I am looking at the declaration of Kathy Noe.
 2          MR. BOWDRE:  May I approach the witness?
 3          THE COURT:  Yes.
 4  MR. BOWDRE:
 5  Q    I'm sorry.  I thought you had this, as well.
 6  A    That's okay.  Thank you.
 7  Q    Okay.  Can you identify this document?
 8  A    I'm looking at "Evidence reviewed:  Gonadotropin releasing
 9  hormone analogs for children and adolescents with gender
10  dysphoria."
11  Q    Have you read this?
12  A    I have not.
13  Q    Are you generally aware of it?
14  A    I have not.  I am not.
15  Q    You testified earlier that you -- well, maybe -- let me
16  ask you this:  Do you keep up with the medical literature in
17  this field?
18  A    I do.  I keep up with the mental health literature most
19  frequently, and I rely on the national medical organizations to
20  review and synthesize the medical findings.
21  Q    Okay.  Are you -- I think you testified that you oversee a
22  clinic; is that correct?
23  A    Uh-huh.
24  Q    And that clinic provides not only mental health
25  counseling, but also, you know, helps people along the pathway
```

```
 1  if -- if you determine it's necessary, they will get puberty
 2  blockers, cross-sex hormones; is that right?
 3  A    Yes.  And I do not oversee the medical arm of medical
 4  care.  That is overseen by -- we have nine medical experts who
 5  do that.
 6  Q    Okay.  Well, you testified earlier that you believe in the
 7  efficacy of the medical care; is that correct?
 8  A    Can you just --
 9  Q    Yeah.  I mean, you testified earlier that the
10  psychological counseling alone is not enough, that these
11  children need puberty blockers.  Is that a fair assessment of
12  your testimony?
13  A    I -- I believe that I said, yes, that puberty blockers and
14  hormones are part of the standard of medical care for children.
15  I --
16  Q    Okay.
17  A    I want to stay in my lane of mental health and be clear
18  that the assessment process then moves over to a physician.
19  Q    Okay.  You would recommend at some point a patient comes
20  in, you diagnose that patient with gender dysphoria; is that
21  right?
22  A    Uh-huh.  Yes.
23  Q    And then at some point, you say, counseling is not enough
24  for you, you need puberty blockers, or at least you need to go
25  and be seen by endocrinologists for you to get puberty
```

```
 1  blockers; is that right?
 2  A    For the child to be assessed for the appropriateness of
 3  puberty blockers.
 4  Q    Okay.  And you are not aware of what kind of assessment
 5  they do?
 6  A    I -- I am -- I am aware of conversations they have that
 7  include discussing all of the risks, benefits, and limitations.
 8  I don't do those meetings because I am not a physician.
 9  Q    Okay.  Are you aware of the risks, limitations that the
10  informed consent -- or the things that might be necessary for
11  informed consent to begin puberty blockers, for instance?
12  A    Yes.  And we do not practice informed consent.  We do --
13  we do a more expanded evaluation and assessment to make sure
14  that young people are aware of -- and parents are aware.
15  Q    Okay.  Are you involved in that informed consent process
16  for puberty blockers?
17  A    I am not involved in those meetings.
18  Q    Okay.  Are you involved in creating what that process
19  might look like because you direct the clinic?
20  A    In my director role, we then bring all of the assessments
21  back into one room and make a collective determination about
22  what would be the best medical mental health care for a child
23  or youth.
24  Q    Okay.  So I just want to be sure I understand.  Would you
25  say that you're generally aware of the risks and the benefits
```

1  in that calculus for beginning puberty blockers?

2  A    I think generally is a fair word.  And especially where it

3  affects psychosocial impacts versus medical impacts.

4  Q    Okay.  But is it fair to say that you have not done a deep

5  dive into the literature of whether puberty blockers are

6  actually effective in treating gender dysphoria?

7  A    To that extent, I rely on our medical leaders to be aware

8  of what that is, and that's --

9  Q    Okay.

10 A    Yeah.

11 Q    Would you agree that there's a difference between

12 literature reviews and relying on, you know, a single study?

13 Is that -- are those two different things?

14 A    By construct, they're two different things.  And I would

15 say that all research in this field is needed and valued,

16 whether it's a literature review, a single case study, or

17 prospective assessment.

18 Q    Okay.  But you have not read -- I just want to make

19 clear -- you have not read, even skimmed the literature reviews

20 done by the UK, National Institute for Health Care -- whatever

21 the CE is.  I'm sorry -- I have missed that.

22 A    I have not done a review such that I would be able to sit

23 here and give witness on that.

24 Q    Okay.  Would it concern you at all if this evidence review

25 surveyed nine -- the nine longitudinal studies of puberty

```
 1  blockers that existed in 2020 when the review was done, and
 2  came to the conclusion that there was not sufficient evidence
 3  to support their efficacy?
 4  A    That would definitely be concerning.
 5  Q    Okay.  Let's look at a couple of just -- I don't want to
 6  spend too much time more on this, but I want to look at a
 7  couple of the specific findings and get your reaction to them.
 8  A    Uh-huh.
 9  Q    So if you could flip -- one question -- are you
10  familiar -- you have plaintiffs' exhibits -- you have the
11  plaintiffs' exhibit binder before you?
12  A    Yes.
13  Q    Okay.  Sorry to keep making you flip, but I just want to
14  make sure.
15       Plaintiffs' Exhibit 42.
16  A    42?
17  Q    Yes, ma'am.
18  A    My binder goes to 41.
19  Q    Sorry.  Are you looking in the plaintiffs' binder?
20  A    The one that you just handed me?
21  Q    No.  I'm sorry.  The one that you had from the plaintiffs.
22  A    Oh.  Sorry.  Sorry.
23  Q    Sorry about that.
24  A    No, no, no.  That was my mistake.  Thank you for
25  clarifying.  Now I see a 42.  Thank you.
```

1   Q    And what is that?

2   A    This is the Longitudinal Impact of Gender From an

3   Endocrine Intervention on the Mental Health and Wellbeing of

4   Transgender Youth Preliminary Results published in 2020 in the

5   International Journal of Pediatric Endocrinology.

6   Q    Who is the main author?

7   A    Achille.

8   Q    Okay.  And then just one more.  Are you familiar with that

9   setting, by the way?

10  A    I haven't reviewed the study.

11  Q    Okay.  Can you turn to Plaintiffs' Exhibit 35 in that same

12  binder?

13  A    Sorry.  Yes.

14  Q    Okay.  And is that the study by Lopez de Lara?

15  A    It is Psychosocial Assessment and Transgender Adolescents

16  published in 2020 in -- I'm not familiar with this journal.

17  Q    Okay.  Do you see the author?

18  A    Yes.

19  Q    And is it Lopez de Lara?

20  A    Yes.

21  Q    Okay.  All right.  So now I think this is the last time I

22  will make you switch between binders, but if you could go back

23  to the other binder, the defendants' exhibit, and go back to

24  the study that we were looking at, which is Defense Exhibit 9.

25  A    Yes.  I got them both.

 1   Q    Sorry.  Just one second.  Yeah.  I flipped it.  I'm sorry.
 2        Could you move on to one more exhibit, Exhibit 10?  It's
 3   just the next one this that same binder.
 4   A    Oh, okay.
 5   Q    I'm sorry this is taking a while.  I will move on pretty
 6   quickly.  Have you seen that before?
 7   A    No.
 8   Q    Okay.  Would you agree that that is -- the evidence review
 9   entitled Gender-Affirming Hormones For Children and Adolescents
10   With Gender Dysphoria?
11   A    I see that exhibit.
12   Q    But, again, you have not reviewed this literature, have
13   you?
14   A    No.
15   Q    Okay.  Could you go to page 16 of that?
16   A    Uh-huh.
17   Q    And this is a listing of the specific studies that this
18   literature reviewed.  And do you see the study that we just
19   looked at by Achille 2020, the one that you said that you were
20   familiar with?
21   A    On page 16, yeah, I see where that's under a Table 1
22   Summary of Included Studies.
23   Q    Yes.  And then could you flip to page 20, and do you see
24   the listing of the Lopez de Lara study that we just looked at,
25   that we just identified?  We didn't look specifically at it.

1  A    I see what looks like a summary of that, as well.

2  Q    Okay.  Okay.  And then could you flip to page 13 with me

3  of the same document?  And then would you read along with me?

4  This is in the discussion section of the literature review.

5  A    Uh-huh.

6  Q    And the authors state, The key limitation to identifying

7  the effectiveness and safety of gender-reforming hormones for

8  children and adolescents with gender dysphoria is the lack of

9  reliable comparative studies.  And it says, All the studies

10  included in the evidence review are uncontrolled observational

11  studies which are subject to bias and compounding and were of

12  very low certainty using modified grade.  A fundamental

13  limitation of all the uncontrolled studies included in this

14  review is that any change in scores from baseline to follow up

15  could be attributed to regression to the mean.

16      And skipping down a paragraph, it says, Most studies

17  included in this review did not report comorbidities, physical

18  or mental health, and no study reported concomitant treatments

19  and details.  Because of this, it is not clear whether any

20  changes seen were due to gender-affirming hormones or other

21  treatments that participants may have received.

22      And then the last part that I will read is on the top of

23  the very next page.  It is difficult to draw firm conclusions

24  for many of the effectiveness and safety outcomes reported in

25  the included studies because many different scoring tools and

1   methods were used to assess the same outcome often with

2   conflicting results.

3        Then the next paragraph, Any potential benefits of

4   gender-affirming hormones must be weighed against the largely

5   unknown long-term safety profile of these treatments in

6   children and adolescents with gender dysphoria.

7        Did I read all that correctly?

8   A    Yes, you did.

9   Q    Okay.  Do these findings give you pause?

10  A    I don't feel like I can speak to the conclusions that are

11  in a document that I have not reviewed and the summaries of an

12  author that I haven't read.

13  Q    Okay.  You mentioned earlier when my friend on the other

14  side asked you about other countries and whether any other

15  countries were banning, you know, puberty blockers or cross-sex

16  hormones.  Do you recall that?

17  A    Yes, I do.

18  Q    You said no other country is banning it; is that right?

19  A    Uh-huh.

20  Q    Are you aware in Sweden if someone has gender dysphoria,

21  are puberty blockers and cross-sex hormones for an adolescent,

22  are those available to that adolescent?

23  A    Off the top of my head, I am not sure what Sweden's age

24  requirement is.

25  Q    Okay.  So you don't know if those treatments are

 1  effectively banned in Sweden or not?

 2  A    To my understanding, they are not banned.

 3  Q    Okay.  Can we go to Defense Exhibit 11, which is --

 4         THE COURT:  Mr. Bowdre, I would say when you reach a

 5  stopping point, let me know, and we will take a break.

 6         MR. BOWDRE:  Yes, Your Honor.

 7         THE WITNESS:  Care of children and adolescent with

 8  children with gender dysphoria?

 9  BY MR. BOWDRE:

10  Q    Yes.  Have you seen this document before?

11  A    No.

12  Q    When you testified earlier that you were familiar with

13  what all these other countries were doing, what was your basis

14  for that testimony?

15  A    I'd like to correct that.  I didn't say that I am aware of

16  everything that's going on in other countries, that I -- to my

17  knowledge, this care has not been banned.  That is what I said.

18  Q    How did you come to that conclusion?

19  A    Reviewing what countries have and -- the fact that the

20  countries are not banning this care as a conclusion.

21  Q    I guess my question is:  What research did you do to

22  figure out whether they're banning that care provided that you

23  have never seen this document before?

24  A    The over -- looking at summaries.

25  Q    Okay.  Could you turn to page 3 of this document?

```
 1   A     Uh-huh.

 2   Q     And under the heading, Recommendations and Criteria For

 3   Hormonal Treatment, it says, For adolescents with gender

 4   incongruence, the NBHW -- which is the National Board of Health

 5   and Welfare of Sweden -- deems that the risks of

 6   puberty-suppressing treatment with GnRH analogs, those are

 7   commonly referred to as puberty blockers; is that right?

 8   A     Yes.

 9   Q     Okay.  And gender-affirming hormonal treatment currently

10   outweigh the possible benefits, and that the treatments should

11   be offered only in exceptional cases.

12         This judgment is based mainly on three factors:  The

13   continued lack of reliable scientific evidence concerning the

14   efficacy and safety of both treatments, the new knowledge that

15   detransition occurs among young adults, and the uncertainty

16   that follows from the yet unexplained increase in the number of

17   care seekers and increased particularly large among adolescents

18   registered as females at birth.

19         Did I read that correct?

20   A     You did.

21   Q     First, do those findings give you any pause about the

22   treatment that you were providing in your clinic?

23   A     Any review of care should give us all pause to make sure

24   that we are abiding by the expectations and the needs of

25   children.  I don't feel like I can speak to this particular
```

 1  piece, because I have not reviewed it.

 2  Q    Okay.  Could you go to the next page with me?  And then I

 3  think we will be ready for a break.

 4       This is page 4 of that document.

 5  A    Uh-huh.

 6  Q    Okay.  And about halfway through that paragraph -- sorry.

 7  Halfway through the second full paragraph of that document,

 8  beginning with, Until a research study is in place.

 9       So it says, Until a research study in place, the NBHW

10  deems that treatment with GnRH analogs and sex hormones may be

11  give in exceptional cases in accordance with the updated

12  recommendations and criteria described in the guidelines.

13  A    Uh-huh.

14  Q    And then a couple of sentences before that, is that, To

15  ensure that new knowledge is gathered, the NBHW further deems

16  that treatment with GnRH analogs and sex hormones for young

17  people should be provided within a research context, which does

18  not necessarily imply the use of randomized controlled trials.

19       Okay.  So my question is:  Are you aware of any ongoing

20  trials in Sweden in which a child or adolescent with gender

21  dysphoria could receive these treatments?

22  A    Not the medical trials, no.  I rely on our medical

23  providers to be aware of the information.

24  Q    Okay.  Okay.

25            MR. BOWDRE:  Your Honor, I think now would be a good

```
 1  time for a break.
 2          THE COURT:  Okay.  Good.  All right.  Let's all be
 3  back in the courtroom at ten minutes until 11:00.
 4          (Recess.)
 5          THE COURT:  I didn't mean to take that long of a
 6  break.  I have just realized this clock is way off from the
 7  regular time.  So breaks will be shorter.  That was my fault.
 8      So go ahead, Mr. Bowdre.
 9          MR. BOWDRE:  Thank you, Your Honor.
10  BY MR. BOWDRE:
11  Q   Dr. Hawkins, I think I would like to move to and focus
12  more on your treatment of the gender dysphoric children and
13  youth that you treat.
14      How long on average are these patients in your care?
15  A   The youngest patient I've met with is four to five years
16  old, and we see folks until they're 21, at which point they
17  transition to adult care providers.  So it can be 5, 10,
18  15 years.
19  Q   Do you keep up with them once they transition out at age
20  21?
21  A   We do, especially for those who are working with the local
22  medical providers, and as much as possible with ongoing
23  research, yes.
24  Q   What does that research look like?
25  A   Keeping track of the outcomes and looking at how young
```

 1  people are doing as they age out of the clinic.

 2  Q    Okay.  And at what point -- are you publishing this

 3  research?

 4  A    Not at this time.  We're still in collection.

 5  Q    Okay.  And what are the long-term -- at what ages are you

 6  asking the patients?  Does that make sense?  Like they leave

 7  your clinic at age 21.  And then you're conducting research as

 8  they progress through life.  What ages are they at now?

 9  A    I would have to hypothesize that based on -- so we started

10  in 2014.  I recall having touched base again with a patient who

11  is nearing 30, who came to us when they were 20 -- or nearing

12  30, yeah, so in the late 20s.  Late 20s is about where the

13  majority of our aged-out patients are right now.

14  Q    Okay.  And when you say that you keep in touch with them,

15  is that something -- I mean, do you send them surveys?  Do you

16  send them -- do you just call them?  Do they call you?  What

17  does that look like?

18  A    We have a research director that's part of the Children's

19  Hospital of Philadelphia that does ongoing -- ongoing

20  assessments and ongoing research.  It is not myself.

21  Q    Okay.  Do all of your patients continue to stay in touch?

22  If you send them a survey or whatever, do they -- how many drop

23  out?

24  A    I can't speak to that.  I'm not the research director.

25  Q    Okay.  Do you know if any of your patients have gone

1  through a transition and then detransitioned and aligned with

2  their biological sex?

3  A    For -- for young people who have gone through the complete

4  thorough assessment and have received medical care from our

5  teams, we have not had somebody desist with regret.

6  Q    What does that mean for young -- I mean, I think you had a

7  qualifier at the very beginning.  Could you explain that?

8  A    The qualifier was for individuals who have gone through

9  our full assessment and as a result ended up in that third

10 category that I described of young people who will benefit from

11 ongoing medical care for their gender dysphoria, we have not

12 seen anybody to date desist with regret.

13 Q    Okay.  And that assumes that you have 100 percent response

14 rates to your surveys or follow up with them once they leave

15 your clinic; is that correct?

16 A    I don't -- I can't speak to the percentages or the follow

17 up --

18 Q    So how do you know that you have not had a detransitioner

19 if you don't know how many drop out of the follow-up studies?

20 A    From the reports back from the research director, we have

21 not seen that yet.

22 Q    Okay.

23 A    That --

24 Q    Are you aware -- at least according to one survey, only a

25 quarter of detransitioners ever tell their doctors -- their

```
 1  gender clinic doctors that they have detransitioned?
 2  A    I had not heard that.
 3  Q    Okay.  So you have not read Lisa Littman's Survey of
 4  Detransitioners?
 5  A    I actually have read Lisa Littman's work.
 6  Q    Okay.  Have you read that specific survey?  I mean, as far
 7  as I know -- I will just stop there.  Have you read that
 8  specific survey?
 9  A    Yes.
10  Q    Okay.  And you just did not pick up on her finding that
11  only a quarter of detransitioners ever told their doctors that
12  they have detransitioned?
13  A    I apologize.  I do not recall that from that study.
14  Q    Okay.  Does that concern you -- assuming that it's true,
15  does that concern you?
16  A    All the research around transgender children and
17  individuals with gender dysphoria concern me.  And it is
18  important to, as a director, hire leaders in each field of
19  medical care, mental health care, and research to lead that.
20  Q    On direct I think you said that your standards of care are
21  exceptional.  Did I get that right?
22  A    Yes.
23  Q    Does that mean -- would you agree does that mean that
24  other clinics might not have exceptional care?
25  A    I wouldn't -- I wouldn't speculate to presume that.
```

 1  Q    Okay.  Is it your understanding that all providers who
 2  prescribe puberty blockers or cross-sex hormones to treat
 3  gender dysphoric youth have the same exceptional standards that
 4  your clinic does?
 5  A    I don't think it's -- I don't think I can say that
 6  everybody has to have the same standards.  We don't -- we
 7  are -- our type of care is incorporating all of the
 8  recommendations from every organization.  So I'm not sure that
 9  I could say that -- in a great world, I would hope that
10  everybody would have the same standards.  I don't -- I can't
11  set that as a standard as an individual from Children's
12  Hospital of Philadelphia.
13  Q    Okay.  So I guess there's two different questions here.
14  One is:  What should the standard be?  And then the other
15  question is:  What is the standard that everyone's using?  And
16  I just want to make sure I'm breaking that down.  And your
17  testimony is that the standard that you use is exceptional, but
18  might not be the only way to treat gender dysphoric children;
19  is that right?
20  A    I would agree.
21  Q    Okay.  And then the second question is:  You would agree
22  that not all clinics or not all pediatrician offices or not all
23  pediatric endocrinologists are using the same standards that
24  you are using to treat gender dysphoric children; is that
25  correct?

