```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF ALABAMA
 2                          NORTHERN DIVISION

 3

 4      REV. PAUL A. EKNES-TUCKER,    *
        et al.,                       *
 5                                    *
                 Plaintiffs,          *   2:22-cv-00184-LCB
 6                                    *   May 6, 2022
        vs.                           *   Montgomery, Alabama
 7                                    *   9:00 a.m.
        KAY IVEY, in her official     *
 8      capacity as Governor of the   *
        State of Alabama, et al.,     *
 9               Defendant.           *
        *****************************
10

11

12            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                                VOLUME II
13             BEFORE THE HONORABLE LILES C. BURKE
                     UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19

20

21

22
        Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
23      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
          and Procedures Vol. VI, Chapter III, D.2.  Transcript
24                 produced by computerized stenotype.

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                          APPEARANCES

 2
            FOR THE PLAINTIFFS:
 3          Melody Eagan, Esq.
            Jeff Doss, Esq.
 4          Amie Vague, Esq.
            LIGHTFOOT, FRANKLIN & WHITE, LLC
 5          The Clark Building
            400 20th Street North
 6          Birmingham, Alabama 35203

 7          Brent Ray, Esq.
            KING & SPALDING
 8          353 N. Clark Street
            12th Floor
 9          Chicago, Illinois 60654

10          Michael Shortnacy, Esq.
            KING & SPALDING
11          633 W. Fifth Street
            Suite 1600
12          Los Angeles, California 90071

13          Jason R. Cheek, Esq.
            US ATTORNEYS OFFICE, NDAL
14          1801 Fourth Avenue North
            Birmingham, Alabama 35203
15
            John Michael Powers, Esq.
16          Coty Montag, Esq.
            DOJ-Crt
17          Civil Rights Division
            950 Pennsylvania Avenue
18          Washington, DC  20530

19

20          FOR THE DEFENDANT:
            James W. Davis, Esq.
21          Edmund LaCour, Esq.
            Barrett Bowdre, Esq.
22          Benjamin Seiss, Esq.
            Christopher Mills, Esq.
23          OFFICE OF THE ATTORNEY GENERAL
            501 Washington Avenue
24          P.O. Box 300152
            Montgomery, Alabama 36130-0152
25          (334) 242-7300
```

COURTROOM DEPUTY:  Deena Harris


COURT REPORTER:  Christina K. Decker, RMR, CRR

1                              <u>I N D E X</u>

2

3    ARMAND ANTOMMARIA                                     213
     DIRECT EXAMINATION                                    213
4    BY MR. POWERS
     CROSS-EXAMINATION                                     225
5    BY MR. BOWDRE

6
     JAMES CANTOR, MD                                      253
7    DIRECT EXAMINATION                                    253
     BY MR. DAVIS
8    CROSS-EXAMINATION                                     305
     BY MS. EAGAN
9    REDIRECT EXAMINATION                                  332
     BY MR. DAVIS

10

11   SYDNEY WRIGHT                                         337
     DIRECT EXAMINATION                                    338
12   BY MR. DAVIS
     CROSS-EXAMINATION                                     355
13   BY MR. DOSS
     REDIRECT EXAMINATION                                  362
14   BY MR. DAVIS

15

16

17

18

19

20

21

22

23

24

25

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    **P R O C E E D I N G S**

2              (In open court.)

3         THE COURT:  Good morning.  Please be seated.

4         All right.  I am going to aim my question at you,

09:08:27  5   Mr. LaCour.

6         You heard the testimony of Pastor Eknes-Tucker.  What, if

7    anything, in his testimony would trip the Alabama statute?

8         MR. LACOUR:  Your Honor, we don't think anything in

9    his testimony would trip the statute, as you said.  The key

09:08:45 10   language is does he engage in or causing the prescription or

11   administration of puberty blockers?  Is he engaging or causing

12   the prescription or administration of the cross-sex hormones?

13        Clearly, he is not under the plain text of the statute, so

14   we don't think he has standing, which I think is probably good

09:09:06 15   news and bad news for him.  But the good news is he is not

16   going to be prosecuted.  The bad news is he doesn't get to --

17   in his words -- make a difference by continuing in this case.

18        But that's the State's answer.

19        THE COURT:  All right.  Since he has addressed

09:09:23 20   standing, anybody want to touch on that from the plaintiffs'

21   side?

22        MR. DOSS:  Yes, Your Honor.

23        Our concern remains that under this Act's language, it

24   does capture speech for referrals, for actions by people who

09:09:42 25   are counseling patients, or people who are counseling anyone to

put them in touch with medical providers knowing full well what
those medical provisions may or may not be.

     I think this does also feed into the void for vagueness
argument, Your Honor, because the State is making these
post-hoc decisions about when the statute does apply, despite
its plain language and when it does not apply.

     So we still think that the statute on its face is
triggered.  We appreciate the State's statement on the record
that it doesn't think that the statute is triggered.

     On the other hand, it shows just how vague the statute is,
that we can't know just by reading it, which violates the Fifth
Amendment rights' notice.

          THE COURT:  All right.  One other thing that I will
put the parties on notice about when we get to closings.

     So I assume everybody has read the Arkansas order and
transcript.  Would that be a correct statement?

     All right.  So I would like everybody to be able to
address at the conclusion of these proceedings what parts of
that order, if any, that they disagree with, why, and to what
degree those -- that legal reasoning is applicable here.  And I
know that we do have some differences in that statute.

     So just put that in your back pocket, and let's be
prepared to talk about that.

     Okay.  So I understand the United States has a witness
this morning; is that correct?

| | |
|---|---|
| 1 | MR. POWERS:  Yes, Your Honor. |
| 2 | Before we get started, I have a quick bit of housekeeping. |
| 3 | The United States moves to admit United States Exhibit Numbers |
| 4 | 1 through 12. |
| 09:11:36 5 | MR. BOWDRE:  No objection, Your Honor. |
| 6 | THE COURT:  Be admitted. |
| 7 | MR. POWERS:  Thank you.  Now, the United States would |
| 8 | like to call Dr. Armand Antommaria to the stand. |
| 9 | THE COURT:  All right. |
| 09:11:47 10 | ARMAND ANTOMMARIA, |
| 11 | having been first duly sworn by the courtroom deputy clerk, was |
| 12 | examined and testified as follows: |
| 13 | DIRECT EXAMINATION |
| 14 | BY MR. POWERS: |
| 09:12:15 15 | Q    Good morning. |
| 16 | A    Good morning. |
| 17 | Q    Doctor, could you please introduce yourself for the Court? |
| 18 | A    My name is Armand Herbert Matheny Antommaria.  I am a |
| 19 | pediatrician and bioethicist.  I am employed by Cincinnati |
| 09:12:32 20 | Children's Hospital Medical Center where I direct its ethics |
| 21 | center.  I'm the Lee Ault Carter chair of pediatric ethics and |
| 22 | an attending physician in the division of hospital medicine. |
| 23 | THE COURT:  Mr. Powers, I neglected to ask you how |
| 24 | long you think this witness will be. |
| 09:12:51 25 | MR. POWERS:  Well under half an hour. |

```
 1            THE COURT:  Okay.  All right.
 2  BY MR. POWERS:
 3  Q    Doctor, do you hold an MD from the Washington University
 4  School of Medicine?
 5  A    I do.
 6  Q    Do you hold a Ph.D. from the University of Chicago
 7  Divinity School?
 8  A    Yes.
 9  Q    Doctor, what are your areas of specialty?
10  A    As a physician, my area of specialty is pediatric hospital
11  medicine.  So I take care of general pediatric patients,
12  patients with asthma or pneumonia, who are admitted to the
13  hospital.  And I'm also a bioethicist and specialize in
14  pediatric clinical ethics.
15  Q    Thank you.
16       Can you please explain what a bioethicist is?
17  A    Bioethics is a multidisciplinary field that addresses the
18  ethical issues that arise in medicine and the life sciences.
19  Q    Doctor, are you board certified?
20  A    I am.  I am board certified in pediatrics and in pediatric
21  hospital medicine.  And I'm also certified as a health-care
22  ethics consultant.
23  Q    Are you part of a multidisciplinary team that provides
24  treatment to adolescent patients with gender dysphoria?
25  A    Yes.  Cincinnati Children's has a clinic that provides
```

The time stamps in the left margin: 09:13:01 (line 5), 09:13:09 (line 10), 09:13:31 (line 15), 09:13:48 (line 20), 09:14:07 (line 25).

care for children and adolescents with gender dysphoria, and I

participate in their monthly multidisciplinary team meetings,

as well as consult on an as-needed basis when special ethical

issues arise in the care of the patients that they treat.

09:14:34 Q     And are the sorts of ethical issues that do arise when

you're consulted regarding the care of transgender patients?

A     At times, there are issues regarding who is able to

provide informed consent, whether adult patients have medical

decision-making capacity or ethical issues when there are

09:14:55 unusual risks or benefits involved in the care of a particular

patient.

Q     Are you involved in the development of treatment protocols

related to treating adolescent patients with gender dysphoria?

A     Yes, to the extent that they have ethical issues in

09:15:10 particular.  I participated in the development and the periodic

review of the clinic's informed consent documents.

Q     Thank you, Doctor.

      As part of your duties, do you consult with medical

providers on the treatment of infants and children with

09:15:28 differences in sex development?

A     Yes.  Cincinnati Children's also has a clinic that

provides care to individuals with differences of sex

development.  And I participate in similar ways in that

multidisciplinary's team meetings both in terms of patient care

09:15:50 and in terms of gender policies.

1  Q     Thank you.

2            MR. POWERS:  Your Honor, the United States moves to

3  have Dr. Antommaria qualified as an expert in bioethics and

4  treatment protocols for adolescents with gender dysphoria.

09:16:05  5            MR. BOWDRE:  No objection, Your Honor.

6            THE COURT:  All right.  He will be accepted for that

7  purpose.

8            MR. POWERS:  Thank you.

9  BY MR. POWERS:

09:16:11 10  Q     Dr. Antommaria, is a diagnosis of gender dysphoria made by

11  physicians and other medical professionals, or is it made by

12  the patient or the parents?

13  A     A diagnosis of gender dysphoria is made by clinicians.

14  Q     And are there external indicators that can be evaluated as

09:16:29 15  part of that process?

16  A     Yes.  There are patient behaviors that can be observed

17  that support the diagnosis such as, you know, missing school or

18  other behaviors which can be observed that support that

19  diagnosis.

09:16:48 20  Q     Doctor, as part of your work, are you familiar with

21  research studies, systematic reviews, and clinical practice

22  guidelines in a variety of areas related to pediatric care?

23  A     Yes, I am.

24  Q     And are you familiar with studies, reviews, and guidelines

09:17:06 25  regarding treatment specifically for adolescents experiencing

1  gender dysphoria?

2  A    Yes.

3  Q    And what is the difference between research and clinical

4  care?

09:17:17  5  A    Research and clinical care are differentiated both in

6  terms of their goals and their methods.  So the goal of

7  research is to generate generalizable knowledge.  And the

8  methods are the use of a protocol that defines the steps in a

9  study.

09:17:36  10     Clinical care's goal is to provide benefit to individual

11  patients, and its procedures are individualized decision

12  making.

13  Q    And what is the difference between observational studies

14  and randomly controlled trials?

09:17:51  15  A    So the two big categories of studies are observational and

16  experimental.

17     In observational studies, the investigators don't control

18  who's exposed to the intervention.  The most -- one of the

19  common forms of an observational study would be a prospective

09:18:15  20  observational study in which individuals who receive a

21  treatment are followed over time to see the effects of that

22  treatment.

23     In experimental studies, the investigators control who

24  receives the intervention.  Commonly in a randomized controlled

09:18:31  25  trial, neither the participant nor the investigator controls

1  who receives the treatment or the intervention or the control.

2  People analogize randomization to a coin flip in terms of

3  determining who receives which.

4  Q    And, Doctor, do you have an opinion about the viability of

09:18:53 5  conducting randomly controlled trials testing the use of

6  treatment, like puberty blockers and hormone therapy, for

7  adolescents with gender dysphoria?

8  A    Yes, I do.  I would have concerns that randomized

9  controlled trials of these interventions would be unethical,

09:19:11 10  and even if they could be ethically performed, they would have

11  substantial methodological limitations.

12  Q    And what are the ethical concerns first?

13  A    In order for a research study to be ethical, particularly

14  a randomized controlled trial, there must exist something

09:19:29 15  called equipoise.  The investigator must believe that the

16  intervention and the control are each likely to be equally

17  efficacious.  And many investigators in this field would

18  believe that there is sufficient evidence of the benefit of the

19  use of puberty blockers or gender-affirming hormone therapy

09:19:51 20  that a randomized controlled trial would not be ethical.

21      In addition, you would need to be sure that the study

22  could be completed.  For example, that you would have enough

23  participants sign up to be in the study to make exposing them

24  to the risks of the study to be beneficial.  And there would be

09:20:12 25  concerns that not enough participants could be recruited to

1  such a trial to be ethical.

2  Q     And do you have any additional methodological concerns

3  regarding randomly controlled trials?

4  A     Yes.  One of the key factors in a randomized controlled

09:20:29  5  trial is they're what's called blinded, but neither the

6  participants nor the investigators know whether the

7  participants is receiving the intervention or the control.

8        And in a randomized control trial of this nature, it would

9  be -- not be possible to blind investigators that are

09:20:50 10  participants because they would know which -- what's called an

11  arm, which arm the participant is in by the development or lack

12  of development of secondary sexual characteristics.  So such a

13  randomized controlled trial would be of substantially less

14  value.

09:21:10 15  Q     Thank you.

16        Now, what's the difference between a systematic review of

17  the literature and a clinical practice guideline?

18  A     So in a systematic review of the literature, the

19  individual will collect all of the evidence and -- relevant to

09:21:27 20  a particular outcome and grade the quality of that evidence.

21        Systematic reviews of the literature, however, do not make

22  treatment recommendations.  Just because the level of evidence

23  for intervention might be low doesn't mean that that

24  intervention should not be used.

09:21:50 25        A clinical practice guideline both evaluates the quality

of the evidence, makes treatment recommendations, and grades

the quality of those recommendations, because there are many

other factors rather than in addition to the quality of the

evidence that need to be considered in making treatment

09:22:09   recommendations.

Q    Doctor, can a clinical practice guideline be based on the

results of observational studies?

A    Yes, they can.  And frequently in pediatrics, clinical

practice guidelines are based on observational studies, because

09:22:27   unfortunately there are fewer randomized controlled trials

available in pediatrics than in adult medicine.

So other Endocrine Society guidelines for other pediatric

conditions like congenital adrenal hyperplasia or obesity are

largely based on observational studies.  And even treatment

09:22:50   guidelines for important crucial things, such as the American

Heart Association's guidelines for performing CPR in children,

are largely based on observational studies.

Q    I think you might have mentioned one of them already, but

what guidelines help establish the standard of care when

09:23:08   treating adolescents with gender dysphoria?

A    The two predominant clinical practice guidelines for

treating adolescents with gender dysphoria would be the

Endocrine Society's and WPATH's.

Q    Thank you.

09:23:23   Is the level of evidence supporting these puberty blockers

1   and hormone therapy in these guidelines comparable to the level

2   of evidence for other treatments in pediatrics?

3   A    Yes.

4   Q    Doctor, are you familiar with the European policies, with

09:23:41 5   respect to treating adolescents diagnosed with gender

6   dysphoria?

7   A    I am.

8   Q    And could you please summarize your understanding of that?

9   A    So in part, particularly reference has been made to the

09:23:56 10   Swedish policy.  That policy is only available in an official

11   English translation of a three-page summary.

12       So it's difficult to fully evaluate these policies, given

13   the limited amount of material that's available in official

14   English translation.

09:24:17 15       But my understanding of the policies are that they have

16   reviewed the literature, but they use less robust methods than

17   the Endocrine Society, because they neither grade the evidence

18   nor the strength of their recommendations, and that none of the

19   policies instantiate a ban on gender-affirming health care, the

09:24:40 20   use of puberty blockers or gender-affirming hormone treatment.

21   Q    Thank you.

22       Doctor, are you familiar with the provisions of Senate

23   Bill 184?

24   A    I am.

09:24:49 25   Q    Are the provisions of Senate Bill 184 consistent with the

```
 1  guidelines issued by any country in Europe?
 2  A    No.
 3  Q    Doctor, once a diagnosis of gender dysphoria has been
 4  made, how does the informed content process work in the
09:25:09 5  pediatric context?
 6  A    In the pediatric context, parental consent is required --
 7  in general, parental consent is required for treatment.
 8       Adolescents should participate in medical decision making
 9  to the extent that it is appropriate, and for adolescents,
09:25:27 10  their assent should also be sought.
11       And the informed consent process requires a discussion of
12  the potential benefits, risks, and alternatives of the
13  treatment.
14  Q    Doctor, do you have an opinion as to whether puberty
09:25:41 15  blockers and hormone therapy treatments have benefits to some
16  adolescents diagnosed with gender dysphoria that outweigh the
17  potential risks?
18  A    Yes.  That for some individuals with gender dysphoria the
19  benefits of treatment outweigh the risks.
09:25:56 20  Q    And what role does desistance play, or what our friends
21  have referred to as desistance play in your analysis?
22  A    So in evaluation of the risk, if treatments are
23  discontinued, there may be effects of those treatments, which
24  are only partially reversible.  But that is only one of the
09:26:24 25  factors that needs to be weighed in the risks and benefit
```

analysis.  And that the evidence about the current rates of

desistance are that it is sufficiently low, that that would not

be in general a reason not to proceed with treatment.

Q    Thank you.

09:26:43     Is there high quality evidence supporting the alternative

of psychotherapy alone, so without the assistance of puberty

blockers and hormone therapy?  Is there high quality evidence

supporting that as a treatment for gender dysphoria in

adolescents?

09:27:03 A    I am not aware of any randomized controlled trials of

psychotherapy alone for the treatment of adolescents with

gender dysphoria.

Q    As an ethicist, do you have an opinion regarding parents

and adolescents' ability to adequately understand the potential

09:27:23 cause and benefits in giving informed consent to the provision

of puberty blockers and hormone therapy?

A    Although this decision involves a complex set of risks,

benefits, and alternatives, it is comparable to other decisions

that parents and their children make in pediatric health care

09:27:42 on a frequent basis.

Q    And in the instance that there was a medical provider who

violated their ethical obligations to their patients with

respect to obtaining informed content, are there forms of

oversight in place?

09:27:57 A    There would be multiple mechanisms to address those

1    potential shortcomings.  If that provider worked for a

2    health-care institution, they would be credentialed by that

3    institution.  The institution would have a responsibility for

4    oversight of their practice.

09:28:14  5        The state medical board could review their practice and

6    potentially discipline them or withdraw their license.

7        And although I am not a lawyer, it's my understanding that

8    there would be the potential for malpractice claims for

9    inadequate informed consent.

09:28:32 10        So there are multiple mechanisms that exist to address the

11   case in which somebody obtained inadequate informed consent.

12   Q    So there are other mechanisms in place other than a direct

13   ban on the treatment itself?

14   A    Yes.  I'm sorry.  You're correct.

09:28:48 15   Q    Doctor, I would like you to consider a circumstance where

16   adolescents no longer have access to puberty blockers or

17   hormone treatments.  Are there any equally effective

18   alternative medical treatments for adolescents with gender

19   dysphoria?

09:29:03 20   A    There are not.

21   Q    Is there an ethical basis for distinguishing the provision

22   of treatment to minors experiencing precocious puberty, from

23   transgender minors experiencing gender dysphoria?

24   A    There is not.

09:29:19 25        So in particular, the type of evidence for both treatments

are the same.  The evidence supporting the use of puberty

blockers for the treatment of central precocious puberty are

also prospective observational trials with relatively small

numbers of participants.

09:29:42    There are no randomized controlled trials to support the

use of puberty blockers for central precocious puberty.

Q    Compared to treatments in other contexts, is there

anything about treatments for adolescents with gender dysphoria

that would require prohibition by the State from an ethical

09:29:58 perspective?

A    No.

Q    And last question, Doctor.  What are the ethical

implications for medical providers treating minors diagnosed

with gender dysphoria if Senate Bill 184 is implemented?

09:30:11 A    They would be unfortunately placed in the untenable

position of either violating their ethical obligations to their

patients to conform with the law, or fulfilling their

professional duties to their patients and being criminally

charged.

09:30:28     MR. POWERS:  Thank you.  No further questions.

     THE COURT:  Cross?

                    CROSS-EXAMINATION

BY MR. BOWDRE:

Q    Good morning, Dr. Antommaria.  My name is Barrett Bowdre.

09:30:53 I represent the State defendants.

1  A     Good morning.

2  Q     You agree, don't you, that most individuals who experience

3  gender dysphoria in childhood desist?

4  A     The evidence would support that individuals who experience

09:31:18  5  gender dysphoria at young ages such as three or four, that the

6  majority of them do desist.

7  Q     You noted that the goal of clinical practice is the

8  individualized assessment in providing care for the individual

9  patient that you're treating.  But no clinician can accurately

09:31:45 10  predict whether the patient sitting in front of him will

11  persist in their gender dysphoria or will, as the majority do,

12  desist; isn't that correct?

13  A     So at the point of evaluating an adolescent, the

14  desistance rate is substantially smaller than it is for the

09:32:11 15  desistance rate of young children, and that there would be the

16  ability to be fairly certain that they are unlikely to desist.

17  But expecting perfection in the practice of medicine and being

18  able to predict with 100 percent certainty is unrealistic

19  because there's nothing in health care that can occur with 100

09:32:36 20  percent certainty.

21  Q     Can you predict with 80 percent certainty whether the

22  individual patient sitting in front of you will persist or

23  desist in his or her gender dysphoria?

24  A     The evidence of which I am aware would suggest that the

09:32:53 25  desistance rate is -- for adolescents is substantially less

1  than 80 percent.  If the desistance rate for adolescents -- I

2  apologize -- is substantially less than 20 percent.

3  Q    Is that for adolescents who are treated with puberty

4  blockers, or adolescents who are not treated with medical

09:33:11  5  interventions?

6  A    The most robust data that is available are adolescents who

7  are treated with gender-affirming health care.

8  Q    So can you tell with 80 percent certainty whether an

9  individual patient, an adolescent who is not treated with

09:33:30  10  puberty blockers, would desist or persist in the gender

11  dysphoria?

12  A    So the evidence base in that area is less robust, but the

13  evidence of which I'm aware would still suggest that the

14  desistance rate for individuals who are adolescents is less

09:33:52  15  than 20 percent.

16  Q    And what studies do you rely on to say that it's -- I

17  mean, for adolescents -- we're talking about a 12 or 13 year

18  old who has entered what, Tanner Stage 2 of puberty; is that

19  correct?

09:34:04  20  A    Correct.

21  Q    Okay.  So what evidence do you rely on to say that without

22  treating with puberty blockers the group who are not treated

23  there's a more than 80 percent likelihood that the individual

24  patient is going to desist to that point?

09:34:19  25  A    So I would say that that is based on -- so I am not aware

```
 1  of a specific prospective observational trial that answers your
 2  question, but that experience in the field would suggest that
 3  that -- the desistance rate is low.
 4  Q    And what is that experience?
 5  A    Of the clinicians who provide care to this patient
 6  population.
 7  Q    I guess my question is -- I'm trying to figure out -- I
 8  understand that the majority of children who are started on
 9  puberty blockers go on to cross-sex hormones.  Is that true?
10  A    Can you restate your question?
11  Q    The majority of children who are -- who start on puberty
12  blockers will then go on to take cross-sex hormones; isn't that
13  right?
14  A    Correct.
15  Q    Okay.  And so my question is:  If a child does not start
16  on puberty blockers, what degree of certainty can we say that
17  the gender dysphoria would go away?  And we are talking about a
18  Tanner Stage 2 adolescent.
19  A    So I would differentiate the likelihood of them desisting
20  from the quality of evidence that supports that claim.  The
21  likelihood of them desisting based on the available evidence
22  would be that it would still be infrequent, the evidence is --
23  would currently be based on expert opinion of individuals who
24  provide that care.
25  Q    Okay.  So there are no studies to support that claim; is
```

09:34:47 (line 5)
09:35:02 (line 10)
09:35:16 (line 15)
09:35:42 (line 20)
09:36:01 (line 25)

1    that right?

2    A    I'm not aware of a study on that specific question.

3    Q    Okay.  Would you agree that the combination of puberty

4    blockers and cross-sex hormones -- let me start over.

09:36:24 5        Because you testified that most children who begin on

6    puberty blockers go on to cross-sex hormones, wouldn't it be

7    reasonable when we're talking about the risks to view those

8    together?

9    A    No.

09:36:42 10   Q    Why is that?

11   A    Because they occur at separate periods of time.  So that

12   informed consent is obtained for the use of puberty blockers,

13   there are ongoing conversations about the efficacy of that

14   treatment and the individual symptomology, and a separate

09:37:01 15   detailed informed consent process is obtained prior to the

16   start of gender-affirming health care.

17   Q    But wouldn't it be relevant to a parent or a child

18   determining whether to start puberty blockers to know that

19   almost everyone who starts on this treatment goes on to

09:37:18 20   cross-sex hormones?

21   A    It would be relevant for parents to know that the clinical

22   practice guidelines for the treatment of gender dysphoria

23   generally recommend treatment with puberty blockers followed by

24   treatment with gender-affirming hormone therapy.

09:37:42 25   Q    Okay.  My question was:  Wouldn't it be relevant for them

1  to know that almost everyone who starts on puberty blockers

2  then goes on to cross-sex hormones?

3  A    I don't believe that that would -- that category of

4  information would be relevant.  I don't know that that specific

09:38:08  5  framing would be useful and informative to patients.

6  Q    Okay.  So you do not think that the --

7         THE COURT:  Hold on a minute, Mr. Bowdre.

8         Ladies and gentlemen, let me say this:  If you are sitting

9  in the audience and you're head nodding or you're mouthing

09:38:23 10  words and looking at the witness, please stop that, because

11  that could give the appearance that you are trying to influence

12  the witness.

13         So let me just put that out there.  Please follow my

14  guidelines on that.

09:38:38 15     I am not suggesting that you are being influenced by

16  anyone out here, but it's possible that someone might want to

17  influence you.

18         So go ahead, Mr. Bowdre.

19         MR. BOWDRE:  Thank you, Your Honor.

09:38:47 20     Could you read the last question?  I'm sorry.

21     (Whereupon, the Court Reporter read back the pending

22  question.)

23  BY MR. BOWDRE:

24  Q    Would you agree that there are substantial risks involved

09:39:26 25  in someone starting puberty blockers and going on to cross-sex

hormones?

A    There are risks involved in the treatment course for the treatment of gender dysphoria.

Q    What are some of those risks?

A    Can you be more specific?  Of the entire course of treatment, or particular parts of the treatment?

Q    The entire course of treatment.

A    So I would disaggregate the risks of puberty blockers from the risks of gender-affirming hormone therapy and the risks of testosterone therapy are different from the -- or are somewhat different than the risks of estrogen therapy.

Would you like me to review all of that.

Q    Let me just ask you a couple of those.

Would you agree that some of the risks of puberty blockers and cross-sex hormones would be loss of fertility?

A    There is a risk of impaired fertility.

Q    Okay.  Would you agree that a risk would be loss of sexual function?

A    Particularly the use of testosterone therapy has a risk of changes in sexual function.  I apologize.  The use of estrogen therapy in -- has a risk of alterations in sexual function.

Q    So if someone cannot predict with very much accuracy whether gender dysphoria will desist, then you cannot predict whether the interventions will help or harm that person; is that true?

1   A      No, that is not true.

2   Q      Why is that not true?

3   A      Because there is sufficient certainty that gender

4   dysphoria will persist to have a discussion about the potential

09:41:37 5   benefits and risks of treatment.

6   Q      Okay.  So if it were the case that one could not tell with

7   much accuracy whether the, you know, 11 or 12 year old at

8   Tanner Stage 2 sitting in front of you, whether that person's

9   gender dysphoria would desist, assuming that, then is it true

09:41:56 10   that you would not be able to know whether the intervention

11   treatments of puberty blockers and the cross-sex hormones would

12   be helpful or harmful to that person?

13   A      So it would depend on how much uncertainty there was, and

14   that would likely be information that was relevant to the

09:42:24 15   informed assent discussion and the parents' decision about

16   whether to proceed with treatment.

17   Q      What if you were 40 percent sure that the -- that the

18   child would persist, then could you tell whether the

19   interventions would be helpful or harmful?

09:42:52 20   A      It -- so part of -- so do you mean 40 percent sure that

21   your prediction of their likelihood of persisting was accurate,

22   or do you mean that their likelihood of persisting was

23   40 percent?

24   Q      I'm sorry.  Let's assume that you are -- that you -- that

09:43:18 25   it is 40 percent accurate that the person sitting in front of

1   you is going to persist.  The person has a 40 percent chance of

2   persisting.

3   A    Then in that hypothetical case, there would be less

4   justification for proceeding with that course of treatment.

09:43:40 5   But that is a hypothetical case and not the decision that

6   patients and their families are currently facing.

7   Q    Okay.  Dr. Antommaria, what is a detransitioner?

8   A    So I don't know that there's a technical -- currently a

9   widely accepted technical definition of that term, because

09:44:05 10   people -- individuals use that term in a variety of different

11   ways to mean different things.

12   Q    Okay.  Would one definition, sort of a common definition

13   be someone who identifies or has been diagnosed with gender

14   dysphoria, has begun puberty blockers, cross-sex hormones, and

09:44:27 15   then the dysphoria desists, or for whatever other reason they

16   realign with their biological sex and they stop the medical

17   interventions; is that a fair overall description?

18   A    So that is a potential definition.  The one qualification

19   I would make is if it's defined in terms of an individual who

09:44:53 20   discontinues medical therapy, there may be a wide variety of

21   reasons for individuals to discontinue their medical therapy

22   beyond change in their gender identity.

23   Q    And have you reviewed the literature -- let me be more

24   specific.

09:45:14 25        Have you reviewed recent surveys of people who identify as

1    detransitioners, specifically Lisa Littman's and Elie

2    Vandenbussche's?  Have you reviewed those two?

3    A    No, I have not reviewed those two.

4    Q    Are you -- do -- let me -- I will strike that.

09:45:34  5        Are you aware that at least, according to one of those

6    studies, only 25 percent of people who detransition ever tell

7    their gender-affirming care doctors that they have

8    detransitioned?

9    A    I heard you state that yesterday in court.  But, no, as I

09:45:54 10   said, I'm not aware of those particular studies.

11        I would say that, for example, our clinic's informed

12   consent documents emphasize if individuals discontinue their

13   treatment, it's very important for them to provide that

14   information to their health-care providers.

