1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF ALABAMA
2                            NORTHERN DIVISION

3

4       REV. PAUL A. EKNES-TUCKER,    *
        et al.,                       *
5                                     *
                Plaintiffs,           *   2:22-cv-00184-LCB
6                                     *   May 5, 2022
        vs.                           *   Montgomery, Alabama
7                                     *   9:00 a.m.
        KAY IVEY, in her official     *
8       capacity as Governor of the   *
        State of Alabama, et al.,     *
9               Defendant.            *
        *****************************

10

11

12                     **TESTIMONY OF RACHEL KOE, MD**

13              TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                                 VOLUME I
14              BEFORE THE HONORABLE LILES C. BURKE
                       UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22
        Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
23      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
          and Procedures Vol. VI, Chapter III, D.2.  Transcript
24                 produced by computerized stenotype.

25

                       *CHRISTINA K. DECKER, RMR, CRR*
                       Federal Official Court Reporter
                  256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                           APPEARANCES

 2
       FOR THE PLAINTIFFS:
 3     Melody Eagan, Esq.
       Jeff Doss, Esq.
 4     LIGHTFOOT, FRANKLIN & WHITE, LLC
       The Clark Building
 5     400 20th Street North
       Birmingham, Alabama 35203
 6
       Brent Ray, Esq.
 7     KING & SPALDING
       353 N. Clark Street
 8     12th Floor
       Chicago, Illinois 60654
 9
       Michael Shortnacy, Esq.
10     KING & SPALDING
       633 W. Fifth Street
11     Suite 1600
       Los Angeles, California 90071
12
       Jason R. Cheek, Esq.
13     US ATTORNEYS OFFICE, NDAL
       1801 Fourth Avenue North
14     Birmingham, Alabama 35203

15     John Michael Powers, Esq.
       DOJ-Crt
16     Civil Rights Division
       950 Pennsylvania Avenue
17     Washington, DC  20530

18

19     FOR THE DEFENDANT:
       James W. Davis, Esq.
20     Edmund LaCour, Esq.
       Barrett Bowdre, Esq.
21     Benjamin Seiss, Esq.
       Christopher Mills, Esq.
22     OFFICE OF THE ATTORNEY GENERAL
       501 Washington Avenue
23     P.O. Box 300152
       Montgomery, Alabama 36130-0152
24     (334) 242-7300

25
```

1    COURTROOM DEPUTY:  Deena Harris

2

3

4    COURT REPORTER:  Christina K. Decker, RMR, CRR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            <u>I N D E X</u>

2

3    RACHEL KOE, MD,                                      170
     DIRECT EXAMINATION                                  171
4    BY MR. RAY
     CROSS-EXAMINATION                                   184
5    BY MR. MILLS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1          **P R O C E E D I N G S**

2                    (In open court.)

22          MR. RAY:  We call Dr. Rachel Koe.

23                    RACHEL KOE, MD,

24   having been first duly sworn by the courtroom deputy clerk, was

15:49:22 25   examined and testified as follows:

<pre>
 1                    DIRECT EXAMINATION
 2  BY MR. RAY:
 3  Q    Good afternoon, Doctor.
 4  A    Hey.
 5  Q    Are you using a pseudonym here today?
 6  A    I am.
 7  Q    What is that pseudonym?
 8  A    Dr. Rachel Koe.
 9  Q    Dr. Koe, would you please introduce yourself to the Court?
10  A    Yes.  I am a pediatrician in southeast Alabama.  I did my
11  medical school and graduate school in Alabama.  During which
12  time, I met my husband, and we spent a short time out of the
13  state of Alabama when I completed my pediatric training as a
14  resident physician at a large children's hospital.
15       And then after that, we looked for a place to start our
16  career and our family.  And southeast Alabama was that place.
17  So we moved back to southeast Alabama where I have been a board
18  certified pediatrician and a licensed physician in Alabama for
19  the last ten years.
20  Q    Would you please describe your current practice to the
21  Court?
22  A    Yeah.  So I practice in a rural town in southeast Alabama.
23  But I see patients from all over southeast Alabama.  And I see
24  patients from birth until they graduate my practice at 19 and
25  364 days.
</pre>

1          And I take care of all conditions.  So I take care of

2     children when they're well, and that's how we like to keep

3     them.  But I also take care of children with any kind of

4     medical or mental health disorder.

15:51:07  5     Q     Do you sometimes encounter conditions that you cannot

6     treat yourself?

7     A     Absolutely.  So I would say frequently pediatricians

8     encounter conditions that we can't treat ourselves, and I am no

9     exception.

15:51:25 10          So while general pediatricians are experts in a wide

11     variety of things, we cannot stay up to date on every single

12     topic.  And so when we are presented with a condition that is

13     rare, we usually rely upon specialists to help us out.

14          But also if there are conditions that require more

15:51:47 15     comprehensive care that I cannot provide all those levels of

16     care in my office -- for example, if a patient has cystic

17     fibrosis, those patients require not only to see a

18     pediatrician, but also a pulmonologist, and a GI doctor, and

19     nutritionist.  And we like to send those patients -- you can

15:52:05 20     imagine that seeing all those different physicians is easier

21     done if it's done in the same place.  So we like to send those

22     patients to centers where they can receive all of that care in

23     the same place.

24     Q     So could you give an overview, then, of the process that

15:52:19 25     you go through when you are considering referring or presenting

