# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

REV. PAUL A. EKNES-TUCKER;
BRIANNA BOE, individually and on behalf
of her minor son, MICHAEL BOE; MEGAN
POE, individually and on behalf of her minor
daughter, ALLISON POE; KATHY NOE,
individually and on behalf of her minor son,
CHRISTOPHER NOE; REBECCA ROE,
individually and on behalf of her minor
daughter, MELISSA ROE; ROBERT VOE,
individually and on behalf of his minor
daughter, APRIL VOE; HEATHER
AUSTIN, Ph.D.; and RACHEL KOE, M.D.

     *Plaintiffs*,

v.

STEVE MARSHALL, in his official capacity
as Attorney General of the State of Alabama;
DARYL D. BAILEY, in his official capacity
as District Attorney for Montgomery County;
C. WILSON BLAYLOCK, in his official
capacity as District Attorney for Cullman
County; JESSICA VENTIERE, in her official
capacity as District Attorney for Lee County;
TOM ANDERSON, in his official capacity as
District Attorney for the 12th Judicial Circuit;
and DANNY CARR, in his official capacity
as District Attorney for Jefferson County.

     *Defendants*.

Civil Action No.
2:22-cv-00184-LCB-CWB

**FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## FIRST AMENDED COMPLAINT

Reverend Paul A. Eknes-Tucker; Brianna Boe, individually and on behalf of her minor son, Michael Boe; Megan Poe, individually and on behalf of her minor daughter, Allison Poe; Kathy Noe, individually and on behalf of her minor son, Christopher Noe; Rebecca Roe, individually and on behalf of her minor daughter, Melissa Roe; Robert Voe, individually and on behalf of his minor daughter, April Voe; Heather Austin, Ph.D.; and Rachel Koe, M.D. (collectively, "Plaintiffs"), bring this Action for Declaratory and Injunctive Relief against Defendants Steve Marshall, in his official capacity as Attorney General of the State of Alabama; Daryl D. Bailey, in his official capacity as District Attorney for Montgomery County; C. Wilson Blaylock, in his official capacity as District Attorney for Cullman County; Jessica Ventiere, in her official capacity as District Attorney for Lee County; Tom Anderson, in his official capacity as District Attorney for the 12th Judicial Circuit; and Danny Carr, in his official capacity as District Attorney for Jefferson County (collectively, "Defendants"), respectfully stating as follows:

## PRELIMINARY STATEMENT

1.     This Action is a federal constitutional challenge to the State of Alabama's Vulnerable Child Compassion and Protection Act (the "Act"), passed by the Alabama Legislature on April 7, 2022, and signed into law by Governor Kay Ivey on April 8, 2022. The Act became effective on May 8, 2022 and was in effect

until this Court granted Plaintiffs' Motion for Preliminary Injunction on May 13, 2022. *See* Doc. 107.

2.      The Act intrudes into the right of parents to make medical decisions to ensure the health and wellbeing of their children. It does so by prohibiting parents from seeking and obtaining appropriate medical care for their children and subjecting them to criminal prosecution if they do so.

3.      The Act also targets transgender minors by imposing criminal penalties on any individuals, including parents and health care providers, who obtain or provide medical treatments essential to the minors' health care needs.

4.      Further, the Act is worded broadly, criminalizing anyone who "causes" an individual to receive the prohibited medical treatments, so that doctors, parents, and even clergy cannot discuss, advise, or counsel parents of transgender minors about how to address their children's medical needs.

5.      Plaintiffs seek declaratory and injunctive relief to enjoin the enforcement of the Act. Without the injunctive relief sought, Plaintiffs will experience irreparable injury.

## **PARTIES**

### I.   *Transgender Plaintiffs and Their Parents*

6.      Plaintiff Brianna Boe is and has at all relevant times been a resident of Montgomery County, Alabama. She is the mother of Plaintiff Michael Boe, a 12-

3

year-old transgender boy for whom she also appears in this case as his next friend. Because of concerns about potential criminal liability, as well as her and her child's privacy and safety, Brianna Boe and Michael Boe are proceeding pseudonymously. *See* Doc. 83.

7.     Plaintiff Megan Poe is and has at all relevant times been a resident of Cullman County, Alabama. She is the mother of Plaintiff Allison Poe, a 15-year-old transgender girl, for whom she also appears in this case as her next friend. Because of concerns about potential criminal liability, as well as her and her child's privacy and safety, Megan Poe and Allison Poe are proceeding pseudonymously. *See* Doc. 83.

8.     Plaintiff Kathy Noe is and has at all relevant times been a resident of Lee County, Alabama. She is the mother of Plaintiff Christopher Noe, a 17-year-old transgender boy, for whom she also appears in this case as his next friend. Because of concerns about potential criminal liability, as well as her and her child's privacy and safety, Kathy Noe and Christopher Noe are proceeding pseudonymously. *See* Doc. 83.

