**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| REV. PAUL A. EKNES-TUCKER, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. |
| | ) | 2:22-cv-184-LCB-SRW |
| and | ) | |
| | ) | Honorable Liles C. Burke |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KAY IVEY, in her official capacity as | ) | |
| Governor of the State of Alabama, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**FREE SPEECH COALITION, *et al.* BRIEF *AMICUS CURIAE***
**IN SUPPORT OF MOTION TO QUASH FILED BY EAGLE FORUM OF ALABAMA**

*Amici* herein are Free Speech Coalition, Free Speech Defense and Education Fund,

America's Future, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal

Defense and Education Fund.  A motion for leave accompanies this Brief.

**STATEMENT OF THE CASE**

In April 2022, the Alabama legislature enacted the "Alabama Vulnerable Child

Compassion and Protection Act," also known as "VCAP," which prohibits certain "medical"

procedures that the state had determined to be harmful to minors.  On April 19, 2022, suit was

filed by private parties to challenge the constitutionality of VCAP.  In May 2022, the United

States sought and was granted intervenor status in that suit.  On May 13, 2022, this court

granted in part a preliminary injunction, and that matter is now on appeal to the Eleventh

2

Circuit.  Meanwhile, the United States has continued to conduct discovery, including a subpoena directed to a small Alabama nonprofit advocacy organization involved in public policy formation which is not a party to the litigation — Eagle Forum of Alabama ("EFA").

The Subpoena seeks 11 categories of documents relating to the role played by EFA with respect to the Alabama legislature's enactment of VCAP (SB 184 and HB 266).  Specifically, the Subpoena seeks to uncover the details of the activities of EFA that led to the enactment of EFA, including drafting the bill, lobbying for the bill, source documents used, and medical studies relating to the bill.  Paras. 1-2.  The Subpoena seeks EFA's internal lobbying strategies.  Para. 3.  The Subpoena seeks all documents provided by EFA to the Alabama State Legislature, including analyses and talking points.  Para. 4.  The Subpoena seeks communications to and from the Alabama government relating to VCAP — the very parties that the United States has sued.  Para. 5.  The Subpoena seeks communications with other nonprofit organizations or consultants.  Para. 6.  The Subpoena seeks EFA's internal minutes regarding VCAP (Para. 7) or polling data (Para. 8).  The Subpoena seeks EFA's records about medical issues.  Para. 9.  The Subpoena seeks private and public communications made by EFA with its members, presumably including its membership and fundraising lists.  Para. 10. The Subpoena seeks EFA's social media on VCAP.  Para. 11.

### STATEMENT

These *amici* view the government's issuance of this subpoena to EFA to be an abusive act which violates the constitutional rights of Eagle Forum of Alabama, as well as all those it was in contact with regarding VCAP.  Should the Subpoena not be quashed, the precedent that would be established will threaten the constitutional rights, not just of this Alabama group, but

3

also potentially the rights of these *amici* and thousands of other nonprofit organizations as well.  There is not a great deal of case law on the scope of government subpoenas of the sort issued here, because this Subpoena constitutes a new type of threat to constitutional liberties emanating from the U.S. Department of Justice.  Some see this new threat as part of the weaponization of the Justice Department, replacing the notion of "equal justice under the law" with the Orwellian mantra that "some are more equal than others."[1]

Although these *amici* question the propriety of this Subpoena under F.R. Civ. P. 45, including its overbreadth and burdensomeness,[2] this *amicus* brief focuses on the issue of relevance and the constitutional issues that the Subpoena raises.

