## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **BRIANNA BOE,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cv-184-LCB-CWB** |
| | ) | |
| **STEVE MARSHALL,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## BRIEF OF 53 ORGANIZATIONS, FEDERAL AND STATE LEGISLATORS, AND INDIVIDUAL CITIZENS AS AMICI CURIAE IN SUPPORT OF NON-PARTY EAGLE FORUM OF ALABAMA'S OBJECTION TO AND MOTION TO QUASH DOCUMENT SUBPOENA

C. Boyden Gray
(*pro hac vice* forthcoming)
R. Trent McCotter
(*pro hac vice* forthcoming)
BOYDEN GRAY & ASSOCIATES
801 17th Street NW., Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com

Albert L. Jordan (ASB-5222-D51A)
WALLACE, JORDAN, RATLIFF &
BRANDT, L.L.C.
800 Shades Creek Parkway, Suite 400
Birmingham, Alabama 35209
(205) 874-0305
bjordan@wallacejordan.com

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... iii

IDENTITY AND INTEREST OF AMICI ...................................................... 1

SUMMARY ..................................................................................................... 3

I.   There Is a Long History of Governments Seeking to Intimidate and Chill Political Activity ................................................................... 4

II.   The Government's Subpoena Is a Transparent Violation of the First Amendment ................................................................................. 9

     A.   The Government's Subpoena Seeks Constitutionally Protected Information, with No Valid Justification—Demonstrating the Intent to Chill Protected Activity .......................................... 10

     B.   The Government Has No Legitimate Interest in a Private Non-Profit's Internal Documents in This Case ............................. 13

     C.   The Government's Subpoena Does Not Even Pretend to Be Tailored, Confirming the Intent to Punish Protected Activity ............ 15

III.   The Court Should Consider Whether Issuance of the Government's Subpoena Violated the Court's Local Rules ................................ 18

CONCLUSION ............................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adderley v. Florida*, 385 U.S. 39 (1966) ........................................................ 6

*AFL-CIO v. FEC*, 333 F.3d 168 (D.C. Cir. 2003) .......................... 10, 11, 12, 15, 16, 17

*Americans for Prosperity v. Bonta*, 141 S. Ct. 2373 (2021) .......... 10, 11, 13, 15, 16, 17

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).......................................... 5, 6, 8

*Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43 (2015)........................................ 14

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).............................. 14

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)........................................ 6, 7

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)................. 8, 10, 11, 12, 13

*Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2009) .................................. 8, 9, 12

*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947 (1984)................ 11

*Shelton v. Tucker*, 364 U.S. 479 (1960) .............................................................. 10, 16

*Talley v. California*, 362 U.S. 60 (1960)...................................................................... 6

*Tenney v. Brandhove*, 341 U.S. 367 (1951) .............................................................. 14

*Thomas v. Collins*, 323 U.S. 516 (1945) ...................................................................... 5

*United States v. Cruikshank*, 92 U.S. 542 (1875) ........................................................ 5

*Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018) .......................... 12, 13

U.S. CONSTITUTION AND DECLARATION OF INDEPENDENCE

U.S. Const. amend. I................................................................................................ 4

The Declaration of Independence para. 4 (U.S. 1776)................................................ 7

STATUTES

Conventicle Act of 1664, 16 Car. 2, c. 4................................................................ 7

Bill of Rights of 1689, 1 Wm. & Mary c. 2 .................................................... 6

MISCELLANEOUS

1 Annals of Congress (1789) (J. Gales ed. 1834)......................................... 7

4 Parliamentary History of England (W. Cobbett ed. 1808)....................... 6

Ala. R. Prof'l Conduct 4.4 ............................................................................... 18

Maggie Blackhawk, *Lobbying and the Petition Clause*, 68 Stan. L. Rev. 1131
(2016) ................................................................................... 5–6, 7–8

Alex Isenstadt, *Document Reveals Identity of Donors Who Secretly Funded
Nikki Haley's Political Nonprofit*, Politico (Aug. 26, 2022),
https://www.politico.com/news/2022/08/26/donors-secretly-funded-nikki-
haleys-nonprofit-00053963.................................................................. 17

Zusha Elinson, *California Takes Down Firearms Dashboard After Gun-
Owner Data Are Leaked*, Wall St. J. (June 29, 2022),
https://www.wsj.com/articles/california-takes-down-firearms-dashboard-
after-gun-owner-data-are-leaked-11656535100................................... 17

