## IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 2:22-cv-184-LCB-CWB |
| | ) |
| STEVE MARSHALL, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**BRIEF OF NATIONAL REPUBLICAN REDISTRICTING TRUST AS *AMICUS CURIAE* IN SUPPORT OF NON-PARTY EAGLE FORUM OF ALABAMA'S OBJECTION TO AND MOTION TO QUASH DOCUMENT SUBPOENA**

Wendy Ann Padilla-Madden (ASB-5307-W71M)
GLOBAL BUSINESS ADVISORS, LLC
249 Lyon Lane
Birmingham, AL 35211
(205) 558-8633 (telephone)
(205) 732-7036 (facsimile)
wendy@gba.law

Jason Torchinsky
(*pro hac vice* forthcoming)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
(540) 341-8808 (telephone)
540) 341-8809 (facsimile)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE .............................................................. 1

SUMMARY ................................................................................................................................ 1

    I.    The People Have a Right To Make Their Preferences Known to Their Elected
Representatives. ............................................................................................................... 2

    II.    The Seven Subpoenas Received by Amicus in the Last Year Have Imposed Substantial
Costs on the Organization. .............................................................................................. 5

CONCLUSION ........................................................................................................................... 7

# TABLE OF AUTHORITIES

## CASES

*Black Panther Party v. Smith*, 661 F.2d 1243 (D.C. Cir. 1981) ...................................................... 6

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) ...................................................................... 2

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................................................... 3, 5, 6

*Fla. State. Conf. of Branches & Youth Units of the NAACP v. Lee*, 568 F. Supp. 3d 1301 (S.D. Fla. 2021) ...................................................................................................................... 3

*LULAC et al. v. Abbott et al.*, No. EP-21-CV-259, 2022 U.S. Dist. LEXIS 131217 (W.D. Tex. July 25, 2022) .................................................................................................................. 5

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................................................ 4, 5

*Ohio A. Philip Randolph Inst. v. Householder*, 2019 U.S. Dist. LEXIS 134829 (S.D. Ohio Jan. 30, 2019) ............................................................................................................................ 6

*Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2010) .............................................................. 4

*S.C. State Conf. of the NAACP et al. v. McMaster et al.*, No. 3:21-cv-3302, 2022 U.S. Dist. LEXIS 118688 (D.S.C. Jan. 19, 2022) ....................................................................................... 5

*Tenney v. Brandhove*, 341 U.S. 367 (1951) ................................................................................ 3, 4

*Thomas v. Collins*, 323 U.S. 516 (1945) ...................................................................................... 2

*United States v. Harriss*, 347 U.S. 612 (1954) .............................................................................. 4

*United States v. Johnson*, 383 U.S. 169 (1966) ............................................................................. 3

## OTHER AUTHORITIES

2 *The Works of James Wilson* (Andrews ed. 1896) ......................................................................... 3

Brief for 53 Organizations et al. as *Amici Curiae* Supporting Non-Party Eagle Forum of Alabama's Objection to and Motion to Quash Document Subpoena, *Boe et al. v. Marshall et al.*, No. 2:22-cv-184-LCB-CWB (M.D. Ala. Sept. 20, 2022) .................................................... 1

NRRT's Motions to Quash and for Protective Orders, *Subpoenas to Adam Kincaid and the National Republican Redistricting Trust et al.*, No. 1:22-mc-67-JEB-RMM (D.D.C. Jan. 19, 2022) .............................................................................................................................. 6

## CONSTITUTIONAL PROVISIONS

Ala. Const. art. I, § 4 ................................................................................................................. 2

Ala. Const. art. IV, § 56 ............................................................................................................. 3

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The National Republican Redistricting Trust ("NRRT") is the central Republican organization tasked with coordinating with national, state, and local groups on a fifty-state congressional and state-legislative redistricting effort. As part of that effort, NRRT reviews redistricting plans produced by state legislatures and analyzes those plans for compliance with state and federal law. Because of its work surrounding the redistricting process, NRRT and its affiliates have been the recipient of seven subpoenas in the last year from private plaintiffs seeking NRRT's internal documentation and communications. Defending itself against these subpoenas has been costly, and NRRT submits this *amicus* brief to offer its perspective on the harms attendant to allowing individuals and organizations like the Eagle Forum of Alabama to become the targets of fishing expeditions simply due to their protected engagement with the public discourse surrounding issues of public concern.

