**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

BRIANNA BOE, et al.,

    Plaintiffs,

      v.

STEVE MARSHALL, et al.,

    Defendants.

No. 2:22-cv-00184-LCB-CWB

**JOINT MOTION OF NONPARTIES AMERICAN ACADEMY OF
PEDIATRICS, WORLD PROFESSIONAL ASSOCIATION FOR
TRANSGENDER HEALTH, AND ENDOCRINE SOCIETY TO QUASH
RULE 45 SUBPOENAS**

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure,

nonparties American Academy of Pediatrics ("AAP"), World Professional

Association for Transgender Health ("WPATH"), and Endocrine Society

(collectively, "*amici*") jointly move to quash the subpoenas for the production of

documents served by the State of Alabama ("State").

AAP, WPATH, and Endocrine Society are nonparty *amici curiae* who are

among the 23 national and state professional medical and mental health

organizations that submitted an *amici* brief in support of Plaintiffs' motion for

temporary restraining order and preliminary injunction.  (Doc. 91-1).  The *amici*

brief described the widely accepted view of the medical community that gender-

affirming care is the appropriate treatment for gender dysphoria, as reflected in publicly-available clinical guidelines published by WPATH and Endocrine Society.  Now, through these subpoenas, the State seeks from these non-profit organizations documents implicating, among other things, *amici*'s work product, internal communications, and associational activities, all in service of the State's self-described interest in "probing" the "credibility" of *amici*.

The State's pursuit of these materials reflects an inexplicable about-face from what it advocated to this Court just weeks ago.  When nonparties Eagle Forum and the Southeast Law Institute moved to quash substantively similar subpoenas issued by the U.S. Department of Justice seeking internal documents and communications regarding their advocacy in favor of the challenged Act, the State characterized those subpoenas as "unprecedented," seeking "irrelevant information," and serving "no legitimate purpose other than to intimidate ordinary citizens whose policy views the [government] disdains."  (Doc. 158-1 at 1, 10). The State demanded that those subpoenas should be quashed to avoid setting a precedent whereby advocacy groups would otherwise be forced to "turn over *to a public policy opponent* [their] internal communications."  (*Id.* at 1, 7; Tr. at 37) (emphasis in original).

At the hearing on Eagle Forum's motion to quash, this Court agreed with the State, questioning "how in the world could what the [DOJ] is asking for possibly

be relevant to this case and its outcome?" and characterizing the requests as "vastly overbroad and unduly burdensome." (Tr. at 9). The Court further highlighted First Amendment concerns: "[I]s the new standard going to be that these kind of subpoenas … to any advocacy organization [seeking] emails to their members, … social media posts, … things that the group considered in their advocacy. … Is that where [the government] thinks we need to go in this country?" (*Id.* at 18). But that is apparently where the *State* now thinks we need to go—at least as to nonparty advocacy organizations whose policy views *it* disdains. The Court should reject the State's about-face.

For the same reasons previously articulated by the State and this Court, the State's subpoenas to *amici* should be quashed in their entirety. The subpoenas seek documents and communications that are irrelevant to the sole issue in dispute in this case, and complying with them would impose undue burdens on these nonparty, non-profit organizations. The subpoenas also infringe upon *amici*'s associational and free speech rights under the First Amendment by discouraging membership and candid, uninhibited dialogue within the organizations, which is integral to the scientific process and the organizations' missions. Indeed, while the State asserted during meet-and-confer discussions that *amici* "opened the door" to this invasive discovery by submitting an *amici* brief, such a principle if accepted would have far-reaching and chilling implications for friends of the court

everywhere.  Finally, given the charged nature of this litigation and the publicity it has attracted, permitting this discovery could subject *amici* and their employees and members—many of whom are identified with specificity in the materials sought by the State—to harassment, threats, and even the risk of physical violence.

## I.     BACKGROUND

### A.     The Amici

On April 8, 2022, Alabama Governor Kay Ivey signed the "Alabama Vulnerable Child Compassion and Protection Act" (the "Act") into law, which prohibits any person from obtaining or providing certain medical treatments consistent with the standard of care for transgender minors.  Plaintiffs in the above-captioned action thereafter filed a complaint for declaratory and injunctive relief, (Doc. 1), followed by a motion for a temporary restraining order and/or preliminary injunction, (Doc. 7).

