# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> STEVE MARSHALL, et al., <br><br> Defendants. | No. 2:22-cv-00184-LCB-CWB |

## DECLARATION OF ENDOCRINE SOCIETY IN SUPPORT OF JOINT MOTION OF NONPARTIES AMERICAN ACADEMY OF PEDIATRICS, WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, AND ENDOCRINE SOCIETY TO QUASH RULE 45 SUBPOENAS

I, ███████████, declare as follows:

1. I am the ████████████████████████ at the Endocrine Society. If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2. I have served as the ████ since ████████. In my role, I oversee the Endocrine Society's Government and Public Affairs Department, which manages the Society's public policy agenda and advocacy efforts. I develop strategies to create and improve policies that affect access to and quality of care, and I engage in advocacy related to endocrine-disrupting chemicals. I also serve as

1

liaison to the Endocrine Society's Clinical Affairs, Research Affairs, and Advocacy & Public Outreach Core Committees. These committees play an integral role in implementing the Society's mission, sharing the latest clinical and research information, and making policy recommendations. Over the past nine years, I have had the opportunity to work closely with our staff, our members, our partner organizations, and others in the medical society, scientific organization, and policy communities. As a result, I have developed a broad and deep knowledge of Endocrine Society's operations and of the clinicians, scientists, and groups with which we collaborate.

Background

3. The Endocrine Society, founded in 1916, is a 501(c)(3) charitable, non-profit organization of physicians and scientists dedicated to accelerating scientific breakthroughs and improving patient health and wellbeing. The Endocrine Society is one of the largest and most active organizations devoted to the study of hormones and clinical practice in endocrinology. Its mission is to advance excellence in endocrinology and promote endocrinology's role in scientific discovery, medical practice, and human health. To accomplish this, the Endocrine Society publishes multiple peer-reviewed journals and publications, hosts forums for the exchange of clinical and scientific

knowledge in the field, and supports over 18,000 clinicians and scientists through every stage of their careers.

4. The Endocrine Society has a top-ranked peer-reviewed journal publishing program that addresses dozens of endocrine issues. The Endocrine Society also publishes policy statements, scientific statements, and clinical practice guidelines. In addition, the Endocrine Society hosts meetings and conferences to provide opportunities to share the latest information and updates in endocrinology and to facilitate professional development and networking for members and all professionals involved in the specialized field of hormone research and clinical endocrinology.

5. The Endocrine Society also offers educational and training opportunities that cover all areas of endocrinology, diabetes, and metabolism. The Endocrine Society's Center for Learning provides a wealth of activities that offer our members opportunities to obtain and maintain specialty certification. The Endocrine Society's Special Interest Groups and online platforms allow our members to share information with their peers, learn best practices, and find research collaborations. The Endocrine Society also works with its members to develop policy positions and educate policy makers about them.

6. As a 501(c)(3) organization, the majority of the Society's policy work involves education; however, as part of its civic responsibility and to represent

the interests of its members and the patients they care for, the Society also engages in advocacy to support or oppose specific legislation as necessary and well within the limits of 501(c)(3) requirements. The Society is viewed as a trusted and credible policy advisor by policy makers around the globe and has also had the opportunity as an *amicus* to provide information to courts considering scientific or clinical information related to endocrinology and endocrine-related science.

7. While the Endocrine Society directs its members to potential endocrine-related research opportunities, the Endocrine Society does not itself conduct clinical research. In other words, the Endocrine Society's work related to clinical practice guidelines involves working with our members who are experts in the field to analyze the publicly available evidence. The Endocrine Society determines the topics for guidelines, selects an expert writing committee, and provides the infrastructure for the development and publication by using a robust and rigorous process that adheres to the highest standards of trustworthiness and transparency as defined by the Institute of Medicine. The Endocrine Society also follows the Grading of Recommendations, Assessment, Development and Evaluation (GRADE) methodology to develop its recommendations. GRADE is a transparent framework for summarizing evidence and provides a systematic approach for

making clinical practice recommendations. Additionally, Endocrine Society guidelines are not developed in a vacuum. Guidelines take an average of 2-3 years to develop through a multi-step drafting, comment, review, and approval process. This includes a public comment period and expert review period, and all comments are addressed by the guideline development panel prior to publication. There is ample opportunity for feedback and debate through this years-long development process. Consequently, the Endocrine Society's guidelines represent a high-quality resource to be used for patient care based on medical evidence, author expertise, rigorous scientific review, and a transparent process.

The Subpoena

8. I have reviewed the non-party subpoena issued to Endocrine Society by the State of Alabama. There are dozens of requests that cover a sweeping set of categories, implicating many different elements of Endocrine Society's work. Based on my experience, responding to the requests as drafted would require us to undertake a substantial and burdensome process of identifying and speaking with a great number of individuals across our organization who may have been involved with our work in these areas, including at least the Clinical Practice Guideline team, the Publications Department, the Communications and Media Relations teams, the Executive Office, the Membership

Department, and the IT team as well as the Government & Public Affairs team.  In addition to Endocrine Society staff, responding to the requests as drafted would also require us to interrupt the work of several Endocrine Society members, including the expert writing panel of the guidelines, the authors of our position statement and policy documents, the Board of Directors, and other member experts in transgender medicine who have participated in the Endocrine Society's work.  Then, we would need to collect potentially responsive documents from those individuals.  Given the number and breadth of the requests, Endocrine Society may need to collect Electronically Stored Information ("ESI") from some or all of those individuals, and we would likely need to retain a third-party vendor to collect and process those documents.

