# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| Brianna Boe, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| *Intervenor Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-184-LCB |
| | ) | |
| Hon. Steve Marshall, in his official | ) | |
| capacity as Attorney General, | ) | |
| of the State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' MOTION TO COMPEL PRODUCTION OF PLAINTIFFS' MEDICAL RECORDS

# TABLE OF CONTENTS

Table of Authorities ................................................................................... ii

Introduction ...............................................................................................1

Background ................................................................................................2

      A.   Plaintiffs' Claims and Reliance on Medical Records ........................2

      B.   Defendants' Requests for Production and Plaintiffs'
           Responses .................................................................................10

Legal Standard .........................................................................................15

Argument..................................................................................................16

    I.   The Requested Medical Records Are Highly Relevant............................16

    II.  Plaintiffs Lack A Valid Reason To Withhold The Medical Records........21

Certificate of Service ...............................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott,*
  717 F.3d 851 (11th Cir. 2013)................................................................20

*Barlow v. Dupree Logistics, LLC,*
  2015 WL 4646812 (N.D. Ala. Aug. 5, 2015).......................................24

*Coker v. Duke & Co., Inc.,*
  177 F.R.D. 682 (M.D. Ala. 1998) .......................................................16

*Eknes-Tucker v. Marshall,*
  No. 2:22-CV-184-LCB, 2022 WL 1521889 (M.D. Ala. May 13, 2022)..............9

*Hansen v. Uber Techs., Inc.,*
  2018 WL 7361084 (M.D. Fla. Aug. 13, 2018)......................................24

*In re Alexander Grant & Co. Litig.,*
  820 F.2d 352 (11th Cir. 1987)..............................................................23

*J.P. as Next Friend of A.W. v. Elmore Cnty. Bd. of Educ.,*
  2021 WL 6926819 (M.D. Ala. Aug. 26, 2021)............................ 23, 24

*McGuire v. Marshall,*
  50 F.4th 986 (11th Cir. 2022)...............................................................18

*Moore v. Armour Pharm. Co.,*
  927 F.2d 1194 (11th Cir. 1991)............................................................16

*MSPA Claims 1, LLC v. Tenet Fla., Inc.,*
  918 F.3d 1312 (11th Cir. 2019).............................................................21

*Oldaker v. Giles,*
  2021 WL 3412551 (M.D. Ga. Aug. 4, 2021).......................................24

*Oppenheimer Fund, Inc. v. Sanders,*
  437 U.S. 340 (1978) ............................................................................16

*Rosen v. Provident Life & Accident Ins. Co.*,
  308 F.R.D. 670 (N.D. Ala. 2015) ........................................................16

*Schultz v. Alabama*,
  42 F.4th 1298 (11th Cir. 2022) ...........................................................18

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .......................................................................21

*Trichell v. Midland Credit Mgmt., Inc.*,
  964 F.3d 990 (11th Cir. 2020) ............................................................20

*Washington State Grange v. Washington State Republican Party*,
  52 U.S. 442 (2008) .............................................................................20

**Statutes**

42 U.S.C. § 300jj–11(c)(3)(A)(ii) .............................................................23

**Other Authorities**

Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty
  Suppression and Gender Reassignment*, 130 PEDIATRICS, No. 4, 696
  (Oct. 2014) .........................................................................................19

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender
  and Gender Diverse People, Version 8*, 23 INT'L J. OF TRANSGENDER
  HEALTH S1, https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.
  2100644 (Sept. 15, 2022) ..............................................................3, 19

Stephen B. Levine et al., *Reconsidering Informed Consent for Trans-Identified
  Children, Adolescents, and Young Adults*, J. OF SEX & MARITAL THERAPY
  (Mar. 17, 2022).............................................................................. 19, 20

**Rules**

Fed. R. Civ. P. 26(b)(1)............................................................... 15, 22, 23

Fed. R. Civ. P. 37(a)(3)(B)(iv)..................................................................15

Fed. R. Evid. 401 .....................................................................................15

## INTRODUCTION

After bringing an action premised on "obtaining appropriate" and "essential" "medical care for" the Minor Plaintiffs (Doc. 159 ¶¶ 2-3 ("Compl.")), Plaintiffs refuse to turn over the medical records necessary to assess their claims. That is perplexing because Plaintiffs' refrain—from their experts, favored guidelines, and studies—has always been that "to determine if and what medical care is essential," "medical providers utilize a multidisciplinary approach for monitoring and assessment of transgender youth patients" that "includ[es] behavioral and physical health specialists." Pls' PI Reply, Doc. 89, at 20, 27. That assertion (and many, many others like it, *see* pp. 2-10, *infra*) makes the records from those specialists highly relevant to this litigation. And it makes them outright critical to Plaintiffs' as-applied challenge.

