## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| Brianna Boe, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| *Intervenor Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-184-LCB |
| | ) | |
| Hon. Steve Marshall, in his official | ) | |
| capacity as Attorney General, | ) | |
| of the State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' RESPONSE TO MOTION TO QUASH SUBPOENAS BY AAP, WPATH, AND THE ENDOCRINE SOCIETY (DOC. 208)

## TABLE OF CONTENTS

Table of Contents ................................................................................. i

Table of Authorities .......................................................................... ii

Introduction ........................................................................................1

Background ..........................................................................................5

    A.  Plaintiffs and the United States Told This Court to Defer to the
         Authority of their Preferred Medical Interest Groups ...............................5

    B.  This Court Relied on the Medical Interest Groups When It Granted a
         Preliminary Injunction ................................................................9

    C.  Evidence Suggests That the "Consensus" Offered by Plaintiffs and
         Relied on by the Court May Not Be a True, Scientifically Driven
         Consensus.................................................................................10

    D.  Defendants Propounded Subpoenas to AAP, WPATH, and the
         Endocrine Society, and Attempted to Work in Good Faith to
         Alleviate Concerns About Burdensomeness .............................................18

Legal Standard ..................................................................................20

Argument............................................................................................21

    I.  The Requested Information Is Highly Relevant Under Plaintiffs' And
       The United States' Theory ...........................................................21

    II.  The Tailored Requests Do Not Impose An Undue Burden ......................26

    III. The Tailored Requests Do Not Violate The First Amendment .................29

Conclusion .........................................................................................34

Certificate of Service .........................................................................37

# TABLE OF AUTHORITIES

## Cases

*Adkins v. Christie*,
    488 F.3d 1324 (11th Cir. 2007) ..........................................................................26

*Coker v. Duke & Co., Inc.*,
    177 F.R.D. 682 (M.D. Ala. 1998)......................................................... 20, 21, 27

*Distrib. Res. Mgmt., Inc. v. Peacock*,
    No. 2:12-CV-00188-SLB, 2012 WL 2930787 (N.D. Ala. July 13, 2012).........28

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022).................................................................................2, 4

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019) .............................................................................12

*Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n*,
    2007 WL 9701863 (S.D. Fla. Mar. 30, 2007) ...................................................21

*Herbert v. Lando*,
    441 U.S. 153 (1979).............................................................................................31

*In re Blue Cross Blue Shield Antitrust Litig.*,
    No. 2:13-CV-20000-RDP, 2018 WL 11425554
    (N.D. Ala. Oct. 24, 2018) .......................................................................... 21, 27

*In re Grand Jury Proceeding*,
    842 F.2d 1229 (11th Cir. 1988) .........................................................................30

*In re Grand Jury Subpoena*,
    831 F.2d 225 (11th Cir. 1987) ...........................................................................30

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    641 F.3d 470 (10th Cir. 2011) .................................................................... 29, 32

*In re Nat'l Hockey League Players' Concussion Inj. Litig.*,
    No. MDL142551SRNBRT, 2019 WL 5288281 (D. Minn. Oct. 18, 2019) .......24

*Jordan v. Comm'r, Miss. Dep't of Corr.*,
  947 F.3d 1322 (11th Cir. 2020) .........................................................................22

*Klay v. All Defendants*,
  425 F.3d 977 (11th Cir. 2005) .................................................................... 24, 26

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014)..........................................................................12

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
  32 F.4th 1363 (11th Cir. 2022) ...................................................................23

*Moore v. Armour Pharm. Co.*,
  927 F.2d 1194 (11th Cir. 1991) .........................................................................21

*NAACP v. Ala. ex rel. Patterson*,
  357 U.S. 449 (1958)...................................................................................30

*New York State Nat. Org. for Women v. Terry*,
  886 F.2d 1339 (2d Cir. 1989) .....................................................................31

*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340 (1978).....................................................................................20

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ...................................................................34

*Perry v. Schwarzenegger*,
  591 F.3d 1147 (9th Cir. 2010) ...................................................................34

*Rosen v. Provident Life & Accident Ins. Co.*,
  308 F.R.D. 670 (N.D. Ala. 2015) ...............................................................21

*Rowlin v. Ala. Dep't of Pub. Safety*,
  200 F.R.D. 459 (M.D. Ala. 2001)................................................................27

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984)......................................................................................34

*Stevenson v. Johnson Bros Corp.*,
  No. 2:18-CV-1702-RDP, 2019 WL 1083781 (N.D. Ala. Mar. 7, 2019)...........21

*United States v. Comley,*
890 F.2d 539 (1st Cir. 1989)..................................................................30

*United States v. Duke Energy Corp.,*
218 F.R.D. 468 (M.D.N.C. 2003)....................................................... 30, 33

*United States v. Nixon,*
418 U.S. 683 (1974).............................................................................34

*Univ. of Pa. v. EEOC,*
493 U.S. 182 (1990).............................................................................26

**Rules**

Fed. R. Civ. P. 26(b)(1)..................................................................... 20, 24

Fed. R. Civ. P. 45(d)(3)(A)(iv) .............................................................27

**Regulations**

Nondiscrimination in Health and Health Education Programs or Activities,
Delegation of Authority, 85 Fed. Reg. 37160 (June 19, 2020) .........................12

**Exhibits**

Ex. 1, Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious
Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022)
https://www.wsj.com/articles/the-american-academy-of-pediatrics-dubious-
transgender-science-jack-turban-research-social-contagion-gender-dysphoria-
puberty-blockers-uk-11660732791....................................................11

Ex. 2, Aaron Sibarium, *The Hijacking of Pediatric Medicine*, THE FREE PRESS
(Dec. 7, 2022) https://www.thefp.com/p/the-hijacking-of-pediatric-medicine..11

Ex. 3, *Questioning America's Approach to Transgender Health Care*,
THE ECONOMIST (Jul. 28, 2022)
https://www.economist.com/united-states/2022/07/28/questioning-americas-
approach-to-transgender-health-care..................................................12

Ex. 4, Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE
(June 15, 2022) https://www.nytimes.com/2022/06/15/magazine/gender-
therapy.html ........................................................................................ 13, 14, 16

Ex. 5, Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts
and Activist Resistance*, 10 PUBLIC RELATIONS INQUIRY, No. 3 (2021) ..... 13, 14

Ex. 6, Videorecording of meeting at 2017 USPATH conference,
https://www.youtube.com/watch?v=rfgG5TaCzsk ............................................14

Ex. 7, Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy" Care*,
THE FREE PRESS (Oct. 4, 2021)
https://www.thefp.com/p/top-trans-doctors-blow-the-whistle ......................15

Ex. 8, Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment
is Failing Trans Kids*, WASH. POST (Nov. 24, 2021)
https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-
psychologist/ ....................................................................................................15

Ex. 9, Joint Letter from USPATH and WPATH (Oct. 12, 2022),
https://www.wpath.org/media/cms/Documents/
Public%20Policies/2021/Joint%20WPATH%20USPATH%20
Letter%20Dated%20Oct%2012%202021.pdf....................................................16

