# Exhibit 5

Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 PUBLIC RELATIONS INQUIRY, No. 3, pp. 295-310 (2021).



*Full Length Conceptual Essay*

# Discursive stickiness: Affective institutional texts and activist resistance

Public Relations Inquiry
2021, Vol. 10(3) 295–310
© The Author(s) 2021
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/2046147X211008388
journals.sagepub.com/home/pri

**Erica Ciszek** 
University of Texas at Austin, USA

**Richard Mocarski**
University of Nebraska at Kearney, USA

**Sarah Price**
Florida Gulf Coast University, USA

**Elaine Almeida**
University of Wisconsin, USA

## Abstract
Pushing the bounds of public relations theory and research, we explore how institutional texts have produced and reified stigmas around gender transgression and how these texts are bound up in moments of activism and resistance. We considered how different discursive and material functions get "stuck" together by way of texts and how this sticking depends on a history of association and institutionalization. Activism presents opportunities to challenge institutional and structural stickiness, and we argue that public relations can challenge the affective assemblages that comprise and perpetuate these systems, unsettling the historical discourses that have governed institutions by establishing new communicative possibilities.

## Keywords
Activism, agency, resistance, stickiness, transgender

**Corresponding author:**
Erica Ciszek, Moody College of Communication, University of Texas at Austin, 300 W. Dean Keeton, Austin, TX 78712, USA.
Email: eciszek@utexas.edu

Pushing the bounds of public relations theory and research, we explore how institutional texts have produced and reified stigmas around gender transgression and how these texts are bound up in moments of activism and resistance. We focus on the Diagnostic and Statistical Manual of Mental Disorders (DSM)—a handbook used by behavioral healthcare professionals in the United States and much of the world—linking lived experiences of transgender people to the history of the epistemological violence perpetrated in the DSM that reifies hegemonic norms of gender, sex, and sexuality. Importantly, the DSM is not a benign text; journalist Reese (2013) critiques the DSM, drawing attention to the bureaucracy implicated in the text:

> The American Psychiatric Association owns the DSM. They aren't only responsible for it: they own it, sell it, and license it. The DSM is created by a group of committees. It's a bureaucratic process. In place of scientific findings, the DSM uses expert consensus to determine what mental disorders exist and how you can recognize them. Disorders come into the book the same way a law becomes part of the book of statutes. People suggest it, discuss it, and vote on it. Homosexuality was deleted from the DSM by a referendum. A straight up vote: yes or no. It's not always that explicit, and the votes are not public. In the case of the DSM-5, committee members were forbidden to talk about it, so we'll never really know what the deliberations were. They all signed non-disclosure agreements. (para 15).

In this article, we contend that the DSM creates the web of language from which we come to understand and communicate about gender variance in the United States, and this language is rooted in institutional discourse and extends to the practices of public relations and activism. We then turn to the connections between discourse, activism, and power-plays among and between key stakeholders. We orient this argument in queer theorist Sarah Ahmed's (2004) concept of stickiness, demonstrating how the affect of disgust gets attached to transgender subjectivity within an institutional text and is carried out performatively within material landscapes. The purpose of this paper is threefold: (1) we argue that institutional texts, because of their prominence as world-defining documents, are important public relations discourses; (2) by historicizing this text, we can see how these documents leave behind a trail of the past, remnants of power, and hegemony; and (3) we demonstrate how activism resists the stickiness of these texts.

A note about terminology and context: "Transgender" is a contemporary term that emerged in recent years to indicate a wide variety of people whose gender identity or expression transgresses the rules of binary gender. We use the term "transgender" to refer to what Susan Stryker, a leading voice in the field of transgender studies and longtime advocate for transgender visibility and rights, refers to as individuals who "move away from the gender they were assigned at birth, people who cross over (trans-) the boundaries constructed by their culture to define and contain gender" (Stryker, 2008: 1). Transgender, according to sociologist Monro (2005: 3) "explodes the notion that male and female are discrete categories." This conceptualization, as other gender scholars have noted, undergirds a historical discussion that allows for a "history sensitive to a wide range of identities and experiences" (Tebbutt, 2012: 506). We also use the phrase "gender transgressive," which transgender activist and legal scholar Spade (2003) argues encapsulates myriad identities and experiences and is not limited to narrow understandings of sex and gender. As historian and transgender activist Beemyn (2013) explains:

"Any attempt to write 'transgender history' is complicated by the contemporary nature of the term 'transgender'" (p. 113). We recognize that applying terms and concepts of gender variance from the early-20th century is problematic (Boag, 2005), for these categories, as historian Cleves (2014) notes are indebted to "a very modern regime of knowledge and power," (p. 461) particularly the role of medicine in defining the category. Spade (2003) draws our attention to the contentious and oppressive relationship between gender transgressive people and medical establishments. Additionally, because culture is a major variable in attitudes toward gender transgression, it is important to note this essay comes from a U.S. perspective using U.S. examples.

In this article, we attend to both discursivity and materiality of the DSM as an institutional text, first in our examination of medical texts and then in our analysis of a moment of resistance. We bring to light the normative linkages brought into power through medicine and legitimized and leveraged through promotion. We make visible these linkages and provide an anecdote that highlights the disruptive power of activism. We start by presenting Ahmed's concept of stickiness and then pivot to the literature on activism and public relations as a space where affect theory can inform an intervention. We are interested in how the DSM, as a discursive object, generates affect and how it travels through institutional texts via affective transfer, as well as how activists challenge this affect. Our analysis is inspired by Ahmed's (2010, 2014) work on affect as sticky, presenting a framework to attend to the production and transference of emotions through institutional texts. We draw on Ahmed's notion that affect is performative, and we point to the ways in which affect is contagious and has the ability to stick. Regarding the stickiness of affect, Ahmed (2014: 91) writes:

> Stickiness involves a form of relationality, or a 'withness,' in which the elements that are 'with' get bound together. One can stick by a friend. One can get stuck in traffic. Some forms of stickiness are about holding things together. Some are about blockages or stopping things moving. When a sign or object becomes sticky it can function to 'block' the movement (of other things or signs) and it can function to bind (other things or signs) together. . .Stickiness then is about what objects do to other objects – it involves the transference of affect – but it is a relation of 'doing.'

