# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

BRIANNA BOE, et al.,

    Plaintiffs,

v.

STEVE MARSHALL, et al.,

    Defendants.

No. 2:22-cv-00184-LCB-CWB

## REPLY OF NONPARTIES AMERICAN ACADEMY OF PEDIATRICS, WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, AND ENDOCRINE SOCIETY IN SUPPORT OF MOTION TO QUASH RULE 45 SUBPOENAS

# **TABLE OF CONTENTS**

I. ARGUMENT ................................................................................................... 3

    A.    The State Fails To Show That the Subpoenas Seek Any Relevant Discovery. ............................................................................. 3

    B.    The State Fails To Address the Undue Burdens the Subpoena Would Impose on *Amici*. ..................................................................... 9

    C.    The State Has No Meaningful Response to the Chilling Effect of the Subpoenas. ................................................................................ 12

II. CONCLUSION ............................................................................................. 15


# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apple Inc. v. Match Grp., Inc.*,
 2021 WL 3727067 (N.D. Cal. Aug. 19, 2021) .....................................................14

*Gibson v. Collier*,
 920 F.3d 212 (5th Cir. 2019) ................................................................................6

*Jordan v. Comm'r, Mississippi Dep't of Corr.*,
 947 F.3d 1322 (11th Cir. 2020) ............................................................................9

*Klay v. All Defendants*,
 425 F.3d 977 (11th Cir. 2005) ..............................................................................5

*Kosilek v. Spencer*,
 774 F.3d 63 (1st Cir. 2014)...................................................................................6

*In re Nat'l Hockey League Players' Concussion Inj. Litig.*,
 2019 WL 5288281 (D. Minn. Oct. 18, 2019) .......................................................5

*Rosa v. City of Seaside*,
 2009 WL 2382760 (N.D. Cal. July 29, 2009) ......................................................7

*In re Subpoenas Served on Am. Acad. of Pediatrics*,
 No. 23-mc-00004-CJN (D.D.C., filed Jan. 13, 2023)...........................................9

*Whole Woman's Health v. Tex. Cath. Conf.*,
 896 F.3d 362 (5th Cir. 2018) .........................................................................2, 12

**Rules**

Fed. R. Civ. P. 45 .........................................................................................................9

**Other Authorities**

9A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. §
 2459 (3d ed.) ......................................................................................................11

*Amici*'s Motion to Quash (Doc. 208) ("Mot.") explained in detail how the subpoenas served on them by Defendants (collectively, the "State") do not seek information relevant to this case, impose substantial and undue burdens on *amici*, and infringe *amici*'s free speech and associational rights under the First Amendment.  The State's Opposition to the Motion to Quash (Doc. 219) ("Opp.") fails to resolve any of these fundamental problems.

*First*, the State argues that this discovery is relevant because it wants to probe Plaintiffs' assertion that the "medical community" as a whole supports the gender-affirming treatments banned by the Act.  But there is a profound disconnect between that proffered theory of relevancy and the discovery the State has actually demanded, because the subpoenas do not seek evidence of the medical community's purported "consensus" on gender-affirming care.  Rather, the State concedes that it is looking for evidence of internal dissent *inside* three specific organizations, based on an accusation that their inner workings have been tainted by "ideology, self-interest, organizational politicking, or other considerations." Opp. at 3.  But the State does not need this discovery to test the medical community's "consensus" or even to challenge the scientific basis and validity of the WPATH and Endocrine Society guidelines, and this Court should reject what is plainly an sideshow effort by the State to put these organizations on trial.

1

*Second*, the State repeatedly characterizes its expansive document requests, which seek "all" communications and documents on a variety of internal subjects, as "tailored" and "targeted" when the discovery is plainly anything but. *Amici* submitted particularized declarations explaining how responding to these subpoenas as drafted would impose an undue burden on each organization, and the State's basic response—that even if there is a burden, it is not an "undue" one—is not tenable.

*Finally*, the State appears to misapprehend the nature of *amici*'s First Amendment argument. None of the responses offered by the State address, much less mitigate, the core First Amendment concern here: that the State's invasive discovery requests impede the "broad, uninhibited, and fearless . . . deliberation [that] is a seminal aspect of the freedom to associate." *Whole Woman's Health v. Tex. Cath. Conf.*, 896 F.3d 362, 372 (5th Cir. 2018). Particularly in the absence of any need for this discovery, this Court should not countenance infringement of a constitutional right.

