# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DYLAN BRANDT *et al.*,

PLAINTIFFS,

v.  Case No. 4:21-CV-00450-JM

TIM GRIFFIN, in his official capacity as
Arkansas Attorney General, *et al.*

DEFENDANTS.

DEFENDANTS' PROPOSED FINDINGS OF FACT

## TABLE OF CONTENTS

Table of Contents ......................................................................................................... i

Proposed Findings of Fact .......................................................................................... 1

    I.   Gender Dysphoria ................................................................................................ 1

        A.  The Transgender Population ......................................................................... 1

        B.  Desistence ....................................................................................................... 3

    II.  Competing Approaches to Treating Gender Dysphoria: Psychotherapy vs. Affirmation ......................................................................................................... 4

    III. Informed Consent ............................................................................................... 5

    IV. Affirmation Treatments ...................................................................................... 7

        A.  Puberty Blockers ........................................................................................... 7

        B.  Cross-Sex Hormones .................................................................................. 10

        C.  Gender Transition Surgeries ..................................................................... 13

    V.  Lack of Evidence for Affirmation Treatments ............................................. 17

        A.  Overview of the Evidence .......................................................................... 17

        B.  Professional Views ...................................................................................... 20

    VI. Gender Medicine in Arkansas ........................................................................ 22

        A.  "Affirmative" Treatments in Arkansas ................................................... 22

        B.  The SAFE Act ............................................................................................. 24

        C.  The Minor Plaintiffs (Sealed) .................................................................... 25

**PROPOSED FINDINGS OF FACT**

I.      **Gender Dysphoria**

     A.      **The Transgender Population**

     1.      Biological sex refers to a person's status as male or female, as determined by their chromosomal makeup and genitalia. (Hruz 1311). The biological differences between males and females exist "in every nucleated cell of the body." (Hruz 1239).

     2.      The term "gender" is commonly used to refer to one's internal perception of their sex. (Karasic 24, Adkins 265, Levine 790, Hiatt 1095). One's gender identity may be male, female, or nonbinary—that is, neither male nor female or both male and female—or fall outside those three categories. (Karasic 117, 178-79, Turban 334, Levine 790).

     3.      Gender dysphoria is the psychological condition of incongruence between one's gender identity and biological sex leading to mental distress. (Levine 789-90, Hruz 1221).

     4.      Gender identity is subjective. (Adkins 269-70, Hruz 1272). It is not immutable and can change over time. (Adkins 267-68, Turban 332, 335, Levine 805, 877, Burleigh 1195-96).

     5.      Gender dysphoria cannot be diagnosed through objective, biological criteria. (Hruz 1271-72).

     6.      Among minors, the transgender population is demographically different today than previously. Historically, more biological males than females were diagnosed with gender dysphoria. But the gender ratio has flipped among minors so biological females are diagnosed with gender dysphoria far than males, at a rate of 7:1. (Levine 795, Regnerus 1018).

     7.      The rate of transgender-identified minors in Arkansas is also majority female. (Hutchison 565).

8. Sociological data does not show a similar demographic flip among adults identifying as transgender. (Regnerus 1020).

9. The number of minors identifying as transgender has grown rapidly in recent years. (Levine 783-84, 795, Regnerus 1018).

10. Researchers have paid "insufficient attention" to potential causes of the rise of transgender identified minors. (Regnerus 1018-19).

11. Studies are inconclusive about the role of genetic or biological causes in transgender identity. (Karasic 113-14, Levine 797-800).

12. Adolescents may be more likely to identify as transgender if they are influenced by friends or social media. (Levine 797, 800, Regnerus 1011).

13. A transgender identity may be explained by an adolescent's view of social and gender roles. (Levine 796).

14. Gender dysphoria or cross-sex identification is strongly correlated with homosexual or bisexual attraction. (Levine 806-07).

15. Violence, sexual abuse, and familial trauma may contribute to a minor's view of gender. The rate of physical or sexual abuse among children who later identify as transgender is "very high." (Levine 801-02, 809).

16. Individuals who suffer from gender dysphoria often have other, co-morbid mental health conditions, such as autism, anxiety, depression, or self-harm. (Levine 785, 808, Hiatt 1103-04).

17. Patients at Arkansas's Gender Spectrum Clinic suffer from co-morbid mental health conditions at a higher rate than the general population. (Hutchison 542, 581-83).

18.     Roughly 60% of Gender Spectrum Clinic patients experience depression. (Hutchison 582).

19.     Between 40 and 60% of Gender Spectrum Clinic Patients experience anxiety. (Hutchison 582).

20.     Approximately 9-10% of Gender Spectrum Clinic Patients present with PTSD. (Hutchison 583).

21.     Approximately 8-9% of Gender Spectrum Clinic Patients have been diagnosed with autism spectrum disorder. (Hutchison 583).

22.     Between 45 and 50% of Gender Spectrum Patients have a history of self-harm. (Hutchison 583).

23.     Plaintiffs presented no evidence establishing that transgender individuals have experienced a history of purposeful unequal treatment under the law or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities.

