1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF ALABAMA
2                           NORTHERN DIVISION

3

4        REV. PAUL A. EKNES-TUCKER,    *
         et al.,                       *
5                                      *
                   Plaintiffs,         *   2:22-cv-00184-LCB
6                                      *   February 8, 2023
         vs.                           *   Montgomery, Alabama
7                                      *   10:00 a.m.
         KAY IVEY, in her official     *
8        capacity as Governor of the   *
         State of Alabama, et al.,     *
9              Defendant.              *
         *****************************

10

11

12                   TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE LILES C. BURKE
13                   UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23       Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
         pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
         and Procedures Vol. VI, Chapter III, D.2.  Transcript
24                  produced by computerized stenotype.

25

                      CHRISTINA K. DECKER, RMR, CRR
                      Federal Official Court Reporter
                   256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                          APPEARANCES

 2

         FOR THE PLAINTIFFS:
 3       Melody Eagan, Esq.
         LIGHTFOOT, FRANKLIN & WHITE, LLC
 4       The Clark Building
         400 20th Street North
 5       Birmingham, Alabama 35203

 6

         Adam Reinke, Esq.
 7       KING & SPALDING, LLP
         Atlanta, Georgia
 8

 9       Barry A. Ragsdale, Esq.
         Robert S. Vance, Esq.
10       DOMINICK FELD HYDE, P.C. LITIGATION
         Birmingham, Alabama
11

12       Cortlin Hall Lannin, Esq.
         COVINGTON & BURLING LLP
13       San Francisco, California

14

         Kaitlin Toyama, Esq.
15       U.S. DOJ
         Civil Rights Division
16       Washington, DC

17

         Jason R. Cheek, Esq.
18       Praveen Krishna, Esq.
         Margaret L. Marshall, Esq.
19       Lane Woodke, Esq.
         U.S. Attorney's Office
20       Birmingham, Alabama

21

         Stephen D. Wadsworth, Esq.
22       U.S. Attorney's Office
         Montgomery, Alabama
23

