# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |
|---|---|
| Brianna Boe, *et al.*,<br><br> *Plaintiffs*,<br><br>United States of America,<br><br> *Plaintiff-Intervenor*,<br><br>v.<br><br>Hon. Steve Marshall, in his official capacity as Attorney General of the State of Alabama, *et al.*,<br><br> *Defendants*. | Case No. 2:22-cv-184-LCB-CWB |

## DECLARATION OF DR. KARL MATHIAS

I, Dr. Karl Mathias, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1. I am employed in the position of Chief Information Officer ("CIO") for the U.S. Department of Health and Human Services ("HHS" or "Department").

2. I have held the position of CIO since March 13, 2022. In this capacity, my current job duties include providing leadership and oversight of the information technology ("IT") systems and cybersecurity activities for a workforce of over 83,000. As the head of the Office of the Chief Information Officer ("OCIO"), I lead the Department's efforts in developing and implementing IT policies, managing high priority projects, and planning strategic IT investments. I also provide leadership and oversight of the Department's $7B IT portfolio in support of its

1

expansive mission to enhance the health and well-being of Americans.

3. Prior to assuming my current position, I held the position of CIO for the U.S. Marshals Service where I was responsible for providing IT services and support to 7,600 U.S. Marshals' employees, contractors, and task force officers spread across 475 sites within the U.S. and at eight overseas locations. During my time as an active-duty Air Force officer, I served as analyst, engineer, and program manager on the Joint Surveillance System, the NORAD Battle Management System, combat simulations at the Air Force Wargaming Institute, and the Air Force Research Laboratory's Enterprise Business System. I was also an Assistant Professor at the Air Force Institute of Technology and a military advisor to the Ministry of Defense and Aviation in Riyadh, Saudi Arabia. After retiring as a Lieutenant Colonel in 2007, I joined the Civil Service and served at the Pentagon as the Executive Director of the 844th Communications Squadron and then as the Deputy Chief Information Officer for Headquarters Air Force.

4. I have a Bachelor's Degree in Computer Science from Utah State University, an M.S. in Computer Systems Technology from the Air Force Institute of Technology, and a Ph.D. in Computer Science and Software Engineering from Auburn University.

5. This declaration is based upon personal knowledge, information acquired by me in the course of performing my official duties, and my review of HHS records, systems, and information maintained by HHS in the regular course of my employment and is true and correct to the best of my knowledge.

6. I understand that, as part of the above-captioned litigation, Defendants served on the United States on September 20, 2022 a document entitled Defendants' First Requests for Production to Intervenor-Plaintiff United States of America ("RFPs"). I understand that

2

Defendants' RFPs required the United States to provide responses on behalf of any executive agency or department in which responsive documents may be found.

7. I understand that Defendants are no longer seeking responsive documents from every executive agency, but only from HHS, including its sub-agencies the Food and Drug Administration ("FDA") and the National Institutes of Health ("NIH").

8. It is my understanding that the RFPs are exceptionally broad, seeking a plethora of documents and data from multiple Operating Divisions. RFPs of this nature are likely to result in terabytes ("TBs") of potentially responsive data that would need to be collected individually from each of the tenants.

9. Collections of this size pose multiple problems that will lead to time-consuming delays. Limitations exist on the Microsoft side because Microsoft 365 is a cloud service and HHS is not the only user in the government community clouds. So, Microsoft has implemented their own limitations as to data movement and bandwidth throttling. Microsoft sets limitations on how much data can be processed and downloaded in a 24-hour period, which limits the speed at which collections can run.

10. Defendants' demand for documents from "only HHS (with the understanding that this includes the agencies within HHS such as the FDA and the NIH)" is predicated on a misunderstanding of HHS's structure and how documents are collected throughout the Department. The primary burden in collective requests like those posed by the RFPs is the federated nature of HHS.

11. The Office of the Chief Information Officer ("OCIO"), Office of Operations runs a system that covers HHS Staff Divisions and five Operating Divisions. The Operating Divisions are the Administration for Community Living, the Administration for Children and Family, the Agency for Healthcare Research and Quality, the Substance Abuse and Mental Health Services Administration, and the Administration for Strategic Preparedness and Response.

