```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE MIDDLE DISTRICT OF ALABAMA
 2                            NORTHERN DIVISION

 3

 4        BRIANNA BOE, et al.,         *
                                       *
 5             Plaintiffs,             *   2:22-cv-00184-LCB
                                       *   March 21, 2023
 6        vs.                          *   Montgomery, Alabama
                                       *   10:00 a.m.
 7        STEVE MARSHALL, et al.,      *
                                       *
 8             Defendants.             *
          ****************************

 9

10

11        TRANSCRIPT OF ORAL ARGUMENT ON THE MOTIONS HEARING
                 BEFORE THE HONORABLE LILES C. BURKE
12                  UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
22      and Procedures Vol. VI, Chapter III, D.2.  Transcript
                  produced by computerized stenotype.

23

24

25
```

```
 1                          APPEARANCES

 2
            FOR THE PLAINTIFFS:
 3          Melody Hurdle Eagan, Esq.
            LIGHTFOOT, FRANKLIN & WHITE, LLC
 4          The Clark Building
            400 20th Street North
 5          Birmingham, Alabama 35203

 6          Coty Rae Montag, Esq.
            DOJ-Crt
 7          Civil Rights Division
            150 M Street NE
 8          4con
            Washington, DC 20002
 9          202-598-1580
            Email: Coty.montag@usdoj.gov
10
            Jason R. Cheek, Esq.
11          U S Atty Office - NDAL
            1801 Fourth Ave N
12          Birmingham, AL 35203
            205-244-2104
13          Email: Jason.cheek@usdoj.gov

14          Kaitlin N Toyama, Esq.
            United States Department of Justice
15          Civil Rights Division
            950 Pennsylvania Avenue, NW
16          Washington, DC 20530
            202-353-5311
17          Email: Kaitlin.toyama@usdoj.gov

18          Margaret Lester Marshall, Esq.
            DOJ-USAO
19          1801 Fourth Avenue North
            Birmingham, AL 35203
20          205-244-2121
            Email: Margaret.marshall@usdoj.gov
21
            Renee Michelle Williams, Esq.
22          United States Department of Justice
            Civil Rights Division
23          950 Pennsylvania Avenue, NW
            Washington, DC 20530
24          202-598-3210
            Email: Renee.williams3@usdoj.gov
25
```

```
 1          Stephen D Wadsworth, Esq.
            Audrey Willis, Esq.
 2          US Attorney's Office for the Middle District of Alabama
            131 Clayton Street
 3          Montgomery, AL 36104
            334-223-7280
 4          Fax: 334-223-7560
            Email: Stephen.wadsworth@usdoj.gov
 5
            Amie Murphy, Esq.
 6          DOJ-Crt
            950 Pennsylvania Avenue-- NW Building
 7          Washington, DC 20530
            202-353-1285
 8          Email: Amie.murphy2@usdoj.gov

 9
            FOR THE DEFENDANT:
10          James W. Davis, Esq.
            Edmund LaCour, Esq.
11          Bethany Lee, Esq.
            OFFICE OF THE ATTORNEY GENERAL
12          501 Washington Avenue
            P.O. Box 300152
13          Montgomery, Alabama 36130-0152
            (334) 242-7300
14

15          AMICI:
            Barry Alan Ragsdale, Esq.
16          Dominick Feld Hyde, P.C.
            Litigation
17          1130 22nd St S - Ste 4000
            Birmingham, AL 35205
18          205-536-8888
            Email: BRagsdale@dfhlaw.com
19
            Cortlin Hall Lannin, Esq.
20          COVINGTON & BURLING LLP
            Salesforce Tower
21          415 Mission Street
            Suite 5400
22          San Francisco, CA 94105
            415-591-7078
23          Email: Clannin@cov.com

24

25          COURTROOM DEPUTY:  Chiquita Baxter
```

1

2

3          COURT REPORTER:   Christina K. Decker, RMR, CRR

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2              (In open court.)

3          THE COURT:  Good morning.

4      All right.  Let's take up the WPATH motion first.

5  Mr. Ragsdale, are you going to argue on this one?

6          MR. RAGSDALE:  I am, although I suspect I will need

7  assistance from Mr. Lannin, but I was going to start, Your

8  Honor.

9          THE COURT:  Fair enough.  Proceed at your leisure.

10          MR. RAGSDALE:  Okay.

11      Good morning, Your Honor.  Barry Ragsdale for WPATH, along

12  with Mr. Lannin, as well.

13      We are here at the Court's direction, and anxious to

14  comply with whatever instructions the Court has for us.

15      I can give you a little background of what's happened

16  since the last time we were in front of you, if that would be

17  helpful.

18          THE COURT:  That would be great.  I'm certainly

19  interested in -- the two issues that I think I would want to

20  jump straight to is what, if any, effect does the fact that you

21  guys filed a brief early on in this -- I know that doesn't make

22  you a party, but you certainly put these guidelines, I would

23  say, to the heart of the case.  And then I want to hear about

24  this D.C. Circuit matter.

25          MR. RAGSDALE:  Sure.

1          I think our position, Your Honor, obviously is that an

2     amicus is not a party to the case, so that we would still be

3     judged and viewed as a nonparty for purposes of discovery.

4          Obviously, we offered those guidelines, along with the

5     other organizations that offered guidelines, in an effort to

6     help this Court as a friend of the Court.  And we did that

7     knowing, obviously, that they were going to be at issue.  They

8     would have been at issue, Your Honor, whether we filed an

9     amicus brief or not, right?  The plaintiffs would have relied

10     on them, and the State would have attacked them.

11          So we don't believe that the fact that we did file an

12     amicus brief changes the calculus that this Court uses in

13     determining whether or not third-party discovery is justified,

14     or burdensome, or any of those categorizations.

15          As I said, we knew, and I think all parties knew that the

16     guidelines themselves were going to be at issue.  Our issue,

17     obviously, is with delving into the background of how the

18     guidelines got done.

19          The science of the guidelines is going to be an issue in

20     your courtroom.  And the parties that are present are going to

21     argue the science of those guidelines.

22          Our objections, obviously, stem from the internal, I'd say

23     politics, the internal decision making that went into the

24     formulation of those guidelines -- not the science of it, but

25     the internal parts.  And that's where we have come to blows to

1  issue with the State is their intent to delve into that.

2      Last time we obviously argued the motion with this Court.

3  You gave us very wise instructions to go and try to reach a

4  compromise.  And we did.

5      We had two separate meet and confers with the State, in

6  which we attempted to try to find some middle ground that would

7  let us go forward, and, you know, eliminate the necessity for

8  you having to rule on that motion -- not that that's a burden,

9  but it's something that we could live with.  And we did that.

10      Now, intervening in that same time period during those

11  meet and confers, where we met in good faith with the lawyers

12  from the State to try to work it out, actions overtook us in

13  D.C.  Mr. Lannin is actually counsel in that, and he can talk

14  to you specifically about what happened.

15      But as we sit here today, we have an order that was

16  entered by Judge Nichols that has been stayed temporarily for

17  purposes of the D.C. Circuit to review it.  That obviously puts

18  us in a difficult position vis-a-vis those two cases, Your

19  Honor.

20      We certainly don't want to be in a position where we

21  voluntarily turn over documents that we are, at this point,

22  protected from having to turn over in D.C.  And that's why we

23  brought that to this Court's attention.

24      To the extent you have detailed questions about D.C.,

25  Mr. Lannin is probably the person to direct those to.

1          Thank you, Your Honor.

2               THE COURT:  Uh-huh.

3               MR. LANNIN:  Good morning, Your Honor.

4               THE COURT:  I suspect the State is going to say, hey,

5     this D.C. Circuit matter is totally different than ours, it

6     doesn't rise and fall on the issue of these guidelines.  So I'd

7     say jump straight to the heart of that.

8               MR. LANNIN:  Your Honor, I'm happy to.

9          And, in fact, I think at its core, both Florida and the

10    State of Alabama are seeking the exact same materials.  And

11    they've both represented that it goes to the heart of the

12    matter.

13         In fact, in Florida, the Court -- I'm sorry -- the State

14    vigorously argued to the district court there, Judge Nichols,

15    that there should be no stay of his order producing some of

16    these materials because, in fact, that's the language of the

17    standard.  It goes to the heart of the matter.

