1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
2                     NORTHERN DIVISION

3

4      BRIANNA BOE, et al.,          *
                                     *
5             Plaintiffs,            *   2:22-cv-00184-LCB
                                     *   May 22, 2023
6      vs.                           *   Montgomery, Alabama
                                     *   10:00 a.m.
7      STEVE MARSHALL, et al.,       *
                                     *
8             Defendants.            *
       ****************************

9

10

11              TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE LILES C. BURKE
12              UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
23      and Procedures Vol. VI, Chapter III, D.2.  Transcript
                 produced by computerized stenotype.

24

25

                 *CHRISTINA K. DECKER, RMR, CRR*
                  Federal Official Court Reporter
              256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                        <u>APPEARANCES</u>

2

       <u>FOR THE PLAINTIFFS</u>:
3      Jeffrey P. Doss, Esq.
       LIGHTFOOT, FRANKLIN & WHITE, LLC
4      The Clark Building
       400 20th Street North
5      Birmingham, Alabama 35203

6      Coty Rae Montag, Esq.
       DOJ-Crt
7      Civil Rights Division
       150 M Street NE
8      4con
       Washington, DC 20002
9      202-598-1580
       Email: Coty.montag@usdoj.gov
10
       Jason R. Cheek, Esq.
11     U S Atty Office - NDAL
       1801 Fourth Ave N
12     Birmingham, AL 35203
       205-244-2104
13     Email: Jason.cheek@usdoj.gov

14     Kaitlin N Toyama, Esq.
       United States Department of Justice
15     Civil Rights Division
       950 Pennsylvania Avenue, NW
16     Washington, DC 20530
       202-353-5311
17     Email: Kaitlin.toyama@usdoj.gov

18

       <u>FOR THE DEFENDANT</u>:
19     James W. Davis, Esq.
       Edmund LaCour, Esq.
20     Alexander Barrett Bowdre, Esq.
       OFFICE OF THE ATTORNEY GENERAL
21     501 Washington Avenue
       P.O. Box 300152
22     Montgomery, Alabama 36130-0152
       (334) 242-7300

23

24

25

                    ***CHRISTINA K. DECKER, RMR, CRR***
                    Federal Official Court Reporter
               (256) 506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1          AMICI:
            Barry Alan Ragsdale, Esq.
 2          Robert Vance, Esq.
            Dominick Feld Hyde, P.C.
 3          Litigation
            1130 22nd St S - Ste 4000
 4          Birmingham, AL 35205
            205-536-8888
 5          Email: BRagsdale@dfhlaw.com

 6          Cortlin Hall Lannin, Esq.
            COVINGTON & BURLING LLP
 7          Salesforce Tower
            415 Mission Street
 8          Suite 5400
            San Francisco, CA 94105
 9          415-591-7078
            Email: Clannin@cov.com
10

