<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE MIDDLE DISTRICT OF ALABAMA
 2                            NORTHERN DIVISION

 3

 4        BRIANNA BOE, et al.,          *
                                        *
 5                 Plaintiffs,          *   2:22-cv-00184-LCB
                                        *   June 26, 2023
 6        vs.                           *   Montgomery, Alabama
                                        *   10:00 a.m.
 7        STEVE MARSHALL, et al.,       *
                                        *
 8                 Defendants.          *
          ****************************

 9

10

11                    TRANSCRIPT OF STATUS CONFERENCE
                    BEFORE THE HONORABLE LILES C. BURKE
12                     UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22        Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
          pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
23          and Procedures Vol. VI, Chapter III, D.2.  Transcript
                      produced by computerized stenotype.
24

25
</pre>

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                              <u>APPEARANCES</u>

2

         <u>FOR THE PLAINTIFFS</u>:
3        Jeffrey P. Doss, Esq.
         LIGHTFOOT, FRANKLIN & WHITE, LLC
4        The Clark Building
         400 20th Street North
5        Birmingham, Alabama 35203

6        Margaret Lester Marshall, Esq.
         DOJ-USAO
7        1801 Fourth Avenue North
         Birmingham, AL 35203
8        205-244-2121
         Email: Margaret.marshall@usdoj.gov
9
         Renee Michelle Williams, Esq.
10       United States Department of Justice
         Civil Rights Division
11       950 Pennsylvania Avenue, NW
         Washington, DC 20530
12       202-598-3210
         Email: Renee.williams3@usdoj.gov
13
         Amie Murphy, Esq.
14       DOJ-Crt
         950 Pennsylvania Avenue-- NW Building
15       Washington, DC 20530
         202-353-1285
16       Email: Amie.murphy2@usdoj.gov

17
         <u>FOR THE DEFENDANT</u>:
18       James W. Davis, Esq.
         Alexander Barrett Bowdre, Esq.
19       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Avenue
20       P.O. Box 300152
         Montgomery, Alabama 36130-0152
21       (334) 242-7300

22

23

24

25

1        AMICI:
         Barry Alan Ragsdale, Esq.
2        Robert Vance, Esq.
         Dominick Feld Hyde, P.C.
3        Litigation
         1130 22nd St S - Ste 4000
4        Birmingham, AL 35205
         205-536-8888
5        Email: BRagsdale@dfhlaw.com

6        Cortlin Hall Lannin, Esq.
         COVINGTON & BURLING LLP
7        Salesforce Tower
         415 Mission Street
8        Suite 5400
         San Francisco, CA 94105
9        415-591-7078
         Email: Clannin@cov.com
10

11

12

13       COURTROOM DEPUTY:  Kelli Fuller

14

15       COURT REPORTER:  Christina K. Decker, RMR, CRR

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2                    (In open court.)

3            THE COURT:  Good morning.  Who wants to speak on

4     behalf of the State this morning?

5            MR. BOWDRE:  Your Honor, I will.

6            THE COURT:  All right.  Why don't we take up the

7     assistant director Levine issue first.

8            MR. BOWDRE:  Yes, Your Honor.  Thank you.

9        And Barrett Bowdre on behalf of the State defendants.

10       First, I want to say that defendants think that overall

11    discovery is going well.  And I think we and the other parties

12    heard you at the last hearing that we need to move forward.

13    And we appreciate what the United States has done in that

14    regard.

15       We certainly have tried to be reasonable to make

16    concessions where we can, to reach compromises.  And I think it

17    is a good time that we only have these two issues at this

18    hearing today.  But those two issues are important.  And we

19    thank the Court for coming down to hear those.

20       With regard to Admiral Levine, the assistant secretary for

21    health, our position is clear and straightforward.  I won't

22    repeat everything that we said in the notice.

23       But it seems to us that Admiral Levine acts as both an

24    expert and the face of HHS, and indeed of the Biden

25    administration when it comes to the safety and efficacy of

1 transitioning treatments for minors.

2     Admiral Levine routinely discusses the safety and efficacy

3 of those treatments with doctors at hospitals, with medical

4 organizations, indeed at WPATH itself.  And it is hard to

5 imagine how Admiral Levine would not have documents that are

6 responsive to our RFPs.

7     I know the United States has made a few arguments for why

8 Admiral Levine should not be made a custodian.  I am happy to

9 address those now, or to allow the United States to address the

10 Court first, whichever the Court prefers.

11         THE COURT:  So I probably would like to hear just some

12 preliminary thoughts on that from both sides.

13     I will tell you, you know, I really don't feel like I have

14 enough information, at least in what's been presented to me, as

15 to what I should do with that issue.  And so, you know,

16 ultimately I think what I am probably going to suggest is that,

17 you know, if you can't work it out, file a motion to compel.

