1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
2                       NORTHERN DIVISION

3

4       BRIANNA BOE, et al.,          *
                                      *
5              Plaintiffs,            *   2:22-cv-00184-LCB
                                      *   November 2, 2023
6       vs.                           *   Montgomery, Alabama
                                      *   10:00 a.m.
7       STEVE MARSHALL, et al.,       *
                                      *
8              Defendants.            *
        ****************************

9

10                           **SEALED**

11

             TRANSCRIPT OF MOTIONS HEARING
12         BEFORE THE HONORABLE LILES C. BURKE
               UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
        pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
23        and Procedures Vol. VI, Chapter III, D.2.  Transcript
                  produced by computerized stenotype.

24

25

                   *CHRISTINA K. DECKER, RMR, CRR*
                   Federal Official Court Reporter
               256-506-0085/ChristinaDecker.rmr.crr@aol.com

APPEARANCES

FOR THE PLAINTIFFS:
Melody Hurdle Eagan, Esq.
Jeffrey P. Doss, Esq.
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203


Michael B. Shortnacy, Esq.
KING & SPALDING, LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071


Jason R. Cheek, Esq.
U S Atty Office - NDAL
1801 Fourth Ave N
Birmingham, AL 35203
205-244-2104
Email: Jason.cheek@usdoj.gov


Margaret Lester Marshall, Esq.
DOJ-USAO
1801 Fourth Avenue North
Birmingham, AL 35203
205-244-2121
Email: Margaret.marshall@usdoj.gov


Amie Murphy, Esq.
DOJ-Crt
950 Pennsylvania Avenue-- NW Building
Washington, DC 20530
202-353-1285
Amie.murphy2@usdoj.gov


Max Lewis Meyers, Esq.
United States Department of Justice
Civil Rights Division
150 M Street
Washington, DC 20002
202-718-3345

```
 1        FOR THE DEFENDANTS:
          James W. Davis, Esq.
 2        Alexander Barrett Bowdre, Esq.
          Charles Arthur McKay, Esq.
 3        OFFICE OF THE ATTORNEY GENERAL
          501 Washington Avenue
 4        P.O. Box 300152
          Montgomery, Alabama 36130-0152
 5        (334) 242-7300

 6
          AMICI:
 7        Barry Alan Ragsdale, Esq.
          Robert S. Vance, III, Esq.
 8        Dominick Feld Hyde, P.C.
          Litigation
 9        1130 22nd St S - Ste 4000
          Birmingham, AL 35205
10        205-536-8888
          Email: BRagsdale@dfhlaw.com
11

12        W. Neil Eggleston, Esq.
          KIRKLAND & ELLIS, LLP
13        1301 Pennsylvania Avenue, N.W.
          Washington, D.C. 20004
14

15
          RESPONDENTS:
16        Brannon Buck, Esq.
          Christopher Driver, Esq.
17        BADHAM & BUCK, LLC
          2001 Park Place North, Suite 500
18        Birmingham, AL 35203

19
          Harlan I. Prater, IV, Esq.
20        M. Christian King, Esq.
          LIGHTFOOT, FRANKLIN & WHITE, LLC
21        The Clark Building
          400 20th Street North
22        Birmingham, Alabama 35203

23

24

25
```

```
1          Bruce F. Rogers, Esq.
           BAINBRIDGE, MIMS, ROGERS & SMITH LLP
2          The Luckie Building, Suite 415
           600 Luckie Drive
3          Birmingham, Alabama 35223
           Phone: 205-879-1100
4

5          Shannon Holliday, Esq.
           COPELAND FRANCO
6          444 South Perry Street
           P.O.Box 347
7          Montgomery, Alabama 36101

8

9          Barry Alan Ragsdale, Esq.
           Dominick Feld Hyde, P.C.
           Litigation
10         1130 22nd St S - Ste 4000
           Birmingham, AL 35205
11         205-536-8888
           Email: BRagsdale@dfhlaw.com
12

13

14         Also Present:  Lena Yueh, Esq.
                          Associate General Counsel for HHS
15                        1600 Clifton Rd.
                          Building 21, Room 10000
16                        Atlanta, GA 30333

17

18

19

           COURTROOM DEPUTY:  Wynn Warren
20

21

22         COURT REPORTER:  Christina K. Decker, RMR, CRR

23

24

25
```

**P R O C E E D I N G S**

1

2          THE COURT: Good morning, ladies and gentlemen.  Please

3   be seated.

4      All right.  Do I have anybody in the courtroom who is not

5   a party or an attorney who is counsel of record in this

6   courtroom?

7      All right.  I'm going to take up a matter for a few

8   minutes that is not related to the merits of this case.  And so

9   I'm going to close the courtroom except for just parties and

10  attorneys of record.  And so if you would step out, we will

11  bring you back in just in a few minutes.

12          MR. BUCK:  So, Your Honor, we represent one of the

13  attorneys in the underlying Vague proceeding.  Is that --

14          THE COURT:  You count.  You get to stay.

15          MR. BUCK:  Okay.  That's what we wanted to know.

16          THE COURT:  I'm just making sure we don't have anybody

17  else who is outside this case.

18      And tell me your names again.

19          MR. BUCK:  Your Honor, Brannon Buck and Christopher

20  Driver.  We represent Kathleen Hartnett.

21          THE COURT:  Got it.

22      I certainly know you, Mr. Buck.  I just wanted to get that

23  on the record to keep everything clean.

24          MR. BUCK:  Thank you, Your Honor.

25          THE COURT:  All right, ladies and gentlemen, let me

1  say this:  It seems like we've got some fundamental

2  misunderstandings in this case about where we are.

3       A three-judge panel has done an inquiry.  They have found

4  that certain attorneys in this case, their actions constituted

5  misconduct.

6       I have a flurry of filings in this case that seem to be

7  turning the heat up in this matter.

8       As Judge Proctor said when he kicked off the three-judge

9  panel, it was not his intent to destroy anybody's career, and

10 neither is it my intent to do that.  But, you know, everybody

11 seems to be just turning the heat up.  And if that's what we

12 want to do, hey, you know, attorneys have to decide their own

13 strategy, and they can do that, and that's fine.

14      Later today, I want to have a discussion with the

15 attorneys about how this case is going to proceed.

16      But let me clear up a few what I would call -- apparently

17 there are misunderstandings out there, based on the motions

18 that I'm seeing, and the notice of appeal, and those sorts of

19 things.  So let's talk through those real quick.

20      There seems to be some question about what the intent of

21 the three-judge panel was.  And so, y'all, there's just 14

22 federal judges in this state.

23      The three judges who served on that panel are my

24 colleagues.  I promise you that if I did anything that was

25 outside of their intent, my cell phone would blow up within

 1  one minute.  That has not happened.

 2      I talked to the chief judge of the three-judge panel just

 3  to make sure that there was no daylight between what the intent

 4  of the panel was and what I'm doing.  And so, for the record,

 5  let me say what Judge Proctor told me.

 6      The first is, the three-judge panel's order said, The

 7  Clerk is directed to serve a copy of this final report on the

 8  Honorable Liles C. Burke, United States District Judge for the

 9  Northern District of Alabama, so he may proceed as appropriate.

10      Judge Proctor said, This is not our case.  This is your

11  case.  We have closed our case.  We have instructed the Clerk

12  to serve you so that you may proceed as appropriate.

13      And he said, Judge Burke, proceed as appropriate means

14  it's up to you to decide all matters.  We have done our work.

15  We made findings of fact, and we have delivered them to you.

16  There is nothing left for this panel to do.

17      Now, there seems to be an additional question of, well,

18  you know, Judge Burke can't act in this case, and why have the

19  findings of fact been filed into this case.  I'll tell you why.

20      The panel made findings of fact that attorneys in this

21  case had committed misconduct.  So I'm filing it in my case,

22  and I will proceed as appropriate.

23      Again, it is not my intention to knock anybody's head off.

24  And we're going to talk about that.  But I would like to see

25  the temperature come down.

1          The second issue.  Been talking a lot about work product.

2    I certainly don't see anything in this order that is work

3    product from the three-judge panel.  And I have given it a

4    solid read.

5          Even if there were something in there that were work

6    product -- which I certainly don't see -- the Eleventh Circuit

7    is very clear that you can't hide behind work product if you

8    have committed misconduct.  So I'm uncertain as to why we're

9    there.

10         Let me read a statement from the three-judge panel about

11   what their intent was about work product.  I asked Judge

12   Proctor to talk to the three judges.  This is what they've

13   asked me to put on the record today.

14         The panel was constituted for a limited purpose,

15   investigating concerns raised by Judge Burke in his April 18th,

16   2022, order in Walker.  This inquiry was handled in a wholly

17   separate proceeding than the three civil cases -- that being

18   Ladinsky, Walker, and Eknes-Tucker.

19         The panel opened a miscellaneous case in the Middle

20   District -- 22-mc-3977.  All filings and proceedings in that

21   miscellaneous case were maintained separate and apart from the

22   litigation of those civil cases before Judge Burke.

23         When work-product objections were asserted in the

24   miscellaneous case, the panel viewed those assertions as

25   counsel's efforts to avoid any waiver of work-product privilege

 1  in the ongoing civil action Eknes-Tucker.

 2        Similarly, the panel understood that counsel were seeking

 3  to ensure that there would not be any obligation to disclose

 4  any such information in the Eknes-Tucker action.  So when those

 5  objections were made, the panel treated the objections as

 6  preserving the argument that there was no obligation to

 7  disclose materials or testimony in Eknes-Tucker.

 8        Having said that, the panel was very clear that the

 9  attorneys were expected to answer the panel's questions in the

10  miscellaneous case.  And counsel clearly indicated that they

11  were not hiding behind any work-product objection, nor refusing

12  to answer the panel's questions.  The discussion about any

13  work-product material, though, would not operate as any type of

14  waiver in Eknes-Tucker.

15        Although the panel included within its final report

16  information about the lawyers' actions and their communications

17  related to the issues before the panel -- specifically, their

18  purported attempts to manipulate the random selection process

19  in the middle and northern districts to have a case assigned to

20  a particular judge or to avoid a particular judge.  The panel

21  took care not to reveal or discuss in its report any

22  work-product information related to matters connected to the

23  claims or issues that are being litigated by the parties in

24  Eknes-Tucker.

25        Rather, the evidence referenced in the panel's report is

1  directly relevant to the lawyers' conduct in this matter, not
2  any of the merits issues in any of those cases.

3      Now, lastly, I know in some of the filings -- I think the
4  notice of appeal there's the issue of, well, the panel did not
5  find that the lawyers acted in bad faith, and so the Court is
6  without power to go forward.  There's nothing left to do here.

7      Judge Proctor has discussed this with the panel.  Here's
8  what he reports to me:  He said, look, Judge, we were -- our
9  job was to make findings of fact, and findings of fact only.
10 The rest was up to you.

11     A finding of bad faith is a mixed finding of law and fact.
12 Therefore, the panel thought it was better for you, for this
13 Court to decide whether or not bad faith existed based on your
14 report.  We didn't find that bad faith didn't exist.  It just
15 was not for us to decide because that involved a standard of
16 law.

17     Now, let me say this:  All of the things that are in this
18 notice of appeal -- we're going to take this up -- I would say
19 might properly have been filed before me.

20     What do I do with this panel report?  Well, we're going to
21 talk about that.  I want to sit down with the attorneys and say
22 what's the roadmap forward here?  What are the next steps?  I
23 can envision that there are four, or five, or ten ways that we
24 could proceed with this.

25     Obviously, the things that are in that notice of appeal in

 1  the miscellaneous case could well properly have been filed
 2  before me to determine, as part of motion practice.
 3      These findings of fact that have been delivered to me are
 4  just that -- they're findings of fact.  They're for my
 5  consideration.
 6      I don't know that I am necessarily bound or not bound by
 7  them.  I also don't know that I, you know, cannot proceed to
 8  take additional inquiry, based on the findings of fact that
 9  they have given me.
10      The last thing I will say:  Just as acceptance of
11  responsibility goes a heck of a long way in a criminal case,
12  and you get points for that, it goes a heck of a long way with
13  me.
14      I am not interested in career-ending action today.  I
15  believe we're all honorable attorneys.  And I would just say
16  let's think about that as we roadmap this forward.
17      All right.  I think that clears up my opening remarks.
18  Let's get to the matters at hand.
19      Let's take up the motion for the Court to take judicial
20  notice.
21      Mr. Ragsdale, I guess I would ask you before we start:
22  Has anything I said in my opening remarks affected your filing?
23          MR. RAGSDALE:  It certainly affected my argument that
24  I was about to make.
25      Your Honor, obviously -- I'm sorry.  Barry Ragsdale here

1  on behalf three of the lawyers in Walker.

2      Our concern, Judge, we didn't know that there was

3  communication obviously going on between you and the panel.

4  And we didn't know whether you had access to the transcripts.

5  I now do know that.

6      And so our intent was merely to make sure that the Court

7  was aware of what we were told by the panel as we went through

8  those proceedings.  Meant no disrespect.  Certainly didn't mean

9  to imply that you weren't keeping up with things, or anything

10 like that.

11     And certainly your words today are taken to heart.

12     So as a consequence, Your Honor, I don't know that there's

13 a need for you to take judicial notice now because you've told

14 us that you know what was going on, and you have talked with

15 Judge Proctor.

16         THE COURT:  All right.  Fair enough.

17     And so does that -- would you say that that motion is moot

18 at this point?

19         MR. RAGSDALE:  I think so.

20         THE COURT:  Okay.  Fair enough.

21     All right.

22         MR. RAGSDALE:  Is that all you have for me, Your

23 Honor?

24         THE COURT:  That's all I have.

25         MR. RAGSDALE:  Thank you.

1              THE COURT:  Thank you.

2         All right.  Why don't we take up the motions to stay?  Who

3    wants to be heard on that?

4              MR. KING:  Your Honor, Chris King.  I represent

5    Ms. Eagan and Mr. Doss.  If I could speak.

6              THE COURT:  Come forward, sir.

7              MR. KING:  Thank you, Your Honor.

8         And if I could start by telling you how much I and my

9    partners appreciate the Court's remarks this morning.  And we

10   take them to heart, and we hear you --

11             THE COURT:  Thank you.

12             MR. KING:  -- Your Honor.

13        And to answer the Court's questions about the notice of

14   appeal.  The only reason we did it on behalf of Ms. Eagan and

15   Mr. Doss was a concern about a waiver.

16        That -- you know, that case was closed.  And we were very

17   concerned that if we let the time run before we were before

18   Your Honor, that -- and then there was a need for an appellate

19   review down the road, they would say, oh, you should have

20   complained about what happened with the panel as a result of

21   that case.

22        The Eleventh Circuit may find that it's not ripe.  But we

23   were -- you know, it's better to file it and have it dismissed

24   than to not file it and have the Eleventh Circuit say we were

25   late.

1                THE COURT:  Right.  Understood.

2                MR. KING:  So that was our explanation, at least for

3     that.

4           And I agree with you.  And this sort of ties in to the

5     motion to stay.  We make two arguments in our motion in the

6     alternative.

7           The first is because of that appeal, to the extent the

8     Court uses or doesn't use the panel's report, we think it makes

9     sense to see what the Eleventh Circuit says about that report.

