## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **BRIANNA BOE**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-184-LCB** |
| | ) | |
| **STEVE MARSHALL,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

After a seventeen-month inquiry into concerns of judge shopping in a high-profile challenge to state law, a panel composed of judges from each of Alabama's three U.S. District Courts published its findings in a 53-page Final Report of Inquiry, roundly concluding that eleven attorneys (the "Respondents") had "purposefully attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama." (Doc. 339 at 52). The Panel's Report was filed under seal, and it was served on this Court with directions to "proceed as appropriate." *Id.*

On March 19, 2024, the Court decided that "appropriate" meant unsealing the Report. As early as November 2, 2023, the Court expressed its doubts that the Report could "stay sealed," since the circumstances did "not seem to meet [the] standard" for overriding the public's right of access under *Romero v. Drummond Co., Inc.*, 480 F.3d 1234 (11th Cir. 2007). (Doc. 354 at 96). The Panel had filed it under seal only

"because that's the way [it had] started everything," but the decision whether to keep its findings sealed was a matter expressly referred to the Court. *Id.* After initial briefing on the issue, the Court was persuaded that the circumstances justified keeping the record sealed for a limited time.

But after carefully and continually considering the relevant authorities, the Respondents' briefs, and their arguments in open court on November 2 and 21, 2023, and March 19, 2024, the Court now finds that the public's right to view the Final Report of Inquiry outweighs the Respondents' private interests in keeping it sealed. The Final Report of Inquiry "involve[s] public concerns that are at the heart of the interest protected by the right of access: 'the citizen's desire to keep a watchful eye on the workings of public agencies . . . [and] the operation of government.'" *Romero*, 480 F.3d 1234, 1246 (11th Cir. 2007). After argument at the latest hearing, the Court directed the Clerk of Court to unseal the Final Report of Inquiry and nearly all other filings in this case, with "a comprehensive written order detailing the Court's rationale and decision" to follow here. (Doc. 450).

## I.   BACKGROUND

On April 8, 2022, Governor Kay Ivey signed into law the Alabama Vulnerable Child Compassion and Protection Act, a law that criminalized the prescription, administration, or performance of certain medical treatments for transgender youth. Within days of its passage, plaintiffs in the Northern and Middle Districts of

Alabama sued to challenge the Act's constitutionality. The plaintiffs' two cases, *Walker v. Marshall*, Case No. 5:22-cv-480-LCB and *Ladinsky v. Ivey*, Case No. 5:22-cv-447-LCB, were reassigned to this Court on April 15, 2022. That very afternoon, both cases were voluntarily dismissed.

The Court closed *Walker* and *Ladinsky* on April 18, 2022. In its order closing *Walker*, the Court wrote that the Plaintiffs' filing activity—not to mention their statements to the media[1]—"could give the appearance of judge shopping," which it flagged as a pernicious practice with "the propensity to create the appearance of impropriety in the judicial system." *Walker v. Marshall*, Case No. 5:22-cv-480 (N.D. Ala. April 18, 2022). The order was served on the Chief Judges of the U.S. District Courts for the Northern, Middle, and Southern Districts of Alabama. *Id.*

After learning of the Court's concerns, the Chief Judges of each district convened a three-judge panel "to inquire about the issues raised by counsel's actions" in *Walker*, *Ladinsky*, and this case. *In re Amie Adelia Vague*, Case No. 2:22-mc-3977-LCB (N.D. Ala May 10, 2022), ECF 1 at 5. "Confidentiality," some of the Respondents have observed, was a "cornerstone" of the proceedings before the three-judge panel. (Doc. 359 at 3). The Panel conducted the inquiry in camera, and

---

[1] Paul Gattis, Lawsuits Seeking to Overturn New Alabama Transgender Law Dropped, Could be Refiled, AL.COM (Apr. 16, 2022, 5:43 p.m.), https://www.al.com/news/2022/04/lawsuits-seekingto-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html.

most of its records—hearing transcripts, attorney declarations, and its Final Report of Inquiry—were sealed.

