```
1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF ALABAMA
2                          NORTHERN DIVISION

3

4       BRIANNA BOE, et al.,        *
                                    *
5             Plaintiffs,           *   2:22-cv-00184-LCB
                                    *   March 19, 2024
6       vs.                         *   Montgomery, Alabama
                                    *   10:00 a.m.
7       STEVE MARSHALL, et al.,     *
                                    *
8             Defendants.           *
        ****************************

9

10

11                      TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE LILES C. BURKE
12                 UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
        pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
23        and Procedures Vol. VI, Chapter III, D.2.  Transcript
                   produced by computerized stenotype.
24

25
```

1                        <u>APPEARANCES</u>

2

3    <u>FOR THE DEFENDANT</u>:
     James W. Davis, Esq.
     Edmund LaCour, Esq.
4    Alexander Barrett Bowdre, Esq.
     OFFICE OF THE ATTORNEY GENERAL
5    501 Washington Avenue
     P.O. Box 300152
6    Montgomery, Alabama 36130-0152
     (334) 242-7300
7

8

9    <u>RESPONDENTS</u>:
     Brannon Buck, Esq.
     Christopher Driver, Esq.
10   BADHAM & BUCK, LLC
     2001 Park Place North, Suite 500
11   Birmingham, AL 35203

12   Harlan I. Prater, IV, Esq.
     LIGHTFOOT, FRANKLIN & WHITE, LLC
13   The Clark Building
     400 20th Street North
14   Birmingham, Alabama 35203

15   Robert D. Segall, Esq.
     COPELAND FRANCO
16   444 South Perry Street
     P.O.Box 347
17   Montgomery, Alabama 36101

18   April A. Otterberg, Esq.
     JENNER & BLOCK
19   353 N. Clark Street
     Chicago, IL 60654-3456
20   (312) 222 9350

21   Barry Alan Ragsdale, Esq.
     Dominick Feld Hyde, P.C.
22   Litigation
     1130 22nd St S - Ste 4000
23   Birmingham, AL 35205
     205-536-8888
24   BRagsdale@dfhlaw.com

25

```
 1        Elizabeth Terenzi, Esq.
          Bainbridge, Mims, Rogers & Smith, LLP
 2        The Luckie Building
          Suite 415
 3        600 Luckie Drive
          Birmingham, AL 35223
 4        (205) 879-1100

 5

 6

 7        COURTROOM DEPUTY:  Deena Harris

 8

 9        COURT REPORTER:  Christina K. Decker, RMR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# P R O C E E D I N G S

1
2          (In open court.)

3          THE COURT:  Let's go back on the record.

4      So the first issue that I think we ought to take up is the

5  issue of the sealing, whether this case should remain sealed.

6  I'm sure everybody got the gist from my order.

7      I continue to have concerns, great concerns about the way

8  Romero weighs in this case, whether this should remain sealed,

9  especially now that we essentially have buttoned up fact

10 finding.

11     So I certainly want to hear from those parties who want to

12 be heard on whether this case should remain sealed.  We will

13 get through that issue, and then we will pick up the rest of

14 the issues that are before us.

15     So why don't I just start with the plaintiffs.  Do y'all

16 want to do this separately?  Together?  Or --

17         MR. RAGSDALE:  I know I speak on behalf of my clients.

18 I suspect these other lawyers will have comments to make after

19 I'm done.

20         THE COURT:  All right.  Since this is still really

21 separately -- well, this is a separate hearing than a merits

22 hearing.  Just for transcript purposes, I think we need to --

23 so let's go ahead and let everybody who is going to speak in

24 this hearing again state their name for the record and who they

25 represent.

1          MR. RAGSDALE:  I'm Barry Ragsdale.  I represent

2    attorneys Esseks, Charles, and Faulks.

3          MR. PRATER:  My name is Harlen Prater, Your Honor.  I

4    represent Melody Eagan and Jeff Doss.

5          MS. OTTERBERG:  My name is April Otterberg, and I

6    represent Jennifer Levi and Shannon Minter.

7          MR. SEGALL:  I don't know if I will speak or not,

8    Judge.  I think they will probably cover it, but I'm Bobby

9    Segall representing -- along with April Otterberg, I represent

10   Jennifer Levi and Shannon Minter, and also represent Scott

11   McCoy and Asaf Orr.

12         MR. BUCK:  Your Honor, I'm Brannon Buck.  Along with

13   Chris Driver, we are here for Kathleen Hartnett.

14         MR. CHEEK:  Your Honor, this is Jason Cheek on behalf

15   of the United States.  I just want to say that we are not going

16   to take any position on this matter.  And if it's okay with

17   you, may we be excused?

18         THE COURT:  I see no reason for you to remain unless

19   you want to.  Anybody have an objection to that?

20       All right.  You are excused, Mr. Cheek.

21         MR. CHEEK:  Thank you, Your Honor.

22         MS. TERENZI:  Betsy Terenzi.  Excuse me.  I'm sorry.

23   Betsy Terenzi on behalf of Michael Shortnacy.

24         MR. DAVIS:  Jim Davis for the state defendants.

25         THE COURT:  All right.  And, Mr. Davis, will you be

1   arguing for the state on the issue of the seal?

2          MR. DAVIS:  Yes.  I am prepared to speak on that.

3          THE COURT:  Gotcha.  All right.  Okay.  So, obviously,

4   I have re-read all of the briefing on this extensively.

5      So I guess we will just start with you, Mr. Ragsdale.

6          MR. RAGSDALE:  Thank you, Your Honor.

7      As I said, I represent attorneys Esseks, Charles, and

8   Faulks, some of the respondents in this case.

9      Back in November, when we briefed this issue for the Court

10  previously, we set out obviously that the standard that we

11  believe applies to these proceedings is that they remain sealed

12  and confidential until there has been a final finding of

13  wrongdoing.  There has been no such final finding of

14  wrongdoing.  That will presumably wait upon this Court's

15  hearing in May.  We don't believe anything has changed about

16  either the law or its application to this case.

17     Romero, as you may be aware, is my case.  I argued it in

18  the Eleventh Circuit.  That case involved the merits of a

19  dispute -- highly-contested dispute involving whether or not an

20  American corporation had hired paramilitary to assassinate

21  union leaders.  It was a matter of public concern.  And we

22  believed and challenged in the Eleventh Circuit that Judge

23  Bowdre's orders had gone too far, in terms of what was sealed.

24     This is an entirely different animal.  This is a

25  disciplinary investigation, sanctions investigation into the

1   conduct of a number of attorneys.  Historically, traditionally,

2   and by rule, that kind of proceeding is maintained as

3   confidential until there is a final resolution.

4       There are good reasons for those rules.  And those rules,

5   by the way, assume that the attorneys' privacy and reputational

6   interests outweigh the limited public interests in having

7   access to investigatory and fact-finding materials.  And that's

8   really all we have at this point, both the report put out by

9   the panel, as well as the transcripts and everything related to

10  it, as well as all of the motions related to the report to the

11  proceedings before this Court all relate to non-final

12  investigations of lawyers' conduct.

13      The rules of the Eleventh Circuit, the rules of the

14  Northern District of Alabama, the rules of the Middle District

15  of Alabama, and the rules of the Alabama State Bar say that

16  those remain confidential and closed to public scrutiny, that

17  the balance favors, the good cause favors protecting lawyers'

18  privacy and reputational interests until there has been a final

19  resolution.

20      So our contention is really is nothing has changed since

21  November, when we presented the briefs to you that indicated

22  that that balancing, that -- you know, there is no absolute

23  public right to access to court proceedings.  It is a balancing

24  act.  And that both the courts and the rule-making authorities

25  have balanced that in favor of the lawyers' privacy and

 1   reputational interests.

 2           THE COURT:  So, you know, clearly, not just with

 3   Romero, this is a discretionary call.  And, you know, what do

 4   you weigh?  The public and the press's right to know that

 5   things be litigated in the light of day versus, you know,

 6   obviously, publicizing the conduct of attorneys before a final

 7   order.

 8       You know, tell me how you think that the fact -- we really

 9   have closed fact finding at this point.  Everybody -- I gave

10   everybody an opportunity to submit new facts.  Everybody has

11   proffered, you know, what their facts are.

12       Why should it remain closed now that we essentially are

13   just, you know, going forward with a hearing?

14           MR. RAGSDALE:  Well, Your Honor, and this may be a

15   misunderstanding on my part.  But I thought you allowing us to

16   submit additional factual materials means that you're going to

17   continue to consider those factual materials as they're

18   submitted.

19           THE COURT:  No, no.  I am.  In fact, if you read my

20   order, you know, I admitted I think 95 percent of the requests

21   that were asked in the proffer.  So, but, you know, again, I

22   have -- y'all have told me now what the additional facts are.

23   I have in almost every event granted those, add them -- and

24   will add them to the factual record.

25       So I realize that, you know, some or all of the

1  respondents at a final hearing, you know, may well decide they

2  want to testify, tell their side of the story.  Some may not.

3      But, you know, as far as going forward with, you know, the

4  factual record, other than just an argument I'm going to get at

5  the show cause hearing, aren't we -- aren't we pretty much at

6  the end of fact finding?

7      MR. RAGSDALE:  I would say no, Your Honor.  The facts

8  haven't been submitted to you yet.

9      The declarations that we are intending to put in both by

10  our clients and others are additional facts that you haven't

11  heard yet.  I mean, I understand we were supposed to describe

12  them to you, but at least I did that only in the most general

13  terms because we're putting those declarations together as we

14  stand so that -- I think maybe what you have done is defined

15  the universe of facts that you will consider, but you haven't

16  yet been presented that universe.  And you have not yet made

17  findings based upon those facts.

18      THE COURT:  So let me ask you this:  The panel, if you

19  read their facts, they basically laid out facts that would

20  support four things:  That some or all of the respondents, you

21  know, were absolutely judge shopping in their actions; that one

22  respondent willfully lied about a material fact to the

23  three-judge panel; that some respondents dismissed their case

24  without the knowledge or consent of their client; and that some

25  or all of the respondents displayed a complete lack of candor

1   to the three-judge panel in their declarations and their

2   testimony.  And, you know, I specifically would just say left

3   out material facts that would have affected the panel's

4   opinion.

5       You know, when I have got a junior associate who is

6   telling the panel things that absolutely this case would turn

7   on that none of the respondents happened to mention is -- it

8   shocks the conscience.

9       So my question is, you know, we've got 11 respondents, one

10  of who, if we believe the panel, may be guilty of a felony, and

11  we've got other respondents, you know, the panel says are judge

12  shopping, not being forthright with the panel.

13      How do I continue to let this be litigated in the dark?

14  Doesn't this look like the biggest coverup of judges and

15  lawyers in history?

16          MR. RAGSDALE:  You know, it depends on which side of

17  the aisle you're on.  But I will say, Your Honor, this has been

18  litigated in the dark by the panel.

19          THE COURT:  I understand.  And I know why they did it.

20  They did it for a good reason.  And, you know, I have adopted

21  their -- I have allowed this to continue.  But, obviously,

22  we're here today because I have grave concerns about it

23  continuing.

24          MR. RAGSDALE:  And frankly, Judge, we have grave

25  concerns about this Court completely deferring to the panel's

1  preliminary findings.

2      In part because, Your Honor, as you have recognized, the

3  standard is clear and convincing evidence before you can impose

4  sanctions.

5         THE COURT:  Now, we're just talking about the seal

6  right now.

7         MR. RAGSDALE:  I understand, Your Honor.  But they

8  made findings not applying the proper legal standard, not

9  applying the proper burden of proof.

10      For example, Your Honor, if 14 people to a telephone

11  conversation testified that it happened this way, and one

12  junior associate remembers it differently, that's not clear and

13  convincing evidence that those 13 people lied.  It's just not.

14  In fact, it begs the question of whether or not the panel, in

15  fact, cherry picked facts to support that.

16         THE COURT:  Well, you know, now that we're on that,

17  let's talk about something else here.  You know, and I think

18  this weighs a little bit here.

19      I will be honest with you.  You know, there is some

20  absolutely what I would consider nearly over-the-top heated

21  rhetoric in some of these filings.  We have got an allegation

22  by you and your clients that a three-judge panel consisting of

23  the three chief judges of the three districts in Alabama or

24  their designee, you know, quote, you know, infected their case

25  with due process deficiencies.

1          That is -- that's -- I mean, that's an allegation.

2               MR. RAGSDALE:  It's also true, Your Honor.

3               THE COURT:  That's -- that's -- that's quite an

4    allegation.  I mean, is -- you know, does the public not have a

5    right to know that a group of lawyers think that the three

6    chief judges in this state or their designees are denying,

7    according to you, your clients' due process?

8               MR. RAGSDALE:  Is that really surprising, Your Honor,

9    that a lawyer would argue --

10              THE COURT:  I know you have got to make your case, but

11   I'm just saying -- you know, hey, I mean, does this need to be

12   in the light of day?

13              MR. RAGSDALE:  I think once there's a final

14   resolution, it will be in the light of day.  But at this point,

15   it's preliminary.  You have not even heard our arguments yet in

16   the briefs that we intend to submit.  And to release it at this

17   point not only damages lawyers that you may ultimately find

18   didn't do anything wrong.  Once you have heard all the facts,

19   once you have heard all the arguments, you may conclude that

20   these lawyers didn't commit --

21              THE COURT:  And by the way, let me say:  You are

22   correct.  In having read these transcripts, these declarations,

23   you know, if what the panel says is correct, you know, very

24   preliminarily without having heard from your clients at which,

25   you know, my opinion could change, yes, I think there are

```
 1   widely varying levels of culpability here.

 2              MR. RAGSDALE:  Well --

 3              THE COURT:  And we may have some who have no

 4   culpability at the end when I hear from them.  So you are

 5   absolutely right about that.

 6              MR. RAGSDALE:  And --

 7              THE COURT:  And I would remind everybody of that, you

 8   know?  I would remind everybody that I have not made my mind up

 9   that they are -- you know, if I am looking at the record

10   fairly, there are widely varying levels of culpability.  And,

11   therefore, if what the panel says is correct and if I take the

12   transcripts for what they are, there would also be widely

13   varying levels of sanctions and maybe no sanction for certain

14   people.  Let me remind everybody of that one more time.

15       So go ahead.

16              MR. RAGSDALE:  Let me say, Your Honor, I am counting

17   on that.  I am counting on you giving this a thorough review

18   and a fair shake and conclude various levels of culpability or

19   not.  And that's part why we believe that it is premature to

20   release the final report or any of those other things until you

21   have had the opportunity to do that, which you will do in May.

22       At best, you will then make a final determination, and all

23   of this will be subject to being unsealed.

24              THE COURT:  Understood.  Anything else you want to

25   tell me, Mr. Ragsdale?
```

1          MR. RAGSDALE:  Well, I do want to say this, Your

2    Honor, that if you decide to unseal the final report, we would

3    ask that you unseal everything in the case, which includes our

4    briefs, filings, arguments, objections, transcripts,

5    everything, so that if we're really trying to educate the

6    public, they get fully educated.

7          THE COURT:  And my view would be if I do unseal it --

8    and I think you can tell that's the way I lean right now.  And

9    I am going to make a decision today.  But I wanted to hear from

10   the attorneys about this.

11        You know, if I were to unseal it -- and I'm willing to get

12   your input on this -- you know, it would be my intention to

13   unseal everything that we have -- that has happened basically,

14   you know, since the panel issued their ruling, along with

15   declarations, et cetera, et cetera.

16        Now, I don't think I have the ability to go back into the

17   Vague case itself -- so I may feel differently -- and change

18   anything in that case.  But I certainly can unseal everything

19   in this case since the panel report, including the panel

20   report, the declarations, et cetera, et cetera.  So that would

21   be my intention if I wind up doing that.

22        MR. RAGSDALE:  Second request while I'm on a roll

23   making requests, if that's okay, Your Honor.

24        If you should decide to unseal it, we would ask that you

25   abate your order for seven days to give us an opportunity to

1   determine whether or not we want to appeal from that ruling.

2        And the last thing I would ask on a personal note, Your

3   Honor, is that because of the nature of the allegation against

4   Mr. Charles, which, Your Honor, we have never had an

5   opportunity to brief that to you.  We're going to, obviously,

6   when we file the supplemental brief.  But we believe at a

7   minimum, the evidence is going to show that Mr. Charles

8   corrected his testimony during his very testimony before the

9   panel.

10       In other words, there's about a two-minute gap between him

11  denying that he made the phone call to chambers to him

12  recalling that he did make the call.  Under standard perjury

13  law, that's a defense to any charge of perjury.

14       But in addition to that, Your Honor, we believe there's

15  additional facts that will lead you to conclude that the panel

16  was dead wrong in concluding that it -- it was even more likely

17  than not much less clear and convincing evidence that he lied

18  about a phone call where he had given the clerk his name and

19  phone number.

20       We believe you're going to take a different view of the

21  allegations against Mr. Charles when we have an opportunity to

22  brief those.  And I know you will keep an open mind.

23           THE COURT:  Well, and I have read what you have

24  already submitted -- the e-mails and all of that.  I have

25  absolutely read it.  I also read the transcript where Judge

1   Watkins and Judge Proctor asked him about 20 different ways

2   whether he called Judge Thompson's chambers.  I mean -- I mean,

3   they asked him every way they could ask him.  They gave him

4   every opportunity that they could to say, yes, I did call Judge

5   Thompson's chambers.

6          MR. RAGSDALE:  And, Judge, I was sitting there.  I

7   will absolutely tell you he forgot that phone call.

8       And keep in mind, Judge, he wrote an e-mail to his own

9   folks, right?  We have submitted that to you.  So he had to

10  assume that he could lie about that phone call and that 15

11  other lawyers were going to lie with him.  I mean, it really

12  makes zero sense.

13      My only point is this, Your Honor:  Because of the nature

14  of that allegation, that is a career-ending allegation.

15         THE COURT:  Well, it certainly could be if we get to a

16  show cause hearing and I --

17         MR. RAGSDALE:  I agree.  The only thing I would -- my

18  request is this, Your Honor:  If you decide to unseal the final

19  report, I would ask you to consider redacting that allegation

20  against Mr. Charles until you have made a final determination.

21      That's all I have, Your Honor.

22         THE COURT:  Gotcha.  Mr. Prater?

23         MR. PRATER:  May it please the Court, Your Honor.

24         THE COURT:  Good morning.

25         MR. PRATER:  Harlen Prater for Melody Eagan and Jeff

1   Doss, my law partners.

2        Your Honor, I think back to November when we were in this

3   courtroom.  And at that time, we had the final report.  And we

4   had the appeal that had been filed in the Eleventh Circuit.

5   And we talked with Your Honor about the fact that the appeal

6   could be mooted if there was a finding by you that the final

7   report was not, in fact, a final determination of the facts,

8   and that no decision about the discipline, if any, of these

9   lawyers was going to take place.

10       The appeal was dismissed.  You rightly so, Your Honor,

11  agreed at that time to keep the final report under seal.

12       I agree with Mr. Ragsdale.  Nothing has changed since then

13  with respect to the unsealing of the order.

14       As a matter of fact, Judge, since then, in your show cause

15  order, you said that one of the things you may consider, in

16  terms of discipline, is a public or private reprimand.

17            THE COURT:  Or nothing.

18            MR. PRATER:  Or nothing.  And, Your Honor, if the

19  report is released at this stage, you've kind of taken a do

20  nothing.  You have kind of taken a private reprimand off the

21  table.  Because the findings by that panel -- and I respect all

22  of those gentlemen.  They're fine jurists.  But those in

23  themselves are damning.  And in the court of public opinion in

24  which these lawyers will be operating, Your Honor, until your

25  findings are final, it's just not fair.  You've always been

1    fair.  I've always appreciated and enjoyed being in your court
2    because of your sense of fairness.
3        And here, I merely ask -- we're not asking for a permanent
4    sealing.  The state in its papers referred to a permanence.
5    We're not asking for that.  We're asking for what the local
6    rules of all our district courts, the Alabama State Bar rules,
7    the Eleventh Circuit rules -- we're just saying keep it sealed
8    until a final determination is made.  Then, if we seek relief
9    if you do sanction these lawyers and we seek relief in the
10   Eleventh Circuit, well, if there's vindication for the lawyers,
11   we get it then.  But until now, we just ask you to keep it
12   sealed, keep an open mind as you have told us today you have,
13   let us come before you in May, make our case, and we see where
14   the chips fall.  That's all we're asking at this stage, Your
15   Honor.
16           THE COURT:  So here's a question I will throw at you.
17       You know, I unfortunately have had to sanction lawyers in
18   my time on the bench for small conduct, big conduct.
19       Honestly, nothing like some of the conduct that we have --
20   that we have here.
21       But, you know, in that time, I have -- I have never sealed
22   a show cause order, or even been asked to do it by an attorney.
23   It was just in the light of day.
24       What makes this case different from basically so many --
25   well, I would say the average case where a lawyer is

1  sanctioned, it's never sealed.  The conduct is -- it happens in

2  court or outside of court.  You get a show cause order.  Then

3  you come to the hearing.  You tell your side of the story.

4  Those are -- I mean, this is clearly the exception, not the

5  rule to have something continuing to be sealed at this point.

6  So tell me your thoughts about that.

7          MR. PRATER:  Your Honor, I think you made a good

8  point.  This is an exceptional case.  This is an exceptional

9  case.

10      If -- this is a case that has had a lot of publicity.

11  This is a case about which both the state and the lawyers for

12  the plaintiffs have made comments to the press.  It has been

13  something that has been public.  So it's not a run-of-the-mill

14  wills case.  It's not a run-of-the-mills personal injury case.

15      And I dare say, Your Honor -- again, all of this we can

16  talk about in May because I haven't had a chance to talk with

17  you about the merits and what Ms. Eagan and what Mr. Doss did

18  and why.

19      But if this was a personal injury case, if this was a

20  typical case, we wouldn't have had a three -judge panel look at

21  this.  We wouldn't have had all of the attention given to how

22  everything happened that this case came before you and what the

23  lawyers did in response to that.  This has been an exceptional

24  case since day one.

25      But just because it's an exceptional case in that regard

1    doesn't heighten the need for this being made public until you

2    have made a final determination.

3         I don't recall a case that's been cited to Your Honor

4    under these circumstances where something akin to this report

5    has been made final -- something akin to this report has been

6    published before a final determination of wrongdoing has been

7    made.

8              THE COURT:  Mr. Prater, I don't know if you are going

9    to win or lose on your argument today, but you need to resign

10   your position and go teach trial advocacy.

11             MR. PRATER:  I am passionate about this, Judge.  You

12   are dealing with good people here.  And they may have made a

13   mistake, and that's for you to ultimately decide.

14        But give them a chance.  Hear them out.  And then if you

15   decide against them, fine.  We will deal with that.

16        But leave yourself the option of doing nothing.  Leave

17   yourself the option of a private reprimand.  You may end up

18   doing a lot worse than that.  And, again, we will deal with

19   that.  But we're just asking until after you make a final

20   determination to keep this damning document under seal

21   consistent with our disciplinary rules.

22             THE COURT:  I'll ask you the same thing I just asked

23   Mr. Ragsdale.  I mean -- I mean, there's been some real heat in

24   some of these latest filings.  I mean, some real heat.

25             MR. PRATER:  Yes, sir.

1          THE COURT:  Everybody has got to protect their record,

2    protect their client.  That's what I want you to do.  That's

3    what your job is.  But, boy, it's reached quite a level.  You

4    know?

5          I've got a bunch of, you know, good lawyers, and I know

6    that they're, you know -- they're facing some uncertainty here

7    in the next couple of months.  And they have been, you know,

8    for a couple of years now.

9          But, you know, I've got pleadings that say that a

10   three-judge panel of the three chief judges of the Northern,

11   Middle, and Southern District or their designee infected this

12   process with error and denied certain of these respondents due

13   process.

14         I mean, that is -- that's -- that's quite an allegation.

15         MR. PRATER:  And, Your Honor, I think -- and, again, I

16   am not going to speak to the merits of that argument.  I don't

17   know that that's a statement that we made.

18         THE COURT:  It's not a statement you made.

19         MR. PRATER:  Yes, sir.  I will say, Your Honor, that

20   if you took the final report in the abstract and things stopped

21   there.

22         THE COURT:  Uh-huh.

23         MR. PRATER:  I understand the argument.  I understand

24   the argument.  Because as Mr. Ragsdale said, yes, there were

25   occasions where eight people testified one way, one person

testified another, and it appeared that the panel tended to
lean toward the one person.  And that's ultimately for you to
decide where the true credibility lies there when you get to
see those people and you get to hear what they have to say
about the circumstances that they were faced with and the
actions that they took.

So, of course, the energy level, the tension has been
heightened.  I remember again back in November when you first
got on the bench and you said we need to tone this down.  We
need to tone this down.

THE COURT:  I don't think anybody heard me.

MR. PRATER:  We did for a little while.

THE COURT:  Right.  About 48 hours.

MR. PRATER:  But you get a show cause order, Your
Honor, that -- and you're doing your job the way you see you
should do your job.  And I respect that.

But there are things that you are seeking through this
show cause process that we're convinced we are going to be able
to change your mind.

And I know I'm swimming upstream.  And I have said that to
you before.  And when I said it before, I lost.  I don't think
I am going to lose this time.  Because I truly believe that
when you hear the facts and you hear from the lawyers who
choose to talk to you about what they did and why, you're going
to understand.

1      And I, again, just ask you to give them that chance before

2  this admittedly non-final document is made public.

3           THE COURT:  I appreciate your arguments --

4           MR. PRATER:  Thank you, Your Honor.

5           THE COURT:  -- very much.

6      Uh-huh.

7      I guess state next?  Anybody else want to be heard?

8           MS. OTTERBERG:  I don't know how I could possibly

9  follow that, Judge, but I just wanted to make I think two quick

10  points.  Again, I represent Jennifer Levi and Shannon Minter.

11      First, Judge, I think it is absolutely crucial to remember

12  that our clients have not had the chance to fully brief and put

13  in the proper light, what we believe is the proper light, the

14  conduct of which they are accused.  And that involves

15  evidentiary standards, that involves the standards for

16  sanctions, and it involves a host of issues that are nowhere

17  cited in the panel's order.  And I think it is very important

18  that our clients be given that chance to make those arguments,

19  and I know you will consider them thoroughly, and I think that

20  that is important.

21      Secondly, you know, to the extent that Your Honor is

22  concerned about the tone of filings and the like, and just sort

23  of the temperature in general and all of those things, I wanted

24  to emphasize that our clients have very difficult decisions to

25  make between now and sort of May, in terms of how they are

1    going to respond and deal with and accept responsibility, not

2    accept responsibility, somewhere in the middle.

3        And to force them to make those decisions in public light

4    and all that will come with that, I think is going to make

5    things even more challenging for clients to make those

6    decisions and to come with you -- and to come to you with the

7    candor that you expect, to come to you with, you know, wanting

8    to speak to you about their perspective, their clients'

9    perspective, why they did what they did, et cetera.  I think

10   that's a lot harder when you have the public light shining on

11   that.  And there will be attention.  And we all know that.

12       And I appreciate Your Honor's concern about the way in

13   which the proceeding has been conducted, and so I just would

14   urge Your Honor it's a right-now decision.  It's a for now

15   until May.

16       And Your Honor has had the chance to give these lawyers

17   the full consideration that they deserve, particularly given

18   that we have never had the chance -- my clients have never

19   submitted a brief on the merits or a brief in response to the

20   panel 's comments about their conduct.

21       And we -- and I believe we deserve that chance.  And I

22   think that keeping this matter under seal until May preserves

23   that chance in the best way possible.  Thank you.

24            THE COURT:  Uh-huh.  I don't want to leave you out,

25   Mr. Segall.

1          MR. SEGALL:  Thank you, Judge.  I think it's been well

2   covered.

3          THE COURT:  Understood.

4          MR. BUCK:  Your Honor, Brannon Buck for Kathleen

5   Hartnett.  I just wanted to mention one other very brief point,

6   and that is the local rules of this Court, the Middle District,

7   adopt the Alabama standards from imposing lawyer discipline,

8   which require that proceedings in terms of disciplinary

9   proceedings before the Alabama State Bar that ultimately go to

10  the Alabama Supreme Court, those Alabama standards for imposing

11  lawyer discipline maintain the confidentiality of those

12  proceedings up until there is a final decision made.  And I

13  just wanted to point out the fact that those rules were adopted

14  as part of the local rules in this Court, as you weigh your

15  decision.

16         THE COURT:  Understood.

17      Anybody else on respondents' side?

18         MS. TERENZI:  Nothing further from Mr. Shortnacy.

19         THE COURT:  Okay.  All right.  Mr. Davis.

20         MR. DAVIS:  Thank you, Judge.  Jim Davis for the state

21  defendants.

22      Judge, as we read the law, the Court has discretion to

23  unseal the report now.  The Court also has discretion to wait

24  until it has made final rulings in this matter.

25      Under Romero, we think all the Romero factors weigh in

1  favor of unsealing the report, at least at some point in time.
2  But as we read it, that could be now, at least if the Court has
3  made the finding that there is at least probable cause that
4  attorney misconduct has occurred.

5      We cited the Auerhahn case, if I'm pronouncing that
6  correctly, from the District of Massachusetts.

7          THE COURT:  Clearly, I wouldn't have issued a show
8  cause order if I didn't think we were at the probable cause
9  level.

10         MR. DAVIS:  I did not want to take anything for
11 granted, Judge.

12         THE COURT:  Right.

13         MR. DAVIS:  But at that point, 35 states and the
14 District of Columbia, unseal at that point in time, and then to
15 decide the rest of the matter under light of day.

16     We don't think the Court is bound by the local rules.
17 Those apply as we read it when a matter is referred to a
18 grievance committee.

19         THE COURT:  I agree, and I have read that.

20         MR. DAVIS:  That's not to say the Court might not find
21 that persuasive.

22         THE COURT:  Sure.

23         MR. DAVIS:  So we think you have discretion to do it
24 now, to wait until you have made final decisions.  Although we
25 do want to be clear we think at some point the common law,

1    public right of access, would suggest that the report should be

2    unsealed.  You might choose to redact portions of it if you

3    make findings a certain way.

4         But at some point, the public needs to see that the courts

5    will vigorously protect the integrity of the judicial process,

6    and we think the bar needs to see that the courts take these

7    issues seriously and that there would be a lot of benefits to

8    this being in the light of day at some point in time.

9         THE COURT:  So let's talk about those Romero factors.

10   And I think the quote is "whether allowing access would impair

11   court functions or harm legitimate privacy interests, the

12   degree of and likelihood of injury, if made public, the

13   reliability of the information, whether there will be an

14   opportunity to respond to the information, whether the

15   information concerns public officials or public concerns, the

16   availability of a less-onerous alternative to sealing the

17   documents."

18        Walk me through that just for a minute.  And I know you

19   have done that in your brief.  But --

20        MR. DAVIS:  No.  Happy to.

21        So would it impair court functions?  We think not.  We

22   think it would help court functions for the public to see that

23   the Court takes this seriously and there should be no abuse of

24   the random assignment procedures.

25        We have privacy interests.  We understand privacy

1    interests that counsel have talked about before and today.  You

2    know, you think about a disgruntled client making a complaint

3    against his or her lawyer to the bar.  There may be no basis to

4    that whatsoever.  So it's understandable why courts and the bar

5    would want to keep that under wraps until they take a look and

6    see if there's likely anything there.

7         Here, we don't think the privacy interest is as strong.

8    To the extent the privacy interests that the plaintiffs are

9    talking about is the allegation or the suggestion that some of

10   this involves work product, we think the Court finds that this

11   conduct was misconduct, that it does not enjoy work-product

12   protection under the Drummond Company case that we have cited.

13        Another factor is the degree and likelihood of injury if

14   made public.  We believe the case law requires that the injury

15   be more than simply reputational harm, that they would be

16   required to say the injury that they would suffer if the report

17   is unsealed is more than just to their reputation.

18        And in terms of whether it contains any conversations

19   about their strategy for this case, you know, we have seen the

20   report.  The Court ordered that it be e-mailed to us, you know,

21   when this matter was first referred to Your Honor.

22        We have seen the report.  And there's nothing in there

23   that's going to help us argue the merits of a due process or

24   equal protection claim.

25        So we don't think there is any injury to plaintiffs in

1    that respect.

2        Reliability of the information.  Again, this isn't a case

3    where the allegation is coming from a disgruntled client.

4    These are findings by three federal judges who have a lot of

5    experience in weighing credibility and making findings of fact.

6        The opportunity to respond.  The plaintiffs have that now.

7    Sounds like you are going to give them that up until May and

8    including at the hearing of May, so they will have the

9    opportunity to respond to the findings of the three-judge

10   court.

11       Fifth, whether the info -- information concerns public

12   concerns.  It clearly does.  The public has an interest in

13   attorney disciplinary proceedings.  The purpose of those

14   proceedings is to protect the public.  So we think this is a

15   matter of public concern.

16       And lastly, the availability of options other than

17   sealing.  Yes.  Your Honor has the freedom -- let's say you

18   find at the end that one of these lawyers or more is not guilty

19   of misconduct, that some portions of the report should be

20   unsealed.  You have the discretion to keep portions of it

21   sealed if you think somebody should be protected in that

22   respect.

23       All six factors we think weigh in favor of unsealing at

24   least at some point in time.

25           THE COURT:  Anybody else want to be heard on this

1   issue?

2          All right.  Let's take a five-minute break.  And then

3   we'll pick back up again.

4              (Recess.)

5              THE COURT:  All right.  Please be seated.

6          All right.  I appreciate everybody's arguments.  I know

7   this is a hard call if you're on the respondents' side.  But in

8   reviewing the Romero factors and hearing the state's argument,

9   there's just no doubt to me that those factors weigh heavily in

10  favor of unsealing this.

11         So I am unsealing everything in Boe immediately as of

12  right now.

13         And that is just where we are.  I know that's bad news for

14  some.  But with where we are with the allegations we have in

15  this case, with all that has happened, I think treating this

16  differently, honestly, is giving special consideration, you

17  know, to attorneys that we wouldn't ordinarily give in a case.

18         So that is my ruling.

19         So now we will pick up the motions to clarify.

20             MR. BUCK:  Your Honor, may I ask one follow-up

21  question to that before we move on?

22             THE COURT:  Yes.  Absolutely.

23             MR. BUCK:  I'm not sure if this -- if a motion of this

24  nature -- and I think the other issue before I ask this

25  question is as Mr. Ragsdale requested will that ruling be

1   stayed or abated for seven --

2            THE COURT:  It will not.  It's open right now.

3            MR. BUCK:  Okay.  Would Your Honor or perhaps it would

4   be directed to the three-judge panel in the Vague proceeding,

5   but entertain a motion to unseal that proceeding, as well?

6            THE COURT:  Yes.  And I will say this:  I think that I

7   likely have the ability to do anything in Vague I could do in

8   Boe.  It's still my case.

9        I will leave that to each of you.  Whether anybody agrees

10  or disagrees, I certainly can confer with the panel and have

11  them unsealed.

12       And I agree with Mr. Ragsdale.  If we are going to unseal

13  part, we really should unseal all.

14       Is everybody in agreement that if we are going to unseal

15  part, we ought to unseal all?  Or no?

16            MR. RAGSDALE:  Obviously, I suggested it, so I agree

17  with my suggestion.

18            THE COURT:  Right.  Right.  Right.

19            MR. PRATER:  We agree, Your Honor.

20            THE COURT:  Okay.  Is there any objection to unsealing

21  everything in Boe?

22       Okay.  Here's my next question:  Does anybody think I

23  can't -- I'm sorry.  Vague.  Does anybody think I can't unseal

24  Vague, that only the panel can do it?

25            MR. RAGSDALE:  We would agree you have that authority.

```
 1            THE COURT:  Everybody in agreement I have that
 2   authority?
 3            MR. PRATER:  Yes, sir.
 4            THE COURT:  Okay.  All right.
 5        State got an opinion on that?
 6            MR. DAVIS:  No, Your Honor.
 7            THE COURT:  Okay.  Fair enough.
 8        Before we start this next segment, let's talk about
 9   Shaygan, because I have to be honest with you.  I am going to
10   use the word "misrepresent," and I don't mean that in a guilty
11   way.
12        I know everybody's representing their client here.  But,
13   you know, all these motions are reciting Shaygan to me that I'm
14   denying your clients due process, and that they're not on
15   notice of the conduct that they're accused of for this show
16   cause hearing.
17        Well, what are the facts of Shaygan?  What are the facts
18   of Shaygan?
19        Well, the facts of Shaygan are that a judge sanctioned an
20   attorney at a hearing for which the attorney did not receive a
21   show cause order, was not on notice of that conduct at all or
22   even that that particular sanction was on the table, did not
23   have a chance to be represented by an attorney in this process,
24   and moreover, one of those who was sanctioned did not even get
25   to speak at the hearing.
```

1    So let's talk about the due process that has been had in

2    this case.  You know, the -- on April 18th, right after the

3    case that I originally was assigned to in the Northern District

4    was dismissed, I issued an order that said, hey, the actions of

5    the plaintiff could give the appearance of judge shopping.  And

6    I copied the three chief judges of this state on that order.

7    Several of the respondents in their own testimony and

8    actions to the three-judge panel clearly were talking about

9    they did not want this to look like judge shopping when they

10   refiled.

11   The panel gave everybody a written notice and then oral

12   notice about exactly what they were there about.  Let me read

13   what Judge Proctor said.

14   "First thing I want to make sure everybody understands is

15   this" -- this is from the first day.  "This is a serious

16   matter.  But it's not so serious that anyone is -- and I'm

17   using this colloquially -- no one is going to jail.  No one is

18   losing a law license over this unless you mislead us.  Okay?

19   So we're just making sure everybody understands that's our

20   view.  Our view is that these are serious matters.  They need

21   to be inquired about.  If things occurred, we will deal with

22   those fairly and appropriately.  But the worst thing you can do

23   is mislead us and not be candid with us.  Out of the gate, we

24   are here about judge shopping, but we could be here about a lot

25   more if everybody's not candid."

1        That's what Judge Proctor says out of the gate.

2        So then over six days, everybody has an opportunity to

3    submit declarations, give testimony, be fully represented by

4    counsel, motion practice.  The panel issues a thoroughly

5    comprehensive 53-page written report outlining the specific

6    conduct that they think constitutes judge shopping, as well as

7    some other things.

8        Now, we're not even to the show cause stage at this point.

9    That is unprecedented due process.

10        And let me also say:  You know, in reading the transcript

11    of the panel, I mean, the panel even asked the attorneys for

12    their input on how the process should be handled.  Everybody

13    got to weigh in.

14        Before we even got to the show cause stage, I sat down

15    informally with lawyers and said, tell me how this would work

16    best.  I want to be fair to your clients.  Tell me what process

17    we should do.  I'll even open the record back up for more

18    factual testimony if you think in six days of testimony you

19    didn't get in everything.  And I did.  And I've granted almost

20    all of that.

21        So I will say I do find it puzzling that anybody in this

22    room thinks they don't know the conduct that we're about here

23    today.

24        What is that conduct?  Well, clearly, judge shopping.

25    That's what got us here.  That's as outlined by the panel.

1    Also, based on what the panel has found, we're clearly

2  here about a lack of candor.  We're here about willful

3  misrepresentation, possibly perjury by one respondent.  And

4  we're here with three respondents about the dismissal of the

5  case without the knowledge or consent of their client.  That's

6  the four things we're here about.

7    So I have to say if anybody didn't know that's why we were

8  here, I'm just stunned.  I'm stunned.

9    This case has been due processed to both goal lines and

10  back.

11    Now, all that being said, I'm going to hear your

12  arguments.  But I hope you're hearing what I'm saying.  If one

13  among you truly doesn't know what conduct has gotten you here,

14  then tell me what it is.  I'm all ears.

15    So why don't I start with -- I know we have a motion filed

16  by Eagan and Doss that then was joined by others.  But I guess

17  that's probably where we should start.

18         MR. PRATER:  Yes, Your Honor.  Harlen Prater.

19    May it please the Court.

20    I don't know, Your Honor, if there's necessarily a

21  question about the conduct at issue.  I think you're going to

22  learn more about the conduct.

23         THE COURT:  Right.

24         MR. PRATER:  And the motivation.

25         THE COURT:  And, again, this is the show cause stage.

1    We're just making sure that everybody understands what the

2    allegation is and so that you come to that hearing, and just

3    like you say, you get to tell me your side of the story.  And

4    then I weigh what, if anything, I should do.

5            MR. PRATER:  Yes, sir.

6        Where I think there may be a disconnect, though, Your

7    Honor, is the precise rule, standard of law that each

8    individual lawyer allegedly violated.

9        You mentioned lack of candor.  I've got Mr. Doss and

10   Ms. Eagan.  Where does the panel -- where does Your Honor see

11   that those two failed to be candid with the panel, if at all?

12           THE COURT:  True.  And one of the ways clearly is in

13   your own pleading.

14           MR. PRATER:  Yes, sir.

15           THE COURT:  You know, where you say, we assume you're

16   talking the fact that we left this fact out.

17           MR. PRATER:  And right now we hope we're right, but we

18   don't know.  We don't know.

19        And the rule -- let's just go with the judge shopping,

20   Judge.

21        What rule does that violate?  I understand Your Honor has

22   cited BellSouth.  BellSouth talks about judge shopping.

23        BellSouth was not a Rule 41 case.  It was not a Rule 41

24   case.  It was an orchestrated effort to hire a lawyer at a law

25   firm to avoid Judge Clemon.  That's what happened.  Rule 41 is

1  not mentioned at all.

2        THE COURT:  Uh-huh.  And let me say I don't -- again,

3  Rule 41 is just what Rule 41 is.  But it doesn't give you carte

4  blanche to just do whatever you want in violation of another

5  rule and then hide behind Rule 41.

6        MR. PRATER:  And not to get ahead of ourselves, Your

7  Honor, in some circuits, it does.

8        THE COURT:  Right.

9        MR. PRATER:  In some circuits, it does.

10        THE COURT:  I agree.  But not in this circuit.

11        MR. PRATER:  And the Eleventh Circuit hasn't spoken to

12  that very point, Judge.  And that's one of the things we will

13  want to talk with you about in May, because we're operating --

14  and I read your most recent sanctions decision, where the

15  lawyer refused to step aside, and you told the lawyer to step

16  aside, and she wouldn't do it.  And you applied rightly in that

17  case the bad faith standard.

18    And I believe that's what applies here, too.  So what

19  you're ultimately going to be asked to look at when you have

20  the full record and you have heard from everybody is the

21  decision that they made in light of the law as they understood

22  it done in bad faith.

23        THE COURT:  Correct.

24        MR. PRATER:  Or did they have a good faith basis for

25  doing it, even if it was wrong?

```
1           THE COURT:  You're absolutely right.  That's the
2   decision I have to make.
3           MR. PRATER:  Yes, sir.  And so what we're looking for
4   from Your Honor is -- and I know it's a burden, Judge.  I get
5   it.  You have got a lot of lawyers.  You have got a lot of
6   allegations.  You have got --
7           THE COURT:  Do you know the bandwidth I have spent on
8   this case?
9           MR. PRATER:  I can tell.  You already have your notes
10  with you --
11          THE COURT:  It's all he does.  It's all he does.  He
12  knows no other world.
13          MR. PRATER:  I understand.  And I regret that.  I
14  regret that.
15      But on behalf of my clients, Your Honor, we respectfully
16  request that you tell us, this is the rule that you violated.
17  I understand what you said now about the conduct.  This is the
18  rule that you violated.  To the extent that we believe there
19  was a lack of candor by you two specific lawyers, we ask
20  respectfully, Judge, tell us where we reflect a lack of candor.
21          THE COURT:  So what I am not going to do is go line by
22  line through everybody's affidavit and declaration.  I mean, I
23  am putting you on notice that -- I am putting everybody on
24  notice that their declarations and testimony materially varies
25  from the declarations and testimony of others.
```

1       And by the way, y'all are going to have all that.

2               MR. PRATER:  Yes, sir.

3               THE COURT:  So, you know, you -- it's very plain where

4       testimony differs.  And, obviously, we get to a show cause

5       hearing, I will have to determine is this variance an honest

6       mistake?  Is it just, you know, differing recollections?  Or

7       was it a bad faith material misrepresentation or withholding of

8       evidence?

9               MR. PRATER:  Yes, sir.

10              THE COURT:  You know, and so -- and all those rules we

11      have cited, those model rules, you know, if you read those

12      rules, they all to one degree or another talk about, you know,

13      whether it's the oath, the model rules, the regular rules of

14      court.  They're all talking about candor, truth, telling the

15      whole truth, nothing but the truth.  They're all -- so, you

16      know, if there are legitimate questions again about how they

17      violated this rule, all those are candor.

18          And, look, I am not saying that your clients violated

19      them.  I'm saying, I've got probable cause based on this order

20      to believe they have.  I'm putting you on notice that we are

21      going to have a hearing, and I want to hear your side of the

22      story.

23              MR. PRATER:  And I appreciate Your Honor.

24          And, again, we stand by our filing.

25              THE COURT:  Uh-huh.

1          MR. PRATER:  We ask that you identify -- and I

2     understand the burden.  I just need to get this out there, Your

3     Honor.  The precise rule, standard of law that we allegedly

4     violated, and how we allegedly violated it, which I think you

5     have told us in large part today with the judge shopping, as

6     you see it.

7          We also ask that it be done on an individualized basis,

8     because Shaygan does talk about no collective guilt and how no

9     one lawyer can be held responsible for the act or omissions of

10    some other lawyer.

11         THE COURT:  Which clearly I think I stated already

12    that, you know, if I am just -- again, without the benefit of

13    your clients' testimony at a show cause hearing, without the

14    benefit of the additional facts that I have said today will be

15    admitted, you know, again, there will be no collective

16    punishment.  I think I have already told you that.  I can look

17    at this and see possibilities of nothing for some people and a

18    lot for others, you know, depending on what we hear at a show

19    cause hearing.

20         So, you know, collective guilt and punishment is the

21    furthest thing from my mind.

22         MR. PRATER:  And that's good to hear, Your Honor, and

23    I am not surprised to hear that.  I'm not surprised to hear

24    that.

25         THE COURT:  And if you look at the show cause order,

1   you know, again, all those things I just mentioned are

2   covered -- judge shopping, lack of candor, possible perjury,

3   dismissal without consent, you know, I say each respondent

4   shall detail in show cause.  Each respondent.  Not all

5   respondents.

6       I do state in there, you know, not all of this conduct

7   applies to each respondent.  But I also very clearly then

8   outline in those specific sections what that conduct is that

9   doesn't apply to everybody.

10      Obviously, willful misrepresentation and perjury only

11  applies to Mr. Charles.  And I say that in my order.

12      Obviously, the dismissal of the case without the consent

13  or knowledge of the client, that only applies to three

14  respondents.  And I say that in the order.

15      You know, everybody else -- judge shopping and lack of

16  candor is what we're talking about.  And I outline how each one

17  of those rules or oaths, you know, takes that into

18  consideration.

19          MR. PRATER:  Yes, sir.

20      I'd like to say a couple more things, Your Honor, that

21  might not be directly related to this.

22          THE COURT:  Sure.

23          MR. PRATER:  I think I have said everything I need to

24  say combined with our papers about it.

25      I do encourage you to stay your earlier ruling.  And I

1  know you're likely going to say no.  But this is my concern,
2  Judge.  It could well happen, given the nature of this case,
3  that even though the state has admitted that what you're
4  looking at now has nothing to do with the merits of their case,
5  nothing to do with the merits of the case, that their first
6  step is to walk out, call the press, this hits the newspaper.
7  This hits the newspaper based on what we know are non-final
8  findings by the panel.

9      And that isn't just reputational damage, Your Honor.
10 That's personal damage to lawyers who have not yet been found
11 guilty of anything.

12         THE COURT:  Sure.  And yet -- and yet, I'm going to
13 have a show cause order -- I mean, a show cause hearing in
14 two months.  And so, you know, obviously, to the extent that
15 some people are completely cleared, hey, you know?  It's an
16 indictment of sorts.  But, you know, the jury verdict is what
17 matters.

18         MR. PRATER:  I understand.  And yet, there's some law
19 out there though, Judge, that when you are considering
20 sanctions against lawyers, it's different.  Courts are supposed
21 to give the benefit of the doubt to the officers of the court
22 who appear in front of them.

23     Courts are not supposed to use hindsight to judge the acts
24 of lawyers in the moment.  And we'll talk about that when we
25 have the show cause hearing.  Because I am concerned that that

1    is a question here.

2        And, again, I ask that you please consider just postponing

3    it for seven days.  Let us prepare.  If bad news is coming out,

4    let us at least get ready for it.

5            THE COURT:  Well, I mean, I said it -- I set this

6    issue sometime ago -- I mean, I think everybody knew that we

7    were coming here today because I wanted to hear your arguments

8    on whether it should be sealed or not, and that I would make a

9    decision probably soon after, you know?

10           MR. PRATER:  Yes, sir.  And I'm asking for a little

11   bit of soon after.

12           THE COURT:  I understand.  I understand.  But let me

13   get through these arguments.  I will think on that.

14           MR. PRATER:  All right.  And that's all I have to say

15   on this particular issue, Your Honor.

16       I do believe that our clients are entitled to know the

17   precise rules, standards of law which they are alleged to have

18   violated.

19       And we can take that on, I believe, Your Honor, and I

20   think we can convince you in May that our people were acting in

21   good faith, not in bad faith.

22           THE COURT:  Understood.

23           MR. PRATER:  Thank you.

24           THE COURT:  Thank you, Mr. Prater.

25       Who wants to go next?

1           MS. TERENZI:  I would like to speak up for

2     Mr. Shortnacy.

3           THE COURT:  All right.

4           MS. TERENZI:  Once again, Your Honor, I am Betsy

5     Terenzi, and I am here for Michael Shortnacy.

6        So Michael Shortnacy filed the motion to clarify an

7     objection to show cause, which he filed along with several

8     other respondents.  That's Document 423, and it's sealed.

9        And, Your Honor, I want to start by clarifying the tone of

10    that document, because I understand that that's one of your

11    concerns.  So at least from Mr. Shortnacy's perspective, I do

12    want to make clear that the main purpose for filing that

13    document is to be sure that Mr. Shortnacy is being as

14    responsive as possible to the Court's concerns.

15       Now, I also heard something else you said, and that is you

16    recognized here that there's varying levels of culpable.  And

17    it's our position that Mr. Shortnacy is on the lower end of the

18    spectrum of that culpability.

19          THE COURT:  If I am objectively looking at this case,

20    Mr. Shortnacy is on the lower end of that.

21          MS. TERENZI:  Okay.  And we appreciate that, Your

22    Honor.

23       And so to that end, in terms of us wanting to be most

24    responsive as possible to the Court's concerns, we filed this

25    motion to ask for clarification regarding what specific rules

1    he violated and how he violated those rules, again, to be sure

2    that we're being responsive.  And so I just wanted to clarify

3    that for the Court to be sure that you understood that on

4    behalf of Mr. Shortnacy.

5              THE COURT:  I understand.

6         Well, let me ask this:  Did my comments to Mr. Prater

7    clear the air for you?

8              MS. TERENZI:  With regard to judge shopping in

9    particular, Your Honor.  I still have some concern about the

10   lack of candor issue simply because the show cause order

11   doesn't make it clear which respondents are the subject of the

12   Court's concern on that front.

13             THE COURT:  All of the respondents.

14             MS. TERENZI:  And I understand that, Your Honor.  And

15   so I would simply ask to the extent that you do have a specific

16   concern as it relates to Mr. Shortnacy on that front, we would

17   appreciate clarification on that front.

18             THE COURT:  Understood.

19             MS. TERENZI:  Thank you, Your Honor.

20             THE COURT:  Uh-huh.

21             MR. RAGSDALE:  May I address a couple of comments,

22   Your Honor?

23        I understand that you believe you've adequately given us

24   due process notice about judge shopping.  My problem is judge

25   shopping is not misconduct unless it violates a particular

1   rule.  It just isn't.  There are all kinds of judge shopping

2   that go on, on a regular basis that don't violate the rules.

3        Sometimes we adopt new rules to try to deal with those.

4   But the -- it's frankly just a pejorative phrase.  Judge

5   shopping is bad.  We all agree.  We will stipulate.  We all

6   agree.

7        But it has to violate a particular rule.  And the notice

8   that we have --

9             THE COURT:  Well, let me ask you this:  If your

10  clients didn't know that they couldn't judge shop, then why is

11  everybody talking when you're about to refile the case we don't

12  want this to look like judge shopping?

13            MR. RAGSDALE:  That wasn't our clients, Your Honor.

14            THE COURT:  I understand.  But I'm saying, why is that

15  a concern?  Why is that a concern among some of the

16  respondents?  We don't want this to look like judge shopping if

17  it's perfectly fine to do it?

18            MR. RAGSDALE:  Let me first say, I can't speak on

19  behalf of those other lawyers.

20            THE COURT:  Right.

21            MR. RAGSDALE:  I will tell you at that point, our

22  lawyers had decided that we were not going to participate in

23  refiling a case.  So that our conduct that I think you are

24  talking about ended when we dismissed the case in front of you

25  and within 24 hours had decided that we would not pursue

1   another case.

2           THE COURT:   I think I agree with you.

3           MR. RAGSDALE:   Okay.  Well, let me say this, then:   If

4   we had decided to file another case, let's assume we dismissed

5   it on that Friday, and we said, you know what?  Let's go back.

6   We could have filed it in your division, and it would have got

7   assigned to you, and there would have been no judge shopping,

8   right?  I mean, I assume if I file it in the same division and

9   draw the same judge, I am not guilty of judge shopping.  We

10  decided not refile it, so we never made that decision.  And we

11  didn't participate in any decision about the case being filed

12  later.

13      So that's part of why I'm troubled with, what did my

14  clients do that violated some declared and articulated rule

15  against judge shopping?

16      Now, when we came to the hearing oh so long ago in front

17  of the three-judge panel, we had been put on notice of your

18  concern in your order, which the panel reiterated, that the

19  dismissal of the case under Rule 41 shortly after it being

20  assigned to you looked like judge shopping.  We were prepared

21  to defend that.

22      What we were not told -- and this is part of why I do

23  continue to maintain that there were due process violations --

24  we were not told beforehand that there were concerns about the

25  fact that our original case had been marked as related to

1  another case and had no notice that that was a concern.

2      We also had no notice -- and this is very important,

3  Judge -- no notice that the panel or anybody else was concerned

4  about an innocuous five-minute phone call that one of our

5  lawyers had made to Judge Thompson's chambers.  If we had been,

6  if we had been given notice, look, we are looking at this phone

7  call and we are worried that this might in some way be a

8  violation, Mr. Charles would have been put on notice to go back

9  and read his own e-mails, and he would have refreshed his

10  recollection that that phone call had been made, and we

11  wouldn't be talking about him committing perjury.

12      The fact that he did not get notice before he was put

13  under oath and grilled about a phone call that he had forgotten

14  about is an egregious due process violation, which we will

15  continue to maintain.

16      Lastly, Judge, I would say this:  About the lack of

17  candor, I understand the part --

18          THE COURT:  I will just say this, Mr. Ragsdale:  I'm

19  not buying that about Mr. Charles.

20      Now, whether he's guilty of this or not, I will decide

21  that at a show cause hearing.  But I'm just not -- I'm not

22  buying that.  The panel didn't know he was going to perjure

23  himself.  They're just asking questions about how this -- you

24  know, about how this all happened.

25      You know, I mean, if anything, they put -- Judge Proctor

1   put him on notice out of the gate and said, do not mislead us.

2          MR. RAGSDALE:  After he's already there under oath.

3   The law is clear that that doesn't count, that that doesn't

4   work to solve due process, because you have already sprung the

5   trap on him.  And that is -- and I'm sorry you have prejudged

6   this, but you seem to have.

7          THE COURT:  I have not.  I have not prejudged anything

8   in this case.  In fact -- I mean, you are making a lot of

9   arguments to me that should be made at the show cause hearing.

10          MR. RAGSDALE:  Well, it's more than that, Your Honor.

11   It's identifying what exactly my clients are accused of doing.

12      Let me take the example.

13          THE COURT:  Let me say, I have said over and over

14   today, all I have is the probable cause.  The only thing I have

15   to go on is what the panel has said.  I will have the

16   opportunity to hear from your clients.

17      I may well believe some or all of your clients.  And some

18   or all of your clients may walk out of that hearing with

19   nothing.  I'm eagerly awaiting to hear what they say.

20      And so to say today that you think I have prejudged

21   something is quite an overreach.

22          MR. RAGSDALE:  Let me say this, Your Honor:  About the

23   lack of candor, for example, my client, Ms. Faulks.

24          THE COURT:  And just to be clear, you know, what I am

25   saying is, I am not buying your legal argument about the panel

1 denying due process to Mr. Charles because they didn't tell him

2 about some specific call that they now believe that he perjured

3 himself about.

4        MR. RAGSDALE:  Then I apologize for suggesting that

5 you had prejudged the entire matter.  I understand your

6 position on legal argument.  I hope you understand mine.

7        THE COURT:  I do.  And, look, I am not mad at anybody

8 for protecting their client and protecting the record.  That's

9 what we have got to do.  But, again, let's watch our rhetoric

10 and tone.  Some of it's just unnecessary.

11        MR. RAGSDALE:  Your Honor, as regards lack of candor.

12 With Ms. Faulks, who is a very minor player in this, I have

13 gone through her testimony before the panel, which was very

14 short.  She didn't testify very long.

15        She did a very brief declaration that has no real

16 substance to it frankly other than addressing a couple of

17 things that the panel wanted.  I can't find any discrepancy

18 between her brief testimony and the testimony of any other

19 respondent.

20        Now, I hope I'm right.  But I don't have any guidance from

21 this Court as to what you might think is a discrepancy between

22 Ms. Faulk's testimony and the testimony of anybody else.  I'm

23 left to try to guess, frankly, as to whether or not you think

24 she's one of the people who didn't show candor or whether she's

25 one of the people that you think is not subject to that

1    criticism.  And I hate to guess wrong.

2              THE COURT:  Right.  Well, you know, I mean, my show

3    cause order says, Each respondent shall show cause on each of

4    those.

5         So I am not saying she showed a lack of candor.  I'm

6    saying she may have.  And I would like to hear her side of the

7    story at a show cause hearing.

8              MR. RAGSDALE:  The last thing I would say, Judge, and

9    I do think this is significant.  Your concerns about the fact

10   that my clients made the decision to dismiss without prejudice

11   the case, without having the express permission of the clients.

12   There's going to be some factual development of that,

13   obviously, because it was not developed in the final report.

14   And it is not cited as one of the grounds for misconduct in the

15   final report.

16        So your show cause order is the first time we've been put

17   on notice that any court has a concern about those rules --

18   Rule 1.2, Rule --

19             THE COURT:  Isn't that what a show cause order is for?

20             MR. RAGSDALE:  It is.  But my point only is, Your

21   Honor, we did not have an opportunity to fully address that in

22   the panel, because we didn't know that was a concern of the

23   panel.

24             THE COURT:  But you will have the opportunity to fully

25   address it in front of me, right?

1          MR. RAGSDALE:  I hope so.  I do.

2      Your Honor --

3          THE COURT:  What does that mean, I hope so?

4          MR. RAGSDALE:  Well, I mean I hope we have that

5  opportunity to fully address it.  You have decided that some

6  evidence that we wanted to try to put before you we can't put

7  before you, right?  Which would include our understanding of

8  what the rules of ethics require, in terms of court permission.

9      We're going to put that in through our clients, obviously,

10  and others.  But I -- as I said, that full opportunity will

11  come, I assume, at that hearing in May.

12          THE COURT:  Yes.

13          MR. RAGSDALE:  Well, we welcome that, Your Honor.

14      Thank you.

15          THE COURT:  Uh-huh.

16          MR. SEGALL:  Your Honor, I'm Bobby Segall, and I'm

17  speaking right now for Scott McCoy and Asaf Orr.  And I'm

18  responding to your question about what further information

19  we -- and it's not different than what other folks have said.

20  But I feel like I should say it for my client.  And that is I

21  understand what everybody's said about the rule and the

22  standard and all that.

23      But specifically, I would like to know with respect to

24  each of those clients wherein there was a lack of candor, or

25  what is the accusation or allegation specifically with respect

1   to each of them, what is it that they said that the Court

2   considers not to have been accurate?  That's what I would like

3   to know as a matter of due process of just as was said for

4   Mr. Shortnacy, just to be able to be more responsive.

5        It's like the show cause order says, you read everything

6   everybody said and try to find something inconsistent with what

7   you said.

8        I would suggest to Your Honor that never mind that a

9   matter of years may have passed between their testimony and

10  some conversations.  I suggest that when we leave this

11  courtroom right now, that -- and the lawyers discuss what

12  happened, we ain't all going to get it the same and from this

13  very hearing.  People remember certain things.  They don't

14  remember other things.  There are a group of people talking.

15       So I would like to know specifically what it is that is --

16  as opposed to you go search out and try to find something that

17  somebody said that was inconsistent, which I may consider

18  totally immaterial.

19       And I assume Your Honor is talking about material

20  discrepancies.

21            THE COURT:  Certainly.  Certainly.

22            MR. SEGALL:  Well, anyway, that's one thing I would

23  like to know.

24       And then, Your Honor, you asked the question of some

25  lawyer who was up here, and I think your question -- and I am

1    not going to get it exactly correct.  I promise.  Even though I

2    heard it five minutes ago, I am going to be a little bit off in

3    what I think your question was.

4         But I think what you said was:  Why would anybody who

5    didn't know they were engaged in judge shopping, why would any

6    such person say, this is going to look like judge shopping to

7    some folks?

8         That was essentially --

9              THE COURT:  That's a rough approximation.

10             MR. SEGALL:  It's rough.  Yes.  That's what I am

11   saying.  It's rough.  I'm trying to be precise, but I know I

12   don't have it correctly, even though it was two minutes ago.

13   That's how people don't remember conversations exactly.

14        But the answer to that -- there could be several answers

15   to that question.  One is, obviously, look, I mean, just the

16   surface judge shopping is, they're all -- and it's got to be

17   wrong, you know.  I mean, as you know, and as is going on

18   discussions nationally about choosing one venue to file in and

19   another as opposed to another because of the judge you may get.

20             THE COURT:  The Judicial Conference in the last

21   seven days has issued an order --

22             MR. SEGALL:  Right.

23             THE COURT:  -- to try to stop judge shopping.

24             MR. SEGALL:  Right.  Exactly.  But there was nothing

25   illegal about that.

1        So is there -- that suggests -- and the fact that there's

2   a rule that's being adopted to stop it -- in other words, there

3   was a rule that permitted people to choose their venue, right?

4   Just like there's a Rule 41 that permits you to dismiss.  And

5   then what else does it permit you to do?  It's clearly as it

6   writ large to refile.  That's what Rule 41 says by its terms.

7   And so what I would say to Your Honor -- I didn't mean to even

8   argue this.  But what I would say to Your Honor is, change the

9   rule.  Do what the United States Judicial Conference is doing.

10  Change the rule.

11       If Rule 41 says something different than the very little

12  words that it says, change it so that us ordinary people can

13  understand it.

14       The point is, though, Judge, the reason somebody might

15  say -- somebody's going to think this looks like judge shopping

16  is because whenever you do something where part of the reason,

17  all of the reason, or part of the reason is rightly or wrongly

18  you are dissatisfied with the judge you have, when you do it,

19  people are going to say that's judge shopping.  People are

20  going to say that.

21       It wasn't judge shopping -- I mean, I'm telling you what

22  somebody could think who would say that.  The people who would

23  say that's judge shopping don't know all the circumstances that

24  we've just been through.  They don't know that every single

25  person in this case on this side of the room and this side of

1    the room, everybody understood that under the rules of the

2    Northern District and about every district I have ever been in,

3    is that if cases are consolidated, they go from the most

4    recent.

5            THE COURT:  I hear your arguments, and I know you want

6    to make those.  But I mean, we're really here on those motions

7    to clarify.

8            MR. SEGALL:  I agree, Judge.  And I wouldn't have said

9    it if you hadn't have said or hadn't have asked why would

10   anybody have said that.  And the reason why is because of the

11   surface knee-jerk reaction somebody might have and could be

12   expected to have reasonably to have who didn't know all of the

13   circumstances.

14       But what I would like to know, Judge, is in what way these

15   folks weren't candid.

16           THE COURT:  Anybody else want to be heard?

17           MR. BUCK:  Your Honor, Brannon Buck on behalf of

18   Kathleen Hartnett again.

19       Just very, very briefly.

20       On the candor piece of this, I mean, I think we --

21           THE COURT:  Back to the candor.  I mean, I am not

22   saying this is the only way, but I mean, again, we're here

23   because I have got a junior associate telling me material facts

24   that everybody else left out of their testimony.  I mean,

25   that's -- that's --

1          MR. SEGALL:  Is that the candor piece?

2          THE COURT:  And I think I made that clear earlier.  If

3   you want -- I am not saying there are others.  We will talk

4   about that.  But I mean, you want one that rings, that one

5   rings.

6          MR. BUCK:  Well, and that's kind of where I am going,

7   Your Honor.

8      As I read your show cause order with my Kathleen Hartnett

9   attorney hat on, you know, I wrote in 2B the misrepresentation

10  and nondisclosure section, you know, the order to show cause

11  why he or she should not be sanctioned for misrepresenting or

12  otherwise failing to disclose key facts.

13      What I wrote in the margin was, what key facts?  What

14  facts?  Because, you know, we are -- having, you know, reviewed

15  the record not aware of -- and I am saying things that have

16  already been said, but not aware of what those key facts might

17  be that the Court is concerned that Ms. Hartnett may have

18  misrepresented.

19      And the same thing about the discrepancies, not sure what

20  discrepancies the Court is concerned about.

21      You have given us a little bit of insight, in terms of

22  reference to a junior associate.  But that's our one concern

23  with the order and where it stands right now in --

24          THE COURT:  The panel specifically cited that in the

25  report, you know.

```
 1              MR. BUCK:  I'm sorry, Your Honor?

 2              THE COURT:  The panel specifically cited that in their

 3    report.

 4              MR. BUCK:  Okay.

 5         Well, I just wanted to state for the record that that is

 6    sort of the open question we still have with regard to our

 7    client.

 8              THE COURT:  Understood.  Understood.

 9              MR. BUCK:  Yeah.

10              MR. RAGSDALE:  If I can, Your Honor.  I just wanted to

11    add one thing.

12         This gets into -- and I don't want to get ahead of where

13    the Court is going.  But it gets into a motion that was filed

14    by one of the respondents involving the sequestration of

15    declarations.

16         My clients at this point have not seen --

17              THE COURT:  And I am going to take that up.

18              MR. RAGSDALE:  Okay.

19              THE COURT:  I am going to take that up today.

20              MR. RAGSDALE:  Thank you.

21              THE COURT:  Anybody else want to be heard on this

22    issue?

23              MR. PRATER:  May I briefly, Your Honor?  Harlen Prater

24    again for Ms. Eagan and Mr. Doss.  And I will be direct and

25    concise.
```

1        We'll deal with the young associate when we're in front of

2   you in May and that differing recollection.

3        We'll be able to talk with you about any comment about

4   perceived judge shopping and the reason for it.  There was some

5   press out there, Your Honor, where questions were being raised

6   about judge shopping.  So, of course, there's a concern about

7   that.

8        Along those lines, I want to say this, too, Judge, because

9   it has been on my mind for a while.  There was an observation

10  made by the panel about Ms. Eagan making a statement to the

11  press on Saturday about refiling.  It begs the rhetorical

12  question:  If she thought that she had done something wrong and

13  was going to be doing something wrong, why would she make a

14  public statement about it?

15            THE COURT:  I asked myself the same question.

16            MR. PRATER:  Because she didn't think it was wrong,

17  Your Honor.  And that's the key here.

18        And Mr. Segall touched on this perfectly, Judge.  If there

19  is a rule that our people violated --

20            THE COURT:  And I hear you, but the panel has kind of

21  made that decision.  These are really arguments for the show

22  cause.

23            MR. PRATER:  I understand, Your Honor.  I just want to

24  make this one point, okay?

25        The Central District of California has a specific local

1    rule that deals with it is not permissible to dismiss and
2    thereafter refile an action for the purpose of obtaining a
3    different judge.
4        If that rule existed in the Northern District of Alabama,
5    Middle District of Alabama, you have got something to talk
6    about.  And I know you do anyway, Judge.  I am not belittling
7    that.  But that would be a rule that arguably was directly
8    violated.  We don't have that here.
9        In the BellSouth case, there was a local rule in place in
10   the Northern District to prohibit exactly what that law firm
11   was doing in hiring somebody to avoid Judge Clemon.  Rule
12   violated.
13            THE COURT:  I get what you are saying.  But, I mean,
14   we are here on those motions to clarify.  I mean, I know you
15   disagree that judge shopping is prohibited behavior.  I get
16   that.  But we're really just here on whether you have gotten
17   sufficient notice of it.
18            MR. PRATER:  Yes, sir.  And I appreciate that.  And I
19   am coming to a point.  I promise.
20            THE COURT:  Okay.  Quickly.
21            MR. PRATER:  We would like to know the specific rule
22   under Shaygan that our people violated.  Is it an abstract
23   judge-shopping concept, or is there a rule that they violated?
24   That's what we're asking, Your Honor.
25        And I appreciate your giving me the opportunity to talk to

1  you a little bit more.

2          THE COURT:  Understood.

3      And, look, you know, I mean, I get it that different

4  circuits have different opinions on this.  You know, in the

5  Ninth Circuit, they have got case law, you know, upholding a

6  judge who just about gave the death penalty in a case for judge

7  shopping.  So, I mean, I get it that different circuits have

8  different opinions on this.  And I get it that the Eleventh

9  Circuit doesn't have clear guidance on this.  Something tells

10  me that we will get it one way or the other when this is over

11  with.

12      Anybody else want to be heard on this issue?

13          MS. OTTERBERG:  Yes, Your Honor.  April Otterberg on

14  behalf of Jennifer Levi and Shannon Minter.

15      Just for the record, that we share the same concerns, and

16  we join in I think one or two of the motions that were filed,

17  but I don't have anything meaningfully to add to the arguments,

18  so I wanted to note for the record --

19          THE COURT:  No.  No. Understood.

20      Anybody else?

21      All right.  I do think with the issues that we have left

22  I'm going to drag everybody into having an empty stomach, and

23  it might be that now is a good time to take an hour and go eat

24  and come back?

25          MR. PRATER:  May I approach, Your Honor, please?

1            THE COURT:  Sure.

2                 (Discussion off the record.)

3            THE COURT:  All right.  One of the attorneys has a

4    personal issue which is completely understandable, and we are

5    just going to process forward until we finish.

6        Let's take a five-minute break, and we will pick up the

7    rest of it.

8            (Recess.)

9            THE COURT:  All right.  As I see it, we have two

10   issues left.  The order of whether or not I lift the

11   sequestration order, and then Mr. Ragsdale has asked the Court

12   to supplement the record with a copy of the Court's case

13   assignment plan.

14       Are there any other issues I am not aware of?

15           MS. OTTERBERG:  Excuse me, Your Honor.  April

16   Otterberg.

17       I think that given everything that we have dealt with

18   today and presumably where Your Honor is headed with the

19   sequestration order, we were conferring amongst ourselves and

20   would request some additional times with the briefs that are

21   due on Friday.  We could do that at the end, but I think that's

22   another issue to address today.

23           THE COURT:  All right.  How much additional time, and

24   who wants that time?

25           MS. OTTERBERG:  I think -- I think it's a collective

1  request if I might, and I think we were contemplating two weeks

2  both for this Friday's deadline as well as the follow-on

3  deadline, which is currently set for April 5th, which would

4  still give everybody and Your Honor I think about six weeks in

5  advance of the May hearing.  But certainly my clients and I

6  think all of us would appreciate the additional time to --

7          THE COURT:  I will grant that.  That's fair enough.

8  Yeah.  That's not a problem.

9          MS. OTTERBERG:  Thank you.

10          THE COURT:  Any other issues?

11      All right.  Hey, I will listen to your arguments on

12  sequestration.  I kind of view it this way:  If I leave the --

13  I can leave the order in place, or if I take the order down --

14  and I don't really have a strong feeling about this -- but if I

15  take the sequestration order down, then I do think it's fair

16  when we get to the final hearing if I ask your clients, hey,

17  did you talk to the other -- the other respondents, you know,

18  prior to your testimony, and what did y'all talk about.

19      I mean, but, you know, but I don't have a strong feeling

20  about lifting it or doing -- or keeping it.

21          MR. BUCK:  Your Honor, if I may.  Brannon Buck.  Since

22  we filed that motion, I believe everybody joined in.

23      But the -- I think the greatest concern here is up to this

24  point, the responding lawyers, the respondents in this

25  proceeding have not had access to a reviewed -- the

```
 1    declarations that have been filed -- and I just want to make
 2    sure.  You may be clear on this, but I want to make sure our
 3    issue is clear in your mind -- have not had access to --
 4         THE COURT:  Let me get ahead of you.  I know where you
 5    are going with this.
 6         MR. BUCK:  Okay.
 7         THE COURT:  So, honestly, I thought the declarations
 8    had already been lifted and everybody could see them.  But I
 9    realize that is not the case.  And so clearly -- and I probably
10    didn't articulate it well earlier today, but I will
11    rearticulate it.  Those are open when we walk out of here.
12         MR. BUCK:  Okay.  Because at this point, we have not
13    let our clients see those other declarations.
14         THE COURT:  Right.
15         MR. BUCK:  We just wanted to get some clarity, and you
16    have done that for us now.
17         THE COURT:  No.  That's honestly something that, you
18    know, I thought had been -- already been unsealed, should be
19    unsealed, but we will take care of that today.
20       You know, so just so I'm clear on what the panel did.
21       So, you know, they obviously didn't allow everybody to
22    look at everybody's declarations, and they didn't let the
23    respondents talk to each other, I assume, about their testimony
24    or about this case.
25         MR. BUCK:  That's right.
```

1        THE COURT:  So when you are talking about

2   sequestration, you are really just saying, hey, we don't have a

3   problem with the sequestration order as to the respondents

4   talking among themselves.  We just want to see the

5   declarations.  Is that what you are really after?  Or no?

6        MR. BUCK:  That was the intent of the motion as we

7   filed it, and I am looking back at the other lawyers to see if

8   they have a different view.  But -- okay.

9        My -- this is my co-counsel, Chris Driver.  Is it okay if

10  he --

11       THE COURT:  Sure.

12       MR. DRIVER:  Your Honor, I believe the sequestration

13  as applied to the attorneys talking to each other was lifted.

14  If I remember correctly, the panel, after they released the

15  respondents -- after they testified and released them, they

16  said you are welcome to sit in and listen.  And I believe they

17  also said that they could talk to each other.  I'm less clear

18  on that second point, but I do know they allowed the attorneys

19  to sit in on future testimony, but they withheld the

20  transcripts -- they didn't withhold the transcripts.  They

21  sequestered the transcripts from the responding attorneys, and

22  they sequestered the declarations from each other.  So our

23  motion focused on those two things is the transcripts and the

24  declarations.

25       I think -- and I am happy to review the record and

1   supplement our motion, but I think the discussions among

2   attorneys has been lifted, that aspect of sequestration.

3        THE COURT:  All right.  Well, then, here's my thought

4   on this unless somebody thinks otherwise.

5        After today, everybody's got access to everything, and

6   anybody can talk to anybody.  But just understand when we get

7   to that hearing, I may well ask your client if they have talked

8   to the other respondents and what those conversations were.

9   Fair enough?

10        MR. DRIVER:  Correct.

11        MR. SEGALL:  Between today and the day of the hearing?

12        THE COURT:  Right.  Well, I am assuming -- well, I am

13   assuming that -- I would say from the -- I do think we may

14   be -- and I would have to go back and look.  I think maybe

15   there's some question about when the ban got lifted on the

16   respondents talking to each other.  And I -- for some reason, I

17   was thinking we hadn't lifted that.

18        Mr. Buck, you are probably correct.  You think it was

19   previously done.  So either way, you know, you know, I might

20   well ask that question.  Hey, since the sequestration order was

21   lifted, you know, have you had discussions?  What were they?

22        Anyway.  Okay.  Well, it seems like we have covered that,

23   too.

24        Anything else we need to take up on that issue?

25        MR. BUCK:  I think we're clear on that, Your Honor.

1          THE COURT:  Okay.  Okay.

2      So that -- I think that only leaves Mr. Ragsdale's motion;

3  is that right?

4          MR. RAGSDALE:  I think that's correct, Your Honor.

5          THE COURT:  All right.  Before we get into this

6  motion -- and I will say as I understand it, Mr. Ragsdale and

7  his three clients are the only ones who are asking for the case

8  assignment system.  So, you know, anybody who's not asking for

9  that, obviously, is free to leave if they want to, because I

10  don't think we have got any other issues.  But in the event you

11  want to stay, you can.

12      I certainly am going to hear your argument on why you want

13  the random assignment plan.  But let me read what Judge Proctor

14  said, again, out of the gate when the panel convened.

15      Okay.  "The Walker procedural history is pretty

16  straightforward and easy.  And I think they're actually

17  straightforward and easy, but I am going to start with Walker.

18      "Walker was the second filed case in the state.  It was

19  filed in the Middle District.  Judge Marks received the

20  assignment.  She became aware of Ladinsky that was the first

21  filed case that was filed in the Northern District of Alabama.

22  She entered a show cause order having the parties explain if

23  there's any objection or position on transferring to the

24  Northern District of Alabama the case.

25      "My understanding and our understanding is there was no

1    opposition to that, and the case was transferred to the

2    Northern District.

3         "There were six parties in Walker initially when it was

4    transferred -- three from Lee County, three from Limestone

5    County.  The way our clerk's office would have handled this is

6    it would have identified the parties and those of the

7    plaintiffs, and then there was a defendant from -- there was

8    the Attorney General in Montgomery, the Limestone County D.A.

9    Jones, and the Lee County D.A." -- I am sure I am going to

10   mispronounce this -- "Ventiere."

11        "The way our clerk's office would have identified this and

12   did identify it since those are Limestone parties, Limestone

13   County parties, it would have gone into the northern jury area,

14   the northeastern division.  Even though it was first filed

15   reference, our clerk does not directly assign cases to a judge

16   on first filed references, civil cover sheets, or anything

17   else.  It would just go into the division in the jury area

18   under our plan.  And that's how -- and the case was randomly

19   assigned within the northern jury area to Judge Burke.

20        "All right?  Any questions about that?"

21        There were no questions.

22        "Ladinsky had more movement, but Ladinsky was the first

23   filed case.  Ladinsky was filed directly in our central jury

24   area.

25        "In Ladinsky, the case was originally assigned to Judge

1   Manasco.  She had a recusal issue based on the parties, and the
2   case was randomly reassigned to Judge Cornelius, our magistrate
3   judge.
4        "By the way, I guess you understand the difference between
5   a magistrate judge and a district judge, both in terms of
6   assignment and qualifications.  District judges get hired on
7   politics.  Magistrate judges get hired on merits.  So Judge
8   Cornelius had the case, but she quickly determined that there
9   would not be consent, and, therefore, the case went back on the
10  wheel and was assigned to Judge Axon.
11       "In the meantime, Walker enters our district and is
12  assigned to Judge Burke.  Judge Axon was on day four of what
13  was scheduled to be a two-week plus criminal trial, an
14  18-defendant case with 4 defendants at trial, and quite a bit
15  of moving parts in that criminal case.
16       "And based upon judicial efficiency and economy, Judge
17  Burke took the case.  Judge Axon would not have had the
18  judicial resources to start the case right away."
19       And then Judge Watkins says, "And there was a TRO."  Judge
20  Proctor then says, "And there was a TRO actually in Judge
21  Burke's case, not in Judge Axon's case.  So there was a simple
22  determination that we would have the judge who could handle the
23  case and wasn't in a long criminal trial to handle that case.
24       "Any questions about that?"
25       There were no questions.

1    And he says, "All right," and went on with the hearing.

2    To that, I would say this:  You know, as Judge Proctor

3    informed you previously, when Walker was transferred to our

4    district based upon the residents of the parties and the lack

5    of any designation of a division of which it was to be filed,

6    it was received in the northern jury area.  The case was

7    randomly assigned to me under our standard reassignment system.

8    The longstanding practice of this Court, which existed

9    well before any of our current judges were even appointed, is

10   that we don't disclose details about how our random assignment

11   process works.  This is because doing so would allow a

12   manipulation of the system.  And I expect that every district

13   in the country has a policy that's probably not too far off

14   from that.

15   So, you know, I certainly want to hear your arguments,

16   Mr. Ragsdale, but I am having a hard time understanding how

17   having a copy of our plan would be relevant to this case.

18   And I will tell you why:  You know, if our plan was, you

19   know, drawing straws to assign it, or if it's a computer pick

20   at random, or if it's, you know, knocking over bowling pins, or

21   if it's, you know, a bingo card, it's a random draw.

22   So how we randomly draw does not seem to me to be relevant

23   in a case where the issue, at least as put by the panel, is

24   that, you know, you tried to evade whatever system was out

25   there.  You didn't like the judge you got, so you dismissed and

1   went to another district.

2       Well, I am having a hard time seeing how that is relevant,

3   number one.  And then the second thing is if what the panel has

4   said is correct, that your clients are guilty of prohibited

5   judge shopping, why would this Court give them a copy of the

6   actual plan so they could judge shop better?

7       So with that, the floor is yours.

8           MR. RAGSDALE:  Thank you, Your Honor.

9       We asked for the random case assignment procedures for two

10  reasons.  First, obviously, you are aware we're unaware of

11  those details.

12          THE COURT:  So, I mean, I think the chief judge in his

13  statement to y'all, and I think we pretty well laid out how it

14  works.  I mean, do you doubt Judge Proctor what his statement

15  to you on how the case was assigned?

16          MR. RAGSDALE:  I do not.

17          THE COURT:  All right.

18          MR. RAGSDALE:  And that isn't at all what we're

19  questioning.

20          THE COURT:  All right.

21          MR. RAGSDALE:  But two things stand out to us.  One,

22  we're accused repeatedly of manipulating and attempting to

23  manipulate those procedures.

24      We think fundamentally we ought to be able to see what the

25  procedures are that we're accused of manipulating.  But I think

 1  there's an even more fundamental reason.

 2      The question -- two things, if I may.

 3      First of all, we think we're accused of manipulating those

 4  procedures by my clients marking Walker as related to a Judge

 5  Thompson case, Corbitt, marking the civil cover sheet as

 6  related.  We're accused of engaging in a manipulation of the

 7  random case assignment procedures in the Middle District, as I

 8  understand the allegation.

 9      We don't know whether there's any provision in there as to

10  what, if any, effect to give to a case being marked as related.

11      I suspect based on experience that it has no effect on the

12  assignment of cases.  But if there's a provision in the random

13  case assignment procedures in the Middle District that we're

14  accused of violating or manipulating because of how we mark

15  that case as related, I think we're entitled to see what those

16  procedures are.

17      Now, as far as the Northern District is concerned, as you

18  recall, the case bounced from Judge Manasco to Judge Cornelius

19  to Judge Axon to you.  That is the Ladinsky case.

20      We expressed through testimony of our clients that several

21  of our clients were surprised at the way in which the case went

22  from Judge Axon to you.  And that part of that surprise is what

23  led to the dismissal of the case that Friday afternoon.

24      Judge Proctor and the panel dismissed that out of hand.

25  Found it incredible.  Found it unbelievable that we had some

1  concern about that.

2  Now, if I could explain what that concern was, Judge, is

3  that when Judge Manasco recused, the case went back on the

4  wheel as it's supposed to.  I think.  At least as I understand

5  the random case assignment procedures.  It then went to Judge

6  Cornelius who couldn't handle it.  There's actually a local

7  order from the Court that says magistrates can't get TRO cases.

8  So it wasn't just that there was a lack of consent.  There's a

9  rule against that.

10  When she couldn't handle it, it went back on the wheel.

11  It then randomly was assigned to Judge Axon.

12  When she couldn't handle it because of workload, it didn't

13  go back on the wheel.  There was not a random case assignment

14  that we understand applied to the Ladinsky case from Judge

15  Axon.  Instead, it was transferred directly to you.

16  Now, does the Court have the authority to do that?  Yes.

17  I think.  I don't know.

18  THE COURT:  Correct me if I'm wrong.  I thought the

19  parties had even agreed that these cases need to be

20  consolidated.  Hadn't the parties agreed to that by e-mail?

21  MR. RAGSDALE:  They did.  In fact, Judge Marks, when

22  she transferred Walker, she said so it could be tried with

23  Ladinsky.

24  But here's the difference, Your Honor.  And I think this

25  gets to the integrity of the random case assignment.

1      If Judge Axon simply would have said, I can't handle this,
2  put it back on the wheel, it would've been -- Ladinsky would
3  have been reassigned to any of the judges in the Northern
4  District, and it would have retained its status as the first
5  filed case.

6      THE COURT:  And then your clients might have lost the
7  case, and I wouldn't have been reversed by the Eleventh
8  Circuit.

9      MR. RAGSDALE:  All true.

10     And, again, Judge, I don't suggest there's anything wrong
11  with this.  But it does, I think, demonstrate why my clients
12  and others and, frankly, kind of coincidentally me, thought
13  there was something strange about the way the case was randomly
14  assigned, randomly assigned, not randomly assigned.

15     THE COURT:  So I mean, I think I can answer that.  It
16  goes to Judge Axon.  She's not -- she doesn't have a conflict.
17  She can hear it.  Everybody already understands and agrees
18  those two cases are going to be consolidated.

19     I'm not in a two-week criminal trial.  So instead of
20  consolidating them to her, consolidate them to me.  There would
21  be no reason that I can think of that they go back on the
22  wheel.  She didn't have a conflict.

23     MR. RAGSDALE:  I would assume that's reflected in the
24  procedures, and that's why we would like to see them.

25     THE COURT:  Well, I mean, look, if you have got some

1  very specific question on one point that you want me to take

2  back to my court, I'll consider it.  But just handing you the

3  plan, it's not relevant.

4        MR. RAGSDALE:  And let me say, Judge, we would

5  obviously be willing to maintain that as lawyers' eyes only or

6  any other kind of seal, but it's the rule we're accused of

7  violating.

8        THE COURT:  I know you would like to see it, but you

9  have still not told me how it's actually even relevant.

10       The point is we have got a random case assignment system,

11  you got me, you dismissed and went to another district.  It

12  really doesn't matter whether we randomly assigned it to me by

13  juggling, by, you know, a turkey shoot, or any other thing.

14       And I -- again, I -- honestly, I see no reason that I

15  should give you this plan.  If you want a specific piece of

16  knowledge about the plan, I will go back to my court and ask.

17       MR. RAGSDALE:  Two.  I do feel like I need to correct

18  you, Your Honor.  We didn't refile in a different district.

19       THE COURT:  I understand.  Well, you know what I am

20  talking about.  I understand.

21       MR. RAGSDALE:  No.  I think you are talking about

22  other lawyers.

23       THE COURT:  I am.  I am.  I wasn't bunching you up

24  with that.  I am talking about the case, not individuals.

25       MR. RAGSDALE:  Sure.  We would like to -- we would

1   make two specific requests.

2        One, is there anything in the Middle District random case

3   assignment procedures that reference marking a case as related

4   on the civil cover sheet, and what, if any, effect that has?

5        Secondly, is there anything in the Northern District

6   procedures which differentiate between a recusal, a magistrate

7   not being able to handle it, and a judge being too busy to

8   handle it that allowed that to be directly assigned, as opposed

9   to go through --

10            THE COURT:  Those are the two things you really want

11  to get at?  That's what you want to know?

12            MR. RAGSDALE:  Yes.

13            THE COURT:  Let me talk to my chief judge and my

14  clerk, and I'll get an answer for you.

15            MR. RAGSDALE:  Thank you, Your Honor.

16            THE COURT:  Fair enough.  Last question.

17  Mr. Ragsdale, this is you.  I am not looking behind the

18  curtain.  I am not getting in your business.  I know that you

19  are a very ethical lawyer.  But I do have one question, because

20  I am trying to keep my ethics clean -- my record clean.

21       So you have got three clients.  You have got one who could

22  have a world of liability out of this, and you have got two

23  others that, you know, depending on what happens, may have

24  little to no or moderate liability.

25       Is there any conflict there?  I know you have probably

1  already checked this out to make sure there's no conflict

2  there.  Are we good on that?

3          MR. RAGSDALE:  I think we are, Your Honor.  Obviously,

4  we have taken precautions to make sure there's full disclosure

5  to each one of those clients.  In addition, Mr. Charles has

6  additional counsel in addition to me advising him on this

7  matter.

8          THE COURT:  Okay.

9          MR. RAGSDALE:  But all clients know exactly what each

10  other is dealing with and has consented to that representation.

11      I would be glad to provide additional information if the

12  Court so --

13          THE COURT:  I'm just asking this again.  I'm just --

14  for all that we are rolling through right now, the last thing I

15  want to do is have something on the record that's going to

16  cause me to have to got back and redo anything.

17      Is that something that we need an ethics opinion on?  Is

18  that something that they've signed a waiver?  Everybody is

19  happy with that?

20          MR. RAGSDALE:  I'm comfortable with their waiver, Your

21  Honor.  But I want the Court to be comfortable with it.

22          THE COURT:  If you are telling me it's good, I am

23  going to accept your word.

24          MR. RAGSDALE:  I think it's good.

25          THE COURT:  Okay.  All right.

1      I think we have covered everything.  Is there anything
2  left to cover today?
3          MR. PRATER:  I have two quick things, Your Honor.
4          THE COURT:  Yes, sir.
5          MR. PRATER:  One, I misspoke when I said the BellSouth
6  case involved a violation of the local rule.  The local rule
7  was discussed in that decision.  It dealt with a presumption.
8  And the Court ultimately decided the Eleventh Circuit, unlike
9  the district court, concluded that it did not apply because it
10 dealt with midstream disqualifications and recusals, as opposed
11 to at the outset of the case.
12         THE COURT:  Was that Judge Smith's case?
13         MR. PRATER:  I believe it was, yes, sir.  And,
14 ironically, it was Judge Proctor's law firm that was involved.
15     Second, Your Honor, I asked you to please delay the
16 unsealing for seven days.
17         THE COURT:  Yes.  And I meant to address that.
18     I have thought about it.  And I understand your concerns,
19 but I think I'm doing the right thing, and I am going to unseal
20 it.  But I appreciate your arguments.
21         MR. PRATER:  Yes, sir.  I understand.
22         THE COURT:  I understand.
23     Anything else we should take up?
24     I haven't asked y'all.  Do y'all have any opinions you
25 want to voice on any of these show cause orders or the motions?

1    I should have given you that opportunity.

2           MR. DAVIS:  No.  Thank you, Judge.  We would have

3    raised our hands.  We do not care to be heard on this.  Our

4    priority now is getting to a trial on the merits, showing you

5    the record we're building.  In terms of how you have managed

6    the proceedings, we don't wish to be heard.

7           THE COURT:  Hey, one last thing.  And let's -- I know

8    I don't have all the merits people here today.  In fact, I have

9    got -- I'm completely lacking some of the merits people.

10          Mr. Doss, could you come up just for a minute?

11          And so I am not making any decision.  I would just call

12   this informal planning, talking, you know.  I know at one time

13   the government had a motion to stay, and it's still out there.

14          You know, in reality, do I think there's a likelihood that

15   we don't try this thing this summer because there are

16   unanswered appellate questions?  I do think that that probably

17   is a likelihood.

18          You know, let's keep on our trial track, but I do feel

19   very strongly that it would be a waste of my efforts and

20   certainly the efforts of all the attorneys in this case for us

21   to go spend two weeks on a merits hearing and then the law

22   changes.

23          And, again, I am not making a decision today.  I know we

24   have got less than all parties here.

25          But, Mr. Doss, do you want to address that for

1   two seconds?  And I will let the state do that.

2          MR. DOSS:  Yes, Your Honor, and a brief update on

3   that.  There's a Sixth Circuit petition pending at the Supreme

4   Court right now.  It was set for the Court's conference this

5   past Friday.  But I believe on last Wednesday, it got

6   rescheduled.  Whatever you can read into that.

7      So it's still pending.

8          THE COURT:  Got it.

9          MR. DOSS:  So we may know one way or another soon on

10  that petition.  But I certainly agree.  If it does get taken

11  up, that changes how to view perhaps the stay issue.

12         THE COURT:  Well, I can't imagine they would let a

13  circuit split live -- I know they let circuit splits live, but

14  on this issue, that would to me seem unlikely.

15         MR. DOSS:  I agree.

16         THE COURT:  Anybody read tea leaves better than me,

17  which would probably be anybody on what the Supreme Court is

18  going to do?

19         MR. DOSS:  I've heard the opinion that if it gets

20  rescheduled like that, that would suggest at least one justice

21  might be interested.  But beyond that, who knows what's going

22  on behind the curtain.

23         THE COURT:  Mr. Davis, do you or Mr. Bowdre want to

24  weigh in on this?

25     Mr. Prater, you do not have to sit here for this if you

```
 1   want to head out.
 2           MR. PRATER:  I am with Mr. Doss, Your Honor.
 3           THE COURT:  Okay.  All right.
 4           MR. BOWDRE:  Your Honor, we would agree that unless
 5   and until the Supreme Court does rule or at least grant cert,
 6   that we should say on the schedule that we are at and head
 7   towards trial, or at the very least, for us to get summary
 8   judgment motions before the Court --
 9           THE COURT:  Right.
10           MR. BOWDRE:  -- and have discovery completed.
11           THE COURT:  Right.  Right.  Fair enough.
12           MR. DAVIS:  And I would add, Judge, if I might, you
13   know, we have got lots of depositions scheduled coming up here
14   towards the end of the discovery period.  I think it would be
15   disruptive not to complete those that --
16           THE COURT:  No.  I agree.  And I don't want to change
17   one thing about our trial track.  I still want us to be done on
18   the schedule we are, just -- just with the knowledge that, you
19   know, it may -- it may be futile and impractical to actually
20   have that trial in August.
21       All right.  Safe travels.
22       Yes, sir?
23           MR. BUCK:  Your Honor, one last housekeeping measure.
24           THE COURT:  Uh-huh.
25           MR. BUCK:  The lawyers who are representing the
```

1  respondents in the disciplinary part of this have a number of

2  questions about how the two-day hearing that's set May 22nd and

3  23rd may play out.

4       And we were thinking it may make sense, if the Court would

5  entertain it, to request just maybe a telephonic or Zoom

6  conference.

7            THE COURT:  I think that's a fantastic idea.  And I

8  would suggest maybe even that we just have an in-person

9  pretrial conference about it.

10           MR. BUCK:  That would be fine, as well, Your Honor.

11           THE COURT:  All right.  I think that's a fantastic

12 suggestion.

13           MR. BUCK:  Okay.

14           THE COURT:  All right.  Safe travels.

15

16           (Whereupon, the above proceedings were concluded at

17     12:11 p.m.)

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

<u>03-21-2024</u>

Christina K. Decker, RMR, CRR              Date

Federal Official Court Reporter

ACCR#:   255