## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **BRIANNA BOE**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-184-LCB** |
| | ) | |
| **STEVE MARSHALL**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

Our federal Constitution holds that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. With deep roots in our Anglo-American legal tradition, the constitutional guarantee of due process entails a raft of procedural rights, including the right for attorneys charged with wrongdoing "to be given fair notice that [their] conduct may warrant sanctions and the reasons why." *United States v. Shaygan*, 652 F.3d 1297, 1318 (11th Cir. 2011).

In these proceedings, eleven attorneys (the "Respondents") have been ordered to show cause why they should not be sanctioned for misconduct first set forth in a 53-page report and amplified in the show-cause order. All eleven have challenged the legal sufficiency of their notice. Five Respondents (Michael Shortnacy, Melody Eagan, Jeffrey Doss, Scott McCoy, and Asaf Orr) object that the order does not "appear" to comply with due process under the Eleventh Circuit's decision in *United*

*States v. Shaygan*, 652 F.3d 1297 (11th Cir. 2011), because, they say, it orders them "to address unidentified instances of misconduct." (Doc. 423). These five move for clarification, asking for separate show-cause orders for each Respondent. *Id.* Two of these Respondents (Eagan and Doss) move for assurances in another filing that they need only address the conduct they've separately identified. (Doc. 432). Three Respondents (James Esseks, Carl Charles, and LaTisha Faulks) object that the order "does not comply" with the due process mandates of *Shaygan* but seek no relief themselves. (Doc. 425). Kathleen Hartnett (Doc. 441) joins in all three filings, Scott McCoy (Doc. 444) also joins in the latter two, and Jennifer Levi and Shannon Minter (Doc. 447) join only in the latter two.

The Respondents objections belie a gross misunderstanding of the governing law, which guarantees little more than notice of the "precise rule, standard, or law that [each Respondent] is alleged to have violated and how he or she violated it." *Shaygan*, 652 F.3d at 1319. Not only have they received their due notice, but for nearly two years they've been accorded process far surpassing *Shaygan*'s constitutional minima.

Even so, the Court will indulge them once more and **GRANT** the Respondents' Joint Motion for Clarification (Doc. 423). Moreover, and for the reasons set forth below, the Respondents' Motion to Receive Clarification of Order to Show Cause (Doc. 432) is **DENIED as moot**; all objections to the show-cause

order (Docs. 423, 425, 432, 441, 444 & 447) are **DENIED as moot**; and the two requests that remain from the motion to submit additional evidence by Esseks, Charles, and Faulks (Doc. 437) are **GRANTED**.

## I.   BACKGROUND

These proceedings began nearly two years ago in the crucible of three challenges to the constitutionality of Alabama's Vulnerable Child Compassion and Protection Act. The first challenge, *Ladinsky v. Ivey*, Case No. 5:22-cv-447-LCB,[1] was filed April 8, 2022, the very day the Act was signed into law. The second came three days later as *Walker v. Marshall*, Case No. 5:22-cv-480-LCB.[2] Both were reassigned to this Court on Friday, April 15, and in the space of nine minutes that

---

[1] *Ladinsky* was filed in the Northern District of Alabama by Dr. Morissa J. Ladinsky, Dr. Hussein D. Abdul-Latif, Robert Roe, and Jane Doe against the Governor, Secretary of State, and the district attorneys for Shelby and Jefferson counties. *Ladinsky v. Ivey*, Case No. 5:22-cv-447-LCB, ECF 1. The attorneys who signed the complaint were Melody Eagan, Jeffrey Doss, and Amie Vague from Lightfoot, Franklin & White LLC; Andrew Pratt, Misty Peterson, Adam Reinke, Gilbert Oladeinbo, Brent Ray, Abigail Hoverman Terry, and Michael Shortnacy from King & Spalding LLP; Asaf Orr from National Center for Lesbian Rights; Jennifer Levi from GLBTQ Legal Advocates & Defenders; Scott McCoy, Diego Soto, and Jessica Stone from Southern Poverty Law Center; and Sarah Warbelow and Cynthia Weaver from Human Rights Campaign Foundation. *Id.* at 33-36.

[2] *Walker* was filed in the Middle District of Alabama by Jeffrey Walker, Lisa Walker, H.W., Jeffrey White, Christa White, and C.W. against the Secretary of State and the district attorneys for Limestone and Lee counties. *Walker v. Marshall*, Case No. 5:22-cv-480-LCB, ECF 1. The attorneys who filed the complaint were LaTisha Faulks and Kaitlin Welborn from American Civil Liberties Union of Alabama Foundation; Lisa Nowlin-Sohl, Malita Picasso, Chase Strangio, and James Esseks from American Civil Liberties Union Foundation, Inc.; Carl Charles, Tara Borelli, and Sruti Swaminathan from Lambda Legal; Kathleen Hartnett, Julie Veroff, Zoë Helstrom, Andrew Barr, Adam Katz, Elizabeth Reinhardt, Katelyn Kang, Valeria Pelet del Toro, and Robby Saldaña from Cooley LLP; and Lynly Egyes, Milo Inglehart, and Dale Melchert from Transgender Law. *Id.* at 46-48.

evening both were voluntarily dismissed. (Doc. 339 at 8). The next day, one of *Ladinsky*'s lead counsel, Melody Eagan, told reporters with AL.com that her team "plan[ned] to refile imminently,"[3] an intention that she reiterated the following Monday in an email to the Montgomery Advertiser.[4] And sure enough, the *Ladinsky* team refiled their suit on April 19, 2022, in the Middle District of Alabama with a new slate of plaintiffs.[5] (Doc. 1). Since it had presided over *Walker* and *Ladinsky*, this Court was reassigned the new case two days later under "the authority of the Court to manage the district court docket, promote the orderly and expeditious disposition of cases, and reassign a case to a judge who presided over a prior-related case." (Doc. 3).

In at least the informal sense, the Respondents first received notice that their conduct may have breached sanctionable legal norms as early as that Monday, April 18, 2022. In closing *Walker v. Marshall*, the Court observed that the Respondents' "course of conduct could give the appearance of judge shopping," admonishing them

---

[3] Paul Gattis, "Lawsuits Seeking to Overturn New Alabama Transgender Law Dropped, Could Be Refiled," AL.com, April 16, 2022, https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html.

[4] *See* Brian Lyman, "Attorney: Plaintiffs Challenging Alabama's Ban On Transgender Medicine Plan New Case." Montgomery Adviser (Apr. 18, 2022) https://www.montgomeryadvertiser.com/story/news/2022/04/18/plaintiffs-challenging-alabamaban-transgender-medicine-plan-new-case-sb-184-kay-ivey-lawsuit/7355576001/.

[5] Namely, Rev. Paul A. Eknes-Tucker, and pseudonymous plaintiffs Brianna Boe, James Zoe, Megan Poe, Kathy Noe, Dr. Jane Moe, and Dr. Rachel Koe, who sued the Governor, the Secretary of State, the district attorneys for Montgomery, Cullman, Lee, and Jefferson counties, and the district attorney for the 12th Judicial Circuit.

that such a practice risked creating an "appearance of impropriety in the judicial system." *Walker v. Marshall*, Case No. 5:22-cv-480-LCB (N.D. Ala. April 18, 2022), ECF 24 at 3. Given its concerns of judge shopping, the Court directed the Clerk of Court to serve a copy of its order on the Chief Judges for the United States District Courts for the Northern, Middle, and Southern Districts of Alabama. *Id.*

The Chief Judges shared the Court's concern. Under their inherent authority "to address lawyer conduct that abuses the judicial process" and "polic[e] the court's docket," the Chief Judges empaneled Judge W. Keith Watkins of the Middle District, Judge R. David Proctor of the Northern District, and Chief Judge Jeffrey U. Beaverstock of the Southern District himself to inquire into the actions and decisions that lay behind *Walker* and *Ladinsky* counsels' filings. *In re Amie Adelia Vague*, Case No. 2:22-mc-3977-LCB, ECF-1 at 5. On May 10, 2022, the Panel ordered the Respondents to appear ten days later so that it could "inquire about the issues raised by counsel's actions." *Id.* The same instruction cited *In re Fieger*, 191 F.3d 451 (6th Cir. 1999) for the proposition that actions by attorneys to circumvent the court's random case assignment rule "fully merited monetary sanctions, an apology, and a reprimand" imposed by a three-judge panel. *Id.*

Early in that first hearing, the Panel told everyone present that the concerns of judge shopping *Walker*, *Ladinsky*, and this case had been discussed with each district judge in the State, and each judge had deemed the actions of the attorneys involved

to warrant an inquiry by the three-judge panel. *In re Amie Adelia Vague*, Case No. 2:22-mc-3977-LCB, ECF-75 at 3-4. Though weighty, the Panel said, the threats of judge shopping that it would investigate were not so grave as to support criminal penalties or the threat of disbarment—unless a lawyer deceived the Panel:

"The first thing I want to make sure everyone understands is this," Judge Proctor announced to the lawyer-packed courtroom on May 20, 2022. *Id.* at 73. "This is a serious matter," he said, "but it's not so serious that anyone. . . is losing a law license over this"—that is, "unless you mislead us." *Id.* Again he stressed the point: "[T]hese are serious matters," and the Panel would "deal with [them] fairly and appropriately. But the worst thing you could do is mislead [or] not be candid with us." *Id.* at 74-75.

In the months after the May 20 hearing, the Panel invited briefing, conferred with counsel, received *in camera* declarations from each attorney under the inquiry, and ruled on written motions. (Doc. 339 at 13-15). Over the next five months, the Panel held four more hearings, eventually terminating the inquiry with respect to all but 11 lawyers. *Id.* at 15-16.

After nearly a year and a half of process, the Panel issued an exhaustive 53-page Final Report of Inquiry. Its ultimate finding, reached "[a]fter carefully considering all the testimony provided in [the] inquiry," was that Melody Eagan, Jeffrey Doss, Scott McCoy, Jennifer Levi, Shannon Minter, James Esseks, Kathleen

Hartnett, Michael Shortnacy, LaTisha Faulks, Asaf Orr, and Carl Charles had "purposefully attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama." *Id.* at 51. The panel articulated ten specific findings of misconduct, capturing in these the pith of the full blow-by-blow narrative recounted in the body of the Report:

(1) *Walker* counsel marking *Walker* related to a case closed one year earlier decided by a "favorable" judge,

(2) *Walker* counsel contacting the chambers of Judge Thompson (who was never assigned to *Walker*) to directly and indirectly influence or manipulate assignments away from Chief Judge Marks to Judge Thompson,

(3) *Walker* counsel attempting to persuade *Ladinsky* counsel to transfer the latter case to the Middle District to be before Judge Thompson,

(4) coordinating the dismissal of the *Walker* and *Ladinsky* cases after their assignment to Judge Burke, and then making clear that the case would be refiled when commenting to the media about re-filing,

(5) engaging in numerous and wide-ranging discussions about how judges were favorable or unfavorable in the context of deciding whether to dismiss and refile their cases,

(6) suddenly dismissing *Walker* and *Ladinsky* after a series of phone conferences in which counsel discussed a number of matters, including their prospects in front of Judge Burke and that he was a bad draw,

(7) even though (as they admit) time was of the essence and their stated goal was to move quickly to enjoin what they viewed as an unconstitutional law, abruptly stopping their pursuit of

emergency relief, and deciding to dismiss and refile a case in the Middle District with brand new plaintiffs,

(8)  *Ladinsky* counsel's over-the-weekend decision to file *Eknes-Tucker* in the Middle District, even though the plan for years had been to file suit in the Northern District,

(9)  *Ladinsky* counsel's decision to file a new case with new plaintiffs in the Middle District to avoid the appearance of judge shopping and to avoid Judge Burke, and

(10)  claiming that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and Judge Burke set *Walker* for a status conference in Huntsville on April 18.

*Id.* at 51-52. After making these findings, the Panel directed the Clerk of Court to serve a copy of its Report on this Court to "proceed as appropriate." *Id.* at 52.

Acting on this referral, the Court heard argument on November 2, 2023, on "all pending motions" and solicited proposals from Respondent's counsel on "the next procedural steps concerning the three-judge panel's Final Report of Inquiry." (Doc. 324). The Court reiterated that it was not considering "career-ending punishment" like license suspension, except perhaps for one Respondent, but it would consider private reprimands, public reprimands, disqualification, and monetary sanctions. (Doc. 352).

Later that month, the Court held a second hearing on the show-cause process. (Doc. 369). After some discussion, the Court announced that the Respondents could submit briefs and propose additional evidence, and the Court would issue a show-

cause order for all Respondents and give each one the opportunity to present his or her case a few weeks later in open court. (Doc. 373).

  After careful consideration of the law, the evidentiary record, the Respondents' briefs and proposals, and the Panel's Final Report of Inquiry, the Court ordered each Respondent on February 21, 2024, "to show cause why they should not be sanctioned for the misconduct outlined in the Final Report of Inquiry and detailed further" in Section II of the show-cause order. (Doc. 406 at 2). As due process required, the order set forth all the rules, standards, and codes that any Respondent must answer for: the applicable federal law prohibiting judge shopping; Rule 11(b)(1) of the Federal Rules of Civil Procedure; 18 U.S.C. § 1621, Local Rule 83.1(f) of the Northern District of Alabama Local Rules; Local Rule 83.1(g) of the Middle District of Alabama Local Rules; Rules 1.2(a), 1.3, 1.4, and 3.3 of the Alabama Rules of Professional Conduct; Model Rules 1.2(a), 1.3, 1.4(a)(1)–(3), and 3.3 of the American Bar Association's Model Rules of Professional Conduct; the Oaths of Admission to the Northern and Middle Districts; and the oath the attorneys swore on May 20, 2022, before the Panel to tell the truth, the whole truth, and nothing but the truth. *Id.* at 4-8.

  The order then laid out each Respondent's potentially sanctionable conduct. While acknowledging that not every rule, standard or code set forth in the order's legal-standards section would apply to every Respondent, the order charged each

Respondent with addressing those rules, standards, and codes of professional conduct that his or her conduct appeared to violate. *Id.* at 8. Specifically, it charged each Respondent to show why he or she

> should not be sanctioned for attempting to manipulate the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama in violation of controlling precedent, Rule 11 of the Federal Rules of Civil Procedure, and the rules of professional conduct applicable in the Northern and Middle Districts of Alabama. In responding, each Respondent must address all applicable grounds of individual and collective misconduct that the three-judge panel identified on pages 51-52 of the Final Report of Inquiry, as well as any other pertinent misconduct described by the panel.

*Id.* at 8-9. It also charged each Respondent to show cause why he or she

> should not be sanctioned for misrepresenting or otherwise failing to disclose key facts during the panel's inquiry, all in violation of controlling precedent, Rule 11 of the Federal Rules of Civil Procedure, the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle Districts of Alabama, and their sworn oaths.

*Id.* at 9. Next, it charged Carl Charles to show cause why he should not be sanctioned

> for deliberately misleading the three-judge panel in violation of 18 U.S.C. § 1623 and the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle Districts of Alabama, and his sworn oath, specifically with respect to his testimony about his phone call to Judge Myron Thompson's chambers on April 12, 2022.

*Id.* at 9–10. And finally, it charged LaTisha Faulks, James Esseks, and Carl Charles to show cause why the Court should not sanction them "for failing to seek or secure their clients' consent in violation of Federal Rule of Civil Procedure 11 and the rules

of professional conduct applicable in the Northern and Middle Districts of Alabama before dismissing *Walker v. Marshall*." *Id.* at 10.

The show-cause order contained all the rules, standards, and laws that the Respondents were charged with violating, and it put them on notice that the Court was considering "several possible sanctions." *Id.* at 10. These sanctions included "suspension from practice in the Northern and Middle Districts of Alabama; censure; public or private reprimand; disqualification; ineligibility for appointment as court-appointed counsel; ineligibility to appear pro hac vice or on behalf of the United States in the Northern and Middle Districts of Alabama; and monetary sanctions." *Id.* The order allowed the Respondents to submit additional evidence as "necessary for the Court to determine a Respondent's culpability or an appropriate sanction," file show-cause briefs, "identify those portions of all other Respondents' briefs with which they agree or disagree" in a separate filing, and appear in open court for a show-cause hearing two months later. *Id.* at 10-11.

In early March, Michael Shortnacy, Melody Eagan, Jeffrey Doss, Scott McCoy, and Asaf Orr objected that the order does not "appear" to comply with due process and moved for new, individualized show-cause orders. (Doc. 423). James Esseks, Carl Charles, and LaTisha Faulks objected that the order "does not comply" with due process under *Shaygan*. (Doc. 425). Eagan and Doss moved separately for an order "identifying the precise conduct the Court is considering sanctioning."

11

(Doc. 432). Kathleen Hartnett joined in all three filings (Doc. 441); Scott McCoy, who was party to the first joint motion, joined also in the latter two (Doc. 444); and Jennifer Levi and Shannon Minter joined in the latter two alone. (Doc. 447).

On March 19, the Court heard argument on each of these motions, as well as a request by Esseks, Charles, and Faulks to submit evidence concerning "the random case assignment procedures for the Northern and Middle Districts of Alabama" and how they were applied in *Walker* and *Ladinsky*. These latter two requests had been taken up in an earlier order, which the Court has reserved ruling on until now. (Doc. 437 at 3; Doc. 449).

## II.   LEGAL STANDARDS

District courts are vested with the inherent power to sanction attorneys for bad faith conduct that "abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991). This inherent sanctioning power is "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases," *id.*, and it "is both broader and narrower than other means of imposing sanctions." *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting *Chambers*, 501 U.S. at 46). It is broader in that other authorities limit the court's sanction power to "certain individuals or conduct," while "the inherent power extends to a full range of litigation abuses"; it is narrower in authorizing sanctions for bad faith conduct alone. *Id.* at 1314-15.

12

Within these limits, a court may rely on its inherent power to sanction attorneys "even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 49. Courts may also "rely on a variety of other sources of judicial power" to impose sanctions, including those prescribed by Rule 11 of the Federal Rules of Civil Procedure, the district court's local rules, and section 1927 of Title 28 of the United States Code. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1336 (4th ed. 2023)

A court may sanction attorneys for misconduct as long as it "compl[ies] with the mandates of due process." *United States v. Shaygan*, 652 F.3d 1297, 1318 (11th Cir. 2011). And while "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause," there is "no doubt" that due process requires "notice and opportunity for hearing appropriate to the nature of the case" before any "deprivation of life, liberty or property by adjudication." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950).

When the nature of the case entails sanctions for attorney misconduct, due process requires "fair notice" to the attorney "that his [or her] conduct may warrant sanctions and the reasons why." *United States v. Shaygan*, 652 F.3d 1297, 1318 (11th Cir. 2011). The notice may come by motion from a party seeking sanctions, or it may come "from the court, or from both." *Id.* The notice itself must apprise the attorneys charged with misconduct of "the precise rule, standard, or law that he or

she is alleged to have violated and how he or she allegedly violated it." *Id.*, at 1319.

Once on notice, "the accused must be given an opportunity to respond, orally or in

writing, to the invocation of such sanctions and to justify his [or her] actions." *Id.* at

1318.

## III.   DISCUSSION

After two rife years of process, the Respondents now make the stunning claim

they've been denied their due. Their objections, though diverse, all rest on the same

root claim: the show-cause order flunks the notice requirements of *United States v.*

*Shaygan*, 652 F.3d 1297. Shortnacy, Eagan, Doss, McCoy, Orr, Hartnett, Minter,

and Levi contend that the show-cause order does not "appear" to comply with

*Shaygan* because it wrongfully applies a "collective" approach and lacks the

specificity needed to notify each Respondent of the rule he or she has allegedly

violated and how he or she allegedly violated it. (Doc. 423 at 2; Docs. 432, 441 &

447). With these objections, they move for "clarification consistent with the

requirements set forth in *Shaygan*," specifically "as to how he or she allegedly

committed judge-shopping, misrepresented facts to the Court or to the Panel, or

otherwise violated the legal standards set forth in Section I of the Order." *Id.*

Esseks, Charles, Faulks, Hartnett, McCoy, Levi, and Minter go further, raising

a host of objections and complaining that the show-cause order "suffers from many

of the same due process deficiencies that infect[ed] the panel's Final Report" by

failing, in short, to comply with "*Shaygan* and other binding Eleventh Circuit precedent." (Doc. 425 at 2, 5; Docs. 441, 444 & 447).

All these objections flatly mischaracterize the law.

## A.   The show-cause order satisfies the due process requirements of *Shaygan*.

For attorney-misconduct proceedings, due process of law "requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why." *Shaygan*, 652 F.3d at 1318. Notice to the attorney passes constitutional muster only if it announces "the precise rule, standard, or law that [the attorney] is alleged to have violated and how he or she allegedly violated it." *Id.* at 1319. The purpose and meaning of this notice requirement are best understood by considering the facts of *Shaygan* itself.

*Shaygan* concerned the propriety of public reprimands that a district court imposed on two federal prosecutors "without notice of any charges of misconduct" or "an opportunity to be heard." 652 F.3d at 1301-02. In a case "marked by hard adversarial tactics," the defendant, Dr. Ali Shaygan, was prosecuted for unlawfully distributing and dispensing controlled substances outside the scope of professional practice. *Id.* at 1302. Early in the case, Dr. Shaygan moved to suppress statements he made to his arresting officers on the grounds that these officers had violated his right to counsel. *Id.* at 1302. Disputing the nature of Dr. Shaygan's statements and his basis for suppressing them, the lead prosecutor, Sean Cronin, confronted defense

counsel and threatened a "seismic shift" in his prosecutorial tactics if counsel pursued the motion. *Id.* at 1302-03. Soon afterwards, the Government escalated its tactics indeed and brought new charges against Dr. Shaygan in a superseding indictment.

Much later, the Court discovered that two witnesses "had cooperated in a collateral investigation about potential witness tampering by members of the defense team." *Id.* at 1301. When the case came to trial, the court recalled these two witnesses for a second cross examination with the instruction that recall was necessary to correct "prosecutorial misconduct in discovery." *Id.* at 1307.

Dr. Shaygan was acquitted of all charges. After the jury's dismissal, defense counsel moved for attorney's fees and costs under the Hyde Amendment, a statute that generally allows defendants to seek attorney's fees and costs in criminal cases when "the position of the United States was vexatious, frivolous, or in bad faith." *Id.* at 1308, 1311. The district court ordered the prosecutors to appear the next week so that it could "'hear alternative requests for sanctions,' including whether a sanction in the form of attorney's fees and costs should be awarded under the Hyde Amendment." *Id.* a 1308.

Seven witnesses were summoned to the inquiry, including Cronin and his fellow prosecutor, Andrea Hoffman. *Id.* After hearing from all of them but Hoffman, the court concluded that it had "heard sufficiently," so no further testimony was

needed. *Id.* Though it authorized additional briefing, it said nothing at any time about sanctions against either Cronin or Hoffman themselves.

In its brief, the Government conceded that reasonable attorney's fees and costs were appropriate for part of the proceedings, but not for the underlying prosecution. *Id.* at 1309. All but ignoring "the substantial evidence" that supported the case against Dr. Shaygan, the district court awarded "$601,795.88 in attorney's fees and costs from the date of the superseding indictment," the date from which Cronin, Hoffman, and others "acted vexatiously and in bad faith in prosecuting Dr. Shaygan." *Id.* It then issued public reprimands to Cronin and Hoffman.

The Eleventh Circuit reversed. To begin with, it found that the district court had applied the wrong standard under the Hyde Amendment, abusing its direction in awarding attorney's fees and costs for an "objectively reasonable" prosecution. Still worse, however, the district court had categorically denied the prosecutors due process before entering public sanctions against them. Not only did the court fail to give notice of the "precise rule, standard, or law" that the prosecutors allegedly violated or how they allegedly violated them, the court gave them "no notice that it was considering a public reprimand" at all. *Id.* at 1318. In fact, Dr. Shaygan was asked during the inquiry whether he wished the court to "exercise any inherent powers of contempt as relating to anyone in the United States Attorney's Office"

and responded with a firm "no." *Id.* But the prosecutors were not privy to this frank exchange; the court had sequestered them as witnesses. *Id.*

Due process violations were sundry. The court denied both prosecutors "a meaningful opportunity to be heard" in the proceeding. Neither prosecutor was represented by counsel. Neither had the opportunity to cross-examine witnesses. And neither was told "that the district court might rely on [their] testimony to impose an individual sanction." *Id.* "[E]ven more egregious" were the due process violations against Hoffman. *Id.* Not only was she denied the opportunity to testify, but the district court's sequestration order meant there was "no way for [her] to know about the testimony of the other witnesses at the proceeding." *Id.*

Given these myriad violations, the panel explained that if any proceedings for attorney misconduct should follow, the district court would be obliged to give "notice of the charge" by announcing "the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it," and it could hold each attorney responsible only for his own acts and omissions. *Id.* at 1319. But in the final analysis, the panel doubted that sanctions were appropriate at all:

> We do not mean to suggest or even hint that the district court should consider sanctions against either Cronin or Hoffman. It is not apparent to us that either attorney necessarily violated any ethical rule or any constitutional or statutory standard. The record before us is unreliable because it was developed, after all, without affording either of them due process.

*Id.*

These proceedings bear no resemblance to the travesty of process in *Shaygan*. The prosecutors in *Shaygan* were sanctioned without notice or an opportunity to be heard, 652 F.3d at 1301-02; the Respondents, who have not been sanctioned, have received notice time and again for two years that their conduct might warrant sanctions, and they've been accorded opportunity after opportunity to be heard. Indeed, the Respondents have likely received more process for attorney-misconduct proceedings than any other lawyers in recent Eleventh Circuit history.

Consider the notice they've received so far. The Respondents were first told in April of 2022 that their conduct gave the appearance of judge shopping, a "pernicious" practice that could "create the appearance of impropriety in the judicial system." *Walker v. Marshall*, Case No. 5:22-cv-480-LCB (N.D. Ala. April 18, 2022), ECF 24 at 3. The next month, they were told that every district judge in the State of Alabama believed their conduct to be grievous enough for evincing judge shopping to warrant an inquiry by a three-judge panel. *In re Amie Adelia Vague*, Case No. 2:22-mc-3977-LCB, ECF-75 at 3-4. The Panel began the inquiry in May of 2022 by telling them that judge shopping could merit moderate sanctions, while misleading or not being candid with the Panel could put one's law license in jeopardy. *Id.* at 75. The Panel's Report laid out with rigor and precision each Respondent's misconduct in judge shopping and misleading the Panel. (Doc. 339). In November of 2023, the Respondents were told on two occasions in open court

that it was considering an array of sanctions for judge shopping and lack of candor to the Panel. (Docs. 352 & 373).

Then came the show-cause order, which without a doubt passes constitutional muster. Section I notifies the Respondents of the "rules, standards, and codes of professional conduct" implicated in the order; Section II notifies each Respondent of the precise rule, standard, or code of professional conduct that he or she allegedly violated and how he or she allegedly violated it; and Section III notifies them of the sanctions that each one could be on the hook for. (Doc. 406)

The Respondents misread *Shaygan* to require far greater specificity than due process requires. With special emphasis on the need to admonish each attorney of the "precise rule" he is charged with violating and "how" each he or she allegedly violated it, they ask the Court to provide a full synopsis of each Respondent's role in the wrongdoing with which he or she has been charged. But the due process failure in *Shaygan* was not a matter precision; it was the wholesale absence of any notice whatsoever. What's more, by incorporating the Panel's full Report, the show-cause order *does* lay out just "how" each Respondent violated the "precise rule[s], standard[s], or law[s]" set forth in the order.

Respondents also misread the show-cause order to apply a forbidden "collective approach." The show-cause order, it's true, is an omnibus filing against all Respondents, but the order charges no one with responsibility for the acts or

omissions of any others. To the contrary, "each Respondent" is charged with responding for certain categories of misconduct only where his or her individual actions support a finding of misconduct in that category; where fewer than all Respondents are charged with certain misconduct, the order names those who must address the additional misconduct separately.

In short, the show-cause order complies with *Shaygan* and gives each Respondent the notice and process they are due.

There is a great deal at stake in these proceedings: the professional reputations of eleven attorneys and the firms and organizations they represent, public trust in the fairness and integrity of the judiciary, and the rule of law itself. In recognition of this great weight, even though the Respondents have received ample process these past two years and are doubtless on notice of the charges against them, the Court will issue new show-cause orders to each Respondent, according each one the individualized notice that their joint motions seek.

## B.     Esseks's, Charles's, and Faulks's further objections are inapt.

Like the other Respondents, Esseks, Charles, and Faulks contend that the show-cause falls short of the due process required by *Shaygan,* raising six separate objections. The Court addresses each in turn.

### 1.  First objection

First, Esseks, Charles, and Faulks object to the order's requirement that "[e]ach Respondent" show cause why he or she should not be sanctioned for violating the "litany" of rules, standards, and codes of professional conduct set forth in the order, even though "not every rule, standard, and code applies to each Respondent." (Doc. 425 at 2).

As discussed above, the show-cause order instructs each Respondent to address only those rules with which he or she has been charged with violating: that's all *Shaygan* requires. That the same order also lists rules that apply to some Respondents but not others is of no import; the order expressly directs each Respondent to the rules his or her conduct implicates.

### 2.  Second objection

Esseks, Charles, and Faulks next object that the order incorporates parts of the Panel's Report when "that report failed to set forth 'the precise rule, standard, or law that [each Respondent] is alleged to have violated and how he or she allegedly violated it." *Id.* This objection belies a misunderstanding of the nature and purpose of both the Report and the show-cause order.

The Report was not required to set forth any rule, standard, or law that the Respondents were alleged to have violated or how each allegedly violated them; after all, the Panel did not impose sanctions. For purposes of due process, notice for

sanctions begins with a show-cause order, which puts attorneys on notice of the charges and the misconduct itself at the same. Indeed, the Court's show-cause order would withstand constitutional scrutiny even if the Report had cited no rules, standards, or law at all.

More to the point, this objection presupposes that the Panel should have anticipated that the Respondents would misrepresent the truth or outright lie. But how could they have known? Most of the rules cited in the show-cause order concern the Respondents' lack of candor, misleading testimony, or perjury, all of which occurred during the inquiry itself. It is disingenuous to complain that the Panel didn't invoke the attorneys' professional responsibilities before testifying in front of three federal judges.

### 3. Third objection

Third, they object that the order refers to "the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama" even though these procedures are withheld from the public. *Id.* at 3. This objection relates to a pending motion from the same three Respondents.

On March 8, 2024, Esseks, Charles, and Faulks moved to submit a host of additional evidence, two categories of which it asked the Court to provide on their behalf: (1) "[e]vidence documenting the 'random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama," and

(2) "[e]vidence documenting how the 'random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama' were applied in [*Ladinsky* and *Walker*,]" and specifically "evidence regarding how the 'random case assignment procedures' impacted the transfer of *Ladinsky* from Judge Axon to this Court." (Doc. 437 at 3). The Court ruled on the rest of their motion in an earlier order, but it has reserved ruling on these two requests till now. At the hearing on March 19, counsel for Esseks, Charles, and Faulks narrowed these requests as follows:

(1) Is there anything in the Middle District random case assignment procedures that reference marking a case as related on the civil cover sheet, and what, if any, effect that has?

(2) Is there anything in the Northern District procedures which differentiate between a recusal, a magistrate not being able to handle it, and a judge being too busy to handle it that allowed that to be directly assigned?

After further consideration, the Court **GRANTS** Respondents' requests. The answers to counsel's questions are as follows:

(1)   **Middle District of Alabama: Whether marking a case as "related" on a civil cover sheet affects the assignment of a case.**

As the Clerk of Court for the Middle District of Alabama told the Respondents when *Walker* was filed, marking the cover sheet as related is not enough to direct the assignment in a particular way. If reassignment is sought after the judge is randomly assigned, an appropriate motion is required. *See, e.g.*, Melcher Testimony 5/20/22 Tr. 60; Hartnett Testimony 8/3/22 Tr. 34; Borelli Testimony 8/3/22 Tr. 100.

There is a random case assignment system, and an assignment as "related" is within the purview of the judge, not the Clerk's Office. *Walker* was randomly assigned to Judge Marks notwithstanding the parties' notation on the civil cover sheet that the case was "related," a further indication that such a marking is not enough to control the assignment of a case.

      (2)    **Northern District of Alabama: Whether the first-filed case in a group of cases that are related and may be consolidated goes back on the random assignment wheel when the judge declines to hear it.**

Judge Axon did not recuse herself from *Ladinsky*: she transferred the case to this Court, a history the docket sheet reflects. *Walker*, on the other hand, was indeed randomly assigned to this Court when it was transferred to the Northern District. Judge Axon transferred *Ladinsky* to this Court only after this Court had already been randomly assigned *Walker*.

### 4. Fourth objection

Fourth, they object that the order cites and quotes rules "without identifying the precise provisions of those rules that **each Respondent** is accused of violating and what **particular conduct** each Respondent is alleged to have committed in violation of such provisions." *Id.*

As discussed above, the show-cause order identifies both the rules and conduct necessary to put the Respondents on notice under *Shaygan*. Each Respondent is charged with answering for judge shopping and misrepresentation and

non-disclosure; Charles for perjury in judicial proceedings; and Esseks, Charles, and Faulks for breach of attorney-client duties. (Doc. 406 at 9-10). The particular conduct is laid out in meticulous detail in the Report, which was expressly incorporated into the show-cause order by reference. *Id.* at 2.

### 5.  Fifth objection

Fifth, they object that the order fails to "identify what **particular** acts or omissions by **each Respondent** are the subject of the Court's potential sanctions" for the charge of judge shopping, a failure not cured by the Court's reliance on the Panel's Report, since the Report likewise "failed to identify which **particular** acts by **each Respondent** are to be addressed. Moreover, they suggest, the show-cause order "expressly recognizes that the Final Report outlines 'collective misconduct' which itself violates the due process requirements established by the Eleventh Circuit." *Id.*

As discussed above, the show-cause order sufficiently notifies the Respondents of the conduct that each Respondent must address, and it charges each Respondent with answering only for his or her own acts or omissions.

### 6.  Sixth objection

Finally, they object that the show-cause order requires "'each Respondent' to "address the discrepancies between his or her own testimony and affidavits and those of all other attorneys involved in the panel's inquiry" without identifying any

**particular** alleged "misrepresentation" or "discrepancy" or "fail[ure] to disclose key facts during the panel's inquiry" that each Respondent must address.

Once again, the show-cause order sufficiently notifies the Respondents of the conduct that each one must address without providing a line-by-line comparison of the testimony he or she gave with the conflicting testimonial evidence.

## IV.   CONCLUSION

For the foregoing reasons, the Joint Motion for Clarification by Michael Shortnacy, Melody Eagan, Jeffrey Doss, Scott McCoy, and Asaf Orr (Doc. 423) is **GRANTED.** The Court will issue new and individualized show-cause orders to all Respondents. Accordingly, the Respondents' new deadline to file show-cause briefs is **April 12, 2024**, and the Respondents deadline to identify those portions of all other Respondents' briefs with which they agree or disagree is **April 26, 2024.**

Defendants' Motion to Receive Clarification of Order to Show Cause, which was filed "[i]n the event the Court does not grant" the Joint Motion for Clarification, is **DENIED as moot.**

The objections filed by James Esseks, Carl Charles, and LaTisha Faulks are likewise **DENIED as moot**, and their motion to receive evidence of the random case assignment procedures is **GRANTED** as described above.

**DONE** and **ORDERED** this April 5, 2024.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE