# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **BRIANNA BOE**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs**, | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-0184-LCB** |
| | ) | |
| **STEVE MARSHALL**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>NOTICE OF FILING</u>

Respondents, James Esseks, Carl Charles, and LaTisha Faulks, hereby give notice of the filing of the following:

1.    Supplemental Declaration of James D. Esseks, attached as Exhibit A.

2.    Supplemental Declaration of Carl S. Charles, attached as Exhibit B.

3.    Declaration of LaTisha Gottell Faulks, attached as Exhibit C.

Respectfully submitted,

*/s/ Barry A. Ragsdale*
Barry A. Ragsdale
Robert S. Vance
Dominick Feld Hyde, PC
1130 22nd Street South, Suite 4000
Birmingham, AL 35205
Tel.: (205) 536-8888
bragsdale@dfhlaw.com
rvance@dfhlaw.com

/s/ *W. Neil Eggleston*
W. Neil Eggleston
Byron Pacheco
Kirkland & Ellis LLP
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Tel.: (202) 389-5016
neil.eggleston@kirkland.com
byron.pacheco@kirland.com

*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I certify that, on May 8, 2024, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will provide notice of such filing to all counsel of record.

/s/ *Barry A. Ragsdale*
OF COUNSEL

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **BRIANNA BOE**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-0184-LCB** |
| | ) | |
| **STEVE MARSHALL**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## SUPPLEMENTAL DECLARATION OF JAMES D. ESSEKS

I, James D. Esseks, declare as follows:

1.     I submit this declaration in response to the Court's Supplemental Order to Show Cause dated May 1, 2024 (Dkt. No. 486, the "Order"). This declaration supplements my prior testimony to the three-judge Panel through a declaration submitted on July 27, 2022 and through oral testimony given on August 3, 2022.

2.     I was one of the counsel to plaintiffs in *Walker v. Marshall*, an action challenging Alabama's ban on medical care for transgender adolescents, which was called SB184. We filed *Walker* in the Middle District of Alabama on April 11, 2022. It was transferred to the Northern District of Alabama on April 14, 2022, and plaintiffs voluntarily dismissed it pursuant to Fed. R. Civ. Pro. 41(a)(1)(A)(i) on April 15, 2022. I did not file another lawsuit challenging Senate Bill 184 ("SB184"), nor did any of the counsel to plaintiffs in the *Walker* matter.

3.      The matters stated herein are based upon my personal knowledge and are true and complete to the best of my recollection. While I do not believe that I engaged in sanctionable misconduct, I understand and deeply regret that my actions have given this Court, and indeed federal judges throughout Alabama, the impression that I was trying to manipulate the random case assignment procedures. I sincerely apologize for creating that appearance.

4.      Because responding to the Order requires me to disclose attorney work product and, in some cases, attorney client protected discussions, I am again objecting and preserve my objection to the sharing of this information. All privileged information previously shared in this inquiry was provided with the understanding that it was protected by the Panel's guaranty of confidentiality and would remain under seal.

5.      I have organized this declaration so that it addresses the following topics:

- Background information on my career as an advocate and my legal practice;

- How the national LGBTQ legal advocacy groups work together;

- Responses to each of the ten preliminary findings of misconduct that appear on pages 51–52 of the Panel's Report of Inquiry dated October 3, 2023 (Dkt. No. 339), and that appear in the Order at 12-14;

- Responses regarding misrepresentation and non-disclosure of key facts;

- Clarification of part of my testimony before the Panel; and

- Response to the alleged breach of attorney-client duties.

## I.   **Background.**

6.      I graduated from law school in 1991 and have worked for the national American Civil Liberties Union (ACLU) since 2001, first as Litigation Director of the LGBTQ & HIV Project (a division of the national ACLU's legal department) and then as Director of that Project starting in 2010. I manage a team of lawyers who litigate constitutional and civil rights claims in state and federal courts across the country.

7.      I was admitted to the California bar in 1992[1] and to the New York bar in 1994 and have been in good standing since I was admitted.

8.      Over my 23 years with the ACLU, my team has litigated cases about the rights of LGBTQ people in federal and state courts in over 40 states. These cases include both cases that focus on pure legal issues and cases with a significant factual component, and my team has tried cases before both judges and juries. Many of our cases have reached either the high court in the state court system or the United States Supreme Court, including cases that have created significant advancements for LGBTQ people under the law.

9.      The United States Supreme Court cases include the following:

---

[1]    I am on "active" status in California now but was "inactive" for several years in the 1990s.

- *United States v. Windsor*, 570 US 744 (2013) (striking down Defense of Marriage Act).

- *Obergefell v. Hodges*, 576 US 644 (2015) (striking down remaining laws banning same-sex couples from marrying).

- *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 US 617 (2018) (addressing whether a business has a constitutional right to discriminate in violation of a civil rights law).

- *Bostock v. Clayton Cnty., Ga.*, 590 US 644 (2020) (holding that Title VII's ban on sex discrimination covers anti-LGBTQ discrimination as well).

- *Fulton v. City of Philadelphia*, 593 US 522 (2021) (addressing religious exemption claim by child welfare agency).

10.    The state high court decisions include the following:

- *Levin v. Yeshiva Univ.*, 96 N.Y.2d 484, 754 N.E.2d 1099 (2001) (holding that private medical college's refusal to allow lesbian couple access to marital student housing was sexual orientation discrimination in violation of New York City statute).

- *Kansas v. Limon*, 280 Kan. 275, 122 P.3d 22 (2005) (holding that imposing higher criminal penalty based on the sexual orientation of the defendant violates equal protection).

- *Dep't of Hum. Servs. v. Howard*, 367 Ark. 55, 238 S.W.3d 1 (2006) (striking down Arkansas regulation that prevented gay people from being foster parents).

- *In re Marriage Cases*, 183 P.3d 384 (Cal. 2008) (recognizing fundamental right of same-sex couples to marry under the California constitution).

11.    Much of our current docket focuses on litigating the constitutionality of a range of laws that restrict the rights of transgender people in various ways. Examples of those cases include the following:

4

- *Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (affirming preliminary injunction barring Arkansas from enforcing law that prevents transgender adolescents from accessing gender-affirming medical care).

- *Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023) (affirming preliminary injunction barring Idaho from enforcing law that prevents transgender girls and women from participating on girls' and women's sports teams).

- *L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) (reversing preliminary injunction barring Tennessee from enforcing law that prevents transgender adolescents from accessing gender-affirming care).

12. In 33 years working as a lawyer, I have never had disciplinary or grievance proceedings filed against me. I am in good standing in every Bar to which I am admitted, and I have never been denied admission to any court.

13. I and my team frequently appear *pro hac vice* in courts across the country. If this Court ultimately sanctions me in this matter, I will likely have to report that sanction before many if not all of the courts where I file a *pro hac vice* application in the future and, depending on the local rules for *pro hac vice* admission, may have to update the courts where I am currently admitted *pro hac vice*.

## II.   **How the national LGBTQ legal groups work together.**

14. In the Report of Inquiry, the Panel recites some evidence presented by Edmund LaCour, Solicitor General of Alabama, at the May 20, 2022 hearing in *In re Vague*, that appears to suggest that the non-profit organizations that brought the *Walker* case and those that brought the *Ladinsky* case were working in close

collaboration to file the two cases. In light of the Panel's discussion of that evidence, I believe it may be helpful to the Court to provide some further information both about how these organizations work together in general and the extent to which we worked together in the run-up to the filing of *Walker* and *Ladinsky*.

15.     My co-counsel in *Walker* were lawyers from the national ACLU ("ACLU"), the ACLU of Alabama, Lambda Legal, the Transgender Law Center ("TLC"), and the law firm Cooley LLP ("*Walker* Counsel").

16.     ACLU, Lambda Legal, and TLC are three of many groups working in the LGBTQ legal advocacy space. Other such groups include the National Center for Lesbian Rights ("NCLR"), GLBTQ Legal Advocates & Defenders ("GLAD"), Southern Poverty Law Center ("SPLC"), and Human Rights Campaign ("HRC"), who are among the counsel for Plaintiffs in *Ladinsky v. Ivey* and *Eknes-Tucker v. Marshall* ("*Ladinsky* Counsel").

17.     These LGBTQ legal advocacy groups collaborate and share information in some circumstances, and sometimes bring joint cases. At the same time, these groups are all independent actors, often file separate cases, and at times pursue differing strategies in litigation. These organizations are as often friendly competitors as we are collaborators.

18.     On many issues (for example, in litigation over the rights of same-sex couples), these organizations (or groups of these organizations) filed separate court

cases challenging the same law or constitutional amendment, sometimes in closely related jurisdictions. Examples of these parallel lawsuits include: *Massachusetts v. U.S. Dep't Health & Hum. Servs.*, 682 F.3d 1 (1st Cir. 2012) (challenge to the federal Defense of Marriage Act filed in D. Mass. by GLAD); *United States v. Windsor,* 570 U.S. 744 (2013) (challenge to the federal Defense of Marriage Act filed in S.D.N.Y. by the ACLU); *Pedersen v. U.S. Off. of Pers. Mgmt.*, 881 F. Supp. 2d 294 (D. Conn. 2012) (challenge to the federal Defense of Marriage Act filed in D. Conn. by GLAD); *Golinski v. U.S. Off. of Pers. Mgmt.*, 824 F. Supp. 2d 968 (N.D. Cal. 2012) (challenge to the federal Defense of Marriage Act filed in N.D. Cal. by Lambda Legal).

19.     Commencing separate litigation is sometimes necessary because the organizations have different clients and at times they take different approaches to what legal claims to bring and how to frame specific legal arguments. Each organization tends to feel strongly about its preferred approach.

20.     In 2020 and again in 2021, the Alabama Legislature considered but did not pass a transgender youth healthcare ban like SB184, which ultimately passed in 2022. ACLU, Lambda, and ACLU of Alabama together prepared to challenge that potential law in 2020 and 2021. Leading up to the 2022 legislative session, the Alabama Legislature indicated that it might again take up this issue in SB184 and

House Bill 266 ("HB266"), the felony healthcare ban. *Walker* Counsel resumed preparations to sue.

21.     As we prepared for potential litigation, I was aware that other plaintiffs, represented by *Ladinsky* Counsel, were likely to file suit if the law passed. *Walker* Counsel and *Ladinsky* Counsel had minimal communication about our respective planned filings. Prior to the public filings of the two cases, I and *Walker* Counsel more broadly were generally aware that *Ladinsky* Counsel planned to sue in the Northern District, and someone on my ACLU team told *Ladinsky* Counsel that we were likely to file in the Middle District. The two groups did not share drafts of any of our filings or discuss case strategy. I believe each team was hoping to get its case filed first.

22.     My goal, and that of the *Walker* team, was to keep the cases separate, not to combine them or to drop one of them.

23.     Attempting to support his assertion that the two legal teams were working together here, the Alabama Solicitor General pointed to the fact that the *Walker* lead plaintiff's transgender child was a patient of the *Ladinsky* lead plaintiff who provided the medical care prohibited by SB184. The Alabama Solicitor General also asserted that Mr. Walker and Dr. Ladinsky, the lead plaintiffs in both cases, participated in a press conference organized by the Human Rights Campaign about the legal challenges to SB184.

24.     It is true that Mr. Walker's child was a patient of Dr. Ladinsky, and it is also true that a very large percentage of the transgender adolescents in Alabama who were accessing gender-affirming medical care were patients at the clinic that Dr. Ladinsky ran. There weren't many options for getting this care in Alabama, even before the ban went into effect. It is not surprising that the families and healthcare providers who stepped forward to challenge the ban knew each other, given the small circles of families openly seeking such medical care for their transgender adolescents and medical professionals providing such care.

25.     It is also true, apparently, that Mr. Walker and Dr. Ladinsky participated in the same press conference shortly after the cases were filed. I learned about that for the first time when the Solicitor General made that assertion in open court on May 20, 2022, on the first day of hearings before the Panel. As far as I know, Mr. Walker agreed on his own to participate in that press conference.  His participation was not at the direction of his legal team, nor were we aware of his participation prior to that first Panel hearing.

**III.     <u>Response to the Panel's Preliminary Findings of Misconduct.</u>**

26.     In its Report of Inquiry, the Panel stated that "Counsel's misconduct in the three cases (both individual and collective) included:" and then listed ten items. Set out below are each of those assertions and my responses.

27.     As a global response to these preliminary findings of misconduct, I respectfully submit that I have never attempted to manipulate, nor ever actually manipulated, the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama in violation of controlling precedent, Rule 11 of the Federal Rules of Civil Procedure, or the rules of professional conduct applicable in the Northern and Middle Districts of Alabama.

**(a)     *(1) Walker counsel marking Walker related to a case closed one year earlier decided by a "favorable" judge.***

28.     In 2020, when the ACLU first began exploring litigation over the threatened health care ban being considered by the Alabama legislature, the ACLU was litigating a separate but similar case in the United States District Court for the Middle District of Alabama, *Corbitt v. Taylor*, No. 2:18-cv-00091 (M.D. Ala.). *Corbitt* challenged Alabama's policy requiring proof of gender-affirming surgery to change the gender marker on a person's driver's license. Judge Thompson presided over *Corbitt*.

29.     In 2020, the ACLU and its partner organizations decided to mark the potential new case as related to *Corbitt*, if and when it was filed. Marking the two cases as related remained the plan when similar bills were proposed in the Alabama legislature in 2021 and 2022.

**(i)     Basis for marking *Walker* as related to *Corbitt*.**

30.     I believe that I had a reasonable, good-faith basis for marking a case challenging Alabama's threatened health care ban as related to *Corbitt* because there would be a substantial overlap in science, facts, and legal arguments between the cases. I also believed that judicial efficiency would be furthered if the judge assigned to *Corbitt* were also assigned to the new case on health care for transgender adolescents.

31.     I and my team have been litigating cases about the rights of transgender people for more than twenty years. In every single case, we need to submit evidence to help educate the judge assigned to the case about many factual issues, including, among others, what it means to be transgender, what gender identity is, what gender dysphoria is, what social transition is, what medical treatments are available and in what circumstances they are appropriate, what the side-effects and risks of various treatments are, and the efficacy of the treatments.

32.     In *Corbitt*, Judge Thompson was presented with evidence on issues relevant to healthcare for transgender people, such as what surgeries some transgender people undergo, how surgery fits into a broader range of gender-affirming care for some transgender people, how it is not medically necessary for all transgender people, and how it is actually not desired by some transgender people.

33.     Plaintiffs in *Corbitt* submitted to Judge Thompson an expert report from a doctor who provides gender-affirming medical care to transgender people, which contained details about that care.

34.     I expected that the evidence that we would present in *Walker* would cover much of the same ground as the evidence about gender-affirming medical care that had been submitted in *Corbitt*, and that it would likely go deeper into the details of the care. The *Walker* lawsuit included a challenge to the ban on surgery in SB184, and the overlap around surgery between *Corbitt* and *Walker* was an important part of the basis for our good-faith belief that the two cases were factually related.

35.     I also believed that the two cases were legally related because both cases involved claims that Alabama state law and policy violated the federal equal protection rights of transgender people living in Alabama. In addition, to my knowledge, prior to the filing of *Walker*, *Corbitt* was the only case ever filed in federal court in the Middle District of Alabama asserting constitutional discrimination claims on behalf of transgender people.

36.     We made the related case designation not in secret, but openly on the civil cover sheet. I did not think there was anything to hide here.

     **(ii)   Lack of guidance in the local rules for the Middle District of Alabama.**

37.     Unlike other federal district courts in Alabama and around the country, the United States District Court for the Middle District of Alabama had no local rule defining what constitutes a related case when we filed *Walker*.

38.     Because the Middle District of Alabama local rules did not address what constituted a related case, we relied on definitions of "related case" from other federal district courts around the country. Those definitions include whether there is overlap in claims or defenses between the cases, whether the cases involved common questions of fact or law, and whether treating the cases as related would save judicial resources. Under those standards, I believe that I had a good-faith basis for considering *Walker* a related case to *Corbitt*, based on the factual and legal connections discussed above.

39.     As I understood it, a significant part of the rationale for having a related case designation is to enhance judicial efficiency and economy by ensuring that a case raising a specific set of factual or legal issues gets assigned to a judge who is already familiar with those facts or that law, both of which were present in the decision to relate *Walker* to *Corbitt*.

### (iii)   My misunderstanding of which judge decides case relatedness in the Middle District of Alabama.

40.     Based on my experience with how related case determinations are made in other federal district courts, I believed that the clerk of court would send a new complaint marked as "related" to the chambers of the judge assigned to the case

asserted to be related (the "related case judge"). If this judge decided that the cases were related, they would accept the assignment; if the judge decided that the cases were not sufficiently related, they would send the case back to the clerk's office for random assignment to a judge.

41.    It is my understanding from my years of practice that in many federal district courts across the country, the related case judge is the person who decides whether one case is related to another. This was the procedure, for example, in the Southern District of New York (where I both clerked and practiced extensively while at a private firm) and the Northern District of California. I assumed this was how it worked in every federal district, although I have since learned that is not true.

42.    I rely on local counsel to understand how local practice may differ from procedures in courts in other parts of the country, and lawyers working for the local ACLU affiliate office usually serve that local counsel function. Tish Gotell Faulks and Kaitlin Welborn, who were lawyers working with the ACLU of Alabama and co-counsel with me in *Walker*, were both relatively new to Alabama and did not have the depth of local experience that many ACLU affiliate lawyers provide and that I am used to getting from our affiliate lawyers. I did not understand how the related case assignment process actually worked in the Middle District of Alabama, and it turned out neither did they.

43.     We realized that we had misunderstood how the case assignment process worked only after we had filed the complaint in *Walker*, when one member of our team learned from staff at the Middle District Clerk's Office that the proper way to seek assignment as a related case is to file a motion to transfer the case to the judge assigned to the assertedly related case, and that the motion to transfer would be decided by the randomly assigned judge. That conversation happened on Tuesday, April 12, 2022. In light of this process in the Middle District, it remains unclear to me what the function is of marking a case as related on the civil cover sheet in that district.

44.     Once we learned that we had misunderstood the related case assignment process, we filed the motion that is required under the Middle District procedures. That motion was filed on the public docket and contained an explanation of our reasons for why the two cases were related.

        **(iv)    Marking *Walker* as related to *Corbitt,* which was on appeal.**

45.     I was aware of developments in the *Corbitt* case because some of the lawyers that I supervised at the ACLU were counsel in *Corbitt*.  I knew that Judge Thompson issued an order granting judgment for the plaintiffs in *Corbitt* in January 2021. The State of Alabama appealed *Corbitt* to the Eleventh Circuit. That appeal was briefed in 2021 and argued on March 15, 2022; the Eleventh Circuit had not

issued its order deciding the appeal when we filed *Walker* in April 2022, and it has still not issued that order.

46.    When *Walker* was filed, I believed that *Corbitt* was still pending because it was on appeal and the Eleventh Circuit would remand the case either for further proceedings or entry of judgment. I believed that the same goals of judicial efficiency would be advanced regardless of whether *Corbitt* was on appeal or still in the district court. Judge Thompson had handled a case that had significant overlap with *Walker*, and judicial economy would be enhanced to have a judge with that base of knowledge handle the second case.

47.    The Middle District of Alabama does not have a local rule defining what "pending" means in the context of marking a case as related on the civil cover sheet.

48.    In the absence of guidance from Middle District local rules or clear guidance from case law, and in light of the goals of judicial efficiency that underlie the related case mechanism, I believed in good faith that it was reasonable for us to consider *Corbitt* as a pending case for purposes of the civil cover sheet and for our motion to transfer *Walker* to Judge Thompson.

> **(v)    The Panel's concern that we marked *Walker* as related to *Corbitt* simply because we considered Judge Thompson to be a "favorable" judge.**

49.     When we filed *Walker*, I believed two things:  a) that *Walker* was related to *Corbitt*, which was a pending case, for the reasons discussed above, and b) that Judge Thompson would be a favorable judge for the *Walker* case in light of his ruling for the transgender plaintiffs in *Corbitt*.

50.     These beliefs are not inconsistent and can both be true.

### (vi)    The Panel's concern about my candor.

51.     The Panel's Report of Inquiry includes a footnote that reads: "To be clear, however, *Walker* counsel's candor on the whole is concerning. For example, Esseks's testimony that, 'based on [his] understanding of what related means,' he would have marked *Corbitt* as related to *Walker*, even if that case had been assigned to a judge that had previously ruled against them, strains credulity, particularly considering the extent of counsel's efforts to steer *Walker* to Judge Thompson. (Aug. 3, 2022 Hr'g Tr. at 188–89)." Report at 18 n.3. The panel cited no conflicting testimony from me or anyone else in support of its view that I was not candid in my testimony, and there was no conflicting testimony.

52.     I testified honestly at the August 3, 2022 hearing in response to the Panel's questions. I think what struck the Panel as not credible was the idea that, as a lawyer representing a plaintiff bringing a transgender-rights case in the Middle District of Alabama, I would have marked the case as related to *Corbitt* if the *Corbitt* judge had ruled against the plaintiff.

53.     If the *Corbitt* judge had ruled against the transgender plaintiff in that case, I would not have filed *Walker* in the Middle District of Alabama at all. I would have been very concerned that I would have to mark *Walker* as related to *Corbitt*; that I would be reprimanded if I did not do so; and that even if I didn't do so, the court would have assigned *Walker* to the *Corbitt* judge as a related case.

54.     Instead, I would have filed *Walker* in the Northern District of Alabama with the plaintiffs we had, or we would have found plaintiffs who would have been able to sue in the Southern District of Alabama.

55.     The Panel was correct that I would not have chosen to file *Walker* initially knowing that it would be assigned to a judge I considered to be unfavorable. But that does not mean that I would not have marked *Walker* as related to *Corbitt*, it means that I would not have filed *Walker* in the Middle District.  I respectfully submit that my testimony before the Panel was truthful.

**(b)     (2) *Walker* counsel contacting the chambers of Judge Thompson (who was never assigned to *Walker*) to directly and indirectly influence or manipulate assignments away from Chief Judge Marks to Judge Thompson.**

56.     As discussed above, I believed that once we marked *Walker* as related to *Corbitt* on the civil cover sheet, the clerk's office would send the complaint to Judge Thompson for him to decide whether he agreed the two cases were related.

57.     We filed *Walker* on the evening of April 11, 2022, and the clerk's office processed the complaint on the morning of April 12, 2022. That morning, the docket

did not reflect a judge assignment or case number. This did not seem strange to me because it was consistent with my understanding that the assignment of a judge would happen after the related case judge decided whether to accept *Walker* as related or instead rejected the assignment, returning the case to the wheel for random assignment.

### (i)   Calling Judge Thompson's chambers.

58.   On April 12, the Middle District of Alabama clerk's office informed *Walker* Counsel that *Walker* would be expedited because the complaint requested a temporary restraining order. One of the lawyers on our team reported this information, but I did not understand what the clerk's office meant by the case being expedited at that point, before we had filed a motion for preliminary injunctive relief. Since I believed that the complaint had been sent to Judge Thompson for his initial review of the related case designation, I suggested that a member of the *Walker* team call Judge Thompson's clerk to alert the Court that plaintiffs would be filing a motion for a temporary restraining order and/or preliminary injunction shortly. Carl Charles volunteered to do so. I wanted the Court to know our motion was coming so that the Court would wait for that motion before scheduling a hearing or setting a briefing schedule based solely on the recital in the complaint that we sought preliminary relief.

59.     In a later conversation on April 12, after Mr. Charles had already spoken to Judge Thompson's chambers, a different member of the *Walker* team learned from the clerk's office that we needed to file a motion to reassign the case to Judge Thompson as a related case, and that simply checking the related case box on the civil cover sheet did not result in the case being sent to Judge Thompson for a determination of whether it was related to *Corbitt*, as I had believed.

60.     After Mr. Charles had already spoken to Judge Thompson's chambers, and after *Walker* counsel learned from the M.D. Alabama clerk's office about the need to file a motion to transfer, I learned that *Walker* had been assigned to Chief Judge Marks.

61.     When I asked Mr. Charles to call Judge Thompson's chambers, I believed that the clerk's office had already sent the complaint and civil cover sheet to Judge Thompson for him to decide whether the case was related to *Corbitt*. I did not think that our call to chambers would be the first his chambers heard of the *Walker* case. I asked Mr. Charles to make the call to notify Judge Thompson's chambers of a scheduling issue, not to influence the judge to take the case.

> **(ii)     Trying to manipulate assignments away from Chief Judge Marks to Judge Thompson.**

62.     The Panel concluded that I and others on the *Walker* team tried to influence or manipulate assignments away from Chief Judge Marks to Judge Thompson. As set forth above, I believed that the clerk's office was going to send

the complaint to Judge Thompson's chambers and that he was going to decide whether to accept the related case designation. Asking Mr. Charles to call Judge Thompson's chambers in those circumstances was proper, in my view. All he was doing was flagging for Judge Thompson that we were about to file a motion for a PI and TRO. It remained up to the judge to decide whether to accept the related case designation.

63.    But my understanding of the related case assignment process was mistaken, and in fact we learned from the Clerk's Office that Chief Judge Marks would decide whether to transfer the case, in response to our motion to transfer. Given that, I do not see how either our marking of *Walker* as related to *Corbitt* on the civil cover sheet or Mr. Charles's call to Judge Thompson's chambers to tell him we were filing a motion for a preliminary injunction constitute efforts to manipulate the assignment process. The reality here is that I didn't understand the assignment process, not that I was trying an end-run around it. Even if I had tried such an end-run, it was necessarily bound to be unsuccessful because nothing we did or could have done would have changed how the process worked or who would make the related case determination. With respect, I was not trying to manipulate the system; I simply misunderstood the process.

### (iii)   Not calling Chief Judge Mark's chambers.

64.   The Panel found it significant that, while the *Walker* team called Judge Thompson's chambers in the late morning to alert them about the fact that we planned to file a PI and TRO motion later that day, we did not call Chief Judge Marks's chambers to similarly inform them once we learned that the case had been assigned to her.

65.   The reason we didn't call Chief Judge Marks's chambers was two-fold. First, my team had a bandwidth issue that afternoon. My team was already working on finalizing the motion for a PI and TRO for filing that afternoon, which involved declarations from experts and a brief and had demanded significant attention from the team for the prior week. In addition, we had just learned that we needed to file a motion explaining why *Walker* was related to *Corbitt*, which was not a motion we had known we needed to file. I had to detail some of the legal team to draft that motion, and we got it drafted, edited, cite-checked, proofread, and filed late that afternoon. That meant that we were even more short-staffed than we had been just that morning.

66.   Second, I had just learned that we had fundamentally misunderstood how the related case assignment process worked in the Middle District of Alabama, and I was not sure what else about local practice we were ignorant about or were getting wrong. That was profoundly unsettling to me.

67.     Between the unexpected extra work that my team faced and the sudden uncertainty I was feeling about my footing in the Middle District, I was distracted and did not think to have someone call Chief Judge Marks's chambers with a heads-up that we were about to file a motion for a PI and TRO.

68.     The panel appears to have been convinced that the disparity is evidence that we were improperly trying to influence Judge Thompson to take the case. Instead, the disparity reflects the added work and increased uncertainty that I and my team were facing that afternoon. I didn't ask Mr. Charles or anyone else to call Chief Judge Marks's chambers simply because I was overwhelmed and unsettled.

### (c)     *(3) Walker counsel attempting to persuade Ladinsky counsel to transfer the latter case to the Middle District to be before Judge Thompson.*

69.     I was surprised to see this finding of misconduct in the Panel's Report of Inquiry because I had no notice that this was an issue that concerned the Panel. I did not address this issue in my initial declaration submitted to the Panel because the Panel did not identify this issue as one that respondents were to address. The panel did not question me about this concern during my testimony on August 3, 2022. I did not know what, if anything, other respondents had said about this topic in their declarations because I had not been allowed to see those declarations in advance of submitting my initial declaration or testifying. I am glad to have the opportunity to address this concern now.

70.     An April 13, 2022 video conference call between some lawyers from the *Walker* team and some from the *Ladinsky* team appears to be the focus of preliminary misconduct finding #3. I do not understand how what we discussed on that call could be attempted manipulation of the random case assignment procedures (or any other kind of misconduct) regardless of whether the Court credits my recollection of the video conference in question, or that of *Ladinsky* lawyers.

71.     As we were preparing our response to Chief Judge Marks's Order to Show Cause why *Walker* should not be transferred to the Northern District, it became clear that one of the arguments we would make was that the first-filed rule should not apply here because *Walker* was materially further along than *Ladinsky* because we had filed our motion for a PI and TRO, while they had not. That difference was particularly meaningful here, we were going to argue, in light of the fact that the new law would go into effect 30 days after signing, with time already passing.

72.     This argument was a version of "our case is better than yours," and I was concerned about how that would be received by the *Ladinsky* team, especially given the history of tensions between some of the non-profit organizations on the two competing teams. I wanted to ensure that the *Ladinsky* team heard this argument first from us, as opposed to simply reading it in our papers, so I asked for a call with the *Ladinsky* team on the evening of Wednesday, April 13, 2022.  My goal for the

call was to explain that we were trying to keep *Walker* in the Middle District, separate from *Ladinsky*, and to flag that this argument was part of how we hoped to do that. This was the first time I spoke to anyone on the *Ladinsky* team about either the *Walker* or *Ladinsky* litigation.

73.     Asaf Orr, one of the counsel in *Ladinsky*, testified before the Panel about his memory of this call. He said that "the *Walker* team indicated that their plan was to respond to Chief Judge Marks' order and indicate that in the interest of judicial efficiency, it would be most appropriate for the *Ladinsky* case to be transferred down to the Middle District and have both cases before Judge Thompson, consistent with their motion to relate *Walker* to *[Corbitt]*." Nov. 3, 2022 Hr'g Tr. at 24:16–22. He also testified that "the call ended with the Walker team essentially indicating that, you know, their plan at that point was to still proceed as they had indicated they would, meaning that they would respond to the show cause order by requesting that both *Ladinsky* and *Walker* be transferred to Judge Thompson." Nov. 3, 2022 Hr'g Tr. at 25:4–9.

74.     Michael Shortnacy, another counsel in *Ladinsky*, testified that the ACLU, on the April 13, 2022 call,[2] discussed "whether *Ladinsky* and *Walker* should both be consolidated before Judge Thompson." Shortnacy Decl. 7/27/2022 at ¶ 8.b.

---

[2]     In the Report of Inquiry at 25-26, the Panel states that Mr. Shortnacy testified that a separate call took place on April 13, 2022, that included Mr. Shortnacy, me, Mr. Charles, Mr. Orr, and Ms. Eagan. That call must be the same call that I have described above. I do not remember

75.     The recollections of Mr. Orr and Mr. Shortnacy are not how I remember the call. I wasn't trying to get their case moved to the Middle District. I didn't want the cases together at all, because of the serious challenges that I foresaw with these two very large teams needing to work together.

76.     I am unsure of how Mr. Orr and Mr. Shortnacy came to their understanding of the phone call between our two teams on April 13. My memory is that my purpose for the video call with the *Ladinsky* team was to inform them of our intended response to the Order to Show Cause from Chief Judge Marks. It was not to coordinate with them to have the cases consolidated in the Middle District. Even if I made comments that being in front of Judge Thompson would have been good for either or both cases, I did not intend to suggest to *Ladinsky* Counsel that they make any effort to move to the Middle District. Regardless, neither team took any actions after that video call to try to stay in or get transferred to the Middle District.

77.     Diego Soto, one of the counsel to plaintiffs in *Ladinsky*, was also present for this video conference on April 13, 2022. In his declaration, Mr. Soto states that "I learned [on the call] that the *Walker* team planned to argue, in response to Chief Judge Marks's show cause order, that *Ladinsky* <u>could</u> be transferred to the Middle District and consolidated with *Walker* before Judge Thompson." *In re*

---

whether Mr. Shortnacy was on the April 13, 2022 call described above, but I am sure that I was not on a second call with anyone from *Ladinsky* Counsel that day.

*Vague*, 22-mc-03977 (M.D. Ala.), Declaration of Diego Soto, July 26, 2022, ¶ 8 (emphasis added).  Mr. Soto's testimony is thus consistent with what I think may have happened on the call, *i.e.* that I talked about how *Ladinsky* <u>could</u> be transferred to the Middle District, not that it <u>should</u> be transferred.

78.     In any event, Mr. Soto made clear later in his declaration that the "*Walker* team thought that it would be ideal for both cases to proceed independently in their separate courthouses." Id. ¶ 14. This is also consistent with my recollection of the call.

79.     Mr. Soto's and my recollection are also consistent with a draft brief I was working on at the time. The *Walker* team began drafting that brief to respond to Chief Judge Marks's Order to Show Cause why *Walker* should not be transferred to the Northern District, but we ended up not filing it because we consented to the transfer. Among the arguments we were considering in the draft brief, we noted that in the event that the Attorney General felt burdened by having to defend two cases in separate districts, that he had the option of moving to have *Ladinsky* transferred to the Middle District to be assigned to the judge who had *Walker*. Given that I was working on the brief at the time that the April 13 call happened, it is possible that I raised this point on the call, though I don't remember doing so. In any event, we did not ask in the draft brief for *Ladinsky* to be transferred and we did not say anything

about what position *Ladinsky* Counsel took on whether *Ladinsky* should stay in the Northern District or be transferred.

80.    Regardless of whose memory of that call is more accurate, I do not believe that this call constitutes communication about to whom the cases would be assigned that is improper in any way, or that it constitutes manipulation of the random case assignment process. In light of the fact that we needed to respond to Chief Judge Marks's Order to Show Cause about whether *Walker* should be transferred to the Northern District to be consolidated with *Ladinsky*, I do not believe it was improper for us to talk with the *Ladinsky* team either about the arguments we were making in our brief about transfer (in my version of what happened on that call) or about what the *Ladinsky* team's views were about where they wanted *Ladinsky* to end up (in Mr. Orr's version of what happened).

81.    I spoke with members of the *Ladinsky* team that evening in a good-faith attempt to avoid unnecessary tensions between the teams. In the call that I remember, I was trying to warn the *Ladinsky* team about the arguments we were making since they could have an impact on whether the cases stayed separate.  I was not attempting to manipulate the random case assignment process.

82.    Even if I had been attempting such a manipulation, Chief Judge Marks still had full control over where *Walker* would end up, our arguments in response to her Order to Show Cause would be filed in a public document, and, even assuming

that we and the *Ladinsky* team had agreed that evening that both teams wanted *Ladinsky* to be transferred to the Middle District, that would still have been decided by Chief Judge Marks and/or by a judge in the Northern District, not by us.

83.    Finally, regardless of whose account of the call is correct, our communications that evening did not produce any action by *Ladinsky* Counsel or by the *Walker* team that resisted Chief Judge Marks's proposal that *Walker* be transferred to the Northern District. The following day, the *Walker* team filed our consent to the transfer.

> **(d)**    ***(4) coordinating the dismissal of the Walker and Ladinsky cases after their assignment to Judge Burke, and then making clear that the case would be refiled when commenting to the media about re-filing.***

84.    We coordinated the timing of the dismissal of *Walker* and *Ladinsky*. I believe we had an absolute right to dismiss *Walker* under Rule 41.

### **(i)    Reasons I agreed to dismiss *Walker*.**

85.    Between the time Chief Judge Marks issued her Order to Show Cause on April 13 and the time *Walker* was assigned to Judge Burke in the Northern District of Alabama on April 15, I had grown increasingly concerned about the workability of coordinating decision-making and strategy across the two case teams, which included eight organizations and three law firms. Given the past tensions between some people on my team and some people on the *Ladinsky* team, I was concerned that I would not have been able to delegate the running of the case to my team and

would have needed to stay more involved than I had planned to be as the litigation progressed. At the same time, the *Walker* team had invested significant resources preparing and filing our case, so it took a couple of days to think through whether to change course. We initially decided to move forward and try to make consolidation of the two cases work in the Northern District. I had been weighing in my mind how best to balance these two competing concerns—a desire to be part of the lawsuit on the one hand and the significant challenges of putting the teams together on the other.

86.    On April 15, 2022, I traveled from New York to St. Louis to visit family. During my travels, I received updates from my team about *Walker*. One of the updates was that, when a *Walker* team member reached out to the *Ladinsky* team to set up a call to start talking through how to put the two cases together, a senior member of the *Ladinsky* team responded by saying that she could answer our questions and that a call was a waste of time. I took that as a bad sign about how challenging it would be to merge these two teams into one.

87.    I also received updates from my team that day on the assignment of *Ladinsky* to Judge Burke, and Judge Burke's order setting a status conference for the following Monday.

88.    I am aware that on April 15, the *Walker* team discussed next steps, including the possibility of dismissal. I am also aware that at least one member of

30

the *Walker* team spoke with *Ladinsky* Counsel about dismissal. I was not a part of those conversations, but I did offer input to *Walker* Counsel who were.

89.    I agreed to dismiss *Walker* for several reasons: We needed time and space to explore whether we could reshape the two cases into one case, bridging differences between the two teams in terms of claims, plaintiffs, and expert witnesses, and figuring out a decision-making structure; if the state answered our complaint before we dismissed, our options for dismissal would be much more limited; the unexplained transfer of *Ladinsky* from Judge Axon to Judge Burke to be consolidated with *Walker*; the assignment to Judge Burke; and an additional concern voiced by one of the plaintiff families, which is protected by the attorney-client privilege.

90.    In its Report of Inquiry, the Panel remarked that the "*Ladinsky* team did not share these concerns [about the two teams being able to work together] to the same degree." Report of Inquiry at 34. I do not know what concerns the *Ladinksy* team had about whether and how the two teams would work together. Mr. Minter's declaration and oral testimony do make clear that he felt strongly about maintaining the first-filed status for *Ladinsky* because it would make it more likely that the *Ladinsky* team's framing of the claims would prevail. See *In re Vague*, 22-mc-03977 (M.D. Ala.), Declaration of Shannon Minter, July 26, 2022, ¶ 5 ("I anticipated that our approaches to the case and to the legal issues would diverge significantly from

*Walker*, and I was concerned that we would not have the first chance to shape those issues before the court."); *id.* ¶ 6 ("While I did not relish the prospect of trying to mesh our divergent approaches, I thought that was preferable to having the *Walker* team in the driver's seat, as would have been the case if *Ladinsky* were consolidated with *Walker* rather than the other way around."). Despite the Panel's comment, I read these statements from Mr. Minter as acknowledging that it would be challenging for the two teams to work together. Mr. Minter may not have shared my concerns "to the same degree" that I held them, as the Panel concluded, but his declaration makes clear that he did share the concerns. I agree with Mr. Minter that the two teams' approaches to the framing of the claims were different and that was part of what I feared would be difficult to work through.

91.    I am not saying that concerns over what we had heard about Judge Burke played no part in my decision to dismiss *Walker*; I am saying that the overwhelming concern that got me to the point of agreeing to dismiss the case was my concern that we needed to figure out whether and how these teams could work together.

92.    I acted in good faith when deciding to dismiss *Walker*. My actions were not intended to, and did not in fact, result in us filing a new case challenging SB184 before a different judge. All I did was dismiss a case under Rule 41 and not file another case.

(ii)     **No comment to the media.**

93.     I did not comment to the media about refiling, nor did anyone from the *Walker* team. We did not file a new case.

(e)     *(5) engaging in numerous and wide-ranging discussions about how judges were favorable or unfavorable <u>in the context</u> of deciding whether to dismiss and refile their cases.*

94.     As we were considering whether to dismiss *Walker* on Friday, April 15, 2022, among the issues I discussed within the *Walker* team was what we had heard about Judge Burke. I had no discussions with anyone from the *Ladinsky* team about judges in the context of either them deciding whether to dismiss *Ladinsky* or us deciding whether to dismiss *Walker*.

95.     I believe that the Panel found these conversations to be problematic based on the assumption that they happened in the context of deciding whether to dismiss one case *and file another*.

96.     But I had these conversations in the context of dismissing *Walker*; I did not file a new case challenging SB184.

97.     I respectfully submit that these conversations are not sanctionable judge-shopping because we dismissed our case and did not file a new case. I did not shop for a different judge, I simply dismissed the case.

98.     I understood that Rule 41 permits the plaintiff to dismiss a case for any reason.  As set forth above, a number of concerns led me to conclude that the case

should be dismissed.  Regardless of the reason or reasons, however, I believed that Rule 41 permitted a plaintiff to dismiss a case regardless of the reason, and that is all I did.

   **(f)     (6) suddenly dismissing Walker and Ladinsky after a series of phone conferences in which counsel discussed a number of matters, including their prospects in front of Judge Burke and that he was a bad draw.**

99.   I incorporate my responses in paragraphs 93–97 in the preceding section as a response to this allegation.

   **(g)     (7) even though (as they admit) time was of the essence and their stated goal was to move quickly to enjoin what they viewed as an unconstitutional law, abruptly stopping their pursuit of emergency relief, and deciding to dismiss and refile a case in the Middle District with brand new plaintiffs.**

   **(i)     Stopping our pursuit of emergency relief.**

100.   Time was of the essence. But our two teams had been forced together. That was not our plan. Moving the cases forward, together, without a plan for reconciling the very significant differences between them, would not serve either our clients or the larger trans community that the cases sought to benefit. We had significantly different ideas about what plaintiffs to use, what claims to bring, how to frame those claims, and which expert witnesses to use. Plus, people on each team felt very strongly that their team's framing was better. There was also a history of tensions among some lawyers across the two teams, including especially around strategic differences like the ones we were facing here. And in addition to all of these

challenges, we didn't have a lot of time to work through these differences, given the impending effective date of the statute.

101.   In light of those serious challenges, my view that Friday was that we needed to hit the Rule 41 pause button and take a moment to talk through whether and how to put the two cases and the two litigation teams together, without risking being stuck in the existing case with an unworkable legal team if the state filed an Answer and removed our clients' rights to dismiss under Rule 41.

102.   In this situation as well, I believe that two things can be true at the same time: It was true both that time was of the essence for our clients and that going forward together, with no plan for how we were going to meld the cases and teams, was not going to help our clients and risked hurting them. I believed that the responsible thing was to take the time to determine whether we could re-jigger the plaintiffs, claims, framing, experts, and legal team so that we could advance the clients' interests effectively.

> **(ii)    Filing a new case in the Middle District with brand new plaintiffs.**

103.   The Panel's preliminary finding of misconduct number seven recites, as part of the misconduct, that we "decid[ed] to dismiss and refile a case in the Middle District with brand new plaintiffs." The *Walker* team did not file a new case.

> **(h)    *(8) Ladinsky counsel's over-the-weekend decision to file Eknes-Tucker in the Middle District, even though the plan for years had been to file suit in the Northern District.***

104.   I was not counsel in *Ladinksy* or *Eknes-Tucker*.

**(i)   (9) Ladinsky counsel's decision to file a new case with new plaintiffs in the Middle District to avoid the appearance of judge shopping and to avoid Judge Burke.**

105.   I was not counsel in *Ladinksy* or *Eknes-Tucker*.

**(j)   (10) claiming that the dismissal was because Judge Axon did not explain the reassignment of Ladinsky and Judge Burke set Walker for a status conference in Huntsville on April 18.**

> **(i)   Unexplained reassignment of *Ladinsky* from Judge Axon to Judge Burke.**

106.   I address here the preliminary finding in the Report of Inquiry and the Order's direction regarding the Panel's finding "that it was misconduct for all counsel, including Mr. Esseks, to claim 'that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and [the Court] set *Walker* for a status conference in Huntsville on April 18.'" Order at 14.

107.   As noted above, the unexplained reassignment of *Ladinsky* to Judge Burke, instead of the expected reassignment of *Walker* to Judge Axon, was a significant contributing factor to my agreement to dismiss *Walker*.

108.   There were two procedural developments in the Northern District that I did not understand and that contributed to my agreement to dismiss *Walker*.

109.   One was the assignment of *Walker* to Judge Burke instead of to Judge Axon when it was transferred from the Middle District of Alabama.

110. When Chief Judge Marks ordered that *Walker* be transferred to the Northern District, I believed that *Walker* would be assigned to the same judge that was presiding over *Ladinsky*, the first-filed case. Indeed, in the order that Chief Judge Marks entered on April 15, 2022, she stated: "After evaluating the factors and requirements for a transfer pursuant to 28 U.S.C. § 1404(a), and in light of the first-filed rule, the Court finds that in the interest of justice, this action should be transferred to the Northern District of Alabama where it might have been brought, to which all parties have consented, and where it may be decided with *Ladinsky* to avoid the possibility of conflicting rulings and to conserve judicial resources. This Court makes no finding on the issues of consolidation as the parties in *Ladinsky* are not before this Court." *Walker v. Marshall*, 2:22-cv-00167-ECM-SMD, Dkt. No. 20 (M.D. Ala. April 15, 2022).

111. Instead, *Walker* was assigned to Judge Burke. That was unexpected and confusing for me. At the time, I did not understand why *Walker* had not been assigned directly to Judge Axon.

112. The second procedural development was the transfer of *Ladinsky* directly from Judge Axon to Judge Burke, instead of being sent by Judge Axon back to the Clerk's Office for reassignment. At the time, this transfer was confusing and only added to my growing sense that we did not understand how the federal courts in Alabama worked and that we needed time to regroup.

113.   It makes sense that the transfer was confusing because *Ladinsky* had previously been assigned to three different federal judges (first Judge Manasco, then Magistrate Judge Cornelius, and then Judge Axon) by the Clerk's Office on a random basis. When first Judge Manasco and then Judge Cornelius were unable to keep *Ladinsky*, the case was sent back to the Clerk's Office each time for re-assignment. *See Ladinsky v. Ivey*, 2:22-cv-447, Dkt. No. 2 (N.D. Ala. Apr. 11, 2022) (order of recusal by Judge Manasco, directing the "the Clerk to reassign this case to another judge in accordance with the Clerk's normal procedure."); Dkt. No. 3 (N.A. Ala. Apr. 11, 2022) (notice of reassignment by clerk's office to Judge Cornelius); Dkt. No. 11 (N.D. Ala. Apr. 14, 2022) (notice of reassignment by clerk's office to Judge Axon).

114.   In contrast, the transfer of *Ladinsky* from Judge Axon to Judge Burke on April 15, 2022 was not done by the Clerk's Office. *See Ladinsky v. Ivey*, 2:22-cv-447, Dkt. No. 14 (N. D. Ala. Apr. 15, 2022) (text order reading: "In the interest of efficiency and judicial economy, this case is hereby transferred to Judge Liles C. Burke. Signed by Judge Annemarie Carney Axon on 4/15/2022."). Neither I nor anyone else on the *Walker* or *Ladinsky* teams knew at the time why the non-random transfer was made.

115.   Judge Proctor explained during the *In re Vague* hearings how it came to be that *Walker* was assigned to Judge Burke instead of staying with Judge Axon.

He also explained that Judge Axon's trial docket did not allow her sufficient time to attend to a TRO application in *Ladinsky* or *Walker*. I accept those explanations, but I did not know any of that information on April 15, 2022.

116.   The unexplained transfer of *Ladinsky* to Judge Burke, coming as it did after a series of random judge assignments that preceded it and departing as it appeared to do from the first-filed rule, combined with *Walker* not being assigned directly to Judge Axon as the judge with the first-filed case, made me feel once again that our team did not understand how things worked in the federal courts in Alabama and made me want to take a moment to regroup and figure out how and whether to go forward.

117.   My statements to the Panel that this concern was part of the reason I agreed to dismiss *Walker* were truthful.

### (ii)   Status conference set for April 18.

118.   I did not assert that Judge Burke scheduling a status conference for April 18 was a basis for my decision to dismiss *Walker*. *See In re Vague*, 22-mc-03977 (M.D. Ala.), Declaration of James Esseks, July 27, 2022, ¶ 41 (listing other bases for agreeing to dismiss *Walker*, but not listing the April 18 status conference as one of them).

119.   I know that the April 18 status conference was part of the basis for other *Walker* team members' decisions, and I know that that was a sincerely held concern

for them. I did not share that concern. As I explained in my testimony before the Panel (Aug. 3, 2022 Hr'g Tr. at 205:24–207:10), I was confident that we could have someone present at a status conference that Monday, but I was also sure that we would not be able to show up at the status conference and explain to the judge that we had a plan for how to put the two cases together, in terms of plaintiffs, claims, relief sought, expert witnesses, etc. I felt that we needed to push pause and give ourselves a chance to figure out how to put the two cases and teams together. As the cross-team discussions that Saturday morning confirmed, crafting such a common plan across all eleven entities involved in the two cases proved impossible within the timeframe we had, and given the pressures we all were under.

## IV.    Response regarding misrepresentations and non-disclosures.

120.    The Order directs me to "show cause why [I] should not be sanctioned for misrepresenting or otherwise failing to disclose key facts during the panel's inquiry… ." Order at 13. The Order further states that I "must address any findings in Section IV of the Panel's Report implicating [my] credibility or any discrepancies between [my] own oral and written testimony and the oral and written testimony of all other attorneys who testified before the Panel." *Id.* at 14.

121.    I have reviewed the testimony and declarations submitted before the Panel. In my responses above to the Panel's ten findings of misconduct, I have identified (and responded to) two possible inconsistencies between my testimony

and that of other respondents:  1) the disparate recollections that I and Mr. Soto, on the one hand, and Mr. Orr and Mr. Shortnacy on the other hand, had of the April 13, 2022 video meeting between some members of the *Walker* and *Ladinsky* teams, and 2) the Panel's suggestion that the *Ladinsky* team did not share my concern about the challenges of merging the two litigation teams "to the same degree." I have also responded to the Panel's suggestion that I was not candid in my testimony that I would have marked *Walker* as related to *Corbitt* even if the *Corbitt* judge had ruled against the transgender plaintiffs in *Corbitt*.

122.   I am not aware of other inconsistencies between my testimony and that of other respondents. I am also not aware of any key facts I failed to disclose to the Panel. Because any other alleged misrepresentations or non-disclosures are not set forth in the Report of Inquiry or in the Order, I would need notice from the Court before being in a position to respond further to this part of the Order.

123.   I am aware that the Court is concerned that some respondents have divergent recollections of what Ms. Eagan said during a call among *Ladinsky* Counsel on April 15, 2022. In the Report of Inquiry at 34, the Panel reported that Ms. Hoverman-Terry testified that "Eagan told those on the [April 15, 2022] call 'that there was zero percent chance that Judge Burke would grant our motion if we filed a PI motion before him in this case.'"

124.   I was not on that call. I was not on any call with *Ladinsky* Counsel on April 15, 2022.

## V.   Clarification of prior testimony.

125.   I would like to clarify one aspect of my testimony before the Panel.

126.   The Panel's Report of Inquiry states: "According to Esseks, after the Saturday morning call, members of the *Walker* team discussed whether they should proceed with the *Ladinsky* team in filing a new case. (See Aug. 3 Hearing Tr. at 230-36). They discussed which plaintiffs they might name in a new case, which subset of attorneys should participate, whether to file suit in the Northern District or the Middle District, and, if they were to file in the Northern District, whether they should file suit in the Southern Division or the Northeastern Division. (Aug. 3 Hearing Tr. at 234-36). Esseks admitted that was a judge-based decision. (*Id.*)." Report of Inquiry at 43–44.

127.   The Panel characterizes these discussions as between members of the *Walker* team, but the discussions I was referring to in my testimony about where to file a new case happened during the Saturday morning call among the legal directors from the non-profit organizations. Once that call was finished, it was clear to me that the teams could not join forces efficiently at that time and that one or more organizations needed to step back. All of the discussion for the rest of that Saturday

among the *Walker* team and with my ACLU colleagues was focused on whether to

withdraw, not where a new case might be filed or what it might look like.

128.   Looking back at my testimony before the Panel, I see the following

exchange with Judge Proctor:

> JUDGE PROCTOR: On that Saturday or Sunday, was there ever
> discussion from the Walker team, the Ladinsky team, or both about
> what a new lawsuit would look like? Where and who?
>
> MR. ESSEKS: There was a little discussion of that on Saturday. We
> did not get very far.

Aug. 3, 2022 Hr'g Tr. at 234:15–19.

129.   I now see that my answer to the question was imprecise. When I said

that "there was a little discussion of that on Saturday," I was referring to the Saturday

morning conversation with the legal directors of the non-profits. And my statement

that "We did not get very far" referred to the legal directors, not the *Walker* team. In

the moment, I believed that my testimony was clear that I was referring only to the

legal director discussions. Seeing the transcript, I understand how my testimony

could be seen as ambiguous.

## VI.   **Response to the alleged breach of attorney-client duties.**

130.   The reason that all the plaintiffs in *Walker* brought the litigation was to

preserve access to health care for the transgender minor plaintiffs and for other

transgender adolescents in Alabama.

131. Sometime after April 15, 2022, I learned from someone on the *Walker* team that team members had spoken with our clients in the *Walker* matter about the dismissal of the complaint, and that the clients had approved of the dismissal, but that we had not spoken with the clients about the dismissal before filing it in court.

132. I do not believe that I violated any ethical rules by dismissing *Walker* prior to getting specific consent from our clients because, as their counsel, I and my team had the authority to determine how best to advance their objectives and because the Rule 41 dismissal left the clients in the position they would otherwise have been in had they never filed *Walker* in the first place.

133. I believe that it is best practice to talk with the client about dismissing a case before doing so, even when the dismissal is without prejudice, and I had assumed that someone on our team would speak with the clients before we dismissed the complaint in this case. I am often not involved in the discussions with clients in our cases and was not involved directly with either of the named plaintiff families here. In addition, on April 15, 2022, I had taken time off and was with family in St. Louis and was not involved in any aspect of the mechanics of dismissing *Walker*.

134. It is my understanding that neither Rule 11 nor the rules of professional conduct applicable in the Northern and Middle Districts of Alabama require a lawyer to "seek or secure [a] client's consent" before dismissing a case without prejudice under Rule 41.

135.   I believed that it was in the best interests of our clients to dismiss the complaint under Rule 41 because doing so avoided some potential harm while preserving the clients' rights to sue over SB184.

136.   Dismissal avoided potential harm because, if the Attorney General filed an answer before we dismissed under Rule 41, the clients' ability to dismiss the case as of right would terminate and they might end up stuck pursuing a case with a group of counsel that was not working well together.

137.   Dismissal preserved the clients' rights to sue because a dismissal under Rule 41 puts the clients in the same position they would have been in had they never filed the complaint in the first place. It is true that dismissing would make it more challenging to get a ruling on a TRO or preliminary injunction prior to the effective date of the new statute, but I believed it would still be possible to get such a motion before a judge in time for a ruling on such a motion, after the legal teams had a chance to sort out whether we could work together. Indeed, the *Eknes-Tucker* team managed to get such a motion on file before Judge Burke, who ruled on it prior to the effective date.

138.   From other *Walker* team members, I understand that members of the *Walker* team had been in regular contact with our clients during the months leading up to filing the *Walker* complaint and that, after SB184 was signed into law on April

8, 2022, team members were in daily contact with them, sometimes talking multiple times per day, up to and including on April 15, 2022.

139.  I understand that, throughout the week of April 11, 2022, team members were in contact with the clients about the status of *Walker*, including confirming when we had filed the complaint and when we planned to file our motion for a TRO/preliminary injunction. I understand that team members also updated the clients about what was happening with regard to the judicial assignment and the case being transferred to the Northern District to be consolidated with *Ladinsky*.

140.  I understand that *Walker* team members were in contact with the clients on April 15, 2022, to update them about the assignment of the case to Judge Burke and the forthcoming motion to transfer *Walker* to be with *Ladinsky* before Judge Axon.

141.  I understand that, later that afternoon/evening, after we received notice of the order from Judge Axon transferring *Ladinsky* to Judge Burke, and after we decided to dismiss *Walker*, team members reached out to the clients, telling them we needed to speak with them as soon as possible.

142.  I understand that team members informed the clients of the dismissal shortly following the entry on the *Walker* docket, including that the decision was made quickly because waiting would have risked losing the clients' ability to dismiss the case under Rule 41, and that the dismissal did not impact their ability to bring

their claims again. I understand that team members told the clients we would be in contact with them as soon as possible over the weekend after we had made a decision about what next steps, if any, we might take. After the *Walker* team decided that we would not be filing a new case, I understand that team members contacted the client families and explained that we had decided not to re-file. Team members explained that we understood that there would be a lawsuit challenging SB184 and that the relief that plaintiffs in that lawsuit would seek would cover our clients' families, but that we would not be counsel in that case and would no longer be representing them. I understand that team members explained that the clients could seek out new legal counsel, and file their claims anew, and would be able to do so because the dismissal under Rule 41 was without prejudice.

143.   As our clients were in the same position they had been in four days earlier when we initially filed *Walker*, there was no harm to their claims or their standing to file a new case at a later date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Date: May 8, 2024
New York, New York                    */s/ James D. Esseks*
                                        James D. Esseks

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| **BRIANNA BOE**, *et al.*, | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **Case No. 2:22-cv-0184-LCB** |
| | ) |
| **STEVE MARSHALL**, *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**SUPPLEMENTAL DECLARATION OF CARL S. CHARLES**

I, Carl S. Charles, declare:

1.     I am providing this Supplemental Declaration in response to the May 1, 2024, Supplemental Order to Show Cause, Dkt. No. 481 ("Order"), and pursuant to the Court's grant of this submission on March 18, 2024, Dkt. No. 449 at 7.  The matters stated herein are based upon my personal knowledge and are true and complete to the best of my recollection.

2.     Because responding to the Order requires me to disclose attorney work product and, in some cases, attorney-client protected discussions, I am preserving my objection to the sharing of this information. I further understand that in submitting this information, I am not waiving any privilege protected by the attorney work product, or attorney-client communication doctrines.

3.      I am admitted to practice law in the Commonwealth of Massachusetts, the State of New York, and the State of Georgia.  I have been admitted to the Southern, Northern, and Eastern District Courts of New York, as well as the Second, Fourth, Ninth, and Eleventh Circuit Courts of Appeals.  I have been admitted through *pro hac vice* motions to practice under supervision in several additional federal courts.

4.      I have never had any ethical complaint filed against me, and I have never been denied admission to practice in any court.

5.      Though I am admitted to practice in several federal district courts and circuit courts of appeal, my appearance at the May 20, 2022 hearing was only the second time I had ever physically appeared, and only the third time I had spoken on the record, in any federal court.  Before the May 20, 2022 hearing, I appeared in the District Court for the District of New Jersey, for the limited purpose of arguing a portion of a discovery motion. (*See generally Conforti* v. *St. Joseph's Healthcare System*, *Inc.*, *et al.*, Case No. 2:17-cv-00050-CCC-CLW (DNJ) (Dkt. No. 90-91)). The only other time I had spoken in any federal district court before May 20, 2022, was to argue a client's motion in opposition to a defendant's motion to dismiss in the Spring of 2021. (*Saba* v. *Cuomo, et al.*, Case No.:1:20-cv-05859-LJL(S.D.N.Y.) (Dkt. No. 38)). I did so telephonically before the Honorable Judge Lewis Liman, in the District Court for the Southern District of New York.

6.      To the extent any of my individual actions contributed to the concerns around improper conduct that gave rise to the initial inquiry and now the Order, I sincerely regret that. Creating such concerns was not my intent, nor do I understand that to have been the intent of any *Walker* counsel.  I hope this declaration helps to clarify the relevant facts and circumstances, including the actions taken by me, and by *Walker* counsel, the circumstances of my and their actions, and the rationale for those actions. My hope is that, upon reviewing the totality of the facts, this Court will understand that my conduct and the conduct of *Walker* counsel, did not violate ethical or legal rules regarding attorney conduct.

### *Response to the Order's Allegations Regarding "Judge-Shopping" and Applicable Grounds of Individual and Collective Misconduct as Alleged on pages 51-52 of the Panel's Report*

7.      I have not ever attempted to manipulate, nor ever actually manipulated, the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama in violation of controlling precedent, Rule 11 of the Federal Rules of Civil Procedure, the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, or the Local Rules applicable in those Districts.

**A.** "***Walker counsel marking Walker related to a case closed one year earlier decided by a favorable judge.*" (*In re Vague*, Dkt. 70 at 51(1))**

8.     Lambda Legal became involved in preparing the litigation that was ultimately filed as *Walker v. Marshall*, No. 2:22-cv-00167 (M.D. Ala.) ("*Walker*") in or around early 2020.  I became personally involved in preparing the litigation that ultimately became *Walker* around the same time.

9.     In 2020, the organizations preparing to file litigation were Lambda Legal, the ACLU, and the ACLU of Alabama.  When the Alabama 2020 legislative session closed without passing legislation criminalizing gender-affirming care for individuals under the age of 19, counsel paused all preparations for litigation until the 2021 legislative session.

10.    In 2021, a bill to criminalize certain medical care for transgender individuals under the age of 19 was again introduced in Alabama's legislature. Lambda Legal, the ACLU, and the ACLU of Alabama again began preparing to file litigation if the bill became law.  At this point, the law firm working with the organizations was Cooley LLP ("Cooley").  When the Alabama 2021 legislative session closed without passing the legislation the team planned to challenge, counsel again paused all preparations until the 2022 legislative session.

11.    In 2022, a bill to criminalize gender-affirming care for individuals under the age of 19 was again introduced in the Alabama legislature.  Lambda Legal, the ACLU, and the ACLU of Alabama again began preparing to file litigation.  In March 2022, another legal advocacy organization, the Transgender Law Center

joined our team.  Cooley continued to be the law firm working pro bono with our organizations.  The Governor of Alabama signed SB 184 into law on April 8, 2022.  Our team filed *Walker* on April 11, 2022.

12.     During the two years of preparing and filing the lawsuit, the ACLU and Cooley took the lead on formulating substantive arguments and making strategic decisions.  Lambda Legal provided input as a participating organization.  At all relevant times, I was a mid-level attorney at Lambda Legal.  My primary responsibility was client communication, which included providing clients with updates on matters such as legal theories the team decided to pursue and major strategic decisions that could impact the clients' substantive rights.  I also routinely reported my discussions with the clients to the team to make sure that the team's decisions were aligned with the clients' interests and wishes.  I attended meetings where leaders of the group discussed strategic issues, but I had no authority to make decisions on behalf of Lambda Legal.  When occasionally none of my supervisors at Lambda Legal were present at such meetings, I relayed the discussions to my supervisors to allow them to provide input on behalf of Lambda Legal.

13.     Although I was involved in the discussions, I did not personally make the decision to mark *Walker* as related to *Corbitt v. Taylor*, No. 2:18-cv-00091 (M.D. Ala.) ("*Corbitt*").  In 2020, one of the members of *Walker* counsel proposed the idea of marking the potential new case as related to *Corbitt*.  From these discussions, I

learned that Judge Thompson was presiding over *Corbitt*.  I also learned from other members of the team that, through the *Corbitt* litigation, Judge Thompson had learned about the various aspects and types of medical care that transgender people undergo.

14.     For example, I remember being told that in *Corbitt*, Judge Thompson was presented with evidence about how surgery fits into transition-related care for some transgender people, including an expert report with details about gender-affirming care.  From what I recall, the team expected at the time to present evidence that would cover the same information about this medical care.

15.     In the 2020 Period, the team planned to mark a new case as related to *Corbitt*. During the 2021 and 2022 Periods, the team continued its plan to mark the new case as related to *Corbitt*.

16.     The *Walker* lawsuit included a plan to challenge the law's ban on surgery. Based on the team's discussions, I understood the overlap around the science, facts, and legal arguments about surgery between *Corbitt* and *Walker* made the two cases legally and factually related. *See Vague* Dkt. No. 75 at 171:21-173:5; 148:12-149:4.

17.     I did not personally do the research, but I remember learning that there was no case law in the Middle District, nor any explanation in the local rules of the Middle District, defining the meaning of a "related case" for the purposes of

completing the opening case form. *See Vague* Dkt. No. 75 at 145:1-9. I also learned from team discussions that in the U.S. District Court for the Middle District of Alabama ("Middle District"), marking a case as related to another case in the same district does not mean the same Judge will necessarily be assigned to the new case. Rather, I learned that that Judge would be asked to make an assessment about whether the new case was related to the pending case.

18.     Notably, the team at the time proceeded on an understanding that the clerk's office, upon seeing a related mark, would automatically send the complaint to the judge presiding over the existing case for the relatedness determination. It was not until after I made the call to Judge Thompson's chambers—based on that understanding—that the clerk's office clarified for the team that the case would not be sent to Judge Thompson based on the related case mark on the cover sheet. Sometime later that morning, another member of the *Walker* team spoke with the clerk's office and learned that a motion to transfer would be necessary in order for Thompson to consider whether it should be transferred to him as related to *Corbitt*.

19.     I recall other members of the *Walker* team conducted research and were not able to locate any relevant guidance, in case law or otherwise, on how related case determinations were made in the Middle District, including with respect to when a case was "pending." I understood based on that research that the case law and local rules in the Middle District also contain no information about what

"pending" means for the purposes of marking a new case related to a "pending" case on the civil cover case opening form.

20.     Based on what I understood from other *Walker* team members, the way that other federal district courts make a related case determination is by sending the complaint of the potentially related case to the Judge presiding over the pending case to make a determination of relatedness. I understand the team did not find any information in their research indicating whether or not this was the procedure in the Middle District.

21.     In 2022, I was told that while the *Corbitt* ruling on the parties' cross motions for summary judgment was on appeal to the Eleventh Circuit, there was also a motion for fees pending in the Middle District before Judge Thompson that the parties had agreed to leave open until after the order issued on the appeal.  *See Vague* Dkt. No. 75 at 145:13-23; 147:23-148:11.

22.     Given that the team was not able to find any guidance in the Middle District case law or local rules on marking our new case as related to a case that was on appeal and open on a fees motion in the presiding district court, the team continued with the plan to mark *Walker* as related to *Corbitt.*

23.     The team's research also revealed that *Corbitt* could be remanded to the district court by the Eleventh Circuit because Judge Thompson's ruling on the parties' cross motions for summary judgment only addressed one cause of action.

*See Vague* Dkt. No. 75 at 147:23-148:11. I recall the team determined that such a remand would also represent a pending case for purposes of marking the related box on the opening case form because, again, the team could not find a hint from the Middle District rules or precedent suggesting the contrary.

24.     As discussed in my previous declaration and above, the team did not learn until after filing the complaint, and shortly before filing the motion for preliminary injunction, that in the Middle District, we would need to file a motion requesting to relate *Walker* to *Corbitt*, through filing a motion to transfer *Walker* to Judge Thompson. *Vague* Dkt. No. 80-16, ¶ 66.

25.     *Walker* counsel's good faith belief about the case-relation procedures in the Middle District is not negated by the subjective belief that Judge Thompson's experience presiding over *Corbitt* meant he would be a favorable judge to preside over *Walker*.  From my vantage point, *Walker* counsel both believed that Judge Thompson would be a favorable draw and that proper related-case procedure was followed, in accordance with the research that the team had done. Based on what I observed, I believe the team made the determination based primarily on its understanding of how the procedures worked.

**B.  *"Walker Counsel contacting the chambers of Judge Thompson (who was never assigned to Walker) to directly and indirectly influence or manipulate assignments away from Chief Judge Marks and to Judge Thompson." (In re Vague*, Dkt. 70 at 51(2)).**

26.     At no point during the pendency of *Walker* in the Middle or Northern District Court of Alabama did I contact the chambers of Judge Thompson to "directly or indirectly influence or manipulate assignments away from Chief Judge Marks and to Judge Thompson."

27.     After filing the complaint on April 11, 2022, the *Walker* team planned to file a motion for a preliminary injunction the following day.  On the morning of April 12, 2022, the team received information from the Middle District clerk's office that the *Walker* case was being expedited because the complaint had requested a temporary restraining order.  *Vague* Dkt. No. 80-16, ¶ 72.  Although the case had not received a judge assignment at that point, the team believed, based on its research in the past two years, that the case would initially be in Judge Thompson's chambers for a determination on relatedness.  Again, this belief turned out to be inaccurate, but the team received clarification from the clerk's office only after I had called Judge Thompson's chambers.

28.     As a result of this understanding, the *Walker* team wanted to inform Judge Thompson's chambers that we would be shortly filing a motion for a preliminary injunction in light of the case's apparent expedited status.  That morning, *Walker* team members communicated regarding whether to call Judge Thompson's chambers to inform the clerks that our motion for temporary restraining order/preliminary injunction would be filed that afternoon.  James Esseks asked if

someone from the *Walker* team was available to call Judge Thompson's chambers and convey that information.  I offered to make the call because I did not have a current and time-sensitive task and I wanted to be helpful to the team.

29.     The call I made was not in any way intended, nor could it have actually been to "directly or indirectly influence assignments away from Chief Judge Marks to Judge Thompson," because neither I nor anyone on the *Walker* team knew before the call, at the time I made the call, or indeed until at least 30 minutes after I reported a summary of the call, that the case had been assigned to Chief Judge Marks.  To set the timeline out clearly: between 10am and 10:30am CT, I called Judge Thompson's chambers; at 10:58am CT, I reported the contents of my call back to the team; at 11:34am CT, an ACLU attorney relayed to the team that the case might have been assigned Chief Judge Marks and asked the team to verify; and at 11:38am CT, Kathleen Hartnett of Cooley checked the docket and reported that the case had been assigned to Chief Judge Marks.

30.     As discussed above, I called Judge Thompson's chambers following Mr. Esseks' request, sometime between 10am and 10:30am CT.  During my conversation with Ben Gunning, who I assumed was one of Judge Thompson's clerks, I stated that a case captioned *Walker v. Marshall* had been filed on April 11, that it had been marked as related to *Corbitt*, and that *Walker* counsel expected to file a motion for preliminary injunction shortly that afternoon.  Mr. Gunning asked

for the *Walker* case number. I told him that we had not received a case number, and that it was my understanding that there was no case number to provide because we had a Rule 5.2 motion pending for the minor clients to proceed under pseudonym. I provided Mr. Gunning with the *Corbitt* case number when he asked for it.

31.    I told Mr. Gunning that we wanted to inform Judge Thompson that *Walker* plaintiffs would shortly be filing a motion for a temporary restraining order/preliminary injunction because we had been told that the case was being expedited. I also said that we wanted to make sure Judge Thompson was aware of, and had the opportunity to see, the motion for temporary restraining order/preliminary injunction.  Mr. Gunning repeated back everything I said and told me he would pass along the information.  He also took down my name and phone number.

32.    I reported back to the *Walker* team the contents of my call with Mr. Gunning at around 11am CT. Approximately 30 minutes later, Kathleen Harnett informed the team that someone from the ACLU had checked the docket sheet and it currently reflected that *Walker* had been assigned to Chief Judge Marks.

33.    At the time I made the call to Judge Thompson's chambers, and until approximately 11:30am CT, myself and the rest of *Walker* counsel were not aware that the case had been assigned to Chief Judge Marks.

34.     The Panel's suggestion of misconduct on this point seems to presume that I (or anyone else on the *Walker* team) knew that *Walker* "was never assigned" to Judge Thompson. With no local rule, precedent, or publicly available information to the contrary, we simply could not have known, and in fact did not know, that *Walker* "was never assigned" to Judge Thompson. We reasonably believed that *Walker* would initially be sent to Judge Thompson to determine whether the case was related to *Corbitt* and decide whether he would keep the case assignment.

35.     I did not know at that time, nor did I have any basis to believe, that the *Walker* case would never be assigned to Judge Thompson. I did not know how either the related case assignment or random case assignment process worked in the Middle District, nor in any other federal district court in Alabama, for that matter.

36.     I also did not know at any point before or during the time I made the call to Judge Thompson's chambers that *Walker* had been assigned to Chief Judge Marks.  Had the team known that *Walker* had been assigned to Chief Judge Marks, I am confident that Mr. Esseks would not have asked anyone to contact Judge Thompson's chambers. But, as explained above, the assignment of *Walker* to Chief Judge Marks was not within my or the team's awareness until the time indicated above, approximately an hour or more after I contacted Judge Thompson's chambers.

37.    As soon as the team was aware that the case had been assigned to Chief Judge Marks, we made no further contact with the chambers of Judge Thompson that I am aware of. *See Vague* Dkt. No. 77 at 146:19-24.

38.    Sometime after learning of the assignment of *Walker* to Chief Judge Marks, Adam Katz, a Cooley attorney, spoke to someone in the Middle District's clerk office.  That clerk apparently informed him that *Walker* was in fact assigned to Chief Judge Marks and *Walker* counsel would need to file a motion for the relatedness assessment to occur; it was not sufficient to check the related case box on the case opening form.

39.    That was the first time that we learned of any Middle District process for "related" case assignment consideration. From my view, this was an unintentional misunderstanding of that process.

## C.  *"Walker counsel attempting to persuade Ladinsky counsel to transfer the latter case to the Middle District to be before Judge Thompson." (In re Vague*, **Dkt. 70 at 51 (3).**

40.    At no point during the pendency of *Walker* in the Middle or Northern Federal District Courts of Alabama did I "attempt[] to persuade *Ladinsky* counsel to transfer [their] case to the Middle District to be before Judge Thompson." *Vague* Dkt. No. 70 at 51. The Panel never questioned me about this, nor requested that I submit written testimony on this issue in my previous declaration or any subsequent briefing.  Furthermore, I am not aware of other *Walker* counsel taking this action.

41.     From reviewing the Panel's Report, it appears that this allegation of misconduct refers to the call that took place between *Walker* and *Ladinsky* counsel on April 13, 2022.  *Vague*, Dkt. No. 70 at 23.  It also appears this allegation is based on Mr. Asaf Orr's recollection of what took place on that call and his agreement with Judge Proctor's "summary" of what took place on that call. *See Vague* Dkt. No. 79 at 24:16-25:9; 25:24-26:4.

42.     I attended the April 13th call but did not provide any substantive input, and my recollection of that call does not support a suggestion that I or other *Walker* counsel attempted to persuade *Ladinsky* counsel to transfer their case to the Middle District to be before Judge Thompson. My recollection of that call also does not comport with Mr. Orr's testimony that *Walker* counsel communicated we were going to argue "it would be most appropriate for the *Ladinsky* case to be transferred down to the Middle District," or that the call concluded with *Walker* counsel saying we were going to "respond to the show cause order by requesting that both *Ladinsky* and *Walker* be transferred to Judge Thompson." *See Vague* Dkt. No. 79 at 24:16-22; 25:4-9. Nor does my recollection comport with the suggestion that *Walker* counsel's position was that *Ladinsky* counsel "ought to agree for Ladinsky to be transferred to the Middle District because we are trying to relate our case to Corbett (sic) and have it assigned to Judge Thompson." *Id*. at 25:24-26:4.

43.     I remember that this call was initiated by Mr. Esseks out of professional courtesy, and to acknowledge *Walker* counsel's desire to keep the cases separate because of our current and ongoing concerns about the ability of the two very large and strategically disparate case teams to work together productively. To that effect, I remember that Mr. Esseks explained to *Ladinsky* counsel that in our response to Chief Judge Marks's Order to Show Cause why *Walker* should not be transferred to the Northern District, we planned to argue that because the *Walker* plaintiffs had already filed a motion for preliminary injunction, a deviation from the "first filed rule" was warranted, thus leaving *Walker* in the Middle District.

44.     I do not remember any *Walker* counsel proposing that *Ladinsky* counsel do anything related to our response to the Order to Show Cause from Chief Judge Marks, case transfer, or otherwise. Nor do I remember any *Walker* counsel suggesting that a workable outcome was for *Ladinsky* to be transferred to the Middle District: that was the exact opposite of what the *Walker* team wanted. If, as described in Mr. Orr's recollection, *Ladinsky* counsel was opposed to a transfer, that supported *Walker* counsel's goal as well: to keep the cases separate.

45.     I remember on the call that *Walker* counsel informed *Ladinsky* counsel of a strategic argument we were planning to make that they might not agree with because of the potential it may have had to impact their case. But I never tried to

persuade *Ladinsky* counsel to do anything, nor do I recall any other member of *Walker* counsel attempting to persuade *Ladinsky* counsel to do anything.

**D. "[C]oordinating the dismissal of the Walker and Ladinsky cases after their assignment to Judge Burke, and then making clear that the case would be refiled when commenting to the media about re-filing." (In re Vague, Dkt. 70 at 51 (4)).**

46.     I did not, nor did anyone from the *Walker* team that I am aware of, make any statement to the media about re-filing the *Walker* case following our dismissal on the evening of April 15, 2022.  The Panel's Report incorrectly includes me and the other *Walker* team members in the actions of the *Ladinsky* team in this regard. To be clear, to the extent the *Ladinsky* team shared with the media their intention to re-file their case, this is not an action that I, or anyone else from the *Walker* team took or coordinated, that I am aware of.

47.     *Walker* and *Ladinsky* counsel did not coordinate on the decision to dismiss their respective cases.   While true that the *Walker* counsel coordinated the timing of dismissal with *Ladinsky* counsel, we reached our own decision to dismiss, and *Ladinsky* reached their own decision.   *See Vague* Dkt. No. 80-16, ¶¶ 40-44. After the groups separately reached their own decisions, the teams did coordinate the timing, which was as a result of *Ladinsky* counsel's insistence that *Walker* not have the upper hand with respect to the first-to-file status.  As previously described in my testimony, and the testimony of other *Walker* counsel, there were multiple

reasons why *Walker* counsel decided to dismiss, and we did so independent of *Ladinsky* counsel's decision to dismiss.

48.     Among the reasons that the *Walker* team decided to dismiss our case without prejudice to the clients as permitted under Rule 41 was because the team was doubtful about its ability to work with the *Ladinsky* counsel on a consolidated case. *See Vague* Dkt. No. 75 at 201:3-8; *Vague* Dkt. No. 77 at 162:1-9; *Vague* Dkt. No. 80-16, ¶ 44. The team reasonably believed that the Northern District viewed *Ladinsky* as the first filed case and the eventuality of a consolidated case was inevitable. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. #3). The differences of strategic opinions and approach between *Walker* and *Ladinsky* counsel were significant enough that the *Walker* team did not see a viable path forward for a consolidated case. *See Vague* Dkt. No. 80-16, ¶ 44.

49.     The Panel's Report mentions that the "*Ladinsky* team did not share these concerns [about the 11 separate law firms and non-profits working together cooperatively] to the same degree." *See Vague* Dkt. No. 70 at 34.  As far as I am aware, the Panel did not ask any *Walker* counsel why we had a seemingly higher degree of concern about the ability to work with *Ladinsky* counsel. The explanation for this difference in concern is conveyed by way of analogy: the person in the driver's seat does not worry about the person in the passenger seat steering the car, because the driver has their hands on the wheel.  It follows then that certain members

of *Ladinsky* counsel were not worried about "working with" *Walker* counsel—they had the first filed case and were confident they could use that to steer the litigation in the way they saw fit, and as second-filed passengers, *Walker* counsel could not change that dynamic.  Indeed, the call on April 16, 2022 confirmed precisely these dynamics, and contributed to *Walker* counsel deciding not to refile.  *Vague* Dkt. No. 77 at 54:25-55:4; 86:17-87:12; 203:2-14.

50.     The *Walker* team also chose to dismiss the case without prejudice to the clients as permitted under Rule 41 due to a serious client safety concern, which I discussed *in camera* at the May 20, 2022 hearing and alluded to in my declaration. *Vague* Dkt. No. 77 at 199:9-24; *Vague* Dkt. No. 80-16, ¶ 35.[1] Because of this concern, the team had intentionally planned not to have our case heard in the Northern District.

51.     Another reason to dismiss the case without prejudice as permitted under Rule 41 was because Judge Burke entered a text order at 4:11pm CT/5:11pm ET on the Friday afternoon immediately preceding a weekend of religious holidays, setting a status conference for *Walker* on the following Monday, April 18th in Huntsville, AL. *See Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. #22.  This presented two

---

[1] The Court did not redact this protected attorney client information before it unsealed all of the hearing testimony and declarations in its March 19, 2024 order. (*See Vague*, Dkt. No. 106). As a result, that sensitive and protected information has now been shared publicly, without providing the former clients the opportunity to consider whether or not they wanted to waive such privilege.

significant issues.  First, the scheduling of the status conference meant we had even less time to decide how to proceed given our concerns above. *Supra,* at ¶¶ 45, 47. Because Judge Burke's text order did not explicitly mention or provide instructions for requesting remote attendance,[2] this amplified the team's increasing concern about not having counsel available to reach Huntsville who were sufficiently experienced regarding: 1) federal district court procedure in the Northern District[3] and 2) the subject matter of the complaint and motion for preliminary injunction. *See Vague* Dkt. No. 75 at 170:18-21; *Vague* Dkt. No. 77 at 73:11-19.

52.     Another reason to dismiss the case without prejudice as permitted under Rule 41 was the significant concern that the Alabama State Attorney General's Office would quickly file their answer that same day or over the weekend, eliminating our clients' right to dismiss under Rule 41, and effectively locking them into the consolidated case whether or not they wanted to be in it, or whether it achieved their goals for the litigation.

53.     Another reason to dismiss *Walker* without prejudice as permitted under Rule 41, was the transfer of *Ladinsky* to Judge Burke in the Northeastern Division

---

[2] *See also Vague* Dkt. No. 77 at 126:25-127:8.

[3] Ms. LaTisha Gotell Faulks, who was then the only member of *Walker* counsel admitted to practice in the Northern District of Alabama, was in South Carolina visiting family for the Easter weekend holiday.

of the Northern District.  This was a surprising and confusing development for which none of us had any context or explanation in light of how the team understood the "first filed" rule. *Walker* counsel did not know much about Judge Burke but what the team learned from *Ladinsky* counsel caused us to "fret[] about [our] chances of success before [this] particular judge." *Vague*, Dkt. No. 70 at 50. As we have explained in other briefing, and as the Report acknowledges, "counsel and parties are permitted to have opinions about (and even gauge their likelihood of) success before different judges," and we should not be sanctioned for such common place actions that occur every day in legal services offices across the United States. *Id*.

54.    *Walker* counsel, separate and apart from *Ladinsky* counsel, weighed the options available to our clients with the multiple and competing time-sensitive concerns and a looming case conference on the following Monday morning, along with a possible responsive filing from the Attorney General, which would prohibit our clients from dismissing without prejudice as of right under Rule 41.

55.    While the *Walker* team was aware that *Ladinsky* counsel was considering dismissing without prejudice under Rule 41, I did not know, nor to my knowledge did any *Walker* counsel know, the *Ladinsky* team's reasoning for doing so. I did not, nor did anyone on the *Walker* team that I am aware of, discuss with *Ladinsky* counsel their reasoning for considering, and ultimately dismissing their

case.  I was not aware of each reason that went into the *Ladinsky* decision to dismiss their case.

56.     After *Walker* counsel decided to dismiss and were preparing our notice of dismissal, *Ladinsky* counsel insisted that we file our notice of dismissal first, and they would file theirs afterwards. *Vague*, Dkt. No. 78 at 87:18-20.  Upon reflection, I believe that *Ladinsky* counsel wanted us to file our notice of dismissal first because they were concerned that if they filed their notice first, *Walker* counsel might not voluntarily dismiss and would then be the only case left, and by default the first filed. Absent *Ladinsky* counsel's fear of this scenario, the notices may not have been filed so close in time as they were that Friday evening.

57.     As explained above, there were many reasons that *Walker* counsel contemplated and ultimately opted for dismissal, and our permissible concern about Judge Burke was just one of those many reasons. I do not believe that both groups separately dismissing our cases for many reasons, including our concern about our possible success before this particular Judge, is evidence of misconduct.

### E. "[E]ngaging in numerous and wide-ranging discussions about how judges were favorable or unfavorable in the context of deciding whether to dismiss and refile their cases." (*In re Vague* Dkt. No. 70 at 51 (5)).

58.     I did not participate in "numerous and wide-ranging discussions about how various judges were favorable or unfavorable in the context of deciding whether or not to dismiss" the *Walker* case under Rule 41.

59.     Even out of that context, I had limited discussions—with anyone—about the favorability or unfavorability of judges in the week of April 11, 2022. The only such discussions occurred between Mr. Asaf Orr and myself about which judicial assignments our respective teams had received and what, if anything, *Ladinsky* counsel knew about the various judges.

60.     As the Panel's Report discusses, Mr. Orr contacted me without request or solicitation, and provided me with updates regarding *Ladinsky*'s initial judicial assignment to Judge Anna M. Manasco, who recused herself, then to Magistrate Judge Staci G. Cornelius (to whom Defendants did not accept jurisdiction), and then ultimately to Judge Annemarie Carnie Axon. *See Vague*, Dkt. No. 70 at 5. I did not solicit this information from Mr. Orr, but rather he first reached out to me and Tara Borelli to congratulate us on filing our complaint and to ask which judge was assigned to our case.  In turn, I shared with him that we had not received an assignment, and then informed him once we were assigned to Chief Judge Marks.  I did not know anything about the judges in the Middle or Northern Districts beyond Judge Thompson, but Mr. Orr was working with local co-counsel who regularly practiced in the federal district courts in Alabama and so he knew more about them and conveyed some of that information to me, which I then passed along to *Walker* counsel.

61.     These discussions with Mr. Orr did not take place in the context of deciding whether or not to dismiss *Walker*. Nor did they take place in the context of discussions about whether or not to dismiss *Ladinsky*. I did not, nor did anyone on the *Walker* team that I am aware of, participate in discussions about whether or not to dismiss *Ladinsky*, either with Mr. Orr, or with any other members of the *Ladinsky* counsel team.

62.     I do not recall that *Walker* counsel engaged in numerous or wide-ranging discussions about how various judges were favorable or unfavorable in deciding whether or not to dismiss on that Friday afternoon.  Instead, I remember *Walker* counsel weighed the many time-sensitive reasons, outlined above, that were pointing us towards voluntary dismissal. What the team had heard about Judge Burke was one of many considerations as the minutes ticked by to make a decision. At most, the team did as the Panel understands all lawyers do: we expressed opinions and fretted about our potential success in front of Judge Burke, which the Report states is normal and not worthy of condemnation.  *Id*. at 50. Regardless, however, that was not the crux of our decision to dismiss, nor of our decision not to refile.

63.     I am not aware of anything in any of the Rules cited by the Court that identifies that conversations about publicly available information about federal judges, or decisions to dismiss and not refile litigation, are unethical, or in violation of any oath or duty of a lawyer, or are disfavored judge-shopping. I do not believe

that deciding to dismiss a case randomly assigned to one judge and then not re-filing

that case could be deemed judge-shopping.

**F. "[S]uddenly dismissing Walker and Ladinsky after a series of phone conferences in which counsel discussed a number of matters, including their prospects in front of Judge Burke and that he was a bad draw." (In re Vague Dkt. No. 70 at 51 (6)).**

64.     As discussed above, the discussions and decision to dismiss *Walker* was

separate from any discussions or decisions that the *Ladinsky* team had reached

regarding the dismissal of their own case.

65.     What may have appeared to be a "sudden" dismissal of *Walker* to the

outside eye was a decision reached after considering the myriad and highly time-

sensitive concerns facing our clients on a holiday weekend with a court appearance

looming the following Monday morning and the threat of the Attorney General filing

an answer or other responsive pleading that would prevent our clients from

voluntarily dismissing under Rule 41.

**G. "[E]ven though (as they admit) time was of the essence and their stated goal was to move quickly to enjoin what they viewed as an unconstitutional law, abruptly stopping their pursuit of emergency relief, and deciding to dismiss and refile a case in the Middle District with brand new plaintiffs." (In re Vague Dkt. No. 70 at 51 (7)).**

66.     I did not, nor to my knowledge did anyone on the *Walker* team, "refile

a case in the Middle District with brand new plaintiffs." The Panel includes *Walker*

counsel in with the actions of *Ladinsky* counsel, and without conceding that such

actions by *Ladinsky* counsel amount to misconduct, those are not actions attributable to me or, as far as I am aware, to any *Walker* counsel.

67.     Even though time was of the essence to challenge SB 184, that reality did not preclude the team from dismissing *Walker* without prejudice under Rule 41 in order to evaluate the other reality: 1) whether moving forward and working with *Ladinsky* counsel was feasible, and under what kinds of constraints that would occur and 2) if moving forward under those constraints ("command and control," as the Panel described it) was going to actually serve the clients' interests. I and other *Walker* counsel had serious doubts about both of those considerations being answered in the affirmative.

68.     After we dismissed our case and discussed next steps with the client families on the evening of April 15, 2022, we set about deciding if it was going to be possible to work with *Ladinsky* counsel.  Lambda Legal decided on April 16 or 17 that we would not join *Ladinsky* counsel if they decided to refile, nor would we refile *Walker*. I did not join any new lawsuit as counsel of record challenging SB 184.

### H. Sub-parts 8-9 of In Re Vague, Dkt. 70 at 52.

69.     These references to alleged misconduct refer to actions taken only by *Ladinsky* counsel and therefore are not applicable to me, or to my knowledge, to any *Walker* counsel. I was never counsel in *Ladinsky* or *Eknes-Tucker*.

I.   "*[C]laiming that the dismissal was because Judge Axon did not explain the reassignment of Ladinsky and Judge Burke set Walker for a status conference in Huntsville on April 18*." (*In re Vague* **Dkt. No. 70 at 52 (10)).**

70.   The Order requires that I address the Panel's finding "that it was misconduct for all counsel, including Mr. Charles, to claim 'that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and [the Court] set *Walker* for a status conference in Huntsville on April 18.'" Order at 14. I did not make any statements to the Panel regarding the reasons that *Ladinsky* was dismissed. I was not involved in the *Ladinsky* counsel's discussions about dismissing their case, nor was I involved in the ultimate decision to dismiss that case. As I have discussed above and elsewhere, I was aware that *Ladinsky* counsel decided to dismiss their case and did so on the same evening that *Walker* was dismissed.

71.   One of the main reasons for dismissing *Walker* was because of our confusion about *Ladinsky* being transferred by Judge Axon to Judge Burke, appearing to contravene what we understood to be the "first filed" rule. This transfer directly from one judge to another was confusing because it appeared to contravene my, and other *Walker* counsel's, understanding that when a Judge does not accept a case assignment, it is sent back to the District's Clerk's Office to be "put on the wheel" for random assignment.

72.   I understood that two previous Judges who were assigned to preside over *Ladinsky* could not keep the assignment, or recused, and the case was then sent

back to the Clerk's Office for random reassignment. But then the transfer by Judge Axon to Judge Burke was not done by the Clerk's Office. I did not know, nor did any *Walker* counsel that I am aware of, know why that was done. It was not until the Panel explained the reasons for that transfer during the May 20, 2022 hearing that I, and I believe others, came to understand why it had occurred that way.

73.    All of this occurring over a hectic and stressful week full of what felt like unending work and confusion on this and other fronts underscored for me that we simply did not have the knowledge we needed to be litigating in the Alabama federal courts at that time, and that dismissing quickly under Rule 41 would give us a chance to release the time pressure and thoughtfully determine what our next steps out to be.

74.    This transfer seemed to ensure that *Walker* would be consolidated in the Northeastern Division in the Northern District, where our clients specifically did not wish to be.  Opting to dismiss and not refile, rather than have our clients face an unknown and fraught litigation future, was plainly not judge-shopping or misconduct: it was making a difficult decision as a legal advocate charged with representing the best interest of our clients. I believe this is a common occurrence in federal courts across the United States.

75.    I understood at that time, and it continues to be my understanding now, that Rule 41 permits a litigant to dismiss their case once, for any reason or no reason,

so long as it is done before Defendants have filed a responsive pleading. Accordingly, while we had several pressing reasons for wanting to dismiss *Walker*, it was my understanding that Rule 41 would have permitted our clients to dismiss their case without having to give any reason.

### *Response to the Order's Allegations of Misrepresentation and Non-Disclosure During the Panel's Inquiry*

76.     To my knowledge, I did not misrepresent or fail to disclose key facts during the panel's inquiry "in violation of controlling precedent, Rule 11 of the Federal Rules of Civil Procedure, the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle Districts of Alabama, and their sworn oaths." Order at 14.

77.     Furthermore, without more specific direction from the Court, as explained in *Boe* Dkt. No. 425, I am unaware of any misrepresentations or non-disclosures I am allegedly charged with having committed and which need addressing in response to this part of the Order's allegations. The alleged misrepresentations are not set forth in the Panel Report or in the Order. I would need notice from the Court before being in any position to respond to this part of the Order.

### *Response to the Order's Allegation of Perjury in Judicial Proceedings*

78.     To the extent my lapse of memory at the May 20, 2022 hearing caused confusion for the Panel for parts of the May 20, 2022 hearing and concern for this

Court, I sincerely apologize. It was not my intent. I hope my statements below can help clarify that I did not deliberately mislead the three-judge panel in violation of 18 U.S.C. § 1623 and the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle District and my sworn oath, specifically with respect to my testimony about the phone call I made to Judge Thompson's chambers on April 12, 2022.

79.     In advance of the May 20, 2022 hearing, Lambda Legal retained Mr. Barry Ragsdale as an attorney to represent myself, Tara Borelli, and Sruti Swaminathan. I participated in several calls, led by Mr. Ragsdale, where *Walker* counsel, approximately 21 of us, listened to statements about, and asked questions regarding, what we might expect from the upcoming proceeding. Mr. Ragsdale was, understandably, cautious in telling us that he did not know what to expect, because the Panel's order simply stated that we were to "answer questions." *See Vague* Dkt. No. 1.

80.     Over the course of the following week, the plan for the hearing that emerged was that one senior representative from each organization (the ACLU, Lambda Legal, Transgender Law Center, and Cooley (James Esseks, Tara Borelli, Lynly Eyges, and Kathleen Hartnett, respectively) would be the main "speakers" to the Panel about our work in filing and later dismissing, *Walker*.  As a mid-level

attorney at Lambda Legal without binding decision making power, I did not expect myself to be within this group.

81.     My review of the Panel's initiating order was that it provided no details about what would transpire at the hearing, and as a result, I was unsure what I might need to do to prepare. In trying to understand how to prepare, Mr. Ragsdale told us that he did not anticipate that we would each, individually, be questioned by the Panel. I understood from this advice that I did not need to perform a detailed and thorough review of each email, note, phone call, or action I took during the week of April 11, 2022.

82.     I was therefore surprised when we appeared at the hearing on the morning of May 20, 2022, and were all put under oath and told that we would individually be answering questions, and that we were not allowed to speak with anyone except Mr. Ragsdale about our testimony or what transpired that day.

83.     I immediately realized that I had not done the detailed review of my notes, emails, phone calls or actions during the week of April 11, 2022 that would have prepared me to thoroughly respond to individual questions from the Panel. A long series of events took place over that week, with many moving pieces involving separate discussions. I was not able to piece together a clear picture of what happened during the week with only my memory to assist me. I tried to review some of my emails and notes while I was waiting outside the courtroom to be called in to

testify, but I did not have my laptop and was not able to do much just using my cell phone. As a result, I was not able to review, and did not remember, my call to Judge Thompson's chambers.

84.    I also realized it was also not possible for Mr. Ragsdale to meet with me to help prepare me individually to testify as he was tasked with managing the concerns of all 21 *Walker* counsel, which included his being present in the courtroom when individual attorneys were testifying.

85.    As discussed above, the May 20 hearing was only my third time speaking, and only second time physically appearing, in a federal district court. Adding to my anxiety about being unprepared to testify, due to the ongoing spread of COVID-19 and subsequent variants, I remained extremely cautious about being in public without a mask because my spouse and I are the primary caregivers for his elderly, severely immunocompromised parents, who we had gone to great lengths to protect during each COVID-19 "wave." Out of concern for the safety of my in-laws, I wore a mask during the entire day, including during my testimony, which prevented the Panel from observing my facial expressions. It was with these serious concerns that I appeared before the Panel on May 20, 2022.

86.    When I was called to testify on the afternoon of May 20, the Panel engaged in thrice repeated questioning about whether I had ever "called anyone's chambers about the assignment of the case." *Vague* Dkt. No. 75 at 178:11-179:21,

184:22-185:3, 190:23-191:3.  Though not reflected in the transcript of the hearing, I sometimes took long pauses to think before responding to the Panel's questions, because I was searching my memory to ensure that I was being as truthful as I could despite the fact that I had not prepared to individually testify or to answer direct questions posed to me about every note, email, phone call or action I took during the week of April 11.

87.    Judge Watkins began the line of questioning by first asking "Did you have any contact with the clerk's office about ***who the case was being assigned to***? Did you receive a call or did you make a call?" I responded, "No, Your Honor, I did not make a call. No, Your Honor, I did not receive a call." *Vague*, Dkt. No. 75 at 178:11-15 (emphasis added).  At this time, I did not remember my call to Judge Thompson's chambers, and this question did not refresh my recollection because that call was not about who the case was being assigned to.

88.    Judge Watkins then asked two questions about where I was physically located for *Walker* calls. But then he returned to the line of questioning about my making any calls about the assignment of *Walker*. He asked, "Did you call anyone's chambers ***about the assignment*** of the case?" I replied, "No, Your Honor," and that "I did not make any telephones (sic) calls about this matter on the day we filed[.]" *Vague*, Dkt. No. 75 at 179:10-15 (emphasis added). Judge Watkins then broadened the question by saying "I'm not asking about the day you filed. I guess I'm asking

about any day." I responded, "I do not recall ever calling any chambers with this request, Your Honor, at any point." *Vague*, Dkt. No. 75 at 179:16-21. I still did not recall my call to Judge Thompson's chambers, nor did this question refresh my recollection.

89.    Judge Watkins then moved on to other questions for a time, but returned a third time to ask me about whether or not I had called a judge's chambers "concerning the *Walker* case **_and the assignment of the case to that judge_**." I responded, "That is correct, Your Honor. I did not," because I never called Judge Thompson's chambers **_to discuss the assignment_** of *Walker*, and I was not reminded of having called Judge Thompson's chambers to alert them of our forthcoming TRO. *Vague*, Dkt. No. 75 at 184:22-185:3 (emphasis added).  I also did not recall we had styled our Motion for Preliminary Injunction as a TRO.

90.    The repetitive nature of the Panel's questions, with their focus on whether I had made a call **_to discuss case assignmen_**t "with any law clerk of a judge in the Middle District" was alarming to me. It was clear to me that that the Panel believed that I, or someone else from *Walker* counsel had made such a call. But I never made such a call for that purpose, so I could not remember that I had made any call at all.

91.    I later came to understand that the Panel framed their questions around a copy of the email that Ben Gunning, presumably Judge Thompson's law clerk, had

sent to Judge Thompson summarizing my phone call on April 12, 2022.  The Panel could see from the face of Mr. Gunning's words that the call was about informing chambers of a forthcoming TRO and that I did not say anything about the assignment of *Walker*.

92.    At the time the Panel was asking questions about whether I had made a call about the assignment of *Walker*, they had email evidence that affirmatively showed that case assignment was ***not*** the subject of the phone call.

93.    To suggest, as the Panel did later during my May 20, 2022 hearing testimony, that a call to inform the Judge who we thought was doing the relatedness assessment about a forthcoming TRO "invites a Judge to reach out and grab a case" is, I believe, inaccurate, especially in light of the email evidence describing what took place on the call.   As discussed *supra*, the team decided to alert Judge Thompson of the forthcoming motion for TRO based on the belief, which we learned to be erroneous only sometime after the call, that the clerk's office would send the complaint, marked related to *Corbitt*, to Judge Thompson for him to make a relatedness determination. At most, the Judge being aware that there was a request for immediate relief would only inform her or him that a decision about case assignment should be made soon, but would not suggest to the Judge what that decision should be.

94.     With this line of questioning and its focus on case assignment in mind, I continued to answer the Panel's other questions, asked of me by Judge Proctor, which included the Panel's view of whether *Corbitt* was pending or closed, and the functioning of the JS44 civil cover sheet in the Middle District.

95.     Judge Proctor returned to the question of whether I had made a call but this time, the question had slightly changed. But in my mind, I was so focused on the framing of the initial questions, about a call "to discuss the assignment" of *Walker*, that I missed the changed question.   Judge Proctor asked me, "Are you telling us that you did not call a judge's chambers and speak to a law clerk about the potential for a TRO in the Walker case?" *Vague*, Dkt. No. 75 at 187:4-6.

96.     I was so unprepared to testify individually that I even had to ask Judge Proctor "Could you—I'm not sure I'm understanding your question. When you say potential of a TRO, I'm not sure what you mean." *Id.* at 187:7-9. The acronym "TRO" was unfamiliar to me because I was unfamiliar with TROs in general at this point in my practice—I came across the term for the first time when a member of the *Walker* team was putting together the complaint—and because I had thought of our TRO as a Motion for Preliminary Injunction. Without defining for me what "TRO" actually meant, as it was clear I was not understanding the acronym, Judge Proctor repeated his question. I remember that while I still did not understand what he meant by TRO, I was worried he was still asking about a conversation regarding

"the assignment of the case," which I had not done, and so, thinking of the initial line of questioning with this focus, I said "No, Your Honor." *Id.* at 187:15.

97.     In that moment, as evidenced from my testimony, I simply did not know what Judge Proctor was talking about, and in fact, I did not even remember that we had styled our Motion for Preliminary Injunction as a "temporary restraining order/motion for preliminary injunction." I simply did not recall the details of that filing, nor that I had called Judge Thompson's chambers to alert him to that forthcoming filing.

98.     Judge Proctor quickly moved on to another question about whether our decision to dismiss *Walker* was due in part to Judge Burke's assignment to the case. But shortly thereafter, acknowledging that he was wary of "turning this into a deposition" he returned again to ask me if I had made a call to "a judge's chambers and talk ***to a law clerk about the Walker case***, you would remember that?" *Vague*, Dkt. No. 75 at 190:23-191:1 (emphasis added).

99.     I responded that I was "incredibly certain I would" remember making such a call. *Id.* at 191:2-3. I made this statement again with the idea in mind that the Panel wanted me to admit to something I had not done: calling any judge's chambers ***to discuss the assignment*** of *Walker*. Judge Proctor's present question seemed to be referring to whether I had called *any* judge's chambers in any federal district court in Alabama to "discuss the Walker case." Again, the context I had in mind for these

questions was that the Panel was searching for someone who had interfered with the random case assignment process by "discussing the assignment of the Walker case." And I had done no such thing, nor did I recall calling Judge Thompson's chambers for any reason at all.

100.    Judge Proctor followed this question immediately with a question about what my phone number was, and then a reading of it aloud, to confirm. I answered that it was my phone number. And that was immediately when I realized that I must be forgetting a phone call that I had made to a Judge's clerk during the week of April 11, 2022.  As I explained to the Panel later, I began thinking about why the Panel would have my phone number, if perhaps I had listed it on my application for admission *pro hac vice*. But I thought that was unlikely, so while I continued to answer the Panel's questions, I was also thinking back to the events of the week of April 11, 2022 in as much detail as I could, trying to remember each action I took, each day.

101.    Judge Proctor moved on to another line of questioning and asked me four questions, which I responded to, and which took up less than a full page of testimony transcript (*Vague,* Dkt. No. 75 at 191:4-25), before I asked if I could return and amend my testimony because I had remembered a call that I had made to Judge Thompson's chambers.

102.   Judge Proctor permitted me to return and amend my testimony about the call I had made to Judge Thompson's chambers. I apologized for any impression I gave that I was trying to obfuscate the fact of the call, and stated that was not my intention, that I was trying to be as forthright as possible.

103.   Judge Proctor described my remembering during my testimony as "coming clean," but I did not, and do not presently, agree with that characterization of what was happening. Instead I stated "those moments of pause were me trying to contemplate and remember." *Id.* at 192:16-24.

104.   Judge Proctor said in response that "It's better you did it now than us having to do it for you later." *Id.* at 192:25-193:1. When Judge Proctor made that comment, I assumed that the Panel understood that I had made an honest mistake in my earlier testimony, and I was glad that I was able to correct it so promptly.

105.   Judge Proctor then asked me "Why were you hesitant to tell us that?" *Id*. at 193:3-4. I replied immediately "Oh, your Honor, I was not hesitant at all. I genuinely could not recall the conversation. And then—" *Id*. at 193:5-7. Judge Proctor asked what sparked my recollection, was it the reading of my phone number. I said "My phone number, yes, your Honor. And so I thought—I was replaying—" *Id*. at 193:10-11.  Judge Proctor interrupted, "It seems to me, ***I'm going to be unfair with you***. I'm just telling you what I'm thinking here. This is not—This is Proctor being cards up. The phone number doesn't spark a recollection. The phone number

sparks a realization that I have some information you didn't think I had." *Id.* at 193:12-17 (emphasis added).

106.   The Panel's reading of my testimony arises directly out of Judge Proctor's—in his words, unfair—assumption about my intentions that was unsupported by any of my testimony that afternoon.

107.   And in my response, I rebutted that characterization and stated that the phone number prompted me to search my memory while the Panel continued asking me other questions. *Id.* at 193:18-23.   The Panel having my phone number said to me that I must have made a call that I was forgetting. *Id.* And as I quickly searched my memory again from the events of April 11, 2022, I remembered that I had called Judge Thompson's chambers to alert them to the imminently to be filed the motion for TRO/preliminary injunction, and asked to amend my testimony as soon as I remembered.

108.   Contrary to the Panel's allegation, I genuinely did not initially recall the phone call to Judge Thompson's chambers. *Vague*, Dkt. No. 70 at 20.  This call was not improperly done to manipulate or attempt to manipulate "the assignment" of *Walker*, nor was it done in bad faith, or done in secret.[4] Further, the call was just one of many normal litigation tasks I did during the hectic and stressful week of

---

[4] We openly marked *Walker* as related to *Corbitt* on the civil cover sheet. Indeed, I messaged an email list-serv containing over 30 people from 5 organizations after making the call to Judge Thompson's chambers—there was nothing secret or surreptitious about it.

litigating a major federal lawsuit, which I was not able to recall on the spot without having an opportunity to review the extensive contemporaneous record contained in my emails, notes, and call logs.

109.   Because there was no intention on my part, or on the part of any other *Walker* counsel to hide or misrepresent this call to Judge Thompson's chambers, or later to the Panel during the inquiry, my memory lapse is factually insufficient grounds upon which to base an allegation of willful misleading or meet the much higher standard associated with an allegation of perjury. Indeed, the Panel does not point to any evidence of willful misrepresentation because there is none—it does not exist.

110.   I do not believe that I "deliberately" misled the Panel about my phone call to Judge Thompson's because as soon as I remembered that I had made the phone call I reported it to the Panel while the hearing was still happening. If I had intended to "deliberately mislead" them, I would not have corrected my testimony as soon as I remembered making the phone call.  I also stated on the record during the May 20 hearing that I did not intend to give an impression through my forgetfulness and lack of preparation that I was obfuscating the fact that I had made the call to Thompson's chambers. *Vague*, Dkt. No. 75 at 192:7-12.

111.   I also understand that on May 20, 2022, the Panel declined to tell me or Mr. Ragsdale that they had evidence of the phone call I had made to Judge

Thompson's chambers, along with my name and phone number from my conversation with Ben Gunning on April 12, 2022. I also understand that despite Mr. Ragsdale's repeated requests that the email from Ben Gunning to Judge Thompson of my call be entered into the record, the Panel, did not enter this evidence into the record, or mention it in their Report.  *See generally Vague,* Dkt. No. 70.  Instead, they instead entered findings of fact directly contradicted by the email.

112.   Two years ago, I was a still relatively junior litigator, making only my second physical appearance in any federal district court under intimidating and stressful circumstances for which I was woefully unprepared. *See supra* at ¶ 5. I, like attorneys practicing across the state of Alabama, and indeed in federal courts each day in every state across this country, did not remember every single action I took during a hectic and overwhelming week of litigating in federal court. The Panel failed to consider that reality in its review and Report.

113.   At the August 3, 2022, hearing I explained in detail the call I made to Judge Thompson, which I was able to do after reviewing all of my notes, emails, and phone logs. I testified clearly and with poise because I was prepared to testify with the benefit of my legal counsel.  The testimony at this hearing stands in stark contrast to what occurred at the May 20, 2022 hearing where I was not advised in advance that I would be testifying, was then subjected to high stakes memory test, and where I was not presented with evidence of the subject of the call that the Panel possessed.

114.    Furthermore, I understand that even if this Court erroneously finds that I "deliberately misled the three-judge Panel," there is a technical defense available to me under this statute which bars prosecution.  I understand the technical defense reads that "Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed." 18 U.S.C. § 1623 (d).

115.    At no point during my testimony had it "become manifest" that the inaccuracy of my statements "has been or will be exposed." The Panel said nothing to me regarding that my statements "had been" or "would be exposed." Indeed, I returned to correct my testimony of my own accord and it was only after doing so that Judge Proctor admitted that he was "being unfair," by suggesting that I requested to amend my testimony because I "realiz[ed] [they] had information [I] did not think I had." *Vague*, Dkt. No. 75 at 193.  I disagreed on the record with that suggestion and explained honestly, as I have at every point since I began testifying before the Panel's on May 20, 2022, that I had not reviewed in detail each email, note, phone call or action I took during the most hectic and stressful week of litigation in federal court I have ever experienced.

### *Response to the Order's Allegations of Breach of Attorney-Client Duties*

116.   During the years we had worked with them, our clients had indicated to us that they deferred to us in strategic decision making. Based on this relationship, I understood that *Walker* counsel were entitled to make decisions about the means to achieve our clients' objectives.  Specifically, I understood that we had the authority to dismiss *Walker* as a means to achieving our clients' objectives without seeking and securing their explicit consent. As such, I did not, nor did any *Walker* counsel that I am aware of, breach our ethical or professional duties to our clients.

117.   *Walker* counsel, and particularly I, had a thorough understanding of our clients' objectives, because I had been working with them for more than a year, since early 2021. I understood their objectives to be that the constitutionality of SB 184 be challenged under the legal arguments most likely to prevail and as a result that the law be stopped from going into effect and that irreparable harm to them and their children's health and well-being be avoided.

118.   A smaller group of attorneys from the *Walker* counsel group, which included myself, had been in regular communication with the clients from the time the SB 184 appeared back on the Alabama state legislative calendar in early 2022. This included regular communications during the months leading up to filing our complaint. After SB 184 was signed into law on April 8, 2022, we were in daily contact with the clients, sometimes multiple times per day.

119.   Throughout the week of April 11, 2022, the client contact group was in touch with the clients about the status of *Walker*. This included informing them after the complaint was filed, and when we planned to file the motion for preliminary injunction/TRO. I also remember that during that week, we updated the clients about the judicial assignment and the case being transferred to the Northern District and likely, we thought, consolidated with *Ladinsky*.

120.   The small client contact group was in contact with the clients on April 15, 2022, to update them about the judicial assignment to Judge Burke and the forthcoming motion to transfer to be with *Ladinsky* before Judge Axon.

121.   Later that afternoon and evening, we decided to dismiss *Walker*. The client contact group reached out to the clients immediately after filing the notice, telling them we needed to speak with them as soon as possible.

122.   We informed the clients of the dismissal shortly following the entry on the *Walker* docket, including that the decision was made quickly because waiting would have meant we may have lost the ability to do so under Rule 41 if the Defendants had filed a responsive pleading, which could have occurred at any time. We also explained that dismissal under Rule 41 preserved their ability to bring their claims again in an identical lawsuit. We told them we would be in contact with them as soon as possible over the weekend after we had deliberated and made a decision about what next steps, if any, we might take.

123. Over the weekend, and after each organization deliberated about what to do and shared with the wider *Walker* counsel the decision not to re-file, we contacted the client families and explained that we did not think it would make sense to re-file *Walker*. We explained that we understood that there would likely be a lawsuit challenging SB 184, but that we would not be counsel of record, and would no longer be representing them and their claims. We explained they could seek out new legal counsel, and file their claims anew, and would be able to do so without prejudice because we had dismissed under Rule 41.

124. I understood that we could not make decisions on behalf of the clients that were dispositive of their claims without their explicit consent, but litigation decisions which were not dispositive of the clients' claims, like voluntary dismissal without prejudice under Rule 41, did not require their explicit consent.

125. I believed that the decision to dismiss *Walker* under the totality of the circumstances that I have described throughout this declaration and in other written and verbal testimony was entirely consistent with, and was a means to achieving, our clients' objective that SB 184 be challenged and enjoined.

126. While true that dismissing *Walker* could create some delay in a ruling on a motion for preliminary injunction before the effective date of the law, I was confident that it was still possible to do given the commitment of the advocates

involved. As this Court well knows, the *Eknes-Tucker* plaintiffs were able to secure such a ruling in short order.

127.   As our clients were in the same position as they were four days earlier when we initially filed *Walker*, there was no harm to their claims, or their standing to either re-file at a later date or have their claims brought by another attorney in an entirely new case. Thus, the dismissal of *Walker* under Rule 41 was a means to achieving the clients' objectives that was not dispositive of their claims, which is not a breach of my, or *Walker* counsel's, professional and ethical duties to our clients.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 7, 2024

Atlanta, Georgia

/s/ ___*Carl Charles*_____
        Carl Charles

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| **BRIANNA BOE, et al.,** } | |
| } | |
| *Plaintiffs*, } | |
| } | |
| **and** } | |
| } | |
| **UNITED STATES OF AMERICA,** } | **Case No. 2:22-CV-184-LCB** |
| } | |
| *Plaintiff-Intervenor*, } | |
| } | |
| **v.** } | |
| } | |
| **STEVE MARSHALL, et al.,** } | |
| } | |
| *Defendants*. } | |

<u>**DECLARATION OF LATISHA ("TISH") GOTELL FAULKS**</u>
<u>**IN RESPONSE TO ORDER TO SHOW CAUSE**</u>

I, LaTisha "Tish" Gotell Faulks, declare:

1.      I submit this Declaration in response to the Supplemental Order to Show Cause dated May 1, 2024 (the "Order"), directing me, and several other former members of the legal team that filed the *Walker v. Marshall* (5:22-cv-480) action in the Middle District of Alabama, to show cause why they should not be sanctioned for alleged "misconduct" identified both in the Order, and in the "Final Report of Inquiry" ("Report"). The Report was submitted to this Court following an inquiry by a three-judge Panel, convened by the Chief Judges of the three federal courts in Alabama at the request of this Court (*In re Amie Adelia Vague*, 2:22-mc-3977-

1

WKW, "*Vague*"), to examine whether several dozen attorneys from over ten different organizations collaborated and conspired in improper "judge shopping" in filing lawsuits in the Middle and Northern Districts of Alabama, including *Walker* and *Ladinsky v. Ivey* (5:22-cv-447), challenging the constitutionality of SB 184, an Alabama law that discriminates against transgender Alabama residents by denying them access to healthcare options.

2.     Given that responding to the Order requires me to discuss topics that may relate to attorney work product and attorney-client communications, by submitting this Declaration, I do not intend to waive any work product protection, attorney-client privilege, or any other applicable privilege or protection, and reserve all rights and objections in that regard.

3.     At the time of the filing of *Walker* and during the initial stages of the *Vague* proceeding, I was the Legal Director of the American Civil Liberties Union of Alabama ("ACLU-AL"), which, along with attorneys from the national American Civil Liberties Union (specifically, the ACLU Jon L. Stryker and Slobodan Randjelović LGBTQ & HIV Project) ("ACLU"), Lambda Legal, Transgender Law Center, and the Cooley law firm, filed the *Walker* action in the Middle District of Alabama.

4.     My involvement in the *Vague* proceeding before the Panel was very limited. Along with a large number of attorneys from the *Walker* and *Ladinsky*

actions, I provided brief testimony in response to a short set of questions from the Panel on May 20, 2022, a copy of which I have attached to this Declaration as **Exhibit 1** (which appears on only 11 of the 327 pages of total testimony on May 20, 2022).

5.     On July 8, 2022, the Panel issued an order "to streamline the proceeding" that directed a narrower subset of twenty-one (21) attorneys to submit *in camera* declarations that addressed eight topics. In that order, the Panel did not seek further testimony from me or the other attorney with the ACLU-AL on the *Walker* team, Staff Attorney Kaitlin Welborn, and did not include either of us on the list.

6.     The Panel also did not request or require further testimony from me (or Ms. Welborn) at any additional evidentiary hearings where other attorneys were called to do so, including on August 3 and 4, 2022, and November 3 and 4, 2022. Thus, my testimony was necessarily constrained to the questions put to me during the May 20, 2022 hearing. I did not attend any other proceeding before the Panel, nor was I asked or compelled to further address any additional purported misconduct the Panel considered.

7.     In light of the Panel's decision not to request or require further testimony from me, and because of my very limited overall role in the issues the

Panel investigated, I was stunned to learn that I was included among the Respondents who are now being ordered to show cause why they should not be sanctioned.

8.    Because I have not had prior opportunities to testify about many of the topics covered in the Report, the Order, or the various other orders issued in this matter (nor has anyone from ACLU-AL), I provide herein additional background information about my role in *Walker* specifically, and the ACLU-AL's role generally, in addition to covering the topics that the Panel investigated and that this Court is currently reviewing as best I understand them — even where I had limited or no involvement or have no firsthand knowledge.

**<u>Professional Background</u>**

9.    At all times relevant to this matter, I was an Alabama-based attorney admitted to practice by the Alabama Supreme Court (October 2020), the United States District Courts for the Southern, Northern, and Middle Districts of Alabama (December 2020), and the United States Court of Appeals for the Eleventh Circuit (July 2020).

10.    I also have been admitted to practice in New Jersey and the District of Columbia, before the United States District Courts for the District of New Jersey and the District of Columbia, and the United States Courts of Appeals for the Fourth and DC Circuits.

4

11.     After graduating from Rutgers Law School in 1999, I served as a law clerk to the Honorable Joseph A. Greenaway, Jr. of the United States Court of Appeals for the Third Circuit (retired) while he served on the United States District Court for the District of New Jersey. I also served as a term staff attorney with the Office of Staff Counsel for the United States Court of Appeals for the Fourth Circuit.

12.     I taught Constitutional Law and Civil Rights and Civil Liberties Law as a visiting or assistant law school professor in Texas, North Carolina, and Georgia.

13.     Including service as a student associate at Rutgers Law, I have twenty-seven years of experience as an attorney, law professor, and civil rights advocate.

14.     I have never previously been the subject of a bar investigation or ethical complaint.

**ACLU of Alabama**

15.     I joined ACLU of Alabama in April 2020. Prior to doing so, I was not admitted to practice in Alabama and had not previously practiced in Alabama. I had been living and working in South Carolina and relocated to Alabama for the position. I was admitted to the Alabama Bar in October 2020, prior to which Randall Marshall (the acting Executive Director and former Legal Director of ACLU-AL (now retired)) oversaw my practice.

16.     The ACLU-AL is a civil rights organization dedicated to combatting government interference with the constitutional rights of traditionally marginalized

communities and individuals. The ACLU-AL is also an independent affiliate of the national ACLU. As Legal Director of ACLU-AL, I sought to increase our emphasis on litigation on behalf of transgender individuals in collaboration with the ACLU. It was in that context that ACLU-AL became involved in what eventually became the *Walker* case.

17.     On the *Walker* case, ACLU-AL served in a "local counsel" support role. ACLU-AL did not, for example, take the lead on strategic decisions, such as where to file, who to name as defendants, which claims to pursue, or which plaintiffs to choose, although ACLU-AL and I certainly had input into those matters. ACLU-AL also did not have primary responsibility for drafting pleadings or court filings, such as the complaint or motion papers, or conducting legal or factual research, though myself and ACLU-AL did have input into those matters as well. With respect to the division of labor within ALCU-AL on the *Walker* case, I supervised Ms. Welborn, who managed most day-to-day matters (including liaising with the other organizations on the *Walker* team), and I offered input and strategic guidance, as necessary.

18.     In that capacity as the "local" counsel, I hand-delivered and filed the *Walker* complaint into the Middle District's after-hours drop box on the afternoon of April 11, 2022, and the civil cover sheet was time-stamped "3:04" pm. At the time of filing *Walker*, the United States District Court for the Middle District of Alabama

required new cases to be opened in person (whereas later, the Court began accepting such filings electronically). Before filing the *Walker* complaint, I had never supervised or attempted an in-person filing in the Middle District. Unfortunately, there was an error that the Clerk's Office called me about the following morning, and I returned to the Court the morning of April 12, 2022, to correct the error.

19.    Among the *Walker* team, I was the only attorney physically in the state, admitted in Alabama, and credentialed in the Middle District at the time. In connection with being local counsel, and because I was the only credentialed PACER user in the Middle and Northern Districts on the *Walker* team, the electronic filings in the case were submitted through my account, with ACLU-AL as the lead e-signatory.

**Judge-Shopping**

20.    I understand that the Order as well as the Report focused on alleged "judge-shopping" and several legal and factual topics related thereto, and I have been ordered to show cause why I should not be sanctioned for the same. I address specific categories of "misconduct" from the Panel's Report (at 51–52) below:

*(1) Marking* Walker *as Related to* Corbitt

21.    As Legal Director of ACLU-AL, I appeared on behalf of ACLU-AL among the counsel of record in the *Corbitt v. Taylor* action that was before Judge Myron Thompson in the Middle District of Alabama (No. 2:18-cv-91-MHT).

ACLU-AL appeared as local counsel for *Corbitt*, and I supervised Ms. Welborn, who handled the day-to-day activity on behalf of ACLU-AL. As such, I have some familiarity with the legal and factual issues in that case and with the decision of the *Walker* team to designate *Walker* as "related" to *Corbitt* on the civil cover sheet.

22.     Though I agreed with the decision to so designate on the civil cover sheet, it was not exclusively "my call" or ACLU-AL's call, as we did not solely control strategic direction of this case. I do not remember who made the final call, but to be clear, . I believed it was the right decision at the time I signed and filed the complaint in person on April 11, 2022 (and again on April 12, 2022, due to the filing error discussed above), on behalf of the broader *Walker* team. I still believe it was the right decision today.

23.     In my experience practicing in federal court, *Corbitt* and *Walker* fit my understanding of what makes two cases related: both cases included the same or similar class of plaintiffs (transgender Alabama residents); the same or similar defendants (the State of Alabama and related government enforcement entities); the same or similar legal issues (the constitutionality of state laws that singled-out and targeted transgender Alabama residents for discrimination); and the same or similar factual issues (including nuanced issues around identity and scientific issues around transgender healthcare).

24.     Also, because Judge Thompson spent so much time on those issues in *Corbitt*, in my view he was somewhat of a "subject-matter" expert, and it would be more efficient to have him adjudicate the case. I did consider him a "good draw" because of how well he was able to master the legal and factual issues in *Corbitt*. Certainly, the fact that he ruled in favor of the transgender plaintiffs in *Corbitt* played a factor, but even if that case came out the other way, because of my own involvement in *Corbitt*, I felt I had a duty to err on the side of informing the court of the potential relatedness, rather than not disclosing it.

25.     Having reviewed the local rules and judge-specific rules, I was not aware of any specific guidance on the relatedness designation or process, though I did understand from the civil cover sheet instructions that a related case must be "pending."  I understood that *Corbitt* was pending because, notwithstanding that *Corbitt* was on appeal to the Eleventh Circuit, it would be remanded back to the District Court for further consideration. Irrespective of the fact that *Corbitt* was on appeal to the Eleventh Circuit at the time *Walker* was filed, plaintiffs-appellees in *Corbitt* anticipated additional motion practice in the district court. Accordingly, at the time we filed *Walker* and designated it as related to *Corbitt*, I understood *Corbitt* to be "closed" only in the administrative sense, as further proceedings in the Middle District would follow, regardless of the outcome of the appeal.

### *(2) Calling Thompson's Chambers*

26.     As discussed previously, the *Walker* team designated *Walker* as "related" to *Corbitt*. Although we did not know at the time of filing if the case would be assigned to Judge Thompson, we believed that because *Walker* was marked as related to *Corbitt*, it was Judge Thompson's decision whether to accept the case as related or not. Because we believed it was possible that Judge Thompson might accept *Walker* as related to *Corbitt*, it was discussed and determined among the team that someone should call Judge Thompson's chambers to provide a heads up that *Walker* intended to file for emergent relief within the next 24 hours. I was not the ultimate decision-maker on this issue, but I participated in the discussions, and I agreed with the decision to make the courtesy call to chambers.

27.     Based on my experience both as a litigator and as a law clerk, it is common practice to inform a judge's chambers about incoming filings for emergent relief, particularly (as here) a Motion for a Temporary Restraining Order. Specifically, as a law clerk, I recall being appreciative of parties who provided chambers with advanced notice of such filings given how disruptive urgent filings can be to the normal workflow in chambers.

28.     At no time did I personally call Judge Thompson's chambers to discuss *Walker*. I am aware that Carl Charles made a call to Judge Thompson's chambers specifically to alert a law clerk of our intent to file for emergent relief within the next

24 hours. It is my understanding that Mr. Charles relayed that information to Judge Thompson's chambers and left his contact information with the clerk. I have no firsthand knowledge of what counsel discussed on that call.

29.     I have no firsthand knowledge or awareness of any other phone calls by or on behalf of the *Walker* team with Judge Thompson's chambers.

### *(3) Persuading* Ladinsky *to Transfer to the Middle District*

30.     I understand the Panel focused on a conversation on April 13, 2022, between members of the *Walker* and *Ladinsky* teams. I was not on that call, and I have no personal knowledge of any conversations or discussions regarding the possible transfer of *Ladinsky* to the Middle District of Alabama. If such discussions occurred, I am unaware of and was not involved in any such discussions with counsel for *Walker* or counsel for *Ladinsky* to discuss or persuade *Ladinksy* to transfer to the Middle District for the case to be heard by Judge Thompson or for any other reason.

### *(4) Coordinating Dismissal and Media Comments*

31.     I was not involved in the conversations regarding dismissing *Walker* or *Ladinsky* on April 15, 2022. By way of background, I was in South Carolina for the Easter holiday weekend, driving and arriving on Good Friday (April 15, 2022). I first became aware of Judge Burke's appointment due to an order issued by the Court around 11:20 AM that Friday. At that time, I was out of the office. I next received an ECF notification informing me of Judge Burke's order setting a status conference

for the following Monday morning at 10:00 AM. I recall thinking that as local counsel, I needed to be present, and began looking into traveling on Easter Sunday evening to make it back to Alabama in time for the morning conference in Huntsville. I also reached out to Ms. Welborn to inform her that I was preparing to fly from South Carolina Sunday evening to attend the hearing in person, and I am aware that Ms. Welborn relayed that information to the broader *Walker* team.

32.     However, during that Friday, although I was included in the *Walker* team email discussions that day, I did not actively participate in any discussions about dismissing *Walker*. As stated above, it was Good Friday, and I was out of town celebrating the Easter Holiday with family. In my supervisory capacity, I had previously provided my filing credentials to effectuate any filings the team needed, and I understand that the litigation team entered the dismissal notice on the docket from my account, with ACLU-AL as lead signatory.

33.     I understand the Panel Report also discusses statements made to the media about refiling. To my knowledge, only the *Ladinsky* team made comments to the media about any intention to refile following dismissal. Regardless, I did not make and was not a part of making any statements to the media about the dismissal or any intention to refile, nor was I aware of any plan by anyone on the *Walker* team to make such media comments.

> *(5) Discussing Favorable/Unfavorable Judicial Assignments When Deciding Whether to Dismiss and Refile*

12

34.    As noted above, I was out of the office on Friday, April 15, 2022, and did not personally participate in any meetings about dismissing *Walker*. Although I was included in email discussions regarding the assignment of *Walker* to Judge Burke that day, I did not provide any input into any conversations regarding how judges may be favorable or unfavorable in the context of deciding whether to dismiss and refile *Walker*. In addition to being out of office, as noted above, I was still fairly new to practice in Alabama, and I had little knowledge or experience with judges, particularly in the Northern District where I rarely practiced.

35.    Prior to filing *Walker*, I did suggest to the *Walker* team that Judge Thompson would be a "good draw" given his familiarity with these issues because of his role in overseeing *Corbitt*. However, I did not provide that opinion in the context of any discussion about dismissing or refiling *Walker*.

*(6) Suddenly Dismissing* Walker *After Series of Phone Calls Discussing Judge Burke*

36.    As mentioned above, I was out of the office on Good Friday (April 15, 2022) and did not attend any phone conferences or other meetings discussing the dismissal of *Walker*. As a result, I have no firsthand knowledge about what was discussed during *Walker* team phone calls on Good Friday, April 15, 2022.

*(7) Claiming Time Was of the Essence and Dismissing and Refiling in Middle District*

37.    The Panel's Report states "even though (as they admit) time was of the essence and their stated goal was to move quickly to enjoin what they viewed as an unconstitutional law, abruptly stopping their pursuit of emergency relief, and deciding to dismiss and refile a case in the Middle District with brand new plaintiffs." Because the *Walker* team did not refile, I understand that this part of the Panel's Report does not concern *Walker* counsel.

38.    To the extent this part of the Panel's Report does concern counsel for *Walker*, after *Walker* was dismissed, I understand that conversations took place between and among counsel for both *Walker* and *Ladinsky*. However, I did not take part in those conversations, including any strategy or planning meetings. In addition to being out of the office on Good Friday, in the days leading up to that Friday, I was working on ACLU-AL's ongoing efforts in a voting rights lawsuit (*Allen v. Milligan*), which was taking up most of my time, focus, and energy that week.

39.    I am aware that, ultimately, it was decided that we would not refile *Walker*. I do not have firsthand knowledge about what reasons led to that choice, but my understanding is that among those reasons, our team did not believe that working with the *Ladinsky* team was practicable, but that regardless of whether *Walker* would be refiled or not, the law would not go unchallenged.

### (10) Claiming Dismissal Was Due to Lack of Explanation and Early Monday Status Conference

40.     The Order directs that I address the Panel's finding "that it was misconduct for all counsel, including Ms. Faulks, to claim 'that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and [the Court] set *Walker* for a status conference in Huntsville on April 18.'"

41.     Although I understand that confusion regarding the reassignment of *Ladinsky* and the pending status conference the next business day in Huntsville played a role in the *Walker* team's decision to dismiss *Walker*, I was not directly involved in any discussions regarding whether to dismiss *Walker*, nor have I previously testified to such. To the contrary, when the Panel asked about my involvement in the decision to dismiss *Walker*, I testified that I was not involved. *See* May 20, 2022, Tr. 169:1-3 ("Q: Friday of that week, were you involved in those decisions to drop this case? A: No, Your Honor.").

42.     As stated above, I was away for the Easter holiday weekend and did not join any team phone calls. After Judge Burke's order came in setting a conference for 10:00 AM on Monday morning, I began exploring the logistics of getting to Huntsville for that Monday conference, which would have required that I travel and stay overnight in a hotel on Easter Sunday. However, given the *Walker* team's decision to dismiss, those efforts were unnecessary.

43.     Regardless of the decision to not refile, both my own and ACLU-AL's efforts to support and advocate for transgender Alabamans and their families did not

15

stop with the dismissal of *Walker*. I knew that additional legislation targeting transgender persons was in the works, including legislation related to the use of bathrooms and participation in sports. In the remainder of the time I was with ACLU-AL through August 2023, I devoted considerable effort to meeting with families and advocacy groups across Alabama to discuss the impact of that legislation and strategizing how to support and advocate for transgender rights.

**<u>Client Consent</u>**

44.    The Order requires that I show cause why this Court should not sanction me for failure to seek or secure our clients' consent before dismissing *Walker*.

45.    I did not play an active, decision-making role in the selection of plaintiffs/clients for the *Walker* case, or in collecting information from the named plaintiffs/clients or providing the plaintiffs/clients with updates regarding the litigation. Although I understand that other members of the *Walker* team did consult and communicate with the clients on a regular basis, that was not my role.

46.    I understand that conversations between the *Walker* and *Ladinsky* teams took place that Easter weekend, but I did not participate in them, and I have no firsthand knowledge of them.

47.    I also understand that the *Walker* team, which had a TRO on file and pending at this point, was concerned that delaying a decision on dismissal could cost our clients their right to dismiss the case under Rule 41 before the State of Alabama

defendants filed an answer, and that this played a role in the urgent need to dismiss the case that Friday, before the court conference in the Northern District the following Monday.

48.     Further, I understand that members of the *Walker* team spoke with the clients the Friday evening that *Walker* was dismissed and again over the weekend, but I was not directly involved in those communications. .

49.     It is my understanding that members of the *Walker* team were in contact with the clients at this time and kept them apprised of the various developments that week, such as when *Walker* was transferred to the Northern District. It is also my understanding that our team informed the clients of the decision to dismiss without prejudice, and that they remained in contact with them over the weekend.

50.     Although I was not the direct client contact person, neither I, nor the *Walker* team violated any rules of professional conduct with respect to the allegations in the Order regarding failing to seek or secure client consent for the *Walker* dismissal.

**Misrepresentation and Non-Disclosure**

51.     The Order requires that I "show cause why [I] should not be sanctioned for misrepresenting or otherwise failing to disclose key facts during the Panel's inquiry…."  The Order further states that I must address "any discrepancies between

[my] own oral and written testimony and the oral and written testimony of all other attorneys who testified before the Panel."

52.    As noted above, the Panel did not request or require any written testimony from me. In reviewing my own oral testimony before the Panel, I have no found any misrepresentations or instances in which I withheld information or failed to disclose key facts to the Panel. Moreover, the Order does not identify any such misrepresentation or undisclosed key fact for which I am responsible. Here, as throughout my limited involvement in this matter, I lack sufficient notice of the basis for any such allegation of misconduct as to me specifically.

53.    However, I would offer one clarification regarding my testimony on May 20, 2022: Judge Proctor asked me whether "you would be a decision maker for ACLU of Alabama," to which I responded, "Yes, Your Honor."  I would clarify that although I was the decision maker for my organization, I was not a decision maker for the litigation itself. As discussed, my organization's role was limited to that of local counsel, and we were not in charge of key litigation decisions.

54.    Based on my review of the Report, I also understand that it notes different recollections of participants on a call between and among *Walker* and *Ladinsky* counsel on April 15, 2022. Although I was included in group emails and calendar invites that day, I was out of the office and did not attend that call; nor was I on any other call with *Ladinsky* counsel on April 15, 2022.

55.     I also understand that Ms. Welborn speculated that I was on the April 15, 2022, call. *See* May 20, 2022, Tr. 149:12-17 ("I believe that either Tish or someone from our team relayed some information about what happened" on the April 15th call.). To be clear, I was not on that call, and I can only assume that Ms. Welborn was relaying information she received from someone else on the *Walker* team, as she suggested.

56.     My testimony in this matter was limited to brief questioning before the Panel on May 20, 2022. The Panel asked me several questions and follow ups. I did not seek then, nor do I seek now, to withhold any pertinent information relevant to this matter.

57.     I acted ethically, truthfully, and provided the Panel with accurate and truthful answers to their questions. Because of my limited overall involvement in the events giving rise to his inquiry, there is very little information I can provide about the testimony of others. If any inconsistencies exist in the testimony of others, I do not have any information to speak to that. I can only state that what I have provided is my honest recollection of events, and as a result, I should not be sanctioned on this basis.

58.     I appreciate being given the opportunity at this juncture to explain my role and knowledge of the relevant events, and I thank the Court for its time and attention to my testimony.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 7, 2024

Montgomery, AL

*/s/ LaTisha Gotell Faulks*
LaTisha Gotell Faulks

# EXHIBIT 1

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF ALABAMA
 2     _____

 3                    UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ALABAMA
 4     _____

 5                    UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF ALABAMA
 6     _____

 7

 8     IN RE:  AMIE ADELIA VAGUE,       CASE NO.: 2:22-mc-3977-WKW
       et al.
 9
                              SEALED DOCUMENT
10
                     *  *  *  *  *  *  *  *  *  *  *  *  *
11
                          EVIDENTIARY HEARING
12
                     *  *  *  *  *  *  *  *  *  *  *  *  *
13

14        BEFORE THE HONORABLE W. KEITH WATKINS, UNITED STATES

15     DISTRICT JUDGE, THE HONORABLE R. DAVID PROCTOR, UNITED STATES

16     DISTRICT JUDGE, and THE HONORABLE JEFFREY U. BEAVERSTOCK, UNITED

17     STATES DISTRICT JUDGE, at Montgomery, Alabama, on Friday, May

18     20, 2022, commencing at 9:39 a.m.

19

20                            APPEARANCES

21     APPEARING ON BEHALF OF ACLU, ACLU IN ALABAMA,
       LAMBDA LEGAL, TRANSGENDER LAW CENTER,
22     COOLEY LLP:

23     Mr. Barry Alan Ragsdale
       Attorney at Law
24     DOMINICK FELD HYDE, P.C.
       1130 22nd Street South - Suite 4000
25     Birmingham, Alabama
```

```
 1   it.
 2          MR. RAGSDALE:  I did not.  I'm sorry.
 3          JUDGE PROCTOR:  Okay.  So you would be a decision maker
 4   for ACLU of Alabama; correct?
 5          MS. LATISHA FAULKS:  Yes, Your Honor.
 6          JUDGE PROCTOR:  Thank you.  That's all I need to know.
 7   Appreciate that.
 8          And Mr. Ragsdale, we're having a tough enough time
 9   keeping the score card, so we understand why that could have
10   occurred easily.  No questions about that.
11          All right.  So let's take a five-minute recess, let us
12   discuss the next step, and we will be back in one moment.
13      (Recess was taken from 1:27 p.m. until 1:38 p.m., after
14        which proceedings continued, as follows:)
15          JUDGE PROCTOR:  All right.  Everyone have a seat,
16   please.  All right.  We're going to give you a similar
17   instruction.  In fact, you should understand it's the exact same
18   instruction we gave the lawyers with knowledge but no input.
19   We're going to proceed into some questioning at this point.
20   It's going to be a lawyer at a time.
21          We're going to start with the folks in the Walker case.
22   The rule is invoked, the modified version rule we talked about,
23   and that is if there is anything that is discussed in this
24   courtroom with you in it, you're not to reveal that to anyone
25   who is also under the oath until you're released to do so by the
```

 1   from the courtroom, and we'll let you know when you're excused

 2   from the proceeding.

 3           MR. CHASE STRANGIO:  Thank you, Your Honors.

 4           (Mr. Chase strangio excused.)

 5           JUDGE WATKINS:  I think Ms. Faulks.

 6           (Ms. Latisha Faulks present.)

 7           JUDGE WATKINS:  Hi, Ms. Faulks.

 8           MS. LATISHA FAULKS:  Good afternoon, Your Honor.

 9           JUDGE WATKINS:  Good afternoon.  How long have you been

10   with the ACLU foundation?

11           MS. LATISHA FAULKS:  I joined the ACLU of Alabama in

12   April of 2020.

13           JUDGE WATKINS:  Okay.  Were you with another ACLU

14   branch before then?

15           MS. LATISHA FAULKS:  I was not.

16           JUDGE WATKINS:  Okay.  Were you involved in the

17   discussions about litigation in 2021 had that bill passed?

18           MS. LATISHA FAULKS:  I was tangentially involved.  As

19   the legal director, I oversee all of the litigation that comes

20   through the affiliate.  However, my reproductive rights fellow,

21   Kaitlin Welborn, is usually my lead attorney on reproductive

22   rights and what we call gender justice, which includes the trans

23   litigation docket.

24           JUDGE WATKINS:  All right.  Well, so, let's take it,

25   then, to April the 8th.  She would have been your lead attorney

1   in the filing of the Walker suit in the Middle District of

2   Alabama?

3          MS. LATISHA FAULKS:  That is accurate, Your Honor.

4          JUDGE WATKINS:  Were you involved in any of the

5   meetings and decisions yourself, or did she report to you how

6   decisions were coming?

7          MS. LATISHA FAULKS:  I was participatory in numerous

8   calls.  I cannot say that I attended every call.  If there was a

9   conflict, I believe that it was appropriate that my staff

10   attorney could take those calls and read me in at a later time.

11          JUDGE WATKINS:  All right.  Did you sign the related

12   litigation sheet when it was filed?

13          MS. LATISHA FAULKS:  Yes, Your Honor, I believe that I

14   did.  I believe that my signature is the only wet signature on

15   the documentation in its entirety.

16          JUDGE WATKINS:  And why would not Ms. Welborn have done

17   that?

18          MS. LATISHA FAULKS:  Ms. Welborn is supervised by me.

19   She has just received her admission to practice in the state of

20   Alabama and, indeed, today put in her documents to be admitted

21   to appear in this district.

22          JUDGE WATKINS:  Oh, okay.  All right.  Well, were you

23   involved in the decisions the next Friday -- or Friday of that

24   week -- let's see.  Your case was filed on the 11th.

25          MS. LATISHA FAULKS:  Yes, Your Honor.

```
 1          JUDGE PROCTOR:  Friday of that week, were you involved
 2   in those decisions to drop this case?
 3          MS. LATISHA FAULKS:  No, Your Honor.
 4          JUDGE WATKINS:  All right.  And were you the client
 5   contact for any of these plaintiffs in the Walker case?
 6          MS. LATISHA FAULKS:  No, Your Honor.  I believe that
 7   Kaitlin Welborn would have been the ACLU of Alabama
 8   representative.  And to my knowledge and understanding, she was
 9   primarily responsible for specific plaintiffs, not all of the
10   plaintiffs.
11          JUDGE WATKINS:  Do you know which ones she was
12   responsible for?
13          MS. LATISHA FAULKS:  I do not recall, Your Honor.
14          JUDGE WATKINS:  All right.  When did you hear that
15   there was a plan to dismiss your case on that Friday afternoon?
16          MS. LATISHA FAULKS:  Your Honor, I did not become aware
17   that the case was being considered --
18          JUDGE WATKINS:  You were in South Carolina.
19          MS. LATISHA FAULKS:  Yes, sir, I was.
20          JUDGE WATKINS:  It was Easter weekend.
21          MS. LATISHA FAULKS:  Well, it was Good Friday.  I
22   recall receiving a message or a text message or a phone call
23   from Kaitlin, asking if I had seen the order for the status
24   conference.  I had not because I had been traveling, and then I
25   was with family.
```

```
1          I looked at the order and immediately began trying to
2   figure out how I was going to fly to Huntsville on Easter Sunday
3   to be able to make the conference on that following Monday.  It
4   was -- I don't think that it was several hours, but it was a
5   time period later that I saw come over the ECF that we had
6   voluntarily dismissed the cause of action.
7          JUDGE WATKINS:  Did anyone ever explain to you how that
8   came about so quickly?
9          MS. LATISHA FAULKS:  I was informed that there was an
10  interest and concern with smoothly moving the case forward in
11  light of our being consolidated.  I understood that there would
12  be work over that weekend in an attempt to figure out how we
13  could more smoothly move forward and refile the litigation if
14  that was appropriate.
15         JUDGE WATKINS:  You think it was in the best interest
16  of your clients that that litigation was dropped on that Friday
17  afternoon after only a couple hours of consideration?
18         MS. LATISHA FAULKS:  Your Honor, I don't know.  Part of
19  the reason that I was not more intimately involved in the
20  litigation was because I do not have the subject matter
21  expertise.  And so when I spoke with cocounsel and my colleague
22  from ACLU National, what I understood was that it was less
23  damaging to dismiss while we still had the option under the
24  rules.  Otherwise, we were in danger of moving forward in the
25  litigation with a great deal of potential disagreement and
```

1     animosity between the plaintiff groups.

2            JUDGE WATKINS:  Okay.  Were you aware -- did you

3     yourself call the clerk's office here with respect to this case

4     at any time?

5            MS. LATISHA FAULKS:  I did not call the Court.  I did

6     receive several calls from the Court which I answered as they

7     were coming in.

8            I'm sorry.  Let me correct that.  There is at least one

9     time when the Court called, and I did not recognize the number

10    coming in, and I called back once I heard the voice mail

11    requesting my attention.

12           JUDGE WATKINS:  And what was that about?

13           MS. LATISHA FAULKS:  I was the person responsible for

14    doing the overnight drop filing of our case.  At the time it was

15    my first time filing in the Middle District, and I had neglected

16    to provide a wet signature, as is required under our rules,

17    because we do not provide -- at that time, I think we're getting

18    ready to provide for electronic filing.

19           JUDGE WATKINS:  Okay.  I don't have any other

20    questions.

21           JUDGE PROCTOR:  Regarding the relatedness box checked

22    indicating Corbett was related, did you understand that --

23    what's your understanding of why you designate a case as

24    related?

25           MS. LATISHA FAULKS:  I understood in these

1  circumstances that we were concerned with moving with some

2  degree of speed.  I understand that the science and all of the

3  intricate background of transitioning is very technical.  I also

4  knew that Judge Thompson had previously worked on a case that

5  the ACLU of Alabama brought along with ACLU National, and that

6  he had been steeped in some of that education over the course of

7  that case.

8         JUDGE PROCTOR:  And that was Corbett?

9         MS. LATISHA FAULKS:  Yes, sir, it was.

10         JUDGE PROCTOR:  But in Corbett, the issue was that in

11  order to change your gender on a driver's license, the state's

12  policy was to require some surgical intervention as opposed to

13  other transitioning events; correct?

14         MS. LATISHA FAULKS:  That is my understanding.  Yes,

15  Your Honor.

16         JUDGE PROCTOR:  And Corbett didn't involve the

17  technical aspects of surgery, but, rather, whether there was

18  surgery and the fact that Alabama required there to be a

19  surgical event that changed gender.

20         MS. LATISHA FAULKS:  Well, Your Honor, as I understand,

21  part of the record that we created in that case was to immerse

22  the Court in an understanding of the physiological changes that

23  one goes through in the transition process so that he would be

24  familiar with the different range of things that someone might

25  do in the process of their transition, depending upon their

1　economic resources, their access to medical support and

2　assistance, their age, et cetera.

3　　　　　　JUDGE PROCTOR:  All right.

4　　　　　　MS. LATISHA FAULKS:  For a lay person, that knowledge

5　and information is not intuitive.

6　　　　　　JUDGE PROCTOR:  All right.  So would it be fair -- and

7　I'm not trying to put words in your mouth, I'm just trying to

8　get this categorized -- that your side viewed Judge Thompson as

9　a subject matter expert that could more expeditiously move

10　through some of those issues that were going to have to be

11　litigated in the case?

12　　　　　　MS. LATISHA FAULKS:  That was the advice that I

13　understood from my predecessor, and that was, in fact, the

14　advice that I gave to the litigation team in 2021 when we were

15　going through the process of bringing back the preparation that

16　had occurred the year prior about which I had very little

17　knowledge other than what was passed on to me.

18　　　　　　JUDGE PROCTOR:  And in 2021, though -- it was early

19　2021 when Corbett was still active and closed at some point; is

20　that correct?

21　　　　　　MS. LATISHA FAULKS:  Well, Your Honor, as I recall,

22　first, Corbett is on the gender justice docket, so that would

23　have been a case that I was supervising Kaitlin and her work on.

24　We also had a change in the staffing of that case.  The attorney

25　who at the time that we started the litigation was with ACLU

1   National moved to a different organization but remained on the

2   record.  I also understood that if we prevailed in the Eleventh

3   Circuit appeal, we would go back to the district court and

4   potentially seek some clarification of some technical issues,

5   and we would be filing for attorneys' fees.  So although the

6   case was closed, my understanding was that there was still

7   potentially an opportunity for us to have to appear before Judge

8   Thompson, or if he was no longer on the bench, whoever had been

9   designated to take over that particular case.

10          JUDGE PROCTOR:  Let me ask you two questions that are

11   just straightforward.  Any discussions that you're aware of on

12   your team or with the Ladinsky team -- or anyone else, for that

13   matter -- as to reasons other than subject matter expertise you

14   may want to draw Judge Thompson?

15          MS. LATISHA FAULKS:  Your Honor, I will tell you

16   candidly that for the ACLU, we are always thrilled when we

17   discover that a case has been assigned to Judge Thompson.  We

18   find him to be a jurist whose philosophy is consistent with many

19   of the cases we opt to bring.  However, as we were going through

20   this process of discussion, as I understood it, the concern was

21   having a jurist who would be knowledgeable and understanding

22   about the science that we were discussing.

23          JUDGE PROCTOR:  All right.  Fair enough.

24          And then the other side of the spectrum is this:  Any

25   discussions about a jurist you didn't want to draw here or in

1  the Northern District of Alabama that you were a party to or

2  aware of?

3         MS. LATISHA FAULKS:  Your Honor, as I understand and as

4  I recall, my primary focus was getting the case before Judge

5  Thompson, with the understanding that he was on senior status,

6  that he may actually stop taking cases at some point, although I

7  had not heard gossip as to when.  I am not familiar enough with

8  the broader judiciary here in Alabama to have made any

9  recommendation.

10         JUDGE PROCTOR:  I'm not asking you recommendations.

11  I'm asking if you're aware of any such discussions or

12  information about people being concerned about a jurist in the

13  state.

14         MS. LATISHA FAULKS:  I am.

15         JUDGE PROCTOR:  You are.

16         MS. LATISHA FAULKS:  I am.

17         JUDGE PROCTOR:  All right.  What is that?

18         MS. LATISHA FAULKS:  As we were finding out we were

19  assigned to Judge Marks, the question was, is Judge Marks a good

20  judge for us or a bad judge?  I know that as we were watching

21  and listening to what was occurring in the Northern District

22  with the Ladinsky litigation, we were trying to dig up and find

23  out information, good, bad, or otherwise, as to each jurist

24  about whom we became aware.

25         JUDGE PROCTOR:  Scouting reports on the judges in the

```
 1   Northern District.
 2           MS. LATISHA FAULKS:  That's it.
 3           JUDGE PROCTOR:  Okay.  And was there any discussion
 4   you're aware of or participated in, either way, about efforts to
 5   avoid a judge in the Northern District?
 6           MS. LATISHA FAULKS:  No, Your Honor.
 7           JUDGE PROCTOR:  All right.  Thank you.  Anything
 8   further?  Thank you so much.
 9           MR. RAGSDALE:  You don't have to stay here, but you
10   can't go home.
11           JUDGE PROCTOR:  That's right.  We're going to excuse
12   you from the courtroom but not from the courthouse, just in case
13   we have a follow-up.
14           MR. RAGSDALE:  Those instructions are making the
15   rounds.
16           JUDGE PROCTOR:  Thank you.
17           (Ms. Latisha Faulks excused.)
18           JUDGE WATKINS:  Carl Charles.
19           (Mr. Carl Charles present.)
20           JUDGE WATKINS:  Good afternoon, Mr. Charles.
21           MR. CARL CHARLES:  Good afternoon, Your Honors.
22           JUDGE WATKINS:  You're a senior attorney with Lambda
23   Legal?
24           MR. CARL CHARLES:  Yes, Your Honor.
25           JUDGE WATKINS:  Where do you reside?  Where do you
```