## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **BRIANNA BOE,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 2:22-cv-0184-LCB** |
| | ) | |
| **STEVE MARSHALL,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

### OBJECTION TO SUPPLEMENTAL ORDERS TO SHOW CAUSE BY JAMES ESSEKS, CARL CHARLES, AND LATISHA FAULKS

Respondent Attorneys **James Esseks, Carl Charles, and LaTisha Faulks** ("these Respondent Attorneys") respectfully submit this response and objection to this Court's Order of April 5, 2024, (Doc. 466) and to the May 1, 2024, individual Supplemental Orders to Show Cause (Docs. 478, 481, and 486), as follows:

### Procedural Background

On April 18, 2022, following the plaintiffs' Notice of Voluntary Dismissal, this Court entered an order in *Walker v. Marshall*, 5:22-cv-480-LCB (N.D. Ala.) observing that "Plaintiffs' course of conduct could give the appearance of judge shopping" and directing that the order be served on the Chief Judges of each of the Districts in Alabama. (*Walker* Doc. 24)

1

On May 10, 2022, a specially convened three judge Panel issued an order summoning thirty-nine attorneys to appear in Montgomery, Alabama for an inquiry into "the issues raised by counsel's actions." (*Vague* Doc. 1). The Panel then conducted five days of closed hearings in which the Respondent Attorneys were questioned under oath by the Panel, culminating on November 4, 2022. At the conclusion of the last hearing, the Panel directed the Respondent Attorneys to file written submissions contingent on the Panel's promise to provide transcripts of the attorneys' testimony. The promised transcripts were not provided by the Panel, so no briefs were submitted.

Instead, eleven months later, on October 3, 2023, the Panel issued a "Final Report of Inquiry" finding "misconduct" on the part of eleven of the attorneys, closing the case, and serving a copy on this Court to "proceed as appropriate" (*Vague* Doc. 70).

The respondent attorneys promptly appealed the Panel's Report to the Eleventh Circuit. (*Vague* Docs. 86, 87 and 92). In response to discussions with this Court following a hearing, the Panel *ex mero motu* entered an order on November 3, 2023, reopening the case, observing that the Report is not a "final decision" and that it "requires further proceedings" before this Court. (*Vague* Doc. 99). The Panel's order transferred the *Vague* miscellaneous proceeding to this Court for "further proceedings" including, but not limited to, "accepting, rejecting, or modifying in

whole or in part the Panel's findings and making additional findings of fact as necessary." (*Id.*). Based on the Panel's reopening of *Vague*, the appeals were dismissed. (*Vague* Docs. 101-103).

On February 21, 2024, this Court entered an Order to Show Cause directed to the eleven attorneys requiring them to show cause "why they should not be sanctioned for the misconduct outlined in the Final Report of Inquiry and detailed further below." (Doc. 406). All eleven respondent attorneys objected to the Court's show cause order on due process grounds. (Docs. 423, 425, 432, 441, 444, and 447).

Following a hearing on March 19, 2024, this Court entered an order on April 5, 2024, addressing the Respondent Attorneys' due process and other objections to the Order to Show Cause and indicating that the Court would "issue new and individualized show-cause orders to all respondents." (Doc. 466).

On May 1, 2024, this Court issued Supplemental Orders to Show Cause to the eleven respondent attorneys and directed that briefs be filed by May 11, 2024, with any submissions in response to the supplemental show cause orders due by May 8, 2024. (Docs. 478-488).

## <u>Argument</u>

The Supplemental Orders to Show Cause ("SOSC") arrive near the end of this process instead of at its outset, when these Respondent Attorneys were entitled to due process notice. The requirements of due process attached at the beginning of

these proceedings before the Panel in May of 2022, not when this Court issued a show cause order almost two years later. The notice provided by the SOSC comes too late in these proceedings to satisfy the requirements of due process. Any notice provided at this point does not cure any due process deficiencies in the proceedings before the Panel.

## I.    Respondents' Due Process Rights Attached at the Commencement of the Panel Proceedings.

In addressing the Respondent Attorneys' initial due process objections to the original show cause order, this Court's April 5, 2024, order observed that any obligation to provide due process and the required notice to the Respondent Attorneys did not apply to proceedings in front of the Panel and only began with this Court's issuance of the Order to Show Cause. (Doc. 466 at 22-23: "For purposes of due process, notice for sanctions begins with a show-cause order …"). These Respondent Attorneys respectfully suggest that this is an incorrect statement of the governing law.

The requirements of due process attached as soon as the Panel compelled thirty-nine respondent attorneys to appear and testify at the May 20, 2022, hearing. That is the unmistakable lesson of the Supreme Court's decision in *In re Ruffalo*, 390 U.S. 554 (1968). In *Ruffalo*, an attorney was charged by a state Disciplinary Committee with twelve counts of misconduct, including solicitation of clients through an agent. An evidentiary hearing was conducted, and both the attorney and

his agent testified. During his testimony, the attorney acknowledged that the agent had investigated accidents involving the railroad company that was the agent's employer. "Immediately after hearing this testimony, the [Disciplinary] Board, on the third day of hearings, added a charge No. 13 against petitioner" for hiring an employee of an adverse party. *Id.* at 546. A motion to strike the new charge was denied, but the Board gave the attorney a continuance to prepare for the new charge. *Id.* The Board subsequently indefinitely suspended the attorney based on several charges, including charge No. 13. *Id.* The Ohio Supreme Court sustained only two of the charges, including No 13. *Id.* The federal courts then considered whether to disbar the attorney based on the findings and proceedings before the state Disciplinary Board and the Sixth Circuit decided that he should be disbarred, based solely on charge No. 13. *Id.* In doing so, the Sixth Circuit expressly "rested on" the state court "record and findings." *Id.* at 549.

The Supreme Court reversed the Sixth Circuit because "charge (No. 13) for which petitioner stands disbarred was not in the original charges made against him. It was only after both he and [the agent] had testified that this additional charge was added." *Id.* According to the Court, the attorney "had no notice that his employment of [the agent] would be considered a disbarment offense until after both he and [the agent] had testified at length on all the material facts pertaining to this phase of the case. As Judge Edwards, dissenting below, said, 'Such procedural violation of due

process would never pass muster in any normal civil or criminal litigation.'" *Id.* at

550–51. The Supreme Court held:

> The charge must be known **before the proceedings commence**. They
> become a trap when, after they are underway, the charges are amended
> on the basis of testimony of the accused.

*Id.* at 551 (emphasis added). In reversing the Sixth Circuit's decision that relied on

the defective state court proceedings, the Court critically observed that "[i]f there

are any constitutional defects in what the Ohio court did concerning Charge 13, those

defects are reflected in what the Court of Appeals decided." *Id.* at 550. *See also Id.*

at 552–53 (White, J., concurring) ("The question therefore is whether the defective

notice in petitioner's state disbarment proceeding so infected that federal proceeding

that justice requires reversal of the federal determination.").[1]

---

[1] This Court has previously taken exception to counsel's statement that "due process deficiencies
… infect[ed] the panel's Final Report" (Doc. 425 at 2), suggesting that the language is "nearly
over-the-top heated rhetoric" (Tr. Mar. 19, 2024, at 11) that attacks the "very integrity of the …
judiciary." (Doc. 459 at 19). The undersigned feels compelled, under the circumstances, to defend
his word choice. The "infected" language used by counsel comes close to being a legal term of art,
historically and routinely used by courts when assessing the impact of alleged due process
violations on the proceedings. *See, e.g., Ruffalo*, 390 U.S. at 552–53 (White, J., concurring);
*Kansas v. Carr*, 577 U.S. 108, 123–24 (2016) ("The test prescribed by *Romano* for a constitutional
violation attributable to evidence improperly admitted at a capital-sentencing proceeding is
whether the evidence 'so **infected** the sentencing proceeding with unfairness as to render the jury's
imposition of the death penalty a denial of due process.'" (Emphasis added)); *Reese v. Sec'y, Fla.
Dep't of Corr.*, 675 F.3d 1277, 1291 (11th Cir. 2012) ("*Darden* explains that a defendant must
establish that the 'prosecutors' comments so **infected** the trial with unfairness as to make the
resulting conviction a denial of due process.'" (Emphasis added)); *Bohannon v. State*, 222 So. 3d
457, 502, 503, 504, 505 (Ala. Crim. App. 2015), *aff'd*, 222 So. 3d 525 (Ala. 2016) ("The
prosecutor's argument did not constitute error, much less plain error. Nor did it so **infect**
Bohannon's trial with unfairness that he was denied due process." (Emphasis added)). Counsel
meant no offense by employing this same language.

In other words, the requirement that the attorney be afforded due process and adequate notice did not just begin when the federal courts formally considered sanctions, but instead attached at the commencement of the previous state court proceedings on which the federal courts relied and incorporated by reference.

The Eleventh Circuit has held that "[t]he fair notice requirement of *Ruffalo* applies, of course, to **each of the district court's prior inquiries from which resulted the findings of bad faith conduct**." *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1452 (11th Cir. 1985) (emphasis added). Due Process was required "before [the Panel's] proceedings commence[d]."  It is not enough that this Court has now attempted to cure the notice and other due process deficiencies by issuing the Supplemental Orders to Show Cause if those due process protections were not previously provided by the Panel before the inquiry and compelled testimony began. *See Comm. on Pro. Ethics & Grievances of Virgin Islands Bar Ass'n v. Johnson*, 447 F.2d 169, 173 (3d Cir. 1971) ("Due process contemplates notice which gives a party adequate opportunity to prepare his case. In these circumstances, respondent was entitled to know the exact nature of the charges against him **before the commencement of proceedings**." (Emphasis added)).

The Panel's inquiry and this Court's Supplemental Orders to Show Cause are parts of the same proceeding. The Panel conducted a disciplinary inquiry, produced

a voluminous preliminary report suggesting misconduct, and then sent that report to this Court to consider sanctions.[2]

In turn, this Court adopted and incorporated the Panel's findings in the original and supplemental Orders to Show Cause. (Doc. 466 at 26: "[T]he Report, which was expressly incorporated into the show-cause order by reference"; Docs. 478, 481 and 486 requiring these Respondent Attorneys to address the findings in the Panel's Report). Any notice contained in the Order to Show Cause or the SOSC does not cure any prior due process deficiencies with the notice provided by the Panel before the proceedings commenced. *See United States v. Shaygan*, 652 F.3d 1297, 1318 (11th Cir. 2011) ("The charge must be known before the proceedings commence." (quoting *Ruffalo*)).

## II.   The Panel's Initial Order did not Provide Respondent Attorneys with Adequate Notice of the Specific Conduct being Investigated.

The Panel initiated this disciplinary investigation with a May 10, 2022, Order for thirty-nine lawyers to appear in Montgomery "to allow the panel to inquire about the issues raised by counsel's actions." (*Vague* Doc. 1 at 5). The actions of counsel described in the Order were identified by reference to this Court's April 18, 2022, Order in *Walker* (*Walker* Doc. 24), and were said to be (1) the voluntary dismissals

---

[2] There has also been ongoing coordination and consultation between the Panel and this Court throughout these proceedings and this Court has noted that there is "no daylight" between the Panel's intent and this Court's actions. (*See, e.g.,* Tr. Nov. 2, 2023, at 6-10; Tr. Nov. 21, 2023, at 14, 18).

of *Walker* and *Ladinsky*, (2) the media statements promising refiling, and (3) the filing of *Eknes-Tucker*. (*Id.*).[3] The only reference in this Court's April 18 Order to actions involving *Walker* Counsel in the Middle District were to the filing and subsequent withdrawal of the motion to reassign the case to Judge Thompson. (*Vague* Doc. 1 at 1-2). There is no mention in this Court's April 18 Order of any concerns about the related case designation on the Civil Cover Sheet, the phone call to Judge Thompson's chambers, or the alleged failure to obtain client consent prior to dismissal. (*Walker* Doc. 24). Similarly, the Panel's May 10 Order mentions the filing and withdrawal of the motion to reassign in *Walker* but does not identify the related case designation, the phone call to chambers, or obtaining client consent as conduct of counsel that would be the subject of inquiry or potential sanction. (*Vague* Doc. 1).

Neither this Court's April 18 Order nor the Panel's May 10 Order identified the related case designation, the telephone call to chambers, or the obtaining of client consent for dismissal as actions about which the panel had concerns or about which counsel could expect to be interrogated. Nothing in either order was designed to give

---

[3] The Panel's Report confirms that the only prior notice given to the respondent attorneys was based on "the conduct Judge Burke described in his [April 18] order" and that the Panel's May 10, 2022, order "also identified specific actions taken by counsel." (Doc. 70 at 4) The Panel, through this Court, later stated: "The panel was constituted for **a limited purpose**, investigating concerns raised by Judge Burke in his April 18th, 2022, order in *Walker*." (Tr. Nov. 2, 2023, at 8) (emphasis added).

the Respondent Attorneys adequate notice that these actions could subject them to sanctions.[4]

It is well established that attorney disciplinary proceedings such as this are "of a quasi-criminal nature" and, as the Supreme Court has held, "[t]he charge must be known before the proceedings commence." *Ruffalo*, 390 U.S. at 551. In *Ruffalo*, the Supreme Court held the "absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived [the attorney] of procedural due process." *Id.* at 552. *See also Comm. on Pro. Ethics & Grievances of Virgin Islands Bar Ass'n v. Johnson*, 447 F.2d 169, 173 (3d Cir. 1971).

Recently, in *In re Gillespie*, No. 23-1819, 2023 WL 7548181 (4th Cir. Nov. 14, 2023), the court applied *Ruffalo* to a situation comparable to the present proceedings. In *Gillespie*, the district court adopted a disciplinary panel's recommendation that an attorney be suspended from practicing in the district for violating various rules of professional conduct, including the failure to adequately communicate with his clients and to keep them reasonably informed about their case. *Id.* at *1. The attorney appealed the district court's adoption of the panel's recommended suspension, arguing that he was not given notice prior to the

---

[4] During its questioning of the respondent attorneys, the Panel also pursued other previously undisclosed areas of alleged misconduct, such as purported attempts to force judicial recusal. *See* Tr. May 20, 2022 at 21:6-11; Tr. May 20, 2022 (Harwood) at 3:17-23; 7:18-25; 15:10-15; Tr. Aug. 4, 2022 at 192:21-24. Those areas of inquiry had no basis in fact.

commencement of the proceedings that the adequacy of his communication with his client could subject him to discipline. The Fourth Circuit agreed with the attorney's due process claim and vacated the suspension, holding:

> We conclude that the district court failed to provide adequate notice to [the attorney] of its intent to rely on the adequacy of his communication with, and representation of, his clients as part of its determination of whether to discipline him. Our review of the record reveals that **the disciplinary panel first expressed concerns about the scarcity of [the attorney's] communications with his clients at an evidentiary hearing.** However, neither the disciplinary panel nor the district court ever explicitly notified [the attorney] that this conduct could subject him to discipline. Moreover, given the lack of notice, [the attorney] did not have an opportunity to respond to this client-focused charge before the panel's recommendation. Because **"charges [may not be] amended on the basis of testimony of the accused,"** *In re Ruffalo*, 390 U.S. at 551, we cannot find harmless the district court's failure to provide [the attorney] with adequate notice that his communications with his clients, or the lack thereof, were a subject of potential discipline.

2023 WL 7548181, at *2 (emphasis added). *See also Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1258 (11th Cir. 2012) (vacating sanctions for failing to "comply with the mandates of due process"); *Adkins v. Christie*, 227 F. App'x 804, 806 (11th Cir. 2007) (vacating sanctions); *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1257 (11th Cir. 2003) (vacating sanctions).

As in *Ruffalo*, these Respondent Attorneys had no advance notice that the related case designation, the telephone call to chambers, or the obtaining of client consent prior to dismissal were actions about which the Panel had concerns or about which counsel could expect to be interrogated and potentially sanctioned or

disciplined. Instead, the Respondent Attorneys were compelled to testify at length before learning that the Panel was considering these other actions as "misconduct" and the basis for further disciplinary proceedings.[5]

Both this Court's show cause orders and the Panel's Report suggest that Respondent Attorneys had ample advance notice that the Panel was investigating "judge shopping" and that this was sufficient notice for purposes of due process. This Court's April 5, 2024, order states that the respondents "must answer for: the applicable federal law prohibiting judge shopping." (Doc. 466 at 9).

The problem with this Court's notice analysis, however, is that there is no "federal law prohibiting judge shopping." Instead, there is a patchwork of local and federal rules and court decisions that restrict or prohibit **particular conduct** that can be rightfully characterized as "judge shopping."   In reality, the term "judge shopping" has no established or universally recognized definition.[6]   Neither the

---

[5] Respondent Attorneys became aware of many of the Panel's concerns only after the proceedings had commenced and testimony was under way. Other concerns were not disclosed until the Panel issued its Report a year and a half later. *See, e.g.* Esseks Supplemental Declaration, dated May 8 2024, ¶ 69 (explaining that Esseks learned only after the Panel issued its Report of Inquiry that the Panel was concerned that *Walker* Counsel attempted to persuade *Ladinsky* Counsel to transfer *Ladinsky* to the Middle District). Still others, such as obtaining client consent prior to dismissal, were not included as a potential charge until this Court issued its Order to Show Cause.

[6] BLACK'S LAW DICTIONARY defines the term narrowly: "**judge-shopping** (1962) The practice of filing several lawsuits asserting the same claims — in a court or a district with multiple judges — with the hope of having one of the lawsuits assigned to a favorable judge and of nonsuiting or voluntarily dismissing the others." **JUDGE-SHOPPING**, BLACK'S LAW DICTIONARY (11th ed. 2019). *See also Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, No. 09-CV-00970-PAB-KMT, 2014 WL 4057118, at *2 (D. Colo. Aug. 14, 2014) (quoting BLACK'S definition); *Lennard v. Yeung*, No. CV1009322MMMAGRX, 2011 WL 13217925, at *7 (C.D. Cal. Aug. 16, 2011) (same); Edwin Lamberth, *Injustice by Process: A Look at and Proposals for the Problems and Abuses of the*

Panel nor this Court's orders define the term by reference to any specific statute, rule or controlling case. The term "judge shopping" is not sufficiently defined to adequately identify particular conduct. Rather, it is an amorphous term which means different things to different courts. Merely giving notice that the Panel was investigating "judge shopping," without identifying the particular conduct involved, is really no notice at all. *See MeridianLink, Inc. v. DH Holdings, LLC*, No. CV102708ABCJEMX, 2010 WL 11512182, at *3 (C.D. Cal. June 16, 2010) (calling allegation of "judge shopping" "conclusory"); *People v. Sullivan*, 142 A.D.2d 695, 696, 531 N.Y.S.2d 295, 296 (1988) (noting term "judge shopping" is "vague and conclusory").[7]

This inherent ambiguity of the term "judge shopping" is now evidenced by the unprecedented and extremely expansive view taken by the Panel and this Court that even "engaging in numerous and wide-ranging discussions about how judges were favorable or unfavorable" can be declared sanctionable "judge shopping" if it takes place "in the context of deciding whether to dismiss and refile their cases," and

---

*Settlement Class Action*, 28 Cumb. L. Rev. 149, 162 (1998) ("Actual case law defining and recognizing judge shopping class actions appears nonexistent."); "Judge-Shopping Law and Legal Definition" https://definitions.uslegal.com/j/judge-shopping/ ("Judge-shopping refers to a practice of filing several lawsuits that assert the same claim. Judge shopping is usually done in a court or a district with multiple judges. It is done with the hope of having one of the lawsuits assigned to a favorable judge. It is also done with intent to nonsuit or voluntarily dismiss the others.").

[7] Respondent Attorneys do not dispute that they received adequate notice that the voluntary dismissal of *Walker*, comments to the media about refiling, and the filing of *Ecknes-Tucker* would be the subject of these proceedings.

that lawyers conducting private "phone conferences in which counsel discussed …
their prospects in front of Judge Burke and that he was a bad draw," can expose those
lawyers to discipline. (Vague Doc. 70 at 51). Respondent Attorneys have been unable
to uncover a single instance in which a lawyer was sanctioned or disciplined for
merely talking about whether a judge was a good or bad draw in a case, and none
has been cited by the Panel or this Court.

This Court's April 5, 2024, order observes that the notice by the Panel that it
intended to "inquire about the issues raised by counsel's actions" is "[t]he same
instruction cited *In re Fieger*, 191 F.3d 451 (6th Cir. 1999)." (Doc. 466 at 5). But the
notice and procedures in *Fieger* were fundamentally different from those employed
by this Panel.  First, the investigation into Fieger's conduct (filing 13 identical suits
and then dismissing 12 of them) **began** with an order to show cause, not an open-
ended inquiry by a three-judge panel. 191 F.3d at *1. Second, unlike the initiating
orders in this case, the show cause order in *Fieger* appears to have sufficiently
identified the specific rules that Fieger was suspected of violating and the particular
conduct for which he faced sanctions. *Id.*[8]  Third, Fieger admitted guilt and accepted
a negotiated set of sanctions without the three-judge panel conducting an evidentiary

---

[8] The actual content of the show cause order is unknown because *Fieger* remains under seal and
the attorney did not challenge the notice he was provided, nor is that notice discussed by the court.
There is no indication, however, that the show cause order in *Fieger* merely referenced "conduct
that abuses the judicial process" or "judge shopping" as the basis for potential sanctions.

hearing. *Id.* at *2.  Fourth, and most importantly, Fieger was only sanctioned for the particular conduct identified in the order to show cause and no charges were added after the proceedings had commenced. *Id.*

The failure to provide Respondent Attorneys with advance notice that the related case designation, the telephone call to chambers, and the obtaining of client consent prior to dismissal were to be the subject of the Panel's inquiry and subsequent findings of "misconduct" violated the Respondent Attorneys' due process rights and calls into question the reliability of the Panel's findings in the Report. *See Shaygan*, 652 F.3d at 1319 ("The record before us is unreliable because it was developed, after all, without affording either of them due process.").

## III.  The Proceedings Before the Panel Violated Respondents' Procedural Due Process Rights.

While concluding that Respondent Attorneys received sufficient due process protections, this Court's April 5, 2024, order sought to distinguish the Panel's proceedings from the facts in *United States v. Shaygan*, 652 F.3d 1297 (11th Cir. 2011). According to this Court:

> Due process violations [in *Shaygan*] were sundry. The court denied both prosecutors "a meaningful opportunity to be heard" in the proceeding. Neither prosecutor was represented by counsel. Neither had the opportunity to cross-examine witnesses. And neither was told "that the district court might rely on [their] testimony to impose an individual sanction." *Id.* "[E]ven more egregious" were the due process violations against Hoffman. *Id.* Not only was she denied the opportunity to testify, but the district court's sequestration order meant there was "no way for

[her] to know about the testimony of the other witnesses at the proceeding." *Id.*

(Doc. 466 at 18). To varying degrees, however, most of these very same due process violations occurred during the Panel's proceedings.

### A.   The Panel questioned lawyers without counsel present and without affording an opportunity for cross examination.

At the initial May 20, 2022, hearing before the Panel, seventeen (17) of the lawyers compelled to attend were segregated from the other respondents and denied access to their own retained counsel while being questioned under oath by Special Master Bernard Harwood. (Tr. May 20, 2022, at 12, 74-76). This procedure was extraordinary and unprecedented.[9]

Despite the fact that each of these 17 respondent lawyers was represented by counsel at the hearing, the Panel refused to permit their counsel to accompany them while they were being questioned *in camera* by the Special Master. At least two requests that their retained counsel be permitted to attend and participate in the questioning of their clients were denied by the Panel. (*Id.* at 78-84). These 17 respondents were then questioned under oath by the Special Master without their retained counsel present and without any respondents' counsel having the

---

[9] *See In re Paradyne Corp.*, 803 F.2d 604, 608 (11th Cir. 1986) ("In our view, this unprecedented program of *in camera, ex parte* inquisitions is so clearly at odds with the principles of the open, adversarial system of justice guaranteed by our Constitution that the district court's contemplated actions without question endanger the defendants' rights.").

opportunity to observe their testimony or cross-examine them. While attorneys Esseks, Charles, and Faulks were not questioned *in camera* by the Special Master, neither they nor their counsel were permitted to observe the testimony or cross-examine the segregated lawyers.

The denial of those 17 respondents' right to be represented by counsel undermines the reliability of the proceedings before the Special Master and constitutes a substantial denial of those respondents' due process and Sixth Amendment rights.  Further, the extraordinary exclusion of the other respondents and their counsel from observing and participating in the proceedings before the Special Master undermines the reliability of those proceedings and constitutes a substantial denial of these Respondent Attorneys' due process rights as well as their rights to confront witnesses. *See Shaygan*, 652 F.3d at 1319.

Prior to the *in camera* questioning by the Special Master, the Panel assured counsel that they would have an opportunity to review and redact the transcript of their clients' and other lawyers' testimony. (Tr. May 20, 2022 at 83). Despite this assurance, the Panel repeatedly declined to release the transcript of the *in camera* questioning by the Special Master to respondents or their counsel. Counsel for respondents made numerous requests to access the transcript of the *in camera* proceeding before the Special Master, which were consistently denied or disregarded by the Panel. (*See, e.g., Vague* Docs. 22, 37, 69, and 72). In fact, counsel for the

respondents were not permitted to review the transcript of the *in camera* May 20, 2022, proceedings before the Special Master until **after** the Panel had issued its Report on October 3, 2023.[10]

The continued refusal by the Panel to allow counsel for the Respondent Attorneys to review the transcript of the May 20 *in camera* proceedings before the Special Master is particularly troubling given the Panel's instructions at the conclusion of the last evidentiary hearing on November 4, 2023, in which the Panel requested written submissions from the respondents tied to the release of the remaining hearing transcripts. (Tr. Nov. 4, 2022, at 86-87). This was to be Respondent Attorneys' only opportunity to respond to the allegations with the now completed testimony. As a part of those instructions, the Panel promised that it was "going to make all transcripts and all declarations available to every lawyer." (*Id.* at 86). Despite repeated motions and informal requests, the Panel did not release the Special Master transcript for **more than a year** after promising to do so, and only **after** the Panel had issued its Report.

Because Respondent Attorneys were denied the opportunity to observe the testimony presented before the Special Master or to cross-examine those witnesses,

---

[10] Five of the segregated respondents were permitted to review excerpts of their own testimony before the Special Master shortly before the Panel brought them back in for further questioning, but each was admonished not to share those excerpts with anyone other than their own counsel. (*Vague* Docs. 40, 62). All other motions requesting access to the transcript were denied.

and then were denied access to the transcript of that testimony, respondents did not have a meaningful opportunity to address or respond to the testimony of these witnesses before the panel issued its Report. *See Shaygan*, 652 F.3d at 1319; *Adkins v. Christie*, 227 F. App'x 804, 806 (11th Cir. 2007) (vacating sanctions, in part, because attorneys were unable to cross-examine witnesses).

It is worth noting that the Panel's proceedings did not comply with the requirements of the local federal court and Alabama State Bar rules governing attorney disciplinary inquiries. *See* NDAL Local Rule 83.1(h)(1)(C) ("**[T]he attorney shall have the right to be present at the taking of testimony,** to present witnesses and other evidence, **to cross examine witnesses**, **and to be represented by counsel**. All testimony presented before the Committee shall be transcribed, and **the accused attorney shall be entitled to a copy thereof** at his or her own cost." (emphasis added)); MDAL Local Rule 83.1(j)(3) (grievance committee hearing must "afford[] the attorney **an opportunity to be represented by counsel**, to present witnesses and other evidence, and **to confront and cross-examine witnesses** in a proceeding guided by the spirit of the Federal Rules of Evidence." (emphasis added)); Ala. R. Disc. Pro. 12(f)(3) ("The notice shall advise the respondent that **he or she is entitled to be represented by counsel, to cross-examine witnesses**, and to present evidence in his or her own behalf." (emphasis added)). Of course, the Panel and this Court may not be obligated to follow these rules, but they should at

least be viewed as instructive of the minimum due process normally afforded attorneys in our courts.[11]

The Panel's denial of the right to counsel and the opportunity to cross-examine witnesses that testified *in camera* to the Special Master, followed by the lengthy denial of access to the transcript of that testimony, violated Respondent Attorneys' due process rights.

## B.   The Panel's exclusion of Respondents from the evidentiary hearings violated due process.

At the commencement of the initial May 20, 2022, hearing, the Panel announced that it would exclude all respondent attorneys from the courtroom while not testifying and would not allow any of them to observe the testimony of other respondent attorneys. (Tr. May 20, 2022, at 74). The unprecedented exclusion of Respondent Attorneys from the courtroom violated their rights to due process and their right to confront witnesses. *See Shaygan*, 652 F.3d at 1318 ("Hoffman's right to due process was even more egregious. Hoffman was never even called as a

---

[11] *See In re Finn*, 78 F.4th 153, 157 (5th Cir. 2023) ("It is well-settled that federal district courts are bound by their own disciplinary rules when proceeding against attorneys for violation of ethical standards. When a court undertakes to sanction an attorney for violating court rules, it is incumbent upon the sanctioning court to observe scrupulously its own rules of disciplinary procedure. Because attorney suspension is a quasi-criminal punishment in character, any disciplinary rules used to impose this sanction on attorneys must be strictly construed resolving ambiguities in favor of the person charged. Strict construction applies even to procedural rules. Again, this is a matter of due process." (Citations and quotation marks omitted)).

witness, and because of the sequestration order there was no way for Hoffman to know about the testimony of the other witnesses at the proceeding.").

Although Fed. R. Evid. 615 allows a court to exclude witnesses, it does not authorize the exclusion of parties. Fed. R. Evid. 615(a)(1) ("[T]his rule does not authorize excluding: (1) a party who is a natural person"). "Exclusion of persons who are parties would raise serious problems of confrontation and due process. Under accepted practice they are not subject to exclusion." Advisory Committee Notes to Fed. R. Evid. 615. *See Johnson v. United States*, 780 F.2d 902, 909 (11th Cir. 1986) (recognizing that Rule 615 does not apply to parties).

Rule 615 is the result of a careful balancing of the risk of shaped testimony against the right of parties to attend and participate in proceedings concerning them. That balance has been resolved in favor of the due process and confrontation rights of parties. *See Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 628 (4th Cir. 1996) ("Despite the powerful policies behind sequestration, the rule must yield to the yet more powerful confrontation and due process considerations of allowing the parties themselves to be in court and to present their cases."); *U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 47–48 (D.D.C. 2008) ("By its language, Rule 615 expressly withholds from the Court the authority to sequester a natural person who is a party to the action. … The Court's inherent authority to manage trial is

nonetheless subject 'to a party's confrontation and due process rights to remain in the courtroom.'").

Nor did the Panel have good cause to exclude the Respondent Attorneys from their own disciplinary proceedings. The Panel's expressed concern that the Respondent Attorneys might alter their testimony if they were allowed to hear the testimony of the other attorneys is without any factual or legal basis and does not justify the denial of the attorneys' due process and confrontation rights. Such an unfounded presumption that these respected attorneys would alter their truthful testimony if they were allowed to hear other lawyers testify is unjustified and contrary to the traditional respect and deference afforded to attorneys. *See Federated Mut. Ins. Co. v. McKinnon Motors, LLC*, 329 F.3d 805, 808 (11th Cir. 2003) ("Because … lawyers are officers of this court and subject to sanctions under Federal Rule of Civil Procedure 11 …, we give great deference to such representations [by counsel] and presume them to be true."); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("Every lawyer is an officer of the court" with "a duty of candor to the tribunal" and a statement by a lawyer "deserves deference and a presumption of truth."); *Cook v. Lynn & William, Inc.*, 344 F.R.D. 149, 154–55 (D. Mass. 2023) ("That ongoing duty of candor, and more importantly an attorney's awareness of it, in turn gives rise to a presumption of trustworthiness, and an

attorney's representations are presumed to be truthful absent any indication that they are untrustworthy.").[12]

**C.    The Panel's failure to permit post-hearing briefing violated due process.**

At the conclusion of the last day of evidentiary hearings, the Panel announced that in lieu of closing arguments, the Panel instead wanted to hear from respondents "in written submissions." (Tr. Nov. 4, 2022, at 72).[13]   The Panel then outlined in some detail what those written submissions should address and requested a proposed briefing schedule from the respondents. (*Id.* at 82-85, 87). In response to the Panel's instructions to file written submissions, counsel inquired once again about access to the transcripts and declarations which had not been provided to counsel. (*Id.* at 74). The Panel stated unequivocally that it was "going to make all transcripts and all declarations available to every lawyer" and that the proposed briefing schedule should be "triggered for when [counsel] have the transcripts and declarations available to us and a reasonable time for [counsel] to review and assess those and take proper positions based upon those" transcripts and declarations. (*Id.* at 86, 87).

---

[12] Conversely, an Assistant Alabama Attorney General was allowed to present unsworn testimony and "evidence" to the Panel, which the Panel apparently credited. (Tr. May 20, 2022, at 33-45). No explanation for this apparent double standard was provided by the Panel.

[13] The Panel had previously disallowed opening statements that would involve any reference to the facts or positions of the respondents. (Tr. May 20, 2022, at 21-22: "An opening statement can't be designed to get into the details of any of these matters so that it would suggest what anybody else's position is going to be in these matters.").

A few days later, on November 8, 2022, counsel submitted a proposed briefing schedule that was tied to counsel's receipt of the Special Master transcript, the transcript from the final two days of the evidentiary hearing, and the other respondents' declarations. (*Vague* Doc. 69).[14] However, the Panel never entered a briefing schedule and never communicated further with respondents' counsel until **eleven months later** when it abruptly released its Report on October 3, 2023, without affording respondents the promised opportunity to file written submissions. No explanation has ever been provided why the Panel apparently elected to forego written submissions after expressly asking to receive them. Additionally, despite repeated motions and informal requests, the Panel did not release the Special Master transcript for **more than a year** after promising to do so, and only **after** the panel had already issued its Report.[15]

---

[14] The Respondents' proposed briefing schedule also requested that the panel provide guidance regarding "(1) which of the attorneys remain subjects of this inquiry; (2) the specific acts or omissions undertaken by each of the attorneys about which the Panel continues to have concerns; and (3) the particular federal rules, local rules, other federal law, or standard of conduct that the Panel believes may have been violated by those attorneys' conduct" as well as a request that the Panel identify the applicable standard to be applied (*e.g.,* subjective bad faith). (*Vague* Doc. 69 at 2).

[15] Counsel emailed the court reporter on January 3, 2023, requesting an update on the remaining transcripts and was informed that work on the transcripts was beginning that day. On March 21, 2023, the court reporter stated in an email that the November 3-4 transcripts had been completed at the end of February but that she was awaiting authorization from the Panel to send them to counsel. After the Panel released its Report on October 3, 2023, a motion was filed again requesting that the Panel give counsel access to the transcripts and the Panel entered an order directing that the transcripts be filed under seal. (*Vague* Docs. 72, 73). Additional motions seeking release of the transcripts and declarations were filed on October 12, 2023 (*Vague* Docs. 81-85). Counsel received the transcripts from the November 3-4 hearings on October 12, 2023, but did not receive the

## Conclusion

Instead of utilizing the disciplinary procedures already available under local rules, this matter was addressed using an unprecedented process with extraordinary and unique rules that evolved over the course of the proceedings.[16] The process utilized by the Panel denied the Respondent Attorneys basic due process and other constitutional protections required by established law. As a consequence, the Panel's findings are unreliable and should not be adopted by this Court. *See Shaygan*, 652 F.3d at 1319.   Respondent Attorneys object to the Supplemental Orders to Show Cause to the extent they rely on, refer to, or incorporate the Panel's Report or its findings.

Further, the Panel expressly authorized this Court to "reject[] … the Panel's findings." (*Vague* Doc. 99). This Court should reject the Panel's findings of misconduct for the reasons set forth herein.[17] Finally, in light of the failure of the

---

transcript from the *in camera* Special Master proceedings until November 9, 2023, following a November 6, 2023, hearing with this Court.

[16] This Court has noted that there has never been "a three-judge panel in the history of this circuit on an issue like this." (Tr. Nov. 2, 2023, at 22).

[17] This Court's April 4, 2024, order makes light of respondents' due process objection by suggesting that it "presupposes that the Panel should have anticipated that the Respondents would misrepresent the truth or outright lie." (Doc. 466 at 23). Respondents agree that neither this Court nor the Panel was required to foresee the accuracy of the testimony to the Panel before it occurred.  Instead, Respondent Attorneys reiterate the uncontroversial principle that if the Court intends to consider disciplining a Respondent for an alleged misrepresentation made during the proceedings before the Panel, the Court must inform the Respondent Attorneys of the allegedly inaccurate statement through an Order to Show Cause and provide the Respondent Attorneys an adequate opportunity to fully respond to the allegation(s) before imposing any discipline on that basis. There are many other reasons why this Court should reject any allegations of such

Panel to adhere to the requirements of due process, this Court should terminate these

proceedings.

                                                    Respectfully submitted,


                                                    */s/ Barry A. Ragsdale*
Barry A. Ragsdale
Robert S. Vance
Dominick Feld Hyde, PC
1130 22nd Street South, Suite 4000
Birmingham, AL 35205
Tel.: (205) 536-8888
bragsdale@dfhlaw.com
rvance@dfhlaw.com

                                                    */s/ W. Neil Eggleston*
W. Neil Eggleston
Byron Pacheco
Kirkland & Ellis LLP
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Tel.: (202) 389-5016
neil.eggleston@kirkland.com
byron.pacheco@kirland.com

                                                    *Counsel for Respondents*

---

misconduct and reject any suggestion that these Respondent Attorneys intentionally misled the Panel or exhibited a lack of candor.

## **CERTIFICATE OF SERVICE**

     I certify that, on May 8, 2024, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will provide notice of such filing to all counsel of record.

                                 /s/ *Barry A. Ragsdale*
                                 OF COUNSEL