**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| BRIANNA BOE, et al.,<br>Plaintiffs,<br>and<br>UNITED STATES OF AMERICA,<br>Plaintiff-Intervenor,<br>v.<br>Hon. STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, et al.<br>Defendants. | : | CIVIL ACTION NO.<br>2:22-CV-000184-LCB-SRW |

## DECLARATION OF MELODY H. EAGAN

1. My name is Melody H. Eagan. I am over nineteen (19) years of age, under no disability, and competent to testify to the matters contained in this Declaration based upon personal knowledge. I submit this Declaration in response to the Court's February 21, 2024, Order to Show Cause (Doc. # 406) and Supplemental Order to Show Cause (Doc. #484).

2. I provided information regarding my educational background, employment, and licensure in Paragraph 2 of my July 27, 2022, Declaration (Doc. # 80-1, Case No. 2:22-mc-03977-LCB) ("First Declaration"), submitted to the *In re Vague* Panel ("the Panel") in response to its July 8, 2022, Order. I have practiced law with Lightfoot, Franklin & White, LLC ("Lightfoot" or "my firm")

since beginning my legal career in 1994, am licensed to practice and in good standing with multiple state and federal courts outlined in my First Declaration, and have not been the subject of any previous court or bar disciplinary proceedings. I also am the Managing Partner of Lightfoot, a Fellow with the Alabama Law Foundation, a graduate of Leadership Alabama's 2018 class, and a 2023-2024 Leadership Alabama Regional Council for the Birmingham Region. From 2012-2013, I served as the President of the Alabama Defense Lawyers Association. In addition to my professional activities, I am an active member of my church, where I teach Sunday School, serve on the Vestry, lead Cursillo in our parish as a Parish Lay Rector, and assist with services as a Eucharistic Minister, a lector, and an usher. I serve on the Board of Directors of Better Basics, a non-profit organization in Birmingham that works to eradicate illiteracy among children in central Alabama by delivering reading and math instruction and resources to the educationally vulnerable.

3. In my First Declaration, I explained how I first became involved as counsel for the plaintiffs in this case, as well as in *Ladinsky v. Ivey*, No. 5:22-cv-00447-LCB (N.D. Ala.) ("*Ladinsky*"). While others at Lightfoot and I recognize that the issues involved in these cases are controversial to some, Lightfoot agreed to represent the plaintiffs as part of our commitment to pro bono advocacy and because of our high respect for King & Spalding, who approached us about serving

as co-counsel for the *Ladinsky* plaintiffs. Lightfoot has not received any compensation in connection with our time or expenses incurred in these two matters.

4. In addition to my First Declaration, I testified before the Panel on August 4, 2022. I have reviewed my First Declaration and the transcript of my live testimony, and the contents of my First Declaration and my testimony before the Panel were honest, forthcoming, and truthful. I attempted to answer the questions asked of me by the Panel fully and provide the information requested to the best of my ability based upon my recollection of facts at the time.

5. In the Final Report of Inquiry (Doc. # 339) ("the Panel Report"), the Panel discusses a telephone call that occurred among some of the *Ladinsky* lawyers at or around 5:00 p.m. on Friday, April 15, 2022 ("the 5:00 Call"). As outlined in my First Declaration and discussed during my testimony before the Panel on August 4, 2022, I participated in the 5:00 Call. On page 31 of the Panel Report, the Panel states that the 5:00 Call included lawyers who represented the plaintiffs in *Walker v. Marshall*, 5:22-cv-480-LCB (N.D. Ala.) ("*Walker*"), but I do not recall that any *Walker* lawyers were on the 5:00 Call that I attended. I do not remember participating in a telephone conversation with any *Walker* counsel on April 15, 2022.

6. The Panel references testimony by Abigail Hoverman Terry on August 4, 2022, in which she testified that I expressed an opinion that there "was zero percent chance" of success on a preliminary injunction motion before Judge Burke during the 5:00 Call. (Panel Rept., pp. 34-35). The Panel then states, "But, when specifically asked about the phone call, Eagan did not admit what she had said about Judge Burke that there was a 'zero percent chance' they would have of succeeding before him." (*Id.* at 35). There is no citation to the Record after that conclusion, so I do not know which question the Panel believed that I failed to admit, answer truthfully, or answer fully, nor have I been able to identify a question asking me what I said in the 5:00 Call. In my First Declaration, I attempted to provide the information requested by the Panel in their July 8, 2022, Order, and I did not interpret the Panel's Order to ask that I recount all statements I made during the 5:00 Call or other calls with *Ladinsky* counsel. During my testimony on August 4, 2022, I was not asked to recount any statements I recalled making during that call, nor was I asked about any statement to other *Ladinsky* counsel that there was "zero percent chance" of success. There was no way for me to know during the Panel process what any other witness testified to because of the sequestration order, so I did not know what I needed to address in my testimony other than what the Panel asked. Now that the sequestration order has been lifted and I have reviewed declarations and testimony given by others during the Panel

Hearing, I see that Ms. Terry, and Ms. Terry alone, testified that she recalled my stating an opinion that there was "zero percent chance that Judge Burke would grant our motion if we filed a PI motion before him" during the 5:00 Call.[1] When I testified on August 4, 2022, I had not heard Ms. Terry or anyone attribute that statement to me. I do not remember using those words during the 5:00 Call or at any time. There was no reason for me to address any "zero percent chance" statement when I gave my Declaration or testified on August 4, because I had not heard it, was not asked about it by the Panel, and do not recall saying it.

7. While I do not remember saying "zero percent chance" during the 5:00 Call, I do not recall the specific words or statements I made during that call. The 5:00 Call was a brief and hectic call that occurred late on a Good Friday, and I was confused about why the *Ladinsky* case had been transferred to Your Honor. I know I had concerns and likely expressed an opinion — consistent with what I testified in the Panel Hearing — about what I perceived at the time to be the likelihood of success before Your Honor in this exceptional case. If I said "zero percent chance" or words to that effect, it would have been hyperbole. In addition, I reviewed the hearing transcript after the sequestration order was lifted and saw that the decision-makers on the *Ladinsky* team, when specifically pressed by the

[1] I have now also reviewed the declaration submitted by Ms. Terry, as well as her testimony before Justice Bernard Harwood on May 20, 2022, and Ms. Terry did not reference any such statement being made by me in this declaration or testimony.

Panel, did not recall my saying "zero percent chance" during the 5:00 Call, which reflects that those words, if spoken, were not critical to the decisions we made.

8. While I was not asked by the Panel about the "zero percent chance" testimony that Ms. Terry gave, I testified candidly and truthfully about my opinions of plaintiffs' prospects of success in *Ladinsky* before Your Honor and that I shared those opinions with *Ladinsky* co-counsel. For example, I testified:

- "I'm sure that I likely had conversations with my co-counsel at points about . . . different judges and who I thought might view our case more favorably or be more receptive to our clients . . . and these issues than possibly other judges." (August 4, 2022 Transcript (Doc. # 78, Case No. 2:22-mc-03977-LCB), p. 27).

- "I do believe that I gave some viewpoints from my perspective as to how I thought [Northern District] judges might receive this type of controversial case" during the April 13, 2022 call with some *Walker* and *Ladinsky* counsel. (*Id.* at 38).

- "Judge Burke I viewed as a conservative judge. . . . I knew that he had been involved in Alabama politics and . . . my view of, if he had been elected, [was] that he is likely either socially conservative or gives the appearance of being socially conservative. And with the controversial issues that were involved here, I had some questions and concerns about whether Judge Burke would relate well to our clients or also what his personal views would be on these issues. I did not know what they were, but that was just my impression, is that I had concerns about how he would receive these issues from a personal standpoint. . . . I always believed that Judge Burke is going to be fair and impartial and try to apply the law, but how we interpret the law can be influenced . . . by the lens that we view the world in." (*Id.* at 49-50).

- "If I were ranking the draws, I would have put [Judge Burke] at the bottom of the list in the Northern District. . . . There were other judges that we had some reservations about or concerns about, but Judge Burke would have been at or close to the bottom as far as from a standpoint of thinking through

. . . what I perceived would be potentially his personal views on some of these issues." (*Id.* at 50).

- "I've always found [Judge Burke] to be fair. I've always found him to be impartial. But in a case of this nature, with this type of controversy, people have strong personal views on it, and I was concerned as to what his personal perspectives might be." (*Id.* at 78).

9. I was not optimistic about our chances of success in obtaining a preliminary injunction before Your Honor in *Ladinsky* based upon what I now know were erroneous opinions. Nevertheless, I did not then, nor do I now, question the integrity of the judicial process or the federal judiciary, including Your Honor, and I did not then, nor do I now, believe that Your Honor would blindly deny justice to any litigant who appears before you.

10. The Panel notes some discrepancies about participants' recollections of discussions regarding Northern District judges or the reason for the discussion during a video call between some *Walker* and *Ladinsky* counsel that I believe occurred on the afternoon of April 13, 2022. While I do not remember everything that was said during that call or what specific words were used, I have testified to the full extent of my memory about that call. I also recall participating in only one call with *Walker* counsel, which is the video call about which I testified to the Panel and referenced in my First Declaration.

11. I understand that the Panel concluded that the fact that the *Ladinsky* case was assigned to Your Honor on April 15, 2022, was the sole reason why

*Ladinsky* was dismissed and this case was filed. This finding, at least as it relates to my reasoning, is not accurate. I truthfully testified in my First Declaration and my August 4, 2022, testimony that I was concerned on April 15, 2022, about a number of issues, and my professional consideration of those multiple factors was why I supported dismissing *Ladinsky* and filing this case. As I told the Panel on August 4, 2022, the assignment of *Ladinsky* to Your Honor was a factor in my decision to support dismissal, but it was not the only or primary factor. (*See*, *e.g.*, August 4, 2022, Transcript, pp. 81, 93, 124, 135-36, 143). I had not experienced or heard of a transfer like what we saw on April 15, 2022.

12. I did not testify during my August 4, 2022, testimony, nor in my First Declaration, that I supported dismissal "because Judge Axon did not explain the reassignment of *Ladinsky* and [the Court] set *Walker* for a status conference in Huntsville on April 18." (Doc. #484, p. 12). As I explained to the Panel, the procedural concerns that arose late on April 15, 2022, the appearance to me that *Ladinsky* was potentially losing its position as the lead case to *Walker,* and my opinion about how Your Honor might receive the issues presented in *Ladinsky* were reasons why I supported voluntary dismissal of *Ladinsky*. The fact that *Walker* but not *Ladinsky* was set for a status conference on Monday, as well as not understanding why *Ladinsky* was transferred to Your Honor (contrary to what we understood to be the normal process in the Northern District), were facts that

weighed into those considerations, among others, but I did not intend to infer that Judge Axon's failure "to explain the reassignment of *Ladinsky*" and the April 18 status conference in *Walker* were the reasons I supported the *Ladinsky* dismissal.

13. Based on my review of the hearing transcripts and declarations submitted to the Panel, no witness—despite *all* witnesses being sequestered—testified that the sole reason *Ladinsky* was dismissed and this case was filed was to avoid Your Honor. Moreover, while each of the *Ladinsky* counsel had their own beliefs or reasons why they supported dismissal, I did not see where any witness testified that *Ladinsky* was dismissed solely "because Judge Axon did not explain the reassignment of *Ladinsky* and [the Court] set *Walker* for a status conference in Huntsville on April 18."

14. We filed the *Ladinsky* case in the Southern Division of the Northern District knowing that we could draw any judge who sits there, including Your Honor. Had this case been randomly assigned to you, I believe counsel would have litigated it without hesitation, just as we did when the *Boe* case was reassigned to you. I did not intend anything I did on that Good Friday, Easter weekend, or the following week to demonstrate a lack of respect to Your Honor. On that late Good Friday afternoon, faced with a non-random assignment in *Ladinsky* that I did not understand and, in my opinion, with no good way to address the situation in the pending case, I did what I believed in my professional judgment

best to advocate zealously for my clients. My decision to support dismissal and thereafter file this case were based on my good-faith belief that I was acting in accordance with Rule 41.

15. I am sorry if my conduct in *Ladinsky* or this case may have raised the appearance or inference of impropriety, and I did not intend to abuse the judicial process or circumvent any procedure, rule, standard, or law. When *Ladinsky* was dismissed under Rule 41(a)(1) with consent of our clients and this case was filed in the Middle District, I was not aware of any rule, standard, controlling precedent, procedure, or practice that would be violated by my actions. I did not believe that dismissal of *Ladinsky* under Rule 41 or the filing of this lawsuit in the Middle District constituted unlawful "manipulat[ion] [of] the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama" or violation of any controlling precedent, Federal Rule or rule of professional conduct. When *Ladinsky* was dismissed, I did not believe we had a randomly assigned judge. I also did not believe that dismissal of *Ladinsky* under Rule 41 or the filing of this lawsuit in the Middle District constituted sanctionable or potentially sanctionable conduct. I still am not aware of a rule, standard, controlling precedent, procedure or practice that I violated. In contrast, I understand that Rule 41(a)(1)(A)(i), by its terms, gives plaintiffs an unconditional and absolute right to dismiss a complaint for any reason before a defendant serves

an answer or a summary judgment motion, and that was the situation on April 15, 2022, when *Ladinsky* was dismissed. I also understand that plaintiffs in this case, along with their counsel, had the right to file this lawsuit in the Middle District, as venue was appropriate in the District and Division in which the case was filed, and I was not aware of any procedure, controlling precedent, or rule that was violated by filing this case in the Middle District.

16. In response to the findings of "misconduct" outlined by bullet point on pages 10-11 of the Supplemental Order to Show Cause (Doc. #484), I respond as follows, in addition to my testimony before the Panel, my First Declaration, the testimony above, and briefing submitted on my behalf in this proceeding and in *In re Vague*:

- <u>Coordinating dismissal of *Walker* and *Ladinsky*.</u>

  I was not aware of any rule, standard, controlling precedent, procedure or practice that I violated when *Ladinsky* was dismissed, nor with coordinating the timing of the filing of Rule 41 Stipulations of Dismissal between *Ladinsky* and *Walker* counsel. I did not participate in the decision to dismiss *Walker*, and I did not participate in any conversations with *Walker* counsel about why they decided to dismiss the lawsuit. My communications with *Walker* counsel on April 15 related to (1) the filing of a motion to consolidate in *Ladinsky* before the case was transferred to Your Honor, and (2) the timing of the filing of the Stipulations of Dismissal, once the decision was made by *Walker* counsel to dismiss the *Walker* case and the decision was made by *Ladinsky* counsel to dismiss *Ladinsky*. As I explained to the Panel, I believed that we needed to move quickly, while we had the right to dismiss under Rule 41, and that it was prudent for the stipulation of dismissal in *Ladinsky* to be filed shortly after the *Walker* dismissal.

- <u>Disclosing counsel's intent to file a lawsuit after *Ladinsky* was dismissed to the media.</u>

When *Ladinsky* was dismissed, I had no plan to make any public statement. I did learn that Attorney General Steve Marshall tweeted on social media Friday night about the voluntary dismissal. About 24 hours after the dismissal, I received an email inquiry from Paul Gattis with AL.com, asking "if there are plans to re-file the lawsuit regarding Alabama's new transgender law that the notice for voluntary dismissal was filed Friday." Because of concern about the families threatened by this litigation and my desire to convey to them that the challenge to the law was not over, I responded to Mr. Gattis instead of ignoring his inquiry with this brief reply:

> We do plan to refile imminently, to challenge this law that criminalizes medical treatment accepted as the standard of care in the medical profession and deprives parents of their right to choose such medical care for their children.

On Monday, in response to additional media contacts, I provided a statement to some reporters along the following lines:

> SB 184 was hastily passed by the Alabama Legislature on April 7 and immediately signed by Governor Ivey on April 8. We promptly filed a lawsuit on behalf of two families and two doctors on the day Governor Ivey signed the bill. After filing that case, we are hearing from numerous Alabama families, including patients facing loss of critical medical care and parents facing potential criminal penalties. We also are hearing from numerous medical providers and others who care for transgender youth in Alabama. We plan to file a new case in the immediate future, to block this dangerous law.

No statements to the media were initiated by me. My statements in response to media inquiries were true, and I do not believe my response violated any standards on lawyers making public statements about potential litigation. Moreover, if I believed that *Ladinsky* counsel were doing anything unethical or improper by dismissing *Ladinsky* or filing another lawsuit challenging the

law, I would not have openly discussed our anticipated actions with the media.

Engaging in "numerous and wide-ranging discussions about how judges were favorable or unfavorable in the context of deciding whether to dismiss and refile *Walker* and *Ladinsky*."

I did not engage in any discussions with *Walker* counsel about whether to dismiss *Walker,* why they made that decision, or the refiling of any action. I likewise did not engage in any discussions with *Walker* counsel about how judges were favorable or unfavorable in the context of deciding whether to dismiss or refile *Walker* or *Ladinsky*. The only discussion I had with *Walker* counsel in which judges in the Northern District or Middle District were discussed was the video call I had with *Walker* counsel on the afternoon of April 13, 2022, referenced in Paragraph 10 of this Declaration, Paragraph 11 of my First Declaration, and discussed during my live testimony on August 4, 2022. This call occurred when *Walker* was still pending in the Middle District of Alabama.

I did have the 5:00 Call with *Ladinsky* counsel about which I have testified. I also believe that I had discussions over the weekend after *Ladinsky* was dismissed regarding judges in the Middle District, including the April 16 conversation with a Montgomery attorney that I described to the Panel. I believe Jeff Doss and I spoke during the weekend about Middle District judges, and I may have shared information with other co-counsel but do not recall the specifics of the communications if they occurred. I was not aware of then, nor am I aware of now, any rule, standard, controlling precedent, procedure or practice that I violated by participating in discussions or expressing opinions about whether certain judges may or may not be receptive to the issues raised in *Ladinsky* and this case, including conversations relating to the dismissal of *Ladinsky* or where to file this case.

- Deciding to "suddenly dismiss *Walker* and *Ladinsky* after a series of phone conferences in which counsel discussed a number of matters, including their prospects in front of the Court and how the Court was a bad draw."

I did not dismiss *Walker* or participate in the decision to dismiss that case. When I had discussions with *Walker* counsel on April 13, 2022, *Walker* was pending in the Middle District.

The right to dismiss under Rule 41 can only be exercised before a defendant answers, so time was of the essence. I was not aware, and am unaware now, of any rule, standard, controlling precedent, procedure or practice that prevented *Ladinsky* counsel from dismissing *Ladinsky*, with our clients' consent, on April 15, 2022. As I testified to the Panel, I considered a number of factors when I agreed to the dismissal of *Ladinsky*. One of those factors was my perception of Your Honor's receptiveness to our claims, but there were other factors about which I have testified. I was not aware, and am not aware now, of any rule, standard, controlling precedent, procedure, or practice that prohibited *Ladinsky* counsel from considering or discussing particular judges and perceptions of how receptive a judge may be toward the case.

- <u>Deciding to "abruptly stop the pursuit of emergency relief", dismiss *Ladinsky*, and file this case, when "time was of the essence."</u>

When *Ladinsky* was dismissed, no motion for injunctive relief had been filed by the *Ladinsky* plaintiffs. During the week of April 11-15, 2022, *Ladinsky* counsel were in the process of preparing an amended complaint and motion for preliminary injunction, with the goal of filing the amended complaint and motion early in the week of April 18. After *Ladinsky* was dismissed on April 15, counsel focused their efforts on drafting the complaint in this case and a motion for preliminary injunction. The *Eknes-Tucker/Boe* complaint was driven by courier to the Middle District for filing on Tuesday, April 19. The Clerk's office in the Middle District did not electronically docket the case until late Wednesday afternoon, April 20, and counsel filed the motion for a preliminary injunction in the early morning hours of April 21. Thus, there was no significant or material delay—perhaps 1-2 days—resulting from the dismissal of *Ladinsky* and filing of this case.

I was not aware, and am not aware now, of any rule, standard, controlling precedent, procedure, or practice that prohibited the voluntary dismissal of *Ladinsky* and the filing of this case in the Middle District, even if a motion for injunctive relief had been filed in *Ladinsky* before the April 15 dismissal.

- <u>Deciding "over the weekend to file *Eknes-Tucker* in the Middle District, even though the plan for years had been to file suit in the Northern District."</u>

Venue was appropriate in this case in both the Northern District and Middle District. I was not aware of, and am not aware of now, any rule, standard,

controlling precedent, procedure, or practice that required us to file this case in the Northern District or precluded us from filing in the Middle District where venue was proper.

- Deciding to "file a new case with new plaintiffs in the Middle District to avoid the appearance of judge shopping and to avoid the Court."

  The concern about accusations of "judge-shopping" was a public relations concern, not a legal or ethical one. I supported the filing of a new case with new plaintiffs, as I did have concerns in this politicized case about potential public accusations by our litigation opponents and their supporters of "judge- shopping" intended to undermine public support of the lawsuit if we were to re-file *Ladinsky*. Some of those "judge-shopping" accusations had already appeared in the media before this case was filed. I did not believe then, nor do I believe now, that our filing of this case—or even if we had simply re-filed *Ladinsky*—would violate any rule, standard, controlling precedent, procedure, or practice in the Northern District or Middle District. If I had thought that dismissal of *Ladinsky* under Rule 41 and the filing of this lawsuit in the Middle District violated any rule or was unethical in any way, I would not have agreed to proceed in that fashion, much less talk about it publicly. Moreover, I supported the decision to file in the Middle District because I believed that filing in that District increased our chances of receiving a randomly assigned judge.

17. The Panel proceeding—which I understand was broadcast to the chambers of every federal district and magistrate judge in Alabama—and the release of the Panel Report have been and continue to be emotionally devastating to me, as well as damaging to my practice, my professional reputation, and my law firm. I have always strived, both professionally and personally, to do things the right way, to be honest and ethical, to preserve my and Lightfoot's hard-earned good reputation, and to make a positive difference in the profession and the community. I would not have agreed to dismissal of *Ladinsky* or the filing of this

pro bono case if I believed that we were doing anything unethical or contrary to the law or any established procedure, and I certainly would not have openly discussed our actions or plan to file a new case with the media on April 16, 2022, and in the days leading up to the filing of this case if I thought we were doing anything improper.

18. I can assure the Court that I have already been punished for the dismissal of *Ladinsky* and the filing of this case. I am an officer of the Court, and I regret that the Panel believed that I had to be placed under oath and sequestered in order to tell the truth. I attempted to answer the Panel's questions and told the truth to the Panel to the best of my ability, as I would have done even if I had not been placed under oath or been sequestered. Now the Panel Report, which paints me in a negative light and finds that I engaged in unethical misconduct by dismissing *Ladinsky* under F.R.C.P. 41 and filing this case, is receiving national attention.

16. I believe that the Panel Report and related press will follow me for the rest of my career. My firm's clients have asked about the Panel Report and proceedings, and we have heard that other law firms are calling my firm's ethics into question as a recruiting tool with law students and summer associates. Even if Your Honor does not levy sanctions against me, I feel like my reputation before the entire federal judiciary in Alabama is tainted. Furthermore, I serve as legal

counsel for several clients in states other than Alabama. Depending on the information requested by *pro hac vice* applications, what Your Honor decides in the way of discipline or sanctions may adversely impact my ability to practice in other states and represent those clients. It also could impact my standing with the state bars and federal courts in which I am already admitted. In sum, this entire process has been devastating, and it has the potential to do permanent damage to my ability to practice law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

[signature] May 8, 2024

Signature Execution Date