# Exhibit A

**UNITED STATE DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

**BRIANNA BOE, et al.**
    **Plaintiffs**

**v.**                                                    **Case No. 22:22-cv-184-LCB**

**STEVE MARSHALL, et al.,**
    **Defendants**

### Declaration of Professor Clark D. Cunningham

Clark D. Cunningham declares as follows:

### I.  Background

A.  Qualifications

1.  I am the Director of the National Institute for Teaching Ethics & Professionalism, Professor of Law, and holder of the W. Lee Burge Chair in Law and Ethics at the Georgia State University College of Law. I was appointed Professor of Law and Burge Chair in Law & Ethics in 2002. I served previously as a full-time faculty member at the Washington University School of Law from 1989 – 2002 and at the University of Michigan School of Law from 1987-1989.

2.  I currently teach a course at the Georgia State College of Law that satisfies the ABA requirement for professional responsibility and also teach the required first year course on Civil Procedure: The Federal Rules. I have previously taught federal pretrial practice and procedure. I have taught law school courses on legal ethics and professional responsibility

since 1985.

3. I am an active member in good standing of the State Bar of Georgia and have been licensed to practice law in Georgia since 2002. I am a member of the United States Supreme Court Bar and the bars of the United States Courts of Appeal for the Sixth and Eleventh Circuits. I have been a licensed attorney since 1981.

4. I have experience in complex federal litigation involving constitutional, civil and consumer rights, including:

a. *Will v. Mich. Dept. of State Police*, 491 U.S. 58 (1989) (on petitioner's brief)

b. *Kelley v Salem Mortgage Co*, 783 F.2d 626 (6ᵗʰ Cir. 1986) (argued)

c. *Falls v. Sporting News Co*., 834 F.2d 611 (6th Cir. 1987) (argued)

d. *Wade v. City of Festus Housing Authority*, (E.D. Mo. 1992) (co-counsel)

e. *Lindsay v. Jones, Parton v. White* (E.D. Mo. 1993) (lead co-counsel in class action to reform prison health care; plaintiffs awarded substantial attorney fees as prevailing party)

f. *Ayres v Dempsey*, 785 F.2d 307 (6ᵗʰ Cir. 1986) (co-counsel)

5. Amicus briefs I have filed on constitutional law have been recognized by federal courts of appeal:

a. *In re Trump*, 958 F.3d 274, 286 (4th Cir. 2020)(en banc), vacated and remanded to dismiss as moot, 592 U.S. ___ (Jan. 25, 2021) (("The President's insistence that 'emoluments' indisputably include only 'profit arising from office or employ' (that is, payment for services rendered in performance of a formal job), while possible, is certainly not indisputable. .... *See, e.g., Brief of Amici Curiae Professor Clark D. Cunningham and*

*Professor Jesse Egbert on Behalf of Neither Party*").

b. *Wright v. Spaulding*, 939 F.3d 695 (6th Cir. 2019) ("We asked the parties to file supplemental briefs on the original meaning of Article III's case-or-controversy requirement, specifically whether the corpus of Founding-era American English helped illuminate that meaning. A team of corpus linguistics researchers submitted two amicus briefs as well. We are grateful to both the parties and the amici for their hard work.")

c. Wilson v Safelite Group, Inc., 930 F.3d 429, 448 (6th Cir. 2019) (Stranch, J. concurring) ("See, e.g., Brief for Professor Clark D. Cunningham, et al. as Amicus Curiae on Behalf of Neither Party, In Re: Donald J. Trump, President of the United States of America, No. 18-2486 (4th Cir. Jan. 29, 2019) (discussing use of corpus linguistics by professor of applied linguistics to help determine the meaning of "emoluments" during the founding era).").

6. I also have served as a Special Master, appointed by the Supreme Court of Georgia, to exercise general supervision over the lawyer disciplinary proceeding assigned to me and to make findings of fact and conclusions of law as to whether discipline should be imposed. My recommendation that Xavier Cornell Dicks be disbarred was adopted by the Supreme Court, *In re Dicks*, 758 S.E.2d 311 (Ga. 2014).

7. I served as the Reporter to the Student Practice Rule Committee of the Georgia Board of Bar Examiners.

8. I served as one of two Reporters to the Georgia Chief Justice's Commission on Indigent Defense.

9. Pursuant to appointment by Georgia Supreme Court Justice David Nahmias, I served on the

3

Ad-hoc Committee on Revised Rules for the Georgia Judicial Qualifications Commission.

10. I have been a member of the Chief Justice of Georgia's Commission on Professionalism since 2002.

11. I have provided expert opinions on legal ethics and professional responsibility by way of affidavit, report and/or testimony in more than 25 cases before federal courts in Georgia, Alabama, and Illinois; state courts in Georgia, California, and Missouri; and the Georgia State Disciplinary Board.

12. In *Downes v Oglethorpe University* (Superior Court, DeKalb County, Georgia) and *Barnett v Johnson* (State Court, Cobb County, Georgia) I provided expert opinions on the potential issuance of sanctions for alleged violations of the rules of professional conduct; my opinion in both cases was that lawyers had conformed to the applicable standard of care and the courts in both cases agreed and did not impose sanctions.

13. In *Kight v Wilner* (Superior Court, Fulton County, Georgia) I testified that Bennett Kight, the former managing partner of Sutherland, Asbill & Brennan, deviated from the applicable standard of care and should be removed as trustee of a multi-million dollar family trust; Kight was removed and subsequently indicted by the federal government for mail fraud.

14. My home office is located at 845 Ashland Avenue NE, Atlanta, Fulton County, Georgia.

15. I have been retained by counsel for Kathleen Hartnett to provide this expert opinion.

16. My base hourly rate for this case is $490/hour. I charge $565/hour for trial and deposition testimony, including time waiting to testify, and for expedited work. The compensation charged in connection with my work on this matter is based on actual hours incurred and is

not in any way contingent upon the opinions expressed herein or the results in this matter.

17.  I am not a party to any action involving any of the parties to this case and am competent to testify as to the expert opinions set forth in this Declaration, as based on the assumptions stated below.

B.  Summary of Expert Opinion.

My opinion pertains to the following issues identified in the Supplemental Order to Show Cause: Kathleen Hartnett filed May 1, 2024 (Doc. 479): (1) marking on the Cover Sheet that Walker v. Marshall was related to Corbitt v. Taylor; (2) voluntary dismissal of the Walker complaint; (3) alleged failure of counsel to consult with plaintiffs before filing the notice of voluntary dismissal. With respect to (1) and (2), it is my opinion based on the assumptions set forth below, that Kathleen Hartnett not only met, but was required by, the standards of care for a lawyer litigating a constitutional rights claim in federal court in Alabama when she participated in marking *Walker* as related to *Corbitt* and filing the notice of voluntary dismissal. With respect to (3), in my opinion, any alleged failure to consult with plaintiffs before filing the notice of voluntary dismissal would have been, in the particular context, not a violation of the applicable standard of care.

**II.  Documents Reviewed.**

I have reviewed the following in preparing this declaration.

1.  The complete transcripts of evidentiary hearings before the Honorable W. Keith Watkins, the Honorable R. David Proctor, and the Honorable Jeffrey U. Beaverstock conducted on May 20, 2022, August 3, 2022, August 4, 2022, November 3, 2022, and November 4, 2022.

2.  The complete transcript of the evidentiary hearing before the Honorable Justice R. Bernard

Harwood conducted on May 20, 2022.

3. Final Report of Inquiry before the Honorable W. Keith Watkins, the Honorable R. David Proctor, and the Honorable Jeffrey U. Beaverstock, dated October 3, 2023.

4. Orders in this matter by the Honorable Liles C. Burke dated February 21, 2024 (Doc. 406), March 18, 2024 (Doc. 449), March 29, 2024 (Doc. 459), April 5, 2024 (Doc. 466) and May 1, 2024 (Doc. 479).

5. The Declaration of Kathleen Hartnett pursuant to July 8, 2022 Order, dated July 27, 2022.

6. Joinder to Motion to Terminate Inquiry filed July 22, 2022 (Doc. 38).

7. Respondent's Post-Hearing Brief filed November 10, 2023 (Doc. 104).

8. *Corbitt v Taylor*, 513 F.Supp.3d 1309 (M.D. Ala. 2021).

9. *Ladinsky v Ivey*, Complaint filed April 8, 2022 (Doc. 1).

10. *Walker v. Marshall*, Complaint and Cover Sheet filed April 11, 2022 (Doc. 1).

11. *Walker v. Marshall*, Plaintiffs' Motion to Reassign to Judge Myron H. Thompson as a Related Case filed April 12, 2022 (Doc. 8).

12. *Walker v Marshall*, Order to Show Cause filed April 13, 2022 (Doc. 3).

13. *Eknes-Tucker v Marshall*, 603 F.Supp. 1131 (M.D. Ala. 2022).

14. *Eknes-Tucker v Governor of Alabama*, 80 F.4th 1208 (11th Cir. 2023).

### III. Factual Assumptions used in forming expert opinion

1. On April 7, 2022, Alabama legislators passed S.B. 184, which prohibited a number of practices from being performed upon a minor for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex. *Eknes-Tucker v*

*Marshall*, 603 F.Supp.3d 1131, 1139 (M.D. Ala. 2022).

2. Governor Kay Ivey signed S.B. 184 into law on the following day, Friday, April 8, 2022. *Id*. at 1140.

3. Within hours after S.B. 184 was signed into law, two medical doctors and two parents filed a lawsuit in the U.S. District Court for the Northern District of Alabama against Governor Ivey, Attorney General Steve Marshall, and two district attorneys seeking to enjoin enforcement of S.B. 184. *Ladinsky v. Ivey*, Case No. 2:22-cv-447.

4. The complaint in *Ladinsky* was signed by lawyers from two law firms (Lightfoot, Franklin & White LLC and King & Spalding LLP) and from four non-profit organizations (National Center for Lesbian Rights, GLBTQ Legal Advocates & Defenders, Southern Poverty Law Center, and Human Rights Campaign Foundation). Shannon Minter from the National Center for Lesbian Rights, although also a lawyer, did not sign the complaint but has been identified, along with Jennifer Levi from GLBTQ Legal Advocates & Defenders, as a decisionmaker for the *Ladinsky* litigation. Statement of Eric Segall, appearing on behalf of National Center for Lesbian Rights, GLBTQ Legal Advocates and Defenders, Southern Poverty Law Center, and Human Rights Campaign Foundation, May 20 at 26-27. (responding to question from Judge R. David Proctor). See also Testimony of Minter, Nov 3 at 158-159 ("if you're looking at who's … really driving the decisions … it would probably be me and Jennifer Levi.").

5. On Monday, April 11, 2022, two family groups – Jeffrey & Lisa Walker and their child identified as "H.W." and Jeffrey & Christa White and their child identified as "C.W.", filed

7

a lawsuit in the U.S. District Court for the Middle District of Alabama against Attorney General Marshall and two district attorneys also seeking to enjoin enforcement of S.B. 184. *Walker v. Marshall*, Case No. 5:22-cv-480.

6. The *Walker* complaint was signed by lawyers from a law firm (Cooley LLP) and from four non-profit organizations (American Civil Liberties Union of Alabama Foundation, American Civil Liberties Union Foundation, Inc., Lambda Legal, and the Transgender Law Center).

7. From May 20, 2022 until November 4, 2022, a special three-judge panel consisting of the Honorable W. Keith Watkins (M.D. Alabama), the Honorable R. David Proctor (N.D. Alabama), and the Honorable Jeffrey U. Beaverstock (S.D. Alabama), conducted evidentiary hearings at which lawyers representing the *Ladinsky* and *Walker* plaintiffs explained actions they took in relation to those cases and I have relied on some of that testimony in forming my opinion.

8. There were a number of differences between the *Ladinksy* and *Walker* complaints, including the following:

a. The lead plaintiffs in *Ladinsky* were health care providers, while only parents and their children were plaintiffs in *Walker*.

b. It was important to the *Ladinsky* lawyers to preserve the anonymity of the family plaintiffs, who were only identified by pseudonyms. In contrast, not only were the parents' real names used in *Walker* but photographs of them and their children were incorporated into the complaint.

8

c.  Governor Ivey was the lead defendant in *Ladinsky* but not a named defendant at all in *Walker*.

d.  Count I of the *Ladinsky* complaint claimed that S.B. 64 violated the federal Affordable Care Act. The *Walker* complaint contained no such claim and only alleged violations of the 14th Amendment of the U.S. Constitution, in particular the Equal Protection Clause.

9.  For the *Walker* complaint, Section VIII of the Civil Cover Sheet, titled "RELATED CASE(S) IF ANY," the blank following the word "JUDGE" was filled in as "Myron H. Thompson" and the blank following the words "DOCKET NUMBER" was filled in "2:18cv91-MHT."

10. This docket number refers to *Corbitt v. Taylor*, 513 F.Supp.3d 1309 (M.D. Ala. 2021). In *Corbitt* three transgender women challenged a policy of the Alabama Law Enforcement Agency that prohibited drivers from changing the sex designation on their driver's license unless their genitalia had been surgically modified. *Id*. at 1311.   Judge Myron Thompson granted summary judgment to the plaintiffs, finding that the policy treated people differently based on the nature of their genitalia, and thus classified by sex and was subject to intermediate scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *Id*. at 1314. The challenged policy, Judge Thompson concluded, "den[ied] the women who are plaintiffs in this case the ability to decide their sex for themselves instead of being told who they are by the State." *Id*. at 1315. An appeal was filed by defendants on February 12, 2021, and oral argument was held on March 15, 2022. *Corbitt v. Secretary of the Alabama Law Enforcement Agency*, Case 21-10486 (11th Cir.) (docket sheet). As of the date of this

declaration, the docket sheet in the 11th Circuit does not show a disposition of the appeal. Several of the lawyers who signed the *Walker* complaint also represented the *Corbitt* plaintiffs including James Esseks, American Civil Liberties Union Foundation, and LaTisha Faulks, ACLU Foundation of Alabama. (Both Esseks and Faulks are on the brief of Plaintiffs-Appellees in the 11th Circuit.)

11. *Walker* could have been filed in either the Northern District or the Middle District of Alabama because at least one defendant resided in the Northern District (Brian Jones, District Attorney for Limestone County) and at least one defendant resided in the Middle District (*e.g.* Jessica Ventiere, District Attorney for Lee County). 28 U.S. Code § 1391(b)(1).

12. Kathleen Hartnett (Hartnett) explained to the three-judge panel that in filing *Walker* in the Middle District *Walker* counsel hoped that the case might be assigned to Judge Thompson. "He had just resolved the transgender discrimination case [Corbitt] in a way that was favorable to the plaintiff." Aug. 3 at 23. "He had just ruled that transgender individuals were subject to protection under the equal protection and due process clauses … he had accepted the same arguments we would be making. … [And] he clearly …understood the general notion of what gender transition means." Aug. 3 at 61-62.

13. Prior to filing *Walker*, the Cooley team investigated what was the standard for indicating a case could be deemed related to another case in the Middle District of Alabama.  That research indicated that there was not a local rule or other controlling standard on this issue in the Middle District. *Id.* at 20.

10

14. The Civil Cover Sheet in use in the Middle District at the time Walker was filed had the words "(*See instructions*)" in Section VIII; on the opposite side the Civil Cover Sheet stated "VIII Related Cases. This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases."

15. The day after the *Walker* lawsuit was filed on April 11, after being told by the Middle District of Alabama's clerk's office that indicating relatedness on the form was not sufficient to allow a relatedness consideration by the Court and that a motion to reassign was necessary, Aug. 3 at XX, plaintiffs filed on April 12 a Motion to Reassign to Judge Myron H. Thompson as a Related Case. Noting that the Local Rules of the Middle District do not define "related," the motion cited local rules from the Central District of California and the Southern District of New York as providing "instructive guidance."

a. Local Rule 83-1.3 of the Central District of California states that it "shall be the *responsibility* of the parties to promptly file a Notice of Related Cases whenever two or more civil cases filed in this District …   call for determination of the same or substantially related or similar questions of law and fact; or for other reasons would entail substantial duplication of labor if heard by different judges." (emphasis added).

b. Local Rule 1.6 of the Southern District of New York states "It shall be the continuing *duty* of each attorney appearing in any civil or criminal case to bring promptly to the attention of the Court all facts which said attorney believes are relevant to a determination that said case and one or more pending civil or criminal cases should be heard by the same Judge,

in order to avoid unnecessary duplication of judicial effort." (emphasis added).

16. The motion to reassign argued that there was substantial factual and legal overlap between *Walker* and *Corbitt* – in line with one of the factors listed in the California local rule – and further argued that "duplication of judicial effort" – a factor in both the California and New York local rules – would be reduced by reassignment to Judge Thompson, who already had familiarity with relevant issues of law and scientific evidence.

17. Notably, both the cited California and New York local rules clarify that the marking of related cases is a service to the court, indicated by language making the marking of relatedness a "responsibility" or "duty" of counsel.

18. The California local rule also provides instructive guidance on the concept of "pending case" by *imposing a duty* on counsel to file a "Notice of Pendency of Other Actions" whenever a civil action in the district court "involves a material part of the subject matter" of an action "then pending before the United States Court of Appeals." Local Rule 83-1.4, Central District of California.

19. The day after the motion to reassign was filed, an Order to Show Cause was entered in the *Walker* case on April 13 by Chief Judge Emily Marks to show cause why *Walker* should not be transferred to the Northern District "where the first-filed action [*Ladinsky*] is pending" where "it may be decided with *Ladinsky* to avoid the possibility of conflicting rulings, and to conserve judicial resources."

20. The parties in *Walker* consented to transferring the case to the Northern District and the plaintiffs withdrew their motion to reassign to Judge Thompson. *Eknes-Tucker*, 603

F.Supp.3d at 1140.

21. On April 15, 2022, *Walker* was transferred to the Northern District and randomly assigned to Judge Liles Burke.   *Id*.

22. At 4:07 pm on Friday, April 15, an ECF notice went out that Judge Burke had scheduled a status conference in *Walker* for 10am the following Monday, April 18, at his court in Huntsville, Alabama. May 20 at 42 (testimony of Solicitor General Edmund LaCour, Jr.)

23. April 15, 2022, was Good Friday of Holy Week in the Christian religious calendar.   April 17, 2022, was Easter. April 18, 2022, was the first day of Passover in the Jewish religious calendar.

24. Upon receiving the notice of the April 18 status conference, Hartnett was concerned because the only lawyer on the *Walker* litigation team who was located in Alabama and admitted to the Northern District was LaTisha Faulks (ACLU-Alabama). Aug. 3 at 28. "We barely made it to the filing bin. I don't mean to be rude to our local counsel, ACLU of Alabama.   I think this was her first complaint and PI filing. There was, apparently, a typo in the caption and we were trying to get that fixed. … From my perspective as Cooley … what we like to have is perfect work product, and it kind of didn't go down as we hoped." Aug 3 at 24.   Hartnett also thought, "[s]he doesn't know the issues in this case." Aug. 3 at 73.

25. At 4:41 pm on April 15 the *Ladinsky* case was transferred to Judge Burke. *Id*. As of this time, defendants in neither the *Walker* nor *Ladinsky* cases had filed an answer or motion for summary judgment.

26. Hartnett told the three-judge panel that the combination of scheduling a Monday 10am status conference and reassigning the *Ladinsky* case to Judge Burke, both taking place in the last hour of the business day on Good Friday, was "the forcing mechanism" that caused her to realize that an "inevitable train wreck … was coming." Id. at 53, 54.

27. Hartnett foresaw the April 18 status conference as an important and potentially critical case event for which the *Walker* litigation team would be inadequately prepared, due to the extremely short notice combined with the intersection of Christian and Jewish religious holidays, with possibly the only lawyer present for the *Walker* plaintiffs being inexperienced and unfamiliar with the substantive issues. Also, at that moment in the last business hour on April 15, she had serious concerns that any presentation by lawyers representing the *Ladinsky* plaintiffs at the status conference would conflict with the objectives of her clients.

28. "[W]e had different experts, we had different philosophies" Hartnett told the three-judge panel. Aug 3 at 55. Further, efforts to that point on collaboration had been very unsuccessful. "The groups really did not work well together." Aug. 3 at 48. "[O]ur folks were … scared to deal with their people." Aug. 3 at 49. "[T]he people on our team were kind of scared of the persons on their team" Aug. 3 at 81. "[T]his was like oil and water in terms of command and control versus collaboration" Aug. 3 at 52. "Why am I talking between Shannon Minter [lead decisionmaker for the Ladinsky plaintiffs] and James Esseks [with Hartnett, the lead decisionmaker for the Walker plaintiffs]? Can't they talk to each other? Well, I guess not." Aug. 3 at 53.

29. Hartnett's concerns about the ability of the teams to coordinate and cooperate—particularly in time for a Monday morning court conference that key team members might be unable to attend—were corroborated by testimony from lawyers representing the *Ladinsky* plaintiffs. Asaf Orr from the National Center for Lesbian rights told the three-judge panel: "we tried to dissuade the *Walker* team from filing their lawsuit." Nov 3 at 55. Shannon Minter from the same organization, consistently described as a lead decisionmaker for the *Ladinsky* plaintiffs, told the panel, "I felt strongly that I wanted our kind of approach to the case to be the one that was heard. … it was very important to me that we …would be the first case filed and would be the lead case. I had somehow been under the misimpression that the ACLU-Lambda team was not going to file in Alabama." Nov 3 at 124. He later told the panel, "this is a horribly important issue. … I thought that our approach to the case … was going to be the best way to approach it. … I really wanted us to have a chance to shape the case." Nov 3 at 142-43. Jennifer Levi from GLBTQ Legal Advocates and Defenders, described as the other lead decisionmaker for the *Ladinsky* litigation, told the panel, "our team's interest was in litigating separately from the Walker team. … it was our interest to bring a separate case." Nov. 4 at 13-14. Sarah Warbelow from the Human Rights Campaign said, "there were clear discrepancies in how the Walker team intended to litigate this matter and how our team intended to litigate the matter" Nov. 3 at 263.

30. Between 4:40 pm and 6:20 pm on Friday, April 15, lawyers for both the *Walker* and *Ladinsky* plaintiffs decided to dismiss their respective cases (without prejudice)  before the option for voluntary dismissal could be terminated by defendants' filing answers to

their complaints, they also agreed to immediately file simultaneous notices of voluntary dismissal. The lawyers from both cases also agreed to confer on Saturday, April 16, to explore the possibility of collaborating on a single new lawsuit.

31. At 6:24 pm on April 15 plaintiffs in *Walker* filed a voluntary notice of dismissal pursuant to Rule 41(a).

32. At 6:33 pm on April 15 plaintiffs in *Ladinsky* filed a voluntary notice of dismissal pursuant to Rule 41(a).

33. Consistent with Hartnett's expectation of "an inevitable train wreck," "the Saturday call"— which did not include Hartnett—"did not go well," as Minter told the panel. "[W]ho would make decisions and … what would be the decision-making process … that was the big sticking point.  We couldn't – yeah.  That was the bottleneck." Nov 3 at 166. See also testimony of Jennifer Levi, Nov. 4 at 48 ("the call on Saturday was to talk about how to [move forward with one case]. It became very quickly apparent that wasn't going to easily happen. There were differences of views about who the plaintiffs would be. There were differences in views expressed about where the case would be filed. There was a discussion about how decisions would be made, and there were very significantly different views about that as well. … I remember there being more disagreement than agreement.")

34. As a result of this unsuccessful meeting, the *Walker* plaintiffs decided not to refile their lawsuit and instead rely on the advocacy groups that had been supporting the *Ladinsky* litigation to pursue the possibility of a new lawsuit challenging S.B. 184.  *See* testimony of Shannon Minter, Nov. 3 at 166-167 ("Y'all go ahead and do this. There's too many

16

cooks in the kitchen.   We can't work this out. Somebody needs to challenge this law. Go. You know, go forward and do that.")

35. By Monday, April 18, Hartnett and the other lawyers at the Cooley law firm had ended their involvement in litigation challenging S.B. 184.

## IV. Opinion

A.  I assume the following legal principles are applicable.

1.  The Supplemental Order to Show Cause: Kathleen Hartnett (Doc. 479) indicates that for both the Northern District and the Middle District of Alabama the conduct of lawyers practicing before these courts is to be governed by the Alabama Rules of Professional Conduct adopted by the Alabama Supreme Court and, to the extent not inconsistent with the preceding, the American Bar Association Model Rules of Professional Conduct.

2.  When an attorney is placed in a situation that requires exercise of professional judgment, "expert testimony *is necessary* to define the standard of care" that applies in those circumstances. *San Francisco Residence Club, Inc. v Baswell-Guthrie*, 897 F.Supp. 1122, 1194 (N.D. Ala. 2012) (granting summary judgment in reliance on defendants' expert testimony) (emphasis in original). *See also Green v. Ingram*, 794 So.2d 1070, 1072 (Ala. 2001) (summary judgment for defendant affirmed where plaintiff failed to provide expert testimony on attorney's standard of care).

3.  Even when deciding a Rule 12(b)(6) motion, federal judges have found the opinion of an expert on legal ethics on standard of care to be useful. *See, e.g.*, *In re Friedman's Inc.*, 385 B.R. 381, 452 (S.D. Ga. 2008) (denying Alston & Bird motion to dismiss malpractice

17

claim, citing and quoting expert affidavit of Professor Clark D. Cunningham submitted by plaintiff).

4. For federal courts in Alabama, standard of care expert testimony can be admissible even if the expert is not licensed to practice law in Alabama if the expert has experience in the same general line of practice. *San Francisco Residence Club, Inc. v. Leader, Bulso & Nolan, PLC*, 2019 WL 7038252 (N.D. Ala. 2019).

B. My opinion addresses the following issues identified in the Supplemental Order to Show Cause: Kathleen Hartnett filed May 1, 2024 (Doc. 479): (1) marking on the Cover Sheet that Walker was related to Corbitt; (2) voluntary dismissal of the Walker complaint; (3) alleged failure of counsel to consult with plaintiff before filing the notice of voluntary dismissal. With respect to issues (1) and (2), it is my opinion that Hartnett not only met, but was required by, the standards of care for a lawyer litigating a constitutional rights claim in federal court in Alabama when she participated in marking *Walker* as related to *Corbitt* and filing the notice of voluntary dismissal. With respect to issue (3), it is my opinion that any alleged failure to consult with plaintiffs before filing the notice of voluntary dismissal would not, in the particular context, have been a violation of the applicable standard of care.

a. <u>Marking *Walker* as related to *Corbitt*</u>

(1) As now-Chief Judge Proctor went out of his way to point out during the three-judge panel proceedings, it is neither illegal nor unethical for a lawyer in representing a plaintiff who has a legitimate choice between more than one forum to pursue proceedings in a   forum where the lawyer hopes the case will be assigned to a judge whose record indicates the possibility of a

18

favorable decision for the plaintiff:

- "Let me be clear. We keep saying judge shopping, and we're using that as a shorthand term for something. But … judge shopping, in and of itself, is not necessarily impermissible. If you have – at the beginning of the case, if you are trying to decide whether to file in the Northern District or the Middle District – and one of your other colleagues has told me this was actually the consideration, we thought we had more favorable draws of judges in the Northern District than even the Middle District, that's one of the reasons we decided to go – there's nothing wrong with that." Nov. 3 at 218-219.

- "Every case that comes in, you evaluate your judge.   You try to assess the judge.   And there's nothing wrong with filing in a particular division to get a judge is my personal view." Aug. 4 at 254.

(2) Given a choice between two permissible litigation options, the standard of care is for a lawyer to choose the option most likely to advance the client's objectives of the representation. *See* Alabama Rule of Professional Conduct 1.2(a). *See also* Comment to Alabama Rule of Professional Conduct 1.3 ("A lawyer should pursue a matter on behalf of a client … and may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.")   Thus, Hartnett was not only acting within the standards of care, she was ethically obliged to file the *Walker* lawsuit in the Middle District rather than the Northern District given her professional judgment that the possibility of assignment to Judge Thompson could significantly advance her clients' objectives.

19

(3) Having decided to file in the Middle District, Hartnett was also ethically obliged to determine whether marking *Corbitt* as a related case was a permissible option since doing so would further advance the objective of having the case heard by Judge Thompson.

(4) Hartnett's testimony before the three-judge panel indicates that she made a good faith determination that marking *Corbitt* was a permissible option, as substantiated by the legal arguments in the motion to reassign filed the next day.

(5) Thus, it is my opinion that under the applicable standard of care Hartnett was not only permitted, but ethically obligated to mark *Corbitt* as a related case and to seek by motion the assignment of *Walker* to Judge Thompson.

b.   Filing notice of voluntary dismissal on April 15

(1) As explained in her testimony to the three-judge panel, late on the afternoon of April 15 Hartnett made the professional judgment that the best option for her clients, under difficult circumstances, was to file a notice of voluntary dismissal without prejudice, thus eliminating the risk of a "train wreck" at an April 18 status hearing, and instead creating what then appeared to be the best possibility for achieving her clients' objectives, which was to explore possible collaboration with the *Ladinsky* team in filing a new lawsuit.

(2) In her professional judgment, it was critical in pursuing this course of action to file the notice of voluntary dismissal as soon as possible to avoid the risk that the filing of an intervening answer by defendants would forego that option.

(3) Thus, it is my opinion that under the applicable standard of care Hartnett was ethically obligated to file the notice of voluntary dismissal on the afternoon of April 15.

c.   Alleged failure to consult with plaintiffs before filing notice of voluntary dismissal.

(1) During the three-judge panel proceedings, after objections asserting attorney-client and work-product privileges were made and overruled, the following testimony was obtained from Carl Charles (Lambda Legal), who was one of the lawyers representing the Walker plaintiffs:

> JUDGE WATKINS: Were you the client contact for any of these clients at all?
> MR. CARL CHARLES: There were a number of attorneys involved in client contact.
> JUDGE WATKINS: Were you one of them?
> MR. CARL CHARLES: I was at times, Your Honor, yes.
> JUDGE WATKINS: Which clients?
> MR. CARL CHARLES: Predominantly, Your Honor, the White family.
> ****
> JUDGE WATKINS: Right. Okay. Did you consult with them before you-all agreed to dismiss the case?
> MR. CARL CHARLES: We spoke with them immediately after that decision, Your Honor.
> JUDGE WATKINS: You told them after?
> MR. CARL CHARLES: Immediately after. Yes.   May 20 at 180-181

(2) There did not appear to be any other testimony before the three-judge panel regarding whether any of the lawyers representing the *Walker* plaintiffs consulted with any of the plaintiffs about filing a voluntary dismissal prior to the filing of the dismissal.

(3) I am informed by counsel for Hartnett that representatives from the *Walker* team consulted with both the Walker and White families about the voluntary dismissal on the evening of April 15, after the notice was filed, and that a declaration to that effect will be filed with the Court.

(4) Even assuming that none of the lawyers representing the *Walker* plaintiffs consulted with them prior to filing the notice of voluntary dismissal, in my opinion, a decision to go ahead with filing the notice of voluntary dismissal without delaying to consult first with the clients was consistent with the applicable standard of care.

(5) Alabama Rule of Professional Conduct 1.2(a) provides that a lawyer "shall consult with the client" as to the means by which the lawyer will work to achieve the client's objectives.

(6) As indicated the Supplemental Order to Show Cause: Kathleen Hartnett (Doc. 479), for both the Northern District and the Middle District of Alabama the conduct of lawyers practicing before these courts is to be governed by the American Bar Association Model Rules of Professional Conduct to the extent that those rules are not inconsistent with the Alabama Rules of Professional Conduct.

(7) ABA Model Rule 1.2(a) adds language that is not inconsistent with Alabama Rule 1.2(a) but rather provides helpful clarification on the particular issue identified by the Supplemental Order to Show Cause: Kathleen Hartnett.

(a) Following the phrase "shall consult with the client as to the means by which they [the client's objectives] are to be pursued," ABA Model Rule 1.2(a) adds this sentence: "A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation."

(b) Immediately preceding the phrase "shall consult with the client as to the means by which they [the client's objectives] are to be pursued," ABA Model Rule 1.2(a) inserts "as required by Rule 1.4."    ABA Model Rule 1.4: Communications adds an explicit reference to the duty to consult about "means" not found in Alabama Rule 1.4: "A lawyer shall … *reasonably* consult with the client about the means by which the client's objectives are to be accomplished" (emphasis added). The comment to ABA Model Rule 1.4 explains the meaning of "reasonably consult" in terms directly applicable to the issue in this case: "Paragraph (a)(2) requires the

lawyer to reasonably consult with the client about the means to be used to accomplish the client's objectives. *In some situations* — depending on both the importance of the action under consideration and the feasibility of consulting with the client — this duty will require consultation prior to taking action. *In other circumstances*, such as during a trial when an immediate decision must be made, *the exigency of the situation may require the lawyer to act without prior consultation.* In such cases the lawyer must nonetheless act reasonably to inform the client of actions the lawyer has taken on the client's behalf." (emphasis added). The comment to Alabama Rule 1.4 similarly says, "Practical exigency may also require a lawyer to act for a client without prior consultation."

(8) Even assuming that consultation with the Walker plaintiffs about voluntary dismissal took place immediately after the notice was filed rather than before, Hartnett's reasonable belief that the exigency of the situation required taking action before the clients' right to voluntary dismissal might be extinguished by the filing of an answer makes this exercise of her professional judgment consistent with the appropriate standard of care.

### V. Conclusion.

I reserve the right to modify and supplement this declaration after I have the opportunity to review any additional documents, testimony, or other factual information regarding this matter. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2024

_Clark D. Cunningham_

Clark D. Cunningham

23

# CLARK D. CUNNINGHAM

**Professor and W. Lee Burge Chair in Law & Ethics**
**Georgia State University College of Law**
P.O. Box 4037
Atlanta, GA 30302-4037
Phone: (404) 413-9168
Fax: (404) 413-9082
Office: Room 210
Administrative Specialist - Managerial: Diadra G. Dorsey Ddorsey@gsu.edu
Email: cdcunningham@gsu.edu
Home Page: www.ClarkCunningham.org
Street Address for Courier Delivery:
85 Park Place NE, 2nd Floor
Atlanta, GA 30303

**EDUCATION**:

WAYNE STATE UNIVERSITY LAW SCHOOL. Detroit, Michigan. J.D. 1981. Summa Cum Laude. Class Rank - 2nd. 3.91/4.0 GPA.

UNIVERSITY OF CHICAGO LAW SCHOOL. Chicago, Illinois. 1977-78. Floyd Mechem Scholarship. 79.6 GPA (top 5% of class). Invited to join Law Review. Joseph Beale award for excellence in first year research and writing program.

DARTMOUTH COLLEGE. Hanover, New Hampshire. A.B. 1975 Summa Cum Laude. Class rank - 3rd/796. Phi Beta Kappa. Senior Fellow. Concentrations in English and Anthropology. Perkins Literature Prize. Gurdin Drama Prize. Daniel Webster Scholar. National Merit Scholar.

**EMPLOYMENT:**

GEORGIA STATE UNIVERSITY COLLEGE OF LAW. Atlanta, Professor and Georgia. W. Lee Burge Chair in Law & Ethics. (6/02 - present). Courses: Civil Procedure; Linguistic Analyis of Legal Texts;The Client Relationship; Civil Procedure: The Federal Rules; Transition to Practice; Seminar on Judicial Power; Fundamentals of Law Practice; Professional Responsibility: Heroes & Villains; Criminal Justice Clinic; Criminal Justice Fieldwork & Law Reform; The Future of Legal Education: Comparative Perspectives; Introduction to the American Legal System (University of Warsaw, Poland).

WASHINGTON UNIVERSITY SCHOOL OF LAW. St. Louis, Missouri. Associate Professor (7/89-6/93); Professor (7/93-5/02). Israel Treiman Research Fellow (1999-2000). Courses: Comparative Constitutional Law; Law, Language & Culture; Remedies; The Legal Profession: Heroes and Villains ; Urban Community Dynamics;

Law in the Urban Community; Urban Law Clinic I and II; Criminal Justice Clinic I and II; Pretrial Practice and Procedure; Law in Context; and seminar on Law as Language, Law as Literature.

1987-89 THE UNIVERSITY OF MICHIGAN LAW SCHOOL. Ann Arbor, Michigan. Clinical Assistant Professor of Law.

1986-1987 STARK AND GORDON. Detroit, Michigan. Associate in law firm specializing in employment discrimination and civil rights litigation.

1986 INDO-AMERICAN FELLOWSHIP PROGRAM. New Delhi, India. Three month fellowship as a visiting scholar at the Indian Law Institute doing comparative research on public interest litigation.

1983-1985 MICHIGAN LEGAL SERVICES. Detroit, Michigan. Staff attorney at the federally designated center for training, research and law reform for legal aid offices in Michigan. My major responsibilities were statewide training of legal aid attorneys, coordination of the Michigan Public Benefits Task Force, individual case consultation, and complex reform litigation.

1981-1983 THE HONORABLE AVERN COHN, U.S. DISTRICT JUDGE. Detroit, Michigan. Law Clerk.


**PUBLICATIONS:**

Four Reasons the Supreme Court Should Reconsider its Article III Standing Doctrine (with Ute Römer-Barron), forthcoming in the Ohio State Law Journal Online Volume 85 (2024)

Did January 6 Defendants (Including Donald Trump) 'Otherwise Obstruct an Official Proceeding'? Linguistic Analysis for the Fischer Case Before the Supreme Court (with Ute Römer-Barron) (February 2, 2024). Georgia State University College of Law, Legal Studies Research Paper Forthcoming, Available at SSRN: https://ssrn.com/abstract=4709559  or http://dx.doi.org/10.2139/ssrn.4709559

Applied corpus linguistics and legal interpretation: A rapidly developing field of interdisciplinary scholarship (with Ute Roemer) (2023), submitted by invitation, Applied Corpus Linguistics

Republicans call for impeachment inquiry into Biden – a process the founders intended to deter abuse of power as well as remove from office, The Conversation (Sep. 12, 2023)

Can a President Be Impeached for Non-Criminal Conduct? New Linguistic Analysis Says Yes (with Ute Roemer) (2023), Georgia State University College of Law, Legal

Studies Research Papers Series,available at SSRN: https://ssrn.com/abstract=4425671

Trump faces possible obstruction of justice charges for concealing classified government documents – 2 important things to know about what this means, The Conversation, Aug. 31, 2022
FBI's Mar-a-Lago search warrant reveals how Trump may have compromised national security -- a legal expert answers 5 key questions, The Conversation, Aug. 26, 2022 (republished Yahoo News, Aug. 26, 2022)

Trump's Mar-a-Lago lawsuit spotlights how difficult search warrants are to challenge – by a criminal suspect or an ex-president – until charges are brought, The Conversation, Aug. 23, 2022

Unsealed court documents show the FBI was looking for evidence Trump violated the Espionage Act and other laws – here's how the documents seized show possible wrongdoing, The Conversation, Aug. 12, 2022

Why searching an ex-president's estate is not easily done – 4 important things to know about the FBI's search of Mar-a-Lago, The Conversation, Aug. 9, 2022 (republished PBS Newshour, Aug. 9, 2022)

*Impeaching a former president – 4 essential reads*, The Conversation (Feb. 5, 2021) (with Jeff Inglis, Gerard Magliocca, Kirsten Carlson & Michael Blake)

*Democrats Are Pursuing the Wrong Impeachment Charges Against President Trump*, Politico (Jan. 10, 2021)

Analyzing Legal Discourse in the United States, *in* Routledge Handbook of Corpus Approaches to Discourse Analysis 462-80 (Eric Friginal & Jack A. Hardy eds. 2020) (with Jesse Egbert), working paper version published on the Social Science Research Network at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3554023

Using Common Sense: Postscript, *in* 2 Charles J . Fillmore: Form and Meaning in Language 347-51 (Pedro Gras, Jan-Ola Ostman & Jeff Verschueren eds. 2020).

Using Empirical Data to Investigate the Original Meaning of "Emolument" in the Constitution, 36 Georgia State Law Review 465-89 (2020) (with Jesse Egbert), available at https://readingroom.law.gsu.edu/gsulr/vol36/iss5/6 and also published on the Social Science Research Network at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3460735.

Questions Involving National Peace and Harmony" or "Injured Plaintiff Litigation"? The Original Meaning of "Cases" in Article III of the Constitution, 36 Georgia State Law Review 535-605 (2020) (with Haoshan Ren, Margaret Wood, Noor Abbady, Ute Römer, Heather Kuhn & Jesse Egbert) available at https://readingroom.law.gsu.edu/

gsulr/vol36/iss5/8 and also published on the Social Science Research Network: https://ssrn.com/abstract=3460743.

Limiting Senate inquiry ignores Founders' intent for impeachment, The Conversation (Jan. 30, 2020)

The Dershowitz Attack on the Trump Articles of Impeachment is Weakened, Perhaps Fatally, by the Possibility That "Misdemeanors" Could Mean "Misconduct", Harvard Law Review Blog, Jan. 29, 2020

The One Word Alan Dershowitz Gets Wrong in the Impeachment Clause: There's a reason the Founders didn't just end it at "high crimes" Politico, Jan. 24, 2020

Founders: Removal from office is not the only purpose of impeachment The Conversation (Sep. 26, 2019, updated Dec. 16, 2019)

Misleading statements on Russia meeting recall Clinton's impeachment , The Conversation (August 3, 2017)

Did Sessions and Trump conspire to obstruct justice? ,The Conversation (June 14, 2017)

"Educational Programs for Professional Identity Formation: The Role of Social Science Research," 68 Mercer Law Review 591 (2017) (with Muriel J. Bebeau and Stephen J. Thoma)

Comey's firing may end other investigations into 2016 election , The Conversation (May 10, 2017)

Restoring transparency and fairness to the FBI investigation of Clinton emails, The Conversation (Oct. 31, 2016)

In getting 'new' Clinton emails, did the FBI violate the Constitution?, The Conversation (Oct. 29, 2016)

Apple and the American Revolution: Remembering Why We Have the Fourth Amendment, 126 Yale Law Journal Forum 218 (Oct. 26, 2016)

Feds: We can read all your email, and you'll never know, The Conversation (Sep. 21, 2016)

"Supreme Court of Georgia Dramatically Expands Student Practice: Supporting Experiential Education and Broadening Access to Justice," Georgia Bar Journal 50 (February 2016).

"Learning Professional Responsibility," Building on Best Practices: Transforming

Legal Education in a Changing World (Deborah Maranville, Lisa Radtke Bliss, Carolyn Wilkes Kaas & Antoinette Sedillo Lopez eds. Lexis/Matthew Bender 2015); expanded version available at www.teachinglegalethics.org/learningpr

"Finding a Better Way to Teach," 17 Chapman Law Review 173 (2013) (Annual Symposium Issue: The Future of Law, Business, and Legal Education: How to Prepare Students to Meet Corporate Needs) (transcribed remarks).

What Do Clients Want From Their Lawyers?", 2013 Journal of Dispute Resolution 143 (Annual Symposium Issue: Overcoming Barriers in Preparing Law Students for Real-World Practice), excerpted in Teaching the Clinic Seminar (Jane H. Aiken, Deborah Epstein & Wallace J. Mlyniec eds. West Academic 2014).

Law School of the Future: Centre of Cutting-Edge Practice?, The Law of the Future and the Future of Law: Volume II (Sam Muller, Stavros Zouridis, Morly Frishman & Laura Kistemaker eds. Torkel Opsahl Academic, The Hague) (2012).

Should American Law Schools Continue to Graduate Lawyers Whom Clients Consider Worthless?, 70 Maryland Law Review 499 (2011).

"Developing Professional Judgment: Law School Innovations in Response to the Carnegie Foundation's Critique of American Legal Education," in The Ethics Project in Legal Education (Eds. Michael Robertson, Francesca Bartlett, Kieran Tranter & Lilian Corbin (London: Routledge-Cavendish 2010) (co-authored with Charlotte Alexander).

"Remediation Program for Dentists Provides Data on Moral Development Important to All Professions," 76 Journal of the American College of Dentists No. 4 (2009).

" 'How Can We Give Up Our Child?' A Practice-Based Approach to Teaching Legal Ethics," 42 The Law Teacher: The International Journal of Legal Education 312 (2008) (Special Issue on The Values of Common Law Legal Education).

"Valuing What Clients Think: Standardized Clients and the Assessment of Communicative Competence" (co-authored with Karen Barton, Gregory Todd Jones & Paul Maharg), 13 Clinical Law Review 1 - 65 (2006); reprinted in New Currents of Law School Education 131-146 (Kwansei Gakuin University Press 2009) (excerpted and translated into Japanese).

Book Review, The Worlds Cause Lawyers Make: Structure and Agency in Legal Practice, by Austin Sarat and Stuart A. Scheingold (eds), 16 Law & Politics Book Review 226 - 29 (2006).

"Legal Education After Law School: Lessons from Scotland & England," 33 Fordham Urban Law Journal 193 - 209 (2005) (special symposium issue on Professional Challenges in Large Firm Practice).

"The Professionalism Crisis: How Bar Examiners Can Make a Difference," 74 Bar Examiner 6 - 9 (Nov 2005) (lead article in special issue on "Other Lawyer Licensing Processes and Alternatives to the Bar Examination").

"Taking the Punishment out of the Process: From Substantive Criminal Justice Through Procedural Justice To Restorative Justice," 67 Law & Contemporary Problems 59 - 86 (Duke Law School Autumn 2004) (co-authored with Brenda Sims Blackwell).

"Rethinking the Licensing of New Attorneys: An Exploration of Alternatives to the Bar Exam," 20 Georgia State University Law Review vii-xxx (2004).

"After the Grutter Decision Things Get Interesting! The American Debate over Affirmative Action Is Finally Ready for Some Fresh Ideas from Abroad," 36 Connecticut Law Review 665 - 76 (2004)

"But What is Their **_Story_**?" 52 Emory Law Journal 1147-56 (2003).

"Lessons on Affirmative Action from India," 1 The Subcontinental: A Journal of South Asian American Political Identity 51-56 (Summer 2003) (Special Issue on Affirmative Action).

"Specialty Certification as an Incentive for Increased Professionalism: Lessons from Other Disciplines and Countries," 54 South Carolina Law Review 987- 1009 (2003) (co-authored with Adrian Evans).

"How to Explain Confidentiality?" 9 Clinical Law Review 579 -621 (2003).

"The World's Most Powerful Court: Finding the Roots of India's Public Interest Litigation Revolution in the Hussainara Khatoon Prisoners Case," in Liberty, Equality and Justice : Struggles for a New Social Order 83-96 (S.P Sathe ed.) (2003).

"Passing Strict Scrutiny: Using Social Science to Design Affirmative Action Programs," 90 Georgetown Law Journal 835-82 (2002) (with Glenn C. Loury & John David Skrentny).

"Affirmative Action: Comparative Policies and Controversies," International Encyclopedia of the Social and Behavioral Sciences 210 -214 (2002).

"Affirmative Action: India's Example," 4 Civil Rights Journal 22-27 (Fall 1999).

"Race, Class, Caste ...? Rethinking Affirmative Action," 97 Michigan Law Review 1296-1310 (1999) (with N.R. Madhava Menon) (published with a reply by Cass Sunstein).

"Evaluating Effective Lawyer-Client Communication: an International Project Moving

From Research to Reform," 67 Fordham Law Review 1959-86 (1999).

"Hearing Voices: Why the Academy Needs Clinical Scholarship," 76 Washington University Law Quarterly 85-95 (1998), reprinted in Legal Education for the 21st Century (Donald B. King ed.1999).

"Rethinking Equality in the Global Society," 75 Washington University Law Quarterly 1561-1676 (1997) (transcribed conference proceedings) (edited entire transcript; authored opening and closing plenary speeches, id. at 1579, 1672).

"Taking It to the Streets: Putting Discourse Analysis to the Service of a Public Defender's Office," 2 Clinical Law Review 285-314 (1995) (with Bonnie S. McElhinny).

Clark D. Cunningham & Charles Fillmore, Using Common Sense: A Linguistic Perspective on Judicial Interpretations of 'Use a Firearm'," 73 Washington University Law Quarterly 1159-1214 (1995), reprinted in 2 Charles J . Fillmore: Form and Meaning in Language 347-51 (Pedro Gras, Jan-Ola Ostman & Jeff Verschueren eds. 2020).

"What is Meaning in a Legal Text?" 73 Washington University Law Quarterly 800-970 (1995) (transcribed proceedings: Northwestern University-Washington University Law and Linguistics Conference).

"Bringing Linguistics into Judicial Decisionmaking," 2 Forensic Linguistics: The International Journal of Speech, Language, and the Law 81-98 (1995) (with Jeffrey P. Kaplan, Georgia M. Green, and Judith N. Levi).

"Learning from Law Students: A Socratic Approach to Law and Literature?" 63 University of Cincinnati Law Review 195-220 (1994) (Symposium on Law, Literature and the Humanities).

"Plain Meaning and Hard Cases," 103 Yale Law Journal 1561-1625 (1994) (with Judith N. Levi, Georgia M. Green, and Jeffrey P. Kaplan) (cited 114 S.Ct. 1259, 1264; 114 S.Ct. 1793, 1806; 114 S.Ct. 2251, 2255).

"Sometimes You Can't Make a Dent, But They Know You've Been There: The Lawyer As God's Witness," 106 Harvard Law Review 1962-79 (1993).

"The Lawyer as Translator, Representation as Text: Towards an Ethnography of Legal Discourse," 77 Cornell Law Review 1298-1387 (1992).

"Why American Lawyers Should Go to India: Retracing Galanter's Intellectual Odyssey," 16 Law & Social Inquiry (Research Journal of the American Bar Foundation) 777-808 (1991).

"A Tale of Two Clients: Thinking About Law as Language," 87 Michigan Law Review

2459-2494 (1989) (reprinted in Alex Hurder et al (eds.), Clinical Anthology (1997).

"A Linguistic Analysis of the Meanings of 'Search' in the Fourth Amendment: A Search for Common Sense," 73 Iowa Law Review 541-609 (l988).

"Professional Responsibility," 34 Wayne Law Review 1005-1031 (l988).

"Public Interest Litigation in the Supreme Court of India: A Study in Light of the American Experience," 29 Journal of the Indian Law Institute 494-523 (1987).

Legal Ethics in a Gandhian Perspective. (First Gandhi Memorial Lecture: Gandhi-In-Action International) New Delhi, India. l987. Reprinted in R. P. Misra, The Gandhian Model of Development and World Peace (1989).

**SCHOLARLY AND PROFESSIONAL PRESENTATIONS**

Are most search warrants for electronically stored information unconstitutional general warrants?, AALS Section on Crimnal Procedure, Association of American Law Schools Annual Meeting 2024, Jan. 5, 2024 (organized and chaired session)

Using Corpus-Based Linguistic Analysis for Legal Interpretation: An Explanation for Law Students, Judges, Lawyers, and Legal Scholars, Eighth Annual Law and Corpus Linguistics Conference, Brigham Young University Law School, Oct. 13, 2023

Oversight of Prosecutorial Decisionmaking and Conduct, Georgia State University College of Law, Aug. 18, 2023 (organized and chaired one-day conference)

"What do we know about prosecutorial misconduct?", Oversight of Prosecutorial Decisionmaking and Conduct, Georgia State University College of Law, Aug. 18, 2023

Can a corpus analysis of "such... as" constructions in 18th century American English facilitate interpretation of the U.S. Constitution's Appointments Clause?, Corpus Linguistics 2023, Lancaster University (UK), July 2023 (with Haoshan Ren and Ute Römer-Barron).

Applied corpus linguistics and legal interpretation: A rapidly developing field of interdisciplinary scholarship, American Association for Applied Linguistics, March 2023 (with Ute Römer)

Testing Supreme Court precedent about the meaning of the Appointments Clause against linguistic analysis of the text (15th American Association for Corpus Linguistics Conference Northern Arizona University September 10, 2022) (with Haoshan Ren and Ute Römer)

Corpus Linguistics meets the law: Can an American president only be impeached for criminal conduct? (ICAME 2022 Cambridge UK July 28, 2022) (with Ute Römer)

*What does it mean to search a cell phone?* (with Jesse Egbert, Megan Wells, Amanda Black & Maria Kostromitina)*,* presented at Seventh Annual Law and Corpus Linguistics Conference, February 4, 2022

*What counted as a misdemeanor in founding era American English? A corpus approach to uncovering the original public meaning of "misdemeanors" in the impeachment clause* (with Ute Roemer), presented at Corpus Linguistics International Conference 2021

"Investigating the Original Meaning of 'Misdemeanors' in the Impeachment Clause," Sixth Annual Conference on Law & Corpus Linguistics, Brigham Young University School of Law (virtual), February 5, 2021 (with Ute Roemer)

"What Could Congress Do about the Pandemic by December 18?," Virtual Conference co-sponsored by Emory University and Georgia State University, Dec 4, 2020 (co-organized and moderated)

"Using Corpus Linguistics to Interpret Legal Texts: When Does a Lawyer Need a Linguist?", Fifth Annual Conference on Law & Corpus Linguistics, Brigham Young University School of Law, Provo, Utah, February 7, 2020

"New Voices on Legal Interpretation," Annual Meeting, Association of American Law Schools, Washington, D.C., January 4, 2020 (organized and moderated)

Law & Linguistics Workshop, Georgia State University, Oct. 18, 2019 (organized and chaired)

"Using Empirical Data to Investigate the Original Meaning of 'Emolument' in the Constitution," Law & Linguistics Workshop, Georgia State University, Oct. 18, 2019

"Linguistic Corpora in the Law," International Language and Law Association, UCLA Law School, Sep. 13, 2019

"President Trump and the Emoluments Clauses," ACS and Federalist Society Student Chapters, Georgia State University College of Law, March 7, 2019

"Non-Partisan Originalism: Using Corpus Linguistics to Discover Original Meaning", ACS Constitutional Law Scholars Forum, jointly sponsored by Barry University School of Law and Texas A&M University School of Law, Orlando, Florida, March 1, 2019

"Assessing Integrity as a Learning Outcome," University of St. Thomas School of Law, Minneapolis, February 16, 2019

"Scientific Methods for Analyzing Original Meaning: Corpus Linguistics and the Emoluments Clauses," Fourth Annual Conference on Law & Corpus Linguistics, Brigham Young University School of Law, Provo, Utah, February 8, 2019

"Ethics for Prosecutors: Communicating with Unrepresented Defendants," National Institute for Teaching Ethics & Professionalism, Atlanta, Georgia, November 21, 2018

"The International Forum on Teaching Legal Ethics and Professionalism," Professional Ethics Committee, International Bar Association, Italy, November 6, 2018

"Teaching Lawyers about Using Corpus Linguistics," 14th Conference of the American Association for Corpus Linguistics, Atlanta, Georgia, September 21, 2018

"Hindu Perspectives on Criminal Defense," Religious Lawyering at Twenty, Institute on Religion, Law & Lawyer's Work, Fordham University School of Law, New York City, September 14, 2018 (chaired panel discussion)

"Objective Methods for Assessing the Effectiveness of Professional Responsibility Programs," 44th American Bar Association National Conference on Professional Responsibility, Louisville, Kentucky, June 1, 2018 (organized and chaired panel presentation)

Third Annual Conference on Law & Corpus Linguistics, Brigham Young University School of Law, Provo, Utah, March 8 - 9, 2018 (invited discussant)

"Constraining Donald Trump with the Rule of Law," Inaugural Lecture, 20th Anniversary Program for the Center for American Legal Studies, University of Warsaw, Poland, October 23, 2017

"Protecting Data: What Happened to the Fourth Amendment?", What Every Lawyer Needs to Know About Data Privacy and Security, Tower to Trenches CLE, GSU College of Law, April 28, 2017 (also served as organizer and moderator)

"Judicial Ethics in Georgia," Georgia Office of Administrative Hearings, Atlanta, April 27, 2017

"The Next Steps of a Professional Formation Social Movement," University of St. Thomas School of Law, Minneapolis, February 17-18, 2017 (invited discussant)

"Outcome Measures for Professional Identity Formation," American Bar Association Standing Committee on Professionalism, Miami, February 4, 2017

"Outcome Measures for Professional Identity Formation," Consortium of Professionalism Initiatives, Miami, February 4, 2017

"FBI v Apple, Microsoft v Department of Justice, and Post-Riley Cell Phone Searches: Rediscovering the Fourth Amendment", presented November 3, 2016 at the American Bar Association Criminal Justice Section Annual Fall Institute

"Educational Programs for Professional Identity Formation: The Role of Social Science Research," opening presentation on October 7, 2016 at 2016 Mercer Law Review Symposium: Educational Interventions to Cultivate Professional Identity in Law Students, Macon, GA

"The Government Says It Can Read All Your Email Without Your Knowledge: What Happened to the Fourth Amendment?" Presented September 15, 2016, Rutgers Law School, Newark, NJ

"Being a Lawyer, Becoming a Hero," presented July 14, 2016 at the 7th International Legal Ethics Conference, held at Fordham Law School, New York City

Implementation of the New Student Practice Rule, presented January 16, 2016, Georgia Supreme Court - Georgia Board of Bar Examiners Meeting, St. Simons Island, Georgia.

Organized Fall 2015 Meeting of the National Institute for Teaching Ethics & Professionalism, Atlanta, Georgia.

Organized 2015 Burge Conference on Law & Ethics, Lawyers as Leaders, November 9, 2015, Georgia State University College of Law, Atlanta, Georgia.

Courage, Compassion and Commitment: Two Ethical Decisions that Changed History, The 2015 Judge Harry J. Wilters, Jr. Lecture on Constitutional Law and Professional Ethics, University of South Alabama, September 2015.

"Public Interest Litigation in India," presented at 8th Worldwide Conference of the Global Alliance for Justice Education, Turkey, July 2015.

"Learning Professional Responsibility for the Practice of Law: the Way Forward," presented at 8th Worldwide Conference of the Global Alliance for Justice Education, Turkey, July 2015.

Deans' Forum on Professional Formation, March 1-2, 2015, Pepperdine University School of Law, Malibu, California (invited discussant).

Proposed New Student Practice Rule, presented January 17, 2015, Georgia Supreme Court - Georgia Board of Bar Examiners Meeting, St. Simons Island, Georgia.

Lessons from Gandhi on Professional Responsibility, presented January 13, 2015, Workshop on Consumer Protection and Public Interest Advocacy, National Law School of India University, Mangalore, India.

Kapila Hingorani: India's First Public Interest Lawyer, presented January 11, 2015, First Kapila Hingorani Memorial Lecture, Nehru Memorial Museum and Library, New Delhi, India.

Courage: Operationalizing Research on Virtue Ethics and Moral Development for Professional Education, presented January 7, 2015, Varieties of Virtue Ethics Conference, Oriel College, University of Oxford, UK.

Organized and Chaired Fall 2014 Meeting of the National Institute for Teaching Ethics & Professionalism, Serenbe, Georgia.

Organized and Chaired 2014 International Workshop of the National Institute for Teaching Ethics & Professionalism, City Law School, London, UK.

Are We Making a Difference? Assessing the Effectiveness of Legal Ethics Education, July 11, 2014, Sixth International Legal Ethics Conference, London, UK (organized and chaired panel).

Vision 2016: Legal Education, June 27, 2014, Annual Meeting of the Florida Bar, Orlando, Florida (invited discussant).

Access to Justice, Legal Education & Incubators, March 3, 2014, Bleckley Inn of Court, Atlanta, Georgia (co-presented with Hulett Askew).

Organized and Chaired Fall 2013 Workshop of The National Institute for Teaching Ethics & Professionalism, Serenbe, Georgia.

Workshop on Moral Courage, Opening Speaker, Teach Legal Ethics UK, The City Law School, London, England, July 12, 2013.

Convivium on Education, Professionalism and the Academy, invited participant, supported by a grant from the United Kingdom Higher Education Academy, Papa Westray, Scotland, July 1-5, 2013.

Lead Presenter, National Conference on Transforming Legal Education, Nigerian Law School, Nigeria, May 5 -10, 2013.

Conflicts of Interest Survival for Corporate Counsel: Advance Waiver -- To Waive or Not to Waive, presented March 14, 2013, Annual Corporate Counsel Conference, Hispanic National Bar Association, Atlanta, Georgia.

"Conflicts, Confidentiality and Representing a Corporate Entity," presented February 21, 2013, Kilpatrick Townsend & Stockton LLP Annual Ethics Conference, Atlanta, Georgia.

"Finding a Better Way to Teach," presented February 1, 2013, Chapman Law Review Symposium: The Future of Law, Business, and Legal Education: How to Prepare Students to Meet Corporate Needs, Orange, California.

"What Do Clients Want From Their Lawyers?"**,** presented October 19, 2012, at Law Review Symposium on Overcoming Barriers in Preparing Law Students for Real-World Practice, University of Missouri School of Law, Columbia, Missouri.

"Does Legal Education Need to Give Higher Priority to Teaching Ethics and Professional Judgment? If So, What Can Be the Role for Professional Bodies and Regulatory Bodies?", organized and co-chaired session on October 5, 2012 at the Annual Conference of the International Bar Association, co-sposored by the Academic & Professional Development Committee, Professional Ethics Committee, and Bar Issues Commission, Dublin, Ireland.

"Where Will the New Law Jobs Be?", organized session on October 4, 2012 at the Annual Conference of the International Bar Association, co-sposored by the Academic & Professional Development Committee, Young Lawyers Committee, and Senior Lawyers Committee, Dublin, Ireland.

"Open-access resource designed for teaching ethics and professionalism," co-presented with Professor Nigel Duncan on July 14, 2012, at the Fifth International Legal Ethics Conference, Banff, Alberta, Canada.

Organized and Chaired 2012 International Workshop of The National Institute for Teaching Ethics & Professionalism, Banff, Alberta, Canada.

Organized and Chaired Spring 2012 Workshop of The National Institute for Teaching Ethics & Professionalism, Seattle, Washington.

"Anti-Money Laundering, Ethics and Professional Judgment: A Teaching Exercise," presented March 9, 2012, Annual Meeting of the American College of Trust & Estate Counsel (ACTEC), Miami.

Real-Life Experience and Authentic Responsibility, Keynote Address, February 13, 2012, National Conference on Curriculum Renewal in Legal Education, Queensland University of Technology, Brisbane, Australia.

A Case That Changed History - Gandhi as Commercial Litigator, presented February 9, 2012, New Foundations for Legal Process and Lawyers' Ethics: Australia New Zealand Legal Ethics Colloquium, University of Otago, Dunedin, New Zealand.

Organized and Chaired 2011 Burge Conference on Law & Ethics, Georgia State University College of Law, Atlanta.

Organized and Chaired Fall 2011 Workshop of The National Institute for Teaching

Ethics & Professionalism, Serenbe, Georgia.

"Anti-Money Laundering, Ethics and Professional Judgment: A Teaching Exercise," presented November 2, 2011, Annual Conference of the International Bar Association, Dubai (Joint Session of the Academic & Professional Development Committee and the Anti-Money Laundering Legislation Implementation Working Group).

"Anti-Money Laundering, Ethics and Professional Judgment: A Teaching Exercise," presented October 29, 2011, Teaching Ethics in the Law Curriculum, The City Law, City University London. Also served as co-organizer of the workshop.

"The OPM Teaching Exercise," presented October 20, 2011, Canadian Association for Legal Ethics, University of New Brunswick Faculty of Law.

"Conflicts, Confidentiality and Representing a Corporate Entity," presented June 1, 2011, Sidley & Austin, New York City.

"Client Satisfaction and Effective Representation through Listening: How Hard Can It Be?," presented June 1, 2011, Sidley & Austin, New York City.

"The Emerging Worldwide Emphasis on Teaching Ethics and Professionalism," presented April 29, 2011 at the opening session of the Spring 2011 Workshop of The National Institute for Teaching Ethics & Professionalism held at St. Thomas University School of Law, Minneapolis. Also organized and chaired the entire workshop.

"When and How Legal Ethics Should be Taught," presented January 29, 2011 at the Fourth Learning in Law Annual Conference, sponsored by the United Kingdom Centre for Legal Education and held at the Warwick University School of Law (co-presented with Nigel Duncan and Tony King).

"Conflicts, Confidentiality and Company Law," presented January 26, 2011 to Dundas & Wilson, Edinburgh (Scotland's largest law firm).

Conference on Empirical Professional Ethics, held at St. Thomas University School of Law, on November 6, 2010, in Minneapolis, Minneapolis (invited discussant).

Are We Making a Difference? Developing Outcome Measures to Evaluate the Effectiveness of Law School Efforts to Teach Ethics and Develop Professionalism, presented on October 16, 2010 at FutureEd 2: Making Global Lawyers for the 21st Century, Harvard Law School.

Educating the Digital Lawyer, Berkman Center for Internet & Society, Harvard University, October 14, 2010 (invited discussant).

Ethical Competence: Preparing Lawyers for Substantial Client Responsibility,

organized and chaired three hour joint session of the Academic & Professional Development Committee and the Professional Ethics Committee on October 7, 2010, at the Annual Conference of the International Bar Association, held in Vancouver, Canada.

When Ethical Rules Differ, participated in panel presentation to the Professional Ethics Committee on October 4, 2010 at the Annual Conference of the International Bar Association, held in Vancouver, Canada.

Ideas for Teaching Ethics and Professionalism, plenary speaker at the Annual Meeting of the Continuing Legal Education Regulators' Association, on July 26, 2010, in New York City.

Global Collaboration Toward More Effective Teaching of Legal Ethics and Professionalism, panel presentation on July 16, 2010 at the Fourth International Legal Ethics Conference held at Stanford Law School.

Fostering An Ethical Professional Identity, participated in plenary panel presentation on June 25, 2010, at the annual American Bar Association Conference of Associate Deans, held in Minneapolis, Minnesota.

Threshold Learning Outcome on Ethics and Professional Responsibility, presented by pre-recorded video on June 7, 2010, for the Inaugural Conference of Associate Law Deans in Melbourne, Australia.

Can We Predict and Prevent Professional Misconduct? Lessons from the Dental and Medical Professions, organized and chaired panel presentation on June 5, 2010, at the American Bar Association Annual National Conference on Professional Responsibility, held in Seattle, Washington.

Developing Criteria for Effective Client Communication from Standardized Client Assessment Protocols, presented May 6, 2010, in Baltimore, Maryland at the 2010 Clinical Conference of the Association of American Law Schools.

"Learning How to be a Lawyer in America: Before or After the Law Degree?", presented April 28, 2010, at the University of Maryland Law School, Symposium on The Profession and the Academy: How Are They Addressing Major Changes in Law Practice?

"How the New Hampshire Program Has Adapted a Required Element of Medical Licensing By Creating "Standardized Client" Assessments," presented on April 23, 2010, at the Conference on A Performance-Based Approach to Licensing Lawyers: The New Hampshire Two-Year Bar Examination, University of New Hampshire School of Law.

"Deciding to Let the Windmill Win: the Baby Jessica Adoption Case," presented in

Madrid, Spain, on October 7, 2009, at a Joint Session of the Academic and Professional Committee and the Judges Forum on *Tilting at Windmills*, Annual Meeting of the International Bar Association.

"What Clients Want from Their Lawyers: Are Big Firm Clients Different?," presented in Denver on May 28, 2009, as part of a panel on *Private Practice Lawyers: Economic & Organizational Structure of Law Firms* at the Annual Meeting of the Law & Society Association.

"Creating an International Web-Based Resource for Teaching Legal Ethics," presented January 23, 2009 at the Third Learning in Law Annual Conference, sponsored by the United Kingdom Centre for Legal Education and held at the Warwick University School of Law.

"The Justice Education Initiative," organized and chaired half-day workshop on December 7, 2008, Fifth Worldwide Conference of the Global Alliance for Justice Education held at the Ateneo de Manila University Law School, the Philippines.

"Innovative Methods for Teaching Legal Ethics," presented July 28, 2008 at a Special Program for Mexican Law Teachers, Annual Conference of the Southeastern Association of Law Schools.

"The Justice Education Initiative of the Global Alliance for Justice Education," presented June 19, 2008 at the Annual Conference of the Consortium for Computer Assisted Legal Instruction (CALI), hosted by the University of Maryland School of Law.

"Lessons from Gandhi on Becoming a Lawyer," presented in India on October 2, 2007 at the Regional Workshop on Clinical Teaching Methods at the National Law Institute in Bhopal; on October 6 at the Regional Workshop on Clinical Teaching Methods at the Symbiosis Law College in Pune; and on October 9 at the Government Law College, Sikkim.

"Effective Lawyer-Client Communication" and "Clinical Methods for Teaching Ethics and Professionalism," presented in India in May and October 2007 at three regional workshops on clinical teaching methods (in Bangalore, Bhopal and Pune) sponsored by the South Asia Forum of Clinical Law Teachers.

"Learning from the Mistakes of American Legal Education," Opening Keynote Address at the 2007 International Legal Education and Legal Profession Forum in Beijing, China, on August 8. The conference was sponsored by the Committee of Chinese Clinical Legal Educators and supported by the Ford Foundation.

" 'Smart Without Purpose': The Carnegie Foundation Critique of American Legal Education," presented at four Australian law schools -- Flinders, Monash, Macquarie and Griffith -- during March and April 2007. An expanded version was presented at a

special faculty meeting of the University of New Mexico School of Law in September 2007.

"Using the Internet to Promote Justice Education," organized and chaired session on December 8, 2006 at the Fourth Worldwide Conference of the Global Alliance for Justice Education, held at the National University of Argentina. Also presented "Innovative Approaches to Teaching Legal Ethics" on December 7.

"The World's Most Powerful Court: Finding the Roots of India's Public Interest Litigation Revolution in the Hussainara Khatoon Prisoners Case," presented November 19, 2006 in London, England at an international conference on Comparative Constitutional Traditions in South Asia, co-sponsored by Johns Hopkins University and the University of London.

"What Clients Want from Their Lawyers," Keynote Speaker, Annual Partners Meeting of Dundas & Wilson, Scotland's largest law firm, in Edinburgh, Scotland, on November 11, 2006.

Professionalism and the Accredited Specialist (co-presenter with Robert Pirrie, Chief Executive, The Society of Writers to Her Majesty's Signet, Edinburgh, Scotland), Annual Roundtable of the ABA Standing Committee on Specialization, San Antonio, March 24, 2006.

"Do We Value What Clients Think About Their Lawyers? If So, Why Don't We Measure It?" Presented October 28, 2005 at the 6th International Clinic Conference at Lake Arrowhead, California, co-sponsored by UCLA Law School and the Institute of Advanced Legal Studies, University of London (co-authors: Karen Barton, Gregory Todd Jones & Paul Maharg).

"Clinical Education Changing the World and the World Changing Clinical Education: the Global Alliance for Justice Education," Keynote Address at the International Conference on Clinical Legal Education, held at Monash University, Melbourne, Australia. July 14, 2005.

Conference on the Training Framework Review, Nottingham Law School, England. June 22-23, 2005. Invited discussant.

"Legal Education After Law School: Lessons from England & Scotland," presented at the Conference on Professional Challenges in Large Firm Practice held at Fordham Law School, April 15, 2005.

"Do We Value What Clients Think About Their Lawyers? If So, Why Don't We Measure It?" 7th Annual Conference of the Learning in Law Initiative, United Kingdom Centre for Legal Education, University of Warwick, England, January 7, 2005 (co-presented with Professor Paul Maharg, Glasgow Graduate School of Law).

Taking the Punishment out of the Process, Marilyn Stein Bellet Conference on Ethics and the Law, Fordham School of Law and Low Country Legal Aid, Hilton Head, S. Carolina, November 12, 2004.

"The U.S. Patriot Act and the War on Terror," The Dartmouth Lawyers Association, Hanover, New Hampshire, September 11, 2004.

Third International Conference of the Global Alliance for Justice Education, Krakow, Poland, July 2004 (opening speaker).

"Confidentiality and Clients," ABA National Conference on Professional Responsibility, Naples, Florida, June 4, 2004.

40th Anniversary Panel, Is the Process Still the Punishment 25 Years Later? Annual Meeting of the Law & Society Association, Chicago, May 28, 2004.

Using Specialty Certification to Promote Professionalism, Annual Roundtable of the ABA Standing Committee on Specialization, New Orleans, March 26, 2004 (Keynote Speaker).

After the Grutter Decision Things Get Interesting! The American Debate over Affirmative Action Is Finally Ready For Some Fresh Ideas from Abroad, Affirmative Action: An International Perspective on a Global Dilemma, Annual Law Review Symposium, University of Connecticut, November 6, 2003 (Opening Speaker).

2003 Symposium on Advanced Issues in Dispute Resolution, Hamline University School of Law, November 2-3, 2003 (discussant).

Re-Examining the Bar Exam: A Workshop to Explore Alternative Licensing Proposals, Society of American Law Teachers, University of Minnesota Law School, October 11, 2003 (discussant).

What is Their Story?, 2003 Conference on Ethics and Professionalism, Emory Law School.

From Ideology to Facts: Shifting Legal Discourse about Affirmative Action in U.S. Higher Education, International Conference on Discrimination, Diversity and Public Policy, Washington University in St. Louis, March 29 - 30, 2003.

"Taking the Punishment out of the Process," 4th Annual Public Law Conference, Duke Law School, December 13-14, 2002.

"Conference on Problems in Discovery and Professionalism," University of Georgia Law School, November 14 -15, 2002 (invited discussant).

"The Effective Lawyer-Client Communication Project," Hispanic National Bar

Association, Annual Meeting, Atlanta, October 17, 2002.

"National Conference on Professionalism," Stanford Law School & University of South Carolina School of Law, Charleston, South Carolina, September 27-29, 2002 (invited participant).

"Taking the Punishment out of the Process," American Council of Chief Defenders, Austin, Texas, September 18, 2002.

"Conference on Restorative Justice," New College Law School, San Francisco, August 30 -September 2, 2002 (invited participant).

"Impact of Alabama v Shelton in Georgia," Chief Justice's Commission on Indigent Defense, Atlanta, July 26, 2002.

"The Reach of Law in India," Annual Meeting of the Law & Society Association, Vancouver, May 29 - June 2, 2002 ( chaired panel discussion).

Second Worldwide Conference of the Global Alliance for Justice Education, University of Natal, Durban, South Africa, December 2001 (facilitator for pre-conference workshop and post-conference training program on teaching legal ethics).

"How to Explain Confidentiality," Fifth International Clinical Conference, UCLA Law School, November 2001 (also chaired session on international clinical education).

"Passing Strict Scrutiny: Using Social Science to Design Affirmative Action Program," Fall 2001 Research Workshop Series, Institute on Race and Social Division, Boston University, November 2001 .

"Law and Narrative as Ways of Creating and Remembering Vast Meaning," Law as Literature Conference, University of Frankfurt, Germany, October 2001.

"Adarand Constructors v Mineta," Annual Supreme Court Preview, William & Mary Law School, September 2001.

"The Client's Perspective on the Initial Interview: A Social Science Approach," Hart Legal Workshop, Institute of Advanced Legal Studies, University of London, June 2001 (also chaired session entitled, "The Attorney-Client Relationship: An Increasingly Important Topic for Legal Education, Research and Law Reform").

"Why the U.S. Supreme Court Should Cite the Supreme Court of India in Its Next Affirmative Action Case," Law and Society in Contemporary India Conference, Harvard University, May 2001.

"Why a Future Lawyer Should Study Literature," Dartmouth College, February 2001 (campus-wide lecture co-sponsored by the English Department and the Daniel

Webster Legal Society).

Supervision Skills Workshop, Vermont Law School, February 2001 (co-sponsored by the Clinical Legal Education Association, provided training to clinical law teachers from around the United States on lawyer-client communication).

"Assessing Quality Legal Services: The Client's Perspective," Clinical Legal Education Association, New York City, July 2000 (organized and chaired workshop held in conjunction with annual meeting of the American Bar Association).

" 'What is Their *Story*?' Using Steven Spielberg's **Amistad** to Improve Lawyer-Client Communication," 2000 Conference on Law, Culture & the Humanities, Georgetown University Law Center, March 2000.

"Linguists in the Supreme Court and the Jail Cell," The Dartmouth Lawyers Association Speakers Series: Law and the Liberal Arts, Dartmouth College, January 1999.

"Race, Class, Caste... Rethinking Affirmative Action," Department of Government, Dartmouth College, January 1999.

"Evaluating Effective Lawyer-Client Communication: an International Project Moving From Research to Reform," Worldwide Advocacy Conference, Inns of Court School of Law, London, England (July 1998) (plenary address); also presented at The Conference on The Delivery of Legal Services to Low-Income Persons: Professional and Ethical Issues sponsored by the American Bar Association, Open Society Institute, and The Legal Services Corporation (Fordham Law School, New York City December 1998), the Annual Meeting of the International Client Counseling Competition Board (March 1999), the Midwest Clinical Teachers Association (October 1999), Inaugural Conference of the Global Alliance for Justice Education (December 1999), New York University Law School (September 2000).

International Seminar of Legal Clinics, Buenos Aires, Argentina, December 1997. Inaugural meeting of faculty and students from seven South American law schools (Argentina, Chile and Peru), funded by the Ford Foundation, to discuss promotion of public interest law through law school clinics. I was one of several North American commentators.

"Rethinking Equality in the Global Society," Washington University, St. Louis, November 1997. (Co-organized this 3-day conference with Marc Galanter and N.R. Madhava Menon and delivered the opening and closing plenary addresses. The conference included over 30 leading legal scholars and social scientists from the United States, South Africa, and India.

"A Modest Proposal: Cross-National Empirical Research on Lawyer-Client Communications." Presented at the Annual Meeting of the Law & Society Association

(June 1997); the Fourth International Conference on Clinical Legal Education and Scholarship sponsored by UCLA and the University of London (October 1997); University of South Pacific Department of Law (March 1998); Bond University School of Law, Griffith University School of Law, Queensland University of Technology Law Faculty; Centre for Legal Education, Australia (March 1998).

"50 Years of Indian Independence," Bangalore, India, May 1997. (Five day workshop on constitutional law, celebrating the 50th anniversary of the Indian Constitution. I was part of a workshop faculty that included two former Indian Supreme Court Justices, the Solicitor General of India, a former Attorney General of India, a former President of the Bar Council of India, and the Dean of the National Law School of India.)

"Empirical Studies of Attorney-Client Communications," Faculty Seminar, University of Sydney Law School, Australia, September 5, 1996.

"Innovations in Clinical Education: The International Law Reform Competition," Clinical Education Conference, Association of American Law Schools, Miami, May 20, 1996.

"Using Linguistics to Interpret Laws: the Problem of Disciplinary Boundaries," presentation to the Law and Social Science Group, Northwestern University, May 9, 1996.

"Arguing and Deciding Hard Cases with the Help of Linguistics: Some Recent Supreme Court Cases," presentation to the American Bar Foundation, May 8, 1996.

"An Auspicious Time: Public Interest Litigation and Legal Education," presentation to the International Institute of Public Interest Law in New Delhi, India, December 7, 1995.

"Northwestern University-Washington University Law and Linguistics Conference," co-chaired three day conference in Evanston, Illinois, bringing together 13 leading American linguists and law professors on the topic, "What is Meaning in a Legal Text?" (March 31-April 2, 1995), and organized subsequent symposium issue on law and linguistics: 73 Washington University Law Quarterly, 769-1313 (1995).

"Taking It to the Streets: Putting Discourse Analysis to the Service of a Public Defender's Office," presented to the New York Clinical Theory Workshop, March 17, 1995.

"Empirical Studies of the Legal Profession," Association of American Law Schools Annual Meeting (1994) (Joint Session of Section on Professional Responsibility and Section on Clinical Legal Education) (co-chaired session with Marc Galanter)

"Linguistic Analysis of Supreme Court Cases" and "Social Science and the Law School Clinic," Annual Meeting of the Law & Society Association (1994) (co-chaired

both roundtable sessions)

"Public Interest Litigation in the Supreme Court of India: The Problem of Remedy," National Law School of India (1994) (also scheduled for presentation to the International Institute of Public Interest Law on 1/27/94 immediately after the inaugural address by the Chief Justice of India)

"Plain Meaning and Hard Cases," Institute for Legal Studies, University of Wisconsin (1993)

"A Plea for Empiricism in the Study of American Law," Annual Meeting of the Law & Society Association (1993)

"The Client's Voice: Using Narrative in Traditional and Clinical Teaching," Association of American Law Schools Annual Meeting (1993) (Joint Session of Committee on Curriculum and Research and Section on Clinical Legal Education).

"Social Science and the Law School Clinic," Annual Meeting of the Law & Society Association (1992) (organized and chaired roundtable program).

"The Lawyer-Client Relationship: Individual Dynamics," Hastings Law School Conference on the Theoretics of Practice (1992) (discussant).

"Crossing the Waters: Transcending International and Interdisciplinary Barriers in the Study of Law and Religion," University of Iowa Conference on Religion and Law in Independent India (1991).

"A New Way of Practicing Law: The Lawyer as Translator." Various versions presented to: the Second International UCLA-Warwick Clinical Conference (1989); the Law & Society Program, Macalaster College (1990); the Institute for Legal Studies, University of Wisconsin-Madison (1990); the Annual Meeting of the Law & Society Association (1990); Annual Cornell Law Review Symposium (1992).

"The Ethnography of Legal Discourse," Annual Mid-West Clinic Conference (1990). "Whether to See the Wizard: The Choice Between Federal and State Forum," Federal Litigation Conference: Legal Services Committee on Regional Training (1990) (opening address).

"Developing Scholarship out of Clinical Education," Mid-West Clinic Conference (1989).

"Teaching and Practicing Law as if Words Matter: Epistemology, Semantics, Metaphor and Legal Reasoning," Symposium on Legal Narrative (University of Michigan Law School 1989).

"In Search of Common Sense, A Linguistic Approach to Fourth Amendment Law,"

Association of American Law Schools Annual Meeting (1988).


**PROFESSIONAL AWARDS**:

2013 JAMES SHEEHAN LIFETIME ACHIEVEMENT AWARD, United Community Housing Coalition, Detroit, Michigan. (In recognition of "your founding efforts to establish the United Community Housing Coalition and the Cass Corridor Neighborhood Development Corporation, your work as a civil rights litigator, and as clinical director at the University of Michigan and Washington University, and your current work as the W. Lee Burge Professor of Law & Ethics at Georgia State University of Law.")

2012 Annual Meeting of the International Bar Association, Award for "achievement of goals of noteworthy significance" on behalf of the Academic and Professional Development Committee. ("In recognition of the exceptional on-going web based initiative for the teaching of ethics.")

ASSOCIATION OF AMERICAN LAW SCHOOLS SCHOLARLY PAPER. Winner of 1988 Competition.

FULBRIGHT SCHOLAR: INDIA. Selected for a Senior Scholar Award to be a visiting professor at the National Law School of India for the 1993-94 academic year. Award declined.

**SIGNIFICANT LITIGATION:**

Brief of Amici Curiae Law-Linguistics Research Team Clark D. Cunningham and Ute Römer-Barron in Support of Neither Party, *Fischer v. United States* (U.S.) (Feb. 5, 2024)

Fourth Amendment Scholar Amicus Brief in Support of Neither Party, *Donald J. Trump v. United States* (11th Cir.) (Sep. 15, 2022)

Amicus Brief of Law-Linguistics Research Team in Support of Neither Party, Corey Nelson v. State of Georgia, Supreme Court of Georgia (with Amanda R. Black, Maria Kostromitina, Megan Wells, Bradford Poston, and Jesse Egbert), Supreme Court set aside 10 minutes of oral argument for presentation of amicus brief; *Nelson v. State*, 863 S.E.2d 61 (2021) ("We thank the amicus curiae for its brief and oral argument regarding the application of corpus linguistics to some of the questions presented.")

Brief of Amici Curiae Professor Clark D. Cunningham and Professor Jesse Egbert in Support of Neither Party, Blumenthal v. Trump, (Oct. 8, 2019), 949 F.3d 14 (D.C. Cir. 2020), also published on the Social Science Research Network at https://papers.ssrn.com/abstract=3475650

Amicus brief filed by Law & Linguistics Research Team, (July 25, 2019), *Wright v. Spaulding*, 939 F.3d 695 (6th Cir. 2019)

Supplemental amicus brief filed by Law & Linguistics Research Team, (August 22, 2019), *Wright v. Spaulding*, 939 F.3d 695 (6th Cir. 2019)

Brief for Professor Clark D. Cunningham & Professor Jesse Egbert as Amici Curiae Supporting Neither Party, *In re* Trump, (Jan. 29, 2019), cited *in In re Trump*, 958 F.3d 274, 286 (4th Cir. 2020)(en banc), vacated and remanded to dismiss as moot, 592 U.S. ___ (Jan. 25, 2021), also published on the Social Science Research Network at, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3334017

Kareem Allen v. State (Supreme Court of Georgia) (2010) (amicus brief).

Alan Cohen as Trustee of Friedman's Creditor Trust v. Morgan Schiff & Co., 385 B.R. 381,. 446-62 (S.D. Ga. 2008) (opinion and order denying defendants' motion to dismiss, citing Cunningham expert witness affidavit for plaintiff on malpractice claim against debtor's former law firm). Law firm settled malpractice claim shortly after this decision, 394 B.R. 623, 634 (S.D. Ga. 4/16/08). *See also* In Re Friedman's Inc. Derivative Litigation, 386 F.Supp 1355, 385 F.Supp 1345 (N.D. Ga 2005) (related case).

McKesson Information Solutions LLC v. Duane Morris LLP (Fulton County Superior Court, Georgia) (Order of Disqualification November 8, 2006) (as independent expert, testified that purported waiver of future conflicts in engagement letter was inconsistent with Georgia Rules of Professional Conduct).

Snapping Shoals Elec. Membership Corp. v. RLI Ins. Corp., 2006 WestLaw 1877078 (N.D.Ga. 2006)(order disqualifying major national law firm for conflict of interest) (served as expert witness in support of motion to disqualify)

ETS Creditors' Litigation Trust v. Charles Edwards et al (N.D. Ga.) (expert witness for plaintiff, appointed by bankruptcy court to represent victims of one of the largest investor scams of the decade, the ETS Payphone scheme; retained to evaluate the ethical conduct of law firm that represented the ETS corporation and its sole stockholder).

State ex rel. Union Planters Bank v Kendrick,142 S.W.3d 729 (Mo. 2004) (expert witness for parties opposing class certification on grounds that class counsel created non-consentable conflict of interest by accepting payment of fees from potential defendant) (Missouri Supreme Court ruling consistent with my expert opinion, remanded for possible decertification of class).

State of Georgia v. Michael Abernathy, 630 S.E.2d 421 (Ga. App. 2006) (expert witness on conflict of interest in support of motion for new trial) (denial of new trial

motion affirmed on appeal).

Adarand Constructors v Mineta, 122 S. Ct. 511 (2001) (filed amicus brief in Supreme Court on behalf of Social Science and Comparative Law Scholars).

Monsanto Company v. Eugene Stratemeyer, S.D. Ill., Case No. 99-4197-GPM (expert witness in support of motion to disqualify; motion granted)

United States v. X-Citement Video, 115 S.Ct. 464 (1994) (filed amicus brief on behalf of the Law & Linguistics Consortium providing the Court with a linguistic analysis of the disputed provision of the federal child pornography act)

Lindsay v. Jones, Parton v. White (E.D. Mo. 1993) (effected major reform of prison health care in Missouri through two consolidated class actions).

Wade v. City of Festus Housing Authority (E.D. Mo. 1992) (successful class action challenge to lack of due process in public housing eviction procedures).

Rahman v. Matador Villa Associates, 821 S.W.2d 102 (Mo. 1991) (on behalf of four amicus law professors, successfully urged the Missouri Supreme Court to review and reverse a decision barring tenants from pursuing personal injury claims if not raised as counterclaims in summary eviction proceedings.)

Will v. Mich. Dept. of State Police, 491 U.S. 58 (1989). Co-counsel on certiorari petition and brief for petitioner Will. Issue: whether a state or a state official can be sued in state court for federal constitutional violations under 42 U.S.C. 1983.

Falls v. Sporting News Co., 834 F.2d 6ll (6th Cir. l987). Counsel for appellant. Case of first impression regarding scope of the employment discrimination provisions of the Michigan Civil Rights Act.

In re Contempt of Dougherty, 429 Mich. 8l, 4l3 N.W.2d 392 (1987). Counsel for Michigan bishops of the Episcopal, Methodist and Roman Catholic churches appearing as amici curiae. Issue raised by amici was the First Amendment right to refuse to promise future compliance with an injunction to refrain from anti-nuclear civil disobedience when such a promise would violate deeply held religious beliefs.

Tyrna v. Adamo Inc., l59 Mich. App. 592, 407 N.W.2d 47 (1987). Counsel for appellant. Case of first impression regarding right to sue under the Michigan Whistleblowers' Protection Act for retaliation arising out of the reporting of occupational health violations.

Detroit Base Coalition for Human Rights of the Handicapped v. Mich. Dept. of Social Services, 431 Mich 172, 428 N.W.2d (1988). Landmark decision interpreting the Michigan Administrative Procedures Act, applying it to policies used by the Michigan Department of Social Services in welfare cases and specifically invalidating policy of

denying in-person hearings because not promulgated as a rule under the APA. I served as co-counsel at the trial level.

Kelley v. Salem Mortgage Co., 34 Bankr. Rep. 902 (E.D. Mich. 1983), 41 Bankr. Rep. 420 (E.D. Mich. 1984), 783 F.2d 626 (6th Cir. l986). Lead counsel for a consortium of legal services attorneys opposing a proposed federal class action settlement affecting over 2500 low-income homeowners victimized by illegal mortgage lending practices. After extended litigation over both the merits and issues of bankruptcy jurisdiction, on a second appeal to the Sixth Circuit in l988 a new settlement was negotiated, substantially increasing benefits to the homeowner class members.

Ayres v. Dempsey (E.D. Mich). Co-counsel in statewide federal class action challenging Michigan policy of denying welfare benefits to children receiving mental health care.

Michigan Welfare Rights Organization v. Dempsey (E.D. Mich). As lead counsel representing a coalition of welfare rights organizations, negotiated federal consent judgment resulting in major reforms to Michigan welfare application procedures.


**OTHER EXPERIENCE:**

Reviewer for Cambridge University Press, University of Chicago Press, Legal Ethics, Applied Corpus Linguistics, The International Journal of Speech, Language and the Law, and the Ninth Annual Law and Corpus Linguistics Conference - 2024.

Director, National Institute for Teaching Ethics & Professionalism (NIFTEP) (2005 - present). NIFTEP is a consortium of nationally-recognized program on ethics and professionalism: The Experiential Advantage at the Sturm College of Law, University of Denver; The Louis Stein Center for Law & Ethics at Fordham University; The Center on the Global Legal Profession at the Maurer School of Law at Indiana University-Bloomington; The Mercer University School of Law Center for Legal Ethics and Professionalism; The Holloran Center for Ethical Leadership in the Professions at the University of St. Thomas School of Law; and The W. Lee Burge Endowment for Law & Ethics at Georgia State University. NIFTEP's national workshops are also sponsored by the American Bar Association Standing Committee on Professionalism. See the NIFTEP web site: www.niftep.org

Member, Board of Directors and Executive Committee, Lawyers for Equal Justice, Inc. (Georgia State University representative to non-profit corporation supported by the State Bar of Georgia and all five Georgia law schools to provide post-graduate training and support to recent law school graduates committed to serving low and moderate income persons)(2015 - present).

Chair, Section on Law & Interpretation, Association of American Law Schools (2020-2022)

Georgia State University. Triennial Evaluation Committee for Associate Provost (2018-2019)

International Bar Association, Academic & Professional Development Committee, Vice-Chair (2011-14), Advisory Board (2015-2017).

Advisory Committee on Proposed Revision of Law School Accreditation Standards, American Bar Association Standing Committee on Professionalism (2016).

Member, Rules Revision Committee, Georgia Judicial Qualifications Commission (2016).

Member, The Chief Justice's Commission on Professionalism, Supreme Court of Georgia (Georgia State University representative) (August 2002 - present); Executive Director Search Committee (2017)

Reporter, Student Practice Rule Committee, Board of Bar Examiners, State of Georgia (2014-15).

Special Master, Supreme Court of Georgia (2010-14) (conduct lawyer discipline hearings and make findings of fact and conclusions of law to be reviewed by Supreme Court of Georgia). Report and recommendation of disbarment adopted by the Supreme Court, In re Dicks, 758 S.E.2d 311 (Ga. 2014).

Georgia State University College of Law.Chair, 1L Curriculum (2023-2024); Chair, Adjunct Teaching (2023-2024); Chair, Faculty Appeals Committee (2020-2022); Chair, College of Law Heanng Panel (2021); Chair, Awards Committee (2013-18); Chair, Lectures & Speakers Committee (2003 - 2008); Strategic Planning Committee, member (2013-14); Curriculum Committee, member (2008 - 2009); Legal Education Study Group, member (2007 - 2008); Dean's Advisory Committee, member (2005 - 2008); organized the major conference held to celebrate the College of Law's 25th anniversary in 2008; co-chaired annual law review symposium (2004).

International Member of the Reference Group advising on a multiyear project for the design, implementation and evaluation of a good practice approach to the final year experience in Australian legal education being funded by the Australian Learning and Teaching Council (2009 - 2012).

International member of the Expert Advisory Group for the Learning and Teaching Standards Project-Law of the Australian Learning & Teaching Council (ALTC) charged with drafting threshold learning outcomes for legal education in Australia (2010).

Member, Teaching Innovation Committee, the *Legal Education Analysis and Reform Network* (LEARN). LEARN was supported by a consortium of 10 law schools, including Harvard, Stanford, Georgetown, New York University and Vanderbilt. Its co-

convenors were Associate Dean Lawrence Marshall, Stanford Law School, and Dr. William M. Sullivan, Co-Director of the Carnegie Foundation's Preparation for the Professions Program. For more information see LEARN's Description of Planned Projects for 2009 - 2010. (2007 - 2009).

Academic Consultant to the Society of Writers to Her Majesty's Signet in the development of a new specialty accreditation program for lawyers in Scotland. The Society, one of the oldest professional bodies in the world, is an independent membership organization for lawyers based in Edinburgh (2005-2009).

Chair, Selection Committee, National Award for Innovation & Excellence in Teaching Professionalism, American Bar Association/Conference of Chief Justices (2003 - 2006). See the Award web site: http://clarkcunningham.org/Professionalism/Award-Home.htm

The Effective Lawyer-Client Communication (ELCC) Project. Director. Pilot project to develop a model methodology for evaluating initial client interviews.

Global Alliance for Justice Education (GAJE). Steering Committee, 1997-99; 2007 - 2009. Convenor, 2007 - 2009. Chair, Communication Committee (2006 - 2007); Chair, Constitution Committee, 1999- 2001. Organized and co-chaired the 1996 Working Group Meeting in Sydney, Australia which developed this international organization to promote socially relevant legal education. See web site: www.gaje.org

Fulton County Criminal Justice Blue Ribbon Commission. Member (January 2005 - October 2006).

Co-Reporter, The Chief Justice's Commission on Indigent Defense, Supreme Court of Georgia (Final Report Issued September 1, 2004).

1999 International Client Counseling Competition, Chicago, Illinois. Served as a judge for international law student competition sponsored by the International Bar Association.

1999 Special City Counselor, Law Department, City of St. Louis. Appointed to represent the City of St. Louis on major cases involving the city's innovative ordinances to stabilize neighborhoods by proceeding against property used for drug sales and other crimes under a public nuisance theory.

1998 - 2001 Urban Families and Community Development Program, Washington University Supervisory Council for inter-disciplinary graduate program bringing together faculty from social work, public health, public policy, education, law and architecture to provide innovative approaches to empowering low-income urban communities.

1996-98 Enforcing Human Rights through Law School Clinics, Project Director. Ford

Foundation project to develop law school clinics in India designed to enforce human rights, with emphasis on women's rights and criminal justice.

1996 Parsons Visiting Scholar, University of Sydney School of Law, Australia.

1995 South Asia Course on Clinical Legal Education, National Law School of India. (Was one of eight members of an international faculty of a 3 week course for law professors from India, Nepal and Bangladesh to expand use of clinical teaching methods in South Asia legal education).

1994 Consultant on Clinical Education, National Law School of India.

1990 Sichuan University. Chengdu, Sichuan, Peoples Republic of China. Visiting Professor of Law (faculty exchange program with Washington University).

Washington University Program on Social Thought and Analysis, Law School Representative to Executive Committee (1990- 2002). Chair, Study Sites Committee (1994-98). Senior Search Committee for first STA Professor (1993-94).

Washington University School of Law. Chair, Committee on Foreign Study (1999 - 2002); Chair, International Programs Committee (1998-99); Chair, Faculty-Student Relations Committee (1996-97); Chair, Computer Committee (1995-96); member, Personnel Committee (1992-94), Curriculum Committee (1990-92, 2000-01); Marketing Committee (1998-99). Institute for Global Legal Studies (1999 - 2002). Center for Interdisciplinary Studies (1999 - 2002).

Association of American Law Schools. Member of 1989 Scholarly Paper Competition Selection Committee. Member of Committee on the In-House Clinic. Member of Committee on Clinical Scholarship. Member of Planning Committee for 1996 Clinical Conference emphasizing international and interdisciplinary perspectives.

1987 University of Michigan Law School. Ann Arbor, Michigan. Visiting Adjunct Lecturer in Law. Taught "Lawyers and Clients."

1987-89 Michigan Attorney Discipline Board. Hearing Panel Member.

1987-89 Michigan Housing Trust Fund. Secretary, Board of Trustees. I was a founding member of MHTF, an innovative charitable foundation which financed housing construction and rehabilitation for persons at or below poverty level.

1985-1988 Wayne State University Law School. Detroit, Michigan. Adjunct Professor. Taught Professional Responsibility and Federal Civil Rights Litigation.

1982-89 Cass Corridor Neighborhood Development Corporation. Chairperson and Chief Executive Officer (1982-87), Secretary (1987-88), Board of Directors. CCNDC is a community-based, non-profit corporation which rehabilitates apartment buildings

for low income tenants using a combination of federal and private funds.

1980-1985 Detroit Community Services Commission. Elected representative to this federally mandated Community Action Board for the Detroit Neighborhood Services Department.

1979-1987 Concerned Citizens of Cass Corridor. Board of Trustees. 4Cs was a non-profit community organization which advocated for low-income residents of an inner city neighborhood and works with the City of Detroit in the expenditure of federal community development funds.

1975-77, 1978-80 United Community Housing Coalition. Detroit, Michigan. UCHC is a non-profit, community based corporation devoted to improving inner city housing conditions. I was originally assigned to UCHC as a federal VISTA volunteer in 1975, at which time UCHC had no paid staff. I wrote successful grant proposal, recruited board of directors, and incorporated UCHC. In 1977 I served as the first executive director, hiring and directing full-time staff of seven. I left to attend law school and then returned in 1978 as special projects director, a position I retained while completing law school.