# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE, et al., | } | |
| | } | |
| *Plaintiffs,* | } | |
| | } | |
| and | } | |
| | } | |
| UNITED STATES OF AMERICA, | } | Case No. 2:22-CV-184-LCB |
| | } | |
| *Plaintiff-Intervenor,* | } | |
| | } | |
| v. | } | |
| | } | |
| STEVE MARSHALL, et al., | } | |
| | } | |
| *Defendants.* | } | |

## <u>RESPONDENTS MELODY H. EAGAN AND JEFFREY P. DOSS'S RESPONSE TO ORDER TO SHOW CAUSE</u>

Samuel H. Franklin
*sfranklin@lightfootlaw.com*
M. Christian King
*cking@lightfootlaw.com*
Harlan I. Prater, IV
*hprater@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE LLC
400 20th Street North
Birmingham, Alabama 35203
(205) 581-0700
***Counsel for Melody H. Eagan
and Jeffrey P. Doss***

# TABLE OF CONTENTS

**The Underlying Litigation** ......................................................... 2

I.    Respondents filed *Ladinsky* in the Northern District and, with each random assignment of judges, took no action............................................ 2

II.    Seven days after filing *Ladinsky* and before any substantive decisions were made in the case, *Ladinsky* was voluntarily dismissed pursuant to Rule 41. .................................................................................................... 4

III.    Two business days after voluntarily dismissing *Ladinsky*, *Eknes-Tucker* was filed in the Middle District.................................................................. 8

**Framework** ...................................................................................... 10

**Discussion** ...................................................................................... 17

I.    Ms. Eagan and Mr. Doss should not be sanctioned because they did not attempt to manipulate the random assignment of judges or otherwise engage in impermissible "judge shopping." .......................................... 17

    A.    *Ladinsky* was not randomly assigned to this Court. .................. 18

    B.    Eleventh Circuit precedent precludes sanctioning Ms. Eagan and Mr. Doss for considering a judge's identity when deciding to voluntarily dismiss *Ladinsky*. ....................................................... 20

        1.    A lawyer cannot be disciplined for allegedly violating an abstract concept rather than an ascertainable rule. ................................................................................... 23

        2.    When *Ladinsky* was dismissed, the only ascertainable standard was that Federal Rule of Civil Procedure 41 conferred an "absolute" and "unconditional" right to dismiss. ..................................................................... 25

        3.    *BellSouth* is inapplicable, did not silently overrule prior precedent, and did not announce a new, sweeping prohibition against "judge shopping." .............................. 28

        4.    Without "clear guidance," Ms. Eagan and Mr. Doss cannot have acted with bad faith................................................... 37

5. Even if this Court determines that impermissible "judge shopping" occurred, the appropriate remedy is reassignment, not discipline. ............................................ 42

II. Ms. Eagan and Mr. Doss were truthful to and candid with the panel. .................................................................................................. 42

A. Ms. Eagan testified truthfully and candidly about conversations with *Walker* counsel regarding judges in the Northern District. ......................................................................................... 42

B. Ms. Eagan and Mr. Doss testified truthfully and candidly about whether they recall Ms. Eagan saying there was a "zero percent chance" of success on the motion for preliminary injunction in this Court. ............................................................................................ 46

1. The panel erroneously determined that Ms. Eagan's testimony was inconsistent with Ms. Terry's testimony about the chances of success. ............................................ 46

2. Ms. Eagan should not be sanctioned for not testifying about a statement that she does not recall saying, multiple witnesses do not recall her saying, and the gist of which she conveyed to the panel. ....................................................... 51

C. Ms. Eagan and Mr. Doss testified truthfully and candidly to the panel about why they dismissed *Ladinsky* and filed *Eknes-Tucker*. ................................................................................. 54

1. The record is undisputed that the discussion about whether to voluntarily dismiss *Ladinsky* was prompted by the non-random and sua sponte transfer of *Ladinsky* to this Court. ................................................................................. 55

2. The record is undisputed that every lawyer associated with *Ladinsky* considered the Court when deciding whether to voluntarily dismiss *Ladinsky* and to file *Eknes-Tucker* in the Middle District. ........................................................... 59

3. There is not clear and convincing evidence that Ms. Eagan and Mr. Doss testified untruthfully to the panel when the overwhelming, undisputed testimony of every witness corroborated their testimony. ........................................... 62

Respondents Melody H. Eagan and Jeffrey P. Doss[1] submit this response to the Court's Order to Show Cause and Supplemental Orders to Show Cause (Docs. 406, 483 & 484) (collectively, "the Order").

When a court charges an attorney with misconduct, a clear, ascertainable rule that the attorney has allegedly violated must be identified. It is "unfair for the court to use the case [in which the sanction is imposed] as the first step in adopting a new rule." *United States v. 789 Cases of Latex Surgeon Gloves*, 13 F.3d 12, 15 (1st Cir. 1993). Ms. Eagan and Mr. Doss did not violate a clear, ascertainable rule. Before the dismissal of *Ladinsky, et al. v. Ivey, et al.* ("*Ladinsky*") and the filing of *Eknes-Tucker, et al. v. Ivey, et al.* ("*Eknes-Tucker*"), no rule, statute, case, or order prohibited them from dismissing *Ladinsky* in the Northern District and filing *Eknes-Tucker* in the Middle District—regardless of the reasons for doing so. This Court recently agreed, "So, I mean, I get it that different circuits have different opinions on [judge shopping]. And I get it that the Eleventh Circuit doesn't have clear guidance on [judge shopping]." (Mar. 19, 2024, Hearing at 60-61). Unlike the concept of "judge shopping," the Eleventh Circuit has provided clear guidance regarding voluntary dismissals: Federal Rule of Civil Procedure 41 dismissals are "absolute" and "unconditional," which necessarily means that the dismissal can be for any reason. Applying the relevant standards to the evidence—clear and convincing proof and subjective bad faith—only one conclusion is possible: Ms. Eagan and Mr. Doss

---

[1]     Throughout this Brief, Melody Eagan and Jeffrey Doss are referred to as Ms. Eagan and Mr. Doss or otherwise as "Respondents."

violated no clear, ascertainable rule when they dismissed *Ladinsky* and filed *Eknes-Tucker*.

Ms. Eagan and Mr. Doss were truthful and straightforward with the panel. Despite being sequestered, Ms. Eagan's and Mr. Doss's testimony aligned in every material respect with every other participant's testimony. Between the two of them, they testified for several hours before the panel, submitted sworn declarations, and answered the questions posed to them truthfully and candidly. Neither the panel nor this Court has identified a question asked of Ms. Eagan or Mr. Doss that either failed to answer honestly and completely. Nor have they identified a passage in their declarations that contained an alleged falsity. There is no evidence—much less clear and convincing proof—of any bad faith misrepresentation or omission by Ms. Eagan or Mr. Doss.

**THE UNDERLYING LITIGATION**

## I.    <u>Respondents filed *Ladinsky* in the Northern District and, with each random assignment of judges, took no action.</u>

Governor Ivey signed into law the Alabama Vulnerable Child Compassion and Protection Act ("the Act") on Friday, April 8, 2022. That evening, Respondents electronically filed the complaint in *Ladinsky, et al. v. Ivey, et al.*, Case No. 2:22-CV-447 ("*Ladinsky*") in the Northern District. They did not mark the case as being related to any other case. They did not take any action to obtain or to avoid any judge. They expected to receive a randomly assigned judge.

The attorneys for *Ladinsky* were aware that other organizations were planning to challenge the Act's legality. They understood that the first-filed action would

2

generally receive precedence under the various rules recognized throughout the Eleventh Circuit. For the attorneys associated with *Ladinsky*, it was very important—and in the best interests of their clients—to ensure that *Ladinsky* was the first-filed challenge to the Act.

On the morning of Monday, April 11, the Northern District Clerk's Office electronically docketed the *Ladinsky* complaint. The complaint was deemed as having been filed on Friday, April 8. At some point during that day, Respondents learned that another case—styled *Walker, et al. v. Marshall, et al.*, Case No. 2:22-CV-167—had been filed by other attorneys in the Middle District ("*Walker*"). Because *Ladinsky* had been docketed first, Respondents felt confident that *Ladinsky* would take precedence over *Walker*.

The Clerk's Office randomly assigned Judge Manasco to *Ladinsky*. Respondents did not take any action in response to the random assignment of the case to Judge Manasco. Later that day—still Monday, April 11, 2022—Judge Manasco entered an order of recusal, and the Clerk's Office randomly reassigned *Ladinsky* to Magistrate Judge Cornelius. Respondents did not take action in response to the random assignment of the case to Magistrate Judge Cornelius.

The attorneys in *Ladinsky* were finalizing an amended complaint and a motion for a preliminary injunction. The original *Ladinsky* complaint did not include certain claims, such as alleging that the Act violates the First Amendment or that the Act has the effect of criminalizing a parent's travel from Alabama to another state to obtain the proscribed treatments for the parent's child. Because neither the amended

3

complaint nor the motion for a preliminary injunction was complete, Respondents deferred serving the defendants in *Ladinsky*.  They did this to avoid having to serve the defendants twice.

By Wednesday, April 13, two attorneys for the State of Alabama appeared for Governor Ivey and Attorney General Marshall in *Ladinsky*.  The next day—Thursday, April 14—the Clerk's Office randomly reassigned *Ladinsky* to Judge Axon. Respondents assumed that the case was reassigned because the defendants in *Ladinsky* declined consent to dispositive jurisdiction by Magistrate Judge Cornelius. Respondents did not decline consent and did not take any action in response to the random reassignment of the case to Judge Axon.

## II.   Seven days after filing *Ladinsky* and before any substantive decisions were made in the case, *Ladinsky* was voluntarily dismissed pursuant to Rule 41.

The following day—Friday, April 15—Respondents learned that *Walker* had been transferred to the Northern District by Chief Judge Marks, following the entry of a show cause order, and assigned to Your Honor.[2]  Consistent with settled Northern District practice, Respondents expected *Walker* to be consolidated with *Ladinsky*, such that (i) any decision regarding consolidation would be decided by Judge Axon, as the judge to whom the first-filed case was assigned; (ii) if a motion to consolidate were granted, then *Walker* would be reassigned to Judge Axon; and (iii) if *Ladinsky* and *Walker* were consolidated, then *Ladinsky* would be the lead case, as the first-filed

---

[2]   Throughout this brief, "this Court" and "Your Honor" are used interchangeably.

case between the two.  Respondents were familiar with that practice in the Northern District and understood the practice as intended to protect random judicial assignments, and various decisions have described it that way.  *See, e.g.*, *Forrester v. MidFirst Bank*, No. 18-1392, 2019 WL 13217066, at *2 (N.D. Ala. Feb. 8, 2019).

The attorneys for the State apparently had the same understanding.  The State's attorneys said that they intended to file a motion to consolidate with Judge Axon, not this Court to whom *Walker* had been assigned, and Respondents consented. Before the attorneys for the State filed their consent motion to consolidate, however, Judge Axon entered an order around 4:40 p.m. on Friday, April 15: "In the interest of efficiency and judicial economy, this case is hereby transferred to Judge Liles C. Burke" ("the Transfer Order").  After the Transfer Order was entered, the attorneys for the State told Respondents that they no longer planned to file a motion to consolidate.

The Transfer Order was surprising.  No one—neither Respondents, co-counsel in *Ladinsky*, nor counsel for the State—expected *Ladinsky* to be reassigned.  To Respondents, *Ladinsky* was no longer randomly assigned. The case had been directly assigned by one judge to another, outside the random assignment procedure for the Northern District.  Respondents knew only that the standard procedure did not appear to have been followed.  The reason for the Transfer Order—"efficiency and judicial economy"—was not clear to them.  This Court had been assigned *Walker* for less than one day and, thirty minutes or so before the Transfer Order was entered, had set a status conference in *Walker*.  Moreover, the Transfer Order came at the end

5

of the business day on Good Friday, and there was no effective way to get additional information about it. Respondents were not sure whether or how any reconsideration of the Transfer Order could be made and hoped to avoid raising an awkward issue.

Less than 30 minutes after the Transfer Order was entered, several attorneys in *Ladinsky*, including Respondents, participated in a conference call at around 5:00 p.m. on Friday, April 15. Respondents did not understand why the Transfer Order had been entered, considering the standard procedure in the Northern District. The group shared concerns that *Walker*, and not *Ladinsky*, was set for a status conference on the following Monday. It appeared that *Walker* was inching ahead of *Ladinsky* in terms of precedence. Given the unusual posture in which Respondents found themselves—including that they no longer had, from their perspective, a randomly-assigned judge—they considered the circumstances as a whole as best they could, including: (i) the way *Ladinsky* had reached this Court; (ii) the appearance that *Walker* was inching ahead of *Ladinsky*; (iii) possibly litigating in Huntsville as opposed to Birmingham; and (iv) their perceptions of Your Honor's philosophical receptiveness to the *Ladinsky* plaintiffs' claims.[3]

---

[3]     Regarding this final factor, for constitutional challenges, there are divergent views among federal judges regarding how the Constitution should be interpreted, especially when it concerns the Due Process Clause and the Equal Protection Clause. Some judges, for example, adhere to an "originalist" interpretation, which heightens a plaintiff's burden when presenting challenges based on those two Clauses. As Judge Proctor observed during a panel hearing, "District judges get hired on politics. Magistrate judges get hired on merits." (May 20, 2022, Trans. at 33).

A consensus was reached to voluntarily dismiss, as no defendant had yet filed an answer or motion for summary judgment, and regroup.  Neither Respondents nor anyone else on the call expressed a concern that this course of action could violate any statute, case, order, or rule.  Respondents were not aware of any impediment to dismissal pursuant to Federal Rule of Civil Procedure 41. Respondents did not believe that voluntarily dismissing—even considering, among a number factors, the judge's identity—would violate any statute, case, order, or rule.

With their clients' consent, Respondents voluntarily dismissed *Ladinsky* at around 6:00 p.m. on Friday, April 15.  Respondents believed the voluntary dismissal needed to be filed quickly. Otherwise, if the State answered the complaint, Respondents would lose that absolute and unconditional right.  *Ladinsky* was one-week old when it was dismissed.  No motion for preliminary injunction or amended complaint had been filed.  And no substantive decisions affecting the litigation had been made by the Court.

Meanwhile, the attorneys in *Walker* voluntarily dismissed their case, too.  On Friday evening and through the weekend, some attorneys in *Ladinsky* had conversations with some attorneys in *Walker* about whether and how to file a single, consolidated lawsuit challenging the Act, so that the clunkiness of two competing lawsuits—and the prior week's procedural "racing"—could be avoided.  Respondents did not participate in those calls.  Ultimately, the *Walker* attorneys decided not  to pursue a challenge to the Act.

### III.   Two business days after voluntarily dismissing *Ladinsky, Eknes-Tucker* was filed in the Middle District.

The attorneys for *Ladinsky* considered what steps to take next.  Although Respondents briefly considered filing a new lawsuit with one or more plaintiffs from *Ladinsky*, they ultimately decided not to do so. Various attorneys in *Ladinsky* worked over the weekend and into the first day or so of the following week to finalize new plaintiffs to challenge the Act.  Other attorneys revised the pleadings to reflect the new plaintiffs and to finalize a motion for a preliminary injunction (a process which had been ongoing since the week prior).

By Monday, April 18, a new set of plaintiffs had been assembled to challenge the Act's legality.  In addition to the challenges pleaded in *Ladinsky*, the new plaintiffs could also make First Amendment arguments and test the Act's criminalization of a parent's decision to transport a minor across state lines to secure otherwise-lawful treatment.  As to venue, Respondents considered all pertinent factors, including whether the new action might be non-randomly assigned to Your Honor as "related" to *Ladinsky* if filed in the Northern District.

The decision was made to start fresh.  On Tuesday, April 19, Respondents sent a courier to Montgomery to conventionally file the new complaint, which opened a new case, *Eknes-Tucker, et al. v. Ivey, et al.*, Case No. 2:22-CV-184 ("*Eknes-Tucker*"), in the Middle District.  Respondents did not designate the case as related to any other case.  They did nothing to steer *Eknes-Tucker* to any judge.

The Clerk's Office for the Middle District electronically docketed *Eknes-Tucker* at around 6:00 p.m. on Wednesday, April 20.  It was randomly assigned to Judge

Huffaker, and Judge Huffaker assigned the case to this Court.  Respondents did not take any action in response to the assignment of *Eknes-Tucker* to Judge Huffaker or his assignment of the case to this Court.

After *Eknes-Tucker* had been docketed, Respondents finalized the motion for a preliminary injunction, and they electronically filed the motion early in the morning of Thursday, April 21.  Later that day, Respondents personally served the new complaint on all but one of the defendants, along with the motion for a preliminary injunction, and Respondents began preparing for a status conference before this Court.  During that same day—Thursday, April 21—an attorney in *Eknes-Tucker* discovered, on a media website, an order entered by Your Honor in *Walker*.  The order, which had been entered on Monday, April 18, suggested that the attorneys for *Walker* and possibly *Ladinsky* had engaged in "judge shopping."  Respondents did not know anything about that order before filing *Eknes-Tucker*.

Respondents appeared for the status conference on Friday, April 22.  Ms. Eagan offered at that time to explain why *Ladinsky* was dismissed, but the Court did not accept her offer.  Over the next several weeks, counsel in *Eknes-Tucker* and the State briefed the motion for preliminary injunction and then attended a multi-day preliminary injunction hearing.

\*     \*     \*     \*

Respondents respectfully submit that they did not take any action to manipulate the random assignment of judges in the Northern District or the Middle District.  When Respondents believed that they had a randomly assigned judge—

Judge Manasco, Magistrate Judge Cornelius, Judge Axon, and Judge Huffaker—they did not do anything in response. They dismissed *Ladinsky* based on a good-faith belief that Rule 41 gave them that absolute and unconditional right to do so, and they filed *Eknes-Tucker* based on a good faith belief that the Middle District was a proper venue. Respondents never thought that they were violating any case, statute, order, or rule.

## FRAMEWORK

The panel gathered evidence during its inquiry. That was its charge, and Ms. Eagan, Mr. Doss, and others responded to the panel's questions.[4] Ms. Eagan and Mr. Doss are now submitting additional evidence for this Court's consideration of whether to sanction them for their conduct. Critical to this Court's decision is framing how to evaluate the universe of evidence. Because potential sanctions are at issue, fundamental and overarching legal principles must guide the analysis.

The legal principles which control this Court's sanctions decision include the following:

**(1)** **This Court's "inherent power should be exercised with caution."** *Kornhauser v. Comm'r of Social Sec.*, 685 F.3d 1254, 1257 (11th Cir. 2012) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)). "A court may exercise this power 'to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for

---

[4]     Respondents have joined (Doc. 497) in an objection to the Supplemental Orders to Show Cause. (Doc. 493). This briefing is without prejudice to that objection.

oppressive reasons.'" *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (quoting *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013)).

**(2)**   **Subjective "bad faith" is a demanding standard.**   For example, subjective "bad faith" is not merely acting based on an unreasonable belief. *See, e.g.*, *Rowe v. Gary*, 773 Fed. App'x 500, 504 (11th Cir. 2019) ("A person may hold an unreasonable belief in good faith."). Nor is subjective "bad faith" "simply bad judgment," "negligence," or even "simple recklessness." *United States v. Shaygan*, 652 F.3d 1297, 1312 (11th Cir. 2011); *J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, No. 19-560, 2021 WL 3421394, at *2 (N.D. Ala. Aug. 5, 2021) (quoting *Purchasing Power, LLC*, 851 F.3d at 1224). Even "false statements alone" do not "indicate bad faith." *Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir. 2001).

Rather, "bad faith" requires "the conscious doing of a wrong because of dishonest purpose or moral obliquity; … it contemplates a state of mind affirmatively operating with furtive design or ill will.'" *Fletcher v. Ben Crump Law, PLLC*, No. 21-1433, 2023 WL 3095571, at *4 (N.D. Ala. Apr. 26, 2023) (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)).

**(3)**   **The "clear and convincing evidence" standard governs whether to impose inherent power sanctions.**   *See, e.g.*, *Fletcher*, No. 21-1433, 2023 WL 3095571, at *5 (applying "clear and convincing" evidence standard); *J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, No. 19-560, 2022 WL 2374369, at *3

(N.D. Ala. June 30, 2022) (applying "clear and convincing" evidence standard); *Peer v. Liberty Life Assurance Co. of Boston*, No. 17-80281, 2022 WL 329217, at *4 (S.D. Fla. Jan. 18, 2022) ("The burden of proof for imposing fees as a sanction under the Court's inherent authority … is clear and convincing evidence."); *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-60885, 2016 WL 3944178, at *2 (S.D. Fla. Mar. 17, 2016) ("[W]hen imposing sanctions pursuant to their inherent authority, courts require that the conduct or fraud be proven by clear and convincing evidence."); *Outlawlessness Prods., Inc. v. Paul*, No. 10-24, 2011 WL 13177704, at *1 (M.D. Fla. Mar. 15, 2011) ("The party seeking sanctions must show such alleged misconduct was committed in 'bad faith' by clear and convincing evidence.").

Generally speaking, "clear and convincing" evidence means "the evidence must persuade [the trier of fact] that the claim or defense is *highly probable* or *reasonably certain*." Eleventh Circuit Pattern Jury Instructions – Civil 1.2 ("Burden of Proof – Clear and Convincing Evidence") (emphasis added). "Quantified, the probabilities [of clear and convincing evidence] might be in the order of above 70%." *Boatright v. CSX Transp., Inc.*, No. 21-28, 2023 WL 4548280, at *14 (S.D. Ga. July 14, 2023); *see also Mezrano v. State Farm Fire & Cas. Co.*, No. 22-313, 2022 WL 1493850, at *2 (N.D. Ala. May 11, 2022) (quoting Black's Law Dictionary (2014)) ("Clear and convincing" evidence means "'[e]vidence indicating that the thing to be proved is highly probable or reasonably certain' and is 'a greater burden than preponderance of the

evidence … but less than evidence beyond a reasonable doubt.'"); *Snell v. Southern-Owners Ins. Co.*, No. 15-368, 2016 WL 9526679, at *4 (M.D. Fla. July 18, 2016) ("'Clear and convincing evidence' is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.").

**(4)   Federal Rule of Civil Procedure 11 applies to "papers" submitted to the Court, and the Eleventh Circuit reviews "*sua sponte* … sanctions" under Rule 11 with "particular stringency."** *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (citations omitted).   Because *sua sponte* Rule 11 sanctions afford no "'safe harbor' opportunity" for a litigant, a court must employ the "akin to contempt" standard of proof.  *Id.*

The Eleventh Circuit has not explained what "akin to contempt" requires, but the State of Alabama has argued that it necessitates "subjective bad faith," like an inherent power sanction.  *In re Office of Ala. Atty. Gen.*, No. 21-13514, 2023 WL 129438, at *3 (11th Cir. Jan. 9, 2023).  Other Circuit Courts have held that "akin to contempt" requires subjective bad faith.  *See, e.g., In re Pennie & Edmonds LLP*, 323 F.3d 86, 87 (2d Cir. 2003) ("[W]here, as here, a *sua sponte* Rule 11 sanction denies a lawyer the opportunity to withdraw the challenged document pursuant to the 'safe harbor' provision of Rule 11(c)(1)(A), the appropriate standard is subjective bad faith.").

When considering attorney sanctions, a court must resolve all doubts in favor of the attorney and never scrutinize with hindsight. *See, e.g., Gust, Inc. v. Alphcap Ventures, LLC*, 905 F.3d 1321, 1327 (Fed. Cir. 2018) (noting that a court must "avoid hindsight and resolve all doubts in favor" of the attorney); *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) ("[T]he court's inquiry focuses only on the merits of the pleading gleaned from the facts and law known or available to the attorney *at the time of filing*. The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time of the pleading, motion, or other paper was submitted.") (citation omitted) (emphasis in original); *Rounseville v. Zahl*, 13 F.3d 625, 633 (2d Cir. 1994) ("[A]ll doubts are to be resolved in favor of the signer of the document that is the basis for Rule 11 sanctions.") (citation omitted).

In addition, the standard for "testing conduct" under Rule 11—including alleged misrepresentations—is "reasonableness under the circumstances." *Office of Ala. Atty. Gen.*, No. 21-13514, 2023 WL 129438, at *3 (quoting *United States v. Milam*, 855 F.2d 739, 743 (11th Cir. 1988)). "In determining reasonableness under the circumstances," a court must employ a two-step process: "first 'whether the party's claims are objectively frivolous' with 'no reasonable factual basis'; and second, 'whether the person who signed the pleadings should have been aware that they were frivolous' after conducting a

reasonable inquiry." *Id.* (quoting *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998)).

**(5)    Attorneys subject to sanctions proceedings must be afforded due process**. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). Foremost, an attorney is entitled to know "the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it." *United States v. Shaygan*, 652 F.3d 1297, 1319 (11th Cir. 2011). But there are procedural safeguards that are equally important. In *Shaygan*, among other deprivations, the attorneys (i) were sequestered, which precluded them from "know[ing] about the testimony of the other witnesses at the proceeding," (ii) "had no opportunity to cross-examine any witnesses," and (iii) "did not know that the district court might rely on [their] testimony to impose an individual sanction." *Id.* at 1318. In addition, the district court "conducted an inquiry, not an adversarial hearing." *Id.* On that record, the Eleventh Circuit found that the district court's proceeding "did not constitute an opportunity to be heard in the Anglo-American tradition." *Id.*

**(6)    Sanctions must be determined on an individual basis**. *Shaygan*, 652 F.3d at 1319 ("Each of these attorneys also cannot be held responsible for the acts or omissions of others …").

*      *      *      *

Considering those rules, the panel's task was different than this Court's obligation:

|  | The Panel | This Court |
|---|---|---|
| Required to Apply the "Clear and Convincing" Evidence Standard? | The panel did not identify what standard it applied. | Yes |
| Required to Make a Finding of Subjective Bad Faith? | The panel made no finding of subjective bad faith. | Yes |
| Required to Identify a Rule, Statute, or Case that the Attorneys Violated? | The panel generally found "misconduct" without pinpointing the alleged violation. | Yes |
| Allowed to Sequester Witnesses? | Because the panel was tasked with gathering evidence, it took the position that it could sequester the participants. | No |
| Required to Allow the Attorneys to Respond to Allegations? | The participants requested an opportunity to respond to the evidence, but the panel denied that request. | Yes |
| Adversarial Proceeding? | The panel repeatedly emphasized that the inquiry was non-adversarial. | Yes |

The panel's inquiry was an evidence-gathering effort, comparable to a grand jury investigation. The culmination of a grand jury's non-adversarial investigation— an indictment—is simply an accusation, not conclusive proof. *See, e.g.*, *United States v. Delaney*, No. 11-497, 2014 WL 12929089, at *1 (N.D. Ill. Aug. 15, 2014) ("Proceedings before a grand jury are non-adversarial, established to determine only whether there is probable cause to believe a crime has been committed, not the guilt or innocence of the accused.").

Although an accusation may initiate further process—much like an indictment or the Report has done in this case—the judiciary prizes an adversarial process to arrive at the truth. *See generally United States v. Thompson*, 827 F.2d 1254, 1259 (9th Cir. 1987) ("Adversary proceedings do in fact take more time, and they are more cumbersome, but with good reason: The adversary process helps us get at the truth.").

The panel was not concerned with standards of proof; legal frameworks tied to a precise rule, statute, or case; whether anyone acted with subjective bad faith; or affording the Respondents an opportunity to respond to the evidence presented. Nor did the panel give the Respondents the benefit of the doubt, refrain from hindsight scrutiny, or evaluate whether anyone acted "akin to contempt." For these reasons, though the Court may consider certain evidence gathered by the panel (in the same way that a petit jury could be presented with evidence received initially by a grand jury), the Court should evaluate that evidence without deferring to the conclusions reached by the panel (in the same way that a petit jury evaluates the evidence, not the indictment, when deciding guilt).

## DISCUSSION

I. <u>**Ms. Eagan and Mr. Doss should not be sanctioned because they did not attempt to manipulate the random assignment of judges or otherwise engage in impermissible "judge shopping."**</u>

The Court's Supplemental Orders to Show Cause directed to Ms. Eagan and Mr. Doss, respectively, requires that both attorneys "show cause why [she and he] should not be sanctioned for attempting to manipulate the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of

Alabama in violation of controlling precedent." (Docs. 483 and 484 at 10). Two unavoidable facts should end this inquiry without further analysis: (i) *Ladinsky* was not randomly assigned to this Court; and (ii) the Federal Rules of Civil Procedure and related caselaw conferred a right to voluntarily dismiss—for any reason—and there was no controlling precedent to the contrary.

### A. *Ladinsky* **was not randomly assigned to this Court.**

***Ladinsky.*** The panel had one task:

> [T]he key question presented here: whether counsel for the plaintiffs in *Walker* and *Ladinsky*, and in a subsequently filed case, *Eknes-Tucker v. Ivey*, 2:22-cv-184-LCB (M.D. Ala.), attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama.

(Final Report of Inquiry at 1).

This begs the dispositive question: Was *Ladinsky* randomly assigned to Your Honor? The panel's Final Report answers this question:

> The practice of the Northern District is that *if there is a motion to consolidate or reassign* a subsequently filed case to a judge presiding over an earlier filed and related case, the motion is decided by the judge presiding over the earlier filed case. Of course, that is exactly what occurred here, *although there was not technically a motion filed* … Judge Axon, who presided over *Ladinsky*, which was the earlier filed case, decided that the cases should be assigned before the same judge, and she entered an order *transferring Ladinsky* to Judge Burke.

*Id.* at 49 (emphasis added).

On May 20, 2022, Respondents learned, for the first time, why *Ladinsky* was transferred to Your Honor on April 15: "Judge Axon was on day four of what was scheduled to be a two-plus-week criminal trial … And based upon judicial efficiency and economy, Judge Burke took the case. Judge Axon would not have had the judicial

resources to start the case right away" and thus transferred *Ladinsky* to this Court. (May 20, 2022, Panel Hearing Trans. at 33). The Respondents did not know about Judge Axon's criminal trial on April 15, 2022, when the decision was made to dismiss *Ladinsky*. (Final Report of Inquiry at 8 n.1). Moreover, the Report acknowledges that *Ladinsky's* transfer to this Court was not in keeping with the Northern District's practice. *See id.* at 49. The undisputed facts regarding *Ladinsky's* path to this Court are as follows:

(1) *Ladinsky*, the first-filed action, initially was *randomly assigned* to Judge Manasco.

(2) After Judge Manasco's recusal, *Ladinsky* was *randomly assigned* to Magistrate Judge Cornelius.

(3) Because the parties did not unanimously consent to dispositive Magistrate Judge jurisdiction, *Ladinsky* was *randomly assigned* to Judge Axon.

(4) Contrary to the Northern District practice, Judge Axon *transferred Ladinsky—without a motion to consolidate or reassign, or an order to show cause, being filed*—to Your Honor, who had been assigned the subsequently-filed *Walker* action.

*Ladinsky* passed through three randomly assigned judges, and Respondents took no action in response to those assignments. There was no motion to consolidate *Ladinsky* and *Walker*, yet *Ladinsky* was directly assigned to this Court. Voluntarily dismissing *Ladinsky*, after it had been directly assigned to this Court, as opposed to being randomly assigned, neither "manipulate[d]" nor "circumvent[ed]" the "random assignment of judges." (Doc. 406 at 4).

***Eknes-Tucker***. Respondents did not do anything to "manipulate" or "circumvent" the "random assignment of judges" to *Eknes-Tucker*. *Id.* Respondents

did not steer *Eknes-Tucker* to or away from any judge in the Middle District. The Clerk randomly assigned *Eknes-Tucker* to Judge Huffaker, and Respondents did not do anything in response to that assignment. Then, when Judge Huffaker assigned *Eknes-Tucker* to this Court, Respondents did not do anything in response to that assignment either.[5]

\*     \*     \*     \*

From a factual standpoint, Respondents are not guilty of "attempting to manipulate the random case assignment procedure" as charged in the Order. When Respondents voluntarily dismissed *Ladinsky*, they did not have a random assignment.

### B.   Eleven Circuit precedent precludes sanctioning Ms. Eagan and Mr. Doss for considering a judge's identity when deciding to voluntarily dismiss *Ladinsky*.

The Order charges Respondents with having violated a rule that did not exist on April 15, 2022, and does not exist today: that parties may not voluntarily dismiss an action under Rule 41 due, even in part, to the assigned judge's identity. That rule appears nowhere in Supreme Court precedent, Eleventh Circuit precedent, the

---

[5]   For *Eknes-Tucker*, "all defendants [were] residents of the State [of Alabama]," (Doc. 1 ¶ 23), and venue was proper in "a judicial district in which any defendant reside[d]." *See* 28 U.S.C. § 1391(b). Some defendants resided in the Northern District, while other defendants resided in the Middle District. *Id.* Both Districts, therefore, qualified as proper venues. Regardless of Respondents' reasons for doing so, the statute imposed no requirement to file *Eknes-Tucker* in the Northern District and, thus, provided no clear guidance of any such mandate simply because *Ladinsky* had been previously pending there.

United States Code, the Federal Rules of Civil Procedure, the local rules of the Northern and Middle Districts, or the Alabama Rules of Professional Conduct.

In sharp contrast, Rule 41's meaning has been fixed and ascertainable for decades: "[T]he plaintiff may dismiss an action without a court order by filing … a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment."  Fed. R. Civ. P. 41(a)(1)(A)(i).  Rule 41 limits only when—not why—that right may be exercised.  *See, e.g., Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 397 (1990) (Rule 41(a)(1) "was designed to limit a plaintiff's ability to dismiss an action" during "the brief period before the defendant had made a significant commitment of time and money"); *Absolute Dismissal under Federal Rule 41(a): The Disappearing Right of Voluntary Nonsuit*, 63 YALE L.J. 738, 738 (1954) (noting that, at common law, "a plaintiff had *an absolute right* to dismiss his suit without prejudice at any time before verdict or judgment," but that Rule 41(a) "limits *absolute dismissal* to an earlier point") (emphasis added).  Binding Eleventh Circuit precedent confirms that reading: "a plaintiff has an *absolute* right to dismiss a lawsuit before the defendant has filed an answer or summary judgment motion." *Carter v. United States*, 547 F. 2d 258, 259 (5th Cir. 1977) (emphasis added); *see generally* Black's Law Dictionary (defining "absolute" as "free from restriction, qualification, or condition").

After *Carter*, the Eleventh Circuit has never suggested, let alone held, that "absolute" means anything other than "absolute." "It is well established that Rule 41(a)(1)(i) grants a plaintiff an *unconditional* right to dismiss his complaint by notice and without an order of the court at any time prior to the defendant's service of an

answer or a motion for summary judgment*.*" *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990) (emphasis added); *see also* Merriam-Webster Dictionary (defining "unconditional" as "not … limited").

If a right is absolute and unconditional, then the "reason for the dismissal" is necessarily "immaterial."  1 Federal Rules of Civil Procedure, Rules & Commentary – Rule 41 (Feb. 2023).  As Judge Posner observed, "One doesn't need a good reason, or even a sane or any reason, to dismiss a suit voluntarily.  The right is absolute, as Rule 41(a)(1) and the cases interpreting it make clear, until, as the rule states, the defendant serves an answer or a motion for summary judgment." *Marques v. Fed. Reserve Bank of Chi.*, 286 F.3d 1014, 1017 (7th Cir. 2002) (citations omitted).

Sanctioning Respondents for voluntarily dismissing *Ladinsky* (and filing *Eknes-Tucker*) would be contrary to two fundamental rules of law, each of which is addressed in the following sections:

(i)     **Fair Notice:** The Eleventh Circuit, speaking through Judge Lynne and Judge Pryor from Alabama, has been crystal clear and demanding: A lawyer is entitled to know the "precise rule" that he or she is accused of violating, and that rule cannot be an unknowable standard of conduct. *United States v. Shaygan*, 652 F.3d 1297, 1319 (11th Cir. 2011); *In re Finkelstein*, 901 F.2d 1560 (11th Cir. 1990); and

(ii)    **Subjective Bad Faith:** A lawyer cannot be disciplined unless he or she acted with subjective bad faith.  *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218 (11th Cir. 2017).

These rules make practical sense.  Most lawyers, like Respondents, endeavor to be honest and ethical and to advocate zealously within the rules.  They cannot do so when the purported rules are unwritten, unknown, or otherwise unascertainable.

1.   **<u>A lawyer cannot be disciplined for allegedly violating an abstract concept rather than an ascertainable rule.</u>**

For a sanctions analysis, the starting point is identifying the rule that a lawyer purportedly violated.  *Shaygan*, 652 F.3d at 1319 ("An attorney charged with misconduct is entitled … to know the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it.").  Once the rule is identified, the Court must ensure that it "provide[d] fair warning to persons of ordinary intelligence of … the conduct prohibited" and "provide[d] ascertainable standards of guilt to protect against arbitrary, erratic, and discriminatory enforcement."  *Fla. Businessmen for Free Enter. v. City of Hollywood*, 673 F.2d 1213, 1218 (11th Cir. 1982) (describing general due process standards) (citations omitted).

That consideration applies with full force to sanctions proceedings.  Judge Lynne, writing for the Eleventh Circuit, observed, "In order to satisfy traditional notions of due process, the conduct prohibited must be ascertainable."  *In re Finkelstein*, 901 F.2d 1560, 1564 (11th Cir. 1990) (citing *NAACP v. Button*, 371 U.S. 415, 432-33 (1963)).  That "[s]pecific guidance"—necessary to satisfy due process—"is provided by case law, applicable court rules, and the 'lore of the profession' as embodied in the codes of professional conduct."  *Id.* at 1564-65 (citing *In re Snyder*, 472 U.S. 634, 645 (1985)).  A court may not "deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct."  *Id.* at 1565 (quoting *In re Ruffalo*, 390 U.S. 544, 556 (1968) (White, J., concurring)); *see also Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 571 (3d Cir. 1985)

(noting that "the absence … of a statute, Federal Rule, ethical canon, local rule or custom, court order, or … court admonition, proscribing the act for which a sanction is imposed," may raise constitutional concerns).

In *Finkelstein*, the district court "disclaimed reliance upon a written canon of ethics, a code provision, or a case which proscribed the conduct which it found reprehensible but depended entirely upon a 'code by which an attorney practices which transcends any written code of professional conduct.'" *Finkelstein,* 901 F.2d at 1565. The Eleventh Circuit, reversing the sanction, rejected that approach: "[t]he fatal flaw with this transcendental code of conduct is that it existed only in the subjective opinion of the court, of which [the sanctioned attorney] had no notice, and was the sole basis of the sanction administered after the conduct had occurred." *Id.*[6]

Other courts have reached similar conclusions. As the First Circuit observed, it is "unfair for the court to use the case [in which the sanction is imposed] as the first step in adopting a new rule." *United States v. 789 Cases of Latex Surgeon Gloves*, 13 F.3d 12, 15 (1st Cir. 1993). 'The law forbids the imposition of a new rule without prior notice." *Id.* (quoting *Boettcher v. Hartford Ins. Group*, 927 F.2d 23, 26 (1st Cir. 1991)); *see also In re Richardson*, 793 F.2d 37, 41 (1st Cir. 1986) (reversing sanction premised

---

[6]    Judge Pryor, writing for the Eleventh Circuit, reaffirmed that principle in *Shaygan*, 652 F.3d at 1319. Although the district court found that the attorneys had "acted vexatiously and in bad faith," the district court identified no "precise rule, standard, or law" that had been violated. *Id.* at 1309. Despite the district court's finding of "bad faith" under the umbrella of "prosecutorial misconduct"—which is no more "precise" than "bad faith" under the umbrella of "judge shopping"—the Eleventh Circuit cautioned that "[i]t is not apparent to us that either attorney necessarily violated any ethical rule or any constitutional or statutory standard" warranting sanctions. *Id.* at 1319.

on violation of an "unwritten rule"); *Eash*, 757 F.2d at 571 ("[F]undamental fairness may require some measure of prior notice to an attorney that the conduct that he or she contemplates undertaking is subject to discipline or sanction by a court.").

The Federal Rules of Civil Procedure endorse this framework. Where there is no controlling law, a court may impose additional obligations on litigants and attorneys through local rules and standing orders. Fed. R. Civ. P. 83(b). But Rule 83(d) limits any sanction for noncompliance: "No sanction … may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement." *Id.*; *see also* Fed. R. Civ. P. 83 advisory committee note (1995) ("[T]his rule disapproves imposing any sanction or other disadvantage on a person for noncompliance with … an internal directive, unless the alleged violator has been furnished actual notice of the requirement in a particular case.").

> **2.  When *Ladinsky* was dismissed, the only ascertainable standard was that Federal Rule of Civil Procedure 41 conferred an "absolute" and "unconditional" right to dismiss.**

Considering that due process framework, when Ms. Eagan and Mr. Doss dismissed *Ladinsky* and filed *Eknes-Tucker*, only one standard was clear: Rule 41(a)(1) provides an "absolute" and "unconditional" right to dismiss a lawsuit before a defendant's service of an answer or motion for summary judgment. *Carter,* 547 F. 2d at 259; *Matthews*, 902 F.2d at 880; *Am. Cyanamid Co. v. McGhee*, 317 F.2d 295, 297 (5th Cir. 1963). The Rule itself is unambiguous: "The plaintiff may dismiss an action without a court order by filing … a notice of dismissal before the opposing party

serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(i).  The only limitations are contained in Rule 41 itself:

> (i) **Timing:** Once the defendant serves either an answer or a summary judgment motion, the plaintiff's right to voluntarily dismiss is extinguished. Fed. R. Civ. P. 41(a)(1)(A)(i).

> (ii) **Repeat Use:** Rule 41(a)(1)(A)(i) can be invoked only once, as the second invocation is with prejudice. Fed. R. Civ. P. 41(a)(1)(B).

> (iii) **Cost Shifting:** In its discretion, the court "may order the plaintiff to pay all or part of the costs of the previous action" if "a plaintiff … previously dismissed an action" and then "files an action based on or including the same claim against the same defendant." Fed. R. Civ. P. 41(d)(1).

Apart from those limitations, Rule 41(a)(1)(A)(i) does not impose any restrictions—"judge shopping," "forum shopping," or otherwise.  The Fifth Circuit illustrated that point in *Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters*, 506 F.2d 914 (5th Cir. 1975), which remains precedential.[7]  The *Pilot Freight* defendants argued that a plaintiff should not be permitted to voluntarily dismiss a complaint after unsuccessfully seeking injunctive relief, warning that strict construction of Rule 41 "permits forum shopping in the sense that a litigant may be able to choose a 'friendly judge.'"  506 F. 2d at 917. The Fifth Circuit rejected the defendants' invitation to rewrite Rule 41(a)(1), observing, "Rule 41(a)(1) means precisely what it says."  *Id.* at 916.  In sum, there is no "judge shopping" exception to Rule 41.

---

[7]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Recognizing the clear meaning of Rule 41, some district courts have adopted local rules that place conditions on cases that are re-filed after Rule 41 dismissals. Some courts have local rules specifying that a subsequently filed case must be assigned or transferred to the judge who presided over the first-filed case. Other courts have local rules expressly precluding the use of Rule 41 dismissals to avoid a particular judge. Attached as Appendix A is a summary of some of those local rules. The Northern District and the Middle District, however, have not implemented comparable local rules.

The Eleventh Circuit likewise has neither a local rule nor otherwise given "clear guidance" about "judge shopping" in the context of Rule 41, a proposition with which this Court agrees:

> MR. PRATER: We would like to know the specific rule under *Shaygan* that our people violated. Is it an abstract judge-shopping concept, or is there a rule that they violated? That's what we're asking, Your Honor. And I appreciate your giving me the opportunity to talk to you a little bit more.
>
> THE COURT: Understood. And, look, you know, I mean, I get it that different circuits have different opinions on this. You know, in the Ninth Circuit, they have got case law, you know, upholding a judge who just about gave the death penalty in a case for judge shopping. *So, I mean, I get it that different circuits have different opinions on this. And I get it that the Eleventh Circuit doesn't have clear guidance on this.* Something tells me that we will get it one way or the other when this is over with.

(Mar. 19, 2024, Hearing at 60-61) (emphasis added).

This uncertainty is dispositive because a lawyer cannot be sanctioned for conduct about which there is no local rule or "clear guidance" to the contrary. If Respondents had knowingly and in bad faith violated either (i) a local rule or (ii)

"controlling [Eleventh Circuit] precedent" addressing Rule 41 dismissals and subsequent filings, the Court's task would be straightforward.  But without a local rule or "clear guidance," the Eleventh Circuit's default rule remains that Rule 41 is "absolute," *Carter,* 547 F.2d at 259, and "unconditional," *Matthews*, 902 F.2d at 880, which, under a plain meaning, means that "[o]ne doesn't need a good reason, or even a sane or any reason, to dismiss a suit voluntarily." *Marques*, 286 F.3d at 1017.

### 3. <u>*BellSouth* **is inapplicable, did not silently overrule prior precedent, and did not announce a new, sweeping prohibition against "judge shopping."**</u>

Unlike its precedent clearly recognizing the "absolute" and "unconditional" nature of Rule 41, the Eleventh Circuit has not defined "judge shopping," which is an abstract concept.[8]  Nor has the Eleventh Circuit defined what qualifies as the "manipulation of the random assignment of judges."  Like the targeted practice of "prosecutorial misconduct" was found too imprecise in *Shaygan* (even when accompanied by the district court's finding of "bad faith"), 652 F.3d at 1309, 1319, "judge shopping" and "manipulation" are not ascertainable prohibitions—reasonable minds might disagree on what they include (and, likewise, exclude).

Like most Circuit Courts, the Eleventh Circuit has expressed general disapproval of both practices in circumstances unrelated to voluntary dismissals.

---

[8]    Even dictionaries disagree on what it means.  *Compare* Black's Law Dictionary (2019) (defining "judge shopping" as "[t]he practice of filing several lawsuits asserting the same claims—in a court or a district with multiple judges—with the hope of having one of the lawsuits assigned to a favorable judge and of nonsuiting or voluntarily dismissing the others"), *with* Bouvier Law Dictionary (2012) (defining "judge shopping" as "[a]n attempt to place a matter before a sympathetic judge").

*See, e.g., In re BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003).  Based on that decision, the Order charges Respondents with having violated *BellSouth* by engaging in "judge shopping" through a Rule 41 voluntary dismissal.  But there are compelling reasons why *BellSouth* has no bearing on this Court's analysis.

   *BellSouth* is factually and legally distinguishable.  *BellSouth* (i) did not involve a plaintiff's absolute and unconditional right to voluntarily dismiss under Rule 41; (ii) addressed whether to prioritize, when they conflict, a litigant's right to counsel of choice or the mandates of the recusal statute, 28 U.S.C. § 455; (iii) involved no sanctions; and (iv) arose from what had "long been a matter of concern that parties in the Northern District of Alabama might be taking strategic advantage of the recusal statute [by hiring a law firm which employed a judge's relative] to, in effect, 'judge-shop,'" so much so that the court had entered a standing order addressing the practice.  334 F.3d at 944-45.

   None of those conditions are present in this case.  There is no reason to extrapolate, from that unusual constellation of variables, any holding pertaining to voluntary dismissals.  To conclude otherwise—that *BellSouth* altered prior precedent that Rule 41 dismissals are "absolute" and "unconditional"—would require this Court to find that the Eleventh Circuit violated its prior panel rule.  *See, e.g.*, *Swann v. Southern Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004) ("Under the prior panel rule, we are bound by the holdings of earlier panels unless and until they are clearly overruled en banc or by the Supreme Court.") (citing *United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir. 1997)).

*BellSouth* provides no guidance for lawyers, like Respondents, when confronted with (i) whether to voluntarily dismiss a case pursuant to Rule 41(a)(1), and (ii) whether to file a new case, with similar claims, in one district or another. The Eleventh Circuit reached neither issue. At most, the Eleventh Circuit suggested that "a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice." *BellSouth,* 334 F.3d at 959. The court, however, made that finding because the relevant standard—whether to disqualify counsel—expressly required it. *Id*. at 948 (describing one of the *Robinson* factors as "possible manipulation and impropriety"). That stray statement, therefore, was part of the Eleventh Circuit's reasoning, not its holding, which is non-precedential. "There is a difference between the holding in a case and the reasoning that supports that holding." *United States v. Vega-Castillo*, 540 F.3d 1235, 1237 (11th Cir. 2008) (citing *Atlantic Sounding Co., Inc. v. Townsend*, 496 F.3d 1282-84 (11th Cir. 2007)). Courts "are bound only by the holding of [a prior decision], not the reasoning behind the holding." *United States v. Murphy*, 306 F.3d 1087, 1090 (11th Cir. 2002).

A decision like *BellSouth* does not accurately predict how a court would evaluate voluntary dismissals. The Eighth, Fifth, and Second Circuits have illustrated that point:

- **Eighth Circuit.** For decades, the Eighth Circuit criticized "judge shopping" tactics. *See, e.g., Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291, 1300 (8th Cir. 1982) (noting that "judge shopping" is "a practice which has been for the most part condemned"). Yet, when deciding whether a lawyer could be

sanctioned for voluntarily dismissing a case due in part to concerns with a judge, the Eighth Circuit reversed that sanction. *Adams v. USAA Cas. Ins. Co.*, 863 F.3d 1069, 1080-81 (8th Cir. 2017) ("Therefore, we hold that the district court erred in concluding that counsel engaged in sanctionable conduct by stipulating to a dismissal under Rule 41(a)(1) for the purpose of forum shopping and avoiding an adverse result.").

In *Adams*, the district court found that the attorneys had voluntarily dismissed one case and then "[r]efil[ed] in a more favorable forum [to] avoid[] an adverse decision" of the district court. *Id*. at 1074. The district court sanctioned the attorneys. *Id*. at 1075. The Eighth Circuit reversed. "The reason for the dismissal is irrelevant under Rule 41(a)(1). Therefore, we hold that the district court erred in concluding that counsel engaged in sanctionable conduct by stipulating to a dismissal under Rule 41(a)(1) for the purpose of forum shopping and avoiding an adverse result." *Id*. at 1080-81; *see also id*. at 1083 (finding that the district court abused its discretion in determining that counsel had "abused the judicial process by stipulating to the dismissal of the federal action for the purpose of seeking a more favorable forum and avoiding an adverse decision").

- **Fifth Circuit.** The Fifth Circuit has condemned "judge shopping" generally, too. *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1164 (5th Cir. 1983) (describing "judge shopping" as "devious" and "bad faith"). Like the Eleventh Circuit in *BellSouth*, the Fifth Circuit affirmed

disqualification when counsel was engaged to force a judge's recusal. *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, (5th Cir. 1983) ("[C]ounsel may not be chosen solely or primarily for the purpose of disqualifying the judge."). Despite its aversion to "judge shopping" and its holding in *McCuin*, the Fifth Circuit later acknowledged that certain types of "judge shopping" are permissible because various rules authorize it, including Rule 41. *See, e.g., Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287, 290 (5th Cir. 2016) ("Although forum-shopping is not a trivial concern, Rule 41(a)(1) essentially permits forum-shopping.").

The *Bechuck* plaintiff voluntarily dismissed under Rule 41(a)(1)(A)(i) after the district court entered adverse rulings against him. *Id.* After he filed his dismissal notice, the district court entered an order requiring the plaintiff, "[i]f [he] sues [the defendants] again for the same cause of action, [to] do so before this court." *Id.* at 290-91. Echoing *Carter* and *Matthews*, the Fifth Circuit reversed:

> *Although forum-shopping is not a trivial concern, Rule 41(a)(1) essentially permits forum-shopping.* It is not uncommon for plaintiffs to use voluntary dismissal to secure their preferred forum, such as when they seek to undo removal and return to state court. While this may seem distasteful to opposing parties, we have consistently held that Rule 41(a)(1) means what it says and defendants who desire to prevent plaintiffs from invoking their unfettered right to dismiss actions under Rule 41(a)(1) may do so by taking the simple step of filing an answer.
>
> The effect of a Rule 41(a)(1) dismissal is to put the plaintiff in a legal position as if he had never brought the first suit. *Therefore, the plaintiff is free to return to the dismissing court or other courts at a later date with the same claim. By placing him back into the*

> *situation as though he had never brought suit, Rule 41(a)(1)(A)(i) necessarily allows him to choose his forum anew.*

814 F.3d at 293 (cleaned up) (emphasis added).

- **Second Circuit.** The same is true for the Second Circuit. The Second Circuit has long condemned the practice of "judge shopping." *See, e.g., United States v. Holland*, 519 F.3d 909, 915 (2d Cir. 2008) (rejecting efforts by defendant to seek a judge's recusal based on his own threats because doing so would authorize "defendants [to] readily manipulate the system" until "the defendant gets a judge he preferred"). Like the Eleventh Circuit in *BellSouth*, the Second Circuit rejected efforts to cause a judge's recusal due to counsel's retention. *In re FCC*, 208 F.3d 137, 139 (2d Cir. 2000) ("As between a judge already assigned to a panel, and a lawyer who thereafter appears in circumstances where the appearance might cause an assigned judge to be recused, the lawyer will go and the judge will stay."). Yet, when confronted with whether an attorney could be sanctioned for voluntarily dismissing a case due to concerns with a judge, the Second Circuit reversed the sanction. *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 115 (2d Cir. 2009) ("Dorsey was entitled to file a valid Rule 41 notice of voluntary dismissal for any reason, and the fact that it did so to flee the jurisdiction of the judge does not make the filing sanctionable.").

In *Wolters Kluwer*, the attorneys filed a lawsuit in the Southern District of New York, voluntarily dismissed the case, and re-filed the same lawsuit in the District of Massachusetts. 564 F.3d at 110. The Southern District of New

York found that the attorneys' "main purpose in filing a Rule 41 voluntary dismissal … was to judge-shop in order to conceal from [their] client 'deficiencies in counsel's advocacy.'" *Id.* at 114.  To the district court, "this sort of judge-shopping was an improper purpose and was accordingly sanctionable." *Id.*  The Second Circuit, however, reversed.  "[The lawyers were] entitled to file a valid Rule 41 notice of voluntary dismissal for any reason, and the fact that [they] did so to flee the jurisdiction or the judge does not make the filing sanctionable."  *Id.* at 115.  Because the attorneys were "entitled by law to dismiss the case," there was no basis to sanction them.  *Id.*

*BellSouth* covers Respondents' conduct only if the Eleventh Circuit's general disapproval of "judge shopping" applies to *every litigation decision* that potentially impacts a judicial assignment, including, but not limited to, Rule 41 dismissals.  That reading of *BellSouth*, however, would prohibit a host of ordinary litigation decisions, subjecting attorneys to discipline for exercising otherwise available procedural rights that happen to affect judicial assignments:

      1.    **Removal:** The plaintiff sues a defendant in state court. The defendant has a plausible argument that the requirements for diversity jurisdiction are met.  The defendant determines that the judge in state court would be less favorable than any judge in the relevant federal court.  The defendant removes the case to federal court, in part, based on an effort to avoid the state court judge.

      2.    **Dismissal Post Removal:** The plaintiff sues a defendant in state court.  The defendant removes the case to federal court and draws a judge.  The plaintiff believes that the assigned federal judge will be less receptive to the claims than the previous state court judge.  The plaintiff voluntarily dismisses, re-files the lawsuit in state court, and adds a non-diverse defendant that the plaintiff did not originally plan to sue.

3. **Magistrate Consent:** The plaintiff sues a defendant in federal court. The case is assigned to a magistrate judge. The plaintiff determines that the magistrate judge would be less favorable than any of the potential district judges. The plaintiff does not consent to the magistrate judge, in part, based on an effort to avoid that magistrate judge.

4. **Choosing a Federal District Court:** The plaintiff plans to sue a defendant in federal court. Under the venue rules, venue is proper is two different federal districts. The plaintiff determines that the judges in one district are better for the case than in the other district. The plaintiff files the lawsuit in the former district, in part, to avoid the judges in the latter district.

5. **Choosing a Federal Division:** The plaintiff plans to sue a defendant in federal court. Only one federal district would be the proper venue. The plaintiff knows that only two judges draw cases in one of the court's divisions. The plaintiff files in that division with the hope of drawing one of those two judges rather than the other judges in the district.

6. **Transferring a Case:** The plaintiff sues a defendant in federal court. The defendant has a plausible argument that the case should be transferred to another federal district court. The defendant also believes that the judges in the transferee court would be superior to the judge presently assigned to the case. The defendant moves to transfer the case, in part, due to the identity of the current judge.

7. **Filing Class Actions:** An attorney files the same class actions, on behalf of different named plaintiffs, in different federal district courts. Each case proceeds, and for one of them, the assigned judge denies the defendant's motion to dismiss and makes remarks indicating that the judge will likely grant a motion to certify a class. The attorney also determines that the Circuit Court over that particular district court will be more likely to affirm a class certification order than the other Circuit Courts. The attorney dismisses all other putative class actions and proceeds only before the preferred district judge.

8. **Consolidating Across Districts:** Dozens of lawyers file similar claims, including putative class actions, around the country against a single defendant. The defendant petitions the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate all cases before a single judge for pre-trial purposes. The lawyers for the plaintiffs agree

that pre-trial consolidation is sensible and propose to the JPML that the cases should be consolidated before a particular judge who they believe will be most favorable to their cases.  The JPML adopts the proposal of the plaintiffs' lawyers and transfers all cases to their proposed judge.

9. **Consolidating Within Districts:** Lawyers file several lawsuits against a single defendant within one federal district.  In the lawyers' view, the judge assigned to the first-filed case is more favorable than the judges assigned to the later-filed cases.  There is a plausible argument that the cases share common questions of fact or law.  Knowing that the district's practice is to consolidate cases before the first-filed judge, the lawyers move to consolidate all cases before the first-filed judge to secure, in their view, the "best" judge for the cases.

10. **Seeking or Not Seeking Recusal:** The plaintiff sues a defendant in federal court.  There is a plausible basis to seek the assigned judge's recusal.  The plaintiff prefers the assigned judge, but the defendant does not.  The plaintiff chooses not to seek the judge's recusal.  The defendant chooses to seek the judge's recusal.

11. **Voluntary Dismissal:** The plaintiff sues a defendant in federal court.  The case is assigned to a particular judge.  The attorney advises the plaintiff that the judge's prior rulings indicate that a loss is likely.  The plaintiff voluntarily dismisses the case before the defendant answers or files a motion for summary judgment.  Months pass, and the plaintiff informs the attorney that she wishes to file anyway and take her chances.  The district court has no rule requiring that the attorney mark the case as a "related case" or otherwise advise, at filing, about the first-filed lawsuit.  The plaintiff re-files the lawsuit and draws a judge different from the judge originally assigned.

Nothing in *BellSouth* suggests that the Eleventh Circuit intended to reach these scenarios.  Nevertheless, for *BellSouth* to prohibit Respondents' actions, it must be interpreted to prohibit "judge shopping" in absolute terms.  If that is the case, then *BellSouth* (i) effectively re-wrote Rule 41 without referencing it, and (ii) expanded the Court's inherent power to include probing every action by a lawyer that could potentially affect judicial assignments and determine whether the judge's identity

contributed to the choice.  The Eleventh Circuit did not reach this conclusion, which

weighs decisively in favor of confining the decision to its unique facts.

      **4.**      <u>**Without "clear guidance," Ms. Eagan and Mr. Doss cannot**</u>
<u>**have acted with bad faith**</u>.

The situation on April 15, 2022, was and remains the following:

1.      The plain language of Rule 41 provides—without qualification—that
"the plaintiff may dismiss an action without a court order by filing … a notice
of dismissal before the opposing party serves either an answer or a motion for
summary judgment."  Fed. R. Civ. P. 41(a)(1)(A)(i).

2.      Controlling Eleventh Circuit precedent recognizes an "absolute" and
"unconditional" right to dismiss a complaint by notice and without an order of
the court at any time prior to the defendant's service of an answer or a motion
for summary judgment.  *Carter*, 547 F. 2d at 259; *Matthews*, 902 F.2d at 880.

3.      No Northern District or Middle District local rule or standing order
addresses Rule 41 voluntary dismissals and subsequent filings.

4.      The Eleventh Circuit has not found "judge shopping," in the context of
Rule 41, to be sanctionable misconduct. In fact, in the one case concerning
alleged "judge shopping" that the Court has cited in its Supplemental Order,
no lawyer was sanctioned or disciplined.  *In re BellSouth Corp.*, 334 F.3d 941
(11th Cir. 2003).  The Eleventh Circuit has not otherwise defined "judge
shopping" or held that dismissal or re-filing decisions could warrant attorney
discipline.  As this Court correctly observed, "the Eleventh Circuit doesn't have
clear guidance on this." (Mar. 19, 2024, Hearing at 60-61).

5.      Every Circuit Court addressing alleged "judge shopping" in the context
of Rule 41 has refused to impose sanctions. *See, e.g., Adams*, 863 F.3d at 1080;
*Bechuck*, 814 F.3d at 293; *Wolters Kluwer Fin. Servs., Inc.,* 564 F.3d at 115.[9]

---

[9]      The Court suggested that the Ninth Circuit has "case law, you know, upholding
a judge who just about gave the death penalty in a case for judge shopping."  (Mar.
19, 2024, Hearing at 60-61).  Respondents have not found that case law or how it
would establish controlling standards for lawyers practicing in the Eleventh Circuit.
Respondents have located *Hernandez v. City of El Monte*, 138 F.3d 393 (9th Cir. 1998),
where the district court dismissed a lawsuit after finding that the litigants were
engaged in "judge shopping."  But Judge Pregerson, writing for the Ninth Circuit,
reversed.  138 F.3d at 398-400.  Unlike the Northern District and the Middle District,
a local rule expressly forbade dismissing one case for the purpose of re-filing to obtain

This record does not show bad faith.  But "[t]he key to unlocking a court's inherent power is a finding of bad faith."  *Purchasing Power, LLC*, 851 F.3d at 1223. That standard requires proof of subjective belief or conduct "so egregious that it could only be committed in bad faith."  *Id.* ("[T]he inherent powers standard is a subjective bad-faith standard."); *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020).

Subjective bad faith is "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; … it contemplates a state of mind affirmatively operating with furtive design or ill will."  *Fletcher*, No. 21-1433, 2023 WL 3095571, at *5 (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)).  The Court's inherent power "is not a vehicle for it to police all behavior" that could be considered "questionable, suspicious, unfair, dishonest, sharp, underhanded or similarly dubious."  *Hunters Run Prop. Owners Ass'n, Inc. v. Centerline Real Estate, LLC*, No. 18-80407, 2019 WL 12038883, at *3 (S.D. Fla. Oct. 22, 2019).  To the contrary, the Eleventh Circuit has found "bad faith" in narrow circumstances, none of which applies to Respondents.  *See, e.g., Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, 813 Fed. App'x 368, 376 (11th Cir. 2020) ("Nothing here smacks of fraud on the court or disobedience to its orders.  False statements—even those recklessly made—cannot justify sanctions

---

a different judge, but there had been no prejudice to the defendants, nor did public policy favor dismissal of the second case.  *Id.* at 399-400.  Considering the balance of factors, the Ninth Circuit held that the district court abused its discretion in dismissing the case.  *Id.* at 400.  No attorney was disciplined.  *See also Fields v. Gates*, 233 F.3d 1174 (9th Cir. 2000) (reversing inherent power sanction against attorney for alleged "judge shopping").

grounded in the court's inherent authority."); *In re Sunshine Jr. Stores, Inc.,* 456 F.3d 1291, 1304 (11th Cir. 2006) ("A party … demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.").

Considering the state of the law, Respondents could not have acted in bad faith when dismissing *Ladinsky*. If anything, binding precedent confirmed that Respondents had the "absolute" and "unconditional" right to dismiss for any reason. There is no evidence—let alone clear and convincing evidence—that Respondents acted with subjective bad faith. On the contrary, the undisputed evidence is:

- Before dismissing *Ladinsky* and filing *Eknes-Tucker*, Respondents were not aware of any rules, statutes, or cases that would preclude them from dismissing *Ladinsky* and filing *Eknes-Tucker* pursuant to Rule 41(a)(1).

- The day after the *Ladinsky* dismissal, Ms. Eagan shared with the media that a new lawsuit would be filed. Her candor with the media reveals innocent intentions. Had Ms. Eagan believed that she had violated a rule, statute, or case, she would not have been transparent with the media regarding next steps. A guilty mind would have operated furtively and outside media amplification. *Fletcher*, No. 21-1433, 2023 WL 3095571, at *5 (noting that bad faith involves "furtive design").

- That Respondents had some concerns with perceived "judge shopping" in the days following the *Ladinsky* dismissal is a red herring. Their concerns were not that they had violated an ethical rule. Instead, because of the controversial nature of the litigation (as well as accusations of "judge shopping" in the media), Respondents were concerned that politicians, opposing their clients' positions, would use cries of "judge shopping" to publicly undermine the lawsuit. Respondents wanted to ensure that appropriate steps were taken— including having an entirely new slate of plaintiffs—to counter the public accusation of "judge shopping."

This record is a far cry from the bad faith required to support a sanction, even if there were a precise rule, standard, or law regarding "judge shopping" in the Eleventh Circuit. There was no "conscious doing of a wrong because of dishonest

purpose or moral obliquity" or "affirmatively operating with furtive design or ill will." *Fletcher*, No. 21-1433, 2023 WL 3095571, at *5. The undisputed evidence is that, if there had been any concern that dismissing *Ladinsky* and filing *Eknes-Tucker* constituted misconduct, Respondents would not have agreed to do so.

Furthermore, even if the law were decisively clarified to prohibit Rule 41 dismissals under these circumstances, a mistaken belief—especially without "clear guidance" beforehand—does not establish subjective bad faith. For example, in *Purchasing Power, LLC* v. 851 F.3d at 1222, "[e]veryone involved in [the] case trusted that diversity jurisdiction existed, but no one verified it." Once the flaw in jurisdiction was discovered, the district court sanctioned counsel for failing to adequately investigate the relevant corporate citizenship and making a variety of related misrepresentations. *Id.* at 1222. On appeal, the Eleventh Circuit reversed. Although the citizenship oversight resulted in "a colossal waste of time and effort," the Eleventh Circuit found that a mistake was insufficient to find bad faith: "[n]o party in this case acted with bad intentions." *Id.* at 1228.

*     *     *     *

An ascertainable standard, known in advance, gives a lawyer an opportunity to make ethical choices. When no ascertainable standard is available, a court may not discipline a lawyer "on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct." *Finkelstein*, 901 F.2d at 1565. For that reason, it is essential to precisely

define the "rule, standard, or law," *Shaygan*, 652 F.2d at 1319, that the lawyer is alleged to have violated.

For this case, when consulting the case law, the rules, and the statutes, "responsible attorneys" would discover that voluntary dismissals are "absolute," *Carter,* 547 F.2d at 259, and "unconditional," *Matthews*, 902 F.2d at 880, and no case compels a litigant to file a lawsuit in one district over another, even when a prior lawsuit had been pending in another district.  The only arguable restriction on those rules is *BellSouth*, but as this Court acknowledged, there is no "clear guidance" on whether that is, in fact, applicable to circumstances like these.  Certainly, none of the facts in *BellSouth* resemble what Respondents did.

Because there is no ascertainable rule or standard that prohibited Respondents' litigation decisions and *BellSouth* did not outlaw all judge-based decision-making, Respondents should not be sanctioned.[10]

---

[10]    Respondents also should not be sanctioned under Rule 11.  Although Rule 11 permits sanctioning a lawyer for filing something with an "improper purpose," as Judge Guin noted, "A legal position is not sanctionable unless case law clearly establishes that the position is frivolous."  *In re O'Dell*, 268 B.R. 607, 618 (N.D. Ala. 2001) (citing *McKnight v. Gen. Motors Corp.*, 511 U.S. 659, 660 (1994)).  Eleventh Circuit case law does not "clearly establish[]" any limits on Rule 41 dismissals, and Rule 11 does not override Eleventh Circuit precedent that Rule 41 dismissals are "absolute" and "unconditional."  *See, e.g.*, *Adams*, 863 F.3d at 1073, 1080-81 (reversing Rule 11 sanction—even after district court found attorneys had dismissed case for an "improper purpose"—because the lawyers dismissed "in accordance with" Rule 41); *Wolters Kluwer Fin. Servs., Inc.*, 564 F.3d at 114-15 (same).

5. **Even if this Court determines that impermissible "judge shopping" occurred, the appropriate remedy is reassignment, not discipline.**

As Respondents explained in their Post-Hearing Brief, "[t]o the extent a remedy is needed for a plaintiff who voluntarily dismisses under Rule 41(a)(1) and then re-files, the remedy is reassignment."  (Case No. 2:22-MC-3977, Doc. 104 at 10) (collecting cases).  Respondents adopt that argument.  This remedy was promptly and fully applied when Judge Huffaker transferred *Eknes-Tucker* to this Court without any protracted proceedings or accusing lawyers of misconduct.

## II. **Ms. Eagan and Mr. Doss were truthful to and candid with the panel.**

The Order directs Ms. Eagan and Mr. Doss to show cause why they "should not be sanctioned for misrepresenting or otherwise failing to disclose key facts" during the panel's inquiry.  (Doc. 406 at 9).

### A. **Ms. Eagan testified truthfully and candidly about conversations with *Walker* counsel regarding judges in the Northern District.**

The panel noted perceived discrepancies between Ms. Eagan's recollection of a conference with *Walker* counsel that occurred on or about April 13, 2022, her impressions from that call, and what some other attorneys remembered.  (Final Report of Inquiry at 24-25).  Ms. Eagan, to the best of her ability, gave extensive details about what she could recall about this conference call, and any discrepancies are not material.  The conversation was Ms. Eagan's first interaction with *Walker* counsel, and she attended only part of the call.  (Aug. 4, 2022, Trans. at 32-33).  When Ms. Eagan testified about the discussion, she provided her best recollection of details, noting that she could not pinpoint exactly what had been said:

JUDGE PROCTOR: All right. Tell me—so let's go back to this phone conversation, then, that you—first time you talked to *Walker* counsel. And your impression you gave us in the declaration is that you hung up from that call with the impression they desired to stay in the Middle District.

MS. EAGAN: Yes, sir.

JUDGE PROCTOR: Tell me what you can recall—everything you can recall about that phone call. I'm going to get your complete recollection of it, if I may.

MS. EAGAN: I remember from the ACLU side, Lambda side of the call, my recollection is that Mr.—I don't even—I'm sorry—James—

JUDGE PROCTOR: Mr. Esseks?

MS. EAGAN: Esseks. Because this was the only time I ever had a conversation with any of them from the standpoint of an actual phone conversation or anything like that.

JUDGE PROCTOR: Other than email traffic or something like that?

MS. EAGAN: Correct. My recollection was that Mr. Esseks was the one from their side who was doing more of the talking, which is I think why I remember him from the call. My recollection or my – from that call or my impression was that they were still going to try to get their case transferred to Judge Thompson and stay in the Middle District. And I remember raising to them, if you do not get your case transferred to Judge Thompson, are y'all going to ask to stay with Chief Judge Marks, or are you going to accept a transfer? I recall that they didn't really have —-they hadn't reached a decision on that at that point.

JUDGE PROCTOR: All right.

MS. EAGAN: I remember expressing, myself, that, you know, we were happy in the Northern District, and that we were where we would—we planned to be and that we would like to be. I remember saying that we had Judge Cornelius. I recall—

JUDGE PROCTOR: Because as of that day, you did.

MS. EAGAN: We did. I recall saying to them that we did not know if the State would decline her jurisdiction, but if they did, then we would be

43

put back in the random assignment pool of the Northern District and that, you know, we could be assigned to any of the judges in the Northern District. I have a recollection, and I don't remember the exact words, but I do seem to recall having a brief sort of—where they were interested in knowing what we knew about the judges in the Northern District. And I recall—I believe I had some sort of brief—and I don't remember if I went through every judge, I don't remember if I just sort of gave an overall synopsis, but I do believe that I gave some viewpoints from my perspective as to how I thought judges might receive this type of controversial case.

JUDGE PROCTOR: I take it that Judge Manasco would not have been discussed, then, since she had already recused.

MS. EAGAN: I don't believe I would have.

JUDGE PROCTOR: But would you have covered all the other judges in the Northern District in response to that inquiry?

MS. EAGAN: I don't remember if I went through them one by one. I don't remember if I just did more—I think—I don't really remember, Judge, exactly what was said on that.

JUDGE PROCTOR: So just generally, then, on this discussion of judges, how would that have—what were the key points of that? Was it whether someone would be receptive to the claim or not as receptive to the claim? Was it what people's different procedures were, how people handled preliminary matters differently or the same? Just give me your best recollection of the things you covered about the judges, just in terms of subject matter.

MS. EAGAN: Again, I don't remember specifically what was said. But what my general recollection is, is that it related to how I thought judges —-my personal opinion on how I thought judges might receive our clients as well as these controversial issues that people have very strong personal opinions about.

JUDGE PROCTOR: All right. And what did you use to form the basis for your views?

MS. EAGAN: It was really based upon either my knowledge of the background of judges or my experience before them. Just a general knowledge of what I knew about different folks or my perceptions.

JUDGE PROCTOR: All right. And I guess that's really—I'm trying to get a little further into that analysis. How do you form your perceptions?

MS. EAGAN: It was just based upon either my experience or my knowledge of different judges in the Northern District, their backgrounds, knowing them as people. I mean, you know, it was just a variety of factors. Could be their background experiences. Again, I just don't remember how much detail—I don't believe I went into much detail with them, I mean, because at that point, I didn't really know them. Them being the ACLU folks. But I do believe that I touched on that topic.

JUDGE PROCTOR: All right. Again, was this in the context of their assessing whether to come to the Northern District of Alabama or whether to consent to the transfer order, or was this in terms of your evaluating in the *Ladinsky* case where the next step might be, depending upon Judge Cornelius's status?

MS. EAGAN: My recollection is that they were curious or they wanted to know what input we could give to them about the judges in the Northern District as they were trying to making that decision was my impression.

(Aug. 4, 2022, Trans. at 36-40).

Ms. Eagan further testified that "it was a fairly short call," and that she did not "remember anything else as far as topics that were discussed during that call." (Aug. 4, 2022, Trans. at 41-42). The panel asked Ms. Eagan no further questions regarding this telephone call.[11]

Ms. Eagan stands behind her testimony to the panel. (Eagan Supp. Dec., Doc. 495-1, at ¶ 10) ("While I do not remember everything that was said during that call

---

[11]     In the Final Report, the panel states, "Shortnacy testified that another call took place on April 13 between at least himself, Esseks, Charles, Orr, and Eagan." (Final Report of Inquiry at 25). Mr. Shortnacy's testimony, however, appears to be referencing the April 13 video conference about which Ms. Eagan testified. Ms. Eagan participated in only one telephone call with *Walker* counsel.

or what specific words were used, I have testified to the full extent of my memory about what I remember about that call."). Ms. Eagan's testimony to the panel was honest and complete. The panel asked her what she recalled about the conversation with *Walker* counsel, and she does not recall anything more than what she recounted.

This Court has not identified a specific statement to the panel by Ms. Eagan regarding her conversations with *Walker* counsel that it believes was intentionally false. It is axiomatic, therefore, that there is no clear and convincing evidence that Ms. Eagan was anything other than honest and candid with the panel about those conversations. That other participants may remember the discussions differently or had different impressions from the call does not mean that one person is not telling the truth. This court must resolve all doubts in favor of Ms. Eagan. *See, e.g.*, *Gust, Inc.* 905 F.3d at 1327; *Jones*, 49 F.3d at 695; *Rounseville*, 13 F.3d at 633.

**B.** **Ms. Eagan and Mr. Doss testified truthfully and candidly about whether they recall Ms. Eagan saying there was a "zero percent chance" of success on the motion for preliminary injunction in this Court.**

**1.** **The panel erroneously determined that Ms. Eagan's testimony was inconsistent with Ms. Terry's testimony about the chances of success.**

Both the panel and this Court have focused on a telephone conference among *Ladinsky* counsel that occurred around 5:00 pm on Friday, April 15, 2022 ("the Friday Call"). This Court has commented, "You know, when I have got a junior associate who is telling the panel things that absolutely this case would turn on that none of the respondents happen to mention is—it shocks the conscience." (Mar. 19, 2024, Hearing Trans. at 10). But Ms. Terry's testimony, even if elevated over the testimony

of every other witness, is not inconsistent with the testimony of Ms. Eagan and every other participant who testified about the Friday Call.

Ms. Terry submitted a declaration and testified twice.  When she testified on the first day of the panel's inquiry, Ms. Terry never said that Ms. Eagan offered the opinion that there was a "zero percent chance" that plaintiffs' motion for preliminary injunction would be successful in this Court.  (May 20, 2022, Trans. at 101-12).  She said only that, during the Friday Call, the participants discussed "chances" of success in this Court: "[t]here was some discussion about what we thought our chances were with Judge Burke about winning, wining our motion …"  *Id.* at 109.

Ms. Terry later submitted a declaration, which included the following reference to the Friday Call:

> We discussed the unexpected assignment of the case to Judge Burke, whether the reassignment followed the first-filed rule, whether we would remain the first-filed case and lead counsel, *Judge Burke's background for the case, whether he would be likely to grant our preliminary injunction motion*, and our ability to file a voluntary dismissal under Rule 41 of the Federal Rules of Civil Procedure.

(Doc. 80-14 at 10) (emphasis added).  As in her initial testimony, Ms. Terry did not testify that Ms. Eagan said there was a "zero percent chance" of success in this Court.  Only during Ms. Terry's second time testifying—which occurred *after* Ms. Eagan testified and *before* Mr. Doss testified that day—did Ms. Terry reference "zero percent chance."  (Aug. 4, 2022, Hearing at 179-80).

Ms. Terry's August 4 testimony is consistent with, but not identical to, her prior statements.  For that reason, it is not clear whether Ms. Terry quoted Ms. Eagan or gave her interpretation of something she recalled Ms. Eagan saying.  Other factors

suggest that perhaps Ms. Terry does not have a clear memory of the Friday Call.  For example, in her declaration, Ms. Terry noted that she believes "[Ms. Eagan] and [Ms. Vague] from Lightfoot, [Mr. Minter] from NCLR and [Ms.] Levi from GLAD" were on the call.  (Doc. 80-14 at 9).  Mr. Doss, however, was another Lightfoot participant, but Ms. Terry did not recall that.  (Doc. 80-2 at ¶ 26).  Meanwhile, Ms. Levi, who Ms. Terry believed participated in the Friday Call, did not.  (Doc. 80-6 at ¶¶ 18-19).

The distinction—whether the "zero percent chance" comment was a quote or an impression—is immaterial.  The panel never asked Ms. Eagan about this statement, and in any event, the record is undisputed: (i) Ms. Eagan admitted that she shared her opinions about the likelihood of success before Your Honor with co-counsel before *Ladinsky* was dismissed, and (ii) no one who participated in the Friday Call recalled that specific comment having been made, other than Ms. Terry (assuming she was referencing a quote).

The panel acknowledged that it "does not condemn the lawyers for fretting about their chances of success before a particular judge," (Final Report of Inquiry at 50), and Ms. Eagan freely told the panel that she shared her opinions regarding the chance of success before Your Honor with her co-counsel before *Ladinsky* was dismissed:

- "I'm sure that I likely had conversations with my co-counsel at points about … different judges and who I thought might view our case more favorably or be more receptive to our clients … and these issues than possibly other judges."  (Aug. 4, 2022, Trans. at 27).

- "Judge Burke I viewed as a conservative judge … I knew that he had been involved in Alabama politics and … my view of, if he had been elected, [was] that he is likely either socially conservative or gives the appearance of

48

being socially conservative.  And with the controversial issues that were involved here, I had some questions and concerns about whether Judge Burke would relate well to our clients or also what his personal views would be on these issues.  I did not know what they were, but that was just my impression, is that I had concerns about how he would receive these issues from a personal standpoint … I always believed that Judge Burke is going to be fair and impartial and try to apply the law, but how we interpret the law can be influenced … by the lens that we view the world in." *Id.* at 49-50.

- "If I were ranking the draws, I would have put Judge Burke at the bottom of the list in the Northern District … There were other judges that we had some reservations about or concerns about, but Judge Burke would have been at or close to the bottom as far as from a standpoint of thinking through … what I perceived would be potentially his personal views on some of these issues." *Id.* at 50.

- "I've always found Judge Burke to be fair.  I've always found him to be impartial.  But in a case of this nature, with this type of controversy, people have strong personal views on it, and I was concerned as to what his personal perspectives might be."  *Id.* at 78.

Ms. Eagan also admitted to the panel that Your Honor's assignment to *Ladinsky* was "a factor" underlying the decision to voluntarily dismiss.  (Aug. 4, 2022, Trans. at 93) ("I did consider the fact that the case had been transferred to Judge Burke and what were my viewpoints on how Judge Burke would potentially receive these issues. That was a factor that was in my mind when we did the dismissal.").

Unable to find fault with Ms. Eagan expressing her opinions, the panel stated that "when specifically asked about the [Friday Call], [Ms.] Eagan did not admit that she had said about Judge Burke that there was a 'zero percent chance' they would have of succeeding before him." (Final Report of Inquiry at 35).  If the panel made that specific "ask," one would expect a cite to the record, yet glaringly, there is none. The panel did not ask Ms. Eagan whether she made that comment, what she said

during the Friday Call, or to recount everything she remembered being said.  In her declaration filed on May 8, 2024, Ms. Eagan explains:

> While I do not remember saying "zero percent chance" during the 5:00 Call, I do not recall the specific words or statements I made during that call.  The 5:00 Call was a brief and hectic call that occurred late on a Good Friday, and I was confused about why the *Ladinsky* case had been transferred to Your Honor.  I know I had concerns and likely expressed an opinion—consistent with what I testified in the Panel Hearing— about what I perceived at the time to be the likelihood of success before Your Honor in this exceptional case.  If I said "zero percent chance" or words to that effect, it would have been hyperbole.  In addition, I reviewed the hearing transcript after the sequestration order was lifted and saw that the decision makers on the *Ladinsky* team, when specifically pressed by the Panel, did not recall my saying "zero percent chance" during the 5:00 Call, which reflects that those words, if spoken, were not critical to the decisions we made.

(Doc. 495-1 at ¶ 7).

The panel also did not ask Mr. Doss whether Ms. Eagan made the comment. In fact, the panel never asked Mr. Doss what *anyone* said during the Friday Call.  He has no recollection of Ms. Eagan making that comment.  (Doss Supp. Decl., Doc. 495-2 at ¶ 45).  Regardless, during his testimony, Mr. Doss freely acknowledged that, as of the Friday Call, he thought Your Honor would be "resistant" to the claims asserted in *Ladinsky*:

> JUDGE WATKINS: … So my question is at that point in time, in the emergency, in the heat of the hour, what was your assessment of the likelihood that Judge Burke—and I understand the team wanted to know what you-all thought. What was your assessment?
>
> MR. DOSS: At that point in time, our thought was he may be less receptive to the claims.
>
> JUDGE WATKINS: Just less? Like 49 percent or how much less?

MR. DOSS: We thought that he would be resistant to certain of those claims.

JUDGE WATKINS: *Basically, you didn't see much opportunity that he would rule in your favor.*

MR. DOSS: *We thought it would be very difficult based on what we knew.*

(Aug. 4, 2022, Trans. at 248-49) (emphasis added); *see also id.* at 242 (acknowledging that *Ladinsky* was dismissed due to a variety of factors, including "the judge").

Other than Ms. Terry, every participant on the Friday Call who was specifically asked about the "zero percent chance" comment did not recall Ms. Eagan making it.  A collection of that testimony is attached as Appendix B.

> ### 2.  <u>Ms. Eagan should not be sanctioned for not testifying about a statement that she does not recall saying, multiple witnesses do not recall her saying, and the gist of which she conveyed to the panel.</u>

The Report does not reflect the totality of the evidence.  First, the panel never "specifically asked" Ms. Eagan about what she said during the Friday Call.  (Final Report of Inquiry at 35).  Ms. Eagan's testimony spans over 130 pages.  (Aug. 4, 2022, Trans. at 15-147).  The panel did not ask her to recount what precisely was said during the Friday Call, nor did the panel ask Ms. Eagan about any statements made by her.  Second, the Report assumes that Ms. Eagan, in fact, said there was a "zero percent chance," when (i) Ms. Terry may or may not have been offering an exact quote (as opposed to an impression), (ii) no one else who participated in the Friday Call recalled Ms. Eagan using those words, and (iii) had the panel asked Ms. Eagan about the statement, she would have testified that she does not recall making it.  Third, no one disputes the underlying sentiment—that, during the Friday Call, Your Honor's

amenability to the claims asserted in *Ladinsky* was discussed and considered, among other things, when the decision to voluntarily dismiss was made.[12]

When courts have applied the "clear and convincing" evidence standard in other contexts, they have demanded more than this record.  For example, one person's testimony—unsupported by any other record evidence—is generally not clear and convincing evidence.  *See, e.g., Gunn v. Sec'y, Dep't of Corrections*, No. 21-336, 2024 WL 775209, at *5 (M.D. Fla. Feb. 26, 2024) (in habeas context, general statements, "unsupported by any other evidence," are not "clear and convincing").  And, when testimony is not "absolute and unequivocal" but perhaps is a "reflection of … mistaken understanding," there is not clear and convincing evidence of a misrepresentation.  *See, e.g., Vasconcelo v. Miami Auto Max, Inc.*, 851 Fed. App'x 979, 984 (11th Cir. 2021) (in post-verdict proceedings).

Layering the substantive law over the standard of proof confirms that Ms. Eagan should not be sanctioned.  For the Court's inherent power, when "there is no evidence of subjective bad faith in the record" and the attorney's conduct is not "so egregious that it could only be committed in bad faith," then sanctions are

---

[12]    When juries are charged in Alabama, for example, they are told to "reconcile the testimony of all witnesses to make them speak the truth, if this can be done reasonably."  Ala. Pattern Jury Instructions—Civil 1.03 (3d ed.).  In the Eleventh Circuit, juries are similarly charged: "When considering a witness's testimony, you may take into account … the reasonableness of the witness's testimony in light of all the evidence …"  Eleventh Circuit Pattern Jury Instructions—Civil 1.1 (2022).

In the same way, Respondents submit that this Court should apply a comparable approach.  When the evidence is undisputed, as it is with this record, only one reasonable construction of the evidence is possible: no one misrepresented or omitted a material fact to the panel while testifying about what they remembered during the Friday Call.

inappropriate. *Virgen v. US Coatings, Inc.*, No. 17-198, 2017 WL 4414162, at *5 (S.D. Ala. Sept. 15, 2017). For Rule 11, "the court is to avoid hindsight and resolve all doubts in favor of the [attorney]," *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (11th Cir. 1986), and may sanction only for conduct that is "akin to contempt." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003)

Applying those standards, the Court could sanction Ms. Eagan only by wrongly piling unreasonable inference on unreasonable inference. "A reasonable inference is one that a 'reasonable and fair-minded [person] in the exercise of impartial judgment might draw from the evidence.'" *Toruno v. Sam's E., Inc.*, No. 17-21918, 2018 WL 3934653, at *4 (S.D. Fla. July 25, 2018) (quoting *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982)). To sanction Ms. Eagan, the Court would have to conclude that (i) Ms. Eagan, in fact, made the "zero percent chance" comment, (ii) Ms. Eagan recalls saying it and chose to withhold it (despite expressing to the panel her erroneous perceptions of the likelihood of success before Your Honor and how those perceptions factored into the decision to dismiss), and (iii) everyone else recalls Ms. Eagan saying "zero percent chance," yet has chosen to withhold it (despite expressing a similar sentiment to the panel). Those inferences, however, are unreasonable and speculative. *See, e.g., McGehee v. Fed. Express Corp.*, No. 16-873, 2018 WL 1408642, at *11 (N.D. Ala. Mar. 21, 2018) (at summary judgment, rejecting a construction of the evidence that "requires the court to accept speculation upon speculation"). Those unsupported inferences would weigh the evidence in the light *least* favorable to Ms. Eagan, resolving *no* doubts in her favor, and drawing all

53

inferences *against* her.  Construction of the evidence in that way would not be an exercise in "restraint and discretion," *Chambers*, 501 U.S. at 43 (requiring courts to exercise their inherent powers with "restraint and discretion"), nor would it resolve doubts in Ms. Eagan's favor, *Oliveri*, 803 F.2d at 1275.

Ms. Eagan has no history of misrepresenting or omitting facts to any court. She has an unblemished professional record that belies any inference that, under these circumstances, she is being anything other than candid and forthright. Considering the totality of the evidence and applying the pertinent legal principles, this Court should not impose sanctions on Ms. Eagan.

**C.**   **Ms. Eagan and Mr. Doss testified truthfully and candidly to the panel about why they dismissed *Ladinsky* and filed *Eknes-Tucker*.**

The panel found that Ms. Eagan and Mr. Doss dismissed *Ladinsky* solely because the case was assigned to this Court, reasoning that it "is the only logical conclusion." (Final Report of Inquiry at 42).  There is simply no substantial evidence that supports that conclusion. The panel ignored two crucial details: (i) although subject to sequestration, every lawyer associated with *Ladinsky*—including Ms. Terry and others who the panel dismissed and accused of no misconduct—identified virtually the same set of factors that motivated the decision to voluntarily dismiss *Ladinsky* and to file *Eknes-Tucker* in the Middle District rather than the Northern District; and (ii) every lawyer associated with *Ladinsky* and *Eknes-Tucker* admitted that Your Honor's assignment to *Ladinsky* played a role in the decisions.

1.    **The record is undisputed that the discussion about whether to voluntarily dismiss *Ladinsky* was prompted by the non-random and sua sponte transfer of *Ladinsky* to this Court.**

The Friday Call followed an unexpected procedural event. Respondents believed that, after *Walker* had been transferred from the Middle District to the Northern District, the case would be consolidated with *Ladinsky* before Judge Axon. When that did not happen, available *Ladinsky* team members convened the Friday Call. The Friday Call began with participants expressing that they did not understand why the case had been assigned directly by Judge Axon to this Court. The transfer was contrary to Ms. Eagan's and Mr. Doss's experience in the Northern District and understanding of Northern District procedure. They had not seen one judge directly assign a case to another judge, without a motion and outside the random case assignment process.

The conversation shifted to whether there were any procedural options available, such as a motion to reconsider, and the consensus was that there was no non-prejudicial way to raise the issue procedurally. The participants discussed what effect, if any, the assignment had on *Ladinsky*'s lead case status. This Court had set *Walker* for a status conference on the following Monday but had not correspondingly set *Ladinsky*. In the context of those discussions, the participants also discussed opinions regarding Your Honor's receptiveness to the claims in this case. Similar discussions had already occurred before filing *Ladinsky*, as Respondents knew that any Northern District judge could draw the case through the random assignment in the Southern Division.

Given the unusual position that the *Ladinsky* team found itself, one participant raised the idea of voluntarily dismissing the case. No one could think of any reason why voluntarily dismissing the case would not be a viable and procedurally proper option. Another participant read Federal Rule of Civil Procedure 41 to the Friday Call's participants. By its plain terms, it appeared that Rule 41 provided an absolute and unconditional right.

The decision was reached that *Ladinsky* should be voluntarily dismissed, provided the clients agreed (which they did) and the *Walker* team likewise voluntarily dismissed. Although the team agreed on the course of action—voluntary dismissal— there was not just one reason for doing so. No member of the *Ladinsky* team has testified that *Ladinsky* was dismissed solely because of its assignment to this Court. Each team member's multiple reasons were his or her own (and, for that reason, each lawyer may have placed different emphasis on different factors).

The panel questioned every lawyer associated with *Ladinsky* regarding the reasons for dismissing the case. Despite having been sequestered, the lawyers— including those the panel dismissed and accused of no misconduct—gave a consistent explanation: several factors, not just one, influenced the dismissal decision. A collection of that testimony is attached as Appendix C. Ms. Eagan and Mr. Doss testified consistent with the testimony of every other lawyer questioned. Ms. Eagan testified as follows:

> MS. EAGAN: Well, I don't remember having discussion about you can dismiss for any reason. But here was the thing. At that point, we had -- we had this unusual transfer. We couldn't explain how it happened and why it happened. And we didn't know how one of my colleagues -- I believe

it was Mr. Shortnacy—I remember he raised, well, can't we just—this has just got to be some snafu. Can't we file a motion to reconsider? And I was the one that said, we can't file a motion to reconsider.

First of all, who would it be heard by? Judge Axon doesn't have our case anymore. Judge Burke has our case now. So we're going to file a motion to reconsider to Judge Burke, to reconsider a case being transferred to him, and ask him to transfer it back to Judge Axon? Not only is that going to send a potentially bad message to Judge Burke and make him think we prefer Judge Axon, but it could have a negative impact on our clients, particularly if we stayed before Judge Burke.

So that was not an option. Sorry I started talking fast, but that really is kind of the tempo of the way that those conversations were going that day. And so we didn't have that. And then we saw—I mean, we were seeing our status as lead case floating away, I mean, in our minds, because we had Judge Burke had now set the *Walker* case for a hearing on Monday or a status conference on Monday. They already had their TRO in place. So that was a concern.

We were not clear, but, I mean, under my impressions, I thought, gosh, our case is going up to Huntsville where we didn't have any connection to the case or to the Northeastern division. So that was going through my mind, although I wasn't a hundred percent sure where the case would go. But, again, this was just the various thoughts that were going through our brain. So we had this—we couldn't figure out what had happened. We didn't have a way to find out.

We were losing our position as lead counsel or lead case in our minds. We might be getting shipped off to Huntsville and consolidated into potentially the *Walker* case, which was then, you know, suddenly stepping into the lead case. And I will say, I mean, did we also consider that Judge Burke was the person that it had been assigned to? Yes, that was in my mind, too, but that wasn't the primary driving factor that day. It was all of these factors combined and the fact that we were in a position that we—something odd had happened, and we didn't understand why, and we couldn't figure out how to figure it out.

And if we had started inquiring, the last thing that I want to do is go before one of y'all and start questioning why a particular procedure was not followed and look like I'm saying, you didn't do something right. And so with all of those factors and all of those things, to us—and I was making a fast decision that day. But to us, the cleanest thing to do was

we had a right to dismiss under Rule 41, we could file a new case, and we could start over.

(Aug. 4, 2022, Trans. at 79-82).

Similarly, Mr. Doss acknowledged that a variety of factors—including Your Honor's perceived receptiveness to the *Ladinsky* claims—contributed to his thinking about voluntarily dismissing *Ladinsky*:

> MR. DOSS: Yes, Your Honor, I was [on the Friday Call]. We didn't understand the transfer order. It was not what we expected to happen. We throughout that day, knowing that the *Walker* case had been transferred to the Northern District, were expecting the State attorneys to actually file the motion to consolidate. We had had communications back and forth with those folks earlier that afternoon. And they had the same understanding we did, which is it would be filed—that motion would be filed in the first filed case, our case, decided there, the cases get consolidated. And so it was not how we expected it to unfold. It was, from our perspective, not the norm. It was a deviation from the rule.
>
> So it was concerning to us. And that was immediately what the topic of discussion was: That we didn't understand what had happened. We were thinking about ways of addressing it. I remember someone on the call, although I do not remember exactly who it was, raised the prospect of filing a motion to reconsider. The consensus at that point was that a motion to reconsider would probably not be the best vehicle to use. From my perspective, it's sort of like filing a motion to recuse. You may have good grounds for doing so, but you're always worried what message that will send to your decision maker. In the same way, if we had challenged the transfer order, our concern was, are we sending a message that we're dissatisfied with how it's being—to whom it's being transferred rather than how it's being transferred?
>
> So we talked through these issues. We were also concerned that the *Walker* litigation appeared to be inching ahead. I note this in my declaration. An important strategic goal for all of us was maintaining the precedence of our case, so we had a concern there that it was inching ahead. We didn't understand why the status conference was going forward. We didn't understand why we had not been included in it. We didn't understand, since that was a Northeastern Division case, would our case be heard in Huntsville as opposed to Birmingham?

There was a lot of uncertainty, and it was, to put it mildly, a chaotic afternoon. A chaotic discussion. *So given those very unusual circumstances—we had a politically sensitive case, we had an appearance of a deviation from the rule of how the first filed case procedure would work—we took into account everything. We took into account the venue. We took into account the Walker litigation. We took into account the unusual nature of how the case was assigned. We took into account—I mean, everything.*

JUDGE WATKINS: *When you say venue, does that include the judge?*

MR. DOSS: *We took into account the judge under that very unusual circumstance, Your Honor. Yes, sir.* And I guess to preface that, I can say, had the case gotten to Judge Burke through the random assignment procedure, it would not have been a factor. I've filed many cases as a plaintiff's attorney. I've removed cases as a defense attorney. The idea of dismissing a case because of the judge has never crossed my mind. But because of the way the case got to him, from our appearance, at least, it looked like the standard procedure had not been followed. It unlocked, at least in my mind, a different analysis of the situation.

(Aug. 4, 2022, Trans. at 240-43) (emphasis added).

In determining that the only "logical conclusion" was that Your Honor's identity was the sole reason for the dismissal, the panel simply chose to disregard or disbelieve the testimony of all witnesses who testified on the topic. The requirement that this Court apply the subjective bad faith and benefit-of-the-doubt standards in considering sanctions prevents such a conclusion here.

### 2.   The record is undisputed that every lawyer associated with *Ladinsky* considered the Court when deciding whether to voluntarily dismiss *Ladinsky* and to file *Eknes-Tucker* in the Middle District.

Respondents knew venue for the new lawsuit would be proper in either the Northern District or the Middle District. They were not aware of any requirement to file this new lawsuit, with new plaintiffs, in the Northern District, where *Ladinsky*

had been pending.  They also were concerned that filing in the Northern District would cause the new lawsuit to be non-randomly assigned to this Court due to its arguably related nature to *Ladinsky*.  If that were to happen, then the exact procedural morass that they had attempted to avoid in *Ladinsky* would be revisited for *Eknes-Tucker*.  Thus, they agreed with the team that filing *Eknes-Tucker* in the Middle District—and attempting to secure a randomly assigned judge there—was the best course of action.

The panel questioned every sequestered lawyer about the reasons for filing *Eknes-Tucker* in the Middle District.  For those lawyers who did know something about it, each testified that having a new slate of plaintiffs (and most defendants situated in the Middle District) and securing a randomly assigned judge (as opposed to having *Eknes-Tucker* automatically assigned to this Court) played a role in the decision.  Ms. Eagan and Mr. Doss testified similarly.  Ms. Eagan explained her rationale for filing *Eknes-Tucker* in the Middle District:

> JUDGE PROCTOR: And it was on Sunday you made the final decision, we're going to file in the Middle District.
>
> MS. EAGAN: I believe it was on that Sunday. I mean, we were strongly considering it on Saturday, but I believe that the final—the final decision to file with new plaintiffs, all new plaintiffs, in the Middle District was made on that Sunday.
>
> JUDGE PROCTOR: All right. And one of the factors that you—well, the concern you had, the concern you had, was that if you filed in the Northern District, the case would just go straight back to Judge Burke.
>
> MS. EAGAN: *We thought there was a high chance that it would be reassigned to Judge Burke—or assigned. Whoever we drew in the random selection would transfer the case likely to Judge Burke, and we would be right back where we were on Friday afternoon, which is outside of the*

*random selection process,* and we would be with these unanswered questions. And so while we considered filing in the Northern District, the decision was if we file in the Middle District with new plaintiffs, and we also added new claims, an all new lawsuit in the Middle District, *we thought that we might be more likely to go into the random selection process and get a randomly selected judge.*

(Aug. 4, 2022, Trans. at 108-09) (emphasis added).

Mr. Doss held a comparable belief—that filing in the Northern District risked having *Eknes-Tucker* automatically re-assigned to Your Honor and recreating the previous procedural morass:

JUDGE PROCTOR: Can you tell us that that was not because you didn't want to have Judge Burke back on this case?

MR. DOSS: The issue there is—I know at some point on that Saturday—and, again, I'm not—it's just a complicated question, and I just want to give a little bit of background before I answer that.

JUDGE PROCTOR: That's fine.

MR. DOSS: At some point that Saturday, we had a discussion amongst team members. Our concern was if we were to file a new lawsuit in the Northern District, it gets randomly assigned to a judge, and the judge looks and sees that Judge Burke had the *Ladinsky* litigation and transfers it back to him as some sort of related action, and then we find ourselves right back where we started with a nonrandom assignment.

That was part of our thought process in filing in the Middle District; that if we were to file in the Northern District, we may find ourselves right back where we started in this awkward, uncomfortable situation where we didn't understand why the case got to him. But the other aspect of it was once we had our new slate of plaintiffs that ultimately became Eknes-Tucker, there were a number of them who the defendants—which were—made venue proper in both the Middle District and the Northern District, to be honest, but there was a slight leaning toward the Middle District. So, I mean, it did have to do with getting out from under the procedural issue we were worried about in the Northern District, but it also had to do with we had a slate of plaintiffs who made venue proper in the Middle District.

JUDGE PROCTOR: Okay. That's the background. Let's get an answer to my question.

MR. DOSS: So it's not that we were trying to get away from Judge Burke, at least from my perspective. We were not trying to get away from Judge Burke, *we were trying to get away from being automatically assigned back to him on a related case basis and again finding ourselves in a position where we felt like we did not have a randomly assigned judge. And that was our issue.*

It was not Judge Burke. All along—I mean, and some background, we'd been working on this matter for almost two years, and very early on in all of this we talked about the different judges of the Northern District and the Middle District and receptivity and that sort of thing to these types of claims. We knew Judge Burke was always a possibility, yet we still filed in the Northern District. It was never—there was never a disqualifying factor for us that we could draw Judge Burke. And it goes back to had this been a random assignment, it would have been a different analysis.

(Aug. 4, 2022, Trans. at 266-68) (emphasis added).

Sequestered and sworn testimony from other participants corroborated Respondents' testimony. A collection of that testimony is attached as Appendix D. As it did with respect to the reasons for the *Ladinsky* dismissal, the panel rejected—without any testimonial basis—the testimony of every single attorney who testified about the decision to file *Eknes-Tucker* in the Middle District. The relevant legal standards for imposing sanctions prevent this Court from doing the same.

> **3.** **<u>There is not clear and convincing evidence that Ms. Eagan and Mr. Doss testified untruthfully to the panel when the overwhelming, undisputed testimony of every witness corroborated their testimony.</u>**

Not one witness testified that the sole reason for dismissing *Ladinsky* (or filing *Eknes-Tucker* in the Middle District) was because of Your Honor. Every witness—sequestered and under oath and many accused of no misconduct—testified that it was

a decision that was influenced by a host of factors.  If this Court gives Ms. Eagan and Mr. Doss the benefit of the doubt and evaluates their representations without hindsight—as it is required to do by law—there is not clear and convincing evidence of sanctionable misrepresentations or omissions.

Ms. Eagan's and Mr. Doss's concerns about the direct assignment of *Ladinsky* to this Court were objectively reasonable.  The panel attempts to downplay Ms. Eagan's and Mr. Doss's worries, but both lawyers—Ms. Eagan having been practicing in the Northern District since 1994 and Mr. Doss having been practicing in the Northern District since 2009, including a clerkship in the Northern District—do not recall seeing a case directly assigned, without a motion and outside the random assignment process, like *Ladinsky* was.  A review of the Northern District's records confirms this.  For all cases filed during the one-year period before *Ladinsky* was dismissed that involved a judicial reassignment, there were hundreds of reassignments, but none of them involved a direct assignment from a first-filed case's judge to a second-filed case's judge.  (Doc. 495-2 at ¶ 36).  Most were reassignments of cases originally assigned to magistrate judges, and some reassignments were due to recusals.  *Id.*  For those categories, the Clerk's Office randomly reassigned the case to another judge; no judge directly assigned the case to another judge.  *Id.*  For consolidations, the Northern District's practice described by the panel, (Final Report of Inquiry at 49), was followed: if consolidation was deemed appropriate by the judge assigned to the first-filed case, then the judge handling the first-filed case assigned all later-filed cases to himself or herself.  *Id.*

That sample of cases confirms Ms. Eagan's and Mr. Doss's belief that direct assignments are not common. They expected *Ladinsky* and *Walker* to be consolidated before Judge Axon, once the consent motion to consolidate was filed by the State on April 15 in *Ladinsky* (as the parties agreed to do), in accordance with the Northern District's practice. When the normal process was not followed in this high profile and politically sensitive case, Respondents were concerned. Whether a judge has the power to reassign a case to another judge is beside the point, and again, Ms. Eagan and Mr. Doss now understand that Judge Axon transferred *Ladinsky* to this Court because of her two-plus-week criminal trial. What does matter is that, from Ms. Eagan's and Mr. Doss's perspective on April 15, 2022, the reassignment was unusual and unprecedented in their experience. Even the panel acknowledges that it did not fit the typical mold.

The Northern District has long acknowledged the process of handling related cases through consolidation. *See, e.g., Forrester v. MidFirst Bank*, No. 18-1392, 2019 WL 13217066, at *2 (N.D. Ala. Feb. 8, 2019) (describing the well-known process for reassigning related cases in the Northern District). For example, six months before the *Ladinsky* dismissal, Mr. Doss defended multiple cases that were consolidated— in the Northern District and after transfer from the Middle District to the Northern District—before Judge Proctor, who had been assigned the first of these cases. *See Morgan, et al. v. Apple Inc.*, et al., Case No. 21-973, Doc. 16 (N.D. Ala. Sept. 17, 2021) (granting motion to consolidate in first-filed case and reassigning subsequent cases to Judge Proctor); Doc. 18 (N.D. Ala. Oct. 21, 2021) (after similar cases were

transferred from the Middle District to the Northern District, reassigning those new cases to Judge Proctor, as the judge assigned to the first-filed case).  In contrast to *Ladinsky* and *Walker*, Judge Proctor did not reassign the first-filed case to another judge.  There is no evidence that Ms. Eagan and Mr. Doss had anything other than a good-faith belief that the assignment of *Ladinsky* to this Court was unusual in their experience.

The Report also ignores key evidence regarding the timing of the litigation.  To the panel, the need for emergency relief diminishes Respondents' stated reasons for the voluntary dismissal of *Ladinsky* and the filing of *Eknes-Tucker*.  But the panel overlooked undisputed evidence regarding this issue.  As Mr. Doss explained, when *Ladinsky* was dismissed, the motion for preliminary injunction was not complete, nor was the amended complaint, which would have added new causes of action.  (Doss Decl., Doc. 80-2 at 4-5).  The *Ladinsky* team was aiming to file those pleadings "by no later than Tuesday, April 19, 2022." *Id.* at 4.  *Eknes-Tucker*—with new causes of action, which had been planned to be included in *Ladinsky*—was filed on April 19. *Id.* at 12.  The motion for preliminary injunction was filed in *Eknes-Tucker* on the next day. *Id.*  Accordingly, "we were only a day or two behind schedule if the *Ladinsky* litigation had continued," as "we had aimed to file the motion for preliminary injunction along with an amended complaint" by April 19, at the latest. *Id.*

No evidence contradicts that testimony.  At most, the attorneys lost one or two days due to dismissing *Ladinsky* and filing *Eknes-Tucker*.  Considering the totality of

the evidence along with the relevant standards, there is no reason to conclude that losing a day or two means that Ms. Eagan and Mr. Doss testified untruthfully.

When the testimony of *every sequestered witness* (including those who the panel dismissed and accused of no misconduct) about why *Ladinsky* was dismissed and *Eknes-Tucker* was filed in the Middle District is consistent, there is no clear and convincing evidence that they are all being dishonest.  No one offered direct testimony reflecting that any of them were not telling the truth about their subjective motivations.  The Court must assess the overall "reasonableness" of representations to determine whether there has been a violation and may sanction only for conduct that is "akin to contempt." *Office of Ala. Atty. Gen.*, No. 21-13514, 2023 WL 129438, at *3.  In the same way, for its inherent power, the Court must apply "restraint and discretion."  *Chambers*, 501 U.S. at 43.  When the record is undisputed, with no evidence undermining the lawyers' testimony, finding that sanctions are appropriate would apply an unreasonable and speculative construction to the record.

The evidence demonstrates there is no reason to doubt the veracity of Ms. Eagan and Mr. Doss, let alone find clear and convincing evidence that they were intentionally dishonest with the panel.  With the benefit of hindsight, perhaps another lawyer would have made a different decision in the heat of the moment, but that is not the test.  *Jones*, 49 F.3d at 695 ("[T]he court's inquiry focuses only on the merits of the pleading gleaned from the facts and law known or available to the attorney at the time of filing.  *The court is expected to avoid using the wisdom of hindsight* and should test the signer's conduct by inquiring what was reasonable to

believe at the time of the pleading, motion, or other paper was submitted.") (emphasis added).

*    *    *    *

For their entire careers, Ms. Eagan and Mr. Doss have been honest and ethical officers of the courts in which they have appeared.  The Court should impose no sanctions.

Respectfully Submitted,

*/s/ Harlan I. Prater, IV*
One of the Attorneys for
Melody H. Eagan and Jeffrey P. Doss

Dated: <u>May 12, 2024</u>

OF COUNSEL:
Samuel H. Franklin
*sfranklin@lightfootlaw.com*
M. Christian King
*cking@lightfootlaw.com*
Harlan I. Prater, IV
*hprater@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE LLC
400 20th Street North
Birmingham, Alabama 35203
(205) 581-0700

## CERTIFICATE OF SERVICE

I certify that, on <u>May 12, 2024</u>, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which provide notice of the filing to all counsel of record.

*/s/ Harlan I. Prater, IV*
OF COUNSEL

67