**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **BRIANNA BOE, et al.,** | } | |
| | } | |
| *Plaintiffs*, | } | |
| | } | |
| and | } | |
| | } | |
| **UNITED STATES OF AMERICA,** | } | **Case No. 2:22-CV-184-LCB** |
| | } | |
| *Plaintiff-Intervenor*, | } | |
| | } | |
| v. | } | |
| | } | |
| **STEVE MARSHALL, et al.,** | } | |
| | } | |
| *Defendants*. | } | |

<u>**BRIEF OF SCOTT MCCOY IN RESPONSE
TO ORDER TO SHOW CAUSE (DOC. 487)**</u>

# TABLE OF CONTENTS

I.   INTRODUCTION AND PREFATORY POINTS ......................................... 1

   A.   **Introduction** ......................................................................................... 1

   B.   **This Court should not defer to the Panel findings** ............................2

   C.   **No sanction can be issued without a finding of subjective bad faith and proof that the attorney was on notice, before the act was committed, that the conduct was prohibited.** ......................................................................................... 4

   D.   **Deference should be given to each lawyer's testimony** ...................... 7

II.   THE FACTS AND WHERE THE PANEL ERRED IN ITS REVIEW AND CONSIDERATION OF THE FACTS ............................................................. 8

   A.   **Introduction** ......................................................................................... 8

   B.   **To the extent the Panel Report can be read to imply that there was coordination between the *Ladinsky* and *Walker* teams, at any point before discussion of the decision to dismiss, that implication is unfounded.** ...................................................11

   C.   **April 8: Alabama enacts the Vulnerable Child Compassion and Protection Act and counsel file *Ladinsky*, the first case challenging the Act.** ...................... 12

     1.   **McCoy's Facts** ........................................................................... 12

     2.   **Problems with the Panel's findings** .......................................... 13

   D.   **April 11: Different counsel filed *Walker*, a second case challenging the Act.** ........... 13

     1.   **McCoy's Facts** ........................................................................... 13

     2.   **Problems with the Panel's findings** .......................................... 14

   E.   **April 12-14: *Walker* plaintiffs move to reassign to Judge Thompson, but Chief Judge Marks orders them to show cause why *Walker* should not be transferred to the Northern District.** ........................................................................... 14

     1.   **McCoy's Facts** ........................................................................... 14

     2.   **Problems with the Panel's findings** .......................................... 15

   F.   **April 15: *Walker* and then *Ladinsky* are assigned to Judge Burke instead of Judge Axon; *Ladinsky* plaintiffs decide to voluntarily dismiss; *Walker* and *Ladinsky* are dismissed; and the lawyers contemplate jointly filing a new case.** ........................... 16

     1.   **McCoy's Facts** ........................................................................... 16

     2.   **Problems with the Panel's findings** .......................................... 20

        (a) **The Panel failed to acknowledge that the very facts it found showed that what the *Ladinsky* team sought to avoid was not the random-case-assignment procedure but the Northern District's seeming departure from it and the concerns that gave rise to.** ...................................................20

        (b) **The Panel reached an entirely incorrect conclusion regarding McCoy's "bank-error" testimony.** ...................................................24

        (c) **The Panel, with benefit of hindsight, substituted its judgment for the *Ladinsky* lawyers at many points, including with respect to whether the lawyers' suspicions were warranted, whether the decision to dismiss was inconsistent with seeking emergency relief, whether the rapidity with which the decision was made suggests lawyer misconduct; all of which was error.** .....................25

        (d) **Failing to recognize the time-pressures inherent in a Rule 41 decision.** .........28

        (e) **The Panel erroneously focused on a junior attorney's testimony about a "zero percent chance" likelihood of success before this Court.** ................................29

(f)  The Panel erroneously concluded that it was misconduct for "all counsel, including McCoy, to claim 'that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and the [Court] set *Walker* for a status conference in Huntsville on April 18.'  Doc. 339 at 52." (Doc. 487 at 12 (this Court's construction of the Panel's findings)). ................................................29

G.  **April 16-17: After *Ladinsky* and *Walker* counsel cannot agree on how to work together, *Walker* counsel decide not to file a new case at all and *Ladinsky* counsel decide to proceed with new plaintiffs.** .......................................................... 30

   1.  McCoy's Facts ................................................................................................. 30

   2.  Problems with the Panel's findings ........................................................... 31

H.  **April 19: Counsel file *Eknes-Tucker* on behalf of new plaintiffs.** .......................... 31

   1.  McCoy's Facts ................................................................................................. 31

   2.  Problems with the Panel's findings ........................................................... 32

     (a) The Panel erred in concluding that the *Ladinsky* teams' decision to refile the case in the Middle District amounted to misconduct. ................................32

     (b) In failing to point out that the *Ladinsky* team did not file in the Middle District in hopes of drawing Judge Thompson but, instead, knew that was not a possibility. ..................................................................................................33

     (c) Ignoring the fact that the *Ladinsky* team did achieve three very important goals by dismissing. ..............................................................................33

     (d) Focusing on testimony regarding avoiding the appearance of judge shopping as evidence of sanctionable behavior. ..................................................33

I.  **April 20: *Eknes-Tucker* is reassigned to Judge Burke.** .......................................... 35

   1.  McCoy's Facts ................................................................................................. 35

J.  **As a general matter, the Panel also clearly erred in concluding that McCoy or any one of the *Ladinsky* lawyers "directed" the case toward a favorable judge.** .......... 36

K.  **Conclusion** ...................................................................................................................... 37

III.  **RULE 41(a)(1)(A)(i) CLEARLY PERMITTED THE *LADINSKY* TEAM'S ACTIONS.** ...................................................................................................................... 37

A.  **McCoy had the unconditional right to dismiss *Ladinsky* under Federal Rule 41(a)(1)(a)(i), and, even if he did not, he reasonably and in good faith believed he did.** ................................................................................................................................ 37

B.  **In re: *Bellsouth Corp.*, is not a Rule 41 case and is not applicable here.** ................. 45

IV.  **EVEN IF THIS COURT DECIDES THAT RULE 41 DID BAR THE CONDUCT, THIS INTERPRETATION OF THE RULE COULD NOT BE RETROACTIVELY APPLIED NOR WOULD MCCOY'S BEHAVIOR AMOUNT TO SUBJECTIVE BAD FAITH.** ...........................................................................................................................47

V.  **EVEN IF THE COURT FINDS THAT IT COULD ISSUE SANCTIONS PURSUANT TO ITS INHERENT AUTHORITY, NO FURTHER SANCTION SHOULD ISSUE HERE.** ...............................................................................................................................48

A.  **Further sanctions are not due here because McCoy was not disobedient to judicial authority and these very proceedings are more than enough to curb the conduct issue and serve as a warning to future litigants.** ..............................................................48

B.  **The time and cost of defending the charges of sanctionable conduct, as well as the effect it has already had on McCoy's life, constitute sufficient sanctions here.** ..... 48

C.  **Other factors weigh in favor of declining to impose any sanction.** ...........................50

VI.  **MCCOY IS ALSO NOT SUBJECT TO RULE 11 SANCTIONS.** ................................50

**VII.   MCCOY HAS VIOLATED NO ETHICAL RULE, LOCAL RULE, OR OATH OF OFFICE AND IS NOT SUBJECT TO SANCTIONS FOR DOING SO.** ...................... 53

**CONCLUSION** .................................................................................................................. 59

I.      INTRODUCTION AND PREFATORY POINTS

    A.      INTRODUCTION

    This brief begins with a few important prefatory points to provide this Court with a framework through which to view the Panel's conclusions and the underlying facts. Sections I.B through I.D address, among other things: (i) the limited nature of the Panel's conclusions, given various procedural issues; (ii) that this Court must apply the subjective-bad-faith standard to every action at issue here; (iii) that it cannot issue sanctions where McCoy was not on notice that his actions were prohibited; (iv) that this Court apply at least the clear-and-convincing evidence burden of proof here; and (v) the level of deference that should be given the attorneys' testimony under these circumstances.

    Then, in Section II, McCoy walks the Court through the events. He explains in great detail why the Panel's ultimate conclusions simply do not follow from the Respondents' testimony or the other evidence, particularly where the appropriate standard, subjective-bad-faith, is the lens through which the actions are viewed. What is shown is that, taking a step back, and viewing the evidence from the perspective of the litigators, the necessary conclusion is that McCoy's April 15 decision with co-counsel to dismiss *Ladinsky* and refile the claims in a different case was based on a good-faith belief that both acts were permissible and in his clients' best interest. Section II also reveals why the Panel erred in concluding that Respondents, including McCoy, were dishonest about their motives. In this Section, McCoy addresses the six Panel conclusions set out in the most recent Show Cause Order (Doc. 487) at pages 10 through 11, as well as other of the Panel's conclusions. *See* particularly, Sections II.F & II.G (coordinating dismissal and comments to media); II.E & II.F (decisions to dismiss and discussions about draws and prospects before this

1

Court); II.F & II.H (postponing emergency relief to refile); II.H (filing *Eknes-Tucker* in the Middle District); and II.H (choosing new plaintiffs).

Section III speaks to Rule 41(a), Fed. R. Civ. P., and *In re: BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003). McCoy shows that circuit-level case law construing Rule 41(a), including a case binding on the Eleventh Circuit, permitted the dismissal here, or, at the very least, precludes any subjective-bad-faith finding. Similarly, McCoy shows why *Bellsouth Corp.* has no true precedential value in this matter, given the existence of Rule 41(a), the aforementioned caselaw construing it, and the multiple distinctions between the scenario in *Bellsouth* and the circumstances here.

Section IV explains that the Panel's apparent interpretation of Rule 41 cannot be used as a basis for sanctioning McCoy. The Panel's interpretation of Rule 41 establishes a new rule, and McCoy cannot be sanctioned for violating a rule of which he was unaware. Section V explains that, even if sanctions could be issued under this Court's inherent authority, no further sanction should issue here. Section VI speaks to whether Rule 11 sanctions are available here. (They are not.) Section VII addresses the ethical rules, local rules, and oaths of office this Court required McCoy to address and explains, often referencing the prior sections of the Brief, why these rules and oaths of office have not been violated and why, thus, sanctions cannot be issued.

While McCoy sincerely and deeply regrets the speculation in which he engaged and the decision he together with co-counsel made on April 15, the actions taken were not prohibited, or, at the least, were not made in bad faith, nor were they efforts to evade the random-case-assignment process. His conduct is simply not sanctionable on any front, and, even if it were, the costs and burdens of these long and stressful proceedings should be deemed sanction enough.

### B.     THIS COURT SHOULD NOT DEFER TO THE PANEL FINDINGS

The Court has suggested that it will defer to the Panel's findings. However, this would be error. The Court should instead treat those findings as an investigation or inquiry. While the Panel states that some due process was provided, its investigation lacked the attributes of a true adversarial proceeding. To name a few deprivations of process, there was virtually no cross-examination largely because the panel emphasized repeatedly at its initial hearing that this was not an adversarial proceeding and was not litigation.[1] The accused (who were sequestered) were not even given the opportunity to hear and respond to the testimony and evidence adduced against them. The lawyers for the Respondents were not permitted to be present during their junior clients' testimony or for the testimony of junior Respondents represented by other lawyers. Lawyers for Respondents were not permitted even to see the transcripts of such testimony for a significant period of time, including testimony which this court has now indicated it considers significant. Transcripts of testimony were withheld from Respondents until all testimony was concluded, and Respondents were not permitted to see other Respondents' declarations until after the Panel Report was issued. Effectively, the Panel members acted both as prosecutors and judges.

In addition, the requirements of *U.S. v. Shaygan*, 652 F.3d 1297 (11th Cir. 2011), were not fully met, including: (a) "fair notice that [the attorney's] conduct may warrant sanctions and the reasons why," *id.* at 1318, and of the "precise rule, standard, or law that he or she is alleged to have

---

[1] Because of the way the inquiry was presented, the lawyers conducted almost no cross examination. At the initial hearing in May of 2022, Respondents and their counsel were repeatedly assured that the Panel proceeding was not an adversarial hearing but that it was, instead, an "inquiry." *See, e.g.*, May 20, 2022 Hearing Tr. at 12 (Judge Proctor recognizing that work product and attorney-client privilege might be implicated stated: "But we're not doing this in an adversarial proceeding, we're not doing this in litigation"); at 15-16 (Judge Proctor: "First, this is not an adversarial proceeding.  This is an inquiry. Alright? Second, since it's not an adversarial proceeding, it's not – we're making a record of this case just so there will be a record, but it's an MC case."); at 28-29 (Judge Beaverstock: "And I just want to emphasize that this is not an adversarial proceeding, so we don't expect the lawyers to lawyer as much as just have an honest and forthright discussion about what happened so that we can just conduct the inquiry.")

violated and how he or she allegedly violated it," *id.* at 1319, and (b) *Shaygan's* dictate that no lawyer be held responsible for another's acts or admission, *id.* The Panel's findings do not attempt to satisfy (a) and find the Respondents collectively guilty in contravention of (b).

As the Ninth Circuit ruled in *Caputo v. Tungsten Heavy Powder, Inc.*, where a court uses its inherent authority to discipline an attorney "heightened criminal-level due process protections" must be provided. 2024 WL 1103117, at *38 (9th Cir. Mar. 14, 2024). The Special Master report adopted by the Ninth Circuit concluded that the burden of proof for such proceedings is beyond a reasonable doubt, a position McCoy adopts here. *Id*.

In addition, as discussed further herein, the Panel arrived at its conclusion through a series of legal and factual errors, including failure to apply: (a) the proper burden of proof (at least clear and convincing and possibly beyond a reasonable doubt) or (b) the proper standard for sanctioning attorney behavior (subjective bad faith).

In sum, the process the Panel provided did not come anywhere close to criminal (or even basic civil) due process protections, and, thus, its findings are not subject to deference. In addition, this Court cannot impose sanctions without satisfying these and other previously briefed due-process requirements.

### C.   NO SANCTION CAN BE ISSUED WITHOUT A FINDING OF SUBJECTIVE BAD FAITH AND PROOF THAT THE ATTORNEY WAS ON NOTICE, BEFORE THE ACT WAS COMMITTED, THAT THE CONDUCT WAS PROHIBITED.

This matter stems from the Court's invocation of its inherent powers "to address lawyer conduct that abuses the judicial process." (*In re Vague* Doc. 1 at 5 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).) "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)); *accord id.* at 64 ("[T]his power 'ought to be exercised with great

caution.'" (quoting *Ex parte Burr*, 9 Wheat. 529, 531 (1824))).

"Invocation of a court's inherent power requires a finding of bad faith." *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) (remanding "for an evidentiary hearing to determine if these parties acted in bad faith" "[b]ecause the reputation of a law firm and its attorneys is at stake"); *accord Roadway Express, Inc.*, 447 U.S. at 767 (remanding in part because "the trial court did not make a specific finding as to whether counsel's conduct in this case constituted or was tantamount to bad faith, a finding that would have to precede any sanction under the court's inherent powers").

In fact, "[i]n the context of inherent powers," the Court must find "*subjective* bad faith." *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (citing *Hernandez v. Acosta Tractors Inc.*, 898 F.3d 1301, 1306 (11th Cir. 2018) and *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017)). Subjective bad faith means deliberate wrongdoing. *See, e.g.*, *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007) (reversing sanctions, under 28 U.S.C. § 1927 and inherent powers, for failing to "make any valid finding of bad faith"); *cf. Powrzanas v. Jones Util. & Contracting Co.*, No. 2:17-cv-975, 2018 WL 6680588, at *2 (N.D. Ala. Dec. 19, 2018) ("Bad faith implies a deliberate purpose, not a mere error or misjudgment about the facts or law of the claim.").

Subjective bad faith can be found only "(1) with direct evidence of the attorney's subjective bad faith or (2) with evidence of conduct 'so egregious that it could only be committed in bad faith.'" *Hyde*, 962 F.3d at 1310 (quoting *Purchasing Power, LLC*, 851 F.3d at 1224-25). The Court must find bad faith as to each attorney to be sanctioned; "[A]ttorneys … cannot be held responsible for the acts or omissions of others." *Shaygan*, *supra*, 652 F.3d at 1319.

In the same vein, the Court must ensure that the attorney was on notice, before the act was committed, that the conduct was prohibited. For example, in *In re Finkelstein*, 901 F.2d 1560 (11th

Cir. 1990), the district court disciplined an attorney for sending a letter that was "threatening and disruptive to the judicial process." *Id*. at 1565.  The district court rooted the sanction in its inherent authority.  *Id*. at 1564.  According to the district court, the attorney's conduct did not violate a "written canon of ethics, a code provision, or a case which proscribed the conduct," *Id.* at 1565, but it found that the attorney's conduct was contrary to a "'code by which an attorney practices which transcends any written code of professional conduct.'" *Id.*

The Eleventh Circuit explained, however, that "[i]n order to satisfy traditional notions of due process, the conduct prohibited must be ascertainable." *Id.* (citing *NAACP v. Button*, 371 U.S. 415, 432-33 (1963)). "Specific guidance is provided by case law, applicable court rules, and the 'lore of the profession' as embodied in the codes of professional conduct." *Id.* at 1564-65. "The fatal flaw with this transcendental code of conduct is that it existed only in the subjective opinion of the court, of which [the attorney] had no notice, and was the sole basis of the sanction administered after the conduct had occurred." *Id.* at 1565. Accordingly, the Eleventh Circuit will not "deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct." *Id.* (quoting *Ruffalo*, 390 U.S. at 556 (White, J., concurring)).

Other courts have reached similar conclusions. As the First Circuit observed, it is "unfair for the court to use the case [in which the sanction is imposed] as the first step in adopting a new rule." *United States v. 789 Cases of Latex Surgeon Gloves*, 13 F.3d 12, 15 (1st Cir. 1993). To comply with due process, "[t]he law forbids the imposition of a new rule without prior notice." *Id.* (quoting *Boettcher v. Hartford Ins. Group*, 927 F.2d 23, 26 (1st Cir. 1991)); *see also In re Richardson*, 793 F.2d 37, 41 (1st Cir. 1986) (reversing sanction premised on violation of an "unwritten rule").

The Federal Rules of Civil Procedure further endorse this framework. Where there is no controlling law, the District Court may impose additional obligations on litigants and attorneys through local rules and standing orders pursuant to Fed. R. Civ. P. 83(b). But Rule 83(d) limits any sanction for noncompliance: "No sanction . . . may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement." *Id.*; *see also* Fed. R. Civ. P. 83 advisory committee note (1995) ("[T]his rule disapproves imposing any sanction or other disadvantage on a person for noncompliance with . . . an internal directive, unless the alleged violator has been furnished actual notice of the requirement in a particular case.").

Accordingly, unless the conduct violates an ascertainable standard imposed on attorneys before the conduct occurred, the conduct is not sanctionable.

### D.    DEFERENCE SHOULD BE GIVEN TO EACH LAWYER'S TESTIMONY

It is clear that, at least with respect to Rule 11, where sanctions are at issue, the law requires that "district courts resolve all doubts in favor of the signer," *i.e.*, the person accused of sanctionable conduct. *See* Burden of Proof with Respect to Rule 11 Sanctions, Generally, 27A Fed. Proc., L. Ed. § 62:778.  Courts also must "avoid hindsight" in judging a lawyer's conduct. *Id; see also, e.g., Norton Tire Co. v. The Kingdom Co.*, 116 F.R.D. 236, 239 (S.D. Fla. 1987), *aff'd*, 858 F.2d 1533 (11th Cir. 1988) (resolve all doubts in favor of signer).  These two rules should apply equally to this Court's application of its inherent authority to sanction attorneys. The reason for this rule in the Rule 11 context is that "[s]anctions under Rule 11 are an extreme remedy." *Id*. Along the same lines, the Supreme Court has admonished federal courts to use "great caution," "restraint," and "discretion," in exercising inherent authority. *Chambers*, 501 U.S. at 43-44.  The Panel utterly failed to resolve the doubts in favor of the attorneys accused here.

7

As explained below, revisiting the Panel's investigatory report, applying the subjective bad faith standard to the testimony and declarations submitted, excluding any conduct that McCoy (and the other lawyers) had no notice was sanctionable, and deferring to the lawyer's testimony, as this Court must, necessarily results in a conclusion that McCoy did not commit any sanctionable act.

## II.    THE FACTS AND WHERE THE PANEL ERRED IN ITS REVIEW AND CONSIDERATION OF THE FACTS

### A.    INTRODUCTION

McCoy, along with co-counsel from his employer, the Southern Poverty Law Center, two law firms, and three other non-profit legal organizations (collectively, "*Ladinsky* counsel"), filed *Ladinsky v. Ivey*, No. 2:22-cv-447 (N.D. Ala.), the first case to challenge the constitutionality of Alabama's Vulnerable Child Compassion and Protection Act. To be the first case filed, counsel rushed to finalize and file a complaint on the day Governor Ivey signed the law, leaving until later the completion of a motion for temporary restraining order and preliminary injunction. Subsequently, different attorneys, acting independently from *Ladinsky* counsel, filed a second challenge, *Walker v. Marshall*, No. 2:22-cv-167 (M.D. Ala.), in a different judicial district on behalf of different plaintiffs.  The *Ladinsky* and *Walker* teams did not coordinate their efforts in filing.

This matter arose from *Ladinsky* counsel's response to a vague *sua sponte* text order transferring their first-filed case to the judge assigned to *Walker*, the second-filed case. As a result, *Ladinsky* counsel first exercised what *Ladinsky* counsel believed was the *Ladinsky* plaintiffs' absolute right to voluntarily and unilaterally dismiss and then exercised what *Ladinsky counsel believed was* the new *Eknes-Tucker* plaintiffs' right to file a new case in a different court.

Counsel's course of conduct spanned just over three days, from when Judge Axon *sua sponte* transferred *Ladinsky* to this Court the evening of Friday, April 15, to when counsel filed

8

*Eknes-Tucker* the morning of Tuesday, April 19. Counsel had little time, if any, to evaluate Judge Axon's order, and possible explanations for it, and the *Ladinsky* plaintiffs' options because the defendants, who had already appeared two days earlier, could have eliminated the option of a Rule 41(a)(1)(A)(i) dismissal by serving an answer. Filing a rudimentary answer by any one of them would have taken just minutes to accomplish. In a compressed timeframe of less than two hours, counsel recommended dismissal for a number of reasons, including because: (a) Judge Axon's seemingly irregular and unexplained order raised at least the possibility that the orderly and transparent process for judicial assignments was not followed; (b) the seemingly irregular transfer was to a judge considered to be a bad draw, which heightened this concern, as explained further herein; (c) there was no time or practical way to inquire into or challenge that transfer order; and (d) *Ladinsky*'s transfer to *Walker*'s courthouse raised serious concerns about *Ladinsky*'s status as the first-filed case. The imminent hearing scheduled in the *Walker* case for the following Monday also contributed to these concerns.

Then, over the next three days, *Ladinsky* counsel developed a new case, ultimately for new plaintiffs in a new court, believing that this would, as a matter of fact and law, not constitute any wrongful behavior, including judge-shopping, and that filing in a new court would avoid a repeat of whatever potential irregularity occurred in the Northern District.

Counsel's collective course of conduct in dismissing *Ladinsky* and filing *Eknes-Tucker* did not evidence any effort "to purposefully attempt[] to circumvent the random case assignment" process, as the Panel's investigative report concluded. It is uncontested that McCoy and others on the *Ladinsky* team would have proceeded without hesitation before Judge Burke had he been

randomly assigned the *Ladinsky* case, even though he was not considered a "good draw."[2] There was, however, an enormous distinction in McCoy's mind between a judge randomly assigned and one who potentially reached out for the case or received it outside the random-case-assignment process, something McCoy believed—rightly or wrongly—might  have happened here, as explained further below.

Counsel took these swift actions believing – even if mistakenly – that they were legally, ethically, and professionally appropriate, that they and their clients had every right to take them, and that they were in their clients' best interests. Just by way of example, this Court became suspicious of forum shopping because one of the Respondent lawyers told a newspaper, and thus the public, including this Court and all other federal judges in Alabama, that the case would be re-filed shortly.  In fairness, who would make such a public statement knowing subjectively that what had been, and was being, done was wrong and in violation of some principle of law?  Indeed, there was nothing about what the Respondents, including McCoy, did relative to dismissing *Ladinsky* and filing *Eknes-Tucker* shortly thereafter that was other than completely open and transparent.

---

[2] 2 See, e..g., McCoy July 27, 2022 Declaration at ¶ 27 ("I should add here that had Ladinsky been randomly assigned to Judge Burke in the first instance, there would have been no Rule 41 dismissal. Also, if Judge Burke had been assigned randomly to a first-filed case other than Ladinsky with Ladinsky subsequently transferred to Judge Burke in compliance with the first-filed rule, there would have been no Rule 41 dismissal."); see also Doc. 500-1**,** McCoy May 8, 2024 Declaration at ¶ 4. Levi Declaration, July 27, 2022 Declaration, ¶ 19 ("To be clear, however, had our case originally been assigned to Judge Burke through the court's random selection procedure, we would not have voluntarily dismissed the case despite that Judge Burke was not considered a good draw for our case. The trigger for dismissal was the way Judge Burke received the case."); Minter Declaration, ¶ 7 ("To be clear, if Ladinsky had been assigned to Judge Burke rather than to Judge Axon in the first instance, I would not have suggested or supported dismissing the case. The same is true had Judge Burke been randomly assigned the first-filed case and Ladinsky, as the second filed case, had been transferred to him pursuant to the first-filed rule. Under those circumstances, I would not have suggested or supported dismissing the case."); Panel Report at 47-48 (Doss testimony: "it was never a disqualifying factor for us that we could draw Judge Burke" and indicating that no dismissal would have occurred "had this been a random case assignment.").

Such open and transparent actions are inconsistent with subjective knowledge of wrongdoing.

There being no basis whatsoever to find that any counsel acted in bad faith, this matter should be dismissed without any further action. McCoy's utter lack of bad faith is addressed in more detail below.

**B.    TO THE EXTENT THE PANEL REPORT CAN BE READ TO IMPLY THAT THERE WAS COORDINATION BETWEEN THE *LADINSKY* AND *WALKER* TEAMS, AT ANY POINT BEFORE DISCUSSION OF THE DECISION TO DISMISS, THAT IMPLICATION IS UNFOUNDED.**

As an introductory matter, it is important to establish the distinction between the *Ladinsky* and *Walker* teams. The testimony before the Panel indicated that the *Ladinsky* and *Walker* teams were competitors. They may have each had the same end-goal, and they did communicate with each other, but they were not working in concert. The *Ladinsky* team took great pains to be the first-filed lawsuit and to be in a position to control the litigation by winning the race to the courthouse. *See, e.g.*, Panel Report at 22-24 (describing the first-filed contest and the *Ladinksy* lawyers' resistance to *Walker's* efforts to get the cases consolidated before Thompson). The first mention in the Report of anyone on the *Ladinsky* team's joining forces with the *Walker* lawyers is <u>after</u> the dismissal. *See* Panel Report at 40 (for first mention of any testimony indicating the *Ladinsky* team's willingness to join forces). As the Panel points out, the two teams were immediately acrimonious during their first attempt to work together after the dismissal. *See* Panel Report at 43 (calling effort "fruitless and acrimonious"). Thus, to the extent that the Panel's findings even hint at coordinated litigation efforts before April 15, including in connection with *Walker's* attempts to draw Judge Thompson, there is no such evidence, and no decision may be based on any such inference.[3]

---

[3] Statements to the Panel by Edmond Lacour regarding his conversations with the Civil Rights Division or an Alabama legislator are not evidence that the *Ladinsky* and *Walker* lawyers were

**C.** **APRIL 8: Alabama enacts the Vulnerable Child Compassion and Protection Act and counsel file *Ladinsky*, the first case challenging the Act.**

       **1.** **MCCOY'S FACTS**

The Alabama Legislature passed the Vulnerable Child Compassion and Protection Act, S.B. 184, Ala, 2022 Reg. Sess. (Ala. 2022), on April 7, 2022, Governor Kay Ivey signed it into law on April 8, and it was set to take effect thirty days later, on Sunday, May 8. (*See Eknes-Tucker* Doc. 1 ¶ 1.)  The day the law was signed by Governor Ivey, counsel from four nonprofit organizations – National Center for Lesbian Rights, GLBTQ Legal Advocates & Defenders, the Southern Poverty Law Center, and the Human Rights Campaign Foundation – co-counseling with two law firms – Lightfoot, Franklin & White LLC and King & Spalding LLP – filed *Ladinsky v. Ivey*, No. 2:22-cv-447, in the Northern District of Alabama. Counsel worked as swiftly as they could to be the first case filed. They then quickly turned to finalizing a motion for a preliminary injunction and accompanying memorandum in support of that motion, which were not completed before the case was later voluntarily dismissed.

*Ladinsky* plaintiffs were two doctors and two families. The doctors work at Children's Hospital of Alabama. (*Ladinsky* Doc. 1 ¶¶ 11-12.) The families resided in Shelby and Jefferson Counties, respectively. (*Id.* ¶¶ 8-9.) The *Ladinsky* defendants were Governor Kay Ivey, Attorney General Steve Marshall, and the District Attorneys of Shelby and Jefferson Counties. (*Id.* ¶¶ 13-16.)

The *Ladinsky* complaint was docketed on Monday, April 11, and assigned to Judge Anna M. Manasco, (*see id.* at 1), who then recused and directed "the Clerk to reassign this case to another

---

working together before April 15.  *See* Panel Report at 12-13. Those statements were rank hearsay not under oath. Similarly, his assertion that Ladinsky and Walker (the lead named plaintiffs for each case) held a joint press conference is also not evidence that the two litigation teams had coordinated litigation efforts.  *Id.*

judge in accordance with the Clerk's normal procedure," (*Ladinsky* Doc. 2). The case was reassigned to Magistrate Judge Staci G. Cornelius. (*See Ladinsky* Doc. 3.)

### 2.    PROBLEMS WITH THE PANEL'S FINDINGS

Despite the fact that the Article III judge randomly assigned (Manasco) and many of the other judges in the Northern District, Southern Division to whom it might have been assigned were known to be Republican appointees, the *Ladinsky* lawyers took no action to secure a *particular* judge for the case and were fully prepared to go forward with whichever judge was randomly assigned, including this Court. *See* evidence set out at n. 2, *supra*.  It was never their intention to manipulate the random-case-assignment process.  The Panel fails to acknowledge this extremely significant point, *i.e.*, that, despite hours of testimony and dozens of lawyers being interviewed, there is no evidence that either McCoy or any member of the *Ladinsky* team ever had a plan to, or sought to, manipulate the random-case-assignment process.  Rather, the dismissal and refiling here were the result of an apparent and unexplained deviation from that process.

### D.    APRIL 11: Different counsel filed *Walker*, a second case challenging the Act.

### 1.    MCCOY'S FACTS

On April 11 – three days after *Ladinsky* was first filed – different counsel from different organizations and law firms – the American Civil Liberties Union of Alabama Foundation, the American Civil Liberties Union Foundation, Inc., Lambda Legal, Transgender Law Center, and Cooley LLP – filed *Walker v. Marshall*, No. 2:22-cv-167, in the Middle District of Alabama, challenging the Act on behalf of different plaintiffs. *Walker* plaintiffs noted their case as related to *Corbitt v. Taylor*, No. 2:18-cv-91 (M.D. Ala.), (*see Walker* M.D. Ala. Doc. 1-1), a case in which Judge Thompson had held unconstitutional an Alabama policy preventing transgender people from obtaining drivers licenses that reflected their gender unless they had undergone surgical

procedures, (*see Walker* M.D. Ala. Doc. 8 ¶ 3). *Walker* was assigned to Chief Judge Marks. (*See Walker* M.D. Ala. Doc. 1 at 1.) *Walker* plaintiffs were two families: one lived in Lee County, another in Limestone County. (*Id.* ¶¶ 17-18.) *Walker* defendants were Attorney General Steve Marshall and the District Attorneys for Lee and Limestone Counties. (*Id.* ¶¶ 19-21.)  As noted earlier, McCoy played no role in the events surrounding the filing of *Walker* nor, to his knowledge, did any of the *Ladinsky* team members.

### 2.    PROBLEMS WITH THE PANEL'S FINDINGS

The Panel never made a clear effort to distinguish these two teams' pre-dismissal actions. As noted above, to the extent that the Panel's conclusion is based, even in part, on an inference that somehow these two independent groups coordinated their litigation efforts at any time prior to the calls late on April 15 regarding potential dismissal, any such conclusion would be baseless. McCoy cannot be charged in any way with the *Walker* team's actions in the Middle District.

### E.    APRIL 12-14: *Walker* plaintiffs move to reassign to Judge Thompson, but Chief Judge Marks orders them to show cause why *Walker* should not be transferred to the Northern District.

### 1.    MCCOY'S FACTS

The next day, April 12, the *Walker* plaintiffs moved to reassign *Walker* to Judge Thompson. (*See Walker* M.D. Ala. Doc. 8.) A day later, April 13, Chief Judge Marks ordered the *Walker* plaintiffs to show cause why *Walker* "should not be transferred to the Northern District of Alabama, where the first-filed action is pending." (*Walker* M.D. Ala. Doc. 3 at 2.)

While there was communication between the *Walker* and *Ladinsky* lawyers after the entry of this show-cause order, McCoy was not involved in those calls.  *See* McCoy Decl. at ¶ 17. While information was shared on these calls, even according to the Panel's findings, it was "the [Marks] order [that] sparked several conversations between and among the two teams," *i.e.*, not any

preordained judge-shopping scheme between the two teams. Panel Report at 22.  It was discussed during a call between the two teams that "the *Walker* team was considering responding to Chief Judge Marks's order with an argument that the first-filed rule should not apply because *Walker* was further along than *Ladinsky*" and that *Ladinsky* should be transferred to the Middle District. The *Ladinsky* team expressed disagreement. Panel Report at 23.  As the Panel noted, there was discussion on this call about Northern District Judges and Melody Eagan shared her perspective on some of them.  Panel Report at 24.

The next day, April 14, the *Walker* plaintiffs consented to transfer to the Northern District "so that [their case] c[ould] be adjudicated alongside *Ladinsky*," and withdrew their pending motion to reassign to Judge Thompson. (*Walker* M.D. Ala. Doc. 18 at 3.) Meanwhile, *Ladinsky* was reassigned to Judge Axon in the Northern District from Magistrate Judge Cornelius (to whom *Ladinsky* counsel planned to consent) when defendants did not consent to Magistrate Judge Cornelius's assignment. (*Ladinsky* Doc. 11; *see also* McCoy's Nov. 3, 2022 Testimony at 116 (*Ladinsky* counsel were happy to proceed with Cornelius).)

## 2.     PROBLEMS WITH THE PANEL'S FINDINGS

The Panel apparently concluded that at least one of the conversations on April 13 was somehow inappropriate or was a harbinger of judge-shopping as evidenced by the following comment: "One question is this: why were the two teams discussing Northern District judges during a call that the *Walker* team convened to hopefully drum up support for *Ladinsky* counsel transferring their case to the Middle District…?"  Panel Report at 24.

The tone of the comment above implies that the Panel perhaps believed that lawyers were trying to hide the real purpose of the call.  But the Panel fails to acknowledge that the *Walker* team

was facing potential imminent transfer to the Northern District.  Judge Mark's *sua sponte* show-cause order clearly suggested her intent to make that transfer.

As McCoy's facts above show, the transfer to Judge Axon had not occurred on April 13 when the conversations were held.  So, conceivably all Northern District judges were "'in the mix'" (Panel Report at 24 (quoting Eagan)), and discussing those judges was an absolutely natural development in the conversation.  It was, in no way, a sign of manipulation of the random-case-assignment process or of any intention to manipulate that process.  In short, the events of April 13 and 14 are not evidence that anyone on the *Ladinsky* team intended to circumvent the random-case-assignment procedure.  Rather, the *Walker* team was naturally interested in who might draw the *Ladinsky* case in the Northern District in the context of making its decision as to whether to oppose the transfer proposed by Judge Marks.

Why is this discussion important?  The discussion absolutely underscores the *Ladinsky* lawyers' expectation that they could have drawn anyone in the Northern District through the random-case-assignment process, and, had the *Ladinsky* team had any intention to circumvent that process or even to file a Rule 41 dismissal had the case landed before a bad draw through the random case-assignment process, evidence of that would have come out in the extensive testimony from the dozens of lawyers gathered by the Panel.  But there is no such evidence.  Rather, the uncontested evidence is that the team would have accepted any judge assigned through the random-case-assignment process.  *See* note 2, *supra.*

F.   **APRIL 15: *Walker* and then *Ladinsky* are assigned to Judge Burke instead of Judge Axon; *Ladinsky* plaintiffs decide to voluntarily dismiss; *Walker* and *Ladinsky* are dismissed; and the lawyers contemplate jointly filing a new case.**

1.   **MCCOY'S FACTS**

On April 15, Chief Judge Marks ordered that *Walker* "shall be transferred immediately to

16

the United States District Court for the Northern District of Alabama." (*Walker* M.D. Ala. Doc. 20 at 3.) When *Walker* was transferred to the Northern District, it was assigned to Judge Burke. (*See Walker* N.D. Ala. Doc. 21.) Judge Burke quickly set a status conference for the following Monday, April 18, in Huntsville, Alabama. (*See Walker* N.D. Ala. Doc. 22.) *Ladinsky* counsel were confused why *Walker* was not directly assigned to Judge Axon, given that she had already been assigned *Ladinsky*, the first-filed case, and the pendency of that prior pending case was the basis for Judge Marks' show cause order (*Walker* M.D. Ala. Doc. 3 at 2.) Judge Marks' transfer Order even contemplated this: "… in light of the first-filed rule, the Court finds that in the interest of justice, this action should be transferred to the Northern District of Alabama where it might <u>be decided with *Ladinsky*</u> to avoid the possibility of conflicting rulings and to conserve judicial resources." *See* Panel Report at 7 (emphasis added). While Judge Marks made "no finding on the issue of consolidation," *id*., two cases can only be "decided together" if they are tried before the same judge, even if not formally consolidated.

The *Ladinsky* lawyers were also concerned by Judge Burke's immediate setting of a status conference in *Walker* for the same reason: they did not expect that a judge other than Judge Axon would schedule any proceedings but that the case would be transferred to be tried by Judge Axon consistent with Judge Marks' order.

That morning, *Ladinsky* counsel called Judge Axon's chambers to ask about her requirements for *pro hac vice* applications and learned from one of her courtroom personnel that, as counsel had anticipated, *Walker* would be transferred to Judge Axon. Panel Report at 27. That afternoon, *Walker* counsel informed *Ladinsky* counsel that Judge Burke's chambers had informed them that, if the cases were to be consolidated before Judge Axon, *Ladinsky* plaintiffs would need to file a motion to do so. Shortly thereafter, *Ladinsky* counsel had a conversation with Edmond

LaCour, counsel for the State, and learned that the defendants intended to file a motion before Judge Axon to consolidate the cases before her. (*See Eknes-Tucker* Doc. 69-40.) These conversations fully confirmed counsel's expectation that the *Walker* case would be transferred to *Ladinsky*.

However, before the anticipated motion was filed, Judge Axon *sua sponte* entered a text order at 4:41 PM Central Daylight Time stating: "In the interest of efficiency and judicial economy, this case is hereby transferred to Judge Liles C. Burke." (*Eknes-Tucker* Doc. 14.)

*Ladinsky* counsel were, to say the least, surprised and confused by the order. The unexplained deviation from their understanding of the first-filed rule, the communications from judges' staff, and local practice raised at least the possibility that someone (*Ladinsky* counsel did not know who) had interfered with the orderly and transparent process for judicial assignments.

The Panel went on to note: "McCoy and others testified to an additional, and more troubling, concern: they suspected that Judge Burke reached out to obtain the *Ladinsky* case. (McCoy Dec. at 28-29, ¶ 25; Nov. 3 Hearing Tr. at 61, 90-91, 185-87, 232). Barry Ragsdale, counsel for some of the attorneys in this inquiry, stated, 'It scared people.'" Panel Report at 31.

This "more troubling" concern, of course, flowed directly from the unexpected, and unexplained nature of, the transfer of *Ladinsky* to *Walker*. A judge, perceived to be probably politically or judicially averse, "reaching out" to take a controversial case in connection with which he might have a possible agenda and who was willing to circumvent accepted procedures to get the case would be troubling to anyone on the wrong side of that perceived agenda. The entire purpose of the random-case-assignment system is to avoid this very concern. Again, while perhaps cynical and, as it turns out, inaccurate, McCoy's concern was certainly a natural, understandable, and not sanctionable human response. That such a concern might offend the Panel and the Court

is completely understandable.  But, as a litigator, McCoy's duty was to his clients and protecting them, to the extent the law allowed, from any such possibility.  And having an ill opinion of a judge and a related concern about the way he obtained the case – even if mistaken and misguided – is not indicative of subjective bad faith.

The order also threw *Ladinsky* counsel's timetable and plans for moving forward into disarray. They were extremely unhappy their case would now be consolidated with a later-filed case that already had a pending motion for injunctive relief and a status conference on that motion scheduled for the following Monday, the next business day, after a major holiday. (Passover and Easter fell on that weekend.) *Ladinsky* counsel were concerned that this unexpected and unexplained turn of events would significantly limit their ability to shape the litigation. *See* McCoy Decl. ¶ 25, Levi Decl. ¶ 19; Minter Decl. ¶ 6; Eagan Decl. ¶ 16.).

The *Ladinsky* lawyers concluded that there was no practical way to inquire into why the cases were not consolidated before Judge Axon under the first-filed rule.  They likewise determined that it would not make sense to file a motion to reconsider the transfer because it would have drawn resources away from the more-pressing need to enjoin the Act and risked defendants' filing an answer to the complaints, thus eliminating the option to dismiss unilaterally under Rule 41(a)(1)(A)(i).[4] *Ladinsky* counsel conferred with their clients, who decided to dismiss their case voluntarily without prejudice. Some *Ladinsky* counsel (but not McCoy) also conferred with *Walker* counsel who also decided to dismiss their case. The two legal teams agreed that they would attempt to work together to file a new case, although noting that many details (such as where to file and

---

[4] Counsel did not learn why Judge Axon determined that this transfer was "[i]n the interest of efficiency and judicial economy" until the Panel informed counsel at the May 20, 2022 hearing in this matter that Judge Axon transferred the case to Judge Burke because she was in the middle of a complex criminal trial.

on behalf of which plaintiffs) would have to be determined.

A notice of voluntary dismissal of *Ladinsky* was filed just after 6:30 CDT. (*See Ladinsky* Doc. 15.) *Walker* plaintiffs had filed a notice of voluntary dismissal of their case a few minutes earlier. (*See Walker* N.D. Ala. Doc. 23.)  All told, these decisions were made collectively within a two-hour period.

The Panel acknowledged that the attorneys testified consistently[5] with the above description of the events of April 15:

> To borrow some of the attorneys' words, members of both teams were immediately "surprised," "confused," "concerned," "in a bit of a panic," and thrown into "a pretty hectic" and "chaotic" state by Judge Axon transferring *Ladinsky* to *Walker*. (See, e.g., May 20 Hearing Tr. At 104; Aug. 3 Hearing Tr. at 109, 226; Aug. 4 Hearing Tr. at 63, 77, 177, 242; Veroff Dec. at 16; Eagan Dec. at 8, ¶ 16; Hoverman Terry Dec. at 8, ¶ 13). In general, the lawyers stated concern that *Ladinsky* was the first-filed case but was being transferred to the judge who had the second-filed case, *Ladinsky* would possibly lose its position as the lead case, they did not have an opportunity to respond to the order, and they had always assumed from Chief Judge Marks's order to show cause that Walker was transferred to the Northern District so that it could eventually be consolidated with *Ladinsky*. (See, e.g., Hoverman Terry Dec. at 8-9, ¶ 13; Shortnacy Dec. at 9, ¶ 9.b; Levi Dec. at 12, ¶ 19; McCoy Dec. at 28-29, ¶¶ 24-26; Minter Dec. at 37, ¶ 5; Orr Dec. at 53, ¶ 19; Warbelow Dec. at 78, ¶ 15).

Panel Report at 29-30. The Panel went on to cite further testimony that the attorneys believed the transfer was "inexplicable," "surprising and confusing," and that it did not make sense.  *Id*. at 30.

### 2.   PROBLEMS WITH THE PANEL'S FINDINGS

(a)   **The Panel failed to acknowledge that the very facts it found showed that what the *Ladinsky* team sought to avoid was not the random-case-assignment procedure but the Northern District's seeming departure from it and the concerns that gave rise to.**

---

[5] The fact that the Respondents' testimony was consistent on this and the other material points is strong proof of their candor; the proof of their candor is stronger still because the Panel sequestered them and forbad them from hearing or reading anyone else's testimony or declarations.

Contrary to the Panel's conclusion, the Northern District did depart from its general practice in assigning *Ladinsky* to this Court, or, at the very least, the *Ladinsky* lawyers had very good reason to believe it had.  The standard practice in the Northern District when consolidating cases is "to do so before the judge who has the earliest filed case." *Morgan v. Apple, Inc.,* Case No. 6:21-CV-00973-RDP, ECF 16 (N.D. Ala. September 17, 2021).  "As a matter of settled practice, when parties ask to consolidate related cases in this district, the cases typically are consolidated by and before the judge presiding over the first-filed case. The practice prevents judge shopping."  *Moore v. MidFirst Bank*, 2019 WL 539041 at *2 (N.D. Ala. Feb. 11, 2019).

Instead of recognizing this Northern District practice, the Panel called the lawyers' expectations "imagined" and "conjured" and argued that the lawyers "misse[d] the mark" and that the "first-filed" rule relates only to inter-district transfers:

> Third, and contrary to the lawyers' real, imagined, or conjured "concerns" otherwise, there was no "procedural issue." Counsel claim they were caught off guard by what they now say was the irregular assignment of *Ladinsky* to Judge Burke. They contend the assignment violated the "first-filed rule." (See Aug. 4 Hearing Tr. at 62-63). But, that position misses the mark. As the Case 2:22-mc-Panel explained at the August 4 hearing, the first filed rule comes into play when there are multiple filings in different districts and the cases have significant overlap. In such a circumstance, the district court assigned to the later-filed case can exercise its discretion to transfer that case to the forum (i.e., the district) of the first-filed case. So, the first filed rule deals with inter-district transfers. Obviously, here, Walker was transferred by Chief Judge Marks from the Middle District to the Northern District.

Panel Report at 48-49.

With respect, this is pure semantics because, regardless of whether the practice described in *Morgan* and *Moore* is called the "first-filed" rule or not, the lawyers were absolutely correct, or at least had good reason to believe, that the case here should have been transferred to Judge Axon.[6]

---

[6] Even if the Panel were correct in its view of the first-filed rule relating only to "inter-district" transfers, that was what was at play here. One need only look to Chief Judge Marks' <u>inter-district</u>

The *Ladinsky* lawyers testified that they expected that this general practice would be followed when *Walker* was transferred, *i.e.*, that the second-filed case would be consolidated before the judge who drew the first-filed case. *See Morgan, supra* & *Moore, supra*. *Ladinsky* counsel's call to Judge Axon's chambers on April 15 regarding a *pro hac* motion confirmed the expectation that the case would be consolidated before Judge Axon. Even the State's counsel expected that to occur.

There was then a 180-degree deviation from the standard practice without any explanation other than Judge Axon's cursory, one-sentence order**:** "In the interest of efficiency and judicial economy, this case is hereby transferred to Judge Liles C. Burke." (*Eknes-Tucker* Doc. 14.)[7] Judge Axon's criminal trial was not mentioned, and none of the lawyers were aware of it or of any reason why the transfer would be in the interest of efficiency or judicial economy any more than would have been a transfer to Judge Axon consistent with the first-filed practice in the Northern District.

As noted above, the Panel did not acknowledge in its Final Report that the Northern District practice is to consolidate the second case with the first-filed case before the judge who drew the first-filed case. The Panel only acknowledged that the "practice" required the first-filed judge to rule on the motion to consolidate. (Panel Report at 49.) But even the Panel had to admit that its

---

transfer order to see how the first-filed rule was expected to play out: "… in light of the first-filed rule, the Court [Chief Judge Marks] finds that in the interest of justice, this action [*Walker*] should be transferred to the Northern District of Alabama where it might <u>be decided with *Ladinsky*</u> to avoid the possibility of conflicting rulings and to conserve judicial resources." *See* Panel Report at 7 (emphasis added). While Judge Marks made "no finding on the issue of consolidation," *id.*, two cases can only be "decided together" if they are tried before the same judge even if not formally consolidated.

[7] The same justification would have been a completely understood and appropriate basis for the transfer of a second filed case for consolidation with a first filed case. No further explanation would have been necessary. When the transfer, however, is inconsistent with the Court's normal practice, as this one was, the justification given provides no information about why the Court has deviated from its normal process.

incomplete rendition of the standard practice was not followed here because no motion had been filed.

In short, there were at least two departures from the Northern District's random-case-assignment practices here, or at least what the lawyers reasonably believed was the practice: (a) a decision to transfer was made without a motion being filed; and (b) the decision was inconsistent with the standard practice which was to consolidate the cases before the first-filed judge to avoid judge shopping. *See Moore*, *supra.*

Given the above departures from the established practice, made without any true explanation to the Parties, the Panel's conclusion that the lawyers purposefully attempted to "circumvent the random case assignment procedures" is clearly erroneous. The testimony of the lawyers is consistent: what the *Ladinsky* lawyers were trying to "circumvent" was the Northern District's unexplained failure to follow the random-case-assignment practice,[8] which, as they correctly understood it, or at the very least had reason to believe, included the first-filed practice.

This failure placed McCoy and the *Ladinsky* team at a disadvantage, including the potential loss, for all intents and purposes, of their first-filed status, and it suggested to them that this Court had potentially reached out for the case. The Panel clearly discounted this concern, despite the consistent testimony about it. As noted elsewhere, the *Ladinsky* lawyers were fully prepared to accept whoever was assigned in the random-case-assignment process. *See* n. 2, *supra*.  No testimony or evidence suggests otherwise.  But the prospect of having a judge, not just perceived to be a bad draw, but one who had possibly been willing to reach out for the case in what appeared

---

[8] The Panel made some distinction between a "procedure" and a "practice," but it does not matter for purposes of this proceeding.  Whatever word is used, the question is what was the practice/procedure and was it followed.  The whole point of the random-case-assignment idea is that there is a standard policy/practice/procedure, whatever it might be called, and that it be followed consistently.

to be disregard of the random-case-assignment process, was an entirely different thing.  Although

the lawyers' concern was misplaced, the natural reaction anyone might have, and McCoy did have,

was that this Court might have an agenda which would result in his clients being treated unfairly.

> **(b)      The Panel reached an entirely incorrect conclusion regarding McCoy's "bank-error" testimony.**

The Panel's conclusion, drawn from McCoy's testimony suggesting that he would not have

agreed to dismiss had the procedural irregularity resulted in a transfer to Judge Axon, simply

misses the point.  The Panel wrote:

> The problem that the lawyers who are subject to this inquiry had with that ruling was not that the wrong process was followed, but the wrong result (at least in their mind) was reached.
>     Indeed, McCoy's testimony at the hearing held on November 3 is indicative of results-oriented decision-making, not a good faith objection to any alleged procedural irregularity. As McCoy candidly informed the Panel, had the posture been reversed – *i.e.*, the case been reassigned in the supposedly irregular manner from Judge Burke to Judge Axon – the *Ladinsky* team would have regarded such a reassignment as a "bank error in [their] favor." (Nov. 3 Hearing Tr. at 214). Of course, counsel and parties are permitted to have opinions about (and even gauge their likelihood of) success before different judges. But, McCoy's testimony is difficult to square with the notion that the *Ladinsky* counsel were truly focused on any supposed procedural irregularity.

Panel Report at 49-50.

McCoy's reference to the Game of Monopoly and the bank-error-in-your-favor card in no

way supports the Panel's conclusion that the "result," not the "irregularity," mattered.[9]  The

---

[9] The Panel also erred with respect to its interpretation of this part of McCoy's testimony by ignoring the testimony that directly precedes and follows it. McCoy's substantive answer to the Panel's hypothetical was: "You know, it's hard to know without being in that circumstance." (Nov. 3 Hearing Tr. at 214.)  After making the reference to a bank error in their favor on which the Panel hangs its hat, McCoy continued "I mean, I don't want to be flippant. It's – the circumstances are different. It's hard to know in the moment what would have been going on. . . I honestly don't know. And, one, it's not up to me. And I don't know what my decision on that would be." *Id.*

It should also be noted that in deciding to go along with the decision to dismiss the *Ladinsky* case, McCoy had the benefit of hearing the views of other very competent lawyers and, although grossly

lawyers' testimony is consistent, as noted elsewhere, that had this Court drawn the case according to the expected random-case-assignment rules and practices in the first instance, no one on the *Ladinsky* team would have sought dismissal. *See* n. 2, *supra*.   McCoy's testimony squares perfectly with his position that the concern was that a judge, deemed a bad draw, would reach out for the case in disregard of the accepted case-assignment protocol (or at least his good-faith understanding of it) for purposes of promoting an agenda adverse to McCoy's clients.   That McCoy might not have dismissed had the irregularity resulted in a transfer to Judge Axon does not in any way fail to "square" with this testimony.   Most lawyers would not raise an issue about a perceived irregularity if they perceived the irregularity to be in their clients' favor. That would be bad advocacy; raising such an error is the job of opposing counsel.

> **(c)      The Panel, with benefit of hindsight, substituted its judgment for the *Ladinsky* lawyers at many points, including with respect to whether the lawyers' suspicions were warranted, whether the decision to dismiss was inconsistent with seeking emergency relief, whether the rapidity with which the decision was made suggests lawyer misconduct; all of which was error.**

The Panel made a fundamental error in substituting its judgment for that of McCoy and the other Respondents. As explained elsewhere in this brief, the Panel was required to focus on whether the lawyers acted with subjective bad faith and should have resolved all doubt in favor of the lawyers' testimony. *See* §§ I.C & I.D, *supra*. These requirements do not permit the Panel to

---

inadequate, at least some modicum of time in which to make a decision.   In the proceeding before the Panel, McCoy was asked to answer a difficult question with no time at all to ponder his answer and, as noted above in this footnote, his ultimate answer "I honestly don't know" was entirely ignored by the Panel without any recognition that when confronted with difficult questions, one's first instinct is not always, or even usually, the choice that is made.

dismiss a party's good-faith judgment calls and replace them with its own.[10] This practice was repeated throughout the Panel Report as the following examples show.

In one particularly egregious example, the Panel concluded: "But, even if counsel had questions about that process, those questions do not even come close to justifying counsel's wholly unwarranted suspicions regarding why the case was assigned to Judge Burke."  Panel Report at 31.  The Panel clearly substituted McCoy's actual judgment (his real concern about a "reaching out" for the case and all it might mean) with its own (the lawyers' suspicions were "wholly unwarranted").  This was error.

Similarly, the Panel included the following from its final list of lawyer "misconduct":

even though (as they admit) time was of the essence and their stated goal was to move quickly to enjoin what they viewed as an unconstitutional law, [the Respondents'] abruptly stopping their pursuit of emergency relief, and deciding to dismiss and refile a case in the Middle District with brand new plaintiffs.

Panel Report at 51.  The conclusion, at least in part, reflects the Panel's position that refiling was not the right choice given the emergency nature of the relief sought. The finding completely ignores the fact that refiling literally took two business days *and* that the initial hearing was only delayed by four business days, from Monday to Friday of the week after dismissal. Moreover, the preliminary injunction was heard on that Friday, *before the* law went into effect.

The Panel also ignores the fact that the lawyers balanced their reasons for dismissing against the emergency nature of the relief and concluded that the balance favored dismissal. The

---

[10] A prohibition on judge's replacing the judgment of a party with its own after-the-fact analysis of events is common in the law.  For instance, in Title VII cases, Courts are prohibited from second-guessing the employer: "[E]mployers may terminate an employee for a good or bad reason without violating federal law.  Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges." *Flowers v. Troup Cty., Ga. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quotation marks and citations omitted).

lawyers testified consistently that they believed that filing any motion to get to the bottom of what occurred regarding the irregular assignment of the case, and any effort to try to get it back to Judge Axon – the judge who had been randomly assigned and was the first-filed judge – would likely have wasted precious resources and would have foreclosed their option to voluntarily dismiss the case.[11]   In other words, had the *Ladinsky* team filed a motion to reconsider, they were concerned it would plunge the case into a procedural sideshow, delaying relief, and foreclosing their clients' Rule 41 rights. The Panel was not free to second-guess this decision, much less to cite it as lawyer misconduct.

At pages 32-33 of the Report, the Panel cites the lawyers' testimony that there were concerns about being able to attend the Monday status conference, having only learned about it after 4:00 on Friday of a holiday weekend.  The Panel appears to conclude that these concerns should not be given credence because: "No attorney even seriously considered contacting Judge Burke's chambers to ask if they could attend the status conference remotely." *Id.* at 33.  The Panel implies that the explanations for not doing so were inadequate. These included that there was no remote call-in information and that it was already after hours. *Id*. But, from an attorney's

---

[11] *See, e.g.*, Minter July 27, 2022 Declaration, ¶ 12 ("We discussed various options, including possibly contesting the transfer based on the court's departure from the first-filed rule. We decided that doing so would not be a good use of our limited time and resources and that we should consider voluntarily dismissing our case. Part of the reason we did not think contesting the transfer was a viable option was our recognition that we had only a small window of opportunity to voluntarily dismiss without prejudice which would close as soon as an answer was filed."); McCoy July 27, 2022 Declaration ¶ 26 ("Because we did not know procedurally how to go about trying to undo what we viewed as an already procedurally aberrant transfer, because we were suspicious of the circumstances leading to where we were, and because we were concerned that any challenge to the transfer would take precious time and resources away from the primary objective of enjoining the Act before it went into effect, we decided that the best thing to do was to advise our clients to voluntarily dismiss their case, which they chose to do. Time was of the essence because we understood that defendants could extinguish our clients' right to voluntary dismissal under Rule 41(a)(1)(A)(i) by filing an answer, so we were forced to act quickly in a very compressed timeframe.").

perspective, these reasons make perfect sense.  The chances of getting a decision from a judge, even on a minor matter, after hours on a holiday weekend is necessarily unlikely. It was likewise reasonable to conclude that getting relief in this situation was equally unlikely, even if someone answered the phone, especially given that the Court knew the predicament the lawyers would be in and nonetheless chose not to provide a call-in option.  The Panel again discounts the lawyers' judgment here and substitutes its own, at least by implication.

These are not the only examples; the whole of the Panel's findings suffer from this approach which flouts the subjective-bad-faith requirement and fails to give deference to the attorneys' testimony.

   (d) **Failing to recognize the time-pressures inherent in a Rule 41 decision.**

The Panel erred in concluding that the speed with which counsel made the dismissal decision was evidence of lawyer misconduct.  This conclusion by the Panel is evidenced by its finding that counsel's misconduct included "*suddenly* dismissing *Walker* and *Ladinsky* after a series of phone conferences in which counsel discussed a number of matters, including their prospects in front of Judge Burke and that he was a bad draw."  Panel Report at 51 (emphasis added). The latter part of this "finding" – that dismissing the case or discussing prospects was sanctionable – is addressed elsewhere.  But the notion that the suddenness of the decision somehow supports a finding of misconduct ignores the difficult choices confronting the *Ladinsky* lawyers. As noted elsewhere, the *Ladinsky* team's right to dismiss could have been thwarted by any defendant filing an answer, which could have been accomplished in minutes.  McCoy and the other *Ladinsky* lawyers realistically recognized the procedural dilemma: act immediately or lose that right forever for their clients.  They chose to act expeditiously believing it was in the best interest of their clients for the reasons discussed elsewhere.

      **(e)**     **The Panel erroneously focused on a junior attorney's testimony about a "zero percent chance" likelihood of success before this Court.**

The Panel mentioned at least twice, calling it "quite significant[]," that a junior member of the *Ladinsky* team testified that, on an April 15th call, Melody Eagan said there was a "zero percent chance" this Court would grant the preliminary injunction motion. Panel Report at 34-35. Though no one else on the call testified to remembering that specific phrase, including McCoy (who was never, in fact, asked about the statement), there is not a shred of evidence that he, or anyone else, was withholding material information. Weeks after a conversation, it would be literally impossible for individuals involved to recall exactly what words were used. Not only did McCoy testify to what he honestly remembered, it is certainly possible that the junior lawyer misheard or misunderstood what was said or that her own memory was wrong.[12]

Second, it is immaterial whether anyone remembered those exact words. McCoy and all of the other Respondents candidly disclosed that the Lightfoot Franklin attorneys said they thought this Court was a bad draw. They likewise candidly testified that this belief factored, at least in part, into the decision to dismiss. It is not logical, therefore, to conclude that failing to mention this single quote about the *Ladinsky* parties' chances with this Court was an effort to hide the ball: bad draw and zero percent change of success (clearly a hyperbole) effectively meant the same thing. *See* Doc. 500-1, McCoy May 8, 2024 Declaration at ¶ 6.

      **(f) The Panel erroneously concluded that it was misconduct for "all counsel, including McCoy, to claim 'that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and the [Court] set *Walker* for a status conference in Huntsville on April 18.' Doc. 339 at 52." (Doc. 487 at 12 (this Court's construction of the Panel's findings)).**

---

[12] For instance, she might have heard the phrase, but not on that phone call or not communicated to McCoy or in his presence.

As explained above, at the very heart of McCoy's view of the transfer, is the concern that this Court reached out for the case outside the normal random case-assignment process, giving rise to concerns about this Court's seeking to exercise an agenda averse to McCoy's clients, which, if true, would have had a perceived negative impact on them.  Had Judge Axon provided the reason for the transfer in her order, that concern would have been addressed and, all things being equal, McCoy would not have agreed to dismiss.  For McCoy, the other reasons for dismissal, which are set out above, coupled with the concern that this Court reached out for the case, tipped the scale toward dismissal.  However, without the concern about the Court reaching out, the scales would have militated against dismissal in McCoy's mind.  *See* n. 2 *supra*. Thus, this statement by the lawyers here, to the extent that any such statement was, in fact, made, was not misconduct, particularly, as to McCoy, because it was true.  The but-for cause of the dismissal was the absence of an articulated reason by Axon for a transfer that was not in accordance with Northern District practice, or, at least, the practice as understood by McCoy.

G.     **APRIL 16-17: After *Ladinsky* and *Walker* counsel cannot agree on how to work together, *Walker* counsel decide not to file a new case at all and *Ladinsky* counsel decide to proceed with new plaintiffs.**

1.     **MCCOY'S FACTS**

*Walker* and some *Ladinsky* counsel (but not McCoy) conferred by video conference the next day, Saturday, April 16, but were unable to reach agreement on how to work together to file a new case. A day later, Sunday, April 17, *Walker* counsel informed *Ladinsky* counsel that they were not filing a new case. By that time, some of the *Ladinsky* counsel determined that they could not file a new case on behalf the *Ladinsky* plaintiffs without risking the possible appearance of judge shopping to those unaware of the permissible use of Rule 41(a) and the myriad concerns of April 15. Of course, McCoy and others believed that their clients had a right to dismiss (and refile

had doing so been the decision) and that their new clients had a right to file similar claims pursuant to Rule 41(a). With the *Ladinsky* plaintiffs' consent, counsel prepared a lawsuit for new plaintiffs.

### 2.      PROBLEMS WITH THE PANEL'S FINDINGS

The Panel focused on Eagan's statement to the media that weekend.  While McCoy did not speak to the media over the weekend between the dismissal and refiling of the lawsuit, there was literally no additional "wrong" that can be attributed to Eagan's having done so, or McCoy's permitting the statement to be made, if he, in fact, had done so.  On the contrary, and as noted above, Eagan's speaking to the media about a plan to file another lawsuit to challenge the statute demonstrates her good faith and the good faith of anyone else who may have known in advance of the statement.  Very few lawyers who had a subjective belief that they had engaged in misconduct, or were about to engage in misconduct, would announce such knowingly wrongful conduct to the media.

### H.      APRIL 19: Counsel file *Eknes-Tucker* on behalf of new plaintiffs.

### 1.      MCCOY'S FACTS

On April 19, *Ladinsky* counsel filed *Eknes-Tucker* in the Middle District of Alabama. At filing, the *Eknes-Tucker* plaintiffs were a pastor, four families, and two doctors. Rev. Paul A. Eknes-Tucker is a pastor in Birmingham, Alabama. (*Eknes-Tucker* Doc. 1 ¶ 12.)[13] The four families reside in Montgomery, Jefferson, Cullman, and Lee Counties, respectively. (*Id.* ¶¶ 6-9.) One doctor practices in Birmingham, (*id.* ¶ 10), the other in the 12th Judicial Circuit of Alabama,

---

[13] Rev. Eknes-Tucker withdrew his claims after the Court held that "'the Act does not criminalize speech that could indirectly lead to a minor taking transitioning medications,' but only speech 'which compels the administration or prescription of transitioning medications to minors.'" (*See Eknes-Tucker* Doc. 153 at 2 (quoting *Eknes-Tucker* Doc. 107 at 28).) Although the case is now captioned *Boe v. Marshall*, counsel will continue to refer to that case as *Eknes-Tucker* in this matter to avoid confusion.

(*id.* ¶ 11). The *Eknes-Tucker* defendants were Governor Kay Ivey,[14] Attorney General Steve Marshall, and the District Attorneys in each of the counties in which plaintiffs reside. (*Id.* ¶¶ 13-19.) Counsel filed *Eknes-Tucker* in the Middle District both because the case included plaintiffs from the Middle District and because they sought to avoid the procedural irregularity that had arisen in the *Ladinsky* case.

### 2.   PROBLEMS WITH THE PANEL'S FINDINGS

#### (a)   The Panel erred in concluding that the *Ladinsky* teams' decision to refile the case in the Middle District amounted to misconduct.

The Panel concluded that the choice to file in the Middle District was evidence of wrongdoing. Panel Report at 52 ¶ 8. But, once again, the context and McCoy's perspective matter. McCoy and the *Ladinsky* team wanted a true fresh start. Their perception that this Court had reached out to get the case outside the random-case-assignment process was one of the reasons for dismissing. The team clearly wanted to avoid that very irregularity by filing in the Middle District. *See* Panel Report at 45-47 (Levi, Eagan and Doss testified that they did not want to file in the Northern District because they believed that the random-case-assignment process would not be employed there and, as Doss said, they would be right back where they were with the "nonrandom case assignment."); *see* McCoy July 27, 2022 Decl. at ¶ 30 (attesting to these reasons for filing *Eknes-Tucker* in the Middle District).[15] Avoiding what they perceived as a non-random assignment in this context did not amount to misconduct as explained in more depth above.

---

[14] Governor Ivey was dismissed by a joint motion of the parties. (*See Eknes-Tucker* Doc. 85.)

[15] The Panel, in quoting Minter on this decision, failed to recognize what he meant in connection with the decision to file in the Middle District. As the Panel reported, Minter said: "We weren't sure what the heck had just happened…" Panel Report at 48. This was clearly a reference to the team's upset over the unexpected assignment to the second-filed judge in the Northern District and the concerns that flowed from that.

        (b)     **In failing to point out that the *Ladinsky* team did not file in the Middle District in hopes of drawing Judge Thompson but, instead, knew that was not a possibility.****

To the extent that the Report even implies that the *Ladinsky* team hoped to draw Judge Thompson as the *Walker* team had hoped, the record is very consistent that the *Ladinsky* lawyers held out no such expectation and believed that Judge Thompson was not taking new cases.[16] This again shows that the team placed themselves at the mercy of the random-case-assignment process.

        (c)     **Ignoring the fact that the *Ladinsky* team did achieve three very important goals by dismissing.**

While the Panel discredited the *Ladinsky* team's testimony regarding their multiple goals in dismissing the case, it failed to acknowledge that by virtue of dismissal, the team achieved three of those very important goals. First, it did regain its first-filed status and its unfettered control over the litigation. Second, its efforts postponed that initial status conference. Third, it was able to file its motion for preliminary injunction prior to that status conference. And this and the preliminary injunction hearing were all accomplished before the law went into effect. In short, the team's strategic choices paid off. Yet, the Panel discounted these strategic considerations as mere inventions cooked up to disguise an attempt to avoid the random-case-assignment process.

        (d)     **Focusing on testimony regarding avoiding the appearance of judge shopping as evidence of sanctionable behavior.**

Finally, the Panel referenced testimony from other Respondents about avoiding the "appearance of judge shopping." Ultimately, one of the Panel "misconduct" findings was based on: "*Ladinsky* counsel's decision to file a new case with new plaintiffs in the Middle District to

---

[16] Panel Report at 23 ("The *Ladinsky* team thought it was a 'fantasy' that *Walker* would end up before Judge Thompson as a case related to *Corbitt*. (Nov. 3 Hearing Tr. at 114-15, 263). McCoy understood that Judge Thompson was presiding over one of his last cases before retiring and thought there was only a remote chance that Judge Thompson was taking on new cases. (*Id.*).").

avoid the appearance of judge shopping and to avoid Judge Burke." Panel Report at 52. However, the testimony cited does not support a finding of misconduct.  As *Ladinsky* lawyer Jennifer Levi put it: "While I believed the *Ladinsky* plaintiffs had an absolute right to dismiss their claims, and my initial research led me to believe it would *not* be unethical to re-file the same case with the same plaintiffs, *in an abundance of caution* I thought it would be preferable to file a new case with new plaintiffs." (Levi Dec. at 15-16, ¶ 26) (emphasis added).

Those five words "in an abundance of caution" are a good lawyer's mantra.  That statement also goes hand in hand with Levi's testimony that one of the "*Walker* lawyers suggested they should take steps to ensure their potential next case did not look like judge shopping."  (Panel Report at 43 (not quoting Levi directly)).

It is the lawyer's craft, not only to promote the client's claim or defense, but to take every step to avoid giving the appearance that the client did anything wrong.  Lawyers do it every time they prepare someone for a deposition or draft answers to complaints or discovery responses.  Avoiding even the appearance that your client might have done something wrong is the lawyer's duty, even, and perhaps especially, when the client did absolutely nothing wrong.   It is the essence of good lawyering to be thoughtful about the way the case is presented.

For instance, in the employment context, lawyers give advice all the time to clients "in an abundance of caution" regarding how to avoid the appearance of discrimination, even when no discrimination occurred and there is a legitimate non-discriminatory basis for the employer's decision.  For example, "wait until the employee is late one more time before terminating him to strengthen your case should he sue" or even "let's discuss whether you should replace this worker or eliminate the position."  In the tax context, lawyers constantly give advice regarding how to avoid the appearance of wrongdoing, even when the action taken is not unlawful.  In short, in every

context in which good lawyers make strategic decisions, avoiding the appearance of anything unlawful is always a concern. Advice given or actions taken "in an abundance of caution" are simply not evidence of wrongdoing. In these examples, just because someone could be accused of discrimination or tax-evasion or judge shopping does not make it so. But, more importantly, measures taken by careful lawyers to avoid even the appearance of wrongdoing do not suggest guilt in the first instance. In fact, this is surely one reason attorney-client communications and work product are privileged.

Moreover, this was a high-profile, controversial case. Media coverage and political sympathies matter in these kinds of cases. In the press, the mere appearance of improper conduct can have had a negative effect on the cause generally, even where the conduct is fully permitted by law, as the Respondents, including McCoy, believed. So, there were additional reasons here to take measures to avoid even the appearance of judge shopping.

Finally, filing a new case in the Middle District certainly was not an effort to hide what the Panel considered "judge shopping." Everything the *Ladinsky* plaintiffs and their lawyers did was entirely transparent, nothing was hidden, and McCoy has been entirely forthcoming about why he agreed to the dismissal and to filing *Eknes-Tucker* in the Midde District.

## I.   APRIL 20: *Eknes-Tucker* is reassigned to Judge Burke.

### 1.   MCCOY'S FACTS

*Eknes-Tucker* was docketed in the evening on April 20. It was assigned to Judge Huffaker, who that evening reassigned the case to Judge Burke, sitting by designation, because he had been assigned *Ladinsky* and *Walker*, which also challenged the Act. (*Eknes-Tucker* Doc. 3.)

Not until the next day, April 21, did *Ladinsky* counsel learn that, on April 18, Judge Burke had entered an order in *Walker* alerting the chief judges of each of Alabama's federal district courts

that "Plaintiffs' course of conduct could give the appearance of judge shopping" and that he would "closely monitor how this case proceeds." (*Walker*, N.D. Ala. Doc. 24 at 3.) The order was not filed in *Ladinsky*. (*Compare Walker*, N.D. Ala. Doc. 24, *with Ladinsky* Doc. 17.)  *Ladinsky* counsel did not receive a copy of the order but instead found it after reading news reports about it.

### J.   AS A GENERAL MATTER, THE PANEL ALSO CLEARLY ERRED IN CONCLUDING THAT MCCOY OR ANY ONE OF THE *LADINSKY* LAWYERS "DIRECTED" THE CASE TOWARD A FAVORABLE JUDGE.

The Panel erred in concluding that McCoy or any one of the *Ladinksy* lawyers ever attempted to "direct" the case toward a "favorable" judge. *See* Panel Report at 52. In fact, quite the opposite occurred: (a) the entire team accepted the randomly assigned judge the case drew; (b) the team leaders all attested under oath that had the case been assigned initially to Judge Burke, in the random-case-assignment process, as they understood it, they would not have dismissed the case; (c) the team rejected the *Walker* team's overtures to transfer the case to the Middle District, where the *Walker* lawyers were attempting to draw Judge Thompson; and (d) McCoy and his co-counsel filed in the Middle District after dismissing in the Northern District but subjected themselves fully (as they had in the Northern District) to the Middle District's random-case-assignment process.  Further, McCoy has testified that had Judge Axon merely explained the reason for the transfer, that would have tipped the scales for him against seeking dismissal, even though were other legitimate strategic concerns militating toward dismissal. *See* Doc. 500-1, McCoy May 8, 2024 Declaration at ¶ 4.  The dismissal here was an effort to avoid the non-random-case-assignment process they believed they had been subjected to in the Northern District, not to steer the case toward a favorable judge in that district or the Middle District.

### K.     CONCLUSION

As this factual recitation shows, focusing on the subjective beliefs of McCoy and his co-counsel, and considering all the facts, as a whole, from their perspective, it becomes clear that the situation here was most certainly not the manipulation of the Court's random-case-assignment process, but rather the good-faith exercise of Rule 41(a) rights, which rights are discussed further below.

### III.     RULE 41(a)(1)(A)(i) CLEARLY PERMITTED THE *LADINSKY* TEAM'S ACTIONS.[17]

### A.     MCCOY HAD THE UNCONDITIONAL RIGHT TO DISMISS *LADINSKY* UNDER FEDERAL RULE 41(a)(1)(A)(i), AND, EVEN IF HE DID NOT, HE REASONABLY AND IN GOOD FAITH BELIEVED HE DID.

Underlying this Court's proceedings is a threshold question: Does a lawyer violate the law when voluntarily dismissing a case under Rule 41(a)(1)(A)(i) if the lawyer considers, at least in part, the identity of the judge to whom the case is assigned? McCoy believed, and continues to believe, that the answer is "no." Both Federal Rule of Civil Procedure 41(a)(1)(A)(i) and the case law interpreting the rule make clear that (1) the right to dismiss, prior to a defendant's answer or motion for summary judgment, is absolute and unfettered, and (2) the subjective reasons underlying a decision to dismiss are not a basis for finding misconduct or imposing a sanction. When Respondents, including McCoy, decided to dismiss *Ladinsky*, they were aware of no controlling order, statute, case, or rule that precluded them from considering the judicial assignment when deciding whether to voluntarily dismiss a case, and still are not.

---

[17] The recitation of law in this section was authored by the Lightfoot Franklin law firm and appears in a prior submission to the Court.  Instead of adopting this statement of the law by reference, we repeat it here with some minor changes both as a convenience to the Court and to fully endorse and emphasize its merit and applicability to Respondent McCoy.

"The plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(i). This straightforward and unrestricted procedure has been available to litigants for over fifty years:

> Rule 41(a)(1) is the shortest and surest route to abort a complaint when it is applicable. So long as plaintiff has not been served with his adversary's answer or motion for summary judgment he need do no more than file a notice of dismissal with the Clerk. That document itself closes the file. There is nothing the defendant can do to fan the ashes of that action into life and the court has no role to play. This is a matter of right running to the plaintiff and may not be extinguished or circumscribed by adversary or court. There is not even a perfunctory order of court closing the file. Its alpha and omega was the doing of the plaintiff alone. He suffers no impairment beyond his fee for filing.

*Am. Cyanamid Co. v. McGhee*, 317 F.2d 295, 297 (5th Cir. 1963).

To curb potential abuse, Rule 41 has limits. Those limits are found in the Rule itself:

(1)     Timing: Once the defendant serves either an answer or a summary judgment motion, the plaintiff's right to voluntarily dismiss is extinguished. Fed. R. Civ. P. 41(a)(1)(A)(i).

(2)     Repeat Use: Rule 41(a)(1)(A)(i) can be invoked only once, as the second invocation is with prejudice. Fed. R. Civ. P. 41(a)(1)(B).

(3)     Cost Shifting: In its discretion, the court "may order the plaintiff to pay all or part of the costs of the previous action" if "a plaintiff . . . previously dismissed an action" and then "files an action based on or including the same claim against the same defendant." Fed. R. Civ. P. 41(d)(1).

The principal safeguard is the prohibition against repeat use: "[T]he primary purpose of the 'two dismissal' rule is to prevent an unreasonable use of the plaintiff's unilateral right to dismiss an action prior to the filing of the defendant's responsive pleading." *ASX Inv. Corp. v. Newton*, 183 F.3d 1265, 1268 (11th Cir. 1999). "But this quick and ready tool may be used once, and only once, if clear consequences are to be avoided. A second notice of dismissal not only closes the file, it also closes the case with prejudice to the bringing of another. The reason for this arbitrary

limitation, pointed out in numerous decisions, is to prevent unreasonable abuse and harassment."

*Am. Cyanamid Co.*, 317 F.2d at 297.

Apart from those safeguards, Rule 41(a)(1)(A)(i) imposes no other restriction on its use. To the contrary, "[i]t is well established that Rule 41(a)(1)(A)(i) grants a plaintiff an unconditional right to dismiss his complaint by notice and without an order of the court at any time prior to the defendant's service of an answer or a motion for summary judgment." *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990). For that reason, no court action is needed: "[t]he dismissal is effective immediately upon the filing of a written notice of dismissal." *Id.* (citing Moore's Federal Practice 41.02(2) (1988)). The rule, therefore, preserves a plaintiff's "unconditional right to dismiss" while limiting only when—not why—that right may be exercised. *See, e.g.*, *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 397 (1990) (Rule 41(a)(1) "was designed to limit a plaintiff's ability to dismiss an action" during "the brief period before the defendant had made a significant commitment of time and money.").

Because the right is unconditional, "[t]he plaintiff's reason for the dismissal is immaterial." 1 Federal Rules of Civil Procedure, Rules & Commentary – Rule 41 (Feb. 2023). "One doesn't need a good reason, or even a sane or any reason, to dismiss a suit voluntarily. The right is absolute, as Rule 41(a)(1) and the cases interpreting it make clear, until, as the rule states, the defendant serves an answer or a motion for summary judgment." *Marques v. Fed. Reserve Bank of Chi.*, 286 F.3d 1014, 1017 (7th Cir. 2002) (citations omitted). Other courts have expressed similar views. *See, e.g.*, *Adams v. USAA Cas. Ins. Co.*, 863 F.3d 1069, 1080 (8th Cir. 2017) ("The reason for the dismissal is irrelevant under Rule 41(a)(1)"); *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 115 (2d Cir. 2009) ("[If] the plaintiff has brought himself within the requirements of Rule

41, his reasons for wanting to do so are not for us to judge.") (quoting *Thorp v. Scarne*, 599 F.2d 1169, 1177 n.10 (2d Cir. 1979)).

The Fifth Circuit recognized this principle in *Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters*, 506 F.2d 914 (5th Cir. 1975), which remains precedential in the Eleventh Circuit.[18]  The *Pilot Freight* defendants argued that a plaintiff should not be permitted to voluntarily dismiss a complaint after unsuccessfully seeking injunctive relief. 506 F.2d at 915-16. The Fifth Circuit rejected the defendants' invitation to rewrite Rule 41(a)(1): "Rule 41(a)(1) means precisely what it says." *Id.* at 916. Importantly, the Fifth Circuit reached that conclusion despite the defendants' warning that "the construction [the court] place[s] on the Rule permits forum shopping in the sense that a litigant may be able to choose a 'friendly judge.'" *Id.* at 917.

The Eleventh Circuit has not overruled the Fifth Circuit's precedent, which consistently recognizes that, "[a]s the plain terms of Rule 41(a)(1)[(A)](i) establish, a plaintiff has an absolute right to dismiss a lawsuit before the defendant has filed an answer or summary judgment motion." *Carter v. United States*, 547 F.2d 258, 259 (5th Cir. 1977); *see also id.* (collecting cases where the Fifth Circuit held that "Rule 41(a)(1) means what it says").

Because the right is unconditional and absolute, Circuit Courts have rejected efforts to scrutinize—or punish through sanctions—the reasons for a voluntary dismissal. The Circuit Courts have reached these decisions even when attorneys were attempting to evade a particular judge after adverse rulings. For example, in *Wolters Kluwer*, 564 F.3d at 110, the attorneys filed a lawsuit in the Southern District of New York, voluntarily dismissed the case, and re-filed the same lawsuit in the District of Massachusetts. The Southern District of New York found that the attorneys' "main

---

[18] All decisions of the Fifth Circuit before October 1, 1981 are binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

purpose in filing a Rule 41 voluntary dismissal . . . was to judge-shop in order to conceal from [their] client 'deficiencies in counsel's advocacy.'" *Id.* at 114. To the district court, "this sort of judge-shopping was an improper purpose and was accordingly sanctionable." *Id.* The Second Circuit, however, reversed: "[The lawyers were] entitled to file a valid Rule 41 notice of voluntary dismissal for any reason, and the fact that [they] did so to flee the jurisdiction or the judge does not make the filing sanctionable." *Id.* at 115. Because the attorneys were "entitled by law to dismiss the case," there was no basis to sanction them. *Id.*

The Eighth Circuit reached a similar result in *Adams v. USAA Casualty Insurance Co.*, 863 F.3d 1069 (8th Cir. 2017). The district court found that the attorneys had voluntarily dismissed one case and then "[r]efil[ed] in a more favorable forum [to] avoid[] an adverse decision" of the district court. 863 F.3d at 1074. The district court sanctioned the attorneys. *Id.* at 1075. The Eighth Circuit reversed: "The reason for the dismissal is irrelevant under Rule 41(a)(1). Therefore, we hold that the district court erred in concluding that counsel engaged in sanctionable conduct by stipulating to a dismissal under Rule 41(a)(1) for the purpose of forum shopping and avoiding an adverse result." *Id.* at 1080-81; *see also id.* at 1083 (finding that the district court abused its discretion in determining that counsel had "abused the judicial process by stipulating to the dismissal of the federal action for the purpose of seeking a more favorable forum and avoiding an adverse decision").

No Circuit Court has held that a dismissal under Rule 41(a)(1) could be a basis on which to find subjective bad faith, let alone sanctionable misconduct.[19] To the contrary, courts have

---

[19] Two cases should be addressed here. In *Hernandez v. City of El Monte*, 138 F.3d 393 (9th Cir. 1998), the plaintiffs filed first in the Central District of California and then in California Superior Court, merely shuffling the names of the parties. This case did not involve the use of Rule 41, in any respect.  At the time of the Court's ruling, no case had been dismissed, and the plaintiffs' counsel merely testified that he had a plan to dismiss the first-filed case. In fact, the second-filed

acknowledged that "plaintiffs are permitted to engage in a certain amount of forum-shopping." *In re TikTok, Inc.*, --- F.4th ---- (5th Cir. 2023).

Closely related, a court may not impose a re-filing requirement on a Rule 41(a)(1)(A)(i) dismissal. *See, e.g.*, 9 Federal Practice & Procedure – Civil § 2366 (4th ed.) ("The district court has no power to impose terms and conditions if a plaintiff properly dismisses by notice under Federal Rule of Civil Procedure 41(a)(1)."). For example, in *Bechuck v. Home Depot U.S.A., Inc.*, the plaintiff voluntarily dismissed under Rule 41(a)(1)(A)(i). 814 F.3d 287, 290 (5th Cir. 2016). The plaintiff did so after the district court had entered adverse rulings against him. *Id.* After the plaintiff filed his dismissal notice, the district court entered an order requiring the plaintiff, "[i]f [he] sues [the defendants] again for the same cause of action, [to] do so before this court." *Id.* at 290-91. Consistent with its prior decisions, the Fifth Circuit reversed:

> Although forum-shopping is not a trivial concern, Rule 41(a)(1) essentially permits
> forum-shopping. It is not uncommon for plaintiffs to use voluntary dismissal to
> secure their preferred forum, such as when they seek to undo removal and return to
> state court. While this may seem distasteful to opposing parties, we have
> consistently held that Rule 41(a)(1) means what it says and defendants who desire

---

case, was ultimately dismissed because it was barred by the statute of limitations. Rule 41 does not contemplate the pendency of two identical causes of action at the same time. Moreover, in *Hernandez*, there was a local rule that prohibited dismissal of a case and refiling for the purpose of obtaining a different judge. 138 F.3d 393, 398 (citing rule C.D. Cal. R. 4.2.1). Here, of course, there is no such local rule in either the Northern or Middle Districts. In *In re Fieger*, 191 F.3d 451 (6th Cir. 1999), an unpublished decision, the Sixth Circuit affirmed a disciplinary decision against an attorney who (i) filed thirteen complaints in the same district court; (ii) failed to mark any of those cases as "related" to any of the others, in violation of a local rule; (iii) dismissed all but one of his lawsuits; and (iv) informed the media that he took those steps "so that he could select the judge." *Id.* at *2. On appeal, the attorney was challenging procedural aspects of the disciplinary process. Accordingly, the Sixth Circuit did not analyze whether it should impose a limitation on a litigant's absolute right to dismiss under Rule 41. While another circuit court case, *Lane v. City of Emeryville*, 56 F.3d 71, 1995 WL 298614 (9th Cir. 1995), was mentioned in the Panel's initial Order, it also does not have any bearing on this case. It was also unpublished and thus not precedent pursuant to Ninth Circuit rules. In *Lane*, the Court did not analyze Rule 41(a) but noted, instead, that the lawyer had violated Local Rule 205-2 which clearly stated that counsel was required to notify the district court if an action was related to another, even one that had been dismissed. Thus, none of these cases contradicts the holdings of the Rule 41 cases cited in the text.

to prevent plaintiffs from invoking their unfettered right to dismiss actions under Rule 41(a)(1) may do so by taking the simple step of filing an answer.

The effect of a Rule 41(a)(1) dismissal is to put the plaintiff in a legal position as if he had never brought the first suit. Therefore, the plaintiff is free to return to the dismissing court or other courts at a later date with the same claim. By placing him back into the situation as though he had never brought suit, Rule 41(a)(1)(A)(i) necessarily allows him to choose his forum anew.

*Id.* at 293 (cleaned up).[20]

"Court-ordered sanctions"— such as restricting future actions after a voluntary dismissal — "should be neither 'a consequence' of a voluntary dismissal without prejudice nor a 'condition' placed upon such a dismissal." *Id.* at 292-93 (quoting *Cooter & Gell*, 496 U.S. at 396-97). If Rule 41(a)(1)(A)(i) "means what it says," then a litigant, following a voluntary dismissal, may file anew in any forum where venue is proper. Upon dismissal, the plaintiff is "put . . . in a legal position as if he had never brought the first suit." *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip.*, Inc., 434 F.3d 320, 324 (5th Cir. 2005) (quoting *LeCompte v. Mr. Chip, Inc.*, 528 F.2d 601, 603 (5th Cir. 1976)). Following dismissal, therefore, "[t]he plaintiff is free to return to the dismissing

---

[20] There are, of course, other ways in which forum-shopping has historically been permitted. For instance, many are familiar with one-judge divisions within federal court districts and the fact that litigators find plaintiffs within those divisions for the purpose of drawing the judge there. And apparently not a single court has ever declared this practice – though clearly judge-shopping – to be contrary to Rule 11 or ethical rules. The panel of federal judges who set policy for the rest of the judiciary announced in March a new rule to curb this practice. In such cases going forward, where plaintiffs are seeking a sweeping remedy, like a nationwide injunction, the judge will be assigned at random from across the district instead of defaulting to the judge or judges in a particular courthouse *See* Mattathias Schwartz*, New Federal Judiciary Rule Will Limit 'Forum Shopping' by Plaintiffs,* N.Y. Times, Mar. 27, 2019. Why is this relevant here? The federal judiciary appears to recognize that, where existing rules permit forum-shopping, new rules must be drafted to prevent it. In other words, a "wrong" cannot be inferred from the mere fact that a rule or practice was used to judge shop. This is, of course, in keeping with the previously mentioned requirement of Fed. R. Civ. P. 83(b).

court or other courts at a later date with the same claim." *Id.* (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505-06 (2001)).

After a case has been voluntarily dismissed and then re-filed, courts generally are free to reassign the second-filed case to the judge assigned to the first-filed case. *See, e.g.*, *Garcia v. Int'l Constr. Equip., Inc.*, 765 Fed. App'x 109, 110 (5th Cir. 2019) ("Any district court . . . is free . . . to require that a re-filed action be assigned to the original judge, or to require that if a re-filed case is assigned to a different judge, that judge shall transfer the case to the original judge.") (quoting *Int'l Driver Training, Inc. v. J-BJRD Inc.*, 202 Fed. App'x 714, 716 (5th Cir. 2006)). But courts are certainly not required to do so. To the extent a remedy is needed for a plaintiff who voluntarily dismisses under Rule 41(a)(1) and then re-files, the remedy is reassignment. Thus, this Court has already accomplished a permissible remedy.

The Eleventh Circuit has not held that a voluntary dismissal pursuant to Rule 41(a)(1)(A)(i) may be the basis for a sanction or a finding of misconduct. Nor has the Eleventh Circuit suggested that an attorney's motivations should be scrutinized. The Fifth Circuit precedent cited herein is, therefore, still binding on this Court, and the Fifth Circuit cases which follow from that precedent are, thus, highly instructive. If Rule 41(a)(1)(A)(i) can be used only for particular reasons and not for others, then – contrary to binding Fifth Circuit precedent – the Rule does not "mean[] what it says."

As one court observed in denying a defendant's motion to strike a Rule 41(a)(1)(A)(i) dismissal due to concerns about potential, future "forum-shopping," "[d]ismissal under Rule 41(a)(1) is a matter of right running to the plaintiff and may not be extinguished or circumscribed by adversary or court." *Kyzar v. Am. Nat'l Prop. & Cas. Co.*, No. 15-527, 2016 WL 3277449, at *1 (M.D. La. May 19, 2016) (quoting *Bailey v. Shell W.E. & P. Inc.*, 609 F.3d 710, 719 (5th Cir.

2010)). As the Eleventh Circuit—and its predecessor, the Fifth Circuit—consistently recognized, Rule 41(a)(1) "means what it says," and "[d]efendants who desire to prevent plaintiffs from invoking their unfettered right to dismiss . . . may do so by taking the simple step of filing an answer." *Carter*, 547 F.2d at 259. Until then, however, the right remains unfettered. *Id.*

## B.   *IN RE: BELLSOUTH CORP.* IS NOT A RULE 41 CASE AND IS NOT APPLICABLE HERE.

The Panel suggested that the Eleventh Circuit's decision in *In re: BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003), should apply. McCoy respectfully submits that *Bellsouth* is not applicable here.[21] *BellSouth* addressed a "[longstanding] matter of concern that parties in the Northern District of Alabama might be taking strategic advantage of the recusal statute to, in effect, 'judge-shop'" away from Chief Judge U.W. Clemon by retaining his nephew's law firm despite a Standing Order governing the appearance of counsel that raised a conflict with the assigned judge. *Id.* at 944-46. The district court, following an evidentiary hearing, noted how the "long history of forced recusal of Judge Clemon in this District" reflected deliberate, systemic "manipulation of the random assignment of judges system." *Id.* at 948. The Eleventh Circuit evaluated the conduct of BellSouth and its counsel against this backdrop and concluded that BellSouth's right to counsel of its choice was overridden when that choice had the "sole or primary purpose of causing the recusal of the judge." *Id.* at 956.  After a lengthy discussion about the "obvious concern with respect to the effects of such manipulation and judge-shopping on the proper administration of justice," the Eleventh

---

[21] McCoy is generally familiar with *BellSouth*, but he does not intend to suggest that he analyzed it before the dismissal of *Ladinsky* and the filing of *Eknes-Tucker*.

Circuit held that the district court's decision to disqualify the nephew's firm was not clearly erroneous. *Id.* at 960.[22]

There are some notable distinctions between *BellSouth* and what this Court is now considering:

> (1) *BellSouth* did not involve a plaintiff's "unconditional right to dismiss his complaint by notice and without an order of the court at any time prior to the defendant's service of an answer or a motion for summary judgment" under Rule 41(a)(1)(A)(i). *Matthews*, 902 F.2d at 880; *see also Carter*, 547 F.2d at 259 (describing Rule 41(a)(1) as an "unfettered right to dismiss actions"); Fed. R. Civ. P. 41 advisory committee note (a litigant has an "unlimited dismissal" right absent a defendant's answer or motion for summary judgment).

> (2) The *BellSouth* action, as far as the litigants knew, was randomly assigned to Judge Clemon when Judge Clemon's nephew was engaged as counsel. *Ladinsky* was transferred to this Court outside the random case assignment process.

> (3) *BellSouth* involved the premeditated selection of counsel "with the sole or primary purpose of causing the recusal of the judge." *BellSouth*, 334 F.3d at 956.[23] The dismissal of *Ladinsky*, in contrast, involved lawyers—in the pandemonium of a chaotic afternoon and an information vacuum about why the case was transferred outside the random case assignment process—exercising their professional judgment and unconditional right under Rule 41.

In sum, McCoy does not believe that anything in *BellSouth* overrules or even diminishes the Eleventh Circuit's clear precedent that Rule 41 confers an absolute and unfettered right to dismiss. Unlike the litigant in *BellSouth*, McCoy (1) did not attempt to manipulate the random-case-assignment process, and (2) did not have a known "history" of attempting to do so. Moreover,

---

[22] The District Court did not sanction *BellSouth*'s attorney, so the Eleventh Circuit did not consider the matter in the context of an attorney sanction.

[23] In *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255 (5th Cir. 1983), which was cited by the Panel, the originally assigned judge's brother-in-law was hired as counsel by the defendant six years after the case had been filed. The original judge recused, and the new judge found that the "defendant had engaged the judge's relative as a stratagem in order to disqualify the judge and that the employment was a sham." *Id.* at 1257. He concluded, "The practice is fast becoming epidemic." *Id.* at 1258.

the party and lawyers in *BellSouth* had prior notice that their conduct was problematic based on a "history of recusal concerns in the Northern District," which had been called out by multiple judicial opinions before the *BellSouth* case, as well as a specific and on-point standing order addressing the issue.  334 F.3d at 944–45.

## IV.    EVEN IF THIS COURT DECIDES THAT RULE 41 DID BAR THE CONDUCT, THIS INTERPRETATION OF THE RULE COULD NOT BE RETROACTIVELY APPLIED NOR WOULD MCCOY'S BEHAVIOR AMOUNT TO SUBJECTIVE BAD FAITH.

Ultimately, even if this Court were to decide that the Rule 41(a) dismissal here was impermissible, that interpretation would be a new rule of law and (i) could not be applied retroactively[24] and, likewise, (ii) could not, as a matter of logic or due process, constitute subjective bad faith on McCoy's part given the existing precedent to the contrary.  Certainly, where a lawyer has a reasonable, good-faith basis for believing his actions are permissible under the Rules of Civil Procedure, as McCoy did here, there cannot be subjective bad faith as a matter of law.[25]

Second, the new rule the Panel appears to have announced is that Rule 41(a) dismissal cannot be used for the purpose of evading or manipulating the random-case-assignment process. As explained here, and as set out in the fact section, the dismissal here did not seek to evade or manipulate that process.  Rather, through dismissal, the lawyers sought to avoid an assignment

---

[24] *See 789 Cases of Latex Surgeon Gloves*, 13 F.3d at 15; *see also* Fed. R. Civ. P. 83(b) (not permitting sanctions where no rule exists precluding the conduct).

[25] There is pending before the Court a motion to alter or amend its order denying expert testimony. The proposed expert testimony of Greg Joseph goes to the reasonableness of Respondents' belief that they could voluntarily – and properly – dismiss once under Rule 41 for any reason.  Because the reasonableness of McCoy's belief about Rule 41 is, therefore, an issue as to whether a sanction could be imposed against him, he requests that the Court consider the expert testimony of Mr. Joseph.

outside the random-case-assignment process, or, at least, one perceived to have been, and to avoid

other consequences of that assignment.  This also precludes a subjective bad faith finding here.

## V.      EVEN IF THE COURT FINDS THAT IT COULD ISSUE SANCTIONS PURSUANT TO ITS INHERENT AUTHORITY, NO FURTHER SANCTION SHOULD ISSUE HERE.

### A.      FURTHER SANCTIONS ARE NOT DUE HERE BECAUSE MCCOY WAS NOT DISOBEDIENT TO JUDICIAL AUTHORITY AND THESE VERY PROCEEDINGS ARE MORE THAN ENOUGH TO CURB THE CONDUCT ISSUE AND SERVE AS A WARNING TO FUTURE LITIGANTS.

The Eleventh Circuit has held that "[c]ourts considering whether to impose sanctions under

their inherent power should look for disobedience and be guided by the purpose of vindicating

judicial authority."  *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1225 (11th

Cir. 2017).  Because there was no disobedience here, sanctions pursuant to this Court's inherent

authority should not issue. Moreover, at least one Eleventh Circuit panel has opined that no

sanctions are warranted where the very proceedings assessing the attorneys' actions are "enough

of a sanction to curb their conduct and to serve as a warning to future litigants."  *Meunier Carlin*

*& Curfman & Curfman, LLC v. Scidera, Inc.*, 813 F. App'x 368, 375 (11th Cir. 2020) (also questioning whether

subjective bad faith had been adequately found); *accord Purchasing Power*, 851 F.3d at 1228 ("We

trust that the damage done to the parties' credibility, finances, and time is enough of a sanction to

curb their conduct and to serve as a warning to future diversity jurisdiction litigants."). As set out

below, in McCoy's case, the effects already felt by him are enough to curb his conduct and serve

as a future warning to future litigants.

### B.      THE TIME AND COST OF DEFENDING THE CHARGES OF SANCTIONABLE CONDUCT, AS WELL AS THE EFFECT IT HAS ALREADY HAD ON MCCOY'S LIFE, CONSTITUTE SUFFICIENT SANCTIONS HERE.

As McCoy has shown in his March 8, 2024 declaration to this Court, his job calls for him to be admitted *pro hac vice* in courts across the country. If this Court were to issue a sanction, his ability to practice in the many jurisdictions across the country in which he seeks *pro hac* admission would be jeopardized. In fact, he has already refrained from making such applications because of the pendency of this matter.  He has likewise refrained from seeking regular admission to the Northern District of Florida.  The pendency, of this matter, therefore, has already had an impact on his ability to practice law. A sanction would, as he says, "almost assuredly prevent me from being admitted *pro hac vice* in other jurisdictions" and from being granted admission to practice before other federal courts.  *See* McCoy March 8, 2024 Decl., ¶ 15.  This matter, of course, has also already taken a toll on McCoy, in connection with the time and expense of defending himself against the allegations of wrongdoing.

As explained previously, a remedy available for "judge-shopping" is to transfer the case back to the judge in the dismissed action.  That has been accomplished here.

McCoy would urge the Court also to follow a rule articulated in the Fifth Circuit: "'Sanctions must be chosen to employ the least possible power to the end proposed. In other words, the sanctioning court must use the least restrictive sanction necessary to deter the inappropriate behavior.' *In re First City Bancorporation of Tex. Inc.*, 282 F.3d 864, 867 (5th Cir. 2002) (internal quotation marks and citations omitted)."  *In re Finn*, 78 F.4th 153, 158 (5th Cir. 2023). Of one thing this Court can be certain:  Mr. McCoy has already been deterred and he will never again join in any decision to dismiss under Rule 41 when the judge who has the case is even indirectly one of the reasons for the proposed Rule 41 dismissal.

Finally, the imposition of a sufficiently substantial punitive sanction requires the protections of criminal procedure. *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 289 (2d Cir.

49

2021); s*ee also* Caputo, 2024 WL 1103117, *supra* at *38 (calling for heightened criminal-level due-process protections for attorney sanctions).  Neither this Court nor the Panel have provided the level of due process that would permit it to issue sanctions here.

### C.   OTHER FACTORS WEIGH IN FAVOR OF DECLINING TO IMPOSE ANY SANCTION.

Rule 83.1(g) of this District's Local Rules incorporates by reference the Alabama Standards for Imposing Attorney Discipline.  In connection with those Standards, which can be found on the Alabama Bar website, there are multiple "mitigating factors" (see Standard 9.3, Mitigation, Alabama Standards for Imposing Attorney Discipline), many of which apply here.  These include "Absence of Prior Disciplinary Record" (Standard 9.32(a); "Absence of Dishonest or Selfish Motive" (Standard -9.32(b)); "Full and Free Disclosure to [the Tribunal] or Cooperative Attitude Toward Proceedings" (Standard 9.32(e)); "Character or Reputation" (Standard 9.32(g)); "Imposition of Other Penalties or Discipline" (Standard 9.32(k)); and "Remorse" (Standard 9.32(l)).  Only the latter two items in this list may require explanation beyond what is already set out in this briefing and in McCoy's March 8, 2024 Declaration.  As explained above, the burdens associated with this proceeding have been tantamount to the "imposition of other penalties and discipline."  As to remorse, McCoy has on more than one occasion, the last being his Declaration of March 8, 2024 ¶ 13, indicated that he is deeply remorseful.

In light of these many mitigating factors, no sanction is warranted.  But if the Court determines that some additional penalty is necessary, then no more than a private reprimand is appropriate.

## VI.   MCCOY IS ALSO NOT SUBJECT TO RULE 11 SANCTIONS.

The Eleventh Circuit has ruled that, where a court issues a show-cause order (as it has here) in connection with Rule 11 sanctions, the standard to be applied is akin to that used in connection

with contempt: "The initiating court must employ (1) a 'show-cause' order to provide notice and an opportunity to be heard; and (2) a higher standard ('akin to contempt') than in the case of party-initiated sanctions. … *Sua sponte* Rule 11 sanctions, then, must be reviewed with 'particular stringency.'" *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003).

Though the *Kaplan* Court established the akin-to-contempt standard, it declined to rule on what it called the "related '*mens rea*' issue" because it did not have to reach that issue. *Id.* at 1256. The Eleventh Circuit has still not ruled on exactly what "akin to contempt" means or what the *mens rea* standard is for Rule 11 sanctions, but at least one district court in the Circuit has ruled that akin to contempt means objective bad faith:

> Objective bad faith arises where an attorney "knowingly or recklessly pursue[s] a frivolous claim or needlessly obstruct[s] the litigation of a non-frivolous claim." *Amlong*, 500 F.3d at 1242 (first and third emphases in original; second emphasis added). A party could demonstrate bad faith, for example, "by delaying or disrupting the litigation or hampering enforcement of a court order." *Barnes*, 158 F.3d at 1214. "If particularly egregious, the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith" as well. *Id*. Recklessness is enough to support a finding of objective bad faith, even if the attorney does not act knowingly and malevolently. *See Amlong*, 500 F.3d at 1239 – 41. "[R]eckless conduct simply means conduct that grossly deviates from reasonable conduct." *Id*. at 1240 (citing *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1227 (11th Cir. 2003)); W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 34 (5th ed. 1984); Black's Law Dictionary, 1298–99 (8th ed. 2004).

*In re Engle Cases*, 283 F. Supp. 3d 1174, 1212–14 (M.D. Fla. 2017). It chose this lower standard, however, notwithstanding that a leading Second Circuit case[26] on the matter requires a showing of subjective bad faith, and McCoy believes that is the proper standard to apply here.

---

[26] "The Second Circuit has held that a court must apply the 'akin to contempt' standard when imposing *sua sponte* Rule 11 sanctions, and further, that the 'akin to contempt' standard requires proof of subjective bad faith. *In re Pennie [& Edmonds, LLP]*, 323 F.3d [86,] 91 [(2d Cir. 2003)]." *In re Engle Cases*, 283 F. Supp. 3d 1174, 1212 (M.D. Fla. 2017).

The conduct alleged here clearly does not meet either standard.  McCoy did not knowingly pursue a frivolous claim. He agreed to the dismissal of *Ladinsky* and filing of *Eknes-Tucker* based on a good-faith belief that both were permitted under the rules and existing case law.  And his behavior, therefore, certainly did not "grossly deviate[]" from reasonable conduct.

Moreover, the allegations here do not even fall within the parameters of Rule 11.  Rule 11(b), which establishes a lawyer's duty under the rule, reads as follows:

> **(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> > **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> > **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> > **(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

In its most recent individual Show Cause Order to McCoy (Doc. 487), the Court indicated that only Rule 11(b)(1) is at issue here.  A Court may issue sanctions only if Rule 11(b) has been violated (after notice and a reasonable opportunity to be heard).  Fed. R. Civ. P. 11(c)(1).  Here, under existing and binding precedent, Rule 41(a) permitted dismissal for any purpose prior to the filing of an answer, including reasons having to do with the judge.  This precludes any Rule 11 sanction.  Moreover, even if this Court concludes that Rule 41(a) and binding precedent did not give that authority, the case law in existence is such that McCoy in good faith believed that the dismissal and refiling, under the circumstances, was permissible.   Thus, analyzing the allegations

pursuant to Rule 11(b)(1), neither the dismissal nor refiling here were "presented for an improper purpose." Moreover, the few days' delay resulting from the immediate refiling neither harassed, caused unnecessary delay, nor needlessly increased the costs of litigation, which are the other enumerated bases for the first requirement under Rule 11(b).

Because the requirements of Rule 11(b)(1) are met, McCoy cannot be sanctioned pursuant to Rule 11.

It should also be noted here that, while no sanction at all can be issued under Rule 11(b), the Court, even if it finds otherwise, cannot issue monetary sanctions because the "show-cause" order was not issued "before voluntary dismissal," as required by Rule 11(c)(5)(B). That part of the Rule states in pertinent part that a court cannot impose monetary sanctions "unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal … by … the party that is, or whose attorneys are, to be sanctioned."

## VII. MCCOY HAS VIOLATED NO ETHICAL RULE, LOCAL RULE, OR OATH OF OFFICE AND IS NOT SUBJECT TO SANCTIONS FOR DOING SO.

While this Court can use its inherent authority to enforce ethical rules, the same standard – subjective bad faith – and the same burden of proof – at least clear and convincing evidence if not beyond a reasonable doubt – would apply.[27] This Court has asked McCoy to brief why his conduct is not sanctionable as violations of various ethical rules. Each is briefly addressed below.

---

[27] *See, e.g.*, *C.H. by Hilligoss v. Sch. Bd. of Okaloosa Cnty. Fla.*, 476 F. Supp. 3d 1214, 1223 (N.D. Fla. 2020) (court can exercise its inherent authority to enforce ethical standards); *Garcia v. Rezi*, No. 1:22-CV-03424-VMC, 2023 WL 6536238, at *2 (N.D. Ga. Feb. 9, 2023) (same); *In re Deepwater Horizon BELO Cases*, No. 3:19-CV-07, 2022 WL 1037307, at *8 (N.D. Fla. Feb. 2, 2022) (applying clear and convincing evidence standard to court's application of its inherent authority to enforce ethical standards), *report and recommendation adopted sub nom. In re Deepwater Horizon Belo Cases*, No. 3:19-CV-07, 2022 WL 1028030 (N.D. Fla. Apr. 6, 2022); *see also Caputo,* 2024 WL 1103117, at *38, *supra* (applying criminal-level due-process standards to lawyer sanctions proceeding, including requiring proof beyond a reasonable doubt).

(a) <u>Alabama Rule of Professional Conduct 3.3(a)(1) which prohibits attorneys from</u> <u>"knowingly" making "false statement[s] of material fact . . . to a tribunal."</u>  McCoy made no false statement of material fact to the tribunal.  The Panel rejected McCoy's position that the reason for dismissal was not the mere fact that this Court drew the case but rather resulted from the collective circumstances surrounding the assignment, including the appearance that this Court reached out for the case outside the random-case-assignment process coupled with *Ladinsky* losing the first-filed status and the imminence of the hearing.  As this Court now knows, McCoy's position was consistent with that of the other lawyers involved.  As explained above, the Panel's rejection of that consistent testimony was based on (a) a series of logical missteps and an erroneous substitution of the Panel's own judgment for that of the Respondent lawyers; (b) the Panel's failure to apply the bad-faith standard, not to mention the clear-and-convincing-evidence or beyond-a-reasonable-doubt burden of proof; and (c) failure to give deference to the lawyer's testimony.

Similarly, to the extent McCoy is accused of misrepresentation in connection with the assertion that the decision to dismiss resulted from Judge Axon's failure to give a reason for the transfer, McCoy is likewise not in the wrong.  As he has said in his May 8, 2024 Declaration, he would not have supported the decision to dismiss had she disclosed in the April 15th Order that she was transferring the case due to the pendency of her multi-week criminal trial.  This is because there would have been no concern that this Court was reaching out for the case and that would have tipped the scales for him against dismissal, notwithstanding the other legitimate concerns at play on April 15.

(b) <u>Alabama Rule of Professional Conduct 3.3(a)(2) which prohibits "fail[ure] to disclose</u> <u>a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent</u> <u>act by the client</u>."  McCoy vehemently disagrees with any assertion that there was a failure to

disclose anything in connection with assistance in any criminal or fraudulent act by the client. Dismissing and refiling is certainly not a criminal act by the client.  Moreover, how could anything that occurred here constitute a "fraudulent act by the client" when there was nothing concealed from the court or anyone else and both the Federal Rules of Civil Procedure and case law permit what occurred.  (As noted elsewhere, announcing the plan to refile in the media was the opposite of trying to conceal it.)  Certainly at this point, McCoy is not on adequate notice of any act that could be considered criminal or fraudulent.

(c)  Alabama Rule of Professional Conduct 3.3(d) which requires "[i]n an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse."  First, McCoy knows of no material fact about which he had knowledge that would have been negative to his interest or that of other Respondents that was not provided to the Panel.  *See* Doc. 500-1 McCoy May 8, 2024 Declaration at ¶ 2.  As noted elsewhere, the Panel and this Court's rejection of the consistent testimony of the lawyers involved here, all of whom were sequestered, evidences that the attorneys were both honest and forthcoming, notwithstanding the Panel member's rejection of that consistent testimony, substitution of their own judgment for the Respondents. and failure to apply the applicable legal standards. Second, the Panel proceedings were not *ex parte* proceedings as that term is used here.   The rule itself indicates that the kind of proceedings at issue are those in which one party seeks relief that, if granted, would injure an absent party, *e.g.*, a TRO.[28]

---

[28] The Alabama Comment to Rule 3.3(d) reads:

> Ex Parte Proceedings
> Ordinarily, an advocate has the limited responsibility of presenting one side of the matters that a tribunal should consider in reaching a decision; the conflicting position is expected to be presented by the opposing party. However, in an ex parte proceeding, such as an application for a temporary restraining order, there is no

In other words, the duty (which is above and beyond the candor required in the other portions of this rule), only exists because there is an absent party *that might be injured* by the Court's ruling.[29] It goes without saying that the proceedings before the Panel were unlike a TRO – they were neither brought at the instance of the lawyers being investigated nor were the attorneys or their clients ever going to benefit from them to the detriment of the opposing party. Moreover, to the extent that there was an adverse party, it had notice of the proceedings. Thus, this Rule is simply inapplicable to McCoy.

(d) <u>American Bar Association Model Rule of Professional Conduct 3.3(a)(1) prohibits attorneys from "knowingly" making "false statement[s] of fact . . . to a tribunal" and "fail[ing] to correct . . . false statement[s] of material fact" that they have "previously made to the tribunal."</u> *See* response, *supra*, to Alabama Rule 3.3(a)(1).

---

balance of presentation by opposing advocates. The object of an ex parte proceeding is nevertheless to yield a substantially just result. The judge has an affirmative responsibility to accord the absent party just consideration. The lawyer for the represented party has the correlative duty to make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision. Since a grand jury proceeding is a preliminary step in the institution of a criminal charge, the prosecutor is not required to present all "material" facts. Otherwise, the grand jury proceeding could become unduly burdened with numerous witnesses, every piece of tangible evidence, and inquiries into possible defense theories, both as to guilt and as to punishment.

[29] As explained in an article in the Georgetown Journal of Legal Ethics construing the American Bar Association Model Rule that corresponds with Alabama's rule, "[S]ince there is no opposing party or counsel present, only one party's interests are presented to the tribunal, even though disposition of the matter *may affect another party* who is not before the tribunal." Jill M. Dennis, The Model Rules and the Search for Truth: The Origins and Applications of Model Rule 3.3(d), 8 Geo. J. Legal Ethics 157, 162 (1994) (emphasis added). As the article goes on to point out, *Black's Law Dictionary* defines "ex parte*"* to mean: "On one side only' by or for one party … A judicial proceeding, order, injunction, etc., is said to be ex parte when it is taken or granted *at the instance and for the benefit of one party only*, and without notice to, or contestation by, any *person adversely interested*." *Id*. at 167 (emphasis added).

(e) <u>American Bar Association Model Rule of Professional Conduct 3.3(d) which requires</u> "<u>[i]n an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the</u> <u>lawyer that will enable the tribunal to make an informed decision, whether or not the facts are</u> <u>adverse</u>." *See* responses, *supra*, to Alabama Rule of Professional Conduct 3.3(d) which includes commentary on the corresponding American Bar Association Model Rule.

(f) <u>Oath of Admission to the Northern District of Alabama which requires that attorneys</u> "<u>maintain the respect due to courts of justice and judicial officers</u>."[30]  McCoy has taken no action here that amounts to a failure to maintain respect due to the courts or judicial officers.  He has abided by every court order and instruction and has given testimony honestly under oath.  To the extent that he or others discussed whether this Court would be a good draw for his clients' case, such discussions are not a failure to respect the court or its officers but merely a part of the work and analysis expected of lawyers who zealously represent their clients.  If this Court takes the position that private and privileged communications between co-counsel as to whether this Court was a bad draw violated the oath, such a conclusion would implicate the First Amendment of the United States Constitution, undermine the lawyer's duty to zealously represent his client, and would be a serious subversion of the attorney-client and work-product privileges. Moreover, McCoy was very careful to keep these communications private so as to avoid even the appearance of disrespect to the Court. *See* McCoy's Nov. 3 Testimony at 186-189.  Finally, the decision to dismiss and refile have been discussed at length elsewhere and, as an act explicitly permitted by rule and controlling case law, was in no way a violation of this oath.

---

[30] With respect to the allegations that McCoy violated any portion of the Oath of Office of either District Court, this Court has not specifically identified what alleged conduct constitutes lack of respect for the court or its officers.  While due-process notice concerns are at play elsewhere in this proceeding, it is of particular concern with respect to these allegations.

(g)  Oath of Admission to the Northern District of Alabama which requires that attorneys "employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by an artifice or false statement of fact or law." That McCoy's representations to the Panel were true and not misleading have been addressed at length elsewhere.  Thus, he has not violated this oath.

(h) Oath of Admission to the Middle District of Alabama which requires that attorneys "at all times maintain the respect due to courts of justice and judicial officers." *See* response, *supra*, to the charge that McCoy violated a similar portion of the Oath of Admission to the Northern District of Alabama.

(i) Oath of Admission to the Middle District of Alabama which requires that attorneys "will at all times maintain a professional conduct in accordance with the rules and orders of this court, the cannons of the American Bar Association and the Code of Ethics of the Alabama State Bar Association." *See* response, *supra*, as to the charge that McCoy violated the similar portion of the Oath of Admission to the Northern District of Alabama.

(j) Local Rule 83.1(f) of the Northern District of Alabama Local Rules, which requires attorneys to comply with the local rules of the Court, the Alabama Rules of Professional Conduct, the American Bar Association Model Rules of Professional Conduct, and Local Rule 83.1(g) of the Middle District of Alabama Local Rules.  *See* discussion, *supra*, regarding McCoy's compliance with all relevant rules cited by this Court.

Thus, McCoy has not violated, nor is he subject to sanctions here for violation of, any ethical rule identified by the Court in its Show Cause Orders.

## CONCLUSION

For the reasons set out herein, McCoy's conduct violated no rule, oath, or standard and is not sanctionable, and, alternatively, no further sanctions should issue.  To the extent applicable to him, Respondent McCoy also hereby adopts the arguments made, and law cited, by the other Respondents in response to the Court's Show-Cause Orders.

Respectfully submitted this 13th day of May, 2024.


*s/Shannon L. Holliday*
Robert D. Segall [ASB-7354-E68R]
Shannon L. Holliday [ASB-5440-Y77S]
COPELAND, FRANCO, SCREWS & GILL, P.A.
444 South Perry Street
Post Office Box 347
Montgomery, Alabama 36101-0347
Phone: (334) 834-1180
Fax: (334) 834-3172
Email: segall@copelandfranco.com
Email: holliday@copelandfranco.com
**Counsel for Scott D. McCoy**


## CERTIFICATE OF SERVICE

I certify that on May 13, 2024, I filed the foregoing electronically with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record.


/s/ Shannon L. Holliday
Of Counsel