# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

BRIANNA BOE, *et al.*,      )
                    )
      Plaintiffs,     )
                    )
v.                   )     **Case No. 2:22-cv-0184-LCB**
                    )
STEVE MARSHALL, *et al.*,   )
                    )
      Defendants.   )

## RESPONDENT CARL CHARLES' RESPONSE TO ORDER TO SHOW CAUSE

Respondent, Carl Charles ("Mr. Charles"), hereby responds to this Court's Supplemental Order to Show Cause why he should not be sanctioned under this Court's inherent power for "willfully and contrary to his oath stating material matters which he did not believe to be true in violation of 18 U.S.C. § 1623 and the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle Districts of Alabama, and his sworn oath."[1] Doc. 481 at 15.

---

[1] Mr. Charles addresses the remainder of the Supplemental Order to Show Cause in the separate response for Respondents James Esseks, Carl Charles, and LaTisha Faulks filed contemporaneously herewith.

## I.    MR. CHARLES TESTIMONY

1.    The testimony at issue took place during the initial proceeding on May

20, 2022, before the three-judge panel in *In re Vague* (the "Panel").  That testimony

is as follows:

> JUDGE WATKINS: All right.  Did you have any contact with the clerk's office about who the case was being assigned to?  Did you receive a call or did you make a call?
>
> MR. CARL CHARLES: No, Your Honor, I did not make a call.  No, Your Honor, I did not receive a call.
>
> . . .
>
> JUDGE WATKINS: Did you call anyone's chambers about the assignment of the case?
>
> MR. CARL CHARLES: No, Your Honor.
>
> JUDGE WATKINS: You didn't call any judge's chambers?
>
> MR. CARL CHARLES: I did not make any telephones [sic] calls about this matter on the day we filed, Your Honor.
>
> JUDGE WATKINS: I'm not asking about the day you filed.  I guess I'm asking about any day.
>
> MR. CARL CHARLES: My pause is only because I am endeavoring to be as candid as possible.  I do not recall ever calling any chambers with this request, Your Honor, at any point.
>
> . . .
>
> JUDGE WATKINS: . . . So I've asked you the question.  I'm going to ask you point blank: Are you telling us that you did not speak to any law clerk of any judge in the Middle District of Alabama concerning the Walker case and the assignment of the case to that judge?

MR. CARL CHARLES: That is correct, Your Honor.  I did not.

. . .

JUDGE PROCTOR: All right.  Speaking of good faith, I want you to think very carefully about this next question and answer you're about to give.  Are you telling us that you did not call a judge's chambers and speak to a law clerk about the potential for a TRO in the Walker case?

MR. CARL CHARLES: I apologize, Your Honor.  Could you – I'm not sure I'm understanding your question.  When you say potential of a TRO, I'm not sure what you mean.

JUDGE PROCTOR: About the potential filing of a TRO or intent to file a TRO or the handling of a TRO.  You're saying that you have never had a communication with a judge's law clerk allowing for -- discussing the filing of Walker and the potential for a TRO being filed in Walker?

MR. CARL CHARLES: No, Your Honor.

. . .

JUDGE PROCTOR: And I don't want to turn this into a deposition, but I want to return to one thing. If you did make a call to a judge's chambers and talk to a law clerk about the Walker case, you would remember that?

MR. CARL CHARLES: I am incredibly certain I would, Your Honor.

JUDGE PROCTOR: All right.  What's your phone number?  Is it (770) 309-1733?

MR. CARL CHARLES: Yes, Your Honor.

5/20/22 Hr'g Tr. at 178–179, 184–185, 187, 190–191, *In re Vague*, No. 22-mc-3977

(M.D. Ala.) ("*Vague*").

2.      However, almost immediately after this, while he was still on the stand,

Mr. Charles corrected his erroneous testimony and apologized to the Panel:

> MR. CARL CHARLES: I'm sorry, Your Honor. I am -- may I return to
> some previous questions that you asked me and amend my testimony?
>
> JUDGE PROCTOR: You may.
>
> MR. CARL CHARLES: Okay.  I did call Judge Thompson's clerk.  I
> am now remembering.  I want to apologize for any impression I gave
> that I was trying to obfuscate that fact. That was not my intention.  And
> in candor, I am very nervous, and I am trying to be as forthright with
> Your Honors as possible.  So I want to --
>
> JUDGE PROCTOR: Now you are.  Let's be fair.  Now you are.
>
> MR. CARL CHARLES: Yes, Your Honor.
>
> JUDGE PROCTOR: You're coming clean.
>
> MR. CARL CHARLES: Well, if I may, Your Honor, those moments of
> pause were really me trying to contemplate and remember.  And not by
> way of excuse, but by way of explanations, Your Honor, things were
> moving extremely quickly over those three days, and it was a very high-
> stress situation.  Again, not an excuse, but there were many things that
> happened which I have in preparation for this hearing endeavored to
> recollect and write down.  And I do sincerely apologize.
>
> JUDGE PROCTOR: It's better you did it now than us having to do it
> for you later.
>
> MR. CARL CHARLES: Yes, Your Honor.  Thank you.
>
> JUDGE PROCTOR: But let me ask you this: Why were you hesitant to
> tell us that?
>
> MR. CARL CHARLES: Oh, Your Honor, I was not hesitant at all.  I
> genuinely couldn't recall the conversation.  And then --

JUDGE PROCTOR: What sparked your recollection?   The phone number?

MR. CARL CHARLES: My phone number.  Yes, Your Honor.  And so I thought -- I was replaying --

JUDGE PROCTOR: It seems to me – I'm going to be unfair with you. I'm just telling you what I'm thinking here.  This is not -- this is Proctor being cards up.  The phone number doesn't spark a recollection.  The phone number sparks a realization that I have some information that you didn't think I had.

MR. CARL CHARLES: Your Honor, I did find it unusual that you had that.  But then I tried to think about what we had to submit to this Court and had I listed that on other filings.  And while you were asking -- while Your Honors were asking me other questions, I was trying to think in my mind about the events of those two days.

*Id.* at 192–193.

3.     Mr. Charles repeated his apology to the Panel at a subsequent hearing

on August 3, 2022:

JUDGE PROCTOR: All right.  All right.  Thank you.  Did you have anything further?  I mean, I didn't want to pretermit your opportunity to -- if there's something maybe that's come to your mind that you think we need to know that we haven't asked about.

MR. CHARLES: No, Your Honor.  I would just like to note again, as I did in my declaration, my apologies to Your Honors for my forgetfulness at the May 20 hearing.

JUDGE PROCTOR: All right.  Thank you.

 8/3/22 *Vague* Hr'g Tr. at 170.

4.     Mr. Charles also apologized in the declaration he submitted to the

Panel:

> I offer to the Panel my sincerest apologies in this declaration, as I did at the May 20 hearing, for my forgetfulness.  I did not intend at the May 20 hearing to mislead or offer incomplete testimony to the Panel.

8/1/22 Charles Decl. ¶ 69 (*Vague*, Doc. 80-16).

## II.    THE PANEL'S FINDINGS

5.    Following the conclusion of the proceedings in *In re Vague*, the Panel issued its Final Report of Inquiry ("Report").  The Report concluded that:

> The only reasonable reading of Charles's testimony is that, initially, he deliberately misled this Panel about the phone call to Judge Thompson's chambers – and continued to do so up until the moment in his testimony that it became clear to him that the Panel was fully aware of his call.  It is inconceivable that, in light of all the circumstances surrounding the call, Charles genuinely forgot about the phone call to Judge Thompson's chambers.

Report at 20.

## III.    THE CALL TO JUDGE THOMPSON'S CHAMBERS

6.    The substance of Mr. Charles' call to Judge Myron Thompson's chambers is briefly summarized in the Report, but is discussed in greater detail in Mr. Charles' August 1, 2022 declaration:

> During my conversation with Ben Gunning, who I assumed was one of Judge Thompson's clerks, I told him that a case called *Walker v. Marshall* had been filed on April 11, that it had been marked as related to *Corbitt*, and that the *Walker* team expected to file a motion for preliminary injunction shortly.  I provided Mr. Gunning with the *Corbitt* case number when he asked for it.  Mr. Gunning also asked for the *Walker* case number.  I told him that we had not yet received a case number, and that it was my understanding that there was no case number yet because we had a pending motion for the plaintiffs to proceed under pseudonyms.  I said that we wanted to flag for Judge

> Thompson that there was a motion for a temporary restraining order/preliminary injunction to be filed that afternoon because we had been told that the complaint was being expedited and wanted to make sure Judge Thompson was aware of and had the opportunity to see the motion.  Mr. Gunning repeated back everything I said to ensure he understood what I said and promised to pass along the information. He also took down my name and phone number.

8/1/22 Charles Decl. ¶ 73 (*Vague*, Doc. 80-16).

7.     Mr. Charles' characterization of the call is corroborated by an email sent by Ben Gunning, the law clerk in question to Judge Thompson summarizing the call:

> Judge,
>
> As I mentioned just now, we received a call from Carl Charles from Lambda Legal (770-309-1733).  He was calling to share that yesterday they filed a complaint in *Walker v. Marshall*, which he said had not been assigned a case number to his knowledge because they had subsequently filed a motion to seal (he referred to this as a 5.2 motion). He reached out to inform the court (1) that the complaint was marked as related to one of your cases, *Corbitt v. Taylor*, 2:18-cv-91, and (2) that they intend to file a motion for a TRO and/or preliminary injunction later today.

Doc. 437-1 (Gunning Email).

8.     Additionally, following the call, Mr. Charles sent an email summarizing the discussion with Judge Thompson's law clerk to other *Walker* counsel.  Charles Suppl. Decl. ¶ 29.[2]  In it, Mr. Charles reported that he had notified Judge Thompson's

---

[2] All cites to the Esseks, Charles, and Faulks Supplemental Declarations refer to the exhibits attached to the 5/8/24 Notice of Filing (Doc. 492): Exhibit A, Esseks Supplemental Declaration; Exhibit B, Charles Supplemental Declaration; Exhibit C, Faulks Supplemental Declaration.

law clerk that a complaint had been filed that was marked as "related" to *Corbitt v. Taylor* and "that we wanted to flag for Judge Thompson that there is a motion for TRO/PI to be filed this afternoon because we had been told that the complaint was being expedited and wanted to make sure Judge Thompson was aware of and had the opportunity to see the TRO/PI." Doc. 437-2 at 2. Finally, Mr. Charles noted that Judge Thompson's law clerk "promised to pass along the information and also took down my phone number." *Id.*

## IV.   STANDARD OF REVIEW

9.     The imposition of sanctions or discipline under a court's inherent power requires clear and convincing evidence of bad faith. *See JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 988-89 (11th Cir. 2017) (stating that a party failed to meet its "burden to prove sanctionable conduct . . . by clear and convincing evidence"); *In re BellSouth Corp.*, 334 F.3d 941, 963 n.19 (11th Cir. 2003); *Fletcher v. Ben Crump L., PLLC*, No. 5:21-cv-01433-LCB, 2023 WL 3095571, at *5 (N.D. Ala. Apr. 26, 2023); *Thompson v. Merchants Adjustment Servs., Inc.*, No. 5:20-cv-1591-LCB, 2021 WL 2682264, at *1 (N.D. Ala. Feb. 11, 2021) ("The sanction of dismissal requires the clear and convincing evidence that a litigant engaged in bad-faith discovery abuses."). This burden of proof applies to all of the charges against

Mr. Charles, except for the charge of "perjury in judicial proceedings." Doc. 481 at 15.[3]

10.    The charge that Mr. Charles committed perjury by "willfully and contrary to his oath stating material matters which he did not believe to be true" requires proof beyond a reasonable doubt. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017) ("This Court has made clear that such a [fee award] sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature. . . . To level that kind of separate penalty, a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." (citations omitted)).  "Depending on circumstances, a party facing sanctions may be entitled to enhanced procedural protections beyond notice and an opportunity to be heard. . . .  Thus, 'the imposition of a sufficiently substantial punitive sanction' requires 'procedural protections appropriate to a criminal case' (for example, the requirement of proof beyond a reasonable doubt)." *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 285 (2d Cir. 2021) (citations omitted).[4]

---

[3] The Panel's Report of Inquiry does not list Charles' alleged perjury among the specific findings of misconduct, Report at 51–52, but includes the statement that Charles "deliberately misled th[e] Panel." *Id.* at 20.

[4] *See also Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1089 (9th Cir. 2021) ("[W]hen a sanction is imposed under a court's inherent authority as a penalty or to punish someone, 'a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof.'" (citation omitted)); *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128 (9th Cir. 2001) (Litigant accused of attempting to bribe receiver

11.     This Court's Supplemental Order to Show Cause cites and relies on a criminal statute (18 U.S.C. § 1623) and suggests that Mr. Charles' conduct could constitute "perjury." Doc. 481 at 15.  Conviction under this criminal statute requires "[p]roof beyond a reasonable doubt." *See* 18 U.S.C. § 1623(e).  "The standard of proof is the same in a § 1623 perjury case as any other criminal case." *United States v. Parr*, 516 F.2d 458, 464 (5th Cir. 1975).

12.     Even if this Court has not cited and relied on a federal criminal statute in its Supplemental Order to Show Cause, there is no doubt that perjury is a sufficiently serious charge and carries with it serious and substantial punitive implications that Mr. Charles should be afforded the "procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." *Goodyear*, 581 U.S. at 108.

## V.     APPLICABLE LAW AND RULES

13.     18 U.S.C. § 1623 provides that:

> Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined under this title or imprisoned not more than five years, or both.

---

had due process right to protection of reasonable-doubt standard in proceedings.); *de Borja v. Razon*, 340 F.R.D. 400, 411 n.3 (D. Or. 2021) ("[T]he imposition of punitive sanctions requires additional procedural safeguards 'applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof.'" (citation omitted)); *Austin v. Harbor Freight Tools USA Inc.*, No. C17-6028 BHS, 2019 WL 2298686, at *2 (W.D. Wash. May 30, 2019) ("[A] Court may not award sanctions that are punitive in nature without 'procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof.'" (citation omitted)).

*Id.* § 1623(a).

14.    Rule 3.3(a) of the Alabama Rules of Professional Conduct, which is incorporated into the Local Rules of the Northern and Middle Districts of Alabama, prohibits attorneys from knowingly making "a false statement of material fact or law to a tribunal[.]"

15.    Rule 3.3(a) of the American Bar Association Model Rules of Professional Conduct, which is incorporated into the Local Rules of the Northern and Middle Districts of Alabama, prohibits attorneys from knowingly making "a false statement of fact or law to a tribunal" and from "fail[ing] to correct . . . false statement[s] of material fact" that they have "previously made to the tribunal."

16.    The Oath of Admission for the Northern District of Alabama requires attorneys to swear that they "will maintain the respect due to courts of justice and judicial officers" and "employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by an artifice or false statement of fact or law."  Doc. 481 at 11–12 (emphasis omitted).

17.    The Oath of Admission for the Middle District of Alabama requires attorneys to swear that they "will at all times maintain the respect due to courts of justice and judicial officers" and "at all times maintain a professional conduct in accordance with the rules and orders of this court, the cannons of the Alabama Bar

Association and the Code of Ethics of the Alabama Bar Association." *Id.* at 12 (emphasis omitted).

18.     The oath sworn by Mr. Charles prior to his testimony required him to tell "the truth, the whole truth, and nothing but the truth." *Id.* at 12 (emphasis omitted).

## VI.   ARGUMENT

19.     Mr. Charles should not be sanctioned because he did not violate 18 U.S.C. § 1623, the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle Districts of Alabama, or his sworn oath.

20.     Mr. Charles' erroneous testimony was the result of a lapse in memory and was quickly corrected on the stand. This was not done "willfully" or "contrary to his oath," and Mr. Charles' inadvertent error does not violate "the respect due to courts of justice and judicial officers" or the standards of "professional conduct in accordance with the rules and orders of this court, the cannons [sic] of the Alabama Bar Association and the Code of Ethics of the Alabama Bar Association." Report at 12, 15.

21.     The Report rejected Mr. Charles' assertion that he had initially forgotten the call, concluding that this was "inconceivable." Report at 20. However, this conclusion is not supported by clear and convincing evidence, much less

satisfying the beyond a reasonable doubt standard. *See* 18 U.S.C. § 1623(e); *Goodyear*, 581 U.S. at 108; *Liebowitz*, 6 F.4th at 285. Sanctions would also be inappropriate because Mr. Charles promptly corrected the erroneous testimony and because of the literal truth of portions of his testimony.

### A.   Mr. Charles Did Not Knowingly Make False Statements to the Panel.

22.   An unknowing, unintentional misstatement does not violate the statute, rules, and oaths cited by this Court's Supplemental Order to Show Cause. *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (erroneous testimony based on "confusion, mistake, or faulty memory" is not perjury); *United States v. Martellano*, 675 F.2d 940, 942 (7th Cir. 1982) ("A false answer given because of inadvertence, honest mistake, carelessness, neglect, or misunderstanding does not constitute [perjury]." (citation omitted)); *In re Brent*, 458 B.R. 444, 457 (Bankr. N.D. Ill. 2011) ("To be sanctionable, a misstatement or omission must be more than an innocent mistake; in making the misstatement or omission, the attorney must have been 'culpably careless.'" (citation omitted))

23.   Lawyers are presumed to be truthful in their statements to the court. The Eleventh Circuit has held that because "[e]very lawyer is an officer of the court" with "a duty of candor to the tribunal," a statement by a lawyer "deserves deference and a presumption of truth." *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994); *see also Federated Mut. Ins. Co. v. McKinnon Motors, LLC*, 329 F.3d

805, 808 (11th Cir. 2003) ("Because . . . lawyers are officers of this court and subject to sanctions under Federal Rule of Civil Procedure 11 . . . we give great deference to such representations [by counsel] and presume them to be true."); *In re Fisher*, 179 F.2d 361, 363 (7th Cir. 1950), *cert. denied*, 340 U.S. 825 (1950) ("Every lawyer . . . is entitled to the presumption that he is honest and acting in the best interest of those whom he is employed to represent."); *McCrory v. Costco Wholesale Corp.*, 584 F. Supp. 3d 1091, 1095 (S.D. Ala. 2022); *Thomas v. Countrywide Home Loans*, No. 3:11-CV-399-WKW, 2012 WL 527482, at *6 (M.D. Ala. Feb. 17, 2012).

24.    Similarly, when deciding whether to impose sanctions, courts generally resolve close calls in favor of the lawyer. *See Eastway Const. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded by rule on other grounds* ("Courts must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any and all doubts must be resolved in favor of the signer."). As one court noted:

> The imposition of sanctions is a serious matter and should be approached with circumspection. An attorney's name and reputation are his stock in trade and thus any unfair or hasty sullying of that name strikes at the sanctioned attorney's livelihood. These considerations suggest that, whenever possible, doubts should be resolved in counsel's favor. . . .

*DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 862 (N.D. Ill. 2021) (quoting *Hart v. Blanchette*, No. 13 CV 6458, 2019 WL 1416632, at *28 (W.D.N.Y. Mar. 29, 2019)).[5]

25.     It is against this background that this Court considers whether Mr. Charles' testimony was "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." *United States v. Cavallo*, 790 F.3d 1202, 1220 (11th Cir. 2015) (quoting *United States v. Ellisor*, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008)). In reaching that decision, this Court should also consider whether the evidence allows the conclusion "that, although the answer was false, the witness had not grasped the form of the question, and had not knowingly or willfully made a false answer with intent to deceive." *Beckanstin v. United States*, 232 F.2d 1, 4 (5th Cir. 1956).

---

[5] *See also AngioDynamics, Inc. v. Biolitec AG*, 880 F.3d 600, 601 (1st Cir. 2018) ("[W]e will, in these circumstances, give defense counsel the benefit of the doubt and not impose sanctions against them"); *Porter v. Daggett Cnty.*, No. 2:18-cv-00389, 2022 WL 18026382, at *2 (D. Utah Dec. 30, 2022) ("[I]n determining if sanctions are appropriate, any doubts must be resolved in favor of the party signing the pleading."); *Casser v. Twp. of Knowlton*, No. 3:17-cv-01174(PGS), 2018 WL 1586035, at *13 (D.N.J. Mar. 29, 2018) ("The Court ordinarily gives lawyers the benefit of the doubt and only reluctantly grants sanctions in extreme circumstances."); Douglas R. Richmond, *Alternative Sanctions in Litigation*, 47 N.M. L. REV. 209, 244 (2017) (noting that giving lawyer "the benefit of the doubt in close cases . . . is consistent with sanctions doctrine generally").

### 1. The Report Does Not Provide Evidence That Mr. Charles Knowingly Made False Statements.

26. The Report concluded that Mr. Charles' lapse in memory was not genuine because "[i]t is inconceivable that, in light of all the circumstances surrounding the call, Charles genuinely forgot about the phone call to Judge Thompson's chambers." Report at 20.

27. Although the Report does not identify what specific "circumstances of the call" made Mr. Charles' claim "inconceivable," they appear to consist of the following:

a. *Walker* was not assigned to Judge Thompson when *Walker* counsel first discussed calling Judge Thompson's chambers.

b. *Walker* was not assigned to Judge Thompson when Mr. Charles made the call.

c. There were several emails among *Walker* counsel regarding the best time of day to call Judge Thompson's chambers.

d. Mr. Charles reported the details of the call to *Walker* counsel by email.

e. No member of *Walker* counsel contacted the chambers of Chief Judge Emily Marks regarding the case after they learned that the case had been assigned to her.

f. *Walker* counsel thought that making the call was "obviously important at the early stages of *Walker*."

16

*Id.* at 19–20.

28.     With respect to *Walker* counsel's discussion and Mr. Charles' call occurring at a time when *Walker* was not assigned to Judge Thompson, the Report's findings show that this was not done in bad faith. The Report states that "*Walker* counsel mistakenly believed that, by marking *Walker* related to *Corbitt*, Judge Thompson would review the *Walker* complaint to determine whether it was indeed related to *Corbitt*." *Id.* at 18.  The Panel also found that *Walker* counsel did not become aware that the case had been assigned to Judge Marks until after Mr. Charles' call.  *Id.* at 19–20.  However, none of this bears on whether it is "inconceivable" that Mr. Charles could have forgotten the call.  The same is true of the fact that *Walker* counsel never contacted Judge Marks.  The Report provides no explanation why these circumstances made Mr. Charles' lapse of memory "inconceivable."

29.     To the extent the Report presumes that the call should have been memorable because there was a wrongful motive behind it, this is contradicted by the substance of the call itself.  Charles Decl. ¶ 73 (*Vague*, Doc. 80-16); Doc. 437-1 (Gunning Email).  There was nothing improper in this communication, nor was there anything particularly significant or memorable.  Charles Suppl. Decl. ¶ 108.  The Report does not present any reason to expect a brief call regarding procedural matters

to stand out in an attorney's memory among the events of the strenuous, hectic week of the filing of a major lawsuit.

30.    With respect to the discussions among *Walker* counsel prior to the call and Mr. Charles' email summarizing the call, nothing suggests that the call was particularly significant or memorable compared to the many calls made, emails sent, and tasks involved in filing *Walker*.  *Id.*  Had Mr. Charles thoroughly reviewed his emails prior to his testimony, he clearly would have remembered the call. However, the Panel failed to identify the call as significant prior to the hearing and, as discussed below, Mr. Charles did not believe he would be called to give testimony at the May 20, 2022 hearing, and so did not prepare by conducting such a review. *Id.* ¶ 81–83.

31.    Lastly, the Report's conclusion that the call was "obviously important" to *Walker* counsel is not supported by any citation to the record, nor is it a logical inference from the other circumstances identified above.  Report at 19.  None of the Report's factual findings suggest that there was any notable significance, importance, or priority given to the call by *Walker* counsel. To the contrary, Kathleen Hartnett, a lead decision-maker for *Walker* counsel, testified that the call was "just a kind of part of the normal business of the morning."  8/3/22 *Vague* Hr'g Tr. at 31.

32.    The circumstances cited in the Report fail to rise to the level of clear and convincing evidence or proof beyond a reasonable doubt that would demonstrate

it was truly "inconceivable" that Mr. Charles could have forgotten this call, or that it was "highly probable" that he knowingly made false statements to the Panel.

**2.    The Report Omits Relevant Evidence of Mr. Charles' Good Faith.**

33.    Additionally, other evidence that is not clearly apparent from the Report supports Mr. Charles' truthfulness.   The circumstances under which Mr. Charles' testimony was given are relevant to this Court's determination, particularly with respect to 18 U.S.C. § 1623.  *See Beckanstin*, 232 F.2d at 2 (noting that "[i]t is important to understand the setting in which the alleged perjured testimony was given in order to determine the real quality and import" of a witness's subsequently recanted testimony).

34.    Neither this Court's April 18, 2022 order nor the Panel's May 10, 2022 order mentioned the phone call to Judge Thompson's chambers as an area of concern or conduct that was subject to the Panel's investigation or potential sanction.

35.    In addition, prior to the hearing on May 20, 2022, Mr. Charles was advised by his counsel, Barry Ragsdale, that Mr. Ragsdale did not anticipate the Panel calling Mr. Charles to testify.  Charles Suppl. Decl. ¶ 81. Based on this belief, as well as the lack of notice provided by the Panel's initiating order, Mr. Charles did not seek to refresh his recollection by reviewing his emails, correspondence, or notes from the week of April 11, 2022. *Id.* ¶ 83.  For the same reason, Mr. Charles did not meet with Mr. Ragsdale to prepare in advance of his testimony. *Id.* ¶ 84.

36.     The initial proceeding on May 20, 2022 was unique, and uniquely stressful, in nature.  At the outset, the Panel warned that it would be inquiring into matters that could implicate the attorney-client privilege and the work product doctrine, making it clear that this was not a typical proceeding.  5/20/22 *Vaqgue* Hr'g Tr. at 12).

37.     As this Court has noted, Mr. Charles was asked whether he had made a call to a judge's chambers in several different ways.  The differences in how these questions were phrased were subtle, but substantively changed their meaning.  The initial questions asked specifically whether Mr. Charles had called or received a call from **the clerk's office** regarding the assignment of the case.  *Id.* at 178.  It is undisputed that Mr. Charles did not make or receive such a call from the clerk's office.

38.     Mr. Charles was next asked if he had "call[ed] anyone **about the assignment of the case**."  *Id.* at 179 (emphasis added).  Mr. Charles' call to Judge Thompson's chambers did not involve the assignment of the case, but only served to notify Judge Thompson's chambers of *Walker* being marked as related to *Corbitt* and the imminent filing of a motion for preliminary injunction.  Charles Decl. ¶ 73 (*Vague*, Doc. 80-16); Doc. 437-1 (Gunning Email); Charles Suppl. Decl. ¶¶ 28–31. Focused on the issue of case assignment raised in this line of questioning,

Mr. Charles still did not remember the call in the broad context of whether he called "anyone" about the case's assignment. Charles Suppl. Decl. ¶ 88.

39.     While subsequent questions broadened the scope to any call placed to chambers, the initial emphasis on case assignment—and the gravely worrying implication that Mr. Charles was suspected of misconduct for making the call— meant that Mr. Charles did not recognize that the Panel's line of questioning had changed until it was too late. *Id.* ¶¶ 95–99.  Once Mr. Charles remembered the call, he voluntarily corrected his testimony unprompted.  5/20/22 *Vague* Hr'g Tr. at 192; Charles Suppl. Decl. ¶¶ 101–102).  His swift correction of his testimony is evidence of his good faith. *See Beckanstin*, 232 F.2d at 4 (A witness's willingness to correct a misstatement is "potent" evidence that they did not have intent to give false testimony.).

40.     At the time the Panel questioned Mr. Charles, it was already in possession of the detailed summary email from Judge Thompson's law clerk.  8/3/22 *Vague* Hr'g Tr. at 129–131; Doc. 437-1 (Gunning Email).  It was thus aware of the call's substance and its purely procedural nature.  If the Panel had asked Mr. Charles directly if he had called a judge's chambers to notify them that *Walker* had been marked related to *Corbitt* or asked Mr. Charles if the law clerk's email was accurate, he would have remembered the call immediately.  Instead, the initial focus on calls with the clerk's office about who the case was being assigned to and on calls

inquiring about case assignment in the Panel's line of questioning did not jog Mr. Charles' memory in the same way.

> **3.** **The Weight of the Evidence Supports Mr. Charles' Claim of Mistake and Faulty Memory and Does Not Support a Charge of Perjury.**

41. The circumstances corroborate that Mr. Charles' testimony was the result of confusion about the questions, lack of preparation, and a faulty memory and was not a willful intent to provide false testimony.

42. First, Mr. Charles had no reason to lie about the phone call. There is no evidence that Mr. Charles thought his phone call to Judge Thompson's chambers was anything other than proper. At the time of the call, Mr. Charles believed that the case had not yet been assigned to a judge and shared *Walker* counsel's good faith belief that Judge Thompson would initially decide whether it was a related case. Report at 18. All the evidence supports the conclusion that the content of the phone call (informing the court of related case designation and impending TRO) was routine and not improper.

43. Second, it is undisputed that at the time of the phone call, Mr. Charles left his name and cell phone number with Judge Thompson's law clerk, and that Mr. Charles was aware that the law clerk "took down [his] phone number." Charles Suppl. Decl. ¶ 31; Doc. 437-2 at 2. Promptly after Mr. Charles called Judge Thompson's law clerk, he reported the call in a "Hi Team" email to dozens of other

*Walker* counsel.  8/3/22 *Vague* Hr'g Tr. at 95, 143; Charles Decl. ¶ 73 (*Vague*, Doc. 80-16); Doc. 437-2 at 2.

44.     In order to find that Mr. Charles was intentionally misleading the Panel, therefore, this Court has to find that he decided to knowingly lie to three federal judges about a routine phone call while knowing that Judge Thompson's law clerk made a record of the call that included Mr. Charles' name and personal cell phone number, and that Mr. Charles himself made a record of the call and distributed it to more than twenty other lawyers.  That means that if Mr. Charles hoped to possibly get away with lying, he would need all those written records to be overlooked and all those other lawyers would need to agree to also lie about the routine phone call. It seems very unlikely that Mr. Charles would intentionally lie to the Panel knowing that there was so much conflicting evidence and testimony that could prove him a liar.  It is much more likely that Mr. Charles was confused and forgetful when he initially denied making the phone call.

45.     In the face of this contradictory evidence, the factual findings contained in the Report fail to demonstrate a "high probability" that Mr. Charles knowingly made false statements to the Panel.  Because there is not clear and convincing evidence that Mr. Charles knowingly made a false statement to the Panel, sanctions under this court's inherent power cannot be imposed on that basis.  *See JTR Enters., LLC*, 697 F. App'x at 987.  Likewise, the Report's factual findings do not rise to the

level of proof beyond a reasonable doubt with respect to any sanctions under

18 U.S.C. § 1623.  *See* 18 U.S.C. § 1623(e); *Goodyear*, 581 U.S. at 108; *Liebowitz*,

6 F.4th at 285.

> **B.   Mr. Charles Did Not Violate 18 U.S.C. § 1623.**

46.     In addition to Mr. Charles' factual innocence and the insufficiency of

the evidence contained in the Report, two additional defenses apply with respect to

18 U.S.C. § 1623.  First, Mr. Charles promptly recanted and corrected his testimony,

triggering § 1623(d)'s bar to prosecution under that statute. Second, portions of

Mr. Charles erroneous testimony were still true, and as such he did not violate

§ 1623.

> **1.   Mr. Charles' Correction of His Erroneous Testimony Bars Prosecution Under 18 U.S.C. § 1623.**

47.     18 U.SC. § 1623(d) bars prosecution of witnesses who timely recant

their testimony:

> Where, in the same continuous court or grand jury proceeding in which
> a declaration is made, the person making the declaration admits such
> declaration to be false, such admission shall bar prosecution under this
> section if, at the time the admission is made, the declaration has not
> substantially affected the proceeding, [and] it has not become manifest
> that such falsity has been or will be exposed.

48.     The text of § 1623(d) states that it applies if "the declaration has not

substantially affected the proceeding, **or** it has not become manifest that such falsity

has been or will be exposed." (Emphasis added).  However, the former Fifth Circuit

has held that this "or" is read as meaning "and." *United States v. Scrimgeour*, 636 F.2d 1019, 1021 (5th Cir. Feb. 12, 1981). *Scrimgeour* remains binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981). Several other circuits have also reached this conclusion. *See, e.g., United States v. Verduzco-Contreras*, 899 F.2d 20 (9th Cir. 1990); *United States v. Fornaro*, 894 F.2d 508, 511 (2d Cir. 1990) (per curiam); *United States v. Scivola*, 766 F.2d 37, 45-46 (1st Cir. 1985*); United States v. Moore*, 613 F.2d 1029 (D.C. Cir. 1979); *United States v. Crandall*, 363 F. Supp. 648, 654-55 (W.D. Pa. 1973), *aff'd* 493 F.2d 1401 (3d Cir. 1974).

49.     The recantation defense "encourage[s] the discovery of truth in judicial and grand jury proceedings." *United States v. Denison*, 663 F.2d 611, 617 (5th Cir. 1981). "[T]he purpose of the statute is to encourage voluntary correction of false testimony, and it is only where the perjurer makes such a voluntary admission that he can claim the statutory bar to prosecution." *United States v. Denison*, 508 F. Supp. 659, 666 (M.D. La.), *aff'd,* 663 F.2d 611 (5th Cir. 1981).

### i.   The Testimony Did Not Have a Substantial Effect on the Proceeding.

50.     The first element of § 1623(d)'s bar to prosecution is that, at the time the recantation occurs, the recanted testimony "has not substantially affected the proceeding[.]" 18 U.S.C. § 1623(d).

51.     While there does not appear to be a bright-line rule defining a "substantial effect" for this purpose, the cases where it has been found have generally involved a substantial burden, delay, or need for additional effort as a result of false testimony given to a factfinder or accurate information withheld from a factfinder.

52.     Courts have found that recanted testimony has had a substantial effect where it "caused considerable additional work" for the tribunal.  *United States v. Wiggan*, 700 F.3d 1204, 1217 (9th Cir. 2012).  A substantial effect has also been found where perjured testimony significantly delayed or impeded a tribunal's proceedings, such as by depriving a grand jury of relevant evidence for an extended period of time or preventing a grand jury from indicting a defendant.  *See United States v. Crandall*, 363 F. Supp. 648, 654-55 (W.D. Pa. 1973); *United States v. Tucker*, 495 F. Supp. 607, 613 (E.D.N.Y. 1980).

53.     Mr. Charles corrected his erroneous testimony while he was still on the stand.  His testimony regarding the call to Judge Thompson's chambers appears on portions of pages 178 through 187 of the May 20, 2022 hearing transcript.  Mr. Charles' recantation appears on page 192.  The timeliness of Mr. Charles' correction weighs against a finding of substantial effect.  *See, e.g., Crandall*, 363 F. Supp. at 655 ("**Had Mr. Crandall recanted his statements immediately, perhaps not too much harm would have been done**, but, as he chose not to do so for a

period of two months, he is certainly in no position to complain that the declaration did substantially affect the proceeding." (emphasis added)).

54.     Any effect that the retracted testimony had on the Panel's proceeding fell short of being "substantial."  Because Mr. Charles corrected his testimony while he was still on the stand, the Panel was not required to conduct any additional investigation or call any additional witnesses regarding the veracity of Mr. Charles' statements, nor did any delay or need for additional effort result from the testimony. The Report does not give any indication that Mr. Charles' testimony affected the Panel's proceedings in any way.

55.     Because of Mr. Charles' timely recantation, his erroneous testimony did not substantially affect the Panel's proceeding, satisfying the first prong of 18 U.S.C. § 1623(d).

### ii.     At the Time of Mr. Charles' Recantation, Exposure Was Not Manifest.

56.     The second element of § 1623(d)'s bar to prosecution is that, at the time the recantation occurs, "it has not become manifest that such falsity has been or will be exposed."  18 U.S.C. § 1623(d).  Exposure is "manifest" where a witness has knowledge that their testimony's alleged falsity has been exposed or that such exposure is imminent.  *Tucker*, 495 F. Supp. at 614 (citations omitted).  Both the "substantial effect" and the "manifest exposure" elements must be satisfied for § 1623(d) to apply.  *Scrimgeour*, 636 F.2d at 1021.

57.     Courts have found that exposure had become manifest where a witness or their counsel had knowledge that the government believed the witness had lied. *United States v. Awadallah*, 202 F. Supp. 2d 17, 38 (S.D.N.Y. 2002); *Crandall*, 363 F. Supp. at 655.

58.     Courts have also found that exposure was manifest where a defendant had knowledge that contradictory testimony or other evidence had been presented to a factfinder or was known to the government. *United States v. Swainson*, 548 F.2d 657, 663 (6th Cir. 1977); *United States v. Kahn*, 472 F.2d 272, 283 (2d. Cir. 1973); *United States v. Fish*, No. 05-CR-228A, 2006 WL 3731292, at *5 (W.D.N.Y. 2006); *Awadallah*, 202 F. Supp. 2d at 38; *Tucker*, 495 F. Supp. at 613; *United States v. Mitchell*, 397 F. Supp. 166, 177 (D.D.C. 1974); *Crandall*, 363 F. Supp. at 655.

59.     The former Fifth Circuit's reasoning in *Scrimgeour* is illustrative here. In *Scrimgeour*, a grand jury witness gave false testimony at a proceeding in June 1977.  636 F.2d at 1024-25.  During the proceeding, the witness was twice warned that there were severe penalties for perjury and given the opportunity to change his testimony.  *Id*. at 1025.  In July 1977, the witness' counsel contacted a government attorney and mentioned the witness' possible perjury.  *Id*.  Subsequently, following another grand jury proceeding in September 1977, the witness' counsel called a government attorney and stated that the witness was aware that a different witness "had been a 'songbird' before the grand jury."  *Id*.  The following day, the witness'

counsel acknowledged the possibility of a perjury indictment, and the prosecutor stated that the witness was a target of the grand jury's investigation for an antitrust indictment. *Id.* In analyzing this sequence of events to determine when exposure became manifest, the Fifth Circuit concluded that:

> Knowledge that an antitrust indictment was probable demonstrates Scrimgeour's awareness that the Government had evidence that directly contradicted his false testimony. Further, Scrimgeour's attorney's statement to Government counsel about a possible perjury indictment manifests that Scrimgeour's false testimony had been exposed to the Government.

*Id.* The *Scrimgeour* Court's reasoning implicitly rejects the proposition that the warning regarding perjury that was given to the witness at the time of his perjured testimony was sufficient to make exposure "manifest."

60.     Another illustrative case is *United States v. Del Toro*, 513 F.2d 656 (2d Cir. 1975), *superseded by statute on other grounds*, 18 U.S.C. § 666. In *Del Toro*, a prosecutor warned a grand jury witness that he might be subject to prosecution for perjury and asked if the witness wished to change his testimony. *Id.* at 665. After the witness declined to do so, the prosecutor "conspicuously put some boxes of tape recordings on the table," which caused the witness to change parts of his testimony. *Id.* In evaluating whether the exposure of the falsehood was manifest, the court stated that "the prosecutor's placing of boxes of tape recordings on the table in the Grand Jury room should have indicated that **the time for recantation had come, or at least, did not have long to run.**" *Id.* at 666 (emphasis added).

61.     Here, there was no indication that the exposure of Mr. Charles' erroneous testimony was manifest.   The Panel's line of questioning—and particularly, Judge Proctor's question regarding Mr. Charles' phone number—led Mr. Charles to believe that he had forgotten a call that he made during the week of April 11, 2022, prompting him to search his memory. Charles Suppl. Decl. ¶ 100–101.   But belief alone is not sufficient—manifest exposure requires actual **knowledge**.   *See Tucker*, 495 F. Supp. at 614.   Even after being asked about his phone number, Mr. Charles did not have knowledge that the Panel believed he had lied, nor did he have knowledge that the Panel was or would be in possession of contradictory evidence.   *See Swainson*, 548 F.2d at 663; *Kahn*, 472 F.2d at 283; *Fish*, 2006 WL 3731292, at *5; *Awadallah*, 202 F. Supp. 2d at 38; *Tucker*, 495 F. Supp. at 613; *Mitchell*, 397 F. Supp. at 177; *Crandall*, 363 F. Supp. at 655.

62.     Rather, the Panel's line of questioning is akin to the warning given to a witness in *Scrimgeour* or the conspicuous display of evidence in *Del Toro*.   At most, these questions indicated that "that the time for recantation had come, or at least, did not have long to run"—and it was exactly at this moment that Mr. Charles withdrew and fully corrected his erroneous testimony.   *See Del Toro*, 513 F.2d at 666.   This is exactly the circumstance envisioned by the "manifest exposure" prong of 18 U.S.C. § 1623(d)'s recantation defense.

63.    Because Mr. Charles' swift correction of his erroneous testimony took place before the testimony had any substantial effect on the proceedings and before its exposure became manifest, § 1623(d)'s bar to prosecution applies here. It would be unwarranted to impose sanctions on this basis, particularly where Congress' intent in providing this statutory defense was to promote the discovery of truth.

### 2.    Portions of Mr. Charles' Challenged Testimony Were True

64.    As discussed above, some of Mr. Charles' responses in the testimony at issue were, in fact, true:

> JUDGE WATKINS: All right. Did you have any contact **with the clerk's office** about who the case was being assigned to? Did you receive a call or did you make a call?
>
> MR. CARL CHARLES: No, Your Honor, I did not make a call. No, Your Honor, I did not receive a call.
>
> . . .
>
> JUDGE WATKINS: Did you call anyone's chambers **about the assignment of the case**?
>
> MR. CARL CHARLES: No, Your Honor.
>
> . . .
>
> JUDGE WATKINS: So I've asked you the question. I'm going to ask you point blank: Are you telling us that you did not speak to any law clerk of any judge in the Middle District of Alabama concerning the Walker case **and the assignment of the case to that judge**?
>
> MR. CARL CHARLES: That is correct, Your Honor. I did not.

5/20/22 *Vague* Hr'g Tr. at 178–179, 184–185 (emphasis added).

65.     Although Mr. Charles did, in fact, call Judge Thompson's chambers, he did not do so regarding the assignment of *Walker*, nor did he ever make or receive a phone call from the clerk's office.  5/20/22 *Vague* Hr'g Tr. at 194–195; Charles Suppl. Decl. ¶¶ 28–31.  Such responses do not violate § 1623.  *United States v. Shotts*, 145 F.3d 1289, 1297 (11th Cir. 1998) ("An answer to a question may be non-responsive, or may be subject to conflicting interpretations, or may even be false by implication. Nevertheless, **if the answer is literally true, it is not perjury**." (emphasis added)) (citation omitted).

66.     Accordingly, to the extent that portions of Mr. Charles' testimony at issue were true, those responses cannot form the basis for a violation of 18 U.S.C. § 1623.

## VII.   CONCLUSION

Mr. Charles should not be sanctioned on the basis of his testimony regarding his call to Judge Thompson's chambers.  Although the Report rejects Mr. Charles' claim that he legitimately forgot the call, this conclusion is not supported by the clear and convincing evidence necessary to impose sanctions under a court's inherent powers—and is contradicted by evidence not mentioned in the Report.  Sanctions under 18 U.S.C. § 1623 would also be inappropriate because the Report's conclusions are not supported by proof beyond a reasonable doubt, Mr. Charles promptly corrected his erroneous testimony, and some of Mr. Charles' responses at

issue were true.  Accordingly, this Court should decline to impose sanctions on Mr. Charles.

Respectfully submitted,

*/s/ Barry A. Ragsdale*
Barry A. Ragsdale
Robert S. Vance
Dominick Feld Hyde, PC
1130 22nd Street South, Suite 4000
Birmingham, AL 35205
Tel.: (205) 536-8888
bragsdale@dfhlaw.com
rvance@dfhlaw.com

*/s/ W. Neil Eggleston*
W. Neil Eggleston
Byron Pacheco
Kirkland & Ellis LLP
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Tel.: (202) 389-5016
neil.eggleston@kirkland.com
byron.pacheco@kirland.com

*Counsel for Respondent*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 13, 2024, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will provide notice of such filing to all counsel of record.

/s/ <i>Barry A. Ragsdale</i>
OF COUNSEL
