## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **BRIANNA BOE,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-0184-LCB** |
| | ) | |
| **STEVE MARSHALL,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## BRIEF IN RESPONSE TO SUPPLEMENTAL ORDERS TO SHOW CAUSE BY JAMES ESSEKS, CARL CHARLES, AND LATISHA FAULKS

Respondents **James Esseks, Carl Charles, and LaTisha Faulks** ("these

Respondents") respond to this Court's Supplemental Orders to Show Cause (Docs.

478, 481, and 486), as follows:

### Introduction

Forum-shopping is sanctioned by our judicial system. It is as American
as the Constitution, peremptory challenges to jurors, and our dual
system of state and federal courts. . . .

The existence of these choices not only permits but indeed invites
counsel in an adversary system, seeking to serve his client's interests,
to select the forum that he considers most receptive to his cause. The
motive of the suitor in making this choice is ordinarily of no moment:
a court may be selected because its docket moves rapidly, its discovery
procedures are liberal, its jurors are generous, the rules of law applied
are more favorable, or the judge who presides in that forum is thought
more likely to rule in the litigant's favor.

. . . .

> In a perfect judicial system forum-shopping would be paradoxical. The same results would obtain in every forum and after every type of trial. But the actual litigation process is not a laboratory in which the same result is obtained after every test. In some situations, such as when a statute of limitations is involved, the choice of forum may determine the rule of law that will be applied. Even when legal rules are identical, justice can be obtained only through human beings, and neither judges nor jurors are fungible. In recognition both of this and of the nature of the adversary, client-serving process, we tolerate a certain amount of manipulation without inquiry into motive.

*McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1261–62 (5th Cir. 1983).

Consistent with the Court's instruction that Respondents must "address only those rules with which he or she has been charged with violating[,]" *see* Doc. 466 at 22, and the Court's issuance of Supplemental Orders to Show Cause on May 1, 2024, *see* Docs. 478, 481 and 486 (the "Supplemental Orders"), these Respondents each specify below the factual and legal reasons why they should not be sanctioned. For the Court's reference, these Respondents summarize their respective involvement in the *Walker* case as follows:

LaTisha Faulks, Legal Director of ACLU-AL, who relocated from South Carolina for the position in 2020, served as "local counsel" for the *Walker* team. Faulks Decl. ¶¶ 15–17.[1] Ms. Faulks had limited involvement in the case: she

---

[1] Citations to the Faulks Declaration, as well as the Esseks and Charles Supplemental Declarations, refer to the declarations submitted in response to the Supplemental Orders, attached to the 5/8/24 Notice of Filing (Doc. 492): Exhibit A, Esseks Supplemental Declaration; Exhibit B, Charles Supplemental Declaration; Exhibit C, Faulks Declaration.

2

handled on-the-ground matters such as hand-delivering the complaint; although she was included in the team's discussions and expected to provide strategic input, her contribution was limited due to her lack of local experience.  Faulks Decl. ¶ 17, 51; Esseks Suppl. Decl. ¶ 42.  Although she was a decisionmaker for her organization, ACLU-AL, she was not a key decisionmaker on strategic litigation decisions such as "where to file, who to name as defendants, which claims to pursue, or which plaintiffs to choose."  Faulks Decl. ¶ 17.  Specifically, although she fully agreed the team had sound basis to mark *Walker* as related to *Corbitt*, it was not "[her] call" to do so.  *Id.* ¶ 22.  She also had no firsthand knowledge of Mr. Charles's call to Judge Thompson's chambers, but was generally looped into discussions, and agreed with the decision because it was best practice in her experience to alert chambers to an incoming urgent motion.  *Id.* ¶ 28.  Nor did she have any role to play in the alleged coordination between the *Walker* and *Ladinsky* teams, because she did not participate in the relevant phone calls on April 13 or 15, 2022 at all.  *Id.* ¶¶ 30–32, 34, 36, 39.  Likewise, she had no direct involvement in client contact.  *Id.* ¶¶ 43, 48.

Carl Charles was a mid-level attorney at Lambda Legal during all relevant times.  Charles Suppl. Decl. ¶ 12.  As a member of a client contact group, he engaged in active and frequent communication with their clients through the preparation, filling, and dismissal of the *Walker* case.  *Id.* ¶¶ 116–23.  In addition, he assisted with discrete tasks, including calling to alert Judge Thompson's chambers of the soon-to-

be-filed motion for preliminary injunction / temporary restraining order.  *Id.* ¶ 89.

As a junior member of the team, Carl sometimes observed meetings where the leader group discussed strategies, but at no time did he have the authority to act solely on behalf of Lambda Legal on these issues.  *Id.* ¶ 12.  Specifically, he did not make the decisions that formed the basis for the Court's concern over judge shopping and coordination.   Nevertheless, he has personal knowledge about the discussions between the *Walker* and *Ladinsky* teams on April 13 and 15, 2022, and he has provided his knowledge to clarify the factual circumstances relevant to its concerns. *Id.* ¶¶ 41–45, 46–57.

James Esseks, Director of the ACLU's LGBTQ & HIV Project, oversaw the major strategies in the *Walker* case, such as the decision to designate *Walker* as related to the *Corbitt* case, and the decision to place the courtesy call to Judge Thompson's chambers regarding the forthcoming TRO motion.  Esseks Suppl. Decl. ¶¶ 6, 58–63.  He was not involved in more "on the ground" tasks such as client contact, though he was routinely apprised and updated regarding the same.  *Id.* ¶¶ 133, 138–142.  More broadly, Mr. Esseks made strategic litigation decisions based on his reasonable understanding of how court procedures worked in the Middle and Northern Districts of Alabama, or where there was no express rule or clear caselaw in those Districts, based on his decades of experience practicing around the country.  *Id.* ¶ 40.  His actions were those that a responsible attorney

could make, which means that they are not sanctionable under controlling Eleventh Circuit authority. In addition, as he and others have consistently testified, Mr. Esseks' and the *Walker* team's decisions were impacted by heightened time pressure and a lack of clarity regarding circumstances surrounding both the *Walker* and *Ladinsky* cases. *Id.* ¶ 89.

These Respondents sincerely regret that their litigation conduct raised concerns of improper "judge-shopping," which was not their intent. However, as demonstrated below, these Respondents did not, individually or as a group, engage in any violation of the ethical or other rules set forth in the Supplemental Orders.

## Argument

The Panel and this Court have stated that they are acting pursuant to the Court's inherent authority in this matter, and not pursuant to any other rule or statute. Final Report of Inquiry ("Report") at 2–4; Doc. 406 at 2. There are, of course, well-established constraints on a court's power to impose sanctions pursuant to its inherent authority. "Because the exercise of an inherent power in the interest of promoting efficiency may risk undermining other vital interests related to the fair administration of justice, a district court's inherent powers must be exercised with restraint." *Dietz v. Bouldin*, 579 U.S. 40, 48 (2016); s*ee also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion."); *Graham v. Wells Fargo Bank, N.A.*, No.

5

1:12cv1034-MHT, 2013 WL 3212296, at *14 (M.D. Ala. June 24, 2013) ("This court's inherent power to impose sanctions for actions taken in 'bad faith, vexatiously, wantonly, or for oppressive reasons' must be exercised with great caution, restraint and discretion." (quoting *Chambers*, 501 U.S. at 43–46)).

Because the exercise of inherent authority "is for rectifying disobedience," a court may exercise the power only "'to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223–25 (11th Cir. 2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013)).

Your Honor has recently observed that "'[b]ad faith' is defined as 'not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'" *Fletcher v. Ben Crump L., PLLC*, No. 5:21-cv-01433-LCB, 2023 WL 3095571, at *5 (N.D. Ala. Apr. 26, 2023) (Burke, J.) (ellipsis in original) (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)).

Finally, any finding of sanctionable conduct must be supported by clear and convincing evidence. *See JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 988–89 (11th Cir. 2017) (stating that a party failed to meet its "burden to prove

sanctionable conduct . . . by clear and convincing evidence"); *In re BellSouth Corp.*, 334 F.3d 941, 963 n.19 (11th Cir. 2003); *Fletcher*, 2023 WL 3095571, at \*5.

"Clear and convincing evidence is a 'demanding but not insatiable' standard, requiring proof that a claim is highly probable.  'Highly probable' is a standard that requires 'more than a preponderance of the evidence but less than proof beyond a reasonable doubt.'"  *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258–59 (11th Cir. 2013) (citation omitted).  In the context of attorney discipline, "clear and convincing evidence" means:

> [T]hat weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*In re Booker*, 611 F. App'x 834, 835 (5th Cir. 2015) (per curiam) (quoting *Crowe v. Smith*, 261 F.3d 558, 565 (5th Cir. 2001)).

## I.  THESE RESPONDENTS DID NOT ENGAGE IN BAD FAITH ATTEMPTS TO MANIPULATE THE RANDOM CASE ASSIGNMENT PROCEDURES.

The Supplemental Orders require Respondents to show cause why they should not be sanctioned "for attempting to manipulate the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama" as "set forth in Section V of" the Panel's Final Report of Inquiry.  Docs. 478 at 12; 481 at 13; 486 at 12.

The Panel's Report seems to imply bad faith in the assertion that "counsel took **surreptitious** steps calculated to steer *Walker* to Judge Thompson."  Report at 22 (emphasis added).  The Eleventh Circuit has noted that "surreptitious" means "secret and unauthorized; clandestine; action by stealth or secretly."  *United States v. Herring*, 993 F.2d 784, 786 (11th Cir. 1993) (en banc) (citation omitted).  It is undisputed, however, that *Walker* Counsel's challenged conduct was all done openly and in full view of the respective courts, from marking *Walker* as related to *Corbitt* on the publicly filed Civil Cover Sheet, to the telephone call to Judge Thompson's chambers in which Mr. Charles made sure to leave his name and cell phone number, to the filing of the Motion to Reassign the case to Judge Thompson once it was assigned to Judge Marks.  None of this conduct was "surreptitious" and none of it done in bad faith.

A.   **The Respondents Did Not Coordinate the Filing of Cases in Different Districts.**

The Panel made no finding that the *Walker* and *Ladinsky* teams coordinated the filings of the two cases in an effort to later decide which case to pursue.[2]  In fact, all evidence suggests that the two teams were in competition to have the first-filed

---

[2] The Panel did receive the unsworn remarks of an Alabama Assistant Attorney General who attempted through circumstantial "evidence" and inuendo to try to draw a connection between the two teams of lawyers with the intent to suggest that the two teams were coordinating in the filing of the two separate lawsuits.  5/20/22 Hr'g Tr. at 35–45, *In re Vague*, No. 22-mc-3977 (M.D. Ala.) ("*Vague*").  The effort was unsuccessful as it failed to show any collusion or collaboration between counsel and, instead, only showed that families of transgender children in Alabama had the same goal in challenging the legislation.  *See* Esseks Suppl. Decl. ¶¶ 23–25.

case and act as lead counsel in this litigation.  Esseks Suppl. Decl. ¶¶ 14–25 ("I believe each team was hoping to get its case filed first."); 8/3/22 *Vague* Hr'g Tr. at 18 (Ms. Hartnett: "Well, it's moving quickly because each of the groups want[] to be the first to . . . .  We're actually kind of doing a race to the courthouse here . . . ."); 7/26/22 Minter Decl. (*Ladinsky* team) ¶ 1 (*Vague*, Doc. 80-6) ("When Governor Ivey signed the bill, we wanted to be the first case filed so we filed our complaint right away, even though we had not yet completed our motion for a preliminary injunction."); 8/4/22 *Vague* Hr'g Tr. at 65 (Ms. Eagan (*Ladinsky* team): "I mean, that was a point that -- that's where we were really in some ways competing with each other because, again, it was all this -- I mean, when we filed Friday, that was a race to the courthouse to get our case on first.").  This is not a case, therefore, in which lawyers filed multiple identical cases and then dismissed any cases that were not assigned to a preferred judge, such as *In re Fieger*, No. 97-1359, 1999 WL 717991 (6th Cir. Sept. 10, 1999).

### B.    Respondents' Designation of *Walker* as Related to *Corbitt* Was Made in Good Faith and Was Plausible.

The Panel's Report preliminarily found that "*Walker* counsel marking *Walker* related to a case closed one year earlier decided by a 'favorable' judge" amounted to misconduct.  Report at 51.  The Panel did not cite to any statute, rule, or controlling caselaw that Respondents allegedly violated and exhaustive research has failed to uncover any reported instance in which a lawyer was sanctioned or even admonished

for "judge shopping" for indicating that a newly filed case was related to a previously filed case on the Civil Cover Sheet.[3]  In marking their case as related to *Corbitt*, Respondents breached no rule or established requirement of federal law.  *See* Fed. R. Civ. P. 83(b) ("No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement.").[4]

As noted in Respondents' Post-Hearing Memorandum of Law (Doc. 370), which is incorporated herein, the Eleventh Circuit addressed this issue in *In re BellSouth*, 334 F.3d 941, in which the court found that designating two cases as "related" on the Civil Cover Sheet is not impermissible judge shopping so long as the relatedness between the two cases was "plausible."  *Id.* at 951.

The Panel's Report does not take issue with the claim that *Walker* and *Corbitt* were plausibly related, noting that the lawyers "each testified that *Walker* counsel

---

[3] There are, however, a plethora of cases in which lawyers have been sanctioned or admonished for **failing** to indicate that a case was related on the Civil Cover Sheet.  In *In re Fieger*, 1999 WL 717991, for example, the lawyer was sanctioned under Rule 11 for failing to indicate on the Civil Cover Sheets that the thirteen identical actions that he simultaneously filed were related to one another.  *See also Stabler v. Transp. Ins. Co.*, Civ. A. No. 06-0237-WS-M, 2006 WL 6915489, at *2 nn.3–4 (S.D. Ala. July 24, 2006).

[4] There is no Local Rule in the Middle District setting forth a standard for marking a case as "related" on the Civil Cover Sheet.  The Middle District's Local Rule states only: "(a) Completed Civil Cover Sheet Required.  A completed civil cover sheet (Form JS-44) shall be submitted to the Clerk with the initial civil complaint or notice of removal filed in this Court by a litigant represented by counsel.  This requirement is solely for administrative purposes, and matters appearing in the civil cover sheet have no legal effect in the action."  M.D. Ala. LR 3.1.

had a good faith belief that *Walker* was related to *Corbitt* because of overlapping legal and factual issues between the two cases." Report at 17. Instead, the Panel found that designating the two cases as related was misconduct because *Corbitt* "was a closed case." *Id.*

Again, neither the Panel nor this Court's Supplemental Orders cite any statute, rule, or controlling caselaw that a case that is on appeal cannot be "related" to a newly filed case, or that such a case cannot be considered "pending." There is no Local Rule or caselaw in the Middle District setting forth a standard for marking a case as "related" or "pending" on the Civil Cover Sheet.[5]

Without a controlling rule or other definition of what it means for a case to be "pending," Respondents made a good faith determination that because *Corbitt* was: (1) currently pending on appeal; (2) likely to return to Judge Thompson on remand; and (3) still subject to an attorney's fee determination, that it was "pending" and could properly be the subject of a related case designation. As previously noted,

---

[5] The Middle District's Local Rule states only: "(a) Completed Civil Cover Sheet Required. A completed civil cover sheet (Form JS-44) shall be submitted to the Clerk with the initial civil complaint or notice of removal filed in this Court by a litigant represented by counsel. This requirement is solely for administrative purposes, and matters appearing in the civil cover sheet have no legal effect in the action." M.D. Ala. LR 3.1. Federal Rule of Civil Procedure 83 authorizes each district court to adopt its own local rules, and almost half of the districts have adopted rules defining what "related case" means. *See* Marcel Kahan & Troy A. McKenzie, *Judge Shopping*, 13 J. Legal Analysis 341, 346 (2021) ("Of the ninety-four ([94] judicial districts, only forty-six [46] have a written rule providing for the assignment of a new case 'related' to a prior case to the judge who hears (or heard) the prior case . . . ."). Thirty-nine (39) of the forty-six (46) districts with a written local rule (and thirteen of the other forty-eight districts) have "a rule providing at least some 'definition' of when a case is related." *Id.* at 347.

Respondents' decisions are supported by established caselaw in other contexts holding that an action is considered "pending" even if it is on appeal. *See Knights of the Ku Klux Klan Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 679 F.2d 64, 67–68 (5th Cir. 1982) ("Absent any legislative history to the contrary, an action is 'pending' so long as a party's right to appeal has not yet been exhausted or expired. The fact that a motion for attorneys' fees is the only matter pending before a court does not mean that court lacks jurisdiction or that the case is not 'pending.'" (citations omitted)).[6]  Further, some district courts have relied on precisely the same language on the Civil Cover Sheet to require counsel to disclose "related cases" that have been closed. *See Obert v. Republic W. Ins. Co.*, 190 F. Supp. 2d 279, 287–88 (D.R.I. 2002) ("It has been the long-standing practice of this Court to consider both related pending and prior cases as 'related cases.'"); Kahan & McKenzie, *supra*, at 347 n.14 ("Some districts explicitly treat a recently closed case as an earlier filed case for which related case status should be asserted.").  Other federal district courts have local rules that make clear that a case that is on appeal can still be considered a related case. *See, e.g.*, Rule 13(a)(2)(B) for the Division of Business Among

---

[6] *See also Mayhew v. Int'l Mktg. Grp.*, 6 F. App'x 277, 280 (6th Cir. 2001) (per curiam) ("As IMG acknowledges, 'an action is "pending" so long as a party's right to appeal has not yet been exhausted or expired.'" (citation omitted)); *Mendoza v. Blum*, 560 F. Supp. 284, 286–87 (S.D.N.Y. 1983) ("The definition of the term 'pending' includes those cases in which the appeal is still pending.  By analogy, cases in which the right to appeal has not yet been exhausted or expired also should be considered pending." (citations omitted)); *L.A. Draper & Son, Inc. v. Wheelabrator-Frye, Inc.*, 454 So. 2d 506, 508 (Ala. 1984) ("An action is deemed pending in federal court so long as a party's right to appeal has not yet been exhausted or expired.").

District Judges, Southern District of New York ("[C]ivil cases presumptively shall not be deemed related unless both cases are pending before the Court (or the earlier case is on appeal)[.]"); United States District Court for the Southern District of New York, Related Case Statement, www.nysd.uscourts.gov/sites/default/files/2019-11/related-case-statement-form-v10-1.pdf (last visited May 10, 2024) (requiring party filing assertedly related case to check a box to indicate whether the earlier-filed case is "Closed" or "Open" and, if "Closed," to "state whether there is an appeal pending").

In the absence of a Local Rule, federal law, or controlling court decision holding that a case pending on appeal cannot be marked as "related" on the Civil Cover Sheet, and in light of the fact that some other federal district courts explicitly provide that a case on appeal is "pending," Respondents marking *Walker* as related to *Corbitt* was done in good faith and cannot be labeled as misconduct or subject Respondents to sanction. *See* Fed. R. Civ. P. 83(b).[7]

## C.   The Telephone Call to Judge Thompson's Chambers Was Not Improper or Sanctionable.

The Panel's Report preliminarily found that "*Walker* counsel contacting the chambers of Judge Thompson (who was never assigned to *Walker*) to directly or

---

[7] In addition, marking *Walker* as related to *Corbitt* is not manipulation of the random assignment of cases because it could affect case assignment only if Chief Judge Marks agreed with that designation and directed that *Walker* be assigned to Judge Thompson. At that point, it would be a court order that affected the assignment, not counsel's designation on the Civil Cover Sheet.

indirectly influence or manipulate assignments away from Chief Judge Marks to Judge Thompson" amounted to misconduct.  Report at 51.  The Panel does not cite any statute, rule, or caselaw that renders the phone call sanctionable.

Traditionally, calls to chambers are not improper so long as they do not discuss the merits of the case.  *See United States v. Feneziani,* No. 05-CR-290A, 2007 WL 2176490, at *3 (W.D.N.Y. July 27, 2007) ("Nor does the *ex parte* communication between the government and the Court's law clerk require recusal. . . .  Such a communication was procedural in nature and did not affect the merits.  Thus, it was not improper."); *AIG Baker Shopping Ctr. Props., LLC v. Deptford Twp. Plan. Bd.*, No. Civ. A. 04-5849FLW, 2006 WL 83107, at *13 (D.N.J. Jan. 10, 2006) (denying motion to recuse based on alleged *ex parte* phone call to judge's chambers, because "[s]uch 'purely procedural' calls 'in no way bear on the merits of the proceeding[s]' to which they are related" and "are commonplace elements of the modern practice of law" (second set of brackets in original) (citation omitted)).

The Panel opined that the call to Judge Thompson's chambers was improper because *Walker* was not assigned to Judge Thompson.  Report at 19.  The evidence is undisputed, however, that, at the time the call was made to Judge Thompson's chambers, Respondents had a good faith belief (1) that the case had not yet been assigned to any judge (Report at 19; Esseks Suppl. Decl. ¶ 58; Charles Suppl. Decl. ¶ 24 ("However, we were not aware that the case had been assigned to any Judge in

the Middle District, nor assigned a case number.")), and (2) that the related case designation meant that Judge Thompson would initially determine whether to accept the case as related to *Corbitt*.   Report at 18, 22; Esseks Suppl. Decl. ¶¶ 56, 58; Charles Suppl. Decl. ¶¶ 17, 24, 27 ("Although the case had not received a judge assignment at that point, the team believed, based on its research in the past two years, that the case would initially be in Judge Thompson's chambers for a determination on relatedness.").   It is also undisputed that the content of the call— reflected in two separate but virtually identical emails—was not improper on its face. As the Panel noted, "[c]alling chambers to alert a judge to an upcoming motion for emergency relief might be innocent and even helpful."  Report at 19.

At a minimum, this means that Respondents cannot be sanctioned for attempting to "manipulate assignments away from Chief Judge Marks to Judge Thompson" because they were unaware that the case had been assigned to Judge Marks.  Charles Suppl. Decl. ¶ 29 ("[N]either I nor anyone on the *Walker* team knew before the call, at the time I made the call, or indeed until at least 30 minutes after I reported a summary of the call, that the case had been assigned to Chief Judge Marks."); Esseks Suppl. Decl. ¶ 60 ("After Mr. Charles had already spoken to Judge Thompson's chambers, and after *Walker* counsel learned from the M.D. Alabama clerk's office about the need to file a motion to transfer, I learned that *Walker* had been assigned to Chief Judge Marks.").  Further, in his call to chambers, Mr. Charles

did not stray from the helpful and proper purposes of informing Judge Thompson that *Walker* had been marked as related to *Corbitt* and that an emergency motion for a TRO was soon to be filed.  8/1/22 Charles Decl. ¶ 73 (*Vague*, Doc. 80-16); Charles Suppl. Decl. ¶¶ 27–28.  There is no evidence that Charles used that call to "lobby" Judge Thompson's law clerk or otherwise tried to influence or manipulate the assignment of *Walker*.

The Panel's report places great significance on the fact that *Walker* Counsel did not place a similar call to Judge Marks' chambers once she was formally assigned the case.  Report at 20.  As explained by Mr. Esseks, by the time that *Walker* Counsel learned that the case had been assigned to Judge Marks, they had also learned of their misunderstanding of the related-case process.  That meant that *Walker* Counsel had an unexpected motion to reassign to draft in short order.  In the midst of this extra work and the realization that they had misunderstood the applicable procedures, Mr. Esseks did not think of having someone call Chief Judge Marks' chambers.  Esseks Suppl. Decl. ¶¶ 65–67.  In addition, *Walker* Counsel were much closer to filing their motion for injunctive relief and a "heads up" call to chambers was much less needed.  8/3/22 *Vague* Hr'g Tr. at 197–98.

Finally, in order for the phone call to chambers "to influence or manipulate" the assignment of *Walker*, it would have required Judge Thompson or Judge Marks, or both, to agree that *Walker* was sufficiently related to *Corbitt* to have it assigned to

Judge Thompson. At that point, it would be a court action and not the phone call that would have decided the assignment.

The telephone call to Judge Thompson's chambers does not constitute misconduct and should not expose Respondents to sanctions.

### D. Respondents Did Not Improperly Attempt to Manipulate the Random Case Assignment Process in the April 13 Call with *Ladinsky* Counsel.

The Panel's Report made a preliminary finding that "*Walker* counsel attempt[ed] to persuade *Ladinsky* counsel to transfer the latter case to the Middle District to be before Judge Thompson." Report at 51.[8] Again, the Panel did not cite any statute, rule, or caselaw making such an alleged conversation between counsel sanctionable. It remains unclear what statute, rule, or caselaw would be violated by counsel engaging in a discussion about potential legal strategy that was never acted upon, and which could not possibly affect the random assignment of cases.[9]

The Panel's finding is not supported by the evidence, much less clear and convincing evidence. The primary problem with this preliminary finding of

---

[8] The Panel's Report appears to credit testimony from a member of the *Ladinsky* team (Mr. Orr) that the purpose of an April 13, 2022 call between the *Walker* and *Ladinsky* teams was to "drum up support for *Ladinsky* counsel transferring their case to the Middle District and proceeding before Judge Thompson[.]" Report at 24. As described further below, although Mr. Esseks and Mr. Orr remember the call differently, neither version evidences any manipulation of the random assignment procedures.

[9] This issue was not identified as an area of concern by either this Court's April 18, 2022 order or the Panel's order of May 20, 2022, so that Respondents had no advance notice that this conduct could subject them to sanctions until after the Panel issued its Report on October 3, 2023.

misconduct by the Panel, however, is that even if it were supported by clear and convincing evidence it is not manipulation of the random case assignment procedures.  Whatever was discussed between the two teams that evening, neither team resisted Chief Judge Marks' show cause order or ever pursued the argument that *Walker* should remain in the Middle District.

The Panel's Report acknowledges that *Walker* Counsel's stated purpose for the April 13 call was to inform *Ladinsky* Counsel that the *Walker* team was considering advancing the argument that because *Walker* had filed a motion for injunctive relief it was further along than *Ladinsky* and should therefore be considered as first-filed for purposes of Judge Marks' recent order to show cause. Report at 23; 8/3/22 *Vague* Hr'g Tr. at 212.[10]  Because *Walker* Counsel was concerned about how this argument would be received by the *Ladinsky* team, *Walker* Counsel requested a call with *Ladinsky* Counsel to let them know about it.  *Id.*

The Panel's Report focuses on the recollection of one participant in that April 13 call[11]—Asaf Orr of the *Ladinsky* team—that "the purpose of the call was to

---

[10] *See Synthes, Inc. v. Knapp*, 978 F. Supp. 2d 450, 455 (E.D. Pa. 2013) ("Although its application is typically the norm, the first-filed rule is not applied rigidly.  Exceptions, though rare, do exist," including that "the later-filed action has developed further than the first-filed action." (citations omitted)).

[11] The Panel's Report states that Michael Shortnacy testified similarly regarding a second call on April 13, 2022.  Report at 25–26.  However, as clarified by Mr. Esseks, only a single call took place that day between the *Walker* and *Ladinsky* team members identified in the Panel Report's discussion.  Esseks Suppl. Decl. ¶ 74, n.2.

determine whether or not the *Ladinsky* team would consent to [transfer to the Middle District] or at least indicate agreement with [*Walker* Counsel's] position." 11/3/22 *Vague* Hr'g Tr. at 24–25.[12]  Mr. Orr's recollection of the conversation is different than Mr. Esseks' and Mr. Charles' recollection.  Esseks Suppl. Decl. ¶¶ 74–75. Mr. Esseks does not recall any effort by *Walker* Counsel to persuade *Ladinsky* Counsel to transfer their case to the Middle District.  To the contrary, *Walker* Counsel was still trying to find a way of keeping the cases separate, while keeping *Walker* in the Middle District.  *Id.*

Mr. Esseks' recollection is confirmed by the declaration of Diego Soto, another member of the *Ladinsky* team.  In his declaration, Mr. Soto states that "I learned [on the call] that the *Walker* team planned to argue, in response to Chief Judge Marks's show cause order, that *Ladinsky* **could** be transferred to the Middle District and consolidated with *Walker* before Judge Thompson." 7/27/22 Soto Decl. ¶ 8 (*Vague*, Doc. 80-6) (emphasis added).  Mr. Soto's testimony is consistent with Mr. Esseks' testimony that *Walker* Counsel may have discussed how *Ladinsky* **could** be transferred to the Middle District, not that it **should** be transferred.  Esseks Suppl. Decl. ¶ 76.  Further, Mr. Soto made clear later in his declaration that the "*Walker*

---

[12] Prior to testifying before the Panel, Mr. Orr submitted a sworn declaration stating that, **"[a]lthough I can no longer recall the specifics of the [April 13] conversations,"** the purpose of that call was for *Walker* Counsel to explain that they were contemplating responding to Judge Marks' order to show cause by arguing that "judicial economy" favored transferring *Ladinsky* to the Middle District.  7/27/22 Orr Decl. ¶ 14 (*Vague*, Doc. 80-6) (emphasis added).

team thought that it would be ideal for both cases to proceed independently in their separate courthouses."  7/27/22 Soto Decl. ¶ 14 (*Vague*, Doc. 80-6).

It is important to note that, at the time this call took place on April 13, this Court had not yet been assigned either *Walker* or *Ladinsky*, so that nothing on that call had (or could have had) anything to do with trying to steer the case away from this Court.

But the core point is that, regardless of whether the Court credits Mr. Orr's recollection of what happened on that call, or Mr. Esseks' and Mr. Charles' recollection, the call did not result in any manipulation of the random case assignment procedures, or any attempt at such, because *Walker* Counsel ultimately consented to the transfer to the Northern District.

Thus, even if there was an effort to convince *Ladinsky* Counsel to agree to transfer their case (there was not), the phone call is not evidence of any sanctionable misconduct.

E.     **The Decision to Dismiss *Walker* Pursuant to Rule 41 Was Made in Good Faith and Is Not Sanctionable.**

The Panel made a number of preliminary findings related to Respondents' decision to voluntarily dismiss *Walker*.  The Panel's Report preliminarily found that respondents (1) "coordinat[ed] the dismissal of the *Walker* and *Ladinsky* cases after their assignment to Judge Burke, and then [made] it clear that the case would be refiled when commenting to the media about re-filing"; (2) "engag[ed] in numerous

and wide-ranging discussions about how judges were favorable or unfavorable <u>in the context</u> of deciding whether to dismiss and refile their cases"; (3) "suddenly dismissing *Walker* and *Ladinsky* after a series of phone conferences in which counsel discussed . . . their prospects in front of Judge Burke and that he was a bad draw"; and (4) "abruptly stopping their pursuit of emergency relief, and deciding to dismiss and refile a case in the Middle District with brand new plaintiffs." Report at 51 (emphasis added). The Panel cited no statutes, rules, or established caselaw making these actions by Respondents sanctionable misconduct.[13]

First, it is important to reiterate that, to the extent that the comments made to the media about re-filing are a concern, those comments were not made by these Respondents or any of the *Walker* team of lawyers.[14] Charles Suppl. Decl. ¶ 46; Esseks Suppl. Decl. ¶ 93; Faulks Decl. ¶ 33.

Second, it is undisputed that *Walker* Counsel had a good faith belief that they had an unfettered right to dismiss *Walker* pursuant to Rule 41(a)(1)(A)(i). 7/27/22 Borelli Decl. ¶ 38 (*Vague*, Doc. 80-13); Charles Suppl. Decl. ¶ 75; Esseks Suppl.

---

[13] Although listed as separate acts of misconduct, all these findings fall under the umbrella of whether the Rule 41 dismissal of *Walker* constituted sanctionable judge shopping. The discussions between counsel cannot be misconduct unless the subsequent dismissal is found to be sanctionable. Respondents have previously addressed the Rule 41 issue in their Post-Hearing Memorandum of Law (Doc. 370) which is incorporated herein.

[14] From the very inception of this matter, there has been the erroneous implication that *Walker* Counsel were at least jointly responsible for these media comments. *Walker*, Doc. 24; *Boe*, Doc. 338. Although these Respondents do not believe that these media comments were improper, they are not responsible for them.

Decl. ¶¶ 84, 98; *see* Faulks Decl. ¶ 47.  That good faith belief was based on the established interpretation of Rule 41 that it gives plaintiffs the "right to one free dismissal."  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397–98 (1990).

Third, *Walker* Counsel did not participate in the filing of *Eknes-Tucker* or any other case following the dismissal of *Walker*.  *See* Charles Suppl. Decl. ¶ 69; *see* Esseks Suppl. Decl. ¶ 104; 7/27/22 Hartnett Decl. ¶¶ 15, 16 (*Vague*, doc. 80-12).  It is undisputed that *Walker* Counsel filed a single case on a Monday and voluntarily dismissed it the following Friday, without ever filing a second case raising the same or similar claims in another forum.[15]  Almost two years of exhaustive research has failed to uncover any reported instance in which a lawyer has been sanctioned or found to have engaged in improper judge shopping for filing and voluntarily dismissing **a single case**, without refiling a second, similar one.

Federal Rule of Civil Procedure 41 gives plaintiffs an unrestricted and unconditional right to voluntarily dismiss their case.  *See Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1264–65 (11th Cir. 2021) ("Relevant here is Rule 41(a)(1)(A)(i), which 'means precisely what it says.'  The Rule's text plainly grants a plaintiff the right to dismiss—without a court order—'an action' prior to a defendant serving 'either an answer or a motion for summary judgment.'"

---

[15] This Court appears to have tentatively agreed that any "judge shopping" by *Walker* Counsel ended once it was decided that they would not refile.  3/19/24 *Boe* Hr'g Tr. at 46–47.

(citations omitted)); *Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*, 506 F.2d 914, 915 (5th Cir. 1975) ("[Rule] 41(a)(1) on its face grants a plaintiff an unconditional right to dismiss his complaint . . . . [We decline] to narrow the express parameters of this right . . . ."); *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114–15 (2d Cir. 2009) ("Dismissal of a suit may be disruptive and annoying, but it is permitted by the rules . . .  It follows that [plaintiff] was entitled to file a valid Rule 41 notice of voluntary dismissal for any reason, and **the fact that it did so to flee the jurisdiction or the judge does not make the filing sanctionable**." (emphasis added) (citation omitted)); *see also United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 n.4 (2023) (Where "dismissal is sought before an answer is filed," "Rule 41 entitles the movant to a dismissal; the district court has no adjudicatory role[.]").

The courts have also held that "[c]ourt-ordered sanctions should be neither 'a consequence' of a voluntary dismissal without prejudice nor a 'condition' placed upon such dismissal." *Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287, 292–93 (5th Cir. 2016) (quoting *Cooter & Gell*, 496 U.S. at 396–97).  In rejecting sanctions for voluntary dismissals under Rule 41(a)(1)—even assuming they were made for the purpose of forum or judge shopping—courts have made clear that the "reason for the dismissal is irrelevant under Rule 41(a)(1)."  *Adams v. USAA Cas. Ins. Co.*,

863 F.3d 1069, 1080–81 (8th Cir. 2017); *see Bechuck*, 814 F.3d at 293 ("Rule 41(a)(1)(i) essentially permits forum shopping." (citation omitted)).

This Court has recognized that "the Eleventh Circuit doesn't have clear guidance" on whether parties can dismiss a case based solely on concerns about the forum or the judge.  3/19/22 *Boe* Hr'g Tr. at 61.[16]  This, in itself, is a strong indicator that Respondents' decision to dismiss was not made in bad faith.

As noted previously, Rule 41 has built-in safeguards to protect against its misuse.  Those safeguards are premised on the filing of **a second action** following a plaintiff's voluntary dismissal.  For example, the courts have uniformly held that costs may not be imposed pursuant to Rule 41(d) unless a second, similar action is filed after the dismissal of a case pursuant to Rule 41(a).  *See Sargeant v. Hall*, 951 F.3d 1280, 1287 (11th Cir. 2020) ("[T]he conduct that Rule 41(d) seeks to deter is the filing of the second action."); 8 James Wm. Moore *et al.*, *Moore's Federal Practice—Civil* § 41.70 (3d ed. 2024) ("Rule 41(d) does not permit an award of costs unless a second action has been commenced.").

Where a dismissal is not followed by the filing of a second case there are no concerns that a party used Rule 41(a) to engage in impermissible judge shopping.

---

[16] However, binding Fifth Circuit precedent characterizes the right to dismiss as "unconditional." *Pilot Freight Carriers,* 506 F.2d at 915; *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (Fifth Circuit decisions issued before October 1, 1981 "shall be binding precedent in the Eleventh Circuit[.]").

"One instance of an action that complied with [Rule 41] cannot, on its own, amount to judge-shopping." *Fried v. Town of Vienna*, No. 1:11cv992 (JCC/TRJ), 2011 WL 5326050, at *2 (E.D. Va. Nov. 4, 2011).

Finally, although the Panel criticizes the dismissal of *Walker* considering counsel's belief that "time was of the essence" (Report at 51), it is undisputed that the effective date of the legislation was still three weeks away and the dismissal did not result in any significant delay. The *Ladinsky* team managed to file *Eknes-Tucker*, and this Court was able to hold a hearing and then enjoin the enforcement of the legislation, which protected not only the plaintiffs in *Eknes-Tucker* but also the plaintiffs in *Ladinsky* and *Walker*.

*Walker* Counsel filed a single case and then exercised their "unconditional right" to dismiss *Walker* pursuant to Rule 41(a)(1)(A)(i), followed by the decision not to file (or refile) a second case. This was entirely within their rights under the rules and is not misconduct. *Walker Counsel* cannot have engaged in improper "judge shopping" where they decided not to "shop" at all, but voluntarily left the courthouse and never returned.[17]

---

[17] Although *Walker* Counsel briefly considered filing (or refiling) a new case with *Ladinsky* Counsel, they quickly decided against it, and they cannot be held responsible for the subsequent decision of *Ladinsky* Counsel to file *Eknes-Tucker* "in the Middle District with brand new plaintiffs[.]" Report at 51. Of course, if *Walker* Counsel had refiled a new case, they may have filed it in the same district and division where *Walker* was pending when it was dismissed and the case would almost certainly have been assigned to this Court where there would be no question of judge shopping.

## II.   *WALKER* COUNSEL DID NOT VIOLATE THEIR PROFESSIONAL RESPONSIBILITIES TO THEIR CLIENTS.

Respondents have been ordered to "show cause why [they] should not be sanctioned for failing to seek or secure [their] clients' consent" prior to dismissing the *Walker* complaint without prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(i).  Docs. 478 at 14; 481 at 15; 486 at 14.  Although this issue was not the subject of a preliminary finding of misconduct in the Panel's Report, the Panel observed that "*Walker* counsel did not request permission to dismiss from their clients, or even inform their clients of the dismissal until after it was filed."  Report at 40–41.[18]

There is no basis, in fact or law, to find misconduct or to sanction Respondents for breaching any duties owed to their clients regarding the voluntary dismissal of *Walker*.  As explained below, Respondents' conduct is entirely consistent with the Alabama and American Bar Association ("ABA") rules cited in the Supplemental Orders.

The Supplemental Orders appear to be premised on the assumption that the professional conduct rules required Respondents to expressly discuss dismissal with their clients before dismissing *Walker* without prejudice.  They do not, as there is no

---

[18] This issue was not identified in this Court's April 18, 2022 order or in the Panel's May 10, 2022 order as an area of concern or as involving conduct that could subject Respondents to sanction, and therefore cannot be the basis for sanctions now.  *See In re Gillespie*, No. 23-1819, 2023 WL 7548181 (4th Cir. Nov. 14, 2023) (per curiam).

rule that an attorney must obtain client consent prior to dismissing a complaint without prejudice. To the contrary, attorneys are impliedly authorized to take actions consistent with their client's objectives, including a voluntary dismissal that does not prejudice their client's ability to pursue their claims further. Put simply, because Respondents had the implied authority to dismiss *Walker* without prejudice, there was no duty to confirm that authority with their clients prior to doing so. Further, the evidence establishes that *Walker* Counsel were diligent in timely communicating with and informing their clients of case developments.

Below we summarize the relevant evidence and address in turn each of the authorities cited in the Supplemental Orders: (i) Alabama Rule of Professional Conduct 1.2(a) and ABA Model Rule 1.2(a); (ii) Alabama Rule of Professional Conduct 1.4 and ABA Model Rule 1.4; (iii) Alabama Rule of Professional Conduct 1.3 and ABA Model Rule 1.3; and (iv) Federal Rule of Civil Procedure 11. *See* Docs. 478 at 5–10, 14; 481 at 5–10, 15; 486 at 5–10, 14 (citing and finding that certain Alabama and ABA Model Rules apply to "Attorney-Client Duties").

## A.     Background and Relevant Testimony.

By way of brief overview, *Walker* Counsel understood that their clients' objective was to advance the cause of protecting access to healthcare for transgender adolescents in the face of bans on such healthcare that were considered by the Alabama Legislature in 2020 and 2021, and later adopted by SB 184 in April 2022.

Charles Suppl. Decl. ¶ 117; Esseks Suppl. Decl. ¶ 130.  Accordingly, *Walker* Counsel had a good faith belief that they were authorized by their clients to make strategy and procedural decisions to advance that cause.  Esseks Suppl. Decl. ¶ 132; *see* 5/20/22 *Vague* Hr'g Tr. at 113 (Nowlin-Sohl testimony: "[T]he decision was made with the understanding that something would be done to challenge this law[.]"); *see* 8/3/22 *Vague* Hr'g Tr. at 76, 77 (Hartnett testimony: "[W]e ha[d] authority to generally make litigation decisions in their best interest[.] . . .  We were just voluntary dismissing [the claim].").  *Walker* Counsel understood that their clients were willing to serve as plaintiffs in a lawsuit challenging SB 184 as a means of achieving that broader objective.  Esseks Suppl. Decl. ¶ 130; *see* Charles Suppl. Decl. ¶¶ 117–16.  In addition to counseling and communicating with the clients before filing the lawsuit, from April 11, 2022, when *Walker* was filed, until April 15, 2022, when it was voluntarily dismissed, *Walker* Counsel communicated with their clients by phone and email regarding the procedural developments.  Charles Suppl. Decl. ¶¶ 119–21; Esseks Suppl. Decl. ¶ 139.  And although *Walker* Counsel did not consult their clients immediately before filing the notice of voluntary dismissal, they spoke with their clients the same evening within hours after filing it.  Charles Suppl. Decl. ¶¶ 121–22; Esseks Suppl. Decl. ¶ 141; 5/22/20 *Vague* Hr'g Tr. at 120 (Nowlin-Sohl testimony: "My understanding is that they were consulted, but maybe immediately after[.]").

*Walker* Counsel believed that it was necessary to move quickly, before the opportunity to dismiss the case under Rule 41(a)(1)(A)(i) was foreclosed by the defendants' filing of an answer, or before having to appear for a court-ordered status conference at 10 a.m. the next business day.  Charles Suppl. Decl. ¶¶ 51–52; Esseks Suppl. Decl. ¶¶ 135–36.  *Walker* Counsel also understood that the dismissal would be without prejudice and would not bar the clients from refiling.  7/27/22 Borelli Decl. ¶ 38 (*Vague*, Doc. 80-13); Charles Suppl. Decl. ¶ 124; Esseks Suppl. Decl. ¶ 137.  On the evening of April 15, *Walker* Counsel spoke with the clients regarding the voluntary dismissal, and thereafter, during continued consultation over the weekend, *Walker* Counsel discussed potentially refiling the lawsuit with the clients, and made the decision not to do so, believing that other plaintiffs would file a lawsuit and that the *Walker* clients' objectives would best be served by securing relief as a result of that separate lawsuit, rather than by filing an additional one.  Charles Suppl. Decl. ¶¶ 68, 121–24; Esseks Suppl. Decl. ¶ 142.

As the Panel recognized, not every member of *Walker* Counsel had a direct role in communicating with or counseling the clients.  5/20/22 *Vague* Hr'g Tr. at 20. Among the *Walker* Counsel that remain as Respondents in this matter, Mr. Charles was one of several members of *Walker* Counsel primarily responsible for liaising with the clients; Mr. Esseks and Ms. Faulks were not.  Charles Suppl. Decl. ¶ 118; Esseks Suppl. Decl. ¶ 131; 5/20/22 *Vague* Hr'g Tr. at 169 (Judge Watkins: "[W]ere

you the client contact for any of these plaintiffs in the *Walker* case?"  LaTisha Faulks: "No, Your Honor.  I believe that Kaitlin Welborn would have been the ACLU of Alabama representative.  And to my knowledge and understanding, she was primarily responsible for specific plaintiffs, not all of the plaintiffs.").  The Panel queried several members of *Walker* Counsel on interactions with their clients, including regarding voluntary dismissal and the decision not to refile a lawsuit.  Three consistent points emerged from that testimony: (i) outreach and client counseling began years earlier, and was ongoing throughout the week between the Monday when the *Walker* complaint was filed and the Friday it was dismissed; (ii) *Walker* Counsel believed that dismissal without prejudice to allow more time to consider next steps was consistent with the clients' overall objectives; and (iii) *Walker* Counsel believed they were authorized to voluntarily dismiss the case without prejudice to their clients.

**1.    Testimony Before the Panel.**

**Carl Charles** was a senior attorney with Lambda Legal working on the *Walker* case.  He was not a high-level decisionmaker but did have input into strategy. Mr. Charles was involved firsthand with contact with the clients, particularly the White family.  Mr. Charles testified before the three-judge Panel regarding client communications surrounding the dismissal of *Walker* as follows:

> JUDGE WATKINS: Right.  Okay.  Did you consult with them before you-all agreed to dismiss the case?

30

MR. CARL CHARLES: We spoke with them immediately after that decision, your Honor.

JUDGE WATKINS: You told them after?

MR. CARL CHARLES: Immediately after.  Yes.

JUDGE WATKINS: Did you have authority to dismiss the case without their approval?

MR. CARL CHARLES: We had been -- we had been in talks in the day immediately preceding about how the case had been moving.

JUDGE WATKINS: Immediately preceding the day the case was with Judge Axon?

MR. CARL CHARLES: Yes, Your Honor.  And communicated with them that --

JUDGE WATKINS: I'm sorry.  Let me be clear about that.  We're talking about the Walker case.  The Ladinsky case, the first filed case, was with Judge Axon.

MR. CARL CHARLES: Oh.  It would have been Judge Marks, then, Your Honor.

JUDGE WATKINS: Yes.  You were still with Judge Marks.

MR. CARL CHARLES: Yes, Your Honor.  And the plaintiffs -- we explained that at that time that we were -- you know, we had updated the clients on what was happening.  And we explained to them that we were not certain what would happen the following day but communicated what we expected would happen.

5/20/22 *Vague* Hr'g Tr. at 180–181.

As evident from the testimony above, the original questioning of Mr. Charles about whether *Walker* Counsel had authority to dismiss was incomplete.  The

questioning shifted to a different topic before Mr. Charles could answer the Panel's

question on authority.  Mr. Charles also testified at the August 3, 2022 hearing about

client communications regarding dismissal as follows:

> JUDGE PROCTOR: Okay.  Now, were you involved in communicating with clients about progress in the case, updates in the case?
>
> MR. CHARLES: I was, Your Honor.
>
> JUDGE PROCTOR: To your knowledge, did you -- Well, first of all, did you consult with clients before the decision to dismiss was made?
>
> MR. CHARLES: I did not, Your Honor.
>
> JUDGE PROCTOR: To your knowledge, did anyone else do so?
>
> MR. CHARLES: Not to my knowledge, Your Honor.
>
> JUDGE PROCTOR: All right.  Was that discussed about, hey, we need to get with our clients and tell them what's going on and make this decision?
>
> MR. CHARLES: Not in a discussion that I recall, Your Honor.
>
> JUDGE PROCTOR: One way or the other?  That just didn't come up?
>
> MR. CHARLES: Again, not that I was privy to on that day as I recall.
>
> JUDGE PROCTOR: I realize you're midlevel management, but you're not aware of anyone having that concern or discussion?
>
> MR. CHARLES: Not from my standpoint, Your Honor.
>
> JUDGE PROCTOR: Were you confident, though, that your clients' interests were going to be litigated either directly or indirectly if you did dismiss the action?

MR. CHARLES: We did believe that someone would challenge SB 184, Your Honor.

8/3/22 *Vague* Hr'g Tr. at 165–67.

**Kathleen Hartnett** is a partner at Cooley LLP serving on the *Walker* attorney team as a decisionmaker and supervisor for all Cooley LLP attorneys working on the matter. She did not have direct client contact. Her testimony regarding client consent to dismissal was as follows:

> JUDGE PROCTOR: I'm trying to make sure I understand what your role was in terms of were you authorized to decide dismissal of your client's claims, or was that the organization's?
>
> ***
>
> MS. HARTNETT: We did have the ability to do that. I mean, our client -- we had -- our client gave us the -- we have authority to generally make litigation decisions in their best interest, and particularly because here we weren't, like, settling their claim or something. We were just voluntary dismissing it. I think we felt like we had the authority as the counsel group to do that.

*Id.* at 75, 76.

**James Esseks** was a decisionmaker for the *Walker* team. He did not have direct client contact. During the August 3, 2022 hearing, he testified as follows about the impact of dismissal on the *Walker* clients:

> JUDGE PROCTOR: I think you've already spoken to this, but I just want to make sure I'm giving you a chance -- I'm not sure you closed the loop on it. How do you balance out, we need to get this case litigated, we need to defeat this statute, we need to dismiss this case, which means we're not going to get as quick a result as we would like?

MR. ESSEKS: So I -- obviously, Your Honor, I ended up in a place of saying that the better decision was to dismiss. And I think I felt that -- I was worried, as I said earlier, about getting stuck. And dismissal -- my understanding was dismissal put our clients in the same position that they would have been in had we never filed the lawsuit in the first place. Which meant that they could or we could on their behalf file a new case potentially on Monday if the discussions over the weekend had gone well.

*Id.* at 224.

**Li Nowlin-Sohl** is a senior staff attorney at the ACLU. She was not a decisionmaker on the *Walker* team, but she did have input into the strategy of the case. Regarding the clients' interest in dismissal, Ms. Nowlin-Sohl testified as follows:

JUDGE PROCTOR: How was it in your client's interest, though, to dismiss the action and start over from scratch when you were days away from the effective date of the statute?

MS. LISA NOWLIN-SOHL: I mean, we were seven days away from the signing of the statute and three weeks away from the effective date. So we had been working around the clock, as quickly as possible, and still had some time. But it's in our client's interest to have kind of, you know, the best case possible and cohesive team that's leading that. And so we did feel that hitting pause was the right answer, and we did not refile a case.

JUDGE WATKINS: Now your clients are out. What happened to your clients?

MS. LISA NOWLIN-SOHL: They are, I believe, still living in the state of Alabama. They were --

JUDGE WATKINS: They're not parties to this suit or any suit, are they?

MS. LISA NOWLIN-SOHL: They are not parties to the suit.

JUDGE WATKINS: Who are you --

MS. LISA NOWLIN-SOHL: The Eknes-Tucker injunction helps them; right?  That law is currently enjoined.

JUDGE PROCTOR: That hadn't occurred yet when you made this decision.

MS. LISA NOWLIN-SOHL: That had not occurred.

JUDGE PROCTOR: That case hadn't even been filed yet when you made this decision.

MS. LISA NOWLIN-SOHL: No, but I think the decision was made with the understanding that something would be done to challenge this law; that it wasn't us walking away; that, you know, there would still be something happening that challenged that law and that helps our clients.

5/20/22 *Vague* Hr'g Tr. at 112–14.

**Kaitlin Welborn** was a staff attorney for the ACLU of Alabama.  She was not a decisionmaker for the *Walker* team but did provide insight on strategy and was a direct client contact.  Ms. Welborn testified as follows regarding the circumstances of dismissal and how it benefited the clients for the attorneys to have more time to consider next steps:

JUDGE PROCTOR: What was discussed on your side about not going forward with the Walker plaintiffs any further?

MS. KAITLIN WELBORN: My understanding was that there were conversations between the decision makers of the Walker and Ladinsky teams to try to work together and file one case.  Those conversations did not result in having one unified front.   There were some disagreements about strategy.  And so the decision was made that it

would not be one case, at which point the various organizations in the Walker case decided, each on their own, whether they thought the Walker team should bring a new case or file again.

We decided -- and Tish and I discussed this after hearing from the other teams -- that it was not a smart use of limited resources to file a second case. That the Ladinsky team is more than capable of vindicating the rights of transgender people, as we saw with the preliminary injunction being granted, and that the ACLU of Alabama in particular is well situated to work with the community in ways outside of litigation.

*Id.* at 150–51).

### 2.      Panel Report.

The Panel's Report lists ten instances of misconduct but does not include any finding of misconduct involving the Respondents' communication with their clients. Report at 51–52. Given the Panel's expansive definition of "misconduct," the failure to include the client consent issue suggests that the Panel did not believe that Respondents' conduct was sanctionable.

### 3.      Response to Supplemental Orders to Show Cause.

Although the Panel posed questions regarding client consent during evidentiary hearings, at no point during the 18 months this inquiry was before the Panel was it suggested that the Panel viewed not seeking or obtaining client consent prior to voluntary dismissal as sanctionable misconduct. The initial February 21, 2024 Order to Show Cause (Doc. 406) is the first time it was characterized as such, and this is Respondents' first opportunity to brief this issue. Respondents have now provided additional information about their interactions with the clients, and the

circumstances surrounding their decision to dismiss the *Walker* complaint, which is summarized below.

Among the remaining three Respondents from *Walker* Counsel, Carl Charles is the only one whose role included direct and regular contact with the clients, the Walker and White families.   *See* Charles Suppl. Decl. ¶¶ 118–23.   In their supervisory roles for their respective organizations, James Esseks and Tish Faulks did not have direct contact with the clients.  *See* Esseks Suppl. Decl. ¶ 131; Faulks Decl. ¶ 50.  However, both were regularly apprised of interactions with clients, and received periodic updates.  *See* Esseks Suppl. Decl. ¶¶ 131, 138–42; Faulks Decl. ¶¶ 45–46.

*Walker* Counsel were in close contact with their clients from the inception of the case and all the way through the filing and eventual dismissal of the complaint. In particular, a client contact group, of which Carl Charles was a member, "had been in regular communication with the clients from the time the SB 184 appeared back on the Alabama state legislative calendar in early 2022."  *See* Charles Suppl. Decl. ¶ 118.  Their communication also became increased as the team got ready to file the complaint, up to once or several times a day. *See id.*  Such frequent communication continued into the week of April 11, 2022, where the team provided timely updates to the client about the filing of the complaint, their plan to file a motion for preliminary injunction and temporary restraining order, judge assignment, and

dismissal. *See id.* ¶¶ 119–23; *see also* Esseks Suppl. Decl. ¶¶ 138–41; Faulks Decl. ¶¶ 45–46. Over the weekend following the dismissal, *Walker* Counsel also consulted with the clients regarding whether to refile. *See* Charles Suppl. Decl. ¶ 123.

Throughout their interaction with the clients, *Walker* Counsel understood that the clients entrusted them with full authority to make any strategic decision that is reasonably calculated to pursue the clients' objectives. *See id.* ¶ 116; Esseks Suppl. Decl. ¶ 132.

### B.   Legal Standards Cited in the Supplemental Orders to Show Cause.

The Supplemental Orders indicate that the following authorities are relevant to the accusation that Respondents wrongfully failed to seek or secure their clients' consent prior to voluntarily dismissing the *Walker* complaint:

> Alabama Rule 1.2(a) requires that attorneys "abide by a client's decisions concerning the objectives of representation" and "consult with the client as to the means by which they are to be pursued." The parallel ABA Model Rule 1.2(a) adds that attorneys may "take such action on behalf of the client as is impliedly authorized to carry out the representation."

> Alabama Rule 1.3 prohibits attorneys from "willfully neglect[ing] a legal matter entrusted to him [or her]." The parallel ABA Model Rule 1.3 contains the similar language.

> Alabama Rule 1.4 requires that attorneys keep clients "reasonably informed about the status of a matter" (even, as the comment states, "when a client delegates authority to the lawyer") and explain such matters "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The parallel ABA Model Rule 1.4 requires attorneys to "(1) promptly inform the client of

> any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules; (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished; [and] (3) keep the client reasonably informed about the status of the matter[.]"

> Federal Rule of Civil Procedure 11(b) prohibits attorneys from "presenting to the court" any "paper . . . for any improper purpose."

*See* Docs. 478 at 5–10, 14; 481 at 5–10, 15; 486 at 5–10, 14.

### C. Counsel's Dismissal of *Walker* without Prejudice Did Not Violate Alabama or ABA Rules of Professional Conduct, or Rule 11.

#### 1. *Walker* Counsel's conduct was entirely consistent with Alabama Rule 1.2 and ABA Model Rule 1.2(a).

Alabama Rule 1.2(a) requires an attorney to "abide by a client's decisions concerning the objectives of representation" and "consult with the client as to the means by which they are to be pursued." The parallel ABA Model Rule 1.2(a) is nearly identical, but also states that attorneys are authorized to "take such action on behalf of the client as is impliedly authorized to carry out the representation." The Supplemental Orders question whether Respondents violated these Rules because they did not obtain their clients' express authorization to dismiss *Walker* without prejudice immediately prior to doing so. *Walker* Counsel had the implied authority to dismiss the action without the clients' prior authorization because the decision was one of means, not ends, and was undertaken for the purpose of furthering the clients' overall objective.

"[A]n attorney has no implied authority to settle or compromise or dismiss his client's cause of action with prejudice.  He does have, where employed to prosecute litigation, implied power to take all action with reference to procedural matters, including the power to dismiss without prejudice." *Engelhardt v. Bell & Howell Co.*, 299 F.2d 480, 483–84 (8th Cir. 1962) (citations omitted).  This is "because doing so does not compromise or settle the client's rights, and the client is not precluded from litigating the merits of the case." *Federated Towing & Recovery, LLC v. Praetorian Ins. Co.*, 283 F.R.D. 644, 662–63 (D.N.M. 2012).  Indeed, "[t]he rule prevailing in most jurisdictions is that an attorney employed to prosecute an action has implied authority, by virtue of such employment, to have the action discontinued or dismissed where such discontinuance or dismissal will not operate as a bar to the institution of a new action on the same cause, or, as expressed in some cases, where the dismissal or other termination is 'without prejudice.'"   C.R. McCorkle, Annotation, *Authority of Attorney to Dismiss or Otherwise Terminate Action*, 56 A.L.R.2d 1290, § 2[a] (1957) (footnotes omitted); *see also* 7A C.J.S. *Attorney & Client* § 295 (2024) ("[I]t is generally held that an attorney has implied authority to enter or take a dismissal, discontinuance, or nonsuit which does not bar the bringing of another suit on the same cause of action.").[19]

---

[19] Courts around the country have similarly long held that an attorney has implied authority to dismiss a client's complaint without prejudice. *See, e.g.*, *Slovitz v. City of New York*, 157 N.Y.S.2d 532, 533 (Sup. Ct. 1956) ("It is familiar law that an attorney's authority to discontinue an action is

The same is true in Alabama,[20] where courts have long distinguished attorney

actions that require express client authorization (such as settlement) from non-

prejudicial actions that do not require express prior authorization (such as dismissal

without prejudice).  *See, e.g.*, *Daniel v. Scott*, 455 So. 2d 30, 32 (Ala. Civ. App. 1984)

(requiring client authorization to "settle a client's action or claim or prejudice a

client's rights"); *Benitez v. Beck*, 872 So. 2d 844, 847 (Ala. Civ. App. 2003) ("An

attorney cannot settle a client's action or claim or prejudice a client's rights without

authorization from the client." (citation omitted)); *Source Med. Sols., Inc. v. Amkai,*

*LLC*, No. CV-09-RRA-0073-S, 2010 WL 11565668, at *2 (N.D. Ala. Nov. 3, 2010)

---

presumed and binding upon his client, especially where there is no settlement or release involved."); *Va. Concrete Co. v. Bd. of Supervisors of Fairfax Cnty.*, 91 S.E.2d 415, 420 (Va. 1956) ("Under his general authority an attorney has control of the remedy and may discontinue the action by a dismissal without prejudice, thus binding his client." (citation omitted)); *Duhe v. Jones*, 186 So. 2d 419, 424 (La. Ct. App. 1966) ("[A]n attorney of record has implied authority to dismiss a suit 'without prejudice'."); *Snyder-Falkinham v. Stockburger*, 457 S.E.2d 36, 39 (Va. 1995) ("An attorney's general authority permits the attorney to discontinue a pending action by a dismissal without prejudice; but this general authority gives the attorney no right to discharge or terminate a cause of action by a dismissal on the merits, such as by a dismissal with prejudice, without special authority or acquiescence on the part of the client."); *Koval v. Simon-Telelect, Inc.*, 979 F. Supp. 1222, 1229 (N.D. Ind. 1997) ("As the dismissal of a suit does not bar the bringing of another for the same cause of action, the attorney of record has the implied authority to discontinue the action if he sees fit." (citation omitted)); *Sewraz v. Nguyen*, No. 3:08CV90, 2011 WL 201487, at *6 (E.D. Va. Jan. 20, 2011) ("An attorney has the general implied authority to nonsuit a case so long as it does not prevent bringing another suit on the same merits."); *Federated Towing & Recovery*, 283 F.R.D. at 662–63 ("An attorney would have implied authority to agree to a dismissal of a case without prejudice, because doing so does not compromise or settle the client's rights, and the client is not precluded from litigating the merits of the case.").

[20] "Federal courts in the Eleventh Circuit also refer to state law principles when reviewing the scope of an attorney's authority . . . ."  *Bailey v. Mead S. Wood Prods.*, 295 F. Supp. 2d 1286, 1288 (M.D. Ala. 2003).

(same); *see also Senn v. Joseph*, 17 So. 543, 543–44 (Ala. 1895) (although an attorney must have express authority to "compromise" a claim, the attorney does otherwise have "authority to bind his client in all matters which relate to the prosecution or defense of the rights of his client").

Legal commentators also agree that attorneys have such implied authority. For example, according to the Restatement (Third) of the Law Governing Lawyers, "a lawyer may take any lawful measure within the scope of representation that is reasonably calculated to advance a client's objectives as defined by the client, consulting with the client as required by § 20." Restatement (Third) of the Law Governing Lawyers § 21 (2000). The Comment continues, "[a] lawyer, for example, may decide whether to move to dismiss a complaint . . . ." *Id.* cmt. e.

On the facts here, having spent over two years consulting with their clients and weighing a potential lawsuit as the Alabama Legislature considered similar transgender healthcare bans in prior legislative sessions, *Walker* Counsel were fully aware of their clients' objectives and reasonably believed that dismissal without prejudice was an appropriate "means by which" their clients' objectives were "to be pursued" under the circumstances. *See* Ala. R. Prof'l Conduct 1.2(a).

In essence, voluntarily dismissing without prejudice to secure more time to weigh litigation options was a "means decision" ordinarily entrusted to attorneys. Ultimately, after discussing the possibility of refiling with the clients, the clients and

*Walker* Counsel elected not to move forward for a variety of reasons, including the understanding that other plaintiffs would continue challenging SB 184 and that relief in such a case would cover the *Walker* plaintiff families as well.

> **2.    *Walker* Counsel kept their clients "reasonably informed" so that they could make "informed decisions," consistent with Alabama Rule 1.4 and ABA Model Rule 1.4.**

Alabama Rule of Professional Conduct 1.4 requires attorneys to keep clients "reasonably informed about the status of a matter" and explain such matters "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  Likewise, the parallel ABA Model Rule 1.4 requires attorneys to "(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules; (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished; [and] (3) keep the client reasonably informed about the status of the matter[.]"

The evidence overwhelmingly supports the conclusion that *Walker* Counsel kept their clients well-informed.  Charles Suppl. Decl. ¶¶ 118-23; Esseks Suppl. Decl. ¶¶ 138–42; Faulks Decl. ¶¶ 45–46.  Because the dismissal without prejudice was not a decision to which the clients had to provide additional consent, Alabama Rule 1.4 and ABA Model Rule 1.4 do not impose any duty on counsel to have informed their clients prior to the dismissal.

To be sure, with the benefit of hindsight and the luxury of more time, in the ordinary course it may well be best practice to reconfirm with clients prior to filing a notice of voluntary dismissal without prejudice.   Esseks Suppl. Decl. ¶ 133.  However, under these circumstances, this was quintessentially a strategic litigation decision about the best means to pursue the clients' objectives that did not require their express prior approval.

That said, even assuming client consultation for a voluntary non-prejudicial dismissal was generally required, any sanction for failing to do so would have to examine whether the client had a reasonable expectation to be consulted under the circumstances.  That is because "reasonabl[eness]" is the cornerstone of Alabama Rule 1.4 and ABA Model Rule 1.4.  The comment to Alabama Rule 1.4 states, "[t]he guiding principle under this Rule . . . is contingent upon the client's ***reasonable*** expectation but is limited or expanded by the client's willingness, ability and desire to participate in the particular representation, and by the practicability of the lawyer's meeting the client's expectations" (emphasis added).  And as further explained in the comment to the Restatement (Third) of the Law Governing Lawyers § 20:

> [A] standard of reasonableness under all the circumstances determines the appropriate measure of consultation.  Reasonableness depends upon such factors as the importance of the information or decision, the extent to which disclosure or consultation has already occurred, the client's sophistication and interest, and the time and money that reporting or consulting will consume.  So far as consultation about specific decisions is concerned, the lawyer should also consider the room for

choice, the ability of the client to shape the decision, and the time available.

Restatement (Third) of the Law Governing Lawyers § 20 cmt. c (2000).

Moreover, although reasonableness is, by its nature, a subjective standard, "[c]ourts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) (second set of brackets in original) (citations omitted). The Eleventh Circuit in *Chandler* also recognized that "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.* at 1313 (alteration in original) (citation omitted).

Here, *Walker* Counsel acted reasonably in voluntarily dismissing without prejudice because they believed the decision to be urgent. Moreover, to the extent there were decisions that required client input, there is ample evidence in the record that *Walker* Counsel acted reasonably. They consulted with their clients over the months before filing suit; they kept their clients updated in the days after filing suit; and they spoke to the clients as soon as possible after the voluntary dismissal, and again as they weighed refiling. 5/20/22 *Vauge* Hr'g Tr. at 180-81; Charles Suppl. Decl. ¶¶ 118–23; Esseks Suppl. Decl. ¶¶ 138–42.

### 3.    There is nothing in the record to support a violation of Alabama Rule 1.3 or ABA Model Rule 1.3.

Alabama Rule 1.3 prohibits an attorney from "willfully neglect[ing] a legal matter entrusted to him [or her]."  Similarly, ABA Model Rule 1.3 states that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." These Rules are typically implicated where an attorney ignores or fails to communicate with a client, or delays or fails to make necessary filings.  *See, e.g.*, *Morgan v. Disciplinary Bd. of Ala. State Bar*, 776 So. 2d 103, 104–05 (Ala. 2000) (Hopper, C.J., concurring).  Here, however, nothing in the record suggests that in voluntarily dismissing the suit without prejudice where the attorneys believed it was urgently necessary to do so, *Walker* Counsel willfully neglected a matter entrusted to them.  In fact, the lawyers were diligent in communicating with their clients, both in general and throughout the week leading up to voluntary dismissal.  *See, e.g.*, Charles Suppl. Decl. ¶¶ 118–23; Esseks Suppl. Decl. ¶¶ 138–42.  Additionally, *Walker* Counsel kept their clients informed of the status of the case and the possibility of refiling.  Charles Suppl. Decl. ¶¶ 122–23; Esseks Suppl. Decl. ¶¶ 138–42; Faulks Decl. ¶ 45.  Rather than neglecting their clients, the evidence shows that *Walker* Counsel acted quickly in making urgent strategic decisions, and communicated the same to their clients.  As such, there is no basis to discipline Respondents under Alabama Rule 1.3 or ABA Model Rule 1.3.

### 4.      Rule 11 does not apply.

The Supplemental Orders suggest that not securing client consent prior to the voluntary dismissal could be a violation of Federal Rule of Civil Procedure 11. However, Rule 11 is the wrong vehicle for evaluating whether an attorney has violated duties owed to a client.  *See Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir. 1995).  This is because Rule 11 addresses the duties that lawyers owe to the tribunal and opposing parties in litigation, but not those owed to clients.  *Id.*  Attorney-client duties are addressed by the rules of professional responsibility applicable to a given jurisdiction, and sanctions for violating such duties are dealt with through a court's inherent power.  *Id.*

*Mark Industries* is instructive.  There, after the district court denied counsel's motion to withdraw as plaintiff's attorney, the attorney filed a "stipulated dismissal" without his client's knowledge or consent.  50 F.3d at 731.  Although the Court of Appeals upheld sanctions against the attorney for filing the stipulated dismissal in bad faith, the sanctions were pursuant to the court's inherent power, *not* for any violation of Rule 11.  *Id.* at 732–34.  The court reasoned that "the purpose of Rule 11 is to deter abuses of the litigation process which have the potential of harming the interests of the opponent, not to discipline attorneys for breaches of duty to their own clients."  *Id.* at 732.  In other words, even where the attorney acted in bad faith in dismissing the case, the court found that he could be sanctioned under other

authorities, but not Rule 11. *See also Weiss v. Johnson* (*In re Rolls Constr. Corp.*),
108 B.R. 807, 808–09 (Bankr. S.D. Fla. 1989) (holding that clients may not seek
Rule 11 sanctions against their attorneys); *In re Palumbo Fam. Ltd. P'ship*, 182 B.R.
447, 473–74 (Bankr. E.D. Va. 1995) (because "the responsibilities connected with
Rule 11 stem from a duty owed to the court," "Rule 11 is not a federal cause of action
available to remedy legal malpractice."); *In re Mitchell*, Nos. CO-11-086 & 07-
10718, 2012 WL 5995443, at *10 n.81 (B.A.P. 10th Cir. Dec. 3, 2012) ("Rule 9011
[Bankruptcy equivalent to Rule 11] sanctions may not be awarded to a client against
its own attorney for a breach of duty to the client."), *aff'd*, 554 F. App'x 756 (10th
Cir. 2014); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and
Procedure* § 1331 (4th ed.) ("[Rule 11's] certification requirement mandate[s] that
all signers consider their behavior in terms of the duty they owe to the court system
to conserve its resources and to avoid unnecessary proceedings.").

Here, because *Walker* Counsel had no affirmative duty to obtain additional
client authorization, there is no basis to conclude that *Walker* Counsel acted in bad
faith or with any improper purpose in dismissing the complaint without prejudice.
*See* Fed. R. Civ. P. 11(b)(1) (There must be a threshold showing that a filing was
"presented for any improper purpose, such as to harass, cause unnecessary delay, or
needlessly increase the cost of litigation"); *see also Barnes v. Dalton*, 158 F.3d 1212,
1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding

of bad faith. 'A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.'" (citations omitted)).

*     *     *

The evidence demonstrates that although *Walker* Counsel did not speak with their clients immediately before filing the voluntary dismissal, they consulted their clients extensively in the days prior (in fact, over several years), spoke with their clients within an hour or two after filing the dismissal (and again over the weekend, and the following week), and were well-aware of their clients' objectives and acted consistent with those objectives. In fact, there is no evidence in the record to the contrary. There is no evidence that the attorneys lacked the authority to dismiss the case without prejudice, nor is there any evidence that dismissal without prejudice under the circumstances was inconsistent with the clients' objectives. Finally, there is no evidence that the dismissal prejudiced the clients in any way. Accordingly, the Court must "assume, absent evidence to the contrary, that lawyers fulfill their professional responsibilities and do not usurp decisions that belong to their clients." *United States v. Shamsid-Deen*, 61 F.4th 935, 951–52 (11th Cir. 2023).

In sum, Respondents respectfully submit that in view of the record evidence, Respondents' supplemental testimony, and the relevant legal authorities, there is no legal or factual basis for a finding of misconduct, or any sanction under Federal Rule

49

of Civil Procedure 11 or the professional responsibility rules cited in the Supplemental Orders.

## III.   RESPONDENTS DID NOT ENGAGE IN MISREPRESENTATION OR FAIL TO DISCLOSE MATERIAL FACTS TO THE PANEL.

In addition to the specific charge against Mr. Charles, the Supplemental Orders require Respondents to "show cause why [they] should not be sanctioned for misrepresenting or otherwise failing to disclose key facts during the Panel's inquiry" and "address any findings in Section IV of the Panel's Report implicating [their] credibility or any discrepancies between [their] oral and written testimony and the oral and written testimony of all other attorneys who testified before the Panel." *See* Docs. 478 at 13–14; 481 at 14; 486 at 13–14.[21]   Respondents previously requested clarification regarding the particular alleged misrepresentations, failures to disclose, or discrepancies when the Court initially made this allegation in the original Order to Show Cause, *see* Docs. 423, 425, but the Court has thus far declined to provide any further particularity, including in the Supplemental Orders. In the absence of further guidance from this Court, Respondents have scoured the Panel's Report and the testimony and declarations of the other respondents in an attempt to discern any potential "discrepancies" between their testimony and that of other respondents.

---

[21] Mr. Charles has filed his own additional response to the Supplemental Orders to Show Cause.

These Respondents all testified truthfully, honestly, and completely to the best of their separate recollections.  Because lawyers are officers of the court, courts give "great deference to such representations [by counsel] and presume them to be true." *Federated Mut. Ins. Co. v. McKinnon Motors, LLC*, 329 F.3d 805, 808 (11th Cir. 2003); *see also Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("[A] statement by a lawyer 'deserves deference and a presumption of truth.'").

### A.     These Respondents Were Not Parties to Ms. Eagan's Alleged "Zero Percent Chance" Call.

The one area where both the Panel and this Court have specified an alleged discrepancy and/or failure to disclose involves a claim by one "junior associate" lawyer on the *Ladinsky* team that respondent Melody Eagan allegedly said in a telephone call "that there was zero percent chance that Judge Burke would grant" a preliminary injunction in the case.  Report at 34–35; 3/19/24 *Boe* Hr'g Tr. at 56–57.

None of these Respondents were on that call or have any recollection of Ms. Eagan saying this in any context.  *See* Esseks Suppl. Decl. ¶¶ 123–24; Charles Suppl. Decl. ¶ 58; Faulks Decl. ¶¶ 34, 36.  Further, none of these Respondents were asked about this alleged comment by Ms. Eagan during their testimony before the Panel.

It does not appear that any of *Walker* Counsel were on the telephone call in which Ms. Eagan purportedly made this comment.   The Panel's Report acknowledges that there were "several other discussions [that] took place among the

various groups within each team" on that afternoon following the transfer of *Ladinsky* to this Court. Report at 32. The Report does not make clear on which of these various telephone calls Ms. Eagan is alleged to have made the "zero percent chance" comment, and there is no evidence that the comment – if it was even made – was made in a call in which Respondents Esseks, Charles, or Faulks were participating. The King & Spalding "junior associate" who recounted the comment (Ms. Hoverman Terry) testified to the Special Master that the call in question involved "a larger case team from the *Ladinsky* case. . . . It was everyone that was in our [*Ladinsky*] case. **No one from the ACLU Walker case**." 5/20/22 *Vague* Special Master Hr'g Tr. at 103 (emphasis added). When she later testified in front of the Panel, Ms. Hoverman Terry did not identify any *Walker* Counsel as having been on that call, although she identified a number of lawyers from the *Ladinsky* team. 8/4/22 *Vague* Hr'g Tr. at 168.[22]

Respondents obviously can't be faulted for failing to testify about a call in which they did not participate. There is no discrepancy or failure to disclose by these Respondents regarding this matter.

---

[22] To be clear: *Walker* Counsel were privy to several internal discussions regarding whether this Court would likely be a "good" or a "bad" draw, but no conversation with *Ladinsky* Counsel that included the alleged "zero percent chance" comment.

**B.      Claiming that Assignment to Judge Burke Was Not the Only Factor for Dismissal.**

The Panel's Report notes that "[e]very attorney who testified on these matters acknowledged that their perceptions of Judge Burke and their chance of success before him was a factor in deciding to dismiss the two cases" but suggests that counsels' contention "that it was not the only factor … ring[s] hollow."  Report at 37. Similarly, the Report characterizes as misconduct respondents' "claiming that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and Judge Burke set *Walker* for a status conference in Huntsville on April 18."  *Id.* at 52.

The Panel's Report provides no evidentiary support for its finding that Respondents intentionally misled them by uniformly testifying that there were other factors, in addition to their perceived worries about this Court, that caused them to voluntarily dismiss *Walker*.  Instead, the Panel seems to rely on hindsight and the Panel's own personal perceptions and understanding of the courts' internal procedures and processes to discount and ultimately reject the lawyers' unanimous testimony.

It is undisputed that none of the lawyers on either team were aware of Judge Axon's reason for transferring *Ladinsky* to this Court.  Report at 29.  Every lawyer testified that the unexplained transfer of *Ladinsky* from Judge Axon to this Court "surprise[d] or confuse[d]" them.  Report at 27.  As the Panel noted, "members of both teams were immediately 'surprised,' 'confused,' 'concerned,' 'in a bit of a

panic,' and thrown into 'a pretty hectic' and 'chaotic' state by Judge Axon transferring *Ladinsky*" to this Court.  Report at 29.

In addition, every lawyer testified that the transfer of *Ladinsky* from Judge Axon to this Court appeared to violate the lawyers' understanding of the normal procedures in the Northern District (and elsewhere).  Report at 29–31.  After *Ladinsky* was randomly assigned first to Judge Manasco, then randomly assigned to Judge Cornelius, and then randomly assigned to Judge Axon, the case was not placed back on the wheel for random assignment but was instead transferred to this Court without explanation beyond a text order that it was done "[i]n the interest of efficiency and judicial economy."  *Ladinsky*, Doc. 14.  Although it was later disclosed by the Panel that Judge Axon declined to handle *Ladinsky* because she was in the middle of a lengthy criminal trial, it is undisputed that "[e]very attorney who testified on the matter stated that they were not aware of Judge Axon's criminal trial on April 15 or that the trial was a reason for transferring the case to Judge Burke."  Report at 29.[23]   Respondents' testimony that this unexplained and apparently

---

[23] Because Respondents did not have access to the "random case assignment procedures" in the Northern District, it was unknown whether those procedures required the random reassignment of cases when a judge declines to accept a case because of workload issues.  In any event, the transfer of *Ladinsky* to this Court was not a random assignment like the three previous assignments in the case.  In the absence of any additional information, respondents were uniformly concerned about what they believed to be the established process for handling related cases under the "first-filed rule" in the Northern District was not followed.  Report 29–31.  Although the Panel concludes in hindsight that counsel's concerns were unfounded, there is no dispute that counsel's beliefs were based on good faith.

unusual transfer of *Ladinsky* factored into the decision to dismiss *Walker*, was truthful and is supported by the undisputed evidence.  Charles Suppl. Decl. ¶ 53; Esseks Suppl. Decl. ¶¶ 110–14.

Further, the testimony of the lawyers was consistent that this Court's late Friday (4:07 p.m.) text order setting a status conference for the following Monday morning in Huntsville was a concern and, for many, was one of the factors that motivated the dismissal.  Report at 32–33.  It is obviously relevant that this Court's text order (1) was entered only in *Walker* and not in *Ladinsky*, the first filed case; (2) was entered late on the afternoon of Good Friday when many of the lawyers had already left work for the holiday weekend; and (3) required *Walker* Counsel to appear in person in Huntsville on the morning of the very next business day – the Monday after Easter.[24]

The Panel's Report offers no explanation as to why it was not reasonable for respondents to have considered these facts when deciding to dismiss *Walker* without prejudice.  Nor does the Panel explain why it summarily rejects counsel's undisputed testimony as misleading.   There is no evidence, and certainly not clear and convincing evidence, that these beliefs and concerns by counsel were based on

---

[24] The *Walker* team included only one lawyer (Ms. Faulks) who lived in Alabama, so any other counsel would have had to travel on Easter Sunday in order to attend the status conference.  In addition, leadership of the *Walker* team had genuine concerns about Ms. Faulks being the sole counsel appearing at the status conference in such a high-profile and important case.  8/3/22 *Vague* Hr'g Tr. at 72.

anything other than good faith.   Nor is there any evidence that Respondents
intentionally misled the Panel in offering this testimony.

**C.    Mr. Esseks Testified Truthfully in Response to a Hypothetical Question About Whether He Would Have Still Claimed That Walker Was a Related Case if the Plaintiffs Had Lost *Corbitt* with a Different Judge.**

The Panel Report refers to Mr. Esseks' testimony in response to a hypothetical
question that "'based on [his] understanding of what related means,' he would have
marked *Corbitt* as related to *Walker*, even if that case had been assigned to a judge
that had previously ruled against them, strains credulity."   Report at 18 n3.   The
Panel does not cite any testimony or other evidence contradicting Mr. Esseks'
response, nor is there any.   Further, there was no follow-up by the Panel to
Mr. Esseks' response to the hypothetical question and he was not asked to elaborate
on his answer.   8/3/22 *Vague* Hr'g Tr. at 188–89.   Instead, the Panel simply moved
on without any indication that the judges apparently thought Mr. Esseks was being
untruthful.   *Id.*

Mr. Esseks testified truthfully and honestly to the question posed by the Panel.
Esseks' Suppl. Decl. at ¶ 52.   Given his good faith understanding of the obligation
to identify related cases on the Civil Cover Sheet, Mr. Esseks testified that, under
the hypothetical, he "would have felt **obligated**" to mark *Walker* as related.   8/3/22
*Vague* Hr'g Tr. at 189 (emphasis added).   This conclusion, of course, is consistent
with the fact that lawyers have been routinely admonished and sanctioned for failing

to mark cases as related. *See, e.g., Ayer v. Frontier Commc'ns Corp.*, No. ED CV 1601946 PA (DTBx), 2017 WL 3891358, at \*4 (C.D. Cal. Sept. 5, 2017); *Certain Underwriters at Lloyd's v. Coastal States Mortg. Corp.*, No. 13-62374-CIV-DIMITROULEAS, 2014 WL 11706436, at \*1 (S.D. Fla. Mar. 10, 2014); *Stabler v. Transp. Ins. Co.*, Civ. A. No. 06-0237-WS-M, 2006 WL 6915489, at \*2 (S.D. Ala. July 24, 2006).

The Panel apparently found it hard to believe that Mr. Esseks would have filed *Walker* in the Middle District and marked it as related to *Corbitt* if the judge presiding over that case had ruled against the transgender plaintiffs. But as Mr. Esseks explains in his declaration, the fact that he would have felt obligated to **mark** *Walker* as related to *Corbitt* under the Panel's hypothetical does not mean that he would have **filed** *Walker* in the Middle District in that circumstance. Instead, he explains that he likely would have filed *Walker* in the Northern or Southern Districts of Alabama. As the Panel made clear during questioning of other respondents, before a lawyer files a case, it is perfectly appropriate to consider who the judges are that the case might be assigned to. *See, e.g.*, 8/4/22 *Vague* Hr'g Tr. at 25 (JUDGE PROCTOR: "And there's, obviously, no concern about looking at judges when you're deciding where to file a case. That's not manipulating the assignment system at all.").

Mr. Esseks' response to the Panel's hypothetical question does not evidence a lack of candor and should not serve as the basis for sanctions.

## IV. THIS COURT SHOULD NOT DEFER TO THE PANEL'S FINDINGS OF FACT.

Because of the highly unusual nature of the proceedings before the Panel, it remains unclear how this Court will treat the findings of the Panel in the Report. *See* 11/2/23 *Boe* Hr'g Tr. at 11.[25]  This Court appears to have tentatively differentiated pure findings of fact from mixed questions of law and fact, such as whether Respondents acted with subjective bad faith, or purely legal conclusions, such as whether their conduct amounted to misconduct. *Id.* at 10–11 ("A finding of bad faith is a mixed question of law and fact. . . . These findings of fact that have been delivered to me are just that -- they're findings of fact.  They're for my consideration. I don't know that I am necessarily bound or not bound by them.  I also don't know that I, you know, cannot proceed to take additional inquiry, based on the findings of fact that they have given me."); *id.* at 20 ("But they did make a finding expressly of ten instances of what they call misconduct, which are legal conclusions, not factual conclusions.").

---

[25] This Court has also characterized the Panel's Report as only providing "probable cause" for the Court's original Order to Show Cause from February 2024.  3/19/24 *Boe* Hr'g Tr. at 39, 49.  In this Court's recent order confirming the unsealing of the Report, the Court stated that the Panel's findings were "non-final" and that this Court could "accept, reject, or modify in whole or in part" those findings.  Doc. 459 at 15.  The Court also observed that "the Report bears all the indicia of reliability that courts typically accord greatest weight." *Id.*

The Panel's findings on mixed questions of law and fact and questions of law regarding whether Respondents' conduct constituted misconduct should be reviewed *de novo* by this court without any deference. *See Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1558 (11th Cir. 1997) ("In reviewing a district court's interpretation and application of the Rules of Professional Conduct, which involve a mixed question of law and fact, we do not defer to the district court's determinations."); *In re Finkelstein*, 901 F.2d 1560, 1563–64 (11th Cir. 1990).

In addition, there are a number of reasons why this Court should not simply defer to the Panel's findings of fact or findings which involve mixed questions of law and fact.

### A.     The Panel Failed to Apply the Correct Legal Standard.

As noted above and in prior filings, for federal courts to exercise the inherent power to sanction or discipline lawyers, there must be a finding of subjective bad faith. *See In re BellSouth Corp.*, 334 F.3d 941, 963 n19 (11th Cir. 2003).   The required finding of subjective bad faith must be made by clear and convincing evidence. *See JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 988–89 (11th Cir. 2017) (stating that a party failed to meet its "burden to prove sanctionable conduct . . . by clear and convincing evidence"); *BellSouth*, 334 F.3d at 963 n19; *Fletcher v. Ben Crump L., PLLC*, No. 5:21-cv-01433-LCB, 2023 WL 3095571, at *5 (N.D. Ala. Apr. 26, 2023); *Thompson v. Merchants Adjustment Servs., Inc.*, No.

5:20-cv-1591-LCB, 2021 WL 2682264, at *1 (N.D. Ala. Feb. 11, 2021) ("sanction of dismissal requires the clear and convincing evidence that a litigant engaged in bad-faith discovery abuses").[26]

The Panel's Report does not identify the evidentiary standard that it applied. The Report certainly never states that the Panel applied the required clear and convincing burden to its consideration of the evidence. Nor does it appear that the Panel scrutinized the evidence with the required discerning eye demanded by this heightened standard of review.

The Panel's failure to specifically identify whether it was applying the correct heightened evidentiary standard makes it difficult for this Court to simply adopt those findings without re-weighing the evidence. *See In re Booker*, 611 F. App'x at 835–36 ("In this case, the magistrate judge and district court failed to cite this evidentiary standard and failed to specifically find that clear and convincing evidence supported the ethical violations the district court attributed to [the attorney]. … Although the district court adopted the thorough findings of the magistrate judge regarding the conduct on which sanctions were based, we cannot discern from the record whether the district court specifically found that [the attorney] acted in bad faith under the clear and convincing evidence standard.").

---

[26] As noted in Carl Charles' separate filing, the burden of proof required to sustain a finding that he committed perjury is "beyond a reasonable doubt." *See* Respondent Carl Charles' Response to Order to Show Cause, Doc. 517 at 9.

**B.      The Panel's Investigation was Fraught with Due Process Issues.**

This Court has appropriately acknowledged that these proceedings, including the proceedings before the Panel, must comply with the requirements of due process. Doc. 406 at 3.  These Respondents have previously objected to the due process violations arising out of the proceedings before the Panel and have recently filed an Objection to Supplemental Orders to Show Cause.  Doc. 493.  These Respondents incorporate those prior filings and objections herein.

As noted in these respondents' objections, the due process failings in the proceedings before the Panel render its findings unreliable.  *See United States v. Shaygan*, 652 F.3d 1297, 1319 (11th Cir. 2011) ("The record before us is unreliable because it was developed, after all, without affording either of them due process.").

<u>Conclusion</u>

The Respondents acted professionally and ethically when representing their clients in *Walker*.  The Respondents violated no "controlling precedent, rules, standards, or codes of professional conduct" while zealously representing their clients *pro bono*.  The Respondents committed no "misconduct" and should not be sanctioned or disciplined for their conduct in *Walker*.  This Court should reject the findings by the Panel and terminate these proceedings with no further sanction or discipline imposed on the Respondents.

Respectfully submitted,

*/s/ Barry A. Ragsdale*
Barry A. Ragsdale
Robert S. Vance
Dominick Feld Hyde, PC
1130 22nd Street South, Suite 4000
Birmingham, AL 35205
Tel.: (205) 536-8888
bragsdale@dfhlaw.com
rvance@dfhlaw.com

*/s/ W. Neil Eggleston*
W. Neil Eggleston
Byron Pacheco
Kirkland & Ellis LLP
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Tel.: (202) 389-5016
neil.eggleston@kirkland.com
byron.pacheco@kirland.com

*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I certify that, on May 13, 2024, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will provide notice of such filing to all counsel of record.

*/s/ Barry A. Ragsdale*
OF COUNSEL