# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **BRIANNA BOE**, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | **Case No. 2:22-CV-184-LCB** |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **STEVE MARSHALL**, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

# RESPONSE BY JENNIFER LEVI AND SHANNON MINTER
# TO ORDERS TO SHOW CAUSE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ..........................................................................1

FACTUAL BACKGROUND ..............................................................3

    A.    Attorneys Jennifer Levi and Shannon Minter. ......................................3

    B.    Work Preceding the Filing of *Ladinsky*. ..............................................4

    C.    Filing of the *Ladinsky* Case. ..................................................6

    D.    Filing of the *Walker* Case. ....................................................7

    E.    Assignment of *Ladinsky* to Judge Axon; Transfer of *Walker* to the Northern District ..................................................9

    F.    *Walker* Status Conference and *Ladinsky* Transfer to Judge Burke.....11

    G.    Dismissal of *Ladinsky* and *Walker*. ..........................................12

    H.    Discussion Around Potentially Combining the *Walker* and *Ladinsky* Teams. ..................................................16

    I.    Filing of *Eknes-Tucker*. ......................................................17

    J.    The Orders to Show Cause. ..................................................19

ARGUMENT ..........................................................................22

I.    Standard of Review..................................................................22

    A.    Inherent-Authority Sanctions Require Clear and Convincing Evidence of Subjective Bad Faith. ..............................................22

    B.    The Legal Standard Governing Inherent-Authority Sanctions Applies to the Rules and Authorities Cited by the Court...................23

    C.    To the Extent the Panel Reached Any Legal Conclusions, the Court Should Not Give Those Conclusions Any Deference. .............25

II.  Levi and Minter's Conduct in Dismissing One Case and Filing a New Case Is Not Sanctionable, and They Were Candid and Truthful in This Proceeding. ..................................................................................25

    A.  Levi and Minter's Testimony Establishes That They Acted in Subjective Good Faith and Were Candid and Truthful with the Panel. ..................................................................................27

        1.  Levi and Minter Had Legitimate, Reasonable Concerns About the Unexplained Transfer to Judge Burke. ....................28

        2.  Levi and Minter Formed a Reasonable, Good-Faith Judgment That Dismissal Would Serve Their Clients' Interests. ...................................................................31

        3.  Levi and Minter Acted Reasonably Under the Circumstances. ...................................................................32

        4.  Levi and Minter Were Forthcoming About the Reasons for Their Concerns About the Transfer to Judge Burke. ................34

        5.  Levi and Minter Acted in Good Faith in Deciding to File *Eknes-Tucker* in the Middle District. .........................................35

    B.  It Was Objectively Reasonable for Levi and Minter to Have Believed the Rules Permitted the Dismissal of *Ladinsky* and the Filing of *Eknes-Tucker*. ........................................................37

        1.  The Plain Text of Rule 41 Authorizes One Unconditional Dismissal and Refiling. ............................................................38

        2.  Three Courts of Appeal Have Held that Attorneys May Not be Sanctioned for Dismissing and Refiling. .............................40

        3.  Neither Rule 41 Nor Any Other Rule Prohibits the Filing of a New Case on Behalf of New Clients. .....................................43

    C.  Sanctioning Levi and Minter for "Engaging in . . . Discussions About Judges" Would Violate the First Amendment. ........................45

|   | D. | Levi and Minter Had No Notice That Their Actions, Which Were Consistent with Rule 41, Nevertheless Could Be Sanctionable. ........46 |

| III. | | The Court Should Decline to Impose Sanctions. ..........................................50 |

|   | A. | Cases Involving Judge-Shopping Allegations Demonstrate That No Sanctions Are Appropriate Here. ....................................................51 |

|   | B. | Levi and Minter Did Not Disobey a Court Order, the Key Concern That Can Justify Inherent-Power Sanctions. .......................................53 |

|   | C. | Other Factors Weigh in Favor of Declining to Impose Any Sanction. ...............................................................................................55 |

| CONCLUSION ........................................................................................................57 |

# TABLE OF AUTHORITIES

**Cases**

*Adams v. USAA Casualty Ins. Co.*, 863 F.3d 1069 (8th Cir. 2017) ................. 42, 43

*Barragan v. Clarity Servs., Inc.*, No. 2:20-cv-00876, 2021 WL 1226537
    (D. Nev. Mar. 31, 2021) ........................................................................ 51, 52

*Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287 (5th Cir. 2016) .... 41, 42, 43, 44

*Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) ........38

*Byrne v. Nezhat*, 261 F.3d 1075 (11th Cir. 2001) ......................................................23

*Carter v. United States*, 547 F.2d 258 (5th Cir. 1977) .............................................38

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) .......................................................50

*Datatern, Inc. v. MicroStrategy, Inc.*, No. 11-11970, 2018 WL 2694458
    (D. Mass. June 5, 2018) ........................................................................ 49, 52

*Disability Advocates & Counseling Group, Inc. v. Betancourt*,
    379 F. Supp. 2d 1343 (S.D. Fla. 2005) ..........................................................48

*Donaldson v. Clark*, 819 F.2d 1551 (11th Cir. 1987) ..............................................47

*Duke v. Smith*, 141 F.R.D. 348 (S.D. Fla. 1992) ......................................................47

*Fletcher v. Ben Crump Law, PLLC*, No. 5:21-CV-01433-LCB,
    2023 WL 3095571 (N.D. Ala. Apr. 26, 2023) (Burke, J.) .................... 22, 24

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) ..................................................46

*Hardnett v. Equifax Info. Servs., LLC*, No. 21-13195, 2023 WL 2056285
    (11th Cir. Feb. 17, 2023) ........................................................................ 39, 48

*Hernandez v. City of El Monte*, 138 F.3d 393 (9th Cir. 1998) ................................49

*Hyde v. Irish*, 962 F.3d 1306 (11th Cir. 2020) .........................................................23

*In re BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003) ....................................... 23, 48

iv

*In re Fieger*, No. 97-1359, 1999 WL 717991 (6th Cir. Sept. 10, 1999) ................48

*In re Finkelstein*, 901 F.2d 1560 (11th Cir. 1990)............................................ 24, 47

*In re Pennie & Edmonds LLP*, 323 F.3d 86 (2d Cir. 2003)....................................24

*In re Piper Aircraft Corp.*, 244 F.3d 1289 (11th Cir. 2001)....................................25

*John Akridge Co. v. Travelers Cos.*, 944 F. Supp. 33 (D.D.C. 1996) ............. 49, 52

*JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976 (11th Cir. 2017).....22

*Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251 (11th Cir. 2003).......................24

*Laborers Local 938 Joint Health & Welfare Tr. Fund v. B.R. Starnes Co. of Fla.*, 827 F.2d 1454 (11th Cir. 1987) .............................................................47

*Matthews v. Gaither*, 902 F.2d 877 (11th Cir. 1990) .............................................39

*Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, 813 F. App'x 368 (11th Cir. 2020) ...................................................................... 51, 54

*Moore v. MidFirst Bank*, No. 5:18-mc-01414-MHH, 2019 WL 539041 (N.D. Ala. Feb. 11, 2019) ................................................................................29

*Morgan v. Apple, Inc.*, Case No. 6:21-CV-00973-RDP (N.D. Ala. Sept. 17, 2021)..............................................................................29

*Murray v. Sevier*, No. 92-1073, 1992 WL 75212 (D. Kan. Mar. 13, 1992)............52

*O'Neal v. Allstate Indem. Ins. Co., Inc.*, 505 F. Supp. 3d 1193 (N.D. Ala. 2020), *aff'd*, No. 20-14712, 2021 WL 4852222 (11th Cir. Oct. 19, 2021).................................................................................50

*Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*, 506 F.2d 914 (5th Cir. 1975) .............................................................................38

*Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218 (11th Cir. 2017) .................................................................... passim

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)..............................................46

*Stanford v. Burlington Motor Carriers*, 74 F. Supp. 2d 1155 (M.D. Ala. 1999) ....24

*Taylor v. Sturgell*, 553 U.S. 880 (2008).................................................................44

*Thomas v. Tenneco Packaging Co., Inc.*, 293 F.3d 1306 (11th Cir. 2002) .............24

*Thompson v. Merchants Adjustment Servs., Inc.*, No. 20-cv-1591,
   2021 WL2682264 (N.D. Ala. Feb. 11, 2021) (Burke, J.)..............................50

*United States v. Gilbert*, 198 F.3d 1293 (11th Cir. 1999) .......................................22

*Vaqueria Tres Monjitas, Inc. v. Rivera Cubano*, 341 F. Supp. 2d 69
   (D.P.R. 2004) .......................................................................................... 49, 52

*Warner v. Tinder, Inc.*, 675 F. App'x 945 (11th Cir. 2017) ....................................51

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110
   (2d Cir. 2009)......................................................................................... 40, 41, 42

**Statutes**

28 U.S.C. § 1404.....................................................................................................37

Ala. Code § 26-26-1................................................................................................32

S.B. 184, Ala. 2022 Reg. Sess. §§ 4–5 (Ala. 2022)..................................................4

**Rules**

Ala. R. Prof'l Conduct 1.7(b)..................................................................................43

Fed. R. Civ. P. 41(a)(1)(A)(i) .................................................................................38

Fed. R. Civ. P. 41(a)(1)(B) .....................................................................................39

Fed. R. Civ. P. 72(b)(3)...........................................................................................25

**Other Authorities**

Alabama Standards for Imposing Lawyer Discipline, *available at*
   https://judicial.alabama.gov/library/RulesBarStd .........................................55

**INTRODUCTION**

Respondents Jennifer Levi and Shannon Minter submit this response to the Orders to Show Cause directed to each of them.[1]  Respectfully, Levi and Minter made the best decisions they could with the information they had, based on a good faith and reasonable understanding of the law.  At all times, their goal was to responsibly advise and protect the interests of vulnerable clients, within the bounds of their professional responsibilities.  Minter and Levi deeply regret that their actions have caused this Court and the Panel to question the integrity of their conduct.  However, as set forth below, because they acted in good faith and did not violate any rule, law, or established ethical requirements, they respectfully submit that no sanction is warranted.

In voluntarily dismissing a lawsuit that challenged Alabama's Vulnerable Child Compassion and Protection Act (the "Act") and filing another suit challenging the Act on behalf of different clients, Levi and Minter acted in a good-faith belief that they were complying with the Federal Rules of Civil Procedure, as well as all applicable local and ethical rules.  Levi and Minter sincerely believed Federal Rule of Civil Procedure 41(a) permitted the dismissal of the *Ladinsky* case for any reason whatsoever.  Given that three circuit courts have determined the same and no

---

[1] Levi and Minter filed an Objection to the Supplemental Orders to Show Cause on May 8, 2024 (Doc. 505).  This briefing is without prejudice to that objection.

Eleventh Circuit precedent has held otherwise, that belief was objectively reasonable. They similarly believed that no law or rule prohibited the filing of a new case with new Plaintiffs. Nor did any law or rule dictate where a new case could be filed. Here, too, where no precedent supports an alternative view, their belief was objectively reasonable.

At all times throughout these proceedings, Levi and Minter have been candid and forthcoming. Neither has made any misrepresentation. They have consistently acknowledged that views about Judge Burke factored into their decision-making. Other factors were also critical, including their concerns about what they understood at the time to be an unusual transfer of their first-filed case (*Ladinsky*) to the judge presiding over the second-filed case (*Walker*), without an explanation or the prompting of a motion; and the negative impact of that transfer on *Ladinsky*, which had become a tagalong case to *Walker*, thereby diminishing Levi and Minter's ability to shape the litigation in a way they thought would best serve their clients' interests. Taking into account all of these factors, Levi and Minter recommended that their clients dismiss the case, which they did. In view of all that had happened, including the unexplained transfer to Judge Burke, Levi and Minter made the decision to file a new case with new plaintiffs in a different district. At all times, Levi and Minter believed they were acting zealously and strategically to serve the best interests of their clients within both the letter and spirit of the law and applicable rules.

2

## FACTUAL BACKGROUND

**A.      Attorneys Jennifer Levi and Shannon Minter.**

Jennifer Levi is the Senior Director of Transgender and Queer Rights at GLBTQ Legal Advocates & Defenders (GLAD).  Ex. 1, Levi Aff., ¶ 6.  Levi has dedicated her career to fighting for the rights of vulnerable clients.  *Id.* ¶¶ 5–6.  Other than this proceeding, she has had a spotless disciplinary record throughout her three-decade legal career.  *Id.* ¶ 10.  She is a former law clerk for the Honorable Judge Michael Boudin of the United States Court of Appeals for the First Circuit.  *Id.* ¶ 3. She is a graduate of the University of Chicago Law School.  *Id.* ¶ 2.

Shannon Minter is the Legal Director of the National Center for Lesbian Rights (NCLR), a non-profit legal organization representing lesbian, gay, bisexual, and transgender people.  Ex. 2, Minter Aff.  ¶ 3.  Minter has devoted his legal career of thirty-plus years to representing LGBT people and their families.  *Id*. ¶¶ 2–3. Other than this proceeding, he has never faced any disciplinary complaint, investigation, or proceeding.  *Id*. ¶ 5.  Minter has taught law at UCLA School of Law, Berkeley University, Stanford University, Golden Gate University, and Santa Clara University, and he is a graduate of Cornell Law School.  *Id.* ¶¶ 1, 4.

### B.     Work Preceding the Filing of *Ladinsky.*

On April 7, 2022, Governor Kay Ivey signed the Act into law.  The Act bans medical treatments for transgender adolescents.  S.B. 184, Ala. 2022 Reg. Sess. §§ 4–5 (Ala. 2022).

Minter's organization (NCLR) had been monitoring the Alabama Legislature's consideration of this Act since 2019 and preparing a potential legal challenge to the Act.  Minter Decl. ¶ 1, located at *In re Vague*, 2:22-mc-03977-WKW (M.D. Ala.), Doc. #80-6, pp. 34–45; Nov. 3, 2022 Hr'g Tr. at 123 (Minter). Levi joined this effort, which would later become the *Ladinsky et al. v. Ivey et al.* litigation team, at least a year before the Act was passed.  Levi Decl. ¶ 2, located at *Vague*, Doc. #80-6, pp. 4–19.

Levi testified that her primary role on the Alabama litigation team was to "frame the legal claims" that the team would bring to challenge the Act. Nov. 4, 2022 Hr'g Tr. at 5; *see* Levi Decl. ¶ 3.  She was brought onto the litigation team because of her knowledge and experience on legal issues affecting transgender persons, as well as her knowledge and experience regarding medical care and treatment for transgender minors.  Levi Decl. ¶ 3.  Levi had never practiced in Alabama before the *Ladinsky* case.  *Id.*  Therefore, she was not brought onto the team to handle procedural aspects of litigating the case, and she was not responsible for those matters.  *Id.*

4

Levi testified that, when she joined the *Ladinsky* case team, she "wasn't aware of information about the judges" in Alabama.  Nov. 4, 2022 Hr'g Tr. at 22.  Before joining the *Ladinsky* team, she had no knowledge of the judges' track records or reputations.  Levi Decl. ¶ 3.  Levi testified that she "very much trust[ed] those on the team who had more information than [she] did" about the judges who could be assigned, Nov. 4, 2022 Hr'g Tr. at 22, and that she deferred to other counsel on the decision of where to file the *Ladinsky* suit, Levi Decl. ¶ 6.  She testified that the team was prepared to litigate the case "in front of any judge to which [they] were assigned."  Nov. 4, 2022 Hr'g Tr. at 20.

Minter was not very involved in the *Ladinsky* team until after the Act was passed.  Minter Decl. ¶ 1.  He was focused on high-level strategic legal issues and leadership, not the specifics of Alabama practice and procedure, and did not file an appearance in any of the lawsuits in question.  *See id*. ¶¶ 1–2.  Minter worked on the *Ladinsky* complaint and engaged in discussions about legal arguments and claims. *See id.* ¶ 1.

At least a year before the Act passed, Levi and Minter were aware that another group—which would later become the *Walker et al. v. Marshall et al*. litigation team—was also planning a legal challenge to the Act.  Levi Decl. ¶ 8; Nov. 3, 2022 Hr'g Tr. at 123–24 (Minter).  Levi and Minter believed it was important for their clients' interests that theirs be the first-filed case, and Levi testified that, after the

Act passed, they were "multitasking" to achieve this goal.  Nov. 4, 2022 Hr'g Tr. at 44 (Levi); *see* Nov. 3, 2022 Hr'g Tr. at 124 (Minter).  Minter testified that they wanted their clients' challenge to be the "lead case" to ensure that their strategy would "be the one that was heard."  Nov. 3, 2022 Hr'g Tr. at 124.  Minter believed that their team had the best approach, and he "wanted [their team] to have a chance to shape the case."  *Id.* at 142–43.

### C.    Filing of the *Ladinsky* Case.

On April 8, the day after the Act's enactment, seventeen attorneys, including Levi, filed a complaint in *Ladinsky et al. v. Ivey et al.*, in the Northern District.  2:22-cv-447-LCB (N.D. Ala. 2022), Doc. #1.  The complaint alleged that the Act violated Section 1557 of the Affordable Care Act as well as constitutional guarantees (including Equal Protection and Due Process).  *Id.*  Because the *Ladinsky* team wanted to "make sure that [they] were the first filed action," they "rushed" to file their complaint.  Aug. 4, 2022 Hr'g Tr. at 23 (Eagan).  Levi testified that filing the complaint so quickly was the result of "exceedingly hard" work.  Nov. 4, 2022 Hr'g Tr. at 43.  Although the *Ladinsky* lawyers had hoped to file a motion for preliminary injunction along with their complaint, they "committed [their] resources to get the complaint filed" because they could not get the complaint and preliminary injunction motion "filed at one time and get filed first."  *Id.* at 44 (Levi).

*Ladinsky* was originally assigned to Judge Manasco. *Ladinsky*, 2:22-cv-447-LCB at Doc. #2. After she recused herself on April 11, the case was reassigned to Magistrate Judge Cornelius. *Id.* at Doc. #3.

### D.    Filing of the *Walker* Case.

That same day, April 11, which was three days after *Ladinsky* was filed, another group of attorneys filed *Walker et al. v. Marshall et al.*, 5:22-cv-480-LCB (M.D. Ala. 2022) in the Middle District of Alabama. *See id.* at Doc. #1. The *Walker* plaintiffs similarly challenged the Act on the grounds that it violated equal protection and due process rights. *Id.* at Doc. #1. Some of the claims asserted in *Walker*, however, differed from those asserted in *Ladinsky*. *Compare id.*, *with Ladinsky*, 2:22-cv-447-LCB at Doc. #1.

On a civil cover sheet filed with the complaint, the *Walker* lawyers indicated that the case was "related" to *Corbitt v. Taylor*, No. 2:18-cv-91 (M.D. Ala. 2021). *See Walker*, 5:22-cv-480-LCB at Doc. #8, ¶ 1. *Corbitt* was an earlier case before Judge Thompson that involved a challenge to another transgender-focused law. *Id.* at ¶ 3.

Levi and Minter were not involved in filing the *Walker* case or decisions with respect to its filing. *See* Levi. Decl. ¶ 8; Minter Decl. ¶ 3. Minter knew that the *Walker* lawyers had been planning to mark the case as "related" to *Corbitt*, but he did not recall having discussed this issue with anyone from the *Walker* team and had "no

involvement" in this decision.   Minter Decl. ¶ 3.   Although Levi had "a few communications" with lawyers associated with the *Walker* team about this topic in the time before the Act passed, Levi Decl. ¶ 8, she was "of the very strong view that there wasn't a basis" for *Walker* to be considered related to *Corbitt*, Nov. 4, 2022 Hr'g Tr. at 13.

On April 12, the *Walker* plaintiffs filed a motion to reassign the case to Judge Thompson in the Middle District, asserting the case was related to *Corbitt*.   *Walker*, 5:22-cv-480-LCB at Doc. #8.   They also filed a motion for a temporary restraining order and/or preliminary injunction against enforcement of the Act.   *Id.* at Doc. #9.

On April 13, Chief Judge Marks issued an order to show cause for why the *Walker* action "should not be transferred to the Northern District of Alabama, where the first-filed action"—*i.e.*, *Ladinsky*—was pending.   *Id.* at Doc. #3.   Thereafter, attorneys from the *Walker* and *Ladinsky* teams had a phone call.   Aug. 3, 2022 Hr'g Tr. at 212–13 (Esseks).   Levi and Minter were not on that call.   Nov. 3, 2022 Hr'g Tr. at 127 (Minter); Nov. 4, 2022 Hr'g Tr. at 11–12 (Levi); Nov. 3, 2022 Hr'g Tr. at 31 (Orr).   Levi had learned earlier that day, consistent with what she later learned was said on that call, that the *Walker* team might attempt to have *Ladinsky* transferred to the Middle District "as part of their effort to get their case in front of Judge Thompson."   Levi Decl. ¶ 9.   Levi's view was that the *Ladinsky* team "should do nothing with respect to the Walker team's effort to get their case before Judge

Thompson." *Id.*  Likewise, Minter testified that he "had no interest in consenting to or agreeing to [*Walker*] seeking to pull [*Ladinsky*] over with them" to Judge Thompson.  Nov. 3, 2022 Hr'g Tr. at 127–28.

### E.   Assignment of *Ladinsky* to Judge Axon; Transfer of *Walker* to the Northern District.

Meanwhile, *Ladinsky* had been assigned to Magistrate Judge Cornelius, but there was not unanimous consent to proceed before a magistrate judge.  Accordingly, on April 14, *Ladinsky* was randomly reassigned to Judge Axon.  Levi Decl. ¶ 11; *Ladinsky*, Doc. #11.  At the time *Ladinsky* was pending before Judge Axon, Levi and Minter had no personal view of the assignment of the case to Judge Axon.  Levi Decl. ¶ 12; Minter Decl. ¶ 4.

At around 9:00 p.m. on April 14, the *Walker* plaintiffs withdrew their motion to reassign their case to Judge Thompson and filed a response to Chief Judge Marks' order stating that they did not oppose the transfer of *Walker* to the Northern District. *Walker*, 5:22-cv-00480-LCB at Doc. #18 at 3.

The next morning, April 15, a lawyer from the *Walker* team, Carl Charles, contacted Levi and indicated that the *Walker* case had been transferred to the Northern District and assigned to Judge Burke.  Levi Decl. ¶ 13; *see also Walker*, 5:22-cv-00480-LCB at Doc. #20.  Charles asked Levi whether the *Ladinsky* lawyers would object to the *Walker* team's effort to get the *Walker* case transferred to Judge Axon so it could be consolidated with *Ladinsky*.  Nov. 4, 2022 Tr. at 15–16 (Levi);

Aug. 3, 2022 Hr'g Tr. at 153 (Charles).  Levi told Charles that she did not think the *Ladinsky* team would object, Levi Decl. ¶ 14; she believed that consolidation would mean *Ladinsky* would still be considered the lead case, *see* Nov. 4, 2022 Hr'g Tr. at 19.  At the time, Levi assumed the *Walker* team would need to file a motion before their assigned judge to obtain this relief.  Levi Decl. ¶ 14.  She was later told by *Walker* attorneys that the motion would need to be filed in *Ladinsky* rather than in *Walker*.  Nov. 4, 2022 Hr'g Tr. at 15–16.  Levi herself could not prepare a motion to transfer; she had to step away from work at approximately 3:15 p.m. CST to attend her child's high school sporting match before preparing to observe Passover.  *Id.*; Levi Decl. ¶¶ 17–18.  The *Walker* lawyers said they would prepare the motion.  Nov. 4, 2022 Hr'g Tr. at 16 (Levi).

The same afternoon, after the *Walker* lawyers had drafted the motion to consolidate, another member of the *Ladinsky* counsel team, Melody Eagan of the Lightfoot firm, called the attorneys for the State.  Aug. 4, 2022 Hr'g Tr. at 68–69 (Eagan).  She learned that the State was drafting and preparing to file, in *Ladinsky*, its own motion to consolidate the two cases.  *Id.* at 69.  Eagan agreed that the State could file its motion and state that both *Ladinsky* and *Walker* counsel consented to consolidation.  *Id.* at 70–71.

### F.    *Walker* Status Conference and *Ladinsky* Transfer to Judge Burke.

At 4:07 p.m. on April 15, before the State could file its motion to consolidate the two cases, Judge Burke set a status conference in *Walker* for the following Monday, April 18.  *Walker*, 5:22-cv-480-LCB at Doc. # 22.

At 4:41 p.m., Judge Axon *sua sponte* transferred the *Ladinsky* case to Judge Burke with no explanation in the transfer order beyond stating that the transfer was "[i]n the interest of efficiency and judicial economy."  *Ladinsky*, 5:22-cv-447-LCB at Doc. #14.  Within ten minutes of the transfer, Eagan received an email from attorneys for the State saying that they no longer intended to file a motion to consolidate *Ladinsky* and *Walker*.  Aug. 4, 2022 Hr'g Tr. at 74 (Eagan).  These events transpired during the time Levi had stepped away from work for family reasons.

While Levi and Minter now understand that Judge Axon transferred *Ladinsky* to this Court because she was presiding over a criminal trial, they were not aware of this fact on April 15.  *See* Nov. 3, 2022 Hr'g Tr. at 137–38 (Minter); Nov. 4, 2022 Hr'g Tr. at 14–15 (Levi).  At the time, the transfer from Judge Axon to this Court was surprising because it contravened their understanding that a second-filed case travels with a first-filed case and not the other way around.  Nov. 3, 2022 Hr'g Tr. at 132–33 (Minter); Nov. 4, 2022 Hr'g Tr. at 17 (Levi).

In addition, *Walker* had a status conference scheduled for the next business day, but *Ladinsky* did not, even though it was the first-filed case.  Levi Decl. ¶ 19.

Minter and Levi did not believe it would be possible for matters relating to *Ladinsky* to be heard at the *Walker* status conference because the two cases had not yet been consolidated and because *Ladinsky* did not yet even have a motion for preliminary injunction finalized for filing.  Minter testified that he "was not sanguine" about any prospect of being able to appear at the *Walker* hearing and "didn't know if [they] would even be able to be heard."  Nov. 3, 2022 Hr'g Tr. at 147.  Levi testified that she believed that the *Ladinsky* team had "no opportunity to appear" at the *Walker* status conference.  Nov. 4, 2022 Hr'g Tr. at 38–39.

Minter testified that although he did not believe Judge Burke had done anything improper in setting a status conference (because *Walker* had a TRO motion on file), Nov. 3, 2022 Hr'g Tr. at 147, that status and the unexplained transfer of *Ladinsky* caused Minter a great deal of concern for his clients.  He testified that because *Walker* was moving forward so quickly even though it was the second-filed case, he felt like the "rug got pulled out" from under the clients in the *Ladinsky* case, and he was concerned that the *Ladinsky* team would "be left behind" in challenging the Act.  *Id.* at 147.  He was particularly worried that the *Ladinsky* lawyers would lose their ability to set the strategy for the litigation.  Minter Decl. ¶ 5.

### G.    Dismissal of *Ladinsky* and *Walker*.

Given the unexpected turn of events and its potential negative impact on the *Ladinsky* clients, Minter thought about the option to file a voluntary dismissal under

Rule 41.  Nov. 3, 2022 Hr'g Tr. at 139–40; *see* Minter Decl. ¶ 6.  He testified that it was possible—although he does not remember specifically—that he raised this option on a call with his NCLR colleague Asaf Orr after Judge Axon's transfer order.  Nov. 3, 2022 Hr'g Tr. at 139–40.  Minter also participated in a *Ladinsky* team call, during which the lawyers discussed voluntarily dismissing the case.  Minter Decl. ¶ 12.

After the *Ladinsky* team call, Minter reached out to Kathleen Hartnett (Cooley/*Walker*) to see if the *Walker* team was also considering whether to voluntarily dismiss their case.  *Id.*; Nov. 3, 2022 Hr'g Tr. at 153–54 (Minter).  Hartnett told Minter that the *Walker* lawyers were "thinking along the same lines."  Nov. 3, 2022 Hr'g Tr. at 154 (Minter).

At about 5:00 p.m. on April 15, there was a conference call between members of the *Ladinsky* and *Walker* teams, including Minter but not Levi (who was still offline because her child had suffered a serious knee injury during the sporting match she had left work to watch).  Minter Decl. ¶ 12; Nov. 4, 2022 Hr'g Tr. at 16, 18 (Levi).  The lawyers on the call discussed the possibility of voluntarily dismissing both cases.  Minter Decl. ¶ 12.  Ultimately, both teams indicated that—pending further consultation and discussion with their respective clients—they would file voluntary dismissals.  *Id.*

When Levi logged on again to work, she learned about the *Walker* status conference and *Ladinsky*'s transfer to Judge Burke.  She testified that she was "very

concerned" because "within a very short period of time, everything had very significantly changed and none of it made sense to [her] in terms of the process by which that happened."  Nov. 4, 2022 Hr'g Tr. at 17.  Because *Walker* already had a motion for emergency relief on file and had an upcoming status conference, Levi worried that *Ladinsky* was "suddenly becoming a tagalong case."  *Id*. at 19.  She testified that "all of the work that [they] had done to try to become the first filed case was potentially being undermined."  *Id.*  Thus, although the *Ladinsky* team had already decided to recommend dismissal of the case to their clients by the time Levi was able to join calls on the evening of April 15, she agreed with the decision.  *Id*.

During discussions on April 15, Levi and Minter were part of *Ladinsky* team communications in which other lawyers stated that Judge Burke "wasn't considered a good draw for the case" and expressed concern about the prospects of their case. *Id.* at 17–18; *see* Levi Decl. ¶ 19; Minter Decl. ¶ 6.  Levi and Minter did not have any independent knowledge or opinions about Judge Burke but had no reason to disagree with their colleagues' views.  Levi Decl. ¶ 19; *see* Minter Decl. ¶¶ 5–6.

Although time was of the essence in challenging the Act, Levi believed that there would be "nearly no difference" in timing if they dismissed *Ladinsky* and filed a new case promptly thereafter.  Nov. 4, 2022 Hr'g Tr. at 29.  Similarly, Minter testified that he was "willing to forego" a day or so in order to "be[ ] able to present the case in what [he] thought would be the best way."  Nov. 3, 2022 Hr'g Tr. at 153.

Levi testified that this assessment was made "with the parties' interests in mind" and that the clients authorized the dismissal. Nov. 4, 2022 Hr'g Tr. at 69.

The *Ladinsky* and *Walker* teams had further communications on April 15 to work out the logistics and timing of filing the motions to dismiss. Minter Decl. ¶ 12. From the *Ladinsky* team's perspective, it did not "make sense for [them] to dismiss unless the *Walker* case also dismissed their case." Nov. 4, 2022 Hr'g Tr. at 31 (Levi). Both teams understood that *Walker* would dismiss before *Ladinsky*; Minter testified that, to the *Ladinsky* team, this sequence eliminated the risk that *Ladinsky* would dismiss and *Walker* would continue forward as the only case. Nov. 3, 2022 Hr'g Tr. at 154–55; *see also* Aug. 4, 2022 Hr'g Tr. at 94 (Eagan).

Accordingly, at 6:24 p.m. on April 15, the *Walker* team dismissed their case. *Walker*, Doc. # 23. Then, the *Ladinsky* team filed a notice of voluntary dismissal at 6:33 p.m. *Ladinsky*, Doc. # 15.

Both Levi and Minter testified that, if *Ladinsky* originally had been assigned to Judge Burke, and not transferred to this Court in the way that the transfer occurred, neither would have recommended or supported dismissing *Ladinsky*. Levi Decl. ¶ 19; Minter Decl. ¶ 7. Levi testified that she was "prepared to litigate the case in front of any judge" to which *Ladinsky* was assigned. Nov. 4, 2022 Hr'g Tr. at 20–21. Levi also testified that, if the identity of the judges had been reversed but all else remained the same—*i.e.*, if *Ladinsky* were the first-filed case and originally assigned

to Judge Burke but transferred to Judge Axon, presiding over the second-filed case—she still would have recommended dismissing the case due to "the same questions about the procedure" and her "concern about how [their] first-filed case had been undermined and overtaken." *Id.* at 59–60. In the same vein, Minter swore in his declaration that if the filing order of the cases had been reversed but all else remained the same—*i.e.*, *Ladinsky* had been the second-filed case and *Walker* had been the first-filed, and *Ladinsky* had been transferred from Judge Axon to this Court consistent with the first-filed rule—he would not have recommended or supported dismissal. Minter Decl. ¶ 7.

### H. Discussion Around Potentially Combining the *Walker* and *Ladinsky* Teams.

During the evening of April 15, Levi spoke to Hartnett about joining the *Walker* and *Ladinsky* teams together to file a new case. Levi Decl. ¶ 23. Levi left that conversation with the understanding that the "*Walker* team would dismiss their case and join forces with the lawyers from the *Ladinsky* case," *id.*, though there were "going to be some issues and questions" regarding the path forward in this "joint effort," Nov. 4, 2022 Hr'g Tr. at 34–35.

The next morning, April 16, the lawyers from the nonprofit organizations on both case teams (including Levi and Minter) had a call to discuss next steps in working together. It quickly became apparent that the teams were not on the same page despite the understanding they had the previous night about the teams joining

forces; in particular, they did not have a shared view of how decisions would be made, where a case would be filed, or who the plaintiffs would be. *Id.*; *see* Levi Decl. ¶ 25; Nov. 3, 2022 Hr'g Tr. at 165–66 (Minter). The call ended "with no final agreements made." Levi Decl. ¶ 25. Ultimately, the two groups did not work together. *Id.* ¶ 28; Minter Decl. ¶ 8. Instead, later in the afternoon on April 16, organizations comprising the *Walker* team, including the ACLU and Lambda Legal, determined that they would not go forward with new litigation. Aug. 3, 2022 Hr'g Tr. at 231 (Esseks). The next morning, April 17, James Esseks (ACLU/*Walker*) informed the *Ladinsky* team of the *Walker* lawyers' decision to not file a new case. *Id.* at 232–33 (Esseks); Minter Decl. ¶ 8.

## I.     Filing of *Eknes-Tucker.*

After the April 16 call with *Walker* counsel, both Levi and Minter further considered the parameters of a new case challenging the Act. Levi researched Rule 41, and Minter consulted with civil procedure experts. Nov. 4, 2022 Hr'g Tr. at 35 (Levi); Nov. 3, 2022 Hr'g Tr. at 163 (Minter). Based on her research, Levi believed that the plaintiffs had an "automatic right under 41(a) to dismiss the case and that [they] could file a new case or the same case in any district." Nov. 4, 2022 Hr'g Tr. at 54. She also understood that there "would be a lot of attention to this case," so she "thought in an abundance of caution," the team should bring a new case with all new plaintiffs, which is what they did. *Id.*

Likewise, while Minter thought Rule 41 allowed them to file a new case with the same plaintiffs, he wanted to be "careful" to avoid the "appearance of judge shopping." Nov. 3, 2022 Hr'g Tr. at 164. Minter's desire to avoid the appearance of judge shopping was *not* because he believed they were, in fact, judge shopping—he wanted to avoid "*any possible* problem." *Id.* (emphasis added).

Minter and others on the team already were aware of an additional family who wished to join a lawsuit and challenge the Act, and they knew generally that there were other families and medical providers in Alabama who were very concerned about the law and who would want to be plaintiffs. Minter Decl. ¶ 8. Two of the new plaintiffs in what became *Eknes-Tucker* were a family that the team had not been able to add in time to the *Ladinsky* case and a pastor who provided counseling to transgender families. Aug. 4, 2022 Hr'g Tr. at 24, 111, 146 (Eagan). The addition of the pastor allowed the team to bring a First Amendment challenge to the Act. *Id.* at 111. *Eknes-Tucker* was a new case, not a copy of *Ladinsky*: it was brought on behalf of different plaintiffs and included some different claims. *Compare Ladinsky*, 5:22-cv-00447-LCB at Doc. #1, *with Eknes-Tucker et al. v. Ivey et al.*, 2:22-cv-00184-LCB-CWB (M.D. Ala.) at Doc. #1.

Levi and Minter were also involved in conversations on April 16 and April 17 about where the new case should be filed. Levi Decl. ¶ 27; *see* Minter Decl. ¶ 9. Levi expressed her view that the case should not be filed in the Northern District

because, at the time, she believed a procedural irregularity had just occurred in the district, and she wanted to avoid the risk that "those procedural complications would potentially arise again" in the new case, including the risk that the case would be reassigned to Judge Burke.  Nov. 4, 2022 Hr'g Tr. at 55; Levi Decl. ¶ 27.  Minter held a similar view.  Minter Decl. ¶ 9.

At the same time, Levi and Minter were both aware that, regardless of where the case was filed, it could be transferred to this Court.  Levi Decl. ¶ 27; Nov. 3, 2022 Hr'g Tr. at 172–73.  They were "prepared for [*Eknes-Tucker*] to be assigned to any judge and to litigate the case in front of any judge to which [they] were assigned," including Judge Burke.  Nov. 4, 2022 Hr'g Tr. at 54; *see* Minter Decl. ¶ 9.

On April 19, the *Ladinsky* team of lawyers filed *Eknes-Tucker* in the Middle District.  Levi Decl. ¶ 28.  *Eknes-Tucker* was then transferred to Judge Burke.  *Id*. The team proceeded to litigate in this Court.  *Id.*; Minter Decl. ¶ 9.

**J.    The Orders to Show Cause.**

On April 18, this Court wrote in an order dismissing the *Walker* case that "Plaintiffs' course of conduct could give the appearance of judge shopping." *Walker*, 22-cv-00480-LCB at Doc. #24 at 3.  This Order was not filed in *Ladinsky* or served on the lawyers appearing in that matter, and Levi and Minter did not learn

of it until after the filing of *Eknes-Tucker*.  *See generally Ladinsky* Dkt.; Aug. 3, 2022 Hr'g Tr. at 134 (Eagan).

On May 10, a three-judge panel consisting of Judge Watkins, Judge Proctor, and Judge Beaverstock (the "Panel") ordered each counsel from *Ladinsky* and *Walker* to appear at hearings so the Panel could inquire into "the issues raised by counsels' actions." *In re Vague*, 2:22-mc-03977-WKW (M.D. Ala.) at Doc. #1.  The order did not elaborate further on what conduct the Panel would be evaluating.  Thereafter, at its first hearing on May 20, 2022, the Panel issued an oral order barring the attorneys from discussing their testimony with anyone other than their counsel.  May 20, 2022 Hr'g Tr. at 74, 93–94, and 202.

On July 8, 2022, the Panel directed the respondents to submit sworn declarations regarding their actions taken in connection with *Ladinsky*, *Walker*, and *Eknes-Tucker*.  *Vague*, 2:22-mc-03977-WKW at Doc. #22.  The July 8 order also barred each respondent from discussing their declarations, or any matters related to the May 20 hearing or July 8 order, with anyone other than the attorneys representing them.  *Id.* at 3-4.

Levi submitted her declaration on July 27, 2022.  *See Vague*, Doc. #80-6 at pp. 4–19.  Although Minter never filed an appearance in *Ladinsky* or *Eknes-Tucker*, he voluntarily participated in these proceedings and submitted a declaration also on July 27, 2022.  *See id*. at pp. 34–45.  Levi and Minter both testified at hearings in

November 2022 regarding their involvement in the decisions to dismiss *Ladinsky* and to file *Eknes-Tucker*.  Nov. 3, 2022 Hr'g Tr. 121–77 (Minter); Nov. 4, 2022 Hr'g Tr. 4–72 (Levi).

On October 3, 2023, the Panel released a Final Report of Inquiry (the "Panel Report") in which it stated, *inter alia*, that Levi and Minter, along with others, "purposefully attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama."  *Vague*, 2:22-mc-03977-WKW at Doc. #70, at 51.  The Panel further stated that "counsel intentionally attempted to direct their cases to a judge they considered favorable and, in particular, to avoid Judge Burke."  *Id.* at 52.

On February 21, 2024, this Court issued an Order to Show Cause in this proceeding (the "Order").  *Eknes-Tucker*, 2:22-cv-00184-LCB-CWB at Doc. # 406.  On May 1, 2024, the Court issued Supplemental Orders to Show Cause for Levi and Minter (the "Individual Orders").  *Eknes-Tucker*, 2:22-cv-00184-LCB-CWB at Docs. #485 ("Minter Order") and # 488 ("Levi Order").  The Individual Orders direct Levi and Minter to show cause why they should not be sanctioned for "attempting to manipulate the [Court's] random case assignment procedures" and "misrepresenting or otherwise failing to disclose key facts during the Panel's inquiry."  Minter Order at pp. 10–11; Levi Order at pp. 10–11.  The Individual Orders also require Levi and Minter to account for "any findings in Section IV of

the Panel's Report" implicating either their credibility or discrepancies between their testimony and anyone else's.  Minter Order at pp. 10–11; Levi Order at pp. 10–11. Levi and Minter have objected to the Individual Orders on due process grounds. *Eknes-Tucker*, 2:22-cv-00184-LCB-CWB at Doc. #505.

## ARGUMENT

## I.     Standard of Review.

### A.     Inherent-Authority Sanctions Require Clear and Convincing Evidence of Subjective Bad Faith.

A court may not impose sanctions under its inherent authority without finding, based on clear and convincing evidence, that a party acted in subjective bad faith. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017); *JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 987 (11th Cir. 2017).  Subjective bad faith is "not simply bad judgment or negligence"; rather, "it contemplates a state of mind affirmatively operating with furtive design or ill will." *Fletcher v. Ben Crump Law, PLLC*, No. 5:21-CV-01433-LCB, 2023 WL 3095571, at *5 (N.D. Ala. Apr. 26, 2023) (Burke, J.) (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)).  This standard is not satisfied by "recklessness alone." *Purchasing Power*, 851 F.3d at 1223.  Where there is no "direct evidence of subjective bad faith," the bad-faith standard can be met only "if an attorney's conduct is so egregious that it could *only* [have] be[en] committed in bad faith." *Id.* at 1224–25 (emphasis added); *accord Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir.

2020).  A court must make "specific findings as to the party's conduct that warrants sanctions," including on the specific issue of subjective bad faith.  *Byrne v. Nezhat*, 261 F.3d 1075, 1123 (11th Cir. 2001) (citations and quotation marks omitted).

### B. The Legal Standard Governing Inherent-Authority Sanctions Applies to the Rules and Authorities Cited by the Court.

The Individual Orders cite the Eleventh Circuit's decision in *In re BellSouth Corporation*, the Rules of Professional Conduct, local rules of practice, and Federal Rule of Civil Procedure 11(b) as potentially implicated by the respondent attorneys' conduct.  Minter Order at 5–10; Levi Order at 5–10.  All these cited authorities either directly implicate the Court's inherent authority or impose standards akin to those governing use of the inherent power.[2]

***BellSouth.***  The Eleventh Circuit's decision applies the standards for inherent-power sanctions to an assertion of judge-shopping.  *In re BellSouth Corp.*, 334 F.3d 941, 959–60, 963 n.19 (11th Cir. 2003).

**Rules of Professional Conduct.**  The Rules of Professional Conduct do not themselves provide an independent authority for this Court to enter sanctions; rather, whether a court can sanction an attorney for violating such a rule involves an exercise of the court's inherent power.  *E.g.*, *Thomas v. Tenneco Packaging Co.*,

---

[2] The Court also cited the Oaths of Admission to the Northern District of Alabama and the Middle District of Alabama.  Levi and Minter have sought to act consistent with the principles in these Oaths.

*Inc.*, 293 F.3d 1306, 1320–28 (11th Cir. 2002); *In re Finkelstein*, 901 F.2d 1560, 1564 (11th Cir. 1990).

**Local Rules.**  Similarly, the local rules of this Court and the Middle District do not give the Court any power to impose sanctions that is separate and independent from the inherent power.  *See, e.g.*, *Thomas*, 293 F.3d at 1322–23.  This is because the local rules themselves are "promulgated pursuant to [the court's] inherent authority." *Stanford v. Burlington Motor Carriers*, 74 F. Supp. 2d 1155, 1156 (M.D. Ala. 1999).

**Rule 11.**  Court-initiated Rule 11 sanctions—the kind potentially implicated here[3]—require findings akin to those required for the use of the inherent power.  Court-initiated Rule 11 sanctions do not contain the "safe harbor" that applies to party-initiated Rule 11 sanctions.   As a "compensating protection[]," a court considering such sanctions must issue an order to show cause and then evaluate counsel's conduct under "a higher standard ('akin to contempt')" than the standard governing party-initiated sanctions.  *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (citation omitted).  Subjective bad faith is required, *In re Pennie & Edmonds LLP*, 323 F.3d 86, 87 (2d Cir. 2003), and the standard of proof is clear and convincing evidence, *Fletcher*, 2023 WL 3095571, at *4.

---

[3] As noted above, Minter did not appear in this case and thus did not sign any pleading presented in *Ladinsky* or *Eknes-Tucker*.

**C.    To the Extent the Panel Reached Any Legal Conclusions, the Court Should Not Give Those Conclusions Any Deference.**

Levi and Minter do not interpret the Panel Report to contain any legal conclusions.  For example, although the Panel stated that various attorneys' actions constituted "misconduct," Panel Report at 51, Levi and Minter do not believe the Panel intended to (or did) make a legal determination that any of the attorneys engaged in sanctionable misconduct, and the Panel Report does not recite any of the standards that apply when making such a legal determination.

If the Court disagrees, however, it should review any conclusions of the Panel *de novo*, particularly given that the attorneys did not have the opportunity to brief any legal issues to the Panel.  *See Vague*, 2:22-mc-03977-LCB at Doc. #99 (affirming the Court's authority to "accept[], reject, or modify[]" the Panel's findings).  *Cf.* Fed. R. Civ. P. 72(b)(3) ("accept, reject, or modify" language used to describe *de novo* review standard for in rule for evaluating magistrate judge's determinations on dispositive issues).  *De novo* review requires the Court to "make a judgment independent of" the Panel's, "without deference to [the Panel's] analysis and conclusions."  *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001).

**II.    Levi and Minter's Conduct in Dismissing One Case and Filing a New Case Is Not Sanctionable, and They Were Candid and Truthful in This Proceeding.**

The Individual Orders identify six categories of alleged misconduct under the heading "judge-shopping."  The first four relate to the dismissal of the *Ladinsky* case,

and the final two relate to the filing of *Eknes-Tucker*.  Levi Order at 10–11; Minter Order at 10–11.

Sanctions are not appropriate here because neither Levi nor Minter acted with any subjective bad faith with respect to any of these categories of alleged misconduct, and they testified truthfully in response to the Panel's inquiry in all these areas.  That testimony shows that Levi and Minter subjectively believed, in good faith, both that the Federal Rules permitted them to dismiss *Ladinsky* and to file a new case with different plaintiffs and that these decisions were in their clients' best interests.  *See* Part II.A, below.

Where, as here, there is no "direct evidence of subjective bad faith," a court cannot find bad faith unless "an attorney's conduct is so egregious that it could *only* [have] be[en] committed in bad faith."  *Purchasing Power*, 851 F.3d at 1224–25 (emphasis added).  That standard is not satisfied.  *See* Part II.B, below.  The record establishes that Levi and Minter made a strategic decision to dismiss and file a new case based on concerns about the transfer of *Ladinsky*, the resulting judicial assignment, and losing the key decision-making role they expected to have as the leading case.  Rule 41, on its face, authorizes plaintiffs to dismiss and refile for any reason.  Decisions from three U.S. Courts of Appeals establish that a plaintiff may dismiss and refile a complaint one time—even when the motive for doing so is to obtain a different judge—and there is no contrary Eleventh Circuit precedent.  In

view of those authorities, it was not "egregious," *see Purchasing Power*, 851 F.3d at 1224–25, for Levi and Minter to conclude that they were permitted to dismiss and file a new case, even if motivated in part by a desire to seek a more favorable forum.

### A. Levi and Minter's Testimony Establishes That They Acted in Subjective Good Faith and Were Candid and Truthful with the Panel.

Levi and Minter acknowledge that a concern over whether Judge Burke was a good judge for the case was a factor in their decisions to dismiss *Ladinsky* and file a new case in the Middle District. However, that was not the sole factor. Both Levi and Minter made clear in their declarations and testimony that they had additional reasons for their actions, including their concern about what was—from their perspective—the unusual transfer of the case and the resulting loss of *Ladinsky*'s first-filed status. They also testified that they filed *Eknes-Tucker* in the Middle District to avoid what they viewed as a procedural irregularity in the Northern District that had caused the transfer of *Ladinsky* to Judge Burke.

Both in making the recommendation to dismiss *Ladinsky* and to file *Eknes-Tucker* in the Middle District, Levi and Minter acted in good faith—that is, they believed their actions were permissible. Levi and Minter understood that Federal Rule of Civil Procedure 41 permits a one-time voluntary dismissal of a case, before an answer is filed, for any reason, without penalty. As Levi testified, she "believed firmly" that they had an "automatic right under [R]ule 41(a) to dismiss the case and

that [they] could file a new case or the same case in any district." Nov. 4, 2022 Hr'g

Tr. at 35, 54; Levi Decl. ¶ 26. She believed that nothing "would prohibit at all the

filing of a new case." Nov. 4, 2022 Hr'g Tr. at 35. Minter "consult[ed] with civil

procedure experts" and performed some research, Nov. 3, 2022 Hr'g Tr. at 163,

concluding there was no bar on dismissing and then filing a new case, *id*. Moreover,

the *Ladinsky* team believed they were permitted—in fact, ethically required—to file

suit in the forum they believed to be in their clients' best interests. At the time, they

"still didn't understand what had happened" in the Northern District and were

concerned "[o]n behalf of [their] clients" about a procedural irregularity; so, they

believed it was in their clients' best interests to file in the Middle District. Nov. 4,

2022 Hr'g Tr. at 36, 71 (Levi). There is no evidence that Levi or Minter acted in

bad faith.

### 1.  Levi and Minter Had Legitimate, Reasonable Concerns About the Unexplained Transfer to Judge Burke.

As Levi and Minter both explained, they saw the transfer of *Ladinsky* to Judge

Burke as a departure from the usual practice of a second-filed case being transferred

to the judge presiding over a first-filed case. Nov. 3, 2022 Hr'g Tr. at 132–33

(Minter); Nov. 4, 2022 Hr'g Tr. at 17 (Levi). The Panel Report quotes Levi's and

Minter's testimony on this issue, without casting doubt on its veracity. Panel Report

at 45 (quoting Levi's testimony regarding "the concerns that our team had about the

unusual transfer of the *Ladinsky* case to the judge presiding over the second-filed

case") and 48 (quoting Minter's testimony that "we weren't sure what the heck had just happened").[4]

Instead, the Panel stated that, in its view, there was no *objective* reason for Levi and Minter to have been concerned about the transfer.  The Panel stated as follows:

> As the Panel explained at the August 4 hearing, the first filed rule comes into play when there are multiple filings in different districts and the cases have significant overlap. In such a circumstance, the district court assigned to the later-filed case can exercise its discretion to transfer that case to the forum (i.e., the district) of the first-filed case. So, the first filed rule deals with inter-district transfers. Obviously, here, Walker was transferred by Chief Judge Marks from the Middle District to the Northern District.
>
> What counsel claim they were concerned with here is perhaps more accurately described as the procedure that comes into play when two cases are filed in the same district and there is a question about whether they should be consolidated or otherwise transferred so that the same judge presides over them. This procedure is not so much a rule as a practice. The practice of the Northern District is that if there is a motion to consolidate or reassign a subsequently filed case to a judge presiding over an earlier filed and related case, the motion is decided by the judge presiding over the earlier filed case. Of course, that is

---

[4] Levi and Minter had good reason to believe that the Northern District had departed from its general practice in transferring *Ladinsky* to this Court.  The standard practice in the Northern District when consolidating cases is "to do so before the judge who has the earliest filed case."  *Morgan v. Apple, Inc.*, Case No. 6:21-CV-00973-RDP, ECF 16 (N.D. Ala. Sept. 17, 2021).  "As a matter of settled practice, when parties ask to consolidate related cases in this district, the cases typically are consolidated by and before the judge presiding over the first-filed case."  *Moore v. MidFirst Bank*, No. 5:18-mc-01414-MHH, 2019 WL 539041, at *2 (N.D. Ala. Feb. 11, 2019).

> exactly what occurred here, although there was not technically a motion filed.

Panel Report at 48–49. Levi and Minter accept the Panel's articulation of local practice. However, and crucially, the Panel made no determination that Levi and Minter were *subjectively* aware of this local practice at the time. As the Panel itself expressly acknowledged, that unwritten practice differs from the practice for inter-district transfers and ordinarily occurs only "if there is a motion," whereas "there was not technically a motion filed" here. *Id.* at 49. Based on the Panel's explanation, Levi and Minter's confusion regarding the transfer was understandable, and Levi and Minter's *subjective* concerns at the time regarding the transfer make sense.

Scott McCoy's testimony that he *might* not have supported dismissal if the identity of Judge Axon and Judge Burke had been reversed does not suggest otherwise. Panel Report at 49. The Panel apparently viewed this testimony as casting doubt on the *Ladinsky* lawyers' assertions that they were genuinely troubled by what they perceived to be procedural irregularities, *id.*, but the evidence does not support that inference. As an initial matter, McCoy was responding to a hypothetical situation, not testifying about his actual reaction to the actual events in question, much less about the motivations or actions of *other lawyers*.[5] Moreover, when Levi

---

[5] McCoy later clarified that he is not sure what he would have done under this hypothetical situation. Nov. 3, 2022 Hr'g Tr. at 214 ("I mean, I don't want to be flippant. It's -- the circumstances are different. It's hard to know in the moment what would have been going on . . . . I honestly don't know. And, one, it's not up to me. And I don't know what my decision on that would be.").

was asked the same question the Panel asked McCoy—whether she would have supported dismissal had *Ladinsky* been transferred from Judge Burke to Judge Axon—she testified that she "think[s] [she] would have," as she still "would have had the same questions about procedure" and *Ladinsky* still "would have become the same tagalong case without an opportunity to appear on Monday."  Nov. 4, 2022 Hr'g Tr. at 59.  Thus, the procedural irregularity was a very substantial concern in Levi's mind, regardless of the presiding judge.  Minter's testimony was similar. Minter Decl. ¶ 7.

### 2. Levi and Minter Formed a Reasonable, Good-Faith Judgment That Dismissal Would Serve Their Clients' Interests.

Levi and Minter also testified that they were deeply concerned that, as a result of the transfer, *Ladinsky* suddenly had been reduced to a tagalong case to *Walker*. Levi Decl. ¶ 19; Minter Decl. ¶ 5; Nov. 4, 2022 Hr'g Tr. at 19 (Levi).  They feared that, as a result, they would not be able to direct the strategy of the litigation, Minter Decl. ¶ 5, contrary to what they had worked so hard to achieve for their clients in filing *Ladinsky* as soon as possible after passage of the law, Nov. 4, 2022 Hr'g Tr. at 19 (Levi).  They believed that dismissing *Ladinsky* and coordinating with the other group of lawyers on a new case would ensure they could play a lead role in litigating the case—something they firmly believed was in the best interests of their clients. *See* Nov. 4, 2022 Hr'g Tr. at 69–71 (Levi); Factual Background, Part G.

Levi and Minter respectfully disagree with the Panel's assertion that dismissing *Ladinsky* was inconsistent with the *Ladinsky* lawyers' stated urgency about the need to challenge the Act. Panel Report at 38–39. As Levi and Minter (and others) testified, they believed that dismissing *Ladinsky* and filing a new case would not cause any material delay in obtaining relief, especially since they had not yet finalized or filed a motion for any emergency relief in *Ladinsky*. *See* Nov. 3, 2022 Hr'g Tr. at 153 (Minter); Nov. 4, 2022 Hr'g Tr. at 29 (Levi); Aug. 3, 2022 Hr'g Tr. at 102–03 (Eagan).[6] Subsequent events corroborated the reasonableness of their belief. The lawyers dismissed *Ladinsky* on Friday, April 15, 2022; filed a new case on Tuesday, April 19, 2022; filed a motion for injunctive relief on Thursday, April 21, 2022 (still over two weeks before the Act was to become effective); and obtained a preliminary injunction in the new case on Friday, May 13, 2022, five days after the Act went into effect.

### 3.   Levi and Minter Acted Reasonably Under the Circumstances.

Nor does anything about "the degree, speed, and substance" of *Ladinsky* counsel's reaction to the transfer undercut their testimony that they were responding to multiple factors. *See* Panel Report at 42.[7] The Panel Report's suggestion otherwise

---

[6] Moreover, the stated effective date of the Act was still three weeks away at the time. *See* Ala. Code § 26-26-1 ("eff. 5/8/2022").

[7] Among other things, the Report notes Asaf Orr's testimony regarding a telephone call with Minter during which concerns about the assignment of *Ladinsky* to Judge Burke were discussed. Panel

ignores the full context of what happened on April 15.  In a very compressed time frame, the *Walker* case was transferred from the Middle District to the Northern District and assigned to Judge Burke; subsequently, *Ladinsky* counsel, *Walker* counsel, and counsel for the State of Alabama were engaged in discussions about who would draft and file a motion to consolidate *Walker* with *Ladinsky* before Judge Axon; *Walker* got set for a status conference on Monday morning; *Ladinsky* was transferred to Judge Burke; and the *Ladinsky* attorneys learned that the State of Alabama no longer planned to file a motion to consolidate the two cases.  All of these events happened in the space of a few hours on Good Friday and before a holiday weekend, when many counsel would be unavailable.  Under these circumstances, the *Ladinsky* attorneys had to move quickly to protect their clients' interests.  Levi and Minter made the best decision they could to preserve their clients' legal options, relying on the information they had in a dynamic and quickly changing situation.

Relatedly, the Panel Report also asserts that the lawyers could have attended the April 18 status conference set in *Walker* and advocated as to how the two cases should be handled.  *See* Panel Report at 52 n.10.  Under the circumstances, however,

---

Report at 42.  Viewed in its entirety, Orr's description of the call corroborates Minter's testimony that a variety of factors influenced the decision to dismiss *Ladinsky*.  As Orr testified, he and Minter discussed "the confusion around . . . why the Walker case had been assigned to Judge Burke as opposed to not directly to Judge Axon as well as the need for the Walker and Ladinsky teams to -- or a desire among the Walker and Ladinsky teams now to really consolidate their case into one case as opposed to kind of two parallel tracked cases, you know, that there was significant reasons for dismissing the case, irrespective of whether it was before Judge Burke or before Judge Axon."  Nov. 3, 2022 Hr'g Tr. at 49–50 (Orr).

Levi and Minter did not consider that to be a viable option.  The cases had not been consolidated, and the State of Alabama could have foreclosed their clients' voluntary dismissal option at any time, including before the Monday hearing, simply by filing an answer.

In all events, the Panel's observation that Levi and Minter *could* have handled matters differently casts no doubt on their testimony that *in fact* they had sincere worries that they had lost for their clients, and would be unable to regain, their ability to direct the strategy as lead counsel on the first-filed case.  Nor does the possibility of other courses of action suggest that their worries—shared by the other *Ladinsky* lawyers as confirmed in their testimony—were so egregiously unreasonable as to demonstrate that Levi and Minter acted in bad faith.

### 4. Levi and Minter Were Forthcoming About the Reasons for Their Concerns About the Transfer to Judge Burke.

For all the reasons stated above, Levi and Minter respectfully disagree that "it was misconduct for all counsel . . . to claim 'that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and [the Court] set *Walker* for a status conference in Huntsville on April 18.'"  Levi Order at 12; Minter Order at 12.

The Panel Report's characterization is both inaccurate and incomplete.  First, Levi and Minter never claimed these were the only reasons for the dismissal; as they have consistently testified, they dismissed in part because the case was transferred to Judge Burke, whom they understood was not considered be a favorable judge for

this case.[8]  Second, the Panel Report's characterization of the additional factors is misleadingly incomplete.  The dismissal was not just because Judge Axon did not explain the transfer.   As Levi and Minter testified, it was *also* because of the perceived irregularity in the transfer of the first-filed case to the judge presiding over the second-filed case, contrary to usual practice and in the absence of a motion.  Levi Decl. ¶ 19; Minter Decl. ¶ 5; Nov. 4, 2022 Hr'g Tr. at 19 (Levi).  Similarly, the dismissal was not just because Judge Burke set a status conference in Huntsville for Monday morning.  It was *also* because the status conference made it apparent, to Levi and Minter, that *Ladinsky* had lost its status as the lead case.  Levi and Minter's genuine concerns, to which they testified truthfully, provide no basis for sanctions.

### 5.   Levi and Minter Acted in Good Faith in Deciding to File *Eknes-Tucker* in the Middle District.

The Panel Report faults the *Ladinsky* lawyers for claiming that "the decision about where to file *Eknes-Tucker* was driven by the identity of the newly selected plaintiffs," contending that those claims "are difficult to square [] with the fact that most of the *Eknes-Tucker* plaintiffs (i.e., four out of seven) reside in the Northern

---

[8] The Panel Report notes testimony by Abigail Hoverman that she recalled Melody Eagan stating "there was zero percent chance" Judge Burke would enjoin the Act.  Panel Report at 34.  Minter testified that while he did not recall this specific statement, he recalled the *Ladinsky* team voicing concerns about the prospects of the case before Judge Burke.  Nov. 3, 2022 Hr'g Tr. at 149–50.  Levi was not asked about Eagan's alleged statement, and it was unlikely she was on the call in which the statement was allegedly made, Nov. 4, 2022 Hr'g Tr. at 16, but she likewise candidly testified that concerns about Judge Burke played a role in the decisions to dismiss *Ladinsky* and file *Eknes-Tucker*.

District." Panel Report at 46. This is a straw man. Levi and Minter have both candidly acknowledged that part of the calculus in filing the new case in the Middle District was to avoid the issues that had just arisen in the Northern District, including the risk of the new case being reassigned to and heard by Judge Burke. The Panel Report itself quoted Minter's testimony that "they filed in the Middle District 'because many of our plaintiffs were there *and because of our concerns about the prior departure from the first-filed rule in the Northern District*.'" Nov. 3, 2022 Hr'g Tr. at 157–58 (emphasis added); *see also* Levi. Decl. ¶ 27 ("The reason for this view [that we should file in the Middle District] related to the concerns that our team had about the unusual transfer of the Ladinsky case to the judge presiding over the second-filed case. I thought that filing the new case in the Northern District of Alabama created a high risk that the case would be reassigned to [Judge Burke].").

It was also appropriate—and an indication of good faith, not bad faith—for Levi and Minter to consider whether their actions would give the appearance of judge shopping. *See, e.g.*, Mar. 19, 2024 Hr'g Tr. at 46. Levi and Minter were rightly concerned about how their actions would be perceived—particularly in a high-profile case, Nov. 4, 2022 Hr'g Tr. at 54 (Levi)—but there is no evidence, and the Panel did not find, that they believed they were breaking any rules or violating any ethical obligations. Instead, Levi and Minter thought that Rule 41 permitted both dismissing and refiling the very same *Ladinsky* case. *E.g.*, *id.* at 69 (Levi). In their minds, by

36

bringing a case on behalf of new plaintiffs, they were endeavoring to take a wide berth around even any possible perceived impropriety.  Nov. 4, 2022 Hr'g Tr. at 54 (Levi); Nov. 3, 2022 Hr'g Tr. at 164 (Minter).  Their testimony to the Panel about wanting to avoid the appearance of judge-shopping was intended to convey that they wanted to ensure they were *not* engaging in impermissible judge-shopping.

### B.   It Was Objectively Reasonable for Levi and Minter to Have Believed the Rules Permitted the Dismissal of *Ladinsky* and the Filing of *Eknes-Tucker*.

Absent "direct evidence of subjective bad faith," the bad-faith standard can be met *only* "if an attorney's conduct is so egregious that it could only [have] be[en] committed in bad faith."  *Purchasing Power*, 851 F.3d at 1224–25.  Levi and Minter's conduct falls far short of satisfying this high standard in view of the substantial case law holding that an attorney has an unconditional right to dismiss and refile, even when motivated by a goal of obtaining a different judge.[9]  Three Courts of Appeal have held that when an attorney dismisses and refiles the *same* case even for the *sole* purpose of getting a new judge, the attorney cannot be sanctioned.  In view of this

---

[9] It also bears emphasis that lawyers permissibly consider judicial assignments in a wide range of contexts.  Every time lawyers consider whether to dismiss based on venue or personal jurisdiction or instead to waive those objections, lawyers take account of their perception of the assigned judge relative to the judge they would get in a different venue.  The same is true when lawyers consider whether to remove a case from state court to federal district court, or whether to move to transfer a case for convenience under 28 U.S.C. § 1404.  There is no ethical problem with considering the judge's identity in those circumstances—indeed, arguably attorneys must, as part of their duty to zealously represent their clients, consider this factor as part of their strategic decision-making.  Levi and Minter reasonably and in good faith believed they were similarly permitted to do so in the circumstances here.

case law, Levi's and Minter's belief that they were acting permissibly was objectively reasonable—and therefore necessarily *not* "so egregious" that it could only have been committed in bad faith. *See id.* at 1224–25.

### 1. The Plain Text of Rule 41 Authorizes One Unconditional Dismissal and Refiling.

Federal Rule of Civil Procedure 41(a)(1)(A)(i) provides: "[T]he plaintiff may dismiss an action without a court order by filing: (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." The law in the Eleventh Circuit, as elsewhere, is that "Rule 41(a)(1) means precisely what it says" and grants "an *unconditional right* to dismiss" "by notice and without order of the court at any time prior to the defendant's service of an answer or motion for summary judgment." *Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*, 506 F.2d 914, 915–16 (5th Cir. 1975) (emphasis added).[10] In *Pilot Freight*, the plaintiff filed a notice of voluntary dismissal under Rule 41 after the court denied preliminary relief, and the defendant sought to vacate the dismissal to get the benefit of that denial. *Id.* at 915. The district court refused to vacate the dismissal, and the Fifth Circuit affirmed. *Id.* at 916; *see also Carter v. United States*, 547 F.2d 258, 259 (5th Cir. 1977) (Rule 41 grants "an absolute right to dismiss a lawsuit before the

---

[10] *Pilot Freight Carriers* is binding in the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting as precedent decisions issued by the Fifth Circuit before October 1, 1981).

defendant has filed an answer or summary judgment motion."). The Eleventh Circuit has reaffirmed these principles time and time again. *See, e.g.*, *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990) ("Rule 41(a)(1)(i) grants a plaintiff an unconditional right to dismiss his complaint[.]"); *Hardnett v. Equifax Info. Servs., LLC*, No. 21-13195, 2023 WL 2056285, at *1 (11th Cir. Feb. 17, 2023) ("[I]n interpreting Rule 41(a)(1), we have repeatedly said that the Rule means precisely what it says.").

In addition to conferring an unconditional right to dismiss, the Federal Rules confer an unconditional right to refile. Rule 41(a)(1) itself clearly contemplates the refiling of the same case that was voluntarily dismissed by specifying that the dismissal is "without prejudice" the first time. Fed. R. Civ. P. 41(a)(1)(B). Rule 41(a)(1), subsection B, "Effect," provides:

> Unless the notice or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

*Id.* The first sentence regarding dismissals "without prejudice" contemplates that a lawsuit may be refiled after a voluntary dismissal. And the second sentence would be superfluous if it were improper to refile a case even once.

The Federal Rules' drafters undoubtedly were aware that lawyers might dismiss and refile cases in order to litigate before different judges. But instead of

authorizing judicial investigations into lawyers' motives for dismissing and refiling, the drafters chose to address that issue in a different way: by permitting this dismissal-and-refiling procedure only once.  No probing of an attorney's mental state is necessary; the first dismissal is without prejudice, regardless of a lawyer's mental state or reasons for dismissal, and the second dismissal operates as an adjudication on the merits, also regardless of a lawyer's mental state or reasons for dismissal. The Federal Rules thus solve the dismissal-and-refiling problem by creating a clear rule: dismissal and refiling is permissible one time only.  The Court should not issue sanctions when the Federal Rules specifically both contemplate the conduct in question (dismissal and refiling one time only) and provide an express consequence if the conduct exceeds the permitted scope (barring a second without-prejudice dismissal and refiling).

> ### 2.    Three Courts of Appeal Have Held that Attorneys May Not be Sanctioned for Dismissing and Refiling.

Courts of Appeal have been explicit in acknowledging that Rule 41(a) authorizes dismissal for any reason, including to avoid a judge.

**Second Circuit.**  The Second Circuit has held that a law firm is "entitled by law" to dismiss a case within the parameters of Rule 41(a) for any reason —even to "*flee the jurisdiction or the judge*."  *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 115 (2d Cir. 2009) (emphasis added).   In *Wolters Kluwer*, the plaintiffs' counsel dismissed a suit filed in the Southern District of New York under

Rule 41 and refiled the same lawsuit in the District of Massachusetts. *Id.* at 113. The district court sanctioned the plaintiffs' law firm based on its finding that counsel's "main purpose" in dismissing "was to judge-shop." *Id.* at 114. The Second Circuit reversed the sanctions, explaining that the plaintiff had "an unfettered right voluntarily and unilaterally to dismiss" the action, and the "reasons for wanting to do so [we]re not for [the court] to judge." *Id.* at 114–15 (quotation and citation omitted). Thus, the law firm "was entitled to file a valid Rule 41 notice of voluntary dismissal for any reason, and the fact that it did so to flee the jurisdiction or the judge d[id] not make the filing sanctionable." *Id.* at 115.

**Fifth Circuit.** Similarly, the Fifth Circuit has concluded that "Rule 41(a)(1) *essentially permits forum shopping*." *Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287, 293 (5th Cir. 2016) (emphasis added) (citation omitted). In *Bechuck*, the plaintiff voluntarily dismissed all his claims under Rule 41(a)(1) after the district court expressed extreme skepticism about his case and indicated an intent to dismiss it with prejudice. *Id.* at 290. In accepting the voluntary dismissal, the court limited the plaintiff to refiling, if at all, only before the same judge. *Id.* at 290–91. The Fifth Circuit reversed this refiling limitation, explaining that "[i]t is not uncommon for plaintiffs to use voluntary dismissal to secure their preferred forum." *Id.* at 293 (quotation marks omitted). The Fifth Circuit further explained that "by requiring that a second voluntary dismissal under Rule 41(a)(1) operate as an adjudication on

the merits, the federal rules already limit a plaintiff's ability to engage in forum-shopping." *Id.* at 293.  In other words, under Rule 41, one dismissal is allowed for any reason, including to seek a more favorable forum.

**Eighth Circuit.**  The Eighth Circuit also has held that "[t]he reason for the dismissal is *irrelevant* under Rule 41(a)(1)." *Adams v. USAA Casualty Ins. Co.*, 863 F.3d 1069, 1080 (8th Cir. 2017) (emphasis added).  In *Adams*, the district court sanctioned attorneys for stipulating to the dismissal of a federal suit "for the allegedly improper purpose of seeking a more favorable forum and avoiding an adverse decision" concerning a settlement structure. *Id.* at 1073.  The Eighth Circuit reversed the sanctions order, finding "no violation of Rule 11 or abuse of the judicial process." *Id.*  As the Eighth Circuit explained, "Rule 41(a)(1) cases require no judicial approval or review as a prerequisite to dismissal; in fact, the dismissal is effective upon filing, with no court action required." *Id.* at 1080.  Accordingly, counsel could not be sanctioned for dismissing a case under Rule 41(a)(1), even where they did so "for the purpose of forum shopping and avoiding an adverse result." *Id.* at 1080–81.

These cases do not merely authorize the *dismissal* of the case.  They hold that it is not sanctionable for an attorney to dismiss *and refile the very same case* for purposes of obtaining a new judge.  In *Wolters Kluwer*, 564 F.3d at 113, the plaintiffs' counsel voluntarily dismissed a case in the Southern District of New York

and refiled the same lawsuit in the District of Massachusetts.  In *Adams*, 863 F.3d at 1074, the plaintiff voluntarily dismissed a lawsuit in federal court and refiled the exact same case in state court.  And in *Bechuck*, 814 F.3d at 293, the Fifth Circuit held that there could be no limitation, restriction, or condition placed upon the refiling of the very same lawsuit after a voluntary dismissal.

In light of these precedents and the absence of any contrary precedent in the Eleventh Circuit, Levi and Minter's belief that their conduct was expressly permitted by Rule 41 was objectively reasonable.[11]

### 3.    Neither Rule 41 Nor Any Other Rule Prohibits the Filing of a New Case on Behalf of New Clients.

If—as the Second, Fifth, and Eighth Circuits have held—it is not sanctionable to refile *the same case*, it surely cannot be sanctionable for attorneys to file a new case for *different clients*, as Levi and Minter did here.

A complaint dismissed voluntarily under Rule 41(a)(1)(A)(i) is a legal nullity that cannot impact any subsequent filings.  As the Fifth Circuit explained in *Bechuck*: "The effect of a Rule 41(a)(1) dismissal is to put the plaintiff in a legal position as if

---

[11] Counsel for Levi and Minter have located no authority to suggest that Rule 41 applies to parties but not their lawyers.  To the contrary, there would be an irreconcilable problem if the federal rules expressly permitted a *party* to do something that his *lawyer* would be sanctioned for doing.  *See, e.g.*, *Bechuck*, 814 F.3d at 292–94 (reversing sanctions against law firm where it followed Rule 41(a) on behalf of its client).  This approach would require the lawyer to choose between acting in the best interests of their client in dismissing a case and fulfilling their own personal interest in avoiding personal sanctions—an impermissible conflict of interest.  *See, e.g.*, Ala. R. Prof'l Conduct 1.7(b) (prohibiting the representation of a client that is "materially limited . . . by the lawyer's own interests").

he had never brought the first suit." 814 F.3d at 293 (quotation marks omitted). The court continued: "By placing him back into the situation as though he had never brought suit, Rule 41(a)(1)(A)(i) necessarily allows him to choose his forum anew." *Id.* Thus, after the dismissal, the *Ladinsky* plaintiffs (and their lawyers) had a clean slate and an unhampered ability to file suit anew. That legal nullity certainly cannot impact subsequent filings by *different* individuals who each had their own interest in challenging the Act.

A finding that the *Ladinsky* dismissal precluded the *Eknes-Tucker* plaintiffs from filing a new lawsuit would be contrary to controlling law. In *Taylor v. Sturgell*, a plaintiff, Greg Herrick, filed a lawsuit in Wyoming federal court to challenge the denial of a FOIA request, and lost. 553 U.S. 880, 885–86 (2008). Harrick's friend, Brent Taylor, then hired Harrick's lawyer to file a lawsuit challenging the denial of a FOIA request for the same records, this time in federal court in the District of Columbia. *Id.* at 889. The D.C. Circuit held the first suit precluded the second, but the Supreme Court unanimously reversed. *Id.* at 885. The Court applied the principle that "everyone should have his own day in court" and found that preclusion was not warranted merely based on "identity of interests" or the overlap in counsel. *Id.* at 893, 901. Although *Taylor* addresses preclusion rather than judge-shopping, *Taylor*'s teachings are directly relevant. Finding sanctionable conduct in this case would be tantamount to holding that filing and dismissing *Ladinsky* precluded Levi

and Minter from filing suit on behalf of the *Eknes-Tucker* plaintiffs. *Taylor* does not permit such *de facto* preclusion.

Without question, any other lawyers—if they were retained by the *Eknes-Tucker* plaintiffs—would have been permitted to consider potential judicial assignments in deciding whether to file in the Middle or Northern Districts. The fact that Levi and Minter previously dismissed *Ladinsky*—which was authorized by Rule 41 and rendered that case a legal nullity—should not have subjected their new clients to unique constraints on their lawyers' ability to zealously represent them.

### C.   Sanctioning Levi and Minter for "Engaging in . . . Discussions About Judges" Would Violate the First Amendment.

The Individual Orders further allege that "it was misconduct for . . . [Levi and Minter] to engage in numerous and wide-ranging discussions about how judges were favorable or unfavorable in the context of whether to dismiss and refile Walker and Ladinsky." Minter Order at 11; Levi Order at 111. Imposing sanctions on this basis would violate the First Amendment.

To be clear, Levi and Minter do not suggest that potential sanctions based on their litigation conduct—such as their decision to dismiss and refile their cases—are subject to a First Amendment defense. But the Panel appeared to suggest that the respondents' "numerous and wide-ranging discussions" were independently sanctionable. *Id.* The First Amendment prohibits sanctioning such pure speech, particularly based on the content of the communication, but that is what the Panel

Report suggests by focusing on the subject matter of views about judges.  This sort of content-based regulation on Levi and Minter's speech would have to survive strict scrutiny to comply with the First Amendment.  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (speech regulation is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed").

The high bar imposed by the strict scrutiny standard is not satisfied here.  Levi and Minter had *private* discussions between counsel, not the sort of out-of-court, public discussions related to a pending court case that courts can regulate out of concerns of "a substantial likelihood of material prejudice" to that proceeding. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991) (noting that restrictions on public discussions are aimed at avoiding "two principal evils" of influencing the trial outcome and prejudicing the jury venire).  The Court cannot impose sanctions to punish such protected speech.

### D.   Levi and Minter Had No Notice That Their Actions, Which Were Consistent with Rule 41, Nevertheless Could Be Sanctionable.

Sanctions are precluded here for an additional reason:  at the time Levi and Minter decided to dismiss *Ladinsky* and file *Eknes-Tucker*, they had no notice that taking these steps could potentially subject them to sanctions.  Rather, the available authorities set forth above all indicate that it was reasonable for them to believe that Rule 41 expressly *permitted* them to do what they did.

46

Eleventh Circuit precedent is clear: attorneys may not be sanctioned if they were not "on notice"—at the time they acted—"that the courts would condemn the conduct" in question. *Finkelstein*, 901 F.2d at 1564 (reversing sanctions where a lawyer sent a threatening and disruptive letter but had no notice that it would lead to his suspension from the practice of law). In evaluating whether a lawyer committed misconduct, this Court must "avoid using the wisdom of hindsight" and instead test the conduct by "what was reasonable to believe at the time" of the alleged misconduct. *Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir. 1987) (reversing sanctions). Where "[t]here was no clear binding precedent on the issue" at the time the attorneys made the decision, they cannot be charged with notice that their conduct was impermissible. *Laborers Local 938 Joint Health & Welfare Tr. Fund v. B.R. Starnes Co. of Fla.*, 827 F.2d 1454, 1458 (11th Cir. 1987) (reversing sanctions); *accord Duke v. Smith*, 141 F.R.D. 348, 349 (S.D. Fla. 1992) (denying motion for sanctions where a single, "unreported opinion" was insufficient to put counsel on notice that issues raised in the complaint may have no longer been legally sound).

Levi and Minter had no notice, at the time they acted, that the Court would consider their actions potentially sanctionable. To the contrary, for the reasons discussed above, they had a strong and reasonable basis to believe their conduct was permissible.

*BellSouth* also provided no reasonable notice that their actions were potentially improper.  In *BellSouth*, a party intentionally retained an attorney who was a close relative of a judge to force the judge to recuse himself.  334 F.3d at 943.  The party and lawyers in *BellSouth* had clear prior notice that their conduct was prohibited based on multiple judicial opinions highlighting a "history of recusal concerns in the Northern District," as well as a specific standing order addressing the issue and expressly prohibiting their conduct.  334 F.3d at 944–45.  No such prior opinions or orders were present here.  In addition, *BellSouth* did not address or even mention Rule 41(a)(1)(A)(i) or include any analysis to undermine or call into question the Eleventh Circuit's repeated admonition that Rule 41(a)(1) "means precisely what it says."  *Hardnett*, 2023 WL 2056285, at *1.

Cases from other jurisdictions also did not give Levi and Minter notice that their intended course of action was potentially impermissible.  Across the board, those cases involve conduct starkly different from the single dismissal and refiling that Rule 41 permits.  For instance, in *Disability Advocates & Counseling Group, Inc. v. Betancourt*, 379 F. Supp. 2d 1343, 1345 (S.D. Fla. 2005), an attorney filed "several hundred" cases to take advantage of a split of authority among district court judges on a question of standing under the ADA, and also failed to disclose an adverse ruling in the same previously-filed case.  Likewise, in *In re Fieger*, No. 97-1359, 1999 WL 717991, at *1 (6th Cir. Sept. 10, 1999), the plaintiff's attorney filed

*thirteen duplicate complaints* in the same district and then dismissed all but one under Rule 41(a)(1)(i) in order to ensure assignment to the judge of his choice.  In *Datatern, Inc. v. MicroStrategy, Inc.*, No. 11-11970, 2018 WL 2694458, at *18 (D. Mass. June 5, 2018), the plaintiff deliberately filed multiple groups of cases "against parties as to which it never intended to proceed" in an attempt to secure his preferred judge.  In other cases where sanctions were levied, the party attempted to escape and/or conceal a prior adverse ruling.  *E.g.*, *John Akridge Co. v. Travelers Cos.*, 944 F. Supp. 33, 34 (D.D.C. 1996) (after federal court dismissed case following three years of litigation, plaintiff filed duplicative suit in state court); *Vaqueria Tres Monjitas, Inc. v. Rivera Cubano*, 341 F. Supp. 2d 69, 70–71 (D.P.R. 2004) (after court denied preliminary injunction, plaintiff dismissed, refiled, and rearranged plaintiffs' names on the caption so as to obscure the connection to the prior case with the adverse ruling).[12]  None of these out-of-jurisdiction cases gives Levi or Minter any notice that their actions here could be sanctionable.  None holds that filing *one* case, dismissing it *once* within the parameters of Rule 41(a)(1)(A)(i), and filing a new case is or could be sanctionable.  Thus, Levi and Minter did not have notice that

---

[12] Ninth Circuit precedent is not to the contrary.  In *Hernandez v. City of El Monte*, 138 F.3d 393 (9th Cir. 1998), for example, the district court violated a local rule on judge-shopping that lacks any parallel in the Northern and Middle Districts of Alabama. *Id.* at 398–99.  The district court dismissed the action based on judge-shopping, but the Ninth Circuit reversed, finding that dismissal was an abuse of discretion. *Id.* at 399–400.

this conduct could be sanctionable.[13]

## III.     The Court Should Decline to Impose Sanctions.

For all the reasons discussed above, Levi and Minter respectfully assert that they did not act in bad faith given their sincere and reasonable understanding of the appliable law at the time they acted.  And when the Panel conducted its inquiry, Levi and Minter were candid and forthcoming.  But even if the Court disagrees, imposing sanctions is discretionary, not mandatory.   Given the circumstances here, the appropriate outcome would be to decline to impose any sanction.

The inherent power is to be used with "restraint and discretion" because of its "very potency."   *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *accord Thompson v. Merchants Adjustment Servs., Inc.*, No. 20-cv-1591, 2021 WL 2682264, at *1 (N.D. Ala. Feb. 11, 2021) (Burke, J.).   When imposing inherent-authority sanctions, courts consider the severity of the misconduct (especially whether the respondent disobeyed a court order) and the objective of deterrence.  *See, e.g.*, *O'Neal v. Allstate Indem. Ins. Co., Inc.*, 505 F. Supp. 3d 1193, 1202–08 (N.D. Ala. 2020), *aff'd*, No. 20-14712, 2021 WL 4852222 (11th Cir. Oct. 19, 2021).  Extreme sanctions are improper except where there is a "clear pattern" of "contumacious conduct" *and* "lesser sanctions would not suffice."  *Warner v. Tinder, Inc.*, 675 F.

---

[13] Even this Court has acknowledged that there was no clear authority from the Eleventh Circuit indicating that the conduction in question was prohibited: "I get it that different circuits have different opinions on this. And I get it that the Eleventh Circuit doesn't have clear guidance on this."  Mar. 19, 2024 Hr'g Tr. at 60-61.

App'x 945, 946 (11th Cir. 2017).  No sanctions are warranted where the very proceedings assessing the attorneys' actions are "enough of a sanction to curb their conduct and to serve as a warning to future litigants."  *Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, 813 F. App'x 368, 375 (11th Cir. 2020); *accord Purchasing Power*, 851 F.3d at 1228.

### A.   Cases Involving Judge-Shopping Allegations Demonstrate That No Sanctions Are Appropriate Here.

Cases specific to claimed judge-shopping—both within and outside of the Eleventh Circuit—counsel in favor of no sanction for Levi and Minter.

Many courts do not impose sanctions at all even after finding misconduct relating to alleged judge-shopping, and instead use their inherent authority simply to transfer the case back to the original judge—which is exactly what ended up happening to *Eknes-Tucker* here.  For instance, in *Barragan v. Clarity Services, Inc.*, No. 2:20-cv-00876, 2021 WL 1226537, at *7 (D. Nev. Mar. 31, 2021), the plaintiffs' attorneys filed a complaint, drew a particular judge, filed several additional complaints a few days later, and then dismissed all but one case.  The court found this to be improper and noted that compounding factors included "the plaintiffs' failure to follow this court's local rules for managing related or similar cases" and the fact that, when confronted with the judge-shopping concern, the attorneys refused to stipulate to the transfer of the case back.  *Id.* at *8.  Still, the court did not impose sanctions; rather, to "curb future abuses" and "mitigate any benefit that may

have been achieved by this outwardly improper maneuvering," it simply transferred the action back to the original judge. *Id.* at \*9; *see also Murray v. Sevier*, No. 92-1073, 1992 WL 75212, at \*2 (D. Kan. Mar. 13, 1992) (where the plaintiff filed six actions and dismissed all but one under Rule 41(a)(1)(i), the court dismissed the action without prejudice until it could determine whether to reassign the last remaining case to the first judge selected).  In essence, many courts find it sufficient to eliminate the unfair benefit that the judge-shopper tried to gain.

Where courts *do* impose sanctions related to alleged judge-shopping, it is because there has been underhandedness or deceit or because a lawyer's actions have financially burdened an opposing party or counsel, and even then, the sanctions are usually modest.  For instance, in *Vaqueria*, 341 F. Supp. 2d at 71–72, where the plaintiff acted underhandedly by switching the order of the plaintiffs' names to conceal the refiling of a case, the court transferred the case back to the original judge and imposed sanctions of $1,000 per attorney. *Id.* at 73–74; *see also Datatern*, 2018 WL 2694458, at \*17–19 (where plaintiff filed multiple suits against various defendants that it never had any intention of pursuing, the court ordered the plaintiff to pay the portion of the defendant's attorneys' fees that were "reasonably related to plaintiff's judge-shopping activities"); *John Akridge Co.*, 944 F. Supp. at 34 (same, where plaintiff filed a new suit in Maryland state court after the federal district court

for the District of D.C. dismissed a nearly identical suit following three years of litigation).

Levi and Minter's conduct in this case is nothing like the misconduct in that line of cases, reinforcing that no sanction is warranted here. First, Levi and Minter did not act with any dishonesty or craftiness. They recommended one voluntary dismissal consistent with Rule 41, announced their intention to bring a new lawsuit challenging the Act, and then did so. Second, *Eknes-Tucker* is proceeding before this Court. Third, the opposing party, the State of Alabama, was not required to expend any resources or otherwise bear any financial burden due to those actions. Thus, even if the Court were inclined to compensate the opposing party for time spent, *see Datatern*, 2018 WL 2694458, at *17–19, there would be nothing to compensate here.

## B. Levi and Minter Did Not Disobey a Court Order, the Key Concern That Can Justify Inherent-Power Sanctions.

Other cases not specific to judge-shopping likewise demonstrate that no sanction is warranted here. This is because the primary concern addressed through inherent authority sanctions is not present here—*i.e.*, there was no disobedience of a court order for which sanctions are required to vindicate court authority.

In *Purchasing Power*, the defendant conducted an inadequate investigation into facts relevant to jurisdiction, "set forth questionable assertions" regarding its citizenship, and ultimately, falsely represented to the court that jurisdiction existed. 851 F.3d at 1225–28. In reviewing the imposition of inherent power sanctions, the

Eleventh Circuit held that the proper analysis asks whether there was disobedience of court orders and a resultant need to vindicate judicial authority. *Id.* at 1225. The Eleventh Circuit held that, despite the "colossal waste of time and effort" caused by the misrepresentations, the key concern of disobedience was absent and therefore sanctions were unwarranted. *Id.* at 1228. The court further noted that "the damage done to the parties' credibility, finances, and time [wa]s enough of a sanction to curb their conduct and to serve as a warning." *Id.*

The same occurred in *Meunier Carlin & Curfman, LLC.* There again, the Eleventh Circuit reviewed inherent power sanctions imposed by the district court for the plaintiff's misrepresentation to the court. It observed that "[n]othing here smacks of fraud on the court or disobedience to its orders." 813 F. App'x at 376. What's more, the record did not reflect that the plaintiff knew his argument was frivolous or sought to harass the other party. *Id.* Applying the *Purchasing Power* analysis, the court noted that the attorney had "already paid a price for" his conduct and concluded that the harm to his "credibility, finances, and time is enough of a sanction to curb [his] conduct and to serve as a warning to future litigants." *Id.* (internal quotation marks omitted). Accordingly, the Eleventh Circuit reversed the sanctions.

Levi and Minter did not disobey any court order at any time, and they have cooperated with and been forthcoming during these proceedings. They also have been impacted by this proceeding and the Panel's inquiry. Under the analysis

54

required by *Purchasing Power* and *Meunier*, sanctions are inappropriate.

**C.      Other Factors Weigh in Favor of Declining to Impose Any Sanction.**

The Alabama Standards for Imposing Lawyer Discipline, adopted in Rule 83.1(g) of this District's Local Rules, also demonstrate that no sanction should be imposed.   Those standards identify mitigating factors that a court determining whether to impose sanctions should consider.  *Id.* at Standard 3.0.[14]  Those mitigating factors all favor Levi and Minter and no sanction:

- **"Absence of Prior Disciplinary Record."**  Both Levi and Minter have pristine disciplinary records and have never been subject to any kind of sanctions proceeding previously.  Ex. 1, Levi Aff. ¶ 10; Ex. 2, Minter Aff. ¶ 5.

- **"Absence of Dishonest or Selfish Motive."**  Levi and Minter acted out of concern for their clients, vulnerable children and their parents, and a desire to help them make decisions that would best protect their interests in an extremely stressful and high-stakes situation.  Their conduct was not driven by a dishonest or selfish motive.

- **"Full and Free Disclosure to [the Tribunal] or Cooperative Attitude Toward Proceedings."**  From the outset of this inquiry, Levi and Minter have been cooperative and transparent.  Minter voluntarily subjected himself to and

---

[14] Ala. Standards for Imposing Lawyer Discipline, *available at* https://judicial.alabama.gov/ library/RulesBarStd.

participated in the proceedings even though (a) he had never appeared in *Ladinsky* or *Eknes-Tucker*, (b) he is not admitted in Alabama or the federal district courts of Alabama, and (c) he was not otherwise subject to the Court's jurisdiction. Further, Levi and Minter have consistently acknowledged that one of the factors driving their decisions was views about Judge Burke.

- **"Character or Reputation."**   Levi and Minter have committed their professional careers to improving the lives of their clients.  They have each spent more than three decades fighting for vulnerable individuals and families.  Ex. 1, Levi Aff. ¶¶ 5–6; Ex. 2, Minter Aff. ¶¶ 2–3.  They have won important victories establishing civil rights protections, all on a *pro bono* basis.

- **"Imposition of Other Penalties or Discipline."**  Levi and Minter have great respect for the authority of the Court and place great value on their professional integrity. They have now undergone almost two years of a proceeding that has cast a cloud over their professional lives and threatened to tarnish their reputations.

- **"Remorse."**  Levi and Minter are remorseful for doing anything that would raise questions or concerns or cause this Court to question their actions.  They sincerely regret the resulting burden on this Court, the Panel, and the judicial system in Alabama.

In light of these mitigating factors, no sanction is warranted.

## CONCLUSION

For the foregoing reasons, Levi and Minter respectfully submit that they did not act in bad faith in dismissing *Ladinsky* and filing *Eknes-Tucker*, that they have been truthful and candid, and that, as a result, sanctions are not warranted.

Respectfully submitted this 13th day of May, 2024.

s/    April A. Otterberg                           _
April A. Otterberg, *pro hac vice*
aotterberg@jenner.com
Adam G. Unikowsky, *pro hac vice*
aunikowsky@jenner.com
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350

Robert D. Segall
Shannon L. Holliday
COPELAND, FRANCO, SCREWS & GILL, P.A.
444 South Perry Street
Post Office Box 347
Montgomery, Alabama 36101-0347
Phone: (334) 834-1180
Fax: (334) 834-3172
Email: segall@copelandfranco.com

*Attorneys for Jennifer L. Levi*
*and Shannon Minter*

## CERTIFICATE OF SERVICE

I certify that on May 13, 2024, I filed the foregoing electronically with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record.

*/s/   April A. Otterberg*_____