# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | Case No.: 2:22-cv-00184-LCB |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVE MARSHALL, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Alabama, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## KATHLEEN HARTNETT'S RESPONSE TO THE COURT'S SUPPLEMENTAL ORDER TO SHOW CAUSE

## **TABLE OF CONTENTS**

TABLE OF AUTHORITES ................................................................ iv

INTRODUCTION ........................................................................1

STANDARDS OF CONDUCT ........................................................4

I.    The Court May Sanction Under Its Inherent Authority Only Upon a Finding of Subjective Bad Faith. ................................................4

II.   *Sua Sponte* Sanctions Under Rule 11 Also Require a Heightened Showing "Akin To Contempt." .................................................7

III.  "Judge Shopping" is not a Specifically-Defined Term That, by Itself, Provides a Standard of Conduct For Attorneys to Follow. ...........9

IV.  Rule 83(b) Requires Actual Notice of Provisions Allegedly Violated for Sanctions to be Imposed. ................................................10

V.   Other Standards ...............................................................10

BACKGROUND INFORMATION ................................................11

SUMMARY OF KATHLEEN'S CONDUCT AND TESTIMONY .......12

ARGUMENT ...........................................................................24

I.    Charge 1: "*Walker* counsel, including Ms. Hartnett, to mark *Walker* related to a case closed one year earlier decided by a 'favorable' judge." ..........................................................................24

      A.   Designating a Case as Related is a Permissible Deviation from the Default Random Case Assignment System in Federal District Courts. ...............................................................25

      B.   Kathleen's Agreement with Other *Walker* Counsel's Decision to Mark *Walker* as Related to *Corbitt* was not for an Improper Purpose..........29

i

C.     Kathleen's Agreement with Other *Walker* Counsel's Decision to Mark *Walker* as Related to *Corbitt* was Objectively Reasonable and Therefore Did Not Violate Rule 11. ...............................................33

D.     Kathleen's Actions Regarding the Relatedness Designation Were Taken in Good Faith and Therefore Are Not Sanctionable Under the Court's Inherent Authority. ...............................................................40

E.     The Other Standards in the Order to Show Cause Do Not Apply to the Relatedness Designation ...................................................................45

II.   Charges 2 and 3 (Conduct Unrelated to Kathleen) .....................................46

A.     Charge 2: "*Walker* counsel, including Ms. Hartnett to contact the chambers of Judge Thompson (who was never assigned to *Walker*) to directly and indirectly influence or manipulate assignments away from Chief Judge Marks to Judge Thompson." ........................46

B.     Charge 3: "*Walker* counsel, including Ms. Hartnett, to attempt to persuade *Ladinsky* counsel to transfer the latter case to the Middle District to be before Judge Thompson." ...............................................49

III.  Dismissal-Related Conduct ..........................................................................50

A.     Other Than Dismissing *Walker*, Kathleen Did Not Engage In Any Of The Other Conduct Described In Charges 4, 5, 6, and 7. ..............51

B.     The *Walker* Team Had A Right To Dismiss Under Rule 41(a)(1)(A)(i) For Any Reason. ......................................................................................55

C.     Sanctioning a Rule 41 Dismissal Would Interpose an Untenable Conflict Between Attorneys and Their Clients. ...................................57

IV.   Paragraph III(b) of the Supplemental Order to Show Cause .....................60

A.     Kathleen did not Misrepresent Her Concern About the Reassignment of *Ladinsky* to This Court, and She Truthfully Testified About Her Reasons for Dismissal. ..........................................................................60

ii

     B.    Kathleen Did Not Make Any Misrepresentations to the Panel, and She Did Not Fail to Disclose any Material Facts. ...............................64

V.    Kathleen Acted With Implied Authorization to Dismiss *Walker* Without Prejudice. ..................................................................................................67

     A.    Kathleen and the *Walker* Team Were not Required Under Rule 1.2 to Obtain Prior Consent From Their Clients to Dismiss Without Prejudice. ............................................................................................68

     B.    Kathleen and the *Walker* Team Did Not Neglect any Matter Entrusted to Them by Their Clients in Violation of Rule 1.3. ............72

     C.    The *Walker* Team Kept Their Clients Reasonably Informed About the Status of the Case in Compliance With Rule 1.4. ........................74

     D.    Rule 11 Does not Apply to This Charge. ..............................................76

CONCLUSION ....................................................................................................77

CERTIFICATE OF SERVICE ............................................................................77

# TABLE OF AUTHORITES

**Cases**

*Absolute Activist Value Master Fund Limited v. Devine*, 998 F.3d 1258 (11th Cir. 2021) ..................................................................................55

*Afzaal v. Upper Iowa Univ.*, 2018 WL 7138388 (E.D. Tex. Dec. 21, 2018) ............7

*Alexander v. Bradshaw*, 599 F. App'x 945 (11th Cir. 2015)....................................69

*Ali v. Tolbert*, 636 F.3d 622 (D.C. Cir. 2011) ............................................................5

*Ambrosia Coal and Construction Co. v. Pages Morales*, 2007 WL 9710667 (S.D. Fla. Aug. 2, 2007) ........................................................................56

*Baker v. Alderman*, 158 F.3d 516 (11th Cir. 1998) ..................................................29

*Barash v. Kates*, 585 F. Supp. 2d 1347 (S.D. Fla. 2006) ..........................................6

*Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287 (5th Cir. 2016)........................56

*Bice v. Stevens*, 325 P.2d 244 (1958) ......................................................................70

*Blackburn v. Lubbock FBI*, 2023 WL 6139457 (N.D. Tex. Aug. 23, 2023) .............7

*Carrasquillo-Rodriguez v. United States*, No. 2:19-CV-526-WKW, 2019 WL 4281925 (M.D. Ala. Sept. 10, 2019)...................................................55

*Carroll v. Jaques Admiralty L. Firm, P.C.*, 110 F.3d 290 (5th Cir. 1997)...............10

*Cellar Door Prods., Inc. of Michigan v. Kay*, 897 F.2d 1375 (6th Cir. 1990) ...........7

*City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750 (Tex. 2003).....70

*Coleman v. Town of Brookside, Alabama*, 2022 WL 4391678 (N.D. Ala. Sept. 22, 2022) ........................................................................................28

*Comm. on Judiciary v. McGahn*, 391 F. Supp. 3d 116 (D.D.C. 2019) ....................27

*Cory v. Howard*, 164 N.E. 639 (1929) .....................................................................70

*Cuyler v. Kroger Co.*, 2015 WL 12602441 (N.D. Ga. Dec. 31, 2015), *report and recommendation adopted*, 2016 WL 6095223 (N.D. Ga. Feb. 4, 2016) ..............6

*Duhe v. Jones*, 186 So. 2d 419 (La. Ct. App. 1966)..................................................70

*Engelhardt v. Bell & Howell Co.*, 299 F.2d 480 (8th Cir. 1962)....................... 68, 69

*Federated Towing & Recovery, LLC v. Praetorian Ins. Co.*, 283 F.R.D. 644 (D.N.M. 2012).............................................................................................69

*Fletcher v. Ben Crump L., PLLC*, 2023 WL 3095571 (N.D. Ala. Apr. 26, 2023) .....6

*Hodge v. Orlando Utilities Comm'n*, 2010 WL 376019 (M.D. Fla. Jan. 25, 2010) ....................................................................................................8

*Howard Johnson Co. v. Khimani*, 892 F.2d 1512 (11th Cir. 1990)...........................8

*In re BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003).................................. 9, 10, 25

*In re Engle Cases*, 283 F. Supp. 3d 1174 (M.D. Fla. 2017).......................................8

*In re Kunstler*, 914 F.2d 505 (4th Cir. 1990)...........................................................29

*In re Moore*, 739 F.3d 724 (5th Cir. 2014)................................................................5

*In re Off. of Alabama Att'y Gen.*, 2023 WL 129438 (11th Cir. Jan. 9, 2023)...........8

*In re Pennie & Edmonds LLP*, 323 F.3d 86 (2d Cir. 2003) ......................................8

*In re: Little Rest Twelve, Inc.*, 662 F. App'x 887 (11th Cir. 2016) ...........................5

*Iparametrics, LLC v. Meier*, 2012 WL 12896231 (N.D. Ga. Oct. 30, 2012, *affd sub nom. iParametrics, LLC v. Howe*, 522 F. App'x 737 (11th Cir. 2013) ...........8

*James v. Hunt*, 761 F. App'x 975 (11th Cir. 2018) ..................................................26

*Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255 (5th Cir. 2007) ..............8

*Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539 (11th Cir. 1996) ..........................................9

*JTR Enterprises, LLC v. An Unknown Quantity*, 2014 WL 12503330 (S.D. Fla. June 19, 2014) ...........................................................................................6

*JTR Enterprises, LLC v. Columbian Emeralds*, 697 F. App'x 976 (11th Cir. June 23, 2017) .................................................................... 5, 6, 46

*Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251 (11th Cir. 2003) ................. 7, 8, 9

*Knights of the Ku Klux Klan Realm of Louisiana v. E. Baton Rouge Par. Sch. Bd.*, 679 F.2d 64 (5th Cir. 1982) ...........................................................................38

*Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254 (11th Cir. 2012) ..................4, 5

*Llort v. BMW of N. Am., LLC*, 2020 WL 2928472 (W.D. Tex. June 2, 2020) ...........7

*Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730 (9th Cir. 1995).........76

*Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928 (7th Cir. 1989) .............76

*Matthews v. Gaither*, 902 F.2d 877 (11th Cir. 1990) ................................... 52, 55, 60

*Mazzei v. Money Store*, 2023 WL 6784415  (2d Cir. Oct. 13, 2023).........................5

*Millard v. Gov't of D.C.*, 2023 WL 2301927 (D.D.C. Mar. 1, 2023)............... 27, 30

*Morse v. Am. Sec. Ins. Co.*, 2011 WL 332544 (S.D. Tex. Jan. 28, 2011) .................7

*Ogier as Trustee for Pampillon v. American National Red Cross*, 2018 WL 10699592 (N.D. Ga. Feb. 21, 2018) .....................................................................27

*Pierce v. Com. Warehouse*, 142 F.R.D. 687 (M.D. Fla. 1992).................................29

*Plants v. US Pizza Company, Inc.*, 2019 WL 13212704 (E.D. Ark. Mar. 27, 2019) ...............................................................................................................27

*Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644 (9th Cir. 1997) ..................6

*Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218 (11th Cir. 2017) ....................................................................................................4, 44

*Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772 (7th Cir. 2016)....................................5

*Rankin v. City of Niagara Falls*, 293 F.R.D. 375 (W.D.N.Y. 2013), *aff'd sub nom. Rankin v. City of Niagara Falls, Dep't of Pub. Works*, 569 F. App'x 25 (2d Cir. 2014) .........................................................................................................9

*Sewraz v. Nguyen*, No. 3:08CV90, 2011 WL 201487 (E.D. Va. Jan. 20, 2011) ......70

*Slovitz v. City of New York*, 157 N.Y.S.2d 532 (Sup. Ct. 1956) ..............................70

*Snyder-Falkinham v. Stockburger*, 249 Va. 376, 457 S.E.2d 36 (1995) .................70

*Tripp v. Exec. Off. Of the President*, 194 F.R.D. 340 (D.D.C. 2000).......................27

*Virginia Concrete Co. v. Bd. of Sup'rs of Fairfax Cnty.*, 197 Va. 821, 91 S.E.2d 415 (1956) .........................................................................................................70

*Watkins v. Angels Trucking Services, LLC*, 2020 WL 7055496 (S.D. Ala. Dec. 2, 2020) ............................................................................................................55

*Wharton v. Superintendent Graterford SCI*, 2024 WL 998036 (3d Cir. Mar. 8, 2024) ................................................................................................................8

*Wolters Kluwer Financial Services, Inc. v. Scivantage*, 564 F.3d 110 (2d Cir. 2009) ....................................................................................................... 55, 60

## Statutes

28 U.S.C. § 137 .........................................................................................................26

## Other Authorities

S.B. 184.................................................................................................. 69, 72, 73

## Rules

ABA Rule of Professional Conduct 1.2(a)................................................................68

vii

ABA Rule of Professional Conduct 1.3 ............................................................72

Ala. Rule of Professional Conduct 1.2(a) ......................................................68

Ala. Rule of Professional Conduct 1.3 ..........................................................72

Ala. Rule of Professional Conduct 1.4 ..........................................................74

D. Haw. LR 40.2 ............................................................................................34

D. Neb. GR 1.4(a)(4)(B)(i) ............................................................................35

D. Nev. LR 42-1(b) ........................................................................................35

D. Utah DUCivR 83-2(g) ..............................................................................35

D. Vt. GO 73(g) ..............................................................................................35

D. Wyo. LR 40.2(a)(1)(A)(ii) ........................................................................35

D.D.C. LR 40.5(c)(1) ......................................................................................35

D.R.I. LR 105(a)(2) ........................................................................................35

E.D. Ark. GO 39(b)(5) ....................................................................................35

E.D. Pa. Civil Rule 40.1(V)(a) ......................................................................35

E.D. Wis. Civil LR 3(b)(4) ............................................................................35

Fed. R. Civ. P. 11 ..............................................................................................7

Fed. R. Civ. P. 11 cmt ....................................................................................40

Fed. R. Civ. P. 11(b) ......................................................................................57

Fed. R. Civ. P. 11(b)(1) ..................................................................................29

Fed. R. Civ. P. 83(b) .............................................................................. 10, 25

LR 40.1............................................................................................................34

M.D. Ala. LR 3.1 ................................................................................. 33

M.D. Ala. LR 40.1 ............................................................................... 26

M.D. Fla. LR 1.05 ............................................................................... 27

M.D. Fla. LR 1.07 ............................................................................... 27

M.D. Tenn. AO 176 ............................................................................ 34

N.D. Cal. LR 3-12 .............................................................................. 35

N.D. Fla LR 5.6 .................................................................................. 34

N.D. Ill. LR 40.4 ................................................................................ 35

S.D. Ohio LR 3.1 ................................................................................ 34

S.D.N.Y, Rules for the Division of Business Among District Judges 13(b)(2) ....... 35

W.D. Pa. LCR Rule 40(E) ................................................................... 35

W.D. Wis. AO 347 .............................................................................. 35

**Treatises**

27A Fed. Proc., L. Ed. § 62:502 ........................................................ 71

56 A.L.R.2d 1290 (Originally published in 1957) ............................... 71

7A C.J.S. Attorney & Client § 295 .................................................... 71

Restatement (Third) of the Law Governing Lawyers § 21 (2000) .......... 71

Respondent Kathleen Hartnett responds to the Court's May 1, 2024 Supplemental Order to Show Cause and states as follows:

## <u>INTRODUCTION</u>

Kathleen is one of the *Walker* counsel. Throughout her involvement in that case, Kathleen acted in good faith, followed governing rules and ethical standards, and pursued her clients' best interests. She has testified honestly and completely in her declarations and live testimony before the Panel and this Court. Because she did not engage in sanctionable conduct, she respectfully requests that the Court dismiss her from this proceeding without sanction.

This brief discusses each of the applicable findings in the Panel's Report of Inquiry (the "Report") issued in *In Re: Amie Adelia Vague, et al.*, No. 2:22-mc-3977-WKW (M.D. Al.) ("*Vague*") and the charges set forth in this Court's Supplemental Order to Show Cause ("Show Cause"). At the outset, Kathleen respectfully highlights a few key overarching considerations:

First, no evidence from the numerous hours of testimony and pages of declarations indicates that anyone—much less Kathleen—was involved in a coordinated scheme to file two cases in an attempt to increase the chances of drawing a particular judge. Rather, the two teams—*Walker* and *Ladinsky*—were competing to be the first-filed case. And, once the cases were filed, there was minimal

1

coordination between the teams until such coordination became unavoidable. For her part, Kathleen never interacted with anyone on the *Ladinsky* team about these cases until Friday, April 15—the date *Walker* was dismissed.

Second, Kathleen was counsel in *Walker* only. She did not participate in the refiling of the *Eknes-Tucker* case. Her involvement in this matter ended with the Rule 41 dismissal in *Walker* on Friday, April 15, 2022, and the *Walker* team's decision that weekend not to refile.

Third, the "misconduct" listed in the Report is principally "collective," and nearly all of it does not involve conduct personal to Kathleen. For instance, the Report and, by extension, the Show Cause address a number of discussions and phone calls—a call to Judge Thompson's chambers; calls between the *Walker* and *Ladinsky* teams involving wide-ranging discussions of judges and their philosophies; and a discussion that purportedly included a comment about the parties having a "zero percent chance" of success in front of Judge Burke. Kathleen was not involved in any of those calls and discussions. The only actions described as "misconduct" involving Kathleen were marking *Walker* as a related case to *Corbitt* and voluntarily dismissing *Walker* without prejudice. As described below, these actions do not support a sanction against Kathleen.

2

Finally, Kathleen requests that the Court consider the Panel's real-time comments about Kathleen during her testimony, as opposed to the Final Report's conclusions of collective misconduct. During her testimony, the Panel repeatedly praised Kathleen and her candor:

> JUDGE PROCTOR: One of the things I was impressed with with your declaration is its clarity, its organization, and its candor. So I want to give you that compliment as we stand here. Aug. 3, 2022 Hrg. Trans. at 22:12–14.

> JUDGE PROCTOR: I think you've given me a good picture of what you're thinking and what your motivations were and what your decisions were. *Id.* at 42:12–14.

> JUDGE PROCTOR: I really appreciate the way you're tackling this, and I just want to affirm that as we're going along. *Id.* at 79:25–26.

> JUDGE PROCTOR: I thank you for the way you've approached this. *Id.* at 89:17.

Throughout this process, Kathleen has been truthful and forthcoming. The Panel's statements indicate that, in real time, they agreed.

Kathleen's testimony also is corroborated by the testimony of each of the other Respondents on all the material issues. Notably, much of that testimony was taken when all Respondents were sequestered and therefore could not—and did not—communicate about their testimony. Such consistency is the hallmark of truthfulness in any judicial inquiry and should be given extraordinary weight as this Court considers whether Kathleen acted in good faith.

3

Kathleen regrets that her actions created an appearance of impropriety and judge shopping and appreciates this opportunity to address the Court. Because she did not engage in any sanctionable conduct and at all times acted in good faith, she respectfully requests dismissal of the charges.

## STANDARDS OF CONDUCT

**I.    The Court May Sanction Under Its Inherent Authority Only Upon a Finding of Subjective Bad Faith.**

The Court's "inherent power should be exercised with caution and its invocation requires a finding of bad faith." *Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1257 (11th Cir. 2012); *see Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (requiring a finding of subjective bad faith for sanctions under the Court's inherent authority). "[I]n the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Id.* at 1224–25. Recklessness alone will not suffice. Rather, to be sanctionable, an attorney's reckless conduct must be paired with a frivolous argument or an intention to harass. *Id.* at 1225.

In "exercising its inherent power to impose sanctions, a court must 'comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees.'" *Kornhauser*, 685 F.3d at 1257 (quoting *Chambers v.*

4

*NASCO, Inc.*, 501 U.S. 32, 50 (1991)). For there to be due process, "the attorney must, first, be afforded 'fair notice that [his or her] conduct may warrant sanctions and the reasons why,' and, second, 'be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify [his or her] actions.'" *Id.* (quoting *In re Mroz*, 65 F.3d 1567, 1575–76 (11th Cir. 1995)).[1]

While the Eleventh Circuit has not clearly adopted an evidentiary standard for sanctions pursuant to the Court's "inherent authority," at least three Circuits require clear and convincing evidence of bad faith before imposing such sanctions. *See Mazzei v. Money Store*, 2023 WL 6784415, at *4 (2d Cir. Oct. 13, 2023); *In re Moore*, 739 F.3d 724, 730 (5th Cir. 2014); *Ali v. Tolbert*, 636 F.3d 622, 627 (D.C. Cir. 2011); *cf. In re: Little Rest Twelve, Inc.*, 662 F. App'x 887, 889 (11th Cir. 2016) (requiring "specific findings"); *but see Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777 (7th Cir. 2016). And in an unpublished decision, the Eleventh Circuit has reviewed sanctions imposed under a district court's "inherent powers" for "clear and convincing evidence." *JTR Enterprises, LLC v. Columbian Emeralds*, 697 F. App'x 976, 978, 986–87 (11th Cir. June 23, 2017). Many district courts in the Eleventh Circuit have also applied a clear and convincing evidence standard. *See e.g.*, *JTR*

---

[1] Kathleen incorporates Doc. 508, which preserves objections to the process utilized in this proceeding.

5

*Enterprises, LLC v. An Unknown Quantity*, 2014 WL 12503330, at *9 (S.D. Fla. June 19, 2014); *Barash v. Kates*, 585 F. Supp. 2d 1347, 1365 (S.D. Fla. 2006); *Cuyler v. Kroger Co.*, 2015 WL 12602441, at *11 (N.D. Ga. Dec. 31, 2015), *report and recommendation adopted*, 2016 WL 6095223 (N.D. Ga. Feb. 4, 2016). This Court applied a clear and convincing evidence standard when imposing sanctions last year. *Fletcher v. Ben Crump L., PLLC*, 2023 WL 3095571, at *5 (N.D. Ala. Apr. 26, 2023).

Additionally, in considering whether to impose a sanction, the Court must assess each attorney individually, including with respect to a determination of bad faith. "[C]ourts levying sanctions [must] assess an attorney's individual conduct and [must] make an explicit finding that he or she acted in bad faith." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 650 (9th Cir. 1997); *see also JTR Enters.*, 697 F. App'x at 987 ("Bad faith is personal to the offender. One person's bad faith may not be attributed to another by operation of legal fictions or doctrines such as respondeat superior or vicarious liability.") (quoting Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 27 (4th ed. 2012)). In other words, Kathleen's conduct must be addressed *individually*, not *collectively*. *Cf. Vague*, Doc. 70 at 51 (making findings of misconduct against "counsel" on an admittedly "collective" basis). Kathleen cannot be sanctioned for another person's conduct.

## II.    *Sua Sponte* Sanctions Under Rule 11 Also Require a Heightened Showing "Akin To Contempt."

Rule 11 applies to "pleading[s], written motion[s], or other paper[s]." Fed. R. Civ. P. 11. In this proceeding, the only two papers at issue are the *Walker* Civil Cover Sheet and the Rule 41 dismissal. Case law is mixed on whether Rule 11 applies to civil covers sheets. *See Morse v. Am. Sec. Ins. Co.*, 2011 WL 332544, at *2 (S.D. Tex. Jan. 28, 2011) ("The civil cover sheet is not a pleading and does not contain the certifications required by Rule 11."); *Blackburn v. Lubbock FBI*, 2023 WL 6139457, at *3 (N.D. Tex. Aug. 23, 2023); *Afzaal v. Upper Iowa Univ.*, 2018 WL 7138388, at *3 (E.D. Tex. Dec. 21, 2018); *Llort v. BMW of N. Am., LLC*, 2020 WL 2928472, at *4 (W.D. Tex. June 2, 2020); *but see Cellar Door Prods., Inc. of Michigan v. Kay*, 897 F.2d 1375, 1379 (6th Cir. 1990) (affirming sanctions for failure to identify a related case on the civil docket sheet). The undersigned counsel has not found any case applying Rule 11 to a Rule 41 voluntary dismissal. Regardless, Kathleen will address Rule 11 below as if it applies, without conceding that it in fact applies, to the Civil Cover Sheet and the Rule 41 dismissal.

The State of Alabama did not file a Rule 11 sanctions motion. Thus, the Show Cause is *sua sponte*. *Sua sponte* Rule 11 sanctions are subject to a heightened standard, which the Eleventh Circuit has described as "akin to contempt." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). Although the Eleventh

Circuit has not elaborated on the meaning of "akin to contempt," district courts have held that negligence or ignorance of the law is not sufficient. *See Iparametrics, LLC v. Meier*, 2012 WL 12896231, at *4 (N.D. Ga. Oct. 30, 2012, *affd sub nom. iParametrics, LLC v. Howe*, 522 F. App'x 737 (11th Cir. 2013); *Hodge v. Orlando Utilities Comm'n*, 2010 WL 376019, at *5 (M.D. Fla. Jan. 25, 2010). To the contrary, only egregious conduct such as "making a knowingly false statement or exhibiting a deliberate indifference to obvious facts is akin to contempt." *See Hodge*, 2010 WL 376019, at *5; *accord Iparametrics*, 2012 WL 12896231, at *4.

Additionally, although the Eleventh Circuit has not reached the question, the Second Circuit has required subjective bad faith to satisfy the "akin to contempt" standard. *See Kaplan*, 331 F.3d at 1255.; *In re Off. of Alabama Att'y Gen.*, 2023 WL 129438, at *3 (11th Cir. Jan. 9, 2023) (declining to adopt a *mens rea* standard); *In re Pennie & Edmonds LLP*, 323 F.3d 86, 87 (2d Cir. 2003) (requiring subjective bad faith); *but see Wharton v. Superintendent Graterford SCI*, 2024 WL 998036, at *4 (3d Cir. Mar. 8, 2024); *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 264 (5th Cir. 2007); *In re Engle Cases*, 283 F. Supp. 3d 1174, 1214 (M.D. Fla. 2017) (finding that subjective bad faith is not required).

Regardless, contempt is subject to a clear and convincing standard of proof. *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990); *Rankin v.*

*City of Niagara Falls*, 293 F.R.D. 375, 387 (W.D.N.Y. 2013), *aff'd sub nom. Rankin v. City of Niagara Falls, Dep't of Pub. Works*, 569 F. App'x 25 (2d Cir. 2014). This "more exacting" clear and convincing evidence standard for contempt, *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1545 (11th Cir. 1996), is consistent with the requirement that *sua sponte* Rule 11 sanctions "must be reviewed with 'particular stringency.'" *Kaplan*, 331 F.3d at 1255.

## III.   "Judge Shopping" is not a Specifically-Defined Term That, by Itself, Provides a Standard of Conduct For Attorneys to Follow.

As other Respondents have explained, "[T]here is no 'federal law prohibiting judge shopping.' Instead, there is a patchwork of local and federal rules and court decisions that restrict or prohibit **particular conduct** that can be rightfully characterized as 'judge shopping.' In reality, the term 'judge shopping' has no established or universally recognized definition." Doc. 493 at 12.

In its "judge-shopping" section, the Show Cause cites to *In re BellSouth Corp*, which said, "a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice." 334 F.3d 941, 959 (11th Cir. 2003). *BellSouth* involved a party hiring Judge U.W. Clemon's nephew in an attempt to get Judge Clemon to recuse. The court found that hiring an attorney for the purpose of recusing a judge was "a contrivance" and an "attempt to manipulate the random assignment process." *Id.* 959–60. *BellSouth* does not define contrivance,

9

and both *BellSouth* and the Fifth Circuit case it cites related to "contrivance[s]" involving attorneys agreeing to representation for the purpose of recusing a judge. *See BellSouth*, 334 F.3d at 949 (quoting *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir. 1983)). Additionally and also unlike here, the Northern District of Alabama had a Standing Order addressing the appearance of counsel that could lead to recusal, and the Court had a history of cases involving the same lawyer appearing in Judge Clemon's cases.

## IV. Rule 83(b) Requires Actual Notice of Provisions Allegedly Violated for Sanctions to be Imposed.

Federal Rule of Civil Procedure 83 provides that "[n]o sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement." Fed. R. Civ. P. 83(b). "Rule 83(b) ensures that litigants are not unfairly sanctioned for failure to comply with a local rule of the court or internal operating procedures or the like of which they are unaware." *Carroll v. Jaques Admiralty L. Firm, P.C.*, 110 F.3d 290, 293 (5th Cir. 1997).

## V. Other Standards

While the Show Cause identifies other standards (Local Rule 83.1, Rule of Professional Conduct 1.2, Rule of Professional Conduct 1.3, Rule of Professional

Conduct 3.3, the Oath of Admission, and Kathleen's sworn oath), these do not apply to each charge in the Show Cause. Kathleen will address those standards below where appropriate. Of note, Kathleen had not reached the point of submitting a *pro hac vice* application, and neither the Northern District nor Middle District's Local Rules require attorneys admitted *pro hac vice* to take this oath. Nevertheless, none of Kathleen's conduct violated these oaths.

## **BACKGROUND INFORMATION**

Kathleen graduated from Harvard Law School in 2000 and then clerked for Judge Merrick Garland on the D.C. Circuit and Justice John Paul Stevens on the U.S. Supreme Court. Ex. A, Hartnett Decl. at p. 2. Her professional experience includes service as special assistant and associate counsel to the President of the United States and as Deputy Assistant Attorney General in the Department of Justice. Ex. A, Hartnett Decl. at p. 3. In 2020, Kathleen joined the Cooley firm where she is a member of the Business Litigation group and leads the firm's Issues and Appeals practice group. Ex. A, Hartnett Decl. at p. 2. Kathleen has a robust commercial litigation practice and she also handles *pro bono* cases. *Id.* The *Walker* case was one of her *pro bono* matters. Ex. A, Hartnett Decl. at pp. 3–4.

Kathleen was the partner supervising the Cooley team working on the *Walker* case. Ex. A, Hartnett Decl. at p. 4. The Cooley team joined Lambda Legal, ACLU

National, and ACLU Alabama to provide litigation support for the constitutional challenge to the Alabama Vulnerable Child Compassion and Protection Act. Ex. A, Hartnett Decl. at pp. 3–4; Aug. 3, 2022 Hrg. Trans. at 42:20–43:18. Because she lives in and bases her legal practice out of California and had not yet applied for *pro hac vice* admission in the *Walker* case, Kathleen and the Cooley team relied on local counsel in Alabama for guidance and information relating to local rules and customs.

## SUMMARY OF KATHLEEN'S CONDUCT AND TESTIMONY[2]

Kathleen's Declaration, Supplemental Declaration, and testimony at the August 3, 2022 evidentiary hearing, along with other testimony and evidence, establish the following facts pertaining to her knowledge, intentions, and actions:

In 2020, the ACLU, ACLU Alabama, and Lambda Legal formed a team to challenge the legality of a contemplated law in Alabama restricting medical care for transgender youth in the Middle District of Alabama. *Vague*, Doc. 80-7, Esseks Decl. at p. 11. Kathleen and Cooley were not a part of the team in 2020. At that time, the team had discussions about and intended to mark the to-be-filed case as related to *Corbitt*, which the ACLU and ACLU Alabama were litigating as counsel of record. Ex. A, Hartnett Decl. at p. 6; *Vague*, Doc. 80-13, Borelli Decl. at p. 5; *Vague*, Doc.

---

[2] Kathleen is attaching her Declaration (Exhibit A; *Vague*, Doc. 80-12), her Supplemental Declaration (Exhibit B; Doc. 506-1), and copy of the *Corbitt* docket sheet (Exhibit C) for reference. In a separate filing, Kathleen made an offer of proof of an expert declaration. Doc. 504. The expert declaration supports a number of conclusions in this brief, should the Court choose to consider it.

80-7, Essex Decl. at p. 16; *Vague*, Doc. 80-16, Charles Decl. at pp. 14–17, 23. No lawsuit was filed in 2020 because the bill did not become law.

In March 2021, the Alabama Legislature was considering a similar bill, and the ACLU asked Kathleen and Cooley to join the team (the "*Walker* team"). Ex. A, Hartnett Decl. at pp 3–4. Kathleen understood from *Walker* co-counsel that they intended to file *Walker* in the Middle District and mark it as related to *Corbitt* because the two cases involved overlapping factual and legal issues. Ex. A, Hartnett Decl. at p. 7. She also understood that *Corbitt* was on appeal and was expected to be remanded back to Judge Thompson for further proceedings that entailed, at minimum, resolution of an attorneys' fee motion. Ex. A, Hartnett Decl. at p. 7. Kathleen did not believe *Corbitt*'s status on appeal meant that it could not be "related" to *Walker*. *See* Aug. 3, 2022 Hrg. Trans. at 20:20–21:2

Soon after joining the case in 2021, Kathleen directed Cooley lawyers to research the related case designation—in particular, to research any local substantive or procedural requirements for marking a case as related to another on the civil cover sheet. Ex. A, Hartnett Decl. at p. 16; *Vague*, Doc. 80-9, Veroff Decl. at p. 4. After reviewing the research, she agreed that the team had a reasonable basis to mark *Walker* related to *Corbitt.* Ex. A, Hartnett Decl. at pp. 7–8; 16–17. Because of the overlapping legal and scientific issues with *Corbitt* and the lack of any Middle

13

District local rule providing standards for marking "related" on the civil cover sheet, Kathleen believed there was a good faith basis for marking *Walker* related to *Corbitt* that did not violate any rules or standards. Ex. A, Hartnett Decl. at pp. 7–8; 16–17. Ultimately, no lawsuit was filed in 2021 because the bill did not become law. Ex. A, Hartnett Decl. at 4.

In early 2022, the *Walker* team—including Kathleen and the Cooley team— again prepared for litigation in light of the potential passage of the law in Alabama. Ex. A, Hartnett Decl. at 4. They resumed work where they had left off in 2021, and, as in 2021, they intended to file their case in the Middle District and mark it as "related" to *Corbitt* on the civil cover sheet. *Corbitt* was still on appeal at this time. Ex. A, Hartnett Decl. at 6–9.

On April 12, 2022, the day after *Walker* was filed, Carl Charles, a *Walker* attorney from Lambda, called Judge Thompson's chambers at the suggestion of others on the *Walker* team to alert chambers that a motion for preliminary injunction was being filed. *See Vague*, Doc. 80-7, Esseks Decl. at p. 20 (explaining that Mr. Charles called Judge Thompson's chambers at Mr. Esseks' suggestion); *Vague*, Doc. 80-16, Charles Decl. at p. 72 (same). Kathleen learned that Carl Charles called Judge Thompson's chambers on April 12 because she was following email traffic among *Walker* counsel while she was in a deposition preparation session that day with a

14

witness in a different case. Ex. B, Supp. Decl. at ¶ 4. Kathleen did not (1) participate in this call, (2) direct or advise Mr. Charles to make this call, or (3) provide any input on whether to make the call or what to say. *See id.*; *Vague*, Doc. 70 at 18; Aug. 3, 2022 Hrg. Trans. at 25:13–15 (Kathleen, explaining that she was "in deposition prep or something that day" and was merely "following the email traffic" related to the call). Regardless, Kathleen does not believe that Charles's call was inappropriate. *See* Aug. 3, 2022 Hrg. Trans. 26:12–20; Ex. B, Hartnett Supp. Decl. at ¶ 4.

Later, on April 12, 2022, the *Walker* team filed a Motion to Reassign *Walker* to Judge Thompson based on instructions from the Middle District clerk's office that such a motion was required to effectuate the related case designation, which was, according to the clerk's office, not self-executing. Ex. A, Hartnett Decl. at p. 10; Doc. 70 at 20 (Report finding that junior associate "spoke to a Middle District clerk's office employee and was told that counsel would need to file a motion to relate *Walker* to *Corbitt*…"). However, after Judge Marks entered a Show Cause Order as to why *Walker* should not be transferred to the Northern District—where the *Ladinsky* had filed a separate action—the *Walker* team, believing a transfer was inevitable, withdrew their motion to reassign and consented to the transfer. *Walker*, Doc. 18.

The Report discusses "an April 13th call that took place between the *Ladinsky* and *Walker* teams" that purportedly included (1) *Walker* team members trying to "drum up support for *Ladinsky* counsel transferring their case to the Middle District and proceeding before Judge Thompson" and (2) discussions about various judges and how they might view these cases. *Vague*, Doc. 70 at 24–25.[3] Kathleen was ***not*** on this call; she was in a deposition in a different case that day. Ex. B, Hartnett Suppl. Decl. ¶¶ 5–6. No one who was on the April 13 call testified that Kathleen participated. Aug. 3, 2022 Hrg. Trans. at 213–214 (Esseks); Nov. 3, 2022 Hrg. Trans. at 30–31 (Orr); Aug. 4, 2022 Hrg. Trans. at 33:1–15 (Eagan).

Good Friday, April 15, 2022 was a hectic day during which the posture of the *Walker* litigation changed rapidly:

- Members of the *Walker* and *Ladinsky* teams (including Kathleen) had a call earlier in the day to discuss procedural next steps and consolidation, now that both of their cases were in the Northern District. This conversation was the first time that Kathleen interacted with any members of the *Ladinsky* team. Hartnett Supp. Decl. at ¶ 10; Hartnett Decl. at 27.

---

[3] Kathleen is relying on the Report's characterization of this call for purposes of reference, as she was not on this call.

16

- Despite Kathleen's belief that *Walker* would be assigned to Judge Axon, who was then presiding over the first-filed *Ladinsky*, *Walker* was assigned to Judge Burke.[4] Aug. 3, 2022 Hrg. Trans. at 46:10–19.

- At 4:07 p.m. that Friday, Judge Burke entered an order setting *Walker* for a status conference on the following Monday morning at 10:00 a.m. *Vague*, Doc. 70 at 28. At this point, Kathleen mistakenly believed that *Walker* would be transferred to Judge Axon, who was then assigned to the first-filed case (*Ladinsky*), and that the Monday status conference would likely be canceled. *See* Aug. 3, 2022 Hrg. Trans. at 64:18–65:24; Hartnett Decl. at pp. 28–29.

- Around 4:45 p.m., Kathleen was on a call with an Alabama Deputy Attorney General discussing consolidation and how to inform Judge Burke of the plan to seek consolidation. During that call, Judge Axon entered an order reassigning *Ladinsky* to Judge Burke. At that point, Kathleen first realized that the status conference set by Judge Burke would go forward on Monday. As explained above, prior to Judge

---

[4] Kathleen now understands, based on the Panel's explanation, why *Walker* was assigned to Judge Burke. At the time, she did not know the Northern District's assignment procedures for transferred cases, and Judge Marks's transfer order said that *Walker* was being transferred so that "it may be decided with *Ladinsky*." *Walker*, Doc. 20.

17

Axon's order, Kathleen believed—albeit mistakenly—that Judge Burke may not have known about the posture of both cases and that he would likely cancel the status conference when the parties informed the Court about the plan to consolidate before Judge Axon. *See* Aug. 3, 2022 Hrg. Trans. at 64:18–65:24; Hartnett Decl. at pp. 28–29.

- Because it was Easter weekend and the beginning of Passover, the lead lawyers in *Walker*, who all lived outside Alabama, faced difficulties being present for the status conference on Monday, April 18. Ex. A, Hartnett Decl. at pp. 29–30.

- Kathleen had serious concerns about the ability of the *Walker* team's sole attorney present in Alabama to handle the status conference. Those reasons included her performance that week, the uncertainties arising from the likely consolidation of *Walker* with *Ladinsky*, the on-the-spot case management decisions that would likely need to be made during the course of the conference, and the tension between the advocacy groups. Ex. A, Hartnett Decl. at pp. 29–30; Aug. 3, 2022 Hrg. Trans. at 24:9–21, 73:6–19, 81:12–14.

- Although the status conference was not planned to discuss the merits, the procedural aspects of the cases were critical and complex. For

18

example, *Ladinsky* was first filed, but *Walker* had a pending motion for a preliminary injunction. Aug. 4, 2022 Hrg. Trans. at 62:16–64:6. The two teams had different experts, different claims, and different philosophies. Aug. 3, 2022 Hrg. Trans. at 52:1–5; 55:15–16. These differences would require effective advocacy and coordination with *Ladinsky* counsel with almost no time to prepare. Among other issues, Kathleen believed the Court was likely to take up how a preliminary injunction hearing would proceed. Kathleen did not have confidence in local counsel to handle these issues at the status conference. Ex. A, Hartnett Decl. at p. 29–30.

- Kathleen's concerns about coordinating with *Ladinsky* counsel, particularly in light of the tension between the advocacy groups, were heightened when she realized that the two teams would have to appear together on Monday. Specifically, Kathleen testified that the status conference was "the forcing mechanism" that made her realize "we're not going to get our acts together in time for Monday." Before that point, the teams had a general plan to work together, but they had not had "even . . . one strategic conversation." In other words, the status

19

conference forced Kathleen to confront the "the inevitable train wreck that was coming." Aug. 3, 2022 Hrg. Trans. at 53:14–54:20.

- Kathleen did not have any personal knowledge about Judge Burke, but she was aware of concerns that had been voiced by other attorneys. She was also concerned with the sudden and unexpected reassignment from Judge Axon to Judge Burke. Ex. A, Hartnett Decl. at p. 30.

- Kathleen also believed the defendants might file an answer over the weekend, which would have eliminated the option of a Rule 41(a)(1)(A)(i) voluntary dismissal.[5] Ex. A, Hartnett Decl. at 30.

- All of these concerns—the lack of confidence in the one attorney who could appear for the *Walker* team at the joint status conference on the Monday after Easter, the potential strategic importance of decisions concerning consolidation and scheduling that might arise at the status conference, the questions about why *Ladinsky* was consolidated with *Walker* before Judge Burke, and the potential loss of the right to dismiss under Rule 41 if the State were to quickly file an answer—led Kathleen to believe that a Rule 41 dismissal without prejudice was in the best

---

[5] Underscoring the validity of this concern, some defendants filed an answer is *Eknes-Tucker* two days after the Complaint was filed.

interests of her clients. Concern with Judge Burke was not Kathleen's sole, or even her predominant, consideration. Ex. A, Hartnett Decl. at pp. 29–30.

- Kathleen viewed Rule 41 as providing an absolute right to voluntarily dismiss as long as the Defendants had not filed an answer or motion for summary judgment. Aug. 3, 2022 Hrg. Trans. at 82:20–83:8.

- Late in the afternoon of April 15, Kathleen briefly spoke with Shannon Minter of *Ladinsky* counsel about dismissal after the transfer of *Ladinsky* to Judge Burke and prior to dismissal.[6] Aug. 3, 2022 Hrg. Trans. at 80:4–83:6. During their interaction, Kathleen and Minter also discussed their teams' shared intent to regroup and discuss possibly joining forces to refile a new case. Hartnett Decl. at p. 21; Aug. 3, 2022 Hrg. Trans. at 82:6–84:10.

- The Report discusses a "5:00 p.m. conference call" on April 15th involving multiple members of both the *Ladinsky* and *Walker* teams and

---

[6] Jennifer Levi testified that she talked to Kathleen on April 15th about dismissing and a possible refiling. Aug. 4, 2022 Hrg. Trans. at 30:14–31:11. Kathleen does not remember talking to Levi about this; she only recalls talking to Minter, but she cannot definitively say that she did not talk to Levi. Hartnett Supp. Decl. at ¶ 14. Regardless, Levi's description of this conversation is consistent with Kathleen's thought process at this time. *See id.* Levi says that they discussed dismissal and that Kathleen said any refiling discussion would have to involve more members of her team but that they would move quickly to discuss the options available to the groups. *Id.*; *compare* Aug. 3, 2022 Hrg. Trans. at 78: 18–79:7, 88:1–12 and Ex. A, Hartnett Decl. at p. 21.

says that Kathleen was on the call. *Vague*, Doc. 70 at 31. Kathleen was

**_not_** on the call described by the Panel, *see* Hartnett Supp. Decl. at ¶¶ 7–

14, and, indeed, this section of the Report appears to confuse several

phone calls among different groups of lawyers. Regardless, the call that

the Report focuses on apparently involved discussions about judicial

preferences—namely, a purported comment about a "zero percent

chance" that Judge Burke would grant the requested relief. Again,

Kathleen was **_not_** on such a call, and to the extent the Report states that

she was, the cited testimony says otherwise. *See* Aug. 4, 2022 Hrg.

Trans. at 168–179; *Vague* Doc. 70 (citing same); *see also* Hartnett Supp.

Decl. at ¶¶ 7–14.

- Kathleen and the *Walker* team independently decided to dismiss

  *Walker*, but the *Ladinsky* team's intent to dismiss was a factor in her

  decision: "The *Walker* team made this decision independently from the

  *Ladinsky* team, but as part of this decision considered that the *Ladinsky*

  team also was contemplating dismissal and was likely to dismiss." Ex.

  A, Hartnett Decl. at pp. 30–31; *see* Aug. 3, 2022 Hrg. Trans. at 85:14–

  17 ("[W]e kind of independently -- I also agreed to that. But it was

informed by the notion that they likely were, and I think we kind of both confirmed that we were around the same time.").

- Kathleen did not view the *Ladinsky* dismissal as a required condition to dismissing *Walker*. Aug. 3, 2022 Hrg. Trans. at 84:25–85:11. However, she did agree to coordinate the timing of the two dismissals with the *Ladinsky* team as a "professional courtesy" Aug. 3. Hrg. Trans. at 84:13–24.

- The *Walker* team dismissed their case on that Friday, April 15, 2022.

Representatives of the various advocacy groups involved in the *Walker* and *Ladinsky* cases had a call on Saturday, April 16 to discuss next steps. Kathleen was not invited to and did not participate in this call, but she learned afterwards that the call was acrimonious and that it revealed an inability of the *Walker* and *Ladinsky* teams to work together to file a new case. After receiving a report of the call that Saturday afternoon, Kathleen decided that Cooley would not participate in the filing of a new lawsuit. Aug. 3, 2022 Hrg. Trans. at 87:3–12. Kathleen did not participate in filing *Eknes-Tucker* or in any decision-making related to filing *Eknes-Tucker*—including where to file and which plaintiffs to include. *See* Ex. A, Hartnett Decl. at pp. 21–22.

## **ARGUMENT**

The Show Cause incorporates eight findings from Section V of the Report into the Charges against Kathleen, and it adds new charges related to obtaining client consent for the dismissal of *Walker* and potential discrepancies and nondisclosures in her testimony. It then requires Kathleen to show cause why she should not be sanctioned under these Charges. Doc. 479 at 12–13. This Argument section is divided into five sections that address the Charges in the Show Cause.

Section I below addresses the Show Cause's first Charge, involving the related case designation; **Section II** below addresses the next two Charges, which do not relate to Kathleen's conduct; and **Section III** below addresses the four Charges that are related to dismissal (only some of which relate to Kathleen's conduct); **Section IV** below addresses Paragraph III(b) of the Show Cause, which relates to Kathleen's credibility and testimony before the Panel; and **Section V** below addresses the dismissal of *Walker* without obtaining client consent. Kathleen's response addresses only her own personal conduct, because other attorneys' conduct and "collective misconduct" cannot be the basis for sanctions.

## I.   **Charge 1: "*Walker* counsel, including Ms. Hartnett, to mark *Walker* related to a case closed one year earlier decided by a 'favorable' judge."**

As explained herein, the *Walker* team's relatedness designation cannot be the basis for sanctions against Kathleen. That designation was not intended to and did

not manipulate the random case assignment procedures, was objectively reasonable, was made in good faith, was not a contrivance, and was not made for an improper purpose. Moreover, Kathleen did not have notice of any controlling rule governing the marking of a case as "related" to another in the Middle District of Alabama and therefore cannot be sanctioned for marking *Walker* as related to *Corbitt*. The Middle District of Alabama does not have a rule that defines "related" or describes the Court's procedure for determining relatedness. When, as here, "there is no controlling law" on a procedural matter, "[n]o sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement." Fed. R. Civ. P. 83(b).

### A. Designating a Case as Related is a Permissible Deviation from the Default Random Case Assignment System in Federal District Courts.

This Court and the Panel have both characterized the relatedness designation as a species of "judge-shopping" and as an attempt to manipulate the random case assignment procedures. For example, the Show Cause cites to a case holding "that a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice." Doc. 479 at 5 (quoting *In re BellSouth Corp.*, 334 F.3d 941, 959 (11th Cir. 2003). However, the consolidation or assignment of

related cases is a permissible exception to the default approach of random assignment, not a contrivance intended to improperly manipulate the random assignment of cases.

In general, courts have broad discretion to establish procedures for the assignment of cases. *See* 28 U.S.C. § 137 ("The business of a court having more than one judge shall be divided among the judges as provided by the rules and orders of the court."). The Middle District of Alabama, like most, if not all, federal district courts, has a random assignment process: "Civil cases shall be divided among the judges of this Court through a computerized random selection process." M.D. Ala. LR 40.1.

However, both by rule and practice, the random assignment process for district courts has certain exceptions, including for related cases. Relevantly, the standard Civil Cover Sheet—which was approved by the Judicial Conference of the United States in 1974—requires a plaintiff to identify any "related cases." Depending on the district, a case that is related to a previously-filed case can be assigned or reassigned to the judge handling the previously-filed related case. *See, e.g.*, *James v. Hunt*, 761 F. App'x 975, 980 (11th Cir. 2018) ("[T]he initiating judge had inherent authority to manage the district court docket and reassign the case to a judge who had presided over a prior related case."); *Ogier as Trustee for Pampillon v. American National*

26

*Red Cross*, 2018 WL 10699592, at *1 (N.D. Ga. Feb. 21, 2018) ("Under this Court's internal operating procedures, it is appropriate to assign related cases to the same judge.").

The District Court for the District of Columbia has described the related case doctrine as "an exception to the general rule of random assignment of cases," *Tripp v. Exec. Off. Of the President*, 194 F.R.D. 340, 342 (D.D.C. 2000), a means "to circumvent the normal random assignment system to make a direct assignment to a particular judge," *Comm. on Judiciary v. McGahn*, 391 F. Supp. 3d 116, 119 (D.D.C. 2019), and "the reason that circumvention of random assignment is sometimes permissible." *Millard v. Gov't of D.C.*, 2023 WL 2301927, at *2 (D.D.C. Mar. 1, 2023); *see also Plants v. US Pizza Company, Inc.*, 2019 WL 13212704, at *2 (E.D. Ark. Mar. 27, 2019) ("There is an exception to this general rule [of random assignment] for 'related cases.'").

Similarly, district courts can have non-random assignment rules and practices for cases involving successive actions with the same parties, vexatious litigants, or judicial efficiency. *See, e.g.*, M.D. Fla. LR 1.05; 1.07. Judge Axon invoked this practice here when she, as Judge Proctor explained, had a two-week criminal trial that prevented her from promptly giving attention to *Ladinsky* or *Walker*, and as a result, she reassigned *Ladinsky* to Judge Burke, who had already been assigned to

27

*Walker*.[7] Judge Proctor similarly stated in a recent opinion: "When two cases are filed in a single district however, 'District Judges have the inherent power to transfer cases from one to another for the expeditious administration of justice.' . . . Given 'the district court's broad authority over its own docket,' a district judge may 'reassign cases at its discretion, consistent with its local rules.'" *Coleman v. Town of Brookside, Alabama*, 2022 WL 4391678, at *1 (N.D. Ala. Sept. 22, 2022) (internal citations omitted).

In short, random assignment is the default procedure for judicial assignments, but in the Middle District, like in all districts, courts and parties can invoke certain exceptions that result in non-random assignments of cases. This context is important here because the *Walker* team attempted to invoke one of these permissible exceptions by designating *Walker* as related to *Corbitt*. Invoking a permissible exception from the default random assignment process is not a sanctionable contrivance to manipulate the random assignment process.

---

[7] Kathleen is not suggesting that the Court acted improperly in any way. Her point is that despite the default of random assignment procedures, *Ladinsky* was not randomly assigned to Judge Burke. The Report and this Court's April 5, 2024 Order both state that Judge Axon—rather than a random system—made the decision to transfer *Ladinsky* to Judge Burke.

28

**B.      Kathleen's Agreement with Other *Walker* Counsel's Decision to Mark *Walker* as Related to *Corbitt* was not for an Improper Purpose.**

Rule 11 prohibits filings that are "being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). The Eleventh Circuit has described this prong of Rule 11 as a pleading that "is filed **in bad faith** for an improper purpose." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998) (emphasis added). "Improper purpose may be shown by excessive persistence in pursuing a claim or defense in the face of repeated adverse rulings or by obdurate resistance out of proportion to the amounts or issues at stake." *Pierce v. Com. Warehouse*, 142 F.R.D. 687, 690–91 (M.D. Fla. 1992). The Fourth Circuit has said:

> [I]f a complaint is filed to vindicate rights in court, and also for some other purpose, a court should not sanction counsel for an intention that the court does not approve, so long as the added purpose is not undertaken in bad faith and is not so excessive as to eliminate a proper purpose. Thus, the purpose to vindicate rights in court must be central and sincere.

*In re Kunstler*, 914 F.2d 505, 518 (4th Cir. 1990). Here, the Court has identified the possible "improper purpose" as "judge shopping," i.e., manipulating or circumventing the random assignment of judges. Doc. 479 at 5.

The *Walker* team's relatedness designation was not for an improper purpose. The related case doctrine is a recognized exception to the random assignment

29

process—a "reason that circumvention of random assignment is sometimes permissible." *Millard*, 2023 WL 2301927, at *2. The exception is recognized in both the standard Civil Cover Sheet and the Middle District of Alabama's Civil Cover Sheet. As noted below, district courts around the country—although *not* the Middle District of Alabama—have rules governing this permissible "exception" to or "circumvention" of the random assignment process. In other words, courts permit parties to designate a case as related and to advocate for why a court should deem two cases as related. Thus, seeking a relatedness determination is not an improper purpose. Rather, it is an accepted practice around the country.

The *Walker* team engaged in that accepted practice. They marked *Walker* as related to *Corbitt*. Then, at the direction of the Middle District clerk's office, they filed a motion arguing why the two cases had overlapping factual and legal issues and why reassignment to Judge Thompson would further judicial economy. *Walker*, Doc. 8. There was nothing underhanded or contriving about this: the arguments were made in the open, on the record, and in a motion that put the relatedness decision firmly within the control of the court. This course of conduct exactly mirrors what this Court said is the procedure for reassignment based on relatedness: "[M]arking the cover sheet as related is not enough to direct the assignment in a particular way. If reassignment is sought after the judge is randomly assigned, an appropriate motion

30

is required." Doc. 466 at 24. Advocating for a well-recognized exception to the random assignment process and following the Court's unwritten procedure—as relayed by the Middle District clerk's office itself—is not a course of conduct taken for an improper purpose. Kathleen and the *Walker* team analyzed the facts and the law and followed an accepted procedure in an effort to advance their clients' objectives as warranted by existing law.

Kathleen readily acknowledged that the *Walker* team viewed Judge Thompson as a favorable draw. She also explained that the relatedness designation and motion to reassign were well-founded as a matter of fact and law. *See* Aug. 3, 2022 Hrg. Trans. at 22:23–23:22. Both can be and are true. As the Motion to Reassign stated, the *Walker* case involved "[t]iming exigencies" because it sought preliminary injunctive relief. *Walker*, Doc. 8 at 2. The emergency nature of this case and the injunctive relief sought, in addition to the overlapping factual and legal issues in *Walker* and *Corbitt*, provided not only a plausible but a reasonable basis for seeking reassignment. Judge Thompson was already familiar with several of the factual, scientific, and legal issues and, thus, was in a position to efficiently rule on a time-sensitive request for injunctive relief. Kathleen testified about Judge Thompson's familiarity with the issues:

> [T]o understand and be able to adjudicate that case, you had to be familiar with transgender versus cisgender people; the general kind of

31

> what is entailed when you change your -- when you do a gender transition. So that -- which is, again, something people are becoming more familiar with, but it's not always a topic that even -- when I started doing these cases, you know, you have to learn it. So he clearly, by having ruled in [*Corbitt*], understood the general notion of what gender transition means when you change your gender marker, that type of thing.

Aug. 3, 2022 Hrg. Trans. at 61:25–62:10. She also testified about Judge Thompson's familiarity with the specific due process claims that *Walker* was advancing. *Id.* at 61:11–20.

Thus, taken together, the facts surrounding the relatedness marking on the civil cover sheet show a proper purpose. Relatedness is a well-recognized exception to the random assignment process. The *Walker* team's marking of the case as related to *Corbitt* was warranted by existing law. The *Walker* team filed a motion arguing the basis for a reassignment, including potential judicial economy, and left the decision to have the cases deemed related to the court. All of these factors demonstrate that Kathleen and the *Walker* team had proper purposes for marking related. Even if the Court concludes that the *Walker* team marked *Walker* as related to *Corbitt* primarily for the purpose of drawing Judge Thompson, then the Court should still "not sanction counsel for an intention that the court does not approve" because the *Walker* team and Kathleen had (1) a good faith basis for marking related

32

and (2) a legitimate and proper purpose in maximizing judicial economy in a case seeking emergency relief. *Kunstler*, 914 F.2d at 518.

**C. Kathleen's Agreement with Other *Walker* Counsel's Decision to Mark *Walker* as Related to *Corbitt* was Objectively Reasonable and Therefore Did Not Violate Rule 11.**

In the absence of clear guidance from the Middle District regarding what cases are "related" or "pending," the *Walker* team's decision to mark *Walker* and *Corbitt*—which overlapped both factually and legally—as related was objectively reasonable and therefore not sanctionable under Rule 11.

***The "Relatedness" Determination was Reasonable.*** Notably, the Middle District does not have a Local Rule, General Order, or other public guidance on the definition of "related," the assignment of related cases, or the determination of relatedness. The only public guidance is the Civil Cover Sheet, which says, "This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases." Local Rule 3.1 even says, "This requirement [to complete a civil cover sheet] is solely for administrative purposes, and matters appearing in the civil cover sheet have no legal effect in the action." M.D. Ala. LR 3.1.

Although the Middle District does not have a rule that defines "related" or describes how related cases are assigned, many district courts do, and the various

33

local rules and orders across the country vary greatly, with at least some districts not merely allowing, but *requiring* cases to be marked as "related" where they involve similar questions of law or fact (as *Corbitt* and *Walker* did):[8]

| District | Rule |
|---|---|
| Northern District of Florida | LR 5.6: "the new case involves issues of fact or law in common with the issues in another case pending in the District." |
| District of Hawaii | LR 40.2: "involve the same or substantially identical transactions, happenings, or events, or the same or substantially identical questions of law." |
| Eastern District of Kentucky Western District of Kentucky (Joint Rules) | LR 40.1: "Cases may be considered related if they meet the requirements of F.R.Civ.P.42(a)" FRCP 42(a): "involve a common question of law or fact" |
| Southern District of Ohio | LR 3.1: "Call for a determination of the same or substantially identical questions of law or fact." |
| Middle District of Tennessee | AO 176: "The cases involve common questions of law or fact (see, e.g., Fed. R. Civ. P. 42(a))" |

In light of these rules, *Walker* counsel's determination that *Walker* was "related" to *Corbitt* was objectively reasonable. Both *Walker* and *Corbitt* dealt with civil rights claims for transgender persons under an emerging, if not novel, theory of

---

[8] Many other districts require similar questions of law *and* fact, but even if this Court finds the facts of *Corbitt* and *Walker* were not plausibly similar, then at least some districts' rules would allow a finding of relatedness based only on similar questions of law.

Constitutional rights. Similarly, they both involved factual issues related to differences between gender identity and biological sex and the different medical treatments and procedures available to transgender persons. As this Court is likely aware, the issues raised in *Walker* and *Corbitt* are not run-of-the-mill issues. Under many district courts' relatedness rules—but particularly those based on similar questions of law—these overlapping legal and factual issues present, at the very least, a colorable claim of relatedness.

In addition, many districts either initially assign later-filed related cases to the judge assigned to the earlier-filed related case or allow the judge with the earlier-filed case to make a relatedness determination: (1) Eastern District of Arkansas, GO 39(b)(5); (2) Northern District of California, LR 3-12; (3) District of Columbia, LR 40.5(c)(1); (4) Northern District of Illinois, LR 40.4; (5) District of Nebraska, GR 1.4(a)(4)(B)(i); (6) District of Nevada, LR 42-1(b); (7) Southern District of New York, Rules for the Division of Business Among District Judges 13(b)(2); (8) Eastern District of Pennsylvania, Civil Rule 40.1(V)(a); (9) Western District of Pennsylvania, LCR Rule 40(E); (10) District of Rhode Island, LR 105(a)(2); (11) District of Utah, DUCivR 83-2(g); (12) District of Vermont, GO 73(g); (13) Eastern District of Wisconsin, Civil LR 3(b)(4); (14) Western District of Wisconsin, AO 347; (15) District of Wyoming, LR 40.2(a)(1)(A)(ii). Thus, in absence of a local rule or

35

order on the matter, the *Walker* team's initial belief that Judge Thompson would either receive the initial assignment of *Walker* or determine relatedness was consistent with several other districts' practices and not precluded by any express rule or procedure in the Middle District.

**The "Pending" Determination Was Reasonable.** Similarly, *Walker* counsel acted reasonably in determining that *Corbitt* was still "pending." The Middle District's Civil Cover Sheet allows, if not requires, the identification of any "related pending cases." The Report noted that *Corbitt* had been marked "closed," which is presumably a reference to the notation on the docket sheet on CM/ECF and Judge Thompson's Order stating "This case is closed." *Corbitt*, Doc. 102. Seemingly, the Panel equated "closed" with "not pending."

However, the Middle District does not provide any guidance on what "pending" means. Neither the Civil Cover Sheet nor any local rule does so. At most, CM/ECF allows searches for "Open cases" and "Closed cases."[9] But, a closed case can still have significant activity and have pending issues for either the district court or the court of appeals to resolve. As of the date of this filing, *Corbitt* itself has eighteen docket entries, including two motions that have been ruled on, since it was

---

[9] This option is available on the Reports>Civil Reports>Civil Cases page. The Middle District also publishes a list of "Flag Definitions" for cases on Pacer and CM/ECF. *See* https://pacer.uscourts.gov/file-case/court-cmecf-lookup/court/ALMDC. This list of definitions does not include a definition of "pending."

marked "closed." *See* Ex. C, *Corbitt* Docket Sheet. The undersigned counsel's firm had a case in the Northern District of Alabama—*Killough v. All Points Logistics*, 5:17-cv-00247-AKK—that was closed on March 8, 2022 when the court entered a judgment after a jury verdict. After being marked "closed," the defendant filed numerous post-trial motions, which required extensive briefing and rulings from the court. The plaintiff also filed a bill of costs, on which the court ruled. In fact, the docket shows over eighty docket entries after the case was "closed." It would not be unreasonable to have understood that case to have been "pending," despite the "closed" marking on the docket.

Further, a "closed" case, like *Corbitt*, can be on appeal. So, while the district court proceeding may be inactive or "closed," the case itself is still very much "pending" in the federal court system. Not only can a case be pending and active in a court of appeals, but it could also eventually be remanded for further proceedings in the district court, including for the award of fees or costs. Indeed, the Fifth Circuit has held, although in a different context, "[a]bsent any legislative history to the contrary, an action is 'pending' so long as a party's right to appeal has not yet been exhausted or expired. . . . The fact that a motion for attorneys' fees is the only matter pending before a court does not mean that court lacks jurisdiction or that the case is

not 'pending.'" *Knights of the Ku Klux Klan Realm of Louisiana v. E. Baton Rouge Par. Sch. Bd.*, 679 F.2d 64, 67 (5th Cir. 1982).

In other words, a "closed" case can still have "pending" issues that require resolution and significant activity. That was exactly the case with *Corbitt*. On March 2, 2021, *after* the case was "closed," the court extended the deadline for the plaintiffs to file a motion for attorneys' fees and expenses until after resolution of an appeal. When *Walker* was filed, the attorneys' fee issue was still pending. Further, on April 27, 2022—only sixteen days after the *Walker* filing—an attorney for the State of Alabama filed a motion to withdraw, which the court granted.

Ultimately, in the absence of express guidance, the term "pending" is not synonymous with "closed," and it could be—and was—reasonably interpreted to mean that the case has not reached a point of final adjudication. Because of the lack of an express rule to the contrary, Rule 83 prohibits the imposition of a sanction for the *Walker* team's implicit statement that *Corbitt* was "pending."

***Relatedness Determination Did Not Violate Rule 11.*** In the absence of explicit rules in the Middle District regarding relatedness, advocating for a relatedness finding that would be permissible in many district courts is not sanctionable under Rule 11. If the relatedness designation would be proper under several other districts' rules, then it could not be frivolous or unwarranted by existing

law. The absence of a specific rule or guidance in the Middle District of Alabama left Kathleen and the *Walker* team with a professional judgment call as to whether to mark *Walker* as related to *Corbitt*, and they did so in a way that was consistent with existing law in other districts. In fact, the *Walker* team filed a Motion to Reassign that included a reasonable legal basis for their relatedness determination. *Walker*, Doc. 8.

Further, marking *Walker* related to *Corbitt* is not "akin to contempt." Other than the Civil Cover Sheet, the Middle District does not have any rule or order defining "related" or "pending." Thus, Kathleen and the *Walker* team could not have knowingly violated or acted with deliberate indifference to any rule. In fact, they did the opposite; they researched and investigated the issues, and they determined that no rule existed. In the absence of that rule, the *Walker* team marked *Walker* as related to *Corbitt* in a manner consistent with commonplace understandings of relatedness and with other districts' rules. This course of conduct is simply not "akin to contempt" and therefore is not sanctionable under Rule 11.

Finally, the *Walker* team ultimately withdrew its relatedness designation without a Rule 11 motion from the State of Alabama or the Court issuing a *sua sponte* Rule 11 show cause order. As the comments to Rule 11 indicate, "Such corrective

action … should be taken into account in deciding what—if any—sanction to impose." Fed. R. Civ. P. 11 cmt.

Moreover, and critically, had the Court addressed the merits of the relatedness issue (which it did not do because the *Walker* team consented to a transfer to the Northern District), it could have ruled that the two cases were not related, and the *Walker* team would have accepted that ruling. The mere marking of the Civil Cover Sheet, where the Court had full discretion to relate or not relate the cases, could not be considered a bad faith attempt to abuse the judicial process—it was an attempt to use an acceptable judicial process appropriately.

In light of the objective reasonableness of Kathleen and the *Walker* team's position and the lack of any conduct akin to contempt, Kathleen cannot be subject to any Rule 11 sanction.

**D.     Kathleen's Actions Regarding the Relatedness Designation Were Taken in Good Faith and Therefore Are Not Sanctionable Under the Court's Inherent Authority.**

Kathleen's extensive testimony regarding relatedness demonstrates that her actions were taken in good faith and therefore cannot be the basis for a sanction issued under the Court's inherent authority. Kathleen testified that she believed that *Corbitt* and *Walker* had overlapping legal and factual issues and that, although *Corbitt* was marked "closed" on the Middle District docket, it was on appeal and

40

would be returning to Judge Thomspon for, at least, further proceedings related to a

petition for fees and costs. Specifically, she said:

> My understanding was that my co-counsel wanted to be before Judge
> Thompson because he was expected to be receptive to our factual and
> legal claims, as he had been regarding similar legal claims in *Corbitt*,
> which involves Equal Protection and Due Process challenges to an
> Alabama law limiting transgender individuals' rights. I also understood
> from co-counsel that the cases were related because they involved
> overlapping legal and factual issues. I understood *Corbitt* was on appeal
> before the Eleventh Circuit Court of Appeals and was expected to be
> remanded back to Judge Thompson for, at a minimum, resolution of an
> attorneys' fee motion.

Ex. A, Hartnett Decl. at p. 7. In addition, Kathleen correctly noted that the Middle

District does not have a local rule on relatedness:

> We determined there was not a local rule on point. The civil cover sheet
> is essentially the rule. And we looked at the case law and did not find -
> - I hope we didn't miss something -- any Middle District case law.

Aug. 3, 2022 Hrg. Trans. at 20:9–12. Kathleen had a good faith, reasonable belief

that marking related to Corbitt was appropriate:

> Ultimately, I concurred in the plan to file the case in the Middle District
> of Alabama and relate the case to Judge Thompson by checking a box
> on the civil cover sheet. Our belief at the time was that as a result of
> checking the box on the civil cover sheet for related cases, the case
> would then be sent to Judge Thompson to decide whether the case was
> sufficiently related to accept the case. We were not aware of any
> requirement in the Middle District of Alabama to file a motion to relate
> or reassign in order to perfect our relatedness designation on the civil
> cover sheet, and our review of the Middle District rules did not indicate
> any such process. I believed that because there was no clear guidance
> on the standard for relating a case in the Middle District of Alabama,

41

> we had a reasonable basis for marking our case as related to *Corbitt* and, if the State opposed our marking the case as related, we might not be successful.

Ex. A, Hartnett Decl. at p. 8.

Kathleen acknowledged in her testimony that her team viewed Judge Thompson as a "good draw" given his prior experience with and favorable ruling in a case raising factual and legal issues similar to those raised by *Walker*: "[T]o be clear, Judge Thompson would be seen as a likely favorable judge for our cause. That's not a surprise." Aug. 3, 2022 Hrg. Trans. at 19:20–21. However, Kathleen at the same time had a good faith, reasonable basis for marking *Walker* as related to *Corbitt*. She was candid on this point when questioned by the Panel:

> JUDGE PROCTOR: One of the things I was impressed with with your declaration is its clarity, its organization, and its candor. So I want to give you that compliment as we stand here. And the reason I'm asking this question is I'm asking you to really give us your candid response to this question. Was marking Corbitt related driven by the overlapping legal and factual issues, or because Judge Thompson, who I think your cocounsel and you have all said you viewed as a favorable draw if you could get Judge Thompson on your Walker case -- was it driven by who the judge was in Corbitt? That's a question we have.

> MS. HARTNETT: Your Honor, we also didn't give it a great deal of thought, to be totally honest with Your Honor. This was not some sort of plot to try to undermine the relatedness thing. We thought we had a reasonable basis for noting it as related, but we didn't really even do that kind of counterfactual analysis.

> What I can say is as I was doing the declaration, I can distinguish between two things. Why did we want, hope that we got Judge Thompson? We thought he would be a good draw. He had just resolved

42

the transgender discrimination case in a way that was favorable to the plaintiff. Why did we mark the cases related? Because we believed that we had a good-faith basis for marking it as related under the rule.

So in my mind, that – I'm not denying that we were hoping that that would be a good draw, there might be other good draws, but that -- the relatedness was not something we thought we could sneak that in or something. It was that we actually looked at the rule, looked at the law and facts, and thought this would actually be efficient for this --

It's a not [an] []obscure topic. Of course, Judge Burke was able to learn it and deal with it, so I appreciate that. But it involves issues of complex scientific issues about, like, what gender is and all these things, so it certainly seemed efficient for someone who had handled the case before to have it again.

Aug. 3, 2022 Hrg. Trans. at 22:12–23:22.

JUDGE PROCTOR: And in fairness, that's one thing you did understand, is Judge Thompson had experience with what you thought was a case that you ultimately said was related?

MS. HARTNETT: Yes.

JUDGE PROCTOR: And you thought his judicial philosophy would be favorable to your clients' claims?

MS. HARTNETT: Well, it's not just in the philosophy, but generally, also, he had just ruled that transgender individuals were subject to protection under the equal protection and due process clauses, and so that's a kind of specific -- some people might generally be open to a civil rights claim, but that would be a newer version of that. So it was -- we had recent understanding that he was kind of -- he had ruled -- he had accepted the same arguments we would be making in a general level in our case, with some complications presented by the medical context.

Aug. 3, 2022 Hrg. Trans. at 61:5–20. Kathleen's testimony is consistent with the

testimony of other *Walker* attorneys on this issue. *See* Aug. 3, 2022 Hrg. Trans. at

43

91:16–95:1 (Borelli), 184:7–185:22 (Esseks); *Vague*, Doc. 80-9, Veroff Decl. at pp. 3–4; *Vague*, Doc. 80-11, Pelet del Toro Decl. at pp. 4–5; *see also*, *e.g.*, *Vague* Doc. 98 at 9:13–17 (junior attorney testifying that Thompson "had decided fairly recently issues related to transgender rights … and so there was some hope for a judge with expertise").

Because inherent authority sanctions require "subjective bad-faith," the Court must inquire into Kathleen's "subjective intent." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224 (11th Cir. 2017). As noted above, Judge Proctor repeatedly praised Kathleen's candor, and he also noted that Kathleen gave the Panel "a good picture of what you're thinking what your motivations were and what your decisions were." *See* Aug. 3, 2022 Hrg. Trans. at 42:12–15. Judge Proctor twice told Kathleen that he appreciated the way that she approached her testimony. *Id.* at 79:25–80:2, 89:22–23. The Report does not specifically identify any instance where Kathleen was not truthful or forthcoming. On the contrary, she truthfully testified that the *Walker* team had a preference for Judge Thompson, but a preference and desire for a certain judge can—and did—coexist with a subjective belief that the *Walker* team could make a reasonable claim of relatedness.

Kathleen and the *Walker* team's good faith is reflected in their decision-making process. They researched relatedness, and they ultimately determined that

the Middle District did not have a controlling standard. They believed that they had a reasonable basis for the relatedness marking based on the overlapping legal and factual issues, and they advocated for a reassignment based on that reasonable belief. Researching an issue, filing a brief, and requesting a favorable ruling from a court is the opposite of a "contrivance." Even if the Court has a differing opinion of the law, that difference of opinion alone is not enough to find bad faith.

In sum, Kathleen believed that by marking *Walker* as related to *Corbitt* and, at the court clerk's direction filing the Motion to Reassign, the *Walker* team was invoking a permissible exception to the default rule of random assignment. The evidence simply does not support a clear and convincing finding of subjective bad faith, and therefore the Court has no basis to sanction Kathleen under the Court's inherent authority.

### E. The Other Standards in the Order to Show Cause Do Not Apply to the Relatedness Designation.

None of the other standards of conduct identified by the Court apply to the relatedness designation. Neither the Panel nor the Court have identified any willful false statement by Kathleen, so 18 U.S.C. § 1621 and Rule of Professional Conduct 3.3 do not apply. Nor did Kathleen violate her sworn oath. Rules of Professional Conduct 1.2, 1.3, and 1.4 do not apply because the relatedness marking does not implicate any client communication issues or any neglect of a matter within

45

Kathleen's attorney-client relationship. Finally, Kathleen never took an oath of admission, which is not even required of attorneys admitted *pro hac vice*, but nevertheless, Kathleen did not violate any standard in the oath.

## II.     Charges 2 and 3 (Conduct Unrelated to Kathleen)

As described below, Kathleen was not involved in the conduct described in Charges 2 and 3. Because Kathleen's conduct must be viewed individually, and because she cannot be sanctioned for someone else's conduct, she should not be sanctioned for any of the conduct in Charges 2 and 3.

### A.     Charge 2: "*Walker* counsel, including Ms. Hartnett to contact the chambers of Judge Thompson (who was never assigned to *Walker*) to directly and indirectly influence or manipulate assignments away from Chief Judge Marks to Judge Thompson."[10]

This charge refers to Carl Charles calling Judge Thompson's chambers the day after *Walker* was filed. Kathleen did ***not*** (1) participate in this call, (2) direct or advise Carl Charles to make this call, or (3) provide any input on whether to make the call or what to say. Hartnett Supp. Decl. at ¶ 4. Because subjective bad faith "is personal to the offender," Kathleen cannot be punished under the Court's inherent authority for another person's conduct. *JTR Enters.*, 697 F. App'x at 987 ("Bad faith is personal to the offender. One person's bad faith may not be attributed to another

---

[10] Kathleen will address the inherent authority standard in this Section. This charge does not involve pleadings or other filings, so Rule 11 does not apply. Similarly, the other standards of conduct do not apply.

by operation of legal fictions or doctrines such as respondeat superior or vicarious liability.").[11]

As Kathleen has explained, at most she was aware that Mr. Charles contacted Judge Thompson's chambers to alert his office that a motion for preliminary injunction was being filed. Aug. 3, 2022 Hrg. Trans. at 26:4–27:5. As she testified, "I was actually in deposition prep or something that day, but I was following the email traffic." *Id.* at 25:13–15; *see* Hartnett Supp. Decl. at ¶ 4. No testimony or other evidence before the Court and Panel indicates that Kathleen had any involvement beyond simple awareness that Charles planned to call Judge Thompson's chambers, and Kathleen confirms that in her supplemental declaration. *See* Ex. B, Hartnett Supp. Decl. at ¶ 4.

The Panel also asked about Kathleen's involvement with the call:

JUDGE PROCTOR: Were you on any conference calls when the idea of calling Judge Thompson's chambers was discussed?

MS. HARTNETT: I was not on any call where that was discussed. It was an email exchange that was being had where I saw the whole thing unfold of, like, maybe we should call over there to let them know it's coming so they're ready for it, and then Tish [Gotell Faulks] saying, I've talked to Kaitlin [Welborn], and that makes sense, and then Carl [Charles] saying -- but Tish saying, I'm busy, and then Carl saying, I'll do it.

---

[11] Kathleen is not suggesting that Charles's phone call was sanctionable.

> JUDGE PROCTOR: And I understand, so they're not conference calls per se, but email traffic that you saw about this subject?
>
> MS. HARTNETT: Yes.

Aug. 3, 2022 Hrg. Trans. at 29:4–16. Kathleen's testimony is consistent with other *Walker* attorneys' testimony. *See* Aug. 3, 2022 Hrg. Trans. at 192:10–194:10; *Vague*, Doc. 80-9, Veroff Decl. at pp. 5–6; *Vague*, Doc. 80-11, Pelet del Toro Decl. at pp. 4–5.

To the extent this Charge also relates to a member of the *Walker* team talking to someone at the Equal Justice Initiative who relayed some information from one of Judge Thompson's law clerks, Kathleen does not recall having any knowledge of that communication at the time. *See Vague*, Doc. 70 at 20–21.[12] The Panel asked her, "Did you learn this as part of your role as counsel in the case, or did you learn this subject matter that you're about to be asked about only after our inquiry began as part of our inquiry?" Aug. 3, 2022 Hrg. Trans. at 37:4–7. Kathleen responded, "I believe only after the inquiry began. . . . I was walking from a deposition to the hotel to be able to get my flight out of Texas when the call happened, so I was on a call where I believe this topic was discussed." *Id.* at 37:8–24. In other words, to the best of her recollection, Kathleen had no knowledge of this contact before it occurred. To

---

[12] Kathleen does not read the Show Cause to cover this conduct, but out of an abundance of caution, she addresses it here.

48

the extent it was discussed by the *Walker* team after the contact was made, it was during a call that Kathleen joined while in transit from a deposition, but she has no specific recollection of hearing about the outreach.

In sum, Kathleen neither made the call to Judge Thompson's chambers nor directed or advised Charles to make that call. She also did not, at the time, know about the indirect outreach to a Judge Thompson clerk. Regardless, these contacts were intended to alert the court to a time-sensitive filing and to understand Court procedure, not to influence or manipulate the Court. *See* Doc. 517 at 7; *Vague*, Doc. 80-9, Veroff Decl. at 2–3. Viewed individually—as she must be—Kathleen cannot be sanctioned for this Charge, as she did not engage in the charged conduct, let alone in subjective bad faith.

**B.    Charge 3: "*Walker* counsel, including Ms. Hartnett, to attempt to persuade *Ladinsky* counsel to transfer the latter case to the Middle District to be before Judge Thompson."[13]**

This charge is based on a call about the possibility of seeking a transfer of *Ladinsky* to the Middle District and Judge Thompson that the Panel described as follows: "Members of both teams—at least Esseks, Orr, Eagan, Nowlin-Sohl, Charles, and Soto—participated in a conference call that started at 5:00 p.m. on April 13, 2022." *Vague*, Doc. 70 at 23. Kathleen was ***not*** on the April 13 call that was the

---

[13] Kathleen will address the inherent authority standard. This Charge does not involve pleadings or other filings, so Rule 11 does not apply. Similarly, the other standards of conduct do not apply.

basis of this finding. In addition to so stating in her supplemental declaration, *see* Ex. B, Hartnett Supp. Decl. at ¶¶ 5–6, none of the participants in the call testified that she was on it. *See* Aug. 3, 2022 Hrg. Trans. at 213–214 (Esseks); Nov. 3, 2022 Hrg. Trans. at 30–31 (Orr); Aug. 4, 2022 Hrg. Trans. at 33:1–15 (Eagan).

Just as with the call to Judge Thompson's chambers, Kathleen cannot be sanctioned under the Court's inherent authority for the conduct of other attorneys. Kathleen could not have acted in subjective bad faith when she did not engage in the specified conduct at all.

## III. Dismissal-Related Conduct

**Charge 4: "All counsel, including Ms. Hartnett to coordinate the dismissal of the *Walker* and *Ladinsky* cases after their assignment to the Court, and then for lead counsel to make clear that the case would be refiled when commenting to the media about refiling."**

**Charge 5: "All counsel, including Ms. Hartnett, to engage in numerous and wide-ranging discussions about how judges were favorable or unfavorable in the context of deciding whether to dismiss and refile their cases."**

**Charge 6: "All counsel, including Ms. Hartnett to suddenly dismiss *Walker* and *Ladinsky* after a series of phone conferences in which counsel discussed a number of matters, including their prospects in front of the Court and that the Court was a bad draw"**

**Charge 7: "All counsel, including Ms. Hartnett, to abruptly stop the pursuit of emergency relief and decide to dismiss, and for *Ladinsky* counsel to refile a case in the Middle District with brand new plaintiffs, even though time was of the essence and their stated goal was to move quickly to enjoin what they viewed as an unconstitutional law"**

### A.    Other Than Dismissing *Walker*, Kathleen Did Not Engage In Any Of The Other Conduct Described In Charges 4, 5, 6, and 7.

Charges 4, 5, 6, and 7 all relate to the dismissals of *Walker* and *Ladinsky*. However, none of these charges relate solely to dismissing under Rule 41 alone. Rather, each of them is based on dismissal *plus* some other conduct (4: comments to the media; 5: engaging in discussions about judges; 6: discussing prospects for success with certain judges, including saying that Judge Burke was a bad draw; 7: deciding to refile in the Middle District with new plaintiffs). Kathleen, however, did not engage in any of the other conduct alleged in these Charges; she was involved in dismissing *Walker* as permitted by Rule 41 and nothing more. In the following subsection (Section III.B), Kathleen explains why dismissal of *Walker*, standing alone, is not sanctionable.  First, however, she explains why she cannot be sanctioned for Charges 4, 5, 6, and 7, given that those charges are all based on dismissal plus additional conduct of which she was not a part.[14]

First, as to Charge 4, Kathleen did not make any comments to the media. *Ladinsky* team members made the comments noted in the Report. *See Vague*, Doc. 70 at 44 (describing comments by the *Ladinsky* team). Kathleen cannot be sanctioned for comments made by someone else in a different case, especially when

---

[14] Kathleen does not concede that any of this alleged conduct warrants sanctions for any Respondent.

Kathleen had no involvement or input in those media comments. Further, even though the *Walker* and *Ladinsky* teams coordinated the timing of their dismissals, both teams had an "an *unconditional right* to dismiss [their] complaint by notice and without an order of the court at any time prior to the defendant's service of an answer or a motion for summary judgment." *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990). Here, Kathleen testified that she coordinated the timing as a professional courtesy to the *Ladinksy* team, but to be clear, she also testified that she independently decided to dismiss.

Second, as to Charges 5 and 6, Kathleen was not involved in any of the "wide-ranging discussions" on April 15th described in the Final Report or discussions with the *Ladinsky* team about the prospects in front of Judge Burke. As noted above, the Report focused on a "5:00 p.m. conference call" on April 15th involving multiple members of the *Ladinsky* and *Walker* teams and says that Kathleen was on the call. *Vague*, Doc. 70 at 31. Kathleen was not on any such call, and, indeed, this section of the Report appears to confuse several phone calls among different groups of lawyers. Regardless, the call on which the Report focuses apparently involved discussions about judicial preferences—namely, the purported comment about a "zero percent chance" that Judge Burke would grant the requested relief. Kathleen was ***not*** on this call, and to the extent the Report states that she was, the cited testimony says

otherwise. *See* Aug. 4, 2022 Hrg. Trans. at 168–179; *Vague* Doc. 70 (citing same).

Kathleen's supplemental declaration also further explains that she was not on any

such call. *See* Ex. B, Hartnett Supp. Decl. at ¶¶ 7–14.

Consistent with Kathleen's testimony, the testimony cited by the Report

regarding the "wide-ranging discussions" about judges does not place Kathleen on

those calls. *See* May 20, 2022 Hrg. Trans. at 125–26 (Nowlin-Sohl testifying but not

describing who was on the call); Aug. 3, 2022 Hrg. Trans. at 77 (Kathleen testifying

about a *Walker*-only call and a one-on-one call with Minter); Aug. 4, 2022 Hrg.

Trans. at at 77–79 (Eagan not describing who was on the call), 167–68 (Terry

testifying that she, Eagan, Vague, Shortnacy, Minter, and Levi were on the call),

239–40 (Doss saying "I don't know" when asked if a Cooley lawyer was in

conversations about dismissal and then describing a *Ladinsky* team call); *Vague* Doc.

80-6, Minter Dec. at 42, ¶ 12 (Minter describing a "team call" and then reaching out

to an attorney from *Walker* after); *Vague* Doc. 80-6, Soto Dec. at 70, ¶ 36 ("On April

15, after Judge Axon transferred *Ladinsky* to Judge Burke, some members of the

*Ladinsky* team got on a call.").

In fact, Kathleen and Minter's testimony show that Minter called Kathleen to

discuss next steps in light of the 5:00 p.m. *Ladinsky* call. *See Vague* Doc. 80-6,

Minter Dec. at 42, ¶ 12; Aug. 3, 2022 Hrg. Trans. at 76:23–80:23; Nov. 3, 2022 Hrg.

Trans. at 154:3–7. Of course, Minter would have had no need to call Kathleen to discuss dismissal if Kathleen was on the 5:00 PM *Ladinsky* call (which she was not). To the best of Kathleen's recollection, this call, or perhaps couple of calls, with Minter were the only calls she had with any member of the *Ladinsky* team after *Ladinsky* was reassigned to Judge Burke.

Third, as to Charge 7, Kathleen was not involved in the decision to file *Eknes-Tucker* in the Middle District with new plaintiffs. Charge 7 is premised on the refiling, and Kathleen cannot be sanctioned for the *Eknes-Tucker* filing with which she had no involvement. Further, Kathleen acknowledged the "tension" Between pursuing emergency relief and dismissal. Aug. 3, 2022 Hrg. Trans. at 78:19, explaining that in deciding to dismiss, Kathleen said: "we need to have the conversation tomorrow morning. I think I'm the one that said, we need to have the calls to the groups. If you-all want to talk, do it tomorrow morning. This needs to move forward. I was worried about the idea of delay." *Id.* at 78:19–23. Lawyers frequently weigh countervailing factors and face difficult decisions. Kathleen reasonably and in good faith believed and that voluntary dismissal was in her clients' best interests, but she was also concerned about delay. That is why she insisted on a prompt meeting to evaluate options for refiling.

**B.     The *Walker* Team Had A Right To Dismiss Under Rule 41(a)(1)(A)(i) For Any Reason.**

Even were Kathleen charged with voluntary dismissal of *Walker* standing alone, Kathleen's decision to dismiss under Rule 41 is not sanctionable. Rule 41(a)(1)(A)(i) "plainly grants a plaintiff the right to dismiss—without a court order—'an action' prior to a defendant serving 'either an answer or a motion for summary judgment.'" *Absolute Activist Value Master Fund Limited v. Devine*, 998 F.3d 1258, 1264 (11th Cir. 2021); *accord Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990) ("It is well established that Rule 41(a)(1)(i) [sic] grants a plaintiff an *unconditional right* to dismiss his complaint by notice and without an order of the court at any time prior to the defendant's service of an answer or a motion for summary judgment.") (emphasis added); *Watkins v. Angels Trucking Services, LLC*, 2020 WL 7055496, at *3 (S.D. Ala. Dec. 2, 2020) (describing plaintiff's dismissal under Rule 41(a)(1)(A)(i) as "his absolute right"); *Carrasquillo-Rodriguez v. United States*, No. 2:19-CV-526-WKW, 2019 WL 4281925, at *1 (M.D. Ala. Sept. 10, 2019) ("his right").

Courts have found that plaintiffs may voluntarily dismiss under Rule 41 for any reason. *See Wolters Kluwer Financial Services, Inc. v. Scivantage*, 564 F.3d 110, 115 (2d Cir. 2009) (finding that the plaintiff "was entitled to file a valid Rule 41 notice of voluntary dismissal for any reason, and the fact that it did so to flee the

jurisdiction or the judge does not make the filing sanctionable."); *accord Ambrosia Coal and Construction Co. v. Pages Morales*, 2007 WL 9710667, at *2 (S.D. Fla. Aug. 2, 2007) ("[T]he plaintiff's motive for filing the notice is irrelevant."). The Fifth Circuit has held, "Court-ordered sanctions should be neither 'a consequence' of a voluntary dismissal without prejudice nor a 'condition' placed upon such dismissal." *Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287, 292–93 (5th Cir. 2016) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396–97 (1990)). "Although forum-shopping is not a trivial concern, 'Rule 41(a)(1) essentially permits forum shopping.'" *Id.* at 293 (quoting *Harvey Specialty & Supply, Inc. v. Anson Flowline Equipment Inc.*, 434 F.3d 320, 324 n.15 (5th Cir. 2005)).

Thus, even if the assignment to Judge Burke was the sole reason for Kathleen's decision to dismiss *Walker*—which it was not—Rule 41 permits such a dismissal. It provides an unconditional right to dismiss for any reason. Kathleen and the *Walker* team exercised this right, and while their "motive for filing the notice is irrelevant," Kathleen testified extensively on her motives. *Ambrosia Coal and Construction*, 2007 WL 9710667, at *2. Kathleen acknowledges that the assignment of Judge Burke was *a* factor in the dismissal, but it was certainly not *the* factor or even the principal factor. She had many other motivations—including the late Friday notice of status conference on the Monday following Easter, the unexpected transfer

of the *Ladinsky* case to Judge Burke (meaning that the Monday status conference would in fact proceed and would involve both cases), the difficulty in having the right attorneys at the status conference, the lack of confidence in the local counsel, and the complexities of coordinating with *Ladinsky* counsel in the face of differing strategies.

In short, sanctions under the Court's inherent authority require subjective bad faith. Kathleen and the *Walker* team did not act in subjective bad faith because they exercised an unconditional right that their clients could exercise for any reason. To find that a voluntary dismissal was in bad faith would impose conditions and require a justifiable reason. Further, even if voluntary dismissals are subject to Rule 11, Kathleen cannot be sanctioned. Because a dismissal can be for any reason, it necessarily cannot have an "improper purpose." Fed. R. Civ. P. 11(b). The other standards of conduct in the Show Cause do not apply.

### C. Sanctioning a Rule 41 Dismissal Would Interpose an Untenable Conflict Between Attorneys and Their Clients.

Although, as explained, the right to dismiss under Rule 41 is absolute, the Court also should consider the duties that Kathleen and the *Walker* team owed to their clients. Both Alabama Rule of Professional Conduct 2.1 and ABA Model Rule 2.1 require a lawyer to "exercise independent professional judgment and render candid advice." In the *Walker* team's professional judgment, the best strategy for

success as of late Friday afternoon on April 15 was to dismiss, regroup, and evaluate

their options. While the decision may certainly be second-guessed, it was made with

the clients' best interests in mind and was expressly permitted under Rule 41. To

sanction Kathleen for making a time-sensitive decision to invoke a right afforded

under the rules of procedure would create a tension, if not a conflict, between the

personal interests of attorneys who do not want to be sanctioned and the interests of

their clients in a voluntary dismissal.

Here, in Kathleen's judgment, dismissal was the best option for her clients.

She stated in her declaration:

> When *Ladinsky* was transferred to Judge Burke, I realized the Monday
> status conference would take place and was concerned about *Walker*
> Counsel's inability to have senior lawyers on the team admitted *pro hac
> vice* and otherwise able to travel from around the country to participate
> in what I thought could become a substantive discussion of the case.
> Additionally, over the past several days of active litigation, I grew to
> have serious questions about the capacity of our sole local counsel to
> handle this matter on her own. I also was concerned about *Walker*
> Counsel's ability to adequately coordinate with *Ladinsky* Counsel
> regarding strategy in advance of the April 18 status conference
> (including because the teams had *not* been coordinating to date and had
> differences in strategy, as well as past challenges working together on
> litigation). Additionally, I had concerns about the sudden, unexpected,
> and unexplained assignment of both *Walker* and *Ladinsky* to Judge
> Burke, whom I did not know and had not personally researched, but
> about whom others had expressed significant concern. Additionally, I
> believed it was necessary to dismiss immediately because were the
> State to answer before we dismissed, we would lose our unilateral right
> to dismiss voluntarily under Federal Rule of Civil Procedure 41.

Ex. A, Hartnett Decl. at pp. 29–30.

Kathleen certainly understood the urgency of the relief sought in *Walker*, but she ultimately decided, "[A]t the end of the day, it's better to bring a properly baked case, even if it's a couple of days later, than a case that's not going to go well earlier." Aug. 3, 2022 Hrg. Trans. at 78:24–79:1. She described the prospects of adequately coordinating with the *Ladinsky* team as "the inevitable train wreck that was coming." Aug. 3, 2022 Hrg. Trans. at 53:21—22. She then said, "I think what really happened in the end is that by having that ten a.m. status conference as the forcing mechanism and seeing what was happening that day, this is not going to get – we're not going to get our acts together in time for Monday." Aug. 3, 2022 Hrg. Trans. at 54: 2–6.

In short, on the evening of Friday, April 15, Kathleen saw the prospects for coordinating with *Ladinsky* as an "inevitable train wreck." She did not have faith in *Walker*'s only counsel located in Alabama. She did not know whether the senior members of her team could even appear in Alabama, much less be admitted *pro hac vice*. She felt that she did not have "a properly baked case." She did not think that her team and the *Ladinsky* team were "going to get our acts together in time for Monday." In a very short period of time on a holiday weekend, Kathleen considered these factors and felt that dismissal was in the best interests of her clients.

Rule 41 indisputably permits voluntary dismissals, and on that Friday afternoon, Kathleen exercised her independent judgment, weighed her clients' interests, and felt that a Rule 41 dismissal was the best option. As the Eleventh Circuit has said, Rule 41 "grants a plaintiff an *unconditional right* to dismiss." *Matthews*, 902 F.2d at 880. The undersigned counsel are aware of no case in which an attorney has been disciplined for a single dismissal pursuant to Rule 41. In fact, in *Wolters Kluwer*, which the Report cited, the Second Circuit reversed a sanction imposed for voluntary dismissing, and it said that the plaintiff had an "unfettered right" to dismiss and that it could do so "for any reason, and the fact that it did so to flee the jurisdiction or the judge does not make the filing sanctionable." 564 F.3d at 115. If this Court finds that a dismissal is sanctionable, then it would interpose a conflict between what Kathleen believed was in the best interests of her clients and her own interest in not being sanctioned.

## IV.   Paragraph III(b) of the Supplemental Order to Show Cause

### A.   Kathleen did not Misrepresent Her Concern About the Reassignment of *Ladinsky* to This Court, and She Truthfully Testified About Her Reasons for Dismissal.

Paragraph III(b) of the Show Cause discusses the *Walker* and *Ladinsky* attorneys' testimony about their reasons for dismissing. The Report and the Show Cause suggest that Kathleen claimed "that the dismissal was because Judge Axon

did not explain the reassignment of *Ladinsky* and [the Court] set *Walker* for a status conference in Huntsville on April 18." Doc. 479. Kathleen testified truthfully and extensively about the reasons she decided to dismiss *Walker*. As she acknowledged in her declaration, "I had concerns about the sudden, unexpected, and unexplained assignment of both *Walker* and *Ladinsky* to Judge Burke, whom I did not know and had not personally researched, but about whom others had expressed significant concern." Ex. A, Hartnett Decl. at p. 30.

However, as reflected by her testimony and as set forth above, Kathleen's reasons for dismissing were multi-faceted. Among other things, Kathleen had serious concerns about the *Walker* team's ability to properly handle the Monday morning status conference, given that its most experienced lawyers were unlikely to be able to be present on short notice after the religious holiday weekend. The consolidation with *Ladinsky* coupled with the tension between the groups and their strategies exacerbated her concerns. Kathleen and the *Walker* team had to make a quick decision because they would lose that right if the State answered the complaint. Thus, in Kathleen's mind, the dismissal was an opportunity to reset the case and get it in the right posture with the right preparation: "But when I think about my ethical obligation, I knew that we still had the right to bring the case back. And

I felt like we weren't in a position to do it right on Monday, but we could maybe be in a position to do it right later." Aug. 3, 2022 Hrg. Trans. at 74:19–22.

Ultimately, this Charge is about credibility. Kathleen stands behind her testimony, which was truthful then and is truthful now. In real time, Judge Proctor thanked Kathleen for her approach to her testimony. He praised her candor. He even said that Kathleen provided "a good picture of what you're thinking what your motivations were and what your decisions were." *See* Aug. 3, 2022 Hrg. Trans. at 42:12–15.

The Final Report does not find that Kathleen testified untruthfully or that she was not fully transparent. Instead, the Final Report casts doubts about the Respondents' collective motivations, which directly conflicts with the repeated praise Judge Proctor expressed towards Kathleen during her live testimony. Judge Proctor's comments to Kathleen ("[o]ne of the things I was impressed with with your declaration is its clarity, its organization, and its candor;" "I think you've given me a good picture of what you're thinking and what your motivations were and what your decisions were;" "I really appreciate the way you're tackling this, and I just want to affirm that as we're going along;" and "I thank you for the way you've approached this.") seem to clearly indicate that Kathleen's testimony was not the basis for the credibility concerns expressed in finding 10 of the Report.

In addition to Kathleen's specific circumstances, the credibility assessments made in the Report are not based on clear and convincing evidence. The *Walker* Respondents were consistent in their testimony about the different considerations for dismissing, even if some Respondents personally placed different emphasis on the various factors. No Respondent testified that Kathleen's stated reasons for dismissing were pretextual or false. Nor does any other evidence suggest that.

The inferences drawn by the Panel from the testimony of the Respondents—besides being improperly "collective," *Vague* Doc. 70 at 51—simply do not suffice to meet the high evidentiary standard required to justify a sanction against Kathleen. Inherent authority sanctions require clear and convincing evidence or, at the very least, specific findings. There is no evidence—no conflicting testimony or documentation—to support a finding that Kathleen failed to testify truthfully. Both the perjury statute and Rule of Professional Conduct 3.3 require heightened *mens rea* (willfulness and knowledge). None of the evidence indicates that Kathleen willfully misrepresented any of her testimony. Simply put, Kathleen told the truth, and to find otherwise would require the Court to discredit the testimony of every other attorney who testified on this topic and to make unsupported inferences.

63

**B.** **Kathleen Did Not Make Any Misrepresentations to the Panel, and She Did Not Fail to Disclose any Material Facts.**

Paragraph III(b) of the Show Cause also requires Kathleen to "show cause why she should not be sanctioned for misrepresenting or otherwise failing to disclose key facts during the panel's inquiry." Doc. 479 at 13. Due process requires that the Court provide fair notice to Kathleen of what conduct may give rise to sanctions. Neither Paragraph III(b) nor the Report provide reasonable notice of a purported misrepresentation or nondisclosure by Kathleen. Instead, Paragraph III(b) required Kathleen to "address any findings in Section IV of the Panel's Report implicating her credibility or any discrepancies between her own oral and written testimony and the oral and written testimony of all other attorneys who testified." *Id*. at 14. Respectfully, Kathleen is left to guess at what the Court may consider to be "matters impacting her credibility" or "discrepancies" between her testimony and that of other Respondents. This directive does not satisfy due process. Regardless, Kathleen is not aware of any statement she made that could be viewed as false or a material nondisclosure. Likewise, she knows of no material discrepancies between her testimony and the testimony of other Respondents.

At the Court's March 19, 2024 hearing, the Court indicated that "a junior associate telling me material facts that everybody else left out of their testimony" was a primary concern underlying this aspect of the Show Cause. March 19, 2024

Hrg. Trans. at 56:23–24. The Court's statement is presumably a reference to the "zero percent chance" comment described by Abigail Terry as having occurred on an April 15th phone call.[15] But as noted above, Kathleen was not on the call where this comment was purportedly made. Thus, Kathleen has no knowledge of whether this comment was made and could not have omitted or misrepresented anything in her testimony about this call and comment.

Absent further guidance, undersigned counsel has scoured the Report and the record, and have determined that there are only three findings or statements that could possibly relate to a misrepresentation or nondisclosure by Kathleen, and none of those actually implicate Kathleen in any wrongdoing.

First, finding 10 in the Report broadly states that every Respondent engaged in misconduct by stating that they had reasons for dismissing other than the assignment of Judge Burke to *Walker* and *Ladinsky*. As discussed above, Kathleen truthfully described her reasons for dismissal, and Judge Proctor praised her candor.

Second, the Panel made the following broad statement in the Report:

> To be clear, however, *Walker* counsel's candor on the whole is concerning. For example, Esseks's testimony that, "based on [his] understanding of what related means," he would have marked *Corbitt* as related to *Walker*, even if that case had been assigned to a judge that had previously ruled against them, strains credulity, particularly

---

[15] Ms. Terry did not testify that Kathleen was on this call. Aug. 4, 2022 Hrg. Trans. at 167:22–168:20.

considering the extent of counsel's efforts to steer *Walker* to Judge
Thompson.

*Vague*, Doc. 70 at 18 n.3. Though this footnote references "*Walker* counsel" as a
group, it does not identify any statement made by Kathleen, much less any
misrepresentation or nondisclosure by Kathleen. Kathleen should not—indeed,
*cannot*—be sanctioned for her co-counsel's response to a hypothetical question.

Third, in reviewing the declarations and testimony, Kathleen noted that
Jennnifer Levi said that she had a call with Kathleen on late Friday about dismissing
the two cases. Aug. 4, 2022 Hrg. Trans. at 30:14–31:11. Kathleen does not recall
talking to Levi. Rather, she only recalls talking to Minter. Minter's testimony appears
to support Kathleen's recollection. He said, "I called one of the attorneys on the
Walker team to see if they were -- what they were thinking." Nov. 3, 2022 Hrg.
Trans. at 154:3–5. In his declaration, he said, "I had some individual
communications with one of the *Walker* attorneys to flag the need for a call between
the two teams over the weekend if possible, given the short time before the law
would take effect." *Vague*, Doc. 80-6, Minter Decl. at ¶ 12.

Regardless, Levi's testimony about the substance of the conversations she
remembers is consistent with Kathleen's intentions at the time and her discussions
with Minter. Levi says that they discussed dismissal and that Kathleen said any
refiling discussion would have to involve more members of her team but that they

66

would move quickly to discuss joining forces. Kathleen's testimony on her thought process and conversation with Minter are similar. *Compare* Aug. 4, 2022 Hrg. Trans. at 30:14–31:11 *and* Aug. 3, 2022 Hrg. Trans. at 78: 18–79:7; 88:1–12 and Hartnett Decl. at p. 21. Thus, this difference in testimony is nothing more than differing memories. There is no material factual difference between what Levi said and Kathleen's thought process. As the Court has noted, it is only concerned with *material* discrepancies. March 19, 2024 Hrg. Trans. at 53:15–21. This difference in memory is therefore not sanctionable.

In sum, Kathleen did not violate her sworn oath, Rule of Professional Conduct 3.3., or any other applicable standard of conduct because she did not make any material misrepresentation or fail to disclose material facts—much less do so intentionally or knowingly. The other standards of conduct are inapplicable.

## V.   Kathleen Acted With Implied Authorization to Dismiss *Walker* Without Prejudice.[16]

Section III(c) of the Show Cause appears to be based on the premise that a voluntary dismissal without prejudice requires client consent. It does not. As the Eighth Circuit has held: "The general rule is that an attorney has no implied authority

---

[16] Kathleen maintains an objection that her clients in the *Walker* case did not waive their privilege with members of the *Walker* team, and the Panel invaded that privilege when it forced members of the *Walker* team to discuss their privileged conversations about the dismissal. She likewise objects, as she noted in Doc. 508, to this charge being added so late in the process.

to settle or compromise or dismiss his client's cause of action with prejudice. . . . [She] does have, where employed to prosecute litigation, implied power to take all action with reference to procedural matters, including the power to dismiss without prejudice." *Engelhardt v. Bell & Howell Co.*, 299 F.2d 480, 483 (8th Cir. 1962). After the *Walker* team acted with its implied authorization and voluntarily dismissed, it consulted with the *Walker* plaintiffs the same day.

**A.    Kathleen and the *Walker* Team Were not Required Under Rule 1.2 to Obtain Prior Consent From Their Clients to Dismiss Without Prejudice.**

Alabama and ABA Rule of Professional Conduct 1.2(a) state that "A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued." ABA Rule 1.2(a) adds, "A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation." The Comment to Rule 1.2 states, "In questions of means, the lawyer should assume responsibility for technical and legal tactical issues, but should defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected."

In short, Rule 1.2 distinguishes between the objectives of representation and the means of representation. In general, the client determines the objectives, and the

attorney is responsible for the means. In this case, the objective was quite clear: challenge the constitutionality of the recently-passed S.B. 184. As of late Friday, April 15, 2022, Kathleen and the *Walker* team had to determine the means of best accomplishing this objective.

A dismissal without prejudice is a matter of means, rather than objective, because it does not compromise the rights of the client. "Where an action is dismissed without prejudice, the plaintiff may refile before the expiration of the applicable statute of limitations." *Alexander v. Bradshaw*, 599 F. App'x 945, 946 (11th Cir. 2015). Courts around the country have distinguished between dismissals with prejudice and those without prejudice because of the right to refile, and as a result, these courts have found that attorneys have the implied authority to dismiss without prejudice as a means to achieve the objective of representation.

As noted, the Eight Circuit has said: "The general rule is that an attorney has no implied authority to settle or compromise or dismiss his client's cause of action with prejudice. . . . [She] does have, where employed to prosecute litigation, implied power to take all action with reference to procedural matters, including the power to dismiss without prejudice." *Engelhardt*, 299 F.2d 480 (8th Cir. 1962). Other courts agree:

- *Federated Towing & Recovery, LLC v. Praetorian Ins. Co.*, 283 F.R.D. 644, 662–63 (D.N.M. 2012): "An attorney would have implied authority to agree

to a dismissal of a case without prejudice, because doing so does not compromise or settle the client's rights, and the client is not precluded from litigating the merits of the case."

- *Slovitz v. City of New York*, 157 N.Y.S.2d 532, 533 (Sup. Ct. 1956): "It is familiar law that an attorney's authority to discontinue an action is presumed and binding upon his client, especially where there is no settlement or release involved."

- *Virginia Concrete Co. v. Bd. of Sup'rs of Fairfax Cnty.*, 197 Va. 821, 827, 91 S.E.2d 415, 420 (1956): "Under his general authority an attorney has control of the remedy and may discontinue the action by a dismissal without prejudice, thus binding his client."

- *Duhe v. Jones*, 186 So. 2d 419, 424 (La. Ct. App. 1966): "[A]n attorney of record has implied authority to dismiss a suit 'without prejudice'."

- *Snyder-Falkinham v. Stockburger*, 249 Va. 376, 382, 457 S.E.2d 36, 39 (1995): "An attorney's general authority permits the attorney to discontinue a pending action by a dismissal without prejudice; but this general authority gives the attorney no right to discharge or terminate a cause of action by a dismissal on the merits, such as by a dismissal with prejudice, without special authority or acquiescence on the part of the client."

- *Cory v. Howard*, 164 N.E. 639, 639 (1929): "As the dismissal of a suit does not bar the bringing of another for the same cause of action, the attorney of record has the implied authority to discontinue the action if he sees fit."

- *Sewraz v. Nguyen*, No. 3:08CV90, 2011 WL 201487, at *6 (E.D. Va. Jan. 20, 2011): "An attorney has the general implied authority to nonsuit a case so long as it does not prevent bringing another suit on the same merits."

- *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 758 (Tex. 2003): "Texas courts have held that an attorney has implied authority to nonsuit a client's claim when the nonsuit does not affect a substantial right or bar the bringing of another suit based on the same cause of action."

- *Bice v. Stevens*, 325 P.2d 244, 251 (1958): "It is clearly within the attorney's authority to dismiss the client's action without prejudice."

70

Treatises also agree on this point:

- **Corpus Juris Secundum:** "[I]t is generally held that an attorney has implied authority to enter or take a dismissal, discontinuance, or nonsuit which does not bar the bringing of another suit on the same cause of action." 7A C.J.S. Attorney & Client § 295.

- **Federal Procedure, Lawyers Edit**ion: "An attorney who is employed to prosecute litigation has the implied power to take all action with reference to procedural matters, including stipulating to a dismissal without prejudice." 27A Fed. Proc., L. Ed. § 62:502.

- **American Law Reports:** "The rule prevailing in most jurisdictions is that an attorney employed to prosecute an action has implied authority, by virtue of such employment, to have the action discontinued or dismissed where such discontinuance or dismissal will not operate as a bar to the institution of a new action on the same cause, or, as expressed in some cases, where the dismissal or other termination is 'without prejudice.'" 56 A.L.R.2d 1290 (Originally published in 1957).

- **Restatement (Third) of the Law Governing Lawyers:** "A lawyer, for example, may decide whether to move to dismiss a complaint." Restatement (Third) of the Law Governing Lawyers § 21 (2000).

Consistent with this substantial case law, Kathleen testified that the *Walker*

team had the authority to voluntarily dismiss without prejudice:

> We did have the ability to do that. I mean, our client -- we had -- our client gave us the -- we have authority to generally make litigation decisions in their best interest, and particularly because here we weren't, like, settling their claim or something. We were just voluntary dismissing it. I think we felt like we had the authority as the counsel group to do that.

Aug. 3, 2022 Hrg. Trans. at 76:9–15.

In short, Kathleen and the *Walker* team had the implied authority—as contemplated by ABA Rule 1.2—to dismiss the case without prejudice. The dismissal was consistent with the *Walker* plaintiffs' objectives in the representation: to challenge the constitutionality of S.B. 184. In Kathleen's mind, the *Walker* case was not optimally positioned to succeed. For the reasons discussed elsewhere in this brief, Kathleen believed, "[A]t the end of the day, it's better to bring a properly baked case, even if it's a couple of days later, than a case that's not going to go well earlier." Aug. 3, 2022 Hrg. Trans. at 78:24–79:1. She believed, in good faith, that a dismissal gave both the *Walker* and *Ladinsky* teams time to regroup and determine the best way to achieve the shared objective of challenging S.B. 184, and she acted with her implied authority to pursue that objective.

## B. Kathleen and the *Walker* Team Did Not Neglect any Matter Entrusted to Them by Their Clients in Violation of Rule 1.3.

Alabama Rule 1.3 provides, "A lawyer shall not willfully neglect a legal matter entrusted to him." ABA Rule 1.3 similarly states, "A lawyer shall act with reasonable diligence and promptness in representing a client." Kathleen and the *Walker* team did not neglect any matter entrusted to them by their clients.

First, Kathleen and the *Walker* team filed a lengthy and well-drafted complaint within just *three days* of Governor Ivey signing S.B. 184, and they filed a motion for a temporary restraining order and/or preliminary injunction one day later. The record

72

here is thus chock full of evidence that Kathleen and the other *Walker* counsel were vigorously pressing their clients' claims both before and during the pendency of the case.

Second, on Friday, April 15, 2022, the *Walker* team dismissed their case, believing it to be the best available option given their procedural circumstances. In doing so, Kathleen and the *Walker* team were cognizant not to "delay" given the urgency and therefore moved quickly to make a decision as to next steps. Aug. 3, 2022 Hrg. Trans. at 78:18–23.

Third, other *Walker* counsel who had relationships with the clients informed the clients of the dismissal and the expectation that another case would be filed within a reasonable timeframe after the dismissal.

Fourth, when Kathleen and the *Walker* team dismissed, they were committed to ensuring that someone challenged S.B. 184. Kathleen agreed with Judge Proctor's statement that, "This wasn't a decamp, walk away" situation. Aug. 3, 2022 Hrg. Trans. at 77:25–78:2; *see id.* at 78:7–7 ("[W]e were committed to having someone do this challenge in the state.").

Fifth, the *Ladinsky* group ultimately refiled—as discussed between the two groups—and got S.B. 184 enjoined, even if temporarily. Thus, the objective of the representation was achieved in the district court.

73

### C.    The *Walker* Team Kept Their Clients Reasonably Informed About the Status of the Case in Compliance With Rule 1.4.

Alabama Rule 1.4 provides:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

ABA Rule 1.4 provides:

(a) A lawyer shall:
    (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
    (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
    (3) keep the client reasonably informed about the status of the matter;
    (4) promptly comply with reasonable requests for information; and
    (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

The obligation in Rule 1.4 is driven by the context of the situation. The comments to Alabama Rule 1.4 state, "Adequacy of communication depends in part on the kind of advice or assistance involved." The comments to ABA Rule 1.4 expressly contemplate that an attorney may need to act immediately without prior

74

consultation with a client: "In other circumstances, such as during a trial when an immediate decision must be made, the exigency of the situation may require the lawyer to act without prior consultation." The Comments to Alabama Rule 1.4 similarly state, "Practical exigency may also require a lawyer to act for a client without prior consultation."

That is exactly what happened here. Kathleen and the *Walker* team faced what they believed were exigent circumstances, and they had to make a decision quickly. At any point, the State could have answered the complaint and removed the right of voluntary dismissal. Given these circumstances, prior consultation was not feasible—particularly when, as the cases cited above note, an attorney has the implied authority to dismiss without prejudice.

Further, Kathleen and Cooley's primary role on the *Walker* team was to lead the litigation effort: conducting legal research, assessing potential claims, and preparing pleadings. She was not responsible for the day-to-day communication with the clients. That was the role of other members of the *Walker* team, but those other members talked with the clients throughout the week that *Walker* was pending and

shortly after the dismissal.[17] The *Walker* team as a whole communicated with their clients on an ongoing basis and kept them informed.

### D.   Rule 11 Does not Apply to This Charge.

Kathleen did not violate Rule 11 by filing a voluntary dismissal without the prior consent of her client. First, Rule 11 imposes duties to the court system and other litigants. *See Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 932 (7th Cir. 1989). Rule 11 is not meant to discipline attorneys for breaching duties to their clients. *Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir. 1995) (agreeing with the proposition "that the purpose of Rule 11 is to deter abuses of the litigation process which have the potential of harming the interests of the opponent, not to discipline attorneys for breaches of duty to their own clients."). Second, ample case law provides that Kathleen had the implied authority to voluntarily dismiss the *Walker* case without prejudice, so she had—at absolute minimum—a reasonable basis for the dismissal. Third, Kathleen's purpose in dismissing was to regroup and determine the best approach for challenging S.B. 184, her clients' ultimate objective—which is not improper.

---

[17] Kathleen defers to the facts in James Esseks, Carl Charles, and LaTisha Faulks's supplemental declarations and brief on this point.

## CONCLUSION

Kathleen accepts responsibility for her actions and stands ready to express to the Court that she deeply regrets that her actions created an appearance of impropriety and judge shopping. However, she at all times acted in good faith and within the bounds of existing rules and standards, and she did not intend to, nor did she, engage in any sanctionable conduct.

Dated: May 13, 2024

*/s/ Brannon J, Buck*
Brannon J. Buck (ASB-5848-K56B)
bbuck@badhambuck.com
Christopher B. Driver (ASB-9178-G39B)
cdriver@badhambuck.com
BADHAM & BUCK, LLC
2001 Park Place North, Ste. 500
Birmingham, Alabama 35203
(205) 521-0036 (Phone)
(205) 521-0037 (Facsimile)

*Counsel for Kathleen Hartnett*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been served on all parties of record via the CM/ECF electronic filing system, electronic mail, and/or U.S. Mail on this the 13th day of May, 2024.

*/s/ Brannon J. Buck*
OF COUNSEL