IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | Case No.: 2:22-cv-00184-LCB |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVE MARSHALL, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Alabama, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONDENTS' BRIEF REGARDING THEIR ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS AND THE INAPPLICABILITY OF THE CRIME-FRAUD EXCEPTION

In response to the Court's show cause order regarding the Q&A Document, Dkt. 527, and pursuant to the Court's directive at the May 20, 2024 status hearing, Dkt. 535,[1] and the Court's May 23, 2024 text order, Dkt. 548, Respondents James D. Esseks, Carl Charles, LaTisha Faulks, Milo Inglehart,[2] and Kathleen Hartnett

---

[1] The transcript for the May 20, 2024 Zoom hearing is attached as Exhibit A.

[2] The Panel dismissed Milo Inglehart from these proceedings, *see Vague*, Dkt. 59, but he is a Respondent for purposes of the Q&A Document show cause order.

(herein, "Respondents") respectfully submit this brief regarding their attorney-client privileged communications with their counsel in this investigation (including the "Q&A Document") and the inapplicability of the crime-fraud exception.

Respondents first describe the relevant factual background, which shows— among other things—that the Q&A Document is a privileged communication between Respondents and their counsel; was not under a continuing order of production by the Panel; was not generated in furtherance of any crime or fraud; and, to the contrary, was entirely appropriate preparation by Respondents and their counsel for the May 20, 2022 hearing. Respondents next explain the applicable legal framework, under which there is nothing approaching a prima facie case to trigger the crime-fraud exception. Respondents also explain why, even if *in camera* review were proper, any *in camera* review should be performed by a special master and not by this Court, given that this is a quasi-criminal proceeding in which the Court is acting both in a prosecutorial and decision-making capacity. *See In re Ruffalo*, 390 U.S. 544, 551 (1968) (attorney-disciplinary proceedings are "adversary proceedings of a quasi-criminal nature"); *see also*, *e.g.*, *Erdmann v. Stevens*, 458 F.2d 1205, 1209 (2d Cir. 1972) ("[A] court's disciplinary proceeding … is comparable to a criminal rather than to a civil proceeding."). The question of whether a special master should be appointed need not be reached, however, because the Court should dismiss the order to produce the Q&A Document.

## BACKGROUND

### I.    Relevant Proceedings Before The Three-Judge Panel.

#### A.    The Three-Judge Panel Institutes This Inquiry And Holds A May 20, 2022 Hearing.

On May 10, 2022, a three-judge panel (the "Panel") was constituted by the Chief Judges of the Alabama Districts to inquire into the conduct of the *Walker* and *Ladinsky* counsel, including Respondents.  Order, *In re Amie Adelia Vague* et al., No. 2:22-mc-03977-WKW (M.D. Ala.), Dkt. 1.  Referencing this Court's April 18, 2022 order in *Walker*, the Panel invoked the courts' "inherent authority to address lawyer conduct that abuses the judicial process," and ordered the nearly 40 attorneys representing the *Walker*, *Ladinsky*, and *Eknes-Tucker* plaintiffs to appear in person 10 days later at a May 20, 2022 hearing "to allow the panel to inquire about the issues raised by counsel's actions."  *Id.* at 5.  The Panel's Order did not state that testimony would be taken from any counsel on May 20.  *See generally id.*  It did, however, assure that "this proceeding will not be adversarial in nature."  *Id.* at 6.  *But see In re Ruffalo*, 390 U.S. at 551 (1968) (attorney-disciplinary proceedings are "adversary proceedings of a quasi-criminal nature").[3]

---

[3] For the proposition that its inquiry was not "adversarial," the Panel has cited *United States v. Shaygan*, 652 F.3d 1297, 1308 (11th Cir. 2011).  *Vague,* Dkt. 70 at 3.  This Court has adopted that proposition.  *See* Dkt. 527 at 15 ("As the Respondents have been continually reminded, this is not an adversarial proceeding, and the Court is a 'neutral decisionmaker.'" (citing *Vague*, Dkt. 41)).  Respectfully, this proposition is contrary to *In re Ruffalo*, and it also overlooks the actual import of this observation

In light of the May 10 order, the twenty-one members of the *Walker* team promptly retained Barry Ragsdale as their investigation counsel. Dkt. 528 at 3-4; *see Vague*, Dkt. 34, 34-1, and 42-1 (protective order motion and declaration filed by *Walker* counsel laying out these facts, and sworn declaration of Mr. Ragsdale attesting to privileged nature of documents at issue). Russell Capone, an attorney at Cooley, also served as investigation counsel for the Cooley Respondents, as reflected by the transcript of the May 20, 2022 hearing. At Mr. Ragsdale's direction, the *Walker* Respondents helped prepare Mr. Ragsdale for the hearing, including by developing materials such as an attorney-client privileged "Q&A Document," to assist Mr. Ragsdale with understanding the facts and history of *Walker* and to prepare him for questioning at the May 20 hearing. *See id.* Because Mr. Ragsdale had been retained just days before the May 20 hearing, *see Vague*, Dkt. 2 (notice of appearance on May 12), he had limited time to learn all the relevant information and ensure that his representations to the Court were informed and accurate; the Q&A Document was part of that preparation. *See* Dkt. 528 at 3-4.

---

in *Shaygan*: that the district court's disciplinary proceedings in that case violated the respondents' due process rights because "[t]he district court conducted an inquiry, not an adversarial hearing, and both prosecutors were denied a meaningful opportunity to be heard in that proceeding." *Shaygan*, 652 F.3d at 1318. In other words, in order for a proceeding to be properly constituted to allow for the imposition of discipline, it must be recognized as adversarial and quasi-criminal in nature and respondents in the proceeding must be afforded full due process rights.

Notably, Respondents and their counsel reasonably believed that the May 20 hearing would involve only a presentation by Mr. Ragsdale, and perhaps comments by certain senior lawyers from the *Walker* and *Ladinsky* teams—not testimony from the dozens of lawyers across the *Walker* and *Ladinsky* counsel teams. *See id.* at 4. For example, as counsel for the Cooley Respondents stated on the record at the May 20 hearing, "Your Honor, I'll just say, we didn't expect that all of the junior lawyers would be put under oath and individually questioned today." *Vague*, Dkt. 75 at 76:23-25. Mr. Capone explained further the **lack** of Respondents' preparation for testimony: "they might have prepared more to be here, sought counsel if they thought they needed counsel. I don't think they do [need individual counsel], but we didn't consider any of that because we weren't necessarily expecting this process today. In fact, I had been told nobody would be put under oath." *Id.* at 77:1-5.

In short, in the run-up to May 20, *Walker* Counsel were **not preparing to provide sworn testimony to the Panel**; they were preparing their lawyer to represent them—truthfully and accurately—at a hearing. *Walker* Counsel had the impression that, at most, perhaps team leaders Hartnett and Esseks might present, *not testify*.

Not only was the Q&A Document and Respondents' other preparation efforts with Mr. Ragsdale for the May 20 hearing entirely appropriate, but Respondents' counsel was forthright with the Panel about this preparation. To begin, after the Panel indicated at the May 20 hearing that the junior Respondents unexpectedly

would be questioned one at a time by Justice Harwood without their counsel present, the Panel claimed that "Justice Harwood has no intention of asking about any communications anyone has had with your lawyer or your firm or organization's lawyer." *Vague*, Dkt. 75 at 80:3-4.  Respondents strenuously objected to this denial of counsel.  *See*, *e.g.*, *id.*, at 81:22-24 (Mr. Segall: "I don't believe I've ever been in a court proceeding where my client gets questioned and I'm not present at the time my client is questioned.").  And in response to the prospect of junior lawyers being questioned without counsel, Mr. Ragsdale transparently explained that there had been attorney-client preparations with all Respondents: "And just so the record is clear, I also talked to my clients about what we anticipated in terms of questions that would be asked and what those facts were.  And we did that both in an effort to make sure that we had all the facts and that there were not some discrepancy that we didn't know about."  *Id.* at 80:5-10.  Mr. Ragsdale further explained that this preparation "was done collaboratively."  *Id.* at 80:12-13.  The Panel responded with the following assurance: "All three of us practiced law before we did this.  *We understand what your responsibilities and activities would have been, and we're not trying to get into the middle of those*."  *Id.* at 80:16-17 (emphasis added).

Prior to taking any testimony, the Panel said, "We're going to invoke a modified version of the rule, which means that if you're in the -- we're only going to have people in the courtrooms who will be answering questions, and you are not to

reveal the questions you're asked or the answers you give to anyone else, period."
May 20, 2022 Hrg. Trans. at 74:5–9. The Panel had not previously instructed the
Respondents on sequestration.

Following this discussion, Justice Harwood then questioned all of the junior
lawyers who were present on May 20 one-by-one, without their counsel present.
May 20, 2022 Hrg. Trans. (Harwood).   In each case, Justice Harwood asked
questions of Respondents that called for attorney-client privileged information about
their preparation with their counsel for the May 20 hearing—with no counsel there
to object. *See id.*  Notwithstanding that the junior Respondents were all asked these
questions while denied counsel, and without the expectation of or preparation for
testifying, **all junior Walker lawyers questioned by Justice Harwood testified that
no one had coached their testimony or otherwise did anything improper with
respect to preparation for the hearing**:

| Andrew Barr, *id.* at 3:8–16. | JUSTICE HARWOOD: Okay. And I guess the first question I would ask: Were you given any instructions or coaching by anyone about what you should or shouldn't say at this hearing?<br><br>ANDREW BARR: There were prep sessions, but it was fact-gathering regarding what did or didn't happen and people's memory of that we'll call it a ten-day period or whatever it might have been. The only thing that we were told, which is exactly what we tell every witness, is to tell the truth. |
| Zoe Helstrom, *id.* at 34:5–14. | JUSTICE HARWOOD: Well, as you heard, there are a couple of questions the Court has assigned me to ask and then pursue as I see fit. The first is have you been coached or instructed by |

| | |
|---|---|
| | anybody about what you should or shouldn't say by way of, quote, "testimony" at this hearing?<br><br>ZOE HELSTROM: Sure. I think beyond what our attorney mentioned -- you know, we had conversations about, like, potential questions that, if we were to be asked questions, we might encounter and what the facts were in terms of, you know, each question, but that's – that's been it. |
| Milo Inglehart, *id.* at 54:22-55:24. | JUSTICE HARWOOD: Okay. You heard me earlier on say that one of the questions the judges had wanted me to ask, has anyone coached you or suggested to you any testimony you should give? That is, if you were asked a certain question, here's what you should say?<br><br>MILO INGLEHART: I don't think so. Not quite like that. We met with our counsel, Barry, a few times who sort of explained to us what he thought might generally –<br><br>JUSTICE HARWOOD: Barry Ragsdale?<br><br>MILO INGLEHART: Barry Ragsdale, yeah. Sorry, sir. We didn't get specific things to say. There was a sort of Q and A document that was circulated, I think, last night for us or maybe a draft was circulated earlier in the week, but the final version was circulated last night that kind of walked through, like, things they think might come up or like -- yeah, just to sort of prep folks. And beyond that, Lynly and Dale and I were going to have a meeting on Thursday night -- no. Sorry -- on Wednesday night, but it ended up getting canceled. So I just ended up going to the group calls and looking over the document.<br><br>JUSTICE HARWOOD: Okay. When you say "Q and A," "A" would be the answers. Was there a suggestion, all right. If you're asked this question, here's the answer to use?<br><br>MILO INGLEHART: Usually it was sort of like -- I'm trying to remember. I just looked over it last night -- like, outlining, like -- like, general -- it wasn't like a word-for-word thing, but like things that might be useful to touch on or like -- yeah. |

| | |
|---|---|
| Katelyn Kang, *id.* at 27:6–20. | JUSTICE HARWOOD: All right. As you know, I've been charged to pursue a couple of limited areas of inquiry. The first thing I would ask, has anyone instructed you or coached you about what you should or shouldn't say in these proceedings?<br><br>KATELYN KANG: I consulted generally with Mr. Ragsdale, our counsel, but other than that, we didn't have any communications amongst ourselves about what to say or not to say.<br><br>JUSTICE HARWOOD: Well, did any counsel instruct you "Here's what you have to say" or "Here's the testimony you need to give"?<br><br>KATELYN KANG: No, Your Honor. He told us to, you know, talk about what we -- what our personal roles were and to speak honestly. |
| Adam Katz, *id.* at 13:20–14:10. | JUSTICE HARWOOD: Okay. And then the question I told you I'd be asking: Any coaching or instructions to what you were or were not to say by way of any discussions and as it now turns I guess we'd call it testimony since it's under oath?<br><br>ADAM KATZ: No, sir. So we did have, I think, one maybe two group meetings, like, with our entire Walker team and our counsel where they talked about what they expected this process might look like, and they shared with us that the draft written submission that we made so everyone could sort of remember the -- the timeline because, again, this all happened in basically 48 hours but –<br><br>JUSTICE HARWOOD: Tell me about it.<br><br>THE WITNESS: Yeah. But, yeah, I -- yeah, it was sort of a mad dash to try to get things done and -- yeah. But -- but no one said, "You should say this, and you should not say this." |
| Dale Melchert, *id.* at 47:9–15. | JUSTICE HARWOOD: Okay. The two questions that I've previewed for everybody, first, has anyone coached you or tried to instruct you about what you should or should not testify about here today? That is, if they ask you this question, here's what you say? |

| | |
|---|---|
| | DALE MELCHERT: No. We were told to be truthful and to be candid with the Court. |
| Malita Picasso, *id.* at 61:3-12. | JUSTICE HARWOOD: Okay. Well, as you know from my preamble earlier, there are two things the Court has asked me to pursue by way of further questioning is, have you been told or instructed as to how you should answer any particular questions or --<br><br>MALITA PICASSO: I have not been directed to answer any questions in any particular manner. As Barry alluded to earlier, we did have discussions about general facts as we all understood them, but at no point has anybody directed me to answer any questions in a particular way. |
| Elizabeth Reinhardt, *id.* at 20:11–18. | JUSTICE HARWOOD: . . .  And so my first question would be: Did you receive any coaching or instruction about what you were or were not to say at these proceedings?<br><br>ELIZABETH REINHARDT: No. |
| Robby Saldana, *id.* at 5:5–9. | JUSTICE HARWOOD: Okay. Well, I'll start out by asking have you been given any particular instructions or coaching about what you were to say or not to say at whatever proceeding this was to turn out to be today?<br>ROBBY L.R. SALDANA: No. |
| Sruti Swaminathan, *id.* at 42:7–12 | JUSTICE HARWOOD: Okay. Well, as you know, my two main thrusts of questioning as requested by the Court to pursue are, first, has anyone instructed you or coached you as to what you should say by way of, quote, testimony that might be taken here today?<br><br>SRUTI J. SWAMINATHAN: No.<br><br>JUSTICE HARWOOD: Okay.<br><br>SRUTI J. SWAMINATHAN: Actually, we weren't even told that we would be giving testimony, so we were definitely not prepared to. |

**B.     The Panel Compels Further Declarations And Testimony From Respondents, But Ultimately Does Not Order The Production of Attorney-Client Communications, Including The Q&A Document.**

On July 8, 2022, the Panel ordered that "the preliminary proceeding in this matter will continue at **10:00 a.m. Central Daylight Time on August 3–4, 2022,**" *Vague*, Dkt. 22 at 1.  The Panel ordered 21 attorneys from the *Walker* and *Ladinsky* teams to provide declarations on eight topics before providing live testimony in August, *see id.* at 1-3.  The seventh declaration topic was: "Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing."  *Id.* at 3.  In addition, Respondent Inglehart from the *Walker* team was ordered to "attach a copy of the Q&A sheet referenced at the May 20 proceeding."  *Id.* at 2 n.1.  The July 8 order also noted that upon the Panel's receipt of the requested testimony, the same Panel would decide whether to "initiate formal charges."  *Id.* at 5.

Because the July 8, 2022 order called for Respondents' production of their attorney-client communications with their investigation counsel, Respondents filed motions for a protective order to protect their attorney-client communications and attorney work product, including the Q&A document.  *See Vague*, Dkt. 27 (*Ladinsky* counsel motion); *Vague*, Dkt. 34 (*Walker* counsel motion).  Both motions expressed similar concerns with respect to the Panel's request for attorney-client

11

communications and work product regarding the May 20 hearing. *Ladinsky* counsel

summarized the concerns as follows:

> [U]pon receiving the May 10 Order and notice of the May 20 hearing, *Ladinsky* Counsel sought legal advice in preparation for the hearing— as is typical for anyone accused of potential wrongdoing. Because these communications were confidential and legal advice was sought, they fall squarely within the cloak of the attorney-client privilege. Yet, Topic Seven of the Panel's July 8, 2022 Order seeks these very communications. . . . *Ladinsky* Counsel object to disclosing any such communications to anyone, especially to the very Panel which says it may "initiate formal charges."

*Vague*, Dkt. 27 at 7.   *Walker* counsel expressed similar concerns, including

specifically with respect to the Q&A document, explaining (*inter alia*):

> Accordingly, because the July 8 Order requests information that is protected by the attorney-client privilege and the attorney work product doctrine, including the Q&A document, Walker Counsel seek a protective order to prevent such disclosure. . . . The Q&A document is plainly protected by the attorney-client privilege. *Walker* Counsel intended the Q&A document to be a confidential communication with their counsel made for the purpose of obtaining legal advice and facilitating counsel's representation of *Walker* Counsel at the May 20 hearing. . . . Here, there is no basis to believe that the attorney-client privilege or the work product doctrine do not apply. The only pertinent evidence in the record—that the Q&A document was prepared for counsel and by counsel through direct communications with clients— does not in any way meet the threshold for in camera review.

*Vague*, Dkt. 34 at 4, 5, 7.

The Panel issued an order on July 25, 2022 resolving the protective order

motions.  *Vague*, Dkt. 41.  The Panel denied the motions, *see id.* at 1, but—

critically—"CLARIFIE[D]" that "***the Panel is not seeking the disclosure of***

***privileged communications***.  To the extent the materials that must be disclosed to the Panel are work product, all disclosures are to be made *in camera*."  *Id.* at 3-4 (emphasis added).  Indeed, according to the Panel's July 25 order, its July 8 order already had "ma[de] clear" that privileged material was not called for.  *See id.*  The July 25 order also reiterated the Panel's view that it was conducting a non-adversarial proceeding, *id.* at 3, and confirmed that there was no allegation of the crime-fraud exception in play: "[t]here is no opposing party to raise potential exceptions to privilege or protection:  for example, waiver or the crime-fraud exception."  *Id.*

In sum, the Panel's July 25, 2022 order clarified and confirmed that ***Respondents were not under any order to provide attorney-client privileged communications***.  Such privileged communications include the Q&A Document, which the *Walker* counsel's protective order motion specifically identified for the Panel (explaining that it was privileged and that no exception to privilege applied), *Vague*, Dkt. 34, at 4, 5, 7—a point undisputed by the Panel's July 25, 2022 order.

In light of the July 25 order, Respondent Inglehart understood that he was no longer required to disclose the privileged Q&A Document and so advised the Panel in a submission by *Walker* counsel on July 27, 2022.  *Vague*, Dkt. 42 at 2 ("On the advice of counsel (*see* Ragsdale Decl. ¶ 2), Declarant Milo Inglehart is not disclosing the 'Q&A document' initially requested by the July 8 Order (Doc. 22 at 2 n.1) because it qualifies as a 'privileged communication' exempt from disclosure

pursuant to the July 25 Order."). Mr. Inglehart filed his declaration on July 29, but did not include the privileged Q&A Document. *See Vague*, Dkt. 80-15. On August 2, 2022, after Mr. Inglehart filed his declaration and a Notice stating he was not producing the Q&A document, the Panel *sua sponte* excused Mr. Inglehart—the only individual ordered to produce the Q&A Document—from appearing at the August hearing. *Vague*, Dkt. 47.

The other remaining *Walker* and *Ladinsky* Counsel also filed declarations prior to the August 2022 hearings. Each *Walker* Counsel addressed Topic 7 by explaining their preparations for the May 2022 hearing at a level sufficient to preserve attorney-client privilege over their communications with counsel, with all making clear that their preparations with Mr. Ragsdale (including the Q&A Document) were appropriate attorney-client communications and attorney work product. *See* Exhibit B (excerpts from *Walker* Counsel declarations concerning Topic 7). All Walker Counsel also confirmed in their declarations their compliance with the Panel's sequestration orders. *See id.*

At the remaining hearings before the Panel, which took place in August and November 2022, no testimony or other evidence called into question the testimony of the junior lawyers before Justice Harwood or the declarations submitted by *Walker* counsel regarding the propriety of the Q&A Document or their preparation for the May 20, 2022 hearing.

And, although the Court's July 25, 2022 Order had already confirmed that Respondents were under no continuing order to produce attorney-client communications, including the Q&A Document, the Panel confirmed this point thrice more. *First*, at a hearing on August 4, 2022, counsel for the *Ladinsky* team began the hearing by "remind[ing] the panel of the fact that we have asserted privileges." *Vague*, Aug. 4, 2022 Tr. at 3:20-21. In response, the Panel confirmed that it "underst[oo]d" that Respondents had "drawn the line on saying we're not going to testify about matters that are attorney-client privileged, both of our clients in those cases or counsel representing the subject lawyers in this matter." *Id.* at 4:16-20. Judge Proctor went on to confirm that "in the declarations the lawyers have observed what I understood the line," *i.e.*, they "disclosed communications about what decisions were made and why they were made as it relates to the subject inquiry, but they have drawn the line and said, we are not going to disclose" privileged communications. *Id.* at 5:12-17. Judge Proctor further confirmed that the Panel was "just going to recognize the objection" to producing privileged communications and, "[i]f that changes at some point, we'll certainly let you know and have a discussion about the best way to proceed." *Id.* at 5:19-23.

*Second*, on September 23, 2022, the Panel entered an Order that said:

 After careful consideration of the oral and written testimony in this matter, the Panel **TERMINATES** this inquiry as to the following attorneys and **RELEASES** them from any obligation under the May 10, 2022 and July 8, 2022 Orders:

15

. . .

-Milo Rohr Inglehart

*Vague*, Dkt. 59. The July 8, 2022 Order required Inglehart to produce the Q&A

document, and in its September 23, 2022 Order, the Panel "**RELEASE[D** Inglehart]

from any obligation under the . . . July 8, 2022 Order." *Id.* And, to be clear, the July

8 Order required Inglehart, but no one else, to produce the Q&A Document. Until

this Court's May 17, 2024 Order, none of Ms. Hartnett, Ms. Faulks, Mr. Esseks, or

Mr. Charles were ever under an Order to produce the Q&A Document.

Finally, at the November 3, 2022 hearing, the Panel expressly stated that it

had "not made" Respondents provide the "Q and A sheet":

> MR. SEGALL: …. I would also, Your Honor, like for today's purposes
> to have a continuing objection on the basis of all the privileges that have
> been mentioned, work product, attorney-client, common interest, joint
> client, et cetera.
>
> JUDGE PROCTOR: …. *[W]e certainly understand we've not made*
> *you provide us documents, the Q and A sheet, the talking points that*
> *Doss was going to use either here or before Judge Burke at the*
> *hearing.* So we're all right with y'all asserting anything we're not
> actually saying is work product we're reserving our work product
> objection. But I thought that there had been a decision to be somewhat
> candid with the Court about why these decisions were made. Am I
> missing the boat on my recollection here?
>
> MR. SEGALL: Well, you're correct that I didn't say anything during
> May 20 at all about that. But if I understand the Court's ruling –and, of
> course, we gave declarations. And in those declarations, we've, in my
> judgment, violated one or more privileges.

JUDGE PROCTOR: Well, you – I wouldn't say you violated it. ***I would say there was a limited waiver of the work product privilege, not the attorney-client privilege but the work product privilege….***

*Vague*, Dkt. 79 at 4:17-5:22 (attached hereto as Exhibit C).

The Q&A Document received no further mention before the Panel or before this Court from November 3, 2022 until Friday, May 17, 2024.  Nor was there any assertion of the applicability of the crime-fraud exception to pierce Respondents' attorney-client privilege with their investigation counsel before the Panel or this Court until this Court's May 17 Order.[4]

## II.   The May 17, 2024 Show Cause Order And Ensuing Proceedings.

On Friday, May 17, 2024, the Court issued an order to Respondents "to produce the Q & A document by May 20, 2024 at 5:00 p.m. or show cause why they should not be sanctioned for violating a court order."  Dkt. 527 at 1.  As the basis for this order, the Court stated that it had "come to the Court's attention that early in these proceedings, when the matter was pending before a three-judge panel, an

---

[4] In the Court's order unsealing these proceedings, *see* Dkt. 459, the Court determined—without any briefing of the issue—that any of Respondents' work product or common interest material in the Panel's Final Report was unprotected because "the crime-fraud exception would remove any work product protections that they might otherwise enjoy."  *Id.* at 12-13.  According to the unsealing order, "[t]he Panel's findings make a prima facie case of misconduct—namely, judge shopping—and the 'mental impressions and strategy' decisions for which the Respondents claim protection were produced in furtherance of that misconduct."  *Id.* at 13.  Although Respondent respectfully submits that this analysis was erroneous, it presents a separate question than that currently before the Court regarding the Q&A Document.

attorney named Milo Inglehart was ordered to produce a document he described as a 'Q & A,' which had been circulated to Respondents James Esseks, LaTisha Faulks, Carl Charles, Kathleen Hartnett and the rest of *Walker v. Marshall*'s litigation team. At the advice of his attorney, Barry Ragsdale, Mr. Inglehart refused to produce the document." *Id.* The May 17 Order further stated that "**[a]ny Respondent or non-Respondent who fails to comply must appear at the U.S. Courthouse in Montgomery, Alabama on May 23, 2024 at 9:30 a.m.** to show cause why the Court should not impose monetary sanctions for non-compliance and remand him or her to the custody of the U.S. Marshals Service until he or she complies." *Id.* at 17.

The May 17 order also asserted that the crime-fraud exception to the attorney-client privilege potentially applied to the Q&A document because there was a "prima facie showing that the *Walker* Respondents were engaged in or planning to engage in fraudulent conduct." *Id.* at 13. As support for claim of a prima facie case, the May 17 order cited two "findings": (1) a footnote in the Final Report and (2) an allegation in the Court's own show-cause orders. *Id.*

On Saturday, May 18, 2024, Respondent Hartnett filed a response and emergency motion for a status conference and stay in response to the May 17 Order, Dkt. 528, in which the other Respondents joined, explaining, among other things, that Respondents did not believe there was a continuing order to produce the Q&A document or any basis for invocation of the crime-fraud exception. On Sunday, May

19, 2024, Respondent Hartnett notified the Court of her intent to seek relief from the Eleventh Circuit absent relief from the production deadline of 5:00 p.m. Monday, May 20. Dkt. 532. At 10:10 a.m. on Monday, May 20, 2024, the Court set a status conference for 1:30 p.m. that day. Dkt. 533. Because the Court had not yet relieved Respondents from the production deadline, Respondents filed a Petition for Writ of Mandamus and Emergency Motion for Stay with the Eleventh Circuit ("Petition") shortly after 1:00 p.m. that day, and served the Petition on the Court and other parties to this proceeding. *See In re Esseks*, No. 24-11618 (11th Cir.).

The Court conducted the status conference on Monday, May 20, and decided to allow Respondents until May 24 to brief the applicability of the crime-fraud exception. Dkt. 548. As a result, Respondents voluntarily dismissed their Petition in the Eleventh Circuit. On May 23, the Court set the issue for oral argument on May 28 and stayed "the deadline for Respondents Esseks, Faulks, Charles, and Hartnett, and Non-Respondent Inglehart to produce the Q & A Document until the Court has had time to consider their arguments at the May 28 hearing and any additional briefing they may file." Dkt. 548.

## ARGUMENT

**I.    RESPONDENTS WERE NOT UNDER A CONTINUING ORDER BY THE PANEL TO PRODUCE THE Q&A DOCUMENT AND HAVE NOT MISPREPRESENTED THE RECORD.**

Undersigned counsel understands that the Court is seeking the Q&A Document regardless of whether Respondents were under a continuing order from the Panel to provide that document. Yet undersigned counsel takes extremely seriously this Court's statements at the May 20 conference that Respondents "misrepresented" the record to the Eleventh Circuit regarding whether they were under a continuing order to produce the Q&A Document by the Panel and whether the Panel viewed that document as subject to an assertion of privilege. Ex. A at 4-5, 10. Respectfully, there has been no misrepresentation. Nor were Respondents under a continuing order from the Panel to produce the Q&A Document.

As Respondents have explained in prior filings, *e.g.*, Dkts. 528, 529; *Vague*, Dkt. 42, and explained in even more detail above, *see supra* pp. 19–22, although the Panel's July 8, 2022 order initially ordered production of the Q&A document (by Mr. Inglehart), *see Vague*, Dkt. 22 at 2 n.1, the Panel later clarified in its July 25, 2022 Order that it was "not seeking the disclosure of privileged communications," *Vague*, Dkt. 41 at 4. Importantly, *Walker* counsel had made clear to the Panel in *Walker* counsel's protective order motion filed prior to the July 25 order that *Walker* counsel considered the Q&A Document, in particular, to be an attorney-client privileged communication. *See Vague*, Dkt. 34 at 4, 5, 7. And, after the July 25 order issued, Respondents openly and specifically informed the Panel that Respondent Inglehart would not be producing the Q&A Document in light of the

Panel's confirmation that it was not seeking attorney-client communications. *See Vague*, Dkt. 42 at 2 (stating that "Inglehart is not disclosing the 'Q&A document' initially requested by the July 8 Order (Doc. 22 at 2 n.1) because it qualifies as a 'privileged communication' exempt from disclosure pursuant to the July 25 Order"). Inglehart was thereafter excused from the August hearings, *Vague*, Dkt. 47, and the Panel never again requested the Q&A document. Instead, the Panel confirmed at an August 4, 2022 hearing that it was respecting that Respondents had "drawn the line on saying" they would not disclose "attorney-client privileged" communications with their "counsel . . . in this matter," and that the Panel would "let [Respondents] know and have a discussion" if "that changes at some point." *Vague*, Aug. 4, 2022 Tr. at 4-5.

Between the August and November hearings, the Panel then expressly released Mr. Inglehart from "any obligation under the . . . July 8, 2022 Order[]." *Vague*, Dkt. 59.  The Panel did not make any exception for the Q&A Document, even though Mr. Inglehart had openly stated that he had not produced the document and his reasons why.

The Panel then reaffirmed this position specifically with respect to the Q&A Document at a November 3, 2022 hearing, stating that "we certainly understand we've not made you provide us documents, the Q and A sheet, the talking points that Doss was going to use either here or before Judge Burke at the hearing," and that the

Panel had not ordered the production of "attorney client privilege" material. Ex. D at 4:17-5:22.

Thus, Respondents respectfully submit that the record is clear that (1) Respondents (in particular, Respondent Inglehart, the only one who had ever been subject to an order concerning the production of the Q&A Document) were not under a continuing order to produce the Q&A Document after the clarification provided by the July 25 Panel order; (2) the Panel thereafter confirmed that it respected Respondents' objection to producing privileged information and that Respondents need not produce the Q&A Document; (3) the Panel expressly released Mr. Inglehart from any obligation under the July 8 Order, and (4) Respondents have made no misrepresentations of the record to the Eleventh Circuit or otherwise.  Notably, the Panel's Final Report cites its original order seeking production of the Q&A Document and notes its receipt of Respondents' declarations that described the Q&A Document, but makes no suggestion or finding that Respondents failed to comply with any order regarding the production of produce the Q&A Document.  *Vague*, Dkt. 70 at 14-15.

## II.   THE ATTORNEY-CLIENT PRIVILEGE PROTECTS THE Q&A DOCUMENT FROM DISCLOSURE ABSENT THE EXISTENCE OF AN EXCEPTION TO THE PRIVILEGE.

Where, as here, a court investigates attorneys for claimed misconduct, those parties are entitled to engage counsel and consult with counsel in confidence, subject

to the attorney-client privilege. *See* Fed. R. Evid. 1101(c) (providing that "[t]he rules on privilege apply to *all* stages of a case or proceeding" (emphasis added)); Fed. R. Evid. 1101(d) (confirming that the evidentiary rules regarding privilege apply to miscellaneous proceedings); Northern District of Alabama Local Rule 83.1(h)(1)(C) (recognizing that privileges may be asserted in an attorney disciplinary proceeding); Middle District of Alabama Local Rule 83.1(j)(3) (same).[5]

Communications between Respondents and the attorneys representing them in this investigation are at the very core of what the attorney-client privilege protects: "disclosures made by a client to his attorney, in confidence, for the purpose of securing legal advice or assistance." *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248 (11th Cir. 2020). The privilege likewise protects communications by attorneys to their clients. *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). And in a case, like this one, that involves joint representation, the privilege protects communications between co-clients and their common attorneys. *See, e.g., Teleglobe Commc'ns Corp. v. BCE, Inc.*, 493 F.3d 345, 363 (3d Cir. 2007). The very point of the privilege is "to encourage full and frank communication between attorneys and their clients," recognizing "that sound legal advice or advocacy serves

---

[5] The attorney work product doctrine also applies in these proceedings and protects the Q&A document. *See Vague*, Dkt. 34. Because the Q&A Document is an attorney-client communication, this brief focuses on the attorney-client privilege.

public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389; *see also United States v. Noriega*, 917 F.2d 1543, 1550 (11th Cir. 1990) (similar).

The Q&A Document is classic attorney-client privileged material. Mr. Ragsdale, representing Respondents in the Panel's investigation, directed his clients to prepare a list of potential questions the Panel might ask at the May 20, 2022 hearing, as well as proposed answers to those questions, so that he could be prepared for the hearing. *Vague*, Dkt. 34 at 2-8; *Vague*, Dkt. 34-1 at ¶¶ 6–15. Senior *Walker* Counsel did so, and discussed the document with Mr. Ragsdale for the purpose of obtaining his legal advice in preparation for that hearing. *See id.* These "disclosures made by . . . client[s] to [their] attorney, in confidence, for the purpose of securing legal advice or assistance," are at the very heart of what the attorney-client privilege protects. *Knox*, 957 F.3d at 1248.

Respondents do not read the Court's show cause order regarding the Q&A Document, Dkt. 527, to dispute that it is covered by the attorney-client privilege. Rather, the Court's order assumes that it is privileged and argues that the crime-fraud exception applies. *See id.* at 8, 11-12.

## III.   THERE IS NO PRIMA FACIE SHOWING OF THE CRIME-FRAUD EXCEPTION TO PERMIT REVIEW OF THE Q&A DOCUMENT.

### A.   The Rare and Extraordinary Crime-Fraud Exception.

"The crime-fraud exception allows a party—*in rare circumstances*—to obtain discovery that otherwise would be protected by the attorney-client privilege or the attorney work product doctrine." *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) (emphasis added); *see also*, *e.g.*, *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994) ("The crime-fraud exception presents one of the *rare and extraordinary* circumstances in which opinion work product is discoverable." (emphasis added)); *United States v. Hogan*, 240 F. App'x 324, 328 (11th Cir. 2007) (referring to the "crime-fraud exception as an extraordinary example of when the work-product privilege may be pierced").  The exception applies only when otherwise protected materials "*are made in furtherance of an ongoing or future crime or fraud*."  *Drummond*, 885 F.3d at 1335. (emphasis added).[6]

A two-part test applies to determine if the crime-fraud exception exists: "[f]irst, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice," and "[s]econd, there

---

[6] Notably, the Panel suggested that the crime-fraud exception may not be available in these proceedings at all.  *See Vague*, Dkt. 41 at 3 ("Again, this is not an adversarial proceeding.  There is no opposing party to raise potential exceptions to privilege or protection:  for example, waiver or the crime-fraud exception.").

must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987); *accord, e.g.*, *Drummond*, 885 F.3d at 1335.

Where, as here, the alleged basis for the exception's applicability is a claimed "fraud on the court,"[7] there must be deception, directed at the court, based on "egregious misconduct" that actually affects the integrity of the proceedings. *Herring v. United States*, 424 F.3d 384, 386-87, 390 (3d Cir. 2005).  As the Eleventh Circuit has made clear "'[f]raud upon the court' … embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1551 (11th Cir. 1985) (even perjury does not rise to the level of fraud on the court).   Thus, "[o]nly the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court." *Russell v. Redstone Fed. Credit Union*, 710 F. App'x 830, 832–33 (11th Cir.

---

[7] Respondents understand this to be the nature of the present allegation of fraud in the May 17 order.  *See* Dkt. 527 at 13.

2017) (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978)); *see also Apotex v. Merck & Co.*, 507 F.3d 1357, 1360-61 (Fed. Cir. 2007); *Zurich N. Am. v. Matrix Serv.*, 426 F.3d 1281, 1291 (10th Cir. 2005).

A federal court may not conduct an *in camera* review of a document to determine whether an exception to attorney-client privilege unless there has been a threshold showing of "a factual basis adequate to support a good faith belief by a reasonable person" that an exception to the attorney-client privilege applies. *United States v. Zolin*, 491 U.S. 554, 572-73 (1989). A "prima facie" case requires evidence that, "if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *In re Grand Jury Investigation*, 842 F.2d at 1226. That showing must "have some foundation in fact, for mere allegations of criminality are insufficient to warrant application of the exception." *Id.* In a Fifth Circuit decision cited approvingly by the Eleventh Circuit in *In re Grand Jury Investigation*, the Fifth Circuit "approved of the definition of a prima face case contained in Black's Law Dictionary." *In re International Systems and Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982). That Dictionary, in turn, defined "prima facie case" as "evidence such as will suffice until contradicted and overcome by other evidence." *Id.* (citing Black's Law Dictionary 4th ed. 1968); *see also* Black's Law Dictionary (11th ed. 2019) (defining "prima facie case" to mean sufficient evidence to allow the trier of fact to "rule in the party's favor.").

27

**B.      No Prima Facie Case Of Crime-Fraud Exists Here, Nor is There Evidence that the Q&A Document Furthered Any Crime or Fraud.**

The Court's show cause order cites two "findings" to support the claimed applicability of the crime-fraud exception here, Dkt. 527 at 13—neither of which comes close to establishing a crime or a fraud.  First, the Court cites its own underlying show cause orders as a claimed basis for the existence of a fraud. *See id.* at 13 ("each of them has been issued a show-cause order"). But an accusation—here the Court's show-cause orders against Respondents—is not evidence of a crime or a fraud.  That an "allegation" cannot make out a prima facie case is settled in this Circuit and others.  *See*, *e.g.*, *In re Grand Jury Investigation*, 842 F.2d at 1228 ("mere allegations" are "insufficient to warrant application of the exception"); *In re International Systems & Controls Corp. Sec. Litig.*, 693 F.2d at 1242 (rejecting application of the exception where proponent of the exception relied on "allegations"); *In re Grand Jury Investigation*, 599 F.2d 1224, 1232 (3d Cir. 1979) ("naked assertion" of a corporate cover-up insufficient to overcome the privilege).

Even if the Court's citation to its own "show-cause order," were construed to incorporate the show-cause order's citations—*i.e.*, Dkt. 478 at 13 (Faulks), Dkt. 479 at 13-14 (Hartnett), Dkt. 481 at 14 (Charles), and Dkt. 486 at 13 (Esseks)—and those citations were in turn construed to incorporate the portions of the Final Report that they reference—*i.e.*, all cite to (1) unspecified misrepresentations and omissions, (2) unspecified "discrepancies" and "credibility" findings in Section IV of the Final

28

Report, and (3) the "finding in Section V that it was misconduct … to claim that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and the Court set *Walker* for a status conference in Huntsville on April 18," *e.g.*, Dkt. 478 at 13-14 (cleaned up)—the prima facie case would still fail.  None of those three nested sources make a prima facie case for a crime or fraud.  The first—unspecified misrepresentations and omissions, *e.g.*, Dkt. 479 at 13—does not actually point to any misrepresentation or omission, or cite to the Final Report.  It is, in short, a "mere allegation."  *Supra* p. 28.  The second—unspecified discrepancies and credibility findings in Section IV—cites to the entire 34-page fact section of the Final Report, without further guidance as to any specific findings.  Even still, an adverse credibility finding is not enough to make out a prima face case that these Respondents were planning an ongoing fraud on the court in the lead-up to the May 20 hearing, as explained *infra* p. 31.  As to "discrepancies," the Final Report itself concedes that "[m]any lawyers provided the same account of the same events," Dkt. 339 at 16.  This Court's show-cause order does not specify a "discrepancy" or "misrepresentation" it has in mind.[8]  The third—the reference to dismissing because

---

[8] The Final Report does not use the words "discrepancy" or "fraud."  The only time the Final Report refers to a "misrepresentation," it is the Panel's mistaken view that Charles—who did not believe he was going to be called to testify and had not attempted to refresh his recollection of the events—forgetting that he called Judge Thompson's chambers was in fact a "misrepresentation[]."  *Vague*, Dkt. 70 at 22.  But even if that were so, there is no suggestion in this Court's order that the Q&A Document—which the Court claims was drafted in order to coordinate identical

the reassignment of *Ladinsky* struck counsel as unusual and this Court set a status conference in Huntsville immediately after Easter and Passover weekend—is not fraudulent in the first place. The Panel believed that Respondents' "suspicions" about the reassignment were "unwarranted," but did not expressly deny that they were genuinely felt. Dkt. 339 at 31. And the Final Report points to nothing to undermine the consistent testimony that Respondents were concerned about the need to quickly combine two large legal teams in time for a presentation in Huntsville after a holiday weekend.

Second, the Court cites a footnote in the Final Report which states that "Walker counsel's candor on the whole is concerning." *Id.* (quoting *Vague*, Doc. No. 70 at 18 n.3). However, that footnote does not support such an assertion: it cites to one answer by one Respondent in response to one hypothetical question—out of hundreds of pages of testimony. *See Vague*, Doc. No. 339 at 18 n.3. Although the Panel may not have found the answer to the hypothetical convincing,[9] it does not

_____

testimony—was or could have been in furtherance of Charles not immediately remembering his call to chambers.

[9] Since the Panel issued its Report, Mr. Esseks has explained in greater detail why his testimony to the Panel was truthful and why the Panel's skepticism may have been based on a misunderstanding of Esseks's testimony—an issue Respondents had no opportunity to brief before the Final Report issued. Esseks Suppl. Decl. dated May 8, 2024 at ¶¶ 51-55. In determining whether there is a prima facie case that Respondents were engaged in a fraud on the Court through their testimony before the Panel, the Court should consider all of the evidence that Respondents have provided in the course of learning what the Panel's concerns were.

support a blanket conclusion that all *Walker* Respondents failed to testify truthfully or defrauded the Court.[10]  Testimony that speculates as to what the testifier might have done in a counterfactual by definition lacks the "foundation in fact" that a prima face case requires.  *In re Grand Jury Investigation*, 842 F.2d at 1226.  To this end, the Panel stated only that the response "strains credulity," Dkt. 339 at 18 n.3—not that it was or could have been factually false.[11]  Moreover, if an adverse credibility finding is enough to raise a prima facie case of the crime-fraud exception—it is not— then at least one party would lose privilege in virtually every case.  That is not the law and would fatally undermine the attorney-client privilege.[12]

---

[10] Neither the Final Report nor this Court have connected this specific piece of testimony to the Q&A Document.  *Supra* p. 25 (explaining that the privileged material must be "in furtherance" of a crime or fraud).  Nor could this connection be made.  Respondents gave varied answers to this and similar hypotheticals, so it would be illogical to blame an answering the Panel found unsatisfying on a document that this Court has suggested was designed to "coordinate[] … testimony." Dkt. 527 at 8.

[11] While the Panel may have thought Mr. Esseks speculated wrongly, he did not testify falsely about a verifiable fact. As a general matter, "[s]peculation, subjective opinions and unfulfilled hopes do not support a claim for fraud." *Next Century Commc'ns Corp. v. Ellis*, 171 F. Supp. 2d 1374, 1380 (N.D. Ga. 2001).

[12] In other situations when the Panel asked a Respondent to weigh in on a hypothetical, it appreciated the possibility for unfairness when asking a fact witness to speculate on facts that did not actually happen.  *See*, *e.g.*, *Vague*, Dkt. 77, at 55:19-20 (Judge Proctor: "this is a hypothetical, and it may be an unfair hypothetical"). Typically, asking a fact witness to speculate on a hypothetical is not considered evidence at all.  *See*, *e.g.*, *Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255, 1268 (N.D. Ala. 2011) ("Speculative testimony is generally not admissible because it is not based on the witness's perception.").

31

Even if an adverse impression of a party's candor were enough to eliminate privilege (it is not), the Panel's footnote ignores that the Panel elsewhere expressly praised *Walker* Counsel's candor. For example, the Panel repeatedly praised Petitioner Hartnett's testimony, making statements such as: "One of the things I was impressed with your declaration is its clarity, its organization, and its candor. So I want to give you that compliment as we stand here." Dkt. No. 521 at 3 (quoting Aug. 3, 2022 Hearing); *see also*, *e.g.*, *Vague*, Dkt. 77 (Judge Proctor: "I really appreciate the way you're tackling this, and I just want to affirm that as we're going along."). A lone reference to an answer to a question about a hypothetical scenario cannot support a prima facie case where, as here, the remainder of the voluminous record includes repeated compliments of counsel's candor.

Further still, even if there were a prima facie case of fraudulent conduct by Respondents (there is not), there would still not be any indication that the Q&A Document was made in "furtherance of" an ongoing or future fraud. *In re Grand Jury Investigation*, 842 F.2d at 1226; *see also*, *e.g.*, *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) (the proponent of the exception must show the legal advice was sought "with the intent to further … illegal conduct"). Indeed, the uncontradicted record in this matter —including the sworn testimony of all *Walker* counsel and their lawyer—is that the only activity that the Q&A Document was created in "furtherance" of was preparation for the May 20, 2022 hearing. *See supra* p. 25.

Were a prima facie case made out on these facts, it would mean that in every case where an individual accused of some form of misconduct hires a lawyer to prepare a defense and advocate on his or her behalf, there would be a risk that the accused's privileged communications with counsel could be breached based on the factfinder merely characterizing that advocacy as being in "furtherance" of the underlying accusations of misconduct.[13]  *Cf. In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (explaining that were the "in furtherance" requirement is not adhered to, it would mean "the privilege would be virtually worthless because a client could not freely give, or an attorney request, evidence that might support a finding of culpability").   What's more, the Q&A Document could not have been in "furtherance" of fraudulent testimony given the uncontradicted evidence that Respondents did not believe they would be testifying at the May 20, 2022 hearing *at all*.  *Supra* p. 4-7.

---

[13] Finally, to the extent the Court's May 17 Order *sub silentio* invokes the Panel's generalized findings of misconduct in the Final Report, that too is insufficient to trigger the crime-fraud exception.  That is so for multiple reasons:  the Panel did not find a fraud on the Court, the Panel did not make individualized findings but rather "collective" findings, and—as noted—the Panel's process was suffered from multiple, severe due process violations such that *all* of the Panel's findings are wholly unreliable.   Indeed, and notably, the Panel's original (and ultimately withdrawn) request for the Q&A Document was spurred by Justice Harwood asking questions the Panel promised he would not ask, to a junior lawyer testifying without counsel present, in a scenario where that lawyer was not expecting to testify or prepared to testify or aware of any rule violated.  *See supra* p. 8.

Put simply, neither the Final Report nor anything else in the record before the District Court supports the notion that Respondents and their counsel in the investigation have been engaged in a fraud on the Court.

While the Court's May 17 Order states, "it is improper for any witness to testify to facts he or she doesn't personally remember, coordinate omissions with other witnesses, or agree to stick to a particular story that is not the truth, the whole truth, and nothing but the truth," it provides no specific examples—i.e., a prima facie case—of this occurring.[14] Rather, it merely says that the Q&A Document was based on the "collective knowledge" of counsel. Prior to the Court's sequestration order on May 20, the *Walker* Respondents were not under any prohibition that prevented them from discussing their recollections of past events. Merely discussing "collective knowledge" about past events alone is not improper in the absence of a sequestration order, particularly as here where the undisputed purpose was to educate counsel for an upcoming hearing.  Typically, Rule 615 requires a party to make a request or "invoke the rule" before sequestration applies. *See United States v. Joseph*, 806 F. App'x 910, 914 (11th Cir. 2020) ("Once a party invokes the rule of sequestration, the district court must exclude witnesses from court proceedings . . .."); Fed. R. Civ. P.

---

[14] The absence of specific examples of fraud is in stark contrast to the prima facie case made in *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324 (11th Cir. 2018).  *See infra* p. 35.

34

615 ("At a party's request, the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony."). No sequestration order had been entered before May 20, 2022.

The Court's May 17 Order relies heavily on *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324 (11th Cir. 2018), but *Drummond* only underscores the impropriety of applying the crime-fraud exception here. In *Drummond*, the party seeking to invoke the crime-fraud exception "set forth over 50 specific misrepresentations" made by its adversary, and the adversary "did not dispute the vast majority of those misrepresentations." *Drummond, Inc. v. Collingsworth*, 2:11-cv-3695, Dkt. 417 (Dec. 7, 2015), at 8. From there, the district court set forth *ten pages* of bullet-pointed examples of specific misrepresentations. *Id.* at 8-17. Moreover, the materials at issue in *Drummond* were plainly in furtherance of the alleged misconduct—*i.e.*, communications to an attorney who served as an intermediary to make illegal bribe payments, in furtherance of "witness bribery." *Drummond*, 885 F.3d at 1333. In short, *Drummond* represents the rare and exceptional case where the crime-fraud exception applies, and provides no support for invoking that exception based on the non-evidence of fraud here.

## IV.  THE COURT SHOULD NOT CONDUCT ANY IN CAMERA REVIEW.

Because there is not a sufficient basis to invoke the crime fraud exception, the Court need not decide whether it should appoint a special master. However, even if

35

this Court were to decide that in camera review is appropriate here, the interests of justice strongly favor the appointment of a special master outside the Alabama district courts.

When a presiding judge reviews privileged materials, there is a possibility that the judge could be "prejudiced."  Douglas R. Richmond, *Understanding the Crime-Fraud Exception to the Attorney Client Privilege and Work Product Immunity*, 70 S.C.L.R. 1, 30 (2018) ("Richmond").  For that reason, "[i]deally, any *in camera* review should be conducted by a judge other than the one presiding over the case involving the communications" or the court should "appoint a special master to conduct the review."  *Id.*; *see*, *e.g.*, Thomas E. Spahn, *A Practitioner's Summary Guide to the Attorney-Client Privilege & the Work Product Doctrine* 297–98 (2013) (noting the "common-sense concept," that "the judge hearing a case (especially in a non-jury setting) should arrange for another judge to review arguably protected communications or documents," to help prevent "adverse effects of the trial judge reviewing what should never have been disclosed"); *see id.* at 298 (noting that "[m]any courts delegate" this review "to special masters").  Courts in this Circuit have appointed special masters to assess the relevance of the crime-fraud exception.  *See*, *e.g.*, *Drummond*, 885 F.3d at 1327 (noting that the district court "ordered a special master to perform an *in camera* review to determine whether the crime-fraud exception … appl[ied]").

36

This proceeding presents an exceedingly strong case for a special master. *First*, the typical factors that favor a special master clearly obtain here: there is a general risk that a judge presiding over a case will be prejudiced by reviewing privileged material and there is no jury so the ultimate findings and penalties here will be made by the same person that would be reviewing the privileged material. *Second*, the underlying charge is that Respondents perpetrated a fraud on the court and, for obvious reasons, the "potential for prejudice would seem to be especially great where the alleged fraud is fraud on the court." Richmond at 30. *Third*, the unconventional structure of these proceedings makes the risk of prejudice especially acute. In the typical case where a court acts as trier of fact (which itself triggers a risk of prejudice), the court is still acting as a neutral arbiter between two adversaries. That is manifestly not this case. Here, the Court is acting as investigator, prosecutor, judge, and jury all at once, and doing so in a quasi-*criminal* proceeding. *See In re Ruffalo*, 390 U.S. 544, 551. In these circumstances, it would be fundamentally unfair to allow the Court unfettered access to privileged communications. It is no "personal criticism" of the Court to observe that a judge in that scenario could not "reasonably be expected to erase the earlier impressions from his mind" gleaned from "privileged communications." *United States v. Nicholson*, 611 F.3d 191, 217–18 (4th Cir. 2010).

Compounding the foregoing problems is another: the allegations in this case are unavoidably personal. In essence, the Panel's Final Report concludes that

because Respondents thought they could not obtain a favorable result from Judge
Burke, they did not want to appear before Judge Burke.  And while Respondents
vigorously contest the charge that they tried to subvert the random-case assignment
system or otherwise acted improperly, there is no dispute that Respondents at times
had concerns about Judge Burke.  *See*, *e.g.*, Dkt. 339 at 31 ("McCoy and others
testified to an additional, and more troubling, concern: they suspected that Judge
Burke reached out to obtain the *Ladinsky* case"); *id.* at 32 (concerns expressed based
on Judge Burke's "prior political affiliations"); *Vague*, Dkt. 77 at 227 (testimony that
because "Judge Burke had a portrait of Jefferson Davis in his chambers," that "did
not seem to be a good fact" for a "civil rights lawyer").  Again, it is not a criticism
to suggest that there is a risk of prejudice when a judge is asked to consider sanctions
in a case predicated on charges that the lawyers attempted to avoid that judge.  That
risk of prejudice makes it all the more important not to poison the well by allowing
the ultimate decisionmaker to review privileged communications.  The Supreme
Court teaches that courts deciding whether and how to engage in "*in camera* review"
should look to the "facts and circumstances of the particular case," *Zolin*, 491 U.S.
at 572, and the circumstances here—a case in which the alleged misconduct is
inextricably bound up with allegations about the attorneys' concerns with a judge—
strongly disfavor this Court conducting *in camera* review.

In sum, there is no basis for the crime-fraud exception and, if there were any

colorable basis, a special master is the only just option.

Respectfully submitted, May 24, 2024

<div style="margin-left: 40%;">

*/s/ Brannon J. Buck*

Brannon J. Buck (ASB-5848-K56B)

bbuck@badhambuck.com

Christopher B. Driver (ASB-9178-G39B)

cdriver@badhambuck.com

BADHAM & BUCK, LLC

2001 Park Place North, Ste. 500

Birmingham, Alabama 35203

(205) 521-0036 (Phone)

(205) 521-0037 (Facsimile)

*Counsel for Kathleen Hartnett*

*/s/ Barry A. Ragsdale*

Barry A. Ragsdale

Robert S. Vance

Dominick Feld Hyde, PC

1130 22nd Street South, Suite 4000

Birmingham, AL 35205

Tel.: (205) 536-8888

bragsdale@dfhlaw.com

rvance@dfhlaw.com

*/s/ W. Neil Eggleston*

W. Neil Eggleston

Byron Pacheco

Kirkland & Ellis LLP

1301 Pennsylvania Ave, N.W.

Washington, D.C. 20004

Tel.: (202) 389-5016

neil.eggleston@kirkland.com

byron.pacheco@kirland.com

*Counsel for Respondents Esseks, Charles, and Faulks and non-party Milo Inglehart.*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing has been served on all parties of record via the CM/ECF electronic filing system, electronic mail, and/or U.S. Mail on this the 24th day of May, 2024.


*/s/ Brannon J. Buck*
OF COUNSEL