# EXHIBIT 17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Intervenor Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-184-LCB |
| | ) | |
| HON. STEVE MARSHALL, in his | ) | |
| Official capacity as Attorney General, | ) | |
| of the State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

# EXPERT REPORT OF
# PATRICK W. LAPPERT, M.D.

## TABLE OF CONTENTS

**Background and Qualifications** ....................................................................**3**

**I.   Surgery is Part of Plaintiffs' "Standard of Care"** .......................**10**

    A.  Gender Affirmation is a Continuum of Care ...............................11

    B.  Surgery in the Continuum of Care (Including Among Minors) ...............16

**II.  Characteristics of Gender Affirmation Surgeries** ........................**17**

    A.  Problems in Gender Affirmation Surgeries ...............................17

    B.  Problems of Surgical Consent ..................................................21

    C.  Erroneous Use of the Word "Reconstructive" to Describe Gender Affirmation Surgeries ..............................................................21

**III. Evidence Does Not Support "Gender Affirmation" Surgeries as a Standard of Care** .........................................................................**25**

    A.  Experimental Practices .............................................................25

    B.  Evidence-Based Medicine ........................................................25

    C.  Watchful Waiting vs. Gender Affirmation ...............................29

**Conclusion** ..............................................................................................**34**

**References** ..............................................................................................**35**

## BACKGROUND AND QUALIFICATIONS

1.      I am a retired plastic surgeon, as well as a retired senior medical officer in the United States Navy. I have been a physician for 40 years. I have been Board Certified in Surgery (American Board of Surgery, 1992-2002) and Plastic Surgery (American Board of Plastic Surgery, 1997-2018). My professional background, experience, and publications are detailed in my curriculum vitae, which is attached to this report.

2.      I have been retained by counsel for Defendants in the above-captioned lawsuit to provide an expert opinion concerning the nature of gender surgeries. My opinion will be based primarily on my own experience as a physician and surgeon, as well as the relevant literature in this area. I have also reviewed the expert reports of Dr. Armand Antommaria, Dr. Daniel Shumer, Dr. Meredithe McNamara, Dr. Aron Janssen, and Dr. Morissa Ladinsky. I may wish to supplement my opinions or the bases for them as new research is published or in response to statements made in my area of expertise.

3.      I have offered testimony, both written and in person, on this issue to state legislators, state health benefits management agencies, and State Attorneys General.

4.      I have testified at trial or deposition in the following cases:

     a.  *Brandt v. Rutledge*, No. 4:21-CV-00450-JM (E.D. Ark. filed May 25, 2021).

     b.  *Kadel v. Folwell*, No. 1:19-CV-272 (M.D.N.C. filed Mar. 11, 2019).

     c.  *Dekker v. Weida*, No. 4:22-CV-00325-RH-MAF (N.D. Fla. filed Sept. 7, 2022).

     d.  *Siefert v. Hamilton Cnty. Bd. of Commissioners*, 354 F. Supp. 3d 815 (S.D. Ohio 2018).

5.    I have also had experience in making judgements concerning distinctions between reconstructive surgery and cosmetic surgery. I gained this experience while serving in senior leadership for a government medical care system in which I had no financial stake. I have no financial interests in the matter in question, and the professional opinion that I offer is not influenced by my sources of income nor by my position in any organization that financially benefits from medical services that are discussed in this opinion.

6.    For my services as an expert witness, I am being compensated at an hourly rate of $400 for preparation of my written testimony as well as for deposition and hearing. Additionally, my travel expenses will be reimbursed. My compensation is not dependent upon the substance of my opinion nor upon the outcome of the litigation.

7.    If called to testify in this matter, I will do so truthfully and to the best of my ability.

8.    I completed my undergraduate education at the University of California, Santa Barbara. While there, I had significant experience in university-level research, having been invited to be an undergraduate research assistant working in the laboratory of Dr. Philip C. Laris. It gave me experience in the evaluation of research publications. We were involved in the collaborative work of elucidating the electrodynamic and stoichiometric quantification of the sodium and potassium pump, located in every living cell. I completed my undergraduate degree in four years and went directly to medical school.

9.    I completed my preliminary medical training while on active duty in the US Navy. I attended the Uniformed Services University of the Health Sciences, F. Edward Hebert School of Medicine, graduating as Doctor of Medicine in 1983.

10.    I completed a surgical internship at the Oakland Naval Hospital, followed by Aerospace Medicine/Flight Surgeon Training at the Naval Aerospace Medical Institute, Naval Air Station Pensacola.

11.    I then served for 2 1/2 years with a deploying, front-line Marine Corps fighter squadron, serving in the dual functions of medical department head and squadron Radar Intercept Officer flying in the F-4 Phantom. I was deployed to Asia and the Western Pacific. I provided medical care to squadron personnel while deployed in Japan, Korea, and the Philippines.

12.     I completed my General Surgery residency at the Oakland Naval Hospital-University of California, Davis/East Bay Consortium. Following residency, I was retained there as a staff surgeon and was responsible for the training of surgical residents. I was awarded the inaugural "Resident's Choice" award given to the attending surgeon deemed most effective by the residents in training; the award was presented by Claude Organ, MD, a past President of the American College of Surgeons.

13.     I trained in Plastic and Reconstructive Surgery at the University of Tennessee, Memphis, graduating in 1994. During that training I traveled to Peru and provided craniofacial surgical care for indigent Peruvian children. This included the publication of a case report of surgical management of a very late post-traumatic ectopic frontal sinus mucocele.

14.     I received Board Certification in General Surgery from the American Board of Surgery in 1992. I received Board Certification in Plastic and Reconstructive Surgery in 1997 from the American Board of Plastic Surgery. I re-certified in Plastic and Reconstructive Surgery in 2008.

15.     I served as a staff plastic surgeon at Naval Hospital Portsmouth, Virginia from 1994 to 2002. I became Department Chairman in 1998 and served in that office until my retirement. We had five staff plastic surgeons and 10 enlisted and civilian members. I established the Wound Care Center, providing specialized

wound care services to a global catchment area. For example, our department was responsible for the limb and pelvic reconstruction of some of the sailors wounded when the USS Cole was attacked while at anchor at Aden in Yemen. I also established and chaired the multi-disciplinary Cleft Palate, Craniofacial Board. We provided comprehensive services for congenital pediatric deformities to a global catchment area.

16.     Following selection to the rank of Captain, USN, I was selected to serve as Specialty Leader, Plastic and Reconstructive Surgery for the office of the Surgeon General, USN. In addition to being responsible for the selection and training of surgical residents, I was also responsible for Navy Medical Department policy concerning coverage for services and medical evaluation and evacuation policy. I served in that position until my retirement. While serving as Department Chairman, I co-authored a textbook chapter on the management of combat injuries with the Chairman of Plastic Surgery at Harvard University, Dr. Eloff Ericksson. During that time, I also published the first case report in the world literature detailing the use of endoscopic technique for reduction and plate fixation of a fronto-facial fracture.

17.     I retired from the Navy after 24 years of continuous active duty. I was invited to join a surgical group in Scottsbluff, Nebraska, primarily to provide comprehensive reconstructive surgery for women suffering breast cancer. I also provided reconstructive services to a very large regional catchment served by the Level II

trauma center at Regional West Medical Center (RWMC). I established and chaired the Cleft Palate/Craniofacial multi-specialty clinic at RWMC. I also established comprehensive wound care services for the many rural community hospitals in the western prairie including Nebraska, Eastern Wyoming, southwest South Dakota, and northeast Colorado.

18.     I moved my practice to northern Alabama in 2005. I have been a solo practitioner in Alabama for the last 18 years. I was brought here by a local hospital that wanted to offer comprehensive breast reconstruction to women affected by breast cancer. I co-authored a groundbreaking article regarding pre-operative plastic surgical planning in the care of women suffering from breast cancer. It is among the most frequently cited papers in the field of breast reconstruction.[1]

19.     I also started a comprehensive wound care center in Alabama and have had a very active practice in aesthetic/cosmetic surgery. I maintained my own surgical suite for in-office facial rejuvenation procedures as well as minimally invasive body contouring procedures. I was an early adopter of advanced techniques in autologous fat grafting for facial re-contouring as well as for the resolution of radiation burn wounds of the skin. I continued to serve in the training of medical students in my office practice.

---

[1] *Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Pre-Operative Planning*, Toth, B.A. and Lappert, P., Plastic and Reconstructive Surgery, 87, 1048-1053. http://dx.doi.org/ 10.1097/00006534-199106000-00006.

20.     Although I maintain a practice in wound consultation, skin care, and laser services, I retired from my surgical practice in 2020, after having practiced as a plastic and reconstructive surgeon for 30 years. I was an Active Member in good standing of the American Society of Plastic Surgery for all but the last two years in practice.

21.     With only two years remaining in my practice, I elected to forgo a third certification by the American Board of Plastic Surgery. The certification was no longer necessary for maintaining my hospital credentials, and I saw it as an unjustifiable expense for a solo practitioner planning retirement.

22.     As can be gleaned from this summary, I have a meaningful breadth of experience in the advanced surgical care of trauma, cancer, head/neck disease, and cranial and facial birth defects. Many of those procedures require the use of the most advanced sensate, microvascular flaps, including composite and pre-fabricated flaps. These are the same techniques employed by today's gender surgeons.

23.     Since 2014, I have made a concerted effort to examine the medical literature pertaining to the care of self-identified transgender persons, including children and adults. I have had an eight-year-long running discussion on these issues with family practitioners, pediatricians, pediatric and adult psychologists and psychiatrists, pediatric endocrinologists, as well as PhDs who specialize in the evaluation of the validity of scientific publications. During that time, I have made many

public presentations to teachers, counselors, and administrators on the subject of transgender care and the medical-scientific evidence that informs that care.

24.     In 30 years of active practice as a plastic and reconstructive surgeon, I have never performed any gender affirmation surgery. That is because, while I recognize gender dysphoria to be a serious psychiatric condition, in my opinion it is unethical to attempt to treat that psychiatric condition with surgery, just as it is unethical to attempt to treat body dysmorphic disorder with surgery. This will be fully explained in the course of this opinion. This fact should not exclude me from offering my expert opinion on the validity and ethics of gender affirmation surgery. All of the specific procedures, from mastectomy to breast enhancement to genital reconstruction to complex sensate microvascular flap surgeries, are within the scope of my experience. In fact, I instructed resident surgeons on these procedures. To claim that I have no expertise to offer an opinion about gender affirmation care would be akin to excluding a board-certified neurosurgeon from opining on the merits of frontal lobotomy, which are too harmful to ethically perform.

## I.     SURGERY IS PART OF PLAINTIFFS' "STANDARD OF CARE"

25.     The plaintiffs in this case seek to enjoin enforcement of the VCAP law in the state of Alabama, claiming that it prevents minor persons from obtaining medical services that are necessary for health and quality of life. They claim that there is an irrefutable body of scientific evidence to support the position that the treatment

model called "gender affirmation" is so superior to other established models of care as to qualify gender affirmation as the standard of care.

26.     The gender-affirmation model of care includes three distinct elements that overlap to varying degrees throughout the life of the patient. Those elements are social transitioning, medical transitioning, and surgical transitioning. All three elements are based in the same model of care which claims that the condition known as gender dysphoria is safely and effectively treated by drastically and irreversibly modifying the appearance of the minor person's body through the use of powerful hormonal medications and very aggressive surgical procedures.

**A. Gender Affirmation is a Continuum of Care**

27.     Opinions and testimony concerning gender affirmation surgery are relevant even though plaintiffs have dropped their challenge to the VCAP law's prohibition of affirmation surgery in minors. Plaintiffs' decision appears to be an attempt to make their claim more reasonable by avoiding discussion of the gruesome realities of gender affirmation care. It must be remembered that the fundamental principle upon which gender affirmation rests—that the psychological condition of gender dysphoria is safely and effectively treated by modification of the appearance of the child's body, including the use of powerful hormonal drugs and aggressive surgery—is the same in all three elements of social, medical, and surgical transition. If the gender affirmation of minors is correct on the social level, it must be correct in

medical transitioning as well, given that the minor was prepared for hormonal manipulation by the prevenient step of social transitioning. Likewise, the minor is prepared for surgical transitioning by the prevenient step of medical transitioning. Both steps are supported by the continuing social affirmation of gender identity. All of it is based on the experimental principle that the medical and surgical modification of the body will cure a profound emotional condition.

28.     If the complete and successful transitioning of the minor is the goal, and if the supporting documents which plaintiffs offer (such as the WPATH Standards of Care) consider the surgical transitioning of minors to be proven safe and effective treatment (which the WPATH Standards do), then we must examine the issue of affirmation surgery given the fact that so many minor patients undergo—or will in the future undergo—surgery.[2] While breast surgery has been the most common gender-transition surgery, genital surgery on self-identified transgender adolescents is reported in the literature.[3] The fact that genital surgery is routinely performed

---

[2] *E.g.*, *Chest reconstructive surgeries in transmasculine youth: Experience from one pediatric center*, Marinkovic M, Newfield R, Published 19 July 2017 Medicine International Journal of Transgenderism DOI:10.1080/15532739.2017.1349706 (describing mastectomies in adolescents ranging in age from 13 to 19); WPATH Standards of Care Version 8, Statement 6.12.g (recommending gender-affirmation surgery on adolescent minors).

[3] *E.g.*, *Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States*, Milrod C and Karasic DH, J. Sex. Med. 2017; 14(4): 624-34. doi: 10.1016/j.jsxm.2017.02.007; *Transgender adolescents and genital-alignment surgery: Is age restriction justified?*, Horowicz E, Clinical Ethics 2019; 14(2): 94-103. doi: 10.1177/1477750919845087.

on minors is evidenced by the fact that the WPATH Standards of Care describe it as a part of the affirmation surgery guidance.[4]

29.    This continuum of care is particularly evident when care is begun in early childhood. The rate at which patients continue from one phase to another is very high. Young children started on social affirmation and transition have a very high likelihood of continuing on to puberty blockade. Singh, Bradley, and Zucker state that socially transitioned boys are over 80% likely to persist in gender dysphoria and so continue on to medical transitioning.[5] And as the Interim Cass Review in the UK recently found, "almost all children and young people who are put on puberty blockers go on to sex hormone treatment."[6]

30.    It is remarkable that plaintiffs' experts claim that puberty blockade and cross-sex hormones reduce the likelihood that patients will seek surgery later in life (Shumer p.22; McNamara p.13; Ladinsky p.23). The use of high-dose testosterone in natal females seeking to present as men has been clearly demonstrated to increase the likelihood of surgical removal of ovaries, uterus, and vagina because it produces

---

[4] WPATH Standards of Care Version 8, Statement 6.12.g.

[5] *A Follow-Up Study of Boys With Gender Identity Disorder*, Singh D, Bradley SJ and Zucker KJ (2021), Front. Psychiatry 12:632784. doi: 10.3389/fpsyt.2021.632784 ("Steensma et al. found two other predictors of persistence: boys who were assessed at an older age and boys who had made either a partial or complete gender 'social transition.' Of the 12 boys who had partially or completely transitioned prior to puberty, 10 (83.3%) were classified as persisters. In contrast, of the 67 boys who had not socially transitioned, only 13 (19.4%) were classified as persisters.").

[6] *The Cass Review: Independent review of gender identity services for children and young people: Interim report*, Hilary Cass (Feb. 2022), https://cass.independent-review.uk/publications/interim-report/.

the conditions of polycystic ovary syndrome, uterine atrophy, and vaginal atrophy. Likewise, such treatment produces fibrous involutional breast atrophy[7,8,9,10,11] In the case of young males hoping to present as adult females, the well-known additional effect is to exclude the possibility of one surgery (penile inversion vaginoplasty, which would normally be an available method in adult males), necessitating other risky surgeries, such as proximal thigh flap and large bowel interposition flap vaginoplasty.[12] This is because early hormonal treatment of natal males results in the underdevelopment of the genital and inadequate tissue to create the counterfeit vagina.

31.    Plaintiffs' expert Dr. Shumer claims (Shumer p. 32) that "there is not an assumption that a patient prescribed GnRHa (puberty blockade) will desire hormonal therapy in adolescence (cross-sex hormones)." Dr. Shumer's assumptions notwithstanding, the medical literature consistently shows approximately 96.5% to

---

[7] Labrie F. Progress in Brain Research Vol. 182, pp. 97-148 (2010).

[8] *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, Radix A, Davis AM, JAMA.2017;318(15):1491–1492. doi:10.1001/jama.2017.13540.

[9] *Long-term health consequences of premature or early menopause and considerations for management*, Faubion SS, Kuhle CL, Shuster LT, Rocca WA, Climacteric. 2015;18(4):483–491. doi:10.3109/13697137.2015.1020484.

[10] *Cardiovascular Disease Risk Factors and Myocardial Infarction in the Transgender Population*, Alzahrani, Talal, et al. Circulation: Cardiovascular Quality and Outcomes, vol. 12, no. 4, 2019, doi:10.1161/circoutcomes.119.005597.

[11] *Breast cancer risk in transgender people receiving hormone treatment: nationwide cohort study in the Netherlands*, Christel J M de Blok, et al., BMJ 2019; 365. https://www.bmj.com/content/365/bmj.l1652.

[12] *Current Approach to the Clinical Care of Adolescents with Gender Dysphoria; Acta Biomed*, Kyriakou A, Nicolaides N, Skordis N., 202;91 (1): 165-175.

98% of children who are started on puberty blockers will continue on to cross-sex hormones.[13]

32.     When puberty blockade results in underdevelopment of the child at every level, and since the desire for cross-sex presentation is often the primary outcome that patients and parents have been offered, the next step of cross-sex hormones is started. Similarly, when cross-sex hormones have manifested the fullness of their effects on the minor's appearance, yet the dysphoria remains because the adolescent's appearance isn't yet sufficient to "affirm" their subjectively perceived gender, then surgical transitioning often begins.

33.     In the paper by Olson-Kennedy et al., which will be discussed in detail below, the authors note that cross-sex hormones (there, testosterone) resulted in an increase in "chest dysphoria," which in turn presented a *greater* motivation for surgery as the result of hormone treatment.[14] This is why affirmation care must be viewed as a continuum. Advocates of affirmation often dismiss all other forms of care outside the continuum as abusive and emphasize this idea with patients, parents, and the broader world. This continuum extends into the area of medical and surgical complications and the need for continuing medical and surgical interventions.

---

[13] *The Cass Review: Independent review of gender identity services for children and young people: Interim report*, Hilary Cass (Feb. 2022), https://cass.independent-review.uk/publications/interim-report/.

[14] *Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts*, Johanna Olson-Kennedy J., Warus J, Okonta V, Belzer M, and Clark LF, 2018 May 1;172(5):431-436. doi: 10.1001/jamapediatrics.2017.5440.

**B. Surgery in the Continuum of Care (Including Among Minors)**

34.     The body of literature cited in support of gender affirmation care, such as the WPATH Standards of Care, consistently supports surgical "affirmation" in minor persons. Those surgeries include surgery of the breast and genital surgery. While Version 7 of the WPATH Standards of Care recommended age 13 as the lower limit for mastectomy in self-identified transgender males (i.e., natal females), among the changes in Standards of Care 8 is that it no longer contains *any* reference to age limitation for gender affirmation surgery. Both versions support these surgeries with the same citations, which are Level-V case-series retrospective reports that include mastectomy in natal females as young as 13 and averaging less than 19 years old. Moreover, recent papers suggest that any lower limit on ages at which children might undergo these irreversible genital surgeries can be thought of as subject to individual clinical decisions.[15] This approach of essentially ignoring age limits as set out in the WPATH Standards of Care for the sake of particular patients makes meaningless the very definition of a "standard of care." The words "standard of care" are used to describe conduct of care that is not subject to clinical judgement and which, if ignored, has a high likelihood of harm to the patient.

---

[15] *Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States*, Milrod C and Karasic DH, J. Sex. Med. 2017; 14(4): 624-34. doi: 10.1016/j.jsxm.2017.02.007; *Transgender adolescents and genital-alignment surgery: Is age restriction justified?*, Horowicz E, Clinical Ethics 2019; 14(2): 94-103. doi: 10.1177/1477750919845087.

## II.    CHARACTERISTICS OF GENDER AFFIRMATION SURGERIES

## A. Problems in Gender Affirmation Surgeries

35.    The predominant demographic of new patients in pediatric gender clinics is adolescent natal females, and the most common surgery performed on these females is called "chest masculinization." This surgery involves the complete removal of both breasts, the placement of free-nipple grafts, and chest wall liposuctioning. In addition to the broad and life-long scars, the minor patient loses the ability to breast feed. Additionally, erotic sensibility of the chest is lost due to the amputation of the fourth intercostal nerve branches. Cosmetic breast augmentation for anything other than congenital breast deformities (such as Poland Syndrome) in minors is not considered ethical professional conduct.[16] Yet this surgery is promoted as a standard of care by WPATH based upon the lowest level of scientific evidence. Such evidence is insufficient even to suggest ethical experimental design. It presents no long-term data to support efficacy in resolving suicide risk or any other long-term benefit since none of the cited studies follows the patients for more than 3 to 5 years.

36.    Gender affirmation surgery of the genital is even more concerning. For natal males, all such surgeries involve castration—the removal of the testicles and mutilation of the penis in natal males. For females, such surgeries require removal

---

[16] *Considerations in Breast Augmentation in the Adolescent Patient,* Jordan SW and Corcoran J, Seminars in Plastic Surg. 2013; 27(1): 67-71. doi: 10.1055/s-0033-1343998.

of ovaries, fallopian tubes, uterus, and vagina. This results in reproductive sterility and life-long medical dependance on prescribed hormones with their associated risks described above.

37.    Most genital surgeries involve the distal urinary tract, and there are frequent complications of urinary fistulas (leakage of urine through the skin), urinary obstruction caused by scarring, urinary tract infections, and need for re-operation to correct these complications. Similar processes in male to female genital surgery can result in fecal fistulas (or connections) due to communication between the neo-vaginal construct and the lower bowel. Loss of urinary continence, extrusion of implanted devices, re-operation to maintain patency of the neo-vaginal construct, and the need for daily self-dilation to maintain the dimensions of the structure are typical. Significant if not complete loss of erotic arousability is typical. If the patient has previously undergone puberty blockade at Tanner Stage 2 and cross-sex hormonal treatment, then loss of orgasmic capacity is a near certainty.[17]

38.    Comparable issues in transgender versus reconstructive surgery can be seen by comparing identical operations. On several occasions I have performed the reconstructive surgery called "sensate radial-forearm microvascular free flap

---

[17] Abigail Shrier, *Why Marci Matters* (Oct. 6, 2021), https://abigailshrier.substack.com/p/why-marci-matters; Libby Emmons, *'Gender-affirming' Surgeon Admits Children Who Undergo Transition Before Puberty Never Attain Sexual Satisfaction* (May 1, 2022), https://thepostmillennial.com/gender-affirming-surgeon-admits-children-who-undergo-transition-before-puberty-never-attain-sexual-satisfaction.

hypopharyngeal reconstruction." I operated to reconstruct the tongue and throat of patients who had suffered a grievous wound of the mouth and throat that resulted from removal of an aggressive cancer. We selected an area of skin on the inside of the forearm that has regular and robust blood flow, is thin and durable, and has an easily dissected sensory nerve that can be attached to the nerves in the wound. The forearm flap satisfied all the requirements. An operation of this complexity, duration, and technical requirements has many issues, big and small, that can diminish or destroy the result.

39.     That throat reconstruction operation is in almost every way identical to the second most commonly performed female-to-male genital surgery, the "sensate radial forearm microvascular free flap phalloplasty." In that operation, the identical flap is raised and transferred. It also must be resistant to abrasion, water tight, pliant, sensate, and of correct volume. Through a process of incision, plication, and suturing, a tubular phallus is constructed within which is placed a skin lined tube which will serve as the urethra. The suture closures in both flaps are where most things go wrong because the skin edges that define the suture line can lose sufficient blood supply. When this happens in the phalloplasty the patient suffers from delayed healing, urine leakage, varying degrees tissue death, and scarring. All those problems can happen with either the throat flap or phallus flap. When the phallus flap fails, the patient suffers due to varying degrees of tissue loss, chronic urinary leakage, or

urinary obstruction due to scarring that can cause kidney injury if left untreated. When the throat flap fails, bacteria laden saliva will leak into the neck where it can cause fulminant infections or erode into a major artery and cause the patient to bleed to death in a matter of moments. A singularly terrible event.

40.     Notably, in the case of the throat operation, if the removal of the cancer had not been performed, there was a known and significant probability that the cancer would have eroded into the tissues of the neck and caused a fulminant infection, or eroded into a large blood vessel, as described above. In contrast, if the phallus flap operation had not been performed, the patient would have remained fully functional in every human capacity, though suffering from an inner subjective disturbance called gender dysphoria, which had not yet been adequately addressed with psychiatric care.

41.     Both operations involve the use of highly complex surgical techniques to remedy a wound. In the case of the cancer operation the wound was the result of a cancer that would have ended in a terrible death. In the case of the phallus operation the surgeon is creating multiple physical wounds (castration, loss of pelvic organs of reproduction, degloving injury of the forearm, skin graft donor site injury), with their associated risks of complications. The surgery is performed in an attempt to remedy a subjective, patient-reported sense of their identity.

## B. Problems of Surgical Consent

42.    Whereas typical patients undergoing mastectomy have historically been middle-aged, and already a mother, in the case of the transgender patient, they are typically young, nulliparous females even as young as 14 years old.[18] The purported justification for the surgery is the severe emotional distress of the patient, often including suicidal ideation, or even a history of suicide attempt. In all other areas of surgery, a patient who reports major depression, anxiety, suicidal ideation, or suicide attempt would be considered incompetent to give informed consent for surgery. They would be referred for psychiatric care, which, if successful in resolving the depression, anxiety, and suicidal ideation, would remove the only claimed indication for the surgery in the first place.[19,20]

## C. Erroneous Use of the Word "Reconstructive" to Describe Gender Affirmation Surgeries

43.    Those in favor of "gender-affirming" surgeries often use the word "reconstructive" to characterize a group of surgical treatments that seek to alter the

---

[18]  *Behavioral Health Concerns and Eligibility Factors Among Adolescents and Young Adults Seeking Gender-Affirming Masculinizing Top Surgery,* Boskey ER, et al., LGBT Health 2020; 7(4). https://doi.org/10.1089/lgbt.2019.0213.

[19] *See Cosmetic Surgery and Body Dysmorphic Disorder – An Update,* Higgins S and Wysong A, Int'l J. Womens' Dermatol. 2017; 4(1): 43-48. doi: 10.1016/j.ijwd.2017.09.007; *Body Dysmorphic Disorder,* Bjornsson AS, et al., Dialogues Clin. Neurosci. 2010; 12(2): 221-32. doi:10.31887/DCNS.2010.12.2/abjornsson.

[20] *Body Dysmorphic Disorder and Cosmetic Surgery,* Crerand CE, et al., Plastic & Reconstructive Surgery. 2006; 118(7): p 167e-180e. doi: 10.1097/01.prs.0000242500.28431.24.

sexed appearance of the person.[21] It is important to understand that these procedures, because of the indications for surgery, the motivations for surgery, and the outcomes of surgery, are not reconstructive, but are properly understood to be cosmetic in nature.

44.     Cosmetic and reconstructive surgery are distinct. Reconstructive surgery is surgery that aims at the structural and functional restoration of what has been lost due to trauma, infection, cancer care, or developmental condition. It always involves measurable structural and functional problems that surgery is designed to correct or restore. The physician can discover the condition through the physical examination of the patient and can quantify the deformity both by physical dimension and functional deficit.

45.     By contrast, in aesthetic or cosmetic surgery, there is no objective physical criteria for the diagnosis. The patient presents with a subjective complaint ranging in severity from annoyance to profound sorrow concerning the appearance of certain features of their physical appearance. They seek to change the appearance of those features in the hope of obtaining happiness and relief from their emotional burden. The most essential criteria in selecting patients for cosmetic surgery is that

---

[21] *Gender Confirmation Surgery: Cosmetic or Reconstructive Procedure?*, Laungani A and Brassard P, Plastic & Reconstructive Surgery – Global Open: 2017 Jun; 5(6): p e1401. doi:10.1097/GOX.0000000000001401. Members of the American Society of Plastic Surgery are encouraged to "interpret" for lay persons and other medical specialists that, although normal anatomy and function is being manipulated for a cosmetic result, the procedures should be labeled "reconstructive."

it be offered only if the physical change is reasonable, does not involve harm or loss of function, and is likely to result in subjective improvement. It is axiomatic in plastic surgery that the more profound the sorrow the patient associates with their appearance, the less likely it is that the patient will obtain happiness (relief from dysphoria) from surgery. To expect resolution of profound emotional conflicts through the use of cosmetic surgery is unreasonable and contrary to foundational principles of plastic surgery.

46.     This is the case for patients seeking "gender affirmation" surgery. The diagnosis which guides all three elements of affirmation treatment is "gender dysphoria." This diagnostic term is found in the Diagnostic and Statistical Manual of Mental Disorders. It describes the unhappy subjective life of the person who suffers distress caused by a felt incongruence between their sex and their gender identity. The entirety of the presenting complaint of the patient is in their psychological/emotional life.

47.     When a patient has profound anxiety or sorrow concerning their physical appearance in the absence of any objective meaningful deformity, their condition is called "body dysmorphic disorder." It is foundational to cosmetic surgery that persons who present with body dysmorphic disorder should not be offered surgery but should instead be referred for psychological treatment. There is no reason why this principle should not apply to the hormonal manipulation of the minor as well,

since the patient is seeking modification of their appearance in the hopes of obtaining a life-changing effect in their emotional life. The fact that high-dose sex hormones are being used instead of surgery to achieve the cosmetic result does not mitigate the ethical problem; it only changes the likely complications given that high-dose sex steroids have a very high association with heart disease, peripheral vascular disease, pulmonary embolism, metabolic syndrome with diabetes, elevated cholesterol, obesity, and overall early mortality as cited above.

48.    Plaintiffs' expert Dr. Ladinsky (Ladinsky p.23) asserts that "[m]edical treatment recommended for and provided to transgender adolescents with gender dysphoria can substantially reduce lifelong gender dysphoria and can eliminate the medical need for surgery later in life." (Dr. McNamara makes a similar claim at page 13 of her report.) This is an assertion with no quality evidence to support it. In fact, Dr. Ladinsky herself offers no citation to support this claim. Practitioners of gender affirmation care, however, routinely make this assertion while offering only low-quality, retrospective or case-series data without comparison cohorts, massive self-selection bias, high drop-out rates, and study periods of only a few years. To assert that such studies can draw conclusions about lifelong benefit is unsupportable. To offer no support for this crucial claim in her expert opinion is evidence of the poverty of scientific support that gender affirmation care has.

## III.   EVIDENCE DOES NOT SUPPORT "GENDER AFFIRMATION" SURGERIES AS A STANDARD OF CARE

### A. Experimental Practices

49.     The distinction between medical practices that are experimental versus those that can be considered proven options of care, or even standards of care, rests on the quality of the scientific data offered in its support. Historically there have been occasions of serious harms to patients because a particular medical practice lacked scientific foundation, even while esteemed experts considered the matter settled in their favor. For example, consider the use of Thalidomide to manage the nausea of pregnancy and the associated disaster of profound arm and hand deformities that resulted.[22] Or the performing of frontal lobotomy to manage emotional conditions.[23] The developer of the frontal lobotomy operation received the Nobel Prize. He was celebrated until the long-term results became better understood. Many patients suffered permanently debilitating neurological injuries as a result.

### B. Evidence-Based Medicine

50.     It is in response to such disasters that professional organizations of physicians and surgeons have developed instruments for determining the quality of scientific evidence, as well as methods of translating the findings of that examination

---

[22] *Thalidomide: the tragedy of birth defects and the effective treatment of disease*, Kim JH and Scialli AR, Toxicol Sci. 2011 Jul;122(1):1-6. doi: 10.1093/toxsci/kfr088.

[23] *Spinning lobotomy: A conventional content analysis of articles by the pioneers of the procedure in the United States*, Afkhami AA, Fatollahi JJ, Peace MA, & Yadgar RJ, SSM Mental Health, Vol. 2, 2022, 100123, ISSN 2666-5603, https://doi.org/10.1016/j.ssmmh.2022.100123.

into safe and effective decision making by practitioners. This process is given the name "evidence-based medicine." In recent years, professional medical societies have been making a concerted effort to strengthen the scientific basis upon which their particular specialties stand. Evidence-based medicine is a systematic effort to categorize the quality of prognostic and therapeutic studies so that physicians reading these publications can distinguish what is vague and speculative from what is a matter of high likelihood or grave certainty. Tools for making such distinctions have been developed that categorize clinical or experimental findings on the basis of how that data were obtained, the reliability of the test instruments used, the variability of the results, the sample size, and the likelihood of bias among other factors. For the purposes of this response, I will use the tool developed by the American Society of Plastic Surgery.[24,25] For prognostic studies, the categorization of evidence is divided into Levels I-V, with Level I being the most rigorous and having the highest likelihood of scientific certainty, and Level V having the least rigor and having very little certainty. Here are the definitions of those levels according to the American Society of Plastic Surgery:

---

[24] https://www.plasticsurgery.org/documents/medical-professionals/health-policy/evidence-practice/ASPS-Rating-Scale-March-2011.pdf
[25] *The Levels of Evidence and their role in Evidence-Based Medicine.* Burns PB, Rohrich RJ, and Chung KC, Plast. Reconstr. Surg. 2011 Jul; 128(1): 305–310.

a. Level I: High quality prospective cohort or comparative study with adequate power or systematic review of these studies.

b. Level II: Lesser-quality prospective cohort or comparative study, retrospective cohort or comparative study, untreated controls from an RCT (randomized control study), or systematic review of these studies.

c. Level III: Case-control study or systematic review of these studies.

d. Level IV: Case series with pre/post-test or only post-test.

e. Level V: Expert opinion developed via consensus process; case report or clinical example; or evidence based on physiology, bench research or "first principles."

51.     These distinctions are very important to physicians who seek to understand the weight of the evidence presented in support of a change in therapeutic care. Sometimes such scientific findings can be so compelling regarding an issue that professional societies will publish clinical guidelines that strongly suggest conformity to a new treatment plan based in that evidence. Occasionally the evidence will be of such certainty, on a matter so grave, that professional societies and even public law will assert that there exists a standard of care based in this evidence that, if ignored, has a high probability of injury or harm to the patient. That is what is implied when the phrase "standard of care" is used.

52.     To that end, the ASPS document provides a grading system for Practice Recommendations that helps in decision making. It is a synthesis of the breadth of scientific data that addresses the issue in question. In the case of Grade A, there is an accompanying "Strong recommendation," versus Grade D, where the evidence is so lacking in empirical value that the proposed treatment can only be offered as an experimental option if at all because the treatment outcome cannot yet be reasonably predicted or compared to established methods with known outcomes.

53.     If a novel treatment for a known condition is proposed, ethical patient care demands that we examine the reliability of the evidence and compare results of treatment to the established treatment. In the case of gender dysphoria, there is high-quality outcomes data that demonstrate successful resolution of sexual identity issues in greater than 80% of minors (over 90% if followed to adulthood) when the treatment model used is what is called "watchful waiting."[26,27] This process includes

---

[26] One examination of the result of care that did not include affirmation care is a study from 2013, which is a long-term prospective study showing that over 80% of children desisted from their cross-sex self-identification. Essentially, studies like these establish the control group, which provides a more reliable baseline for comparison. The paper additionally examines multiple published studies and concludes: "To date, the prospective follow-up studies on children with GD, for whom the majority would meet the DSM-IV diagnostic criteria for Gender Identity Disorder (GID) collectively reported on the outcomes of 246 children. At the time of follow-up in adolescence or adulthood, these studies showed that, for the majority of children (84.2%; n= 207), the GD desisted." *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, Steensma TD, Mcguire JK, Kreukels BPC, Beekman AJ, & Cohen-Kettenis PT, Journal of the American Academy of Child & Adolescent Psychiatry, 52(6), 582-590. doi:10.1016/j.jaac.2013.03.016.

[27] Endocrine Society Guidelines also support this conclusion: "[T]he large majority (about 85%) of prepubertal children with a childhood diagnosis (of GD) did not remain gender dysphoric in

individual cognitive and behavioral psychological care, family therapy, and other methods all aimed at resolution of the internal psychological conflict concerning the minor person's sexed appearance. Furthermore, watchful waiting accomplishes this without irreversibly sterilizing the minor or iatrogenically harming them with the disfigurements of surgery as described above.

### C. Watchful Waiting vs. Gender Affirmation

54.     The watchful waiting treatment model is based in very long-term Level-III data. Such data are sufficient to drive clinical decision-making as outlined in the ASPS instrument described above. The gender affirmation model of care must be compared to the existing watchful waiting/psychotherapeutic model, and the existing model should be compared with all documents submitted by plaintiffs' experts, including the WPATH Standards of Care v.8, and all the publications cited by them. None of those documents present any evidence above Level-IV, and the bulk of them are Level-V. This means that, at present in the American medical community, the transgender treatment model of affirmation rests only on expert opinion (Level-V) woven into policy statements produced by historically flawed consensus methodology and is therefore insufficient to make clinical decisions such as abandoning watchful waiting in favor of affirmation medicine and surgery.

---

adolescence." *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Hembree WC, Cohen-Kettenis PT, Gooren L, et al., The Journal of Clinical Endocrinology & Metabolism 2017; 102(11): 3869-903.

55.     An example of the poor-quality evidence that is driving clinical deci-
sion-making in the U.S. is one of the most frequently cited papers offered in support
of chest masculinization in minor females seeking to present as males.[28]

56.     The principle author, Dr. Olson-Kennedy, is also an academic expert in
her capacity as Associate Professor of Clinical Pediatrics, Keck School of Medicine
of USC, and Medical Director of The Center for Transyouth Health and Develop-
ment in Los Angeles. She holds professional membership in The Society for Pediat-
ric Research, WPATH, and the Society for Adolescent Health and Medicine.

57.     In their summary of findings, the authors report that "chest dysphoria"
is common among "trans males" (natal females seeking to present as males), and
that the dysphoria is decreased by surgery. They claim that regret for surgery is
"rare." The article reports breast removal surgery on at least one girl aged 13 years.
The average age was 19. Children were entered into the study through recruitment
from among patients visiting the clinic and by telephone over a six-month period.
The authors found that patients recruited from among visitors to the clinic (conven-
ience sampling) yielded an abundance of non-operated patients, so they were forced
to reach out to all the post-surgical patients by phone. 26% of the clinic's post-

---

[28] *Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts*, Johanna Olson-Kennedy J., Warus J, Okonta V, Belzer M, and Clark LF, 2018 May 1;172(5):431-436. doi: 10.1001/jamapediatrics.2017.5440.

surgical patients could not be reached for various reasons including no working phone or failure to respond to multiple messages.

58.    A 26% drop-out rate is never questioned by the authors. Were they lost to follow up because of dissatisfaction, psychiatric hospitalization, or suicide? This problem is called "self-selection bias" and is evidence of careless study design. Of the remaining 74% of patients, only 72% of them (only 53% of the study patients) completed the survey. This is a second example of self-selection bias. Why would some post-surgical patients who had been successfully contacted not complete the survey? The authors do not ask the question. The loss to follow-up of post-surgical patients is a serious concern, particularly when the surgery is of such a serious nature and intended to radically improve the life of the patient. In my experience, such loss can result from outcomes that are so disappointing that the patient has lost confidence in the abilities of the surgeon and does not return for follow-up care. Additionally, if major issues such as risk of medical complication, surgical complication (as described above), or self-harm are involved, the patient may have come into the care of other physicians including emergency medical and psychiatric providers, and continuity of care has been broken.

59.    In the study, dysphoria was measured using "a novel measure" (an unproven test instrument), which was a series of subjective questions about happiness. Among the designers of this novel test instrument were some of the adolescent

31

patients themselves. Their flawed methodology included the use of an entirely un-validated test instrument, with no known error rates, or proven predictive power, *that was in part designed by the minors and young adults who were the subject of the study*. Subjective, psychological test instruments, such as Quality of Life sur-veys, are the product of a long and laborious process of developing questions that, when answered by the patient, will have some ability to distinguish very subtle psy-chological processes of response in the patient. To ask an adolescent child, who has no training in the development of psychological test instruments, and who is suffer-ing from a DSM-V diagnosed psychological conflict, to write questions about that very same psychological conflict, is a scientifically unsupportable decision on the part of Olson-Kennedy et al.

60.     Furthermore, the post-surgical patients were given the survey at varying time intervals post-surgery. The longest interval between surgery and the satisfaction survey was five years, but children less than a year post surgery were included in their flawed sample, and yet the authors claim evidence of "negligible regret." This is a remarkable claim given that long term, longitudinal population studies show that there is a dramatic rise in post-surgical problems such as depression, hospitalization, substance abuse, and suicide beginning at around year seven post-surgery.[29] The

---

[29] *Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden*, Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, Landén M, PLoS One 2011 Feb 22;6(2):e16885. doi: 10.1371/journal.pone.0016885.

Olson-Kennedy paper is a low-quality Level-V document that has no prognostic power since it was a poor sample of patients followed only briefly.

61.    Having promised in the introduction to their paper that "chest dysphoria" is reduced by surgery, at the conclusion the authors confess that the study design and execution produced very low-quality data that is not useful for patient selection or prediction of outcomes. They even confess that the study does not address the efficacy of surgery in improving outcomes regarding the single most compelling reason for performing the operation: mitigation of depression and suicide. The authors write: "An additional limitation of the study was the small sample size. The nonsurgical cohort was a convenience sample, recruited from those with appointments during the data collection period. There could be unknown imbalances between the nonsurgical and postsurgical cohorts that could have confounded the study findings. Finally, the Chest Dysphoria Scale is not yet validated, and may not represent distress or correlate with validated measures of quality of life, depression, anxiety, or functioning."

62.    This paper is a typical example of a publications which are used to support transgender medicine and surgery, written by board-certified transgender expert physicians who practice in our nation's largest pediatric gender clinics, and published in peer-reviewed medical journals. The article is essentially useless in making

33

any clinical decisions regarding who should be offered surgery, what the likelihood is that they will benefit from it, or the likelihood that they will regret their decision.

## CONCLUSION

63.     It is my professional opinion that the VCAP legislation is a prudent and necessary step in protecting Alabama minors from scientifically unproven treatments that have known harms. The social, medical, and surgical transitioning of self-identified transgender minors is a treatment model that has no basis in scientific evidence to support efficacy, and it results in well-known severe and life-long harms to the minor.

Executed: May 18, 2023

Patrick W. Lappert, M.D.

34

# REFERENCES

1. *Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Pre-Operative Planning*, Toth, B.A. and Lappert, P., Plastic and Reconstructive Surgery, 87, 1048-1053. http://dx.doi.org/ 10.1097/00006534-199106000-00006.

2. *Chest reconstructive surgeries in transmasculine youth: Experience from one pediatric center*, Marinkovic M, Newfield R, Published 19 July 2017 Medicine International Journal of Transgenderism DOI:10.1080/15532739.2017.1349706.

3. WPATH Standards of Care Version 8, Statement 6.12.g.

4. *Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States*, Milrod C and Karasic DH, J. Sex. Med. 2017; 14(4): 624-34. doi: 10.1016/j.jsxm.2017.02.007.

5. *Transgender adolescents and genital-alignment surgery: Is age restriction justified?*, Horowicz E, Clinical Ethics 2019; 14(2): 94-103. doi: 10.1177/1477750919845087.

6. *A Follow-Up Study of Boys With Gender Identity Disorder*, Singh D, Bradley SJ and Zucker KJ (2021), Front. Psychiatry 12:632784. doi: 10.3389/fpsyt.2021.632784.

7. *Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study*, de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT, J Sex Med. 2011;8(8):2276-2283. doi:10.1111/j.1743-6109.2010.01943.x.

8. Labrie F. Progress in Brain Research Vol. 182, pp. 97-148 (2010).

9. *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, Radix A, Davis AM, JAMA.2017;318(15):1491–1492. doi:10.1001/jama.2017.13540.

10. *Long-term health consequences of premature or early menopause and considerations for management*, Faubion SS, Kuhle CL, Shuster LT, Rocca WA, Climacteric. 2015;18(4):483–491. doi:10.3109/13697137.2015.1020484.

11. *Cardiovascular Disease Risk Factors and Myocardial Infarction in the Transgender Population*, Alzahrani, Talal, et al. Circulation: Cardiovascular Quality and Outcomes, vol. 12, no. 4, 2019, doi:10.1161/circoutcomes.119.005597.

12. *Breast cancer risk in transgender people receiving hormone treatment: nationwide cohort study in the Netherlands*, Christel J M de Blok, et al., BMJ 2019; 365. https://www.bmj.com/content/365/bmj.l1652.

13. *Current Approach to the Clinical Care of Adolescents with Gender Dysphoria; Acta Biomed*, Kyriakou A, Nicolaides N, Skordis N., 202;91 (1): 165-175.

14. *Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts*, Johanna Olson-Kennedy J., Warus J, Okonta V, Belzer M, and Clark LF, 2018 May 1;172(5):431-436. doi: 10.1001/jamapediatrics.2017.5440.

15. *Considerations in Breast Augmentation in the Adolescent Patient,* Jordan SW and Corcoran J, Seminars in Plastic Surg. 2013; 27(1): 67-71. doi: 10.1055/s-0033-1343998.

16. Abigail Shrier, *Why Marci Matters* (Oct. 6, 2021), https://abigailshrier.substack.com/p/why-marci-matters

17. Libby Emmons, *'Gender-affirming' Surgeon Admits Children Who Undergo Transition Before Puberty Never Attain Sexual Satisfaction* (May 1, 2022), https://thepostmillennial.com/gender-affirming-surgeon-admits-children-who-undergo-transition-before-puberty-never-attain-sexual-satisfaction.

18. *Behavioral Health Concerns and Eligibility Factors Among Adolescents and Young Adults Seeking Gender-Affirming Masculinizing Top Surgery,* Boskey ER, et al., LGBT Health 2020; 7(4). https://doi.org/10.1089/lgbt.2019.0213.

19. *Cosmetic Surgery and Body Dysmorphic Disorder – An Update,* Higgins S and Wysong A, Int'l J. Womens' Dermatol. 2017; 4(1): 43-48. doi: 10.1016/j.ijwd.2017.09.007.

20. *Body Dysmorphic Disorder,* Bjornsson AS, et al., Dialogues Clin. Neurosci. 2010; 12(2): 221-32. doi:10.31887/DCNS.2010.12.2/abjornsson.

21. *Body Dysmorphic Disorder and Cosmetic Surgery,* Crerand CE, et al., Plastic & Reconstructive Surgery. 2006; 118(7): p 167e-180e. doi: 10.1097/01.prs.0000242500.28431.24.

22. *Gender Confirmation Surgery: Cosmetic or Reconstructive Procedure?*, Laungani A and Brassard P, Plastic & Reconstructive Surgery – Global Open: 2017 Jun; 5(6): p e1401. doi:10.1097/GOX.0000000000001401.

23. *Thalidomide: the tragedy of birth defects and the effective treatment of disease*, Kim JH and Scialli AR, Toxicol Sci. 2011 Jul;122(1):1-6. doi: 10.1093/toxsci/kfr088.

24. *Spinning lobotomy: A conventional content analysis of articles by the pioneers of the procedure in the United States*, Afkhami AA, Fatollahi JJ, Peace MA, & Yadgar RJ, SSM Mental Health, Vol. 2, 2022, 100123, ISSN 2666-5603, https://doi.org/10.1016/j.ssmmh.2022.100123.

25. https://www.plasticsurgery.org/documents/medical-professionals/health-policy/evidence-practice/ASPS-Rating-Scale-March-2011.pdf

26. *The Levels of Evidence and their role in Evidence-Based Medicine*. Burns PB, Rohrich RJ, and Chung KC, Plast. Reconstr. Surg. 2011 Jul; 128(1): 305–310.

27. *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, Steensma TD, Mcguire JK, Kreukels BPC, Beekman AJ, & Cohen-Kettenis PT, Journal of the American Academy of Child & Adolescent Psychiatry, 52(6), 582-590. doi:10.1016/j.jaac.2013.03.016.

28. *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Hembree WC, Cohen-Kettenis PT, Gooren L, et al., The Journal of Clinical Endocrinology & Metabolism 2017; 102(11): 3869-903.

29. *Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden*, Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, Landén M, PLoS One 2011 Feb 22;6(2):e16885. doi: 10.1371/journal.pone.0016885.

30. *The Cass Review: Independent review of gender identity services for children and young people: Interim report*, Hilary Cass (Feb. 2022), https://cass.independent-review.uk/publications/interim-report/.

**Curriculum Vitae-  Patrick W. Lappert, MD**

**Education and Training :**

— Bachelor of Arts in Biological Sciences at the University of California, Santa Barbara, 1979.  Research in cell membrane physiology with Dr. Philip C. Laris, studying stoichiometry of the sodium: potassium ATPase pump.

— M.D., Doctor of Medicine degree at the Uniformed Services University of the Health Sciences, 1983 at Bethesda, Md.

— General Surgery Residency at the Naval Hospital Oakland/ UC Davis East Bay Consortium, 1987-1991

— Chief Resident, Department of Surgery, Naval Hospital Oakland, 1990-1991.

— Plastic Surgery Residency at the University of Tennessee- Memphis, 1992-1994.

**Board Certifications in Medicine :**

— Board Certified in Surgery —  American Board of Surgery, 1992-2002

— Board Certified in Plastic Surgery — American Board of Plastic Surgery, 1997-2018

**Medical Staff Appointments :**

— Staff General Surgeon at the Naval Hospital Oakland, CA 1991-1992

— Associate Professor of Surgery, UC Davis-East Bay, 1991-1992.

— Plastic and Reconstructive Surgeon, Naval Medical Center, Portsmouth, VA 1994-2002

— Chairman, Department of Plastic and Reconstructive Surgery, Naval Hospital Portsmouth, VA 1996-2002.

— Clinical Assistant Professor, Department of Surgery, Uniformed Services University of the Health Sciences, 1995-2002

— Founding Director, Pediatric Cleft Palate and Craniofacial Deformities Clinic, Naval Hospital Portsmouth, VA 1996-20002

— Founding Director, Wound Care Center, Naval Hospital Portsmouth, VA 1995-2002.

— Staff Plastic Surgeon in Nebraska, and Alabama.

**U.S.N. Surgeon General Service:**

— Specialty Leader, Plastic and Reconstructive Surgery, Office of the Surgeon General-USN, 1997-2002

**Faculty Appointments:**

— Teaching Faculty at Eastern Virginia Medical School, Division of Plastic Surgery, 1995-2002

**Military Service :**

— Aviation Officer Candidate, Naval Aviation Schools Command, NAS Pensacola, 1978

— Commissioned an Ensign, MC, USNR 1979 and Commissioned as a Lieutenant, MC, USN 1983 .

— Designated Naval Flight Surgeon, Naval Aerospace Medical Institute, 1985

— Flight Surgeon, Marine Fighter/ Attack Squadron-451

— Radar Intercept Officer in the Marine F-4S Phantom, accumulating 235 flight hours, and trained for qualification as an Air Combat Tactics Instructor.

— Deployed to the Western Pacific as UDP forward deployed fighter squadron in Korea, Japan, and the Philippines.

— Service in the US Navy for 24 years

— Service in the US Marine Corp. for 3 years.

— Retired with the rank of Captain, USN in 2002

**Military Awards:**

— Navy Commendation Medal - For service with Marine Fighter/Attack Squadron - 451

— Meritorious Unit Citation- 3rd award

— Humanitarian Service Medal - For service in the aftermath of the Loma Prieta earthquake.

**Publications - Peer Reviewed Medical Journals** :

— Lappert PW. Peritoneal Fluid in Human Acute Pancreatitis. Surgery. 1987 Sep;102(3):553-4

— Toth B, Lappert P. Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Preoperative Planning. J Plastic and Reconstructive Surgery. 1991; 87: 1048-53

— Lappert P. Patch Esophagoplasty. J Plastic and Reconstructive Surgery. 1993; 91 (5): 967-8

— Smoot E C III, Bowen D G, Lappert P, Ruiz J A. Delayed development of an ectopic frontal sinus mucocele after pediatric cranial trauma. *J Craniofacial Surg.* 1995;6(4):327–331.

— Lappert PW. Scarless Fetal Skin Repair: "Unborn Patients" and "Fetal Material". J Plastic and Reconstructive Surgery. 1996 Nov;98(6):1125

— Lappert PW, Lee JW. Treatment of an isolated outer table frontal sinus fracture using endoscopic reduction and fixation. P!astic and Reconstructive Surgery 1998;102(5):1642-5.

**Publications - Medical Textbooks:**

— Wound Management in the Military. Lappert PW, Weiss DD, Eriksson E. Plastic Surgery: Indications, Operations, and Outcomes, Vol. 1; 53-63. Mosby. St. Louis, MO 2000

**Operations and Clinical Experience - Consultations and Discussions :** As a physician and surgeon, I have treated many thousands of patients in 7 states and 4 foreign nations. My practice has included Primary Care, Family Medicine, Aerospace Medicine, General Surgery, Reconstructive Surgery for combat injured, cancer reconstructive surgeries including extensive experience with microvascular surgery, Pediatric Congenital Deformity, and the care of chronic wounds. I have practiced in rural medicine, urban trauma centers, military field hospitals, university teaching hospitals, and as a solo private practitioner. In my private practice I have had occasion to treat many self-identified transgender patients for skin pathologies related to their use of high dose sex steroids, laser therapies for management of facial hair both in transitioners and detransitioners. I have performed breast reversal surgeries for detransitioning patients. My practice is rated as "LGBTQ friendly" on social media. I have consulted with families with children who are experiencing gender discordance. I have given many presentations to professional meetings of educators and counselors on the subject of transgender, and the present state of the science and treatment. I have discussed the scientific issues relevant to the case with many physicians and experts over a number of years and also discussed related issues with parents and others.