# EXHIBIT 33

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4

5     CASE NO: 2:22-cv-00184-LCB-CWB

6

7     BRIANNA BOE, individually and on

8     behalf of her minor son, MICHAEL BOE;

9     et al.,

10              Plaintiffs,

11    and

12    UNITED STATES OF AMERICA,

13              Plaintiff-Intervenor,

14    v.

15    STEVE MARSHALL, in his official

16    Capacity as Attorney General of the

17    State of Alabama, et al.,

18              Defendants.

19

20                   DEPOSITION

21                      OF

22           MORISSA J. LADINSKY, M.D.

23              APRIL 12, 2023

1       Deposition of MORISSA LADINSKY, M.D.,
2   called as a witness by the Defendants, before
3   Jennifer Madaris, Certified Court Reporter for the
4   State of Alabama, with principal offices in
5   Jefferson County, commencing at 9:00 a.m., on the
6   12th day of April, 2023, at 20th Street North,
7   Birmingham, Alabama 35203.
8
9   A P P E A R A N C E S
10
11   APPEARING ON BEHALF OF THE PLAINTIFFS:
12   LIGHTFOOT, FRANKLIN & WHITE
13     Melody H. Eagan, Esquire
14     20th Street North
15     Birmingham, Alabama 35203
16
17   GLAD, Legal Advocates & Defenders
18     Jennifer L. Levi, Esquire
19     18 Tremont, Suite 950
20     Boston, Massachusetts 02108
21
22   KING & SPALDING
23     Adam Reinke, Esquire

1   Michael Shortnacy, Esquire
2   1180 Peachtreet Street, Northeast
3   Suite 1600
4   Atlanta, Georgia 30309
5
6   NATIONAL CENTER FOR LESBIAN RIGHTS
7   Shannon Minter, Esquire
8   870 Market Street
9   Suite 370
10   San Francisco, California 94102
11
12   APPEARING ON BEHALF OF THE PLAINTIFF-INTERVENOR:
13   U.S. ATTORNEY'S OFFICE
14   Maggie Marshall, Esquire
15   1801 4th Avenue North
16   Birmingham, Alabama 35203
17
18   APPEARING ON BEHALF OF THE DEFENDANTS:
19   ALLIANCE DEFENDING FREEDOM
20   Roger G. Brooks, Esquire
21   Laurence Wilkinson
22   440 First Street Northwest, Suite 600
23   Washington, DC 20001

1   OFFICE OF THE ATTORNEY GENERAL
2   STATE OF ALABAMA
3   A. Barrett Bowdre, Esquire
4   Hal Frampton, Esquire
5   Bethany Lee, Esquire
6   Bob Overing, Esquire
7   501 Washington Avenue
8   Montgomery, Alabama 36130
9
10   U.S. DEPARTMENT OF JUSTICE
11   Kaitlin Toyama, Esquire
12   4 Constitution Square
13   150 M Street, Northeast
14   Washington, DC 20530
15
16
17
18
19
20
21
22
23

1               I N D E X
2                          PAGE:
3   EXAMINATION BY:
4   Mr. Brooks                    10
5
6             E X H I B I T S
7   Exhibit 1                     11
8       Curriculum vitae
9   Exhibit 2
10       Withdrawn
11   Exhibit 3                     30
12       Declaration
13   Exhibit 4                     31
14       Responses and objections to interrogatories
15   Exhibit 5                     37
16       Expert report
17   Exhibit 6                     58
18       WPATH Standards of Care Version 8
19   Exhibit 7                     60
20       Single page document
21   Exhibit 8                     66
22       The Endocrine Society Guidelines 2017
23   Exhibit 9                     86

Page 6

1      Press release
2      Exhibit 10                    93
3      Chapter from book
4      Exhibit 11                    115
5      Document from Cochrane Library
6      Exhibit 12                    125
7      Document
8      Exhibit 13                    126
9      Document
10     Exhibit 14                    127
11     Document
12     Exhibit 15                    129
13     Document
14     Exhibit 16                    150
15     Document
16     Exhibit 17                    160
17     Document
18     Exhibit 18                    168
19     Document
20     Exhibit 19                    176
21     Document
22     Exhibit 20                    185
23     Document

Page 8

1      Document
2      Exhibit 33                    303
3      Document
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1      Exhibit 21                    193
2      Document
3      Exhibit 22                    209
4      Document
5      Exhibit 23                    215
6      Document
7      Exhibit 24                    229
8      Document
9      Exhibit 25                    239
10     Document
11     Exhibit 26                    243
12     Document
13     Exhibit 27                    244
14     Document
15     Exhibit 28                    269
16     Transcript
17     Exhibit 29                    279
18     Document
19     Exhibit 30                    281
20     Document
21     Exhibit 31                    292
22     Document
23     Exhibit 32                    295

Page 9

1          I, Jennifer Madaris, CCR, RPR, a
2      Court Reporter and Notary Public of the State of
3      Alabama, acting as Commissioner, do certify that
4      on this date, as provided by the Alabama Rules of
5      Civil Procedure and the foregoing stipulation of
6      counsel, there came before me at 20th Street
7      North, Birmingham, Alabama 35203, on April 23
8      2023, beginning at 9:00 a.m., MORISSA LADINSKY,
9      M.D., witness in the above cause for oral
10     examination, whereupon the following proceedings
11     were had:
12
13          MORISSA LADINSKY, M.D.
14     having been first duly sworn, was examined and
15     testified as follows:
16
17          COURT REPORTER:  Everyone on Zoom,
18     please state your appearance.
19          MR. REINKE:  Adam Reinke of King &
20     Spalding on behalf of the private plaintiffs.
21          MR. SHORTNACY:  Michael Shortnacy
22     from King & Spalding also on behalf of the private
23     plaintiffs.

3 (Pages 6 - 9)

1        MR. MINTER:  Shannon Minter from
2  NCLR also on behalf of the private plaintiffs.
3        MS. TOYAMA:  My name is Kaitlin
4  Toyama for the Department of Justice.
5        MR. BOWDRE:  Bethany Lee and Bob
6  Overing are from the Attorney General Office.
7
8  EXAMINATION BY MR. BROOKS:
9
10       Q.   I am Roger Brooks with Alliance
11  Defending Freedom representing Alabama, and I'll
12  be asking a few questions today.
13       A.   All right.
14       Q.   Thank you for being here.
15       A.   My pleasure.
16       MS. EAGAN:  Before we get started we
17  reserve the right to read and sign the deposition.
18       Q.   (BY MR. BROOKS)  And Dr. Ladinsky,
19  let me ask first whether you have ever been
20  through this deposition process before?
21       A.   I've only been party to a deposition
22  once, and that was in the context of a divorce,
23  family law kind of thing ages ago.

1        Q.   I'm not going to try to explain law
2  to you, but you have seen the process?
3        A.   Yes, sir, I have.
4        Q.   I will ask questions.  At any point
5  feel free to ask for clarification if you think
6  one of my questions is unclear.  I'm going to show
7  you a lot of documents today and ask you questions
8  about documents.  And I will hand you in advance
9  to save trouble, there are four documents that I
10  think we may refer to frequently enough that
11  having them in one place as the pile builds up
12  will be handy.  And I'll tell you right now what
13  those are.  That includes a transcript of your
14  testimony at the preliminary injunction hearing,
15  your expert report submitted a couple of months
16  ago in this matter, the Endocrine Society
17  Guideline 2017 Edition, and a report -- a document
18  that we, of course, will discuss that's titled the
19  Cass Review.
20       A.   Yes, sir.
21       Q.   That's what's in this binder.
22  Everything in it we will come to in due course,
23  but I want you to have that in front of you.

1        A.   Thank you.
2        MR. BROOKS:  Let me ask the reporter
3  to mark as Ladinsky Exhibit 1, a copy of the
4  witness' curriculum vitae.
5
6        (Whereupon, Ladinsky Exhibit 1 was
7        marked and copy of same is attached
8        hereto.)
9
10       Q.   (BY MR. BROOKS)  And, Dr. Ladinsky,
11  let me just ask:  Does this appear to be a copy of
12  your curriculum vitae?
13       A.   It does.
14       Q.   And am I correct that you consider
15  yourself to be a pediatrician?
16       A.   Correct.
17       Q.   You have a license that is titled
18  physician and surgeon, but am I correct that you
19  are not a surgeon?  That is simply the formal
20  licensing title?
21       A.   That is correct.
22       Q.   All right.  And you are not an
23  endocrinologist; am I correct?

1        A.   You are correct.
2        Q.   And you're not a psychiatrist?
3        A.   You are correct.
4        Q.   And you have no degree in
5  psychology?
6        A.   I do not.
7        Q.   Are you a neurologist?
8        A.   I am not.
9        Q.   And you consider yourself to be an
10  expert in cognition and the study of development
11  cognition?
12       A.   On the level a primary care and
13  board-certified pediatrician and should be.
14       Q.   That is, you have the expertise in
15  cognition and developmental -- cognitive
16  development that you consider to be standard for a
17  pediatrician?
18       A.   That's fair.
19       Q.   But you don't consider yourself a
20  specialist in cognition or cognitive development?
21       A.   That's fair.
22       Q.   Describe for me what training you
23  have in adolescent developmental psychology.

Page 14

1     A.   Again along the lines of a primary
2  care pediatrician.  We do a lot of work throughout
3  residency, life experience, and a fellowship in
4  academic general pediatrics.  That takes that up
5  to a level of being able to impart concepts to
6  trainees, pediatric trainees.  I also have 31
7  years of frontline work with the entire range of
8  the pediatric population, 0 through about 21 or
9  22.
10    Q.   Am I correct that you came to the
11 University of Alabama Medical Center in 2015?
12    A.   That's correct.
13    Q.   And you came for the purpose of
14 starting a pediatric gender clinic?
15    A.   I would not say I came here to do
16 that, no, sir.
17    Q.   Okay.
18    A.   No, sir.  I came here to accept a
19 faculty attending spot.  This developed after I --
20 well, in proximate to.
21    Q.   All right.  Tell me -- describe for
22 me if you would when you and colleagues decided to
23 start that pediatric gender clinic.

Page 15

1     A.   In 2014 in the lead-up to my
2  relocation here or the early part of 2015.
3  Because I relocated to Alabama in the summer of
4  2015 to take this position.
5         MS. EAGAN:  I think he asked you
6  when.
7         THE WITNESS:  Okay.
8     Q.   (BY MR. BROOKS) I asked you to
9  describe when you and your colleagues formed the
10 plan to start a pediatric gender clinic at the
11 University of Alabama?
12    A.   Sure.  Absolutely.  The early part
13 of 2015.
14    Q.   Okay.  So essentially close in time
15 to your move here?
16    A.   That's fair.
17    Q.   Okay.  Is there any other gender
18 clinic in the state of Alabama to your knowledge?
19    A.   Not to my knowledge, no.
20    Q.   And --
21        MS. EAGAN:  Pediatric, correct?
22        MR. BROOKS:  That is -- I will
23 clarify the question.

Page 16

1     Q.   Is there any other pediatric gender
2  clinic in the state of Alabama?
3     A.   There is not to my knowledge.  I
4  presume that's what you had been asking.  I'm
5  sorry.
6         MR. BROOKS:  Thank you for the
7  clarification.
8     Q.   What number of pediatricians or
9  primary care physicians in Alabama outside your
10 clinic do you consider to be expert in diagnosing
11 gender dysphoria?
12        MS. EAGAN:  From her personal
13 knowledge?
14        MR. BROOKS:  Correct.
15    A.   From my personal knowledge, I mean,
16 primary care pediatricians are well trained and
17 taught to recognize what could be emerging gender
18 dysphoria.  They don't -- no pediatrician has the
19 level of expertise that, for example, a Ph.D.
20 psychologist does --
21    Q.   Well --
22    A.   -- in that domain.
23    Q.   -- how many pediatric physicians,

Page 17

1  primary care physicians in Alabama outside your
2  clinic, in your view, have the expertise necessary
3  to make an actual diagnosis of gender dysphoria in
4  a child?
5         MS. EAGAN:  Object to the form.
6     A.   Tell me more about make a diagnosis.
7  What do you mean in that way?  Because do you mean
8  it as it is asserted in guideline documents or as
9  we may see that on the ground?
10    Q.   (BY MR. BROOKS) Gender dysphoria is
11 a mental health diagnosis defined in DSM-5; am I
12 correct?
13    A.   It is.
14    Q.   And appropriately trained mental
15 health professional may be tasked to make an
16 evaluation as to whether a child does or does not
17 fit the criteria for mental -- for gender
18 dysphoria as set forth in DSM-5, correct?
19    A.   Correct.
20    Q.   That's what I mean by diagnosis.  So
21 my question is:  How many primary care physicians
22 in Alabama outside of your clinic, in your view,
23 have the expertise necessary to actually make a

5 (Pages 14 - 17)

Page 18

1  diagnosis of gender dysphoria according to the
2  DSM-5 guidelines?
3      A.   I could not answer that question.
4      Q.   Your clinic receives referrals from
5  doctors around the state; am I correct?
6      A.   That's correct.
7      Q.   Do you rely on doctors outside your
8  clinic to make an actual diagnosis of gender
9  dysphoria?
10     A.   It's fair to say that we rely on
11 doctors outside of our clinic to recognize gender
12 dysphoria and recognize when referral to our
13 clinic is necessary and warranted.
14     Q.   Do you ever rely on doctors outside
15 your clinic in Alabama to make a diagnosis of
16 gender dysphoria as a sufficient basis to proceed
17 with medical treatment or do you always insist on
18 making a diagnosis within your own clinic?
19     A.   I don't -- I mean, specifically --
20 restate that because it was a two part.
21     MR. BROOKS:  Let me ask you to read
22 the question back.
23

Page 19

1          (Whereupon, a portion of the
2          testimony was read by the court
3          reporter.)
4
5          MS. EAGAN:  Just for clarification,
6  by medical treatment, you're referring to puberty
7  blockers and hormones; is that correct?
8          MR. BROOKS:  Hormones or surgery,
9  yes.
10     A.   Okay.  What judge -- or
11 transitioning treatments for the purpose of this?
12 Okay.
13     Q.   I think we're all on the same page.
14     A.   That's good.  So for Part 1, that
15 would be a no.  We rely on them to recognize.  And
16 by them, I mean MDs or primary providers of
17 pediatric care around the state.  The second,
18 yeah.  Go ahead.
19     Q.   You finish your answer.  I
20 apologize.
21     A.   You're fine.  The Part 2 is:  Do we
22 always require them to come to us?  Let's just say
23 that is not something in our, you know, plans of

Page 20

1  care if you make that diagnosis you have to come
2  to us.  Does that help?  In other words, if
3  someone in the community is working closely with a
4  well-trained psychologist who understands, knows,
5  and works in the space of gender dysphoria, they
6  still need to come to us but we will pick up from
7  there.
8      Q.   Does it ever happen that your clinic
9  prescribes puberty blockers or cross-sex hormones
10 for a minor for whom no mental health professional
11 associated with your clinic has confirmed a
12 diagnosis of gender dysphoria?
13     A.   Can you restate that?
14     Q.   She can read it back.
15          THE WITNESS:  Can you read it back?
16
17          (Whereupon, a portion of the
18          testimony was read by the court
19          reporter.)
20
21     A.   That is not part of our practice
22 parameter.  But as I've stated before, there is
23 the occasional case where a youth will come to us

Page 21

1  having been under the care of a very well-trained
2  experienced competent Ph.D. psychologist in the
3  community and may arrive with that diagnosis.  It
4  will then be also -- there are many other factors
5  that go into prescribing.  So, like I said, we
6  will pick up from there.  Short answer, no.
7      Q.   In your clinic do you attempt to
8  follow the WPATH Standards of Care --
9      A.   We do.
10     Q.   -- for treatment of adolescents and
11 children?
12     A.   We do.
13     Q.   And have you accordingly made any
14 changes to your procedures since the issuance of
15 WPATH Standards of Care Version 8?
16     A.   No, not formally.
17     Q.   Do you personally diagnose gender
18 dysphoria?  Do you personally make diagnoses of
19 gender dysphoria in minors?
20     A.   We do.
21     Q.   My question is you personally?
22     A.   Me personally, in the context of our
23 team setting.

Page 22

1    Q.   What is your role in the process of
2  diagnosing whether a young person who presents to
3  your clinic does or does not suffer from gender
4  dysphoria?
5    A.   A very robust history with not just
6  the youth but their parents, guardians, household
7  members, those that love them that they bring with
8  them to appointments.  We review all records that
9  come to us from the referring primary care doctor
10 as well as mental health professionals that youth
11 may be seeing in community.
12   Q.   My question was:  What is your
13 personal role in the diagnostic process?
14   A.   My personal role is to bring out and
15 help my team understand through elevation of the
16 various elements that that youth manifest that may
17 indicate gender dysphoria.
18   Q.   Who within your team or what job
19 description of your team has the responsibility to
20 make the final decision as to whether a child does
21 or does not suffer from gender dysphoria as
22 defined in DSM-5?
23   A.   Our psychologist's view of all of it

Page 23

1  weighs heavily, and that must resonate with
2  everyone on the team.
3    Q.   So ultimately with heavy reliance on
4  the psychologist, it's a collective decision?
5    A.   That's fair.
6    Q.   Okay.  Do you yourself ever
7  prescribe puberty blockers or cross-sex hormones?
8    A.   Only in the context of youth seen in
9  this team for the purpose of gender dysphoria.
10   Q.   And you yourself in some occasions
11 write that prescription?
12   A.   Sometimes.
13   Q.   Okay.
14        MR. BROOKS:  Let me ask the reporter
15 to mark as Ladinsky Exhibit 2 the transcript of
16 May 5, 2022, one of the days of the preliminary
17 injunction hearing in this matter.
18
19        (Whereupon, Ladinsky Exhibit 2 was
20        marked and copy of same is attached
21        hereto.)
22
23   Q.   (BY MR. BROOKS)  And I will tell you

Page 24

1  that the days that constitute your testimony -- we
2  have the whole day here, but you don't care too
3  much about most of it.  The days that constitute
4  your testimony are behind Tab Number 12.
5        MS. EAGAN:  Is this the redacted
6  version or do we need to put this under the
7  protective order?  Because there was one version
8  that's protected under the protective order
9  because of Ms. Poe's testimony.
10        MR. BROOKS:  Ms. Poe's testimony is
11 which pages?
12        MS. EAGAN:  151 to 170.
13        MR. BROOKS:  Let me have the --
14        MS. EAGAN:  Can we remove those
15 pages?
16        MR. BROOKS:  Let me simplify and
17 remove those pages from the marked exhibit.
18        MS. EAGAN:  If you're just looking
19 at her testimony, can we just mark whatever you
20 put into this notebook that's just her testimony?
21        MR. BROOKS:  Yes.
22        MS. EAGAN:  That will simplify
23 things.

Page 25

1        MR. BROOKS:  Okay.  That's fine.
2        MS. EAGAN:  So why don't we replace
3  what you previously identified as Exhibit 2 with
4  the transcript of just her testimony.
5        MR. BROOKS:  Okay.  Remark Exhibit
6  2.
7        What we're now marking as Ladinsky
8  Exhibit 2 is a portion of the mini-script
9  transcript from May 5, 2022, including a cover
10 page and then commencing on Page 89 and continuing
11 up to Page 152.  That comprising the testimony of
12 Dr. Ladinsky.
13
14        (Whereupon, a discussion was held
15        off the record.)
16
17   Q.   (BY MR. BROOKS)  Dr. Ladinsky, I
18 don't want to make this a -- I don't want to waste
19 time going to the transcript all the time.  I also
20 don't want to make it a memory test.  You
21 testified at the hearing that you had, you said --
22 and I'm referring to Page 96 if you want to find
23 this -- "Since our clinic's opening, we have

1  touched the lives of some 400 to 450 youth."  Is
2  that consistent with your recollection generally?
3      A.  That's consistent with my
4  recollection.
5      Q.  And you testified also -- and I
6  quote from Page 128 Line 24.  Quote, "No more than
7  a third of them, though, have received medication
8  relative to gender dysphoria."
9      A.  I recall that statement.
10     Q.  And is that generally consistent
11  with your recollection of the facts?
12     A.  It's generally consistent, yes.
13     Q.  And so that takes us to something in
14  the neighborhood of 125 to 150 who over the years
15  have been -- have received medication, either
16  puberty blockers or cross-sex hormones from your
17  clinic; am I correct?
18     A.  That's a fair statement as an
19  approximation, sure.
20     Q.  Do you believe that all of those
21  minors who received puberty blockers or cross-sex
22  hormones from your clinic had, in fact, been
23  diagnosed as suffering from gender dysphoria

1  according to the criteria of DSM-5?
2      A.  I believe so.
3      Q.  And does your clinic make an effort
4  to ensure that all minors under their care who are
5  receiving hormones or puberty blockers are also
6  receiving supporting counseling and psychotherapy?
7      A.  We do.  It's just not fair to say
8  that as an every single one 100 percent.  This is
9  a huge range of youth.  But when appropriate,
10  absolutely.
11     Q.  What I asked was:  Do you make an
12  effort to ensure that everybody who's receiving
13  puberty blockers or cross-sex hormones is also
14  receiving counseling and psychotherapy?
15     A.  Yes.
16     Q.  Now, the gist of what we've just
17  been through is that two-thirds of those minors
18  who are referred to your clinic do not end up
19  receiving a prescription for puberty blockers or
20  cross-sex hormones; am I right?
21     A.  That's fair.
22     Q.  And why is that?  What sorts of
23  situations result in children having enough

1  difficulty that they're referred to your clinic
2  but they ultimately don't receive a prescription?
3      A.  There are segments of the youth for
4  whom we see and provide care who are prepubertal.
5  In those younger kids, there's absolutely no
6  indication for any medical treatment or
7  intervention.  There's a sizable population of
8  youth presenting to us who are already very far
9  into or have completed a puberty aligned with
10  their natal sex.  Those youth are not eligible for
11  medication as well at the time we see them.
12     Q.  Is it your testimony that
13  individuals who have completed puberty aligned
14  with their natal sex are not under any
15  circumstances eligible for cross-sex hormones?
16     A.  They may well be eligible for
17  cross-sex hormones or hormonal therapy with
18  sustained dysphoria and meeting all of the other
19  criteria that our team -- that our team
20  necessitates and mandates before those medications
21  are begun.
22     Q.  Do some young people who come to
23  your clinic who are referred to your clinic, in

1  your experience, cease to experience gender
2  dysphoria over -- during the course of counseling
3  and psychotherapy?
4      A.  That's always possible.
5      Q.  Has it happened sometimes?  Does
6  that account for some of these children who are
7  referred to your clinic who don't receive a
8  prescription?
9      A.  Good question.  For some we'll never
10  know.  Some of those 450 may come to see us once
11  and never come back or twice and never come back,
12  and we don't know why.  Others -- we have one that
13  I can think of that during the course of work on
14  puberty blockers aligned -- decided in the context
15  of family and therapy that it wasn't necessary.
16     Q.  I appreciate that.  That's -- and I
17  recall your testimony about that individual.
18         Among young people who have been
19  referred to your clinic who have not yet received
20  any prescription for either puberty blockers or
21  cross-sex hormones, does it sometimes happen that
22  in the course of the psychotherapeutic support
23  that your clinic provides or recommends that they

1  cease to experience gender dysphoria without ever
2  receiving any prescription?
3      A.   It's possible but not to my
4  knowledge.
5      Q.   Okay.  Do you have a sense -- let me
6  just take the year 2022 as the most recent
7  completed year -- of what proportion of minors
8  referred to your clinic were natal female versus
9  natal male?
10     A.   I can give you only an
11 approximation, and it matches the approximation of
12 our previous years.
13     Q.   What is that?
14     A.   We see a very close to half/half,
15 very close.
16     Q.   Tab 11.  This was your PI
17 declaration, earlier declaration.
18          MR. BROOKS:  I'll ask the reporter
19 to mark this as Exhibit 3.
20
21          (Whereupon, Ladinsky Exhibit 3 was
22          marked and copy of same is attached
23          hereto.)

1
2      Q.   (BY MR. BROOKS)  And Dr. Ladinsky,
3  do you recall preparing and signing this
4  declaration prior to the preliminary injunction
5  hearing in this matter?
6      A.   Yes, sir.
7      Q.   In Paragraph 6 -- and this is dated
8  April 20, 2022.  In Paragraph 6, you state that,
9  "Since starting at the gender clinic at UAB, I
10 have treated approximately 250 transgender young
11 people for gender dysphoria."
12          And earlier we looked at testimony
13 in which you had mentioned a number of 400 to 450.
14 Here you said you've treated approximately 250.
15 Can you explain to me what the 250 number
16 represents?
17     A.   At that time it was an approximation
18 of youth that had come through our doors and I
19 believe may have received some form of medication.
20 It was an approximation.
21     Q.   So as the number that have received
22 medication, your testimony now is that it's closer
23 to one-third of that 400ish number; am I correct?

1      A.   That's fair.
2      Q.   And you're going to want to start a
3  stack of paper off to the side somewhere.
4          MR. BROOKS:  Let me mark as Ladinsky
5  Exhibit 4 a set of responses and objections to
6  document request interrogatories served by the
7  University of Alabama System on March 3, 2023.
8
9          (Whereupon, Ladinsky Exhibit 4 was
10         marked and copy of same is attached
11         hereto.)
12
13     Q.   (BY MR. BROOKS)  Dr. Ladinsky, did
14 you play any role in -- to your knowledge, in
15 preparing answers, responses and objections, or
16 just the responses to certain questions on behalf
17 of the University of Alabama System?
18     A.   I played a role.
19     Q.   Without getting into conversations
20 that you had with counsel, would you describe for
21 me what that role was?
22     A.   Of course.  Together with my
23 colleague, my partner at the Gender Health Clinic,

1  UAB Pediatric, Dr. Abdul-Latif, we worked together
2  to provide answers and provide documents to the
3  subpoena request.  Also to clarify, especially to
4  counsel, the differences between what's called the
5  UAB Gender Health Clinic where the subpoena was
6  sent, the adult team, as we call it.  And a
7  separate multi-disciplinary clinical care team
8  providing care within the UAB Pediatrics
9  Department of Endocrinology.
10     Q.   And just to make sure we're clear on
11 the record, the so-called Gender Health Clinic
12 serves adults; am I correct?
13     A.   It starts at age 18 and up.
14     Q.   Age 18 and up?
15     A.   Yes, sir.
16     Q.   And in Alabama, the legal age of
17 majority is 19 which is different than many
18 states?
19     A.   That's correct.
20     Q.   And the UAB Pediatric Endocrinology
21 Department is the clinic that you are
22 associated --
23     A.   That's correct.

Page 34

1    Q.   -- with that serves minors up to --
2    A.   That's correct.
3    Q.   -- the age of 18?
4         MS. EAGAN:  Let him finish his
5    answer before you speak.  She has a hard time
6    taking this down.
7         THE WITNESS:  My apologies.
8    Q.   (BY MR. BROOKS)  Let me ask you to
9    turn to Page 5 and the objection and response to
10   Number 11.  And in this response three lines from
11   the bottom, three, four lines from the bottom, it
12   says, "UAB states that since 2017 the UAB
13   Pediatric Endocrinology Department provided 17
14   minor patients with puberty blockers and the
15   Gender Health Clinic did not provide any minor
16   patients with puberty blockers."  Do you see that?
17   A.   I see that.
18   Q.   Now, earlier you testified that
19   something in the neighborhood of a third of
20   something in the neighborhood of 400 to 450 minors
21   have been treated by the UAB Pediatric
22   Endocrinology Department, if I understand
23   correctly, with either puberty blockers or

Page 35

1    cross-sex hormones, correct?
2    A.   Approximately, yes.
3    Q.   And is it the case -- is it
4    consistent with your knowledge that only 17 of
5    those minors have received puberty blockers?
6    A.   That is correct.
7    Q.   So the overwhelming number of minors
8    who have received any sort of hormonal
9    prescription from your department have received
10   only a prescription for cross-sex hormones?
11   A.   That's fair.
12   Q.   Okay.  I just wanted to understand
13   the relationship between those numbers.
14        And is that reflective of the fact
15   that the overwhelming majority of minors who
16   present at your clinic are already well into
17   puberty at the time you first see them?
18   A.   That is what we see.
19   Q.   Is it fair to say that the majority
20   of minors who present at your clinic are 14 or
21   older the first time you see them?
22   A.   That's a fair statement.
23   Q.   Are the majority 15 or older?

Page 36

1    A.   I would not be able to make that
2    distinction for you without --
3    Q.   Okay.
4    A.   -- a records deep dive.
5    Q.   All right.  I'm in the right
6    neighborhood, 14 or over?
7    A.   I think that's -- that's the right
8    neighborhood.
9    Q.   In your preliminary injunction
10   declaration which is --
11        MR. BROOKS:  What was the exhibit
12   number on that?
13        MS. EAGAN:  3.
14   Q.   (BY MR. BROOKS)  Let me ask you to
15   turn to Paragraph 11.  And there you said, quote,
16   "Most of our patients are in the care of the
17   gender clinic for one to three years before
18   initiating medical treatment for gender
19   dysphoria."  Do you see that?
20   A.   I do.
21   Q.   Is that a policy that is written
22   anywhere?
23   A.   I don't believe it's written

Page 37

1    anywhere, but it's very consistent with
2    guideline-driven standards of care longitudinally.
3    Q.   In your professional view, why is it
4    important that patients be in the care and under
5    the observation of your clinic from one to three
6    years before you initiate any medical treatment?
7    A.   Realizing each young person is an
8    individual and is looked at in an individual way.
9    But it's important to -- for us that sustained
10   dysphoria over a longitudinal period of time
11   remains present before initiating such
12   medications.  In addition, it gives that youth in
13   the context of, you know, family environment to
14   live in that identity and reflect back from it.
15   Q.   I think you testified that in all of
16   your experience, very few youth who presented with
17   gender dysphoria have desisted from that dysphoria
18   prior to receiving medication, correct?
19   A.   To my knowledge.
20   Q.   And, therefore, why do you believe
21   it to be important to have this extended period of
22   observation before prescribing puberty blockers or
23   cross-sex hormones?

Page 38

1      A.   As I said, each youth is unique, and
2   it's very supported of observation not just of the
3   youth but the family.  But, again, to ensure to be
4   sure that mental health is optimized, that the
5   youth sustains that dysphoria over a longer period
6   of time.
7      Q.   In your expert report, which is
8   behind Tab 13 in your binder, and is
9   Exhibit Number --
10         MR. BROOKS:  Let me mark as Exhibit
11   5 the expert report of Dr. Morissa Ladinsky
12   submitted in this matter.
13
14         (Whereupon, Ladinsky Exhibit 5 was
15         marked and copy of same is attached
16         hereto.)
17
18      Q.   (BY MR. BROOKS)  Dr. Ladinsky,
19   you're looking at the copy, which, I believe, is a
20   complete copy in the binder.  And do you recognize
21   this as the expert report you prepared and
22   submitted?
23      A.   That's correct.

Page 39

1      Q.   Let me ask you to turn to page 11.
2   And there towards the bottom of the page, you
3   wrote, quote, "The WPATH SOC 8 advises that 'it is
4   important to establish the young person has
5   experienced several years of persistent gender
6   diversity/incongruence prior to initiating less
7   reversible treatments such as gender-affirming
8   hormones.'" Closed quote.  Do you see that?
9      A.   I do.
10         MS. EAGAN:  I think you said WPATH
11   7.  Should be SOC 8.
12         MR. BROOKS:  Did I say 7?  I
13   apologize.  It does say 8.
14      A.   There's reference to both in the
15   paragraph, but 8 in the last sentence.
16      Q.   Let me read it again for clarity of
17   the record.  Quote, "The WPATH SOC 8 advises that
18   'it is important to establish the young person has
19   experienced several years of persistent gender
20   diversity/incongruence prior to initiating less
21   reversible treatments such as gender-affirming
22   hormones.'"  Closed quote.
23         In the case of patients who are

Page 40

1   presenting at, for instance, age 14, what steps do
2   you take to ensure that those patients experience
3   several years of persistent gender diversity
4   before your clinic prescribes less reversible
5   treatments such as cross-sex hormones?
6      A.   For clarification, I heard you to
7   say gender diversity.  Did you mean that or did
8   you intend to say dysphoria?
9      Q.   I use the term that was in -- that
10   you quoted from WPATH SOC 8.
11      A.   Okay.
12      Q.   I can re-ask the question.
13      A.   I'm just making sure.  I got you.
14      Q.   They said gender diversity slash
15   incongruence, and I didn't mean anything
16   different.
17      A.   Perfect.  No problem.  Thank you.
18   That clarifies it for me.
19      Q.   My question was -- it's been a
20   little while -- what steps do you take to make
21   sure that that patient who walks in the door at
22   age 14 or 15 has experienced several years of
23   persistent gender diversity or incongruence before

Page 41

1   your clinic prescribes any sort of less reversible
2   treatment such as gender-affirming hormones?
3      A.   So that would be obtained -- the
4   first step is a very robust and comprehensive
5   history not just from the youth but the family
6   members or household members that have come to us.
7   We look at records sent from the referring primary
8   care physician or provider as well as taking into
9   account anything that we may have documented or
10   learned from a mental health professional or
11   provider that youth had been seeing in community.
12      Q.   And then, in addition, you, as a
13   general practice, make sure that your clinic sees
14   that youth for at least a year or between one and
15   three years before you prescribe cross-sex
16   hormones?
17      A.   Generally.  It depends on the age.
18   This is a 14 year old?  Quite likely.
19      Q.   And the reason that you're willing
20   to require several years of observation and mental
21   healthcare before you will prescribe cross-sex
22   hormones is in order to safeguard against
23   something reversible and later regretted mistake;

11 (Pages 38 - 41)

1 am I correct?
2        MS. EAGAN:  Object to the form.
3      A.   That's part of.  But I would prefer
4 the term they use right here of "less reversible".
5      Q.   (BY MR. BROOKS)  Less reversible
6 than what?
7      A.   What do you mean?
8      Q.   Less is a comparative word.  I asked
9 you less reversible than what?
10      A.   Permanent.  That was what you said
11 that -- I was just clarifying in WPATH's language.
12      Q.   Do some parents or patients, in your
13 judgment, sometimes walk in the door more certain
14 than they should be that that child needs
15 cross-sex hormones?
16      A.   Great question.  And that they
17 should be is probably a value judgment made by --
18 that may be different for every person in that
19 room.  But if we are seeing a youth who may not,
20 you know, fall into our guideline-driven care,
21 that's even more reason for extended support and
22 time with us.
23      Q.   Now, the process of having -- making

1 sure the child goes through several years of
2 gender incongruence or gender dysphoria before
3 receiving a hormonal prescription that's advocated
4 by WPATH in the language that you just -- that you
5 quoted in your report may require that child to
6 endure distress as DSM-5 says, clinically
7 significant distress, for an extended period of
8 years before receiving medical treatment; am I
9 right?
10        MS. EAGAN:  Object to the form as to
11 the use of the term "several years of gender
12 dysphoria as opposed to gender diversity."
13      Q.   (BY MR. BROOKS) Are you able to
14 answer my question?
15      A.   If you meant several years of
16 sustained gender dysphoria, I would disagree with
17 that because a youth in that age and stage who
18 manifests gender dysphoria and intense affective
19 possible harmful behavior or thought processes,
20 they will be supported in many different ways
21 through that time both through mental health and
22 through medicine, not including the initiation of
23 hormones, though.

1      Q.   Ultimately you will decide to
2 prescribe hormones only if you believe that that
3 will relieve distress being suffered by a young
4 person, correct?
5      A.   Among other indicators.
6      Q.   But that's a necessary requirement,
7 correct?
8      A.   An important one.
9      Q.   Is there any circumstance in which
10 you would prescribe cross-sex hormones for a minor
11 where you don't -- where you haven't reached a
12 professional conclusion that that is going to
13 lessen distress suffered by the minor?
14      A.   No, sir.
15      Q.   Okay.  Then let me circle back.
16      A.   Okay.
17      Q.   The process of requiring a child to
18 go through several years of gender diversity or
19 incongruence and at least one year of close
20 observation by your clinic before receiving a
21 hormonal prescription means that child will have
22 to endure distress for a significant period before
23 receiving medication; am I right?

1      A.   No.  We don't see it that way.
2      Q.   How am I not right?
3      A.   Well, first and foremost, depending
4 on the age that that youth comes to us, we could
5 stay with the hypothetical 14 year old or extend
6 it to the youth that come to our space for visits.
7 They may be as old as 18.  And who may have lived
8 some of this for years before being able to get to
9 us.  That's one section.  But for youth who, on an
10 ongoing period of work with our team as necessary,
11 they will be very well supported during that time,
12 mental health, possibly other medications.
13      Q.   Other medications appropriate to
14 other mental health indications that you determine
15 this child has?
16      A.   Both that and there are other
17 medications that are used to weigh components of
18 dysphoria.  For example, I mean, if you want an
19 example of supportive medication.  For a trans
20 male, someone who was female at birth who's
21 through a full female puberty, we can very, very
22 safely reversibly delay menstruation for that
23 person.  That's what I meant by supportive

12 (Pages 42 - 45)

Page 46

1  medication and care.
2      Q.   Is it the experience of your clinic
3  that for these young people who come in diagnosed
4  with or receiving diagnosis of gender dysphoria
5  that you are able to significantly alleviate their
6  suffering during this interim period by means of
7  other medications such as you've described and the
8  mental health support that you've described?
9      A.   Family support, yes.
10      Q.   Let me ask you to turn to Page 16 of
11  your expert report, Exhibit 5.  And there at the
12  bottom of the page and running into the next page,
13  it reads, "I prescribe puberty-delaying treatments
14  starting at the Tanner 2 or early Tanner 3 stages
15  of puberty.  For people assigned as male at birth,
16  these stages of puberty are typically between ages
17  9 and 15.  And for people assigned female at
18  birth, typically between ages 8 and 13."  Do you
19  see that language?
20      A.   I do.
21          MR. BROOKS:  It's Exhibit 5, the
22  expert report submitted.
23          MS. EAGAN:  Thank you.

Page 47

1      Q.   (BY MR. BROOKS)  Why is the age at
2  which you will initiate puberty blockers for
3  children different for those who are born female
4  than for those who are born male?
5      A.   Remember it's a very individualized
6  decision-making process.  And it's based far more
7  upon the physiologic Tanner staging, the physical
8  manifestations of puberty aligned with the natal
9  sex than the age of any individual patient.
10      Q.   Well, Dr. Ladinsky, I started by
11  just quoting language from your report where you
12  noted a typical age difference between when you
13  would begin for someone born female versus someone
14  born male.  And my question is:  Why that
15  difference?
16      A.   On a population level, the secondary
17  sex characteristic emergence or physical stigma
18  that show us hormonal puberty is starting, right.
19  On a population level, it's earlier for folks
20  assigned female at birth.
21      Q.   And that in your experience is true
22  regardless of their gender identity?
23      A.   Yes.

Page 48

1      Q.   And even for earlier maturing
2  patients and taking this on an individual basis,
3  why not nevertheless wait until age 11 or 12
4  consistent with the original Dutch protocol
5  procedures instead of starting at 8 or 9?
6      A.   If -- like I said, each, you know,
7  each youth is an individual.  We have not, in our
8  clinic population, seen the need for what you just
9  hypothetically elucidated in 8- or 9-year-olds.
10  The majority of our youth beginning -- assigned
11  female at birth beginning blockers are 11 or 12.
12      Q.   Why then did you write in your
13  expert report that the stages at which you
14  prescribe are typically between -- begin at age 9
15  in the case of males and age 8 in the case of
16  females?
17      A.   To reinforce the population level
18  data around entry into puberty.
19      Q.   And, in fact, across the now eight
20  years since you started your clinic, your clinic
21  has prescribed puberty blockers for a grand total
22  of 17 children?
23      A.   That's correct, sir.

Page 49

1      Q.   So your clinic experience really
2  doesn't actually even take us to a kind of
3  statistically significant experience and sample;
4  am I right?
5          MS. EAGAN:  Object to the form.
6      A.   I could not answer that.  I can only
7  comment on our own experience.
8      Q.   (BY MR. BROOKS)  Well, my question
9  had to do with your own experience.
10      A.   Okay.
11      Q.   In your professional judgment,
12  seeing 17 patients who are treated this way across
13  eight years is not a sample large enough to --
14  from which to draw statistically significant
15  conclusions, is it?
16          MS. EAGAN:  Object to the form.
17      A.   It would completely depend on the
18  question as the population studied.  The metrics
19  desired to then calculate what we know as
20  statistical significance.
21      Q.   (BY MR. BROOKS)  Have you attempted
22  any systematic study of outcomes for the 17
23  patients who received puberty blockers from your

13 (Pages 46 - 49)

1 clinic?

2     A.   We have not undertaken or

3 commissioned a systematic study, no.  In fact,

4 three of them have relocated out of state under

5 the pressure of this law.  It's now 14.

6     Q.   Your clinic has not, as a result of

7 this law, refused to treat any patient, have you?

8     A.   In the way that we had been

9 practicing, that's correct.  With the exception of

10 the week that the law was in effect, we most

11 certainly did not undertake anything that would

12 have broken it.

13       MS. EAGAN:  We've been going about

14 an hour.  Whenever you get to maybe a stopping

15 point or a change in point, if we could take a

16 short break.

17       MR. BROOKS:  I agree.  Let me take

18 us back, and we'll break shortly.

19     Q.   Let me take you again to what's Tab

20 17 in --

21     A.   I'm sorry.  I don't think I have a

22 17.

23     Q.   You're right.  17 is the responses

1 and objections, which is Exhibit 4.  I apologize.

2       Let me take you to the response to

3 Number 15, which is on Page 7.  And the very last

4 sentence of this response to Number 15 at the top

5 of Page 7 reads -- sorry.  The next to last

6 sentence.  "UAB does not track a patient once that

7 patient leaves the care of UAB."

8       So I just want to ask you about

9 that.  What proportion of the patients who enter

10 your clinic do you continue to provide care for

11 through age 18?

12     A.   The majority who -- the majority who

13 continue to return to us and clearly those who are

14 receiving medication.

15     Q.   Of those who have received

16 prescriptions for cross-sex hormones from your

17 clinic, what proportion continued under your care

18 through age 18?

19     A.   The majority unless they relocated

20 out of state.

21     Q.   Well, I'll ask a flip-side question.

22 What proportion of minors received a prescription

23 for cross-sex hormones from your clinic for

1 whatever reason terminated contact with your

2 clinic before they reached age 18?

3     A.   None to my knowledge.

4     Q.   None?

5     A.   To my knowledge.

6     Q.   You have had, in your experience, no

7 patients who received prescriptions for cross-sex

8 hormones who are, to use the term, "lost to

9 follow-up" who just ceased contact with your

10 clinic?

11     A.   To my knowledge, no.

12     Q.   Your clinic has been in operation

13 for approximately eight years; am I correct?

14     A.   Correct.

15     Q.   The majority, the substantial

16 majority of patients that you see, you first see

17 at age 14 or 15 or even older, correct?

18     A.   That's correct.

19     Q.   Is it the case that the majority of

20 patients that you have provided prescriptions for

21 over the years have now been adults and outside

22 the care of your clinic for several years?

23     A.   A small cohort, sure.  Those that

1 were older when we first opened and began and

2 initiated.

3     Q.   Well, those who came in at age 15

4 just three years ago --

5     A.   Right.

6     Q.   -- are now outside the care of

7 UAB -- I want to use the right term -- Pediatric

8 Endocrinology Department; am I correct?

9     A.   Well, they would be 18 or 19, some.

10 They may be away at college.

11     Q.   The 19-year-olds you don't see.

12 Those are treated in the adult clinic?

13     A.   For the most part.  There are

14 exceptions.

15     Q.   Let me take you back to your

16 testimony at the preliminary injunction hearing,

17 which is in the binder, Tab 12.

18       MR. BROOKS:  I'm sorry.  We'll take

19 a break that I promised you first.

20       MS. EAGAN:  Okay.

21

22       (Whereupon, a brief recess was

23       taken.)

Page 54

1
2      Q.   (BY MR. BROOKS) Let me ask you to
3  take you to the exhibit of your responses and
4  objections to requests of UAB and turn there to
5  Page 6 if you would.  And there midway down the
6  page towards the end of the objections and
7  responses to request Number 13, it reads, quote,
8  "Since opening in July 2020, the Gender Health
9  Clinic has conducted one transitioning surgery for
10  an 18-year-old, but no longer provides such
11  treatment to 18-year-olds."  Do you see that
12  language?
13      A.   I do see that language, sir.
14      Q.   When was the surgery that's
15  referenced in that response conducted?
16      A.   Sir, I have no knowledge of that
17  because this applies to the Gender Health Clinic
18  at UAB Medicine, what we know as the adult team.
19      Q.   But you have literally no knowledge
20  about this surgery whatsoever?
21      A.   That is correct, sir.  I have
22  absolutely no knowledge of this.
23      Q.   Do you know what surgery procedure

Page 55

1  was performed?
2      A.   I do not.
3      Q.   And you don't know when it was
4  performed?
5      A.   No, I do not know that either.  That
6  was not performed -- I mean, that was not a
7  patient under the care of the UAB Pediatric Gender
8  Health team of which I'm a part of.
9      Q.   Now, that patient was, in fact,
10  according to this description a minor,
11  18-year-old.  Were you consulted in any way in
12  connection with that patient?
13      A.   I do not recall.  That was -- I
14  really don't.
15      Q.   The Gender Health Clinic, the adult
16  clinic was founded in July of 2020 it says.  Did
17  you have -- were you consulted in any way in
18  connection with the founding of the Gender Health
19  Clinic?
20      A.   I attended one meeting in -- a good
21  deal before its opening as they were conceiving of
22  it, and they asked my partner and I to attend one
23  meeting long before they opened.

Page 56

1      Q.   Okay.  The response that I just read
2  includes the statement that the Gender Health
3  Clinic, quote, "no longer provides such treatment
4  to 18-year-olds."
5           Have you been part of any
6  discussions about that decision to no longer
7  provide such treatment to 18-year-old?
8      A.   No, sir, I'm not.  I can only infer
9  they're talking about the law.
10      Q.   Are you aware of any written policy
11  prepared by anyone associated with your clinic or
12  any other part of the UAB medical system, any
13  written policy relating to when surgeries will or
14  will not be provided to legal minors as a
15  treatment for gender dysphoria?
16      A.   I am not.
17      Q.   When did you first become aware that
18  UAB medical system had performed a transition
19  surgery on an 18-year-old?
20      A.   The moment you referred me to this
21  statement.
22      Q.   You never before read this document
23  in its entirety?

Page 57

1      A.   No, sir, not -- I don't recall.
2      Q.   And when I read that statement to
3  you, was that inconsistent with what you had
4  previously believed to be true?
5      A.   No.
6      Q.   That is, you previously believed
7  that the UAB Health System had performed surgeries
8  on legal minors as a treatment for gender
9  dysphoria?
10      A.   I was not aware as to whether they
11  were or were not in the particular narrow scope of
12  an 18-year-old.  I had no knowledge of policy or
13  action.
14      Q.   Does the Pediatric Endocrinology
15  Department have a policy with respect to
16  recommending surgery for minors as a treatment for
17  gender dysphoria?
18      A.   It is not part of our regular
19  treatment protocol.
20      Q.   Do you have any policy on that
21  written anywhere?
22      A.   I don't believe we have a written
23  policy, but we have a very, very, very long track

1 record of such.

2     Q.   And why is surgery on minors not

3 part of your protocol?

4     A.   Well, it's currently illegal.  But

5 prior to the VCAP law being passed and the surgery

6 section, that being joined, it had not been

7 provided in Alabama nor was it our practice to do

8 such.

9     Q.   And my question is why?

10     A.   We felt -- we align in our thinking

11 very much with the WPATH Standards of Care as well

12 as the Endocrine Society.  They do carve out a

13 very, very narrow scope of individually viewing

14 older teens with severe and unrelenting chest

15 dysphoria that they may be candidates for

16 masculinizing chest surgery.  That is part of the

17 standards of care and guideline-driven treatment.

18 Beyond that, they do not endorse it and we concur.

19     MR. BROOKS:  Let me mark as Ladinsky

20 6 the WPATH Standards of Care Version 8.

21

22     (Whereupon, Ladinsky Exhibit 6 was

23     marked and copy of same is attached

1     hereto.)

2

3     Q.   (BY MR. BROOKS)  And Dr. Ladinsky,

4 do you recognize this document as a document that

5 you are well familiar with?

6     A.   I'm familiar with it, yes.

7     Q.   Let me ask you to turn to Page 133

8 or S133 as they number these things for reasons

9 best known to themselves.

10     MS. EAGAN:  Hold on a second.  133?

11     MR. BROOKS:  Yes.

12     MS. EAGAN:  My copy must have missed

13 that.

14     THE WITNESS:  Mine does too.  It

15 goes from 120 to something and then 157.

16     MS. EAGAN:  It's missing that part.

17 It goes from 127 to S156.

18     THE WITNESS:  Mine as well.

19     MR. BROOKS:  Never mind.

20     Q.   I'm going to read you -- let me ask

21 you this first, Dr. Ladinsky.  You can put that

22 down since it doesn't have the pages I intended.

23     MS. EAGAN:  Can we get a copy if

1 you're going to start asking questions about a

2 particular section or language.  I would like for

3 her to have copy of it to review.  I can make a

4 quick copy of it if that's okay.

5     MR. BROOKS:  You can make a copy of

6 this page.

7     MS. EAGAN:  Are you going to ask her

8 about other sections of this?

9     MR. BROOKS:  I don't know that I

10 will.  Let's just get that.

11     MS. EAGAN:  It's fine if you want to

12 ask her a question and hand to her.

13     MR. BROOKS:  I'll do that and then

14 we'll mark the page.

15     Q.   When SOC 8 came out, did you make an

16 effort to familiarize yourself with its contents?

17     A.   With relevant sections, yes.

18     Q.   And did you, in fact, participate in

19 any way in the development of the WPATH SOC 8?

20     A.   No, sir.

21     Q.   I'm going to read you a quote from

22 Statement 13.7 on Page S133 and then hand you the

23 text.  It says, quote, "We recommend surgeons

1 consider gender-affirming surgical interventions

2 for eligible transgender and gender diverse

3 adolescents when there is evidence of a

4 multidisciplinary approach that includes mental

5 health and medical professionals has been involved

6 in the decision-making process."

7     MR. BROOKS:  Let me ask the reporter

8 to mark this single page as Ladinsky Exhibit 7 and

9 hand it to her.

10

11     (Whereupon, Ladinsky Exhibit 7 was

12     marked and copy of same is attached

13     hereto.)

14

15     MR. BROOKS:  If you're wanting to

16 identify what section it's in, we do have the

17 table of contents.

18     MS. EAGAN:  It looks like it's not

19 in the section is what she was raising.

20     MR. BROOKS:  That may be the case.

21     Q.   My initial question is:  Are you

22 familiar with the recommendation 13.2 that is

23 contained in Exhibit 7?

Page 62

1      A.   You mean 13.7?
2      Q.   I do.
3      A.   It aligned with Chapter 13 in its
4   applicability to adults, yes.
5      Q.   Well, do you see the language that I
6   read to you that pertains to adolescents
7   specifically?
8      A.   I do see that.  That's correct.
9      Q.   And were you familiar before I
10  showed you this that recommendation from WPATH?
11     A.   I was.
12     Q.   All right.  And in the Exhibit 6,
13  let me ask you to turn to Page 66, which I believe
14  you'll find in the section relating to
15  adolescents.  66.
16     A.   Yeah.  Okay.
17     Q.   And there in the first column about
18  3 inches from the bottom, it says, "Chest
19  masculinization surgery can be considered in
20  minors when clinically and developmentally
21  appropriate."
22     A.   Right here, yeah.
23     Q.   So WPATH, you would agree,

Page 63

1   recommends that chest masculinization surgery can
2   be considered in minors; am I correct?
3      A.   Correct.
4      Q.   And that -- another term for that
5   would be a mastectomy.  It's removal of the
6   breasts of a natal female; am I correct?
7      A.   I'm not a surgeon to comment on that
8   exact detail.
9      Q.   You are a doctor.  Do you understand
10  the surgery that's referred to to consist of
11  removing the female breasts?
12     A.   Yes.
13     Q.   And let me ask you to look at second
14  column on the same page.
15     A.   Okay.
16     Q.   And about 2 inches down is a
17  sentence that begins, "Limited data are available
18  on the outcomes for youth undergoing
19  vaginoplasty."  Do you see that?
20     A.   I do, yes.
21     Q.   And a little farther below it says,
22  While the sample sizes are small, these studies
23  suggest there may be benefit for some adolescents

Page 64

1   to having these procedures -- that is
2   vaginoplasty -- performed before the age of 18.
3   Do you see that?
4      A.   I see that.
5      Q.   And am I correct -- do you have an
6   understanding of what vaginoplasty as the term is
7   used by WPATH refers to?
8      A.   I do.
9      Q.   It's a procedure performed on natal
10  males; am I correct?
11     A.   Correct.
12     Q.   And it includes --
13     A.   In this context.
14     Q.   -- removal of the penis?
15     A.   That's correct.
16     Q.   And it includes castration; am I
17  correct?
18     A.   I believe so.
19     Q.   And it is, in your understanding,
20  absolutely and completely irreversible, is it not?
21     A.   I view it that way.
22     Q.   And you were aware, were you not,
23  that WPATH says that that surgery may be

Page 65

1   appropriate before age 18?
2          MS. EAGAN:  Object to the form.
3      A.   I'm seeing it in front of me here.
4      Q.   (BY MR. BROOKS)  Well, you testified
5   earlier that once the Standards of Care 8 came
6   out, you took care to familiarize yourself with
7   the sections dealing with adolescent health,
8   right?
9      A.   Correct.
10     Q.   And you were aware before you sat
11  down for this deposition today that WPATH is
12  stating to the world that this procedure,
13  including castration and removal of the penis, may
14  be appropriate for natal males younger than 18?
15     A.   That is what they're saying right
16  here.
17     Q.   And you were aware of that shortly
18  after the Standards of Care 8 came out; am I
19  right?
20     A.   Aware, yes.
21         MR. BROOKS:  Let me mark as Ladinsky
22  Exhibit 8 the Endocrine Society --
23         MS. EAGAN:  Hold on one second,

17 (Pages 62 - 65)

1  Roger.
2      A.   This is what I take with me when I
3  review this chapter, the line just a few
4  sentence -- at the end of that long paragraph on
5  the right-hand side.  Given the complexity -- da,
6  da, da -- "it is not recommended this surgery be
7  considered in youth under 18 at this time."
8      Q.   (BY MR. BROOKS)  And then it says,
9  "see Chapter 13-Surgery and Postoperative Care,"
10  correct?
11      A.   Correct.
12      Q.   And earlier I directed your
13  attention to language in Chapter 13, correct,
14  where we discussed the recommendation to surgeons.
15  Do you recall that language?
16      A.   I do.
17      Q.   All right.
18      MR. BROOKS:  Let me mark as Ladinsky
19  Exhibit 8, the Endocrine Society Guidelines 2017
20  edition.  This is in your binder behind Tab 37.
21
22          (Whereupon, Ladinsky Exhibit 8 was
23          marked and copy of same is attached

1          hereto.)
2
3      Q.   (BY MR. BROOKS)  Let me call your
4  attention -- and I should ask:  Is this a document
5  that you consider yourself to be well familiar
6  with?
7      A.   I'm familiar with it, yes.
8      Q.   And have you consulted it with some
9  regularity in your practice since it issued in
10  2017?
11      A.   We're aware of it, yes.
12      Q.   Is it a document that you rely on as
13  an important source of standards in your
14  profession?
15      A.   It's an important document, yes.
16      Q.   Let me ask you to turn to 3894.  I
17  see you checking the section heading, which is
18  appropriate.  2 inches from the bottom of the
19  first column of 3894, it reads, quote, "Because
20  some transgender male adolescents present after
21  significant breast development has occurred, they
22  may also consider mastectomy two years after they
23  begin androgen therapy and before age 18 years."

1  Closed quote.  Do you see that?
2      A.   I do see that.
3      Q.   And in fact many of the natal
4  females who present at your clinic have already
5  experienced significant breast development; am I
6  correct?
7      A.   That's correct.
8      Q.   And therefore according to the
9  Endocrine Society Guidelines, they would be
10  candidates for mastectomy before the age of 18?
11      A.   The endocrine -- the guidelines
12  suggest that, yes, it may be considered for that
13  narrow population.
14      Q.   Dr. Ladinsky, you actually described
15  that in your other testimony not as a narrow
16  population but as the primary population
17  presenting at your clinic; am I correct?
18      MS. EAGAN:  Object to the form.
19      A.   By narrow, sir, I meant the small
20  group of older teens assigned female at birth.
21      Q.   (BY MR. BROOKS)  Let's be clear.
22  Most girls by age 14 have some significant breast
23  development, correct?

1      A.   That's fair.
2      Q.   And I believe you've testified that
3  the majority of girls consenting at your clinic
4  are 14 or older when you first see them?
5      A.   That's true.
6      Q.   And therefore it follows that
7  majority of girls who present at your clinic,
8  according to the Endocrine Society Guidelines, are
9  candidates for mastectomy before age 18, correct?
10      A.   If you read it as such.
11      Q.   Do you read it differently?
12      A.   It simply says may be considered.
13  The clinician should individualize treatment based
14  on the physical and mental health status of the
15  individual.  It's a guideline.  Yeah.
16      Q.   Are you aware of any guidelines that
17  you consider to be respected in your field that do
18  not approve mastectomies for natal females younger
19  than 18?
20      A.   I am not.
21      Q.   And yet in your clinic, you do not
22  perform or refer natal females for mastectomies
23  younger than 18, correct?

1    A.   Correct.
2    Q.   Is that because you disagree with
3  the medical views expressed by WPATH and the
4  Endocrine Society?
5    A.   No, sir, does not.
6    Q.   Do you think it is appropriate or
7  inappropriate to perform mastectomies on minors?
8    A.   Are you asking for my opinion?
9    Q.   Yes.  You're an expert offering
10  opinion evidence.
11    A.   I think the guidelines read very
12  accurately and very fairly in that there is a
13  small group of older teens assigned female at
14  birth who manifest severe chest related dysphoria.
15  And for those teens, I agree with the guidelines
16  that it could be considered.
17    Q.   But you don't consider it in your
18  clinic and you never have?
19    A.   Consider is a relative term.  Is it
20  discussed?  At times when patients bring that up.
21  The procedure itself has not been assessable in
22  the state of Alabama and is now illegal.
23    Q.   To your knowledge, clinics in

1  multiple states are in fact performing
2  irreversible mastectomies on natal females under
3  the age of 18 in numerous cases each year,
4  correct?
5        MS. EAGAN:  Object to the form.
6    A.   I could not comment on the numerous
7  part of it.  I don't know how many are being
8  performed in centers around the country, but I am
9  aware that that does occur.
10    Q.   (BY MR. BROOKS)  Well, based on your
11  reading the literature and your conversation with
12  colleagues, you are aware, are you not, that
13  mastectomies are being performed on hundreds of
14  girls around the country each year as a treatment
15  for gender dysphoria?
16        MS. EAGAN:  Object to the form.
17    A.   Again, I could not comment on
18  numbers, sir.
19    Q.   (BY MR. BROOKS)  You have no
20  knowledge?
21    A.   I don't have knowledge of numbers.
22  I'm aware it happens.
23    Q.   If the Endocrine Society and WPATH

1  recommend that mastectomies be considered as a
2  treatment for natal females who are minors, do you
3  think it's medically reasonable for your clinic to
4  never approve such procedures among your several
5  hundred patients?
6        MS. EAGAN:  Object to the form.
7    A.   I mean, the guidelines speak to a
8  very, very small group of exception, older trans
9  masculine teenagers.  Now to your question, it's
10  never been part and parcel of the surgical work
11  performed at my hospital, and my hospital is the
12  only tertiary referral hospital in the state of
13  Alabama.
14    Q.   Have you ever referred a natal
15  female for chest surgery to a medical center
16  outside of Alabama?
17    A.   Tell me what you mean by refer.
18    Q.   Well, let me ask you if that is a
19  term that has a technical meaning to you as a
20  doctor?
21    A.   It does.
22    Q.   What does it mean to you?
23    A.   As a primary care doctor, it means

1  we are identifying and securing for the patient
2  the source of care, and then we're discussing with
3  the accepting physician, providing records and
4  such, et cetera.  So that is -- no, it has not
5  been part of our practice to do so in that way.
6    Q.   You have not done that?
7    A.   I have not, sir, no.
8    Q.   Okay.  Let me ask you to find your
9  transcript from the preliminary injunction
10  hearing, which is 12.  It's in the binder.  Tab
11  12, your transcript.
12        MS. EAGAN:  Did you say a page?
13        MR. BROOKS:  I didn't yet.
14    Q.   I'm going to direct your attention
15  to Page 122.
16    A.   I don't have 122.
17        MS. EAGAN:  Here.
18    Q.   (BY MR. BROOKS)  I'll regularly
19  refer only to the little page numbers.  If you
20  look at Line 22.
21    A.   Okay.
22    Q.   You were asked, "Did you review any
23  studies or literature reviews or other research in

1 putting together the declaration?"  Referring to
2 your PI declaration.  And you respond, "We're
3 continually doing that.  It's part of our job."
4 Do you see that testimony?
5     A.   I do see that.
6     Q.   Can you describe for me the steps
7 you take to make sure that you are continually
8 reviewing and current with the literature in your
9 field?
10     A.   Sure.  The steps we take are this:
11 We're always reviewing and re-reviewing
12 guidelines.  So, for example, the WPATH SOC 8,
13 which are fairly new, so there's review of those
14 as it pertains to patients we care for.  There's
15 continually reading published studies in this
16 area.  As well as national meetings and
17 conferences where we're discussing with
18 colleagues.
19     Q.   And the guidelines -- so, for
20 instance, the WPATH SOC 7 came out in 2012,
21 correct?
22     A.   Correct.
23     Q.   So it was 11 years between Version 7

1 and Version 8; am I correct?
2     A.   Roughly.  A decade apart.
3     Q.   So the guidelines wouldn't necessary
4 make you aware of the latest research in your
5 field, would they?
6     A.   Not necessarily because findings or
7 studies may be published subsequent to it.
8     Q.   And the Endocrine Society
9 Guidelines, the current version, was published in
10 2017, correct?
11     A.   Correct.
12     Q.   How do you go about making sure that
13 you are identifying and reading important new
14 research papers in your field?
15     A.   Those of us that do this work are
16 united on multiple different lists.  As
17 colleagues, we're always elevating for each other
18 anything new that may have come out.  So we work
19 as a team throughout the nation.
20     Q.   Let me ask you to find your CV,
21 which is Exhibit 1.  Let me ask you to turn to
22 Page 8.
23     A.   Okay.

1     Q.   And there you listed major research
2 interests.  Do you see that?
3     A.   Yes, sir.
4     Q.   Nothing relating to the effects of
5 puberty blocker or hormones on the body or brain
6 of children or adolescents is one of your major
7 research interests, correct?
8     A.   That's correct.
9     Q.   And nothing relating to the
10 long-term physical and mental health outcomes of
11 children or adolescents who are subjected to
12 puberty blockers or cross-sex hormones are among
13 your research interest, correct?
14     A.   Very interested in them, but I'm not
15 doing that research myself.
16     Q.   If you turn to Page 11, again it's a
17 list of manuscripts.  And just to avoid any
18 confusion, by manuscripts, do you mean papers
19 submitted to peer-reviewed journals?
20     A.   Papers published in peer-reviewed
21 journals.
22     Q.   You don't have any peer-reviewed
23 paper that relate to any issue of transgender

1 medicine, diagnosis, therapy, or outcomes, do you?
2     A.   That's correct.  I'm not a
3 researcher.  I'm a clinician.
4     Q.   Let me ask you to look again at your
5 transcript, Tab 12, and turn with me to Page 121
6 if you would.  And at 121 beginning at Line 9, you
7 testified, quote, "An experimental treatment will
8 be a drug or a medical intervention that is part
9 of a very, very tightly controlled clinical trial,
10 a trial that has been granted, you know, granted a
11 yes or no, granted the ability to do so by an
12 institutional review board which strictly upholds
13 the ethical rights of human subjects."  Closed
14 quote.  Have I read that more or less correctly?
15     A.   You have.
16     Q.   Are you familiar with the term "case
17 study"?
18     A.   I am.
19     Q.   And do you consider a case study to
20 report on, in some cases, to report on an
21 experimental treatment?
22     A.   Not generally.
23     Q.   Based on your definition of

Page 78

1  experimental treatment as given in your
2  preliminary injunction testimony, am I correct
3  that you yourself in the course of your work at
4  the UAB Pediatric Clinic have never engaged in any
5  experimental treatments?
6      A.   As defined in this way, that's fair.
7      Q.   And you have never in fact
8  undertaken any experimental work in the field of
9  pediatric treatment of gender dysphoria?
10     A.   Personally, no.
11     Q.   Have any of your colleagues, to your
12 knowledge, at UAB participated in any experimental
13 work relating to treatment of minors for gender
14 dysphoria?
15     A.   I'm not aware of that.
16     Q.   You would agree, would you not, that
17 before full clinical trials are undertaken that
18 clinicians may in some cases try novel drugs or
19 therapies on individual patients separate and
20 apart from a tightly controlled clinical trial?
21         MS. EAGAN:  Object to the form.
22     A.   I'm not sure what you mean.
23     Q.   (BY MR. BROOKS)  In some cases,

Page 79

1  drugs that have not been subjected to a formal
2  clinical trial are nevertheless prescribed to
3  patients on an experimental basis, would you
4  agree?
5      A.   I'm not sure I use the word
6  "experimental" in the same way, though.  That's
7  where I'm getting stuck.
8      Q.   Well, if it hasn't -- if a drug has
9  not been proven to be efficacious or it has not
10 been proven to be safe, wouldn't you agree that
11 its use on a human subject is experimental?
12         MS. EAGAN:  Object to the form.
13     A.   I don't know that we use the -- we
14 don't use the word "experimental" in that way.
15     Q.   (BY MR. BROOKS)  That would be more
16 pre-experimental?
17     A.   No.  I've not heard that term
18 either.
19     Q.   Well, when a drug is used in a
20 context for which the type of formal experiment
21 you described in your testimony has not yet been
22 done, we don't have that information.  We don't
23 have the results of that type of carefully

Page 80

1  controlled clinical trial.  How would you
2  describe -- what terms would you use to describe
3  that usage of the thus far untested
4  pharmaceutical?
5      A.   Well, it's not part and parcel of my
6  regular practice, but I would assume that a
7  medical provider engaging in what you describe
8  would first and foremost explain to the patient
9  and family in a detailed way what is known, what
10 may not be known, and what they hope to achieve
11 and how they will monitor for it.
12     Q.   Well, my question for you is:  What
13 term would you use for the use of a drug for an
14 indication or in a population for which it has not
15 yet been tested and proven efficacious through the
16 type of very, very careful clinical trial that you
17 described in your testimony?
18     A.   I think clinicians have a variety of
19 terms if they're engaging in this that they would
20 use.  It's not part of my regular practice.
21     Q.   What do you consider to be terms
22 that clinicians would use for that type of use
23 prior to proof of efficacy through a carefully

Page 81

1  controlled clinical trial?
2      A.   I think the word that would come to
3  mind would be novel.
4      Q.   Do you know whether any of your
5  colleagues at UAB are currently enrolling minors
6  in any experimental research relating to treatment
7  of gender dysphoria?
8      A.   I'm not aware.  That doesn't mean
9  it's not happening in other divisions.
10     Q.   Let me ask you to find your expert
11 report, which is 5.  Let me ask to you turn to
12 Page 21.  At the top of Page 21, you write in your
13 expert report, quote, "In addition to my patients
14 with intersex traits, I regularly manage
15 non-transgender patients receiving the same
16 hormones that are provided to transgender
17 patients."  Closed quote.
18         Given that you're not an
19 endocrinologist, can you describe to me your
20 professional responsibilities at UAB associated
21 with non-transgender patients and the
22 administration of hormones?
23     A.   I'm a primary care pediatrician, and

21 (Pages 78 - 81)

1  I see patients as well as teach in our pediatric
2  primary care clinic.  So we have adolescents who
3  may have indications for hormonal therapy for
4  reasons that -- for indications that don't involve
5  gender dysphoria.  Patients in that top paragraph,
6  hypogonadotropic hypogonadism, the endocrinologist
7  may have those patients on hormonal therapy.  As a
8  primary care physician, I am sort of -- I'm their,
9  you know, I have a deep understanding of the
10 medication and am helping endocrinology monitor
11 for, you know, for that.
12     Q.   You yourself have never prescribed
13 hormones for any non-transgender patient; am I
14 correct?
15     A.   What do you mean by -- like right
16 here, hormonal birth control?
17     Q.   Well, let me be more specific.
18     A.   Okay.
19     Q.   You yourself have never prescribed
20 testosterone suppression for any non-transgender
21 patient, correct?
22     A.   I have not.
23     Q.   And you yourself have not prescribed

1  estrogen for non-transgender girls for the type of
2  use that you describe in the middle of that
3  paragraph?
4     A.   For which use, the hypothalamic,
5  pituitary issues?
6     Q.   I'm glad you said that.  You say,
7  and I'll quote, "For example, non-transgender
8  girls with hypogonadotropic hypogonadism (delayed
9  puberty due to lack of estrogen caused by a
10 problem with the pituitary gland or hypothalamus)
11 may be treated with estrogen to initiate puberty."
12 Closed quote.  Have I read that accurately?
13     A.   You have.
14     Q.   And have you yourself ever
15 prescribed estrogen to a non-transgender girl for
16 that purpose?
17     A.   For that indication, I have not.
18 But I do help manage them.
19     Q.   What do you mean by manage?
20     A.   As a primary care physician, we see
21 our patients fairly frequently, and they know how
22 to find us.  So I will continue to review
23 potential side effects, potential

1  contraindications.  I see you're taking estrogen,
2  we're not smoking or vaping, that kind of thing.
3  That's what I mean.
4     Q.   You don't consider yourself a
5  specialist in intersex conditions, do you?
6     A.   I do not.
7     Q.   And, indeed, that is not a topic on
8  which you've ever made any publications, correct?
9     A.   No, sir.
10    Q.   Nor have you ever given a
11 presentation on intersex condition at any
12 professional meeting, am I correct?
13    A.   Not on that as a primary reason, no.
14    Q.   Colleagues do not consult you for
15 your expertise in intersex conditions, correct?
16    A.   No, sir.  Not for the medical
17 management of them.
18    Q.   How much of your professional
19 time -- you've mentioned that you have a role as a
20 primary care physician?
21    A.   Correct.
22    Q.   How much of your professional life
23 is occupied with your work with the UAB Gender

1  Clinic?
2     A.   Percentage?  Fraction?  Which would
3  you like me to?
4     Q.   Whatever you're comfortable with.
5     A.   Maybe 25 percent.
6     Q.   And do you receive separately
7  identified compensation from the UAB System in
8  connection with your work with the Gender Clinic?
9     A.   No, sir.  I'm salaried.
10    Q.   And within the last five years, have
11 you received any other compensation beyond your
12 UAB salary of any sort related to gender dysphoria
13 or treatment for gender dysphoria?
14    A.   Not for medical management or
15 anything thereof.
16    Q.   Have you received speaker fees for
17 talks given on that topic?
18    A.   I think I once got a $25 honorarium.
19    Q.   Have you received any sort of
20 compensation or reimbursement for any
21 pharmaceutical company relating to treatment for
22 gender dysphoria?
23    A.   No, sir.

22 (Pages 82 - 85)

Page 86

1    Q.    You were named as a plaintiff in a
2  lawsuit in 2022: Ladinsky versus Ivy, correct?
3    A.    Correct.
4    Q.    And did you carefully review the
5  complaint in that action and satisfy yourself that
6  everything in it that fell within your scope of
7  knowledge was true and correct?
8    A.    I believe so.
9    Q.    In that lawsuit, you were not
10 attempting to fill the role of a disinterested and
11 impartial expert, but rather you were a plaintiff
12 personally suing the State of Alabama; am I
13 correct?
14   A.    That's correct.
15       MR. BROOKS:  Let me mark as Ladinsky
16 Exhibit 9 a press release that appears to be dated
17 March 8, 2021.  Titled City of Birmingham's LGBTQ
18 plus Advisory Board Issues Statement on HB1/SB10.
19
20       (Whereupon, Ladinsky Exhibit 9 was
21       marked and copy of same is attached
22       hereto.)
23

Page 87

1    Q.    (BY MR. BROOKS)  Dr. Ladinsky, do
2  you recognize this document?
3    A.    I do.
4    Q.    I see that your name is the first of
5  several signators?
6    A.    Correct.
7    Q.    Are you the primary draftsman of the
8  document?
9    A.    One of them.  The first reviewer.
10   Q.    Who was the initial drafter?
11   A.    That's an excellent question.  I
12 believe it was one or a combination of my
13 colleagues on the mayor's task force advisory
14 firm.
15   Q.    Who specifically?
16       MS. EAGAN:  If you remember.
17   A.    Yeah, I don't recall.
18   Q.    (BY MR. BROOKS)  That's always a
19 fine answer.
20       MS. EAGAN:  It's the truth.
21   A.    It is the truth.  That was a few
22 years back.
23   Q.    (BY MR. BROOKS)  I understand.

Page 88

1  Towards the bottom of the text, the sentence it
2  reads, quote, "The medicine in question follows a
3  standardized evidence-based gender affirmative
4  model of pediatric care."  Do you see that?
5    A.    I do.
6    Q.    Can you explain to me what you
7  understand the term "evidence-based" to mean?
8    A.    Meaning simply consensus bodies of
9  experts in the area have and are continually
10 reviewing the best available evidence in the
11 issue standards of care guidelines for practice
12 and are continually reviewing and revising them.
13   Q.    Do you understand evidence-based to
14 be a term of art?
15   A.    I do not.  I've not viewed it that
16 way.
17   Q.    Have you ever received any training
18 in what is referred to formally as evidence-based
19 medicine?
20   A.    I have.
21   Q.    And describe to me the context in
22 which you've received that training.
23   A.    Through not just my medical training

Page 89

1  but more so during my fellowship training.  We
2  work with -- we spent a lot of time in the
3  distillation of different studies, validity
4  consistency, how to read the literature and
5  understand science in the most empirical form
6  relative to the issue in question.
7    Q.    Are you aware that there is now a
8  whole field developed of evidence-based medicine?
9    A.    I am aware of that.
10   Q.    And do you believe you have an
11 understanding of how evidence-based medicine is
12 defined within that field?
13   A.    I will -- I have an understanding of
14 it, but I could not give you the exact verbiage of
15 their vision and how they see it.
16   Q.    You continue in the sentence that --
17 I read a partial sentence into the record, and it
18 continues that this model of pediatric care is,
19 quote, "endorsed by the American Academy of
20 Pediatrics and its 67,000 members nationwide."
21 Closed quote.  Do you see that language?
22   A.    I do.
23   Q.    Is it your understanding that the

23 (Pages 86 - 89)

Page 90

1  AAP membership, which you refer to, was ever given
2  any opportunity to vote on any standard or
3  statement relating to medical care for gender
4  dysphoria in minors?
5      A.   I believe there are processes that
6  involve that.
7      Q.   You believe there was a process that
8  involved an opportunity for the entire membership
9  of the AAP to vote on whether or not to endorse
10  any statement or standard relating to medical care
11  of gender dysphoria in minors?
12     A.   The process does not, you know, does
13  not solicit individual votes from all 67,000
14  members prior to the issuance of a policy
15  statement or a set of guidelines.  However, there
16  are processes that entail the ability for feedback
17  and for local regional, you know, executive
18  leadership in so many domains to bring that input.
19  It's sort of a small democracy basically.
20     Q.   But a democracy in which the 67,000
21  members that you refer to never get an opportunity
22  to vote, correct?
23     A.   Through their sections councils, et

Page 91

1  cetera.  They don't, you know, take a vote on
2  every single policy statement, but they are given
3  time to elevate input and questions, absolutely.
4      Q.   You stated in the previous paragraph
5  that, quote, "The bill further demands that school
6  personnel out students who are trans or
7  gender-diverse to their parents or guardians."
8  Closed quote.  Do you see that?
9      A.   I do see that.
10     Q.   And am I to understand that you
11  support policies under which a child's adult
12  authority figures at school may actively
13  participate in a social transition of a child
14  without first obtaining parental consent?
15         MS. EAGAN:  Object to the form.
16     A.   Tell me what you mean by participate
17  in a transition.
18     Q.   (BY MR. BROOKS)  Sure.  Addressing a
19  child with a transgender name or cross-sex
20  pronoun, for example.
21     A.   Okay.  Now tell me your question
22  relative to that.
23     Q.   Should I take it from the statement

Page 92

1  in this press release from 2021 that you support
2  policies under which a child's adult authority
3  figures at school may actively participate in the
4  social transition of a child without first
5  informing the child's parents and obtaining
6  parental consent?
7          MS. EAGAN:  Object to the form.
8      A.   I'm not sure I can answer it in the
9  way that you've asked it.  I think the sentence
10  gets to the heart of what could be a safety issue
11  for some students in Alabama.
12     Q.   (BY MR. BROOKS)  Dr. Ladinsky, do
13  you or do you not believe that schools in Alabama
14  should be permitted to actively participate in the
15  transition of children without the consent of
16  their parents?
17     A.   I'm confused by this actively
18  participate in the transition --
19     Q.   I explained what I meant by that
20  because you asked me for an explanation.
21     A.   Because I don't see that -- I don't
22  see that the same as simply affirming a child or
23  an adolescent in the school setting in the name or

Page 93

1  identity they've asked to be identified with.
2      Q.   Then let me make my question more
3  precise.
4      A.   Okay.
5      Q.   Do you or do you not believe that
6  schools in Alabama should have policies that allow
7  the child's adult authority figures at school to
8  participate in the social transition of a child by
9  addressing the child with a cross-sex name or
10  pronouns without first obtaining parental consent?
11     A.   I believe that lies within the
12  purview of educators in that school, period.  They
13  know what's best for their youth.
14     Q.   Your testimony here today is that
15  it's your professional opinion that the educators
16  in this field of gender dysphoria know what's best
17  for youth more than the parents?
18         MS. EAGAN:  Object to the form.
19     A.   No, sir.
20         MS. EAGAN:  Misstates her testimony.
21     A.   No, that is not my testimony at all.
22     Q.   (BY MR. BROOKS)  Then explain better
23  what you just tried to tell me.

24 (Pages 90 - 93)

Page 94

1    A.   What I meant to say is that it is
2  purview of the schools, the district, the school
3  setting to set policy relative to how educators
4  address and possibly affirm students.
5         MR. BROOKS:  I'd like to mark as
6  Ladinsky Exhibit 10 an excerpted chapter from a
7  book entitled "Users' Guide to the Medical
8  Literature, Essentials of Evidence-Based Clinical
9  Practice" by Gordon Guyatt and others, Third
10 Edition.
11
12         (Whereupon, Ladinsky Exhibit 10 was
13         marked and copy of same is attached
14         hereto.)
15
16    Q.   (BY MR. BROOKS)  Dr. Ladinsky, let
17 me first ask whether you're at all familiar with
18 the name and reputation of Dr. Gordon Guyatt?
19    A.   I'm not.
20    Q.   And let me ask whether you have ever
21 seen this book in any edition: Essentials of
22 Evidence-Based Clinical Practice?
23    A.   I have not.

Page 95

1    Q.   Have you ever attended -- taken a
2  course or attended a seminar in principles of
3  formal evidence-based clinical practice?
4    A.   I have not.
5    Q.   Let me ask you to turn to Page 15.
6  And there Figure 2.3 or 2 dash 3 is headed
7  Hierarchy of Evidence.  And let me ask whether you
8  believe you have any familiarity with the concept
9  of a hierarchy of evidence as a characteristic of
10 evidence-based medicine?
11   A.   I'm familiar with that.
12   Q.   And when you look at Figure 2-3, are
13 these categories of evidence that you believe you
14 understand?
15   A.   Yes.
16   Q.   What do you understand the
17 observational study to be?
18   A.   When a researcher identifies a sort
19 of new population of patients or patients with a
20 specific entity or characteristic and also metrics
21 that would underlie patient important outcomes.
22 They follow that group for a period of time.
23   Q.   And what do you understand to be the

Page 96

1  difference between an observational study and a
2  multi-patient randomized trial?
3    A.   Both would be to an extent
4  prospective, meaning they start at time zero and
5  study population going forward.  However, the
6  second one, the randomized trial assumes what they
7  call equipoise, meaning that if you're looking at
8  the -- wondering about outcomes relative to this
9  population, we really do not know that an
10 intervention or that an outcome can be modified by
11 something.  We want to find out.  And so you would
12 randomly select, and there are procedures for
13 that.  In a randomized trial, two different groups
14 of patients, following them forward.
15   Q.   Are you able to explain why a
16 multi-patient randomized trial ranks higher in the
17 hierarchy of quality of evidence than an
18 observational study?
19   A.   Because when you have two different
20 groups whose characteristics are tightly
21 controlled from the beginning, it's easier to
22 factor out what we call preponderance or
23 extraneous factors impacting your metrics, what

Page 97

1  you want to learn about at the end.
2    Q.   Let me ask -- were you finished?
3    A.   Yes, sir.
4    Q.   Let me ask you to turn to -- it's a
5  long preface.  If you would turn to Page 27 in the
6  preface.
7    A.   Here's 27.
8    Q.   We're going to -- so if you look
9  earlier in the preface, you will find Roman
10 numerals pagination rather than arabic.  And I
11 said 27, but I meant 26.
12   A.   Okay.  I'm confused.  We're going
13 back to Roman numeral areas?
14   Q.   Yes, we are.
15   A.   Okay.  So that's going to be closer
16 to the beginning.
17   Q.   It is.  Page 26.  And there's a
18 paragraph I want you to read that begins,
19 "Awareness of the importance of the pre-appraised
20 evidence and evidence-based recommendations."  And
21 then it says, quote, "We have added a fundamental
22 principle to the hierarchy of evidence and the
23 necessity for value and preference judgments: that

25 (Pages 94 - 97)

Page 98

1 optimal clinical decision-making requires
2 systematic summaries of the best available
3 evidence."
4      A.   Okay.
5      Q.   Are you familiar with the concept of
6 systematic review of medical evidence in your
7 field?
8      A.   I am.  Not in a, you know, deep dive
9 detailed researcher way, but yes.
10      Q.   Have you ever participated in
11 performing a systematic review?
12      A.   No, I have not.
13      Q.   Have you ever had occasion to
14 carefully study a systematic review done by some
15 outfit or group of analysts?
16      A.   I've certainly read them.
17      Q.   Are you able to tell me as you sit
18 here today any specific systematic reviews
19 relating to literature relevant to your field that
20 you have consulted?
21      A.   Explicitly, not -- I mean, the
22 guideline documents themselves include systematic
23 reviews, and there are papers and a number of

Page 99

1 papers on literature relative to the topic at hand
2 that include this as part of what they're
3 discussing.
4      Q.   Is your understanding that the
5 Endocrine Society Guidelines themselves include
6 or -- include a systematic review?
7      A.   I believe that's incorporated into
8 it.
9      Q.   Have you ever consulted the
10 systematic review that you believe those
11 guidelines made use of?
12      A.   I've not explicitly reviewed every
13 single one.
14      Q.   Have you explicitly reviewed a
15 single systematic review relied on by the
16 Endocrine Society 2017 Guidelines?
17      A.   I would have to go back and look at
18 the guidelines to see which ones they referenced
19 and cross it with which ones I read.
20      Q.   And do you know, as you sit here
21 today, whether in comparing WPATH SOC 8, WPATH, or
22 anybody associated with WPATH performed any
23 systematic guideline of any systematic review of

Page 100

1 literature on any topic?
2      A.   I do not explicitly know the answer
3 to that question.
4      Q.   A little father down in the
5 paragraph that begins, "This principle has led,"
6 is a reference to GRADE, G-R-A-D-E, Grading of
7 Recommendations Assessment, Development, and
8 Evaluation.  At which it refers to as providing,
9 quote, "an assessment of the confidence that one
10 can place in the estimates of effect emerging from
11 the review and meta-analysis."
12          Are you familiar with the GRADE
13 system of evaluating the strength of evidence?
14      A.   I'm familiar with it, yes.
15      Q.   And have you ever received any
16 training in how to apply the GRADE system to
17 evaluate the strength of particular published
18 evidence?
19      A.   Not formally but it is part and
20 parcel of the work that we do as clinicians and
21 especially as educators in academic centers.
22      Q.   Have you yourself ever attempted to
23 apply the criteria specified by the GRADE system

Page 101

1 to arrive at a conclusion about the reliability of
2 a particular experimental result reported in the
3 literature?
4      A.   I take it into account as I read
5 each recommendation, yes.
6      Q.   You believe that you are on an
7 ongoing basis familiar with the criteria specified
8 in the GRADE system for evaluating strength of
9 evidence?
10      A.   I'm familiar with it.  It's
11 generally reviewed to in studies.
12      Q.   On Page 15 of this document, which I
13 had you look at Figure 2-3 on previously.  Page
14 15.
15      A.   Okay.
16      Q.   It reads toward the bottom of the
17 page, quote, EBM, evidence-based medicine, places
18 the unsystematic observations of individual
19 clinicians lowest on the hierarchy.  Closed quote.
20 Do you see that language?
21      A.   I do.
22      Q.   Is it consistent with your
23 professional understanding that the unsystematic

26 (Pages 98 - 101)

Page 102

1  observations of an individual clinician such as
2  yourself is the least reliable form of evidence?
3       MS. EAGAN:  Object to the form.
4       A.  I would infer they are referring to
5  a published case report or case collection in the
6  literature, not my own personal commentary or
7  observation.
8       Q.  (BY MR. BROOKS)  Is it your opinion
9  that your own personal unpublished observation is
10  a more reliable source of evidence than published
11  observations of clinicians?
12       MS. EAGAN:  Object to the form.
13       A.  I don't think that plays into what
14  is being discussed in this document.  This is
15  about medical literature and a hierarchy of study
16  design.
17       Q.  (BY MR. BROOKS)  And in the
18  hierarchy of evidence in Figure 2-3, clinical
19  experience is the lowest least reliable form of
20  evidence; am I correct?
21       A.  In the setting in which they
22  describe study design and type, that is what
23  they've got here.

Page 103

1       Q.  And is it consistent with your
2  understanding as a scientist that clinical
3  experience is the least -- provides the least
4  reliable evidence when it comes to potential
5  treatments and outcomes?
6       MS. EAGAN:  Object to the form.
7       A.  I don't think the clinical
8  experience of one clinician plays into what
9  they're evaluating here.  How to understand
10  evidence is presented in a formal published study
11  or a prospective trial.
12       Q.  (BY MR. BROOKS)  And why is it that
13  you don't believe that the clinical experience of
14  an individual clinician such as yourself fits into
15  the hierarchy of evidence specified by
16  evidence-based medicine and principles?
17       A.  Because I think -- it's my
18  impression in this context, having not read the
19  document, but in this context, that they refer to
20  clinical experience -- right here, "either your
21  own or that of a colleague."  As a reference point
22  to understand evidence there all the way up to
23  what you refer to as a randomized trial.

Page 104

1       Q.  In fact, it's your understanding, is
2  it not, that opinions and clinical decisions
3  simply based on a clinician's experience is
4  exactly the problem that evidence-based medicine
5  was developed to solve?
6       A.  I do not know the answer.
7       Q.  In the seven or now eight years
8  since UAB Pediatric Gender Clinic was founded,
9  your clinic has never published -- no one
10  associated with your clinic has published any
11  systematic observational studies of the outcomes
12  in children as a function of the selection or
13  timing of treatment options, correct?
14       A.  That's correct.
15       Q.  And you don't cite anywhere in your
16  report any quantitative data from your own clinic
17  or your own years of experience practicing in this
18  field, correct?
19       A.  Correct.
20       Q.  You don't cite anywhere in your
21  report any systematic review of literature
22  relating to your field, do you?
23       A.  I'd have to look back to see.  I

Page 105

1  know that there are references in some.
2       Q.  You know that there are references
3  to systematic reviews in your expert report?
4       A.  I would have to look back at the
5  many, many that -- the studies that I referenced
6  there.
7       Q.  Did you make an effort to identify
8  relevant systematic reviews of evidence relevant
9  to your field in the course of preparing your
10  expert report?
11       A.  I believe so.
12       Q.  You would agree, would you not, that
13  the seminal and most cited research relating to
14  the treatment of gender dysphoria in minors came
15  out of the Netherlands and Vrije University
16  research team in particular?
17       A.  The earliest ones leaned on the
18  foundation for care provided, yes.
19       Q.  And prominent researchers and
20  clinicians associated with that clinic include Dr.
21  Cohen-Kettenis, Dr. de Vries, Dr. Steensma, Dr.
22  van Goran, correct?
23       A.  I know those names, yes.

27 (Pages 102 - 105)

1    Q.   Over the years you've read many
2  papers published by researchers associated with
3  the Vrije University clinic, have you not?
4    A.   Several.
5    Q.   Is it consistent with your
6  understanding that that university team is the
7  most respected source of research in your field in
8  the world?
9    A.   I think that's a subjective
10  question.
11    Q.   It is, and I asked your opinion.
12    A.   I never -- I mean, are they highly
13  respected, absolutely.  Are they highly
14  experienced, absolutely.
15    Q.   And important publications are still
16  being put out by the Vrije University research
17  team up to the present, correct?
18    A.   Correct.
19    Q.   And they're published in English to
20  your knowledge, right?
21    A.   Those that I've read certainly are.
22    Q.   Have you met any of these four
23  doctors that I just mentioned at conferences or

1  any professional context?
2    A.   I have not.
3    Q.   As part of the continual work that
4  you mention to stay current in research relating
5  to the treatment of gender dysphoria in minors,
6  you attempt to stay abreast of publications from
7  the Vrije University research team, do you not?
8    A.   I do my best.
9    Q.   It's not your opinion that
10  peer-reviewed research coming out of Europe is
11  somehow less relevant to you as an American
12  doctor, is it?
13    A.   Tell me what you mean by less
14  relevant.  Do you mean unimportant or not relevant
15  to what I do?
16    Q.   Is it your opinion that
17  peer-reviewed research coming out of Europe is
18  somehow less relevant to your clinical
19  decision-making than research coming from American
20  researchers?
21    A.   It would depend on the topic being
22  evaluated.  If they're looking purely at systems
23  of care, possibly.  But if they're looking at

1  valid results of certain elements of care,
2  possibly.  Of course we're going to take that into
3  strong consideration.
4    Q.   In fact, it continues to be the case
5  that much of the important research relevant to
6  your practice as a clinician comes from European
7  authors, is it not?
8    A.   I can't agree with that statement.
9    Q.   No.  Is it your opinion that the
10  bodies of children in Europe respond differently
11  to puberty blockers or cross-sex hormones than the
12  bodies of children in America?
13    A.   I can't imagine that being a
14  truthful statement.
15    Q.   And likewise, it's not your opinion
16  that the minds of children in Europe would respond
17  differently to puberty blockers or cross-sex
18  hormones than the minds of children in America?
19    A.   It's a pretty absolute statement
20  with subjectivity.  It's confusing.  They're
21  different environments.
22    Q.   Well, is it your opinion that the
23  minds of children in Europe respond differently to

1  puberty blockers or cross-sex hormones than the
2  minds of children in America?
3    A.   I have not seen evidence to that.
4    Q.   Of any such difference?
5    A.   Correct.
6    Q.   You would agree, would you not, that
7  any responsible clinician needs to stay current on
8  the latest research results and systematic
9  analysis from North America, Europe, and the UK?
10    MS. EAGAN:  Object to the form.
11    A.   I agree they should -- all of us do
12  our best to stay current with relevant research.
13  We also do so with an eye to the various factors
14  that impact the patients including the study.
15    Q.   (BY MR. BROOKS)  Are you aware of
16  the Karolinska Institute in Sweden as a respected
17  source of research in your field?
18    A.   I've heard of such.
19    Q.   Are you familiar with a Dr. -- I'm
20  not going to say her name correctly --
21  D-h-e-j-n-e, Dhejne as a researcher whose
22  literature you have seen?
23    A.   I've seen that name.

Page 110

1    Q.   Are you aware that another author
2 with a substantial number of peer-reviewed papers
3 relating to treatment of gender dysphoria in
4 children is Professor Michael Biggs of Oxford
5 University?
6    A.   I'm not aware of that name, no.
7    Q.   Let me take you to the Endocrine
8 Society Guidelines which are tab 37 in your binder
9 and Exhibit 8 and ask you to turn to Page 3872.
10 Do you have 3872?
11    A.   I do.
12    Q.   Column 2.  Down below the heading
13 Method of Development.
14    A.   Okay.
15    Q.   It states five lines down, the
16 task -- quote, "The task force followed the
17 approach recommended by the Grading of
18 Recommendation, Assessments, Development, and
19 Evaluation group."  GRADE.  And it says a little
20 farther down, "The task force used the best
21 available research evidence to develop the
22 recommendations."  Do you see that?
23    A.   Correct.

Page 111

1    Q.   Do you know whether the Endocrine
2 Society either -- whether the authors, I should
3 say, of these guidelines, either performed or
4 commissioned any systematic review of available
5 science in connection with preparing the
6 guidelines?
7    A.   I would hope so.
8    Q.   Do you know whether they did?
9    A.   In the way that you're defining it,
10 I don't.  Right here it talks about it, though.
11 "The task force commissioned two systematic
12 reviews to support this guideline."
13    Q.   Do you know what the subject of
14 those two systematic reviews was?  And I don't --
15 I'm not -- I don't want to trick you.  There is a
16 description --
17    A.   It's right here.
18    Q.   -- 3873 if you look in Column 1.
19    A.   Right.
20    MS. EAGAN:  Take the time to read
21 that.  If he's going to ask you questions about
22 this commissioned systematic review, take your
23 time if you need to and read through it, Dr.

Page 112

1 Ladinsky.
2    THE WITNESS:  I will.
3    A.   Just this section, sir, commissioned
4 systematic review?
5    Q.   (BY MR. BROOKS)  I understand that
6 to be the paragraph that you just read to be a
7 description of the two systematic reviews that are
8 referred to.
9    A.   Well, right here --
10    MS. EAGAN:  I'm not sure there is a
11 question, though, on the table.
12    Q.   (BY MR. BROOKS)  And let me --
13 before calling your attention to this paragraph,
14 did you have any recollection as to what the
15 Endocrine Society had sought systematic reviews
16 of?
17    A.   It was my impression there were
18 several different entities within this field.
19    Q.   And what this paragraph tells us is
20 that there was, quote, first review that focused
21 on the effect, quote, the effect of steroid use in
22 transgender individuals on the cardiovascular
23 outcomes, correct?

Page 113

1    A.   That's what it says.
2    Q.   And at the top of the next column,
3 it says that, "The second review summarized the
4 available evidence regarding the effect of sex
5 steroids on bone health in transgender
6 individuals."
7    Do you have an understanding of how
8 lipids and cardiovascular outcomes are potentially
9 relevant to your field?
10    A.   I do as in long-term risk factors,
11 but I would be curious as to -- I would want to
12 know the populations involved here.  Were these
13 adults?
14    Q.   Do you have an understanding of what
15 relevance bone health has to your field?
16    A.   Of course.
17    Q.   And what is that relevance?
18    A.   That relevance is the laying down
19 and then retaining supporting of bone mineral
20 density, the strength of the cortical bone.
21    Q.   And why is that an issue of
22 potential concern in connection with treatment of
23 transgender individuals?

29 (Pages 110 - 113)

1     A.    Any time you're discussing a
2  hormonal impact relative to adolescents, bone
3  density may be involved.
4     Q.    Because bone density develops in the
5  course of adolescence?
6     A.    Because it develops more rapidly
7  during certain periods of adolescence.
8     Q.    Did you ever attempt to locate and
9  study the two systematic reviews that the
10  Endocrine Society says they relied on in preparing
11  these guidelines from 2017?
12        MS. EAGAN:  Just to be clear, you're
13  talking about has she gone back and looked at more
14  detail at the two that are mentioned in this
15  section, Commissioned Systematic Review on Page
16  3873; that's what you're asking?
17        MR. BROOKS:  That's exactly what I
18  mean.
19     Q.    Have you attempted to locate --
20  determine whether those are published and locate
21  them and review them?
22     A.    Well, I may have reviewed them.  I
23  have not intentionally done that relative to this

1  paragraph in the last couple of weeks.
2     Q.    Do you know whether you've ever read
3  the systematic reviews referred to in this
4  paragraph?
5     A.    If I saw the reference or the exact
6  paper, I might.
7     Q.    But the Endocrine Society didn't
8  give us a reference, so my question stands:  Do
9  you know whether you have ever read the systematic
10  reviews referred to by the Endocrine Society in
11  this paragraph?
12     A.    Given only this paragraph to look
13  at, I do not.  But I've reviewed many, so.
14     Q.    Are you familiar with an
15  organization called the Cochrane Library?
16     A.    I'm familiar with it.
17     Q.    And are you aware of its reputation
18  as a respected source of systematic reviews of
19  medical evidence?
20     A.    Cochrane reviews have been around
21  for a long time, and they're a respected
22  organization.
23        MR. BROOKS:  Let me mark Ladinsky

1  Exhibit 11 a document with the Cochrane Library
2  logo on it titled "Antiandrogen or estradiol
3  treatment or both during hormone therapy in
4  transitioning transgender women (Review)."  The
5  first author being Haupt.
6
7        (Whereupon, Ladinsky Exhibit 11 was
8        marked and copy of same is attached
9        hereto.)
10
11     Q.    (BY MR. BROOKS)  My first question
12  will be, Dr. Ladinsky, whether you think you've
13  ever seen this document before today?
14     A.    I don't believe I've seen or
15  reviewed this particular document.
16     Q.    Is it consistent with your
17  understanding that antiandrogen or estradiol are
18  hormone therapies used in treatment of natal males
19  who desire to pursue a feminine gender identity?
20     A.    I am.
21     Q.    And, indeed, those are cross-sex
22  hormones in that application that your clinic
23  sometimes prescribes; am I right?

1     A.    That's correct.
2     Q.    Does it surprise you that you have
3  not previously seen this 2020 systematic review of
4  cross-sex hormones prescribed in your clinic that
5  was issued by a respected source of medical
6  systematic reviews?
7        MS. EAGAN:  Object to the form in
8  your phrase couch -- excuse me.  How you've
9  couched this document.  She said she's never
10  reviewed this document.  If you're going to ask
11  her questions about the document and what it is, I
12  would ask that we would be able to take a break so
13  she can review it and she have time to familiarize
14  herself with the document.
15        MR. BROOKS:  Well, I'm not yet and I
16  may not ask questions about the detailed contents.
17     Q.    But given your early testimony about
18  the reputation of the Cochrane Library and your
19  testimony that part of your job is to stay current
20  in the literature, let me ask a slightly different
21  question.
22        Isn't a systematic review from the
23  Cochrane Library of the use of antiandrogen or

Page 118

1  estradiol treatments in transitioning in
2  transgender women a source of information that you
3  would want to be aware of in the course of your
4  professional duties?
5       MS. EAGAN:  Object to the form.
6    A.   Only if it were relevant and timely.
7  Relevant with regard to the group of patients that
8  I study and work with, not that I work with.
9    Q.   (BY MR. BROOKS)  Well, you've
10  testified that these are cross-sex hormones that
11  you use on minors, correct?
12    A.   That's correct.
13    Q.   And this study down in the left-hand
14  corner of the first page shows a date of 2020,
15  correct?
16    A.   It does.  But if we look at when the
17  records that they analyzed were obtained was that
18  well before 2020 in addition --
19       MS. EAGAN:  I think it's best if
20  you're going to ask her questions about the
21  document, whether it's something she would be --
22  important to her, it's only fair to give her time
23  the read the document.  We can take a break for

Page 119

1  that or -- but I don't want her to answer
2  questions without knowing what this document is.
3       MR. BROOKS:  We won't take a break,
4  and I'm not asking questions about the substance
5  of the document.
6    Q.   It's your understanding, Dr.
7  Ladinsky, is it not, that a continued thorough
8  systematic review is going to consider papers
9  across the span of time up until the systematic
10  review is performed?
11       MS. EAGAN:  Object to the form.
12    A.   Researched studies up to 19 December
13  2019.
14    Q.   (BY MR. BROOKS)  I didn't ask you a
15  question about this document.
16       MR. BROOKS:  Would you read the
17  question?
18       MS. EAGAN:  He's asking you about
19  just in general.  Listen to his question.
20       MR. BROOKS:  Let me ask you to read
21  the question back.
22
23       (Whereupon, a portion of the

Page 120

1       testimony was read by the court
2       reporter.)
3
4    A.   I mean, to my recollection, Cochrane
5  reviews focus more on type of studies that have
6  been reviewed and analyzed, less of content.
7    Q.   (BY MR. BROOKS)  It's your
8  understanding that Cochrane reviews, Cochrane
9  systematic reviews are not applying GRADE criteria
10  to evaluate the strength of evidence in medical
11  fields?
12    A.   I know they weight strength of
13  evidence relative to study designs systematically.
14  I'm not aware if they use the exact GRADE system
15  or not.
16    Q.   Are you familiar with antiandrogen
17  that is referred to commonly as CTA?  I'm not
18  asking you a question about the document.
19    A.   I'm not.
20    Q.   All right.  Would you agree that
21  before prescribing antiandrogens or estradiol as a
22  therapy for gender dysphoria, it would be
23  important to have reliable information as to

Page 121

1  results including outcomes of feminization, sexual
2  function, and reduction of gender dysphoria?
3    A.   Best available evidence, sure.
4    Q.   Well, before prescribing
5  body-altering hormones, is it not your opinion
6  that you would want to have reliable evidence on
7  those topics?
8    A.   I believe so.
9    Q.   It's information that you want to
10  the maximum extent it's available, correct?
11    A.   Correct.
12    Q.   Are you able to point to any
13  randomized control study or what you consider to
14  be a methodologically statistically reliable
15  cohort study that, in your opinion, sufficiently
16  establishes the efficacy and safety of hormonal
17  treatments for males transitioning to female
18  gender identities?
19    A.   I think there are a compilation of
20  studies that were taken together analyzed by
21  consensus opinion as you see done in WPATH in the
22  Endocrine Society's guidelines.  There is, you
23  know, solid evidence on that.

31 (Pages 118 - 121)

Page 122

1    Q.   What do you consider to be the most
2  statistically reliable cohort study relevant to
3  establishing the efficacy and safety of hormonal
4  treatments for male transitioning to female gender
5  identities?
6         MS. EAGAN:  You're asking here to
7  identify one specific study?
8         MR. BROOKS:  I am.
9         MS. EAGAN:  Object to the form
10 unless -- I mean --
11        MR. BROOKS:  Counsel, I have been
12 relaxed about it, but you're supposed to say
13 objection and stick with that.
14        MS. EAGAN:  Not in Alabama.  You
15 object to the form.
16        MR. BROOKS:  Exactly.  You object to
17 the form, but I'm hearing a lot more than that.
18        MS. EAGAN:  I don't think I said
19 anything more than that.  But, I mean, she can
20 answer if she has an opinion on what particular
21 study.  I will say, you know, when you look at her
22 expert disclosure, you really are going in areas
23 that are not really what we are tendering her

Page 123

1  specifically for as an expert.  If she has an
2  opinion, she's welcome to talk about it.  But when
3  it comes to all these studies and all that --
4         MR. BROOKS:  Counsel --
5         MS. EAGAN:  -- our other experts
6  will talk about that.
7         MR. BROOKS:  Counsel, lectures, no.
8  And she's offered views on safety and efficacy.
9  And I'm asking questions about the foundation, and
10 I am utterly within the zone.
11        MS. EAGAN:  I'm allowing you to ask
12 your question.  I just want to make clear that
13 there will be another expert that will address
14 some of these studies and data in more detail than
15 she as a clinician.  But if she has an opinion,
16 she certainly is welcome to offer that.
17    Q.   (BY MR. BROOKS)  Dr. Ladinsky, you
18 offered opinions in courts previously that
19 hormonal treatments were safe and efficacious.
20 And my question for you is:  What specific
21 studies -- study or studies do you consider to
22 provide the most statistically reliable evidence
23 of the efficacy and safety of hormonal treatments

Page 124

1  for males transitioning to a female gender
2  identity?
3         A.   I think the body of studies coming
4  out in the last two years, preliminary data from
5  study in the Journal of Medicine.  But it's a
6  compilation of such tendered with expert
7  scientific consensus and oversight that gives us
8  as clinicians on the ground the information to not
9  just treat our patients and see -- but what -- in
10 addition, what to always be sure we're discussing
11 with patients.
12    Q.   Is it the case that as a clinician
13 you primarily rely on what you refer to as
14 consensus opinion as reflected in the WPATH and
15 Endocrine Society Guidelines rather than
16 attempting to form your own opinion based on the
17 peer-reviewed literature as to what is or is not
18 safe and efficacious?
19    A.   We utilize all of it together in the
20 context of cost, benefit for each patient in front
21 of us.
22    Q.   Correct.  Then let's go back to the
23 literature.  You mentioned Chen's recent paper.

Page 125

1  Is there any other paper that you want to identify
2  as providing what, in your opinion, is reliable
3  evidence of the safety and efficacy of cross-sex
4  hormonal treatments for males seeking to
5  transition to a female gender identity?
6         A.   Not at this time when it comes to
7  specific details of specific studies.
8         Q.   You testified preliminary injunction
9  hearing that you were -- you were asked.  I'll
10 refer you to Page 125 of that testimony.  It is
11 12.
12         You were asked about a statement
13 from Sweden's National Board of Health.  And what
14 I want to ask you now is:  What you said was, "I'm
15 not imminently apprised of that."  I'm going to
16 ask you a little bit more about Sweden.
17         At the time of that testimony, were
18 you aware of the policy statement put out by
19 Sweden in February of 2022?
20    A.   I was not.
21    Q.   So the question on the stand was the
22 first you had heard of that?
23    A.   I believe so.

32 (Pages 122 - 125)

1    Q.   Have you since then gone and
2  reviewed at least the official English language
3  summary put out by the Swedish health authority?
4    A.   Not in immense detail.
5    Q.   Have you read it?
6    A.   I'm not sure we're referring to the
7  same document.  If you have the document, I'll be
8  happy to look at it and tell you if I've seen it
9  before.
10    MR. BROOKS:  Let me mark this
11  Ladinsky Exhibit 12 the document "Care of children
12  and adolescents with gender dysphoria.  Summary."
13
14        (Whereupon, Ladinsky Exhibit 12 was
15        marked and copy of same is attached
16        hereto.)
17
18    Q.   (BY MR. BROOKS)  My question at this
19  point is simply whether you believe you've read
20  this document before today?
21    A.   I've skimmed it.
22    Q.   How did you obtain it?
23    A.   It's on the Internet.  If it's the

1  same document.
2    Q.   Have you made any efforts to obtain
3  documents related to the systematic review of the
4  literature relating to treatment of gender
5  dysphoria in minors that was commissioned by the
6  Swedish health authority?
7    A.   No, I have not.  I've simply skimmed
8  what they have in the public domain.
9    MR. BROOKS:  I want to mark as
10  Ladinsky Exhibit 13 what is titled "Appendix 3.
11  Characteristics of included studies:  Extracted
12  data."  Dated 2022.
13
14        (Whereupon, Ladinsky Exhibit 13 was
15        marked and copy of same is attached
16        hereto.)
17
18    MR. BROOKS:  I want to mark as
19  Ladinsky Exhibit 14 a document titled "Appendix 2
20  Studies excluded due to high risk of bias."  Also
21  dated 2022.
22
23        (Whereupon, Ladinsky Exhibit 14 was

1        marked and copy of same is attached
2        hereto.)
3
4    Q.   (BY MS. EAGAN) Dr. Ladinsky, these
5  documents are in the public domain with modest
6  exceptions are in English.  Are these documents
7  that you've obtained and reviewed before today?
8    A.   Certainly not exhaustively.  I do
9  believe I've skimmed some of them.
10    Q.   Exhibit 14 is the excluded studies
11  taken.
12    A.   Okay.
13    Q.   Is this a document that you've
14  reviewed before today?
15    A.   No, sir.
16    Q.   So you don't have any -- they're
17  described as "excluded due to high risk of bias."
18  Do you see that language?
19    A.   I see that.
20    Q.   Do you have an understanding of a
21  formal or technical meaning of bias relevant to
22  medical research literature?
23    A.   I believe that these are studies

1  whose methodology is quite dissimilar from a
2  randomized double-blind placebo-controlled study.
3    Q.   Do you have an understanding of the
4  technical meaning of bias when it comes to
5  discussion of the results of research studies?
6    A.   To a superficial extent.
7    Q.   What is that extent?
8    A.   Simply that there can be
9  confounders.  There can be elements influencing
10  the results that may not have been controlled for
11  in the same way they could have in an RCT,
12  randomized controlled trial.  It does not mean the
13  results are insignificant or should be adopted or
14  not adopted.  It simply refers to study
15  methodology and the ability to eliminate
16  confounders.
17    Q.   And aspects of methodology that
18  create a high risk of bias, am I correct, can
19  result in the results being unreliable or I should
20  say unpredictive of results that would be obtained
21  in other patients?
22    A.   I don't agree with that.  As a
23  clinician I see that term as perhaps the study

Page 130

1  findings are less generalizable.
2      Q.   Do you believe that you have
3  previously reviewed the document that I've marked
4  as Ladinsky Exhibit 13 which is a list of included
5  studies?
6      A.   I do not. I've not seen this. It's
7  just extracted --
8          MS. EAGAN:  I think the question
9  was:  Have you seen or recall seeing DX 13?
10     A.   No.
11         MR. BROOKS:  Let me mark as Ladinsky
12  Exhibit 15 a document entitled "Evidence review:
13  Gonadotrophin releasing hormone analogues for
14  children and adolescents with gender dysphoria."
15  Dated October 2020.
16
17         (Whereupon, Ladinsky Exhibit 15 was
18         marked and copy of same is attached
19         hereto.)
20
21     Q.   (BY MR. BROOKS)  And Dr. Ladinsky,
22  this document says in its opening paragraph,
23  quote, "This document will help inform Dr. Hilary

Page 131

1  Cass' independent review into gender identity
2  services for children and young people."  And it
3  goes on.
4          But is this a document that you have
5  studied before today?
6      A.   No, sir.
7      Q.   Are you familiar with a report
8  issued by Dr. Hilary Cass to the English health
9  service in 2022?
10     A.   I believe it's an interim report.
11     Q.   It is titled "Interim report."  Have
12  you studied that document with some care?
13     A.   Not studied it but I'm familiar with
14  it.
15     Q.   And given your desire to stay
16  current in the scientific knowledge in your field,
17  why have you not before today reviewed the
18  analysis and conclusions of this evidence review
19  prepared by the NICE organization in England?
20         MS. EAGAN:  Object to the form.
21     A.   I've read it but I'm not going to
22  say I read every single page and every single word
23  in deep deep detail. These are Dr. Cass' interim

Page 132

1  recommendations.
2      Q.   (BY MR. BROOKS) I'm sorry. Let me
3  be clear in my question because we're confusing
4  documents.
5          Back to Exhibit 15, which is the
6  evidence review, not the interim report. We
7  talked earlier in the context of evidence-based
8  medicine about the role of systematic reviews.
9  And my question is:  Given the testimony you have
10  given about your desire to stay current and
11  knowledgeable about the scientific knowledge in
12  your field, why have you not studied the analysis
13  and conclusions of this systematic review of
14  puberty blockers as a treatment of gender
15  dysphoria in children and adolescents?
16         MS. EAGAN:  Object to the form.
17     A.   This document that I'm looking at
18  was never elevated to my attention in the form it
19  is right here.
20     Q.   (BY MR. BROOKS) Do you have any
21  knowledge as to whether this particular systematic
22  review has been cited by healthcare authorities in
23  other European countries?

Page 133

1      A.   I do not. I have no knowledge.
2      Q.   Do you have any knowledge as to
3  whether it's been cited by healthcare authorities
4  in various states of the United States?
5      A.   I do not.
6      Q.   Do you have any knowledge as to
7  whether this systematic review is the most
8  comprehensive and detailed systematic review of
9  the literature relating to use of puberty blockers
10  in minors that have been performed to date?
11     A.   I do not.
12     Q.   As a clinician, it is important to
13  you to have the best available knowledge with
14  regard to the clinical effectiveness of treatment
15  of children and adolescents with puberty blockers
16  compared with treatment relying solely on
17  psychological support, correct?
18         MS. EAGAN:  Object to the form and
19  the term "best available".
20         MR. BROOKS:  Let's hear the question
21  back.
22
23         (Whereupon, a portion of the

34 (Pages 130 - 133)

1        testimony was read by the court
2        reporter.)
3
4        MS. EAGAN:  Object to the form.
5    A.   I would think it's important to all
6  clinicians, but I'm not sure really what you're
7  asking.
8    Q.   (BY MR. BROOKS) I'm asking:  Don't
9  you want to be aware of the latest information and
10  best analysis with regard to the safety and
11  efficacy of puberty blockers as a treatment for
12  gender dysphoria in minors as compared to the
13  alternative of psychological support and
14  psychotherapy alone?
15    A.   Like I said, I'm not sure what
16  you're trying to ask.
17    Q.   What part of my question is unclear
18  to you?
19    A.   The idea of comparing those two
20  groups.
21    Q.   Well, you testified earlier that in
22  your own clinic you're able to significantly
23  ameliorate distress by means of psychotherapy and

1  support prior to administration of hormones,
2  correct?
3        MS. EAGAN:  Object to the form.
4  Misstates previous testimony.
5    A.   Only -- it's not that that's -- I
6  mean --
7        THE WITNESS:  Should I answer that?
8        MS. EAGAN:  I mean --
9        MR. BROOKS:  That's how it works.
10        I will ask the court reporter to
11  read the question.
12
13        (Whereupon, a portion of the
14        testimony was read by the court
15        reporter.)
16
17    A.   Okay.  So youth who are not
18  currently receiving puberty blockers or hormones,
19  okay, either because they're too young or not
20  quite eligible for such are not simply set out
21  with psychotherapy alone.  These youth by and
22  large have made a social transition and are living
23  in their identity.  They're not a homogeneous

1  group of patients.  Each one is unique and
2  different.  But for these youth with significant
3  gender dysphoria in our space and having been
4  referred to us, they're not a case-controlled
5  group.  They're -- those eligible for puberty
6  blocking medication may receive it.  Individual
7  cases.  Each one is looked at.  Others may not yet
8  be eligible or may be of an age that they're no
9  longer eligible.  However, they are living in
10  their identity.  Family, work is going on, therapy
11  is going on.  And they see down the line that they
12  may become eligible for hormonal therapy.  Those
13  are taken together what can allay the dysphoria.
14  Not a single intervention.  So I guess where I had
15  trouble with that one is that I don't see these
16  two groups -- eligible for puberty blockers, you
17  get them, you don't.  Let me compare them.  I
18  don't see that as a safe or realistic description
19  of the use for hormonal care.
20    Q.   Well, let me ask, I guess, a simpler
21  question.
22    A.   Okay.
23    Q.   Isn't it important to you as a

1  clinician to know how the effectiveness for
2  reducing gender dysphoria of puberty blockers or
3  cross-sex hormones compares in outcomes to
4  psychological support and psychotherapy alone
5  without medical intervention?
6    A.   I believe we have a wide body of
7  research that helps us understand that.  I don't
8  believe that those two hypothetical groups would
9  be eligible for a prospective randomized
10  controlled trial to understand that.
11    Q.   Nor did I ask you that.
12    A.   Okay.  Just making sure.
13    Q.   What I asked you was:  Don't you
14  believe it's important to you as a clinician to
15  have the best available information about the
16  relative efficacy for relieving gender dysphoria
17  in minors of hormonal interventions on the one
18  hand and psychotherapeutic interventions without
19  medical intervention on the other?
20        MS. EAGAN:  Object to the form.
21    A.   And I believe a wide body of
22  research does discuss that.
23    Q.   (BY MR. BROOKS)  I didn't ask that.

35 (Pages 134 - 137)

Page 138

1 I asked whether it's important to you as a
2 clinician to have the best available information
3 on that question?
4      A.   It's important to have the best
5 available information on anything that pertains to
6 my patients.
7      Q.   And it would likewise be important
8 to parents of a child facing medical choices for a
9 gender dysphoric child to have that information?
10      MS. EAGAN:  Object to the form.
11      A.   It's important for parents to have
12 all of the available information.
13      Q.   (BY MR. BROOKS)  And it's important
14 for medical health policy-makers to have that
15 information?
16      MS. EAGAN:  Object to the form.
17      A.   When you say policy-makers, do you
18 mean governments, institutions, consensus bodies
19 issuing recommendations?
20      Q.   (BY MR. BROOKS)  I mean any
21 organization that is making recommendations or
22 making decisions about reimbursement or making
23 decisions about availability, making decisions

Page 139

1 about medical policy?
2      A.   On a very general level, it would be
3 relative to any proposed treatment or any proposed
4 medical intervention.
5      Q.   And likewise, I was asking about
6 efficacy.  It's important to you as a clinician to
7 have the best available information about both
8 short-term and long-term safety of hormonal
9 interventions on the one hand and
10 psychotherapeutic support and counseling without
11 medical interventions on the other?
12      MS. EAGAN:  Object to the form.
13      A.   The former, absolutely.  The latter,
14 there's a wide body of evidence as well as
15 clinical experience which shows us that that is
16 not a population I would propose to study.
17      MR. BROOKS:  Let me ask you to read
18 back the question.
19
20      (Whereupon, a portion of the
21      testimony was read by the court
22      reporter.)
23

Page 140

1      MS. EAGAN:  Object to the form.
2      Q.   (BY MR. BROOKS)  And you can try to
3 answer the question.
4      A.   I thought I just did.
5      Q.   And I think you -- is it your
6 testimony that you don't consider it important to
7 have the best available information about short
8 and long-term safety of psychotherapy and
9 counseling support as a treatment for gender
10 dysphoria in minors?
11      A.   I think the relevant research and
12 clinical experience to date informs us very well
13 in those spheres.  We are always evaluating
14 ongoing work as it's done and comes in.
15      Q.   Dr. Ladinsky, is it important to you
16 as a clinician to have the best available evidence
17 about the safety, both short and long term, of
18 both hormonal interventions for gender dysphoria
19 in minors and, on the other hand, treatments that
20 rely on psychotherapy and counseling support,
21 short and long term?
22      MS. EAGAN:  Object to the term
23 "available evidence" and the form.  You can

Page 141

1 answer.
2      A.   I don't -- I mean that's information
3 that is very helpful, but I don't see a
4 prospective study looking at those two groups as a
5 safe ethical practical or doable entity.  That
6 would put people in harm's way.
7      MR. BROOKS:  Let's take a break.
8
9      (Whereupon, a lunch recess was
10      taken.)
11
12      Q.   (BY MR. BROOKS)  Let me ask you, Dr.
13 Ladinsky, if you can find your expert report Tab
14 13 in the binder, and turn to Page 19 if you
15 would.
16      And at the end of the only full
17 paragraph on the page, it reads, "Suicidality is
18 of particular concern for this population because
19 the estimated lifetime prevalence of suicide
20 attempts among transgender people is as high as 40
21 percent."  Do you see that language?
22      A.   I see it.
23      Q.   And let me ask you first:  Do you

36 (Pages 138 - 141)

Page 142

1  consider yourself an expert in suicide and
2  suicidality?
3      A.   I am not an expert in that area, no.
4      Q.   And do you have any understanding as
5  to whether the 40 percent number -- and I think in
6  the Ivy complaint, actually you have a 45 percent
7  number -- refers to actual attempts or intents or
8  suicidal ideation?
9      A.   I stated here, suicide attempts
10 among transgender people as high as 40.  And I
11 agree with what's written right there.
12     Q.   And --
13     A.   Attempts.
14     Q.   I just want to get clear on that
15 before we went elsewhere.
16          I want to ask you some questions
17 about suicide.  Have you ever made any efforts to
18 find research that reports information about
19 actual completed suicide among gender dysphoric
20 individuals, minors either before or after
21 transition?
22     A.   I've read a bit about that.
23     Q.   And what studies are you aware of

Page 143

1  that provide information about actual suicide
2  among that population either before or after
3  transition?
4      A.   I mean, again, as a clinician, sir,
5  I'm not going to be encyclopedic on specific
6  studies, who wrote them, when were they published,
7  et cetera, but more in that generalized body of
8  knowledge.  So there are many that discuss this
9  topic.
10     Q.   There are many that discuss actual
11 suicide rates is your testimony?
12     A.   There are several that discuss
13 suicide rates similar to what's quoted here.
14     Q.   Are you -- what you've quoted here
15 is not a suicidal rate.  It's --
16     A.   No.
17     Q.   -- an attempt rate, correct?
18     A.   It's a prevalence of suicide
19 attempt.  That's correct.
20     Q.   While you're not an expert in
21 suicide and suicidality, you understand that there
22 is a very wide large difference between suicide
23 attempts and actual completed suicide, correct?

Page 144

1          MS. EAGAN:  Object to the form.
2      A.   I'm not an expert.  I think all of
3  it -- all of it is inordinately concerning and
4  front and center in care for this population.
5      Q.   Do you know whether it is the case
6  that the vast majority of suicidality among minors
7  does not lead to suicide?
8      A.   Your definition of suicidality is?
9      Q.   It's a term I believe you used.  Do
10 you have a definition that you prefer to work
11 with?
12     A.   We consider it suicidality to --
13 it's a broad term to sort of encompass thoughts of
14 actual intent to pursue, intent with a plan,
15 failed action, completion.  It's a very wide range
16 group of thoughts or behaviors.
17     Q.   Are you aware of any evidence of
18 suicide by any prepubertal child believed to be
19 the results of gender dysphoria?
20          MS. EAGAN:  You said prepubertal?
21          MR. BROOKS:  I did.
22     A.   Am I aware of or have I read about;
23 is that your question?

Page 145

1      Q.   Are you aware of any evidence of
2  actual completed suicide by any prepubertal child
3  that's believed to be due to gender dysphoria?
4      A.   I am not personally, but that
5  doesn't mean it hasn't happened.
6      Q.   All I can ask you about today is
7  what you know.
8      A.   Sure.
9      Q.   You would agree with me, would you
10 not, that evidence relating to actual completed
11 suicide whether before -- among gender dysphoric
12 minors whether before or after transition could be
13 quite important for considerations of clinical
14 decisions, informed consent?
15     A.   Yes.
16     Q.   Are you aware of any study that
17 demonstrates that medical transition of any type
18 reduces the rate of completed suicides among any
19 gender dysphoric population whether adult or
20 minor?
21     A.   I cannot speak to specific studies,
22 but I believe the body of literature helps us in
23 showing that transgender people who are afforded

37 (Pages 142 - 145)

Page 146

1  the ability to live, present, you know, consistent
2  with their identified gender will have less
3  suicide attempts completion.
4      Q.   And my question was not about
5  suicide attempts.  So let's -- I want to talk
6  about suicide, people who die.
7          Do you believe -- have you ever read
8  any study that concluded that medical transition
9  of any type reduced the rate of suicide among
10  gender dysphoric population?
11     A.   As I've said, I'm not, you know, the
12  researcher that knows every single study in its
13  isolation.  But I believe there's a body of
14  evidence that helps us affirm that.
15     Q.   When you refer to a body of
16  evidence, what are you referring to?
17     A.   Collections of data.
18     Q.   What collections of data?
19     A.   I mean --
20     Q.   Dr. Ladinsky, if the answer is I
21  don't know, then that's the answer.  I want you to
22  identify for me what you're referring to as a body
23  of evidence.

Page 147

1      A.   I cannot point to specific study or
2  a specific compilation of studies.
3      Q.   Would you agree that the long-term
4  effects of hormones on suicide, completed suicide
5  is at least as important to a meaningful
6  evaluation of the beneficence of such procedures
7  as are measures of short-term happiness?
8      A.   That was a mouthful.
9          MR. BROOKS:  She can read it back.
10
11         (Whereupon, a portion of the
12          testimony was read by the court
13          reporter.)
14
15     A.   I'm not a medical ethicist, and I
16  will not render an opinion on that.
17     Q.   (BY MR. BROOKS)  All right.  Let me
18  ask a slightly more general question.  Would you
19  agree that the long-term effects of hormones on
20  health and mental health into the adult years are
21  at least as important to the meaningful evaluation
22  of the ethics of administering those treatments to
23  children as are the short-term effects?

Page 148

1          Long-term effects --
2      A.   Right.
3      Q.   -- need to be considered at least as
4  important as short-term effects; would you agree
5  with that?
6      A.   We're talking about long-term and
7  short-term effects.  I'm happy to do so with one
8  caveat.  Those treatments are never administered
9  to children.  But if we're talking about
10  adolescents going forward, that's a little bit
11  clearer.
12     Q.   To be clear on the record, I accept
13  your making it more precise.
14     A.   Thank you.  So I'm not going to make
15  a value statement about care in adolescents versus
16  quality of life in adulthood.  It's critically
17  important that we are well aware of -- and we
18  discuss with families -- potential long-term
19  effects of these medications on their young person
20  in adulthood.
21     Q.   That is you as a clinician.  It's
22  not appropriate for you to focus with the family,
23  with the child just on short-term mental health

Page 149

1  and happiness?
2      A.   Agree.  It's a comprehensive
3  discussion.
4      Q.   And do you have any view as to
5  whether data as to whether hormones increase or
6  decrease death by suicide in the long term would
7  be relevant to whether a doctor can ethically
8  prescribe such medications to adolescents?
9      A.   I don't believe I can answer that in
10  a yes or no, you know, using the principles of
11  ethics that our medical ethicists use because I'm
12  not one.  I do think the discussion of what is
13  known about long-term effects must come into and
14  is part and parcel of the discussions we have with
15  families around the care we provide.
16     Q.   You're a doctor who has obligations
17  under medical ethical principles; am I correct?
18     A.   That's correct.
19     Q.   And yet you're unable to tell me
20  whether, in your view, data about whether hormones
21  increase or decrease death by suicide in the long
22  term is relevant to the question of whether you
23  can ethically prescribe those hormones to an

38 (Pages 146 - 149)

1  adolescent?
2         MS. EAGAN:  Object to the form.
3      A.   It's extremely difficult to draw a
4  linear relationship between one medication or one
5  course of medical therapy in adolescents and
6  suicide in adulthood because there's so many
7  different factors and life trajectories that
8  impact one to the other.
9      Q.   (BY MR. BROOKS)  Does your clinic
10 maintain contact and records with your patients
11 that enable you to know with confidence how many
12 of those for whom your clinic has prescribed
13 cross-sex hormones as adolescents or its young
14 adults have subsequently committed suicide?
15     A.   We do not have a formal mechanism
16 around, you know, obtaining that data going
17 forward in the same way as in my primary care
18 pediatric clinic.  We don't have a systematic way
19 of tracking parameters of health and well-being
20 once our patients graduate from our space and go
21 on into college or adulthood.  One would hope we
22 would be apprised of a tragedy like that through
23 families.  Because we get to know our families

1  very well, and we have fortunately never received
2  that phone call.
3         MR. BROOKS:  Let me mark as Ladinsky
4  Exhibit 16 a paper entitled "Psychosocial
5  Functioning in Transgender Youth after 2 Years of
6  Hormone."  By Diane Chen and many other authors.
7  From 2023.
8
9         (Whereupon, Ladinsky Exhibit 16 was
10        marked and copy of same is attached
11        hereto.)
12
13     Q.   (BY MR. BROOKS)  Dr. Ladinsky, am I
14 correct that this is a paper that you referred to
15 in testimony this morning?
16     A.   I have reviewed this document, yes.
17     Q.   And you referred to it specifically
18 in testimony this morning, correct?
19     A.   Uh-huh.  As a study that gives us
20 time zero going forward prospective.
21     Q.   And is Diane Chen or these other
22 coauthors respected researchers in your field to
23 your knowledge?

1      A.   I do not know all of them.  But
2  those whose names I've seen, the answer is yes.
3      Q.   What names stand out that you are
4  able to direct us to?
5      A.   Drs. Rosenthal, Hidalgo, Ehrensaft,
6  Olson-Kennedy.
7      Q.   Is Dr. Chen among those whose
8  reputation you know?
9      A.   Quite possibly.  I just -- remember
10 I'm not a researcher.  I'm a clinician.  I'm
11 not --
12     Q.   But this is a paper that you studied
13 for some care after it came out?
14     A.   I've read it.  I don't know that I
15 could quote you exact details of any given
16 anything, but I'm happy to --
17     Q.   Well, I couldn't either.  But just a
18 few details I want to ask you about.
19     A.   Let's do it.
20     Q.   Sticking with the first page where
21 things are simplified a bit.  Under results, it
22 refers to a total of 315 transgender and nonbinary
23 participants.  That seems to be -- you understand

1  that to be the study size?
2      A.   Study population.
3      Q.   Study population?
4      A.   Correct.
5      Q.   Thank you.  And it says that they
6  have a mean age of 16 when they were enrolled.
7  Standard deviation of 1.9, right?
8      A.   I would have to look at methods to
9  find out if that 16 reflects when they were
10 enrolled or when the evaluative analysis was done.
11     Q.   Okay.  It says with mean age of 16
12 were enrolled.
13     A.   Perfect.
14     Q.   But I don't know the math terms on
15 that so I won't take time.
16     A.   No worries.
17     Q.   And the study covers -- if you look
18 at conclusions or the title of the study, it
19 covers two years following the beginning of
20 hormone treatments for adolescents, correct?
21     A.   I believe so.
22     Q.   If you turn with me to Page 243, it
23 tells us -- about 3 or 4 inches down in the first

Page 154

1 column in 243 -- that two participants died by
2 suicide during the study, one after 6 months of
3 follow-up and the after 12 months of follow-up.
4 Do you see that?
5       A.    Yes, I do.
6       Q.    And so for one, that was 6 months
7 after beginning hormonal treatment; and for the
8 other, it was approximately a year after beginning
9 hormonal treatment, correct?
10      A.    That's correct.  That's what it
11 says.
12      Q.    And that is -- across the span, that
13 is of the study population of 315, two committed
14 suicide within a year of beginning cross-sex
15 hormonal treatments, right?
16      A.    That's correct.
17      Q.    And if you turn with me to Page 245
18 and Table 2, the authors identify death by
19 suicide.  There's two deaths by suicide as adverse
20 events associated with this study, correct?
21      A.    That's what they state in this
22 chart.  I would have to go back to see exactly how
23 they -- what they -- what the conclusion criteria

Page 155

1 were for an adverse.
2       Q.    The authors --
3       A.    That's what they say.
4       Q.    The authors label those suicides as
5 adverse events in this study?
6       A.    Absolutely.
7       Q.    Are you aware of -- so that's 2 out
8 of 315 in the course of a year.  That's a rate of
9 something more than one-half percent mortality in
10 a year, agree?  2 is more than half a percent of
11 315?
12      A.    The most.  Okay.  I'm not doing math
13 in my head right now.
14      Q.    You know what, I'm going to
15 represent to you that 2 divided by 315 is about .6
16 percent?
17      A.    Not even 1 percent, okay.
18      Q.    Well you said not even 1 percent.
19 But are you able to point me to any study or any
20 compilation or any body of information anywhere
21 that found that high a rate of death by suicide
22 among gender dysphoric adolescents who had not
23 received cross-sex hormones?

Page 156

1       A.    I think my first question is this,
2 and I don't know the answer.
3       Q.    I ask the questions, but you can go
4 ahead.
5       A.    Where my brain is going to be able
6 to answer your question is what is the prevalence
7 of suicide in the general population if we took a
8 group of people who are 16 plus or minus 1.9
9 years.
10      Q.    That is because we don't have a
11 control here, you can't attribute causation?
12      A.    No, I did not say that.
13      Q.    Wouldn't you say it?
14      A.    No.  I only -- all I said was in
15 order to answer that question, I would love to
16 know the answer to my first thought:  What is the
17 population prevalence relative to this group --
18 this age group of young adults currently in
19 America.
20      Q.    Without being an expert in suicide,
21 you know, do you not, that the general adolescent
22 population does not exhibit an annual suicide rate
23 of half a percent?

Page 157

1       A.    I don't know what the exact number
2 is.
3       Q.    But let me ask again whether you're
4 aware of any study or summary or body of knowledge
5 that found a rate of suicide as high as half a
6 percent per year among gender dysphoric
7 adolescents who had not been subjected to
8 cross-sex hormones?
9       A.    I cannot point you to a singular
10 study.  But my inference from my own clinical
11 experiences, it would be higher.  And given the
12 youth I see in the hospital, I would imagine it
13 would be higher.
14      Q.    You would imagine that?
15      A.    I would imagine that.  I don't have
16 an exact study to point you to.
17      Q.    Dr. Ladinsky, would you not agree
18 that in this paper, Dr. Chen and Olson-Kennedy and
19 others report what is in fact a catastrophic
20 suicide rate?
21            MS. EAGAN:  Object to the form.
22      A.    I would only say that they report
23 that using that adjective if they stated that in

1 the study. Can I look through and see if that's
2 in their conclusion?
3    Q.   They don't use that word.
4    A.   Okay.
5    Q.   I'm asking for your opinion.
6    A.   Okay.
7    Q.   Isn't this a stunningly high suicide
8 rate, 2 out of 315 in just one year?
9    A.   I would not call that catastrophic.
10    Q.   All right.  Do you believe that the
11 rate of suicide that they experienced amongst
12 their study population is unexpectedly high among
13 a population receiving cross-sex hormones?
14    A.   No, sir, I don't.
15    Q.   Do you think that a reasonable
16 parent considering whether to approve cross-sex
17 hormones for their adolescent child would want to
18 know that this recent study by Chen, et al.,
19 observed a completed suicide rate deaths of 2 out
20 of 315 in just a year?
21       MS. EAGAN:  Object to the form.
22    A.   I've never had a parent ask for that
23 figure as we discuss use of these medications for

1 their own individual young person.
2    Q.   (BY MR. BROOKS)  And if they don't
3 ask, you don't tell?
4       MS. EAGAN:  Object to the form.
5    A.   I don't think that's an appropriate
6 statement to say what we do or don't do in
7 counseling families relative to these medications.
8    Q.   Let me re-ask my original question.
9 Don't you believe that a parent considering
10 whether or not to approve cross-sex hormones for
11 their adolescent child would want to know that
12 this recent and prominent study experienced an
13 actual death rate of 2 out of 315 adolescents in
14 just one year?
15    A.   I can't speak for what any parent
16 would or would not want to know.
17    Q.   Are you a parent?
18    A.   I am.
19    Q.   Wouldn't you want to know that?
20    A.   I would want to know -- and I'm kind
21 of bringing with you the framework that many of
22 the parents come to us with.  They are aware of
23 very high suicide rates or rates of suicidal

1 ideation among transgender people who have not had
2 the opportunity or even those who may have to live
3 in accordance with their identity.  Most parents
4 are very aware of that.  They also may have
5 experienced it in their child.  So would they want
6 to know, is there data that suicide can still
7 happen even while my child is receiving
8 medication?  I can't tell you if they would want
9 to know that or not.  But I'm saying it's -- I
10 can't put myself in the place of any one parent.
11 It's a very complex interplay in these rooms with
12 each individual patient.
13    Q.   When you read the Chen, et al.,
14 study just out this year, am I correct in assuming
15 that you noticed the data about the two suicides?
16    A.   I did.
17    Q.   So you're aware of that?
18    A.   That's for sure.  I'm sorry.  Yes, I
19 am aware of that.
20    Q.   You can say that's for sure.
21    A.   No.  It's more of an expression than
22 a statement of empirical fact.
23    Q.   Are you aware of any data from any

1 source that reports an equally high rate of
2 suicide per year among an untreated gender
3 dysphoric population?
4    A.   I am not aware of any specific data
5 set.
6       MR. BROOKS:  We'll mark as Ladinsky
7 17 an article by Dutch name Wiepjes,
8 W-i-e-p-j-e-s, and others dated 2020.  Titled
9 "Trends in suicide death risk in transgender
10 people: results from the Amsterdam Cohort of
11 Gender Dysphoria study (1972 to 2017)."
12
13       (Whereupon, Ladinsky Exhibit 17 was
14       marked and copy of same is attached
15       hereto.)
16
17    Q.   (BY MR. BROOKS)  Dr. Ladinsky, you
18 cite at least one different paper by Wiepjes in
19 your expert report, but I don't recall whether you
20 cited this one.  Is this a paper that you're
21 familiar with?
22    A.   I'm not.
23    Q.   Are you familiar with the existence

41 (Pages 158 - 161)

Page 162

1  of a number of papers over the years coming out of
2  the so-called Amsterdam cohort?
3      A.   Peripherally.
4      Q.   And looking at the authors here, you
5  see Wiepjes, Steensma, and others?
6      A.   Uh-huh.
7      Q.   And do you have any knowledge as to
8  the reputation of those researchers?
9      A.   The final author.  Steensma appears
10 throughout the literature.
11     Q.   If you look in the methods summary
12 on the first page, it describes this as a chart
13 study including all -- just on the very first page
14 where it says methods.
15          "A chart study, including all 8,263
16 referrals to our clinic since 1972."  Do you see
17 that?
18     A.   I do.
19     Q.   Do you have an understanding of what
20 a chart study is?
21     A.   Retrospective chart review, yes,
22 sir, I do.
23     Q.   Can you describe briefly what a

Page 163

1  chart study is?
2      A.   It's where researchers at time, a
3  certain fixed point in time review backwards
4  information simply from what is documented in the
5  medical record looking at a certain population
6  around a certain study metric.
7      Q.   And these -- this team had perhaps
8  due to the medical record structures of the
9  Netherlands a very large study population,
10 correct?
11     A.   It's a good number.
12     Q.   They claim that it's everybody who
13 has been referred to their clinic since 1972,
14 correct?
15     A.   That's what they claim.
16     Q.   And this is one of the world's
17 preeminent gender clinics?
18     A.   Certainly one of the earliest.
19     Q.   Are you not willing to concede that
20 to this day it's one of the world's preeminent
21 gender clinic?
22     A.   I think preeminent is a valuating
23 term.  So what one person may call preeminent,

Page 164

1  someone else may not.
2      Q.   It is.  But you're a professional in
3  the field, and I want your opinion as to whether
4  this is recognized as one of the preeminent gender
5  clinics in the world?
6      A.   It's a fair statement.  Some would
7  recognize it that way.
8      Q.   How about you?
9      A.   Honestly, I've never -- it's not
10 something that I've said, oh, yeah, they're
11 preeminent.  I've just said, they were certainly
12 one of the earliest and have phenomenal data and
13 can be very instructive in how others do what they
14 do.
15     Q.   Let me take you to Page 489, the
16 second column.  And down to the very bottom
17 crossing over into 490, I want to read a sentence
18 to you.  It says, quote, "In our cohort, both
19 trans women and trans men show a three- to
20 four-fold elevated risk of suicide compared with
21 the population rate in the Netherlands and can
22 therefore be considered a high risk group."  Do
23 you see that language?

Page 165

1      A.   I do.
2      Q.   And is that consistent with your
3  general understanding of the -- strike that.
4          On Page 490 second column, these
5  authors, including Dr. Steensma state in the first
6  full paragraph, "An important finding was that the
7  incidence for observed suicide deaths was almost
8  equally distributed over the different stages of
9  treatment."  And if you go down another inch and a
10 half is a sentence --
11         MS. EAGAN:  Where are you reading?
12         THE WITNESS:  Right there.
13     Q.   (BY MR. BROOKS) And down an inch and
14 a half is a sentence that reads, quote, "This
15 indicates that vulnerability for suicide occurs
16 similarly in the different stages of transition."
17 Closed quote.  Do you see that?
18     A.   I do.
19     Q.   If it's true that suicide occurs
20 similarly both before and after transition, is
21 that an important fact for clinical decisions
22 about medical transition?
23         MS. EAGAN:  Object to the form.

42 (Pages 162 - 165)

Page 166

1    A.   That statement in isolation that
2  risk of suicide for transgender people before,
3  during, within, and after transition remains
4  elevated.  That's an important element to know.
5  It underscores a longitudinal mental health that's
6  provided along the way.  I think it's hard to
7  generalize any statement from this cohort study,
8  though, because it involves 1972 to 2017 in The
9  Netherlands where social norms and acceptance of
10  transgender people may not have been the same as
11  what it is today because there are many factors
12  that impact suicide from marginalized populations
13  such as trans people.
14    Q.   Dr. Ladinsky, if it's true as these
15  authors report that the incidence of observed
16  completed suicide deaths was almost equally
17  distributed across the different stages of
18  treatment; that is, before and after hormonal
19  interventions, surgeries, the works, is that
20  potentially an important consideration in deciding
21  the clinical appropriateness of prescribing
22  cross-sex hormones for minors?
23    A.   In this study the mean age was 28,

Page 167

1  so these are adults going forward.  But if you
2  want to -- do you want to rephrase that relative
3  to minors?
4    Q.   No.  I'll let the question stand as
5  it is.
6    A.   Can you --
7    Q.   Do you believe -- I'll restate it to
8  save time.  If it's the case as these authors
9  report that the actual rate of completed suicide
10  is closely similar before and after medical
11  intervention for gender dysphoria, is that
12  potentially an important consideration for you as
13  the clinician in deciding when or whether it's
14  appropriate to prescribe cross-sex hormones?
15    MS. EAGAN:  Dr. Ladinsky, if you
16  need to read this document that you've never read
17  to understand the context of that statement, she
18  certainly is entitled to do so before answering
19  that question, so.
20    MR. BROOKS:  I didn't ask a question
21  about the document and I disagree.
22    MS. EAGAN:  Well, you've asked her
23  about a conclusion that is stated in the document

Page 168

1  wouldn't that be an important consideration.  She
2  certainly should understand the context of the
3  statement.
4    Q.   My question -- and I'm happy to just
5  take the document away so it's not a question
6  about the document.
7    A.   Okay.  These is median age of first
8  visit 28 years.
9    Q.   If it is true that the rate of
10  completed suicide is closely similar before and
11  after hormonal interventions in individuals
12  suffering with gender dysphoria, isn't that, in
13  your opinion, an important fact you need to
14  consider as a clinician in deciding whether to
15  prescribe cross-sex hormones to adolescents?
16    A.   Can I presume that you're asking
17  that as a theoretical?
18    Q.   Yes.
19    A.   Okay.  That helps.  If that were
20  true -- and I am not positing it as true.  I don't
21  believe it to be true.  But if it were true, it
22  would be an important thing not just to know, but
23  it would also help govern the robust mental health

Page 169

1  oversight that's already very robust but further
2  discussions would be had relative to that.
3    MR. BROOKS:  I'm going to mark as
4  Ladinsky Exhibit 18.  A title of -- an article
5  entitled "A long-term follow-up study of mortality
6  in transsexuals receiving treatment with cross-sex
7  hormones" from 2011 with authors including
8  Asscheman, Gooren, and others.
9
10    (Whereupon, Ladinsky Exhibit 18 was
11    marked and copy of same is attached
12    hereto.)
13
14    Q.   (BY MR. BROOKS) Dr. Ladinsky, this
15  is a -- you'll see up at the top another article
16  coming out of Vrije University or VU Center.  And
17  let me ask whether you believe you've seen this
18  article before today?
19    A.   I have not seen this article before
20  today, sir.
21    Q.   Have you ever made any organized
22  effort to find literature that addressed actual
23  suicide among gender dysphoria individuals?

43 (Pages 166 - 169)

Page 170

1    A.   I've read a good bit about it in the
2  literature I read.  But have I, you know, done a
3  Google search putting those terms together, no.
4    Q.   Isn't it important to you to know
5  what the literature knows about actual suicide
6  among gender dysphoric individuals?
7    A.   It's important to know what we know.
8  This is an area where there is -- numbers may be
9  higher than we know.
10    Q.   In the abstract of this paper under
11  design, it says this is "a cohort study with the
12  median follow-up of 18.5 years at a university
13  gender clinic."  Do you see that?
14    A.   I see that.
15    Q.   In terms of the information
16  available in your field, that's a very long
17  follow-up study, correct?
18    A.   It's hard because we're not
19  comparing apples to apples again.  This is a
20  cohort study with a median follow-up at 18.5 years
21  that enrolled adults at 31.4 and 26.1 mean age
22  respectively.  It may yield important information,
23  but 18.5 years isn't something that's -- isn't

Page 171

1  fully generalizable to the adolescent.  We take
2  this for what it's worth.
3    Q.   My only question at this point is:
4  Compared to what's available in the literature, an
5  18.5 year follow-up is one of the longest studies
6  that you're aware of; am I correct?
7    A.   I do not know comparatively.  I
8  think it's a good length of follow-up.
9    MS. EAGAN:  I would like for her to
10  have time to get herself familiar with this
11  document.
12    MR. BROOKS:  Well, let's see what I
13  have to ask.
14    MS. EAGAN:  At this point she --
15    MR. BROOKS:  I understand.
16    MS. EAGAN:  We don't know what this
17  document is you're asking.
18    MR. BROOKS:  Suicide.
19    MS. EAGAN:  Before questioning about
20  the document, I would like for the witness to have
21  an opportunity to familiarize herself with the
22  document.
23    Q.   (BY MR. BROOKS)  Let me ask you to

Page 172

1  turn to Page 638.
2    A.   Okay.
3    Q.   Where we are within the results
4  section if you turn back.  In the second column
5  towards the bottom is a paragraph that begins,
6  "External causes of death were increased almost
7  eightfold due to suicide and illicit drug use.
8  The suicide rate in males to female was increased
9  sixfold."  Do you see that?
10    A.   I do.
11    Q.   And if it's the case that the
12  suicide rate among post-transition transsexuals is
13  eightfold or sixfold depending on which number we
14  look at, is that a number that you think that
15  parents considering whether to authorize medical
16  transition of their child would want to know?
17    A.   I would not use data produced from
18  this particular study in my counseling of families
19  in Birmingham, Alabama, in 2023.  These are adults
20  when they transitioned.  They also transitioned in
21  the 90s and early 2000s at a time when there were
22  very, very different forces impacting the world in
23  which they lived.  HIV, AIDS was still very real

Page 173

1  in The Netherlands at that time as you see here.
2  And what I glean from that that I will continue to
3  use and counsel with families is that transgender
4  people, regardless of transition, remain at risk
5  for discrimination, of marginalization.  And we
6  will always work with that in the population we
7  care for.
8    Q.   I'm sorry.  Remain at risk for what?
9    A.   Marginalization, discrimination,
10  societal challenges.  That's what you'll see
11  through here.
12    Q.   Do you think that you take away from
13  this also advising families that after transition,
14  transgender individuals remain at high risk for
15  actual completed suicide?
16    A.   I would not draw that conclusion
17  from this document, but that is something we --
18  that is within the sphere of the counseling we
19  provide, the oversight, the work that we do.
20    Q.   That is your disclosure to the
21  parents for purposes of informed consent tells
22  them that according to the available data,
23  transgender individuals remain at high risk of

Page 174

1  completed suicide after transition?
2       MS. EAGAN:  Object to the form.
3       A.   I would have to look and see if that
4  is a line item on our extensive informed consent
5  document.  But it is within the anticipatory
6  guidance and counseling that's had with families
7  that most all appointments relative to the
8  importance of mental health, of coping, et cetera.
9       Q.   (BY MR. BROOKS)  Do you have an
10 opinion as to whether data about suicide rates
11 among individuals who have undergone transition
12 surgeries is something you should consider as you
13 decide whether to recommend or whether to
14 authorize transitioning hormones?
15      A.   It's not part and parcel of a
16 discussion because we're looking -- when we're
17 talking about initiation of hormonal therapy and
18 the criteria that goes into that, we're not
19 extrapolating years and years and years into the
20 future presuming and assuming that every patient
21 will one day have gender-affirming surgery.
22 That's a very individualized decision made by
23 adults.

Page 175

1       Q.   In counseling families and
2  adolescents about transition options, isn't it, in
3  fact, part of your job to envision and help them
4  envision life and outcomes years and years and
5  years in the future?
6       A.   Those are discussions that are
7  always had.
8       Q.   Is it part of your job?
9       A.   I wouldn't say it's a line item in
10 anything, but these are discussions that are had
11 with -- by pediatricians in all contexts of the
12 work that we do, not just gender health.
13      Q.   To the extent that you as a gender
14 specialist counsel parents and adolescents about
15 transition, about medical transition, don't you
16 consider that you have an ethical obligation to
17 help them foresee outcomes and life years and
18 years and years into the future?
19      A.   I don't think anyone has a crystal
20 ball.  Your pediatrician doesn't foresee your
21 children's life in the future but certainly helps
22 and guides with medical decision-making around
23 current health, sustained health, and health going

Page 176

1  forward.  We do so to optimize the future.
2       Q.   Do you believe that as a doctor
3  participating and advising parents and adolescents
4  about medical transitions that you have an ethical
5  obligation to help them think about not just the
6  short term but about how this will affect their
7  life and mental health years and years and years
8  into the future?
9       A.   I'm not sure I would say we have an
10 ethical obligation to predict their health years
11 and years and years into the future because we
12 don't.  No one does.  But we certainly can talk
13 about how to optimize that.
14      MR. BROOKS:  Let me mark as Exhibit
15 19 a paper entitled "Suicide by Clinic-Referred
16 Transgender Adolescents in the United Kingdom" by
17 Michael Biggs dated 2022.
18
19      (Whereupon, Ladinsky Exhibit 19 was
20      marked and copy of same is attached
21      hereto.)
22
23      Q.   (BY MR. BROOKS)  Dr. Ladinsky, are

Page 177

1  you familiar with the clinic that's referred to in
2  some cases as the Gender Identity Development
3  Services or GDIS or the Tavistock Clinic in
4  England?
5       A.   I'm well aware of it, yes.
6       Q.   And I'll represent that this is a
7  study of actual suicide rates based on extensive
8  data from the Tavistock Clinic.  My question right
9  now simply is:  Do you believe that you have seen
10 this paper before today?
11      A.   I don't.
12      Q.   Would it be consistent with the
13 understanding that the Tavistock Clinic has over
14 the years served a large number of adolescents and
15 would have a large dataset?
16      A.   It would certainly have the largest
17 dataset in the UK.
18      Q.   And if a study of suicide among
19 those referred to the Tavistock Clinic was
20 published in 2022 and you had earlier testified
21 about the various listservs and other things you
22 rely on to bring relevant literature to your
23 understanding, do you have an understanding how it

45 (Pages 174 - 177)

Page 178

1  could be that until now you're unaware of this
2  paper from just last year about suicide at the
3  Tavistock Clinic?
4       MS. EAGAN:  Dr. Ladinsky, I would
5  ask that you actually take the time to review the
6  paper before you begin answering questions as to
7  the paper's contents.
8       MR. BROOKS:  And I haven't asked any
9  questions about the paper's contents.
10       MS. EAGAN:  Well, you have.  That's
11  what you're implying.
12       MR. BROOKS:  I have not asked
13  questions about the paper's contents nor do I
14  intend to.
15       MS. EAGAN:  Well, she still can
16  review it.
17       MR. BROOKS:  If you want to go off
18  the clock since I'm not asking questions about it,
19  we can go off the clock.  But she cannot take my
20  clock time reading a paper I'm not asking her
21  questions about.
22       MS. EAGAN:  That's fine.  We can go
23  off the clock.  But I think before you're asking

Page 179

1  questions as to why she wasn't aware of this
2  paper, she's certainly entitled to understand the
3  contents of the paper and the context.
4       MR. BROOKS:  Off we go.
5
6       (Whereupon, a brief recess was
7       taken.)
8
9       Q.  (BY MR. BROOKS)  Have you heard or
10  read the catchphrase "Would you rather have a
11  living daughter or a dead son"?
12       A.  I've heard that said.
13       Q.  Or vice versa as the case may be.
14  And are you aware that that catchphrase circulates
15  on social media to a considerable extent?
16       A.  I'm not.
17       Q.  You're not?
18       A.  I'm not a social media person.
19       Q.  Me neither.  And do you believe that
20  you or your colleagues ever use that phrase in
21  counseling parents or adolescents?
22       A.  I do not and I have not heard it
23  said in my clinic space when counseling parents.

Page 180

1       Q.  And as you sit here today, you can't
2  point to any specific data or paper that shows
3  that hormonal intervention reduces actual rates of
4  death by suicide among gender dysphoric
5  adolescents, correct?
6       A.  This one helps to assuage that
7  concern.
8       Q.  And you refer to?
9       A.  The conclusion, "The proportion of
10  individual patients who died by suicide was 0.03
11  percent, which is orders of magnitude smaller than
12  the proportion of transgender adolescents who
13  report attempting suicide when surveyed.  The fact
14  that deaths were so rare should provide some
15  reassurance to transgender youth and their
16  families."
17       Additionally, two of the patients
18  who committed suicide known to the Tavistock
19  Clinic included here were patients on the waiting
20  list.  That's important.  They did not have the
21  opportunity to get gender-affirming care or to
22  even be considered eligible for some.  Hope can
23  save lives.

Page 181

1       Q.  Dr. Ladinsky, are you aware of -- I
2  won't take time to ask you what else you found.  I
3  wouldn't have pulled that out if that was all you
4  found.
5       Are you aware of any data that shows
6  that administration of cross-sex hormones or
7  puberty blockers for adolescents or children
8  reduces the actual rate of death by suicide?
9       A.  I cannot refer you immediately in
10  this instance.
11       Q.  And absent that data, it's not
12  scientifically supported to refer to those
13  treatments as lifesaving, is it?
14       MS. EAGAN:  Object to the form.
15       A.  I don't think that's a fair
16  statement at all.  It does not describe what's in
17  the literature.  It's kind of an editorial comment
18  that is not like an impaired statement.
19       Q.  (BY MR. BROOKS)  Well, you yourself
20  have referred to those treatments as lifesaving,
21  have you not?
22       A.  If I have referred to them in any of
23  these documents, then I have.

46 (Pages 178 - 181)

Page 182

1    Q.   Putting aside documents created for
2  litigation, you have from time to time referred to
3  those treatments as lifesaving, have you not?
4    A.   I'm not aware of that.
5    Q.   Okay.
6    A.   If you have evidence to that from a
7  presentation I've made, then I guess I did.  But
8  in this moment, I don't recall it.
9    Q.   In your opinion in counseling a
10 parent given what we know and what we don't know,
11 it would not be ethical to use that phrase, "Would
12 you rather have a living daughter or a dead son,"
13 would it?
14   A.   That is not a phrase I use in the
15 counseling I provide.
16   Q.   And you consider it to be unethical
17 to say that to a parent, don't you?
18   A.   I could not make a value judgment on
19 it.
20   Q.   Why not?
21   A.   Because it's not appropriate.
22   Q.   You as a doctor don't have to make
23 value judgments as you counsel parents?

Page 183

1    A.   Of course I make value judgments.
2    Q.   Ethical judgments?
3    A.   Ethical judgments within structure
4  around framework.  But to ask me if a certain
5  idiomatic phrase is ethically just or not is not
6  something I could answer.  Most importantly it's
7  not a phrase I use.
8    Q.   Why not?
9    A.   It's -- I mean, it's not the way
10 that I talk or think, if that makes sense.  When I
11 emphasize -- when we talk about counseling
12 families is data that reinforces the positive
13 mental health impacts of transgender people being
14 allowed to live in ways that are most aligned with
15 their gender identity at each stage.
16   Q.   Have you ever had a parent ask you,
17 in essence, whether that's the choice they face,
18 having a live daughter or a dead son?
19   A.   I have not.
20        MS. EAGAN:  Can we take like a
21 five-minute bathroom break?
22        MR. BROOKS:  Yes.
23

Page 184

1        (Whereupon, a brief recess was
2    taken.)
3
4    Q.   (BY MR. BROOKS)  Let me ask you to
5  find Exhibit 5, your expert report, which is in a
6  binder.  Turn to Page 29 if you would.  In the
7  middle of the page is a short paragraph that
8  reads, "Dr. Hurz's suggestion that 'alteration of
9  normal adolescent brain maturation' may be another
10 'possible side effect' of puberty blockers is not
11 accurate.  I have not seen this in my practice and
12 science does not support this statement."  Do you
13 see that?
14   A.   I do.
15   Q.   And you cite a single paper in
16 reference to your statement about science by Dr.
17 Staphorsius, correct?
18   A.   Correct.
19   Q.   When you say "I have not seen this
20 in my practice," let me ask whether in your
21 practice you systematically make any tests of
22 cognitive capability of your patients before and
23 after treatment?

Page 185

1    A.   No, sir.  That is not part and
2  parcel of standards of care in what we do.  I
3  assume you're implying neuropsychological
4  evaluative examinations?
5    Q.   Yes.
6    A.   Okay.
7    Q.   So when you say "I have not seen
8  this in my practice," all you mean is that you
9  haven't seen any effect on brain maturation that
10 was dramatic enough for you just to notice it in
11 ordinary interactions with the child?
12   A.   More importantly, parents noticing
13 elements of cognitive decline, academic decline
14 that, you know, was --
15   Q.   Well, your understanding as a
16 pediatrician is that adolescence is -- healthy
17 adolescence is a period of positive development
18 and mental capability, correct?
19   A.   In a general sense, yes.
20   Q.   And you say "science does not
21 support the statement."  Did you have anything in
22 mind in addition to the Staphorsius paper that you
23 referenced?

47 (Pages 182 - 185)

Page 186

1     A.    This is -- this paper is referenced
2  because it directly addresses this from a
3  neuropsychological perspective using what they
4  identify as validated -- validated evaluations,
5  executive functioning.
6         MR. BROOKS:  Let me mark as Ladinsky
7  Exhibit 20 an editorial by de Vries and Hannema
8  from The New England Journal of Medicine dated
9  2023 entitled "Growing Evidence and Remaining
10  Questions in Adolescent Transgender Care."
11
12         (Whereupon, Ladinsky Exhibit 20 was
13         marked and copy of same is attached
14         hereto.)
15
16     Q.    (BY MR. BROOKS)  And I believe
17  you've testified earlier that de Vries is a
18  researcher of strong reputation; am I correct?
19     A.    That's fair.
20     Q.    And this paper is -- this editorial,
21  I should say.  This is not a research paper.  But
22  The New England Journal of Medicine in which it
23  was published is an extremely prestigious medical

Page 187

1  journal; am I correct?
2     A.    It is.
3     Q.    One of the premier journals in the
4  world?
5     A.    I believe that's fair.
6     Q.    And on the next -- on the second
7  page, 276, Column 2, writing in 2023, de Vries
8  states -- and I'm 3 inches from the bottom.  A
9  paragraph that begins, quote, "Finally, benefits
10  of early medical intervention, including puberty
11  suppression, need to be weighed against possible
12  adverse effects.  For example, with regard to bone
13  and brain development and fertility."  Closed
14  quote.  Do you see that?
15     A.    I do.
16     Q.    Now, writing in 2023, Dr. de Vries
17  thought that possible adverse effects of medical
18  intervention in gender dysphoric youth and
19  children were adverse effects on brain
20  development.  Do you agree that that's what's
21  accurately described in what Dr. de Vries says?
22     A.    I'm sorry.  I'm going to have to ask
23  you to repeat that because I was finishing reading

Page 188

1  that paragraph.
2     Q.    Writing in 2023, Dr. de Vries listed
3  as among possible adverse effects from medical
4  intervention in children and adolescents negative
5  impact on brain development, correct?
6     A.    I believe Dr. de Vries posed this
7  here as a question, not as a statement of fact.
8     Q.    And do you disagree or agree with
9  Dr. de Vries that as of 2023, it is an open
10  question whether medical interventions in minors
11  affect brain development in an adverse manner?
12     A.    In her editorial or opinion
13  commentary on the Chen article, her job is to do
14  what physicians do.  We work hard to elevate
15  potential research questions.  Dr. de Vries does
16  state in that same paragraph, right, "that
17  adolescents' educational achievements are as
18  expected given their pretreatment status, which is
19  reassuring."  In other words, we do not have
20  evidence of this.  But as a research question, Dr.
21  de Vries seems to find it merits asking.
22     Q.    Well, indeed, Dr. de Vries says it
23  merits weighing against possible benefits of

Page 189

1  medical intervention, does she not?
2     A.    She does say that, and I take that
3  to mean again she is probing.  Because in her last
4  paragraph, she continues that, Despite
5  uncertainties that call for further study, current
6  information shows that mental health improves with
7  gender-affirming hormone, GAH, whereas withholding
8  treatment may lead to, da, da, da, adversely
9  affect psychological functioning.
10     Q.    And mental health is a different
11  question from brain development, do you agree?
12     A.    She raises them as different
13  questions, however, they are not inextricable.
14     Q.    Endocrine Society is Tab 37.  Let me
15  ask you to turn to Ladinsky Exhibit 8, which is
16  Tab 37 in the binder I gave you.  And if you would
17  turn to Page 3882.  And under side effects in
18  Column 1, the Endocrine Society, Guidelines, state
19  that, "The primary risks of pubertal suppression
20  in GD/gender incongruent adolescents may include"
21  and she -- and then they list a number of things.
22  One of which is, quote, "unknown effects on brain
23  development," period, closed quote.  Do you see

48 (Pages 186 - 189)

Page 190

1 that?
2     A.  I see that.
3     Q.  And I think you've testified you're
4 not a neurologist, and you haven't done research
5 in this area.  Do you agree or disagree with the
6 Endocrine Society Guidelines when they state that
7 the effect of pubertal suppression on brain
8 development in adolescents is unknown?
9     A.  That is what they state right there.
10 We must take some comfort in generalizing from the
11 extended longitudinal data on young people treated
12 with the same medication for central precocious
13 puberty who are well into adulthood, and it does
14 not show a decrement in cognitive development.
15     Q.  Are you aware of studies of the
16 effect of pubertal suppression or central
17 precocious puberty that specifically measured
18 cognitive development?
19     A.  I am not aware of studies that may
20 have measured cognitive development with
21 neuropsychological tests.
22     Q.  All right.
23     A.  It doesn't mean they don't exist.

Page 191

1     Q.  Let me ask you to turn to Page 3883,
2 the next page there.  And at the top of the first
3 column, the first full paragraph reads, "Limited
4 data are available regarding the effects of GnRH
5 analogs."  That's puberty blockers, correct?
6     A.  Correct.
7     Q.  "On brain development.  A single
8 cross-sectional study demonstrated no compromise
9 of executive function."
10     A.  Right.
11     Q.  "But animal data suggest there may
12 be effect of GnRH analogs on cognitive function."
13 Closed quote.  Do you see that?
14     A.  I see that.
15     Q.  And do you yourself have any
16 knowledge concerning what animal data may -- does
17 or does not show about the effect of blocking
18 puberty on cognitive function?
19     A.  I have no knowledge of this.
20     Q.  Do you consider information from
21 animal data to be at all relevant to reasonable
22 inferences about effect on humans?
23     A.  Less so when there is available data

Page 192

1 on humans, especially humans that are relevant to
2 the population for which I work.
3     Q.  Now, the Endocrine Society
4 Guidelines that are focused -- the committee that
5 is focused specifically on puberty blockers and
6 cross-sex hormones chose to warn here that animal
7 data suggests that puberty blockers may have an
8 effect on cognitive function.  Do you consider
9 that this committee or you have a more informed
10 view on that question?
11     MS. EAGAN:  Object to the form as to
12 the term "warn".
13     A.  I'm not sure what you're asking.
14 Can you help me with that?
15     Q.  (BY MR. BROOKS)  I can ask it again.
16 The Endocrine Society committee that prepares the
17 guidelines state in the text that I read that
18 animal data suggest there may be an effect of
19 puberty blockers on the development of cognitive
20 function, correct?
21     A.  Relative to animal data, that's what
22 they say right here, yes.
23     Q.  And presumably, it's fair to say

Page 193

1 that they would not have included that information
2 unless they thought it was at least potentially
3 relevant to humans, correct?
4     A.  I can not infer why they chose to
5 include it or not.  I do -- what my read as a
6 frontline physician is this sentence is a
7 testament to their robustness.  They're
8 inordinately thorough.  They're not telling us
9 what to do or not with this.
10     Q.  Certainly you have no basis to
11 disagree with the statement of the committee that
12 animal data suggest that there may be an effect of
13 puberty blockers on cognitive function, do you?
14     A.  If that's what they state.  I have
15 no knowledge of it or knowledge to negate it.
16     MR. BROOKS:  Let me mark as Exhibit
17 21 a paper entitled "Consensus Parameter:
18 Research Methodologies to Evaluate
19 Neurodevelopmental Effects of Pubertal Suppression
20 in Transgender Youth" from 2020.  Lead author is
21 Diane Chen.
22
23     (Whereupon, Ladinsky Exhibit 21 was

49 (Pages 190 - 193)

1          marked and copy of same is attached
2      hereto.)
3
4      Q.    (BY MR. BROOKS)  Dr. Ladinsky, you
5  understand Diane Chen to be one of the lead
6  investigators in the ongoing prospective study
7  that's reported on by the Chen paper that we
8  looked at previously, correct?
9      A.    I would assume so given her position
10  at Lurie which is one of the forecenters.
11      Q.    Which is one of the?
12      A.    One of the forecenters involved in
13  this prospective data collection.
14      Q.    And here from three years earlier,
15  2020, is a paper specifically directed at research
16  methodologies for evaluating the effect of puberty
17  suppression on neurodevelopment or brain
18  development.  And my first question for you is:
19  Have you seen this paper before?
20      A.    I have not, sir.
21      Q.    Are you familiar with something
22  called a Delphi consensus procedure?
23      A.    Not in detail but I'm familiar with

1  its existence and what it is around obtaining
2  expert consensus when asking a question in a
3  scientific or a systematic way.
4      Q.    Okay.  Is it consistent with your
5  understanding or is it outside your expertise that
6  the adolescent period is associated with profound
7  neurodevelopment including increase in
8  capabilities for distraction and logical thinking?
9      A.    That is outside my area of expertise
10  to comment on it any quantitative way.
11      Q.    Okay.  And is it consistent with
12  your understanding as a doctor or outside your
13  expertise to say that several neurodevelopmental
14  processes occur during adolescence including
15  myelin development and changes in neural
16  connectivity?
17      A.    I think we're talking about -- I'm
18  not -- not being a neurologist or neuroscientist,
19  I could not give you, for example, the functional
20  MRI components of which pathways are being pruned
21  and fine-tuned.
22      Q.    Well, then let me ask a more
23  behavioral question.  Is it consistent with your

1  understanding or outside your expertise to say
2  that the puberty process in humans has been linked
3  to developmental changes in social and emotional
4  processing as well as emotional control?
5      A.    That's a generalization that, again,
6  a two-part generalization that I don't have the
7  capability -- I'm not a neuroscientist or
8  neurologist to give you quantitative backing for
9  either part of those.
10      Q.    Okay.  I always tell my witnesses, I
11  don't know, is the quickest way out of some
12  topics.
13          Let me take you however to Page 254.
14      MS. EAGAN:  We can go off the
15  record, but I would like for her to have a chance
16  to review this report.
17      MR. BROOKS:  I'll take her to the
18  particular language, and then she can see what she
19  wants to review around that.
20      MS. EAGAN:  Okay.
21      Q.    (BY MR. BROOKS)  In 254, Column 1,
22  these authors state -- and this is not a research
23  paper.  They are not reporting on data?

1      A.    Right.
2      Q.    They state under discussion in the
3  second sentence, I believe, 254.
4      A.    Okay.
5      Q.    254 under discussion, second
6  sentence reads, quote, "puberty is a major
7  developmental process and the full consequences,
8  (both beneficial and adverse) of suppressing
9  endogenous puberty are not yet understood."
10  Closed quote.
11          So my question for you -- and,
12  again, this is -- there's no date reported in this
13  paper.  It's not a study.  Do you agree or
14  disagree with these authors when they state that
15  "the full consequences of suppressing endogenous
16  puberty are not yet understood?"
17      A.    That's a statement that they make
18  and have convened sort of a consensus -- group of
19  experts to work on how to best evaluate that.
20      Q.    And do you agree or disagree or is
21  it outside your expertise to say the full
22  consequences of suppressing endogenous puberty are
23  not yet understood?

Page 198

1      A.   Outside of my expertise to know how
2  quantitatively, qualitatively, that's a fair
3  statement.
4      Q.   Let me ask you to turn to Page 249.
5      A.   Okay.
6      Q.   And the second column -- this isn't
7  even a statement by the author.  It's a question
8  by the author.  249 second column.  Towards the
9  top it says, first full paragraph, "We employed a
10  two-round Delphi procedure to obtain expert
11  consensus regarding the most efficacious research
12  design elements to address the following research
13  question:  What, if any, real-world impact does
14  pubertal suppression have on transgender
15  children's cognitive and neural development?"
16  Closed quote.  Do you see that?
17      A.   I do.
18      Q.   And do you agree that learning the
19  answer to that question could have important
20  clinical implications?
21      A.   I think it's a research question
22  that merits asking.
23      Q.   Do you agree or disagree that

Page 199

1  knowing the real-world impact of pubertal
2  suppression on cognitive and neural development
3  could have important clinical implications?
4      A.   In theory, it could.
5      Q.   And the answer to that question
6  could be important to you as a clinician, to
7  parents, and to health policymakers, correct?
8          MS. EAGAN:  Object to the form.
9      A.   I think the results of a
10  multi-center methodologic study, should it be
11  undertaken, could have clinical ramifications, but
12  that would depend completely upon the methodology,
13  the possible confounders, the length of time.  And
14  just as they say there may be a larger database if
15  more was available that the cohort could be
16  compared to.  In other words, validating the
17  comparison groups.  I would be interested also in
18  youth who received the same medication at the same
19  physiologic stage for central precocious puberty.
20      Q.   So far as you know since this
21  article was published in 2020 in the Transgender
22  Health Journal, no researchers have undertaken the
23  type of careful study that's described -- that

Page 200

1  you've just described to attempt to measure the
2  real-world impact, if any, of pubertal suppression
3  on children's cognitive and neural development?
4      A.   I do not know.
5      Q.   Let me ask you to turn to 248.
6      A.   They do say here, the real -- it's
7  on the record.  "The real world clinical care
8  considerations may well be undeveloped in the
9  proposed research design."
10          MS. EAGAN:  I don't think there is a
11  question on the table right now.
12          THE WITNESS:  I was just finishing
13  up.
14      Q.   (BY MR. BROOKS) I'll take your
15  attention to Page 248.
16      A.   Yes, sir.
17          MS. EAGAN:  Dr. Ladinsky, if you
18  need more time -- if you need any more time to
19  review this document more robustly, we can go off
20  the record and you can review it if you need to.
21          THE WITNESS:  Well, if I'm going to
22  be asked about the content of 248, which is
23  probably the intro.

Page 201

1      Q.   (BY MR. BROOKS)  Again, I'm going
2  ask you a question rather than a content question.
3  Towards the bottom of 248 about an inch up is a
4  sentence that begins animal studies.
5      A.   Okay.
6      Q.   2 inches up.
7      A.   I see it.
8      Q.   It reads, "Animal studies
9  demonstrate pubertal hormones exert broad neural
10  influence, including effects on neurogenesis,
11  differentiation, apoptosis, dendritic branching,
12  spine density, and regional gray and white matter
13  volumes," period.  I'm afraid to ask whether I
14  read that correctly?
15      A.   You did pretty well.
16      Q.   So Chen and these many authors also
17  mention animal studies, as would you agree,
18  suggestive or as flagging questions that need to
19  be investigated?
20      A.   I don't read this as suggestive.  I
21  read this as simply making a statement relative to
22  findings on rodents and monkeys and projecting.
23      Q.   In fact, medical research often

51 (Pages 198 - 201)

Page 202

1  begins by studying the effects of procedures or
2  pharmaceuticals on rodents or monkeys before
3  moving on to humans, correct?
4      A.   It can definitely.
5      Q.   Indeed, ethical principles often
6  require that experiments be done on animals before
7  they're done on humans, correct?
8      A.   Completely depends on the nature of
9  what's being studied.
10     Q.   Let me ask you to turn to Page 253.
11 Talk a little bit more about rodents.  Column 2, 3
12 inches down.  Says, quote, "studies in rodents
13 show ovarian hormones, acting during puberty,
14 program cognitive flexibility by exerting
15 long-lasting effects on excitatory-inhibitory
16 balance in the prefrontal cortex."  Period.  Do
17 you see that?
18     A.   I do.
19     Q.   Do you have any reason to agree with
20 that or is it simply outside your expertise that
21 rodents studies have shown that ovarian hormones
22 can have long-lasting effects in brain
23 development?

Page 203

1      A.   It is outside my area of expertise
2  to comment on this finding and any semblance of
3  generalized ability to higher-order animals and
4  humans.
5      Q.   You would agree, however, would you
6  not, that a scientist who is faced with animal
7  studies that report long-lasting effects, to use
8  the phrase from the paper, of pubertal hormones on
9  animal brain development should conclude at least
10 that there is some possibility that pubertal
11 hormones may also have broad influence on brain
12 development in humans?
13     A.   I don't agree with that statement.
14 I don't know.  I don't have the knowledge base to
15 understand how the effect of pubertal hormones on
16 brains; ergo, observed behavior in rodents are
17 generalizable to that same impact in people or
18 even primates with their higher-order brain
19 functioning that takes into account so many
20 environmental messages.
21     Q.   Does data -- and I admit I'm curious
22 as to what kind of intelligence test you would
23 give to a rat, but that's another question.

Page 204

1      Before I showed you this Chen, et
2  al., 2020 article, were you aware of references in
3  literature relating to gender dysphoria and
4  treatment for gender dysphoria to animal research
5  and its potential in patients relating to brain
6  development?
7      A.   No, not in that way.
8      Q.   And having seen these references in
9  the Endocrine Society Guidelines and in the Chen,
10 et al., paper, does that cause you as a clinician
11 to want to know the answer to the question of
12 whether puberty blockers in humans have
13 long-lasting effects on a child's brain
14 development?
15     A.   You're asking from what I'm seeing
16 here about findings relative to animals?
17     Q.   Correct.  And my question is:  What
18 you've seen just today -- and that's why I ask you
19 before.  You didn't know that before.  From what
20 you've seen today, does that make you as a
21 clinician want to know the answer to the question
22 of whether puberty blockers administered during
23 the time of endogenous puberty have long-lasting

Page 205

1  effects on the neural development of that child?
2      A.   I appreciate and have an eye to
3  ongoing research.  Does what I've read here about
4  rodents concern me greatly, just the animal
5  related information?  For me personally as a
6  frontline provider, it does not.
7      Q.   Turn to Page 252 if you would.  In
8  the first column on 252, inch and a half from the
9  bottom, the sentence begins, quote, "The effects
10 of pubertal suppression."  I'll give you a moment
11 to find it.
12     A.   Got it.
13     Q.   "The effects of pubertal suppression
14 may not appear for several years.  Any
15 GnRHa-related difference in brain structure is
16 likely to be observed over the long term, rather
17 than immediately."  End of quote.  Do you see
18 that?
19     A.   I do.
20     Q.   And so Dr. Chen, the lead
21 investigator in the currently ongoing NIH-funded
22 prospective study, writes here that effects of
23 puberty suppression on brain structure is, quote,

52 (Pages 202 - 205)

Page 206

1 "likely to be observed over the long term, rather
2 than immediately." Closed quote. And my question
3 for you is given that you're not a neurologist:
4 Do you agree, disagree, or consider it beyond your
5 expertise to comment on Dr. Chen's statement
6 there?
7     A.   So this one sentence, Dr. Chen's
8 conjecture that the effects of pubertal
9 suppression may not appear for several years.
10 That?
11     Q.   Yes.
12     A.   Does it -- what was the question?
13     Q.   My question is: Do you agree,
14 disagree, or consider it outside your expertise to
15 comment on that statement by Dr. Chen?
16     A.   The latter. It's outside my
17 expertise to comment on. Here it's really
18 posed -- I see it posed as a research question,
19 and I look forward to any data.
20     Q.   Let me ask you to turn to Page 255.
21 And in the first column almost halfway down the
22 page, sentence begins, "Yet evidence suggests."
23 Not quite halfway down the page.

Page 207

1     A.   I'll get there.
2         MS. EAGAN: Take your time and read
3 through the section.
4     A.   I'm bringing the previous page's
5 context into what you asked me to look at if it's
6 okay.
7     Q.   (BY MR. BROOKS) Of course it is.
8     A.   Thanks.
9         Okay. I have a better context now.
10 Thank you, sir.
11     Q.   Okay. Back in the middle of the
12 first column of 255.
13     A.   Okay.
14     Q.   There is statement that says, quote,
15 "evidence suggests an overoccurrence of
16 neurodiversity characteristics (especially related
17 to autism) among gender-referred youth." It
18 continues, "The neurodevelopmental impacts of
19 pubertal suppression on neurodiverse,
20 gender-diverse youth might well be different than
21 in neurotypical gender-diverse youth, given
22 variations in neurodevelopmental trajectories
23 observed across neurodevelopmental conditions."

Page 208

1 Period. Closed quote.
2         Is it consistent with your own
3 clinical observation that young people with
4 neurodiversity characteristics, including autism,
5 are disproportionately represented than those
6 referred to your clinic as compared to the general
7 population?
8     A.   I think it is consistent
9 subjectively with our experience.
10     Q.   And before reading this, have you
11 given any consideration to the question of whether
12 the effect of puberty blockers on those types of
13 young people might be different than it is on,
14 I'll say, a clinically normal --
15     A.   Neurotypical.
16     Q.   Neurotypical youth?
17     A.   Well, in fact, I was looking for a
18 paragraph that addressed that and was grateful to
19 find it.
20     Q.   Okay. That is -- this is a question
21 you have given some thought to in your
22 professional work?
23     A.   I think we all have but not in a

Page 209

1 negative way.
2     Q.   Well, I take it that simply finding
3 out the answer to the question of what impact it
4 may have is not a negative or a positive question,
5 correct?
6     A.   I haven't even gone that far. I was
7 just -- as this consensus article is looking at
8 how to study the trajectory of neurodevelopment in
9 patients who receive puberty blockers. It's to me
10 important that it takes into account those with
11 neurodiverse processing. Methodologically how
12 will you make sure that any evaluation, to answer
13 the question, is talking about takes the breadth
14 and depth of the youth we see into account.
15     Q.   And so far as you know, when it
16 comes to the effect of puberty blockers on
17 neurodevelopment, nobody has yet attempted any
18 study to determine how, if at all, those effects
19 differ on neuro atypical adolescence versus neuro
20 typical adolescence?
21     A.   Not that I'm aware of. It doesn't
22 mean it doesn't exist.
23     Q.   I know that I've looked enough

53 (Pages 206 - 209)

1  that --
2      A.  Yeah.
3      Q.  -- I know it doesn't exist.
4          MR. BROOKS:  I'm going to mark as
5  Ladinsky Exhibit 22 a document entitled "The Cass
6  Review, interim report" February 2022.  This is in
7  your binder behind Tab 55.
8
9          (Whereupon, Ladinsky Exhibit 22 was
10         marked and copy of same is attached
11         hereto.)
12
13     Q.  (BY MR. BROOKS)  And Dr. Ladinsky, I
14 believe you testified earlier that sometime after
15 this interim report was issued that you read it?
16     A.  I have.  I've reviewed it.
17     Q.  And --
18     A.  I can't quote intimate detail,
19 though.
20     Q.  I understand.
21     A.  It's pretty long.
22     Q.  It's pretty long.  Do you have any
23 knowledge as to the reputation of Dr. Hilary Cass?

1      A.  Not in detail.  I believe that she's
2  a retired psychologist, if that's correct, who had
3  considerable experience in the GIDS.
4      Q.  That's not correct.
5      A.  Okay.
6      Q.  She's a pediatrician.  Whether she's
7  retired or not, I couldn't say.  She obviously had
8  some time.
9      A.  I believe she's retired.
10     Q.  Is this a document that you have
11 discussed with colleagues in your clinic?
12     A.  It is not.
13     Q.  Are you aware that this document has
14 been cited with respect to health authorities in
15 multiple countries?
16     A.  I'm not aware of that.
17     Q.  When you read the document, was it
18 generally your opinion that it raised legitimate
19 questions and concerns or did you think it was
20 scientifically unreliable?
21     A.  That's a tall ask because I believe
22 more importantly the focus of Dr. Cass' immensely
23 robust work is with an eye to evaluating capacity,

1  competence capability to decentralize this care
2  given by multi-disciplinary teams but with an eye
3  to the need to do so in more than one location
4  throughout the Kingdom looking towards Sweden.
5  And so she took into account and continues to, the
6  input from many, many, many providers in Britain's
7  NHS at many levels.
8      Q.  Let me ask you to -- let me ask you
9  to turn to Page 38 of this document.
10     A.  Okay.
11     Q.  And there under -- this document is
12 easy to refer to.  It has these nice numbered
13 paragraphs.  Call your attention to 3.32.
14     A.  Uh-huh.
15     Q.  Where Dr. Cass writes, quote, "A
16 closely linked concern is the unknown impacts on
17 development, maturation, and cognition if a child
18 or young person is not exposed to the physical,
19 psychological, physiological, neurochemical and
20 sexual changes that accompany adolescent hormone
21 surges."  Do you see that language?
22     A.  I do.
23     Q.  And do you agree that up to the

1  present, the impacts of blocking, preventing
2  puberty at its natural or endogenous time on
3  development of maturation and cognition of that
4  child is unknown?
5          MS. EAGAN:  I'm sorry.  Read back
6  that question.  I was reading the document and I
7  missed the question.
8
9          (Whereupon, a portion of the
10         testimony was read by the court
11         reporter.)
12
13     A.  I believe it's what level you're
14 asking the question on.  You know, myelination,
15 dendrites, pruning on a very very physiologic
16 level or robust development in how that
17 individual's interacting in accordance with
18 age-related expectations, meaning biological or
19 sociologic.  Is it unanswered?
20     Q.  (BY MR. BROOKS)  If I -- and indeed,
21 the paragraph here speaks broadly to development
22 and maturation, so let me narrow the question.
23         Do you agree that the impact of

54 (Pages 210 - 213)

Page 214

1  puberty blockers on the child's developmental
2  cognition is up to the present unknown?
3     A.   I don't know.  It's beyond my
4  expertise to answer that because it can be
5  answered on different levels, as I said, by
6  different specialists.
7     Q.   Okay.  Toward the bottom of that
8  section, that column.  Dr. Cass writes, "If
9  pubertal sex hormones are essential to these brain
10  maturation processes, this raises a secondary
11  question of whether there is a critical time
12  window for the processes to take place, or whether
13  catch-up is possible when estrogen or testosterone
14  is introduced later."  Closed quote.
15    And my question for you is:  Are you
16  aware of any study that addresses the question of
17  whether any negative impact on brain maturation
18  due to puberty blockade can be made up if a child
19  is later exposed to either endogenous or cross-sex
20  hormones?
21     A.   I am not aware if that has been
22  systematically studied in the way you ask it.
23     Q.   And in any context, are you aware of

Page 215

1  development processes -- strike that.
2     Dr. Cass refers to a critical time
3  window.  And let me ask whether in any context as
4  a doctor you're aware of developmental processes
5  that have to happen at a particular time in the
6  sequence of a child's development or they cannot
7  happen properly?
8     A.   In a general sense in pediatrics,
9  yes.  Thinking of visual input during an infant's
10  first six months kind of thing.
11     Q.   That is if they don't get the
12  appropriate visual input, there are certain
13  neurodevelopmental things that don't add up?
14     A.   They may have some visual
15  impairment.
16     Q.   Okay.  But visual impairment has to
17  do with nerves, right?
18     A.   Well, that's -- when you talk about
19  a critical window of development, there are some
20  anatomic structures.  There are some areas in the
21  developing person that that has applicability.
22     Q.   All right.
23     MR. BROOKS:  I'm going to mark as

Page 216

1  Ladinsky 23 a paper entitled "Puberty suppression
2  and executive functioning:  An fMRI-study in
3  adolescents with gender dysphoria" by Staphorsius
4  and others dated 2015.
5
6     (Whereupon, Ladinsky Exhibit 23 was
7     marked and copy of same is attached
8     hereto.)
9
10     Q.   (BY MR. BROOKS)  Dr. Ladinsky, this
11  is the paper that you cited in your expert report
12  in connection with cognitive development; am I
13  correct?
14     A.   It's correct, sir.
15     Q.   And you believe that you studied it
16  with some care and are reasonably familiar with
17  its contents?
18     A.   Reasonably familiar.
19     Q.   And would you agree with me that
20  when it comes to impact of puberty suppression on
21  executive functioning, to use the term that they
22  use, that the results reported in the Staphorsius
23  and Cohen-Kettenis paper are mixed?

Page 217

1     A.   There are some sentences that might
2  lead you to believe that.  However, I'm not sure I
3  completely agree.
4     Q.   Well, needless to say, we'll look at
5  it in more detail.
6     A.   Okay.
7     Q.   Just for context, this is dated
8  2015.  It is again out of the Vrije University
9  research clinic in Amsterdam, correct?
10     A.   That's correct.
11     Q.   And we saw earlier that in 2023, Dr.
12  de Vries, in that clinic, stated that one possible
13  effect of puberty blockers could be adverse
14  effects on brain development, but I won't ask you
15  about that again.
16     Let's look at what Staphorsius says
17  about that.  Now, the methodology here was to use
18  the so-called Tower of London test.  Can you -- do
19  you have any understanding of how that is used to
20  measure cognitive development?
21     A.   It actually to my knowledge -- and
22  remember I'm not a neuropsychologist or a
23  neuroscientist, but this is a test that can be

55 (Pages 214 - 217)

Page 218

1  done on a computer.  And it looks at, to an
2  extent, visual spatial but more importantly what
3  they're looking at is a part of the brain on the
4  executive function which has to do with planning
5  and organizing.  I don't believe that test
6  elucidates somebody's cognitive development which
7  is more like age appropriate or even IQs.
8      Q.    So, and I used the wrong term
9  obviously.  I don't -- I'm learning.  Executive
10  functioning?
11      A.    Right.
12      Q.    Describe for me again what executive
13  functioning refers to?
14      A.    Well, Reader's Digest version is
15  it's part of the brain's ability in an age
16  appropriate way to plan, to organize, to quickly
17  incorporate information learned in one setting to
18  another one.
19      Q.    Okay.  That sounds important for
20  maturation to adult life; you would agree?
21      A.    I would agree.
22      Q.    And just so I can picture this a
23  little more.  Is the Tower of London test

Page 219

1  basically like this child's toy that I've seen
2  that you're rearranging disks to try to get them
3  in a -- you don't know?
4      A.    I'm not a neuroscientist or a
5  neuropsychologist.  I do know it can be done on
6  the computer which is not going to be the same
7  thing as hand-eye coordination.
8      Q.    Now, this was -- so that we don't
9  kind of over read it.  If you turn to Page 192, it
10  says that there were 41 adolescents with gender
11  dysphoria in the study, 22 female to males.  Some
12  of whom had been subjected to puberty suppression
13  and some who had not.  And 18 male to females of
14  which some had been subjected to puberty
15  suppression and some had not.  So all in all, it's
16  a sample of 41; am I correct?
17      A.    It's a very small sample, yes.
18      Q.    And the mean time, if we turn to
19  Page 194 at Column 1 at the end of the little
20  Paragraph Number 3.1.  It says the duration of
21  suppression for male to females was 1.8 years.
22  With the standard of deviation show ing it for
23  female to males, it was 1.4 years.  Do you see

Page 220

1  that?
2      A.    I do.
3      Q.    So would you consider that to be a
4  long, short, or kind of standard length puberty
5  suppression?
6      A.    Fairly standard.
7      Q.    And this is, if I understand
8  correctly, not a longitudinal study.  That is,
9  it's a one-time study.  Some of the subjects have
10  been subject to suppression and some have not.
11  But it's not a prospective study.  It's not a
12  longitudinal study, correct?
13      A.    I believe so.
14      Q.    Okay.  If you look at 194, Column 1,
15  towards the beginning of Section 3.1.  It says,
16  control boys, i.e., those who had not had puberty
17  suppression, had significantly higher IQ scores
18  than the suppressed male to females.
19      A.    Okay.
20          MS. EAGAN:  Roger, show me where you
21  are.
22          MR. BROOKS:  Paragraph 3.1, second
23  sentence.

Page 221

1          MS. EAGAN:  Thank you.
2      Q.    (BY MR. BROOKS)  And it's not
3  longitudinal.  But whatever report that those who
4  had not experienced puberty suppression among the
5  boys had higher IQ scores as measured by whatever
6  test they use than males who had had puberty
7  suppressed, correct?
8      A.    That's what this sentence indicates,
9  yes.
10      Q.    And based on the nature of this
11  study, that could be cause and effect or it could
12  be a random variation between the control group
13  and the study group, we can't tell?
14      A.    It certainly could.  What it
15  indicates is that the case and control groups at
16  the start may not have been equal for reasons we
17  don't know.
18      Q.    And if you turn back to Page 191
19  which is the -- not quite the first page.
20      A.    Okay.
21      Q.    In the abstract up top -- the
22  abstract continues over from the previous page,
23  and you certainly are free to refer to that part.

56 (Pages 218 - 221)

1 It says on the first full sentence at the top of
2 Page 191, it says, the suppressed male to females,
3 if I may translate, had significantly lower
4 accuracy scores than the control groups and the
5 untreated female to males.  Do you see that?
6     A.   I do.
7     Q.   And again, that potentially could be
8 reflecting a negative impact of puberty
9 suppression, but it could be reflecting other
10 factors.  We can't tell?
11     A.   Correct.  I read that the same way
12 you do.
13     Q.   Now, in a technical paper when the
14 authors write that the accuracy scores of those
15 boys who had been subjected to puberty suppression
16 was, quote, significantly lower, that
17 significantly is a term of art and refers to
18 statistical significance, correct?
19     A.   Correct, which is interpreted
20 lightly with these very small numbers.
21     Q.   Well, with small numbers, you would
22 have to have a larger difference for it to be
23 statistically significant, correct?  That's how it

1 works.
2     A.   That may be how stats work, but it
3 leaves someone reading a paper like this with --
4 you take it for what you see.  But with very few
5 small numbers, it may not be generalizable to an
6 entire population.
7     Q.   What do you understand to be the
8 statistical -- the formal meaning of statistically
9 significant?
10     A.   It's been a long time.
11     Q.   Something to do with P values?
12     A.   Has to do with P values, greater
13 than .05, less than -- depends on the test
14 involved.  But the question is the sample size, et
15 cetera.
16     Q.   Let me turn -- ask you to turn back
17 to Page 194.  In 3.2, which is headed Tower of
18 London performance data.  You're on the right
19 page, 3.2.
20     A.   Okay.
21     Q.   3.2, ToL, Tower of London
22 performance data.  It states that in the second
23 sentence, Post hoc analyses show the suppressed

1 male to females had significantly lower accuracy
2 scores than the control groups and the untreated
3 female to males.  Have I read that correctly?  I
4 left one out.  Let me try again.
5     Quote, Post hoc analyses showed that
6 the suppressed male to females had significantly
7 lower accuracy scores than the control groups,
8 open paren, p equals .02 compared to control boys
9 and p equals .04 compared to control girls, closed
10 paren, and the untreated female to males.  Closed
11 quote.  Do you see that?
12     A.   I do.
13     Q.   And again, the report here is that
14 the treated subjects; that is, treated with
15 puberty blockers had significantly lower accuracy
16 scores on the Tower of London test than two
17 different control populations, right?
18     A.   That's what they're saying here.
19     Q.   Well, you cited this paper.  I
20 assume that's because you thought it was a
21 reliable scientific source?
22     A.   I think it's the only source
23 available at the time that has asked this question

1 and done a bit to evaluate it.
2     Q.   And by saying that the puberty
3 suppressed boys, male to females had significantly
4 lower accuracy scores, what that means is they
5 just got the puzzle wrong more often than the
6 control groups, correct?
7     A.   I do not know.  I've never
8 administered a Tower of London test.
9     Q.   I'm going to go home this evening
10 and take one online and see how I do.
11     A.   Let me know.
12     Q.   If you look a little farther in that
13 paragraph, it states, quote, even after correcting
14 for IQ -- and we looked at IQ earlier -- a
15 significant effect of group on accuracy remained.
16 Closed quote.
17     A.   Right.
18     Q.   Do you think you understand that
19 sentence?
20     A.   Somewhat, yeah.
21     Q.   What do you understand it to be
22 telling us?
23     A.   That even if you -- you can use

57 (Pages 222 - 225)

Page 226

1  statistical equations to control for the fact that
2  one of these groups had an overall lower IQ. The
3  findings can't. They didn't do as well on the
4  Tower test.
5      Q. Let me call your attention to Table
6  1 on the next page, 193. And first I'll ask
7  whether you studied this table of key results
8  before you cited this paper in your expert report?
9      A. Not in intense depth.
10     Q. One of the things that's measured by
11 the Staphorsius authors is reaction time; am I
12 correct?
13     A. That's correct.
14     Q. And is that something that you
15 understand generally improves across pubertal
16 development?
17     A. I could not comment on that.
18     Q. Okay.
19     A. I've never administered a
20 neuropsychological test to accept that point.
21     Q. I have watched my small children and
22 my older children and as a layman, I suspect it's
23 true, but I also don't claim to know.

Page 227

1          MS. EAGAN: Boys don't react real
2  fast when they have to do something.
3          MR. BROOKS: That's a different
4  question.
5      Q. The final column on this is RT
6  which, am I correct you -- well, below the table
7  it says RT, reaction times in seconds. So it's
8  not a guessing game. RT is reaction time in
9  seconds to whatever the test is. And if you look,
10 we have the male to female suppressed and
11 untreated. And do you see that the reaction
12 time -- and pardon me. Let me ask a background
13 question.
14          It is consistent with your
15 understanding that when you're measuring reaction
16 times, longer is worser?
17     A. Again, I'm not a neuropsychologist.
18     Q. Dr. Ladinsky, you cited this paper
19 to say that there are no negative effects of
20 pubertal suppression. Do you not know, quite
21 apart from being a neuropsychologist, that a lower
22 reaction time is less advantageous?
23     A. That's a generalized statement. I'm

Page 228

1  not sure I can generalize from the data presented
2  here in the small groups information that may
3  impact at this time in our history of clinical
4  decision-making.
5      Q. Understood. It's a small sample?
6      A. Uh-huh.
7      Q. It's a one time rather than
8  prospective?
9      A. Correct.
10     Q. But what they found in Staphorsius,
11 et al., is that the reaction time of the puberty
12 suppressed boys was slower than the untreated male
13 to female boys and slower than the control's
14 non-transgender boys, correct?
15     A. That is what they report.
16     Q. Which is, again, causation can't be
17 determined from an experiment like this, but
18 it's -- to the extent papers like this do
19 anything, it raises a concern, does it not, that
20 the puberty blockade may have, within the time
21 period we have here, a negative effect on the
22 development of reaction time?
23          MS. EAGAN: Object to the form.

Page 229

1      A. I don't read it that way.
2      Q. (BY MR. BROOKS) Why not?
3      A. My take from this is in the narrow
4  scope of how it is conducted and carried out. It
5  raises investigative questions, but it -- I don't
6  see in it generalizability to come to the
7  statement you made.
8      Q. If you don't see in this paper
9  generalizability for all the reasons you
10 explained, why did you cite it as evidence that
11 Dr. Hruz was wrong in the concern that he raised?
12     A. "In conclusion, our results suggest
13 that there are no detrimental effects of GnRHa on
14 EF."
15     Q. I took you to data. If you don't
16 believe the data is generalizable, why did you
17 cite this paper as disproving Dr. Hruz' concern
18 about potential impact on brain development from
19 puberty blockers?
20     A. I put a bit more -- I utilized the
21 authors' interpretation of their own data relative
22 to the research question they asked. And the
23 conclusion that they glean is what I took with me.

58 (Pages 226 - 229)

Page 230

1    Q.   All right.
2    A.   That sentence I read and, "We found
3  no evidence for this and if anything, we found
4  that puberty suppression even seemed to make some
5  aspects of brain functioning more in accordance
6  with natal sex."
7          MR. BROOKS:  I'd like to mark as
8  Exhibit 24 a scientific statement from the
9  Endocrine Society dated 2021 entitled "Considering
10 Sex as a Biological Variable in Basic and Clinical
11 Studies."
12
13          (Whereupon, Ladinsky Exhibit 24 was
14          marked and copy of same is attached
15          hereto.)
16
17   Q.   (BY MR. BROOKS)  Dr. Ladinsky,
18 you've repeatedly referred to the Endocrine
19 Society Guidelines relating to treatment of gender
20 dysphoria.  This is a different document from the
21 Endocrine Society.  And I'll ask first whether you
22 think you've ever seen it before?
23   A.   I do not recall seeing this document

Page 231

1  before.
2    Q.   I am going to ask you about one
3  scientific proposition that it states.  If you
4  would turn to Page 238.  Before that let me ask:
5  Are you generally aware of a requirement from the
6  NIH, the National Institute of Health, that
7  studies that they fund must consider sex as a
8  biological variable; that is, they need to
9  separately record data with respect to male or
10 female individuals or even male or female cells in
11 whatever the experiments are?
12   A.   I'm not aware of that, sir.  I'm not
13 a researcher.
14   Q.   Would you look on Page 238, Column
15 2.  And 3 inches down from the bottom -- 3 inches
16 up from the bottom -- pardon me -- is a sentence
17 that begins "Recent evidence."  It's a buried
18 sentence.  "Recent evidence has revealed."
19   A.   Okay.
20   Q.   Let me read that into the record.
21 Quote, "Recent evidence has revealed that
22 molecular sex differences in the brain are more
23 widespread than initially thought and such

Page 232

1  seemingly small-scale differences can have a large
2  impact on physiology and behavior.  Neurons
3  typically communicate with each other via
4  neurotransmitters and neuropeptides, which are
5  released presynaptic neurons and travel across a
6  synapse to bind receptors on the postsynaptic
7  neuron to exert downstream cellular effects.
8  There are sex differences in production and
9  release of many neurotransmitters and
10 neuropeptides that can result in behavioral
11 changes."
12          First, let me ask at a high level:
13 Is it within your knowledge that in recent years
14 science has discovered more and more differences
15 down to the cellular levels between male and
16 female brains?
17   A.   I'm not aware of that.
18   Q.   You're not aware of that?
19   A.   But again I'm not a --
20   Q.   I understand.
21   A.   -- psychologist or researcher.
22   Q.   And you don't have any knowledge as
23 to whether it's true or not true that sex-based

Page 233

1  differences in human brains go even to the level
2  of neurotransmitters and neuroreceptors?
3    A.   Not in detail, no.
4    Q.   It is within your knowledge, is it
5  not, that every brain -- every cell in a human
6  brain contains either XY male chromosomes or XX
7  female chromosomes in a normal healthy human?
8    A.   Unless there's a genetic or receptor
9  based disorder of sexual development.
10   Q.   Hence my qualification, normal
11 healthy human.
12   A.   Okay.
13   Q.   You would agree with the statement?
14   A.   I guess.
15   Q.   Well, every cell in your brain is
16 female in the sense of having an XX chromosome,
17 and every cell in my brain is male in the sense of
18 having an XY chromosome, correct?
19   A.   If you say so, yeah.
20   Q.   No.  I'm asking you.  You're the
21 witness.
22   A.   I believe so.
23   Q.   And are you aware of any study ever

59 (Pages 230 - 233)

Page 234

1  of the effect on brain function and health of
2  flooding a male brain with estrogen levels that
3  never occur in a healthy male and could never
4  naturally occur in that brain?
5      A.   Again, I'm certainly -- I'm not a
6  researcher, and I'm not encyclopedic in the
7  literature relative to basic science studies.
8      Q.   If you have no knowledge as to the
9  effect of flooding a male brain with female
10 hormones at levels that could never naturally
11 occur in that brain, on what basis do you assert
12 that administering cross-sex hormones is safe?
13     A.   If we take a step back -- and I
14 think why this question was so difficult for me
15 even though it seems easy is that as physicians we
16 don't -- pediatricians we don't think about brains
17 as male brains or female brains.  They're just
18 that child's brain.  So that's why it was hard for
19 me to answer this question.  Even outside of
20 gender health, we don't think of child development
21 as boy brain, girl brain.  We think of it as that
22 child's brain.  So with that caveat, it's a little
23 hard -- that's why it was harder to answer that

Page 235

1  one.
2      Q.   Is it your professional opinion that
3  experts in child development don't think and don't
4  research in terms of boy brain and girl brain?
5      A.   Those are just not terms that are
6  familiar to me nor have I seen them in the
7  literature I read.
8      Q.   In fact, you're well familiar with
9  literature that documents that boy brains and girl
10 brains follow different developmental trajectories
11 and are well recognized in repeatable fashions,
12 are you not?
13     A.   Give me some examples.
14     Q.   No.  I ask questions only.
15          Are you or are you not familiar with
16 such literature?
17     A.   That boy brains and girl brains
18 develop differently at different times?
19     Q.   Yes.
20     A.   That's not --
21     Q.   Indeed that they develop in
22 physically different ways identifiable by MRI
23 scans?

Page 236

1      A.   I'm not aware of it on the level
2  that you're discussing.
3      Q.   Let me ask you to turn in your
4  expert report to Page 7, where in the first full
5  sentence on the page you wrote, quote, "All the
6  major medical professional groups in the United
7  States, including the American Academy of
8  Pediatrics, the American Medical Association, and
9  the American Academy of Child and Adolescent
10 Psychiatry, agree that this care is safe,
11 effective, and medically necessary treatment for
12 the health and wellbeing of children and
13 adolescents suffering from gender dysphoria."
14 Closed quote.  Do you see that?
15     A.   I do see that.
16     Q.   And in writing that, did you go
17 check and ascertain that these organizations had
18 actually represented that these treatments were,
19 quote, "safe"?
20     A.   I believe -- not sure how you're
21 defining safe or how they're defining, but I know
22 that all three of these organizations -- three
23 here -- endorse this care --

Page 237

1      Q.   Did you --
2      A.   -- as safe, effective, and medically
3  necessary for the health and wellbeing.
4      Q.   You cite the Endocrine Society
5  Guidelines?
6      A.   Right.
7      Q.   Let me ask you to turn to that which
8  is Tab 37 in your binder.
9      A.   Okay.
10     Q.   Do you believe that you found any
11 representation from the Endocrine Society in this
12 document that either puberty blockers or cross-sex
13 hormones are safe when administered to
14 adolescents?
15     A.   If you give me your definition of
16 safe that would be great --
17     Q.   No.
18     A.   -- to help me.
19     Q.   You represented in your expert
20 report that these organizations had stated that it
21 was safe.  So we'll work with your -- whatever you
22 meant when you said that.
23          Do you think you looked for and

60 (Pages 234 - 237)

Page 238

1 found any such representation before making that
2 statement in your report?
3      A.   I think endorsing a specific line of
4 treatment carries that notion within it.  In other
5 words, everything in medicine is a cost-benefit
6 evaluation application to an individual patient,
7 but I certainly did not see in any of these
8 guidelines a statement that this treatment is
9 unsafe.
10     Q.   You did see statements in the
11 Endocrine Society Guidelines raising concerns that
12 puberty blockers could affect brain development,
13 did you not?  We looked at that earlier.
14     A.   Yeah.  They raise it as a
15 possibility, though they don't cite solid
16 evidence.  And they raise it as a question for
17 research.
18     Q.   And you did see reference in the
19 Endocrine Society Guidelines to a number of other
20 known or potential adverse effects of both puberty
21 blockers and cross-sex hormones for adolescents,
22 did you not?
23     A.   Correct.

Page 239

1      Q.   And what you didn't see anywhere in
2 the Endocrine Society Guidelines was a statement
3 that either of those treatments was safe when
4 administered to adolescents, did you?
5      A.   We think about that term in a
6 clinically relevant way.  In other words, when
7 weighing risk versus benefits for an individual
8 patient, there is a level of safety.  And we have
9 data, the use of these medications in similar ages
10 for other indications.
11     Q.   That's you.  But what you can't do
12 is point me to anything in the Endocrine Society
13 Guidelines that represent to the world that these
14 treatments are safe when administered to children
15 or adolescents; is that correct?
16     A.   I'm not sure that that sentence
17 exists in here.
18     Q.   All right.
19          MR. BROOKS:  Let me mark as Exhibit
20 25 a paper by Rafferty headed "Ensuring
21 Comprehensive Care and Support For Transgender and
22 Gender-Diverse Children and Adolescents" dated
23 2018.

Page 240

1
2          (Whereupon, Ladinsky Exhibit 25 was
3          marked and copy of same is attached
4          hereto.)
5
6      Q.   (BY MR. BROOKS)  Dr. Ladinsky, this
7 is the AAP statement that you cited in support of
8 your representation that the AAP has asserted that
9 the use of puberty blockers and cross-sex hormones
10 are, quote, "safe;" am I correct?
11          The question on the table is --
12     A.   This is the policy statement to
13 which I referred, yes.
14     Q.   Okay.  I have searched with the
15 benefit of an online search key --
16     A.   Tool.
17     Q.   -- and I can't find any assertion by
18 Rafferty, the AAP, that either puberty blockers or
19 cross-sex hormones are safe when administered to
20 children.  Do you believe that you found such
21 before making that representation in your expert
22 report?
23     A.   When endorsing -- again, when a

Page 241

1 consensus body endorses a modality or a treatment
2 protocol or paradigm, within that is data
3 reflecting on relative safety that doctors take
4 into consideration in the cost-benefit analyses
5 with patients.  You will not find that single
6 sentence in there.
7      Q.   Have you yourself participated in
8 developing such a medical association statement?
9      A.   This?  No, I have not.
10     Q.   Any such?
11     A.   No, sir.
12     Q.   How do you know how -- and by the
13 way, do you have any knowledge as to who
14 participated in preparing the AAP statement?
15     A.   So not only Dr. Rafferty, but you
16 had a lot of input from members of two different,
17 what we call, AAP heads, bodies, sections, and
18 committees.  So you had a number of people from
19 the committee on psychosocial aspects of child and
20 family health, the adolescent health, and then the
21 section on LGBTQ.
22     Q.   Do you have any personal knowledge
23 as to what input, if any, any of those individuals

61 (Pages 238 - 241)

Page 242

1 had?
2     A.  I do.
3     Q.  And on what bases?
4     A.  I'm a member of the section on LGBTQ
5 health and wellness. I'm also a member of the
6 minority health equity and inclusion subcommittee,
7 and so --
8     Q.  Prior to 2018, you --
9         MS. EAGAN:  Were you through with
10 your answer? I thought you interrupted her. I.
11         Wasn't sure if you were you through
12 with your answer because you said, "and so -- ".
13     A.  But I was going to say I know the
14 processes by which these policy statements are
15 arrived at. There is a lot of member input.
16     Q.  (BY MR. BROOKS) In general,
17 multiple members would review such policy
18 statements? Multiple members would have a hand in
19 revising it perhaps?
20     A.  That's correct.
21     Q.  It would have to be approved by the
22 entire committee or multiple committees?
23     A.  That's correct, yes.

Page 243

1     Q.  All right. But just to be clear,
2 your citation of -- so far as you recall, your
3 citation of the Rafferty paper was not based on
4 finding any representation in Rafferty that
5 puberty blockers or cross-sex hormones were safe
6 as administered to adolescents, but rather you
7 inferred that from the endorsements of those
8 procedures?
9     A.  That's a relative sort of inference,
10 but that is inherent in how physicians interpret,
11 align with, utilize policy statements like these
12 and other standards of care and guidelines.
13         MR. BROOKS:  Let me mark as Exhibit
14 26 a document headed "AACAP Statement Responding
15 to Efforts to Ban Evidence-Based Care For
16 Transgender and Gender Diverse Youth" dated
17 November 2019.
18
19         (Whereupon, Ladinsky Exhibit 26 was
20         marked and copy of same is attached
21         hereto.)
22
23     Q.  (BY MR. BROOKS) Did you review this

Page 244

1 document preferably before citing it for the
2 proposition that the AACAP had stated that use of
3 puberty blockers and cross-sex hormones was,
4 quote, "safe"?
5     A.  AACAP being the American Academy of
6 Child and Adolescent Psychiatry, correct?
7     Q.  I take your word for it, yes.
8     A.  No. I've not seen this document,
9 but I'm well aware of the endorsement from this
10 organization.
11     Q.  Well, let me ask:  You cited in your
12 footnote a November 8, 2019 statement from the
13 AACAP. This is a November 8, 2019 statement. I'm
14 sorry. Maybe I misspoke. This is the date you
15 cited in your footnote, and yet you say you've
16 never seen it before?
17     A.  I'm sure I've seen it in putting
18 this together, yes. Actually, yes.
19     Q.  Did you or did you not review this
20 document before citing it in your expert report?
21     A.  I did review it.
22     Q.  And did you find any statement from
23 the AACAP that these hormonal interventions in

Page 245

1 minors are, quote, "safe"?
2     A.  I do not see a sentence that states
3 that.
4         MR. BROOKS:  Let me mark as Exhibit
5 27 a document headed "AMA, State Advocacy Update".
6 March 26, 2021.
7
8         (Whereupon, Ladinsky Exhibit 27 was
9         marked and copy of same is attached
10         hereto.)
11
12     Q.  (BY MR. BROOKS) And is this a
13 document that you cited in your footnote in
14 support of the proposition that medical
15 organizations had endorsed hormonal interventions
16 as, quote, "safe"?
17     A.  Quite honestly, possibly. I know
18 that there are other -- and that's perhaps yes.
19     Q.  Well, I didn't --
20     A.  There are other AMA documents that
21 go into more detail.
22     Q.  If it's -- I don't want to make a
23 mistake on this. So behind Tab 13 is your expert

62 (Pages 242 - 245)

Page 246

1  report. Let's double-check whether that's what
2  you cited.
3      A.   That's a fair statement.
4      Q.   Okay.
5      A.   It's a summary of -- what I'm seeing
6  in my head is a more lengthy document.
7      Q.   And you are not expressing the view
8  that this advocacy update is something that was
9  voted on by the membership or by any formal
10  committee of the AMA, are you?
11      A.   I'm sorry. Can you restate that?
12      Q.   Yes. You don't have any opinion as
13  to whether this advocacy update was voted on by
14  any committee of the AMA, do you?
15      A.   I'm not aware of the details within
16  the AMA. I'm quite aware of the AMA's disdain for
17  criminalizing health for transgender minors.
18      Q.   And do you believe that you can
19  point me to any statement in this document from
20  the AMA that hormonal interventions in minors are,
21  quote, "safe"?
22      A.   No, sir. And that's not the point
23  of this document.

Page 247

1          MS. EAGAN: Roger, when you get
2  through with this line of questioning, can we take
3  a break? We've been going for a long time.
4          MR. BROOKS: Let's do a break. I'm
5  at the end of that line of questioning.
6
7          (Whereupon, a brief recess was
8          taken.)
9
10      Q.   (BY MR. BROOKS) New topic.
11      A.   New topic. Okay.
12      Q.   Would you agree with me that
13  biologically a key, almost defining, aspect of
14  puberty is development into fertility. That is
15  the individual becoming potentially fertile? It's
16  not a mysterious question.
17          Would you agree with me that a key,
18  almost definitional, aspect of the pubertal
19  process is a child sexually maturing to become
20  potentially fertile?
21      A.   That is a longitudinal aspect of the
22  physiologic changes that happen during puberty.
23      Q.   And specifically, puberty includes

Page 248

1  gonadal and hormonal changes that are necessary to
2  achieve fertility?
3      A.   In today's world not necessarily,
4  but.
5      Q.   I'll ask a more precise question.
6  Natural healthy puberty includes gonadal and
7  hormonal changes necessary to achieve fertility,
8  correct?
9      A.   Ideally.
10      Q.   Let's go back to the Rafferty paper,
11  Exhibit 25. And you cited this in your expert
12  report because you believe it to be a generally
13  reliable document?
14      A.   Generally reliable, what do you
15  mean?
16      Q.   In your opinion is the description
17  of the science a description that you can rely on
18  as a clinician?
19      A.   I think that's fair.
20      Q.   Let me ask you to turn to Page 6.
21  And there is a Table 2 at the top of the page that
22  says -- titled "The process of gender affirmation
23  may include one or more of the following

Page 249

1  components."
2      A.   Right.
3      Q.   And puberty blockers -- one of the
4  columns is reversibility, right? You see that?
5      A.   Right.
6      Q.   And puberty blockers, it says
7  reversible and then has a little footnote.
8      A.   Little C.
9      Q.   If we follow that C, what it says
10  is, quote, "The effect of sustained puberty
11  suppression on fertility is unknown." Do you see
12  that?
13      A.   I see that. It's Footnote C.
14      Q.   Footnote C?
15      A.   Yeah.
16      Q.   And do you agree or disagree with
17  the American Academy of Pediatrics or is it
18  outside your expertise to say that the effect of
19  sustained pubertal suppression on fertility of the
20  adolescent is unknown?
21      A.   I think the remainder of that and
22  then Footnote 6 of 68, and they refer, yeah, right
23  back to the Endocrine Society Clinical Practice

63 (Pages 246 - 249)

Page 250

1  Guidelines.  So I think that's the way that it's
2  stated here.  And in Footnote C, I don't have any
3  problem with that.
4      Q.   That is, you don't disagree with the
5  statement that the effects of sustained puberty
6  suppression on fertility is unknown?
7      A.   I don't have any -- I agree with
8  that statement.  The question is:  What does the
9  Endocrine Society and Dr. Rafferty and our
10  clinical judgment mean by sustained?
11      Q.   Let's look at what the Endocrine
12  Society has to say since you mentioned that, and
13  that is in your binder, Tab 37.  And I'm going to
14  call your attention to Page 3880, but you're going
15  to want to look back and see what recommendation
16  this discussion pertains to which is on the
17  previous page, 1.5.  And what that recommendation
18  says is, quote, "We recommend that clinicians
19  inform and counsel all individuals seeking
20  gender-affirming medical treatment regarding
21  options for fertility preservation prior to
22  initiating puberty suppression in adolescents and
23  prior to treating with hormonal therapy of the

Page 251

1  affirmed gender in both adolescents and adults."
2  Closed quote.  Do you see that?
3      A.   I do.
4      Q.   And do you have any understanding if
5  puberty suppression is simply a pause why the
6  Endocrine Society recommends counseling regarding
7  options for fertility preservation prior to
8  administering puberty suppression?
9      A.   I do believe that section -- this
10  recommendation Number 1.5, "The task force placed
11  a high value on avoiding harm with
12  gender-affirming hormone therapy in prepubertal
13  children with GD/gender incongruence."  That's --
14  so that's the sentence that proceeds it.
15      Q.   Yes.
16      A.   Meaning prepubertal children are not
17  prescribed medication.  That is the standard of
18  care.  They're talking in generalizable terms,
19  puberty suppression and prior to treating with
20  hormonal therapy.  They're talking about the
21  entire manuscript there.
22      Q.   Well, they speak specifically about
23  providing counsel for options fertility

Page 252

1  preservation prior to initiating puberty
2  suppression in adolescence.  Do you see that?
3      A.   I do.
4      Q.   And if puberty suppression just acts
5  as a pause, do you have any understanding why the
6  Endocrine Society recommends that clinicians
7  provide counseling on fertility preservation prior
8  to administering puberty blockers?
9      A.   I can only infer.  But for youth who
10  begin puberty blocker medications and then over a
11  period of time maintain sustained significant
12  dysphoria becoming eligible for hormonal therapy,
13  okay, that discussion must be had because there is
14  a possible decrement to fertility in that group.
15      Q.   For a child who's put on puberty
16  blockers at, let's say, 10 or Stage 2 and proceeds
17  without interruptions onto cross-sex hormones,
18  there are in fact no options for fertility
19  preservation, are there?
20      A.   There are.
21      Q.   What demonstrated options for
22  fertility preservation in that context are there?
23      A.   If that young person were to allow

Page 253

1  for a little bit of space in between, it can be
2  obtained.
3      Q.   That is if the child -- that's
4  contrary to my hypothetical, so let's break it
5  down.
6          My hypothetical was a child is put
7  on puberty blockers at 10 or Stage 2 and proceeds
8  without interruption to cross-sex hormones at
9  whatever age you generally consider to be
10  clinically appropriate, for that individual, there
11  are no fertility preservation options, are there?
12      A.   I'm not -- remember I'm not a
13  reproductive endocrinologist.  However, in the
14  future that person, if they, you know, cease their
15  treatment for a little while, may be able to
16  procure gametes.  But I think the Endocrine
17  Society makes this recommendation in a very
18  general way here, and it's a sound board.
19      Q.   Now, they mentioned in the little
20  heading, values of preferences, that you just
21  stated, that -- I take it from the way they
22  stated, that all the evidence relating to
23  fertility is, quote, what they call "low-quality

64 (Pages 250 - 253)

Page 254

1  evidence", correct?
2      A.   Everything, all of it throughout the
3  whole document?
4      Q.   Everything on which they base their
5  recommendation they describe as low-quality
6  evidence; am I right?
7      A.   They say right here, okay, "This
8  justifies the strong recommendation in the face of
9  low-quality evidence."  But I think it's important
10  to understand the context around this term "low
11  quality", "lesser quality", et cetera.  That does
12  not refer to utilizing, not utilizing, negating
13  the recommendation.  That term "low-quality
14  evidence" simply refers to the studies that
15  undergird that recommendation and how their
16  methodology aligns with randomized prospective
17  double-blind placebo-controlled.  These are terms
18  that physicians and clinicians use in interpreting
19  evidence.  The notion of low quality is more of a
20  technical term referring to study methodology.
21  Not bad, good, horrible, yucky.
22      Q.   Technical terms, right?
23      A.   Yes, sir.

Page 255

1      Q.   So if we turn over the page, we're
2  still on the discussion of the remarks about use
3  of puberty blockers.
4      A.   Okay.
5      Q.   And at the top of Column 388 -- of
6  Column 1 of 3880, the first full sentence reads --
7  and we're talking here about males as will be
8  obvious.  "Note that there are no data in this
9  population concerning the time required for
10  sufficient spermatogenesis to collect enough sperm
11  for later fertility."  Do you see that?
12      A.   Right here.  I do see that.
13      Q.   And this is -- that population
14  refers to boys who have been on puberty
15  suppression for a period of time and then ceased
16  puberty suppression for a period of time, correct?
17      MS. EAGAN:  Dr. Ladinsky, I would
18  ask that you read -- I would like for her to read
19  all these remarks leading up to it because you're
20  asking about one sentence.
21      MR. BROOKS:  That's fine.  I already
22  thought she had, basically.
23      MS. EAGAN:  I'm not sure she has.

Page 256

1      A.   I've read it, but, I mean, it's
2  important to know that this is in a section,
3  recommendations for those involved in the gender
4  hormonal treatment of individuals.  It's not a
5  single section on puberty blockers.
6      MS. EAGAN:  What I would ask,
7  though -- read the remarks, Dr. Ladinsky.  Take
8  your time to read the remarks and then answer his
9  question about the context of that one sentence,
10  please.
11      A.   Okay.
12      Q.   (BY MR. BROOKS)  All right.  At
13  the -- referring to the population of natal males
14  who have been on puberty blockers, it says at the
15  top of Column 1, quote, "There are no data in this
16  population concerning the time required for
17  sufficient spermatogenesis to collect enough sperm
18  for later fertility."  Closed quote.  Do you see
19  that?
20      A.   I see that.
21      Q.   So far as you know, is it still true
22  that there is no data on that topic?
23      A.   While I am not a researcher --

Page 257

1  remember this was 2017.
2      Q.   That's why I asked.
3      A.   There is considerable work ongoing
4  not just in the field of gender health but more
5  importantly in pediatric oncology where nothing to
6  do with gender, this population may need to enter
7  into chemotherapeutic regimens that could later
8  impair fertility.  And there is a good amount
9  going on right now to find, you know, to give us a
10  better idea.  But you see right there .7 to 3
11  years.
12      Q.   I'm sorry.  What was -- I see.
13      A.   In the next sentence because --
14      Q.   This is in a different use case;
15  that is, in adult men --
16      A.   No.  In males treated for precocious
17  puberty.
18      Q.   Pardon me.  Yes.
19      A.   Spermarche means the ability to
20  obtain viable sperm from a sample from that
21  patient.  0.7 to 3 years after cessation of GnRH
22  analogs.
23      Q.   So --

65 (Pages 254 - 257)

Page 258

1    A.    Puberty blockers.
2    Q.    So far as you know, there's been no
3  study of how long it takes or whether an
4  individual whose puberty -- whose ordinary
5  endogenous puberty has been blocked can generate
6  enough sperm to use the language here, quote, "for
7  later fertility," closed quote?
8    A.    I think you see it right here.  0.7
9  to 3 years after cessation, after stopping the
10  blockers.
11    Q.    That doesn't make any representation
12  about whether there was enough to achieve
13  fertility, does it?
14    A.    Well, spermarche implies that.
15    Q.    Is that your understanding of the
16  literature?
17    A.    No.  Looking at the term.
18    Q.    I understand.
19    A.    The ability to collect viable sperm.
20    Q.    Do you know whether in the
21  literature spermarche implies actually fertility?
22    A.    I do not, but.
23    Q.    And as to another use case; that is,

Page 259

1  adult men with gonadotropin deficiency, it notes
2  that sperm numbers were quote, "far below the
3  normal range", correct?
4    A.    I don't take care of adult men with
5  gonadotropin deficiency.
6    Q.    You don't prescribe puberty blockers
7  for children with precocious puberty either, do
8  you?
9    A.    My endocrinology colleagues do.
10    Q.    And what the Endocrine Society says
11  is that in the case of adult men who have for
12  whatever medical reason been subjected to
13  blockade, after some period of time it remains
14  true that their sperm numbers are, quote, "far
15  below the normal range", right?
16    A.    That's referring to this unique
17  population of men.  That's how I read it.
18    Q.    And you wouldn't want to extrapolate
19  from that population to adolescents who have had
20  puberty blocked at its normal healthy time,
21  correct?
22         MS. EAGAN:  Object to the form.
23    A.    Let me just look at -- if you don't

Page 260

1  mind, 70 and 71, I'd like to look at this
2  footnote.
3         Okay.  Both of these studies were
4  looking at a different population of adult men who
5  for exactly as you said, reasons we don't know,
6  are gonadotropin deficient.
7    Q.    And my question was simply:  You
8  don't think it's appropriate to extrapolate from
9  the experience of that population to what the
10  experience may be of adolescents who have normal
11  healthy puberty blocked?
12    A.    Not in a clinically significant way
13  for me on a frontline.
14    Q.    And for similar reasons, it would
15  also not be appropriate to extrapolate from a
16  population that suffered from precocious puberty
17  and had puberty blocked -- and had puberty occur
18  at -- postponed until, I should say, a normal time
19  period for puberty?
20         MS. EAGAN:  Object to the form.
21    A.    On the contrary, I think that's
22  immensely helpful.  It gives me information about
23  pediatric patients who began the same treatment at

Page 261

1  the same physiologic stage.
2    Q.    (BY MR. BROOKS)  So let me ask you
3  about physiologic stage.  It's not your testimony,
4  is it, that children who suffer from precocious
5  puberty are at the same brain developmental stage
6  as children to whom your team prescribes puberty
7  blockers as a treatment for gender dysphoria?
8    A.    Some may be.  I can't state, you
9  know, that's a yes or a no.
10    Q.    I would have thought you could.
11    A.    It's a wide range.
12    Q.    So let me ask:  Precocious puberty,
13  how do you understand that to be defined?
14    A.    Precocious puberty in a natal male
15  is the development of secondary sex
16  characteristics or adrenal ketones under androgen
17  before the age of 9; and in a girl, before the age
18  of 8.  Again, androgenic, not breast buds, but
19  other elements.
20    Q.    And if that was happening, for
21  instance, in a boy at age 8 and a girl at age 7,
22  would your hospital potentially prescribe puberty
23  blockers?

66 (Pages 258 - 261)

1    A.   They may.
2    Q.   For that small advance?
3    A.   They may.
4    Q.   It is not your testimony, is it,
5  that on average children who suffer from
6  precocious puberty are at a level of neurological
7  development comparable to the average level of
8  development of children for whom you prescribe
9  puberty blockers as a treatment for gender
10  dysphoria?
11    A.   If by brain development you mean
12  they're a few years on average younger, that's
13  true.
14    Q.   And to your knowledge, important
15  aspects of brain development routinely occur
16  during those few years, correct?
17    A.   Important aspects of brain
18  development occur at all ages.
19    Q.   And it's not your testimony, is it,
20  that on average children who are prescribed
21  puberty blockers as a treatment for precocious
22  puberty have physical size and body development
23  comparable to children for whom you prescribe

1  puberty blockers as a treatment for gender
2  dysphoria?
3    A.   On the contrary they often may.
4  They may have the same height.
5    Q.   I didn't ask may.  I said on
6  average.
7    A.   I think it's quite common.
8  Precocious puberty puts them at a physiology,
9  including size, on par with someone who may be
10  eligible to receive puberty blocking medication
11  for significant gender dysphoria in early
12  adolescent Stage 2.
13    Q.   A little farther down in the column
14  on 3880, it says in the next paragraph, "In girls,
15  no studies have reported long-term, adverse
16  effects of pubertal suppression on ovarian
17  function."  However, in the next sentence it says,
18  "Clinician should inform adolescents that no data
19  are available regarding either time to spontaneous
20  ovulation after cessation of GnRH analogs or the
21  response to ovulation induction following
22  prolonged gonadotropin suppression."  Do you see
23  that language?

1    A.   I see it.
2    Q.   And is it still consistent with your
3  understanding that there is no data out there
4  about how long after cessation of puberty blockers
5  a girl may resume ovulation?
6    A.   At the moment, there are no data
7  available at the time of this report.  And if
8  there are data looking specifically at the timing
9  of eventual ovulation for someone assigned female
10  at birth that was placed on GnRH analog for
11  central precocious puberty or for gender
12  dysphoria.  I do not know if there have been data
13  since that.  I do know that there's long-term data
14  in cisgender females treated with GnRH analogs for
15  central precocious puberty that report normal
16  pregnancy, ultimate fertility, et cetera.
17    Q.   So as far as you know, there are no
18  data with regard to females treated with puberty
19  blockers to prevent normal healthy timed puberty
20  as to when, if ever, those girls can achieve
21  healthy levels of fertility?
22    A.   It would -- I mean, to me that's a
23  two-part question that would also -- are we

1  looking at a population of theoretical girls that
2  did begin puberty suppression at 10 or 2 or early
3  10 or 3 and then took a pause to maturation before
4  beginning hormonal therapy; or are we talking
5  about girls that go straight.
6    Q.   In neither case is there any data to
7  your knowledge as to when or whether those girls
8  can ever achieve healthy levels of fertility?
9    A.   As to whether I believe, there may
10  be.  There's some data showing that if they
11  stop -- stopping testosterone or decreasing,
12  fertility is quite possible.
13    Q.   Well --
14    A.   There's also --
15    Q.   Go a little bit further down here.
16    A.   -- many cases of trans men becoming
17  pregnant, intended and unintended.
18    Q.   It says -- at the end of the
19  paragraph -- it says in the third paragraph,
20  restoration -- and now we're talking about
21  cross-sex hormones.  "Restoration of
22  spermatogenesis after prolonged estrogen treatment
23  has not been studied."  Period.  Do you see that?

67 (Pages 262 - 265)

Page 266

1    A.   At the timing here, it had not been
2  studied.
3    Q.   And so far as you know, it has still
4  not been studied, correct?
5    A.   I believe -- I'm no expert and I'm
6  not an endocrinologist, a reproductive
7  endocrinologist.  But there is some data showing
8  that even after prolonged estrogen treatment,
9  restoration of spermatogenesis, quite possible.
10    Q.   Do you have any study in mind when
11  you say that or a statement from any organization?
12         No consulting with counsel on that.
13    A.   All right.  I would need to look
14  into it.
15    Q.   As you sit here now, you don't
16  recall?
17    A.   I'm telling you anecdotally, I can't
18  give you an exact reference.
19    Q.   Do you have a specific case from
20  your clinic's experience in which a natal male who
21  underwent prolonged cross-sex hormone treatment
22  has subsequently become a father?
23    A.   No, sir.  Our clinic hasn't been

Page 267

1  around long enough for that to have taken place.
2    Q.   Are you aware of any report of such
3  a case in the literature?
4    A.   Not that I can specifically direct
5  you to.
6    Q.   And anybody that you've treated in
7  your clinic -- and if you started at 15 perhaps,
8  they would be --
9    A.   23.
10    Q.   -- 23.  Just old enough.  Are you
11  aware of any case in which a natal female who
12  underwent prolonged treatment with endogenous
13  testosterone has later conceived and born a
14  healthy child?
15    A.   Yes.
16    Q.   In one of your patients?
17    A.   No, sir.  Our patients aren't that
18  old.  Our first cohort are in college.
19    Q.   And what case did you have in mind
20  when you said yes, sir?
21    A.   This is a case of an adult male, an
22  adult trans man, that a colleague of ours --
23  not -- in a different state.  A colleague of ours

Page 268

1  had brought to our attention where this man,
2  transgender man became pregnant unintentionally
3  but very happily and gave birth to a very healthy
4  baby boy.
5    Q.   What do you know about what hormonal
6  or puberty blocking treatments that natal female
7  had been subjected to prior to that pregnancy?
8    A.   I do not know that gentleman's
9  entire medical history.  This was a case that a
10  colleague had elevated in a discussion section
11  with many of us, so I do not know a thing about
12  that gentleman's history nor is it my business to
13  know.  However, he is far from the -- he's far
14  from the only one.
15    Q.   All right.  Tell me another one.
16    A.   Many adult trans men do carry their
17  own children.
18    Q.   Many adult trans men, natal females
19  don't in fact choose to undergo cross-sex
20  hormones, correct?
21    A.   I couldn't speak to any individual's
22  preference choice or how they manage their gender
23  care.

Page 269

1    Q.   General question.
2    A.   Right.
3    Q.   Many natal females who choose -- who
4  live in a transgender male identity choose not to
5  take cross-sex hormones; am I correct?
6    A.   I think it's fair to say that
7  transgender adults as a group may or may not
8  choose to take or to continue hormonal therapy.
9    Q.   So when we see a news item about a
10  transgender man who has conceived and borne a
11  child, we just don't know anything about whether
12  that individual ever was subjected to prolonged
13  testosterone, exogenous testosterone treatment, do
14  we?
15    A.   We don't know each individual man's
16  medical history.
17    Q.   And you're not aware of any
18  published case study that documents a natal female
19  who has been subjected to prolonged exogenous
20  testosterone who has conceived and borne a healthy
21  child?
22         MS. EAGAN:  Object to the form.
23    Q.   (BY MR. BROOKS)  You can answer the

68 (Pages 266 - 269)

Page 270

1  question.
2      A.   If you give me a computer, I can
3  find you one, but I can't point you to one right
4  now.  That does not mean it has not been studied
5  or that case collections have not been assembled.
6      Q.   I understand.  Part of my function
7  today is just to get clear what you know and what
8  you don't, and others may know other things.  We
9  put puzzle pieces together.
10      MR. BROOKS:  I'm going to mark as
11  Ladinsky Exhibit 28 a transcript of the PI,
12  preliminary injunction hearing testimony of Dr.
13  Antommaria from May 6, 2022.
14
15          (Whereupon, Ladinsky Exhibit 28 was
16          marked and copy of same is attached
17          hereto.)
18
19      Q.   (BY MR. BROOKS)  On Page 231 of this
20  transcript, Dr. Antommaria was asked, "Would you
21  agree that some of the risks of puberty blockers
22  and cross-sex hormones would be loss in
23  fertility?"  And Dr. Antommaria answered, "There

Page 271

1  is a risk of impaired fertility."
2          Let me just ask you:  Do you agree
3  with Dr. Antommaria on that point, do you
4  disagree, or do you think it's really outside your
5  expertise?
6      A.   If we are allowed to start at
7  Sentence 8, I fully agree with Dr. Antommaria's
8  bolded 8 through 11.  And then as it continues
9  with reference to some of the risks of puberty
10  blockers and cross-sex would be loss of fertility.
11  I agree with Dr. Antommaria's statement of, "There
12  is a risk of impaired fertility."
13      Q.   All right.  Let's look at a very
14  recent statement because you referred to a number
15  of times of the possibility of more recent
16  research.  And I will take you to Exhibit 20 which
17  is the de Vries editorial in the New England
18  Journal of Medicine if we can find that.  And I'm
19  just going to take you back to language that we
20  actually read into the record earlier, but we were
21  focusing on brain development.  The second page,
22  the second column, two-thirds of the way down, it
23  reads, "Finally, benefits of early medical

Page 272

1  intervention, including puberty suppression, need
2  to be weighed against possible adverse effects,
3  for example, with regard to bone and brain
4  development and fertility."  Period.  Closed
5  quote.
6      A.   Right.
7      Q.   And if Dr. de Vries of Vrije
8  University team, writing in 2023, expresses the
9  view that adverse effects on fertility are still
10  possible effects of puberty suppression and early
11  medical intervention, then do you agree, disagree,
12  or think that you lack information to form an
13  opinion on Dr. de Vries' statement?
14      MS. EAGAN:  Object to the form.
15      A.   Dr. de Vries is simply, to me,
16  articulating what is done clinically on the
17  frontlines which is weighing no risks, unknown
18  risks, known benefits in the context of each
19  individual patient.
20      Q.   (BY MR. BROOKS)  And one of the
21  risks that Dr. de Vries thinks as of 2023 needs to
22  be weighed is the risk of impairing fertility,
23  correct?

Page 273

1      MS. EAGAN:  Object to the form.
2      A.   Correct.  That is what Dr. de Vries
3  says right here.
4      Q.   (BY MR. BROOKS)  Let me ask you to
5  turn to your expert report to Paragraph 21.  Maybe
6  it's Page 21.  You don't have numbered paragraphs.
7  Page 21.  Tab 13.
8          You state four lines from the
9  bottom, quote, "Many people undergo fertility
10  preservation before any treatment that could
11  compromise fertility."
12          Of -- and you've said that the
13  preponderance of the patients who present at your
14  clinic are 14 years or older?
15      A.   Correct.
16      Q.   And among natal girls, what
17  proportion who are age 14 have experienced
18  menarche and are producing potentially fertile
19  eggs?
20      A.   Many.
21      Q.   Many?
22      A.   Yeah.
23      Q.   What proportion of young people who

69 (Pages 270 - 273)

Page 274

1  come to your clinic into adolescence -- we'll talk
2  about those 17 that you've given puberty blockers
3  to. What proportion of those who arrive late
4  enough that that's not an issue in fact undergo
5  fertility preservation techniques before you
6  administer cross-sex hormones to them?
7      A.  Similar to Dr. Antommaria, I'd like
8  to desegregate my trans ladies, natal males, from
9  my trans men, natal females.
10     Q.  Please.
11     A.  Okay. And with reference to the
12  former.
13     Q.  Natal males?
14     A.  Natal males identify female and
15  those who go on to begin cross-sex hormones as
16  older teens, those trans ladies. Following, you
17  know, lengthy discussions leading up to that, more
18  than half --
19     Q.  Okay.
20     A.  -- do bank gametes.
21     Q.  And now for the natal females?
22     A.  For the natal females, so those
23  assigned male -- assigned female at birth identify

Page 275

1  male --
2      Q.  I'm glad you get confused too.
3      A.  -- that are beginning testosterone
4  therapy. The preponderance of the evidence is
5  such that as adults they are not as likely to
6  experience impaired fertility should they want to,
7  you know, one day have their own biologic
8  children. So again, medicine, cost-benefit rate,
9  the evidence showing that should they want to as
10 adults either stop testosterone; if they have a
11 uterus, carry their own child; relative to the
12 procurement of eggs, which is extremely costly and
13 quite invasive. It's cost-benefit given the
14 family, the information we have, but it's not
15 common that that's chosen.
16     Q.  I think we saw earlier in the
17 Endocrine Society document their representation
18 that there was in fact no data on recovery of
19 fertility by natal females after prolonged
20 exposure to testosterone. You recall that?
21     A.  That was a statement in 2017.
22     Q.  And when I asked for more recent
23 information, you referred to things you had seen

Page 276

1  in the news rather than anything in the scientific
2  literature?
3      A.  I didn't say that, sir.
4      Q.  I thought you did?
5      A.  Something I'd seen in the news?
6      Q.  Then let me --
7      A.  No, sir.
8      Q.  Then let me ask:  Are you aware of
9  any peer-reviewed report, whether a study or a
10 case study, of a natal female who has conceived
11 and borne a healthy child after an extended period
12 of years on cross-sex testosterone?
13     A.  I have reason to believe that data
14 exists. I cannot encyclopedically procure it for
15 you out of my head, though.
16     Q.  Despite the fact that you can't
17 identify any such study, you advise natal females
18 that fertility preservation is not so urgent for
19 them because they will be able to have a better
20 chance of recovering fertility later in adulthood
21 if they change their minds?
22     A.  It is not said exactly like you said
23 that in counseling family.

Page 277

1      Q.  How do you say it?
2      A.  We talk about the risks of impaired
3  fertility as adults should they maintain a uterus
4  and want to carry their own biologic children and
5  the possible need for fertility -- assisted
6  fertility should that occur. We talk about the
7  banking of ova and what is involved. And families
8  weigh that and make their decision accordingly.
9      Q.  When you say assisted fertility,
10 what do you refer to?
11     A.  The need to visit a reproductive
12 endocrinologist later in life.
13     Q.  But again, up to the present, you
14 haven't seen a specific case study of any natal
15 female who has been on cross-sex testosterone for
16 a period of years who has conceived and borne a
17 healthy child even with the assistance of a
18 reproductive endocrinologist, correct?
19         MS. EAGAN:  Object to the form.
20     Q.  (BY MR. BROOKS)  Unless she
21 instructs you not to answer, you still have to
22 answer.
23     A.  I'll just restate what I just told

70 (Pages 274 - 277)

1  you.
2      Q.   Then let me ask her to read the
3  question first, and then you can decide whether
4  that's what you need to do.
5
6          (Whereupon, a portion of the
7          testimony was read by the court
8          reporter.)
9
10     A.   I cannot point you to such a study.
11  It does not mean it is nonexistent in the
12  literature, the popular literature as well as the
13  medical literature.
14     Q.   (BY MR. BROOKS)  Let me ask you to
15  turn to Page 27 in your expert report.  And you
16  say -- there's a paragraph, full paragraph here
17  that leads into the discussion of bone density.
18  Do you see that?
19     A.   I do.
20     Q.   And you say towards the end, quote,
21  "we know from excellent data that bone density
22  catch-up ensues.  This is well documented and
23  matches our own clinical experience."  Do you see

1  that?
2      A.   I see that.
3      Q.   And for well documented -- well, let
4  me ask you first about your clinical experience;
5  that is, do you routinely measure the bone density
6  of young people in your practice before and after
7  they take cross-sex hormones or puberty blockers?
8      A.   We do not routinely unless they
9  have -- remember, we use puberty blockers for
10  short durations of time.  If they have other
11  medical indications or other medical challenges
12  that could interfere with calcium metabolism,
13  vitamin D metabolism, or bone density, we do.  But
14  at this point, there is not -- it's not for these
15  brief periods of time.
16     Q.   In your clinical experience, you
17  haven't compiled quantitative data about bone
18  density, correct?
19     A.   No, sir.
20     Q.   So now let's look at what you say in
21  Footnote 20 which is van der Loos.
22         MR. BROOKS:  Let me mark as Exhibit
23  29.  I think this will be called a research

1  report, a short thing by van der Loos.
2
3          (Whereupon, Ladinsky Exhibit 29 was
4          marked and copy of same is attached
5          hereto.)
6
7      Q.   (BY MR. BROOKS)  And this is titled
8  "Development of hip bone geometry in transgender
9  adolescents resembles the experienced gender if
10  GnRHa treatment is started in early, but not late,
11  puberty."  Do you see that?
12         My initial question is:  Am I
13  correct that this is what your Footnote 20 refers
14  to?
15     A.   I am -- but I believe that if you
16  see that the original publication was in the
17  Journal of Bone and Mineral Research, and this is
18  in The Journal of the Endocrine Society.  I
19  believe that this is sort of a concise summary of
20  that article as sort of abridged and published in
21  the Journal of Endocrine Society, not the
22  original.
23     Q.   That's probably right and I'll have

1  to follow that link there for the exciting --
2      A.   Sorry.
3      Q.   -- completion of this installment.
4  Okay.  I will not take your time on what's not the
5  right document.
6          MR. BROOKS:  Why don't we take a
7  five-minute break while I kind of do a final scan.
8
9          (Whereupon, a brief recess was
10         taken.)
11
12     Q.   (BY MR. BROOKS)  Let me ask a
13  process question.  As you prepared your expert
14  report, did -- and without going into the
15  substance, did counsel assist you, by for
16  instance, in identifying articles that you might
17  find useful to cite?
18     A.   I think that's fair.
19     Q.   And did counsel provide any
20  editorial suggestions to the text?
21     A.   It was a sort of back-and-forth if
22  that makes sense.
23     Q.   That does make sense.

71 (Pages 278 - 281)

Page 282

1    A.   Okay.
2    Q.   And did you ever take care that by
3  the end everything in this report reflects your
4  opinion rather than the opinion of counsel?
5    A.   Yes, sir.
6        MR. BROOKS:  Let me mark as Ladinsky
7  Exhibit 30 a document entitled "Patient
8  information for informed consent feminizing
9  medications for transgender clients," which was
10 apparently marked as Plaintiff's Exhibit 41 at the
11 preliminary injunction hearing.
12
13       (Whereupon, Ladinsky Exhibit 30 was
14       marked and copy of same is attached
15       hereto.)
16
17   Q.   (BY MR. BROOKS)  And Dr. Ladinsky, I
18 read the title that you see here.  It's several
19 pages in, you will see also the document -- it's
20 probably in -- sometimes a separate document --
21 client information for informed consent,
22 testosterone for transgender clients.  I just want
23 you to understand what we have here.

Page 283

1    A.   So I'm assuming I have both -- okay.
2    Q.   And I've just marked it as it was
3  used as an exhibit at trial.  I just want you to
4  be aware that both of those are in here.
5        And does this -- do these two
6  documents, if I may, are these still the forms
7  that you're using in your clinic today?
8    A.   They are.
9    Q.   And when was the last time any
10 change was made to these documents?
11   A.   I believe they were reviewed,
12 reformatted in the lead-up to the PI hearing.
13   Q.   Was the substance changed as far as
14 you know?
15   A.   No, sir.
16   Q.   And any of the specific disclosures
17 changed in the lead-up to the PI period?
18   A.   Not to my knowledge.
19   Q.   So the first document refers to
20 feminizing medication, and then the second one
21 refers to testosterone for transgender clients.
22 Neither of those categories include puberty
23 blockers; am I correct?

Page 284

1    A.   Correct.
2    Q.   And do you have a different informed
3  consent form that you use prior to administering
4  puberty blockers?
5    A.   So we actually do not use a written
6  informed consent form for puberty blockers, and
7  that's in line with the practice in many centers
8  around the country.  We at our center view them as
9  a reversible but sort of pause button.  We do in
10 each patient's chart have, you know, basically a
11 summary of what we discussed with the patients
12 relative to potential side effects, intended
13 effects, et cetera, of puberty blockers.
14   Q.   Well, do you have any script that
15 you or people associated with your clinic use to
16 make sure that they have raised all potential side
17 effects of puberty blockers in those oral
18 conversations?
19   A.   We do.
20   Q.   And what does that look like?  How
21 long a document is it?
22   A.   It's -- I'm visualizing it sort of
23 as a phrase in the medical record.  But it's a

Page 285

1  paragraph like that (indicating).
2    Q.   It's not more than a page long?
3    A.   That's fair.
4        MR. BROOKS:  Counsel, I will say
5  that I believe that that document is clearly
6  called for by the document request, and we will
7  request that it be produced following up.
8        MS. EAGAN:  Well, I'll say I'm not
9  UAB's lawyer, so you'll have to take that up with
10 UAB's lawyer.
11       MR. BROOKS:  Quite so.
12   Q.   We will follow up on that.
13   A.   Sure, absolutely.
14   Q.   I appreciate your assurance.
15   A.   Remember that the UAB Gender Health
16 Clinic --
17       MS. EAGAN:  There is no question on
18 the table.
19       THE WITNESS:  Okay.
20   Q.   (BY MR. BROOKS)  I like to think the
21 Gender Health Clinic is not using puberty
22 blockers, but that's a separate question.
23   A.   Ditto.

72 (Pages 282 - 285)

Page 286

1    Q.   All right.  Let me just ask you
2  about Page 3 of this document.  And I'm looking at
3  the information for feminizing.
4    A.   Okay.
5    Q.   You specifically require -- at the
6  bottom of this page it states, "I know that there
7  may be mood changes with these medicines, and I
8  agree to continue therapy with a qualified
9  therapist."  Do you see that?
10   A.   Uh-huh.
11   Q.   So as a requirement to receiving
12 cross-sex hormones from your clinic, you actually
13 require that the patient agree to continue
14 psychotherapy with a qualified therapist, correct?
15   A.   That's what it says right there.
16   Q.   Well, and do you know that to be
17 your actual practice?
18   A.   It is our practice.
19   Q.   Okay.  Let's look at your expert
20 report Page 31.  And there you say in the final
21 paragraph, "If my clinic is barred from providing
22 this care, it is foreseeable and certain that
23 transgender youth in Alabama will suffer medical

Page 287

1  and mental health consequences, including
2  declining mental health, suicide ideation, suicide
3  attempts, and possibly completed suicides."  Do
4  see that language?
5    A.   I see that language.
6    Q.   And if in your view it is
7  foreseeable and certain that these negative
8  effects will happen if you do not provide hormonal
9  care for the puberty blockers, is it your
10 professional opinion that these harms will be
11 avoided if you are able to provide hormonal
12 interventions?
13   A.   These medical interventions are part
14 of gender affirmation required by transgender,
15 gender incongruent young people to live in
16 accordance with their identified gender in a
17 robust way.  Will it -- we've talked about this
18 today.  Will it in a linear way prevent, we cannot
19 say that.  But we know that the inability to
20 provide it will accelerate these negative effects.
21   Q.   Well, on the proposition that it is
22 certain that the absence of these treatments will
23 cause worsening condition, you cite nothing.  And

Page 288

1  part of what your expert report is to do is to
2  provide us not only your opinions but the basis
3  for those opinions.  And I would like you to tell
4  me what the basis of that opinion is.
5    A.   There's a wealth of literature that
6  comes together to underscore improved mental
7  health, improved physical health for young people
8  who are able to access this care.  If this care is
9  not available -- and I'm going to bifurcate that
10 as well.  Okay.  Let's talk about youth who are
11 gender incongruent who are at high risk for gender
12 dysphoria and what comes with it who have no
13 ability to receive this care.  We know the
14 outcomes will be lessened.  Mental health alone
15 has not been shown to alleviate some of the
16 downstream serious negative effects of untreated
17 gender dysphoria.
18   Q.   Is it your testimony that studies
19 which you believe to be a sufficiently large size
20 and sound methodology have shown that hormonal
21 interventions will alleviate these harms?
22   A.   Alleviate is a strong word.  Okay.
23   Q.   I thought it was a weak word.

Page 289

1    A.   Will mitigate.
2    Q.   All right.
3    A.   Okay.  When, you know, taken
4  together with all of the other factors, family
5  support, et cetera.  But the bifurcation that is
6  also very very important in this statement is if
7  my colleagues and I are forced to cease care for
8  youth receiving it currently, okay, to just stop
9  it, that's not only medically contraindicated, but
10 it's an ethical breach, and it has been shown to
11 be associated with these harms.
12   Q.   That is ceasing care, ceasing
13 hormonal care for those already receiving it has
14 been shown?
15   A.   Well, first of all, in the case --
16 in the unique case of testosterone, that's
17 medically contraindicated regardless.  Anyone
18 receiving testosterone for any number of medical
19 indications, including gender dysphoria.  That's
20 medication that medically you don't stop.  It's
21 medically contraindicated to just cease that, but.
22   Q.   Let me ask you a question about that
23 if I may.

73 (Pages 286 - 289)

1    A.   Okay.

2    Q.   You've talked throughout the day

3  about the fact or the possibility of the young

4  people have a choice to cease cross-sex hormones

5  if they choose to?

6    A.   That's correct.

7    Q.   Do you tell them before prescribing

8  testosterone that it would be medically indicated

9  not to stop it once they begin it?

10    A.   We tell them and we talk at each

11  visit that our patients have the freedom and

12  ability to change their mind.  In the unique case

13  of testosterone, we tell them, we don't want you

14  to simply stop the medication.  But should you

15  decide that taking the medication is not warranted

16  for you, we will do this together under a

17  medically supervised taper.  We have yet to see

18  this specific situation.  But yes, we have those

19  discussions.

20    Q.   You referred earlier to children who

21  were suffering gender incongruence and were at

22  risk for gender dysphoria.  Do you recall that?

23    A.   I do.

1    Q.   Does your clinic prescribe either

2  puberty blockers or cross-sex hormones for

3  children who have not received a diagnosis of

4  gender dysphoria?

5    A.   We do not.

6    Q.   Then what were you talking about

7  when you talked about children who are gender

8  incongruous and at risk for gender dysphoria if

9  they don't receive treatment?

10    A.   I was speaking of a group of young

11  people who may be in the phase of developing or

12  understanding a gender incongruent identity,

13  meaning as it's evolving.  Should they evolve into

14  teens with a transgender identity and for many the

15  accompanying dysphoria, to know that the standard

16  of care medicine is not available to them could

17  accelerate mental health -- negative mental health

18  outcomes.

19    Q.   Let me ask for your unbigoted

20  testimony under oath as to whether your clinic

21  ever provides puberty blockers or cross-sex

22  hormones for any young person who has not received

23  a formal diagnosis of gender dysphoria by a

1  qualified mental health professional?

2    A.   Are you asking:  Is it conceivable

3  the diagnosis could have been made by physician or

4  others?

5    Q.   Has your clinic ever prescribed

6  puberty blockers or cross-sex hormones for a young

7  person who has not received a formal diagnosis of

8  gender dysphoria by an appropriately qualified

9  medical or mental health provider?

10    A.   No, sir.

11    Q.   Okay.

12    A.   We have not.

13        MR. BROOKS:  Let me mark as Ladinsky

14  Exhibit 31 a document entitled "Advancing

15  knowledge of transgender medical intervention

16  effects" by Joshua Safer, from the Urology

17  Journal.

18

19        (Whereupon, Ladinsky Exhibit 31 was

20        marked and copy of same is attached

21        hereto.)

22

23    Q.   (BY MR. BROOKS)  Let me ask first

1  whether you've ever had any professional

2  interactions with Dr. Safer?

3    A.   I have not.

4    Q.   Do you -- have you heard of his

5  professional reputation?

6    A.   I have not.

7    Q.   Are you familiar with the gender

8  clinic at the Mount Sinai Medical Institute in

9  Manhattan?

10    A.   I know that they have one.

11    Q.   Okay.  But you had no interactions?

12    A.   No, sir.

13    Q.   Then this will be quick.  Writing in

14  2019 in the very first paragraph, Dr. Safer says

15  the following:  When assessing the risks and

16  benefits of transgender hormone therapy, the

17  evidence base to guide decision-making is thin.

18  Although transgender hormone treatment seems to be

19  generally safe when prescribed under medical

20  supervision, the data that exist are mostly from

21  medical record review of convenience samples with

22  dozens or hundreds of patients."  And he goes on a

23  little bit later in that same paragraph to say,

Page 294

1 quote, "The nature of these studies has been to
2 show minimal harm rather than to show benefit."
3 Do you see the language that I've read?
4     A.  I'm sorry.  I was reading the --
5     Q.  Feel free to read the entire
6 paragraph.
7     A.  I was reading the sentence before
8 that.
9     MS. EAGAN:  Look through the whole
10 document.  You're not familiar with this document.
11     THE WITNESS:  Not at all.
12     MS. EAGAN:  Let's take time to --
13     Q.  (BY MR. BROOKS)  Let me ask a fairly
14 simple question.  If Dr. Safer concluded in 2019,
15 November of 2019, that the studies available up to
16 that point tended to show minimal harm rather than
17 to show benefit from cross-sex hormone therapy for
18 gender dysphoria, do you simply disagree with Dr.
19 Safer?
20     A.  I'm struggling with this because
21 I -- my first glance is that Dr. Safer is
22 commenting on an article that's similar to --
23     Q.  That's correct.  And up front he's

Page 295

1 summarizing the state of the science.
2     A.  As he sees it.
3     Q.  That's right.  And my question for
4 you is very simple.  If, as he sees it, the state
5 of the science is to show minimal harm rather than
6 to show benefit from cross-sex hormones, do you
7 simply disagree with his evaluation of the
8 science?
9     A.  I cannot in any way comment on Dr.
10 Safer's impressions relative to this.  This is a
11 group -- the study involves and the analysis here
12 involves a group of adults.  These may well have
13 been adults who transitioned as adults.
14 Therefore, physiologically the changes they
15 experienced from those hormones may be quite
16 different than those experienced by an adolescent.
17 In addition, it's tempered by their expectations,
18 their perception of their own bodily feelings,
19 pain, discomfort, or comfort.  So that's what I'm
20 seeing here if that helps.
21     Q.  All right.
22     MR. BROOKS:  Let me mark as Ladinsky
23 Exhibit 32 a paper entitled "Psychological

Page 296

1 Functioning in Transgender Adolescents Before and
2 After Gender-Affirmative Care Compared With
3 Cisgender General Population Peers" by authors
4 including van der Miesen, Steensma, de Vries, and
5 others with Dutch names.  That's dated 2020.
6
7     (Whereupon, Ladinsky Exhibit 32 was
8     marked and copy of same is attached
9     hereto.)
10
11     Q.  (BY MR. BROOKS)  My first question
12 to you, Dr. Ladinsky, will be whether this is an
13 article that you have read before today?
14     A.  I recall seeing this article.  I
15 cannot -- I don't recall detail.
16     MS. EAGAN:  Take your time.
17     Q.  (BY MR. BROOKS)  I want to ask you
18 not so much about the results but about a couple
19 of cautions the authors authored.  Page 703.
20     MS. EAGAN:  Dr. Ladinsky, do you
21 want to review the article?
22     Q.  (BY MR. BROOKS)  Well, let me ask
23 the question before you review the whole article.

Page 297

1     If you turn to Page 703, an inch and
2 a half from the bottom in the first column, maybe
3 2, is a sentence that reads, "It should be
4 acknowledged that the care provided in the present
5 study also involved the offering of appropriate
6 mental health care."  Period.  Closed quote.  Do
7 you see that?
8     A.  Hang on.
9     MS. EAGAN:  What page?
10     MR. BROOKS:  It's 703, the first
11 column.
12     Q.  And you're in the second column
13 right now?
14     A.  Okay.
15     Q.  An inch and a half from the bottom
16 of the first column.
17     A.  Do you mind if I read the discussion
18 quickly?
19     Q.  Let me ask you a question first, and
20 then you can decide what you need to read.  What
21 the authors here say is, "It should be
22 acknowledged that the care provided in the present
23 study also involved the offering of appropriate

Page 298

1  mental health care." Inch and half from the
2  bottom of that column, maybe 2.
3      A.  I got you.
4      Q.  So let me ask: That's consistent
5  with your clinic's practice where we saw you --
6      A.  That's correct.
7      Q.  -- require your patients to be
8  receiving appropriate mental health care
9  concurrently with whatever medical care you
10  provide, correct?
11      A.  That's correct. It is our practice.
12      Q.  Does that -- just speaking general
13  methodology, does that create what you early refer
14  to as a confound when you attempt to analyze the
15  significance of improvements or lack of
16  improvements on the part of patients? I think you
17  used the term. Do you understand what a confound
18  is?
19      A.  I do. I'm trying to put it into the
20  context of what you're asking relative in addition
21  to this.
22      Q.  So let's put this study aside for a
23  moment because just generally it studies gender

Page 299

1  dysphoric youths who are receiving medical
2  intervention of some type?
3      A.  Right.
4      Q.  And you're measuring outcomes. If
5  they are concurrently receiving mental healthcare,
6  does that in your understanding create a confound
7  that stands between you and formed conclusion
8  about the effect of the medical care on the one
9  hand versus the mental health care on the other?
10      A.  No.
11          MS. EAGAN: Object.
12      Q.  (BY MR. BROOKS) Why is that?
13      A.  First of all, I'm not actively
14  engaged in research. Are you insinuating, meaning
15  when I'm evaluating --
16      Q.  Exactly so.
17      A.  -- successive treatment with an
18  individual patient?
19      Q.  Or when you're evaluating
20  literature?
21      A.  That's very different. Okay. When
22  I'm evaluating literature as in this study?
23      Q.  Or any study whether there's medical

Page 300

1  care and mental health care delivered
2  concurrently?
3      A.  In this -- in gender health,
4  especially in work with adolescents, you know,
5  to -- the mental health piece is standard of care
6  for good reasons. I'm not a researcher, but I
7  would not see it as a confounding variable because
8  it's being received before, during, and ongoing,
9  their receipt of these individual transitioning
10  therapies. It shouldn't confound our analysis of
11  success around the role of medication.
12      Q.  Let me ask a question unrelated --
13  entirely unrelated to this paper. I don't think
14  anything in the paper mentions this.
15          You testified that the large
16  majority of your patients who come in are age 14
17  or above when you first see them, correct?
18      A.  Many, yes.
19      Q.  And is it the case that at least
20  most young people who come to you at that stage in
21  life are experiencing distress or mental health
22  difficulties of one type or another?
23      A.  Many.

Page 301

1      Q.  And do you have any knowledge as to
2  whether -- putting aside gender dysphoria in young
3  people -- young people who are, let's say, at age
4  15 suffering mental health issues are on average
5  in a better place, in the same place, or in a
6  worse place two years later? In other words, does
7  maturation in that age period, simple process of
8  getting older, provide a statistical improvement
9  in mental health?
10      A.  I'm sorry. Were you talking about
11  youth who experience gender dysphoria or the
12  general population of just, say, cisgendered
13  teenagers experiencing anxiety, depression?
14      Q.  The latter.
15      A.  The latter. Okay.
16      Q.  My question is: Do you have any
17  knowledge about whether such a trend either
18  getting worse or getting better in that age period
19  exists?
20      A.  In my clinical experience as a
21  primary care provider for children and
22  adolescents, it is my experience that adolescents
23  who have mental health challenges and are not

76 (Pages 298 - 301)

Page 302

1  provided therapeutic programming pharmacology
2  around them, they do not get better.  They can get
3  far worse.
4      Q.   Back to our friends at the Vrije
5  University clinic in the second column of 703.
6  The authors state 2 inches -- everything I call
7  out is an inch or 2 from the bottom.  So 2 inches
8  from the bottom.  The sentence that begins, "The
9  present study can."  Do you see that?
10     A.   Got it.
11     Q.   Let me read that in the record.
12 "The present study can, therefore, not provide
13 evidence about the direct benefits of puberty
14 suppression over time and long-term mental health
15 outcomes.  Conclusions about long-term benefits of
16 puberty suppression should thus be made with
17 extreme caution needing prospective long-term
18 follow-up studies with a repeated measure design
19 with individuals being followed over time to
20 confirm the current findings."  Do you see that
21 language?
22     A.   I see that language.
23     Q.   And do you agree that up to the

Page 303

1  present, conclusions about the long-term
2  benefits -- this is what they specifically speak
3  to -- of puberty suppression need to be made with
4  extreme caution?
5      A.   Without putting it into the context
6  of the entire study, I don't know what they mean
7  by "with extreme caution".
8           A clinical implication of these
9  findings is the need for worldwide availability of
10 gender-affirming care including puberty
11 suppression to alleviate mental health problems.
12         MS. EAGAN:  Dr. Ladinsky, you
13 probably answered his question.  He asked if you
14 agree with that statement, and you said you can't
15 do it without the context of the document.  So I
16 think it's time for another question.
17         MR. BROOKS:  Well testified.
18         THE WITNESS:  She's professional.
19         MR. BROOKS:  Let me mark as Exhibit
20 33 a paper by Polly Carmichael dated 2021 entitled
21 "Short-term outcomes of pubertal suppression in a
22 selected cohort of 12-to-15-year-old young people
23 with persistent gender dysphoria in the UK."

Page 304

1
2           (Whereupon, Ladinsky Exhibit 33 was
3           marked and copy of same is attached
4           hereto.)
5
6      Q.   (BY MR. BROOKS)  You'll see at a
7  glance that this is research coming out of the
8  Tavistock Clinic --
9      A.   We do.
10     Q.   -- that we spoke about earlier.
11 Have you encountered professionally any of the
12 authors of this article?
13     A.   I have not.
14     Q.   And is this article one that you
15 believe that is part of your process of staying
16 abreast of the literature in the field that you
17 read sometime soon after it was published?
18     A.   I vaguely recall it being published.
19     Q.   They list in the methods paragraph
20 certain metrics that they followed including youth
21 self-report, CBCL, YSR.  Are those metrics that
22 you're familiar with?
23     A.   The YSR, I'm not familiar with.

Page 305

1  I've heard of the CBCL.  But these are, you know,
2  as you see by the spelling of behavior, these are
3  British tools.
4      Q.   You know that to be the case?  You
5  don't believe that the CBCL and the YSR are used
6  by American researchers as well?
7      A.   They may well be used by American
8  researchers as well, but I am not familiar with
9  them, put it that way.
10     Q.   And you see that this article is
11 from February 2021.  Do you see that?
12     A.   It was published then, that's
13 correct.
14     Q.   Presumably the work done was earlier
15 than that?
16     A.   Yes, exactly.
17     Q.   Do you recall -- you said you recall
18 this being published.  Obviously coming from a
19 large and prestigious institute, correct?
20     A.   The Tavistock/Portman Clinic is a
21 very very well, you know, longstanding
22 institutional source of care, yes.
23     Q.   Was this, in your opinion, an

77 (Pages 302 - 305)

Page 306

1 important piece of research information when it
2 came out?
3     A.   It was sort of an observational
4 study looking at 44 young people receiving puberty
5 blockers with persistent severe gender dysphoria.
6 Their observations are always going to be of
7 interest to anybody working in this field.  Do I
8 remember it as sentinel, I can't -- I don't
9 recall.
10     MR. BROOKS:  Well, with a minute or
11 two to go, I will cede my time.  I have no further
12 questions for the witness.
13     MS. EAGAN:  I do not have any
14 questions.
15     COURT REPORTER:  Do you want a copy
16 of the transcript?
17     MS. EAGAN:  Absolutely.  We're going
18 to read and sign.
19
20     (Whereupon, a discussion was held
21     off the record.)
22
23     MR. BROOKS:  The defendants are

Page 307

1 withdrawing from the record Exhibit 2, which was
2 as transcript of the May 5, 2022 session of the
3 preliminary injunction hearing.
4     MS. EAGAN:  And plaintiff is in
5 agreement with that withdrawal, so it will not
6 part of this deposition transcript.
7
8     (Whereupon, the deposition ended at
9     5:56 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 308

1         C E R T I F I C A T E
2
3 STATE OF ALABAMA    )
4 JEFFERSON COUNTY    )
5     I hereby certify that the above and
6 foregoing proceeding was taken down by me in
7 stenotype, and the questions and answers thereto
8 were transcribed by means of computer-aided
9 transcription, and that the foregoing represents a
10 true and correct transcript of the testimony given
11 by said witness upon said hearing.
12     I further certify that I am neither of
13 counsel, nor of kin to the parties to the action,
14 nor am I in anyway interested in the result of
15 said cause.
16     Signed the 21st day of April, 2023.
17
18     _____
19     Jennifer Madaris
20         ACCR 585
21     My license expires September 30, 2023
22     My Commission expires January 4, 2026
23

Page 309

1 To: Melody H. Eagan, Esq.
2 Re: Signature of Deponent Morissa J. Ladinsky, M.D.
3 Date Errata due back at our offices: 30 days
4
5 Greetings:
6 This deposition has been requested for read and sign by
  the deponent.  It is the deponent's responsibility to
  review the transcript, noting any changes or corrections
  on the attached PDF Errata.  The deponent may fill
8 out the Errata electronically or print and fill out
  manually.
9
10 Once the Errata is signed by the deponent and notarized,
  please mail it to the offices of Veritext (below).
11
12 When the signed Errata is returned to us, we will seal
  and forward to the taking attorney to file with the
13 original transcript.  We will also send copies of the
  Errata to all ordering parties.
14
15 If the signed Errata is not returned within the time
  above, the original transcript may be filed with the
16 court without the signature of the deponent.
17
18 Please Email the completed errata/witness cert page
  to CS-SOUTHEAST@VERITEXT.COM
19 or mail to
20 Veritext Production Facility
21 2031 Shady Crest Drive
22 Hoover, AL 35216
23 205-397-2397

78 (Pages 306 - 309)

Page 310

1   ERRATA for ASSIGNMENT #5816927

2   I, the undersigned, do hereby certify that I have read the
    transcript of my testimony, and that

3

4   ___ There are no changes noted.

5   ___ The following changes are noted:

6

    Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)

7   (2017). Rule 30(e) states any changes in form or
    substance which you desire to make to your testimony shall

8   be entered upon the deposition with a statement of the
    reasons given for making them.  To assist you in making any

9   such corrections, please use the form below.  If additional
    pages are necessary, please furnish same and attach.

10

11  Page _____ Line _____ Change _____

12  _____

13  Reason for change _____

14  Page _____ Line _____ Change _____

15  _____

16  Reason for change _____

17  Page _____ Line _____ Change _____

18  _____

19  Reason for change _____

20  Page _____ Line _____ Change _____

21  _____

22  Reason for change _____

23  Page _____ Line _____ Change _____

Page 311

1   Page _____ Line _____ Change _____

2   _____

3   Reason for change _____

4   Page _____ Line _____ Change _____

5   _____

6   Reason for change _____

7   Page _____ Line _____ Change _____

8   _____

9   Reason for change _____

10  Page _____ Line _____ Change _____

11  _____

12  Reason for change _____

13  Page _____ Line _____ Change _____

14  _____

15  Reason for change _____

16

17

18      _____
            DEPONENT'S SIGNATURE

19

    Sworn to and subscribed before me this ___ day of

20

        _____, _____.

21

22  _____

23  NOTARY PUBLIC / My Commission Expires:_____