# EXHIBIT 43

Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
2                   NORTHERN DIVISION
3                      *   *   *
4    BRIANNA BOE, et al.,
5           Plaintiffs,
6    UNITED STATES OF AMERICA,
7           Intervenor Plaintiff,
8         vs.              CASE NO. 2:22-cv-184-LCB
9    HON. STEVE MARSHALL, in his
     Official capacity as Attorney
10   General, of the State of
     Alabama, et al.,
11
12          Defendants.
13                     *   *   *
14           Deposition of ARMAND H. ANTOMMARIA,
15   M.D., Ph.D., FAAP, HEC-C, Witness herein, called
16   by the Defendants for examination pursuant to the
17   Rules of Civil Procedure, taken before me, Monica
18   K. Schrader, a Notary Public in and for the State
19   of Ohio, at the U.S. Attorney's Office, Cleveland
20   Branch Office, Atrium II Building, 221 East Fourth
21   Street, Suite 400, Cincinnati, Ohio, on Friday,
22   April 21, 2023, at 9:03 a.m.
23                     *   *   *
24
25

**Page 2**

```
 1              I N D E X
 2
 3  WITNESS: ARMAND H. ANTOMMARIA, M.D.,
 4  Ph.D., FAAP, HEC-C
 5  EXAMINATION                    PAGE
 6      BY MR. FRAMPTON:................  9
 7
 8          E X H I B I T S
 9  No.        Description        Page
10
11  Exhibit 1   curriculum vitae         10
12  Exhibit 2   Hormone Therapy, Mental   22
            Health, and Quality of Life
13          Among Transgender People: A
            Systematic Review
14
    Exhibit 3   Psychosocial Functioning in   24
15          Transgender Youth after 2
            Years of Hormones
16
    Exhibit 4   Users' Guides to the        34
17          Medical Literature
18  Exhibit 5   A Systematic Literature     40
            Review of Individuals'
19          Perspectives on Broad
            Consent and Date Sharing in
20          the United States
21  Exhibit 6   Systematic Review of        41
            Typologies Used to
22          Characterize Clinical
            Ethics Consultations
23
    Exhibit 7   GRADE guidelines: 3. Rating   46
24          the Quality of Evidence
25
```

**Page 3**

```
 1  Exhibit 8   GRADE guidelines: 4. Rating   54
            the Quality of Evidence -
 2          Study Limitations (Risk of
            Bias)
 3
    Exhibit 9   Impact of Blinding on        72
 4          Estimated Treatment Effects
            in Randomised Clinical
 5          Trials:
            Meta-Epidemiological Study
 6
    Exhibit 10  GRADE guidelines: 5. Rating   74
 7          the Quality of Evidence -
            Publication Bias
 8
    Exhibit 11  GRADE guidelines 6. Rating    77
 9          the Quality of Evidence -
            Imprecision
10
    Exhibit 12  Growing Evidence and         86
11          Remaining Questions in
            Adolescent Transgender Care
12
    Exhibit 13  GRADE guidelines: 7. Rating   92
13          the Quality of Evidence -
            Inconsistency
14
    Exhibit 14  GRADE guidelines: 8. Rating   94
15          the Quality of Evidence -
            Indirectness
16
    Exhibit 15  The Cass Review             96
17
    Exhibit 16  GRADE guidelines: 11.        111
18          Making An Overall Rating of
            Confidence in Effect
19          Estimates For a Single
            Outcome and All Outcomes
20
    Exhibit 17  Endocrine Treatment of      115
21          Gender-Dysphoric/Gender-
            Incongruent Persons: An
22          Endocrine Society Clinical
            Practice Guideline
23
    Exhibit 18  Standards of Care for the   125
24          Health of Transgender and
            Gender Diverse People,
25          Version 8
```

**Page 4**

```
 1  Exhibit 19  Gender Dysphoria In Young   128
            People Is Rising - And So
 2          Is Professional
            Disagreement,
 3
    Exhibit 20  Gender Dysphoria In Young   130
 4          People Is Rising - And So
            is Professional
 5          Disagreement
 6  Exhibit 21  Congenital Adrenal          139
            Hyperplasia Due to Steroid
 7          21-Hydroxylase Deficiency:
            An Endocrine Society
 8          Clinical Practice Guideline
 9  Exhibit 22  Pediatric Obesity -         144
            Assessment, Treatment, and
10          Prevention:  An Endocrine
            Society Clinical Practice
11          Guideline
12  Exhibit 23  Part 4: Pediatric Basic and  148
            Advanced Life Support
13
    Exhibit 24  Hormonal Treatment in Young  156
14          People With Gender
            Dysphoria: A Systematic
15          Review
16  Exhibit 25  Consensus Parameter:        158
            Research Methodologies to
17          Evaluate Neurodevelopmental
            Effects of Pubertal
18          Suppression in Transgender
            Youth
19
    Exhibit 26  Evidence Review:            160
20          Gonadotropin Releasing
            Hormone Analogues for
21          Children and Adolescents
            With Gender Dysphoria
22
    Exhibit 27  Evidence Review:            171
23          Gender-Affirming Hormones
            For Children and
24          Adolescents With Gender
            Dysphoria
25
```

**Page 5**

```
 1  Exhibit 28  Body Dissatisfaction and    176
            Mental Health Outcomes of
 2          Youth on Gender-Affirming
            Hormone Therapy
 3
    Exhibit 29  Care of Children and        189
 4          Adolescents With Gender
            Dysphoria
 5
    Exhibit 30  Expert Declaration of       190
 6          Armand H. Antommaria, M.D.,
            Ph.D., FAAP, HEC-C
 7
    Exhibit 31  PLaintiff-Intervenor United  192
 8          States' Disclosure of
            Expert Testimony of Armand
 9          H. Matheny Antommaria,
            M.D., Ph.D., FAAP, HEC-C
10
    Exhibit 32  Bilaga 3. Inkluderade       199
11          Studier Appendix 3.
            Characteristics of Included
12          Studies: Extracted data
13  Exhibit 33  Bilaga till rapport         201
14  Exhibit 34  Considering Sex as a        210
            Biological Variable in
15          Basic and Clinical Studies:
            An Endocrine Society
16          Scientific Statement
17  Exhibit 35  A Critical Commentary on    218
            Follow-up Studies and
18          Desistance Theories About
            Transgender and
19          Gender-nonconforming
            Children
20
    Exhibit 36  A Critical Commentary on A  222
21          Critical Commentary on
            Follow-up Studies and
22          Desistance Theories About
            Transgender and Gender
23          Nonconforming Children
24
25
```

Veritext Legal Solutions

Page 6

1  Exhibit 37  The Amsterdam Cohort of      225
        Gender Dysphoria Study
2       (1972-2015): Trends in
        Prevalence, Treatment, and
3       Regrets
4  Exhibit 38  A Follow-Up Study of Boys     233
        With Gender Identity
5       Disorder
6  Exhibit 39  Medical Decision-making in    242
        Children and Adolescents:
7       Developmental and
        Neuroscientific Aspects
8
   Exhibit 40  Assessing Medical             246
9       Decision-Making Competence
        in Transgender Youth
10
   Exhibit 41  The Competency of Children    254
11      and Adolescents to Make
        Informed Treatment
12      Decisions
13 Exhibit 42  A Qualitative Study of        260
        Adolescents' Understanding
14      of Biobanks and Their
        Attitudes Toward
15      Participation, Re-contact,
        and Data Sharing
16
17
18
19
20
21
22
23
24
25

Page 8

1    On behalf of the Defendants:
2        Alliance Defending Freedom
3    By:  Roger G. Brooks, Esq.
         Henry W. Frampton, Esq.
4        Laurence Wilkinson, Esq.
         15100 North 90th Street
5        Scottsdale, Arizona 85260
6        and
7        Office of the Attorney General, State of
         Alabama
8
     By:  Barrett Bowdre, Esq.
9        Bethany Lee, Esq.
         Deputy Solicitors General
10       501 Washington Avenue
         Montgomery, Alabama 36130
11
     ALSO PRESENT:
12
         Jennifer L. Levi, Esq.
13       Shannon Minter, Esq.
14                * * *
15
16
17
18
19
20
21
22
23
24
25

Page 7

1  APPEARANCES:
     On behalf of the Intervenor Plaintiff:
2
         U.S. Department of Justice
3
   By:  Jason R. Cheek, Esq.
4        Deputy Chief, Civil Division
         1801 Fourth Avenue North
5        Birmingham, Alabama 35203-2101
6        and
7        Kaitlin Toyama, Esq.
         Renee Williams, Esq. (Via Zoom)
8        Attorney Advisor, Federal Coordination
         and Compliance
9        950 Pennsylvania Avenue NW
         Washington, D.C. 20530-0001
10
         and
11
     By:  Coty Montag, Esq. (Via Zoom)
12       Deputy Chief, Federal Coordination and
         Compliance Section, Civil Rights Division
13       4 Constitution Square
         150 M Street NE, Room 7.1817
14       Washington, D.C. 20002
15 On behalf of the private Plaintiffs:
         King & Spalding, LLP
16
17 By:  Adam Reinke, Esq. (Via Zoom)
         1180 Peachtree Street, NE, Suite 1600
18       Atlanta, Georgia 30309
19       and
20       Michael B. Shortnacy, Esq. (Via Zoom)
         633 West Fifth Street, Suite 1600
21       Los Angeles, California 90071
22
23
24
25

Page 9

1    ARMAND H. ANTOMMARIA, M.D., Ph.D., FAAP, HEC-C
2  of lawful age, Witness herein, having been first
3  duly cautioned and sworn, as hereinafter
4  certified, was examined and said as follows:
5               EXAMINATION
6  BY MR. FRAMPTON:
7        Q.  Good morning, Dr. Antommaria.      09:03:33
8        A.  Good morning.                09:03:35
9        Q.  How are you?                 09:03:35
10       A.  I am all right, thank you.       09:03:36
11       Q.  Very good.  I introduced myself   09:03:37
12 earlier, but I am Hal Frampton.  I am        09:03:40
13 representing the State of Alabama, and I am   09:03:42
14 going to ask you some questions over the course  09:03:44
15 of the day.  Have you had your deposition taken  09:03:46
16 before?                         09:03:50
17       A.  I have.                  09:03:50
18       Q.  How many times about?          09:03:51
19       A.  Twice.                   09:03:53
20       Q.  Twice.  What cases were those in,  09:03:54
21 to the best of your recollection?          09:03:57
22       A.  The case in Arkansas and the case  09:03:58
23 in Florida.                     09:04:01
24       Q.  Okay, got it.  The case in       09:04:02
25 Arkansas, the Brandt case; is that right?    09:04:07

Page 10

1    A.  Correct.                              09:04:09
2    Q.  And Florida, was that a recent         09:04:09
3  deposition?                                  09:04:12
4    A.  Yes.                                   09:04:13
5    Q.  When was it?                           09:04:13
6    A.  About two weeks ago.                   09:04:14
7    Q.  Okay, got it.  Well, you know          09:04:17
8  basically how this process works.  This will  09:04:20
9  work the same as your others.  I am going to  09:04:22
10  ask you a series of questions.  You understand  09:04:25
11  that you are under oath this morning, correct?  09:04:27
12    A.  I do.                                 09:04:28
13    Q.  Fair enough.  Dr. Antommaria, I am    09:04:45
14  going to hand you what I am marking as       09:04:52
15  Exhibit 1.                                   09:04:53
16        (Thereupon, Exhibit 1, curriculum    09:05:01
17  vitae, was marked for purposes of identification.)  09:05:02
18  BY MR. FRAMPTON:                             09:05:02
19    Q.  All right.  Dr. Antommaria, is        09:05:17
20  Exhibit 1 a current copy of your CV?         09:05:18
21    A.  Yes, it's a current copy of my CV.    09:05:21
22    Q.  Thank you, sir.                       09:05:41
23        MR. CHEEK:  And, Mr. Frampton, my     09:05:42
24  apologies, can I put something on the record  09:05:45
25  before we go further?  That we are not agreeing to  09:05:46

Page 11

1  the usual stipulations.  We will take this    09:05:49
2  deposition according to the Federal Rules.    09:05:51
3        MR. FRAMPTON:  Okay.                   09:05:53
4        MR. CHEEK:  And we will also reserve   09:05:53
5  the right to read and sign.                   09:05:55
6        MR. FRAMPTON:  Okay.                   09:05:57
7        MR. CHEEK:  My apologies.              09:05:57
8  BY MR. FRAMPTON:                              09:05:58
9    Q.  All right.  Dr. Antommaria, I see      09:06:01
10  on the second page of your CV that you are in  09:06:04
11  the Department of Surgery; is that correct?   09:06:07
12    A.  I have a secondary appointment in     09:06:11
13  the Department of Surgery.                    09:06:15
14    Q.  Okay.  Are you a surgeon?             09:06:17
15    A.  No, I am not.                         09:06:19
16    Q.  What is your specialty?              09:06:20
17    A.  My clinical specialty is as a         09:06:24
18  pediatric hospitalist.                       09:06:31
19    Q.  And so that means you manage the      09:06:33
20  care of pediatric patients while they are    09:06:36
21  inpatients; is that correct?                 09:06:39
22    A.  That is an aspect of what a           09:06:40
23  pediatric hospitalist does or how a pediatric  09:06:47
24  hospitalist is defined.                      09:06:50
25    Q.  Okay.  What did I miss in that        09:06:52

Page 12

1  definition?                                   09:06:54
2    A.  Oh, we don't care for all types of     09:06:55
3  pediatric inpatients.                         09:06:58
4    Q.  Okay.  What types of pediatric         09:06:59
5  inpatients do you not care for?               09:07:03
6    A.  We don't care for surgical            09:07:04
7  patients or patients exclusively admitted for a  09:07:12
8  single subspecialty condition.                09:07:17
9    Q.  Is it the case in your clinical        09:07:19
10  practice that all of your patients are        09:07:25
11  inpatients?                                   09:07:27
12    A.  So all the patients that I care       09:07:28
13  for were admitted as an inpatient.  We are    09:07:38
14  increasingly managing transitions to home and  09:07:43
15  do receive phone calls for patients following  09:07:49
16  their discharge.  So all of the patients that I  09:07:51
17  am providing medical care for are not         09:07:55
18  concurrently inpatients but were inpatients at  09:07:58
19  one point in time.                            09:08:02
20    Q.  It looked to me on the website for    09:08:02
21  Cincinnati Children's that child psychiatry has  09:08:15
22  its own inpatient facilities; is that correct?  09:08:18
23    A.  Yes.  There are specific inpatient    09:08:20
24  psychiatric beds at Cincinnati Children's.    09:08:28
25    Q.  And do you service those patients?  09:08:31

Page 13

1        MR. CHEEK:  Objection, form.           09:08:37
2        THE WITNESS:  So I am sorry that this  09:08:43
3  is complicated.  So as a pediatric hospitalist, I  09:08:45
4  do admit psychiatric patients either awaiting  09:08:49
5  medical clearance or who have been medically  09:08:54
6  cleared and are awaiting psychiatric admission.  09:08:57
7  And as a bioethicist, I consult on patients   09:09:03
8  admitted to -- so the name of the facility at  09:09:10
9  Cincinnati Children's where the inpatient     09:09:13
10  psychiatric beds are located is called College  09:09:16
11  Hill.  I consult on patients who are admitted at  09:09:19
12  College Hill.                                 09:09:22
13  BY MR. FRAMPTON:                              09:09:23
14    Q.  In your capacity as a medical         09:09:23
15  ethicist?                                     09:09:25
16    A.  Yes.                                   09:09:26
17    Q.  What about in your capacity as a      09:09:26
18  pediatric hospitalist?                        09:09:31
19    A.  No.                                    09:09:33
20    Q.  Approximately what percentage of      09:09:33
21  your time is spent on your practice as a      09:09:41
22  pediatric hospitalist?                        09:09:44
23    A.  30 percent of my effort is            09:09:45
24  dedicated to my work as a pediatric           09:09:49
25  hospitalist.                                  09:09:51

4 (Pages 10 - 13)

Page 14

1    Q.  And what percentage as a medical   09:09:52
2  ethicist?                              09:09:54
3    A.  So 70 percent of my time is      09:09:55
4  dedicated to my role as the director of the   09:09:59
5  Ethics Center at Cincinnati Children's.   09:10:04
6    Q.  You do not perform the initial   09:10:05
7  diagnosis of gender dysphoria in a patient, do   09:10:11
8  you?                                  09:10:14
9    A.  That is correct, I don't perform   09:10:14
10  the initial diagnosis.                 09:10:17
11    Q.  And you do not initiate medical   09:10:18
12  treatment; is that correct?            09:10:22
13        MR. CHEEK:  Objection, form.     09:10:24
14        THE WITNESS:  Could you be more --   09:10:28
15  what do you mean by medical treatment, sir?   09:10:29
16  BY MR. FRAMPTON:                       09:10:32
17    Q.  Do you initiate the treatment of   09:10:33
18  puberty-suppressing medication in patients with   09:10:35
19  gender dysphoria?                     09:10:39
20    A.  No, I do not.                   09:10:39
21    Q.  What about cross-sex hormones?   09:10:40
22    A.  I don't initiate the use of gender   09:10:43
23  affirming hormone therapy.            09:10:49
24    Q.  Your medical ethics practice, what   09:10:50
25  all does that consist of?              09:11:04

Page 15

1    A.  So I direct the Ethics Center at   09:11:05
2  Cincinnati Children's, so I have oversight for   09:11:16
3  the center's activities.  The center has   09:11:19
4  activities related to research, clinical and   09:11:23
5  organizational ethics.  I would be happy to   09:11:28
6  provide more specific information about any of   09:11:33
7  those areas.                          09:11:39
8    Q.  Sure.  About what percentage of   09:11:39
9  your time is spent actually consulting on   09:11:43
10  clinical care?                        09:11:46
11    A.  I think it's hard to identify a   09:11:46
12  particular percentage of my time because I   09:11:58
13  don't track time in the way lawyers track   09:12:02
14  billable hours, so I don't -- it would be   09:12:07
15  difficult for me to give an estimate of that.   09:12:10
16    Q.  Is it the majority of your time?   09:12:12
17    A.  Probably not the majority of my   09:12:15
18  time.                                 09:12:22
19    Q.  Are you compensated separately for   09:12:23
20  your clinical practice and your practice as   09:12:28
21  director of ethics or director of the Ethics   09:12:31
22  Center?                               09:12:34
23    A.  By compensated separately, can I   09:12:34
24  ask what you mean?                    09:12:41
25    Q.  Sure.  I am simply asking are   09:12:42

Page 16

1  you -- do you have sort of a compensation line   09:12:45
2  item for your clinical practice and a line item   09:12:48
3  for your role as director of the Ethics Center?   09:12:50
4  Is it broken out in that way?          09:12:54
5    A.  So within the Ethics Center       09:12:56
6  budget, there is compensation for my clinical   09:13:00
7  time, which comes from the Division of Hospital   09:13:05
8  Medicine.  And there is our other budget lines   09:13:09
9  for my effort related to being the director of   09:13:14
10  the Ethics Center.                    09:13:18
11    Q.  In your clinical consultation    09:13:18
12  practice, that is not limited as an ethicist --   09:13:28
13  that is not limited to gender dysphoria issues,   09:13:34
14  correct?                             09:13:37
15        MR. CHEEK:  Objection, form.     09:13:37
16        THE WITNESS:  No, it is not limited   09:13:39
17  in that way.                         09:13:41
18  BY MR. FRAMPTON:                      09:13:41
19    Q.  About what percentage of your time   09:13:43
20  do you believe you spend on gender dysphoria   09:13:44
21  issues in your role as an ethicist?   09:13:46
22    A.  So, again, it's difficult for me   09:13:50
23  to put a percentage.  I would say that I attend   09:14:00
24  and participate in Adolescent Medicine Clinic   09:14:06
25  that cares for transgender patients,   09:14:12

Page 17

1  multidisciplinary team meeting.  I consult on   09:14:17
2  patients on an as-needed basis when particular   09:14:20
3  ethical issues arise, which may be two to three   09:14:28
4  patients.  I may have separate conversations   09:14:31
5  about patients that don't arise to a formal   09:14:36
6  ethics consult.  And I am engaged in   09:14:40
7  institutional issues related to policies and   09:14:45
8  procedures related to the care of patients with   09:14:53
9  gender dysphoria, which are not individual   09:14:55
10  patient consultation.                 09:15:03
11    Q.  Would you say all of that adds up   09:15:04
12  to a majority of your time?            09:15:10
13    A.  It does not.                    09:15:11
14    Q.  You said two to three patients.   09:15:12
15  What number -- what number are you referring to   09:15:17
16  there?                               09:15:20
17    A.  It would be two to three patients   09:15:20
18  per year.                            09:15:21
19    Q.  Got it, fair enough.  You are not   09:15:22
20  a psychiatrist; is that correct?      09:15:27
21    A.  That is correct.                09:15:28
22    Q.  You are not a psychologist; is   09:15:30
23  that correct?                        09:15:33
24    A.  That is correct.                09:15:33
25    Q.  I have got a few of these.  You   09:15:33

5 (Pages 14 - 17)

Page 18

1 are not an endocrinologist; is that correct?   09:15:37
2      A.   That is correct.   09:15:39
3      Q.   All right.  What training do you   09:15:40
4 have in adolescent developmental psychology?   09:15:44
5      A.   I have training in adolescent   09:15:48
6 development psychology as part of my medical   09:15:55
7 school education, as part of my pediatric   09:15:59
8 residency training, and as part of my ongoing   09:16:02
9 professional education.   09:16:06
10      Q.   Do you consider yourself an expert   09:16:07
11 in adolescent developmental psychology?   09:16:12
12      A.   No, I don't consider myself an   09:16:15
13 expert in that area.   09:16:19
14      Q.   What is your training in the study   09:16:20
15 of cognitive development?   09:16:32
16      A.   Again, I have training in the   09:16:33
17 study of cognitive development as a result of   09:16:40
18 my medical school education, my residency   09:16:43
19 training, and my ongoing professional   09:16:46
20 development.   09:16:49
21      Q.   Do you consider yourself an expert   09:16:50
22 in that area?   09:16:53
23      A.   So I don't consider myself an   09:16:54
24 expert in that area colloquially.  There are   09:17:02
25 particular areas related to, say, adolescent   09:17:07

Page 19

1 capacity to make decisions that are a narrow   09:17:11
2 subset of the entire field in which I have a   09:17:16
3 greater knowledge.   09:17:20
4         MR. FRAMPTON:  Let's go off the   09:17:20
5 record because I don't want to burn time on people   09:17:20
6 joining.
7         (Thereupon, an off-the-record   09:17:20
8 discussion was had.)
9 BY MR. FRAMPTON:
10      Q.   Back on.  Dr. Antommaria, you do   09:18:04
11 not have any peer-reviewed publications on any   09:18:06
12 issues of transgender medicine; is that   09:18:08
13 correct?   09:18:10
14      A.   That is correct.   09:18:10
15      Q.   You have not been an investigator   09:18:13
16 in any study of the safety or efficacy of any   09:18:17
17 hormonal interventions as treatment for gender   09:18:20
18 dysphoria; is that correct?   09:18:23
19      A.   That is correct.   09:18:24
20      Q.   All right.  Can you tell me the   09:18:27
21 difference between suicide and suicidality, if   09:18:52
22 you know?  I mean, if I ask questions that are   09:18:57
23 outside your expertise, just tell me.   09:18:58
24      A.   So if by suicide you mean   09:19:06
25 completed suicide, that would be somebody who   09:19:09

Page 20

1 attempts to take their life and is successful   09:19:14
2 and has died, and suicidality would be that   09:19:16
3 someone has thoughts of committing suicide or   09:19:22
4 potentially attempts to commit suicide.   09:19:28
5      Q.   Suicidality is far more common   09:19:37
6 than completed suicide; is that correct?   09:19:40
7      A.   That is correct.   09:19:41
8      Q.   Do you consider yourself an expert   09:19:42
9 in suicide or suicidality?   09:19:47
10      A.   No, I don't consider myself an   09:19:50
11 expert on those topics.   09:19:52
12      Q.   When -- are you aware of any study   09:19:53
13 demonstrating that the medical transition of   09:20:12
14 any type, whether it's hormonal, surgical,   09:20:17
15 whatever, reduces the rate of completed suicide   09:20:20
16 among any population of transgender   09:20:24
17 individuals?   09:20:29
18         MR. CHEEK:  Objection.  I didn't hear   09:20:29
19 the last part of your question, Counsel.   09:20:31
20         MR. FRAMPTON:  I'll just do it again.   09:20:40
21 BY MR. FRAMPTON:   09:20:41
22      Q.   Are you aware of any study -- I'll   09:20:42
23 speak up -- are you aware of any study   09:20:43
24 demonstrating that medical transition of any   09:20:46
25 kind reduces the rate of completed suicides   09:20:48

Page 21

1 among any population of transgender   09:20:52
2 individuals?   09:20:54
3      A.   I am not aware of such a study.   09:20:54
4      Q.   When we treat an adolescent -- a   09:21:00
5 gender dysphoric adolescent with hormone   09:21:15
6 therapy, the hope certainly is that they are   09:21:19
7 going to have far more adult years in their   09:21:20
8 life than teenage years, correct?   09:21:23
9      A.   Yes, we would anticipate that   09:21:26
10 individuals have more adult years than teenage   09:21:36
11 years.   09:21:38
12      Q.   And so the effect of the hormonal   09:21:38
13 intervention over the course of adult years is   09:21:45
14 at least as important as the short-term effect   09:21:48
15 of the intervention, would you agree?   09:21:52
16      A.   Both the short term and long-term   09:21:54
17 effects of the intervention are important   09:21:58
18 considerations.   09:22:00
19      Q.   Equally important?   09:22:01
20      A.   It would depend on the clinical   09:22:10
21 context, sir.   09:22:12
22      Q.   How is that?   09:22:13
23      A.   For someone with less severe   09:22:13
24 dysphoria, the long-term effects may have a   09:22:26
25 greater weight.  And for somebody with a severe   09:22:31

6 (Pages 18 - 21)

Page 22

1 dysphoria, the short-term effects might have 09:22:37
2 greater weight. 09:22:40
3     Q.  Even in the latter case, the 09:22:40
4 long-term effects are important, are they not? 09:22:45
5     A.  In the latter case, being someone 09:22:47
6 with severe dysphoria? 09:22:53
7     Q.  Yes. 09:22:54
8     A.  Yes. 09:22:55
9         (Thereupon, Exhibit 2, Hormone 09:23:06
10 Therapy, Mental Health, and Quality of Life Among 09:23:06
11 Transgender People: A Systematic Review, was 09:23:06
12 marked for purposes of identification.) 09:23:07
13 BY MR. FRAMPTON: 09:23:07
14     Q.  All right.  Dr. Antommaria, I am 09:23:21
15 going to show you what I am marking as 09:23:23
16 Exhibit 2.  What I marked is a paper entitled 09:23:24
17 Hormone Therapy, Mental Health, and Quality of 09:23:58
18 Life Among Transgender People, A Systematic 09:24:01
19 Review.  The lead author is Kellan Baker.  And, 09:24:04
20 Dr. Antommaria, first question, is this an 09:24:07
21 article that you are familiar with? 09:24:10
22     A.  No, sir, it is not. 09:24:11
23     Q.  So this wasn't something that you 09:24:13
24 reviewed in preparing your expert report? 09:24:17
25     A.  No, sir, it is not. 09:24:22

Page 23

1     Q.  Then my questions about it are 09:24:24
2 going to be very limited.  But I would like you 09:24:29
3 to turn to page 13. 09:24:32
4     A.  I am on page 13, sir. 09:24:44
5     Q.  Look under acknowledgements.  Do 09:24:46
6 you see where it says Financial Support:  This 09:24:49
7 review was partly funded by the World 09:24:51
8 Professional Association for Transgender 09:24:53
9 Health? 09:24:56
10     A.  Yes, sir, I do see that. 09:25:00
11     Q.  Are you familiar with that 09:25:02
12 organization? 09:25:03
13     A.  I am, sir. 09:25:04
14     Q.  Do you know if this was a review 09:25:04
15 commissioned by WPATH for Standards of Care 8? 09:25:13
16         MR. CHEEK:  Objection, speculation. 09:25:19
17         THE WITNESS:  As I said, sir, I am 09:25:20
18 not familiar with the article, so I am not 09:25:21
19 familiar with that aspect of the article. 09:25:22
20 BY MR. FRAMPTON: 09:25:24
21     Q.  Okay.  Well, then I am not going 09:25:25
22 to ask you anything terribly substantive about 09:25:27
23 this.  What I will -- look on page 12 under 09:25:30
24 discussion.  At the bottom of that first 09:25:34
25 paragraph, it says:  It was impossible to draw 09:25:42

Page 24

1 conclusions about the effects of hormone 09:25:46
2 therapy on death by suicide.  Do you see that? 09:25:48
3     A.  I do see that sentence, sir. 09:25:50
4     Q.  And my question is simply are you 09:25:53
5 aware of any systematic reviews that have been 09:25:55
6 able to draw conclusions about the effects of 09:25:59
7 hormone therapy on suicide? 09:26:04
8     A.  So I believe that my answer to the 09:26:05
9 prior question was that I wasn't aware of any 09:26:13
10 individual studies.  And not being aware of any 09:26:17
11 individual studies, I am also not aware of any 09:26:22
12 meta-analyses of individual studies. 09:26:29
13     Q.  Fair.  Okay, we are done with that 09:26:30
14 one. 09:27:13
15         (Thereupon, Exhibit 3, Psychosocial 09:27:13
16 Functioning in Transgender Youth after 2 Years of 09:27:13
17 Hormones, was marked for purposes of 09:27:13
18 identification.) 09:27:13
19 BY MR. FRAMPTON: 09:27:13
20     Q.  I think we'll have a little better 09:27:13
21 luck with this one.  I am going to show you, 09:27:13
22 Dr. Antommaria, what I am marking as 09:27:14
23 Defendants' Exhibit 3.  I found my exhibit 09:27:17
24 sticker, so we are starting off on the right 09:27:22
25 foot. 09:27:24

Page 25

1         And what I have marked as 09:27:36
2 Exhibit 3 is an article entitled Psychosocial 09:27:39
3 Functioning in Transgender Youth after 2 Years 09:27:42
4 of Hormones.  The lead author is Diane Chen. 09:27:45
5 And, Dr. Antommaria, are you familiar with this 09:27:54
6 article? 09:27:56
7     A.  Yes, I am. 09:27:56
8     Q.  You cited this one in your expert 09:28:00
9 report, correct? 09:28:02
10     A.  So I don't have my expert report 09:28:03
11 before me.  I believe so. 09:28:09
12     Q.  We will.  You are familiar with 09:28:11
13 the article.  It doesn't matter for purposes of 09:28:15
14 this line of questioning.  Let's -- first, are 09:28:17
15 you familiar with any of the researchers listed 09:28:25
16 here? 09:28:29
17     A.  Familiar in what way, sir? 09:28:31
18     Q.  Do you know any of them? 09:28:34
19     A.  I have met Dr. Rosenthal, as 09:28:35
20 Dr. Rosenthal has lectured at Cincinnati 09:28:43
21 Children's. 09:28:45
22     Q.  Does he have a strong reputation? 09:28:45
23         MR. CHEEK:  Objection, form. 09:28:57
24         THE WITNESS:  A strong reputation for 09:28:58
25 what, sir? 09:29:04

7 (Pages 22 - 25)

Page 26

1 BY MR. FRAMPTON:                        09:29:04
2     Q.  For this kind of research.      09:29:07
3     A.  My general understanding is that   09:29:12
4 Dr. Rosenthal is an expert in the field of   09:29:14
5 transgender health care.                09:29:17
6     Q.  Are you familiar with Dr. Chen?   09:29:18
7 Have you read other publications by her?   09:29:25
8     A.  So given that many articles have   09:29:28
9 multiple authors, and I may not always be as   09:29:38
10 attentive to the middle authors of a      09:29:44
11 publication, I may have read articles by   09:29:47
12 Dr. Chen, but none immediately come to mind.   09:29:51
13     Q.  Okay, fair.  This is published in   09:29:57
14 the New England Journal of Medicine, correct?   09:30:04
15     A.  It is, sir.                     09:30:06
16     Q.  Is that a prestigious medical   09:30:09
17 journal, in your understanding?          09:30:12
18     A.  It is, sir.                     09:30:13
19     Q.  All right.  Let's talk about this   09:30:14
20 study.  This is a perspective cohort study; is   09:30:18
21 that correct, in terms of research design?   09:30:29
22     A.  Yes, sir.                       09:30:31
23     Q.  And that means that the          09:30:31
24 researchers are sort of monitoring the   09:30:34
25 participants as the experiment proceeds,   09:30:37

Page 27

1 correct?                                09:30:40
2     A.  Yes, they establish a cohort of   09:30:41
3 patients and follow them over time.  One might   09:30:48
4 refer to it as an observational study.   09:30:54
5     Q.  Fair enough.  This study, we have   09:30:56
6 got 315 participants, correct?          09:31:02
7     A.  Yes, sir.                        09:31:05
8     Q.  The mean age is 16; is that right?   09:31:11
9     A.  Yes, sir.  I believe that would be   09:31:17
10 a reference to their mean age at the time of   09:31:26
11 enrollment.                             09:31:29
12     Q.  Right.  And if you flip to page   09:31:29
13 241, about halfway down the second column.  Is   09:31:37
14 it your understanding that these patients were   09:31:49
15 followed for 24 months?                 09:31:52
16     A.  Yes, sir.                       09:31:55
17     Q.  Flip to page 243, please, sir.   09:31:56
18 The first column under sample characteristics   09:32:17
19 towards the bottom, do you see where it says   09:32:19
20 two participants died by suicide during the   09:32:20
21 study, one after six months of follow-up and   09:32:22
22 the other after 12 months of follow-up and six   09:32:25
23 participants withdrew from the study?   09:32:29
24     A.  So I'm sorry, which subsection in   09:32:31
25 the article are you reading that?       09:32:33

Page 28

1     Q.  I'm sorry, that's sample         09:32:34
2 characteristics.                        09:32:35
3     A.  Okay.                           09:32:36
4     Q.  Next to last sentence in the      09:32:36
5 bottom of that particular section, I'll read it   09:32:40
6 one more time.  Two participants died by   09:32:42
7 suicide during the study, one after six months   09:32:45
8 of follow-up and the other after 12 months of   09:32:48
9 follow-up, and six participants withdrew from   09:32:51
10 the study.  Did I read that correctly?   09:32:55
11     A.  Yes, sir.                       09:32:56
12     Q.  Okay.  The authors recognized   09:32:56
13 those suicide deaths as adverse events; is that   09:33:08
14 correct?                                09:33:11
15     A.  I would have to look at their   09:33:11
16 methods and results to confirm that, sir.   09:33:22
17     Q.  Yeah, let me help you out.  Go to   09:33:24
18 page 245, Table 2, top left-hand corner.   09:33:30
19     A.  Okay.                           09:33:33
20     Q.  Based on that table, do you agree   09:33:33
21 that they recognized these deaths as adverse   09:33:40
22 events in their protocol?                09:33:43
23     A.  Yes, so Table 2 is titled Adverse   09:33:48
24 Events.  An event is listed by death by   09:33:51
25 suicide.                                09:33:54

Page 29

1     Q.  What is an adverse event in a   09:33:54
2 research study?                         09:33:57
3     A.  So an adverse event in a research   09:33:57
4 study would be a negative outcome in the study,   09:34:05
5 although it may not necessarily be attributable   09:34:12
6 to the intervention in the study.       09:34:16
7     Q.  Right.  Whether it's attributable   09:34:18
8 or not is unknown; is that correct?     09:34:23
9     A.  There would be efforts made to   09:34:25
10 determine whether it's attributable or not.   09:34:33
11     Q.  So the suicide rate in this   09:34:36
12 particular study is 2 out of 315; is that   09:34:45
13 correct?                                09:34:50
14     A.  So there would be multiple ways to   09:34:50
15 report a suicide rate, and they are frequently   09:35:01
16 reported as rate per individual years.  And so   09:35:05
17 one way to describe the rate might be 2 out of   09:35:13
18 115, but I don't know that that would   09:35:19
19 necessarily be the way it would be typically   09:35:22
20 reported in the literature.             09:35:24
21     Q.  If we -- understood.  If we did   09:35:25
22 patient years, it would be 2 out of 630,   09:35:29
23 correct, because we have got two patient years   09:35:37
24 per patient?                            09:35:39
25     A.  Correct.                        09:35:40

8 (Pages 26 - 29)

1    Q.   And that would be 0.3 percent per      09:35:40
2 patient year, my math roughly, correct?       09:35:42
3    A.   I would need to take your word          09:35:47
4 that your math is correct, sir.                09:35:49
5    Q.   Do you have any sense of whether        09:35:50
6 that is a particularly high suicide rate?      09:35:54
7    A.   Based on other literature that I        09:35:58
8 have read, I would have reason to believe that  09:36:12
9 it is higher than the population average, sir. 09:36:14
10   Q.   Can you think of any study that         09:36:17
11 has found that high of a rate of death by     09:36:24
12 suicide among gender dysphoric children or    09:36:28
13 youth who were not given hormonal             09:36:34
14 interventions?                               09:36:36
15   A.   Can you repeat your question, sir?      09:36:38
16   Q.   I am happy to.                          09:36:44
17   A.   Just so I understand.                   09:36:45
18   Q.   Understood. Can you think of any        09:36:46
19 study as you sit here today that has found that 09:36:47
20 high of a suicide rate among gender dysphoric  09:36:50
21 children or youth who were not given hormonal  09:36:55
22 interventions?                               09:36:58
23      MR. CHEEK:   Objection, form.            09:37:03
24      THE WITNESS:   So, sir, I can't think    09:37:07
25 of a study of the suicide rate in individuals who 09:37:08

1 did not receive gender affirming medical care, so 09:37:14
2 I am unable to make a comparison between the rate 09:37:19
3 of such a study and the rate reported in this  09:37:22
4 study.                                         09:37:24
5 BY MR. FRAMPTON:                               09:37:25
6    Q.   You would agree that in a study of      09:37:32
7 this nature, suicide is the most serious       09:37:34
8 adverse event possible, would you not?         09:37:37
9      MR. CHEEK:   Object to form.              09:37:50
10      THE WITNESS:   So I would agree that     09:37:52
11 death is the most adverse event possible. I would 09:37:55
12 have to give greater consideration to whether  09:37:57
13 death by suicide is more severe or not than death 09:38:01
14 in general.                                    09:38:05
15 BY MR. FRAMPTON:                               09:38:06
16   Q.   Fair enough. Would you agree the        09:38:07
17 suicide rate reported in this study is         09:38:10
18 unexpected?                                    09:38:13
19   A.   No, sir.                               09:38:13
20   Q.   And why is that?                        09:38:26
21   A.   I don't know that I have a              09:38:27
22 particular expectation of what the rate would  09:38:30
23 be in order for the rate that the investigators 09:38:34
24 reported to be unexpected.                     09:38:37
25   Q.   Had you -- I know you said you          09:38:38

1 were familiar with this study. Had you -- in    09:38:42
2 reading it before today, had you noticed the    09:38:45
3 suicide point, that two of the participants had 09:38:50
4 committed suicide? Is that something that       09:38:56
5 stuck out to you?                              09:38:59
6    A.   So, sir, it's included in the          09:38:59
7 abstract. So yes, it was something I was aware 09:39:04
8 of.                                            09:39:06
9    Q.   Did you in reviewing it find any        09:39:06
10 explanation that the authors provided as to the 09:39:12
11 suicide rate?                                  09:39:16
12   A.   So it's been a while since I have       09:39:18
13 read this study. I would need to review the    09:39:22
14 authors' discussion to determine how they      09:39:25
15 discussed the suicide rate in their study. So, 09:39:29
16 sir, in scanning the discussion without        09:41:09
17 rereading it thoroughly, I don't see a specific 09:41:14
18 discussion of the two participants who          09:41:16
19 unfortunately committed suicide during the     09:41:20
20 study.                                         09:41:23
21   Q.   That's fine. You can put that one       09:41:23
22 aside for now. We will probably come back to   09:41:25
23 it at some point. Dr. Antommaria, in your      09:41:28
24 understanding, is the term evidence-based      09:41:34
25 medicine a term of art that has a particular   09:41:38

1 meaning?                                       09:41:43
2    A.   So by term of art, you then mean        09:41:44
3 has a particular meaning in the field of        09:41:48
4 medicine?                                      09:41:50
5    Q.   Yes.                                    09:41:50
6    A.   Yes, it is.                            09:41:51
7    Q.   Okay. And tell me, what is              09:41:52
8 evidence-based medicine, to your understanding? 09:41:54
9    A.   Evidence-based medicine would be        09:41:56
10 the effort to base clinical decision making on  09:42:01
11 the best available evidence and to improve that 09:42:06
12 evidence base over time.                       09:42:11
13   Q.   Did evidence-based medicine as a        09:42:12
14 paradigm replace some sort of paradigm that    09:42:19
15 came before it?                               09:42:22
16      MR. CHEEK:   Objection, form.            09:42:28
17      THE WITNESS:   So presumably, the        09:42:34
18 paradigm for medical care in the 18th century was 09:42:35
19 not based on evidence-based medicine because there 09:42:41
20 were not clinical trials at that time.         09:42:45
21 BY MR. FRAMPTON:                               09:42:47
22   Q.   Have you taken any particular            09:42:52
23 courses on evidence-based medicine?            09:42:58
24   A.   So evidence-based -- so              09:43:00
25 particularly as medical education has changed  09:43:10

1 over time, there is less of an emphasis on        09:43:13
2 individual courses and the integration of          09:43:18
3 knowledge into larger blocks of courses.  So       09:43:22
4 no, I have not taken a individual course on         09:43:25
5 evidence-based medicine, but it has been a          09:43:29
6 component then of my undergraduate medical          09:43:31
7 education, my residency, and my continuing          09:43:35
8 medical education.  And I teach medical             09:43:39
9 evidence-based medicine to the trainees that I      09:43:42
10 supervise.                                          09:43:47
11      Q.  And you teach that they are to            09:43:47
12 base their care to the greatest extent possible    09:43:57
13 on the best available evidence; is that             09:43:59
14 correct?                                            09:44:03
15      A.  Yes.                                       09:44:03
16          (Thereupon, Exhibit 4, Users' Guides      09:44:09
17 to the Medical Literature, was marked for purposes 09:44:09
18 of identification.)                                 09:44:09
19 BY MR. FRAMPTON:                                    09:44:09
20      Q.  All right.  I am going to hand            09:44:40
21 you, Dr. Antommaria, what I am marking as           09:44:41
22 Defense Exhibit 4.  We are going to go through      09:44:43
23 this page by page.  I am joking, we are not.        09:44:50
24 What I have marked as Exhibit 4 is called           09:44:55
25 User's Guides to the Medical Literature.  The       09:44:58

1 lead author is Gordon Guyatt.  Dr. Antommaria,      09:45:03
2 is this a document you have seen before?            09:45:09
3      A.  So I am familiar with JAMA's              09:45:10
4 Users' Guides to the Medical Literature, and --     09:45:22
5 but not necessarily this compilation.               09:45:27
6      Q.  Okay.  Does -- okay.  So this one         09:45:31
7 is subtitled Essentials of Evidence-Based           09:45:37
8 Clinical Practice.  Does JAMA publish other         09:45:40
9 users' guides to the literature?                    09:45:46
10      A.  So you will see that this is the         09:45:49
11 third edition --                                    09:45:51
12      Q.  Oh, okay.                                 09:45:52
13      A.  -- and that this is a book.  There       09:45:53
14 are individual articles about topics in            09:45:59
15 evidence-based medicine that JAMA has published     09:46:03
16 in the past.  And so I just -- to be specific,      09:46:08
17 just trying to be specific, I haven't seen the      09:46:15
18 third edition of --                                 09:46:18
19      Q.  Fair enough.                             09:46:19
20      A.  -- this book, but I am familiar          09:46:21
21 with JAMA's Users' Guides to the Medical            09:46:22
22 Literature, having read articles in this series     09:46:25
23 in the past.                                        09:46:28
24      Q.  Got it.  And do you recognize the        09:46:30
25 name Gordon Guyatt?                                 09:46:35

1      A.  I do.                         09:46:36
2      Q.  What do you know about Dr. Guyatt? 09:46:37
3      A.  I know that Dr. Guyatt works in   09:46:39
4 the area of evidence-based medicine, and I am      09:46:45
5 familiar with his role in the development of       09:46:48
6 the GRADE methodology.                            09:46:51
7      Q.  Got it.  Turn in the preface if     09:46:56
8 you would to page 26, but it's Roman numeral      09:47:03
9 XXVI.                                              09:47:11
10      A.  I am there, sir.                09:47:29
11      Q.  Okay.  And in that first full      09:47:30
12 paragraph, do you see the sentence:  We have      09:47:35
13 added a fundamental principle to the hierarchy    09:47:42
14 of evidence and the necessity for value and       09:47:46
15 preference judgments; that optimal clinical       09:47:50
16 decision making requires systematic summaries     09:47:54
17 of the best available evidence, do you see        09:47:58
18 that?                                              09:48:00
19      A.  I do see that sentence, sir.      09:48:01
20      Q.  Do you agree with that sentence?   09:48:02
21      A.  So it's hard for me to necessarily 09:48:03
22 understand a sentence removed from its broader    09:48:22
23 context, sir.                                      09:48:26
24      Q.  Do you agree in general with the    09:48:27
25 principle that optimal clinical decision making   09:48:33

1 requires systematic summaries of the best         09:48:36
2 available evidence?                                09:48:41
3      A.  I would in principle agree with     09:48:42
4 that statement, sir, recognizing that             09:48:56
5 frequently systematic summaries of the best       09:49:00
6 available evidence are not available when         09:49:03
7 clinical decisions must be made.                  09:49:07
8      Q.  But when they are available, they   09:49:07
9 are important to the decision-making process,     09:49:14
10 correct?                                           09:49:16
11      A.  Yes, sir.                        09:49:16
12      Q.  Let's unpack a few of the concepts 09:49:19
13 in that sentence.  So what do you understand by   09:49:26
14 hierarchy of evidence?                            09:49:30
15      A.  So I understand by hierarchy of    09:49:33
16 evidence that there are a variety of types of     09:49:40
17 evidence that can be used to support clinical     09:49:43
18 decision making and that some types of evidence   09:49:46
19 are stronger than other types of evidence and     09:49:50
20 that there are a variety of different ways to      09:49:55
21 characterize the types of evidence and their      09:49:59
22 relative strength.                                 09:50:04
23      Q.  What is a systematic review of      09:50:05
24 evidence?                                          09:50:27
25      A.  As the name suggests, a systematic 09:50:29

Page 38

1  review of the evidence uses a systematic        09:50:35
2  process to collect and review evidence         09:50:39
3  generally related to a specific clinical        09:50:45
4  decision so that there would be mechanisms for  09:50:49
5  searching the literature, reviewing abstracts   09:50:58
6  and titles and then reviewing full texts of     09:51:01
7  articles, abstracting data from the articles,   09:51:03
8  and then summarizing that information in some    09:51:08
9  systematic reviews may also then involve a      09:51:13
10  meta-analysis, the analysis of the data from a  09:51:15
11  number of individuals.                          09:51:19
12      Q.  So typically, the methodology for       09:51:20
13  searching for potentially relevant evidence     09:51:25
14  would be disclosed in the review, correct?      09:51:28
15      A.  So there are published                  09:51:30
16  recommendations for best practices for          09:51:41
17  performing systematic reviews of the            09:51:43
18  literature.  And I am not going to remember     09:51:45
19  which of the appropriate guidelines is, but     09:51:47
20  there are guidelines and checklists for         09:51:50
21  recommending what is a best practice for        09:51:54
22  performing a systematic review.                 09:51:57
23      Q.  And do you know sitting here            09:51:59
24  whether disclosing the methodology, the search  09:52:04
25  methodology, is one of those best practices?    09:52:06

Page 39

1      A.  I believe it would be, sir.             09:52:08
2      Q.  Will a systematic review often          09:52:12
3  rate the quality of the evidence or assess the   09:52:19
4  quality of the evidence?                         09:52:22
5      A.  Some systematic reviews rate the        09:52:23
6  quality of evidence, and others do not.          09:52:31
7      Q.  What is the value of a systematic       09:52:33
8  review compared to sort of a more traditional    09:52:43
9  narrative review of the literature?             09:52:49
10      A.  By being systematic, it decreases      09:52:51
11  the likelihood of omitting relevant evidence in  09:52:59
12  the summary of the available evidence.          09:53:04
13      Q.  Have you ever conducted or             09:53:05
14  supervised a systematic review on the effects   09:53:13
15  of a medical intervention?                       09:53:16
16      A.  So I have conducted systematic --      09:53:18
17  a systematic review of the literature, but I     09:53:24
18  have not conducted a systematic review of the    09:53:27
19  literature of an effect of a medical            09:53:33
20  intervention.                                    09:53:35
21      Q.  And have you ever conducted a          09:53:35
22  systematic review in which you assessed the      09:53:41
23  quality of evidence using the GRADE             09:53:45
24  methodology?                                     09:53:45
25      A.  So if I have not conducted a           09:53:52

Page 40

1  systematic review of the literature on a         09:53:57
2  medical intervention, I will not have utilized   09:53:57
3  the GRADE methodology to assess the quality of   09:53:59
4  that evidence, sir.                              09:54:03
5      Q.  Okay.  Well, as a methodology, is       09:54:06
6  GRADE limited to medical interventions?         09:54:09
7      A.  So it may also be applicable to         09:54:10
8  diagnostic tests, as well as treatments.         09:54:21
9      Q.  But you have not done that kind of      09:54:25
10  systematic review, either, correct?            09:54:30
11      A.  No, I have not, sir.                    09:54:31
12      Q.  Okay, fair enough.  It looked like     09:54:32
13  you have done two systematic reviews; is that    09:54:39
14  right?                                           09:54:42
15      A.  So can I refer to my CV, sir?          09:54:42
16      Q.  Yeah, let me -- in fact, let's go      09:54:57
17  ahead and --                                     09:55:01
18          MR. FRAMPTON:  Grab 110 and 111.        09:55:02
19          THE WITNESS:  So, sir, one systematic   09:55:16
20  review immediately comes to mind.  I have        09:55:18
21  hesitance regarding the characterization that I  09:55:24
22  have performed two.                              09:55:28
23          MR. FRAMPTON:  We'll just go ahead      09:55:28
24  and mark them.  That way, we are all clear.      09:55:36
25      (Thereupon, Exhibit 5, A Systematic        09:55:36

Page 41

1  Literature Review of Individuals' Perspectives on  09:55:36
2  Broad Consent and Date Sharing in the United     09:55:36
3  States, was marked for purposes of               09:55:36
4  identification.)                                  09:55:37
5  BY MR. FRAMPTON:                                  09:55:37
6      Q.  I hand you what I am marking as          09:55:41
7  Defendants' Exhibit 5.                            09:55:43
8      A.  Oh, yes, sir, two.                       09:55:45
9      Q.  Okay.  What I have marked as             09:55:58
10  Exhibit 5 is called a Systematic Literature       09:56:01
11  Review of Individuals' Perspectives on Broad     09:56:04
12  Consent and Data Sharing in the United States.   09:56:09
13  The lead author is Dr. Garrison.                 09:56:12
14  Dr. Antommaria, is this one of the systematic    09:56:16
15  reviews that you have been involved in?          09:56:18
16      A.  Yes, sir.                               09:56:19
17      Q.  And were you involved in assessing      09:56:20
18  the quality of the studies?                      09:56:29
19      A.  No, sir, I was not.                     09:56:45
20      (Thereupon, Exhibit 6, Systematic          09:56:52
21  Review of Typologies Used to Characterize Clinical  09:56:52
22  Ethics Consultations, was marked for purposes of   09:56:52
23  identification.)                                  09:56:52
24  BY MR. FRAMPTON:                                  09:56:52
25      Q.  Then I am going to hand you what I      09:56:52

11 (Pages 38 - 41)

Page 42

1  am marking as Defendants' Exhibit 6. That one  09:56:58
2  is titled Systematic Review of Typologies Used  09:57:04
3  to Characterize Clinical Ethics Consultations.  09:57:09
4  And you will have to help me pronounce your --  09:57:15
5  the lead author's last name.  09:57:18
6      A.  deSante-Bertkau, sir.  09:57:22
7      Q.  Thank you, de-Sante-Bertkau.  Is  09:57:23
8  this the other systematic review you were  09:57:29
9  involved with, Dr. Antommaria?  09:57:30
10     A.  Yes, sir.  09:57:31
11     Q.  Okay.  And this one did not assess  09:57:31
12 the quality of evidence; is that right?  09:57:33
13     A.  Because of the nature of the  09:57:35
14 systematic review and the types of articles  09:57:39
15 that we were reviewing, no, it did not assess  09:57:44
16 the quality of the evidence.  09:57:48
17     Q.  Okay, fair enough.  You agree that  09:57:49
18 clinical practice guidelines should be based on  09:57:59
19 systematic reviews of the evidence, correct?  09:58:02
20     A.  Ideally, clinical practice  09:58:04
21 guidelines should be based on systematic  09:58:11
22 reviews, yes, sir.  09:58:13
23     Q.  Are you familiar with the Cochrane  09:58:14
24 Library?  09:58:16
25     A.  I am, sir.  09:58:16

Page 43

1      Q.  Tell me what it is, please, to the  09:58:17
2  extent you know.  09:58:19
3      A.  So the Cochrane Collaboration is a  09:58:21
4  group that does methodological research related  09:58:26
5  to systematic reviews and supports the  09:58:33
6  performance of systematic reviews, and the  09:58:36
7  systematic reviews that they publish are then  09:58:39
8  published in the Cochrane Library.  09:58:43
9      Q.  And are they recognized in the  09:58:46
10 community of experts as doing good work in  09:58:59
11 publishing systematic reviews, conducting and  09:59:01
12 publishing systematic reviews?  09:59:04
13     A.  Yes, they are recognized as  09:59:05
14 producing high quality or publishing high  09:59:08
15 quality systematic reviews.  09:59:10
16     Q.  Go back to that JAMA guide.  09:59:11
17 That's Exhibit 4 for you, please.  Turn to page  09:59:18
18 15, if you would, the normal 15.  09:59:26
19     A.  I am on page 15, sir.  09:59:35
20     Q.  All right.  Bottom of the page, I  09:59:36
21 think it's the last -- next to last full  09:59:40
22 sentence.  It says:  Returning to the hierarchy  09:59:42
23 of therapy, noting the limitations of human  09:59:46
24 intuition, EBM places the unsystematic  09:59:49
25 observations of individual clinicians lowest on  09:59:55

Page 44

1  the hierarchy.  Did I read that correctly?  09:59:58
2      A.  You did, sir.  10:00:01
3      Q.  And in this context, does EBM mean  10:00:01
4  evidence-based medicine?  10:00:06
5      A.  Yes, sir.  10:00:06
6      Q.  What do they mean by unsystematic  10:00:06
7  observations of individual clinicians?  10:00:12
8      A.  So based on the figure above, they  10:00:18
9  describe that presumably as the clinical  10:00:21
10 experience of individual clinicians.  10:00:23
11     Q.  And they place lowest on the  10:00:26
12 rung of evidence that one might consider,  10:00:31
13 correct?  10:00:35
14         MR. CHEEK:  Objection, form.  10:00:35
15         THE WITNESS:  So it's just to say,  10:00:43
16 sir, that we are moving back and forth between a  10:00:44
17 couple of different ways of understanding the  10:00:48
18 hierarchy of evidence and the way in which  10:00:52
19 systematic reviews may grade the evidence.  And so  10:00:56
20 this is a particular way of describing that  10:01:03
21 hierarchy which is different than the GRADE  10:01:06
22 methodology.  But within the way they are choosing  10:01:14
23 to describe the hierarchy, yes, they are putting  10:01:16
24 the clinical experience as the lowest level of  10:01:19
25 evidence.  10:01:21

Page 45

1  BY MR. FRAMPTON:  10:01:22
2      Q.  Right.  Below laboratory and  10:01:23
3  physiology research, correct?  10:01:31
4      A.  Based on Figure 2-3, yes, sir.  10:01:32
5      Q.  Below observational studies,  10:01:37
6  right?  10:01:39
7      A.  Again, based on that figure, yes,  10:01:39
8  sir.  10:01:42
9      Q.  And even beyond the figure, is  10:01:42
10 that your understanding as someone who -- as an  10:01:46
11 expert that that is sort of how the hierarchy  10:01:51
12 of evidence works?  10:01:54
13     A.  So there are likely to be some  10:01:56
14 nuances within this hierarchy, particularly the  10:02:08
15 relationship between basic research and  10:02:11
16 clinical experience that I don't have a  10:02:13
17 particular opinion on.  But in general, in  10:02:17
18 general, randomized trials are a higher level  10:02:24
19 of evidence than observational studies than  10:02:28
20 would be individual clinical experience, sir.  10:02:31
21     Q.  We have -- we mentioned a few  10:02:48
22 minutes ago the GRADE methodology.  Could you  10:02:48
23 tell me sort of in general terms, what is the  10:02:50
24 GRADE methodology?  10:02:53
25     A.  The GRADE methodology is  10:02:54

12 (Pages 42 - 45)

Page 46

1 methodology for grading the quality of evidence   10:02:58
2 and the strength of recommendations.   10:03:02
3      Q.   And is it a well-recognized method   10:03:04
4 within the community of experts that you   10:03:13
5 inhabit?   10:03:17
6      A.   It is a well-recognized   10:03:18
7 methodology within medicine, sir.   10:03:22
8      (Thereupon, Exhibit 7, GRADE   10:03:36
9 guidelines: 3. Rating the Quality of Evidence, was   10:03:36
10 marked for purposes of identification.)   10:03:37
11 BY MR. FRAMPTON:   10:03:37
12      Q.   I show you what we will mark as   10:03:37
13 Exhibit 7. Dr. Antommaria, what I am marking   10:03:39
14 as Exhibit 7 is an article from the Journal of   10:03:53
15 Clinical Epidemiology called GRADE guidelines:   10:03:58
16 3. Rating the Quality of Evidence. I believe   10:04:00
17 you are familiar with this one, correct?   10:04:03
18      A.   Yes, I am, sir.   10:04:05
19      Q.   And just so we sort of set the   10:04:06
20 stage, the Journal of Clinical Epidemiology in   10:04:12
21 2011 published a whole series of GRADE   10:04:15
22 guidelines, correct?   10:04:18
23      A.   So there is a series of   10:04:21
24 approximately I want to say 12 articles. To   10:04:24
25 the best of my memory, I don't recall if they   10:04:30

Page 47

1 were all published in a single year or over   10:04:32
2 time.   10:04:34
3      Q.   Right.   10:04:34
4      A.   But yes, there are a series of --   10:04:35
5 there was an initial publication describing the   10:04:39
6 GRADE guidelines and subsequent publications   10:04:42
7 describing the guidelines in greater detail,   10:04:45
8 and this is one of the individual articles   10:04:48
9 describing a particular aspect of the   10:04:51
10 guidelines.   10:04:54
11      Q.   And the author group are the   10:04:54
12 developers of the GRADE guidelines, correct?   10:05:01
13      A.   So it's hard for me to be specific   10:05:03
14 about that, sir, given that there are multiple   10:05:19
15 publications over time and that all of the   10:05:22
16 authors may not have participated in the   10:05:25
17 development of the methodology at all phases in   10:05:27
18 its development.   10:05:29
19      Q.   Would you consider this article   10:05:30
20 series an authoritative explanation of the   10:05:38
21 GRADE methodology?   10:05:42
22      A.   Yes, sir.   10:05:43
23      Q.   All right. Turn to 402, and let's   10:05:43
24 look at key points in the box up there.   10:05:51
25      A.   I am on 402, sir.   10:05:58

Page 48

1      Q.   Thank you. Third bullet says:   10:05:59
2 The optimal application of GRADE requires   10:06:02
3 systematic review of the impact of alternative   10:06:06
4 management strategies on all patient-important   10:06:06
5 outcomes. Did I read that correct?   10:06:13
6      A.   You did, sir.   10:06:14
7      Q.   What -- to your understanding,   10:06:15
8 what is meant by patient-important outcomes?   10:06:25
9      A.   So, again, I would have to review   10:06:29
10 the article again in detail for the authors'   10:06:36
11 definition of that term, but it would be the   10:06:40
12 relevant outcomes of a medical intervention.   10:06:46
13      Q.   And that would include potential   10:06:49
14 benefits of the intervention; is that correct?   10:06:54
15      A.   Yes, sir.   10:06:57
16      Q.   And would it also include   10:06:59
17 potential risks of the intervention?   10:07:02
18      A.   Yes, sir.   10:07:04
19      Q.   In sort of lay terms, the outcomes   10:07:06
20 that would matter to a reasonable patient; is   10:07:13
21 that fair?   10:07:16
22      MR. CHEEK:  Objection, form.   10:07:17
23      THE WITNESS:  So as an ethicist, I   10:07:21
24 might say the outcomes that would be relevant to   10:07:23
25 obtaining informed consent from a patient.   10:07:26

Page 49

1 BY MR. FRAMPTON:   10:07:28
2      Q.   Which would include potential   10:07:37
3 risks and benefits, correct?   10:07:39
4      A.   Yes, sir.   10:07:41
5      Q.   And GRADE as a general matter is a   10:07:42
6 method for rating the strength of the evidence   10:07:49
7 to predict the outcome of the tested   10:07:56
8 intervention; is that right?   10:08:01
9      A.   So I think it's important to   10:08:03
10 recognize that GRADE has two components, both   10:08:04
11 rating the quality of the evidence as well as   10:08:08
12 the strength of recommendations and that rating   10:08:10
13 quality -- the quality of the evidence does not   10:08:15
14 have the sole determinant of the strength of a   10:08:17
15 recommendation, sir.   10:08:23
16      Q.   Let's talk for a moment about the   10:08:24
17 quality of evidence piece, the rating the   10:08:28
18 quality of evidence piece. That's essentially   10:08:30
19 rating how well -- how well we are able to   10:08:36
20 predict the effects of the tested intervention,   10:08:43
21 correct?   10:08:46
22      A.   Yes, sir, both the kind of   10:08:47
23 magnitude of the effect and the certainty that   10:08:50
24 that estimate is correct.   10:08:53
25      Q.   Turn to page 404, please, and look   10:08:55

1 at Table 2.                          10:09:05
2     A.  I am there, sir.             10:09:09
3     Q.  Thank you.  Is Table 2 -- well,   10:09:10
4 it's got in it quality levels high, moderate,   10:09:15
5 low, and very low, correct?          10:09:18
6     A.  Correct, sir.                10:09:19
7     Q.  And in the GRADE methodology, you   10:09:21
8 assign one of those quality levels to the piece   10:09:24
9 of evidence, correct?                10:09:29
10    A.  The body of evidence, sir.    10:09:30
11    Q.  And have you, yourself, ever done   10:09:34
12 that exercise?                       10:09:45
13    A.  No, sir, I have not.          10:09:46
14    Q.  And so high quality evidence means   10:09:48
15 essentially that there is a high level of   10:09:55
16 confidence that the true effect of the   10:10:01
17 intervention lies close to the estimate of the   10:10:06
18 effect of the intervention, correct?   10:10:11
19    A.  You read that correctly, sir.   10:10:11
20    Q.  And sort of in lay terms, that   10:10:12
21 means if the evidence tells us that the effect   10:10:15
22 of an intervention will be X, we are pretty   10:10:21
23 confident that it's going to be close to that,   10:10:26
24 right?                               10:10:28
25    A.  Correct, sir.                 10:10:28

1     Q.  Then explain in your own terms   10:10:29
2 what sort of a moderate quality level of   10:10:36
3 evidence means.                      10:10:38
4     A.  So, sir, my general understanding   10:10:43
5 is that there are qualitative differences in   10:10:46
6 the degree of certainty between the various   10:10:50
7 quality levels.                      10:10:54
8     Q.  And low means that the true effect   10:10:55
9 may be substantially different from the   10:11:01
10 estimate, correct?                  10:11:04
11    A.  You read that correctly, sir.   10:11:05
12    Q.  And so essentially, if the   10:11:07
13 estimate is a moderately beneficial effect, the   10:11:10
14 reality might be a profound beneficial effect,   10:11:16
15 correct?                            10:11:20
16    A.  Yes, sir, the variation might be   10:11:20
17 either higher or lower.              10:11:26
18    Q.  Right.  Or it might be a no   10:11:27
19 effect, right?                      10:11:30
20    A.  Correct, sir.                 10:11:31
21    Q.  And then low is then even   10:11:31
22 qualitatively worse than that.  We believe that   10:11:36
23 it's likely to be substantially different from   10:11:39
24 the estimate, correct?              10:11:42
25    A.  Correct.                      10:11:43

1     Q.  And you mentioned strength of   10:11:43
2 recommendation earlier.  You would agree that   10:11:50
3 the quality of evidence informs the strength of   10:11:52
4 recommendation, correct?             10:11:57
5     A.  That is correct, but it is but one   10:11:57
6 factor that informs the direction of the   10:12:00
7 strength of recommendations.         10:12:04
8     Q.  Got it.  Let's go to Table 3.  So   10:12:05
9 if I understand, it should be -- is it on your   10:12:11
10 next page or is it at the bottom of the page   10:12:14
11 you are looking at?                 10:12:17
12    A.  It's at the bottom of the page,   10:12:18
13 sir.                                10:12:19
14    Q.  That's what I thought.  Basic   10:12:19
15 flowchart if you are applying the GRADE   10:12:20
16 methodology is that you start with an initial   10:12:23
17 quality rating based on the methodology in the   10:12:26
18 body of evidence, correct?           10:12:32
19    A.  Yes, sir.                     10:12:34
20    Q.  High if you are dealing with   10:12:37
21 randomized controlled trials, low if you are   10:12:38
22 dealing with observational studies, right?   10:12:41
23    A.  Correct, sir.                 10:12:43
24    Q.  But then you may lower the quality   10:12:43
25 rating based on any of five factors, correct?   10:12:48

1     A.  Correct, sir.                 10:12:51
2     Q.  And you also may raise the quality   10:12:56
3 rating based on one of three factors, one or   10:13:01
4 more of three factors, right?        10:13:05
5     A.  Correct, sir.                 10:13:06
6     Q.  And then once you have sort of   10:13:08
7 done all of that, you assign a quality rating   10:13:11
8 based on where you landed, right?    10:13:13
9     A.  Yes, sir.                     10:13:15
10    Q.  And so because of this process of   10:13:17
11 upgrading and downgrading, randomized control   10:13:21
12 trials will not necessarily end up providing   10:13:27
13 high quality evidence, correct?      10:13:29
14    A.  That is correct, sir.          10:13:30
15    Q.  And observational studies will not   10:13:34
16 necessarily end up providing low quality   10:13:36
17 evidence, correct?                  10:13:38
18    A.  Correct, it is possible for   10:13:39
19 observational studies to produce high quality   10:13:41
20 evidence.                           10:13:44
21        THE WITNESS:  Can we take a   10:13:58
22 three-minute break, sir?            10:13:59
23        MR. FRAMPTON:  Of course.  Let's go   10:14:00
24 off the record real quick.          10:14:00
25        (Recess taken.)              10:14:02

14 (Pages 50 - 53)

Page 54

```
1          (Thereupon, Exhibit 8, GRADE      10:14:02
2   guidelines: 4. Rating the Quality of Evidence -  10:14:02
3   Study Limitations (Risk of Bias), was marked for  10:14:02
4   purposes of identification.)              10:19:40
5   BY MR. FRAMPTON:                          10:19:40
6        Q.  We are back on the record.      10:19:40
7   Dr. Antommaria, I am handing you what I am  10:19:42
8   marking as Defendants' Exhibit 8.  Exhibit 8 is  10:19:43
9   also from the Journal of Clinical Epidemiology.  10:20:00
10  It is titled GRADE guidelines for Rating the  10:20:03
11  Quality of Evidence - Study Limitations ( Risk  10:20:03
12  of Bias).  Are you familiar with this one,  10:20:09
13  Doctor?                                   10:20:11
14       A.  Yes, I am, sir.                  10:20:11
15       Q.  All right.  This is from that same  10:20:12
16  series of GRADE guidelines we just looked at;  10:20:14
17  is that right?                            10:20:16
18       A.  It's in the same series as the  10:20:17
19  previous exhibit, sir.                    10:20:20
20       Q.  Thank you.  All right.  Turn to  10:20:21
21  page 409, please.                         10:20:28
22       A.  One moment.  I am on page 409,  10:20:33
23  sir.                                      10:20:38
24       Q.  All right.  Bottom right-hand of  10:20:38
25  the page, right above Table 2.            10:20:40
```

Page 55

```
1        A.  Okay.                           10:20:45
2        Q.  Do you see where it says:       10:20:45
3   Ideally, observational studies will choose  10:20:47
4   contemporaneous comparison groups that, as far  10:20:50
5   as possible, differ from intervention groups  10:20:54
6   only in the decision typically by patient or  10:20:59
7   clinician not to use the intervention.  Did I  10:21:01
8   read that correctly?                      10:21:03
9        A.  You did, sir.                    10:21:04
10       Q.  Okay.  And the idea they are  10:21:05
11  getting at there is that when you are doing an  10:21:09
12  observational study, it's best to include some  10:21:11
13  kind of control or comparison group, right?  10:21:14
14       A.  Within the limitations of as far  10:21:16
15  as possible and ideally, sir.             10:21:22
16       Q.  And why is that important?  Why is  10:21:25
17  a comparison group important?             10:21:32
18       A.  To be able to potentially        10:21:33
19  differentiate the effects of the intervention  10:21:46
20  from other effects in the environment.    10:21:50
21       Q.  Right.  Difficult to infer       10:21:55
22  causation on the part of the intervention  10:22:01
23  without some kind of comparison group, correct?  10:22:05
24       A.  So it would be to say that there  10:22:07
25  are differences between observational studies  10:22:16
```

Page 56

```
1   and randomized controlled trials in terms of  10:22:19
2   the ability to infer causation so that simply  10:22:22
3   having a comparison group might not be    10:22:27
4   sufficient.                               10:22:29
5        Q.  Necessary, but not sufficient?  10:22:31
6        A.  Yes, necessary, but not sufficient  10:22:35
7   to -- well, so I would have to -- I would have  10:22:43
8   to think about that, sir.                 10:22:49
9        Q.  Well, still on 410 which we      10:22:50
10  flipped to, the top left-hand corner, first  10:22:55
11  full paragraph.  Do you see where it says:  To  10:23:00
12  make inferences regarding intervention effects,  10:23:02
13  case series must still refer to results in a  10:23:06
14  comparison group?  Did I read that correctly?  10:23:09
15       A.  Yes, sir.                        10:23:13
16       Q.  Do you agree with that statement?  10:23:14
17       A.  I think referring to a comparison  10:23:16
18  group is one way to make such inferences, sir.  10:23:29
19       Q.  Well, the sentence uses the word  10:23:32
20  must, does it not?                        10:23:39
21       A.  May I read the full paragraph,  10:23:42
22  sir?                                      10:23:59
23       Q.  Of course.                       10:24:00
24       A.  So, sir, I would agree that there  10:24:59
25  needs to be a reference to a comparison group  10:25:01
```

Page 57

```
1   but that those comparison groups might be the  10:25:03
2   general population or historic controls.  10:25:06
3        Q.  And that generally should be     10:25:10
4   explicit in a study if they are referencing a  10:25:13
5   historic control or a general population,  10:25:16
6   right?                                    10:25:18
7        A.  So the study would be stronger if  10:25:18
8   those references were more explicit.      10:25:25
9        Q.  Turn back to 409.  Let's look at  10:25:27
10  Table 2.                                  10:25:36
11       A.  Yes, sir.                        10:25:40
12       Q.  Do you agree generally that this  10:25:41
13  table lists things that might cause a risk of  10:25:43
14  bias in an observational study?           10:25:48
15       A.  So the table is entitled Study  10:25:51
16  Limitations in Observational Studies.  I don't  10:25:55
17  necessarily know that all limitations result in  10:26:01
18  a risk of bias.                           10:26:06
19       Q.  Would you agree that a failure to  10:26:07
20  adequately control confounding can create a  10:26:18
21  risk of bias?                             10:26:22
22       A.  So a failure to adequately control  10:26:23
23  confounding is a potential study limitation,  10:26:32
24  sir.                                      10:26:37
25       Q.  This article is about risk of  10:26:37
```

15 (Pages 54 - 57)

Page 58

1 bias, so I am asking does that study limitation 10:26:42
2 potentially create a risk of bias, as GRADE      10:26:45
3 uses that phrase?                    10:26:47
4      A.  Again, I would have to review the 10:26:49
5 article in order to see.  The table is not      10:26:59
6 entitled Bias in Observational Studies.  So I    10:27:01
7 am just uncertain as to why the authors have     10:27:05
8 chosen to title it in a different way.  And so   10:27:09
9 I would just need -- in order to be certain,     10:27:12
10 sir, I would need to review the article in      10:27:14
11 order to understand why they are shifting the   10:27:18
12 terminology.  That's my hesitance, sir.         10:27:21
13      Q.  Can you tell me generally what       10:27:27
14 risk of bias is within the GRADE methodology?  10:27:29
15      A.  So in reading the title, sir, and   10:27:33
16 in reading the introduction, they are using     10:27:51
17 study limitations and risk of bias it appears   10:27:55
18 synonymously.  So the answer to your question   10:27:58
19 would be, yes, failure to adequately control    10:28:02
20 for confounding would be a potential source of  10:28:06
21 bias.                      10:28:09
22      Q.  And what are confounding factors?  10:28:10
23 What does that phrase mean?            10:28:14
24      A.  So a confounding factor would be a 10:28:16
25 unmeasured variable that would potentially      10:28:27

Page 59

1 influence the outcome.                 10:28:30
2      Q.  So, for example, if you were doing  10:28:30
3 a study on people with depression and one group 10:28:46
4 received some kind of medication, SSRIs plus     10:28:53
5 cognitive behavioral therapy and another group  10:29:00
6 just received cognitive behavioral therapy, you 10:29:03
7 wouldn't be able to determine -- I'm sorry, bad 10:29:08
8 example, strike all of that.           10:29:12
9      One arm, one arm study.  People      10:29:16
10 with depression, they receive both SSRIs and   10:29:18
11 cognitive behavioral therapy, and they improve 10:29:23
12 over time.  You wouldn't be able to tell        10:29:26
13 whether it was the medication or the therapy    10:29:29
14 that led to the improvement, correct?          10:29:32
15      MR. CHEEK:  Objection, form.         10:29:34
16      THE WITNESS:  So, sir, we talked     10:29:38
17 previously about implicit controls.  So it would 10:29:40
18 be -- it would depend on what implicit control  10:29:44
19 there was and what data there was about the     10:29:49
20 utility of cognitive behavioral therapy itself. 10:29:53
21 So one might be able to draw a conclusion, but it 10:30:00
22 would require more information about the entire  10:30:03
23 body of evidence.                    10:30:08
24 BY MR. FRAMPTON:                    10:30:10
25      Q.  One way or another, you would have 10:30:10

Page 60

1 to have information on cognitive behavioral      10:30:13
2 therapy alone, correct?                10:30:14
3      A.  You would have to have more       10:30:15
4 information about that patient population and    10:30:25
5 their clinical course over time.        10:30:29
6      Q.  Would you need information about   10:30:30
7 the effect of cognitive behavioral therapy      10:30:34
8 alone?                     10:30:36
9      A.  Just so I answer your question    10:30:37
10 correctly, sir, can you repeat your question?  10:30:57
11      Q.  Sure.  Again, the example is if   10:30:59
12 you did a study of people with depression, you  10:31:02
13 treated them with medication and therapy, found 10:31:05
14 that over, say, 24 months they improved in some 10:31:10
15 form or fashion, you would not be able to       10:31:14
16 disentangle the effects of the medication       10:31:19
17 versus the therapy, would you?          10:31:21
18      MR. CHEEK:  Objection, form.         10:31:23
19      THE WITNESS:  Again, it would depend 10:31:27
20 on what available evidence outside of that study 10:31:28
21 was available about that patient population.  So 10:31:33
22 if there was evidence that individuals who receive 10:31:39
23 cognitive behavioral therapy did not have       10:31:50
24 sufficient remission in their symptoms, one might 10:31:54
25 be able to then draw conclusions about the      10:31:57

Page 61

1 efficacy of the pharmacological intervention.   10:32:00
2 BY MR. FRAMPTON:                    10:32:04
3      Q.  And you are assuming if you had   10:32:04
4 evidence about people who had undergone         10:32:07
5 cognitive behavioral therapy alone, correct?   10:32:11
6      MR. CHEEK:  Objection, form.         10:32:15
7      THE WITNESS:  Yes, evidence broadly  10:32:16
8 understood.                 10:32:23
9 BY MR. FRAMPTON:                    10:32:23
10      Q.  What does that mean?            10:32:26
11      A.  Well, we have talked about the   10:32:26
12 variety of levels of evidence.  One wouldn't    10:32:31
13 need a randomized control trial of cognitive -- 10:32:36
14 a randomized placebo control trial of cognitive 10:32:40
15 behavioral therapy to potentially draw that     10:32:44
16 inference.                 10:32:46
17      Q.  But you would want more than      10:32:46
18 individual clinician experience, would you not? 10:32:49
19      A.  That would be a form of evidence, 10:32:51
20 sir.                       10:32:54
21      Q.  You would not want more than      10:32:54
22 individual clinician experience?        10:32:57
23      MR. CHEEK:  Objection, form.         10:32:59
24      THE WITNESS:  So as we discussed     10:33:02
25 earlier, sir, individual clinician experience is a 10:33:03

Page 62

1  form of evidence.  There is a large difference   10:33:06
2  between making decisions in clinical practice in   10:33:12
3  the real world and what ideally one might want as   10:33:16
4  we have read in these guidelines, the use of   10:33:20
5  ideally in their language.   10:33:26
6  BY MR. FRAMPTON:   10:33:32
7       Q.  My question is would you want   10:33:32
8  better evidence than clinician experience   10:33:34
9  alone?   10:33:35
10       A.  Clinician experience alone might   10:33:38
11  in the clinical context be the evidence that   10:33:41
12  one had available and needed to make a clinical   10:33:45
13  judgment.   10:33:49
14       Q.  So you would not necessarily want   10:33:50
15  better evidence than that?   10:33:52
16       A.  One might always want higher   10:33:53
17  quality evidence than lower quality evidence.   10:34:01
18  But, unfortunately, that's not always available   10:34:04
19  to clinicians.   10:34:06
20       Q.  What do you understand the phrase   10:34:06
21  regression to the mean to mean?   10:34:18
22       A.  That if -- if a, say, cohort is   10:34:22
23  followed over time and they have a parameter   10:34:33
24  which is significantly different from the   10:34:38
25  general population, that over time that   10:34:42

Page 63

1  parameter might move more toward the value in   10:34:45
2  the general population.   10:34:49
3       Q.  And that -- let me ask you, have   10:34:58
4  you ever looked at regression to the mean in   10:35:05
5  the context of depression or anxiety or any   10:35:09
6  similar mental health condition?   10:35:14
7       A.  I'm sorry, sir, I am not sure what   10:35:15
8  you are asking.   10:35:21
9       Q.  Have you ever looked at anything   10:35:21
10  looking -- have you ever looked at a study   10:35:23
11  attempting to measure the extent to which   10:35:29
12  regression to the mean affects results in   10:35:31
13  studies on mental health?   10:35:35
14       A.  No, sir, I haven't investigated   10:35:37
15  the extent to which that particular factor   10:35:44
16  occurs over time.   10:35:48
17       Q.  Do you agree it's at least a   10:35:49
18  potential confounder in studies on mental   10:35:56
19  health?   10:35:59
20       A.  So, again, in terms of   10:36:00
21  terminology, I don't know that I would describe   10:36:07
22  it as a confounder.  I would describe it as a   10:36:09
23  potential study limitation or a risk of bias.   10:36:13
24       Q.  Fair.  Going back to our earlier   10:36:15
25  discussion, relying on what you have called   10:36:22

Page 64

1  implicit controls is a reason a study might be   10:36:27
2  legitimately downgraded in the GRADE   10:36:32
3  methodology, correct?   10:36:36
4       A.  May I, sir?   10:36:36
5       Q.  Uh-huh.   10:36:41
6       A.  So I believe we made reference to   10:36:57
7  Exhibit 7, Table 3.  I think that that would be   10:37:00
8  considered under a risk of bias and the result   10:37:07
9  of potentially lowering the quality of   10:37:11
10  evidence.   10:37:13
11       Q.  Tell me what is meant in the   10:37:14
12  literature, the methodological literature, by   10:37:23
13  lost to follow up.   10:37:28
14       A.  So in a observational study, one   10:37:32
15  would develop a cohort of individuals and   10:37:36
16  follow them over time.  I think we discussed   10:37:40
17  the Chen study.  They developed a cohort of   10:37:47
18  individuals and followed them over a period of   10:37:50
19  two years.  And lost to follow up would be   10:37:53
20  individuals for whom data is not available at   10:38:00
21  the end of that period of time.   10:38:03
22       Q.  And is that a study limitation, or   10:38:04
23  at least a potential study limitation?   10:38:12
24       A.  So depending on the degree to   10:38:15
25  which lost to follow up occurs, it can be a   10:38:21

Page 65

1  study limitation.   10:38:26
2       Q.  Right.  And is that because we   10:38:28
3  don't know if the group that was lost to follow   10:38:30
4  up would have the same results as the group   10:38:34
5  that we are still able to study?   10:38:36
6       A.  Yes, sir.   10:38:39
7       Q.  And if those groups had vastly   10:38:41
8  different results, it would pretty seriously   10:38:52
9  bias the study, correct?   10:38:55
10       A.  Again, it depends on the degree of   10:38:56
11  the lost to follow up.  Studies will at times   10:39:03
12  make assumptions about individuals lost to   10:39:05
13  follow up in their outcomes in order to   10:39:08
14  potentially examine those implications.  And if   10:39:10
15  the lost to follow up is not large, it may have   10:39:15
16  limited implications on the results of the   10:39:19
17  study.   10:39:22
18       Q.  Right.  There is only so much   10:39:22
19  effect a 5 percent lost to follow up can have,   10:39:24
20  right?   10:39:28
21       A.  Again, not wanting to be specific   10:39:29
22  about particular percentages.  But yes, a   10:39:31
23  smaller lost to follow up would have a less   10:39:34
24  effect potentially than a larger lost to follow   10:39:37
25  up.   10:39:39

17 (Pages 62 - 65)

Page 66

1     Q.  Right.  Larger than if, say, you   10:39:39
2 lost half of your participants, correct?   10:39:42
3     A.  Correct.   10:39:44
4     Q.  What about too short of a follow   10:39:44
5 up, how can that bias results?   10:39:55
6     A.  So that's a difficult question to   10:39:56
7 answer because short is a relative term.  Too   10:40:05
8 short relative to what, sir?   10:40:11
9     Q.  To -- yeah, I know what you mean.   10:40:14
10 If, for example, you study a population for two   10:40:23
11 years and there are significant effects at five   10:40:28
12 years, you would miss those in the two-year   10:40:33
13 study, correct?   10:40:35
14     A.  That is correct, sir.   10:40:36
15     Q.  And so particularly in a medical   10:40:38
16 intervention that people are going to take,   10:40:46
17 people are going to undergo for the rest of   10:40:49
18 their life, you would want to make sure you are   10:40:51
19 studying it long enough to capture those   10:40:53
20 effects, correct?   10:40:55
21     A.  You would want -- you would want   10:40:56
22 to study it in order to do what, sir?   10:41:05
23     Q.  In order to understand what the   10:41:09
24 effects are going to be over the course of   10:41:11
25 someone's life.   10:41:13

Page 67

1     A.  So I will give an example of   10:41:19
2 vaccines.  So once you give somebody a vaccine,   10:41:22
3 you cannot unvaccinate them.  The COVID   10:41:27
4 vaccines were studied for a finite period of   10:41:34
5 time prior to FDA approval.  There is   10:41:38
6 post-marketing surveillance to look at what   10:41:43
7 happens in a larger population of individuals   10:41:47
8 and for a longer period of time.  But in that   10:41:51
9 case, even though the vaccine is going to be --   10:41:56
10 in some ways be with individuals for the rest   10:42:01
11 of their lives, it wasn't necessary to study   10:42:03
12 the vaccines for 40 years prior or 70 years   10:42:07
13 prior to their approval.   10:42:13
14     Q.  If we discovered in that follow up   10:42:14
15 that, say, 10 years after vaccination people   10:42:23
16 started experiencing significant adverse   10:42:27
17 effects, that would then start -- that would   10:42:30
18 then have implications for clinical decision   10:42:33
19 making going forward, would it not?   10:42:38
20     A.  It would, sir.  So it is to say   10:42:39
21 that is a reason to continue ongoing studies   10:42:46
22 but is not a reason that those studies need to   10:42:50
23 be completed before, say, FDA approval or   10:42:54
24 before a clinician is utilizing the   10:42:57
25 intervention.   10:43:03

Page 68

1     Q.  I mean, that depends on the risk   10:43:03
2 profile of the intervention we are talking   10:43:05
3 about, correct?   10:43:07
4     A.  That's why short is a relative   10:43:09
5 term, sir.   10:43:12
6     Q.  Are you familiar with the phrase,   10:43:13
7 I have seen it in the literature, quasi RCT?   10:43:22
8 Have you ever seen that?   10:43:25
9     A.  I may have, sir.   10:43:25
10     Q.  Do you have any understanding of   10:43:29
11 its meaning?   10:43:31
12     A.  I can only speculate based on   10:43:32
13 those words, sir.  There are increasingly novel   10:43:38
14 study designs that are utilized over time, but   10:43:49
15 I don't know that -- I am not aware that quasi   10:43:53
16 RCT is a specific study design, sir.   10:44:01
17     Q.  In RCTs, is incomplete blinding a   10:44:05
18 risk of bias?   10:44:12
19     A.  Yes, sir.   10:44:13
20     Q.  That being said, there are plenty   10:44:17
21 of medical interventions out there for which   10:44:23
22 perfect blinding is not possible or practical,   10:44:26
23 correct?   10:44:30
24     A.  So, again, plenty is a -- is an   10:44:30
25 indiscriminate term.  There are some medical   10:44:43

Page 69

1 interventions for which masking is difficult,   10:44:44
2 particularly surgical interventions.   10:44:48
3     Q.  Have you ever -- have you ever   10:44:51
4 reviewed the literature on what percentage of   10:44:57
5 RCTs are not blinded?   10:44:59
6     A.  I am not aware of a specific   10:45:00
7 number, sir.   10:45:06
8     Q.  And when you are looking at   10:45:07
9 something that may present a risk of bias in   10:45:12
10 the GRADE guidelines, there is no requirement   10:45:18
11 that you downgrade simply because you have   10:45:20
12 identified that there might be a risk of bias,   10:45:24
13 correct?   10:45:27
14         MR. CHEEK:  Objection.   10:45:27
15 BY MR. FRAMPTON:   10:45:28
16     Q.  It's a judgment call as to how   10:45:28
17 serious the risk is?   10:45:29
18         MR. CHEEK:  Objection, form.   10:45:30
19 BY MR. FRAMPTON:   10:45:33
20     Q.  Is that correct?   10:45:33
21     A.  Can you repeat your question just   10:45:33
22 so I have heard it correctly, sir?   10:45:37
23     Q.  Absolutely.  Within the GRADE   10:45:39
24 guidelines, if the assessor identifies a   10:45:41
25 potential risk of bias, there is then a   10:45:46

Page 70

1 judgment call on behalf of the assessor as to   10:45:50
2 whether it is serious enough to warrant   10:45:53
3 downgrading, correct?   10:45:56
4     A.  Yeah.  So the GRADE guidelines is   10:45:58
5 not a computer program that you put data in and   10:46:01
6 a -- that there are judgments made by   10:46:08
7 individuals who are rating the quality of the   10:46:10
8 evidence.   10:46:11
9     Q.  So an unblinded RCT is not   10:46:12
10 automatically downgraded, correct?   10:46:16
11     A.  An unblinded RCT is likely to   10:46:21
12 have a significant risk of bias, which would be   10:46:37
13 downgrading it by 1 to 2 points, so I think it   10:46:42
14 would be highly likely to be downgraded.   10:46:49
15     Q.  Is that your testimony, every   10:46:52
16 unblinded RCT gets downgraded at least one   10:46:55
17 level?   10:46:59
18     A.  So, sir, you have moved from the   10:47:00
19 recommendations of the GRADE guidelines to an   10:47:09
20 empirical claim about how they are applied in   10:47:15
21 practice, and I don't -- again, I am not   10:47:18
22 familiar with a study that has looked at how   10:47:24
23 they have -- a systematic review of how they   10:47:30
24 have been applied in practice.   10:47:32
25     Q.  You would agree that the GRADE   10:47:33

Page 71

1 guidelines do not rigidly say you must   10:47:37
2 downgrade an unblinded RCT?   10:47:40
3     A.  May I, sir?   10:47:45
4     Q.  Sure.   10:47:47
5     A.  So, sir, I am on page 410 of   10:48:43
6 Exhibit 8.  And so it is -- every study   10:48:46
7 addressing a particular outcome will differ to   10:48:52
8 some degree in risk of bias.  Review authors   10:48:55
9 and guideline developers must make an overall   10:48:57
10 judgment considering all the evidence, whether   10:49:00
11 quality of evidence for an outcome warrants   10:49:04
12 rating down on the basis of study limitations.   10:49:07
13     So I take it that, again, this is   10:49:14
14 a general set of recommendations that are --   10:49:18
15 relied on judgment.  So, no, it does not say   10:49:22
16 must, but it would not be clear to me that   10:49:32
17 there are other things that do have the quality   10:49:34
18 of a must within the guidelines.   10:49:38
19     Q.  Have you ever reviewed any   10:49:42
20 literature or any meta-analyses studying   10:49:46
21 blinded versus nonblinded studies of the same   10:49:55
22 intervention to see if the effects are   10:49:59
23 different or see if the results are different?   10:50:02
24     A.  So I am aware that that literature   10:50:08
25 exists.  I have not had reason to review   10:50:12

Page 72

1 particular articles within that body of   10:50:16
2 literature.   10:50:18
3     Q.  And do you -- so you are not aware   10:50:18
4 as we sit here today the extent to which they   10:50:23
5 have found or not found that blinding makes a   10:50:26
6 difference?   10:50:30
7     A.  So I am generally aware that a   10:50:31
8 failure to adequately mask an intervention does   10:50:35
9 have -- make a difference, and that is part of   10:50:40
10 the reason why in general the GRADE guidelines   10:50:43
11 would see that as a potential source of bias   10:50:47
12 and a potential reason to lower the quality of   10:50:49
13 the evidence.   10:50:53
14     Q.  It's not something that you have   10:50:53
15 looked at for purposes of this case?   10:50:57
16     A.  Not to this point in time, sir.   10:51:00
17     (Thereupon, Exhibit 9, Impact of   10:51:08
18 Blinding on Estimated Treatment Effects in   10:51:08
19 Randomised Clinical Trials: Meta-Epidemiological   10:51:08
20 Study, was marked for purposes of identification.)   10:51:08
21 BY MR. FRAMPTON:   10:51:08
22     Q.  I show you what I will mark as   10:51:08
23 Exhibit 9.  What I am marking as Exhibit 9 is   10:51:10
24 titled Impact of Blinding on Estimated   10:51:23
25 Treatment Effects and Randomized Clinical   10:51:24

Page 73

1 Trials: Meta-Epidemiological Study.  The lead   10:51:26
2 author is Helene Moustgaard.  Dr. Antommaria,   10:51:29
3 is this a study that you are familiar with?   10:51:34
4     A.  No, sir, it is not.   10:51:35
5     Q.  Do you recognize any of the   10:51:37
6 authors?   10:51:42
7     A.  No, sir, I do not.   10:51:42
8     Q.  Do you recognize the journal?   10:51:49
9     A.  Yes, sir; I do.   10:51:52
10     Q.  What journal is it?   10:51:54
11     A.  It's published in the BMJ, sir.   10:51:55
12     Q.  Is that a prestigious medical   10:51:58
13 journal?   10:52:00
14     A.  May I look at the article, sir?   10:52:00
15     Q.  Yeah.  I am actually not going to   10:52:05
16 ask you substantive questions about the   10:52:07
17 article.  So my question is simply whether the   10:52:08
18 BMJ is a reputable article -- I mean, a   10:52:10
19 reputable journal?   10:52:14
20     A.  And all I am distinguishing, sir,   10:52:15
21 is there are a number of different journals   10:52:18
22 within the BMJ publishing group, and I am just   10:52:21
23 ascertaining that this article was published in   10:52:26
24 the BMJ as opposed to another journal within   10:52:29
25 its family of --   10:52:31

19 (Pages 70 - 73)

Page 74

```
1     Q.  Sure.                    10:52:32
2     A.  -- journals.  So yes, the BMJ is a  10:52:32
3  high-impact medical journal.       10:52:40
4     Q.  Okay.  And, I mean, you don't need  10:52:41
5  to look at this further.  I am just curious, as  10:52:43
6  a general matter, what is a         10:52:45
7  meta-epidemiological review?        10:52:47
8     A.  Sir, I am not familiar with that  10:52:49
9  as a specific term of art.          10:53:00
10    Q.  Okay, fair enough.         10:53:03
11       (Thereupon, Exhibit 10, GRADE   10:53:09
12  guidelines: 5. Rating the Quality of Evidence -  10:53:09
13  Publication Bias, was marked for purposes of  10:53:09
14  identification.)                  10:53:11
15  BY MR. FRAMPTON:                  10:53:11
16    Q.  I show you what I am going to mark  10:53:20
17  as Defendants' Exhibit 10, still Journal of  10:53:21
18  Clinical Epidemiology, GRADE Guidelines 5.  Is  10:53:37
19  this, Dr. Antommaria, an article in that same  10:53:40
20  Journal of Clinical Epidemiology series on the  10:53:42
21  GRADE guidelines that we were looking at  10:53:45
22  earlier?                        10:53:45
23    A.  Yes, sir.                  10:53:46
24    Q.  And are you familiar with this  10:53:48
25  one?                          10:53:49
```

Page 75

```
1     A.  I am familiar with this one, sir.  10:53:51
2     Q.  And just tell me in general terms  10:53:56
3  what publication bias is.           10:54:01
4     A.  Not all studies that are performed  10:54:05
5  are published in the literature, and so  10:54:07
6  publication bias would be the difference  10:54:11
7  between what is published and the entire body  10:54:16
8  of potential evidence.             10:54:21
9     Q.  And the concern is that positive  10:54:22
10 results are more likely to be published than  10:54:35
11 negative results; is that correct?  10:54:37
12    A.  That is one of the concerns, sir.  10:54:39
13    Q.  Are you familiar with the Dutch  10:54:41
14 studies on people with gender dysphoria?  10:54:57
15    A.  I am familiar with some Dutch  10:55:02
16 studies on treatment of individuals with gender  10:55:09
17 dysphoria, sir.                   10:55:12
18    Q.  Right.  And if I understand, these  10:55:13
19 is essentially -- it's performed out of Vrije  10:55:16
20 University; is that correct?        10:55:20
21    A.  I don't recall that particular  10:55:23
22 name of the university, sir.        10:55:27
23    Q.  The idea is this is a data set of  10:55:30
24 people who sought care for some form of gender  10:55:32
25 incongruence at a particular clinic in the  10:55:40
```

Page 76

```
1  Netherlands, right?               10:55:40
2     A.  Yes, it is a particular clinic in  10:55:42
3  the Netherlands that has an area of expertise  10:55:44
4  in the treatment of individuals with gender  10:55:47
5  dysphoria, and they have published a series of  10:55:49
6  studies based on the patients that they have  10:55:52
7  seen over time.                   10:55:56
8     Q.  And they have been seeing patients  10:55:57
9  since, like, the '70s; is that correct?  10:56:00
10    A.  I am aware that they have been  10:56:02
11 seeing patients since at least the '90s.  I  10:56:05
12 can't speak to how much earlier they have  10:56:10
13 seen -- when it was initially established, sir.  10:56:13
14    Q.  As you said, they have published a  10:56:15
15 series of observational studies based on the  10:56:17
16 data from their clinic, correct?    10:56:19
17    A.  They have at least published a  10:56:22
18 series of observational studies on patients in  10:56:24
19 their clinics.                    10:56:27
20    Q.  And those studies are important  10:56:28
21 pieces of the literature in the treatment of  10:56:31
22 gender dysphoria?                 10:56:34
23    A.  So, again, sir, you are speaking  10:56:35
24 in general about some unspecified group of  10:56:40
25 studies.  But yes, a Dutch group has published  10:56:45
```

Page 77

```
1  an important series of observational studies,  10:56:49
2  particularly on adolescents with gender  10:56:54
3  dysphoria.                       10:56:58
4     Q.  And there is no way of knowing if  10:56:58
5  the studies that they have published represent  10:57:00
6  all or a fraction of the studies that they have  10:57:05
7  conducted, is there?              10:57:07
8     A.  Presumably, there is a way of  10:57:08
9  knowing.                        10:57:11
10    Q.  Are you able to know the answer to  10:57:12
11 that?                          10:57:14
12    A.  I do not know the answer to that,  10:57:14
13 sir.                          10:57:17
14       (Thereupon, Exhibit 11, GRADE   10:57:32
15  guidelines 6. Rating the Quality of Evidence -  10:57:32
16  Imprecision, was marked for purposes of  10:57:32
17  identification.)                  10:57:32
18  BY MR. FRAMPTON:                  10:57:32
19    Q.  I show you what I will mark as  10:57:32
20 Defendants' Exhibit 11.  All right.  Exhibit  10:57:35
21 11, published still in the Journal of Clinical  10:57:46
22 Epidemiology, titled GRADE Guidelines 6.  10:57:51
23 Rating the Quality of Evidence - Imprecision.  10:57:53
24 And, Dr. Antommaria, this is -- this article is  10:57:58
25 from that same series on the GRADE guidelines  10:58:00
```

Page 78

1 from the Journal of Clinical Epidemiology,        10:58:03
2 correct?                                10:58:06
3      A.  Correct, sir.               10:58:06
4      Q.  And you are familiar with it?      10:58:07
5      A.  I am aware of it.  I am less      10:58:08
6 familiar with it than some other articles in   10:58:13
7 the series, sir.                        10:58:16
8      Q.  Are you familiar generally with    10:58:17
9 the concept of imprecision as it is used in the 10:58:19
10 GRADE methodology?                     10:58:23
11      A.  Yes, sir.                  10:58:24
12      Q.  And imprecision is one of the    10:58:26
13 factors that may warrant downgrading the       10:58:29
14 quality of evidence; is that right?          10:58:33
15      A.  May I refer to one of the other   10:58:34
16 articles, sir?                         10:58:41
17      Q.  Yeah.                     10:58:42
18      A.  So yes, sir; imprecision is one of 10:58:42
19 the five categories for lowering the rating of  10:58:56
20 the quality of evidence.                 10:59:00
21      Q.  And sort of the basic idea is that 10:59:00
22 imprecision is when there is too much        10:59:06
23 variability around the estimated effect of the  10:59:09
24 intervention to be confident in that estimate;  10:59:12
25 is that right?                         10:59:16

Page 79

1      A.  I think that's a reasonable      10:59:17
2 summary, sir.                         10:59:21
3      Q.  Look on page 1284 in the key     10:59:21
4 points box on the top left-hand corner.       10:59:28
5      A.  I am on 1284, sir.            10:59:38
6      Q.  Thank you.  The first bullet      10:59:39
7 reads:  GRADE's primary criterion for judging  10:59:42
8 precision is to focus on the 95 percent       10:59:46
9 confidence interval, CI, around the difference  10:59:49
10 in effect between intervention and control for  10:59:52
11 each outcome.  Did I read that correctly?      10:59:56
12      A.  Yes, you did, sir.            10:59:58
13      Q.  And you can't calculate a 95     11:00:05
14 percent confidence interval around the        11:00:09
15 difference in effect between intervention and   11:00:11
16 control without a control, can you?          11:00:13
17      A.  You cannot, sir.             11:00:16
18      Q.  And so we are -- at least as the   11:00:18
19 GRADE methodology uses the term, we are not   11:00:26
20 able to evaluate the risk of imprecision in    11:00:28
21 studies that lack a control, are we?         11:00:32
22      MR. CHEEK:  Objection, form.       11:00:38
23      THE WITNESS:  So I think you are able 11:00:39
24 to evaluate the risk of imprecision in that there 11:00:41
25 is no measure of imprecision and, therefore, there 11:00:45

Page 80

1 would be a way to adjust the quality of the    11:00:50
2 evidence, given there is not a confidence      11:00:52
3 interval, sir.                         11:00:56
4 BY MR. FRAMPTON:                      11:00:57
5      Q.  Right.  You would assume that    11:00:57
6 there is at least some risk of imprecision,    11:00:59
7 correct?                            11:01:00
8      A.  Yes, sir.                   11:01:01
9      Q.  Okay.  Let's flip back to that    11:01:01
10 Chen article.  What exhibit number is it?     11:01:11
11 Exhibit 3.  I will help you find it.  I am     11:01:13
12 sorry, you are going to have a -- you have got  11:01:17
13 a bit of a stack going over there.          11:01:19
14      A.  Okay.  So I have Exhibit 3, sir.  11:01:25
15      Q.  Thank you.  Take a look through   11:01:27
16 this.  This was a study you are familiar with.  11:01:34
17 There was not a control or comparison group in  11:01:36
18 this study, was there?                  11:01:38
19      A.  There was not an explicit control 11:01:41
20 group, although the authors did some additional 11:01:48
21 statistical analysis to potentially address     11:01:53
22 issues of confounding.                  11:01:56
23      Q.  And what do you mean by that?     11:02:01
24      A.  So in their methods, they say we  11:02:05
25 also examined how initial levels and rates of   11:02:18

Page 81

1 change in appearance congruence correlated with 11:02:21
2 those of each psychosocial outcome.  So I am on 11:02:24
3 page 240 --                          11:02:39
4      Q.  I see it.                   11:02:39
5      A.  -- in the methods in the last    11:02:40
6 sentence, sir.                         11:02:41
7      Q.  I see it.  So those are rates of  11:02:41
8 change in appearance congruence and         11:02:45
9 psychosocial outcomes are all things they      11:02:48
10 measured for the study participants, correct?   11:02:50
11      A.  Yes, sir.                   11:02:52
12      Q.  They weren't comparing that      11:02:54
13 against any kind of comparison or control      11:02:57
14 group, correct?                       11:03:01
15      A.  No, sir.                   11:03:01
16      Q.  Let's look at page 248.  Every    11:03:02
17 document has got page numbers in a different    11:03:10
18 place.  These are at the bottom of the page.    11:03:13
19      A.  I am on page 248, sir.         11:03:15
20      Q.  Thank you.  And, hey, there is not 11:03:17
21 a lot of text there, so that helps us find     11:03:19
22 where we are going.  The first full sentence,   11:03:21
23 do you see where it says:  In addition, despite 11:03:24
24 improvement across psychosocial outcomes on    11:03:27
25 average, there was substantial variability     11:03:30

Page 82

1 around the mean trajectory of change. Some    11:03:31
2 participants continued to report high levels of  11:03:35
3 depression and anxiety and low positive affect  11:03:39
4 in life satisfaction, despite the use of GAH.  11:03:44
5 Did I read that correctly?    11:03:48
6       A. You did, sir.    11:03:48
7       Q. Does that sentence suggest a    11:03:49
8 potential imprecision issue to you?    11:03:55
9       A. So I think that that sentence has  11:03:57
10 implications. I don't know, as you have said,  11:04:16
11 given that a measure of imprecision requires a  11:04:22
12 confidence interval that I would necessarily  11:04:26
13 frame it in the terms of imprecision, but I  11:04:29
14 think that that's a relevant finding of the  11:04:32
15 study.    11:04:36
16       Q. All right, okay. Would a better  11:04:36
17 term be heterogeneity in outcomes?    11:04:39
18       A. I think that is an alternative way  11:04:43
19 to describe it, sir.    11:04:48
20       Q. Let me just sort of back up for a  11:04:49
21 second. The common hormonal intervention for  11:04:54
22 natal males transitioning to female is    11:05:02
23 Estradiol plus anti-androgens; is that correct?  11:05:06
24       A. Is estrogen frequently accompanied  11:05:11
25 by an anti-androgen, yes, sir.    11:05:16

Page 83

1       Q. And the common hormonal    11:05:19
2 intervention for natal females transitioning to  11:05:23
3 male is testosterone; is that correct?    11:05:28
4       A. So I would use the language of  11:05:29
5 individuals' sex assigned at birth, but in  11:05:32
6 general, yes, sir.    11:05:34
7       Q. Do you understand what I mean if I  11:05:35
8 use the phrase natal male and natal female?  11:05:38
9       A. I do, sir.    11:05:40
10       Q. Okay. Those are estrogen plus  11:05:41
11 anti-androgens on the one hand, testosterone on  11:05:46
12 the other hand. Those are different    11:05:48
13 interventions, are they not?    11:05:50
14       A. They are different pharmacologic  11:05:51
15 agents, sir, yes.    11:05:57
16       Q. They have different effects on the  11:05:58
17 body?    11:06:00
18       A. They have some different effects  11:06:01
19 on the body, sir.    11:06:05
20       Q. One has a masculinizing effect,  11:06:06
21 one has a feminizing effect; is that correct?  11:06:09
22       A. That is correct.    11:06:11
23       Q. They have at least some different  11:06:11
24 side effects; is that correct?    11:06:15
25       A. Some of their side effects are  11:06:16

Page 84

1 different, yes, sir.    11:06:20
2       Q. Would you agree that you can't  11:06:20
3 assume the effect of one on psychosocial  11:06:23
4 outcomes is the same as the effect of the  11:06:29
5 other?    11:06:31
6       MR. CHEEK: Objection, form.    11:06:36
7       THE WITNESS: I think that it would  11:06:44
8 be a reasonable hypothesis that the effect on one  11:06:45
9 patient population is different than the other,  11:06:49
10 and I think that that was something that Chen and  11:06:54
11 colleagues investigated.    11:06:57
12 BY MR. FRAMPTON:    11:06:58
13       Q. Right, and that was sort of part  11:06:58
14 of my question. That is why they separately  11:07:02
15 reported the effects on natal males and the  11:07:04
16 effects on natal females; is that correct?  11:07:09
17       A. I wouldn't describe it as    11:07:11
18 separately. They reported the results of the  11:07:12
19 cohort and then did subgroup analysis on those  11:07:16
20 two populations.    11:07:22
21       Q. And are you aware of studies    11:07:24
22 finding an association between positive mental  11:07:27
23 health metrics and -- and -- sort of on one  11:07:31
24 natal sex and not the other?    11:07:41
25       A. So I believe, in fact, Chen, when  11:07:42

Page 85

1 they did their subgroup analysis, found that  11:07:54
2 the effects were different in each of the  11:07:58
3 different subgroups.    11:08:03
4       Q. Was this one -- I am trying to  11:08:04
5 remember, was it positive -- association with  11:08:07
6 positive effects on natal females or natal  11:08:09
7 males, I should have it highlighted somewhere.  11:08:12
8       A. So I would have to review the  11:08:14
9 study, sir.    11:08:16
10       Q. Sure.    11:08:16
11       A. I do recall that that subgroup  11:08:16
12 analysis showed differences in the different  11:08:19
13 subgroups.    11:08:22
14       Q. Yeah, I'm sorry, I don't know why  11:08:22
15 this wasn't -- look at page 244, if you would,  11:08:36
16 bottom of the page under designated sex at  11:08:43
17 birth. Do you see where it says: Depression  11:08:46
18 and anxiety scores decreased among youth  11:08:54
19 designated female at birth but not among those  11:08:57
20 designated male at birth. Similarly, T scores  11:09:00
21 for life satisfaction increased among youth  11:09:02
22 designated female at birth but not among those  11:09:05
23 designated male at birth? Did I read that  11:09:08
24 correctly?    11:09:11
25       A. Yes, you did, sir.    11:09:11

22 (Pages 82 - 85)

Page 86

1    Q.   And are you aware of any studies        11:09:12
2  finding the association essentially going the    11:09:15
3  other way, positive associations for natal      11:09:18
4  males but not natal females?                    11:09:22
5    A.   So it is common for studies to do       11:09:24
6  subgroup analysis on the different outcomes,     11:09:31
7  including the studies by the Dutch team.  But I  11:09:35
8  don't recall off the top of my head whether      11:09:44
9  there has been any systematic review that        11:09:46
10 summarizes those results of subgroup analysis    11:09:51
11 across the variety of outcomes.                  11:09:54
12    Q.   Sure, all right.                        11:09:56
13       MR. FRAMPTON:  Let's go to what I am      11:09:56
14 going to mark as Exhibit -- maybe I am on --     11:09:56
15       MR. WILKINSON:  12.                       11:09:56
16       MR. FRAMPTON:  -- 12.  I was going to     11:09:56
17 get it right.  It's still early in the day.      11:09:59
18       (Thereupon, Exhibit 12, Growing          11:09:59
19 Evidence and Remaining Questions in Adolescent   11:09:59
20 Transgender Care, was marked for purposes of     11:09:59
21 identification.)                                11:10:00
22 BY MR. FRAMPTON:                                 11:10:00
23    Q.   All right.  And what I am handing       11:10:15
24 you, Dr. Antommaria, is a piece titled Growing   11:10:16
25 Evidence and Remaining Questions in Adolescent   11:10:20

Page 87

1  Transgender Care.  The lead author is Annelou    11:10:25
2  de Vries, published in the New England Journal   11:10:31
3  of Medicine, January 19th, 2023.  Do you --      11:10:32
4  it's a short piece, Dr. Antommaria.  Do you      11:10:41
5  recognize it?                                   11:10:43
6    A.   I do, sir.                              11:10:43
7    Q.   You do?  You have read this             11:10:44
8  before?                                         11:10:46
9    A.   I have, sir.                            11:10:46
10    Q.   And is this a -- sort of an            11:10:47
11 editorial comment on the Chen paper that we      11:10:51
12 just looked at?                                 11:10:53
13    A.   As the heading states, it was          11:10:53
14 published as an editorial.  And the first        11:10:57
15 sentence of the article is this week in the      11:11:01
16 Journal, a much awaited primary report from      11:11:04
17 Chen, et al.  And so yes, it's an editorial on   11:11:07
18 Chen's study.                                   11:11:11
19    Q.   And are you familiar with these        11:11:11
20 researchers, Drs. de Vries and Hannema?         11:11:15
21    A.   So I am most familiar with Dr. de      11:11:21
22 Vries and less so with Dr. -- if it's            11:11:23
23 pronounced Hannema.                             11:11:25
24    Q.   I am guessing, too.  What's your       11:11:26
25 familiarity with Dr. de Vries?  What do you      11:11:29

Page 88

1  know about her?                                 11:11:32
2    A.   Dr. de Vries is a member of what's      11:11:33
3  colloquially referred to as the Dutch group.    11:11:38
4    Q.   She has been publishing in             11:11:41
5  transgender care for a very long time, right?    11:11:46
6  Well, for a few decades?                        11:11:49
7    A.   For several decades, yes, sir.          11:11:51
8    Q.   Be more precise.  Look on page 276      11:11:53
9  if you would, second full paragraph.  Drs. de   11:12:17
10 Vries and Hannema state:  Although overall       11:12:17
11 psychological functioning in the study           11:12:17
12 participants improved, there was substantial     11:12:43
13 variation among participants; a considerable     11:12:43
14 number still had depression, anxiety, or both    11:12:47
15 at 24 months, and two died by suicide.  Did I    11:12:50
16 read that correctly?                            11:12:52
17    A.   You did, sir.                          11:12:53
18    Q.   And is that just like we were          11:12:54
19 speaking earlier commenting on the               11:12:57
20 heterogeneity in the data reported by Dr. Chen   11:13:00
21 and her colleagues?                             11:13:04
22    A.   In part, sir, yes.                     11:13:05
23    Q.   And in other parts?                    11:13:07
24    A.   They are not only commenting on        11:13:11
25 the variability, but they state a considerable   11:13:15

Page 89

1  number still had depression and anxiety, sir.    11:13:19
2    Q.   Sure.  A little further down they       11:13:21
3  say:  However, other possible determinants of    11:13:30
4  outcomes were not reported, particularly the     11:13:38
5  extent of mental health care provided            11:13:39
6  throughout GAH treatment.  Did I read that       11:13:42
7  correctly?                                      11:13:47
8    A.   You did, sir.                          11:13:47
9    Q.   And help me understand, is there        11:13:48
10 concern that the --                            11:13:52
11    A.   Sir, may I read the full paragraph     11:13:57
12 before you ask your question --                 11:13:59
13    Q.   Oh, of course.                         11:14:01
14    A.   -- so I am prepared to answer?         11:14:03
15    Q.   Sure.                                  11:14:05
16    A.   Thank you, sir.  Please go ahead.      11:14:39
17    Q.   Sure.  Is the concern that they        11:14:40
18 are expressing that the mental health care       11:14:44
19 provided throughout the GAH treatment could be   11:14:50
20 affecting or confounding the results?            11:14:55
21    A.   So the sentence that you didn't        11:14:59
22 read, sir, was that the correlation between      11:15:04
23 appearance congruence and various               11:15:06
24 psychological-outcome variables suggests an      11:15:10
25 important mediating role of GAH in consequent    11:15:12

23 (Pages 86 - 89)

Page 90

1 body changes.  So Chen and colleagues, as I had   11:15:17
2 mentioned previously, did attempt to control      11:15:23
3 for confounders, and their analysis suggested     11:15:25
4 that the GAH and consequent body changes are      11:15:29
5 responsible for the psychological outcomes.        11:15:36
6 But they do then subsequently go on to             11:15:41
7 highlight a concern about a lack of information    11:15:43
8 about the mental health care that the             11:15:49
9 participants received and the way that that       11:15:53
10 might influence the outcome.                      11:15:56
11      Q.  And the idea is that the mental         11:15:56
12 health care provided could be confounding the    11:15:59
13 outcome, correct?                                 11:16:03
14      A.  That the mental health could be         11:16:03
15 contributing to the outcome, yes, sir.            11:16:08
16      Q.  Right, it could be responsible for      11:16:09
17 some of the improvement?                          11:16:11
18      A.  Again, the investigators made           11:16:12
19 efforts to identify whether the GAH was          11:16:19
20 responsible for the outcomes and provide          11:16:26
21 evidence that it was responsible for the          11:16:28
22 outcomes.  But yes, they did not control for     11:16:30
23 the mental health care provided.                  11:16:35
24      Q.  And Dr. de Vries is raising that        11:16:38
25 as a potential confounder, right?                 11:16:41

Page 91

1      A.  Dr. De Vries is quote -- is            11:16:44
2 recommending, quote, future studies that          11:16:52
3 compare outcomes with different care models are   11:16:54
4 needed, preferably using similar measures, sir.   11:16:56
5      Q.  My question was she is raising the      11:16:59
6 provision of mental health care as a potential    11:17:03
7 confounder, right?                                 11:17:06
8      A.  I think that that's one potential       11:17:06
9 interpretation of what she is saying, sir.        11:17:14
10      Q.  Is it how you read it?                  11:17:16
11      A.  I think that she is suggesting          11:17:18
12 that in future studies, methods that compare     11:17:22
13 outcomes with different care models are needed.  11:17:28
14 I think that's what she states.  She is not       11:17:30
15 making an explicit claim, sir, about             11:17:33
16 confounders.                                       11:17:37
17      Q.  She is calling mental health care      11:17:38
18 a possible determinant of outcomes, right?       11:17:41
19      A.  Yes, sir.                               11:17:43
20      Q.  What do you think she means by          11:17:50
21 different care models?                            11:18:23
22      MR. CHEEK:  Objection, speculation.         11:18:24
23 BY MR. FRAMPTON:                                  11:18:25
24      Q.  Or do you know?                         11:18:29
25      A.  I am rereading the paragraph, sir,      11:18:29

Page 92

1 if that's all right.  So, sir, it's not clear    11:18:31
2 to me from the paragraph what she means by        11:19:09
3 different care models.                            11:19:12
4      (Thereupon, Exhibit 13, GRADE              11:19:12
5 guidelines: 7. Rating the Quality of Evidence -  11:19:12
6 Inconsistency, was marked for purposes of         11:19:12
7 identification.)                                   11:19:38
8 BY MR. FRAMPTON:                                  11:19:38
9      Q.  I show you what I am marking as         11:19:46
10 Exhibit 13.  The Journal of Clinical             11:19:48
11 Epidemiology, GRADE Guidelines: 7. Rating the    11:20:07
12 Quality of Evidence - Inconsistency.  This       11:20:08
13 article, Exhibit 13, Dr. Antommaria, is from     11:20:12
14 that same Journal of Clinical Epidemiology       11:20:16
15 series on the GRADE guidelines, correct?         11:20:18
16      A.  Correct, sir.                          11:20:21
17      Q.  And you are familiar with it?          11:20:22
18      A.  I am, sir.                             11:20:23
19      Q.  All right.  Inconsistency is one       11:20:24
20 of the factors one might use to downgrade a      11:20:29
21 body of evidence under the GRADE guidelines; is  11:20:32
22 that right?                                        11:20:34
23      A.  That is correct, sir.                  11:20:34
24      Q.  And the basic idea is that studies     11:20:35
25 within the body of relevant evidence are         11:20:43

Page 93

1 reporting meaningfully different outcomes,       11:20:46
2 right?                                            11:20:48
3      A.  Yes, sir.  Whereas uncertainty is      11:20:48
4 within a individual study, inconsistency is a    11:20:54
5 cross study.                                       11:20:59
6      Q.  So the basic idea is if some           11:21:00
7 studies suggest that a particular intervention   11:21:13
8 is effective and some suggest that it has no     11:21:15
9 benefit, that would raise concerns about         11:21:17
10 inconsistency, right?                            11:21:19
11      A.  Can you repeat the question just       11:21:20
12 so I understand it?                               11:21:23
13      Q.  Sure.  Some studies suggest that       11:21:24
14 an intervention has benefit and some suggest it  11:21:26
15 has no benefit, that would raise concerns about  11:21:30
16 inconsistency, correct?                          11:21:32
17      A.  Correct, sir.                          11:21:33
18      Q.  And as we talked about in the way      11:21:34
19 that studies in the gender medicine area often   11:21:41
20 do subgroup analyses among birth sex, if you     11:21:47
21 have got some studies suggesting benefit among   11:21:51
22 natal males but not females and others           11:21:55
23 suggesting benefit among natal females but not   11:21:58
24 males, that would also raise concerns about      11:22:02
25 inconsistency, would it not?                     11:22:04

24 (Pages 90 - 93)

Page 94

```
 1          MR. CHEEK:  Objection, form.      11:22:06
 2          THE WITNESS:  If that were, in fact,  11:22:07
 3  the case, sir.  I don't know that that is an   11:22:09
 4  accurate representation of the literature.    11:22:11
 5  BY MR. FRAMPTON:                             11:22:11
 6      Q.  Right.  But if it were, that would   11:22:14
 7  raise inconsistency concerns?                11:22:16
 8      A.  If it were, sir, yes, it would.     11:22:18
 9      Q.  And have you done a sort of         11:22:21
10  systematic assessment of the literature to   11:22:23
11  evaluate whether that is, in fact, what the  11:22:25
12  literature shows?                            11:22:28
13          MR. CHEEK:  Objection, form.        11:22:30
14          THE WITNESS:  I have not conducted a  11:22:32
15  systematic review of the literature focusing on  11:22:34
16  that question, sir.                          11:22:38
17          (Thereupon, Exhibit 14, GRADE       11:22:47
18  guidelines: 8. Rating the Quality of Evidence -  11:22:47
19  Indirectness, was marked for purposes of     11:22:47
20  identification.)                             11:22:49
21  BY MR. FRAMPTON:                             11:22:49
22      Q.  I hand you what I am marking as     11:22:56
23  Exhibit 14, still Journal of Clinical        11:22:58
24  Epidemiology, GRADE Guidelines: 8.  Rating the  11:23:03
25  Quality of Evidence - Indirectness.  And,    11:23:05
```

Page 95

```
 1  Dr. Antommaria, Exhibit 14 is a article from  11:23:10
 2  the same GRADE guidelines series we have been  11:23:12
 3  looking at in the Journal of Clinical        11:23:15
 4  Epidemiology; is that right?                 11:23:18
 5      A.  That is correct, sir.               11:23:19
 6      Q.  And one of the factors that may     11:23:19
 7  warrant downgrading a body of evidence is    11:23:24
 8  indirectness, correct?                       11:23:27
 9      A.  Yes, sir.                           11:23:31
10      Q.  And one form of indirectness is     11:23:31
11  differences between the population that you are  11:23:34
12  interested in and the population that was    11:23:37
13  studied in the body of evidence, correct?    11:23:42
14      A.  I might say the population that     11:23:44
15  you are treating as opposed to the -- you are  11:23:51
16  interested in.  But yes, if you are considering  11:23:52
17  treating a patient, you would be concerned   11:23:56
18  about differences between that patient's     11:23:59
19  characteristics and the participants in the  11:24:01
20  study, sir.                                  11:24:03
21      Q.  Right.  The basic idea being that   11:24:05
22  you want to be careful about assuming that the  11:24:07
23  effects of an intervention on one population  11:24:10
24  will be the same as on a different population,  11:24:12
25  correct?                                     11:24:15
```

Page 96

```
 1      A.  In general, sir.                    11:24:15
 2          (Thereupon, Exhibit 15, The Cass    11:24:26
 3  Review, was marked for purposes of           11:24:26
 4  identification.)                             11:24:26
 5  BY MR. FRAMPTON:                             11:24:26
 6      Q.  I am going to hand you what I am     11:24:42
 7  marking as Exhibit 15, with apologies for the  11:24:43
 8  size.  You can blame Dr. Cass, not me.  What I  11:24:54
 9  am handing you, Dr. Antommaria, is titled the  11:25:03
10  Cass Review, Independent Review of Gender    11:25:06
11  Identity Services For Children and Young      11:25:12
12  People, Interim Report, February 2022.  I    11:25:12
13  assume you are familiar with this document?  11:25:14
14      A.  I am familiar with it, sir.         11:25:16
15      Q.  Okay.  What do you know about       11:25:18
16  Dr. Cass?                                    11:25:28
17      A.  I generally know that Dr. Cass is   11:25:29
18  a British pediatrician.                      11:25:33
19      Q.  Is it your understanding that she   11:25:35
20  has been commissioned by the British government  11:25:50
21  to review the provision of care for children  11:25:56
22  and young people with gender dysphoria by the  11:26:01
23  National Health Service?                     11:26:04
24      A.  I believe that she chairs a        11:26:05
25  review --                                    11:26:13
```

Page 97

```
 1      Q.  Right.                              11:26:15
 2      A.  -- that is reviewing that topic,    11:26:15
 3  sir.                                         11:26:17
 4      Q.  Turn with me if you would -- well,  11:26:19
 5  actually, before we do that, do you in your  11:26:25
 6  clinical practice initiate treatment for     11:26:29
 7  central precocious puberty?                  11:26:32
 8      A.  No, I do not, sir.                  11:26:36
 9      Q.  Is that typically done by an        11:26:37
10  endocrinologist?                             11:26:39
11      A.  That would generally be done by an  11:26:40
12  endocrinologist, sir.                        11:26:43
13      Q.  And do you in your clinical         11:26:44
14  practice make the diagnosis of central       11:26:49
15  precocious puberty?                          11:26:52
16      A.  I might have reason to suspect a    11:26:55
17  patient has central precocious puberty but   11:26:57
18  would generally refer to another provider to  11:27:01
19  confirm that diagnosis and initiate treatment,  11:27:05
20  sir.                                         11:27:07
21      Q.  Got it.  Would you generally refer  11:27:07
22  to a pediatric endocrinologist?             11:27:09
23      A.  I would, sir.                       11:27:11
24      Q.  Do you know, I am sure you do as a  11:27:12
25  pediatrician, sort of the typical normal ages  11:27:19
```

25 (Pages 94 - 97)

Page 98

1 for initiation of puberty in natal boys?  Is   11:27:23
2 there a typical age range?                11:27:28
3      A.  I believe that central precocious   11:27:30
4 puberty would be defined as beginning puberty   11:27:35
5 before 10 years of age in an individual.  So I   11:27:39
6 would have to look -- it's somewhere between 8   11:27:42
7 and 10 years of age in individuals who are   11:27:49
8 assigned male at birth.               11:27:51
9      Q.  So before 8 to 10 years or --   11:27:52
10      A.  Before 8 to 10 years would be   11:27:56
11 considered precocious.  And I would have to   11:27:59
12 look to refresh my memory about what specific   11:28:01
13 age it is, sir.                 11:28:05
14      Q.  It would be slightly younger for   11:28:06
15 natal females?                 11:28:09
16      A.  Yes, for -- individuals who are   11:28:09
17 assigned female at birth typically begin   11:28:11
18 puberty earlier than individuals assigned male   11:28:15
19 at birth.                   11:28:18
20      Q.  Turn to page 63 of the Cass   11:28:19
21 Review, if you would.  Let's look at the second   11:28:23
22 sentence in 5.23 where she says, or the   11:28:46
23 reviewers say:  Again, it is important that it   11:28:51
24 is not assumed that outcomes for, and side   11:28:53
25 effects --                   11:28:56

Page 99

1      A.  Hang on.               11:28:56
2      Q.  I'm sorry, are we in the wrong   11:28:57
3 place?                    11:28:59
4      A.  No, no, no, you are just not   11:28:59
5 starting at the beginning, and I needed to find   11:29:01
6 where you were, sir.               11:29:02
7      Q.  That's fine.              11:29:03
8      A.  Okay, please.             11:29:04
9      Q.  Again, it is important that it is   11:29:04
10 not assumed that outcomes for, and side effects   11:29:06
11 in, children treated for central precocious   11:29:09
12 puberty will necessarily be the same in young   11:29:12
13 people with gender dysphoria.  Did I read that   11:29:15
14 correctly?                   11:29:17
15      MR. CHEEK:  I am going to object.   11:29:18
16 You did not read that correctly.       11:29:19
17      MR. FRAMPTON:  Oh, I didn't?   11:29:20
18      MR. CHEEK:  Correct.          11:29:21
19      MR. FRAMPTON:  I am going to try it   11:29:22
20 again.                    11:29:23
21 BY MR. FRAMPTON:               11:29:23
22      Q.  Starting it over.  Again, it is   11:29:24
23 important that it is not assumed that outcomes   11:29:27
24 for, and side effects in, children treated for   11:29:31
25 precocious puberty will necessarily be the same   11:29:35

Page 100

1 in children or young people with gender   11:29:39
2 dysphoria.  Now did I read it correctly?   11:29:42
3      A.  I believe you did, sir.       11:29:45
4      Q.  Do you agree with the authors on   11:29:49
5 that?                    11:29:55
6      A.  May I read the whole paragraph,   11:29:55
7 sir?                     11:29:59
8      Q.  Sure.              11:30:00
9      A.  All right.  And then would you   11:31:04
10 repeat your question, sir?           11:31:05
11      Q.  Do you agree with Dr. -- or the   11:31:07
12 author's statement that I read into the record?   11:31:09
13      A.  So, again, it's difficult to   11:31:11
14 interpret a sentence outside of its larger   11:31:20
15 context.  But I would agree that it is   11:31:23
16 important to be open to the possibility that   11:31:26
17 outcomes and side effects in one population may   11:31:30
18 be different than outcomes inside of a   11:31:35
19 different population.             11:31:38
20      Q.  You would agree that you are   11:31:39
21 generally not going to initiate puberty   11:31:42
22 suppression for central precocious puberty in a   11:31:46
23 12-year-old natal female, correct?       11:31:51
24      A.  So, in general, a 12-year-old who   11:31:58
25 is not -- would not fulfill the diagnostic   11:32:03

Page 101

1 criteria for central precocious puberty.   11:32:08
2      Q.  You would potentially, depending   11:32:11
3 on the assessment and all of that kind of   11:32:15
4 stuff, initiate puberty suppression in a natal   11:32:17
5 female at age 12 for gender dysphoria, correct?   11:32:22
6      A.  And, again, would you repeat your   11:32:25
7 question, sir?                 11:32:38
8      Q.  Sure.  Provided appropriate   11:32:40
9 assessments and criteria were fulfilled, you   11:32:42
10 may initiate puberty suppression in a   11:32:45
11 12-year-old natal female for gender dysphoria,   11:32:49
12 correct?                   11:32:51
13      A.  You may, sir.            11:32:51
14      Q.  And you would -- in the child with   11:32:53
15 gender dysphoria, you would continue puberty   11:33:06
16 suppression until the child either decided to   11:33:08
17 discontinue or was ready to go to hormonal   11:33:11
18 interventions, correct?             11:33:17
19      A.  You would not continue them   11:33:18
20 indefinitely and would need to at some point   11:33:21
21 reach a decision to discontinue them or to   11:33:24
22 begin gender affirming hormone therapy, yes.   11:33:27
23      Q.  With central precocious puberty,   11:33:31
24 you would generally discontinue the treatment   11:33:39
25 when the child reached an age appropriate for   11:33:42

26 (Pages 98 - 101)

Page 102

1 puberty, correct?                          11:33:45
2      A.  At an age that was consistent with   11:33:46
3 statistical population norms, yes.          11:33:51
4      Q.  And I believe what you have said    11:33:54
5 in other forums is that you would not -- you   11:33:59
6 would not initiate puberty suppression to treat  11:34:05
7 gender dysphoria in a child that had not at   11:34:09
8 least reached Tanner Stage 2, correct?      11:34:11
9      A.  So those are the recommendations   11:34:14
10 or the clinical practice guidelines for the   11:34:18
11 field, and I wouldn't have reason to believe   11:34:19
12 that I contradicted them in some other forum.  11:34:25
13      Q.  Sure.  And Tanner Stage 2 means    11:34:29
14 the child has actually started puberty,      11:34:31
15 correct?                                    11:34:32
16      A.  Correct.                           11:34:33
17      Q.  Let's stick with Dr. Cass for a    11:34:33
18 minute.  Move to page 32, if you would.      11:34:56
19      A.  Yes, sir.                          11:35:07
20      Q.  Looking at 3.10:  In the last few   11:35:07
21 years, there has been a significant change in   11:35:20
22 the numbers and case-mix of children and young   11:35:22
23 people being referred to GIDS.  From a baseline  11:35:24
24 of approximately 50 referrals per annum in    11:35:28
25 2009, there was a steep increase from 2014-15,  11:35:32

Page 103

1 and it all -- and at the time of the CQC     11:35:37
2 inspection of the Tavistock and Portman NHS    11:35:41
3 Foundation Trust in October 2020 there were    11:35:45
4 2,500 children and young people being referred  11:35:48
5 per annum, 4,600 children and young people on   11:35:51
6 the waiting list, and a waiting time of over   11:35:54
7 two years to first appointment.  Did I read    11:35:55
8 that correctly?                             11:35:59
9      A.  You did, sir.                       11:35:59
10      Q.  Has it also been your experience   11:36:00
11 that there has been a substantial increase in   11:36:08
12 the number of patients, children and young    11:36:12
13 people presenting with potential gender       11:36:16
14 dysphoria?                                  11:36:20
15      A.  I believe that the literature     11:36:20
16 shows, sir, increasing numbers of individuals   11:36:24
17 presenting to clinics that treat gender       11:36:28
18 dysphoria, yes.                             11:36:33
19      Q.  And we don't know why, do we?     11:36:34
20      A.  I think there are a variety of    11:36:36
21 potential reasons why, sir.                 11:36:43
22      Q.  Any that have been rigorously     11:36:45
23 studied and established?                    11:36:49
24      A.  So, again, part of the question   11:36:51
25 would be what rigorously studied means, but not  11:37:01

Page 104

1 established, sir.  But I don't think that     11:37:11
2 that's fundamentally different than some of the  11:37:12
3 changes in the epidemiology of other          11:37:15
4 conditions, such as autism or Type 1 diabetes.  11:37:18
5      Q.  And we don't know why those are    11:37:21
6 increasing, either, do we?                  11:37:32
7      A.  We do not, sir.                     11:37:33
8      Q.  And that raises indirectness       11:37:34
9 issues, does it not, if we have got an        11:37:36
10 increase, a new population, we don't really   11:37:37
11 understand why?                             11:37:40
12      A.  I don't believe, sir, that it     11:37:41
13 necessarily -- that an increasing population   11:37:44
14 necessarily raises indirectness issues, sir.   11:37:47
15      Q.  You think we can just assume that   11:37:51
16 this increased population will have the same   11:37:55
17 outcomes as the prior much smaller population?  11:37:58
18      MR. CHEEK:  Objection, form.           11:38:02
19      THE WITNESS:  So it depends on the    11:38:04
20 characteristics of the population, sir.  If the  11:38:05
21 population has the same demographic and clinical  11:38:09
22 characteristics but there is simply a larger   11:38:14
23 number of them, there would be no indirectness  11:38:16
24 concerns.                                   11:38:19
25 BY MR. FRAMPTON:                            11:38:19

Page 105

1      Q.  You don't think that the etiology   11:38:20
2 of the increase matters at all to that        11:38:24
3 analysis?                                   11:38:26
4      MR. CHEEK:  Objection, form.           11:38:28
5      THE WITNESS:  So, sir, my             11:38:31
6 understanding of the issue of directness is the  11:38:32
7 characteristics of the population in the study are  11:38:37
8 whether they are the same or different from the  11:38:43
9 characteristics of the individuals who you are   11:38:46
10 considering treating.  Many of the individuals who  11:38:50
11 are presenting to clinics would have met the   11:38:56
12 criteria for inclusion in the Dutch studies.  And,  11:38:59
13 therefore, I would say that I don't think that on  11:39:05
14 the face of it, it necessarily raises indirectness  11:39:08
15 questions.                                  11:39:12
16 BY MR. FRAMPTON:                            11:39:12
17      Q.  The case-mix has also changed, has  11:39:21
18 it not?                                     11:39:25
19      MR. CHEEK:  Can you repeat that       11:39:26
20 question?                                   11:39:27
21 BY MR. FRAMPTON:                            11:39:27
22      Q.  I said the case-mix has also      11:39:27
23 changed, has it not?                        11:39:29
24      MR. CHEEK:  Objection, form.          11:39:30
25      THE WITNESS:  And by case-mix you     11:39:31

27 (Pages 102 - 105)

Page 106

1  mean what, sir?                         11:39:33
2  BY MR. FRAMPTON:                         11:39:33
3      Q.  Well, let's see what Dr. -- let's  11:39:35
4  just read what Dr. Cass said about that, still  11:39:37
5  on page 32.                              11:39:39
6      A.  I am on 32, sir.                 11:39:48
7      Q.  All right, 3.11.  This increase in  11:39:50
8  referrals has been accompanied by a change in  11:39:52
9  the case-mix from predominantly          11:39:54
10  birth-registered males presenting with gender  11:39:57
11  incongruence from an early age, to       11:40:00
12  predominantly birth-registered females   11:40:02
13  presenting with later onset of reported gender  11:40:04
14  incongruence in the early teen years.  In  11:40:07
15  addition, approximately one-third of children  11:40:10
16  and young people referred to GIDS have autism  11:40:11
17  or other types of neurodiversity.  There is  11:40:16
18  also an over-representation percentage wise  11:40:19
19  compared to the national percentage of looked  11:40:20
20  after children.  Did I read that paragraph  11:40:21
21  correctly?                               11:40:23
22      A.  You did, sir.                   11:40:23
23      Q.  Does this accurately reflect your  11:40:25
24  understanding of the US experience as well in  11:40:32
25  terms of the changing population?        11:40:36

Page 107

1      A.  So I think that looked after    11:40:39
2  children is likely to be a British        11:40:46
3  colloquialism that I am not clear --      11:40:49
4      Q.  Put that one aside.             11:40:49
5      A.  -- what it's referring to.      11:40:51
6      Q.  Put that one aside, rest of the  11:40:52
7  paragraph.  Well, let's just do them in turn.  11:40:53
8      A.  Okay.                           11:40:58
9      Q.  Predominantly birth-registered  11:40:58
10  males presenting with gender incongruence from  11:41:00
11  an early age to predominantly birth-registered  11:41:02
12  females presenting with later onset of reported  11:41:06
13  gender incongruence in early teen years.  Is  11:41:08
14  that consistent with the US experience?  11:41:12
15      A.  So my sense is that there is some  11:41:14
16  heterogenous data about those potential changes  11:41:27
17  but that some individuals have reported similar  11:41:34
18  changes in the United States.            11:41:38
19      Q.  And what about the increase in   11:41:38
20  children with autism or other types of   11:41:50
21  neurodiversity?                          11:41:53
22      MR. CHEEK:  Objection, form.        11:41:54
23      THE WITNESS:  So I don't read       11:41:56
24  Dr. Cass's reporting that as a change.  I take it  11:41:58
25  that she says, in addition, approximately  11:42:03

Page 108

1  one-third of children and young people referred to  11:42:05
2  GIDS have autism or other types of neurodiversity.  11:42:08
3  I don't believe that at least in this sentence she  11:42:12
4  is representing that that proportion has changed  11:42:14
5  over time.                               11:42:16
6  BY MR. FRAMPTON:                          11:42:17
7      Q.  Does that sound about right for  11:42:21
8  the US, about a third?                   11:42:22
9      A.  I apologize --                  11:42:24
10      Q.  Or do you know?                 11:42:31
11      A.  -- I do not know the specific   11:42:32
12  numbers.                                 11:42:34
13      Q.  Look at page 19.               11:42:34
14      A.  Sir, recognizing this is a very  11:42:48
15  big exhibit, when you reach a point in your  11:42:50
16  line of questioning, can we take another break?  11:42:54
17      Q.  Yes, we will be there very, very  11:42:57
18  shortly, I promise.                      11:43:00
19      A.  Thank you.                     11:43:01
20      Q.  All right, 1.28.  Much of the    11:43:01
21  existing literature about natural history and  11:43:13
22  treatment outcomes for gender dysphoria in  11:43:15
23  childhood is based on a case-mix of        11:43:17
24  predominantly birth-registered males presenting  11:43:19
25  in early childhood.  There is much less data on  11:43:22

Page 109

1  the more recent case-mix of predominantly  11:43:25
2  birth-registered females presenting in early  11:43:27
3  teens, particularly in relation to treatment  11:43:29
4  and outcomes.  Did I read that correctly?  11:43:31
5      A.  You did, sir.                   11:43:33
6      Q.  Do you agree with her statement  11:43:34
7  about the state of the statements with regard  11:43:40
8  to the state of the literature?          11:43:42
9      A.  So if I recall the Dutch studies  11:43:49
10  correctly, there were a reasonable number of  11:43:53
11  individuals assigned female at birth in their  11:43:58
12  data.  I would agree that there is potentially  11:44:01
13  less data about individuals with a shorter  11:44:09
14  duration of gender dysphoria.            11:44:17
15      Q.  A later onset of gender dysphoria?  11:44:18
16      A.  I think it's complicated to figure  11:44:20
17  out when gender dysphoria has its onset, but  11:44:36
18  potentially later presentation to clinical  11:44:39
19  care.                                    11:44:43
20      Q.  When you say the Dutch studies had  11:44:45
21  a reasonable number of what you are calling  11:44:47
22  birth-assigned females, natal females, what do  11:44:52
23  you mean by a reasonable number?         11:44:56
24      A.  So, again, I would have to refresh  11:44:57
25  my memory looking at the -- at the studies.  11:44:58

Page 110

1  But, for example, I don't believe that there    11:45:04
2  were only 5 percent of participants were female  11:45:05
3  assigned at birth.                               11:45:09
4      Q.  So you just -- you disagree with         11:45:09
5  Dr. -- with this review when it says the         11:45:12
6  case-mix was predominantly birth-registered      11:45:14
7  males and that there is much less data on the    11:45:17
8  more recent case-mix?                            11:45:20
9      A.  So all I am -- so when you -- when        11:45:21
10  I read this, sir, Dr. -- the authors of this    11:45:31
11  report are contrasting both sex assigned at     11:45:44
12  birth and age of presentation, and I would put  11:45:53
13  more emphasis than the authors of the report on 11:46:01
14  the age of presentation than I would on the sex 11:46:06
15  assigned at birth.                              11:46:09
16      Q.  Are you aware of any study as to        11:46:10
17  whether responses and long-term outcomes from   11:46:16
18  puberty blockers or cross-sex hormones are      11:46:19
19  different for children on the autistic          11:46:23
20  spectrum, aware of any studies that have looked 11:46:26
21  at that?                                        11:46:29
22      A.  I cannot recall a study that            11:46:29
23  does -- that focused exclusively on that        11:46:32
24  population or did subgroup analysis on that     11:46:35
25  population.                                     11:46:38

Page 111

1          MR. FRAMPTON:  All right.  Then we      11:46:39
2  will take a break.                               11:46:39
3          THE WITNESS:  Thank you.                 11:46:40
4      (Recess taken.)                              11:46:41
5          MR. FRAMPTON:  Let's go back on.         11:53:52
6      (Thereupon, Exhibit 16, GRADE              11:53:54
7  guidelines: 11. Making An Overall Rating of      11:53:54
8  Confidence in Effect Estimates For a Single      11:53:54
9  Outcome and All Outcomes, was marked for purposes 11:53:54
10  of identification.)                            11:53:55
11  BY MR. FRAMPTON:                                11:53:55
12      Q.  Dr. Antommaria, I am going to show      11:53:55
13  you what I am marking as Exhibit 16.  And this  11:53:56
14  is still Journal of Clinical Epidemiology,      11:54:09
15  GRADE Guidelines 11.  Dr. Antommaria, is this   11:54:12
16  an article in the same Journal of Clinical      11:54:16
17  Epidemiology GRADE Guidelines series we have    11:54:21
18  been looking at?                                11:54:21
19      A.  It is, sir.                             11:54:22
20      Q.  You are familiar with it?              11:54:23
21      A.  I am, sir.                              11:54:26
22      Q.  All right, turn to page 152.           11:54:26
23  Let's look at the key points in the upper       11:54:28
24  left-hand corner.  So if you are applying the   11:54:31
25  GRADE methodology, you assign a rating of       11:54:41

Page 112

1  confidence in effect estimates, or quality of   11:54:48
2  evidence, to each outcome that you are          11:54:52
3  studying, correct?                              11:54:53
4      A.  Yes, sir.                               11:54:54
5      Q.  And that presumably should be the       11:54:56
6  patient important outcomes that we looked at    11:55:00
7  before, right?                                  11:55:03
8      A.  Yes, sir.                               11:55:03
9      Q.  And to do that, you simultaneously      11:55:05
10  consider all eight sort of upgrade and         11:55:13
11  downgrade domains, correct?                    11:55:15
12      A.  Yes, sir.                              11:55:17
13      Q.  And one way at least of presenting     11:55:17
14  the application of the GRADE methodology is an 11:55:24
15  evidence profile, like we see in Table 1 on the 11:55:28
16  next page, correct?                            11:55:32
17      A.  Yes, sir.                              11:55:32
18      Q.  And this sort of presents the          11:55:55
19  number and type of studies the authors         11:55:58
20  considered, correct?                           11:56:01
21      A.  That the individual performing the     11:56:01
22  evaluation considered, yes.                    11:56:09
23      Q.  Yes, I'm sorry.  I will say            11:56:10
24  evaluator from here forward so we are saying   11:56:12
25  the same thing.  And it gives you the          11:56:14

Page 113

1  evaluator's conclusion as to each of the        11:56:17
2  upgrade or downgrade domains, right, or at      11:56:20
3  least as to the downgrade domains?             11:56:29
4      A.  Yes, I only see five of the eight       11:56:30
5  listed in the table, sir.                       11:56:33
6      Q.  And it's the five downgrade            11:56:34
7  domains that you see, right?                    11:56:35
8      A.  Yes, sir.                               11:56:36
9      Q.  Okay.  And then they have given         11:56:38
10  you at least some explanation when they        11:56:41
11  downgraded as to why?                          11:56:45
12      A.  So there is comments under each of     11:56:48
13  the columns.  I don't see necessarily that they 11:57:01
14  have assigned a minus 1 or minus 2.  But in the 11:57:04
15  quality concluding, they give a reason for the  11:57:08
16  final conclusion, sir.                         11:57:14
17      Q.  They give a reason that's grounded     11:57:15
18  in the five downgrade domains, correct?        11:57:18
19      A.  Yes, sir.                              11:57:21
20      Q.  Go to the next -- I'm sorry, page      11:57:24
21  155, if you would.                             11:57:29
22      A.  I am on 155, sir.                      11:57:37
23      Q.  Okay.  The second full paragraph       11:57:39
24  on the left-hand column says:  Despite the     11:57:43
25  limitations of breaking continua into discrete 11:57:48

29 (Pages 110 - 113)

Page 114

1 categories, treating each domain for rating   11:57:52
2 confidence up or down as a discrete category   11:57:55
3 enhances transparency.  Indeed, the example   11:57:58
4 highlights once again that the great merit of   11:58:02
5 GRADE is not that it necessarily ensures   11:58:05
6 reproducible judgments, observers will   11:58:07
7 inevitably differ in close-call situations when   11:58:11
8 rating up or down for individual domains or for   11:58:14
9 the overall confidence per outcome, but that it   11:58:16
10 achieves explicit and transparent judgment.   11:58:19
11 Did I read that correctly?   11:58:22
12    A.  You did, sir.   11:58:22
13    Q.  Do you agree that one of the --   11:58:23
14 one of the great merits of the GRADE system is   11:58:28
15 that done correctly, there should be a right   11:58:31
16 level of transparency as to why the evaluator   11:58:34
17 rated the evidence quality the way that he or   11:58:39
18 she did?   11:58:42
19    A.  Yes, one of the benefits of the   11:58:44
20 GRADE methodology is its emphasis on   11:58:49
21 transparency.   11:58:53
22    Q.  So that even if you don't agree   11:58:54
23 with the evaluator, you at least know why a   11:58:55
24 particular quality rating was assigned, right?   11:58:58
25    A.  That would be one of the   11:59:01

Page 115

1 components of the transparency, sir.   11:59:04
2    Q.  And you know what studies went   11:59:06
3 into that conclusion, right?   11:59:08
4    A.  Yes, that is part of a systematic   11:59:10
5 review, that they list the studies that they   11:59:20
6 evaluated.   11:59:26
7    Q.  When you read a systematic review   11:59:29
8 that has followed the GRADE methodology, you   11:59:35
9 should come away with it with a clear   11:59:36
10 understanding of the evaluator's judgment calls   11:59:39
11 on the quality of evidence and why he or she   11:59:43
12 made those calls, correct?   11:59:46
13    A.  Ideally, that would be the way the   11:59:47
14 GRADE methodology is applied.   11:59:53
15    Q.  All right.  Let's go to -- let's   11:59:54
16 go to what I am going to mark as Exhibit 17.
17       (Thereupon, Exhibit 17, Endocrine
18 Treatment of Gender-Dysphoric/Gender-Incongruent
19 Persons:  An Endocrine Society Clinical Practice
20 Guideline, was marked for purposes of
21 identification.)   12:00:15
22 BY MR. FRAMPTON:   12:00:15
23    Q.  This document is entitled   12:00:27
24 Endocrine Treatment of Gender Dysphoric/Gender   12:00:30
25 Incongruent Persons, an Endocrine Society   12:00:33

Page 116

1 Clinical Practice Guideline.  Dr. Antommaria,   12:00:38
2 you are familiar with this document, correct?   12:00:40
3    A.  I am.   12:00:42
4    Q.  And this is a set of clinical   12:00:44
5 practice guidelines published by the Endocrine   12:00:45
6 Society in 2017 for treating people with gender   12:00:49
7 dysphoria or gender incongruence, correct?   12:00:53
8    A.  It is a clinical practice   12:00:58
9 guideline, yes.   12:01:00
10    Q.  I'm sorry if I used a different   12:01:00
11 article.  It is a clinical practice guideline   12:01:02
12 published by the Endocrine Society, correct?   12:01:05
13    A.  Correct.   12:01:08
14    Q.  And it is their most recent   12:01:08
15 clinical practice guideline, is it not?   12:01:10
16    A.  It's their most recent clinical   12:01:12
17 practice guideline on this particular topic,   12:01:13
18 yes.   12:01:16
19    Q.  Yes, okay.  And the evaluators   12:01:16
20 used -- claim to have used the GRADE   12:01:23
21 methodology, correct?   12:01:29
22    A.  Yes, the authors of this guideline   12:01:29
23 report that they used the GRADE methodology.   12:01:33
24    Q.  And you have not conducted your   12:01:34
25 own systematic review of this evidence,   12:01:39

Page 117

1 correct?   12:01:42
2    A.  No, sir, I have not.   12:01:42
3    Q.  You have not conducted your own   12:01:44
4 sort of application of the GRADE methodology to   12:01:47
5 this evidence, correct?   12:01:49
6    A.  No, sir, I have not.   12:01:50
7    Q.  Let's go to page --   12:01:53
8    A.  I think it would be -- I think it   12:01:57
9 would be exceptionally difficult for a single   12:02:00
10 individual to do either of those things, sir.   12:02:02
11    Q.  All right.  Let's go to page 37 --   12:02:04
12 I'm sorry, 3873.   12:02:11
13       MR. CHEEK:  Counsel, can you say it   12:02:18
14 again, 38?   12:02:19
15       MR. FRAMPTON:  3873.   12:02:21
16       MR. CHEEK:  Thank you.   12:02:22
17       MR. FRAMPTON:  We have got a lot of   12:02:22
18 four-digit page numbers in this one.   12:02:24
19       THE WITNESS:  I am on that page, sir.   12:02:26
20 BY MR. FRAMPTON:   12:02:27
21    Q.  Okay.  Are you familiar with what   12:02:27
22 systematic reviews the authors commissioned for   12:02:33
23 this set of clinical practice guidelines?   12:02:37
24    A.  I believe that the authors   12:02:39
25 commissioned two systematic reviews for this   12:02:42

30 (Pages 114 - 117)

1 guideline, sir.                                    12:02:45
2    Q.  Okay.  And what were they on?     12:02:45
3    A.  So one was on the effect of sex       12:02:47
4 steroid use in transgender individuals on     12:02:55
5 lipids and cardiovascular outcomes, and the   12:02:58
6 second was on the effect of sex steroids on   12:03:03
7 bone health in transgender individuals.       12:03:08
8    Q.  They did not commission any          12:03:12
9 systematic reviews on psychosocial outcomes,  12:03:14
10 did they?                                     12:03:18
11    A.  They did not, sir.                    12:03:18
12    Q.  Or effects on brain development?      12:03:23
13    A.  They did not, sir.                    12:03:28
14    Q.  Fertility?                            12:03:33
15    A.  So, again, I think that -- so I      12:03:34
16 would say that I think that their commissioning 12:03:40
17 of systematic reviews would be unlikely that  12:03:43
18 they would be able to commission systematic   12:03:45
19 reviews on all of the patient relevant outcomes 12:03:48
20 because of the way in which professional       12:03:52
21 societies are resourced and that the systematic 12:03:53
22 reviews that were commissioned for this        12:04:01
23 clinical practice guideline are comparable to  12:04:03
24 the type -- the number of systematic reviews   12:04:06
25 commissioned for other clinical practice       12:04:08

1 guidelines.                                    12:04:10
2    Q.  There is no systematic review on       12:04:10
3 the efficacy of these interventions in         12:04:18
4 improving mental health, is there?             12:04:21
5    A.  There is not, sir.                     12:04:23
6    Q.  Let's go to page 3883.                 12:04:24
7    A.  Yes, sir.                              12:04:37
8    Q.  All right.  2.4 is a strong            12:04:37
9 recommendation for the use of sex hormone      12:04:50
10 treatment based on what they have assessed as  12:04:55
11 low quality evidence; is that -- am I reading  12:04:59
12 that correctly?                                12:05:03
13    A.  Yes, that's what the No. 1 and the     12:05:04
14 two circles with plus signs in them indicate.  12:05:08
15    Q.  Okay.  Turn to the next page, if       12:05:10
16 you would.  And I just -- structurally in this 12:05:15
17 guideline, they follow that recommendation with 12:05:19
18 the evidence, the values and preferences, and  12:05:25
19 the remarks on that recommendation, correct?   12:05:29
20    A.  Yes, sir.  You have reviewed          12:05:31
21 extensively the components of the GRADE        12:05:40
22 guidelines relative to the rating of quality of 12:05:44
23 the evidence.  There are a number of papers    12:05:46
24 about making recommendations.  But yes, as part 12:05:48
25 of making the recommendations, they describe   12:05:53

1 the values and preferences as part of being    12:05:55
2 transparent about their methods.               12:06:00
3    Q.  They do not give us how they           12:06:06
4 evaluated any of the downgrade domains for this 12:06:14
5 body of evidence, do they?                     12:06:19
6    A.  So they do not provide a table         12:06:20
7 similar to the one that we just reviewed, sir. 12:06:28
8    Q.  Nor do they explain in the            12:06:31
9 evidence section how they applied any of the   12:06:34
10 downgrade or upgrade factors, do they?        12:06:39
11    A.  So, again, so I would have to read    12:06:41
12 the evidence statement related to each of the  12:06:47
13 individual recommendations to know whether they 12:06:50
14 mention any of those factors or not.           12:06:52
15    Q.  I am asking about 2.4.                 12:06:54
16    A.  Then please let me read the           12:06:57
17 evidence statement.                            12:07:00
18    Q.  Sure.                                 12:07:00
19    A.  So, sir, on page 3885, the end of     12:09:31
20 the first incomplete paragraph, the authors    12:09:38
21 state:  However, only minimal data support     12:09:42
22 earlier use of gender-affirming hormones in    12:09:45
23 transgender adolescents currently exist.  So I 12:09:48
24 take it that that is a reference to            12:09:54
25 indirectness, which would be potentially a     12:09:58

1 reason for downgrading the evidence.           12:10:01
2    Q.  We don't know whether they did or      12:10:03
3 did not downgrade the evidence based on        12:10:06
4 indirectness, do we?                           12:10:09
5    A.  They do not explicitly state that     12:10:10
6 the reason why they graded the evidence to be  12:10:21
7 of low quality was as a result of indirectness, 12:10:24
8 no.                                           12:10:26
9    Q.  Well, all of the studies are          12:10:26
10 observational, right, or do we know?           12:10:30
11    A.  They would in general be             12:10:35
12 observational.                                 12:10:37
13    Q.  Which would start us at low           12:10:38
14 quality, right?                                12:10:40
15    A.  Yes, sir.                             12:10:41
16    Q.  So we don't know if it's just that    12:10:41
17 they left them at low quality or if they       12:10:47
18 upgraded and downgraded, or we don't know how  12:10:50
19 they planted it low, do we?                    12:10:54
20    A.  No, we do not, sir.                   12:10:56
21    Q.  And it doesn't tell us how many       12:10:58
22 studies went into this quality assessment, does 12:11:05
23 it?                                            12:11:09
24    A.  So indirectly, sir, so, for          12:11:09
25 example, currently available data from         12:11:21

Page 122

1 transgender -- I am on page --          12:11:24
2      Q.  I see it.               12:11:27
3      A.  -- 84.  Currently available data   12:11:28
4 from transgender adolescent support treatment   12:11:33
5 with sex hormones starting at age 16, and they   12:11:35
6 provide two references.  We need to look at     12:11:38
7 those references to see if they are to studies   12:11:41
8 or summaries of studies or reviews.  But they   12:11:44
9 do reference the recommendations, sir, so there  12:11:50
10 would be a way to determine in some way how      12:11:53
11 many studies they are basing their             12:11:57
12 recommendations on.             12:11:58
13      Q.  You would have to piece together   12:11:59
14 the footnotes and figure out -- or the end      12:12:00
15 notes and figure out what they seem to be       12:12:03
16 using, right?  They have not compiled it for us  12:12:05
17 and presented it?               12:12:07
18      A.  Again, as I said, they don't    12:12:08
19 provide a table similar to the table that we    12:12:10
20 reviewed in Exhibit 16.           12:12:12
21      Q.  And we don't know if these studies  12:12:14
22 were selected via systematic review.  In fact,   12:12:17
23 it appears they were not, correct?        12:12:21
24      A.  That would be a reasonable       12:12:24
25 conjecture.               12:12:26

Page 123

1      Q.  Let's look at this endnote 63 that   12:12:27
2 you just referenced.  So the statement         12:12:31
3 currently available data from transgender      12:12:43
4 adolescents support treatment with sex hormones  12:12:47
5 starting at age 16 years is citing to a paper   12:12:48
6 lead author de Vries published in Pediatrics in  12:12:56
7 2014, correct?              12:13:00
8      A.  Correct, sir.          12:13:00
9      Q.  And that is a -- that's not a      12:13:02
10 systematic review or anything, that's a single   12:13:05
11 study, is it not?               12:13:07
12      A.  Yes, sir.               12:13:08
13      Q.  And then they are also citing to   12:13:08
14 122, which is an NHS document, correct?    12:13:12
15      A.  The author of that document is the  12:13:16
16 NHS, sir.                12:13:29
17      Q.  And do you know if that's a study   12:13:30
18 or review or what it is?             12:13:33
19      A.  I do not, sir.           12:13:35
20      Q.  And assuming if it is not a study   12:13:41
21 itself, do you have any idea what studies it    12:13:44
22 cites to?                12:13:47
23      A.  I would have to reference the     12:13:48
24 document, sir.              12:13:49
25      Q.  Fair enough.  Do you -- can you    12:13:50

Page 124

1 tell me in what situations the GRADE guidelines  12:14:03
2 permit making a strong recommendation based on  12:14:09
3 low quality evidence?             12:14:13
4      A.  So there are specific situations   12:14:15
5 in which they report that that is acceptable.    12:14:21
6 I would need to refer to the appropriate       12:14:24
7 article in the series to identify those.  I     12:14:27
8 believe that there are approximately five      12:14:31
9 situations in which they state that that is an   12:14:34
10 inappropriate thing to do.            12:14:40
11      Q.  Did the Endocrine Society in its   12:14:41
12 2017 guidelines tell us which of those        12:14:43
13 situations they were relying upon to make a     12:14:46
14 strong recommendation based on low quality      12:14:50
15 evidence?                12:14:52
16      A.  They did not.  The thing that I    12:14:53
17 would state, sir, is that the GRADE guidelines   12:14:59
18 are an ideal process and that this guideline is  12:15:02
19 comparable to many other clinical practice     12:15:10
20 guidelines in medicine that clinicians rely on,  12:15:12
21 and in some ways you may be holding the        12:15:20
22 guidelines up to unrealistic standards in      12:15:25
23 practice.                12:15:29
24      Q.  Have you independently determined   12:15:30
25 which of the situations for making a strong     12:15:34

Page 125

1 recommendation based on low quality evidence    12:15:38
2 would apply here?               12:15:40
3      A.  I have not, sir.          12:15:41
4      Q.  All right.  Let's look at         12:15:43
5 something else.              12:15:47
6      A.  But not having done so does not    12:15:48
7 mean that one of those situations does not, in   12:15:50
8 fact, apply.               12:15:52
9      Q.  I am trying to understand your     12:15:53
10 testimony.  You in preparing your expert report  12:15:54
11 did not opine as to which one applies, correct?  12:15:57
12      A.  I have not formed an opinion on    12:16:00
13 that matter, sir.               12:16:03
14      Q.  Understood.             12:16:04
15      (Thereupon, Exhibit 18, Standards of  12:16:05
16 Care for the Health of Transgender and Gender   12:16:05
17 Diverse People, Version 8, was marked for purposes 12:16:05
18 of identification.)             12:16:05
19 BY MR. FRAMPTON:                12:16:05
20      Q.  All right.  Dr. Antommaria, I am   12:16:23
21 handing you what I am marking as Exhibit 18.    12:16:24
22 Hopefully, it's excerpts from WPATH's SOC8.     12:16:31
23 That's what it's supposed to be.  Tell me if    12:16:37
24 that's what it appears to be.          12:16:39
25      A.  Yes, it appears to be portions but  12:16:59

32 (Pages 122 - 125)

Page 126

1 not the entirety of WPATH's SOC8.                    12:17:01
2       Q.   That's right.  It should have the         12:17:07
3 entirety of the adolescent chapter, which is         12:17:09
4 probably all we are going to look at.  So            12:17:14
5 flip -- let's see, I don't even have it in           12:17:20
6 front of me.  Let's go to the adolescent             12:17:24
7 chapter, which I believe begins on page 43,          12:17:56
8 S43.  I don't know why there is an S in front        12:18:11
9 of it, but it's S43.                                 12:18:13
10      MR. CHEEK:  Counsel, just sort of             12:18:15
11 flipping through this, there are -- like it goes     12:18:17
12 from page S13, S14, and then jumps to S43.           12:18:24
13      MR. FRAMPTON:  Yeah.                           12:18:32
14      MR. CHEEK:  Okay, okay.                        12:18:33
15      MR. FRAMPTON:  No, that's correct.  I          12:18:34
16 mean, that's -- you can see there is a table of      12:18:35
17 contents on S4.  I eliminated a bunch of chapters    12:18:37
18 I wasn't going to ask him about.                     12:18:41
19      MR. CHEEK:  Understood.  Thank you             12:18:42
20 for the clarity.                                     12:18:43
21 BY MR. FRAMPTON:                                     12:18:44
22      Q.   Dr. Antommaria, I --                      12:18:47
23      MR. CHEEK:  I'm sorry, which page are          12:18:48
24 you on?                                              12:18:49
25      MR. FRAMPTON:  I am on S43.                     12:18:49

Page 127

1       MR. CHEEK:  Thank you.                         12:18:51
2 BY MR. FRAMPTON:                                      12:18:51
3       Q.   Doctor, are you also on --                12:18:51
4       A.   I am on S43.                              12:18:51
5       Q.   Thank you, sir.  Are you familiar         12:18:54
6 generally with this chapter 6 on adolescents of      12:19:00
7 SOC8?                                                12:19:04
8       A.   I am, sir.                                12:19:05
9       Q.   And I'm sorry, did you answer my          12:19:06
10 question?  We are, in fact, looking at WPATH         12:19:08
11 SOC8, correct?                                       12:19:11
12      A.   Yes, I agreed that this exhibit           12:19:12
13 was parts of WPATH's SOC8.                           12:19:14
14      Q.   Great.  Do you agree that the             12:19:19
15 recommendations in the adolescent chapter are       12:19:27
16 not based on a systematic review of the             12:19:29
17 evidence?                                            12:19:31
18      A.   That is correct, sir.                     12:19:31
19      Q.   And as a result, there are no             12:19:35
20 GRADE type assessments of the quality of the        12:19:43
21 evidence, correct?                                   12:19:46
22      A.   As a result of that and a number          12:19:47
23 of additional factors, yes.                          12:19:51
24      Q.   We will just read it.  On S46, in         12:19:54
25 that first not full paragraph in the upper          12:20:09

Page 128

1 left-hand corner, the authors provide what they      12:20:17
2 call a short narrative review instead of a           12:20:19
3 systematic review; is that correct?                  12:20:23
4       A.   That's what they state.                   12:20:24
5       Q.   Okay.  And their claim is that the        12:20:26
6 number of studies is too small to allow for a        12:20:29
7 systematic review; is that right?                    12:20:33
8       A.   The low number of studies is one          12:20:36
9 of the reasons that they provide for not             12:20:52
10 performing the systematic review or that a          12:20:55
11 systematic review was not possible.  Are we         12:20:57
12 moving to another document, sir?                     12:21:20
13      Q.   We are moving to another document.        12:21:22
14      (Thereupon, Exhibit 19, Gender                 12:21:22
15 Dysphoria In Young People Is Rising - And So Is      12:21:22
16 Professional Disagreement, was marked for purposes   12:21:22
17 of identification.)                                  12:21:22
18 BY MR. FRAMPTON:                                     12:22:15
19      Q.   All right.  Do you have the new           12:22:15
20 exhibit?  Oh, I see it there.  All right.  What      12:22:18
21 I have marked as Exhibit 19 is an article           12:22:20
22 entitled Gender Dysphoria In Young People Is         12:22:26
23 Rising - And So is Professional Disagreement,        12:22:29
24 Jennifer Block and the BMJ; is that correct?         12:22:31
25      A.   If by article you mean a news             12:22:34

Page 129

1 article, yes, sir.                                   12:22:41
2       Q.   Yes, I understand this is not a           12:22:44
3 peer-reviewed article, correct?  Correct?            12:22:45
4       A.   Correct.                                  12:22:49
5       Q.   Sorry, she has to have a verbal           12:22:49
6 response or she can't --                             12:22:52
7       A.   I apologize.                              12:22:53
8       Q.   Have you seen this before?                12:22:54
9       A.   I am familiar with it, sir.              12:22:57
10      Q.   Have you read it?                         12:22:59
11      A.   I have, sir.                              12:23:07
12      Q.   Go to page 2, the second page.           12:23:16
13 The very bottom of the page, that paragraph          12:23:30
14 that starts and spills over reads:  Guyatt, who      12:23:31
15 co-developed GRADE, found, quote, serious           12:23:34
16 problems, unquote, with the --                       12:23:37
17      A.   Oh, I'm sorry.                            12:23:38
18      Q.   Are you in the wrong place?               12:23:39
19      A.   No, I just want to -- so we are on        12:23:40
20 2 of 10, sir?                                        12:23:44
21      Q.   You are not looking -- no, we need        12:23:45
22 the other set of copies.  I'm sorry, I am going      12:23:52
23 to remark this.  I made a better copy of that        12:23:55
24 exhibit.                                             12:23:57
25      MR. CHEEK:  Do you want to just mark           12:24:05

Page 130

1  that as 20?                              12:24:07
2          MR. FRAMPTON:  Sure.             12:24:09
3          (Thereupon, Exhibit 20, Gender   12:24:09
4  Dysphoria In Young People Is Rising - And So is  12:24:09
5  Professional Disagreement, was marked for purposes  12:24:09
6  of identification.)                      12:24:10
7  BY MR. FRAMPTON:                         12:24:10
8      Q.  This is a whole lot easier to    12:24:10
9  read.                                    12:24:12
10     A.  The PDF as opposed to the web     12:24:12
11 page, right?                             12:24:15
12     Q.  Yes.                             12:24:15
13     A.  Thank you.                       12:24:16
14     Q.  All right.  Do we appear to be   12:24:26
15 looking at the same document, just a better  12:24:27
16 copy?                                    12:24:30
17     A.  We now appear to be viewing the  12:24:30
18 PDF of that article.                     12:24:31
19     Q.  Great, all right.  Bottom of page  12:24:33
20 2.                                       12:24:37
21     A.  Yes, sir.                        12:24:37
22     Q.  All right.  It says:  Guyatt, who  12:24:38
23 co-developed GRADE, found, quote, serious  12:24:42
24 problems with the Endocrine Society guidelines,  12:24:44
25 noting that the systematic reviews didn't look  12:24:47

Page 131

1  at the effect of the interventions on gender  12:24:50
2  dysphoria itself, arguably, quote, the most  12:24:52
3  important outcome, unquote.  We'll stop there  12:24:56
4  for now.  Did I read that correctly?     12:25:01
5      A.  You did, sir.                    12:25:02
6      Q.  Do you think a reasonable        12:25:03
7  scientist could agree with Dr. Guyatt's  12:25:15
8  concerns expressed in that sentence?     12:25:19
9      A.  So I think that part of the      12:25:22
10 difficulty, sir, is knowing what Dr. Guyatt's  12:25:26
11 concerns are or are not in that this is not an  12:25:30
12 article that is published by Dr. Guyatt.  This  12:25:34
13 is a newspaper.  It is a news article in which  12:25:38
14 a reporter is characterizing statements by  12:25:42
15 Dr. Guyatt and, in part, selectively quoting  12:25:46
16 him and running partial quotes into a sentence.  12:25:52
17 So it's difficult for me to know what     12:25:56
18 Dr. Guyatt's concerns are or are not because of  12:26:00
19 the nature of this material, sir.         12:26:04
20     Q.  Have you ever -- have you seen    12:26:05
21 anything, any medium in which Dr. Guyatt  12:26:09
22 disagreed with the way that he was       12:26:12
23 characterized in this piece?             12:26:15
24     A.  I don't, but I would imagine that  12:26:17
25 there are many people who believe that they  12:26:26

Page 132

1  have been mischaracterized in news reports who  12:26:29
2  don't publicly affirm their belief.      12:26:33
3      Q.  Other than your general view that  12:26:39
4  news reports might mischaracterize someone, do  12:26:41
5  you have any specific reason to believe that  12:26:44
6  Dr. Guyatt's comments here were          12:26:47
7  mischaracterized or taken out of context?  12:26:49
8      A.  I don't have specific reason to   12:26:51
9  believe that.  I am just marking for you, sir,  12:26:56
10 that a news article is very different than a  12:26:58
11 peer-reviewed article that Dr. Guyatt has  12:27:02
12 written on the subject.                   12:27:04
13     Q.  Assuming the sentence that I read  12:27:05
14 you -- well, it doesn't even -- we don't even  12:27:08
15 have to make that assumption.  Could a   12:27:12
16 reasonable scientist share the concerns   12:27:16
17 expressed in the sentence that I read you,  12:27:18
18 regardless of whether they were or were not  12:27:20
19 expressed by Dr. Guyatt?                  12:27:22
20     A.  So the sentence reads that he     12:27:24
21 found serious problems with the Endocrine  12:27:47
22 Society guidelines, noting the systematic  12:27:50
23 reviews didn't look at the effects of    12:27:51
24 interventions on gender dysphoria itself.  The  12:27:53
25 systematic reviews weren't intended to look at  12:27:59

Page 133

1  the effect on gender dysphoria.  They looked at  12:28:12
2  other factors.  And the study does cite  12:28:14
3  articles which did look at the effect on gender  12:28:21
4  dysphoria and other mental health outcomes.  12:28:25
5      Q.  Sorry, my question was could a    12:28:31
6  reasonable scientist share the concern   12:28:36
7  expressed in the sentence I read you that the  12:28:39
8  Endocrine Society didn't look at the effective  12:28:43
9  interventions on gender dysphoria itself?  12:28:46
10     A.  So, again, sir, it's difficult for  12:28:47
11 me to answer your question because it's hard  12:28:51
12 for me to understand the concern that is being  12:28:54
13 expressed in this sentence.  We have discussed  12:28:58
14 the systematic reviews that were conducted.  12:29:01
15 The systematic reviews for the guideline  12:29:05
16 addressed other important outcomes, and the  12:29:09
17 Endocrine Society guidelines does cite studies  12:29:16
18 which looked at the effect of interventions on  12:29:19
19 gender dysphoria.                         12:29:21
20     Q.  Could a reasonable scientist be   12:29:24
21 concerned that they didn't systematically look  12:29:26
22 at the effect of interventions on gender  12:29:30
23 dysphoria?                               12:29:32
24     A.  That might be a reasonable        12:29:43
25 concern.                                 12:29:46

34 (Pages 130 - 133)

Page 134

1    Q.   All right.  Further down the page,  12:29:46
2  bottom, it says, last partial paragraph.       12:29:50
3       A.   So I'm sorry, page 3 now, sir?       12:29:55
4       Q.   I'm sorry, yes, you're right.  So   12:29:58
5  turned the page.  I did not flag that for you.  12:29:59
6  Page 3, left-hand column, bottom of the page.   12:30:02
7  For minors, WPATH contends that the evidence is 12:30:06
8  so limited that, quote, a systematic review    12:30:09
9  regarding outcomes of treatment in adolescents  12:30:12
10  is not possible, unquote.  But Guyatt counters  12:30:15
11  that, quote, systematic reviews are always     12:30:17
12  possible, unquote, even if few or no studies   12:30:19
13  meet the eligibility criteria.  If an entity   12:30:23
14  has made a recommendation without one, he says, 12:30:27
15  quote, they would be violating standards of    12:30:30
16  trustworthy guidelines, end quote.  Did I read 12:30:32
17  that correctly?                       12:30:35
18       A.   You did, sir.              12:30:35
19       Q.   Could a reasonable scientist share 12:30:36
20  the concerns expressed in the portion that I   12:30:38
21  read?                            12:30:43
22       A.   So I take it that the portion that 12:30:43
23  you read articulates at least two separate     12:30:46
24  concerns.  I would agree with the statement    12:30:52
25  that a systematic review is always possible if 12:30:57

Page 135

1  the -- even if the results of that systematic   12:31:01
2  review identified few, if any -- the language   12:31:04
3  here is few, if no, studies.  The additional   12:31:09
4  concern that is expressed is if an entity has   12:31:13
5  made a recommendation without one, and I take   12:31:17
6  it a systematic review, they would be violating 12:31:20
7  the standards of the trustworthy guidelines.    12:31:23
8       And I would say that given the        12:31:26
9  practical limitations of being able to do a    12:31:30
10  systematic review for every single           12:31:34
11  recommendation in the guideline that a         12:31:36
12  guideline might be -- still be trustworthy and 12:31:40
13  important in relevant ways without having      12:31:46
14  conducted a systematic review for every single 12:31:48
15  recommendation that it makes.                12:31:52
16       Q.   Would you agree that the          12:31:58
17  importance of conducting a systematic review   12:31:59
18  turns at least in part on the importance of the 12:32:02
19  outcome to be reviewed?                    12:32:06
20       MR. CHEEK:  Objection, form.         12:32:10
21       THE WITNESS:  Just so I understand   12:32:17
22  your question, can you rephrase it?           12:32:18
23  BY MR. FRAMPTON:                       12:32:20
24       Q.   Absolutely.  So, for example -- if 12:32:21
25  I am understanding your comment correctly, for 12:32:27

Page 136

1  example, if a -- if a guideline committee      12:32:29
2  decided to forego doing a systematic review on 12:32:36
3  a relatively unimportant outcome, presumably,   12:32:43
4  that would be more acceptable than neglecting a 12:32:47
5  systematic review on a critically important    12:32:51
6  outcome, correct?                       12:32:53
7       MR. CHEEK:  Objection, form.         12:32:54
8       THE WITNESS:  So the relative        12:33:01
9  importance of an outcome might be one of multiple 12:33:03
10  factors that was taken in consideration in     12:33:06
11  prioritizing potential systematic reviews in   12:33:12
12  preparation for writing the guideline.        12:33:16
13  BY MR. FRAMPTON:                       12:33:16
14       Q.   It's something that should be    12:33:16
15  taken into consideration, right?            12:33:17
16       A.   I believe that I said that it was 12:33:19
17  one of the -- one of the factors that should be 12:33:21
18  considered.                          12:33:24
19       Q.   There are systematic reviews out 12:33:24
20  there on the efficacy of puberty suppression   12:33:51
21  and cross-sex hormones on psychosocial outcomes 12:33:57
22  in adolescents, are there not?              12:34:00
23       MR. CHEEK:  Objection, form.         12:34:02
24       THE WITNESS:  There are systematic   12:34:04
25  reviews of those topics.                  12:34:05

Page 137

1  BY MR. FRAMPTON:                       12:34:06
2       Q.   Since 2017, correct?            12:34:15
3       A.   And there may be systematic      12:34:15
4  reviews predating 2017.  One of the factors    12:34:22
5  that goes into whether you would perform a     12:34:27
6  systematic review might be a consideration as   12:34:30
7  to whether or not you think that there is      12:34:33
8  significant evidence of which you are already   12:34:35
9  not aware.                          12:34:38
10       Q.   The systematic reviews on        12:34:38
11  psychosocial outcomes of puberty suppression or 12:34:47
12  cross-sex hormones in adolescents that you can 12:34:51
13  think of post date 2017, do they not?         12:34:53
14       MR. CHEEK:  Objection, form.         12:34:58
15       THE WITNESS:  So I don't recall the   12:35:01
16  publication dates of the systematic reviews that I 12:35:02
17  can think of.  So without referring --        12:35:06
18  BY MR. FRAMPTON:                       12:35:10
19       Q.   Which ones can you think of?      12:35:10
20       A.   So there are the two reviews which 12:35:11
21  have been performed as part of the Cass Review. 12:35:17
22  But there is an older systematic review that   12:35:20
23  was published in Pediatrics, which is         12:35:23
24  pre-pandemic.  And so I don't recall from the   12:35:29
25  top of my head whether that was published      12:35:33

35 (Pages 134 - 137)

Page 138

1 before or after 2017, I apologize.      12:35:36
2      Q.  Is that the Chew article; is that   12:35:38
3 the lead author?                 12:35:43
4      A.  I don't --              12:35:44
5      Q.  Let's find Chew.           12:35:45
6      A.  I don't recall --          12:35:47
7      Q.  Let's see if it's the right one.   12:35:47
8      A.  -- the first author of that      12:35:49
9 systematic review, sir.            12:35:52
10      Q.  Maybe we'll get there, maybe we   12:36:57
11 won't.  All right.  Are you aware of any   12:36:59
12 clinical practice guidelines that recommend   12:37:19
13 puberty suppression or cross-sex hormones for   12:37:23
14 treating adolescents with gender dysphoria that   12:37:25
15 are based on a systematic review of the   12:37:28
16 efficacy of puberty blockers or cross-sex   12:37:31
17 hormones?                 12:37:33
18      A.  Can you repeat your question just   12:37:34
19 so I am clear, sir?              12:37:42
20      Q.  I am going to try.  Are you aware   12:37:44
21 of any clinical practice guidelines that      12:37:48
22 recommend puberty suppression or cross-sex   12:37:51
23 hormones for adolescents with gender dysphoria   12:37:54
24 that are based on a systematic review of the   12:37:57
25 efficacy of either puberty blockers or      12:38:01

Page 139

1 cross-sex hormones?              12:38:04
2      A.  I am not, sir.  Again, though, I   12:38:04
3 think that that is consistent with clinical   12:38:21
4 practice guidelines in many other areas in      12:38:22
5 health care, in medicine, including pediatrics.   12:38:26
6      Will we be coming back to these,      12:39:09
7 sir?                    12:39:12
8      Q.  We might.  We'll come back to at   12:39:12
9 least some of them.              12:39:15
10      A.  May I set them here?         12:39:16
11      Q.  That's fine.             12:39:17
12      (Thereupon, Exhibit 21, Congenital   12:39:22
13 Adrenal Hyperplasia Due to Steroid 21-Hydroxylase   12:39:22
14 Deficiency:  An Endocrine Society Clinical   12:39:22
15 Practice Guideline, was marked for purposes of   12:39:22
16 identification.)              12:39:22
17 BY MR. FRAMPTON:              12:39:22
18      Q.  Handing you what I marked as      12:39:43
19 Exhibit 21.  All right.  And this is a document   12:39:44
20 entitled Congenital Adrenal Hyperplasia Due to   12:39:57
21 Steroid 21-Hydroxylase Deficiency, An Endocrine   12:40:01
22 Society Clinical Practice Guideline.  I would   12:40:06
23 never have read this but for you,      12:40:08
24 Dr. Antommaria.  Do you recognize this   12:40:10
25 document?                 12:40:11

Page 140

1      A.  I do, sir.            12:40:11
2      Q.  What is it?           12:40:12
3      A.  As the title suggests, it's a   12:40:14
4 clinical practice guideline prepared by the   12:40:20
5 Endocrine Society for a clinical condition   12:40:22
6 called congenital adrenal hyperplasia.      12:40:27
7      Q.  And is that a condition that you   12:40:29
8 are responsible for making the initial      12:40:33
9 diagnosis of?              12:40:38
10      A.  No, sir, it is not.        12:40:38
11      Q.  Is it a condition for which you   12:40:41
12 are responsible for initiating treatment?      12:40:45
13      A.  No, sir, it is not.        12:40:47
14      Q.  Would those two things generally   12:40:50
15 be done by an endocrinologist?         12:40:53
16      A.  In clinical settings where an   12:40:55
17 endocrinologist was available, yes.  There may   12:41:06
18 be clinical settings in which a pediatric   12:41:10
19 endocrinologist was not available, and someone   12:41:13
20 else might make that diagnosis and initiate   12:41:16
21 that treatment.              12:41:21
22      Q.  Tell us -- tell me generally what   12:41:21
23 the condition is.  Describe it for me, please.   12:41:25
24      A.  So it is a condition in which   12:41:30
25 individuals are lacking an enzyme, that enzyme   12:41:35

Page 141

1 being 21-Hydroxylase.  And as a result, the   12:41:42
2 individuals produce an excess of I believe   12:41:48
3 cortisol, sir, which then has a variety of   12:41:53
4 effects on the individual.         12:41:59
5      Q.  The typical treatment is      12:42:00
6 corticosteroids; is that correct?      12:42:06
7      A.  It is, sir.           12:42:07
8      Q.  And what happens if it's not   12:42:10
9 treated?                 12:42:14
10      A.  It depends on the type of      12:42:15
11 congenital adrenal hyperplasia the individual   12:42:21
12 has.  But in the -- what's referred to as the   12:42:24
13 salt wasting form, individuals potentially can   12:42:28
14 die as a result of a lack of treatment.      12:42:32
15      Q.  Flip to 4044, if you would.  And   12:42:35
16 just as sort of a backup, clinical practice   12:42:51
17 guidelines --              12:42:55
18      A.  Hold on a second, sir.      12:42:55
19      Q.  Yeah.  Well, this question      12:42:56
20 actually doesn't --            12:42:57
21      A.  No, that's --           12:42:58
22      Q.  I appreciate you finding it.      12:42:59
23 Clinical practice guidelines like this will   12:43:01
24 often have -- they will often address more than   12:43:03
25 just therapy for the condition, correct?   12:43:07

36 (Pages 138 - 141)

Page 142

```
1       A.  Yes, sir.  They will address      12:43:10
2  features such as diagnosis.               12:43:19
3       Q.  Screening, potentially?          12:43:22
4       A.  If screening is relevant to --   12:43:24
5       Q.  Right.                           12:43:32
6       A.  -- the -- to the diagnosis.  In  12:43:34
7  many conditions, screening would be irrelevant. 12:43:35
8       Q.  Right.  Look at the section on   12:43:39
9  4044 entitled Treatment of Classic Congenital  12:43:47
10 Adrenal Hyperplasia.  Do you see that, 4.1  12:43:52
11 through 4.6?                               12:43:56
12      A.  I do, sir.                        12:43:57
13      Q.  Are any of those strong          12:43:58
14 recommendations based on low quality evidence  12:44:02
15 in that section?                           12:44:06
16      A.  All of the recommendations are   12:44:07
17 based on moderate quality evidence, sir.   12:44:08
18      Q.  Let's look then at the stress    12:44:12
19 dosing section, 4.7 to 4.11.  Again, are all of  12:44:15
20 those based on at least moderate quality   12:44:27
21 evidence?                                  12:44:29
22      A.  No, sir.                          12:44:29
23      Q.  Which one did I -- oh, there we   12:44:32
24 go.  Are there any strong recommendations in  12:44:37
25 favor of pharmacological intervention based on  12:44:44
```

Page 143

```
1  low quality evidence?                      12:44:47
2       A.  Can you -- so I am reading the    12:44:48
3  recommendation that's based on low quality  12:45:08
4  evidence.  Can you repeat your question, sir?  12:45:10
5       Q.  Is there a strong recommendation  12:45:13
6  in favor of pharmacological intervention based  12:45:15
7  on low quality evidence?                   12:45:18
8       A.  There is a strong recommendation  12:45:20
9  against pharmacological treatment based on low  12:45:33
10 quality evidence, sir.                     12:45:35
11      Q.  Right.  My question was is there a  12:45:36
12 strong recommendation in favor of          12:45:39
13 pharmacological intervention based on low  12:45:41
14 quality evidence?                          12:45:43
15      A.  So the answer to your question is  12:45:44
16 no, sir.  But I don't understand the import of  12:46:01
17 your question, given that within the GRADE  12:46:04
18 approach, recommendations for and          12:46:08
19 recommendations against are treated as     12:46:10
20 symmetric.                                 12:46:15
21      Q.  In the -- when the GRADE          12:46:16
22 guidelines go through the situations in which a  12:46:20
23 strong recommendation may be based on low  12:46:24
24 quality evidence, is it your testimony that  12:46:27
25 they are symmetric as to whether the       12:46:31
```

Page 144

```
1  recommendation is for or against intervention,  12:46:33
2  or do you know?                            12:46:35
3           MR. CHEEK:  Objection, form.     12:46:37
4           THE WITNESS:  So as I previously  12:46:42
5  stated, sir, I don't recall all of those criteria  12:46:43
6  at this point in time, so I don't know.  But I  12:46:51
7  would say that in general, the GRADE approach  12:46:53
8  treats strong recommendations for and strong  12:46:57
9  recommendations against similarly.         12:46:59
10 BY MR. FRAMPTON:                           12:47:03
11      Q.  Look at -- go to the next -- are  12:47:13
12 you on 4045 now?                           12:47:15
13      A.  I am on 4044, sir.                12:47:17
14      Q.  All right, go to 4045.  All right.  12:47:19
15 And I am just going to do one more set of  12:47:21
16 these.  Treatment of Nonclassic Congenital  12:47:23
17 Adrenal Hyperplasia, 5.1 through 5.6.  Any  12:47:26
18 strong recommendations in favor of         12:47:31
19 pharmacological intervention based on low  12:47:34
20 quality evidence?                          12:47:36
21      A.  No, sir.  But we skipped the      12:47:36
22 section on monitoring therapy.             12:47:50
23      Q.  Okay.  All right, we are going to  12:47:51
24 move to another document.                  12:48:22
25          (Thereupon, Exhibit 22, Pediatric  12:48:22
```

Page 145

```
1  Obesity - Assessment, Treatment, and Prevention:  12:48:22
2  An Endocrine Society Clinical Practice Guideline,  12:48:22
3  was marked for purposes of identification.)  12:48:52
4  BY MR. FRAMPTON:                           12:48:52
5       Q.  I show you what I am marking as   12:48:52
6  Exhibit 22.  It's entitled Pediatric Obesity -  12:48:54
7  Assessment, Treatment, and Prevention:  An  12:48:54
8  Endocrine Society Clinical Practice Guideline.  12:49:03
9  Dr. Antommaria, do you recognize this document?  12:49:05
10      A.  I do, sir.                        12:49:08
11      Q.  Is this the Endocrine Society's   12:49:09
12 clinical practice guidelines for pediatric  12:49:12
13 obesity?                                   12:49:14
14      A.  It is, sir.                       12:49:16
15      Q.  All right, a couple of very quick  12:49:16
16 things on this document.  Go to page 710,  12:49:20
17 please.                                    12:49:24
18      A.  Yes, sir.                         12:49:24
19      Q.  Do you see in 3.2 a strong        12:49:24
20 recommendation in favor of -- well, I'll just  12:49:30
21 read it.  We recommend that clinicians     12:49:36
22 prescribe and support healthy eating habits  12:49:39
23 such as avoiding the consumption of        12:49:42
24 calorie-dense, nutrient-poor foods.  Did I read  12:49:44
25 it correctly so far?                       12:49:47
```

37 (Pages 142 - 145)

Page 146

```
 1      A.  Yes, sir, you did.        12:49:48
 2      Q.  And then they also encourage the   12:49:49
 3 consumption of whole fruits rather than fruit   12:49:52
 4 juices; is that correct?          12:49:55
 5      A.  Omitting a parenthetical phrase,   12:49:55
 6 yes, sir.                   12:50:01
 7      Q.  Yeah, I didn't feel like we needed   12:50:01
 8 to read all of the various forms of junk food   12:50:02
 9 there.  And that's a strong recommendation      12:50:06
10 based on low quality evidence, correct?      12:50:08
11      A.  It is, sir.              12:50:09
12      Q.  Can you identify any risks        12:50:10
13 associated with avoiding the consumption of   12:50:15
14 calorie-dense, nutrient-poor foods?        12:50:19
15      A.  Sir, I think that many people      12:50:28
16 derive enjoyment and pleasure from eating      12:50:31
17 calorie-dense, nutrient-poor foods.        12:50:35
18      Q.  Can you -- can you identify any      12:50:37
19 medical risks?               12:50:43
20      A.  I think that, unfortunately,      12:50:52
21 individuals who live in food deserts may have   12:50:56
22 limited access to other sources of nutrition,   12:51:02
23 and foregoing alternative sources of nutrition   12:51:06
24 might result in medical risks, sir.        12:51:11
25      Q.  If they just don't eat; is that      12:51:12
```

Page 147

```
 1 what you are saying?             12:51:17
 2      A.  Yes, because of lack of access to   12:51:18
 3 alternative forms of food.           12:51:21
 4      Q.  Any others?              12:51:23
 5      A.  Not that I can think of at this   12:51:28
 6 time, sir.                   12:51:30
 7      Q.  And you don't imagine a reasonable   12:51:31
 8 pediatrician would ever recommend that a child   12:51:33
 9 not eat rather than eating nutrient-poor foods   12:51:35
10 that are available to him or her?        12:51:40
11      MR. CHEEK:  Objection, form.      12:51:42
12 BY MR. FRAMPTON:                12:51:47
13      Q.  Do you?                12:51:47
14      A.  I would think that a reasonable      12:51:47
15 pediatrician would have other alternatives than   12:51:53
16 making that recommendation, sir.        12:51:56
17      Q.  Flip one more page.  4.3 is:  We   12:51:57
18 recommend that clinicians prescribe and support 12:52:09
19 the reduction of inactivity and also a minimum   12:52:10
20 of 20 minutes of moderate to vigorous physical   12:52:13
21 activity daily, with a goal of 60 minutes, all   12:52:16
22 in the context of a calorie controlled diet.   12:52:19
23 Did I read that correctly?           12:52:22
24      A.  You did, sir.            12:52:23
25      Q.  Do you agree that a normal healthy   12:52:25
```

Page 148

```
 1 child can comply with this recommendation with  12:52:28
 2 minimal risk?                12:52:30
 3      A.  Depending on the type of moderate  12:52:31
 4 to vigorous physical activity they are        12:52:53
 5 performing and where that is performed, yes.   12:52:55
 6      (Thereupon, Exhibit 23, Part 4:      12:52:55
 7 Pediatric Basic and Advanced Life Support, was  12:52:55
 8 marked for purposes of identification.)      12:53:03
 9 BY MR. FRAMPTON:                12:53:03
10      Q.  I will represent to you what I      12:53:21
11 have done here.  So these are pediatric basic   12:53:22
12 and advanced life support.  Do you recall      12:53:26
13 citing the document that I am about showing      12:53:28
14 you?  I am about to hand it to you.        12:53:32
15      A.  I cited pediatric and advanced      12:53:34
16 life support.  I don't know that I have cited   12:53:36
17 what you are about to hand to me until I see   12:53:38
18 it.                     12:53:40
19      Q.  Fair enough, and I'll tell you      12:53:40
20 what I have done.  There was a table in here   12:53:41
21 that I just had to pull out and print        12:53:43
22 separately because it wouldn't print within the  12:53:45
23 document.  That's what I have done.        12:53:47
24      MR. CHEEK:  Just for the record,      12:53:52
25 counsel is attaching that table to the tail end 12:53:54
```

Page 149

```
 1 of --                     12:53:54
 2      MR. FRAMPTON:  In the back, yeah.  12:53:54
 3      MR. CHEEK:  The tail end of the   12:53:54
 4 exhibit, yeah.                12:54:01
 5 BY MR. FRAMPTON:                12:54:01
 6      Q.  Handing you what I am marking as   12:54:01
 7 Exhibit 23, Dr. Antommaria, does this appear   12:54:03
 8 to be a set of clinical practice guidelines   12:54:39
 9 published by the American Heart Association on   12:54:41
10 pediatric basic and advanced life support?   12:54:43
11      A.  It does, sir.            12:54:48
12      Q.  And you recall citing this in your  12:54:49
13 expert report, right?             12:54:52
14      A.  I do, sir.              12:54:52
15      Q.  And look at the back at this      12:54:53
16 table.  Yeah, you can detach it for now and   12:54:57
17 just put it back when we finish.  The table at  12:55:04
18 the back is the recommendation and rating      12:55:13
19 system that they use instead of the GRADE      12:55:16
20 methodology, correct?             12:55:21
21      A.  Yes, sir.              12:55:21
22      Q.  Okay.  And would you agree if you   12:55:22
23 look on the right-hand column, level quality of  12:55:30
24 evidence, that level C-LD most closely aligns   12:55:33
25 to what GRADE would call low quality evidence?  12:55:42
```

Page 150

1    A.  With certain exceptions, sir.  I  12:55:46
2 don't believe that GRADE includes physiological 12:56:14
3 and mechanistic studies in human subjects  12:56:20
4 within its categorization of low quality  12:56:22
5 evidence.                        12:56:24
6    Q.  And on the left-hand side, they  12:56:25
7 have got a class of recommendation that's  12:56:26
8 called a strong recommendation, correct?  12:56:28
9    A.  They have two classes of  12:56:30
10 recommendations that are called strong  12:56:35
11 recommendations, sir.              12:56:38
12    Q.  I am seeing strong and moderate.  12:56:39
13 What am I missing?                 12:56:44
14    A.  So Class I is strong.  And Class  12:56:45
15 III, the Roman numeral III at the bottom of  12:56:49
16 column one, is also a strong recommendation.  12:56:52
17    Q.  Oh, okay.  And one -- Class I is  12:56:53
18 strongly recommend that the benefit is greater  12:57:02
19 than the risk.  Class III is strong that the  12:57:04
20 risk is greater than the benefit, correct?  12:57:07
21    A.  Yes.  In the GRADE  12:57:09
22 recommendations, there are strong  12:57:13
23 recommendations for and against, as we  12:57:15
24 previously discussed.  And I would take these  12:57:19
25 to be strong recommendations for and against.  12:57:21

Page 151

1    Q.  Okay.  These clinical practice  12:57:23
2 guidelines are for dealing with pediatric  12:57:29
3 cardiac arrest, correct?            12:57:31
4    A.  That's the core issue, sir.  12:57:37
5    Q.  Yeah.  That's a medical emergency,  12:57:40
6 is it not?                        12:57:43
7    A.  Yes, sir.               12:57:43
8    Q.  Okay.  Left untreated, what's the  12:57:46
9 mortality rate?                   12:57:50
10    A.  Of someone in full arrest?  12:57:51
11    Q.  Yes, sir.               12:57:56
12    A.  Exceptionally high, sir.  12:57:58
13    Q.  Approaching a hundred percent?  12:58:00
14    A.  Not a hundred percent, but  12:58:02
15 exceptionally close to a hundred percent.  12:58:05
16    Q.  Got it.  So as a general matter,  12:58:06
17 medical intervention is required to avoid  12:58:09
18 imminent death, right?             12:58:11
19    A.  Some intervention, including  12:58:15
20 bystander CPR, is necessary to prevent that,  12:58:20
21 yes.                           12:58:22
22    Q.  Okay.  Go to page 9 of the  12:58:22
23 document.                       12:58:27
24    A.  Yes, sir.               12:58:42
25    Q.  All right.  So we have got a -- in 12:58:43

Page 152

1 5.1, we have got lay rescuers should begin CPR 12:58:44
2 for any victim who is unresponsive, not  12:58:48
3 breathing normally, and does not have signs of  12:58:51
4 life; do not check for a pulse.  Did I read  12:58:53
5 that correctly?                   12:58:56
6    A.  That is the first recommendation,  12:58:57
7 sir.                           12:59:01
8    Q.  And that's a strong  12:59:01
9 recommendation, correct?            12:59:03
10    A.  Yes, sir.               12:59:03
11    MR. CHEEK:  I just want to make clear 12:59:07
12 for the record, we are also looking at the table 12:59:09
13 as opposed to the recommendation-specific  12:59:11
14 supportive text below.             12:59:15
15    MR. FRAMPTON:  Sure.          12:59:16
16 BY MR. FRAMPTON:                   12:59:17
17    Q.  And the level of evidence is  12:59:17
18 classified as C-LD, correct?         12:59:19
19    A.  That is correct, sir.        12:59:22
20    Q.  And if you look at the specific  12:59:28
21 supportive text, that's based on evidence that 12:59:29
22 lay rescuers are not able to reliably determine 12:59:32
23 if people have a pulse, right?        12:59:35
24    A.  I would need to read the text to  12:59:36
25 confirm that, sir.  Would you like me to?  12:59:39

Page 153

1    Q.  Actually, no.  In the absence  12:59:46
2 of -- if you don't have medical equipment  12:59:52
3 readily available, would you agree that CPR is 12:59:58
4 the only intervention known to decrease  13:00:00
5 mortality for someone who is in cardiac arrest? 13:00:02
6    A.  Can you repeat your question, sir? 13:00:06
7    Q.  Sure.  If there is no medical  13:00:14
8 equipment readily available, would you agree  13:00:18
9 that CPR is the only intervention known to  13:00:21
10 decrease mortality in someone with cardiac  13:00:25
11 arrest?                         13:00:27
12    A.  I am having difficulty with your  13:00:27
13 formulation of your question because I don't  13:00:40
14 quite understand how not having medical  13:00:43
15 equipment available relates to performing CPR 13:00:47
16 in that there are components of CPR that can be 13:00:55
17 performed without medical equipment and  13:00:59
18 components of CPR that require medical  13:01:01
19 equipment.  So I am just having trouble  13:01:03
20 understanding the formulation of your question, 13:01:04
21 sir.                           13:01:09
22    Q.  What medical equipment do you need 13:01:09
23 to perform CPR?                   13:01:11
24    A.  So CPR is a very broad term.  13:01:13
25 There are different forms of CPR.  Potentially, 13:01:19

39 (Pages 150 - 153)

Page 154

1 performing CPR entails establishing a reliable   13:01:23
2 airway, which might include intubation. And   13:01:27
3 so, again, as a doctor and you being a lawyer,   13:01:35
4 there's reasons why I am having trouble   13:01:44
5 understanding your question because of -- it's   13:01:46
6 conflating things that I wouldn't   13:01:50
7 necessarily --   13:01:52
8       Q. Let me try again.   13:01:53
9       A. Please.   13:01:54
10       Q. For a lay rescuer, is there   13:01:54
11 anything they can do for someone in cardiac   13:01:58
12 arrest that increases mortality other than CPR?   13:02:01
13       MR. CHEEK: Objection, form.   13:02:06
14 BY MR. FRAMPTON:   13:02:08
15       Q. I'm sorry, that decreases   13:02:09
16 mortality.   13:02:11
17       A. That decreases mortality. So it's   13:02:11
18 not my intention to be pedantic, sir. But yes,   13:02:17
19 they could activate 9-1-1 if they didn't know   13:02:23
20 how to perform CPR or alert other individuals   13:02:26
21 who might know how to perform CPR in order to   13:02:29
22 decrease mortality.   13:02:32
23       Q. Anything else?   13:02:33
24       A. That would be the primary   13:02:34
25 alternative, sir.   13:02:50

Page 155

1       Q. Is that all you can think of   13:02:51
2 sitting here today?   13:02:53
3       A. That are aside from performing CPR   13:02:54
4 that a lay bystander could do to decrease   13:02:59
5 mortality in somebody with cardiac arrest, sir?   13:03:02
6       Q. Yes. You said call 9-1-1, perform   13:03:05
7 CPR, or alert someone who can perform CPR.   13:03:12
8 Anything else?   13:03:16
9       A. I think that sitting here today,   13:03:16
10 those would be the primary options that I would   13:03:22
11 think of, sir.   13:03:26
12       Q. You cited in your expert report   13:03:28
13 the three non-gender dysphoria systematic   13:03:29
14 reviews that we have just looked at, correct?   13:03:33
15       A. Can you repeat that, sir?   13:03:35
16       Q. Sure. I am just -- you -- we have   13:03:39
17 just now looked at three clinical practice   13:03:41
18 guidelines that you cited in your expert   13:03:43
19 report, correct?   13:03:47
20       A. Yes, I cite each of these clinical   13:03:47
21 practice guidelines in my expert report.   13:03:52
22       Q. And how did you select those to   13:03:53
23 cite?   13:03:57
24       A. I selected the two other Endocrine   13:03:57
25 Society guidelines because they are two -- the   13:04:03

Page 156

1 only other Endocrine Society guidelines that   13:04:06
2 are specific to the pediatric population. And   13:04:09
3 I picked CPR as a important non-Endocrine   13:04:13
4 Society guideline.   13:04:26
5       Q. Okay. Why CPR?   13:04:26
6       A. Because of its view of its   13:04:29
7 potential importance and it being potentially   13:04:41
8 salient to nonphysician readers in a way that   13:04:45
9 congenital adrenal -- I'm sorry, CAH would not   13:04:51
10 be salient.   13:04:56
11       Q. Did you look at any clinical   13:04:57
12 practice guidelines in trying to decide which   13:04:59
13 ones to include that you did not end up citing   13:05:02
14 in your report?   13:05:07
15       A. No, sir; I did not.   13:05:08
16       Q. You just picked out these three?   13:05:08
17       A. Yes.   13:05:11
18       MR. FRAMPTON: I think we can break   13:05:14
19 for lunch.   13:05:15
20       (Lunch recess taken.)   13:05:17
21       MR. FRAMPTON: Let's go on the   13:40:33
22 record.   13:40:34
23       (Thereupon, Exhibit 24, Hormonal   13:40:46
24 Treatment in Young People With Gender Dysphoria: A   13:40:46
25 Systematic Review, was marked for purposes of   13:40:46

Page 157

1 identification.)   13:40:46
2 BY MR. FRAMPTON:   13:40:46
3       Q. Doctor, I am handing you what I   13:40:47
4 marked as Exhibit 24, which is titled Hormonal   13:40:48
5 Treatment in Young People With Gender   13:40:50
6 Dysphoria, a Systematic Review. Lead author,   13:40:50
7 Denise Chew, published in Pediatrics in 2018.   13:40:54
8 And my question as you look at it is simply   13:40:58
9 going to be is that the systematic review that   13:41:00
10 you believe you were referencing in your   13:41:04
11 testimony this morning that you believed you   13:41:06
12 had seen?   13:41:09
13       A. Yes, sir. You could appreciate   13:41:09
14 distinguishing 2017 and 2018.   13:41:17
15       Q. Obviously. No, I just -- why we   13:41:20
16 wanted to show it to you, all right. Tell me   13:41:23
17 if I am correctly stating -- well, let me back   13:41:29
18 up and lay a foundation. You are familiar with   13:41:35
19 the principle of clinical equipoise, correct?   13:41:38
20       A. I am, sir.   13:41:41
21       Q. Tell me if I am stating it   13:41:41
22 correctly, the idea being that there is   13:41:44
23 clinical equipoise when there is genuine   13:41:50
24 uncertainty within the community of experts as   13:41:53
25 to which arm of a trial is more beneficial.   13:41:54

40 (Pages 154 - 157)

1      A.   That's a reasonable summary, sir.    13:42:00
2          (Thereupon, Exhibit 25, Consensus    13:42:37
3  Parameter:  Research Methodologies to Evaluate    13:42:37
4  Neurodevelopmental Effects of Pubertal Suppression    13:42:37
5  in Transgender Youth, was marked for purposes of    13:42:37
6  identification.)                          13:42:37
7  BY MR. FRAMPTON:                          13:42:37
8      Q.   Dr. Antommaria, I am handing you    13:42:37
9  what I have marked as Exhibit 25.  It is titled    13:42:38
10  Consensus Parameter:  Research Methodologies to    13:42:43
11  Evaluate Neurodevelopmental Effects of Pubertal    13:42:45
12  Suppression in Transgender Youth.  The lead    13:42:50
13  author, Diane Chen.  And, Dr. Antommaria, is    13:42:51
14  this a paper that you are familiar with?    13:43:04
15      A.   One minute, sir.                13:43:06
16      Q.   I don't think you cited it in your    13:43:18
17  expert report.  I am just curious if you are    13:43:21
18  familiar with it.                         13:43:24
19      A.   It is not an article with which I    13:43:25
20  am familiar, sir.                         13:43:28
21      Q.   That's fine.  You can put it aside    13:43:30
22  then.  Do you believe -- do you believe it    13:43:32
23  would be ethical to conduct a cohort study in    13:43:45
24  which you are comparing -- again, cohort study,    13:43:50
25  not RCT, cohort study in which you are    13:43:54

1  comparing adolescents receiving cross-sex    13:43:58
2  hormones to transgender adolescents who for    13:44:02
3  whatever reason are not receiving cross-sex    13:44:04
4  hormones?                             13:44:07
5      A.   So whether a study is ethical    13:44:07
6  relies on a variety of different factors.  In    13:44:27
7  part, it would rely on the importance of the    13:44:31
8  question and what the participants were    13:44:36
9  anticipated to do.  So in your general    13:44:41
10  description, it's hard to know what the    13:44:45
11  relevant outcome is.                      13:44:46
12          And the way in which individuals    13:44:49
13  who are and are not receiving treatment might    13:44:52
14  differ from one another.  So if there were    13:44:59
15  greater specificity provided about a variety of    13:45:05
16  different factors, that might potentially be    13:45:10
17  ethical.  But it's hard to answer your question    13:45:12
18  at the level of abstraction that you have posed    13:45:14
19  it.                                    13:45:17
20      Q.   You can't say sitting here today    13:45:17
21  that it would unequivocally be unethical?    13:45:19
22          MR. CHEEK:  Objection, form.    13:45:24
23          THE WITNESS:  No, sir, I could not.    13:45:29
24  BY MR. FRAMPTON:                          13:45:30
25      Q.   And the same thing, a cohort study    13:45:30

1  comparing transgender youth who did not take    13:45:33
2  puberty-suppressing medication to transgender    13:45:36
3  youth who do take puberty-suppressing    13:45:40
4  medication, can you say unequivocally sitting    13:45:43
5  here today such a study would be unethical?    13:45:45
6      A.   No, sir, I cannot.             13:45:48
7          (Thereupon, Exhibit 26, Evidence    13:46:04
8  Review: Gonadotropin Releasing Hormone Analogues    13:46:04
9  for Children and Adolescents With Gender    13:46:04
10  Dysphoria, was marked for purposes of    13:46:04
11  identification.)                         13:46:05
12  BY MR. FRAMPTON:                          13:46:05
13      Q.   We are going to go across the    13:46:11
14  Atlantic.  Not physically, unfortunately, that    13:46:12
15  would be more fun, but in our minds.  I hand    13:46:15
16  you what I am marking as Exhibit 26, a document    13:46:24
17  entitled Evidence Review:  Gonadotropin    13:46:33
18  Releasing Hormone Analogues For Children and    13:46:38
19  Adolescents With Gender Dysphoria, prepared by    13:46:39
20  NICE in October of 2020.  Dr. Antommaria, are    13:46:42
21  you familiar with that document?    13:46:55
22      A.   I am, sir.                    13:46:56
23      Q.   Do you understand it to be a    13:46:56
24  systematic review conducted by NICE on puberty    13:46:59
25  suppression for children and adolescents with    13:47:03

1  gender dysphoria?                       13:47:05
2      A.   Yes, sir.                     13:47:06
3      Q.   Just as a general matter, I am    13:47:15
4  presuming you don't view the British medical    13:47:17
5  establishment as less technically sophisticated    13:47:20
6  than the medical establishment in the United    13:47:22
7  States, or do you?                       13:47:24
8      A.   That high level of abstraction,    13:47:25
9  no, sir, I don't consider them less    13:47:32
10  sophisticated.                          13:47:34
11      Q.   And in the community of medical    13:47:35
12  experts on gender dysphoria, you regularly    13:47:38
13  review and rely upon studies conducted in    13:47:46
14  Europe, do you not?                      13:47:49
15          MR. CHEEK:  Objection, form.    13:47:51
16          THE WITNESS:  Can you repeat the    13:47:58
17  question just so I answer it correctly?    13:47:58
18  BY MR. FRAMPTON:                          13:48:00
19      Q.   Sure.  In the community of medical    13:48:00
20  experts who deal with gender dysphoria, would    13:48:02
21  you agree that you regularly review and rely    13:48:07
22  upon studies conducted in Europe?    13:48:10
23      A.   I think that's a fair    13:48:13
24  characterization, sir.                    13:48:17
25      Q.   Sure.  Go to page 14 of this    13:48:17

41 (Pages 158 - 161)

Page 162

1 document, if you would.                    13:48:25
2        A.  I am on page 14, sir.           13:48:34
3        Q.  Thank you.  All right.  They have   13:48:35
4 got under review process -- well, let me just   13:48:42
5 ask you this:  Have you undertaken a close   13:48:51
6 review of the search methodology that the   13:48:53
7 authors of this systematic review undertook?   13:48:57
8        A.  Again, I apologize for asking.   13:49:01
9 Can you repeat the question?               13:49:10
10        Q.  Sure.  Have you undertaken a close   13:49:11
11 review of the search methodology employed by   13:49:12
12 the authors of this systematic review?   13:49:14
13        A.  And search methodology, meaning   13:49:16
14 the specific search strategies --         13:49:24
15        Q.  Yes.                           13:49:28
16        A.  -- that were implemented in the   13:49:29
17 various databases that they searched?   13:49:31
18        Q.  Yes, sir.                       13:49:33
19        A.  No, I have not, sir.            13:49:34
20        Q.  So sitting here today, you don't   13:49:35
21 have any criticisms of that process?   13:49:37
22        A.  As I have said, I haven't reviewed   13:49:45
23 it, so I don't currently have any criticisms.   13:49:46
24        Q.  Let's look at the review   13:49:49
25 questions.  We are still on page 14.  Review   13:49:57

Page 163

1 question 1:  For children and adolescents with   13:50:01
2 gender dysphoria, what is the clinical   13:50:04
3 effectiveness of treatment with GnRH analogs   13:50:07
4 compared with one or a combination of   13:50:12
5 psychological support, social transitioning to   13:50:15
6 the desired gender, or no intervention.  Did I   13:50:18
7 read that correctly?                      13:50:21
8        A.  You did, sir.                   13:50:21
9        Q.  Do you agree that's an important   13:50:22
10 question for a systematic review to look at?   13:50:26
11        A.  So it's been awhile since I have   13:50:28
12 looked at this report, sir.  It's unclear how   13:50:37
13 they are distinguishing children and   13:50:40
14 adolescents.  Given that GnRH analogs are only   13:50:43
15 used in individuals who are adolescents, I   13:50:48
16 don't quite understand the children and   13:50:55
17 component of the question.  But in terms of the   13:50:57
18 remainder of the question, yes, I think that   13:51:00
19 that's an important question, sir.   13:51:11
20        Q.  Question 2 is:  For children and   13:51:12
21 adolescents with gender dysphoria, what is the   13:51:17
22 short-term and long-term safety of GnRH analogs   13:51:21
23 compared with one or a combination of   13:51:24
24 psychological support, social transitioning to   13:51:25
25 the desired gender, or no intervention.  And   13:51:28

Page 164

1 putting aside your concern about what they mean   13:51:30
2 by children, do you agree that is also an   13:51:33
3 important question?                       13:51:36
4        A.  Yes, also evaluating the safety as   13:51:36
5 well as the efficacy is important.         13:51:41
6        Q.  Looking on page 15, so one more   13:51:43
7 page.  Would you agree that in Table 1, they   13:51:54
8 appear at least to have provided a summary of   13:52:00
9 all of the included studies?              13:52:09
10        A.  That is the title of the table,   13:52:14
11 sir.                                      13:52:27
12        Q.  And you don't have any reason to   13:52:27
13 doubt that they did that, correct?   13:52:30
14        A.  I do not, sir.                  13:52:31
15        Q.  Let's go to page 4.             13:52:32
16        A.  I'm sorry, page number what?   13:52:41
17        Q.  4, sorry.  I let my voice drop.   13:52:42
18        A.  I am on page 4, sir.            13:52:50
19        Q.  Would you agree that on page 4,   13:52:51
20 they have identified the critical outcomes that   13:52:59
21 they have examined in this systematic review?   13:53:07
22        A.  So, sir, on page 4, I see the   13:53:10
23 first question about clinical effectiveness.  I   13:53:18
24 see that they are providing greater specificity   13:53:24
25 as to which aspects of clinical effectiveness   13:53:29

Page 165

1 they considered and that they appear to be   13:53:35
2 distinguishing critical and important outcomes.   13:53:41
3        Q.  And they then provide the studies   13:53:51
4 that they were able to identify and examine for   13:53:54
5 each of those outcomes, correct?   13:53:57
6        A.  Yes, sir.                        13:53:59
7        Q.  Go to page 76, if you would.   13:54:06
8        A.  I am on page 76, sir.            13:54:41
9        Q.  And on page 76, Appendix E, which   13:54:43
10 is a set of evidence tables further discussing   13:54:46
11 the included studies, correct?            13:54:49
12        A.  That's what it appears to be, sir.   13:54:51
13        Q.  Are you familiar with the   13:55:08
14 Newcastle-Ottawa tool for cohort studies?   13:55:10
15        A.  Not at a high level of detail,   13:55:14
16 sir.                                      13:55:23
17        Q.  Well, do you have any   13:55:23
18 understanding of what that is?            13:55:24
19        A.  It appears to be a tool that they   13:55:25
20 are utilizing to appraise the quality of the   13:55:29
21 evidence that appears to offer domains that are   13:55:32
22 not identical with the domains utilized by the   13:55:40
23 GRADE approach, sir.                      13:55:45
24        Q.  Okay.  Have you studied what the   13:55:46
25 Newcastle-Ottawa tool is?                 13:55:54

42 (Pages 162 - 165)

Page 166

1      A.  No, sir, I have not.          13:55:58
2      Q.  Do you recognize it as a tool that  13:56:00
3  is sometimes cited in the literature?     13:56:05
4      A.  I do, sir.                    13:56:06
5      Q.  And then if we -- go to page 99,   13:56:07
6  if you would.                         13:56:14
7      A.  I am on page 99, sir.          13:56:21
8      Q.  All right.  And here, they have   13:56:22
9  given us GRADE profiles for the various studies  13:56:24
10  included, correct?                    13:56:30
11      A.  So, again, sir, I haven't looked  13:56:32
12  at this recently.  It's in a different format  13:56:52
13  in terms of, like, Table 2 only includes a   13:56:58
14  single study instead of all of the studies,  13:57:02
15  sir.                                 13:57:06
16      Q.  Well, do you know how many studies  13:57:06
17  they identified as included for that particular  13:57:11
18  question?                           13:57:15
19      A.  No, sir, I don't.  I am just -- in  13:57:15
20  looking at this briefly at this time, I am just  13:57:26
21  noting that the format of the table is    13:57:29
22  significantly different than the evidence   13:57:34
23  tables presented in Appendix E.          13:57:37
24      Q.  Right.  But in Appendix G, they   13:57:41
25  have given an evaluation of risk of bias,   13:57:52

Page 167

1  indirectness, inconsistency, and imprecision  13:57:57
2  for each of the studies, correct?       13:58:00
3      A.  They do, sir.  There would be a   13:58:01
4  fifth category, if I recall correctly.  And   13:58:17
5  it's not clear to me, again, not having    13:58:21
6  reviewed this recently why that fifth category  13:58:26
7  isn't included.                      13:58:29
8      Q.  Right.  We don't see publication   13:58:29
9  bias, correct?                       13:58:31
10      A.  I would have to double-check and  13:58:31
11  see which one is the one that is omitted.  13:58:33
12      Q.  And then they provide a certainty  13:58:36
13  rating, correct?                     13:58:40
14      A.  They do, sir.                 13:58:40
15      Q.  So they are telling you, for     13:58:48
16  example, in Table 2, study one, they are   13:58:59
17  telling you that this study -- this is a cohort  13:59:03
18  study, and it was downgraded one level because  13:59:08
19  of high risk of bias, correct?  Is that what  13:59:13
20  they are reflecting here?             13:59:18
21      A.  So, again, sir, it's been awhile  13:59:19
22  since I have looked at this.  I am unclear as  13:59:24
23  to why they are listing a certainty category as  13:59:26
24  opposed to a grade of efficacy category.  And  13:59:31
25  you represented this as having been downgraded  13:59:34

Page 168

1  a level, but I don't -- you know, I don't   13:59:43
2  necessarily see a comprehensive list of     13:59:47
3  upgrades and downgrades and the specific reason  13:59:49
4  listed.  So it would take me more time to    13:59:52
5  refamiliarize myself with the table.       13:59:58
6      Q.  Footnote 2 does say downgraded one  13:59:59
7  level.  The cohort study by de Vries, et al.,  14:00:04
8  2011, was assessed as at high risk of bias,   14:00:08
9  poor quality overall, lack of blinding, and no  14:00:10
10  control group, correct?               14:00:13
11      A.  Yes, sir.                     14:00:16
12      Q.  Okay.  And if you downgraded an   14:00:16
13  observational -- let me back up.  Observational  14:00:21
14  studies start out at low quality under the   14:00:24
15  GRADE methodology, right?             14:00:27
16      A.  Yes, that's the initial category   14:00:28
17  to which they are assigned.            14:00:32
18      Q.  And if it was downgraded one     14:00:32
19  level, that would take it to very low, correct?  14:00:34
20      A.  Correct.                      14:00:36
21      Q.  And that appears to be what they  14:00:37
22  are reflecting in this table of the de Vries  14:00:40
23  study, correct?                      14:00:47
24      A.  Oh, and as I said, I am just      14:00:47
25  unclear as to why the far right column is    14:00:51

Page 169

1  labeled as certainty as opposed to grade of the  14:00:53
2  evidence.                            14:00:56
3      Q.  All right.  Go to page 74.        14:00:56
4      A.  Yes, sir.                      14:01:21
5      Q.  This appears to be a table of     14:01:21
6  excluded studies; is that correct?        14:01:24
7      A.  Yes, sir.                      14:01:26
8      Q.  So they have listed the          14:01:29
9  potentially relevant studies that they      14:01:32
10  excluded, and then they have given reasons for  14:01:35
11  the exclusion, right?                 14:01:37
12      A.  One moment, sir.               14:01:38
13      Q.  Sure.                         14:01:42
14      A.  So these appear to be the studies  14:01:57
15  that pass the level of screening for titles and  14:01:59
16  abstracts but were excluded at the level of   14:02:05
17  reviewing the full article, and they have    14:02:07
18  listed them, these 16 articles and the reasons  14:02:12
19  for exclusion.                       14:02:15
20      Q.  And that's good practice if you   14:02:16
21  are doing a systematic review, is it not?    14:02:17
22      A.  Yes, sir.                      14:02:19
23      Q.  That way, if you are a researcher  14:02:21
24  in the field and you think, well, why didn't  14:02:26
25  they include X, Y, or Z study, you know you can  14:02:29

43 (Pages 166 - 169)

Page 170

1 look at this table and have some idea as to     14:02:33
2 what their reasons were, correct?     14:02:35
3      A. Correct, sir.     14:02:37
4      Q. All right. Let's flip back to     14:02:37
5 page 4.     14:02:40
6      A. I am on page 4, sir.     14:02:47
7      Q. Thank you. Directly under     14:02:48
8 critical outcomes, it says: The critical     14:02:49
9 outcomes for decision making are the impact on     14:02:53
10 gender dysphoria, mental health, and quality of     14:02:56
11 life. The quality of evidence for these     14:02:58
12 outcomes was assessed as very low certainty     14:03:01
13 using modified GRADE. Did I read that     14:03:04
14 correctly?     14:03:06
15      A. You did, sir.     14:03:07
16      Q. So they do claim to be using some     14:03:07
17 form of the GRADE methodology, correct?     14:03:11
18      A. Yes, sir.     14:03:13
19      Q. And have you done any research on     14:03:14
20 NICE to understand how that particular     14:03:18
21 organization might modify the GRADE     14:03:21
22 methodology?     14:03:26
23      A. So, sir, I am not sure whether the     14:03:26
24 reference to modify GRADE is a modification     14:03:32
25 that NICE made or it is one of the various     14:03:35

Page 171

1 updated versions of the GRADE methodology.     14:03:39
2      Q. Fair enough. That assessment of     14:03:41
3 very low certainty would appear to match up     14:04:06
4 with that GRADE evidence table we looked at,     14:04:12
5 correct, where they called it certainty?     14:04:15
6      A. It would appear to, sir.     14:04:17
7      Q. Okay. You don't have any     14:04:18
8 criticisms of the thoroughness of the NICE     14:04:25
9 review that we are looking at right now, do     14:04:29
10 you?     14:04:31
11      A. Not at this time, sir.     14:04:31
12      (Thereupon, Exhibit 27, Evidence     14:04:31
13 Review: Gender-Affirming Hormones For Children and     14:04:31
14 Adolescents With Gender Dysphoria, was marked for     14:04:31
15 purposes of identification.)     14:05:00
16 BY MR. FRAMPTON:     14:05:00
17      Q. Dr. Antommaria, I am going to hand     14:05:00
18 you what I am marking as Exhibit 27, which is     14:05:01
19 titled Evidence Review: Gender-Affirming     14:05:07
20 Hormones For Children and Adolescents With     14:05:10
21 Gender Dysphoria. Dr. Antommaria, do you     14:05:12
22 recognize this as the other NICE 2020     14:05:17
23 systematic review of evidence?     14:05:22
24      A. Yes, sir.     14:05:24
25      Q. And you have reviewed this before,     14:05:26

Page 172

1 right?     14:05:28
2      A. I have, sir.     14:05:28
3      Q. And similar to the last one we     14:05:29
4 looked at, you don't have any criticisms of     14:05:40
5 their search strategy or methodology in     14:05:40
6 conducting this systematic review, do you?     14:05:43
7      A. Not at this time, sir.     14:05:45
8      Q. Okay. Let's go to page 14. So     14:05:46
9 review question 1: For children and     14:06:07
10 adolescents with gender dysphoria, what is the     14:06:12
11 clinical effectiveness --     14:06:14
12      A. I'm sorry.     14:06:15
13      Q. I am in the -- are we in the wrong     14:06:16
14 place? I'm sorry.     14:06:19
15      A. I am on page 14. I don't see     14:06:20
16 review questions.     14:06:21
17      Q. I think it's at the very bottom.     14:06:22
18      A. Oh, thank you so much.     14:06:25
19      Q. No worries. It's cut off, which     14:06:26
20 makes it a little bit more difficult. All     14:06:29
21 right. So No. 1: For children and adolescents     14:06:31
22 with gender dysphoria, what is the clinical     14:06:35
23 effectiveness of treatment with     14:06:38
24 gender-affirming hormones compared with one or     14:06:41
25 a combination of psychological support, social     14:06:44

Page 173

1 transitioning to the desired gender, or no     14:06:47
2 intervention. And, Dr. Antommaria, presumably     14:06:51
3 putting aside again your concern about how they     14:06:55
4 are using the word children, do you agree this     14:06:58
5 is an important question?     14:07:02
6      A. I do, sir.     14:07:02
7      Q. No. 2: For children and     14:07:03
8 adolescents with gender dysphoria, what is the     14:07:08
9 short-term and long-term safety of     14:07:09
10 gender-affirming hormones compared with one or     14:07:12
11 a combination of psychological support, social     14:07:14
12 transitioning to the desired gender, or no     14:07:17
13 intervention. Did I read that correctly?     14:07:20
14      A. You did, sir.     14:07:22
15      Q. And putting aside your concern     14:07:23
16 about how they are using the word children, you     14:07:25
17 agree this is also an important question,     14:07:28
18 correct?     14:07:30
19      A. I do, sir.     14:07:30
20      Q. Let's go to page 70, please.     14:07:33
21      Seven zero, sir?     14:07:43
22      Q. Seven zero, yes.     14:07:45
23      A. I am on page 70, sir.     14:07:54
24      Q. And this one also has a list of     14:07:55
25 excluded studies; is that correct?     14:07:57

44 (Pages 170 - 173)

Page 174

1     A.   It does, sir.                    14:07:59
2     Q.   Okay.  And on page 72, does it    14:07:59
3  appear that one of the excluded studies is the  14:08:13
4  de Vries 2014 study in Pediatrics?      14:08:18
5     A.   It does, sir.                   14:08:23
6     Q.   Okay.  And they have provided the  14:08:26
7  reasons why they excluded that study, correct?  14:08:28
8     A.   I am just reading the reasons,   14:08:30
9  sir.                               14:08:42
10    Q.   Sure.                         14:08:42
11    A.   Yes, they provide reasons for    14:08:42
12  excluding the study, sir.             14:08:45
13    Q.   And that was the study the       14:08:46
14  Endocrine Society cited to support its   14:08:51
15  recommendation for the use of cross-sex   14:08:58
16  hormones, correct?                  14:09:00
17    A.   It was one of the studies, sir.  14:09:01
18    Q.   And the other was an NHS document;  14:09:05
19  is that right?                      14:09:09
20    A.   For that single sentence, yes.   14:09:09
21    Q.   Go to page 4, please.          14:09:22
22    MR. CHEEK:  Which page?            14:09:32
23    MR. FRAMPTON:  4.  Sorry, I let my  14:09:33
24  voice drop again.                   14:09:35
25    THE WITNESS:  I am on page 4, sir.  14:09:37

Page 175

1  BY MR. FRAMPTON:                      14:09:38
2     Q.   All right.  And it looks like in  14:09:38
3  this review as well they have identified their  14:09:44
4  critical outcomes and listed the studies that  14:09:49
5  were relevant to each of their critical    14:09:52
6  outcomes, correct?                  14:09:54
7     A.   Yes, sir.                     14:09:54
8     Q.   And you have not reviewed these to  14:10:06
9  determine whether you agree that they picked   14:10:09
10  out the most pertinent studies for each    14:10:11
11  outcome, have you?                  14:10:14
12    A.   I have not reviewed it for that  14:10:14
13  purpose, sir.                       14:10:18
14    Q.   And would the same be true for the  14:10:49
15  studies listed for the important outcomes?  14:10:51
16    A.   Would the same what be true, sir?  14:10:55
17    Q.   Let me just ask it again.  With   14:11:00
18  respect to the studies they have listed    14:11:01
19  concerning what they have identified as    14:11:03
20  important outcomes, you have not gone and    14:11:05
21  determined if you agree or disagree with their  14:11:08
22  list of included studies?             14:11:11
23    A.   No, sir, I haven't had a reason   14:11:15
24  to do that.                        14:11:17
25    Q.   Got it.                      14:11:17

Page 176

1     (Pause in proceedings.)          14:11:17
2     MR. FRAMPTON:  All right.  Let's go  14:15:27
3  back on the record.                  14:15:27
4  BY MR. FRAMPTON:                      14:15:27
5     Q.   All right.  Dr. Antommaria, would  14:15:27
6  you go to page 6, please?             14:15:27
7     A.   I am on page 6, sir.          14:15:27
8     Q.   Great.  At the top of that page,  14:15:27
9  do you see a discussion of a study by Kuper, et  14:15:27
10  al., published in 2020?              14:15:27
11    A.   Yes, sir.                     14:15:27
12    Q.   Is that a study you are familiar   14:15:27
13  with?                              14:15:28
14    A.   Sir, do you know where the full   14:15:28
15  reference to that article is?         14:15:28
16    Q.   Yeah.  Go to the very last page,  14:15:28
17  it's at the top.                    14:15:28
18    A.   I would need to look at the      14:15:28
19  article itself.                     14:15:28
20    (Thereupon, Exhibit 28, Body       14:15:40
21  Dissatisfaction and Mental Health Outcomes of  14:15:40
22  Youth on Gender-Affirming Hormone Therapy, was  14:15:40
23  marked for purposes of identification.)   14:15:52
24  BY MR. FRAMPTON:                      14:15:52
25    Q.   I hand you what I am marking as   14:15:56

Page 177

1  Exhibit 28.  It's a study entitled     14:15:57
2  Testicular -- wait a minute, that's the wrong  14:16:03
3  one.  What did I hand you?           14:16:08
4     A.   You handed me the Kuper study,   14:16:10
5  sir.                               14:16:12
6     Q.   That's what I meant to hand you.  14:16:12
7  I was looking at the wrong tab.  All right.  I  14:16:13
8  handed you a study called Body Dissatisfaction  14:16:16
9  and Mental Health Outcomes of Youth on     14:16:18
10  Gender-Affirming Hormone Therapy, correct?   14:16:21
11    A.   You did, sir.                  14:16:22
12    Q.   All right.  It appears to be     14:16:24
13  the -- you are calling -- do we pronounce her  14:16:30
14  name Kuper?  Is that your understanding, or do  14:16:35
15  you know?                           14:16:38
16    A.   I don't know, sir.            14:16:38
17    Q.   All right.  In any event --     14:16:39
18    A.   I am happy to refer to it as the  14:16:44
19  Kuper study, sir.                   14:16:46
20    Q.   I don't know, either, so we will  14:16:47
21  do our best.  The question was this is the  14:16:48
22  study that we just looked at that was cited in  14:16:51
23  the NICE review on cross-sex hormone therapy,  14:16:54
24  correct?                           14:17:00
25    A.   Yes, on gender-affirming hormone  14:17:00

45 (Pages 174 - 177)

Page 178

1 therapy.                                    14:17:04
2      Q.  Yes, okay.  You asked to see the   14:17:04
3 whole thing.  Is this a study that you are   14:17:08
4 familiar with?                              14:17:10
5      A.  I may have seen it in the past.  I 14:17:10
6 am not particularly familiar with it, sir.  14:17:14
7      Q.  All right.  We won't mess with it  14:17:16
8 then, that's fine.  Put it aside.  All right. 14:17:18
9 Go back to the NICE review, the             14:17:32
10 Gender-Affirming Hormones For Children and  14:17:37
11 Adolescents With Gender Dysphoria.          14:17:40
12      MR. CHEEK:  So you are referring to    14:17:42
13 Defendants' Exhibit 27?                     14:17:44
14      MR. FRAMPTON:  Yes.                    14:17:46
15      MR. CHEEK:  Thank you.                 14:17:47
16 BY MR. FRAMPTON:                            14:17:48
17      Q.  Go to page 13, if you would.  I    14:17:59
18 don't know if I already told you that or not. 14:18:02
19      A.  I am on page 13, sir.             14:18:08
20      Q.  Great.  The second paragraph under 14:18:10
21 discussion:  All the studies included in the 14:18:12
22 evidence review are uncontrolled observational 14:18:15
23 studies which are subject to bias and       14:18:18
24 confounding and were a very low certainty using 14:18:21
25 modified GRADE.  A fundamental limitation of 14:18:23

Page 179

1 all the controlled studies included in this  14:18:26
2 review is that any changes in scores from     14:18:28
3 baseline to follow-up could be attributed to a 14:18:30
4 regression to the mean.  Did I read that      14:18:33
5 correctly?                                   14:18:37
6      A.  Yes, you did, sir.                  14:18:37
7      Q.  Do you agree that a reasonable     14:18:40
8 scientist could share that concern about the 14:18:41
9 uncontrolled observational studies?         14:18:47
10      A.  That is a possible explanation for 14:18:49
11 the results, sir.                          14:18:54
12      Q.  Go to page 14.  I'm sorry, let's   14:18:55
13 go to 13 again.  I was wrong.  Let's just read 14:19:29
14 the next paragraph there.  The included studies 14:19:33
15 have relatively short follow-up, with an     14:19:37
16 average duration of treatment with           14:19:39
17 gender-affirming hormones between around 1 year 14:19:40
18 and 5.8 years.  Further studies with a longer 14:19:43
19 follow-up are needed to determine the long-term 14:19:47
20 effect of gender-affirming hormones for       14:19:50
21 children and adolescents with gender dysphoria. 14:19:52
22 Did I read that correctly?                   14:19:56
23      A.  You did, sir.                      14:19:57
24      Q.  Do you agree that some of the      14:19:58
25 risks associated with these hormonal         14:20:02

Page 180

1 interventions are more long-term risks, risks 14:20:08
2 that don't necessarily manifest in 1 to 5.8   14:20:13
3 years?                                       14:20:18
4      MR. CHEEK:  Objection, form.            14:20:18
5      THE WITNESS:  There may be risks that   14:20:24
6 become apparent after 5.8 years that weren't  14:20:26
7 apparent prior to that time.                 14:20:30
8 BY MR. FRAMPTON:                             14:20:31
9      Q.  Well, 5.8 years is not typically    14:20:32
10 long enough for the cardiovascular risks to   14:20:36
11 result in someone having a heart attack or    14:20:39
12 stroke or something like that; is that correct? 14:20:42
13      A.  There would be cardiovascular       14:20:44
14 risks which appeared later.  There are also to 14:20:54
15 the best of my knowledge adult studies with a 14:21:01
16 longer period of follow-up to look at those   14:21:03
17 risks in adult individuals, sir.             14:21:05
18      Q.  And they found increased           14:21:09
19 mortality, have they not, or do you know?     14:21:12
20      A.  I believe that some of them have   14:21:16
21 found increased mortality, sir, although not  14:21:20
22 necessarily primarily or solely associated with 14:21:26
23 cardiovascular risks.                        14:21:31
24      Q.  Some have found increased           14:21:34
25 mortality associated with cardiovascular risks, 14:21:39

Page 181

1 have they not?  Do you know?                 14:21:42
2      A.  So my specific recall is that some  14:21:43
3 of the studies that have looked at long-term  14:21:51
4 mortality attributed a significant component of 14:21:54
5 long-term mortality to things such as HIV.  And 14:21:59
6 so I would need to look at the specific       14:22:06
7 contribution that cardiovascular risk made to 14:22:11
8 long-term mortality.                         14:22:14
9      Q.  And that wasn't something you       14:22:15
10 dealt with in your report, correct?          14:22:18
11      A.  So in my report, I discuss the     14:22:20
12 relative risks and benefits of gender-affirming 14:22:27
13 health care and opine that the potential      14:22:30
14 benefits may outweigh the potential risks, sir. 14:22:34
15 And so that would be one of the considerations 14:22:37
16 of the potential risks.                      14:22:39
17      Q.  Let's go to the next paragraph on  14:22:40
18 page 13.  Most studies included in this review 14:22:45
19 did not report comorbidities, physical or     14:22:52
20 mental health, and no study reported          14:22:55
21 concomitant treatments in detail.  Because of 14:22:58
22 this, it is not clear whether any changes seen 14:23:01
23 were due to gender-affirming hormones or other 14:23:04
24 treatments the participants may have received. 14:23:08
25 Did I read that correctly?                   14:23:12

46 (Pages 178 - 181)

Page 182

1    A.  You did, sir.                14:23:13
2        Q.  And other treatments the        14:23:14
3    participants may have received could include   14:23:17
4    psychiatric medication, could it not?        14:23:20
5        A.  That is one of the possible other   14:23:22
6    treatments, sir.                14:23:26
7        Q.  Another possible treatment could   14:23:27
8    be some form of mental health therapy; is that   14:23:29
9    correct?                    14:23:32
10       A.  Yes, sir.                14:23:32
11       Q.  Go back to page 4.            14:23:34
12       A.  I am on page 4, sir.            14:23:55
13       Q.  Under critical outcomes, using   14:23:57
14   modified GRADE, this review rated the quality   14:23:59
15   of evidence on clinical effectiveness as     14:24:03
16   low certainty, correct?            14:24:13
17       A.  Yes, sir.                14:24:14
18       Q.  And in the GRADE methodology,    14:24:24
19   there is a qualitative difference between low   14:24:27
20   and very low quality evidence, correct?    14:24:34
21       A.  That is why they have two        14:24:37
22   different categories, sir.            14:24:41
23       Q.  I assumed so, that's why I asked   14:24:41
24   the question.  And so when you are formulating   14:24:43
25   a treatment recommendation, it matters whether   14:24:47

Page 183

1    the evidence base is low or very low quality,   14:24:54
2    correct?                    14:24:57
3        A.  The quality of the evidence is one   14:24:57
4    of the factors that is considered in making   14:25:02
5    recommendations, sir.            14:25:06
6        Q.  Would you agree that there is     14:25:07
7    discordance between the Endocrine Society's    14:25:13
8    assessment of the evidence on gender-affirming   14:25:17
9    hormones and the NICE's assessment?        14:25:23
10       A.  May I, sir?                14:25:28
11       Q.  Yeah.  And what I am getting at is   14:25:32
12   one assessed the quality of evidence as low,   14:25:37
13   and the other assessed it as very low.        14:25:39
14       A.  Again, it would be helpful to     14:25:49
15   refer specifically to the guideline and to    14:25:51
16   specific recommendations that we discussed    14:25:53
17   earlier today.  May I?            14:25:57
18       Q.  Sure.                14:25:59
19       A.  So, sir, the Endocrine Society   14:26:39
20   makes six recommendations relative to the    14:26:41
21   treatment of adolescents.  They evaluate the   14:26:43
22   quality of evidence for five of those        14:26:46
23   recommendations as being of low quality and of   14:26:47
24   one of those recommendations as being very low   14:26:51
25   quality.                    14:26:54

Page 184

1        Q.  And at least with respect to the   14:26:54
2    critical outcomes, the NICE review rated the   14:27:00
3    quality of evidence as very low, correct?    14:27:04
4        A.  For -- we have just reviewed the   14:27:06
5    efficacy, we haven't looked at the safety.  But   14:27:14
6    yes, relative to the efficacy of            14:27:18
7    gender-affirming hormones and the efficacy and   14:27:21
8    I believe safety of GnRH agonist, yes, it was   14:27:25
9    very low.                    14:27:31
10       Q.  So would you agree there is at     14:27:32
11   least some degree of discordance there?    14:27:33
12       A.  They rated the quality of the     14:27:35
13   evidence differently, sir.            14:27:39
14       Q.  And would you take the position   14:27:41
15   that no reasonable scientist could agree with   14:27:47
16   the NICE reviews on that point and disagree   14:27:52
17   with the Endocrine Society?            14:27:55
18       A.  So, sir, I thought that part of   14:28:00
19   our conversation earlier today is that these   14:28:04
20   were matters of judgment and that it would be a   14:28:09
21   matter of judgment as to whether the evidence   14:28:16
22   is of low or very low quality.            14:28:20
23       Q.  All right.  Go back to Exhibit 15,   14:28:22
24   which is the Cass Review.            14:28:29
25       A.  One moment, sir.  I have it, sir.   14:28:54

Page 185

1        Q.  All right.  Let's look at page --   14:29:01
2    I mean, I'm sorry, paragraph 4.15.        14:29:13
3    Clinicians --                14:29:19
4        A.  Can you tell me what page number   14:29:19
5    that is?                    14:29:21
6        Q.  I'm sorry, 47.            14:29:21
7        A.  4.15, sir?                14:29:30
8        Q.  Yes, sir.                14:29:31
9        A.  All right.                14:29:31
10       Q.  Clinicians and associated        14:29:32
11   professionals we have spoken to have        14:29:34
12   highlighted the lack of an agreed consensus on   14:29:36
13   the different possible implications of        14:29:39
14   gender-related stress, whether it may be an   14:29:42
15   indication that the child or young person is   14:29:44
16   likely to grow up to be a transgender adult and   14:29:46
17   would benefit from physical intervention or   14:29:49
18   whether it may be a manifestation of other   14:29:51
19   causes of distress.  Following directly from   14:29:54
20   this is a spectrum of opinion about the correct   14:29:56
21   clinical approach ranging broadly between those   14:29:58
22   two take a more gender-affirmative approach to   14:30:01
23   those who take a more cautious development and   14:30:05
24   informed approach.  Did I read that correctly?   14:30:08
25       A.  You did, sir.                14:30:09

47 (Pages 182 - 185)

Veritext Legal Solutions
877-373-3660                                        800.808.4958

Page 186

1     Q.   And do you have any doubt that the   14:30:16
2  authors conducting the Cass Review found a lack   14:30:17
3  of consensus among the relevant clinicians?   14:30:19
4     A.   So I am not aware of the specific   14:30:33
5  methodology that they utilized in order to   14:30:36
6  ascertain that conclusion.  But given the   14:30:39
7  general credibility of Dr. Cass and the British   14:30:42
8  medical profession, I would not have a prima   14:30:46
9  facie reason to think that this is inaccurate.   14:30:49
10     Q.   Fair enough.  All right.  Go to   14:30:52
11  page 63.                        14:30:54
12     A.   Yes, sir.             14:31:02
13     Q.   5.21.  The lack of available high   14:31:03
14  level evidence was reflected in the recent NICE   14:31:08
15  review into the use of puberty blockers and   14:31:12
16  feminizing/masculinizing hormones commissioned   14:31:16
17  by NHS England with the evidence being too   14:31:19
18  inconclusive to form the basis of a policy   14:31:23
19  position.  Did I read that correctly?   14:31:26
20     A.   You did, sir.          14:31:29
21     Q.   Would you agree that she is   14:31:30
22  saying -- well, this interim review based on   14:31:38
23  what they deemed to be too inconclusive in   14:31:46
24  evidence did not make specific treatment   14:31:49
25  recommendations, correct?         14:31:53

Page 187

1     A.   My understanding of the interim   14:31:54
2  report is that the Cass Review does not make   14:32:02
3  specific recommendations relative to the use of   14:32:07
4  so-called puberty blockers or gender-affirming   14:32:10
5  hormone therapy for adolescents.    14:32:12
6     Q.   They believed in this interim   14:32:16
7  report that the evidence was too inconclusive   14:32:19
8  to form the basis of a policy position; is that   14:32:21
9  correct?                       14:32:24
10     A.   So that's what the sentence that   14:32:24
11  you read states, sir.             14:32:32
12     Q.   Would you interpret that as them   14:32:33
13  saying that there is uncertainty as to what the   14:32:37
14  proper policy should be?          14:32:40
15     MR. CHEEK:  Objection, speculation.   14:32:43
16     THE WITNESS:  So, sir, we have spent   14:32:44
17  a considerable amount of time discussing the GRADE   14:32:50
18  approach to rating the quality of the evidence.   14:32:54
19  We haven't discussed the GRADE approach to making   14:32:59
20  recommendations.  It's not clear to me at this   14:33:03
21  point that the Cass Review has under -- has   14:33:10
22  undertaken the necessary steps to formulate a   14:33:15
23  policy position.  So I am somewhat agnostic to the   14:33:23
24  meaning of this sentence and its implications.   14:33:31
25  BY MR. FRAMPTON:                  14:33:41

Page 188

1     Q.   They did not promote a policy   14:33:42
2  position, correct?                14:33:44
3     A.   So this is a -- at the point of   14:33:44
4  issuing an interim report, the interim report   14:33:52
5  does not contain a policy position relative to   14:33:58
6  the use of puberty blockers and   14:34:02
7  gender-affirming hormone therapy.  It makes   14:34:06
8  other recommendations for the organization of   14:34:11
9  services to individuals with gender dysphoria,   14:34:15
10  but it does not make recommendations either for   14:34:19
11  or against the use of puberty blockers or   14:34:24
12  gender-affirming hormone therapy.   14:34:29
13     Q.   And they tell us the reason for   14:34:30
14  that is inconclusive evidence, correct?   14:34:32
15     A.   So that's what this sentence says.   14:34:33
16  I don't -- one might still be able to take a   14:34:50
17  policy position relative to there being   14:34:55
18  inconclusive evidence.  That's why I am having   14:34:58
19  difficulty interpreting this statement.  We   14:35:00
20  frequently in medicine make -- have to make   14:35:03
21  medical judgments and decisions on the   14:35:06
22  available evidence.               14:35:09
23     Q.   Making a judgment for a particular   14:35:11
24  patient is different from making a clinical   14:35:15
25  practice guideline recommendation, correct,   14:35:19

Page 189

1  that would apply to many patients?   14:35:24
2     A.   They are distinct but related,   14:35:25
3  sir.                           14:35:32
4     Q.   All right.  Let's go --   14:35:33
5     A.   May I set this aside, sir?   14:35:52
6     Q.   Yes.                   14:35:54
7     (Thereupon, Exhibit 29, Care of   14:35:55
8  Children and Adolescents With Gender Dysphoria,   14:35:55
9  was marked for purposes of identification.)   14:36:05
10  BY MR. FRAMPTON:                  14:36:05
11     Q.   I show you what I am marking as   14:36:09
12  Defendants' Exhibit 29, a document entitled   14:36:11
13  Care of Children and Adolescents With Gender   14:36:20
14  Dysphoria.  And, Dr. Antommaria, are you   14:36:21
15  familiar with this document?       14:36:27
16     A.   I am, sir.             14:36:28
17     Q.   And what do you understand it to   14:36:31
18  be?                            14:36:33
19     A.   I understand it to be an official   14:36:33
20  English language translation of the summary of   14:36:39
21  the Swedish National Board of Health and   14:36:48
22  Welfare's report on the care of adolescents and   14:36:51
23  children with gender dysphoria, sir.   14:36:55
24     Q.   Okay.  Turn to page 3, please.   14:36:58
25     A.   Yes, sir.             14:37:01

48 (Pages 186 - 189)

Page 190

1    Q.  The last paragraph begins:  A    14:37:01
2  systematic review published in 2022 by the      14:37:07
3  Swedish Agency For Health Technology Assessment   14:37:11
4  and Assessment of Social Services, endnote 2,    14:37:16
5  shows that the state of knowledge largely       14:37:20
6  remains unchanged compared to 2015.  Did I read   14:37:21
7  that correctly?                14:37:24
8    A.  You did, sir.         14:37:25
9    Q.  All right.  So they are        14:37:26
10  purporting -- they purport to be citing to a     14:37:29
11  systematic review published in 2022, correct?    14:37:32
12    A.  Yes, sir.             14:37:34
13    Q.  Let me show you your expert        14:37:38
14  report, which oddly enough this far into our    14:37:45
15  deposition I have not yet marked, but we will    14:37:47
16  do that.                  14:37:49
17       (Thereupon, Exhibit 30, Expert       14:37:50
18  Declaration of Armand H. Antommaria, M.D., Ph.D.,  14:37:50
19  FAAP, HEC-C, was marked for purposes of       14:37:50
20  identification.)              14:38:09
21  BY MR. FRAMPTON:               14:38:09
22    Q.  I show you what I am marking as      14:38:09
23  Exhibit 30.  And, Dr. Antommaria, is Exhibit 30   14:38:11
24  your expert report in this case?        14:38:27
25    A.  One moment, sir.          14:38:29

Page 191

1    Q.  Yeah.               14:38:30
2    A.  It appears to be, sir.        14:38:45
3       MR. CHEEK:  Hal, this is -- let me    14:38:49
4  just -- can you look and make sure that the one we  14:38:54
5  are entering as Defendants' Exhibit 30 is a     14:38:58
6  complete copy?  That was your intention, right?  14:39:00
7       MR. FRAMPTON:  Yes.        14:39:04
8       THE WITNESS:  So the part where it    14:39:06
9  becomes unstapled looks like it has the relevant   14:39:08
10  pages.                  14:39:12
11       MR. CHEEK:  But it's a complete copy   14:39:13
12  of your expert report?  The reason I am asking is  14:39:15
13  we have got an extra page here.        14:39:19
14       THE WITNESS:  What is the page     14:39:21
15  titled, 50 what?  It's like double printed.    14:39:23
16       MR. CHEEK:  I don't know.       14:39:26
17       THE WITNESS:  So that page is in    14:39:38
18  here.                  14:39:40
19       MR. FRAMPTON:  So it was in one of   14:39:43
20  yours.                  14:39:44
21  BY MR. FRAMPTON:               14:39:44
22    Q.  All right.  Dr. Antommaria, flip    14:39:45
23  to page 19.  And I am looking at the       14:39:46
24  footnote --                14:39:56
25    A.  So I apologize, the page numbers    14:39:57

Page 192

1  are double printed.  Can you give me the     14:39:59
2  paragraph number, sir?            14:40:04
3    Q.  Yeah, I am looking at footnote --    14:40:06
4  looking at footnote 41, but the second page of   14:40:12
5  footnote 41.                14:40:17
6    A.  So I'm sorry, the copy of the      14:40:27
7  report that you gave me has the references     14:40:29
8  included in the paragraph and not footnotes.    14:40:36
9    Q.  Let me see it.  We will mark a new   14:40:39
10  one.                   14:40:55
11       MR. CHEEK:  For clarity, Defense    14:40:57
12  Exhibit No. 30 is Dr. Antommaria's declaration   14:40:59
13  from the PI hearing?            14:41:02
14       MR. FRAMPTON:  Correct.       14:41:03
15       MR. CHEEK:  Okay.          14:41:04
16       (Thereupon, Exhibit 31,         14:41:05
17  PLaintiff-Intervenor United States' Disclosure of  14:41:05
18  Expert Testimony of Armand H. Matheny Antommaria,  14:41:05
19  M.D., Ph.D., FAAP, HEC-C, was marked for purposes  14:41:05
20  of identification.)             14:41:05
21  BY MR. FRAMPTON:               14:41:05
22    Q.  All right.  31 is your expert      14:41:05
23  report.  And hopefully, now you can turn to     14:41:07
24  page 19.                  14:41:15
25    A.  All right.  I am on page 19, sir.   14:41:20

Page 193

1    Q.  Great.  Do you see in that        14:41:22
2  footnote, it's one, two, three, four lines     14:41:26
3  down -- I'm sorry, yeah, three lines down:     14:41:29
4  Note the Swedish Agency for Health Technology    14:41:41
5  Assessment and Assessment of Social Services,    14:41:44
6  SBU, gender dysphoria in children and       14:41:49
7  adolescents, an inventory of the literature,    14:41:52
8  and then there is a citation, is a scoping     14:41:53
9  review.  Do you see that language?        14:41:56
10    A.  Yes, sir.             14:41:59
11    Q.  And what is the date of that      14:42:01
12  scoping review document?            14:42:04
13    A.  Here, it's reported as 2019, sir.   14:42:09
14    Q.  Okay.  Go back to the Swedish     14:42:11
15  English language summary.           14:42:19
16    A.  Yes, sir.             14:42:20
17    Q.  And go to endnote 2, which is the   14:42:20
18  systematic review that they appear to be      14:42:27
19  citing.                  14:42:30
20    A.  Yes, sir.             14:42:30
21    Q.  And what is the date on that      14:42:30
22  document?                 14:42:32
23    A.  2022, sir.             14:42:32
24    Q.  Is it possible, Dr. Antommaria,    14:42:35
25  that the Swedish government commissioned a     14:42:37

49 (Pages 190 - 193)

Page 194

1 scoping review in 2019 and a systematic review   14:42:39
2 in 2022?                                         14:42:42
3      A.  That is a possibility, sir.          14:42:43
4      Q.  Do you know one way or the other?     14:42:46
5      A.  Not at the present moment, sir.       14:42:52
6      Q.  And do you know whether the 2022      14:42:57
7 systematic review assessed the quality of       14:43:10
8 evidence based on the GRADE methodology?         14:43:13
9      A.  I do not, sir.  You will note that    14:43:15
10 even in this English language translation of    14:43:35
11 the summary, the title of that document is      14:43:39
12 given in Swedish.  And so one of the            14:43:42
13 difficulties of assessing this literature is    14:43:48
14 not all of the material is available in         14:43:52
15 official English translation.                   14:43:55
16      Q.  And have you made an effort to        14:43:57
17 obtain an English translation of the document   14:44:04
18 reflected in endnote 2 of the Swedish language  14:44:08
19 summary?                                        14:44:14
20      A.  I have made an effort to ascertain    14:44:14
21 all of the relevant European literature.  I     14:44:21
22 have not independently commissioned English     14:44:27
23 translations of any of the literature, sir.     14:44:32
24      Q.  Have you run any of them through      14:44:35
25 Google Translate?                               14:44:37

Page 195

1      A.  No, sir.  I have colleagues who        14:44:42
2 conduct research in regard to patients with      14:44:45
3 what might be referred to as low health          14:44:50
4 literacy, and there is good evidence in the      14:44:54
5 literature that Google Translate is not a        14:44:56
6 reliable source of translation of medical        14:44:59
7 documentation.                                   14:45:02
8      Q.  So it is possible this Swedish         14:45:02
9 recommendation is based on a systematic review  14:45:10
10 of the evidence rather than just a scoping      14:45:12
11 review?                                         14:45:15
12      A.  That is a possibility, sir.          14:45:16
13      Q.  And it's also possible that          14:45:21
14 systematic review may rate the quality of       14:45:24
15 evidence using the GRADE methodology?           14:45:27
16      A.  So, sir, this document makes a        14:45:33
17 variety of recommendations.  In its making of   14:45:39
18 recommendations, it neither grades the quality  14:45:44
19 of the evidence nor the strength of the         14:45:46
20 recommendations.  If it was relying on a        14:45:48
21 document that graded the quality of the         14:45:51
22 evidence, I would have thought that that would  14:45:55
23 be reflected in this document.  So, no, I don't 14:45:58
24 know for certain, but I would have good reason  14:46:01
25 to believe that that's not the case.            14:46:05

Page 196

1      Q.  Flip to page 4, please.               14:46:06
2      MR. CHEEK:  And we are still on --         14:46:57
3      MR. FRAMPTON:  We are on the               14:46:59
4 Swedish --                                       14:47:00
5      MR. CHEEK:  29, right?                     14:47:01
6      MR. FRAMPTON:  Yes.                        14:47:02
7      THE WITNESS:  I am on page 4, sir.         14:47:03
8 BY MR. FRAMPTON:                                 14:47:05
9      Q.  All right.  Do you see about           14:47:10
10 halfway down the page, it says:  To ensure that 14:47:12
11 new knowledge is gathered, the NBHW further     14:47:16
12 deems that treatment with GnRH analogs and sex  14:47:19
13 hormones for young people should be provided    14:47:23
14 within a research context which does not        14:47:24
15 necessarily imply the use of randomized control 14:47:26
16 trials, RCTs.  Did I read that correctly?       14:47:30
17      A.  You did, sir.                          14:47:33
18      Q.  So the Swedish government is           14:47:34
19 concluding that going forward, puberty blockers 14:47:38
20 and cross-sex hormones should be provided only  14:47:41
21 within a research context; is that correct?     14:47:43
22      A.  That is correct, sir.                  14:47:45
23      Q.  And you don't consider that            14:47:48
24 recommendation unethical, do you?               14:47:52
25      A.  One minute, I am just reading the      14:47:55

Page 197

1 paragraphs.                                      14:48:05
2      Q.  Sure.                                   14:48:06
3      A.  So, in general, I don't, sir.  I       14:48:42
4 will note that later in the paragraph, it does   14:48:46
5 state until the research study is in place that  14:48:48
6 NBHW deems that relevant treatment with GnRH     14:48:53
7 analogs and sex hormones may be given in         14:48:59
8 exceptional cases in accordance with the         14:49:01
9 updated recommendations and criteria described   14:49:03
10 in this guideline.  So I take it that they      14:49:07
11 considered that treatment is sufficiently       14:49:10
12 important that it should go on prior to          14:49:12
13 research studies being in place.                14:49:18
14      Q.  As soon as they get a research        14:49:21
15 protocol, everything is going to be in the      14:49:23
16 context of research, correct?                   14:49:24
17      A.  That's their recommendation, sir.     14:49:26
18      Q.  Back on page 3.                       14:49:29
19      A.  Yes, sir.                              14:49:38
20      Q.  Recommendations and criteria for      14:49:38
21 hormonal treatment.  So they say:  For          14:49:45
22 adolescents with gender incongruence, the NBHW  14:49:45
23 deems that the risks of puberty-suppressing     14:49:50
24 treatment with GnRH analogs and                 14:49:51
25 gender-affirming hormonal treatment currently   14:49:54

50 (Pages 194 - 197)

Page 198

1  outweigh the possible benefits and that the          14:49:57
2  treatment should be offered only in exceptional      14:50:00
3  cases.  Did I read that correctly?                   14:50:02
4      A.  You did, sir.          14:50:03
5      Q.  And does that suggest that they          14:50:04
6  believe there is significant uncertainty as to       14:50:10
7  the benefits and risks of these treatments?          14:50:13
8          MR. CHEEK:  Objection, speculation.      14:50:19
9          THE WITNESS:  So, sir, the difficulty    14:50:21
10  with this document is that this is a six-page        14:50:22
11  summary of a substantially longer document which     14:50:29
12  presumably would go into greater detail about that   14:50:33
13  judgment.  But because that is not currently         14:50:40
14  available in an official English translation, it's   14:50:48
15  hard to fully assess the justification for the       14:50:51
16  statement, sir.          14:50:54
17  BY MR. FRAMPTON:          14:50:55
18      Q.  The statement certainly suggests         14:50:56
19  they believe there is uncertainty --                14:50:58
20          MR. CHEEK:  Objection.          14:51:00
21  BY MR. FRAMPTON:          14:51:01
22      Q.  -- as to the risks and benefits,         14:51:01
23  correct?          14:51:02
24          MR. CHEEK:  Objection, speculation.      14:51:03
25          THE WITNESS:  So in reading that         14:51:13

Page 199

1  statement, sir, they don't make reference to         14:51:15
2  uncertainty.          14:51:20
3  BY MR. FRAMPTON:          14:51:20
4      Q.  They make reference to their          14:51:23
5  judgment being that the benefits generally           14:51:24
6  outweigh the risks -- I mean, I'm sorry, that        14:51:28
7  the risks generally outweigh the benefits,           14:51:30
8  correct?          14:51:32
9      A.  Correct, sir.          14:51:32
10          (Thereupon, Exhibit 32, Bilaga 3.       14:51:39
11  Inkluderade Studier Appendix 3. Characteristics of   14:51:39
12  Included Studies: Extracted data, was marked for     14:51:39
13  purposes of identification.)          14:51:39
14  BY MR. FRAMPTON:          14:51:39
15      Q.  I hand you what I am marking as         14:51:39
16  Defendants' Exhibit 32.  And my question,           14:51:42
17  Dr. Antommaria, have you -- the document is          14:51:58
18  marked Characteristics of Included Studies:          14:52:03
19  Extracted Data.  Does this document appear to        14:52:06
20  be available in English?          14:52:12
21      A.  May I look at the document, sir?         14:52:13
22      Q.  Yeah, of course.          14:52:16
23      A.  So this document, which I am not         14:52:42
24  certain what the nature of the document is, is       14:52:44
25  in English, sir.          14:52:48

Page 200

1      Q.  In reviewing what was available in       14:52:49
2  English from the Swedish report, did you not         14:52:59
3  come across this document?          14:53:04
4      A.  No, I did not, sir.          14:53:06
5      Q.  It appears to be a table of          14:53:08
6  evidence of included studies; is that at least       14:53:17
7  what it appears to be?          14:53:22
8      A.  Sir, I can't read the -- may I?          14:53:23
9      Q.  Uh-huh.          14:53:47
10      A.  So, sir, it's hard for me to know       14:54:11
11  what this is.  I am looking at Reference 2,          14:54:14
12  which you pointed to earlier.  That title in         14:54:17
13  Swedish is different than the title in the top       14:54:22
14  right-hand corner of this.  So -- so it's hard       14:54:24
15  for -- although this is dated 2002, it's hard        14:54:34
16  for me to -- at this point, not knowing from         14:54:38
17  where this was downloaded or other information,      14:54:40
18  it's hard for me to know what it is, sir.            14:54:43
19      Q.  The title -- were you looking at        14:54:45
20  endnote 2?          14:54:50
21      A.  I am looking at -- I am going to        14:54:51
22  go to Exhibit 29.          14:54:55
23      Q.  Yes.          14:54:56
24      A.  Reference 2, I believe that was a       14:54:58
25  reference that you pointed me to earlier, sir?       14:55:01

Page 201

1      Q.  Right.  And do you see in that          14:55:04
2  title Hormonbehandling vid könsdysfori?              14:55:06
3      A.  So, again, sir, I don't read          14:55:19
4  Swedish.  There is a sentence -- a first             14:55:22
5  sentence, then I do see a second sentence which      14:55:27
6  appears to have some similarity, but I don't --      14:55:32
7  so I will -- I don't know what the top title         14:55:36
8  is, and that top title doesn't correspond to         14:55:41
9  the first sentence.  So, again, it would be          14:55:44
10  hard for me to form an opinion about --             14:55:46
11      A.  Sure.          14:55:50
12      A.  -- what this is.          14:55:52
13      Q.  Okay.  It's just not something you      14:55:52
14  have come across in your review of the Swedish      14:55:55
15  documents?          14:55:58
16      A.  It is not, sir.          14:55:58
17      Q.  Okay.          14:55:59
18          (Thereupon, Exhibit 33, Bilaga till    14:56:03
19  rapport, was marked for purposes of                 14:56:03
20  identification.)          14:56:03
21  BY MR. FRAMPTON:          14:56:03
22      Q.  I hand you what I am marking as         14:56:04
23  Exhibit 33.  And is this also not something you      14:56:07
24  came across in your review of the Swedish           14:56:40
25  literature?          14:56:42

51 (Pages 198 - 201)

Page 202

```
1      A.  So this is not something that I am   14:56:43
2  familiar with, sir.                         14:56:45
3      Q.  All right, then I won't ask you     14:56:46
4  about that.  What's lupus nephritis?        14:56:58
5      A.  So nephritis would be an            14:57:04
6  inflammation of the kidneys, and lupus is a  14:57:09
7  rheumatologic condition.  So it would be a   14:57:12
8  inflammation of the kidneys caused by a      14:57:15
9  specific rheumatologic condition.           14:57:17
10     Q.  Is that -- would treating that      14:57:20
11 normally be the province of a               14:57:23
12 nephrologist?                               14:57:28
13     A.  A nephrologist or a                 14:57:29
14 rheumatologist, sir.                        14:57:31
15     Q.  You typically would not initiate   14:57:31
16 treatment for that condition?               14:57:35
17     A.  No, sir; I am neither a            14:57:36
18 rheumatologist nor a nephrologist.          14:57:40
19     Q.  Do you have an understanding of    14:57:42
20 what happens if that condition is left      14:57:53
21 untreated?                                  14:57:55
22     A.  A general understanding, sir.      14:57:55
23     Q.  And what is that?                  14:57:57
24     A.  My general understanding is that   14:57:58
25 if it is left untreated, the individual might  14:58:04
```

Page 203

```
1  progress to chronic renal failure and require  14:58:08
2  dialysis or a kidney transplant for their renal  14:58:12
3  failure.                                    14:58:17
4      Q.  Okay.  Chronic kidney disease is a  14:58:17
5  life-threatening disease, is it not?        14:58:25
6      A.  Untreated it can be                14:58:26
7  life-threatening, sir.                      14:58:30
8      Q.  Do you have -- do you have any     14:58:31
9  knowledge of the quality of evidence supporting  14:58:36
10 the efficacy of cyclophosphamide to treat lupus  14:58:40
11 nephritis?                                  14:58:45
12     MR. CHEEK:  Objection, foundation.     14:58:46
13     THE WITNESS:  No, sir, I do not.       14:58:49
14 BY MR. FRAMPTON:                            14:58:57
15     Q.  When we call -- just generally in  14:58:57
16 the medical literature, when we call a       14:59:00
17 condition refractory, what does that generally  14:59:02
18 mean?                                       14:59:06
19     A.  It would generally mean that it    14:59:06
20 has not responded to treatment.             14:59:12
21     Q.  What -- could you treat multiple  14:59:15
22 sclerosis in your practice?                 14:59:25
23     A.  I do not, sir.  So in my practice  14:59:26
24 as a pediatric hospitalist, I do not treat  14:59:36
25 multiple sclerosis.                         14:59:39
```

Page 204

```
1      Q.  Do you know the quality of        14:59:41
2  evidence supporting the efficacy of any      14:59:45
3  particular treatment on progressive or       14:59:48
4  refractory MS?                              14:59:51
5      A.  At a high level of generality, I   14:59:52
6  do, sir.                                    14:59:59
7      Q.  Okay.  What about therapy that can  14:59:59
8  be gonadotoxic?                             15:00:06
9      MR. CHEEK:  Objection, form.           15:00:10
10     THE WITNESS:  Do I know the level of   15:00:13
11 evidence that supports gonado -- potentially  15:00:14
12 gonadotoxic therapy for MS?                 15:00:21
13 BY MR. FRAMPTON:                            15:00:21
14     Q.  Yes.                               15:00:21
15     A.  No, sir, I do not.                 15:00:22
16     Q.  What is familial adenomatous      15:00:22
17 polyposis?  Did I even say that right?      15:00:29
18     A.  You are close enough that I       15:00:31
19 understand what you are asking me, sir.     15:00:33
20     Q.  That's all I'm going for.         15:00:34
21     A.  It is a genetic condition that    15:00:38
22 results in polyps in the intestinal tract which  15:00:41
23 can progress to be cancerous.               15:00:46
24     Q.  Without surgical intervention, is  15:00:50
25 a person with that condition's likelihood of  15:00:58
```

Page 205

```
1  developing cancer at a young age pretty high?  15:01:01
2      A.  Without appropriate screening and  15:01:04
3  intervention, yes, sir.                     15:01:08
4      Q.  What are endometriomas?           15:01:10
5      A.  An endometrioma would be a        15:01:16
6  proliferation of the endometrium, which is the  15:01:20
7  lining of the uterus, sir.                  15:01:21
8      Q.  And can -- if they are large      15:01:22
9  enough, can they impair fertility?          15:01:25
10     A.  They can, sir.                     15:01:27
11     Q.  Do you know the quality of        15:01:28
12 evidence supporting the efficacy of surgical  15:01:36
13 intervention to treat large endometriomas?   15:01:38
14     A.  I do not, sir.                     15:01:44
15     Q.  What is ulcerative colitis?       15:01:45
16     A.  Ulcerative colitis is an          15:01:56
17 inflammatory process of the intestinal tract,  15:02:00
18 sir.                                        15:02:05
19     Q.  And surgery is not generally the  15:02:05
20 first line treatment for that condition, is it?  15:02:07
21     A.  No, there would be other          15:02:09
22 interventions that would be utilized to try to  15:02:10
23 prevent the need for surgery, sir.          15:02:13
24     Q.  And surgery generally would only  15:02:17
25 be done if there is no other way of controlling  15:02:20
```

Page 206

1  the condition, correct?                    15:02:23
2      A.  If medical therapy was              15:02:23
3  unsuccessful, surgery might be considered, sir.  15:02:28
4      Q.  And you can have with that          15:02:30
5  condition emergency situations that require  15:02:34
6  surgery, correct, like a bleed or perforation,  15:02:36
7  if you know?                                15:02:42
8      A.  I don't know that surgery would be  15:02:44
9  necessarily the primary intervention for    15:02:46
10 bleeding, but for perforation, yes, sir.    15:02:48
11     Q.  Because if a perforation is left    15:02:52
12 untreated, that can cause death presumably,  15:02:54
13 right?                                      15:02:57
14     A.  It can cause peritonitis, which     15:02:58
15 would be an infection in the abdominal cavity  15:03:01
16 which if left untreated could result in death,  15:03:06
17 sir.                                        15:03:08
18     Q.  For a natal male at Tanner Stage 2  15:03:09
19 seeking to begin puberty blockers, what are the  15:03:22
20 options for preserving that child's fertility?  15:03:26
21     A.  The primary option for preserving   15:03:29
22 fertility in that case would be delaying the  15:03:38
23 use of puberty blockers, sir.               15:03:41
24     Q.  So you wouldn't actually start      15:03:43
25 them at Tanner 2 if you were trying to preserve  15:03:45

Page 207

1  fertility?                                  15:03:48
2      MR. CHEEK:  Objection, foundation.      15:03:48
3      THE WITNESS:  If that was your          15:03:50
4  exclusive or predominant goal, there would be a  15:03:56
5  reason to delay utilizing puberty blockers.  There  15:04:00
6  might be other ways later in the future that by  15:04:05
7  discontinuing gender-affirming medical care  15:04:13
8  fertility could be reestablished.           15:04:16
9  BY MR. FRAMPTON:                            15:04:20
10     Q.  Have you seen any studies showing   15:04:22
11 the success of that process?                15:04:23
12     A.  I am aware of studies that show     15:04:28
13 the resumption of fertility in individuals who  15:04:34
14 have discontinued gender-affirming hormone   15:04:37
15 therapy, sir.                               15:04:41
16     Q.  Aware of any studies dealing with   15:04:41
17 individuals who started puberty suppression at  15:04:44
18 Tanner Stage 2?                             15:04:47
19     MR. CHEEK:  Objection, form.            15:04:48
20     THE WITNESS:  Not specifically of       15:04:50
21 that population, sir.                       15:04:53
22 BY MR. FRAMPTON:                            15:04:54
23     Q.  Just as a general matter, if a      15:04:54
24 natal male starts puberty suppression at Tanner  15:04:57
25 Stage 2, continues seamlessly into estrogen and  15:05:01

Page 208

1  anti-androgen therapy, that person will never  15:05:06
2  develop fertility, correct, without stopping  15:05:10
3  treatment?                                  15:05:14
4      A.  So, in general, the expectation     15:05:14
5  would be if that individual continued       15:05:19
6  treatment, that is correct that they would not  15:05:23
7  be fertile.                                 15:05:25
8      Q.  And, likewise, with a natal female  15:05:26
9  who begins puberty suppression at Tanner Stage  15:05:30
10 2 and progresses seamlessly to testosterone  15:05:34
11 therapy, that individual would not develop   15:05:38
12 fertility, correct?                         15:05:41
13     A.  If they continued on treatment,     15:05:43
14 they would not be anticipated to have        15:05:51
15 biologically related children.  It is to say  15:05:53
16 that for some individuals the benefit of     15:05:56
17 treatment would outweigh that risk, but that  15:05:59
18 risk would exist.                           15:06:01
19     Q.  And it wouldn't be a risk, it       15:06:02
20 would be they are not going to have fertility  15:06:12
21 without discontinuing treatment, correct?    15:06:15
22     MR. CHEEK:  Objection, form.            15:06:20
23     THE WITNESS:  I'm sorry, I don't        15:06:21
24 understand the distinction that you are making,  15:06:22
25 sir.                                        15:06:24

Page 209

1  BY MR. FRAMPTON:                            15:06:24
2      Q.  Well, I think you were              15:06:25
3  characterizing it as a risk of infertility, and  15:06:26
4  I was distinguishing it's really -- without  15:06:30
5  discontinuing treatment, it's a certainty of  15:06:33
6  infertility, is it not?                     15:06:36
7      A.  So when -- as an emphasis, when I   15:06:37
8  would refer to a risk, I wouldn't say that   15:06:40
9  risks involve both a magnitude and a         15:06:42
10 probability.  So while colloquially risk might  15:06:44
11 have implications about probability, I don't  15:06:48
12 know that in the way an ethicist uses a risk  15:06:52
13 that it necessarily has those similar         15:06:57
14 implications.                               15:07:04
15     Q.  But you would agree, again, for     15:07:06
16 the natal female starting puberty suppression  15:07:08
17 at Tanner Stage 2 continuing seamlessly through  15:07:10
18 to testosterone therapy that that person -- you  15:07:13
19 would not have any expectation that person   15:07:16
20 would develop fertility with that course of  15:07:18
21 treatment, correct?                         15:07:22
22     A.  So given the currently available    15:07:22
23 resources for fertility preservation, no.    15:07:34
24     Q.  Are you aware of any studies that   15:07:37
25 document healthy conception and birth by a   15:08:02

53 (Pages 206 - 209)

Page 210

1 natal female after an extended period of years 15:08:06
2 on cross-sex hormones? By that, I mean at 15:08:09
3 least five years. 15:08:11
4    A.  So as I have said, I am aware of 15:08:17
5 literature that shows that individuals have 15:08:19
6 fertility after discontinuing gender-affirming 15:08:26
7 hormone therapy for a period of time. I would 15:08:31
8 have to look at those specific studies to see 15:08:32
9 whether individual -- whether individuals are 15:08:36
10 assigned female at birth in those studies had 15:08:39
11 been on gender-affirming hormone therapy for 15:08:42
12 more than or less than five years. 15:08:45
13    Q.  Okay.  Sitting here today, can you 15:08:47
14 name any studies we should look at for that 15:08:50
15 proposition? 15:08:52
16    A.  I thought they might be referenced 15:08:53
17 in my report, sir, but they are not. 15:11:33
18    Q.  Okay.  Let me -- let me show you 15:11:34
19 what I am going to mark as Defendants' 15:11:43
20 Exhibit 34. 15:11:46
21       (Thereupon, Exhibit 34, Considering 15:11:46
22 Sex as a Biological Variable in Basic and Clinical 15:11:46
23 Studies: An Endocrine Society Scientific 15:11:46
24 Statement, was marked for purposes of 15:11:46
25 identification.) 15:11:47

Page 211

1 BY MR. FRAMPTON: 15:11:47
2    Q.  34 is an exhibit entitled 15:12:01
3 Considering Sex As a Biological Variable in 15:12:03
4 Basic and Clinical Studies, an Endocrine 15:12:06
5 Society Scientific Statement.  And I am 15:12:09
6 curious, Dr. Antommaria, if you are familiar 15:12:11
7 with this scientific statement from the 15:12:14
8 Endocrine Society? 15:12:16
9    A.  I am not, sir. 15:12:19
10    Q.  I have got one thing I am going to 15:12:20
11 ask you about in it, and I simply want to see 15:12:22
12 if their delineation of what a DSD is aligns 15:12:26
13 with your understanding.  So flip to page 225, 15:12:31
14 please. 15:12:34
15    A.  Yes, sir. 15:12:41
16    Q.  Under Biological Basis of 15:12:42
17 Diversity in Sexual/Gender Development and 15:12:48
18 Orientation, do you see that heading? 15:12:51
19    A.  I do, sir. 15:12:53
20    Q.  There it says:  Given the 15:12:53
21 complexities of the biology of sexual 15:12:55
22 determination and differentiation, it is not 15:12:58
23 surprising that there are dozens of examples of 15:12:59
24 variations or errors in these pathways 15:13:02
25 associated with genetic mutations that are now 15:13:05

Page 212

1 well-known to endocrinologists and geneticists. 15:13:08
2 In medicine, these situations are generally 15:13:12
3 termed disorders of sexual development, DSD, or 15:13:14
4 differences in sexual development.  DSD 15:13:18
5 includes genetic disorders in the sexual 15:13:22
6 determination pathway, disorders of 15:13:25
7 steroidogenesis, disorders of steroid hormone 15:13:30
8 action, especially androgen insensitivity 15:13:33
9 syndrome, and less well-defined, quote, 15:13:36
10 developmental field defects, unquote, such as 15:13:38
11 Mayer-Rokitansky-Küster-Hauser syndrome.  Did I 15:13:45
12 read that correctly? 15:13:48
13    A.  Yes, sir. 15:13:48
14    Q.  That's amazing.  Is that a 15:13:49
15 reasonable sort of explanation of what a DSD is 15:13:51
16 to your understanding, or do you have a 15:13:58
17 different understanding? 15:14:00
18    A.  May I reread it, sir? 15:14:00
19    Q.  Of course. 15:14:03
20    A.  So I would say that it has a 15:14:58
21 relative slant toward endocrinological causes 15:15:02
22 of DSDs but that the general description is 15:15:07
23 accurate, sir. 15:15:13
24    Q.  Do you agree that most transgender 15:15:13
25 people do not have a DSD? 15:15:17

Page 213

1    A.  I believe that that's an accurate 15:15:20
2 statement, sir. 15:15:31
3    Q.  What is complete androgen and 15:15:32
4 sensitivity syndrome? 15:15:48
5    A.  It is a disorder in which an 15:15:51
6 individual has a variant in androgen receptor. 15:15:57
7 And so although they make testosterone, their 15:16:04
8 body does not respond to testosterone or other 15:16:10
9 androgens. 15:16:15
10    Q.  They are chromosomally male; is 15:16:15
11 that correct? 15:16:20
12    A.  They have XY chromosomes. 15:16:20
13    Q.  But they will not experience 15:16:26
14 endogenous male puberty, correct? 15:16:34
15    A.  If by -- if by male puberty you 15:16:36
16 mean puberty in the technical sense of the 15:16:49
17 development, enlargement of testes and other 15:16:54
18 features of a typically masculinizing puberty, 15:16:58
19 no, they will not. 15:17:02
20    Q.  And there is no medical 15:17:03
21 intervention that will cause them to experience 15:17:07
22 male puberty, correct? 15:17:10
23    A.  There is no current intervention 15:17:11
24 that's capable of producing those phenotypic 15:17:17
25 changes. 15:17:21

54 (Pages 210 - 213)

Page 214

1    Q.  And they nearly always identify as   15:17:22
2  female, according to the literature, correct?   15:17:26
3    A.  Yes, individuals with complete   15:17:28
4  androgen sensitivity generally have female   15:17:33
5  gender identities.   15:17:37
6    Q.  And the only -- the only   15:17:39
7  experience of puberty that they can have just   15:17:48
8  physically is female puberty, correct?   15:17:51
9    A.  As I have said, they are unable to   15:17:55
10  develop a so-called masculine phenotype.  And,   15:18:09
11  yes, they are capable of developing   15:18:16
12  effeminate -- so-called effeminate or female   15:18:21
13  phenotype.   15:18:22
14    Q.  For a natal male with gender   15:18:23
15  dysphoria who does not have a DSD, okay?   15:18:33
16    A.  Okay.   15:18:39
17    Q.  Without medical intervention, that   15:18:40
18  individual will experience endogenous male   15:18:44
19  puberty, assuming they progress to that point   15:18:48
20  in their life?   15:18:51
21    A.  Well, so there might be multiple   15:18:52
22  other reasons why somebody assigned male at   15:19:02
23  birth doesn't have an endogenous male puberty,   15:19:05
24  aside from a DSD such as a physical injury to   15:19:11
25  their testes so that there would be multiple   15:19:15

Page 215

1  reasons why they might not experience   15:19:19
2  masculinizing puberty, sir.   15:19:22
3    Q.  So barring some other medical   15:19:25
4  condition or injury, no DSD, no other medical   15:19:27
5  condition or injury other than gender   15:19:31
6  dysphoria, they will experience endogenous   15:19:33
7  puberty, correct?   15:19:39
8    A.  Yes, aside from injury, infection,   15:19:40
9  or other illness, yes.   15:19:47
10    Q.  And, again, we are assuming no   15:19:48
11  other medical conditions, injuries, infections,   15:20:03
12  illness.  During endogenous puberty, they will   15:20:07
13  develop secondary sex characteristics typical   15:20:10
14  of their native sex, correct?   15:20:13
15    A.  Yes, typical of their sex assigned   15:20:14
16  at birth.   15:20:16
17    If you are reaching the end of a   15:20:29
18  section, sir, can we take another brief break?   15:20:30
19    MR. FRAMPTON:  Let's do it.   15:20:32
20    (Recess taken.)   15:20:33
21    MR. FRAMPTON:  Back on the record.   15:34:01
22  BY MR. FRAMPTON:   15:34:01
23    Q.  Dr. Antommaria, could you pull out   15:34:18
24  Exhibit 17 of your -- my apologies for your   15:34:20
25  ridiculous stack there.  It's all good stuff,   15:34:25

Page 216

1  though.  All right.  You are looking at the   15:34:29
2  Endocrine Society guidelines from 2017,   15:34:34
3  correct?   15:34:36
4    A.  I am, sir.   15:34:36
5    Q.  All right.  Go to page 3879.   15:34:37
6    A.  Yes, sir.   15:34:47
7    Q.  All right.  And you have   15:34:47
8  already -- you said you believe that these   15:34:53
9  guidelines were developed through a rigorous   15:34:56
10  method, correct?   15:34:58
11    A.  Yes, sir.   15:34:59
12    Q.  All right.  Under 3879 under   15:35:05
13  evidence it says:  In most children --   15:35:10
14    A.  So I'm sorry, just so we are in   15:35:13
15  the same place, that's under 1.3 and 1.4, sir?   15:35:15
16    Q.  That's right.   15:35:20
17    A.  Okay.   15:35:21
18    Q.  It says:  In most children   15:35:21
19  diagnosed with GD/gender incongruence, it did   15:35:23
20  not persist into adolescence.  The percentages   15:35:28
21  differed among studies, probably dependent on   15:35:31
22  which version of the DSM clinicians used, the   15:35:33
23  patient's age, the recruitment criteria, and   15:35:37
24  perhaps cultural factors.  However, the large   15:35:39
25  majority, about 85 percent, of prepubertal   15:35:42

Page 217

1  children with a childhood diagnosis did not   15:35:46
2  remain GD/gender incongruent in adolescence.   15:35:49
3  Did I read that correct?   15:35:54
4    A.  You did, sir.   15:35:55
5    Q.  And that was the Endocrine Society   15:35:55
6  author's view of the evidence, correct?   15:36:03
7    A.  That is their summary of the   15:36:05
8  evidence, sir.   15:36:10
9    Q.  Okay.  And they are basing it --   15:36:10
10  and if you need to look at endnote 20, go   15:36:14
11  ahead.  They are basing it on primarily Dutch   15:36:17
12  studies, correct?   15:36:19
13    A.  So there is a single reference to   15:36:20
14  Reference 20, which is a study by the Dutch   15:36:32
15  group, yes.   15:36:37
16    Q.  Okay.  And in the Dutch group   15:36:37
17  studies on persistence and desistance, they did   15:36:44
18  not measure the point at which someone stopped   15:36:49
19  experiencing gender dysphoria, correct?   15:36:56
20    A.  Correct, sir.  I believe my   15:36:58
21  general understanding of this study design was   15:37:05
22  to look at individuals' gender identity at two   15:37:08
23  different points in time.   15:37:14
24    Q.  And no understanding of where   15:37:15
25  between those points in time their experience   15:37:17

55 (Pages 214 - 217)

Page 218

1 of gender dysphoria changed, right?          15:37:21
2      A.  So presumably, the clinicians may   15:37:23
3 have a sense of when that changed, but the    15:37:30
4 studies did not report data about that.        15:37:41
5          (Thereupon, Exhibit 35, A Critical   15:37:55
6 Commentary on Follow-up Studies and Desistance 15:37:55
7 Theories About Transgender and               15:37:55
8 Gender-nonconforming Children, was marked for  15:37:55
9 purposes of identification.)                  15:37:55
10 BY MR. FRAMPTON:                            15:37:55
11      Q.  I show you what I am marking as     15:37:59
12 Exhibit 35.  It is a document that I have got  15:38:01
13 to switch notebooks for.  All better.  It is a 15:38:07
14 document entitled Critical Commentary on       15:38:20
15 Follow-up Studies and Desistance Theories About 15:38:23
16 Transgender and Gender Nonconforming Children.  15:38:26
17 The lead author is Julia Temple Newhook.  All  15:38:29
18 right.  You are -- I imagine you are familiar  15:38:43
19 with this paper, correct, sir?               15:38:46
20      A.  Yes, sir.                          15:38:48
21      Q.  All right.  And it comments on      15:38:50
22 four studies related to -- that it believes are 15:38:58
23 related to desistance rates, correct?         15:39:04
24      A.  Without reviewing the study again,  15:39:09
25 I don't know if it's forcer, but it does       15:39:15

Page 219

1 analyze studies about so-called desistance.   15:39:18
2      Q.  Well, let me nail that down.  Go     15:39:23
3 to page 1.  We have got somewhat normal page   15:39:27
4 numbers.                                      15:39:34
5      A.  I am on what I take to be the       15:39:37
6 first page, sir.                             15:39:39
7      Q.  That's my understanding as well,    15:39:39
8 you are with me.  The second sentence in the  15:39:43
9 main text:  This statement largely draws on   15:39:48
10 estimates from four follow-up studies conducted 15:39:51
11 with samples of gender-nonconforming children  15:39:54
12 in one of two clinics in Canada or the        15:39:58
13 Netherlands, and then it contains a citation to 15:40:03
14 four studies; is that correct?                15:40:05
15      A.  Oh, I'm sorry, I was reading that    15:40:06
16 in the abstract, not in the text.  Let me look  15:40:08
17 in the text, sir.                            15:40:11
18      Q.  Okay.                              15:40:12
19      A.  You read that correctly, sir.       15:40:20
20      Q.  And then it says:  This article     15:40:21
21 outlines methodological, theoretical, ethical, 15:40:25
22 and interpretive concerns regarding these     15:40:28
23 studies, correct?                            15:40:31
24      A.  Correct, sir.                       15:40:31
25      Q.  So would you agree that the author  15:40:32

Page 220

1 is reporting that she is -- that they are going 15:40:36
2 to review these four particular studies        15:40:38
3 concerning desistance?                        15:40:42
4      A.  In part, sir.                        15:40:45
5      Q.  What do you mean in part?            15:40:49
6      A.  Well, they say this statement        15:40:50
7 largely draws on.  So I take it that they are   15:40:52
8 also drawing on other sources than the four     15:40:55
9 studies that are -- that are subsequently       15:40:59
10 listed in the reference.                      15:41:01
11      Q.  Is this -- this paper is not a       15:41:02
12 systematic review of the literature on        15:41:14
13 desistance rates, is it?                      15:41:16
14      A.  No, it's not, sir.                   15:41:18
15      Q.  And you would agree that there are  15:41:21
16 more than four studies out there measuring     15:41:25
17 desistance rates, correct?                    15:41:28
18      A.  Yes, sir.                           15:41:31
19      Q.  Okay.  And we don't know if these   15:41:33
20 authors -- well, strike that.  The only studies 15:41:37
21 these authors call out are the four listed     15:41:44
22 there on page 1, right?                       15:41:49
23      A.  So, again, sir, I would have to     15:41:50
24 reread relevant portions of the article.  At   15:41:58
25 the beginning of the article, yes, they        15:42:01

Page 221

1 identify them.  Their article is focusing on   15:42:02
2 these four articles.                          15:42:06
3      Q.  They certainly -- because it's not   15:42:07
4 a systematic review, they are not purporting to 15:42:14
5 provide any kind of comprehensive analysis of  15:42:19
6 the literature on desistance rates, correct?   15:42:22
7      A.  They are not purporting to have      15:42:25
8 conducted a systematic review.               15:42:29
9      Q.  Did -- to your awareness, did any    15:42:30
10 of the authors of the four studies they did    15:42:42
11 call out publish any kind of response to this  15:42:46
12 article?                                     15:42:50
13      A.  It's my understanding that         15:42:50
14 Professor Zucker published an article that he  15:42:59
15 in part comments on this one, sir.            15:43:03
16      Q.  Is he the only one?                 15:43:05
17      A.  Others may have commented on it in  15:43:09
18 passing, so that's a possibility.  I don't     15:43:20
19 recall.                                      15:43:29
20      Q.  You are not aware of Dr. Steensma   15:43:29
21 publishing a response to this article?        15:43:32
22      A.  So I know that Dr. Steensma has     15:43:34
23 published articles about desistance.  It's hard 15:43:39
24 for me to recall whether I would characterize  15:43:49
25 any of those articles as a response to this    15:43:52

56 (Pages 218 - 221)

Page 222

1 article, as opposed to he references this          15:43:53
2 article among other articles. My sense was          15:43:57
3 that Professor Zucker's article is much more a          15:44:05
4 response, sir.                                      15:44:07
5            (Thereupon, Exhibit 36, A Critical       15:44:10
6 Commentary on A Critical Commentary on Follow-up    15:44:10
7 Studies and Desistance Theories About Transgender   15:44:10
8 and Gender Nonconforming Children, was marked for   15:44:10
9 purposes of identification.)                        15:44:11
10 BY MR. FRAMPTON:                                    15:44:11
11       Q.  I show you what I am marking as          15:44:43
12 Defendants' Exhibit 36. The document I am           15:44:45
13 handing you is titled A Critical Commentary on      15:44:56
14 a Critical Commentary on Follow-up Studies and      15:44:59
15 Desistance Theories About Transgender and           15:45:04
16 Gender Nonconforming Children. The lead author      15:45:09
17 is Thomas Steensma. Is that the document I          15:45:10
18 have handed you, Dr. Antommaria?                    15:45:12
19       A.  It is. I appreciate --                   15:45:14
20       Q.  Have you seen this one before?           15:45:14
21       A.  I appreciate you having such a           15:45:15
22 comprehensive collection of articles, sir.          15:45:17
23       Q.  I have got a lot. Have you seen          15:45:19
24 this one before?                                    15:45:21
25       A.  I believe I -- I believe I have,         15:45:22

Page 223

1 sir.                                                15:45:27
2       Q.  Would you not -- you would                15:45:27
3 characterize this as a response to the Temple       15:45:28
4 Newhook article we just looked at, would you        15:45:34
5 not?                                                15:45:36
6       A.  So seeing it again, sir, yes, it's        15:45:36
7 a commentary on the commentary.                     15:45:41
8       Q.  Is there some reason you didn't           15:45:44
9 cite either Professor Zucker's or Professor         15:45:51
10 Steensma's responses in your expert report?        15:45:54
11       A.  Sir, I don't understand my expert        15:45:57
12 report to be a systematic review of the            15:46:05
13 literature. There are lots of articles that I      15:46:09
14 don't cite in my expert report.                    15:46:12
15       Q.  Sure. You didn't think it                15:46:13
16 relevant to cite Professor Steensma and Zucker     15:46:15
17 critically responding to Professor Temple          15:46:22
18 Newhook's article?                                  15:46:27
19       A.  May I look at my report, sir?            15:46:28
20       Q.  Sure.                                    15:46:32
21       A.  So, sir, I am trying to find where       15:47:49
22 I cite --                                          15:47:50
23       Q.  Temple Newhook?                          15:47:55
24       A.  -- Temple Newhook. But I would           15:47:56
25 say in the process of looking at that, I would     15:47:59

Page 224

1 say that Reference 52 does cite Zucker on the       15:48:02
2 natural history of gender identity disorder in      15:48:06
3 children in Zucker debate Different Strokes For     15:48:09
4 Different Folks, which -- you know, I would         15:48:13
5 have to look at those articles. But I believe       15:48:17
6 one of those is his quote, response, or             15:48:22
7 commentary on Temple Newhook, or at least          15:48:25
8 references that.                                    15:48:29
9       Q.  So the reference to Temple Newhook        15:48:29
10 is -- I'll find it for you. This is going to       15:48:42
11 be on page 22.                                     15:48:50
12            MR. CHEEK:  And just so we are clear,   15:48:51
13 this is Defendants' Exhibit 31?                    15:48:52
14            MR. FRAMPTON:  Yes, you are right.      15:48:53
15 BY MR. FRAMPTON:                                    15:48:53
16       Q.  Middle of the page, the studies to       15:48:56
17 which the legislation refers have substantial      15:48:58
18 limitations. For example, many include             15:49:01
19 children who would not fulfill the current         15:49:03
20 diagnostic criteria for gender dysphoria. Do       15:49:05
21 you see that?                                      15:49:09
22            THE WITNESS:  Yes. So I'm sorry that    15:49:09
23 I don't understand your question, sir. So I        15:49:21
24 believe that Newhook's paper does provide support  15:49:24
25 for that claim and is an appropriate reference to  15:49:28

Page 225

1 support that claim.                                 15:49:34
2       Q.  Okay. And you didn't think it             15:49:35
3 appropriate to cite Steensma or Zucker             15:49:37
4 responding to the claim of methodological          15:49:42
5 deficiencies?                                      15:49:51
6       A.  No, sir. I believe that the              15:49:52
7 Newhook paper does identify limitations in the     15:50:01
8 studies that she analyzes and that the Steensma    15:50:06
9 article and the Zucker article do not              15:50:12
10 comprehensively refute her identification of      15:50:15
11 some of the limitations of those studies.          15:50:19
12       Q.  They do disagree with some of her        15:50:22
13 methodological concerns, do they not, or do you   15:50:33
14 recall?                                            15:50:36
15            MR. CHEEK:  Objection, form.            15:50:36
16            THE WITNESS:  They do, sir. But,        15:50:43
17 again, my report is not intended to be a           15:50:44
18 comprehensive review of the literature. I have    15:50:48
19 cited a reference that provides appropriate        15:50:51
20 justification for the opinion that I have offered. 15:50:57
21            (Thereupon, Exhibit 37, The Amsterdam  15:51:16
22 Cohort of Gender Dysphoria Study (1972-2015):      15:51:16
23 Trends in Prevalence, Treatment, and Regrets, was 15:51:16
24 marked for purposes of identification.)            15:51:17
25 BY MR. FRAMPTON:                                    15:51:17

57 (Pages 222 - 225)

Page 226

1      Q.  I show you what I am marking as   15:51:17
2   Exhibit 37, a document titled The Amsterdam   15:51:19
3   Cohort of Gender Dysphoria Study (1972-2015):   15:51:28
4   Trends in Prevalence, Treatment, and Regrets.   15:51:33
5   The lead author is Dr. Wiepjes.  That's my best   15:51:36
6   Dutch pronunciation for today.  Does that   15:51:43
7   appear to be what I have handed you, sir?   15:51:46
8      A.  It does, sir.   15:51:48
9      Q.  Are you familiar with this one?   15:51:49
10      A.  I am, sir.   15:51:51
11      Q.  All right.  So let's look at what   15:51:52
12   this study did.  All right.  So if you look at   15:51:58
13   the bottom of the first column on page 583, are   15:52:15
14   you there?   15:52:22
15      A.  The left-hand column, sir?   15:52:22
16      Q.  Yes.   15:52:24
17      A.  Yes.   15:52:26
18      It says:  In the present study we   15:52:26
19   included the complete population seen at the   15:52:29
20   gender identity clinic of the VUmc from 1972   15:52:31
21   through December 2015 to assess the current   15:52:35
22   prevalence of transgender people who received   15:52:38
23   medical treatment, the frequency of specific   15:52:41
24   medical treatments performed, and the numbers   15:52:44
25   of people who received HT in line with their   15:52:46

Page 227

1   sex assigned at birth because they regretted   15:52:50
2   undergoing gonadectomy.  Did I read that   15:52:56
3   correctly?   15:52:59
4      A.  Yes, sir.   15:52:59
5      Q.  So if I understand that sentence,   15:53:01
6   they are reporting -- they are measuring   15:53:07
7   essentially three things, how many of their   15:53:09
8   patients received specific medical treatments,   15:53:15
9   that's one, right, they are measuring that?   15:53:18
10      A.  Well, I believe the first thing   15:53:20
11   that they list, sir, is, yes, the prevalence of   15:53:24
12   transgender people who received medical   15:53:31
13   treatment.   15:53:32
14      Q.  And by prevalence, they are   15:53:33
15   counting their own patients as to how many of   15:53:36
16   them received particular medical treatments,   15:53:38
17   right?   15:53:41
18      A.  Correct.   15:53:41
19      Q.  All right.  And second, they are   15:53:42
20   measuring the frequency within their patient   15:53:49
21   population of specific medical treatments,   15:53:53
22   right?   15:53:57
23      A.  Correct.   15:53:58
24      Q.  And then, third, how many of their   15:53:58
25   patients had a gonadectomy but then came back   15:54:02

Page 228

1   to them asking for hormones consistent with   15:54:07
2   their birth sex, right?   15:54:12
3      A.  Yes, they analyzed regret, or what   15:54:15
4   they characterize as regret.   15:54:22
5      Q.  Yeah, well, that's what I am   15:54:24
6   trying to get at is they are characterizing   15:54:24
7   regret as a patient who had a gonadectomy but   15:54:28
8   then came back to them asking for hormones   15:54:33
9   consistent with their birth sex, correct?   15:54:37
10      A.  Yes, sir.   15:54:40
11      Q.  Okay.  And those are the only   15:54:40
12   people that they are characterizing as   15:54:50
13   regretting, correct?   15:54:51
14      A.  I'm sorry, I am reviewing their   15:54:52
15   methods.   15:54:59
16      Q.  Understood.   15:54:59
17      A.  So I am reading, sir, at the top   15:55:35
18   of page 584.  Some people regretted the   15:55:37
19   interventions they had undergone.  Trans women   15:55:40
20   who started testosterone treatment after a   15:55:42
21   vaginoplasty or trans men who started estrogen   15:55:45
22   treatment after oophorectomy and expressed   15:55:49
23   regret were categorized as those who   15:55:51
24   experienced regret.  So it appears that there   15:55:54
25   were two criteria; that it was both initiating   15:55:58

Page 229

1   hormone therapy consistent with the sex   15:56:03
2   assigned at birth and an expression of regret.   15:56:05
3      Q.  Okay.  But they are only people   15:56:08
4   who underwent a gonadectomy and then came back   15:56:13
5   and sought hormones consist with their birth   15:56:17
6   sex, correct?   15:56:21
7      A.  I think that's roughly analogous   15:56:21
8   to what they are saying, sir.   15:56:29
9      Q.  Okay.  They did not measure   15:56:30
10   satisfaction with any particular therapy, did   15:56:35
11   they?   15:56:38
12      A.  May I look at the methods?   15:56:38
13      Q.  Of course.   15:56:42
14      A.  So it appears that they did   15:57:15
15   abstract reasons for regret from the patients'   15:57:17
16   medical records, but they did not appear to   15:57:24
17   have administered a measure of patient   15:57:26
18   satisfaction, sir.   15:57:29
19      Q.  But, again, Doctor, that is only   15:57:31
20   people who underwent a gonadectomy and then   15:57:33
21   came back to them requesting hormones consist   15:57:36
22   with their birth sex, right?   15:57:38
23      A.  So I don't -- I don't know -- so,   15:57:40
24   again, I would have to read this more closely   15:57:44
25   to know whether they reviewed all of the   15:57:46

58 (Pages 226 - 229)

Page 230

1 patients' records for expressions of regret or   15:57:49
2 just that subpopulation of patients' records   15:57:55
3 for expressions of regret.  But you had asked   15:57:59
4 about satisfaction, and they did not administer   15:58:05
5 a measure of satisfaction to the patient   15:58:08
6 population.   15:58:12
7        Q.  They did not measure how long   15:58:12
8 patients continued a particular therapy?   15:58:19
9        A.  Please let me look.  So your   15:58:26
10 question again, sir?   15:59:20
11        Q.  They did not measure how long   15:59:21
12 patients continued a particular therapy?   15:59:23
13        A.  So I am looking at Table 1, and it   15:59:25
14 provides data about individuals starting what I   15:59:45
15 would believe to be puberty suppression and   15:59:49
16 stopping puberty suppression.  So there may be   15:59:51
17 data potentially about the duration of therapy,   16:00:02
18 but I don't -- again, in this -- and, again, in   16:00:05
19 Table 4 there is information about the   16:00:21
20 characteristics of people who regret, and they   16:00:22
21 report ages and times.   16:00:29
22        So there does appear to be some   16:00:30
23 data in the report about duration of some   16:00:32
24 treatments for some patient populations.  So,   16:00:35
25 again, I would have to reread the article to   16:00:39

Page 231

1 give you more detail about what that looks   16:00:42
2 like.   16:00:44
3        Q.  In Table 4, everyone that they   16:00:44
4 characterize as having regret, all of them had   16:00:48
5 a gonadectomy, did they not?  You have got a   16:00:50
6 year listed for all of them, right?   16:00:53
7        A.  So your question again, sir?   16:00:55
8        Q.  Everyone they characterize as   16:01:07
9 having regret had a gonadectomy, correct?   16:01:08
10        A.  Yes, sir.   16:01:11
11        Q.  Go to page 589.   16:01:13
12        A.  Yes, sir.   16:01:22
13        Q.  All right.  First full paragraph   16:01:22
14 towards the bottom:  Our findings could be an   16:01:25
15 underestimation of people with --   16:01:29
16        A.  Oh, I'm sorry.  Sir, are you --   16:01:30
17 which paragraph are you in, sir?   16:01:32
18        Q.  First full paragraph on the   16:01:34
19 left-hand side, page 589.  And I am towards the   16:01:35
20 bottom of that paragraph.   16:01:39
21        A.  All right.   16:01:41
22        Q.  Our findings could be an   16:01:41
23 underestimation of people with regret after   16:01:44
24 gonadectomy because some might choose to go   16:01:49
25 elsewhere for reversal therapy or might   16:01:51

Page 232

1 experience regret without pursuing reversal   16:01:54
2 surgery or hormone therapy, HT.  Regret might   16:01:58
3 not always result in a desire for reversal   16:01:59
4 therapy, as it may be hidden from others.  In   16:02:02
5 addition, in our population the average time to   16:02:04
6 regret was 130 months, so it might be too early   16:02:07
7 to examine regret rates in people who started   16:02:10
8 with HT in the past 10 years.  Do you see that?   16:02:12
9        A.  I do, sir.   16:02:16
10        Q.  So they seem to be saying they   16:02:16
11 were not counting people who chose not to seek   16:02:20
12 reversal therapy, correct?   16:02:22
13        A.  So your question again, sir, is?   16:02:23
14        Q.  The authors are noting that they   16:03:03
15 are not counting people who regret the   16:03:05
16 gonadectomy but did not pursue reversal   16:03:09
17 therapy, correct?   16:03:12
18        A.  Reversal surgery or hormone   16:03:12
19 therapy, yes, sir.  It's common for authors at   16:03:20
20 the conclusion of a study to discuss potential   16:03:29
21 limitations, and I take it that that's what   16:03:32
22 they are doing.   16:03:36
23        Q.  Sure.  Go to page 587.   16:03:36
24        A.  Yes, sir.   16:03:47
25        Q.  Bottom of the page:  An   16:03:48

Page 233

1 interesting finding is the percentage of   16:03:54
2 children who were referred in childhood before   16:03:56
3 12 years of age and who started PS when the GD   16:03:59
4 persisted and the eligibility criteria were   16:04:03
5 fulfilled.  This 40 percent of children who   16:04:07
6 started PS is almost identical to the 39   16:04:10
7 percent of persistence of childhood GD reported   16:04:13
8 in a previous Dutch study using a smaller   16:04:17
9 cohort of children.  Did I read that correctly?   16:04:22
10        A.  You did, sir.   16:04:23
11        Q.  So in this study, they are   16:04:24
12 claiming that they are reporting essentially a   16:04:30
13 40 percent persistence rate for childhood   16:04:32
14 gender dysphoria; is that right?   16:04:35
15        A.  Yes, in the population that they   16:04:37
16 are referring to, yes, sir.   16:04:44
17        (Thereupon, Exhibit 38, A Follow-Up   16:05:19
18 Study of Boys With Gender Identity Disorder, was   16:05:19
19 marked for purposes of identification.)   16:05:20
20 BY MR. FRAMPTON:   16:05:20
21        Q.  I show you what I am marking as   16:05:21
22 Defendants' Exhibit 38.  This is a study titled   16:05:22
23 A Follow-Up Study of Boys With Gender Identity   16:05:26
24 Disorder.  The lead author is Devita Singh.   16:05:30
25 Dr. Antommaria, are you familiar with this   16:05:53

59 (Pages 230 - 233)

Page 234

1 study?                                    16:05:55
2      A. I have read this study previously. 16:05:55
3      Q. And have you evaluated the        16:05:58
4 desistance rates calculated in this study? 16:06:21
5      A. What do you mean by evaluated,     16:06:26
6 sir?                                       16:06:27
7      Q. Are you familiar with them?        16:06:28
8      A. To the extent that I have          16:06:30
9 previously read the study, yes, sir.       16:06:35
10     Q. Go to page 14.                      16:06:37
11     A. Yes, sir.                           16:06:52
12     Q. All right. In that very first      16:06:52
13 partial paragraph at the top left-hand side we 16:06:57
14 read: It can, however, be said with certainty 16:07:03
15 that the vast majority of boys were seen over a 16:07:06
16 particular period of time when the therapeutic 16:07:10
17 approach of recommending or supporting a gender 16:07:12
18 social transition prior to puberty was not 16:07:15
19 made. Indeed, in the current study, there was 16:07:18
20 only one patient who had socially transitioned 16:07:21
21 prior to puberty at the suggestion and support 16:07:25
22 of the professionals involved in this    16:07:27
23 individual's care and this particular patient 16:07:30
24 was one of the persisters with a          16:07:32
25 biphilic/androphilic sexual orientation. Did I 16:07:38

Page 235

1 read that correctly?                       16:07:40
2      A. You did, sir.                       16:07:40
3      Q. Do you agree that social           16:07:41
4 transition may affect rates of persistence and 16:07:51
5 desistance?                                16:07:56
6      A. So, sir, the care of prepubertal   16:07:56
7 children with gender dysphoria is not an area 16:08:11
8 of my clinical practice and is somewhat outside 16:08:16
9 of the scope of my expertise.              16:08:21
10     Q. Okay, fair. It's the easiest way   16:08:24
11 to make me stop asking the question. Let's go 16:08:27
12 to the next sentence there. Second, it should 16:08:32
13 also be recognized --                      16:08:34
14     A. May I go back, sir?                 16:08:36
15     Q. Yeah, yeah, yeah, go back to where  16:08:38
16 I was. I am just going to read the next    16:08:40
17 sentence.                                  16:08:42
18     A. No, you had just implied that you  16:08:42
19 were going to stop asking questions, and I had 16:08:44
20 closed the document.                       16:08:48
21     Q. Not yet. Second, it should also    16:08:49
22 be recognized that for the boys seen in the 16:08:53
23 current study, none who were in late childhood 16:08:56
24 and had likely entered puberty, Tanner Stage 2, 16:09:00
25 had received puberty-blocking hormone      16:09:04

Page 236

1 treatment, GnRH analogs, to suppress somatic 16:09:06
2 masculinization until sometime during      16:09:13
3 adolescence. Did I read that correctly?    16:09:15
4      A. You did, sir.                       16:09:17
5      Q. Okay. So if I am understanding     16:09:18
6 what I am reading, the children in this study 16:09:20
7 did not receive puberty suppression at Tanner 16:09:26
8 Stage 2, they received it later, correct?  16:09:30
9      A. So, sir, it's been awhile since I  16:09:32
10 have read this study. You are reading material 16:09:37
11 out of the discussion, and it seems as though 16:09:42
12 she is -- that the authors are making a    16:09:46
13 conjecture about what individuals' state of 16:09:48
14 pubertal development was based on their age 16:09:53
15 rather than having explicitly collected data 16:09:56
16 about individuals' Tanner staging. So I don't 16:10:00
17 know about the rigor or the evidence supporting 16:10:04
18 that claim without reviewing their methods and 16:10:09
19 results.                                   16:10:14
20     Q. Do you agree that the point -- the 16:10:15
21 point in pubertal development -- I'm sorry, 16:10:22
22 strike that. You agree in this study, as with 16:10:25
23 the Dutch studies we discussed earlier, they 16:10:44
24 did not measure the point at which a child  16:10:47
25 experienced desistance, the age or Tanner stage 16:10:51

Page 237

1 at which someone experienced desistance,   16:10:56
2 correct?                                   16:10:58
3      A. So my general recall is that       16:10:59
4 studies of so-called desistance measured   16:11:05
5 individuals' gender identity at two separate 16:11:10
6 points in time, as opposed to continuously. 16:11:13
7 But I would have to again review the methods of 16:11:16
8 this study to confirm that that is, in fact, 16:11:19
9 what these authors did in this specific study. 16:11:22
10     Q. And in a study like that of that  16:11:25
11 design, the child could have ceased experienced 16:11:30
12 gender dysphoria at any point between the  16:11:37
13 initial visit and the follow-up visit, correct? 16:11:40
14     A. Yes, sir.                           16:11:43
15     Q. Okay. Let's go back to the Cass    16:11:48
16 report, Exhibit 15 for you, Dr. Antommaria. 16:11:52
17     A. I have it, sir.                     16:12:00
18     Q. Great, the question is do I have   16:12:00
19 it. Go to page 38.                         16:12:06
20     A. Yes, sir.                           16:12:35
21     Q. Paragraph 3.31: The most          16:12:37
22 difficult question is whether puberty blockers 16:12:42
23 do, indeed, provide valuable time for children 16:12:44
24 and young people to consider their options or 16:12:46
25 whether they effectively lock in children and 16:12:49

Veritext Legal Solutions

877-373-3660                                       800.808.4958

1 young people to a treatment pathway which   16:12:52
2 culminates in progression to   16:12:55
3 feminizing/masculinizing hormones by impeding   16:13:00
4 the usual process of sexual orientation and   16:13:01
5 gender identity development.  Did I read that   16:13:05
6 correctly?   16:13:07
7      A.  You did, sir.   16:13:07
8      Q.  I will keep going, I'm sorry.   16:13:08
9 Data from both the Netherlands and the study   16:13:12
10 conducted by GIDS demonstrated that almost all   16:13:15
11 children and young people who are put on   16:13:18
12 puberty blockers go on to sex hormone   16:13:21
13 treatment, 96.5 percent and 98 percent   16:13:23
14 respectively.  The reasons for this need to be   16:13:26
15 better understood.  Did I read that correctly?   16:13:28
16      A.  You did, sir.   16:13:30
17      Q.  Do you agree, is it consistent   16:13:31
18 with your experience and understanding of the   16:13:35
19 literature that almost all children put on   16:13:37
20 puberty blockers continue on to cross-sex   16:13:40
21 hormones?   16:13:42
22      A.  Yes, it's consistent with my   16:13:43
23 understanding.  I am not sure that the   16:13:47
24 significant majority of individuals who begin   16:13:50
25 puberty blockers proceed to treatment with   16:13:53

1 gender-affirming hormone therapy.   16:13:56
2      Q.  Do you agree that it is a   16:13:57
3 difficult question whether the effect of   16:14:03
4 beginning puberty blockers during adolescence   16:14:07
5 effectively locks children and young people to   16:14:09
6 a treatment pathway?   16:14:12
7      A.  So I think it's difficult to   16:14:13
8 assess the statement in the Cass report that,   16:14:20
9 quote, the most difficult question is this one.   16:14:24
10 But I would agree that it is a important   16:14:30
11 question and methodologically difficult to   16:14:34
12 answer.   16:14:39
13      Q.  Are you aware of any studies that   16:14:39
14 have attempted to determine whether the   16:14:45
15 administration of puberty blockers is changing   16:14:46
16 the path of gender identity development in   16:14:48
17 children and increasing persistence of gender   16:14:52
18 dysphoria or transgender identification?   16:14:55
19      A.  Can you repeat the question, sir?   16:14:59
20      Q.  Absolutely.  Are you aware of any   16:15:04
21 study that has attempted to determine whether   16:15:06
22 puberty blockers are changing the path of   16:15:08
23 gender identity development in children and   16:15:11
24 increasing the persistence of gender dysphoria   16:15:13
25 or transgender identification?   16:15:18

1      A.  So the studies of initiating   16:15:19
2 individuals on puberty blockers continue to   16:15:27
3 follow their gender identity, so they are   16:15:30
4 investigating the persistence of gender   16:15:34
5 dysphoria.  It's harder for me to understand   16:15:37
6 what you mean by the difference between that   16:15:41
7 and evaluating quote, unquote, changing the   16:15:44
8 path.   16:15:48
9      Q.  Right.  Any studies evaluating   16:15:48
10 whether the administration of puberty blockers   16:15:52
11 as opposed to some other intervention like   16:15:55
12 counseling or psychological support changes the   16:16:00
13 pathway?   16:16:04
14          MR. CHEEK:  Objection, form.   16:16:04
15          THE WITNESS:  So, in particular, I am   16:16:09
16 not aware of any randomized controlled trials of   16:16:10
17 puberty blockers and mental health care compared   16:16:16
18 to mental health care alone.   16:16:23
19 BY MR. FRAMPTON:   16:16:24
20      Q.  Or any cohort studies?   16:16:25
21      A.  So there are -- so I would have to   16:16:27
22 refresh my memory.  There are cohort studies   16:16:33
23 that look at -- I don't recall off the top of   16:16:36
24 my head whether it is puberty blockers or   16:16:39
25 gender-affirming hormone therapy in adolescents   16:16:42

1 and compare them to some types of control,   16:16:46
2 particularly the CoSta study.  But I would have   16:16:52
3 to reacquaint myself with what the intervention   16:16:55
4 in that study is.   16:16:58
5      Q.  The CoSta study is the only one   16:17:00
6 that's coming to mind?   16:17:06
7      A.  Yes, sir.   16:17:07
8      Q.  And you are not recalling what the   16:17:07
9 control was there?   16:17:09
10      A.  Well, the control was individuals   16:17:13
11 who did not receive the gender-affirming   16:17:15
12 hormone treatment -- the gender-affirming   16:17:19
13 medical care.  What I don't recall is whether   16:17:21
14 that gender-affirming medical care was puberty   16:17:25
15 blockers or gender-affirming hormone therapy   16:17:27
16 and/or both.   16:17:29
17      Q.  Okay.  And what was the conclusion   16:17:30
18 of that study as to whether the administration   16:17:40
19 of either puberty blockers or cross-sex   16:17:43
20 hormones is changing the path of gender   16:17:46
21 identity development, or was it not evaluating   16:17:49
22 that question?   16:17:52
23      A.  I don't believe that there were   16:17:54
24 differences between the two groups in terms of   16:17:56
25 individuals' gender identity at the beginning   16:18:03

Page 242

1 of the study and at the end of the study, sir. 16:18:05
2 But, again, I would have to look at the 16:18:13
3 particular study and the outcomes that they 16:18:15
4 reported. 16:18:18
5 Q. Sure. 16:18:19
6 A. Are we done with the Cass review, 16:18:58
7 sir, for the time being? 16:19:00
8 Q. Yes. 16:19:01
9 (Thereupon, Exhibit 39, Medical 16:19:03
10 Decision-making in Children and Adolescents: 16:19:03
11 Developmental and Neuroscientific Aspects, was 16:19:03
12 marked for purposes of identification.) 16:19:04
13 BY MR. FRAMPTON: 16:19:04
14 Q. I hand you what I am marking as 16:19:17
15 Exhibit 39. This is a document titled Medical 16:19:18
16 Decision-making in Children and Adolescents: 16:19:25
17 Developmental and Neuroscientific Aspects, from 16:19:27
18 BMC Pediatrics. Do you have the article, 16:19:32
19 Dr. Antommaria? 16:19:35
20 A. I do. 16:19:35
21 Q. Are you familiar with this one? 16:19:35
22 A. I try to be familiar with much of 16:19:39
23 the literature, sir, but I am not familiar with 16:19:45
24 this article. 16:19:46
25 Q. Are you familiar with the journal, 16:19:47

Page 243

1 BMC Pediatrics? 16:19:51
2 A. I am familiar with the family of 16:19:54
3 BMC journals, but I do not frequently read BMC 16:19:59
4 Pediatrics, sir. 16:20:05
5 Q. Go to page 4, please. 16:20:05
6 A. I am on page 4, sir. 16:20:30
7 Q. Under adolescence and 16:20:31
8 decision-making competence, it says, the second 16:20:43
9 sentence: However, due to differences in 16:20:48
10 cross-talk between the various -- 16:20:51
11 A. Hang on one second, sir, let me 16:20:52
12 find it. 16:20:54
13 Q. Oh, I'm sorry. 16:20:54
14 A. Okay. Please go ahead. 16:20:56
15 Q. However, due to differences in 16:20:57
16 cross-talk between the various brain structures 16:21:03
17 over the course of brain development, 16:21:05
18 competence might fluctuate. A period in which 16:21:08
19 this is especially pronounced is adolescence. 16:21:11
20 In this period, great changes and developmental 16:21:15
21 leaps take place in the brain, which can have a 16:21:17
22 profound effect on decision-making competence. 16:21:20
23 Do you agree with those statements? 16:21:25
24 A. So, again, you have asked me, sir, 16:21:27
25 to read several sentences out of an article of 16:21:31

Page 244

1 which I am not familiar. There would be 16:21:36
2 reasons for me to have concern about some of 16:21:40
3 the claims that are being made in these 16:21:43
4 sentences, but I would need to read the article 16:21:45
5 in order to fully evaluate them. 16:21:49
6 Q. What concerns immediately come to 16:21:52
7 mind? 16:21:55
8 A. So in the US context, competence 16:21:56
9 would generally be seen as a legal category, 16:22:04
10 not a medical or ethical category. And the 16:22:08
11 relative -- relevant category would be medical 16:22:13
12 decision-making capacity and that the authors 16:22:18
13 refer to developmental leaps. And my general 16:22:25
14 understanding is that there are gradual changes 16:22:29
15 in neurodevelopment over adolescence and young 16:22:34
16 adulthood. But the categorization of something 16:22:39
17 as a developmental leap is language that I am 16:22:44
18 not familiar with, sir. 16:22:48
19 Q. Are you familiar in general with a 16:22:49
20 notion that adolescents -- that adolescent 16:22:57
21 decision making is affected particularly by 16:23:02
22 whether a context is, quote, hot or cold, the 16:23:08
23 emotional context? 16:23:15
24 A. I am familiar with that account of 16:23:16
25 increased risk taking in adolescents, yes, sir. 16:23:18

Page 245

1 Q. And the notion that adolescent 16:23:22
2 decision making is particularly affected by 16:23:26
3 emotionally difficult situations? 16:23:32
4 A. I don't know that my understanding 16:23:35
5 of hot contexts is specifically framed in terms 16:23:44
6 of -- your term again, emotionally -- 16:23:53
7 Q. Emotionally loaded. 16:23:55
8 A. Emotionally loaded circumstances. 16:23:57
9 My understanding is that, in part, hot 16:23:59
10 circumstances are related to things such as 16:24:03
11 peer influence and that as a clinician I try to 16:24:07
12 support adolescent decision making by creating 16:24:13
13 what in that frame -- that conceptualization 16:24:19
14 might be a cold environment. 16:24:23
15 Q. Other than peer influence, what 16:24:26
16 contributes to a hot context for adolescents, 16:24:29
17 in your understanding? 16:24:34
18 A. So I would say that the -- so I 16:24:50
19 would distinguish the relative risks and 16:24:59
20 benefits of the decision that is being made 16:25:02
21 from the emotionality of the situation and have 16:25:04
22 certainly interacted with adolescents in making 16:25:10
23 decisions that have significant risks and 16:25:12
24 benefits that they have nonetheless been able 16:25:15
25 to approach in a cool circumstance. So 16:25:18

62 (Pages 242 - 245)

Page 246

1 emotionality might be things like anger or    16:25:22
2 frustration, as opposed to other components of    16:25:30
3 emotionality.    16:25:32
4    Q.   So are you saying that    16:25:33
5 emotionality can contribute to a hot    16:25:34
6 circumstance?    16:25:36
7    A.   Some forms of emotionality can.    16:25:37
8    Q.   Have you seen literature    16:25:44
9 suggesting that adolescents tend to overvalue    16:25:53
10 short-term rewards rather than long-term    16:25:58
11 rewards?    16:26:01
12    A.   I am aware of literature that    16:26:01
13 reports that as an aggregate finding for    16:26:11
14 adolescent -- for children and adolescents,    16:26:13
15 yes, sir.    16:26:23
16       (Thereupon, Exhibit 40, Assessing    16:26:28
17 Medical Decision-Making Competence in Transgender    16:26:28
18 Youth, was marked for purposes of identification.) 16:26:29
19 BY MR. FRAMPTON:    16:26:29
20    Q.   I am showing you what I am marking    16:27:00
21 as Exhibit 40, a document titled Assessing    16:27:01
22 Medical Decision-Making Competence in    16:27:17
23 Transgender Youth. Dr. Antommaria, are you    16:27:17
24 familiar with this document?    16:27:19
25    A.   May I look at it for a moment,    16:27:20

Page 247

1 sir?    16:27:27
2    Q.   Of course.    16:27:27
3    A.   I am, sir.    16:27:29
4    Q.   And this was a study of medical    16:27:30
5 decision-making capacity in adolescents who    16:27:40
6 were about to go on puberty suppression; is    16:27:45
7 that correct? I'm sorry, medical    16:27:50
8 decision-making competence.    16:27:51
9    A.   So it is about individuals'    16:28:02
10 medical decision-making capacity to make    16:28:07
11 decisions about pubertal suppression, yes, sir.  16:28:10
12    Q.   Okay. And the structure of this    16:28:25
13 study is the patients were all at a point where 16:28:29
14 the clinician was ready to prescribe puberty    16:28:35
15 suppression, and then they did both an informed  16:28:38
16 consent interview and then an interview where    16:28:42
17 they applied this MacCAT-T instrument; correct? 16:28:46
18    A.   So I am just reviewing the method,    16:28:54
19 sir.    16:28:56
20    Q.   Yep.    16:28:56
21    A.   So yes, the population were    16:29:31
22 adolescents who were -- the language that the    16:29:36
23 report uses were about to start PS, or puberty   16:29:39
24 suppression. And the second part of your    16:29:43
25 question, sir?    16:29:48

Page 248

1    Q.   So they did an informed consent    16:29:48
2 interview with them that was videotaped,    16:29:51
3 correct?    16:29:53
4    A.   I'm sorry, I am looking at their    16:29:54
5 procedure, sir.    16:30:03
6    Q.   And I am looking in procedures,    16:30:03
7 that this standard IC session was videotaped    16:30:14
8 and used to establish the reference standard.    16:30:17
9    A.   Yes. And then it says in the    16:30:21
10 following sentence after the IC or informed    16:30:23
11 consent session, the MacCAT-T interview was    16:30:26
12 administered by one of the researchers.    16:30:31
13    Q.   Okay. Is MacCAT-T an instrument    16:30:32
14 that you have ever used?    16:30:35
15    A.   To the -- it is not, sir.    16:30:36
16    Q.   All right. So with the informed    16:30:44
17 consent interviews, staying in procedures, they  16:30:54
18 then had two experts and the clinician review    16:30:58
19 those to determine if they thought the    16:31:07
20 adolescent exhibited medical decision-making    16:31:12
21 competence, correct?    16:31:14
22    A.   Yes, medical decision-making    16:31:15
23 capacity, sir.    16:31:20
24    Q.   Yeah. And then they had three    16:31:20
25 different people review the MacCAT-T video and   16:31:24

Page 249

1 make a decision based on that, whether they    16:31:28
2 believed the adolescent exhibited MDC, correct? 16:31:31
3    A.   Yes, sir.    16:31:34
4    Q.   And on the MacCAT-T, if you flip    16:31:44
5 back a page, you can see where they explain    16:31:48
6 what that is. There is no cutoff score,    16:31:51
7 correct?    16:32:00
8       MR. CHEEK: Objection to form.    16:32:12
9       THE WITNESS: So I am reading the    16:32:13
10 MacCAT-T is a quantitative semi-structured    16:32:17
11 interview used to assess the four medical    16:32:19
12 decision-making capacity criteria. I am    16:32:22
13 continuing to read, sir.    16:32:28
14 BY MR. FRAMPTON:    16:32:28
15    Q.   You will get there.    16:32:29
16    A.   So yes, it states that an overall    16:32:37
17 cutoff score for the MDC is not provided.    16:32:40
18 So no particular score means that    16:32:43
19 the adolescent has medical decision-making    16:32:49
20 competence, correct?    16:32:52
21    A.   So it states, sir, that the    16:32:53
22 overall cutoff score for the MDC is not    16:33:05
23 provided. The assessor weighs the sub scale    16:33:08
24 scores along with conceptual information and    16:33:11
25 judges the MDC in each individual case. I    16:33:14

63 (Pages 246 - 249)

Page 250

1 would assume that -- and we have talked about 16:33:18
2 the GRADE criteria earlier today. And, again, 16:33:21
3 often tools rely on individual judgment in 16:33:26
4 applying them. 16:33:31
5 Q. So the reviewers could -- one 16:33:31
6 reviewer could regard a score of 14 as 16:33:36
7 generally establishing competence, and one 16:33:39
8 reviewer could regard a score of 18 as 16:33:41
9 generally establishing competence, correct? 16:33:44
10 A. Well, that's assuming that they 16:33:46
11 were judging competence on the basis of a 16:33:51
12 score, as opposed to weighing the scores and 16:33:53
13 other contextual information. It would suggest 16:33:57
14 that using the cutoff score in the way you 16:34:00
15 suggest was not the way the tool was designed. 16:34:03
16 Q. Go to Table 2, please, if you 16:34:06
17 would. 16:34:09
18 A. On what page, sir? 16:34:12
19 Q. It's going to be page 6. 16:34:13
20 A. I am on page 6, sir. 16:34:16
21 Q. Okay. The study involved 16 natal 16:34:18
22 boys, correct? 16:34:25
23 A. Yes, 16 individuals who were 16:34:26
24 assigned male at birth. 16:34:30
25 Q. So far fewer natal males than 16:34:31

Page 251

1 natal females, right? 16:34:33
2 A. So there were 58 individuals 16:34:35
3 assigned female at birth in the study, sir. 16:34:38
4 Q. And if we go down to Table 3 and 16:34:41
5 count the number of natal males who were judged 16:34:49
6 incompetent on one or both standards, how many 16:34:54
7 do you get? 16:34:59
8 A. So if you combine the reference 16:35:00
9 standard and the MacCAT-T, it would appear 11, 16:35:20
10 sir. 16:35:26
11 Q. Now, how many of them were natal 16:35:26
12 males? 16:35:28
13 A. Four. It appears that the number 16:35:29
14 is four, sir. 16:35:38
15 Q. So 25 percent of natal males, 16:35:41
16 correct, adjudged incompetent on one or both 16:35:43
17 standards? 16:35:47
18 MR. CHEEK: Objection, form, 16:35:52
19 misstates evidence. 16:35:53
20 MR. FRAMPTON: No, it doesn't. But 16:35:55
21 go ahead. 16:35:56
22 THE WITNESS: Four out of 11, sir. 16:35:57
23 BY MR. FRAMPTON: 16:36:00
24 Q. I'm sorry, four out of 16 natal 16:36:01
25 males in the study, correct? 16:36:04

Page 252

1 A. Oh, can you repeat your question, 16:36:06
2 sir? 16:36:09
3 Q. Does it appear that four out of 16:36:09
4 the 16 natal males in the study were adjudged 16:36:14
5 incompetent on one or both standards? 16:36:18
6 A. Yes, four out of 16, sir. 16:36:23
7 Q. And that is 25 percent, is it not? 16:36:25
8 A. Yes, sir. 16:36:29
9 Q. Okay. Go to -- stay on that same 16:36:29
10 page. Go to the main column of text on the 16:36:32
11 right-hand side, first full paragraph. Do you 16:36:34
12 see -- 16:36:46
13 A. Yes, sir. 16:36:46
14 Q. -- where it says: In all of these 16:36:47
15 11 adolescents assessed incompetent except for 16:36:50
16 one, the involved clinician had no doubts about 16:36:53
17 medical decision-making competence. Do you see 16:36:59
18 that? 16:37:01
19 A. You read that sentence correctly, 16:37:01
20 sir. 16:37:04
21 Q. So in the 11 cases where the 16:37:04
22 adolescent was assessed incompetent on one or 16:37:08
23 both measures, the clinician got it wrong 10 16:37:12
24 out of 11 times; is that right? 16:37:19
25 A. Can I read the study, sir? 16:37:21

Page 253

1 Q. Uh-huh. 16:37:29
2 A. So I don't -- so the sentence that 16:38:18
3 you are quoting, sir, appears in the 16:39:06
4 discussion. I am just having difficulty seeing 16:39:10
5 where in the results, including the tables, 16:39:14
6 it's reporting the results that in all of these 16:39:18
7 11 adolescents assessed incompetent except for 16:39:22
8 one, the involved clinician had no doubts about 16:39:26
9 the MDC. 16:39:29
10 For example, in Table 3 where 16:39:32
11 those 11 individuals are described, it 16:39:35
12 describes the results for the reference 16:39:37
13 standard in the MacCAT-T, but I don't see a 16:39:40
14 separate column for the involved clinician. So 16:39:43
15 I am just having trouble putting the discussion 16:39:51
16 together with the results that the 16:39:54
17 investigators provide. 16:39:58
18 Q. They could be discussing results 16:39:58
19 that they did not separately report in a table, 16:40:00
20 correct? 16:40:02
21 MR. CHEEK: Objection, calls for 16:40:03
22 speculation. 16:40:05
23 THE WITNESS: In general, it would be 16:40:08
24 best practice to include all of the results in 16:40:10
25 results section and not introduce new results in 16:40:15

Page 254

1 the discussion. So I am just having difficulty 16:40:19
2 reconciling that with reacquainting myself with 16:40:22
3 this study this afternoon, sir. 16:40:26
4 BY MR. FRAMPTON: 16:40:27
5     Q.  Okay. But you do see that in the 16:40:28
6 discussion, at least, they report that in 10 16:40:30
7 out of the 11 adolescents assessed incompetent, 16:40:35
8 the clinician believed the adolescent was 16:40:38
9 competent, correct? 16:40:40
10     A.  Yes, I see that sentence, sir. 16:40:41
11     Q.  All right. I am going to move on. 16:40:44
12         (Thereupon, Exhibit 41, The 16:40:46
13 Competency of Children and Adolescents to Make 16:40:46
14 Informed Treatment Decisions, was marked for 16:40:46
15 purposes of identification.) 16:40:46
16 BY MR. FRAMPTON: 16:40:46
17     Q.  Show you what I am marking as 16:40:47
18 Exhibit 41. I am handing you an article titled 16:40:53
19 The Competency of Children and Adolescents to 16:41:16
20 Make Informed Decisions, from 1982. Do you 16:41:17
21 recognize this article, sir? 16:41:20
22     A.  I do, sir. 16:41:20
23     Q.  And this is a study that you 16:41:21
24 cited, correct? 16:41:34
25     A.  I believe so, sir. 16:41:34

Page 255

1     Q.  Look on page 1592, please. 16:41:36
2     A.  Yes, sir. 16:41:46
3     Q.  All right. The top left-hand 16:41:46
4 corner, the second sentence says: From 25 16:41:48
5 dilemmas that were pilot tested, four were 16:41:50
6 chosen because they represented a range of 16:41:52
7 complexity, content, and difficulty and were 16:41:55
8 not viewed as being too sensitive or disturbing 16:41:57
9 to present to the youngest subjects. Of these 16:41:59
10 four dilemmas, two described treatment 16:42:05
11 alternatives for medical problems, diabetes and 16:42:07
12 epilepsy, and two described alternatives for 16:42:10
13 psychological problems, depression and 16:42:12
14 enuresis. Did I read that correctly? 16:42:17
15     A.  You did, sir. 16:42:17
16     Q.  So the authors report that they 16:42:18
17 avoided scenarios that they deemed too 16:42:31
18 sensitive or disturbing, correct? 16:42:33
19     A.  That's what you read, sir. 16:42:36
20     Q.  And you don't have any way of 16:42:38
21 knowing if they would have judged gender 16:42:39
22 dysphoria too sensitive or disturbing, do you? 16:42:41
23     A.  So based on what you have read, 16:42:45
24 sir, they don't identify the topics of the 16:42:50
25 scenarios that they excluded. 16:42:54

Page 256

1     Q.  The scenarios they did include do 16:42:55
2 not involve potential loss of fertility, 16:43:00
3 correct? 16:43:10
4     A.  That would not be a major risk of 16:43:10
5 diabetes, epilepsy, depression, or enuresis, 16:43:14
6 sir. 16:43:19
7     Q.  Impairment of neurodevelopment? 16:43:19
8     A.  I'm sorry, sir? 16:43:22
9     Q.  Would impairment of 16:43:23
10 neurodevelopment be a major risk of any of 16:43:26
11 those diseases? 16:43:28
12     A.  Potentially epilepsy, sir. 16:43:29
13     Q.  If I understand the basic 16:43:32
14 structure of this study, they were presenting 16:43:46
15 the participants with these sort of medical 16:43:49
16 scenarios and then applying a couple of -- a 16:43:54
17 series of instruments to how they made 16:43:57
18 decisions based on the scenario, correct, in at 16:43:59
19 least general terms? 16:44:06
20     A.  One moment, sir. So, yes, they 16:44:08
21 were presented with the dilemmas and then 16:44:37
22 interviewed about decision making relative to 16:44:39
23 those dilemmas, sir. 16:44:41
24     Q.  Go to page 1596, please. 16:44:42
25     A.  Yes, sir. 16:44:58

Page 257

1     Q.  And before I ask you, these are -- 16:44:58
2 they are presenting these folks with 16:45:01
3 hypothetical scenarios, correct? 16:45:05
4     A.  Yes, sir. 16:45:08
5     Q.  So, by definition, the participant 16:45:11
6 has no sort of emotional stake in the scenario 16:45:14
7 that's being presented, correct? It's not a 16:45:20
8 medical problem they are actually experiencing, 16:45:22
9 right? 16:45:24
10     A.  So I would have to look at their 16:45:25
11 inclusion and exclusion criteria to know if 16:45:29
12 they excluded individuals who might be 16:45:33
13 experiencing those conditions. Certainly, 16:45:36
14 enuresis is relatively common, and so I 16:45:40
15 don't -- again, looking at this again today, I 16:45:44
16 don't know whether they explicitly excluded 16:45:48
17 individuals with enuresis from this study. 16:45:51
18     Q.  As a general matter, these were 16:45:53
19 hypothetical scenarios, correct? 16:45:56
20     A.  That's my understanding of this 16:45:58
21 study. 16:46:02
22     Q.  So unless a participant had a 16:46:02
23 particular one of these, they would not have a 16:46:04
24 particular emotional stake in the treatment 16:46:07
25 decision, correct? 16:46:10

65 (Pages 254 - 257)

Page 258

1        A.   So, again, sir, I think that        16:46:10
2    that's an overgeneralization.  Certainly,        16:46:19
3    diabetes and epilepsy and depression are very    16:46:21
4    common in the general population so that even    16:46:24
5    if the participant in the study did not have    16:46:26
6    one of those conditions, one of their family    16:46:29
7    members may have had those conditions and they   16:46:30
8    may have had a significant emotional investment  16:46:33
9    in the condition.  Again, I don't know that    16:46:35
10   those individuals were excluded from the study.  16:46:36
11       Q.   Page 1596, the first full         16:46:39
12   paragraph.  It says, second sentence:  Subjects  16:46:49
13   clearly were not influenced by a current    16:46:53
14   physical illness or physiological disorder or    16:46:58
15   by factors such as weakness, confusion,    16:46:58
16   depression, or anxiety, which sometimes    16:47:02
17   accompany such conditions.  These factors may    16:47:02
18   decrease individuals' ability to use their    16:47:05
19   cognitive capacities in health care decision    16:47:08
20   making.  Do you see that?        16:47:11
21       A.   Which paragraph are you in, sir?    16:47:12
22       Q.   Right-hand column, first full      16:47:14
23   paragraph.                16:47:17
24       A.   So, again, sir, I take it that     16:47:33
25   that description is stating that the      16:47:36

Page 259

1    participant in the study doesn't currently have  16:47:39
2    a physical illness or a psychological disorder.  16:47:41
3    I think the claim that I was making is that    16:47:44
4    certainly their parent or a family member might  16:47:47
5    have diabetes or epilepsy.  I don't see that    16:47:50
6    that possibility is is excluded by that    16:47:53
7    sentence, sir.            16:47:55
8        Q.   You don't have any reason to       16:47:56
9    disagree with the author's sentence, do you?    16:47:58
10       A.   May I read the full paragraph,     16:48:01
11   sir?                  16:48:08
12       Q.   Actually, I'll leave it.  Let me   16:48:14
13   go to the paragraph on -- left-hand column,    16:48:16
14   last paragraph.  Although the performance of    16:48:19
15   the 14-year-olds was generally equivalent to    16:48:23
16   that of the adults, numerically small but    16:48:26
17   statistically significant differences between    16:48:29
18   these groups were found for the epilepsy    16:48:32
19   dilemma on two of the four competency scales.    16:48:35
20   These findings may relate to the concerns of    16:48:37
21   early adolescence about body image and physical  16:48:39
22   attractiveness, since the recommended      16:48:41
23   medication rejected by 12.5 percent of the    16:48:43
24   14-year-olds was described as sometimes leading  16:48:47
25   to periodontal problems and occasionally    16:48:50

Page 260

1    causing an excess growth of body hair,    16:48:52
2    hirsutism.  Did I read that correctly?    16:48:56
3        A.   You did, sir.            16:48:57
4        Q.   And then it goes on to say:  These  16:48:57
5    differences do suggest that competency, as    16:49:00
6    defined by certain legal tests, may depend to    16:49:02
7    some degree upon the dimensions of the specific  16:49:05
8    decision-making context.        16:49:07
9        A.   You read that correctly, sir.     16:49:12
10       Q.   Do you recall from looking at this  16:49:14
11   study that the 14-year-olds experienced    16:49:17
12   decreased decision-making competence with    16:49:21
13   respect to matters affecting body image?    16:49:23
14       A.   Prior to your reading this, sir, I  16:49:27
15   did not recall that nuance of the study    16:49:32
16   results.                16:49:37
17       Q.   Okay, that's fine.  I'll move on.  16:49:37
18       (Thereupon, Exhibit 42, A Qualitative    16:49:46
19   Study of Adolescents' Understanding of Biobanks  16:49:46
20   and Their Attitudes Toward Participation,    16:49:46
21   Re-contact, and Data Sharing, was marked for    16:49:46
22   purposes of identification.)      16:49:47
23   BY MR. FRAMPTON:            16:49:47
24       Q.   I hand you what I am marking as    16:50:02
25   Defendants' Exhibit 42.  And this is an article  16:50:03

Page 261

1    titled A Qualitative Study of Adolescents'    16:50:19
2    Understanding of Biobank and Their Attitudes    16:50:23
3    Towards Participation, Re-contact, and Data    16:50:25
4    Sharing; is that right?          16:50:28
5        A.   Yes, sir.            16:50:29
6        Q.   You obviously recognize this one,  16:50:30
7    do you not?              16:50:33
8        A.   I do, sir.            16:50:34
9        Q.   You were one of the investigators  16:50:34
10   here, correct?            16:50:38
11       A.   Correct, sir.          16:50:38
12       Q.   What are biobanks?        16:50:39
13       A.   Biobanks are large collections of  16:50:41
14   individuals' biological specimens and data that  16:50:50
15   are utilized to conduct research potentially at  16:50:54
16   a particular point in time and then in the    16:50:58
17   future.                16:51:03
18       Q.   They are not used for treatment of  16:51:04
19   the individual patients who contribute,    16:51:07
20   correct?                16:51:10
21       A.   So there is an ongoing debate      16:51:10
22   about the potential return of medically    16:51:17
23   actionable results to participants in biobanks.  16:51:20
24   But yes, the primary intention of a biobank is  16:51:24
25   to support research, not clinical care.    16:51:27

66 (Pages 258 - 261)

1    Q.   And in this study, you personally   16:51:31
2 conducted all of the interviews, correct?      16:51:38
3    A.   No, sir; I did not personally      16:51:40
4 conduct the interviews.           16:51:44
5    Q.   Oh, all right.  Look at page 931.   16:51:45
6 Oh, I see what happened here.  You are not      16:51:52
7 A.M.M.              16:51:58
8    A.   I am not, sir.         16:51:58
9    Q.   You are A.M.A.  All right.  So one   16:51:59
10 of your colleagues conducted the interviews,    16:52:04
11 correct?              16:52:06
12    A.   Ms. Murad, the primary author, who  16:52:06
13 was a graduate student in the genetic      16:52:14
14 counseling program, I believe conducted the    16:52:17
15 interviews.             16:52:20
16    Q.   Okay.  Go to page 932.        16:52:20
17    A.   I am on 932, sir.         16:52:38
18    Q.   All right.  Under results, it says  16:52:39
19 sort of second full paragraph, the second      16:52:45
20 sentence:  Following the presentation of the    16:52:47
21 educational information about biobanks,      16:52:49
22 participants were asked to restate in their own  16:52:51
23 words what they thought a biobank was and were  16:52:53
24 then asked to describe the benefits of      16:52:56
25 participating in a biobank.  Many participants  16:52:59

1 did not have a good understanding of biobanks,   16:53:01
2 and then it references Table 2.  Did I read      16:53:04
3 that correctly?           16:53:07
4    A.   You did, sir.         16:53:07
5    Q.   Was that, indeed, something you     16:53:08
6 found in this study, that most of the      16:53:11
7 participants did not ultimately exhibit a good  16:53:13
8 understanding of biobanks?        16:53:19
9    A.   So what a biobank, as you had      16:53:21
10 asked me to describe a biobank, is not a      16:53:30
11 concept that is very familiar or seemingly to   16:53:32
12 adolescents.  They were provided brief      16:53:38
13 educational information.  But as Table 2      16:53:39
14 suggests, that after that brief educational      16:53:43
15 intervention, there were some misunderstandings  16:53:47
16 that persisted, yes, sir.         16:53:51
17    Q.   Go to page 935.         16:53:53
18    A.   I am on 935, sir.         16:54:03
19    Q.   All right.  You list -- under      16:54:05
20 discussion, you list four numbered findings,    16:54:07
21 correct?              16:54:13
22    A.   The first paragraph in the        16:54:13
23 discussion includes four numbered findings,     16:54:16
24 yes.               16:54:18
25    Q.   The first of which is very few     16:54:18

1 adolescents had previously heard of biobanks,   16:54:20
2 and many of them had misconceptions about      16:54:22
3 biobanks that persisted even after attempts at  16:54:25
4 education, correct?           16:54:29
5    A.   Correct, sir.         16:54:30
6    Q.   Dropping down to the next        16:54:31
7 paragraph, it says:  Misunderstandings about    16:54:35
8 the purpose of biobanks persisted throughout    16:54:41
9 the interview.  Some of these misunderstands    16:54:42
10 were sufficient, for example, that the primary  16:54:45
11 purpose of the biobank was clinical care rather  16:54:46
12 than research, to suggest that some adolescents  16:54:49
13 may have insufficient background knowledge to   16:54:52
14 make an adequately informed decision about      16:54:54
15 participation.  Did I read that correctly?      16:54:57
16    A.   You did, sir.         16:54:58
17    Q.   So in this study, you found that   16:54:59
18 at least some of your participants would not    16:55:03
19 have been in a sufficient place to make an      16:55:05
20 adequately informed decision about      16:55:09
21 participating in a biobank, correct?      16:55:10
22    A.   So it is to say that it is not   16:55:12
23 uncommon for adolescents or adults to confuse   16:55:17
24 research with clinical practice and, hence, the  16:55:22
25 concept of therapeutic misconception.  The      16:55:26

1 objective of this study was not to consent      16:55:30
2 individuals for participation in biobanks.  And  16:55:34
3 so yes, after a brief education about biobanks,  16:55:41
4 there was still inadequate knowledge about what  16:55:44
5 a biobank was.  We did not conduct further      16:55:47
6 interventions to see if that misunderstanding   16:55:51
7 was persistent or whether it was surmountable   16:55:55
8 with new -- with additional or improved      16:55:58
9 educational interventions, sir.         16:56:01
10    Q.   Go over to the next column.  Tell   16:56:03
11 me what the effect heuristic is.         16:56:10
12    A.   Which paragraph are you in, sir?   16:56:16
13    Q.   The second full paragraph on the   16:56:18
14 second column of 935.           16:56:19
15    A.   So the sentence in the paragraph   16:56:30
16 reads, sir:  The affect heuristic is when      16:56:32
17 individuals who have favorable feelings about   16:56:36
18 participating in an activity tend to judge the  16:56:38
19 risks of participation as low and the benefits  16:56:40
20 as high.              16:56:43
21    Q.   And so the basic idea is if      16:56:44
22 someone comes into -- if someone comes in with  16:56:51
23 a preconception with favorable feelings about a  16:56:59
24 particular activity or intervention, that may   16:57:03
25 color their perception of the risks and      16:57:06

Page 266

1 benefits, correct?                        16:57:10
2      A.  So, sir, given the increasing        16:57:11
3 literature about behavioral economics, we       16:57:17
4 increasingly understand the heuristics that     16:57:22
5 both adolescents and adults use in decision     16:57:25
6 making.  And in clinical practice, we attempt   16:57:28
7 to recognize those potential heuristics and     16:57:31
8 lead individuals in decision making in ways     16:57:37
9 that address ways that those heuristics might   16:57:40
10 mislead them.                               16:57:45
11      Q.  My question was is it the case        16:57:46
12 that if someone -- I understand what you are    16:57:50
13 saying you do in practice.  My question is if   16:57:52
14 someone comes in with favorable feelings about  16:57:55
15 a particular activity, do we understand that    16:57:59
16 that may lead them to judge the risks as low    16:58:02
17 and the benefits as high?                   16:58:08
18      MR. CHEEK:  Objection, form.          16:58:10
19      THE WITNESS:  So, sir, this is a      16:58:12
20 paragraph from the discussion.  It is speculating  16:58:14
21 about a potential cause of a finding.  The      16:58:18
22 sentence at the end of the paragraph reads:     16:58:23
23 Additional research would be needed to validate  16:58:26
24 this hypothesis.                            16:58:28
25 BY MR. FRAMPTON:                           16:58:30

Page 267

1      Q.  And I am just saying as a general    16:58:31
2 matter, is that what the -- is the affect       16:58:33
3 heuristic something that you are aware of from   16:58:36
4 the literature?                             16:58:38
5      A.  We cite to the literature in this   16:58:39
6 discussion, sir.                            16:58:43
7      Q.  Right, right.  And did I           16:58:43
8 accurately describe the affect heuristic as the  16:58:46
9 idea that if someone comes in with a favorable  16:58:51
10 view of a particular activity, then they tend   16:58:54
11 to judge the risks as low and the benefits as   16:58:56
12 high?                                      16:58:59
13      A.  Yes, sir.  And we discussed        16:58:59
14 earlier the risks of bias and masking.  And     16:59:01
15 part of the reason for masking is to affect to  16:59:06
16 prevent those types of heuristics from         16:59:12
17 influencing the results of studies.            16:59:14
18      Q.  Do you contend that Tanner Stage 2  16:59:16
19 adolescents can meaningfully understand the     16:59:21
20 importance of healthy sexual relationships to   16:59:25
21 mental health and happiness across the decades  16:59:26
22 of adult life?                              16:59:29
23      A.  Can you repeat your question, sir?  16:59:30
24      Q.  Yeah.  Do you contend that a       16:59:34
25 Tanner Stage 2 adolescent can meaningfully      16:59:35

Page 268

1 understand the importance of healthy sexual     16:59:38
2 relationships to mental health and happiness    16:59:40
3 across the decades of adult life?              16:59:42
4      MR. CHEEK:  Objection, form.          16:59:45
5      THE WITNESS:  So I think the          16:59:47
6 fundamental thing to say is that medical decision  16:59:52
7 making for adolescents generally requires parental  16:59:57
8 consent and that adolescents are not being --    17:00:01
9 Tanner Stage 2 adolescents are not being asked to  17:00:06
10 give informed consent to the use of GnRH analogs.  17:00:10
11 I would say that there is variability in the    17:00:17
12 medical decision-making capacity of adolescents  17:00:21
13 and that there are adolescents who are capable of  17:00:27
14 understanding the implications of a variety of  17:00:32
15 medical treatments for their adult life, including  17:00:36
16 having biologically related children.           17:00:42
17 BY MR. FRAMPTON:                           17:00:44
18      Q.  You believe that they can          17:00:46
19 understand the importance of being able to      17:00:47
20 become a biological parent?                 17:00:50
21      A.  Can you repeat the question, sir?   17:00:52
22      Q.  Sure.  You believe that a Tanner   17:00:55
23 Stage 2 adolescent can meaningfully understand   17:00:58
24 the importance of becoming -- being able to     17:01:00
25 become a biological parent?                 17:01:03

Page 269

1      A.  Yes, I believe that there are       17:01:04
2 adolescents who are at Tanner Stage 2 who are    17:01:08
3 capable in a meaningful way of understanding     17:01:11
4 that.                                      17:01:17
5      Q.  And also meaningfully              17:01:17
6 understanding the importance of healthy sexual   17:01:18
7 relationships?                             17:01:21
8      A.  Can you be more specific about      17:01:21
9 what you mean by healthy sexual relationships,   17:01:31
10 sir?                                       17:01:34
11      Q.  Sure, the ability to orgasm.        17:01:34
12      MR. CHEEK:  Objection, form.          17:01:37
13      THE WITNESS:  I would say that many    17:01:45
14 Tanner Stage 2 adolescents do not have personal  17:01:50
15 experience with the experience that you have     17:01:54
16 described, but certainly they may well understand  17:01:57
17 the importance of sexuality broadly understood in  17:02:01
18 their parental relationships and may be able to  17:02:06
19 understand in some ways the way that that would  17:02:08
20 affect the relationships which they wish to have  17:02:11
21 as an adult.                               17:02:14
22 BY MR. FRAMPTON:                           17:02:14
23      Q.  And I simply asked the question     17:02:17
24 because would you agree that anorgasmia is one   17:02:19
25 of the risks associated with starting pubertal  17:02:23

Page 270

1 suppression at Tanner Stage 2 and continuing   17:02:27
2 immediately to cross-sex hormones, particularly   17:02:29
3 for natal males?   17:02:32
4    A.   So I understand that there is some   17:02:33
5 discussion of that in the literature.  I   17:02:40
6 haven't seen substantial data about the   17:02:43
7 frequency with which that occurs.   17:02:48
8       MR. FRAMPTON:  Let's take a quick   17:02:51
9 break.  I think I have got about five minutes   17:02:52
10 left.   17:02:54
11       (Recess taken.)   17:02:56
12       MR. FRAMPTON:  Let's go back on the   17:04:25
13 record.   17:04:26
14 BY MR. FRAMPTON:   17:04:26
15    Q.   Dr. Antommaria, are you aware of   17:04:26
16 any published literature documenting a Tanner   17:04:28
17 Stage 2 natal male beginning puberty   17:04:36
18 suppression at that point and continuing on   17:04:41
19 cross-sex hormones immediately and then in   17:04:43
20 adult life being able to achieve orgasm?   17:04:47
21       MR. CHEEK:  Objection, form.   17:04:50
22       THE WITNESS:  So that's not a subject   17:04:51
23 that I have searched the literature in order to   17:04:57
24 find an answer for, sir.   17:04:59
25 BY MR. FRAMPTON:   17:05:00

Page 271

1    Q.   So you are not aware of one   17:05:01
2 sitting here today; is that correct?   17:05:02
3    A.   I am not, but there would not be a   17:05:03
4 particular reason that I would know whether   17:05:10
5 that type of literature exists or not.   17:05:14
6    Q.   It's not something you have ever   17:05:16
7 looked for?   17:05:17
8    A.   No, it's not something I have   17:05:18
9 specifically looked for, sir.   17:05:21
10       MR. FRAMPTON:  I think we are done.   17:05:24
11 In fact, I know we are done.   17:05:26
12       (Thereupon, the deposition was   17:05:41
13 concluded at 5:05 p.m.)   17:05:42
14
15
16
17
18
19
20
21
22
23
24
25

Page 272

1 STATE OF OHIO        )
2 COUNTY OF MONTGOMERY ) SS: CERTIFICATE
3       I, Monica K. Schrader, a Notary
4 Public within and for the State of Ohio, duly
5 commissioned and qualified,
6       DO HEREBY CERTIFY that the
7 above-named ARMAND H. ANTOMMARIA, M.D., Ph.D.,
8 FAAP, HEC-C, was by me first duly sworn to testify
9 the truth, the whole truth and
10 nothing but the truth.
11       Said testimony was reduced to
12 writing by me stenographically in the presence
13 of the witness and thereafter reduced to
14 typewriting.
15       I FURTHER CERTIFY that I am not a
16 relative or Attorney of either party, in any
17 manner interested in the event of this action,
18 nor am I, or the court reporting firm with which
19 I am affiliated, under a contract as defined in
20 Civil Rule 28(D).
21
22
23
24
25

Page 273

1       IN WITNESS WHEREOF, I have hereunto set
2 my hand and seal of office at Dayton, Ohio, on
3 this 4th day of May, 2023.
4
5
6
7
8       *Monica K. Schrader*
        MONICA K. SCHRADER
9       NOTARY PUBLIC, STATE OF OHIO
        My commission expires 4-18-2025
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

69 (Pages 270 - 273)

Page 274

1  To: Jason R. Cheek, Esq.
2  Re: Signature of Deponent Armand H. Antommaria, M.D., Ph.D.
3  Date Errata due back at our offices: 30 days
4
5  Greetings:
6  This deposition has been requested for read and sign by
   the deponent.  It is the deponent's responsibility to
7  review the transcript, noting any changes or corrections
   on the attached PDF Errata.  The deponent may fill
8  out the Errata electronically or print and fill out
   manually.
9
10 Once the Errata is signed by the deponent and notarized,
   please mail it to the offices of Veritext (below).
11
12 When the signed Errata is returned to us, we will seal
   and forward to the taking attorney to file with the
13 original transcript.  We will also send copies of the
   Errata to all ordering parties.
14
15 If the signed Errata is not returned within the time
   above, the original transcript may be filed with the
16 court without the signature of the deponent.
17
18 Please Email the completed errata/witness cert page
   to CS-SOUTHEAST@VERITEXT.COM
19 or mail to
20 Veritext Production Facility
21 2031 Shady Crest Drive
22 Hoover, AL 35216
23 205-397-2397
24
25

Page 276

1  Page _____ Line _____ Change _____
2  _____
3  Reason for change _____
4  Page _____ Line _____ Change _____
5  _____
6  Reason for change _____
7  Page _____ Line _____ Change _____
8  _____
9  Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16
17
18     _____
       DEPONENT'S SIGNATURE
19
     Sworn to and subscribed before me this ___ day of
20
       _____, _____.
21
22 _____
23 NOTARY PUBLIC / My Commission Expires:_____
24
25

Page 275

1  ERRATA for ASSIGNMENT #5816974
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6
   Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7  (2017). Rule 30(e) states any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any
9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24
25

Veritext Legal Solutions
877-373-3660                                            800.808.4958