# EXHIBIT 59

Page 1

1           IN THE UNITED STATE DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
2                   NORTHERN DIVISION
3
4
    --------------------------x
5   BRIANNA BOE, et al,          :
                                 :
6            Plaintiffs,         :
                                 :
7   UNITED STATES OF AMERICA,    :
                                 :
8       Intervenor Plaintiff     :
                                 :CIVIL ACTION NO.
9       -verus-                  :2:22-CV-184-LCB
                                 :
10  HON. STEVE MARSHALL, in his  :
    official capacity as         :
11  Attorney General of the      :
    State of Alabama, et al,     :
12                               :
             Defendants          :
13  --------------------------x
14
15
16  Deposition of DR. MEREDITHE McNAMARA, taken
17  pursuant to Rule 30(b) of the Federal Rules of
18  Civil Procedure, held at SANDERS, GALE & RUSSELL
19  COURT REPORTING, 555 Long Wharf Drive, First
20  Floor, New Haven, Connecticut, before Julia Flynn
21  Cashman, RPR, CSR 250 and Notary Public in and for
22  the State of Connecticut, on Thursday, April 4,
23  2024, at 9:00 a.m.(Eastern)
24
25

Page 2

1 A P P E A R A N C E S:
2
3      ATTORNEYS FOR PLAINTIFFS:
4      GLBTQ LEGAL ADVOCATES & DEFENDERS
       18 Tremont Street, Suite 950
5      Boston, Massachusetts  02108
       BY:  JENNIFER L. LEVI, ESQUIRE
6         JLevi@glad.org
7      -with-
8      HUMAN RIGHTS CAMPAIGN
       1640 Rhode Island Ave. NW
9      Washington, DC  20036
       BY:  CYNTHIA CHENG-WUN WEAVER, ESQUIRE
10        Senior Director of Litigation
          Cynthia.weaver@hrc.org
11
12
       ATTORNEY FOR INTERVENOR PLAINTIFF:
13
       US DEPARTMENT OF JUSTICE
14     CIVIL RIGHTS DIVISION
       BY:  COTY MONTAG, ESQUIRE
15        US Deputy Chief
          Coty.montag@usdoj.gov
16
17
       ATTORNEYS FOR DEFENDANT:
18
       ALLIANCE DEFENDING FREEDOM
19     15100 N. 90th Street
       Scottsdale, Arizona  85260
20     BY:  ROGER G. BROOKS, ESQUIRE
          Rbrooks@adflegal.org
21        SUZANNE BEECHER, ESQUIRE
22
23
24
25

Page 3

1        S T I P U L A T I O N S
2
3  IT IS HEREBY STIPULATED AND AGREED by and between
4  counsel for the respective parties hereto that all
5  technicalities as to proof of the official
6  character before whom the deposition is to be
7  taken are waived.
8  IT IS FURTHER STIPULATED AND AGREED by and between
9  counsel for the respective parties hereto that the
10 reading and signing of the deposition by the
11 deponent are waived.
12 IT IS FURTHER STIPULATED AND AGREED by and between
13 counsel for the respective parties hereto that all
14 objections, except as to form, are reserved to the
15 time of trial.
16
17        * * * * *
18
19
20
21
22
23
24
25

Page 4

1  DR. MEREDITHE McNAMARA,
2  15 York Street, New Haven, Connecticut  06511,
3  having been first duly sworn by Julia Flynn
4  Cashman, a Notary Public in and for the State of
5  Connecticut, testified on her oath as follows:
6        MR. BROOKS:  I'd ask the reporter to
7  mark as McNamara Exhibit 1, the Curriculum Vitae
8  of Meredith McNamara.
9        (DEFENDANT'S EXHIBIT 1 FOR
10       IDENTIFICATION Received and Marked.)
11 DIRECT EXAMINATION
12 BY MR. BROOKS:
13   Q. Dr. McNamara, good morning.
14   A. Good morning.
15   Q. My name is Roger Brooks.  I represent the
16 defendants in this action.  The Curriculum Vitae
17 that I have marked as Exhibit 1 was attached to
18 your Expert Report.
19      Let me just ask you to take a look at this
20 and see whether you believe it to be -- it's dated
21 January '23.  Are there any important changes to
22 your responsibilities or publications as listed on
23 this Curriculum Vitae?
24   A. I have submitted a newer CV with my Rebuttal
25 Report.  This one is a little over a year old.

Page 5

1   Q. And does that new one contain any important
2  changes in your professional responsibilities?
3   A. Not in my professional responsibilities.
4   Q. Let me ask a few questions to kind of get a
5  scope of the boundaries of your expertise.
6      I see at the bottom of the page, it's marked
7  28, that you have board certification in General
8  Pediatrics and Adolescent Medicine.  Do you have
9  any other board certifications?
10   A. No, sir.
11   Q. Am I correct that you do not consider
12 yourself a mental health professional?
13   A. That's correct, I do not.
14   Q. You're not a psychiatrist?
15   A. No, sir.
16   Q. You're not an expert in psychology?
17   A. No, sir.
18   Q. You have no expertise in adolescent
19 development psychology?
20   A. No, sir.
21   Q. You're not an expert in cognition or the
22 study of cognitive development?
23   A. No, sir.
24   Q. You're not a neurologist?
25   A. No.

2 (Pages 2 - 5)

1    Q. Do you consider yourself an expert in the
2 diagnosis and treatment of intersex conditions or
3 disorders of sexual development?
4    A. No, I do not.
5    Q. Your peers don't consult you on that topic?
6    A. No, they have not.
7    Q. Do you consider yourself an expert in
8 medical ethics beyond that which any medical
9 doctor needs to know?
10    A. No, I do not.
11    Q. Do you have any publications in the field of
12 medical ethics?
13    A. Not as of now.
14    Q. Have you submitted something that, in that
15 field, that you hope to get published?
16    A. Yes, I have.
17    Q. And tell me what that is.
18    A. I submitted a paper on the Ethics of Bans on
19 Gender Affirming Care.
20    Q. To what journal?
21    A. To a journal called the Journal of
22 Pediatrics, a medical ethics special edition.
23 It's under consideration.
24    Q. And have you ever taught a course in medical
25 ethics?

1    A. No, sir.
2    Q. Have you, yourself, ever participated in the
3 conduct of any clinical trial on any topic?
4    A. No, sir.
5    Q. Certainly nothing relating -- no clinical
6 trial related to gender dysphoria?
7    A. No.
8    Q. Are you a member of WPATH?
9    A. No.
10    Q. Have you ever attended any WPATH meetings?
11    A. Yes.
12    Q. Is there a reason that you're not a member
13 of WPATH?
14    A. Yes, their membership is expensive and I
15 have limited educational funds.
16    Q. Do you know whether you satisfy the
17 professional qualifications for membership?
18    A. I'm unaware of what those professional
19 qualifications may be.
20    Q. Have you had any role in the development of
21 either WPATH's standard of care or SOC 7 or SOC 8?
22    A. No, I have not.
23    Q. Were you invited to review or comment on any
24 draft materials of either of those standards of
25 care?

1    A. I was not.
2    Q. Now, you're not an endocrinologist either;
3 am I correct?
4    A. I am not an endocrinologist.
5    Q. You are not a member of the Endocrine
6 Society?
7    A. I'm not a member of the Endocrine Society.
8    Q. And had no participation in the development
9 of the 2009 Endocrine Society Guidelines For
10 Treatment of Gender Dysphoria, nor in the 2017
11 update of those guidelines; am I correct?
12    A. I haven't participated in either guideline
13 development process.
14    Q. And you don't know with regard to either
15 WPATH or the Endocrine Society, how the members of
16 the committees that did that drafting were
17 selected, do you?
18    A. I do not.
19    Q. Nor what their qualifications might have
20 been?
21    A. I don't know about that.
22    Q. Do you consider yourself an expert in
23 clinical experimental methodology?
24    A. I'm unsure of what you mean by "clinical
25 experimental methodology."

1    Q. Have you ever published any peer-reviewed
2 article relating to experimental methodology?
3    A. Again, I'm unsure of what you mean by
4 "experimental methodology."
5    Q. Do you consider yourself an expert in the
6 field of evidence-based medicine?
7    A. Yes, I do.
8    Q. Have you ever taught a course in
9 evidence-based medicine?
10    A. No, I have not.
11    Q. Have you ever taken a course in
12 evidence-based medicine?
13    A. Yes, I have taken several.
14    Q. And where did you take those courses?
15    A. I obtained a Master's in Clinical Research,
16 a MSCR degree, at Emory University in 2013. It
17 was two years of training in clinical research and
18 the courses included in that program were
19 biostatistics, epidemiology, study design,
20 research bioethics, statistical programming, grant
21 writing, among others. And I completed a mentored
22 senior thesis project, which I published in that
23 two-year span.
24    Q. Have you ever studied any texts on
25 evidence-based medicine authored in whole or in

1 part by Gordon Guyatt?
2    A. I have familiarized myself with Dr. Guyatt's
3 work.  I have not read a book of his cover to
4 cover.  I have read many of his peer-reviewed
5 articles.
6    Q. And were those articles that you read in the
7 course of the education that you've described just
8 now?
9    A. No, those articles and his body of work was
10 not covered in my evidence-based medicine
11 training.
12    Q. Do you have any understanding of Dr.
13 Guyatt's reputation in the field of evidence-based
14 medicine?
15    A. I'm loosely familiar with him as a founding
16 member of the grade working group.
17    Q. And what is the, quote, great working group?
18    A. It is a cohort of --
19    Q. Pardon me, I may have misunderstood you.
20 Did you say "great" or "grade"?
21    A. I said "grade."
22    Q. G-R-A-D-E.
23    A. Correct.
24    Q. Pardon me.  For the record, now let me ask
25 you the right question.  What is the grade working

1 group?
2    A. It is a cohort of statisticians and
3 clinicians with research experience who have
4 developed a methodology for assessing clinical
5 evidence and devising recommendations utilizing
6 guidelines of care.
7    Q. Have you, at any point in your professional
8 work, made a special study of suicide or
9 suicidality?
10    A. Could you be a little more specific with the
11 meaning -- with what you mean by "special study"?
12    Q. Is that an area that you have made a focus
13 of professional research?
14    A. Professional research is what you mean by
15 "special study"?
16    Q. Yes.
17    A. No, I have not.
18    Q. Let me ask you to turn to 32 in your CV.
19      And here, if I have missed something by
20 using the older version, you can tell me.  I'm
21 looking at, on page 32 of Exhibit 1, the heading
22 that says "Peer-Reviewed Original Research."  Do
23 you see that?
24    A. Yes, I do.
25    Q. And there are three items listed there.  Has

1 anything been added to that list since the
2 beginning of 2023?
3    A. Yes.
4    Q. And what is that?
5    A. It was an article published in Pediatrics
6 sometime in July, I believe, on my working groups
7 process for developing and disseminating reports
8 on scientific mis- and disinformation, and policy
9 discussions pertaining to bans on gender affirming
10 care.
11    Q. Now, was that paper a paper that reported on
12 original clinical research?
13    A. It was not clinical research.
14    Q. When I see the three items listed here, I
15 see a case -- a single case report.  Am I correct
16 that a case report reports on a single patient,
17 rather than on a study across multiple patients?
18    A. Under the section entitled Peer-Reviewed
19 Original Research, I do not see a case report.
20    Q. I'm sorry.  I was --
21    A. There's a peer-reviewed case report at the
22 very bottom of this page.
23    Q. Yes.  And that's -- sorry, I was focusing on
24 the "peer-reviewed."  Am I correct that the case
25 report deals with a single patient?

1    A. Correct.
2    Q. And that is a paper that has nothing to do
3 with gender dysphoria issues or any issues
4 relating to identity; correct?
5    A. No.
6    Q. Not correct?
7    A. Let me be a little clearer.  This paper is
8 about a genetic deletion in a patient who had
9 epilepsy and brain malformations.  This patient
10 was a toddler and one that I cared for in
11 residency.  And I coauthored this with some
12 colleagues and supervising attending in my
13 residency program.
14    Q. And, again, that case report and that case
15 had nothing do with gender identity, am I correct?
16    A. Correct, it had nothing do with gender
17 identity.
18    Q. Okay.  And when I look at the heading that
19 says "Peer-Reviewed Original Research," the first
20 item there is a paper that you coauthored with
21 authors' last names Kempton and Antun, correct?
22    A. Yes, that's correct.
23    Q. And that, again, related to hemophilia and
24 had nothing to do with gender identity; am I
25 correct?

1    A. That's correct.
2    Q. You have no peer-reviewed publications
3 reporting original research by you on any topic
4 relating to gender identity; am I right?
5    A. That is correct.
6    Q. We may come back to this, but you can set it
7 aside.
8        MR. BROOKS:  I'd like to mark as
9 McNamara Exhibit 2, transcript of proceedings on
10 August 10, 2023, in the Northern District of
11 Georgia.
12        (DEFENDANT'S EXHIBIT 2 FOR
13        IDENTIFICATION, Received and Marked.)
14    Q. And Dr. McNamara, let me ask you to turn in
15 this transcript to page -- let me ask you first,
16 am I correct that you testified in a hearing in
17 Georgia in August of last year?
18        MS. LEVI:  You have to take a look
19 through it.
20    Q. What I believe I have provided here is the
21 subset of the transcript of that day's hearing
22 that includes all of your testimony.  You will see
23 yourself introduced on page 76 at line 14, --
24        MS. LEVI:  Take your time.
25    Q. -- you're sworn in.  And I will I -- I am

1 not going to ask you whether the entire transcript
2 is accurate.  I'm going to ask you about a couple
3 of specific portions.
4        Let me ask you to turn to page 104.
5        Let me ask you to turn to page 104.
6    A. Yes, I'm working my way there.
7    Q. Well, if need be, I'll ask you to just put
8 the thing aside.  I'm not going to take time for
9 you to read the whole transcript.
10    A. Okay.  Let me get to that page.  Okay.
11    Q. At page 104, beginning at line 7, you
12 testified -- and you can tell me if, in your
13 recollection, anything about this transcript is
14 not correct as I read it -- but you testified "I
15 provide full spectrum care for adolescents and
16 that includes youth who experience gender
17 dysphoria."
18        Then counsel asked you, "Do you prescribe
19 hormone therapy, puberty blockers, or hormones?"
20        And you responded, "I don't prescribe
21 puberty blockers."
22        Let me ask you now, a few months later, does
23 it remain true that in your professional practice,
24 you yourself are never responsible for prescribing
25 puberty blockers?

1    A. I have prescribed puberty-blocking
2 medications for people who do not have gender
3 dysphoria for uses outside of that context.
4    Q. And was that in the context of precocious
5 puberty?
6    A. No, that's not a condition I diagnose or
7 manage.
8    Q. For what conditions have you prescribed
9 puberty blockers?
10    A. For adolescent females with autoimmune
11 conditions that require therapies that would be
12 toxic to their ovaries, we will utilize
13 puberty-blocking medications to stop cellular
14 development temporarily in their ovaries and
15 protect them while they receive those medications.
16 That is something that I have done since this
17 testimony.
18    Q. Okay.  It remains true that you yourself
19 have not had, professionally, prescribed puberty
20 blockers as a therapy for gender dysphoria?
21    A. That's correct.
22    Q. In the next line here, line 14 and
23 continuing, you testified, "I take care of
24 patients up to about age 25.  My position at Yale
25 is a little unique.  I'm kind of their generalized

1 medicine person and we have a gender clinic."  Do
2 you see that testimony?
3    A. Yes.
4    Q. And am I correct that Yale has a gender
5 clinic, but you are not a member of the staff of
6 that gender clinic?
7    A. That's correct.
8    Q. And you don't hold and have never held an
9 appointment as a member of any gender clinic; am I
10 correct?
11    A. That's correct.
12    Q. The leading members of Yale's gender clinic
13 include Drs. -- I may say these names
14 incorrectly -- Boulware, Olezeski and Patel?
15    A. Those are some of them, correct.
16    Q. And do you consider them to be expert in the
17 treatment of gender dysphoria?
18    A. Yes, I do.
19    Q. If a patient who you see as a pediatrician
20 raises issues to you that suggest to you that they
21 may suffer from gender dysphoria, do you yourself
22 undertake to diagnose whether that patient does or
23 does not suffer from gender dysphoria?
24    A. Generally, no, if that patient is a minor, I
25 do not.

5 (Pages 14 - 17)

1   Q. And in what context have you diagnosed
2  gender dysphoria in adults?
3   A. I have diagnosed gender dysphoria in adults
4  when they meet diagnostic criteria for gender
5  dysphoria according to the most recent edition of
6  the DSM.
7   Q. I'm just curious, given that your
8  appointment seems to relate to Pediatrics, in what
9  context do you find yourself treating or
10  diagnosing and dealing with adults who may suffer
11  from gender dysphoria?
12   A. So I'm an adolescent medicine physician and
13  I'm board certified and able to care of patients
14  up until the age of 25, with some flexibility
15  there.
16   Q. And am I correct that you have never been a
17  physician with primary responsibility for
18  prescribing treatment for gender dysphoria in a
19  minor?
20   A. That's correct.
21   Q. You testified in Georgia -- and I'll skip
22  down to the bottom on page 104, that "I only have
23  20 minutes per appointment and I see a lot of
24  other things.  I see a lot of complex trauma,
25  sexual reproduction health needs, sports medicine

1  issues, other menstrual concerns, dermatology.  I
2  could go on and on, but it's just where my
3  institution needs me is to provide general
4  adolescent care."
5   Does that continue to accurately describe
6  your responsibilities today?
7   A. I have been able to expand some of my
8  appointment times to 40 minutes, which is nice and
9  allows me to go in further depth with some of my
10  patients about complex issues.  But otherwise I
11  would say that that characterizes the type of
12  clinical care that I provide.
13   Q. You don't claim to be an expert in the
14  specifics of administration of either puberty
15  blockers or hormones, cross-sex hormones, to use
16  to treat endocrine disorders or gender dysphoria,
17  correct?
18   A. If you are describing minors, that is
19  correct.
20   Q. What steps, if any, have you taken to
21  familiarize yourself with the actual practices in
22  the gender clinic at the University of Alabama
23  Birmingham Gender Clinic?
24   A. I haven't taken any steps.
25   Q. Have you ever talked with Dr. Ladinsky to

1  learn from her anything about her actual
2  practices?
3   A. I have had two conversations with Dr.
4  Ladinsky that were largely surface level and not
5  pertinent to her practice.
6   Q. So you yourself don't have any knowledge and
7  don't plan to offer any testimony as to what
8  extent the University of Alabama Gender Clinic and
9  Dr. Ladinsky have or have not followed WPATH
10  standards of care in the course of their treatment
11  of minors for gender dysphoria?
12   A. I cannot offer any testimony to that regard.
13   Q. You don't know anything about how long they
14  require a patient, a minor patient, to undergo
15  psychological evaluation before authorizing
16  puberty blockers or cross-sex hormones?
17   A. That's not something I'm aware of.
18   Q. Have you reviewed their Informed Consent
19  disclosures to form an opinion as to whether those
20  are adequate?
21   A. I have not seen those forms.
22   Q. Have you ever been asked to review the
23  Informed Consent disclosure forms of the Yale
24  Pediatric Gender Clinic to form a view as to
25  whether those were adequate disclosures?

1   A. I have not reviewed those forms.
2   Q. When was the Yale Pediatric Gender Clinic
3  founded?
4   A. I don't know.
5   Q. How many minors have you, in your practice,
6  ever referred to that clinic?
7   A. Just give me a moment while I search my
8  recollection.
9   Q. And I will say, approximately, roughly.
10   A. I believe two.
11   Q. And were both those minors who you referred
12  to the clinic in fact ultimately diagnosed with
13  gender dysphoria?
14   A. One has not yet been seen.  That patient is
15  still awaiting their appointment, I believe.  And
16  I am unfamiliar with the specific details of the
17  patient who was assessed off the top of my head.
18   Q. Would you tell me -- of course, not names --
19  but ages and sexes of those two patients that you
20  referred and when you made those referrals?
21   A. One was --
22   Q. And to be clear, I refer to natal sex
23  particularly.
24   A. I understand that.  Thank you for the
25  clarification.  I'm pausing just to gather my

1  recollection.

2     Q. Mm-hmm.

3     A. One was 14 at the time of referral, assigned
4  female sex at birth, received an assessment at the
5  age of 15.  And one was 15 at the time of referral
6  and assigned female sex at birth.

7     Q. And that second one is the one who's waiting
8  her first appointment?

9     A. Yes.

10    Q. The one natal female who you referred at age
11 14 who received an assessment, I think you said at
12 age 15 -- am I remembering that correctly?

13    A. Yes.

14    Q. Do you know what medical treatments, if any,
15 have now been prescribed to her by the clinic?

16       MS. LEVI:  Object as to form.

17    A. That patient has not received any
18 prescriptions since the time of their assessment.

19    Q. Do you know whether the Yale Pediatric
20 Gender Clinic takes systematic steps to monitor
21 the mental and physical health of patients who
22 treat for gender dysphoria past the age of 18?

23       MS. LEVI:  Object as to form.

24    A. I do know that they do.

25    Q. And what steps do you know that they take to

1  monitor the mental and physical health of those
2  patients past the age of 18?

3     A. They maintain continued relationships with
4  their patients into adulthood.  They transition
5  their patients to other services on a highly
6  individualized basis.  And those patients meet
7  with a multidisciplinary mental health team with
8  whom they've been working for some time as
9  adolescents.

10    Q. Do you have any knowledge as to what
11 percentage of patients who are referred by any
12 physician to the Yale pediatric gender clinic are
13 ultimately prescribed gender affirming or
14 cross-sex hormones by that clinic while they're
15 minors?

16       MS. LEVI:  Object as to form.

17    A. I don't know.

18    Q. And do you know what percentage of patients
19 who are prescribed puberty blockers or hormonal
20 medications as a treatment for gender dysphoria by
21 the Yale Gender Clinic ultimately desist from
22 pursuing a transgender identity and cease taking
23 those medications?

24       MS. LEVI:  Objection as to form.

25    A. I have no awareness of that.

1     Q. And do you know whether any minors who have
2  been treated by the Yale Pediatric Gender Clinic
3  with puberty blockers or cross-sex hormones have
4  later been able to achieve healthy levels of
5  fertility and have a healthy child?

6       MS. LEVI:  Objection to form.

7     A. That's not something that I would have
8  access to as a physician, apart from their
9  services.

10       MR. BROOKS:  Let me mark as McNamara
11 Exhibit 3, a chapter from the DSM-V-TR manual
12 headed "Gender Dysphoria."

13       (DEFENDANT'S EXHIBIT 3 FOR
14          IDENTIFICATION Received and Marked.)

15    Q. And Dr. McNamara, I will represent to you
16 that this is what I have described as the chapter
17 from the DSM-V-TR edition.  Is this a document
18 that you are -- is this a chapter that you are
19 familiar with?

20    A. Yes, I have seen this before.

21    Q. Let me ask you to turn to page 517 in
22 Exhibit 3.

23    A. My page numbers are cut off.

24    Q. All right, it is a page -- I see that; I
25 apologize.  The text begins -- it's a ways in.  At

1  the very top of the page, begins in italics, "Late
2  onset or pubertal/postpubertal onset gender
3  dysphoria."  Do you have that page?

4     A. Yes.

5     Q. I apologize for --

6       MS. LEVI:  Can you give me one minute?

7       MR. BROOKS:  Of course.

8       MS. LEVI:  Okay, thank you.

9       I'm sorry, can you represent the actual
10 page number, for the record?

11       MR. BROOKS:  Yes, I can.  And while I
12 won't mark my highlighted copy, I'll show you 517
13 is the page number there.

14       MS. LEVI:  Okay, thank you.

15    Q. The language that I read refers to "late
16 onset or pubertal/postpubertal onset gender
17 dysphoria."  And it goes on to say that that can
18 occur "even much later in life" than puberty.

19       Is adult onset gender dysphoria a mental
20 health condition that you are familiar with
21 professionally?

22    A. I'm not aware that there's a
23 characterization with that specific terminology in
24 the literature.

25    Q. Well, let me flip it around.  Are you

1 familiar -- are you professionally familiar with
2 the phenomena of gender dysphoria that first
3 manifests itself after puberty?
4     A. After puberty has completed?
5     Q. Yes.  I just read you language from the
6 DSM-V that referred to gender dysphoria that may
7 occur "even much later in life" than puberty.  And
8 my question is, has your professional work made
9 you familiar with the phenomena described in DSM-V
10 there?
11     A. My professional work has not -- let me say
12 that differently.  I have not encountered a
13 patient who has been -- an adult who did not have
14 gender dysphoria, and then developed gender
15 dysphoria in my care.
16     Q. Okay.  That has not been part of what you,
17 yourself, have observed professionally?
18     A. That's correct.
19     Q. Do you have any opinion as to whether
20 clinical observation of adults who, at least as
21 far as reported, have developed gender dysphoria
22 only after the completion of puberty, whether
23 clinical observation of that population is
24 relevant to medical decisions for the treatment of
25 adolescents who experience gender dysphoria?

1         MS. LEVI:  Objection to form.
2     A. I'm sorry, I don't understand your question.
3         MR. BROOKS:  Let me ask the reporter to
4 read it back.
5         (THE REPORTER READ THE RECORD)
6         MS. LEVI:  Same objection.
7     A. I am sorry, her reading it back did not help
8 me understand it better.
9     Q. All right.  I'll return to that with
10 specific articles from this.
11         At the end of the paragraph at the top of
12 page 517 that I have directed you to is a sentence
13 that reads "Parents of individuals with gender
14 dysphoria of pubertal/postpubertal onset often
15 report surprise, as they saw no signs of gender
16 dysphoria during childhood."
17         In the two cases that you have referred to
18 the pediatric gender clinic, both of those, am I
19 correct, were cases that first presented in young
20 people who were well into adolescence; correct?
21     A. At this time, I -- just give me a moment to
22 try to remember.
23     Q. Let me break it apart.  The first you
24 mentioned was a girl who was 14, correct?
25         MS. LEVI:  Objection to form.

1     Q. And am I correct that at age 14, she was
2 well into adolescence?
3     A. I don't remember the exact age that that
4 patient began puberty.
5     Q. And as you picture her in your mind, you
6 have no recollection as to whether she was well
7 into the process of adolescence?
8         MS. LEVI:  Objection to form.
9     A. Where I am pausing is that the patient and
10 parent presenting to my care was sometime after
11 the patient began expressing a gender diversity.
12 And I do not know off the top of my head at this
13 time today if that disclosure and beginning of
14 expressing that identity occurred before or after
15 pubertal onset.
16     Q. In either of the two cases that you have
17 referred on to the Yale Pediatric Gender Clinic,
18 did the parents report surprise and tell you that
19 they had not seen signs of gender dysphoria prior
20 to puberty?
21     A. I don't recall either -- parental figures
22 for either adolescent reporting any measure of
23 surprise in my clinical encounters with them.
24     Q. And you referred to parental figures.  In
25 those two cases, were you interacting with

1 biological parents of the child?
2         MS. LEVI:  And I just want to be clear,
3 nothing that would disclose confidential
4 information.
5         MR. BROOKS:  Of course.
6     A. I use the term "parental figures" generally.
7 Those were biological parents of both children.
8     Q. Do you consider it as a matter of science,
9 known or at present not known, whether an
10 adolescent onset gender dysphoria population
11 exists which in fact experienced no gender
12 dysphoric symptoms prior to puberty?
13     A. I am aware that there are adolescents who
14 experience gender dysphoria at pubertal onset or
15 after who did not report awareness of symptoms
16 before puberty.  I am also aware that there's a
17 lot of heterogeneity in that.
18         MR. BROOKS:  Let me ask the reporter to
19 mark as Exhibit 4, the Expert Report of Meredithe
20 McNamara.
21         (DEFENDANT'S EXHIBIT 4 FOR
22         IDENTIFICATION Received and Marked.)
23     Q. And Dr. McNamara, does this indeed appear to
24 be a copy of your original Expert Report?
25     A. Yes, that's what this is.

8 (Pages 26 - 29)

Page 30

1  Q. Let me ask you to turn to page 11 in that
2  document. And there, there's a heading,
3  "Defendants' Experts' Statements About Suicide."
4  Do you see that?
5  A. Yes, I do.
6  Q. Part way into that paragraph, and then you
7  discuss in the beginning of that paragraph, a
8  study, a published paper, by authors, leading
9  with -- there's so many names that I don't know
10  how to pronounce -- Dhejne, D-H-E-J-N-E.
11  At the end of that, or late in that
12  discussion, you say, "The Dhejne study has no
13  applicability to adolescents."
14  Let me ask you to explain the basis of your
15  opinion that the findings of the Dhejne study
16  relating to suicide in adult years has no
17  applicability to adolescents.
18  A. Just give me a moment, I'll refresh my
19  memory by reading this paragraph.
20  Q. Of course.
21  A. This study evaluated a cohort of adults.
22  Q. And what is the basis for your conclusion
23  that the incidence in suicide among the cohort of
24  adults who had received cross-sex hormones had no
25  applicability to adolescents?

Page 31

1  A. They are very different populations in
2  several regards. The study did not gather data on
3  adolescents specifically. It undertook no
4  comparative analysis. One would have to perform
5  several logical leaps in order to apply data in
6  adults of older ages to minors.
7  Q. What leads you to conclude that for purposes
8  of studying suicide and suicide attempts, that
9  adolescents are different in important ways from
10  adults?
11  A. Could you repeat that question.
12  MR. BROOKS: I'll ask the reporter to
13  read it back.
14  (THE REPORTER READ THE RECORD)
15  A. Adolescents have very different social
16  circumstances, different risks and experiences
17  with mental health issues. But more so, my
18  conclusion here is that a study that only reports
19  on adults can only report on adults.
20  Q. Is it also your opinion that adolescents
21  differ in important ways from prepubertal
22  children?
23  A. That is the case, yes.
24  Q. And it is also your opinion, is it not, that
25  barring catastrophe, all adolescents grow up to be

Page 32

1  adults?
2  MS. LEVI: Objection to form.
3  Q. This is an easy question, but it's not a
4  trick question.
5  A. It's interesting sometimes when physicians
6  and lawyers communicate. Adolescents do grow up
7  to become adults, yes.
8  Q. Every single one who survives adolescence
9  becomes an adult.
10  A. Yes.
11  Q. You would agree with me, would you not,
12  therefore, that health outcomes among adults who
13  have received and are receiving cross-sex hormones
14  are something that you, as a physician, would want
15  to take into account when advising an adolescent
16  as to whether or not to start taking cross-sex
17  hormones?
18  MS. LEVI: Objection to form.
19  A. With this particular study --
20  Q. I'm not asking you a question about this
21  study.
22  MR. BROOKS: Let me ask the reporter to
23  read back the question.
24  (THE REPORTER READ THE RECORD)
25  A. I would want to take into account any data

Page 33

1  that -- or any research with methodology and
2  statistical design that was able to establish
3  causal links between intervention and an outcome.
4  And I regularly do so with some adult data in some
5  ways.
6  This particular study does not lend itself
7  to establishing a causative -- a causative --
8  excuse me, a causal relationship between
9  gender-forming hormones and suicide, as the
10  authors state, and as I quote in my Declaration.
11  Q. Dr. McNamara, is it your testimony that
12  unless an outcome study is designed and structured
13  so that it can establish a causal relationship,
14  you, as a physician, do not wish to take into
15  account the reported outcomes in providing medical
16  advice?
17  A. That is not my testimony generally and
18  across the board.
19  Q. But it's your testimony with regard to adult
20  suicide statistics?
21  A. If I were to review evidence in a population
22  that differed significantly from my population, I
23  would probably have an extremely high standard for
24  understanding causal relationships before I were
25  to base clinical decisionmaking on that data.

9 (Pages 30 - 33)

1    Q. Have you yourself made any study of
2  differences that may or may not exist between
3  adolescent gender dysphoria patients and adult
4  gender dysphoria patients when it comes to suicide
5  and suicidality?
6    A. I have seen studies that report on findings
7  in both groups.
8    Q. And have you yourself made any efforts to
9  understand to what extent there are important
10  differences or not important differences between
11  adolescents who suffer from gender dysphoria and
12  adults who suffer from gender dysphoria when it
13  comes to the experience of suicidality or actual
14  completed suicide?
15        MS. LEVI:  Objection to form.
16        THE DEPONENT:  Can I have the question
17  back?
18        (THE REPORTER READ THE RECORD)
19        MS. LEVI:  Same objection.
20    A. I'm not sure that reading it back helps me
21  understand the question better.
22    Q. Do you know, as you sit here today, whether
23  rates of suicidality are significantly different
24  among adolescents who are receiving cross-sex
25  hormones and adults who are receiving cross-sex

1  hormones in both case as treatment for gender
2  dysphoria?
3    A. I'm -- off the top of my head, I cannot
4  recall data that helps me make that comparison.
5        MR. BROOKS:  Let me ask the reporter to
6  mark as Exhibit 5, an article entitled "Long Term
7  Follow-Up of Transsexual Persons Undergoing Sex
8  Reassignment Surgery:  Cohort Study in Sweden,"
9  authored by Cecilia Dhejne and others.
10        (DEFENDANT'S EXHIBIT 5 FOR
11        IDENTIFICATION Received and Marked.)
12    Q. Dr. McNamara, at the top, you will see that
13  many, perhaps most of the authors, are associated
14  with the Karolinska Institute in Stockholm,
15  Sweden.  Are you familiar with the reputation of
16  that institute when it comes to the diagnosis and
17  treatment of gender dysphoria?
18    A. I only know this institution by name.
19    Q. You don't know to what extent scientists
20  associated with that institution have been
21  responsible for important research in the area of
22  treatment of gender dysphoria?
23    A. Not relative to anywhere else.
24    Q. Well, let me ask about anywhere else.  Has
25  any particular institution or institutions that

1  you consider to be responsible for foundational
2  work in this field, that are most known as sources
3  of research in the field?
4    A. Many institutions have produced robust
5  research.  Many institutions have collaborated to
6  produce robust research.  At this point in time, I
7  don't consider anyone to be superior or leading
8  the field compared to others.
9    Q. Is it consistent with your understanding
10  that the Vrije University in Amsterdam is
11  particularly noted for its foundational research
12  in this field?
13    A. It's my understanding that they produced
14  some of the initial studies on medical treatments
15  for gender dysphoria and youth.
16    Q. Do you know whether their doctors continue
17  to publish some of the most respected work in this
18  field?
19    A. I personally have not seen research from, to
20  the best of my knowledge, from an individual with
21  that institutional affiliation within the past six
22  months or so.
23    Q. Let me ask you to look at Exhibit 5.  And is
24  this a paper that you have studied with some care
25  in connection with preparing your Expert Report

1  for this litigation?
2    A. Yes, we just reviewed a paragraph that I
3  read about it.
4    Q. And looking in the abstract, there's a
5  heading that says "Participants."  And it refers
6  there to, and states there, that all 324 sex
7  reassigned persons in Sweden across a span of 30
8  years were included in the study; correct?
9    A. That's what it says.
10    Q. And by including all subjects who received
11  sex reassignment surgery across those years, this
12  study design avoids possible methodological
13  problems that might be related to cherry-picking
14  an unrepresentative sample, correct?
15        MS. LEVI:  Object to form.
16    A. I would not be able to say that.
17    Q. And why is that?
18    A. Let me review the methodology.
19    Q. Let me ask you a question separate from this
20  paper, then, to save time.
21      Do you have a view as to whether a study
22  that includes all patients who have undergone a
23  certain procedure within a clinic avoids potential
24  methodological risks associated with
25  cherry-picking an unrepresentative sample that may

Page 38

1 afflict a study that is based on only a subset of
2 patients treated for a particular condition?
3    A. I don't agree with that categorically.  It
4 would be highly dependent on several factors, such
5 as the time period during which that study was
6 conducted, the methods that the study used, the
7 diagnostic criteria that the investigators used to
8 identify patients of interest, and the way that
9 outcomes were measured.
10    Q. In the Dhejne study, it tells us on page 2,
11 at the top of the second column, that mental
12 health issues were measured by reference to -- not
13 based on self reports, but by reference to
14 national health records.  Is that consistent with
15 your understanding?
16    A. The National Health System captured
17 diagnostic codes in accordance with international
18 classification of disease codes from 1969 to 1986,
19 and then 1987 to 1996; and then 1997 to the
20 study's time of publication, which I believe
21 was --
22    Q. 2011, if you look at the bottom of the page.
23    A. So then it would have been the time at which
24 the data capturing period concluded, which was
25 2003.

Page 39

1    Q. And my question was, are you aware that in
2 the Dhejne study to measure mental health, they
3 referenced national registry records, rather than
4 self reports by patients.  Is that consistent with
5 your understanding of the study?
6    A. Can I have the question back one more time.
7    Q. I'll just say it, I'll ask again.
8      Is it consistent with your understanding of
9 the Dhejne study that the authors measured mental
10 health of the subjects by reference to diagnostic
11 records from national registers, rather than self
12 reports from the study subjects?
13    A. They used international classification of
14 disease categorizations that are very different
15 now than they were at the time regarding diagnoses
16 pertinent to gender dysphoria.
17    Q. That has nothing to do with the question I
18 asked.
19      MR. BROOKS:  Let me ask the reporter to
20 read it back.
21      (THE REPORTER READ THE RECORD)
22    A. What I said is true and important for
23 contextualizing this study.  And what I'm also
24 pausing on is how you're characterizing mental
25 health versus how the investigators are

Page 40

1 characterizing their outcomes.
2    Q. Let me ask a simpler question.
3      Dr. McNamara, do you know or not know
4 whether in this Dhejne, et al study from 2011, the
5 authors relied on self reports from patients; or,
6 on the contrary, whether they relied only on
7 medical and mental health records?
8    A. The authors themselves did not engage with
9 the patients and ask them specific questions.  But
10 some of the measures that were captured in the
11 medical records were gathered on the basis of
12 physicians talking to their patients.
13    Q. Do you have any knowledge from your study of
14 the Dhejne, et al paper as to how many of the
15 subjects of that study had experienced childhood
16 onset gender dysphoria?
17    A. I would need to review the paper in depth to
18 see if there's any mention of that.  Off the top
19 of my head, I'm not sure.
20    Q. That's not something you recall.  Okay,
21 we'll leave it there.  Let me ask you to --
22      MS. LEVI:  Do you need a break?
23      THE DEPONENT:  We could take a break.
24      Are you done with this study?
25      MR. BROOKS:  I am done with that study.

Page 41

1      MS. LEVI:  Going close to an hour, I
2 think.
3      MR. BROOKS:  That's fine.  We can spend
4 our seven hours however you like.
5      MS. LEVI:  I understand.
6      THE DEPONENT:  We won't shortchange you.
7      (R E C E S S)
8 BY MR. BROOKS:
9    Q. Let me ask you to find, again, Exhibit 4,
10 your Expert Report.  And if you would find page 23
11 in that report.  At the very bottom, there's a
12 heading, text that carries over, that says
13 "Research shows gender identity has a strong
14 innate biological basis."  Do you see that?
15    A. Yes.
16    Q. When I turn over to the text underneath that
17 heading, is there anywhere in that, the two
18 paragraphs under that heading, in which you
19 identify any research that you believe shows a
20 strong innate biological basis for gender
21 identity?
22    A. I believe I cited various articles that
23 contained discussions of research supporting
24 biological basis of gender identity.  And I would
25 need to source citation 63, 65, Bauer, et al, and

Page 42

1 some others in order to point to you where.
2    Q. Is there any sentence in those two
3 paragraphs that you would point me to that
4 addresses the question of biological basis for
5 gender identity?
6    A. Again, I would have to point to the
7 citations.  This report is heavily cited.
8    Q. My question is this:  Did you write a single
9 sentence of text in support of the proposition
10 that gender identity has a biological basis?
11    A. No, not in this section.
12        MR. BROOKS:  Let me ask the reporter to
13 mark as Exhibit 6, Endocrine Society Guidelines
14 from 2017.
15        (DEFENDANT'S EXHIBIT 6 FOR
16         IDENTIFICATION Received and Marked.)
17    Q. And Dr. McNamara, you cite these guidelines
18 in your report, do you not?
19    A. I do.
20    Q. And do you consider yourself to be well
21 familiar with them?
22    A. I have reviewed them a few times.
23    Q. Do you have occasion to consult them in the
24 ordinary course of your professional practice?
25    A. Generally not.  In clinical practice, I

Page 43

1 have.
2    Q. They're not relevant to your practice to any
3 extent?
4    A. I have practiced in accordance with some of
5 the guidelines when it comes to referrals and
6 how -- but otherwise, no.
7    Q. Let me ask you to turn to page 3876.  In the
8 first column, I'm going to direct your attention
9 to the first paragraph.
10        Let me ask you to read -- well, let me just
11 read into the record the first sentence.
12        "With current knowledge, we cannot predict
13 the psychosexual outcome for any specific child."
14        Let me ask you this:  Are you aware -- and
15 these guidelines, just to be clear, are from 2017.
16 Are you aware of any of the literature up to the
17 present that has identified any measurable genetic
18 basis that permits doctors to, for instance, take
19 a blood sample from a newborn and predict whether
20 that child will develop a transgender identity?
21    A. Not familiar with that.
22    Q. You're not aware that any such genetic
23 marker has been identified?
24    A. I'm not aware that any such genetic marker
25 has been identified.

Page 44

1    Q. And up to the present, so far as you know,
2 there's nothing in the literature that has
3 identified any hormonal marker that would enable a
4 doctor to take a blood sample from a child and
5 determine or predict whether that child would
6 develop a transgender identity, correct?
7    A. I am not aware that there's any hormonal
8 marker that would predict gender identity.
9    Q. And when you have seen a teen who may be
10 suffering from gender dysphoria, you're not aware
11 of any genetic test or hormone test that could
12 tell you whether an adolescent presenting in a
13 clinic actually has a transgender identity?
14    A. No, I'm not aware of any tests like that.
15    Q. Outside of genes and hormones, what, in your
16 professional opinion, is a strong biological basis
17 for gender identity?
18    A. I'm familiar with studies that I have not
19 cited in my Declaration, but that I have reviewed,
20 that show differential brain structures between
21 cisgender people and transgender people with the
22 same sex assignment at birth.  And I also know,
23 based on other studies, that gender identity is
24 highly resistant to change when subject to efforts
25 to try to change it.

Page 45

1    Q. You have written, however, have you not,
2 that an adolescent's self experience gender
3 identity does sometimes change.
4    A. I have -- are you referring to my
5 Declaration?
6    Q. I'm not referring to your declaration.
7    A. Okay.  Well, that is what some muse
8 experience what gender dysphoria is.  They may
9 have grown up socialized and considered themselves
10 in a conscious level as a gender that aligns with
11 their sex assigned at birth, and then their
12 conscious experience changed.
13    Q. Am I correct that it is your professional
14 opinion that there is no definitive basis for
15 determining an individual's gender identity other
16 than their self perception?
17        MS. LEVI:  Object as to form.
18    A. The diagnostic criteria are not a binary
19 question of yes or no.  They require six different
20 areas, some of which must be satisfied for a
21 minimum period of six months, to determine whether
22 or not somebody has gender dysphoria.  I would not
23 consider that to be self report.  I would consider
24 that to be a diagnosis made after a clinical
25 assessment.

12 (Pages 42 - 45)

1   Q. Is it your testimony and/or belief that an
2   individual cannot have a transgender gender
3   identity unless they satisfy diagnostic criteria
4   for gender dysphoria?
5   A. No, not necessarily. Those things are not
6   mutually exclusive.
7   Q. So let me ask you again. In your opinion,
8   is there any basis for definitively determining an
9   individual's gender identity, other than that
10  individual's self perception?
11  A. Self perception is a way to understand a
12  person's gender identity, as it is a way to
13  determine many different experiences one might
14  have with various health or disease issues.
15  Migraines, for instance, we can only use self
16  report. I only say that so that I can
17  contextualize what I'm saying so that it's clear
18  that that's not exceptional or unique to gender
19  identity.
20  Q. It's not your view, is it, that every child
21  who suffers from gender dysphoria necessarily has
22  a stable transgender identity?
23       MS. LEVI: Object as to form.
24  A. I would not be able to opine on that because
25  it's an absolute comment -- excuse me, it's an

1   absolutist comment about every child. So I
2   don't -- I don't have an opinion on your specific
3   question.
4   Q. Well, do you consider the question of
5   whether every child who satisfies the diagnostic
6   criteria for gender dysphoria must necessarily
7   have a transgender -- a stable, true transgender
8   identity to be beyond your professional expertise?
9       MS. LEVI: Object as to form.
10  A. I don't perform those assessments myself, so
11  I don't have clinical experience in the area that
12  you're asking me about.
13  Q. Do you consider it to be beyond your
14  professional expertise?
15  A. Say what you're considering to be beyond
16  my --
17  Q. I will.
18  A. Please repeat your question.
19  Q. The question is -- let me start, is the
20  question of whether every child who satisfies
21  diagnostic criteria for gender dysphoria has an
22  innate transgender identity, one that is beyond
23  your professional expertise?
24       MS. LEVI: Object as to form.
25  A. It's not something that I can opine on

1   today.
2   Q. And is that because it's outside of your
3   professional expertise?
4   A. It's because I can't opine on it today.
5   Q. Well, let me ask it differently.
6       Do you consider that question to be one
7   that's within your professional expertise, but you
8   just don't know the answer to it?
9   A. What I said before is that I don't perform
10  psychological assessments on prepubescent children
11  with gender dysphoria. That is outside of my
12  professional expertise.
13       MR. BROOKS: Let me ask the reporter to
14  mark as McNamara Exhibit 7, a Scientific Statement
15  from the Endocrine Society dated 2021, titled
16  "Considering Sex As a Biological Variable."
17       (DEFENDANT'S EXHIBIT 7 FOR
18       IDENTIFICATION Received and Marked.)
19  Q. Dr. McNamara, is this a document that you're
20  familiar with?
21  A. I don't believe so.
22  Q. You have referred to the 2017 Endocrine
23  Society Guidelines that we looked at earlier in
24  your Expert Report, correct?
25  A. That's correct.

1   Q. And do you consider the Endocrine Society to
2   be a respected and reliable scientific voice?
3   A. I do.
4   Q. You have never reviewed this document so far
5   as you recall?
6   A. I don't believe so, no.
7   Q. The document is entitled a Scientific
8   Statement from the Endocrine Society published in
9   Endocrine Reviews in 2021. So it's about four
10  years more recent than the guidelines that you
11  cited. Do you see that is in the date at the top,
12  as it happens.
13  A. I do see that, yes.
14  Q. And, as such documents tend to be, has a
15  long list of authors that I will not attempt to
16  read into the record. But the first is Bhargava,
17  B-H-A-R-G-A-V-A.
18       Let me ask you to turn in this document, I'm
19  just going to ask you about a few factual
20  assertions in the document to see whether they
21  match your scientific understanding.
22       Page 221, column one, there's a heading that
23  says "Biological Sex: The definition of Male and
24  Female."
25  A. I'm with you.

13 (Pages 46 - 49)

Page 50

1    Q. It says in the third line of text under that
2  heading, "All mammals have two distinct sexes."
3       You've been in medical school.  You've had
4  high school biology.  Is it consistent with your
5  scientific understanding that all mammals have two
6  distinct sexes?
7    A. I am more familiar with sex as a
8  multidimensional variable that takes into account
9  endogenous hormone production, genitalia,
10  genetics, and other features.
11    Q. So if the Endocrine Society, in their
12  Scientific Statement published in 2021, asserts
13  that "All mammals have two distinct sexes," you
14  simply disagree?
15    A. No, not necessarily.  The rest of this
16  document goes into detail, many other things that
17  I have just laid out very briefly.  There are also
18  other places where sex is discussed.
19    Q. Well, let me take you to another one of
20  those, just a little bit farther down, maybe eight
21  lines down, the same section.  I'll read the
22  following text:
23       "The classical biological definition of the
24  two sexes is that females have ovaries and make
25  larger female gametes (eggs), whereas males have

Page 51

1  testes and make smaller male gametes (sperm)."
2  Obviously, that expression here in the context of
3  mammals.
4       Is that definition of the classical
5  biological definition of the two sexes one that --
6  let me start that question again.
7       Do you agree or disagree that what the
8  Endocrine Society authors have recited here is
9  indeed a classical biological definition of the
10  two sexes?
11       MS. LEVI:  Object as to form.
12    A. The word "classical" seems quite subjective
13  here.  I'm not sure how the authors are using it.
14  I might need a little bit more context on the
15  intention in using that word before I could offer
16  an opinion either way.
17    Q. Based on your own medical knowledge and
18  education, do you agree or disagree that, among
19  mammals, a widely used biological definition of
20  the two sexes is that females have ovaries and
21  make larger female gametes, generally referred to
22  as eggs, whereas males have testes and make
23  smaller male gametes, referred to as sperm?
24    A. In medical school, I didn't learn about
25  mammalian biology as a general concept.  I learned

Page 52

1  about human biology.  And I learned about
2  variations in sex based on several nuanced
3  biological factors.
4    Q. Let me take you down, there's a paragraph
5  that begins, "In mammals, numerous sexual traits."
6  Do you see that?
7    A. Yes.
8    Q. And the second sentence in that paragraph
9  begins "The type of gonads is controlled by the
10  presence of XX or XY chromosomes."  Do you see
11  that language?
12    A. Yes.
13    Q. And do you agreed or disagree with that
14  assertion by the Endocrine Society authors?
15    A. That's correct.
16    Q. Let me ask you to turn to 225.  And there, I
17  call your attention -- let's see here.  Give me a
18  moment to find it.
19       Midway down the column, 225, is a sentence
20  that begins, "Similar masculinizing effects."  Do
21  you see that?
22    A. No, are you in the --
23    Q. 225, column two.
24       MS. LEVI:  It's right here.
25    Q. I may not have said column two.  And right

Page 53

1  after that is sentence that I will read into the
2  record.
3       "Second, all aspects of neural development
4  are capable of being organized or programmed by
5  sex steroids.  This includes cell generation(as
6  read), migration, myelination, dendritic and
7  axonal growth and branching, synapse formation,
8  synapse elimination, and neurochemical
9  differentiation."
10       MS. LEVI:  Just, I think you said
11  "generation," and it's "genesis."
12       MR. BROOKS:  I'm sure you're right.
13       MS. LEVI:  Okay.
14       MR. BROOKS:  You try reading that.
15       MS. LEVI:  Fair enough.  Just would like
16  the record to be accurate.
17       MR. BROOKS:  Thank you.
18    Q. Let me ask whether you agree or disagree or
19  consider it outside your professional expertise
20  whether all these listed aspects of neural
21  development are capable of being organized or
22  programmed by sex steroids?
23    A. So just getting some context with this
24  paragraph here, it does seem like they might be
25  referring to a differentiation between primates

1 and rodents.
2     "To discern whether the biological basis of
3 sexual differentiation of sexual differentiation
4 of brain and behavior differs between primates and
5 rodents, one needs to identify mechanisms by which
6 steroids transduce signals to modify the
7 trajectory of the nervous system. While those
8 mechanisms are incompletely understood, a few
9 general principles are clear. First" -- and this
10 is one concept. I'll skip to what you just read.
11     "Second, all aspects of neural development
12 are capable of being organized or programmed by
13 sex steroids."
14     Q. My question for you about the second
15 sentence you just read is do you believe that to
16 be true, false, or outside your personal
17 expertise?
18     A. And my response is this sentence seems to
19 pertain to primates and rodents, and that does
20 definitely fall outside of my expertise.
21     Q. And if I ask the same question about human
22 development, that is, is it true in the case of
23 human development, brain development, that all
24 aspects of neural development are capable of being
25 organized or programmed by se steroids, do you

1 consider that also to be outside your expertise?
2     A. That seems like it would fall much more
3 under the expertise of a neuroscientist. And
4 that, I am not.
5     Q. Okay, all right.
6         MR. BROOKS: Let me ask the reporter to
7 mark as Exhibit 8, an article entitled "Protecting
8 Transgender Health and Challenging Science
9 Denialism and Policy" by Dr. McNamara and two
10 other authors.
11         (DEFENDANT'S EXHIBIT 8 FOR
12         IDENTIFICATION Received and Marked.)
13     Q. And Dr. McNamara, is this in fact an article
14 that you coauthored sometime in 2022?
15     A. Yes, it is.
16     Q. And am I correct that the authors -- you're
17 obviously a doctor. Anne Alstott is a law
18 professor; am I correct?
19     A. Yes.
20     Q. And Christina Lepore was a law student?
21     A. No, Ms. Lapore is a soon to be graduating
22 medical student.
23     Q. A medical student. And obviously, two years
24 earlier from graduating when this was written. Is
25 it the case that the medical and scientific

1 assertions in this article are based on your
2 knowledge?
3     A. Based on the combined knowledge of all
4 authors.
5     Q. Well, were you resting scientific assertions
6 on the knowledge of a lawyer?
7     A. Certainly not.
8     Q. Oh, good. So the science, you would say, is
9 the combined input of you and Christina Lepore, a
10 medical student?
11     A. Mm-hmm.
12     Q. Okay. Let me ask you to turn -- and did you
13 edit this carefully? Before it went out the door,
14 did you consider every sentence in this to
15 represent your professional opinion?
16     A. Absolutely.
17     Q. Let me ask you to turn to the first page.
18 And there, you refer, towards the bottom of the
19 first column, to a false -- "false claims about
20 risks associated with treatment." Do you see
21 that?
22         It's an inch from the bottom of the first
23 column.
24     A. Yes.
25     Q. Is it your testimony that any scientist or

1 medical policy maker who expresses -- who asserts
2 that there are potentially serious risks relating
3 to administering puberty blockers or cross-sex
4 hormones to minors, is making false claims?
5     A. In preparation for writing this piece in the
6 New England Journal, I did a thorough inventory of
7 claims regarding risks of treatment and how
8 emphatic or emphasized they were. And I
9 identified several claims that were incorrect or
10 overly emphasized at the expense of discussing the
11 benefits of care.
12         It is not my opinion that everybody who
13 discusses risk is denying scientific fact. That
14 would not be a fair characterization of what this
15 sentence means here.
16     Q. And that's exactly the clarification I am
17 asking for. That is, it is not your opinion that
18 every doctor or medical authority who expresses
19 concern that there may be serious risks associated
20 with administering puberty blockers or cross-sex
21 hormones to minors is making false claims?
22         MS. LEVI: Object as to form.
23     A. We would need to review specific claims in
24 detail so that I could offer my opinion, my expert
25 opinion on whether or not I felt that those claims

1 were false or overemphasized.

2     Q. And if you look at the third column, also

3 about an inch from the bottom, there's a sentence,

4 maybe an inch and a half, that reads "State laws

5 banning gener-affirming care make similarly

6 unsupported claims about risks of cardiovascular

7 disease, thromboembolic events, and cancer

8 associated with administration of exogenous

9 estrogen and testosterone."

10     To clarify, it is not your expert opinion,

11 is it, that any medical authority or doctor who

12 asserts that there are serious risks associated

13 with administering puberty blockers or cross-sex

14 hormones to minors is necessarily making

15 unsupported claims?

16       MS. LEVI:  Object as to form.

17     A. Your use of the word "serious" is subjective

18 and I'm unsure of its meaning.  But it is entirely

19 possible and common, and what I'm referring to

20 here, that risks have been overrepresented,

21 incorrectly characterized and overemphasized.

22     Q. Let me ask you to turn to the second page of

23 your article.  And in the third column, the final

24 paragraph begins "Bans on gender-affirming care

25 are grounded in science denialism."  Do you see

1 that?

2     A. I do.

3     Q. Is it your expert opinion that anyone who

4 asserts that hormonal interventions in minors

5 imposed serious risks of harm that have not yet

6 been adequately studied is guilty of science

7 denialism?

8     A. I would need to review specific statements

9 and comments in order to opine as to whether or

10 not that is the case.  And in this article, I cite

11 numerous instances of that.

12     Q. A little bit above this, in the previous --

13 the preceding paragraph in column three of page

14 1920 in Exhibit 8, you refer to reports that are

15 "composed by subject matter experts without

16 conflicts of interest."  Do you see that?

17     A. Yes.

18     Q. And what is your understanding of what

19 constitutes a conflict of interest?

20     A. A conflict of interest entails some sort of

21 compensation for the work.  Usually it's financial

22 or something that could be construed as having

23 some sort of financial value.

24     Q. In your opinion, does a clinician who

25 derives a significant percentage of his or her

1 practice from treatment of minors for potential

2 gender dysphoria, face a conflict of interest in

3 opining on the risks or benefits of such

4 treatments?

5     A. No. Physicians discuss risks and benefits of

6 treatment as part of their commitment to patient

7 care.  It's far removed from the concept of

8 conflicts of interest.

9     Q. Well, I thought you just told me that a

10 financial conflict of interest would exist where

11 an individual had a financial interest in the

12 performance or nonperformance of the treatment at

13 issue.

14       MS. LEVI:  Object as to form.

15     A. Conflicts of interest in the medical world

16 pertain to specific services outside of your

17 clinical care; things that don't necessarily

18 pertain to clinical care.

19     If a researcher or physician had received

20 compensation for writing something or endorsing a

21 product, that would be a conflict of interest and

22 that would need to be disclosed.  But the

23 provision of patient care, which does receive

24 financial remuneration, is not considered to be a

25 conflict of interest in my profession.

1     Q. So in your view, a physician who derives his

2 larger share of his or her personal income from

3 providing hormonal treatment of minors for gender

4 dysphoria, does not face the financial conflict of

5 interest in commenting on a law that prohibits

6 such treatments?

7     A. Say that one more time, please, if you don't

8 mind.

9       MR. BROOKS:  I'll ask the reporter to

10 read that.

11     (THE REPORTER READ THE RECORD)

12     A. I don't think so, no.

13     Q. And in your view, does a clinician who would

14 face large malpractice liability if juries

15 ultimately conclude that hormonal intervention in

16 minors were harmful and unjustified, face a

17 financial conflict of interest in commenting on a

18 law that prohibits such therapies?

19       MS. LEVI:  Object as to form.

20     A. I feel like that's outside my scope of

21 expertise.  I have very little knowledge of

22 medical malpractice.

23     Q. My question wasn't about medical practice,

24 it was about conflict of interest.

25     A. You referenced medical malpractice.

16 (Pages 58 - 61)

1    Q. You're aware of the concept of doctors being
2  held financially responsible for harming patients?
3    A. My understanding of medical malpractice is
4  that physicians can obtain insurance and their
5  covering institutions protect them from being
6  financially vulnerable to such cases. That's
7  where my knowledge ends. And I am unsure how to
8  answer your question without knowing more.
9    Q. All right. Do you have any understanding of
10  the conflict -- of the concept of intellectual
11  conflict of interest?
12    A. No.
13    Q. All right. Let me ask you to find your
14  Expert Report, Exhibit 4, and turn with me to page
15  6. And just under the heading C, you begin, the
16  first paragraph there, with the statement
17  "Adolescents undergo a critical period of
18  cognitive and social development between the ages
19  of 11 to 18." Do you see that?
20    A. I do.
21    Q. And you would agree with me, would you not,
22  that both those endpoints are -- let's just say
23  soft numbers. That is, there's -- for example,
24  there's evidence that cognitive development
25  continues after the age of 18.

1    A. Correct.
2    Q. Okay. Can you explain to me what you meant
3  when you wrote that adults undergo a critical
4  period of cognitive development within that
5  general age range?
6    A. You said "adults." I believe you meant to
7  say "adolescents."
8    Q. Let me ask it again. Explain to me what you
9  meant when you wrote that "Adolescents undergo a
10  critical period of cognitive...development between
11  the ages of 11 to 18."
12    A. I said "Adolescents undergo a critical
13  period of cognitive and social development between
14  the ages of 11 to 18."
15      And by that, I mean that that time period of
16  a young person's life, which does not exclude the
17  possibility of similar changes before or after,
18  undergo a great deal of change and development in
19  those domains. They begin to experience formative
20  social relationships outside of their families and
21  their immediate home environments. They begin to
22  develop romantic relationships. They develop
23  skills and talents as connections between the
24  midbrain and the prefrontal cortex are being
25  formed. And that can help those young people

1  retain those skills and talents in adulthood.
2    Q. Let me focus, if I may, on the cognitive
3  development. You've testified that you're not a
4  developmental psychologist or a neurologist, all
5  these things. But what did you -- what were you
6  referring to specifically when you wrote that
7  adolescents at that time period undergo critical
8  stages of cognitive development?
9    A. So as an Adolescent Medicine specialist,
10  adolescent cognitive development regarding
11  risk/benefit analysis, health decisionmaking,
12  educational function, all of that being pertinent
13  to cognition and cognition change, is becoming
14  more adult-like during those years. Adolescents
15  are undergoing changes that are highly
16  individually dependent.
17    Q. Are you familiar with the term "executive
18  function"?
19    A. Yes.
20    Q. And what does that refer to in the area of
21  cognitive development?
22    A. "Executive," meaning to execute or to make
23  decisions in various scenarios.
24    Q. You're asking me?
25    A. That's not a question. Sorry. Would you

1  like me to rephrase what I just said?
2    Q. Please.
3    A. So executive function refers to the ability
4  to execute or make decisions in various scenarios.
5    Q. And is that a capability that is known to
6  develop in important ways across the adolescent
7  years that you've bracketed here?
8    A. It's certainly known to change. It's
9  present in many ways, but it is known to change
10  during this time.
11    Q. Well, let me take you out of the clinic for
12  a moment. Have you, yourself, raised a child
13  through adolescence?
14    A. I would prefer not to answer any personal
15  questions about my life in this deposition.
16    Q. I'm sorry, but I'm asking the question.
17    A. And when you say "raised," do you mean as a
18  parent?
19    Q. I do.
20    A. I have not raised an adolescent.
21    Q. But you have seen many adolescents in your
22  practice.
23    A. Yes, I have.
24      MR. BROOKS: Let me mark as Exhibit 9 an
25  article with the lead author Diane Chen from 2023

Page 66

1  entitled "Psychosocial Functioning and Transgender
2  Youth after Two Years of Hormones."
3        (DEFENDANT'S EXHIBIT 9 FOR
4        IDENTIFICATION Received and Marked.)
5        MS. LEVI:  You okay to keep going?
6        THE DEPONENT:  Yes, we can go through
7  this one.
8    Q.  And Dr. McNamara, is this an article that
9  you refer to in your Expert Report?
10   A.  Yes, it is.
11   Q.  Are you familiar with the reputation of
12  Diane Chen?
13   A.  Yes, I am.
14   Q.  And what is that reputation, in your view,
15  in the field of gender medicine?
16   A.  Dr. Chen is a well-regarded psychologist who
17  has contributed a great deal of clinical research
18  to this field.
19       MR. BROOKS:  Let me ask the reporter to
20  mark as Exhibit 10, another article with Diane
21  Chen as the lead author entitled "Consensus
22  Parameter:  Research Methodologies to Evaluate
23  Neurodevelopmental Effects of Pubertal Suppression
24  in Transgender Youth" from 2020.
25       (DEFENDANT'S EXHIBIT 10 FOR

Page 67

1        IDENTIFICATION Received and Marked.)
2    Q.  And let me ask whether this is a paper that
3  you are familiar with.
4    A.  I have skimmed this before.  I don't believe
5  it's one that I have cited --
6    Q.  I think that's the case.
7    A.  -- in any of my Declarations.
8    Q.  But you have read it yourself?
9    A.  Yes, as I mentioned, I skimmed it.
10   Q.  And without asking you to read all of them,
11  going through the list of affiliations of the
12  coauthors which appear on the first page, you
13  would agree with me, would you not, that this
14  paper is could authored by a lineup of authors
15  from quite a number of high reputation research
16  institutions.
17   A.  I would agree with that.
18   Q.  Are you familiar with a process called a
19  Delphi Consensus Procedure?
20   A.  I am only very loosely familiar with it.
21   Q.  Then I will not ask you questions about
22  that.
23   A.  Okay.
24   Q.  You haven't participated in a Delphi --
25   A.  No, I have not.

Page 68

1    Q.  -- Consensus process yourself, okay.
2        Let me ask you to turn to page 248.
3    A.  Of which document?
4    Q.  I'm sorry, Exhibit 10.  You can put Exhibit
5  9 to one side.  We won't -- probably won't be
6  coming back to that.  We'll see.
7        MS. LEVI:  I'm sorry, 248, did you say.
8        MR. BROOKS:  248.
9    Q.  And just to kind of connect this to what
10  we've just been discussing, midway down, a
11  sentence begins "The pubertal and adolescent
12  period is associated with profound
13  neurodevelopment."  You see that language?
14   A.  I do.
15   Q.  And that's consistent with what you were
16  just explaining to me, am I correct?
17   A.  Yes, I would say so.
18   Q.  And that goes on to say "including
19  trajectories of increasing capabilities for
20  abstraction and logical thinking, integrative
21  thinking (e.g., consideration of multiple
22  perspectives), and social thinking and
23  competence."  Do you see that language?
24   A.  I do.
25   Q.  And do you agree or is it outside your

Page 69

1  expertise that now well-established neuroscience
2  tells us that the maturation process that we call
3  puberty and adolescence includes profound
4  developments that affect the capability for
5  logical thinking, social thinking, and competence?
6    A.  Could you -- could I hear your question
7  again, please.
8        MR. BROOKS:  Yes, I'll ask the reporter
9  to help me out.
10       (THE REPORTER READ THE RECORD)
11   A.  Social thinking, competence, and then there
12  was one initial thing you mentioned.
13   Q.  Logical thinking, which is a clause that I
14  took out of the sentence that we --
15   A.  I see.
16   Q.  -- just read.
17   A.  Yeah, I would agree with that.
18   Q.  And let me ask, take you a little bit
19  farther down.
20       An inch and a half down, there's a sentence
21  that begins, two-thirds of the way along the
22  line -- it's hard to find these things -- that
23  begins "At the level of the brain."  Let me ask
24  you to find that.
25   A.  I see it.

18 (Pages 66 - 69)

Page 70

1   Q. Okay. And that says "At the level of the
2   brain, several primary neurodevelopmental
3   processes unfold during adolescence, including
4   myelin development and changes in neural
5   connectivity, synaptic pruning, and gray matter
6   maturation, changes in functional connectivity,
7   and maturation of the prefrontal cortex and the
8   social brain network."
9       MS. LEVI: There's no -- there's no
10  quote at the end of the sentence.
11      MR. BROOKS: I'm closing my quotation.
12      MS. LEVI: Got it.
13  Q. And this is referring more to physical,
14  measurable brain development, rather than more
15  abstract descriptions of capabilities, correct?
16  A. That's correct.
17  Q. And is it -- are the physical changes in
18  brains during adolescence that are described in
19  the sentence I just read into the record accurate,
20  to your knowledge, or going beyond your
21  professional expertise?
22  A. I have enough expertise to agree with the
23  sentence.
24  Q. Okay. Would you agree that these known
25  facts about brain development during puberty raise

Page 71

1   the possibility, at least, that blocking normal,
2   healthy puberty hormones produced by the child's
3   body may have some effect on the child's brain
4   development?
5       MS. LEVI: Object as to form.
6   A. So I would say that these processes are not
7   solely and exclusively dependent on pubertal
8   maturation to unfold. Adolescence is also
9   characterized by rapidly changing social
10  environment and that sex hormones are one of a few
11  influential factors that support this type of
12  brain development.
13  Q. What knowledge do you have, if any -- strike
14  that.
15      Can you point me to any study that informs
16  us as to what extent the changes described in the
17  sentences I just read from Chen, et al 2020, are
18  driven by puberty-linked hormones versus other
19  factors, such as social environment that you've
20  just described?
21  A. I'm looking at the reference list to see if
22  I reviewed any of the papers that they cite in
23  this paragraph. Nothing looks familiar to me.
24      This is a fact that I generally understand
25  from my fellowship training, understanding that

Page 72

1   this is a criteria of my board certification.
2       For my immediate recollection, I cannot list
3   a study. However, I am sure I could source some
4   if given the opportunity.
5   Q. Well, let me back up and ask you again. The
6   known facts about brain development during puberty
7   that are recited in Chen, et al, that you have
8   agreed with a moment ago, you would agree, raise
9   the possibility that blocking normal pubertal
10  hormones produced by the child's body may have
11  some effect on the child's brain development?
12  A. This paragraph as it's written does not
13  contain any information about pubertal blockade or
14  the presence or absence, or the influence of sex
15  hormones specifically.
16  Q. My question for you as a scientist is, do
17  you agree, disagree, or consider it outside your
18  expertise to say that the known facts about brain
19  development during puberty raise the possibility
20  that blocking normal, healthy pubertal hormones
21  produced by the child's body may have some effect
22  on the child's brain development?
23  A. I am loosely aware of research that has
24  listened to that question. It would not be proper
25  for me to offer an opinion without having done an

Page 73

1   in-depth analysis on relative research that could
2   be used to answer your question. So I consider
3   cognitive development in the setting of pubertal
4   blockade to be something that is outside the scope
5   of my expertise as it's represented in the
6   literature.
7   Q. All right. Based on your review of Chen, et
8   al 2020, you understand that what that paper does
9   is propose some methodology or metrics that the
10  authors believe should be deployed to study the
11  question of whether pubertal blockade may have an
12  impact on the child's brain development; correct?
13  A. Let me just read the abstract for a second
14  to refresh myself.
15      So the purpose of this study was to identify
16  methodologies for studying the impact of pubertal
17  blockade on cognitive function in adolescents by
18  gender dysphoria.
19  Q. To your knowledge, no study applying the
20  methodology recommended by Chen, et al in 2020 has
21  yet been published, correct?
22  A. I couldn't opine on that one way or the
23  other.
24  Q. So far as you know today -- let me put it in
25  a way that's easier to answer.

19 (Pages 70 - 73)

1      As you sit here today, you're not aware of
2 any study applying the methodology recommended by
3 Chen, et al in 2020 that is in process today?
4      A. I cannot offer any answer to that question.
5 I don't know.
6      Q. The sense of the question was you're not
7 aware; you can't offer an answer, you're not
8 aware --
9      A. I'm unaware.
10      Q. -- of any such study, okay.
11      A. I would not have a reason to be aware,
12 having not done an in-depth look at the
13 literature.
14      Q. And in your report, in your supplemental
15 report, you don't actually offer any opinion as to
16 whether the use of puberty blockers in adolescents
17 as a treatment for gender dysphoria, does or does
18 not have any negative effect on the child's brain
19 development, do you?
20      A. I don't discuss any studies pertinent to
21 brain development in my supplemental report.  But
22 I do discuss several studies that describe
23 psychosocial functions and mental health
24 improvements.
25      Q. It is also the case in your original report,

1 you don't offer any opinion as to whether applying
2 puberty blockers adolescents as a treatment for
3 gender dysphoria does or does not have any harmful
4 effect on the child's brain development?
5      A. Similarly, I don't source any studies on
6 cognitive development.  But I do discuss several
7 studies that show stability or improvements in
8 various domains of mental health and/or gender
9 dysphoria.
10      Q. You would agree, would you not, that mental
11 health and cognitive development are not the same
12 concept?
13      A. I would not agree that they're entirely
14 distinct; that there is overlap.  And that
15 untreated or worsening mental health conditions
16 can certainly limit one's ability to develop
17 cognitive skills in adolescence.
18      Q. You would agree, would you not, that mental
19 health and cognitive development are not the same
20 concept?
21      A. I agree that they're overlapping concepts
22 that are interrelated.
23      Q. Would you agree that they are not the same
24 concept?
25      A. They don't overlap completely, but they're

1 intrinsically linked.
2          MS. LEVI:  I think she's answered the
3 question.  You asked it three times now.
4          MR. BROOKS:  Fine.
5      Q. Do you agree, as a clinician, that knowing
6 whether the administration of puberty blockers
7 adolescents during years of natural pubertal
8 development has a lasting negative impact on brain
9 development, is an important question for
10 clinicians, for parents, for health policy
11 experts, tasked to decide whether or not to
12 administer puberty blockers to minors?
13          MS. LEVI:  Object as to form.
14      A. Can I have the question back, please.
15          (THE REPORTER READ THE RECORD)
16      A. It is one of many questions that should be
17 considered in a medical decisionmaking process
18 between a physician, a parent, and a patient.  And
19 there are many others that should be considered
20 simultaneously.
21      Q. You, as a clinician, would want to know the
22 answer to that question if at all possible, right?
23      A. I would want to know the answer to that
24 question alongside and at the same time as the
25 answer to the question of what happens to

1 cognitive function when gender dysphoria
2 progresses without intervention.
3      Q. And in fact, there's a great deal about
4 brain development in adolescents undergoing
5 alternative treatment for gender dysphoria that
6 just isn't known at present, correct?
7          MS. LEVI:  Object as to form.
8      A. I am unaware of any alternative treatments
9 to gender dysphoria or what you may mean by that.
10      Q. Let me rephrase the question.  There's a
11 great -- there's a great deal about the effect of
12 puberty blockers or cross-sex hormones in the
13 brain development of adolescents that we simply
14 don't know yet, correct?
15      A. Can I have the question back?
16          (THE REPORTER READ THE RECORD)
17      A. There is a great deal that is known and
18 unknown, as is the case in many different domains
19 of medicine.
20          MR. BROOK:  Let me ask the reporter to
21 mark as Exhibit 11, an article by Drs. Leibowitz
22 and de Vries entitled "Gender Dysphoria in
23 Adolescence."
24      A. Shall we set these aside?
25      Q. Yes.

20 (Pages 74 - 77)

Page 78

1        (DEFENDANT'S EXHIBIT 11 FOR
2        IDENTIFICATION Received and Marked.)
3     Q. Let me ask first whether you professionally
4 know either Dr. Leibowitz or Dr. de Vries?
5     A. I don't.
6     Q. Do you know -- do you have any opinion as to
7 the professional reputation of Dr. de Vries?
8     A. I know that Dr. de Vries is a well-known
9 researcher and clinician in this field.
10    Q. And she is associated with the Vrije
11 University clinic that I mentioned earlier.  Is
12 that consistent with your recollection?
13    A. I will take your word for that.  I'm not
14 sure what VU University Medical Center in
15 Amsterdam refers to, but perhaps that's an
16 abbreviation.
17    Q. It refers to -- and I'll spell this for you
18 since it's Dutch -- Vrije, V-R-E-I-J, University.
19 So when I say "Vrije," it's V-R-E-I-J.
20      Is this a paper that you are -- you believe
21 you have reviewed before now?
22    A. That's what I'm trying to figure out.  It
23 doesn't immediately look familiar to me.
24    Q. Do you know anything about Dr. Leibowitz's
25 reputation?

Page 79

1     A. I'm a little bit more familiar with Dr.
2 Leibowitz, and that he is a well-respected
3 psychiatrist who cares for gender diverse youth.
4     Q. Let me ask you to turn to page 30.  And
5 there's Table 2 there with two columns.  One says
6 "What is Known," and the second says "What is Not
7 Known."  Do you see that?
8     A. Yes.
9     Q. And these authors in the "What is Not Known"
10 column say -- writing in 2016; I don't want to try
11 to blur the years.  Find what I'm looking for.
12      Under the "What is Not Known" column, they
13 write "Unclear long-term effects on brain
14 development in this population."
15      Do you consider these authors to be, in
16 stating that it's unclear what the effect of
17 pubertal suppression on brain development in
18 adolescents may be, to be deploying scare tactics?
19         MS. LEVI:  Object as to form.
20    A. Can I have the question back.
21    Q. Do you consider Dr. de Vries and Dr.
22 Leibowitz, in stating that it is unknown what the
23 long term effects on brain development in the
24 adolescent population of pubertal suppression, to
25 be deploying scare tactics?

Page 80

1     A. I have no information to help me answer that
2 question either way.
3     Q. Do you consider Dr. Leibowitz and Dr. de
4 Vries to be science deniers?
5     A. No.
6     Q. Do you believe either of them to be
7 transphobes?
8         MS. LEVI:  Object as to form.
9     A. I do not know either of them at all.
10    Q. But you know their professional reputations
11 to some extent, correct?
12    A. What you're describing reflects more of a
13 personal belief that I would not have any
14 knowledge of.
15    Q. And you would -- it is beyond your
16 professional knowledge that Dr. De Vries is widely
17 considered to be one of the seminal researchers in
18 the field of treatment of gender dysphoria in
19 minors?
20    A. I tend not to think about experts in this
21 field on a concrete hierarchy like that,
22 especially at this point in time, when there are
23 so many who have produced solid research and
24 contributed extensively to the field.
25    Q. You're not prepared to offer expert

Page 81

1 testimony that it has been established by reliable
2 evidence that use of puberty blockers to treat
3 gender dysphoria in adolescents does not have
4 negative long term effects on brain development in
5 that adolescent population, are you?
6     A. What I can tell you is that a statement in a
7 paper from 2016 is likely outdated, given the
8 possibility of eight years of subsequent research
9 that is not included in this paper.
10        MR. BROOKS:  Let ask the court reporter
11 to read back the question.
12        (THE REPORTER READ THE RECORD)
13    A. And as I answered, what I can tell you, and
14 what I did tell you at the beginning, is that I
15 had seen several articles looking into pubertal
16 suppression and cognitive development, that I did
17 not review them extensively for any of my reports;
18 that I do not know what years they were published
19 in.  And I do not know whether or not they
20 resulted from any of the methodologies that Chen
21 and colleagues described in the 2020 paper.  And
22 that referring to a sentence in a paper from 2016
23 that describes unclear long-term effects may not
24 hold true eight years later.
25    Q. My question for you today, as you sit here,

21 (Pages 78 - 81)

1 is are you willing, today, to offer expert
2 testimony that it has been established by reliable
3 evidence that use of puberty blockers to treat
4 gender dysphoria in adolescents does not have
5 negative long-term effects on brain development?
6    A. That is not an area that I have formed an
7 opinion on in this case.
8    Q. All right.  Do you have an opinion as to
9 whether that's a question on which, on the state
10 of the science today, there's room for reasonable
11 disagreement among scientists?
12    A. I don't have an opinion on that either.
13    Q. Let me take you a little closer to the
14 present and ask the reporter to mark as Exhibit
15 12, a 2023 article by Dr. De Vries and another
16 author named Hannema.
17        (DEFENDANT'S EXHIBIT 12 FOR
18        IDENTIFICATION Received and Marked.)
19    Q. Is this an article that you believe you have
20 seen before --
21    A. Yes, I have seen this before.
22    Q. -- today.  And is it an article that you
23 have referenced for any reason other than
24 preparation for this litigation?
25    A. I don't believe so.  It's not something I

1 cited in my reports, either.
2    Q. Do you know anything about the reputation of
3 Dr. Hannema?
4    A. Nothing.
5    Q. And as to Dr. de Vries, you have already
6 testified.  This is obviously much more recent;
7 down the bottom it says January of 2023.
8      Let me call your attention -- and this is,
9 just to be clear, this is not an article that is
10 reporting on original research.  This is a
11 short -- what would you call it, a scientific
12 comment?  Is there a term you prefer for this sort
13 of article?
14    A. It's in the editorial section of the New
15 England Journal.
16    Q. And the New England Journal being a highly
17 respected publication?
18    A. Yes.
19    Q. The New England Journal of Medicine, that
20 is, to be clear.
21      Let me ask you to turn to page 276, in the
22 second column.  And an ultimate paragraph in the
23 second column begins "Finally."  Do you see that
24 paragraph?
25    A. I do.

1    Q. And there, Dr. de Vries writes "Finally,
2 benefits of early medical intervention, including
3 puberty suppression, need to be weighed against
4 possible adverse effects - for example, with
5 regard to bone and brain development and
6 fertility."  Do you see that sentence?
7    A. Yeah.
8    Q. And Dr. De Vries here, just last year,
9 writes that benefits needs to be weighed against
10 what she refers to as possible adverse events,
11 including adverse effect on brain development;
12 correct?
13    A. That is what the authors go on to say.
14    Q. So these authors, at least, as of last year,
15 considered that adverse impact on brain
16 development was still a possibility as of 2023;
17 correct?
18        MS. LEVI:  Object as to form.
19    A. It would not -- let me say that differently.
20 One could not tell, based on this sentence, what
21 evidence the authors had reviewed, if any.
22    Q. My question simply is, these authors, at
23 least, as of last year, expressed the view that
24 the possibility of adverse effects on brain
25 development was or remains something that needed

1 to be put in balance against benefits of puberty
2 suppression; correct?
3    A. They express the need for weighing the risks
4 and benefits, as is common practice.
5    Q. And indeed, you would agree that clinicians
6 need to weigh possible adverse effect of puberty
7 blockade, including possible harm to brain
8 development and fertility, against potential
9 benefits of puberty blockade; correct?
10    A. I would agree that they need to and further,
11 that they do.
12    Q. And it's not science denialism to say that
13 those possible negative impacts on brain
14 development and fertility should be considered?
15    A. No, it's not.
16    Q. Indeed, you would agree, would you not, that
17 ethical decisionmaking regarding the use of
18 puberty blockers on adolescents need to weigh
19 those risks?
20    A. Ethical decisionmaking needs to weigh the
21 risks and the benefits simultaneously.
22 Hyper-focusing on the risks without considering
23 the benefits is not scientific.
24    Q. That is, leaving either the risks or the
25 benefits out of the equation is not the way to go

Page 86

1 about ethical decisionmaking?
2    A. Ethical decisionmaking risks on a careful
3 balance and consideration of risks and benefits,
4 in partnership with a patient and the legal
5 decisionmaker, if that applies.
6    Q. Let me ask you to find -- I think it's in
7 the stack where -- the Endocrine Society 2017
8 Guidelines. That's Exhibit 6.
9        MS. LEVI:  Are you likely to go back to
10 Exhibit 12?
11       MR. BROOKS:  I think the answer is no.
12 Or if I do --
13       MS. LEVI:  It's fine.  It won't be far.
14 It won't be far.
15       THE DEPONENT:  And I think after this
16 set of questions --
17       MR. BROOKS:  Would you prefer to stop,
18 take a break?
19       MS. LEVI:  Take a break now?
20       THE DEPONENT:  Yeah.
21       MS. LEVI:  Just in terms of timing, do
22 you want to take a short break, have more and then
23 lunch?  Do you want to take a longer break.
24       THE DEPONENT:  Let's take about 10
25 minutes now and then come back.

Page 87

1        MR. BROOKS:  I generally recommend to my
2 witnesses that we not break at 12:00 because the
3 afternoon is just brutally long.
4        MS. LEVI:  I'm there.  I just want to do
5 whatever you need to do physically as well.
6        THE DEPONENT:  We'll take a break.
7        MS. LEVI:  We're just going to take a
8 10-minute break.
9        (R E C E S S)
10 MR. BROOKS:
11    Q. Do you now have Exhibit 10, Chen 2020, in
12 front of you again?
13    A. Yeah, I do.
14    Q. Let me ask you to turn in that document to
15 page 252.  And there, about an inch and a half
16 from the bottom, the sentence begins "The effects
17 of pubertal suppression may not appear."  Do you
18 see that?
19    A. No.
20    Q. I'll give you a moment.
21    A. Could you tell me where it is again?
22    Q. First column, inch and a bit more from the
23 bottom, the sentence begins towards the end of the
24 line.
25    A. I got it.

Page 88

1    Q. All right.  Let me just read that into the
2 record.
3        It says "The effects of pubertal suppression
4 may not appear for several years.  Any
5 GnRHa-related difference in brain structure is
6 likely to be observed over the long term, rather
7 than immediately."
8        Do you agree with the Chen, et al authors,
9 or is it outside your expertise, that any effects
10 of pubertal suppression on neurodevelopment might
11 not appear for several years?
12    A. Outside the scope of my expertise.
13    Q. And do you agree or is it outside the scope
14 of your expertise that any difference in brain
15 structure resulting from puberty blockade is
16 "likely to be observed over the long term, rather
17 than immediately"?
18    A. Similarly, that is outside my scope of
19 expertise.
20    Q. And you're not, as you sit here today, aware
21 of any long-term study that has been undertaken of
22 the effects of pubertal suppression on brain
23 structure; correct?
24    A. "Long-term" is a very general phrase.
25    Q. Let me ask a more precise question.  You're

Page 89

1 not aware, as you sit here today, of any multiyear
2 study of the effect of pubertal suppression on
3 brain structure?
4    A. I am not, and I have not done an in-depth
5 analysis of the literature to try to find such
6 studies.
7    Q. When discussing potential treatments for
8 gender dysphoria with your patients, do you warn
9 them that respected scientists have stated that
10 effects on the child's brain development might not
11 appear for several years?
12    A. I do not perform any clinical counseling
13 regarding pubertal suppression used beyond a few
14 months in patients who do not have gender
15 dysphoria.
16    Q. Let me call your attention to the next
17 sentence, beyond the one I read, which, still in
18 column one, page 252, says "Shifts in social and
19 affective learning processes might cause subtle
20 short-term differences that could ultimately
21 result in clinically impactful longer-term
22 effects."
23        Let me ask what you think you understand
24 what the authors are saying there.
25    A. It's difficult to discern the meaning of the

23 (Pages 86 - 89)

1 sentence without understanding the article as a
2 whole.
3    Q. Before I called your attention to this
4 language, were you aware that the Chen, et al
5 authors had expressed concern that administration
6 of puberty blockers to adolescents might result in
7 "clinically impactful long-term effects"?
8        MS. LEVI: Object as to form.
9        THE DEPONENT: Can I have the question
10 back?
11        (THE REPORTER READ THE RECORD)
12    A. So I have not learned anything new from that
13 language. I'm referring back to the abstract of
14 this paper and the purpose of this study. Final
15 sentence of the section "Purpose" under the
16 abstract states "Given the widespread changes in
17 brain and cognition that occur during puberty, a
18 critical question is whether this treatment
19 impacts neurodevelopment," in the context of
20 preliminary evidence suggesting pubertal
21 suppression improves mental health functioning.
22    Q. So as you have worked with patients and
23 referred them to the gender clinic, you were aware
24 that these authors, at least, had expressed
25 concern that administration of puberty blockers to

1 adolescents could result -- could ultimately
2 result in clinically impactful long-term effect?
3        MS. LEVI: Object as to form.
4    A. Sir, I would draw your attention back to my
5 prior testimony, when I discussed that I had two
6 patients who I referred as minors to gender
7 competent clinical services. And both patients
8 had completed puberty. That was not context that
9 I gave earlier.
10        I have not yet encountered a patient with
11 gender dysphoria who may be eligible for pubertal
12 blockade and referred them to a gender clinic.
13 Further, I would not endeavor to perform
14 counseling on medications that I myself would not
15 be prescribing or managing.
16    Q. Is it your testimony that the 14-year-old
17 girl that you referred to had, to use your phrase,
18 quote, completed puberty?
19    A. Yes, that was my clinical assessment. The
20 patient was Tanner Stage 5 in all domains of
21 pubertal development, which means that puberty had
22 been completed.
23    Q. And what is the relationship between that,
24 and your opinion that we referred to earlier where
25 you talked about puberty-related neurodevelopment

1 between the ages of 11 and 18?
2    A. I don't understand your question.
3    Q. It is not your testimony, is it, that a
4 14-year-old girl has completed all aspects of
5 neurodevelopment associated with puberty and
6 adolescence?
7    A. Adolescence is still ongoing in a
8 14-year-old. It's a chronological, just as it is
9 a social and developmental phase. And this
10 particular patient we're discussing had not
11 completed many aspects of puberty. But, in terms
12 of physical maturation, the patient was Tanner
13 Stage 5, which meant that in accordance with the
14 standards of care and the Endocrine Society
15 Guidelines, there would be no utility in using the
16 puberty-blocking medication.
17    Q. Got it. Let me ask you to turn to page 248
18 in this Chen 2020. And if I can take you perhaps
19 two inches down in the second column. It is a
20 paragraph that begins, "The combination of
21 animal." Just tell me when you've found that
22 paragraph.
23    A. Got it.
24    Q. And the authors say that this evidence
25 "supports the notion that puberty may be a

1 sensitive period for brain organization; that is,
2 a limited phase when developing neural connections
3 are uniquely shaped by hormonal and experiential
4 factors, with potentially lifelong consequences
5 for cognitive and emotional health."
6        Do you see that language?
7    A. I do.
8    Q. And again, you've described the purpose of
9 the Chen, et al paper and the questions that it
10 poses.
11        Do you believe that by warning that
12 interference with the normal process of puberty
13 may have "potentially lifelong consequences for
14 cognitive and emotional health," the Chen, et al
15 authors are engaging in false and deceptive
16 claims?
17        THE DEPONENT: Could I have the question
18 back.
19        (THE REPORTER READ THE RECORD)
20    A. I don't hear that as a fair characterization
21 of the writing of these authors. In the sentences
22 that we are reviewing now, they do not appear to
23 be referring to pausing puberty with
24 puberty-blocking medications.
25    Q. That indeed is the focus and context of

1 their entire paper and project; am I correct?
2    A. They are discussing endogenous puberty as
3 well, and offering a great deal of background
4 information. It's not the case that every
5 sentence in the paper refers exclusively and
6 directly to blocking puberty.
7    Q. Then let me take you to some sentences that
8 do.
9      Just below that, two sentences, I believe,
10 says "There is also some evidence to suggest that
11 delayed puberty onset predicts slightly poorer
12 adult functional outcomes."  Do you see that
13 language?
14    A. That is a sentence that refers to a study in
15 citation 49 in the paper.  And the title of that
16 paper is on "Cognitive Consequences of the Timing
17 of Puberty."  I would need to look at that study
18 and the study population that those authors
19 reviewed, if this is even a clinical research
20 study, in order to offer further context on the
21 sentence you read.  It's not clear to me if the
22 citation itself is discussing people with gender
23 dysphoria, adolescents with gender dysphoria.  So
24 I'm not sure how the sentence is relevant.
25    Q. Then let me take you to these authors'

1 conclusion, how they think it's relevant.
2      The next sentence reads "Taken as a whole,
3 the existing knowledge about puberty and the brain
4 raises the possibility that suppressing sex
5 hormone production during this period could alter
6 neurodevelopment in complex ways, not all of which
7 may be beneficial."  Do you see that language?
8    A. I do.
9    Q. And in your view, by stating the possibility
10 or asserting that the existing evidence "raises
11 the possibility that pubertal suppression could
12 alter neurodevelopment in complex ways, not all of
13 which may be beneficial," these authors are
14 engaging in science denialism?
15    A. These authors wrote a sentence describing
16 the possibility that there may be some
17 nonbeneficial impacts of suppressing [uberty.  And
18 that implies that there would be beneficial impact
19 of suppressing puberty.  I am presuming that
20 they're referring now to the patient population of
21 interest, which is patients with gender dysphoria.
22 And I would take this sentence as a measured and
23 thoughtful comment in isolation, and not as a
24 denial of fact, because the sentence includes a
25 balance between risks and benefits.

1    Q. To your mind, for these authors to raise a
2 concern that one of the costs, one of the risks
3 that needs to be balanced is that puberty blockers
4 could alter neurodevelopment in ways that are not
5 beneficial, is not science denialism?
6      MS. LEVI:  I think she's answered the
7 question, but you can answer it again.
8    A. I think I --
9      MR. BROOKS:  Let's hear the question
10 back because I don't think you have.
11    A. So this paper provides a substantive
12 introduction that summarizes evidence on positive
13 outcomes observed in youth with gender dysphoria
14 who qualify for and are offered pubertal
15 suppression.  And it also discusses the
16 possibility of risks.
17      To me, that is an example of an instance
18 where there is no science denialism, but rather a
19 faithful engagement of risks, benefits, potential
20 unknowns, and knowns.
21    Q. Is it fair to say that in evaluating whether
22 a treatment should be offered or not offered for
23 an individual, just picking up on what you just
24 said, that a clinician, or for that matter, a
25 parent, should consider both known benefits, known

1 risks, and potential unknowns?
2    A. That's what Informed Consent discussions
3 entail.
4      MR. BROOKS:  And let me ask the reporter
5 to mark as Exhibit 13, a 2023 Review Article by
6 Sallie Baxendale of the University College London.
7      (DEFENDANT'S EXHIBIT 13 FOR
8      IDENTIFICATION, Received and Marked.)
9    Q. Let me ask first, Dr. McNamara, whether this
10 is an article that you have seen before today?
11    A. I have seen this article.
12    Q. And are you familiar with the journal Acta
13 Pediatrica in which it was published?
14    A. I have heard of it before.
15    Q. Do you know anything about its reputation in
16 the field?
17    A. I do not.
18    Q. And are you familiar generally with the
19 reputation of the University College London as a
20 research institution?
21    A. Not really, no.
22    Q. Now, this is a review article; so it says at
23 the top.  Do you have an understanding generally
24 of what a review article -- what it means that an
25 article is a review article?

25 (Pages 94 - 97)

1   A. Yes, I do.
2   Q. What is that?
3   A. A review article does not present original
4   previously unpublished research.  It summarizes
5   existing evidence in a particular area of
6   interest.
7   Q. When did you first read this article?
8   A. This article was accepted January 30th of
9   2024.  I believe I reviewed it perhaps a month
10  ago.
11  Q. Okay.  In connection with your work for this
12  litigation?
13  A. Correct.
14  Q. Let me take you to the second page.  Down
15  towards the bottom of the first column is a
16  heading that reads "Puberty as a Critical Window
17  in Neurodevelopment."  And that paragraph
18  continues into the second column.  I want to read
19  the first sentence that begins in the second
20  column.
21      That says "A period is defined as a critical
22  window if the brain requires a specific input to
23  allow for the optimal development of a particular
24  function, e.g., exposure to language or visual
25  stimuli.  If the neural network is left without

1   the correct input or stimulation, the functions
2   served by that circuit will be permanently
3   compromised."
4       Is the concept of a critical window in
5   neurodevelopment one that you are familiar with,
6   or do you consider that to be outside your
7   personal expertise?
8   A. As a pediatrician, I'm certainly familiar
9   with its importance in the three life periods
10  mentioned, infancy, childhood and adolescence.  I
11  haven't performed any original research on the
12  neuropsychology of their critical window, but I
13  clinically have considered it in relevant
14  patients.
15  Q. And can you describe for me at a high level
16  what you understand by "critical window of
17  neurodevelopment," your own understanding?
18  A. A critical window is a time in which the
19  optimization of wellbeing, enrichment, support,
20  and health, can pay off in dividends throughout
21  that person's life.
22  Q. Or conversely, if they don't obtain the
23  appropriate stimulation, to use the term from Dr.
24  Baxdendale's article, during that time period, that
25  may have negative impact for life?

1   A. So using my understanding of the critical
2   window, if somebody is deprived of resources, such
3   as food, attention, nurturing, if they endure
4   traumatic experiences and then don't receive
5   adequate support, if they have medical problems
6   that go insufficiently addressed, then they are
7   likely to experience the harms of that past the
8   critical window.
9       And yet, if deprivation of that kind were to
10  occur outside of the critical window, it is less
11  likely that that deprivation would be as harmful
12  in a long-term sense.
13  Q. Let me ask you to turn to page 3.  And in
14  this first column, down towards the bottom,
15  there's a paragraph that begins "In summary."  Do
16  you see that?
17  A. I do.
18  Q. And what it says in the first sentence is
19  that "In summary, puberty is characterized by both
20  regressive and progressive stages of brain
21  development.  Unlike earlier developmental
22  milestones, many of these processes are associated
23  with pubertal stage, rather than chronological
24  age."  Do you see that language?
25      MS. LEVI:  It's not the end of the

1   sentence.
2       MR. BROOKS:  You're right.
3   A. I see it.
4   Q. Close quote, period.  You mentioned earlier
5   that, I think, both pubertal hormones and age and
6   social environment affect neurodevelopment, to
7   your understanding.  Am I correct?
8   A. I offered a little bit more context and
9   descriptors there, I believe.
10  Q. And I wasn't trying to cut anything out, I
11  was just taking us to a topic --
12  A. Certainly.
13  Q. -- and trying to be open.  Is it consistent
14  with your understanding, or do you disagree, or is
15  it outside your expertise, that many of the
16  neurodevelopmental stages associated with puberty
17  are associated with pubertal stage, rather than
18  chronological age?
19  A. Can I have the question back?
20  Q. Yes.  Is it -- do you agree, disagree, or
21  consider it to be outside your expertise, to say
22  that many of the neurodevelopmental processes
23  known to occur during puberty are associated with
24  pubertal stage, rather than chronological age?
25      MS. LEVI:  Object as to form.

Page 102

1    A. Your question, to me, as an adolescence
2 medicine physician, feels overly simplistic and is
3 vague.  "Many," as a qualifier, is not specific
4 enough so that I can grasp your question.
5    Q. Do you have any opinion as to whether
6 important aspects of neurodevelopment in the
7 adolescent brain are more strongly associated with
8 pubertal stage than with chronological age?
9    A. I do not understand the utility in comparing
10 chronological age with pubertal stage when there
11 are other key determinants of development that are
12 neither of those things, that shape one's pubertal
13 experiences.
14    Q. Well, you're familiar with the concept of a
15 multivariable function, are you not?
16    A. That is not a term that I'm familiar with.
17 But we may have a shared understanding if you
18 explain more.
19    Q. You studied a certain amount of math and
20 statistics in your day?
21    A. I did.  That's why I think it's significant
22 that the term you're using is not one that I'm
23 familiar with.
24    Q. A multivariable function is not a term
25 you're familiar with?

Page 103

1    A. Could you describe what you mean by it, and
2 then I can see if we have a shared understanding.
3    Q. I mean a function, the outcome of which
4 depends on more than one variable.
5    A. When you say a function --
6    Q. If you don't understand what a function is,
7 I'm not going to waste time on that.  But let me
8 ask you to turn to page -- to the second column,
9 and it says on the top --
10    MS. LEVI:  Is that on page 3?
11    MR. BROOKS:  Yes.
12    Q. It says at the top, at the end of the first
13 partial paragraph, "The male and female brain
14 develops differently during adolescence both in
15 terms of structural connectivity and developmental
16 trajectory."
17    A. I don't see where -- oh, okay, I found it.
18    Q. In the first partial paragraph.  Is that
19 consistent -- statement consistent with your
20 understanding as a doctor, or not?
21    A. I am loosely familiar with that.  I have not
22 done an in-depth search of the literature to
23 ascertain what the current status of evidence is
24 on that.
25    Q. Is it consistent with your general

Page 104

1 understanding that in recent years, data
2 documenting differential development between male
3 and female brains has increased?
4    A. I have no knowledge one way or the other.
5    Q. All right.  Immediately below that is the
6 sentence that reads "Completely reversible
7 neuropsychological effects would not be predicted
8 given our current understanding of the windows of
9 opportunity model of neurodevelopment."  Do you
10 see that?
11    A. I do see that on the page.
12    Q. And is the assertion that completely -- is
13 the assertion that given our current understanding
14 of the windows of opportunity model of
15 neurodevelopment, complete reversibility of
16 impacts on that development from puberty blockers
17 would not be predicted, consistent with your
18 understanding, inconsistent with it, or outside
19 your expertise?
20    MS. LEVI:  Object as to form.
21    THE DEPONENT:  Can I have the question
22 back?
23    (THE REPORTER READ THE RECORD)
24    A. I'm so sorry, it's -- it feels, to me, a
25 complex question and I need it back one more time.

Page 105

1    (THE REPORTER READ THE RECORD)
2    A. I have no opinion on that.
3    Q. Have you yourself made any effort to review
4 published animal studies relating to the
5 neurological impact of puberty blockers?
6    A. It's my understanding that the
7 interpretation of animal studies is best done by
8 people who have scientific expertise at an
9 in-depth level in a particular area.  I do not
10 consider myself an expert in neuropsychology, in
11 the endocrinologic processes of pausing puberty,
12 and so I would not review an animal study in-depth
13 to be able to determine whether or not its results
14 might be generalizable to humans.
15    Q. Is it your view as a scientist that in
16 general, animal studies may raise hypotheses
17 relating to human impact, or are they -- strike
18 that.  This may not be achievable.
19    You would agree, would you not, that in
20 general, what animal studies can do is raise
21 hypotheses or questions with regard to impact of a
22 therapy on humans, but are rarely directly
23 generalizable to humans?
24    MS. LEVI:  Object as to form.
25    A. So, again, I raise the initial caveats, that

27 (Pages 102 - 105)

Page 106

1  I myself do not review or consider myself capable
2  of engaging with animal research. But I would
3  also say that I cannot agree or disagree with your
4  statement because it would depend on the specific
5  study, the methodology used, the sample size, the
6  duration of follow-up, and the clinical research
7  question of interest.
8      Q. All right. Let me ask you to turn to page 7
9  in the Baxendale 2024 article. And there, under
10  -- there's a heading that says "Central Precocious
11  Puberty," a third of the way down. Do you see
12  that?
13     A. Yes.
14     Q. And that begins, "In the only human study
15  that established a baseline prior to treatment,
16  Mul, et al examined," and it goes on.
17     Have you yourself reviewed the Mul, et al
18  study that Baxendale refers to here?
19     A. This is a study entitled "Psychological
20  Assessment Before and After Treatments of Early
21  Puberty in Adopted Children." It was published in
22  2001. I have not read this study.
23     Q. Okay. Baxendale says that this is the only
24  human study that establishes a baseline prior to
25  treatment and then follows the administration of

Page 107

1  puberty blockade, albeit, as you've noted, for a
2  different condition.
3      Are you aware, yourself aware, of any other
4  human study that has established a baseline and
5  then done posttreatment measurement of factors
6  that Mul measures, such as IQ?
7      A. Later in this paper, Baxendale cites
8  Arnoldson, et al, which is titled "Association
9  Between Pretreatment IQ and Educational
10  Achievement After Gender-Affirming Treatment,
11  Including Pubertal Suppression, in Transgender
12  Adolescents." I have read that study. I would
13  need to be able to answer -- I'd need to review
14  it. But I believe that the study does do a pre
15  and posttreatment assessment of a similar type of
16  measure --
17     Q. Okay.
18     A. -- in a more heterogenous population, not
19  specifically youth with gender dysphoria. I have
20  not done an in-depth analysis of the literature
21  and it's not an area of my expertise. So I'm
22  unsure if this sentence saying that this is the
23  only study --
24     Q. All right.
25     A. -- is correct.

Page 108

1      Q. Looking back at page 7, Baxendale's summary
2  of the findings of Mul -- and I recognize that's
3  layers -- says that "Three years after treatment
4  commenced, the group as a whole had experienced a
5  loss in both performance IQ and full scale IQ,
6  with a decline of seven points in the latter."
7      Now, let me ask you a hypothetical question.
8  I don't have the Mul to put in front of you. You
9  don't recall having read it. But if in fact a
10  study found that girls treated with puberty
11  blockade for central precocious puberty
12  experienced a loss of 7 IQ points across three
13  years, would you agree with me that that would be
14  quite a concerning result?
15         MS. LEVI: Object as to form.
16     A. Again, I could not answer your question
17  without reviewing the study to assessing the rigor
18  of its methodologies, the sample size, the
19  analysis.
20     Q. Well, if it were a fact that treatment with
21  puberty blockade for central precocious puberty in
22  girls resulted, over a span of years, in an
23  average decline of IQ of 7 points, you would agree
24  with me, would you not, that that would be quite a
25  concerning result?

Page 109

1      A. That information would need to be
2  contextualized with the -- with observations in a
3  comparable group of individuals who did not
4  receive treatment, if one were to -- let me just
5  stop there.
6      Q. Well, and I'm not asking about ultimate
7  conclusions. 7 points in an IQ scale is
8  significant, you would agree with me, right?
9      A. I don't know if I know one way or the other
10  to agree or disagree.
11     Q. And you just don't have any -- you're not
12  able to offer any opinions, as you sit here today,
13  as to whether a finding that girls treated with
14  puberty blockade for central precocious puberty
15  lost 7 IQ points over three years on average would
16  concern you as a clinician?
17     A. There's so many other factors that would
18  need to be considered before weighing in on that.
19     Q. Let's look at page 8. At the bottom of
20  column two -- I'm sorry, at the bottom of column
21  one, Baxendale begins a discussion of a single
22  case study, Schneider, et al from 2017.
23     A. Mm-hmm.
24     Q. Are you familiar with the Schneider, et al
25  case study?

28 (Pages 106 - 109)

1   A. No.
2   Q. Baxendale's summary of the findings in
3   that -- and just let me stop.
4       Would you agree as a general matter that a
5   single case -- a case study of a single patient
6   really can simply raise questions and concerns; it
7   can't provide statistically sound information,
8   correct?
9   A. If even, yes.
10  Q. If even, yes. The finding in this case
11  study as summarized by Baxendale included that
12  where treatment was initiated -- and I'm at the
13  top of the second column -- where treatment was
14  initiated with puberty blockades at age 11 years
15  11 months, by age 13 years and 3 months, a loss of
16  9 IQ points had occurred.
17      MS. LEVI:  Just so I'm clear, are you
18  summarizing from the bottom of the left-hand
19  column, to the top of right-hand column?
20      MR. BROOKS:  I am doing exactly that.
21      MS. LEVI:  Okay, thank you.
22  Q. And specifically, the first -- the second
23  full sentence beginning on the second column,
24  treatment with GnRH was initiated as the start and
25  finish time that I gave.

1       MS. LEVI:  On the left-hand column, I'm
2   sorry, I just want to be clear.  You're focusing
3   on the Schneider study in the context of the three
4   studies that are being discussed?  I just want the
5   record to be clear and I want to make sure I'm
6   understanding.
7       MR. BROOKS:  The language that I have
8   focused on concerns only the Schneider study,
9   which is only a case study of a single patient, --
10      MS. LEVI:  Thank you.
11      MR. BROOKS:  -- and reports a loss of 9
12  IQ points across the two plus years of treatment.
13  Q. And my question to you, similarly to the Mul
14  study that we looked at, does that result cause
15  you, as a clinician, concern about the
16  administration of puberty blockers to adolescents?
17  A. Well, case studies are case studies.  And it
18  is not possible to control for confounders in a
19  rigorous way to elucidate the relationship between
20  the exposure and the outcome of interest.
21      In this single young person, it's unclear
22  what other factors might have been going on in
23  their life that may have impacted their
24  intellectual quotient.  They may or may not have
25  been in school.  They may or may not have had

1   other illnesses.  They may or may not have
2   experienced a number of other factors that could
3   influence IQ over time.
4       So as a clinician who is interested in the
5   totality of the evidence, I would not draw any
6   conclusions from this case report.
7   Q. So just to be clear, as a clinician, you are
8   not willing to say that Mul's observation based on
9   25 girls of a decline of IQ of 7 points, or
10  Schneider's observation based on a single patient
11  of a decline of 9 IQ points, causes you concern?
12  A. I haven't reviewed either study.  I can only
13  take the summaries that are presented here as an
14  indicator of what those studies might show.
15  Regardless, a study of the impact of the
16  medication on a population that is likely very
17  different from the population that we are
18  discussing and is of interest, in a single case
19  report that does not control or assess for
20  confounders, do not lead me in a -- down a path of
21  being able to consider the import of either study
22  in the question we're discussing.
23  Q. Let me ask you to turn to the next page, and
24  there's this section headed "Discussion" at the
25  end of the first full paragraph.

1       Dr. Baxendale writes "There have been no
2   human studies to date that have systematically
3   explored the impact of these treatments" -- the
4   subject being puberty blockers -- "on
5   neuropsychological function with an adequate
6   baseline and follow-up."  Do you see that
7   language?
8   A. Yes, I do.
9   Q. Do you agree with Dr. Baxendale that there
10  have not yet been studies done on the impact of
11  puberty blockers on neuropsychological function
12  that did adequate baseline measures and follow-up?
13  A. Unfortunately, the language "adequate
14  baseline and follow-up" is vague.  And I am not
15  able to agree or disagree without knowing what
16  this author had in mind, and whether that might be
17  clinically relevant to the subject matter at hand.
18  Q. Well, let me ask you, based on your own
19  understanding of sound methodology, can you point
20  me to any study that you believe has systemically
21  explored the impact of puberty blockers on
22  neuropsychological function with what you consider
23  to be adequate baseline and follow-up
24  measurements?
25  A. As we have discussed before, and as I have

1  defined my area of expertise in this case,
2  puberty-blocking medications and cognitive
3  functioning is not something I have done an
4  in-depth analysis on in preparing any reports.  So
5  I do not have an opinion on your question.
6     Q. On page 9, in the first column, Dr.
7  Baxendale writes in the second paragraph of the
8  discussion, "While there is some evidence that
9  indicates pubertal suppression may impact
10 cognitive function, there is no evidence to date
11 to support the off cited assertion that the
12 effects of puberty blockers are fully reversible."
13 Do you see that?
14    A. Yes.
15    Q. And are you able to point me to any study
16 today that you believe demonstrates that the
17 effect of puberty blockers on adolescents as a
18 treatment for gender dysphoria have only fully
19 reversible effects on neurodevelopment?
20    A. In order to answer your question, I would
21 have needed to do an in-depth analysis of the
22 literature on that question, and I haven't done
23 so.
24    Q. Are you able to identify any medical
25 association that has taken any official position

1  stating that puberty blockade is fully reversible
2  with respect to impact on an adolescent's brain
3  development?
4     A. Again, I could not answer your question
5  either way because I have not done an in-depth
6  analysis on this topic.
7     Q. Do you know whether any medical association
8  has taken any position - has taken the position
9  that cross-sex hormones administered to minors
10 have no irreversible effect on brain development?
11 This is not a topic that Baxendale speak to.
12    A. I know.
13        THE DEPONENT:  Can I have the question
14 back?
15       (THE REPORTER READ THE RECORD)
16    A. I have not seen that, to the best of my
17 knowledge.
18    Q. Is it consistent with your understanding
19 that every cell in an individual's brain contains
20 either XY, male sex chromes, or XX, female sex
21 chromosomes?
22    A. There are disorders of sexual development
23 where people have different numbers of
24 chromosomes.  I do not know whether or not neurons
25 contain chromosomal distribution patterns that are

1  hallmarks of those disorders in people who have
2  those disorders.
3     Q. Let me exclude those who suffer from genetic
4  disorders of sexual development and ask whether,
5  apart from that category of genetic defect, it's
6  consistent with your understanding that every
7  human individual's brain contains either XY male
8  sex chromosomes in every cell and every neuron, or
9  XX female sex chromosomes in every cell, every
10 neuron?
11       MS. LEVI:  Object as to form.
12    A. I'm not sure who or what neuroscientific
13 researcher could speak with certainty to the
14 chromosomal contents of every neuron in a person's
15 brain.  I certainly cannot.
16    Q. Is it outside your knowledge that every cell
17 in my body, except somatic cells, contains XY
18 chromosomes?
19    A. I believe it's outside the realm of
20 knowledge of anyone to be able to decide that with
21 certainty.  There are millions of neurons in the
22 human brain.
23    Q. Let me ask you to find your Expert Report.
24       MS. LEVI:  Put these aside?
25       MR. BROOKS:  Yes, for the moment.

1     Q. And ask you to turn to page 15 of that
2  report.
3     A. Okay.
4     Q. In the top partial paragraph, you have
5  written "Physicians carefully counsel patients and
6  their parents on the possibility of impairments in
7  fertility should the patient continue on cross-sex
8  hormones."  You see that sentence?
9     A. Yes.
10    Q. And what is your basis for your
11 understanding of what physicians do or don't
12 carefully counsel patients about, given your
13 earlier testimony that you yourself don't do that
14 counseling?
15    A. I am a member of the Society of Adolescent
16 Health and Medicine.  It's the largest
17 international organization of Adolescent Medicine
18 specialists.  I have professional relationships
19 with many people who have obtained subspecialized
20 training in this field.  We communicate at
21 conferences via Listserv.  I have coauthored
22 articles with other people in the field.  And I
23 have had discussions with these people who I
24 consider to be colleagues from other institutions
25 about their practices and about the nature of such

1 conversations. And further, I have read sections
2 in the clinical practice guidelines, both from the
3 Endocrine Society and WPATH, that discuss this.
4    Q. You wrote that "Physicians carefully counsel
5 patients about the possibility of impairments to
6 fertility."
7        In your view, is it important that
8 physicians carefully counsel patients about that
9 topic?
10    A. Since it is an anticipated impact of some
11 gender-affirming medical treatments, I do.
12    Q. And do you consider the potential loss of
13 fertility to be an important impact on
14 individuals?
15    A. I believe that all individuals should
16 consider its relative importance to them.
17    Q. Do you have any knowledge as to whether
18 undesired infertility in adults is recognized to
19 be highly distressing to many individuals?
20    A. It's not something that I have any clinical
21 experience in.
22    Q. Do you have any knowledge as to whether
23 undesired infertility in adults is associated with
24 mental health issues in the affected adults?
25    A. Again, not something that I have experience

1 with professionally.
2    Q. Do you have an understanding as to whether
3 sterilization without Informed Consent is
4 internationally recognized to be a serious
5 violation of human rights?
6    A. I am familiar with that.
7    Q. Do you believe that to be the case?
8    A. I do.
9    Q. And do you have an understanding that
10 ethical principles preclude parents from giving
11 consent to the sterilization of their children
12 except to avoid imminent risk of death?
13    A. "Sterilization" is a broad term. If you
14 could be more specific by what you mean about it,
15 I could answer your question more specifically.
16    Q. In what way is "sterilization" a broad term?
17 Is that unclear to you?
18    A. Yes, it is.
19    Q. Tell me in what respect it's broad.
20    A. In many respects.
21    Q. Well, by "sterilization," I mean loss of the
22 ability to conceive or father children.
23    A. So you're describing infertility.
24 Sterilization is something I understand not to be
25 the same as infertility.

1    Q. But you understand sterilization to perform
2 an action on somebody that causes them to become
3 infertile, correct?
4    A. I would understand that as an action that
5 causes somebody to -- that renders somebody
6 infertile with the intent of rendering them
7 infertile.
8    Q. Do you recognize that ethical principles
9 preclude parents from giving consent to procedures
10 that will sterilize their children, except to
11 avoid imminent risk of death?
12        MS. LEVI: Object as to form.
13    A. I am not familiar with that principle as
14 you've described it. I know of cases in the
15 literature that would potentially contradict that
16 point you just raised.
17    Q. Would you yourself consider a risk that a
18 certain treatment would reduce an individual's
19 lifetime likelihood of being able to become a
20 parent through natural conception, to be a serious
21 adverse impact?
22        THE DEPONENT: Can I have the question
23 back.
24        (THE REPORTER READ THE RECORD)
25        MS. LEVI: Object as to form.

1    A. I don't understand that question.
2    Q. All right. Would you agree that a critical
3 aspect of obtaining Informed Consent to any
4 treatment for gender dysphoria must include
5 ascertaining whether that adolescent has the
6 psychological maturity to comprehend the role that
7 having children may play in that individual's
8 wholeness and happiness across the years of adult
9 life?
10    A. That's a long question. I'd like to hear it
11 again, please.
12        (THE REPORTER READ THE RECORD)
13    A. Could you rephrase your question?
14    Q. No, I don't think so. You're unable to
15 answer it?
16        THE DEPONENT: Maybe I need to hear it
17 again. It's very long. I apologize.
18        (THE REPORTER READ THE RECORD)
19        THE DEPONENT: Okay, thank you. I
20 appreciate your patience.
21    A. So what you're describing, and based off of
22 my professional experiences which I described when
23 you first pulled up my Declaration, is a
24 conversation that happens over time with mental
25 health providers who are skilled in the area of

31 (Pages 118 - 121)

Page 122

1 gender diversity and patients and parents, as they
2 consider treatments for gender-affirming care.
3      I bring this up to say that what you're
4 describing is part of the decisionmaking process,
5 to the best of my knowledge.
6   Q. And putting aside how that analysis is done,
7 which I'll come back to, you would agree that in
8 order to conclude that you had Informed Consent,
9 you would want some confidence that that
10 adolescent had the psychological maturity to
11 comprehend the role that having children might
12 play in that young person's wholeness and
13 happiness across the years of adult life?
14   A. I would agree --
15      MS. LEVI:  I'm going to object as to
16 form, and then you can answer.
17   A. I would agree that any discussion along
18 those lines should be informed by the best
19 available evidence on the impact of those
20 medications and fertility, and that patients
21 understand all options for family building.
22   Q. That, however, is not what I asked.  My
23 question is, do you believe that in order to give
24 Informed Consent, an adolescent, let's say to --
25 in order to give Informed Consent to let's say

Page 123

1 cross-sex hormones, the treating physician or team
2 needs to conclude that that adolescent has the
3 psychological maturity to comprehend the role that
4 having children may play in that young person's
5 wholeness and happiness across the years of adult
6 life?
7      MS. LEVI:  And I'm going to object as to
8 form, and you can answer.
9   A. And perhaps to clarify my answer, the best
10 available evidence on the likelihood of that
11 medication impacting that outcome as you described
12 it, should guide that conversation.
13   Q. You're unable to answer the question as to
14 whether, as part of an Informed Consent process,
15 it's important to ascertain that the young person
16 has the psychological maturity to comprehend the
17 role that having children might have in the
18 wholeness and happiness of that individual's adult
19 life?
20      MS. LEVI:  Going to object as to form.
21 I think you've asked her at least three times.
22      MR. BROOKS:  Maybe if I ask four, I'll
23 get an answer.
24   A. I don't have an different answer for you.
25   Q. That will play an interesting way at trial.

Page 124

1      Let me -- when it comes to how, let me take
2 you back to your Georgia testimony, which was
3 Exhibit 2.  If you could find that, that would be
4 helpful.
5      I won't take more time with that.  Pardon
6 me, put that aside.
7      MS. LEVI:  It's one o'clock.  I'm just
8 checking.
9      MR. BROOKS:  One o'clock is a good time.
10 I'm going it move to a new document, so it's a
11 good time to break for lunch.
12      MS. LEVI:  That makes sense, okay.
13      (R E C E S S)
14 BY MR. BROOKS:
15   Q. Dr. McNamara, when it comes to evaluating
16 whether a young person has the capacity to give
17 Informed Consent to puberty blockers or cross-sex
18 hormones, you yourself have never been responsible
19 for making that decision, have you?
20   A. I have not.
21   Q. And indeed, that's a decision that, in your
22 view, would be made by a mental health specialist?
23   A. It's a multidisciplinary team.  It's not
24 just one person.
25   Q. In the course of deciding whether an

Page 125

1 adolescent has the capacity to give informed
2 consent, whether it's to puberty blockers or
3 cross-sex hormones, have you yourself been an
4 active participant in that decision process?
5   A. No, I have not.
6   Q. Okay.  Do you consider yourself to have the
7 expertise necessary to make that determination?
8   A. No, I do not.
9      MR. BROOKS:  Let me mark as Exhibit 14,
10 selected chapters from the WPATH SOC-8.
11      (DEFENDANT'S EXHIBIT 14 FOR
12      IDENTIFICATION, Received and Marked.)
13   Q. And included in here, I believe, at least
14 Chapter 6 -- I've got the Table of Contents in
15 front of me, and turning to C, and I've got here
16 the "Adolescent" Chapter 6, "Children" Chapter 7.
17 And there may be other chapters in here, but I did
18 not include the whole of that document.
19      Let me ask you in here to turn to page 57.
20 And for some reason they're all labeled an S
21 before the number, so S57.
22      Is the WPATH SOC-8 a document that you have
23 studied with some care?
24   A. Yes, it is.
25   Q. You have page 57 in the second column, there

32 (Pages 122 - 125)

Page 126

1 is a paragraph that begins "Currently, there are
2 only preliminary results." Do you see that
3 paragraph?
4    A. (Affirmative nod.)
5    Q. The authors of SOC-8 write in that
6 paragraph, "It is important not to make
7 assumptions" -- let back up to give us a little
8 context.
9       This is comment under Statement 6.10, which
10 speaks to providing information about topics,
11 including the potential loss of fertility to minor
12 patients. Do you see that?
13    A. I do.
14    Q. I'm not reading the whole thing, but I'm
15 trying to keep it at a high level.
16       And on the paragraph that I directed you to
17 in the second column, it reads "Currently, there
18 are only preliminary results from retrospective
19 studies evaluating transgender adults and the
20 decisions they made when they were young regarding
21 the consequences of medical-affirming treatment on
22 reproductive capacity.
23       SOC-8 goes on to say "It is important not to
24 make assumptions about what future adult goals an
25 adolescent may have."

Page 127

1       And they go on to note that "Research in
2 childhood cancer survivors found participants who
3 acknowledged missed opportunities for fertility
4 preservation reported distress and regrets
5 surrounding potential infertility."
6       And finally, the last sentence of that
7 paragraph reads, "Furthermore, individuals with
8 cancer who did not prioritize having biological
9 children before treatment have reported changing
10 their minds in survivorship."
11       Now, SOC-8 advises that it is "important not
12 to make assumptions" that what an adolescent
13 thinks today about their interest in having
14 children necessarily reflects what they will feel
15 in later years as an adult.
16       Is that your understanding of this
17 paragraph?
18    A. That's a fair summary.
19    Q. Okay. And do you agree that it's important
20 not to make that assumption?
21    A. I do.
22    Q. And the SOC-8 in this paragraph goes on to
23 cite a collateral example of young people who
24 faced cancer treatment decisions when they were
25 young and thought they didn't care about

Page 128

1 preserving the ability to have biological
2 children, and later changed their minds and
3 regretted not being able to.
4       Is that also a fair summary of what they
5 tell us there?
6    A. Yes, that is.
7    Q. As a clinician, does it surprise you to see
8 evidence that what adolescents think about their
9 desire to have children in the future may be quite
10 different than what they actually desire when
11 they're adults?
12    A. I am not surprised by that.
13    Q. Why is that?
14    A. Because it's not new information to me.
15    Q. What information did you have that led you
16 to understand already, apart from what SOC-8 tells
17 you, that what young people think about their
18 future desire to have children may be quite
19 different than their actual desire once they're
20 adults?
21    A. So I took your initial question to not be
22 explicitly pertinent to fertility and family
23 planning.
24    Q. So your point was more generally that what
25 adolescents think can be quite different from what

Page 129

1 they think or want when they have matured into
2 adults?
3    A. My point is that it's highly individually
4 dependent.
5    Q. Do you have any view as to whether, if it is
6 individually dependent, it's possible to know
7 whether a specific adolescent is likely to
8 continue -- strike it. It's too complicated.
9       Do you know of any studies as to
10 specifically whether individuals who have
11 expressed a lack of interest in fertility
12 preservation when making treatment choices for
13 gender dysphoria as adolescents, change their
14 minds on their desire to have children in their
15 adult years?
16    A. That area of the literature is not something
17 that I have gone in depth on in preparation of my
18 report for this case.
19    Q. Is it something that you've discussed with
20 peers and colleagues?
21    A. I don't believe so.
22    Q. Let me ask you a question.
23       MR. BROOKS: I'm going to ask a question
24 based upon Dr. Ladinsky's deposition transcript in
25 this case. I don't think it's technically

33 (Pages 126 - 129)

Page 130

1 essential that I mark it as an exhibit. Do you
2 have a preference as to whether I do or not?
3        MS. LEVI: It would be easier to have it
4 marked.
5        MR. BROOKS: Okay.
6        MS. LEVI: But is it just a volume issue
7 that you're asking about?
8        MR. BROOKS: Yeah, it doesn't matter
9 much today as it used to since things turned
10 electronic. I will mark as Exhibit 15, deposition
11 transcript of Morissa Ladinsky from April 12th of
12 2023.
13        (DEFENDANT'S EXHIBIT 15 FOR
14        IDENTIFICATION, Received and Marked.)
15 A. May I set aside the Georgia transcript?
16 Q. Yes, I think you can.
17    I am guessing, Dr. McNamara, that you have
18 not seen this transcript. I'm not going to ask
19 you to look at much of it. Am I right, have you
20 had a chance to read this before?
21 A. I have seen it.
22 Q. Oh, all right. Then let me ask you to turn
23 to page 250.
24 A. All right.
25 Q. And for context, if you look at the previous

Page 131

1 pages, you will see that page 248 mentioned the
2 Rafferty paper, Exhibit 25, which is the -- are
3 you familiar with a paper authored by Dr. Rafferty
4 on behalf of the American Academy of
5 Pediatricians?
6 A. Yes.
7 Q. Okay. The questioning was against the
8 background of that.
9    Page 250, I asked Dr. Ladinsky, page 250,
10 line 4, "That is, you don't disagree with the
11 statement that the effects of sustained puberty
12 suppression on fertility is unknown?"
13    And Dr. Ladinsky answered "I agree with that
14 statement." And went on to say "The question is,
15 what does sustained mean." Do you see that
16 testimony?
17 A. I do.
18 Q. Do you also agree with the statement that
19 the effects of prolonged puberty suppression --
20 pardon me.
21    Do you also agree with the statement that
22 the effects of sustained puberty suppression on
23 fertility is unknown as of today?
24 A. I have a similar question as Dr. Ladinsky
25 did, which would be the definition of the term

Page 132

1 "sustained" as it's intended here.
2 Q. Well, let's see if we can find that by
3 reference to WPATH standards of care. Those
4 standards of care advocate beginning puberty
5 blockade for suitable young people at Tanner Stage
6 2; am I correct?
7 A. We would need to refer to the specific
8 language for me to --
9 Q. You don't know the answer to that?
10 A. I don't have them memorized. So from
11 memory, I could neither disagree or agree. But we
12 could refer to them.
13 Q. We could, but it would take time. And
14 Tanner Stage 2 occurs on average at what age among
15 girls?
16 A. It's highly dependent on the individual,
17 their nutritional status, race, ethnicity.
18 Q. Well, let's take --
19 A. 9 to 11.
20 Q. 9 to 11, fair enough. And according to the
21 protocols that you're familiar with, for a child
22 who's put on puberty blockers and then ultimately
23 proceeds to cross-sex hormones, at what stage does
24 one cease administering puberty blockers to that
25 adolescent?

Page 133

1 A. I don't make those treatment decisions, and
2 I'm not involved in that care at that level. I'm
3 not sure I could answer your question.
4 Q. You just don't have any knowledge on that as
5 you sit here today?
6 A. I'd like to give you an informed and
7 accurate answer, and I don't have clinical
8 experience to support a response. You're asking
9 about a stage. I also don't know what you mean by
10 "stage."
11 Q. Would you agree, disagree, or consider it
12 outside your knowledge, that the effects of
13 puberty suppression for three or more years on a
14 child, on an adolescent, on fertility, is unknown?
15 A. It's outside the realm of my expertise, I
16 have no source data on that.
17 Q. Let's find the Endocrine Society Guidelines
18 for 2017, Exhibit 6. And you can put that aside
19 and we will not return to it.
20 A. Okay.
21 Q. Can I ask you to find Exhibit 6, Endocrine
22 Society Guidelines.
23        MS. LEVI: Yes.
24 Q. And there, let me ask you to turn to page
25 3880.

34 (Pages 130 - 133)

1   A. Mm-hmm.
2   Q. And if you go to the first full paragraph,
3 it begins "In girls."  Do you see that paragraph?
4   A. I do.
5   Q. And it reads there that "Clinicians should
6 inform adolescents that no data are available
7 regarding either the time to spontaneous ovulation
8 after cessation of puberty blockers, or the
9 response to ovulation induction following
10 prolonged gonadotropin suppression."  Do you see
11 that?
12   A. I do.
13   Q. And am I correct that gonadotropin
14 suppression is also a reference to puberty
15 blockade?
16   A. That's correct.
17   Q. Same thing as GnRH, functionally?
18   A. Gonadotropin releasing hormones stimulates
19 the secretion of FSH and LH, and those two
20 hormones are known as gonadotropins.
21   Q. You understand the reference to GnRH analogs
22 to be referring to the same thing as gonadotropin
23 suppression, correct?
24   A. GnRH analogs are used to achieve
25 gonadotropin suppression.

1   Q. Thank you.  I don't know why they chose
2 different terms there, I couldn't say.
3     Does it remain true, so far as you know,
4 that there is no data available regarding the
5 timing of resumption of ovulation after prolonged
6 gonadotropin suppression?
7   A. I am, at this time, as I sit here today,
8 unaware if there are any other studies on that
9 topic that have been published in the seven or so
10 years since these guidelines were issued.
11   Q. And in fact, you're not aware of any study
12 that's been published up to the present that
13 provides data on whether the population of natal
14 females who are subjected to prolonged
15 gonadotropin suppression will ever achieve healthy
16 levels of fertility, are you?
17   A. It's not a topic that I have endeavored to
18 do a thorough literature search on.
19   Q. Would you agree that the answer to that
20 question is something that a reasonable clinician,
21 a reasonable parent, and a reasonable health
22 policy expert, would want to know and consider
23 when deciding when or whether it's appropriate to
24 administer puberty blockers to children as a
25 treatment for gender dysphoria?

1   A. I would say to that, that it's important to
2 know whether or not there is sufficient evidence
3 to answer that question, and to consider the
4 presence or absence of that sufficient evidence,
5 if it exists, in the context of other knowns,
6 including risks and benefits of this treatment.
7 In short, it's not the only thing that should be
8 considered.
9   Q. Fair enough.  Are you able to identify any
10 medical organization that has asserted that the
11 administration of puberty blockers as a treatment
12 for gender dysphoria is fully reversible with
13 respect to its impact on that child's fertility?
14     THE DEPONENT:  Can I have the question
15 back?
16     (THE REPORTER READ THE RECORD)
17   A. I don't have medical statements memorized.
18 And off the top of my head, I'm unsure.
19   Q. And are you able to direct me towards any
20 original research paper in a peer-reviewed journal
21 that asserts a conclusion that the effects of
22 puberty blockers administered as a treatment for
23 gender dysphoria are fully reversible with respect
24 to the impact on that child's future fertility?
25   A. I am aware of numerous studies showing

1 resumption of menses, resumption of ovulation,
2 resumption of spermatogenesis in individuals who
3 receive puberty-blocking medications and then stop
4 receiving them.
5   Q. Are you aware of a single study in which the
6 authors state the conclusion that their data
7 suggests that the effect of puberty blockers
8 administered as a treatment for gender dysphoria
9 adolescents is fully reversible with respect to
10 the impact on that child's fertility?
11   A. Over what time course?
12   Q. Ever.
13   A. I'm not aware of any research study that has
14 followed such individuals for decades at a time.
15   Q. Are you aware of any research of study that
16 asserts, as a conclusion of the authors, that the
17 effect of puberty blockers on -- administered as a
18 treatment for gender dysphoria adolescents, is
19 fully reversible with respect to the impact on
20 that child's fertility?
21   A. I think I have answered your question.
22   Q. I think not.
23     MR. BROOKS:  Let me ask you to read it
24 back.
25     (THE REPORTER READ THE RECORD)

1   A. I suppose the question that you're posing is
2 a research question that's incredibly broad and
3 could, as it's presented, span the duration of
4 one's life. And I have not seen any such study.
5   Q. With respect to cross-sex hormones
6 administered to adolescents, would you agree with
7 me that it is widely accepted that sustained
8 exposure to cross-sex hormones may permanently
9 damage a young person's fertility?
10     MS. LEVI:  Object as to form.
11   A. I'd need you to be more specific about the
12 term "sustained," and also by what you mean with
13 the phrase "permanent damage."
14   Q. Do you have any understanding about what age
15 congenital cross-sex hormones are commenced for an
16 adolescent as a treatment for gender dysphoria?
17   A. There is no specific chronologic age. It
18 would be a possibility for an adolescent who meets
19 diagnostic criteria, has a consenting parent or
20 guardian, consents to a treatment, and has
21 completed puberty.
22   Q. To your knowledge, based on your reading of
23 the literature and discussion with colleagues, is
24 there a kind of an average age at which cross-sex
25 hormones are started for patients who have begun

1 to be seen by a clinic from an early -- you know,
2 from a younger age, just an average start time?
3   A. I couldn't commit to an average chronologic
4 age. Highly dependent.
5   Q. Is it highly -- is it commonly begun by, for
6 instance, age 14?
7   A. I could not answer that.
8     MR. BROOKS:  Let me have tab 16 and ask
9 the reporter to mark as Exhibit 16, a collection
10 of Informed Consent forms in the University of
11 Alabama Birmingham Pediatric Endocrinology Gender
12 Health Team.
13     (DEFENDANT'S EXHIBIT 16 FOR
14     IDENTIFICATION, Received and Marked.)
15   Q. Is this a document you have seen before?
16   A. No, I have never seen this.
17   Q. The only -- well, let me ask you to -- I
18 will represent to you, based on Dr. Ladinsky's
19 testimony, that this is -- or these are, I think
20 there's a version here for -- this is a form that
21 they use in their Informed Consent process before
22 prescribing cross-sex hormones for minors.
23     Let me ask you to turn to page 3. And look
24 at those numbers in the lower left-hand corner, as
25 well as at the top, that match.

1     Two-thirds of the way down, the last in the
2 second series of bullets, says "I know that this
3 treatment may, but is not assured to make me
4 permanently unable to make a woman pregnant." Do
5 you see that?
6   A. No.
7   Q. No?  On page 3, there are three sets of
8 bullet points.
9   A. Correct.
10   Q. The last of the second set --
11   A. I see it now, thank you.
12   Q. -- reads as I have said. And the major
13 heading on the previous page here is "Effects of
14 Feminizing Medications."
15     So these are bullets relevant to a natal
16 male. University of Alabama Birmingham Gender
17 Clinic is telling those natal male patients that
18 hormonal cross-sex treatment may, but is not
19 assured to make me permanently unable to make a
20 woman pregnant. Do you see that?
21   A. I do.
22   Q. And do you consider that to be a deceptive
23 claim about risk?
24   A. I do not.
25   Q. Why is that?

1   A. The statement reads the caveat of "may, but
2 is not assured to." But importantly, I have not
3 done an in-depth analysis on the literature on
4 fertility to be able to render an expert opinion
5 on this statement as it appears in the Informed
6 Consent forms.
7   Q. Let's turn to page 10, according to the
8 numbers in the upper right-hand, in the upper --
9 the fax numbers, essentially -- the production
10 numbers, I should say, across the top, since
11 there's multiple paginations in the document. You
12 see page 10 of 14 at the top?
13   A. I do.
14   Q. And here, we're in a heading that relates to
15 masculinizing treatments. And it begins
16 immediately to talk about testosterone.
17     Do you even understand that to be referring
18 to cross-sex hormones that would be administered
19 to a natal female; correct?
20   A. That's correct.
21   Q. And the University of Alabama Birmingham
22 tells its patients two-thirds of the way down the
23 page "I know that the effect of testosterone on
24 fertility are unknown. I have been told that I
25 may or may not be able to get pregnant even if I

Page 142

1 stop taking testosterone." Do you see that?
2     A. I do.
3     Q. And do you believe that in telling its natal
4 female patients that testosterone may or may not
5 make them permanently unable to get pregnant, the
6 university of Alabama Birmingham is engaging in
7 scare tactics?
8     A. This reads, to me, like a careful and
9 measured way to inform a patient about knowns,
10 unknowns, and potential risks.
11     Q. You don't consider it to be a deceptive
12 description of the risk?
13     A. To agree with that, I would have to know the
14 intent of the authors of this document.  And I do
15 not, so I can't offer an opinion on that either
16 way.
17     Q. Do you believe it to be a false description
18 of the risks?
19     A. Given my general knowledge of the
20 literature, reading this with the potential of
21 "may or may not" described, might still get
22 pregnant, should know about birth control options,
23 and informing a patient a pregnancy would preclude
24 a receipt of testosterone therapy, I view this as
25 a thoughtful, measured way to inform patients.

Page 143

1     Q. And in fact, you know it to be the case, do
2 you not, that it's known that exposure to high
3 levels of testosterone, for instance normal male
4 ranges, damages ovaries?
5         MS. LEVI:  Object as to form.
6     A. I don't know what is meant by "damage."
7     Q. Reduces their ability to produce viable
8 eggs.
9     A. While in use, or while in one's system,
10 either because it's endogenously produced or
11 exogenously received, testosterone suppresses
12 ovulation to varying degrees.
13     Q. And whether testosterone permanently damages
14 the ability of ovaries -- pardon me, whether
15 prolonged exposure to high levels of testosterone
16 permanently damages the ability of ovaries to
17 produce viable healthy eggs, that, you don't know?
18     A. That would not be an appropriate question
19 for me because it's not my area of expertise.
20     Q. All right.  Go to the SOC-8 tab again,
21 Exhibit 14.  And I'll ask you to turn to page 157.
22     A. See if I can find it.
23     Q. Towards the very bottom of the second
24 column --
25     A. 157.

Page 144

1     Q. 157.
2     A. The very bottom of the second column, okay.
3     Q. There is a sentence, an inch or little more
4 up, it begins "However, there have been."  Do you
5 see that?
6     A. Yes.
7     Q. Let me read that into the record.
8         In SOC-8 of 2022, WPATH states "There have
9 been no prospective studies to date evaluating the
10 effect of long-term hormone therapy on fertility,
11 i.e. started in adolescence, or in those treated
12 with puberty blockers in early puberty followed by
13 testosterone therapy."  Do you see that?
14     A. Mm-hmm.
15     Q. Do you think you understand that statement
16 by WPATH?
17     A. Yes, I do.
18     Q. Am I correct that you also are not aware of
19 any prospective studies up to the present
20 evaluating the effect of either long-term hormone
21 therapy, or puberty blockers on fertility?
22     A. Not with great certainty, no.
23     Q. If you look at the next page, column one,
24 seven-eighths of the way down, inch and half from
25 the bottom, is a sentence that begins

Page 145

1 "Spermatogenesis might resume."  Do you see that?
2     A. Mm-hmm.
3     Q. And that sentence reads "Spermatogenesis
4 might resume after discontinuation of prolonged
5 treatment with antiandrogens and estrogens, but
6 data are limited."  Do you see that?
7     A. Yes.
8     Q. And so far as the data that's available
9 today, 2024, am I correct that for you also, the
10 most you can say is that viable spermatogenesis
11 might resume after discontinuation of prolonged
12 treatment with antiandrogens and estrogens, but we
13 just don't know yet?
14         MS. LEVI:  Object as to form.
15     A. My opinion on the matter is limited because
16 I have not done an in-depth analysis of any
17 literature published on this topic since the
18 issuance of the 8th Edition of the standards of
19 care in the fall of 2022.
20     Q. You don't have any basis as you sit here to
21 disagree with that statement by WPATH?
22     A. It would require an in-depth analysis of the
23 literature for me to agree or disagree that this
24 sentence still holds.  It's been about 18 months.
25     Q. Yes.  Time flies when you're litigating.

37 (Pages 142 - 145)

Page 146

1    Correct me if I'm wrong, but I don't believe
2  that your Expert Report or your Supplemental
3  Report contain any assertions that cross-sex
4  hormones don't permanently sterilize some
5  percentage of those to whom they are administered
6  as adolescents; am I correct?
7        MS. LEVI:  Object as to form.
8    A. We would need to review it in depth to see
9  if there's any particular line.  And I believe I
10 may have touched on --
11   Q. Well, then we won't do that, so let me just
12 ask your opinion as sit here today.  As you sit
13 here today, are you able to offer an expert
14 opinion that cross-sex hormones administered to
15 adolescents do not permanently sterilize some
16 percentage of those adolescents?
17       THE DEPONENT:  Let me have the question
18 back, please.
19       (THE REPORTER READ THE RECORD)
20       THE DEPONENT:  One more time, please.
21       (THE REPORTER READ THE RECORD)
22   A. I am pausing because I'm aware of the fact
23 that conception diagnoses can occur in
24 individuals, including adolescents who are in
25 receipt of cross-sex hormones.

Page 147

1        MR. BROOKS:  Why don't you read the
2  question back again.
3        (THE REPORTER READ THE RECORD)
4    A. I am -- sorry about that, excuse me.  I am
5  unable to opine either way.  I haven't done the
6  type of literature search that would be required
7  to answer that question sufficiently.
8    Q. All right.  In this Exhibit 6 that we looked
9  at before, you and your coauthors state in column
10 one of page 2920 -- actually, leaking over from
11 the previous page, "Conception can occur in TGE
12 people taking hormones."  And just for the record,
13 can you explain what TGE refers to?
14   A. Transgender and gender expansive.
15   Q. And by referring to conception, am I correct
16 that in this particular sentence here, you're
17 referring to natal females?
18   A. Not completely.  I am referring to pregnancy
19 of any kind.  A transgender female receiving
20 estrogen could have sex with and conceive a
21 pregnancy with --
22   Q. Okay, all right.
23   A. -- someone capable of carrying a pregnancy.
24   Q. Am I correct that all examples of conception
25 after a period of years of taking cross-sex

Page 148

1  hormones, in the case of natal females, involves
2  females who have gone through full normal female
3  puberty before beginning cross-sex hormone
4  treatments?
5    A. I don't know enough to agree or disagree
6  with your statement as you stated it.
7    Q. All right.
8        MR. BROOKS:  Ask the reporter to mark as
9  Exhibit 17, a paper, the first author Light,
10 L-I-G-H-T, titled "Transgender Men Who Experience
11 Pregnancy After Female to Male Gender Transition."
12       (DEFENDANT'S EXHIBIT 17 FOR
13        IDENTIFICATION, Received and Marked.)
14   Q. And Dr. McNamara, am I correct that this is
15 an article that you cited in your expert report?
16   A. I believe it IS. I would have to look at
17 this, footnotes, just to make sure it's the right
18 one.
19   Q. If you look at page 14 of 38 of your initial
20 Expert Report, you can I think check that.
21 Footnote 38, i think it's the second reference, if
22 I found it correctly.
23   A. Great, thank you.
24   Q. And did you study this article with some
25 care before citing it?

Page 149

1    A. Yes, I did.
2    Q. You state in the footnote that "The majority
3  of transgender men" -- that is natal females --
4  "who had regular menses before starting
5  testosterone therapy are reported to resume menses
6  if testosterone is discontinued."  Do you see
7  that?
8    A. Give me just a second.
9        MS. LEVI:  Are you saying that's in the
10 Footnote 38?
11       MR. BROOKS:  I think it's actually in
12 the text.  I misstated.
13   Q. And my question for you is, you're not
14 offering an opinion, are you, that resumption of
15 menses is itself sufficient evidence to conclude
16 that those natal females have recovered healthy
17 levels of fertility?
18       MS. LEVI:  Object as to form.
19   A. It would depend on how one considers
20 "healthy" to be meant.
21   Q. Well, you're not offering an expert opinion
22 that the occurrence of menses demonstrates that
23 that woman has the ability to conceive and bear a
24 child to term, are you?
25   A. It is certainly an indicator of the

1 possibility of one's ability to conceive a
2 pregnancy.
3    Q. Necessary, but not sufficient, correct?
4    A. Correct.
5    Q. Now, the Light paper, as I understand it,
6 and looking at page 1121, reports on an online
7 survey of ultimately 41 natal females who claim to
8 have self identified as male, and then experienced
9 a pregnancy sometime within the last 10 years.  Is
10 that --
11    A. Where are you reading from?
12    Q. I am summarizing the "Materials and
13 Methods."  Some of that is column one, under
14 "Materials and Methods."
15    A. Okay.  You're summarizing it a little bit
16 quickly for me.  Would you mind if I take a moment
17 to read this?
18    Q. Well, let me just give you some guideposts
19 and then invite you to.
20        It refers, in the first column, under
21 "Materials and Methods," to self identification as
22 male, pregnancy within the last 10 years.  And
23 under "Results," after explaining certain thinning
24 out, it says about an inch under the heading
25 "Results," "41 percent remained for final

1 analysis."  Those are the things I was attempting
2 to summarize.
3    A. Okay.
4    Q. And if I could direct your attention to
5 Table 2, I will ask you about that specifically.
6 Table 2 is on page 1123.
7    A. Okay.
8    Q. Again, to summarize, I'll represent -- and I
9 know you have seen the article before, you cited
10 it -- that some percentage of those who had self
11 identified as male before being pregnant had never
12 taken testosterone.
13        Table 2 gives us information about the 25
14 among those 41 who had reported that they had used
15 testosterone before pregnancy.  I'll represent
16 that much.
17        This tells us that, in the first line of
18 Table 2, that testosterone was first initiated at
19 an average age of 25, and at age range between age
20 17 and 35.  Do you understand that as I understand
21 it?
22    A. I do.
23    Q. And you would agree that healthy females
24 have completed maturation of their reproductive
25 organs and are fully fertile by age 17?

1    A. Certainly the vast majority are.
2    Q. And so all test subjects -- well, these
3 aren't tests.  All subjects reported in the Light
4 article who said they had taken testosterone
5 before becoming pregnancy -- before becoming
6 pregnant, had gone through full reproductive
7 maturation before disrupting their endogenous
8 hormones with testosterone; correct?
9    A. I would need to look to see if the study
10 confirmed that.
11    Q. Well, I will also represent to you that the
12 study confirmed nothing.  It's all self-report
13 data, so make of that what you will.
14        MS. LEVI:  Object as to form, if that
15 was a question.
16        MR. BROOKS:  It wasn't.
17    A. Then I don't have a response.
18    Q. Well, let me ask this question.  If it is
19 the case, that all these subjects as reported in
20 Table 2 began taking testosterone no earlier than
21 age 17, then it would also be the case that all of
22 them had gone through full maturation of their
23 reproductive organs before disrupting their
24 endogenous hormones with testosterone; correct?
25    A. I would agree that the study is highly

1 likely to capture individuals who have completed
2 puberty before the initiation of testosterone
3 blockade.  Although I would need to review it
4 again to determine testosterone -- I misspoke, I'm
5 sorry.
6        Individuals who received testosterone.  I
7 think I said testosterone blockade.  I would need
8 to review it in depth to see if it mentioned any
9 participants had any heterogeneity in that.
10    Q. So far as you recall, and so far as Table 2
11 tells us, no subject reported on in the Light
12 paper began taking testosterone during her years
13 of adolescence while sexual organs and fertility
14 were still in the process of development; correct?
15    A. If I were to see a specific sentence where
16 they said that, that would be helpful.
17    Q. Well, the sentence I would point you to is
18 the one that says "Age when testosterone was
19 initiated, range 17 to 35."  Table 2.
20    A. I'm just looking at the inclusion and
21 exclusion criteria.
22        I don't see anything that says whether or
23 not participants completed puberty before starting
24 testosterone.  I agree with your general
25 assumption.  If I saw something that specifically

Page 154

1 said that in the paper, it would be helpful.  But
2 the paper may not include that.
3    Q. That is, you agree with my general
4 assumption that healthy women have completed
5 puberty by age 17?
6    A. About 95 percent have, that's a rough
7 estimate.
8    Q. Is it not the case that for -- that a natal
9 female who has not completed puberty by age 17 is
10 considered to be in an unhealthy condition?
11    A. It's too general of a term.  If somebody
12 were an athlete, a very high performing athlete,
13 they may not have menstruated yet.  They may have
14 a family history of late age of menarcheal onset.
15    Q. So far as you recall, this article, this
16 study that you cited, does not include any
17 subjects who reported having been subjected to
18 puberty blockers to prevent undergoing normal
19 female puberty; correct?
20    A. I'm scanning the study to see any mention of
21 that, and I do not see it was.  I will note that I
22 don't see that included either way.  I don't think
23 we can say with certainty whether or not any of
24 these 25 patients described in Table 2 have or
25 have not received puberty-blocking medications.

Page 155

1 We might have to ask the authors.
2    Q. So far as you understand, based on this
3 article, this article does not report any case of
4 a woman who was exposed to puberty blockers to
5 prevent ordinary female puberty, and then treated
6 with testosterone, subsequently becoming pregnant?
7    A. I don't see anything in this study to say
8 yes or no to that question.
9    Q. You understand this to have been data from
10 some local clinic, or a nationwide survey?
11    A. We can refer to the "Materials and Methods."
12    Q. Yes, I think the first paragraph perhaps
13 answers that, the last sentence of the first
14 paragraph.
15    A. The recruiters participated through a
16 web-based survey.  Participation was not limited
17 by geographic location.
18    Q. Might even be wider than nationwide.
19    A. It might be.  I don't see any indication if
20 that were -- oh, wait.  There were six patients in
21 Table 1 who reported residing outside the United
22 States.
23    Q. Well, let me ask this:  This web-based
24 survey identified a total of 25 natal females who
25 claimed to have experienced pregnancy and

Page 156

1 childbirth after undergoing testosterone treatment
2 for at least some period of time.  Is that your
3 understanding?
4    A. That's a fair understanding, yes.
5    Q. And you will agree with me, will you not,
6 that the results of that survey can tell us
7 literally nothing about how many women who took
8 testosterone for a period of their lives, later
9 wished to but were unable to become pregnant?
10       MS. LEVI:  Object as to form.
11    A. That is not the study question that this
12 study sought to evaluate.
13    Q. So it gives you no information about that,
14 correct?
15    A. It doesn't seem like that question was
16 pertinent to what the authors sought to
17 investigate.
18    Q. Well, in short, this article tells us
19 nothing about how many women, if any, have been
20 permanently sterilized as a result of taking
21 testosterone as across-sex hormone in support of a
22 transgender identity.
23       MS. LEVI:  Object as to form.
24    A. This would not be the study to source to
25 look for information pertinent to that question.

Page 157

1    Q. All right.
2       MR. BROOKS: Let's look at Schneider
3 2017.  And let me ask the reporter to mark this as
4 Exhibit 18.
5       (DEFENDANT'S EXHIBIT 18 FOR
6       IDENTIFICATION, Received and Marked.)
7    Q. Is this also an article that you're familiar
8 with and cited in your Expert Report?
9    A. Yes, it is.
10    Q. And you studied it with some care before
11 citing it?
12    A. Yes, I did.
13    Q. Now, you cited it in your report, which feel
14 free to reference, if you have that, again, text
15 associated with Note 39, I believe.  Let me find
16 that.
17       Yes, text associated with Note 39.  You
18 wrote "Reduced spermatogenesis is common while
19 patients remain on estrogen, but this occurs in
20 varying degrees with some maintaining fertility
21 even while on hormone therapy."
22       Have I read that language correctly?
23    A. You read the sentence on the page correctly.
24    Q. If you turn to page 877 in Schneider, et al,
25 in the first column, the last paragraph above the

1 heading "Sex Reassignment Surgery," begins "In
2 children treated with GnRH agonists."  You see
3 that paragraph?
4    A. Not yet.
5       Oh, I see it, I'm sorry.
6    Q. Immediately above that heading.  In that
7 paragraph, they use a lot of big words and fancy
8 terms.  And then they conclude in the last
9 sentence, "Hence, suppressing gonadotropins early
10 in the development might hinder the preparation of
11 the adult testis."
12       And did you believe you understood that
13 sentence when you read this article before you
14 cited it?
15    A. I'm not sure I can go back into that
16 specific point in time.
17    Q. Do you think you understand it today?
18    A. I do understand it today.
19    Q. All right.  What do you understand by "the
20 preparation of the adult testis"?
21    A. They're describing who Rhesus monkeys in
22 Plant, et al, 2005, postnatal and pubertal
23 developments of a Rhesus monkey.  So potentially,
24 that refers to one Rhesus monkey.
25       In that study, the investigator noted that

1 the density and shape of testicular cells was
2 dependent on gonadotropins.  And thus, a
3 downstream-related phenomena would be the
4 secretion of testosterone.
5       The authors of this study that we're
6 reviewing now stated that suppressing
7 gonadotropins early in development would
8 hinder -- or excuse me, might hinder the
9 preparation of the adult testis.
10    Q. And what do you mean, what do you understand
11 "preparation of the adult testis" to refer to?
12    A. I would assume that it means something akin
13 to maturation.
14    Q. And do you agree, disagree, or consider to
15 be outside your expertise, to say that the
16 evidence cited by the Schneider, et al authors
17 suggests that suppressing the gonadotropins early
18 in development, which is what puberty blockers do,
19 might hinder the healthy formation of the adult
20 testis?
21    A. Because I did not cite this paper outside
22 the context of the relationship between estrogen
23 and spermatogenesis, I do not have an opinion on
24 your question.
25    Q. Let me ask you to turn to page 878.  And in

1 the first column, two inches from the bottom, in a
2 paragraph that begins "Before starting CHT," the
3 third sentence reads "The desire to reproduce and
4 raise children is an inadequately studied field in
5 transsexual persons."  Do you see that language?
6    A. I do.
7    Q. And do you agree or disagree with these
8 authors' conclusion that the desire to reproduce
9 and raise children has been inadequately studied
10 among transsexual persons?
11    A. I am loosely aware that there has been
12 subsequent research in the seven years since the
13 publication of this paper.
14    Q. And when it comes to the desire of
15 transsexual individuals to reproduce and raise
16 children, what research since this time do you
17 have in mind?
18    A. As I said, I'm loosely aware and I did not
19 do an in-depth analysis of that particular
20 question in preparing my Expert Report for this
21 case.
22    Q. As you sit here today, you don't recall any
23 particular paper?
24    A. None off the top of my head.
25    Q. Do you know whether -- and let's, again, to

1 be clear, the Schneider, et al cited in your
2 Expert Report is a review article, not an original
3 research article; correct?
4    A. Correct.
5    Q. So it says.  And Schneider discusses and
6 cites a number of different research articles;
7 correct?
8    A. That is correct.
9    Q. In fact, he has listed on Table 1 on page
10 876, right?
11    A. There are 11 studies listed under Table 1 on
12 that page.
13    Q. And so far as you recall, none of those
14 studies involved males who were subject to puberty
15 blockers to prevent full natural pubertal
16 development prior to cross-sex hormones, correct?
17    A. Not that I'm aware of.
18       MR. BROOKS:  Let me ask the reporter to
19 mark as Exhibit 19, a paper from 2021, lead author
20 de Nie, D -- well, you'll see it -- entitled
21 "Histological Study on the Influence of Puberty
22 Suppression and Hormonal Treatment on Developing
23 Germ Cells in Transgender Women."
24       (DEFENDANT'S EXHIBIT 19 FOR
25       IDENTIFICATION, Received and Marked.)

41 (Pages 158 - 161)

Page 162

1    Q. And Dr. McNamara, this is an article also
2 that you cited in your Expert Report and studied
3 before you cited, am I correct?
4    A. Yes, I'm just trying to find where -- oh,
5 yes, here we are.
6    Q. 15, page 15, cited in Footnote 41, I
7 believe.
8       Now, you wrote in your report that "In a
9 cohort of patients treated with puberty blockers
10 starting at the onset of pubertal development,
11 Tanner Stages 2 and 3, and adding estrogen
12 treatment starting at 16 years of age,
13 histological examination of testicles showed
14 normal-appearing, immature sperm-producing cells
15 in the testes, suggesting those individuals had
16 retained fertility potential."
17      Do you see that language in your report?
18    A. Yes.
19    Q. And you've described the subjects here, they
20 began puberty blockers at Tanner Stages 2 or 3,
21 and added cross-sex estrogen at age 16; correct?
22      I'm summarizing what you wrote in your
23 report.
24    A. You're summarizing what I wrote in my report
25 correctly.

Page 163

1    Q. And to your understanding, is that a fairly
2 standard sequence in terms of when puberty
3 blockers are begun for natal males and when
4 estrogen cross-sex hormones are commenced?
5    A. Could I have the quote back?
6    Q. Yes.  In your understanding, does that
7 sequence that you've described there reflect a
8 fairly standard timing of the commencement of
9 puberty blockers and the timing of adding
10 cross-sex estrogen treatment for natal males?
11    A. I'm pausing because I'm not aware of any
12 study or national repository of data that
13 describes typical ages of onset because it's so
14 highly individualized.
15    Q. Just that --
16    A. All --
17    Q. I'm sorry?
18    A. It depends on when patients present to care,
19 and what their goals of care are and how the
20 assessments go.
21    Q. Does that sequence for that timing
22 correspond with what you have heard described as
23 the Dutch protocol?
24    A. The only difference is that the Dutch
25 protocol has an age at which -- a chronological

Page 164

1 age at which they consider pubertal blockade.  And
2 this is based on pubertal stage.
3    Q. Well, at any rate, it's done by a bunch of
4 Dutch people, but we'll move on from that.
5    A. All right.
6    Q. Just looking at the abstract study design,
7 we have 214 male-to-female subjects, all of whom
8 are adults at the time of the study; correct?
9    A. I see 214 transgender women included in the
10 final study cohort.
11    Q. And the procedure here, all of these are
12 individuals who have undergone surgery as adults,
13 and the experimental process after castration, the
14 testes are examined for the presence or absence of
15 sperm cells at various stages of maturity;
16 correct?
17      I think the first sentence of the study
18 design, trying to summarize.
19    A. Of course, I appreciate it.  I just need a
20 moment.
21      Yes, that's correct.
22    Q. And if we turn to page 301, Figure 1, let me
23 see if I can parse this out.
24      I'm sorry, not Figure 1.
25      301, column two, it reports that 4.7 percent

Page 165

1 of these natal males who had been subjected to
2 puberty blockers followed by cross-sex hormones,
3 4.7 percent contained some apparently full mature
4 sperm; correct?
5    A. The sentence reads, "In 10 transgender women
6 (4.7 percent) some seminiferous tubules contained
7 full spermatogenesis, all of whom had initiated
8 medical treatment in Tanner Stage 4 or higher."
9    Q. And let me ask, do you understand full
10 spermatogenesis to mean the development of, at
11 least by visual inspection, fully mature sperm
12 cells?
13    A. That's what I would take that to mean.
14    Q. Okay.  So in 95 percent of the subjects who
15 had been subjected to puberty blockers followed by
16 cross-sex hormones, no mature sperm cells were
17 found in the testicles, correct?
18    A. I'm not sure that's what this means.
19    Q. Why are you not sure that's what that means?
20    A. Unless I would see that stated specifically,
21 I don't think I can agree with that statement.
22    Q. Among those in whom any mature sperm cells
23 were found, all of those subjects had not begun
24 puberty blockade until Tanner Stage 4 or higher,
25 so the authors tell us; correct?

42 (Pages 162 - 165)

Page 166

1   A. Say that again.
2   Q. Among those subjects in whom any mature
3 sperm cells were found in their testes, none of
4 them had begun puberty blockade earlier than
5 Tanner Stage 4; correct?
6   A. Just give me a second.
7   Q. I'll call your attention to lines that you
8 read into the record where it says, column two,
9 page 301, referring to those in whom some mature
10 sperm cells were found, "all of whom had initiated
11 medical treatment in Tanner Stage 4 or higher."
12   Do you recall that language?
13   A. This is just quite a detailed study. I'm
14 wrapping my mind around it again.
15   Okay, your question back?
16   Q. In cases involved, that in those 4.7 percent
17 of subjects in whom at least some mature sperm
18 cells were found in their testes, none of those
19 had commenced puberty blockade earlier than Tanner
20 Stage 4, according to these authors.
21   A. Okay. Okay, I would agree with that.
22   Q. And having had more time to study the text
23 and Table 2, would you agree with me also that in
24 95 percent of the subjects who had been subjected
25 to puberty blockade and then cross-sex hormones,

Page 167

1 95 percent of those subjects had no mature sperm
2 cells found in their testes?
3   A. Your question one more time, please.
4   Q. It's the case, is it not, that of the 4.7
5 percent of the subjects in whom at least some
6 fertile sperm cells were found in their testes,
7 none of them had commenced puberty blockers at a
8 stage prior to Tanner Stage 4.
9   MS. LEVI: Object as to form.
10   Q. And my real question is, isn't that what you
11 understand the authors to tell us on page 301 in
12 column two, in the language you previously read
13 into the record?
14   A. So no -- if we're -- so if we're referring
15 to mature sperm cells, that is correct. No
16 other -- no other participants showed histologic
17 signs of mature sperm cells.
18   Q. And in fact, zero percent of the subjects
19 who commenced puberty blockade at Tanner Stage 2
20 or 3, as recommended in the WPATH standards of
21 care, showed signs of any mature sperm cells in
22 their testes; correct?
23   A. Among the 29 participants in this study,
24 none of them developed or had histological signs
25 of spermatozoa, and some had histological signs of

Page 168

1 spermatocytes and spermatogonia.
2   Q. Now, according to these authors, is it your
3 understanding that having only spermatocytes or
4 spermatogonia is effective in fertility, at least
5 on present technology?
6   I call your attention to page 306, first
7 full sentence at the top of the first column.
8   A. Could you just give me just one second
9 before I look there?
10   Q. Of course.
11   A. Okay, take me to where...
12   Q. Let me take you first to page 298. And
13 there, still in the abstract, right at the very
14 end of the abstract, it reads, "If maturation
15 techniques like in vitro spermatogenesis become
16 available in the future," and then it continues.
17 Do you see that?
18   A. Yes.
19   Q. To your knowledge, at present, there are no
20 technologies available to take spermatocytes or
21 spermatogonia and progress them to viable sperm
22 cells?
23   A. I don't know if, in the three years since
24 the publication of this paper, that's been
25 developed.

Page 169

1   Q. These authors say at the top of page 306,
2 "Although these techniques are successful in
3 animal models, they are still experimental and far
4 from the clinical realm." Do you see that
5 language?
6   A. Yes, cited in a 2020 paper by Pelzman, et
7 al.
8   Q. And as you sit here today, you don't have
9 any basis to disagree that technology to take
10 spermatocytes or spermatogonia and achieve mature,
11 viable sperm cells remains "from the clinical
12 realm." Correct?
13   A. I don't know of anything, no.
14   Q. Okay. And the net result of that is that
15 according to de Nie, et al, some 95 percent of
16 their subjects who had been subjected to puberty
17 blockers and cross-sex hormones were infertile at
18 the time of their study; correct?
19   MS. LEVI: Object as to form.
20   A. I don't know that this study is able to
21 comment on anything beyond the testicular
22 histology that was sampled. That's highly
23 dependent on the tissue that's analyzed.
24   I'm just trying to see if the authors say
25 anything similar to what you said.

43 (Pages 166 - 169)

1   Q. Let me ask my question differently.
2 Earlier, you agreed with me that according to the
3 numbers in this paper, 95 percent of their
4 subjects had no mature sperm cells detected in
5 their study; correct?
6   A. Say that one more time.
7   Q. You earlier agreed with me, had you not,
8 that according to the data in this paper, 95
9 percent of their test subjects -- in 95 percent of
10 their test subjects, no mature sperm cells were
11 detected according to the analysis that they did?
12   A. In Table 2, 4.7 percent of all subjects had
13 spermatozoa, which is the most mature form of
14 sperm.  The remaining subjects -- in the remaining
15 subjects, excuse me, the investigators isolated
16 sperm cells of varying degrees of maturation.  Or
17 among 7, none at all.
18   Q. And you would agree with me, would you not,
19 that only mature spermatozoa cells are able to
20 fertilize an egg?
21   A. At that very moment in time.
22   Q. Correct.  And so far as these authors study
23 reports, in 95 percent of their subjects who had
24 been subjected to puberty blockers followed by
25 cross-sex hormones, they did not detect evidence

1 of mature sperm cells necessary for fertility in
2 those subjects?
3   A. At that point in time, yes.
4   Q. And let me ask you to turn to page 301.
5     In column two, in the last paragraph, the
6 authors state "Hyalinization of seminiferous
7 tubules was observed."  Do you know what
8 hyalinization is?
9   A. I believe it's describing some degree of
10 histologic maturation of seminiferous tubules,
11 which is where sperm cells are produced.
12   Q. Is it your understanding that hyalinization
13 describes a level of maturation, or some level of
14 degeneration and blockage?
15   A. Off the top of my head, I'd have to look it
16 up.
17   Q. Fair enough.  At the end of the -- that
18 paragraph, these authors write "The complete
19 absence of a lumen was most comment in those who
20 initiated treatment in Tanner Stage 2."
21     Let me similarly ask whether you understand
22 what the authors are referring to when they
23 mention "absence of a lumen"?
24     MS. LEVI:  I just want to say on the
25 record, that didn't complete the sentence.

1     MR. BROOKS:  You are right.
2     MS. LEVI:  I'm sure that wasn't
3 intentional, but I didn't want to have the
4 record --
5     MR. BROOKS:  It was an error not in my
6 favor, so let me correct it.
7   Q. The sentence reads "The complete absence of
8 a lumen was most common in those who initiated
9 treatment in Tanner Stage 2 or 3."
10     And Dr. McNamara, if all you know about that
11 is what you would read in this article, then you
12 tell me that, and I will simply move on.
13   A. Yeah, I'm just trying to avail myself to the
14 terminology again.
15   Q. We can just move on.
16   A. Sure.
17   Q. Let me ask you to turn to --
18     THE DEPONENT:  Can I get a break?
19     MS. LEVI:  I'm sorry, are you done with
20 this article?
21     MR. BROOKS:  I've got probably three
22 more minutes on this document, if that's all
23 right.  If it's not all right, we can take a
24 break.
25     THE DEPONENT:  That's all right.

1   Q. Let me ask you to turn to 305, column two,
2 where, at the very first sentence at the top,
3 these authors from Vrije University in this paper
4 that you cited from 2022, say "It is unknown if
5 spermatogenesis can recover in if gender-affirming
6 hormone therapy is stopped and how much time is
7 needed for this purpose."  Do you see that?
8   A. Yes.
9   Q. Do you have any basis to disagree with the
10 authors of this paper that it's unknown if
11 spermatogenesis can recover if gender-affirming
12 hormone therapy is stopped?
13   A. As a general matter, amongst population-wide
14 samples, I have no reason to disagree.
15   Q. If you look a little farther down in that
16 column, a little below halfway is the sentence
17 that begins "Another study, however, reported."
18 That's the end of the line.  Tell me when you
19 found that.
20   A. I'm not seeing it.
21   Q. Pointing on my page just to help you locate
22 it.
23   A. I got it here.
24   Q. Of course, I cheated and highlighted.
25   A. That was helpful, though.

Page 174

1   Q. It reads "Another study, however, reported
2  that 48 percent of transgender adolescents
3  acknowledged that their desires regarding
4  parenthood might change over time," citing a
5  Strang, et al paper.
6      Are you familiar with the Strange, et al
7  paper?
8   A. I might have read it at some point. I don't
9  recall off the top of my head.
10  Q. Do you, based on your own reading or
11 experience, have any basis to disagree with the
12 conclusion of Strang, et al that 48 percent of
13 transgender adolescents stated that their desires
14 regarding parenthood might change in the future?
15  A. Well, that statistic describes the
16 population that these authors studied. It doesn't
17 necessarily apply to all transgender adolescents.
18  Q. And are you aware of some study that reaches
19 a different conclusion, based on a different
20 population?
21  A. I am aware that a finding like this in one
22 study should not be generalized as it is described
23 to all adolescents.
24  Q. And finally, let me ask you to turn to page
25 306. And there, in the top of the first column,

Page 175

1  an inch down, is the sentence that begins
2  "Furthermore." Tell me when you've found that.
3   A. Help me out.
4   Q. (Indicating.)
5   A. Got you. Thank you.
6   Q. It reads "Furthermore, future research
7  should focus on how GHAT influences the quality of
8  germ cells and the safety of using cells harvested
9  from orchiectomy specimens for reproductive
10 techniques."
11     When you read this article, do you believe
12 that you understood what the authors were getting
13 at in that sentence?
14  A. Yes, I believe I did.
15  Q. Do you understand the authors to be raising
16 a concern that even apparently viable sperm cells
17 that had been subjected to GAHT might be damaged
18 in some way that would result, for instance, in
19 birth defects?
20  A. I'm not interpreting any concern from this
21 statement. I am interpreting that the authors are
22 highlighting an area where future research is
23 needed.
24  Q. By "quality of the germ cells," did you
25 understand them to be speaking to -- I should say

Page 176

1  "by quality of germ cells and safety of using
2  them," did you understand the authors to be
3  referring perhaps, among other things, to the
4  possibility of genetic defects, birth defects?
5   A. I'm not reading that in this sentence.
6   Q. What do you understand that to be referring
7  to when they refer to safety?
8   A. I couldn't infer anything else from the
9  words on the page.
10     MR. BROOKS: All right, let's take a
11 break.
12     THE DEPONENT: Sounds good, thank you.
13     (R E C E S S)
14 BY MR. BROOKS:
15  Q. Let me ask you to find once again the
16 Endocrine Society Guidelines, Exhibit 6. And I
17 will ask you to turn to page 3895, and I want to
18 take you down to the very bottom of the second
19 column where it reads "Disclaimer." Do you see
20 that little header?
21  A. I do.
22  Q. There, the Endocrine Society states "The
23 guidelines should not be considered inclusive of
24 all proper approaches or methods, or exclusive of
25 others. The guidelines cannot guarantee any

Page 177

1  specific ought come, nor do they establish a
2  standard of care."
3      Dr. McNamara, were you aware that the
4  Endocrine Society has explicitly denied that its
5  guidelines do constitute or could be considered a
6  standard of care?
7   A. I am not sure how they mean "standard of
8  care," what meaning that has for this
9  organization. It's a -- more of a subjective term
10 that I think different individuals and
11 organizations can have difference meanings of.
12  Q. So in your understanding, "standard of care"
13 is not a well-defined term?
14  A. Let me -- for me, personally, as an
15 individual reading this, I do not know what the
16 Endocrine Society's intended meaning of "standard
17 of care" in this particular context might be.
18  Q. In the first sentence I read, at least
19 they're telling us that other approaches to
20 treating gender dysphoria may also be appropriate;
21 correct?
22  A. Your question again, please.
23  Q. The sentence that reads "The guidelines
24 should not be considered inclusive of all proper
25 approaches or methods, or exclusive of others."

45 (Pages 174 - 177)

1 Do you see that language?
2    A. I do.
3    Q. And at the very least, the Endocrine Society
4 there is telling us that there may be other
5 appropriate approaches to treating gender
6 dysphoria, correct?
7    A. They are saying that these guidelines should
8 not be considered inclusive of all proper
9 approaches -- they are saying that these
10 guidelines should not be considered inclusive of
11 all proper approaches or methods, or exclusive of
12 others.
13    Q. And what that means to you as the reader is
14 that there might be other proper approaches to
15 treating gender dysphoria, correct?
16        MS. LEVI:  Object as to form.
17    A. I don't draw that conclusion from this
18 sentence.
19    Q. Interesting.  The Endocrine Society tells us
20 that their guidelines do not establish standard of
21 care -- strike that.
22        Can you identify for me any national health
23 authority, any country, that has endorsed the
24 WPATH as the standard of care, either 7 or 8, as
25 the standard of care for their health service?

1    A. I don't understand, meaning the term "health
2 service."
3    Q. Well, you well understand that in many
4 countries, there is a unified National Health
5 Service of some sort, correct?
6    A. In countries outside the United States,
7 perhaps you can provide some examples so I know
8 what you're talking about.
9    Q. Europe.  You're well aware in European
10 countries, there is a National Health Service,
11 government-funded, unlike anything we have in this
12 country; correct?
13    A. Correct.
14    Q. And are you aware of any National Health
15 Service anywhere in the world that has endorsed
16 the WPATH standard of care as the practiced
17 standard of care in their nation for treatment of
18 gender dysphoria?
19    A. I am not aware of whether any country's
20 nationalized health system has endorsed WPATH's
21 standards of care in any version, or any other
22 guidelines for any other medical organization.
23    Q. And likewise, you're not aware of whether
24 any National Health Service has endorsed the
25 Endocrine Society Guidelines?

1    A. Similarly, my answer to that question is the
2 same.
3    Q. If you would find your report, let me ask
4 you to turn to page 5 of your report.
5        At the top of page 5, you state
6 "Organizations such as the American Academy of
7 Pediatrics, the American Psychological
8 Association, and the American Academy of Child and
9 Adolescent Psychiatry have endorsed these
10 standards of care."  And I believe you're
11 referring to, in that paragraph, to WPATH's
12 standard of care and Endocrine Society Guidelines.
13 Am I understanding you correctly?
14    A. That's correct.
15    Q. And can you point to any document in which
16 the American Medical Association has endorsed
17 WPATH's standard of care?
18    A. I did not list the American Medical
19 Association in this paragraph.
20    Q. Can you point me to any document with which
21 the American Academy of Pediatrics has endorsed
22 the WPATH's standards of care, whether Version
23 seven or 8.  There's no cites, so I'm asking.
24    A. In Dr. Rafferty's article written with the
25 sexual and gender minority group within the AAP,

1 they cite both guidelines throughout.
2    Q. Is it your recollection that Dr. Rafferty's
3 paper published by the American Academy of
4 Pediatrics anywhere endorses the WPATH standards
5 of care?
6    A. If you'd like us to refer to that paper, I
7 can point to specific areas where they cite that
8 paper.
9    Q. Is it the case, Dr. McNamara, that every
10 time you cite a paper, you endorse everything in
11 it?
12    A. I don't really try to cite things that I
13 write completely that affirm or support key points
14 that I'm trying to make.  I'll leave it there.
15    Q. Well, you state that these organizations
16 have endorsed these standards of care.  And my
17 question for you is for any one of these three
18 organizations, can you point me to any document in
19 which that organization states "We endorse, we
20 approve, these standard of care"?
21    A. While you and I might have slightly
22 different understandings of the term "endorse,"
23 for a medical organization to cite guidelines in a
24 position statement, that is certainly an
25 affirmative position that I, as the author of this

Page 182

1  expert testimony, drew an opinion on and opined
2  that it constituted an endorsement, as I
3  understand an endorsement to be.
4      Q. Did you make any effort to research whether
5  any of those organizations had adopted -- had any
6  formal endorsement of either the WPATH SOC-8 or
7  the Endocrine Society Guidelines before making
8  that statement in your report?
9      A. As I discussed, sourcing statements made by
10  these organizations where those guidelines are
11  cited and discussed as expert and authoritative,
12  is not something that a medical organization would
13  do lightly.
14      Q. And so far as you know, it's not something
15  they've ever done?
16      A. You were previously referring to
17  nationalized health care systems when you were
18  talking about organizations.  And now we've
19  switched to talking about medical organizations,
20  which are very different.
21          MR. BROOKS:  Let me hear back the
22  witness's previous answer, not this one, about the
23  previous answer.
24          (THE REPORTER READ THE RECORD)
25      Q. What is it you were saying that a medical

Page 183

1  organization would not do lightly?
2      A. As she just read, a medical organization
3  would not favorably cite guidelines without -- let
4  me say that differently.  Apologies.
5      A medical organization would not cite and
6  describe guidelines lightly.
7      Q. Let me ask you a different question.  What
8  knowledge do you have as to whether gender clinics
9  in Alabama, prior to the enactment of the law at
10  issue in this litigation, consistently followed
11  WPATH SOC-7 guidelines or the Endocrine Society
12  Guidelines?
13      A. So we've already discussed in my testimony
14  earlier today that I have no in-depth knowledge of
15  any of the practices in the University of Alabama
16  at Birmingham gender services.
17      Q. And what knowledge do you have as to whether
18  gender clinics across the US consistently follow
19  the WPATH standard of care or the Endocrine
20  Society Guidelines?
21      A. Of my colleagues who I communicate with on
22  these matters, who practice in gender clinics
23  throughout the country, they report utilizing the
24  WPATH's standards of care and the Endocrine
25  Society Clinical Practice Guidelines.

Page 184

1          MR. BROOKS:  Let me mark as Exhibit 20,
2  an article from the Washington Post, coauthored by
3  Dr. Laura Edwards-Leeper and Dr. Erica Anderson
4  entitled "The Mental Health Establishment is
5  Failing Trans Kids."
6          (DEFENDANT'S EXHIBIT 20 FOR
7          IDENTIFICATION Received and Marked.)
8      Q. Do you personally know either Dr.
9  Edwards-Leeper or Dr. Anderson?
10      A. No.
11      Q. Are you aware that Dr. Edwards-Leeper is one
12  of the named authors of the SOC-8?
13      A. I don't have it in front of me, so I can't
14  verify that.
15      Q. Well, let's find it.  Exhibit 14, there's a
16  lot of names, but I have --
17      A. I agree with you.  I found it myself.
18      Q. Okay, good.  And do you know whether Dr.
19  Edwards-Leeper has held any, other than being one
20  of the coauthors of the SOC-8 guidelines, do you
21  know whether she has held any executive position
22  in WPATH?
23      A. I don't know.
24      Q. Do you have any knowledge as to what level
25  of professional experience in treating minors with

Page 185

1  gender dysphoria Dr. Edwards-Leeper has?
2      A. I believe she has professional experience.
3  I'm not sure how much and to what extent.
4      Q. And are you familiar with the reputation of
5  Dr. Laura Anderson?
6      A. I believe her name is Erica Anderson.
7      Q. Yes, pardon me.  Are you familiar with the
8  reputation of Dr. Erica Anderson?
9      A. Not really.
10      Q. Are you aware that Dr. Anderson was
11  president of the United States USPATH, the United
12  States Professional Association For Transgender
13  Health?
14      A. I am now.
15      Q. Not really.  You shouldn't take my word.
16      Let me ask you to turn to the first text
17  page, the second page of this exhibit.  Let me ask
18  you whether you have read this article before
19  today?
20      A. No, I haven't.
21      Q. Do you recall discussion about it about the
22  time it came out amongst your colleagues and
23  peers?
24      A. I don't.  This is November 2021.
25      Q. Right.  At the very bottom of -- the

47 (Pages 182 - 185)

Page 186

1 subtitle here, of the article, is "Gender
2 Exploratory Therapy As a Key Step. Why Aren't
3 Therapists Providing It?"
4     Now, let me take you to the text at the very
5 bottom of the page, the first text page. And
6 there, Dr. Edwards-Leeper, coauthor of SOC-8, says
7 "A study of 10 pediatric gender clinics there
8 found that half do not require psychological
9 assessment before initiating puberty blockers or
10 hormones." Do you see that?
11   A. No, not yet.
12   Q. Very last sentence on the page.
13   A. Oh, I see. Starts with a different --
14 "Canada, too," yes. I see the sentence now.
15   Q. And above that, three lines above that,
16 these authors state that many providers are being
17 spurred into sloppy, dangerous care. Do you see
18 that?
19   A. I see that phrase.
20   Q. Do you share Dr. Edwards-Leeper's concern
21 that many providers around the country are
22 providing sloppy, dangerous care to children
23 suffering from gender dysphoria?
24   A. I take this phrase to be from both authors,
25 not just one.

Page 187

1   Q. Correct. But if I say both their names all
2 the time, it will take too much time.
3   A. Hmm.
4   Q. They're coauthors.
5   A. Correct. Your question, then?
6   Q. My question is do you share these authors'
7 concern that many providers are engaging in
8 "sloppy, dangerous care" for minors suffering from
9 gender dysphoria?
10   A. I only have knowledge of the opposite;
11 careful, measured, thoughtful care.
12   Q. Do you believe that your knowledge of
13 practice around the country is sufficient for you
14 to reject as mistaken these authors' belief that
15 many providers are engaging in sloppy, dangerous
16 care?
17   A. I don't know what these authors are basing
18 that on. And that is knowledge that I would need
19 in order to answer your question.
20   Q. Referring back to the study was actually a
21 Canadian sample. Do you have any knowledge as to
22 what proportion of gender clinics in the United
23 States require psychological assessment before
24 initiating puberty blockers or hormones?
25   A. I don't know whether or not there's data on

Page 188

1 that.
2   Q. And it is consistent with your
3 understanding, is it not, that the WPATH standards
4 of care require a psychological assessment before
5 puberty blockers or hormones are initiated?
6     MS. LEVI: Object as to form.
7   A. I would need to refer to the specific
8 section of the Adolescent chapter to refresh
9 myself on the language before I could answer your
10 question.
11   Q. You practice in this area and you can't tell
12 me today that whether or not the WPATH standards
13 of care require psychological evaluation before
14 initiating puberty blockers or cross-sex hormones?
15   A. I want to answer your question as accurately
16 and thoroughly as possible. And I would want to
17 look at the language with you today before I
18 answered the question. I'd be happy to do so if
19 you wanted to find out.
20   Q. I'm not going to spend my time that way.
21     Let me ask you to turn to the second text
22 page. If you look down to the first full
23 paragraph, begins with a big A.
24     These authors state "The pendulum has swung
25 from a vile fear and skepticism around ever

Page 189

1 treating adolescents medically to what must be
2 described in some quarters as an overreaction.
3 Now the treatment pushed by activists, recommended
4 by some providers and taught in many training
5 workshops, is to affirm without question." Do you
6 see that language?
7   A. I do.
8   Q. Do you share these authors' concern that
9 some providers are affirming without question?
10   A. I'm not sure I understand what that means,
11 as they're wording it.
12   Q. Let me ask you to turn to the next text
13 page. And there, in the top partial paragraph,
14 these authors, beginning partway through line
15 three, state "Frequently, those community
16 clinicians" -- that is, those who refer children
17 to specialty clinics -- "just like the parents,
18 assume that a more comprehensive assessment will
19 occur in the gender specialty clinic. But in our
20 experience, and based on what our colleagues
21 share, this is rarely the case. Most clinics
22 appear to assume that referral means a mental
23 health provider in the community has diagnosed
24 gender dysphoria and therefore -- and thereby
25 given the green light for medical intervention."

48 (Pages 186 - 189)

Page 190

1 Do you see that language?

2 A. I do.

3 Q. Do you share these authors' concern that in
4 many cases within the US, neither the primary care
5 physician, nor the gender clinic, is performing a
6 thorough diagnosis before medical intervention?

7    MS. LEVI: Object as to form.

8    THE DEPONENT: Can I have the question
9 back?

10    (THE REPORTER READ THE RECORD)

11 A. My experiences, as I have described them,
12 don't include anything along these lines. And my
13 familiarity with the literature shows that youth
14 often experience long delays from their first
15 contact with the gender clinic until receipt of
16 medication.

17 Q. Is it possible that your position associated
18 with Yale has you less in touch with the actual
19 practice across the nation than these authors, one
20 of whom is a coauthor of SOC-8?

21 A. If anything, my position here at Yale as the
22 only board certified Adolescent Medicine physician
23 has driven me to connect with people who I
24 consider to be colleagues across the country and
25 from other institutions. Being the sole board

Page 191

1 certified provider of your institution means that
2 you often look outside of it for professional
3 community.

4 Q. A little farther down in this third page of
5 text is a paragraph that begins "Some providers
6 may move quickly." You see that paragraph?

7 A. I do.

8 Q. And the second sentence reads, in part,
9 "Some assume that a person with gender dysphoria
10 who declares they are transgender is transgender,
11 and needs medical interventions immediately." Do
12 you see that?

13 A. I do see that.

14 Q. And do you share these authors' belief that
15 some young people who declare they're transgender
16 may not need medical intervention immediately?

17    MS. LEVI: Object as to form.

18 A. It seems like they're referencing the
19 subsequent study here to back up that point. I
20 would probably need to look at that to get more
21 context into what they're saying here.

22 Q. Ask you to turn to the next page.

23 A. Okay.

24 Q. There, these authors state "Longer term
25 longitudinal studies are needed to better

Page 192

1 understand the role of medical interventions on
2 lifetime psychological health, particularly with
3 the newer subset of adolescents presenting with no
4 childhood dysphoria and significant mental health
5 concerns."

6    Is it consistent with your knowledge and
7 your expert opinion that in recent years, a newer
8 su set of patients are presenting at gender
9 clinics who experienced no childhood gender
10 dysphoria and suffer significant other mental
11 health concerns?

12 A. The demographics of patients being referred
13 to gender clinics are different in some ways than
14 they were in years past. I would not characterize
15 that as meaning that they are a separate subset.

16 Q. So as to that characterization, you disagree
17 with Dr. Edwards-Leeper?

18 A. I don't have enough information as it's
19 written here to understand what information that
20 individual is basing this statement on.

21 Q. In the next paragraph, the third line, these
22 authors state that "Without proper assessment,
23 many youths are being rushed toward the medical
24 model, and we don't know if they will be liberated
25 or restrained by it."

Page 193

1    Let me ask whether you share these authors'
2 concern that today, many youths are being rushed
3 towards a medical response to gender dysphoria.

4 A. Again, I'm not sure what data they're basing
5 that claim on.

6 Q. Yes, but my question is whether you share
7 their concern.

8 A. I base all of my opinions in this case on
9 evidence and data. And I don't have anything to
10 go with here. So I can neither agree or disagree
11 with this statement as it's written.

12 Q. The very first, the very top of the page, I
13 asked you about the back half of the sentence, but
14 let me ask you about the first half.

15    "Longer term longitudinal studies are needed
16 to better understand the role of medical
17 interventions on lifetime psychological health."

18    You have spent a fair amount of time
19 studying the literature. Let me ask whether you
20 agree with these authors that we need longer term
21 studies to understand the role of medical
22 interventions in lifetime psychological health of
23 young people who are presented in clinics?

24 A. Longer term, larger, multiinstitutional
25 studies are always a benefit in the field of

49 (Pages 190 - 193)

1 clinical research and can always guide medical
2 decisionmaking in patient care in a better way.  I
3 consider this first half of this sentence to be
4 something that I agree with on that basis.
5     Q. And towards the end of the -- well, the
6 paragraph begins "The pressure by activist medical
7 and mental health providers, along with some
8 national LGBT organizations to silence the voices
9 of detransitioners and sabotage the discussion
10 around what is occurring in the field is
11 unconscionable."
12     Let me ask, have you yourself, as you pay
13 attention to the literature, or the media, or
14 discussions within academia, do you have any view
15 as to whether there is or is not pressure by
16 activists and some LGBT organizations to silence
17 the voices of detransitioners?
18     A. I have not noted that.
19     Q. Let me ask you to take the WPATH standards
20 of care, Exhibit 14, out.  And let me ask you to
21 turn to page 46.
22     Is it your testimony that -- let me put it
23 this way:  Is it your belief that the WPATH SOC-8
24 recommendations with regard to care of adolescents
25 suffering from gender dysphoria are based on

1 systematic reviews of the available evidence?
2     A. Are you referring to a specific chapter?
3     Q. Well, I asked about adolescents.  And there
4 is a chapter that pertains specifically to
5 adolescents.
6     A. That might have been what I didn't catch in
7 your last question.  Can I have the question back
8 so I make sure I understand completely?
9         (THE REPORTER READ THE RECORD)
10        THE DEPONENT:  Thank you.
11     A. This particular chapter, as the authors
12 describe, was not based on a systematic review.
13 It was based on a review of the evidence, which
14 the authors describe a bit further.
15     Q. So far as you're aware, WPATH has not
16 claimed that its recommendations regarding medical
17 transition of adolescents or children are based on
18 any systematic review, correct?
19     A. I have not seen an instance of that
20 organization saying that regarding the care of
21 adolescents.
22     Q. Or children?
23     A. I have not looked at -- excuse me, I haven't
24 looked at the Children chapter.
25     Q. I think you and I are looking at the same

1 language in column one.  About two inches down,
2 the authors of SOC-8 tell us that "There are few
3 outcome studies that follow youth into adulthood."
4 Do you see that language?
5     A. I do.
6     Q. And is that consistent with your
7 understanding of what is out there in the
8 literature?
9     A. Yes, it is.
10     Q. So when it comes adolescents being treated
11 in gender clinics, we simply don't have studies
12 that tell us about either their mental or their
13 physical health of such patients by the time they
14 are, for instance, age 30?
15     A. I have not seen that study, to the best of
16 my knowledge.
17     Q. Or age 40, or age 50?
18     A. There may be studies that have included
19 participants of some of those ages who did receive
20 some type of care as an adolescent.  Off the top
21 of my head, I can't recall one.
22     Q. The WPATH authors tell us in language, that
23 because the number of studies is low and there are
24 few outcome studies that follow youth into
25 adulthood, "Therefore, a systematic review

1 regarding outcomes of treatments in adolescents is
2 not possible."  Do you see that?
3     A. Yes.
4     Q. And based on your understanding of what is
5 meant today by evidence-based medicine, does it
6 make sense and is it consistent with the way
7 terminology is used in evidence-based medicine to
8 say that a systematic review regarding outcomes in
9 adolescents is not possible?
10     A. It is this organization's prerogative to
11 make that determination about their own standard
12 of care.  I don't have an opinion on that sentence
13 further from that.
14     Q. Do you believe the standard of care
15 generated by WPATH to have been generated in
16 compliance with accepted principles of
17 evidence-based medicine?
18     A. I generally agree with that.
19     Q. And yet you think it's their prerogative to
20 define a standard when a systematic view can or
21 cannot be performed?
22     A. As subject matter experts on this particular
23 area, I believe that they're well positioned to
24 make that determination.
25        MR. BROOKS:  I ask the reporter to mark

50 (Pages 194 - 197)

1 as Exhibit 21, an article from the British Journal
2 of Medicine, 2023, entitled "Gender Dysphoria in
3 Young People is Rising and So is Professional
4 Disagreement."
5       (DEFENDANT'S EXHIBIT 21 FOR
6       IDENTIFICATION Received and Marked.)
7    Q. And Dr. McNamara, I asked you earlier about
8 the reputation of the New England Journal of
9 Medicine.  Do you have any understanding of the
10 international reputation of the British Medical
11 Journal?
12    A. It is certainly a reputable journal.  I am
13 not aware of whether or not this document was
14 printed in a peer-reviewed journal or if it was
15 simply included on their website.
16    Q. Well, it doesn't purport to be original
17 research, and it doesn't purport to be a review
18 article.  It is titled -- it is by Jennifer Block,
19 who is designated as an investigations reporter.
20 But is it consistent with your understanding that
21 the British Medical Journal is perceived as one of
22 the premiere medical journals in the world?
23    A. It's certainly a high impact, reputable
24 journal.  I wouldn't qualify it further than that.
25    Q. Well, if somebody testified that it was

1 viewed as one of the world's premiere medical
2 journals, would you disagree with that?
3    A. I think I have given you my opinion on what
4 this journal means to me as a physician.  I don't
5 have anything else to say about it.
6    Q. Let me ask you to turn to the fifth page.
7 The numbers are small type down at the lower
8 right-hand corner.  And the third full paragraph
9 begins, "For minors."  Do you see that?
10    A. I do.
11    Q. And there, it reads "For minors, WPATH
12 contends that the evidence is so limited that a
13 systematic review regarding outcomes of treatment
14 in adolescents is not possible.  But Guyatt
15 counters" -- that's G-U-Y-A-T-T -- "that
16 systematic reviews are always possible, even if
17 few or no studies meet the eligibility criteria.
18 If an entity has made a recommendation without
19 one, he says, they'd be violating standards of
20 trustworthy guidelines."  Do you see that?
21    A. Mm-hmm.
22    Q. Do you agree with Dr. Guyatt, who we've
23 mentioned earlier, the guidelines that are not
24 based on a systematic review of the relevant
25 literature do not comply with standards for

1 trustworthy guidelines?
2    A. What I'm reading on the page is a little
3 different from how you're presenting it to me as a
4 summary.  It's a truncated quote.  And I'm not
5 sure in the context with which it's being
6 attributed to this individual, it doesn't appear
7 to be citing any peer-reviewed research that this
8 individual has produced.
9    Q. Do you believe that you or Dr. Guyatt are
10 better informed about the definition and
11 principles of evidence-based medicine?
12    A. I don't understand the question.
13       MR. BROOKS:  Read it back, please.
14       (THE REPORTER READ THE RECORD)
15    A. I'm not sure I have any evidence upon which
16 to compare my knowledge to somebody who I -- I
17 have never met, and I think I'll leave it there.
18    Q. Is it outside your knowledge that Dr. Guyatt
19 is considered one of the founders of the field of
20 evidence-based medicine?
21    A. I am unsure who specifically considers Dr.
22 Guyatt to be considered a founder of
23 evidence-based medicine.  I would need to
24 understand that further.
25    Q. And o you know or not know whether Dr.

1 Guyatt has written an entire textbook that's
2 widely used on evidence-based medicine?
3    A. I know that he's written textbooks on
4 evidence-based medicine.  I have read several
5 textbooks on evidence-based medicine.  And in my
6 training on evidence-based medicine, I received
7 education from several leaders in clinical
8 research.  And Public Health resourced a wide
9 variety of educational documents on the topic.
10 And they were not all written by the same person.
11    Q. At the very last paragraph, let me just ask,
12 there's a mention also of a Dr. Helfand,
13 H-E-L-F-A-N-D, who I'll represent to you that he's
14 a professor of Medicine and Medical Informatics
15 with the Oregon Health and Science University.
16       Let me just ask, have you heard his name, do
17 you know anything about his reputation?
18    A. I have never heard of him.
19    Q. Okay.  I won't rest anything oh that.  And
20 the final paragraph of this article reads -- the
21 final paragraph on page 5, not the final
22 paragraph, I apologize.
23    A. I see.
24    Q. "Calling a treatment recommendation
25 evidence-based should mean that a treatment or

1 guideline has not just been systematically
2 studied, says Helfand, but that there was also a
3 finding of high quality evidence supporting its
4 use.
5    Now, my question for you is is it
6 consistent, do you agree or disagree, with the
7 proposition that in order for a guideline to be
8 considered evidence-based, it should be based on
9 high quality evidence?
10   A. The way that this is written here, what you
11 just read me doesn't seem to be a quotation.
12   Q. That's all right, I'm just asking whether
13 you agree with the proposition.
14   A. It might be a summary.
15   Q. Let me ask you a question in my own words:
16 Do you agree or disagree that in order to be
17 considered an evidence-based guideline, or an
18 evidence-based recommendation, that that guideline
19 or recommendation should be based on what is
20 deemed high quality evidence according to
21 principles of evidence-based medicine?
22   A. High quality evidence often refers to
23 evidence derived from randomized controlled
24 trials. And the vast majority of medical practice
25 is informed by evidence that is not derived from

1 randomized controlled trials. Vast majority of
2 medical practice is informed by evidence derived
3 from observational studies. Which puts us,
4 according to the way the grade working group
5 defines "evidence," not often in the realm of high
6 quality evidence.
7    So I take this sentence that you read to me
8 earlier to be a summary of something that a
9 journalist interpolated from a quote. And I have
10 good reason to disagree, that the majority of
11 evidence-based guidelines are supported by high
12 quality evidence.
13      MS. LEVI: I apologize, can we just take
14 a very quick break?
15      MR. BROOKS: I'm in favor.
16      (R E C E S S)
17 BY MR. BROOKS:
18   Q. Let me ask you to look at your expert
19 report, Exhibit 4. Turn to page 2. And there, in
20 your Roman I heading, you assert that
21 "Transitioning medications are safe and
22 effective." Do you see that language?
23   A. I do.
24   Q. And is it your testimony that using puberty
25 blockers to block natural, healthy puberty for a

1 period of years in a child who's suffering no
2 genetic defect or precocious puberty is known to
3 medical science to be safe?
4    A. When accounting for the known adverse
5 effects, the benefits of treatment, and the risks
6 of treatment, it is my opinion that the use of
7 puberty-blocking medications and treatment of
8 gender dysphoria is safe.
9    Q. And is it your view that no responsible
10 medical expert could say that it is presently
11 unknown in important respects whether such use is
12 safe?
13      (The reporter asked for clarification)
14   Q. Is it your testimony that no responsible
15 medical expert could be of the view that it is
16 presently unknown in important respects whether
17 such use is safe?
18   A. I would need to know what important respects
19 were being considered to proceed with answering
20 your question.
21   Q. Well, is it your testimony that no
22 responsible medical expert could be of the view
23 that it is presently unknown whether the use of
24 puberty blockers for an extended period of years
25 in a child suffering no genetic defect or

1 precocious puberty is safe with respect to
2 neurodevelopment?
3    A. There are quite a few qualifiers and double
4 negatives in there. I need to hear the question
5 again.
6      (THE REPORTER READ THE RECORD)
7    A. I would need to know what was meant by "some
8 years" in order to answer that question.
9    Q. Let's say three.
10      THE DEPONENT: I need the question back
11 because of our interruption.
12      (THE REPORTER READ THE RECORD)
13   A. If someone were to express that view, it
14 would be proper and correct to engage in a
15 discussion with them about why they hold those
16 views, and to review relevant literature pertinent
17 to this specific issue.
18   Q. Are you aware that multiple European health
19 authorities have now published statements to the
20 effect that it is not known yet whether
21 administration of puberty blockers for multiple
22 years to children suffering from no genetic defect
23 or precocious puberty is safe?
24   A. I am aware that some European countries have
25 performed evidence reviews on that topic.

52 (Pages 202 - 205)

Page 206

1  Q. Are you unaware that they have made formal
2  statements now that it is not yet known whether
3  such treatments are safe?
4  A. I did not cite statements from other
5  countries in any of my reports. And I would need
6  to review them in detail to comment on their
7  contents.
8  Q. As you sit here today, are you aware of
9  whether or not some European health authorities
10 have issued statements to the effect that it is
11 unknown at present whether use of puberty blockers
12 to treat gender dysphoria is safe?
13 A. I would need to specifically review the
14 reports that those countries have produced, look
15 at their methodology for making those statements,
16 and then I would be able to answer your question.
17 Q. And are you telling me that you have not,
18 either in your normal professional capacity or
19 your preparation to provide expert testimony to
20 the court in this case, you have not taken the
21 time or the trouble to familiarize yourself with
22 those recent European statements?
23 A. I don't know what statements specifically
24 you're referring to. Specific details would help
25 so I'm sure that we're talking about the same

Page 207

1  thing.
2  Q. Have you read Dr. Katz's interim report
3  published for the National Health Service?
4  A. Yes, I have.
5  Q. Have you read the very recently published
6  policy statements from the National Health
7  Service?
8  A. Not in its entirety.
9  MR. BROOKS: Let me ask the reporter to
10 mark as Exhibit 22, a document from NHS England
11 titled "Clinical Policy Puberty Suppressing
12 Hormones For Children and Young People Who Have
13 Gender Incongruence/Gender Dysphoria," dated March
14 12, 2024.
15 (DEFENDANT'S EXHIBIT 22 FOR
16 IDENTIFICATION Received and Marked.)
17 Q. Dr. McNamara, this document is both very
18 recent, March 12th, and very short. Is it your
19 testimony that prior to now, you have not read
20 this two-page document?
21 A. I don't think I read this specific document.
22 Q. Well, it's just out. Let me ask you this:
23 On the third page, the last line of the text
24 states "We have concluded that there is not enough
25 evidence to support the safety or clinical

Page 208

1  effectiveness of PSH to make the treatment
2  routinely available at this time." And PSH is
3  defined in the beginning of the document as
4  "puberty suppressing hormones."
5  My question is this: Is it your testimony,
6  do you intend to testify to the court that only a
7  science denier could conclude that as of March
8  2024, there is not enough evidence to support the
9  safety or clinical effectiveness of puberty
10 suppression as a treatment for gender dysphoria?
11 MS. LEVI: Object as to form.
12 THE DEPONENT: Can I have the question
13 back?
14 (THE REPORTER READ THE RECORD)
15 A. I am aware of multiple studies in the
16 literature that show that puberty suppression is
17 one effective treatment for youth suffering from
18 gender dysphoria. And that statement does not --
19 that is my testimony. I'll leave it there.
20 Q. You're aware of -- you have reviewed the
21 systematic reviews commissioned for the National
22 Health Service of England, so-called Cass review,
23 put out by their NICE organization; correct?
24 A. I have seen those reviews.
25 Q. And you're aware that when it comes to

Page 209

1  efficacy and benefit, those reviews conclude that
2  all available evidence is of very low quality?
3  A. I am aware that as you described, that is a
4  conclusion of that document.
5  Q. And you disagree with their evaluation of
6  that evidence, am I correct?
7  A. I have seen instances of studies that they
8  assessed, being assessed using the same
9  methodology, and the authors come up with
10 different results.
11 Q. And in your view, is that the sort of
12 evaluation on which reasonable experts could
13 disagree?
14 A. I would say that using an evidence
15 assessment tool that is subjective and can be user
16 dependent, is likely to lead to discrepant
17 assessment.
18 Q. Now, backing up, do you intend to tell the
19 court that only a science denier could conclude
20 that as of March of 2024, there's not enough
21 evidence to support the safety or clinical
22 effectiveness of puberty suppressing hormones as a
23 treatment for gender dysphoria?
24 MS. LEVI: Object as to form.
25 THE DEPONENT: Can I have the question

53 (Pages 206 - 209)

Page 210

1 back?
2      (THE REPORTER READ THE RECORD)
3      A. I would say that the available literature to
4 date demonstrates both short term and medium term
5 beneficial impact of puberty-suppressing
6 medications as a treatment for gender dysphoria.
7      Q. And is it your expert opinion that any
8 medical professional who disagrees with you about
9 that must be denying the relevant science?
10      MS. LEVI:  Object as to form.
11      A. It is my expert opinion that a careful
12 assessment of all of the literature would yield
13 the conclusion that in the short or medium term,
14 puberty-suppressing medications confer benefit to
15 youth with gender dysphoria if they qualify for,
16 desire and receive them in accordance with the
17 standard of care outlined by WPATH and the
18 clinical practice guidelines outlined by the
19 Endocrine Society.
20      Q. And therefore, it's your opinion that
21 anybody who disagrees with you on that is simply
22 denying the relevant science, or do you believe
23 that's an issue on which reasonable scientists can
24 differ?
25      MS. LEVI:  Object as to form.

Page 211

1      THE DEPONENT:  I'll take the question
2 again, please.
3      (THE REPORTER READ THE RECORD)
4      A. I don't have an opinion on that.
5      Q. Do you know whether the Endocrine Society
6 has anywhere taken an official position or indeed
7 stated in the guidelines that the use of puberty
8 blockers as a treatment for gender dysphoria is,
9 quote, safe?
10      A. The Endocrine Society undertook a thorough
11 inventory of the evidence on this issue.  They
12 sourced available studies at the time the
13 guidelines were developed.  And they issued a
14 recommendation regarding the use of
15 puberty-blocking medications for youth with gender
16 dysphoria.  I would need to refer to the specific
17 guidelines to pull out the language, but I can
18 tell you without doing so that their process
19 undertook a consideration of the safety of that
20 medication.
21      Q. Well, let's pull that out and see what they
22 said about what they learned about safety through
23 that process that you mention.
24      Exhibit 6, let me ask you to turn page 3874
25 in the Endocrine Society Guidelines.  Towards the

Page 212

1 bottom of the first column is a paragraph, about
2 two inches from the bottom, that begins "In the
3 future."  Find that for me, if you would.
4      A. Yes.
5      Q. It reads "In the future, we need more
6 rigorous evaluations of the effectiveness and
7 safety of endocrine and surgical protocols."  And
8 it goes on to call specifically for a careful
9 assessment of "the effects of prolonged delay of
10 puberty in adolescents on bone health, gonadal
11 function, and the brain, including effects on
12 cognitive, emotional, social and sexual
13 development."  Do you see that language?
14      A. Yes, I am reading this paragraph with you.
15      Q. All right.  And you understand the reference
16 to gonadal function to be a reference to
17 fertility, right?
18      A. Yes.
19      Q. So what the Endocrine Society says here
20 about safety is that we need more rigorous
21 evaluations of the safety of puberty blockers with
22 respect to -- let me start again.
23      What the Endocrine Society said here is that
24 we needs more rigorous evaluations of the safety
25 of endocrine treatments and in particular, with

Page 213

1 respect to the prolonged delay of puberty in
2 adolescents on health issues, including those
3 we've been discussing today; that is, fertility,
4 brain development, sexual development; correct?
5      A. So this paragraph does not pertain
6 explicitly to puberty-blocking medications.
7      Q. It does, if I may.  The language I read five
8 lines in refers specifically to the effects of
9 prolonged delay of puberty in adolescents.
10      A. Okay, I suppose we're inferring from that --
11      Q. It's a complicated sentence, I grant you.
12 But I'd like to focus on the call for a careful
13 assessment of the following.  And item one is,
14 "the effects of prolonged delay of puberty in
15 adolescents on bone health, gonadal function, and
16 the brain."  Correct?
17      A. That's correct, that's what it says.
18      Q. That is a reference to potential adverse
19 effects of puberty blockade; correct?
20      A. That's correct.
21      Q. And what the Endocrine Society says is we
22 need careful assessment of those potential adverse
23 effects; correct?
24      A. They don't refer to them as adverse effects.
25 They refer to them as effects.

54 (Pages 210 - 213)

Page 214

1    Q. Well, you would agree that any negative
2  impact on brain development would be adverse,
3  would you not?
4    A. I don't see discussion of negative impacts
5  on brain development here.
6    Q. Dr. McNamara, this paragraph begins with a
7  reference to safety.  Do you believe that the
8  Endocrine Society means, as you read this, to
9  refer to positive impact?
10   A. I'm just reading the words on the page.
11   Q. Is that all?  You don't think you understand
12 it?  Let me ask a question.
13     It's correct, is it not, that what the
14 Endocrine Society says about safety in this
15 paragraph, among other things, is that we need
16 more careful assessment of the effect of puberty
17 blockade in adolescents on bone health, gonadal
18 function, and the brain?
19   A. They're saying that they need more rigorous
20 evaluations of effectiveness and safety of the
21 current protocols.
22   Q. And you agree with that, do you not?
23   A. In general, I would always agree with the
24 pursuit of even more rigorous research.
25   Q. Insofar as you're aware, nowhere in the

Page 215

1  guidelines does the Endocrine Society tell the
2  reader that the prolonged delay of puberty in
3  adolescents is safe?
4    A. We would need to turn to the section, the
5  section in this document, that discusses puberty
6  blockade further.
7    Q. Well, before you said in your Expert Report
8  that puberty blockade is safe.  Did you not
9  carefully review the Endocrine Society Guidelines
10 to see whether the Endocrine Society thinks it
11 safe?
12   A. I certainly did.  And if we're going to
13 discuss it in depth today, it would be best to
14 move to that section of this document.
15   Q. And which section is it that you have in
16 mind?  Probably have 2.3 in mind, if I may.
17   A. The entire section of 2.0, as it begins on
18 page 3880, would be good to consider on this
19 topic.
20   Q. Well, I'll ask you this, due to shortness of
21 time.  2.3 is the recommendation that says "where
22 indicated, GnRH" -- that is, puberty suppression
23 -- should be used "to suppress pubertal hormones,"
24 correct?
25   A. If pubertal suppression is being considered,

Page 216

1  a GnRH analog would be the proper medication to
2  consider.
3    Q. And in the discussion that follows, there is
4  a section headed "Side Effects" on the next page.
5  Do you see that?
6    A. Yes.
7    Q. And there, in the discussion of what they
8  refer to as primary risks of pubertal suppression,
9  the Endocrine Society lists first, compromised
10 fertility; and second, unknown effects on brain
11 development.  Am I right?
12   A. That's correct, that's what it says.
13   Q. And then a few lines down, they go on to say
14 that a recent study also suggested suboptimal bone
15 mineral accrual; correct?
16   A. "Initial data on gender dysphoric
17 gender-incongruent subjects demonstrated no change
18 of absolute Areal BMD during two years of GnRH
19 analog therapy, but a decrease in bone mineral
20 density Z scores."
21     So what that means is that that particular
22 study --
23   Q. As you recall, is that the Klink study?
24   A. No.
25   Q. That's perhaps a more recent study, all

Page 217

1  right.
2    A. This particular study analyzes mineral
3  density by using Z scores.  Z scores of bone
4  mineral density are a statistical comparison to
5  age-matched controls.  But there are no controls
6  for interpopulation differences.  And it is well
7  known that youth with gender dysphoria deal with,
8  unfortunately, certain naturalistic risk factors
9  for lower bone mineral density.
10   Q. We're just speaking of risk factors, rather
11 than causation, what the -- the third risk
12 identified here, under the section "Side Effects"
13 of puberty blockers by the Endocrine Society, is
14 simply they point to a study that suggested
15 suboptimal bone minimal accrual during puberty
16 blockade treatment; correct?
17   A. That's correct.
18   Q. And they identify risk to fertility, risk to
19 brain development, risk to bone accrual.
20     My question for you is, so far as you
21 recall -- we're not going to look through the
22 whole document.  I just want to ask if you recall
23 today, does the Endocrine Society anywhere in
24 these guidelines assert that prolonged pubertal
25 suppression, that is, for a period let's say of

1 three or more years, to treat gender dysphoria in
2 adolescents is, to quote the term you use in your
3 Expert Report, safe?
4    A. In making the recommendation to offer
5 puberty blockade to youth gender dysphoria, the
6 Endocrine Society accounted for the safety profile
7 and the risks and benefits of treating versus not
8 treating.
9    Q. Well, to say that they accounted for it is
10 not to say that it's safe. It's to say that they
11 performed some balancing of potential harms
12 against potential benefits, correct?
13    A. To me -- and it's my word that I use in my
14 report, safe. To me, a consideration of safety
15 requires balancing.
16    Q. That is balancing of potential harms versus
17 potential benefits.
18    A. And the harms of treating versus not
19 treating.
20    Q. Yes. Okay. Let me ask to you to find the
21 SOC-8 again. And if you turn to page 47, it, in
22 the first column, more than halfway down, begins a
23 paragraph "Providers may consider."
24    A. I'm with you.
25    Q. And there, WPATH authors write "Providers

1 may consider the possibility an adolescent may
2 regret gender-affirming decisions made during
3 adolescence, and a young person will want to stop
4 treatment and return to living in the
5 birth-assigned gender role in the future."
6 Correct?
7    A. That's what it says.
8    Q. They go on to cite certain studies the WPATH
9 believes show that the likelihood of that is low;
10 am I correct?
11    A. That's correct.
12    Q. But then they say, "At present, no clinical
13 cohort studies have reported on profiles of
14 adolescents who regret their initial decision or
15 detransition after irreversible affirming
16 treatment. Recent research indicates there are
17 adolescents who detransition." Do you see that?
18    A. Yes.
19    Q. And at the top of the next page, it states
20 "Some adolescents may regret the steps they have
21 taken."
22        Now, let me ask you, in using the word
23 "regret" to describe the feelings of these
24 individuals who undergo medical transition as
25 adolescents and later change their view of

1 their -- wish they had not go through those
2 procedures, do you believe that WPATH was using
3 harmful terminology?
4    A. What terminology specifically are you
5 referring to?
6    Q. "Regret."
7    A. I don't associate any harm with that word.
8    Q. And similarly, when WPATH states that there
9 are adolescents who detransition, do you have any
10 objection to the use of the word "detransition" to
11 describe an individual's return to identifying
12 with his or her natal sex?
13    A. I prefer birth sex re-identification because
14 it's more specific and it tells you what it means.
15    Q. Do you consider the term detransition to be
16 misleading in any way?
17    A. I consider it to be somewhat ambiguous.
18    Q. What is the nature of the ambiguity you're
19 concerned about?
20    A. It's hard to describe ambiguity.
21    Q. Well, you can point to some possible
22 incorrect interpretation of it. Is there some way
23 in which you believe that term is misleading?
24    A. I believe that it could describe many
25 different experiences or phenomena that may not

1 necessarily be related. And that is where the
2 ambiguity, in my mind, stems from.
3    Q. The WPATH authors in column two, about an
4 inch and half down, write "Providers should be
5 prepared to support adolescents who detransition."
6        Do you agree that it's important that
7 providers support adolescents who choose to
8 detransition?
9    A. I believe that providers should support all
10 adolescents in all areas of their life. And that
11 includes agreeing with this sentence.
12    Q. And you've described earlier that Yale has a
13 multidisciplinary approach to providing care for
14 minors with gender dysphoria, correct?
15    A. That's correct.
16    Q. And would you agree that providers,
17 including mental health providers, should support
18 adolescents who detransition?
19    A. Yes, I do agree.
20    Q. And farther down in that, at the very end of
21 that paragraph, the authors write "Many of
22 them" -- referring to -- well, to use their term,
23 detransitioning minors -- Many of them expressed
24 difficulties finding help during their
25 detransition process and reported their

56 (Pages 218 - 221)

Page 222

1 detransition was an isolating experience during
2 which they did not receive either sufficient or
3 appropriate support." Do you see that?
4     A. I do see that.
5     Q. And as a pediatrician and clinician, does it
6 cause you concern that as WPATH reports here,
7 minors who have detransitioned have experienced
8 difficulty in finding support from professionals?
9     A. I don't read this as saying that these
10 patients were unable to find support from
11 professionals. It's more general than that. And
12 I would need to source the study that they cite to
13 learn more. And I will say that there are likely
14 many different reasons why such an individual may
15 experience challenges in receiving sufficient or
16 appropriate support.
17     MS. LEVI: I just want to get a time
18 check.
19     MR. BROOKS: I suspect that's it, right?
20     (DISCUSSION HELD OFF THE RECORD)
21     MR. BROOKS: Thank you for your time.
22 See you in Birmingham. Why that has to be in
23 August is another question.
24     MS. LEVI: I do have a couple
25 questions, --

Page 223

1     MR. BROOKS: Yes, ma'am.
2     MS. LEVI: -- if I may. Do you need a
3 minute?
4     THE DEPONENT: I'm ready.
5     MS. LEVI: I also want to give the
6 attorney from the United States an opportunity if
7 they want to ask some questions. So can we just
8 take two minutes to figure out what we're going to
9 do?
10     MR. BROOKS: Of course, yes.
11     (R E C E S S)
12 CROSS-EXAMINATION
13 BY MS. LEVI:
14     Q. I have one question for you. Has anything
15 that you heard or read today changed your expert
16 opinion regarding the safety and efficacy of
17 gender transition medications for adolescents
18 diagnosed with gender dysphoria?
19     A. No.
20     MS. LEVI: I have nothing further.
21     THE DEPONENT: Thank you.
22     MS. LEVI: Coty, are you there?
23     MS. MONTAG: I'm here, but no questions
24 from the United States.
25     MS. LEVI: Okay. I think we're off the

Page 224

1 record and concluded.
2     THE REPORTER: Could I just get
3 clarification on transcripts?
4     MS. MONTAG: Yes, and I put my email and
5 title and DOJ info in that chat.
6     (WHEREUPON, the deposition was concluded
7 at 5:22 p.m.)

Page 225

1     WITNESS INDEX
2 Witness - DR. MEREDITHE McNAMARA          PAGE
3 Direct Examination by Mr. Brooks          4
4 Cross-Examination by Ms. Levi          223
5
6
7     DEFENDANT'S EXHIBIT INDEX
8 Exhibit 1    Curriculum Vitae          4
9 Exhibit 2    10/10/23 transcript          14
10 Exhibit 3    DSM-V-TR article          24
11 Exhibit 4    Expert Report          29
12 Exhibit 5    Cohort Study in Sweden          35
13 Exhibit 6    Endocrine Society Guidelines     42
14 Exhibit 7    2021 Scientific Statement     48
15 Exhibit 8    "Protecting Transgender Health" 55
16 Exhibit 9    "Psychological Functioning in   66
     Transgender Youth"
17 Exhibit 10   "Consensus Parameters"          66
18 Exhibit 11   "Gender Dysphoria in          77
     Adolescence"
19 Exhibit 12   de Vries/Hannema article     82
20 Exhibit 13   2023 Baxendale Review Article  97
21 Exhibit 14   WPATH SOC-8 chapters          125
22 Exhibit 15   12/12/23 Deposition transcript 130
     of Dr. Ladinsky
23 Exhibit 16   Informed Consent forms     139
24 Exhibit 17   Light article          148
25 Exhibit 18   Schneider 2017 article     157

57 (Pages 222 - 225)

Page 226

1 Exhibit 19    de Nie 2021 article           161
2 Exhibit 20    Washington Post article        184
3 Exhibit 21    British Medical Journal 2023    198
4 Exhibit 22    NHS England article 2024        207
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 227

1         C E R T I F I C A T E
2      I hereby certify that I am a Notary Public
3  in and for the State of Connecticut duly
4  commissioned and qualified to administer oaths.
5  I further certify that the deponent named in the
6  foregoing deposition was by me duly sworn and
7  thereupon testified as appears in the foregoing
8  deposition; that said deposition was taken by me
9  stenographically in the presence of counsel and
10 transcribed by means of computer-aided
11 transcription by the undersigned, and the
12 foregoing is a true and accurate transcript of the
13 testimony.
14 I further certify that I am neither of counsel nor
15 attorney to either of the parties to said suit,
16 nor of either counsel in said suit, nor related to
17 or employed by any of the parties or counsel to
18 said suit, nor am I interested in the outcome of
19 said cause.
20 Witness my hand and seal as Notary Public this
21 26th day of March, 2024.
22
23          _Julia Stryne Bachman_
24      NOTARY PUBLIC
25      My commission expires:  11/30/2027

58 (Pages 226 - 227)