```
 1  A    I don't think I could make that speculation about what
 2  other people are doing.
 3  Q    Okay.  I just want to make sure.  You testified -- we
 4  touched briefly on the informed consent process that your
 5  clinic uses.  And I believe you said that you are not directly
 6  involved in that process, at least for the puberty blockers and
 7  cross-sex hormones; is that correct?
 8  A    That's completed by a physician.
 9  Q    Okay.  And you could not testify about what is in that
10  process, what risks are given to the patient or the patient's
11  parents?
12  A    Not the medical risks, no.
13  Q    Okay.  So you don't know if the patients are given and are
14  told about the long-term effects that being on puberty blockers
15  might have for them?
16  A    The medical leaders in the clinic are following the
17  expected guidelines that are put out by the medical
18  associations and has been -- have been approved by the
19  Children's Hospital of Philadelphia as best care practice.  I
20  can guarantee that.
21  Q    Okay.  But I guess -- you don't know -- I guess to go back
22  to my question.  You don't know what specific risks the
23  children or their parents are told about being on puberty
24  blockers; is that right?
25  A    Medical risks?
```

1  Q    Medical risks, psychological risks, whatever the risks

2  are.

3  A    I don't sit in those meetings.  My job is to determine

4  that a young person is ready to have those conversations with

5  the medical providers.  The medical providers are staying on

6  top of the best practice and the best information to be sharing

7  with the parents and the child -- and the adolescent.

8  Q    Okay.  How do you determine when a patient is ready to

9  start that process for medical treatment?

10 A    When psychosocially there is confirmation of the diagnosis

11 of gender dysphoria, and that the distress that a young person

12 or an adolescent is experiencing meets criteria psychosocially

13 or mental health-wise for the distress to be reduced or

14 stopped.

15 Q    And so what is the youngest patient that you have said has

16 met that criteria and was ready to go meet with an

17 endocrinologist about puberty blockers?

18 A    We don't do a lot based on age.  We do it based on Tanner

19 staging.

20      And so the -- I would say the youngest would be

21 conversations with folks in the 14-year-old age range.

22      And we look at two variables.  One is the physical

23 distress that's being described that the breast development,

24 the menstruation is highly distressing and/or the anticipation

25 of those body changes.  And for kids who are assigned male at

```
 1  birth, that would be deepening of the voice and increasing of
 2  the genital size.
 3  Q    What Tanner stage are you looking for?
 4  A    The physicians are looking for Tanner Stage 2.
 5  Q    Okay.  And I'm correct that there are five Tanner stages?
 6  A    From what I have read, yes.
 7  Q    Okay.  And the Tanner Stage 2 is really the first stage of
 8  pubertal changes; is that correct?
 9  A    From what I understand from sharing from medical
10  providers, yes.
11  Q    And do you know if -- if a person at Tanner Stage 2, is
12  that person fertile?
13  A    I can't speak to that level of medical knowledge.
14  Q    Okay.  So then does that also mean that you are not aware
15  of whether the patients are told that if they start on cross
16  sex -- if they start on puberty blockers and then move on to
17  cross-sex hormones at Tanner Stage 2 that they might be
18  permanently infertile?
19  A    We have on our team fertility specialists who are part of
20  the University of Pennsylvania hospital system, and they are
21  part of the multidisciplinary medical team that does a
22  comprehensive sharing of information and review of systems with
23  every patient and their family.  So I have the experts on the
24  team that provide that information.
25  Q    Okay.  And they tell the patient that she might end up
```

1   permanently infertile?

2   A     I can't speak to that.

3   Q     Okay.

4   A     They provide all the information needed.

5   Q     Okay.  Let's move on to diagnosis.

6   A     Uh-huh.

7   Q     And I think you testified earlier that the gender

8   dysphoria is a psychological diagnosis based on the DSM-5; is

9   that right?

10  A     Yes.

11  Q     And as I understand it, the two criteria are gender

12  incongruence and a clinical level of distress about that

13  incongruence; is that fair?

14  A     Correct.

15  Q     Okay.  And I think you also said this, that at present

16  there are no brain studies or blood tests that we can do to

17  figure out whether someone has gender dysphoria or not?

18  A     Correct.

19  Q     It's based on patient report and what the family tells

20  you?

21  A     Patient report, what the family tells us, as well as the

22  360 evaluation of the other people who are involved in the

23  young person's life, including pediatricians, other mental

24  health providers.  So...

25  Q     Would you agree that --

```
1            THE COURT:  Mr. Bowdre, I am not getting in the middle
2   of your case, but I would be interested to have some practical
3   knowledge of what exactly does that clinical level of distress
4   look like.
5            MR. BOWDRE:  Okay.
6            THE COURT:  And maybe that's a better one for their
7   redirect.  So I will just aim that at both parties.
8            MR. BOWDRE:  Thank you, Your Honor.
9   BY MR. BOWDRE:
10  Q    Just to follow up on that there are no brain scans that
11  can identify gender dysphoria or blood tests or any of those
12  sorts of biological tests.  Would you agree that that is
13  different than diagnosing precocious puberty, for instance?
14  A    I don't diagnose precocious puberty, so I can't speak to
15  that diagnostic process for a medical provider.
16  Q    Okay.  Can you -- do you have any idea whether precocious
17  puberty is based on -- is a psychological condition or
18  something that can be found in, you know, blood work, for
19  instance?  Do you have any idea?
20  A    As a nonmedical provider, I can't answer that.
21  Q    Okay.  So you testified that most -- that gender identity
22  begins to form between ages three and five, and that that is
23  really when we start to see gender dysphoria being manifest.
24  And I think you put in your declaration that it is insistent,
25  persistent, and consistent in the cross-gender identification;
```

1  is that right?

2  A    Correct.  For some children, that is when we start to hear

3  their proclamations of their gender identity.

4  Q    Okay.  Would you agree that that is -- the traditional or

5  classic case of childhood onset gender dysphoria is around

6  three to five?

7  A    I would agree with that.

8  Q    Okay.  Am I correct -- and do you want to explain at this

9  point what the distress -- part of the diagnosis of the three

10  to five year old, what that second component, the distress,

11  what that looks like?

12  A    Yeah.  For a kiddo -- I'm sorry.  For children that age,

13  oftentimes we will see the manifestation of that distress in

14  difficulties sleeping, excessive tearfulness, nighttime is that

15  time at bedtime where you hear what's really upsetting a

16  kiddo -- child, sorry.  And it also comes out in desires not to

17  go to school, where preschools and kindergartens are very

18  gender separated.  So opportunities for that child to be

19  repeatedly misgendered because they're being told to line up in

20  one line or another.

21      We have had five year olds who say that they want to throw

22  themselves out of a moving car, end their life.  More commonly,

23  we see that the bellyaches, the GI distress, the headaches, and

24  overall significant -- and it's not just a little bit.  We're

25  looking at significant distress.

1    Q    I understand that the DSM-5 requires this finding of

2    distress.  Wasn't that also true for the DSM-IV?

3    A    Yes.  Under the diagnosis of the DSM-IV that was gender

4    identity disorder, the distress was also needed as part of that

5    diagnostic criteria.

6    Q    Was that also true for DSM-III?

7    A    Yes.  Also as gender identity disorder.  The terms changed

8    with the DSM-5.

9    Q    But they all required this level of significant distress,

10   right?

11   A    Correct.  The one word that I would like to add is that in

12   the DSM-5 there became flexibility for the understanding that

13   perceived distress in childhood also warrants significant

14   distress.  So in that regard, if a child is fearful of future

15   body changes, that qualifies as a diagnosis of dysphoria.

16   Q    Okay.  Thank you.

17        I want to address desistance for a moment.  And my

18   understanding is that the most likely outcome for this cohort

19   of gender dysphoric children who present at age three to five

20   is desistance.  Is that true?

21   A    Going back to what I said earlier about is -- if the child

22   is actually diagnosed with gender dysphoria, through a

23   multidisciplinary longitudinal systemic assessment process, we

24   do not see desistance at the rates that were identified.

25   Q    Okay.

1   A      By --

2   Q      Would you agree that the DSM-5 has a contrary statement?

3   A      What statement would you be referring to?

4   Q      Okay.  Let's look at it.  Could you go to defense

5   Exhibit 17?

6   A      I see the Diagnostic and Statistical Manual of Mental

7   Disorders, DSM-5.

8   Q      Could you go to the internal pages 455, or if it's ECF

9   stamped, it's page 7 of the ECF document.

10  A      Sorry.  That print's small.  455?

11  Q      Yes.

12  A      Uh-huh.

13  Q      And then under the heading, gender dysphoria without a

14  disorder of sex development, the second full paragraph begins,

15  Rates of persistence of gender dysphoria from childhood into

16  adolescent or adulthood vary and, in natal males, persistence

17  has ranged from 2.2 percent to 30 percent.  In natal females,

18  persistence has ranged from 12 percent to 50 percent.

19         Did I read that correctly?

20  A      Yes, you did.

21  Q      Okay.  And so that would indicate that somewhere, what,

22  between 97.8 and 70 percent of boys, and between 50 percent and

23  88 percent of girls with diagnosed gender dysphoria, the

24  dysphoria will desist by the time they become adults, according

25  to the DSM-5?

```
1    A    You said 80 percent?

2    Q    In natal females, persistence has ranged from 12 to

3    50 percent, so that would mean desistance would be between

4    88 percent and 50 percent; is that right?

5    A    Oh, I'm sorry.  Thank you for clarifying that.  I see

6    that.

7    Q    Okay.  Can we also go to -- if you flip over to Defense

8    Exhibit 19.

9    A    The Endocrine Treatment of Gender Dysphoric Gender

10   Incongruent Persons by the Endocrine Society.

11   Q    Yes.  Are you familiar with this document?

12   A    Yes.

13   Q    Does your clinic use this document to treat gender

14   dysphoric youth?

15   A    Yes.  It is used as a guideline and recommendation.

16   Q    Okay.  Can you go to internal page 3879?  And then do you

17   see under the heading, Evidence?

18   A    Uh-huh.

19   Q    It says -- Defense Exhibit 19.

20        Quote, In most children diagnosed with GD or gender

21   incongruence, it did not persist into adolescence.  The

22   percentages differed among studies probably dependent upon

23   which version of the DSM clinicians used, the patient's age,

24   the recruitment criteria, and perhaps cultural factors.

25   However, the large majority -- about 85 percent -- of
```

```
 1  prepubertal children with a childhood diagnosis did not remain
 2  GD/gender incongruent in adolescence.
 3      Did I read that correctly?
 4  A   Yes.
 5  Q   Okay.  And then it goes on to note that social transition
 6  is associated with the persistence of GD and gender
 7  incongruence as the child progresses into adolescence; is that
 8  correct?
 9  A   Uh-huh.
10  Q   Okay.  And then I want to look at one more exhibit, which
11  is Defense Exhibit 18.  So just flip one to the left.
12  A   Standards of care.
13  Q   Yes.  What are these?
14  A   I'm sorry?
15  Q   I'm sorry.  What is this document?
16  A   This is the World Professional Association for Transgender
17  Health standards of care for the health of transsexual
18  transgender and gender nonconforming people.
19  Q   These are the WPATH standards that you talked about
20  earlier?
21  A   Correct.
22  Q   Okay.  Could you go to internal page 11?
23  A   Yes.
24  Q   Okay.  And then that first full paragraph beginning with
25  the second sentence.  Gender dysphoria during childhood does
```

 1  not inevitably continue into adulthood.  Rather, in follow-up

 2  studies of prepubertal children, mainly boys, who were referred

 3  to clinics for assessment of gender dysphoria, the dysphoria

 4  persisted into adulthood for only 6 to 23 percent of children.

 5  And then I will skip the citations.

 6      And it says, Boys in these studies were more likely to

 7  identify as gay in adulthood than as transgender.  Newer

 8  studies also including girls showed a 12 to 27 persistent rate

 9  of gender dysphoria into adulthood.

10  A    Uh-huh.

11  Q    Did I read that correctly?

12  A    Yes, you did.

13  Q    So my question is:  You testified earlier that you don't

14  believe these statistics because you believe that -- I don't

15  want to put words in your mouth.  So let me see if this is a

16  fair characterization.

17      My understanding of your testimony was that these

18  statistics are all wrong because it might be that everyone was

19  diagnosing people with gender dysphoria who, in fact, did not

20  have it; is that correct?

21  A    The care with which we look at the research findings needs

22  to include the appropriateness and accuracy of a diagnosis.

23  And that is why the DSM has continued to improve and modify the

24  diagnosis so that we can be more clear, based on what we're

25  understanding about gender dysphoria in children, especially as

1  it relates to medical care, to keep an eye on the knowledge

2  we're gaining.

3  Q    Okay.  Well, you testified -- earlier I asked you, does

4  the DSM-IV, does the DSM-III, they both require clinical levels

5  of distress for the diagnosis of gender dysphoria, correct?

6  A    Uh-huh.  Yes.

7  Q    Okay.  And so I guess my question is:  Why do you think

8  all these statistics, all these studies from WPATH, Endocrine

9  Society, DSM-5, how are they all wrong?

10  A    I'm not saying that they're all wrong.  They're guiding us

11  to really carefully take a look at the diagnostic process.  And

12  the benefit of the care that's provided would follow children

13  for several years and never activate medical care.

14      So if a child were to, as you say, desist prior to

15  adolescence, there is no harm.

16  Q    I guess -- all right.  So what do you think the rate of

17  desistance in childhood dysphoria is?

18  A    I -- I would -- I don't feel comfortable giving a rate or

19  a percentage based on that question.

20  Q    Okay.  And so on this harm aspect, wouldn't you agree that

21  if you start someone on medical interventions and it turns out

22  that that person would have been in the vast majority,

23  according to the DSM-5, Endocrine Society, WPATH, of people who

24  would have desisted but for the medical interventions, isn't

25  that a harm?

1  A     Potentially it could be a harm.  I -- the statement I was

2  making earlier was about the importance of not having medical

3  care occur under puberty and being able to watch and then

4  assess and reassess.

5  Q    Okay.  And so how do you tell if one of your patients, if

6  his or her gender dysphoria will persist, and so that he or she

7  is a good candidate for medical treatments?

8  A     The duration of time, which is what -- one of the areas of

9  diagnosis that has changed is the requirement for there to

10  be -- you used the words insistent, persistent, and consistent

11  evidence of the child or the young person's identity as male or

12  female opposite to their sex assigned at birth for a

13  significant duration of time with significant mental health

14  improvement or stabilization when receiving medical and mental

15  health care for their gender dysphoria and experience

16  significant distress when not able to receive medical or mental

17  health for their gender dysphoria.

18  Q    Okay.  And what's -- what -- I guess my question is:

19  If -- if it is true that by adulthood the vast majority of the

20  childhood gender dysphoric youth, their dysphoria will have

21  desisted, but we have medical interventions before adulthood,

22  how can you be confident that the person sitting in front of

23  you is a persister rather than a desister?

24  A     The comprehensive assessment that we do with the children,

25  the parents, all of the providers leads us to that confidence.

1  Q    Okay.  Would you say that you are -- you have -- using

2  your diagnostic criteria, that you would be 100 percent sure

3  that the person in front of you is a persister rather than a

4  desister?

5  A    The assessment -- it's interesting you say 100 percent.

6  The assessment process we use, we try to assure we are

7  180 percent sure that the right kids are getting the right

8  medicine.

9  Q    Okay.  And which studies can you point to that show

10  180 percent chance that you have the right person in front of

11  you, that it is a persister and not a desister?

12  A    Hopefully soon we will have one from us.  I can't point to

13  one as you said.

14  Q    So there are no formal studies as of this time that tell

15  us whether -- what criteria you can use to determine whether

16  someone desists or is a persister in front of you?

17  A    Sorry.  Can you repeat that question?

18  Q    Yep.  There are no formal studies at this time that can

19  tell you what diagnostic criteria to use to make sure that you

20  are confident and accurate that the person sitting in front of

21  you is a persister and not a desister?

22  A    The assessment process that includes longitudinal

23  assessments with multidisciplinary team of the multi-systemic

24  areas of a child is the ideal assessment process to determine

25  that, to determine the appropriateness of what medical and

1  mental health care a child or an adolescent with dysphoria

2  experiences.

3  Q    Okay.  Can you point to a study that provides an accuracy

4  percentage of, you know, these children were diagnosed, and

5  they were -- they ended up persisting, and we got it right,

6  versus these children were diagnosed, and they were part of the

7  majority and desisted, and we got the diagnosis wrong?  Are

8  there any studies like that?

9  A    I would lean to Tordoff, our colleagues in -- at Seattle

10 Children's who did a one-year longitudinal study following

11 children who were -- youth -- sorry -- who were receiving

12 medical and mental health care.

13 Q    Okay.  So that study showed -- those children got the

14 intervention, right?  They got the puberty blockers?

15 A    Uh-huh.

16 Q    And then we're saying, well, this shows that we got it

17 right where it could also show, as the Tavistock vs. Bell

18 decision showed, that once you start them on puberty blockers,

19 then they're likely to persist.  Isn't that also likely?

20 A    Correct me if I'm wrong.  What I heard you say was that

21 the puberty blockers would make somebody persist.  Youth

22 persist because they're getting the right care.

23 Q    How do you know that?

24 A    Because they continue to do well, to have baseline of the

25 same mental health challenges that their cisgender peers do,

```
 1   and continue to thrive.
 2   Q    Can you go back with me to Defendants' Exhibit 19?
 3   A    Yes.
 4   Q    This is internal page 3876.  At the very top.  And these
 5   are the Endocrine Society guidelines, right?
 6   A    Yes.
 7   Q    At the very top, With current knowledge, we cannot predict
 8   the psychosexual outcome for any specific child.
 9        Did I read that right?
10   A    Yes.
11   Q    Do you disagree with that?
12   A    In general, that's an accurate statement.
13   Q    Okay.  What is -- I think -- okay.  Thank you.
14        THE COURT:  No rush, Mr. Bowdre, but tell me how long
15   you think this cross is going to continue.
16        MR. BOWDRE:  Your Honor, I'm sorry.  At least another
17   30 minutes.  Maybe not at least.  I will do my very best to get
18   done within 30 minutes.
19        THE COURT:  Is there going to be some amount of
20   redirect?
21        MS. EAGAN:  At this point, Judge, I anticipate a short
22   redirect.
23        THE COURT:  Five minutes?
24        MS. EAGAN:  Yes, sir.
25   BY MR. BOWDRE:
```

1   Q    Just one clarifying question.  When you say that in

2   general you agree with that statement, is the -- your hesitancy

3   to fully agree with that, is that based on the Tordoff study?

4   A    No.  It's based on the fact that we -- we can't predict

5   any child's psycho -- psychological well-being based on human

6   variables in life.

7        So if there is a trauma, if there is a challenge that

8   occurs in someone's life, if there is additional reasons for

9   anxiety or depression, that's why I'm saying I would not

10  uniformly say that.

11  Q    But I guess going back to the statistic earlier.  If it's

12  true that children are between, you know, 50 percent and

13  90 percent, 95 percent likely to desist, then we can predict

14  that it is at least more likely than not that any individual

15  child is -- will desist.  Isn't that correct?

16  A    I don't know that I would agree with that.

17  Q    Okay.  So far we've been talking about the children ages

18  three to five.  My understanding is that there is -- in recent

19  years, the patient profile has changed to become predominantly

20  adolescence and often adolescent girls presenting with gender

21  dysphoria.  Do you agree that?

22  A    I would agree that there are more youth coming in who are

23  in the 13 to 15 year old range than in the past, yes.

24  Q    Okay.  And have you seen that at your clinic?

25  A    Yes.

```
 1   Q    And these -- these youth were -- are not considered the
 2   traditional gender dysphoric childhood onset class; is that
 3   true?
 4   A    There's -- there's two categories that we're seeing.  The
 5   additional youth who are coming into clinics, one is teens who
 6   are identifying in adolescence that they did have an
 7   identification and -- in childhood or in earlier years that as
 8   they start to go through puberty, they realize qualified as
 9   gender dysphoria, though they didn't speak on it in the past.
10   And there is -- right now the young people around the United
11   States are enjoying a lot of developmental exploration around
12   gender and sexuality, and thus increasing our needs to do very
13   careful assessments about what type of care each child gets in
14   its youth.
15   Q    Okay.  Let's address those in turn.  What studies do you
16   rely on for the idea that you would treat someone who
17   identifies as an adolescent as gender dysphoric -- or as
18   diagnosed as an adolescent with gender dysphoria for the first
19   time, what studies do you rely on to say that the treatment,
20   the cross-sex hormones, the puberty blockers are appropriate
21   for that class of children?
22   A    I -- I would lean back on some of the colleagues who have
23   published the Achille, as well as Tordoff and the medical
24   leaders that then guide this information and the mental health
25   leaders.
```

1   Q    Okay.  One of the studies that you cite in your report is

2   the 2014 Dutch study.  Are you familiar with that?

3   A    Uh-huh.

4   Q    Is the one by Dr. de Vries and others from the Dutch

5   gender clinic?

6   A    Yes.

7   Q    Would you agree that that is a leading study on the

8   treatment of gender dysphoric children?

9   A    Yes.

10  Q    Would you agree that that study only looked at the

11  classical onset, childhood onset age three to five for gender

12  dysphoria?

13  A    Yes.

14  Q    Okay.  It did not look at people whose gender dysphoria

15  came to light when they were adolescents; is that true?

16  A    From my recollection.

17  Q    Okay.  And so you would agree that treating adolescent

18  onset gender dysphoric youth with those same interventions is

19  at least not supported by the Dutch study itself; is that true?

20  A    I wouldn't come to that summary.

21  Q    Why not?

22  A    Because the research and the findings they have are

23  continuing to evolve, so I think making a definitive statement

24  like that is not something I would do.

25  Q    Okay.  You also mentioned that you are seeing an

1  increasing number of people with different gender identities;

2  is that right?

3  A    Describe what you mean by different gender identities.

4  Q    I'm sorry.  I forget the exact wording that you used.  But

5  would you agree that gender -- that you are seeing nonbinary

6  identifying youth?

7  A    We are seeing an increase in youth across the sex spectrum

8  and gender spectrum who are exploring gender, yes.

9  Q    Okay.  Would you agree that gender can be fluid?

10  A    I see gender presentation as fluid.  That's what somebody

11  puts on themselves to express who they are.  And that is --

12  that is something that is gaining popularity right now.

13  Q    Okay.  Does -- is there an age at which gender identity

14  becomes set?

15  A    Given the opportunity for typical childhood development,

16  meaning no traumas, no challenges, no deficits in nutrition and

17  support, we see that there is a point around six that a sense

18  of understanding that gender is permanent in society is part of

19  natural and normal gender development.

20       For many individuals, where there are challenges to

21  healthy and typical development, whether that's from just

22  neurological differences, family and stress differences, the

23  understanding and solidification of gender identity can emerge

24  at other different times, later different times in life.

25  Q    Okay.  So are the adolescents that are coming to your

 1  clinic for the first time identifying as trans or showing signs
 2  of gender dysphoria, are you saying that those -- their gender
 3  identities were not set at the normal age; is that right?
 4  A    No.  I'm saying that there's a difference between somebody
 5  who has gender dysphoria and is transgender and somebody -- a
 6  teen who is exploring their gender identity.
 7       Between our two clinics in Philadelphia and New Jersey,
 8  we're seeing about -- we're supporting about 3,000 kids and
 9  teens.  Only two-thirds of those folks are on any type of
10  gender-affirming medical care.
11       So a third that are exploring their gender are in kind of
12  those first two categories I spoke of today, either gender --
13  something else is going on that is not gender dysphoria, or
14  we're in a place of continued assessment before any type of
15  medical recommendation is made.
16  Q    Okay.  Thank you.
17       What studies do you rely on for the proposition that only
18  puberty blockers and cross-sex hormones and not therapy alone
19  would reduce suicide rates in gender dysphoric use?
20  A    Can you say that again?
21  Q    What studies do you rely on for the proposition that only
22  puberty blockers and cross-sex hormones and not therapy alone
23  can reduce suicide rates in gender dysphoric youth?
24  A    I rely on the medical and mental health guidelines that
25  are prepared by the professionals that review all those

 1  studies.

 2  Q    Okay.  So you testified earlier that it is your

 3  understanding that without the medical interventions, suicide

 4  rates go up; is that fair?

 5  A    For the kids who are diagnosed with gender dysphoria.

 6  Q    Okay.  And your basis for saying that is just that you

 7  rely on the professionals?

 8  A    The professional organizations, yes.  And, yes, I do read

 9  the research, and the Tordoff, and Olsen, and Achille, and --

10  and, again, look at the synthesis of each of those studies

11  collectively and how the collective understanding that we gain

12  from those studies are brought into guidelines and expectations

13  for our care.

14  Q    Okay.

15         MR. BOWDRE:  May I have a moment to consult with my

16  co-counsel?

17      Okay.  Thank you, Dr. Hawkins.

18         THE WITNESS:  Thank you.

19                    REDIRECT EXAMINATION

20  BY MS. EAGAN:

21  Q    Dr. Hawkins, after an adolescent is placed on -- an

22  adolescent with gender dysphoria is placed on puberty blockers,

23  do you continue to treat that adolescent?

24  A    Yes.  We continue to assess and reassess continually,

25  checking in with family, parents, the youth, and checking on

 1  any changes in functioning at school with any mental health.

 2  Q    In your clinical practice, have you personally observed

 3  improvement in those patients with gender dysphoria,

 4  adolescents who have been placed on puberty blockers?

 5  A    I have.

 6  Q    Describe that, please.

 7  A    The symptomology of distress, the anxiety and depression,

 8  the fear of their bodies changing can reduce greatly.  And what

 9  we see -- what we've witnessed with our work with over 2000

10  kids is that, you know, that opportunity to have their bodies

11  stop going in the direction that it shouldn't be going in is

12  incredibly relieving.

13  Q    Same question for hormones.  You continue to treat those

14  adolescents after they begin hormone treatments?

15  A    Yes.  We have continued visits.

16  Q    And in your clinical practice, what have you observed, in

17  regards to improvement in their psychosocial condition?

18  A    Significant improvement.

19  Q    Mr. Bowdre asked you about what does distress look like in

20  a young child ages three to five with gender dysphoria?

21  A    Uh-huh.

22  Q    I am going to ask the question tying it to an adolescent,

23  who is about -- who is going into puberty when medication can

24  be started with these children that is banned by this law.

25      What does the distress look like, Dr. Hawkins, in an

 1  adolescent with gender dysphoria who is being considered for

 2  medical treatment?

 3  A    In addition to all the distress that I described in

 4  childhood, the fact that adolescents can have access to more

 5  ways of harming themselves means that we often will see an

 6  addition of cutting behaviors, missing school, similar to the

 7  younger age, but it gets bigger.  The consequence of missing

 8  school, the lethality of an adolescent's ability to take their

 9  own life is significantly different than a five year old.  Not

10  to minimize the importance of what I shared about a five year

11  old.  And the addition of substance use, substance abuse, as in

12  eating disorders.  Those are the layers that are added to the

13  distress categories that we see in adolescents, all of which

14  increase the significant lethality of not doing this care.

15  Q    Turning to when Mr. Bowdre was asking you about Sweden.

16  In Sweden -- and he showed you the paper -- were you aware that

17  in Sweden that -- that -- or you saw it then.  I can pull it

18  back up -- that treatments are allowed in exceptional

19  circumstances for children?

20  A    Yes.

21  Q    Or for adolescents, correct?

22  A    Uh-huh.

23  Q    And Sweden, in fact, has -- adolescents who are 16 can get

24  the treatments, correct?

25  A    Yes.

1  Q    Okay.  Alabama, unlike Sweden, their law has no exception?

2  A    Uh-huh.

3  Q    Correct?

4  A    From my read of it, yes.

5  Q    It's a blanket ban, regardless of exceptional

6  circumstances?

7  A    Correct.

8  Q    Now, Mr. Bowdre also walked you through some literature

9  from the UK.  Let me ask you this just to wrap this up.  Has

10  any of the data that he reviewed with you, has any of that data

11  changed the position of any major medical association in the

12  United States regarding the appropriateness and the efficacy of

13  these medical treatments for adolescents with gender dysphoria?

14  A    Not to my knowledge.  The -- what the research has advised

15  is stronger and better assessments of the mental health to

16  assure that the right kids are getting the right medicine at

17  the right time.

18  Q    Mr. Bowdre asked you about the standard of care that you

19  described as exceptional that y'all practice with your clinic

20  at Children's.  Let me ask you this:  Does the standards that

21  are used by Children's Hospital in your practice, do those

22  standards, the ones -- do -- does that follow recognized

23  protocols for best care practices, the same protocols that we

24  talked about earlier that's endorsed by every major medical

25  association?

1  A    I just want to clarify.  I'm sorry.

2  Q    Sure.  My point is this:  He was asking you, well, you

3  don't know what other folks, what other practices do, so I

4  can't speak for a specific practice, but you know what your

5  practice does.

6      Are the practices that you follow, are those in compliance

7  with what are the recommended practices for best treatment for

8  children, transgender youth with gender dysphoria that's

9  recognized by the guidelines that we talked about earlier?

10 A    Yes.  Thank you for clarifying that.

11     It incorporates -- the care provided incorporates the

12 highest standards from endocrine, from adolescent medicine,

13 from psychiatry, from psychology, all of those together, yes.

14 Q    Okay.  Mr. Bowdre asked you, Dr. Hawkins, he talked with

15 you about some statistics that he phrased as desistance for

16 children, which would be young children up to adults or

17 children to adolescence, okay?

18 A    Uh-huh.

19 Q    When gender dysphoria, however, has persisted from

20 childhood into adolescence, when medical treatments are being

21 considered, what has been your experience regarding later

22 realign -- what he's called desistance?  What has been your

23 experience on that once they have had that persisted dysphoria?

24 A    In my experience, when a child has expressed insistent,

25 persistent, and consistent cross-gender identity or cross-sex

```
 1  identity for a significant amount of time, they persist.
 2  Q    Okay.  Stated differently, if they have persisted and been
 3  consistent and insistent from being a young child up until the
 4  point of puberty and have entered puberty, in your experience,
 5  those children continued to experience gender dysphoria and
 6  continued to -- they're transgender children; is that fair?
 7  A    Correct.  And they continue to require medical and mental
 8  health in support of addressing the distress from their gender
 9  dysphoria.
10  Q    Doctor, I am going to -- let me see if I can put this up
11  on the Elmo.
12        This is from plaintiffs -- excuse me -- Defendants'
13  Exhibit 19, if you want to turn in your book.
14        And just to identify, these are the endocrine treatment
15  guidelines for gender dysphoria, the clinical practice
16  guidelines, correct?
17  A    Yes.
18  Q    Okay.  Sorry.  I was making notes on this.  This is my
19  only copy.
20        All right.  I want to turn you to the language or some of
21  the language that I believe that Mr. Bowdre was referring to
22  you.  And he pointed out just the first sentence, which says --
23  this is on -- Natural History of Children With Gender
24  Incongruence or Gender Dysphoria.
25        The sentence he directed you to is, With current
```

```
 1  knowledge, we cannot predict the psychosexual outcome of any
 2  specific child.
 3       Do you remember him asking you about that sentence?
 4  A    Yes.
 5  Q    Let's go on into that, that section.
 6       And I am going to start where I started outlining.  And
 7  this is where they're talking about combining all outcome
 8  studies to date, the GD/gender incongruence of a minority of
 9  prepubertal children appears to persist into adolescence?
10  A    Uh-huh.
11  Q    Okay?  And then it talks about in adolescence, a
12  significant number of these children whose -- who identify as
13  homosexual or bisexual.  And then it goes on to say this:  It
14  may be that children who only showed some gender nonconforming
15  characteristics have been included in these follow-up studies.
16       Is that the phenomena that you were talking about earlier
17  that children are being wrongfully grouped in this that don't
18  really have gender dysphoria?
19  A    Yes, that was what I was referring to.
20  Q    And then it goes on to say this:  That they may have been
21  included because the DSM-IV text revision criteria for a
22  diagnosis was rather broad?
23  A    Uh-huh.
24  Q    And DSM-IV criteria, that's an older way of doing things;
25  is that fair to say?
```

1  A     Yes.  Yes.

2  Q     Okay.  It's not what we use today or not what you use

3  today?

4  A     Correct.  We use the DSM-5.

5  Q     Okay.  And then it says -- goes on to say, However, the

6  persistence of gender -- GD, and that stands for gender

7  dysphoria; is that right?

8  A     Correct.

9  Q     The persistence of GD/gender incongruence into adolescence

10 is more likely if it had been extreme in childhood, and then it

11 says, With the newer, stricter criteria of the DSM-5,

12 persistence rates may well be different in future studies?

13 A     Correct.

14 Q     And the DSM-5 criteria, is it a more robust criteria than

15 what DSM-IV was?

16 A     I would say it's -- I would say one of the best editions

17 is the duration of time and the -- just the additional layers,

18 yes.

19 Q     And in your clinical experience and also with the study

20 that y'all are undergoing with -- is it your experience that

21 with the DSM -- or in the clinical experience with DSM-5

22 criteria, you're seeing much higher or you're seeing high

23 persistence rates?

24 A     Yes.  And what I would add to that is that there are more

25 professionals who are trained in how to clearly assess

 1  individuals for gender dysphoria or not.

 2  Q    Okay.  The final thing, Dr. Hawkins, is I would like to

 3  direct your attention to Plaintiffs' Exhibit 33.  These large

 4  notebooks are a little bit unwieldy.

 5       And Mr. Bowdre asked you about a de Vries study.  And I

 6  believe he said that -- he couched it as, Dr. Hawkins, do you

 7  agree that the de Vries or de Vries study is a leading study in

 8  the area of analyzing the outcome of puberty suppression and

 9  gender reassignment in young adults?

10  A    Correct.  I recall that.

11  Q    Okay.  And he -- it was his words that he said a leading

12  study, correct?

13  A    Correct.

14  Q    Is Plaintiffs' Exhibit 33, is this the findings from the

15  de Vries -- is it de Vries or de Vries?

16  A    I say de Vries.

17  Q    Okay.

18  A    Sorry.

19  Q    Is this Plaintiffs' Exhibit 33, that's a summary of the --

20  or the findings from that study?

21  A    Yes.

22  Q    Okay.  And first, I would like to direct you to the

23  background of this study.  It explains puberty suppression by

24  means of gonadotropin releasing hormone analogs has become

25  accepted in clinical management of adolescents who have gender

 1  dysphoria, and that's referring to puberty blockers; is that

 2  correct?

 3  A    Correct.

 4  Q    And then it says, The current study is the first

 5  longer-term longitudinal evaluation of this effectiveness in

 6  this approach.

 7       What does a longitudinal evaluation mean, Doctor?

 8  A    This is following the youth who have been part of her

 9  clinic in the Netherlands.

10  Q    And in this assessment, what was it that they were looking

11  at in this longitudinal evaluation?

12  A    They -- I mean, they were following young transgender

13  folks who were receiving -- who had received puberty

14  suppression and then cross-sex hormones in adolescence.

15  Q    And in this study they then, as they aged into adults,

16  they looked at things such as their psychological functioning,

17  depression, and anxiety, basically how they were doing both

18  function-wise both mentally and in life, correct?

19  A    Correct.  In particular, they utilized many psychological

20  measures in addition to self-report.

21  Q    All right.  And then if you turn to the conclusions

22  section on this.

23  A    Uh-huh.

24  Q    This was the conclusion of the study:  A clinical protocol

25  of a multidisciplinary team with mental health professionals,

```
 1  physicians, and surgeons, including puberty suppression,
 2  followed by cross-sex hormones and gender reassignment surgery,
 3  provides gender -- let me back up.  The gender reassignment
 4  surgery for the student -- or the people that were the subject
 5  study, that was gender reassignment surgery that was performed
 6  in adulthood, correct?
 7  A    Correct.
 8  Q    Okay.  So let's go back to the conclusion.  A clinical
 9  protocol in the multidisciplinary team with mental health
10  professionals, physicians, and surgeons, including puberty
11  suppression, followed by cross-sex hormones, and gender
12  reassignment surgery, provides gender dysphoric youth who seek
13  gender reassignment from early puberty on the opportunity to
14  develop into well-functioning young adults.
15       Did I read that right, Doctor?
16  A    Yes.
17  Q    And was that the findings of the study that Mr. Bowdre
18  called a leading study?
19  A    Yes.
20            MS. EAGAN:  Thank you, Doctor.
21            THE WITNESS:  Thank you.
22            THE COURT:  All right, Ms. Eagan.  It's Conn Law 2,
23  and we are going to see if you can book the class.
24       Had Alabama adopted this statute but with Sweden's
25  exceptions, would you be here today?  Does that pass
```

1    constitutional muster?

2              MS. EAGAN:  If they --

3              THE COURT:  If Alabama had passed this law but with

4    Sweden's exceptions for 16 years old and for exceptional

5    circumstances, would you be here today asking me to enjoin the

6    enforcement of this Act?

7              MS. EAGAN:  I will -- I -- I can't claim to be a

8    constitutional scholar, Judge.  I would anticipate -- I will

9    say this:  The way to have -- to tailor this to whatever the

10   justification of the State is -- is not a blanket ban.  That is

11   not reasonably tailored to any liable justification.  So to --

12             THE COURT:  Would the Swedish rule be nearly tailored?

13   I'm not going to let you off the hook here.

14             MS. EAGAN:  Can I refer with my much brighter

15   colleague?

16             THE COURT:  You certainly can.  Absolutely.

17        Let me go ahead and warn the United States.  You're next.

18             MS. EAGAN:  All right.  Mr. Doss is --

19             MR. DOSS:  I mean, I think the issue would be what are

20   exceptional circumstances.  I mean, for example, we take the

21   position that untreated gender dysphoria would be exceptional

22   circumstances for the reasons that we just heard from

23   Dr. Hawkins, that if you have no medical intervention, then it

24   can lead to increased suicide rates and depression, anxiety.

25   We do think those are exceptional circumstances.

1         And so if there was no definition to the Alabama law about

2     exceptional circumstances, or there was a definition that

3     allowed for physician judgment in consultation with parents,

4     and a clear assessment and a clear weighing of the risks by the

5     parents with input from the doctors, and that was sufficient to

6     satisfy exceptional circumstances, I'm not sure that we would

7     be here, Your Honor.  Because it would like -- it would allow

8     room for those difficult judgments to be made.

9         If exceptional circumstances is something that could never

10    be obtained as a practical matter under current medical

11    outlooks, then maybe we would be here because it would not be

12    narrowly tailored.  There would be no narrow tailoring in the

13    event that it categorically always and repeatedly overrode

14    parental judgment and doctor judgment.

15        So as long as there's some room for discretion within that

16    definition, it would be a different scenario, we think.

17            THE COURT:  All right.  General Garland, what do you

18    say?

19            MR. CHEEK:  Your Honor, I most certainly am not

20    General Garland.  I am just a lowly assistant United States

21    attorney.

22        What we would say is, of course, that would still require

23    intermediate scrutiny.  And so there would have to be a

24    substantial relation to an important government interest.

25        Is protecting children an important government interest?

1    Of course.  But here -- and we'd have to look at the law and
2    the circumstances surrounding a law that Your Honor is
3    proposing -- is that a legitimate basis or is it pretextual or
4    a post-hoc rationale?  I think those questions would matter and
5    potentially be material.
6              THE COURT:  All right.  I'm not going to let you off
7    that easy.
8              MR. CHEEK:  Sure.
9              THE COURT:  So, I am speaking in general.  If the
10   Alabama law had Sweden's exceptions, what's your gut?  Would
11   you be here today?  That's my question.
12             MR. CHEEK:  I'm not sure, Your Honor.  I mean, I have
13   not pondered that specific scenario.
14             THE COURT:  So you might well be here even with
15   Sweden's exceptions?  Is that what I'm hearing?
16             MR. CHEEK:  Absolutely.  That's a possibility.  Sure.
17   Sure.
18             THE COURT:  Fair enough.  All right.  Thank you.
19             MR. CHEEK:  Thank you.
20             THE COURT:  Anybody from the State want to be heard on
21   this?
22             MR. LACOUR:  Your Honor, just very briefly, I will
23   point you back to Gonzales vs. Carhart, which we cited
24   yesterday.
25       In areas of medical uncertainty, the State has tremendous

```
1   ability to regulate.  So I don't think the Constitution has
2   empowered federal courts or private plaintiffs to require the
3   State to get it absolutely just right, much less defer to the
4   AAP or the AMA whenever we are trying to protect public health
5   in the state.
6          THE COURT:  All right.
7          MR. CHEEK:  Your Honor, can I add just one additional
8   thought?
9          THE COURT:  Why not?
10         MR. CHEEK:  The fact -- if it were a felony in Your
11  Honor's hypothetical, I think absolutely we would be here.
12         THE COURT:  Okay.
13         MR. LACOUR:  And, Your Honor, I don't see why it would
14  make any difference whether it's a felony or it's a physician
15  losing their license.  It's still banned, and there's not any
16  constitutional provision they've cited that makes the question
17  turn on the punishment that attaches to the ban.
18         THE COURT:  All right.  Are we still on track
19  time-wise?
20         MS. EAGAN:  I had hoped to get Dr. Ladinsky on before
21  now, but I know it's noon, Your Honor.  I mean, I could -- I
22  would expect Dr. Ladinsky would be about the same length as my
23  direct was with Dr. Hawkins, which I think was right at around
24  between 30 and 40 minutes.  I would expect probably about the
25  same for Dr. Ladinsky.
```

```
 1            THE COURT:  All right.  All right.  I will see
 2    everybody back here, then, at 1:25.  No.  That clock is wrong.
 3    1:15.
 4            MS. EAGAN:  15?
 5            THE COURT:  1:15.
 6            (Recess.)
 7            THE COURT:  All right.  Well, I detect that we are off
 8    track on time and that we need to get back on track.
 9        So I will ask everybody to tighten up, and everybody knows
10    how to do that, I'm certain.
11        One way of tightening up might be -- are you going to
12    offer Dr. Ladinsky for certain purposes, I assume?
13            MS. EAGAN:  Yes, Your Honor.
14            THE COURT:  And those purposes will be?
15            MS. EAGAN:  We are going to tender her as an expert in
16    pediatric transgender care in the state of Alabama.
17            THE COURT:  Is there going to be an agreement by the
18    State for that tender?
19            MR. LACOUR:  No objection, no, Your Honor.
20            THE COURT:  No objection?
21            MR. LACOUR:  No objection.
22            THE COURT:  Gotcha.  I realize you have to make your
23    record, but, you know, to the extent we can get a foundation
24    laid in lightning speed...
25            MS. EAGAN:  Yes, sir.  We are -- we have put her CV
```

 1   into evidence, and so I can probably just refer to it on a
 2   couple of quick points and get moving with it.
 3          THE COURT:  Excellent.  All right.
 4      One other thing I will say before we start is the same
 5   thing that I did yesterday with evidence, I'm going to do to
 6   you again tomorrow when we give closings, which, obviously, I
 7   don't need cases.  You have given me your cases.
 8      But in your closing argument, I will want whoever is going
 9   to give those to cite me back to specific evidence that has
10   come in through testimony or otherwise that you think would be
11   in your top ten list on each issue.
12      Okay.  Then are we ready for Dr. Ladinsky?
13          MS. EAGAN:  Yes, Your Honor.
14          THE COURT:  Okay.
15          MS. EAGAN:  Plaintiffs call Dr. Morissa Ladinsky.
16                  MORISSA LADINSKY, MD,
17   having been first duly sworn by the courtroom deputy clerk, was
18   examined and testified as follows:
19          THE COURT:  And you think you're 30 minutes?  And,
20   Mr. Bowdre, are you doing cross again?  No.  Mr. LaCour?
21          MR. LACOUR:  I will be doing cross, Your Honor.  I
22   will try to keep it 30 to 45.
23          THE COURT:  All right.  Here we go.
24                  DIRECT EXAMINATION
25   BY MS. EAGAN:

1  Q    Good afternoon, Dr. Ladinsky.

2  A    Good afternoon.

3  Q    Could you please give us your full name?

4  A    Sure.  Morissa Jean Ladinsky.

5  Q    Dr. Ladinsky, what do you do for a living?

6  A    I am an associate professor of pediatrics.  As such, I am

7  a faculty attending physician, UAB Pediatrics, in the division

8  of general peds.

9  Q    Okay.  And what is your area of specialty, Dr. Ladinsky?

10 A    I am a primary care pediatrician and also a clinician

11 educator, as such.  I lead our primary care clinic team,

12 educate the residents within that space.  I colead our regional

13 NICU follow-up clinic, and then I also colead our

14 multidisciplinary gender health team.

15 Q    I want to focus on the multidisciplinary gender clinic.

16 Is that a clinic that you founded?

17 A    It is.

18 Q    And if you could -- I am going to mark as -- actually,

19 there's a notebook up there, Dr. Ladinsky, that's plaintiffs'

20 exhibits.  Do you see that?  There's a lot of notebooks up

21 there.

22 A    I'm guessing it's this one.  Yeah.

23           MS. EAGAN:  Your Honor, may I approach and help her?

24           THE COURT:  Yes.

25 BY MS. EAGAN:

1  Q    Dr. Ladinsky, could you please turn to what's been marked

2  as Plaintiffs' Exhibit 7?

3  A    Yes, ma'am.  Okay.

4  Q    Dr. Ladinsky, is this your curriculum vitae?

5  A    It is.

6  Q    And does your curriculum vitae provide a detailed outline

7  of your background, training, education, and experience?

8  A    It does.

9  Q    All right.  Dr. Ladinsky, are you a board certified

10 physician?

11 A    Yes, I am.

12 Q    In what field?

13 A    In pediatrics, American Board of Pediatrics.

14 Q    All right.  Dr. Ladinsky, let's talk about the gender

15 clinic at UAB hospital.  You said that it is a

16 multidisciplinary gender clinic.  What do you mean by

17 multidisciplinary?

18 A    Indeed it is.  The clinic is held within the pediatric

19 endocrinology space, UAB Children's.  However, an entire team

20 consisting of a pediatric endocrinologist, myself, a primary

21 care pediatric in adolescent medicine, as well as peds to

22 psychologists, social worker, a pediatric and adolescent

23 gynecologist, as well as our chaplain are in that space

24 together and work in an interdisciplinary way to make decisions

25 and deliver the best care at each visit to our patients and

1  families.

2  Q    Dr. Ladinsky, when did the UAB gender clinic open?

3  A    Dr. Latif and I opened our doors in that space in the late

4  fall of 2015.

5  Q    How many gender clinics like UAB's are there in the state

6  of Alabama?

7  A    There are none, to my knowledge.

8  Q    Okay.  Are there any -- are you aware of any such clinics

9  in the state -- adjacent state like of Mississippi?

10  A    There are none.

11  Q    Okay.  About how many gender clinics like yours are there

12  in the country?

13  A    Approximately 55, these team-based clinics that are

14  located in pediatric academic centers.

15  Q    At UAB, have you treated transgender young people with

16  gender dysphoria?

17  A    I have.

18  Q    How many would you estimate?

19  A    Since our clinic's opening, we have touched the lives of

20  some 400 to 450 youth.

21  Q    And from where do your patients come, Dr. Ladinsky?

22  A    Our patients come from every corner of Alabama,

23  Mississippi, the Florida Panhandle, and occasionally the sort

24  of southern border of Tennessee, western border of Georgia.

25  Q    So describe the path of how a pediatric patient ends up at

1  your -- in your care at UAB, please.

2  A    By all means.  So about 80 percent of the patients for

3  whom we provide care were referred to us.

4      This is a multi -- this is a subspecialty referral level

5  of care.  And these youth have been identified by their primary

6  care pediatrician or family doctor in community.  Many have

7  also been seeing a mental health professional in community.

8  They are referred to us.

9      The other 20 percent are youth who we first meet in

10  consultation in the pediatric emergency center inpatient

11  psychiatry or on the inpatient medical floors.  And these are

12  transgender youth who have entered the health care system due

13  to suicide, severe eating disorders, or suicidal ideation.

14  Q    So let's talk -- let's briefly focus on guidelines for the

15  treatment of gender dysphoria and transgender youth.

16  Dr. Ladinsky, are you familiar with the standards that provide

17  guidance for treating physicians for the diagnosis and the

18  treatment of gender dysphoria in youth?

19  A    I am.

20  Q    And please elaborate on that.

21  A    So standards of care by an international body of experts

22  known as WPATH, in addition -- and does touch on -- has many --

23  the revised version has a lot of guidance around pediatrics.

24  Those are standards of care.  The Endocrine Society's

25  guidelines, again, consensus bodies of high-level endocrinology

```
 1  experts, digesting and continually looking at literature to
 2  prescribe the guidelines, all of this is again incorporated
 3  into a policy statement by our organization, the American
 4  Academy of Pediatrics issued in 2018.
 5       So these provide excellent guardrails for the care that we
 6  provide.
 7  Q    These guardrails and policies and procedures that you've
 8  just mentioned, are those endorsed by every major medical
 9  association in the United States?
10  A    Absolutely.
11  Q    Okay.
12  A    Especially those who touch the lives of children.
13  Q    And do those guidelines support the use of puberty
14  blockers and hormone treatments in pediatric -- excuse me -- in
15  adolescents with gender dysphoria?
16  A    They do, with very critical, you know, parameters and
17  diagnoses.
18  Q    Now, you were in here for Dr. Hawkins's testimony this
19  morning?
20  A    Yes, ma'am.
21  Q    And you heard me when I went through and just had her
22  identify numerous of our exhibits that are the various policies
23  for some organizations and procedures, correct?
24  A    That's correct.
25  Q    All right.  I'm going to focus you on one that I did not
```

 1  ask her about, and that is Plaintiffs' Exhibit 32, if you could

 2  please turn to that, Dr. Ladinsky.

 3  A    Okay.

 4  Q    Dr. Ladinsky, what is this document?

 5  A    There is the 2018 American Academy of Pediatrics' policy

 6  statement that provides guidance to pediatricians throughout

 7  the nation.

 8  Q    And does this document endorse the guidelines for care

 9  that y'all follow at UAB?

10  A    It does.

11  Q    And very quickly, what is the American Academy of

12  Pediatrics?

13  A    The American Academy of Pediatrics is a body about 70,000

14  pediatrician members throughout this entire continent that does

15  two things:  It advocates for pediatricians, as well as for

16  policy around the health and welfare of women and children.  It

17  also, through its expert subspecialty teams, is continually

18  vetting the latest, most well-validated and most important

19  research to impact the care of kids issuing guidelines and

20  recommendations along those lines.

21  Q    Are you a member of that academy?

22  A    I am.

23  Q    Is there also an Alabama chapter?

24  A    There is.

25  Q    And are you a member of that, as well?

1  A    Yes, ma'am, I am.

2  Q    All right.  So let's talk about the process that y'all use

3  at UAB, Dr. Ladinsky, for assessing a pediatric patient for

4  gender dysphoria.  Can you walk us through that, please?

5  A    I can.  And remember, patients are going -- it's

6  individualized care based on patients' ages, physical stages,

7  and physiology.

8       However, our -- most of the patients coming to us have

9  been followed longitudinally in community by a mental health

10  professional.  Most have already been diagnosed with gender

11  dysphoria, and together with their pediatricians have elevated

12  a level of dysphoria warranting subspecialty insight.  It's

13  about a six-month wait to be seen.

14      But in that first visit, again, the assessment of mental

15  health dysphoria underlying mental health conditions is made by

16  our psychology team, along with information coming from their

17  psychologist.  And then all of the members of the team meet

18  with youth and family to assess where they are and what levels

19  of dysphoria and concern they manifest in that visit.

20  Q    And then once you have assessed whether they have gender

21  dysphoria and the level of dysphoria, then where do you go from

22  there?

23  A    Well, it is a very robust team.  And there will be a good

24  bit of this focused on support for the family, where are the

25  parents, the household, and what concerns do they have and

 1  share.  There are resources that we provide, and mental health,
 2  if that needs to be escalated.  And then the physical health
 3  for each patient.
 4       We also look at what will be needed going forward and when
 5  we will see them again.
 6  Q    As far as the type of care that is needed, is that
 7  impacted by the age and life stage of a youth with gender
 8  dysphoria?
 9  A    Oh, absolutely.
10  Q    Can you elaborate on that a little bit more, please,
11  ma'am?
12  A    For youth before puberty, our younger and elementary age
13  kids, there is no medical treatment indicated ever for gender
14  dysphoria in that young population.  It's more about how to
15  best address that dysphoria, and making sure that all of the
16  different spaces and places and households where this youth
17  navigates are coming to places of support for them.
18       For youth just into puberty, when immense dysphoria can
19  ratchet up, and we are seeing severe -- we are seeing anxiety,
20  depression, academic decline, grades plummeting, withdrawal,
21  and parents saying, what's -- this is not my child, that's when
22  we talk about what is needed to alleviate that dysphoria.
23       If putting a pause on puberty at that point is medically
24  indicated, as well as mental health, to, you know, to uphold
25  their mental health, and then for our older teens who have

1  manifested, you know, gender dysphoria for a long period of
2  time, along with a lot of support, are they eligible and ready
3  for hormonal therapy.
4      Most of our youth are with us for one to three years
5  before any medical therapy is initiated.
6  Q    Dr. Ladinsky, why is it that the recommended practice is
7  to wait until a child begins puberty before you consider any
8  type of medications for the child?
9  A    That's critically important.  We know there are some youth
10 who may have a gender diverse or gender questioning identity
11 during childhood that may return to align with their sex
12 assigned at birth as puberty happens.  Puberty is a very
13 sentinel event for transgender or youth experiencing gender
14 dysphoria.
15     Youth whose dysphoria is not just present, but increased
16 in severity with the onset of a natal puberty, we know very
17 well that those youth may -- they are most likely to contend
18 with dysphoria life long, and they are most likely to maintain
19 that identity life long, and they may very well merit medical
20 therapy.
21 Q    If -- as far as when a -- sorry.
22     When a patient has been determined that puberty blockers
23 or hormones is appropriate medical treatment for them, what is
24 the interplay of medical health providers at UAB?  Do they
25 continue to stay involved in the adolescent's care?

```
1   A      They do, absolutely.  Oh, goodness, yes.

2   Q      Dr. Ladinsky, do you believe that if you support a child

3   with their gender identity that differs from the birth sex, do

4   you believe that then you're setting them on a path for

5   blockers and for hormones?

6   A      I don't.

7   Q      Can you please explain?

8   A      Our younger youth who manifested gender questioning or

9   transgender identity with significant levels of dysphoria need

10  that robust management in their identity, but they're evaluated

11  at each -- each page and each stage.

12         At each visit, we're always telling our families, we're

13  here for you.  You are not here for us.

14         We always discuss that exit ramps are available at each

15  age, each stage.

16         And then we look at where we are with dysphoria at that

17  point in time.

18  Q      Okay.  So let's first talk about puberty blockers.  Could

19  you just explain to us an overview of what puberty blockers

20  are?

21  A      Sure.  It's a sort of umbrella term for a family of

22  medications known as GnRH agonists.  But what these medications

23  do functionally, especially as they're used in pediatric and

24  adolescent care, is to place a short-term pause on the

25  continued development of the secondary sex characteristics
```

1  aligned with puberty.

2  Q    And how are those generally administered to your patients

3  at UAB?

4  A    So they are administered by injection once every

5  three months.  So that's what we call a depo preparation.

6       That injection needs to be administered by a trained

7  medical professional -- a nurse, a physician assistant.  And

8  that usually once you have reached that point, the medication

9  is usually administered by those personnel in their local

10 pediatric office or space.

11 Q    Okay.  Are puberty blockers used only with transgender

12 youth?

13 A    No, ma'am.

14 Q    What are other reasons that puberty blockers are used in

15 pediatric patients?

16 A    The most common, I believe, is in pediatric endocrinology

17 for a condition called central precocious puberty, or premature

18 puberty, when puberty begins too early.  That affects about one

19 in 5,000 kids.  And they are used in the same way.

20      They've been used for, gosh, over 30 years for that

21 indication with an enviable record of safety and reversibility.

22 Q    And that was my next question, actually.

23 A    Oh, okay.

24 Q    So are puberty blockers considered to be safe for use in

25 pediatric patients?

1  A    Absolutely.  For patients just into initial puberty,

2  absolutely.

3  Q    And are they considered to be reversible?

4  A    They are.  When the medication is stopped, puberty aligned

5  with the natal sex will restart.

6  Q    And when you say the natal sex --

7  A    Uh-huh.

8  Q    -- what do you mean by that?

9  A    Physical puberty in line with their sex assigned at birth.

10 Q    Dr. Ladinsky, what steps are taken at UAB before a

11 transgender adolescent is prescribed puberty blockers?

12 A    There will be, first of all, a robust assessment of the

13 information coming to us from their pediatrician, their mental

14 health provider, and in-depth time spent with their family and

15 them, a physical examination to assess and confirm that Tanner

16 2 staging by our pediatric endocrinologist, as well as the

17 input from everyone on the team.

18 Q    Okay.  And as part -- before an adolescent is prescribed

19 puberty blockers -- let me ask you this:  What are the benefits

20 of puberty blockers for a transgender adolescent with gender

21 dysphoria?

22 A    The benefit is that pause button.  And that just putting a

23 hold on continued physical maturation, aligned with the sex

24 assigned at birth, meaning for a youth whose internal sense of

25 gender is not at all aligned with what that body is doing, that

1   is horrific for some gender dysphoric adolescents, and the

2   improvement in mental health for them by freeing them up from

3   that concern can be transformative.

4   Q    Are there also risks?

5   A    There are risks with any medication.

6   Q    What are some of the recognized risks of puberty blockers?

7   A    There may be weight gain, mood changes.  There may be

8   local reactions at the injection sites, or pain.  And there is

9   a mild, but potential brief kind of decrease in the rate of

10  bone mineral acquisition, or the rate at which the developing

11  bones acquire their strength.

12       That is short lived.  And excellent data show us, though,

13  that long term, when a hormonal puberty fills in and completes,

14  that bone strength will unquestionably approximate youth at

15  that same age and stage.

16  Q    How -- I'm sorry?

17  A    Go ahead.

18  Q    Were you done?

19  A    Oh, yeah.

20  Q    Okay.  Dr. Ladinsky, at UAB, how long do y'all use

21  puberty-blocking medication with your patients?

22  A    We view puberty-blocking medication as a short-term pause.

23  So one or two years for most of our patients.

24  Q    Okay.

25  A    Two and a half at the most.

1  Q    In your practice, have you had occasions with patients

2  where they begin taking puberty blockers and then their gender

3  dysphoria stops and as a teenager they align their gender ID

4  with their birth sex?  Have you had that happen at UAB?

5  A    We have seen two or three patients with that trajectory,

6  yes.

7  Q    Okay.  Would you describe -- how would you describe -- is

8  that rare?

9  A    It's uncommon, yes.

10 Q    Okay.

11 A    But it does underscore the whole point of using that

12 pharmacologic intervention.  It's completely reversible and

13 gives youth time to explore that gender identity.  And really

14 feel if it innately aligns with who they are.

15 Q    So in those rare occasions, those -- that you just

16 described, I mean, what did y'all do?

17 A    The blockers -- they're discontinued.  Puberty aligned

18 with their natal sex fills in.

19      But we ensure that they continue with their ongoing mental

20 health therapy, and make sure that their pediatricians have

21 great communication with us.

22 Q    I hope -- I can't remember if I asked you this or not.  I

23 apologize.

24      You talked about the risks and the benefits.  Before a

25 child goes onto puberty blockers, do you have a discussion with

1   the parents and with the child about those risks?

2   A    We do.  Absolutely.  It's a pretty lengthy discussion.

3   And it's well documented in the medical record.

4   Q    Let's now move to hormone therapy, Dr. Ladinsky.

5   A    Okay.

6   Q    What is that?

7   A    So hormone therapy is a potential pharmacologic initiative

8   or intervention that is undertaken with older adolescents who

9   have manifested gender dysphoria continued over a long period

10  of time.  They have been what we call living in their

11  identified gender, expressing with their name, pronouns, hair,

12  their expression for a long period of time at school, at home.

13  They have also had long-term mental health over time.

14       We request a written letter from their mental health

15  provider attesting to not just their capacity to assent to

16  hormones and to the potential risk-benefit analysis, but as

17  well as a decision that's made by the entire team, as well as

18  lengthy informed consent documents that are reviewed

19  longitudinally and must be signed and agreed upon by any and

20  all parents or guardians with legal custodial medical decision

21  making.

22  Q    Okay.  And I am going to turn to the consent document a

23  little bit.  We have those marked as exhibits.  Before I go

24  there --

25  A    Uh-huh.

1  Q    -- why is it that hormone treatment is beneficial for

2  older teenagers, transgender teenagers with gender dysphoria?

3  A    They are finally at a point where they can further align

4  some of the physical elements of their body with their internal

5  sense of gender.

6  Q    If you could turn to Plaintiffs' Exhibit 41, Dr. Ladinsky,

7  in that notebook.

8  A    Uh-huh.

9  Q    You got it?

10 A    Yes, ma'am.

11 Q    Could you identify for us what Plaintiffs' Exhibit 41 is?

12 A    These are the informed consent documents that are used in

13 our clinic space for the initiation of hormones.

14 Q    I believe there are two different forms here.  If you

15 could just identify what those are, please, ma'am.

16 A    One is Feminizing Medications for Transgender Clients.

17 The other is titled Testosterone for Transgender Clients.

18 Q    How do these forms compare to what is generally used at

19 academic-based clinics like yours, gender clinics?

20 A    They're virtually identical.

21 Q    And how do you use these forms?

22 A    These forms are given to families, as well as kids -- to

23 families and kids as they are getting closer to the time of

24 initiation of hormonal therapy.  So they have a lot of time to

25 review them, read about them, digest them, and share them with

 1   other family members who may not have been present at that
 2   visit.  They have ample opportunity to ask questions and to
 3   make decisions together as a family and as a team.
 4   Q    Okay.  And then once the -- if once they've weighed the
 5   risks and the benefits before starting them, do they actually
 6   sign the forms?
 7   A    They do.  They must be signed in multiple places by all
 8   legal parents and guardians, as well as assent by those kids.
 9   Q    What about a situation where parents are divorced, but
10   both have some level of custody over the child, or joint
11   custody or custodial rights?  How does that work with consent
12   for these treatments?
13   A    If parents are divorced or not together, but they have
14   shared legal medical decision making, both parents must not
15   only sign the forms, but be offered time and space and
16   opportunity to ask questions of us.
17   Q    If both parents do not consent, what happens?
18   A    Hormonal therapy is not initiated.
19   Q    Dr. Ladinsky, what are the hormones that you generally use
20   for these hormone treatments in these older teens?
21   A    For our trans ladies, those assigned male at birth with a
22   female identity, primarily estrogen, which is taken orally.
23   For our trans men, our trans guys assigned female at birth,
24   testosterone.
25   Q    Is testosterone and estrogen prescribed to nontransgender

1  adolescents?

2  A    Absolutely.

3  Q    For what purposes?

4  A    So estrogen is used in pediatric endocrinology for --

5  well, both for genetic and/or metabolic congenital challenges

6  where the body may not produce ample amounts of either hormone.

7  It's quite common in pediatric endocrinology.

8  Q    And what about testosterone?

9  A    The same.

10  Q    And how long has that been the practice, Dr. Ladinsky?

11  A    Decades and decades.

12  Q    Are puberty blockers and testosterone and estrogen you use

13  in your practice, are those FDA approved medications?

14  A    They are FDA approved medications, yes.

15  Q    Okay.  For the -- how they are used in your clinic, is

16  that considered to be what's called an off-label use?

17  A    It is.  And off-label use of medications is very, very

18  common in the medical profession.

19      In fact, the FDA recognizes that its approval gives the

20  medical profession the peace of mind we need, that rigorous

21  safety and efficacy trials have been done in this age group.

22  We have that, along with 35 years of such for GnRH agonists.

23      But the FDA allows physicians clinical judgment and leeway

24  to use medications in similar clinical entities.

25  Q    Okay.  And are there other examples that you can think of,

1  of use of medications that may -- hormones for off-label uses

2  that's a common practice?

3  A    That's quite common in medicine.

4       Estrogen in what we know as a combined birth control pill

5  is used frequently among teenage girls, teenage young ladies to

6  manage acne, to deal with very, very difficult, very, very

7  heavy periods, polycystic ovary syndrome, which can induce

8  that.  Progesterone alone can be used to cease menstrual

9  migraines.  It's very, very common.

10 Q    Dr. Ladinsky, based on your clinical experience, research,

11 clinical experience and research in your field, what is the --

12 let me back up.

13      Let's talk about your clinical experience with your

14 patients.  What have you observed to be the benefit in your

15 parents with the use of hormonal therapy?

16 A    Oh, my gosh.  To see gender dysphoria averted, abated, you

17 will see a radiance, a self-confidence, but most importantly,

18 we see teenagers who have been sullen, withdrawn, failing

19 academically, not interested in the activities and peer groups

20 they used to be in, join the world in ways they hadn't before.

21      Academic prowess soars.  We see graduation.  We see higher

22 education.  But most importantly, we also see youth who

23 manifested severe anxiety and depression sometimes even

24 self-harm and cutting to see that long gone is incredible.

25 Q    In your clinical experience, Dr. Ladinsky, for those

 1  patients of yours who have undergone hormone treatments, either

 2  past patients or present patients, how many of those patients

 3  have expressed regret or retransitioned to their birth sex?

 4  A    In our clinic population, those who have received medical

 5  therapy and gone on, we have seen none.  It doesn't mean it

 6  doesn't happen.  But in our clinic population, none.

 7  Q    Dr. Ladinsky, the use of puberty blockers and hormone

 8  therapy in transgender adolescents and teens with gender

 9  dysphoria, are those experimental treatments?

10  A    Oh, no, ma'am.

11  Q    Are those types of treatments, is that taught to the

12  future doctors in medical schools as recommended care?

13  A    Oh, it is.  It is --

14  Q    Is the -- I'm sorry.  Go ahead.

15  A    Absolutely.  It's part of the standard curriculum in

16  American medical schools per the AAMC since at least 2014.

17  Q    Is the topic of transgender medicine, do you find that on

18  state board exams for doctors?

19  A    You do.  You find it on -- you will find a few questions

20  for students in graduating on their licensure exams, and it

21  will absolutely be on the board certifying exams in several

22  medical specialties.

23  Q    Okay.  I want to move just very briefly to the topic of

24  gender transition-related surgeries.

25       Dr. Ladinsky, are any type of gender transition-related

1  surgeries performed here in the state of Alabama on transgender

2  minors?

3  A    Not to my knowledge.

4  Q    Do the established guidelines for the treatment of gender

5  dysphoria recommend gender transition-related surgeries for

6  minors?

7  A    The established guidelines recommend waiting until the age

8  of legal majority for gender-related surgeries.

9  Q    Okay.  Dr. Ladinsky, you were here again for Dr. Hawkins's

10 testimony this morning, and you heard Mr. Bowdre ask

11 Dr. Hawkins about some reviews and recommendations coming out

12 of the United Kingdom.  Are you familiar are those reviews and

13 recommendations coming out of the UK?

14 A    I am aware of them.  I'm not familiar with them in

15 intimate detail.

16 Q    Why don't you follow those recommendations and reviews

17 more closely?

18 A    Recommendations coming out of the UK and some of the other

19 countries are quite applicable to refining best practices,

20 selecting patients appropriately and judiciously within the

21 health care systems of those nations.

22    The health care system in the United States is very, very

23 different from the United Kingdom.  Our decentralized system of

24 health care allows for those 55 very high level subspecialty

25 pediatric academic settings to evaluate and manage gender

1  dysphoria.

2  Q    And just to make sure it's clear, when you're talking

3  about the system being decentralized and 55 treatment centers,

4  I believe you said the United Kingdom -- were you referring to

5  the United States?

6  A    I meant the United States, yeah.  The United Kingdom has

7  one.

8  Q    Okay.  Dr. Ladinsky, based on your general understanding,

9  what do you know about the efforts to either narrow or expand

10 access to blockers or hormones in the United Kingdom?

11 A    I know that the United Kingdom is not just formally

12 recommending, but working very hard to design and implement

13 wider-spread subspecialty centers of excellence to expand

14 access to that care appropriately.

15 Q    All right.  Dr. Ladinsky, are you familiar -- I will just

16 say you're familiar with SB 184 which was the law, of course,

17 that we are here about today?

18 A    Yes, ma'am, I am.

19 Q    Has the American Academy on Pediatrics taken a position on

20 SB 184?

21 A    They have.

22 Q    Has the Alabama chapter taken a position on SB 184?

23 A    Oh, indeed they have, and both have condemned it.

24 Q    Okay.  And if you could look Plaintiffs' Exhibit 30 in the

25 plaintiffs' exhibits, is that actually the written position

```
 1  statement by the American Academy of Pediatrics and the Alabama

 2  chapter on this law?

 3  A    I'm getting there.  It is.

 4  Q    If you could turn also, Dr. Ladinsky, to Plaintiffs'

 5  Exhibit 31?

 6  A    Okay.

 7  Q    Have other state medical associations' chapters taken a

 8  similar position to the American Academy of Pediatrics opposing

 9  SB 184?

10  A    Absolutely.  This exhibit portrays the formal statement

11  made by the Alabama Psychological Association.  They were also

12  very active with us --

13  Q    Okay.

14  A    -- in, you know, advocating against this bill of the

15  Legislature.  As well, I don't see it here, but the Alabama

16  chapter of the American Academy of Family Practice.

17  Q    Okay.  If you could turn to Plaintiffs' Exhibit 19,

18  please, Dr. Ladinsky.

19  A    Okay.  I think I got it.  There you go.

20  Q    You there?

21  A    I think so.  Yep.

22  Q    Okay.  Dr. Ladinsky, are you familiar with this document,

23  Plaintiffs' Exhibit 19?

24  A    This is the Yale, yes, ma'am.

25  Q    What is this document?
```

1  A    So this document was released very recently by a

2  compendium of three mental health and medical professionals in

3  front line care who provide the same gender care that we do, as

4  well as an attorney, to analyze point by point, aggregate all

5  of the data and evidence in this nation to sort of illustrate

6  and articulate how the evidence-based standard of care

7  practices are contradicted and -- by both the Alabama VCCAP

8  law, as well as the Texas Attorney General's opinion.

9  Q    And you said that there are three mental health care

10 providers.  So were there three other medical doctors,

11 pediatricians, endocrinologists?

12 A    Correct.

13 Q    So six --

14 A    There are six.

15 Q    -- there are scientists, and doctors, and MDs, and Ph.D.s

16 total?

17 A    Six clinicians, scientists, medical providers, and one

18 attorney.

19 Q    Okay.  In this document, do the authors also cite a number

20 of peer-reviewed studies that contradict some of the supports

21 or the principles that the State articulated as the reasons for

22 SB 184?

23 A    They do.  A considerable compendium of them.

24 Q    All right.  Dr. Ladinsky, if SB 184 goes into effect, what

25 impact will that law have on medical providers in Alabama who

1   treat transgender youth?

2   A     For the medical providers, which is myself, my teammates,

3   this will force us into a place of risking a felony conviction

4   for providing evidence-based standard of care medicine, or

5   turning our backs on our Hippocratic Oath and literally doing

6   harm.

7   Q     Dr. Ladinsky, what impact will this law have on

8   transgender youth here in Alabama who suffer from gender

9   dysphoria?

10   A     For those who are not yet receiving medication, but

11   one day live in that hopes of doing so, or of their families

12   knowing that there is care for them, if that becomes needed,

13   you will see an escalation of mental health challenges, and you

14   will see families with levels of stress that are inexplicable

15   and unfair.

16        For youth who are already receiving these medications,

17   this would be an unprecedented ask of us to abruptly stop that

18   care and treatment, which is medically contraindicated,

19   especially in the place with testosterone.  That is a medical

20   contraindication.  No matter the use.  You don't just stop

21   that.  That will take these youth to very dark places.  And we

22   are fully aware of many of those places from which they came.

23        You will have colossal mood swings, mental health decline,

24   the potential for self-harm, and possible suicidality.  This is

25   not even a hypothetical.

1        One year ago, when the Arkansas Legislature enacted this

2   law over the Governor's veto, in the seven days following that

3   override, my counterpart there had five of her youth show up at

4   that emergency room with severe suicide attempts.  The final

5   one, that young man was in an operating room for ten hours with

6   two different teams of surgeons to save his life.

7        We're Alabama.  We're better than this.

8   Q    Thank you, Dr. Ladinsky.

9                         CROSS-EXAMINATION

10  BY MR. LACOUR:

11  Q    Good afternoon, Dr. Ladinsky.  My name is Edmund LaCour.

12  I am here on behalf of the State defendants.

13  A    My pleasure.

14  Q    It sounds like you are strongly opposed to SB 184; is that

15  fair to say?

16  A    It is.

17  Q    Why did you drop your challenge to that law on April 15th,

18  2022?

19  A    Under advisement of counsel, I did so.

20  Q    And -- okay.  Do you still oppose the law even though

21  you're not challenging it?

22  A    Yes, sir.

23  Q    All right.  And do you know who Jeff Walker is?  Jeffrey

24  Walker?

25  A    I do.

1  Q    In full disclosure, I am not asking you to disclose

2  anything that's not already in the public record.  Did you

3  appear on a YouTube video with him on April 8th, 2022, for a

4  livestream press release run by the human rights campaign in

5  response to SB 184?

6  A    I'm not aware of that.

7  Q    All right.

8  A    I would be happy to see it.

9  Q    One moment.  Let me -- we may get to that in a moment.

10  A    Okay.

11  Q    So you were here for Dr. Hawkins's testimony; is that

12  correct?

13  A    I was, yes.

14  Q    She was unable to define sex for us.  Do you recall?  She

15  was asked to define sex and said she was not able to do that?

16  A    I don't recall that.

17  Q    Okay.  Well, would you be able to provide your definition

18  of sex just so we can be working with the same definitions?

19  A    In the context of the youth with whom we're talking about

20  and this law is directed to, we talk about sex assigned at

21  birth, which is a combination of physical attributes when a

22  baby is born, as well as, if needed, what we call the genotype,

23  the genetic makeup of that individual.

24  Q    Okay.

25  A    As far as sex chromosomes, XX/XY.

1  Q    Okay.  And those are not things that can be changed, are

2  they, the genotype?

3  A    No.

4  Q    Okay.  Now, we've talked a little bit today about what's

5  experimental, perhaps.  What would -- in your view, what would

6  you say constitutes experimental medicine?

7  A    In a center such as the one where I practice?

8  Q    Just generally.

9  A    Just generally.  An experimental treatment would be a drug

10  or an -- a medical intervention that is part of a very, very

11  tightly controlled clinical trial, a trial that has been

12  granted, you know, granted a yes or no -- granted the ability

13  to do so by an institutional review board, which strictly

14  upholds the ethical rights of human subjects.  So to us, an

15  experimental treatment is a treatment that is being studied in

16  a very tightly controlled clinical trial.

17  Q    Would one reason you would be studying this type of

18  treatment would be to determine what the risks might be of the

19  treatment course?

20  A    Possibly.  But generally it's more about efficacy.

21  Q    Okay.  But with any drug, right, I mean, there are going

22  to be benefits and there are going to be risks, correct?

23  A    That's a fair statement.

24  Q    And so whether it should be made available or prescribed

25  to someone would turn both on the potential benefits and the

1  potential risks, correct?

2  A    Correct.

3  Q    Would you consider a medical treatment to be well

4  established if its risks are unknown?

5  A    I think there are many, many, many medical treatments that

6  are well established with a long track record of critically

7  studied safety and efficacy, but there may still be long-term

8  effects that are not completely known.

9  Q    Okay.  So there can be well-established treatments with

10  unknown risks?

11  A    I feel there can, yes.  And that's all information that is

12  discussed with -- in my situation as a pediatrician -- parents

13  and families, you know, if that -- if the choice is to consider

14  that medication, yes.

15  Q    Okay.  Now, you submitted a declaration in this case, did

16  you not?

17  A    I did.

18  Q    You didn't cite any research in that declaration, did you?

19  A    That I have personally been a part of?

20  Q    Any studies or research whatsoever in the declaration?

21  A    I don't believe so.

22  Q    Okay.  Did you review any studies or literature reviews or

23  other research in putting together the declaration?

24  A    We're continually doing that.  It's part of our job.

25  Q    Okay.  I think you did reference one study a moment ago

```
 1  when Ms. Eagan was questioning you, the -- from the AAP.  It's
 2  their policy; is that correct?
 3  A    Oh, yeah.  We did touch on that.  It's an exhibit.
 4  Q    Yes.  I think Plaintiffs' Exhibit 32.
 5       Could you turn with me to Defendants' Exhibit 2?
 6  A    Do I have --
 7  Q    Probably --
 8  A    Is that it?
 9  Q    That might be it.  Ours had a blue piece of paper on the
10  front.  So if you see blue --
11  A    It's blue.  Yep.  Defendants' exhibit list.
12  Q    Thank you.
13  A    Which one, sir?  I'm sorry.
14  Q    Number 2.
15  A    Number 2?
16  Q    Yes, ma'am.
17  A    Gotcha.  Okay.
18  Q    So if you will turn to page 100, going by the blue numbers
19  at the very top of the page.
20  A    Okay.
21  Q    Okay.  So are you looking at an article by James Cantor
22  entitled Transgender and Gender Diverse Children and
23  Adolescents, Fact Checking of AAP Policy?
24  A    It appears to be.
25  Q    Great.  And I will put this on the Elmo, as well.
```

1    A     Oh, great.

2    Q     The highlighting is mine.

3    A     Okay.

4    Q     But if you see that first sentence, the American Academy

5    of Pediatrics, AAP, recently published a policy statement

6    entitled Ensuring Comprehensive Care and Support For

7    Transgender and Gender Diverse Children and Adolescents.

8          Is that the same study you were referencing when you were

9    talking to Ms. Eagan?

10   A     Yes, sir, it is.

11   Q     I will continue.  Skipping a couple of lines.

12   A     Okay.

13   Q     Although almost all clinics and professional associations

14   in the world use what's called the watchful waiting approach to

15   helping transgender and gender diverse GD children, the AAP

16   statement rejected that consensus, endorsing only gender

17   affirmation.  That is, where the consensus is to delay any

18   transitions after the onset of puberty, AAP instead rejected

19   waiting before transition.

20         With AAP taking such a dramatic departure from other

21   professional associations, I was immediately curious about what

22   evidence led them to that conclusion.  As I read the works on

23   which they based their policy however, I was pretty surprised,

24   rather alarmed, actually.  These documents simply did not say

25   what AAP claimed they did.  In fact, the references that AAP

```
 1  cited as the basis of their policy instead outright
 2  contradicted that policy, repeatedly endorsing watchful
 3  waiting.
 4       Did I read that correctly?
 5  A    You did.
 6  Q    Are you aware of whether AAP ever responded to this
 7  article?
 8  A    I am not, sir.  I have not seen this before.
 9  Q    Okay.  Now, Dr. Ladinsky, are you aware of Sweden's
10  National Board of Health and Welfare and the statement they put
11  out in February of 2022?
12  A    I am not intimately apprised of that.
13  Q    Okay.  Could we turn to Defendants' Exhibit 11?
14  Specifically to page 3.
15  A    Okay.
16  Q    I will put it up here again.  You see the part that I
17  marked with my pen.  I will represent to you that this is that
18  document from Sweden's National Board of Health and Welfare.
19       It states, For adolescents with gender incongruence, the
20  board deems that the risk of puberty-suppressing treatment with
21  GnRH analogs and gender-affirming hormonal treatment currently
22  outweigh the possible benefits, and that the treatments should
23  be offered only in exceptional cases.
24       Did I read that correctly?
25  A    You did.
```

1   Q     And are you aware of this position out of Sweden?

2   A     I confess that I am not intimately associated with the

3   position statements of other nations.  Their health care

4   systems, as I've said, are very different than ours.

5   Q     Uh-huh.

6   A     But I'm acquainted with ours.

7   Q     So I mean, based on the statement, would you conclude that

8   the Swedish Board of Health and Welfare would deem puberty

9   blockers cross-sex hormones to be well-established treatment

10  for gender dysphoria in youth?

11  A     I could not comment on the truth or falsity of that

12  statement based on what I'm seeing.

13  Q     Thank you.

14        So you said earlier that treatment with puberty blockers

15  and cross-sex hormones for gender dysphoria youth is well

16  established; is that correct?

17  A     Yes.

18  Q     When did it become well established?

19  A     Well, tell me what you -- give me your definition of well

20  established so I can make sure we're --

21  Q     Perhaps --

22  A     -- the same.

23  Q     -- the definition you used earlier.

24  A     Sort of becoming evidence-based guideline-driven standards

25  of care.

1  Q    Sure.

2  A    Okay.  So this work has been done in pediatric academic

3  centers in the U.S. since 2006.  The guidelines issued by the

4  pediatric endocrine societies around, you know, specific to

5  pediatrics really fine tuned what we call the guardrails or the

6  standards of care along with WPATH probably by about 2010.

7  Q    Okay.

8  A    Roughly.

9  Q    Did you hear the discussion earlier about the WPATH

10  guidelines?  And would you say that they are well established

11  when the WPATH guidelines were released, I believe it was 2011

12  or 2012, the current version?

13  A    The current version standards of care.  I think they were,

14  you know, getting to that place, but I'm still -- you know, the

15  term well established is very relative.

16  Q    Would they have been experimental back then?

17  A    No.

18  Q    No.  Okay.

19  A    Okay.

20  Q    But they were established enough even though at the time

21  they found rates of desistance of as high as 80 percent.  Is

22  that your position?

23  A    That 80 percent figure applied to youth before entrance to

24  puberty.  That's my -- that's my recollection of that.

25  Q    You talked about some of the positions AAP has taken,

 1  particularly SB 184.  Do they wade into other potentially

 2  controversial issues sometimes?

 3  A    I'm not aware of what you mean by that.

 4  Q    Are you aware of whether AAP has taken a position as to

 5  whether adolescents should have access to abortion without

 6  having to inform their parents?

 7  A    I am not aware of that.  I do know that the American

 8  Academy of -- the American Academy of Pediatrics absolutely

 9  views itself as a non-political physician association.  And I'm

10  not aware of that stance.

11  Q    Do you think they represent the views of all

12  pediatricians?

13  A    I don't think anyone can represent the views of everybody

14  who's a member of their association or group.  I think they do

15  a phenomenal job in refining and prescribing evidence-based

16  standards of care.

17  Q    So I think you said earlier that you've treated about 450

18  patients for gender dysphoria; is that right?

19  A    I think.

20  Q    Correct me if I'm wrong.

21  A    We've touched the lives of about 400 to 450 patients

22  referred to us or who we've met in the hospital and followed

23  since we opened in 2015.

24        No more than a third of them, though, have received

25  medication relative to gender dysphoria, at least the type that

1  are discussed in SB 184.

2  Q    Okay.  What's the youngest age for which you have

3  prescribed puberty blockers?

4  A    Remember that it is relative to the age at which that

5  youth, with persistent dysphoria, et cetera, is at a physical

6  Tanner 2 staging with definitive entrance to puberty.

7       For someone assigned female at birth, that's going to

8  happen earlier.  And there may be, I think, 11 years, is

9  probably the earliest.

10 Q    Okay.  What percentage of children who you have prescribed

11 and who have taken puberty blockers have gone on to take

12 cross-sex hormones?

13 A    The majority of them.

14 Q    Would you say it's sort of in the 75 percent range, or the

15 90 percent range, or the 50 percent range?

16 A    I'm going to have to estimate for you, and I will tell you

17 why in just a second.  But I would estimate it's more like

18 85 percent.

19      In the state of Alabama, the majority of youth presenting

20 to our clinic, especially in our early years, really having not

21 had the opportunity to take advantage of this and also given

22 some of our more Alabama norms, et cetera, have realized at

23 later ages, or have not had the chance to access this medicine.

24      So the vast majority of our patients initially presented

25 to us as older adolescents.  We now have kind of the first

```
 1  cohort of younger youth who are eligible for blockers and who
 2  are transitioning over.  It's at least 85 percent, if not
 3  higher, considerably, yeah.
 4  Q    That's helpful.
 5            THE COURT:  Mr. LaCour, when you get to a stopping
 6  point, we will take a ten-minute break.
 7            MR. LACOUR:  I will be looking for one, and I will try
 8  to take one shortly, if that's okay.
 9            THE COURT:  All right.
10  BY MR. LACOUR:
11  Q    Has UAB clinic performed double mastectomies on any
12  transgender youth?
13  A    Before the age of legal majority?
14  Q    Correct.
15  A    Absolutely not.
16  Q    Okay.  So and why not?
17  A    It is not -- it is not indicated per the guidelines of our
18  profession that surgical procedures are taken before the age of
19  legal majority.  It is also not covered by the major insurers
20  in the state of Alabama.  But it is the best care for these
21  youth, we feel, in our clinic setting that surgical
22  interventions are not undertaken before the age of legal
23  majority.
24  Q    And why is that?
25  A    Youth must be at a level of maturity.  And their families
```

```
 1   would agree that they need to be at an age where they consent
 2   legally to their own care before a very permanent intervention
 3   is undertaken.
 4        We agree with the guidelines recommendation in waiting
 5   until the age of legal majority.
 6   Q    Because there are potentially permanent and irreparable
 7   harms that could occur from a transition surgery?
 8   A    That's a fair statement.
 9   Q    Are there any potential irreparable harms that could occur
10   from starting a child on puberty blockers and then continuing
11   them on cross-sex hormones?
12   A    There are side effects to any medication regimen, but we
13   do not see these medical initiatives in that way.  They're
14   small side effect risks.
15   Q    What about fertility?
16   A    We don't see them in the same way at all.
17   Q    What about permanent loss of sexual function?
18   A    Great question.  Puberty-blocking medications, when
19   introduced at Tanner Stage 2 and used in a short-term way,
20   there's excellent longitudinal data to bare out that loss of
21   sexual function is not part of the long-term picture.
22   Q    What do you mean by short term?
23   A    One to three years.
24   Q    And you said you had some kids who were taking it for up
25   to two-and-a-half years?
```

1  A    One to three years, yes.

2  Q    What if they then move from puberty blockers to cross-sex

3  hormones?

4  A    Correct.  Then, you know, there are -- we get -- we go

5  from puberty blockers to cross-sex hormones.

6       So they will only go through one puberty.  And their

7  mental health in our estimate, after rigorous, rigorous time

8  and work, will be absolutely enhanced by it.

9       Could there be longer-term risk, potential risks to

10  fertility?  It is possible.  They're mild.  But long

11  discussions are held around this.  The informed consent process

12  is huge.

13  Q    And what about sexual function?  If a child never goes

14  through natural puberty and goes through the puberty of the

15  opposite sex --

16  A    Uh-huh.

17  Q    -- I mean, how does that affect their ability for sexual

18  pleasure, for intimacy, for example?

19  A    We do not see longer term problems with that.  It may not

20  happen in the conventional ways, but there is, you know, the

21  presence of tissue that underscores that, that is not harmed.

22       And, you know, the majority -- all of our youth basically

23  enjoy age-appropriate developmentally healthy relationships

24  because their mental health allows it.  We have not seen

25  long-term problems in this.

1  Q    Is it your position that there is no risk of fertility

2  loss?

3  A    That is not my position.  My position is especially in the

4  use of estrogen for a trans woman, someone assigned male at

5  birth, there is a small risk of, you know, like lessening or

6  possibly impairing future fertility.

7            MR. LACOUR:  I apologize, Your Honor.  If I could have

8  a few more minutes, I think we will be at a stopping point.

9            THE COURT:  I'm not trying to end your cross.  I was

10 just going to take a break and let you continue.  But you

11 define your own stopping point.

12 BY MR. LACOUR:

13 Q    If you would turn to Plaintiffs' Exhibit 41.  I think we

14 talked about this earlier.  This is the informed consent form

15 from your clinic, I believe.  Please confirm that for me.

16 A    I have to get there.  It's all the way at the back.

17      Okay.  41 is -- 41 is not this.  It's Sydney's essay.

18 Q    Plaintiffs' - I think you have the defendants' binder.

19 You can look at the plaintiffs' binder.

20 A    Okay.  I will look at this.  I'm sorry.  I was in the

21 other one.

22      Okay.  I can see it right here.

23 Q    Great.

24 A    Uh-huh.

25 Q    Does this look familiar to you?

1  A     It does.

2  Q     If I represented that this was --

3  A     Yes.

4  Q     -- the informed consent form?

5  A     Uh-huh.

6  Q     Let's look at some of the highlighted portions.

7  A     Yeah.

8  Q     First, I know that my body will make less testosterone,

9  androgen, or male hormone.  This may affect my sex life in

10 different ways and future ability to cause a pregnancy.

11       Did I read that correctly?

12 A     You did.

13 Q     The options for sperm banking have been explained to me?

14 A     Correct.  Yes.

15 Q     Let's go down a couple more lines.

16 A     Okay.

17 Q     I know I may not be able to achieve or maintain an

18 erection for penetrative sex.

19       Finally, I know this treatment may but is not assured to

20 make me permanently unable to make a woman pregnant.

21 A     Correct.

22 Q     So there are risks of infertility from these treatments,

23 is that correct?

24 A     There are, correct.

25 Q     Permanent irreversible damage, correct?

```
 1  A    Correct.  And you see it right there in the informed
 2  consent form.  These are difficult discussions, but they're
 3  lengthy, and they're had over time.
 4  Q    If a natal female who is 17 --
 5  A    Uh-huh.
 6  Q    -- cannot provide informed consent to a mastectomy, how
 7  could a 14-year-old boy who is maybe just beginning puberty
 8  consent to giving up his ability to ever have sexual
 9  intercourse?
10  A    We would not be starting -- in our clinic and in how we do
11  what we do in Alabama, we're not starting these medications on
12  a 14 year old.  But to get to the larger question, which is an
13  excellent one, for the initiation of hormonal therapy,
14  regardless of that patient being 17 or 15, parental informed
15  consent is actually what this form requires legally, and then
16  the youth will assent.
17  Q    Why couldn't a parent consent to her natal female child's
18  double mastectomy?
19  A    I suppose she could if she wanted to, but she would not
20  find that care in my institution.
21  Q    Okay.  Well, how, then, is it that a mother could consent
22  to her natal son, her natal 15-year-old child's potential loss
23  of ability to ever father a child of this person's own?
24  A    So, first of all, you have highlighted the options for
25  sperm banking have been explained to me.  And many of our young
```

 1  ladies do elect that option.  And we help facilitate that care

 2  for them.  So they can bank gametes.

 3      If they one day want that potential to be there and, you

 4  know, realize -- and then we have, you know, significant

 5  discussions about this.

 6  Q    Do you think a child is able to fully comprehend what it

 7  might mean to not have sexual intimacy if that child has never

 8  had sexual intimacy, they've never been through puberty even

 9  because they have been put on puberty blockers?

10  A    I think it's individualized.  But remember that in this

11  nation, and remember that the care that we're giving is a very,

12  very robust risk-benefit analysis.

13      These are some of the risks.  They are not 100 percent

14  guaranteed to happen.

15      And then that has to be weighed with this family, the

16  entire team, mental health, around the gravity of that person's

17  gender dysphoria relative to their incongruence.  That's the

18  decision that's being made in a very longitudinal robust way.

19  It's a risk benefit.

20  Q    You had a 16-year-old girl who came to your clinic, natal

21  female, cisgender, every female in her family has received

22  female circumcision, and she is greatly distressed because she

23  is the only one who is not.

24  A    Uh-huh.

25  Q    She is convinced that receiving this procedure would

1  alleviate these concerns and allow her to fit in better with

2  her family and her peers.  Could she consent to that procedure?

3  A    In the United States, no.

4  Q    Through a medical ethical sense, could she provide

5  informed consent to that procedure?

6  A    She could only provide informed assent.  Youth under the

7  age of legal majority for any surgical procedure in the United

8  States requires the consent of their parents or legal

9  guardians.

10  Q    If the parents were also on board with this procedure from

11  a medical ethical perspective, could that consent be provided

12  for female genital circumcision?

13  A    Regardless of whether the consent was provided or not,

14  that procedure in the United States is contrary to the

15  standards of care for pediatric surgeons, or urologists, or

16  plastic surgeons.  That procedure is not performed in this

17  nation.

18       It is judged that the harm outweighs the benefit.  And

19  that is how the American system, the American surgical

20  associations have judged it.

21  Q    It's also how the federal government has judged it,

22  correct?

23  A    I'm not informed on the federal government's stance to

24  female genital mutilation.  I'm sorry.

25  Q    Are you aware have any states have banned the procedure?

1  A    I'm sorry.  What?

2  Q    Are you aware of whether any states have banned that

3  procedure?

4  A    I am not.  I would believe it's banned throughout the

5  United States.  It's not standard-of-care medicine.

6  Q    All right.

7         MR. LACOUR:  I think this is a good stopping point,

8  Your Honor.

9         THE COURT:  Excellent.  All right.  Let's take a

10  ten-minute break.

11         (Recess.)

12         THE COURT:  Let's pick back up.  Where are we on time?

13         MR. LACOUR:  I will probably be done in about

14  ten minutes.

15         THE COURT:  Okay.

16  BY MR. LACOUR:

17  Q    Thank you, Dr. Ladinsky, for being back with us.

18  A    Of course.

19  Q    So I wanted to touch very briefly on something you

20  discussed with my colleague from the other side.

21      If you could turn to Defendants' Exhibit 1, it's in the

22  defense booklet.

23  A    In your booklet, correct?

24  Q    Yes.

25  A    Okay.

1  Q    Or if you would like to wait, I can put it on the big

2  screen for you.

3  A    Can we do both?  SB 184, correct?

4  Q    Yes.  Specifically, page 6, Section 4(a).

5  A    Section 4(a).

6  Q    Yes.  And let me explain why we're turning here.

7  A    Sure.

8  Q    You stated earlier that if SB 184 went into effect, then

9  youth who are on testosterone would have to stop immediately.

10  Is that your understanding of the law?

11  A    That is my read from Section 4, number 1, testosterone is

12  administered by injection.  So...

13  Q    So can I draw you to some language in 4(a) that I

14  underlined here, where it says paraphrasing a little, but --

15  A    Okay.

16  Q    -- for the purpose of attempting to alter the appearance

17  or affirm the minor's perception of his or her appearance -- of

18  his or her gender or sex, if that appearance or perception is

19  inconsistent with the minor's sex as defined in this Act.

20  A    Okay.

21  Q    So, Dr. Ladinsky, if you were tapering one of your

22  patients off of testosterone, would that be for the purpose of

23  attempting to alter the appearance or affirm the minor's

24  perception?  Or would that be for a different purpose?

25  A    I'm assuming that -- are you assuming that the

1  testosterone is being prescribed to address gender dysphoria?

2  Q    If it had been prescribed to address gender dysphoria --

3  A    Uh-huh.

4  Q    -- but that course of treatment can no longer continue,

5  and you were then trying to responsibly taper the patient off

6  of the testosterone?

7  A    Okay.

8  Q    Would that be for the purpose of attempting to alter the

9  appearance, or would that be for a different purpose?

10 A    It was initiated for the purpose described in the law, so

11 I would assume that administering the medication would thus be

12 against the law.

13 Q    Thank you.

14      So I mentioned earlier a livestreaming press conference

15 from April 8th, 2022, the day the law went into effect.  And

16 you said you did not recall being a part of this human rights

17 campaign organized press conference from just a month ago?

18 A    I don't recall being part of a press conference, no, sir.

19 Q    Do you recall being part of any sort of livestreaming

20 event or videoconference call with the human rights campaign

21 with attorneys from the National Center for Lesbian Rights or

22 with Mr. Jeff Walker?

23 A    I don't.

24      MR. LACOUR:  Your Honor, at this time, I would like to

25 admit Defendants' Exhibit 42.  It's not on our list, but it is

1  a YouTube video of this press conference.

2       I believe it will show, Dr. Ladinsky, at this -- whether

3  you define as a press conference, a livestream event.  I'd like

4  to just confirm that this is her and that it's Jeff Walker.

5            THE COURT:  Any objection?

6            MS. EAGAN:  I haven't seen the video, but I don't

7  think so, Judge.

8            THE COURT:  All right.  It will be admitted.

9            MR. LACOUR:  It will be short.

10  BY MR. LACOUR:

11  Q    So, Dr. Ladinsky, does that appear to be you?

12  A    That is a not flattering picture of me.

13  Q    None of us have loved the Zoom age.

14            MR. LACOUR:  Christopher, if you could hit play.

15            (Whereupon, Defendants' Exhibit 42 was played in open

16       court.)

17  BY MR. LACOUR:

18  Q    Does that refresh your recollection?

19  A    It does.  I'm not sure -- I don't recall it being --

20  anyway.

21  Q    Sometime earlier this year?

22  A    Evidently.

23  Q    Okay.

24  A    Ooh.

25  Q    Unplug for now.

```
1    A    Yeah.  Thank you.  Thank you.

2    Q    I apologize for that.

3    A    No apologies needed.  That was me.

4    Q    So you do know Jeff Walker, correct?

5    A    I do.

6    Q    Okay.  And are you aware that he filed a lawsuit around

7    the same time that you did challenging SB 184?

8    A    I believe so.

9    Q    Do you know why he dropped his lawsuit around the same

10   time you dropped your lawsuit on April 15th?

11   A    I do not.  And I have not spoken with him in a very long

12   time.

13   Q    Okay.  After you dropped your lawsuit, did you recruit any

14   patients, colleagues, or doctors to join the present lawsuit?

15   A    No.  How do you mean recruit?

16   Q    Did you reach out to any of them and suggest that they

17   should file suit instead of you?

18   A    No.

19   Q    I will represent to you that yesterday your attorney,

20   Mr. Doss, stated that the four patient plaintiffs in this case

21   are patients of yours or have been treated by you at some

22   point.  Is that accurate?

23   A    One of them, I believe, is on a wait list to be seen.

24   Q    Okay.

25   A    The others I do believe so.
```

1   Q      Okay.  Thank you.

2          Changing gears just a little?

3   A      Sure.

4   Q      Back to the science.

5          What is a normal testosterone range for a 12-year-old boy?

6   A      It depends where that boy is in puberty.

7   Q      Uh-huh.

8   A      Some are at the very, very beginning.  Some have not even

9   entered.  And then there are other 12 year olds who may be well

10  into puberty.  So that would be hard for me to actually say.

11  Q      A boy who's entered puberty, what would be the normal

12  range for him?

13  A      I have to say I am not a pediatric endocrinologist.  And I

14  am not encyclopedic as to normals.  I would know exactly where

15  to find it.

16  Q      Okay.  I think you discussed earlier there are some natal

17  males who suffer from testosterone deficiencies; is that

18  correct?

19  A      That can be, yes.

20  Q      Okay.  And would you prescribe a boy suffering from that

21  condition testosterone if it would bring his levels up to a

22  normal range?

23  A      That -- so youth with this myriad of clinical challenges,

24  or, for example, side effects secondary to medications they

25  took for or for chronic illnesses, like inflammatory bowel

1  disease, Crohn's, or cancer, that work would be undertaken by

2  our pediatric endocrinology team.  I, as a general

3  pediatrician, would absolutely refer that youth there if he was

4  not already being seen by them.

5  Q    Okay.  With the understanding he would likely receive

6  testosterone to bring his levels up to the levels of a normal

7  boy?

8  A    They would undertake the initiation of that as their

9  clinical practice dictates.

10  Q    Okay.  If --

11  A    That is what they do.

12  Q    If there was a second boy who came to with you normal

13  levels of testosterone who wanted the same dose as that first

14  boy for purposes of raising his testosterone to abnormal levels

15  because he's in body building and feels his muscles are too

16  small, would you send that kid to the pediatric endocrinologist

17  for the purpose of obtaining testosterone treatment?

18  A    That would not be an indication for referral.  And, in

19  fact, that would be un -- I mean, that would be an unideal use

20  of that medication, not be clinically indicated.

21  Q    That would be a different treatment altogether, wouldn't

22  it?

23  A    It would.

24      Now, if a parent demanded to see the endocrinologist for

25  such, as a primary care physician, I would say, I will -- I

1  will order that referral and allow you that consultation.

2  Q    Okay.  And similarly, using puberty blockers to treat

3  precocious puberty --

4  A    Uh-huh.

5  Q    -- is also a different treatment than using puberty

6  blockers to treat gender dysphoria, correct?

7  A    Well, it's the same treatment given to youth.

8  Q    How -- sorry.  Go ahead.

9  A    It's the same treatment that is given to youth at similar

10  physiologic ages.  However, the clinical entity for which it is

11  being initiated is different.

12  Q    I thought -- I mean, isn't it true that some children are

13  started on puberty blockers because they're starting puberty

14  around age four or five, if they are -- if they're suffering

15  from precocious puberty?

16  A    That would be, if they met the, you know, endocrinologic

17  indications, yes.

18  Q    So it's a very different treatment to prescribe a child

19  suffering from precocious puberty a puberty blocker to move

20  them into the normal range for beginning puberty than it is to

21  prescribe a puberty blocker to a child who's starting puberty

22  at the normal age and push him to a later age than normal for

23  puberty; is that right?

24  A    When both scenarios, center precocious puberty and

25  significant gender dysphoria, both of your theoretical youth

```
 1   would be at roughly a Tanner Stage 2 physiology.  And they
 2   would both have medical indications for that pause button.
 3   Q    All right.  And you discussed earlier the importance of
 4   parental rights, correct, or parental input in the process of
 5   informed consent and ensuring that these children are able to
 6   properly balance the risks and the benefits of puberty blockers
 7   and cross-sex hormones, correct?
 8   A    I did.  Yes, that's correct, sure.
 9   Q    Now, your gender clinic also has social workers, correct?
10   A    Correct.
11   Q    What role do they play?
12   A    Social workers, the biggest role they play is in working
13   with not just the youth and family around the supports that
14   they may need and helping them align with resources throughout
15   the state and in their community for support when raising a
16   transgender or gender dysphoric youth.
17   Q    Okay.
18   A    And all the administrative things that they do.
19   Q    Have your social workers ever worked with a child to
20   terminate a legal guardianship relationship between the child
21   and his or her guardian?
22   A    In our clinic setting, no.
23   Q    Dr. Abdul Latif works with you, correct?
24   A    Correct.
25   Q    Did you participate with him on September 14th, 2021, in
```

1  on online program for the American Medical Women's Association?

2  A    That was -- within our institution at UAB?

3  Q    Yes.

4  A    Yes.

5  Q    Do you recall him -- do you recall him recounting how

6  there are children who are transgender who do not have

7  supportive parents who start communicating more with our social

8  workers trying to find what is a path for them to go?  One of

9  them was actually very successful that the child made a case of

10 changing who their guardian is and ended up coming to the

11 clinic because of their child's advocacy?

12 A    I recall that, and I recall that very unique case.  That

13 was the case of a young teen who actually was in a very abusive

14 relationship within his family.  I mean, he was -- if I recall,

15 under -- he was the victim of physical abuse in that household.

16      He himself contacted our social worker at the time via

17 e-mail to dialogue and to understand what supports might be

18 available to him.  As time went on, if I believe, and the abuse

19 worsened, for I'm certain reasons that transcend this youth's

20 gender identity and dysphoria, custody of the young man was

21 awarded to an older sister who, as I recall, was over the age

22 of 21.

23 Q    Okay.  And then it was with his sister's consent that he

24 was able to begin these treatments?

25 A    I believe so.

1  Q      Okay.

2  A      But there was a -- I mean, there were years in between.

3  Q      Okay.  Is that the only circumstance you can remember

4  where a social worker helped to have a legal guardianship

5  terminated and then the clinic treated that patient?

6  A      That's the only situation I'm aware of.  But I'm not sure,

7  sir, to what extent.

8         Our social worker actually -- and I would beg to differ

9  with the term facilitated because such reassignments is under

10 the purview of the Alabama Department of Human Resources.

11 Social workers don't have that power.

12 Q      Okay.  Thank you.

13        And once again, you are not a plaintiff in this case?

14 A      Correct.

15 Q      So you are not seeking injunctive relief?

16 A      That's correct.

17 Q      Okay.  And if injunctive relief is not extended -- is

18 extended only to the plaintiffs in this case, is it your

19 understanding that would apply to you, as well, and you would

20 be able to continue to prescribe these medicines?

21 A      I'm sorry.  Can you define injunctive relief?

22 Q      Basically, the plaintiffs in this case are asking the

23 Court to order the defendants not to enforce the law against

24 them.  You are not asking the Court to not enforce the law

25 against you, though, correct?

1  A    I believe that the plaintiffs are asking the Court to keep
2  the law from going into effect.  That was my understanding.
3  Q    Okay.  All right.
4           MR. LACOUR:  I think that might be it for me,
5  Dr. Ladinsky.  Thank you for your time.
6           THE WITNESS:  Oh, my goodness.  Thank you very much.
7           MS. EAGAN:  No questions, Your Honor.
8           THE COURT:  All right.  All right.  May the witness
9  step down?
10      All right.  Thank you.
11           THE WITNESS:  Of course.  Thank you, sir.
12           THE COURT:  Are we ready for the minor witness?
13           MR. DOSS:  Yes.  We will call Megan Poe, Your Honor.
14           THE COURT:  Ladies and gentlemen, at this time, the
15  parties have an agreement that this testimony would be heard in
16  camera, which would mean only the attorneys and myself.  And
17  for the reasons that were put forward in the motions to proceed
18  under pseudonym, I have granted that agreement.
19      So at this time, I'd ask everyone please to step out into
20  the hall.  And then the marshals will let you know when you can
21  come back in.
22      Thank you.
23           (In camera:)
24           **(THE FOLLOWING PORTION OF THE RECORD IS FILED UNDER SEAL**
25      **AT THE DIRECTION OF THE COURT)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9            (End of in-camera examination.)
10            (Recess.)
11            THE COURT:  All right.  Did I hear 15 or 20 minutes?
12            MR. DOSS:  That is my aim, Your Honor.
13            THE COURT:  All right.  Let's proceed.
14            MR. DOSS:  Your Honor, plaintiffs call Pastor Paul
15  Eknes-Tucker.
16                        PAUL EKNES-TUCKER,
17  having been first duly sworn by the courtroom deputy clerk, was
18  examined and testified as follows:
19                        DIRECT EXAMINATION
20  BY MR. DOSS:
21  Q    Would you mind stating your name for the record, please,
22  sir?
23  A    Paul Eknes-Tucker.
24  Q    What's your occupation?
25  A    I am pastor of Pilgrim Church in Birmingham.
```

1   Q     And sometimes people all you Pastor Paul?

2   A     They call me Pastor Paul, yeah.

3   Q     How long have you been a pastor at Pilgrim Church?

4   A     Seven years.

5   Q     What kind of church is it?

6   A     It's part of the United Church of Christ denomination.

7   Q     For how long have you been a pastor?

8   A     I've been a pastor for 45 years.

9   Q     Did you grow up in Alabama?

10  A     I was born in Alabama, grew up here until I finished

11  college at Birmingham-Southern.

12  Q     Did you obtain any education after Birmingham-Southern?

13  A     Moved to Atlanta to go to seminar at Candler School of

14  Theology at Emory University.

15  Q     Have you always been with United Church of Christ?

16  A     No.  I started out as a United Methodist.  That's my birth

17  denomination.

18  Q     All right.  And were you always United Methodist before

19  you became United Church of Christ?

20  A     No.  I was part of the Metropolitan Community Churches for

21  the interim part between those two.

22  Q     Over the course of your 40-plus year career as a pastor,

23  have you had occasions where parents have come to talk to you

24  about their child who is transgender?

25  A     In every congregation I have served in those -- the last

1   40 of the 45 years, there has been either persons in my

2   congregation that were transgender, or people in the community

3   I served at that sought me out about issues around their

4   transgender children or relatives.

5   Q    And those sorts of circumstances when folks are coming to

6   you to talk to you about their transgender children, what kind

7   of concerns are the parents voicing to you?

8   A    All kinds of things.  Primarily, there would be religious

9   issues.  Often parents felt they could not talk to their

10  pastors of their home churches because they weren't sure

11  exactly how to -- this would play in their home churches, how

12  they would feel about their child identifying this way.

13          THE COURT:  Mr. LaCour, just to give you fair notice,

14  I am likely to ask you the same question at the conclusion of

15  his testimony that I asked at the conclusion of Dr. Koe.

16          MR. DOSS:  Thank you, Your Honor.

17  BY MR. DOSS:

18  Q    When parents come to you about these issues, Pastor Paul,

19  what kind of advice do you give them?

20  A    I try to talk about their questions, particularly around

21  religious issues.  Those are the things I feel like I can talk

22  about.  And then I try to connect them to resources in the

23  community to whatever kinds of things they are looking to find,

24  we try make sure they can get those resources.

25  Q    Those resources sometimes include medical help?

1  A     They do.

2  Q     In the past, Pastor Paul, have you helped connect parents

3  with transgender minors to doctors who provide gender-affirming

4  care for patients?

5  A     I have.

6  Q     And generally speaking, do you understand that

7  gender-affirming care for minors can include, for example,

8  puberty blockers and hormone treatments?

9  A     Yes.

10  Q     Are you familiar with UAB's gender clinic for children?

11  A     I am.

12  Q     And since becoming aware of the UAB gender clinic, if you

13  had a parent come to you telling you I have a transgender

14  minor, would you consider recommending to that parent that the

15  parent take the kid to that clinic?

16  A     I would.

17  Q     Having seen the law that we're here about today, do you

18  have concerns that doing what you just described would run

19  afoul of that law?

20  A     I do.  Having read the part that says that anyone who is

21  accused of having a cause for connecting someone with a medical

22  professional could be criminalized through this law.  And that

23  could include someone like me.

24  Q     Have you had an occasion over your years of being a pastor

25  to see kids who have been transgender and have received medical

1  help and who have flourished?

2  A    Yes.

3  Q    Are you aware of other clergy in the state of Alabama who

4  share your concerns that you have expressed to me today about

5  this particular law?

6  A    Yes.  In fact, after I was contacted to be a part of this

7  case, I told other clergy friends and colleagues in Birmingham

8  area, and word began to spread.  And we created a letter for

9  other clergy to sign on to about this issue, about supporting

10  families with transgender members.  And as of today, there are

11  over 80 clergy from across Alabama who, if I couldn't have been

12  here today, would have been willing to step into my place.

13          MR. DOSS:  One moment, Your Honor.

14      All right.  I appreciate your time here today, Pastor

15  Paul.  Attorneys for the State defendants may have some

16  questions for you now.

17          THE WITNESS:  Thank you.

18                      CROSS-EXAMINATION

19  BY MR. MILLS:

20  Q    Good afternoon, Pastor.

21  A    Good afternoon.

22  Q    My name is Christopher Mills, and I represent the State

23  defendants.  I thank you for being here today.

24      Could an individual obtain from you a puberty blocker

25  medication?

```
 1   A      No.

 2   Q      Could they obtain a cross-sex hormone?

 3   A      No.

 4   Q      Could they obtain a surgery for gender transition

 5   purposes?

 6   A      No.

 7   Q      Have you advised minors or their parents that a minor

 8   should submit to any of those specific procedures?

 9   A      No.

10   Q      Have you advised minors or their parents that their

11   religion requires them to submit to any of those specific

12   procedures?

13   A      No.

14   Q      Your medical advice is limited to suggesting that those

15   you counsel seek professional help; is that right?

16   A      I don't give medical advice.  I try to connect folks to

17   where the resources are.

18   Q      You mentioned just a minute ago, when I was contacted

19   before this lawsuit.  What did you mean?

20   A      When the attorneys asked me if I would be interested in

21   being a part of this lawsuit.

22   Q      And when did that happen?

23   A      The Monday after Easter.

24   Q      That was April 18th; is that right?

25   A      That sounds right.  I think so.
```

1 Q    And before you were contacted by the attorneys, had you

2 considered filing a lawsuit against this law?

3 A    I was not sure how in the world to be -- to make a

4 difference.  So this was a great opportunity that I felt

5 honored to be a part of.

6 Q    Before you were contacted by them, you didn't think the

7 law criminalized your ministry, did you?

8 A    I didn't know.

9 Q    And when the attorneys called you, what did they say?

10         MR. DOSS:  Your Honor, I am going to object, to the

11 extent this calls for privileged communications between counsel

12 and him.  It is privileged, attorney-client communication.

13         MR. MILLS:  Your Honor, there was no attorney-client

14 relationship at this point.

15         MR. DOSS:  Communications in anticipation of creating

16 that relationship.

17     For example, if I go meet with an attorney and discuss

18 generally my problems, that can include privileged

19 communications.

20         MR. MILLS:  But this client wasn't seeking an

21 attorney.  The attorneys contacted him.

22         THE COURT:  From what I have heard right now, we have

23 got privilege.  If you want to voir dire him some more and see,

24 but from what I see, we have got privilege.

25         MR. MILLS:  That's fine, Your Honor.  I will move on.

```
 1   BY MR. MILLS:
 2   Q    So after they contacted you, you agreed to become a
 3   plaintiff in this lawsuit; is that right?
 4   A    Yes.
 5              MR. MILLS:  Thank you.  No further questions.
 6              THE WITNESS:  Thank you.
 7              MR. DOSS:  Nothing further, Your Honor.
 8              THE COURT:  All right.  And does that conclude your
 9   witnesses?
10              MR. DOSS:  It does, Your Honor.
11              THE COURT:  The United States has a witness; is that
12   correct?
13              MR. CHEEK:  Your Honor, if I may.
14              THE COURT:  Uh-huh.
15              MR. CHEEK:  Throughout today, we have been trying to
16   streamline our presentation.  And so we may not have a witness.
17   We just need to go over the evidence from today and confer with
18   our group, if that's okay, and then make that determination.
19   So...
20              THE COURT:  If you are telling me you are speeding my
21   trial up, that's always going to be okay.
22              MR. CHEEK:  Can we have at least 30 minutes, or do we
23   want to...
24              THE COURT:  Is that a decision you just want to make
25   in the morning?
```

 1          MR. CHEEK:  That's fine with us.  Whatever the Court
 2   prefers, obviously.
 3          THE COURT:  And y'all correct me if I am wrong.  It
 4   does seem like we're back on track with time.  Everybody agree
 5   with that?
 6       You know, if I take 30 minutes and then you say, no, we've
 7   waited here 30 minutes.  If I take 30 minutes, and then we do
 8   call a witness, then we're here at 6:00 o'clock.  I'd say it's
 9   a better use of everybody's time.
10       We'll call it a day today.  Come back at 9:00 o'clock in
11   the morning.
12       I appreciate what you have said, and that will give you
13   plenty of time to make your mind up.
14          MR. CHEEK:  Thank you, Your Honor.
15          THE COURT:  So I know we have had just up and down and
16   off and on air conditioning today.  And so Judge Thompson has
17   graciously offered to let us use his courtroom tomorrow.  On
18   the off chance that GSA gets this normalized by 8:00 o'clock in
19   the morning, we will come back here.  If they don't, we are
20   going to go to 68-degree air and not have to suffer anymore.
21       So stand by, and I'm sure that my courtroom deputy will
22   find a way to get the word out if we decide to change things in
23   the morning.
24          MR. CHEEK:  That is a welcome change.
25          MR. DAVIS:  May I ask one thing?

1            THE COURT:  Absolutely.

2            MR. DAVIS:  If the United States does not call a

3  witness, we are certainly prepared to begin with Dr. Cantor at

4  9:00 in the morning.  I do not know that he will last all

5  morning.  He very well may.  I think probably would.

6      If he doesn't, our next witness, I do not expect to be

7  here before about 12:30.  We had anticipated it would be later

8  in the afternoon.

9      She's driving.  She is the individual, Sydney Wright, who

10  detransitioned.  She's driving from her home near the Georgia

11  line.  I don't think I could get her here any earlier.

12      I'm asking the Court if it would be okay if there happens

13  to be a gap between Cantor and this next witness of -- it

14  should not be long.

15            THE COURT:  How long a witness do you think that your

16  last witness would be?

17            MR. DAVIS:  I think my direct will be probably about a

18  half an hour.

19            THE COURT:  Okay.  So, yeah, if you -- if we're

20  leaving room for the United States in the event they do have a

21  witness, and then your first witness, I think that probably

22  works out about right, and we're still finished by 1:30 or 2:00

23  o'clock.

24            MR. DAVIS:  It sounds like if the United States does

25  call a witness, there is zero risk -- we are great with time

1  with both of our witnesses going tomorrow.

2       If the United States does not call a witness, when Cantor

3  finishes, our second witness may not be here, but it won't be

4  long before she does arrive.

5            THE COURT:  That's okay.  We can always slide lunch up

6  a little bit if we need to.

7            MR. DAVIS:  We appreciate the courtesy.

8            THE COURT:  Absolutely.

9       Any other procedural matters we ought to take up today in

10  anticipation of tomorrow?

11            MS. EAGAN:  No, Your Honor.

12            THE COURT:  Okay.  All right.  Excellent.

13       Well, then, I will see everybody at 9:00 o'clock again in

14  the morning.

15       We will make the decision early about moving courtrooms.

16  We won't make that decision at 8:59.

17       All right.  Anyway, thank you.  Have a good day.

18            (Whereupon, the above proceedings were concluded at

19       4:50 p.m.)

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Christina K Decker_                    05-08-2022

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255