09:46:11 15   Q    Okay.  Does the fact that some people who are diagnosed

16   with gender dysphoria, given puberty blockers and cross-sex

17   hormones, dramatically change their bodies, sometimes

18   permanently, and then divert to identifying with their

19   biological sex give you any pause that we might not be so good

09:46:32 20   at identifying who are good candidates for these medical

21   interventions and who might not be good candidates?

22   A    Can I ask what you mean by give me pause?

23   Q    Does it give you concern?

24   A    So I think that in this field, all the available data and

09:46:46 25   information should be considered in making treatment decisions.

1   That would be potentially relevant information that should be

2   incorporated in an ongoing basis in treatment decisions and

3   revisions of clinical guidelines when they're revised.

4   Q    But you have not reviewed at least these studies on

09:47:09 5   detransitioners to consider whether those would impact your

6   clinical standards; is that true?

7   A    So those -- so I am aware of the discussion about

8   detransition, including the stories of individual patients who

9   have detransitioned.  The body of literature is large.

09:47:38 10       And at this point in time, no, I have not reviewed those

11   two specific studies.  If it became relevant, I would make

12   effort to review those studies.

13   Q    Thank you.

14       You do not touch on this in your testimony, but in your

09:47:56 15   declaration, you spent a couple of pages talking about access

16   to top surgery for gender dysphoric minors; is that right?

17   A    Yes.  There's reference to top surgery in my declaration.

18   Q    Okay.  In such surgeries -- we're talking about

19   mastectomies usually; is that right?

09:48:14 20   A    That's one way to characterize the procedure.

21   Q    Okay.  And they are performed on minors in at least some

22   states in the United States; isn't that true?

23   A    That is true.

24   Q    Okay.  At what age do you think that a -- someone can

09:48:36 25   consent to a double mastectomy as part of the gender-affirming

1   care?

2   A   So I would be unable to answer that in terms of an age.

3   The relevant factor is their decision-making capacity, which

4   only has a correlation with age, but is not specific to age.

09:48:56 5   Q   Okay.  You said in your declaration that adolescents

6   generally possess comparable medical decision-making capacity

7   to adults; is that right?

8   A   So part of the question is how you define adolescents.

9   But, yes, older adolescents generally have comparable medical

09:49:22 10   decision-making capacity to adults.

11   Q   So what age are we talking about?

12   A   So the specific study that I cited in my declaration

13   compared 14 year olds to older adults.

14   Q   Okay.

09:49:35 15   A   Or to adults.

16   Q   And you would agree that Tanner Stage 2 puberty normally

17   occurs before age 14?

18   A   Correct.

19   Q   Okay.  So given that adults can consent to both top and

09:49:51 20   bottom sex-change surgeries, why can't a 14 year old not?

21   A   Can you restate the question?

22   Q   Yeah.  Given that adults can consent to both top and

23   bottom sex-change surgeries, why should a 14 year old not be

24   able to consent to those procedures?

09:50:15 25   A   Because in general, adolescents are not permitted to

1  consent to medical treatment, and we rely on their parents or

2  legal guardians to consent.

3  Q      But why is that?  If they -- you just testified that 14

4  year olds have comparable medical decision-making abilities to

09:50:31 5  adults, is it simply a matter of law that they cannot consent,

6  or is there some basis in the literature that would require the

7  parental consent for 14 year olds?

8  A      So at a minimum, the legal requirement -- so informed

9  consent is in part a legal requirement.  And although there are

09:50:53 10  exceptions to permit minor -- some minors to provide consent

11  for certain forms of medical treatment, parental consent is

12  required for a variety of different reasons, not a single

13  reason.

14  Q    I want to read to you a paragraph -- I will go -- I want

09:51:30 15  to read to you a paragraph on an amicus brief to the American

16  Psychological Association, the American Psychiatric

17  Association, and the National Association of Social Workers did

18  in a case called Miller vs. Alabama.

19      All right.  And so this is the amicus brief.  And I am

09:51:50 20  going to flip to page 12.

21      In highlighted portion, paragraph 3, it says, Finally,

22  juveniles differ from adults in their ability to foresee and

23  take into account the consequences of their behavior.  By

24  definition, adolescents have less life experience on which to

09:52:15 25  draw, making it less likely that they will fully apprehend the

1    potential negative consequences of their actions.  Moreover,

2    adolescents are less able than adults to envision and plan for

3    the future, a capacity still developing during adolescence.

4    The study of maturity of judgment discussed above found that

09:52:39 5   adolescents' future orientation is weaker than adults'.

6        I will skip the sentence about the specific subjects.

7        Then it says, Similarly, studies have shown that among 15

8    to 17 year olds, realism in thinking about the future increases

9    with age, and that the skills required for future planning

09:53:03 10  continue to develop until the early 20s.  The ability to resist

11   and control emotional impulses, to gauge risks and benefits in

12   an adult manner, and to envision the future consequences of

13   one's actions -- even in the case of environmental or peer

14   pressures are critical components of social and emotional

09:53:21 15  maturity necessary in order to make mature, fully considered

16   decisions.  Empirical research confirms that even older

17   adolescents have not fully developed these abilities and hence

18   lack an adult's capacity for mature judgment.

19       Do you disagree with that?

09:53:40 20  A    So you would appreciate having seen this for the first

21   time and not being able to review the evidence on which it's

22   based, it's difficult for me to form a full opinion, but I am

23   happy to provide my initial reaction.

24       And that would be that informed consent is generally

09:54:04 25  considered to be a threshold at which people need to meet.  The

1  language that I see here refers to optimal capacities which

2  might far exceed that threshold.  If you read the language that

3  it continues to mature into the 20s, I don't take it that

4  that's justifying that the age of consent should be moved to 20

09:54:30 5  or 22 instead of 18.

6      So I think it's consistent to say that individuals'

7  medical decision-making capacity may continue to mature over

8  time without saying that adolescents lack the sufficient

9  capacity to assent to treatment.

09:54:49 10  Q     Thank you.

11          THE COURT:  How much longer do we have with our cross?

12          MR. BOWDRE:  20 minutes, maybe 30.

13  BY MR. BOWDRE:

14  Q     Do you agree that more research is needed to study the

09:55:23 15  efficacy and the cost and benefits of providing

16  gender-affirming care to minors?

17  A     I would say that more research is needed in all areas of

18  health care, and that the State's legislation would prohibit

19  such research.

09:55:44 20  Q     And what are the questions that would need to be answered

21  that the research needs to answer in this area that are left

22  open?

23  A     There are a range of questions that might benefit from

24  further refinement, including issues about the timing of the

09:56:10 25  initiation of therapy, dosing.  There are a variety of

1  considerations that could be further refined and developed.

2  But further refining those treatment protocols would be a

3  refinement.

4  Q    In your declaration, you noted that once the FDA has

09:56:41  5  approved a medication for one indication, thereby agreeing that

6  it is safe and effective for this intended use, prescribers are

7  generally free to prescribe that for other indications; is that

8  correct?

9  A    That is correct.

09:56:54  10  Q    Okay.  But that does not mean that an off-label use would

11  always be safe to prescribe to an individual simply because it

12  is an FDA-approved medication for some purpose?

13  A    Correct.

14  Q    So, for instance, a nine-year-old boy with diabetes, the

09:57:14  15  FDA has approved the use of insulin for that purpose, but

16  providing insulin to a nine-year-old boy without diabetes would

17  be very dangerous, wouldn't it?

18  A    Yes.

19  Q    So whether an off-label use is appropriate depends on the

09:57:33  20  proven risks and benefits of that particular use that we're

21  looking at?

22  A    Yes.  But the fact that a medication is used off label

23  does not intrinsically mean that that evidence does not exist.

24  Q    Okay.  In your direct testimony, you said -- I think you

09:58:02  25  said -- correct me if I'm wrong -- that randomized controlled

1  trials in this area would be unethical because no equipoise

2  exists between treating someone simply with psychotherapy

3  versus treating someone with psychotherapy and puberty blockers

4  and cross-sex hormones; is that fair?

09:58:21 5  A    Correct.

6  Q    When did that equipoise come into existence?

7  A    I don't know that I can provide you a particular date as

8  to when that lack of equipoise came into existence.

9  Q    For that equipoise or lack of equipoise to come into

09:58:48 10  existence, wouldn't we need studies that, you know -- doesn't

11  there need to be at least one study that shows -- that looks at

12  a group treated only with psychotherapy and one group treated

13  with the medical interventions?

14  A    Can you restate your question?

09:59:09 15  Q    For the lack of equipoise to come into existence, for us

16  to know that, you know, psychotherapy plus puberty blockers and

17  cross-sex hormones are the way to go and that any other

18  treatment would be unethical, don't we first need to have a

19  study that treats someone with psychotherapy and has a

09:59:30 20  controlled group that way versus someone who is treated with

21  all of those interventions?

22  A    No.  There are prospective observational trials that

23  demonstrate the efficacy of puberty blockers and

24  gender-affirming hormone therapy, and withhold those treatments

09:59:48 25  from an individual may be considered unethical.

1   Q    Okay.  So you were asked whether there were any high

2   quality randomized controlled studies looking only at

3   psychotherapy, which I will note is not the level of evidence

4   that you are relying on.

10:00:29  5        But doesn't that concern you that we have no idea whether

6   psychotherapy alone versus psychotherapy plus puberty blockers

7   plus cross-sex hormones is doing the work in creating any

8   benefits that we see?

9   A    So there is substantial clinical experience that -- so I

10:00:53 10 will differentiate psychotherapy from psychological and

11  psychiatric treatment given that psychotherapy is a distinct

12  entity.  But that there is substantial experience that

13  providing mental health care to adolescents with gender

14  dysphoria in and of itself is not sufficient to resolve

10:01:21 15 individuals' dysphoria and hence the reason for proceeding with

16  medical interventions.

17       If a patient had gender dysphoria and was -- their gender

18  dysphoria was adequately treated with mental health care, they

19  would not proceed to medical therapy.

10:01:40 20 Q    Do you contend that the Endocrine Society's practice

21  guidelines that were released in 2017 provides a more robust

22  overview of the literature than the UK's recent literature

23  review of looking at puberty blockers and cross-sex hormones?

24  A    Can you be specific as to which British report you're

10:02:16 25 referring to?

Q    Yes.  And if you want to look at them, they are

Defendants' Exhibits 9 and 10.  I think you do have the right

binder.

A    So I can't answer your question because it's asking me

10:02:49  what in effect are apples and oranges.  One is a systematic

review of the literature, and one is a clinical practice

guideline, which are different types of material.

Q    Okay.  I believe you testified that the -- I mean, the

clinical practice guidelines you said does a comprehensive

10:03:11  review of the literature and then suggests -- suggests, you

know, practices.  Is that fair?

A    So a clinical practice guideline will be based on a

systematic review of the literature and grades the quality of

the evidence and the strengths and recommendations.

10:03:29  Q    Okay.  So for that part of the practice guideline

analysis, the literature review part, would you say that the

Endocrine Society's review was more extensive and is more

accurate than the UK's more recent literature reviews that

you're looking at in Defendants' Exhibits 9 and 10?

10:03:53  A    So I can't answer your question in detail without more

thoroughly reviewing the documents.

Based on my understanding of the Endocrine Society's

methodology, I would expect them to be comparable, but I can't

form a formed opinion based on the information that I currently

10:04:19  have.

1  Q    Okay.  You have not reviewed closely the UK's recent

2  literature reviews?

3  A    So I've reviewed their conclusions.  I haven't reviewed

4  them in the degree of methodological detail that your question

10:04:33  5  would require.

6       There are a large number of systematic reviews available

7  in the literature.  Some of which I know in detail, and others

8  of which I know at less -- a lesser level of detail.

9  Q    What are the prospective observational studies that you

10:05:02 10  claim demonstrate the efficacy of puberty blockers and

11  gender-affirming care?

12  A    So the specific references are included in my report.  But

13  in general, they're the studies that are conducted by the Dutch

14  group.

10:05:19 15  Q    And in that study, both the 2011 study that looks only at

16  puberty blockers and then the 2014 report that reported on

17  people who then went on to cross-sex hormones and total

18  surgical interventions, those studies -- so everyone in those

19  studies got psychotherapy and psychiatric help the entire time;

10:05:47 20  is that true?

21  A    Correct.

22  Q    Is it also true that people who had psychological

23  comorbidities, depression, things like that, were excluded from

24  the treatments from the medical interventions?

10:05:59 25  A    So I would have to review their specific inclusion and

      1  exclusion criteria to be able to answer your question.

      2  Q    Okay.  Do you know if everyone in that study, whether

      3  their psychological functioning and improvements went to a new

      4  clinical range or not?

10:06:29 5  A    So there were a variety of different outcome variables

      6  that were examined in the study, some of which were unchanged,

      7  but some -- but others of which showed statistically

      8  significant improvement.  And so can you clarify what you mean

      9  by a new range?

10:06:52 10  Q    I think I will move on, given our time.

      11      If parents of a 14 year old can consent to cross-sex

      12  hormones, why cannot parents of -- and the 14 year old consent

      13  to a double mastectomy?

      14  A    As a legal matter -- can you clarify your question?

10:07:28 15  Q    As a medical ethical matter.

      16  A    So I don't believe that there would be an indication to

      17  perform a mastectomy on a 14 year old.

      18  Q    Why not?  Isn't mastectomy a gender-affirming care for a

      19  transgender man?

10:07:52 20  A    So in general, the purpose of utilizing puberty blockers

      21  would be to prevent the development of those secondary sexual

      22  characteristics, and the use of cross-sex hormones would be to

      23  promote the development of secondary sexual characteristics

      24  that are consistent with an individual's gender identity.  And

10:08:19 25  there would be a period of time in which it would be required

```
 1  for the gender-affirming hormone therapy to take an effect.

 2      The effects develop over a period of years.  So it's hard

 3  for me to understand the clinical scenario that you're

 4  presenting.
```

10:08:37
```
 5  Q    Well, what if someone did not start on puberty blockers

 6  and comes to the clinic as a 14 year old already having

 7  developed?

 8  A    So in -- so it would be my general understanding that that

 9  individual -- would they be -- presumably may be pursuing
```

10:08:59
```
10  gender-affirming hormone therapy and would not -- so I'm having

11  trouble understanding.

12      Are you suggesting that they're not starting

13  gender-affirming hormone therapy and are simply moving to top

14  surgery?
```

10:09:12
```
15  Q    Either that, or -- I mean, my understanding is that if,

16  you know, if a biological woman has already developed breasts,

17  then providing testosterone, you know, doesn't make the breasts

18  go away, right?  You still need the double mastectomy.  So why

19  could not that person, a 14 year old, not -- her and her
```

10:09:31
```
20  parents not consent to that?

21  A    So I'm having trouble with your construction, particularly

22  related to the age.

23      But I would say that I think that parents and their

24  adolescent children who are less than 18 potentially are
```

10:09:54
```
25  capable of consenting to top surgery.  And it would depend,
```

 1  then, on the specific clinical circumstance.

 2      It's hard for me to answer your abstract formulation.

 3  Q    You provided an example in your declaration on -- I guess

 4  as an example of how the medical community often relies on

10:10:22  5  low-quality evidence.  And your example was that a doctor might

 6  prescribe, you know, 20 minutes of exercise and a low-calorie

 7  diet as a way to treat obesity.  And I guess your point was

 8  there were no randomized controlled studies showing that

 9  20 minutes of exercise and a good diet, you know, is always

10:10:47 10  going to treat obesity.

11      But in that example, the risks of following that protocol

12  are pretty low, aren't they?

13  A    Yes.

14  Q    Yeah.  And would you agree that it might make sense to

10:11:04 15  follow minimal low-quality evidence for low risks for high

16  reward endeavors, such as exercising for 20 minutes, but that

17  we might want higher quality of evidence or more robust mound

18  of it before relying on it for something where the risks were

19  quite high?

10:11:24 20  A    That assumes that we cannot make decisions until some

21  speculative future in which that evidence is available.

22  Unfortunately, clinicians have to make decisions based on the

23  evidence that is currently available to them.

24  Q    Okay.

10:11:48 25      MR. BOWDRE:  May have just a moment to confer with

1    counsel?

2                THE COURT:  Yes.

3                MR. BOWDRE:  Thank you, Dr. Antommaria.

4                THE WITNESS:  Thank you.

10:12:02  5          MR. POWERS:  No further questions.

6                THE COURT:  All right.  May the witness be excused?

7          Sir, you can step down.  Thank you.

8                THE WITNESS:  Thank you, sir.

9                THE COURT:  All right.  In the interim -- do you have

10:12:15 10   something you want to say?

11                MR. DAVIS:  No, Judge.  I wanted to see how you wanted

12   to proceed.

13                THE COURT:  All right.  Well, I thought -- I know we

14   have several parties seeking leave to file briefs, including

10:12:27 15   several states and several professional organizations.  I just

16   wanted to see if the parties wanted to address that very

17   quickly, whether there are any objections or not.

18                MR. LACOUR:  I will go first, if that's all right,

19   Your Honor.

10:12:41 20          THE COURT:  That's fine.

21                MR. LACOUR:  Would you like me to approach the podium?

22                THE COURT:  Yes, please.

23                MR. LACOUR:  Your Honor, we think that the brief from

24   states should come in.  It was filed in a timely manner, indeed

10:12:57 25   before Alabama's brief was even on file, which gave plaintiffs

1    time to assess those arguments before their brief was filed.

2        We do not -- for similar reasons, we do not think that the

3    brief from the AAP should come in.  They did not file it until

4    we were actually here about the beginning of opening

10:13:20 5    statements.  So there was not time to look it over.

6        I will be candid.  I have not even had time to read it

7    myself.  I think some people on the team have, but there has

8    been a lot to do in a very short amount of time.

9        And so I think for that reason the Court would -- we would

10:13:38 10    oppose that brief coming in at this moment.

11            THE COURT:  All right.  What about original

12    plaintiffs?

13            MR. DOSS:  Your Honor, we think both sets of amicus

14    briefs are another data point that Your Honor could consider in

10:13:55 15    looking at all of the evidence and thinking through all the

16    arguments.

17        We have no opposition to the several states, their amicus

18    brief, provided that the amicus brief of the professional

19    organizations is also allowed to be filed in.

10:14:10 20        This has been a long week.  I think, if I remember

21    correctly, the states' brief was filed on Tuesday, the

22    professional organizations' brief was filed on Wednesday.  I

23    don't think the timing makes any difference one way or the

24    other.

10:14:25 25        But to the extent Your Honor is wishing to consider any

1    amicus brief, I would submit that both should be considered,

2    Your Honor.

3           THE COURT:  Well, I certainly will consider them all,

4    you know, on final merits.  The issue is whether we consider

10:14:41 5    them now.  Obviously, if I do consider them now, we are looking

6    at this deadline.

7           Does anyone have any thoughts on that, just the

8    practicality of me trying to take that in and consider it with

9    all this evidence under a time crunch?  I think that's worth

10:14:56 10    addressing by both sides.

11           MR. DOSS:  As I read the states' brief, Your Honor, it

12    expresses general criticism as to what it -- what they refer to

13    as consensus-based medicine.  I don't really see the states'

14    amicus brief is presenting really any legal argument, as best I

10:15:18 15    could tell.  The only legal citations were two citations to

16    dissenting opinions from the U.S. Supreme Court.  It seemed to

17    me more of a policy statement rather than really much of

18    evidence or legal argument.

19           As to the professional organizations, their amicus brief,

10:15:37 20    I think we have gotten a sense of what those positions are over

21    the past day and a half from Dr. Ladinsky and Dr. Hawkins.  If

22    consideration of any brief is going to delay consideration of

23    the merits for present purposes, I would say -- I would submit

24    defer consideration of those amicus briefs until later.  We're

10:16:03 25    just trying to get the preliminary relief at this point.

```
 1              THE COURT:  A very practical position.

 2         How about the United States?

 3              MR. CHEEK:  We would concur with the plaintiffs on

 4    that.

10:16:16  5              THE COURT:  Do you want another bite at the apple,

 6    Mr. LaCour?

 7              MR. LACOUR:  Your Honor, I would just note -- sorry --

 8    point out the ECF notice.  The Arkansas brief was on file by

 9    5:23 p.m. or 5:30 p.m. on Monday.  So just for the record, that

10:16:43 10    is when it came in.

11         And, of course, the brief from the medical organizations

12    did not come in until the hearings were essentially already

13    begun, so...

14              THE COURT:  All right.  All right.  Last question that

10:17:00 15    I have, and it won't offend me if nobody wants to address this,

16    but it's possible I have missed this in the briefing or the

17    filings, but I certainly know who sponsored this bill.  Where

18    did this bill come from?  Who wrote this bill?  Is that

19    something any party wants to address?

10:17:27 20              MR. LACOUR:  Your Honor, it was a bill introduced into

21    the Legislature, considered by the Legislature, enacted, so

22    this is the work product of the Legislature.

23         If there are more detailed questions, we can certainly try

24    to answer them.

10:17:58 25              THE COURT:  I'm just throwing the door open for any
```

```
 1   party to say what they want to.

 2              MR. LACOUR:  That's what we have to say, Your Honor.

 3              THE COURT:  All right.

 4              MR. CHEEK:  Your Honor, the United States does not

 5   know, but we are happy to get some people to work on it.  And

 6   if we can find it out during the course of, you know, the next

 7   couple of hours, would it be permissible for us to revisit that

 8   question or submit a one-page notice to the Court if we can pin

 9   that down?

10              THE COURT:  We have got more time.  We can take it up

11   again if somebody wants to.

12         Mr. Doss, is this something that you want to address?

13   Again, nobody has to.  I am just asking the question.

14              MR. DOSS:  I don't know, Your Honor.

15              THE COURT:  All right.  Who is our next witness?

16              MR. DAVIS:  Your Honor, we are going to call Dr. James

17   Cantor.  I don't know if you want us to begin now.  We're

18   prepared.

19              THE COURT:  I think this is a great time to have a

20   short break.

21         So why don't we come back in 12 minutes?

22              (Recess.)

23              THE COURT:  Thank you.  Please be seated.

24         All right.  Any further witnesses from either of the

25   plaintiffs?
```

```
 1            MS. EAGAN:  No, Your Honor.

 2            THE COURT:  All right.  State's case.

 3            MR. DAVIS:  Your Honor, the State calls Dr. James

 4  Cantor when you are ready.

 5            THE COURT:  I'm ready.

 6                       JAMES CANTOR, MD,

 7  having been first duly sworn by the courtroom deputy clerk, was

 8  examined and testified as follows:

 9                       DIRECT EXAMINATION

10  BY MR. DAVIS:

11  Q    Good morning, Dr. Cantor.

12  A    Good morning.

13  Q    Would you state your full name?

14  A    James Michael Cantor.

15  Q    What is your profession, Dr. Cantor?

16  A    I am a clinical psychologist and neuroscientist.

17  Q    What degrees do you have?  Academic degrees.

18  A    Bachelor's degree in computer science and mathematics, a

19  master's degree in applied psychology, and a Ph.D in clinical

20  psychology.

21  Q    Where do you work?

22  A    I am currently in private practice in Toronto, Canada.

23  Q    And what is the nature -- are there any particular focuses

24  of the counseling you provide or the research that you have

25  performed?
```

```
 1  A      Human sexuality and atypical sexualities.

 2  Q      Would that include studies of gender identity?

 3  A      Yes, it is.  Yes, it does.

 4  Q      Are you knowledgeable about the research surrounding

 5  gender dysphoria?

 6  A      Yes, I am.

 7  Q      Have you analyzed research concerning the benefits and

 8  harms of different ways of treating gender dysphoria?

 9  A      Yes, I have.

10  Q      Do you have skills and expertise assessing the strengths

11  and weaknesses of scientific studies?

12  A      Yes, I do.

13  Q      And do these skills and expertise include judging what

14  those studies do and do not prove as a matter of science?

15  A      Yes.

16  Q      Have you treated people who presented with gender

17  dysphoria?

18  A      Yes.

19          MR. DAVIS:  Your Honor, we proffer Dr. Cantor as an

20  expert on psychology, human sexuality, research methodology,

21  and the state of the research literature on gender dysphoria

22  and its treatment.

23          THE COURT:  Any objection?

24          MS. EAGAN:  No, Your Honor.

25          THE COURT:  All right.  He will be accepted for that
```

```
       1  purpose.
       2  BY MR. DAVIS:
       3  Q    Dr. Cantor, there is a notebook in front of you with a
       4  blue cover.  Would you please turn to the second tab?
10:41:51 5  A    I'm sorry.  It just occurs to me I didn't bring my reading
       6  glasses.  They're in my brief case.
       7          MR. DAVIS:  Your Honor, can the witness get his
       8  glasses?
       9          THE COURT:  Absolutely.
10:42:43 10         THE WITNESS:  Part 2, you said?
      11  BY MR. DAVIS:
      12  Q    Yes.  Tab 2, which is Defendants' Exhibit 2.
      13          Can you identify that document, Dr. Cantor?
      14  A    Yes.  That is my report, which I submitted for these
10:42:54 15 proceedings.
      16  Q    Thank you.
      17          I think actually, since we just heard Dr. Antommaria, I
      18  would like to begin with addressing some things that we heard
      19  this morning.
10:43:02 20         Did you have the opportunity hear this morning's testimony
      21  by Dr. Antommaria?
      22  A    Yes, I did.
      23  Q    Did you understand Dr. Antommaria to testify that randomly
      24  controlled studies are not available in this area of medicine?
10:43:16 25 A    Yes.
```

1   Q     Did he then say, if you understand -- as you understand,

2   that because the randomly controlled trials are not available,

3   we can rely on observational trials?

4   A     That is roughly what I understood him to say, yes.

10:43:33  5   Q     Do you have any response to that?

6   A     Yes.   That's not -- it is true that none of the existing

7   studies are randomized, but it is entirely untrue that we

8   therefore can rely -- can make decisions based on the least

9   reliable kinds of studies.

10:43:48  10        There is a wide, wide range of studies in between, and

11   there's a wide, wide, range of different scientific

12   methodologies that we can employ in order to minimize the laws

13   that we get from completely randomized studies.

14        It's also actually possible if we wanted to conduct such

10:44:09  15   studies such as by allowing people to undergo different parts

16   of a treatment at different times, so we can compare the

17   differences between them when one group has started on that

18   type of treatment and the other hadn't yet.

19   Q     Okay.   So the randomized trials would be considered like

10:44:29  20   the gold standard, the top-tier level of scientific research?

21   A     Randomization is one factor in determining how high

22   quality a study is.   It is not a -- it's neither an all or

23   nothing.

24   Q     I understand.   But did I understand you to say that if you

10:44:47  25   assume that's not available, that's no reason to drop down to

1  the lowest quality of evidence?

2  A     That is correct.

3  Q     I understood Dr. Antommaria to testify that the level of

4  evidence supporting the WPATH and Endocrine Society guidelines

10:45:05 5  is comparable to the level of evidence supporting other

6  treatments in pediatrics.  Can you respond to that?

7  A     I am not aware, of course, of all the other treatments in

8  pediatrics.  However, there are no studies yielding positive

9  effects of either the Endocrine Society standards or the WPATH

10:45:24 10  standards.

11      The studies which have shown effects have used the Dutch

12  model, which uses a higher set of standards than either the

13  Endocrine Society or the WPATH group.

14  Q     Speaking of the Dutch study, I also understood

10:45:42 15  Dr. Antommaria to say there is no high quality evidence

16  supporting the use of psychotherapy alone for gender dysphoria.

17  Do you agree with that?

18  A     No, I do not.

19  Q     What would you say in response?  What's the countervailing

10:45:56 20  evidence?

21  A     There exists roughly 15'ish studies following up these

22  kids at all.  All of the studies, which without exception that

23  used medical interventions also used psychological --

24  psychotherapy at the same time.  So all of the studies which

10:46:17 25  could seem to show a benefit for medical interventions are

1    unable to distinguish that it was the medical intervention

2    causing the benefit, versus the psychotherapy causing the

3    benefit.

4         Of those studies, two were designed in a way that it was

10:46:33  5    possible to peel apart the effects of psychotherapy versus

6    medicine -- the Costa study and the Achille study.  The full

7    references are in my report.

8         In the Costa study, there was a -- there were two phases.

9    There was a phase that people went through when they received

10:46:52 10    psychotherapy alone.  And then in the subsequent phase, they

11    received both psychotherapy and medical interventions.

12        There were no significant differences between the group.

13    Both groups improved, and there were no significant differences

14    between the group that received psychotherapy alone and the

10:47:08 15    group that received psychotherapy plus medical interventions.

16        The other study, the Achille study, used a statistical

17    method to control for the effects of psychotherapy.  That group

18    also improved after medical intervention, but when the effects

19    of psychotherapy were statistically controlled, there was no

10:47:28 20    additional benefit of the medical interventions after that.

21    Q    I want to break some of that down.  You mentioned studies

22    where all the participants were receiving both psychotherapy

23    and medical-affirming care at the same time, right?

24    A    Correct.

10:47:48 25    Q    Is that the Dutch -- oh, is the Dutch protocol, the Dutch

1   study an example of such a study?

2   A    Both Dutch studies, the 2011 and the 2014, yes.

3   Q    If, at the end of that trial, you look and see the people

4   that were receiving both psychotherapy and medical-affirming

10:48:06  5   care at the same time, improved in mental health at the end of

6   the trial, can you as a scientist tell whether the improvement

7   is the result of the pharmaceuticals or the psychotherapy?

8   A    Not in the design of those studies, no.  That's what in

9   science is called a confound.

10:48:27 10   Q    Confound?

11   A    Correct.

12   Q    What does that mean, confound?

13   A    It describes exactly that situation.  When two things are

14   done at once, when you see the result, you can't peel apart

10:48:37 15   which -- which of those two interventions was responsible or

16   the interaction between those two interventions was

17   responsible.

18   Q    Okay.  But the Costa and Achille study, on the other hand,

19   they do provide scientific evidence that psychotherapy alone is

10:48:53 20   helpful, did --

21   A    That's correct.

22   Q    Okay.

23   A    That psychotherapy is helpful and not the medical

24   interventions.

10:49:01 25   Q    I also understood Dr. Antommaria to say that he had not

```
 1  read studies about detransitioning.  But if it ever became
 2  relevant, he would make an effort to review such studies.
 3       You are familiar with the body of the literature
 4  concerning gender dysphoria, correct?
10:49:21  5  A    Yes.
 6  Q    In your opinion, are the studies of detransitioning
 7  relevant to someone trying to assess the benefits and harms of
 8  these treatments?
 9  A    Yes, of course.  It's very difficult -- detransition would
10:49:35 10  be the situation that one is trying to avoid.  The best way to
11  avoid a situation is to understand that situation.
12  Q    Dr. Antommaria said that there are prospective
13  observational trials that demonstrate the efficacy of puberty
14  blockers in gender-affirming care, and then later said the
10:49:59 15  trials he is referring to were primarily the Dutch group
16  studies.
17       Are those the studies you just mentioned, the 2011, 2014
18  studies?
19  A    Those are the Dutch studies that usually we use.  I can't
10:50:12 20  know if he is referring to some other study that I didn't make
21  a specific reference to.
22  Q    That's fair.
23       In this area of medicine, when someone's talking about the
24  Dutch studies, the Dutch group studies, is it your
10:50:25 25  understanding they're generally referring to these 2011 and
```

```
        1  2014 studies from the Dutch project?
        2  A    Almost always, yes.
        3  Q    Okay.  And those are the studies you just mentioned that
        4  have the confound problem, right?
10:50:36 5  A    Correct.
        6  Q    You can't unpack whether it's the psychotherapy or -- not
        7  from that study, you can't unpack whether it is the
        8  psychotherapy or the pharmaceuticals that are making the
        9  difference?
10:50:47 10 A    That's correct.
       11  Q    Okay.  More generally, I'd like to read for you a
       12  statement from the plaintiffs' brief in support of their
       13  preliminary injunction motion.
       14       For the record, it's Doc 8 at page 18.
10:51:07 15      Dr. Cantor, the plaintiffs wrote in that brief, For more
       16  than four decades, medical organizations have studied and
       17  created an evidence-based standard for the medical treatment of
       18  transgender patients.  This standard confirms that transition,
       19  including puberty blockers and hormone therapy where
10:51:26 20 appropriate, is the only safe and effective treatment for
       21  gender dysphoria?
       22       Dr. Cantor, does the research literature support that
       23  statement?
       24  A    No, it does not.
10:51:37 25 Q    Do you understand the plaintiffs primarily to be pointing
```

to the guidelines of medical organizations such at WPATH and

the Endocrine Society and the American Academy of Pediatrics to

support their positions that wish to continue giving these

treatments to children?

10:51:52 5   A    Yes.  They cited those repeatedly.

6   Q    Okay.  What observations have you had about the WPATH

7   guidelines and whether they have support in evidence?

8   A    The WPATH guidelines and the Endocrine Society guidelines

9   have been tested among the set of -- as I say, roughly 15

10:52:13 10  outcome studies, some of them have used the WPATH guidelines or

11  Endocrine Society guidelines instead of the Dutch protocol.

12  And those studies demonstrated that there was no improvement at

13  all.

14      I shouldn't say none at all.  One of them used several

10:52:36 15  kinds of measures of improvement, and I think it was all but

16  one demonstrated no differences at all.  And one small one gave

17  an indication that suggested the possibility.

18  Q    Have these organizations acknowledged anything about

19  desistance rates -- these organizations, I'm referring

10:52:57 20  specifically to WPATH and the Endocrine Society?

21  A    I can't say that they've never addressed it, but to the

22  extent if it was ever addressed, they are grossly, grossly

23  minimized.

24  Q    Can I refer you to paragraph 12 of your report on page 4?

10:53:33 25  A    I got it.

1    Q    You say in that paragraph that the plaintiffs'

2    documentation -- and I assume by documentation, you mean

3    their -- the pleadings in this case and the briefs that you had

4    seen?

10:53:50 5    A    That's correct.

6    Q    You said the plaintiffs' documentation misrepresents the

7    contents of the associations' policies themselves.

8         Which associations were you speaking of there?

9    A    They mentioned several other societies which made short

10:54:04 10   statements in general support of sexual diversity, but without

11   actually issuing specific standards about how to treat people

12   in that community with what or at what ages.

13   Q    And what inconsistencies did you see between what those

14   organizations have said and the arguments you saw in

10:54:23 15   plaintiffs' briefing?

16   A    The plaintiffs referred to the societies as if they were

17   providing very specific support for very specific policies

18   rather than general recommendations to provide, for example,

19   respect and values for diversity, but no specific guidelines.

10:54:48 20   Q    Okay.  Well, looking at paragraph 12, is one of your

21   points here looking at the bullet points that even WPATH and

22   Endocrine Society acknowledge as you write, that desistance of

23   gender dysphoria occurs in the majority of prepubescent

24   children?

10:55:04 25   A    That is correct.

1    Q    And then turning the page, were there other issues you saw

2    that the statements -- that these organizations believed and

3    plaintiffs' briefing was inconsistent with what the

4    organizations had stated?

10:55:16  5    A    That the issue of mental health and that mental illnesses

6    and similar concerns need to be resolved before considering

7    transition rather than depending on transition to be the

8    resolution of, for example, depression and anxiety.

9    Q    And have any of these organizations acknowledged that

10:55:42 10    puberty-blocking medication is an experimental not a routine

11    treatment?

12    A    Yes, they have used that phrase.

13    Q    Which organization?

14    A    Again, I would have to look up to see exactly who used

10:55:52 15    which word.  I believe it was WPATH, but I again have to go

16    back and check to make sure that it was they.

17    Q    And let's turn to the American Academy of Pediatrics.  And

18    I will refer you to your appendix.

19         And, Dr. Cantor, if you look at the top of the page, you

10:56:12 20    will see a line of blue figures.  And it's page X out of 106.

21    The appendix I am referring to is page 100 out of 106.

22    A    Got it.

23    Q    What does the American Academy of Pediatrics or AAP, what

24    do they recommend in this area of care?

10:56:42 25    A    They recommend what I can best describe as affirmation on

```
 1  demand.
 2  Q    Okay.  Did you review their recommendation when it came
 3  out?
 4  A    Specifically I reviewed the sources on which they based
 5  their recommendations.
 6  Q    Okay.  Did you write about that?
 7  A    Yes, I did.
 8  Q    And does that appear as an appendix to your report
 9  beginning at page 100 of that pdf?
10  A    That is correct.  I summarized all of my comments.  I
11  submitted them to a journal where they underwent peer review.
12  And it's an official published peer-reviewed paper.
13  Q    This is not a letter to the editor?
14  A    That is correct.  This is part of a scientific -- now part
15  of the scientific literature.
16  Q    What did you comment upon?
17  A    I really just checked what the authors of the AAP policy,
18  Dr. Rafferty, what their claims were, what they said was in
19  their references versus what was actually in their references.
20       And not only did their sources not contain what they were
21  alleged to have obtained, they often contained the very
22  opposite of what the AAP policy said they contained.
23  Q    Did you have an agenda to disprove -- to prove or disprove
24  anybody when you undertook that review of the evidence?
25  A    I wouldn't say an agenda other than to set the record --
```

1   pardon the pun -- straight.

2       This was a situation where these sources I had known for

3   many years.  I had read them when they had first came out.

4       And when AAP came out with its policy, I was stunned by

10:58:21 5   its content.  And as I read what they were basing it on, my

6   recollection was immediately this is not what those sources

7   said.

8       So immediately I just started double checking myself.  Did

9   I misread something?  Am I misremembering something?

10:58:36 10       And as I just checked in my own files with copies of these

11   papers -- most of these papers already in it, my memory was

12   correct.  They said as -- the kinds of things I recalled them

13   to be saying.

14       Because we were now talking a major medical association

10:58:51 15   rather than an individual other scientist.  This was different

16   from just one scientist like me disagreeing with another

17   scientist.  This was now -- now had the potential to cause a

18   great deal of damage to a great number of people.

19       So because I had the ability to do it, I simply summarized

10:59:11 20   the contents of the original paper and contrasted point by

21   point the claims being made by AAP and simply quoting verbatim

22   what was in the original studies.

23       That entire thing was published, and the AAP has never

24   responded.  They were approached by the media, and they just

10:59:33 25   would refuse to talk even to the media.  They have yet to have

1  any response.

2  Q    So to date, the AAP has not responded to the criticisms

3  that you raised?

4  A    That is correct.

10:59:42 5  Q    I will refer you now to page 6 of your report.  Going by

6  the numbers at the bottom of the pages.

7  A    Yep.

8  Q    As you noted in your review of the plaintiffs' expert

9  report -- well, first off, did you review the expert reports

11:00:08 10  submitted by the plaintiffs by Dr. Hawkins and Dr. Ladinsky?

11  A    Yes, I did.

12  Q    And did you note that they studied a 2016 Olsen study

13  claiming that it proves that transition reduces the risk of

14  mental illness?  That that was their claim?

11:00:23 15  A    Correct.

16  Q    Does the Olsen study show that?

17  A    Just referring to my own report.  Ultimately, no, it did

18  not.  There was several statistical errors in the Olsen study.

19  The data were obtained then by the -- they -- upon request, and

11:00:45 20  Olsen provided their data to another author who reanalyzed -- I

21  should say, correctly analyzed the Olsen data, who demonstrated

22  that Olsen's data did not contain evidence of improvement.  In

23  fact, it contained evidence of deterioration.

24  Q    So in your opinion, does the 2016 Olsen study support

11:01:04 25  plaintiffs' position that children need these affirming --

 1  these medicalized affirming treatments in order to improve

 2  their mental health?

 3  A    No, it does not.  Making such a claim is a half truth.  It

 4  would ignore the subsequent entries in the scientific

11:01:20  5  literature.

 6  Q    And what about the de Vries study that plaintiffs cited in

 7  which you address on page 9 of your report?  And does it show

 8  that medical transition of minors improves mental health?

 9  A    No.  It contains part of the confound.  The de Vries study

11:01:43 10  as part of a Dutch group also included psychotherapy during

 11  transition.  So it is not possible to differentiate which type

 12  of therapy, medical or psychotherapy, is responsible for the

 13  benefits reported in that study.

 14  Q    I see.  So participants in that study did have improved

11:02:00 15  mental health, correct?

 16  A    Yes.

 17  Q    But it's just not possible scientifically to tell what

 18  caused the improvement?

 19  A    Correct.

11:02:06 20  Q    And what about the Greene and Turbin studies plaintiffs'

 21  experts cited which you discuss in paragraph 24 of your report?

 22  A    Yep.

 23  Q    Do those studies show that medical transition improves

 24  mental health?

11:02:25 25  A    No, they do not.  These are retrospective correlational

1  studies.  They are not able of describing any causal effect

2  coming to any causal conclusion.

3  Q    Okay.  Now, you mentioned there that -- you say this very

4  pattern is what one would predict from clinical gatekeeping.

11:02:43 5  What do you mean by clinical gatekeeping?

6  A    One of -- across the various clinical standards are to

7  prevent somebody with mental illness from undergoing

8  transition.  So such people are being held back.  They're being

9  filtered out of groups who do undergo transition.

11:03:03 10      So when a clinic then compares the people who underwent

11  transition to the people in their files who did not undergo

12  transition, they are necessarily comparing a group of people

13  from whom the mental illness was removed and comparing them to

14  a group of people from whom the mental illnesses were not

11:03:22 15  removed.

16      So when you see better mental health amongst the people

17  who had transitioned, the improvement is not because of the

18  transition, the improvement is because you have removed the

19  people with the worst mental health from the group in the first

11:03:40 20  place.

21  Q    Okay.  So is it correct, then, that one thing you might

22  see in these studies is by picking out the people with the best

23  mental health, and giving them the treatment, then comparing

24  them to the people with lower mental health, then, of course,

11:03:57 25  the people who went through the study would do better?

```
 1  A    That is correct.
 2  Q    Did you review any of the other studies that plaintiffs
 3  have submitted into evidence such as the Allen study, the
 4  Turban articles, the Biggs (phonetic) study, the Lopez de Lara
 5  study, Tordoff?
 6  A    Yes, I have.
 7  Q    Do you have any comments on those studies and whether they
 8  support plaintiffs' position?
 9  A    They suffered from the same methodological problems as the
10  other studies.
11  Q    Did any of those studies support the position that medical
12  transition improves mental health?
13  A    No, they did not.
14  Q    In minors with gender dysphoria?
15  A    Correct.  No, they do not.
16  Q    Oh.  What has been called the Yale study by Brouware,
17  B-R-O-U-W-A-R-E, was the first named author.  Did you review
18  that one?
19  A    Yes, I did, but it wasn't a study.
20  Q    What was --
21  A    Apparently, that was a report submitted by those authors
22  for another -- or for a combined set of court cases.
23  Q    Okay.  But you would not refer to that document as a
24  scientific study?
25  A    From the Yale group with -- again, the name I don't -- I
```

1   hesitate to try to pronounce, but, no, it was not a study at

2   all.  It was those authors' report reviewing the literature and

3   providing their opinions.

4   Q    Okay.  As a matter of fact, Dr. Ladinsky was asked about

11:05:39 5   that study yesterday.  And for the record, that testimony

6   appears on page 116 of the rough transcript.

7        The question was:  In this document, do the authors also

8   cite a number of peer-reviewed studies that contradict some of

9   the supports or the principles that the State articulated as

11:06:00 10   the reasons for SB 184?  And Dr. Ladinsky responded, They do, a

11   considerable compendium of them.

12        Is she right?  Did those authors show that there are

13   studies that contradict the State's position in this case?

14   A    There was such a statement.  There was no meaningful way

11:06:21 15   to try to put together what claim went together with what

16   source.  Rather than -- what's done more typically either in

17   science or in pause, best as I understand, is here the claim

18   and here is the source justifying it.  Here is next claim, here

19   the source justifying it.

11:06:38 20        Instead, that document made a long series of unsourced

21   claims and then provided a long series -- a series of very

22   large footnotes with 20 and 30 references.  And there was just

23   no way to see what fact was alleged to have come from what

24   source.

11:06:56 25   Q    So we've talked about whether the literature the

plaintiffs' -- the studies that plaintiffs cite to support

their position.  Let's talk about whether the literature

supports the State's position.  But a little background first.

Could you describe from your review of the literature just

what's the difference between adult onset gender dysphoria,

child onset, and adolescent onset?  And I know this is a broad

question, but I just mean like age groups.

A    Usually we would be referring to these as a prepubescent

onset.  Then the literature is very, very long, but reported on

adult onset.  And by adult, on average, these were people in

their 20s and in their 30s and 40s.  It was very, very

distinct.  It was not, you know, a bell-shaped curve with some

midpoint around 18 or 19 years old.

It's only within the past --

THE COURT:  Hold on one second.

Go ahead.  Sorry.

THE WITNESS:  It's only within the past ten years or

so that a different profile has begun to emerge and was noticed

by clinicians.  And that now is being called either adolescent

onset or rapid onset.

Now, all three of these groups have in common that they're

complaining about the same thing.  Doc, I feel like I am in the

wrong body.  Doc, I am the brain of one, but in the body of the

other.

So the way that they describe it is similar.  But every

objective way we have of measuring these people shows that

these are independent phenomena.  They are not related except

in the way that people describe the situation, describe what

they're experiencing.

11:08:50       The best analogy I have would be if somebody came to a

doctor saying I have a headache.  Okay.  I got it.  Got that's

a symptom.  I have some more questions.  But we cannot from

that say that a migraine headache is the same thing as a

tension headache is the same thing as having just suffered a

11:09:08  head injury.

The causes are different.  How we respond to them is

different.  And the other characteristics about each of these

are different.  They only resemble each other in the most

superficial ways.

11:09:19       Childhood onset or prepubescent onset gender dysphoria

appears to be entirely unrelated to adult onset gender

dysphoria.  And the two of those appear to be entirely

unrelated to the rapid onset or adolescent onset gender

dysphoria.

11:09:40  BY MR. DAVIS:

Q    Well, let's break that down.  Adult onset, typically

people who present with what you're referring to adult onset

gender dysphoria, what age are they when they come into the

doctors' office and say, something's wrong?

11:09:50  A    On average, in their 30s and 40s.

```
 1  Q    Okay.  Has there been research considering whether
 2  those -- that universe, the adult onset universe does well
 3  after transitioning?
 4  A    Those who are mentally healthy by and large do, do well
 5  after transition.
 6  Q    Can you apply those studies to consider whether someone
 7  with child onset gender dysphoria is going to do well after
 8  transitioning?
 9  A    No.  Because these are independent phenomena.  The
10  information from one does not -- from one group does not
11  generalize to the other.
12  Q    Comparing the adult and the child onset, what is the
13  difference that makes the studies of one, you know, it's not
14  apples to apples?
15  A    Correct.
16  Q    Okay.  What is the difference between those patients?
17  A    The -- they -- as I say, differed in just about every
18  objective measure we've been able to apply to them.
19       There are, of course, the ages themselves.  Something --
20  the sex ratios in them are different.  The adults are almost
21  100 percent biological male.  There's more of a mix amongst the
22  childhood onset.
23       The adults are almost always attracted to females.  That
24  is to say, relative to being biological male, they are almost
25  always heterosexual.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1      The childhood onset almost always are attracted to the

2 same biological sex.  They are almost always homosexual.

3 Q    Talking about the child onset, is that a new phenomenon,

4 child onset gender dysphoria?

11:11:31 5 A    I wouldn't say new.  It's been systematically studied for

6 20 to 30 years'ish.

7 Q    From the literature that you reviewed, do most of these

8 kids, if not socially transitioned and given hormones, will

9 they want to transition after reaching puberty?

11:11:52 10 A    Generally not.

11 Q    And page 36 -- excuse me -- paragraph 36 of your report,

12 Dr. Cantor, what statistics do you provide about the rates of

13 desistance among those presenting with childhood onset gender

14 dysphoria?

11:12:15 15 A    The exact numbers are between 61 to 88 percent of them

16 desist.  In the appendix in my report, I list all of the

17 studies that have ever been conducted with that group, all the

18 outcome studies that have been conducted with that group.

19 Q    We probably both need to slow down just a little bit

11:12:37 20 for...

21 A    I'm from New York.  It just happens.

22 Q    We'll do our best.

23      Dr. Hawkins was asked about your paragraph 36 yesterday.

24 And I will represent that on page 30 of the rough transcript,

11:12:54 25 she said that when the study such as the ones you're citing

1    offers this elevated rate of desisters, quote, what we tend to

2    find is that the initial cohort that was given the diagnosis of

3    gender dysphoria is actually false.

4        My question, Dr. Cantor, is:  Does the research literature

11:13:15  5    support Dr. Hawkins's statement?

6    A    No.  As I say, I listed every single such study.

7    Q    Do we have any tools today that reliably tell us which

8    kids will desist and which kids will persist?

9    A    No, we do not.  There have been some attempts to develop

11:13:34 10   such a test, but they have never been able to find a good

11   characteristic, a feature, a pattern, a test result in which

12   the majority continued to want to persist.

13       The best that they have ever been able to do was find a

14   tool which distinguished unlikely to want to persist versus

11:13:54 15   even less likely to want to persist.

16   Q    There's been testimony about something called the DSM-5.

17   Do you know what that is?

18   A    Yes, I do.

19   Q    What is it?

11:14:04 20   A    The full name is the Diagnostic and Statistical Manual of

21   Mental Illnesses, published by the American Psychiatric

22   Association.

23   Q    If someone were to claim that now that we have the DSM-5

24   we may be able to do a lot better with identifying who's the

11:14:24 25   desister and who is the persister, is there any research on

1    that?

2    A    No.  Nobody's ever tried to differentiating any of the

3    DSMs from DSM-I through its various versions to the current

4    one.

11:14:38  5    Q    So there have been at least five?

6    A    There was a I, a II, a III, III-R, IV, IV then had a text

7    revision.  They switched some of the commentary around the

8    diagnoses, but they didn't change any of the diagnostic

9    criteria themselves.  There was then the 5.  And there is as of

11:15:01 10    last month a 5 again with a text revision, but no changes to

11    any of the actual diagnostic criteria.

12            THE COURT:  Mr. Davis, how much longer do you think we

13    will be?

14            MR. DAVIS:  Your Honor, direct will take us up to

11:15:14 15    about noon, I would predict.  There's just a lot to cover with

16    Dr. Cantor.

17            THE COURT:  I am not rushing you.  I am just trying to

18    get a road map of that.

19        So how long do we think cross might be?

11:15:25 20            MS. EAGAN:  It's difficult to predict because I am not

21    sure what else he may say, but maybe an hour, hour or less, I

22    would think.

23            THE COURT:  All right.  I am leaning toward an earlier

24    lunch than we did yesterday.  So maybe -- if it's okay with

11:15:45 25    you, let's just go ahead and find a stopping point at your

```
 1   leisure, and we will just pick back up after lunch.
 2             MR. DAVIS:  Thank you, Your Honor.  This is as good as
 3   any.
 4             THE COURT:  Is it?
 5             MR. DAVIS:  Yes.  We have just talked about DSM-5.
 6   Going to watchful waiting next.  This is as good a place as
 7   any.
 8             THE COURT:  Okay.  Good.  Good.  With that said, then
 9   are we still on target with your last witness?
10             MR. DAVIS:  Yes, Your Honor.  Ms. Wright is here.  I
11   don't know if she is in the courtroom yet or not, but she is in
12   Montgomery, and she will be ready to go when we finish with
13   Dr. Cantor.
14             THE COURT:  We think the length of that witness would
15   be what?
16             MR. DAVIS:  Oh, I would say direct would be well under
17   30 minutes, but I don't know about cross.
18             THE COURT:  Okay.  All right.  Okay.  Well, I think
19   we're on target.
20        Let's take a good long lunch today.  Let's see here.
21   Let's come back at 12:45.
22             MR. DAVIS:  Thank you, Judge.
23             THE COURT:  Thank you.
24             MR. DOSS:  Judge?
25             THE COURT:  Yes?
```

```
 1              MR. DOSS:  Closing, how long would you like?
 2              THE COURT:  You know, I mean, this is important.  I'm
 3      not going to, you know, jack everybody up on this, but to the
 4      extent you can hold it to around 25, I think would probably be
 5      a good thing.
 6           And in your openings, I think you really road mapped it
 7      very well, both sides did.
 8           So, you know, again, I know the arguments.  I'm really
 9      interested in, you know, some analysis with case law.  And I am
10      going to be directly asking about a few cases.  I'm very
11      interested to know parallels between the Arkansas decision and
12      that law.  And then I may give you some hypotheticals that you
13      won't like.
14           See you after lunch.
15              (Recess.)
16              THE COURT:  All yours, Mr. Davis.
17              MR. DAVIS:  Thank you, Judge.
18      BY MR. DAVIS:
19      Q    Welcome back, Dr. Cantor.
20           We spoke earlier about the Dutch protocol.  Did the
21      participants in those Dutch studies have psychotherapy before
22      beginning treatment?  Before that study?
23      A    They were receiving treatment as part of their
24      participation in the study.  I don't think they reported
25      whether anybody happened to have attempted psychotherapy before
```

11:17:07  5
11:17:22 10
11:17:40 15
12:51:00 20
12:51:21 25

1    approaching the clinic at all.

2    Q    Okay.  Forgive me if I'm mistaking which study is which.

3    I was reading about a study that described the psychotherapy

4    that was available to the participants as extensive.  And that

12:51:40 5    that extensive psychotherapy was at least two years.  Which

6    study am I thinking of?

7    A    That wouldn't have been a particular study so much as what

8    they use in their process in general.

9         And then the Dutch group was reporting the results, you

12:51:56 10    know, of -- periodically over the course of the study.

11    Q    I see.

12    A    But by the time the first set of results, their earlier

13    study, the 2011 study, the participants in it will have already

14    been through a substantial amount of therapy.

12:52:13 15    Q    Okay.

16    A    They also emphasize that in assessing the children that

17    it's a very extensive assessment, and the assessment itself was

18    also ongoing over the course of the study.

19         So even before deciding who might be eligible for

12:52:30 20    hormones, they have now many, many months to years' experience

21    with the particular case even with a particular child even

22    before making a decision.  That's very, very different from

23    just having an appointment, taking a test, and then having a

24    diagnostic decision an hour later.

12:52:46 25    Q    That is exactly what I was meaning to ask you about.  I

1  was using sloppy language.

2       So this extensive assessment that happened before some of

3  these children began treatments, they were assessed, you said,

4  over a course of a couple of years?

12:52:59 5  A    Correct.

6  Q    Okay.  So does literature support having such an extensive

7  assessment period before subjecting someone to these

8  treatments?

9  A    I don't know if I would say support it, but all of the

12:53:16 10  conclusions that come from the literature depend on it.

11  Q    Thank you.

12       Is there a way of treating gender dysphoria that some

13  practitioners refer to as a watchful waiting approach?

14  A    Yes.  Watchful waiting usually refers specifically to

12:53:40 15  withholding any decision about medical interventions until they

16  have a better idea or feel more confident for a particular case

17  about whether that kid is going to be a persister or desister.

18  It is given the knowledge that that's available that the

19  majority of these kids do desist.  Nobody wants to make a

12:54:00 20  decision upon first appointment.

21       And so -- so they tend to provide psychotherapy, whatever

22  kind of care, whatever is appropriate to the individual kid

23  until enough time has gone by to give -- to suggest is this a

24  kid whose feelings like they're feelings are slowing down and

12:54:19 25  they just need more time, are they building up, or are they

1   staying steady?

2       So the watchful waiting period would be postponing any

3   decision about medical interventions until the clinicians had

4   some confidence.

12:54:31 5   Q   While you are watching and while you are waiting, are you

6   just leaving him alone, or her?

7   A   No.  That would be the time during which one would be

8   supplying a therapy for whatever else is going on in the kid's

9   life.

12:54:42 10  Q   Okay.

11  A   Usually they're associated with -- there's a great deal of

12  what we call comorbidity.  They're also suffering from other

13  problems at the same time, either depressions, anxieties, early

14  evidence of personality disorders, for example.  And it's never

12:55:00 15  clear whether their gender dysphoria is a result of those other

16  psychological problems.

17      So by helping them develop the tools to deal with those

18  other problems, if they remain dysphoric afterwards, we know

19  that the dysphoria wasn't the result of those other problems.

12:55:17 20  So rather than just leaving them alone, they're still receiving

21  support, and the family is still receiving support over that

22  period.

23  Q   So I believe you pointed out in your report that clinical

24  guidelines suggest that mental health issues such as the

12:55:33 25  comorbidities you mentioned should be resolved before

1    transition; is that correct?

2    A    Yes.

3    Q    Okay.   Why?

4    A    Because it's never clear what's causing what.   We cannot

12:55:44  5    from a correlation conclude anything about a causation.   It's

6    very possible, and it's been frequently observed that a lot of

7    these kids are using gender issues as an explanation for the

8    unhappiness that they're experiencing elsewhere in their life.

9         So rather than developing the skills to -- for example --

12:56:04 10    better social skills.   If a person feels awkward and they're

11    withdrawing from kids their own age, we are not sure if they

12    want to transition because they're blaming gender dysphoria for

13    why they feel unpopular or uncomfortable, and we're not --

14    versus we can't tell if anxiety or depression is a result of

12:56:27 15    how they're being treated by the rest of society.

16         So it's only by helping them deal with and by giving them

17    the skills to overcome those other disorders that we can see if

18    the gender dysphoria itself resolves just as a result of that.

19    Q    So if a person is suffering from depression, or is

12:56:48 20    struggling with their own sexual identity, or some type of

21    abuse, or any of these other comorbidities, explain how this

22    psychotherapy process would work, how a psychotherapist such as

23    yourself would try to dig down into the issue and see if that

24    is something that's generating these feelings that are being

12:57:08 25    mistaken as gender dysphoria, or whether the gender dysphoria

1    is its own thing.

2    A    Just to be specific, I'm specifically an adult clinical

3    psychologist.  I see clients ages 16 and up.  So it wouldn't be

4    me personally.

12:57:23 5        What the literature shows about these kids is that they

6    can be very, very diverse.  It certainly is feasible that they

7    are experiencing, for example, depression or anxiety as a

8    result of social transphobia, but that doesn't explain the

9    other things that we're observing.

12:57:41 10        For example, a transphobia doesn't cause autism, which is

11    another very, very common disorder in that group.  Transphobia

12    wouldn't cause the development of borderline personality

13    disorder, which we're seeing in very, very, large proportions

14    among the teenagers.

12:57:58 15        So although certain symptoms like anxiety and depression

16    can feasibly be the result of social reactions to being trans,

17    but that does not explain the overall phenomenon.  What does

18    better explain the overall phenomenon is that there is some

19    thing troubling this kid, and it is resulting in both the

12:58:20 20    psychological symptoms, depression, anxiety in someone, and

21    also producing the gender dysphoria, that discomfort with being

22    their natural sex.

23    Q    I would expect this could vary wildly from patient to

24    patient, but if you -- and I recognize and thank you for

12:58:37 25    clarifying that you deal with a more adult-age group.

 1          But if you're helping someone, an adolescent, work through

 2     some of these issues, how often do you think a psychotherapist

 3     would want to see the patient and over what period of time?

 4     A    It does vary widely.  And the kind of disorders that

12:58:57  5     they're reporting do tend to be the kinds that require very

 6     long-term interventions.

 7          As I say, autism, and related Asperger's syndrome, and

 8     also very, very high rates of borderline personality disorders,

 9     which, again, is a very, very long-term disorder to help

12:59:14 10     somebody deal with.

11     Q    Fair to say this would not be two or three sessions?

12     A    Correct.  This would be over the course of months or

13     years.

14     Q    Does the research literature show that there are risks

12:59:30 15     associated with medical transitioning?

16     A    Yes, quite substantial, including both loss of --

17     primarily loss of function, and depending on the person's point

18     of view, whatever the cosmetic effects are.

19     Q    What are the risks of the watchful waiting approach in

12:59:48 20     providing psychotherapy in helping the child deal with any

21     underlying emotional issues?

22     A    There don't appear to be any, at least any concrete.

23     Q    I will refer you to paragraph 68 of your report,

24     Dr. Cantor.

13:00:06 25          Tell me what the advantages there are to a patient, what

1    opportunities it opens up to him or her if any emotional issues
2    are dealt with before the decision to transition.
3    A    If a person fails to deal with whatever emotional issues
4    before it transition, and then transitions and discovers that
13:00:30 5    they continue with whatever psychological issues are pervading
6    them, they have gone through the entire transition process
7    entirely unnecessarily.  They haven't been helped.  They have
8    now lost whatever -- they have now been sterilized, lost
9    whatever sexual -- or other functions, but it hasn't actually
13:00:49 10    resulted in any improvement in their psychological function.
11        If you go the other way around and you help the person
12    deal with psychologically whatever it is that's going on, they
13    still retain the option for transition after that.  And it's
14    that situation that the professional societies have
13:01:05 15    repeatedly -- that the standards of care have repeatedly
16    pointed out.
17    Q    So watchful waiting approach does not eliminate a person's
18    ability to transition to the opposite sex later in life if they
19    so choose?
13:01:19 20    A    Correct.
21    Q    Does the research literature show there's any relationship
22    between children who present with gender dysphoria and those
23    who later in life turn out to identify as gay?
24    A    Yes.  The large majority of the ones who believe that they
13:01:42 25    were born the wrong sex turn out to be gay or lesbian.

1          To a prepubescent child who doesn't yet have a sex drive,

2    they have no way to interpret why they feel different from

3    other boys or other girls their age.  It's only with the onset

4    of sex drive that they start -- and start developing crushes

13:01:58  5    and physical attractions that they now have the information

6    they need to realize why they're different.  But to an eight

7    year old or to prepubescent children, the only explanation they

8    have for why they're not like other boys or not like other

9    girls is they must be the wrong sex.  They're misinterpreting

13:02:18 10    their feelings.

11          THE COURT:  Let's take a quick time out.

12      So, you know, I guess I'm wondering how both sides are

13    wanting me to use all this expert testimony.  I mean, the

14    Eleventh Circuit has said more than one time that, you know,

13:02:31 15    medical psychiatric professionals are in a far better position

16    to make decisions about medical and psychiatric issues than

17    judges are.

18      So I guess I want to know from each side real quickly, how

19    do y'all envision that I use these experts?  I mean, are you

13:02:48 20    asking me to say, well, this guy's science is junk and this

21    guy's science is perfect; or something in between?  What am

22    I -- tell me how you envision me using this.

23          MR. LACOUR:  May I?

24          THE COURT:  Perfect.  Absolutely.

13:03:05 25          MR. LACOUR:  Your Honor, as we began the opening

<table>
<tr><td>13:03:29</td></tr>
<tr><td>13:03:45</td></tr>
<tr><td>13:04:03</td></tr>
<tr><td>13:04:19</td></tr>
<tr><td>13:04:45</td></tr>
</table>

1    statements, when there's an area of medical uncertainty, the

2    State has wide discretion to regulate.  So if it's not so clear

3    to you as to which side's experts have it right, if you see

4    that uncertainty, then under Supreme Court precedent, the State

5    is allowed to regulate.

6         The State has to think about all 5 million Alabamians.  We

7    have to take all that into account when regulating in these

8    areas where it is not certain.

9         The judge has an important but a limited role in our

10   federal system to see whether those judgments the State has

11   reached in those areas of uncertainty somehow conflict with the

12   Constitution.

13        And we submit we have come forward with evidence to at

14   least put into question whether there is this consensus that

15   has been proclaimed by the plaintiffs here.

16        Again, I think the bar on the plaintiffs is quite high, to

17   show an absence of uncertainty, or to show some great

18   certainty.

19        And when you look at the international studies and the

20   literature reviews, when you hear from very qualified experts

21   like Dr. Cantor, who have applied great rigor to these studies

22   that are being relied upon by the plaintiffs, by their experts,

23   by the AAP, for example, then I think that is enough to create

24   that doubt to create that space for uncertainty.  And when that

25   is there, the State can step in.

1      So that's how we see it.  We don't think that you sit here

2  as an independent medical board to assess whether a particular

3  treatment is going to be the best for any particular

4  individual.  The role of the federal courts in our federal

13:05:01  5  system, the laboratories of democracy is to see if we have done

6  something that is somewhat inexplicable.

7      I think there is ample evidence to explain why the State

8  has done what it's done in addition to the lengthy legislative

9  findings in SB 184.

13:05:22 10      We have come forward with multiple experts from fields of

11  endocrinology, psychology, and pediatrics, and have brought

12  forward substantial amount of other peer-reviewed research and

13  literature reviews to show that this very novel area of the

14  law -- keep in mind the UAB clinic didn't open until

13:05:44 15  seven years ago.  This is a novel area of medicine, rather --

16  is just, in the State's judgment, too risky.  And if that's a

17  reasonable judgment for the State to make, then that's the end

18  of the case.

19          THE COURT:  All right.  Mr. Doss.

13:06:03 20          MR. DOSS:  Your Honor, I'm unaware of a case that

21  establishes that principle that's so long as there's

22  uncertainty and a reasonable judgment, then that alone is

23  sufficient for the State to violate constitutional protections.

24      The standard of review is what I think helps frame some of

13:06:23 25  this testimony.  So, for example, if strict scrutiny applies,

1  it is the State's burden to establish a compelling state

2  interest.  And that its infringement on the constitutional

3  protection has been narrowly tailored.

4      And I guess to preview Your Honor for closing, that is a

13:06:40  5  key focus that I plan to spend some time with in closing on why

6  this testimony we've heard yesterday and today, number one,

7  does not establish a compelling State interest.  But number

8  two, even if you assume that it does establish some interest by

9  the State, the interest that the State has identified and the

13:06:58  10  regulation that it has imposed are mismatched.  It's not

11  narrowly tailored for the very reasons offered by the State

12  through its witnesses.

13      And based on the standard of review, it is not a reasoned

14  judgment.  That's not the test for when a constitutional

13:07:13  15  violation has occurred.  The test is whether there is

16  satisfaction of this demanding standard for the law's

17  viability.

18      And so as I mentioned in opening, I don't think that Your

19  Honor's job for the purpose of this hearing is deciding

13:07:31  20  ultimately maybe even who is right.  It's to show that there is

21  scientific -- there are standards of care that exist, there are

22  approved approaches to dealing with these issues.  These are

23  real medical diagnoses.  These are real medical treatments.

24      And though the State may disagree them, that's not enough

13:07:50  25  to establish the violation of the constitutional rights, Your

1   Honor.

2          THE COURT:  And on that note, at least from what I can

3   tell from both sides, State and government, and original

4   plaintiffs, am I correct to say that everybody agrees that

13:08:07 5   these are real diagnoses?  Or no?

6          MR. LACOUR:  Your Honor, could you --

7          THE COURT:  And I am going to say this one more time.

8   I don't need head nods.  It is out of hand.  This is not

9   entertainment.  This is the real world and the law.  So we're

13:08:25 10   not in a movie theater.  I don't need head nods.  I don't need

11   approval or disapproval.  If you want to do that, take it

12   outside.

13          Go ahead.

14          MR. LACOUR:  Your Honor, I think -- Your Honor, we

13:08:46 15   agree that gender dysphoria is a psychological diagnosis, but

16   as we have shown in both our written evidence and through

17   witness testimony from both defense witnesses and plaintiffs'

18   witnesses, we don't know whose gender dysphoria is likely to

19   persist.  And that's very important.

13:09:07 20          Even Dr. Antommaria this morning said that if you -- the

21   level of certainty you have --

22          THE COURT:  You are giving me more detail than I want.

23   I just need you to answer my question.

24          MR. LACOUR:  Okay.  Can I respond to something

13:09:21 25   Mr. Doss said before?

1              THE COURT:  Very quickly.

2              MR. LACOUR:  He is unaware of the standard.  We cited

3    it multiple times in our P.I. response.  It's Gonzales vs.

4    Carhart, a 2007 decision from the Supreme Court where the

13:09:32 5    federal government had regulated partial birth abortion.  That

6    was an area of medical uncertainty.

7         There were -- I will go back and I will look at the

8    filings in that case, but I would be shocked if the AMA did not

9    chime in, in favor of the plaintiffs who were challenging the

13:09:46 10   ban on partial birth abortion there saying that it was a safe

11   or necessary -- medically necessary treatment for some people.

12        It was enough that Congress found medical uncertainty

13   there.  And there were values, as well, in unborn life that

14   Congress was able to promote even though there were medical

13:10:04 15   organizations.

16        I will confirm this before closing, but I am fairly

17   certain there were medical organizations who were not fans of

18   Congress's action there.

19        Even so, and even in an area like abortion where there is

13:10:16 20   more law at least for the last 49 years in that space,

21   addressing some right to abortion, even then, that ban was

22   upheld by the Supreme Court.

23              THE COURT:  And I'm sure you can get into that on

24   closing.

13:10:31 25        Let's go back to my original question.  Just answer it

1   succinctly for me.

2         MR. LACOUR:  And that would be are these real

3   diagnoses?

4         THE COURT:  Yes.  Just answer my question in two

13:10:41  5   sentences.

6         MR. LACOUR:  Gender dysphoria is a diagnosis.  I think

7   the debate is how should it be treated.  And SB 184 is

8   expressed in Section 6.

9      There's no ban on psychotherapy whatsoever.  The ban only

13:10:58 10   applies to these novel risky potentially long-term

11   harm-inducing or causing medications.

12         THE COURT:  So no argument from the State on status,

13   diagnosis, any of that?  You are only -- your only issue is

14   treatment; is that correct?

13:11:17 15         MR. LACOUR:  Correct, Your Honor.

16         THE COURT:  Got it.  Thank you.

17      Anything else, Mr. Doss?  And I will give the government a

18   shot --

19         MR. DOSS:  No, Your Honor.

13:11:25 20         THE COURT:  -- if they want to be heard.

21         MR. CHEEK:  Nothing else to add that hasn't already

22   been said, Your Honor.  Thank you.

23         THE COURT:  Okay.  All right.

24      Mr. Davis, I have gotten right in the middle of your

13:11:34 25   witness again.  Sorry.  Pick it back up.

```
 1              MR. DAVIS:  I certainly understand, Judge.
 2    BY MR. DAVIS:
 3    Q    Okay.  Dr. Cantor, we to try to pick up where we were.
 4         Let's take two young boys, eight years old, say.  So
```
13:11:52 5    puberty hasn't started yet.  They both have gender dysphoria,
```
 6    even though they may not really understand it yet.
 7         And I know I'm asking you to assume some things that an
 8    outside observer may not be able to confirm just by looking at
 9    that child.
```
13:12:06 10        And let's assume that both those young boys would, if not
```
11    intervened with transitioning care, would both grow up to
12    identify as gay.
13         So the boy who is left alone to go through natural
14    puberty, what does he come to understand once puberty kicks in?
```
13:12:24 15   A    Once he -- as puberty kicks in, of course, sex drive comes
```
16    in as a part of that, and he starts experiencing sexual
17    attractions and sexual arousal.
18         That, then, because he is experiencing it towards other
19    men, teachers, peers, whoever it is, he can now -- he now has
```
13:12:41 20   the opportunity to understand the nature of his experiences and
```
21    why he doesn't feel quite like other boys, why he doesn't feel
22    as masculine, and why he doesn't feel as masculine.
23         Now, in otherwise healthy circumstances, he will grow up
24    to be a healthy gay man.
```
13:12:57 25   Q    Now, the other boy is given puberty blockers.  What

1   happens in his case?

2   A    Such a person who does not develop sexual -- the capacity

3   for sexual arousal and sexual attractions because the very

4   biological features which produce that have been held from him,

13:13:14  5   he never experiences an orgasm.  He never experiences sexual

6   arousal, and doesn't have the opportunity to understand the

7   other potential explanations for why he feels the way he does,

8   and go from a child's understanding of why he doesn't feel like

9   other boys, to an adult's understanding of why he doesn't feel

13:13:36 10   like other boys.

11       By blocking puberty, you are blocking the very information

12   that he needs to understand his own situation.

13   Q    And you are not claiming to describe every person who is

14   experiencing gender dysphoria, I take it?

13:13:49 15   A    Correct.

16   Q    Does the evidence show that sexual orientation changes

17   after a person identifies as gay or lesbian?

18   A    No.  There is no evidence to suggest that sexual

19   orientation is unstable or changes.

13:14:05 20   Q    What does the evidence show about whether a person's

21   gender identity can change?

22   A    That shows the very opposite.  Among the children, it

23   changes in the majority of them.

24       They're even people who identify and describe themselves,

13:14:19 25   for example, as being fluid, the very definition of which is

1   that their gender identity changes on a constant basis.

2   Q    Are you familiar with the argument that if we do not allow

3   minors to transition medically, the result will be increased

4   suicides within these group of young people?

13:14:38  5   A    I've heard that said, yes.

6   Q    Does the research literature support the argument that

7   denying these treatments will lead to an increase in

8   suicidality?

9   A    No, it does not.

13:14:50 10   Q    Are you familiar with what other countries are doing, with

11   respect to treatment of gender dysphoria?

12   A    Yes, I am.

13   Q    Are there any changes going on in recent years?

14   A    Very much.  In fact, things -- it's almost as if the

13:15:10 15   pendulum has reached its far point, and it's now coming back to

16   a much more moderate evidence-based tone.

17        There was really -- sparking off of the social media age

18   more than anything else, we're able to identify a greatly,

19   greatly accelerated, great and greatly expanded number and type

13:15:31 20   of person who was potentially going to go through transition

21   entirely, unlike the groups which we had previously studied.

22        Several countries, especially in Europe, permitted them

23   with lower and lower standards.  And then once the reports

24   started coming out that that was failing greatly, they're now

13:15:53 25   restricting very, very quickly and very, very greatly.

         1        The two most substantial bans have been in Sweden and in
         2   Finland.  And there are also now very, very strong statements
         3   urging the medical field to pull things back in the UK and in
         4   France.
13:16:08 5   Q    Dr. Ladinsky testified yesterday that -- I don't have her
         6   exact words in front of me -- but she said that what's going on
         7   in the UK and Sweden and Finland isn't as relevant here because
         8   those countries have a centralized health-care system, whereas
         9   we have a less centralized health-care system, and all these
13:16:35 10  experts unrelated can see the same child.
        11        That's a poor paraphrase.  The record will speak for
        12   itself.  But assume she made that type of testimony.  Would you
        13   agree with her?
        14   A    No.  I can't see the logic of it.  It's certainly
13:16:53 15  feasible, in fact, more than likely that decisions are made
        16   differently when there are centralized boards and a centralized
        17   authority charged specifically with reviewing the evidence that
        18   will be the basis of the medical procedures of that country,
        19   and the U.S. lacks that.
13:17:11 20       But there's no reason to think that that situation would
        21   change the actual outcomes of the actual children getting the
        22   actual interventions.
        23   Q    So is it possible, then, that a more centralized
        24   health-care system may provide the ability -- an even greater
13:17:24 25  ability to study and evaluate the risks and benefits of

1  gender-affirming care?

2  A    That's demonstrably true.  That is exactly the process

3  they have gone through.  They have published the results of

4  exactly their reviews, and that is how their health-care

13:17:40 5  systems -- that is what their health-care systems are

6  responding to.

7       The American professional associations have not gone

8  through such a comprehensive process.  They're merely coming up

9  with policies and citing only individual pieces of studies that

13:17:54 10  appear to support it, rather than a comprehensive review.

11  Q    I want to close a loop on adolescent onset gender

12  dysphoria.  We talked about ways different groups are

13  different.

14       What's unique about this group of adolescent onset, or you

13:18:11 15  referred to it also as rapid onset gender dysphoria?

16  A    Yeah.  It's been called both.

17       Where both the childhood onset and the adult onset are

18  primarily male, the adolescent -- the adult onset and childhood

19  onset are primarily male.  The adolescent onset is primarily is

13:18:28 20  female.  They present with a different set -- it's a different

21  epidemiological set of characteristics, and the evidence that

22  we have about both adults and children don't seem to apply to

23  that middle group.

24  Q    Does this group of people presenting with gender dysphoria

13:18:45 25  in their adolescence -- you said primarily female?

```
 1  A     Yes.
 2  Q     Do they tend to have any issues or comorbidities in common
 3  with each other?
 4  A     The most common one of those would be borderline
13:18:57 5  personality disorders and other difficulties with integrating
 6  socially into their environments.  As I say, such as autism and
 7  Asperger's syndrome.
 8  Q     You are not saying that's true for everyone presenting
 9  with gender dysphoria for the first time in their adolescence?
13:19:13 10  A     Correct.
11  Q     But many?
12  A     Correct.
13  Q     What does the research literature show about the
14  desistance or detransition rates of people who transition after
13:19:25 15  first presenting with gender dysphoria in their adolescence?
16  A     There has never been any such study.
17  Q     Did you review the plaintiffs' reply brief, Dr. Cantor?
18  A     Yes, I did.
19  Q     Did you see any response to your report in plaintiffs'
13:19:41 20  reply?
21  A     Not a single comment.  My name was never mentioned.  None
22  of the studies that I cited were referred to.  None of the
23  arguments were addressed.  I don't believe I was quoted
24  anywhere in it, unlike the other experts.
13:19:56 25  Q     I did note a line that the plaintiffs criticized the
```

1    defendants' experts in general for relying on older studies.

2    A     Yes.  I saw that claim.  I was a bit confused by it.

3          In my report, I provided a comprehensive list of every

4    single study.  There were 11 in total.  So the old studies were

13:20:18  5    listed, the new studies were listed.  It was comprehensive.

6          It was also a tangential argument.  As I said, the 11

7    studies which have been conducted were unanimous in their

8    findings.  They all found the same thing.  The majority

9    desists.

13:20:33 10          So it doesn't matter even if one did rely only on the

11    older studies, the newer studies showed exactly the same thing

12    as the older studies.

13    Q     We spoke a little bit about some of the things we heard

14    from Dr. Antommaria this morning.  I want to turn to some of

13:20:55 15    the things in his report.

16          You reviewed his written expert report, did you not?

17    A     Yes, I did.

18    Q     He -- Dr. Antommaria wrote on -- in paragraph 17 of his

19    report -- and I will find a copy if you need it, but this is

13:21:07 20    one sentence.

21          Quote, gender-affirming medical care is supported by

22    clinical studies.  Is he right?

23    A     That's true for adults, but that's not true for the other

24    groups.

13:21:21 25    Q     And Dr. Antommaria spoke about how if a drug is FDA

1  approved in one area, it's okay to use it off label in another

2  area?

3  A    That's what he said, yes.

4  Q    What does the research literature say, or what opinion do

13:21:44  5  you have about using the same drug, a puberty-blocker in the

6  case of a person who's six, seven, eight, the purpose is to --

7  precocious puberty, what about the cases of precocious puberty

8  and using puberty-blockers to help someone medically transition

9  at the beginning of normal puberty?

13:22:03 10  A    Well, the ability to use a medication off label is not a

11  blanket permission to give any drug you want for any reasons

12  you want or for any conditions you want.

13       Ultimately, it's going to depend on what the scientific

14  literature itself says, which in turn is what the various

13:22:22 15  regulatory bodies use to make their decisions to decide what's

16  off label or on label to begin with.

17       So because a medication would be useful for some people in

18  some situations and some circumstances, does not mean it's

19  automatically going to be useful for other people in other

13:22:37 20  circumstances.  Indeed it could be deleterious.

21       If you use a puberty-blocker in somebody with precocious

22  puberty, you are pushing somebody who is far below the average

23  age of puberty, and you are bringing them closer to the

24  species-typical range of puberty.

13:22:55 25       If you give that same drug to somebody who is already

1   having a typical age of puberty, you are now pushing them

2   outside of the species-typical age.

3   Q      Thank you, Dr. Cantor.

4          I am going to sum up.  Does the research literature

13:23:21 5   support plaintiffs' claims that we need to treat children and

6   adolescents with gender dysphoria with social transition

7   puberty-blockers and cross-sex hormones?

8   A      I'm sorry.  Could you say that -- I missed the first half

9   of that sentence.

13:23:33 10   Q      My apologies.

11          Does the research literature support plaintiffs' claims

12   that we need to treat children and adolescents with gender

13   dysphoria with social transition, puberty-blockers, and

14   cross-sex hormones?

13:23:46 15   A      No.  That's terrible overstatement.

16   Q      Does the research literature support Alabama's description

17   of these treatments as experimental?

18   A      Yes.  They're fairly called experimental.

19   Q      When does a drug or a course of treatment stop being

13:24:02 20   experimental?

21   A      That's an excellent question.  There is no real test for

22   it.  There is no objective way to decide something is one

23   versus the other.

24          Science is never finished.  It's always possible for there

13:24:14 25   always to be some future piece of information that changes what

1    we know.

2         There are, of course, you know, different situations --

3    drugs, issues under active investigation, where it's very clear

4    that it's still experimental, and others where, you know, there

13:24:32  5    is only very little question left.

6         For this particular situation, we have a very small number

7    of studies that in certain situations might look like they

8    might be helping, but a much larger body of better performed

9    studies showing that the improvement is not actually coming

13:24:47 10    from the transition itself.

11         Indeed, there were other areas of the report that were

12    referred to already ongoing studies testing exactly these

13    interventions.  Well, that there exists ongoing tests of these

14    interventions is pretty much the definition of calling

13:25:05 15    something experimental.

16    Q    If scientists are eventually able to replicate the same

17    results under the same conditions over and over again, can you

18    then pretty much say something is established?

19    A    Yes.

13:25:17 20    Q    Has anybody been able to replicate the results of, say,

21    the Dutch study that showed at least some positive results with

22    a combination of treatments?

23    A    No.  Most of the studies have demonstrated no improvement

24    in these children from medical transition.

13:25:32 25    Q    Do you understand plaintiffs to argue that Alabama is out

1   of step with groups like the American Academy of Pediatrics?

2   A    Yes, I've heard them say that.

3   Q    What's your response?

4   A    Well, it's actually the American Academy of Pediatrics

13:25:54 5   which is out of step with the international standards.

6   Q    Is there a consensus, a medical consensus internationally

7   in support of these treatments?

8   A    There is now a very quickly developing one.  It is still

9   ongoing debate, so I would hesitate to describe it -- describe

13:26:12 10   that there is a solid consensus.

11       As I say, really what we have seen is a pendulum swing

12   which is overswung and now is substantially and very quickly

13   correcting itself.

14   Q    Is the pendulum swinging in favor of medical transition

13:26:27 15   use of puberty-blockers and cross-sex hormones for children and

16   adolescents?

17   A    No.  It's swinging now against that.

18   Q    Is there a medical consensus in the United States for the

19   best way to treat gender dysphoria?

13:26:39 20   A    No, there is not.

21           MR. DAVIS:  Thank you, Dr. Cantor.

22           THE COURT:  So I do have a question myself.

23       Dr. Cantor, you said that an adult should be affirmed in

24   their transgender status.

13:26:58 25           THE WITNESS:  An otherwise mentally healthy adult,

1    yes.

2              THE COURT:  All right.  So make it clear to me, then,

3    when should an adolescent or a child be affirmed in that

4    status?

13:27:10  5              THE WITNESS:  That, to me, is an empirical question.

6         We are not sure actually when the best time do that is.

7    Every time we check, we keep finding that, no, that's not

8    exactly the right way.  No, that's not exactly quite working.

9         And when we do think we have run into a clue that gives us

13:27:26 10   an idea of when, we are not able to recreate that situation.

11             THE COURT:  Is that case by case, then?

12             THE WITNESS:  I would hesitate to say case by case

13   exactly because --

14             THE COURT:  Let me rephrase it.  Under what

13:27:44 15   circumstances would you affirm a child or an adolescent?

16             THE WITNESS:  I can't say that there's a situation --

17   all of the situations will be gray.  I can't think of any

18   evidence that would give us the kind of certainty in any case

19   that would outweigh the potential risks.

13:28:19 20             THE COURT:  So you would never affirm a child or an

21   adolescent?

22             THE WITNESS:  Not with the current evidence available,

23   no.

24             THE COURT:  Okay.  All right.  Cross?

13:28:28 25                     CROSS-EXAMINATION

1   BY MS. EAGAN:

2   Q     Good afternoon, Dr. Cantor.

3   A     Good afternoon.

4   Q     Dr. Cantor, you are an adult clinical psychologist,

13:29:15  5   correct?

6   A     Yes.

7   Q     You are not a medical doctor?

8   A     Correct.

9   Q     Your private practice -- in your private practice in

13:29:22 10   Toronto, the average age of your patients is 30 to 35 years

11   old?

12   A     Average, that would be about right, yes.

13   Q     You've not ever provided clinical care to transgender

14   prepubertal children?

13:29:39 15   A     Correct.

16   Q     You have not provided care to a transgender adolescent

17   under the age of 16?

18   A     Correct.

19   Q     The extent of your experience, Dr. Cantor, working with

13:29:52 20   transgender adolescents consists of counseling six to eight

21   transgender patients between the ages of 16 and 18; isn't that

22   correct?

23   A     Yes.

24   Q     So your clinical experience with gender dysphoria really

13:30:09 25   lies in the counseling of adult patients?

1  A    Correct.

2  Q    And you acknowledge that gender dysphoria in children does

3  not represent the same phenomenon as adult gender dysphoria,

4  correct?

13:30:24  5  A    Correct.

6  Q    And, in fact, to use your words, they differ in every

7  known regard, from sexual interest patterns to responses to

8  treatments?

9  A    Correct.

13:30:36  10  Q    Dr. Cantor, you have never diagnosed a child or an

11  adolescent with gender dysphoria?

12  A    Correct.

13  Q    Never treated a child or an adolescent for gender

14  dysphoria?

13:30:48  15  A    Correct.

16  Q    You have no experience personally with monitoring patients

17  who are undergoing puberty-blocking treatment?

18  A    Correct.

19  Q    You don't know what type of monitoring is typically done

13:31:04  20  or not done on those types of patients; isn't that fair?

21  A    No.

22  Q    No, that's not fair?

23  A    Well, you -- I personally didn't do it, but I am aware of

24  the procedures that are done.

13:31:15  25  Q    Okay.  But you have no experience with that?

 1  A    That's correct.

 2  Q    Similarly, you have never monitored -- or you have not

 3  monitored an adolescent or teenage patient on hormone therapy?

 4  A    Correct.  Until -- well, I wouldn't be monitoring the

13:31:34  5  status in any case, so, yes, that's correct.

 6  Q    I am going to switch to UAB Children's, the gender clinic

 7  here in Alabama.

 8      Have you ever spoken to a child or adolescent who was

 9  treated at the gender clinic here in Alabama?

13:32:00  10  A    No.

 11  Q    Have you ever spoken to any former patients of the clinic?

 12  A    No.

 13  Q    You weren't here yesterday to hear Dr. Ladinsky talk about

 14  the treatment protocols they have at children's UAB, were you?

13:32:12  15  A    Correct.

 16  Q    You weren't here to listen to the results of treatments

 17  provided to adolescent patients at UAB's Children's in the

 18  gender clinic; fair?

 19  A    Yes.  They have never published them.

13:32:27  20  Q    And you weren't here to hear them?

 21  A    Correct.

 22  Q    Dr. Cantor, you have no personal knowledge of the

 23  assessment or the treatment methodologies that are used here in

 24  Alabama at UAB Children's Hospital, correct?

13:32:42  25  A    Correct.  Correct.

1  Q    You do not know the disciplines of the medical providers

2  who are part of the treatment team involved in that assessment

3  at UAB Hospital?

4  A    Correct.

13:32:56  5  Q    Now, I heard your opinion that it's important to assess

6  the mental health issues of an adolescent patient to see

7  whether that is a potentially contributing factor to gender

8  dysphoria and whether there's a need to address.  That's a fair

9  statement of your opinion?

13:33:17 10  A    I'm sorry.  Would you repeat that, please?

11  Q    Sure.  It's your belief that mental health issues need to

12  be assessed and addressed before a transition occurs?

13  A    Correct.

14  Q    Do you know what assessment protocols at UAB Children's

13:33:31 15  are to address mental health issues before a child is put on

16  any transitioning medication?

17  A    No, I do not.

18  Q    Do you have any idea or do you know what the doctors at

19  UAB Children's discuss with their adolescent patients about the

13:33:48 20  risks and the benefits of medical treatments at UAB?

21  A    No.

22  Q    Wouldn't you agree -- well, never mind.  I am going to

23  move on.

24       Dr. Cantor, I want to talk with you a minute about -- or a

13:34:18 25  little bit about your criticisms of the various studies

```
 1  regarding the efficacy of puberty blockers and hormone
 2  treatments, okay?
 3  A    Yep.
 4  Q    As I understand your report and your testimony today, one
 5  of the criticisms you have of some of those studies is that it
 6  relies on participant's self-assessment I believe is the
 7  language that you used.
 8       Essentially, it is based upon what socially transitioned
 9  youth and their family is reporting about their mental health
10  in these studies?
11  A    I would say that's incomplete.  My criticisms would be
12  relying on such subjective accounts entirely for all the
13  decision making rather than using it as one part of the
14  decision making.
15  Q    In other words, basing your study based upon what the
16  participants in the study tell you how they're feeling at
17  different points in the study?
18  A    Being limited to that is a problem, yes.
19  Q    And I believe the way that you phrased it, you said,
20  subjective self-reports about how one is doing may not be
21  reflecting reality objectively.
22  A    Correct.
23  Q    But, Dr. Cantor, self-reports about how one is doing may
24  reflect reality, fair?
25  A    That's correct.
```

1   Q    So when somebody says, I am doing well, my mental state is

2   better, that very well may be the case?

3   A    May be the case, yes.

4   Q    Another complaint that you have, I believe, is what you

13:35:58  5   call confounded data.  And I believe you referred to the de

6   Vries study for that?

7   A    The two de Vries's studies, yes.  As a matter of fact,

8   it's all but two of all papers in that set of literature.

9   Q    And by confounded data, the way that I am understanding

13:36:13 10  it, what you're saying is that you are not able to tell because

11  the data is, quote, confounded, whether one's improved mental

12  health for a minor who has socially transitioned, whether that

13  came from the actual medical services, whether it came from the

14  psychotherapy, or whether it came from the combination of both?

13:36:34 15  A    Correct.

16  Q    But one thing, Doctor, that you do have to admit is when

17  adolescents with gender dysphoria have transitioned through a

18  combination of medical services and psychotherapy, you have to

19  admit that based upon the studies, their mental health

13:36:55 20  improved, correct?

21  A    No.  There were several studies that showed no improvement

22  even though -- even though they were receiving both.  I've

23  listed them in my report.

24  Q    Can you direct me to where in your report those are,

13:37:11 25  please, sir?

```
 1  A     Sure.

 2            THE COURT:  While he is looking, did you say your

 3  target is an hour; is that right?

 4            MS. EAGAN:  Yes, sir.  I believe I should be able to

 5  be done in an hour.

 6            THE WITNESS:  Page 20, footnote 40.

 7  BY MS. EAGAN:

 8  Q    I'm sorry, sir?

 9  A    Page 20, footnote 40.  The Carmichael study, the

10  Hisle-Gorman, et al, study, and Kaltiala.

11       My full sentence was, New studies continue to appear at an

12  accelerating rate, repeatedly reporting deteriorations or lacks

13  of improvement in mental health, footnote 40 -- or again, those

14  were the specific studies -- and then or lack of improvement

15  beyond psychotherapy alone, footnote 41.

16  Q    Certainly, Dr. Cantor, though, there are many study -- or

17  there are studies that indicate when adolescents with the

18  combination of medical service and psychotherapy transition,

19  their mental health has improved.  You agree with that

20  statement?

21  A    I would have to check to see if the number is zero or a

22  handful.  There have been reports of there having been such

23  improvement, such as the Branstom study, which once it was

24  reanalyzed, discovered to have problems, and the finding was

25  withdrawn.
```

1          So there -- again, I would have to go through and check to
2     be sure that it's not zero.  It would be fair to say that there
3     might have been a study which found such a thing.  But the
4     majority of studies are finding either no improvements or
13:39:17  5     deteriorations, or it's a situation that we call a failure to
6     replicate.
7     Q    Sir, I am a little bit confused, because I want to go to
8     two of your studies that you have actually talked about today,
9     the Costa study and the Achille study.
13:39:33 10          Now, as I understand your testimony today, in those
11    studies, there was -- the studies reported that there was an
12    improvement in mental state for adolescents who were treated
13    with medication and psychological treatment in transition that
14    there was an improvement, but in those, you said you can't tell
13:39:58 15    whether it's from the medication or from the psychological
16    treatment?
17    A    No.  The Costa study and the Achille study associated the
18    improvement specifically with the psychotherapy and ruled out
19    that the effects were due to the medical interventions.
13:40:13 20    Q    Okay.  Well, let's pull those studies, Doctor, and let's
21    look at those.
22          If you could, there should be a notebook up there that has
23    plaintiffs' exhibits in it.  Is that one plaintiff, sir?
24          If you could please, sir, turn to Plaintiffs' Exhibit 34.
13:40:55 25    A    Yes.

```
 1   Q    All right.  Plaintiffs' Exhibit 34, is this the -- do you
 2   say Costa or Costa?
 3   A    I'm sorry?
 4   Q    Do you say Costa?
 5   A    My guess is Costa.  I have never met the person.
 6   Q    All right.  Exhibit 34 that you have in front of you, is
 7   that the Costa study?
 8   A    Yes, it is.
 9   Q    All right.  So, Doctor, I first want to focus in on --
10   well, let me ask this:  This study was aimed at assessing
11   gender dysphoric adolescents' global functioning after
12   psychological support and after puberty suppression, correct?
13   A    Yes.
14   Q    Bear with me.  I am going to take this out so I can put it
15   up on the Elmo, sir.
16        All right, sir.  I am going to direct your attention to
17   results that I have highlighted on my copy.  Okay?  According
18   to the abstract here, the results?
19   A    Yes.
20   Q    At baseline, gender dysphoric adolescents showed poor
21   functioning with -- it defines the mean scores.  So baseline
22   means at the start of the study, correct?
23   A    Usually it does.  I would have to check that that's
24   exactly how they used the term.
25   Q    All right.  We will get to the details of that in a
```

13:41:05 (line 5)
13:41:18 (line 10)
13:41:42 (line 15)
13:42:18 (line 20)
13:42:35 (line 25)

```
 1  minute.
 2       Okay.  Gender dysphoric adolescents' global functioning
 3  improved significantly after six months after psychological
 4  support.  And then it goes on to say, Moreover, gender
 5  dysphoric adolescents receiving also puberty suppression had
 6  significantly better psychosocial functioning after 12 months
 7  of puberty suppression compared to when they had received only
 8  psychological support.
 9       Did I read that right, sir?
10  A    Yes.
11  Q    Do you remember the methodology that was used for this
12  study, sir?
13  A    Roughly.
14  Q    Pardon?
15  A    Yes.  Roughly.
16  Q    Sorry.  I meant to -- all right.  And do you recall that
17  the methodology was everybody started at baseline.  For the
18  first six months all of the adolescents received psychological
19  counseling.  And then for the next 12 months beyond that, one
20  group received puberty blockers, and one group just continued
21  to receive psychological counseling.  Do you recall that?
22  A    Yes.
23  Q    All right.  And then I am going to direct you, sir, to
24  page 2211 of the -- if you look at the blue writing on the top,
25  it's page 6 of 9.
```

13:42:49  (line 5)
13:43:07  (line 10)
13:43:14  (line 15)
13:43:36  (line 20)
13:44:12  (line 25)

```
 1  A     Yes.

 2  Q     All right.  And I am going to direct you, sir, to on the

 3  CGAS on follow-up?

 4  A     Yes.

 5  Q     All right.  And I am going to start at the second

 6  paragraph where it says delayed eligible.  Do you see where I

 7  am talking about?

 8  A     Yes.

 9  Q     This is talking about there were three follow-ups, right,

10  at 6 months, at 12 months, and at 18 months for this study; is

11  that correct?

12  A     That sounds familiar to me, yes.

13  Q     And let's read through that together.

14        Delayed eligible gender dysphoric adolescents, who

15  received only -- and gender delayed, GD adolescents, is your

16  recollection that those were adolescents who were eligible to

17  receive puberty blockers, but they delayed them for six months

18  so that they had everybody at a -- doing psychological study?

19  Do you remember this is the group that gets the puberty

20  blockers?

21  A     Yes, that sounds correct.

22  Q     Okay.  The delayed eligible gender dysphoric adolescents

23  who received only psychological support for the entire duration

24  of the study -- excuse me -- I take that back.

25        This was actually the group that just got the
```

```
 1   psychological -- had significantly better psychosocial
 2   functioning after six months of psychological support, okay?
 3       However, despite scoring better at the following
 4   evaluations, they did not show any further significant
 5   improvement in their psychosocial functioning.
 6       Did I read that right?
 7   A   Yes.
 8   Q   Also, the delayed eligible group continued to score lower
 9   than a sample of children adolescents without observed
10   psychological psychiatric symptoms even after 18 months of
11   being in psychological support.
12       So what that's saying is after 18 months, they were still
13   below a group that did not have psychological therapy or
14   issues, correct?
15   A   Yes.
16   Q   On the contrary, the immediately eligible group, who at
17   baseline had a higher, but not significantly different
18   psychosocial functioning than the delayed eligible group, did
19   not show any significant improvement after six months of
20   psychological support.  However -- and this is the key --
21   immediately eligible adolescents had a significantly higher
22   psychosocial functioning after 12 months of puberty suppression
23   compared to when they had received only psychological support.
24       Did I read that correctly?
25   A   Yes.
```

1   Q   Then you see at the top of this, there is a chart.  And

2 when you look at this chart, the bottom is actually the three

3 different check-ins.  Time zero is baseline, when the study

4 started, right?

13:47:18 5   A   Yes.

6   Q   Time one is the six-month check-in, correct?

7   A   Yes.

8   Q   And during that six months, both groups are getting just

9 psychotherapy, correct?

13:47:31 10   A   Yes, I believe so.

11   Q   The rest -- and just to orient us.

12     The red group, the red line is the group of adolescents

13 who only got psychotherapy or psychotherapy through the entire

14 18-month study, right?

13:47:46 15   A   Yes.

16   Q   The green line that you see that goes up -- goes up and

17 keeps going up, that is the line of adolescents who receive

18 puberty blockers; fair?

19   A   Yes.

13:47:59 20   Q   And so, Doctor, to get to the ultimate conclusion of this

21 study that you say shows that puberty blockers don't work or

22 don't give any improvement in mental condition over

23 psychotherapy, the conclusion, this study confirms the

24 effectiveness of puberty suppression for gender dysphoric

13:48:37 25 adolescents.  Recently, a long-term follow-up evaluation of

puberty suppression among gender dysphoric adolescents after

that CSHT, which is hormone therapy and GRS, which is puberty

blockers, has demonstrated that gender dysphoric adolescents

are able to maintain a good functioning into their adult years.

13:49:00 5   This present study, together with this previous research,

indicate that both psychological support and puberty

suppression enable young gender dysphoric individuals to reach

a psychosocial functioning comparable with their peers.

          Did I read that conclusion correctly?

13:49:17 10  A     Yes.

          THE COURT:  Ms. Eagan, when you reach a comfortable

spot, let's take a post-lunch break.

          MS. EAGAN:  Perfect.  We're good, Judge.  We can go

ahead and break now.

13:49:35 15          THE COURT:  Okay.  I will see you in 15 minutes.

          (Recess.)

          THE COURT:  Go ahead, Ms. Eagan.

          MS. EAGAN:  Thank you, Your Honor.

BY MS. EAGAN:

14:09:00 20  Q    Dr. Cantor, my understanding from paragraph 63 of your

declaration is that the other study that you point to in

support of your assertion that testing revealed that puberty

blockers did not improve mental health any more than mental

health does on its own is the Achille study you mentioned

14:09:29 25  earlier today; is that right?

```
 1  A    Yes.

 2  Q    If you, please, sir, could turn to Plaintiffs' Exhibit 42

 3  in that binder in front of you, and this would be the

 4  plaintiffs' exhibits that we were looking at earlier.

 5  A    Yep.  Got it.

 6  Q    All right.  Is Plaintiffs' Exhibit 42 the Achille study

 7  that we just mentioned?

 8  A    Yes.

 9  Q    All right.

10        MS. EAGAN:  Your Honor, do you mind if I take this off

11  of this?

12        THE COURT:  That's fine.

13  BY MS. EAGAN:

14  Q    All right.  I am going to -- so this is Plaintiffs'

15  Exhibit 42.

16        And the Achille study, again, was -- in this case if we

17  look at the abstract, the background of the study or the

18  purpose of the study was to examine the associations of

19  endocrine intervention puberty suppression and/or cross-sex

20  hormones therapy with depression and quality of life scores

21  over time in transgender youths.

22        That was the purpose of the study, correct?

23  A    Yes.

24  Q    And looking down to the results section, between 2013 and

25  2018 -- so this went over a five-year period, right?
```

```
 1  A     Yes.

 2  Q     And there were 50 participants in the study, correct?

 3  A     That sounds right, yes.

 4  Q     All right.  And that they received endocrine intervention

14:11:17 5  both -- some were in the form of puberty blockers, and some

 6  were in the form of cross-sex hormones, but endocrine -- and

 7  over that time period and completed three waves of

 8  questionnaires.

 9        Is that your recollection of this study?

14:11:30 10 A     Yes, roughly.

11  Q     Okay.  And when that was -- with those treatments, mean

12  depression scores and suicidal ideation decreased over time,

13  which means their depression was -- went down, or they got

14  better.  Suicidal ideation went down, which is improvement,

14:11:50 15 correct?

16  A     Yes.

17  Q     While mean quality of life scores improved over time.

18        And then it goes on to say, When controlling for

19  psychiatric medications and engagement in counseling,

14:12:03 20 regression analysis suggested improvement with endocrine

21  intervention.  And then it goes on to say that this reached

22  significance in male to female participants.  And the male to

23  female participants, those are ones that were receiving hormone

24  therapy, correct?

14:12:23 25 A     I believe they were both receiving hormone therapy.  It
```

 1  was not significant in one group, and so they're just reporting

 2  the successful in the other and not reporting the nonsuccessful

 3  group.

 4  Q   Well, let's talk about that.  Let me pull up paragraph 63

14:12:39  5  of your declaration.

 6       When you're discussing this study, here is what you said.

 7  You said that upon follow-up, some incremental improvements

 8  were noted; however, after -- so, in other words, upon

 9  follow-up, they saw improvements.

14:13:07 10       But after statistically adjusting for psychiatric

11  medication and engagement and counseling, quote, most

12  predictors did not reach statistical significance.

13       And that's your basis -- that statement is your basis to

14  say there was not a statistical significance of difference

14:13:26 15  between just counseling versus with meds; is that right?

16  A   I'm sorry.  Could you say that part again?

17  Q   The language that you seize onto, to say that puberty

18  blockers did not improve mental health more than mental

19  healthcare did on its own --

14:13:43 20  A   Right.

21  Q   -- was the statement in the study that most predictors did

22  not reach statistical significance.

23  A   Well, I wouldn't say that I derived that just from that

24  sentence.  It's just easier to convey that idea to readers by

14:13:56 25  using the sentence.  My evaluation of the study is by those

 1  statistics directly.

 2  Q    All right.  Let's go to the language in the study that

 3  they talk about, the regression analysis that you were just

 4  referencing there.

14:14:11  5     Okay.  And this is here in the regression analysis.

 6     Let me first say this:  The mean changes over time.  And

 7  it does say, Mean depression scores decreased.  Quality of life

 8  improved, but did not reach statistical significance.

 9     But then when you go on to the regression analysis, here

14:14:39 10  is what it says.  It says, Given our modest sample size --

11  which in this case was 50 people, right?

12  A    Yes.

13  Q    Given our modest sample size, particularly when stratified

14  by gender, most predictors did not reach statistical

14:14:57 15  significance.

16     So one of the contributing factors to that, of course, was

17  the size of the number of participants, correct?

18  A    Yes.  In statistics, that's a truism.  The precision of

19  the statistics is the direct -- direct result of the sample

14:15:20 20  size.

21  Q    Okay.  And then it goes on to say, That being said, effect

22  sizes values were notably large in many models.  In the male to

23  female participants, only puberty suppression reached a

24  significance level.  And it gives the number in one of the

14:15:43 25  sample -- one of the tests, and associations with the two other

1    scores approached significance.

2         And then it goes on to say, For female to male

3    participants, only cross-sex hormone therapy approached

4    statistical significance.

14:15:57  5         All right.  Statistical significance are not -- on all

6    planes, the numbers improved, correct?

7    A    No.  That's -- the very meaning of determining --

8    factoring in whether something is statistically significant or

9    not.

14:16:15  10   Q    Ultimately, the writers of this study stated, if you look

11   at the next paragraph -- or look on the discussion part if you

12   want -- can you see the screen up here?

13   A    Oh, I have the same thing on this screen.

14   Q    Oh.  You have got one.  Okay, good.

14:16:31  15        Our results suggest that endocrine intervention is

16   associated with improved mental health among transgender youth.

17        Did I read that right?

18   A    Yes.  Those are their words.

19   Q    Doctor, to be clear, you agree that the U.S.-based medical

14:17:15  20   association guidelines and position statements are in support

21   for the use of medical treatment combined with mental health

22   treatment for adolescents with gender dysphoria, correct?

23   A    I don't think I would phrase it quite that strongly.  Most

24   of the associations are using relatively vague terms.  And it's

14:17:35  25   not clear when they're talking about adults or children, when

1  they're talking about transition, medical services versus

2  psychotherapy, or a relatively blanket statement of

3  demonstrating respect.  I can only accept that they're

4  endorsing a particular treatment when they're endorsing a

14:17:54 5  particular treatment.

6      So is there a specific association or specific statement

7  you have in mind?

8  Q   The major medical associations that were involved in this

9  space endorse the use of medications to treat gender dysphoria

14:18:08 10  in children -- excuse me -- gender dysphoric adolescents once

11  they reach puberty when appropriate?

12  A   I can think of two medical associations, one

13  interdisciplinary association, and the other -- and all of the

14  others are, as I say relatively, vague words of support, and

14:18:44 15  it's not clear exactly what it is that they're recommending.

16  Q   Well, my understanding is what you like to look at is the

17  international standards.  That's what you're talking about

18  today in support of your opinions?

19  A   Oh, I looked at each of them, and I think I described each

14:18:59 20  of them.  I did my best not to leave any out.

21  Q   So, and according to you, the Dutch approach is

22  internationally the most widely-respected and utilized method

23  for the treatment of children who present with gender

24  dysphoria?

14:19:13 25  A   Yes.

```
 1  Q    And the Dutch approach is also, I believe, what you call
 2  that watchful waiting approach?
 3  A    No.
 4  Q    Okay.  The Dutch approach is what is accepted -- I have
 5  already said what you said.
 6       The Dutch approach says social transition can happen at
 7  age 12, puberty blockers may be prescribed at age 12, hormones
 8  at age 16, and then resolve other mental health issues before
 9  transition.  That's the Dutch method?
10  A    Yes.
11  Q    Do you know how that approach aligns with protocols that
12  are utilized at UAB Children's in Alabama?
13  A    I don't know.
14  Q    In any event, what you say is internationally the most
15  widely-respected and utilized method for treatment of children
16  who present with gender dysphoria, you would agree that that
17  approach would be a felony in Alabama with this new law,
18  correct?
19  A    Yes.  It's true that the Alabama law didn't leave an
20  exception for research purposes.
21  Q    Okay.  So let's talk about the European countries that you
22  mentioned very briefly, the UK, Finland, Sweden and France.
23       When you look at those four European countries, Doctor,
24  not one of them has enacted a ban to puberty blockers and
25  hormone treatments as Alabama has done here, correct?
```

```
 1  A     No.

 2  Q     That's not correct?

 3  A     Correct.  That is not correct.

 4  Q     UK has not fully banned puberty blockers and hormone

 5  treatments in youth 18 and younger?

 6  A     That's correct.

 7  Q     Finland has not banned -- let me ask it this way:  Has

 8  Finland banned blockers and hormone treatments in youth ages 18

 9  and under for gender dysphoria?

10  A     Yes, I believe it has.

11  Q     It has?

12  A     I believe so.

13  Q     A blanket ban?  Should I refer you to paragraph 131 of

14  your declaration, sir?

15  A     Hang on.  That's just where I am now.

16  Q     Okay.

17  A     Oh, yes, they did leave an exception for hormones.  The

18  total ban was on surgery.

19  Q     Thank you, sir.

20        Sweden, has Sweden put an absolute ban on puberty

21  blockers?

22  A     Yes.

23  Q     And bear with me.  Have they put a ban on puberty blockers

24  and hormone treatments in youth ages 18 and under for gender

25  dysphoria in Sweden?
```

```
 1   A    18 and under?

 2   Q    Yes, sir.

 3   A    No.  They allowed exceptions for 16 year olds -- 16 year

 4   olds within research circumstances.

14:22:32  5   Q    Has France banned the use of puberty blockers and hormone

 6   treatments for adolescents ages 18 and under?

 7   A    No.

 8   Q    Can you point me to a single country, Doctor, in Europe

 9   that has put a blanket ban on the use of puberty blockers or

14:22:50 10   hormone treatments for youth ages 18 and under for gender

11   dysphoria?

12   A    Blanket ban in the way you're describing it, no.

13           THE COURT:  How about any country?

14           THE WITNESS:  No, not that I know of.

14:23:04 15   BY MS. EAGAN:

16   Q    I want to turn very briefly to the subject of -- I will

17   use your word desistance.

18       If you turn to paragraph 36 of your declaration.

19   A    Yes.

14:23:36 20   Q    In that -- you state, Among prepubescent children who feel

21   gender dysphoric, the majority cease to want to be the other

22   gender over the course of puberty ranging from 61 to 80 percent

23   desistance across the large prospective studies.

24       I know that's a point that you also raised earlier today.

14:23:59 25       So I want to ask this question:  Of those that number, do
```

1  you know, Doctor, what percentage of those kids cease to want

2  to be the other gender -- that's using your words -- before or

3  as they enter puberty, in other words, before they actually get

4  into puberty?  Do you know how many of those desisters are in

14:24:27  5  that window?

6  A    I must not be understanding your question, because it

7  makes me want to say the same number that's in the report, 61

8  to 88 percent.  What's different from what I said and what

9  you're asking?

14:24:39 10  Q    The 61 to 88 percent, is that children that realign with

11  their birth sex before -- or as they're entering into puberty,

12  that's that number?

13  A    Yes.

14  Q    Okay.  All right.  So I want to focus on a different

14:25:01 15  category of youth.  Let me ask you this:  The medications in

16  the United States, puberty blockers and hormone treatments

17  cannot be given to kids for gender dysphoria until after

18  they've actually entered into puberty, correct?

19  A    Very many clinics are doing it as close to the beginning

14:25:23 20  as soon as puberty starts as they are able.

21  Q    But it's once they have entered puberty?

22  A    Yes.

23  Q    So let me ask you about that category of youth.

24       And that is adolescents who have entered into puberty,

14:25:38 25  okay, and who have been -- have suffered from gender dysphoria

```
 1  persistently, consistently, and insistently in childhood
 2  leading up to puberty, okay?
 3  A    Okay.
 4  Q    Do you have any data regarding what percentage of those
 5  individuals desist after they enter into puberty?
 6  A    No.  I don't think that level of follow-up has yet been
 7  conducted.
 8  Q    And, Doctor, in fact, it's your belief that the
 9  majority -- that while the majority of prepubescent kids cease
10  to feel trans, you know, to puberty or during puberty, in other
11  words, as they enter into puberty, the majority of kids who
12  continue to feel trans after puberty rarely cease?
13  A    That does seem to be the case, yes.
14  Q    Okay.  Doctor, are you being paid to be here to testify
15  today?
16  A    Yes.
17  Q    What's your rate?
18  A    400 an hour.
19  Q    Who is paying your fees?
20  A    The Alabama state -- State of Alabama.
21  Q    Okay.  Dr. Cantor, have you attempted to recruit parents
22  in Alabama whose children have gender dysphoria and were
23  prescribed or referred to gender-affirmative treatments, have
24  you tried to recruit them to give a witness statement in this
25  case that they believe the treatments are harmful?
```

The timestamps in the left margin are: 14:25:58 (line 5), 14:26:35 (line 10), 14:27:10 (line 15), 14:27:14 (line 20), 14:27:38 (line 25).

```
 1   A     No.

 2   Q     Do you tweet?

 3   A     Yes.

 4              MS. EAGAN:  Your Honor, may I approach?

 5              THE COURT:  Yes.

 6   BY MS. EAGAN:

 7   Q     Doctor, I've marked as Plaintiffs' Exhibit 45 a tweet

 8   Dr. James Cantor retweeted.  And it's -- let me say this:  Is

 9   this a tweet that you actually did?

10   A     No.  I --

11   Q     You retweeted?

12   A     Retweeted, exactly.

13   Q     From a group called Genspect, or what's -- I don't tweet.

14   Would you call that a group?  I guess it's a group called

15   Genspect?

16   A     It's there is a group called Genspect, and this is their

17   Twitter account.

18   Q     All right.  And then you retweeted it?

19   A     Yes.

20   Q     And it says, Urgent.  Attention.  Alabama parents, if your

21   child experienced gender dysphoria and was prescribed or

22   referred to gender-affirmative treatments and you believe these

23   treatments are harmful, please direct message, e-mail us at

24   once.  We are looking for witness statements.  Can be anon.

25        By anon, I guess that means anonymous, correct?
```

```
 1  A    That would be my reading, yes.
 2  Q    All right.  Doctor, have you seen a sworn statement under
 3  penalty of perjury for any Alabama parent whose kid received
 4  puberty blockers or hormones and the parent said the
14:29:50 5  medications hurt their kid more than they helped them?
 6  A    I'm sorry.  Did you ask have I seen such a statement?
 7  Q    Yes, sir.
 8  A    Not that I recall.
 9           MS. EAGAN:  Nothing further.
14:30:05 10           THE COURT:  Any redirect?
11           MR. DAVIS:  Short.
12           THE COURT:  Ms. Eagan, did you intend to offer that
13  into evidence or no?
14           MS. EAGAN:  Oh, yes.  Thank you, Judge.  I offer
14:30:37 15  Plaintiffs' Exhibit 45.
16           THE COURT:  It will be admitted.
17                    REDIRECT EXAMINATION
18  BY MR. DAVIS:
19  Q    Dr. Cantor?
14:30:51 20  A    Hi.
21  Q    Is it true as a clinician you are not treating anyone who
22  has presented with gender dysphoria as an adult or as a child?
23  A    I treat adults with gender dysphoria, not children.
24  Q    You are not treating them while they are adolescents or
14:31:09 25  children, you are not currently treating someone who is like
```

     1  under age 16?

     2  A    Correct.

     3  Q    Okay.  But you are familiar with the research literature

     4  on these issues, correct?

14:31:19 5  A    Yes, quite.

     6  Q    And even those that are studying -- or children in

     7  adolescents?

     8  A    Of course.

     9  Q    You're knowledgeable about the treatment they're

14:31:29 10 receiving?

    11  A    Yes, very.

    12  Q    And are you knowledgeable about what the research shows

    13  about the efficacy of these treatments?

    14  A    Yes.

14:31:35 15 Q    You had an exchange with Ms. Eagan where you admitted that

    16  a fact that is self-reported by a participant may be true?

    17  A    Correct.

    18  Q    What's the rest of that sentence?

    19  A    It is certainly not necessarily true.  We need something

14:31:53 20 objective before we can make any decisions upon it.

    21  Q    Let's turn to the Costa study.  That's at Tab 38 of the

    22  book of plaintiffs' exhibits.

    23        MR. DAVIS:  Your Honor, I'm sorry.  I left a notebook.

    24  May I step over?

14:32:40 25       THE COURT:  Certainly.

```
 1              THE WITNESS:  I'm sorry.  You said Tab 38?
 2    BY MR. DAVIS:
 3    Q    I was mistaken, Dr. Cantor.  It was 34.
 4    A    34 of the defendants'?
 5    Q    No.  Of the plaintiffs' book.
 6    A    Yes.  Now I'm back there.
 7    Q    Okay.  Now, you have a line in your report in paragraph 57
 8    of your report that I will just read to you.
 9         It says, Both groups improved in psychological functioning
10    over the course of the study, but no statistically significant
11    differences between the groups was detected at any point?
12    A    Correct.
13    Q    Okay.  Are the three groups represented by the three
14    colored lines -- the three groups you're talking about, the
15    three groups on the three colored lines on this chart I'm
16    showing you?
17    A    Part of the information is contained in that graph, yes.
18    Q    Okay.  Does this table tell us more about the statistical
19    significance or lack thereof shown in the Costa study?
20    A    Yes, it does.  The results of this table, although much
21    harder to read, indicate that there was no statistical
22    significance between the groups.
23    Q    Okay.
24    A    What was changing in the groups was change over time
25    within the group relative to the same group previously.  But
```

```
 1  there were no changes -- no significant differences between the

 2  groups themselves.

 3  Q    Okay.  What does it mean in a study if a finding lacks

 4  statistical significance?

 5  A    That there was a substantial probability of getting a

 6  pattern like that just by random chance.

 7  Q    And are there any reasons other than puberty suppression

 8  that the delayed group did not have the same change over time

 9  as the immediately eligible group?

10  A    It's not exactly clear if they didn't change just as much.

11  That's one of the ambiguities that, again, comes from

12  statistics.  When you look at it in different ways, you can see

13  different aspects, different aspects of it.

14  Q    And the authors actually noted statistical significance or

15  lack thereof, did they not, in the language that are bracketed

16  there?  It says, this difference failed to reach significance

17  possibly because of sample size?

18  A    That is correct.

19  Q    Have you said anything about the Costa study in your

20  report that you need to withdraw after your exchange with

21  Ms. Eagan?

22  A    No.  Everything I said is accurate.

23  Q    Okay.  Is the same true for everything that you have said

24  about the Achille study?

25  A    Yes.  Everything I said was accurate.  Nothing in the
```

14:34:29
14:34:45
14:35:11
14:35:24
14:35:39

1    prior discussion changed it.

2    Q    The UK is still reviewing these treatments, are they not?

3    A    They are in the middle of deciding what to do with what

4    they have now discovered from their comprehensive review of the

14:35:57 5    literature, which showed what they were doing was wrong.

6    Q    What did they discover?

7    A    They discovered that they said exactly what I said, that

8    there is no evidence to support the medical transition of these

9    children.

14:36:09 10    Q    And they have not yet decided how to respond to that

11    revelation, correct?

12    A    Correct.  They have now taken that report, and they're now

13    reorganizing and deciding exactly what it is that they're going

14    to do.

14:36:21 15    Q    And in France, is it not correct that they've said about

16    hormones that the greatest reserve is required for their use?

17    A    That is correct.

18    Q    And is it true that, quote, they have said that speaking

19    of hormones, they're irreversible nature must be emphasized?

14:36:38 20    A    That is correct.

21    Q    And in Sweden, is anyone under 16 getting puberty blockers

22    or hormone treatments?

23    A    No.  That is banned.

24    Q    And what about over 16?  Youth -- like --

14:36:51 25    A    Between 16 and 18, they're permitted to do it, but only

```
 1  within recognized research programs.  A regular physician
 2  can't.
 3  Q    And how many such research programs are going on at
 4  present?
 5  A    Oh, in Sweden?
 6  Q    Are you aware of any?
 7  A    I am aware of one lab that has two locations.  I don't
 8  know what its current status is with its current research
 9  program.
10  Q    Okay.  Can you say whether a single child under 18 is
11  currently receiving hormones for the purpose of transitioning
12  in Sweden?
13  A    I don't know.
14            MR. DAVIS:  Thank you, Dr. Cantor.
15            THE COURT:  Any recross?
16            MS. EAGAN:  No, Your Honor.
17            THE COURT:  May this witness be excused?
18            MR. DAVIS:  Yes, of course, Your Honor.
19            THE COURT:  All right.  You can step down, sir.
20            THE WITNESS:  Thank you.
21            THE COURT:  All right.  Call your next witness.
22            MR. DAVIS:  Your Honor, the State calls Ms. Sydney
23  Wright.
24            THE COURT:  All right.
25                         SYDNEY WRIGHT,
```

Timestamps (left margin): 14:37:04 (line 5), 14:37:20 (line 10), 14:37:39 (line 15), 14:37:48 (line 20), 14:37:54 (line 25)

```
 1  having been first duly sworn by the courtroom deputy clerk, was

 2  examined and testified as follows:

 3            THE COURT:  And we think this will be how long, again?

 4            MR. DAVIS:  Less than 30 minutes on direct.

 5            THE COURT:  Good afternoon, ma'am.

 6                        DIRECT EXAMINATION

 7  BY MR. DAVIS:

 8  Q    Good afternoon, Ms. Wright.

 9  A    Good afternoon.

10  Q    Would you state your name for the record, please?

11  A    Yes.  It is Sydney Wright.

12  Q    Can you pull that mic up a little closer to you?

13  A    Yes.  Will that work a little bit better?

14  Q    Yes.  Where do you live?

15  A    I live in Cedar Bluff, Alabama.

16  Q    And how old are you?

17  A    I am 23.

18  Q    What do you do for a living?

19  A    Me and my wife own a business together.

20  Q    What kind of business?

21  A    We own a cleaning company.

22  Q    Do you have any children?

23  A    Yes.  We have two.

24  Q    What is your biological sex, Ms. Wright?

25  A    It is female.
```

```
 1  Q    Did you at any time in your life seek medical treatment to
 2  try to appear more like a male?
 3  A    Yes, sir, for many years.
 4  Q    How old were you when you first decided to seek some type
 5  of transitioning care?
 6  A    I was 17 when I first started.
 7  Q    I've put a picture on the screen, Ms. Wright.  This, for
 8  the record, is page 2 of Defendants' Exhibit 41.  Is this you?
 9  A    Yes, sir, it is.
10  Q    How old were you in this picture?
11  A    This is my graduation pictures.
12  Q    Were you about 17 when these were taken?
13  A    Yes, I was.  The summer before.
14  Q    At the time -- at the time of this picture -- well, is
15  this before you started receiving any cross-sex hormones?
16  A    Yes.  Yes.  Yes.
17  Q    To be clear for the record, at some point, you did receive
18  testosterone, a cross-sex hormone in order to transition to
19  male?
20  A    Yes, I did.
21  Q    What was going on in your life at the time that you
22  decided that you were -- that you wanted to transition or to at
23  least explore that?
24  A    In my mind, there was this confusion inside of me that I
25  was not matching with what was in my head, and what I saw in
```

14:39:13  (line 5)
14:39:37  (line 10)
14:39:52  (line 15)
14:40:05  (line 20)
14:40:23  (line 25)

```
 1  the mirror with how I looked in the mirror.  Like I felt like I
 2  was not the person I was supposed to be.
 3  Q    Had you been dating by the time you were 17?
 4  A    Yes.
 5  Q    Had you dated boys?
 6  A    Yes.  I had -- I dated one man, yes.
 7  Q    Had you also dated girls?
 8  A    Yes.
 9  Q    Did you decide you would rather date girls?
10  A    I sure did.
11  Q    Did you at first struggle with coming to peace with the
12  desire you had to date girls?
13  A    I did.  Both of my parents are very religious, as am I,
14  and I struggled with being seen as being a lesbian and holding
15  my partner's hand and being seen that way, yes, sir.
16  Q    When you started feeling that way, did having a feminine
17  body cause you distress?
18  A    Yes, sir.
19  Q    What clicked for you?  What first made you think that you
20  were living in the wrong body?  What gave you the belief that
21  you wanted your body to be more masculine?
22  A    I first saw -- I never knew much about it until I got on
23  Instagram, and I saw that others were transitioning.
24        And everything that I read up on it seemed to be so
25  positive, in that -- like that would fix the problems that I
```

```
 1  was feeling inside, and it would fix my current problem of

 2  feeling like I shouldn't have been a woman.

 3  Q    Was it -- was most of what you learned about transitioning

 4  and gender-affirming care at first at least from social media?

 5  A    Yes.  Yes, sir, most of it.  Uh-huh.

 6  Q    Where did you turn for treatment when you decided, I

 7  really want to look into this?

 8  A    I turned to a psychologist at first.  And then I turned to

 9  a gender clinic, as well.

10  Q    Let's talk about the psychologist.  How many times did you

11  visit this psychologist?

12  A    The psychologist, I visited them about six to eight times.

13  I did keep going after I got my testosterone letter.

14  Q    All right.  How many times had you seen the psychologist

15  before you got the testosterone letter?

16  A    I saw her one hour five times.

17  Q    Okay.  And I guess we need to make clear for the record

18  what a testosterone letter is.  What are you talking about?

19  A    You have to have a letter to present to your gender clinic

20  doctor in order to be approved for hormones.

21  Q    Now, understand I'm asking you to talk only about the

22  experience that you had, not what anybody else going through

23  this has had or what happened in any other clinics.

24      But for you, how deeply did you think this psychologist

25  delved into what was going on in your life before he or she
```

14:42:03 (line 5)
14:42:16 (line 10)
14:42:32 (line 15)
14:42:49 (line 20)
14:43:13 (line 25)

said, let's get you some testosterone?

A     Looking back, she did not dive in deep.  I was -- I
went -- I had let known that I had been through trauma and that
my parents went through a really bad divorce, and there was
some very rough things in my childhood that was not dived into.

Q     Did she also refer you to a mastectomy?

A     Yes, she did.

Q     Now, after you got your letters, did you go to a medical
doctor to try to get these treatments?

A     Yes, I did.

Q     And where did you go?  Is that the gender clinic you're
referring to?

A     Yes.  I did go to the gender clinic.

Q     All right.  Tell me about your experience at the gender
clinic.

A     The gender clinic, they want to move you in and move you
out as fast as they can with as little as talking to you as
they can.  The gender clinic I went to -- I went to two
different ones, and they both acted the same.

     The doctor that I gave my hormone letter to never even
opened the letter.  He kind of scoffed at me.  And it was very
belittling.

     And I could tell right off the bat these people didn't
care about me.  And it -- and then you keep going.  And I had
read on my blood work on a couple lines, and he told me

1  everything was fine.  And I started looking things up, and they

2  were not so fine.

3  Q    What do you mean you started looking things up?

4  A    My blood work was showing signs that had never been shown

14:44:45 5  in any of my blood work all through my life.  And all of a

6  sudden, they're off the charts.  Like everything's going

7  everywhere.  And I'm starting to panic.  I've committed my life

8  to something, you know, and here I am now I -- you don't know

9  what's happening.  You're scared.  So I was -- I was really

14:45:07 10  scared at the time.

11  Q    Did you seek medical treatment for these things that were

12  going on?

13  A    Yes.  I ended up in the ER like four times.

14  Q    Let's -- before we get further into that, let's talk more

14:45:22 15  about these gender clinics.  Where were they?

16  A    In Atlanta, Georgia.

17  Q    Okay.  So you have never visited a gender clinic in

18  Alabama?

19  A    No.  But they do, do them here at Planned Parenthood, and

14:45:34 20  there is a couple of different places.

21  Q    You don't have personal knowledge about those clinics?

22  A    No, sir.  Huh-uh.

23  Q    So you saw the two clinics in Alabama (sic).

24      That first time you went, you said the doctor didn't even

14:45:47 25  open your testosterone letter?

```
 1  A      No, sir, he did not.

 2  Q      Did you get the prescription for testosterone?

 3  A      He gave it to me without opening the letter.  He -- I

 4  handed it to him, and he goes, great, here.  You can go pick

 5  your prescription up.

 6  Q      Okay.  What do you do then?  What do you do with your

 7  prescription?

 8  A      Well, I asked him, I said, am I -- what do I do?  Like how

 9  do I -- are you going to give me my first shot today?  And he

10  was like -- he kind of laughed at me.  And he goes, no, not

11  unless you are going to go pick it up from Rome and drive back

12  to Atlanta, which was two hours, and bring it back to me.  And

13  I said, no, I can't do that.  And he said, well, you can go

14  home and figure it out.  Watch YouTube videos.  He said, you

15  can't kill yourself.  So...

16  Q      But you don't get the testosterone shot at the gender

17  clinic.  You get a prescription that you go get filled, and

18  then you self-administer the shots?

19  A      You can do it either way.

20  Q      Okay.  What were you told about the effects of

21  testosterone?

22  A      At the time, I was told everything you want to hear is

23  going to happen.  And I was told that there was going to be

24  muscle mass increased, and that you are going to get facial

25  hair, and that your voice is going to deepen.  You know,
```

                everything that you are thinking is going to fix you.

1   Q     Did your voice deepen?

2   A     Yes, very much so.

3   Q     Is it still deeper than it was when you were 17?

4   A     Yes.

14:47:12   5   A     Yes.

6   Q     Is that likely a permanent effect?

7   A     It is a permanent effect.

8   Q     What were the other effects on your body from taking

9   testosterone?

14:47:23   10   A     Permanently?

11   Q     Any.

12   A     Any?

13   Q     Let's start with when you were actually taking it.  How

14   did your body change?

14:47:34   15   A     When I started taking it, the first couple things was my

16   voice did drop.  I did start to gain slight weight.  And then

17   after more months of being on it, the weight gain got very,

18   very excessive.  And I became prediabetic from my blood work

19   and from the hormones.  And then also my digestive system

14:47:55   20   started to not fail, but they were not working properly.

21   Q     This picture, this picture is printed over two different

22   pages, so I am trying to put it together now.  Is that you?

23   A     Yes, sir, it is.

24   Q     And this is for the record pages 7 and 8 of Exhibit 42.

14:48:15   25       Where in the course of your treatment were you about this

```
 1  time this picture was taken?

 2  A    A little under a year.

 3  Q    So you said weight gain.  And then did you say

 4  prediabetic?

 5  A    Yes.  I have become prediabetic.

 6  Q    And were you told that that was the result of the

 7  testosterone?

 8  A    Yes, sir, it was.

 9  Q    And this picture is from pages 9 and 10 of Exhibit 41, and

10  I will represent to you that the caption on this picture says

11  that it was after a year on hormones?

12  A    Okay.  Yes.  That one, yeah.  That one.

13  Q    That's you?

14  A    Yes, it is.

15  Q    And is that about a year after you were on hormones?

16  A    Yes, sir.

17  Q    How were you feeling physically?

18  A    Physically, exhausted.  I felt drained of life.  Every bit

19  of it.

20  Q    Were you at least at first pleased with your body becoming

21  more masculine?

22  A    Absolutely.  It was -- it was what I was wanting.  That's

23  why I can see both sides of everything.

24       And I was on the complete other side at the beginning.  I

25  was all for this.  This is everything I ever wanted.  That's
```

```
 1  why I did not want to -- I would have rather died than quit at
 2  the time.
 3  Q    Were you telling people you were a male?
 4  A    Yes.
 5  Q    Were you presenting yourself as a male?
 6  A    Yes.  At the time, I worked for a very large corporation,
 7  and everybody referred to me as male.
 8  Q    Did you make any other changes in your life to reflect
 9  your change and identity from female to male?
10  A    Yes.  My driver's license and a lot of documents did
11  reflect.
12  Q    At the time, you were sure, weren't you --
13  A    Oh --
14  Q    -- that you wanted to be a male?
15  A    -- 100 percent.
16  Q    Were there any changes with your blood counts, like your
17  red blood counts?
18  A    Yes.  My red blood cell count went sky high.  That's when
19  they started warning me of a heart attack or a stroke.  That's
20  when things started getting way more intense.
21  Q    Other than you mentioned being tired, feeling tired, did
22  any of this -- any of the rest of this just make you feel bad
23  in any way?
24  A    Yes.  So the red blood cell count -- I had no idea, but I
25  started itching very badly around my legs and my arms.  It was
```

from the red blood cell count going up.  My blood was starting

to thicken.  So it was putting me at a risk of heart attack or

stroke.

        They thought at one point I was developing a blood clot in

my lung.  And I was in the ER.  And we had to do a couple of

different painful tests.  And they came to find out that it

wasn't the blood clot, but that it was tachycardia, which was

also caused by the hormones.

Q    After you went to the emergency room, did you decide then,

oh, I have made a mistake, I am going to get off these

hormones?

A    No.  I was still determined.

Q    Are you living as a male today?

A    No, sir.

Q    Are you a male?

A    No, sir.

Q    You are a woman, right?

A    Yes, sir.

Q    What changed?  What made you at some point decide, I'm

going back, and I am going to present myself as a woman and be

the woman that I am?

A    Well, one day my grandfather, who is the most important

man in my life, like we had a down-to-earth talk.  And we -- he

made me realize a couple of things.  And he said, if you will

just quit, just for three years, just, you know, take a step

1  back, look at this at a couple of things.  And so I did.  I

2  said, all right.  You know what?  You are not asking me to quit

3  permanently.  You are not asking anything outrageous.  So, yes,

4  of course.  And so I quit.  And that's where we went from

14:52:13  5  there.

6  Q    Let me show you the picture that's page 11 of Exhibit 41.

7  Who is in this picture?

8  A    My granddad.

9  Q    And you?

14:52:27 10  A    (Nodded head.)  Yes.  He -- he is the one that helped me

11  and saved my life.  And, gah, he's been a blessing.

12  Q    That's you with your grandfather, though, right?

13  A    Yes.  He's never cared how I looked or anything, as long

14  as I came to see him.

14:52:46 15  Q    So he was suggesting that you get off the hormones long

16  enough to look at things clearly?

17  A    Yes.  He was worried about my health.

18  Q    Looking back, when you were going to the gender clinic,

19  what did you need?  Did you need medicine to try to make you

14:53:11 20  look like a man?  Or did you need counseling?

21  A    I needed counseling.

22  Q    You gave a written declaration in this case, did you not?

23  A    Yes, sir, I did.

24  Q    You had a line in there that I am going to read to you.

14:53:27 25  For the record, this is Exhibit 27 and paragraph 23 of that

1   exhibit.

2   A      Uh-huh.

3   Q      You said, Unfortunately, there are more and more young

4   people like me being deceived every day, being told that the

14:53:41  5   solution to their insecurity and identity problems is to get a

6   sex change.

7         Do you think the people telling those young people that

8   are right, that that's what they need?  They need a sex change?

9   A      No.

14:53:52 10   Q      Why not?

11   A      Well, I believe that unfortunately that the doctors are

12   out for the money, because there's a huge market on it.

13   Because once you get somebody hooked on some medicine like

14   this, you can never get off.  It is a lifelong commitment.  You

14:54:12 15   have a lifelong patient.

16         But I also believe that at the end of every single day, I

17   remember how I felt.  At the end of every single day, I was a

18   woman.  You can't change it.  There's no way -- like I could

19   not change it.  I could not escape what I was trying to escape.

14:54:26 20   And eventually, you have to come to terms with that.

21         There's no -- I couldn't -- there was no way.  And I lived

22   it.  I wanted it to be true.  I wanted it so bad.  But, no.  At

23   the end of every day, it's not.

24   Q      What was your biological sex after you had been taking

14:54:43 25   testosterone for a year?

```
 1  A     It was a female.

 2  Q     What was your biological sex when it said male on your

 3  driver's license?

 4  A     It was a female.  I mean, every time.

 5  Q     So how long have you been off the testosterone and decided

 6  you're not going to go that course anymore, I am going to live

 7  my life as a female?

 8  A     I think I've been off for about three-and-a-half years, I

 9  would say.

10  Q     Is there any way that you're different today physically --

11  still today as a result of having taken hormones

12  three-and-a-half years ago?

13  A     Yes.  Yes.  I still have to go to the doctor.  I'm still

14  having -- my digestive system is still messed up.  I have

15  tachycardia still.  I still have to get my blood work done

16  because they're worried about my red blood cell count.

17        And some doctors -- my gynecologist isn't even sure if I

18  am ever going to be ever be able to have children.  It took my

19  right away to have children.

20  Q     Did you ever consider making a claim against the doctors

21  who gave you these treatments?

22  A     I tried to do a malpractice suit.  And I couldn't find a

23  single attorney to take the case.

24  Q     Why not?

25  A     They were afraid.
```

```
 1   Q     Afraid of what?

 2   A     They were afraid against the standard of code.

 3   Q     Was there any concern that you heard from any of the

 4   lawyers you spoke with about how long it had been since you had

 5   received treatments?

 6   A     They were worried about the statute of limitations.

 7   Q     How long did it take you to realize that -- bad question.

 8   Let me start over.

 9         How long did it take, from the day you set off on the

10   course of this treatment, to come to believe that the doctors

11   had mistreated you?

12   A     From starting it?

13   Q     Yes.

14   A     Okay.  Half -- I would say around six to seven months I

15   started getting a little shaky feeling because I could -- I

16   could -- I have common sense.  I can see when people care and

17   don't care about me.  And when you're just being, you know.  So

18   I started seeing how they treated people.  And I started

19   watching the others at the gender clinics.  And I -- it raised

20   more and more concerns as I went on.

21   Q     Maybe some inkling.  But I mean when you were -- when your

22   eyes were opened --

23   A     Oh.

24   Q     -- and you realized oh, this was wrong?  And you needed to

25   do something about it and possibly even seek recourse against
```

1   these doctors?

2   A    That was -- when I was very much so in the hospital all

3   the time was when I knew that I had to probably do a

4   malpractice suit, or do something, or fight it.  Because I

14:57:44 5  didn't want anybody else to go through this at all.

6   Q    It wasn't overnight.  It took a while for you to come to

7   that realization, right?

8   A    Yes.  It took months, years, like very, very time

9   consuming.  It took time.

14:57:57 10  Q    Did you support Alabama's bill that affects these

11  treatments?

12  A    Yes, I did.

13  Q    In what way did you support it?

14  A    I spoke in support of the bill at the committee hearing.

14:58:13 15  Q    The committee hearing.  You mean the committee at the

16  Legislature?

17  A    Yes.

18  Q    So you were a witness there?

19  A    I was, yes.

14:58:21 20  Q    Did you tell them that you hoped they would vote in favor

21  of this bill?

22  A    I did, yes.

23  Q    What would you tell a young person who is struggling with

24  gender dysphoria, feels like they were born in the wrong body,

14:58:43 25  and they're wondering if the answer to their problems is to see

1  a doctor and get some hormones that will help them transition

2  to the other sex?  What would you advise that person?

3  A    I would advise them to take a lot of time.  Take a lot of

4  time.

14:58:57  5       And you're going to realize in life that there is so many

6  more important things than this.  You are going to see that,

7  you know, the people that care and love you.  And just time

8  will show you and open your eyes that it's not necessarily --

9  you will slowly see how you'll learn to love yourself.  It

14:59:22  10  takes a lot of time.

11       And we can't fix who we are.  But we are stuck who we are.

12  And you should just love yourself.

13       And it doesn't matter if you are a girl.  You can do guy

14  things.  And I can dress like a tomboy if I want.  And it

14:59:37  15  doesn't have to be a certain way.

16       I've learned to love myself and love -- hold my wife's

17  hand in front of other people.  And it doesn't have to -- I

18  don't have to transition for it.

19  Q    Now, you have been through these treatments yourself,

14:59:55  20  Ms. Wright?

21  A    Yes, sir.

22  Q    Do you think doctors should be allowed to give minor

23  children hormone treatments to try to make that person appear

24  to be the other sex?

15:00:03  25  A    Absolutely not.

```
 1              MR. DAVIS:  Thank you.  I pass the witness, Your
 2     Honor.
 3                         CROSS-EXAMINATION
 4     BY MR. DOSS:
 5     Q    Good afternoon, Ms. Wright.
 6     A    Good afternoon.
 7     Q    My name is Jeff Doss.  I'm one of the attorneys
 8     representing the plaintiffs.  We haven't met before.
 9          Just to be clear, you don't know which of my clients,
10     Michael Boe, Zachary Zoe, Allison Poe, and Christopher Noe, all
11     of whom are children, you don't know which of those children
12     are, in fact, transgender, do you?
13     A    No, sir.  I would have no way of knowing.
14     Q    Exactly.  You don't know any of these kids, do you?
15     A    No, sir.
16     Q    And so you don't know whether any of my clients have been
17     correctly diagnosed with gender dysphoria, do you?
18     A    I don't believe in that diagnosis, sir.
19     Q    I appreciate that clarification.
20          So, in your opinion, you don't think any medical
21     treatments should be provided for anyone with gender dysphoria,
22     do you?
23     A    I believe that that's your own decision after the age of
24     21 or 18.
25     Q    Another good point.
```

The timestamps in the left margin are: 15:00:17 (line 5), 15:00:34 (line 10), 15:00:49 (line 15), 15:01:01 (line 20), 15:01:14 (line 25).

1       When you were testifying on direct examination, you kept

2   using the expression young people, right?

3   A     Okay.  Uh-huh.

4   Q     Now, you wrote an article in October of 2019 for the Daily

15:01:29 5   Signal, correct?

6   A     Yes, sir.

7   Q     And that's marked as Defendants' Exhibit 41.  And I will

8   show you page 3 of that article.

9       You wrote, At age 18, I started seeing a bunch of

15:01:46 10   transgender men's success stories on Instagram, right?

11   A     Okay.  Yes.

12   Q     And you went on to write, I resented that and began to

13   envy the transgenders.  I looked into it for myself.  Correct?

14   A     Right.

15:01:58 15   Q     So you were a legal adult at the time that you began

16   considering that perhaps you were transgender, right?

17   A     No, sir.  I was 17.  And then I turned 18 when I got the

18   hormones.

19   Q     Well, let's talk about that.  On page 4 of the article,

15:02:19 20   you wrote, I soon found a therapist who said she would help me,

21   and I took her -- I told her I wanted to start the hormones on

22   my 19th birthday, which was only five weeks off.  She required

23   only a one-hour appointment each week.  Right?

24   A     Right.  Yes.

15:02:33 25   Q     So did you start the hormones on your 19th birthday or

1 before?

2 A     Started questioning at 17.  18, I started taking action to

3 get a psychologist.  And then I wanted to have the hormones by

4 my birthday.

15:02:47 5 Q     Okay.  Did you, in fact, get your hormones by your 19th

6 birthday?

7 A     I was a couple of weeks off, but right at it.

8 Q     Okay.  So is it fair to say that when you received the

9 diagnosis and you received the hormones, you were an adult?

15:03:00 10 A     At the time, yes, uh-huh.

11 Q     Ms. Wright, you are not and never have been transgender,

12 right?

13 A     I was transgender at some point, yes.

14 Q     You considered yourself to be transgender?

15:03:22 15 A     Yes.

16 Q     Do you believe that you are, in fact, transgender?

17 A     I am not now, no.

18 Q     But at the time, did you believe you were transgender?

19 A     Yes.  When I believed it was something that could happen.

15:03:34 20 Q     Okay.  I believe you received a diagnosis of gender

21 dysphoria; is that right?

22 A     Yes, I did.

23 Q     But sitting here today, you don't think that you really

24 had gender dysphoria, right?

15:03:44 25 A     No.  I think it was a mental delusion.

```
 1   Q     So you did not think -- sitting here today, you don't
 2   think you had a diagnosis of gender dysphoria?
 3   A     No.  I think I had mental problems.
 4   Q     Okay.  And what was the name of the doctor who prescribed
 5   the testosterone for you?
 6   A     Katrina Jensen.
 7   Q     What practice was the doctor with?
 8   A     Balanced Living.
 9   Q     Okay.  And that was in Georgia, right?
10   A     Correct.
11   Q     And, in your opinion, your counselor misdiagnosed with you
12   gender dysphoria, right?
13   A     Not that she misdiagnosed me.  Because at the time, I did
14   believe in gender dysphoria.  That is why I was there.
15   Q     Sitting here today, you believe that your counselor
16   misdiagnosed you with gender dysphoria?
17   A     Looking back, I don't think it was a misdiagnosis.  I
18   think it is a problem with gender dysphoria.
19   Q     Okay.  So do you think at the time you, in fact, did have
20   gender dysphoria?
21   A     You can think that the symptoms are similar and not
22   necessarily the same as -- gender dysphoria, it's a mental
23   problem.  Like you don't see yourself as who you want to be,
24   but it's probably caused from other issues coming in your life.
25         So necessarily, gender dysphoria is probably caused from
```

1   some other things coming from your life.

2       So I mean, I guess that she could have summed it up as

3   that, yes, and whatever she put at the time was what she had

4   thought.  I -- I don't want to say I believe in it or don't

15:05:15  5   believe in what she put at the time.  She has since resigned

6   counseling.

7   Q    Okay.  And to be clear, you have had no academic training,

8   in terms of psychological diagnoses, right?

9   A    No.

15:05:27 10  Q    Okay.  You testified that you tried to file a medical

11  malpractice lawsuit against this doctor, but no attorney would

12  take the case.

13      Did you report the doctor who prescribed the testosterone

14  to you to any sort of state regulatory board in Georgia?

15:05:46 15  A    I did not -- I reported -- I reported the counselor.  The

16  counselor has -- had her license removed, I believe.  So that's

17  the only one.

18      And then I tried to handle the doctor, but I could not

19  make progress with the actual gender doctor.

15:06:07 20  Q    When you say you tried to handle the doctor, what do you

21  mean by that?

22  A    I tried to -- I tried to do a malpractice suit and tried

23  to report him anywhere I could.

24  Q    So did you report the doctor to the state regulatory board

15:06:18 25  concerning doctors?

```
 1  A    No.  At the time, I didn't know how to do that.
 2  Q    All right.  Ms. Wright, because you don't know any of my
 3  clients, you can't say whether or not they have benefitted or
 4  will benefit from puberty blockers or hormone treatments,
 5  right?
 6  A    Can I give a response?  I can --
 7  Q    That's what I am looking for.
 8  A    Right.  The only thing is I can say that it could harm
 9  them in the future if they change their mind.  It's permanent.
10  Q    But sitting here today, you don't know what benefits that
11  they have experienced as a result of these medical
12  interventions, correct?
13  A    I don't know the benefits, but I do know the cons.
14  Q    Absolutely.  So you don't know what benefits they have
15  experienced, right?
16  A    Sure.
17  Q    All right.  In your article that we looked at a second ago
18  on page 14, you closed with, Until we do something, until the
19  medical community puts up serious guardrails and begins to do
20  its due diligence, and until politicians grow a spine and step
21  in, expect to see more young people scarred for life.
22       Did I read that correctly?
23  A    Yes, sir.
24  Q    Do you know what guardrails exist at the UAB Children's
25  health clinic?
```

1    A      Please do tell me.

2    Q      I am asking if you know.

3    A      I don't.  I want to know.

4    Q      And then getting ready for today, I noticed -- I am not

15:08:00  5   marking this as an exhibit, but I noticed, is this your

6    LinkedIn page, Ms. Wright?

7    A      I don't have it any longer, but at one point, yes.

8    Q      Okay.  And that's a photo of you when you appeared at the

9    Alabama State House while testifying against this particular

15:08:17 10  law, right?

11   A      Yes, sir.

12   Q      And if we go down a little bit, the about section, you

13   wrote, I also speak as a child advocate in very large court

14   cases all around the U.S.

15:08:29 15       Did I read that correctly?

16   A      Yes.

17   Q      Other than this case, what other court cases have you

18   testified in?

19   A      I have spoken for the VCCAP bills, the Vulnerable Child

15:08:39 20  Protection Act.  And I have spoke for South Dakota.  I have

21   spoke for Alabama a couple of times.  And I think that's all at

22   the moment.

23   Q      And let me clarify.  You wrote court cases.

24   A      Oh, well --

15:08:51 25  Q      Have you ever testified in court before?

```
 1   A    No.  I'm -- I might not be the brightest on lawyer terms.
 2   Q    Likewise, under volunteer experience, you wrote that you
 3   are a public speaker for Compassion Coalition, and you said, I
 4   travel and speak at very -- all caps -- large court cases that
 5   change laws and standards of care and health, as well as make
 6   new laws.  Right?
 7   A    That was what I helped with at one point.
 8        I was trying to build my resume to try to look good for a
 9   position that I had put some experience that I did on there.
10   So this is what I have experienced, not what I have done or any
11   positions that I hold.
12   Q    Okay.
13   A    What does my past have to do with -- my past work have to
14   do with the court case -- or not court case, but today?
15            MR. DOSS:  One moment, Your Honor.
16            THE COURT:  Uh-huh.
17            MR. DOSS:  Thank you, Ms. Wright.  That's all the
18   questions I have for you.
19            THE WITNESS:  Perfect.  Thank you.
20                      REDIRECT EXAMINATION
21   BY MR. DAVIS:
22   Q    Ms. Wright, were you just mistaken when you referred to
23   other events as court cases?
24   A    Yes.  1,000 percent.  I was -- and that was probably
25   three years ago when I spoke at my first one and was extremely
```

Timestamps: 15:09:11 (line 5), 15:09:27 (line 10), 15:09:44 (line 15), 15:09:53 (line 20), 15:10:10 (line 25)

1   excited.

2   Q    Now, you said you do not support medical treatment for

3   folks with seeking to transition.  Let's be clear about that.

4        You mean -- did you mean by that like puberty blockers and

15:10:28  5   cross-sex hormones, that's what you're against?

6   A    Right.  Yes.

7   Q    Are you in favor of those folks getting counseling?

8   A    Yes, 1,000 percent.  I want all the children to be helped.

9   Q    Do you consider yourself to have been mature enough to

15:10:46 10   make the decision to transition to male and to take the

11  hormones?

12  A    No.

13  Q    And you were how old at that time?

14  A    At the time, I was 19.  I still probably wouldn't have

15:10:56 15  been good by 21.

16  Q    Do you think under any circumstances a 13, 14, 15 year old

17  would be mature enough to take these drugs?

18  A    Absolutely not.  If you would have told me that I could

19  have become an animal or something at 12, you know, you would

15:11:11 20  have taken that leap or something?  No.

21  Q    Thank you, Ms. Wright.

22  A    You're welcome.

23            THE COURT:  May this witness be excused?

24       You can step down, ma'am.  Thank you.

15:11:23 25            THE WITNESS:  Thank you.

1         MR. DAVIS:  Your Honor, the State defendants have no
2   other witnesses.
3         THE COURT:  Okay.  All right.  Well, then, why don't I
4   give everybody 20 minutes to get ready for their closing.
15:11:38 5         You know, again, I will give everybody 25 minutes.  I
6   think that's probably too long.  I'm really interested in you
7   giving me your analysis and tying in your evidence here at the
8   end.
9         You know, to the United States, you know, I would say
15:11:51 10  since you are only arguing one issue and not five, to the
11  extent you can limit yourself to ten, that would be
12  appreciated, as well.
13        Does that sound reasonable to everybody?
14        All right.  And by the way, if anybody just, you know,
15:12:04 15  needs five minutes, that's okay, too.  So don't be compelled to
16  use all your time.
17        Okay.  Well, let's take 20 minutes so you have time to
18  kind of recap, and we will come back and knock those out.
19  Thank you.
15:12:17 20        (Recess.)
21        THE COURT:  Please be seated.  Thank you.
22        All right.  Let's go ahead and get started.
23        Tell me how you think your time usage is going to run,
24  Mr. Doss.
15:33:26 25        MR. DOSS:  Hoping well below 25 minutes, Your Honor.

1          THE COURT:  Excellent.  Excellent.

2      So instead of asking any hypotheticals and putting anybody

3   on the spot too hard, let me just say, you know, and I think

4   you probably will do this anyway, but I would like everybody to

15:33:43 5   directly address how to read Bostock and Brumby together.

6      I get it that Fourth Circuit precedent is not binding

7   here, but I also want to see what you think the interplay is

8   with Grimm.  And then anything else you want to tell me.

9      But that would kind of be at the front of my mind.

15:34:05 10   Everybody read those together for me.

11      So all right.  Go ahead.

12          MR. DOSS:  May it please the Court.

13      First, Your Honor, thank you for your time the past

14   two days.

15:34:22 15      The State has spent the last two days, Your Honor,

16   answering a question that is not dispositive of anything.

17      The State has focused and questioned our witnesses and

18   introduced its own evidence to prove that there exists medical

19   risks associated with the treatments that this particular Act

15:34:45 20   aims at banning.  We don't dispute that premise, Your Honor.

21   We haven't disputed it since the beginning.

22      There is no such thing as a risk-free medical treatment.

23   No one has come forward into this courthouse and identified

24   what that risk-free treatment would be.

15:35:03 25      Mr. Bowdre, I thought it was telling when he was

 1   questioning the United States' expert this morning,

 2   Dr. Antommaria about what if a person has a 40 percent chance

 3   of persisting, would it be appropriate to prescribe

 4   gender-affirming treatments?  But that is simply not how

15:35:22  5   clinical practice works, Your Honor.

 6       No doctor in the state of Alabama that Your Honor has

 7   heard about is making these sorts of sterile clinical judgments

 8   based on statistics alone.  It is a three-dimensional

 9   assessment that takes into account the parents, the child, the

15:35:41 10   network, the child's background, the history of gender

11   dysphoria that the child may have presented with.  All of these

12   issues are taken into account.  It's never as easy as opening a

13   book and looking at statistics and basing a medical judgment

14   upon it.  It requires individualized attention and

15:36:04 15   individualized treatment.

16       Even Dr. Cantor suggests that multiyear diagnoses

17   preceding medication ought to be the widely-accepted approach

18   in this area.  But this Act, Your Honor, strips doctors of that

19   ability, and it strips the parents of the ability to weigh

15:36:27 20   those risks.  It is a fundamental freedom in this country, Your

21   Honor, that parents have control over the care and custody and

22   medical matters affecting that parent's child.

23       But the State replaces that right to weigh the risks.

24   With its categorical prohibition, it supplants parental

15:36:54 25   judgment and replaces it with the State's sole unchallengeable

without exception judgment that no child should receive these.

There was a question this morning by the State to one of the witnesses that if a nine year old with diabetes receives insulin, that would be effective, but if a nine year old without diabetes receives insulin, it would be, quote, very dangerous.  That hypothetical illustrates exactly what the problem the State is concerned about.  Whether the diagnosis is accurate, and if it's not accurate, the treatment.

It makes sense that if you don't have diabetes, you shouldn't be prescribed insulin.  In the same way, if you don't have gender dysphoria, it may cause issues if you're prescribed these gender-affirming treatments.

That becomes relevant, Your Honor, because of the standard of review applicable to our due process claim on behalf of the parents.  Because the State is interfering in a fundamental right, the State must show a compelling State interest, and the State must show that these laws are narrowly tailored to meet that interest.  This Act fails on both levels.

First, even if the Court were to credit all of the evidence in the State's favor and find that the evidence demonstrates a compelling interest, that alone does not save this law.  If we take a step back and look at the evidence offered by the State, the principal concern, as I understand it, is that there's a strong possibility of desistance, as the State says.  So this idea of watchful waiting is better than

1    medical intervention.

2         But that's a problem with the diagnosis, Your Honor.  By

3    definition, the obliteration of choice, the obliteration of

4    treatment cannot be narrowly tailored.

15:39:05 5    Perhaps if the State had implemented regulations that set

6    forth concrete guidelines that a clinician must follow before

7    prescribing these medications, maybe that would present a

8    closer question.  Maybe we wouldn't be here today.

9         But the State didn't do that.  The State took all

15:39:28 10   treatments off the table and made it a felony to follow these

11   widely-regarded medical approaches.

12        A concern for misdiagnosis does not call for the

13   obliteration of choice and treatment.  I expect the State will

14   cite to the Carhart vs. Gonzales opinion for the proposition

15:39:56 15   that medical uncertainty gives the government wider discretion

16   in terms of regulating medical treatment.

17        Carhart, Your Honor, was an abortion case.  It concerned

18   the federal so-called partial birth abortion ban.  And as Your

19   Honor might expect, there's a very different analysis

15:40:17 20   associated when you're considering an abortion regulation, as

21   opposed to when you're considering the deprivation of a

22   fundamental freedom like parental choice.

23        Setting aside that difference, even assuming we can draw

24   some meaning from the Carhart decision, the language that the

15:40:36 25   State is seizing upon, this issue of medical uncertainty, was

1   only part of the analysis.  That may have given the State some

2   interest in regulation, but that alone was not the end of the

3   inquiry.

4       The Supreme Court went on to consider whether the

15:40:58 5   regulation imposed an undue burden, including whether the

6   regulation would cause harm.  We have shown, Your Honor, that

7   this Act will undisputedly cause harm.

8       Our four plaintiff parents have very similar stories.  You

9   heard from one of them live, Ms. Poe.  I don't think anyone can

15:41:27 10  hear her testimony and think that she is not sincere, that she

11  doesn't have the best interest of her child in mind, and that

12  she's -- she is seeing positive transformative, amazing

13  benefits from these treatments that the State has dubbed risky.

14      Our other parents share similar stories.  And those are

15:41:53 15  reflected in the declarations which we've submitted for Your

16  Honor's consideration.

17      In this case, even if Your Honor were to apply that

18  Carhart standard, which the State seems to be proposing, this

19  law still fails.  It undisputedly causes harm to those it is

15:42:14 20  seeking to supposedly protect.  It is stripping them of

21  positive medical treatments that exist.

22      Over the past day and a half, Your Honor, we have heard a

23  refrain that these treatments are experimental.  We've heard

24  one -- two witnesses now define what that means.

15:42:40 25      Dr. Ladinsky gave an explanation.  It doesn't fit these

1   treatments.

2        Dr. Cantor gave a definition I thought was interesting.

3   As Dr. Cantor noted, it's very difficult to say when it no

4   longer is experimental and it's established.

15:42:56 5        Under the State's logic, simply by dubbing a treatment

6   experimental until we've reached some unknowable and

7   undefinable level of certainty, that alone should be sufficient

8   to override parental choice.

9        The problem, though, Your Honor, is that there are risks

15:43:15 10  with every medical treatment, and there are always unknowable

11  risks.  That's what makes them unknowable.

12       I can think of many commercials I have seen over the years

13  where medications that have been on the market for years, some

14  studies begin to associate them with adverse risks.  And

15:43:32 15  plaintiffs' attorneys are soliciting clients because of these

16  newfound risks.

17       In that regard, Your Honor, if we were to be as risk

18  averse as the State is proposing, I submit with the

19  introduction of antibiotics, the State likely wouldn't have

15:43:48 20  been on board because it had unknowable risks, despite our now

21  knowledge that they are life saving.

22       At some point, medical treatment is going to be new.  But

23  newness on its own doesn't make it bad.  And it certainly

24  doesn't justify the State's interest in obliterating it and

15:44:06 25  criminalizing it.

1   And that is exactly what the Arkansas -- Eastern District

2   of Arkansas found in the Brandt case.  In that case, Your

3   Honor, it didn't criminalize the parents.  It only criminalized

4   the physicians.

15:44:26 5   The Arkansas Court there still recognized that the

6   physicians -- because this so intimately implicates parental

7   choice, the physicians even had standing to assert those

8   fundamental protections on behalf of their patients' parents.

9   The Eastern District of Arkansas found that the law in

15:44:47 10   Arkansas, which again didn't criminalize anything, it applied

11   civil penalties.  It was less egregious than the law here.

12   Even the Arkansas law violated these fundamental protections

13   and failed at strict scrutiny.

14   But we also challenge the compelling interest piece of the

15:45:13 15   strict scrutiny analysis, Your Honor.  The State's compelling

16   interest is, at best, that there's a concern for this

17   desistance.  But we have presented evidence suggesting that

18   that concern is overblown.

19   Dr. Ladinsky testified that the standard of care endorsed

15:45:32 20   by every major medical association in the United States

21   recognizes that the use of puberty blockers and hormone

22   treatments can be appropriate in some adolescents with gender

23   dysphoria.

24   Dr. Hawkins testified that the standard of care requires a

15:45:48 25   360 assessment that takes several months, and in some cases,

years before prescribing medical intervention such as puberty
blockers.  The standard of care allows time for adolescents to
explore their gender identity, and not all adolescents receive
medical intervention.

15:46:09    Recall, Your Honor, Ms. Poe's testimony.  It took
two years from the time that she and her daughter first visited
the UAB Children's clinic until any medication was prescribed.

It is telling, Your Honor, that the State has been unable
to identify a single doctor in the state of Alabama who has
15:46:38 ever run afoul of these kind of guardrails.  It is equally
telling, Your Honor, that the State has identified not one
child who has received these treatments ever in the state of
Alabama who later regretted them.

What we heard this afternoon was from Ms. Sydney Wright, a
15:47:03 Georgia resident who was an adult.  Even if Georgia had had
this exact same law in place, it would not have prevented her
from obtaining the treatments she obtained.  Ms. Wright's story
is an unfortunate one.  And if only Ms. Wright had had a doctor
like Dr. Hawkins or a doctor like Dr. Ladinsky who was
15:47:31 committed to a deep meaningful evaluation of the child.

In Alabama, children receiving these treatments from the
University of Alabama -- from UAB's clinic, they walk hand in
hand with these physicians.  That informs their choice.

We have introduced into the record, Your Honor, the
15:48:04 informed consents that parents are provided with, in addition

1  to loads of information.  The parents still sign off on these

2  treatments.

3       As Ms. Poe testified, she is terrified of what would

4  happen if these treatments are prohibited.  She knows well the

15:48:26  5  risks, and she's weighed those risks against the benefits of

6  receiving the treatment, and the devastating effects of not.

7  And in light of that constellation, she exercised her freedom

8  as a parent to make that decision in consultation with her

9  child's team of doctors.

15:48:59 10       Indeed, Your Honor, even the study that the defendants

11  have cited as the leading study, it recognizes the benefit of

12  multidisciplinary approaches, including medical treatments in

13  appropriate cases.  The Dutch model that we heard about, it is

14  the well-regarded standard nationally.  It, too, would be

15:49:19 15  illegal under this law.

16       So to the extent the State expresses some concern in

17  support of its compelling interests, we submit that concern is

18  hollow.

19       Even in the Carhart decision, Your Honor, the Supreme

15:49:37 20  Court acknowledged that a federal court's review of the

21  constitutionality of a state statute looks at that underlying

22  evidence, not just the State's stated concern.

23       In addition, as to the desistance risk, we've put in the

24  Yale statement, Plaintiffs' Exhibit 19.  There are two

15:50:06 25  footnotes that are important:  43 and 45.  In that statement,

which is a literature review, it's a summary of the available

scientific literature concerning this matter.  It debunks this

notion that there's widespread concern about desistance for the

children who are receiving or eligible for treatment in the UAB

15:50:30  clinic.

As I mentioned in my opening, Your Honor, at base, this

law criminalizes a parent's concern and love for a child.

There can be no clearer example of a violation of fundamental

parental freedom.

15:50:57  So as to the other compelling interests that the State

cites, the kids can't understand because they haven't had sex

and don't know if they will want kids.  These are difficult

questions, Your Honor, admittedly.

And if I were a parent of a child going through this, I

15:51:13  don't know how I would weigh it.  But that's the point.  I

don't.  And it's not my job to weigh it for someone else.

These are highly personal, intimate considerations.

There are risks of fertility with other medications.  A

child with cancer going through chemotherapy faces such a risk.

15:51:40  Under the State's logic, we ought to ban that.  Of course, we

don't do that.

In the same way, these treatments have proven, as

Dr. Ladinsky testified, to be life saving.  And they haven't

been handed out like candy, as Dr. Cantor has tried to suggest.

15:51:56  There's no transition on demand in Alabama.  It is not a

1    documented concern.  I haven't even heard of it being a

2    documented concern in the last day and a half anywhere in the

3    United States.

4        The studies cited by the defendants in support of this

15:52:15 5    concern for transition on demand, they all originate in Europe.

6    Whereas, Dr. Ladinsky explained, regulation of hospitals,

7    clinics in Europe, very different than it is in the United

8    States.

9        The United States, the standard is clinics will have these

15:52:30 10   robust protocols and procedures in place.  They have these

11   professional organizations that are providing this sort of

12   oversight and input.  We don't see that in Europe.  So perhaps

13   they may have been getting a little lax in Europe.  But that's

14   not happening in Alabama.

15:52:50 15      The defendants have suggested another compelling State

16   interest is that the majority of kids ultimately align with

17   their gender identity.  But we've disproven that.

18      As Dr. Hawkins testified, gender identity is hardwired.

19   It's unlikely to change.  And once an adolescent reaches

15:53:12 20   puberty, it's unlikely that they'll grow out of their gender

21   dysphoria.

22      They suggest that a European pause is better than

23   America's rush to treatment, but they have identified no

24   country in Europe, in fact, no country in the world that has

15:53:32 25   enacted a law like this one.

1        So for being a compelling State interest, I find it

2   interesting that no other country has enacted a solution like

3   Alabama proposes.

4        What does the State propose instead?  Do nothing.  Counsel

15:54:01 5   them.  That's an untested proposal.  The State proposes an

6   experiment on a grand scale.  All transgender youth in the

7   state of Alabama suffering from gender dysphoria should be

8   guinea pigs.

9            THE COURT:  I notice you're rolling through your time

15:54:21 10   pretty good.  Are you leaving some time to talk about your

11   legal arguments?

12            MR. DOSS:  Yes, Your Honor.

13            THE COURT:  All right.

14            MR. DOSS:  What's my time so far?

15:54:30 15            THE COURT:  I think you are just about there, but I

16   might spot you a little bit.

17            MR. DOSS:  In terms of the equal protection, I am

18   going to defer to the government -- the United States because

19   they're arguing that one.  But I do want to make a couple of

15:54:44 20   points.

21        The Eleventh Circuit has recognized that a violation of

22   the Equal Protection Clause occurs when you discriminate on the

23   basis of transgender people on transgender status, gender

24   identity.

15:54:56 25        In the State's opening, the argument I heard was that

1  that's in the employment context, and for employment, it may

2  make a difference as to whether someone -- it should make no

3  difference as to whether someone is male or female; whereas in

4  the medical context, it does make a difference, and, therefore,

15:55:12  5  it doesn't ultimately matter.

6      But it's not the Equal Protection Clause for an employment

7  agreement.  It's the Equal Protection Clause which ensures that

8  no law forces the discrimination on the basis of sex.  That

9  that case concerned an employment issue is not the ultimate

15:55:31 10  disposition.  The issue is does the Equal Protection Clause

11  recognize the discrimination on the basis of being transgender

12  is, in fact, a violation?  The Eleventh Circuit has said yes.

13      So in light of that ruling, this law does, in fact, do

14  that.  It defines the scope of the law, in terms of people who

15:55:49 15  are transgender, of obtaining a medical treatment in order to

16  align one's gender identity with one's sense of self.

17      By definition, the State tries to say not everyone with

18  gender dysphoria is transgender, and not everyone who is

19  transgender has gender dysphoria.  But as Justice Scalia once

15:56:10 20  noted, if you put a tax on yamakas, it's a tax on Jews.  In the

21  same way, not everybody may who has a yamaka may be Jewish, not

22  every Jewish person may have a yamaka.  But these things are so

23  closely related that it's impossible to differentiate them and

24  separate them out.

15:56:30 25      And in that regard, we think it does violate the Equal

Protection Clause.  The State doesn't meet the standard of
review for the same reasons outlined, with respect to the
fundamental right to parental choice.

In terms of the First Amendment claim, I have appreciated
the State's concessions, that they don't think that these
things like referrals and mentioning the opportunities violates
the First Amendment because of science or requirement.

But the problem is if you're making a referral for
treatment as a doctor, you know full well what treatments are
available, and you could, in fact, be construed as causing the
receipt of those treatments.  So it does criminalize speech.

THE COURT:  So, you know, Alabama's criminal statute
has a "but-for" in the definition of cause.  So you think that
overcomes the "but-for"?

MR. DOSS:  I think the problem, Your Honor, it is not
a proximate cause requirement.  It's not the closest in time
cause of treatment, but it is a "but-for" cause.  It is a
cause.

So had the child not received the referral, Dr. Ladinsky
testified that 80 percent of her patients come to her through
referrals.  Had the patient not received the referral from the
pediatrician, it's questionable whether or not the child would
have been ultimately seen at the UAB clinic.

So it does raise a problematic chain of events.  I mean,
if it is a "but-for" cause, then that's all the -- alone that

1  is required.

2  THE COURT:  I really like your chances in court in

3  front of a jury if it comes down to just that.

4  MR. DOSS:  As someone who primarily does criminal

15:58:08  5  defense work, it's a little odd for me to be in court

6  suggesting that something my client may do is a crime.

7  However, for purposes of this, I will say the way the

8  statute's written, it's so broad.  As the State argued in

9  opening, a referral is both speech and an act.

15:58:27  10  So it is speech.  In the same way the pastor's conduct

11  could be swept under, that's enough to trigger First Amendment

12  scrutiny.

13  As to the preemption claim, Your Honor, I will be brief.

14  It's going to be primarily the same reasons as the Equal

15:58:46  15  Protection Claim.  There's at least the Northern District of

16  Georgia case which recognizes that under the ACA,

17  discrimination on the basis of sex can include discrimination

18  due to transgender status.

19  It forces doctors to have to decide between compliance

15:58:59  20  with federal law and compliance with state law.  And,

21  therefore, it should be viewed as preempted.

22  As to the void for vagueness argument, Your Honor, I think

23  the State's responses to your questions throughout the past day

24  and a half have illustrated the vagueness of this law.

15:59:18  25  When asked who is the primary defendant that the State

 1   would charge, who is defendant number one that the State would

 2   charge under this law, the State hesitated.  And you asked

 3   if -- Your Honor asked if it would only be doctors.  The State

 4   hesitated.

15:59:36  5        The problem with this law, Your Honor, is no one can read

 6   this statute and get fair notice of what is and is not covered

 7   by the statute.

 8        If I am a parent like the Noes, and I drive my child

 9   across state lines to get these treatments in Georgia where it

15:59:52 10   is legal, I've arguably caused.  But I don't know.  Maybe the

11   State says that isn't covered.

12        If I am a treating pediatrician, if I am a local

13   pediatrician, I make a referral, have I caused it?  I don't

14   know.

16:00:07 15        If I am a pastor, and I suggest that these things are

16   available, have I caused it?  I don't know.

17        The vagueness undercuts its constitutionality for those

18   additional reasons.

19        Your Honor, we respectfully request that the Court enjoin

16:00:28 20   the enforcement of this Act.

21             THE COURT:  Are you going to talk to me about Brumby?

22             MR. DOSS:  That was the Eleventh Circuit --

23             THE COURT:  Grimm?

24             MR. DOSS:  That was the --

16:00:36 25             THE COURT:  Bostock?

1          MR. DOSS:  Bostock.

2          THE COURT:  Three of those.

3          MR. DOSS:  Bostock recognized in the Title VII context

4   that discrimination against transgender people would be

16:00:46 5   sufficient to qualify as a violation of Title VII.  It's

6   discrimination on the basis of sex.

7       Under Bostock, we think the same logic would apply when

8   you're looking at either the ACA anti-discrimination provision

9   or you're looking at the Equal Protection Clause, which would

16:01:02 10   be consistent with Brumby, which was the Eleventh Circuit case

11   I was referencing.  I apologize I didn't mention the name.

12       But Brumby was the Eleventh Circuit opinion where the

13   Eleventh Circuit recognized that both Title VII, as well as the

14   Equal Protection Clause, protected against discrimination on

16:01:20 15   the basis of transgender status.

16          THE COURT:  So obviously Grimm is not binding

17   precedent here.

18       And Bostock, the majority said, you know, we shouldn't

19   prejudge what we might say about several other things,

16:01:39 20   including the conduct in Grimm.  And yet, they denied cert.

21       Do you want to read any tea leaves on that?

22          MR. DOSS:  I don't, Your Honor.  Only because I don't

23   know -- it could have been a waiver issue.  It could have

24   been -- as to the denial of cert.

16:01:56 25          THE COURT:  All right.  Anything else?

1          MR. DOSS:  That's all, Your Honor.

2      We respectfully request that the Court issue the

3  injunction.  We think that we've proven a substantial

4  likelihood of success on the merits, as well as the other

16:02:09 5  factors as laid out in our brief.

6          Thank you, Your Honor.

7          THE COURT:  All right.  United States.

8          MS. MONTAG:  Good afternoon, Your Honor.  Can you hear

9  me?

16:02:25 10          THE COURT:  I can.

11          MS. MONTAG:  I'm Coty Montag on behalf of the United

12  States.  I intend to be brief.

13      At the outset of this hearing, the United States posed a

14  single question to the Court.  Does criminalizing certain

16:02:39 15  medical treatments for transgender youth and only transgender

16  youth constitute a form of discrimination that's barred by the

17  Equal Protection Clause?

18      The testimony the Court has heard clearly demonstrates

19  that the answer is yes.  And failing to enjoin Senate Bill 184

16:02:58 20  before it goes into effect in two days will immediately and

21  irreparably harm youth, families, and providers.

22      The balance of the equities strongly favors preliminary

23  relief.

24      The testimony the Court has heard demonstrates that we

16:03:14 25  have met the requirements for preliminary relief on the Equal

1    Protection claim.  And I want to briefly touch on the elements

2    there.

3        First, the testimony set forth by the plaintiffs and

4    United States demonstrates a substantial likelihood of success

16:03:29 5   on the merits.  Section 4 of Senate Bill 184 is subject to

6    heightened scrutiny because it discriminates on the basis of

7    sex and transgender status.

8        The law discriminates on the basis of sex by criminalizing

9    gender-affirming care only when that care is being provided to

16:03:46 10  transgender minors.  The law prohibits transgender minors from

11   obtaining care that has been well established as medically

12   appropriate and necessary while imposing no comparable

13   limitation on other youth for obtaining these same forms of

14   care.

16:04:01 15      And Your Honor asked us to address Bostock, Glenn, and

16   Grimm.  And I just want to be very clear that these cases make

17   clear the discrimination against transgender people is sex

18   discrimination.  And as Mr. Doss pointed out, in the Eleventh

19   Circuit in Glenn vs. Brumby, this was in the Equal Protection

16:04:21 20  context.

21       So because this is sex discrimination, heightened scrutiny

22   must apply.  And the burden is on the State to show that the

23   law serves important governmental objectives, and that the

24   means employed are substantially related to the achievement of

16:04:37 25  those objectives.

1          And I just want to note from Bostock, when Justice Gorsuch

2     said, Treating an individual differently because that person is

3     transgender unavoidably constitutes sex discrimination because

4     it rests on a person having one sex identified at birth, but

16:04:56 5     identifying with a different sex or gender today.

6          Your Honor, defendants' assertion that the law does not

7     discriminate based on sex is incorrect.  There is no ambiguity

8     in the law about the class of minors that it targets.  It

9     prohibits certain treatments only when used by those whose

16:05:13 10    gender identity is different from their sex assigned at birth.

11          Defendants cannot meet the standard under heightened

12    scrutiny.  They cannot show that Section 4 of Senate Bill 184

13    serves important and governmental objectives, and that the

14    discriminatory means employed are substantially related to the

16:05:32 15    achievement of those objectives.

16          And I really want to touch on the substantial relation

17    piece here, Your Honor, and make sure I'm connecting it to the

18    testimony you have heard over the last few days.

19          First, as the Court has heard, the weight of medical

16:05:46 20    evidence confirms that the medical care that Senate Bill 184

21    forbids is widely accepted, safe, effective, and medically

22    necessary treatment for the health and wellbeing of some minors

23    suffering from gender dysphoria based on individualized

24    case-by-case consideration in accordance with well-established

16:06:05 25    guidelines.

1          And for that, Your Honor, I would refer you to the

2    testimony of Dr. Ladinsky, as well as United States Exhibit 7,

3    the declaration of Dr. Antommaria at paragraphs 23 to 38.

4          The Court also heard testimony that the medical research

16:06:22  5    supporting gender-affirming care is substantial rather than new

6    or experimental, and that parents and minors are able to

7    consent or assent to the risks involved.

8          And, again, I would refer to Dr. Ladinsky's testimony, as

9    well as United States' Exhibit 7 at paragraph 16 and 21, and

16:06:42 10    Plaintiffs' Exhibit 6, Dr. Ladinsky's declaration at paragraphs

11    7 and 47.

12          The Court has also heard testimony that individualized

13    treatment is the goal here and that there is no rush to

14    treatment under established guidelines for the care and

16:06:57 15    treatment of transgender youth.

16          Again, this is from the testimony of Dr. Ladinsky,

17    Plaintiffs' Exhibit 6 at paragraphs 9 to 13.  It's very

18    important here to emphasize that serious review and

19    reconsideration at every step over a long period of time,

16:07:16 20    normally years, is involved here.  And all of the standards of

21    care require a tailored approach based on an individual's

22    needs.

23          The Court heard testimony that the medical care provided

24    improves mental health for many transgender youth and reduces

16:07:34 25    the risk of anxiety, depression, and self-harm.  As Dr. Hawkins

1  testified, these youth receiving gender-affirming care not just

2  survive, but thrive.

3       Again, I would refer to the testimony of Dr. Hawkins and

4  Dr. Ladinsky, as well as Plaintiffs' Exhibit 3 at paragraph 27,

16:07:53 5  and Plaintiffs' Exhibit 6 at paragraph 15.

6       The Court also heard testimony as to the many harms if

7  these minors are not treated, including depression, anxiety,

8  suicidal ideation, eating disorders, and substance abuse.  And

9  we heard that from Dr. Hawkins and Dr. Ladinsky.

16:08:12 10      As Dr. Antommaria testified this morning, the law puts

11  clinicians in the untenable position of either having to follow

12  state law and knowingly harm their patients, or face penalties,

13  including imprisonment and loss of their medical licenses.

14       Your Honor, the standards of care for treating transgender

16:08:37 15  individuals and particularly youth have evolved and will

16  continue to evolve.  But at the end of the day, it is well

17  recognized that gender-affirming care can be and is an

18  appropriate treatment for gender dysphoria for some transgender

19  youth based on an individualized medical assessment in line

16:08:56 20  with accepted standards of care.

21       The well-recognized standards of care make clear that

22  these treatments should only be made after extensive

23  consultation with trained and qualified medical professionals,

24  informed consent of the parents and the patient, et cetera.

16:09:12 25      But defendants' response through Senate Bill 184 is to

1  simply criminalize access for transgender youth and only offer
2  counseling.

3      At a minimum, even if there are two sides to whether this
4  care is appropriate and effective and medically necessary,
16:09:28 5  which, of course, we don't concede, that doesn't support a
6  total ban, and a felony one at that.  Instead, it supports
7  individualized assessments of patients, which is already the
8  status quo.

9      The State has repeatedly argued in its papers and during
16:09:45 10  oral argument that its legislative judgments are entitled to
11  deference, and that the State is not required to de facto
12  accept or adopt the conclusions or recommendations of a medical
13  association or anyone else.

14      But that's not what is at issue here under the Equal
16:10:01 15  Protection Clause.  It is well established that if the State
16  makes the extraordinary decision of making a distinction or
17  classification based on sex, which this law does, the burden
18  shifts to the State to justify why it needs to take such a
19  drastic step and why such a classification is necessary and
16:10:20 20  justified.  The weight of the evidence makes clear that the
21  State has failed to meet that standard.

22      Your Honor, I will not go into the other elements.  We
23  believe we have shown irreparable injury, the balance of the
24  equities, and the public interests, and that they all justify
16:10:37 25  preliminary relief.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1        The United States seeks to preserve the status quo here

2   and ensure that transgender minors can continue to access

3   medically necessary and appropriate care while the

4   constitutionality of this law continues to be litigated.

16:10:54 5       And I will close by saying the issue before the Court

6   today is not whether someone's gender identity is fixed at

7   birth, or whether minors with gender dysphoria have a right to

8   gender-affirming care in every instance, or whether there's

9   evidence on both sides as to whether and when these treatments

16:11:11 10 are clinically indicated.  Rather, the question is whether

11  Alabama can outright ban these treatments in every single

12  instance, and not only that, make it a felony to provide or

13  cause such care.  Under the Equal Protection Clause, it cannot.

14       The United States asks this Court to maintain the status

16:11:31 15 quo, and grant its motion for temporary restraining order

16  and/or preliminary injunction.

17            THE COURT:  All right.  Thank you.

18       Before you begin, Mr. LaCour, let me ask you the one

19  question based on the original plaintiffs' closing.

16:12:03 20       So if a parent drives their child to Georgia for this

21  treatment, does that trip the statute?

22            MR. LACOUR:  Your Honor, I think the key is to look at

23  the words "engage in" or "cause, prescription, or

24  administration," not just cause in a vacuum.  You always read

16:12:22 25 statutes in context.  And "engage in" also "prescribe or

administer" are shedding light on cause.  I don't think just

driving them there would be causing the administration.  I

think -- another way to think about it is what would be cause?

So engaging in the administration of the puberty blocker

for the prohibited purposes would be, for example, if a doctor

used a needle and engaged in the administration.

Now, if the doctor ordered a nurse practitioner to do that

instead, the doctor might not be engaging in the

administration, but the doctor would be causing the

administration.

So I don't think buying somebody a bus pass or driving

them to the doctor would be that closely related such that it

would be causing the administration.  This is not a butterfly

flaps its wings in the Amazon, as the plaintiff suggested in

the reply brief.  This is, I think, much tighter to the other

key verbs in the statute.

THE COURT:  All right.  Go ahead with your closing.

MR. LACOUR:  Thank you, Your Honor.

Over the last couple of weeks, and the last two-and-a-half

days, the Court has heard about children and families facing

very difficult situations.  But as a matter of law, this is not

a difficult case.

As mentioned earlier, the State has wide discretion to

regulate areas of medical uncertainty.  This has long been the

law.  As the Supreme Court reaffirmed in Gonzalez, at 550 U.S.

163, when the State, quote, undertakes to act in areas fraught

with medical and scientific uncertainties, legislative options

must be especially broad.

So when there is competing evidence about benefits and

16:14:19 risks, the State can evaluate that evidence and make judgments

with all five million Alabamians in mind.  That is a

well-established role of the State.

What this means is that in our federal system, a federal

court has an important, but limited role.  It is not up to

16:14:38 federal courts to make the determination of the best treatment

options for any particular individual.  Rather, the judge's job

is to determine whether the Constitution bars states from

regulating in a particular area of medical uncertainty.

So plaintiffs have not only failed to bear their heavy

16:14:58 burden of showing a lack of medical uncertainty, they have

confirmed that SB 184 does not discriminate on the basis of sex

or transgender status for reasons I will address in a moment.

Now, earlier -- and I apologize, Your Honor.  I had

suggested that the AMA had supported the partial birth abortion

16:15:15 ban in Gonzalez.  It does not appear they submitted an amicus

brief in this case, but numerous other medical groups did.

The California Medical Association, which represented

30,000 members, submitted a brief.  The American College of

Obstetricians and Gynecologists submitted a brief.  The

16:15:32 American Medical Women's Association, which was a national

1  organization of 10,000 women physicians, surgeons, and

2  physicians in training submitted a brief, as did the American

3  Public Health Association, the Medical Students for Choice, the

4  New York Obstetrical Society, and the University of Chicago

16:15:49 5  Hospital's Department of Obstetrics and Gynecology.

6      Even so, the Gonzalez Court did not hold that Congress was

7  somehow limited in its ability to regulate in an area of

8  medical uncertainty.  Quite the contrary.

9      The Court refused to adopt a, quote, policy that would

16:16:09 10  strike down legitimate abortion regulations if some part of the

11  medical community were disinclined to follow the prescription.

12  Considerations of marginal safety, including the balance of

13  risks, are within the legislative competence when the

14  regulation is rational and in pursuit of legitimate ends.

16:16:29 15      Rational and legitimate ends.  That is the language of

16  rational basis, Your Honor.  That is not the language of strict

17  scrutiny.

18      Mr. Doss suggested it's different because it was an

19  abortion case.  Well, abortion is an area of the law where for

16:16:43 20  half a century the Court has recognized a fundamental privacy

21  right.  And there is no similar right to gender transition

22  procedures.  And these are quite new.  They're quite new on the

23  medical scene.

24      So if anything, the fact that abortion was involved in

16:16:59 25  that case cuts in the State's favor, not in favor of the

1   plaintiffs.

2       Plaintiffs' strict scrutiny rule we need to think about.

3   What are the limits of it?  I mean, it would destroy the system

4   for FDA drug approval, because anytime a plaintiff could -- who

16:17:17  5   is a parent and has a child who wants some sort of drug that

6   the FDA has decided is still experimental at this point, and it

7   is not -- if the FDA has not decided yet whether the risks

8   outweigh the benefits, or vice versa, the child would have no

9   right to the drug, the parent would have no right to the drug

16:17:37 10   for the parent's use, but the parent would have a right to get

11   it for their child.

12       But, of course, during the last two years of the pandemic

13   as the FDA was considering the safety and efficacy of the COVID

14   vaccine, there was no substantive due process right for a

16:17:53 15   parent to cut in line and sue and say, I think this is going to

16   be really helpful for my kid.  My kid is immunocompromised.

17   They really, really need it.

18       That was not -- it's not a Fourteenth Amendment issue.

19   There was not a right.  Because what they have done is the same

16:18:08 20   thing the Eleventh Circuit has rejected expressly in the

21   Morrissey case, which we discussed at opening.

22       They have defined the right with broad generality, a broad

23   right to provide medical -- to basically care for your child.

24       But as the Eleventh Circuit and the Supreme Court have

16:18:28 25   recognized, when we're dealing with substantive due process to

the extent that's even a thing, you need to really describe the

right with great specificity, and then root it in the history

and traditions of our nation.

     And there is no deeply-rooted right in the history and

traditions of America that guarantees a parent the right to

puberty blockers or cross-sex hormones for their child,

particularly when the state of science is so uncertain.

     If the plaintiffs are right, that this is a strict

scrutiny case, then federal judges are going to become medical

boards that are going to be adjudicating issue after issue

after issue.  And it is going to be difficult to imagine what

sort of medical judgment is going to be available, what sort of

medical judgment a state could still exercise, at least when it

comes to parents desiring the drugs for their children.

     So, I mean, turning to some of the facts, I mean, for

years, rates of gender dysphoria in youth had remained stable,

as did the patient profile which was typically male.  And for

years, the standard treatment for gender dysphoria was watchful

waiting.

     And that is not nothing, as Mr. Doss suggested.  That is

careful therapy with other types of mental health support to

help relieve children's distress as they explored their still

forming identities.  The sort of thing that would have been

very helpful to Ms. Wright, who you heard from earlier today,

but instead received the fast-track approach.

1    Now, all that has changed, and quite dramatically and

2   quite quickly.  If you look at Defendants' Exhibit 7 at page

3   26, there is a very telling chart showing the increase in young

4   people seeking treatment in gender clinics in the UK and

16:20:16 5   Australia from 2010 to 2020.  I mean, that data is particularly

6   useful because they have national health-care systems that

7   track all of these patients; whereas, we have a more

8   disaggregated system in the U.S., where a plaintiff -- not a

9   plaintiff -- a patient might go to a clinic and then later

16:20:33 10   never show up again, and you lose track of them.

11    So, if anything, the fact that some of these studies are

12   coming up out of Europe suggest that they should be given more

13   weight because they just have better data on the people.

14    If you look also at Defense Exhibit 7 at page 31, that is

16:20:51 15   two maps.  That's the chart, the explosion of gender clinics in

16   the last 15 years.  So as of 15 years ago, there were two

17   clinics in the entire country.

18    Now we're into the 50s or 60s.  UAB is only seven years

19   old.  And, of course, we have heard a lot about UAB, but

16:21:10 20   they're not the only place in Alabama where you can receive

21   these sorts of drugs.

22    Ms. Wright had a different situation in Georgia.  But I

23   mean, really any doctor with a script could potentially write

24   for some of these -- for some of these drugs, and there could

16:21:27 25   be other clinics in the future that open up.

1        And in light of this new evidence, many countries are

2   waking up to the grave uncertainty and the risks that this new

3   approach to treating gender dysphoria has for youth.

4        You heard from leaders from two of the prominent gender

16:21:44  5   clinics, Dr. Hawkins and Dr. Ladinsky.  Neither of them had

6   substantial familiarity with the careful assessments and

7   conclusions reached by these progressive nations.

8        Hawkins transcript page 39, 1 through 4 said, Are you

9   generally aware of it?  Response to one of these studies?  And

16:22:03 10  she said she was not.

11       Dr. Ladinsky stated at page 124 through 125, I confess

12   that I am not intimately associated with the position

13   statements of other nations.

14       But listen to what Sweden had to say.  Quote, For

16:22:18 15  adolescents with gender incongruence, the board deems that the

16   risk of puberty-suppressing treatments with puberty blockers

17   and gender-affirming hormonal treatment currently outweigh the

18   possible benefits.  And the statement further emphasized both,

19   quote, the continued lack of reliable scientific evidence

16:22:35 20  concerning the efficacy and the safety of both treatments and

21   the, quote, new knowledge that detransition occurs among young

22   adults.  It's Defense Exhibit 11 at page 3.

23       Similarly, the UK's review went through all of these

24   studies, unlike the AAP's review that the plaintiffs have

16:22:58 25  relied on.  Their conclusion was again, quote, Any potential

1  benefits of gender-affirming hormones must be weighed against

2  the largely unknown long-term safety profile of these

3  treatments in children and adolescents with gender dysphoria.

4       And that same review found only five uncontrolled

16:23:14 5  observational studies suggesting any benefit, and it graded

6  those studies as, quote, a very low certainty, closed quote.

7  In other words, medical uncertainty.  It's Defense Exhibit 10

8  at page 14.

9       And, again, I implore the Court to look again to the

16:23:34 10  appendix to Dr. Cantor's declaration where he has devastating

11  explanation of all the problems in that AAP report that

12  Dr. Ladinsky, I believe, had referred to.

13       Finland similarly said that in light of the available

14  evidence, gender reassignment of minors is an experimental

16:23:54 15  practice.  It's Defense Exhibit 12 at page 8.

16       In France, they said, quote, there is no test to

17  distinguish a structural gender dysphoria from transient

18  dysphoria in adolescents.  And because, quote, the risk of

19  overdiagnosis is real, closed quote, treatment should consist

16:24:10 20  only of, quote, psychological support as long as possible for

21  children and adolescents expressing a desire to transition,

22  closed quote.  That's Defense Exhibit 13 at 2.

23       France even went on to emphasize, quote, the addictive

24  character of excessive consultation on social networks as

16:24:29 25  harmful to the psychological development of young people and

1  responsible for a very important part of the growing sense of

2  gender incongruence.  It's not just the French.

3       We had Ms. Wright here talking about going on Instagram,

4  seeing these images, learning these things, and it, in turn,

16:24:48 5  causing her to feel this dysphoria that she mistook for

6  transgender status with great consequences for her personally.

7       So the evidence -- what WPATH itself has said shows that

8  desistance rates are between 50 and 90 percent.  That's Defense

9  Exhibit 18, page 11.

16:25:10 10      Now, Dr. Hawkins, of course, said that unlike any other

11  gender clinic this history they are, quote, exceptional at

12  identifying who is, in her words, truly transgender.  That is

13  whose gender dysphoria is going to persist.  But they don't

14  have studies to back up this newfound certainty.

16:25:26 15      When asked to respond to evidence that only 25 percent of

16  detransitioners tell their doctors that they have

17  detransitioned, they said that they had read the study, but

18  hadn't noticed that finding.  That's Hawkins transcript page 53

19  through 54.

16:25:41 20      And I will try to make sure I'm moving quickly, Your

21  Honor.  I do want to get into some of the legal issues.

22       But, I mean, I think it's important that even if

23  plaintiffs could guarantee whose gender dysphoria is likely to

24  persist, there is still great uncertainty about whether these

16:25:59 25  treatments even provide long-term benefits.

                    On the other hand, the risks are potentially quite severe.
       Recall Plaintiffs' Exhibit 41.  This is the informed consent
       form from UAB.  It detailed numerous risks, including heart
       disease, liver disease, blood disorders, loss of sexual
16:26:18  function, and sterility.

                    And there are still other risks that are unknown because
       the long-term consequences of using puberty blockers and then
       cross-sex hormones such that a child never goes through natural
       puberty has simply not been studied with any rigor.

16:26:34       So in light of this uncertainty, how could plaintiffs
       possibly -- or how could -- yeah.  How could plaintiffs
       possibly obtain informed consent from either children or from
       their parents?

                    The plaintiffs couldn't even explain the difference
16:26:47  between the refusal to take consent for a mastectomy or a
       female circumcision for that matter, and their willingness to
       take consent for cross-sex hormones that they agree can cause
       equally, quote, permanent irreversible damage to basic
       reproductive function.  That was Dr. Ladinsky's testimony,
16:27:04  pages 133 through 136.

                    And you also heard from Dr. Antommaria that he does think
       that some young people could consent to mastectomy.  So even
       some uncertainty and some conflict between the different
       witnesses that the plaintiffs have presented.

16:27:22       And worse still, even if puberty blockers and cross-sex

1   hormones would help -- and it's not clear that they do help --

2   because we can't know if a child is likely to persist, we

3   really are in a situation like the hypothetical RSV vaccine

4   that was discussed with Dr. Koe that would sterilize 5 percent

16:27:43 5   of its recipients.  That treatment would never be approved by

6   the FDA, and Dr. Koe testified quite rightly she would never

7   recommend to that her patients.  The risks are just too great.

8   In other words, it would be banned.

9       And here we have sterilizing treatments with far less

16:28:02 10   guarantee of any sort of benefit at the end of the day.

11       So turning to the Arkansas order.  I think this will be a

12   good framework for addressing some of the legal issues, and I

13   will try to thread some of the key facts, as well.

14       I am going to get to Equal Protection.  I will also

16:28:20 15   address Glenn, Bostock, and Grimm.

16       So first, at the beginning, there are statutory

17   differences between the Arkansas law and the Alabama law.  We

18   think the Arkansas law is perfectly constitutional.  That case,

19   of course, is up on appeal at the Eighth Circuit.  We would

16:28:37 20   recommend Arkansas's briefing to the Court because it can

21   explain in greater detail some of the problems with the Brandt

22   decision.

23       For one thing, the Arkansas law lacks extensive

24   legislative findings that support SB 184.

16:28:51 25       Second, our law is narrower because there is no provision

1    that expressly bans referrals.

2         Third, Alabama's law also expressly leaves open

3    psychotherapy as a treatment for gender dysphoria.

4         And fourth, our law more specifically defines the

16:29:07  5    treatments that are barred by the law.

6         But turning to the opinion, first heightened scrutiny.

7    The Brandt decision said the transgender people constitute at

8    least a quasi-suspect class.

9         What the Court did not do is cite any evidence to back

16:29:23  10   that up.  They have said in Grimm, and that was it.  Contrast

11   that with the last time the Supreme Court had before it the

12   occasion to determine whether there was a new quasi-suspect

13   class, that's the Cleburne case, 1985.

14        I particularly recommend the Fifth Circuit's opinion that

16:29:42  15   was facially -- or at least the releasing of which was reversed

16   by the Supreme Court.  There the Fifth Circuit had a great

17   amount of record evidence of the discrimination against

18   intellectually disabled people from the '80s and going back.

19        Such robust evidence that Justice Thurgood Marshall, who

16:30:04  20   would have concluded that the intellectually disabled were a

21   quasi-suspect class, stated that in his view, quote, the

22   mentally retarded were, in 1985, a group that suffered eugenic

23   marriage and sterilization laws and whose treatment paralleled

24   the worst excesses of Jim Crow.  That was the record.

16:30:23  25        And even then, the Supreme Court said, this is not a

1  quasi-suspect class.  We are not going to take that very

2  dramatic step in designating a new quasi-suspect class.

3      So plaintiffs have submitted substantially no evidence to

4  try to back up their claim that there's a quasi-suspect class

16:30:40 5  here.  I think for that reason, they have not made that

6  showing, and the Brandt Court -- I have not looked all the

7  evidence that was in front of the Brandt Court, but I know the

8  analysis is incredibly thin.  That would be one grounds to

9  distinguish.

16:30:53 10      Next, the Court applied heightened scrutiny, because

11  assuming there was suspect class, the Court held that the --

12  Arkansas's law, quote, refers to gender transition which is

13  only sought by transgender individuals, closed quote.

14      Now, that's wrong as both a legal matter and a factual

16:31:12 15  matter.  And I mean, I think the facts that we have established

16  here also clearly distinguish that decision from this case.

17      But first on the law, we've discussed it.  We've briefed

18  it extensively.  The Supreme Court's 1974 decision in Geduldig,

19  that was a case where California covered many medical

16:31:33 20  treatments, did not cover pregnancy, however, in their state

21  insurance plan.

22      A group of women sued saying this is discrimination on the

23  basis of sex because only women can get pregnant.  And the

24  Supreme Court said this is not discrimination on the basis of

16:31:48 25  sex, because there are two categories here -- people who are

1  pregnant and people who are not pregnant.  While it's only

2  women in the people who are pregnant category, there are men

3  and women in the people who are not pregnant category.

4  Therefore, not discrimination on the basis of sex.

16:32:03  5       Now, we can do you one better in this case, Your Honor,

6  because there are certainly -- it's undisputed, there are

7  people who are transgender who do not seek these treatments.

8  And so in that category of people who don't seek these

9  treatments are both transgender and nontransgender persons.

16:32:20 10       But then unlike in Geduldig, in the other category, there

11  are also transgender persons and nontransgender persons who are

12  in that category.

13       Dr. Ladinsky testified that at 106, lines 3 through 8,

14  that some of her patients did start puberty blockers, but later

16:32:36 15  stopped and had their gender identity agree with their

16  biological sex.

17       So -- and Dr. Hawkins's -- in the phrasing of Dr. Hawkins,

18  these patients would not be, quote, truly transgender.  Thus,

19  as plaintiffs agree, not every person who is diagnosed with

16:32:55 20  gender dysphoria is transgender, and at least some people who

21  are not transgender receive puberty blockers and cross-sex

22  hormones.  Indeed you heard from one such person today,

23  Ms. Wright.

24       Justifications for the law.  The Brandt Court said that,

16:33:14 25  quote, defendants state that the Arkansas general assembly

passed Act 626 in response to a recent judicial ruling of the

UK High Court of Justice of England and Wales and in Arizona

District Court.  And then the Brandt Court found that neither

of these authorities were persuasive or precedential.

In contrast, as I mentioned earlier, we have extensive

legislative findings backing up our law.  This was not simply

hereto interesting Court decisions.  Let's go ahead and enact

this new law.

Then the Court further found that the reliance on the UK

court's ruling was not credible because the State allows the,

quote, same treatment for cisgender minors as long as the

desired results conform with the stereotype of their biological

sex.

Now, I don't know all the evidence that was before the

Brandt Court, but on our record here, we have shown that

puberty blockers for precocious puberty is not the same

treatment as puberty blockers for gender dysphoria.  I mean,

that's the whole premise of the FDA having on-label and

off-label distinctions.  They're different treatments, even if

similar medications might be used.

So here -- I mean, in the context of hormones, giving a

certain dose of testosterone to a boy with a measurable hormone

deficiency to bring him up to normal range is not the same

treatment as giving the same dose of testosterone to a

biological female to bring her levels up to a range that would

be abnormally high for females.

As our endocrinologist Dr. Laidlaw explained at Defendants' Exhibit 3, pages 3 through 5, that first type of treatment involves an endocrine diagnosis rooted in objective testing of hormone levels.

In contrast, a gender dysphoria is a psychological diagnosis.  The fact the treatment for one might bear some passing resemblance to treatment for the other does not make them the same treatment.

And further, as discussed in treating gender dysphoria with hormones carries unique and serious risks, including many of those risks listed on the informed consent form from UAB and that are outlined by Dr. Laidlaw on pages 17 through 19 of his report.

Dr. Ladinsky herself appeared to recognize this fact when she was asked about two hypothetical boys.  As you might recall, one of them had low testosterone and was -- needed some testosterone to get up to normal levels.  The other had normal testosterone and wanted more to get to abnormally high levels so he could build more muscle mass.  She agreed on page 143 of the transcript that those would be altogether different treatments.

A fortiori, when one child is given puberty blockers or hormones for an endocrine disorder, to move them into a normal range for their age and sex, that is an altogether different

1   treatment than using similar doses of those drugs to treat a

2   psychological disorder and move them into abnormal ranges.

3   It's simply not the same.

4       Dr. Koe basically confirmed the same thing on pages 185

16:36:27  5   and 186 of the transcript from yesterday.  She stated that she

6   performed testicular exams only on males, but not on females.

7   And when she's treating transgender males for gender dysphoria,

8   she would give them testosterone, but she would not treat a

9   transgender female for gender dysphoria with testosterone.

16:36:46 10      She was asked, Are you discriminating based on sex?  And

11   she said no.  She was, quote, giving each patient the care for

12   which their sex and gender requires.  It's not discrimination

13   to recognize biological realities that you must recognize to

14   perform medicines.

16:37:03 15      For the same reasons, Alabama doesn't discriminate because

16   of sex.  This also helps illustrate why our case is much

17   different from Glenn vs. Brumby, Bostock, or Grimm, for that

18   matter.

19       To greatly simplify the Glenn, the Bostock cases, I think

16:37:24 20   a similar analysis would apply to Grimm, although Grimm was a

21   bathroom case and not an employment case.  In both Glenn and

22   Bostock, there was a biological male who was fired because he

23   wanted to show up at work presenting as a woman.  Even though

24   men and women are both able to wear dresses, only the man would

16:37:43 25   lose his job for wearing one to work.

1       But here there is no way to provide a testicular exam to

2  females.  It would be a different treatment altogether.  And

3  prescribing testosterone to a boy to get his levels up to a

4  normal boy's levels cannot be done for a girl, because she is a

16:37:59 5  girl and not a boy.  It would be a different treatment

6  altogether.

7       Second, Bostock and Brumby were premised on the notion

8  that sex is irrelevant to employment decisions.  But sex is

9  obviously relevant to medical decisions.  Dr. Koe confirmed as

16:38:17 10  much.  Dr. Ladinsky confirmed as much.

11      So either there is no discrimination here, or if there is

12  some sort of discrimination, although the Court has said in the

13  Nyugen decision that recognizing biological realities is not a

14  stereotype, like a law could not be more tailored.  Like you

16:38:37 15  have to know the sex to know what the treatment even is.  The

16  fit could not be tighter.

17      So moving on.  The Brandt Court found that Arkansas's law

18  was not substantially related to the regulation of ethics of

19  the medical profession because gender-affirming treatment is

16:38:54 20  supported by medical evidence that has been subject to rigorous

21  study.

22      Now, the record before Your Honor shows that these

23  statements are simply not accurate, at least on the record here

24  in Alabama.  The one certainty in this field is that there is

16:39:15 25  no certainty.  There are not rigorous studies, and we have

1   presented ample evidence of medical uncertainty.

2        The Brandt Court did not address similar issues.  They did

3   not address the Gonzales decision.  They did not address the

4   European reviews.  They didn't recognize the weakness of the

16:39:33  5   evidence for these interventions.

6        The Court also said, quote, Every major expert medical

7   association recognizes that gender-affirming care for

8   transgender minors may be medically appropriate and necessary.

9        The Court, of course, never addressed the international

16:39:49  10   literature reviews.

11        And another key distinction, Your Honor, not -- some of

12   these weren't even available at the time the Court was ruling

13   on August 2nd, 2021.  There's been more evidence coming to

14   light.  As Dr. Cantor said, to the extent the pendulum is

16:40:03  15   swinging, it is swinging in Alabama's direction.

16        Turning again to substantive due process, which I

17   addressed at the beginning, the Brandt Court I think made some

18   of the same errors that the plaintiffs are making here finding

19   that the plaintiffs in that case had a fundamental right to

16:40:21  20   seek medical care for their children and in conjunction with

21   their adolescent child's consent and their doctor's

22   recommendation make a judgment that medical care is necessary.

23        Of course, that, again, defines the right far too broadly

24   and misstates the right.  And the Court never identified a

16:40:41  25   history or tradition of that particular right, and similarly

1  ignored the implications of the new right.  For example, every

2  FDA decision would be subject to strict scrutiny.

3      Turning to the First Amendment, Brandt -- there was a

4  First Amendment claim in Brandt that the claim there centered

16:41:00 5  on the physician referral provision, which we do not have one

6  of those in Alabama's law.

7      Now, finally, one thing -- another big thing I think that

8  distinguishes our case from Brandt -- an issue we have with the

9  Court's decision, it never once mentioned the risks of these

16:41:23 10  procedures for kids.  You will not see them mentioned at all.

11  Not a word about bone health, not a word about heart disease,

12  blood disorders, sexual disorders, or infertility.  Not a word

13  about a young women like Sydney Wright and the 13 other

14  declarants who are either detransitioners or the parents of

16:41:44 15  troubled youth, like not a word about any of them.  And these

16  people are suffering from having been experimented on.

17      But in this case, Your Honor, you should consider those

18  risks.  In this case, the only endocrinologist who has

19  addressed whether treating someone at Tanner Stage 2 will

16:42:02 20  affect fertility is Dr. Laidlaw.  This is at page 9 of Defense

21  Exhibit 3, the Laidlaw report.  He lays this out.

22      Awareness of the Tanner stage of the developing adolescent

23  is also useful to assess for maturation of sex organ

24  development leading to fertility.

16:42:18 25      For girls, menstruation and ovulation occurs about

1   two years after Tanner Stage 2, and will typically be at Tanner

2   Stage 4 or possibly 3.  For boys, the first appearance of sperm

3   is typically Tanner Stage 4.  If puberty is blocked before

4   reaching these critical stages, the sex glands will be locked

16:42:35 5   in a premature state and incapable of fertility.  His similar

6   statements addressing the problems of sexual dysfunction that

7   come from these treatments.

8       In contrast, you heard from Dr. Antommaria today.  It is

9   his view that clinics don't need to tell patients and families

16:42:55 10   that puberty blockers will almost certainly lead to cross-sex

11   hormones before kids are started on that pathway.  That is

12   their standard of care.  And these are half truths to create a

13   false consensus with the health and the lives of children on

14   the line.

16:43:09 15       And to Mr. Doss's assertion, there is no evidence of lax

16   methods in the U.S.  They are completely ignoring the 14

17   declarations from -- and the testimony of Ms. Wright, for that

18   matter.

19       There is plenty of evidence of this both in studies and in

16:43:27 20   sworn declarations.  There will be more and more of this unless

21   states step forward and protect their children, because the

22   medical community is not doing their job.

23       Now, addressing vagueness.  We touched on it briefly.

24   Again, the key language is, quote, no person shall engage in or

16:43:46 25   cause, prescribing, or administering puberty-blocking

1  medication to stop or delay normal puberty.  Of course, the

2  cross-sex hormones provision that follows after that.

3      Here's how it works.  If a doctor writes a prescription

4  for puberty blockers, that would be engaging in prescribing the

16:44:01  5  puberty blockers.  If the doctor orders the nurse practitioner

6  at the clinic to write the prescription, the doctor would be

7  causing the prescription of the puberty-blocking medication.

8      Similarly, if the doctor gave a shot of testosterone for

9  purposes of gender transition, she would be administering.  If

16:44:18  10  she ordered the nurse to do it, she would be causing.

11      But if a patient merely posted on Facebook that she had a

12  great experience at the clinic, she would not be engaging in or

13  causing the prescription of puberty blockers, even if a friend

14  read the testimony or reached out to the clinic and later got

16:44:34  15  it.

16      If Reverend Eknes-Tucker tells a congregant that she might

17  receive help for her gender dysphoria at the clinic, he hasn't

18  engaged in or caused the prescribing or administration of

19  anything.

16:44:45  20      And if a parent merely drives his child to the clinic, he

21  hasn't engaged in or caused the prescription of any drugs.

22      Now, if the parent injects the medications, I think he

23  probably has engaged in the administering the puberty blockers.

24  But merely driving him to the clinic, having conversations with

16:45:02  25  their child, being there for them, that is not administering,

1  engaging in, or causing the administration of these drugs.

2      And, Your Honor, I think that's why Reverend Eknes-Tucker

3  wasn't ready to go and file a lawsuit on April 8th like

4  Dr. Ladinsky or Mr. Jeff Walker were.  He didn't think that

16:45:23  5  this law applied to him.  But when he got a call on Monday,

6  April 16th, from one of Dr. Ladinsky's lawyers, he was excited

7  to -- I believe his phrase -- was make a difference.

8      But as we discussed earlier today, the good news and the

9  bad news for Mr. Eknes-Tucker is that while he did help SBLC

16:45:43 10  and Lightfoot get back into court, and his conduct does not

11  violate the law, so he doesn't have to worry about that, the

12  bad news is he likely doesn't have standing to be challenging

13  this law.  So he's going to have to make a difference some

14  other way going forward.

16:45:58 15      Now, one thing to equities I want to address.

16  Dr. Ladinsky stated that she would be concerned that if SB 184

17  goes into effect, her patients --

18          THE COURT:  I will say I think you have kind of run

19  through your time, but I was easy with Mr. Doss.  I will be

16:46:14 20  with you.  But I would say we are close to wrapping it up.

21          MR. LACOUR:  Very, very close, Your Honor.  I am ready

22  to go home myself.  But I appreciate all of the time and

23  consideration you have given to this very important case.

24      I will just say, Dr. Ladinsky was -- stated she was

16:46:30 25  concerned that if SB 184 went into effect, her patients would

1    have to stop taking testosterone cold turkey.

2        Now, going back to language of the statute -- and this is

3    something I have tried to emphasize in the cross-examination --

4    it says, do not engage in or cause the following practices for

16:46:47 5    the purpose of attempting to in effect cause a gender

6    transition.

7        Being responsible and tapering somebody off of these

8    artificial hormones is not for the -- would not be using the

9    hormones for that prohibited purpose.  Just like using

16:47:05 10   testosterone for that boy with the low T to get him up to a

11   normal range is not an improper purpose, either.  So we don't

12   think that's something that anyone needs to worry about.

13       Now, in closing, Mr. Doss suggested that SB 184 is somehow

14   a grand experiment.  Now, with all due respect, I mean, there

16:47:28 15   were only two of these clinics in 2007.  UAB has only been on

16   the scene for seven years.

17       In hitting the pause button, Alabama is halting an

18   experiment on our kids, and nothing in the Constitution or

19   federal law requires Alabama to expose children to these

16:47:46 20   unproven and sterilizing treatments.  For that reason, the

21   preliminary injunction motions should be denied.

22       If you have any questions, I would be happy to answer

23   them.  Otherwise, we rest.

24            THE COURT:  All right.  I thank you all for your

16:48:00 25   arguments.  Let's talk housekeeping just for a minute.

1          Obviously, in the long term, we have got to put together a

2   discovery plan and a trial track.  Have the parties talked

3   about that?

4          MR. LACOUR:  We have not yet, Your Honor.

16:48:15  5          THE COURT:  Do you want to give me your 30-second idea

6   of how long you think how long a track this should be on?  My

7   guess is it should be expedited.

8          MR. LACOUR:  Your Honor, there is a fair amount of

9   discovery we think we would like to get, including some

16:48:31 10  third-party discovery.  Plaintiffs have put at issue the

11  credibility of the AAP, some of these other organizations.  We

12  have some questions about donations that the Endocrine Society

13  might be receiving from the prescription drug manufacturers who

14  are profiting off of this use of their puberty blockers and

16:48:49 15  their cross-sex hormones.  That might be relevant assessing the

16  credibility of these institutions.

17     I mean, we will certainly move with all deliberate speed,

18  but we would want a chance to fully develop the record.

19          THE COURT:  So give me a number.

16:49:06 20          MR. LACOUR:  My colleague Mr. Davis is usually a

21  little better at this.  I'm just a humble appellate attorney.

22          THE COURT:  All right.

23          MR. DAVIS:  Mr. LaCour's welcome to correct me, but

24  before we -- we would like the chance to confer about that.  We

16:49:18 25  have been so focused on getting ready for this hearing --

 1              THE COURT:  I get that.

 2              MR. DAVIS:  -- we really haven't thought about what

 3    all we want to do.  If we could have until the first of the

 4    week to talk about it amongst ourselves and let Your Honor know

16:49:29 5    what our thoughts are.

 6              THE COURT:  Maybe you can confer with the plaintiffs

 7    and y'all can present a joint thought on that.

 8              MR. DAVIS:  I think we could be ready for like a Rule

 9    26 conference the first of the week.  Give us a chance to talk

16:49:42 10    internally on each side, then with each other, then report to

11    Your Honor by -- well, by middle of the week or end of the

12    week.

13              THE COURT:  Let me say this.  Here is all I am trying

14    to accomplish.  You know, if we just want to put this on a

16:49:55 15    regular trial track, I will just leave it to y'all, and we will

16    go from there.  I was just guessing that somebody might want

17    this to be on an expedited track.  And so that's why I am

18    raising the issue.

19              MR. DOSS:  That would be our preference, Your Honor.

16:50:09 20    I mean, our thought just right now would be like maybe a

21    six-month discovery window.  I mean, I think we are going --

22              THE COURT:  That was the number in my mind was

23    six months.  So, you know, to the extent --

24              MR. DAVIS:  That might be fine with us after we

16:50:23 25    confer.

 1          THE COURT:  All right.

 2          MR. DAVIS:  But I would like that chance to talk about

 3    that specifically.

 4          THE COURT:  I get it.  No problem.  No problem.

16:50:29 5      I will leave it to the parties to talk.  To the extent you

 6    agree, great.  To the extent you don't agree, we can sort that

 7    out.

 8          All right.  Thank you for your arguments.  All very good.

 9    I appreciate every witness that we've had in the last two days.

16:50:47 10   Thank each of you.

 11         Obviously, this was filed on April the 19th.  My staff

 12   attorneys and I have done nothing since it was filed but work

 13   on this case.  We will be doing nothing else but this case

 14   until we get an order.

16:51:02 15     Just like all of you, I want a well-reasoned order that is

 16   right on the law.  And so I just ask that everybody be patient.

 17         I can't say that it's going to be out tomorrow, or the

 18   next day, or the next day, except to say we are not going to

 19   work on anything until we get it out and we get it right.

16:51:22 20     So I thank you all.  And we're adjourned.

 21         (Whereupon, the above proceedings were concluded at

 22         4:51 p.m.)

 23

 24

 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                              <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11                                                    <u>05-08-2022</u>

12     Christina K. Decker, RMR, CRR              Date

13     Federal Official Court Reporter

14     ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25