```
 1  the option of a referral to a patient and their family?
 2  A    Absolutely.  So when I need to make a referral for a
 3  patient -- which I don't like to do if I don't have to because
 4  you know that means extra travel and extra cost for my
 5  patients, as well.
 6       When I need to make a referral for my patient, first and
 7  foremost, I want to make sure that the level of care that they
 8  are getting or the quality of care that they're getting is at
 9  least as good as the quality of care that I am giving them in
10  my office.
11       I, you know, pride myself on being a physician who
12  attempts to provide highest quality evidence-based care for all
13  of my patients, regardless of how they present to me.  And so I
14  want to make sure those patients get that same quality of care.
15       And so when I am considering a referral, you know, I --
16  the first -- I have to present the referral to the family.  And
17  I usually will explain why I think they need a referral to
18  somebody else, why I cannot provide all of the care that they
19  need.  And if there are options of multiple places where I can
20  refer them, I will give them multiple options.
21       Some cases there are no options, there's just one place
22  that I can refer, and then I will tell them that.
23       But I also try to ensure that whoever I am making that
24  referral to, whoever I am recommending a referral to or
25  suggesting a referral to is someone that I -- that I trust.
```

And so I am looking for a specialist who has, you know,

adequate training, that has experience taking care of the

condition that -- for which I'm making the referral, and that

has -- has had good outcomes.  And so that their reputation is

15:54:10 that they've had good outcomes treating that -- treating that

condition.

Q    When was the first time that you treated a transgender

patient?

A    Yeah.  It's a -- much to my surprise, the first time that

15:54:23 I treated a transgender patient was about two years into my

career.  It was eight years ago.  Although to be fair, I had

been treating him since I moved to southeast Alabama.  I just

did not know that he was transgender.

And so I had a patient that I had developed a relationship

15:54:45 with right when I moved to southeast Alabama.  He was one of my

first patients that I had an encounter with.  We developed a

relationship over time.

And I was caring for him for a variety of conditions, so I

saw him for his well-child checkups.  But he was also

15:55:02 presenting to me with migraines.  And so I took care of him for

his migraine disorders.  And he presented to me with anxious

thoughts and depressed thoughts and thoughts of self-harm.  And

so I was caring for him, as well.

Initially for those things, I referred him to what -- he

15:55:20 was already seeing his pastor for some pastoral care, and I

1  referred him to a counselor.  And I started him on some medical

2  treatments for migraines and depression.  But those medical

3  treatments were proving ineffective.  And he continued to have

4  escalating concerns.

15:55:37  5      And so I eventually referred him to a psychiatrist and a

6  neurologist, as well.  And it was about that time, you know, a

7  year or so into seeing the psychiatrist and neurologist and he

8  was still not getting anywhere that he and his parents came to

9  me and revealed to me that he was transgender.

15:55:58 10  Q    Let me stop you there.

11  A    Yeah.

12  Q    So just to sum up, this particular patient you had seen

13  for two years at this point in time?

14  A    Uh-huh.

15:56:07 15  Q    And they were -- this patient was seeing a therapist, a

16  psychiatrist, and a pastoral counselor; is that right?

17  A    That's correct.

18  Q    And were they on the psychiatric medication at this time,

19  as well?

15:56:21 20  A    Yeah.

21  Q    What were they on?

22  A    By this point, they were on Zoloft and Topamax.

23  Q    And how would you describe the dosages of these

24  medications at this time?

15:56:30 25  A    The doses were higher than I would have felt comfortable

1    with.  Those are not medications -- those are medications that
2    I have prescribed, but not at those doses.
3    Q    Despite these treatments, was care and the level -- was
4    the mental health of this patient improving?
15:56:55 5    A    No.  In fact, when he presented to me at that time, you
6    know, two years into our relationship, that was the concern
7    that he and his mom presented to me with was that we weren't
8    getting anywhere.  And they could see the medicines he was on,
9    and they could see that, you know, he had all these different
15:57:17 10   doctors' appointments, but they were concerned that he was
11   still suffering from thoughts of self-harm and he was not
12   making any -- any gains.
13   Q    And so at this time, did the patient express to you --
14   what did the patient say about thoughts of self-harm?
15:57:39 15   A    Yeah.  It was actually -- well, he told me that he was
16   thinking that he would be better off dead.  But it was his mom
17   that really first told me that he was thinking of hurting
18   himself.  And she was really concerned.
19        They had a good relationship, and she said, you know, I
15:57:59 20   think I'm going to lose my son.  But he said he wasn't trying
21   -- he didn't want to commit suicide.  But he wished he was
22   better off dead.
23   Q    At the time that this patient's issues around gender were
24   revealed to you, what else did you learn about their history
15:58:18 25   with these issues?

1  A    So this was the time when kind of all of the pieces of the

2  puzzle started to come together for me.  I had learned from his

3  mom that he had been saying he was a boy since he was a young

4  child, even wishing on his fourth birthday candles that people

15:58:40  5  would know that he was a boy.  She had allowed him to present

6  this way at home.  It just made him look like a tomboy, and

7  that, you know, wasn't problematic in their community.

8       But over time as he approached puberty, it had been

9  getting worse.  And that's when I had come into the picture.

15:59:00 10  But, again, not knowing the gender concerns, I didn't have that

11  piece of the puzzle at the time.

12      And he -- but it had been getting worse since puberty

13  started.  They had actually taken him out of school, and he was

14  being home schooled because he did not feel comfortable

15:59:16 15  presenting as a female at school.  And so they were trying to

16  home school.  But his grades were in decline.  And so was his

17  mental health.

18  Q    At this point in time, then, did you consider referring

19  the patient and the family to the specialist?

15:59:37 20  A    Absolutely.

21      So at this time is when I began to make the diagnosis of

22  gender dysphoria.  Gender dysphoria obviously is a diagnosis

23  that is not a snapshot in time, but he presented with those --

24  the pieces that we had been seeing for years.

15:59:55 25      And with that history of long-standing gender dysphoria

```
 1  and really was able to put that together for me, that that was
 2  where -- why his mental health -- or may have been one of the
 3  reasons why his mental health was in decline.
 4      I had heard about transgender medicine when I was in
 5  residency, but the --
 6          THE COURT:  Ma'am, you're kind of getting into answers
 7  that his questions are not calling for.
 8          THE WITNESS:  I'm so sorry.
 9          THE COURT:  That's okay.  Just listen very carefully
10  to what he's asking you.  Make sure you are not giving a
11  narrative response.  Just answer just what he asks you, okay.
12          THE WITNESS:  Absolutely.
13  BY MR. RAY:
14  Q   So you choose at this point in time to engage in a
15  referral process.  How did that conversation go with the
16  family?
17  A   Yes.  So I told the family that I understood that this
18  patient was transgender, but that I -- and I knew that that was
19  not in and of itself pathological.  So I reassured them of
20  that.  But I did not know what other help to offer them because
21  that was not my specialty.  And, but I told them that I could
22  find someone who did know more about gender health if they were
23  interested in learning more about transgender medicine.
24  Q   And to whom did you -- and what was the family's reaction
25  to this?
```

16:00:15 (line 5)
16:00:25 (line 10)
16:00:40 (line 15)
16:01:03 (line 20)
16:01:25 (line 25)

```
 1  A    The parent at the time said, absolutely, we want to know
 2  as much as we can because we're not getting anywhere right now.
 3            THE COURT:  Mr. Ray, how much longer is your direct
 4  going to be?
 5            MR. RAY:  It will be another ten minutes, Your Honor.
 6            THE COURT:  Okay.
 7  BY MR. RAY:
 8  Q    And to whom did you then refer this patient?
 9  A    I referred the patient to Dr. Latif at UAB.
10  Q    So did you keep up with your patient after the referral?
11  A    Absolutely.  I --
12  Q    And from your perspective as the primary pediatrician, how
13  did the condition of the patient change after they began going
14  to the UAB clinic?
15  A    Over time, he was able to come off of medication for his
16  migraines.  He was able to come off of medication for his
17  depression.  And he was able to see his counselor less and less
18  frequently over the years.  And he graduated from high school
19  with honors and did well.
20  Q    During this time, as well, did you administer any care to
21  this patient regarding their gender dysphoria?
22  A    Yes.  He did not feel comfortable giving himself the
23  testosterone injections, and so our clinic provided -- we did
24  not prescribe the testosterone, but we gave the testosterone
25  injections, and we performed any labs that the gender clinic
```

16:01:38  (line 5)
16:01:48  (line 10)
16:02:12  (line 15)
16:02:32  (line 20)
16:03:01  (line 25)

1  needed.  And I would review those labs before sending any

2  information on to the gender clinic and kept up with his blood

3  pressure and basic health.

4  Q    Have you kept up with this patient in recent months or

16:03:18 5  years?

6  A    Yes.  I -- I see his mother frequently because she brings

7  in her other grandchildren to see me.

8  Q    And what is -- what do you understand about how this

9  experience has been for your patient at the gender clinic?

16:03:32 10  A    So he is a thriving healthy adult and has no regrets and

11  is doing well.

12  Q    In subsequent experiences, have you had occasion to

13  encounter patients who at least are expressing ideas of gender

14  diversity?

16:03:54 15  A    Yes.

16  Q    And how do you deal with those patients who express those

17  ideas, but without, you know, demonstrating severe distress?

18  A    Yeah.  So in, especially in prepubertally, we simply talk

19  to the families and reassure them that gender diversity is not

16:04:21 20  pathological.

21      We talk about allowing children to present as however they

22  feel comfortable in dress and name and pronouns, however they

23  feel comfortable, and if -- even if there's not a significant

24  amount of psychological distress, if there is some distress

16:04:41 25  within the family, then we make a referral for -- so that they

1    can receive mental health care, see a counselor.

2    Q    So when you have a patient who is experiencing these types

3    of symptoms, you don't automatically refer them to the gender

4    clinic?

16:04:58 5    A    No.

6    Q    When you, however, have a different situation, what are

7    you seeing in some of the patients who you believe are

8    experiencing gender dysphoria?

9    A    Yeah.  So when a patient -- typically at the time that

16:05:18 10   they're entering puberty or during or after puberty is

11   experiencing significant mental health concerns and they

12   have -- they are transgender, and they explain to me that that

13   is related and that's part of why they are suffering from their

14   depressed and anxious thoughts, then I will share with them and

16:05:41 15   their family that there are gender experts out there that can

16   help guide them if they need more information or want to pursue

17   other options.

18   Q    Have you ever had a patient with gender dysphoria that

19   later desisted?

16:05:56 20   A    No, I have not had that experience.

21   Q    Have you ever had any of your transgender patients express

22   regret over gender-affirming treatment?

23   A    No.

24   Q    Dr. Koe, what will happen to your transgender patients if

16:06:20 25   the law SB 184 goes into effect?

1  A     So I have patients -- or a patient that is on hormone

2  therapy right now.  I am -- that therapy has been very

3  effective for her.

4     I am concerned that because it is so effective that she is

16:06:41 5  not going to stop therapy, but she's going to find some other

6  not great ways to get the therapy.  And that -- you know, less

7  safe.

8     So, you know, she may get estrogen from a source that is

9  not reputable.  She is not going to be followed by a physician

16:07:01 10  for side effects or for efficacy or even for dosing.  And so I

11  am concerned about that.

12     And then future patients, I'm concerned that I won't have

13  more than that I can do for them when they come to me with

14  dysphoria that is not being effectively treated by mental

16:07:20 15  health therapy alone.

16  Q     And specifically to the parents of your patients, how do

17  you perceive the enactment of this law will affect them?

18  A     I -- I can't read minds, of course.  But my first family,

19  when they came to me for -- to express to me that gender

16:07:43 20  dysphoria was the issue, the mom felt lost and hopeless, and

21  that's what she told me.  She said, you know, I don't know what

22  else I can do.  I don't know where to go from here.

23     And so I -- if they don't have other options, and they

24  don't have experts in the state that they can talk to about

16:08:04 25  this issue, or options for other treatments that have been

1   shown to be effective, I imagine that they will stay feeling

2   hopeless and lost.

3   Q    Final question.

4   A    Uh-huh.

16:08:16 5   Q    Doctor, what do you believe this law will do to you in

6   your practice?

7   A    Well, as I already mentioned, I strive to provide the

8   highest level of evidence-based care that I can.  And I imagine

9   that I will continue to see transgender patients.  I have had

16:08:35 10   five in my ten years.  And I don't see that stopping.

11       And so I imagine that I will be stuck in a place where I

12   don't know how to proceed.  Do I counsel them on therapies that

13   exist in other states?  Do I make those referrals?  What are

14   the legal consequences to that?  Do I, you know, do I not

16:09:02 15   provide them what is known to be evidence-based care?  Am I

16   providing discriminatory care in that situation?

17       You know, I don't -- I won't know what to do with these

18   patients.  And I'm afraid --

19            THE COURT:  Hold on just a minute.

16:09:19 20       So I have got a question for Mr. LaCour, whoever wants to

21   field it on your end.  We may have covered this yesterday, and

22   maybe I am not clear on it.

23       But does the State of Alabama consider a referral to trip

24   the law?

16:09:35 25            MR. LACOUR:  Your Honor, I don't think simply

```
 1   referring someone to another doctor would be causing treatment.
 2   There would still be -- the cause would still ultimately be
 3   whatever the other doctor does at the end of the day.  So...
 4            THE COURT:  Is there anything that you have seen in
 5   what she's just described on the record that she does in her
 6   practice that would trip the law?
 7            MR. LACOUR:  Well, administering could -- I mean, that
 8   would be directly -- directly administering the drugs would be
 9   covered by the law.  But...
10            THE COURT:  Anything other than that?
11            MR. LACOUR:  No.  Your Honor, I don't believe so.
12            THE COURT:  Okay.  All right.  Sorry to interrupt.
13            MR. RAY:  That's all right.
14       Thank you, doctor.  No further questions.
15            THE COURT:  Who is handling cross?
16            MR. MILLS:  I am, Your Honor.
17            THE COURT:  Are we tendering the witness?  Hello?
18            MS. EAGAN:  I'm sorry, Your Honor.  May I consult with
19   him just a minute, please?
20            THE COURT:  You can.
21            MS. EAGAN:  Thank you.
22            MR. RAY:  Nothing further.
23                      CROSS-EXAMINATION
24   BY MR. MILLS:
25   Q    Good morning, Doctor.  My name is Christopher Mills, and I
```

```
 1   represent the State defendants.  I have just a few questions
 2   for you.  If any of them are not clear, please just let me
 3   know.
 4        Have you been a plaintiff in any other cases involving
 5   this law?
 6   A    No.
 7   Q    In your practice, do you discriminate against patients
 8   based on their sex?
 9   A    No.
10   Q    In one of your declarations in this case -- we can pull it
11   up if you want, but I don't think we need to -- you said, My
12   practice group recommends that parents vaccinate their
13   children.  Why do you recommend vaccination?
14   A    Because it is evidence based and proven to be safe and
15   effective.
16   Q    And the FDA has approved those vaccinations?
17   A    And the FDA has approved those vaccinations.
18   Q    Are you familiar with RSV?
19   A    I am familiar with RSV.
20   Q    What is it?
21   A    RSV is respiratory syncytial virus.  It is a virus that
22   causes the common cold in most people, but occasionally can put
23   children in the hospital.
24   Q    Can it result in children dying?
25   A    Yes.
```

```
 1   Q     Is there a vaccine?
 2   A     Yes.  But it is not a vaccine actually.  It's an
 3   immunologic agent, but people call it a vaccine.
 4   Q     Is that recent?
 5   A     There has been a vaccine for a some time.  There -- so it
 6   is not recent.  I mean --
 7   Q     And --
 8   A     -- there's been a vaccine -- as long as I have been in
 9   practice, there has been some sort of a vaccine.
10   Q     Starting at what age can that be given?
11   A     At birth.  I mean, so it depends.  But it depends on what
12   the situation is.
13   Q     And does it prevent RSV?
14   A     It does not prevent RSV.  Again, it is not an actual
15   vaccine.  It is a like an antibody against RSV.  So if you are
16   exposed to RSV, then it stops -- it attacks the RSV for you.
17   Q     Sure.  So I'm just going to ask you to -- sort of a
18   thought question.
19         If there were a vaccine that would completely prevent RSV
20   in young children under five, but sterilized 5 percent of
21   children who got it, would you give the vaccine?
22   A     Probably not.  And I don't think it would be routinely
23   recommended.
24   Q     You are not aware of any FDA-approved vaccine like that?
25   A     I'm not aware of any FDA-approved vaccine like that.
```

1  Q    I'd like you to look -- and I will put it up on the

2  monitor for you.  This is Plaintiffs' Exhibit 4.  This was the

3  declaration you submitted.  And I have underlined a line there.

4       Would you be able to read that line for me?

16:14:10  5  A    Yes.  If I were to comply with the Act, I would be limited

6  to referring her for counseling and psychiatry -- or and a

7  psychiatrist.

8  Q    So you would agree if the Act went into effect, you could

9  refer patients for counseling and psychiatric help?

16:14:24 10  A    Correct.

11  Q    You choose to accept federal funding through Alabama

12  Medicaid; is that right?

13  A    Correct.

14  Q    You are not required to accept federal funding?

16:14:34 15  A    No.

16  Q    In your well-child visits, do you give testicular exams to

17  teens who are biological males?

18  A    Yes.

19  Q    Do you give testicular exams to teens who are biological

16:14:48 20  females?

21  A    Yes.  Sorry.  No.  Obviously.  I apologize.  I did not

22  listen to the question correctly.

23  Q    And, okay.  Do you perform Tanner stage assessments?

24  A    I do perform Tanner stage assessments.

16:15:02 25  Q    What are you looking for in biological males?

1  A    In biological males, I am looking for pubic hair where

2  pubic hair is located and the description of the pubic hair and

3  I am looking for the size of the testicles.

4  Q    And what are you looking for in biological females?

16:15:18 5  A    In -- I would be looking for absence of testicles in

6  females.  But I am also looking for breast staging.  And so

7  breast growth.  And I am looking for pubic hair development.

8       And then signs of estrogenation, which are like increased

9  thickness of the labia and increased thickness of the vaginal

16:15:45 10  walls, and things like that.

11  Q    The declaration you submitted in this case, you were

12  talking about your current patient, your current transgender

13  patient.  You mentioned that that patient is prescribed

14  estrogen; is that right?

16:15:58 15  A    Uh-huh.

16  Q    Why aren't you administering testosterone to this patient?

17  A    I'm sorry.  I did not understand the question.

18  Q    Sure.  Why are you administering estrogen and not

19  testosterone to this patient?

16:16:15 20  A    The patient is a transgender female.

21  Q    And your original -- your first patient who we talked

22  about a few minutes ago?

23  A    Right.

24  Q    You talked about they came to your office to have

16:16:27 25  testosterone administered.  Why was testosterone administered

1   and not estrogen?

2   A     Because they are a transgender male.

3   Q     So for each of the treatments we just talked about --

4   testicular exams, Tanner stage assessments, cross-sex

16:16:43   5   hormones -- do you consider your treatment to be discrimination

6   based on sex?

7   A     I do not.

8   Q     Why is that?

9   A     Discrimination is not a medical term.  So I -- I don't

16:17:04  10   know if I'm applying it correctly, but I am using -- I am

11   giving each patient the care for which their -- their sex and

12   gender requires.

13        I still do Tanner stage patients with -- that are

14   transgender.  I still do examinations on those patients.  I do

16:17:26  15   not -- not do -- you know, general exams on those patients.

16        But understanding that they are transgender and so their

17   genital exam is going to look different than somebody else's

18   genital exam.

19   Q     I apologize.  These seem a bit silly.

16:17:41  20        Have you been investigated for discrimination on the basis

21   of sex because you only give biological males testicular exams?

22   A     Nope.

23   Q     Have you been sued for that basis?

24   A     No.

16:17:52  25   Q     Has the federal government threatened to revoke your

1   funding for that reason?

2   A    No.

3   Q    Do you agree that this Act that we're talking about here

4   today prohibits you from prescribing or administering puberty

16:18:08  5   blockers for purposes of gender transition to both boys and

6   girls?

7   A    Can you repeat that for me, please?

8   Q    Sure.  The Act we're here today talking about --

9   A    Uh-huh.

16:18:16 10   Q    -- do you agree that that would prohibit you from

11   prescribing or administering puberty blockers to biological

12   males or females?

13   A    Yes.

14   Q    So both your original patient and your newest patient?

16:18:29 15   A    Yes.

16   Q    And the same is true for a cross-sex hormones; is that

17   right?

18   A    Yes.

19   Q    You talked about your first patient was struggling with

16:18:41 20   gender dysphoria, but you didn't know that originally.  So how

21   old was that patient when you started seeing them?

22   A    About 12.

23   Q    And then how old were they when you determined that they

24   were transgender?

16:18:54 25   A    When they told me they were transgender was at 14.

1   Q    And you hadn't seen a sign of that beforehand?

2   A    Well, he presented himself as a male, but often we expect

3   gender diverse presentation among children.  And so it did

4   not -- it shows my ignorance that it did not occur to me to ask

16:19:16   5   him if he was transgender.

6   Q    Your declaration mentions four more transgender patients

7   since that first one.

8        You said, when those patients first came to see me, most

9   had just started expressing that they were transgender.  About

16:19:32  10   how old were they at those points?

11   A    So there have been four.  So one already was actually

12   transitioning.  But another was 14.  Another was 12.  And then

13   the other is -- gosh.  I have to count.

14        So about 12.

16:20:00  15   Q    And what was the biological sex of those patients?

16   A    Their natal sex was male, male, female, sorry.  My -- I'm

17   trying to think through all my patients now.

18        So female, male, male, male.

19   Q    You mentioned in your declaration that not all those

16:20:42  20   patients went for experimental procedures at the UAB gender

21   clinic.  What happened to those patients who did not go for

22   these procedures?

23   A    Well, one is no longer -- was -- I only was able to see

24   briefly as they were in the care of the State, and I do not

16:21:04  25   know what happened to her.

1          One was -- is still in counseling.

2   Q    And is that -- would you consider that patient to be

3   healthy?

4   A    Currently, yes.

16:21:20  5   Q    So counseling has been sufficient to address that

6   patient's gender dysphoria?

7   A    Yes, which speaks to the diverse nature, the diverse

8   trajectory of gender dysphoria in all children.

9   Q    Your declaration mentions the necessity of regular blood

16:21:42 10   tests and lab work for individuals using these treatments.  Why

11  is that necessary?

12  A    All medications can have side effects.  So it really

13  depends on their medication.  Some of the lab work is actually

14  for their psychiatric medications they were on prior to

16:21:58 15   starting -- starting the gender treatments.  But to, you know,

16  monitor normal things, kidney function and lipids that we know

17  change during puberty.  So when we start somebody on puberty,

18  we need to monitor those things.

19          THE COURT:  Mr. Mills, how long do you think the

16:22:19 20   continuation of your cross will be?

21          MR. MILLS:  Four minutes.

22          THE COURT:  That's a good number.

23  BY MR. MILLS:

24  Q    And are there particular risks of estrogen or testosterone

16:22:31 25   in this context?

```
 1   A     There are risks of estrogen and testosterone always.
 2   Q     You would agree that at least some childhood gender
 3   dysphoria desists by adulthood, right?
 4   A     If it presents prepubertally, yes.
 5   Q     And you would agree that some individuals who transition
 6   their gender choose to detransition; is that right?
 7   A     I have never had that experience.
 8   Q     You think no -- you think no person like that exists?
 9   A     No, I don't -- I have not met such a person, but I don't
10   know if they exist.
11   Q     You have never heard of that happening?
12   A     I have heard of that happening, but by reputation only.  I
13   don't know.  And I don't know anything about that person's
14   medical care.
15   Q     Because you don't treat patients past the age 19, you
16   wouldn't necessarily know if one of your patients decided to
17   detransition, right?
18   A     Correct.  Except that we live in southeast Alabama, and I
19   know my patients for a very long time.
20   Q     Do you think that children have the same decision-making
21   abilities as adults?
22   A     No.
23   Q     Are they better or worse?
24   A     That's a good question.  But they're different.  They do
25   not have executive functioning, so they do not always think
```

1  through consequences.  And that is why we rely upon their

2  parents to help consent for them.

3  Q    Okay.

4          MR. MILLS:  No more questions.

16:24:04 5          THE COURT:  Any further redirect?

6          MR. RAY:  No, Your Honor.

7

8          (End of testimony of Dr. Rachel Koe, MD.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

         I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.

_Christina K Decker_                    05-08-2022

Christina K. Decker, RMR, CRR              Date

Federal Official Court Reporter

ACCR#:  255