9.     Plaintiff Rebecca Roe is and has at all relevant times been a resident of Jefferson County, Alabama. She is the mother of Plaintiff Melissa Roe, a 9-year-old transgender girl, for whom she also appears in this case as her next friend. Because of concerns about potential criminal liability, as well as her and her child's privacy

and safety, Rebecca Roe and Melissa Roe seek to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

10.    Plaintiff Robert Voe is and has at all relevant times been a resident of Florida. He is the father of Plaintiff April Voe, a 12-year-old transgender girl, for whom he also appears in this case as her next friend. Because of concerns about potential criminal liability, as well as his and his child's privacy and safety, Robert Voe and April Voe seek to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

## II.    *Healthcare Provider Plaintiffs*

11.    Plaintiff Heather Austin is a Ph.D. level, licensed clinical child psychologist with over 20 years of experience who maintains a practice in Jefferson County, Alabama. Dr. Austin works in a hospital setting within the University of Alabama at Birmingham ("UAB") system where she regularly provides mental health care to children and adolescents, including transgender youth. Dr. Austin also resides in Jefferson County, Alabama.

12.    Plaintiff Rachel Koe, M.D., is a board-certified pediatrician with over 10 years of experience. Dr. Koe is a pediatrician in southeast Alabama where she regularly treats children and adolescents. She also refers transgender patients and their parents to healthcare providers who specialize in working with transgender patients, including to the Children's Hospital of Alabama and medical staff at UAB

Hospital, which are both located in Jefferson County, Alabama. Dr. Koe resides and works in the 12th Judicial Circuit of Alabama. Because of concerns about potential criminal liability, as well as the privacy and safety of her patients, Dr. Koe is proceeding pseudonymously. *See* Doc. 83.

### III.   *Reverend Paul A. Eknes-Tucker*

13.    Plaintiff Reverend Paul A. Eknes-Tucker is a Senior Pastor at Pilgrim Church in Birmingham, Alabama. In his role as Senior Pastor, Reverend Eknes-Tucker has provided pastoral counseling to parents of transgender children who are congregants at his church as well as members of the Birmingham community. Reverend Eknes-Tucker counsels parents of transgender children about religious faith-based teachings about love, support, and respect for all persons. He also supports parents who are seeking medical treatment for their child's gender dysphoria.

### IV.   *Defendants*

14.    Defendant Steve Marshall is the Attorney General of the State of Alabama. He is the chief law enforcement officer of the State with the power to initiate criminal action to enforce the Act. In his capacity as Attorney General, Mr. Marshall has the ability to enforce the Act. Mr. Marshall is sued in his official capacity as Attorney General of Alabama.

15.     Defendant Daryl D. Bailey is the District Attorney of Montgomery County, Alabama. He is the chief law enforcement officer of Montgomery County, who prosecutes all felony and some misdemeanor criminal cases which occur within Montgomery County. In his capacity as District Attorney, Mr. Bailey has the ability to enforce the Act. Mr. Bailey is sued in his official capacity as District Attorney of Montgomery County, Alabama.

16.     Defendant C. Wilson Blaylock is the District Attorney for the 32nd Judicial Circuit overseeing Cullman County, Alabama. He is the chief law enforcement officer of Cullman County who prosecutes all felony criminal cases that occur within Cullman County. His prosecutorial authority extends to the enforcement of the Act within Cullman County. Defendant Blaylock is sued in his official capacity as District Attorney of Cullman County, Alabama.

17.     Defendant Jessica Ventiere is the District Attorney for Lee County, Alabama. She is the chief law enforcement officer of Lee County, who prosecutes all felony and some misdemeanor criminal cases which occur within Lee County. In her capacity as District Attorney, Ms. Ventiere has the ability to enforce the Act. Ms. Ventiere is sued in her official capacity as District Attorney of Lee County, Alabama.

18.     Defendant Tom Anderson is the District Attorney for the 12th Judicial Circuit overseeing Coffee County and Pike County, Alabama. He is the chief law enforcement officer of Coffee and Pike Counties, who prosecutes all felony and

some misdemeanor criminal cases which occur within Coffee and Pike Counties. In his capacity of District Attorney, Mr. Anderson has the ability to enforce the Act. Mr. Anderson is sued in his official capacity as the District Attorney of the 12th Judicial Circuit.

19.    Defendant Danny Carr is the District Attorney of Jefferson County, Alabama. He is the chief law enforcement officer of Jefferson County who prosecutes all felony criminal cases that occur within the Birmingham Division of Jefferson County, including the City of Birmingham. In his capacity as District Attorney, Mr. Carr has the ability to enforce the Act. Mr. Carr is sued in his official capacity as District Attorney of Jefferson County, Alabama.

20.    Defendants each have separate and independent authority to enforce the Act within their respective jurisdictions.

## JURISDICTION AND VENUE

21.    Plaintiffs seek redress for the deprivation of their rights secured by Section 1557 of the Affordable Care Act, the United States Constitution, and the equitable powers of this Court to enjoin unlawful official conduct. This action is instituted pursuant to 42 U.S.C. § 18116 and 42 U.S.C. § 1983 to enjoin Defendants from enforcing the Act and for a declaration that the Act violates federal law. Therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8

22.     This Court has personal jurisdiction over Defendants because Defendants are domiciled in Alabama and the denial of Plaintiffs' rights guaranteed by federal law occurred within Alabama.

23.     All Defendants reside in Alabama, and, upon information and belief, Defendants Marshall, Bailey, Ventiere, and Anderson reside in this judicial district. Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

24.     If enforced, the Act would violate the federal statutory and constitutional rights of Plaintiffs in this judicial district. Therefore, venue is also proper in this district pursuant to 28 U.S.C § 1391(b)(2).

25.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 57 and 65, 28 U.S.C. §§ 2201 and 2202, and this Court's inherent equitable powers.

## FACTUAL ALLEGATIONS

### I.   *Gender Identity and Gender Dysphoria*

26.     Gender identity is an innate, internal sense of one's sex and is an immutable aspect of a person's identity. Everyone has a gender identity. Most people's gender identity is consistent with their birth sex. Transgender people, however, have a gender identity that differs from their birth sex.

27.     Gender dysphoria is the clinical diagnosis for the distress that arises when a person's gender identity does not match their birth sex. To receive a

diagnosis of gender dysphoria, a young person must meet the criteria set forth in the Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5").[1] If left untreated, gender dysphoria can cause anxiety, depression, and self-harm, including suicidality.

28.   In fact, 56% of transgender youth reported a previous suicide attempt and 86% of them reported suicidality. *See* Austin, Ashley, Shelley L. Craig, Sandra D. Souza, and Lauren B. McInroy (2022), *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*. J. of Interpersonal Violence. Vol. 37 (5–6) NP2696-NP2718.

29.   Research has shown that an individual's gender identity is biologically based and cannot be changed. In the past, mental health professionals sought to treat gender dysphoria by attempting to change the person's gender identity to match their birth sex; these efforts were unsuccessful and caused serious harms. Today, the medical profession generally recognizes that such efforts put minors at risk of serious harm, including dramatically increased rates of suicidality.

---

[1] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 noted that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se*. Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender & Gender Variant Individuals* (2012).

30.     Gender dysphoria is highly treatable. Healthcare providers who specialize in the treatment of gender dysphoria follow a well-established standard of care that has been adopted by the major medical and mental health associations in the United States including, but not limited to, the American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

31.     The standards of care for treatment of transgender people, including transgender youth, were initially developed by the World Professional Association for Transgender Health ("WPATH"), an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria. WPATH published the most recent edition of the Standards of Care for the treatment of gender dysphoria in minors and adults in 2011 and is in the process of finalizing a revised edition of the Standards of Care, which will likely be published later this year.

32.     The Endocrine Society has also promulgated a standard of care for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults. *See* Wylie C. Hembree, et al., *Endocrine Treatment of Gender-*

*Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinol. Metab. 3869 (2017).

33.    The American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and other professional medical organizations also follow the WPATH and Endocrine Society standards of care.

34.    The treatment of gender dysphoria is designed to reduce a transgender person's psychological distress by permitting them to live in alignment with their gender identity. Undergoing treatment for gender dysphoria is commonly referred to as transition. There are several components to the transition process: social, legal, medical, and surgical. Each of these components is part of the medically approved process for transition, some or all of which a transgender person may undertake as part of their transition.

35.    Social transition typically involves adopting a new name, pronouns, hairstyle, and clothing that match that person's gender identity, and treating that person consistent with their gender identity in all aspects of their life, including home, school, and everyday life. Following those steps, transgender people often obtain a court order legally changing their name and, where possible, changing the sex listed on their birth certificate and other identity documents.

36.     For transgender people who have begun puberty, it may be appropriate for them to start taking puberty-blocking medication and later hormone-replacement therapy to ensure their body develops in a manner consistent with their gender identity.

37.     Finally, surgical treatment may in some cases be part of essential medical care for a transgender individual. The only surgical treatment available to transgender minors is male chest reconstruction surgery, a procedure to remove existing breast tissue and create a male chest contour for transgender males. Like all treatments for gender dysphoria, male chest reconstruction surgery is safe and effective in treating gender dysphoria. The medical necessity of surgical care is determined on a case-by-case basis that considers the age of the patient, medical need, and appropriateness of the procedure relative to the psychological development of the individual.

38.     Longitudinal studies have shown that children with gender dysphoria who receive essential medical care show levels of mental health and stability consistent with those of non-transgender children. Lily Durwood, et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina Olson, et al., *Mental Health of Transgender Children who are Supported in Their Identities*, 137 Pediatrics 1 (2016). In contrast, children with gender dysphoria who do not receive appropriate

medical care are at risk of serious harm, including dramatically increased rates of suicidality and serious depression.

## II.   *The Alabama Vulnerable Child Compassion and Protection Act*

39.    On April 8, 2022, Governor Kay Ivey signed the Act into law. The Act became effective on May 8, 2022, and remained in effect until this Court granted Plaintiffs' Motion for Preliminary Injunction on May 13, 2022. *See* Doc. 107.

40.    The Act prevents parents from consenting to, and healthcare professionals from providing, well-established medically necessary care.  The Act also applies to any individual who "cause[s]" such care to be provided to a transgender minor.

41.    Specifically, subsection 4(a) of the Act provides that:

> Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:
>
> (1)  Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>
> (2)  Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.
>
> (3)  Prescribing or administering supraphysiologic doses of estrogen to males.

(4)   Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

(5)   Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(6)   Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

42.   A violation of subsection 4(a) of the Act is a Class C felony, punishable upon conviction by up to 10 years imprisonment or a fine of up to $15,000.

43.   As a result of subsection 4(a) of the Act, medical professionals, including the Healthcare Provider Plaintiffs, and parents of transgender minors, including the Parent Plaintiffs, are forced to choose between withholding medically necessary treatment from their minor transgender patients or children, on the one hand, or facing criminal prosecution, on the other.  Moreover, the broad language of the Act imposes content-based restrictions on discussions, counseling, or referrals regarding gender dysphoria treatments for well-recognized in the medical community that may result in such care being provided to a transgender minor.

## III.   *The Act Will Irreparably Harm the Plaintiffs*

Brianna Boe and Michael Boe

44.   Michael Boe is a 12-year-old transgender boy who resides with his mother in Montgomery County, Alabama.

45.     In his early years, Michael was a happy, outgoing child. But at nine years old, Michael became depressed and anxious. Michael also started struggling academically and socially.

46.     Michael eventually confided in his mother that he felt as though he was not like other girls and was worried about being judged by his classmates. He also reported that he was being bullied in school. Brianna placed Michael in a new school for the following school year and brought him to a therapist to help him with his depression.

47.     Michael began to talk with Brianna about his male gender identity and the distress and discomfort he was experiencing as he entered puberty, as his body began to develop in ways that were inconsistent with his sense of self.

48.     In June 2021, Michael told his mother that he is transgender. With support from his family and a mental health provider experienced in working with transgender youth, Michael began to socially transition, including adopting a male name and pronouns and generally living as a boy in all aspects of his life.

49.     Since Michael began to socially transition, his mood has improved greatly. His therapist recently recommended that Michael be evaluated for additional medical treatment to address the mismatch between his body and his gender identity.

50.     In February 2022, Brianna reached out to the Children's Hospital of Alabama to make an initial appointment for Michael. If this law goes into effect,

however, that appointment will be cancelled, and Michael will have to further delay his assessment for critical medical care.

Megan Poe and Allison Poe

51.     Allison Poe is a 15-year-old transgender girl who resides with her mother, Megan Poe, in Cullman County, Alabama.

52.     As a young child, Allison showed interest in girls' toys and clothing. Thinking this was a phase, her parents initially refused to buy Allison any girl toys. Without asking, Allison's grandmother bought Allison a Barbie doll. Allison was so happy and carried it everywhere.

53.     When the family returned to the United States from her father's military deployment abroad, Allison would become very upset when her mother refused to buy her girls' clothes. As a compromise, Megan bought Allison a few girls' toys. Eventually, Allison's father found them and attempted to throw them away, but Allison's brother snuck them back into the house.

54.     When Allison was around nine years old, her personality began to change significantly. She became withdrawn, quiet, showed signs of depression, and regularly commented that she wanted to die. She also stopped eating regularly. Allison's actions became so worrisome to Megan that she consulted with a pediatrician. The pediatrician suggested that Allison may be transgender and referred them to the gender clinic at UAB Hospital.

17

55.     After evaluating Allison, the team of clinicians educated Megan about what Allison was experiencing and gave her advice about how to support Allison. That visit was a turning point for Megan. She became supportive of Allison, helping her redecorate her room and buying her girls' clothes. The first time Allison came out of her room in girls' clothes, she was beaming with joy.

56.     By fifth grade, many of Allison's peers had started showing the first signs of puberty, and Allison became scared about going through a male puberty.  In anticipation of her starting puberty, Allison started the process to be evaluated for puberty-blocking medication.

57.     About seven months ago, just as Allison was beginning high school, she was evaluated for and eventually started on estrogen.  Her mental health has improved dramatically; she is confident, social, and doing well in school.

58.     If the Act is allowed to go into effect, Allison's medical care will be disrupted, which would cause Allison extreme anxiety and distress. She will develop physical traits that are inconsistent with her identity as a girl that will require her to undergo otherwise avoidable surgeries in the future as an adult.

Kathy Noe and Christopher Noe

59.     Christopher Noe is a 17-year-old transgender boy who resides with his mother, Kathy Noe, in Lee County, Alabama. Christopher and Kathy have deep roots in Alabama, having moved to the State just before Christopher turned 4 years old.

18

Kathy is former active-duty military, while Christopher's father is still active-duty military and is deployed abroad.

60.    Since Christopher was a toddler, he resisted attempts to dress him as a girl. For example, he refused to attend his sixth-grade graduation because doing so meant he would have to wear a dress.

61.    As Christopher began to enter puberty, his distress at the changes his body was undergoing and at being made to present as female intensified.

62.    When Christopher was 14, he told his mother he is transgender. Kathy found Christopher a therapist experienced in working with transgender young people. The therapist helped both Christopher and Kathy navigate the beginning stages of Christopher's transition.

63.    About a year later, Christopher came out to his father as transgender. Christopher's father struggled initially, but because of his love for Christopher, his father began to accept Christopher for who he is.

64.    With his father's support, Kathy took Christopher to a physician to begin the evaluation for hormone-replacement therapy. Because Kathy and Christopher live close to the Alabama-Georgia state line, Christopher's doctors are in Columbus, Georgia. Christopher's prescriptions, however, are filled at a pharmacy in Alabama.

65.     Christopher began hormone replacement therapy in March 2022. Christopher has been noticeably happier. He is bubbly and more outgoing and is confident at work and around other people.

66.     If the Act is allowed to go into effect, Christopher's medical care will be disrupted, which will have devastating and irreversible physical and psychological consequences.

<u>Rebecca Roe and Melissa Roe</u>

67.     Melissa is a nine-year-old transgender girl who lives with her mother, stepparent, and stepsibling in Jefferson County, Alabama.

68.     When Melissa was about three, she began expressing a preference for wearing girls' clothing and having long hair. At preschool, Melissa would dress up in girls' clothing every day, spending the whole day in dresses.

69.     Over time, Melissa continued to express a strong preference for girls' clothing and would become angry and distressed when others would refer to her or treat her like a boy.

70.     In first grade, Melissa increasingly asserted that she is a girl. For example, Melissa consistently grouped herself with the other girls in the class when the teacher separated the class by boys and girls. About a month into the school year, Rebecca learned from Melissa's teacher that Melissa asked to be referred to as a girl in school.  Around the same time, Melissa also told her mother, "I am a girl."

71.     Rebecca reached out to Melissa's pediatrician for support and Melissa also began seeing a new therapist.

72.     Melissa's pediatrician referred Melissa to the clinic at UAB. Melissa had her first appointment in spring 2021. Her next appointment is in December 2022.

73.     With puberty approaching, Melissa is starting to show signs of distress in anticipation of the physical changes that accompany puberty and is concerned that she will be perceived by others as a boy.

74.     During their prior visits, Rebecca had extensive conversations with doctors at the clinic about the risks and benefits of puberty blockers and feels very well informed about treatment options for Melissa's gender dysphoria. If and when Melissa's doctors indicate that puberty blockers are medically necessary to treat Melissa's gender dysphoria, Rebecca plans to carefully review the consent forms and ensure she fully understands them before consenting to treatment. Given Melissa's prior difficulties with behavior, Rebecca is concerned that Melissa will attempt to hurt herself if Melissa does not obtain appropriate treatment for her gender dysphoria.

75.     If Melissa were unable to access necessary medical treatment in Alabama, it would not only harm her, but her whole family as well. Rebecca, a professor at a public university, would be forced to leave Alabama in order to protect

Melissa. That move would tear her family apart as Rebecca's husband and his daughter—Melissa's stepfather and stepsibling—are unable to leave Alabama.

<u>Robert Voe and April Voe</u>

76.    April is a twelve-year-old transgender girl who lives with her parents and three siblings in Florida, but has been a patient at the UAB clinic for several years.

77.    April started showing an interest in typical girls' clothing and toys from a very early age.

78.    During preschool, April would always have a change of clothes in her backpack in case she got dirty or needed clean clothes. Her parents would allow April to pick out the clothes she would bring, and she always chose girls' clothes. At preschool, April would not even wait to get dirty before changing into her back-up set of clothes. The staff at the daycare would then eventually coax April back into boys' clothes, which was very upsetting for April. After learning about this, April's parents spoke with the daycare about allowing April to wear whatever clothes she wanted. April's preference for girls' clothing did not seem like anything more than a phase, but they wanted to give April the latitude to play out her imagination.

79.    By age four, April became quite insistent that she is a girl. After taking a bath one night, April expressed intense distress to her mother about her penis. Unsurprisingly, that caused April's parents to realize that this may not be a phase,

and that April needed to see a mental health professional who could help April and her parents navigate this issue.

80.     April's parents found a psychologist with experience working with children experiencing gender dysphoria. After evaluating April, the psychologist recommended using female pronouns when referring to April. Although a seemingly small change, April's parents saw a significant positive change in her attitude and behavior following her social transition.

81.     Even though April's dysphoria had noticeably subsided since her social transition, April's parents wanted to get the advice of a medical doctor to ensure they were doing everything they could to keep April healthy. When they first started looking for a medical provider with experience working with transgender children, Robert's mother, a retired healthcare provider in Birmingham, suggested that they contact a doctor at the UAB clinic. Finding a doctor they could trust was of paramount importance to April's parents. Thus, they decided to make the approximately ten-hour drive for April to be seen at the UAB clinic.

82.     April's first appointment with the UAB clinic occurred in September 2019. She had been going for annual visits at the clinic until recently when they started going more frequently given how close April is to the beginning of puberty. April's next appointment at the clinic is in September 2022. April's mother is a nurse and based on what April is reporting to her, April's parents anticipate that April will

have reached the onset of puberty by the September appointment, and that it may be time for her to begin puberty blockers.

83.     April's parents have done research on their own to learn about the treatment options for gender dysphoria, including puberty blockers. At the next appointment and provided that April's doctor indicates that puberty blockers are medically necessary, April's parents plan to discuss this treatment option and thoroughly review all the materials provided by April's doctor and the clinic and to make sure they fully understand the risks and benefits of this treatment before consenting.

84.     Not being able to get puberty blockers when it is medically necessary for April would be devastating for April. There is no doubt in April's parents' minds that if April had to go through male puberty, she would attempt to harm herself and that her mental health would decline.

85.     If SB 184 is allowed to go into effect, it would block April's ability to obtain the care she needs. Being unable to receive puberty blocking medication would result in physical changes to her body and appearance that would exacerbate her gender dysphoria, causing long-lasting harm to her physical and mental health.

Dr. Rachel Koe

86.     Dr. Rachel Koe is a board-certified pediatrician in southeast Alabama. Over the past decade, Dr. Koe has treated a handful of transgender patients, including one current patient for whom she provides primary care.

87.     Depending on the needs of the patient, Dr. Koe has referred patients and their parents to local mental health providers as well as the gender clinic at UAB Hospital. Even after referral, Dr. Koe remains involved with her patients' care. For example, Dr. Koe's office draws blood for their patient's regular blood work in advance of appointments with the gender clinic. Additionally, she and her staff provide support to patients who need assistance in self-administering injectable medications like testosterone.

88.     Dr. Koe is familiar with the standards of care for the treatment of gender dysphoria and the medical literature regarding those treatments. She has also seen the significant positive effects medical treatment for gender dysphoria has had on the health and wellbeing of her patients.

89.     If the Act goes into effect, Dr. Koe would be forced to choose between complying with the Act and the medical needs of her current and any future transgender patients whose mental and physical health will deteriorate if denied ongoing medical treatment for their gender dysphoria. The Act forces Dr. Koe to violate her professional and ethical obligations as a physician by denying her patients

access to a course of treatment that is evidence-based and consistent with the established standards of care.

90.     Dr. Koe would also be required to curtail her speech as she would no longer be allowed to provide accurate and comprehensive information to parents and about medically necessary treatment options for gender dysphoria and would be prohibited from making referrals to specialists who could prescribe those treatments.

91.     Changing her practice in those ways would also require Dr. Koe to violate her legal obligation as a Medicaid provider to not discriminate in the provision of medical care to her transgender patients. Ignoring that obligation would jeopardize her ability to provide primary medical care in rural southeast Alabama.

Heather Austin, Ph.D.

92.     Dr. Heather Austin is a doctoral-level clinical child psychologist with a specialty in child development who currently practices in a hospital setting within the UAB System. Dr. Austin has been a practicing clinical psychologist for twenty years and has experience working with children and adolescents with a variety of mental health issues. For the past two years, part of Dr. Austin's practice has been dedicated to mental health treatment and evaluation of transgender young people.

93.     Dr. Austin's work with transgender patients is guided by the well-established standards of care and the hospital's informed-consent protocol. Her assessment process engages both the patient and the patient's parents and requires a

minimum of three to four visits. It is quite common for the assessment to require additional visits, but that determination is made on a case-by-case basis and dependent on the needs of the patient and the patient's family.

94.     In order to conduct her assessment, Dr. Austin gathers information about the patient from questionnaires, rating scales, and discussions with the patient and the patient's family. Pulling from multiple sources provides Dr. Austin with the information she needs to determine whether the patient meets the diagnostic criteria for gender dysphoria as outlined in the DSM-5.

95.     Once she has made, or confirmed, the diagnosis, Dr. Austin then begins taking the patient and the patient's parents through the informed-consent protocol. As required by the protocol, she has detailed discussions about the risks and benefits of the particular medical treatment being considered by the patient and their medical provider. Because of the large amount of information that is reviewed as part of the informed-consent protocol, this discussion can occur over multiple sessions and sometimes Dr. Austin will have separate sessions with the patient and the parent(s) to give each person an opportunity to ask questions and engage with the information being provided.

96.     After completing the informed-consent protocol, Dr. Austin writes a letter to the patient's medical provider detailing the results of her assessment. That letter will include, for example, an overview of the patient's mental health and, if

needed, recommendations on follow up mental health care. Although the letter discusses a patient's readiness to proceed with treatment, Dr. Austin always recommends in the letter that the medical provider conduct a further assessment before initiating treatment.

97.     If enforced, the Act will prevent Dr. Austin from continuing to treat transgender patients in a manner that is consistent with the applicable standards of care. She would not be able to provide the level of detailed information or engage in in-depth conversations with her transgender patients or the patient's parents about medical treatments for gender dysphoria. Practicing this way would require Dr. Austin to violate her professional and ethical obligations. Unwilling to do so, Dr. Austin fears that she will be subject to criminal prosecution under the Act.

98.     Dr. Austin is also concerned for the health and wellbeing of her patients should the Act go into effect. She has witnessed the significant distress her patients experience before starting medical treatment and the tremendous positive effects those treatments have on her patients' mental health. Without access to that critical care, Dr. Austin worries that her patients' mental health will deteriorate in ways that will interfere with their ability to function and cause lasting harm to their health and wellbeing, including developing substance use issues and increased suicidality.

<u>Reverend Paul A. Eknes-Tucker</u>

99.    Reverend Eknes-Tucker is the Senior Pastor at Pilgrim Church in Birmingham, Alabama. The church was established in 1903 and is part of the United Church of Christ. The core tenet of the congregation is to love and support all people to be their true and authentic selves. As such, his faith compels him to support and encourage parents to love and affirm their transgender children.

100.   As a pastor, Reverend Eknes-Tucker provides pastoral counseling to families of transgender children who are often uncertain about what guidance their faith can provide, as they try to figure out how to support their children who are experiencing gender dysphoria.

101.   During these pastoral counseling sessions, parents of transgender children share their worries and fears as well as hopes and aspirations for their transgender children's future. Reverend Eknes-Tucker and the parents extensively discuss the application of their faith's teachings to each family's unique circumstances. He also strives to answer questions and provide information to help parents make decisions about what is best for their children, including whether to consent to particular medical treatments, by accounting for their child's spiritual wellbeing in that decision-making process.

102.    This includes counseling parents to seek the advice of other professionals, such as medical providers and mental health professionals, as needed, to further assist their children.

103.    If this Act comes into effect, Reverend Eknes-Tucker is concerned for the spiritual and mental wellbeing of families he has counseled because he has seen the benefits that pastoral counseling has provided the families he has worked with. Because of the content of Reverend Eknes-Tucker's pastoral counseling sessions with parents raising transgender children, he will face criminal penalties for his pastoral work as it could "cause" a transgender minor to begin medical treatments for their gender dysphoria.

## CLAIMS FOR RELIEF

### COUNT I
Deprivation of Substantive Due Process
Parent Plaintiffs Against Defendants in Their Official Capacities
Violation of Parent Plaintiffs' Right to Direct the Upbringing of Their Children
U.S. Const. Amend. XIV

104.    Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

105.    The Parent Plaintiffs bring this Count against all Defendants.

106.    The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000). That fundamental right includes the liberty to make medical decisions for

their minor children, including the right to obtain medical treatments that are recognized to be safe, effective, and medically necessary to protect their children's health and well-being.

107.   The Act violates this fundamental right by preventing the Parent Plaintiffs from obtaining medically necessary care for their minor children.

108.   By intruding upon parents' fundamental right to direct the upbringing of their children, the Act is subject to strict scrutiny.

109.   Defendants have no compelling justification for preventing parents from ensuring their children can receive essential medical care. The Act does not advance any legitimate interest, much less a compelling one.

**COUNT II**
Deprivation of Equal Protection
All Plaintiffs Against Defendants in Their Official Capacities
U.S. Const. Amend. XIV

110.   Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

111.   All Plaintiffs bring this Count against all Defendants.

112.   The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

113.   The Act singles out transgender minors and prohibits them from obtaining medically necessary treatment based on their sex and transgender status.

114.   The Act also treats transgender minors differently and less favorably than non-transgender minors by allowing minors who are not transgender to obtain the same medical treatments that are prohibited when medically necessary for transgender minors.

115.   Under the Equal Protection Clause, government classifications based on sex are subject to heightened scrutiny and are presumptively unconstitutional.

116.   Transgender-based government classifications are subject, at a minimum, to heightened scrutiny because they are also sex-based classifications.

117.   Because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different than their birth sex, they comprise a discrete group. This defining characteristic bears no relation to a transgender person's ability to contribute to society. Nevertheless, transgender people have faced historical discrimination and have been unable to secure equality through the political process.

118.   As such, transgender classifications are subject to strict scrutiny.

119.   The Act does nothing to protect the health or well-being of minors. To the contrary, the Act undermines the health and well-being of transgender minors by denying them essential medical care.

120.   The Act is not narrowly tailored to further a compelling government interest and is not substantially related to any important governmental interest. Moreover, the Act is not even rationally related to a governmental interest. Accordingly, the Act violates the Equal Protection Clause of the Fourteenth Amendment.

## COUNT III

Preemption
Healthcare Provider Plaintiffs, Parent Plaintiffs, and Transgender Plaintiffs Against Defendants in Their Official Capacities
42 U.S.C. § 18116

121.   Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

122.   Healthcare Provider Plaintiffs, Parent Plaintiffs, and Transgender Plaintiffs bring this Count against all Defendants.

123.   Under Section 1557 of the Affordable Care Act, "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)" on the basis of sex. 42 U.S.C. § 18116.

124.   The prohibition on sex discrimination in Section 1557 of the Affordable Care Act protects transgender individuals from discrimination by healthcare providers, including physicians and hospitals.

125.   The Parent Plaintiffs obtain medical care for their children, the Transgender Plaintiffs, from providers who are recipients of federal financial assistance and therefore subject to the non-discrimination requirements of Section 1557 of the Affordable Care Act.

126.   The Act subjects the Transgender Plaintiffs and the Parent Plaintiffs to unlawful sex discrimination by preventing Plaintiff Parents from obtaining medically necessary care for their children, the Transgender Plaintiffs, because of the children's transgender status and by requiring their healthcare providers to discriminate against the children because they are transgender. As such, the Act conflicts with the non-discrimination requirements of Section 1557. It also conflicts with and undermines the purposes and goals of Section 1557.

127.   In addition, as providers for transgender beneficiaries of Alabama Medicaid, the Healthcare Provider Plaintiffs are recipients of federal financial assistance and therefore subject to the non-discrimination requirements of Section 1557 of the Affordable Care Act.

128.   It is impossible for the Healthcare Provider Plaintiffs to continue to comply with their obligations under Section 1557 and also comply with the

restrictions imposed by the Act. On the one hand, refusing to comply with the Act would bring them into compliance with Section 1557, but subject them to criminal penalties under the Act. On the other hand, complying with the Act would subject the Healthcare Plaintiffs to civil liability for discrimination under Section 1557.

129.   The Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, including the objective of preventing discrimination in the provision of healthcare based on sex.

130.   The Healthcare Provider Plaintiffs, Parent Plaintiffs, and Transgender Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause them irreparable harm.

131.   Accordingly, the Healthcare Provider Plaintiffs are entitled to declaratory and injunctive relief.

## COUNT IV
Deprivation of Free Speech
All Plaintiffs Against Defendants in Their Official Capacities
U.S. Const. Amend. I

132.   Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

133.   All Plaintiffs bring this Count against all Defendants.

134.   The Free Speech Clause of the First Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "Congress shall make no law . . . abridging the freedom of speech."

135.   The First Amendment is applicable to the State of Alabama under the Fourteenth Amendment to the United States Constitution.

136.   The Act creates an unlawful restriction on speech. By imposing criminal penalties on anyone who "cause[s]" any of the proscribed treatments to be performed on a minor, Defendants are punishing the Healthcare Provider Plaintiffs, the Parent Plaintiffs, and Reverend Eknes-Tucker for any speech that can be pointed to as resulting in a minor receiving any of the proscribed treatments – *e.g.*, referrals, counseling, or discussions relating to well-established care recognized in the medical community as appropriate, safe treatment for gender dysphoria in transgender minors.

137.   There is no constitutionally sufficient justification for the Act's restriction of speech. The Act is not rationally related to the furtherance of any legitimate government interest, let alone narrowly tailored to substantially advance any compelling or important government interest.

**COUNT V**
Deprivation of Procedural Due Process
All Plaintiffs Against Defendants in Their Official Capacities
Void for Vagueness
U.S. Const. Amend. V and XIV

138.   Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

139.   All Plaintiffs bring this Count against all Defendants.

140.   Under the Due Process Clause, a criminal statue is void for vagueness if it either: (1) fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or (2) authorizes or encourages "arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

141.   Section 4(a) of the Act states, in relevant part, that "no person shall . . . cause any of the following practices to be performed upon a minor . . . ."

142.   As written, the Act does not provide sufficient definiteness to ordinary people, including Plaintiffs, of what actions constitute "caus[ing]" any of the proscribed activities upon a minor.

143.   The lack of definiteness in the Act encourages arbitrary and discriminatory enforcement against anyone who is aware of, refers to, discusses, talks about, recommends, or gives an opinion on a transgender person's healthcare.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

(1)   issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that the Act violates federal law for the reasons and on the Counts set forth above;

(2)   temporarily, preliminarily, and permanently enjoin Defendants and their officers, employees, servants, agents, appointees, or successors from enforcing the Act;

(3)  declare that the Act violates the First, Fifth, and Fourteenth Amendments

to the United States Constitution; and

(4)  grant such other relief as the Court finds just and proper.

Respectfully submitted this 5th day of August, 2022.

 /s/ Melody H. Eagan
Melody H. Eagan (ASB-9780-D38M)
Jeffrey P. Doss (ASB-4212-R62D)
Amie A. Vague (ASB-4113-Q46I)
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
205.581.0700
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt (ASB-3507-J56P)
Misty L. Peterson (GA Bar No. 243715) (*pro hac vice*)
Adam Reinke (GA Bar No. 510426) (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
404.572.4600
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com

Brent P. Ray (IL Bar No. 6291911) (*pro hac vice*)
Abigail Hoverman Terry (IL Bar No. 6327057) (*pro hac vice*)
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800

38

Chicago, IL 60606
312.995.6333
bray@kslaw.com
ahoverman@kslaw.com

Michael B. Shortnacy (CA Bar No. 277035) (*pro hac vice*)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
213.443.4355
mshortnacy@kslaw.com

Asaf Orr (CA Bar No. 261650) (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
aorr@nclrights.org

Jennifer L. Levi (MA Bar No. 562298) (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org

Scott D. McCoy (FL Bar No. 1004965) (*pro hac vice*)
SOUTHERN POVERTY LAW CENTER
2 Biscayne Boulevard, Suite 3750
Miami, FL 33131
334.224.4309
scott.mccoy@splcenter.org

Diego A. Soto (AL Bar No. ASB-3626-Y61S)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104

39

334.604.1414
diego.soto@splcenter.org

Jessica L. Stone (GA Bar No. 275567) (*pro hac vice*)
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
404.221.5837
jessica.stone@splcenter.org

Sarah Warbelow (MI Bar No. P66690) (*pro hac vice*)
Cynthia Weaver (NY Bar No. 5091848) (*pro hac vice*)
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
202.628.4160
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

## **CERTIFICATE OF SERVICE**

I certify that on August ___, 2022, I electronically filed the foregoing using

the Court's CM/ECF system, which will send notification to all counsel of record.

Coty Montag
Alyssa C. Lareau
Renee Williams
Kaitlyn Toyama
Eliza Dermody
John Michael Powers
U.S. Department of Justice
Coty.Montag@usdoj.gov
Alyssa.Lareau@usdoj.gov
Renee.Williams3@usdoj.gov
Kaitlin.Toyama@usdoj.gov
eliza.dermody@usdoj.gov
john.powers@usdoj.gov

Jason R. Cheek
Margaret Lester Marshall
Lane Hines Woodke
U.S. Attorney's Office
Northern District of Alabama
jason.cheek@usdoj.gov
mmarshall2@usa.usdoj.gov
lane.woodke@usdoj.gov

Stephen D. Wadsworth
Sandra Jean Stewart
U.S. Attorney's Office
Middle District of Alabama
Stephen.Wadsworth@usdoj.gov
sandra.stewart@usdoj.gov

Elizabeth Prim Formby Escalona
Maynard Cooper & Gale, P.C.
pescalona@maynardcooper.com

Edmund G. LaCour Jr.
A. Barrett Bowdre
James W. Davis
Benjamin M. Seiss
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

Christopher E. Mills
Spero Law LLC
557 East Bay Street
Charleston, SC 29413
cmills@spero.law

John D. Ramer
Peter A. Patterson
Brian W. Barnes
David H. Thompson
Cooper & Kirk, PLLC
jramer@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
dthompson@cooperkirk.com

*Counsel for Defendants*

*Counsel for Plaintiff-Intervenor*

*/s/ Melody H. Eagan*