## ARGUMENT

### I.   The Subpoena Seeks Documents that Are Irrelevant to the Claims Made by the United States in Its Complaint.

The United States Justice Department's cover letter for its Subpoena to EFA attempts to blame the district court for provoking the Subpoena's issuance, stating: "During the preliminary injunction hearing, the Court asked who drafted the bill that resulted in VCAP." Letter from AUSA Jason R. Cheek to EFA dated August 9, 2022, p. 1.  That casual comment from the bench was in no way a justification for issuance of the Subpoena and its remarkable

---

[1] *See, e.g.,* Victor Davis Hanson, "Equal Justice, They Said," *American Greatness* (Sept. 18, 2022) ("America is not quite America anymore.  We are now a revolutionary society in decline that uses the courts, prosecutors, the administrative state, and the law itself to punish enemies, help friends, and declare such asymmetry 'social justice.'  There is no equality under the law, but simply 'some are more equal than others.'").

[2] *See, e.g.,* "[I]f the person to whom the document request is made is a non-party, the court may also consider the expense and inconvenience to the non-party."  *Wiwa v. Royal Dutch Petroleum Company*, 392 F.3d 812, 818 (5th Cir. 2004).

4

scope.  EFA should not be obligated to satisfy the unbridled curiosity of the Justice

Department to discover which political forces are working in Alabama to protect minor

children against life-altering surgical and hormonal intervention in their natural development,

in opposition to the political agenda of the Department of Justice.

The Complaint filed by the United States contains one count — asserting that protection

of minor children constitutes a violation of the Equal Protection Clause.  As framed, that claim

raises the question of whether the Alabama law's "classifications based on sex or on

transgender status" has the effect of "discriminat[ing] on the basis of sex and on the basis of

transgender status...."  Complaint Para. 57-58.  Documents in the possession of EFA would

not help the Court decide that legal issue.  The only question that the United States could

possibly ask EFA which might be relevant would be for copies of any testimony that EFA may

have provided to the state legislature.  However, any such testimony as may exist would be a

matter of public record and certainly would not require EFA to respond to the Subpoena.

The United States appears to be attempting to concoct a case of "discriminatory intent"

by obtaining communications to and from members of the Alabama legislature.  But as the

Supreme Court has held, "it simply is 'not consonant with our scheme of government for a

court to inquire into the motives of legislators.'"  *Bogan v. Scott-Harris*, 523 U.S. 44, 55

(1998) (citations omitted).  The Subpoena issued also seeks to discover how the People of

Alabama, working primarily through nonprofit organizations in Alabama, were able to

persuade the state legislature to enact a state law to protect minors from the consequences of

the transgender ideology being pushed by the Biden Administration.  To justify its

intervention, the DOJ informed this court: "The Attorney General of the United States has

certified that this case is of general public importance." The government's Subpoena is also of "general public importance" as it offends the Constitution's separation of powers, the First Amendment, and basic principles of Federalism.

## II.    The Subpoena Seeks Documents Protected by Freedom of the Press.

EFA's work of informing the public, its members, state legislators, and others of important state legislation is a quintessential exercise of the freedom of the press.  "EFA's mission … has been to equip citizens with information, so they may know how, when, and where to make their voices heard on public policy issues of importance to them and their families."  EFA MTQ at p. 2.  "EFA has an email list of approximately 3500 people…. These people receive weekly emails from EFA on issues of importance while the Alabama Legislature is in session…."  EFA's mission of informing the public is no less an exercise of the freedom of the press because EFA openly bills itself as an advocacy organization, rather than a large corporate media conglomerate.  As Justice Clarence Thomas explained:

> When the Framers thought of the press, they did not envision the large, corporate newspaper and television establishments of our modern world. Instead, they employed the term "the press" to refer to the many independent printers who circulated small newspapers or published writers' pamphlets for a fee….  "It was in this form — as pamphlets — that much of the most important and characteristic writing of the American Revolution occurred."  1 B. Bailyn, Pamphlets of the American Revolution 3 (1965).  [*McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 360 (1995) (Thomas, J., concurring) (citations omitted).]

As with any organization, EFA chooses what information to publish under its own name, and what to publish anonymously.  Freedom of the press has always been understood in this country to include the right of anonymity.  Thomas Paine published his pamphlet "Common Sense," supporting American independence, under the authorship of "an

6

Englishman."[3]  Madison, Hamilton, and John Jay wrote *The Federalist Papers* under the

pseudonym "Publius."  *See McIntyre* at 360 (Thomas, J., concurring).

In 1960, the Supreme Court struck down a ban on distribution of handbills by

individual private citizens as an infringement of the freedom of the press.  "Anonymous

pamphlets, leaflets, brochures and even books have played an important role in the progress of

mankind.  Persecuted groups and sects from time to time throughout history have been able to

criticize oppressive practices and laws either anonymously or not at all."  *Talley v. California*,

362 U.S. 60, 64 (1960).  "Pamphlets and leaflets … have been historic weapons in the defense

of liberty."  *Id*. at 62 (internal quotation omitted).  Today the vehicle may be electronic

communications (sought by the government in their "native" form so the government can

discover everything possible about the communication), but the principle is the same.

EFA should not be compelled to disclose to the federal government communications it

chose to be anonymous.  The risk is not just of disclosure to the public — but just as

importantly, disclosure to the government.  As EFA's volunteer general counsel Margaret S.

Clarke notes in her Declaration appended to EFA's Motion to Quash, the subpoena will "have

a chilling effect on me and other citizens … when our views happen to be contrary to the

political views of the current Administration in Washington."  Dkt. 151-4, p. 6 (hereinafter

"Clarke Decl.").  "I consider this subpoena to be political harassment.  If this subpoena is

enforced it will … certainly increase the chilling effect … on others who already feel

---

[3]  H. Kaye, "'Common Sense' and the American Revolution," *Thomas Paine National
Historical Association* (May 2001).

threatened or fear political harassment by either the government or private parties simply

because they support [the challenged statute]." *Id.*

## III.   The Subpoena Seeks Documents Protected by Freedom of Association and Assembly.

The Subpoena seeks to learn not just the identity of those with whom EFA worked, but

also their communications as well.  The Supreme Court has made clear, from *NAACP v.*

*Alabama* in 1958 to *Americans for Prosperity Foundation v. Bonta* in 2021, that the freedoms

of assembly and association are subject to the highest constitutional protection.

> It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.  Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.  [*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460-461 (1958) (citations omitted).]

Protected association rights further "a wide variety of political, social, economic,

educational, religious, and cultural ends," and are "especially important in preserving political

and cultural diversity and in shielding dissident expression from suppression by the majority….

[T]he freedom of association may be violated … where individuals are punished for their

political affiliation…." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382

(2021) (citations omitted).[4]

---

[4]  In one of the district court cases later consolidated in *Bonta*, the district court made factual findings showing the chilling effect of harassment directed at the Thomas More Law Center, an initial plaintiff in the case.  *See Thomas More Law Ctr. v. Harris*, 2016 U.S. Dist. LEXIS 158851 at \*\*11-12 (C.D. Calif. 2016) (rev'd on other grounds).

8

The concerns of Californians who supported Proposition 8 that they would be harassed for expressing their policy views turned out to be well-founded.

> Support for Proposition 8, the democratically established marriage amendment in California, has come with a heavy price for many individuals and institutions that think that marriage should remain the union of husband and wife. Publicly available sources, including evidence submitted in a federal lawsuit in California, show that expressions of support for Prop 8 have generated a range of hostilities and harms that includes harassment, intimidation, vandalism, racial scapegoating, blacklisting, loss of employment, economic hardships, angry protests, violence, at least one death threat, and gross expressions of anti-religious bigotry.[5]

The transgender issue has created even stronger emotions. When North Carolina passed a law in 2016 preventing biological men from using women's bathrooms, activists and their supporters in corporate America immediately declared economic war on the entire state. "The NBA relocated its All-Star game, while a long list of big businesses, like Bank of America, Wells Fargo and Dow Chemical, demanded a repeal. Forbes estimated the state had suffered $630 million in losses" within a few months of the bill's passage.[6]

Just this week, it was reported by Andy Ngo that "Fred Sergeant, a 74-year old gay-rights activist who was at the Stonewall Riots, & who co-founded the first pride march in NYC, was beaten & robbed by far-left queer & trans activists at the pride event in Burlington, Vt. on Sunday. He held a sign critical of trans ideology."[7]

---

[5] T. Messner, "The Price of Prop 8," *The Heritage Foundation* (Oct. 22, 2009).

[6] E. Schneider, "The Bathroom Bill That Ate North Carolina," *Politico* (Mar. 23, 2017).

[7] *See also* Tweet of LGB Alliance USA ("Simply put, Fred Sargeant is a hero to all of us who have faced discrimination for wanting to assert our same sex attraction. It is sad that fifty years later, a new face of homophobia has taken over Pride and now threatens violent

9

It is no wonder that, as EFA's Clarke notes in her Declaration, "Several witnesses who testified at the first committee hearing [on VCAP] in 2020 refused to return to participate in later legislative sessions because they were harassed and put in fear of bodily harm by the opposition on the first day of committee hearings.  Other witnesses have asked for their names to be redacted from communications.  The State House Security was notified and provided supporting affidavits…."  Clarke Decl. at 7-8.  Clarke herself, though the volunteer general counsel for EFA, notes, "If this subpoena is enforced, I will certainly be more reticent to volunteer and be much more cautious when I participate in the advocacy of controversial issues due to the burdensome impact this has had on me and my family."  *Id.* at 8.

Numerous district and appellate courts have followed the teaching of *NAACP v. Alabama*.  "An individual or trade group may invoke the First Amendment privilege in response to a Rule 26 discovery request when it can show — with an objectively reasonable probability — that compelled disclosure will chill associational rights."  *Flynn v. Square One Distrib., Inc.*, 2016 U.S. Dist. LEXIS 68645 at *6-*7 (M.D. Fla. 2019) (internal citations omitted).  "[T]he First Amendment's associational privilege applies in the context of discovery orders where the disclosure of the requested information will chill associational rights."  *Tesla Motors, Inc. v. Johnson*, 2018 U.S. Dist. LEXIS 228622 at *8 (W.D. Mich. 2018).

> [I]f [the non-party] is forced to divulge his internal communications with ADM and its members, or communications sent on behalf of ADM to legislators, regulators, and other similarly situated associations and persons, such disclosure could possibly have a chilling effect on [his] (and by extension, ADM's) ability to participate in the political process and could chill the free flow of information amongst its members.  **If made publicly available, the Subpoena could create**

retribution.").

10

**a roadmap into ADM's legislative interests and strategies, and subject [the non-party], ADM, and its members to undue retaliation**.  Courts nationwide have held that the First Amendment protects against precisely these harms.  [*Id.* at \*10 (emphasis added).]

## IV.   Each Aspect of the Subpoena Is Constitutionally Objectionable.

1.  The Subpoena demands "[a]ny communications between Eagle Forum of Alabama and any other non-governmental organization, consultant, or lobbyist concerning VCAP, SP 184, HB 266, and/or any predecessor bills."  Dkt. 151-1, p. 7.  A recent Georgia case is almost directly on point.

> [T]he State Defendants can still explore the … Plaintiffs' motivations for bringing suit **without interfering with their associational rights by requiring them to disclose the identities of persons with whom they had private conversations**.  Accordingly, the Court finds that **the State Defendants' interest in disclosure does not outweigh the potential First Amendment harm to the….  Plaintiffs to the extent they seek to ask the….  Plaintiffs about the identities of specific individuals or organizations with whom they spoke, or the particular offices with which any of those individuals may have been associated**.  The … Plaintiffs thus will not be required to answer any questions on these topics.  [*Curling v. Raffensperger*, 2021 U.S. Dist. LEXIS 214202 at \*9-10 (N.D. Ga 2021) (emphasis added).]

2.  The Subpoena demands voluminous information regarding conversations between EFA and the state legislature, governor, lieutenant governor and attorney general.  Dkt. 151-1, p. 7.  The United States could not obtain this information from the elected officials involved, as it is protected by the state legislative privilege.  "A privilege that prohibits a plaintiff from asking a legislator what was said in the decisive meeting but allows questions concerning any potential influences on his or her decision — such as conversations with constituents, review of documents and other information-gathering, as well as potential bias — offers a legislator no protection worth having."  *Dyas v. City of Fairhope*, 2009 U.S. Dist. LEXIS 92001 at \*26

11

(S.D. Ala. 2009). What the Justice Department could not obtain directly it should not be

allowed to obtain indirectly from EFA.

3. The Subpoena demands "Any records or documents relating to presentations,

videos, interviews, and/or speeches Eagle Forum of Alabama representatives have given or

participated in regarding medical care or treatment related to gender identity, transgender

minors or youth, "trans-identifying" minors or youth, or minors or youth with gender

dysphoria and any "mass letters, newsletters, or emails" or "social media posting" that "Eagle

Forum of Alabama sent to members of a mailing or email list related to or concerning VCAP,

SP 184, HB 266, and/or any predecessor bills." Dkt. 151-1, p. 7. But as a Michigan federal

court has noted:

> it is clear that permitting third-party discovery into a private citizen's lawful
> actions on a matter of public debate would clearly cause her and other
> individuals to be hesitant about becoming involved in the political process.
> Indeed protecting against such a chilling effect is one of the First Amendment's
> very purposes. [*Muslim Cmty. Ass'n v. Pittsfield Twp.*, 2014 U.S. Dist. LEXIS
> 184684 at *14-15 (E.D. Mich. 2014).]

4. The Subpoena demands "[a]ny document concerning Eagle Forum of Alabama's

legislative or policy goals, initiatives, and/or strategies relating to medical care or treatment of

transgender minors, or minors with gender dysphoria." But as a Washington court has held,

"[d]isclosure would reveal the [organization's] strategy and goals in lobbying, drafting

legislation, coordinating with interested members of the public, and managing membership.

Thus, disclosure has the distinct potential to violate the [organization's] right to act, speak and

associate for political purposes" and should be denied. *Toering v. Ean Holdings LLC*, 2016

U.S. Dist. LEXIS 197116 at *6 (D. Wash. 2016) (citations omitted). In this case,

12

affidavits indicate that compelled disclosure of internal planning materials, though less direct than regulation of political group leadership or structure, will similarly frustrate those groups' decisions as to "how to organize ... [themselves], conduct ... [their] affairs, and select ... [their] leaders," as well as their selection of a "message and ... the best means to promote that message." Eu, 489 U.S. at 230-31 & n.21.  [Where government] compels public disclosure of an association's confidential internal materials, it intrudes on the "privacy of association and belief guaranteed by the First Amendment," Buckley, 424 U.S. at 64, as well as seriously interferes with internal group operations and effectiveness.  [*AFL-CIO v. FEC*, 333 F.3d 168, 177-78 (D.C. Cir. 2003).]

5.  The Subpoena demands "any records or minutes of meetings concerning VCAP, SP 184, HB 266, and/or any predecessor bills" (Dkt. 151-1, p. 7):  "[C]ommunications within such a group must be permitted to be broad, uninhibited, and fearless, and ... protecting such deliberations is a seminal aspect of the freedom to associate."  *Whole Woman's Health v. Smith*, 896 F.3d 362, 372 (5th Cir. 2018).  "Even more disturbing, this discovery order forces [the non-party] to turn over to a public policy opponent its internal communications, setting a precedent that may be replicated in litigation anywhere."  *Id.* at 373 (emphasis added).

A district court in Florida granted a motion for a protective order against a third party in similar circumstances, and its analysis is applicable here:

> **Alliance has not pointed to any case which permitted discovery** into a proponent of legislation's understanding or **interpretation** of the proposed legislation, the proponent's **communications** concerning "supporting, opposing, lobbying for or otherwise seeking passage of the" legislation, the extent of the proponent's involvement in the legislative process…. Such information is **not relevant**.  While the Supreme Court permits courts to probe beyond assertions of legislative purpose in determining the "actual purpose," the Court has **not permitted probing into the political affairs of citizens**, lobbyists, or other proponents of legislation.  Participants in the legislative process should have input into laws which govern areas of concern, but **the responsibility for statutory language enacted by Florida's Legislature rests with the Legislature.  It is primarily from the Legislature that discovery is obtained** to inquire into a statute's purpose and intent.  [*Alliance of Auto. Mfrs.*

*v. Jones*, 2013 U.S. Dist. LEXIS 132185 at *17-18 (N.D. Fla. 2013) (emphasis added).]

*Alliance of Auto. Mfrs. v. Jones* was cited in a North Dakota district court opinion to protect against discovery that affidavits had shown would have a chilling effect on First Amendment rights. *See Ass'n of Equip. Mfrs. v. Burgum*, 427 F. Supp. 3d 1082, 1098 (D. N.D. 2019). The Court also cited *Flynn* for the proposition that "The burden [of the privilege] is light, given the crucial place speech and associational rights occupy under our constitution." *Id*. (internal quotation omitted.) The court concluded: "the professed fears of intimidation and reprisal on the part of at least some of NDIDA's members are genuine and that disclosure of the privileged information would result in a chilling of First Amendment rights." *Id*.

And, in a case close to home, the district court for the northern district of Alabama was unwilling to compel "legislators from having to produce documents shared with third parties or communications between themselves and third parties where they engaged in such sharing or communications for the purpose of exploring and formulating legislation." *Greater Birmingham Ministries v. Merrill*, 2017 U.S. Dist. LEXIS 233149 at *29 (N.D. Ala. 2017). If the discovery for communications with EFA could not be obtained from the state legislatures, then certainly, the end run attempted by the Department of Justice here to obtain those same communications from EFA should not be allowed.

**V.     The Precedent Established by Denying EFA's Motion to Quash Would Endanger the Legislative Process and the Rights of Organizations Involved Therein.**

Most or all of the following consequences could be reasonably expected to follow should this court deny EFA's motion to quash.

14

1.  Nonprofit organizations involved in the public policy process would find it more difficult to recruit members and financial supporters, or even persons willing to sign up for their email list.

2.  Nonprofit organizations would be less likely to join in coalitions with other nonprofit organizations to support or oppose legislation, violating their rights of assembly and association.

3.  Nonprofit organizations would be less likely to engage in the public policy process, and exercise their constitutional right to freedom of the press and to petition the government for the redress of grievances.

4.  State legislators would find it difficult to seek input from Alabamians working with nonprofit organizations, as both the legislators and the nonprofit organizations would be reluctant to share information.

5.  The precedent established here would be used elsewhere to allow parties to demand records to discover who is really behind any enacted bill, so that, for example, a pro-gun government lawyer could demand records detailing the complete activities of anti-gun lobbyists, or *vice versa*.

None of these effects should be allowed to occur.  As another district court concluded:

> The Organizations have made a prima facie case that [the] discovery request targets constitutionally protected activities.  **Disclosure would reveal the Organizations' strategy and goals in lobbying, drafting legislation, coordinating with interested members of the public, and managing membership.  Thus, disclosure has the distinct potential to violate the Organizations' right to "act, speak and associate for political purposes**." [*Toering v. Ean Holdings LLC*, 2016 U.S. Dist. LEXIS 197116 at *6 (W.D. Wash. 2016) (citation omitted) (emphasis added).]

15

**CONCLUSION**

For the foregoing reasons, these *amici* urge that EFA's motion to quash the Subpoena

be granted.

Respectfully submitted,

*Phillip L. Jauregui*

Phillip L. Jauregui (Ala. Bar No. 9217G433P)
Phillip Jauregui, LLC
2700 Corporate Drive, Suite 200
Birmingham, AL  35242
(205) 314-4822
Counsel for *Amici Curiae*

William J. Olson
William J. Olson, P.C.
370 Maple Avenue West, Suite 4
Vienna, VA  22180
(703) 356-5070
wjo@mindspring.com
*Of Counsel*