John D. Inazu, *Liberty's Refuge: The Forgotten Freedom of Assembly* (2012)............ 7

M.D. Ala. L.R. 83.1 ............................................................................................ 18

William Sharp McKechnie, Magna Carta: A Commentary on the Great
Charter of King John (rev. 2d ed. 1958)................................................ 5

United States Office of Personnel Management, Cybersecurity Resource
Center, https://www.opm.gov/cybersecurity/cybersecurity-incidents/ (last
accessed Sept. 17, 2022) ..................................................................... 17

## <u>IDENTITY AND INTEREST OF AMICI[1]</u>

Amici consist of the following organizations, government officials, and private

citizens (who sign in their individual capacities):

Advancing American Freedom, Inc.
Alabama Center for Law and Liberty
America First Legal Foundation
American Family Association, Inc.
Americans United for Life
The Buckeye Institute
Cardinal Institute for West Virginia Policy
Center for Arizona Policy
Center for Family and Human Rights
Citizens United
Citizens United Foundation
The Commonwealth Foundation for Public Policy Alternative
Concerned Women for America
Faith & Freedom Coalition
The Family Action Council of Tennessee, Inc.
The Foundation for Government Accountability
Foundation for Moral Law
Frontline Policy Council
Independent Women's Forum
John Locke Foundation
Judicial Watch, Inc.
The Liberty Justice Center
Louisiana Family Forum
Manhattan Institute
Michigan Family Forum
Mountain States Legal Foundation
The National Right to Work Committee
Oklahoma Council of Public Affairs
Parental Rights Foundation
Pennsylvania Family Council
Private Citizen
Protect Our Kids
Public Interest Legal Foundation
The Religious RoundTable, Inc.
Susan B. Anthony Pro-Life America

---

[1] No party or counsel for any party has authored this brief in whole or in part, nor made any monetary contribution to fund the preparation or submission of this brief.

1

Tea Party Patriots Action, Inc.
Tennessee Eagle Forum
Texas Public Policy Foundation

U.S. Congressman Robert B. Aderholt
U.S. Congressman Mo Brooks
U.S. Congressman Jerry L. Carl
U.S. Congressman Barry Moore
U.S. Congressman Gary Palmer
U.S. Congressman Mike Rogers

Alabama Sen. T. Christopher Elliott
Alabama Sen. J.T. "Jabo" Waggoner
Alabama Rep. Chip Brown
Alabama Rep. Arnold Mooney
Alabama Rep. Matt Simpson
Alabama Rep. Tim R. Wadsworth

Caroline M. Aderholt
Allen Mendenhall
Hon. Hans von Spakovsky

Amici comprise a wide range of organizations and individuals, from non-profit policy groups, to federal and state legislators, to individual citizens. Their interests and goals vary. But all agree that the United States' subpoena in this case is a transparent use of the civil litigation process to chill the speech and political organizing of those who hold views contrary to those of the United States and the Department of Justice. The subpoena harms not just members of the public across all ideological and political spectra, who will be inhibited from open discourse and petitioning, but also legislators themselves, who benefit from hearing from their constituents without those citizens fearing subsequent federal investigations seeking reams of protected materials.

## SUMMARY

In a transparent and flagrant violation of the First Amendment, the United States served a subpoena on Eagle Forum of Alabama ("EFA") with no legitimate purpose but instead to intimidate and chill the free speech, associational, and petitioning rights of an organization whose views are currently contrary to those of the United States Government. In so doing, the government seeks to force a small non-profit with only one full-time employee to pony up the resources to fight the Department of Justice, the world's largest law firm. The government's message is clear and unmistakable: exercise your rights and participate in the political process at your own peril. Any group that might dare engage in grassroots political activity on any controversial issue is now on notice that disfavored views will call down the weight of the government and result in a subpoena from an Assistant United States Attorney demanding every conceivable scrap of information relating in any way to those protected actions, going back years.

For centuries, governments around the world have pursued similar tactics to deter and punish speech, assembly, and political activity. Courts have long been a bulwark against those efforts in the United States, thwarting such attempts to circumvent core rights.

This situation should be no exception. Under Supreme Court precedent, to obtain compelled disclosure of sensitive political speech materials, the government would need to demonstrate a compelling or substantial interest. But the government has no interest at all here. The subpoena's transparently thin justification—premised

3

on a passing remark by this Court at a hearing months ago, on a since-adjudicated motion—demonstrates the lack of a valid basis for propounding the subpoena. Moreover, the Supreme Court has made clear that generally even the legislature's motivations are irrelevant, and the motivations, intent, beliefs, and actions of *private parties* are several degrees removed from that inquiry, as they have no governmental role at all.

In short, the subpoena here seeks information that has no bearing on any judicial inquiry into the subject of this lawsuit, *i.e.*, the constitutionality of the Vulnerable Child Compassion and Protection Act. This confirms the intent of the subpoena to intimidate and chill grassroots political organizing, not just of EFA but of any and all organizations that may try to organize and petition the government— a conclusion made all the more apparent by the incredible overbreadth of the subpoena.

This Court should quash the subpoena and prohibit the weaponization of the civil litigation process against organizations with whom the United States Government disagrees.[2]

## I.   There Is a Long History of Governments Seeking to Intimidate and Chill Political Activity.

The First Amendment prohibits the federal government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble,

---

[2] For ease of reading, this brief refers to the subpoena issued to EFA, but the Court should also quash the similar subpoena issued by the United States to Southeast Law Institute, for the same reasons. *See* ECF No. 152.

and to petition the Government for a redress of grievances." U.S. Const. amend. I. In many cases, and especially this one, these rights "are inseparable." *Thomas v. Collins*, 323 U.S. 516, 529–30 (1945). "The very idea of a government, republican in form, implies the right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875).

The First Amendment has deep historical roots, driven in part by governments demanding the identity of speakers and the substance of their non-public communications, both to retaliate against prior speech and political organization, and also to deter the exercise of those rights in the future.

"The right to petition traces its origins to Magna Carta, which confirmed the right of barons to petition the King." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 395 (2011) (citing William Sharp McKechnie, Magna Carta: A Commentary on the Great Charter of King John 467 (rev. 2d ed. 1958)). In fact, "[t]he Magna Carta itself was King John's answer to a petition from the barons." *Id.* (citing McKechnie, *supra*, at 30–38). In the centuries that followed, the right to petition spread to the general public and "often drove the legislative agenda, which included petitions for public and private matters without any mechanism to distinguish them." Maggie Blackhawk, *Lobbying and the Petition Clause*, 68 Stan. L. Rev. 1131, 1144 (2016). "Petitioning became an intrinsic part of English political life by the seventeenth century, the words 'petition' and 'bill' were used interchangeably in legislatures, and the petition process was regarded as part of the constitutional framework." *Id.* This mechanism

5

was "the primary means of political engagement for the unenfranchised and for collective political activity, as petitioners formed associations and petitioned on behalf of the collectivity." *Id.* at 1144–45; *see also Borough of Duryea*, 564 U.S. at 395–96.

By 1669, Parliament's House of Commons resolved that "it is an inherent right of every commoner of England to prepare and present Petitions to the house of commons in case of grievance." 4 Parliamentary History of England 432 (W. Cobbett ed. 1808). Importantly, Parliament was clear "[t]hat no court whatsoever hath power to judge or censure any Petition presented." *Id.* at 433. The 1689 English Bill of Rights similarly affirmed that "it is the right of the subject to petition the king," and therefore "all commitments and prosecutions for such petitioning are illegal.'" 1 Wm. & Mary c. 2; *see also Adderley v. Florida*, 385 U.S. 39, 49 n.2 (1966) (Douglas, J. dissenting).

The right to petition was no less important to the American colonists, where it permeated political life. *Borough of Duryea*, 564 U.S. at 396; Blackhawk, *supra*, at 1145–47. However, the government continued to interfere with grassroots political organizing. "Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts." *Talley v. California*, 362 U.S. 60, 65 (1960). The most famous example was "the pre-Revolutionary War English pamphleteer 'Junius,' whose true identity remains a mystery." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 n.6 (1995). The Continental Congress ultimately

6

cited violations by the English crown of the petition right as a justification for the American Revolution. *See* The Declaration of Independence para. 4 (U.S. 1776).

After the Constitution was drafted, the Federalist Papers sought to persuade the public to adopt that Constitution. It was no accident that "even the arguments favoring the ratification of the Constitution advanced in the Federalist Papers were published under fictitious names." *McIntyre*, 514 U.S. at 342. The Anti-Federalists likewise "tended to publish under pseudonyms." *Id.* at 343 n.6.

When it came time to draft the Bill of Rights, some believed that an express protection of the right to assemble was unnecessary. For example, Representative Theodore Sedgwick of Massachusetts argued that "[i]f people freely converse together, they must assemble for that purpose," and thus "it is certainly a thing that never would be called in question[.]" 1 Annals of Congress 759 (1789) (J. Gales ed. 1834). But it was necessary to preserve the right explicitly, Virginia's John Page contended, because dissenters had often "been prevented from assembling together on their lawful occasions." *Id.* at 760; *see* John D. Inazu, *Liberty's Refuge: The Forgotten Freedom of Assembly* 24 (2012) (citing Conventicle Act of 1664, 16 Car. 2, c. 4).

The First Congress received "over six hundred petitions" on matters of both private and public concern—"including regulation of commerce, the need for public credit, the institution of slavery, requests for intellectual property protection, disposition of public lands, public employment and elections, the location of postal offices and federal courts, and the settlement of war debts and pensions." Blackhawk,

*supra*, at 1152. Many "proposed statutory language." *Id.* The right to petition has subsequently played a central role in our nation's history. *See, e.g.*, *Borough of Duryea*, 564 U.S. at 396–97.

But even after adoption of the First Amendment, American government officials have still sought to punish the right to free speech, association, and political activity by demanding information about private individuals and political organizations. One of the most famous examples was Alabama's attempts in the 1950s to deter the activities of the NAACP by demanding its full membership rolls. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). Because "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs," the demand for membership rolls violated the free speech and associational rights of the First Amendment, applicable to the state via the Fourteenth Amendment. *Id.* at 462.

As the subpoena at issue in this case demonstrates, such intimidation tactics are becoming more common. For example, after Proposition 8 amended the California Constitution to define marriage as between one man and one woman, challengers issued subpoenas to proponents of the Proposition, demanding "internal campaign communications relating to campaign strategy and advertising." *Perry v. Schwarzenegger*, 591 F.3d 1126, 1131 (9th Cir. 2009). The district court refused to quash the subpoenas, but the Ninth Circuit granted mandamus, finding that such

"discovery would have the practical effect of discouraging the exercise of First Amendment associational rights." *Id.* at 1132.

In sum, for centuries, governments and even private parties via litigation have tried to chill and restrict fundamental speech, association, and petitioning rights by demanding production of communications and materials by groups holding views that are unpopular or controversial in some quarters. And for centuries, courts have intervened to protect those core rights. This Court should do the same here, as explained next.

## II.    The Government's Subpoena Is a Transparent Violation of the First Amendment.

The subpoena at issue in this case was drafted and served by the Department of Justice on a non-profit organization that has not participated in any way in this litigation. The United States, which is an intervenor in this case, seeks to use its party status to issue subpoenas to acquire sensitive information it could never otherwise obtain in compliance with the First Amendment. The mere issuance of this subpoena—even if it is ultimately quashed—severely chills First Amendment rights because individuals will now fear that their communications on any controversial issue—either now or in the future—will be subjected to a subpoena issued by an Assistant United States Attorney on behalf of the federal government. Those individuals will undoubtedly curtail their political activities as a result. Indeed, the curtailment of political activities has already occurred as a result of the subpoena issued in this case.

Although the chilling *effect* alone is sufficient to quash the subpoena, the lack of any governmental interest or narrow tailoring suggest that chilling protected conduct was also the government's *intent*. This Court should not only quash the subpoena but make clear that using the civil litigation process to punish and intimidate those who may disagree on important political issues is unacceptable. Indeed, free and open debate and public engagement is most important in the context of controversial issues.

A. **The Government's Subpoena Seeks Constitutionally Protected Information, with No Valid Justification—Demonstrating the Intent to Chill Protected Activity.**

"[C]ompelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation." *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003); *see NAACP*, 357 U.S. at 462. "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and thus "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association" as even a direct prohibition. *NAACP*, 357 U.S. at 460, 462. "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462.

"Every demand that *might* chill association" is constitutionally suspect. *Americans for Prosperity v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (emphasis added). "Even if there [is] no disclosure to the general public," *Shelton v. Tucker*, 364 U.S.

479, 486 (1960), the "unnecessary risk of chilling" nonetheless violates the First Amendment, *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 968 (1984); *see also AFL-CIO*, 333 F.3d at 176.

Thus, where a political group demonstrates that a compelled disclosure is "likely to affect adversely the ability of … [the group] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate," the government may justify the disclosure requirement only by demonstrating that it directly serves a compelling or substantial state interest. *NAACP*, 357 U.S. at 462–63; *Bonta*, 141 S. Ct. at 2383.

The government's subpoena to EFA deters the exercise of constitutional rights because it transparently seeks to silence and intimidate, as well as retaliate against, speech espousing a particular viewpoint and political association with which the United States disagrees. EFA's volunteers and associates will feel betrayed, and draw down or discontinue their engagement with EFA, thereby stifling free discourse—not just within EFA, but also between EFA and the public. Clarke Decl. (ECF No. 151-4) ¶¶ 12–13; Gerritson Decl. (ECF No. 151-3) ¶ 12. And EFA's volunteers and associates already have a well-founded basis for fearing they may become victims of the violence increasingly visited on Americans who disagree on controversial issues. Clarke Decl. (ECF No. 151-4) ¶¶ 12–13; Gerritson Decl. (ECF No. 151-3) ¶ 12.

Nor is EFA somehow unique in suffering chilling effects from a subpoena of this nature. Private individuals and organizations of all stripes—like amici here—now know that expressing or supporting opinions disfavored by the current

Administration will be subject to the crushing weight of the federal government. They will know that any communications or work product might be subject to a subpoena issued by the United States and enforced by the Department of Justice, deterring those individuals and groups from exercising their speech, associational, and petitioning rights on controversial topics in the future. *See NAACP*, 357 U.S. at 462–63.

In a similar case, the D.C. Circuit did not hesitate to recognize the "substantial First Amendment interests" at stake via "chilling of political participation by [a private organization's] members" where the Federal Election Commission sought "the names of hundreds of volunteers, members, and employees," as well as "detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies." *AFL-CIO*, 333 F.3d at 176–78; *see also Perry*, 591 F.3d at 1141–42 ("We have little difficulty concluding that disclosure of internal campaign communications can have such an effect on the exercise of protected activities" by "chilling participation and by muting the internal exchange of ideas."). Those requests were similar to, although still not as broad as, the subpoena here.

Similarly, the Fifth Circuit recently addressed a scenario where the Executive Director of a religious organization testified in administrative proceedings in support of several laws about abortion, and then the organization faced subpoenas from private parties that challenged the laws in court. *See Whole Woman's Health v. Smith*, 896 F.3d 362, 364–65 (5th Cir. 2018). The subpoenas demanded "[a]ll [d]ocuments concerning [embryonic and fetal tissue remains], miscarriage, or abortion," including

12

all "communications" on these topics between members of the organization and "the Office of the Governor of Texas, the Office of the Attorney General of Texas, or any member of the Texas Legislature, since January 1, 2016." *Id.* at 366. The Fifth Circuit held that the chilling effect of this subpoena "seems self-evident" because the religious organization would be unable "to conduct frank internal dialogue and deliberations." *Id.* at 373. And that was in the context of a subpoena issued by a private party, not by the United States Government, as here, where First Amendment protections are at their strongest.

Given both the documented and self-evident chilling effect of the subpoena issued to EFA, this Court should next determine whether the government could prove a compelling or substantial interest in the protected information. *See NAACP*, 357 U.S. at 462–63; *Bonta*, 141 S. Ct. at 2383. But as demonstrated next, there is no governmental interest at all.

### B.     The Government Has No Legitimate Interest in a Private Non-Profit's Internal Documents in This Case.

The subpoena's stated justification is exceedingly thin. It purports to seek information solely because of a passing remark by the Court at a hearing that took place months ago, on a motion that has already been adjudicated. *See* Subpoena Cover Sheet (ECF No. 151-1) ("In April of this year, the United States—along with Private Plaintiffs—sought to enjoin the enforcement of VCAP. During the preliminary injunction hearing, the Court asked who drafted the bill that resulted in VCAP."). That single, off-hand remark by the Court is the government's sole proffered

justification for demanding five years' worth of internal political information from a private non-profit organization that has played no role in this litigation.

That contrived basis is all the United States can muster because there simply is no legitimate interest in probing private parties' protected speech and grassroots efforts to influence possible legislation. The Supreme Court has held that even *the legislature's* own intent is irrelevant, with rare exception. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2256 (2022) ("[I]nquiries into legislative motives are a hazardous matter.") (cleaned up). Moreover, even if the legislature's intent were relevant, the United States already has access to the legislative hearings of the Vulnerable Child Compassion and Protection Act, which was debated at length and featured extensive hearings, experts, and witnesses.

Similarly, *individual* legislators' beliefs or intent are irrelevant to the judicial inquiry because "it [is] not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *see Dobbs*, 142 S. Ct. at 2256 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it.") (cleaned up).

Individual citizens' and groups' motivations, beliefs, or communications are even further removed. They cannot possibly provide any legitimate information because those people and groups have no governmental role whatsoever. *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("Private entities are not vested with 'legislative Powers.'").

14

The lack of government interest at issue is more than just a failure by the United States to demonstrate relevance. It presents a fundamental constitutional violation, given that the United States is the party seeking to compel this protected information.

### C. The Government's Subpoena Does Not Even Pretend to Be Tailored, Confirming the Intent to Punish Protected Activity.

Even where the government demonstrates a sufficient interest (which, again, it hasn't here), courts also consider "the degree to which the government has tailored the disclosure requirement to serve its interests." *AFL-CIO*, 333 F.3d at 176. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly— 'because First Amendment freedoms need breathing space to survive.'" *Bonta*, 141 S. Ct. at 2384 (cleaned up).

The subpoena fails the tailoring requirement because it seeks essentially every conceivable type and piece of information in existence that pertains in even the most tangential ways to a lengthy list of legislative proposals. In short, the subpoena is not tailored—and does not even pretend to be. In *AFL-CIO*, the D.C. Circuit noted the Federal Election Commission likewise "made no attempt to tailor its policy to avoid unnecessarily burdening the First Amendment rights of the political organizations it investigates." 333 F.3d at 178. Given this, the D.C. Circuit declined to engage in any "detailed" analysis and concluded straightaway that the government had failed to meet its burden. *Id.*

"Given the amount and sensitivity of th[e] information" that the subpoena would collect, "one would expect" it to be "integral" to the fruition of the United States'

interest in airing the issue of the Vulnerable Child Compassion and Protection Act's constitutionality. *Bonta*, 141 S. Ct. at 2386. But "the strength of the governmental interest [does not] reflect the seriousness of the actual burden on First Amendment rights." *Id.* at 2383. "There is a dramatic mismatch"—indeed, there is no overlap— "between the interests that the [United States] seeks to promote" and the subpoena "in service of that end." *Id.* at 2386.

Nor is there any merit to the notion that some type of protective order could cure the serious First Amendment violations here. The government made the same argument in *AFL-CIO*, and the D.C. Circuit rightly concluded that this would "turn[] every discovery request and subpoena into a First Amendment court battle," which would "burden … the judiciary," 333 F.3d at 179, as well as the private parties themselves, who often lack the resources to engage in such fights. And even with a protective order, the government itself would still possess reams of constitutionally protected information, with the inevitable risk of retaliation against the disfavored groups and individuals. This is precisely why courts have held that the First Amendment provides strong protections from such compelled disclosures even when there is never any public release. *See Shelton*, 364 U.S. at 486; *AFL-CIO*, 333 F.3d at 176.

Of course, odds are strong that there would be leaks of information the government procures, regardless of any claim of confidentiality. As the Supreme Court aptly put it in *Bonta*, given the frequency with which controversial material is leaked or hacked, the government's "assurances of confidentiality are not worth

16

much" and "'ring[] hollow.'" 141 S. Ct. at 2388 n.*.[3] This only heightens the chilling effects of the subpoena, as well as the government's burden in demanding such information. *See, e.g., AFL-CIO*, 333 F.3d at 176 (noting that the prospect of any public release would "require[] a separate justification" beyond the extraordinary showing already required).

* * *

The United States is surely aware of all this—the decades of caselaw, the chilling of core constitutional rights, the irrelevance of EFA's communications and internal materials, the tremendous overbreadth of the requests, the difficulty of small grassroots groups to defend themselves against the machinery of the Department of Justice, and the likelihood of governmental leaks of protected information. As such, there is only one possible purpose in serving the subpoena on EFA—to deter and punish free speech, associational, and petitioning rights, not just of EFA but of any

---

[3] Recent high-profile government data breaches and leaks indicate that private, confidential information is not particularly safe inside government agencies. For example, in 2015, the United States Office of Personnel Management announced that the personal data—including social security numbers—of 21.5 *million* people were stolen. OPM Cybersecurity Resource Center, https://www.opm.gov/cybersecurity/cybersecurity-incidents/ (last accessed Sept. 17, 2022). Most recently, the State of California leaked the ages and addresses of concealed-carry weapons permit holders. Zusha Elinson, *California Takes Down Firearms Dashboard After Gun-Owner Data Are Leaked*, Wall St. J. (June 29, 2022), https://www.wsj.com/articles/california-takes-down-firearms-dashboard-after-gun-owner-data-are-leaked-11656535100. Similarly, it appears that either the Internal Revenue Service or the New York Attorney General's Office cannot (or chooses not to) adequately safeguard confidential tax returns of conservative organizations. Alex Isenstadt, *Document Reveals Identity of Donors Who Secretly Funded Nikki Haley's Political Nonprofit*, Politico (Aug. 26, 2022), https://www.politico.com/news/2022/08/26/donors-secretly-funded-nikki-haleys-nonprofit-00053963.

group that might dare to engage in grassroots political organizing with views adverse to the United States Government.

This Court should quash the subpoena in full and make clear that the First Amendment does not tolerate governmental use of the civil litigation process to inhibit core constitutional rights, regardless of viewpoint.

## III. The Court Should Consider Whether Issuance of the Government's Subpoena Violated the Court's Local Rules.

Finally, the Court should consider whether, by directing or authorizing the issuance of this unprecedented subpoena, Department of Justice leadership violated this Court's local rules, which incorporate the Alabama Rules of Professional Conduct. M.D. Ala. L.R. 83.1(g). Alabama Rule 4.4 states, "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, *or use methods of obtaining evidence that violate the legal rights of such a person*." Ala. R. Prof'l Conduct 4.4 (emphasis added); *see also* M.D. Ala. L.R. 83.1(h) (dictating procedure for alleged violations).

To be clear, amici do not currently challenge the motivations of the Assistant U.S. Attorney who signed the subpoena, but rather the Department of Justice's Civil Rights Division and leadership officials who presumably directed or authorized the issuance of this unprecedented subpoena. Those high-level officials, who are running this case on behalf of the government, would have realized the direct and inevitable chilling effects of issuing the subpoena. And that violation remains even if the government subsequently offered to narrow the requests, as doing so would not remove the deterrence already visited upon EFA and similar organizations, which

18

itself violates their rights, as discussed above. Moreover, it is worth noting that the United States is an intervenor in this case, which raises questions about whether the United States sought intervention, at least in part, for purposes of using its party status to issue such subpoenas.

Merely quashing this subpoena is unlikely to deter the United States from issuing such subpoenas in the future, perhaps to amici themselves. The government could simply try again in the hopes of obtaining success, especially against small groups or individuals unable to defend themselves adequately against the Department of Justice. Further deterrence is needed to ensure the United States does not again attempt to use the Court's litigation process for intimidating and chilling core constitutional rights of organizations whose views may diverge from those the government holds at the moment.

At the very least, the Court should quash the subpoenas in a written opinion that unmistakably vindicates the First Amendment rights at stake. This may help to deter the government from using the awesome power of the Department of Justice to chill the rights of citizens and organizations advocating positions contrary to those the government currently holds.

## **CONCLUSION**

The Court should quash the United States' subpoena in full.

19

Respectfully submitted this 20th day of September 2022.

| | |
|---|---|
| */s/ R. Trent McCotter* | */s/ AlbertL. Jordan* |
| C. Boyden Gray | Albert L. Jordan (ASB-5222-D51A) |
| (*pro hac vice* forthcoming) | WALLACE, JORDAN, RATLIFF & |
| R. Trent McCotter | BRANDT, L.L.C. |
| (*pro hac vice* forthcoming) | 800 Shades Creek Parkway, Suite 400 |
| BOYDEN GRAY & ASSOCIATES | Birmingham, Alabama 35209 |
| 801 17th Street NW., Suite 350 | (205) 874-0305 |
| Washington, DC 20006 | bjordan@wallacejordan.com |
| 202-706-5488 | |
| mccotter@boydengrayassociates.com | |

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 20, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Albert L. Jordan*
OF COUNSEL