## SUMMARY

The subpoena issued by the Department of Justice to the Eagle Forum of Alabama in this case threatens the free speech and petition rights of that nonprofit organization and any other group of American citizens that seeks to make its voice heard in the legislative process. The *amicus* brief submitted by several dozen nonprofit advocacy organizations and public officials effectively lays out the Supreme Court's caselaw in this area and the history of legal protections for speech and petition. *See generally* Brief for 53 Organizations et al. as *Amici Curiae* Supporting Non-Party Eagle Forum of Alabama's Objection to and Motion to Quash Document Subpoena, *Boe et al. v. Marshall et al.*, No. 2:22-cv-184-LCB-CWB (M.D. Ala. Sept. 20, 2022), ECF No. 165.

This threat is not purely hypothetical, however, and the Eagle Forum is not the first nonprofit organization to receive a subpoena that appears calculated to disrupt its legislative advocacy efforts. *Amicus* has itself received no fewer than seven subpoenas in the last year concerning its First-Amendment-protected advocacy efforts in various states, and it has incurred a significant cost in time and resources in defending itself against such fishing expeditions. This brief will detail the concrete harms that would attend any judicial endorsement of the instant subpoena.

I.     **The People Have a Right To Make Their Preferences Known to Their Elected Representatives.**

When an individual or an advocacy group communicates with state legislators or members of their staff to express their opinion concerning a pending bill, they are simultaneously exercising at least two rights protected under the First Amendment: The right to free speech and the right to petition the government for redress of grievances. U.S. Const. amend. I. These rights receive additional legal protection from the Alabama Constitution, which provides that "any person may speak, write, and publish his sentiments on all subjects." Ala. Const. art. I, § 4.

"Both speech and petition are integral to the democratic process." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Id.* "It was not by accident or coincidence" that these twin rights are protected by the same constitutional provision, for they "are inseparable." *Thomas v. Collins*, 323 U.S. 516, 530 (1945). Both are rights common to every American citizen (including groups of citizens that band together to achieve a common purpose) and they are fundamental to the American scheme of ordered liberty. In cases where the government seeks to compel disclosure

of information protected by a group's asserted First Amendment privilege, the party from which disclosure is sought "must demonstrate a 'reasonable probability that the compelled disclosure . . . will subject them to threats, harassment, or reprisals from either Government officials or private parties[]'" to properly invoke the privilege. *Fla. State. Conf. of Branches & Youth Units of the NAACP v. Lee*, 568 F. Supp. 3d 1301, 1307 (S.D. Fla. 2021) (quoting *Buckley v. Valeo*, 424 U.S. 1, 74 (1976)).

The value of public engagement with government is twofold: Not only do members of the public benefit by expressing their opinions on important issues to their elected representatives, but the legislators themselves benefit by having the freedom to seek out relevant information that helps them do their jobs. Since before the U.S. Constitution was ratified, the legislative privilege "has been recognized as an important protection of the independence and integrity of the legislature." *United States v. Johnson*, 383 U.S. 169, 178 (1966). "Freedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation. It was deemed so essential for representatives of the people that it was written into the Articles of Confederation and later into the Constitution." *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). States have also deemed the legislative privilege sufficiently important to enshrine in law; Alabama replicated the federal Speech and Debate Clause in its state constitution. *See* Ala. Const. art. IV, § 56 ("[F]or any speech or debate in either house [legislators] shall not be questioned in any other place.").

Founder James Wilson succinctly described the rationale underlying the protection of the legislative privilege: "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary[] that he should enjoy the fullest liberty of speech." 2 *The Works of James Wilson* 38 (Andrews ed. 1896); see also *Tenney*,

3

341 U.S. at 373 (quoting same). If legislators cannot inquire into the opinions of their constituents on matters of public concern, then they are flying blind, legislating without any insight into what the public actually thinks about the issues. Federal and state law encourage public input into the legislative process because it improves the quality of policymaking at every level of government.

Inquiry into those private citizen-legislator communications, however, impairs the operation of government and discourages the free expression of ideas. Legal harassment in the form of subpoenas, particularly when issued by the federal government as in this case, can chill protected speech and disincentivize lawful engagement in the public discourse over important issues. The Supreme Court has long recognized the possibility of "unconstitutional intimidation of the free exercise of the right to advocate," even when "[t]he governmental action challenged may appear to be totally unrelated to protected liberties." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 (1958) (citing *United States v. Harriss*, 347 U.S. 612, 625–26 (1954)). The protection of privacy is particularly important in cases "where a group espouses dissident beliefs" that conflict with those of the people in power. *Id.* at 462. And the danger is not limited to subpoenas backed by the imprimatur of the state; in one case brought by private plaintiffs in which they sought "internal campaign communications" from an intervening party related to the intervenors' advocacy of a California ballot proposition, the Ninth Circuit held that permitting the requested "discovery would have the practical effect of discouraging the exercise of First Amendment associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1126, 1132 (9th Cir. 2010).

Here, there has been no allegation on the part of the government that the Eagle Forum engaged in any conduct that would violate the restrictions accompanying its tax-exempt status or any other provision of federal law; the Eagle Forum is not even an intervenor in the underlying lawsuit, *cf. id.*, much less a party. The *only* possible effect of forcing compliance with DOJ's

subpoena would be "to affect adversely the ability of [the Eagle Forum] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." *Patterson*, 357 U.S. at 462–63. Compelling the disclosure of Eagle Forum's private communications and analyses concerning a hot-button political issue is liable to result in "threats, harassment, or reprisals from either Government officials or private parties" that will impede the ability of the organization to continue carrying out its mission. *Buckley*, 424 U.S. at 74. Moreover, the Eagle Forum is not the first organization to be subjected to such pressures; the following section details the real-world impact that compelled discovery into First Amendment-protected activity has had on *Amicus* and its staff.

II. **The Seven Subpoenas Received by *Amicus* in the Last Year Have Imposed Substantial Costs on the Organization.**

*Amicus* NRRT has received seven (7) subpoenas in two separate cases in the last year related to its expression on issues of public concern (namely, congressional and state legislative redistricting). In the first case, *LULAC et al. v. Abbott et al.*, No. EP-21-CV-259, 2022 U.S. Dist. LEXIS 131217 (W.D. Tex. July 25, 2022), private plaintiffs challenging a Texas redistricting plan issued four subpoenas—two to NRRT as an organization, and two to executive director Adam Kincaid—seeking any redistricting proposals prepared by NRRT staff and the justifications therefore, legal memos, and communications with individuals working for the Governor, Attorney General or any state legislator. In the second case, *S.C. State Conf. of the NAACP et al. v. McMaster et al.*, No. 3:21-cv-3302, 2022 U.S. Dist. LEXIS 118688 (D.S.C. Jan. 19, 2022), private plaintiffs challenging a South Carolina redistricting plan issued three subpoenas seeking similar nonpublic information from both NRRT and Mr. Kincaid concerning the organization's funding, communications with state legislators and their staff members concerning redistricting matters, and internal analyses and draft maps prepared by NRRT staff.

After receiving these invasive requests, *Amicus* could not rest on its laurels; after all, the disclosure of *Amicus*'s internal analyses and communications could subject it to "threats, harassment, or reprisals from either Government officials or private parties," thereby rendering null the First Amendment privilege applicable to protect the documents sought. *Buckley*, 424 U.S. at 74. In the Texas case, *Amicus* engaged counsel to prepare and file a motion to quash and request for a protective order in the United States District Court for the District of Columbia. *See* NRRT's Motions to Quash and for Protective Orders, *Subpoenas to Adam Kincaid and the National Republican Redistricting Trust et al.*, No. 1:22-mc-67-JEB-RMM (D.D.C. Jan. 19, 2022), ECF No. 1. The recent spate of third-party subpoenas is not the first time that *Amicus*'s First Amendment rights have been threatened, either; in one 2019 case arising out of Ohio, a federal district court ordered the requesting party to limit the scope of a deposition of Mr. Kincaid to only questions that were "central or highly relevant to the Plaintiffs' claims" in order to protect *Amicus*'s First Amendment interests. *Ohio A. Philip Randolph Inst. v. Householder*, 2019 U.S. Dist. LEXIS 134829, at *25–26 (S.D. Ohio Jan. 30, 2019).

Furthermore, both *Amicus* and the Eagle Forum, as well as the dozens of other *amici* organizations that submitted briefs in this case, share a second relevant attribute beyond their engagement in the legislative process: They all advocate for values and policies antithetical to those advanced by the administration currently in power in Washington. As other courts have recognized, "[p]rivacy is particularly important where the group's cause is unpopular. . . . And privacy is important where the government itself is being criticized, for in this circumstance it has a *special incentive to suppress opposition*." *Black Panther Party v. Smith*, 661 F.2d 1243, 1265 (D.C. Cir. 1981) (emphasis added). Here, it appears that the Eagle Forum has been unfairly targeted by DOJ because it had the temerity to advocate for state legislation that the federal government

6

has now seen fit to intervene in this case to oppose. This is precisely the kind of targeted political harassment that the First Amendment privilege exists to prevent.

Make no mistake: The *only* reason that NRRT has been repeatedly subjected to the onerous process of civil discovery in multiple states is because it has dared to provide (or been suspected of providing) relevant information to state legislators concerning redistricting matters. NRRT has been dragged into litigation by private plaintiffs challenging redistricting plans simply because it decided to lend its expertise and analysis to the public discourse surrounding redistricting, no different than thousands of other citizens and groups. Defending itself against such fishing expeditions has not been cheap, but NRRT has diligently defended its constitutional rights in the face of multiple subpoenas that seek to impede its mission.

The Eagle Forum is now engaged in a similar defense of its own constitutional rights, but this Court should recognize the national implications of its decision concerning this subpoena. A decision to deny the Eagle Forum's Motion to Quash would open the floodgates to further targeted harassment of individuals and organizations that hold views out of step with the party in power in Washington, D.C. and advocate for them in the public square; a decision to grant the Motion, by contrast, would discourage DOJ from pursuing similar fishing expeditions in other states against other organizations. Although the facts of this case are limited to the enactment of a particular bill in Alabama, the Court's decision will impact the First Amendment rights of other organizations that seek to educate and inform legislators in their states—for better or for worse.

## CONCLUSION

For the foregoing reasons, this Court should grant the Eagle Forum's Motion to Quash.

September 28, 2022                                  Respectfully submitted,

                                                   /s/ Wendy Ann Padilla-Madden

7

Bar #: 5307W71M
GLOBAL BUSINESS ADVISORS, LLC
249 Lyon Lane
Birmingham, AL 35211
(205) 558-8633 (telephone)
(205) 732-7036 (facsimile)
wendy@gba.law

/s/ Jason Torchinsky
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
(540) 341-8808 (telephone)
(540) 341-8809 (facsimile)

*Counsel for Amicus Curiae National Republican Redistricting Trust*

**CERTIFICATE OF SERVICE**

I certify that on September 28, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ Wendy Ann Padilla-Madden</u>
Wendy Ann Padilla-Madden