AAP, WPATH, and Endocrine Society are among the 23 national and state professional medical and mental health organizations that submitted an *amici* brief in support of Plaintiffs' motion for a temporary restraining order and preliminary injunction.  (Doc. 91-1).  AAP, founded in 1930, is a 501(c)(3) non-profit organization of 67,000 pediatricians whose mission is to attain the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults.  *See* Declaration of AAP (Dec. 23, 2022) ("AAP

Decl."), filed under seal, ¶ 4.  WPATH, founded in 1979, is a 501(c)(3) non-profit

interdisciplinary professional and educational organization whose mission is to

promote evidence-based care, education, research, public policy, and respect in

transgender health.  *See* Declaration of WPATH (Dec. 23, 2022) ("WPATH

Decl."), filed under seal, ¶ 4.  Endocrine Society, founded in 1916, is a 501(c)(3)

non-profit organization of physicians and scientists whose mission includes

uniting, leading, and growing the endocrine community to accelerate scientific

breakthroughs and improve health worldwide.  *See* Declaration of Endocrine

Society (Dec. 23, 2022) ("Endocrine Society Decl."), filed under seal, ¶ 3.

The *amici* brief explained that gender-affirming care, as described in

publicly-available guidelines issued by WPATH and Endocrine Society, is the

widely-accepted standard of care for gender dysphoria.  (Doc. 91-1 at 6–19).

While AAP was a signatory to the *amici* brief, AAP does not author or publish any

clinical guidelines related to gender-affirming care.  *See* AAP Decl. ¶ 8.

### B.    The Subpoenas

On August 10, 2022, a few months after the Court granted an injunction

pending trial, the State issued a subpoena to AAP containing 25 separate document

requests.  *See* Declaration of Cortlin H. Lannin (Dec. 26, 2022) ("Lannin Decl.")

¶ 2.  On October 13, 2022, the State issued an even more expansive subpoena to

WPATH with 47 document requests, and on December 1, 2022, the State issued a subpoena with 29 document requests to Endocrine Society.  *See id.* at ¶¶ 4, 6.

The subpoenas seek documents bearing on *amici*'s work product, internal communications, and associational activities, as reflected in the chart attached hereto as Exhibit A.  *See also* Lannin Decl., Exs. 1, 3, 5 (subpoenas).

## C.    The Eagle Forum and Southeast Law Institute Subpoenas

At the same time the State was issuing these nonparty subpoenas to *amici*, it was opposing the enforcement of substantively similar subpoenas issued to two nonparty proponents of the Act.

On August 10, 2022, the United States issued subpoenas to two nonparties, Eagle Forum of Alabama and the Southeast Law Institute.  These two entities advocated for the passage of the Act by, *inter alia*, providing legal research, assisting Alabama with bill drafting, and arranging for witnesses to testify at committee hearings.  (Doc. 151-1 at 3; Doc. 152-1 at 2).  The United States' subpoenas to these organizations sought, for example, (1) "documents concerning the nonparties' policy goals;" (2)  "communications with nongovernmental organizations;" (3) "records and minutes of meetings;" (4) "documents related to presentations, videos, interviews and speeches given by the nonparties' representatives;" and (5) "materials the nonparties considered when preparing"

various publications or work product.[1]  *Id.*  Those nonparties moved to quash the subpoenas, (Docs. 151, 152, 184), and the State of Alabama filed a brief in support of the motions to quash.  (Doc. 158-1).

The State argued that the documents sought from Eagle Forum of Alabama and Southeast Law Institute—the same types of documents it now seeks from AAP, WPATH, and Endocrine Society—are irrelevant and outside the scope of discovery, and that the "unprecedented" subpoenas "demanding both internal and legislative policy communications must be quashed."  (Doc. 158-1 at 1, 10).  The State further argued that "the federal government's subpoenas [were] themselves a pretext:  they [had] no legitimate purpose other than to intimidate ordinary citizens whose policy views the current Administration's Department of Justice disdains.  Enforcing the subpoenas would set a dangerous precedent against citizens of all political stripes."  (*Id.* at 1).

The State further asserted that "it is hard to understand the subpoenas' demands for private groups' meeting minutes, newsletters, and the like except as an attempt to punish those groups for advocating public policies that the federal government dislikes."  (*Id.* at 4).  It was "[e]ven more disturbing," according to the State, that those "subpoenas would [have] force[d] the groups to turn over *to a*

---

[1] *See also* Exhibit A (comparing document requests issued to *amici* with those issued to Eagle Forum of Alabama and Southeast Law Institute).

*public policy opponent* its internal communications, setting a precedent that may be replicated in litigation anywhere." (*Id.* at 7 (citation and internal quotation marks omitted) (emphasis in original)).

On October 14, 2022, this Court held a hearing on the motions to quash, during which the Solicitor General of Alabama further elaborated on the State's view as to why discovery into why and how the organizations supported the Act was irrelevant:

> Like in any challenge to a statute, if you're trying to determine its purpose, the best place and oftentimes the only place you even need to look is the text of the statute. That's the only thing everyone has voted on, agreed upon, and ultimately enacted. … So that's why we don't think that what they're requesting is relevant.

(Tr. at 37). This Court agreed, questioning "how in the world could what the [government] is asking for possibly be relevant to this case and its outcome?" and characterizing the requests as "vastly overbroad and unduly burdensome." (Tr. at 9). This Court further highlighted the First Amendment concerns implicated by the government's subpoenas: "[I]s the new standard going to be that these kind of subpoenas … to any advocacy organization [seeking] emails to their members, … social media posts, … things that the group considered in their advocacy. … Is that where [the government] thinks we need to go in this country?" (*Id.* at 18).

On October 14, 2022, this Court issued an order granting the nonparties' motions and quashing the subpoenas. The Court held that the requested materials

8

had "little—if any—relevance" and were "unlikely to reveal or lead to any

information that would help resolve the fundamental issue in this case, which is

whether Section 4(a)(1)-(3) of the Alabama Vulnerable Child Compassion and

Protection Act is constitutional under the Fourteenth Amendment."  (Doc. 192 at

5-6).  Furthermore, as the nonparties were represented by pro bono counsel and

staffed by volunteers who would have had to review thousands of documents to

comply with the subpoena, the Court held that the burden of producing such

information "greatly outweigh[ed] any slight relevance it may have." (*Id.*).  The

only documents in the nonparties' possession that were potentially relevant and not

unduly burdensome to produce, as the Court noted at the hearing, were "medical

studies and literature" considered by the nonparties when they prepared the

legislation, "such as they exist."  (Tr. at 40).

### D.    Meet-and-Confer Efforts

Counsel for *amici* served the State with timely written objections, *see*

Lannin Decl., Exs. A-2, A-4, A-6, and thereafter conferred with the State's counsel

in an attempt to narrow the requests, lessen the burden on *amici*, and address their

First Amendment concerns.  *Id.* at ¶¶ 8-15.  During those discussions, counsel for

*amici* repeatedly expressed their view that the disposition of the Eagle Forum

dispute should control here, despite the State's implausible attempts to distinguish

the two sets of subpoenas.  *Id.* at ¶¶ 13-15.  The State ultimately agreed to

withdraw certain RFPs directed at AAP and WPATH.[2]  *Id.* at ¶ 11, Ex. 7.

However, notwithstanding its argument and this Court's ruling on the Eagle Forum

dispute, the State refused to withdraw the majority of its requests, including those

seeking voluminous internal communications from all three organizations.  In an

effort to avoid motion practice, *amici* ultimately offered to produce the same set of

documents that this Court observed may be of marginal relevance: medical studies

referenced in *amici's* guidelines.  *Id.* at ¶ 13.  The State rejected that compromise,

resulting in the instant motion.  *Id.* at ¶¶ 14-15.

## II.   ARGUMENT

This Court should quash the subpoenas directed at AAP, WPATH, and

Endocrine Society because they seek discovery irrelevant to the sole issue in

dispute, impose undue burdens on these nonparties, and infringe upon *amici*'s

associational rights under the First Amendment.

---

[2] With respect to the subpoena to AAP, the State offered to withdraw the requests
numbered 9, 12, 16, 17, 19, 20, 21, 24, and 25 and limit request 23 to materials
dated after Jan. 1, 2020.  Lannin Decl. ¶ 11, Ex. 7.  As for the subpoena to
WPATH, the State offered to withdraw the requests numbered 13, 17, 22, 25, 26,
27, 29, 30, 36, 37, 38, 39, 42, 45, and 46 and limit request 41 to materials dated
after February 1, 2019.  *Id.*  The State has not withdrawn any of the requests
directed at Endocrine Society.  *Id.*

### A.     The Subpoenas Seek Discovery Irrelevant to the Sole Issue in Dispute in This Litigation.

Subpoenas issued pursuant to Federal Rule of Civil Procedure 45 must satisfy the relevance requirements of Rule 26.  *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1329 (11th Cir. 2020) ("[A] subpoena issued under Rule 45 should be quashed to the extent it seeks irrelevant information".).  "[T]he relevance of information sought in discovery depends on the claims asserted in the underlying action and the legal standards that govern those claims."  *Id.*  "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action."  *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1068 (11th Cir. 2014).  In this case, this Court has already established that "relevant discovery" within the meaning of Rule 26 "would be things that bear on whether or not this statute is constitutional."  (Doc. 192 at 5).  The discovery sought by the State fails that standard.

Through this subpoena, the State has demanded that *amici* produce any and all documents broadly related to *amici*'s work product, organizational activities, policy positions, meetings, outreach, communications, and internal organizational structure and membership.  *See* Exhibit A.  None of this discovery would bear on whether the Act is constitutional or not.  Indeed, the State has conceded that "neither speech between … private parties about public policies nor their

11

correspondence with government officials is relevant to any legal issue before this Court." (Doc. 158-1 at 17).

WPATH and Endocrine Society do publish clinical guidelines related to gender-affirming care, which were described in the *amici* brief to which they were signatories.[3] Those guidelines are publicly-available, cite every study and piece of evidence on which they rely, and reflect the consensus view of the organizations that publish them. They speak for themselves—or, as the State put it in describing the Act, they are "the only thing everyone has voted on, agreed upon, and ultimately enacted." (Tr. at 37). Instead of litigating the merits of the guidelines on their own terms, however, the State through this discovery is attempting to litigate the internal processes and supposed motives of their sponsoring organizations. This discovery is irrelevant, as the State *has already conceded* when it described for this Court its position on how this case should proceed:

> We're looking at publicly available information. That's how these inquiries usually proceed, just like they proceeded at the preliminary injunction, where we came forward with expert testimony. They cited certain studies. We produced certain studies as exhibits. Plaintiffs and the Department of Justice did the same thing.
>
> That's how we think that this case will ultimately be adjudicated when we get to final judgment. You will hear from experts. Studies will be put forward. Our experts will explain why we think some studies are stronger than

---

[3] As noted above, AAP does not generate or publish clinical guidelines regarding gender-affirming care. *See* AAP Decl. ¶ 8.

others. Their experts will presumably have some contrary opinion on some of those issues. … That's how these things go.

It's not sitting some member of the House or some member of the Senate down to say, tell me every conversation you have had with somebody for the last five years about issues of gender dysphoria. That's foreign to our concept of government and how courts work.

(Tr. at 38). In other words, the State has assured the Court that this case would proceed with each side putting forward their best expert analysis, based on publicly available information, and that discovery into nonparty internal deliberations and discussions would be irrelevant and "foreign … to how our courts work." This Court should hold the State to its word.

In meet-and-confer discussions, the State has stated that it views *amici*'s internal communications and deliberations as relevant because they will permit the State to probe *amici*'s "credibility." Lannin Decl. ¶ 9. The State further claimed that *amici* had opened the door to this discovery by submitting their brief. *Id.* As courts have recognized, however, "[t]he mere filing of an *amicus* brief … does not open oneself to broad discovery demands, nor does it make one's bias, if any, relevant to the underlying action." *N.C. Right to Life v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005). Instead, "[c]redibility of *amici* is a determination to be made by the trial judge, not a question that the parties should pursue in discovery." *Id.* "[W]ere the bias or credibility of *amici* presumptively relevant in every case,

litigation and discovery of the issue would threaten the efficacy of the federal courts." *Id.* Furthermore, and as discussed further below, endorsing the proposition that *amici* "opened the door" to invasive discovery, under the guise of testing their "credibility," simply because they submitted a brief would necessarily discourage these and other *amici* from ever doing so again, depriving the courts of their valuable input. *See, e.g.*, *Mobile Cnty. Water, Sewer and Fire Prot. Auth., Inc. v. Mobile Area Water & Sewer Sys., Inc.*, 567 F. Supp. 2d 1342, 1344 n.1 (S.D. Ala. 2008) ("The role of an amicus is to assist the court in cases of general public interest by making suggestions to the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision." (citations and quotation marks omitted)).

Because the State cannot articulate any plausible theory of relevance that would justify the expansive discovery sought, the subpoenas should be quashed.

### B. Complying With the Subpoenas Would Impose Undue Burdens on *Amici.*

Under Rule 45, the Court must also quash a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). An undue burden exists when complying with the subpoena would result in time, expense, or collection efforts that "greatly outweigh" any relevance the requested documents may have. (Doc. 192 at 5-6). Additionally, courts in this Circuit consider the recipient's nonparty

14

status as a "factor that can weigh against disclosure in the undue burden inquiry." *Jordan*, 947 F.3d at 1337; *Hinton v. Ala. State Univ.*, 2020 WL 11273045 at *2, *4 (M.D. Ala. Mar. 13, 2020); *see also Updateme Inc. v. Axel Springer SE*, 2018 WL 5734670 at *3 (N.D. Cal. Oct. 31, 2018) (observing that "[n]on-parties that are unrelated to the litigants should not be burdened in discovery to the same extent as litigants") (collecting cases). Courts therefore quash subpoenas when compliance would require nonparties like *amici* to parse through voluminous records to identify responsive documents. *See, e.g.*, *Braxton v. Farmer's Ins. Grp.*, 209 F.R.D. 651, 653 (N.D. Ala. 2002) (quashing a subpoena that would impose on the nonparty recipient "the arduous task of combing through [the nonparties'] email files and other records" for the documents). In accord, this Court quashed the nonparty subpoenas issued to Eagle Forum and Southeast Law Institute, in part, because compliance would have required volunteer staff and pro bono counsel to sort through "thousands of documents" spanning multiple years. (Doc. 192 at 5-6).

That reasoning applies with even more force here. Complying with these expansive subpoenas would require substantial efforts by each organization and their pro bono counsel. Indeed, the subpoenas' broad scope would require *amici* to collect and review countless documents scattered across numerous directories and individuals. The declarations of AAP, WPATH, and Endocrine Society detail the extent to which these *amici* would be unduly burdened by the subpoenas. *Amici* do

15

not have in-house e-discovery teams and could be forced to hire contract attorneys to review these documents, itself an undue burden for a non-profit with limited resources. *See* AAP Decl. ¶ 10; WPATH Decl. ¶ 9; Endocrine Society Decl. ¶ 9. *Amici* would need to dedicate staff members to this review, as their internal documents are highly contextual and contain esoteric medical terminology that staff will need to explain to hired counsel. *See* AAP Decl. ¶ 11; WPATH Decl. ¶ 9; Endocrine Society Decl. ¶ 9. *Amici* would also need to identify and speak with a significant number of potential custodians across their organizations and membership, many of whom utilize the external e-mail accounts of their employers, including hospitals, medical groups, and educational institutions. *See* AAP Decl. ¶ 9; WPATH Decl. ¶¶ 7-8; Endocrine Society Decl. ¶¶ 8, 11. Endocrine Society, a 501(c)(3) organization with a limited legal budget, has already begun identifying which programs, products, and services would need to be suspended to devote staff time to complying with the subpoena. *See* Endocrine Society Decl. ¶¶ 8-11.

Furthermore, as unduly burdensome as the Eagle Forum subpoena was— which is currently subject to a sanctions motion—that subpoena only contained eleven document requests. The subpoenas issued to the *amici* are far broader and demand between 16 and 32 categories of documents, even after the State withdrew some of its original requests. And as with the Eagle Forum subpoena, the

materials requested from *amici* would require nonparty, non-profit organizations to rely extensively on pro bono counsel.  In short, this Court's ruling on the Eagle Forum subpoena substantiates the objectionable and burdensome nature of the instant subpoenas.

### C.    The Subpoenas Infringe on *Amici*'s Free Speech and Associational Rights Under the First Amendment.

The subpoenas should also be quashed because they infringe on *amici*'s free speech and associational rights guaranteed by the First Amendment.  Complying with the subpoenas would discourage members from joining or participating in the organizations, and chill the robust and uninhibited internal exchange of ideas that these organizations rely on to do their work.  As discussed below, courts routinely quash subpoenas that would infringe upon these types of protected interests.

Under the First Amendment's associational privilege, organizations are protected from compelled disclosure that would "induce members to withdraw . . . and dissuade others from joining because of fear of exposure."  *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 463 (1958).  To invoke the associational privilege, an organization must first make a prima facie showing of "arguable first amendment infringement"—*i.e.*, that compelled disclosure would result in a "chilling" of associational rights.  *Adolph Coors Co. v. Mvmt. Against Racism & the Klan*, 777 F.2d 1538, 1542 (11th Cir. 1985); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2009).  The burden of making a prima facie case is low.  *See Perry*, 591

F.3d at 1140; *Flynn v. Square One Distrib., Inc.*, 2016 WL 2997673, at *3 (M.D. Fla. May 25, 2016).  Courts credit declarations that contain "historical facts, personal observations, personal experience, or first-hand knowledge" and that explain how compelled disclosure would chill the exercise of members' rights. *Flynn*, 2016 WL 2997673, at *3; *see Christ Covenant Church v. Town of S.W. Ranches*, 2008 WL 2686860 (S.D. Fla. June 29, 2008), at *6–*7 (finding a prima facie case by crediting specific evidence of hostile comments against a Church at a town meeting).  Once the burden is met, the requesting party must demonstrate a "compelling need" for the information sought.  *Perry*, 591 F.3d at 1140; *Flynn*, 2016 WL 2997673, at *3.

Here, *amici* have explained in detail how disclosure of the information sought by the State would chill their associational rights.  As set forth in the declarations of AAP, WPATH, and Endocrine Society, the mere issuance of the subpoenas (let alone enforcement of them) has already had a chilling effect on member participation due to fears of being embroiled in litigation and costly discovery.  *See* AAP Decl. ¶¶ 13-19; WPATH Decl. ¶¶ 11-16; Endocrine Society Decl. ¶¶ 12-15.  Additionally, the declarations detail how the subpoenas have already discouraged dialogue in a field that requires robust scientific debate and candid exchanges.  *See id*.  Indeed, as the Fifth Circuit recognized, the chilling effect of a subpoena that seeks internal communications of a nonparty is "self-

evident" because it would discourage "frank internal dialogue and deliberations."

*Whole Woman's Health v. Texas Catholic Conference*, 896 F.3d 362, 372-373 (5th

Cir. 2018) (quashing subpoena that sought a nonparty religious organization's

internal communications about a Texas abortion regulation, and explaining that

"communications within such a group must be permitted to be broad, uninhibited,

and fearless"). *Amici* are entitled to the same type of vigorous, "uninhibited, and

fearless" debate under the First Amendment. *See id.*

Moreover, the declarations detail the alarming threats of violence and

intimidation already received by *amici* due to their work on issues related to

gender-affirming care. *See, e.g.*, AAP Decl. ¶ 16; WPATH Decl. ¶¶ 12-15;

Endocrine Society Decl. ¶ 14. This includes, for example, the receipt of emails

characterizing individuals who provide gender-affirming care as "child molesters"

and warning that "[y]our attempt to hide the child molesters will get you killed. If

I see you or anyone who supports you. I will kill them." WPATH Decl. ¶ 14.

Complying with these subpoenas—which would require, among other things, the

production of personally identifying information about the organizations, their

employees, and their members—risks amplifying these threats. It is no answer that

such information could be produced subject to a protective order, given the

possibility such information could nonetheless become public. Indeed, detailed

information about similar subpoenas issued to these and other organizations in

connection with a Florida case was recently leaked by unknown entities to an online website that has previously characterized gender-affirming care as the "mutilation of children."[4]

In light of the heightened First Amendment interests at stake, the State cannot possibly carry its burden of establishing a "compelling need" for any of this irrelevant and protected information.

## III.   CONCLUSION

For the reasons set forth above, AAP, WPATH, and Endocrine Society respectfully request that the Court quash the State's subpoenas in their entirety.

---

[4] *See* Dylan Housman, *EXCLUSIVE: Florida Subpoenas Organizations Pushing Transgender Care on Children in Lawsuit* (Dec. 14, 2022), https://dailycaller.com/2022/12/14/florida-transgender-care-lawsuit-medicaid-subpoena/.

Dated: December 27, 2022

Respectfully submitted,

*/s Barry A. Ragsdale*

Barry A. Ragsdale
ASB 2958-A23B

Cortlin H. Lannin (CA Bar No. 266488)
(admitted *pro hac vice*)
Dylan M. Silva (CA Bar No. 306363)
(*pro hac vice* motion to be submitted)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com
dsilva@cov.com

Barry A. Ragsdale (ASB 2958-A23B)
Robert S. Vance III (ASB 9916-B11Q)
DOMINICK FELD HYDE, P.C.
1130 22nd Street South Ridge Park
Suite 4000
Birmingham, AL 35205
Phone:  (205) 536-8888
BRagsdale@dfhlaw.com
RVance@dfhlaw.com

D. Jean Veta (D.C. Bar No. 358980)
(admitted *pro hac vice*)
Noah S. Goldberg (D.C. Bar No.
90003045) (*pro hac vice* motion to
be submitted)
Yuval Mor (Admitted to the D.C.
Bar) (*pro hac vice* motion to be
submitted)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com
ngoldberg@cov.com
ymor@cov.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s Barry A. Ragsdale*
Of Counsel