9. Any collected documents would also need to be reviewed by attorneys for responsiveness and privilege.  Our pro bono counsel would be involved in that work, but I understand that depending on the volume of documents, Endocrine Society could need to retain additional contract attorneys to review the materials.  Moreover, my team would need to closely review the responsiveness and privilege determinations, because many of our documents may be highly technical (including use of acronyms and medical information) or require familiarity or expertise to properly categorize.  Further, many of

our documents may involve third parties with their own privacy interests, or sensitive patient or health data. Screening for this information would require a substantial commitment of time and resources from Endocrine Society.

10. I understand that discovery costs of this type can often run into the hundreds of thousands of dollars, which has significant budget implications for a 501(c)(3) organization like our medical society. Approximately eight years ago, the Endocrine Society was involved in discovery related to a different matter. At that time, our costs were close to $100,000 plus significant staff time. Consequently, based on the breadth of the subpoena in this case, we estimate that our costs would be well over that amount plus weeks of IT and other relevant staff time. For a medical society like ours, this cost and staff burden is not easily absorbed and would have significant effect on our budget. Our Finance Department is already considering the budget impact of compliance to the subpoena and identifying what programs, products, and services will be affected, moved, delayed, or stopped. Our IT Department also must consider what the budgetary impact of compliance will be on technology infrastructure plans as well as its staff capacity and what additional help would be needed.

11. The work I have described that would be required to respond to the subpoena as drafted would divert our staff from the vital, urgent work Endocrine Society

      does to advance endocrine practice for patients and endocrine research. It would compromise our ability to deliver on other critical programs and services of the Society, including the preparation for our annual meeting; development of educational products and programs such as other guidelines; and hinder our ability to do core functions of the Society. In addition, the subpoena requests would create new burdens on not only Society member leaders but also rank-and-file members who volunteered to lend their expertise. Our members, like other physicians and researchers across the country, are overwhelmed with patient and administrative activities particularly during the ongoing public health emergency. Responding to these broad requests would reduce their time for caring for patients and for research.

12. I am also seriously concerned about the effect this subpoena will have on our ability to freely communicate as an organization. As drafted, the subpoena requests production of internal communications with our members and partners, internal chats, notes, drafts, social media posts, and private emails. Our staff and members use these tools to communicate with each other and engage in robust, frank, and healthy discussion of the Society's work product.

13. Based on my experience working with Endocrine Society members, I believe that our staff and members will communicate less, and less freely, if the State's subpoena were enforced. Already, our staff are more cautious about

      sending written communications. In addition to disrupting communications between staff, the subpoena has already created an environment in which departments and teams affected are pausing some new activities or reducing current activities out of concern that if required to comply with the subpoena they will be unable to perform other duties and responsibilities of their jobs. For example, the guidelines team already feels forced to delay an update of the gender dysphoria guideline; the media relations team is hesitant to respond to reporter inquiries; and the Government and Public Affairs Department has paused certain activities related to work on other issues, such as engagement in coalitions, and expansion of policy priorities to provide capacity to respond.

14. I am also concerned that if this subpoena is enforced our staff and members will avoid communicating with each other to complete work on Endocrine Society projects and programs; that our members will step back from volunteering to work on future clinical practice guidelines, educational sessions and materials, and participating in Endocrine Society committees and work groups; and that new members will fear joining. While Endocrine Society members are committed to ensuring access to care for individuals suffering from gender dysphoria, we are hearing that our members do not feel comfortable using our platforms to discuss the issue. Currently, our members who see people with gender dysphoria or who are transgender are working in

       hostile environments in which their clinics are subject to threats and in some cases actual violence. Consequently, some members have requested that we remove their contact information from our online directory. While this keeps their name out of public attention, it also has the effect of making it harder for patients to find a physician with this expertise. If these members learn that their communications with their professional society are now discoverable, I am concerned that it will cause some to walk away from the Society just when they need it the most and when their contributions will be helpful to others.

15. This subpoena has also created a notable strain on our activities to help educate policy makers and the courts about transgender medicine so that they have medical evidence and scientific information to inform their decisions. As a result of this subpoena, whenever Endocrine Society prepares to submit a new amicus filing, send a letter to the government, meet with a legislator or government official, or issue a new policy statement, our board now must consider whether this will result in future document subpoenas. This is truly crushing to the Endocrine Society's ability to participate in the policy, legislative, and regulatory process and share our views as well as clinical and scientific information with policy makers. In my view, the effect of the subpoena on the Endocrine Society's advocacy activities is a blow to our First Amendment protections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C., on December 23, 2022.



Endocrine Society

11