Defendants thus requested medical records related to the diagnosis, assessment, and treatment of the Minor Plaintiffs for gender dysphoria. Yet after extolling the benefits and safeguards of their purported "comprehensive assessment" and treatment guidelines (as Dr. Hawkins told this Court at the preliminary injunction hearing, PI Tr. 27, 31[1]), Plaintiffs now refuse to produce comprehensive medical records. Without them, Defendants, their experts, and this Court have little way of

---

[1] All references to the preliminary injunction hearing are to the continuously paginated transcript, Docs. 104 & 105.

assessing Plaintiffs' claims that they require certain treatments or that Alabama's law prohibits them from receiving the care they need.

Accordingly, this Court should compel Plaintiffs to provide to Defendants their medical records related to gender dysphoria, including records that reflect past mental health diagnosis or treatment and any side effects from the transitioning treatments. The requested medical records easily clear the low bar for relevancy and are thus discoverable under Rule 26(b)(1). And Plaintiffs have no other grounds to withhold these highly relevant documents, which are already subject to protective orders entered by the Court. Docs. 137 & 138. Plaintiffs cannot put their medical conditions at issue and then refuse to provide records necessary to assess their claims.

## BACKGROUND

### A.   Plaintiffs' Claims and Reliance on Medical Records

Plaintiffs—minors, their parents, and medical providers—challenge Alabama's Vulnerable Child Compassion and Protection Act on two bases. First, they allege that the Act "prohibit[s] parents from seeking and obtaining appropriate medical care for their children." Compl. ¶ 2. Second, they allege that the Act "targets transgender minors by imposing criminal penalties on any individuals . . . who obtain or provide medical treatments essential to the minors' health care needs." *Id.* ¶ 3. As these descriptions suggest, a fundamental underlying question is what constitutes "appropriate" or "essential" medical care. *See also id.* ¶¶ 98, 101 (due

process claim limited to "medical treatments" that are "medically necessary" or "essential"); ¶¶ 105, 106, 111 (equal protection claim likewise limited).

Plaintiffs have defined their favored medical care, at least in part, by reference to the "standards of care" "developed by the World Professional Association for Transgender Health ('WPATH')" and other organizations like the Endocrine Society. *Id.* ¶ 29; *see id.* ¶ 30; Pls' PI Reply, Doc. 89, at 15 (describing WPATH standards as "authoritative"). WPATH's standards, in turn, state that "health care professionals working with gender diverse adolescents [should] undertake a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns." E. Coleman et al., *WPATH Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 INT'L J. OF TRANSGENDER HEALTH S1 (Sept. 15, 2022) Statement 6.3, https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644. Indeed, the standards explain that "there are no studies of the long-term outcomes of gender-related medical treatments for youth who have not undergone a comprehensive assessment," and that "[t]reatment in this context (e.g., with limited or no assessment) has no empirical support." *Id.*

The WPATH standards also suggest than an extended assessment process "may be useful" when youth present "with more complex presentations (e.g., complicating mental health histories), co-occurring autism spectrum characteristics, and/or an absence of experienced childhood gender incongruence." *Id.* (citations

omitted); *see also id.* Statement 6.12d ("[I]t is critical to differentiate gender incongruence from specific mental health presentations, such as obsessions and compulsions, special interests in autism, rigid thinking, broader identity problems, parent/child interaction difficulties, severe developmental anxieties (e.g., fear of growing up and pubertal changes unrelated to gender identity), trauma, or psychotic thoughts."); *id.* ("[I]t is important any mental health concerns are addressed sufficiently so that gender-affirming medical treatment can be provided optimally").

The Endocrine Society's guidelines likewise "expressly require," by Plaintiffs' own telling, "multiple, staged assessments and reassessments before moving patients from one step in medical treatment to the next." Pls' PI Reply, Doc. 89, at 19; *see id.* at 25-26. And the foundational Dutch studies, relied on by these guidelines and by Plaintiffs' experts (*e.g.*, Rosenthal Decl., Doc. 8-3 ¶ 53), "repeatedly and consistently emphasize the need for extensive mental health assessment, including clinical interviews, formal psychological testing with validated psychometric instruments, and multiple sessions with the child and the child's parents." Cantor Decl., Doc. 69-2 ¶ 49; *see id.* ¶ 58.

Accordingly, to prove that transitioning treatments are "appropriate" or "necessary" for these Minor Plaintiffs, a central focus of Plaintiffs' case has been the minors' medical histories, particularly their mental health histories but also physical issues. Compl. ¶¶ 43-47 ("His therapist recently recommended that Michael be

evaluated for additional medical treatment to address the mismatch between his body and his gender identity."), 50-56 ("About seven months ago, just as Allison was beginning high school, she was evaluated for and eventually started on estrogen. Her mental health has improved dramatically"), 58-63 ("Kathy took Christopher to a physician to begin the evaluation for hormone-replacement therapy."), 66-72 ("With puberty approaching, Melissa is starting to show signs of distress in anticipation of the physical changes that accompany puberty and is concerned that she will be perceived by others as a boy."), 75-83 ("April has also been under the care of a mental health provider who specializes in working with transgender youth for about three years.").

Likewise, Plaintiffs presented extensive testimony at the preliminary injunction hearing about both the holistic analysis that is purportedly a prerequisite to transitioning treatments and the Minor Plaintiffs' own histories. All of the Parent Plaintiffs' declarations and testimonies referenced health diagnoses and treatments. *E.g.*, Doc. 8-5 ¶ 9 ("The therapist confirmed that Michael has gender dysphoria and recommended that he be evaluated for medical treatment."); Doc. 8-7 ¶¶ 10-12, 19, 21; Doc. 8-8 ¶ 14 ("The endocrinologist reviewed Christopher's medical history, the recommendation of Christopher's counselor, and Christopher's lab results.").

Plaintiffs' experts claimed *ad nauseam* that "we will not prescribe any treatment unless the full multidisciplinary team agrees that treatment is appropriate."

Ladinsky Decl., Doc. 8-2 ¶ 11; *see* Hawkins Decl., Doc. 8-1 ¶¶ 32-37 (same); Rosen-thal Decl., Doc. 8-3 ¶¶ 48-51 (same). As Dr. Hawkins put it at the preliminary in-junction hearing, "[t]he assessment process" is "a 360 assessment" that "involves multiple visits and multiple professionals who are trained in this care," starting with "developmental specialists, mental health specialists, including psychologists and psychiatrists, [and] social workers." PI Tr. 22.

Dr. Hawkins then assured the Court that mental health issues are "100 per-cent" part of the assessment and "usually where we start," to purportedly ensure that a child's "gender identity is not somehow a symptom of something else, or some-thing else masking . . . gender dysphoria." *Id.* at 23. According to her, "mental health struggles or significant chronic mental health conditions" must be considered "to make sure that we don't move a child down the road of assessment into gender care when that's really not the right care." *Id.*; *see id.* at 19 (noting concern about "falsely . . . perceiv[ing] a child as transgender when there's really something else going on"). Thus, Dr. Hawkins testified that "[w]e look very closely at trauma, neu-rological development, our kids with autism or ASD, any type of childhood or youth mental health or neurological condition that could have them not really understand-ing who they are because of that trauma or mental health." *Id.* She concluded: "The assessment process we use, we try to assure we are 180 percent sure that the right kids are getting the right medicine." *Id.* at 69.

Dr. Hawkins also stated that patients are considered "ready to start" transitioning treatments "[w]hen psychosocially there is confirmation of the diagnosis of gender dysphoria, and that the distress that a young person or an adolescent is experiencing meets criteria psychosocially or mental health-wise." *Id.* at 57. This confirmation relies on "the 360 evaluation of the other people who are involved in the young person's life, including pediatricians, other mental health providers." *Id.* at 59. "[B]ased on the guidelines," Dr. Hawkins testified, only after such thorough assessment might medical care be "appropriate." *Id.* at 25; *see id.* at 41 ("[W]e then bring all of the assessments back into one room and make a collective determination about what would be the best medical mental health care for a child."); *id.* at 62 (asserting "a multidisciplinary longitudinal systemic assessment process"); *id.* at 69-70 ("The assessment process that includes longitudinal assessments with multidisciplinary team of the multi-systemic areas of a child is the ideal assessment process to determine that, to determine the appropriateness of what medical and mental health care a child or an adolescent with dysphoria experiences.").

Dr. Ladinsky offered similar testimony. She testified that the "first step" in seeing a patient was conducting "a robust assessment of the information coming to us from their pediatrician, their mental health provider, and in-depth time spent with their family and them, a physical examination to assess and confirm that Tanner 2 staging by our pediatric endocrinologist, as well as the input from everyone on the

7

team." *Id.* at 105. And she explained that to provide cross-sex hormones, "[w]e re-quest a written letter from their mental health provider attesting to not just their ca-pacity to assent to hormones and to the potential risk-benefit analysis, but as well as a decision that's made by the entire team." *Id.* at 108.

Plaintiffs' experts also testified that "[o]nce a patient begins medical treat-ment, their progress is monitored at regular intervals, typically every six months, to assess the efficacy of the prescribed treatment through a physical examination or laboratory tests." Doc. 8-2 ¶ 13 (Ladinsky). The monitoring is also necessary be-cause the side effects of the transitioning treatments can be many and severe—rang-ing from risks of diminished bone density, infertility, and loss of sexual function to cancers, stroke, and heart disease. *See* UAB Informed Consent Form, Doc. 78-41. According to Plaintiffs' experts, "[t]his ongoing monitoring also ensures ongoing evaluation of a patient's mental health." *Id.*; *see* Doc. 8-10 ¶ 9 (Plaintiff Koe: "these patients would come to me for regular blood tests and lab work, the results of which would be sent to the UAB gender clinic so their medical providers could monitor their progress."). And—according to Plaintiffs' experts—mental health providers "100 percent" "stay involved" by "constantly assessing and reassessing the appro-priateness of every treatment plan." PI Tr. 25 (Hawkins).

At every stage of this litigation, Plaintiffs have thus built their case around the alleged facts that transitioning treatments are only provided after and guided by an

exhaustive assessment by all relevant medical professionals and that the Minor Plaintiffs require these treatments. At the preliminary injunction stage, they argued that the decision to provide transitioning treatments "is a three-dimensional assessment that takes into account the parents, the child, the network, the child's background, the history of gender dysphoria that the child may have presented with." PI Tr. 366. They asserted that "Alabama medical providers utilize a multidisciplinary approach for monitoring and assessment of transgender youth patients to determine if and what medical care is essential at each stage of adolescence." Pls' Reply, Doc. 89, at 20. The purpose of that assessment, according to Plaintiffs, is "to (1) ensure that treatment is medically necessary and appropriate to the individual, and that (2) any 'co-existing psychological, medical, or social problems' have been addressed." *Id.* at 15. And the "authoritative protocols," Plaintiffs argued, "require multiple, staged assessments and reassessments." *Id.* at 15, 19.

In its preliminary injunction order, this Court relied on the Plaintiffs' testimony about the guidelines and their individual diagnoses. The Court held that "Parent Plaintiffs are substantially likely to show that the Act violates their fundamental right to treat their children with transitioning medications *subject to medically accepted standards*." *Eknes-Tucker v. Marshall*, No. 2:22-CV-184-LCB, 2022 WL 1521889, at *8 (M.D. Ala. May 13, 2022) (emphasis added); *see id.* at *5 (discussing testimony of Megan Poe about her child's mental health diagnosis and outcomes).

And the Court stated "that at least twenty-two major medical associations in the United States endorse these medications as well-established, evidence-based methods for treating gender dysphoria in minors." *Id.* at *10; *see id.* at *2 (stating that these associations "endorse" WPATH's "guidelines for treating gender dysphoria in minors with these medications").[2] As shown, those guidelines allegedly require a complete assessment.

## B.    Defendants' Requests for Production and Plaintiffs' Responses

On July 18, 2022, Defendants served their first requests for production under Rule 34 on Plaintiffs. *See* Bowdre Decl., Exhibit 1. As relevant here, Defendants requested the following from the Parent Plaintiffs:

> 5. All medical records in your possession of any child of yours which relates to treatment for Gender Dysphoria or a Related Condition.
>
> 6. All Documents in your possession of . . . of any mental health treatment provided to a child of yours who has been treated for Gender Dysphoria or a Related Condition.
>
> 7. All Documents between you and any medical provider or mental health professional who has treated a child of yours for Gender Dysphoria or a Related Condition.
>
> 8. All calendars, notes, or other Documents, reflecting the dates of any treatment of a child of yours for Gender Dysphoria or a Related Condition.

---

[2] A new version of WPATH's guidelines (cited above) has since been released and may be relevant to other issues, but no changes appear to be relevant to the extensive medical assessment emphasized by Plaintiffs.

9. All forms, disclosures, or other Documents provided to you by any Health Care Provider or mental health provider who has treated a child of yours for Gender Dysphoria or a Related Condition.

*Id.* at 7-8.

On August 22, Plaintiffs responded to these requests, objecting that "Plaintiffs[ ] challenge on its face the constitutionality of the Act" and that "Documents called for in this Request are not relevant to the parties' claims or defenses." Bowdre Decl., Exhibit 2, at 6-7. Plaintiffs also objected that the requests were broad and sought material protected by a mental health provider-patient privilege. *See id.* at 7-13. Plaintiffs declined to produce any responsive documents.

For four months, the parties have met and conferred, by telephone conference and email. *See generally* Bowdre Decl., Exhibit 3. As the correspondence reflects, Defendants were open to limitations on medical record production "if Plaintiffs agreed that they are arguing only that the challenged provisions are facially unconstitutional and are not, in contrast, arguing that the Act is unconstitutional as applied to Plaintiffs." *Id.* at 18. If Plaintiffs had so agreed, offered "evidence sufficient to establish standing," and refrained from "go[ing] into their medical history on summary judgment or at trial since that history would be irrelevant to the facial challenge" and prejudicial, Defendants expressed willingness to limit their requests for medical records. *Id.* at 18-19.

Plaintiffs, however, decided that they will press both facial and as-applied challenges to the Act. *Id.* at 2. As a result, Defendants explained that they would need all medical records involving gender dysphoria or related issues, including "materials relating to comorbidities with gender dysphoria" and "side effects of the drugs at issue." *Id.* at 10.

Plaintiffs again refused, insisting on limiting production to certain categories chosen by Plaintiffs' counsel, with production subject to redaction by counsel. *Id.* at 8. Plaintiffs proposed:

> To resolve the State's discovery requests concerning medical records for minor plaintiffs, private plaintiffs will agree to produce the following categories of medical records:
>
> (1) medical records that reflect an evaluation and diagnosis of gender dysphoria for each of the minor plaintiffs;
>
> (2) medical records that assess the medical need for treatment of gender dysphoria for each of the minor plaintiffs; and
>
> (3) medical records that reflect the provision of medical treatment for gender dysphoria and ongoing monitoring and evaluation of the condition for each of the minor plaintiffs.
>
> …
>
> To ensure that no irrelevant medical records are produced, private plaintiffs propose the following procedure:
>
> (1) For Records in Private Plaintiffs' Possession: private plaintiffs' lawyers have obtained copies of medical records for the minor plaintiffs and will produce those medical records that fall within the three categories above; and

 (2) For Additional Records: if the State wishes to obtain additional medical records for the minor plaintiffs, the State will provide the name of the medical provider to private plaintiffs' counsel who (a) will obtain copies of the medical records (through authorization or subpoena), (b) will redact any information that does not fall within the three categories above, and (c) will produce copies of the redacted medical records to the State.  The State will agree not to issue subpoenas for medical records so that the parties can avoid needless motion practice.

*Id.*

Defendants explained that the problem with Plaintiffs' proposal is that it encompasses only some, but not all, of the relevant medical records. Defendants "noted that the medical records relevant to Plaintiffs' as-applied challenges would go well beyond the [categories] listed in [Plaintiffs'] proposal" and would include, for instance, "medical records related to potential side effects of these treatments," "history of gender expression and identity," and "mental health comorbidities." *Id.* at 4.

As for potential side effects, Defendants noted that "a central issue in this case is whether the use of these treatments can be justified given the risk of harm." *Id.* They continued:

The known harms caused by puberty blockers include greater risks of diminished bone density, cognitive impairment, infertility, mood changes (including depression, suicidal ideation, and irritability), and pseudotumor cerebri. For males, the known harms caused by cross-sex hormones include increased risk of thromboembolic disease, cholelithiasis, coronary artery disease, macroprolactinoma, cerebrovascular disease, hypertriglyceridemia, breast cancer, infertility, pulmonary embolism, stroke, heart attack, diabetes, prolactinomas, and loss of sexual function. For females, the known harms include increased risk of erythrocytosis, thrombophlebitis, liver dysfunction, coronary artery disease,

depression, hypertension, infertility, loss of sexual function, mood dis-
orders, weight gain, stroke, insulin resistance, vaginal atrophy, swelling
of hands, feet, and legs, and breast, cervical, and uterine cancers. Thus,
medical records related to potential side effects of these treatments are
highly relevant to the case.

*Id.*

Defendants also explained why Plaintiffs' mental health care records are rel-

evant to assessing their as-applied challenge:

It is critical to know the Plaintiffs' history of gender expression and
identity; if they have suffered from mental health comorbidities, such
as anxiety, depression, ADHD, and autism; whether they experienced
and were treated for past psychiatric illness or trauma; and what their
school, community, and family environments are and have been like.
There are several reasons for this. As just one example, the WPATH
standards recommend a "comprehensive biopsychosocial assessment"
(SOC8 at S48), which necessarily entails a "360"-degree understanding
of the patient (as Dr. Hawkins put it at the PI hearing). Thus, these med-
ical records, including mental health records, would demonstrate the
process that medical and healthcare professionals undertook before di-
agnosing Plaintiffs with gender dysphoria and prescribing puberty
blockers or cross-sex hormones. The comprehensiveness of this process
is relevant to Plaintiffs' claims. In addition, there is some literature sug-
gesting that, if transitioning treatments are permissible at all, they
should be offered only after other mental health issues are resolved.
There is also a risk that autism (or other mental health issues) can be
misdiagnosed as gender dysphoria, meaning that treatments for gender
dysphoria were completely unnecessary in the first place.

*Id.* at 4.

"In short," Defendants concluded, "we think all of Plaintiffs' mental

healthcare records are relevant to the as-applied challenge." *Id.*

14

Plaintiffs continue to refuse to produce all their relevant records, "maintain[ing] that the State does not need extensive medical records because the State's position has been that there are no circumstances where transitioning medications are justified for minors with gender dysphoria." *Id.* at 2. Plaintiffs thus reason that it is "irrelevant" whether "Plaintiffs [we]re misdiagnosed" or if "harms [of the treatments] to [the] individual Plaintiffs outweigh the benefits." *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 37(a)(3)(B)(iv) permits a party to move to compel discovery responses.[3] Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Relevant factors include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence,

---

[3] Pursuant to Rule 37(a)(1), the undersigned counsel certifies that Defendants have in good faith conferred with Plaintiffs in an effort to obtain the requested documents without court action.

and the fact is of consequence in determining the action." In the discovery context, relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case," no matter if the material itself would be admissible. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). The scope of discovery is broad "in order to provide parties with information essential to the proper litigation of all relevant facts, to eliminate surprise and to promote settlement." *Coker v. Duke & Co., Inc.*, 177 F.R.D. 682, 685 (M.D. Ala. 1998) (citations omitted).

The Federal Rules "strongly favor full discovery whenever possible." *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991). "The party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information." *Rosen v. Provident Life & Accident Ins. Co.*, 308 F.R.D. 670, 680 (N.D. Ala. 2015) (cleaned up). "Where there is a doubt over relevancy, the court should still permit discovery." *Coker*, 177 F.R.D. at 685.

## ARGUMENT

## I.      The Requested Medical Records Are Highly Relevant.

The centerpiece of Plaintiffs' claims is that the Minor Plaintiffs are being denied "appropriate" or "essential" medical treatments. Compl. ¶¶ 2-3. Plaintiffs, their experts, and their favored "guidelines" have all said—over and over—that the way

16

to determine the "appropriate" or "essential" treatment is through a multidisciplinary assessment that considers all aspects of an individual's physical and mental health, including underlying conditions that may mean "something else" accounts for signs of gender dysphoria. PI Tr. 23; *see supra* at 2-9. And they have said that the only way to determine whether to continue such treatment is through thorough and complete reassessments of an individual's ongoing physical and mental health. *Supra* at 7-8.

Accordingly, medical records that reflect the inputs into this assessment—including mental and physical health records—are essential to a proper resolution of this case. Indeed, Plaintiffs themselves have repeatedly referred to and relied on individuals' medical histories in discussing the diagnosis of gender dysphoria and the provision and assessment of transitioning treatments. *See supra* at 4-5. Without those records, neither Defendants nor the Court can fully assess Plaintiffs' claims that they are entitled to transitioning treatments. Again, Plaintiffs' own experts and the guidelines that this Court emphasized at the preliminary injunction stage all say that this evidence is *critical* to an individual's care. That necessarily means the evidence is relevant, in at least three respects.

*First*, Plaintiffs have now confirmed that they are bringing an as-applied challenge. "[A] factual, as-applied challenge asserts that a statute cannot be constitutionally applied in particular circumstances." *Schultz v. Alabama*, 42 F.4th 1298, 1319

17

(11th Cir. 2022) (cleaned up). "[I]t necessarily requires the development of a factual record for the court to consider." *Id.* In particular, the "court addresses whether a statute is unconstitutional" "in its application to a particular party." *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022) (cleaned up).

Applied here, Plaintiffs have already told the Court what they think is relevant to their as-applied challenge. According to Plaintiffs' own experts and guidelines, the only way to determine whether the medical treatments that Plaintiffs claim are "appropriate" and "essential" (Compl. ¶¶ 2-3) are indeed "appropriate" and "essential" *for them* is by reviewing all relevant medical histories and records, including those reflecting mental and physical health. Plaintiffs' medical records are thus extremely relevant, if not central, to their as-applied challenge.

This is true not only for the limited categories of medical records Plaintiffs have agreed to produce, but also for those they won't. For instance, medical records that reflect side effects of the transitioning treatments are relevant to assessing the risks and benefits of the treatments. And past mental health records are necessary to understand Plaintiffs' history of gender expression; whether they have suffered from mental health comorbidities, such as anxiety, depression, ADHD, or autism; whether they experienced and were treated for past psychiatric illness or trauma; and what their social and family surroundings are like.

These are all relevant considerations not just for meeting WPATH's own standard of care, *see WPATH Standards of Care 8*, *supra*, Statement 6.3 (suggesting "a comprehensive biopsychosocial assessment"), but also for determining whether the foundational Dutch Study on which those standards rely can be applied to Plaintiffs' circumstances, *cf., e.g.*, *id.* at S46 (repeatedly citing to the Dutch Study). The participants in the Dutch Study were carefully chosen: all of them had childhood-onset gender dysphoria; all of them received a "comprehensive psychological evaluation with many sessions over a longer period of time," none of them had any "psychosocial problems interfering with assessment or treatment," and all of them had "adequate family or other support" and a "good comprehension of the impact of medical interventions." Doc. 78-33, Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 130 Pediatrics, No. 4, 696, 697 (Oct. 2014). In other words, "the subjects were selected because they were free from significant mental health problems"—so much so that "there was little opportunity" for their mental health "to meaningfully improve." Doc. 69-8, Stephen B. Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, J. OF SEX & MARITAL THERAPY 10 (Mar. 17, 2022). In fact, "[f]rom the 196 adolescents initially referred, 111 were considered eligible to start puberty blockers, and of this group, only the 70 most mature and mentally stable who proceeded to cross-sex hormones were included in the study."

*Id.* at 12. Since this study is the one on which Plaintiffs' proposed standard of care ultimately rests, it behooves to ask: Are the Minor Plaintiffs like the subjects of that study? The only way to answer that question is by reviewing the entirety of their relevant medical and mental health records.

*Second*, Plaintiffs are also bringing a facial challenge. "[A] plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008); *see Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013). By definition, if the Act is constitutional as applied to Plaintiffs, their facial challenge fails; and, because the medical records are relevant to the as-applied challenge, they are also relevant to the facial challenge. The records are further relevant to the facial challenge in that they will enable testing of Plaintiffs' claims about how transitioning treatments are prescribed and monitored in Alabama, and may potentially lead to additional discovery on these issues.

*Third*, Plaintiffs must establish standing under Article III. *E.g.*, *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020). If Plaintiffs cannot prove a redressable injury-in-fact—for instance, if the Act would not in fact limit Plaintiffs' receipt of necessary medical treatments because Plaintiffs have not yet received the type of comprehensive evaluation that Plaintiffs' own experts teach is

essential before any invasive hormonal intervention could be medically indicated—
this case must be dismissed for lack of jurisdiction

For all these reasons, the requested medical records are highly relevant.

## II.      Plaintiffs Lack A Valid Reason To Withhold The Medical Records.

In resisting production of the medical records in dispute, Plaintiffs asserted
that the records are not "need[ed]" "because the State is saying there are no circum-
stances which can justify providing transitioning medications to a minor." Bowdre
Decl., Exhibit 3, at 2. According to Plaintiffs, this position somehow makes it "irrel-
evant whether an individual minor has a correct diagnosis[, a] particularized need,"
or "harms" from treatments—unless "the State is conceding that the treatments are
necessary or appropriate for minors who are properly diagnosed." *Id.*

This objection fundamentally misunderstands how an as-applied challenge
works. Plaintiffs have the burden of proof to prove their case, and the State does not
have to defend its laws in the abstract. After all, "[u]nder Article III, federal courts
do not adjudicate hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*,
141 S. Ct. 2190, 2203 (2021). Instead, the only "constitutional role" of the federal
courts is to "resolv[e] 'Cases' and 'Controversies'—i.e., discrete disputes between
parties." *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1317 (11th Cir.
2019). Here, Plaintiffs assert that certain treatments are "appropriate" or "essential"
*for the individual Minor Plaintiffs*. Whether that assertion is true is, by their own

telling, of central relevance. *See* Bowdre Decl., Exhibit 3, at 2 (describing their as-applied challenge as whether "our Plaintiffs fall within th[e] category" of minors "prevent[ed] . . . from getting the transitioning medications they need"). And the records remain relevant too to Plaintiffs' facial challenge and to standing, as explained above.

Moreover, it is fully consistent for the State to argue both that "there are no circumstances where transitioning medications are justified for minors with gender dysphoria" (Bowdre Decl., Exhibit 3, at 2) and that these treatments are not justified for *these* Plaintiffs. Like any defendant, the State may offer multiple defenses, whether jurisdictional (*e.g.*, standing) or on the merits (*e.g.*, that the Plaintiffs are not entitled to as-applied relief). Plaintiffs may not hamstring the State's defenses up-front by declining to produce highly relevant medical records—particularly after Plaintiffs themselves chose to make this an as-applied challenge. They cannot have it both ways: if they, for example, wish to present medical histories via Parent Plaintiff declarations and testimony about the Minor Plaintiffs' mental and physical health, Defendants have a right to test that testimony. So too if they wish to present experts who promise that transitioning treatments are only administered after complete assessment of the patient's mental and physical health. PI Tr. 22. "When a plaintiff's claims rise to this level, giving a defendant access to the records is a matter of fairness." *J.P. as Next Friend of A.W. v. Elmore Cnty. Bd. of Educ.*, 2021 WL

6926819, at *4 (M.D. Ala. Aug. 26, 2021). In short, because the requested records are "relevant to any party's *claim or defense*," they are discoverable. Fed. R. Civ. P. 26(b)(1) (emphasis added).

Plaintiffs also cannot show that the requested production is disproportionate "to the needs of the case." *Id.* In a case where the central question is the propriety of certain medical treatments, the medical records that Plaintiffs themselves say are necessary to provide such treatments are crucial. Defendants have no other way of obtaining the medical records of anonymous Plaintiffs. *Cf. id.* ("the parties' relative access to relevant information" is one factor).

Nor is this production likely to be particularly burdensome. The Plaintiffs have alleged that they see a limited number of providers—generally one or two therapists, a pediatrician, and the UAB team. *E.g.*, Compl. ¶¶ 47, 52-53, 69-70. Electronic medical records, now standard and legally required, *see* 42 U.S.C. § 300jj–11(c)(3)(A)(ii), are easy to reproduce.

Last, while the requested documents will contain an individual's medical information—and the State Defendants recognize the general privacy of such information—"information collected through discovery . . . is not a matter of public record." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987). Plus, relevant protective orders are already in place. *See* Docs. 137, 138. Even more to the point, "ha[ving] placed [their] physical health and mental state at issue," Plaintiffs

cannot now refuse "discovery of medical records to determine if those records support" their claims. *Barlow v. Dupree Logistics, LLC*, 2015 WL 4646812, at *4 (N.D. Ala. Aug. 5, 2015). For the same reason, no privilege protects these documents from disclosure through discovery. *See J.P.*, 2021 WL 6926819, at *2-3 ("[D]istrict courts in this circuit have agreed with other federal courts that the [psychotherapist-patient] privilege is impliedly waived when a plaintiff puts his mental or emotional state at issue."); *see also Oldaker v. Giles*, 2021 WL 3412551, at *3 (M.D. Ga. Aug. 4, 2021) (collecting cases); *Hansen v. Uber Techs.*, *Inc.*, 2018 WL 7361084, at *3 (M.D. Fla. Aug. 13, 2018) (same).

## CONCLUSION

For these reasons, the Court should compel production of the relevant medical records requested by Defendants.

Respectfully submitted,

Steve Marshall
  *Attorney General*

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, South Carolina
29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
Thomas A. Wilson (ASB-1494-D25C)
  *Deputy Solicitors General*
James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*
Benjamin M. Seiss (ASB-2110-O00W)

24

Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document using the Court's CM/ECF system on January 5, 2023, which will serve all counsel of record.

s/ A. Barrett Bowdre
*Counsel for Defendants*