Ex. 10, Genevieve Gluck, *Top Trans Medical Association Collaborated With
Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022)
https://reduxx.info/top-trans-medical-association-collaborated-with-castration-
child-abuse-fetishists/ ........................................................................................16

Ex. 11, Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*,
N.Y. POST (Sept. 29, 2022) https://nypost.com/2022/09/29/kid-gender-guide-
lines-not-driven-by-science/. ............................................................................16

Ex. 12, Videorecording of Dr. Tishelman's presentation at 2022
WPATH conference,
https://twitter.com/SwipeWright/status/1571999221401948161......................17

Ex. 13, Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'* N.Y. TIMES (Sept. 26, 2022), https://www.nytimes.com/2022/09/26/health/top-surgery-transgender-teenagers.html ............................................................17

Ex. 14: Amanda Prestigiacomo, *'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender 'Care,' Threats Against Dissenting Doctors*, THE DAILYWIRE (Sept. 20, 2022), https://www.dailywire.com/news/huge-money-maker-video-reveals-vanderbilts-shocking-gender-care-threats-against-dissenting-doctors. ..............................................................................................18

## Other Authorities

9A Wright & Miller, *Federal Practice & Procedure* § 2459 (3d ed.) ............. 21, 28

Aaron Devor, WPATH, *History of the Association*, https://www.wpath.org/about/history (last accessed Jan. 17, 2023) .................17

*Correction*, 23 INT'L J. OF TRANSGENDER HEALTH S259 (2022), https://bit.ly/3qSqC9b ..........................................................................................16

AAP Financial Statements, June 30, 2021 and 2020, AAP, https://downloads.aap.org/AAP/PDF/American_Academy_of_Pediatrics-0621_FA-Final.pdf ..............................................................................................27

Nonprofit Explorer - Endocrine Society, PROPUBLICA (fiscal year 2020), https://projects.propublica.org/nonprofits/organizations/730531256 ...............28

WPATH, *WPATH Condemns Dangerous Misinformation* (Sept. 23, 2022), https://perma.cc/QL62-7WP9 ............................................................................17

WPATH et al., *Statement Regarding Interim Service Specification for the Specialist Service for Children and Young People with Gender Dysphoria (Phase 1 roviders) by NHS England* (Nov. 25, 2022), https://perma.cc/VTM7-LEE6.......9

# INTRODUCTION

Try as they might, the American Academy of Pediatrics (AAP), the World Professional Association for Transgender Health (WPATH), and the Endocrine Society cannot shoehorn their position into the one faced by Eagle Forum and Southeast Law Institute. Unlike with the current movants, no one—not the parties, not this Court, and not the medical interest groups themselves—so much as mentioned Eagle Forum or Southeast Law Institute in pleadings, evidentiary submissions, testimony, amicus filings, or the Court's preliminary injunction order. Why? Because no action or opinion by Eagle Forum or Southeast Law Institute could make it more or less likely that Alabama's Vulnerable Child Compassion and Protect Act passes constitutional muster. Their actions and positions are irrelevant to the case. Thus, when the U.S. Department of Justice demanded that they produce irrelevant, protected communications, Defendants supported the organizations' motion to quash.[1]

Under Defendants' reading of the Constitution, the opinions of AAP, WPATH, and the Endocrine Society are largely irrelevant as well. That is because it is the State Legislature that has the duty to regulate medicine, and the "normal rule" is "that courts defer to the judgments of *legislatures*"—not self-interested medical interest groups—"in areas fraught with medical and scientific uncertainties." *Dobbs*

---

[1] *See* Defs' Br. in Supp. of Mot. to Quash, Doc. 158-1; Defs' Mot. for Partial Judgment on the Pleadings, Doc. 157; Def's Reply in Supp. of Mot. for Partial Judgment on the Pleadings, Doc. 200.

*v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2268 (2022) (cleaned up and emphasis added). So, for example, even though AAP recently told the Supreme Court that abortion is "widely accepted" medical "care," the high court refused to defer. It listened instead to the voice that mattered: the state legislature's. "[T]he position of the American Medical Association" and other medical interest groups may be relevant to "a legislative committee," the Court explained, but it could not "shed light on the meaning of the Constitution." *Id.* at 2267 (cleaned up).

Plaintiffs and the United States offer a different standard. From the beginning, they have made the positions of medical interest groups—particularly AAP, WPATH, and the Endocrine Society—central to their case. Over and over they invoked as "authoritative" the positions of these groups to argue against the constitutionality of Alabama's legislative judgment. *E.g.*, Pls' PI Reply, Doc. 89 at 23.[2] That was true in their complaints, briefing, and witness testimony. *Over a third* of Plaintiffs' exhibits at the preliminary injunction hearing consisted solely of position statements from medical interest groups. *See* Docs. 78-15, 78-17, 78-18, 78-20 through 78-28, 78-30, 78-31, 78-32. According to Plaintiffs and the United States, it is the consensus of these groups that sets the constitutional floor. *See* Pls' PI Reply, Doc. 89 at 23.

---

[2] Citations are to the ECF-stamped page number.

This Court endorsed that argument, relying on the groups' positions to find that Plaintiffs were entitled to a preliminary injunction. *See* PI Op., Doc 112-1. For instance, after recounting that known risks of transitioning treatments "include loss of fertility and sexual function," the Court reasoned: "Nevertheless, WPATH recognizes transitioning medications as established medical treatments and publishes a set of guidelines for treating gender dysphoria in minors with these medications." *Id.* at 3-4. It continued: "The American Medical Association, the American Pediatric Society, the American Psychiatric Association, the Association of American Medical Colleges, and at least eighteen additional major medical association endorse these guidelines as evidence-based methods for treating gender dysphoria in minors." *Id.*

Although Defendants respectfully disagree with the Court's conclusion, under the legal standard the Court preliminarily adopted, the position of these medical interest groups is central to Plaintiffs' case. Defendants are thus entitled to probe the groups' positions. How did those groups come to their conclusions? Do the positions represent the considered view of membership, or only of carefully "stacked" committees? What process did they use to determine who would have input, and who would not? Did the groups conduct systematic examinations of the scientific literature, or did they cherry-pick studies? In short: Is there evidence indicating that the alleged "consensus" is not actually based on best scientific practices but, at least in part, on ideology, self-interest, organizational politicking, or other considerations?

3

Based on public reporting, there *is* such evidence—or at the very least, there is enough smoke to raise the serious prospect of fire. *See infra* 10-18. Accordingly, Defendants sent targeted Rule 45 subpoenas to the three primary interest groups Plaintiffs, the United States, and the other medical interest groups rely on: AAP, WPATH, and the Endocrine Society. Defendants then engaged in extensive meet-and-confer phone calls with counsel for these organizations and, based on counsel's representations, agreed to withdraw a number of requests to alleviate concerns about burdensomeness. Defendants also offered to work with the groups to identify proper custodians and search terms to enable production of the relevant information Defendants need to litigate this case under the standards advanced by Plaintiffs and preliminarily adopted by this Court. The interest groups refused and moved to quash.

This Court should deny the interest groups' motion and order them to produce the documents Defendants have requested. What matters is not, as the groups repeatedly suggest, that they filed an amicus brief in this case. Instead, what makes the requested material highly relevant and discoverable is that Plaintiffs and the United States have made these groups' positions a centerpiece of this litigation. Again, Defendants think the groups' views should matter as little here as they did in *Dobbs*. But if these interest groups' positions determine the constitutional rule—or are relevant to that question—Defendants must be able to probe the strength and soundness of those positions. If the Court does not grant Defendants that relief, then to avoid

4

undue prejudice to Defendants, the Court should grant Defendants' contemporane-ously filed motion in *limine* and exclude all evidence based on the positions of AAP, WPATH, and the Endocrine Society.

## BACKGROUND

### A.   Plaintiffs and the United States Told This Court to Defer to the Authority of their Preferred Medical Interest Groups.

Plaintiffs and the United States challenge Alabama's law on the basis that it regulates "medically necessary" care in a manner that violates the Fourteenth Amendment. *See* Pls' Compl., Doc. 159 ¶¶38, 41, 72, 82, 83, 98, 99, 105, 106; U.S. Compl., Doc. 92 ¶¶4, 6, 7, 8, 9, 45, 48, 52, 54. To show that transitioning treatments for minors are "medically necessary," they have relied primarily on the imprimatur of medical interest groups, particularly AAP, WPATH, and the Endocrine Society.

Take the United States' Complaint. Nearly *every paragraph* of the factual al-legations regarding the "standard of care for treating transgender youth" begins with an appeal to the authority of one of these organizations. *See* U.S. Compl., Doc. 92 ¶28 ("According to clinical guidelines from the World Professional Association for Transgender Health…."); *id.* ¶29 ("The American Academy of Pediatrics agrees that gender-affirming care is safe, effective, and medically necessary…."); *id.* ¶35 ("Un-der the Endocrine Society's clinical guidelines…."); *id.* ¶¶30, 32-37 (similar).

Plaintiffs likewise relied on the interest groups, alleging in their Complaint that WPATH and the Endocrine Society have promulgated standards of care that are

followed by "[t]he American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association." Pls' Compl., Doc. 159 ¶¶29-31. They expressly tied their proposed constitutional standard to the position of the interest groups in their preliminary injunction motion. Pls' PI Mot., Doc. 8 at 29; *see id.* at 21, 24, 36. And they dismissed concerns about the state of pediatric gender care by invoking the organizations: "[G]ender clinics, including the one at UAB, expressly follow the guidelines published by WPATH (2012), the Endocrine Society, and other major, reputable medical organizations." Pls' PI Reply, Doc. 89 at 23.

Plaintiffs' experts were also reliant on these organizations' views. Dr. Hawkins, herself a member of WPATH, PI Tr. 16[3], testified that puberty blockers and cross-sex hormones are "effective medications" for transgender adolescents "based on the guidelines from the leading mental health and medical experts." *Id.* at 25. When Plaintiffs' counsel asked Dr. Hawkins to "talk about the guidance by the medical leaders," Dr. Hawkins rattled off "the American Academy of Pediatrics, the American Medical Association, the American Psychiatric Association, [and the] American Psychological Association," before identifying the "WPATH standards of

---

[3] All references to the preliminary injunction hearing are to the continuously paginated transcript, Docs. 104 & 105.

care" as the "set of guidelines, recommendations for comprehensive care for transgender individuals." *Id.* at 27. So much attention did Dr. Hawkins pay to what the *medical organizations* said that she seemed unaware of what the *scientific literature* said—including that, for example, the UK's National Institute for Health and Care Excellence had published major, systematic literature reviews examining the safety and efficacy of puberty blockers and cross-sex hormones for minors. *Id.* at 39. She defended her lack of knowledge: "I rely on the national medical organizations to review and synthesize the medical findings." *Id.* at 39; *see id.* at 77 (Q."[Y]our basis for saying" "that without the medical interventions, suicide rates go up" "is just that you rely on the professionals?" A. "The professional organizations, yes.").

As for Dr. Ladinsky (a member of AAP), when asked to explain the "standards that provide guidance for treating physicians," she immediately invoked the interest groups: "[S]tandards of care by an international body of experts known as WPATH … has a lot of guidance.… The Endocrine Society's guidelines, again, consensus bodies of high-level endocrinology experts, digesting and continually looking at literature to prescribe the guidelines, all of this is again incorporated into a policy statement by our organization, the American Academy of Pediatrics." *Id.* at 97-98. Specifically addressing AAP's 2018 policy statement, Dr. Ladinsky testified that AAP "is continually vetting the latest, most well-validated and most important research to impact the care of kids[,] issuing guidelines and recommendations along those

lines." PI Tr. 99. These guidelines, Dr. Ladinsky assured the Court, "provide excellent guardrails for the care that we provide." *Id.* at 98.

Dr. Antommaria, another AAP member, also relied on the interest groups, explaining that the Endocrine Society and WPATH have released "clinical practice guideline[s]" that are trustworthy because they were developed "using systematic processes to select and review scientific evidence." Antommaria Decl., Doc. 78-13 ¶¶10, 34, 35; *see also* PI Tr. 220. So did Dr. Rosenthal, a former board member of the Endocrine Society, current board member of WPATH, and contributing author to both sets of standards. *See* Rosenthal Decl., Doc. 78-11 ¶¶8, 27, 29, 30.

The interest groups themselves also urged the Court to rely on their authority, representing that their views constitute "important expertise." Interest Groups' Amicus Br., Doc. 91-1 at 12. They argued that "the respected professional organizations participating here as *amici*" represent the "widely accepted recommendation of the medical community" in favor of transitioning treatments. *Id.* at 13 (footnotes omitted). To support their claim, the organizations cited … themselves. *E.g.*, *id.* at 16 & n.16 (citing Endocrine Society position statement). Then they discussed their purportedly "established, evidence-based clinical guidelines." *Id.* at 16-27.

Plaintiffs' counsel repeated the theme in closing argument. He argued that transitioning treatments are "endorsed by every major association in the United States." PI Tr. 371. And he sought to explain away the response of European

countries severely restricting access to pediatric transitioning treatments as the result of things having gotten "a little lax in Europe." *Id.* at 375. In contrast, he said, clinics in the United States "have these professional organizations that are providing this sort of oversight." *Id.* "We don't see that in Europe." *Id.* Putting aside that WPATH is the *World* Professional Association for Transgender Health whose standards were used in Europe until healthcare authorities there began viewing *them* as too lax,[4] Plaintiffs' message was clear: It is the medical interest groups that establish the standard of care in America, and it is to them the Court should defer.

### B.   This Court Relied on the Medical Interest Groups When It Granted a Preliminary Injunction.

The Court agreed with Plaintiffs' framing and relied on the opinions of the medical interest groups to preliminarily enjoin enforcement of Alabama's law. For example, although the Court acknowledged the risks of transitioning treatments, the Court deemed those treatments "medically accepted" in part because "WPATH recognizes transitioning medications as established medical treatments and publishes a set of guidelines for treating gender dysphoria in minors with these medications." PI

---

[4] We know that European countries like the UK, Sweden, and Finland are not following the WPATH standards because WPATH recently expressed "major reservations" over NHS England's service specifications for transitioning minors. The purported problems? In contrast to the WPATH standards, the new specifications "severely limit[] access to puberty suppression," "do[] not describe any process for provision of estrogen or testosterone therapies for older adolescents," and "reassert[]" the "'gatekeeping model' of access to gender affirming care." WPATH et al., *Statement Regarding Interim Service Specification for the Specialist Service for Children and Young People with Gender Dysphoria (Phase 1 Providers) by NHS England* (Nov. 25, 2022), https://perma.cc/VTM7-LEE6.

Op., Doc. 112-1 at 3-4. It further noted that AAP and other "major medical associa-tion endorse these guidelines as evidence-based methods for treating gender dyspho-ria in minors." *Id.* (citing amicus brief filed by the medical interest groups). Later in its opinion, the Court adopted Plaintiffs' framing of their constitutional arguments, finding that "Parent Plaintiffs are substantially likely to show that they have a fun-damental right to treat their children with transitioning medications *subject to medi-cally accepted standards*" because "the uncontradicted record evidence is that at least twenty-two major medical associations in the United States endorse transition-ing medications." *Id.* at 16-17 (emphasis added); *see id.* at 19, 24 (similar).

### C.   Evidence Suggests That the "Consensus" Offered by Plaintiffs and Relied on by the Court May Not Be a True, Scientifically Driven Consensus.

Given the prominent role the medical interest groups played at the preliminary injunction phase, Defendants noted at the close of the hearing that "a fair amount of discovery" would be needed to "assess[] the credibility of these institutions." PI Tr. 413. Indeed, recent reporting has raised questions about nearly every assertion made about the reliability and trustworthiness of the interest groups Plaintiffs put at issue.

Start with AAP. It would be one thing if its position statement truly reflected either the state of the science or its membership's views. Instead, the organization has apparently moved to suppress its membership's desire for an updated statement that accurately reflects the science. A recent resolution "submitted to the AAP's

annual leadership forum to inform the academy's 67,000 members about the grow-
ing international skepticism of pediatric gender transition" was quashed by "the
AAP's leadership" "[e]ven though the resolution was in the top five of interest based
on votes by members cast." Ex. 1, Julia Mason & Leor Sapir, *The American Acad-
emy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17,
2022). AAP "decried the resolution as transphobic and noted that only 57 members
out of 67,000 had endorsed it," but allowed a motion supporting "affirming" inter-
ventions to go through the next week with only 53 members supporting it. *Id.* As
AAP member Dr. Julia Mason concluded, "The AAP has stifled debate on how best
to treat youth in distress over their bodies, shut down efforts by critics to present
better scientific approaches at conferences, used technicalities to suppress resolu-
tions to bring it into line with better-informed European countries, and put its thumb
on the scale … in favor of a shoddy but politically correct research agenda." *Id.*

Other reporting supports Dr. Mason's concerns. According to one report, the
2018 AAP statement—heavily relied on by Dr. Ladinsky, PI Tr. 99—was "written
by a single doctor," who "'conceptualized,' 'drafted,' 'reviewed,' 'revised,' and 'ap-
proved' the manuscript himself." *See* Ex. 2, Aaron Sibarium, *The Hijacking of Pe-
diatric Medicine*, THE FREE PRESS (Dec. 7, 2022). "By 2019," the position statement
"was eliciting quiet concern among rank-and-file doctors affiliated with the AAP."
*Id.* But "[r]ather than promoting dialogue or compromise," AAP leadership "sought

to stifle dissent," "urg[ing] the Department of Justice to investigate critics of 'gender affirming care,' arguing that they were spreading 'disinformation' that puts lives at risk," "barr[ing] the Society for Evidence-based Gender Medicine, which advocates the watchful waiting approach, from being an exhibitor at its national conference," and "block[ing] a resolution calling for a review of the AAP's current guidance on puberty blockers." *Id.*[5]

Things are, if anything, only worse at WPATH. As Dr. Stephen Levine, a psychiatrist who "helped to author the fifth version of the [WPATH] Standards of Care" has testified, "WPATH aspires to be both a scientific organization and an advocacy group for the transgendered," and "[t]hese aspirations sometimes conflict." *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014). According to Dr. Levine, "[s]kepticism and strong alternative views are not well tolerated" at WPATH and "have been known to be greeted with antipathy." *Id.* (alteration omitted). This and other testimony led the First and Fifth Circuits—and, until recently, the U.S. Department of Health and Human Services—to find that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate."[6]

---

[5] *The Economist* also recently reported on AAP's suppression of dissenting views, highlighting "a growing number of doctors who are starting to push back against the apparent medical consensus on transgender issues" who "accuse the academy of trying to suppress debate." Ex. 3, *Questioning America's Approach to Transgender Health Care*, THE ECONOMIST (Jul. 28, 2022).

[6] *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek*, 774 F.3d at 90; Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37160, 37198 (June 19, 2020) (warning of "rel[ying] excessively on the conclusions of an advocacy group (WPATH) rather than on independent scientific fact-finding").

Dr. Ken Zucker was one such professional "greeted with antipathy" by activists at WPATH and its U.S. affiliate, USPATH, for his alternative views. Zucker is "a psychologist and prominent researcher who directed a gender clinic in Toronto" and headed the committee that developed the American Psychiatric Association's criteria for "gender dysphoria" in the DSM-5. Ex. 4, Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022). The 2012 WPATH Standards of Care—SOC 7—"cited his work 15 times." *Id.* In his nearly forty years of research, Zucker discovered "that most young children who came to his clinic stopped identifying as another gender as they got older." *Id.* Instead, "[m]any of them would go on to come out as gay or lesbian or bisexual, suggesting previous discomfort with their sexuality, or lack of acceptance." *Id.* As a result, Zucker became concerned that socially transitioning children could entrench gender dysphoria that would otherwise resolve.

Zucker's position was not popular with activists at WPATH. In 2017, when USPATH hosted its inaugural conference, Zucker submitted research, "his research passed the peer review process," and he was invited to present. Ex. 5, Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 PUBLIC RELATIONS INQUIRY, No. 3, pp. 295-310 (2021), at 302. When his panel discussion began, though, protestors "used their voices to drown out Zucker's presentation." *Id.* "That evening, at a meeting with the conference leaders, a group of

13

advocates led by transgender women of color read aloud a statement in which they said the 'entire institution of WPATH' was 'violently exclusionary' because it 'remains grounded in cis-normativity and trans exclusion.'" Ex. 4, Bazelon, *supra*. "Activists demanded Zucker's symposium be cancelled and for the WPATH Executive Board to provide an explanation and apology for his presence." Ex. 5, Ciszek, *supra*, at 302. "Additionally, activists demanded" "that gender transgressive persons" "be given seats on WPATH committees, including the scientific committees that decide which academic papers are accepted for conferences." *Id*; *see* Ex. 6, Videorecording of meeting, https://www.youtube.com/watch?v=rfgG5TaCzsk.

The disruption worked. "Th[e] uprising resulted in the cancellation of Zucker's panels," and "[c]onference organizers and board members publicly apologized for Zucker's presence at the conference and their part in perpetuating the mistreatment of and violence against transgender women of color in particular" by allowing Zucker to attend. Ex. 5, Ciszek, *supra*, at 304. They also "promised to incorporate transgender women of color into each level of WPATH's organization." *Id.* The public apology ended with the activist protesters on stage, surrounded by "supporters[] and allies," chanting "'Trans Power!'" *Id.* "After th[e] controversy, other providers were on notice that Zucker's methods were no longer acceptable," and "[h]is approach was likened to conversion therapy." Ex. 4, Bazelon, *supra*.

14

A few years later, in the fall of 2021, a number of articles by and about three WPATH leaders exposed further fissures in the organization. Dr. Marci Bowers, a world-renowned vaginoplasty specialist who currently serves as president of WPATH; Dr. Erica Anderson, a clinical psychologist and a former president of USPATH; and Dr. Laura Edwards-Leeper, the founding psychologist at the first hospital-based children's gender clinic in the United States, voiced their concern that medical providers in America were transitioning minors without proper gender exploratory psychotherapy and other safeguards. *See, e.g.*, Ex. 7, Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy" Care*, THE FREE PRESS (Oct. 4, 2021); Ex. 8, Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, WASH. POST (Nov. 24, 2021).

When Anderson, Bowers, and Edwards-Leeper went public with their concerns, they knew their colleagues at WPATH would not welcome the open discussion. *See* Ex. 7, Shrier, *supra.* (Anderson: "[T]his is going to earn me a lot of criticism from some colleagues, but … I'm worried that decisions will be made that will later be regretted by those making them."); *id.* (Bowers: "There are definitely people who are trying to keep out anyone who doesn't absolutely buy the party line that everything should be affirming, and that there's no room for dissent."). Sure enough, in October, USPATH and WPATH released a joint statement condemning "the use of the lay press … as a forum for the scientific debate" over "the use of pubertal

delay and hormone therapy for transgender and gender diverse youth." *See* Ex. 9, Joint Letter from USPATH and WPATH (Oct. 12, 2022), https://perma.cc/X7ZN-G6FS. "In early November, the board of USPATH privately censured Anderson, who served as a board member. In December, the board imposed a 30-day moratorium on speaking to the press for all board members. That month, Anderson resigned." Ex. 4, Bazelon, *supra*.

That same month—December 2021—WPATH released a draft of the updated 8th edition of its Standards of Care (SOC 8). In addition to adding a controversial "Eunuch" chapter and making other changes,[7] SOC 8 initially retained (some) age requirements for transitioning minors—14 years old for cross-sex hormones (down from 16 in SOC 7), 15 for mastectomies, "and vaginoplasty and hysterectomy at 17." Ex. 11, Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. POST (Sept. 29, 2022). Though SOC 8 had been in development for years, WPATH issued a "correction" shortly after publication *removing* the minimum age requirements. *See Correction*, 23 INT'L J. OF TRANSGENDER HEALTH S259 (2022), https://bit.ly/3qSqC9b. Why? According to Dr. Tishelman, lead author of the chapter, it was to "bridge th[e] considerations" regarding the need for insurance coverage for the surgeries with the desire to ensure that doctors would not be held legally

---

[7] *See* Ex. 10, Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022).

liable for malpractice if they deviated from the standards. Ex. 12, Videorecording of Dr. Tishelman's WPATH presentation, https://twitter.com/SwipeWright/status/1571999221401948161.[8] Plus, according to WPATH's president, to "propose" surgeries at defined "younger age[s]" would require "a better political climate." Ex. 13, Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'* N.Y. TIMES (Sept. 26, 2022), https://perma.cc/9786-V27T. Tuning supposed "Standards of Care" so as to minimize liability for harm done to minors (or to reflect the political winds) is not disinterested science.

Turning to Endocrine Society, while there has been less public reporting about the organization, many of the concerns raised about WPATH apply to the Endocrine Society's practice guidelines. WPATH is a co-sponsor of the Endocrine Society's practice guidelines, after all, *see* Doc. 78-14 at 1, and of the nine listed authors of those guidelines, it appears that only *one* (M. Hassan Murad) is not publicly affiliated with WPATH.[9] And, as is true with the authors of the WPATH and AAP

---

[8] WPATH complained that Dr. Tishelman's comments were "taken out of context, twisted and used to spread hate and lies on social media." WPATH, *WPATH Condemns Dangerous Misinformation* (Sept. 23, 2022), https://perma.cc/QL62-7WP9. Of course, any lack of context in the video simply underscores the need for discovery.

[9] *See generally* Aaron Devor, WPATH, *History of the Association*, https://www.wpath.org/about/history (last accessed Jan. 17, 2023).

standards, all of them make their livings performing the treatments blessed by the standards they write, raising concerns about financial conflicts of interest.[10]

* * *

These episodes are necessarily incomplete, dependent as they are on public reporting and leaks from the medical organizations and practitioners. But they highlight the need for more, and more complete, information. What is publicly available raises serious questions about the narrative Plaintiffs, the United States, and the medical interest groups told this Court about a reliable medical consensus.

### D.   Defendants Propounded Subpoenas to AAP, WPATH, and the Endocrine Society, and Attempted to Work in Good Faith to Alleviate Concerns About Burdensomeness.

Given these (and other) worrisome accounts and the need for fuller, more accurate information about the interest groups Plaintiffs and the United States built their case around, Defendants propounded third-party subpoenas on AAP, WPATH, and the Endocrine Society. *See* Doc. 208-2 at 7-18 (AAP), 56-70 (WPATH), 129-43 (Endocrine Society). After months of phone calls with counsel for the interest groups, Defendants offered to narrow their requests substantially to try to alleviate the alleged burden of production, provided that the organizations "work[ed] [with

---

[10] As one physician at Vanderbilt University Medical Center's Clinic for Transgender Health put it, transitioning services are a "big money maker." *See* Ex. 14, Amanda Prestigiacomo, *'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender 'Care,' Threats Against Dissenting Doctors*, THE DAILYWIRE (Sept. 20, 2022).

Defendants] in good faith to provide responsive documents." Doc. 208-2 at 190. The

revised subpoenas sought documents surrounding:

- The process AAP, WPATH, and the Endocrine Society used to create, review, and adopt their position statements, treatment guidelines, and standards of care regarding transitioning treatments (AAP RFPs 11, 13-15, 18, 22; WPATH RFPs 1-12, 14; ES RFPs 1-10, 12, 26);

- Efforts by AAP's membership to update the group's position statement on transitioning treatments (AAP RFPs 1-8);

- The groups' consideration, if any, of the UK's NICE literature reviews, the Swedish and French statements regarding transitioning care for minors, and certain other literature related to transitioning minors (AAP RFP 23; WPATH RFPs 15-16, 41, 47; ES RFP 27);

- The organizations' reaction to members' concerns about pediatric transitioning care in America (WPATH RFPs 18-21; ES RFPs 13-14);

- The groups' involvement, if any, in the creation of standards of care or diagnostic standards for other organizations related to pediatric transitioning (WPATH RFPs 23, 31-32; ES RFPs 15-17);

- USPATH's cancellation of Dr. Zucker's talk (WPATH RFP 23);

- The groups' review of the literature related to transitioning treatments for minors (WPATH RFPs 33-35, 43; ES RFPs 18-24);

- The organizations' knowledge of pediatric transitioning treatments in Alabama (WPATH RFP 44; ES RFP 28).

*See* Doc. 208-2 at 7-18, 56-70, 129-43, 190.

The groups refused Defendants' offer, claiming that the document requests

are "irrelevant to any claims or defendants in this case." Doc. 208-2 at 187. On

December 27, 2022, the groups moved to quash the subpoenas "in their entirety." Jt. Mot. to Quash, Doc. 208 at 3 ("Mot.").

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Relevant considerations include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action." Fed. R. Evid. 401. In the discovery context, relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case," no matter if the material itself would be admissible. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). The scope of discovery is broad "in order to provide parties with information essential to the proper litigation of all relevant facts." *Coker v. Duke & Co., Inc.*, 177 F.R.D. 682, 685 (M.D. Ala. 1998) (citations omitted).

"The scope of discovery that may be sought through a Rule 45 non-party subpoena is the same permissible scope under [Rule] 26(b)." *Stevenson v. Johnson Bros Corp.*, No. 2:18-CV-1702-RDP, 2019 WL 1083781, at *2 (N.D. Ala. Mar. 7, 2019). "[N]on-parties may not use Rule 45 to escape the required production of relevant documents sought by a party under a subpoena." *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2018 WL 11425554, at *1 (N.D. Ala. Oct. 24, 2018). Thus, "[t]he party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information." *Rosen v. Provident Life & Accident Ins. Co.*, 308 F.R.D. 670, 680 (N.D. Ala. 2015) (cleaned up); *see* 9A Wright & Miller, *Federal Practice & Procedure* § 2459 (3d ed.). This burden is "heavy." *Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n*, 2007 WL 9701863, at *3 (S.D. Fla. Mar. 30, 2007) (collecting cases).

The Rules "strongly favor full discovery whenever possible." *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991). "Where there is a doubt over relevancy, the court should still permit discovery." *Coker*, 177 F.R.D. at 685.

## ARGUMENT

## I.      The Requested Information Is Highly Relevant Under Plaintiffs' And The United States' Theory.

As explained in detail above, a central allegation of both Plaintiffs and the United States is that the Act denies "necessary" medical care that is (as the United States puts it) "widely recognized within the medical community." U.S. Compl.,

Doc. 92 ¶54. Though Defendants argue that any alleged consensus is all but irrelevant to the constitutional inquiry, this Court disagreed in its preliminary injunction order. And regardless of Defendants' arguments, this claim about a consensus remains a centerpiece of Plaintiffs' and the United States' cases. *Supra* 5-9. As the interest groups concede, "[t]he relevance of information sought in discovery depends on the claims asserted in the underlying action." Mot. 11 (quoting *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1329 (11th Cir. 2020)). Because Plaintiffs and the United States depend on an alleged medical consensus, evidence pertaining to the strength, soundness, and reliability of such a consensus is highly relevant.

The interest groups make no effort to respond to this simple, obvious explanation of relevance. Instead, over and over, they strain to make this discovery dispute look like the separate dispute occasioned by the United States' subpoenas on Eagle Forum and Southeast Law Institute. But the two disputes could not be more different.

First, the interest groups say that their guidelines "speak for themselves" and are "'the only thing everyone has voted on, agreed upon, and ultimately enacted'"— so the "processes" and "motives" leading to those guidelines must be irrelevant. Mot.12 (quoting Defendants' arguments about the Act). The interest groups thus compare themselves to a state legislature, noting Defendants' arguments that Alabama legislators' private decisionmaking processes are irrelevant. *Id.*

This makes no sense. These private medical interest groups are not legislatures, and they have no similar presumption of good faith. *E.g.*, *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022). Quite the opposite: extensive public evidence shows that the "processes" and "motives" of the interest groups in devising their recommendations are highly suspect. *Supra* 10-18. The organizations' circular assertion that the recommendations "reflect the consensus view of the organizations that publish them" (Mot. 12) simply begs the question. How did that "consensus" come to be, and does it reflect the best scientific evidence or something else (like, say, the "policy views" of these self-described "advocacy organizations," Mot. 3)?

In other words, the evidence sought here is nothing like the evidence the United States demanded from Eagle Forum and Southeast Law Institute. Defendants are not asking for communications with legislators to unearth imagined legislative motives. Those motives are, as Defendants have always said, *see* Doc. 157, irrelevant to what the law is. Instead, Defendants seek this information because Plaintiffs and the United States have made the existence of a medical consensus a crucial element of the case. Under Plaintiffs' and the United States' views, that consensus helps prove that the Act cannot satisfy constitutional scrutiny. If that alleged consensus is not as it seems—if it reflects not just science or medicine but something else—such evidence is patently relevant to the claims here. Similar cases routinely compel

discovery. *E.g.*, *Klay v. All Defendants*, 425 F.3d 977, 986 (11th Cir. 2005) (explaining that because the plaintiffs "relied upon [the American Medical Association's] data in the prosecution of their claims for relief," the court properly compelled AMA to provide the data "vital to" the defendants' case); *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, No. MDL142551SRNBRT, 2019 WL 5288281, at *2 (D. Minn. Oct. 18, 2019) (noting in case about concussions in hockey that the plaintiffs "obtained discovery and depositions from relevant third parties, including NHL member clubs, the NHL Players' Association and medical professionals advising the Association, as well as third-party medical institutions and affiliated researchers").

Repeatedly, the interest groups highlight Defendants' argument that "publicly available information" is what matters in this case. Mot. 12, 13. But that argument was made in the context of the United States' efforts to uncover the hidden motives of state legislators, which *are* irrelevant to the case (thus making "publicly available information" the only thing that mattered). And to the extent the interest groups are referring to Defendants' broader argument about the appropriate constitutional rule being decided without relying on the views of private interest groups, this Court rejected that argument at the preliminary injunction stage. *Supra* 9-10. Unless the Court grants Defendants' motion to exclude, the evidence is highly relevant.

Discovery encompasses "any nonprivileged matter that is relevant to any party's claim or defense," Fed. R. Civ. P. 26(b)(1), so Defendants are entitled to

discovery if only because Plaintiffs and the United States have made the medical consensus a centerpiece of their claims. When every aspect of their case—and each of their experts—relies on the purported medical consensus, *supra* 5-9, a proper adjudication requires probing the reliability and credibility of that consensus. Defendants are not limited to making broad defenses (*e.g.*, that the purported medical consensus is irrelevant), but may also offer narrower defenses (*e.g.*, that the purported consensus is not only irrelevant but suspect, the product of quashing dissent and prioritizing ideology or financial interest over science). Neither Defendants nor this Court should be forced to presume that the purported "consensus" reflects some universal truth of science, particularly when there is so much evidence to the contrary. *Supra* 10-18. Plaintiffs and the United States have put that "consensus" at issue, so Defendants are entitled to discovery to contest the assertion.

AAP appears to offer its own argument, stating that it "does not generate or publish clinical guidelines regarding gender-affirming care." Mot. 12 n.3. But Plaintiffs' witnesses testified extensively that they relied on AAP's policy statement, so whatever that document is labeled, its development is highly relevant. *See supra* 7; *see also* U.S. Compl., Doc. 92 ¶¶29, 30, 32. According to the interest groups, "[t]he widely accepted recommendation of the medical community, including that of the [AAP], is that the standard of care for treating gender dysphoria is 'gender-affirming care.'" Doc. 91-1 at 13. Again, the credibility of this recommendation is relevant.

The interest groups try to change the subject, pretending that they have received these requests only because they filed amicus briefs. Mot. 13-14. Nonsense. What Defendants care about is not that the interest groups filed amicus briefs, but that Plaintiffs offer these groups' opinions as the constitutional standard that governs how the State may legislate to protect the people. Plaintiffs and the United States have treated the interest groups not as "friends of the court," but as arbiters of what medical procedures the State may regulate. *That* is why the interest groups received the requests for information. As explained in Defendants' motion to exclude, if this Court were to treat the interest groups merely as amici and exclude evidence based on their self-interested advocacy positions, Defendants would be more than happy to withdraw these requests. But as long as Plaintiffs and the United States view these interest groups' positions as stating some sort of factual scientific consensus relevant to the constitutional questions, Defendants' requests seek highly relevant information. *See Klay*, 425 F.3d at 986.

## II.     The Tailored Requests Do Not Impose An Undue Burden.

Because of the great relevance of the information requested, the interest groups have a heavy burden to show that they may nonetheless withhold evidence critical to a proper adjudication of this case. The presumption is that "the public has a right to every man's evidence." *Adkins v. Christie*, 488 F.3d 1324, 1328 (11th Cir. 2007) (ellipses omitted) (quoting *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990)).

Third parties are not "immune from the burdens and costs of discovery," and "cannot escape the duty to provide their evidence relevant to the controversy." *In re Blue Cross Blue Shield*, 2018 WL 11425554, at *1. "The public has the right to their evidence, even if that imposes on them some burdens and expenses." *Id.* "A mere showing of burden and expense is not enough." *Rowlin v. Ala. Dep't of Pub. Safety*, 200 F.R.D. 459, 461 (M.D. Ala. 2001). Instead, the "resisting party must make a particular and specific demonstration of fact," "show[ing] specifically how a discovery request is overly broad, burdensome or oppressive." *Coker*, 177 F.R.D. at 686.

Here, the limited burdens from these tailored requests for highly relevant information are not "undue." Fed. R. Civ. P. 45(d)(3)(A)(iv). The interest groups make no effort to show how any specific request imposes particular burdens, as they must to prevail. Instead, they offer a blanket objection to answering *any* request, asking the Court to quash the subpoenas "in their entirety." Mot. 3. That is insufficient.

Once again, the major medical interest groups start off by comparing themselves to Eagle Forum and Southeast Law Institute, with "volunteer staff and pro bono counsel" being told to "parse through voluminous records." Mot. 15. Once again, it is hard to take this comparison seriously. The AAP has revenues in excess of $116 million.[11] *Contra* Doc. 208-3 ¶12 (asserting that AAP has "limited resources"). The Endocrine Society appears to have revenues in excess of $28

---

[11] *See* Financial Statements, June 30, 2021 and 2020, AAP, https://perma.cc/Z56R-GK2S .

million.[12] It is not *necessary* for these professional interest groups "to rely exten-
sively on pro bono counsel." Mot. 17.

The interest groups offer no specifics of why the burden of complying with
the requests would be undue. They specifically identify neither any requests that
they consider irrelevant nor any requests that they consider burdensome.[13] They
merely complain that they would have "to collect and review countless documents
scattered across numerous directories and individuals." Mot. 15. But this generalized
description of modern e-discovery does not suffice. As Wright & Miller explains, a
subpoena need not "be quashed because the documents themselves are voluminous
and cumbersome and significant difficulty and expense will be involved in produc-
ing them": "[s]ubpoenas of this kind are inevitable in the type of highly complex
cases that are now common." 9A *Federal Practice & Procedure* § 2459 (3d ed.).
Likewise, that the interest groups might need to hire attorneys and use staff time
(Mot. 16) is not an *undue* burden; that, along with shifting resources (*id.*), is *always*
involved in answering a subpoena. The declarations offered by the interest groups
contain no more detail and do not substantiate any undue burden.[14] Moreover, they

---

[12] *See* PROPUBLICA, https://perma.cc/4XAN-BCMS (fiscal year 2020).

[13] And the Court should not "consider issues or arguments raised for the first in a reply, for to do
so deprives the non-movant of a fair opportunity to respond." *Distrib. Res. Mgmt., Inc. v. Peacock*,
No. 2:12-CV-00188-SLB, 2012 WL 2930787, at *2 (N.D. Ala. July 13, 2012) (cleaned up).

[14] *E.g.*, Doc. 208-3 ¶¶10, 12 (speculating as to what efforts might be required "[t]o the extent AAP
needed to" find certain documents or collect "ESI," and emphasizing that "we have not obtained
quotes from discovery vendors for the work" the declarant speculated about); Doc. 208-4 ¶¶8-9
(similar, WPATH); Doc. 208-5 ¶¶8-10 (similar, Endocrine Society).

are represented pro bono by highly competent counsel—a major international law firm and a prominent Birmingham attorney. These interest groups' receipt of free legal counsel only reduces their burden of complying with these subpoenas.

The different number of requests relative to the Eagle Forum subpoena (Mot. 16) is irrelevant. What matters is the relevance, specificity, and any burden of particular requests. Yet the interest groups offer no argument about the merits of any specific requests, and Defendants repeatedly stated their willingness to continue to work with the groups to reduce their perceived burden, including through the identification of custodians and search terms. The Court should thus disregard their blanket assertion of burdensomeness and, given the great relevance of the requested documents to this litigation, deny the interest groups' motion and order production. Purported inconvenience to the interest groups from answering any requests whatsoever does not justify denying the parties and the Court of highly relevant evidence.

## III.     The Tailored Requests Do Not Violate The First Amendment.

The interest groups' cursory First Amendment argument is meritless. "[T]he party claiming a First Amendment privilege in an objection to a discovery request bears the burden to make a prima facie showing of the privilege's applicability." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 488 (10th Cir. 2011) (collecting cases). The interest groups must therefore "show a reasonable probability that the compelled disclosure will subject them to threats, harassment, or reprisals

from either Government officials or private parties." *In re Grand Jury Proceeding*, 842 F.2d 1229, 1236 (11th Cir. 1988); *see id.* at 1235 ("subjective fear of future reprisal is insufficient"). "[A] party cannot meet its burden of proof with a blanket assertion of privilege." *In re Grand Jury Subpoena*, 831 F.2d 225, 228 (11th Cir. 1987). And "the First Amendment does not prohibit discovery into legitimate, relevant matters, even when such discovery may produce a chilling effect." *United States v. Duke Energy Corp.*, 218 F.R.D. 468, 473 (M.D.N.C. 2003).

The interest groups fail at the outset to show that disclosure would impose a cognizable burden on First Amendment rights. Unlike the subpoenas in the cases cited by the interest groups, these subpoenas do not seek membership or donor lists, much less involve any showing that the State is seeking to use the information to publicize or prosecute individuals disclosed through discovery. *Cf. NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 463 (1958); *United States v. Comley*, 890 F.2d 539, 544 (1st Cir. 1989) ("[T]he magnitude of the first amendment concerns seems less . . . where the extent of any disclosure of identities is speculative and is not the specific objective of the government subpoena."). And unlike the United States' subpoenas to Eagle Forum and Southeast Law Institute, the focus of these subpoenas is not protected (and irrelevant) communications with legislative representatives. Instead, the interest groups are merely asked to disclose certain highly relevant

information regarding disputed claims in this case. They offer no adequate explanation of how complying with the subpoenas restrains their free speech or association.

Rather than making a particularized showing, the interest groups lodge a facial attack to the federal discovery rules, objecting that *any disclosure at all* would have "a chilling effect" and be "costly." Mot. 18. If that were true, no discovery regarding third-party communications could *ever* be taken. Because the interest groups make no specific claims of privilege tied to any specific requests, their First Amendment argument fails. *See New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989) ("Absent a more specific explanation of the consequences of compliance with discovery, defendants failed to make the required initial showing of potential First Amendment infringement."); *see also Herbert v. Lando*, 441 U.S. 153, 176-77 (1979) (overruling First Amendment objection to discovery into the internal affairs of a news organization).

Moreover, the interest groups' arguments fail even on their own terms. Attempting to show a "chill," the groups rely on purported "threats" "already received" "due to their work on issues related to gender-affirming care." Mot. 19. They claim that "the mere issuance of the subpoenas" has also led to "fears." *Id.* at 18. The organizations assert without explanation that responding to the subpoenas could "risk[] amplifying [alleged] threats." *Id.* at 19. Tellingly, the interest groups cite no caselaw suggesting that Rules 26 and 45 are subject to a heckler's veto or that relevant

31

material can be withheld because of unrelated speech that was already occurring and has no connection to production of the requested information. *Every* organization subject to a subpoena could claim that its members might not want to participate "due to fears of being embroiled in litigation." Mot. 18. That cannot be enough to avoid production of relevant material.

Courts have rejected similar contentions that "a chilling effect" is shown because the party "will have to devote time and money to comply with the discovery requests." *In re Motor Fuel*, 641 F.3d at 490. As those courts have explained, the theory that "the cost of compliance decreases the amount of available [organization] funds" and is thus a chill fails as a matter of law: "no court has construed the First Amendment privilege so broadly." *Id.* "[T]aken to its logical extreme, this argument would render all discovery prima facie privileged under the First Amendment because any time or money spent complying with a discovery request could conceivably be spent petitioning the government or engaging in other activities which are protected under the First Amendment." *Id.* That is not the law.

The interest groups also claim that "the subpoenas have already discouraged dialogue in a field that requires robust scientific debate and candid exchanges." Mot. 18. That is ironic coming from groups that have repeatedly tried to stifle such debate and now oppose turning over material that would shed light on those efforts. *See*

*supra* 10-18. Regardless, and again, if a generalized chill were enough to quash a subpoena, no discovery could ever occur. *See Duke Energy*, 218 F.R.D. at 473 n.5.

In any event, any *actually* sensitive or personal information that is responsive to particular requests can be subject to a protective order, eliminating any claimed harms from public disclosure. As other courts have recognized, "the answer" to First Amendment privilege claims "is not to suppress [all] evidence, but rather to exercise judicial discretion by providing protection short of suppression." *Duke Energy*, 218 F.R.D. at 473. Yet here again, the interest groups "fail[] to offer any proposal for protection less than suppression." *Id.* Instead, they offer only the unexplained, blanket assertion that production subject to a protective order "could nonetheless become public." Mot. 19. This Court should not decide this motion based on conspiracy theories that court officials or parties might flout judicial orders.[15]

Last, even if the interest groups had shown a First Amendment burden as to some specific requests, Defendants would still be entitled to this highly relevant material that (as the groups do not dispute) cannot be obtained elsewhere. The federal discovery rules "further[] a substantial governmental interest unrelated to the suppression of expression": "enabl[ing] parties to litigation to obtain information

---

[15] The interest groups reference a purported "leak[]" of generalized information about subpoenas in a Florida case. Mot. 19-20. But the interest groups do not suggest that such information was protected by court order, much less explain how the disclosure of unprotected information in another case suggests that court officials or parties would violate a protective order in this case.

relevant to the subject matter involved that they believe will be helpful in the preparation and trial of the case." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984) (cleaned up). "The need to develop all relevant facts in the adversary system is both fundamental and comprehensive," for "[t]he very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence." *United States v. Nixon*, 418 U.S. 683, 709 (1974). And in this specific case, State Defendants seek to uphold the democratic will of the people, who acted through their elected representatives to protect children. *See Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) ("[A] State's interest in safeguarding the physical and psychological wellbeing of a minor is compelling." (cleaned up)). Because Defendants seek highly relevant information that cannot be obtained elsewhere and is necessary to a full adjudication of Plaintiffs' and the United States' attack on a presumptively valid state statute, Defendants are entitled to the requested discovery regardless of alleged "deterrent effect[s]." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1161 (9th Cir. 2010).

## CONCLUSION

Defendants take their discovery obligations seriously, including the duty to avoid imposing undue burden or expense on third parties. And they wholeheartedly support the First Amendment right of citizens to associate, to debate, to petition their legislators for change without fear that the government will seek irrelevant discovery

as a means to chill speech. That is why Defendants so vehemently defended Eagle Forum and Southeast Legal Institute when the federal government came knocking.

The dispute here is nothing like that. Whereas no one so much as mentioned Eagle Forum and Southeast Legal Institute at the preliminary injunction phase, nearly *everyone*—Plaintiffs, the United States, their expert witnesses, and this Court in its preliminary injunction order—put the positions of AAP, WPATH, and the Endocrine Society front and center. The Court should thus deny the interest groups' motion to quash and order them to produce documents so Defendants can test the evidence upon which Plaintiffs and the United States have built their case. Otherwise, the Court should exclude at summary judgment and trial all evidence based on the opinions of the interest groups.

Respectfully submitted,

Steve Marshall
  *Attorney General*

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, South Carolina
29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*
A. Barrett Bowdre (ASB-2087-K29V)
Thomas A. Wilson (ASB-1494-D25C)
  *Deputy Solicitors General*
James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorney General*

COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF

system on January 17, 2023, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
*Counsel for Defendants*