Stickiness, according to Ahmed, involves the transference of affect, and for Ahmed, objects become sticky, or logged with affect, and pickup traces of where they have been. We argue that institutional discourses and frameworks, like those of pathology put forth in the DSM, sustain a particular kind of affective relation, that of pathology, to social norms and texts that govern bodies and material realities. We conclude with an anecdote in which transgender activists employ public relations to block the binding of pathology to transgender subjectivity. We wish to highlight that the vanguard of this activism was transgender women of color. The intersection of race and gender is vital to understanding the manifestation of this activism, as the resistance mounted was multi-pronged in regards to which vectors of power the activism unmasked. Given the history of the DSM as a white-centric text (Thomas, 2014) where non-white identies have been othered (Cermele et al., 2001), paired with the high incidence of physical and institutional violence against transgender women of color, the anecdote demonstrates displays of agency in response to multifaceted hegemonic vectors of silence.

Case 2:22-cv-00184-LCB-CWB   Document 219-5   Filed 01/17/23   Page 5 of 17

## Tracing gender variance in institutional discourses

For nearly the last 70 years, the DSM has been used to identify, classify, and categorize mental illness, diagnoses that are social and contextual. It is a text that holds much power, as it is used by clinicians, researchers, regulatory agencies, health insurance companies, pharmaceutical companies, and policy makers. According to the American Psychiatric Association, the DSM is significant because it provides a common language for "clinicians to communicate about their patients and establishes consistent and reliable diagnoses that can be used in the research of mental disorders" (DSM–5: Frequently Asked Questions, 2019, para 1). To understand the bearing of the DSM in shaping the stigmatization of transgender individuals and the subsequent impact on material conditions for these persons, we must first ground our understanding of how health care functions in the United States. The dominant model of health care in the western world is the single-disease model of health, also known as the biomedical model (Wade and Halligan, 2004). The biomedical model of health is a reductionist framework that creates a myopic and non-reflexive orientation toward health that may create malady where arguably none exists. The medical establishment has the power to construct and shape identity, classifying what is considered normal and abnormal (Foucault, 1965), a classification that can have long-term societal impacts that range from positive (e.g. vaccinations against smallpox) to negative (e.g. stigmatization of sexualities). The diagnosis and treatment of behaviors is predicated on medical and psychiatric classification (Foucault, 1965). In short, medicine is socially constructed, and, therefore, the history of a gender variance is a journey that reveals mechanisms of hegemonic power, structures in which public relations plays a role. Importantly, in a cultural and political context in which medical care remains inaccessible to many and particularly low-income transgender people of color, medical care associated with gender confirmation is administered through gender-regulating processes—often guided by the DSM—that reinforce oppressive gender binaries. Thus, in acknowledgement of these contexts, we proceed with caution when approaching the historically interwoven systems and structures of medical and communicative realms that continue to shape the lives and experiences of transgender people.

This history of the clinicalization of gender transgression in the United States illuminates some of the parallels between medical and psychiatric institutions and how these texts are linked to very public and promotional moments in history. Importantly, we do not intend to group any past figures or classifications with modern identity categories; rather, we understand them as historical and contextual, serving as a framework for contemporary transgeder activism. By way of publicity and promotion, in the early 1950s, American Christine Jorgensen was the first person widely known for having sex reassignment surgery, and she became the face of transsexuality. Jorgensen's story was the subject of a front-page story of the *New York Daily News* and appeared in mainstream magazines like *Time* and *Newsweek*, and she became a celebrity using her platform to advocate for transsexuals. Importantly, as historian Skidmore (2011) chronicles, Jorgensen distanced herself from "deviant" groups, providing the press with a narrative of white respectability that was distinct from stories of homosexuality or cross-dressing. Within the backdrop of Jorgensen's publicity, in the 1960s, clinicians in the United States began to develop criteria for gender identity programs, most notably with the publication

of endocrinologist Harry Benjamin's *The Transsexual Phenomenon* and the opening of the first gender identity clinic at Johns Hopkins University in 1966. Prior to this time, clinicians provided individuals surgical interventions on the basis of correcting what they considered anomalies (Stone, 1991), often grounding diagnoses in the DSM.

To date, there are eight iterations of the DSM: DSM-I (1952), DSM-II (1968), DSM-II sixth printing (1973), DSM-III (1980), DSM-III-R (1987), DSM-IV (1994), DSM-IV-TR (2000), and DSM-V (2013). We argue the DSM is an institutional text that catalogs and codifies gender transgression; it is a reification of authoritative knowledge production that, through its various iterations, produces remnants of stigma that travel through time. These texts demonstrate how institutional discourses have shaped and continue to shape contemporary gendered subjectivities. Since the publication of its first edition in 1952, the DSM has created pathways through diagnostic classifications that link gender variance to other pathological categories. For example, the pathology of gender variance can be traced to the first iteration of the DSM where transgenderism was listed in the "Sexual Deviation" section (000-x63), a list derived from "cases formally classed as 'psychopathic personality with pathologic sexuality'" (1952: 39). Specifically transvestism, or what at the time was understood as cross-dressing, listed alongside homosexuality, pedophilia, fetishism, and sexual sadism—which includes rape, assault, and mutilation. A formal diagnosis of transsexualism as a psychiatric disorder did not appear in the DSM until the third iteration published in 1980, identifed as "Gender Identity Disorder," categorized as an Axis I mental illness—disorders most commonly found in the public. In 2008, as part of the revision and update of the DSM, the American Psychiatric Association appointed a Work Group on Sexual and Gender Identity Disorders resulting in concern among the lesbian, gay, bisexual, and transgender (LGBT) community, largely focused on the status of the diagnostic categories of Gender Identity Disorder. As with homosexuality in the 1970s[1], activists maintained that it is wrong to label expressions of gender variance as symptoms of a mental disorder. While some activists contend the perpetuation of Gender Identity Disorder (GID) diagnoses in the DSM would further stigmatize and cause harm to transgender individuals, other advocates in the transgender community expressed concern that removing GID could lead to the denial of medical and surgical care for transgender individuals (see Drescher, 2010). In the latest iteration of DSM V, the introduction to the section on Gender Dysphoria reads: "The area of sex and gender is highly controversial and has led to a proliferation of terms whose meanings vary over time and within and between disciplines." This quote encapsulates the historical and contextual nature of discourses surrounding gender variance and the contested nature of representing gender variance.

Inclusion of gender variance in the DSM is complex and arguably a double-edged sword. On one hand, classifying gender variance as a disorder "open[ed] many door[s]" (Arune, 2004: 115), providing access to hormone therapy and gender affirmation surgeries in countries with state health programs. Conversely, through the anchoring of gender variance in the DSM, it could be argued that gender transgressive individuals have had the "misfortune to become objects of medical concern" (Brown and Tucker, 2010: 230), embodying the stigma of a mental disorder (Arune, 2004). Furthermore, the history of the DSM as a normative text includes embedded understandings of hegemonic race, which can serve as a framework for systemic racism, as has been documented

Case 2:22-cv-00184-LCB-CWB   Document 219-5   Filed 01/17/23   Page 7 of 17

300                                                                                     Public Relations Inquiry 10(3)

by scholars (Alarcón et al., 2009; Cermele et al., 2001; Loring and Powell, 1988). This misfortune, when coupled with other vectors of hegemonic power, can serve to further erase and stigmatize groups such as transgender women of color.

Although the DSM was developed within an American context, it is applied in a range of countries across the globe. Edited by the American Psychiatric Association (APA), the DSM has positioned itself as "the most authoritative text on mental health in the Western culture" (Crowe, 2000: 69) with influence in health domains and on social practices including legal fields and insurance (see Harper, 2013; Lafrance and Mckenzie-Mohr, 2013). The DSM is a powerful tool within a hegemonic block, and we argue that its temporal nature creates a stickiness through the editions of the text that allows it to have such a prominent place. These texts and the institutional practices they are implicated in are social forms, and it is through repetition, as queer theorist Butler (1993) reminds us, that norms materialize. Within the context of materialization, Ahmed is interested in how different figures of speech get stuck together and how this sticking relies upon histories of association. We argue the DSM functions as a vector of hegemonic power that sets the guidelines for transgressive behavior, defining gender norms as those that are linked to normative or dominant understandings of sex. We argue that through circulation and repetition of the DSM, the pathology of gender transgression generates stickiness, and activists challenge this stickiness through public relations.

## Activism in public relations

While promotional and persuasive communication has long been part of the work of activism and social movements (see Coombs and Holladay, 2007; Heath and Waymer, 2009), public relations research has experienced a swell in activism scholarship over the past decade (see Adi, 2019). Heath and Waymer remind us that that "obtaining the democratic exchange long championed by public relations" required "seeing how and when activists engage in the dialogue that occurs on various issues" (2009: 195). Activism requires the development of oppositional consciousness, contesting dominant ideologies, and providing "symbolic blueprints" for collective action and social change (Morris and Braine, 2001: 26). Activists use a variety of public relations strategies and tactics, including boycotts, demonstrations, and symbolic events, to galvanize attention and influence public opinion and policy. Historically, scholars have studied activists to understand their communication practices, their strategies, their ideological motivations, and the power differences between them and the organizations they are resisting (Manheim and Holt, 2015). From a tactical perspective, scholars note how activists mobilize resources and power to influence decision-making, employing techniques such as persuasion, negotiation, pressure, and/or force (Kim and Sriramesh, 2009). Public relations literature on activism has tended to focus on organizational perspectives and management of activist groups (Brown, 2010; Smith and Ferguson, 2010), with a recent shift to looking at how practitioners function as activists (Holtzhausen, 2007, 2012) and how activists engage in public relations practice (Ciszek, 2015, 2017).

While traditionally public relations research has positioned activists as "an antagonistic force" (Coombs and Holladay, 2012: 82), aside from a handful of contemporary projects (e.g. De Moya and Bravo, 2016; Stokes and Atkins-Sayre, 2018; Toledano, 2016),

until fairly recently few studies have looked at how activists use public relations to achieve their objectives. Activists play an important role and often function as pressure groups that influence and shape society. Coombs and Holladay contend:

> Activists seek to change organizations in some fashion and that requires them to utilize power and persuasion. Typically, activists are marginalized by and have much less power than organizations. Through public relations, activists can attempt to build power and to persuade organizations to alter their behaviors and policies (2012, 882).

Reconceptualizing the activist role, Holtzhausen (2007, 2012) carves out a space in public relations theory for exploring resistance and dissent to normative power structures. Holzthausen (2012) conceptualized public relations activism as public relations which resists power structures, employs dissent, and incorporates subaltern voices to challenge normative practices. In this article, we come at activist public relations by way of Ahmed's notion of stickiness to articulate and explicate the ways activists utilize public relations to unstick the structural and discursive connections between ideas, values, and objects surrounding transgender subjectivity. We look at the instutionalization of gender transgression, turning to a moment of activist resistance, and contributing a non-corporate context for the discussion of how activists use public relations. We attend to the webs of power and institutional logics that transgender individuals are located within, illustrating through one example how activists utilize materiality as a form of resistance.

### Activism, agency, and resistance

In 2017, one author attended the United States regional conference of the Professional Association for Transgender Health (USPATH) in Los Angeles in the presence of clinicians, researchers, and TGD advocates.[2] At this conference, Drs. Kenneth Zucker, Heino Meyer-Bahlburg, Dan Karasic, and Vilanayur Ramachanfran, a group of controversial psychologists of sexual orientation and gender identity, presented a session entitled "Development of Gender Variations: Features and Factors," in which they discussed myriad cases. The purpose of the session was to lay out potential clinical implications for working with transgender clients. However, the tenor of the session was one of caution and liability, with panelists (particularly Zucker) questioning the increase in prevalence of transgender identifying persons. Zucker, the lead of the DSM-V Sub-Work Group on Sexual and Gender Identity Disorders, has had a long career working with gender-diverse clients, but he is viewed by transgender activists as harmful for his ties to conversion techniques (see Serano, 2016). Zucker is famous for his contested corrective reparative therapy for gender-variant children, where as part of his research he forced children assigned female at birth not to play with trucks and soldiers and children assigned male at birth not to play with dolls (Ashley, 2020). In 2015, Zucker's practice of gender conversion psychotherapies on transgender children was famously shut down (Hayes, 2018), shrouding Zucker and his supporters in a veil of stigma. Social work and gender studies scholar Jake Pyne and other transgender advocates and scholars contend that at the heart of Zucker's approach is an understanding of gender diverse children as disordered, casting a specter of shame over their behaviors (and over parents' tolerance of it) and seeking

"redemption, success, and normality for the gender problematic child" (Pyne, 2014: 88). Despite these critiques, Zucker maintains a private clinical psychology practice focused on gender dysphoria, and holds the position of Professor in the Department of Psychiatry at the University of Toronto.

At the 2017 conference, Zucker presented his hypothesis on the increased prevalence of transgender persons, pointing to desistance (a false claim by Zucker that 80% of adolescents who transition desist; see Winters, 2016) and regrets of clients (psychological faults of clients, including sexual fixations). Zucker's presentation embodies a performative iteration of the stickiness of pathology. Despite his controversial practices, his research passed the peer review process that governs WPATH conferences, and he was given authority and power to hold a forum which was buttressed by his position as the lead of the Sexual and Gender Identity Disorders working group. Importantly, no space was made for transgender persons on this panel, reifying the othering of gender transgressive people. Furthermore, this lack of inclusion echoes the institutional documents that govern the *treatment* of gender transgressive bodies, as the authors and users of these documents are almost exclusively cisgender, individuals whose gender is the same as their birth-assigned sex (Aultman, 2014). The term cisgender emerged in the 1990s from trans activist discourses that critiqued the hegemony surrounding sex and gender and gained popularity among activists and scholars.

The fragility and vulnerability of this space was demonstrated by the cisgender heteronormativity governing it. As Butler (2004) notes, "the regulation of gender has always been part of the work of heterosexist normativity" (p. 186), and this wielding of control continued the hegemonic formations of power. However, what resulted next demonstrates the ways in which activism can exploit fissures of logic within hegemonic webs of power. During the panel, Lina Riparia, a transgender woman of color, led a walkout where protesters used their voices to drown out Zucker's presentation. Importantly, this protest led to hegemonic rebukes; specifically, hotel security removed the protesters from the premises. As a result, activists employed public relations: issuing press releases, hosting community forums, and engaging in performative strategies that challenged the stickiness of pathology. Activists demanded Zucker's symposium be cancelled and for the WPATH Executive Board to provide an explanation and apology for his presence at this conference and the 2016 WPATH conference in Amsterdam. In a statement, transgender people of color asked for a formal apology both in person and on the USPATH/WPATH website from the USPATH/WPATH board for calling security on transgender conference attendees for exercising their right to protest. Additionally, activists demanded that WPATH hire transgender people as paid consultants, give local transgender communities input into planned conferences and promise that gender transgressive persons will be given seats on WPATH committees, including the scientific committees that decide which academic papers are accepted for conferences. This example embodies what transgender scholar Keegan (2020) calls a moment of resistance "gendered self-fashioning" (p. 61) by gender transgressive people who have existed both within and against the systems that have classified them. Importantly, this was not a forum for dialog; it was a space cultivated by and for transgender women of color to vocalize their demands to the USPATH executive board. Transgender women of color demanded to be listened to and for conference organizers to acknowledge the institutional erasure and

violence against gender transgressive persons, and they called into focus the historical dissymmetry and marginalization that governs a conference focused on transgender people.

The protesters' presence was, in and of itself, an exposure of the fissures in logic in Zucker's presentation and the institutions that supported him, as it demonstrated how those with lived experiences as transgender did not conform to the constitution of normative gender that Zucker reified in his presentation. As a member of the DSM board, Zucker functions as a hegemonic vector of power. Zucker, the flagbearer of the DSM's power over transgender subjectivities, was withdrawn from the program and was institutionally rebuked through this removal. Transgender women of color used their material and embodied experiences to challenge medical and institutional hegemony. The protest was enough for several transgender women of color to gain the attention of conference organizers. During a meeting with USPATH organizers held the next morning, these women were given the floor to air their grievances with Zucker's presence at the conference. Transgender women of color refused to concede power to white and cisgender individuals, noting as one activist, Danielle Castro, emphasized during the meeting:

> Trans women of color are being pushed out to the sidelines even though we are tokenized and asked to participate in ways that exploit us to your benefit. That's not going to happen anymore. We are taking back our power and taking back our voice. . . . It's time to include us in meaningful paid and respected ways. We're not here for a dog and pony show. We've gone to school. We're working in professional settings. And it's high time our voices are respected as such.

The transgender women of color shared their list of requirements and reinforced the need for each of their demands to be immediately addressed by USPATH organizers. These demands included a formal apology posted on USPATH's social media pages and website and shared publicly at the conference, the dismissal of the individuals who called security to stop the protesters, and removal of Zucker from the conference, specifically cancelling his upcoming session. Additioally, activists called for the organization to employ transgender women of color as paid consultants throughout all levels of the USPATH and WPATH working on transgender health and conference organization. This meeting embodied the creation of "third space feminism," or what Golombisky (2015) called womanist tactics, to "get things done" (p. 407), but importantly did not include "harmonizing and coordinating" or "dialog," as it was not designed as a dialogic space between activists and organizers, rather it functioned as space for agency and dissent. This is embodied by the comments of Bamby Salcedeo, the president and CEO of the TransLatin@Coalition:

> Even though we are here in a peaceful manner, I think it's important that we understand that these are serious demands that we are presenting to all of you. We're actually expecting direct results that will change the landscape of the current violence that we're continuing to face institutionally, and within our society.

This uprising resulted in the cancelation of Zucker's panels, the issuing of a public apology to these women and to TGD conference attendees, and the instatement of a new

panel of and by transgender women of color. In this panel discussion, transgender women of color articulated their lived experiences to a standing-room-only audience, working to challenge, and unstick the pathology from its roots in institutional erasure and marginalization. They demanded accountability, respect, and safety. In this way, activist public relations that utilizes materiality functions as a way to disrupt stickiness across temporal planes. Therefore, activism is a resistance to institutional power, and this example embodies the discursive struggle that underpins the work of cultural intermediation that is anchored in the acquisition of power (Thompson, 2016).

In opposition to the hegemonically sanctioned discourses, activists were able to reclaim space and, through public relations techniques, dispel fallacies through narratives of their own lived realities. During the public apology issued by USPATH and the conference organizers, transgender women of color led the presentation by inviting those who stand in solidarity with trans women of color and the protesters to join the presenters onstage. The majority of the audience stood up and moved to the stage, demonstrating solidarity, and support for transgender women of color. Conference organizers and board members publicly apologized for Zucker's presence at the conference and their part in perpetuating the mistreatment of and violence against transgender women of color in particular, and they promised to incorporate transgender women of color into each level of WPATH's organization. Although this public apology was generally well-received, the leading activists Danielle Castro and Bamby Salecedo reiterated the importance of practicable action and material change throughout the organization, instead of limiting the apology to a single moment of solidarity. Slecedo reiterated this need for tangible change, asserting:

> I want for us to acknowledge and remember this time. Right? This is a show of solidarity. This is what solidarity looks like [. . .] We can change the landscape of our community if we really are intentional.

Surrounded on stage by transgender protesters, supporters, and allies, the transgender women of color controlled the direction and tenor of the public apology and discussion of institutional change. Centering their voices and lived experiences, the activists directly confronted the pathologization of and violence against transgender women of color and concluded with a chant of "Trans Power!" This embodied performance of agency and solidarity serves to "unstick" the association of pathology and trangender subjectivity, especially for transgender women of color. This USPATH case demonstrates how activists utilized public relations to bring key stakeholders together to pressure decision-makers to challenge the hegemonic iterations of pathology and bring about institutional change. The protest of Zucker's panel, the public apology at the conference, and the resulting panel by transgender women highlight the fissures of logic within the hegemonic orderings perpetuated by the DSM. Furthermore, these actions lay bare the racialized patholigization of institutional bodies and documents, as the organizers of these actions deliberately centered their racial identities and both the epistimioloical and physical violence perpetuated against them in their efforts. Specifically, they called attention to the inordinate levels of violence perpetuated against transgender women of color, the lack of transgender representation in positions of power in governing health institutions,

Case 2:22-cv-00184-LCB-CWB   Document 219-5   Filed 01/17/23   Page 12 of 17

and the tokenization of their bodies for these organizations. In short, these efforts exposed a vertable cross-section of fissures of logic, setting the stage for measurable action and progress, and through activist public relations, transgender women of color took power back both materially and discursively.

This anecdote necessitates that we do not reduce transgender persons to historical victims; rather, we need to understand them as complex individuals that challenge our expectations and continuously resist the historic erasure and pathologization placed upon them by dominant health discourses. Their communication became affectively sticky to the extent that it gave rise to new capacities for thinking, doing, and being. In this instance, through their physical presence and opposition, transgender women of color "intervene[d] in and reconfigure[d] contexts. . .informing and mediating ways of knowing and acting" (Trimble, 2010: 300). This is a moment that illuminates the performance of institutional legitimacy that was challenged and apended. These activists center their lived reality, signaling a shift away from the textual to the material. Therefore, activist public relations that utilizes materiality functions as a way to disrupt stickiness across temporal planes.

We conclude with this example of the dance between hegemony and resistance, highlighting a moment of opposition. Opposition is active, not passive, and according to philosopher McWhorter (1999), is the way to enact change and to untie us from the systems of normalization:

> Opposition. . . involves a great deal more than resistance. Resistance is merely negative, a no to domination. Opposition involves something positive, a departure from dominating networks. It involves the production of a different sort of self and a different sort of community—selves and communities not bound by the dictates of sexual identification. . .Opposition, then, is not just a matter of re-creating ourselves or of creating counterculture; opposition will involve changing the dominant culture as well. And, therefore, opposition entails exercising power over other people to force them to allow us to do our self-transformative work. (p. 191).

McWhorter furthers our understanding of how to build new systems, demonstrating that in order to displace systems, we must use the systems of power already in place. In other words, the tools of the system must be inverted to reflect the fissures of the system. In this example, the USPATH conference functioned as a tool of hegemonic power, through tacit support (e.g. providing individuals like Zucker a platform) and explicit support (e.g. by upholding the WPATH standards of care). In this example, Zucker's panel represents a fissure in the logic of transgender intelligibility, as transgender women of color lay bare the illogic of this panel.

The conference served as a stage for hegemonic reification of transgender intelligibility and resistance, and the perspectives of transgender women of color provide a critical counter voice to the white cisnormativity that has produced and upheld structural and institutional violence and exclusion of trans people of color.

We argue that affect theory provides a framework to understand how discursive texts like the DSM are used performatively and have material consequences that perpetuate and reify existing pathology, and affect theory also allows us to understand how social actors, like the transgender women of color at the 2017 WPATH conference, challenge these discourses to reclaim agency, and ownership of their identities. Ahmed (2014) reminds us of "the way in

which a signifier, rather than simply naming something that already exists, works to generate that which it apparently names" (p. 92). Therefore, this moment of activism is a successful performative utterance, as it is grounded in norms already in existence, but it opens up the future, challenging the temporality of the hegemonic vectors of power like Zucker and the DSM. Importantly, a successful performative utterance relies on the citation of norms and conventions already in existence; it opens up the future by repeating past conventions.

Activists, like the transgender women of color in the aforementioned anecdote, may be well-positioned to do public relations work, facilitating change through strategic communications. Like our analysis above demonstrates, to assist in this move, activists must exploit the fissures of logic within these discourses. Turning back to McWhorter, in protest, transgender women of color first leveraged their own material existence to expose this fallacy and then utilized the conference platform, the very tools of hegemonic power, to tell their stories in contrast to the dominant discourses bull-horned by USPATH. Ahmed asks us to consider why social transformation is so difficult to achieve and why power relations are enduring even in the face of collective resistance. Activism, like that at USPATH, presents opportunities to challenge institutional and structural stickiness. In this manuscript we considered how different discursive and material functions get "stuck" together by way of texts and how this sticking depends on a history of association and institutionalization. We argue that public relations can challenge the affective assemblages that comprise and perpetuate these systems, unsettling the historical discourses that have governed gender variance by establishing new communicative possibilities.

## Pulling it all together

This article challenges the public relations research that has traditionally focused on activist impact on corporate performance (Adi, 2019), and it acknowledges activists' achievements in institutional and structural change. As Weaver (2019) reminds us, "recent work that has reinterpreted activism as part of PR history is not without challenge or controversy" (p. 12). On the one hand, historically there was considerable resistance to the notion of activism as public relations work, because according to Grunig and those in the "Excellence" camp the role of public relations was to help mitigate negative impacts on corporations from potential activists (see Ciszek, 2015). On the other hand, some activists may not agree with being associated with public relations, because they might regard the term as tainted with corporate ideologies (see Coombs and Holladay, 2012). While some scholars point to consensus oriented communicative actions within activism and public relations (e.g. advocacy, dialog, engagement), other scholars emphasize the importance of dissensus where dissymmetrical relationships exist (Ciszek and Logan, 2018; Place and Ciszek, 2021). Our article argues that sometimes facilitating "understanding, sharing and forgiveness" (Toledano, 2016: 280) should not be the goal of activist public relations, especially within the historical context of groups whose lives and identities have been pathologized and marginalized.

Public relations has the opportunity to challenge the stickiness of affect, moving discourses of marginality away from structures of oppression. Affect is implicated in communicative practices, and to challenge sticky assemblages, new forms of communication are needed that present alternative potentialities. We contend public relations is an

affective practice, whereby communicators—including activists—can bring together different cognitive, social, cultural, and affective dimensions to shift the discourse around gender variance and create opportunities for future research and theory-building. There has been a "deafening silence in public relations practice and research on transgender perspectives" (Ciszek, 2018: 7), and thinking through an affective lens allows us to better understand the how public relations can challenge pathology and marginalization.

Both practically and theoretically, one of the most important implications of this manuscript is a consideration of how affective markers of institutional texts stick across time and space and how they may be challenged by activist public relations. As an institutional text, the DSM produces and circulates power. But power is not all encompassing and can be challenged through moments of activism and resistance. The potential impacts of reflective, community-generated public relations include the destabilization of institutions that are undergirded by texts like the DSM and are perpetuated through affective stickiness. Paradoxically, since documents like the DSM are created to navigate hegemonic terrain, resistance often recreates the power structure of that which it resists. In this manuscript we raise theoretical questions as to how we understand and reproduce affect, arguing that the DSM has planted the seeds for larger forms of institutional erasure and violence. Future research should examine how institutional texts influence and are influenced by power and agency, and how these texts shape the production and consumption of meaning. If, as Ahmed argues, affect is realized in and through its constant repetition, it can also be detached and reconstituted. Public relations scholars should explore the role of affect in promotional communication, attending to the role public relations plays in perpetuating and challenging institutional and structural stickiness. This article demonstrates the rich opportunities to study the flow of discursive texts in shaping the understanding of historically marginalized groups and the resulting material and institutional conditions that shape the experiences of these populations.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## ORCID iDs

Erica Ciszek https://orcid.org/0000-0001-6402-7649
Sarah Price https://orcid.org/0000-0003-0843-6688

## Notes

1. While homosexuality was removed from the DSM-II in 1973, not long thereafter, the Gender Identity Disorder (GID) diagnoses found their way into DSM-III in 1980.
2. It should be noted that WPATH is the largest organization focused on transgender health and publishes the influential standards of care document (currently on its seventh edition), which is utilized by clinicians and insurance companies to dictate the terms of affirmation care for gender transgressive persons. These standards of care include the guidance that persons seeking hormone care should seek a behavioral health provider for a letter that states their mental health is sufficient. Further, for gender affirmation surgeries, letters from two behavioral health providers are required in these standards.

**References**

Adi A (2019). Protest public relations: Communicating dissent and activism–An introduction. In: Adi A (ed.) *Protest Public Relations: Communicating Dissent and Activism*. New York, NY: Routledge pp.1–11.

Ahmed S (2004). Affective economies. *Social Text* 22(2): 117–139.

Ahmed S (2010) Happy object. In: Gregg M and Seigworth GJ (eds.) *The Affect Theory Reader*. Durham: Duke University Press, pp.29–51.

Ahmed S (2014) *The Cultural Politics of Emotion*. Edinburgh: Edinburgh University Press.

Alarcón RD, Becker AE, Lewis-Fernandez R, et al. (2009) Cultural Psychiatry Committee of the Group for the Advancement of Psychiatry. *Issues for DSM-V: The role of culture in psychiatric diagnosis*.

Arune W (2004) I *am* Arune. *Transgender Tapestry* 106: 44–51.

Ashley F (2020) Homophobia, conversion therapy, and care models for trans youth: Defending the gender-affirmative approach *Journal of LGBT Youth* 17(4): 361–383.

Aultman B (2014) Cisgender *TSQ: Transgender Studies Quarterly* 1(1–2): 61–62.

Beemyn G (2013) A presence in the past: A transgender historiography *Journal of Women's History* 25(4): 113–121.

Boag P (2005). Go west young man, go east young woman: Searching for the trans in western gender history *Western Historical Quarterly* 36(4): 477–497.

Brown RE (2010) Symmetry and its critics. In: Heath RL (ed.) *Sage Handbook of Public Relations*, 2nd edn. Thousand Oaks, CA: Sage, pp.277–292.

Brown SD and Tucker I (2010) Affect, somatic management, and mental health service users. In: Gregg M and Seigworth GJ (eds.) *The Affect Theory Reader*. Durham: Duke University Press, pp.229–249.

Butler J (1993) *Bodies That Matter: On the Discursive Limits of Sex*. London: Routledge.

Butler J (2004) *Undoing Gender*. London: Routledge.

Cermele JA, Daniels S and Anderson KL (2001) Defining normal: Constructions of race and gender in the DSM-IV casebook. *Feminism & Psychology* 11(2): 229–247.

Ciszek EL (2015) Bridging the gap: Mapping the relationship between activism and public relations. *Public Relations Review* 41(4): 447–455.

Ciszek EL (2017) Public relations, activism and identity: A cultural-economic examination of contemporary LGBT activism. *Public Relations Review* 43: 809–816.

Ciszek E (2018) Queering PR: Directions in theory and research for public relations scholarship. *Journal of Public Relations Research* 30(4): 134–145.

Ciszek E and Logan N (2018) Challenging the dialogic promise: How Ben & Jerry's support for Black Lives Matter fosters dissensus on social media. *Journal of Public Relations Research* 30(3): 115–127.

Cleves RH (2014) Beyond the Binaries in Early America: Special Issue Introduction. *Early American Studies* 12(3): 459–468.

Coombs WT and Holladay SJ (2007) The negative communication dynamic: Exploring the impact of stakeholder affect on behavioral intentions. *Journal of Communication Management* 11(4): 300–312.

Coombs WT and Holladay SJ (2012) Fringe public relations: How activism moves critical PR toward the mainstream. *Public Relations Review* 38(5): 880–887.

Crowe M (2000) Constructing normality: A discourse analysis of the DSM-IV. *Journal of Psychiatric and Mental Health Nursing* 7(1): 69–77.

De Moya M and Bravo V (2016) The role of public relations in ethnic advocacy and activism: A proposed research agenda. *Public Relations Inquiry* 5(3): 233–251.

Drescher J (2010) Queer diagnoses: Parallels and contrasts in the history of homosexuality, gender variance, and the Diagnostic and Statistical Manual. *Archives of Sexual behavior* 39(2): 427–460.
Foucault M (1965) *Madness and Civilization: A History of Insanity in the Age of Reason*. New York, NY: Vintage Books.
Golombisky K (2015) Renewing the commitments of feminist public relations theory from velvet ghetto to social justice. *Journal of Public Relations Research* 27: 389–415.
Harper DJ (2013) On the persistence of psychiatric diagnosis: Moving beyond a zombie classification system. *Feminism & Psychology* 23(1): 78–85.
Hayes M (2018) Doctor fired from gender identity clinic says he feels 'vindicated' after CAMH apology, settlement. *The Globe and Mail*, 7 October.
Holtzhausen D (2007) Activism. In: Toth E (ed.) *The Future of Excellence in Public Relations and Communication Management*. Mahwah, NY: Lawrence Erlbaum Associates, pp.357-379.
Holtzhausen D (2012) *Public Relations as Activism: Postmodern Approaches to Theory and Practice*. New York, NY: Routledge.
Keegan CM (2020) Transgender studies, or how to do things with trans. *The Cambridge Companion to Queer Studies*, 66.
Kim J and Sriramesh K (2009) Activism and public relations. In: Sriramesh K and Vercic D (eds.) *The Global Public Relations Handbook: Theory, Research and Practice*. New York, NY: Routledge.
Lafrance MN and Mckenzie-Mohr S (2013) The DSM and its lure of legitimacy. *Feminism & Psychology* 23: 119–140.
Loring M and Powell B (1988) Gender, race, and DSM-III: A study of the objectivity of psychiatric diagnostic behavior. *Journal of Health and Social Behavior* 29(1): 1–22.
Manheim JB and Holt AD (2015) Contraband: Activism and leveraging of corporate reputation. In: Carroll G (ed.) *Handbook of Communication and Corporate Reputation*. West Sussex: John Wiley.
McWhorter L (1999) *Bodies and Pleasures: Foucault and the Politics of Sexual Normalization*. Bloomington: Indiana University Press.
Monro S (2005) Beyond male and female: Poststructuralism and the spectrum of gender. *International Journal of Transgenderism* 8(1): 3–22.
Morris A and Braine N (2001) Social movements and oppositional consciousness. In: Mansbridge J and Morris A (eds.) *Oppositional Consciousness: The Subjective Roots of Social Protest*. Chicago: University of Chicago Press, pp.20–37.
Place K and Ciszek E (2021) Troubling dialogue and digital media: A subaltern critique. *Social Media + Society* 7(1), 2056305120984449.
Pyne J (2014) The governance of gender non-conforming children: A dangerous enclosure *Annual Review of Critical Psychology* 11: 79–96.
Reese H (2013) *The Real Problems With Psychiatry*. The Atlantic. Available at: https://www.theatlantic.com/health/archive/2013/05/the-real-problems-with-psychiatry/275371/ (accessed 25 March 2021).
Serano J (2016) Placing Ken Zucker's clinic in historical context. In: Whipping Girl. Available at: http://juliaserano.blogspot.com/2016/02/placing-ken-zuckers-clinic-in.html (accessed 25 March 2021).
Skidmore E (2011) Constructing the "Good Transsexual": Christine Jorgensen, Whiteness, and Heteronormativity in the Mid-Twentieth-Century Press *Feminist Studies* 37(2): 270–300.
Smith MF and Ferguson DP (2010) Activism 2.0. In: Heath RL (ed.) *The Sage Handbook of Public Relations*. Los Angeles: Sage, pp.395–408.

Spade D (2003) Resisting medicine, re/modeling gender *Berkeley Women's Law Journal* 18(1): 15–37.
Stokes AQ and Atkins-Sayre W (2018) PETA, rhetorical fracture, and the power of digital activism. *Public Relations Inquiry* 7(2): 149–170.
Stone S (1991) The Empire strikes back: A posttransexual manifesto. In: Epstein J and Straub K (eds.) *Body Guards: The Cultural Politics of Gender Ambiguity*. New York, NY: Routledge, pp.280–304.
Stryker S (2008) *Transgender History*. New York, NY: Seal Press.
Tebbutt C (2012) "Transgender History by Susan Stryker / Bodies in Doubt: An American History of Intersex by Elizabeth Reis". Women's History Review 22(3): 505–509.
Thomas JM (2014) Medicalizing racism. *Contexts* 13(4): 24–29.
Thompson P (2016) Dissent at work and the resistance debate: departures, directions, and dead ends *Studies in Political Economy* 97(2): 106–123.
Toledano M (2016) Advocating for reconciliation: Public relations, activism, advocacy and dialogue. *Public Relations Inquiry* 5(3): 277–294.
Trimble S (2010) (White) rage: Affect, neoliberalism, and the family in 28 Days Later and 28 Weeks Later. *The Review of Education, Pedagogy, and Cultural Studies* 32(3): 295–322.
Wade DT and Halligan PW (2004) Do biomedical models of illness make for good healthcare systems? *British Medical Journals* 329(7479): 1398–1401.
Weaver CK (2019) The slow conflation of public relations and activism: Understanding trajectories in public relations theorising. In: Adi A (ed.) *Protest Public relations: Communicating Dissent and Activism.* New York, NY: Routledge, pp.12–28.
Winters K (2016) *Media misinformation about trans youth: The persistent 80% desistance myth*. GID Reform. Available at: https://gidreform.wordpress.com/2016/07/26/media-misinformation-about-trans-youth-the-persistent-80-desistance-myth/ (accessed 25 March 2021).

## Author biographies

Erica Ciszek is an Assistant Professor at the Stan Richards School of Advertising & Public Relations at the University of Texas at Austin. Her research explores the intersections of public relations, activism and social change.

Richard Mocarski is the Chief Research Officer at the University of Nebraska at Kearney and the co-founder of the community-based participatory research collaborative Trans Collaborations. His work focuses on the importance of agency and voice for members health disparate communities for the navigation of the health system.

Sarah Price is an Assistant Professor of Communication at Florida Gulf Coast University. Her research takes a rhetorical and mixed methodological approach to the intersections of gender, embodiment, and health of marginalized communities.

Elaine Almeida is a graduate student at the University of Wisconsin-Madison's school of Journalism and Mass Communication. She is currently pursuing scholarship and community work that emphasizes digital webs of healing for men of color.