Since *amici* filed the instant motion, another district court in the District of Columbia has adjudicated a motion to quash similar subpoenas that were directed at these three organizations by the State of Florida in connection with a related case. As is discussed below (at p. 9), Florida—like Alabama here—sought voluminous internal discovery from each organization. Judge Nichols

2

substantially narrowed Florida's document requests, ultimately ordering each organization to produce "documents sufficient to show" a limited number of topics. Without conceding the relevancy of even that information, in the interests of efficiency *amici* have offered to produce the same materials to Alabama if it would moot the instant dispute. As of the date of this filing the parties are discussing that offer, but no compromise has been reached.

I.  **ARGUMENT**

   A.  **The State Fails To Show That the Subpoenas Seek Any Relevant Discovery.**

In their opening motion, *amici* explained how the requested discovery was inconsistent with this Court's previous rulings and sought irrelevant information. *See* Mot. at 11-14. The State's response is unavailing.

The State defends its theory of relevance as resting on Plaintiffs' and the United States' purported argument that the Act denies medical treatments that are "widely recognized within the medical community." Opp. at 21. In the State's view, "every aspect" of Plaintiffs' and the United States' case "relies on the purported medical consensus" supporting gender-affirming care. *Id.* at 25; *see also id.* at 22 ("[T]his claim about a consensus remains a centerpiece of Plaintiffs' and the United States' cases."). According to the State, these subpoenas are meant to develop "evidence pertaining to the strength, soundness, and reliability of such a consensus." *Id.* at 22.

3

Even crediting the State's characterization of Plaintiffs' theory of their case as resting on a "medical consensus" that supports gender-affirming care, that does not mean the discovery the State has actually sought is relevant to that inquiry. That is because the State is not seeking evidence of a consensus *across* the medical community. Rather, as the State candidly acknowledges, it is looking for evidence of dissent *inside* each of these organizations—or, as it summarizes, for evidence that the organizations' clinical guidelines (in the case of WPATH and Endocrine Society) and policies (in the case of AAP, which does not publish clinical guidelines) are based not on science but rather "on ideology, self-interest, organizational politicking, or other considerations." *Id.* at 3.

The State's argument is internally inconsistent and fails on its own terms. These organizations' internal deliberations and communications regarding their guidelines and policy positions cannot possibly be relevant to the *different* question of whether the broader medical community supports gender-affirming care. The former is not connected to the latter.[1] In other words, the "medical community" is not privy to the inner workings of WPATH, Endocrine Society, and AAP, and there is no reason to think (and certainly the State offers no evidence to suggest)

---

[1] For this reason, the State's lengthy itemization of the alleged "evidence" of "ideology, self-interest, [and] organizational politicking" driving these organizations' decision-making processes, *see* Opp. at 10-18, is not just inflammatory but also irrelevant.

that the medical community's purported support for gender-affirming care is conditioned on access to the same materials the State seeks here.

The State claims that "[s]imilar cases routinely compel discovery," Opp. at 23-24, but those cases are inapposite. For example, *Klay v. All Defendants*, 425 F.3d 977 (11th Cir. 2005), addresses whether a subpoenaed party is entitled to payment of production costs, not the propriety of the order compelling production in the first place. In all events, to the extent that order compelling production was premised on a showing the requested data was "vital" to the requesting party's case, that is certainly not the case here. *Id.* at 986. Furthermore, *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 2019 WL 5288281 (D. Minn. Oct. 18, 2019), is an order on suggestion of remand and, besides the court observing that "[t]hird-party discovery also occurred throughout the litigation," has nothing at all to do with the dispute here. *Id.* at *3.

Equally unavailing is the State's attempt to distinguish this Court's ruling in the Eagle Forum subpoena dispute. For example, the State claims that *amici*, unlike legislatures, are not entitled to a "presumption of good faith." Opp. at 23. Even assuming that is correct, it is beside the point; the subpoenas this Court quashed were not directed at *state legislators*, but rather to third-party private organizations that advocated in favor of the challenged legislation. That decision supports the quashing of subpoenas the State has now directed at third-party

5

private organizations that advocated *against* the challenged legislation. Similarly, the State claims discovery into the "hidden motives" of state legislators is off-limits while the discovery *it* wants of *amici*'s alleged "hidden motives" is entirely proper, but that again mischaracterizes the discovery that actually was quashed.

Indeed, cases cited *by the State* betray the flaws in its relevance argument. As the State notes, *see* Opp. at 12 n.6, the Fifth and First Circuits have stated that the WPATH recommendations regarding sex reassignment surgery, as reflected in the organization's guidelines, "reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (citing *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014)). But what the State fails to mention is that these courts were discussing an alleged lack of consensus *among* the medical community. *See, e.g.*, *id.* at 221 ("As the First Circuit concluded in *Kosilek*, there is no consensus in the medical community about the necessity and efficacy of sex reassignment surgery as a treatment for gender dysphoria."). Indeed, the court concluded the "exhaustively detailed" record of expert testimony from both sides in *Kosilek* "provides objective evidence that the medical community is deeply divided about the necessity and efficacy of sex reassignment surgery." *Id.* In short, both *Gibson* and *Kosilek* look to evidence of the medical community's views; neither sanctions what Alabama is attempting

6

here: to attack the guidelines with materials extracted from the inside of each organization.

Notably, the State does *not* argue that this discovery is meant to support a facial challenge to the scientific basis and validity of the WPATH and Endocrine Society guidelines. Nor could it plausibly do so, because—as *amici* observed in their opening motion—the guidelines are publicly-available and cite every study and piece of evidence on which they rely. Mot. at 12.[2] They also incorporate detailed information about the methodology that was used to create them. If the process through which they were created was actually informed by "ideology, self-interest, [and] organizational politicking," as the State alleges, presumably the guidelines will reflect those issues. For example, they might cite studies of dubious quality, or conspicuously fail to account for contrary evidence. The State can and presumably will marshal its own scientific evidence to make such points. But the internal discovery it has sought from each organization is not relevant to that inquiry. *See, e.g.*, *Rosa v. City of Seaside*, 2009 WL 2382760, at *2 (N.D. Cal. July 29, 2009) (holding that there was no substantial need to depose the author of a

---

[2] *See* https://www.wpath.org/soc8 (information about and link to WPATH's Standards of Care Version 8); https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence (information about and link to Endocrine Society's Gender Dysphoria/Gender Incongruence Clinical Practice Guideline).

7

report where, as here, the report disclosed the relied-upon sources and methodology).

A related case in Arkansas is instructive in this regard. There, plaintiffs challenged that State's enactment of a law banning the use of the treatments also at issue here to treat adolescents with gender dysphoria. The scientific basis and validity of the WPATH and Endocrine Society guidelines were vigorously litigated, with both sides presenting expert testimony on that front. But as the parties' Proposed Findings of Fact confirm, neither the plaintiffs nor Arkansas sought or needed internal discovery from WPATH or Endocrine Society to make their case. Lannin Reply Decl. ¶¶ 2, 3. There is no good reason Alabama needs what Arkansas did not.

Finally, a recent decision in a related Florida case likewise confirms the untenably broad sweep of the State's requests. There, several individual plaintiffs challenged the Florida Medicaid agency's adoption of a rule banning reimbursement for many of the same gender-affirming treatments at issue in this case. Citing the same theory of relevance asserted by Alabama—to probe the supposed "consensus" of the medical community—Florida subpoenaed WPATH, Endocrine Society, and AAP (along with 19 other organizations) for a broad swath of their internal documents through requests similar to those at issue here, including (for example) "[a]ny communications with your membership concerning

your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria." *See In re Subpoenas Served on Am. Acad. of Pediatrics*, No. 23-mc-00004-CJN (D.D.C., filed Jan. 13, 2023) (Docs. 1-4 through 1-25).

The subpoenaed organizations filed a motion to quash in the District Court for the District of Columbia, and Judge Nichols proceeded to substantially narrow Florida's requests.[3]  Specifically, Judge Nichols ordered each organization to produce "documents sufficient to show" a few specific items.  Lannin Decl. Ex. 3 (order setting forth narrowed requests).[4]  If this Court is inclined to order *any* production, Judge Nichols' order reflects a sensible compromise.

### B. The State Fails To Address the Undue Burdens the Subpoena Would Impose on *Amici*.

The State does not dispute that where a subpoena imposes an undue burden that outweighs the need of the requesting party, it should be quashed.  *See Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1337 (11th Cir. 2020) ("[Rule 45] makes mandatory the quashing of any subpoena that would impose

---

[3] The motion to quash was filed in D.D.C. as the operative subpoenas had been noticed for compliance in that jurisdiction.  *See* Fed. R. Civ. P. 45(d)(3).

[4] Without conceding their relevance to the Alabama case, *amici* offered to produce those same materials to Alabama if the State agreed that would constitute satisfaction of their obligations under the subpoenas.  Lannin Decl. ¶ 5.  As of the date of this filing the parties are discussing that offer, but have not reached a compromise based on Judge Nichols' order.  *Id.*

9

such a burden on the target of the subpoena."). The State, however, dismisses the undue burdens imposed by its subpoenas, which far outweigh its (non-existent) need for this discovery.

In response to *amici*'s specific showing of undue burden, the State repeatedly asserts that its discovery requests are "tailored" and "targeted," and would impose only a "limited" burden on *amici*. *See e.g.,* Opp. at 4, 27. But even a cursory review of the document requests belies the State's argument. The State served between 25 and 47 requests for production on each of the *amici* seeking wide-ranging internal information.[5] By way of example, the State's purportedly "tailored" requests seek "all [d]ocuments and [c]ommunications":

- From AAP, "regarding the impetus for, preparation of, discussion of, drafting of, [] adoption[,] . . . funding[,] . . . post-publication consideration, review, analysis, or reconsideration of" AAP's position statement on gender-affirming care, Lannin Decl. (Doc. 208-2) at 15 (AAP Subpoena, Reqs. Nos. 11-13);

- From WPATH, "relating to" "the decision regarding what chapters to include in" the current edition of the WPATH guidelines, "the development and approval of" 11 of the 18 chapters of those guidelines, and "the development, review, and approval of" a chapter of the previous edition of the WPATH guidelines, *id*. at 63, 65 (WPATH Subpoena, Reqs. Nos. 2-3, 14); and

---

[5] The State served 25 requests for production on AAP, 29 request for production on Endocrine Society, and 47 requests for production on WPATH. Before *amici* filed their motion to quash, the State offered to withdraw nine of its requests for production to AAP and 15 of its of its requests for production to WPATH. The State did not offer to withdraw any of its requests for production to the Endocrine Society. *See* Mot. at 9-10.

10

- From the Endocrine Society, "regarding the need for and development of the 2017 [Endocrine Society guidelines]," *id*. at 138 (Endocrine Soc'y Subpoena, Req. No. 2); *see also, e.g.*, *id.* at 137-39 (Reqs. Nos. 1 and 3-9).

Other requests are broader still, demanding *amici* produce, for example, "all Communications with the . . . United States of America and any agencies, departments, or employees thereof," without any limitation as to time or subject matter, *id*. at 68, 142 (WPATH Subpoena, Req. No. 40, and Endocrine Society Subpoena, Req. No. 25).  On their face, these and similar requests calling for "all" documents and communications are anything but "tailored."

The State also argues that, even if the subpoenas impose a burden, it is not an "*undue*" one.  Opp. at 28 (emphasis in original).  But this cursory assertion ignores the detailed declarations that WPATH, Endocrine Society, and AAP submitted describing the time and resources that would be required to comply with these subpoenas as drafted.  *See* AAP Decl. (Doc. 208-3) ¶¶ 9-12 (detailing work required to collect, review, and produce requested documents); WPATH Decl. (Doc. 208-4) ¶¶ 7-10 (same); Endocrine Soc'y Decl. (Doc. 208-5) ¶¶ 8-11 (same). The State asserts that these declarations "do not substantiate any undue burden," Opp. at 29, but that claim is impossible to reconcile with the State's offer to assist *amici* with the "identification of custodians and search terms"—which means the State is also contemplating the exact sort of expensive and time-consuming ESI process that each organization described in their declarations.  *Cf.* 9A Charles Alan

11

Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2459 (3d ed.) (noting that subpoenas for "voluminous and cumbersome" electronically stored information are a "problem" in "highly complex cases").[6]

### C. The State Has No Meaningful Response to the Chilling Effect of the Subpoenas.

In their motion and attached declarations, *amici* articulated how these subpoenas infringe on their free speech and associational rights under the First Amendment. Mot. at 17-20. The State has no persuasive response to these concerns, in part because it does not appear to appreciate the core First Amendment concern presented here: that the State's invasive discovery requests will inhibit the "broad, uninhibited, and fearless . . . deliberation [that] is a seminal aspect of the freedom to associate." *Whole Woman's Health*, 896 F.3d at 372 (holding that order compelling nonparty group to produce its internal communications in light of its support for the law being challenged in the case was an abuse of discretion); *see also id.* at 375 (nonparty group was given "the 'Hobson's choice' of retreating from the public square or defending its position

---

[6] The State attempts to distinguish this Court's conclusion that the similar Eagle Forum subpoenas also imposed an undue burden by suggesting at least two of the *amici* have more resources than Eagle Forum. *See* Opp. at 27. The State's citation to AAP's and Endocrine Society's gross (not net) revenue is inherently misleading, but more importantly, the State cites no authority for the proposition that whether a burden is "undue" or not depends on whether the subpoenaed entity can afford to comply.

while creating a precedent (for the first time) that may open its internal deliberations to public scrutiny").

*First*, the State dismisses *amici*'s First Amendment argument as "cursory" and claims they failed to make a "particularized showing" as to how their rights would be infringed. But the declarations from AAP, WPATH, and Endocrine Society describe *in detail* how even the receipt of these subpoenas, to say nothing of their potential enforcement, has chilled participation in their organizations and inhibited the type of robust, candid discussions that are necessary to do their work. *See, e.g.*, AAP Decl. (Doc. 208-3) ¶¶ 14-19; WPATH Decl. (Doc. 208-4) ¶¶ 11-16; Endocrine Soc'y Decl. (Doc. 208-5) ¶¶ 12-15. These particularized declarations substantiate exactly how and why these subpoenas have affected each organization and their members.

*Second*, the State dismisses the death threats and other forms of intimidation these organizations have received as a "heckler's veto" and suggests relevant material cannot be withheld "because of unrelated speech that was already occurring and has no connection to production of the requested information." Opp. at 31-32. The State cites no authority for this proposition, and in any event it is not applicable here, as the "speech that was already occurring"—these organizations' support for gender-affirming care—is very much related to and has a strong connection to production of the requested material.

13

*Third*, the State claims the "subpoenas do not seek membership or donor lists." Opp. at 30. Regardless of whether the State has specifically requested member names and other personally-identifying information, however, such details will necessarily appear throughout the requested materials—and that again implicates the core First Amendment concern. Members who know their identity will be disclosed to a prominent public policy opponent will be less likely to participate in the organization. It is the *fact* of disclosure that matters, not whether it would be subject to a protective order. *See, e.g.*, *Apple Inc. v. Match Grp., Inc.*, 2021 WL 3727067, at *8 (N.D. Cal. Aug. 19, 2021) (refusing to enforce request for advocacy group's internal documents on First Amendment grounds and observing "[w]ho in their right mind would want to participate in a public advocacy organization, knowing that all their internal communications about strategy, lobbying, planning, and so on, would be turned over to their principal opponent?").

*Fourth*, the State claims that the costs of complying with a subpoena do not constitute a cognizable "chill" under the First Amendment. *See* Opp. at 32. But *amici*'s First Amendment argument does not rest on the costs of compliance (although those costs certainly do implicate the undue burden analysis discussed above).

14

*Fifth*, the State asserts that even if the subpoenas do infringe on First Amendment interests, its need for this purportedly "highly relevant material" outweighs that concern. As set forth above, however, the requested information is irrelevant, and the State does not "need" it at all. With no need to weigh against the infringement of a constitutional right, that should be the end of the First Amendment inquiry.

## II.     CONCLUSION

For the reasons set forth above, AAP, WPATH, and Endocrine Society respectfully request that the Court quash the State's subpoenas in their entirety.

Dated: January 31, 2023                                    Respectfully submitted,

*/s Barry A. Ragsdale*
Barry A. Ragsdale
ASB 2958-A23B

| | |
|---|---|
| Cortlin H. Lannin (CA Bar No. 266488) (admitted *pro hac vice*) COVINGTON & BURLING LLP Salesforce Tower 415 Mission St., Suite 5400 San Francisco, CA 94105 Phone: (415) 591-6000 clannin@cov.com | D. Jean Veta (D.C. Bar No. 358980) (admitted *pro hac vice*) Noah S. Goldberg (D.C. Bar No. 90003045) (admitted *pro hac vice*) COVINGTON & BURLING, LLP One CityCenter 850 Tenth St., N.W. Washington, D.C. 20001 Phone: (202) 662-6000 jveta@cov.com ngoldberg@cov.com |
| Barry A. Ragsdale (ASB 2958-A23B) Robert S. Vance III (ASB 9916-B11Q) DOMINICK FELD HYDE, P.C. 1130 22nd Street South Ridge Park Suite 4000 Birmingham, AL 35205 Phone:  (205) 536-8888 BRagsdale@dfhlaw.com RVance@dfhlaw.com | |

16

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

<div style="text-align:right">

*/s Barry A. Ragsdale*
Of Counsel

</div>