**B.     Desistence**

24.     The term "desistence" refers to individuals who at one point had a gender identity discordant with their biological sex later desiring to allow their body to proceed through development consistent with their sex. (Hruz 1241).

25.     The term "detransition" refers to individuals who lived as the opposite gender but now seek to live congruent with their biological sex. (Levine 877). Detransitioners must often undergo new medical procedures to realign their bodies with their biological sex. (Smalts 1147, 1150-52, Burleigh 1192, 1196-97).

26.     Among minors who experience gender-incongruence, 11 studies have shown that a majority will desist and express a gender identity consistent with their biological sex if not socially transitioned or given puberty blockers, hormones, or surgery. (Levine 804).

27.     The WPATH 7 Guidelines, in effect when the SAFE Act passed, acknowledges that the majority of children who have prepubertal gender dysphoria will desist before puberty. (Karasic 164-65).

28.     Among adults who medically transition, some studies show that over 20% later desist. (Levine 804, 953).

29.     The rate of detransition is increasing. (Levine 850, 879).

30.     There is no way to know whether a particular patient will persist in their present understanding of their gender identity. (Adkins 271).

31.     The Gender Spectrum Clinic cannot identify which minor patients will desist or will continue to experience gender dysphoria through adulthood. (Stambough 622).

## II.     Competing Approaches to Treating Gender Dysphoria: Psychotherapy vs. Affirmation

32.     There are two principal approaches to treating gender dysphoria: the psychotherapy approach and the "affirmative" model.

33.     The goal of psychotherapy is to treat the root of gender dysphoria, as well as other co-morbidities. (Levine 808-09).

34.     Psychotherapy approaches gender dysphoria like all other childhood psychiatric problems. (Levine 809, 858). It focuses on determining "what lies behind" a minor's depression, unhappiness, or suicidality. (Levine 810).

35.     Psychotherapy instructs caution before medical transition, recognizing that minors suffering from gender dysphoria may have limited views of the world, their role, and their future. (Levine 810-11, 830).

36.     Prior to 2011, psychotherapy was required before any medical transition. (Levine 842-43).

37.     Psychotherapy is now the recommended approach to treating gender dysphoria in Sweden, Finland, the United Kingdom, and France. (Levine 817-18).

38.     The "affirmative" model seeks to treat gender dysphoria through puberty blockers, cross-sex hormones, and various surgeries. (Levine 791, 820-21).

39.     The "affirmative" model "is not interested in how [a] person" began to suffer from gender dysphoria but rather in "what to do to support that [transgender] identity." (Levine 820). As endorsed by the WPATH Guidelines, the affirmative care model does not require investigation into co-morbidities or traumas. (Levine 821, 841-42).

40.     The "affirmative" model prioritizes patient autonomy—"what the patient wants"—over preventing possible harms. (Levine 842-43).

41.     The "affirmative" model is unusual in medicine, which prioritizes "do no harm" over patient wishes. (Levine 842-43). The affirmative care model would not be used to treat biological gynecological conditions, for instance. (Hutchison 625).

42.     The practitioner plaintiff follows the "affirmative" model and provides treatment based on the individualized goals of each plaintiff. (Stambough 624-25). Other Arkansas medical professionals also follow the "affirmative" model and prescribe treatments based on the patient's goals. (Cathey 771).

### III.     Informed Consent

43.     "Informed consent is not a perfunctory signing of [a] document." (Levine 870). Instead, it ensures that patients have the time they need to fully appreciate the risks inherent in any procedure and know about any alternatives. (Levine 812, 870-71, Lappert 1053-54).

44.     Age impacts capacity to consent. Minors cannot legally consent, so their parents must consent on their behalf. (Levine 870). There is no established standard for obtaining informed consent for medical procedures involving minors. (Levine 873-874).

45.     Minors and their parents may not be able to effectively consent to procedures risking infertility because "infertility is not . . . germane" to their goals at that stage of life. (Levine 828). An adult is more likely to appreciate those risks because adults are more focused on starting a family. (Levine 829-30).

46.     Minors and their parents may not be able to fully consent to mastectomies because breastfeeding is "not seemingly germane" to their goals at that stage of life. (Levine 828).

47.     Minors and their parents may not be able to fully consent to procedures risking sexual functioning because they may not be sexually active. (Levine 831).

48.     Most patients at the Gender Spectrum Clinic are not sexually active. (Hutchison 589).

49.     Mental health impacts capacity to consent. A person who is "threatening suicide . . . is considered incompetent to give consent." (Lappert 1056).

50.     The relative risks and benefits of a procedure impact capacity to consent. (Levine 1054-55, 1057, 1062). When the evidence does not strongly support the benefits of a particular treatment, a practitioner cannot recommend that treatment with as much confidence as for scientifically confirmed treatments. (Lappert 1054-55).

51.     Time impacts capacity to consent. Doctors must spend time getting to know their patients so that they can accurately assess the risks and benefits of a particular treatment. (Levine 874-75).

52.     The affirmative care model does not require time spent discussing long-term risks and benefits. Some clinics practicing the affirmative care model prescribe transgender patients hormones on their first visit. (Levine 848).

53.     The growing number of transgender-identified individuals hinders the process of obtaining informed consent. With more patients, doctors have less time to spend getting to know patients and discussing the risks with them. (Levine 874-75).

## IV.     Affirmation Treatments

54.     Starting one "affirmative" treatment increases the likelihood of proceeding to the next.  (Turban 351-52). Indeed, medical intervention is often a "pathway" to further procedures because the person may always be concerned that "they're not feminine enough or masculine enough." (Levine 822-23; *accord* Smalts 1141-43).

55.     Puberty blockers are not a pause button. The overwhelming majority of minors who are prescribed puberty blockers proceed to cross-sex hormones. (Hruz 1241).

56.     Cross-sex hormones can encourage further procedures because they may worsen dysphoria unless followed by surgery. (Turban 350, Levine 834-35).

57.     Transgender individuals who receive surgery have a 30% reoperation rate. (Levine 824-25).

### A.     Puberty Blockers

58.     GnRH agonists, commonly referred to as "puberty blockers," "suppress[] the signals from the pituitary gland" and stop the production of sex hormones. (Hruz 1228). Because they suppress the production of sex hormones, puberty blockers can cause mood changes, such as depression, or brain pressure causing vision problems and headaches. (Hruz 1232-33).

59.     Puberty blockers work the same way in males as in females, so biological sex has no bearing on the prescription or dosage. (Adkins 256, Hruz 1234).

60.     Other than gender dysphoria, puberty blockers are not prescribed to treat psychological conditions. (Hruz 1242).

61.     Other than the affirmative model's approach to treating gender dysphoria, puberty blockers are not prescribed to minors who are distressed about the onset of puberty. (Hruz 1242).

62.     Other than the affirmative model's approach to treating gender dysphoria, puberty blockers are ordinarily prescribed to minors for central precocious puberty. (Hutchison 519, Hruz 1223). Precocious puberty occurs when "abnormalities in the signaling within the pituitary gland within the brain" stimulate the production of the sex hormone gonadotropin at an unusually early age. (Hruz 1224-25). In males, gonadotropin stimulates the gonads to produce testosterone. In females, it leads to the production of estrogen. (Hruz 1225).

63.     Endocrinologists diagnose precocious puberty with "objective biological measures": they look for "objective physical changes . . . occurring at an age that is abnormal for what we know about normal development." (Hruz 1223-24; *accord* Hutchison 571, Stambough 626).

64.     In biological females, pubertal changes, such as breast development and changes to the sex organs, are considered abnormal before age 8. (Hruz 1223, 1226). In biological males, androgen production or testicular growth before age 9 are considered abnormal. (Hruz 1223).

65.     Endocrinologists halt puberty before these ages because children who go through puberty too early are unprepared developmentally for their bodies' physical changes. Plus, precocious puberty will halt a child's growth sooner than his or her peers, leaving him or her significantly shorter. (Hruz 1226-27).

66.     By using puberty blockers to treat precocious puberty, endocrinologists aim to "restore [children] to that natural state that they would normally have if they did not have that disease condition." (Hruz 1228).

67.     When treating precocious puberty, practitioners do not prescribe puberty blockers beyond the normal age for pubertal development, about age 11 or 12. (Adkins 257-60, Hruz 1229). Practitioners affiliated with the Gender Spectrum Clinic treat precocious puberty consistent with the ordinary practice. (Hutchison 571, Stambough 631).

68.     Delaying puberty beyond the normal age has risks. Puberty is a critical stage for bone development. (Hutchison 535, Stambough 628). Individuals who delay puberty for too long might "reach a peak bone density that is too low" and be "at much greater risk of having severe bone disease, osteoporosis" in late adulthood. (Hruz 1230-31). That bone density deficit may not be reversible. (Hruz 1238).

69.     Because puberty is tied up with adolescent social and mental development, delaying puberty beyond the normal age risks stunting a child's social development relative to his or her peers. (Levine 827, Hruz 1237). And there are other potential consequences that are not well investigated. (Hruz 1236).

70.     When treating gender dysphoria, affirmative-model practitioners prescribe puberty blockers beyond the normal pubertal age; indeed, puberty blockers are not prescribed for gender dysphoria until a child reaches puberty. Some transgender individuals continue on puberty blockers even after starting cross-sex hormones, well into their late teens and early 20s. (Adkins 255).

71.     The Gender Spectrum Clinic stops puberty blockers in patients with gender dysphoria "at the time that the patient requests stopping them." (Hutchison 572). Patients ordinarily remain on puberty blockers until age 14, two or three years older than precocious puberty patients. (Hutchison 541-42, Stambough 632).

72.     The Gender Spectrum Clinic does not require its patients to monitor their bone density. (Hutchison 586). It believes that there are no risks to bone density because transgender patients will follow with cross-sex hormones. (Stambough 630-31).

73.     Prescribing cross-sex hormones does not replicate natural puberty because each cell of the body is coded male and female and it is "well-documented" that those cells react differently to testosterone or estrogen. (Hruz 1239-40).

**B.     Cross-Sex Hormones**

74.     Other than for gender dysphoria, endocrinologists prescribe hormones to "restor[e] the body to its state of natural health." (Hruz 1252).

75.     Gender dysphoria does not cause impaired reproductive functioning, and gender-dysphoria patients are not prescribed cross-sex hormones to treat a biological hormonal deficiency that can be diagnosed through objective lab results. (Stambough 633-34, Ho 743, Hruz 1264).

76.     Hormonal treatments for gender dysphoria are unique in that they are aimed at "disrupt[ing]" the "normal [reproductive] function." (Hruz 1263).

77.     Except for affirmative-model practitioners treating gender dysphoria, most endocrinologists consider it malpractice to prescribe cross-sex hormones beyond the range of normal, including for the purpose of addressing dissatisfaction with bodily appearance. (Hruz 1252, 1256-57).

78.     "It is not identical to give testosterone to a male as it is to give it to a female, nor is it the same thing to give estrogen to a male versus female." (Hruz 1239). Cross-sex hormones do not replace naturally occurring hormones in the male or female body. (Ho 743). And the normal amount of testosterone and estrogen for males and females "differ[s] markedly." (Hruz 1246; *see also* Hruz 1251-53).

79.     A male given estrogen will not develop typical male reproductive capacities, nor will he develop female reproductive capacities. A female given testosterone will not develop the typical female reproductive capacities, nor will she develop male reproductive capacities. (Hruz 1240).

80.     When prescribed to biological males, estrogen can render an individual infertile and impair sexual functioning, including the ability to orgasm. (Levine 828, Hruz 1263).

81.     When prescribed to biological females, testosterone can render an individual infertile. (Levine 828, Hruz 1262).

82.     An individual who proceeds from puberty blockers to cross-sex hormones might be rendered infertile. (Adkins 225-26, Levine 791, Hruz 1262).

83.     Other than affirmative-model practitioners treating gender dysphoria, endocrinologists do not prescribe hormones that will cause infertility, outside of treating life-threatening cancer. (Hruz 1264-65).

84.     Other than for gender dysphoria, Plaintiff Dr. Katheryn Stambough does not administer medical treatments that will lead to infertility, outside of treating cancer. (Stambough 614-15).

85.     Spironolactone is a drug used to block androgens, the male type hormones that spark hair growth, acne, and other pubertal changes. (Hruz 1243).

86.     Other than affirmative-model practitioners treating gender dysphoria, spironolactone is not prescribed to treat psychological conditions. (Hruz 1248).

87.     Other than affirmative-model practitioners treating gender dysphoria, spironolactone is not prescribed to male minors for the purpose of regulating androgens. (Hruz 1245, 1247).

88.    Spironolactone is ordinarily used in females to treat polycystic ovarian syndrome (PCOS), in which females produce excess testosterone. (Hutchison 520, Hruz 1244).

89.    PCOS is diagnosed through objective criteria, such as elevated testosterone levels. (Hruz 1244-45). PCOS can harm a female's fertility, metabolism, and heart. (Hruz 1245).

90.    Testosterone is the hormone that stimulates the development of secondary sex characteristics in males. Administering excess testosterone beyond a person's normal range can elevate that individual's red blood cell count, impacting blood pressure and heart health. (Hruz 1250, Smalts 1145-46).

91.    Other than affirmative-model practitioners treating gender dysphoria, testosterone is not ordinarily prescribed to treat psychological, body-image conditions. (Hruz 1256).

92.    Other than affirmative-model practitioners treating gender dysphoria, testosterone is not ordinarily prescribed to females. (Hruz 1257). If it is prescribed to females to treat an objective hormonal deficiency, it is prescribed to the "normal physiologic level" for females, which is much lower than for males. (Adkins 264).

93.    Testosterone may be prescribed to treat males with hypogonadism: damaged or nonfunctioning testes which can also lead to small phallic size due to incomplete development. (Hruz 1248-49). These conditions are diagnosed through "objective criteria," such as hormone levels. (Hruz 1249).

94.    When treating hypogonadism, the goal is to provide the patient with the testosterone level he would have without the condition. (Hruz 1249). Doctors will not provide testosterone outside the normal range. (Hruz 1253).

95.    Testosterone may be prescribed to initiate puberty in males who are unable to go through puberty normally. (Hutchison 520, Hruz 1250-51).

96.     Other than affirmative-model practitioners treating gender dysphoria, testosterone is not used to initiate puberty in females. (Hruz 1250).

97.     Estrogen is the hormone that stimulates the development of secondary sex characteristics in females. Administering exogenous estrogen can increase the risk of stroke and clotting, harm blood pressure, arrest bone growth, and increase the risk of cancer. (Hruz 1259).

98.     Other than affirmative-model practitioners treating gender dysphoria, estrogen is not ordinarily prescribed to treat psychological or body-image conditions. (Hruz 1260-61).

99.     Other than affirmative-model practitioners treating gender dysphoria, estrogen is not ordinarily prescribed to males. (Adkins 262, Hruz 1260-61).

100.    Estrogen may be prescribed to females with hypogonadism. (Hutchison 520, Hruz 1258).  This condition is diagnosed through objective criteria, such as hormone levels. (Hruz 1258-59).

### C.     Gender Transition Surgeries

101.    Plastic surgeries can be categorized as either reconstructive or aesthetic.

102.    Reconstructive plastic surgery focuses on restoring form or function lost due to trauma, injury, cancer, or congenital deformity. (Lappert 1038, 1043). When a patient seeks reconstructive surgery, the surgeon uses objective "physical" or "functional" criteria to diagnose and treat the abnormalities. (Lappert 1046).

103.    Aesthetic surgery seeks to improve subjective appearance, without any physical or functional deficit. (Lappert 1038, 1043, 1046).

104.    Transgender persons seeking surgery do not have an objective physical deficit but rather are seeking to address mental distress and to obtain "happiness." (Lappert 1047-48). Thus, surgeries related to gender transition are best categorized as aesthetic. (Lappert 1047-48).

105.     Aside from affirmative-model practitioners treating gender dysphoria, no surgery to address mental distress rather than an objective deficit is classified as reconstructive. (Lappert 1081).

106.     Aside from affirmative-model practitioners treating gender dysphoria, plastic surgeons often see patients seeking surgery to address significant mental distress caused by a body part. (Lappert 1049-50). Those patients often ascribe significant "emotional harm," "isolation," or "failure" to a "defect" that the plastic surgeon cannot identify using objective metrics. (Lappert 1051).

107.     It would be "malpractice" for a plastic surgeon to provide surgery to patients attributing significant mental distress to a body part that is not defective by any objective metric. (Lappert 1049-51).

108.     The ethical problems with providing aesthetic surgery to someone seeking it to alleviate significant mental distress are heightened when that surgery involves high risks, such as "hazarding a fundamental human function." (Lappert 1057).

109.     When operating, plastic surgeons often borrow muscles or skin from other parts of the body. This can affect the function of those other body parts, and plastic surgeons call those effects "donor defects." (Lappert 1044).

110.     Though plastic surgeons can ethically tolerate a donor defect when reconstructing part of the body, there are ethical problems with "surrender[ing] function for the sake of a cosmetic result." (Lappert 1045).

111.     Ethical concerns are heightened when the patient is a minor. It is ethically permissible to perform a "simple" aesthetic operation that poses "zero risk" to the minor patient, but not permissible to perform riskier aesthetic operations. (Lappert 1062).

112.     Transgender individuals might seek "top" surgeries, surgeries of the face and breast. Face surgeries include masculinizing or feminizing the face and neck. Breast surgeries include breast augmentation, mastectomy, and chest masculinization. (Lappert 1063, Burleigh 1187-90).

113.     Breast augmentation involves placing a prosthesis behind either the chest muscle or natal breast tissue. (Lappert 1065). Complications of breast augmentation include pain, infection, or failure of wound closure. (Lappert 1067).

114.     Natal females might seek breast augmentation for either aesthetic or reconstructive purposes. One reconstructive purpose is addressing a congenital defect, such as Poland Syndrome, where one breast is not fully developed. (Lappert 1065). A plastic surgeon treating Poland Syndrome would diagnose it through objective physical criteria. (Lappert 1066).

115.     Plastic surgeons are ethically discouraged from providing breast augmentations to female minors. (Lappert 1062, 1066).

116.     A mastectomy, the complete removal of the breast, is typically performed to manage cancer. (Lappert 1069-70). Complications of mastectomies include failure of the wound to heal, fluid accumulation, or the need for a drainage tube. (Lappert 1071).

117.     Because a mastectomy "involves the destruction of a human function," it is ethically unacceptable to perform a cosmetic mastectomy. (Lappert 1078).

118.     Breast reductions are typically reconstructive procedures performed to address orthopedic issues, such as severe neck, back, and shoulder pain. (Lappert 1071-72). These reconstructive surgeries are performed after consulting objective orthopedic criteria to measure the mass of the breasts. (Lappert 1072).

119.     Breast reductions can also be cosmetic, but performing a cosmetic breast reduction on a minor is ethically discouraged because breast reductions can have adverse outcomes, such as loss of nipple sensation or inability to breastfeed, that a minor cannot adequately consent to. (Levine 828, Lappert 1073-74).

120.     Biological males may receive a procedure resembling breast reduction to address gynecomastia, a condition in which the contour of the male chest resembles a female breast. (Lappert 1074). Surgery to treat gynecomastia can have complications that breast reductions on a biological female do not, including an increased risk of post-operative bleeding since "[t]he male chest has larger caliber blood vessels supplying the skin." (Lappert 1075-76).

121.     If gynecomastia is caused by obesity, a surgery to treat it is cosmetic. (Lappert 1075). If gynecomastia is caused by a mass resembling female glandular tissue, the surgery is reconstructive because there is "a[n] objective problem" that often causes pain. (Lappert 1075).

122.     "Bottom" surgeries "include castration, removal of the ovaries or . . . testicles and use of the natal genital tissues to create counterfeit genitalia." (Lappert 1063).

123.     Removing the genitalia renders an individual permanently sterile. (Levine 828).

124.     A vaginoplasty performed on transgender individuals utilizes similar procedures and techniques as vaginal reconstruction performed on a biological female. (Lappert 1067).

125.     A biological female may seek vaginal reconstruction to address damage from trauma or cancer. (Lappert 1067-68). That damage is assessed through objective diagnostic criteria. (Lappert 1068).

126.     Because vaginal reconstruction requires skin or muscle grafts, it risks donor defects and complications, including infection and loss of range of movement. (Lappert 1068-69, Burleigh 1188).

127.    In the United States, vaginoplasties have been performed on gender-dysphoria patients as young as 15 years old. (Karasic 189-90).

128.    Phalloplasties are "a broad range of procedures." (Lappert 1076). Most commonly, plastic surgeons use skin and muscle grafts taken from elsewhere on the body to reconstruct a phallus and urethra. (Lappert 1063, 1076). More recently, plastic surgeons have begun constructing a phallus on a remote part of the body and attaching the constructed cylinder to the genital area. (Lappert 1076).

129.    A biological male may seek a phalloplasty to address damage from trauma or cancer. (Lappert 1077). That damage is assessed through objective diagnostic criteria. (Lappert 1077).

130.    Because phalloplasties require skin or muscle grafts, they risk donor defects and complications. (Lappert 1077, Burleigh 1193-95). A "very common" complication is "urethrocutaneous fistula," which occurs when suture lines fail and "urine leak[s] out" along the phallus. (Lappert 1077).

## V.      Lack of Evidence for Affirmation Treatments

### A.      Overview of the Evidence

131.    Different types of scientific studies have different levels of reliability. Case studies are the lowest level of evidence. Longitudinal or cross-sectional studies are more reliable; they seek to observe associations between variables. But those associational studies do not identify the cause of any observed effect. Randomized controlled trials isolate a potential cause of the observed effect; thus, they are the most reliable. (Hruz 1272-73).

132.    The affirmative care model is grounded in the so-called "Dutch Studies," which had significant methodological limitations: it did not control for other factors or create a control group to compare patient outcomes. (Levine 864-66).

133.    The authors of the Dutch Studies have expressed concerns with applying their re-search to design a standard of care for all transgender individuals. (Levine 865-66).

134.    The affirmative care model is often justified by concerns about suicidality in transgender individuals. But there is little research into the connection between gender dysphoria and completed suicides. (Regnerus 1023). What literature exists does not indicate a heightened risk of completed suicides; to the contrary, the rate of completed suicides is just slightly greater than the rate for all people with mental illness. (Levine 832-33, Regnerus 1022).

135.    Among the transgender population, the suicide rate is highest 10 years after the last surgery. (Levine 835, 854).

136.    There are no randomized controlled trials examining whether puberty blockers or cross-sex hormones benefit minors with gender dysphoria. (Karasic 68, Turban 296, Hruz 1274).

137.    There have been a few cross-sectional and non-controlled longitudinal studies ex-amining the effects of puberty blockers. (Hruz 1275). None of these studies provides reliable evi-dence that puberty blockers benefit gender dysphoria patients. (Hruz 1275-84, 1291-93, 1296).

138.    There have been a few cross-sectional and non-controlled longitudinal studies ex-amining the effects of cross-sex hormones. None of these studies provides reliable evidence that cross-sex hormones benefit gender dysphoria patients. (Levine 822, Hruz 1286-91, 1296).

139.    There is no uniform standard for following up with patients who have received cross-sex hormones and, thus, no way of knowing whether most outcomes are positive or nega-tive. (Levine 859, 861).

140.    Though there are anecdotes suggesting that some patients may be happy immedi-ately after receiving cross-sex hormones, there's "very little evidence" that cross-sex hormones promote happiness and prevent suicide in the long run. (Levine 834; *accord* Smalts 1141-43).

141.    A European study shows an elevated suicide rate in transgender individuals who have received hormones but not surgery. (Levine 834-35).

142.    A 2018 study by Olson-Kennedy et al suggests that providing testosterone to biological females suffering from gender dysphoria can worsen dysphoria focused on the breasts. (Turban 350).

143.    There have been a few cross-sectional and non-controlled longitudinal studies examining surgical outcomes among transgender adults. None of these studies provides reliable evidence that gender transition surgeries benefit gender dysphoria patients. (Levine 823, Hruz 1293-95).

144.    There are no cross-sectional studies examining surgical outcomes among transgender minors. (Levine 824).

145.    There is no uniform standard for following up with patients who have received gender transition surgery; to the contrary, most surgeons stop following up with the patient is physically healed and functional. (Levine 859-60). Without follow-up, practitioners and researchers cannot know if most outcomes are positive or negative. (Levine 861).

146.    Though anecdotal evidence may suggest that patients are happier immediately after receiving gender transition surgery, that immediate happiness may not last. It is "very common" for patients with other body dysmorphic disorders to have "a period of happiness after . . . surgery" but that happiness often wears away because the surgery didn't fix underlying sources of sorrow in the patient's life. (Lappert 1052-53).

147.    There is evidence that, even after taking cross-sex hormones and getting surgeries, transgender individuals have a higher suicide rate than the general population. (Levine 792, 832).

148.     There is evidence that gender transition surgery is correlated with a worsening quality of health. (Levine 793, 824-25).

149.     Because these studies do not establish that the affirmative care model works, it would be ethically permissible for doctors to design controlled studies to compare the approaches. (Levine 856).

**B.     Professional Views**

150.     Professional organizations do not represent all doctors but rather at most those doctors who are members. (Levine 836-38).

151.     Professional consensus can only serve as a proxy for truth if that consensus was reached after sufficient "independent evaluation" of the science without outside political pressure. (Regnerus 1001; *accord* Levine 836-37).

152.     There is "a lot of conflict" over whether professional organizations settled on the affirmation model "too soon" and as a result of political pressure. (Regnerus 1000-01).

153.     Professional organizations that endorse the affirmation model have often been hostile to dissenting voices because of "popular voices" outside the academy, rather than address critiques of that model of care. (Levine 839, Regnerus 1005-09, 1017).

154.     The GRADE system rates the quality of evidence used in clinical practice guidelines. (Hruz 1267-68). It grades evidence quality as high, moderate, low, or very low to assess its reliability. (Hruz 1268).

155.     Recommendations based on high quality evidence are unlikely to change. Recommendations based on low or very-low quality evidence are likely to change as more evidence becomes available. (Hruz 1268).

156.    Because recommendations based on low quality evidence are likely to change, those recommendations are generally tentative, recognizing that the science is "unsettled." (Hruz 1270-71).

157.    Though the Endocrine Society recommends the affirmation model, nearly all of its recommendations are based on evidence graded as low or very low quality. (Adkins 242-46, Antommaria 385, Levine 845). Only one recommendation—on the adverse effects of affirmation intervention—is based on moderate quality evidence. (Hruz 1269).

158.    Europe does not follow the WPATH Guidelines. (Levine 839-41).

159.    National review committees, made up of people with expertise in transgender medicine and other scientific fields, in Sweden, the UK, and Finland have reviewed the evidence supporting the use of puberty blockers and cross-sex hormones. These national reviews are more trustworthy than a single, peer-reviewed study. (Levine 847).

160.    Each of these national review committees has concluded that the quality of the evidence supporting the use of puberty blockers and cross-sex hormones was "low or very low." (Levine 844).

161.    Because the quality of the evidence supporting the use of puberty blockers and cross-sex hormones is low, the Sweden, UK, and Finland committees concluded that the science does not prove that the "benefits" of these interventions "outweigh the harms." (Levine 844-45).

162.    Recognizing the weaknesses of research into the gender affirmative approach, Sweden's Karolinska Institute will not provide "affirmative" treatments outside of research studies. (Levine 851, Hruz 1303). Instead, the Karolinska Institute says that psychotherapy should be the treatment of choice. (Levine 845, 851).

163.     Because the UK's national health care organization has concluded that the evidence does not support the alleged benefits of the "affirmative" approach, the UK has restructured its system. (Levine 850, Hruz 1304). It now discourages hormones and surgery and says that psychotherapy should be the treatment of choice. (Levine 845, 850).

164.     Concerned that individuals do not have full decisionmaking capacity until their mid-20s, Finnish authorities recommend against providing cross-sex hormones until that age. (Levine 852). For individuals under that age, cross-sex hormones are only offered when they can be managed by a panel of experts. (Levine 853). Instead, Finland says that psychotherapy should be the treatment of choice. (Karasic 182, Levine 845).

165.     French authorities are concerned with the lack of knowledge about the causes of a transgender identity and the potential for serious medical complications. (Levine 955-58). Thus, France has issued a statement recommending psychotherapy, not the "affirmative" model, as the first approach. (Levine 855).

166.     The State of Florida commissioned an independent review that concluded that the evidence supporting the affirmative care model was "very low quality" and that "the risk of harm exceeded the knowledge of the benefits." (Levine 945).

## VI.     Gender Medicine in Arkansas

### A.     "Affirmative" Treatments in Arkansas

167.     In Arkansas, Planned Parenthood offices will prescribe cross-sex hormones to minors. Dr. Janet Cathey, a practitioner at Planned Parenthood does not require her patients to participate in therapy or get a mental health diagnosis before receiving cross-sex hormones. (Cathey 754-55, 761).

168.     Planned Parenthood will prescribe hormones on a patient's first visit. (Cathey 761).

169. At Planned Parenthood, non-medical personnel obtain a patient's signature on a consent form at the start of a visit. (Cathey 762). These non-medical personnel do not discuss the risks of cross-sex hormones before obtaining the patient's consent. (Cathey 766).

170. At Planned Parenthood, Dr. Janet Cathey discusses the risks of cross-sex hormones with patients after they have signed a consent form. (Cathey 766). Cathey spends only 40 minutes to one hour with patients discussing numerous topics, including these risks, as well as the patient's medical and surgical history, history of cross-gender identification, and treatment goals. (Cathey 767).

171. At Planned Parenthood, Dr. Janet Cathey advises all patients that the "risks" of cross-sex hormones "are extremely small." (Cathey 766).

172. In Northwest Arkansas, Dr. Stephanie Ho prescribes puberty blockers and cross-sex hormones. Ho does not require patients to meet with a mental health provider before obtaining cross-sex hormones. (Ho 737).

173. Very few of Dr. Stephanie Ho's patients pursue fertility preservation options. (Ho 743).

174. In Little Rock, the Gender Spectrum Clinic used to prescribe puberty blockers and cross-sex hormones. But it does not currently prescribe either puberty blockers or cross-sex hormones to new patients. (Hutchison 552, Stambough 602). It does not perform any kind of gender transition surgery. (Stambough 605).

175. When it was prescribing puberty blockers, the Gender Spectrum Clinic did not obtain written consent for puberty blockers, believing them to be "fully reversible." (Hutchison 534, 540).

176.    As written, the Gender Spectrum Clinic's policy would allow an adolescent who began to experience gender dysphoria for the first time at age 15 to receive cross-sex hormones a year later. (Hutchison 584).

177.    The Gender Spectrum Clinic would consider on a case-by-case basis prescribing puberty blockers or hormones to individuals who do not have gender dysphoria but request those treatments. (Hutchison 570).

178.    Very few Gender Spectrum Clinic patients pursue fertility preservation options. (Stambough 614).

**B.    The SAFE Act**

179.    Before enacting the SAFE Act, the Arkansas General Assembly heard testimony from an Arkansas doctor, Dr. Roger Hiatt, who has treated approximately 200 trans-identified minors. (Hiatt 1094, 1097).

180.    Dr. Hiatt has treated several minors who suffered from co-morbid mental health issues serious enough to require hospitalization even after starting cross-sex hormones. (Hiatt 1105, 1119).

181.    Dr. Hiatt practices watchful waiting, as opposed to a gender affirmation method. (Hiatt 1107).

182.    Dr. Hiatt has had at least a half dozen patients desist from a transgender identity. (Hiatt 1108-10).

183.    Before enacting the SAFE Act, the Arkansas General Assembly also heard testimony from a man who transitioned to living as a female and then detransitioned back years later, Billy Burleigh. (Burleigh 1210).

184.    Before he transitioned, Burleigh attended therapy for nine years. But his therapist did not ask about other mental health issues, childhood trauma, or suicidal thoughts. (Burleigh 1176-77).

185.    Burleigh decided to seek and later obtained surgeries without being required to consult with doctors or therapists. (Burleigh 1186-87).

186.    When Burleigh obtained a vaginoplasty, his artificial vagina bled so badly that he needed a blood transfusion. (Burleigh 1188).

187.    After deciding to detransition, Burleigh needed additional surgery to legally identify as male. (Burleigh 1192). His reconstructive phalloplasty had significant complications. (Burleigh 1193-95).

188.    Because he lost his testicles, Burleigh needs to have his hormones balanced constantly. (Burleigh 1196-97).

### C.    The Minor Plaintiffs (Sealed)

189.    ████████████████████████████████████████████
████████████████████

190.    ████████████████████████████████

191.    ██████████████████████████████████████████
████████████████████

192.    ██████████████████████████████████████████
████████████████████████████████

193.    ████████████████████████████████
██████████████████████████████████████
████████████████████

194. 

195.

196.

197.

198.

199.

200.

201.

202.

203. 

204.

205.

206.

207.

208.

209.

210. ████████████████████████████████████
████████████████████████████████████████
███████████

211. ████████████████████████████████████
████████████████████████████████████

212. ████████████████████████████████████
█████████████████████████████████

213. ████████████████████████████████████
██████████████████████████████████

214. ████████████████████████████████████
██████████████████████████████

215. ████████████████████████████████████
███████████████████████████████

216. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

217. ████████████████████████████████████
███████████████████

218. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████

Dated:  January 18, 2023                    Respectfully submitted,

TIM GRIFFIN
    Attorney General

DYLAN L. JACOBS (2016167)
    Deputy Solicitor General
MICHAEL A. CANTRELL (2012287)
HANNAH L. TEMPLIN (2021277)
    Assistant Solicitors General
OFFICE OF THE ARKANSAS
    ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007 (main)
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Defendants*