24

25
```

1
2          FOR THE DEFENDANTS:

3          James W. Davis, Esq.
           Edmund LaCour, Esq.
           A. Barrett Bowdre, Esq.
4          Benjamin Seiss, Esq.
           OFFICE OF THE ATTORNEY GENERAL
5          501 Washington Avenue
           P.O. Box 300152
6          Montgomery, Alabama 36130-0152
           (334) 242-7300
7

8
           FOR MOVANT EAGLE FORUM OF ALABAMA AND SOUTHEAST LAW
9          INSTITUTE:

10         John Graham, Esq.
           PHELPS DUNBAR LLP
11         Birmingham, Alabama

12

13

14         COURTROOM DEPUTY:  Kimberly Ruffin

15

16         COURT REPORTER:  Christina K. Decker, RMR, CRR

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

1

2          (In open court.)

3          THE COURT:  Good morning.

4      All right.  Before we get started, one quick question.  Is

5  the defendants' motion for judgment on the pleadings moot based

6  upon previous rulings of the Court, or is that still something

7  that's at issue?

8          MR. BOWDRE:  Your Honor, we do not think it's moot.

9  We believe it's still a live issue at this point.

10          THE COURT:  All right.  Fair enough.

11      Well, let's pick up the motion for sanctions first, and

12  then we will go to the judgment on the pleadings, and then

13  we'll get through some of these other issues.

14      All right.  On sanctions, who is going to speak for the

15  movant?

16          MR. GRAHAM:  John Graham, Your Honor.

17          THE COURT:  Okay.  And I don't envision this to be a

18  very long argument, but I certainly will give everybody the

19  time that they need.

20          MR. GRAHAM:  Okay.  Right.  I don't think I need very

21  long.  Thank you.

22          THE COURT:  All right.

23          MR. GRAHAM:  I know Your Honor's familiar with the

24  context of this.  We were here back in October on our motion to

25  quash the subpoenas that came from the federal government.  And

1   Your Honor quashed all of those in their entirety.

2        Just a reminder, there were 11 very broad categories of

3   documents going for -- asking for documents from these two

4   non-parties, these two volunteer grassroots organizations going

5   back to 2017.  And asking for everything from draft

6   legislation, polling data, internal policy goals,

7   communications with other non-parties, and the political

8   groups, as well as legislation given to the -- proposed to the

9   state legislature.  And Your Honor recognized, we believe

10  properly, that those were just way outside the scope of proper

11  discovery.

12       You did not reach, and it wasn't necessary for you to

13  reach the First Amendment privilege issues also associated with

14  that.  And I think that that's -- the political speech context

15  of this, I think, is particularly important for the motion for

16  sanctions.

17       We are not just talking about a run-of-the-mill document

18  subpoena.  We are talking about a document subpoena -- a very

19  broad, extremely overly broad subpoena, I'd say completely

20  irrelevant, but to grassroots organizations for political

21  speech.  I mean, what the First Amendment is all about.

22       We -- the language of the federal rule, I believe, covers

23  this issue very clearly.  It's mandatory on the lawyers and the

24  party and -- the DOJ in this case.  They were required to take

25  reasonable steps on the front end before they issued the

 1  subpoena to avoid putting any undue burden or expense on a

 2  non-party who received the subpoena.

 3      And then the Court, charged with enforcing that duty,

 4  certainly entered discretion about the type of sanctions.  But

 5  I believe it says that the appropriate sanctions include, not

 6  limited to reasonable attorneys' fees, and the like.

 7      So I believe punitive and compensatory damages are

 8  certainly authorized by the rule.  In fact, the word sanctions

 9  certainly implies punitive nature to begin with.

10      I think what's been telling in this case is just sort of

11  the evolving rationale that we have heard from the federal

12  government for all of this.  And basically it's been, well, we

13  just needed to know who wrote the statute.  That's what we

14  heard.  That's what was in the original cover letter from

15  Mr. Cheek as the purpose for this 11-category multi-year

16  subpoena.

17      And I just think that just doesn't hold water.  I think

18  Your Honor's previously order recognizes that.

19      Even if they wanted to argue one or two of the categories

20  could be potentially relevant to those.  And I disagree that

21  they are.  I mean, they have no argument, have not even tried

22  to make an argument for the overwhelming majority of this.

23      In fact, as you recall about the Friday evening before the

24  last hearing, they suddenly went from the 11 categories down to

25  about 1 percent and tried to -- and changed what they were

1 after.

2          THE COURT:  Well, and I was going to ask you about

3 that, too.

4          MR. GRAHAM:  Yes, sir.

5          THE COURT:  So in the weighing and balancing of this

6 test for sanctions, does the government get credit, and if they

7 do, how much credit do they get for essentially acknowledging

8 pre hearing that most of what they sought they were not

9 entitled to?

10          MR. GRAHAM:  Well, I would suggest -- certainly it's

11 in your discretion -- but I would suggest they don't get much

12 credit.

13      At that point, we had gotten subpoenas that they had to

14 have known from the outset were just ridiculously overbroad.  I

15 mean, they knew what this was about.  They knew that these --

16 and, again, even tried to argue for the relevance in most of

17 them.  We filed our objection, our motion to quash.  They, at

18 that point, have no particular compromise in mind.

19      They come back a few days later.  They come back with

20 about half of the categories they still say they want.  You

21 know, that's -- and they're still way over-the-top overbroad.

22 We didn't agree with that.

23      And they take the position in their opposition to our

24 motion to quash that the subpoenas are narrowly tailored, which

25 they're not.

1        And so we go along.  We have to file a reply brief.  We

2   have to have a hearing.

3        And so, yeah, after two months of fighting about this,

4   incurring a lot of costs on our behalf, and a lot of effort,

5   last minute they, I guess, finally read some cases, or read the

6   writing on the wall, or what have you.  I don't know.  I can't

7   speak for their thought process.  But I would suggest under

8   these circumstances they should not get much credit for that.

9        The -- again, the rule -- language of the rule is

10  mandatory.  The Eleventh Circuit case we've cited on this, the

11  Progressive Emu case, I think, is very much on point.  And in a

12  lot of ways.  I'd say here the conduct is probably more

13  egregious.

14        They made a point in that case that one of the problems

15  with that subpoena was it was untimely.  And certainly that's

16  not the issue here.

17        On the other hand, that was a commercial case and a -- not

18  the government, but a law firm on the heat of trial preparation

19  who probably went overboard on the subpoena.  And the party

20  resisting it did not have to comply.  The judge quashed the

21  subpoena and entered sanctions.

22        One of their as arguments being, well, you don't get

23  sanctions unless you had to actually comply with the subpoena.

24  Well, I think that's just wrong.  The Eleventh Circuit

25  Progressive Emu case shows it's wrong.  I think the language of

1  the rule shows it's wrong.

2        In fact, there's, you know, the rules have actually --

3  what they're talking about is a cost-shifting provision that's

4  in a separate part of the rule.  Our motion for sanctions is

5  under 45(d)(1).

6        There's a separate part on 45(d)(2)(B)(ii) that would

7  provide for in a case where if a party, a non-party objected to

8  a subpoena and the Court ruled that some parts were duly

9  complied with, the Court could still order the cost to be

10  shifted to -- the cost of compliance to be shifted to the

11  requesting party.

12        Well, that's not what we are here about.  And that's a

13  separate provision.  If that's what it means, then 45(d)(1)

14  essentially has no meaning, in terms of the sanction.  I don't

15  believe that's what the -- would be the proper interpretation

16  of that.

17        They suggested or implied that bad faith is the standard

18  for this.  That's simply not true.  The language of the rule is

19  the standard.  But I would say I do believe there's bad faith

20  here.

21        I am not attributing this to Mr. Cheek personally.  Do I

22  think he should have pushed back a little bit on whoever was

23  calling the shots here and pushing the subpoena?  Yes, I do.

24  But I have nothing personal at all with Mr. Cheek.

25        But whoever is responsible for this, I believe sanctions

1   are appropriate.  This is uncalled for.

2       This Department has become very political.  I think that's

3   clear from watching the news these days.  And there's just no

4   justification for this.  And I think sanctions are appropriate

5   in whatever form Your Honor deems appropriate.

6           THE COURT:  Thank you.

7           MR. GRAHAM:  Thank you.

8           THE COURT:  Mr. Cheek, are you going to argue this for

9   the government?

10          MR. CHEEK:  Your Honor, my colleague Praveen Krishna

11  will argue on behalf of the government.

12          THE COURT:  Okay.

13          MR. KRISHNA:  Thank you, Your Honor.  May it please

14  the Court.  Praveen Krishna for the United States.

15      In the last hearing, we -- this Court quashed our

16  subpoena, and that is a ruling we have absolutely taken to

17  heart.  We have followed this Court's ruling to the letter.

18  And we are not seeking to challenge or have this Court

19  reconsider its prior ruling in any way.

20      But today we're faced with a very different question,

21  because we are not just looking at the subpoena alone.  We are

22  looking at the overall conduct of the United States, and we're

23  asking whether we took reasonable steps to avoid imposing an

24  undue burden.

25      Now, there's been a little bit of discussion about what

1  the appropriate standard is under Rule 45.  And we're happy to
2  use the standard set forth in Progressive Emu, the case that my
3  friend just cited, which is whether the conduct is sufficiently
4  egregious.

5      Conduct that is sanctionable under Rule 45 has to be
6  extreme conduct.  It has to be conduct that falls well outside
7  of the balance of normal civil advocacy.  And we simply don't
8  have that here.

9      The motion for sanctions should be denied for three basic
10  reasons.  The first is, we had a good faith reasonable basis to
11  believe that our subpoena would cover relevant information
12  because we were addressing open questions of law about the role
13  of legislative history and the role that private organizations
14  can play in providing that history.

15     For example, Chief Judge Pryor -- let me back up for a
16  second.

17     Legislative intent and legislative purpose are questions
18  that are central to our equal protection claim.  And Chief
19  Judge Pryor, in Stout vs. Jefferson County, he explained that
20  only a state actor can violate the Fourteenth Amendment, but
21  constituents' statements and conduct can be relevant in
22  determining the intent of public officials.

23     That was the rationale that we relied upon in issuing the
24  subpoenas to the Eagle Forum and SLI.  As constituents who
25  played a central role in advocating for and enacting VCAP, they

1   were sources of relevant evidence about the legislative history
2   that could provide evidence about legislative purpose and
3   legislative intent.

4       Wal-Mart, the Alabama Educational Association, the Florida
5   State NAACP, all of these different organizations have issued
6   successfully similar subpoenas.  Now, our arguments relying on
7   those cases were not ultimately persuasive with this Court, but
8   they weren't frivolous arguments.  These were arguments that
9   fall within the bounds of normal civil advocacy.

10      Getting to the second reason why the motion should be
11  denied.  It was understandable that at the time that we were
12  drafting the subpoena, we couldn't have anticipated the burden
13  that it would impose.  And it should be noted here that it's
14  only ever been that the Eagle Forum that has said that this
15  subpoena is too difficult, in terms of the number of documents
16  it is asking for.  The SLI has never made that claim.  But at
17  the time we were drafting the subpoena, we had no basis to
18  distinguish between the two.

19      Now, the standard that we have to -- the rule asks us to
20  take reasonable steps.  And what is reasonable is based on what
21  we could reasonably know.

22      And so the idea that facts that we learn afterwards would
23  make our pre -- would make our conduct unreasonable, that just
24  doesn't make sense.  What matters instead is, once we learn
25  about the burden, what do we do about it?

 1       And here, we fulfilled our duties to the letter.  The

 2  efforts that we made to narrow the scope of the subpoena and to

 3  accommodate the interests of the Eagle Forum, those should not

 4  be taken as a signal that we believe we weren't entitled to

 5  this information in the first place.  Instead, what we were

 6  doing is we're running a cost-benefit analysis, where, on the

 7  one hand, we are weighing our interest in this information, but

 8  we're also offsetting the difficulties that the Eagle Forum and

 9  other institutions will have in producing it.  We are also

10  thinking about the likelihood of future litigation down the

11  line, and our interests in advancing and developing other parts

12  of our case.

13       And so the fact that we made these concessions, that

14  weighs very strongly in favor of denying the motion for

15  sanctions.  Because to take it the other way, to adopt the

16  interpretation that the Eagle Forum and SLI are advancing, that

17  would have some serious consequences.

18       It is the normal case that an issuer of a subpoena will

19  reach out to the recipient, there will be an informal dialogue,

20  and there will be compromise.  But if an issuer of a subpoena

21  thinks that, well, if I offer to drop these categories, the

22  recipient can come back and then move for sanctions because

23  that will be proof that I didn't need those categories in the

24  first place.

25       That means that instead of issuers and recipients

1  resolving issues individually and informally, they will be

2  coming to the Court far more often because there is a strong

3  incentive for the issuer to remain intransigent.  And that's

4  why every court that has looked at this issue, they have

5  consistently held that when an issuer of a subpoena issues a

6  motion -- or issues a subpoena and that is overbroad and that

7  is quashed, if that issuer engages in good faith negotiations

8  to narrow the scope of that subpoena, then sanctions are

9  inappropriate.

10      The Eagle Forum and SLI haven't cited a single case where

11  anybody has made the kinds of concessions that we have made,

12  and still faced sanctions.  The closest case that they have is

13  Progressive Emu, which is, as my friend noted, is completely

14  distinguishable on the basis of timing.

15      The central fact in that case was that the subpoena that

16  was issued by Progressive Emu, that was described as an end run

17  around discovery.  The issuer had multiple opportunities to

18  seek the information they wanted in that case.  In Progressive

19  Emu, they had a discovery period.  They had a remand period.

20  But they waited almost a year until the eve of trial to ask for

21  a decade's worth of documents within less than one business

22  day.  There's nothing like that that we have done here.

23      Now, in terms of the scope of the subpoena and whether it

24  was overbroad, I'd also like to direct this Court's attention

25  to the case that I previously referred to, Florida State NAACP.

1   And the cite is 568 F.Supp.3d, 1301.  And that's an important

2   case because there the Florida State NAACP was challenging an

3   election law.  The law was drafted in part by The Heritage

4   Foundation.  The NAACP moved for the similar materials to what

5   we were seeking in this case.  And the Southern District of

6   Florida, in that case, it granted a motion to compel, requiring

7   The Heritage Foundation to provide substantially similar

8   information to what we were seeking.

9       And my point in citing that case isn't to get into a

10  question about whether that case was right or wrong.  It's

11  simply to note that the arguments that we were making and the

12  conduct that we engaged in are within the bounds of normal

13  civil advocacy.  It isn't egregious for us to rely on theories

14  and court decisions that favor the points that we take.  That's

15  the bread and butter of civil advocacy.

16      And, as for the questions about the First Amendment, this

17  Court did not resolve those issues.  And we maintained the

18  arguments that we have made before.

19      But I'd also note that Rule 45 distinguishes between

20  questions of privilege and questions of undue burden.  And Rule

21  45 says that you could quash a subpoena either because it seeks

22  privileged information or because it would impose an undue

23  burden.

24      In contrast, Rule 45(d)(1) speaks only about the undue

25  burden.  And that would be the only basis for sanctions.  So

1   the strict First Amendment arguments that my friend has raised,

2   those are outside the scope of this hearing, I believe.

3        And, furthermore, in terms of the intent of the United

4   States in issuing the subpoena, there is no evidence that we

5   had any sort of untoward motives.  The correspondence between

6   the United States and Mr. Graham, that is in the record, and it

7   is perfectly civil and professional.  The only basis for

8   imputing any kind of an improper purpose to the United States

9   is the subpoena itself, but this subpoena is not unusual.

10       Now, it certainly may be controversial, and reasonable

11   minds can disagree about whether it was appropriate, but our

12   conduct here in issuing it was not sanctionable.

13       I'm happy to answer any questions this Court might have.

14   Otherwise, I ask that you deny the motion for sanctions.

15           THE COURT:  You mentioned earlier in your argument,

16   you said "when we were drafting the subpoena."  My question is

17   who is "we"?  What actors were involved in the drafting of this

18   particular subpoena?

19           MR. KRISHNA:  Your Honor, I don't fully know that.  I

20   mean, I think the conduct here --

21           THE COURT:  You can give me your best understanding.

22           MR. KRISHNA:  Sure.  Well, I mean, I first want to say

23   that the conduct --

24           THE COURT:  I really just want a direct answer.

25           MR. KRISHNA:  Sure.  It would -- I have to defer to my

1  colleagues because I don't know the individuals.

2          THE COURT:  All right.  Why don't I give you

3  15 seconds to talk?

4          MR. CHEEK:  Do you want me to answer?

5          THE COURT:  Sure.  Go ahead.

6          MR. CHEEK:  So, Your Honor, just for the record, this

7  is Jason Cheek.

8      It was a collaborative effort between assistant United

9  States attorneys in the Northern District of Alabama and

10  attorneys in the Civil Rights Division in Washington, D.C.

11          THE COURT:  And let me ask this question, Mr. Cheek.

12  Who would you say that the idea originated with?

13          MR. CHEEK:  I would say probably myself.

14          THE COURT:  All right.

15      All right.  I don't have any other questions for you other

16  than that.  So I think we have covered this subject.

17          MR. KRISHNA:  All right.  Well, could I make one

18  point, Your Honor?

19          THE COURT:  Yes.

20          MR. KRISHNA:  Thank you.

21      And I just want to emphasize that what's under review here

22  isn't the conduct of any individual attorney.  It's just the

23  Department as a whole.  And so we stand together as one team.

24  And it's that conduct that should be evaluated.

25          THE COURT:  I get that.  But I also think the answer

```
 1   that we've just gotten bears on this issue, as well.
 2            MR. KRISHNA:  All right.  Thank you, Your Honor.
 3            THE COURT:  All right.  Well, let's take up the
 4   judgment on the pleadings.
 5        Who is going to argue that for the State?
 6            MR. LACOUR:  I will, Your Honor.
 7            THE COURT:  How much time do we need on this?
 8            MR. LACOUR:  I think it will be very brief.
 9            THE COURT:  Excellent.
10            MR. LACOUR:  Thank you, Your Honor.  I think the
11   points here are few, and I think fairly simple.
12        When the private plaintiffs brought their claim, it was
13   really focused on the effects of SB 184, the effects on
14   transgender minors.
15        When the DOJ intervened, they said they were bringing a
16   similar equal protection claim that was not asking for more.
17            THE COURT:  Hold on one second, Mr. LaCour.  Is
18   anybody going to argue this on the other side?
19            MR. CHEEK:  Your Honor, the United States was not of
20   the impression that this motion was going to be heard today.
21   It's my understanding that we were to be heard on March 8th,
22   but I think clearly that's incorrect.
23            THE COURT:  Well, I'm just moving forward since we're
24   all here.  I actually thought that it was probably moot.  I'm
25   clearly wrong.  And so, you know, to the extent that somebody
```

1  is prejudiced and wants to wait until March the 8th, I am fine
2  with that.
3        MS. TOYAMA:  Your Honor, this is Kaitlin Toyama for
4  the United States, and we would agree.  I think March 8th would
5  be great.
6        THE COURT:  All right.  Then we will put that on hold
7  until then.
8        MS. TOYAMA:  Thank you, Your Honor.
9        THE COURT:  Let's take up the motion to compel
10  production of plaintiffs' medical records.
11     Mr. LaCour, how long do we think this will take?
12        MR. LACOUR:  Probably somewhere in the range of 10,
13  15 minutes.
14        THE COURT:  10 minutes sounds good to me.
15        MR. LACOUR:  I will keep it 10 or less, Your Honor.
16     Your Honor, from the very beginning of this case, from the
17  very beginning of private plaintiffs' complaint, they have said
18  that this case concerns the right of the minor plaintiffs to
19  receive treatments that they have described alternatively as
20  medically necessary, appropriate, and essential.
21     They allege a constitutional right, not to these drugs in
22  general, or even to transitioning treatments in general, but to
23  medically necessary care.  That's paragraphs 99 and 105 of
24  their current complaint.  And it's found elsewhere in the
25  complaint and their pleadings.

1    But as we all agree, these interventions carry tremendous

2  risks.  That's why it's important that they be appropriate,

3  that they be essential.

4    Plaintiffs did not argue to Your Honor back here in May in

5  the P.I. hearing that there was some unfettered right to give

6  kids sex hormones or puberty blockers no matter the risk, only

7  for certain kids were the treatments appropriate.

8    Indeed, in the reply brief at the preliminary injunction

9  stage, they said, quote, to determine if and what medical care

10 is essential, medical providers utilize a multidisciplinary

11 approach for monitoring and assessment of transgender youth

12 patients that includes behavioral and physical health

13 specialists.

14    And Your Honor also heard from Drs. Ladinsky and Hawkins,

15 plaintiffs' experts, who said that there was a comprehensive

16 360-degree assessment that was recommended by WPATH and

17 performed at their clinics before anyone was subjected to these

18 treatments that might have lifetime effects.

19    And, indeed, the WPATH standards do state that healthcare

20 professionals should, quote, undertake a comprehensive

21 biopsychosocial assessment of adolescents who present with

22 gender identity related concerns, particularly because, quote,

23 there are no studies of the long-term outcomes of

24 gender-related medical treatments for youth who have not

25 undergone a comprehensive assessment, and that treatment in

1  this context, for example, with limited or no assessment has no

2  empirical support.

3      So, in other words, WPATH is saying that if you are

4  providing these powerful drugs to children based on only a

5  limited assessment or no assessment at all, then this is

6  experimental.  There's no empirical support to back this up.

7      And based on these guarantees that there's a careful

8  assessment going on for these minor plaintiffs, the Court was

9  at least preliminarily persuaded that they were going to likely

10  prevail on the merits.  The Court held that plaintiffs were

11  likely to establish a constitutional right to these

12  interventions, quote, subject to accepted medical standards.

13  That's page 1 of the preliminary injunction opinion.

14      The Court recounted the testimony from Drs. Ladinsky and

15  Hawkins, explaining that the benefits outweigh the risks in,

16  quote, certain cases, and that, quote, minors and their parents

17  undergo a thorough screening process.  That's page 10 of the

18  opinion.

19      The Court even recounted the testimony of Megan Poe, one

20  of the parent plaintiffs, who stated, in the words of the

21  Court's opinion, quote, medications have had no adverse effects

22  on Allison, that Allison is now happy and thriving.

23      The Court further held that nothing in the record shows

24  that medical providers are pushing transitioning medications on

25  minors, and that there was an imminent threat of harm to parent

1  plaintiffs -- plaintiffs and minor plaintiffs.

2       But now having secured their preliminary injunction on

3  assertions that puberty blockers and cross-sex hormones are

4  appropriate and essential care for these plaintiffs, the

5  plaintiffs have performed an about-face.  They now claim that

6  it is irrelevant whether the drugs are appropriate or

7  inappropriate.  That it's irrelevant whether they are essential

8  or whether they are doing unnecessary harm.  Irrelevant, as

9  plaintiffs put it, whether, quote, plaintiffs were

10  misdiagnosed.  That's on Document 215-1 at page 60.

11       And irrelevant, as they say at page 10 of their response

12  to this motion, whether UAB actually follows the standards that

13  their expert Dr. Ladinsky claims to follow.

14       I mean, these assertions are shocking both in their

15  departure from what they told this Court at the preliminary

16  injunction stage, and also in their implications for the

17  plaintiffs' position.

18       Indeed, it appears now to be that their position is that

19  the Constitution guarantees a right not just to give cross-sex

20  hormones to kids when it's appropriate, but also to be able to

21  harm kids and give them these treatments when it's

22  inappropriate and not essential, as long as you are doing it

23  for the purpose of a sex change.

24       And so unless that is plaintiffs' new theory of the

25  case -- and I doubt that's the banner under which they want to

1  travel -- basic principles of fairness, as well as judicial

2  estoppel, require that the motion to compel be granted.  The

3  documents are obviously relevant to the case, as presented by

4  the plaintiffs.  They allege these treatments are mental health

5  treatments that are appropriate and essential for them.  And

6  defendants have to be able to test those assertions.

7       They assert that because there is a blanket ban here, it's

8  irrelevant whether these treatments are actually helping or

9  undoubtedly harming the particular plaintiffs in this case.

10  That is not how as-applied challenges work.

11       I think if you imagine a scenario in a different

12  constitutional context, that becomes quite clear.  If there was

13  a Second Amendment implicated law that said anyone guilty of

14  any offense under state or local law is forever barred from

15  possessing a firearm, someone whose only offense was a parking

16  ticket would have a very strong as-applied Second Amendment

17  claim there.

18       But another plaintiff, whose offenses include multiple

19  counts of armed bank robbery would have a very weak as-applied

20  Second Amendment claim here.

21       Similarly, plaintiffs have to prove that they are

22  appropriate candidates for these treatments.  Merely signing a

23  declaration saying they are transgender simply won't do it.  I

24  mean, and plaintiffs' own experts admit that they're seeing a

25  greater number of kids showing up in their clinics claiming

 1  gender congruence, which is, quote, increasing our needs to do

 2  very careful assessments about what type of care each child

 3  gets.  It's at page 73 of the preliminary injunction

 4  transcript.

 5       So defendants also need to see these records from the

 6  private plaintiffs to see if that careful assessment is going

 7  on or not.

 8       And Dr. Hawkins stated there's a difference between

 9  someone who has gender dysphoria and is transgender, and

10  somebody who is merely exploring their gender identity.

11       And, indeed, at the close of the preliminary injunction

12  hearing, Mr. Doss told you don't worry about testimony from

13  de-transitioners like Ms. Wright because the care in Alabama is

14  better than the care in Georgia that she received.

15       At page 372 of the transcript, he lamented, quote, If only

16  Ms. Wright had had a doctor like Dr. Ladinsky who is committed

17  to a deep meaningful evaluation of the child.

18       Well, we need to see if that deep meaningful evaluation

19  actually happened.  It's the most basic principle of fairness

20  here.  These are clearly relevant.  The assertion that they're

21  irrelevant raises very serious questions about exactly what

22  their claim is in the first place.

23       And if it's anything like what they have pleaded, if it's

24  anything like what they told this Court it was at the

25  preliminary injunction stage, then the motion to compel has to

 1  be granted.

 2          THE COURT:  Do you want to touch on the assertion of

 3  privilege?

 4          MR. LACOUR:  Yes, Your Honor.

 5      The psychotherapist privilege, obviously recognized by the

 6  Supreme Court, in the same opinion, in footnote 14, the Court

 7  says, like any testimonial privilege, this privilege can be

 8  waived.

 9      So if you are a criminal defendant bringing a *Strickland*

10  claim, and you say, my lawyer gave me really bad advice, you

11  are putting that attorney-client privilege matter at issue.

12  And, of course, the State is going to be able to talk to your

13  lawyer and say, Did you really say that?

14      The same is true of this testimonial privilege, where they

15  are putting their mental health at issue.  I mean, the

16  complaint has multiple allegations about depression, about

17  seeing therapists, about the thorough assessment that was

18  undergone; biopsychosocial, that means biological components

19  that might explain the gender dysphoria; social components,

20  like physical trauma, or family dynamics; other psychological

21  components; comorbidities like autism, ADHD.  And other factors

22  that might explain why you are seeing gender confusion, and

23  might be the real cause, and would make that person an

24  inappropriate candidate for a lifetime of medicalization on

25  puberty blockers, cross-sex hormones, and eventually surgeries.

1        So they have put these squarely -- they put mental health

2   squarely at issue.  They have put their medical records and

3   medical history squarely at issue because these are very

4   dangerous drugs.  And that's why Dr. Ladinsky and Dr. Hawkins

5   told you we're doing a very, very careful assessment.

6        I mean, Megan Poe told you they practically had to beg the

7   UAB doctors to get these drugs.  Well, we need to be able to

8   test that.

9        And, I mean, under the WPATH standards that plaintiffs

10  have been telling this Court are the gold standard for gender

11  dysphoria treatment, that's the sort of assessment that's

12  supposed to be happening.

13       And there haven't been any studies done, as WPATH has

14  said, on the effects of these drugs on kids who have only had

15  the limited assessment or have had no assessment.  So unless

16  their theory, again, is the radically broad theory that there

17  is an unfettered constitutional right to give even a

18  three-year-old testosterone for purposes of changing her sexual

19  appearance, we have to be able to assess whether these really

20  are appropriate and essential.

21       And there are also sorts of different, again, biological,

22  social, and psychological factors that could go into a child's

23  gender dysphoria, so we need to be able to assess those records

24  to see if these really are appropriate.

25       We had offered them a chance to just back off and only

```
 1   press a facial challenge --

 2            THE COURT:  Well, and I was about to ask you about

 3   that.

 4       So in your motion, you have kind of outlined some of the

 5   back and forth, and the offers to compromise and maybe limit

 6   the scope that were exchanged.

 7       Is your position the same as it was when it was filed?

 8   Tell me, you know, specifically, what does the State think they

 9   absolutely have to have?

10            MR. LACOUR:  I think we need, as long as they're still

11   applying an as-applied challenge, where they are going to come

12   forward with testimony saying we are doing this carefully in

13   every instance, our doctors are doing this carefully in every

14   instance, the doctors did it very carefully and appropriately

15   in the instance of these five minor plaintiffs, and children

16   are thriving and are facing no side effects now, despite being

17   on these powerful drugs.  We're going to need to test that with

18   the five categories of documents that we have outlined in these

19   RFPs that are also set forth in our motion.

20            THE COURT:  So I realize this is all guesswork on your

21   part and my part at this point.  But give me some what-ifs.

22       Okay, Judge, if you let me have this record, you know, if

23   it showed scenario A, or scenario B, or scenario C, it's

24   absolutely relevant to the meat of this matter.  Give me some

25   fact scenarios, just what-ifs.  What you -- what you could find
```

1  that you think would be relevant.

2      MR. LACOUR:  Well, Your Honor, at page 20 of your P.I.

3  opinion, you said the records showed there was a thorough

4  consideration that happens before these drugs are given to kids

5  that could leave them sterilized for life.

6      The records might show that a thorough assessment didn't

7  happen.  And that, thus, there is a much greater increased risk

8  and a much lesser chance that there's going to actually be a

9  benefit for a particular child.  That would be one example.

10      You also said in your P.I. order that there wasn't

11  competent evidence or relevant evidence rather, that these

12  drugs were being pushed by medical providers in the state.

13      We think some of the declarations we submitted provided

14  such evidence, but evidence in the records that plaintiffs have

15  might be further evidence of that, that there are limited or no

16  assessments going on, that there are obvious comorbidities or

17  social factors, like trauma, that might explain why a

18  particular child or teen is feeling this gender discomfort that

19  are being overlooked either for reasons of ideology, or

20  financial interests, or just sloppy work.

21      I think that would be very relevant to determine whether

22  those legislative findings that were laid out in the Act have

23  some evidence to back them up.

24      THE COURT:  Has there been any discussion about a

25  protective order coupled with an in camera review by the Court

1  to solve this, or no?

2          MR. LACOUR:  I think we already have a protective

3  order in place and have had it in place for a while in

4  anticipation of this.

5      I mean, in the Arkansas case that you are well aware of, I

6  mean --

7          THE COURT:  Quite well aware.

8          MR. LACOUR:  Quite well aware of.  The Arkansas

9  plaintiffs turned over mental health records.  They turned over

10 medical records.  There wasn't any fight about this.  It was

11 all subject to a protective order, of course.  So, and we

12 absolutely will take that seriously and be sensitive to that.

13     But this happens in litigation, when a plaintiff comes

14 forward and puts a medical or mental health assertion at issue.

15 And we cite many of those cases in our brief to explain why

16 that privilege is waived by the assertions that they have made.

17     And, so, what typically happens in these cases, is if

18 there's --

19         THE COURT:  I probably didn't formulate that question

20 very well.  My question really wasn't about a protective order

21 as much as it was has anybody talked about just an in camera

22 review as a way to solve this?  Does the State have a position

23 on that?

24         MR. LACOUR:  I don't think we have discussed that,

25 Your Honor.

```
 1              THE COURT:  Is that something that -- is that
 2   something that either side thinks would help here?  Or do you
 3   want me to rule on the merits of this?
 4              MR. LACOUR:  Could you explain a little more how you
 5   think that would work?  You would look at the records?  I
 6   mean --
 7              THE COURT:  I'm not saying we should or shouldn't.
 8   I'm just throwing it out there.
 9              MR. LACOUR:  I don't think that that would necessarily
10   help, Your Honor.  Part of the reason we want these records is
11   to provide them to our experts who are physicians, who are
12   mental health experts, who are going to be better equipped than
13   I certainly would be, to look at them and determine whether
14   that thorough assessment really happened or whether some things
15   were overlooked.
16              THE COURT:  Got it.  I was just asking the question.
17              MR. LACOUR:  Yes.
18              THE COURT:  All right.  Anything else you want to put
19   forth today?
20              MR. LACOUR:  If there are no further questions, then,
21   no, Your Honor.
22              THE COURT:  All right.
23              MR. LACOUR:  Thank you.
24              THE COURT:  Ms. Eagan, it seems like you are going to
25   be the person to argue this.
```

1          MS. EAGAN:  Yes, sir.  It's just me today.

2          THE COURT:  All right.  So I guess my first question

3   to you would be:  Are we full-throatedly standing on privilege

4   today?  Or is it really just the scope and relevance?

5          MS. EAGAN:  Judge, maybe I should first start off.  We

6   have made an offer to the State for -- to produce records that

7   would be the medical and mental health records that relate to

8   the evaluation, diagnosis, and treatment of gender dysphoria

9   for these minor plaintiffs.

10       That would include medical records that reflect the

11  evaluation and reflect the diagnosis of gender dysphoria for

12  each of these children.  That would be records that assess the

13  medical need for the treatment of the gender dysphoria that is

14  at issue in this case.  It also would be medical records that

15  reflect the provision of medical treatment and mental health

16  treatment for gender dysphoria, as well as the ongoing

17  monitoring and evaluation for the condition of each of these

18  minor plaintiffs.

19       Hearing Mr. LaCour and what he says why they need these

20  records, I did not hear anything that he said that would be

21  something outside of the scope of what we have already offered

22  to produce to them.  But when we made that offer to the

23  defendants, we were told, no, we think we need to get all

24  mental health records on these children.  And I said even back

25  to the age of three?  And they said, yes, we believe we're

 1  entitled to that.

 2          THE COURT:  Are there mental health records on these

 3  children to the age of three?

 4          MS. EAGAN:  I don't know, Judge.  But my point is, is

 5  that they're saying we should be entitled to anything that

 6  relates to anything related with these children.

 7      And to be clear, in the Arkansas case, what the plaintiffs

 8  gave in that were records, my understanding is, relating to the

 9  diagnosis and treatment of gender dysphoria for the children.

10  I mean, we have really gone, I think, beyond with what we have

11  made the offer.  But to the extent there were other records,

12  those were redacted.

13      And so, you know, it is our position -- and I will say the

14  protocol that we offered to the defendants was so that they are

15  not going and subpoenaing records and getting them and then

16  getting records outside of what we have offered.

17      What we said is we will go, we will get them through

18  authorizations, we will then produce things that are within

19  those categories to you.  If you see something else that you

20  feel like you need to know, come back to us, we can go get

21  those, look at those records, and then provide to you if it

22  fits within these categories.

23      It is a more than generous offer that we have made to the

24  State.  But they have rejected it.  And so that's why we're

25  here today to argue this.

1    And to be very clear, Judge, our offer really goes beyond,
2  in my opinion and in our opinions, what they would even be
3  entitled to in this case.  Because the issue before this Court
4  is, is this categorical ban unconstitutional?

5    It is a categorical ban of transitioning medications for
6  transgender youth, which is what Your Honor specifically has
7  found already in your preliminary injunction.  You said this is
8  a categorical ban.

9    And it doesn't matter what the conditions are -- the
10 individual circumstances are of a particular child.

11   And, Judge, this is a case about the constitutionality of
12 this law on its face and what it says.  This isn't a medical
13 malpractice case to put into question whether this particular
14 doctor met the standard of care, or whether that particular
15 doctor met the standard of care.  Whether or not they met the
16 standard of care, the law still makes it a crime to provide
17 these transitioning medication to transgendered youth.

18   And so whether or not a transgender minor has or has not
19 been properly diagnosed with gender dysphoria, whether or not
20 the medical assessments met the requirements of WPATH is really
21 of no issue because it's still a crime under this law.

22   And because this is a categorical ban, Your Honor,
23 defendants presumably are taking the position that no
24 transgender minor -- not these plaintiffs, not any transgender
25 minor -- regardless of the circumstances, should receive these

```
 1   transitioning medications.

 2            THE COURT:  I have one question.  So, as you know from

 3   my order, I made credibility determinations and gave certain

 4   testimony greater weight than others.

 5        You know, I don't think that I would find this in the

 6   medical records, but what if one of your experts did no

 7   evaluation and just wrote prescriptions for anybody that came

 8   in the door?  Wouldn't that directly bear on the outcome of the

 9   this case, depending on what I heard at the next hearing?

10            MS. EAGAN:  Your Honor, then, let's go back to what it

11   is that we have already offered.

12            THE COURT:  I understand that.  But my question is:

13   That would directly bear, right?

14            MS. EAGAN:  As far as the constitutionality of this

15   law?  I don't believe so.  Could it go to the credibility of

16   the witness?  Yes.

17            THE COURT:  Aren't they all kind of tied up together?

18            MS. EAGAN:  Not necessarily.  I mean, I guess the

19   question that I have --

20            THE COURT:  I mean, I don't think you would have put

21   those experts up there if you didn't think that they were

22   necessary to your case.

23            MS. EAGAN:  And I agree.  And it is our position that

24   these experts at UAB are following the standards of care.  And

25   counsel has issued a subpoena to UAB to get records related to
```

```
 1   their protocols and what they are doing at UAB, and is doing
 2   discovery, or can do discovery about what is happening at UAB.
 3           THE COURT:  My question would be how do I separate out
 4   one mental health record from another in this?  How do I
 5   reasonably make that determination?  That they're not entitled
 6   to it?  Are they not related?
 7           MS. EAGAN:  Well, Judge, I guess -- they have asked
 8   for mental health records that could be, you know, a child --
 9   I'm struggling with going through it because these children --
10   because we're launching a constitutional challenge that somehow
11   that would entitle them to every medical record and mental
12   health record that a child has had since the age of zero.
13           THE COURT:  Correct me if I'm wrong, but I thought
14   experts on both sides of the hearing, you know, testified that,
15   you know, other mental health issues are often tied up in the
16   assessment of these issues.  Am I wrong about that?
17           MS. EAGAN:  And, Your Honor, what we have offered to
18   provide them is the records that all relate to the assessments.
19           THE COURT:  You are just arguing to me.  You are not
20   answering my question.
21           MS. EAGAN:  I'm sorry.  I thought I was, Judge.
22        What's your question again, Judge?  I'm sorry.
23           THE COURT:  I mean, my question was:  My
24   understanding, my memory of the trial was that all of the
25   experts basically said, hey, you know, other mental health
```

 1  issues often and can be tied up with gender dysphoria.  You

 2  know, it's not always just limited to that.  And so am I

 3  correct about that testimony?

 4          MS. EAGAN:  They did say that there are other factors

 5  that could be weighing into children's mental health

 6  conditions, and that those are considered as part of the

 7  evaluation.

 8          THE COURT:  So if I limit it just to gender dysphoria

 9  without any of those other conditions, it seems like maybe I am

10  closing the window down from what both experts said they took

11  into consideration when they made a diagnosis.  Am I wrong

12  about that?

13          MS. EAGAN:  Can I step back a little bit and see if

14  this helps?

15          THE COURT:  Yes.  Certainly.

16          MS. EAGAN:  Here's the thing, is that -- and these

17  children and that they're diagnosed with gender dysphoria is

18  relevant.  I mean, and, again, this is an -- our challenge is

19  because these are trans children -- transgender youth who have

20  been deprived access to standard-of-care medications.

21      And in an equal protection challenge, it is not -- we do

22  not have to demonstrate that the child actually would take the

23  medicine if they do not have -- if they have the benefit.

24      It is well established in the cases such as in the United

25  States vs. Virginia case, those were women who wanted to get

into VMI.  They didn't have to demonstrate they actually would
go to VMI, or would have gotten accepted into VMI in order to
have standing to challenge the statute.

But here's where I really am struggling, Judge, from a
standpoint -- and I don't know -- I think I know what the
State's position is on this.  The burden here is we show this
is a sex-based classification.  And then the burden shifts on
the State to show what was the justification when the law was
passed?  And it ties to when the law was passed.

The United States vs. Virginia case is clear on that.  Not
some sort of post hoc information you gather through
litigation.  And then whether or not it was narrowly tailored
to that state interest.  How is a child's individual records
relevant to what the State's interest was at the time?

Now, is the State's position going to be that if these
plaintiffs were properly assessed, and if a gender dysphoria
diagnosis was appropriate, and a doctor has found these to be
medically -- these treatments to be medically necessary, is it
going to be their position that then, in that situation, that
this law is unconstitutional as applied to that child?

If that is their position, then maybe we reassess what
we're doing with the medical records.  But that's not their
position.

Their position is that this treatment -- these treatments
and this ban is constitutional and that no child should receive

1   these treatments, regardless of their individual circumstances.

2        That is why these records really have no relevance to the

3   issues that are here, which is, is this a sex-based

4   classification?  And if so, what was the State's interest at

5   the time that the law was passed?  And what they did, is that

6   narrowly or appropriately tailored to the state interest?  An

7   individual child's records are not relevant.

8        Now, I do recognize that at the preliminary injunction

9   hearing we did get into issues about how these particular

10  children benefitted from these medications and what the impact

11  would be on a particular child when -- if they were removed.

12       At the preliminary injunction hearing, we had to prove

13  imminent harm.  We had a different standard that we had to

14  prove than what we have at the permanent injunction stage.  At

15  the permanent injunction stage, the evidence plays out

16  differently.

17       And so the fact that we talked about and we put up Ms. --

18  I think it was Poe, but the mother that testified.  I mean,

19  that went to what we needed to prove at the time of the

20  preliminary injunction, as opposed to what would be important

21  at the permanent injunction stage.

22       So, Judge, a couple of other points, if I may, just to

23  address some of the arguments that have been raised by the

24  defendants as to why they believe that these records should be

25  discoverable.  Unless you have any other questions, or if we

1  need to go back to your last question.  Okay.

2      On the issue of the facial versus as-applied challenge,

3  the defendants try to say, oh, well, they were making an

4  as-applied challenge, so that somehow opens the door to these

5  records where you wouldn't be able to get them if this was a

6  facial challenge.

7      To be clear, the plaintiffs challenged this Act on its

8  face because it targets transgender minors, and it deprives

9  them of transitioning medications regardless of the individual

10  circumstances.

11      Your Honor recognized specifically in your opinion last

12  year that the Act prohibits transgender minors and only

13  transgender minors from taking transitioning medications due to

14  their gender non-conformity.

15      And then as to our plaintiffs, they challenged the law

16  because they are transgender minors who are deprived of these

17  transitioning medications.

18      Now, the distinction here between whether it's facial or

19  as-applied, it's murky.  And whether -- it really is their --

20  what we have to prove is the same.

21      The United States Supreme Court has specifically

22  recognized in the Bucklew vs. Precythe case, which is 139 S.

23  Ct. 1112 from 2019, classifying a lawsuit as a facial or an

24  as-applied challenge does not speak at all to the substantive

25  rule of law necessary to establish a constitutional violation.

1        What we plan to show is that this violates the

2    constitutional rights of these children because they're

3    transgender or transgender children, in general, is really one

4    and the same, Judge.

5        And, again, when it comes to -- we can prove or we

6    demonstrate from the face of this that this is -- this

7    categorical ban is a sex-based classification, so then it

8    shifts to the State to show at the time the Act was enacted,

9    what was their justification.

10        And the State's justification as to when the Act was

11    enacted -- that it's experimental, or they're different, or

12    that it's being that the medical community is pushing these --

13    those do not turn on whether a particular doctor met the

14    standard of care as to a particular child.

15        On the holistic approach piece, where they say that the

16    standard of care requires a comprehensive holistic look, again,

17    that does not, for purposes of a constitutional challenge, make

18    an individual child's mental health and medical records

19    relevant.  The defendants do not need -- we do not need this to

20    prove that this law is constitutional -- is unconstitutional,

21    and defendants do not need an individual child's medical

22    records to prove the law is, or to defend the

23    constitutionality.

24        And the realities of this, Judge, is that what we believe

25    the State is trying to do is, they're trying to put the minor

 1   plaintiffs' physicians on trial here and question their medical

 2   decisions, and to question whether they were stringent with

 3   their evaluations, or whether they met the standard of care.

 4   Essentially create a medical malpractice sideshow and to

 5   convert you into finding whether or not a doctor has or has not

 6   met the standard of care.  And that is not what is intended

 7   with this constitutional challenge.

 8        And, again, whether UAB did this -- as I wrote down the

 9   words of Mr. LaCour -- deep evaluation into these particular

10   children, again, that will be covered with what we have already

11   offered the defendants.

12        And then the last piece -- and then I will get to the

13   privilege -- is the standing question.  There has -- the

14   defendants did raise that we would need to use these records

15   for standing.  Again, these children have standing because they

16   are transgender minors who are harmed by the Act.

17        We will gladly produce the record that says this child has

18   been diagnosed with gender dysphoria.  We'll gladly produce

19   records that will demonstrate for those children who are taking

20   these medications that they are taking these medications.

21        That's enough for them to have standing.  But whether

22   doctors disagree about whether the gender diagnosis was correct

23   or not correct, doesn't weigh into whether these children have

24   standing to challenge the law.

25        On the mental health privilege, I will touch briefly on

1  that, Judge.  Without question, the mental health records are

2  protected by the psychotherapist patient privilege.  There's no

3  question for that.

4      The State's position is that we have wholesale waived that

5  privilege by filing a constitutional challenge.  Or these

6  children have by filing a constitutional challenge against the

7  Act.

8      They do not cite to any case that supports their position

9  that filing this -- a transgender minor filing this Act, even

10 if they are asserted that they have gender dysphoria, has

11 wholesale waived the privilege.

12     These children are not seeking damages for emotional

13 distress like what were in some of those cases.  These children

14 are not putting their overall mental health at issue.

15     Again, to me, it is strange to say that when someone files

16 a constitutional challenge to an Act that protects -- because

17 they are saying that it targets transgender minors, would

18 somehow put their confidential communications with health

19 providers at issue.  And defendants have not demonstrated or

20 shown us one case that would indicate that.

21     Judge, I believe that's all that I have for now unless you

22 have any other questions.

23         THE COURT:  All right.  Let's take a five-minute break

24 and we will come back.

25         MS. EAGAN:  Thank you, Judge.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                  (Recess.)

2                  THE COURT:  All right.  Who all wants to be heard on

3       the motion to quash?

4                  MR. RAGSDALE:  We do, Your Honor.

5                  THE COURT:  All right.  Are we going to have

6       one person handle it for everybody?  Or do we have multiple --

7                  MR. RAGSDALE:  No, Your Honor.  I brought a smart

8       lawyer with me to take the argument.

9                  THE COURT:  Gotcha.

10         How long do we need on this?  The reason I'm asking is if

11      we are going to have lengthy arguments, and we think we're

12      going to run 45 minutes or an hour, we may just take a quick

13      lunch break and come back and do it after lunch.  If we think

14      it's relatively short, then we might just press ahead.

15         Do y'all have an opinion on that?

16                 MR. RAGSDALE:  My opinion is that since I'm not

17      arguing it is, it will be relatively short.

18                 MR. LANNIN:  I second that motion, Your Honor.

19                 THE COURT:  Okay.  How short is relatively short?

20                 MR. LANNIN:  I think I need no more than 10 minutes.

21                 THE COURT:  10 minutes.

22                 MR. LANNIN:  Yes, sir.

23                 THE COURT:  Okay.  What about from the other side?

24         Do we want to hit this motion in limine at the same time?

25      Or separately?

1          MR. LACOUR:  Yes, sir.  I would think the motion to

2   quash and motion in limine rise and fall together.

3        So we think it will be relatively short on our end, as

4   well.

5          THE COURT:  Okay.  Well, let's just press on.

6          MR. LANNIN:  Good morning, Your Honor.  My name is

7   Cortlin Lannin.  I'm here on behalf of the three non-parties

8   that brought that motion to quash.

9        And, thanks, Your Honor, for letting me appear before you

10  today.

11       Part of the reason I'm optimistic that this could be short

12  is because a lot of ground has been trod already.  And I don't

13  know if Your Honor had seen the notice we filed yesterday, but

14  I'm glad to report that the State and two of my clients have

15  now settled their dispute.  So there is no live issue as to the

16  subpoenas directed at AAP or the Endocrine Society.

17       We do have a dispute about WPATH.  And, unfortunately,

18  that's what brings us before you today.

19       If Your Honor will indulge me, I think a little bit of

20  table setting about how we got here might be instructive.

21       The state of Florida has instituted a similar rule that

22  the Medicaid agency in Florida has now adopted a rule that

23  would ban Medicaid reimbursement for certain gender-affirming

24  treatments.

25       And the State subpoenaed these three organizations, in

1   addition to 18 others, seeking the same types of materials that

2   the State has sought in this case.  So, essentially, internal

3   documents reading on the development of the guidelines in the

4   case of Endocrine Society and WPATH are policy positions for

5   all of the other organizations.

6      And the rationale that Florida offered in that case was

7   similar to the rationale we have now seen from the State, that

8   they wanted to probe the medical consensus across the community

9   in support of these gender-affirming treatments.  And we moved

10   to quash those subpoenas, as well.

11      And that notice to quash was heard before Judge Nichols in

12   the District of Columbia, where the subpoenas had been noticed

13   for compliance.

14      And after a very robust hour and a half hearing just a few

15   weeks ago, Judge Nichols essentially rewrote the RFPs that the

16   state of Florida had served, and substantially narrowed the

17   scope of discovery.  He did order those 22 organizations to

18   produce some documents, but it was a very limited set, as

19   compared to what Florida had first sought.

20      So we went back to the State and said, in light of that

21   development, why don't we agree to reproduce the exact same

22   things that Judge Nichols has now ordered produced in Florida,

23   we'll give those to you and call it a day.  And the State

24   accepted that offer, with respect to AAP and Endocrine, as I

25   said, in addition to a handful of small documents from each

1    organization that they will provide.

2         But the State has, as to WPATH, requested four different

3    categories of documents that, at the end of the day, WPATH was

4    not prepared to provide.  It just went far beyond any

5    reasonable conception of relevance, in that organization's

6    view.

7         So that's why we're here today.  We came close to a deal

8    on WPATH, but unfortunately couldn't quite bridge the gap.

9         And I'm happy to provide context to Your Honor about the

10   additional documents that the State sought, if that would be

11   helpful.  But I do think they read directly on the relevance

12   issues presented here.

13        And on that point, Your Honor, you know, the State has now

14   said that, and they repeated again and again in their brief,

15   that this case, according to the plaintiffs, is about the

16   medical establishment's views of gender-affirming care, as

17   reflected in the guidelines that are published by WPATH in this

18   instance.  And they're looking to probe whether the medical

19   community in fact does support these guidelines, whether there

20   is the consensus that they attest to.  And so they thus served

21   these subpoenas.

22        But the problem from our view, Your Honor, is that there

23   is a very serious disconnect between that theory of relevancy

24   and what the State has actually sought here.

25        The 47 RFPs that were served on WPATH really seek to probe

1    every nook and cranny inside the organization.  They seek

2    communications between members, among members, about the

3    guidelines, about the studies that were considered for the

4    guidelines, all their internal dialogue that went into the

5    making of the guidelines.  And none of that, in our view, has

6    anything to do with whether the medical community as a whole

7    supports these medical guidelines that are published by WPATH.

8         That is a knowable fact.  There are policy statements

9    available from many medical organizations that reflect their

10   view about gender-affirming care.

11        And in Florida, the State subpoenaed those types of policy

12   statements from 18 other organizations, which I note the State

13   hasn't done here -- not that I am inviting that discovery, but

14   it does seem to reflect some disconnect between what they've

15   told Your Honor about this discovery and what they have

16   actually sought.

17        I think what the State really wants here, Your Honor, is

18   quite clear from the face of the request.  It's the internal

19   documents.  And they're trying to show, it seems to me,

20   internal dissent within this organization in particular.

21        They want to show that members may have spoken up, and

22   that had critical -- critical of some surveys that were used,

23   or wanted to use other studies that weren't considered.  And in

24   our view, again, that is just not relevant here because the

25   guidelines speak for themselves.

 1          They are available online.  They include a robust section

 2     that describes the methodology that was used to create the

 3     guidelines and the multi-step process that was used.  That

 4     includes a description of the methodology for which evidence

 5     was graded for use in the guidelines.  It includes a list of

 6     all the authors of the guidelines.  And that includes every

 7     study that was relied upon when creating the guidelines.

 8          All of that is knowable.  Any of us could find it right

 9     now on the Internet, including the State.

10          But they want more than that, as I said, Your Honor.  And

11     we think that there's no need for that discovery.

12          And even if we credited an argument that the State is

13     looking to show that the guidelines are flawed, that they

14     reflect bad science, that is, again, a challenge that the State

15     can mount without internal discovery among members.  Because

16     the State has said to Your Honor today that it has experts

17     lined up to attest to the science, that it can speak to the

18     studies that should have been considered or that were

19     considered and why they're wrong.  All of that the State can

20     do, and it doesn't need any of this internal discovery for that

21     type of challenge.

22          So at the end of the day, there's just a disconnect, I

23     think, between what they are seeking and the reason they're

24     seeking it, according to their papers.  But even if you look at

25     what the discovery does want, Your Honor, the internal

1    materials, there's just no, in our view, plausible argument for

2    how that's relevant at all.

3         And I should add, Judge Nichols in the District of

4    Columbia agreed when he narrowed these requests and said you

5    should produce a document that shows how you establish

6    guidelines, or how you establish a policy position.  That's

7    fine.

8         But the judge was emphatic that the State was not entitled

9    to delve into the inner workings of these organizations.  And,

10   in fact, he lambasted the State for seeking document requests

11   that sought any and all documents reading on these issues.

12        That leads to the next -- and I will just add, Your Honor,

13   that we have heard about Arkansas today.  Your Honor's clearly

14   familiar with that case.

15        In Arkansas, the plaintiffs did not seek, the defendant,

16   the State, did not seek any internal discovery from these

17   organizations.  They didn't need it.

18        The findings of fact that both sides have now submitted

19   and which we included with our reply, evidenced that there was

20   a fairly robust discussion about the validity of the WPATH

21   guidelines.  But both sides felt perfectly prepared to make

22   those attacks and those argument without this type of invasive

23   internal discovery.

24             THE COURT:  Let's talk about the burden of this

25   discovery, if I allow it.

1          MR. LANNIN:  Yes, Your Honor.  Thank you.  I was

2    headed right there.

3         So, as I said, there are 47 requests.  I think the State

4    had withdrawn a few of them in the course of our negotiations,

5    although it's not clear to me that that offer stands now.

6         The majority, if not all of them, seek any and all

7    documents reading on, again, variety of the internal topics.

8    Read, I think, holistically they seek pretty much every

9    document the organization has that would touch on the

10   guidelines.

11        We submitted a declaration from a WPATH personnel who

12   attested to the burden that would be involved in responding to

13   these subpoenas as they're drafted.  Just anytime you see a

14   request for any and all documents, you are necessarily thinking

15   about some type of invasive ESI search of e-mail collections,

16   of custodial collections.

17        And the State in its opposition paper alludes to that when

18   it suggests that it would be willing to help with the

19   identification of custodians and search terms.

20        You know, I am sure Your Honor is aware that anytime you

21   start talking about collecting vast quantities of ESI, and

22   applying search terms, and then review, you're talking about a

23   non-trivial amount of money and time spent to review those

24   documents.

25        And Judge Nichols in D.C., as I said earlier, went out of

1  his way to say these any and all document requests are facially

2  burdensome.  And when he redrafted them, which he said frankly,

3  I am drafting these again, he purposely substituted the phrase

4  documents sufficient to show several categories of documents,

5  because he acknowledged that he did not want the organizations

6  to have to indulge in that type of invasive ESI discovery.

7       So, you know, the State, Your Honor, in its opposition,

8  says again and again this discovery is narrow, it's tailored.

9  You know, just saying that doesn't make it so.

10      And I think even reviewing the face of the 47 requests,

11 puts to lie to any suggestion that these document requests are

12 narrow.

13      Unless Your Honor has questions...

14          THE COURT:  I don't have any.  I probably will have

15 some after the State gives their argument.

16          MR. LANNIN:  Would Your Honor indulge me for a

17 60-second piece on the First Amendment issues, as well?

18          THE COURT:  Sure.

19          MR. LANNIN:  Which are quite acute here.  And we have

20 alluded to it in the context of the Eagle Forum dispute.

21      And I should say, you know, in our view, this situation is

22 very hard to distinguish from the Eagle Forum issue.  The

23 distinguishing factor is whether the organization supported or

24 opposed this Act.

25      In this case, the State doesn't like the views of our

1    organization and seems to think it is appropriate to delve

2    inside it.  It was full of righteous fury when the shoe was

3    flipped on the other side.

4         In our view --

5              THE COURT:  I get that.  But, I mean, Eagle Forum was

6    not submitting a set of guidelines that this case rises or

7    falls on.  Tell me -- I see a big distinguishing factor there.

8    Tell me about that.

9              MR. LANNIN:  Yeah.  In our view, Your Honor, it's more

10   about the guidelines, like the Act itself, can be evaluated on

11   its face.  And the State said we intend to challenge the Act on

12   its face.  We don't -- that the plaintiffs don't need to know

13   what went into the making of the Act.

14       I recognize and appreciate, Your Honor, that there is a

15   distinction between an Act and the guidelines themselves.  But

16   in our view, the principles are the same, that if you are going

17   to test the validity of something on its face, which we think

18   is entirely appropriate here, that you can do that without kind

19   of looking into what the Court, or what the -- I'm sorry --

20   what the State called the hidden motives of the people who

21   wrote the, in this case, the guidelines.

22       As I said earlier, Your Honor, that all the evidence they

23   need to mount that attack on the guidelines is available to

24   them now.

25            And, in fact, WPATH offered to produce to them at an

1  earlier stage of our discussions not only the guidelines

2  themselves, but also every study that is cited therein, which

3  in our view, is consistent with what this Court had ordered in

4  the Eagle Forum dispute.  And that offer was also rejected.

5       But the First Amendment issues, Your Honor, are similar,

6  insofar as, you know, as Your Honor well knows, where compelled

7  disclosure could implicate an organization's associational

8  rights, that's where the First Amendment interest is most

9  acute.  And, particularly, where it could chill kind of in a --

10 a robust internal dialogue of an organization.

11      For an advocacy organization that needs kind of an open,

12 uninhibited debate among its members to arrive at its

13 positions, the courts have repeatedly said we need to be very

14 concerned about intrusions into that zone that is protected by

15 the First Amendment.  And in this case, we have a declaration

16 from WPATH that attests to the mere fact that these subpoenas,

17 as issued, has served to chill the organization.

18      I have heard directly from the client that they have

19 members saying, I don't want anything to do with this.  I don't

20 know if I want to go to your conference.

21      I know for a fact that the organization has considered

22 whether they should have panels about some of these topics

23 right now, simply because of the extraordinarily charged

24 political atmosphere in which this case arises.  And nobody at

25 the organization is interested in having their name put out

1  there, or even in having their internal communications
2  disclosed to what is one of the primary public policy
3  opponents.

4       And it's not enough, Your Honor, to say, as the State
5  does, that we have a protective order.  And so everything that
6  we submit would be protected.

7       That's fine for what it is, but it doesn't answer the
8  concerns of WPATH members who say why in the world would I make
9  my voice heard in this organization or raise a critical opinion
10  if I knew that a state that is opposed to what I'm trying do,
11  that is opposed to this organization and its efforts, will get
12  that material and be able to use it for its own litigation
13  purposes.

14       Your Honor, in that context, as I said, the First
15  Amendment issues are particularly acute.  And when you balance
16  that against what we would say is a very marginal, if not
17  non-existent need for this material, there just seems to us to
18  be no question about the right outcome here.

19       I will come back to the notion, Your Honor, that, you
20  know, if Your Honor is inclined to order any production, you
21  know, Judge Nichols didn't give everybody what they wanted.  He
22  didn't give Florida what they wanted.  He made us give stuff we
23  didn't want to give, either.

24       But, in our view, it's a sensible place to arrive if we
25  are looking for a compromise that could be workable not only in

1  this case, but in other cases, as well.

2          THE COURT:  All right.  Who is going to argue for the

3  State?

4          MR. LACOUR:  Your Honor, the plaintiffs' complaints,

5  their P.I. briefs, their expert declarations, the testimony

6  that they provided at the preliminary injunction hearing, all

7  invited this Court to rely on WPATH and the guidelines.

8      Dr. Ladinsky, as you might recall, referred to the WPATH

9  guidelines as, quote, excellent guardrails.

10     As Your Honor just alluded, at least under plaintiffs'

11 theory of the case, the case might rise or fall on these

12 guidelines.

13     So WPATH is featured heavily already in this case.  The

14 existence of their guidelines and the plaintiffs' position that

15 these are authoritative, appears to have been at least a heavy

16 consideration in this Court's decision to grant a preliminary

17 injunction back in May.

18     Pages 3 to 4 of the preliminary injunction order noted

19 that while these transitioning treatments come with risks,

20 including lost fertility and sexual function, quote,

21 nevertheless, WPATH recognizes transitioning medications as

22 established medical treatments, and publishes a set of

23 guidelines for treating gender dysphoria in minors with these

24 medications.

25     So this Court held that plaintiffs were likely to

 1  establish a constitutional right to treat kids with

 2  transitioning treatments, quote, subject to accepted medical

 3  standards, closed quote.  It is the defendants' position that

 4  we quite evidently need to be able to test those standards.

 5      What WPATH and what the plaintiffs have said -- more

 6  importantly what the plaintiffs have said about WPATH and the

 7  guidelines is that these are the product of dispassionate

 8  science.  But there is ample evidence in the public record now

 9  to suggest that these are rather the product of impassioned

10  advocacy.

11      And I think that's one thing that sets our briefing apart

12  from that in Florida's case, where they had very little

13  evidence to suggest that there was some reason to think that

14  ideology was driving the train within WPATH and the production

15  of these guidelines, whereas on pages 10 through 18 of our

16  response to the motion to quash, we lay out in some detail some

17  of the reasons why we think these appeals to authority are

18  misplaced.

19      I mean, in 2017, at the USPATH conference -- USPATH is a

20  subsidiary of WPATH -- Dr. Zucker, who is from Toronto, he is a

21  leading researcher in gender dysphoria for kids, had practiced

22  for decades.  His work was cited by WPATH in their Version 7 of

23  their guidelines, which came out in 2012.  He was invited to

24  speak at the conference after his research had passed a blind

25  peer-review.

1        Well, after he began speaking, a group of activists

2   started shouting him down until he had to leave the stage.  And

3   the reason why is because, in his decades of practice, he had

4   found that many kids, if you did not start them on social

5   transition or drugs, would later come out of their gender

6   dysphoria and reidentify with their birth sex.  And he

7   suggested maybe we should be cautious about social

8   transitioning.  That was offensive to the activists, who

9   decided he needed to be shouted down.

10       Later, USPATH offered an apology not to Dr. Zucker,

11  though, but to those activists -- sorry we did the -- the

12  violence of having someone come and present medical research.

13       You just heard from my friend on behalf of WPATH about the

14  importance of open dialogue.  There does not appear to have

15  been any of that at the 2017 conference.

16       Likewise, we see from the most recent version of the

17  guidelines, which were released in 2022, a version was posted

18  by WPATH online.  And there was a change in the age limits for

19  different types of care for children.  Previously, the

20  recommendation had been don't start kids on cross-sex hormones

21  until they're 16.  In this version, the age had been dropped to

22  14.  They also set age limits for mastectomies -- age 15.  For

23  bottom surgeries -- those are vaginoplasties, hysterectomies --

24  age 17 for kids.

25       Now, shortly after this was posted, the guidelines were

1  pulled offline.  A new set was posted later with no age limits

2  at all.  And no explanation as to why these age limits

3  disappeared.

4       We have a clip online from Dr. Tishelman.  She was the

5  lead author of the guidelines chapter on children.  And from

6  what we can tell from this video, it appears she is suggesting

7  that it's very important in the guidelines that they be

8  specific enough that you can get insurance coverage for these

9  treatments, but not so specific that they can be cited in a

10 later malpractice case brought by one of these children; for

11 example, a 12-year-old girl who was started on testosterone at

12 age 12 instead of 14; or maybe a 13-year-old girl who received

13 a mastectomy and later came to regret it.

14      And so by taking out the age limits, there is less of a

15 chance that the guidelines are going to be valuable for a

16 plaintiff who may have been harmed by one of these

17 practitioners.

18      As Marci Bowers stated to the -- I believe this is quoted

19 from the New York Times, the political climate right now is not

20 such that they would recommend definitive lower ages for some

21 of these treatments.  We find that deeply troubling, that if

22 it's politics that are driving this, or if it is self-interest,

23 or putting the interest of the doctors ahead of the potential

24 patients that are driving these recommendations, then we would

25 hope the Court would be very loathe to hold that these

1   guidelines set the constitutional floor for the entire country

2   below which no state may regulate.

3       We also heard that you can hear -- you can see the

4   guidelines and judge them on the their face, like a piece of

5   legislation.

6       We've said who -- they claim that they've told us who the

7   authors are.  Well, that's partially true.  We don't know the

8   roles that everyone played in forming these guidelines.

9       The guidelines themselves note that activists have a

10  role -- or they call them stakeholders.  These are people with

11  no medical training whatsoever, but are active in transgender

12  advocacy in some way, shape, or form, who have roles in shaping

13  even these medical guidelines.  Again, non-medically trained

14  people shaping medical guidelines.

15      And so we know that one thing we're not going to get if

16  this Court ultimately decides that we only get the documents

17  that the Court in D.C. ordered WPATH to provide to Florida, is,

18  like we know we will not get access to a list of who those

19  stakeholders are, and who played a role in the development of

20  the guidelines, and the role that they played.

21      That was one of the compromised positions we offered that

22  my friend just alluded to, along with three videos -- the video

23  from the 2017 conference that I just referenced, and videos

24  from their 2019 and 2022 conferences, which we know were

25  live-streamed.

1          They have access to those videos presumably unless

2     somebody somewhere hit the delete button.  If that's the case,

3     that's mighty suspicious, too.  And that would be interesting

4     for us to know before we decide whether WPATH gets to set

5     constitutional standards for the country.

6          We can look at what they have cited in the guidelines, and

7     we can look at what is included.  But that doesn't give us much

8     information about what is not there and why it is not there.

9          If there are studies that are critical of the approach

10    that they ultimately adopted, were they missed because of an

11    honest mistake?  Were they not considered because of good

12    science?  Or were they set aside because, like the activists in

13    2017 concluded with regard to Dr. Zucker, they just don't

14    satisfy the party line?  I think that's very relevant to

15    determine whether these guidelines are something that should be

16    trusted or not.

17         And, again, there is more evidence about -- that I think

18    raises questions about how this process worked.  The most

19    recent version of the guidelines, again, that came out in 2022

20    after there had been much discussion in the medical community

21    about de-transitioners -- one of whom you heard from, Your

22    Honor -- does not include a chapter on de-transitioners, but it

23    does include a chapter on eunuchs.

24         There was a draft chapter on ethics.  That was dropped.

25    We didn't know why there is not an ethics chapter in the

1  guidelines.

2       But the eunuchs explains -- and I'm quoting from

3  guidelines version 8 -- among the many people who benefit from

4  gender-affirming medical care, those who identify as eunuchs

5  are among the least individuals.  Eunuch individuals are those

6  assigned male at birth and wish to eliminate masculine physical

7  features, masculine genitals or genital functioning.  As with

8  other gender diverse individuals, eunuchs may also seek

9  castration to better align their bodies with their gender

10 identity.  As such, eunuch individuals are gender

11 non-conforming individuals who have needs requiring medically

12 necessary gender-affirming care.

13      So I just note here the as-such language that says eunuchs

14 may want castration.  As such, castration becomes medically

15 necessary gender-affirming care.

16      Is a simple desire to change one sexual's appearance when

17 present in a child enough to make that care medically

18 necessary?  Or is it not -- I mean, these are serious questions

19 raised.

20      And I think there's a just very different picture of WPATH

21 that could be presented at final judgment or at the final trial

22 than what was presented to this Court at the preliminary

23 injunction phase, which is why at the close of that preliminary

24 injunction I stood up here and told the Court that we did think

25 we were going to need discovery to explore the credibility of

 1  some of these organizations.

 2       My friend noted that, well, the medical community as a

 3  whole has endorsed these guidelines.  But tellingly in their

 4  reply brief, they stated that the medical community, the AMA,

 5  and the APA, and others, don't have access to the internal

 6  documents of WPATH, yet they endorse these particular

 7  guidelines.

 8       Well, I think that just casts shade on all those other

 9  organizations, that they are potentially accepting in some rote

10  fashion these particular guidelines, despite the fact that

11  there's increasing information in the public domain suggesting

12  that these are not to be trusted or relied on as excellent

13  guardrails, as Dr. Ladinsky would have it.

14       Now, it comes to undue burden, Your Honor.  We worked for

15  months having good faith back and forth with counsel for the

16  organizations.  We were ultimately able to reach an agreement

17  with two of the organizations.

18       I think we offered a very reasonable compromise recently

19  to WPATH that they rejected.  Again, all we asked for was a

20  list of these non-medical stakeholders who played a role in

21  developing the guidelines, and the role that they played, which

22  WPATH said they will not turn over to us even under protective

23  order, and then three videos, which, again, they decided not to

24  turn over, despite their professed interest and open dialogue

25  over matters of science.

1    So, and, again, we were working with them.  We dropped 16

2  of our requests, which left 31 RFPs.  They note the large

3  number of RFPs.  But the nature of burdensome doesn't turn

4  solely on the number of requests.  You could have one

5  incredibly broad request -- give us all your documents.  That's

6  going to be far more burdensome than 31 targeted requests that

7  say give us all your documents about this specific document or

8  that specific issue.  So I don't think the total number is in

9  any way relevant to the burdensomeness requirement.

10    And, again, we offered to work with them, to identify

11  specific custodians and specific search terms, which is what

12  happens a lot of time in modern E-discovery now, to try to make

13  sure we were only pulling documents that were likely to be

14  relevant to this case.  And as discussed before, we think these

15  documents are highly relevant to this question of the validity

16  and credibility of WPATH and their guidelines.

17    Finally, when it comes to the First Amendment, yes, First

18  Amendment implications need to be taken into account, but it's

19  never a grounds for completely rejecting turning over highly

20  relevant, important information.  There are numerous cases we

21  cite where the First Amendment concern was raised and documents

22  were still produced at the end of the day.  So, and, again, we

23  think that the protective order will go a long way towards

24  addressing some of those concerns.

25    So for all those reasons, we think the motion to quash

 1   should be rejected, and this Court should order WPATH to

 2   produce these documents.

 3          THE COURT:  I probably will have a question for you,

 4   but let me start with the other side first.

 5      All right.  So certainly the plaintiffs in this case are

 6   relying on your standards to prove their case.  In fact, I

 7   think if they were standing up here right now they would say in

 8   their opinion this case rises and falls on those to some

 9   degree.

10      So don't you think that I have to factor that in this is

11   not just any ordinary discovery, this is discovery around the

12   very heart of what plaintiffs think is the core of their case?

13   So maybe you can address that for me just a little bit.

14          MR. LANNIN:  Absolutely, Your Honor.

15      I don't think there's any dispute whatsoever that the

16   WPATH guidelines are relevant to this case.  And I am not going

17   to characterize on behalf of the State or the plaintiffs

18   whether it's the heart of the matter.  That's their litigation.

19      But WPATH isn't claiming that the guidelines are

20   irrelevant to this case.  And that's exactly why from the get

21   we told the State we are happy to produce the guidelines, and

22   we're happy to produce every study on which they relied.

23      I think the issue, Your Honor, is that the expedition for

24   internal documentation about which member said what to who

25   about these guidelines, in our view, isn't relevant to the

1   question of whether the guidelines are grounded in good

2   science, and are valid.  And the reason for that is because the

3   guidelines are capable of testing as they stand now.

4        And the State has now alluded to, for example, statements

5   by Dr. Zucker, where he was allegedly shouted down, or however

6   the State characterized it, because he had views that were not

7   allegedly incorporated into the guidelines, or nonetheless were

8   disfavored.

9        And that's fine.  We can credit that on its face.

10        But if that's right, then why can't the State talk to

11   Dr. Zucker, or look at the science that Dr. Zucker wanted to

12   talk about, and put that as part of its case in chief and say

13   to Your Honor, here's our expert who can tell you exactly why

14   the guidelines are flawed because they don't talk about this

15   study, they don't talk about this study, they do talk about

16   this study, which is flawed.

17        And by the way, there's a whole body of evidence in Europe

18   that countermands the guidelines.  I'm laying out their case

19   for them.  But the point is I've heard all these themes before,

20   and all that evidence is extrinsic to the guidelines

21   themselves.

22        What they are looking for -- and I think, Your Honor, that

23   the compromise that the State has now put in front of the

24   Judge, in front of Your Honor, the four categories of things

25   they have now said we wanted in addition to what Florida is

 1  getting, really crystallize exactly what's going on here.

 2      The first is this list of stakeholders.  So that's it.

 3  The list of stakeholders who were involved in the guidelines

 4  and documents sufficient to show their role.

 5      So my answer -- my question for that is why?  Why is it so

 6  important to you to know the names of people of members of

 7  WPATH who contributed or made their views known about the

 8  guidelines?  What are you hoping to do with that list?  And how

 9  does that not possibly implicate core First Amendment concerns,

10  when you're disclosing a list of members who may have

11  contributed, or may have not, in any meaningful way, to these

12  guidelines, what is the possible relevance of that argument?

13  And how do you avoid the First Amendment issue?

14      The other three items that were on the table, Your Honor,

15  are these videos.  So there's a video from 2017 that they're

16  seeking of Dr. Zucker, who is allegedly harassed at a

17  conference.  I don't know.  I wasn't there and I haven't seen a

18  video.

19      The second is a 2019 town hall, where allegedly

20  transgender women of color stood up at a town hall and

21  protested the inclusivity or not of WPATH.  I wasn't there, but

22  I believe that at least some of that is available online for

23  viewing.

24      And the third video is a 2022 video, the entire 2022 WPATH

25  conference.  And, again, to that, my question becomes to what

 1   end?  What are you hoping to achieve by looking at video of

 2   members interacting in their day-to-day conference and standing

 3   up and saying what they think of all manner of items, many of

 4   which have nothing to do with the guidelines themselves?

 5        If you look, I think, at those four items in particular,

 6   you come to the same place, which is, if you were okay with

 7   what Florida's getting, plus these four things, then what is

 8   this about?  And how, again, does it not, at the end of the

 9   day, implicate those very severe First Amendment issues?

10        THE COURT:  Understood.  Let me say this:  So,

11   obviously, I am going to go back to my office and take several

12   days to sort through all of this.

13        I would say on this issue, I am likely to be more generous

14   to the State in allowing them discovery.  So, to the extent you

15   gentlemen want to, you know, have another time to sit down and

16   work something out, I would certainly love to see your

17   compromise better than what I order, because you really know

18   what's at the heart of what you need.

19        But I would suggest that following this hearing you sit

20   down with the State and make another go at it, because I think

21   I'm likely to give them a lot of what they want.  But maybe not

22   all.  But, again, I will evaluate that.  But, you know, that

23   would be my encouragement.

24        All right.

25        MR. LANNIN:  May I ask a quick question, Your Honor?

1          THE COURT:  Absolutely.

2          MR. LANNIN:  And I apologize if this risks seeming

3    like an advisory opinion, which I don't mean it to be.

4        Of course, we are happy to talk to the State.  If Your

5    Honor has any views about the appropriateness or not of types

6    of e-mail collections, and custodial searches, and search

7    terms, and the burdens involved in that, that might be helpful

8    as we think about what's -- what might be doable or not in

9    response to Your Honor's comments.  But, again, I appreciate if

10   you are not prepared to go there.

11         THE COURT:  You know, now, I'm absolutely spit

12   balling.  But, you know, I would think that you might be able

13   to use some search terms, maybe get some representative

14   e-mails, as opposed to every single one.  That might be a

15   starting point.

16       But, again, you know your cases better than I do.  That's

17   why I'm hopeful that with a little guidance you might be able

18   to achieve a compromise.

19       But, again, I do find some of these things the State is

20   asking for to be relevant ultimately to this, you know.  We're

21   just talking about discoverability, not admissibility.  So that

22   would be my general guidance to you.

23         MR. LANNIN:  Very good.  Thank you, Your Honor.

24         THE COURT:  Mr. LaCour, you look like you might have a

25   question yourself.

```
 1             MR. LACOUR:  Nothing more, Your Honor.
 2             THE COURT:  Okay.  All right.
 3      And, look, you know, to the extent everybody just wants to
 4 stand on their position, I get it, and we will sort it out.
 5 And that's why they direct deposit my check every month.  So,
 6 you know, no problem.
 7      Okay.  Anything else that we ought to take up today?
 8             MR. LACOUR:  Your Honor, if we are able to work out a
 9 compromise, we just file a notice with the Court?
10             THE COURT:  Absolutely.  That would be great.  That
11 would be excellent.
12      Anything else from any party?
13             MS. EAGAN:  Your Honor, may I approach Mr. LaCour and
14 confer with him on one thing?
15             THE COURT:  Absolutely.  Do you need me to hold on
16 here before --
17             MS. EAGAN:  Well, Your Honor, on the motion in limine,
18 we would be the ones that would be arguing against that motion
19 in limine.  It sounds like, in light of the Court's
20 representations, that motion is likely going to be rendered
21 moot.
22      Mr. LaCour and I have already agreed that it is moot, as
23 to the pediatric association and the medical association, where
24 they worked out their differences on the subpoenas.
25      What I would suggest, if it is all right with Your Honor,
```

1   is maybe we, depending on how Your Honor rules, that motion is

2   likely going to be mooted.  And so perhaps we hold off on any

3   sort of decision making or argument on that, if it needs to be

4   taken up until the next hearing.

5           THE COURT:  I think that's probably an excellent idea,

6   so...

7           MS. EAGAN:  Thank you, Judge.

8           THE COURT:  Uh-huh.  All right.  We are adjourned.

9       Thank you.

10

11          (Whereupon, the above proceedings were concluded at

12      12:14 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


<u>02-10-2023</u>

Christina K. Decker, RMR, CRR                Date

Federal Official Court Reporter

ACCR#:  255