12. However, other Operating Divisions, including the FDA, NIH, the Centers for Medicare & Medicaid Services ("CMS"), the Centers for Disease Control and Prevention ("CDC"), the Indian Health Service ("IHS"), the Health Resources and Services Administration ("HRSA"), etc. (each of which would be expected to have documents potentially responsive to Defendants' RFPs as part of HHS, even though Defendants have not specified they are seeking documents from these sub-agencies) all run their own systems and would have to be individually queried.

13. Therefore, it is my understanding that each RFP served on "HHS" would actually constitute multiple RFPs served on each particular Operating Division in that each Operating Division that might have responsive documents would have to search, individually, for anything responsive to a given RFP. HHS does not have the ability to search across all Operating Divisions as a unitary function.

### Operating Divisions' Diverse Data Storage Systems

14. Each of the individual searches referenced above would require different technical personnel to perform the searches according to the systems and processes that the respective Operating Divisions have in place. While the entire Department of Health and Human Services

4

subscribes to Microsoft 365, each Operating Division co-exists as a separate, distinct "tenant" in the Microsoft 365 ecosystem. A Microsoft 365 tenant is a dedicated instance of the services of Microsoft 365 and an organization's data is stored within a specific default location, such as in multiple Microsoft data centers in North America. Each Microsoft 365 tenant is distinct, unique, and separate from all other Microsoft 365 tenants.

15. Thus, FDA, NIH, CMS, CDC, IHS, HRSA, etc. store their data in tenants that are distinct and separate from the data of other tenants, with hard boundaries around the tenant's space so that a particular Operating Division will be the only entity with access to the data stored in that tenant.

16. For example, data stored in the FDA tenant is inaccessible for eDiscovery requests by CMS personnel, and vice versa. Thus, in order to search for responsive documents in the FDA tenant, an FDA team must implement their processes. Similarly, in order to search for responsive documents in the CMS tenant, a CMS team must implement their processes. HHS cannot search in a unitary fashion for potentially responsive data from both FDA and CDC. Even Microsoft, which hosts the data for the Operating Divisions, would not provide access to non-tenant entities.

17. Within the Microsoft 365 environment, information is stored in Microsoft data centers. The data resides there in email, SharePoint, Microsoft Teams, and other collaboration tools. Each of those constitutes a large repository of data that is specific to the users of the tenant and inaccessible to other tenants.

18. Further, various Operating Divisions could possess data in a variety of different systems that may not all be part of the Microsoft environment. Each Operating Division has its

5

own unique architecture and systems. Some of this data could be hosted by Amazon, Oracle, or another system, which would also be limited to those tenants. Thus, for every RFP for which a particular Operating Division might have responsive documents, each request would have to be parsed out to the Operating Division/tenant individually.

19. Therefore, if three different tenants have documents potentially responsive to a particular RFP, three different groups of technical personnel would have to perform individual searches of their respective tenants.

20. Further, the act of collecting data has a performance impact on the systems from which the data is being collected. For example, if a large collection of the type that would be necessitated by Defendants' RFPs were to be run across the Agency for Healthcare Research and Quality's ("AHRQ") email system, that could have a performance impact on the email system. Depending on how severe that impact is, which would depend on the size of the collection effort, AHRQ personnel could have trouble performing their job duties due to the lack of consistent, uninterrupted email access. Therefore, to perform this type of large-scale collection, the technical team would need to partition the search into multiple parts and run the partitioned searches after hours in order to minimize any disruption to AHRQ's systems. Even more, AHRQ gets email service from the same tenant/system that serves four additional small Operating Divisions and all the Office of the Secretary Staff Divisions as well as the Immediate Office of the Secretary. Searches of the AHRQ email system of the type that would be required by the RFPs could impact many more organizations than just AHRQ.

21. The content of a particular RFP, as described in the RFP's verbiage, cannot be input into an eDiscovery software system in order to run a search for potentially responsive

documents. Instead, the technical team has to input the requirements of the RFP in an eDiscovery system(s) to run the search. Each query for each Operating Division/tenant will be unique depending on what systems each Operating Division/tenant uses, where the documents reside, etc. Therefore, there is often significant trial and error just to determine the scope of the data set to be collected. It requires considerable work just to create the functional implementation of the RFPs. And that work will be bespoke depending on the systems the various Operating Division/tenant uses to house its data.

22. The functional implementation of the RFP in order to run a search for potential responsive documents via the eDiscovery system(s) will be complicated by the necessity of partitioning the search as described above in order to minimize any disruption to the underlying system. Care must be taken, and time spent developing the search parameters, to ensure that the partitioning of the search does not result in missed elements of the RFP's content.

23. Realistically, the RFPs at issue in this litigation would likely take weeks, if not months, to collect the data set from any individual Operating Division/tenant. While each Operating Division/tenant can theoretically search for potentially responsive documents in parallel, some Operating Division/tenant's underlying architecture may complicate the searches and increase the amount of time required to collect a data set, especially where an Operating Division/tenant does not store all documents in the same Microsoft 365 tenant space.

24. Each Operating Division/tenant utilizes a unique architecture and information system, which results in numerous different locations where data is housed. Therefore, different processes need to be utilized to search for and collect data depending on the Operating Division in question. The tools and physical infrastructure all vary from Operating Division to Operating

Division, which will result in potentially massively different processes that need to be followed, which will result in vastly different collection times and efforts.

25. For example, CMS utilizes Box instead of OneDrive for primary document storage and integration. This means that documents stored on network drives are not in Microsoft's space (though other data is stored in Microsoft's tenant space), which would require CMS to search both its Microsoft 365 tenant space for certain documents stored therein while also searching Box for other documents stored in that system. Similarly, NIH has 25 institutes that operate under NIH, all of whom do things a little bit differently. Each of those institutes has some unique aspects to their architecture and the systems they use based on the focus area of their individual missions. This would parse the collection process out even further and complicate the collection effort.

26. Further, RFPs 18, 19, 20, 22, 23, 24 25, 28, 29, 30, & 36 do not include timeframes. Each of the Operating Divisions have used their current platforms for varying time periods, but it is likely that there must be documents (perhaps in paper copies) that predate the Operating Divisions' use of Microsoft 365, Box, or other document storage systems. Thus, in addition to the burdensome digital searches described above, each Operating Division would likely need to manually search physical files in order to locate responsive documents, scan those documents to create digital copies, and then process them along with the digital files that each Operating Division would locate.

### Practical Issues with Moving Large Amounts (TBs) of Data

27. As noted above, it is likely that a collection "across HHS" (i.e., of the many Operating Division/tenants within HHS) would produce TBs of potentially responsive data.

8

28. If this is true, HHS's various technical teams and vendors would quickly encounter a physics problem: moving TBs of data. This issue would itself create delays with the collection. A TB is equal to 1,024 gigabytes of data. It would take 728,177 floppy disks or 1,498 CDs to hold 1 TB of information. Although different files have different sizes, a TB is the equivalent of 85,899,345 pages of Word documents.

29. If, for example, the resulting data set from these collections comprised 10TB of data, it would take days, even potentially weeks, just to transfer the data set onto a series of hard drives for delivery to a vendor for processing, uploading, and review.

30. After that 10TB of data is transferred to hard drives, it would then take days or weeks for the vendor to load the data into their review platform, assuming that they do not run into data corruption errors.

**Practical Issues with Reviewing Data from Various Operating Divisions**

31. It is my understanding that documents that are located in the various Operating Divisions will likely be unique as compared to documents residing in the custody of other Operating Divisions. Each category of unique documents that are housed in a particular Operating Division would require review by that Operating Division's disclosure program staff and attorneys, given their subject matter expertise. This specialized knowledge is critical for identifying and redacting privileged information (e.g., confidential business information, personal privacy information, or information concerning an Operating Division's ongoing investigative or law enforcement efforts) contained within the often highly technical documents held by that Operating Division.

9

32. For example, RFP 22 broadly seeks, *inter alia*, documents concerning FDA's consideration of "Puberty Blockers," which Defendants ambiguously define as "medication *administered* to Minors to delay or prevent the onset or continuation of puberty, or otherwise to prevent the formation or maturation of secondary sex characteristics consistent with the patient's Biological Sex," regardless of whether FDA has *approved* the drug for such uses (emphasis added). This request would seem to encompass, among other things, an unspecified number of New Drug Applications ("NDAs") concerning an unspecified number of drugs that are in the sole custody of FDA because they were filed with the agency to seek its approval to market such drugs in the United States. *See* 21 U.S.C. § 355(a).

33. Even if Defendants' RFPs were limited to seeking an NDA for a specific drug, responding to the request would still be burdensome. It is my understanding NDAs often contain in excess of 100,000 pages of documents, and typically include a variety of documents such as full reports of pre-clinical and clinical investigations to demonstrate the safety and efficacy of the drug for its intended use, correspondence pertaining to FDA's review and approval of the drug, approval documents relating to various supplements to the manufacturer's NDA, and other correspondence between FDA and the manufacturer. NDAs frequently also include numerous data files in a format similar to a spreadsheet for which a page count cannot readily be generated.

34. Moreover, NDAs contain various types of sensitive information that FDA seeks to protect from discovery, such as trade secret information ("TSI") and confidential commercial information ("CCI"). By law, an NDA must contain extensive data concerning the drug at issue, and TSI and CCI are essential parts of such data. *See* 21 U.S.C. § 355(b); 21 C.F.R. § 314.50. Generally, FDA's ability to disclose TSI and CCI in NDAs is restricted under federal statutes and the agency's regulations. *See, e.g.*, 18 U.S.C. § 1905; 21 U.S.C. § 331(j); 21 C.F.R. § 20.61.

10

Pharmaceutical companies rely on these disclosure restrictions when submitting an NDA to FDA because the TSI and CCI therein reflect, among other things, how the company intends to meet FDA's regulatory expectations for approval. In the competitive marketplace for pharmaceutical drugs, TSI and CCI filed in an NDA are closely guarded commercial secrets, as disclosure of this information could allow competitors to adapt the company's data to help secure FDA approval of their own NDAs.

35. The example above illustrates one of the burdens that HHS would face should HHS be required to collect, review and produce the documents responsive to the RFPs. Each Operating Division has specialized subject matters that fall under its purview, necessitating different skill sets and expertise of the government personnel who interact with these documents. These differing skill sets extend to the attorneys and legal support staff who serve in the various Operating Divisions and will be tasked with reviewing and, where appropriate, withholding or redacting documents pursuant to governmental privileges or legal obligations.

36. For example, attorneys and legal support staff working with CMS will have little familiarity with the NDAs in the custody of the FDA and therefore will not be able to easily or quickly review the NDAs without extensive oversight by attorneys and legal support staff working with the FDA. This is just one example and is likely applicable to various types of potentially responsive documents in the custody and control of numerous Operating Divisions within HHS.

37. The unique nature of the various potentially responsive documents in the custody and control of different Operating Divisions within HHS as well as the breadth of Defendants' RFPs that will likely encompass documents from various, diverse Operating Divisions within the

11

Agency, will prevent HHS from forming a team of attorneys and legal support staff that can review documents from the various agencies that possess potentially responsive documents. Rather, HHS will likely be forced to have numerous teams of attorneys and legal support staff to review documents from their respective Operating Divisions, applying their particular expertise to the documents under review. This will decrease the efficiency of any review and exponentially increase the burden on HHS's manpower in order to comply with Defendants' RFPs.

38. Even more, the breadth of the RFPs served by Defendants increases the undue burden on HHS. As an easily-ascertainable example, RFP Number 6 seeks "[a]ll Communications and Documents since January 1, 2017, concerning Transitioning or the treatment of Minors for Gender Dysphoria or a Related Condition."

39. This particular RFP likely includes much of the 2,274,244 pages of documents that HHS has produced in currently-pending litigation, which comprise the totality of discovery in that litigation. But here, Defendants seek all of this documentation in just one (of many) RFPs.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 13, 2023.

Dr. Karl Mathias
Chief Information Officer
Department of Health and Human Services