18         So with respect to the State, I just -- I don't see there

19    being a distinction.  I think the issue is whether or not the

20    internal deliberative process, those materials, is fair game.

21         And to amplify what Mr. Ragsdale said, coming off of Your

22    Honor's last hearing, we did attempt to reach a compromise.  In

23    the interim, Judge Nichols, in D.C., had clarified his original

24    order and ordered WPATH to produce certain internal materials.

25    And it wasn't a voluminous collection of e-mail searching, and

1  things like that, but it was a collection of materials that

2  evidenced the internal process.

3      And, Your Honor, WPATH went to work and started gathering

4  those materials.  And was preparing a deponent to testify about

5  them because Judge Nichols had so ordered.  And literally the

6  evening before we were set to produce the deponent, potentially

7  produce those materials, the D.C. Circuit stayed that order.

8      So, as it sits, WPATH has a collection of materials that

9  reflect internal deliberative process.  I suspect that's

10 exactly the sort of materials that the State of Alabama is

11 seeking.

12     Nonetheless, the D.C. Circuit has instructed WPATH not to

13 produce those materials to Florida.  And, so I think, as

14 Mr. Ragsdale rightly puts it, we are in kind of a box.

15     And I -- I think we and the State agree that Your Honor's

16 guidance on what to do here would be appropriate.  And I

17 apologize if our notice to the Court suggested otherwise.

18     I think, you know, frankly the parties had a meet and

19 confer shortly before we filed those notices and agreed that,

20 at the end of the day, we may just need an order from Your

21 Honor so that we know how to proceed.

22         THE COURT:  Understood.

23     Well, I think everybody agrees this case rises and falls,

24 to some degree, on these guidelines, right?

25     And I am pulling a few quotes here from the brief you

1  filed with this Court last year.  You know, "The guidelines are

2  characterized as established evidence-based clinical

3  guidelines," "the product of careful and robust deliberation,"

4  "subject to rigorous requirements," "the result of a drafting,

5  comment, and review process that took five years," et cetera,

6  et cetera.

7       So, you know, I, obviously, to some degree, think the

8  State ought to be able to look behind the curtain on that.  You

9  know, are there specific items here that you want to address,

10 as far as what you absolutely please don't make us turn this

11 over, as opposed to, well, really, you know, it won't kill us

12 if they get this?

13          MR. LANNIN:  Your Honor, I appreciate the question.

14      And it is a very difficult line to draw because, at its

15 base level, we're talking about First Amendment issues now, and

16 what's protected now and what's not.  And, obviously, now the

17 D.C. Circuit will take a close look at that issue and attempt

18 to divine a line in this case.

19      I think, in our view, you know, we had reached actual -- a

20 reasonable compromise with Florida that we would be able to,

21 for example, redact the names of any individuals that appeared

22 on internal documents, which goes some way to some mitigating

23 some First Amendment issues.  And we had, you know, with Judge

24 Nichols's guidance, I think reached a compromise where the

25 organization was not turning itself inside out to produce every

1  relevant e-mail or document that could ever exist, but rather,

2  you know, as Judge Nichols ordered, a set of documents that

3  were sufficient to show the internal process.

4      So, for example, drafts of earlier chapters, comments to

5  those drafts, comments that members made, comments they

6  received, how they were addressed, those types of materials

7  that the organization could get its hands on without having to

8  hire a vendor and doing, you know, very expensive e-discovery.

9  That was what we collected.

10      And to be honest with Your Honor, obviously, that's the

11  materials that are sitting on a hard drive now.  They're

12  just -- they haven't been produced pursuant to the D.C. stay.

13      I can't tell Your Honor that WPATH would be excited about

14  producing anything.  And, obviously, we now have a feeling the

15  D.C. Circuit at least sees there's an issue here and wants to

16  take a closer look.

17      But if Your Honor is inclined to disagree with that, and,

18  as is your right, order the organization to produce something,

19  I could only suggest that, you know, the guidance that Judge

20  Nichols gave in the first instance may be a nice elegant place

21  to start there.

22      THE COURT:  I tell you what.  Why don't we switch

23  sides, let the State take a turn.  And then I probably will

24  have questions for all of you.

25      MR. LANNIN:  Very good.  Thank you, Your Honor.

1           MR. LACOUR:  Thank you, Your Honor.  Edmund LaCour

2  here on behalf of the defendants.

3       I think there's a lot more for us to say that we didn't

4  say back at the hearing in February.  As you noted, Your Honor,

5  the WPATH did come to this Court selling itself not as an

6  advocacy group, but as a, quote, respected professional

7  organization who was putting forward dispassionate science, not

8  impassioned advocacy.

9       Plaintiffs invited you to rely on those WPATH guidelines.

10  The United States invited you to rely on those guidelines.  In

11  the preliminary injunction order, it appears that you, at least

12  as a preliminary matter, did place some reliance on those

13  guidelines.  And so as you were just stating before, we do

14  think it is fair.  And we think it is critical to a fair trial

15  that we are able to test those guidelines.

16       My friend suggested that our case is just like Florida's.

17  I dispute that for two fundamental reasons.

18       First, the Florida case, at least as a preliminary matter,

19  when the Court in Florida denied the motion for preliminary

20  injunction that the plaintiffs had brought there, applied a

21  much more state friendly legal standard.  Basically -- I'm

22  reading now.

23       This is docket entry 64 from that case, 4:22-cv-325, at

24  page 4.  And the standard there was if the State has reasonably

25  determined -- which is like a rational basis, a state

1   deferential standard.

2       If the State has reasonably determined these treatments

3   are experimental, the refusal to pay for them under the

4   Medicaid program is unconstitutional, or violates the ACA

5   non-discrimination provision, only if the State pays for other

6   equivalently experimental treatments, the plaintiffs will face

7   a difficult task to show that any other treatment is

8   equivalently experimental.

9       So a far more state friendly standard than what was

10  applied at the preliminary injunction stage, where the Court

11  recognized that these treatments carry very severe harms,

12  numerous harms, including loss of fertility, loss of sexual

13  function.  But then the Court wrote, Nevertheless, WPATH has

14  put forward these guidelines.  So very pro WPATH, very -- like

15  a higher burden for the State to satisfy, at least under

16  plaintiffs' approach to the case.

17      Second, we have a distinction, in terms of the evidence

18  that was presented by Alabama to Your Honor versus the evidence

19  that was presented by Florida and the D.C. case, which is -- I

20  think we presented significant evidence of bias, and

21  significant evidence to call into question the validity and the

22  soundness of the WPATH guidelines, evidence that was not

23  presented to the District Court in D.C. or to the D.C. Circuit.

24      And it's documented in our response to the motion to

25  quash, including the activists shouting down Dr. Zucker at the

 1  2017 conference, the removal inexplicably of any age limits for

 2  cross-sex hormones, mastectomies, and bottom surgeries on

 3  children, and other issues that we find to be deeply troubling.

 4       And including this -- and, yes, it does require us to look

 5  beyond just the glossy pdf that WPATH has produced.  But their

 6  decisions on what not to include and why not to include them --

 7  why is there not a chapter on de-transitioners?  Why is there

 8  not a chapter on ethics?  We know there is a draft chapter on

 9  ethics, it's not in final version.  But they do have a chapter

10  on eunuchs, for example.

11       So for all those reasons, we think, both as a legal matter

12  and as a factual matter, our case is different from Florida's.

13  And for that reason, we think we are entitled to this

14  discovery.  It is obviously relevant under the plaintiffs'

15  standard of the case.

16            THE COURT:  Do you want to jump to the specific things

17  you're requesting and just quickly address those?

18            MR. LACOUR:  Yes, Your Honor.

19       I can say that we were in negotiations.  They were moving

20  along.  We identified, I think, ten potential custodians, I

21  think five of whom are WPATH executives who have WPATH e-mails,

22  which should make it a little bit easier to search them.  And

23  then five other very senior members of WPATH who don't work

24  directly for WPATH, but are on the board or on certain, like

25  guidelines drafting boards, and had senior positions in that

1 process.

2       We were working towards coming up with search terms.  And

3 then things started to break WPATH's way in the D.C. Circuit,

4 and they cut off discussions -- they didn't cut off

5 discussions.  They basically said that they were not going to

6 be able to keep moving forward with us.

7             THE COURT:  All right.  Why don't we give them another

8 bite at the apple, and then we'll see where we are.

9             MR. LACOUR:  Thank you.

10            MR. LANNIN:  Your Honor, we're not a party to the

11 Florida litigation, WPATH isn't.  We attempted to submit an

12 amicus brief, but the District Court did not.  So I am not

13 intimately familiar with the judge's decisions down there,

14 except to say that I know because Judge Nichols in D.C. asked,

15 that the judge in Florida has made it clear that he intends to

16 conduct a sweeping review of the evidence.

17       And it's not evidence limited to the time that Florida

18 enacted the ban that's challenged there.  It's an

19 evidence-based review up to the moment.  What does the

20 contemporary record show?  And that's why Florida sought

21 exactly the same types of materials that Alabama has sought

22 here.

23       As I said to Your Honor earlier, the standard, the heart

24 of the matter, that's exactly the standard that was at issue in

25 the D.C. Circuit.  That's the language that the D.C. Circuit

1  uses for evaluating relevance in this context.

2       And Florida urged the Court that this discovery did go to

3  the heart of the matter.  Judge Nichols agreed, obviously, in

4  ordering the discovery and refusing to stay it.

5       The D.C. Circuit may have a different view.  We don't

6  know.  We know they stayed that order.

7       So I candidly and respectfully disagree with the State

8  about the importance of the discovery.  I think it's the same.

9       You know, I think the -- the issue of, you know, when we

10 had our first meet and confer and the State proposed ten

11 custodians, I was frankly a little shocked because that's a lot

12 of folks.  That's more than I see in many, you know, ordinary

13 corporate cases.  And it's really a list that would -- of

14 everyone who could possibly be associated with the

15 organization.

16      And, so, you know, our view and what we suggested to the

17 State at that point was that it may make sense to take a more

18 targeted approach.  Let's start with, as Judge Nichols said,

19 documents sufficient to show, instead of e-mail searches, and

20 collections, and search terms, maybe we can ask these folks to

21 just put their hands on documents that are responsive to these

22 issues on central servers, or on their own files and send it to

23 us, and then we could from there produce the materials that

24 were responsive.

25      We were in the middle of that exercise, as I said to Your

1    Honor earlier, when the D.C. Circuit stayed their order.  So --

2         THE COURT:  So I guess here would be my thought.  You

3    know, after hearing both sides of this, certainly I have read

4    what you put before me.  And if I don't let the State look

5    behind the curtain, I'm really, you know, not giving them a

6    chance to get discovery that truly goes to the heart of this

7    case.  And I am making them try this with a hand behind their

8    back.

9         To the issue of whether some of this is burdensome, or

10   what the manner is, you know, I guess I would put it this way:

11   If you guys wanted to take some time this morning, or whatever,

12   to discuss method and manner, you know, I'm certainly open to

13   that.  If you want me to just rule, I can just rule.  But I'm

14   inclined to let them have the discovery.

15        Now, if there is a better way to do it between the two

16   sides that's less burdensome or makes more sense, you know,

17   then I would say let me let you go back and talk about that.

18   Or if you just want me to rule, I can do that.

19        But I think both of you know far more about the

20   particulars of what you're looking for and how to get it, and

21   to also protect both of your clients.  So I guess that would be

22   my question.  Do you want some time to talk?  Is that something

23   you could work out in 20 minutes, or not really?

24        MR. LANNIN:  Your Honor, I think 20 minutes may be

25   optimistic.

```
 1            THE COURT:  Right.  I understand.

 2            MR. LANNIN:  But let me say this, Your Honor.  I

 3   appreciate your guidance.

 4      I'm never adverse to talking further.  I think if you

 5   could give us a day or two to convene.  My concern for Your

 6   Honor, just so you know what I am thinking, you know, at the

 7   end of the day, if there's a compromise to be had or not, I

 8   think we, WPATH, would appreciate Your Honor memorializing it

 9   in an order, because the D.C. Circuit has now instructed us not

10   to produce some of these materials to the State of Florida.

11      And so, again, not to reveal too much of my thinking

12   litigation-wise, but if we voluntarily turn over materials that

13   we have vigorously urged the D.C. Circuit we shouldn't have

14   to --

15            THE COURT:  Understood.

16            MR. LANNIN:  -- I am concerned that Florida's going to

17   turn around and say, Your Honor -- or to the D.C. Circuit how

18   could they possibly mean this when they voluntarily turned it

19   over in Alabama.

20            THE COURT:  Got it.

21            MR. LANNIN:  Your Honor's imprimatur on an order,

22   whether by agreement, or simply because we just need Your Honor

23   to rule, I think is the aiding of that.

24            THE COURT:  All right.  So am I hearing you say, then,

25   that y'all will talk, if you work something out in a day or
```

1  two, then for me to put it in an order?  Or do you want me to

2  put it in an order right now and ask you to talk and determine

3  the method?

4          MR. LANNIN:  I think an order -- I'm interested in the

5  State's views, but I think the latter might be helpful, Your

6  Honor.  An order instructing the parties -- are you

7  contemplating it would be an order to produce materials and

8  then to figure out exactly how to implement it?

9          THE COURT:  Yes.

10          MR. LANNIN:  That, in my view, would be helpful.  And

11  then if there are disputes as to the methodology or the means,

12  I suppose we could come back to Your Honor and seek guidance on

13  that.

14          THE COURT:  Mr. LaCour, do you have thoughts on this?

15          MR. LACOUR:  Your Honor, we served the subpoena

16  five months ago.  We had a hearing a month ago.

17      What I think I'm hearing from my friend here is they need

18  an order from you to move forward.  I think an order would be

19  helpful, as well, in that respect, too.  And if they do intend

20  to seek a mandamus from the Eleventh Circuit, then we can prove

21  that up.  But hopefully keep things moving forward, in terms of

22  discovery, because we do believe this is very important

23  discovery if the case is going to proceed under the plaintiffs'

24  legal theory.

25          THE COURT:  Got it.  So just so for our own schedule

1  and timing, you know, would it be your intent to go to the

2  Eleventh Circuit over this discovery order?  It doesn't hurt my

3  feelings either way.  I'm just trying to figure out our own

4  timetable here.

5          MR. LANNIN:  Your Honor, I don't want to sound like I

6  am punting.  I don't know.

7          THE COURT:  Okay.

8          MR. LANNIN:  I think it would depend on what agreement

9  could be reached, to be honest.

10         THE COURT:  Okay.

11         MR. LANNIN:  If you would indulge me for one second,

12 Your Honor, I just -- I have a feeling what I'm saying today

13 will be quoted back to me in the D.C. Circuit at some point by

14 Florida.

15     And so I want to make it clear, you know, WPATH feels that

16 any discovery inside their organization is inappropriate and is

17 violative of its First Amendment issues.

18         THE COURT:  I hear you loud and clear on that.

19         MR. LANNIN:  I understand, Your Honor.  I'm just

20 putting it on the record for that day in the future.

21         THE COURT:  Understood.

22         MR. LANNIN:  But I do agree that an order from Your

23 Honor would be helpful in moving this forward.

24         THE COURT:  Okay.  All right.

25     Anything else we -- Mr. Ragsdale?

1                 MR. RAGSDALE:  Can I say one thing?

2                 MR. LANNIN:  Of course.

3                 MR. RAGSDALE:  Your Honor, I've heard you now say

4    several times that the State's entitled to a peek behind the

5    curtain.  And I think you -- I don't think we necessarily

6    disagree with that.  I would just simply caution that there is

7    a difference between a peek behind the curtain and rifling

8    through our private papers and possessions.  And that's really

9    kind of where we've ended up.

10       We have tried to work with the State to give them that

11   look behind -- here's how the guidelines were reached, here's

12   the studies we relied on, here's the science that we looked at,

13   which is really what this ought to be about.

14       The State, it seems to me, is really more intent on

15   attacking the organization.  And that's where the First

16   Amendment implications arise.

17       And so, in drafting your order, which we welcome, I would

18   just simply ask for the Court to recognize that there is a

19   difference between an opportunity to look behind the curtain

20   and an opportunity to go on a witch hunt against an

21   organization with which the State apparently disagrees.

22       And that's the only thing I would add to our final

23   comments.  And probably Mr. Lannin's going to tell me he wishes

24   I wouldn't have said that.  But that's my thoughts.

25                 THE COURT:  Understood.

```
1          Does the State want the last word?
2              MR. LACOUR:  Your Honor, as we said before, we want to
3   be able to test whether this is dispassionate science or
4   impassioned advocacy that has produced these guidelines.  We
5   want the documents we need to be able to make that assessment.
6   And we have put forward evidence that we think shows there is
7   reason to be concerned that this is not simply dispassionate
8   science being done by this group.
9          And so we hope that we can get adequate evidence to be
10  able to present a full case without, as Your Honor alluded to,
11  having one hand tied behind our back.
12        So thank you very much for your attention to this matter.
13            THE COURT:  All right.
14            MR. RAGSDALE:  Thank you, Your Honor.
15            THE COURT:  Yes.  Thank you.
16            MR. LANNIN:  Thank you, Your Honor.
17            THE COURT:  Let's talk about the motion for judgment
18  on the pleadings.  Is that going to be you, Mr. Davis?
19            MR. DAVIS:  That's me.
20            THE COURT:  All right.  And just so I'm clear -- do we
21  have any -- as we sit here today, do we have any discovery that
22  has been propounded by the other side that would be the subject
23  of your motion?
24            MR. DAVIS:  Not that's currently an issue, Judge.
25  There was some served by the United States that would go
```

1   towards legislative motive after -- and as part of our meet and

2   confers, those are no longer in play.

3              THE COURT:  Gotcha.

4              MR. DAVIS:  We still think the issue's important and

5   it would be helpful to simplify the case.

6              THE COURT:  So a couple of questions I would have is,

7   you know, your motion for judgment on the pleadings really

8   seems to be sort of trying to build a wall on discovery.

9        And so I guess I'm -- my question would be:  Wouldn't that

10  be better addressed by a motion to quash in the event that

11  somebody filed something that was objectionable?

12             MR. DAVIS:  We don't think so, Judge.

13       And I forgot I was cautioned that I need to introduce

14  myself for the record before I speak.  I'm Jim Davis arguing

15  for the defendants.

16       We think the Court -- it would be appropriate for the

17  Court to go ahead and address these issues.

18       The United States came in.  They promised you that they

19  weren't doing anything more than tagging along on the equal

20  protection claim that the plaintiffs were bringing.  But now

21  they're arguing for different types of equal protection claims,

22  in addition to that original one.  So we think it would be

23  helpful to simplify the case and hold the United States to its

24  promise.

25       We also think that under Rule 12 we're entitled to a

1  judgment on the pleadings because the United States has not --

2  its complaint does not contain the type of allegations that

3  would support these other varieties of equal protection claims.

4       Their Arlington Heights invidious discrimination claim

5  they say they want to bring needs to be supported by some

6  allegation somewhere that the Legislature was motivated, at

7  least in part, by invidious discrimination.  But their

8  complaint contains exactly zero allegations.

9       So we think under Rule 12 we are entitled to a judgment on

10 the pleadings at this time, and that it would be helpful to

11 simplify the case.  Because the United States is reserving the

12 right to go after this stuff in the future.

13      We're here.  We have got the motion in front of you.  We

14 would like a ruling now that we're entitled to this.  And to be

15 clear to the parties what kind of record we need to be

16 building.

17      And I can address the arguments on the rational basis

18 claim that they say they're also bringing and why -- in more

19 detail why we think we're entitled to it for each variety.  But

20 that's why we think it would be helpful to go ahead and get a

21 ruling now.

22           THE COURT:  All right.  Who's going to argue on the

23 other side?

24           MS. TOYAMA:  I am, Your Honor.

25           THE COURT:  All right.

1           MS. TOYAMA:  Good morning, Your Honor.  Kaitlin Toyama

2   for the United States.

3        So, I mean, just listening right now to what defendants

4   are talking about, I think there's been a lot of confusion on

5   what it means to plead an equal protection claim.  And there's

6   a difference between evidentiary standards versus theories of

7   liability --

8           THE COURT:  Can you stand a little closer to the

9   microphone?  Thank you.

10          MS. TOYAMA:  Oh, yes.  Sorry.

11       And so, Your Honor, there's really two reasons to deny

12  this motion.  The first goes to basic civil procedure and

13  whether it's appropriate to bring its 12(c) motion here.  But I

14  think maybe it would be helpful to go back to -- go to our

15  second reason, which is that the United States has properly

16  pleaded its equal protection claim.  And this is one claim.  I

17  do want to be clear on that.

18          THE COURT:  Can you turn her microphone up just a

19  little bit?

20          MS. TOYAMA:  I can lean forward.

21          THE COURT:  All right.

22          MS. TOYAMA:  And I'll try to speak louder, if that's

23  helpful.  I will lean forward.

24          THE COURT:  I can hear you well now.

25          MS. TOYAMA:  Okay.

1    So, Your Honor, the United States intervenes in this claim

2 under one claim, and that's violation of the Equal Protection

3 Clause.

4    The single claim, however, contains multiple layers of

5 analysis that can be approached in different ways.  And the

6 problem with defendants' motion is that they are confusing

7 these different analytical frameworks as separate and distinct

8 claims, which is wrong.

9    So our single claim does ask one question, and that is

10 does SB 184 violate the Equal Protection Clause?  And at the

11 end of this litigation, there will be one answer -- yes or no.

12    But to get to that answer, it's not a straight line.

13 There is -- the path to that answer is varied, it's complex,

14 and it requires different tests at different stages.

15    And so taking a step back and looking at equal protection

16 on a more fundamental level, the seminal cases like Washington

17 vs. Davis and Village of Arlington Heights establish that for

18 equal protection to come into play, there must be

19 discriminatory intent or purpose.  And that a law that does not

20 intend to discriminate does not violate the Equal Protection

21 Clause.  That is a requirement across the board.

22    And to be clear, when we're talking about intent to

23 discriminate, that does not necessarily mean intent to harm.

24 What we're talking about is does a law treat people

25 differently.  Does it create classifications.  And there are

1    different ways to identify that in a statute.

2          And so, for example, the Eleventh Circuit, in E&T Realty

3    vs. Strickland, broke these three different types of theories

4    for a statute into three categories.

5          The first are statutes that discriminate on their face;

6    the second are neutral statutes that purposefully discriminate;

7    and the third are facially mutual statutes administrated in a

8    discriminatory matter.  But, again, these are three different

9    ways to show that a single statute has a requisite

10   discriminatory intent or purpose to trigger the protections of

11   the Equal Protection Clause.

12         And, here, the United States has primarily advanced the

13   theory under the first argument or the first theory, which is

14   that the intent to discriminate is clear by looking at the

15   statute on its face.  But we have not foreclosed and have

16   offered evidence on a second theory, which is that the statute

17   is facially neutral, but it has the -- it still has the

18   requisite intent to discriminate.  And you can find that by

19   looking beyond the face of the statute.

20         For example, that it could include statements made by

21   legislators before a law was enacted, or it could also include

22   disparate impact.

23         But, again, both approaches take us to the same

24   conclusion, that the law is intended to discriminate.  We

25   cannot have an Equal Protection Clause without intent.  That is

1   across the board.

2        And then from there, after we show that a law

3   discriminates and again creates a classification, treats people

4   differently, that's when we get into the question of does that

5   discrimination violate the Constitution.  And so that's where

6   we have the different layers of analysis -- the different

7   frameworks for analysis.

8        So we have strict scrutiny, we have heightened scrutiny,

9   we have rational basis.  But, again, we don't get into that

10  analysis until we first demonstrate that the law intends to

11  treat people differently.

12        When we get to that level of analysis, of course, we are

13  arguing that heightened scrutiny applies.  And there the

14  standard turns on the State to show that SB 184 serves an

15  important government interest, and that the discriminatory

16  means are employed in a substantially related way to achieve

17  those objectives.

18        The proper justification must be genuine and sufficient.

19  It cannot differ from the law's actual purpose.  It cannot be

20  hypothesized, cannot be invented post hoc in response

21  litigation.

22        In defendants' brief, and as suggested now, they're asking

23  for a judgment on, I guess, the United States' rational basis

24  claim, its Arlington Heights claim, its facial discrimination

25  claim, to the extent that claim is based on pretextual purpose.

1   But, respectfully as this explains, that is not how equal
2   protection claims work.
3        In the preliminary injunction order, Your Honor wrote that
4   the -- that there is a substantial likelihood that the
5   plaintiffs will succeed on their equal protection claim, which
6   is correct that there is one claim.  You cannot break it up
7   into separate claims.
8        So given this full context, it's easy to see how the
9   United States' complaint and intervention satisfies the basic
10  pleading standard, the notice pleading standard required under
11  Rule 12.
12       For example, paragraphs 4 through 7, 24 through 39, 41
13  through 44, 46 through 54, and 57 of the complaint
14  intervention, those paragraphs allege and describe how the
15  intent or purpose of SB 184 is to discriminate.  And, again,
16  here we're talking about this threshold question does the law
17  treat people differently.
18       Paragraphs 9 and 57 through 58 allege that heightened
19  scrutiny applies.
20       Paragraphs 8 and 59 discuss how the law fails heightened
21  scrutiny.
22       And in the alternative, paragraphs 48 and 60 discuss how
23  the law fails rational basis review.
24       So that complaint is clearly sufficient to prove -- to
25  provide notice as to the United States' equal protection claim.

 1  Though if the Court is inclined to find that more information

 2  is needed, we would respectfully ask for leave to amend.  But

 3  going --

 4        THE COURT:  Well, I don't know that I heard you

 5  specifically address the wording of your complaint.  I think

 6  the State's position is pretty clear that that should have been

 7  specifically alleged in the complaint.

 8    And so I would ask you to address that.  But also I'd ask

 9  you to address -- I know you were not here on that date, but,

10  you know, the Department of Justice did come in and say we

11  assert no claim outside of what is already before the Court, no

12  other theories.  We're just asking to join as a party to the

13  already existing claims.

14    So maybe you could address that a little bit.

15        MS. TOYAMA:  Right, Your Honor.

16    I think I could actually combine the answer into one --

17  the questions into one answer, which is that plaintiffs and

18  United States -- again, we are bringing one claim -- equal

19  protection claim.  And there are just different theories and

20  different tests that go into answering the question of whether

21  the equal protection clause is violated.

22    And so we're not required under the rules to plead every

23  single specific argument, every theory.  We just have to

24  establish that -- or we have to plead sufficient facts

25  demonstrate --

1          THE COURT:  Let me cut you off right there and let

2     Mr. Davis come back to the podium.  I will give you another

3     bite at the apple.

4          MS. TOYAMA:  Okay.

5          MR. DAVIS:  Judge, they're all calling it an equal

6     protection claim, but there are different varieties of equal

7     protection claim and a different way to get there.

8        Even if what my friend is saying is true, that this is all

9     just an equal protection claim, they're still doing something

10    different than what the private plaintiffs are doing.

11       The private plaintiffs are arguing that this statute

12    that's being challenged draws a line between transgender

13    children and other children, that it's not sufficiently tied to

14    a sufficiently important state interest.  The private

15    plaintiffs, in other words, put the statute itself on trial.

16       The United States says that they reserve the right at any

17    time to change the theory and put the Legislature on trial, to

18    start examining what was in their hearts and minds when they

19    passed this statute.  We want to know if that's going to be in

20    the case or not.

21       We think a ruling on our motion for judgment on the

22    pleading is a way for the Court to be clear that the United

23    States is going to be tied to the theory, the type of record,

24    the type of case that the private plaintiffs are bringing.

25         THE COURT:  So she says, hey, if you decide otherwise,

1  then let us amend.  Do you want to address that?

2          MR. DAVIS:  Well, amendment would fix the lack of

3  allegations in the complaint, but it would be, I think,

4  breaking their promise to tag along with what the private

5  plaintiffs are doing.  I think it would turn this into a very

6  different type of case.

7      It's not the case that you heard at the preliminary

8  injunction hearing.  It's not the case that we have been

9  litigating for these past several months.

10          MS. TOYAMA:  Thank you, Your Honor.  Again, Kaitlin

11  Toyama for the United States.

12      I guess I would answer that by -- in a couple of different

13  ways.  The first is that the United States is bringing the same

14  claim as plaintiffs.  And our primary theory is that the law

15  does discriminate on its face.  And so, again, that means just

16  by looking at the words on paper, it's clear that the law

17  discriminates.  But that --

18          THE COURT:  So depending on how I rule on this, is it

19  going to be your intent, then, to go subpoena legislators'

20  e-mails, and correspondence, and this sort of thing?

21          MS. TOYAMA:  Your Honor --

22          THE COURT:  Is that where you are going to head?

23          MS. TOYAMA:  I don't think I can really speak to what

24  our intention is for current -- for the next phase.

25          THE COURT:  Well, I need you to speak to it.  I need

```
 1   you to answer my question.  I need to know that.  Is that where
 2   you are headed?
 3            MS. TOYAMA:  Well, Your Honor, we're currently --
 4   well, there are current discovery requests to defendants asking
 5   for information along those lines.
 6            THE COURT:  Okay.  So I don't know what -- I'm not
 7   being rude.  But I don't know what's a secret about that.  If
 8   that's -- if this is your theory of the case, then I don't know
 9   why you can't tell me what you're going to do.
10            MS. TOYAMA:  And I wish I could -- I wish I could
11   answer yes or no, but to be perfectly honest, I don't know what
12   our plan is going to be.
13            THE COURT:  Let's take a five-minute break, and you
14   can confer with your folks, and then you can let me know what
15   your intent is.
16            MS. TOYAMA:  Okay.  Thank you, Your Honor.
17            (Recess.)
18            THE COURT:  What did we decide?
19            MS. TOYAMA:  Thank you, Your Honor.  Again, Kaitlin
20   Toyama for the United States.
21        So I do want to confirm that we are not going to be -- we
22   are not going to be subpoenaing legislators.  But I do want to
23   just make a point that public statements from the legislators
24   have already been entered in this case, and we should be
25   allowed to present that information at trial.  Whether that --
```

1   so because it does go to our burden of proof.  And so whether

2   we can meet our burden of proof, it seems more appropriate to

3   be decided at the time of trial.

4       I did want to go back, if I may, to actually your first

5   question to defendants about whether this whole motion is moot.

6   And our position is that it is moot, it's untimely, and it's

7   also procedurally deficient under Rule 12(c).

8       And so as you mentioned, there are no current discovery

9   requests that are pending that this motion could apply to.

10  When defendants filed this motion, they filed it concurrently

11  with their brief in support of the motions to quash.  And when

12  Your Honor denied -- or when Your Honor granted that motion,

13  ostensibly all the arguments that went into whether the

14  subpoenas were appropriate, those were resolved.  And so

15  there's no current discovery that this motion could apply to.

16      Rule --

17      THE COURT:  All right.  So I have a quick question for

18  you, then, Mr. Davis.  Could you not accomplish what you want

19  with a 12(e) motion for a more definite statement?

20      MR. DAVIS:  That would bear some thought, Judge.  And

21  I would want to confer with colleagues about that.  Perhaps so.

22      The main thing we want to do is streamline the case, find

23  out what is in the case and what is not, and whether they're

24  going to be held to their promise that they were just -- not

25  going to do anything different from what the private plaintiffs

```
 1   did.

 2        If you would like, Judge, we could file something with the

 3   Court in the next couple of days after we have had a chance to

 4   discuss it as to whether we want to do this, whether we want a

 5   ruling on our motion for judgment on the pleadings, or whether

 6   we would be content to ask for a more definite statement from

 7   the United States.  We don't want anything to drag the case

 8   down.

 9             THE COURT:  I understand.  And I don't necessarily see

10   this as a new claim as much as a new theory of the claim or an

11   additional theory of the claim.  At the same time, I certainly,

12   you know, want everybody to be on notice of, you know, the

13   clock is running and the sand is running through the hourglass

14   right now, so...

15             MR. DAVIS:  Exactly.  We want to be able to enforce

16   our law again.  We want the chance to convince you that this

17   law is constitutional so that we can protect these kids.

18        And, you know, if you want to just tell the parties now

19   whether you're going to let the plaintiffs or the United States

20   run down a different rabbit trail of legislative intent, or

21   whether you're going to hold them to the theories that we have

22   been litigating so far, that would be helpful, too.

23             THE COURT:  Right.  I think I'm going to have to think

24   on that --

25             MR. DAVIS:  Fair enough.
```

```
 1            THE COURT:  -- a day or two myself.  But, yes, we will
 2   have to move down that line.
 3        Anything else you want to say?
 4            MS. TOYAMA:  Sure, Your Honor.  Just very quickly.
 5        I do just want to also make clear that the United States
 6   and the plaintiffs both reserved our right to go through a
 7   different type of analysis for the equal protection claim, so
 8   the Arlington Heights claim.
 9        And on the first issue of whether the law is facially
10   discriminatory or facially neutral, that is a claim -- or
11   whether the law is facially neutral was something that was
12   raised by defendants on the Eleventh Circuit.
13        And so to the extent that we're going to be limiting
14   claims, it needs to be equal.  We need to be able to prove our
15   case on different theories that defendants are also going to be
16   raising.
17            THE COURT:  All right.  Anybody have anything else
18   they want the Court to hear on this?  Fair enough.
19        All right.  Thank you.
20        All right.  Let's talk about the HHS issue.
21            MR. DAVIS:  Jim Davis for the defendants again.
22        What I was just discussing with my friends representing
23   the United States was whether it made sense to talk about the
24   interrogatories and the requests for productions together
25   because of the overlap.
```

1          They're planning on arguing those separately.  I will
2     start with whichever one you want me to start with, but a lot
3     of it's going to apply to both.
4               THE COURT:  Right.  Right.  You know, to the extent we
5     could do them together, that would be great.  If you want to do
6     it in two separate tranches, that's fine, too.
7               MR. DAVIS:  I plan to address them both, and if my
8     friends wish to divide the argument up however they wish, of
9     course, that's their right.
10         Jim Davis again for the defendants, Judge.
11         The United States inserted itself into this litigation
12    arguing that puberty blockers and cross-sex hormones are safe,
13    effective, and medically necessary for children with gender
14    dysphoria.
15         And in this case, they have cited material from the United
16    States Department of Health and Human Services for the
17    proposition that if we don't give children with gender
18    dysphoria these treatments, those children would be harmed.
19    They have documents and information that will help you decide
20    whether those claims are true.
21         At HHS they have folks who look at these issues, who are
22    monitoring ongoing experiments on children, who are --
23              THE COURT:  So let me drill down right there.
24              MR. DAVIS:  Okay.
25              THE COURT:  I didn't see a case that I thought set the

1  woods on fire as the definitive, you know, the HHS 100 percent

2  can be treated as DOJ and the government for purposes of

3  discovery.

4          MR. DAVIS:  Okay.  Let me go to that point, then.

5          THE COURT:  All right.

6          MR. DAVIS:  Because their objection, they say HHS is

7  not part of the United States for purposes of discovery.

8          THE COURT:  Right.

9          MR. DAVIS:  I think that's crazy.  There is nothing in

10  the rules that says the United States has some kind of

11  exemption.

12      Now, I can see -- it would be one thing -- the United

13  States is a large entity, the federal government.  It would be

14  one thing if we were saying you need to go look at commerce,

15  and state, and the treasury, and defense, and every agency

16  you've got.  You need to go look there.

17      We have targeted HHS, which has folks who are looking at

18  this.  They are funding studies that experts for the plaintiffs

19  and the United States are saying is part of this so-called vast

20  body of evidence supporting the treatment.

21      So they are very much involved in these issues.  And one

22  of the cases we cited -- and you are right, Judge.  There is

23  nothing from the Supreme Court that says definitively one way

24  or another what you are supposed to do.  But one of the cases

25  we cited, United States vs. UBS Securities, says the definition

1  of United States also include agencies that inform the

2  policies, rules, and regulations that the executive branch

3  sets.

4       We also cited a case from the Eastern District of

5  Louisiana, Deane vs. Dynasplint Systems, Inc., where they said

6  you're not allowed to just limit yourself to the Department of

7  Justice, the lawyers.

8       DOJ doesn't have teams of scientists looking at this

9  stuff.  HHS does.  So they're all -- both agencies are subject

10 to directives from the same president.  HHS is part of the

11 United States.

12      And I'd say this, too.  The Department of Justice is not

13 the intervening party.  And Merrick Garland is not the

14 intervening party.  The intervening party is the United States.

15 They intervened under 42 U.S.C. 2000h-2.  That statute permits

16 intervention for or in the name of the United States.  That's

17 the party.

18      The case that they cite under U.S. vs. New York, the

19 language is -- says that -- in that case, the Attorney General

20 intervened under a different statute.  And that statute says

21 that the Attorney General may intervene -- for or in the name

22 of the United States may intervene in such an action.  But it's

23 the Attorney General who may bring the civil -- I messed up,

24 Judge, okay?  Let me go back.

25      In the case they cite for U.S. vs. New York, it's -- the

1   statute says the Attorney General may bring a civil action.

2   The statute they used here says the Attorney General for or in

3   the name of the United States may intervene.  So the United

4   States is the party for you here.  In the case they cite, the

5   statute says that the Attorney General may bring a civil

6   action.

7        So that's why we think it's perfectly fair game to say the

8   United States includes more than just the lawyers.  We have an

9   agency here who, as U.S. vs. UBS Securities, says, is informing

10  the policies, rules, and regulations that the executive branch

11  sets.

12            THE COURT:  Why don't we switch sides real quick, and

13  then I will bring you back up, Mr. Davis.

14            MS. MURPHY:  Good morning, Your Honor.  Amie Murphy on

15  behalf of the United States.

16            THE COURT:  Good morning.

17            MS. MURPHY:  Your Honor, I just want to begin by

18  addressing some of the points that defendants made about the

19  case law.

20       It's true that the cases that the United States cited are

21  a bit thin.  But they come to the right result, that the United

22  States -- when the Attorney General intervenes on behalf of the

23  United States, he doesn't do so on behalf of the entire federal

24  government.

25            And a point about the cases that defendants cited, when

1   read together, it makes clear that it's not simply that the

2   Attorney General has intervened in these particular

3   circumstances.  What's required is that party discovery is

4   allowed when these non-party agencies have been heavily

5   involved in the litigation, either through because there was a

6   joint investigation, or they were part of the investigation, or

7   part of the litigation of the case.  And that's simply not the

8   case here.

9        Your Honor, up until this point, HHS has not been involved

10  in the case.  We've simply relied on some of their research

11  that they funded in some of our pleadings.  And that's not

12  enough to make them subject to party discovery.

13       The issue, the threshold question here is whether or not

14  HHS -- whether or not the Attorney General has custody and

15  control of the documents.  And he simply does not.

16       Like I said, we have cited some of the research that they

17  funded, but the connection stops there.

18       This concept is not unique to the federal government.  If

19  you look at in the private sector, if someone was hurt at a

20  Walmart, they can sue Walmart, but it doesn't subject all the

21  Walmart subsidiaries to party discovery.  You can't get

22  discovery from jet.com, you can't get discovery from Sam's

23  Club, all because you sued Walmart.  It's the same with the

24  federal government.

25       If Your Honor would like, I can move on and talk a little

1  bit about relevance, because I think that's important here,
2  too.

3      So far, up to this point, the United States has produced
4  approximately 2.5 million pages of documents.  2.3 million of
5  those documents have been over the United States' own
6  objections, and they were on behalf of HHS.

7      Now, to be clear, those 2.3 million documents consisted of
8  an administrative record, which had already been compiled and
9  produced in another lawsuit where the rule-making process
10 itself was at issue.

11     So since it had already been produced, the burden to
12 produce it here was not very great.  And we did it, because as
13 we told defendants repeatedly throughout the meet and confer
14 process, if they could just narrow the scope of their requests
15 and tell us what it is that they actually wanted, we were open
16 to facilitating a production on behalf of HHS in order to keep
17 this case moving along, for efficiency, and in the interest of
18 cooperation.

19     But here's the problem, Your Honor.  What defendants say
20 they want with respect to the evidence, which is evidence
21 related to the safety and efficacy of the treatments at issue,
22 what -- their requests actually demand far more than that.

23     And I am not even talking about all 45.  I'm talking just
24 about the ones, the 14 that are the subject of this motion.

25     So I can give you some examples.  For instance, request

number 6 asks for every type of document or communication

regarding transitioning.  Not the safety and efficacy of the

treatments related to transitioning, but just the very notion

of transitioning itself.  That's far more than what defendants

have said that they want.

Other requests, such as request number 18, that refers to

a specific study.  But then, in addition to wanting every type

of communication and document, they also want a long list of

types of documents that the United States believes does not

bear on the outcome of this case.

For the first time in their reply brief, defendants

offered that what they want with respect to requests 18, 19,

and 20 is actually a little bit different.  And so what they

say is that they want to understand the process behind the

study's development and implementation, to ensure that the

studies fairly and accurately portray the information that is

in the possession, custody, and control of HHS.

So if I understand that correctly, on the one end,

defendants want -- defendants' justification for wanting these

documents is that so their experts can critique the studies.

And on the other end of the spectrum, they want these documents

so that they can show that HHS, a government agency, is

potentially hiding something.

But on that latter point, Your Honor, defendants have put

forth no evidence in this case that indicates that any of the

1   research that's been funded by HHS misrepresents the real

2   picture.   HHS is not on trial here, and there's no basis for

3   that theory.

4        On the other end, there is simply no need for them to have

5   the underlying documents for their experts to critique any of

6   the HHS-funded studies.  The studies speak for themselves.  And

7   each study includes information within it that their experts

8   can use to analyze it.

9        It includes information on the methodology.  It includes

10  information on whether there were any conflicts.  It also

11  includes information on funding sources.

12       So my last --

13            THE COURT:  I'm assuming that not every single thing

14  in an underlying document would wind up in the published study.

15            MS. MURPHY:  I'm sorry, Your Honor.  Can you --

16            THE COURT:  So why would it not be helpful for the

17  State to be able to see the underlying documents to understand

18  what made it into the study results and what didn't?

19            MS. MURPHY:  Sure.  Your Honor --

20            THE COURT:  If they only have the study, then, you

21  know, they're just getting the headline.  So can you address

22  that for me a little bit?

23            MS. MURPHY:  Sure.

24       Your Honor, I mean, it's -- we are of the opinion that the

25  studies speak for themselves.  And some of the documents that

1   they've requested go far beyond what would ordinarily be used

2   to critique a study -- the funding sources, meeting minutes,

3   board meeting minutes.  All of those seem irrelevant to the

4   outcome of the study itself.

5          THE COURT:  So, I mean, is there anything that you

6   would concede behind the study should be discoverable?

7          MS. MURPHY:  Sure.

8     Your Honor, I think that there's definitely room for

9   compromise on a lot of these requests.  Specifically the ones

10   where they've specified studies and they've -- if -- we can

11   probably have a discussion about what documents we -- the HHS

12   could produce.

13          THE COURT:  Well, it just seems to me I can make a

14   study come out any way I want it to.  I'm not saying that's

15   what happened here.  But I've been around 53 years, and I've

16   certainly seen studies that came out that were one-sided on a

17   variety of issues.

18     So if you -- you know, I can tell you as we sit here today

19   I would think that it would be very relevant, you know, the

20   decision making that went into how these studies arrived at the

21   result.

22     So, you know, I know there can be some quibbling about,

23   you know, which exact items should be included in that, but

24   just to say you can only have the study, that seems to be --

25   that seems to be drawing the line too far to one side.

 1            MS. MURPHY:  Sure.

 2        And, Your Honor, I think one of the problems we have is

 3    that a lot of the documents underlying the studies that

 4    defendants have requested would most likely be protected by the

 5    deliberative process privilege.  And so I think there is -- the

 6    documents are going to fall on a spectrum.

 7        There's going to be some that I think, as Your Honor

 8    points out, are probably relevant to the outcome of the study

 9    and may assist in them analyzing the study.  On the other end

10    of the spectrum, there's things like e-mails and internal

11    communications that the disclosure of which would violate

12    deliberative process.  And that's what we're most concerned

13    with.

14        And the reason why that's important, Your Honor, is

15    because what makes studies of high quality is the ability for

16    the employees and the researchers to have frank discussions, to

17    have the ability to speak up to say -- you know, to question

18    the evidence, to question the underlying data.  But if those

19    documents are subject to discovery, they're unable to have

20    those frank communications.

21            THE COURT:  So do I hear you saying today that

22    whatever the result of this, that DOJ will facilitate discovery

23    with HHS?

24            MS. MURPHY:  Yes, Your Honor.  I mean, we've told

25    defendants all along that we've been willing to facilitate a

 1  production on behalf of HHS, despite the fact that we don't --
 2  we are not legally obligated to do so.
 3          THE COURT:  So based on what I have kind of given you
 4  as my thoughts on this, what items would you now say, hey, yes,
 5  we think this should be discoverable?  Tell me the items you
 6  think, yes, I'll go to HHS and I will get these things for
 7  them, but, Judge, these three things, or whatever, we don't
 8  think we ought to discuss.
 9          MS. MURPHY:  I think -- it's hard for me to name
10  specific documents, Your Honor, since I -- I can come up with
11  some examples, maybe, from the list.
12          THE COURT:  Would it help if we took another
13  five minutes and let you confer with your folks on that?  I'm
14  just trying to find a way to solve our issue today if we can.
15          MS. MURPHY:  Sure.
16      Your Honor, I think part of the issue is that simply
17  there's such a variety of documents that are out there.  You
18  know, if we could take e-mails, internal communications off the
19  table, I think that would -- that would really narrow down.
20  And it would also make our searches for documents much more
21  efficient.
22          THE COURT:  So, Mr. Davis, I will ask you that
23  question on the other side.  Are there certain documents that
24  you can live without?  Say, hey, we need these top eight items,
25  or --

```
 1            MR. DAVIS:  I don't know what's there, Judge.  We do
 2   think it important -- I don't know if you want to take the
 3   break now, or if you want to hear my response to some of this
 4   stuff.
 5            THE COURT:  Yeah.  Go ahead and give me your response,
 6   and then --
 7            MR. DAVIS:  It sounds like the issue of whether HHS is
 8   part of the United States is sort of moot.  If you order it --
 9            THE COURT:  That's what I gathered.
10            MR. DAVIS:  All right.  Let me skip to the importance.
11      My friends said we haven't shown that there might be
12   something behind the study, but our response on the
13   interrogatory motion, Doc 267, page 7, talks about the Chen
14   study.
15      This is a study that the experts for the plaintiffs and
16   the United States rely on.  And this is where -- we think it
17   critically important that we get, just like with WPATH, we get
18   to peek behind the study of this.  The four corners doesn't
19   tell you everything.
20      This will take just a second, but I want to lay this out.
21   That study started when the some authors or people who wanted
22   to do the study in 2015, they issued a protocol.  They said
23   this is what we want to study, somebody please fund it.
24      And what they said they wanted to do was create a body of
25   evidence supporting gender-affirming care by measuring how
```

1    children performed over time.  They wanted to see how children

2    getting these treatments did in eight areas.  And that included

3    gender dysphoria, depression, anxiety, trauma symptoms,

4    self-injury, suicidality, body esteem, and quality of life.

5    That's what we're going to study.  HHS decided to fund the

6    study.

7         Two years after they started the study, the authors came

8    back and they published a paper.  And they said good news, the

9    treatments work.  The children who are getting these treatments

10   are improving in two areas.

11        They say nothing about the other six.  They say nothing

12   about why they chose not to disclose anything about how the

13   children were doing in those other six areas that they said

14   they were going to measure.  We don't know what happened.

15        But somebody at HHS has been getting data, reviewing

16   progress updates.  We need discovery to see what happened with

17   that study.  What are we not being told as a result of these

18   ongoing experiments on children?  I can't tell you exactly what

19   we need to show that, because I do not know what is there.

20        The deliberative process privilege does not protect facts.

21   We need facts.  I can't say if there are e-mails that are not

22   protected by the deliberative process privilege or not because

23   I don't know what's there.

24        If you want us -- well, I think that is what I wanted to

25   explain to the Court about that.  I don't know -- we think we

1   need an order granting our motion to compel.

2       If there are particular areas that they want to talk

3   about, we'll talk about it.  If there are particular areas that

4   they weren't aware of at this time that would be unduly

5   burdensome in their view, and they want to say, hey, we just

6   discovered that if we do this, that's going to be too much, we

7   need to narrow this a little bit, we are open to those

8   discussions.

9       But we have got expert reports due next month.  We've been

10  litigating this case for a long time.

11      We ask for an order granting the motion to compel.  If

12  there are issues they want to talk about, wrinkles we need to

13  iron out, we will work on that.  But we need them to start

14  giving us some of this stuff quickly so our experts can start

15  reviewing it.

16          MS. MURPHY:  Your Honor, the point that I wanted to

17  make is simply that right now, as the requests are written,

18  they're way to overly broad for us to have a meaningful

19  discussion with HHS about what documents are relevant.

20      If defendants -- if we can have a productive discussion

21  with defendants where they can identify particular documents

22  that they want, and we can find them, but so far we haven't

23  been able to do that.  So far what defendants have said is that

24  they simply want to use search terms to alleviate the

25  burdensomeness.  But we are not there yet.

1        Search terms are a good tool to use once the requests

2   themselves have been narrowed to the scope of permissible

3   discovery.  We're simply not there.  We're still unable to

4   figure out what some of these requests are really asking for,

5   and what documents they want.

6        We can have a discussion about what documents might be

7   useful for each of these studies.  But I also wanted to point

8   out that these are studies that are funded by HHS.  So some of

9   the documents they may have control over, and some of the

10  documents they may not.

11       Funding documents, probably yes.  But some of the other

12  documents, like meeting minutes, notes from meetings, they may

13  not have custody and control over.

14       So once we're able to narrow the requests and understand

15  what it is that we're looking for, then we can have more

16  productive discussions about what we can offer to respond to

17  the requests.

18            THE COURT:  So, you know, I would say this:  At least

19  from what I'm hearing today, DOJ's position on facilitating and

20  meeting and confer seems to be vastly different than what the

21  State said in its pleadings.  You know, what I gathered from

22  what the State said in its pleadings was they tried to talk to

23  you guys, but hit a dead end.  Can you help me reconcile that?

24            MS. MURPHY:  Your Honor, we've produced 2.5 million

25  pages of documents.  As I said before, 2.3 of those were an

1    administrative record.  So it's -- it was something that was

2    not burdensome to produce.

3             THE COURT:  You're talking about things from HHS?

4             MS. MURPHY:  Pardon me?

5             THE COURT:  Have you produced anything from HHS?

6             MS. MURPHY:  The administrative record -- so the

7    2.3 million documents were on behalf of HHS.  It was an

8    administrative record that had already been compiled for the

9    purposes of another lawsuit.  It was compiled and produced.

10        So -- and specifically, what the administrative record

11   includes are documents that the agency considered when, in its

12   rule-making process for the 2020 regulation, related to the

13   Section 1557 of the Affordable Care Act.

14        So these are all documents that the agency considered.

15   But notably, Your Honor, when compiling an administrative

16   record, HHS doesn't include internal memos, e-mails, stuff that

17   is otherwise privileged, because, in their view, it's something

18   that's not considered.

19             THE COURT:  All right.  I think I have probably heard

20   what I need to on this.

21             MS. MURPHY:  Okay.  Thank you, Your Honor.

22             THE COURT:  Uh-huh.

23        Was there anything else anybody wanted to say regarding

24   the interrogatories?

25             MR. DAVIS:  No, Judge.  I think the same argument

```
 1    applies on the interrogatories.  What we've lined up -- we have
 2    narrowed it down significantly.  And those -- the ones that are
 3    still an issue you'll find at Doc 259 at pages 2 and 3.
 4         The information at HHS is as available to the Department
 5    of Justice as HHS documents are.  And if it's in their hands,
 6    it's reasonably available, and they need to use that
 7    information from HHS to respond to our interrogatories.
 8              THE COURT:  Well, and as I understand it, you know, I
 9    hear DOJ saying regardless of whether -- I mean, do I even need
10    to determine whether or not HHS is the same thing as the United
11    States for the purposes of discovery?  Or are you just telling
12    me, hey, that's moot, Judge, we're going to get it for them?
13              MS. MURPHY:  Your Honor, I don't think that you have
14    to decide that issue since we have agreed to produce documents
15    on their behalf.
16              THE COURT:  And I appreciate your willingness to do
17    that.  I do.
18         Okay.  Anything else the government wants to say about
19    this?
20              MS. WILLIAMS:  Your Honor, Renee Williams for the
21    United States.
22         We had -- excuse me.  Good morning, Your Honor.
23              THE COURT:  Good morning.
24              MS. WILLIAMS:  Renee Williams for the United States.
25         We had -- my colleague and I had decided to split up the
```

1  argument related to the interrogatories and the requests for

2  production.  Just one quick point, Your Honor, because I think,

3  as you have mentioned, you know, we have covered a lot of

4  ground.

5      With respect to what -- I believe Mr. Davis was talking

6  about the Chen study that he referred to, and how, you know, in

7  defendants' view there was some deficiencies there as they've

8  characterized it.

9      We would just submit, Your Honor, that the defendants were

10  able to do that analysis with the study itself.  They were able

11  to review the study, review the -- I believe it was the

12  protocol, and, you know, compare the two and see, oh, okay,

13  well, there are some things in the final study that were not

14  there that were promised.

15     And so we would just submit, Your Honor, that that's

16  exactly why we think that the studies stand for themselves.

17  And so our experts, the defendants' experts would be able to

18  make those assessments.  And if, you know, if the studies are,

19  you know, in any way deficient, then, you know, the four

20  corners of the study wouldn't allow the parties to make those

21  determinations and arguments to Your Honor.

22     So that's just -- I just wanted to make that note, with

23  respect to those particular -- that study that was referenced.

24     Thank you, Your Honor.

25        MR. DAVIS:  I can look at the study and know

1  something's missing, but I don't know why.  And I don't know

2  what the missing part says.  I don't know if the kids were

3  doing worse in those other six areas.  I don't know.

4       Just like with WPATH, we need to peek behind the curtain

5  at some of these studies so you can see at trial whether the

6  evidence -- whether what you heard at the preliminary

7  injunction hearing was correct, whether you were told the full

8  story at the hearing.

9       We think there's a whole lot more if we get the chance to

10  look behind the curtain of some of these things.  So we ask

11  that you grant both motions to compel.

12           THE COURT:  All right.  We've covered a lot of ground

13  today.  I appreciate the arguments of all the parties.  And we

14  will get an order out.

15       Anything else we need to cover today?

16       All right.  Nobody sees any -- do we see any discovery

17  issues that are about to break through the surface of the

18  water, or no?

19           MR. DAVIS:  Jim Davis for the defendants.

20       I'm not aware of anything.  We are just anxious to get

21  some productions going so that we can get our experts some

22  material.  I don't -- but at this time, I don't know of

23  anything else.

24           THE COURT:  All right.

25           MS. MURPHY:  Nothing on behalf of the United States,

1  Your Honor.

2            THE COURT:  Okay.

3            MR. LACOUR:  Your Honor, the only other thing I would

4  note is the motion that was argued back in February on the

5  plaintiffs' medical records, we are still hoping to get those

6  medical records so we can review them, have our experts review

7  them.  Our expert reports are due April 10th, I believe it is.

8  And then set up depositions of the plaintiffs.

9            THE COURT:  Roger.

10      Okay.  We're adjourned.  Thank you.

11

12            (Whereupon, the above proceedings were concluded at

13      11:32 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

     I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.




03-23-2023

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255