11

12

13
            COURTROOM DEPUTY:  Wanda Robinson
14

15
            COURT REPORTER:  Christina K. Decker, RMR, CRR
16

17

18

19

20

21

22

23

24

25
```

1                   **P R O C E E D I N G S**

2                  (In open court.)

3           THE COURT:  All right.  Good morning.  Who wants to

4  address the State's motion on the scheduling order?

5           MR. BOWDRE:  For the State, I would like to do that.

6           THE COURT:  All right.

7           MR. BOWDRE:  Thank you.

8       Thank you, Your Honor.  Barrett Bowdre on behalf of the

9  State defendants.

10      We take no pleasure in coming to this Court asking for an

11  amendment to the scheduling order.  It is the State's law that

12  is being enjoined from being enforced.  And we want to go to

13  trial and provide the evidence that this Court needs.  That we

14  think once we do that, we think the Court will agree to lift

15  the injunction.

16      But we are in a frustrating position, in that we sent

17  discovery requests to HHS and WPATH seven and eight months ago,

18  and we still don't have that discovery.  And the Court has

19  recognized that that discovery is really, really important to

20  our case.  It has recognized that without that discovery we

21  would be going to trial with a hand tied behind our back.  And

22  so it has rightfully ordered HHS and WPATH to produce that

23  discovery.

24      And since the Court's order --

25           THE COURT:  Quick question.  Just so you can address

1   this, and you probably are, anyway.

2       Is the State's time frame or scheduling affected at all by

3   the last ruling we had on the interlocutory appeal?  Does that

4   change any of your -- or do we still think March is when you

5   want it to be?

6       MR. BOWDRE:  Your Honor, I think March -- well, I

7   guess two responses.

8       First, is the proposal that we have is our best idea.

9   We're not wedded to those dates.  But we do think that

10  specifically, with regard to HHS, that that amount of time is

11  probably necessary for them to give us a complete production.

12      And in the HHS's filing on Friday, they said that they

13  hope to be able to start production by June 30th, which, of

14  course, is the current deadline for producing all discovery.

15      As to WPATH, we think that there are a couple of ways that

16  we can move forward quickly.  I mean, one is that this Court

17  can order WPATH to produce the hard drive that WPATH told the

18  Court in March they had ready to go.  We still don't have that

19  hard drive.  We have received zero documents from WPATH after

20  this Court's order.

21      And then we are in negotiations about custodians and

22  search terms, with regard to our request that don't -- that go

23  beyond the Standards of Care 8.

24      And I am happy to address that further, if you would like.

25  But I think --

1           THE COURT:  No.  Go ahead and address it.

2           MR. BOWDRE:  Okay.  So with regard to WPATH, we think

3    there are -- there are two issues that we have run into with

4    WPATH.  One is that we have not received any of the discovery

5    that they say they have ready to go, with regard to how they

6    created the Standards of Care 8.  And they say that they will

7    not and have not used custodians and search terms to find those

8    documents, but have done a different method and have that ready

9    to go.

10        We are -- we tend to think that custodians and search

11   terms would be appropriate, but we are willing to look at what

12   they have, and then go from there and see if we think that is a

13   complete production or not.

14        But then there are all these other requests that we have

15   not heard anything from WPATH about how they plan to address

16   those and how they plan to file -- find the responsive

17   documents.  And those requests go to questions about the

18   organization's reaction to members' concerns about pediatric

19   transitioning care in America, and whether WPATH is quashing

20   those concerns and quashing people who speak up.  And we have

21   evidence to suggest that they are.

22        We have the cancellation of Dr. Ken Zucker's panel

23   discussion, that we have talked with this Court about, at the

24   2017 USPATH conference.  We have leaders from, or former

25   leaders from WPATH going public with their concerns over

1  pediatric transitioning in America.  And WPATH issues a

2  statement saying, Don't speak to the press.

3       And so we think that the e-mails that go into those public

4  statements are really, really important, that those e-mails,

5  those message board posts are the things that are going to

6  provide evidence about whether WPATH is actually quashing

7  dissent within the ranks, or whether it's, as it seems to

8  indicate, really open to the science.

9       And so we have proposed a list of custodians to WPATH.  We

10 proposed a starting list of ten custodians for them to

11 consider, and hopefully for us to have a discussion about

12 whether these custodians work, or whether they think other

13 people might be the correct entities to search their e-mails

14 and computers.

15      But instead of having that conversation, WPATH came back

16 and said, no, we're not going to use any custodians or any

17 search terms.  And they gave two reasons.  One is that the

18 custodians that we suggested are either they don't have control

19 over those persons' e-mails, or those persons are not likely to

20 have responsive information.  And I want to break those out

21 into those two categories.

22      So we provided two sets of custodians.  One, we had a

23 number of five custodians that work for WPATH.  They have WPATH

24 e-mail addresses.  They are the administrative arm of WPATH.

25 They run WPATH day to day.  That's our understanding.

1       And some of these custodians -- two of them are

2 specifically listed in the back of the Standards of Care 8 as

3 providing administrative support for Standards of Care 8.  So

4 we figured those two people would be likely candidates to have

5 useful information, responsive information, with regard to how

6 Standards of Care 8 was created.

7       Some of the other custodians that again work for WPATH or

8 for the administrative agency that runs WPATH are seen on video

9 after Dr. Zucker -- after the cancellation of Dr. Zucker's

10 panel, the 2017 USPATH conference, and they're seen on video

11 responding on behalf of WPATH to the protesters who interrupted

12 the panel and made him not able to speak.

13       So those two people we think obviously have responsive

14 documents to at least that instance, and they likely have

15 responsive documents to others.  And yet WPATH's response is,

16 no, these people are not likely to have responsive documents at

17 all.

18       The other category of custodians that we have suggested

19 are leaders within WPATH who have long been involved with WPATH

20 and their positions and their public statements and the

21 Standards of Care 8.  These are people who either serve or have

22 served on the board of directors, or who have been the

23 president or senior leadership of WPATH, and often are also

24 authors of Standards of Care 8.  There's a lot of overlap

25 between the leadership and the creation of the standards.

1          And so we chose five of the authors and leaders that we

2   thought would have the most responsive information with regard

3   to pediatric and adolescent transitioning.  That's what we're

4   after.  And their response to that was, well, those people

5   don't have WPATH e-mail addresses and so we cannot search

6   those.

7          And, of course, if that were the standard, Walmart would

8   be pretty well advised to make sure that its senior leadership

9   and board of director members also don't have Walmart e-mail

10  addresses, and instead conduct Walmart business over their

11  personal gmail accounts so Walmart doesn't have to conduct

12  discovery.

13         Of course, that's not the standard.  And the question is

14  whether they have control over these -- over these e-mails, and

15  whether they have the legal right to ask for the e-mails.

16         And yet WPATH has not even offered to ask those custodians

17  that we have suggested for the responsive e-mails that are

18  related to WPATH and related to the requests that we have asked

19  for.

20             THE COURT:  I think I have got what I need from you on

21  that issue -- your argument combined with what you have put

22  forward in your pleadings.

23             MR. BOWDRE:  Okay.

24             THE COURT:  So let's talk scheduling, then, for a

25  little bit.

1          MR. BOWDRE:  Yeah.

2       So we have proposed a schedule.  Like I said, we are not

3   wedded to those dates, but we do think that there are two

4   important components of any schedule this Court enters.

5       And the first is that there needs to be a date certain by

6   which HHS and WPATH produce a full and complete set of

7   discovery responses.  We think that that is important to give

8   them enough time to do a complete production.  We don't think

9   it would be fair -- in fact, we think would be manifestly

10  unfair if they were able to take advantage of the time

11  exigencies that they created to do less discovery than

12  otherwise they would be required to do, and which this Court

13  has already ordered them to do.

14      But we think that they should have enough time to complete

15  that production, but that it should be a pretty tight timeline.

16  We need to hold their feet to the fire and make this discovery

17  production a priority for them.  They need to devote their

18  resources to make this go quickly.

19      And then the second thing that we think is really

20  important is that there needs to be a time period -- and we

21  think a three-month time period is sufficient -- after the

22  production from HHS and WPATH for all the other discovery that

23  has to occur that depends on that.  And so that, you know, when

24  we get the production, it will take us time to review the

25  production.

1    If the production is as big as HHS seems to have

2 indicated, it's going to take us some time to review that.  And

3 we plan to devote a lot of resources to that.  But it will take

4 time.  It will take time to --

5            THE COURT:  Let me jump ahead of you just a little

6 bit.

7            MR. BOWDRE:  Yeah.

8            THE COURT:  Why don't you -- I am not saying I am

9 going to grant these, but just so I've got this as a time

10 frame, why don't you just set for me some proposed dates -- the

11 30 day, the 90 day -- that you think things ought to happen.

12     Then I want to hear and see what WPATH and the government

13 think.

14            MR. BOWDRE:  Yes, Your Honor.

15     So our proposal is the date certain for the full

16 production is October 1.  And these dates are listed in the

17 proposed order that we submitted.

18            THE COURT:  Right.

19            MR. BOWDRE:  But it's October 1 for HHS and WPATH.

20     Defendants' supplemental reports would be due

21 November 20th.

22     Plaintiffs' rebuttal reports would be due December 18th.

23     The discovery cutoff, we propose January 19th.

24     Dispositive motions, February 9th.

25     And trial in March.

 1          THE COURT:  I'm going to give you another bite at the

 2   apple, Mr. Bowdre, but let's see what WPATH has to say real

 3   quick.

 4          MR. BOWDRE:  Yes, Your Honor.

 5          MR. RAGSDALE:  Good morning, Your Honor.

 6          THE COURT:  Good morning.

 7          MR. RAGSDALE:  I'm Barry Ragsdale on behalf of WPATH,

 8   with Cortlin Lannin, as well.

 9       A couple of things I would say, Your Honor.  First of all,

10   we obviously take no position on the scheduling of the

11   plaintiffs' and defendants' trial.  We're not a party to the

12   case, as you are well aware.

13       I would also say, Your Honor, that I am a little surprised

14   by the tone of Mr. Bowdre's presentation, and the notion that

15   we have somehow refused to comply with this Court's order.

16       We have obviously been pursuing our rights and remedies

17   under an appeal.  And, Your Honor, we intend to take you

18   obviously at your word that you would not be upset if we

19   pursued a mandamus petition on this same issue.

20       Obviously, the issues that are presented to us are

21   fundamental First Amendment issues, organizational issues that

22   we feel like we have a right to pursue that.

23       We have been --

24          THE COURT:  I have been reversed before, Mr. Ragsdale.

25          MR. RAGSDALE:  Well, Your Honor, I have failed to

1  reverse numerous judges on a lot of occasions, so...

2       And I understand that.  And I wanted to let the Court know

3  that we do intend to file a mandamus petition this week.

4       It would be -- we intend to ask the Eleventh Circuit to

5  act expeditiously on that.  They obviously get to decide how

6  expeditiously they act on it.  But certainly make them aware of

7  the fact that it is a factor factoring into this Court's

8  scheduling, as well.  That will be filed this week.

9       As far as the specifics, in terms of what we have or

10 haven't agreed to produce in those, Mr. Lannin is actually in a

11 better position to talk about that, if that is a concern to

12 this Court.  I mean, at this point, it seems to me what the

13 Court is focused on is what am I going to do with my schedule

14 and how does this fit into that schedule.

15          THE COURT:  No.  Absolutely.  And, you know, I'm just

16 looking at this.  You know, certainly we had hoped to try this

17 in August.

18      I tend to agree with the State that that's going to be

19 hard to manage at this point.  I also realize if I'm going to

20 reset it, it's going to be a two-week trial.  That makes a

21 pretty big dent in the schedule.

22      If I'm going to reset it, then I ought to probably

23 reasonably reset it with the knowledge that probably there will

24 be another discovery fight that might slow us down as we get

25 down the road.

1        And so I am inclined to reset -- I cannot do it that March

2   date, but I might be looking at April.

3        And I haven't heard anybody say, please, please don't

4   reset it.  So, you know, I'm aware of that.

5        I also -- obviously, this is a very important case.  I do

6   not want to put any of the parties in the position that, you

7   know, they did not feel like they were able to complete fully

8   discovery they thought that they might need.

9        So, anyway, with that said, go ahead with your argument.

10           MR. RAGSDALE:  Well, I'm actually done.  If you want

11   to add anything.

12           MR. LANNIN:  Your Honor, thanks again for having me.

13   And I don't have a whole lot to add.

14        I will just say this:  Mr. Ragsdale is absolutely correct.

15   We will file the mandamus and seek expedited treatment of the

16   petition.  And if the Eleventh Circuit denies our petition, we,

17   as you saw in our reply, are prepared to produce at this point,

18   nearly 8 or 900 documents that, as Your Honor hopefully saw in

19   our submission, really --

20           THE COURT:  Well, I hope you are prepared to produce

21   it now awaiting a hopeful decision from the Eleventh Circuit,

22   because I think my order is good until you get something

23   different.

24           MR. LANNIN:  We are, Your Honor.  Absolutely.

25           THE COURT:  All right.

1          MR. LANNIN:  And our intention -- and I wanted to

2    assure Your Honor that since the moment you denied our motion

3    to quash, WPATH has been working to gather those documents.

4    Many hundreds of attorney hours have been spent gathering and

5    then redacting the documents in accord with Your Honor's order.

6    So we haven't been sitting on our hands.  I just wanted to make

7    that clear.

8          And those documents are quite sensitive in our view, of

9    course, and cover every stage of the development of the

10   guidelines process.  They reflect member input on the

11   guidelines.  They reflect candid comments before the guidelines

12   even came together.  A lot of what we heard from the State

13   they're looking for is covered in this set of documents.

14         There is a discussion about e-mail custodians.  I do take

15   issue with the State's representation that we have

16   categorically refused to entertain discussions about e-mail

17   custodians.  We've been clear, and included in our reply, that

18   we would be happy to meet and confer on that issue.

19         I do agree with the State that we have some disagreements

20   about it.  I don't know that this is the right forum or moment

21   to ventilate those issues.

22         I would just preview for Your Honor that, unfortunately, I

23   think there may well be more discovery issues coming your way

24   on that issue.  We have a strong disagreement about whether

25   third-party doctors, third parties of third party at this

 1    point, if they are properly subjected to discovery for, you

 2    know, their volunteer efforts on behalf of WPATH.

 3         But, again, I don't want to rabbit hole on that now if

 4    Your Honor is -- you know, proceeds to move ahead on the

 5    scheduling front first.

 6         THE COURT:  Well, that's probably my inclination, you

 7    know.

 8         Again, though, I mean, I think the parties need to sit

 9    down and work most of this out.  You know, just in reading

10    everybody's filings, you know, and hearing the beginnings of

11    some of these arguments today, you know, it's not hard for me

12    to already kind of figure out, well, here is really probably

13    what ought to happen.

14         So, you know, everybody is a good lawyer in this courtroom

15    or they wouldn't be here.  It seems to me that everybody could

16    sit down and work through these things if we just got in a room

17    for about six hours and knocked it out.

18         You know, obviously, the next step is going to be for

19    somebody to file a motion to compel, and God knows what after

20    that.  You know, I certainly -- we can air this thing out with

21    me if you want to.  And I will figure out what's going on and

22    what needs to happen.  And I'm perfectly glad to do that.

23         But, you know, I do want to say, you know, if I have to

24    air this out, you know, there's some likelihood that I may find

25    somebody's not acting in good faith.  And who it is, I don't

1  know.

2      You know, Judge Monk in Calhoun County used to have a

3  great saying.  He said, Now, you lawyers ought to work this

4  out.  And I'm going to tell you if you make me have a hearing

5  on it, we're going to have one.  And I'm going to listen to the

6  facts and apply the law.  But he said, I'm going to tell you

7  this:  Whoever wins is going to know they won, and whoever

8  loses is going to know they lost.

9      That's probably a standard I'm not going to use.  But, you

10 know, I would say you guys ought to sit down and let's work

11 this out.  Save us all a whole lot of time.

12     Look, no doubt that WPATH is the standard, you know.  Your

13 guidelines are the standard.  And so, you know, I would say

14 generally anything that's clearly relevant to that standard,

15 you know, needs to come out one way or the other.

16     I get it on third parties.  But I bet y'all can work

17 together to find a solution, you know, to those things, as

18 well.

19         MR. LANNIN:  Very good, Your Honor.  I don't want to

20 be on the receiving end of knowing that I made a mistake, so...

21     Let me say this, Your Honor, just to be clear.  I think

22 our current intent, with Your Honor's consent, would be to

23 expeditiously produce that set of documents just as soon as the

24 Eleventh Circuit acts on our petition.  And, again, we are

25 going to ask them to move quickly because it's not our intent

1  to wait.

2       I heard this morning the State -- I thought I heard the

3  State open or express openness to reviewing those documents and

4  then coming back and entertaining a meet and confer at that

5  point about other materials that might fill gaps in their view.

6  That sounds like a process that, in fact, I think we proposed

7  the same thing in our submission.

8       That's all to say we are happy to keep talking.  I think

9  those documents, assuming the Eleventh Circuit moves as quickly

10 as we want them to, that they should be in their possession

11 within the next two to three weeks.

12       THE COURT:  So I certainly don't try to predict what

13 appellate courts will do, but how quickly have they ruled on

14 such things in the past?  Educate me.

15       MR. LANNIN:  The best example I have, Your Honor, is

16 in a case in Florida that also concerns this type of issue, the

17 district court ordered a deposition to proceed of the

18 administrator of Florida's health and -- basically, the HHS of

19 Florida, the Medicare agency.  And the State had moved for a

20 protective order citing the Apex Doctrine.  The district court

21 overruled it and mandated the deposition to proceed.  And the

22 State moved for mandamus with the Eleventh Circuit.

23       And, again, I'm -- don't quote me on this, but I believe

24 they acted within weeks.  And in the submission, in the writ,

25 the State had acted -- or had asked that the Eleventh Circuit

 1  to move quickly, and they did so.

 2       So I'm afraid it might mean that the State has an

 3  expedited deadline to oppose the writ.  I think that's probably

 4  likely.  But I don't think any of the arguments will be

 5  particularly novel or new.  And so hopefully, you know, there's

 6  material they can live with there.

 7            THE COURT:  All right.  And I think Mr. Ragsdale said

 8  WPATH has -- obviously, y'all don't care what the dates are in

 9  this proposed order.

10            MR. LANNIN:  We do not, Your Honor.

11            THE COURT:  All right.  Anything else from WPATH?

12            MR. LANNIN:  No, sir.

13            THE COURT:  All right.  Well, let's hear from the

14  private plaintiffs, and then the government.

15            MR. LANNIN:  Thank you, Your Honor.

16            MR. DOSS:  Your Honor, the only thing that I would add

17  on behalf of the private plaintiffs is if a trial is likely to

18  occur in April, if that's what's available for the Court, if

19  the parties could have an opportunity within the next week or

20  so to confer on a proposed schedule backed out from that trial

21  date about the interim deadlines, like the expert disclosures,

22  and the fact cutoff, and that sort of thing, and then propose

23  it to Your Honor based on that trial date.  That would be the

24  only request on behalf of the private plaintiffs.

25            THE COURT:  A reasonable request.

1          MR. DOSS:  Thank you, Your Honor.

2          THE COURT:  Uh-huh.  Uh-huh.

3      Government?

4          MS. MONTAG:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MS. MONTAG:  Coty Montag on behalf of the United

7  States.

8      Since the Court issued its March 27th order, the United

9  States has endeavored to comply with the order as efficiently

10  and diligently as possible.  And we have operated in good faith

11  throughout this process.  We just want to let you know that

12  compliance with the Court's order is of utmost priority to the

13  United States' counsel in this case.

14      The United States does not oppose an extension of the

15  schedule in this case, and we do not take issue with the

16  specific dates proposed by defendants.  Having an opportunity

17  to meet and confer would be useful, as suggested by the private

18  plaintiffs.

19      What we're asking the Court to do is set parameters on the

20  method for HHS's document production so that we can get

21  defendants the documents they assert they need as quickly as

22  possible.  And we've set this out in our brief.  I would be

23  happy to go over it briefly for you.

24          THE COURT:  No.  I have read it.  I am familiar with

25  the differences between each of your proposals for searches.

1           MS. MONTAG:  Okay.  Well, we'd ask the Court to adopt
2  the proposal set forth by HHS.
3       And I did want to note here today, just to show how
4  seriously we're taking this, we do have representatives from
5  HHS here, including the chief information officer, Dr. Karl
6  Mathias.
7       And so we just wanted to express to the Court how
8  seriously we're taking this.  And in order for HHS to meet its
9  discovery obligations, we'd ask the Court to adopt the proposal
10 set forth by the United States.
11          THE COURT:  And while we're on that, Mr. Bowdre, why
12 don't I let you address specifically that HHS proposal again.
13      And I will bring you back up again.
14          MS. MONTAG:  Okay.
15          MR. BOWDRE:  Thank you, Your Honor.
16      I think the main point is that we think the proposal is
17 premature for this Court to act on.  Friday was the first time
18 that we heard of the United States' proposal to limit eleven
19 custodians and ten narrow search terms.
20      We think that -- or we thought that we were getting to a
21 place of good compromise with regard to the search terms.  And
22 I think that if we have a little more time we can -- we can at
23 least move forward and clarify where our disagreements are.
24      With that said, we do have --
25          THE COURT:  So do I hear you say give us a few weeks

1    to address this more, and then we may come back to the Court?

2          MR. BOWDRE:   That is our request.

3      And I think it might make sense to go on and put us on the

4    calendar, if that's available, for three weeks, four weeks from

5    now, to take up the specifics of the parameters that you --

6    that this Court might want to set for the HHS discovery.

7      I'm happy to address some of our broad concerns.  We did

8    so briefly in the reply brief.

9      We don't think, for instance, that the eleven search terms

10   is very useful and -- or very appropriate.

11         THE COURT:   Just for argument's sake --

12         MR. BOWDRE:   Yeah.

13         THE COURT:   -- let's say you do it that their way

14   first.  And then you look at it and you say, well, clearly

15   there are holes in this, now let's try my way.  Address that

16   for me.

17         MR. BOWDRE:   I think -- I think one problem is, given

18   the process that HHS uses, I think that would set us back

19   another six months.  That if we don't come up with a good

20   framework at the beginning, it's really hard to go back, I

21   would assume, and get another bite at the apple and ask for

22   more, given how long it takes evidently for them to run

23   searches and the different divisions that are siloed out from

24   one another from HHS.

25       I do think it makes sense for us to have this conversation

1  now, maybe not today, but in three weeks, and to work through
2  some of this and come to an agreement on those sorts of things.
3       But, again, we do have really serious concerns about
4  limiting it artificially to ten narrow search terms.  We don't
5  think that's an efficient way to move forward.  And that's not
6  our understanding of how -- of how best to use search terms.
7       Because I guess our understanding is that if you are
8  looking for the universe of documents that are likely to be
9  responsive, just like in Westlaw searching, you want some sort
10 of broader search terms, and you want some really narrow ones
11 to grab the specific things that you are after, and so some
12 combination would be useful.  And it's not necessarily the case
13 that fewer search terms necessarily means less work or -- or
14 fewer documents on the output side.
15      We also have concerns with the network drives proposal.
16 Our understanding is that the network drives encompasses
17 anything that's not e-mail.  So it's all the documents, all the
18 papers that the HHS staff have on their computers.
19      And HHS says that adding in the subjective human element
20 has benefits.  And I don't doubt that it has some benefits.
21 But it also has some really true costs to that, as well, that
22 it removes any sort of objective standard and objective check
23 to make sure that we are getting documents that maybe the HHS
24 workers weren't there when they were created, and so they just
25 don't know about.  Or maybe as they are subjectively

```
 1   interpreting our requests, they are interpreting it very
 2   narrowly and don't produce the documents that are, you know,
 3   the ones that might be most helpful and useful and responsive
 4   to the requests.
 5        So we have concerns about their proposal.  But, again, I
 6   this it's premature for this Court to rule on that today.
 7             THE COURT:  So you want me to convene basically
 8   another status in 30 days to talk about this, and give the two
 9   of you a chance to exchange ideas and come up with a plan?
10             MR. BOWDRE:  Yes, Your Honor.  That would be our
11   suggestion.
12             THE COURT:  All right.  Have you -- I know we have HHS
13   attorneys in the courtroom today.  Have you previously had a
14   chance to sit down with them in person?  Or just --
15             MR. BOWDRE:  Not in person.  And we are happy to do
16   that today.
17        We have had hours and hours of phone calls.  And I think
18   since the Court's order very productive phone calls.
19        And, frankly, if we had been having those phone calls
20   seven months ago, I don't think we would be in the position
21   that we are today.
22        So I think we are moving forward.  We are making progress.
23   And I think if the Court gives us a little more time, we can at
24   least tee up the issues in a much more narrow way for this
25   Court to rule on.
```

1              THE COURT:  Does HHS desire to be heard from today?

2              MS. MONTAG:  Your Honor, if I could just address a few

3    points.

4         So on the e-mail searches for custodians and search terms,

5    we can continue to negotiate with defendants.

6         And I do want to make clear that HHS's counsel has been

7    participating in those conversations.  So HHS has been able to

8    talk directly to defendants in those conversations.

9         As we set forth in our brief, there is a burden, the more

10   search terms that are used, because of the way HHS's operating

11   systems are set up, what the parties have agreed to is that HHS

12   will collect documents from nine separate operating divisions,

13   which employ 47,000 people.  And every time search terms are

14   run, they have to be run one at a time across each operating

15   division.

16        And so we're more than happy to continue to meet and

17   confer with defendants on this, but did want to point out there

18   is a burden associated here.

19        I also would just like to briefly address this manual

20   collection method that we're calling the go-get method.  This

21   is the procedure that HHS customarily uses when compiling an

22   administrative record.  This is not novel.  This is not

23   something we have developed just for this case.  This is what

24   they typically do, including in litigation.

25        And so it's a very reasonable method.  There are quality

1    control measures to ensure that the process is documented from
2    start to finish.
3              THE COURT:  So I think I heard Mr. Bowdre say, well,
4    you know, you may miss things some that way.  And I think maybe
5    he said in a very gentle way that the human element might --
6              MS. MONTAG:  Sure.
7              THE COURT:  -- exclude certain things that he wanted.
8    Address those things.
9              MS. MONTAG:  So we -- if there's anything missing, we
10   can go back and address those deficiencies.  We think this is
11   the fastest method, because actually it can begin immediately.
12             THE COURT:  How fast?  So if you start this tomorrow,
13   when is it done and when is this all in their hands?
14             MS. MONTAG:  So for the network drives, HHS
15   anticipates today -- that if it started today, it would take
16   four months from start to finish, which is the fastest, you
17   know, that we can -- that we can do.
18        But that's getting defendants the bulk of the documents --
19             THE COURT:  How many people are on this?
20             MS. MONTAG:  Many.  I -- we have -- we have multiple
21   attorneys at DOJ who will be reviewing, HHS --
22             THE COURT:  Four months is a long time.
23             MS. MONTAG:  Given the nature of HHS's systems -- and,
24   again, we are talking about nine operating divisions.  We're
25   talking about essentially nine separate companies.

 1          And HHS will be deploying point people in each of those

 2   nine operating divisions.  Once the documents are pulled --

 3          THE COURT:  I feel like if I ask 3M to do this across

 4   their divisions, it could be done in three weeks.

 5          MS. MONTAG:  Well, 3 --

 6          THE COURT:  Are we getting -- are we running into

 7   bureaucracy here?

 8          MS. MONTAG:  Absolutely not, Your Honor.  This is --

 9          THE COURT:  I'm going to interrupt you.

10      Mr. Bowdre, what do you think about this time period of

11   four months?  If you agree with it, it won't hurt my feelings.

12   That just seems like a long time.

13          MR. BOWDRE:  I'm not sure if we have enough

14   information to know one way or the other.  I think -- you know,

15   we tend to have a lot of faith in our federal government, and

16   that if the Court orders them to produce something, I think

17   they can figure out a way to do it.

18      But as for the specifics, we understand the federal

19   government's concerns.  And we just -- we agree that there has

20   to be a way to get us the responsive documents in a timely

21   manner.

22          THE COURT:  So that brings me back to what you just

23   said a minute ago, which is, well, you know, if we go through

24   this first process for the first tranche, then the clock is

25   running out on us again if we have to come back to the Court.

1  That's my concern.

2         MR. BOWDRE:  And, yes.  Yes, Your Honor.  I think

3  that's why it's important to have the -- to have the full

4  process at the very beginning and not on the back end.

5         THE COURT:  All right.

6     All right.  Let's switch again.  So if we have got ten

7  people on it, and it's going to take you four months, why don't

8  we put 30 people on it, and it's going to take you half that

9  time?

10        MS. MONTAG:  Certainly.

11    Well, Your Honor, I do want to point out this will be a

12 rolling production.  So, again, this will be the fastest way

13 for HHS to start pulling responsive documents, have them

14 reviewed for responsiveness and privilege, and start getting

15 them over to the defendants.

16    If we go to the search term methods, even if we have 30

17 more people, we still need to negotiate the search terms with

18 defendants, we have to run the search terms, we have to provide

19 them hit reports, we have to modify the search terms.  I think

20 that will be months before we're --

21        THE COURT:  But it's about resources, right?  It's

22 about how many resources you want to dedicate.

23    An unnamed federal agency asked me for an additional

24 six months some time ago to produce a record.  And I said,

25 that's -- that's not reasonable.  They said, well, that's the

```
 1   fastest we can produce it.  I said, I think you can produce it
 2   in 30 days.  They said, we can't produce it in 30 days.  I
 3   said, If it's not produced in 30 days, then I want your
 4   director in my courtroom and let's talk about sanctions.  It
 5   was produced in 21 days.
 6       I'm just asking about resources.  That's all.  And I'm not
 7   saying four months is unreasonable.  I just need you to show me
 8   why it's not, you know?
 9           MS. MONTAG:  Sure.  Really, this goes down to the way
10   HHS's systems are set up.  And again, what I've said about the
11   nine separate companies, all with their own technical
12   personnel.  So even if we had a hundred attorneys on this, my
13   understanding is that it would still take this amount of time.
14       We will move as quickly as possible.  If we can do it
15   faster than four months, I would love to do it in three months.
16       We can come back to the Court.  I think by July we will
17   have a much better sense of how long it will take.
18       But, again, this can start today.  And so no further delay
19   would be needed.  It can start today.  We can come back to the
20   Court and give you a better estimate once we've started the
21   process.
22           THE COURT:  Gotcha.  And let me say this.  Look, I
23   have not done a full argument on this.  I don't know if all the
24   State's opinion about your discovery and WPATH's is correct.  I
25   don't know that your positions are correct.
```

1    The only thing I do know is now I'm having to continue
2  this case until next year.  I don't want to continue it again.
3  I'm going to be really mad if we had to continue it again.

4    And so everybody on the discovery side -- I'm not just
5  singling out you guys.  The State, too.  Everybody has got to
6  work together.

7    And, again, I can solve some of this -- I can actually
8  solve it all if we have a hearing, but I just don't think
9  anybody really wants me to do that.  So I really want everybody
10  to put this in climbing gear and let's move forward.  Because
11  we have got to get all this discovery done.  And we have got to
12  get it done fast.

13    MS. MONTAG:  Absolutely.

14    THE COURT:  Here's my thought:  I like Mr. Bowdre's
15  idea about, you know, let's come back and have a status on all
16  of this in 30 days, and we will know a whole lot more.

17    I think you will be able to go back to HHS and say, hey, I
18  think the judge may want this done faster than four months.
19  And I bet in 30 days you're going to have a plan for me about
20  how it can be done quicker.

21    So let's move on to that track.  And we'll look at our
22  days.

23    If I am looking 30 days down the road right now,
24  anybody -- today would be the 22nd -- 30 days out from this, is
25  that a bad week for anybody?

 1            MS. MONTAG:  We could certainly make it work.

 2            THE COURT:  Excellent.

 3       All right.  Anybody think we ought to address any other

 4  issues?

 5            MS. MONTAG:  Nothing from the United States.

 6            THE COURT:  All right.  I am going to continue this

 7  trial.  So I will ask the parties to confer on all these dates.

 8       I will say that, you know, the State's dates look

 9  reasonable.  We don't have to pick those exact dates, but they

10  look pretty reasonable to me.  I would hope that, you know,

11  y'all can agree, even if it's not those exact dates, but agree

12  on reasonable dates and move forward.

13       Okay.  Last question.  Everybody's in the room.  Does it

14  do any good for everybody to go eat lunch, come back in here

15  and just sit down while we've got everybody in the room, and

16  begin this conversation?  Or do y'all just want to go back to

17  the office and get on the telephone?

18            MS. MONTAG:  Your Honor, we have some flights back to

19  D.C., but we're more than happy to start the conversation with

20  defendants today.  And, again --

21            THE COURT:  When are those flights?

22            MS. MONTAG:  2:30.

23            THE COURT:  2:30.

24       All right.  Well, does that help anybody, if I leave the

25  courtroom and y'all -- and everybody from HHS stays, and maybe

 1  even WPATH, if we need to?  Does that help?

 2          MR. BOWDRE:  We are obviously happy to begin the

 3  conversations today.

 4          THE COURT:  If it doesn't help, then don't worry.  I'm

 5  just saying does it help?

 6          MS. MONTAG:  Your Honor, I think we would benefit from

 7  returning home and having more conversations.  I don't know

 8  that we will be able to figure anything out today.  But if

 9  that's what you'd like us to do, we're more than happy to --

10          THE COURT:  All right.  Well, sounds like we just need

11  to get on the flights.

12      I will say this:  When we come back in 30 days, I want

13  some definites from every side.  And I want some give from

14  every side.  And I've given everybody some leeway today.

15      WPATH, I understand that, you know, you don't want to give

16  this up, you don't want to waive any of your rights by

17  producing too quickly, but we're narrowing in now on a firm

18  order.  We'll see what happens at the Eleventh Circuit, but I

19  expect things to start moving at this point.

20      I do appreciate that you brought HHS.  I really do.  I'm

21  glad they're here in the room today.  That's a sign of good

22  faith that we're getting this process rolling.

23      I do think it might help me before we get out of here to

24  hear actually from somebody at HHS about this process.

25          DR. MATHIAS:  Good morning, Your Honor.  I'm Karl

1  Mathias.  I'm the Chief Information Officer from HHS.

2          THE COURT:  Good morning.

3          DR. MATHIAS:  And I just wanted to elaborate a little

4  bit more on the complexity so you understand what we're talking

5  about.

6      And if I could just tell you a little background about

7  myself.

8          THE COURT:  Sure.

9          DR. MATHIAS:  I had seven years as an assistant

10  director of the CIO at the U.S. Marshals.  So I wish -- I will

11  be honest -- it was the best job I ever had, so...

12      But here at HHS, complexity's a little higher.  But I am

13  familiar with the issues.  And certainly with your concerns,

14  Your Honor.

15      So I just want to reassure you that when it comes to

16  getting an order for discovery, I take that very seriously.

17      HHS is an interesting organization, in that it's these

18  multiple operating divisions.  You've got these staff

19  divisions.  And we're not all on the same mail system.  We're

20  not all on the same file system.  And even within the different

21  organizations, you've got multiple file systems within them.

22      So, for example, if I were to look at the office of the

23  secretary, which is the staff divisions, not only do we have

24  e-mail that is on its own thing, we have a document system

25  called OneDrive.  We have another system called SharePoint.  We

1   have another system you'll hear called Azure.

2       And so when we come to respond to this, we're searching

3   across all of those to look for responsive documents and

4   potentially e-mail.

5       I have to do those separately.  We have a different set of

6   organizations that do, you know, that cover FDA, that cover

7   CDC, that cover National Institutes of Health.  They have their

8   own systems.

9       And when you look at the National Institutes of Health, it

10  gets even more interesting, because they have 27 institutes

11  underneath that umbrella organization.  And sometimes even

12  those are using different systems that they then have to go out

13  and look for documents.

14      So when we're going to put together the -- to be

15  responsive to the request for discovery, we're reaching out

16  within the organization with different people doing different

17  searches, and then bringing it back together to be responsive

18  to the request.  So I don't want you to think --

19           THE COURT:  So let me interrupt just for a second.

20           DR. MATHIAS:  Yeah.

21           THE COURT:  And the answer to this may be no.  But I'm

22  assuming everybody in this room has reached out to other states

23  that are in this same litigation -- Arkansas comes to mind.

24  Was any of this discovery conducted previously in any other

25  case?

```
 1              MS. MONTAG:  It was not, Your Honor.
 2              THE COURT:  Okay.  All right.
 3         I'm sorry.  Go ahead.
 4              DR. MATHIAS:  Yeah.  So I just wanted to -- when we
 5    talk about the complexity, it's really about pulling all of
 6    this together.  And we're pulling significant amounts of
 7    information together.
 8         And I wish I could tell you technology is firm and solid.
 9    You would think it is, reading the headlines.  But we actually
10    see transmission errors that cause things to restart.
11         It takes us some time to pull it together before we can
12    deliver it to the attorneys for them to do their processes on
13    it.
14         So that's -- when we talk about the complexity, that's
15    what we are talking about, is pulling all of this together.
16         And, also, you know, we have started looking at this to
17    make sure that we are going to be responsive.  We have been
18    looking at document discovery.
19         If we extend this into e-mail, my experience has been that
20    you just order -- just expand this by an order of magnitude of
21    what's going to come back.  And it does take time.  So...
22              THE COURT:  All right.  I will give the State the last
23    word if they want it.
24              MR. BOWDRE:  Your Honor, I appreciate the chance to
25    work with HHS.  I think there are ways that we can move
```

1  forward.  And I think, you know, we -- one thing that comes to

2  mind is that we can narrow the divisions in which we are

3  seeking search terms to be used for the network drives.  So I

4  appreciate that.

5      The only question I have is when would you like a proposed

6  schedule?  Once you enter the order setting the trial date, we

7  will confer.  When do you want us to propose a schedule?

8          THE COURT:  I'm guessing the parties would need a

9  couple of weeks to confer?  Would that be a fair amount?

10         MR. DOSS:  Yes, Your Honor.

11         THE COURT:  Maybe two weeks?  And that way I'll know

12 what it is coming into the next status hearing, if there's any

13 issue there.

14         MR. BOWDRE:  Yes, Your Honor.

15         THE COURT:  And I would be looking at whatever the

16 first Monday is in April as a trial date.

17     We're still talking about two weeks; is that right?

18         MR. BOWDRE:  Yeah.

19         THE COURT:  Everybody still think that's a reasonable

20 number?  Do we think it could be more or less?

21         MR. BOWDRE:  We think two weeks sounds about right for

22 the trial.

23         THE COURT:  Government?  Private plaintiffs?

24         MS. MONTAG:  We would say less.  Less than two weeks.

25         MR. DOSS:  I'd say about two weeks.  We are looking at

1  maybe ten experts total, I think, between both sides, which is
2  going to take some time to work through.

3          THE COURT:  Right.  Right.

4      So, yeah, I would leave y'all with this.  So when we come
5  back in 30 days, I'm probably going to be a little bit more
6  prickly about discovery and all these other issues.  I have
7  kind of given some leeway that I am not going willing to give,
8  you know, when we get another 30 days down the road.

9      So I expect discovery to start moving really, really,
10  really fast.  And, you know, at the end of this, you know, we
11  are about to reset this until next spring.

12      Look, you know, if this law is unconstitutional, then we
13  need finality on it.  If it is not unconstitutional, then, you
14  know, the will of the Legislature and the Governor needs to be
15  implemented.

16      So everybody needs to really pick up the ball and run with
17  it.  And whatever priorities you may have with other cases, or
18  administratively within your organization, or anything else,
19  this is the top priority.  This is the top priority.

20      And so if things aren't moving, then I'm going to be
21  asking questions about, okay, I want to know exactly how many
22  people are working on this, I want to know exactly how many
23  hours a day they're working on it, I want to know what your
24  resources are to add more people to it.  And that's for
25  everybody on both sides to make this go, so...

1        And, hey, I'm also -- you know, I'm also going to want to

2   know is everything the State is asking for reasonable?  And

3   does it meet the discovery standard?

4        So, again, I don't know the answers to any of those,

5   except to know we have really got the blue-ribbon group of

6   lawyers in here on both sides.  Everybody knows what the

7   expectation is.  And so let's pull together and get this done.

8        Anything else?

9            MR. BOWDRE:  Not from the defendants, Your Honor.

10           THE COURT:  All right.

11           MS. MONTAG:  Not from the United States.

12           THE COURT:  All right.  We're adjourned.

13

14           (Whereupon, the above proceedings were concluded at

15       10:48 a.m.)

16

17

18

19

20

21

22

23

24

25

1                            <u>CERTIFICATE</u>

2

3

4        I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11   _Christina K. Decker_              <u>05-25-2023</u>

12   Christina K. Decker, RMR, CRR              Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25