18     I really would like to see full briefing on that issue.

19         MR. BOWDRE:  Yes, Your Honor.  I am happy to address

20 some of the arguments.

21     So the United States first argues that Admiral Levine

22 should not be made a custodian because Levine does not

23 personally conduct research or oversee that research.  And

24 that's fine, insofar as it goes.  But many of the custodians

25 that the United States has offered would fit into that camp.

1       And we are obviously interested in the research that HHS

2   is funding that is central to the case.  But it remains true

3   that Admiral Levine goes and discusses the safety and

4   efficacy --

5           THE COURT:  Hold on a minute.

6           MR. BOWDRE:  Sorry.

7           THE COURT:  We've got some gum chewing going on in my

8   courtroom.  I don't allow gum chewing in the U.S. District

9   Court.  So if that's you, take care of it.

10      Go ahead.

11          MR. BOWDRE:  Thank you.

12      It remains true that Admiral Levine obviously has

13  responsive documents, because the admiral discusses the safety

14  and efficacy of transitioning treatments.  And that falls

15  squarely within the RFPs that we have requested of the United

16  States.

17      It is -- and I guess I would also say that to the

18  extent -- I guess we assume that there is some basis for what

19  the admiral is saying, that there is some research behind it,

20  or some documents that the admiral has looked at to support the

21  admiral's position that these transitioning treatments are safe

22  and effective, that WPATH is a nonpartisan organization, all

23  the different things that the admiral has said.

24      And so those -- the inputs into the speeches would be

25  responsive documents that we're entitled to.  And if it is the

1  case that the admiral does not have any input into the

2  speeches, that, too, would be relevant to our case if there's

3  simply nothing there, which we don't think is the case.  But

4  even if it were, I think that would be pertinent.

5      Another argument that the United States raises is that it

6  should be allowed simply to produce to us the documents that it

7  plans to produce to a third-party FOIA request.  And our simple

8  answer there is that the third party has produced a bunch of

9  search terms that are its search terms.  They're not our search

10  terms.  They are not tailored to our case.  They're not

11  tailored to the requests for production that are specific to

12  the issues in this case.

13      And just for instance, those search terms, which are

14  included, I believe, in the United States' response -- you can

15  look at those terms -- they do not ask about adverse effects

16  from the treatments.  They do not ask about informed consent.

17  They do not ask about Lisa Littman or rapid-onset gender

18  dysphoria.  They say nothing about the literature reviews that

19  England and Sweden and Finland have all conducted about

20  transitioning treatments.  They don't mention the health-care

21  policy changes in those countries.  And they don't ask about

22  the trans youth study that HHS is funding and that Admiral

23  Levine has specifically referenced.

24      So it might be that some of those documents would also be

25  responsive to our request, but there's not a complete overlap.

1   And when the United States entered this case as a party, it

2   became subject to the discovery standards of Rule 26 and Rule

3   34, which require discovery and production, not simply turning

4   over FOIA documents that it happens to turn over to a third

5   party.

6        I will also mention that the standards under FOIA and

7   under Rule 26 and 34 are different.  There are some overlap to

8   be sure.  But, for instance, privilege logs work differently

9   under the two standards.  And I think are generally less

10  comprehensive in the FOIA world.  And privileges themselves

11  work differently.

12       So, for instance, the deliberative process privilege is an

13  absolute bar in FOIA.  But it is a qualified privilege in

14  discovery.

15       So if we were proceeding under Rule 26 and Rule 34, and we

16  found documents that were marked as deliberative process, we

17  could come to the Court and make a showing as to why we should

18  still be entitled to those documents.  But that is not the case

19  if we were simply relying on the third party in the FOIA

20  context.

21       Finally, the United States argues that making Admiral

22  Levine a custodian would be burdensome and simply duplicative

23  of what it already plans to produce.  And just a few responses

24  to that.

25       One is that we have no way of knowing, and I don't think

1    HHS has any way of knowing the degree of duplicativeness until

2    they have run the searches, which they have not done of Admiral

3    Levine's e-mails.

4        Second, to the extent that the documents are duplicative,

5    and the United States argues that that -- that they would have

6    to, you know, review the same document two or three times if it

7    came from different custodians.  There's an easy answer to

8    that, and that is that most ESI software can very easily

9    identify identical documents and de-duplicate them so that the

10   United States only has to review each document once, no matter

11   how many times that document pings as a result of searches

12   through different custodians.

13       And, indeed, different courts have credited that argument

14   in requiring additional custodians.  So I will mention just

15   two cases that do that.

16       One is Fort Worth Employees' Retirement Fund vs. J.P.

17   Morgan Chase.  That's a case out of the Southern District of

18   New York, 297 F.R.D. 99.  That was a class action security case

19   involving -- the defendants had already agreed to 80,000 search

20   terms and 42 e-mail custodians.  And the plaintiffs in that

21   case were asking for 16 additional custodians.

22       And like the United States here, the defendants argued

23   that adding those custodians would be burdensome and simply

24   result in duplicative documents.  And the Court denied that and

25   said, quote, The presence of these proposed custodians on the

1   working groups' list is sufficient to establish that their

2   inclusion and ESI searches are equally calculated to lead to

3   relevant evidence that might not be captured if they were

4   excluded.  The defendant shall therefore add the additional 18

5   custodians.  And then it says, Because there is likely to be

6   some overlap in the discoverable information possessed by the

7   individuals on these lists, the defendants may continue to

8   utilize procedures to eliminate duplicative search output from

9   their production.

10      I think that same reasoning applies here.  We have reason

11  to believe that Admiral Levine has responsive documents.  To

12  the extent that they are duplicative documents, there is an

13  easy way to deal with that within the ESI search protocol.

14      One other case, and then I will sit down on this unless

15  the Court has other questions.  Ramirez vs. United States

16  Immigration and Customs Enforcement.  It's 331 F.R.D. 194 out

17  of the District of D.C., 2019.

18      In that case, plaintiffs had sued the Immigration and

19  Customs Enforcement about custody and confinement assignments.

20  They were seeking an additional 16 custodians.  And the Court

21  granted that request because the Court found that it was, one,

22  likely that the custodians would have responsive information,

23  and, two, that to the extent that the United States was arguing

24  that it would be burdensome and cumulative to add those

25  custodians, the Court rejected that argument for the same

1    reason the Fort Worth Employees' Fund court did.  And said,

2    quote, Defendants have offered no response to plaintiffs'

3    assertion that the dedupe technology would resolve any

4    duplication here.

5          Again, I think we are in the same position.  We think

6    Admiral Levine obviously has responsive information.  As the

7    United States itself has said, within these divisions and

8    within each office information flows up the chain of command.

9    And so it is the senior personnel who are likely to have the

10   most broad view of things.  And so simply offering a custodian

11   lower on the chain, you know, good, but probably not

12   comprehensive because that person would only be working in a

13   siloed area, whereas the assistant secretary for health has the

14   global view of the total office's responsibilities.

15         We don't think that it would be, you know, unduly

16   burdensome to add Admiral Levine.  In fact, it would be within

17   the requirements of Rule 26 and Rule 34.

18         Unless the Court has any questions, I am happy to sit down

19   or to address the WPATH issue, whatever the Court --

20             THE COURT:  I am going to take them one at a time, so

21   I want to hear from the United States on this issue, and then

22   we will pick that one up.

23             MR. BOWDRE:  Thank you, Your Honor.

24             THE COURT:  Uh-huh.

25             MS. MURPHY:  Good morning, Your Honor.  Amie Murphy on

```
 1   behalf of the United States.

 2            THE COURT:  Good morning.

 3            MS. MURPHY:  With me I have my colleagues Renee

 4   Williams.  I also have two representatives from HHS, to the

 5   extent there are any questions that they can answer.  Lena

 6   Yueh, she is from the General Counsel's office.  And I also

 7   have Chief Information Officer Dr. Karl Mathias.

 8            THE COURT:  Good.  Glad you brought them with you.

 9            MS. MURPHY:  I do want to begin, Your Honor, by

10   suggesting that since there are certain issues that defense

11   counsel raised this morning on this topic, that we do have an

12   opportunity to fully brief this issue, to the extent that the

13   parties can't work it out today or, you know, subsequent to

14   this hearing.

15       We do have some remarks prepared.  But given that defense

16   counsel's cited two cases, we would like the opportunity to

17   respond on this very important topic.

18       But for today's purposes, I do want to say we agree with

19   defendants.  We have been working cooperatively up until this

20   point.  And this seems to be just one issue that we have to

21   move -- move past.

22       So what I will say is that HHS has named nine custodians

23   to produce e-mails in this litigation.  You know, Admiral

24   Levine was not designated as an e-mail custodian.  And the

25   reason for that is because HHS designated an individual within
```

1   Admiral Levine's office to act in that role.

2       Her name is Deputy Assistant Secretary For Policy Maura

3   Calsyn.  The reason why HHS designated Ms. Calsyn is that she

4   was a member of Admiral Levine's immediate office team during

5   the relevant time period.  Her role was to advise Admiral

6   Levine on all relevant issues to her role.  And these are

7   aspects of legislation, on policy, pending litigation, and all

8   intergovernmental matters.

9       Ms. Calsyn was, in fact, the member of Admiral Levine's

10  office team who worked specifically on transgender issues.  So

11  in contrast to the on-the-ground type of work that Ms. Calsyn

12  does, Admiral Levine's work is far more top level.  Like any

13  top-level agency official, Admiral Levine relies on her office

14  staff to prepare her for her public appearances, prepare her

15  speeches, and also to prepare documents for her to sign.

16      While the admiral has spoken publicly on issues of

17  transgender and gender-affirming care, again, she has -- she

18  has people within her office who prepare her for that.  She is

19  not conducting studies.  She is not performing any of the

20  research.

21      In practice, her e-mails are going to be substantially the

22  same as Ms. Calsyn's e-mails.  And so on that line, it's going

23  to be, you know, producing documents, or adding her to the list

24  of custodians is just going to result in duplicative documents.

25  It is going to take HHS longer to collect the documents and

1 review them and produce them.

2      Now, defendants argue that they're entitled to the
3 information that Admiral Levine relied on to produce the
4 speeches and prepare for the public appearances.  All of the
5 studies that would have been relied on to prepare those
6 speeches are already going to be produced in this litigation.
7 So, you know, defendants are going to have that material.

8      They already have a lot of the public speeches.  We're
9 prepared to produce those, too.  It's simply the e-mails that
10 we feel should not -- would be duplicative and don't need to be
11 produced.

12           THE COURT:  Remind me.  How many e-mails are we
13 talking about?

14           MS. MURPHY:  Well, I don't have a number to put on
15 that right now, but I can tell you that, you know, one of the
16 things that defense counsel mentioned is there has been a FOIA
17 request for Admiral Levine's e-mails related to this topic.  So
18 the -- so a lot of her e-mails are already being compiled by
19 HHS.  And so we've offered to produce those same documents to
20 the defendants well within the time period -- well within the
21 time period that HHS is required to produce documents.

22           THE COURT:  So how many e-mails would Admiral Levine
23 send in a typical week?  Send or receive.

24           MS. MURPHY:  That's a good question, Your Honor.  I
25 don't have an answer for that.  I can refer to my colleague to

 1   see if she knows.

 2           THE COURT:  No.  That will be great.  We will take

 3   20 seconds.

 4           MS. MURPHY:  Your Honor, unfortunately, we don't have

 5   an estimate at this time.  I can tell you that it -- her

 6   style -- Admiral Levine's style has been described to me as she

 7   is a two-finger typer.  And so oftentimes she's, you know --

 8   her e-mails consist of, you know, okay, that sounds good,

 9   giving approval for things that people have been -- have

10   recommended, and don't contain a large bit of substance.

11           THE COURT:  All right.  All right.  Anything else you

12   want to address?

13           MS. MURPHY:  Sure, Your Honor.

14       The one thing I wanted to address, with respect to the

15   United States' offer to produce these documents that are being

16   compiled for FOIA, I've -- unaware of any privileges that apply

17   differently in response to a FOIA request that they've been due

18   in litigation.  Given that they would be produced in the con --

19   it's -- it's just the same documents, right?  So we're not

20   saying that the same rules should apply.

21       So if defendants have objections, we would certainly

22   respond to them the way we would any objections to documents in

23   this litigation.  We would be prepared to produce the privilege

24   log, which would meet the same requirements that we meet when

25   we -- throughout the context of this litigation.

1    So the concerns that they have over not being able to

2 object, I frankly just don't think hold water.

3    I think the other thing I wanted to point out about that

4 is that while the FOIA requests -- the terms that the requester

5 has suggested to search the e-mails are not the same as the

6 terms that we're using in this litigation.  They're actually

7 much broader.

8    And so, you know, there is puberty blockers, hormone

9 replacement therapy, medically necessary, WPATH.  They're very

10 broad terms.  And so it's hard for me to wrap my head around

11 the idea that there would be documents that we would miss.

12    Additionally, you know --

13        THE COURT:  So what I'm hearing from you is, look,

14 we're going to provide them all the same stuff, we just want to

15 provide it by a different method.

16    What's the reason you don't want to provide it through the

17 discovery process, you want to provide it through a FOIA

18 process?

19        MS. MURPHY:  So we wouldn't be providing it through

20 the FOIA process, Your Honor.  We would be providing it through

21 the discovery process.

22    We are simply saying don't make us run a separate set of

23 terms, because it takes up more time, more resources.

24    We think these terms are broad enough to encompass all the

25 relevant documents.  And so we see no reason that this isn't

 1  sufficient.

 2          THE COURT:  Mr. Bowdre, why don't you address that for

 3  two minutes?

 4          MR. BOWDRE:  Yes, Your Honor.

 5          MS. MURPHY:  Thank you, Your Honor.

 6          THE COURT:  Uh-huh.  Thank you.

 7          MR. BOWDRE:  Your Honor --

 8          THE COURT:  Or less than two minutes.

 9          MR. BOWDRE:  I will do my best.

10      Our main concern with the FOIA request is that they're

11  someone else's search terms tailored to someone else's search

12  and investigation.

13      And HHS, we have gone back and forth, and back and forth,

14  to agree on a set of 20 search terms --

15          THE COURT:  Fundamentally, what are we going to miss?

16  What are you afraid you are going to miss between those search

17  terms and the ones that you're using in the other discovery?

18          MR. BOWDRE:  Document search specifically tailored to

19  our request for production.

20      So, for instance, there are no search terms in the FOIA

21  request regarding what is happening in Sweden, Finland,

22  England.

23      I think there is one search term regarding the Tavistock

24  Clinic, but not about the literature reviews or changes in the

25  health-care policy in those countries.

1        Obviously, we think those are very relevant to our case.

2        There is no search terms about rapid-onset gender

3    dysphoria, and the changing -- how it is that the changing

4    patient profile of who it is that is suffering from gender

5    dysphoria, we think that is very integral to our case and the

6    legislative concerns.  And, but yet that is not mentioned in

7    the FOIA requests.

8        Responses about Lisa Littman's studies about rapid-onset

9    gender dysphoria.  Again, we have agreed to search terms as

10   part of the 20 that we have agreed to with HHS looking for

11   those documents.  And yet those documents, I don't think, or at

12   least there is no guarantee that these documents would be

13   pulled from the search terms from the third-party FOIA

14   recipient.

15           THE COURT:  All right.  I would say this:  I think

16   both of you have given me a working understanding of this issue

17   today.  I still think I would like to see full briefing on it.

18   And if it can't be worked out, then I would just say the State

19   go ahead and file a motion, and we will have a full hearing on

20   it with full briefing and see where we go.

21           MR. BOWDRE:  Yes, Your Honor.  Happy to do that.

22           THE COURT:  Perfect.

23       I let him have a second bite at the apple.  Do you need a

24   second bite?

25           MS. MURPHY:  Thank you, Your Honor.

1      I'm not going to -- I don't want to waste the Court's time

2 with this.

3      The only thing I will point out again is that the

4 request -- the FOIA request -- the terms in the FOIA request

5 are so much broader than the terms that Mr. Bowdre just listed

6 here.  And so it is hard for me to imagine that the documents

7 are not going -- you know, transgender is one of the terms.

8 Transgender youth.  Transitioning.

9      These are all very broad terms that it's hard to imagine

10 that some of these documents that defendants are concerned

11 about aren't going to be hit upon using these very broad terms.

12      But that's all I have to say, Your Honor.  Thank you very

13 much.

14          THE COURT:  Okay.  Well, then, let's move to the WPATH

15 issue.  Mr. Bowdre, you are going to speak to that, as well?

16          MR. BOWDRE:  Yes, Your Honor.  Just briefly.

17      Our position is that this Court denied WPATH's motion to

18 quash three months ago on March 27th.  We have been patient as

19 WPATH has sought to exhaust its appeal rights.

20      It has moved for a stay in this Court.  This Court denied

21 that motion.

22      It moved for permission to file an interlocutory appeal.

23 This Court denied that motion.

24      It filed -- a month ago today it filed a petition for writ

25 of mandamus in the Eleventh Circuit, asked that court to rule

1   by June 16th.  That day has come and gone.

2       Throughout, this Court's order has been in effect, and yet

3   WPATH has made its position clear that it will not produce

4   responsive documents until ordered to do so.  And, indeed, on

5   Friday, basically filed an additional motion for stay to stay

6   things until August 15th.

7       And we think that we need production to start rolling now

8   to stay on the timeline that this Court has set.  We think it's

9   important to start getting those documents so that we can

10  determine what our next steps are, whether we need -- we will

11  have disputes about custodians, whether we will need to seek

12  third-party subpoenas about our proposed custodians that WPATH

13  says it does not have custody or control over.  All those

14  things, we think will be informed by seeing what it is that

15  WPATH plans to produce.

16      And so we simply ask that the Court order WPATH to comply

17  with this Court's order from three months ago.

18          THE COURT:  All right.  Mr. Ragsdale, are you going to

19  speak on this?

20          MR. RAGSDALE:  I am, Your Honor.

21          THE COURT:  Okay.

22          MR. RAGSDALE:  Good morning.  Thank you for this

23  opportunity.

24          THE COURT:  Good morning.

25          MR. RAGSDALE:  I do want to make it clear, Judge, we

1    are not flaunting your order.  Obviously, we are seeking some

2    review in the Eleventh Circuit.

3         You tell us that time is up, we'll obviously comply

4    without blinking.  But we do believe that we are pursuing the

5    appropriate channel through the mandamus petition.

6         We did ask the Court -- the Eleventh Circuit to rule by a

7    specific date.  As you know, they tend to have a mind of their

8    own.  That consideration of the mandamus petition may have been

9    complicated by the fact the State has requested a specific

10   panel to hear that mandamus petition, which includes a district

11   court judge.

12        I don't know how those mechanics work.  I mean, you know,

13   when a district court sits with the Eleventh Circuit, it's on a

14   case-by-case basis.  But in this instance, the State has

15   specifically requested that the same panel that heard the

16   appeal from the preliminary injunction was -- is the panel they

17   would like to hear.  That may explain somewhat the delay.  I

18   don't want to suggest that the Eleventh Circuit is not acting

19   promptly.

20        But I would say this:  If I had that petition, I was the

21   Eleventh Circuit, I would ask one of my clerks to check your

22   docket, and there in your docket is an order that gives us

23   until October 1st to complete discovery in these circumstances.

24   I might be inclined to believe there's not an emergency if this

25   Court, pursuant to an agreement with the State, gives us until

 1  October 1st to complete that discovery.

 2       I am not suggesting that I know that happened.  I don't.

 3  But it might give some explanation why the Court didn't feel

 4  compelled to rule by the June 15th or 16th day that we

 5  suggested.

 6            THE COURT:  Possibly, but that's also just a date that

 7  it would be complete, as opposed to when it would start.

 8            MR. RAGSDALE:  Sure.  No, I understand that.  And we

 9  recognize that is coming up.

10       I think it's important, maybe, to remind this Court a

11  little bit that WPATH is not a huge organization.  It is not a

12  big group.  It doesn't have a lot of employees.  And so as a

13  result, responding to these discovery requests takes time, but

14  we have been doing that.

15       We have put together the initial documents that we think

16  would be responsive to that.  We have continued to negotiate

17  with the State about e-mail and e-mail custodians.  That is

18  ongoing.  We expect to have probably additional information

19  provided to them about search terms and custodians this week.

20       The problem, of course, Your Honor, is once we produce

21  those documents, the cat's out of the bag on the First

22  Amendment protections that we have raised in the mandamus

23  petition, right?  Once those documents that we believe are

24  protected by the First Amendment are turned over to the State,

25  the mandamus petition, I don't know if it becomes moot, but

1    certainly it helps blunt the argument that we have that these

2    documents are protected by the First Amendment and not subject

3    to being produced.

4        I would take issue and we do take issue with the notion

5    they have to have them right now.  We obviously have until

6    October 1st to complete our discovery with production of

7    documents.  But they have until February 1st of next year to

8    complete discovery.

9        So the notion that waiting a couple more weeks for the

10   Eleventh Circuit to rule potentially is balanced by whatever

11   emergent need they have.  And we don't believe that their

12   notice establishes that there's an emergency that they have to

13   have them today, as opposed to several weeks from now.

14       And that's why we asked the Court --

15           THE COURT:  What's magic about the two weeks you just

16   mentioned?

17           MR. RAGSDALE:  Well, it's not two weeks, Your Honor.

18   We have obviously suggested that what this Court may consider

19   doing is looking at a date in mid August that if we haven't

20   heard from the Eleventh Circuit by then, then we would proceed

21   with whatever this Court feels like needs to be done.

22       I have no reason to believe, and I cannot represent to

23   this Court that the Eleventh Circuit will have ruled by then.

24   But we don't think there's an emergency.

25       I would, for example, say one of the things that they rely

1  on is this notion that they need to get all our discovery to

2  determine who they might need to issue third-party subpoenas

3  to.  And keep in mind, we are a third party.  What they're

4  talking about, I guess I would characterize as fourth

5  parties -- people who either contributed, or were volunteers,

6  or made information available to WPATH, but aren't WPATH

7  employees or independent contractors, don't work for us, are

8  not within our control, as far as producing those documents.

9      We have made it very clear to the State that we don't have

10  the ability to produce documents from those individuals,

11  e-mails or otherwise.  That position is not going to change,

12  obviously, unless this Court determines with a fully briefed

13  motion to compel, et cetera, that we need to produce those

14  documents.  But that really is getting way ahead of ourselves

15  for them to suggest that because they might need to subpoena

16  people beyond WPATH, that that means we have got to produce

17  documents today, which is what they've asked for.

18      I mean, our suggestion, Your Honor, only is that the

19  status quo continues to make sense at this point, which is

20  WPATH should have the opportunity to exhaust its appellate

21  remedies, which we believe includes the mandamus petition.

22      If this Court were, for example, to suggest that we have

23  another status conference in mid August, we could communicate

24  that immediately to the Eleventh Circuit and say that's the

25  date by which we have to have a determination of whether or not

1   the Court intends to provide some protection under the First

2   Amendment or not.

3       And we don't believe the State has demonstrated that -- I

4   guess that would be more like five or six weeks -- that that

5   would make any difference towards their ability to prepare this

6   case for trial.

7       THE COURT:  You know, one thing I think we have all

8   discovered in this case was, you know, we originally thought we

9   could have a trial at the end of the summer.  Obviously, you

10  know, once you peel back one layer of the onion, you discover

11  something you didn't know about.

12      Obviously, we have had additional motion practice on some

13  of these issues that I don't believe we would have predicted

14  eight weeks ago.

15      And so I guess I probably would say, you know, the sooner

16  the better on all of this, just because we don't -- you know, I

17  can't imagine that we could get derailed from the current trial

18  schedule we're on, but the sooner we get on with this, the

19  better.

20      I don't pretend to know what the Eleventh Circuit is going

21  to do, but, you know, I would say y'all have squarely put the

22  issue in front of them.  And, you know, if they desired to

23  issue a stay or to act, they could have done so or could have

24  been, you know, setting a schedule to do so.  I am not saying

25  that their failure to do that indicates anything.  I don't

1    know.

2         I will say this:  I do not know what the internal workings

3    are as to, you know, how you get the same panel, how you don't,

4    you know.  When I was on the Court of Criminal Appeals, we

5    always made sure that, you know, if you had one case that came

6    up on one issue, you tried to give it to the same judge, you

7    know, on the second.

8         Anybody want to educate me on Eleventh Circuit panels

9    dealing with the same case?

10             MR. RAGSDALE:  I will tell what you my experience is,

11   is that oftentimes the Court will notice on its own that this

12   is related to another case.  I think there is a position on the

13   docketing or an indication on the docketing sheet -- I know

14   there is on a civil cover sheet, I just don't recall, these

15   appellate lawyers may know more about it than I do about

16   that -- about it being related.

17        In this case, the State has affirmatively filed a motion,

18   which has now been pending for, what, a couple of weeks maybe

19   or maybe longer, in which the State specifically requested that

20   the same panel that heard -- or that is considering and will

21   hear the preliminary injunction -- or did hear -- sorry -- did

22   hear the preliminary injunction hearing also hear this.

23        My only point is that's complicated by the fact that it's

24   not three Eleventh Circuit judges.  It's two and a district

25   court judge.  And I don't know whether it's gummed up the

1  process, as the State has asked for that panel.  I don't -- I
2  don't think it's automatic, I guess is what I would say.

3          THE COURT:  Understood.

4          MR. RAGSDALE:  I will let Mr. Bowdre, if he wants to
5  add to that.

6          THE COURT:  Mr. Bowdre, do you know anything further
7  about that?

8          MR. BOWDRE:  Just briefly.  I think I generally agree
9  with that, Your Honor.

10     We moved the Court, just out of an abundance of caution,
11  to send the mandamus petition to the P.I. panel because we
12  thought that would speed things up, because that panel is
13  already familiar with the case, and there are intertwined
14  issues.  And so we did it simply to try to speed things up, not
15  to slow things down.

16     I am happy to address other concerns that WPATH has
17  raised, or -- I am not sure if you are --

18          THE COURT:  Were you finished, Mr. --

19          MR. RAGSDALE:  I think for all practical purposes I'm
20  finished, Your Honor.

21          THE COURT:  All right.  I tell you what.  I am going
22  to do same thing here.  I may let him give a little rebuttal,
23  and then I will give you a final bite at the apple then.

24          MR. RAGSDALE:  Thank you, Your Honor.

25          THE COURT:  Anybody else from your side want to speak

1   on this, Mr. Ragsdale?

2           MR. RAGSDALE:  My colleague here from California seems

3   to think just because he traveled here so far, he ought to be

4   able to say something.  He is not willing to step up --

5           THE COURT:  I mean, 3,000 miles ought to be worth

6   something.

7           MR. LANNIN:  Your Honor, I appreciate that.

8   Mr. Ragsdale speaks better than I can.

9       I will just emphasize what he said in the end.  If Your

10  Honor gives us -- sets a status conference for whatever date

11  Your Honor thinks appropriate, or says on the record today I

12  think by this date you all should begin producing, we will file

13  a motion with the Eleventh Circuit tomorrow and let them know

14  that that happened and to elevate the expediency of the appeal.

15      I can't -- for all the reasons we have discussed, I don't

16  know what they'll do.  But I would think that if we've made

17  that motion, and the date that Your Honor sets comes and passes

18  without action, I would doubt you are going to look too kindly

19  on our coming back to Your Honor to say more time.

20      But, again, for all the reasons we talked about, it just

21  feels to us that in this posture we can afford a few more weeks

22  to wait and see what happens.

23      And, again, we are trying behind the scenes to move things

24  along.  We are reviewing documents.  We are preparing to

25  produce if and when we run out of options.

```
 1              THE COURT:  All right.  Mr. Bowdre, I think you had
 2    one other thing you wanted to say.
 3              MR. BOWDRE:  Thank you, Your Honor.
 4         Just one thing, and that is, as this Court recognized,
 5    this time last year, or -- yeah, about this time last year we
 6    didn't know what was ahead of us.  And we thought we would be
 7    ready for trial in August.
 8         We sent our requests to WPATH eight-and-a-half months ago,
 9    on October 13th.  And we're still litigating that.
10         And so I think that is instructive when we're talking
11    about what is -- what's coming next.  And there are probably
12    disputes that we don't know, but we need time.  And I don't --
13    we don't want to be in this same position again, throwing the
14    discovery off track.
15         And so we would ask that the Court order WPATH to start
16    production now, or at the very least to pick a date certain --
17    this Friday, next Monday -- to allow them to apprise the
18    Eleventh Circuit if they need to and to get things moving.
19         But we think that we are entitled to the discovery that
20    this Court has already ordered three months ago.
21              THE COURT:  All right.  Anybody got anything else or
22    any other issue they want to raise while we're all here?
23              MS. MURPHY:  No, Your Honor.  Not from the United
24    States.
25              THE COURT:  All right.
```

1          MR. BOWDRE:  Nothing from the defendants, Your Honor.

2          THE COURT:  All right.

3          MR. RAGSDALE:  We're good, too, Your Honor.

4          THE COURT:  Let's take a five-minute break, and we

5    will reconvene in five minutes.

6          (Recess.)

7          THE COURT:  Well, I didn't need the whole

8    five minutes.

9        So here's what I generally think.  Obviously, you know,

10   the Admiral Levine issue, if that can't be worked out,

11   Mr. Bowdre, and the State can file its motion and go forward.

12       On the WPATH issue, I would say this:  I do get that

13   you're seeking, you know, mandamus relief on this.  I also hear

14   you say, hey, Judge, you know, the minute you tell us to start

15   producing, we will.  I really have already said to start

16   producing.

17       And so, you know, here's what I am going to do.  I am

18   going to say this:  I want you to start producing 14 days from

19   today.  That would give you adequate time to notify the

20   Eleventh Circuit again, hey, we are -- you know, we are under a

21   very, very hard deadline.  If that doesn't happen, then,

22   Mr. Bowdre, you know, you can file your motion for sanctions,

23   and we will go from there and figure it out.

24       I think that's probably a fair way to start moving this

25   case along.

1          And just in all honesty, you know, I really don't know

2   what's around every corner.  So, you know, I really think if we

3   sit around and delay discovery in this case until October, we

4   are just setting ourselves up for failure again for holding our

5   deadlines, and we need to get this case done.

6          So that would be where we are.  I hope you can work that

7   issue out on Admiral Levine, but if you can't, you know, file a

8   motion, and we will figure it out.

9          Let me ask you this:  You know, does anybody see any

10  specific motion practice coming, other than the issues we have

11  talked about this morning, in the next 60, 90 days?

12               MR. BOWDRE:  I do not, Your Honor.

13               THE COURT:  All right.

14               MR. BOWDRE:  Which is not to say that there won't be,

15  just we don't see anything.

16               THE COURT:  No, no.  I understand.  Yes.  Understood.

17               MS. MURPHY:  No, Your Honor.

18               THE COURT:  All right.

19               MR. DOSS:  Nothing foreseeable from us, Your Honor.

20               THE COURT:  All right.  All right.  And anything from

21  WPATH?

22               MR. RAGSDALE:  No, sir.  I mean, I think we are going

23  to have disagreements.

24               THE COURT:  Right.

25               MR. RAGSDALE:  But maybe we will work all those out

1   without there having to be motion practice.

2           THE COURT:  No.  Understood.  Understood.

3       Okay.  Well, fair enough.  I think we have covered what we

4   need to cover today.  I wish everybody safe travels.

5       And we're adjourned.

6

7           (Whereupon, the above proceedings were concluded at

8       10:51 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2

 3

 4        I certify that the foregoing is a correct

 5   transcript from the record of proceedings in the

 6   above-entitled matter.

 7

 8

 9

10

11                                        06-29-2023

12   Christina K. Decker, RMR, CRR              Date

13   Federal Official Court Reporter

14   ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25
```