10          And that's just a judicial economy issue.  And --

11               THE COURT:  And I'll just interrupt you briefly.

12          I understand.  Everybody has to represent their client.

13    I'm not working any trial strategy up here.  And I am not

14    sitting in judgment of any trial strategy.  You have got to do

15    what you think is in the best interest of your client.  So I

16    don't want you to take what I have said today as any judgment.

17          I just thought we had some misconception I needed to clear

18    up.

19               MR. KING:  Yes, sir.  And we appreciate it.

20          You know, we lawyers are all so paranoid about waiving

21    appellate rights.  And so that drives a lot of our thinking

22    there.

23               THE COURT:  So I will throw a couple of things at you.

24          The first is, you know, is there any thought that that

25    case should be actually consolidated with this one?

```
 1          I believe what may happen is, even though that case is
 2     closed, it could wind up going ahead and being reassigned at
 3     this point, you know, depending on where this is going.  Unless
 4     we're all in agreement that we're going to move forward on
 5     these issues in this case, that's certainly my intent.
 6          Do you have any thoughts on that issue?
 7              MR. KING:  I will give you my personal preference.  I
 8     don't mean to speak for any other person.
 9          My personal preference is to let it all flow -- if we can
10     solve the concern about waiving any appellate rights --
11              THE COURT:  Right.
12              MR. KING:  -- I think that would be great, because the
13     problem -- as the Court indicated, you know, this may be a
14     process that doesn't need to be appealed at the end.
15          And so, but if there were a way to make sure that there
16     was no waiver of our -- the issues, with respect to the panel's
17     findings, that would be my personal preference; that we just
18     let Your Honor play this out in the way you see fit, and that
19     we still have our rights that haven't been waived.
20              THE COURT:  Gotcha.  So how would that work?  Would
21     you withdraw your notice of appeal until a final order if we
22     did that?  Or how does that work procedurally?
23              MR. KING:  Well, I have never done it.
24              THE COURT:  Right.
25              MR. KING:  So we got -- I think there should be a way
```

```
 1   to do it.  If there were some reopening of that case so -- you
 2   know, what scares me, Your Honor, frankly, is that case closed
 3   every time -- you know, that caption case closed, that makes me
 4   worry about the Eleventh Circuit and what they're going to do.
 5        I would think if there were a way -- kind of thinking out
 6   loud -- for the panel to reopen it for purposes of
 7   consolidating it with this case so that it remain alive, you
 8   know, then we could probably satisfy ourselves that we could
 9   withdraw the --
10             THE COURT:  So maybe have the panel reopen it and
11   reassign it to me?
12             MR. KING:  Yes, sir.  That's -- if there's a way to do
13   that.  I know it's a miscellaneous action.  And I have to be
14   frank.  In my 41 years, I have never dealt with one before.
15             THE COURT:  Right.
16             MR. KING:  So I'm not sure.  But I'm just thinking out
17   loud.  I think there would be a way to do that.
18             THE COURT:  Got it.  Got it.
19             MR. KING:  So, Your Honor, if we were to do that, I
20   think, then, that takes us to the second prong of our motion.
21        If the appeal were to go away so we're no longer waiting
22   on that, then the second prong of our motion requests that the
23   Court deal with the merits of the case and hold this over until
24   the end because -- and we cited some law where it's not a
25   required practice.
```

1          The Court can hear the sanctions when it wants to hear the

2    sanctions.  But the Cunningham case that we cited discusses the

3    wisdom of getting the merits done, and then having this

4    collateral matter dealt with later.

5          Now, part of me doesn't want to argue that.  Because all

6    of these lawyers, this is -- as you would expect, it's been

7    very, very difficult for all the lawyers.  It's been a personal

8    nightmare for them.  And I know how sorry they are that this

9    ever happened.

10         And they can tell you that themselves.  And I don't intend

11   to -- you know, I don't mean to speak for them.

12         But part of me, you know, wants to get it behind these

13   lawyers -- my partners.

14         But, you know, the other part is that, if you look at

15   Cunningham, dealing with this in the middle of the case is a

16   distraction.  It might slow the other case down.  And it --

17   also, if something bad were to happen to these lawyers, which I

18   hope and pray it doesn't, and I -- then they would not have the

19   right to appeal right away.  And so this would hang over them.

20         And, you know, the practical effect of this really is not

21   only professional embarrassment, Your Honor, but it's pro hac

22   applications, for instance.  You know, there are a lot of

23   implications to any sanction these days.

24         And so it's extremely important not only personally to

25   them, but professionally.  So part of me wants to get it behind

 1  them.

 2       But then I don't want something hanging over them for a

 3  long period of time.  That was the second prong of the motion

 4  to stay.

 5       And I don't know what the Court's thoughts are.  If I can

 6  answer any other questions about that.

 7            THE COURT:  My general thoughts are this -- and

 8  obviously, I have not heard all the argument in this.  And

 9  that's really what today is about.

10       My general thoughts are that this is, you know, apparently

11  I would say a non-final order.  It's a finding of fact with no

12  action taken on it.

13       You know, depending on what motion practice I have, I

14  think there's the possibility there could be additional facts

15  in this case.

16       I certainly respect the work of the panel.  I have no

17  reason to think that their findings of fact aren't the findings

18  of fact I should go with.

19       But also, you know, I understand that y'all may want to do

20  some motion practice in front of me regarding that, regarding

21  the panel's findings.  And some or all of you, you know, may

22  have some thoughts on that.

23       So, you know, so I would say we've got non-final findings

24  of fact until I make them final.  And yet, you know, we --

25  obviously, the next step would be to decide, you know, what, if

 1  anything, do we do about those findings of fact.  And then at

 2  that point, certainly I would think it becomes appealable.

 3       But right now, I don't know that there's anything to

 4  appeal from, it would appear to me, based on current status of

 5  the law.

 6            MR. KING:  I hear you.  And I tend to agree with you.

 7  We're just scared not to in the current posture.

 8            THE COURT:  I got it.  I got it.

 9            MR. KING:  And so, but, Your Honor -- and the final

10  thing I will say, unless the Court has other questions is this:

11  There's a tension about the temperature.  We want to keep the

12  temperature low.  And we have tried to do that and will do that

13  at the same time, of course, dealing with waiver issues.  And

14  so that's always the balance.

15       But we want the Court to know that we appreciate the

16  Court's consideration.  We appreciate the position the Court's

17  been put in, with the receipt of this report.  And we do trust

18  the Court to give our clients justice.

19            THE COURT:  Absolutely.  I appreciate your remarks.

20            MR. RAGSDALE:  May I be heard?

21            THE COURT:  Absolutely.

22            MR. RAGSDALE:  I'm afraid I'm going to do exactly what

23  you told me not to do.

24            THE COURT:  Okay.

25            MR. RAGSDALE:  I think if the panel would have stopped

1    with findings of fact, we would be exactly where you say we
2    are.  But they didn't.  They made legal conclusions of
3    misconduct.
4         When they went the step further, it's just like what Your
5    Honor said -- a finding of subjective bad faith is a mixed
6    question of law and fact.  And that's why they didn't make it.
7         But they did make a finding expressly of ten instances of
8    what they call misconduct, which are legal conclusions, not
9    factual conclusions.
10        And that's frankly what caused us to feel like we had to
11   appeal.  Because there were legal final conclusions in a closed
12   case.
13        Now, if what the Court is telling us -- and I -- I'm not
14   trying to put, obviously, words in the Court's mouth -- is that
15   you are not going to defer to those findings of misconduct,
16   that you're going to revisit that and see whether or not it
17   really was misconduct, then I think the approach that you have
18   discussed with Mr. King makes perfect sense.
19        But already we have seen, for example, Your Honor, the
20   notion argued by both the State and elsewhere, that because
21   there's a finding of misconduct, there's automatically a waiver
22   of the work-product doctrine, and --
23             THE COURT:  Let me address that.
24             MR. RAGSDALE:  Okay.
25             THE COURT:  And I should have addressed this on the

1   front end.

2        So, look, here's how I view this.  I obviously have these

3   findings from the panel.  And I know the State's position.  But

4   all of those things can be addressed at a later time.

5        To the extent that, you know -- I know you have a concern

6   that, you know, these findings could go to the merits of the

7   case and all that.  I don't think this does or does not open

8   the door to that.

9        I would just say that, you know, when we get to that issue

10  before we have a trial, I think that's limine practice, you

11  know.  Hey, can we use this, can we not use it.  And, you know,

12  so I don't view that question as decided right now one way or

13  the other.

14           MR. RAGSDALE:  So, at this point, you don't believe

15  there's been a finding of misconduct that is binding on you or

16  that you would defer to.

17           THE COURT:  No.  That's not what I'm saying.

18       Let me say this:  I have no reason to think that the

19  panel's findings are not good findings that I should go with.

20  I have no reason to think that.

21       I'm just saying I've been presented with them.  And I

22  believe that the attorneys in this case ought to have the

23  opportunity to make arguments to me, much as what I saw in the

24  notice of appeal to the Eleventh Circuit.

25       I think everybody ought to have the right to bring that to

1  me before I say, yes, these are the final findings of fact.

2          MR. RAGSDALE:  Then, in that instance -- I mean, all

3  I'd ask, Your Honor, is that you put yourself in our

4  position --

5          THE COURT:  Right.

6          MR. RAGSDALE:  -- which is a final decision, which is

7  the language that's used in 1291 for appeals --

8          THE COURT:  Right.

9          MR. RAGSDALE:  -- by this three-judge panel that

10 reached what appeared to us to be legal conclusions.

11         THE COURT:  Again, I guess we're spit-balling here,

12 but --

13         MR. RAGSDALE:  Yeah.

14         THE COURT:  -- you want me to enter an order that says

15 these are not final at this point?  Does that help you?

16         MR. RAGSDALE:  I think it would.  Although, Your

17 Honor, we're in uncharted territory.

18         THE COURT:  We are.  I don't think there's been a

19 three-judge panel in the history of this circuit on an issue

20 like this.  And I agree we are in uncharted territory, you

21 know.

22     I think -- I'm not going to put myself in a box here, but

23 I think there's an argument to be made that the panel's

24 findings are much like a magistrate judge's report and

25 recommendation.  I'm not going to say they're perfectly

1    aligned, but there's a thought process there.  And so -- well,

2    let's address that.

3        I know counsel for Ms. Eagan and Mr. Doss kind of charted

4    a path, hey, you know, if we can -- if we all agree there are

5    further things to do, and maybe reopen this case, then we don't

6    need to appeal this, at least at this stage.

7        Maybe I'd ask you to come back around the podium with

8    Mr. Ragsdale, and let's talk this through just a second.

9            MR. RAGSDALE:  He may not want to stand next to me.  I

10   don't know, Judge.

11           THE COURT:  He may not.

12       You have heard what Mr. Ragsdale has suggested here.  And

13   I think what I hear him saying is, you know, if the Court

14   issued an order, at least at this point, to say, hey, this is a

15   non-final order, does that change anything with you?

16           MR. KING:  We are spit-balling, Your Honor.

17       But my view is that that order coming from the panel, as

18   opposed to Your Honor, or maybe both, would be a good thing.

19       I think maybe reopened by the panel -- and I'm looking at

20   Barry because we haven't talked about any of this.  But a

21   reopen by the panel, the -- an order that it's not final, and

22   it's being transferred to you for further proceedings -- which

23   is kind of what they said in the order, anyway.  It would at

24   least make me less concerned about waiver.

25       Of course, the problem is the Eleventh Circuit can do what

```
 1   the Eleventh Circuit does, no matter what.

 2           THE COURT:  Absolutely.

 3           MR. KING:  So we are --

 4           THE COURT:  I'm not short circuiting your appeal, if

 5   that's what you want to do.  I'm just saying --

 6           MR. KING:  Don't want to do it.

 7           THE COURT: Right.  Right.

 8           MR. KING:  Don't want to do it.

 9           THE COURT: Right.

10           MR. RAGSDALE:  We agree on that.

11           THE COURT:  Well, this may be something that we take a

12   break and talk about further.

13        So anything else you want to add on this, Mr. Ragsdale?

14           MR. RAGSDALE:  The only thing I would add, Your

15   Honor -- and I sound like a broken record on this, and I'm

16   sorry.

17        But I do think it's worth repeating that my clients are

18   not counsel in this case, have never been counsel in this case.

19   Were never counsel in Ladinsky.  They filed the case, and

20   five days later, dismissed it.  And that's all they did.

21        So to the extent it has some effect on your view of -- not

22   your view.  That's not fair.  But on counsel in this case or

23   the parties in this case, that's not my clients.

24           THE COURT:  Understood.

25           MR. RAGSDALE:  Okay.
```

1          THE COURT:  Understood.

2       So nobody wants to say anything else about the motion to

3  stay?  Is that...

4          MR. KING:  No, sir.

5       I mean, if the Court says that let's try a way around --

6  let's try to get everybody comfortable so we can dismiss our

7  notice of appeal, we would then request a scheduling order that

8  sort of sets out a process.  And we would like that to happen,

9  as we've argued, at the end of the case on the merits to avoid

10 the distraction.  But we can talk about that, you know, at the

11 Court's convenience, but that would be -- as we see the

12 sequencing, you know.

13      For instance, we may well bring an expert witness or two,

14 if this is -- you know, if there's going to be further hearing.

15 The Court may just decide to do something without that

16 rigmarole.  And we understand that, as well.

17      But, you know, we would like to discuss a schedule, if we

18 can get ourselves comfortable, with respect to the notice of

19 appeal.

20          THE COURT:  No.  I got it.

21      And, look, I want everybody to understand.  There are a

22 lot of judges who, presented with this order, you guys would

23 just get a show cause order motion -- I mean, order in the mail

24 for 10 days out.  I have not done that.

25          MR. KING:  You haven't, Your Honor.

1          MR. RAGSDALE:  And I personally appreciate it.  And I
2     think others do, as well, Your Honor.

3          And let me also say, I also think the approach that you
4     brought to the bench this morning is exactly what we needed in
5     this case.

6          THE COURT:  All right.  Anybody else want to be heard
7     on this motion to stay?  I know the State will.

8          Who's going to speak for the State?

9          MR. DAVIS:  Good morning, Judge.  Jim Davis for the
10    State for the defense.

11         THE COURT:  Good morning.

12         MR. DAVIS:  Judge, our priority is working with
13    Ms. Eagan and Mr. Doss and their colleagues, and getting the
14    case ready for trial, for decision.  And defending the
15    constitutionality of the law.

16         So what happens next, and when Your Honor chooses to do
17    it, we do not take a position on that.  We ask only that the
18    Court consider which options would best make it possible for
19    the lawyers here to get this case ready for you to decide the
20    constitutional issues.

21         THE COURT:  Got it.  All right.  All right.  Fair
22    enough.

23         All right.  We still have, looks like to me, two filings
24    that are under seal.  One is the sealed brief in support of
25    emergency motion to stay, dissemination of the sealed final

 1  report by Esseks, Charles, and Faulks.

 2      Mr. Ragsdale, I mean, has anything that we have talked

 3  about this morning solved that issue?  Or where does that

 4  stand?

 5          MR. RAGSDALE:  First, Your Honor, we served a copy on

 6  the State of that brief in its entirety.

 7          THE COURT:  All right.

 8          MR. RAGSDALE:  If this Court's made a ruling that

 9  there's no -- may I approach?

10          THE COURT:  Sure.  No.  No.  Come around.

11          MR. RAGSDALE:  I have two problems, or maybe I have 99

12  problems.  But the two I want to talk about are not only the

13  work product, which I understand you have indicated you don't

14  think there's work product, and we obviously recognize that.

15      But, Your Honor, as we tried to point out, the panel went

16  to great lengths to keep us from sharing the information -- not

17  keep us from -- I'm not trying to make it sound nefarious.  But

18  they put very strict restrictions on the dissemination of the

19  transcripts, of what occurred in the hearings, on the evidence

20  that was presented, the declarations.  I mean, we were

21  repeatedly told we could not share that with anybody, and in

22  some instances, not even with our own client.

23      So as a consequence, although I am always fearful of

24  running afoul of a judge's orders, I was concerned that taking

25  that information, putting it in a brief, and then filing it on

```
 1   the public record violated the panel's directions to me.  And I
 2   have no more interest in making three of them mad as I do
 3   making you mad.
 4       And so that was our reason for why things were filed under
 5   seal was because we had been directed by those three judges not
 6   to disclose any of that information.
 7           THE COURT:  And all of that could have properly been
 8   put in a motion to file under seal before it was filed under
 9   seal.
10           MR. RAGSDALE:  Absolutely, Your Honor.  Bud I would,
11   in my defense, only say things were moving at a pretty fast
12   pace at that point.
13           THE COURT:  Understood.  Understood.
14           MR. RAGSDALE:  And I apologize to this Court for not
15   following those proper procedures early on and continuing to do
16   that.  And I have tried to rectify my mistakes as best I can.
17       We've certainly made sure that we have served everything
18   on the State.  They have now seen all of those filings.  Our
19   last filing, obviously, we did not put under seal.
20       And, again, Your Honor, that was not to try to hide
21   anything from anybody other than the fact that I felt like I
22   remained under a court order from three federal judges telling
23   me I could not disclose that information.
24           THE COURT:  Understood.
25       You know, and I would say this:  The panel's work is
```

1  different from my work.  You know, they opened an inquiry not

2  regarding the merits of this action, but the circumstances

3  under which it was filed, and other cases were dismissed.  And,

4  you know, they operated under that rule.

5      I'm certain they didn't know what they would find.  They

6  didn't know what, if any, work product might come out in the

7  process of this.  They didn't know what, if any, information

8  they might get.

9      And so I'm certain that they -- they set these rules up,

10  you know, basically to protect the inquiry because they didn't

11  know where they were headed from the onset.

12      But now I also have a different job.  Now I do have

13  findings of fact.  They've been given to me to proceed.

14  They're in this case.

15      And so, you know, from my end, if this were just a regular

16  case, if I had, you know, entered into an inquiry as to

17  whether, you know, misconduct or sanctionable action had taken,

18  it would have been in this case.  It wouldn't have been in a

19  separate case.  Every person who was a party, including the

20  State, you know, would have a right to respond to any motion

21  practice, and all that.

22      And, so I don't want to create a situation where the State

23  is cut out, or other parties are cut out just because the panel

24  did its work, you know, for administrative purposes under a

25  separate case number.

1    And so, you know, my belief, unless somebody convinces me

2  otherwise, my belief is that all filings regarding this now,

3  you know, should go to all parties, and all parties should have

4  a right to respond.

5    Any thoughts on that?

6    MR. RAGSDALE:  I absolutely agree with you, Your

7  Honor.

8    There are two filings that still remain under seal by us,

9  as you pointed out.  One of which was filed under seal at your

10  direction.  We can unseal that, obviously, at your direction,

11  as well.  And then we will file the brief on the record, as

12  well, if that's the Court's preference.

13    And, again, Your Honor, I promise you, I was not trying to

14  flaunt your rules.  I was trying to figure out which judge was

15  going to get madder at me.

16    THE COURT:  I'm glad to hear you say that.

17    MR. RAGSDALE:  Okay.

18    THE COURT:  All right.  So that seems like that solves

19  that emergency motion to stay.  We'll just enter an order

20  unsealing that based on what you've said.

21    And then the notice of supplemental authority is the same;

22  is that correct?

23    MR. BOWDRE:  I'm sorry, Your Honor.  Are you talking

24  about the notice that we filed?

25    THE COURT:  Yes.

 1            MR. BOWDRE:  Yes, Your Honor.  May I approach?

 2            THE COURT:  Yes.

 3            MR. BOWDRE:  The notice of supplemental authority that

 4  we filed, we filed under seal.  It regards the WPATH documents

 5  that we received in discovery.

 6       We think that -- and those documents were produced to us

 7  under the Court's protective order.  They were marked as

 8  confidential and attorneys' eyes only.  We thought that those

 9  documents clearly fall within that protective order.  And so to

10  bring that to the Court's attention, we filed it under seal

11  pursuant to that protective order.

12            THE COURT:  Let me turn this -- is there anybody who

13  thinks that that should not remain under seal?  Or is everybody

14  good with that remaining under seal?

15       All right.  It looks like that stays under seal.

16            MR. BOWDRE:  Thank you, Your Honor.

17            THE COURT:  All right.  Let's take up this motion

18  regarding Admiral Levine.

19       Mr. Bowdre, are you going to argue that?

20            MR. BOWDRE:  Yes, Your Honor.

21            THE COURT:  All right.

22            MR. BOWDRE:  Barrett Bowdre for the State defendants.

23       I don't think I have too much to add to this besides what

24  we've already put in our briefing and in our notice of

25  supplemental authority.

1      I think that notice really emphasizes the importance of

2  making Admiral Levine a custodian in this case.  We think it is

3  clear that the Admiral has highly relevant documents that go

4  directly to the issues in this case.  And we also think it's

5  clear that we're likely not to get those same documents

6  elsewhere; that at the very least, the proposed custodian from

7  HHS, who is a lawyer, who is on Admiral Levine's staff -- that

8  lawyer left in May or June.  So at the very least, we have

9  documents from then that I don't think there is a single

10 custodian for.

11     But even were that not the case, I think it's clear that

12 Admiral Levine as HHS's, you know, most outspoken advocate of

13 these treatments for children, and a person that we know is

14 working on these issues, we think it's obvious that the Admiral

15 has highly relevant documents that we are entitled to.

16     I don't think I have much more to add.  If the Court has

17 any questions, I'm happy to answer them.

18             THE COURT:  Well, I guess I would say this:  So if I'm

19 boiling this down, I know you want Admiral Levine to be a

20 custodian.  But I think the bottom line is you just really want

21 your search terms to be done with her correspondence; is that

22 correct?

23             MR. BOWDRE:  Yes, Your Honor.

24             THE COURT:  So is it of any consequence whether or not

25 she's a custodian if you get your search terms?

1            MR. BOWDRE:  Well, we want the search terms of the

2    Admiral's e-mails.

3            THE COURT:  Right.

4            MR. BOWDRE:  And so that is the part that makes the

5    Admiral a custodian.  Like right now, my understanding is that

6    HHS is not searching Admiral Levine's --

7            THE COURT:  I guess what I'm saying is, obviously, you

8    know, Admiral Levine is an important person, has a big job to

9    do.

10       You know, is the desire that she has to be the one to do

11   this; or is it that, you know, this deputy to her that already

12   is a custodian could do that search?

13           MR. BOWDRE:  Your Honor, I think if the deputy had

14   complete access to the Admiral's files and that custodian

15   record was the exact same, our position would be different.

16       But my understanding is that the Admiral has an e-mail

17   address, the deputy -- or the former lawyer has an e-mail

18   address, and that they're not coextensive, that the lawyer

19   Calsyn does not have access to all of the Admiral's e-mails.

20       There are e-mails that the Admiral has both sent and

21   certainly received that HHS has indicated that their proposed

22   custodian does not have access to.  And, so, therefore, they

23   would not be searching.

24           THE COURT:  All right.  Well, let's hear from the

25   government on this.

1          Any reason he can't have his search terms on the Admiral's
2   e-mails?

3              MS. MURPHY:  Good morning, Your Honor.  Amie Murphy
4   for the United States.

5          Yes.  The reason why HHS chose Deputy Assistant Secretary
6   Maura Calsyn as the custodian is because her e-mails are
7   substantially the same as Admiral Levine's.

8          The two of -- those two officials worked closely together.
9   In fact, they've been working together since they were
10  officials in the state of Pennsylvania.

11         And Ms. Calsyn -- the way that Admiral Levine operates,
12  she doesn't send a lot of e-mails.  She doesn't work through
13  written work product.

14         She started her practice as a treating physician.

15         And so even today, when she receives an e-mail, or she
16  sends an e-mail, it goes through Ms. Calsyn.  Ms. Calsyn is
17  either CC'd on the e-mail, or Admiral Levine will forward
18  something to her.

19         And so that's why HHS chose her -- chose Ms. Calsyn as the
20  custodian is because she does have -- and it's unclear to me
21  why the State feels that she doesn't -- Ms. Calsyn does have
22  access to Admiral Levine's e-mails.

23         And so our position is it's wholly unnecessary to
24  specifically search the records of a high-ranking official
25  simply because of defendants' speculation.

1          THE COURT:  So, look, the State's brief is pretty

2     compelling.  Admiral Levine is not just a bystander.  She is a

3     very important person in the United States Government.

4          She has chosen -- and that's fine -- but to put herself

5     squarely in the middle of this issue with speeches.  She is on

6     the board of the very authority that all parties agree --

7     WPATH -- that their guidelines, you know, are the gold standard

8     that will decide -- that will help decide this case one way or

9     the other.

10         She's obviously in a position that, you know, she can ask

11    for rulings and authority to go out from her organization.

12         Tell me how -- tell me how what she has wouldn't likely be

13    able to produce relevant evidence.

14         MS. MURPHY:  I understand that point, Your Honor.

15         And, you know, what I would say to that is the

16    determination on who to make a custodian is not based on the

17    person's credentials alone.  In fact, it's based on who is the

18    person who is most likely to have --

19         THE COURT:  I'm not so worried about who is the

20    custodian, as long as the State gets their search terms and the

21    e-mails they want.

22         MS. MURPHY:  Correct, Your Honor, and --

23         THE COURT:  Can her deputy, who is already, you know,

24    designated by you as a custodian, produce to them the same

25    thing to them as if Admiral Levine herself did it?

1          MS. MURPHY:  It's our position that that's already

2     been in place.  We produced -- I can't say the number, because

3     I don't know off the top of my head.

4          THE COURT:  There seems to be a dispute whether we are

5     going to use the State's preferred terms that they're using in

6     the other searches, or whether they're using the FOIA terms.

7          MS. MURPHY:  Oh, I think the dispute is actually over

8     whose records are going to be searched, as I understand it.

9     And so the search terms are the same.

10         We have already agreed on a set of search terms.  And the

11    question is whether -- whether or not they're going to be run

12    through Ms. Calsyn's files, or they're going to be run -- which

13    they already have been -- or whether they'll also be run

14    through Ms. Levine's files.

15         THE COURT:  So if Ms. Calsyn -- is that right?

16         MS. MURPHY:  Yes.

17         THE COURT:  I know you're saying, well, they're

18    substantially the same.  That's not the same, substantially the

19    same.  But, I mean, what are we afraid of here?  Why can't we

20    run these terms through her e-mails, too?

21         MS. MURPHY:  Your Honor, as I understand HHS's

22    position on this, it's pretty much unprecedented to search the

23    e-mails of a high-ranking government official.  And it's simply

24    the time, the effort, and the level of review that those

25    documents will need go through.

 1          THE COURT:  Well, I understand if there's a privilege

 2   issue, or anything like that, I am certain you would assert it,

 3   if you found something that you thought was covered by that; is

 4   that right?

 5          MS. MURPHY:  That's correct, Your Honor.

 6          THE COURT:  All right.  And, look, you know, I'm just

 7   asking the question here -- can we get the State this

 8   information.  But, you know, Admiral Levine doesn't have to be

 9   the person to sit down and do this.  If somebody else can do

10   that, I don't want to burden her with that.  Again, she has got

11   a big job to do.

12      But, you know, is there a way -- I am going to take a

13   break in a minute and let everybody talk and settle in as we --

14   maybe this is something you could talk to Mr. Bowdre about.  I

15   think you've got a fair idea of where I'm headed right now.

16          MS. MURPHY:  Yes, Your Honor.

17          THE COURT:  All right.  All right.  Anything else you

18   want to tell me?

19          MS. MURPHY:  Your Honor, one thing that we put on the

20   table back when this motion was initially filed, was that we

21   offered to produce e-mails that were already compiled in

22   response to a FOIA request.

23      Now, that -- the truth is, the search terms are different,

24   but they're substantially the same.  Many of the same search

25   terms that the government proposed and agreed on with the State

1  are included in that FOIA request -- WPATH, transgender.  Those

2  are on there.

3      The difference is those documents have already been

4  compiled, and so the burden is far less than running the

5  State's preferred search terms into her files.

6      And so I just --

7          THE COURT:  I thought you said y'all had agreed on

8  search terms.  This doesn't sound like you have an agreement on

9  search terms.

10         MS. MURPHY:  We did.  Maybe I'm not explaining it

11  correctly.

12     We agreed on search terms to use for each of the

13  custodians in the case.  There's nine custodians.  And we have

14  agreed search terms for that.

15     The State wants those search terms to be used for Admiral

16  Levine's files.

17     There was also, when we initially said that we didn't feel

18  that it was necessary to run those search terms through her

19  files, we offered a compromised position, which was to produce

20  files that were in response to a FOIA request.  It was Admiral

21  Levine's e-mails in response to a FOIA request.  Similar, but

22  different search terms.

23     The difference is these documents have already been

24  compiled, and reviewed, and are, as I understand it, pretty

25  much ready to go.  So the difference is it would eliminate the

```
 1  burden if we took that option.
 2          THE COURT:  I understand.
 3      You know, if the shoe were on the other foot -- and it's
 4  not -- but if it were, you know, I don't want to put the State
 5  in the position of, you know, the person with the discovery
 6  that's sought gets to determine the terms under which it will
 7  be provided.
 8      I don't think the request is unreasonable.
 9          MS. MURPHY:  Thank you, Your Honor.
10          THE COURT:  Absolutely.  Absolutely.
11      But, again, let me just say, you know, I do not want to
12  burden Admiral Levine with this.  And I think if the two of you
13  talk, we can find a way to accomplish their discovery without
14  it being any burden at all to her, much less a substantial
15  burden.  I think we can do this through subordinates, and she
16  won't have to spend any time on it at all.
17          MS. MURPHY:  Thank you, Your Honor.
18          THE COURT:  All right.  Do we have any additional
19  motions that we need to take up today?
20          MR. BOWDRE:  Yes, Your Honor.
21          THE COURT:  Okay.
22          MR. BOWDRE:  I think there are two other things that
23  we would like to talk with you about.
24      One is the HHS's notice that it's going to be two months
25  late in producing discovery.
```

1        And then the other is our motion to stay the Court's

2   preliminary injunction.

3        I will start with the schedule.

4        So, as you know, when the parties proposed and this Court

5   entered the scheduling order in June --

6            THE COURT:  Let me just help you on the preliminary

7   injunction order.

8        That's the Eleventh Circuit's business.  They've issued --

9   they've issued their ruling.  For whatever reason, they have

10  not issued a mandate.  That's up to them.

11       And, so, you know, if the Eleventh Circuit decides that

12  they want to issue a mandate on this case, and make that order

13  final and permanent, that will act.  But I have no intention of

14  doing anything at this time with that order.  That's fully in

15  the Eleventh Circuit hands, and that's up to them.

16           MR. BOWDRE:  Yes, Your Honor.

17       And just to clarify, though.  We are not asking you to

18  vacate the preliminary injunction, but to stay it, which we

19  think the Court has jurisdiction to do.

20       I understand if the Court doesn't want to do that, we

21  would just ask that the Court deny the order quickly so we can

22  pursue an appeal, if necessary.

23           THE COURT:  Understood.

24           MR. BOWDRE:  Back to HHS.

25       The schedule that this Court entered was a tight schedule,

1  but it depended on each phase being completed before the next

2  phase could take place.

3      So HHS was to produce all of its discovery to us by

4  October 20th.  So then we had just a little over a month to

5  review that discovery with our experts, and then for those

6  experts to write their supplemental reports, which are due

7  December 1.

8      And then that gave the plaintiffs just over a month to

9  review those before their rebuttal reports were due.  And then

10  there are a few weeks for final depositions before discovery

11  closed.

12      When HHS said that it's not going to be able to complete

13  discovery until December 15 -- two months later, and two weeks

14  after our supplemental reports are due -- that really throws a

15  wrench into things.

16      And I would also just point out that the discovery that is

17  delayed is from the National Institutes of Health, which is the

18  subdivision within HHS that is funding and overseeing the

19  ongoing studies into the safety and efficacy of these

20  transitioning treatments for children.  So we think that

21  discovery is actually very important for our experts to be able

22  to review and opine on in the supplemental report.

23      So, obviously, we want to get to trial --

24         THE COURT:  What's the solution?

25         MR. BOWDRE:  I think reluctantly, and very

```
 1   frustratingly for defendants, I think the solution is to kick
 2   everything back by two months -- so adjust the schedule.
 3       Because we think -- you know, we want to get to trial.  We
 4   want to vindicate the State's law.  But we also need the
 5   discovery to do that.
 6           THE COURT:  So move the trial?
 7           MR. BOWDRE:  Yes, Your Honor.
 8           THE COURT:  I had come to generally the same
 9   conclusion myself.
10           MR. BOWDRE:  One other --
11           THE COURT:  Let me say something else about your
12   motion for me to vacate my preliminary injunction.
13       I mean, I'm not really sure why you filed that.  You know,
14   that's the Eleventh Circuit's business.
15       Why do you think they haven't issued a mandate?
16           MR. BOWDRE:  Well, Your Honor, I think there's a
17   difference between a stay and vacating the injunction.  I just
18   want to be very clear that the mandate goes to whether this
19   Court has jurisdiction to vacate the injunction.  And the
20   answer to that is clear, that it doesn't.
21       The mandate has nothing to do with whether this Court can
22   stay the injunction.  And courts do that all the time.
23           THE COURT:  I understand that.
24           MR. BOWDRE:  Okay.
25           THE COURT:  But you're asking me to get in front of
```

1   them.  You are asking me to get out in front of them.

2       This is their business.  They have issued an order, but

3   they have not issued a mandate.  And I don't know what that

4   means.

5       Does it mean they're going to hear it *en banc*?  Does it

6   mean the order might change?  Does it mean it might not change?

7       But you are asking me to second guess them really, aren't

8   you?

9           MR. BOWDRE:  No, Your Honor, I don't think so.  I

10  think we are asking you to recognize that, as of right now, all

11  of the Eleventh Circuit is bound by the precedential decision

12  that the Court issued.

13      And so that is why, for instance, the Georgia district

14  court stayed its injunction that it had issued in light of the

15  Court's ruling.  And so we just thought it would be very odd

16  that if that is proper for the Georgia district court to stay

17  its injunction in light of that ruling, the same effect should

18  take place here.

19          THE COURT:  So let's get in the "what about" business.

20      So, then, I vacate my order based on this opinion, and a

21  new opinion comes out *en banc* that says something entirely

22  different.

23          MR. BOWDRE:  If that's the case, Your Honor, then we

24  follow the new opinion.

25      The point is we follow the precedent as it exists today.

```
 1   And the precedent as it exists today shows that we are likely
 2   to succeed on the merits.
 3             THE COURT:  All right.
 4             MR. BOWDRE:  And, again --
 5             THE COURT:  I think we have covered it.
 6             MR. BOWDRE:  Yes, Your Honor.
 7             THE COURT:  All right.  Anybody think that we don't
 8   need to set this trial out a little bit further?
 9             MS. EAGAN:  Judge, Melody Eagan.  From our
10   perspective, that is acceptable to us.
11             THE COURT:  Okay.  All right.
12             MS. MURPHY:  Your Honor, Amie Murphy on behalf of the
13   United States.
14      I just want to correct the record very quickly, if I may.
15             THE COURT:  Yes.
16             MS. MURPHY:  Your Honor, defendants approached us last
17   week with the request to agree to change the scheduling order.
18   We gave it some thought in our office.  We spoke with HHS.
19      Although HHS believes that they can complete the
20   production by mid November, we informed the defendants that we
21   were not opposed to an extension of the discovery schedule.
22      So I'm not sure why they made a motion here today.  But we
23   said that we would agree to it.
24             THE COURT:  Got it.  Got it.  Thank you.
25      Well, while I've got everybody, let's see what the
```

 1  calendar says.

 2      How do the first two weeks of July look for everybody?

 3          MR. BOWDRE:  I believe that would be fine with the

 4  State defendants, Your Honor.

 5          THE COURT:  My wife is going to be very put out about

 6  this.

 7          MS. EAGAN:  Your Honor, from our perspective -- from

 8  our calendars, it's fine.  But as a wife, who might have family

 9  vacations planned --

10          THE COURT:  Absolutely.

11          MS. EAGAN:  But from our perspective, that works for

12  our calendars.

13          THE COURT:  So the unexpected continues to happen in

14  this case, it seems, at every turn on a myriad of issues.  And

15  I don't think it's impossible that another one -- another turn

16  could happen.

17      Do we want to make look at August the 1st, and keep

18  everybody's calendar intact and not risk having another

19  continuance?

20          MR. BOWDRE:  Your Honor, either one would be fine with

21  us, Your Honor.

22          THE COURT:  Got it.

23          MS. EAGAN:  Your Honor, from our perspective, that is

24  fine.

25          THE COURT:  Got it.

1          MR. CHEEK:  Your Honor, I hate to put a cog in the

2   wheel, but I do have a vacation I have planned for over a year,

3   paid deposit, been planning for years that week.

4          THE COURT:  We won't mess you up.  Tell me what the

5   dates of that are.

6          MR. CHEEK:  August 1st through the 4th.

7          THE COURT:  Where are you going?

8          MR. CHEEK:  Grand Canyon, sir.

9          THE COURT:  Excellent.  Excellent.

10      All right.  Let's see.

11      You come home the 4th?  Or you leave the 4th?

12          MR. CHEEK:  We're hoping to do a cross country, but

13   anything after the 12th forward is --

14          THE COURT:  All right.  Well, if we started it on

15   Monday, August the 12th, does that work with everybody?

16          MR. BOWDRE:  Yes, Your Honor.

17          MS. EAGAN:  Yes, Your Honor, for private plaintiffs.

18          MR. CHEEK:  It works for the United States, Your

19   Honor.

20          THE COURT:  All right.  Then it's set for trial --

21   reset for trial on August the 12th.  That will certainly give

22   us some more room.  And if we do have any other discovery

23   issues, we will have some breathing room to work through them.

24      Why don't we take a ten-minute break.  Let me let the

25   attorneys for the respondents and what was originally the

 1    miscellaneous matter talk about procedure, and what we ought to
 2    do.  I would like to have a game plan, get Judge Proctor and
 3    the panel on the phone today, and figure out what the best way
 4    is to go forward.
 5        I would love to see an agreement by everybody as to what
 6    that looks like.  Let the State and the government talk about a
 7    way to accomplish these e-mails with as little or no burden to
 8    Admiral Levine, as possible.
 9        And then we'll reconvene in 10, 15 minutes.
10        (Recess.)
11        THE COURT:  Please sit down.
12        All right.  Mr. Bowdre, have you talked with the
13    government?
14        MR. BOWDRE:  Yes, Your Honor.
15        THE COURT:  And what's the status of that?
16        MR. BOWDRE:  I think we have reached an agreement.
17    And I will defer to my friend from the government to explain
18    that.
19        THE COURT:  All right.  If you want to come to the
20    podium and state the agreement, that would be fantastic.
21        MS. MURPHY:  Thank you, Your Honor.
22        Your Honor, I believe we have seen the writing on the wall
23    here.  So HHS has agreed to just produce the documents, you
24    know, according to the search terms that we have agreed upon
25    with the State.

 1          We simply request that Your Honor enter an order stating

 2     that their motion is granted, or what have you, simply because,

 3     you know, Admiral Levine is a public official.  And we simply

 4     don't want to, you know, set the precedent that something like

 5     this is sort of routine.

 6          THE COURT:  Understood.

 7          MS. MURPHY:  And so we would appreciate that.

 8          THE COURT:  I appreciate your agreement.

 9       All right.  Let's see.  And have we worked out our

10     thoughts maybe on the miscellaneous case?

11          MR. KING:  Your Honor, as you might expect, with that

12     many lawyers in one room, there was -- let me say I think so,

13     but I certainly want to invite anyone else that wants to add

14     something or say something differently to this.

15          THE COURT:  Understood.

16       And I know I don't have a notice of appeal from

17     Mr. Segall, but I do have a pending motion.

18       Is Mr. Segall or anybody with his firm here today?

19          MR. RAGSDALE:  Shannon is here, right?

20          MR. KING:  I'm sorry.  Chris King for Ms. Eagan and

21     Mr. Doss.

22          MR. RAGSDALE:  And I'm Barry Ragsdale.

23          THE COURT:  All right.

24          MS. HOLLIDAY:  Shannon Holliday.  I'm here for

25     Mr. Orr, Mr. McCoy, Ms. Levi and Mr. Minter.

1          THE COURT:  Got it.

2      All right.  Who wants to summarize our thoughts on all of

3  this?

4          MR. KING:  Well, I'll start.

5          MR. RAGSDALE:  And I will correct him.

6          MR. KING:  And I will be corrected, which is fine.

7      Your Honor, what we're thinking might work is to have the

8  panel, if they're willing, amend the order to call it a

9  preliminary order, as opposed to a final order.  Then say

10  something like this at the end -- and we just scribbled

11  something down -- This action is not final.  Judge Burke may

12  take such additional process as he deems appropriate in his

13  review of these findings.

14      And then have them issue an order reopening the case and

15  transferring it to Your Honor.

16          THE COURT:  So a couple of thoughts about that.

17      I think that's probably all doable.  I have already called

18  Judge Proctor -- but I couldn't get him on the telephone --

19  just to apprise him of what I thought.

20      I am trying not to -- you know, the panel basically came

21  in at a time when I was dealing with the merits of this case.

22  And they did their work separately.  And that, honestly, was a

23  gift to me, because I didn't have two tracks going at the same

24  time.

25      But I'm trying not to burden them with going back to them

 1   every two or three days with what about this, what about that,

 2   because I have, obviously -- from what I had to read into the

 3   record earlier, I have already had to go back to them on two or

 4   three issues for clarity.

 5        Does it change anybody's opinion on this if they just

 6   reopen the case, reassign it to me, and then let me enter such

 7   an order, as opposed to them?

 8             MR. KING:  That probably works.  I don't like it quite

 9   as much personally, just because I feel like the optics -- the

10   Eleventh Circuit is -- you know, they said what they said.  And

11   I think it would be great -- if that's all we can get, that's

12   all we can get.

13        But I think from my perspective, I do prefer that the

14   panel do it.  And then the Court, obviously, belts and

15   suspenders could pile on in some way.

16             THE COURT:  Well, I will ask that question.  I am just

17   trying not to work them to death, because every time I call

18   with a question, they have to get on a conference call, and

19   then, you know, have agreed language, and all that sort of

20   stuff.  So I'm just trying not to wear them out here.

21        Okay.  So, then, is everybody in agreement, then, we would

22   do that, y'all would basically withdraw your appeal.  And then,

23   you know, depending on what my final order, if any, says, you

24   know, take it up at that time?  Is that where we're headed with

25   this?

1              MR. KING:  Yes, sir.

2              THE COURT:  Got it.  Got it.

3              MR. ROGERS:  Your Honor -- I'm sorry.  Bruce Rogers

4  for Michael Shortnacy, one of the respondents.

5      I am not able to say we are in agreement.  I have a

6  hierarchy I have to talk to.  And I was trying to do that.  And

7  I have not been able to complete that process.

8              THE COURT:  All right.  Do you have any thoughts on

9  where that might wind up?

10             MR. ROGERS:  I don't want to be an outlier, but I have

11 to have some conversations.

12     Michael Shortnacy, we think it was a mistake that he is in

13 the group that has been accused of misconduct.  On the spectrum

14 of responsibility and action, he's way at the far end.  That

15 may be a motion practice in front of Your Honor.  But we have

16 concerns about that.

17     I just need -- I've got to talk to certain people that

18 give me my marching orders.

19             THE COURT:  I understand.  I understand.

20     Well, let me drill down just a little further.  What's

21 your recommendation going to be to them?

22             MR. ROGERS:  I don't know yet.

23             THE COURT:  Don't know.  Got it.

24             MR. ROGERS:  I had a five-minute breakout.  We had a

25 group discussion.  You have heard what Mr. King, my colleague

1  and who I have great respect for, has said.  I had a brief

2  discussion with my client.  I tried to get the internal partner

3  at the King and Spalding firm on the phone.  I had them, and

4  then I was told to come back in the courtroom.

5       So I need -- I'm not trying to burden Your Honor --

6            THE COURT:  Oh, no.  I understand.

7            MR. ROGERS:  -- but I have got to -- I can't say that

8  we agree yet.

9            THE COURT:  And, look.  I'm not trying to get anybody

10  to withdraw their notice of appeal.

11       I think what I am trying to do is make your lives a little

12  easier until we get further down the road.  And you don't have

13  to brief these issues right this second.  And we will see, you

14  know, how this all eventually plays out.

15       So, you know, to the extent anybody needs to continue with

16  their appeal, that's fine.  You know, I view that as one track.

17  And I -- you know, this is obviously another one.

18            MR. ROGERS:  Thank you for that and thank you for the

19  courtesy of letting me do a little more due diligence so I can

20  make sure I have input before I say whether we agree or not.

21            THE COURT:  Absolutely.  Absolutely.

22       All right.

23            MR. BUCK:  Your Honor, Brannon Buck on behalf of

24  Kathleen Hartnett.

25       There are several of us, if not all of us here, who had

1  clients, lawyer clients who have either been expressly

2  discharged by the panel, or who were not identified in the

3  group of persons that the misconduct label was attached to.

4      Those folks would obviously feel much better if we were

5  able to get some kind of formal order, or dismissal, or

6  discharge of them.  In light of the fact that this is -- this

7  report, which I am not objecting to, is going to continue to

8  have life.

9      And so I just wanted to present to Your Honor would it be

10  possible for the lawyers to get together and maybe present the

11  Court with a proposed order or a list of names that we believe

12  were dismissed or discharged through that inquiry?

13          THE COURT:  Hey, I am an old state court judge.  I

14  love a proposed order.

15          MR. BUCK:  Okay.  Perfect.  I mean, I don't want to

16  speak for everybody, but I think we could probably get together

17  and submit something to Your Honor for your consideration.

18          THE COURT:  I think that's fine.

19      And, you know, obviously, if your name is not in this

20  order, then there's -- nothing's going to go forward, anyway.

21  So I see no reason not to make that clear, to the extent it's

22  not.

23          MR. BUCK:  Great.

24      And, so, Your Honor, one last sort of housekeeping

25  question.  Some of us -- my client Kathleen Hartnett has never

1  been counsel in the Boe or Eknes-Tucker case.

2       If the plan is, I guess is to transfer the Vague

3  proceeding to Your Honor, will -- is your -- is your sort of

4  vision that further proceedings will be done under that

5  miscellaneous case number going forward if it's transferred to

6  you?

7            THE COURT:  You know, I kind of -- I kind of view the

8  Vague case as that was where the panel was doing its work and

9  I'm doing my work in this case.

10      So maybe I've not thought that clearly all the way down

11 the line.

12      You know, just as a practical matter, if, in fact, a

13 lawyer commits misconduct, whether it's in this case or not, or

14 even in a dismissed case, I continue to have jurisdiction to

15 operate over that lawyer, whether in the case or not, whether

16 the case is dismissed or not.

17      And so I kind of view that as, you know, we can do it this

18 way, we can do it that way, we can do it this way, but they're

19 all okay.

20      You got any thoughts on that?

21           MR. BUCK:  Well, Your Honor, I -- it may be that some

22 of the lawyers who are involved in the Boe case that continues

23 would rather the proceedings be done in a separate -- in the

24 separate miscellaneous proceeding and not attached to the

25 merits case.

 1            THE COURT:  And then what do I do with the State?

 2            MR. BUCK:  Well, Your Honor, they were excluded from

 3    the panel's inquiry thus far, so I guess the question for the

 4    Court would be whether they are now allowed to participate or

 5    not in whatever further process transpires.

 6            THE COURT:  Somebody would have to show me some

 7    gigantic precedent that says a party can rightly be excluded

 8    from misconduct that occurs in their case.

 9        You know, if this were -- again, if I had just done this

10    in my -- in this case, as opposed to the panel doing it in a

11    miscellaneous case, the State would certainly have, I think,

12    every right to be involved.  There's certainly an argument to

13    be made -- a good argument -- that if the panel's findings are

14    correct, that the State would be an aggrieved party of that

15    conduct, not just the Court.  So I would think they would have

16    a right to be heard.

17        Do you have any thoughts?

18            MR. BUCK:  Some of my co-counsel may, Your Honor.  I

19    really don't.  I mean, I don't see that that's -- I see that

20    that's probably within your discretion as to how you choose to

21    proceed with that.

22            THE COURT:  Got it.  But I mean, that's certainly

23    something I am willing to talk through.

24        And that leads me to the next thing.  You know, what I

25    would like to do is sit down with just the attorneys on the

1 record, though, but just sit down at a table and let's just

2 talk, okay, where do we think this ought to go from here?

3 What's the best process?

4     I suspect that won't be a five-minute conversation.  And

5 so I'm just wondering do we want to take a lunch break and come

6 back?  Is that going to destroy anybody's schedule?

7          MR. DOSS:  Your Honor, I have a hearing in bankruptcy

8 court in the northern district at 1:00 o'clock that I can

9 participate by phone on.

10          THE COURT:  Got it.  Got it.

11     And I will say this:  Really, what I want to do is really

12 just talk to counsel for the respondents who are named.  I

13 think you would be fine to go on to that hearing, if you wanted

14 to.

15     I really just want to kind of talk about, you know, hey,

16 what does everybody think we ought to do?  What's our next

17 step?  Does anybody disagree about what the next step?  You may

18 have already talked about those things.

19     So I will leave that to you.  To the extent you think you

20 need to be there, go.  To the extent you want to do it by

21 telephone and stay here, you are certainly welcome to do that.

22          MR. DOSS:  Thank you, Your Honor.

23          MR. KING:  Judge, we obviously defer to the Court and

24 its staff.

25     I have an obligation that I will reschedule this

```
 1  afternoon, if the Court wants lunch.  But, you know, I learned
 2  a long time ago not to tell the Court when it should break,
 3  but --
 4          THE COURT:  Understood.
 5      Well, I hate for us to sit down and at 1:30 we're still
 6  talking --
 7          MR. KING:  I understand.
 8          THE COURT:  -- about this, you know.
 9      Why don't we take a quick lunch.  Let's be back in, you
10  know, an hour --
11          MR. KING:  Yes, sir.
12          THE COURT:  -- and we will get started quick.
13      And then, you know -- this afternoon will go as long or as
14  short as y'all want.  I just want everybody's input.
15          MR. KING:  Yes, sir.
16          THE COURT:  I certainly have my ideas about what the
17  next steps are, but I want to hear that from y'all, as well.
18          MR. KING:  Yes, sir.
19          THE COURT:  So, and obviously, the State will be
20  included in those conversations, as well.
21      So, all right.
22          MR. CHEEK:  Judge, this is Jason Cheek.
23      May I ask -- do you expect the United States to appear and
24  participate in that?
25          THE COURT:  I think that's at your leisure.
```

 1          MR. CHEEK:  Okay.

 2          THE COURT:  You know, to the extent you want to be

 3   involved, you are a party.

 4          MR. CHEEK:  Okay.

 5          THE COURT:  And so to the extent you don't want to be

 6   involved, I just leave that up to you.  Just know that you have

 7   a full right to participate.

 8          MR. CHEEK:  Thank you, Your Honor.

 9          THE COURT:  Right.

10      But, you know, to the extent -- hey, we don't have an

11   opinion, I get that, you know.

12      I do have that motion to stay, Ms. Holliday, I think that

13   you and Mr. Segall filed.  Do you want to address that?

14          MS. HOLLIDAY:  It's just a joinder, the motion to stay

15   that Mr. -- that was filed on behalf of Mr. Doss and Ms. Eagan.

16          THE COURT:  Okay.

17          MS. HOLLIDAY:  So it's the same arguments.

18      We just think that it's a burden on the Court and on the

19   parties to do the proceedings related to sanctions while the

20   merits are ongoing and having -- having this hanging over --

21   sanctions could have very serious effects.  And having it

22   hanging over folks' heads and not -- and having them not able

23   to appeal it is a real problem because this case could last for

24   a long time.

25          THE COURT:  Are you in agreement with the other

1   attorneys that, you know, as to basically what they see as the

2   way forward, as far as not doing an appeal right now, but

3   waiting until this is more ripe?  Or no?

4           MS. HOLLIDAY:  Yes.  I am.  I have -- we have four

5   clients.  There's one whose feelings I am reading between the

6   lines in saying I am in agreement.  But I'm 98 percent sure

7   that that would be his position, as well, that it would be

8   fine, if there is a way forward to make that -- the panel's

9   decision un-final at this point and move it to this case.

10      I think everybody on my roster will be okay with that.

11          THE COURT:  Got it.

12      All right.  Well, I hate to drag this day out, and I

13  certainly don't mean to impact everybody's schedule.  But, you

14  know, obviously these are serious and important matters, and I

15  know it will probably give all of us a little more peace if we

16  go ahead and map this out instead of putting this off to a

17  later day.

18      So I will see everybody back here at 1:00.  And we will

19  see what everybody thinks.

20          (Recess.)

21          (In chambers:)

22          THE COURT:  All right.  Back on the record.

23      Really I just want to sit around just informally with

24  everybody, and let's just kind of talk through what everybody

25  thinks are the next steps.  And y'all may have already talked,

```
 1  and everybody has a uniform game plan or suggestions, or you
 2  may not have them.
 3       But have y'all had discussions yourselves?
 4            MR. RAGSDALE:  We have talked, yes.
 5            THE COURT:  All right.
 6            MR. RAGSDALE:  And speaking for all of us is a little
 7  bit hard, but --
 8            THE COURT:  I understand.
 9            MR. RAGSDALE:  -- I think at least our position is we
10  would like the opportunity fairly quickly to brief the legal
11  issues --
12            THE COURT:  Okay.
13            MR. RAGSDALE:  -- to you.
14            THE COURT:  That makes sense to me.
15            MR. RAGSDALE:  Okay.  You know, we think, obviously,
16  we have to figure out how we have got to get Vague directly in
17  front of you, however we do that.
18            THE COURT:  Right.
19            MR. RAGSDALE:  And that may be more your call than
20  ours.  But once we do that, we would like the opportunity to
21  brief the various charges of misconduct in the final report,
22  and make our legal arguments by why we don't believe that is,
23  A, misconduct, or, B, worthy of a sanction.
24            THE COURT:  Okay.  All right.  And then depending on
25  what I do there, let's say the case moves forward.  What do you
```

```
 1  see there?
 2            MR. RAGSDALE:  I am going to let Chris take that.
 3            MR. KING:  So what I see is that the Court go ahead
 4  and handle the underlying case.
 5            THE COURT:  Uh-huh.
 6            MR. KING:  And then if it moves forward from there,
 7  there's a couple of cases in the Eleventh Circuit that really
 8  set forth a process for sanctions that is sort of a multi-step
 9  process.  And --
10            THE COURT:  And what are those two cases?
11            MR. KING:  They're Shaygan and Finkelstein.
12            THE COURT:  Okay.
13            MR. KING:  And what I would like to do is, I can send
14  the Court -- we can send the Court a short brief on that --
15            THE COURT:  That would be great.
16            MR. KING:  -- as well, and say, here are the steps.
17       I mean, we're hoping that step one, obviously, the Court
18  finds that it being reassigned back to the Court was sufficient
19  remedy.
20       We really hope the Court finds that there was no
21  misconduct.  But -- or that the -- that what has already
22  occurred was a sufficient remedy.
23       But we can send the Court sort of the next steps.  Those
24  two cases sort of lay it out, especially the Shaygan case.
25            THE COURT:  Okay.
```

1          MR. KING:  It lays out our process.  And that's what

2 we would propose.

3      But, again, we would propose it happen after the case on

4 the merits.  And the reason for that is, if the Court were to

5 enter a sanction, the attorneys are hung with it until they can

6 get an appeal.  And they can't appeal the sanction award until

7 the Boe case becomes final.

8          THE COURT:  Understood.

9      Ms. Holliday?

10          MS. HOLLIDAY:  I, on at least the behalf of two of my

11 clients -- Jennifer Levi and Shannon Minter -- they want me to

12 convey to you that what's in the panel report, as to what they

13 did, the actual acts, not the conclusions drawn about what they

14 intended to do, or what the legal conclusions drawn --

15          THE COURT:  Right.

16          MS. HOLLIDAY:  -- they agree with those as being

17 accurate.  And they want me to tell you they defer to you as to

18 how you will proceed going forward.

19          THE COURT:  Okay.

20          MS. HOLLIDAY:  I also have two other clients.  And I

21 think they're, you know, also in sort of -- in keeping -- I

22 think they're probably in keeping with the kind of

23 proceedings -- procedures that we're talking about right now.

24          THE COURT:  All right.

25      All right.  And what would Mr. Shortnacy's preference be?

 1              MR. ROGERS:  Bruce Rogers for Mr. Shortnacy, who is
 2   here in the conference room, Your Honor.
 3        We will go along with the process of consolidation,
 4   provided our appeal is preserved and not waived.
 5              THE COURT:  Got it.
 6              MR. ROGERS:  And we would follow the process, I think,
 7   that was outlined earlier.
 8              THE COURT:  All right.
 9              MR. ROGERS:  And thank you to Your Honor for giving me
10   an opportunity to look at that.
11        And I think I would further say, Your Honor, the
12   evaluation of you as a judge that was thought to be correct was
13   dead wrong.  And Your Honor has proceeded in the underlying
14   case with great patience and insight.  And the Eleventh Circuit
15   was dead wrong, with respect to your preliminary injunction.
16              THE COURT:  They haven't issued a mandate yet.  We
17   will see what happens.  Who knows.
18              MR. ROGERS:  One can hope.
19              THE COURT:  We will see what happens.
20        Thank you.  Thank you for that.
21        One thing I would also add is, you know, again, everybody
22   has their own position that they have to take, want to take.
23   And I'm not giving anybody legal advice.  But, you know, it's
24   also never too early just to say I did it, I'm sorry, good
25   Lord, you know, in the haste and rush of this, I made a

1  terrible, terrible decision.

2      Is anybody in the position that they want to do that?

3  Because I think you probably get extra credit if that's the

4  position you take right now.

5          MR. PRATER:  Your Honor, on behalf of Ms. Eagan and

6  Mr. Doss, who I have known and admired professionally and

7  personally for decades --

8          THE COURT:  Right.

9          MR. PRATER:  -- they welcome what Your Honor said at

10  the start of today's proceeding.  I personally appreciate what

11  you said and what you said just now.

12      And they do look forward to an opportunity to having a

13  conversation with Your Honor about those very things.

14          THE COURT:  Gotcha.  All right.

15          MR. PRATER:  Whenever Your Honor think it's

16  appropriate, they welcome that.

17          THE COURT:  Fair enough.  Fair enough.  Good to hear.

18          MS. HOLLIDAY:  Your Honor, Shannon Minter, Jennifer

19  Levi, and Scott McCoy, my clients are in a position to do what

20  you just suggested, yes.

21          THE COURT:  Understood.

22      Is that something that they would want to do now?  Or

23  would they want the motion practice to play out?

24          MS. HOLLIDAY:  I, quite frankly, think that they're

25  willing to do it now, but I'm not sure I can say it right this

1  second.

2          THE COURT:  Understood.

3          MS. HOLLIDAY:  But we had a very serious conversation

4  about that, just not a lot of time and a lot of, you know,

5  but -- time to flesh it out.  But I have, you know, definitely

6  learned from particularly -- well, Scott's here and can speak

7  for himself -- but from Shannon Minter and Jennifer Levi, that

8  they do want to get this behind them, and go ahead and go

9  forward with whatever's going to happen.

10     They're willing to say to you, you know, essentially, we

11 did not intend to do anything wrong, but what we did, we did

12 do.  And those facts about what happened, you know, are facts

13 that actually happened.  And, you know, sorry that was

14 perceived in a way that that looked like judge shopping.  And

15 ready to take whatever consequences you're -- you think are

16 appropriate.

17     I think they are in that position.  But they also said to

18 me on the phone, also defer to you as to what the proceedings

19 should be.  So, you know, I think they're ready, the three of

20 them.

21     Mr. Orr is in a little bit different position because his

22 involvement was pretty marginal.  And I had only about

23 three minutes to talk to him.

24          THE COURT:  Right.  Right.

25          MR. KING:  Your Honor, if we could backtrack back to

```
1   us.  Ms. Eagan and Mr. Doss will be pleased to have a
2   discussion today.  They're here.
3       And they don't -- the less time that passes -- and I know
4   all of our clients aren't here.  But they're here.
5                THE COURT:  Right.
6                MR. KING:  And they would be pleased to have a
7   discussion with the Court today.
8                THE COURT:  Okay.
9                MS. HOLLIDAY:  And I can reach my other two clients by
10  phone, if you wish.
11               THE COURT:  Okay.  All right.
12      All right.  To the extent we do that, are those
13  discussions that everybody thinks should occur with everybody
14  in the room?  Or myself, and their counsel, and that person,
15  and the court reporter?
16               MR. RAGSDALE:  I personally don't think anybody other
17  than those individuals need to be present with you.
18               MR. BUCK:  And, Your Honor, for those of us who don't
19  have clients here today, but may be able to raise them on the
20  phone, you know, for Ms. Hartnett -- I mean, I believe when she
21  was in front of the panel, I recall her saying repeatedly she
22  deeply regrets, you know, what's transpired as a result of
23  their actions.  And I have no doubt that she would be more than
24  willing to, you know, express those views again.
25               THE COURT:  Got it.
```

1           MR. BUCK:  And my question to you was going to be it

2    sounds like some of this may happen today, was going to be what

3    forum do you envision that occurring in?  I mean, is that --

4           THE COURT:  Honestly, that's why I am here with y'all

5    right now.  Whatever we do, I want to do it the right way.

6       And so I don't want there to be any surprises, anybody

7    jump out of the shadows.  That's -- I welcome your thoughts on

8    what that would look like.

9           MR. KING:  Judge, do you contemplate having it

10   reported by the court reporter?

11      I say that because the lawyers and all of us is going to

12   start worrying about waiver and -- but I don't want to -- I

13   don't want an apology to be half an apology, you know what I

14   mean?

15          THE COURT:  Right.  Right.  No, no.  I understand.  I

16   hadn't thought about that.

17      I think whatever we do has to be on the record --

18          MR. KING:  Okay.

19          THE COURT:  -- you know.  Now, what we do with it once

20   it's on the record, I think is something that we could all have

21   further discussion about.  But I think it does have to be on

22   the record.

23          MR. KING:  If you will just permit us to make the

24   lawyer disclaimers before they start talking, then that's fine,

25   Your Honor.

```
 1              THE COURT:  Understood.  Understood.
 2              MR. BUCK:  And, Your Honor, I think the only other
 3    question would be if there's some opportunity for this to
 4    happen and to -- I don't know if short circuit is the right
 5    word, but to try to get this to a final conclusion sooner
 6    rather than later, that maybe leaves open the question of we
 7    have got this final report that we were going to, you know, be
 8    transferred to Your Honor, and then restyled preliminary
 9    inquiry report, or whatever we -- a language we arrived at.
10         So I guess the question would be would we still go through
11    that process of having that report sort of restyled?
12              THE COURT:  Yeah.  I think -- I think we have to do
13    that just to keep our record clean.  I do.  I do.
14         But, you know --
15              MR. BUCK:  And I think the lawyers would want that.
16              THE COURT:  Right.  Right.
17         You know, the only thing I would say -- I don't know that
18    I'm prepared today today to do this, but I certainly in the
19    next week could make that happen.  And, again, you know, we can
20    talk about that.
21         The only thing I will say is I share one thing in common
22    with U. W. Clemon, which is, if you're going to say I'm guilty,
23    then it can't be halfway.  We're going to have to allocute.
24    And so that's the only thing I would say.
25         You know, to the extent that any mea culpa is halfway, I
```

1  don't know how far that gets.  I haven't heard what anybody is

2  going to say yet, but that would be my only word of caution

3  is --

4          MS. HOLLIDAY:  Can I ask you a question?

5          THE COURT:  Certainly.

6          MS. HOLLIDAY:  So by halfway, do you mean that the

7  lawyer would have to say -- not me, the lawyer -- the lawyers

8  who are being accused of the wrongdoing would have to say, I

9  intended to violate the random case assignment?

10         THE COURT:  I think they would have to say what their

11 intentions were, not just state the conduct is accurate.

12      Okay.  Well, if that was your conduct, then what were your

13 intentions?

14         MS. HOLLIDAY:  Well, that's kind of a nuanced thing.

15 I mean, you do accept that's a little bit nuanced, because I

16 think for my clients they would say, you know, there were a lot

17 of factors that went into the decision.

18         THE COURT:  Right.  Right.

19      Well, I will say, you know, in the panel's -- in the

20 panel's findings, they quote two or three, what I might call

21 junior partners who very, very, very clearly laid out what

22 happened.  And a lot of those details and statements are,

23 frankly, missing from many of your clients' accounts of what

24 happened, you know.

25         And the statements that the panel quotes -- a couple of

1  them in particular, you know, these were lawyers who were

2  junior and had every reason to tell everything they knew,

3  because they probably rightly suspected, if I tell everything I

4  know, I'm off the hook.

5       But, you know, I think you all know what your own clients'

6  statements to the panel were.  And they all differed.  I'm well

7  aware of that.

8       But, you know, I would say that some of the under-oath

9  testimony and statements made to the panel by some of the

10  respondents left out very critical details, you know.  Again, I

11  have got affidavits from other attorneys that lay out specific

12  actions, words, and conduct of other respondents.  And that --

13  those actions, words, and conduct are missing from those

14  respondents' sworn testimony to the panel.

15       So I guess that would be one thing I'm focusing on here,

16  is, you know, if everybody is going to come clean -- and I am

17  going to say this one more time.  I have zero desire to end

18  anybody's career.  This is not capital murder.

19       But if what occurred occurred, well, what are the

20  ramifications for us?  What are the ramifications for our court

21  if you just dismiss your case and re-file it over and over

22  until you get the judge that you think might be most favorable?

23  I'm not saying that happened here, but the panel certainly

24  thinks it happened.

25       If what the panel says happened occurred, that's obviously

1  a practice that has got to be stopped for the integrity of the

2  court system.  And the Eleventh Circuit has said that over and

3  over again.

4       So I've said a whole lot now.  But I guess what I mean is,

5  if anybody says I did it, I did it, but it wasn't judge

6  shopping, and, you know, that's not the reason for it, that

7  needs to be really legitimate.

8            MS. HOLLIDAY:  I have one more question.

9            THE COURT:  Yes.

10            MS. HOLLIDAY:  As a new person, I totally don't have

11  the right to ask this many questions.

12            THE COURT:  No.  Ask all you want.  This is what

13  we're -- we're here for as long as we need to be, for everybody

14  to talk this through.

15            MS. HOLLIDAY:  Is it sufficient to say that was one of

16  the reasons, but there were two or three other reasons?

17            THE COURT:  Oh, I think that's legitimate.  I don't

18  think everything can fall into one tiny, you know, one size

19  fits all.

20            MS. HOLLIDAY:  Well, is it also legitimate to say I

21  thought Rule 41 permitted it?  Because on its face, it does.

22  And so I'm just wondering if that's something you see as a half

23  guilty plea.

24            THE COURT:  I don't know.  I probably need to look at

25  that.  And I know all the arguments about Rule 41, you know.

1      And I also recognize that different circuits have taken
2  some different positions.  But I don't think that's -- you
3  know, the Eleventh Circuit very clearly has made their position
4  known on judge shopping.
5          MS. HOLLIDAY:  But not in connection with Rule 41,
6  though.
7          THE COURT:  Correct.  Correct.
8          MS. HOLLIDAY:  That's kind of the thought, is
9  that's -- that's what we're hearing -- Rule 41 seems like a
10 rule that we could use.
11         THE COURT:  Right.  Right.
12     But in an expansive view of Rule 41, though, you know, you
13 just dismiss, re-file, dismiss, re-file until you get the right
14 judge.
15         MS. HOLLIDAY:  And there has to be a limit.
16         THE COURT:  Right.
17         MR. KING:  Well, the second dismissal is with
18 prejudice under the rule.
19         THE COURT:  Correct.  That's true.
20         MR. KING:  You know, the way I read it, you get one
21 free bite --
22         THE COURT:  Right.
23         MR. KING:  And, Your Honor, I hear what you're saying.
24 And in light of what you're saying, I think what's best is --
25 you're contemplating something more than an apology.  And

1   you're -- more of an allocution.

2        I think our clients should study their testimony before --

3             THE COURT:  Agreed.

4             MR. KING:  -- before they do that.

5             THE COURT:  Right.

6             MR. BUCK:  And a question I have as a corollary to

7   that.

8        The panel -- and I am not exactly sure that we ever got

9   clarity on this.  The panel instructed the responding lawyers

10  not to be provided with and not to review anyone else's

11  testimony.

12            THE COURT:  Right.

13            MR. BUCK:  In light of Your Honor's comments about

14  there are some -- there's some details that come out, or some

15  facts that come out in some testimony, but not others, is it

16  appropriate now for us to allow our clients to review the full

17  record?

18            THE COURT:  That's probably something else I should

19  consider, you know.

20       Again, though, the testimony I would be relying on is

21  sitting right there in the order that you already have, you

22  know?

23            MR. KING:  And, Your Honor, I don't like to criticize

24  other federal judges.

25       The transcripts are better -- there's stuff in those

1   transcripts.  You know, our clients testified.  And there's

2   snippets in the order, for sure.

3           THE COURT:  Right.

4           MR. KING:  But that testimony itself, I think all the

5   clients -- because they didn't hear each other, but I did hear

6   it.

7       And the clients were remarkably -- considered they'd been

8   sequestered, they were remarkably consistent in saying it was a

9   multi-factored decision.

10      And the number one factor -- they almost all said it.  The

11  number one factor was the -- they didn't understand how the

12  case made its way -- and I'm not talking about the Walker.  I'm

13  talking about the Ladinsky people.  They didn't understand how

14  the case made its way to Your Honor.  And they didn't know how

15  to find out.  Because it was not the first filed.  It was the

16  second filed.  Your Honor had the second filed.

17      And so the number one factor they all said is they

18  couldn't figure out how it happened.  So there was a procedural

19  event that occurred that none of them in their experience had

20  ever seen.

21          THE COURT:  And if they had come to the hearing that I

22  set the next day, they could have asked that question.

23          MR. KING:  They could have.  But it's never fun, as

24  I'm demonstrating right now, it's never fun to have to ask a

25  federal judge, Judge, what happened?  How did we get here?

1              THE COURT:  Right.

2              MR. KING:  Because it sends a bad signal to you that

3  they don't want you.

4              THE COURT:  I hear you.  I hear you.

5      And, you know, I have been at this for nearly 30 years

6  myself.

7              MR. KING:  Yes, sir.

8              THE COURT:  And I have had plenty of cases that got

9  reassigned to other judges for reasons I didn't know, but I

10 didn't go dismiss them as a result, you know.  And because --

11             MR. KING:  I hear you.

12             THE COURT:  -- you never know what the reason is.

13             MR. KING:  I hear you.

14     And, look, you ended up handling the case.  And as

15 Mr. Rogers said, you know, those lawyers prevailed.  And -- so

16 just proves the point, right, that you never know.

17             THE COURT:  Absolutely.

18             MR. KING:  But the second factor, Your Honor.  The

19 second factor that was involved is there was a competition --

20 and you see this in the transcripts -- between the Walker case

21 and the Ladinsky as to who was going to take control.

22     Our lawyers were worried about if it came here, they would

23 lose their first filed status.  So there were -- there was the

24 way it got here, the fact that they were worried they would

25 lose their first filed status.

1       And every one of them honestly said they viewed Judge
2   Burke as more conservative, and they were concerned about it.
3   There's no -- it's in there.  And I think they all very
4   truthfully laid all of those out.

5       Was your identity a factor?  I think they would all say
6   and already have testified, yes, sir, it was.  It was your
7   reputation as a conservative jurist was a factor.  No question
8   about it.

9       But there were other factors, and they all combined.  And
10  in their minds, rightly or wrongly, Rule 41 gives parties just
11  one shot.  You can dismiss for, as the Courts have said, good
12  reason, bad reason, no reason.  You can only do it once.

13      And they did that rather than come on Monday, as the Court
14  said they -- in hindsight they wish a thousand times they would
15  have done, come on Monday and said, Judge, can we just ask what
16  happened.

17      They had no idea Judge Axon was in trial, you know.

18          THE COURT:  And I think you can tell from this
19  discussion today I would have answered the question.

20          MR. KING:  You would have, Your Honor.  Clearly, you
21  would have.

22      And if they could do this over, I assure you they would.
23  This has been a nightmare for them, as you would expect.

24      But they do want to express all of that to you.  But so we
25  just need to let them study their testimony so -- since it's a

 1  little cold so they can bone up on what they've testified to.

 2          THE COURT:  Got it.

 3      All right.  So let's take it the next step.  Let's say

 4  that I set a time those parties that -- those respondents that

 5  decide that they want to come and have a conversation with the

 6  Court about their conduct.

 7      That obviously is going to short circuit the rest of the

 8  process.  What is an appropriate action by the Court, then, as

 9  a result of those admissions?

10          MR. KING:  Well, we would advocate that -- and there's

11  case law to support this -- the remedy for judge shopping is to

12  make sure the judge from whom the party fled hears the case,

13  which has occurred in this case.

14      And, you know, it would be our fervent hope that the Court

15  would find that the remedy was exercised in this case when the

16  case was assigned to you in spite of the re-filing, and that

17  then they could go on and proceed on the merits.

18          THE COURT:  What about your clients?

19          MS. HOLLIDAY:  My clients?

20          THE COURT:  Uh-huh.  What would their position be?

21  What would your position be?

22          MS. HOLLIDAY:  They would love that, Judge.

23          THE COURT:  Right.

24          MS. HOLLIDAY:  First choice.  But, you know, I've been

25  told they defer to you.

1         Now, I don't -- I say that, and my notes also say don't

2   want to waive any kind of procedural rights we might have.  And

3   it's kind of a plea hearing situation, so...

4         THE COURT:  Right.  And, you know, I have to say in my

5   position, you know, I really -- I won't know what's appropriate

6   until we have that conversation, you know?

7         MS. HOLLIDAY:  Right.

8         THE COURT:  And I also recognize -- I think it's very

9   clear from even the panel's findings that, you know, even

10  though they found that everybody was involved, it does appear

11  that some were more involved than others.

12      And so I don't know that -- I don't know that we can or

13  can't put an equal sign between everybody who's a named

14  respondent.

15      Does anybody disagree with that?

16         MR. RAGSDALE:  No.  In fact -- and I have tried to be

17  quiet, but it's not in my nature.

18      But the example you give of filing a case and re-filing it

19  and re-filing it.  Our clients filed one case and dismissed

20  one case.  Did not re-file a case.  Did not seek to go to

21  another venue.  Did nothing other than filed a case, and

22  five days later dismissed it.

23      And we've tried for some time to try to find out what rule

24  that violates.  I mean, part of their motivation for dismissing

25  was, obviously, the fact that you had drawn the case.  But it

1  was also the fact that they knew they were competing with

2  another group of lawyers who had the first filed case.  And so

3  they dismissed it and never re-filed it.  I've never found a

4  case in the history of the universe where lawyers have been

5  sanctioned for that, ever.

6       And so I want my clients to come forward and tell you what

7  they did, but they didn't do what you just said; that is,

8  re-filed a case attempting to avoid a judge.  They didn't.

9  They gave up and let these folks carry the water.

10      So we think it's very important that the Court not look at

11  this as one big group of lawyers.  And, really, not even two

12  groups of lawyers, because lawyers had different roles,

13  obviously, to play.

14      I also have a client who's in a much different position,

15  because the panel, I think wrongfully, concluded that he lied

16  to them.  We've got to be able to provide you with additional

17  facts to prove that that's not true.

18      And I will say he doesn't believe he lied to anybody.  I

19  was there.  I don't believe he lied to anybody, either.

20      But we've -- I've got to be able to address that because

21  that naked finding can't sit.  And I don't think he's going to

22  plead guilty to something he didn't do.

23      Does that make sense?

24          THE COURT:  I hear you.  Yeah.  Yeah.  Yeah.

25          Anybody else got any more thoughts?

1          MR. ROGERS:  Your Honor, Bruce Rogers on behalf of

2   Michael Shortnacy.

3      You know, group allegations of wrongdoing are problematic,

4   as Your Honor knows.  And this gentleman didn't know you from

5   Adam's house cat, but he participated in a conference call with

6   counsel on that Friday afternoon.

7          The only sin he committed was raising a question of maybe

8   we should file a motion to reconsider in front of Judge Axon.

9   That didn't happen.  He's now found guilty of misconduct.

10         He was on a conference call.  He made those disclosures to

11  the panel.  He is not a leader or decision maker, based on the

12  panel's own findings.  He's not listed as one of those in

13  Ladinsky and Eknes-Tucker, and yet here he is accused in

14  wrongdoing in a group context.

15         And so if we were before Your Honor in a private session,

16  I think Michael would say to you, I'm on the phone call because

17  I'm invited to be -- in Los Angeles, California -- on Friday

18  afternoon.  I haven't even appeared pro hac vice.  And yet I'm

19  accused of wrongdoing because counsel, who knows the lay of the

20  land, was making some decisions.  And he didn't stop it.

21         So his sin is, I quit, can't do it.  That doesn't seem

22  fair, or right, or just.

23         So if you asked us to come in and admit something, we

24  would admit we were on the phone call.  We testified to the

25  panel.

1    One thing we didn't do -- and I think all the lawyers will

2  agree with this.  We didn't cross-examine in front of the

3  panel.  We didn't stand up and point out some of the things

4  that would maybe provide more context, like what I just

5  mentioned to Your Honor about my own client.  Shame on us for

6  not doing it then.

7    But the panel told us, this is not adversarial.  We have

8  questions.  We want information.  And then we will go forward

9  from there.

10    And here we are.

11    THE COURT:  And, y'all, I certainly reviewed some of

12  the transcripts, but not all.  And I intend to do that as

13  quickly as I can.  But as you know, they're not short, so...

14    MR. ROGERS:  We do know.

15    THE COURT:  And one reading is not going to get me to

16  where I should be if I'm going to, you know, accurately take a

17  look at this.

18    Anything you want to add to this?

19    MR. BUCK:  Yes.

20    Your Honor, Kathleen Hartnett with the Cooley firm, who

21  was a California lawyer, who was working on this case pro bono

22  was working with Barry's clients.  They were in the Walker

23  case.  And they didn't re-file.

24    And so, you know, to come before you and sort of give a

25  mea culpa -- and I heed your advice and warning that it can't

 1  be a half-hearted or halfway guilty plea -- it's a little

 2  bit -- it's a -- that's a little bit of a quandary for the

 3  Walker counsel, you know, since they didn't re-file.

 4       But she has consistently said -- and the reason she has

 5  not had us file a notice of appeal yet is because she said, I

 6  would welcome the chance to talk to Judge Burke, and, you know,

 7  explain, you know, what I did, and what we did, and why we

 8  thought it was important, and that I'm sorry it's led to this.

 9       And so she would be more than happy to appear before you.

10            THE COURT:  Got it.

11       Well, I think one thing that I have as a takeaway today

12  is, you know, while we're briefing this, you know, you might

13  all very quickly, like maybe in the next seven days before I

14  sit down with your client, you might all want to maybe, to the

15  extent you want to, you know, brief differences in conduct

16  between your client and others, and what role you think they

17  play.

18       You know, obviously, some people were bigger decision

19  makers, some people were smaller.  I don't think there's any

20  doubt about that.  I don't think anybody in this room disagrees

21  with that, you know.

22       And to the degree that, you know, you want to, you're

23  welcome to include in that brief, you know, maybe what you

24  perceive as the differences in conduct between the first case

25  and the second case.

1          MR. RAGSDALE:  Can I make one other problematic

2    statement?

3          THE COURT:  Sure.

4          MR. RAGSDALE:  It's not problematic, but it might be.

5          THE COURT:  You have been making them all day long.

6          MR. RAGSDALE:  I know.  I've built a career on it.

7      We still have not received the transcript from the

8    separate session that was done with Judge -- or Special Master

9    Harwood on May 20th.  It was a different court reporter.  And

10   so the court reporter that handled all the other sessions has

11   gotten us the transcripts.  That other reporter has not.  It's

12   not her fault.  I don't think it is.  I don't think she's been

13   told to do it.

14         THE COURT:  So I had a conversation with the clerk

15   here when this issue first got raised.  That was why I included

16   in my order that you would have access to those transcripts.

17   But it sounds like we've just got an administrative flat tire.

18         MR. RAGSDALE:  I think it's fallen through the cracks.

19         THE COURT:  And what date was that?

20         MR. RAGSDALE:  May 20th.

21         THE COURT:  May 20th.  I will get to the bottom of

22   that.

23         MR. RAGSDALE:  Okay.  Thank you, Your Honor.

24         MR. BUCK:  So, Your Honor, it sounds like perhaps what

25   you're envisioning now is you are going to set some -- another

1   hearing when these lawyers can appear, and you would like for

2   us to submit briefs relating to their conduct in advance.  Is

3   that --

4            THE COURT:  You don't have to.  And I am not even

5   saying I recommend it.  But I'm just saying you can.  You know,

6   if those are factors, you know, you can do that.

7            But, you know, no -- and I will set such a hearing, you

8   know -- I can't say I can set it in the next seven days, but I

9   could certainly have such a hearing set in two weeks, to the

10  extent that some of your clients want to go ahead and come in.

11           MS. HOLLIDAY:  And you want them in person.

12           THE COURT:  I do.  I do.

13           And, you know -- but I assume if we do that, then we

14  would, you know, go straight to, you know, what, if any,

15  punishment, depending on what I hear.

16           Is that what you envision if we did that?

17           MR. KING:  Your Honor, the Eleventh Circuit lays out

18  certain formal guidelines that have to be followed that -- so I

19  think what I would envision is the punishment the Court is

20  considering, such that we've got a decision to make as to

21  whether we say, okay, we waive these procedural requirements

22  and take our licking, or we don't.

23           THE COURT:  Right.

24           MR. KING:  But it's hard to do that in the abstract.

25           THE COURT:  Right.

1           MR. KING:  So, and I know that's cutting against your

2    allocution, you know, the blind plea theory.  But, you know,

3    what I would request on behalf of Melody and Jeff was, you

4    know, let you hear from them, give us some idea of what the

5    Court is considering, and then allow us to decide whether we

6    want to request that the Court go through the formal process

7    that the Eleventh Circuit has signed off on.

8           THE COURT:  Right.  Right.

9       And, you know, I very frankly, you know, if I'm in a

10   criminal sentencing hearing -- and I'm not putting an equal

11   sign between this and that -- but, you know, what happens in

12   that hearing, I listen.  I pay attention.

13          MR. KING:  I understand.

14          THE COURT:  I read the presentence report.  You know,

15   what the defendant says on the record matters.

16       And, you know, people have gotten probation that I was

17   convinced I was going to send them to prison for three years,

18   and people have been sentenced to prison for twenty years when

19   I thought I was going to give them ten, because, you know,

20   advocacy by the attorney -- Judge, I want you to understand

21   this thing that you don't know, you know, acceptance of

22   responsibility, genuine, by the party -- all those matter.

23       So it's hard for me to just tell you on the front end

24   here's what I would do.

25          MR. KING:  I get it.

 1              THE COURT:  You know?

 2              MR. KING:  I get it.

 3              THE COURT:  But, you know, for those who may be in

 4    fear that I'm, you know, again, going to do something career

 5    ending, that's not on the table.  That's not where I'm headed

 6    here, you know.

 7              MR. PRATER:  You are dealing with good people, Your

 8    Honor.  I think you know that.

 9              THE COURT:  I do.  I do.

10              MR. PRATER:  You do.

11              THE COURT:  I do.

12              MS. HOLLIDAY:  Can I just ask what you define as

13    career ending?

14              THE COURT:  Yeah.  Well, you know, taking -- probably

15    making a finding that, you know, results in the suspension of

16    your license.  That would certainly be career ending.

17        For me, I'm not -- the only exception to that, of course,

18    is your one client, because that is a very problematic finding,

19    as it stands.  But I'm absolutely going to let you do motion

20    practice on that issue.  And I think, you know, that's

21    contemplated by these facts.

22        But, you know, I'm in the -- with what the panel says

23    about him, I don't even know that any action by me changes

24    anything, unless I change the finding of fact.

25              MR. RAGSDALE:  And I think he, in particular -- I

1    think all three of my clients are going to want to come talk to

2    you.  But I think he, in particular, would welcome that

3    opportunity.

4         And I will just tell you, Judge, that is an egregiously

5    wrong finding.  And I need to do what I can to persuade you

6    that it is.  And I think I can.

7         There are things -- and, for example, there are things --

8    there is evidence that I don't think is in the record before

9    you that we need to get in front of you.

10        And I am just going to say it's an e-mail from Judge

11   Thompson's law clerk that records the conversation that he had

12   with the law clerk.  And so we want to get that in front of

13   you.

14        And I want to give this young man an opportunity also to

15   come speak to you, because I think I have said it -- it's

16   egregiously wrong.

17             THE COURT:  Right.  Right.

18        So without having heard anything, without knowing what

19   anybody would say, or what arguments you would make, what's on

20   the table?

21        I think a private reprimand might be a consideration,

22   depending on what I hear.  I think a public reprimand by the

23   Court and admonishment could be -- could be.

24        Honestly, I think, you know, disqualification could be.

25   But I don't know that.  I would have to hear and see, you know.

 1   Is it possible somebody could have a monetary sanction?

 2   Possible, but probably not the way I would go.

 3        So, and, again, it's very clear to me that, you know,

 4   there are differing levels of culpability within this -- within

 5   this order, or at least it would appear to me, so...

 6        Now, how many of these respondents fall into any of these

 7   blocks right now?  I have no idea.

 8             MS. HOLLIDAY:  Disqualification means in the Eleventh

 9   Circuit practicing --

10             THE COURT:  In this case.

11             MS. HOLLIDAY:  Disqualification in this case.  Got it.

12             THE COURT:  Right.  Right.

13             MS. HOLLIDAY:  Okay.

14             THE COURT:  Again, though, I could find something

15   that, you know, I don't -- I don't know what I don't know.

16             MS. HOLLIDAY:  Right.  And that's done from time to

17   time.

18             THE COURT:  And I'm not saying I am going to

19   disqualify anybody, or that I am going to do any of those

20   things.  I would just say if we're talking about what are

21   possibilities.

22             MS. HOLLIDAY:  That's very helpful.  Extremely

23   helpful.  Thank you.

24             THE COURT:  Anybody else got any thoughts?

25             MR. DAVIS:  Question, Judge.  We don't claim a role in

1  this, or we're not trying to make any suggestions.  We want to

2  know what you're contemplating, in terms of our ability to see

3  any briefing that's presented to you, or be at least present

4  when the lawyers of the case are talking to you, Judge.

5          THE COURT:  So your question is can you?

6          MR. DAVIS:  Yes.

7          THE COURT:  Do you want to?

8          MR. DAVIS:  I don't know that.

9          THE COURT:  Okay.

10          MR. DAVIS:  I'm hesitant right now just to say that

11  we're okay with opposing counsel talking to the judge in our

12  case without us there, but I don't know that.  It's something

13  we want to talk about.

14      I'm just asking if I could know what you are contemplating

15  at this time.

16          THE COURT:  Right.  Right.

17      You know, again, this, at least for the conduct that

18  happened in this case, I don't know how I can exclude the

19  State, to the extent -- to the extent you want to be included.

20      But I'm willing again, to listen to anybody's thoughts, if

21  they think there's a, you know, if there's a case out there

22  that says something different.

23          MR. RAGSDALE:  This is probably a time for me to

24  repeat again that we've never been in this case.

25          THE COURT:  Understood.

 1              MR. RAGSDALE:  We're not in this case.  Our conduct is
 2    not in this case.
 3              THE COURT:  Understood.
 4              MR. RAGSDALE:  Okay.
 5              THE COURT:  And I recognize that.
 6              MR. RAGSDALE:  Okay.
 7              THE COURT:  And that's why I say, you know, at least
 8    for the folks in this case, I don't know that --
 9              MR. DAVIS:  We certainly want to be fair to everybody.
10    If folks think we should be excluded from the court proceeding,
11    I think it's incumbent upon them to ask you and give us a
12    chance to respond to that.
13         And we may, depending on what it is they're requesting, we
14    may be perfectly fine with that.  But I would just like, before
15    it takes place, the chance to object and make our arguments.
16              THE COURT:  All right.  So do we want to go down the
17    line real quick on whether, at least as far as the attorneys
18    who were or are in this case, do you want to go down the line
19    real quick and see what positions are on what, if any, role the
20    State should play?
21              MR. KING:  Our position is that we would hope they
22    would volunteer not to be present because it's a pretty
23    uncomfortable and personal situation.  It doesn't involve the
24    merits of the case.
25         So we would hope that we wouldn't have to ask the Court to

1   order the State not to be present, but just as a matter of

2   comity and professional empathy, that they would choose not to

3   be present.

4        We don't think they need to be present.  This is not an

5   issue that involves the State, in terms of -- you know, they

6   now have the final report.  And we appreciate that they

7   maintained it under seal.

8        But our position would be we would hope they would agree

9   not to be present.

10            THE COURT:  Well, I guess my follow up could be,

11   though, if they don't, is there any law that says --

12            MR. KING:  I sure can't cite you any right now, Judge,

13   as we sit here.

14            THE COURT:  Gotcha.  Gotcha.

15            MR. KING:  I mean, I know there is some law about the

16   confidentiality of disciplinary proceedings --

17            THE COURT:  Right.

18            MR. KING:  -- which this is sounding like.  So, you

19   know, perhaps that law is applicable, but I'm scared to tell

20   you something without the book in front of me.

21            THE COURT:  No.  Understood.  Understood.

22            MR. PRATER:  And, Your Honor, given that you do

23   contemplate having a court reporter present, there would be a

24   record of the conversation --

25            THE COURT:  Right.

1          MR. PRATER:  -- if that needed at some point to be

2     provided to the State.  I don't see why, but that is

3     conceivable.

4          THE COURT: It is.  It is.  Absolutely.  Yeah.  The

5     State, even if they weren't present, would have a right to see

6     the record, I would assume.

7       Ms. Holliday?

8          MS. HOLLIDAY:  I think I just join in what they have

9     said.

10          THE COURT:  Okay.

11       Mr. Rogers?

12          MR. ROGERS:  Yes, Your Honor.  Thank you.

13       Respectfully, this dilemma suggests that anything related

14     to the respondent lawyers should be delayed until the

15     underlying case is completed, and we not get into potential

16     disciplinary issues until the merits of the underlying case are

17     over.

18       So I just renew that -- I may be barking up a pretty tall

19     tree, but I renew that request to hold on any pursuit of

20     lawyers, let the case on the merits proceed, and then come back

21     to this.

22          THE COURT:  All right.  And I will be very honest.

23     I'm unlikely do that.  I am likely --

24          MR. ROGERS:  I see how tall the tree is.

25          THE COURT:  Right.  I'm likely to resolve this issue.

1    And however much your clients want to put this behind them and

2    close the book, I'm ready just to get back to the merits of the

3    case, too, and let's get this done with and resolved.

4        And, you know, very honestly, I can contemplate very

5    easily, if I were one of the respondents, and what, you know,

6    the past 18 months have probably been -- sleepless nights.  And

7    so for their own good, I don't think they want to wait until

8    August for this to be decided.

9            MR. ROGERS:  You make a fair point.  The tension is

10   that they've got disclosure obligations to their clients.  Now

11   their clients who are parties, now suddenly the lawyers are

12   parties to something, have been -- it just creates a lot of

13   tension.  And the thought behind the stay process was stay

14   focused on the merits, not let this be a distraction.

15       But I agree with you, there's the counter balance, which

16   is let's be done with it; whatever it is, let's be done with

17   it.

18           THE COURT:  If I were one of these folks, I can't

19   imagine waiting until August.

20           MR. ROGERS:  Well, if the outcome is the release and

21   discharge of Michael Shortnacy, I am happy to proceed.

22           THE COURT:  Well, I didn't say that.

23           MR. ROGERS:  He is here, Your Honor.  He's available

24   to meet with you right now.

25           THE COURT:  Absolutely.  No.  Absolutely.  Absolutely.

1            MS. HOLLIDAY:  What about appealability, though, if we

2    do address this all in the next couple of weeks, and somebody's

3    disqualified that's not -- that puts in an awkward -- it puts

4    them in -- it just becomes -- the appeal becomes moot, right,

5    at the end of the case?

6            THE COURT:  I would assume so.  I hadn't thought that

7    step.  And I'm not saying I would do that.  But y'all asked me,

8    hey, you know --

9            MS. HOLLIDAY:  No, no, no.  I appreciate that.

10           THE COURT:  -- what are all the possibilities.

11           MS. HOLLIDAY:  Yeah.

12           THE COURT:  And I don't -- you know, and there are

13    probably possibilities -- additional possibilities.  Those

14    would just be some that could come to mind, you know?

15           MS. HOLLIDAY:  There's no other possibilities.  This

16    is the whole universe of possibilities.  We are going to nail

17    that down right here.

18           MR. KING:  So, Your Honor, I do think that sort of

19    argues for -- I know I am asking a lot of the Court -- but to

20    let us know after the Court hears from the lawyers what your

21    sort of range of thinking is.

22        Because we do have to make a decision about whether we

23    insist on these, you know, a formal hearing with the expert

24    witnesses, and blah, blah, blah.

25           THE COURT:  Right.

```
 1            MR. KING:  And, obviously, it's just going to matter
 2   what the Court -- they want to put it behind them.  But at the
 3   same time, they don't want to put something behind them that
 4   causes, you know, career consequences, whether that's
 5   disclosure on pro hac -- you know, every pro hac application,
 6   or other disclosure obligations that that imposes upon them.
 7         So I like the way it's set up, except the only amendment
 8   I'd ask is to give us the right after you talk with them, to
 9   let you know if we insist on a more formal process.
10            THE COURT:  I see no reason that that couldn't happen.
11            MR. KING:  Thank you, Your Honor.
12            THE COURT:  And, look, I am going to have to sit down
13   myself and kind of take everything in that we've talked about
14   today, you know?
15            MR. KING:  We are all in uncharted waters here.
16            THE COURT:  Right.
17            MR. KING:  So we understand that the Court is, as
18   well.
19            THE COURT:  All right.  Anybody else got any -- of
20   course.
21            MR. RAGSDALE:  Of course.  Two things.
22         One, I thought I understood you to say you would entertain
23   a brief from us in seven days, or some short period of time,
24   for us to identify why he could be culled out of this herd.
25            THE COURT:  If you desire to.  Now, I just said
```

1    seven days, because it's clear that some people want to go

2    ahead and --

3              MR. RAGSDALE:  No problem.

4              THE COURT:  And to the extent they do, I want to go

5    ahead and let that process begin.

6              MR. RAGSDALE:  I agree.  And we can do that.

7         My second, is it the Court's intent to keep the final

8    report from the panel sealed?

9              THE COURT:  That is a really good question.

10             MR. RAGSDALE:  See, I waited to save one for the end.

11             THE COURT:  That is.  I don't -- I don't -- I don't

12   foresee that that can just stay sealed.

13        They are findings of fact.  I don't -- you know, as I'm

14   looking at the law, and I am willing to be -- you know,

15   somebody can convince me otherwise, you know, the -- if I'm

16   looking at -- there's a couple of U.S. Supreme Court cases.

17   And I have forgotten the name of one of them.  Maybe -- is it

18   Romulus?  I don't know.  Anyway, this case does not seem to

19   meet that standard.

20        Now, I haven't unsealed it until now.  And in talking to

21   Judge Proctor, he said, look, you know, we gave it to you

22   sealed because that's the way we started everything.  But now,

23   you know, once it's yours, you can make that decision.

24        But if I am looking at the current state of the law, I

25   don't see how I keep that sealed forever.  Again, I'm willing

```
 1   to be educated here, but that doesn't look like I would have
 2   the authority just to seal that forever.
 3           MR. RAGSDALE:  One of the cases you are referring to
 4   is Romero, which is an Eleventh Circuit case.  That's the law I
 5   made.
 6           THE COURT:  Oh, really.
 7           MR. RAGSDALE:  Yeah.  So never make law, because you
 8   end up dealing with it.
 9       But I would ask if the Court would indulge us to be able
10   to brief that issue.  Because I think -- I think there is an
11   exception for attorney disciplinary matters.  I mean, I don't
12   think this case -- the merits of this case should be sealed in
13   some fashion.  But I do believe that the law allows for
14   attorney disciplinary matters to be kept confidential until
15   there's a sanction imposed.
16       And if we could have an opportunity to brief that just
17   before you make a decision about that.
18           THE COURT:  Sure.  Sure.  Absolutely.
19           MR. BUCK:  And, Your Honor, if we are going to do what
20   we talked about, which is if that is going to be -- that
21   proceeding is going to be transferred to you -- and I think we
22   talked about that would then become -- it would be sort of
23   amended to be a preliminary report of inquiry.  Isn't that what
24   we talked about, I think?
25       I mean, so it seems to me that the report might change a
```

```
 1  bit between now and when the Court needs to make a decision
 2  about whether to unseal it; is that right?
 3           THE COURT:  I think it's certainly possible.
 4           MR. BUCK:  Okay.  So it may be that we see what -- how
 5  that process plays out, and then submit a brief once we know
 6  what the final preliminary report of inquiry looks like once we
 7  get to that stage.
 8           MS. HOLLIDAY:  On that sealing?
 9           MR. BUCK:  Yes.  Before -- once -- I would say let's
10  see if there's -- how that report gets amended after --
11           THE COURT:  I hear what you are saying.  But here's
12  what I want to be on defense against, is, you know, when the
13  Montgomery Advertiser, or some like group comes and says, we
14  understand you've got a report here that may indicate lawyer
15  misconduct.  You do not have the right to seal that, and we're
16  about to file suit.
17      So I do think we need to brief this right this second.
18           MR. RAGSDALE:  Okay.
19           THE COURT:  ASAP.  Because I do need to know exactly
20  what the law is on that.  That would -- that would be one heck
21  of a distraction, and a distraction that I would not want to
22  get wrong.  And y'all wouldn't want me to, either.
23      So I would say let's brief this unsealing in the next
24  seven days.
25           Yes, sir, Mr. Davis?
```

1          MR. DAVIS:  Judge, I'm sure you are going to want

2    robust briefing on that point, and you should get it.  I don't

3    think we are going to be in a good position to argue the other

4    side even if we disagree with what the lawyers say about that.

5          I would want to be able for our team to maintain good

6    professional relationships with the lawyers who are involved

7    here and focus on the underlying case.

8          So if you think the Court would benefit from somebody

9    arguing the other side, I want to avoid the awkward position of

10   it being us.  And I know in some cases involving disciplinary

11   matters, the Court will appoint somebody to sort of take the

12   other side for the lawyers.  I'm putting that out there.

13         So we reserve the right to respond.  I want, if at all

14   possible, for us to avoid that and to stay as out of these

15   proceedings as we can, if you understand.

16         THE COURT:  I do.  I do.  And so I think what I've

17   generally been hearing from you guys today is you're just going

18   to kind of sit on the back row; is that right?  Is that what

19   the State's position is?  And let this play the process out?  I

20   mean, what role do y'all want to play?

21         MR. DAVIS:  Well, we don't want to be in the role of

22   anything akin to a prosecutor here.  We want to defend our law.

23   We don't want to give up our right to be heard.  Because there

24   may be something that I'm not foreseeing that comes up that we

25   need to stand up, and say, no, we need to disagree with this

1  point.

2       So I don't want to waive the ability to be heard on this.

3  We would like to avoid it as much as possible, though.  And

4  that's why I might suggest that, like a court-appointed amicus

5  could say -- could brief the disclosure issues on whether a

6  report should be sealed, or some other issues that might come

7  up.

8            THE COURT:  Right.

9       That does -- I hear what you are saying, but that seems to

10  add an unnecessary complication at this point if I do this.

11  And I don't want to make this terribly adversarial.  But I also

12  do want to hear from the State on what you think the current

13  state of the law is.

14       You know, whether this should be sealed or unsealed, I

15  think you could brief it to me without being adversarial, just

16  say here's what we think the current state of the law is.  And,

17  you know, you may agree with them, you may not.  But, you know,

18  you are a party to the case.

19            MR. DAVIS:  I understand.

20            THE COURT:  And not only are you a party, you know, I

21  would say you could be an aggrieved party, as well.

22       And so I do want to hear from you.  It doesn't have to be

23  adversarial.  You don't have to, you know, be a zealot, but it

24  would be important for me to know what a party thinks the law

25  is as I'm making decisions.

```
 1              MR. DAVIS:  Understood.

 2              THE COURT:  Got it.

 3              MR. PRATER:  And, Your Honor, I would just urge you --

 4    you have always been a step-by-step judge, and I have admired

 5    that in how you conduct your court.

 6         We've talked about steps today that include submissions

 7    from the lawyers, the lawyers coming to see you.  And while I

 8    understand and respect your interest in doing the right thing,

 9    with respect to this what may prove to be interim report being

10    unsealed, please keep a step-by-step approach in mind, and

11    let's just see how it plays out a little bit.

12         And I think we've got a good plan in place right now.  I

13    think it is helpful for you to hear from us about what we see

14    the law being in that regard.  But let's continue to work

15    together in figuring out how best to handle that to the benefit

16    of everybody -- the lawyers, the Court, everyone.

17              THE COURT:  No, no.  And I have no reason to deviate

18    from that course on this.

19         At the same time, I will tell you, you know, I almost

20    never seal my courtroom.  And I get asked a lot, you know,

21    Judge, I want to exclude these witnesses, or want to exclude

22    the public.  Okay.  Well, what's the reason?  I can't -- that's

23    not a uniform ability that I have.

24         We want you to seal this.  Okay.  But understand I can't

25    seal something just because I want to.
```

1       And so, you know, that's why I want to know the current

2   state of the law.  If the law says I can't seal it, I'm going

3   to unseal it whether anybody asks me to or not.  If the law

4   says I can seal it, I'm going to hear your arguments about why

5   it should stay sealed.

6           MR. PRATER:  And I guess all I'm advocating right now,

7   Your Honor, is let's work together, if it's going to be

8   unsealed, on when.

9           THE COURT:  Right.

10          MR. PRATER:  That's --

11          THE COURT:  Obviously, the first thing I want to do is

12  let y'all educate me on the law on that issue.  And then we

13  will figure out.

14          MR. PRATER:  Yes, sir.

15          THE COURT:  If the law is you can't, let's answer the

16  question.  If it's you can, then we can talk about why it

17  should or shouldn't.

18          MR. PRATER:  Yes, sir.

19          MR. BUCK:  Your Honor, I have a related administrative

20  question about if the -- if the case or the miscellaneous

21  proceeding is transferred to you, and there's an amendment made

22  to what is now the final report, does that replace what is on

23  the docket -- what is now filed in the docket under seal as the

24  final report?  If it were amended, would it replace that?  Or

25  would there be -- would they both be on the docket going

1    forward?

2            THE COURT:  You know, I don't know any way to remove

3    something from the case once it's there.  But it would

4    certainly, you know -- it would be just like an amended

5    judgment.  It wouldn't -- it wouldn't matter.  It wouldn't be

6    the -- it wouldn't be the finding of the Court if I changed

7    something in it.

8            MR. BUCK:  Okay.  I'm just thinking through about what

9    exactly might be unsealed, because there's one thing -- I mean,

10   from the lawyers' perspective, there's a difference between a

11   final report of inquiry being unsealed and a, you know,

12   preliminary report of inquiry being unsealed, and what that

13   might mean in the public eye.

14       That's what I'm asking.

15           THE COURT:  Understood.  Understood.  Well, I think

16   once we brief this, we will be in a lot better position to know

17   what our options are and where we go.

18           MR. RAGSDALE:  Next Friday?

19           THE COURT:  Perfect.

20           MR. RAGSDALE:  Okay.

21           THE COURT:  If we can have them all filed by next

22   Friday, I think that would be excellent.

23           MR. KING:  One more administrative thing, Your Honor.

24   I wanted to let the Court know 30 days from when the panel

25   issued its final report runs on Monday.

1              THE COURT:  Okay.

2              MR. KING:  I'm not positive that deadline makes a

3    difference, but I tend to think it does.

4              THE COURT:  This Monday.

5              MR. KING:  It's going to be easier -- yes, sir.

6         It's going to be easier to, you know, reopen for the panel

7    to do what you have requested -- or going to request them to do

8    by that Monday.  I just wanted you to be aware of that 30-day

9    deadline.

10             THE COURT:  Right.  I don't think Judge Proctor has

11   called me back.  Judge Watkins is here.  I have seen him, and

12   so I intend to talk to him before I leave.

13             MR. KING:  Thank you, Your Honor.

14             THE COURT:  I think that will all get accomplished

15   very quickly.

16        Okay.  Well, that's a lot of work in an hour and

17   10 minutes.  Anything else we ought to pick up?

18             MR. ROGERS:  Thank you, Your Honor.  We appreciate it.

19             MR. PRATER:  Thank you, Your Honor.

20             THE COURT:  All right.  This has been helpful.

21        And I tell you what.  I know I've got a bunch of folks

22   from Birmingham, some from Montgomery, some from other places.

23        For some part of -- no substantive hearings.  But, you

24   know, if we want to sit down again like this, is everybody okay

25   with doing that at the Hugo Black in Birmingham?

```
1              MR. ROGERS:  Yes.

2              MR. RAGSDALE:  Absolutely.

3              THE COURT:  All right.  And we can pass the pain of

4    travel around.

5         Again, I'm not going to conduct a substantive hearing

6    outside the Middle District.  But to the extent that we want to

7    do another one of these at some point, that might be a good way

8    to do it.

9         Okay.  Thank you all.

10

11             (Whereupon, the above proceedings were concluded at

12        2:09 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>CERTIFICATE</u>

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_Christina K Decker_                          <u>11-05-2023</u>

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255