The Panel published its Report on October 3, 2023, and served it on the Court with directions to "proceed as appropriate." (Doc. 339 at 52). To decide what process would be most "appropriate," the Court heard argument from the Respondents on November 2, 2023, letting each of them propose a format for future hearings, his or her preferred motion practice, proposals for briefing schedules, and any other process that he or she believed appropriate to nature of the case. (Doc. 352).

It would also be "appropriate," they argued, for the Report to stay sealed. After the hearing, the Court ordered all parties and Respondents to brief whether the Panel's Report should remain under seal. (Doc. 349). The State (Doc. 357); Jennifer Levi and Shannon Minter (Doc. 358); and James Esseks, Carl Charles, and LaTisha Faulks (Doc. 359) briefed the issue; Michael Shortnacy joined the last of these (Doc. 360), and Asaf Orr and Scott McCoy (Doc. 361), Melody Eagan and Jeffrey Doss (Doc. 362), and Kathleen Hartnett (Doc. 365) joined the latter two. The Government took no position. (Doc. 355). The Court heard argument again on November 21, after which it shared its expectations for the process. The Court would issue a show-cause order, and all Respondents would be given the opportunity to present their own arguments at a show-cause hearing a few weeks later. (Doc. 373). Meanwhile, the Report stayed sealed.

The show-cause order was issued on February 21, 2024. (Doc. 406). Each Respondent was ordered "to show cause why they should not be sanctioned for the misconduct outlined in the Final Report of Inquiry and detailed further" in the show-cause order itself. *Id.* at 2. Given the order's reliance on the Report, each Respondent was allowed to move for submission of "specific additional evidence" to clarify the Panel's findings as "necessary for the Court to determine [the] Respondent's culpability or an appropriate sanction." *Id.* at 11. The Respondents were further ordered to submit show-cause briefs and, later, additional briefs in which they ratified or disavowed the other Respondents' statements by "identify[ing] those portions of all other Respondents' briefs with which they agree or disagree." *Id.* Finally, the Respondents were ordered to appear at the end of May to show cause in open court.

The Court received motions to submit additional evidence from Melody Eagan and Jeffrey Doss (Doc. 433); Michael Shortnacy (Doc. 434); Kathleen Hartnett (Doc. 435); Asaf Orr (Doc. 436); James Esseks, Carl Charles, and Latisha Faulks (Doc. 437); Scott McCoy (438); and Jennifer Levi and Shannon Minter (Doc. 439). In ruling on these motions, the Court admitted nearly all evidence that the Respondents had proffered for consideration. (Doc. 449).

Having ordered the Respondents to show cause and set the matter for a final hearing, the Court found it appropriate to revisit the propriety of keeping the Report

sealed. Since the issue was "ripe for decision," the Respondents were ordered to argue the matter once more and submit any supplemental briefing before the March 19 hearing.

On March 19, the Respondents argued once more that the Report should stay sealed, and the State, at the Court's request, set forth its understanding of the governing law. (Doc. 451). At the close of argument, the Court ruled that the Report should be unsealed: the controlling factors of *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1246 (11th Cir. 2007) now favored the public's right of access over the Respondents' privacy interests, so good cause no longer existed for the Report to stay sealed. With the Report to be unsealed, the Respondents jointly moved to unseal all other filings related to the Panel's inquiry. The motion was granted, and the Clerk of Court was directed to unseal all filings in both this case and the related matter of *In re Vague* immediately. (Docs. 450 & 452).

## II.  DISCUSSION

The Respondents have been litigating the soundness and validity of the Panel's findings under the cloak of a sealed record for nearly six months. Before that, they enjoyed confidentiality for the seventeen months of the Panel's inquiry. But confidentiality must eventually give way to openness if the public is to trust that courts will vigorously protect the integrity of the judicial process and police misconduct among the bar. Since October 3, the Court has carefully weighed the

Respondents' privacy interests against the public's right to the Report; till recently, the balance has ever so slightly favored the Respondents.

But no longer. After further consideration of the Panel's findings, and after months of briefs, hearings, and motion practice, the scales have tipped the public's way.

### A. The Respondents have not shown good cause to overcome the presumption in favor of public access to judicial records.

The public has long enjoyed a "common-law right to inspect and copy judicial records." *Chicago Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1309 (11th Cir. 2001). With its deep roots in the democratic process, *id.*, the right of access to judicial records is the *sine qua non* of "public confidence in our system of justice" and plays an instrumental role "in securing the integrity of the process," *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1358–59, 1361 (11th Cir. 2021). The very legitimacy of our justice system depends on "public acceptance of both the process and its results," and so the law holds courts "accountable to the citizens it serves" by presuming that their records are available to any who wish to see them. *Callahan*, 17 F.4th at 1361, 1363. At bottom, the right "has been resolute[ly]" enforced, *id.* at 1359, because "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 839 (1978).

But while the public's right to inspect judicial records is "indispensable," it is "not absolute." *Callahan*, 17 F.4th at 1363. Those who wish to trammel the public's right of access to court records must show good cause for confidentiality, and this showing depends on "the nature and character of the information in question." *Romero*, 480 F.3d at 1246. Courts must balance the public's right of access "against a party's interest in keeping the information confidential" by weighing at least six factors:

> [1] whether allowing access would impair court functions or harm legitimate privacy interests, [2] the degree of and likelihood of injury if made public, [3] the reliability of the information, [4] whether there will be an opportunity to respond to the information, [5] whether the information concerns public officials or public concerns, and [6] the availability of a less onerous alternative to sealing the documents.

*Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007). In addition to these six factors, courts may also consider "[c]oncerns about trade secrets or other proprietary information," as well as the possibility that the records might be "sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage." *Callahan*, 17 F. 4th at 1363.

To begin with, the Final Report of Inquiry is a "judicial record" that the public has the presumptive right to inspect. "There is no doubt that . . . court orders themselves are judicial records," as a court's "decisions are the quintessential business of the public's institutions." *In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1128 (D.C. Cir. 2020) (internal

quotation marks omitted). And since "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern," the public's presumptive right to inspect court records is here far weightier than usual. The Final Report of Inquiry was prepared by a panel of three judges, each of whom was designated by the Chief Judge of each district in the United States District Courts of Alabama; indeed, the Southern District was represented by the Chief Judge himself. If the Chief Judges of each district in the State deemed the threat of judge shopping grave enough to warrant an inquiry by a three-judge panel, then a report of their findings is precisely the sort of judicial record that the public enjoys the right to inspect: the public must be able to evaluate the gravity of the charge and the effectiveness with which the judiciary has policed it.

Since the public is presumptively entitled to view the Report, the Court should not keep it under seal without "good cause," which exists only if the public's right of access is outweighed by the Respondents' "interest in keeping the information confidential." *Romero*, 480 F.3d at 1246. At this point in the case, the interests weigh in favor of lifting the seal.

**(1)   Whether allowing access would impair court functions or harm legitimate privacy interests.**

Taken together, the threat of harm to court functions and to legitimate privacy interests weigh in favor of unsealing the Report. First, public disclosure of the Panel's findings is unlikely to impair court functions; rather, it's likely to strengthen

them. After all, "[t]he press . . . guards against the miscarriage of justice by subjecting . . . judicial processes to extensive public scrutiny and criticism," and the panel's findings concern efforts to subvert the judicial process itself. *Landmark Commc'ns, Inc.*, 435 U.S. at 839.

Second, no "legitimate privacy interests" would be harmed by unsealing the Panel's Report, though the Respondents have raised two threatened interests: (1) the confidentiality of their attorneys' work product, and (2) their reputational interests. The first contention is without merit; the second is insufficient to warrant sealing the record.

The work product of attorneys is generally protected against "inquiries" from the opposing side "into an attorney's work files and mental impressions." *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018); *see Hickman v. Taylor*, 329 U.S. 495, 510 (1947). This protection extends to materials that counsel obtains or prepares "in the course of their legal duties," as long as "that work was done with an eye toward litigation." *Drummond Co., Inc.*, 885 F.3d at 1334-35. The rule is meant "to protect the integrity of the adversary process by allowing a lawyer to work 'with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.'" *Id.* at 1335 (citing *Hickman v. Taylor*, 329 U.S. at 510).

But these protections are "not absolute." *Id.* "The crime-fraud exception," for instance, "removes the 'seal of secrecy' from . . . work product materials when they are made in furtherance of an ongoing . . . fraud." *Id.* Though typically arising in cases of crime or fraud by a client, the crime-fraud exception also applies in cases of an attorney's fraud so long as there's a prima facie showing that (1) the attorney was engaged in fraudulent conduct; and (2) the documents, testimony, or other work product materials were produced in furtherance of the fraudulent activity." *See Drummond Co., Inc.*, 885 F.3d at 1335-38. Put simply, "in cases of attorney misconduct[,] there is no protection for the attorney's work product," *id.* at 1337, and the reason for this is clear: no attorney should "be able to exploit work product protection for ends outside of and antithetical to the adversary system any more than a client who attempts to use the privilege to advance criminal or fraudulent ends," *id.* at 1338.

After receiving the Report, the Court directed the Clerk to e-mail a copy of the Panel's findings to all attorneys in this case who were not party to the Panel's inquiry, a slate of attorneys that included representatives for the State Defendants. (Doc. 318). Respondents Esseks, Charles, and Faulks objected to this order and moved to stay dissemination of the Report. (Doc. 319). According to these Respondents, "[v]irtually all" of the Panel's factual findings contain their "mental impressions and strategy," which they consider "paradigmatic work product and

common interest materials that should not be disclosed to adverse parties" (Doc. 321 at 12).

The "mental impressions and strategy" set forth in the Report are not the privileged variety that the work-product doctrine protects. To be sure, protections for work product are based on a lawyer's need to "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. at 510. To "faithfully protect[] the *rightful interests* of [their] clients," attorneys must be free to "assemble information, sift what [they] consider[] to be the relevant from the irrelevant facts, prepare [their] legal theories and plan [their] strategy without undue and needles interference." *Id.* at 510–11 (emphasis added). But the Respondents impressions did not pertain to the relevancy of certain facts, the merits of their legal theories, or to their clients "rightful interests" whatsoever. To the contrary, the "mental impressions" they wish to keep sealed are their frank, unguarded opinions of judges in the Northern and Middle Districts of Alabama and their thoughts on how best to steer their cases toward one they deemed "favorable." These are neither the "documents and tangible things protected in anticipation of litigation" protected by Rule 26(b)(3) nor the "mental impressions" protected under the doctrine of *Hickman* and its progeny.

But even if Esseks, Charles, and Faulks were right that these materials are "paradigmatic work product and common interest materials," the crime-fraud

exception would remove any work product protections that they might otherwise enjoy. *See Drummond Co., Inc.*, 885 F.3d at 1337 (11th Cir. 2018). The Report explained that "so-called judge shopping—that is, attempting to circumvent a court's random case assignment—abuses the judicial process," yet the threat of abuse had not kept the Respondent from "purposefully attempt[ing] to circumvent the random case assignment procedures" for the Northern and Middle Districts of Alabama. (Doc. 339 at 2-3, 50-51). In the attempt, the Panel found, the Respondents had engaged in "misconduct." *Id.* at 50-51. The Panel's findings make a prima facie case of misconduct—namely, judge shopping—and the "mental impressions and strategy" decisions for which the Respondents claim protection were produced in furtherance of that misconduct. Given these findings, the Respondents' asserted privacy interest in any putative work product the Panel may have disclosed in its Report carries no weight.

The Respondents interests in their reputation is another matter. From the beginning, the Court has been sensitive to the risk that public access to the Panel's findings could harm the professional reputations of all persons involved in the Panel's inquiry. Until recently, the Court assigned such weight to this factor that the balance of interests favored the Respondents; the Report, in other words, stayed sealed.

But the threat of reputational harm is not enough "to overcome the strong common law presumption in favor of public access." *Wilson v. American Motros Corp.*, 759 F.2d 1568, 1570-71 (1985). Attorneys might have an interest in sealing filings to keep the public from learning of "very serious allegations" against them, but "[t]hat interest . . . cannot meet the weighty standard for overriding the presumptions of open records and public access." *In re Demetriades*, 58 F.4th 37, 45-47 (2d Cir. 2023) (internal quotation marks omitted).

In short, the importance of these concerns has inverted: the integrity of the judicial process—and indeed the integrity of the federal judiciary itself—is now best served by vindicating the public's right of access to the Report, while the risk of reputational harm that the Respondents might suffer, though persistent, must be accorded less weight.

### (2)    The degree of and likelihood of injury if made public.

For the reasons given in section II(A)(1), this second factor favors unsealing too. Till now, the Report has been sealed precisely because publication of the Report unduly risked injury to the Respondents.

But just as the Panel's inquiry called for confidentiality, the Court's order to show cause calls for openness: when judicial records concern attorney misconduct, the public's right of access becomes "most important," since only this transparency can guarantee "a measure of accountability" and give the public "confidence in the

administration of justice." *United States v. Nejad*, 521 F. Supp. 3d 438, 452 (S.D.N.Y. 2021).

While full evidentiary submissions are still forthcoming, the Respondents have proffered all evidence that they believe will clear up, correct, or contextualize the Panel's findings. Put simply, the Court has defined the universe of facts it will consider at the show-cause hearing, and it has found it appropriate to order each Respondent to show cause. At this point, then, the Court has mitigated both the degree and likelihood of injury from disclosure, tipping the balance in favor of public access.

### (3)   The reliability of the information.

The reliability of the Panel's findings greatly favors unsealing the Report. Although a non-final order whose findings the Court may accept, reject, or modify in whole or in part, the Report bears all the indicia of reliability that courts typically accord greatest weight. For one, it is a court record. It was prepared by three federal judges with decades of judicial and litigation experience between them and published only after seventeen months of meticulous factfinding and deliberation. For another, its findings are open to independent corroboration. The findings were based on live testimony, attorney declarations, and briefing that are now matters of the public record.

**(4)    Whether there will be an opportunity to respond to the information.**

The Respondents' opportunities to respond to the Panel's findings likewise counsel in favor of unsealing. To date, the Respondents have been able to respond in open court, over zoom calls, in post-hearing briefs, and through motions to submit additional evidence. They will also be allowed to respond in show-cause briefs, in separate filings that identify those portions of the other Respondents' briefs with which they agree or disagree, and in open court at the final show-cause hearing itself. In short, the proceedings have abounded with opportunities to amend, correct, or otherwise counter the Panel's findings, and these opportunities will continue through at least the final hearing.

**(5)    Whether the information concerns public officials or public concerns.**

This fifth factor above all favors unsealing the Report. The Panel's findings concern high-profile attorneys from leading law firms and civil-rights advocacy groups, judges from every federal district court in the State of Alabama, and the fairness and efficacy of the judicial process. These are doubtless "matters of utmost public concern." *Landmark Commc'ns, Inc.*, 435 U.S. at 839.

The public's interest in the professional conduct of attorneys that practice in their courts is paramount. These are the counselors, community leaders, and stock of learned professionals who defend our civil interests and vindicate our private

rights, the professionals whom the public must trust above all to fulfill their duties with probity. For this reason the right to judicial records is still more compelling when the records concern attorney discipline, since these proceedings speak squarely to the integrity of the profession and, as a result, to the proper administration of justice. After all, "[t]he purpose of attorney discipline . . . is to maintain appropriate standards of professional conduct to protect the public and the administration of justice from lawyers who have demonstrated by their conduct that they are unable or are likely to be unable to properly discharge their professional duties." Preamble, ALA. R. DISC. P.

So too with the public's interest in the judges of their courts and the efficacy of the judicial process. The federal judiciary's random case-assignment procedures "promote[] the impartiality of proceedings and bolster[] public confidence in the federal Judiciary." United States Courts, Conference Acts to Promote Random Case Assignment (Mar. 12, 2024), https://www.uscourts.gov/news/2024/03/12/conference-acts-promote-random-case-assignment.

But precisely the reverse is true with concerns of judge shopping. To credit the belief that a certain judge will categorically deny justice to a certain cause or that justice is best achieved by subverting the judicial process in the name of politics is to erode the public's trust in the rule of law. The only antidote to this threat is

transparency: rather than take the promise of justice on faith, the public can watch the process unfold and see the results that the process achieves.

**(6)   The availability of a less onerous alternative to sealing the documents.**

The sixth factor favors unsealing too. The only less onerous alternative to unsealing the Report is the publication of a redacted version of the Panel's findings. Although an imperfect remedy, redaction generally strikes a satisfactory balance between the public's right of access with a movant's interest in confidentiality: the public can glean the filing's gist without infringing the movant's legitimate privacy interests.

Not so here: the public's concern lies precisely with those findings that the Respondents most wish to conceal. Rather than illuminating the Panel's findings, the redactions that would be needed to preserve the Respondents' confidentiality interests would so occlude the narrative as to leave the Report's very purpose a mystery.

## III.   CONCLUSION

It should come as no surprise that the *Romero* factors all weigh in favor of unsealing the Report immediately—attorney misconduct is rarely litigated in the dark. The misconduct for which attorneys are charged usually occurs in open court or in the public's view, and the Court's show-cause order is widely available for copying and inspection. Attorneys appear in public to justify their actions, and

18

members of the press may attend the hearings and publicize the final adjudication. Transparency is the norm.

As it should it be. There is a malignant perception among the public that lawyers seldom face consequences for professional misconduct. The belief rests on an antiquated view of the law as an Old Boys' network, where lawyers are reluctant to punish their friends and lawyers reward their judicial colleagues in a mutual pact of favoritism with lectureships and accolades. Only the light of day can dispel this perfidious notion: an open docket where the public and press alike can scrutinize the "process and its results." *Callahan*, 17 F.4th at 1361. The press has long "been regarded as the handmaiden of effective judicial administration," because it "guards against the miscarriage of justice by subjecting the . . . judicial process to extensive public scrutiny and criticism." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. at 839. This case illustrates the urgency of public access to judicial records: eleven attorneys, charged with judge shopping, have countercharged their judges with "infect[ing]" the record with "due process deficiencies." With the very integrity of the bar and judiciary at stake, public scrutiny is paramount.

To be absolutely clear, this order finds only that the Respondents lack good cause to keep the Report under seal. The Court will make no factual findings about the Respondents' conduct nor judge anyone's culpability until it has heard from everyone at the show-cause hearing. But even if the Respondents should be cleared

that day of all misconduct and liability, the balance of interests now calls for unsealing the record; regardless of the outcome, these proceedings should be litigated in the light of day.

For these reasons, the Court has **DIRECTED** the Clerk of Court to unseal the Final Report of Inquiry (Doc. 339). At the Respondents' joint motion in open court, the Court also **DIRECTED** the Clerk of Court to unseal all filings in the matter of *In re Amie Adelia Vague*, Case No. 2:22-mc-3977, and, except as otherwise directed, (*see* Doc. 452), all filings in this case as well.

Finally, for the reasons set forth in Section II(A)(1), the Emergency Motion to Stay Dissemination of Sealed Final Report (Doc. 319) by Esseks, Charles, and Faulks is **DENIED**.

**DONE** and **ORDERED** this March 29, 2024.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE