# EXHIBIT 63



INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH
2022, VOL. 23, NO. S1, S1–S258
https://doi.org/10.1080/26895269.2022.2100644



Taylor & Francis
Taylor & Francis Group

REPORT

∂ OPEN ACCESS   ✓ Check for updates

# Standards of Care for the Health of Transgender and Gender Diverse People, Version 8

E. Coleman[1], A. E. Radix[2,3], W. P. Bouman[4,5], G. R. Brown[6,7], A. L. C. de Vries[8,9], M. B. Deutsch[10,11], R. Ettner[12,13], L. Fraser[14], M. Goodman[15], J. Green[16], A. B. Hancock[17], T. W. Johnson[18], D. H. Karasic[19,20], G. A. Knudson[21,22], S. F. Leibowitz[23], H. F. L. Meyer-Bahlburg[24,25], S. J. Monstrey[26], J. Motmans[27,28], L. Nahata[29,30], T. O. Nieder[31], S. L. Reisner[32,33], C. Richards[34,35], L. S. Schechter[36], V. Tangpricha[37,38], A. C. Tishelman[39], M. A. A. Van Trotsenburg[40,41], S. Winter[42], K. Ducheny[43], N. J. Adams[44,45], T. M. Adrián[46,47], L. R. Allen[48], D. Azul[49], H. Bagga[50,51], K. Başar[52], D. S. Bathory[53], J. J. Belinky[54], D. R. Berg[55], J. U. Berli[56], R. O. Bluebond-Langner[57,58], M.-B. Bouman[9,59], M. L. Bowers[60,61], P. J. Brassard[62,63], J. Byrne[64], L. Capitán[65], C. J. Cargill[66], J. M. Carswell[32,67], S. C. Chang[68], G. Chelvakumar[69,70], T. Corneil[71], K. B. Dalke[72,73], G. De Cuypere[74], E. de Vries[75,76], M. Den Heijer[9,77], A. H. Devor[78], C. Dhejne[79,80], A. D'Marco[81,82], E. K. Edmiston[83], L. Edwards-Leeper[84,85], R. Ehrbar[86,87], D. Ehrensaft[19], J. Eisfeld[88], E. Elaut[74,89], L. Erickson-Schroth[90,91], J. L. Feldman[92], A. D. Fisher[93], M. M. Garcia[94,95], L. Gijs[96], S. E. Green[97], B. P. Hall[98,99], T. L. D. Hardy[100,101], M. S. Irwig[32,102], L. A. Jacobs[103], A. C. Janssen[23,104], K. Johnson[105,106], D. T. Klink[107,108], B. P. C. Kreukels[9,109], L. E. Kuper[110,111], E. J. Kvach[112,113], M. A. Malouf[114], R. Massey[115,116], T. Mazur[117,118], C. McLachlan[119,120], S. D. Morrison[121,122], S. W. Mosser[123,124], P. M. Neira[125,126], U. Nygren[127,128], J. M. Oates[129,130], J. Obedin-Maliver[131,132], G. Pagkalos[133,134], J. Patton[135,136], N. Phanuphak[137], K. Rachlin[103], T. Reed[138†], G. N. Rider[55], J. Ristori[93], S. Robbins-Cherry[4], S. A. Roberts[32,139], K. A. Rodriguez-Wallberg[140,141], S. M. Rosenthal[142,143], K. Sabir[144], J. D. Safer[60,145], A. I. Scheim[146,147], L. J. Seal[35,148], T. J. Sehoole[149], K. Spencer[55], C. St. Amand[150,151], T. D. Steensma[9,109], J. F. Strang[152,153], G. B. Taylor[154], K. Tilleman[155], G. G. T'Sjoen[74,156], L. N. Vala[157], N. M. Van Mello[9,158], J. F. Veale[159], J. A. Vencill[160,161], B. Vincent[162], L. M. Wesp[163,164], M. A. West[165,166] and J. Arcelus[5,167]

[1]Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [2]Callen-Lorde Community Health Center, New York, NY, USA; [3]Department of Medicine, NYU Grossman School of Medicine, New York, NY, USA; [4]Nottingham Centre for Transgender Health, Nottingham, UK; [5]School of Medicine, University of Nottingham, Nottingham, UK; [6]James H. Quillen College of Medicine, East Tennessee State University, Johnson City, TN, USA; [7]James H. Quillen VAMC, Johnson City, TN, USA; [8]Department of Child and Adolescent Psychiatry, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, Netherlands; [9]Center of Expertise on Gender Dysphoria, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, The Netherlands; [10]Department of Family & Community Medicine, University of California—San Francisco, San Francisco, CA, USA; [11]UCSF Gender Affirming Health Program, San Francisco, CA, USA; [12]New Health Foundation Worldwide, Evanston, IL, USA; [13]Weiss Memorial Hospital, Chicago, IL, USA; [14]Independent Practice, San Francisco, CA, USA; [15]Emory University Rollins School of Public Health, Atlanta, GA, USA; [16]Independent Scholar, Vancouver, WA, USA; [17]The George Washington University, Washington, DC, USA; [18]Department of Anthropology, California State University, Chico, CA, USA; [19]University of California San Francisco, San Francisco, CA, USA; [20]Independent Practice at dankarasic.com; [21]University of British Columbia, Vancouver, Canada; [22]Vancouver Coastal Health, Vancouver, Canada; [23]Ann & Robert H. Lurie Children's Hospital of Chicago, Chicago, IL, USA; [24]New York State Psychiatric Institute, New York, NY, USA; [25]Department of Psychiatry, Columbia University, New York, NY, USA; [26]Ghent University Hospital, Gent, Belgium; [27]Transgender Infopunt, Ghent University Hospital, Gent, Belgium; [28]Centre for Research on Culture and Gender, Ghent University, Gent, Belgium; [29]Department of Pediatrics, The Ohio State University College of Medicine, Columbus, OH, USA; [30]Endocrinology and Center for Biobehavioral Health, The Abigail Wexner Research Institute at Nationwide Children's Hospital, Columbus, OH, USA; [31]University Medical Center Hamburg-Eppendorf, Interdisciplinary Transgender Health Care Center Hamburg, Institute for Sex Research, Sexual Medicine and Forensic Psychiatry, Hamburg, Germany; [32]Harvard Medical School, Boston, MA, USA; [33]Harvard T. H. Chan School of Public Health, Boston, MA, USA; [34]Regents University London, UK; [35]Tavistock and Portman NHS Foundation Trust, London, UK; [36]Rush University Medical Center, Chicago, IL, USA; [37]Division of Endocrinology, Metabolism & Lipids, Department of Medicine, Emory University School of Medicine, Atlanta, GA, USA; [38]Atlanta VA Medical Center, Decatur, GA, USA; [39]Boston College, Department of Psychology and Neuroscience, Chestnut Hill, MA, USA; [40]Bureau GenderPRO, Vienna, Austria; [41]University Hospital Lilienfeld—St. Pölten, St. Pölten, Austria; [42]School of Population Health, Curtin University, Perth, WA, Australia; [43]Howard Brown Health, Chicago, IL, USA; [44]University of Toronto, Ontario Institute for Studies in Education, Toronto, Canada; [45]Transgender Professional Association for Transgender Health (TPATH); [46]Asamblea Nacional de Venezuela, Caracas, Venezuela; [47]Diverlex Diversidad e Igualdad a Través de la Ley, Caracas, Venezuela;

CONTACT Dr Eli Coleman, PhD ✉ Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA
†Deceased.

© 2022 The Author(s). Published with license by Taylor & Francis Group, LLC.
This is an Open Access article distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives License (http://creativecommons.org/licenses/by-nc-nd/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited, and is not altered, transformed, or built upon in any way.

S2 ⊖ E. COLEMAN ET AL.

[48]University of Nevada, Las Vegas, NV, USA; [49]La Trobe Rural Health School, La Trobe University, Bendigo, Australia; [50]Monash Health Gender Clinic, Melbourne, Victoria, Australia; [51]Monash University, Melbourne, Victoria, Australia; [52]Department of Psychiatry, Hacettepe University, Ankara, Turkey; [53]Independent Practice at Bathory International PLLC, Winston-Salem, NC, USA; [54]Durand Hospital, Guemes Clinic and Urological Center, Buenos Aires, Argentina; [55]National Center for Gender Spectrum Health, Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [56]Oregon Health & Science University, Portland, OR, USA; [57]NYU Langone Health, New York, NY, USA; [58]Hansjörg Wyss Department of Plastic Surgery, New York, NY, USA; [59]Department of Plastic Surgery, Amsterdam UMC Location Vrije Universiteit Amsterdam , Amsterdam, Netherlands; [60]Icahn School of Medicine at Mount Sinai, New York, NY, USA; [61]Mills-Peninsula Medical Center, Burlingame, CA, USA; [62]GrS Montreal, Complexe CMC, Montreal, Quebec, Canada; [63]Université de Montreal, Quebec, Canada; [64]University of Waikato/Te Whare Wānanga o Waikato, Hamilton/Kirikiriroa, New Zealand/Aotearoa; [65]The Facialteam Group, Marbella International Hospital, Marbella, Spain; [66]Independent Scholar; [67]Boston's Children's Hospital, Boston, MA, USA; [68]Independent Practice, Oakland, CA, USA; [69]Nationwide Children's Hospital, Columbus, OH, USA; [70]The Ohio State University, College of Medicine, Columbus, OH, USA; [71]School of Population & Public Health, University of British Columbia, Vancouver, BC, Canada; [72]Penn State Health, PA, USA; [73]Penn State College of Medicine, Hershey, PA, USA; [74]Center for Sexology and Gender, Ghent University Hospital, Gent, Belgium; [75]Nelson Mandela University, Gqeberha, South Africa; [76]University of Cape Town, Cape Town, South Africa; [77]Department of Endocrinology, Amsterdam UMC Location Vrije Universiteit Amsterdam , Amsterdam, Netherlands; [78]University of Victoria, Victoria, BC, Canada; [79]ANOVA, Karolinska University Hospital, Stockholm, Sweden; [80]Department of Medicine Huddinge, Karolinska Institutet, Stockholm, Sweden; [81]UCTRANS—United Caribbean Trans Network, Nassau, The Bahamas; [82]D M A R C O Organization, Nassau, The Bahamas; [83]University of Pittsburgh School of Medicine, Pittsburgh, PA, USA; [84]Pacific University, Hillsboro, OR, USA; [85]Independent Practice, Beaverton, OR, USA; [86]Whitman Walker Health, Washington, DC, USA; [87]Independent Practice, Maryland, USA; [88]Transvisie, Utrecht, The Netherlands; [89]Department of Clinical Experimental and Health Psychology, Ghent University, Gent, Belgium; [90]The Jed Foundation, New York, NY, USA; [91]Hetrick-Martin Institute, New York, NY, USA; [92]Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [93]Andrology, Women Endocrinology and Gender Incongruence, Careggi University Hospital, Florence, Italy; [94]Department of Urology, Cedars-Sinai Medical Center, Los Angeles, CA, USA; [95]Departments of Urology and Anatomy, University of California San Francisco, San Francisco, CA, USA; [96]Institute of Family and Sexuality Studies, Department of Neurosciences, KU Leuven, Leuven, Belgium; [97]Mermaids, London/Leeds, UK; [98]Duke University Medical Center, Durham, NC, USA; [99]Duke Adult Gender Medicine Clinic, Durham, NC, USA; [100]Alberta Health Services, Edmonton, Alberta, Canada; [101]MacEwan University, Edmonton, Alberta, Canada; [102]Beth Israel Deaconess Medical Center, Boston, MA, USA; [103]Independent Practice, New York, NY, USA; [104]Northwestern Feinberg School of Medicine, Chicago, IL, USA; [105]RMIT University, Melbourne, Australia; [106]University of Brighton, Brighton, UK; [107]Department of Pediatrics, Division of Pediatric Endocrinology, Ghent University Hospital, Gent, Belgium; [108]Division of Pediatric Endocrinology and Diabetes, ZNA Queen Paola Children's Hospital, Antwerp, Belgium; [109]Department of Medical Psychology, Amsterdam UMC Location Vrije Universiteit Amsterdam , Amsterdam, Netherlands; [110]Department of Psychiatry, Southwestern Medical Center, University of Texas, Dallas, TX, USA; [111]Department of Endocrinology, Children's Health, Dallas, TX, USA; [112]Denver Health, Denver, CO, USA; [113]University of Colorado School of Medicine, Aurora, CO, USA; [114]Malouf Counseling and Consulting, Baltimore, MD, USA; [115]WPATH Global Education Institute; [116]Department of Psychiatry & Behavioral Sciences, Emory University School of Medicine, Atlanta, GA, USA; [117]Jacobs School of Medicine and Biomedical Sciences, University at Buffalo, Buffalo, NY, USA; [118]John R. Oishei Children's Hospital, Buffalo, NY, USA; [119]Professional Association for Transgender Health, South Africa; [120]Gender DynamiX, Cape Town, South Africa; [121]Division of Plastic Surgery, Seattle Children's Hospital, Seattle, WA, USA; [122]Division of Plastic Surgery, Department of Surgery, University of Washington Medical Center, Seattle, WA, USA; [123]Gender Confirmation Center, San Francisco, CA, USA; [124]Saint Francis Memorial Hospital, San Francisco, CA, USA; [125]Johns Hopkins Center for Transgender Health, Baltimore, MD, USA; [126]Johns Hopkins Medicine Office of Diversity, Inclusion and Health Equity, Baltimore, MD, USA; [127]Division of Speech and Language Pathology, Department of Clinical Science, Intervention and Technology, Karolinska Institutet, Stockholm, Sweden; [128]Speech and Language Pathology, Medical Unit, Karolinska University Hospital, Stockholm, Sweden; [129]La Trobe University, Melbourne, Australia; [130]Melbourne Voice Analysis Centre, East Melbourne, Australia; [131]Stanford University School of Medicine, Department of Obstetrics and Gynecology, Palo Alto, CA, USA; [132]Department of Epidemiology and Population Health, Stanford, CA, USA; [133]Independent PracticeThessaloniki, Greece; [134]Military Community Mental Health Center, 424 General Military Training Hospital, Thessaloniki, Greece; [135]Talkspace, New York, NY, USA; [136]CytiPsychological LLC, San Diego, CA, USA; [137]Institute of HIV Research and Innovation, Bangkok, Thailand; [138]Gender Identity Research and Education Society, Leatherhead, UK; [139]Division of Endocrinology, Boston's Children's Hospital, Boston, MA, USA; [140]Department of Reproductive Medicine, Karolinska University Hospital, Stockholm, Sweden; [141]Department of Oncology-Pathology, Karolinska Institute, Stockholm, Sweden; [142]Division of Pediatric Endocrinology, UCSF, San Francisco, CA, USA; [143]UCSF Child and Adolescent Gender Center; [144]FtM Phoenix Group, Krasnodar Krai, Russia; [145]Mount Sinai Center for Transgender Medicine and Surgery, New York, NY, USA; [146]Epidemiology and Biostatistics, Dornsife School of Public Health, Drexel University, Philadelphia, PA, USA; [147]Epidemiology and Biostatistics, Schulich School of Medicine and Dentistry, Western University, Ontario, Canada; [148]St George's University Hospitals NHS Foundation Trust, London, UK; [149]Iranti, Johannesburg, South Africa; [150]University of Houston, Houston, TX, USA; [151]Mayo Clinic, Rochester, MN, USA; [152]Children's National Hospital, Washington, DC, USA; [153]George Washington University School of Medicine, Washington, DC, USA; [154]Atrium Health Department of Obstetrics and Gynecology, Division of Female Pelvic Medicine and Reconstructive Surgery, Charlotte, NC, USA; [155]Department for Reproductive Medicine, Ghent University Hospital, Gent, Belgium; [156]Department of Endocrinology, Ghent University Hospital, Gent, Belgium; [157]Independent Practice, Campbell, CA, USA; [158]Department of Obstetrics and Gynaecology, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, Netherlands; [159]School of Psychology, University of Waikato/Te Whare Wānanga o Waikato, Hamilton/Kirikiriroa, New Zealand/Aotearoa; [160]Department of Psychiatry & Psychology, Mayo Clinic, Rochester, MN, USA; [161]Division of General Internal Medicine, Mayo Clinic, Rochester, MN, USA; [162]Trans Learning Partnership at https://spectra-london.org.uk/trans-learning-partnership, UK; [163]College of Nursing, University of Wisconsin MilwaukeeMilwaukee, WI, USA; [164]Health Connections Inc., Glendale, WI, USA; [165]North Memorial Health Hospital, Robbinsdale, MN, USA; [166]University of Minnesota, Minneapolis, MN, USA; [167]Belivitge Biomedical Research Institute (IDIBELL), L'Hospitalet de Llobregat, Barcelona, Spain.

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH  53

**ABSTRACT**

***Background:*** Transgender healthcare is a rapidly evolving interdisciplinary field. In the last decade, there has been an unprecedented increase in the number and visibility of transgender and gender diverse (TGD) people seeking support and gender-affirming medical treatment in parallel with a significant rise in the scientific literature in this area. The World Professional Association for Transgender Health (WPATH) is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health. One of the main functions of WPATH is to promote the highest standards of health care for TGD people through the Standards of Care (SOC). The SOC was initially developed in 1979 and the last version (SOC-7) was published in 2012. In view of the increasing scientific evidence, WPATH commissioned a new version of the Standards of Care, the SOC-8.

***Aim:*** The overall goal of SOC-8 is to provide health care professionals (HCPs) with clinical guidance to assist TGD people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment.

***Methods:*** The SOC-8 is based on the best available science and expert professional consensus in transgender health. International professionals and stakeholders were selected to serve on the SOC-8 committee. Recommendation statements were developed based on data derived from independent systematic literature reviews, where available, background reviews and expert opinions. Grading of recommendations was based on the available evidence supporting interventions, a discussion of risks and harms, as well as the feasibility and acceptability within different contexts and country settings.

***Results:*** A total of 18 chapters were developed as part of the SOC-8. They contain recommendations for health care professionals who provide care and treatment for TGD people. Each of the recommendations is followed by explanatory text with relevant references. General areas related to transgender health are covered in the chapters Terminology, Global Applicability, Population Estimates, and Education. The chapters developed for the diverse population of TGD people include Assessment of Adults, Adolescents, Children, Nonbinary, Eunuchs, and Intersex Individuals, and people living in Institutional Environments. Finally, the chapters related to gender-affirming treatment are Hormone Therapy, Surgery and Postoperative Care, Voice and Communication, Primary Care, Reproductive Health, Sexual Health, and Mental Health.

***Conclusions:*** The SOC-8 guidelines are intended to be flexible to meet the diverse health care needs of TGD people globally. While adaptable, they offer standards for promoting optimal health care and guidance for the treatment of people experiencing gender incongruence. As in all previous versions of the SOC, the criteria set forth in this document for gender-affirming medical interventions are clinical guidelines; individual health care professionals and programs may modify these in consultation with the TGD person.

**KEYWORDS**

adolescents; assessment; children; communication; education; endocrinology; eunuch; gender diverse; health care professional; institutional settings; intersex; mental health; nonbinary; population; postoperative care; primary care; reproductive health; sexual health; SOC8; Standards of Care; surgery; terminology; transgender; voice

## Table of contents

|  |  | Page No. |
|---|---|---|
| | Introduction | S5 |
| Chapter 1. | Terminology | S11 |
| Chapter 2. | Global Applicability | S15 |
| Chapter 3. | Population Estimates | S23 |
| Chapter 4. | Education | S27 |
| Chapter 5. | Assessment of Adults | S31 |
| Chapter 6. | Adolescents | S43 |
| Chapter 7. | Children | S67 |
| Chapter 8. | Nonbinary | S80 |
| Chapter 9. | Eunuchs | S88 |
| Chapter 10. | Intersex | S93 |
| Chapter 11. | Institutional Environments | S104 |
| Chapter 12. | Hormone Therapy | S110 |
| Chapter 13. | Surgery and Postoperative Care | S128 |
| Chapter 14. | Voice and Communication | S137 |
| Chapter 15. | Primary Care | S143 |
| Chapter 16. | Reproductive Health | S156 |
| Chapter 17. | Sexual Health | S163 |
| Chapter 18. | Mental Health | S171 |
| | Acknowledgements | S177 |
| | References | S178 |
| | Appendix A: Methodology | S247 |
| | Appendix B: Glossary | S252 |
| | Appendix C: Gender-Affirming Hormonal Treatments | S254 |
| | Appendix D: Summary Criteria for Hormonal and Surgical Treatments for Adults and Adolescents | S256 |
| | Appendix E: Gender-Affirming Surgical Procedures | S258 |

## INTRODUCTION

### Purpose and use of the Standards of Care

The overall goal of the World Professional Association for Transgender Health's (WPATH) Standards of Care—Eighth Edition (SOC-8) is to provide clinical guidance to health care professionals to assist transgender and gender diverse (TGD) people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment. This assistance may include but is not limited to hormonal and surgical treatments, voice and communication therapy, primary care, hair removal, reproductive and sexual health, and mental health care. Healthcare systems should provide medically necessary gender-affirming health care for TGD people: See Chapter 2—Global Applicability, Statement 2.1.

WPATH is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health. Founded in 1979, the organization currently has over 3,000 health care professionals, social scientists, and legal professionals, all of whom are engaged in clinical practice, research, education and advocacy that affects the lives of TGD people. WPATH envisions a world wherein people of all gender identities and gender expressions have access to evidence-based health care, social services, justice, and equality.

One of the main functions of WPATH is to promote the highest standards of health care for individuals through the Standards of Care (SOC) for the health of TGD people. The SOC-8 is based on the best available science and expert professional consensus. The SOC was initially developed in 1979, and the last version was published in 2012.

Most of the research and experience in this field comes from a North American and Western European perspective; thus, adaptations of the SOC-8 to other parts of the world are necessary. Suggestions for approaches to cultural relativity and cultural competence are included in this version of the SOC.

WPATH recognizes that health is not only dependent upon high-quality clinical care but also relies on social and political climates that ensure social tolerance, equality, and the full rights of citizenship. Health is promoted through public policies and legal reforms that advance tolerance and equity for gender diversity and that eliminate prejudice, discrimination, and stigma. WPATH is committed to advocacy for these policy and legal changes. Thus, health care professionals who provide care to TGD people are called upon to advocate for improved access to safe and licensed gender-affirming care while respecting the autonomy of individuals.

While this is primarily a document for health care professionals, individuals, their families, and social institutions may also use the SOC-8 to understand how it can assist with promoting optimal health for members of this diverse population.

The SOC-8 has 18 chapters containing recommendations for health care professionals working with TGD people. Each of the recommendations is followed by explanatory text with relevant references. The recommendations for the initiation of gender-affirming medical and/or surgical treatments (GAMSTs) for adults and adolescents are contained in their respective chapters (see Assessment for Adults and Adolescent chapters). A summary of the recommendations and criteria for GAMST can be found in Appendix D.

### Populations included in the SOC-8

In this document, we use the phrase transgender and gender diverse (TGD) to be as broad and comprehensive as possible in describing members of the many varied communities that exist globally of people with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. This includes people who are culturally specific and/or language-specific experiences, identities or expressions, which may or may not be based on or encompassed by Western conceptualizations of gender or the language used to describe it.

WPATH SOC-8 expands who is included under the TGD umbrella, and the settings in which these guidelines should be applied to promote equity and human rights.

Globally, TGD people encompass a diverse array of gender identities and expressions and have differing needs for gender-affirming care across their lifespan that is related to individual goals and characteristics, available health care resources, and sociocultural and political contexts. When standards of care are absent for certain groups this vacuum can result in a multiplicity of therapeutic approaches, including those that may be counterproductive or harmful. The SOC-8 includes recommendations to promote health and well-being for gender diverse groups that have often been neglected and/or marginalized, including nonbinary people, eunuch, and intersex individuals.

The SOC-8 continues to outline the appropriate care of TGD youth, which includes, when indicated, the use of puberty suppression and, when indicated, the use of gender-affirming hormones.

Worldwide, TGD people commonly experience transphobia, stigmatization, ignorance, and refusal of care when seeking health care services, which contributes to significant health disparities. TGD people often report having to teach their medical providers how to care for them due to the latter's insufficient knowledge and training. Intersectional forms of discrimination, social marginalization, and hate crimes against TGD people lead to minority stress. Minority stress is associated with mental health disparities exemplified by increased rates of depression, suicidality, and non-suicidal self-injuries than rates in cisgender populations. Professionals from every discipline should consider the marked vulnerability of many TGD people. WPATH urges health care authorities, policymakers, and medical societies to discourage and combat transphobia among health care professionals and ensure every effort is made to refer TGD people to professionals with experience and willingness to provide gender-affirming care.

### Flexibility in the SOC

The SOC-8 guidelines are intended to be flexible to meet the diverse health care needs of TGD people globally. While adaptable, they offer standards for promoting optimal health care and for guiding treatment of people experiencing gender incongruence. As in all previous versions of the SOC, the criteria put forth in this document for gender-affirming interventions are clinical guidelines; individual health care professionals and programs may modify them in consultation with the TGD person. Clinical departures from the SOC may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health care professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm-reduction strategies. These departures should be recognized as such, explained to the patient, and documented for quality patient care and legal protection. This documentation is also valuable for the accumulation of new data, which can be retrospectively examined to allow for health care—and the SOC—to evolve.

The SOC-8 supports the role of informed decision-making and the value of harm reduction approaches. In addition, this version of the SOC recognizes and validates various expressions of gender that may not necessitate psychological, hormonal, or surgical treatments. Health care professionals can use the SOC to help patients consider the full range of health services open to them in accordance with their clinical needs for gender expression.

### Diversity versus Diagnosis

The expression of gender characteristics, including identities, that are not stereotypically associated with one's sex assigned at birth is a common and a culturally diverse human phenomenon that should not be seen as inherently negative or pathological. Unfortunately, gender nonconformity and diversity in gender identity and expression is stigmatized in many societies around the world. Such stigma can lead to prejudice and discrimination, resulting in "minority stress." Minority stress is unique (additive to general stressors experienced by all people), socially based, and chronic, and may make TGD individuals more vulnerable to developing mental health concerns such as anxiety and depression. In addition to prejudice and discrimination in society at large, stigma can contribute to abuse and

neglect in one's interpersonal relationships, which in turn can lead to psychological distress. However, these symptoms are socially induced and are not inherent to being TGD.

While Gender Dysphoria (GD) is still considered a mental health condition in the Diagnostic and Statistical Manual of Mental Disorders, (DSM-5-TR) of the American Psychiatric Association. Gender incongruence is no longer seen as pathological or a mental disorder in the world health community. Gender Incongruence is recognized as a condition in the International Classification of Diseases and Related Health Problems, 11th Version of the World Health Organization (ICD-11). Because of historical and current stigma, TGD people can experience distress or dysphoria that may be addressed with various gender-affirming treatment options. While nomenclature is subject to change and new terminology and classifications may be adopted by various health organizations or administrative bodies, the medical necessity of treatment and care is clearly recognized for the many people who experience dissonance between their sex assigned at birth and their gender identity.

Not all societies, countries, or health care systems require a diagnosis for treatment. However, in some countries these diagnoses may facilitate access to medically necessary health care and can guide further research into effective treatments.

### Health care services

The goal of gender-affirming care is to partner with TGD people to holistically address their social, mental, and medical health needs and well-being while respectfully affirming their gender identity. Gender-affirming care supports TGD people across the lifespan—from the very first signs of gender incongruence in childhood through adulthood and into older age—as well as people with concerns and uncertainty about their gender identity, either prior to or after transition.

Transgender health care is greater than the sum of its parts, involving holistic inter- and multidisciplinary care between endocrinology, surgery, voice and communication, primary care, reproductive health, sexual health and mental

health disciplines to support gender-affirming interventions as well as preventive care and chronic disease management. Gender-affirming interventions include puberty suppression, hormone therapy, and gender-affirming surgeries among others. It should be emphasized there is no 'one-size-fits-all' approach and TGD people may need to undergo all, some, or none of these interventions to support their gender affirmation. These guidelines encourage the use of a patient-centered care model for initiation of gender- affirming interventions and update many previous requirements to reduce barriers to care.

Ideally, communication and coordination of care should occur between providers to optimize outcomes and the timing of gender-affirming interventions centered on the patient's needs and desires and to minimize harm. In well-resourced settings, multidisciplinary consultation and care coordination is often routine, but many regions worldwide lack facilities dedicated to transgender care. For these regions, if possible, it is strongly recommended that individual care providers create a network to facilitate transgender health care that is not available locally.

Worldwide, TGD people are sometime forced by family members or religious communities to undergo conversion therapy. WPATH strongly recommends against any use of reparative or conversion therapy (see statements 6.5 and 18.10).

### Health care settings

The SOC-8 are guidelines rooted in the fundamental rights of TGD people that apply to all settings in which health care is provided regardless of an individual's social or medical circumstances. This includes a recommendation to apply the standards of care for TGD people who are incarcerated or living in other institutional settings.

Due to a lack of knowledgeable providers, untimely access, cost barriers and/or previous stigmatizing health care experiences, many TGD people take non-prescribed hormone therapy. This poses health risks associated with the use of unmonitored therapy in potentially supratherapeutic doses and the potential exposure to blood-borne illnesses if needles are shared for administration. However, for many individuals, it is the only means of acquiring medically necessary

gender-affirming treatment that is otherwise inaccessible. Non-prescribed hormone use should be approached with a harm-reduction lens to ensure individuals are connected with providers who can prescribe safe and monitored hormone therapy.

In some countries, the rights of TGD are increasingly being recognized, and gender clinics are being established that can serve as templates for care. In other countries, however, such facilities are lacking and care may be more fragmented and under-resourced. Nonetheless, different models of care are being pioneered, including efforts to decentralize gender-affirming care within primary care settings and establish telehealth services to reduce barriers and improve access. Regardless of the method of care delivery, the principles of gender-affirming care as outlined in the SOC-8 should be adapted to align with local sociocultural, political, and medical contexts.

### Methodology

This version of the Standards of Care (SOC-8) is based upon a more rigorous and methodological evidence-based approach than previous versions. This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion. Evidence-based guidelines include recommendations intended to optimize patient care that are informed by a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility.

While evidence-based research provides the basis for sound clinical practice guidelines and recommendations, it must be balanced by the realities and feasibility of providing care in diverse settings. The process for development of the SOC-8 incorporated the recommendations on clinical practice guideline development set forth by the National Academies of Medicine and the World Health Organization, which addressed transparency, conflict-of-interest policy, committee composition, and group process.

The SOC-8 guidelines committee was multidisciplinary and consisted of subject matter experts, health care professionals, researchers, and stakeholders with diverse perspectives and geographic representation. A guideline methodologist assisted with the planning and development of questions and systematic reviews with additional input provided by an international advisory committee and during the public comment period. All committee members completed conflict of interest declarations. Recommendations in the SOC-8 are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. Consensus on the final recommendations was attained using the Delphi process that included all members of the guidelines committee and required that recommendation statements were approved by at least 75% of members. A detailed overview of the SOC-8 Methodology is included in Appendix A.

### SOC-8 Chapters Summary

The SOC-8 represents a significant advancement from previous versions. Changes in this version are based upon a fundamentally different methodology, significant cultural shifts, advances in clinical knowledge, and appreciation of the many health care issues that can arise for TGD people beyond hormone therapy and surgery.

These updated guidelines continue the process started with the SOC-7 in 2011 to broaden in scope and move from a narrow focus on psychological requirements for "diagnosing transgenderism" and medical treatments for alleviation of gender dysphoria to gender-affirming care for the whole person. WPATH SOC-8 expands guidelines specifying who is included under the TGD umbrella, what should and should not be offered with gender-affirming care, and the settings in which these guidelines should be applied to promote equity and human rights.

The SOC-8 has several new chapters such as the Assessment of Adults, Education, Eunuchs, and a Nonbinary chapter. In addition, the chapter for children and adolescents of the SOC-7 has been divided into two different chapters. Overall, the SOC-8 is considerably longer than previous versions and provides a more in-depth introduction and recommendations for health care professionals. A summary of every chapter of the SOC-8 can be found below:



### Chapter 1—Terminology

This new chapter lays the framework for language used in the SOC-8 and offers consensually agreed upon recommendations for the use of terminology. The chapter provides (1) terms and definitions, and (2) best practices for utilizing them. This document is accompanied by a glossary (see Appendix B) of common terms and language to provide a framework for use and interpretation of the SOC-8.

### Chapter 2—Global Applicability

This chapter references key literature related to development and delivery of health care services, broader advocacy care for TGD people from beyond Western Europe and North America and provides recommendations for adapting and translating the SOC-8 to varied contexts.

### Chapter 3—Population Estimates

This chapter updates the population estimates of TGD people in society. Based on the current evidence, this proportion may range from a fraction of a percent to several percentage points depending on the inclusion criteria, age group, and geographic location.

### Chapter 4—Education

This new chapter provides a general review of the literature related to education in TGD health care. It offers recommendations at governmental, nongovernmental, institutional and provider levels to increase access to competent, compassionate health care. The intent is to lay the groundwork in the education area and invite a much broader and deeper discussion among educators and health care professionals.

### Chapter 5—Assessment of Adults

This new chapter provides guidance on the assessment of TGD adults who are requesting gender-affirming medical and surgical treatments (GAMSTs). It describes and updates the assessment process as part of a patient-centered approach and the criteria that health care professionals may follow in order to recommend GAMSTs to TGD adults.

### Chapter 6—Adolescents

This new chapter is dedicated to TGD adolescents, is distinct from the child chapter, and has been created for this 8th edition of the Standards of Care given (1) the exponential growth in adolescent referral rates; (2) the increase in studies available specific to adolescent gender diversity-related care; and (3) the unique developmental and gender-affirming care issues of this age group. This chapter provides recommendations regarding the assessment process of adolescents requiring GAMSTs as well as recommendations when working with TGD youth and their families.

### Chapter 7—Children

This new chapter pertains to prepubescent gender diverse children and focuses on developmentally appropriate psychosocial practices and therapeutic approaches.

### Chapter 8—Nonbinary

This new chapter in the SOC-8 consists of a broad description of the term nonbinary and its usage from a biopsychosocial, cultural, and intersectional perspective. The need for access to gender-affirming care, specific gender-affirming medical interventions, as well as an appropriate level of support is discussed.

### Chapter 9—Eunuchs

This new chapter describes the unique needs of eunuchs, and how the SOC can be applied to this population.

### Chapter 10—Intersex

This chapter focuses on the clinical care of intersex individuals. It addresses the evolving terminology, prevalence, and diverse presentations of such individuals and provides recommendations for providing psychosocial and medical care with their evidence-based explanations.

### Chapter 11—Institutional Environments

This chapter has been expanded to include both carceral and non-carceral settings and has been built upon the last 3 versions of the SOC. This chapter describes how the SOC-8 can be applied to individuals living in these settings.

### Chapter 12—Hormone Therapy

This chapter describes the initiation of gender-affirming hormone therapy, the recommended regimens, screening for health concerns before and during hormone therapy, and specific considerations regarding hormone therapy prior to surgery. It includes an expanded discussion about the safety of gonadotropin releasing hormone (GnRH) agonists in youth, various hormone regimens, monitoring to include the development of potential therapy-related health concerns, and guidance on how hormone providers should collaborate with surgeons.

### Chapter 13—Surgery and Postoperative Care

This chapter describes a spectrum of gender-affirming surgical procedures for the diverse and heterogeneous community of individuals who identify as TGD. It provides a discussion about the optimal surgical training in GAS procedures, post-surgical aftercare and follow-up, access to surgery by adults and adolescents, and individually customized surgeries.

### Chapter 14—Voice and Communication

This chapter describes professional voice and communication support and interventions that are inclusive of and attentive to all aspects of diversity and no longer limited only to voice feminization and masculinization. Recommendations are now framed as affirming the roles and responsibilities of professionals involved in voice and communication support.

### Chapter 15—Primary Care

This chapter discusses the importance of primary care for TGD individuals, including topics of cardiovascular and metabolic health, cancer screening, and primary care systems.

### Chapter 16—Reproductive Health

This chapter provides recent data on fertility perspectives and parenthood goals in gender diverse youth and adults, advances in fertility preservation methods (including tissue cryopreservation), guidance regarding preconception and pregnancy care, prenatal counseling, and chest feeding. Contraceptive methods and considerations for TGD individuals are also reviewed.

### Chapter 17—Sexual Health

This new chapter acknowledges the profound impact of sexual health on physical and psychological well-being for TGD people. The chapter advocates for sexual functioning, pleasure, and satisfaction to be included in TGD-related care.

### Chapter 18—Mental Health

This chapter discusses principles of care for managing mental health conditions in TGD adults and the nexus of mental health care and transition care. Psychotherapy may be beneficial but should not be a requirement for gender-affirming treatment, and conversion treatment should not be offered.

## CHAPTER 1 Terminology

This chapter will lay the framework for language used in the SOC-8. It offers recommendations for use of terminology. It provides (1) terms and definitions, and (2) best practices for utilizing them. This document is accompanied by a glossary of common terms and language to provide a framework for use and interpretation of the SOC-8. See Appendix B for glossary.

### Terminology

In this document, we use the phrase transgender and gender diverse (TGD) to be as broad and comprehensive as possible in describing members of the many varied communities globally of people with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. This includes people who have culturally specific and/or language-specific experiences, identities or expressions, and/or that are not based on or encompassed by Western conceptualizations of gender, or the language used to describe it. TGD is used for convenience as a shorthand for transgender and gender diverse.

The decision to use transgender and gender diverse resulted from an active process and was not without controversy. Discussions centered on avoiding over-emphasis on the term transgender, integrating nonbinary gender identities and experiences, recognizing global variations in understandings of gender, avoiding the term gender nonconforming, and recognizing the changing nature of language because what is current now may not be so in coming years. Thus, the term transgender and gender diverse was chosen with the intent to be most inclusive and to highlight the many diverse gender identities, expressions, experiences, and health care needs of TGD people. A Delphi process was used wherein SOC-8 chapter authors were anonymously and iteratively surveyed over several rounds to obtain consensus on terms. The SOC-8 presents standards of care that strive to be applicable to TGD people globally, no matter how a person self-identifies or expresses their gender.

### Context

The language selected in this chapter may not be (nor ever could be) comprehensive of every culture and geographic region/locale. Differences and debates over appropriate terms and specific terminologies are common, and no single term can be used without controversy. The goal of this chapter is to be as inclusive as possible and offer a shared vocabulary that is respectful and reflective of varied experiences of TGD people while remaining accessible to health practitioners and providers, and the public, for the purposes of this document. Ultimately, access to transition-related health care should be based on providing adequate information and obtaining informed consent from the individual, and not on what words TGD people, or their service providers, use to describe their identities. Using language and terminology that is respectful and culturally responsive is a basic foundation in the provision of affirming care, as is reducing the stigma and harm experienced by many TGD people seeking health care. It is vital for service providers to discuss with service users what language is most comfortable for them and to use that language whenever possible.

This chapter explains why current terms are being used in preference to others. Rather than use specific terms for medical, legal, and advocacy groups, the aim is to foster a shared language and understanding in the field of TGD health, and the many related fields (e.g., epidemiology, law), in order to optimize the health of transgender and gender diverse people.

Sex, gender, gender identity, and gender expression are used in the English language as descriptors that can apply to all people—those who are TGD, and those who are not. There are complex reasons why very specific language may be the *most* respectful, *most* inclusive, or *most* accepted by global TGD communities, including the presence or absence of words to describe these concepts in languages other than English; the structural relationship between sex and gender; legal landscapes at the local, national, and international levels; and the consequences of historical and present-day stigma that TGD people face.

---

**Statements of Recommendations**

1.1- We recommend health care professionals use culturally relevant language (including terms to describe transgender and gender diverse people) when applying the Standards of Care in different global settings.

1.2- We recommend health care professionals use language in health care settings that uphold the principles of safety, dignity, and respect.

1.3- We recommend health care professionals discuss with transgender and gender diverse people what language or terminology they prefer.

---

Because at present, the field of TGD health is heavily dominated by the English language, there are two specific problems that constantly arise in setting the context for terminology. The first problem is that words exist in English that do not exist in other languages (e.g., "sex" and "gender" are only represented by one word in Urdu and many other languages). The second problem is that there are words that exist outside of English that do not have a direct translation into English (e.g., *travesti, fa'afafine, hijra, selrata, muxe, kathoey, transpinoy, waria, machi*). Practically, this means the heavy influence of English in this field impacts both what terms are widely used and which people or identities are most represented or validated by those terms. The words used also shape the narratives that contribute to beliefs and perceptions. While in past versions of the Standards of Care, World Professional Association for Transgender Health (WPATH) has used only transgender as a broadly defined umbrella term, version 8 broadens this language to use TGD as the umbrella term throughout the document (see Chapter 2—Global Applicability).

Furthermore, the ever-evolving nature of language is impacted by external factors and the social, structural, and personal pressures and violence enacted on TGD people and their bodies. Many of the terms and phrases used historically have been marred by how, when, and why they were used in discussing TGD people, and have thus fallen out of use or are hotly contested among TGD people, with some individuals preferring terms others find offensive. Some wish that these Standards of Care could provide a coherent set of universally accepted terms to describe TGD people, identities, and related health services. Such a list, however, does not and cannot exist without exclusion of some people and without reinforcing structural oppressions, with regards to race,

national origin, Indigenous status, socioeconomic status, religion, language(s) spoken, and ethnicity, among other intersectionalities. It is very likely that at least some of the terminology used in SOC-8 will be outdated by the time version 9 is developed. Some people will be frustrated by this reality, but it is hoped it will be seen instead as an opportunity for individuals and communities to develop and refine their own lexicons and for people to develop a still more nuanced understanding of the lives and needs of TGD people, including TGD people's resilience and resistance to oppression.

Finally, law and the work of legal professionals are within the remit of these Standards of Care. As such, language used most widely in international law is included here to help with the development of the functional definitions of these terms and encourage their usage in legal contexts in lieu of more antiquated and/or offensive terms. The currently most thorough document in international human rights law uses the term "gender diverse."[1]

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 1.1

**We recommend health care professionals use culturally relevant language (including terms to describe transgender and gender diverse people) when applying the Standards of Care in different global settings.**

Culturally relevant language is used to describe TGD people in different global settings. For example, the concepts of sex, gender, and gender diversity differ across contexts, as does the language used to describe them. Thus, the language used when caring

for TGD people in Thailand is not going to be the same as that used for TGD care in Nigeria. When applying the Standards of Care globally, we recommend health care professionals (HCPs) utilize local language and terms to deliver care in their specific cultural and/or geographical locale.

Gender affirmation refers to the process of recognizing or affirming TGD people in their gender identity—whether socially, medically, legally, behaviorally, or some combination of these (Reisner, Poteat et al., 2016). Health care that is gender-affirming or trans-competent utilizes culturally specific language in caring for TGD people. Gender-affirming care is not synonymous with transition-related care. Provision of transition-related care, such as medical gender affirmation via hormones or surgery, does not alone ensure provision of gender-affirming care, nor does it indicate the quality or safety of the health care provided.

Consultation and partnerships with TGD communities can help to ensure relevancy and inclusivity of the language used in providing health care locally in a particular context and setting.

Statement 1.2

**We recommend health care professionals use language in health care settings that upholds the principles of safety, dignity, and respect.**

Safety, dignity, and respect are basic human rights (International Commission of Jurists, 2007). We recommend HCPs utilize language and terminology that uphold these human rights when providing care for TGD people. Many TGD people have experienced stigma, discrimination, and mistreatment in health care settings, resulting in suboptimal care and poor health outcomes (Reisner, Poteat et al., 2016; Safer et al., 2016; Winter, Settle et al., 2016). Such experiences include misgendering, being refused care or denied services when sick or injured and having to educate HCPs to be able to receive adequate care (James et al., 2016). Consequently, many TGD people feel unsafe accessing health care. They may avoid health care systems and seek other means of getting health-related needs met, such as taking hormones without a medical prescription or monitoring and relying on peers for medical advice. Furthermore, previous negative experiences in health care settings are associated with future avoidance of care among TGD people.

Many TGD people have been treated unjustly, with prejudice, and without dignity or respect by HCPs, and lack of trust is often a barrier to care. Using language grounded in the principles of safety, dignity, and respect in health care settings is paramount to ensure the health, well-being, and rights of TGD people globally. Language is a significant component of gender-affirming care, but language alone does not resolve or mitigate the systematic abuse and sometimes violence TGD people face globally in care settings. Language is but one important step toward patient/client-centered and equitable health care among TGD people. Other concrete actions HCPs can take include obtaining informed consent and refraining from making assumptions about a person's needs based on their gender or TGD status.

Statement 1.3

**We recommend health care professionals discuss with transgender and gender diverse people what language or terminology they prefer.**

In providing health care to TGD people, we recommend HCPs discuss with their patients what language or terminology they prefer be used when referring to them. This discussion includes asking TGD people how they would like to be addressed in terms of name and pronouns, how they self-identify their gender, and about the language that should be used to describe their body parts. Utilizing affirming language or terminology is a key component of TGD-affirming care (Lightfoot et al., 2021; Vermeir et al., 2018). Furthermore, these discussions and communications can serve to build rapport and reduce the mistrust many TGD people feel toward HCPs and experience within health care systems. Discussions and usage of language or terminology can also facilitate engagement and retention in care that is not specifically TGD-related, such as uptake of routine preventive screenings and any necessary medical follow-up of findings. In electronic health records, organ/anatomical inventories can be standardly used to inform appropriate clinical care, rather than relying solely on assigned sex at birth and/or gender identity designations.

HCPs and health care settings can implement standardized procedures to facilitate these conversations such as: using intake forms that include chosen pronouns and name, inviting

S14 E. COLEMAN ET AL.

all staff (regardless of gender, i.e., cisgender, TGD) to use pronouns in introductions, having pronouns accompany names on a document for all patients, and not using gendered honorifics (e.g., Ms., Mr.). Policies for HCPs and health care settings can be put in place to ensure a TGD person's privacy and right to confidentiality, including when they disclose being a TGD person, and if/how to appropriately document. For example, a clinic policy may be to record this information as private and confidential between HCPs and patients/clients, and that it should only be disclosed on a "need to know" basis.

**Note**

1.  A/73/152, Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity

**CHAPTER 6 Adolescents**

*Historical context and changes since previous Standards of Care*

Specialized health care for transgender adolescents began in the 1980s when a few specialized gender clinics for youth were developed around the world that served relatively small numbers of children and adolescents. In more recent years, there has been a sharp increase in the number of adolescents requesting gender care (Arnoldussen et al., 2019; Kaltiala, Bergman et al., 2020). Since then, new clinics have been founded, but clinical services in many places have not kept pace with the increasing number of youth seeking care. Hence, there are often long waitlists for services, and barriers to care exist for many transgender youth around the world (Tollit et al., 2018).

Until recently, there was limited information regarding the prevalence of gender diversity among adolescents. Studies from high school samples indicate much higher rates than earlier thought, with reports of up to 1.2% of participants identifying as transgender (Clark et al., 2014) and up to 2.7% or more (e.g., 7–9%) experiencing some level of self-reported gender diversity (Eisenberg et al., 2017; Kidd et al., 2021; Wang et al., 2020). These studies suggest gender diversity in youth should no longer be viewed as rare. Additionally, a pattern of uneven ratios by assigned sex has been reported in gender clinics, with adolescents assigned female at birth (AFAB) initiating care 2.5–7.1 times more frequently as compared to adolescents who are assigned male at birth (AMAB) (Aitken et al., 2015; Arnoldussen et al., 2019; Bauer et al., 2021; de Graaf, Carmichael et al., 2018; Kaltiala et al., 2015; Kaltiala, Bergman et al., 2020).

A specific World Professional Association for Transgender Health's (WPATH) Standards of Care section dedicated to the needs of children and adolescents was first included in the 1998 WPATH Standards of Care, 5th version (Levine et al., 1998). Youth aged 16 or older were deemed potentially eligible for gender-affirming medical care, but only in select cases. The subsequent 6th (Meyer et al., 2005) and 7th (Coleman et al., 2012) versions divided medical-affirming treatment for adolescents into three categories and

presented eligibility criteria regarding age/puberty stage—namely fully reversible puberty delaying blockers as soon as puberty had started; partially reversible hormone therapy (testosterone, estrogen) for adolescents at the age of majority, which was age 16 in certain European countries; and irreversible surgeries at age 18 or older, except for chest "masculinizing" mastectomy, which had an age minimum of 16 years. Additional eligibility criteria for gender-related medical care included a persistent, long (childhood) history of gender "non-conformity"/dysphoria, emerging or intensifying at the onset of puberty; absence or management of psychological, medical, or social problems that interfere with treatment; provision of support for commencing the intervention by the parents/caregivers; and provision of informed consent. A chapter dedicated to transgender and gender diverse (TGD) adolescents, distinct from the child chapter, has been created for this 8th edition of the Standards of Care given 1) the exponential growth in adolescent referral rates; 2) the increased number of studies specific to adolescent gender diversity-related care; and 3) the unique developmental and gender-affirming care issues of this age group.

Non-specific terms for gender-related care are avoided (e.g., gender-affirming model, gender exploratory model) as these terms do not represent unified practices, but instead heterogenous care practices that are defined differently in various settings.

*Adolescence overview*

Adolescence is a developmental period characterized by relatively rapid physical and psychological maturation, bridging childhood and adulthood (Sanders, 2013). Multiple developmental processes occur simultaneously, including pubertal-signaled changes. Cognitive, emotional, and social systems mature, and physical changes associated with puberty progress. These processes do not all begin and end at the same time for a given individual, nor do they occur at the same age for all persons. Therefore, the lower and upper borders of adolescence are imprecise and cannot be defined exclusively by age. For example, physical pubertal changes may

begin in late childhood and executive control neural systems continue to develop well into the mid-20s (Ferguson et al., 2021). There is a lack of uniformity in how countries and governments define the age of majority (i.e., legal decision-making status; Dick et al., 2014). While many specify the age of majority as 18 years of age, in some countries it is as young as 15 years (e.g., Indonesia and Myanmar), and in others as high as 21 years (e.g., the U.S. state of Mississippi and Singapore).

**For clarity, this chapter applies to adolescents from the start of puberty until the legal age of majority (in most cases 18 years), however there are developmental elements of this chapter, including the importance of parental/caregiver involvement, that are often relevant for the care of transitional-aged young adults and should be considered appropriately.**

Cognitive development in adolescence is often characterized by gains in abstract thinking, complex reasoning, and metacognition (i.e., a young person's ability to think about their own feelings in relation to how others perceive them; Sanders, 2013). The ability to reason hypothetical situations enables a young person to conceptualize implications regarding a particular decision. However, adolescence is also often associated with increased risk-taking behaviors. Along with these notable changes, adolescence is often characterized by individuation from parents and the development of increased personal autonomy. There is often a heightened focus on peer relationships, which can be both positive and detrimental (Gardner & Steinberg, 2005). Adolescents often experience a sense of urgency that stems from hypersensitivity to reward, and their sense of timing has been shown to be different from that of older individuals (Van Leijenhorst et al., 2010). Social-emotional development typically advances during adolescence, although there is a great variability among young people in terms of the level of maturity applied to inter- and intra-personal communication and insight (Grootens-Wiegers et al., 2017). For TGD adolescents making decisions about gender-affirming treatments—decisions that may have lifelong consequences—it is critical to understand how all these aspects of development may impact decision-making for a given young person within their specific cultural context.

### Gender identity development in adolescence

Our understanding of gender identity development in adolescence is continuing to evolve. When providing clinical care to gender diverse young people and their families, it is important to know what is and is not known about gender identity during development (Berenbaum, 2018). When considering treatments, families may have questions regarding the development of their adolescent's gender identity, and whether or not their adolescent's declared gender will remain the same over time. For some adolescents, a declared gender identity that differs from the assigned sex at birth comes as no surprise to their parents/caregivers as their history of gender diverse expression dates back to childhood (Leibowitz & de Vries, 2016). For others, the declaration does not happen until the emergence of pubertal changes or even well into adolescence (McCallion et al., 2021; Sorbara et al., 2020).

Historically, social learning and cognitive developmental research on gender development was conducted primarily with youth who were not gender diverse in identity or expression and was carried out under the assumption that sex correlated with a specific gender; therefore, little attention was given to gender identity development. In addition to biological factors influencing gender development, this research demonstrated psychological and social factors also play a role (Perry & Pauletti, 2011). While there has been less focus on gender identity development in TGD youth, there is ample reason to suppose, apart from biological factors, psychosocial factors are also involved (Steensma, Kreukels et al., 2013). For some youth, gender identity development appears fixed and is often expressed from a young age, while for others there may be a developmental process that contributes to gender identity development over time.

Neuroimaging studies, genetic studies, and other hormone studies in intersex individuals demonstrate a biological contribution to the development of gender identity for some

individuals whose gender identity does not match their assigned sex at birth (Steensma, Kreukels et al., 2013). As families often have questions about this very issue, it is important to note it is not possible to distinguish between those for whom gender identity may seem fixed from birth and those for whom gender identity development appears to be a developmental process. Since it is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person, a comprehensive clinical approach is important and necessary (see Statement 3). Future research would shed more light on gender identity development if conducted over long periods of time with diverse cohort groups. Conceptualization of gender identity by shifting from dichotomous (e.g., binary) categorization of male and female to a dimensional gender spectrum along a continuum (APA, 2013) would also be necessary.

Adolescence may be a critical period for the development of gender identity for gender diverse young people (Steensma, Kreukels et al., 2013). Dutch longitudinal clinical follow-up studies of adolescents with childhood gender dysphoria who received puberty suppression, gender-affirming hormones, or both, found that none of the youth in adulthood regretted the decisions they had taken in adolescence (Cohen-Kettenis & van Goozen, 1997; de Vries et al., 2014). These findings suggest adolescents who were comprehensively assessed and determined emotionally mature enough to make treatment decisions regarding gender- affirming medical care presented with stability of gender identity over the time period when the studies were conducted.

When extrapolating findings from the longer-term longitudinal Dutch cohort studies to present-day gender diverse adolescents seeking care, it is critical to consider the societal changes that have occurred over time in relation to TGD people. Given the increase in visibility of TGD identities, it is important to understand how increased awareness may impact gender development in different ways (Kornienko et al., 2016). One trend identified is that more young people are presenting to gender clinics with nonbinary identities (Twist & de Graaf, 2019). Another phenomenon occurring in clinical practice is the increased number of adolescents

seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender diversity during their childhood years. One researcher attempted to study and describe a specific form of later-presenting gender diversity experience (Littman, 2018). However, the findings of the study must be considered within the context of significant methodological challenges, including 1) the study surveyed parents and not youth perspectives; and 2) recruitment included parents from community settings in which treatments for gender dysphoria are viewed with scepticism and are criticized. However, these findings have not been replicated. For a select subgroup of young people, susceptibility to social influence impacting gender may be an important differential to consider (Kornienko et al., 2016). However, caution must be taken to avoid assuming these phenomena occur prematurely in an individual adolescent while relying on information from datasets that may have been ascertained with potential sampling bias (Bauer et al., 2022; WPATH, 2018). It is important to consider the benefits that social connectedness may have for youth who are linked with supportive people (Tuzun et al., 2022)(see Statement 4).

Given the emerging nature of knowledge regarding adolescent gender identity development, an individualized approach to clinical care is considered both ethical and necessary. As is the case in all areas of medicine, each study has methodological limitations, and conclusions drawn from research cannot and should not be universally applied to all adolescents. This is also true when grappling with common parental questions regarding the stability versus instability of a particular young person's gender identity development. While future research will help advance scientific understanding of gender identity development, there may always be some gaps. Furthermore, given the ethics of self-determination in care, these gaps should not leave the TGD adolescent without important and necessary care.

### Research evidence of gender-affirming medical treatment for transgender adolescents

A key challenge in adolescent transgender care is the quality of evidence evaluating the effectiveness of medically necessary gender-affirming medical

and surgical treatments (GAMSTs) (see medically necessary statement in the Global chapter, Statement 2.1), over time. Given the lifelong implications of medical treatment and the young age at which treatments may be started, adolescents, their parents, and care providers should be informed about the nature of the evidence base. It seems reasonable that decisions to move forward with medical and surgical treatments should be made carefully. Despite the slowly growing body of evidence supporting the effectiveness of early medical intervention, the number of studies is still low, and there are few outcome studies that follow youth into adulthood. Therefore, a systematic review regarding outcomes of treatment in adolescents is not possible. A short narrative review is provided instead.

At the time of this chapter's writing, there were several longer-term longitudinal cohort follow-up studies reporting positive results of early (i.e., adolescent) medical treatment; for a significant period of time, many of these studies were conducted through one Dutch clinic (e.g., Cohen-Kettenis & van Goozen, 1997; de Vries, Steensma et al., 2011; de Vries et al., 2014; Smith et al., 2001, 2005). The findings demonstrated the resolution of gender dysphoria is associated with improved psychological functioning and body image satisfaction. Most of these studies followed a pre-post methodological design and compared baseline psychological functioning with outcomes after the provision of medical gender-affirming treatments. Different studies evaluated individual aspects or combinations of treatment interventions and included 1) gender-affirming hormones and surgeries (Cohen-Kettenis & van Goozen, 1997; Smith et al., 2001, 2005); 2) puberty suppression (de Vries, Steensma et al., 2011); and 3) puberty suppression, affirming hormones, and surgeries (de Vries et al., 2014). The 2014 long-term follow-up study is the only study that followed youth from early adolescence (pretreatment, mean age of 13.6) through young adulthood (posttreatment, mean age of 20.7). This was the first study to show gender-affirming treatment enabled transgender adolescents to make age-appropriate developmental transitions while living as their affirmed gender with satisfactory objective and subjective outcomes in adulthood (de Vries et al., 2014). While the study employed a small (n = 55), select, and socially supported sample, the results were convincing. Of note, the participants were part of the Dutch clinic known for employing a multidisciplinary approach, including provision of comprehensive, ongoing assessment and management of gender dysphoria, and support aimed at emotional well-being.

Several more recently published longitudinal studies followed and evaluated participants at different stages of their gender-affirming treatments. In these studies, some participants may not have started gender-affirming medical treatments, some had been treated with puberty suppression, while still others had started gender-affirming hormones or had even undergone gender-affirming surgery (GAS) (Achille et al., 2020; Allen et al., 2019; Becker-Hebly et al., 2021; Carmichael et al., 2021; Costa et al., 2015; Kuper et al., 2020, Tordoff et al., 2022). Given the heterogeneity of treatments and methods, this type of design makes interpreting outcomes more challenging. Nonetheless, when compared with baseline assessments, the data consistently demonstrate improved or stable psychological functioning, body image, and treatment satisfaction varying from three months to up to two years from the initiation of treatment.

Cross-sectional studies provide another design for evaluating the effects of gender-affirming treatments. One such study compared psychological functioning in transgender adolescents at baseline and while undergoing puberty suppression with that of cisgender high school peers at two different time points. At baseline, the transgender youth demonstrated lower psychological functioning compared with cisgender peers, whereas when undergoing puberty suppression, they demonstrated better functioning than their peers (van der Miesen et al., 2020). Grannis et al. (2021) demonstrated transgender males who started testosterone had lower internalizing mental health symptoms (depression and anxiety) compared with those who had not started testosterone treatment.

Four additional studies followed different outcome designs. In a retrospective chart study, Kaltiala, Heino et al. (2020) reported transgender

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH    S47

adolescents with few or no mental health challenges prior to commencing gender-affirming hormones generally did well during the treatment. However, adolescents with more mental health challenges at baseline continued to experience the manifestations of those mental health challenges over the course of gender-affirming medical treatment. Nieder et al. (2021) studied satisfaction with care as an outcome measure and demonstrated transgender adolescents were more satisfied the further they progressed with the treatments they initially started. Hisle-Gorman et al. (2021) compared health care utilization pre- and post-initiation of gender-affirming pharmaceuticals as indicators of the severity of mental health conditions among 3,754 TGD adolescents in a large health care data set. Somewhat contrary to the authors' hypothesis of improved mental health, mental health care use did not significantly change, and psychotropic medication prescriptions increased. In a large non-probability sample of transgender-identified adults, Turban et al. (2022) found those who reported access to gender-affirming hormones in adolescence had lower odds of past-year suicidality compared with transgender people accessing gender- affirming hormones in adulthood.

Providers may consider the possibility an adolescent may regret gender-affirming decisions made during adolescence, and a young person will want to stop treatment and return to living in the birth-assigned gender role in the future. Two Dutch studies report low rates of adolescents (1.9% and 3.5%) choosing to stop puberty suppression (Brik et al., 2019; Wiepjes et al., 2018). Again, these studies were conducted in clinics that follow a protocol that includes a comprehensive assessment before the gender-affirming medical treatment is started. At present, no clinical cohort studies have reported on profiles of adolescents who regret their initial decision or detransition after irreversible affirming treatment. Recent research indicate there are adolescents who detransition, but do not regret initiating treatment as they experienced the start of treatment as a part of understanding their gender-related care needs (Turban, 2018). However, this may not be the predominant perspective of people who

detransition (Littman, 2021; Vandenbussche, 2021). Some adolescents may regret the steps they have taken (Dyer, 2020). Therefore, it is important to present the full range of possible outcomes when assisting transgender adolescents. Providers may discuss this topic in a collaborative and trusting manner (i.e., as a "potential future experience and consideration") with the adolescent and their parents/caregivers before gender-affirming medical treatments are started. Also, providers should be prepared to support adolescents who detransition. In an internet convenience sample survey of 237 self-identified detransitioners with a mean age of 25.02 years, which consisted of over 90% of birth assigned females, 25% had medically transitioned before age 18 and 14% detransitioned before age 18 (Vandenbussche, 2021). Although an internet convenience sample is subject to selection of respondents, this study suggests detransitioning may occur in young transgender adolescents and health care professionals should be aware of this. Many of them expressed difficulties finding help during their detransition process and reported their detransition was an isolating experience during which they did not receive either sufficient or appropriate support (Vandenbussche, 2021).

To conclude, although the existing samples reported on relatively small groups of youth (e.g., n = 22-101 per study) and the time to follow-up varied across studies (6 months–7 years), this emerging evidence base indicates a general improvement in the lives of transgender adolescents who, following careful assessment, receive medically necessary gender-affirming medical treatment. Further, rates of reported regret during the study monitoring periods are low. Taken as a whole, the data show early medical intervention—as part of broader combined assessment and treatment approaches focused on gender dysphoria and general well-being—can be effective and helpful for many transgender adolescents seeking these treatments.

### Ethical and human rights perspectives

Medical ethics and human rights perspectives were also considered while formulating the

S48   E. COLEMAN ET AL.

---

**Statements of Recommendations**

6.1- We recommend health care professionals working with gender diverse adolescents:

6.1.a- Are licensed by their statutory body and hold a postgraduate degree or its equivalent in a clinical field relevant to this role granted by a nationally accredited statutory institution.

6.1.b- Receive theoretical and evidenced-based training and develop expertise in general child, adolescent, and family mental health across the developmental spectrum.

6.1.c- Receive training and have expertise in gender identity development, gender diversity in children and adolescents, have the ability to assess capacity to assent/consent, and possess general knowledge of gender diversity across the life span.

6.1.d- Receive training and develop expertise in autism spectrum disorders and other neurodevelopmental presentations or collaborate with a developmental disability expert when working with autistic/neurodivergent gender diverse adolescents.

6.1.e- Continue engaging in professional development in all areas relevant to gender diverse children, adolescents, and families.

6.2- We recommend health care professionals working with gender diverse adolescents facilitate the exploration and expression of gender openly and respectfully so that no one particular identity is favored.

6.3- We recommend health care professionals working with gender diverse adolescents undertake a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns and seek medical/surgical transition-related care, and that this be accomplished in a collaborative and supportive manner.

6.4- We recommend health care professionals work with families, schools, and other relevant settings to promote acceptance of gender diverse expressions of behavior and identities of the adolescent.

6.5- We recommend against offering reparative and conversion therapy aimed at trying to change a person's gender and lived gender expression to become more congruent with the sex assigned at birth.

6.6- We suggest health care professionals provide transgender and gender diverse adolescents with health education on chest binding and genital tucking, including a review of the benefits and risks.

6.7- We recommend providers consider prescribing menstrual suppression agents for adolescents experiencing gender incongruence who may not desire testosterone therapy, who desire but have not yet begun testosterone therapy, or in conjunction with testosterone therapy for breakthrough bleeding.

6.8- We recommend health care professionals maintain an ongoing relationship with the gender diverse and transgender adolescent and any relevant caregivers to support the adolescent in their decision-making throughout the duration of puberty suppression treatment, hormonal treatment, and gender- related surgery until the transition is made to adult care.

6.9- We recommend health care professionals involve relevant disciplines, including mental health and medical professionals, to reach a decision about whether puberty suppression, hormone initiation, or gender-related surgery for gender diverse and transgender adolescents are appropriate and remain indicated throughout the course of treatment until the transition is made to adult care.

6.10- We recommend health care professionals working with transgender and gender diverse adolescents requesting gender-affirming medical or surgical treatments inform them, prior to initiating treatment, of the reproductive effects including the potential loss of fertility and available options to preserve fertility within the context of the youth's stage of pubertal development.

6.11- We recommend when gender-affirming medical or surgical treatments are indicated for adolescents, health care professionals working with transgender and gender diverse adolescents involve parent(s)/guardian(s) in the assessment and treatment process, unless their involvement is determined to be harmful to the adolescent or not feasible.

*The following recommendations are made regarding the requirements for gender-affirming medical and surgical treatment (All of them must be met):*

6.12- We recommend health care professionals assessing transgender and gender diverse adolescents only recommend gender-affirming medical or surgical treatments requested by the patient when:

6.12.a- The adolescent meets the diagnostic criteria of gender incongruence as per the ICD-11 in situations where a diagnosis is necessary to access health care. In countries that have not implemented the latest ICD, other taxonomies may be used although efforts should be undertaken to utilize the latest ICD as soon as practicable.

6.12.b- The experience of gender diversity/incongruence is marked and sustained over time.

6.12.c- The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.

6.12.d- The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed.

6.12.e- The adolescent has been informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.

6.12.f- The adolescent has reached Tanner stage 2 of puberty for pubertal suppression to be initiated.

6.12.g- The adolescent had at least 12 months of gender-affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender-affirming treatment unless hormone therapy is either not desired or is medically contraindicated.

---

adolescent SOC statements. For example, allowing irreversible puberty to progress in adolescents who experience gender incongruence is not a neutral act given that it may have immediate and lifelong harmful effects for the transgender young person (Giordano, 2009; Giordano & Holm, 2020; Kreukels & Cohen-Kettenis, 2011). From a human rights perspective, considering gender diversity as a normal and expected variation within the broader diversity of the human experience, it is an adolescent's right to participate in their own decision-making

process about their health and lives, including access to gender health services (Amnesty International, 2020).

### Short summary of statements and unique issues in adolescence

These guidelines are designed to account for what is known and what is not known about gender identity development in adolescence, the evidence for gender-affirming care in adolescence, and the unique aspects that distinguish adolescence from other developmental stages.

> *Identity exploration*: A defining feature of adolescence is the solidifying of aspects of identity, including gender identity. Statement 6.2 addresses identity exploration in the context of gender identity development. Statement 6.12.b accounts for the length of time needed for a young person to experience a gender diverse identity, express a gender diverse identity, or both, so as to make a meaningful decision regarding gender-affirming care.

> *Consent and decision-making*: In adolescence, consent and decision-making require assessment of the individual's emotional, cognitive, and psychosocial development. Statement 6.12.c directly addresses emotional and cognitive maturity and describes the necessary components of the evaluation process used to assess decision-making capacity.

> *Caregivers/parent involvement*: Adolescents are typically dependent on their caregivers/parents for guidance in numerous ways. This is also true as the young person navigates through the process of deciding about treatment options. Statement 6.11 addresses the importance of involving caregivers/parents and discusses the role they play in the assessment and treatment. No set of guidelines can account for every set of individual circumstances on a global scale.

### Statement 6.1
We recommend health care professionals working with gender diverse adolescents:

a. Are licensed by their statutory body and hold a postgraduate degree or its equivalent in a clinical field relevant to this role granted by a nationally accredited statutory institution.

b. Receive theoretical and evidenced-based training and develop expertise in general child, adolescent, and family mental health across the developmental spectrum.

c. Receive training and have expertise in gender identity development, gender diversity in children and adolescents, have the ability to assess capacity to assent/consent, and possess general knowledge of gender diversity across the life span.

d. Receive training and develop expertise in autism spectrum disorders and other neurodevelopmental presentations or collaborate with a developmental disability expert when working with autistic/neurodivergent gender diverse adolescents.

e. Continue engaging in professional development in all areas relevant to gender diverse children, adolescents, and families.

When assessing and supporting TGD adolescents and their families, care providers/health care professionals (HCPs) need both general as well as gender-specific knowledge and training. Providers who are trained to work with adolescents and families play an important role in navigating aspects of adolescent development and family dynamics when caring for youth and families (Adelson et al., 2012; American Psychological Association, 2015; Hembree et al., 2017). Other chapters in these standards of care describe these criteria for professionals who provide gender care in more detail (see Chapter 5—Assessment for Adults; Chapter 7—Children; or Chapter 13—Surgery and Postoperative Care). Professionals working with adolescents should understand what is and is not known regarding adolescent gender identity development, and how this knowledge base differs from what applies to adults and prepubertal children. Among HCPs, the mental health professional (MHP) has the most appropriate training and dedicated clinical time to conduct an assessment and elucidate treatment priorities and goals when working with transgender youth, including those seeking gender-affirming medical/surgical care. Understanding and managing the dynamics of family members who may share differing perspectives regarding the history and needs of the

young person is an important competency that MHPs are often most prepared to address.

When access to professionals trained in child and adolescent development is not possible, HCPs should make a commitment to obtain training in the areas of family dynamics and adolescent development, including gender identity development. Similarly, considering autistic/neurodivergent transgender youth represent a substantial minority subpopulation of youth served in gender clinics globally, it is important HCPs seek additional training in the field of autism and understand the unique elements of care autistic gender diverse youth may require (Strang, Meagher et al., 2018). If these qualifications are not possible, then consultation and collaboration with a provider who specializes in autism and neurodiversity is advised.

### Statement 6.2
**We recommend health care professionals working with gender diverse adolescents facilitate the exploration and expression of gender openly and respectfully so that no one particular identity is favored.**

Adolescence is a developmental period that involves physical and psychological changes characterized by individuation and the transition to independence from caregivers (Berenbaum et al., 2015; Steinberg, 2009). It is a period during which young people may explore different aspects of identity, including gender identity.

Adolescents differ regarding the degree to which they explore and commit to aspects of their identity (Meeus et al., 2012). For some adolescents, the pace to achieving consolidation of identity is fast, while for others it is slower. For some adolescents, physical, emotional, and psychological development occur over the same general timeline, while for others, there are certain gaps between these aspects of development. Similarly, there is variation in the timeline for gender identity development (Arnoldussen et al., 2020; Katz-Wise et al., 2017). For some young people, gender identity development is a clear process that starts in early childhood, while for others pubertal changes contribute to a person's experience of themselves as a particular gender (Steensma, Kreukels et al., 2013), and for many others a process may begin well after pubertal

changes are completed. Given these variations, there is no one particular pace, process, or outcome that can be predicted for an individual adolescent seeking gender-affirming care.

Therefore, HCPs working with adolescents should promote supportive environments that simultaneously respect an adolescent's affirmed gender identity and also allows the adolescent to openly explore gender needs, including social, medical, and physical gender-affirming interventions should they change or evolve over time.

### Statement 6.3
**We recommend health care professionals working with gender diverse adolescents undertake a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns and seek medical/surgical transition-related care, and that this be accomplished in a collaborative and supportive manner.**

Given the many ways identity may unfold during adolescence, we recommend using a comprehensive biopsychosocial assessment to guide treatment decisions and optimize outcomes. This assessment should aim to understand the adolescent's strengths, vulnerabilities, diagnostic profile, and unique needs to individualize their care. As mentioned in Statement 6.1, MHPs have the most appropriate training, experience, and dedicated clinical time required to obtain the information discussed here. The assessment process should be approached collaboratively with the adolescent and their caregiver(s), both separately and together, as described in more detail in Statement 6.11. An assessment should occur prior to any medically necessary medical or surgical intervention under consideration (e.g., puberty blocking medication, gender-affirming hormones, surgeries). See medically necessary statement in Chapter 2—Global Applicability, Statement 2.1; see also Chapter 12—Hormone Therapy and Chapter 13—Surgery and Postoperative Care.

Youth may experience many different gender identity trajectories. Sociocultural definitions and experiences of gender continue to evolve over time, and youth are increasingly presenting with a range of identities and ways of describing their experiences and gender-related needs (Twist & de

Graaf, 2019). For example, some youth will realize they are transgender or more broadly gender diverse and pursue steps to present accordingly. For some youth, obtaining gender-affirming medical treatment is important while for others these steps may not be necessary. For example, a process of exploration over time might not result in the young person self-affirming or embodying a different gender in relation to their assigned sex at birth and would not involve the use of medical interventions (Arnoldussen et al., 2019).

The most robust longitudinal evidence supporting the benefits of gender-affirming medical and surgical treatments in adolescence was obtained in a clinical setting that incorporated a detailed comprehensive diagnostic assessment process over time into its delivery of care protocol (de Vries & Cohen-Kettenis, 2012; de Vries et al., 2014). Given this research and the ongoing evolution of gender diverse experiences in society, a comprehensive diagnostic biopsychosocial assessment during adolescence is both evidence-based and preserves the integrity of the decision-making process. In the absence of a full diagnostic profile, other mental health entities that need to be prioritized and treated may not be detected. There are no studies of the long-term outcomes of gender-related medical treatments for youth who have not undergone a comprehensive assessment. Treatment in this context (e.g., with limited or no assessment) has no empirical support and therefore carries the risk that the decision to start gender-affirming medical interventions may not be in the long-term best interest of the young person at that time.

As delivery of health care and access to specialists varies globally, designing a particular assessment process to adapt existing resources is often necessary. In some cases, a more extended assessment process may be useful, such as for youth with more complex presentations (e.g., complicating mental health histories (Leibowitz & de Vries, 2016)), co-occurring autism spectrum characteristics (Strang, Powers et al., 2018), and/or an absence of experienced childhood gender incongruence (Ristori & Steensma, 2016). Given the unique cultural, financial, and geographical factors that exist for specific populations, providers should design assessment models that are flexible and allow for appropriately timed care for as many young people as possible, so long as the assessment effectively obtains information about the adolescent's strengths, vulnerabilities, diagnostic profile, and individual needs. Psychometrically validated psychosocial and gender measures can also be used to provide additional information.

The multidisciplinary assessment for youth seeking gender-affirming medical/surgical interventions includes the following domains that correspond to the relevant statements:

- **Gender Identity Development:** Statements 6.12.a and 6.12.b elaborate on the factors associated with gender identity development within the specific cultural context when assessing TGD adolescents.
- **Social Development and Support; Intersectionality:** Statements 6.4 and 6.11 elaborate on the importance of assessing gender minority stress, family dynamics, and other aspects contributing to social development and intersectionality.
- **Diagnostic Assessment of Possible Co-Occurring Mental Health and/or Developmental Concerns:** Statement 6.12.d elaborates on the importance of understanding the relationship that exists, if at all, between any co-occurring mental health or developmental concerns and the young person's gender identity/gender diverse expression.
- **Capacity for Decision-Making:** Statement 6.12.c elaborates on the assessment of a young person's emotional maturity and the relevance when an adolescent is considering gender affirming-medical/surgical treatments.

## Statement 6.4

**We recommend health care professionals work with families, schools, and other relevant settings to promote acceptance of gender diverse expressions of behavior and identities of the adolescent.**

Multiple studies and related expert consensus support the implementation of approaches that promote acceptance and affirmation of gender diverse youth across all settings, including families, schools, health care facilities, and all other organizations and communities with which they

interact (e.g., Pariseau et al., 2019; Russell et al., 2018; Simons et al., 2013; Toomey et al., 2010; Travers et al., 2012). Acceptance and affirmation are accomplished through a range of approaches, actions, and policies we recommend be enacted across the various relationships and settings in which a young person exists and functions. It is important for the family members and community members involved in the adolescent's life to work collaboratively in these efforts unless their involvement is considered harmful to the adolescent. Examples proposed by Pariseau et al. (2019) and others of acceptance and affirmation of gender diversity and contemplation and expression of identity that can be implemented by family, staff, and organizations include:

1. Actions that are supportive of youth drawn to engaging in gender-expansive (e.g., non-conforming) activities and interests;
2. Communications that are supportive when youth express their experiences about their gender and gender exploration;
3. Use of the youth's asserted name/pronouns;
4. Support for youth wearing clothing/uniforms, hairstyles, and items (e.g., jewelry, makeup) they feel affirm their gender;
5. Positive and supportive communication with youth about their gender and gender concerns;
6. Education about gender diversity issues for people in the young person's life (e.g., family members, health care providers, social support networks), as needed, including information about how to advocate for gender diverse youth in community, school, health care, and other settings;
7. Support for gender diverse youth to connect with communities of support (e.g., LGBTQ groups, events, friends);
8. Provision of opportunities to discuss, consider, and explore medical treatment options when indicated;
9. Antibullying policies that are enforced;
10. Inclusion of nonbinary experiences in daily life, reading materials, and curricula (e.g., books, health, and sex education classes, assigned essay topics that move beyond the binary, LGBTQ, and ally groups);

11. Gender inclusive facilities that the youth can readily access without segregation from nongender diverse peers (e.g., bathrooms, locker rooms).

We recommend HCPs work with parents, schools, and other organizations/groups to promote acceptance and affirmation of TGD identities and expressions, whether social or medical interventions are implemented or not as acceptance and affirmation are associated with fewer negative mental health and behavioral symptoms and more positive mental health and behavioral functioning (Day et al., 2015; de Vries et al., 2016; Greytak et al., 2013; Pariseau et al., 2019; Peng et al., 2019; Russell et al., 2018; Simons et al., 2013; Taliaferro et al., 2019; Toomey et al., 2010; Travers et al., 2012). Russell et al. (2018) found mental health improvement increases with more acceptance and affirmation across more settings (e.g., home, school, work, and friends). Rejection by family, peers, and school staff (e.g., intentionally using the name and pronoun the youth does not identify with, not acknowledging affirmed gender identity, bullying, harassment, verbal and physical abuse, poor relationships, rejection for being TGD, eviction) was strongly linked to negative outcomes, such as anxiety, depression, suicidal ideation, suicide attempts, and substance use (Grossman et al., 2005; Klein & Golub; 2016; Pariseau et al., 2019; Peng et al., 2019; Reisner, Greytak et al., 2015; Roberts et al., 2013). It is important to be aware that negative symptoms increase with increased levels of rejection and continue into adulthood (Roberts et al., 2013).

Neutral or indifferent responses to a youth's gender diversity and exploration (e.g., letting a child tell others their chosen name but not using the name, not telling family or friends when the youth wants them to disclose, not advocating for the child about rejecting behavior from school staff or peers, not engaging or participating in other support mechanisms (e.g., with psychotherapists and support groups) have also been found to have negative consequences, such as increased depressive symptoms (Pariseau et al., 2019). For these reasons, it is important not to ignore a youth's gender questioning or delay consideration of the youth's gender-related

care needs. There is particular value in professionals recognizing youth need individualized approaches, support, and consideration of needs around gender expression, identity, and embodiment over time and across domains and relationships. Youth may need help coping with the tension of tolerating others' processing/adjusting to an adolescent's identity exploration and changes (e.g., Kuper, Lindley et al., 2019). It is important professionals collaborate with parents and others as they process their concerns and feelings and educate themselves about gender diversity because such processes may not necessarily reflect rejection or neutrality but may rather represent efforts to develop attitudes and gather information that foster acceptance (e.g., Katz-Wise et al., 2017).

Statement 6.5

**We recommend against offering reparative and conversion therapy aimed at trying to change a person's gender and lived gender expression to become more congruent with the sex assigned at birth.**

Some health care providers, secular or religious organizations, and rejecting families may undertake efforts to thwart an adolescent's expression of gender diversity or assertion of a gender identity other than the expression and behavior that conforms to the sex assigned at birth. Such efforts at blocking reversible social expression or transition may include choosing not to use the youth's identified name and pronouns or restricting self-expression in clothing and hairstyles (Craig et al., 2017; Green et al., 2020). These disaffirming behaviors typically aim to reinforce views that a young person's gender identity/expression must match the gender associated with the sex assigned at birth or expectations based on the sex assigned at birth. Activities and approaches (sometimes referred to as "treatments") aimed at trying to change a person's gender identity and expression to become more congruent with the sex assigned at birth have been attempted, but these approaches have not resulted in changes in gender identity (Craig et al., 2017; Green et al., 2020). We recommend against such efforts because they have been found to be ineffective

and are associated with increases in mental illness and poorer psychological functioning (Craig et al., 2017; Green et al., 2020; Turban, Beckwith et al., 2020).

Much of the research evaluating "conversion therapy" and "reparative therapy" has investigated the impact of efforts to change gender expression (masculinity or femininity) and has conflated sexual orientation with gender identity (APA, 2009; Burnes et al., 2016; Craig et al., 2017). Some of these efforts have targeted both gender identity and expression (AACAP, 2018). Conversion/reparative therapy has been linked to increased anxiety, depression, suicidal ideation, suicide attempts, and health care avoidance (Craig et al., 2017; Green et al., 2020; Turban, Beckwith et al., 2020). Although some of these studies have been criticized for their methodologies and conclusions (e.g., D'Angelo et al., 2020), this should not detract from the importance of emphasizing efforts undertaken a priori to change a person's identity are clinically and ethically unsound. We recommend against any type of conversion or attempts to change a person's gender identity because 1) both secular and religion-based efforts to change gender identity/expression have been associated with negative psychological functioning that endures into adulthood (Turban, Beckwith et al., 2020); and 2) larger ethical reasons exist that should underscore respect for gender diverse identities.

It is important to note potential factors driving a young person's gender-related experience and report of gender incongruence, when carried out in the context of supporting an adolescent with self-discovery, is not considered reparative therapy as long as there is no a priori goal to change or promote one particular gender identity or expression (AACAP, 2018; see Statement 6.2). To ensure these explorations are therapeutic, we recommend employing affirmative consideration and supportive tone in discussing what steps have been tried, considered, and planned for a youth's gender expression. These discussion topics may include what felt helpful or affirming, what felt unhelpful or distressing and why. We recommend employing affirmative responses to these steps and discussions, such as those identified in SOC-8 Statement 6.4.

Statement 6.6

**We suggest health care professionals provide transgender and gender diverse adolescents with health education on chest binding and genital tucking, including review of the benefits and risks.**

TGD youth may experience distress related to chest and genital anatomy. Practices such as chest binding, chest padding, genital tucking, and genital packing are reversible, nonmedical interventions that may help alleviate this distress (Callen-Lorde, 2020a, 2020b; Deutsch, 2016a; Olson-Kennedy, Rosenthal et al., 2018; Transcare BC, 2020). It is important to assess the degree of distress related to physical development or anatomy, educate youth about potential nonmedical interventions to address this distress, and discuss the safe use of these interventions.

Chest binding involves compression of the breast tissue to create a flatter appearance of the chest. Studies suggest that up to 87% of trans masculine patients report a history of binding (Jones, 2015; Peitzmeier, 2017). Binding methods may include the use of commercial binders, sports bras, layering of shirts, layering of sports bras, or the use of elastics or other bandages (Peitzmeier, 2017). Currently, most youth report learning about binding practices from online communities composed of peers (Julian, 2019). Providers can play an important role in ensuring youth receive accurate and reliable information about the potential benefits and risks of chest binding. Additionally, providers can counsel patients about safe binding practices and monitor for potential negative health effects. While there are potential negative physical impacts of binding, youth who bind report many benefits, including increased comfort, improved safety, and lower rates of misgendering (Julian, 2019). Common negative health impacts of chest binding in youth include back/chest pain, shortness of breath, and overheating (Julian, 2019). More serious negative health impacts such as skin infections, respiratory infections, and rib fractures are uncommon and have been associated with chest binding in adults (Peitzmeier, 2017). If binding is employed, youth should be advised to use only those methods considered safe for binding—such as binders specifically designed for the gender diverse population—to reduce the risk of serious negative health effects. Methods that are considered unsafe for binding include the use of duct tape, ace wraps, and plastic wrap as these can restrict blood flow, damage skin, and restrict breathing. If youth report negative health impacts from chest binding, these should ideally be addressed by a gender-affirming medical provider with experience working with TGD youth.

Genital tucking is the practice of positioning the penis and testes to reduce the outward appearance of a genital bulge. Methods of tucking include tucking the penis and testes between the legs or tucking the testes inside the inguinal canal and pulling the penis back between the legs. Typically, genitals are held in place by underwear or a gaff, a garment that can be made or purchased. Limited studies are available on the specific risks and benefits of tucking in adults, and none have been carried out in youth. Previous studies have reported tight undergarments are associated with decreased sperm concentration and motility. In addition, elevated scrotal temperatures can be associated with poor sperm characteristics, and genital tucking could theoretically affect spermatogenesis and fertility (Marsh, 2019) although there are no definitive studies evaluating these adverse outcomes. Further research is needed to determine the specific benefits and risks of tucking in youth.

Statement 6.7

**We recommend providers consider prescribing menstrual suppression agents for adolescents experiencing gender incongruence who may not desire testosterone therapy, who desire but have not yet begun testosterone therapy, or in conjunction with testosterone therapy for breakthrough bleeding.**

When discussing the available options of menstrual-suppressing medications with gender diverse youth, providers should engage in shared decision-making, use gender-inclusive language (e.g., asking patients which terms they utilize to refer to their menses, reproductive organs, and genitalia) and perform physical exams in a sensitive, gender-affirmative manner (Bonnington et al., 2020; Krempasky et al., 2020). There is no formal research evaluating how menstrual

suppression may impact gender incongruence and/or dysphoria. However, the use of menstrual suppression can be an initial intervention that allows for further exploration of gender-related goals of care, prioritization of other mental health care, or both, especially for those who experience a worsening of gender dysphoria from unwanted uterine bleeding (see Statement 6.12d; Mehringer & Dowshen, 2019). When testosterone is not used, menstrual suppression can be achieved via a progestin. To exclude any underlying menstrual disorders, it is important to obtain a detailed menstrual history and evaluation prior to implementing menstrual-suppressing therapy (Carswell & Roberts, 2017). As part of the discussion about menstrual-suppressing medications, the need for contraception and information regarding the effectiveness of menstrual-suppressing medications as methods of contraception also need to be addressed (Bonnington et al., 2020). A variety of menstrual suppression options, such as combined estrogen-progestin medications, oral progestins, depot and subdermal progestin, and intrauterine devices (IUDs), should be offered to allow for individualized treatment plans while properly considering availability, cost and insurance coverage, as well as contraindications and side effects (Kanj et al., 2019).

Progestin-only hormonal medication are options, especially in trans masculine or nonbinary youth who are not interested in estrogen-containing medical therapies as well as those at risk for thromboembolic events or who have other contraindications to estrogen therapy (Carswell & Roberts, 2017). Progestin-only hormonal medications include oral progestins, depo-medroxyprogesterone injection, etonogestrel implant, and levonorgestrel IUD (Schwartz et al., 2019). Progestin-only hormonal options vary in terms of efficacy in achieving menstrual suppression and have lower rates of achieving amenorrhea than combined oral contraception (Pradhan & Gomez-Lobo, 2019). A more detailed description of the relevant clinical studies is presented in Chapter 12—Hormone Therapy. HCPs should not make assumptions regarding the individual's preferred method of administration as some trans masculine youth may prefer vaginal rings or IUD implants (Akgul et al., 2019). Although hormonal medications require monitoring for potential mood lability, depressive effects, or both, the benefits and risks of untreated menstrual suppression in the setting of gender dysphoria should be evaluated on an individual basis. Some patients may opt for combined oral contraception that includes different combinations of ethinyl estradiol, with ranging doses, and different generations of progestins (Pradhan & Gomez-Lobo, 2019). Lower dose ethinyl estradiol components of combined oral contraceptive pills are associated with increased breakthrough uterine bleeding. Continuous combined oral contraceptives may be used to allow for continuous menstrual suppression and can be delivered as transdermal or vaginal rings.

The use of gonadotropin releasing hormone (GnRH) analogues may also result in menstrual suppression. However, it is recommended gender diverse youth meet the eligibility criteria (as outlined in Statement 6.12) before this medication is considered solely for this purpose (Carswell & Roberts, 2017; Pradhan & Gomez-Lobo, 2019). Finally, menstrual-suppression medications may be indicated as an adjunctive therapy for breakthrough uterine bleeding that may occur while on exogenous testosterone or as a bridging medication while awaiting menstrual suppression with testosterone therapy. When exogenous testosterone is employed as a gender-affirming hormone, menstrual suppression is typically achieved in the first six months of therapy (Ahmad & Leinung, 2017). However, it is vital adolescents be counseled ovulation and pregnancy can still occur in the setting of amenorrhea (Gomez et al., 2020; Kanj et al., 2019).

<u>Statement 6.8</u>

**We recommend health care professionals maintain an ongoing relationship with the gender diverse and transgender adolescent and any relevant caregivers to support the adolescent in their decision-making throughout the duration of puberty suppression treatment, hormonal treatment, and gender-related surgery until the transition is made to adult care.**

HCPs with expertise in child and adolescent development, as described in Statement 6.1, play an important role in the continuity of care for

young people over the course of their gender-related treatment needs. Supporting adolescents and their families necessitates approaching care using a developmental lens through which understanding a young person's evolving emotional maturity and care needs can take place over time. As gender-affirming treatment pathways differ based on the needs and experiences of individual TGD adolescents, decision-making for these treatments (puberty suppression, estrogens/androgens, gender-affirmation surgeries) can occur at different points in time within a span of several years. Longitudinal research demonstrating the benefits of pubertal suppression and gender-affirming hormone treatment (GAHT) was carried out in a setting where an ongoing clinical relationship between the adolescents/families and the multidisciplinary team was maintained (de Vries et al., 2014).

Clinical settings that offer longer appointment times provide space for adolescents and caregivers to share important psychosocial aspects of emotional well-being (e.g., family dynamics, school, romantic, and sexual experiences) that contextualize individualized gender-affirming treatment needs and decisions as described elsewhere in the chapter. An ongoing clinical relationship can take place across settings, whether that be within a multidisciplinary team or with providers in different locations who collaborate with one another. Given the wide variability in the ability to obtain access to specialized gender care centers, particularly for marginalized groups who experience disparities with access, it is important for the HCP to appreciate the existence of any barriers to care while maintaining flexibility when defining how an ongoing clinical relationship can take place in that specific context.

An ongoing clinical relationship that increases resilience in the youth and provides support to parents/caregivers who may have their own treatment needs may ultimately lead to increased parental acceptance—when needed—which is associated with better mental health outcomes in youth (Ryan, Huebner et al., 2009).

Statement 6.9
**We recommend health care professionals involve relevant disciplines, including mental health and medical professionals, to reach a decision about whether puberty suppression, hormone initiation, or gender-related surgery for gender diverse and transgender adolescents are appropriate and remain indicated throughout the course of treatment until the transition is made to adult care.**

TGD adolescents with gender dysphoria/gender incongruence who seek gender-affirming medical and surgical treatments benefit from the involvement of health care professionals (HCPs) from different disciplines. Providing care to TGD adolescents includes addressing 1) diagnostic considerations (see Statements 6.3, 6.12a, and 6.12b) conducted by a specialized gender HCP (as defined in Statement 6.1) whenever possible and necessary; and 2) treatment considerations when prescribing, managing, and monitoring medications for gender-affirming medical and surgical care, requiring the training of the relevant medical/surgical professional. The list of key disciplines includes but is not limited to adolescent medicine/primary care, endocrinology, psychology, psychiatry, speech/language pathology, social work, support staff, and the surgical team.

The evolving evidence has shown a clinical benefit for transgender youth who receive their gender-affirming treatments in multidisciplinary gender clinics (de Vries et al., 2014; Kuper et al., 2020; Tollit et al., 2019). Finally, adolescents seeking gender-affirming care in multidisciplinary clinics are presenting with significant complexity necessitating close collaboration between mental health, medical, and/or surgical professionals (McCallion et al., 2021; Sorbara et al., 2020; Tishelman et al., 2015).

As not all patients and families are in the position or in a location to access multidisciplinary care, the lack of available disciplines should not preclude a young person from accessing needed care in a timely manner. When disciplines are available, particularly in centers with existing multidisciplinary teams, disciplines, or both, it is recommended efforts be made to include the relevant providers when developing a gender care team. However, this does not mean all disciplines are necessary to provide care to a particular youth and family.

If written documentation or a letter is required to recommend gender-affirming medical and surgical treatment (GAMST) for an adolescent, only one letter of assessment from a member of the multidisciplinary team is needed. This letter needs to reflect the assessment and opinion from the team that involves both medical HCPs and MHPs (American Psychological Association, 2015; Hembree et al., 2017; Telfer et al., 2018). Further assessment results and written opinions may be requested when there is a specific clinical need or when team members are in different locations or choose to write their own summaries. For further information see Chapter 5—Assessment for Adults, Statement 5.5.

Statement 6.10

**We recommend health care professionals working with transgender and gender diverse adolescents requesting gender-affirming medical or surgical treatments inform them, prior to the initiation of treatment, of the reproductive effects, including the potential loss of fertility and available options to preserve fertility within the context of the youth's stage of pubertal development.**

While assessing adolescents seeking gender-affirming medical or surgical treatments, HCPs should discuss the specific ways in which the required treatment may affect reproductive capacity. Fertility issues and the specific preservation options are more thoroughly discussed in Chapter 12—Hormone Therapy and Chapter 16—Reproductive Health.

It is important HCPs understand what fertility preservation options exist so they can relay the information to adolescents. Parents are advised to be involved in this process and should also understand the pros and cons of the different options. HCPs should acknowledge adolescents and parents may have different views around reproductive capacity and may therefore come to different decisions (Quain et al., 2020), which is why HCPs can be helpful in guiding this process.

HCPs should specifically pay attention to the developmental and psychological aspects of fertility preservation and decision-making competency for the individual adolescent. While adolescents may think they have made up their minds concerning their reproductive capacity, the possibility their opinions about having biologically related children in the future might change over time needs to be discussed with an HCP who has sufficient experience, is knowledgeable about adolescent development, and has experience working with parents.

Addressing the long-term consequences on fertility of gender-affirming medical treatments and ensuring transgender adolescents have realistic expectations concerning fertility preservation options or adoption cannot not be addressed with a one-time discussion but should be part of an ongoing conversation. This conversation should occur not only before initiating any medical intervention (puberty suppression, hormones, or surgeries), but also during further treatment and during transition.

Currently, there are only preliminary results from retrospective studies evaluating transgender adults and the decisions they made when they were young regarding the consequences of medical-affirming treatment on reproductive capacity. It is important not to make assumptions about what future adult goals an adolescent may have. Research in childhood cancer survivors found participants who acknowledged missed opportunities for fertility preservation reported distress and regret surrounding potential infertility (Armuand et al., 2014; Ellis et al., 2016; Lehmann et al., 2017). Furthermore, individuals with cancer who did not prioritize having biological children before treatment have reported "changing their minds" in survivorship (Armuand et al., 2014).

Given the complexities of the different fertility preservation options and the challenges HCPs may experience discussing fertility with the adolescent and the family (Tishelman et al., 2019), a fertility consultation is an important consideration for every transgender adolescent who pursues medical-affirming treatments unless the local situation is such that a fertility consultation is not covered by insurance or public health care plans, is not available locally, or the individual circumstances make this unpreferable.

Statement 6.11

**We recommend when gender-affirming medical or surgical treatments are indicated for adolescents, health care professionals working with transgender and gender diverse adolescents**

**involve parent(s)/guardian(s) in the assessment and treatment process, unless their involvement is determined to be harmful to the adolescent or not feasible.**

When there is an indication an adolescent might benefit from a gender-affirming medical or surgical treatment, involving the parent(s) or primary caregiver(s) in the assessment process is recommended in almost all situations (Edwards-Leeper & Spack, 2012; Rafferty et al., 2018). Exceptions to this might include situations in which an adolescent is in foster care, child protective services, or both, and custody and parent involvement would be impossible, inappropriate, or harmful. Parent and family support of TGD youth is a primary predictor of youth well-being and is protective of the mental health of TGD youth (Gower, Rider, Coleman et al., 2018; Grossman et al., 2019; Lefevor et al., 2019; McConnell et al., 2015; Pariseau et al., 2019; Ryan, 2009; Ryan et al., 2010; Simons et al., 2013; Wilson et al., 2016). Therefore, including parent(s)/caregiver(s) in the assessment process to encourage and facilitate increased parental understanding and support of the adolescent may be one of the most helpful practices available.

Parent(s)/caregiver(s) may provide key information for the clinical team, such as the young person's gender and overall developmental, medical, and mental health history as well as insights into the young person's level of current support, general functioning, and well-being. Concordance or divergence of reports given by the adolescent and their parent(s)/caregiver(s) may be important information for the assessment team and can aid in designing and shaping individualized youth and family supports (De Los Reyes et al., 2019; Katz-Wise et al., 2017). Knowledge of the family context, including resilience factors and challenges, can help providers know where special supports would be needed during the medical treatment process. Engagement of parent(s)/caregiver(s) is also important for educating families about various treatment approaches, ongoing follow-up and care needs, and potential treatment complications. Through psychoeducation regarding clinical gender care options and participation in the assessment process, which may unfold over time, parent(s)/caregiver(s) may better understand their adolescent

child's gender-related experience and needs (Andrzejewski et al., 2020; Katz-Wise et al., 2017).

Parent/caregiver concerns or questions regarding the stability of gender-related needs over time and implications of various gender-affirming interventions are common and should not be dismissed. It is appropriate for parent(s)/caregiver(s) to ask these questions, and there are cases in which the parent(s)/caregiver(s)' questions or concerns are particularly helpful in informing treatment decisions and plans. For example, a parent/caregiver report may provide critical context in situations in which a young person experiences very recent or sudden self-awareness of gender diversity and a corresponding gender treatment request, or when there is concern for possible excessive peer and social media influence on a young person's current self-gender concept. Contextualization of the parent/caregiver report is also critical, as the report of a young person's gender history as provided by parent(s)/caregiver(s) may or may not align with the young person's self-report. Importantly, gender histories may be unknown to parent(s)/caregiver(s) because gender may be internal experience for youth, not known by others unless it is discussed. For this reason, an adolescent's report of their gender history and experience is central to the assessment process.

Some parents may present with unsupportive or antagonistic beliefs about TGD identities, clinical gender care, or both (Clark et al., 2020). Such unsupportive perspectives are an important therapeutic target for families. Although challenging parent perspectives may in some cases seem rigid, providers should not assume this is the case. There are many examples of parent(s)/caregiver(s) who, over time with support and psychoeducation, have become increasingly accepting of their TGD child's gender diversity and care needs.

Helping youth and parent(s)/caregiver(s) work together on important gender care decisions is a primary goal. However, in some cases, parent(s)/caregiver(s) may be too rejecting of their adolescent child and their child's gender needs to be part of the clinical evaluation process. In these situations, youth may require the engagement of larger systems of advocacy and support to move

forward with the necessary support and care (Dubin et al., 2020).

### Statement 6.12
**We recommend health care professionals assessing transgender and gender diverse adolescents only recommend gender-affirming medical or surgical treatments requested by the patient when:**

### Statement 6.12.a
**The adolescent meets the diagnostic criteria of gender incongruence as per the ICD-11 in situations where a diagnosis is necessary to access health care. In countries that have not implemented the latest ICD, other taxonomies may be used although efforts should be undertaken to utilize the latest ICD as soon as practicable.**

When working with TGD adolescents, HCPs should realize while a classification may give access to care, pathologizing transgender identities may be experienced as stigmatizing (Beek et al., 2016). Assessments related to gender health and gender diversity have been criticized, and controversies exist around diagnostic systems (Drescher, 2016).

HCPs should assess the overall gender-related history and gender care-related needs of youth. Through this assessment process, HCPs may provide a diagnosis when it is required to get access to transgender-related care.

Gender incongruence and gender dysphoria are the two diagnostic terms used in the World Health Organization's International Classification of Diseases (ICD) and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM), respectively. Of these two widely used classification systems, the DSM is for psychiatric classifications only and the ICD contains all diseases and conditions related to physical as well as mental health. The most recent versions of these two systems, the DSM-5 and the ICD-11, reflect a long history of reconceptualizing and de-psychopathologizing gender-related diagnoses (American Psychiatric Association, 2013; World Health Organization, 2019a). Compared with the earlier version, the DSM-5 replaced gender identity disorder with gender dysphoria, acknowledging the distress experienced by some people stemming from the incongruence between experienced gender identity and the sex assigned at birth. In the most recent revision, the DSM-5-TR, no changes in the diagnostic criteria for gender dysphoria are made. However, terminology was adapted into the most appropriate current language (e.g., birth-assigned gender instead of natal-gender and gender-affirming treatment instead of gender reassignment (American Psychiatric Association, 2022). Compared with the ICD 10th edition, the gender incongruence classification was moved from the Mental Health chapter to the Conditions Related to Sexual Health chapter in the ICD-11. When compared with the DSM-5 classification of gender dysphoria, one important reconceptualization is distress is not a required indicator of the ICD-11 classification of gender incongruence (WHO, 2019a). After all, when growing up in a supporting and accepting environment, the distress and impairment criterion, an inherent part of every mental health condition, may not be applicable (Drescher, 2012). As such, the ICD-11 classification of gender incongruence may better capture the fullness of gender diversity experiences and related clinical gender needs.

Criteria for the ICD-11 classification gender incongruence of adolescence or adulthood require a marked and persistent incongruence between an individual´s experienced gender and the assigned sex, which often leads to a need to "transition" to live and be accepted as a person of the experienced gender. For some, this includes hormonal treatment, surgery, or other health care services to enable the individual´s body to align as much as required, and to the extent possible, with the person's experienced gender. Relevant for adolescents is the indicator that a classification cannot be assigned "prior to the onset of puberty." Finally, it is noted "that gender variant behaviour and preferences alone are not a basis for assigning the classification" (WHO, ICD-11, 2019a).

Criteria for the DSM-5 and DSM-5-TR classification of gender dysphoria in adolescence and adulthood denote "a marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration' (criterion A, fulfilled when 2 of 6 subcriteria are manifest; DSM-5, APA, 2013; DSM 5-TR, APA, 2022).

Of note, although a gender-related classification is one of the requirements for receiving medical gender-affirming care, such a classification alone does not indicate a person needs medical-affirming care. The range of youth experiences of gender incongruence necessitates professionals provide a range of treatments or interventions based on the individual's needs. Counseling, gender exploration, mental health assessment and, when needed, treatment with MHPs trained in gender development may all be indicated with or without the implementation of medical-affirming care.

Statement 6.12.b
**The experience of gender diversity/incongruence is marked and sustained over time.**

Identity exploration and consolidation are experienced by many adolescents (Klimstra et al., 2010; Topolewska-Siedzik & Cieciuch, 2018). Identity exploration during adolescence may include a process of self-discovery around gender and gender identity (Steensma, Kreukels et al., 2013). Little is known about how processes that underlie consolidation of gender identity during adolescence (e.g., the process of commitment to specific identities) may impact a young person's experience(s) or needs over time.

Therefore, the level of reversibility of a gender-affirming medical intervention should be considered along with the sustained duration of a young person's experience of gender incongruence when initiating treatment. Given potential shifts in gender-related experiences and needs during adolescence, it is important to establish the young person has experienced several years of persistent gender diversity/incongruence prior to initiating less reversible treatments such as gender-affirming hormones or surgeries. Puberty suppression treatment, which provides more time for younger adolescents to engage their decision-making capacities, also raises important considerations (see Statement 6.12f and Chapter 12—Hormone Therapy) suggesting the importance of a sustained experience of gender incongruence/diversity prior to initiation. However, in this age group of younger adolescents, several years is not always practical nor necessary given the premise of the treatment as a means to buy time while avoiding distress from irreversible pubertal changes. For youth who have experienced a shorter duration of gender incongruence, social transition-related and/or other medical supports (e.g., menstrual suppression/androgen blocking) may also provide some relief as well as furnishing additional information to the clinical team regarding a young person's broad gender care needs (see Statements 6.4, 6.6, and 6.7).

Establishing evidence of persistent gender diversity/incongruence typically requires careful assessment with the young person over time (see Statement 6.3). Whenever possible and when appropriate, the assessment and discernment process should also include the parent(s)/caregiver(s) (see Statement 6.11). Evidence demonstrating gender diversity/incongruence sustained over time can be provided via history obtained directly from the adolescent and parents/caregivers when this information is not documented in the medical records.

The research literature on continuity versus discontinuity of gender-affirming medical care needs/requests is complex and somewhat difficult to interpret. A series of studies conducted over the last several decades, including some with methodological challenges (as noted by Temple Newhook et al., 2018; Winters et al., 2018) suggest the experience of gender incongruence is not consistent for all children as they progress into adolescence. For example, a subset of youth who experienced gender incongruence or who socially transitioned prior to puberty over time can show a reduction in or even full discontinuation of gender incongruence (de Vries et al., 2010; Olson et al., 2022; Ristori & Steensma, 2016; Singh et al., 2021; Wagner et al., 2021). However, there has been less research focused on rates of continuity and discontinuity of gender incongruence and gender-related needs in pubertal and adolescent populations. The data available regarding broad unselected gender-referred pubertal/adolescent cohorts (from the Amsterdam transgender clinic) suggest that, following extended assessments over time, a subset of adolescents with gender incongruence presenting for gender care elect not to pursue gender-affirming medical care

(Arnoldussen et al., 2019; de Vries, Steensma et al., 2011). Importantly, findings from studies of gender incongruent pubertal/adolescent cohorts, in which participants who have undergone comprehensive gender evaluation over time, have shown persistent gender incongruence and gender-related need and have received referrals for medical gender care, suggest low levels of regret regarding gender-related medical care decisions (de Vries et al., 2014; Wiepjes et al., 2018). Critically, these findings of low regret can only currently be applied to youth who have demonstrated sustained gender incongruence and gender-related needs over time as established through a comprehensive and iterative assessment (see Statement 6.3).

Statement 6.12.c
**The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.**

The process of informed consent includes communication between a patient and their provider regarding the patient's understanding of a potential intervention as well as, ultimately, the patient's decision whether to receive the intervention. In most settings, for minors, the legal guardian is integral to the informed consent process: if a treatment is to be given, the legal guardian (often the parent[s]/caregiver[s]) provides the informed consent to do so. In most settings, assent is a somewhat parallel process in which the minor and the provider communicate about the intervention and the provider assesses the level of understanding and intention.

A necessary step in the informed consent/assent process for considering gender-affirming medical care is a careful discussion with qualified HCPs trained to assess the emotional and cognitive maturity of adolescents. The reversible and irreversible effects of the treatment, as well as fertility preservation options (when applicable), and all potential risks and benefits of the intervention are important components of the discussion. These discussions are required when obtaining informed consent/assent. Assessment of cognitive and emotional maturity is important because it helps the care team understand the adolescent's capacity to be informed.

The skills necessary to assent/consent to any medical intervention or treatment include the ability to 1) comprehend the nature of the treatment; 2) reason about treatment options, including the risks and benefits; 3) appreciate the nature of the decision, including the long-term consequences; and 4) communicate choice (Grootens-Wiegers et al., 2017). In the case of gender- affirming medical treatments, a young person should be well-informed about what the treatment may and may not accomplish, typical timelines for changes to appear (e.g., with gender-affirming hormones), and any implications of stopping the treatment. Gender-diverse youth should fully understand the reversible, partially reversible, and irreversible aspects of a treatment, as well as the limits of what is known about certain treatments (e.g., the impact of pubertal suppression on brain development (Chen and Loshak, 2020)). Gender-diverse youth should also understand, although many gender-diverse youth begin gender- affirming medical care and experience that care as a good fit for them long-term, there is a subset of individuals who over time discover this care is not a fit for them (Wiepjes et al., 2018). Youth should know such shifts are sometimes connected to a change in gender needs over time, and in some cases, a shift in gender identity itself. Given this information, gender diverse youth must be able to reason thoughtfully about treatment options, considering the implications of the choices at hand. Furthermore, as a foundation for providing assent, the gender-diverse young person needs to be able to communicate their choice.

The skills needed to accomplish the tasks required for assent/consent may not emerge at specific ages per se (Grootens-Wiegers et al., 2017). There may be variability in these capacities related to developmental differences and mental health presentations (Shumer & Tishelman, 2015) and dependent on the opportunities a young person has had to practice these skills (Alderson, 2007). Further, assessment of emotional and cognitive maturity must be conducted separately for each gender-related treatment decision (Vrouenraets et al., 2021).

The following questions may be useful to consider in assessing a young person's emotional and

cognitive readiness to assent or consent to a specific gender-affirming treatment:

- Can the young person think carefully into the future and consider the implications of a partially or fully irreversible intervention?
- Does the young person have sufficient self-reflective capacity to consider the possibility that gender-related needs and priorities can develop over time, and gender-related priorities at a certain point in time might change?
- Has the young person, to some extent, thought through the implications of what they might do if their priorities around gender do change in the future?
- Is the young person able to understand and manage the day-to-day short- and long-term aspects of a specific medical treatment (e.g., medication adherence, administration, and necessary medical follow-ups)?

Assessment of emotional and cognitive maturity may be accomplished over time as the care team continues to engage in conversations about the treatment options and affords the young person the opportunity to practice thinking into the future and flexibly consider options and implications. For youth with neurodevelopmental and/or some types of mental health differences, skills for future thinking, planning, big picture thinking, and self-reflection may be less-well developed (Dubbelink & Geurts, 2017). In these cases, a more careful approach to consent and assent may be required, and this may include additional time and structured opportunities for the young person to practice the skills necessary for medical decision-making (Strang, Powers et al., 2018).

For unique situations in which an adolescent minor is consenting for their own treatment without parental permission (see Statement 6.11), extra care must be taken to support the adolescent's informed decision-making. This will typically require greater levels of engagement of and collaboration between the HCPs working with the adolescent to provide the young person appropriate cognitive and emotional support to consider options, weigh benefits and potential challenges/costs, and develop a plan for any needed (and potentially ongoing) supports associated with the treatment.

Statement 6.12.d

**The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and/or gender-affirming medical treatments have been addressed.**

Evidence indicates TGD adolescents are at increased risk of mental health challenges, often related to family/caregiver rejection, non-affirming community environments, and neurodiversity-related factors (e.g., de Vries et al., 2016; Pariseau et al., 2019; Ryan et al., 2010; Weinhardt et al., 2017). A young person's mental health challenges may impact their conceptualization of their gender development history and gender identity-related needs, the adolescent's capacity to consent, and the ability of the young person to engage in or receive medical treatment. Additionally, like cisgender youth, TGD youth may experience mental health concerns irrespective of the presence of gender dysphoria or gender incongruence. In particular, depression and self-harm may be of specific concern; many studies reveal depression scores and emotional and behavioral problems comparable to those reported in populations referred to mental health clinics (Leibowitz & de Vries, 2016). Higher rates of suicidal ideation, suicide attempts, and self-harm have also been reported (de Graaf et al., 2020). In addition, eating disorders occur more frequently than expected in non-referred populations (Khatchadourian et al., 2013; Ristori et al., 2019; Spack et al., 2012). Importantly, TGD adolescents show high rates of autism spectrum disorder/characteristics (Øien et al., 2018; van der Miesen et al., 2016; see also Statement 6.1d). Other neurodevelopmental presentations and/or mental health challenges may also be present, (e.g., ADHD, intellectual disability, and psychotic disorders (de Vries, Doreleijers et al., 2011; Meijer et al., 2018; Parkes & Hall, 2006).

Of note, many transgender adolescents are well-functioning and experience few if any mental health concerns. For example, socially transitioned pubertal adolescents who receive medical

gender- affirming treatment at specialized gender clinics may experience mental health outcomes equivalent to those of their cisgender peers (e.g., de Vries et al., 2014; van der Miesen et al., 2020). A provider's key task is to assess the direction of the relationships that exist between any mental health challenges and the young person's self-understanding of gender care needs and then prioritize accordingly.

Mental health difficulties may challenge the assessment and treatment of gender-related needs of TGD adolescents in various ways:

1. First, when a TGD adolescent is experiencing acute suicidality, self-harm, eating disorders, or other mental health crises that threaten physical health, safety must be prioritized. According to the local context and existing guidelines, appropriate care should seek to mitigate the threat or crisis so there is sufficient time and stabilization for thoughtful gender-related assessment and decision-making. For example, an actively suicidal adolescent may not be emotionally able to make an informed decision regarding gender-affirming medical/surgical treatment. If indicated, safety-related interventions should not preclude starting gender-affirming care.

2. Second, mental health can also complicate the assessment of gender development and gender identity-related needs. For example, it is critical to differentiate gender incongruence from specific mental health presentations, such as obsessions and compulsions, special interests in autism, rigid thinking, broader identity problems, parent/child interaction difficulties, severe developmental anxieties (e.g., fear of growing up and pubertal changes unrelated to gender identity), trauma, or psychotic thoughts. Mental health challenges that interfere with the clarity of identity development and gender-related decision-making should be prioritized and addressed.

3. Third, decision-making regarding gender-affirming medical treatments that have life-long consequences requires

thoughtful, future-oriented thinking by the adolescent, with support from the parents/caregivers, as indicated (see Statement 6.11). To be able to make such an informed decision, an adolescent should be able to understand the issues, express a choice, appreciate and give careful thought regarding the wish for medical-affirming treatment (see Statement 6.12c). Neurodevelopmental differences, such as autistic features or autism spectrum disorder (see Statement 6.1d, e.g., communication differences; a preference for concrete or rigid thinking; differences in self-awareness, future thinking and planning), may challenge the assessment and decision-making process; neurodivergent youth may require extra support, structure, psychoeducation, and time built into the assessment process (Strang, Powers et al., 2018). Other mental health presentations that involve reduced communication and self-advocacy, difficulty engaging in assessment, memory and concentration difficulties, hopelessness, and difficulty engaging in future-oriented thinking may complicate assessment and decision-making. In such cases, extended time is often necessary before any decisions regarding medical-affirming treatment can be made.

4. Finally, while addressing mental health concerns is important during the course of medical treatment, it does not mean all mental health challenges can or should be resolved completely. However, it is important any mental health concerns are addressed sufficiently so that gender-affirming medical treatment can be provided optimally (e.g., medication adherence, attending follow-up medical appointments, and self-care, particularly during a postoperative course).

Statement 6.12.e
**The adolescent has been informed of the reproductive effects, including the potential loss of fertility, and available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.**

For guidelines regarding the clinical approach, the scientific background, and the rationale, see Chapter 12—Hormone Therapy and Chapter 16—Reproductive Health.

### Statement 6.12.f
**The adolescent has reached Tanner stage 2 of puberty for pubertal suppression to be initiated.**

The onset of puberty is a pivotal point for many gender diverse youth. For some, it creates an intensification of their gender incongruence, and for others, pubertal onset may lead to gender fluidity (e.g., a transition from binary to nonbinary gender identity) or even attenuation of a previously affirmed gender identity (Drummond et al., 2008; Steensma et al., 2011, Steensma, Kreukels et al., 2013; Wallien & Cohen-Kettenis, 2008). The use of puberty-blocking medications, such as GnRH analogues, is not recommended until children have achieved a minimum of Tanner stage 2 of puberty because the experience of physical puberty may be critical for further gender identity development for some TGD adolescents (Steensma et al., 2011). Therefore, puberty blockers should not be implemented in prepubertal gender diverse youth (Waal & Cohen-Kettenis, 2006). For some youth, GnRH agonists may be appropriate in late stages or in the post-pubertal period (e.g., Tanner stage 4 or 5), and this should be highly individualized. See Chapter 12—Hormone Therapy for a more comprehensive review of the use of GnRH agonists.

Variations in the timing of pubertal onset is due to multiple factors (e.g., sex assigned at birth, genetics, nutrition, etc.). Tanner staging refers to five stages of pubertal development ranging from prepubertal (Tanner stage 1) to post-pubertal, and adult sexual maturity (Tanner stage 5) (Marshall & Tanner, 1969, 1970). For assigned females at birth, pubertal onset (e.g., gonadarche) is defined by the occurrence of breast budding (Tanner stage 2), and for birth-assigned males, the achievement of a testicular volume of greater than or equal to 4 mL (Roberts & Kaiser, 2020). An experienced medical provider should be relied on to differentiate the onset of puberty from physical changes such as pubic hair and apocrine body odor due to sex steroids produced by the adrenal gland (e.g., adrenarche) as adrenarche

does not warrant the use of puberty-blocking medications (Roberts & Kaiser, 2020). Educating parents and families about the difference between adrenarche and gonadarche helps families understand the timing during which shared decision-making about gender-affirming medical therapies should be undertaken with their multidisciplinary team.

The importance of addressing other risks and benefits of pubertal suppression, both hypothetical and actual, cannot be overstated. Evidence supports the existence of surgical implications for transgender girls who proceed with pubertal suppression (van de Grift et al., 2020). Longitudinal data exists to demonstrate improvement in romantic and sexual satisfaction for adolescents receiving puberty suppression, hormone treatment and surgery (Bungener et al., 2020). A study on surgical outcomes of laparoscopic intestinal vaginoplasty (performed because of limited genital tissue after the use of puberty blockers) in transgender women revealed that the majority experienced orgasm after surgery (84%), although a specific correlation between sexual pleasure outcomes and the timing of pubertal suppression initiation was not discussed in the study (Bouman, van der Sluis et al., 2016), nor does the study apply to those who would prefer a different surgical procedure. This underscores the importance of engaging in discussions with families about the future unknowns related to surgical and sexual health outcomes.

### Statement 6.12.g
**The adolescent had at least 12 months of gender-affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender-affirming treatment unless hormone therapy is either not desired or is medically contraindicated.**

GAHT leads to anatomical, physiological, and psychological changes. The onset of the anatomic effects (e.g., clitoral growth, breast growth, vaginal mucosal atrophy) may begin early after the initiation of therapy, and the peak effect is expected at 1–2 years (T'Sjoen et al., 2019). To

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH   S65

ensure sufficient time for psychological adaptations to the physical change during an important developmental time for the adolescent, 12 months of hormone treatment is suggested. Depending upon the surgical result required, a period of hormone treatment may need to be longer (e.g., sufficient clitoral virilization prior to metoidioplasty/phalloplasty, breast growth and skin expansion prior to breast augmentation, softening of skin and changes in facial fat distribution prior to facial GAS) (de Blok et al., 2021).

For individuals who are not taking hormones prior to surgical interventions, it is important surgeons review the impact of hormone therapy on the proposed surgery. In addition, for individuals undergoing gonadectomy who are not taking hormones, a plan for hormone replacement can be developed with their prescribing professional prior to surgery.

### Consideration of ages for gender-affirming medical and surgical treatment for adolescents

Age has a strong, albeit imperfect, correlation with cognitive and psychosocial development and may be a useful objective marker for determining the potential timing of interventions (Ferguson et al., 2021). Higher (i.e., more advanced) ages may be required for treatments with greater irreversibility, complexity, or both. This approach allows for continued cognitive/emotional maturation that may be required for the adolescent to fully consider and consent to increasingly complex treatments (see Statement 6.12c).

A growing body of evidence indicates providing gender-affirming treatment for gender diverse youth who meet criteria leads to positive outcomes (Achille et al., 2020; de Vries et al., 2014; Kuper et al., 2020). There is, however, limited data on the optimal timing of gender-affirming interventions as well as the long-term physical, psychological, and neurodevelopmental outcomes in youth (Chen et al., 2020; Chew et al., 2018; Olson-Kennedy et al., 2016). Currently, the only existing longitudinal studies evaluating gender diverse youth and adult outcomes are based on a specific model (i.e., the Dutch approach) that involved a comprehensive initial assessment with follow-up. In this approach, pubertal suppression was considered at age 12, GAHT at age 16, and

surgical interventions after age 18 with exceptions in some cases. It is not clear if deviations from this approach would lead to the same or different outcomes. Longitudinal studies are currently underway to better define outcomes as well as the safety and efficacy of gender-affirming treatments in youth (Olson-Kennedy, Garofalo et al., 2019; Olson-Kennedy, Rosenthal et al., 2019). While the long-term effects of gender-affirming treatments initiated in adolescence are not fully known, the potential negative health consequences of delaying treatment should also be considered (de Vries et al., 2021). As the evidence base regarding outcomes of gender-affirming interventions in youth continues to grow, recommendations on the timing and readiness for these interventions may be updated.

Previous guidelines regarding gender-affirming treatment of adolescents recommended partially reversible GAHT could be initiated at approximately 16 years of age (Coleman et al., 2012; Hembree et al., 2009). More recent guidelines suggest there may be compelling reasons to initiate GAHT prior to the age of 16, although there are limited studies on youth who have initiated hormones prior to 14 years of age (Hembree et al., 2017). A compelling reason for earlier initiation of GAHT, for example, might be to avoid prolonged pubertal suppression, given potential bone health concerns and the psychosocial implications of delaying puberty as described in more detail in Chapter 12—Hormone Therapy (Klink, Caris et al., 2015; Schagen et al., 2020; Vlot et al., 2017; Zhu & Chan, 2017). Puberty is a time of significant brain and cognitive development. The potential neurodevelopmental impact of extended pubertal suppression in gender diverse youth has been specifically identified as an area in need of continued study (Chen et al., 2020). While GnRH analogs have been shown to be safe when used for the treatment of precocious puberty, there are concerns delaying exposure to sex hormones (endogenous or exogenous) at a time of peak bone mineralization may lead to decreased bone mineral density. The potential decrease in bone mineral density as well as the clinical significance of any decrease requires continued study (Klink, Caris et al., 2015; Lee, Finlayson et al.,

2020; Schagen et al., 2020). The potential neg-ative psychosocial implications of not initiating puberty with peers may place additional stress on gender diverse youth, although this has not been explicitly studied. When considering the timing of initiation of gender-affirming hor-mones, providers should compare the potential physical and psychological benefits and risks of starting treatment with the potential risks and benefits of delaying treatment. This process can also help identify compelling factors that may warrant an individualized approach.

Studies carried out with trans masculine youth have demonstrated chest dysphoria is associated with higher rates of anxiety, depression, and dis-tress and can lead to functional limitations, such as avoiding exercising or bathing (Mehringer et al., 2021; Olson-Kennedy, Warus et al., 2018; Sood et al., 2021). Testosterone unfortunately does little to alleviate this distress, although chest masculinization is an option for some individuals to address this distress long-term. Studies with youth who sought chest masculinization surgery to alleviate chest dysphoria demonstrated good surgical outcomes, satisfaction with results, and minimal regret during the study monitoring period (Marinkovic & Newfield, 2017; Olson-Kennedy, Warus et al., 2018). Chest mas-culinization surgery can be considered in minors when clinically and developmentally appropriate as determined by a multidisciplinary team expe-rienced in adolescent and gender development (see relevant statements in this chapter). The duration or current use of testosterone therapy should not preclude surgery if otherwise indi-cated. The needs of some TGD youth may be met by chest masculinization surgery alone. Breast augmentation may be needed by trans feminine youth, although there is less data about this procedure in youth, possibly due to fewer individuals requesting this procedure (Boskey et al., 2019; James, 2016). GAHT, specifically estrogen, can help with development of breast tissue, and it is recommended youth have a min-imum of 12 months of hormone therapy, or lon-ger as is surgically indicated, prior to breast augmentation unless hormone therapy is not clinically indicated or is medically contraindicated.

Data are limited on the optimal timing for ini-tiating other gender-affirming surgical treatments in adolescents. This is partly due to the limited access to these treatments, which varies in differ-ent geographical locations (Mahfouda et al., 2019). Data indicate rates of gender-affirming surgeries have increased since 2000, and there has been an increase in the number of TGD youth seeking vaginoplasty (Mahfouda et al., 2019; Milrod & Karasic, 2017). A 2017 study of 20 WPATH-affiliated surgeons in the US reported slightly more than half had performed vaginoplasty in minors (Milrod & Karasic, 2017). Limited data are available on the outcomes for youth undergoing vaginoplasty. Small studies have reported improved psychosocial functioning and decreased gender dysphoria in adolescents who have undergone vaginoplasty (Becker et al., 2018; Cohen-Kettenis & van Goozen, 1997; Smith et al.,2001). While the sample sizes are small, these studies suggest there may be a benefit for some adolescents to having these pro-cedures performed before the age of 18. Factors that may support pursuing these procedures for youth under 18 years of age include the increased availability of support from family members, greater ease of managing postoperative care prior to transitioning to tasks of early adulthood (e.g., entering university or the workforce), and safety concerns in public spaces (i.e., to reduce trans-phobic violence) (Boskey et al., 2018; Boskey et al., 2019; Mahfouda et al., 2019). Given the complexity and irreversibility of these procedures, an assess-ment of the adolescent's ability to adhere to post-surgical care recommendations and to comprehend the long-term impacts of these procedures on reproductive and sexual function is crucial (Boskey et al., 2019). Given the complexity of phalloplasty, and current high rates of complications in com-parison to other gender-affirming surgical treat-ments, it is not recommended this surgery be considered in youth under 18 at this time (see Chapter 13—Surgery and Postoperative Care).

Additional key factors that should be taken into consideration when discussing the timing of interventions with youth and families are addressed in detail in statements 6.12a-f. For a summary of the criteria/recommendations for medically necessary gender-affirming medical treatment in adolescents, see Appendix D.

## CHAPTER 7 Children

These Standards of Care pertain to prepubescent gender diverse children and are based on research, ethical principles, and accumulated expert knowledge. The principles underlying these standards include the following 1) childhood gender diversity is an expected aspect of general human development (Endocrine Society and Pediatric Endocrine Society, 2020; Telfer et al., 2018); 2) childhood gender diversity is not a pathology or mental health disorder (Endocrine Society and Pediatric Endocrine Society, 2020; Oliphant et al., 2018; Telfer et al., 2018); 3) diverse gender expressions in children cannot always be assumed to reflect a transgender identity or gender incongruence (Ehrensaft, 2016; Ehrensaft, 2018; Rael et al., 2019); 4) guidance from mental health professionals (MHPs) with expertise in gender care for children can be helpful in supporting positive adaptation as well as discernment of gender-related needs over time (APA, 2015; Ehrensaft, 2018; Telfer et al., 2018); 5) conversion therapies for gender diversity in children (i.e., any "therapeutic" attempts to compel a gender diverse child through words, actions, or both to identify with, or behave in accordance with, the gender associated with the sex assigned at birth are harmful and we repudiate their use (APA, 2021; Ashley, 2019b, Paré, 2020; SAMHSA, 2015; Telfer et al., 2018; UN Human Rights Council, 2020).

Throughout the text, the term "health care professional" (HCP) is used broadly to refer to professionals working with gender diverse children. Unlike pubescent youth and adults, prepubescent gender diverse children are not eligible to access medical intervention (Pediatric Endocrine Society, 2020); therefore, when professional input is sought, it is most likely to be from an HCP specialized in psychosocial supports and gender development. Thus, this chapter is uniquely focused on developmentally appropriate psychosocial practices, although other HCPs, such as pediatricians and family practice HCPs may also find these standards useful as they engage in professional work with gender diverse children and their families.

This chapter employs the term "gender diverse" given that gender trajectories in prepubescent children cannot be predicted and may evolve over time (Steensma, Kreukels et al., 2013). At the same time, this chapter recognizes some children will remain stable in a gender identity they articulate early in life that is discrepant from the sex assigned at birth (Olson et al., 2022). The term, "gender diverse" includes transgender binary and nonbinary children, as well as gender diverse children who will ultimately not identify as transgender later in life. Terminology is inherently culturally bound and evolves over time. Thus, it is possible terms used here may become outdated and we will find better descriptors.

This chapter describes aspects of medical necessary care intended to promote the well-being and gender-related needs of children (see medically necessary statement in the Global Applicability chapter, Statement 2.1). This chapter advocates everyone employs these standards, to the extent possible. There may be situations or locations in which the recommended resources are not fully available. HCPs/teams lacking resources need to work toward meeting these standards. However, if unavoidable limitations preclude components of these recommendations, this should not hinder providing the best services currently available. In those locations where some but not all recommended services exist, choosing not to implement potentially beneficial care services risks harm to a child (Murchison et al., 2016; Telfer et al., 2018; Riggs et al., 2020). Overall, it is imperative to prioritize a child's best interests.

A vast empirical psychological literature indicates early childhood experiences frequently set the stage for lifelong patterns of risk and/or resilience and contribute to a trajectory of development more or less conducive to well-being and a positive quality of life (Anda et al., 2010; Masten & Cicchetti, 2010; Shonkoff & Garner, 2012). The available research indicates, in general, gender diverse youth are at greater risk for experiencing psychological difficulties (Ristori & Steensma, 2016) than age- matched cisgender peers as a result of encountering destructive experiences, including trauma and maltreatment stemming from gender diversity-related rejection and other harsh, non-accepting interactions (Barrow & Apostle, 2018; Giovanardi et al., 2018; Gower, Rider, Brown et al., 2018; Grossman & D'Augelli, 2006; Hendricks & Testa, 2012; Reisner, Greytak

et al., 2015; Roberts et al., 2014; Tishelman & Neumann-Mascis, 2018). Further, literature indicates prepubescent children who are well accepted in their gender diverse identities are generally well-adjusted (Malpas et al., 2018; Olson et al., 2016). Assessment and treatment of children typically emphasizes an *ecological* approach, recognizing children need to be safe and nurtured in each setting they frequent (Belsky, 1993; Bronfenbrenner, 1979; Kaufman & Tishelman, 2018; Lynch & Cicchetti, 1998; Tishelman et al., 2010; Zielinski & Bradshaw, 2006). Thus, the perspective of this chapter draws on basic psychological literature and knowledge of the unique risks to gender diverse children and emphasizes the integration of an ecological approach to understanding their needs and to facilitating positive mental health in all gender care. This perspective prioritizes fostering well-being and quality of life for a child throughout their development. Additionally, this chapter also embraces the viewpoint, supported by the substantial psychological research cited above, that psychosocial gender-affirming care (Hidalgo et al., 2013) for prepubescent children offers a window of opportunity to promote a trajectory of well-being that will sustain them over time and during the transition to adolescence. This approach potentially can mitigate some of the common mental health risks faced by transgender and gender diverse (TGD) teens, as frequently described in literature (Chen et al., 2021; Edwards-Leeper et al., 2017; Haas et al., 2011; Leibowitz & de Vries, 2016; Reisner, Bradford et al., 2015; Reisner, Greytak et al., 2015).

Developmental research has focused on understanding various aspects of gender development in the earliest years of childhood based on a general population of prepubescent children. This research has typically relied on the assumption that child research participants are cisgender (Olezeski et al., 2020) and has reported gender identity stability is established in the preschool years for the general population of children, most of whom are likely not gender diverse (Kohlberg, 1966; Steensma, Kreukels et al., 2013). Recently, developmental research has demonstrated gender diversity can be observed and identified in young prepubescent children (Fast & Olson, 2018; Olson & Gülgöz, 2018; Robles et al., 2016). Nonetheless, empirical

study in this area is limited, and at this time there are no psychometrically sound assessment measures capable of reliably and/or fully ascertaining a prepubescent child's self-understanding of their own gender and/or gender-related needs and preferences (Bloom et al., 2021). Therefore, this chapter emphasizes the importance of a nuanced and individualized clinical approach to gender assessment, consistent with the recommendations from various guidelines and literature (Berg & Edwards-Leeper, 2018; de Vries & Cohen-Kettenis, 2012; Ehrensaft, 2018; Steensma & Wensing-Kruger, 2019). Research and clinical experience have indicated gender diversity in prepubescent children may, for some, be fluid; there are no reliable means of predicting an individual child's gender evolution (Edwards-Leeper et al., 2016; Ehrensaft, 2018; Steensma, Kreukels et al., 2013), and the gender-related needs for a particular child may vary over the course of their childhood.

It is important to understand the meaning of the term "assessment" (sometimes used synonymously with the term "evaluation"). There are multiple contexts for assessment (Krishnamurthy et al., 2004) including rapid assessments that take place during an immediate crisis (e.g., safety assessment when a child may be suicidal) and focused assessments when a family may have a circumscribed question, often in the context of a relatively brief consultation (Berg & Edwards-Leeper, 2018). The term assessment is also often used in reference to "diagnostic assessment," which can also be called an "intake" and is for the purpose of determining whether there is an issue that is diagnosable and/or could benefit from a therapeutic process. This chapter focus on comprehensive assessments, useful for understanding a child and family's needs and goals (APA, 2015; de Vries & Cohen-Kettenis, 2012; Srinath et al., 2019; Steensma & Wensing-Kruger, 2019). This type of psychosocial assessment is not necessary for all gender diverse children, but may be requested for a number of reasons. Assessments may present a useful opportunity to start a process of support for a gender diverse child and their family, with the understanding that gender diverse children benefit when their family dynamics include

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH      S69

**Statements of Recommendations**

7.1- We recommend health care professionals working with gender diverse children receive training and have expertise in gender development and gender diversity in children and possess a general knowledge of gender diversity across the life span.

7.2- We recommend health care professionals working with gender diverse children receive theoretical and evidenced-based training and develop expertise in general child and family mental health across the developmental spectrum.

7.3- We recommend health care professionals working with gender diverse children receive training and develop expertise in autism spectrum disorders and other neurodiversity or collaborate with an expert with relevant expertise when working with autistic/neurodivergent, gender diverse children.

7.4- We recommend health care professionals working with gender diverse children engage in continuing education related to gender diverse children and families.

7.5- We recommend health care professionals conducting an assessment with gender diverse children access and integrate information from multiple sources as part of the assessment.

7.6- We recommend health care professionals conducting an assessment with gender diverse children consider relevant developmental factors, neurocognitive functioning, and language skills.

7.7- We recommend health care professionals conducting an assessment with gender diverse children consider factors that may constrain accurate reporting of gender identity/gender expression by the child and/or family/caregiver(s).

7.8- We recommend health care professionals consider consultation, psychotherapy, or both for a gender diverse child and family/caregivers when families and health care professionals believe this would benefit the well-being and development of a child and/or family.

7.9- We recommend health care professionals offering consultation, psychotherapy, or both to gender diverse children and families/caregivers work with other settings and individuals important to the child to promote the child's resilience and emotional well-being.

7.10- We recommend health care professionals offering consultation, psychotherapy, or both to gender diverse children and families/caregivers provide both parties with age-appropriate psychoeducation about gender development.

7.11- We recommend that health care professionals provide information to gender diverse children and their families/caregivers as the child approaches puberty about potential gender affirming medical interventions, the effects of these treatments on future fertility, and options for fertility preservation.

7.12- We recommend parents/caregivers and health care professionals respond supportively to children who desire to be acknowledged as the gender that matches their internal sense of gender identity.

7.13- We recommend health care professionals and parents/caregivers support children to continue to explore their gender throughout the pre-pubescent years, regardless of social transition.

7.14- We recommend the health care professionals discuss the potential benefits and risks of a social transition with families who are considering it.

7.15- We suggest health care professionals consider working collaboratively with other professionals and organizations to promote the well-being of gender diverse children and minimize the adversities they may face.

---

acceptance of their gender diversity and parenting guidance when requested. Comprehensive assessments are appropriate when solicited by a family requesting a full understanding of the child's gender and mental health needs in the context of gender diversity.

In these circumstances, family member mental health issues, family dynamics, and social and cultural contexts, all of which impact a gender diverse child, should be taken into consideration (Barrow & Apostle, 2018; Brown & Mar, 2018; Cohen-Kettenis et al., 2003; Hendricks & Testa, 2012; Kaufman & Tishelman, 2018; Ristori & Steensma, 2016; Tishelman & Neumann-Mascis, 2018). This is further elaborated upon in the text below.

It is important HCPs working with gender diverse children strive to understand the child and the family's various aspects of identity and experience: racial, ethnic, immigrant/refugee status, religious, geographic, and socio-economic, for example, and be respectful and sensitive to cultural context in clinical interactions (Telfer et al., 2018). Many factors may be relevant to culture and gender, including religious beliefs, gender-related expectations, and the degree to which gender diversity is accepted (Oliphant et al., 2018). Intersections between gender diversity, sociocultural diversity, and minority statuses can be sources of strength, social stress, or both (Brown & Mar, 2018; Oliphant et al., 2018; Riggs & Treharne, 2016).

Each child, family member, and family dynamic is unique and potentially encompasses multiple cultures and belief patterns. Thus, HCPs of all disciplines should avoid stereotyping based on preconceived ideas that may be incorrect or biased (e.g., that a family who belongs to a religious organization that is opposed to appreciating gender diversity will necessarily be unsupportive of their child's gender diversity) (Brown & Mar, 2018). Instead, it is essential to approach each family openly and understand each family member and family pattern as distinct.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 7.1

**We recommend the health care professionals working with gender diverse children receive training and have expertise in gender development and gender diversity in children and possess general knowledge of gender diversity across the life span.**

HCPs working with gender diverse children should acquire and maintain the necessary training and credentials relevant to the scope of their role as professionals. This includes licensure, certification, or both by appropriate national and/or regional accrediting bodies. We recognize the specifics of credentialing and regulation of professionals vary globally. Importantly, basic licensure, certification, or both may be insufficient in and of itself to ensure competency working with gender diverse children, as HCPs specifically require in-depth training and supervised experience in childhood gender development and gender diversity to provide appropriate care.

Statement 7.2

**We recommend health care professionals working with gender diverse children receive theoretical and evidenced-based training and develop expertise in general child and family mental health across the developmental spectrum.**

HCPs should receive training and supervised expertise in general child and family mental health across the developmental spectrum from toddlerhood through adolescence, including evidence-based assessment and intervention approaches. Gender diversity is not a mental health disorder; however, as cited above, we know mental health can be adversely impacted for gender diverse children (e.g., through gender minority stress) (Hendricks & Testa, 2012) that may benefit from exploration and support; therefore, mental health expertise is highly recommended. Working with children is a complex endeavor, involving

an understanding of a child's developmental needs at various ages, the ability to comprehend the forces impacting a child's well-being both inside and outside the family (Kaufman & Tishelman, 2018), and an ability to fully assess when a child is unhappy or experiencing significant mental health difficulties, related or unrelated to gender. Research has indicated high levels of adverse experiences and trauma in the gender diverse community of children, including susceptibility to rejection or even maltreatment (APA, 2015; Barrow & Apostle, 2018; Giovanardi et al., 2018; Reisner, Greytak et al., 2015; Roberts et al., 2012; Tishelman & Neumann-Mascis, 2018). HCPs need to be cognizant of the potential for adverse experiences and be able to initiate effective interventions to prevent harm and promote positive well-being.

Statement 7.3

**We recommend health care professionals working with gender diverse children receive training and develop expertise in autism spectrum disorders and other neurodiversity or collaborate with an expert with relevant expertise when working with autistic/neurodivergent, gender diverse children.**

The experience of gender diversity in autistic children as well as in children with other forms of neurodivergence may present extra clinical complexities (de Vries et al., 2010; Strang, Meagher et al., 2018). For example, autistic children may find it difficult to self-advocate for their gender-related needs and may communicate in highly individualistic ways (Kuvalanka et al., 2018; Strang, Powers et al., 2018). They may have varied interpretations of gender-related experiences given common differences in communication and thinking style. Because of the unique needs of gender diverse neurodivergent children, they may be at high risk for being misunderstood (i.e., for their communications to be misinterpreted). Therefore, professionals providing support to these children can best serve them by receiving training and developing expertise in autism and related neurodevelopmental presentations and/or collaborating with autism specialists (Strang, Meagher et al., 2018). Such training is especially relevant as research has documented

42

higher rates of autism among gender diverse youth than in the general population (de Vries et al., 2010; Hisle-Gorman et al., 2019; Shumer et al., 2015).

### Statement 7.4
**We recommend health care professionals working with gender diverse children engage in continuing education related to gender diverse children and families.**

Continuing professional development regarding gender diverse children and families may be acquired through various means, including through readings (journal articles, books, websites associated with gender knowledgeable organizations), attending on-line and in person trainings, and joining peer supervision/consultation groups (Bartholomaeus et al., 2021).

Continuing education includes 1) maintaining up-to-date knowledge of available and relevant research on gender development and gender diversity in prepubescent children and gender diversity across the life span; 2) maintaining current knowledge regarding best practices for assessment, support, and treatment approaches with gender diverse children and families. This is a relatively new area of practice and health care professionals need to adapt as new information emerges through research and other avenues (Bartholomaeus et al., 2021).

### Statement 7.5
**We recommend health care professionals conducting an assessment with gender diverse children access and integrate information from multiple sources as part of the assessment.**

A comprehensive assessment, when requested by a family and/or an HCP can be useful for developing intervention recommendations, as needed, to benefit the well-being of the child and other family members. Such an assessment can be beneficial in a variety of situations when a child and/or their family/guardians, in coordination with providers, feel some type of intervention would be helpful. Neither assessments nor interventions should ever be used as a means of covertly or overtly discouraging a child's gender diverse expressions or identity. Instead, with appropriately trained providers, assessment can be an effective means of better understanding how to support a child and their family without privileging any particular gender identity or expression. An assessment can be especially important for some children and their families by collaborating to promote a child's gender health, well-being, and self-fulfillment.

A comprehensive assessment can facilitate the formation of an individualized plan to assist a gender diverse prepubescent children and family members (de Vries & Cohen-Kettenis, 2012; Malpas et al., 2018; Steensma & Wensing-Kruger, 2019; Telfer et al., 2018; Tishelman & Kaufman, 2018). In such an assessment, integrating information from multiple sources is important to 1) best understand the child's gender needs and make recommendations; and 2) identify areas of child, family/caregiver, and community strengths and supports specific to the child's gender status and development as well as risks and concerns for the child, their family/caregivers and environment. Multiple informants for both evaluation and support/intervention planning purposes may include the child, parents/caregivers, extended family members, siblings, school personnel, HCPs, the community, broader cultural and legal contexts and other sources as indicated (Berg & Edwards-Leeper, 2018; Srinath, 2019).

An HCP conducting an assessment of gender diverse children needs to explore gender-related issues but must also take a broad view of the child and the environment, consistent with the ecological model described above (Bronfenbrenner, 1979) to fully understand the factors impacting a child's well-being and areas of gender support and risk (Berg & Edwards-Leeper, 2018; Hendricks & Testa, 2012; Kaufman & Tishelman, 2018; Tishelman & Neumann-Mascis, 2018). This includes understanding the strengths and challenges experienced by the child/family and that are present in the environment. We advise HCPs conducting an assessment with gender diverse children to consider incorporating multiple assessment domains, depending on the child and the family's needs and circumstances. Although some of the latter listed domains below do not directly address the child's gender (see items 7–12 below), they need to be accounted for in a gender assessment, as indicated by clinical judgment, to understand the complex web of factors

that may be affecting the child's well-being in an integrated fashion, including gender health, consistent with evaluation best practices a (APA, 2015; Berg & Edwards-Leeper, 2018; Malpas et al., 2018) and develop a multi-pronged intervention when needed.

Summarizing from relevant research and clinical expertise, assessment domains often include 1) a child's asserted gender identity and gender expression, currently and historically; 2) evidence of dysphoria, gender incongruence, or both; 3) strengths and challenges related to the child, family, peer and others' beliefs and attitudes about gender diversity, acceptance and support for child; 4) child and family experiences of gender minority stress and rejection, hostility, or both due to the child's gender diversity; 5) level of support related to gender diversity in social contexts (e.g., school, faith community, extended family); 6) evaluation of conflict regarding the child's gender and/or parental/caregiver/sibling concerning behavior related to the child's gender diversity; 7) child mental health, communication and/or cognitive strengths and challenges, neurodivergence, and/or behavioral challenges causing significant functional difficulty; 8) relevant medical and developmental history; 9) areas that may pose risks (e.g., exposure to domestic and/or community violence, any form of child maltreatment; history of trauma; safety and/or victimization with peers or in any other setting; suicidality); 10) co-occurring significant family stressors, such as chronic or terminal illness, homelessness or poverty; 11) parent/caregiver and/or sibling mental health and/or behavioral challenges causing significant functional difficulty; and 12) child's and family's strengths and challenges.

A thorough assessment incorporating multiple forms of information gathering is helpful for understanding the needs, strengths, protective factors, and risks for a specific child and family across environments (e.g., home/school). Methods of information gathering often include 1) interviews with the child, family members and others (e.g., teachers), structured and unstructured; 2) caregiver and child completed standardized measures related to gender; general child well-being; child cognitive and communication skills and developmental disorders/disabilities; support and acceptance by parent/caregiver, sibling, extended

family and peers; parental stress; history of childhood adversities; and/or other issues as appropriate (APA, 2020; Berg & Edwards-Leeper, 2018; Kaufman & Tishelman, 2018; Srinath, 2019).

Depending on the family characteristics, the developmental profile of the child, or both, methods of information gathering also may also benefit from including the following 1) child and/or family observation, structured and unstructured; and 2) structured and visually supported assessment techniques (worksheets; self-portraits; family drawings, etc.) (Berg & Edwards-Leeper, 2018).

### Statement 7.6

**We recommend that health care professionals conducting an assessment with gender diverse children consider relevant developmental factors, neurocognitive functioning and language skills.**

Given the complexities of assessing young children who, unlike adults, are in the process of development across a range of domains (cognitive, social, emotional, physiological), it is important to consider the developmental status of a child and gear assessment modalities and interactions to the individualized abilities of the child. This includes tailoring the assessment to a child's developmental stage and abilities (preschoolers, school age, early puberty prior to adolescence), including using language and assessment approaches that prioritize a child's comfort, language skills, and means of self-expression (Berg & Edwards-Leeper, 2018; Srinath, 2019). For example, relevant developmental factors, such as neurocognitive differences (e.g., autism spectrum conditions), and receptive and expressive language skills should be considered in conducting the assessment. Health care professionals may need to consult with specialists for guidance in cases in which they do not possess the specialized skills themselves (Strang et al., 2021).

### Statement 7.7

**We recommend health care professionals conducting an assessment with gender diverse children consider factors that may constrain accurate reporting of gender identity/gender expression by the child and/or family/caregiver(s).**

HCPs conducting an assessment with gender diverse children and families need to account for developmental, emotional, and environmental factors that may constrain a child's, caregiver's, sibling or other's report or influence their belief systems related to gender (Riggs & Bartholomaeus, 2018). As with all child psychological assessments, environmental and family/caregiver reactions (e.g., punishment), and/or cognitive and social factors may influence a child's comfort and/or ability to directly discuss certain factors, including gender identity and related issues (Srinath, 2019). Similarly, family members may feel constrained in freely expressing their concerns and ideas depending on family conflicts or dynamics and/or other influences (e.g., cultural/religious; extended family pressure) (Riggs & Bartholomaeus, 2018).

<u>Statement 7.8</u>
**We recommend health care professionals consider consultation, psychotherapy, or both for a gender diverse child and family/caregivers when families and health care professionals believe this would benefit the well-being and development of a child and/or family.**

The goal of psychotherapy should never be aimed at modifying a child's gender identity (APA, 2021; Ashley, 2019b; Paré, 2020; SAMHSA, 2015; UN Human Rights Council, 2020), either covertly or overtly. Not all gender diverse children or their families need input from MHPs as gender diversity is not a mental health disorder (Pediatric Endocrine Society, 2020; Telfer et al., 2018). Nevertheless, it is often appropriate and helpful to seek psychotherapy when there is distress or concerns are expressed by parents to improve psychosocial health and prevent further distress (APA, 2015). Some of the common reasons for considering psychotherapy for a gender diverse child and family include the following 1) A child is demonstrating significant conflicts, confusion, stress or distress about their gender identity or needs a protected space to explore their gender (Ehrensaft, 2018; Spivey and Edwards-Leeper, 2019); 2) A child is experiencing external pressure to express their gender in a way that conflicts with their self-knowledge, desires, and beliefs (APA, 2015); 3) A child is struggling with mental health concerns, related to or independent of their gender

(Barrow & Apostle, 2018); 4) A child would benefit from strengthening their resilience in the face of negative environmental responses to their gender identity or presentation (Craig & Auston, 2018; Malpas et al., 2018); 5) A child may be experiencing mental health and/or environmental concerns, including family system problems that can be misinterpreted as gender congruence or incongruence (Berg & Edwards-Leeper, 2018); and 6) A child expresses a desire to meet with an MHP to get gender-related support. In these situations, the psychotherapy will focus on supporting the child with the understanding that the child's parent(s)/caregiver(s) and potentially other family members will be included as necessary (APA, 2015; Ehrensaft, 2018; McLaughlin & Sharp, 2018). Unless contraindicated, it is extremely helpful for parents/guardians to participate in some capacity in the psychotherapy process involving prepubescent children as family factors are often central to a child's well-being. Although relatively unexplored in research involving gender diverse children, it may be important to attend to the relationship between siblings and the gender diverse child (Pariseau et al., 2019; Parker & Davis-McCabe, 2021).

HCPs should employ interventions tailor-made to the individual needs of the child that are designed to 1) foster protective social and emotional coping skills to promote resilience in the face of potential negative reactions to the child's gender identity, expressions, or both (Craig & Austin, 2016; Malpas et al., 2018; Spencer, Berg et al., 2021); 2) collaboratively problem-solve social challenges to reduce gender minority stress (Barrow & Apostle, 2018; Tishelman & Neumann-Mascis, 2018); 3) strengthen environmental supports for the child and/or members of the immediate and extended family (Kaufman & Tishelman, 2018); and 4) provide the child an opportunity to further understand their internal gender experiences (APA, 2015; Barrow& Apostle, 2018; Ehrensaft, 2018; Malpas et al., 2018; McLaughlin & Sharp, 2018). It is helpful for HCPs to develop a relationship with a gender diverse child and family that can endure over time as needed. This enables the child/family to establish a long-term trusting relationship throughout childhood whereby the HCP can offer support and guidance as a child matures and as potentially

different challenges or needs emerge for the child/family (Spencer, Berg et al., 2021; Murchison et al., 2016). In addition to the above and within the limits of available resources, when a child is neurodivergent, an HCP who has the skill set to address both neurodevelopmental differences and gender is most appropriate (Strang et al., 2021).

As outlined in the literature, there are numerous reasons parents/caregivers, siblings, and extended family members of a prepubescent child may find it useful to seek psychotherapy for themselves (Ehrensaft, 2018; Malpas et al., 2018; McLaughlin & Sharp, 2018). As summarized below, some of these common catalysts for seeking such treatment occur when one or more *family members* 1) desire education around gender development (Spivey & Edwards-Leeper, 2019); 2) are experiencing significant confusion or stress about the child's gender identity, expression, or both (Ashley, 2019c; Ehrensaft, 2018); 3) need guidance related to emotional and behavioral concerns regarding the gender diverse child (Barrow & Apostle, 2018); 4) need support to promote affirming environments outside of the home (e.g., school, sports, camps) (Kaufman & Tishelman, 2018); 5) are seeking assistance to make informed decisions about social transition, including how to do so in a way that is optimal for a child's gender development and health (Lev & Wolf-Gould, 2018); 6) are seeking guidance for dealing with condemnation from others, including political entities and accompanying legislation, regarding their support for their gender diverse child (negative reactions directed toward parents/caregivers can sometimes include rejection and/or harassment/abuse from the social environment arising from affirming decisions (Hidalgo & Chen, 2019); 7) are seeking to process their own emotional reactions and needs about their child's gender identity, including grief about their child's gender diversity and/or potential fears or anxieties for their child's current and future well-being (Pullen Sansfaçon et al., 2019); and 8) are emotionally distressed and/or in conflict with other family members regarding the child's gender diversity (as needed, HCPs can provide separate sessions for parents/caregivers, siblings and extended family members for support, guidance, and/or psychoeducation)

(McLaughlin & Sharp, 2018; Pullen Sansfaçon et al., 2019; Spivey & Edwards-Leeper, 2019).

<u>Statement 7.9</u>
**We recommend health care professionals offering consultation, psychotherapy, or both to gender diverse children and families/caregivers work with other settings and individuals important to the child to promote the child's resilience and emotional well-being.**

Consistent with the ecological model described above and, as appropriate, based on individual/family circumstances, it can be extremely helpful for HCPs to prioritize coordination with important others (e.g., teachers, coaches, religious leaders) in a child's life to promote emotional and physical safety across settings (e.g., school settings, sports and other recreational activities, faith-based involvement) (Kaufman & Tishelman, 2018). Therapeutic and/or support groups are often recommended as a valuable resource for families/caregivers and/or gender diverse children themselves (Coolhart, 2018; Horton et al., 2021; Malpas et al., 2018; Murchison et al., 2016).

<u>Statement 7.10</u>
**We recommend HCPs offering consultation, psychotherapy, or both to gender diverse children and families/caregivers provide both parties with age appropriate psycho-education about gender development.**

Parents/caregivers and their gender diverse child should have the opportunity to develop knowledge regarding ways in which families/caregivers can best support their child to maximize resilience, self-awareness, and functioning (APA, 2015; Ehrensaft, 2018; Malpas, 2018; Spivey & Edwards-Leeper, 2019). It is neither possible nor is it the role of the HCP to predict with certainty the child's ultimate gender identity; instead, the HCP's task is to provide a safe space for the child's identity to develop and evolve over time without attempts to prioritize any particular developmental trajectory with regard to gender (APA, 2015; Spivey & Edwards-Leeper, 2019). Gender diverse children and early adolescents have different needs and experiences than older adolescents, socially and physiologically, and those differences should be reflected in the individualized approach HCPs

provide to each child/family (Keo-Meir & Ehrensaft, 2018; Spencer, Berg et al., 2021).

Parents/caregivers and their children should also have the opportunity to develop knowledge about gender development and gender literacy through age-appropriate psychoeducation (Berg & Edwards-Leeper, 2018; Rider, Vencill et al., 2019; Spencer, Berg et al., 2021). Gender literacy involves understanding the distinctions between sex designated at birth, gender identity, and gender expression, including the ways in which these three factors uniquely come together for a child (Berg & Edwards-Leeper, 2018; Rider, Vencill et al., 2019; Spencer, Berg et al., 2021). As a child gains gender literacy, they begin to understand their body parts do not necessarily define their gender identity and/or their gender expression (Berg & Edwards-Leeper, 2018; Rider, Vencill et al., 2019; Spencer, Berg et al., 2021). Gender literacy also involves learning to identify messages and experiences related to gender within society. As a child gains gender literacy, they may view their developing gender identity and gender expression more positively, promoting resilience and self-esteem, and diminishing risk of shame in the face of negative messages from the environment. Gaining gender literacy through psychoeducation may also be important for siblings and/or extended family members who are important to the child (Rider, Vencill et al., 2019; Spencer, Berg et al., 2021).

### Statement 7.11

**We recommend health care professionals provide information to gender diverse children and their families/caregivers as the child approaches puberty about potential gender-affirming medical interventions, the effects of these treatments on future fertility, and options for fertility preservation.**

As a child matures and approaches puberty, HCPs should prioritize working with children and their parents/caregivers to integrate psychoeducation about puberty, engage in shared decision-making about potential gender-affirming medical interventions, and discuss fertility-related and other reproductive health implications of medical treatments (Nahata, Quinn et al., 2018; Spencer, Berg et al., 2021). Although only limited

empirical research exists to evaluate such interventions, expert consensus and developmental psychological literature generally support the notion that open communication with children about their bodies and preparation for physiological changes of puberty, combined with gender-affirming acceptance, will promote resilience and help to foster positive sexuality as a child matures into adolescence (Spencer, Berg et al., 2019). All these discussions may be extended (e.g., starting earlier) to include neurodivergent children, to ensure there is enough time for reflection and understanding, especially as choices regarding future gender-affirming medical care potentially arise (Strang, Jarin et al., 2018). These discussions could include the following topics:

- Review of body parts and their different functions;
- The ways in which a child's body may change over time with and without medical intervention;
- The impact of medical interventions on later sexual functioning and fertility;
- The impact of puberty suppression on potential later medical interventions;
- Acknowledgment of the current lack of clinical data in certain areas related to the impacts of puberty suppression;
- The importance of appropriate sex education prior to puberty.

These discussions should employ developmentally appropriate language and teaching styles, and be geared to the specific needs of each individual child (Spencer, Berg et al., 2021).

### Statement 7.12

**We recommend parents/caregivers and health care professionals respond supportively to children who desire to be acknowledged as the gender that matches their internal sense of gender identity.**

Gender social transition refers to a process by which a child is acknowledged by others and has the opportunity to live publicly, either in all situations or in certain situations, in the gender identity they affirm and has no singular set of parameters or actions (Ehrensaft et al., 2018).

Gender social transition has often been conceived in the past as binary—a girl transitions to a boy, a boy to a girl. The concept has expanded to include children who shift to a nonbinary or individually shaped iteration of gender identity (Chew et al., 2020; Clark et al., 2018). Newer research indicates the social transition process may serve a protective function for some prepubescent children and serve to foster positive mental health and well-being (Durwood et al., 2017; Gibson et al., 2021; Olson et al., 2016). Thus, recognition that a child's gender may be fluid and develop over time (Edwards-Leeper et al., 2016; Ehrensaft, 2018; Steensma, Kreukels et al., 2013) is not sufficient justification to negate or deter social transition for a prepubescent child when it would be beneficial. Gender identity evolution may continue even after a partial or complete social transition process has taken place (Ashley, 2019e; Edwards-Leeper et al., 2018; Ehrensaft, 2020; Ehrensaft et al., 2018; Spivey & Edwards-Leeper, 2019). Although empirical data remains limited, existing research has indicated children who are most assertive about their gender diversity are most likely to persist in a diverse gender identity across time, including children who socially transition prior to puberty (Olson et al., 2022; Rae et al., 2019; Steensma, McGuire et al., 2013). Thus, when considering a social transition, we suggest parents/caregivers and HCPs pay particular attention to children who consistently and often persistently articulate a gender identity that does not match the sex designated at birth. This includes those children who may explicitly request or desire a social acknowledgement of the gender that better matches the child's articulated gender identity and/or children who exhibit distress when their gender as they know it is experienced as incongruent with the sex designated at birth (Rae et al., 2019; Steensma, Kreukels et al., 2013).

Although there is a dearth of empirical literature regarding best practices related to the social transition process, clinical literature and expertise provides the following guidance that prioritizes a child's best interests (Ashley, 2019e; Ehrensaft, 2018; Ehrensaft et al, 2018; Murchison et al., 2016; Telfer et al., 2018): 1) social transition should originate from the child and reflect the child's wishes in the process of making the decision to initiate a social transition process; 2) an HCP may assist exploring the advantages/benefits, plus potential challenges of social transition; 3) social transition may best occur in all or in specific contexts/settings only (e.g., school, home); and 4) a child may or may not choose to disclose to others that they have socially transitioned, or may designate, typically with the help of their parents/caregivers, a select group of people with whom they share the information.

In summary, social transition, when it takes place, is likely to best serve a child's well-being when it takes place thoughtfully and individually for each child. A child's social transition (and gender as well) may evolve over time and is not necessarily static, but best reflects the cross-section of the child's established self-knowledge of their present gender identity and desired actions to express that identity (Ehrensaft et al., 2018).

A social transition process can include one or more of a number of different actions consistent with a child's affirmed gender (Ehrensaft et al., 2018), including:

- Name change;
- Pronoun change;
- Change in sex/gender markers (e.g., birth certificate; identification cards; passport; school and medical documentation; etc.);
- Participation in gender-segregated programs (e.g., sports teams; recreational clubs and camps; schools; etc.);
- Bathroom and locker room use;
- Personal expression (e.g., hair style; clothing choice; etc.);
- Communication of affirmed gender to others (e.g., social media; classroom or school announcements; letters to extended families or social contacts; etc.).

Statement 7.13

**We recommend health care professionals and parents/caregivers support children to continue to explore their gender throughout the pre-pubescent years, regardless of social transition.**

It is important children who have engaged in social transition be afforded the same opportunities as other children to continue considering

meanings and expressions of gender throughout their childhood years (Ashley 2019e; Spencer, Berg et al., 2021). Some research has found children may experience gender fluidity or even detransition after an initial social transition. Research has not been conclusive about when in the life span such detransition is most likely to occur, or what percentage of youth will eventually experience gender fluidity and/or a desire to detransition—due to gender evolution, or potentially other reasons (e.g., safety concerns; gender minority stress) (Olson et al., 2022; Steensma, Kreukels et al., 2013). A recent research report indicates in the US, detransition occurs with only a small percentage of youth five years after a binary social transition (Olson et al., 2022); further follow-up of these young people would be helpful. Replication of these findings is important as well since this study was conducted with a limited and self-selected participant pool in the US and thus may not be applicable to all gender diverse children. In summary, we have limited ability to know in advance the ways in which a child's gender identity and expressions may evolve over time and whether or why detransition may take place for some. In addition, not all gender diverse children wish to explore their gender (Telfer et al., 2018). Cisgender children are not expected to undertake this exploration, and therefore attempts to force this with a gender diverse child, if not indicated or welcomed, can be experienced as pathologizing, intrusive and/or cisnormative (Ansara & Hegarty, 2012; Bartholomaeus et al., 2021; Oliphant et al., 2018).

### Statement 7.14

**We recommend health care professionals discuss the potential benefits and risks of a social transition with families who are considering it.**

Social transition in prepubescent children consists of a variety of choices, can occur as a process over time, is individualized based on both a child's wishes and other psychosocial considerations (Ehrensaft, 2018), and is a decision for which possible benefits and challenges should be weighted and discussed.

A social transition may have potential benefits as outlined in clinical literature (e.g., Ehrensaft et al., 2018) and supported by research (Fast &

Olson, 2018; Rae et al., 2019). These include facilitating gender congruence while reducing gender dysphoria and enhancing psychosocial adjustment and well-being (Ehrensaft et al., 2018). Studies have indicated socially transitioned gender diverse children largely mirror the mental health characteristics of age matched cisgender siblings and peers (Durwood et al., 2017). These findings differ markedly from the mental health challenges consistently noted in prior research with gender diverse children and adolescents (Barrow & Apostle, 2018) and suggest the impact of social transition may be positive. Additionally, social transition for children typically can only take place with the support and acceptance of parents/caregivers, which has also been demonstrated to facilitate well-being in gender diverse children (Durwood et al., 2021; Malpas et al., 2018; Pariseau et al., 2019), although other forms of support, such as school-based support, have also been identified as important (Durwood et al., 2021; Turban, King et al., 2021). HCPs should discuss the potential benefits of a social transition with children and families in situations in which 1) there is a consistent, stable articulation of a gender identity that is incongruent with the sex assigned at birth (Fast & Olson, 2018). This should be differentiated from gender diverse expressions/behaviors/interests (e.g., playing with toys, expressing oneself through clothing or appearance choices, and/or engaging in activities socially defined and typically associated with the other gender in a binary model of gender) (Ehrensaft, 2018; Ehrensaft et al., 2018); 2) the child is expressing a strong desire or need to transition to the gender they have articulated as being their authentic gender (Ehrensaft et al., 2018; Fast & Olson, 2018; Rae et al., 2019); and 3) the child will be emotionally and physically safe during and following transition (Brown & Mar, 2018). Prejudice and discrimination should be considerations, especially in localities where acceptance of gender diversity is limited or prohibited (Brown & Mar, 2018; Hendricks & Testa, 2012; Turban, King et al., 2021). Of note, there can also be possible risks to a gender diverse child who does not socially transition, including 1) being ostracized or bullied for being perceived as not conforming to prescribed community

gender roles and/or socially expected patterns of behavior; and 2) living with the internal stress or distress that the gender they know themselves to be is incongruent with the gender they are being asked to present to the world.

To promote gender health, the HCP should discuss the potential challenges of a social transition. One concern often expressed relates to fear that a child will preclude considering the possible evolution of their gender identity as they mature or be reluctant to initiate another gender transition even if they no longer feel their social transition matches their current gender identity (Edwards-Leeper et al., 2016; Ristori & Steensma, 2016). Although limited, recent research has found some parents/caregivers of children who have socially transitioned may discuss with their children the option of new gender iterations (for example, reverting to an earlier expression of gender) and are comfortable about this possibility (Olson et al., 2019). Another often identified social transition concern is that a child may suffer negative sequelae if they revert to the former gender identity that matches their sex designated at birth (Chen et al., 2018; Edwards-Leeper et al., 2019; Steensma & Cohen-Kettenis, 2011). From this point of view, parents/caregivers should be aware of the potential developmental effect of a social transition on a child.

HCPs should provide guidance to parents/caregivers and supports to a child when a social gender transition is being considered or taking place by 1) providing consultation, assessment, and gender supports when needed and sought by the parents/caregivers; 2) aiding family members, as needed, to understand the child's desires for a social transition and the family members' own feelings about the child's expressed desires; 3) exploring with, and learning from, the parents/caregivers whether and how they believe a social transition would benefit their child both now and in their ongoing development; 4) providing guidance when parents/caregivers are not in agreement about a social transition and offering the opportunity to work together toward a consistent understanding of their child's gender status and needs; 5) providing guidance about safe and supportive ways to disclose their child's social transition to others and to facilitate their child transitioning in their various social environments (e.g., schools,

extended family); 6) facilitating communication, when desired by the child, with peers about gender and social transition as well as fortifying positive peer relationships; 7) providing guidance when social transition may not be socially accepted or safe, either everywhere or in specific situations, or when a child has reservations about initiating a transition despite their wish to do so; there may be multiple reasons for reservations, including fears and anxieties; 8) working collaboratively with family members and MHPs to facilitate a social transition in a way that is optimal for the child's unfolding gender development, overall well-being, and physical and emotional safety; and 9) providing psychoeducation about the many different trajectories the child's gender may take over time, leaving pathways open to future iterations of gender for the child, and emphasizing there is no need to predict an individual child's gender identity in the future (Malpas et al., 2018).

All of these tasks incorporate enhancing the quality of communication between the child and family members and providing an opportunity for the child to be heard and listened to by all family members involved. These relational processes in turn facilitate the parents/caregivers' success in making informed decisions about the advisability and/or parameters of a social transition for their child (Malpas et al., 2018).

One role of HCPs is to provide guidance and support in situations in which children and parents/caregivers wish to proceed with a social transition but conclude that the social environment would not be accepting of those choices, by 1) helping parents/caregivers define and extend safe spaces in which the child can express their authentic gender freely; 2) discussing with parents/caregivers ways to advocate that increase the likelihood of the social environment being supportive in the future, if this is a realistic goal; 3) intervening as needed to help the child/family with any associated distress and/or shame brought about by the continued suppression of authentic gender identity and the need for secrecy; and 4) building both the child's and the family's resilience, instilling the understanding that if the social environment is having difficulty accepting a child's social transition and affirmed gender identity, it is not because of some shortcoming in the child but because of

insufficient gender literacy in the social environment (Ehrensaft et al., 2018).

<u>Statement 7.15</u>

**We suggest health care professionals consider working collaboratively with other professionals and organizations to promote the well-being of gender diverse children and minimize the adversities they may face.**

All children have the right to be supported and respected in their gender identities (Human Rights Campaign, 2018; Paré, 2020; SAMHSA, 2015). As noted above, gender diverse children are a particularly vulnerable group (Barrow & Apostle, 2018; Cohen-Kettenis et al., 2003; Giovanardi et al., 2018; Gower, Rider, Coleman et al., 2018; Grossman & D'Augelli, 2007; Hendricks & Testa, 2012; Reisner, Greytak et al., 2015; Ristori & Steensma, 2016; Roberts et al., 2012; Tishelman & Neumann-Mascis, 2018). The responsibilities of HCPs as advocates encompass acknowledging social determinants of health are critical for marginalized minorities (Barrow & Mar, 2018; Hendricks & Testa, 2012). Advocacy is taken up by all HCPs in the form of child and family support (APA, 2015; Malpas et al., 2018).

Some HCPs may be called on to move beyond their individual offices or programs to advocate for gender diverse children in the larger community, often in partnership with stakeholders, including parents/caregivers, allies, and youth (Kaufman & Tishelman, 2018; Lopez et al., 2017; Vanderburgh, 2009). These efforts may be instrumental in enhancing children's gender health and promoting their civil rights (Lopez et al., 2017).

HCP's voices may be essential in schools, in parliamentary bodies, in courts of law, and in the media (Kuvalanka et al., 2019; Lopez et al., 2017; Whyatt-Sames, 2017; Vanderburgh, 2009). In addition, HCPs may have a more generalized advocacy role in acknowledging and addressing the frequent intentional or unintentional negating of the experience of gender diverse children that may be transmitted or communicated by adults, peers, and in media (Rafferty et al., 2018). Professionals who possess the skill sets and find themselves in appropriate situations can provide clear de-pathologizing statements on the needs and rights of gender diverse children and on the damage caused by discriminatory and transphobic rules, laws, and norms (Rafferty et al., 2018).

## CHAPTER 8 Nonbinary

Nonbinary is used as an umbrella term referring to individuals who experience their gender as outside of the gender binary. The term nonbinary is predominantly but not exclusively associated with global north contexts and may sometimes be used to describe indigenous and non-Western genders. The term nonbinary includes people whose genders are comprised of more than one gender identity simultaneously or at different times (e.g., bigender), who do not have a gender identity or have a neutral gender identity (e.g., agender or neutrois), have gender identities that encompass or blend elements of other genders (e.g., polygender, demiboy, demigirl), and/or who have a gender that changes over time (e.g., genderfluid) (Kuper et al., 2014; Richards et al., 2016; Richards et al., 2017; Vincent, 2019). Nonbinary people may identify to varying degrees with binary-associated genders, e.g., nonbinary man/woman, or with multiple gender terms, e.g., nonbinary and genderfluid (James et al., 2016; Kuper et al., 2012). Nonbinary also functions as a gender identity in its own right (Vincent, 2020). It is important to acknowledge this is not an exhaustive list, the same identities can have different meanings for different people, and the use of terms can vary over time and by location.

Genderqueer, first used in the 1990s, is an identity category somewhat older than nonbinary—which first emerged in approximately the late 2000s (Nestle et al., 2002; Wilchins, 1995). Genderqueer may sometimes be used synonymously with nonbinary or may communicate a specific consciously politicized dimension to a person's gender. While transgender is used in many cultural contexts as an umbrella term inclusive of nonbinary people, not all nonbinary people consider themselves to be transgender for a range of reasons, including because they consider being transgender to be exclusively within the gender binary or because they do not feel "trans enough" to describe themselves as transgender (Garrison, 2018). Some nonbinary people are unsure or ambivalent about whether they would describe themselves as transgender (Darwin, 2020; Vincent, 2019).

In the context of the English language, nonbinary people may use the pronouns they/them/theirs, or neopronouns which include e/em/eir, ze/zir/hir, er/ers/erself among others (Moser & Devereux, 2019; Vincent, 2018). Some nonbinary people use a combination of pronouns (either deliberately mixing usage, allowing free choice, or changing with social context), or prefer to avoid gendered pronouns entirely, instead using their name. Additionally, some nonbinary people use she/her/hers, or he/him/his, sometimes or exclusively, whilst in some regions in the world descriptive language for nonbinary people does not (yet) exist. In contexts outside of English, a wide range of culturally specific linguistic adaptations and evolutions can be observed (Attig, 2022; Kirey-Sitnikova, 2021; Zimman, 2020). Also of note, some languages use one pronoun that is not associated with sex or gender while others gender all nouns. These variations in language are likely to influence nonbinary people's experience of gender and how they interact with others.

Recent studies suggest nonbinary people comprise roughly 25% to over 50% of the larger transgender population, with samples of youth reporting the highest percentage of nonbinary people (Burgwal et al., 2019; James et al., 2016; Watson, 2020). In recent studies of transgender adults, nonbinary people tend to be younger than transgender men and transgender women and in studies of both youth and adults, nonbinary people are more likely to have been assigned female at birth (AFAB). However, these findings should be interpreted with caution as there are likely a number of complex, sociocultural factors influencing the quality, representativeness, and accuracy of this data (Burgwal et al., 2019; James et al., 2016; Watson, 2020; Wilson & Meyer, 2021) (see also Chapter 3—Population Estimates).

### Understanding gender identities and gender expressions as a non-linear spectrum

Nonbinary genders have long been recognized historically and cross-culturally (Herdt, 1994; McNabb, 2017; Vincent & Manzano, 2017). Many gender identity categories are culturally specific and cannot be easily translated from their context, either linguistically or in relation to the Western paradigm of gender. Historical settler colonial interactions with indigenous people with

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH  S81

non-Western genders remain highly relevant as cultural erasure and the intersections of racism and cisnormativity may detrimentally inform the social determinants of health of indigenous gender diverse people. From the 1950s, gender was used to reference the socially constructed categorization of behaviors, activities, appearance, etc. in relation to a binary model of male/man/masculine, and female/woman/feminine within contemporary Western contexts. However, gender now has a wider range of possible meanings, appreciating interrelated yet distinguishable concepts, including gendered biology (sex), gender roles, gender expression, and gender identity (Vincent, 2020). Aspects of gender expression that might traditionally be understood culturally as "masculine", "feminine", or "androgynous" may be legitimately expressed among people of any and all gender identities, whether nonbinary or not. For example, a nonbinary individual presenting in a feminine manner cannot be taken to imply they will necessarily later identify as a woman or access interventions associated with transgender women, such as vaginoplasty. A person's gender nonconformity in relation to cultural expectations should neither be viewed as a cause for concern nor assumed to be indicative of clinical complexity—for example, a nonbinary person assigned male at birth (AMAB) wearing feminine-coded clothing, using she/her pronouns, but keeping a masculine-coded first name.

Modeling gender as a spectrum offers greater nuance than a binary model. However, there remain significant limitations in a linear spectrum model that can lead to uncritical generalizations about gender. For example, while it is intuitive to position the "binary options" (man/male, woman/female) at either end of such a continuum, doing so situates masculinity as oppositional to femininity, failing to accommodate gender neutrality, the expression of masculinity and femininity simultaneously, and genderqueer or non-Western concepts of gender. It is essential HCPs do not view nonbinary genders as "partial" articulations of transgender manhood (in nonbinary people AFAB) or transgender womanhood (in nonbinary people AMAB), or definitively as "somewhere along the spectrum of masculinity/femininity"; some nonbinary individuals consider themselves outside male/female dichotomization altogether. A *non-linear* spectrum indicates differences of gender expression, identity, or needs around gender affirmation between clients should not be compared for the purposes of situating them along a linear spectrum. Additionally, the interpretation of gender expression is subjective and culturally defined, and what may be experienced or viewed as highly feminine by one person may not be viewed as such by another (Vincent, 2020). HCPs benefit from avoiding assumptions about how each client conceptualizes their gender and by being prepared to be led by a given client's personal understanding of gender as it relates to the client's gender identity, expression, and any need for medical care.

The gender development process experienced by all transgender and gender diverse (TGD) people regardless of their relationship to a gender binary appear to share similar themes (e.g., awareness, exploration, meaning making, integration), but the timing, progression, and personal experiences associated with each of these processes vary both within and across groups of transgender and nonbinary people (Kuper, Wright et al., 2018; Kuper, Lindley et al., 2019; Tatum et al., 2020). Sociocultural and intersectional perspectives can be helpful at contextualizing gender development and social transition, including how individual experiences are shaped by the social and cultural context and how they interact with additional domains of identity and personal experience.

### The need for access to gender-affirming care

Some nonbinary people seek gender-affirming care to alleviate gender dysphoria or incongruence and increase body satisfaction through medically necessary interventions (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1). Some nonbinary people may feel a certain treatment is necessary for them—see also Chapter 5—Assessment of Adults (Beek et al., 2015; Jones et al., 2019; Köhler et al., 2018), whilst others do not (Burgwal & Motmans, 2021; Nieder, Eyssel et al., 2020), and the proportion of nonbinary people who seek gender-affirming care and the specific goals of

that care, remains unclear. It is the role of the health care professional to provide information about existing medical options (and their availability) that might help alleviate gender dysphoria or incongruence and increase body satisfaction without making assumptions about which treatment options may best fit each individual person.

Motivations for accessing (or not accessing) gender-affirming medical interventions, including hormone treatment, surgeries, or both are heterogeneous and potentially complex (Burgwal & Motmans, 2021; Vincent, 2019, 2020) and should be explored collaboratively before making decisions about physical interventions. The need of an individual to access gender-affirming medical procedures cannot be predicted by their gender role, expression, or identity. For example, some transgender women have no need of vaginoplasty, while some nonbinary individuals AMAB may need and benefit from that same intervention. Further, nonbinary people seeking gender-affirming care associated closely with a transition pathway from their assigned sex/gender to the other binarily-recognized category (i.e., estrogen therapy and vaginoplasty for someone AMAB) does not undermine the validity of their nonbinary identity.

While barriers to care remain widespread for many transgender people, nonbinary people appear to experience particularly high rates of difficulty accessing both mental health and gender-affirming medical care (Clark et al., 2018; James, 2016). Many nonbinary people report having experiences with health care professionals who were not affirming of their nonbinary gender, including experiences where health care professionals convey beliefs that their gender is not valid, or they are fundamentally more difficult to provide care for (Valentine, 2016; Vincent, 2020). Nonbinary people may face provider assumptions that they do not need or want gender-affirming treatment (Kcomt et al., 2020; Vincent, 2020) and have described experiencing pressure to present themselves as transgender men or transgender women (within a binary framework of gender) in order to access treatment (Bradford et al., 2019; Taylor et al., 2019). At times, nonbinary people find themselves educating the provider from whom they are seeking services despite the inappropriateness of providers

relying primarily on their patients for education (Kcomt et al., 2020). In comparison to transgender men and transgender women, Burgwal and Motmans (2021) found that nonbinary people experienced more fear of prejudice from health care providers, less confidence in the services provided, and greater difficulty knowing where to go to for care. Studies in both Europe and US have shown that nonbinary individuals tend to delay care more often than binary transgender men or transgender women, with fear of insensitive or incompetent treatment being the most cited reason (Burgwal & Motmans, 2021; Grant et al., 2011). Nonbinary people also appear less likely to disclose their gender identity to their health care providers than other transgender people (Kcomt et al., 2020).

### The need for an appropriate level of support

Providing gender-affirming care to nonbinary people goes beyond the provision of specific gender-affirming interventions such as hormone therapy or surgery and involves supporting the overall health and development of nonbinary people. Minority stress models have been adapted to conceptualize how the gender-related stressors experienced by transgender people are associated with physical and mental health disparities (Delozier et al., 2020; Testa et al., 2017). Nonbinary people appear to experience minority stressors that are both similar to and unique from those experienced by transgender men and transgender women. Johnson (2020) reported that experiences of invalidation are particularly high among nonbinary people, e.g., statements or actions conveying a belief that nonbinary identities are not "real" or are the result of a "fad" or "phase," and nonbinary people appear less likely than transgender men and transgender women to have their correct pronouns used by others. Similarly, nonbinary people have described feeling "invisible" to others (Conlin, 2019; Taylor, 2018) and one study found that nonbinary youth reported lower levels of self-esteem in comparison to young transgender men and transgender women (Thorne, Witcomb et al., 2019).

While many TGD people report experiences of discrimination, victimization, and interpersonal rejection (James, 2016) including bullying within

samples of youth (Human Rights Campaign, 2018; Witcomb et al., 2019), the prevalence of these experiences may vary across groups and appears influenced by additional intersecting characteristics. For example, Newcomb (2020) found transgender women and nonbinary youth AMAB experienced higher levels of victimization than transgender men and nonbinary youth AFAB, with nonbinary youth AMAB reporting the highest levels of traumatic stress. In a second study, Poquiz (2021) found transgender men and transgender women experienced higher levels of discrimination than nonbinary people. This intersectional complexity is also likely contributing to the variability in findings from studies comparing the physical and mental health of nonbinary and transgender men and transgender women, with some studies indicating more physical and mental health concerns among nonbinary people, some reporting less concerns, and some reporting no difference between groups (Scandurra, 2019).

Given nonbinary identity narratives may be less widely available than more binary-oriented identity narratives, nonbinary people may have less resources available to explore and articulate their gender-related sense of self. For example, this might include access to community spaces and interpersonal relationships where nonbinary identity can be explored, or access to language and concepts that allow more nuanced consideration of nonbinary experiences (Bradford et al., 2018; Fiani & Han, 2019; Galupo et al., 2019). Clinical guidance is now developing to assist providers in adapting gender-affirming therapeutic care to meet these unique experiences of nonbinary people (Matsuno, 2019; Rider, Vencill et al., 2019).

### Gender-affirming medical interventions for nonbinary people

In contexts where a particular medical intervention does not have established precedent, it is important that before the intervention is considered, the individual is provided with an overview of the available information, including recognition of potential knowledge limits. It is equally important to undertake and document a comprehensive discussion of the physical changes needed and the potential limitations in achieving those attributes, as well as the implication that any given intervention may or may not enhance an individual's ability to express their gender.

With regards to estrogen therapy for nonbinary people AMAB, it is important to note the possibility of breast growth cannot be avoided (Seal, 2017). Although the extent of growth is highly variable, this should be made clear if a nonbinary person seeks some of the other changes associated with estrogen therapy (such as softening of skin and reduction in facial hair growth) but does not want or is ambivalent about breast growth. Likewise, for nonbinary people AFAB who may wish to access testosterone to acquire some changes but not others, it should be recognized that if facial hair development is needed, genital growth is inevitable (Seal, 2017). The time frame for taking testosterone means these changes are likely also to be accompanied by an irreversible vocal pitch drop, although the extent of each is individual (Vincent, 2019; Ziegler et al., 2018). A vocal pitch drop without the development of body hair is another such challenge. For some nonbinary people, hair removal is a very important part of their gender affirmation (Cocchetti, Ristori, Romani et al., 2020).

If hormonal therapy is discontinued and gonads are retained, many physical changes will revert to pre-hormone therapy status as gonadal hormones once again take effect, including reversal of amenorrhea and body hair development in nonbinary people AFAB and reduction in muscular definition and erectile dysfunction in nonbinary people AMAB. Other changes will be permanent such as "male-pattern" baldness, genital growth, and facial hair growth in nonbinary people AFAB or breast development in nonbinary people AMAB (Hembree et al., 2017). These will require further interventions to reverse, such as electrolysis or mastectomy and are sometimes described as "partially reversible" (Coleman et al., 2012). As the implications of using low-dose hormone therapy are not documented in this patient population, it is important to consider monitoring for cardiovascular risk and bone health if low-dose hormone therapy is used. For more detailed information see Chapter 12—Hormone Therapy.

If neither testosterone nor estrogen expression is needed, inhibition of estrogen and/or testosterone

---

**Statements of Recommendations**

8.1- We recommend health care professionals provide nonbinary people with individualized assessment and treatment that affirms their experience of gender.

8.2- We recommend health care professionals consider gender-affirming medical interventions (hormonal treatment or surgery) for nonbinary people in the absence of "social gender transition."

8.3- We recommend health care professionals consider gender-affirming surgical interventions in the absence of hormonal treatment, unless hormone therapy is required to achieve the desired surgical result.

8.4- We recommend health care professionals provide information to nonbinary people about the effects of hormonal therapies/surgery on future fertility and discuss the options for fertility preservation prior to starting hormonal treatment or undergoing surgery.

---

production is possible. The implications of this with regards to increased cardiovascular risk, reduced bone mineralization, and risk of depression should be discussed and measures taken to mitigate risk (Brett et al., 2007; Vale et al., 2010; Wassersug & Johnson, 2007). For more information see also Chapter 9—Eunuchs and Chapter 12—Hormone Therapy. Exploration of medical and/or social transition independently of each other and options to explore hormones, surgery, or both independently of each other should be available to everyone, whether the person is a transgender man, transgender woman, or a nonbinary person.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

## Statement 8.1

**We recommend health care professionals provide nonbinary people with individualized assessment and treatment that affirms their nonbinary experiences of gender.**

An individualized assessment with a nonbinary person starts with an understanding of how they experience their own gender and how this impacts their goals for the care they are seeking. How individuals conceptualize their gender-related experiences are likely to vary across groups and cultures and may incorporate experiences associated with other intersecting aspects of identity (e.g., age, sexuality, race, ethnicity, socioeconomic status, disability status) (Kuper et al., 2014; Subramanian et al., 2016).

HCPs should avoid making a priori assumptions about any client's gender identity, expression, or needs for care. They should also be mindful that a client's nonbinary experience of gender may or may not be relevant to the assessment and treatment-related goals. The extent to which the client's gender is relevant to their treatment goals should determine the level of detail at which their gender identity is explored. For example, when seeking care for a presenting concern wholly unrelated to gender, simply determining the correct name and pronouns may be sufficient (Knutson et al., 2019). When addressing a concern for which current or past hormonal or surgical status is relevant, more detail may be needed, even if the concern is not specifically gender-related.

Clinical settings need to be welcoming, reflective of the diversity of genders, and affirm the experiences of gender of nonbinary people to be culturally competent. Ensuring clinic and provider information (e.g., websites), forms (e.g., intake surveys), and other materials are inclusive of nonbinary identities and experiences conveys that nonbinary people are welcome and recognized (Hagen & Galupo, 2014). Using free text fields for gender identity and pronouns is more inclusive than using a list of response options. Ensuring privacy at the reception desk, setting up alternatives for listing legal names in digital databases (in cultural contexts where this is necessary), installing gender-neutral toilets, and setting up alternatives to calling out the legal name in the waiting room are additional examples of transgender and gender diverse (TGD) cultural competency (Burgwal et al., 2021). In care settings, it is important preferences for names, pronouns, and other gender-related terms are asked and used both initially and on a regular basis as they may vary over time and circumstance.

HCPs are encouraged to adopt an approach that focuses on strengths and resilience.

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH   S85

Increasingly, critiques are emerging regarding HCPs over-focus on gender-related distress as it is also important to consider experiences of increased comfort, joy, and self-fulfilment that can result from self-affirmation and access to care (Ashley, 2019a; Benestad, 2010). In addition to utilizing diagnoses when/where required to facilitate access to care, HCPs are encouraged to collaboratively explore with clients this broader range of potential gender-related experiences and how they may fit with treatment options (Motmans et al., 2019). For all TGD people, resiliency factors such as supportive relationships, participation in communities that include similar others, and identity pride are essential to consider as they are associated with a range of positive health outcomes (Bowling et al., 2019; Budge, 2015; Johns et al., 2018).

Awareness of the limitations that exist in the tools providers have historically used to assess transgender people's experience of dysphoria is important as they may be particularly pronounced for many nonbinary people. Most gender-related measures assume clients experience their gender in a binary way, among other concerns (e.g., Recalled Gender Identity Scale, Utrecht Gender Dysphoria Scale). While several newer measures have been developed in an attempt to better capture the experiences of nonbinary people (McGuire et al., 2018; McGuire et al., 2020), open-ended discussion is likely to provide a deeper and more accurate understanding of each individual's unique experiences of dysphoria and their associated care needs. Similarly, while more recent iterations of diagnostic categories (i.e., "gender dysphoria" in the DSM 5 and "gender incongruence" in ICD-11) were intended to be inclusive of people with nonbinary experiences of gender, they may not adequately capture the full diversity and scope of experiences of gender-related distress, particularly for nonbinary people. In addition to distress associated with aspects of one's physical body and presentation (including features that may be existing or absent), distress may arise from how one experiences their own gender, how one's gender is perceived within social situations, and from experiences of minority stress associated with one's gender (Winters & Ehrbar, 2010). Nonbinary peoples' experiences in each of these areas may or

may not be similar to those of transgender men or women.

A person-centered approach for affirming care includes specific discussion of how different interventions may or may not shift the client's comfort with their own experience of gender, and how their gender is perceived by others. Nonbinary people can face challenges in reconciling their personal identities with the limits of the medical treatments available and can also encounter confusion and intolerance from society regarding their gender presentations (Taylor et al., 2019). Emerging research suggests the medical treatment needs of nonbinary people are particularly diverse, with some reporting needs for treatments that have typically been associated with transition trajectories historically associated with transgender men and women and some reporting alternative approaches (e.g., low dose hormone therapy, surgery without hormone therapy), some reporting a lack of interest in medical treatment, and some reporting feeling unsure about their needs (Burgwal & Motmans, 2021; James et al., 2016). Conceptualizing assessment as an ongoing process is particularly important given gender-related experiences and associated needs may shift throughout the lifespan. Given the ongoing evolution in treatment options and knowledge of treatment effects, particularly for nonbinary people, clients will benefit from providers who regularly seek up-to-date knowledge and convey these updates to their clients.

Statement 8.2

**We recommend health care professionals consider medical interventions (hormonal treatment or surgery) for nonbinary people in the absence of "social gender transition."**

Previous requirements for accessing hormonal treatment and surgery, such as "living in a gender role that is congruent with one's gender identity," do not reflect the lived experiences of many TGD people (Coleman et al., 2012). Due to the entrenched nature of the gender binary in most contemporary Western cultures, one can typically only be understood by others as a man or woman within most settings (Butler, 1993). Hence, the visibility and understanding of nonbinary embodiments and expressions is limited. This is due to gendered cues

being almost always understood in reference to a gender binary (Butler, 1993). Presently, it can be difficult for nonbinary people to be reliably recognized as their gender via visual cues associated with their gender expression (e.g., clothing, hair). However, androgyny or gender nonconformity may be communicated by the mixing or combining of cultural markers with traditionally masculine or feminine connotations. Because there is no commonly recognized "nonbinary category" within most contemporary Western, global north cultural contexts, nonbinary visibility often necessitates explicit sharing of one's gender with others or the use of cues that may be interpreted as gender nonconformity (but not necessarily nonbinary).

For these reasons, framing access to medical care in the context of someone experiencing a "social gender transition" where they are "living in a gender role that is congruent with one's gender identity" is not in line with the way many TGD people understand themselves and their personal transition process. For some, "living in a gender role that is congruent with one's gender identity" does not involve changes in name, pronouns, or gender expression even as medical intervention may be necessary. Even if a person is able to live in ways that are congruent with their gender identity, it may be difficult for an outside observer to assess this without learning directly from that person how they understand their own experience in this regard. Expectation of "social gender transition" may be unhelpful when considering eligibility for gender- affirming care, such as hormones and surgery, and rigid expectations of what a "social gender role transition" "should" look like can be a barrier to care for nonbinary people. There is no logical requirement gender-affirming medical interventions can only be done once a person legally changes their name, changes the gender marker on their identity documents, or wears or refrains from wearing particular items of clothing. Nonbinary people may struggle to access recognition of their genders on formal documentation, which may negatively affect their mental health or well-being (Goetz & Arcomano, 2021). TGD people may benefit from specific support in accessing (or retaining) their gender marker of preference. A requirement that someone disclose their gender

identity in all circles of their lives (family, work, school, etc.) in order to access medical care may not be consistent with their goals and can place them at risk if it is not safe to do so.

Statement 8.3
**We recommend health care professionals consider gender-affirming surgical interventions in the absence of hormonal treatment unless hormone therapy is required to achieve the desired surgical result.**

The trajectory of "hormones before surgery" is an option across a range of surgical interventions. Some nonbinary people will seek gender-affirming surgical treatment to alleviate gender incongruence and increase body satisfaction (Beek et al., 2015; Burgwal & Motmans, 2021; Jones et al., 2019; Koehler et al., 2018), but do not want hormonal treatment or are unable to undergo hormonal therapy due to other medical reasons (Nieder, Eyssel et al., 2020). Currently, it is unknown for which proportion of nonbinary people these options apply.

Perhaps the surgery which has some specific association with nonbinary people (rather than sought by transgender men or undergone by some cisgender women) is mastectomy in nonbinary people AFAB who have not taken testosterone—although testosterone is not a requirement for this type of surgery—and some nonbinary people AFAB may need breast reduction (McTernan et al., 2020). An example of a surgery for which at least a period of hormone therapy may be necessary is metoidioplasty that enhances the enlarged clitoris produced by testosterone therapy. See Chapter 13—Surgery and Postoperative Care for more detail on whether hormone therapy is necessary for various surgeries. Procedures addressing the internal reproductive system include hysterectomy, unilateral or bilateral salpingo-oophorectomy, and vaginectomy. Hormone therapy is not required for any of these procedures, but hormone replacement therapy (either with estrogens, testosterone, or both) is advisable in those individuals undergoing a total gonadectomy to prevent adverse effects on their cardiovascular and musculoskeletal systems (Hembree et al., 2017; Seal, 2017). For phalloplasty, while there is no surgical requirement per se for a minimum period of testosterone

treatment, virilization (or the absence of virilization) of the clitoris and labia minora may impact the choice of surgical technique and influence surgical options. For more information see Chapter 13—Surgery and Postoperative Care.

Nonbinary AMAB clients should be informed commencing estrogen therapy post-surgically with no prior history of estrogen therapy may influence (perhaps adversely) the surgical result (Kanhai, Hage, Asscheman et al., 1999; Kanhai, Hage, Karim et al., 1999). Nonbinary people AMAB requesting a bilateral orchiedectomy do not require estrogen therapy to achieve a better outcome (Hembree et al., 2017). In these contexts, it is good practice to inform clients of the risks and benefits of hormone replacement therapy (estrogens, testosterone, or both) in preventing adverse effects on the cardiovascular and musculoskeletal system as well as alternative treatment options, such as calcium plus vitamin D supplementation to prevent osteoporosis (Hembree et al., 2017; Seal, 2017). See also Chapter 9—Eunuchs for those who choose to forgo hormone replacement therapy. In the case of vaginoplasty, individuals should be advised lack of testosterone-blocking therapy may cause postoperative hair growth in the vagina when hair-bearing skin graft and flaps have been used (Giltay & Gooren, 2000).

Additional surgical requests for nonbinary people AMAB include penile-preserving vaginoplasty, vaginoplasty with preservation of the testicle(s), and procedures resulting in an absence of external primary sexual characteristics (i.e., penectomy, scrotectomy, orchiectomy, etc.). The surgeon and individual seeking treatment are advised to engage in discussions so as to understand the individual's goals and expectations as well as the benefits and limitations of the intended (or requested) procedure, to make decisions on an individualized basis and collaborate with other health care providers who are involved (if any).

Statement 8.4.

**We recommend health care professionals provide information to nonbinary people about the effects of hormonal therapies/surgery on future fertility and discuss the options for fertility preservation prior to starting hormonal treatment or undergoing surgery.**

All nonbinary individuals who seek gender-affirming hormonal therapies should be offered information and guidance about fertility options (Hembree et al., 2017; De Roo et al., 2016; Defreyne, Elaut et al., 2020; Defreyne, van Schuvlenbergh et al., 2020; Nahata et al., 2017; Quinn et al., 2021). It is important to discuss the potential impact of hormone therapy on fertility prior to initiation. This discussion should include fertility preservation options, the extent to which fertility may or may not be regained if hormone therapy is ceased, and the fact that hormone therapy per se is not birth control. For more information see Chapter 16—Reproductive Health.

Recent studies suggest that nonbinary individuals are less likely to access care and make their needs for potential interventions heard (Beek et al., 2015; Taylor et al., 2019). As such, it stands to reason that any gender diverse individual should be offered information on current options and techniques for fertility preservation, ideally prior to commencing hormonal treatment as the quality of the sperm or eggs may be impacted by exposure to hormones (Hamada et al., 2015; Payer et al., 1979). However, this should in no way preclude making inquiries and seeking more information at a later time, as there is evidence that fertility is still possible for individuals taking estrogen and testosterone (Light et al., 2014). A decision by a nonbinary or gender diverse person that fertility preservation or counseling is not needed should not be used as a basis for denying or delaying access to hormonal treatment.

S110   E. COLEMAN ET AL.

## CHAPTER 12 Hormone Therapy

Transgender and gender diverse (TGD) persons may require medically necessary gender-affirming hormone therapy (GAHT) to achieve changes consistent with their embodiment goals, gender identity, or both (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1). This chapter describes hormone therapy recommendations for TGD adults and adolescents. Please refer to Chapter 5—Assessment of Adults and Chapter 6—Adolescents for the assessment criteria related to initiation of hormone therapy for adults and adolescents, respectively. A summary of the recommendations and assessment criteria can be found in Appendix D.

Ever since the first World Professional Association for Transgender Health (WPATH) Standards of Care (SOC) was published in 1979 and in subsequent updates of the SOC, including SOC version 7, GAHT has been accepted as medically necessary (Coleman et al., 2012). WPATH endorsed the Endocrine Society's guidelines for GAHT for TGD persons in 2009 and 2017 (Hembree et al., 2009; Hembree et al., 2017). The European Society for Sexual Medicine has also published a position statement on hormone management in adolescent and adult TGD people (T'Sjoen et al., 2020). When provided under medical supervision, GAHT in adults is safe (Tangpricha & den Heijer, 2017; Safer & Tangpricha, 2019). However, there are some potential long-term risks, and careful monitoring and screening are required to reduce adverse events (Hembree et al., 2017; Rosenthal, 2021).

In general, the goal is to target serum levels of the sex steroids to match the levels associated with the individual's gender identity, although optimal target ranges have not been established (Hembree et al., 2017). Health care professionals (HCPs) can use serum testosterone and/or estradiol levels to monitor most sex steroid treatments. However, conjugated estrogens or synthetic estrogen use cannot be monitored. The assumption that the estrone/estradiol ratio should be monitored was not supported in a recent cohort study as there was no relationship between estrone concentration and change in body fat or breast development seen in a European cohort of 212 adult transgender women during a 1-year follow-up of hormone treatment (Tebbens et al., 2021). This study demonstrated higher estrone concentrations or higher estrone/estradiol ratios are not associated with antagonistic effects on feminization (fat percentage and breast development) (Tebbens et al., 2021). Thus, monitoring of the estrone to estradiol ratio is not supported by the current published evidence. Previously used conjugated estrogens have been abandoned in favor of bioidentical estrogens. Even if several studies have shown a significantly greater risk of thromboembolic and cardiovascular complications with the use of oral conjugated estrogens compared with oral estradiol in postmenopausal women, no randomized controlled trials have taken place, either in postmenopausal women or in transgender people undergoing estrogen treatment (Smith et al., 2014).

The approach to GAHT differs and depends on the developmental stage of the individual at the time of initiation of hormone therapy as well as their treatment goals. Hormone therapy is not recommended for children who have not begun endogenous puberty. In eligible youth (as per Chapter 6—Adolescents) who have reached the early stages of puberty, the focus is usually to delay further pubertal progression with gonadotropin releasing hormone agonists (GnRHas) until an appropriate time when GAHT can be introduced. In these cases, pubertal suppression is considered medically necessary. Eligible adults may initiate GAHT if they fulfill the criteria as per Chapter 5—Assessment for Adults. In addition, health care providers should discuss fertility goals and fertility preservation procedures prior to initiating GAHT. See Chapter 16—Reproductive Health.

GAHT with feminine embodiment goals typically consists of estrogen and an androgen-lowering medication (Hembree et al., 2017). Although there are anecdotal reports of progesterone use for breast development and mood management, there is currently insufficient evidence the potential benefits of progesterone administration outweigh the potential risks (Iwamoto, T'Sjoen et al., 2019). Masculinizing GAHT typically consists of testosterone. Both WPATH and the Endocrine Society recommend monitoring levels of sex

hormones. While GAHT is customized to meet the individual needs of the TGD person, typically hormone levels are maintained at a concentration sufficient to support good bone health and are not supraphysiologic (Hembree et al., 2017; Rosen et al., 2019).

---

**Statements of Recommendations**

12.1- We recommend health care professionals begin pubertal hormone suppression in eligible* transgender and gender diverse adolescents after they first exhibit physical changes of puberty (Tanner stage 2).

12.2- We recommend health care professionals use gonadotropin releasing hormone (GnRH) agonists to suppress endogenous sex hormones in eligible* transgender and gender diverse people for whom puberty blocking is indicated.

12.3- We suggest health care professionals prescribe progestins (oral or injectable depot) for pubertal suspension in eligible* transgender and gender diverse youth when GnRH agonists are either not available or are cost prohibitive.

12.4- We suggest health care professionals prescribe GnRH agonists for suppression of sex steroids without concomitant sex steroid hormone replacement in eligible* transgender and gender diverse adolescents seeking such intervention and who are well into or have completed pubertal development (past Tanner stage 3) but are either unsure about or do not want to begin sex steroid hormone therapy.

12.5- We recommend health care professionals prescribe sex hormone treatment regimens as part of gender-affirming treatment for eligible* transgender and gender diverse adolescents who are at least Tanner stage 2, with parental/guardian involvement unless their involvement is determined to be harmful or unnecessary to the adolescent.

12.6- We recommend health care professionals measure hormone levels during gender-affirming treatment to ensure endogenous sex steroids are lowered and administered sex steroids are maintained at levels appropriate for the treatment goals of transgender and gender diverse people according to the Tanner stage.

12.7- We recommend health care professionals prescribe progestogens or a GnRH agonist for eligible* transgender and gender diverse adolescents with a uterus to reduce dysphoria caused by their menstrual cycle when gender-affirming testosterone use is not yet indicated.

12.8- We recommend health care providers involve professionals from multiple disciplines who are experts in transgender health and in the management of the care required for transgender and gender diverse adolescents.

12.9- We recommend health care professionals institute regular clinical evaluations for physical changes and potential adverse reactions to sex steroid hormones, including laboratory monitoring of sex steroid hormones every 3 months during the first year of hormone therapy or with dose changes until stable adult dosing is reached followed by clinical and laboratory testing once or twice a year once an adult maintenance dose is attained.

12.10- We recommend health care professionals inform and counsel all individuals seeking gender-affirming medical treatment about the options available for fertility preservation prior to initiating puberty suppression and prior to treating with hormone therapy.

12.11- We recommend health care professionals evaluate and address medical conditions that can be exacerbated by lowered endogenous sex hormone concentrations and treatment with exogenous sex hormones before beginning treatment for transgender and gender diverse people.

12.12- We recommend health care professionals educate transgender and gender diverse people undergoing gender-affirming treatment about the onset and time course of the physical changes induced by sex hormonal treatment.

12.13- We recommend health care professionals not prescribe ethinyl estradiol for transgender and gender diverse people as part of a gender-affirming hormonal treatment.

12.14- We suggest health care professionals prescribe transdermal estrogen for eligible* transgender and gender diverse people at higher risk of developing venous thromboembolism based on age > 45 years or a previous history of venous thromboembolism, when gender-affirming estrogen treatment is recommended.

12.15- We suggest health care professionals not prescribe conjugated estrogens in transgender and gender diverse people when estradiol is available as a component of gender-affirming hormonal treatment.

12.16- We recommend health care professionals prescribe testosterone-lowering medications (either cyproterone acetate, spironolactone, or GnRH agonists) for eligible* transgender and gender diverse people with testes who are taking estrogen as part of a hormonal treatment plan if the individual's goal is to approximate circulating sex hormone concentrations in cisgender women.

12.17- We recommend health care professionals monitor hematocrit (or hemoglobin) in transgender and gender diverse people treated with testosterone.

12.18- We suggest health care professionals collaborate with surgeons regarding hormone use before and after gender-affirmation surgery.

12.19- We suggest health care professionals counsel transgender and gender diverse people about the various options available for gender-affirmation surgery unless surgery is not indicated or is medically contraindicated.

12.20- We recommend health care professionals initiate and continue gender-affirming hormone therapy for eligible* transgender and gender diverse people who require this treatment due to demonstrated improvement in psychosocial functioning and quality of life.

12.21- We recommend health care professionals maintain existing hormone therapy if the transgender and gender diverse individual's mental health deteriorates and assess the reason for the deterioration, unless contraindicated.

*For eligibility criteria for adolescents and adults, please refer to Chapter 5—Assessment for Adults and Chapter 6—Adolescents and Appendix D.*

In most cases, GAHT is maintained throughout life. It is not known if doses of GAHT should be reduced in older TGD people. Discontinuation of hormone therapy may result in bone loss in TGD individuals and will definitely do so in individuals whose gonads have been removed (Wiepjes et al., 2020). Routine primary care should also be performed (see Chapter 15—Primary Care). Epidemiology studies have reported an increased incidence of cardiovascular disease and venous thromboembolism (VTE) in TGD people receiving estrogen, most notably in older people and with different preparations of GAHT (Irwig, 2018; Maraka et al., 2017). TGD individuals treated with testosterone may also have increased adverse cardiovascular risks and events, such as increased myocardial infarction, blood pressure, decreased HDL-cholesterol, and excess weight (Alzahrani et al., 2019; Irwig, 2018; Kyinn et al., 2021). Health care professionals (HCPs) should discuss lifestyle and pharmacologic therapy with patients who are at the highest risk of developing cardiovascular disease (see Chapter 15—Primary Care). Polycythemia is another disorder that may present in TGD people taking testosterone (Antun et al., 2020). Therefore, it is important to continuously monitor for the development of conditions that can be exacerbated by GAHT throughout life (Hembree et al., 2017).

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

### Gender-Affirming Hormone Therapy in Youth

The following sections will discuss hormone therapy in TGD youth. Depending on the developmental stage of the youth, this hormone therapy generally comprises two phases, namely pubertal suppression followed by the addition of GAHT. During the first phase, pubertal development is halted to allow the youth to explore their gender identity and embodiment goals to prepare for the next phase, which may include GAHT. This section will discuss the recommendations for the use of gonadotropin releasing hormone agonists (GnRHas) as well as alternate approaches to pubertal suppression and will be followed by recommendations for GAHT. Sections that are applicable to youth and adults will follow in the next section.

### Statement 12.1

**We recommend health care professionals begin pubertal hormone suppression in eligible\* transgender and gender diverse adolescents only after they first exhibit physical changes of puberty (Tanner stage 2).**

In general, the goal of GnRHa administration in TGD adolescents is to prevent further development of the endogenous secondary sex characteristics corresponding to the sex designated at birth. Since this treatment is fully reversible, it is regarded as an extended time for adolescents to explore their gender identity by means of an early social transition (Ashley, 2019e). Treatment with GnRHas also has therapeutic benefit since it often results in a vast reduction in the level of distress stemming from physical changes that occur when endogenous puberty begins (Rosenthal, 2014; Turban, King et al., 2020).

For those prepubertal TGD children who have been persistent in their gender identity, any amount of permanent development of secondary sex characteristics could result in significant distress. While one might consider use of a GnRHa to prevent initiation of puberty in such individuals who remain at Tanner Stage 1, this use of GnRHa has not been recommended (Hembree et al., 2017). When a child reaches an age where pubertal development would normally begin (typically from 7-8 to 13 years for those with ovaries and from 9 to 14 years for those with testes), it would be appropriate to screen the child more frequently, perhaps at 4-month intervals, for signs of pubertal development (breast budding or testicular volume > 4 cc). Given the typical tempo of pubertal development (3.5–4 years for completion), it would be very unlikely for permanent pubertal changes to develop if one is only in puberty for 4 months or less. Thus, with frequent follow-up, the initiation of puberty can easily be detected before there are irreversible physical changes, and GnRHa can be started at that time with great efficacy. Of note, following initiation of a GnRHa, there is typically

a regression of one Tanner stage. Thus, if there is only Tanner stage 2 breast development, it typically fully regresses to the prepubertal Tanner stage 1; the same is typically true with Tanner stage 2 testes (often not even discernable to the patient and is not associated with development of secondary sex characteristics).

Given GnRHas work through GnRH receptor desensitization, if there's no uptick in endogenous GnRH stimulation of the pituitary (the first biochemical sign of puberty), there's no need for GnRH receptor desensitization. In addition, because of the wide variability in the timing of the start of puberty (as noted above), it is hard to justify using a GnRHa that might have some unknown risk if there's no physiological benefit before pubertal onset. Using a GnRHa with a child at Tanner stage 1 would only be initiated in cases of constitutional delay in growth and puberty, likely alongside the start of GAHT.

However, the use of a GnRHa could be considered in a child who, due to a constitutional delay in growth and puberty, starts GAHT while still in Tanner Stage 1. Initiating GAHT may activate the hypothalamic-pituitary gonadal axis in the beginning but may also mask the effects on the body of this activation. To avoid body changes with the potential to exacerbate an individual's gender incongruence, the GnRHa can be started as an adjunctive therapy to the GAHT shortly after the initiation of the GAHT to provide for pubertal development of the identified phenotype.

In addition, the suppression of the development of secondary sex characteristics is most effective when sex hormonal treatment is initiated in early to mid-puberty when compared with the initiation of sex hormonal treatment after puberty is completed (Bangalore-Krisha et al., 2019). Correspondingly, for adolescents who have already completed endogenous puberty and are considering starting GAHT, GnRHas can be used to inhibit physical functions, such as menses or erections, and can serve as a bridge until the adolescent, guardian(s) (if the adolescent is not able to consent independently), and treatment team reach a decision (Bangalore-Krishna et al., 2019; Rosenthal, 2021).

The onset of puberty occurs through reactivation of the hypothalamic-pituitary-gonadal axis.

Clinical assessment of the stages of puberty is based on physical features that reflect that reactivation. In individuals with functioning ovaries, Tanner stage 2 is characterized by the budding of the mammary gland. The development of the mammary gland occurs from exposure to estrogen produced by the ovaries. In individuals with functioning testes, Tanner stage 2 is characterized by an increase in testicular volume (typically greater than 4 ml). The growth of the testes is mediated through the gonadotropins luteinizing hormone (LH) and follicle stimulating hormone (FSH). In the later stages, the testes produce enough testosterone to induce masculinization of the body.

Statement 12.2

**We recommend health care professionals use GnRH agonists to suppress endogenous sex hormones in eligible* transgender and gender diverse people for whom puberty blocking is indicated. For supporting text, see Statement 12.4.**

Statement 12.3

**We suggest health care professionals prescribe progestins (oral or injectable depot) for pubertal suspension in eligible* transgender and gender diverse youth when GnRH agonists are not available or are cost prohibitive. For supporting text, see Statement 12.4.**

Statement 12.4

**We suggest health care professionals prescribe GnRH agonists to suppress sex steroids without concomitant sex steroid hormone replacement in eligible transgender and gender diverse adolescents seeking such intervention who are well into or have completed pubertal development (past Tanner stage 3) but are unsure about or do not wish to begin sex steroid hormone therapy.**

GnRHas reduce gonadotrophin and sex steroid concentrations in TGD adolescents and thus halt the further development of secondary sex characteristics (Schagen et al., 2016). Their use is generally safe with the development of hypertension being the only short-term adverse event reported in the literature (Delemarre-van de Waal & Cohen-Kettenis, 2006; Klink, Bokenkamp et al., 2015). GnRHas prevent the pituitary gland from

secreting LH and FSH (Gava et al., 2020). When the gonadotropins decrease, the gonad is no longer stimulated to produce sex hormones (estrogens or androgens), and the sex hormone levels in the blood decrease to prepubertal levels. GnRHa treatment leads to partial regression of the initial stages of the already developed secondary sex characteristics (Bangalore et al., 2019). TGD adolescents with functioning ovaries will experience diminished growth of breast tissue, and if treatment is started at Tanner stage 2, the breast tissue may disappear completely (Shumer et al., 2016). Menarche can be prevented or discontinued following the administration of GnRHas in adolescents with a uterus. In TGD adolescents with functioning testes, testicular volume will regress to a lower volume.

When GnRHa treatment is started in adolescents at the later phases of pubertal development, some physical changes of pubertal development, such as late-stage breast development in TGD adolescents with functioning ovaries and a lower voice and growth of facial hair in TGD adolescents with functioning testes, will not regress completely, although any further progression will be stopped (Delemarre-van de Waal & Cohen-Kettenis, 2006). GnRHas have been used since 1981 for the treatment of central precocious puberty (Comite et al., 1981; Laron et al., 1981), and their benefits are well established (please also see the statements in Chapter 6—Adolescents). The use of GnRHas in individuals with central precocious puberty is regarded as both safe and effective, with no known long-term adverse effects (Carel et al., 2009). However, the use of GnRHas in TGD adolescents is considered off-label because they were not initially developed for this purpose. Nonetheless, data from adolescents prescribed GnRHas in a similar dose and fashion demonstrate effectiveness in delaying the onset of puberty although the long-term effects on bone mass have not been well established (Klink, Caris et al., 2015). Although long-term data are more limited in TGD adolescents than in adolescents with precocious puberty, data collection specifically in this population are ongoing (Klaver et al., 2020; Lee, Finlayson et al., 2020; Millington et al., 2020; Olson-Kennedy, Garofalo et al., 2019).

We recognize even though GnRHas are a medically necessary treatment, they may not be available for eligible adolescents because it is not covered by health insurance plans in some countries or may be cost-prohibitive. Therefore, other approaches should be considered in these cases, such as oral or injectable progestin formulations. In addition, for adolescents older than 14 years, there are currently no data to inform HCPs whether GnRHas can be administered as monotherapy (and for what duration) without posing a significant risk to skeletal health. This is because the skeleton will not have any exposure to adequate levels of sex steroid hormones (Rosenthal, 2021).

A prolonged hypogonadal state in adolescence, whether due to medical conditions such as hypergonadotropic hypogonadism, iatrogenic causes such as GnRHa monotherapy or physiological conditions such as conditional delay of growth and development, is often associated with an increased risk of poor bone health later in life (Bertelloni et al., 1998; Finkelstein et al., 1996). However, bone mass accrual is a multifactorial process that involves a complex interplay between endocrine, genetic, and lifestyle factors (Anai et al., 2001). When deciding on the duration of GnRHa monotherapy, all contributing factors should be considered, including factors such as pretreatment bone mass, bone age, and pubertal stage from an endocrine perspective and height gain, as well as psychosocial factors such as mental maturity and developmental stage relative to one's adolescent cohort and the adolescent's individual treatment goals (Rosenthal, 2021). For these reasons, a multidisciplinary team and an ongoing clinical relationship with the adolescent and the family should be maintained when initiating GnRHa treatment (see Statements 6.8, 6.9, and 6.12 in Chapter 6—Adolescents). The clinical course of the treatment, e.g., the development of bone mass during GnRHa treatment and the adolescent's response to treatment, can help to determine the length of GnRHa monotherapy.

Statement 12.5

**We recommend health care professionals prescribe sex hormone treatment regimens as part of gender-affirming treatment in eligible**[*]

transgender and gender diverse adolescents who are at least Tanner stage 2, with parental/guardian involvement unless their involvement is determined to be harmful or unnecessary to the adolescent. For supporting text, see Statement 12.6.

Statement 12.6

We recommend health care professionals measure hormone levels during gender-affirming treatment to ensure endogenous sex steroids are lowered and administered sex steroids are maintained at a level appropriate for the treatment goals of transgender and gender diverse people according to the Tanner stage.

Sex steroid hormone therapy generally comprises two treatment regimens, depending on the timing of the GnRHa treatment. When GnRHa treatment is started in the early stages of endogenous pubertal development, puberty corresponding with gender identity or embodiment goals is induced with doses of sex steroid hormones similar to those used in peripubertal hypogonadal adolescents. In this context, adult doses of sex steroid hormones are typically reached over approximately a 2-year period (Chantrapanichkul et al., 2021). When GnRHa treatment is started in late- or postpubertal transgender adolescents, sex steroid hormones can be given at a higher starting dose and increased more rapidly until a maintenance dose is achieved, resembling treatment protocols used in transgender adults (Hembree et al., 2017). An additional advantage of GnRHa treatment is sex steroid hormones do not have to be administered in supraphysiological doses, which would otherwise be needed to suppress endogenous sex steroid production (Safer & Tangpricha, 2019). For TGD individuals with functioning testes, GnRHa treatment (or another testosterone-blocking medication) should be continued until such time as the TGD adolescent/young adult ultimately undergoes gonadectomy, if this surgical procedure is pursued as a medically necessary part of their gender-affirming care. Once adult levels of testosterone are reached in TGD individuals with functioning ovaries who have been initially suppressed with GnRHa's, testosterone alone at physiological doses is typically sufficient to lower ovarian estrogen secretion, and

GnRHas can be discontinued as discussed below (Hembree et al., 2017). For TGD adolescents with functioning ovaries who are new to care, GAHT can be accomplished with physiological doses of testosterone alone without the need for concomitant GnRHa administration (Hembree et al., 2017).

Gender-affirming sex steroid hormone therapy induces the development of secondary sex characteristics of the gender identity. Also, the rate of bone mineralization, which decreases during treatment with GnRHa's, rapidly recovers (Klink, Caris et al., 2015). During GnRHa treatment in early-pubertal TGD adolescents, the bone epiphyseal plates are still unfused (Kvist et al., 2020; Schagen et al., 2020). Following the initiation of sex steroid hormone treatment, a growth spurt can occur, and bone maturation continues (Vlot et al., 2017). In postpubertal TGD adolescents, sex steroid hormone treatment will not affect height since the epiphyseal plates have fused, and bone maturation is complete (Vlot et al., 2017).

In TGD adolescents with functioning testes, the use of 17-ß-estradiol for pubertal induction is preferred over that of synthetic estrogens, such as the more thrombogenic ethinyl estradiol (see Appendix D (Asscheman et al., 2015). It is still necessary to either continue GnRHa's to suppress endogenous testosterone production or transition to another medication that suppresses endogenous testosterone production (Rosenthal et al., 2016). Breast development and a female-typical fat distribution are among a number of physical changes that occur in response to estrogen treatment. See Appendix C—Table 1.

For TGD adolescents seeking masculinizing treatment, androgens are available as injectable preparations, transdermal formulations, and subcutaneous pellets. For pubertal induction, the use of testosterone-ester injection is generally recommended by most experts initially because of cost, availability, and experience (Shumer et al., 2016). It is advised to continue GnRHas at least until a maintenance level of testosterone is reached. In response to androgen treatment, virilization of the body occurs, including a lowering of the voice, more muscular development particularly in the upper body, growth of facial and body hair, and clitoral enlargement (Rosenthal et al., 2016). See Appendix C—Table 1.

In almost all situations, parental/caregiver consent should be obtained. Exceptions to this recommendation, in particular when caregiver or parental involvement is determined to be harmful to the adolescent, are described in more detail in Chapter 6—Adolescents (see Statement 6.11) where the rationale for involving parents/caregivers in the consent process is also described.

### Statement 12.7

**We recommend health care professionals prescribe progestogens or a GnRH agonist for eligible\* transgender and gender diverse adolescents with a uterus to reduce dysphoria caused by their menstrual cycle when gender-affirming testosterone use is not yet indicated.**

Menstrual suppression is a treatment option commonly needed by TGD adolescents who experience distress related to menses or the anticipation of menarche. Statement 6.7 in Chapter 6—Adolescents describes this in more detail. To achieve amenorrhea, menstrual suppression can be initiated as a solo option before initiating testosterone or alongside testosterone therapy (Carswell & Roberts, 2017). Some youth, who are not ready for testosterone therapy or are not yet at an appropriate pubertal/developmental stage to begin such treatment, will benefit from the induction of amenorrhea (Olson-Kennedy, Rosenthal et al., 2018). Adolescents who experience an exacerbation of dysphoria related to the onset of puberty may elect to be treated with GnRHas for pubertal suppression (also see the Adolescents chapter).

Progestogens may be effective in adolescents whose goal is solely menstrual suppression. Continuous administration of progestin-only oral pills (including the contraceptive and noncontraceptive options), medroxyprogesterone injections, or levonorgestrel intrauterine device can be used for induction of amenorrhea (Pradhan & Gomez-Lobo, 2019). TGD individuals with functioning ovaries who start testosterone therapy may have 1–5 menstrual cycles before amenorrhea is achieved (Taub et al., 2020). Once amenorrhea is achieved, some TGD individuals with functioning ovaries may also choose to continue progestin treatment for birth control if relevant to their sexual practices.

TGD individuals with functioning ovaries and a uterus should be counseled about the potential for breakthrough menstrual bleeding in the first few months after initiating menstrual suppression. With GnRHa therapy, breakthrough bleeding may occur 2–3 weeks after initiation of the medication. For individuals seeking contraception or for those who continue to experience menstrual bleeding on progestin therapy, an estrogen combination with progestin may be considered for the maintenance of amenorrhea, yet they should be counseled on the possible side effect of breast development (Schwartz et al., 2019).

### Statement 12.8

**We recommend health care providers involve professionals from multiple disciplines who are experts in transgender health and in the management of the care of transgender and gender diverse adolescents.**

As with the care of adolescents, we suggest where possible a multidisciplinary expert team of medical and mental health professionals (MHPs) be assembled to manage this treatment. In adolescents who pursue GAHT (given this is a partly irreversible treatment), we suggest initiating treatment using a schedule of gradually increasing doses after a multidisciplinary team of medical and MHPs has confirmed the persistence of GD/gender incongruence and has established the individual possesses the mental capacity to give informed consent (Hembree et al., 2017). Specific aspects concerning the assessment of adolescents and the involvement of their caregivers and a multidisciplinary team are described in more detail in Chapter 6—Adolescents.

If possible, TGD adolescents should have access to experts in pediatric transgender health from multiple disciplines including primary care, endocrinology, fertility, mental health, voice, social work, spiritual support, and surgery (Chen, Hidalgo et al., 2016; Eisenberg et al., 2020; Keo-Meier & Ehrensaft, 2018). Individual providers are encouraged to form collaborative working relationships with providers from other disciplines to facilitate referrals as needed for the individual youth and their family (Tishelman et al., 2015). However, the lack of available

experts and resources should not constitute a barrier to care (Rider, McMorris et al., 2019). Helpful support for adolescents includes access to accurate, culturally informed information related to gender and sexual identities, transition options, the impact of family support, and connections to others with similar experiences and with TGD adults through online and in person support groups for adolescents and their family members (Rider, McMorris et al., 2019).

Many TGD adolescents have been found to experience mental health disparities and initial mental health screening (e.g., PHQ-2, GAD) can be employed as indicated (Rider, McMorris et al., 2019). Providers should keep in mind being transgender or questioning one's gender does not constitute pathology or a disorder. Therefore, individuals should not be referred for mental health treatment exclusively on the basis of a transgender identity. HCPs and MHPs who treat these youths and make referrals should, at a minimum, be familiar with the impact of trauma, gender dysphoria, and gender minority stressors on any potential mental health symptomatology, such as disordered eating, suicidal ideation, social anxiety. These health care providers should also be knowledgeable about the level of readiness of inpatient mental health services in their region to provide competent, gender-affirming care to TGD youth (Barrow & Apostle, 2018; Kuper, Wright et al., 2018; Kuper, Mathews et al., 2019; Tishelman & Neumann-Mascis, 2018). Statements 6.3, 6.4, and 6.12d in Chapter 6—Adolescents address this in more detail. Because parents of these youth commonly experience high levels of anxiety immediately after learning their youth is TGD, and their response to their child predicts that child's long-term physical and mental health outcomes, appropriate referrals for mental health support of the parents can be of great utility (Coolhart et al., 2017; Pullen Sansfaçon et al., 2015; Taliaferro et al., 2019).

Statement 12.9
**We recommend health care professionals organize regular clinical evaluations for physical changes and potential adverse reactions to sex steroid hormones, including laboratory monitoring of sex steroid hormones every 3 months during the first year of hormone therapy or with dose changes until a stable adult dosing is reached followed by clinical and laboratory testing once or twice a year once an adult maintenance dose is attained.**

Sex steroid hormone therapy is associated with a broad array of physical and psychological changes (Irwig, 2017; Tangpricha & den Heijer, 2017) (see Appendix C—Table 1). After sex steroid hormone therapy has been initiated, the HCP should regularly assess the progress and response of the individual to the treatment (also see Chapter 6—Adolescents). This evaluation should assess the presence of any physical changes as well as the impact of treatment on gender dysphoria (if present) and psychological well-being (see Appendix C—Table 1). Clinical visits provide important opportunities for HCPs to educate patients about the typical time course required for physical changes to manifest and encourage realistic expectations. During the first year of hormone therapy, sex steroid hormone doses are often increased. A major factor guiding the dose is the serum level of the corresponding sex steroid hormone. In general, the goal is to target serum levels of the sex steroids to match the levels associated with the individual's gender identity, although optimal target ranges have not been established (Hembree et al., 2017).

In addition to assessing the positive changes associated with sex steroid hormone therapy, the HCP should regularly assess whether the treatment has caused any adverse effects (see Appendix C—Table 2). Examples of adverse signs and symptoms include androgenic acne or bothersome sexual dysfunction (Braun et al., 2021; Kerckhof et al., 2019). GAHT also has the potential to adversely influence several laboratory tests. For example, spironolactone may cause hyperkalemia, although it is an uncommon and transient phenomenon (Millington et al., 2019). Testosterone increases the red blood cell count (hematocrit), which may occasionally cause erythrocytosis (Antun et al., 2020) (see Statement 12.17) (Hembree et al., 2017). Both estrogen and testosterone can alter lipid parameters, such as high-density protein lipoprotein (HDL) cholesterol and triglycerides (Maraka et al., 2017). See Appendix C—Tables 3 and 4.

The frequency of clinical evaluations should be individualized and guided by the individual's response to treatment. We suggest clinical assessments be performed approximately every 3 months during the first year of hormone therapy in patients who are stable and are not experiencing significant adverse effects (Appendix C—Table 5). We suggest rather than recommend testing be carried out every 3 months in the first year to allow some flexibility on the timing of these tests as there is no strong evidence or evidence from published studies supporting specific testing intervals. If an individual does experience an adverse effect, more frequent laboratory testing and/or clinical visits are often needed. Given the potential harm associated with sex hormone levels that exceed expected ranges in humans, we strongly recommend regular testing be performed as a standard practice when initiating GAHT in TGD individuals. Once a person has reached a stable adult dose of sex steroid hormone with no significant adverse effects, the frequency of clinic visits can be reduced to one to two per year (Hembree et al., 2017).

Statement 12.10

**We recommend health care professionals inform and counsel all individuals seeking gender-affirming medical treatment about options for fertility preservation prior to initiating puberty suppression and prior to administering hormone therapy.**

Pubertal suppression and hormone treatment with sex steroid hormones may have potential adverse effects on a person's future fertility (Cheng et al., 2019) (see also Chapter 6—Adolescents and Chapter 16—Reproductive Health). Although some TGD people may not have given much thought to their future reproductive potential at the time of their initial assessment to begin medical therapy, the potential implications of the treatment and fertility preservation options should be reviewed by the hormone prescriber and discussed with the person seeking these therapies (Ethics Committee of the American Society for Reproductive Medicine et al., 2015; De Roo et al., 2016).

Individuals with testes should be advised prolonged treatment with estrogen often causes testicular atrophy and a reduction in sperm count and other semen parameters (Adeleye et al., 2018). Nonetheless, there are major gaps in knowledge, and findings regarding the fertility of trans feminine people who take estrogen and antiandrogens are inconsistent (Cheng et al., 2019). In one study, heterogeneity in testicular histology was evident whether patients discontinued or continued therapy prior to orchiectomies (Schneider et al., 2015). For example, the discontinuation of estrogen and antiandrogens for six weeks resulted in complete spermatogenesis in 45% of individuals with the remainder showing meiotic arrest or spermatogonial arrest (Schneider et al., 2015). However, serum testosterone levels confirmed to be within female reference ranges leads to complete suppression of spermatogenesis in most transgender women (Vereecke et al., 2020). The principal fertility preservation option for patients with functioning testes is sperm cryopreservation, also known as sperm banking (Mattawanon et al., 2018). For prepubertal patients, suppression of puberty with GnRHs pauses the maturation of sperm (Finlayson et al., 2016).

Individuals with functioning ovaries should be advised testosterone therapy usually results in the cessation of menses and ovulation, often within a few months of initiation (Taub et al., 2020). There are also major gaps in knowledge regarding the potential effects of testosterone on oocytes and subsequent fertility of TGD patients (Eisenberg et al., 2020; Stuyver et al., 2020). One study found testosterone treatment may be associated with polycystic ovarian morphology, whereas other studies reported no metabolic (Chan et al., 2018) or histologic (De Roo et al., 2017; Grynberg et al., 2010) evidence of polycystic ovary syndrome (PCOS) following treatment with testosterone, and some studies have found a pre-existing higher prevalence of PCOS in transgender patients with ovaries (Baba, 2007; Gezer et al., 2021). TGD patients with an intact uterus and ovaries often regain their fertility potential if testosterone therapy is discontinued (Light et al., 2014). Indeed, a live birth after assisted reproductive technology has been reported following hormone-stimulated egg retrieval from a TGD

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH    S119

individual who did not discontinue testosterone therapy (Greenwald et al., 2021; Safer and Tangpricha, 2019). Other fertility preservation options for TGD patients with ovaries are oocyte cryopreservation and embryo cryopreservation with sperm from a partner or donor. The above options require hormonal stimulation for egg retrieval and the use of assisted reproductive technology.

For early pubertal transgender youth, suppression of puberty with GnRHa's pauses the maturation of germ cells, although a recent report noted ovarian stimulation of a TGD adolescent treated with a GnRHa's in early puberty (and continued during ovarian stimulation) resulted in a small number of mature oocytes that were cryopreserved (Rothenberg et al., 2019). Treating an TGD adolescent with functioning testes in the early stages of puberty with a GnRHa not only pauses maturation of germ cells but will also maintains the penis in a prepubertal size. This will likely impact surgical considerations if that person eventually undergoes a penile-inversion vaginoplasty as there will be less penile tissue to work with. In these cases, there is an increased likelihood a vaginoplasty will require a more complex surgical procedure, e.g., intestinal vaginoplasty (Dy et al., 2021; van de Grift et al., 2020). Such considerations should be included in any discussions with patients and families considering use of pubertal blockers in early pubertal adolescents with functioning testes.

## Statement 12.11

**We recommend health care professionals evaluate and address medical conditions that can be exacerbated by lowered endogenous sex hormone concentrations and treatment with exogenous sex hormones before beginning treatment in transgender and gender diverse people.**

TGD people seeking masculinization must be informed about the possibilities, consequences, limitations, and risks associated with testosterone treatment. Testosterone therapy is contraindicated during pregnancy or while attempting to become pregnant given its potential iatrogenic effects on the fetus. Relative contraindications to testosterone therapy include severe hypertension, sleep apnea, and polycythemia since these conditions

can be exacerbated by testosterone. Monitoring blood pressure and lipid profiles should be performed before and after the onset of testosterone therapy. The increase in blood pressure typically occurs within 2 to 4 months following the initiation of testosterone therapy (Banks et al., 2021). Patients who develop hypercholesterolemia and/or hypertriglyceridemia may require treatment with dietary modifications, medication, or both.

TGD people seeking feminizing treatment with a history of thromboembolic events, such as deep vein thrombosis and pulmonary embolism, should undergo evaluation and treatment prior to the initiation of hormone therapy. This is because estrogen therapy is strongly associated with an increased risk of thromboembolism, a potentially life-threatening complication. In addition, risk factors that can increase the risk of thromboembolic conditions, such as smoking, obesity, and sedentary lifestyle, should be modified. In patients with nonmodifiable risk factors, such as a known history of thrombophilia, a past history of thrombosis, or a strong family history of thromboembolism, treatment with transdermal estrogen concomitant with anticoagulants may decrease the risk of thromboembolism. However, there are limited data to guide treatment decisions. The presence of a disease at baseline such as a hormone sensitive cancer, coronary artery disease, cerebrovascular disease, hyperprolactinemia, hypertriglyceridemia, and cholelithiasis should be evaluated prior to the initiation of gender-affirming hormone therapy as relative risks may be shifted in association with exogenous hormone treatment (Hembree et al., 2017).

## Statement 12.12

**We recommend health care professionals educate transgender and gender diverse people undergoing gender-affirming treatment about the onset and time course of physical changes induced by sex hormone treatment.**

The effects of testosterone treatment are multiple and may include the appearance of increased body and facial hair, male pattern baldness, increased muscle mass and strength, decreased fat mass, deepening of the voice, interruption of

menses (if still present), increased prevalence and severity of acne, clitoral enlargement, and increased sexual desire (Defreyne, Elaut et al., 2020; Fisher, Castellini et al., 2016; Giltay & Gooren, 2000; T'Sjoen et al., 2019; Yeung et al., 2020). Other testosterone-associated changes include increased lean body mass, skin oiliness, (de Blok et al., 2020; Hembree et al., 2017; Kuper, Mathews et al., 2019; Taliaferro et al., 2019; Tishelman & Neumann-Mascis, 2018) (see Appendix C—Table 1).

Estrogen treatment induces breast development. However, fewer than 20% of individuals reach Tanner breast stages 4–5 after 2 years of treatment (de Blok et al., 2021). Additional changes include decreases in testicular volume, lean body mass, skin oiliness, sexual desire, spontaneous erections, facial hair, and body hair along with increased subcutaneous body fat) (see Appendix C—Table 1). In adult patients, estrogen does not alter a person's voice or height (Iwamoto, Defreyne et al., 2019; Wiepjes et al., 2019).

The time course and extent of physical changes vary among individuals and are related to factors such as genetics, age of initiation, and overall state of health (Deutsch, Bhakri et al., 2015; van Dijk et al., 2019). Knowledge of the extent and timing of sex hormone–induced changes, if available, may prevent the potential harm and expense of unnecessary treatment changes, dosage increases, and premature surgical procedures (Dekker et al., 2016).

### Statement 12.13

**We recommend health care professionals not prescribe ethinyl estradiol for transgender and gender diverse people as part of a gender-affirming hormonal treatment. For supporting text, see Statement 12.15.**

### Statement 12.14

**We suggest health care professionals prescribe transdermal estrogen for eligible\* transgender and gender diverse people at higher risk of developing venous thromboembolism based on age >45 years or a previous history of venous thromboembolism, when gender-affirming estrogen treatment is recommended. For supporting text, see Statement 12.15).**

### Statement 12.15

**We suggest health care professionals not prescribe conjugated estrogens in transgender and gender diverse people when estradiol is available as part of a gender- affirming hormonal treatment.**

Determining the safest and most efficacious estrogen compound and route of administration for TGD people is an important topic. The recommended estrogen-based regimens are presented in Appendix C—Table 4. The Amsterdam Medical Center (AMC) first reported 45 events of VTE occurring in 816 transgender women, notably an expected incidence ratio of VTE 20-fold higher than that reported in a reference population (van Kesteren et al., 1997). Following this report, the AMC clinic recommended the use of transdermal estradiol for transgender women older than 40 years of age, which subsequently lowered the incidence of VTE (Nota et al., 2019; Toorians et al., 2003). Other studies suggested ethinyl estradiol is associated with a higher risk of blood clotting due to an increased resistance to the anticoagulating effects of activated protein C (APC) and elevated concentrations of the clotting factors protein C and protein S (Toorians et al., 2013). Other studies published within the past 15 years from other clinics reported transgender women taking other forms of estrogen had lower rates of VTE than transgender women taking ethinyl estradiol (Asscheman et al., 2013). Furthermore, a 2019 systematic review concluded ethinyl estradiol administration was associated with the highest risk of VTE in transgender women, while an association between progesterone use and VTE was also identified (Goldstein et al., 2019).

The 2017 Endocrine Society guidelines did not recommend conjugated equine estrogens (CEEs) as a treatment option because blood levels of conjugated estrogens cannot be measured in transgender women making it difficult to prevent supraphysiologic dosing of estrogen and thereby increasing the potential risk of VTE (Hembree et al., 2017). A retrospective study from the UK examined the risks of oral CEE versus oral estradiol valerate versus oral ethinyl estradiol and found up to a 7-fold increase in the percentage of transgender women in the oral CEE group

who developed VTE compared with transgender women using other forms of estrogen (Seal et al., 2012). In a nested, case-control study, over 80,000 cisgender women aged 40–79 who developed a VTE were matched to approximately 390,000 cisgender women without VTE; the results showed oral estradiol use had a lower risk of VTE than conjugated estrogens, and transdermal estrogen was not associated with an increased risk of VTE (Vinogradova et al., 2019).

A systematic review evaluated several formulations of estrogen and identified a retrospective and a cross-sectional study that made head-to-head comparisons of the risks associated with different formulations (Wierckx, Mueller et al., 2012; Wierckx et al., 2013). No identified studies evaluating the risk of different formulations of estrogen employed a prospective interventional design. The retrospective study examined 214 transgender women taking transdermal estradiol (17β-estradiol gel 1.5 mg/d or estradiol patch 50 mcg/d) or a daily intake of oral estrogens (estradiol 2 mg/d, estriol 2 mg/d, ethinyl estradiol 50 mcg/day, or ethinyl estradiol 30–50 mcg in an oral contraceptive) (Wierckx et al., 2013). Within a 10-year observation period, 5% of the cohort developed a VTE, 1.4% (3 of 214) experienced a myocardial infarction (MI), and 2.3% (5 of 214) a transient ischemic attack or cerebrovascular accident (TIA/CVA). The prevalence of VTE, MI and TIA/CVA was increased following the initiation of estrogen therapy. However, the authors did not report differences between regimens of estrogen in terms of these endpoints.

The same group of investigators conducted a cross-sectional study that examined 50 transgender women (mean age 43 ± 10) taking oral estrogen (estradiol valerate 2 mg/d, estriol 2 mg/d or ethinyl estradiol 50–120 mcg/day) or using transdermal estradiol (17β-estradiol 1.5 mg/day or estradiol 50 mcg/day) over a follow-up duration of 9.2 years (Wierckx, Mueller et al., 2012). Twelve percent (n = 6) developed either a VTE, MI, or a TIA/CVA. Two of the participants were taking conjugated estrogen 0.625 mg/d (one person in combination with cyproterone acetate), 2 participants were taking ethinyl estradiol 20–50 mcg/d, 1 was taking cyproterone acetate 50 mg/d, while the estrogen regimen used by the sixth participant was not defined. None of the subjects taking oral estradiol or transdermal estradiol developed a VTE, MI, or TIA/CVA.

One prospective study examined the route of estrogen administration in 53 transgender women in a multicenter study carried out throughout Europe. Transgender women younger than 45 years of age (n = 40) received estradiol valerate 4 mg/d in combination with cyproterone acetate (CPA) 50 mg/d and transgender women older than 45 years of age (n = 13) received transdermal 17β-estradiol, also with CPA. No VTE, MI, or TIA/CVA was reported after a 1-year follow-up in either the oral or transdermal estrogen group. An additional retrospective study from Vienna found no occurrences of VTE among 162 transgender women using transdermal estradiol who were followed for a mean of 5 years (Ott et al., 2010).

We are strongly confident in our recommendation against the use of ethinyl estradiol based on historical data from the Amsterdam clinic demonstrating a reduction in the incidence of VTE after discontinuing the use of ethinyl estradiol and the recent systematic review demonstrating an increased risk of VTE in transgender women taking ethinyl estradiol (Weinand & Safer, 2015). We are confident in our recommendation against the use of CEE based on the 2012 study by Seal et al. demonstrating an increased risk of VTE in transgender women taking CEE compared with other formulations of estrogen and with data from cisgender women on hormone replacement therapy (Canonico et al., 2007; Seal et al., 2012). Prospective and retrospective studies in transgender women have reported occurrences of VTE/MI/CVA only in those taking CEE or ethinyl estradiol. Since estradiol is inexpensive, more widely available, and appears safer than CEE in limited studies, the committee recommends against using CEE when estradiol is an available treatment option. The quality of studies may be limited to prospective, cohort or cross-sectional study designs; however, the stronger level of recommendation is based on the consistent evidence supporting the association between the use of ethinyl estradiol and CEE and a greater risk of VTE/MI/CVA in transgender women.

We are also confident in our recommendation for the administration of transdermal preparations of estrogen in older transgender women

(age > 45 years) or those with a previous history of VTE. The confidence in our recommendation is based on the decreased incidence of VTE reported from the Amsterdam clinic when transgender women are switched to using transdermal preparations after age 40 (van Kesteren et al., 1997). Furthermore, the prospective, multicenter cohort study ENIGI found no incidence of VTE/MI/CVA in transgender women who are routinely switched to transdermal estrogen at age 45 (Dekker et al., 2016). In addition, a study by Ott et al. demonstrated no incidence of VTE in 162 transgender women treated with estradiol patches (Ott et al., 2010).

With the exception of cyproterone acetate (note this is not approved for use in the US because of concerns of potential hepatotoxicity), the use of progestins in hormone therapy regimens remains controversial. To date, there have been no quality studies evaluating the role of progesterones in hormone therapy for transgender patients.

We are aware some practitioners who prescribe progestins, including micronized progesterone, are under the impression there may be improvements in breast and/or areolar development, mood, libido, and overall shape for those seeking it along with other benefits yet to be demonstrated (Deutsch, 2016a; Wierckx, van Caenegem et al., 2014). However, these improvements remain anecdotal, and there are no quality data to support such progestin use. An attempted systematic review we commissioned for this version of the SOC failed to identify enough data to make a recommendation in favor of any progestins. Instead, existing data suggest harm is associated with extended progestin exposure (Safer, 2021).

For cisgender women who have a uterus, progestins in combination with estrogens are necessary to avoid the endometrial cancer risk associated with the administration of unopposed estrogen. For cisgender women who do not have a uterus, progestins are not used. The best data for the concerns related to progestin use come from comparisons between the above two cisgender populations, which we acknowledge is not necessarily generalizable to this population. Although not definitive of a class effect for all progestins, medroxyprogesterone added to combined equine estrogens is associated with greater breast cancer and cardiac risks (Chlebowski 2020; Manson, 2013). It is important to note data from the Women's Health Initiative (WHI) studies may not be generalizable to transgender populations. Compared with the cisgender women in the studies, transgender populations seeking hormone therapy tend to be younger, do not use equine estrogen, and hormone therapy in these cases address current mental health and quality of life and not solely risk prevention (Deutsch, 2016a).

Potential adverse effects of progestins include weight gain, depression, and lipid changes. Micronized progesterone may be better tolerated and may have a more favorable impact on the lipid profile than medroxyprogesterone (Fitzpatrick et al., 2000). When paired with estrogens for transgender women, the progestin cyproterone acetate is associated with elevated prolactin, decreased HDL cholesterol, and rare meningiomas—none of which are seen when estrogens are paired with GnRH agonists or spironolactone (Bisson, 2018; Borghei-Razavi, 2014; Defreyne, Nota et al., 2017; Sofer et al., 2020).

Thus, data to date do not include quality evidence supporting a benefit of progestin therapy for transgender women. However, the literature does suggest a potential harm of some progestins, at least in the setting of multi-year exposure. If, after a discussion of the risks and benefits of progesterone treatment, there is a collaborative decision to begin a trial of progesterone therapy, the prescriber should evaluate the patient within a year to review the patient's response to this treatment.

Statement 12.16

**We recommend health care professionals prescribe testosterone-lowering medications (either cyproterone acetate, spironolactone, or GnRH agonists) for eligible\* transgender and gendered diverse people with testes taking estrogen as part of a hormonal treatment plan if their individual goal is to approximate levels of circulating sex hormone in cisgender women.**

Most gender clinics in the US and Europe prescribe estrogen combined with a testosterone-lowering medication (Mamoojee et al., 2017) (see Appendix C—Table 5). In the

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH   S123

US, spironolactone is the most commonly pre-scribed testosterone-lowering medication, while GnRHas are commonly used in the UK, and cyproterone acetate are most often prescribed in the rest of Europe (Angus et al., 2021; Kuijpers et al., 2021). The rationale for adding a testosterone-lowering medication is two-fold 1) to lower testosterone levels to within the reference range of cisgender women; and 2) to reduce the amount of estrogen needed to achieve adequate physical effects. Each testosterone-lowering medication has a different side effect profile. Spironolactone is an antihypertensive and potassium-sparing diuretic, and thus may lead to hyperkalemia, increased frequency of urination, and a reduction in blood pressure (Lin et al., 2021). Cyproterone acetate has been associated with the development of meningioma and hyper-prolactinemia (Nota et al., 2018). GnRHa's, while very effective in lowering testosterone levels, can result in osteoporosis if doses of estrogen given concurrently are insufficient (Klink, Caris et al., 2015).

One systematic review identified one study that reported findings from a head-to-head comparison of the testosterone-lowering medications cyproterone acetate and leuprolide (Gava et al., 2016). Two studies compared a group of transgender women taking estrogen plus testosterone-lowering medications with a group who received only estrogen. The systematic review did not provide sufficient evidence to suggest any of the three testosterone-lowering medications had a better safety profile in terms of improved outcomes in bone health, testosterone levels, potassium levels, or in the incidence of hyperprolactinemia or meningiomas (Wilson et al., 2020). Therefore, no recommendation can be given. The review did report spironolactone-based regimens were associated with a 45% increase in prolactin levels, whereas cyproterone-based regimens increased prolactin levels by more than 100%. However, the clinical significance of elevated prolactin levels is not clear because the rates of prolactinomas were not significantly elevated in either the spironolactone- or CPA-treated groups (Wilson et al., 2020). One retrospective, cohort study from a single center in the US reported no clinically significant increases in prolactin levels in 100 transgender women treated with estrogen plus spironolactone (Bisson et al., 2018). A retrospective study from the Netherlands of 2,555 transgender women taking primarily CPA with various formulations of estrogen reported an increased standardized incidence ratio of meningiomas in patients who used cyproterone acetate after gonadectomy for many years when compared with the general Dutch population (Nota et al., 2018). Furthermore, in a shorter study in Belgium, 107 transgender women had transient elevations in prolactin levels following treatment with cyproterone acetate, which declined to normal after discontinuation (Defreyne, Nota et al., 2017). A recent publication, not included in the systematic review, examined 126 transgender women taking spironolactone, GnRHas, or cyproterone and concluded cyproterone was associated with higher prolactin levels and a worse lipid profile than spironolactone or GnRHas (Sofer et al., 2020). After balancing the costs and accessibility of measuring prolactin levels against the clinical significance of an elevated level, a decision was made not to make a recommendation for or against monitoring prolactin levels at this time. HCPs should therefore make individualized clinical decisions about the necessity to measure prolactin levels based on the type of hormone regimen and/or the presence of symptoms of hyperprolactinemia or a pituitary tumor (e.g., galactorrhea, visual field changes).

Cyproterone has also been linked to meningiomas. Nine cases of meningioma have been reported in the literature among transgender women primarily taking cyproterone acetate (Mancini et al., 2018). This increased risk has also been identified in cisgender populations. In 2020, the European Medicines Agency published a report recommending cyproterone products with daily doses of 10 mg or more should be restricted because of the risk of developing meningioma (European Medicines Agency, 2020). Most likely this association is a specific effect of cyproterone acetate and has not been extrapolated to include other testosterone-lowering drugs. In the US, where cyproterone acetate is not available, the North American Association of Central Cancer Registries (NAACCRs) database did not identify an increased risk of brain tumors (not specific to

meningiomas) among transgender women (Nash et al., 2018). Furthermore, there was not an increase in the hazard ratio of brain tumors in the Kaiser cohort of 2,791 transgender women compared with cisgender controls (Silverberg et al., 2017). No long-term studies have reported on the risk of meningiomas and prolactinomas in transgender women taking GnRHas.

Our strong recommendation for the use of testosterone-lowering medications as part of a hormone regimen for transgender individuals with testes is based on the global practice of using these medications in addition to estrogen therapies as well as the relatively minimal risk associated with these therapies. However, we are not able to make a recommendation favoring one testosterone-lowering medication over another at this time. The published data thus far raises some concerns about the risk of meningiomas with the prolonged use (>2 years) and higher doses (>10 mg daily) of cyproterone acetate (Nota et al., 2018; Ter Wengel et al., 2016; Weill et al., 2021).

Bicalutamide is an antiandrogen that has been used in the treatment of prostate cancer. It competitively binds to the androgen receptor to block the binding of androgens. Data on the use of bicalutamide in trans feminine populations is very sparse and safety data is lacking. One small study looked at the use of bicalutamide 50 mg daily as a puberty blocker in 23 trans feminine adolescents who could not obtain treatment with a GnRH analogue (Neyman et al., 2019). All adolescents experienced breast development which is also commonly seen in men with prostate cancer who are treated with bicalutamide. Although rare, fulminant hepatotoxicity resulting in death has been described with bicalutamide (O'Bryant et al., 2008). Given that bicalutamide has not been adequately studied in trans feminine populations, we do not recommend its routine use.

The administration of 5α-reductase inhibitors block the conversion of testosterone to the more potent androgen dihydrotestosterone. The Food & Drug Administration (FDA) approved indications of finasteride administration include benign prostatic hypertrophy and androgenetic alopecia. Data on the use of 5α-reductase inhibitors in trans feminine populations is very sparse (Irwig, 2021). It is unclear whether this class of medication could have any clinical benefit in trans feminine individuals whose testosterone and dihydrotestosterone levels have already been lowered with estrogen and an antiandrogen. We therefore do not recommend their routine use in trans feminine populations. Finasteride may be an appropriate treatment option in trans masculine individuals experiencing bothersome alopecia resulting from higher dihydrotestosterone levels. Nonetheless, treatment with a 5α-reductase inhibitor may impair clitoral growth and the development of facial and body hair in trans masculine individuals. Studies are needed to assess the efficacy and safety of 5α-reductase inhibitors in transgender populations.

### Statement 12.17
**We recommend health care professionals monitor hematocrit (or hemoglobin) levels in transgender and gender diverse people treated with testosterone.**

There are good quality data suggesting a rise in hematocrit (or hemoglobin) is associated with TGD persons treated with testosterone (Defreyne et al., 2018). The testosterone regimens in the systematic review included testosterone esters ranging from the equivalent of 25–250 mg SC/IM weekly, testosterone undecanoate 1000 mg every 12 weeks, or testosterone gel 50 mg applied daily to the skin (Defreyne et al., 2018; Gava et al., 2018; Giltay et al., 2000; Meriggiola et al., 2008; Pelusi et al., 2014; T'Sjoen et al., 2005; Wierckx, van Caenegem et al., 2014; Wierckx, van de Peer et al., 2014). The expected rise should be consistent with reference ranges in cisgender males.

### Statement 12.18
**We suggest health care professionals collaborate with surgeons regarding hormone use before and after gender-affirmation surgery. For supporting text, see Statement 12.19.**

### Statement 12.19
**We suggest health care professionals counsel eligible\* transgender and gender diverse people about the various options for gender-affirmation surgery unless surgery is either not indicated or is medically contraindicated.**

Despite the absence of evidence, perioperative clinical standards for gender-affirmation surgeries have included cessation of hormone therapy for 1–4 weeks before and after surgery, most commonly genital surgeries (Hembree et al., 2009). Such practice was meant to mitigate the risk of VTE associated with exogenous estrogen administration (Hembree et al., 2009). Estrogen and testosterone could then be resumed at some point postoperatively.

After careful examination, investigators have found no perioperative increase in the rate of VTE among transgender individuals undergoing surgery, while being maintained on sex steroid treatment throughout when compared with that among patients whose sex steroid treatment was discontinued preoperatively (Gaither et al., 2018; Hembree et al., 2009; Kozato et al., 2021; Prince & Safer, 2020). Sex steroid treatment is especially important after gonadectomy to avoid the sequelae of hypogonadism, the risk of developing osteoporosis, and for the maintenance of mental health and quality of life (Fisher, Castellini et al., 2016; Rosen et al., 2019). Thus, hormone providers and surgeons should educate patients about the necessity for continuous exogenous hormone therapy after gonadectomy.

To be able to educate patients and serve as clinical advocates, HCPs should be knowledgeable about the risks and benefits of gender-affirmation surgeries and should also be cognizant of the performance measures and surgical outcomes of the surgeons to whom they might refer patients (Beek, Kreukels et al., 2015; Colebunders et al., 2017; Wiepjes et al., 2018). In general, most medically necessary surgeries can be thought of as involving three regions: the face, chest/breasts, and genitalia (internal and external). Additional medically necessary procedures include body contouring and voice surgery. See medical necessity statement in Chapter 2—Global Applicability, Statement 2.1).

Multiple procedures are available for facial gender-affirming surgeries including, but not limited to chondrolanryngoplasty, rhinoplasty, contouring or augmentation of the jaw, chin, and forehead, facelift, hair removal and hair transplantation (see Chapter 13—Surgery and Postoperative Care). Procedures available for chest/breast surgery include breast augmentation, double mastectomy with nipple grafts, periareolar mastectomy, and liposuction. The most common gender-affirmation surgery for TGD individuals with endogenous breast development is masculinizing chest surgery (mastectomy) (Horbach et al., 2015; Kailas et al., 2017).

Internal genital surgery procedures include but are not limited to orchiectomy, hysterectomy, salpingo-oophorectomy, vaginoplasty, and colpectomy/vaginectomy (Horbach et al., 2015; Jiang et al., 2018). The inner lining in vaginoplasty is typically constructed from penile skin, skin grafts, a combination of both, or a bowel segment. Removal of the uterus/ovaries can be performed individually or all at once (hysterectomy, salpingo-oophorectomy, and colpectomy). If colpectomy is performed, a hysterectomy must also be performed. The ovaries may remain in situ, upon patient request. A potential benefit of leaving one or both ovaries is fertility preservation, while the downside is the potential for the development of ovarian pathology, including cancer (De Roo et al., 2017).

External genital surgery procedures include but are not limited to vulvoplasty, metoidioplasty, and phalloplasty (Djordjevic et al., 2008; Frey et al., 2016). Hair removal is generally necessary before performing external genital procedures (Marks et al., 2019). Vulvoplasty can include the creation of the mons, labia, clitoris, and urethral opening. Urethral lengthening is an option for both metoidioplasty and phalloplasty, but is associated with a greatly increased complication rate (Schechter & Safa, 2018). Wound care and physical therapy are necessary for managing wounds resulting from the donor sites for phalloplasty (van Caenegem, Verhaeghe et al., 2013). Pelvic physical therapy can also be an important adjunct intervention after surgery for managing voiding and sexual function (Jiang et al., 2019). Dialogue, mutual understanding, and clear communication in a common language between patients, HCPs, and surgeons will contribute to well-considered decisions about the available surgical procedures.

## Statement 12.20

**We recommend health care professionals initiate and continue gender-affirming hormone**

therapy for eligible* transgender and gender diverse people who wish this treatment due to demonstrated improvement in psychosocial functioning and quality of life. For supporting text, see Statement 12.21.

Statement 12.21

We recommend health care professionals maintain existing hormone therapy if the transgender and gender diverse individual's mental health deteriorates and assess the reason for the deterioration, unless contraindicated.

Several mental health disparities have been documented in the transgender population including depression, suicidality, anxiety, decreased self-esteem, and post-traumatic stress disorder (Arcelus et al., 2016; Becerra-Culqui et al, 2018; Bouman et al., 2017; Eisenberg et al., 2017; Heylens, Elaut et al., 2014; Witcomb et al., 2018). The gender minority stress model provides evidence of several mediators and moderators of these disparities (Hendricks & Testa, 2012; Meyer, 2003). Mediators and moderators of mental health disparities unique to transgender people include experiences of discrimination, victimization, misgendering, family rejection, and internalized transphobia (Hendricks & Testa, 2012). Factors that have a positive effect on mental health include family acceptance, supportive social and romantic relationships, transgender community connectedness, protection by affirming and inclusive policies, policies of affirmation and inclusion, possession of updated legal name/gender documentation, and achievement of physical gender transition based on individualized embodiment goals (Bauer et al., 2015; Bockting et al., 2013; Bouman et al., 2016; Davey et al., 2014; de Vries et al., 2014; Du Bois et al., 2018; Gower, Rider, Brown et al., 2018; Hendricks & Testa, 2012; Keo-Meier et al., 2015; Meier et al., 2013; Pflum et al., 2015; Ryan et al., 2010; Smith et al., 2018).

Hormone therapy has been found to positively impact the mental health and quality of life of TGD youth and adults who embark on this treatment (Aldridge et al., 2020; Allen et al., 2019; Bauer et al., 2015; Nobili et al., 2018; Russell et al., 2018; Ryan, 2009). In many cases, hormone therapy is considered a lifesaving intervention (Allen et al., 2019; Grossman & D'Augelli, 2006; Moody et al., 2015). Several studies have found associations between the initiation of hormone therapy and improved mental health in youth and adults (Aldridge et al., 2020; Costa et al., 2016; de Vries et al., 2014; Kuper et al., 2020; Nguyen et al., 2018; White Hughto & Reisner, 2016), including improvements in quality of life (Gorin-Lazard et al., 2012; Gorin-Lazard et al., 2013; Murad et al., 2010; Newfield et al., 2006; Nobili et al., 2018; White Hughto & Reisner, 2016), a reduction in anxiety and depression (Aldridge et al., 2020; Colizzi et al., 2014; Davis & Meier, 2014; de Vries, Steensma et al., 2011; Gómez-Gil et al., 2012; Rowniak et al., 2019), decreased stress, and decreased paranoia (Keo-Meier & Fitzgerald, 2017). A prospective, controlled trial using the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) demonstrated significant improvement in multiple domains of psychological functioning in transgender men after only 3 months of testosterone treatment (Keo-Meier et al., 2015). Although there are higher rates of autism symptoms in the transgender population, these symptoms have not been found to increase after the initiation of hormone therapy (Nobili et al., 2020).

As a reduction in depressive symptoms may correlate with a decrease in the risk of suicide, withholding hormone therapy based on the presence of depression or suicidality may cause harm (Keo-Meier et al., 2015; Levy et al., 2003). Turban, King et al. (2020) found a decrease in the odds of lifetime suicidal ideation in adolescents who required pubertal suppression and had access to this treatment compared with those with a similar desire with no such access (Turban, King et al., 2020). A recent systematic review found pubertal suppression in TGD adolescents was associated with an improved social life, decreased suicidality in adulthood, improved psychological functioning and quality of life (Rew et al., 2020). Because evidence suggests hormone therapy is directly linked to decreased symptoms of depression and anxiety, the practice of withholding hormone therapy until these symptoms are treated with traditional psychiatry is considered to have iatrogenic effects

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH   S127

(Keo-Meier et al., 2015). If psychiatric treatment is indicated, it can be started or adjusted concurrently without discontinuing hormone therapy.

*For eligibility criteria for adolescents and adults, please refer to Chapter 5—Assessment for Adults and Chapter 6—Adolescents as well as Appendix D.

## CHAPTER 16 Reproductive Health

All humans, including transgender individuals, have the reproductive right to decide whether or not to have children (United Nations Population Fund, 2014). Medically necessary gender-affirming hormonal treatments (GAHTs) and surgical interventions (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1) that alter reproductive anatomy or function may limit future reproductive options to varying degrees (Hembree et al., 2017; Nahata et al., 2019). It is thus critical to discuss infertility risk and fertility preservation (FP) options with transgender individuals and their families prior to initiating any of these treatments and to continue these conversations on an ongoing basis thereafter (Hembree et al., 2017). Established FP options, such as embryo, oocyte, and sperm cryopreservation, may be available for postpubertal transgender individuals (Nahata et al., 2019). Research protocols for ovarian and testicular tissue cryopreservation have also been developed and studied (Borgström et al., 2020; Nahata et al., 2019; Rodriguez-Wallberg, et al., 2019). Whereas the use of embryos, mature oocytes, and sperm have all proven to be efficacious when employed within clinical treatments, cryopreserved gonadal tissues would require either future retransplantation aimed at obtaining fully functional gametes or the application of laboratory methods for culture, which are still under development in basic science research settings. Of note, recent American Society for Reproductive Medicine guidelines have lifted the experimental label on ovarian tissue cryopreservation, but evidence remains limited in prepubertal children (Practice Committee of the American Society for Reproductive Medicine, 2019).

Individualized care should be provided in the context of each person's parenthood goals. Some research suggests transgender and gender diverse (TGD) people may be less likely to desire genetically related children or children at all when compared with cisgender peers (Defreyne, van Schuylenbergh et al., 2020; Russell et al., 2016; von Doussa et al., 2015). Yet, several other studies have shown many TGD individuals 1) desire

genetically related children; 2) regret missed opportunities for FP; and 3) are willing to delay or interrupt hormone therapy to preserve fertility and/or conceive (Armuand, Dhejne et al., 2017; Auer et al., 2018; De Sutter et al., 2002; Defreyne, van Schuylenbergh et al., 2020; Tornello & Bos, 2017).

Many barriers to FP have been reported, such as cost (which is exacerbated when insurance coverage is lacking), urgency to start treatment, inability to make future-oriented decisions, inadequate provider knowledge/provider biases that affect offering FP, and difficulties accessing FP (Baram et al., 2019; Defreyne, van Schuylenbergh et al., 2020). Additionally, transgender individuals may have worsening dysphoria due to various steps in the FP process that are inseparably connected with the gender assigned at birth (Armuand, Dhejne, et al., 2017; Baram et al., 2019). When available, a multidisciplinary team approach, where both medical and mental health providers collaborate with gender-affirming fertility specialists, can help overcome some of these barriers (Tishelman et al., 2019). TGD individuals should be educated about the distinction between fertility (utilizing one's own gametes/reproductive tissues) and pregnancy. In addition to fertility considerations, efforts to ensure equitable high-quality care for all forms of family planning and building throughout the full reproductive continuum must be maintained. This includes procreative options such as perinatal care, pregnancy, delivery, and postpartum care, as well as family planning and contraceptive options to prevent unplanned pregnancies, and pregnancy termination if sanctioned (Bonnington et al., 2020; Cipres et al., 2017; Krempasky et al., 2020; Light et al., 2018; Moseson, Fix et al., 2020). TGD people who wish to carry a pregnancy should undergo standard of care preconception care and prenatal counseling and should receive counseling about breast/chest feeding in environments supportive of people with diverse gender identities and experiences (MacDonald et al., 2016; Obedin-Maliver & Makadon, 2016).

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH ⊕ S157

---

**Statements of Recommendations**

16.1- We recommend health care professionals who are treating transgender and gender diverse people and prescribing or referring patients for hormone therapies/surgeries advise their patients about:

16.1.a- Known effects of hormone therapies/surgery on future fertility;

16.1.b- Potential effects of therapies that are not well studied and are of unknown reversibility;

16.1.c- Fertility preservation (FP) options (both established and experimental);

16.1.d- Psychosocial implications of infertility.

16.2- We recommend health care professionals refer transgender and gender diverse people interested in fertility preservation to providers with expertise in fertility preservation for further discussion.

16.3- We recommend transgender care teams partner with local reproductive specialists and facilities to provide specific and timely information and fertility preservation services prior to offering medical and surgical interventions that may impact fertility.

16.4- We recommend health care professionals counsel pre- or early-pubertal transgender and gender diverse youth seeking gender-affirming therapy and their families that currently evidence-based/established fertility preservation options are limited.

16.5- We recommend transgender and gender diverse people with a uterus who wish to carry a pregnancy undergo preconception care, prenatal counseling regarding use and cessation of gender-affirming hormones, pregnancy care, labor and delivery, chest/breast feeding supportive services, and postpartum support according to local standards of care in a gender-affirming way.

16.6- We recommend medical providers discuss contraception methods with transgender and gender diverse people who engage in sexual activity that can result in pregnancy.

16.7- We recommend providers who offer pregnancy termination services ensure procedural options are gender-affirming and serve transgender people and those of diverse genders.

---

harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

## Statement 16.1

**We recommend health care professionals who are treating transgender and gender diverse people and prescribing or referring patients for hormone therapies/surgeries advise their patients about:**

a. **Known effects of hormone therapies/surgeries on future fertility;**
b. **Potential effects of therapies that are not well studied and are of unknown reversibility;**
c. **Fertility preservation (FP) options (both established and experimental;**
d. **Psychosocial implications of infertility.**

### TGD individuals assigned female at birth

GAHT may negatively impact future reproductive capacity (Hembree et al., 2017). Based on current evidence in transgender men and gender diverse people assigned female at birth, these risks are as follows:

Gonadotropin-releasing hormone agonists (GnRHas) may be used for pubertal suppression to prevent further pubertal progression until adolescents are ready for masculinizing treatment. GnRHas may also be used for menstrual suppression. GnRHas impact the maturation of gametes but do not cause permanent damage to gonadal function. Thus, if GnRHas are discontinued, oocyte maturation would be expected to resume.

There are few studies detailing the effects of testosterone therapy on reproductive function in transgender men (Moravek et al., 2020). Restoration of normal ovarian function with oocyte maturation after testosterone interruption has been demonstrated in transgender men who have achieved natural conception. A retrospective study on oocyte cryopreservation showed no differences in the total number of oocytes retrieved or in the number of mature oocytes between transgender men and age- and BMI-matched cisgender women (Adeleye et al., 2018, 2019). The first results have recently been published evaluating live birth rates after controlled ovarian stimulation in transgender men compared with cisgender women (Leung et al., 2019). Testosterone was discontinued prior to ovarian stimulation. Overall, the results concerning the influence of testosterone on reproductive organs and their function appear to be reassuring. However, there have been no prospective studies to date evaluating the effect of long-term hormone therapy on fertility (i.e., started in adolescence) or in those treated with GnRHas in early puberty followed by testosterone therapy. It is important to take into consideration that required medications and procedures for cryopreserving oocytes (a

pelvic examination, vaginal ultrasound monitoring, and oocyte retrievals) may lead to increasing gender dysphoria in transgender men (Armuand, Dhejne et al., 2017).

Surgical interventions among transgender men will have obvious implications for reproductive capacity. If patients desire a hysterectomy, the option should be offered of preserving the ovaries to retain the possibility of having a genetically related child. Alternatively, if the ovaries are removed either separately or concurrently with the hysterectomy, egg freezing should be offered prior to surgery and/or ovarian tissue cryopreservation can be done at the time of oophorectomy. Although this procedure is no longer considered experimental, many transgender men may desire *in vitro* maturation of primordial follicles, which is still investigational. Studies evaluating oocyte function have shown oocytes isolated from transgender men with testosterone exposure at the time of oophorectomy can be matured *in vitro* to develop normal metaphase II meiotic spindle structure (De Roo et al., 2017; Lierman et al., 2017).

**TGD individuals assigned male at birth**

Based on current evidence in transgender women and gender diverse people assigned male at birth (AMAB), the influence of medical treatment is as follows:

GnRHas inhibit spermatogenesis. Data suggest discontinuation of treatment results in a re-initiation of spermatogenesis, although this may take at least 3 months and most likely longer (Bertelloni et al., 2000). Furthermore, the psychological burden of re-exposure to testosterone should be considered.

Anti-androgens and estrogens result in an impaired sperm production (de Nie et al., 2020; Jindarak et al., 2018; Kent et al., 2018). Spermatogenesis might resume after discontinuation of prolonged treatment with anti-androgens and estrogens, but data are limited (Adeleye et al., 2019; Alford et al., 2020; Schneider et al., 2017). Testicular volumes diminish under the influence of gender-affirming hormone treatment (Matoso et al., 2018). Semen quality in transgender women may also be negatively affected by specific life-style factors, such as a low frequency of masturbation, wearing the genitals tight against the body (e.g., with use of tight undergarments for tucking) (Jung & Schuppe, 2007; Mieusset et al., 1985, 1987; Rodriguez-Wallberg, Häljestig et al., 2021).

Statement 16.2

**We recommend health care professionals refer transgender and gender diverse people interested in fertility preservation to providers with expertise in fertility preservation for further discussion.**

Research shows many transgender adults desire biological children (De Sutter et al., 2002; Defreyne, van Schuylenbergh et al., 2020; Wierckx, Van Caenegem et al., 2012), yet FP rates remain widely variable, particularly in youth (< 5%–40%) (Brik et al., 2019; Chen et al., 2019; Chiniara et al., 2019; Nahata et al., 2017; Segev-Becker et al., 2020). In a recent survey, many youth acknowledged their feelings about having a biological child might change in the future (Strang, Jarin et al., 2018). Non-elective sterilization is a violation of human rights (Ethics Committee of the American Society for Reproductive Medicine, 2015; Equality and Human Rights Commission, 2021; Meyer III et al., 2001) and due to advances in social attitudes, fertility medicine, and affirmative transgender health care, opportunities for biological parenthood during transition should be supported for transgender people. Due to the influence clinical opinion may have on transgender or nonbinary people's FP and on parenting decisions, FP options should be explored by health care providers alongside options such as fostering, adoption, coparenting, and other parenting alternatives (Bartholomaeus & Riggs, 2019). Transgender patients who have been offered this type of discussion and have been given the choice to undergo procedures for FP have reported the experience to be an overall positive one (Armuand, Dhejne et al., 2017; De Sutter et al., 2002; James-Abra et al., 2015).

In other patient populations, fertility referrals and formal fertility programs have been shown to increase FP rates and improve patient satisfaction (Kelvin et al., 2016; Klosky, Anderson et al., 2017; Klosky, Wang et al., 2017;

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH ⊙ S159

Shnorhavorian et al., 2012) Physician attitudes have been investigated, and recent studies indicate both an awareness and a desire to provide fertility-related information to children and their families (Armuand et al., 2020). However, barriers have also been identified, including lack of knowledge, comfort, and resources (Armuand, Nilsson et al., 2017; Frederick et al., 2018). Thus, the need for appropriate training of health care providers has been highlighted, with emphasis placed on fertility counseling and offering FP options to all at-risk individuals in an unbiased way (Armuand, Nilsson et al., 2017). Parents' recommendations have also been shown to significantly influence FP rates in adolescent and young adult males with cancer (Klosky, Flynn et al., 2017). While there are clear clinical differences in these populations, these findings can help inform best practices for fertility counseling and FP referrals for transgender individuals.

Statement 16.3

**We recommend transgender care teams partner with local reproductive specialists and facilities to provide specific and timely information and fertility preservation services prior to offering medical and surgical interventions that may impact fertility.**

Cryopreservation of sperm and oocytes are established FP techniques and can be offered to pubertal, late pubertal, and adult birth assigned males and birth assigned females, respectively, preferably prior to the initiation of GAHT (Hembree et al., 2017; Practice Committee of the American Society for Reproductive Medicine, 2019). Cryopreservation of embryos can be offered to adult (post-pubertal) TGD people who wish to have a child and have an available partner. The future use of cryopreserved gametes is also dependent on the gametes and reproductive organs of the future partner (Fischer, 2021; Maxwell et al., 2017)

Although semen parameters have been shown to be compromised when FP is performed after initiation of GAH medication (Adeleye et al., 2019), one small study showed when the treatment was discontinued, semen parameters were comparable to those in TGD patients who had never undergone GAH treatment. With regard to ovarian stimulation, oocyte vitrification yield and subsequent use of the oocytes in in-vitro fertilization (IVF), there is no reason to anticipate a different outcome in assisted reproductive technology (ART) treatments for TGD patients than that obtained in cisgender patients undergoing ART—other than individual confounding factors related to (in)fertility—when gametes are banked prior to any medical treatment (Adeleye et al., 2019). The use of oocytes in ART treatment resulted in similarly successful outcomes in TGD compared with controlled, matched cisgender patients (Adeleye et al., 2019; Leung et al., 2019; Maxwell et al., 2017).

Although these are established options, few pubertal, late pubertal or adult TGD people undergo FP (Nahata et al., 2017), and many experience challenges while undergoing FP interventions. Not only is access and cost of these methods a barrier (particularly in regions without insurance coverage), but these procedures are often physically and emotionally uncomfortable, and many express concerns about postponing the transitioning process (Chen et al., 2017; De Sutter et al., 2002; Nahata et al., 2017; Wierckx, Stuyver et al., 2012). Especially for the birth assigned females, the invasiveness of endovaginal ultrasound follow-up of the ovarian stimulation and oocyte retrieval procedures (and associated psychological distress) have been cited as a barrier (Armuand, Dhejne et al., 2017; Chen et al., 2017). There is also the concern young adults going through transitioning may not have a clear vision of parenting and are therefore likely to decline the opportunity to use FP at that time—while as adults, they may have different opinions about parenthood (Cauffman & Steinberg, 2000). The reduction of gender dysphoria during transitioning could also influence the decision-making process surrounding FP (Nahata et al., 2017). Based on research showing TGD youths' fertility perspectives may change over time (Nahata et al., 2019; Strang, Jarin et al., 2018), FP options should be discussed on an ongoing basis.

Statement 16.4

**We recommend health care professionals counsel pre- or early-pubertal transgender and**

**gender diverse youth seeking gender-affirming therapy and their families that currently evidence-based/established fertility preservation options are limited.**

For prepubertal and early-pubertal children, FP options are limited to the storage of gonadal tissue. Although this option is available for TGD children in the same way that it is available for cisgender prepubertal and early-pubertal oncological patients, there is no literature describing the utilization of this approach in the transgender population. Ovarian tissue autotransplantation has resulted in over 130 live births in cisgender women. Most of these patients conceived naturally without ART (Donnez & Dolmans, 2015; Jadoul et al., 2017), and the majority stored their ovarian tissue either as adults or during puberty. Although the recent American Society for Reproductive Medicine guideline has lifted the experimental label from ovarian tissue cryopreservation (Practice Committee of the American Society for Reproductive Medicine, 2019), there are very few case reports describing a successful pregnancy in a woman following the transplantation of ovarian tissue cryopreserved before puberty. Demeestere et al. (2015) and Rodriguez-Wallberg, Milenkovic et al. (2021) described cases of successful pregnancies following transplantation of tissue procured at the age of 14, and recently Matthews et al. (2018) described the case of a girl diagnosed with thalassemia who had ovarian tissue stored at the age of 9 and transplantation 14 years late. She subsequently conceived through IVF and delivered a healthy baby.

Currently, the only future clinical application for storing ovarian tissue is autotransplantation, which might be undesirable in a transgender man (due to the potentially undesirable effects of estrogen). A laboratory procedure that would make it possible to mature oocytes *in vitro* starting with ovarian tissue would be the ideal future application of stored ovarian tissue for transgender people, but this technique is currently only being investigated and optimized in basic science research settings (Ladanyi et al., 2017; Oktay et al., 2010).

Prepubertal procurement of testicular tissue has been documented as a low-risk procedure (Borgström et al., 2020; Ming et al., 2018). Some authors have also described this approach as a theoretical option in transgender people (De Roo et al., 2016; Martinez et al., 2017; Nahata, Curci et al., 2018). However, there are no reports in the literature describing the clinical or investigational utilization of this FP option for TGD patients. Moreover, the viability of the clinical application of autotransplantation of testicular tissue remains unknown in humans, and *in vitro* maturation techniques are still in the realm of basic science research. Thus, specialists currently consider this technique experimental (Picton et al., 2015). The possibility of storing gonadal tissue should be discussed prior to any genital surgery that would result in sterilization, although the probability of being able to use this tissue must be clearly addressed.

## Statement 16.5

**We recommend transgender and gender diverse people with a uterus who wish to carry a pregnancy undergo preconception care and prenatal counseling regarding the use and cessation of gender-affirming hormones, pregnancy care, labor and delivery, chest/breast feeding supportive services, and postpartum support according to local standards of care in a gender-affirming way.**

Most transgender men and gender diverse people (AFAB) retain their uterus and ovaries and thus can conceive and carry a pregnancy even after long-term testosterone use (Light et al., 2014). Many transgender men desire children (Light et al., 2014; Wierckx, van Caenegem et al., 2012) and are willing to carry a pregnancy (Moseson, Fix, Hastings et al., 2021; Moseson, Fix, Ragosta et al., 2021). ART has expanded the opportunity for many transgender men to conceive and fulfill their family planning wishes (De Roo et al., 2017; Ellis et al., 2015; Maxwell et al., 2017). Some transgender men report psychological isolation, dysphoria related to the gravid uterus and chest changes, and depression (Charter, 2018; Ellis et al., 2015; Hoffkling et al., 2017; Obedin-Maliver & Makadon, 2016). Conversely, other studies have reported some positive experiences during pregnancy as well (Fischer, 2021; Light et al., 2014). Mental health providers should be involved to provide support, and counseling should be

provided addressing when to stop and when to resume gender-affirming hormones, what options are available for the mode of delivery and for chest/breast feeding (Hoffkling et al., 2017). Finally, system-level and interpersonal-level interventions should be implemented to ensure person-centered reproductive health care for all people (Hahn et al., 2019; Hoffkling et al., 2017; Moseson, Zazanis et al., 2020; Snowden et al., 2018).

Given the potential harmful effects of testosterone on the developing embryo, discontinuing testosterone or masculinizing hormone therapy prior to conception and during the entire pregnancy is recommended. However, the optimal time for both the discontinuation of testosterone prior to pregnancy and its resumption after pregnancy is unknown. Since stopping gender-affirming hormones may cause distress and exacerbate dysphoria in transgender men, when and how to stop this therapy should be discussed during prenatal counseling (Hahn et al., 2019). Because information about the duration of testosterone exposure and the risk of teratogenicity is lacking, testosterone use should be discontinued prior to attempting pregnancy and before stopping contraception. Moreover, there is limited information regarding health outcomes of infants born to transgender men. Small case series attempting to evaluate this question have revealed no adverse physical or psychosocial differences between infants born to transgender men and infants in the general population (Chiland et al., 2013).

### Chest/Breast feeding

In the limited studies evaluating lactation and chest/breast feeding, the majority of transgender men and TGD individuals AFAB who chose to chest/breast feed postpartum were successful, with research suggesting induction of lactation is in part dependent on preconception counseling and experienced lactation nursing support (MacDonald et al., 2016; Wolfe-Roubatis & Spatz, 2015). Specifically, transgender men and TGD people who use testosterone should be informed 1) although quantities are small, testosterone does pass through chest/breast milk; and 2) the impact on the developing neonate/child is unknown, and therefore gender-affirming testosterone use is not recommended during lactation but may be resumed after discontinuation of chest/breast feeding (Glaser et al., 2009). Transgender men and other TGD individuals AFAB should be made aware some patients who carry a pregnancy may experience undesired chest growth and/or lactation even after chest reconstruction and should therefore be supported if they desire to suppress lactation (MacDonald et al., 2016).

There is limited information concerning lactation in transgender women as well as other TGD AMAB but many also express the desire to chest/breast feed. While there is a case report of a transgender woman successfully lactating and chest/breast feeding her infant after hormonal support using a combination of estrogen, progesterone, domperidone, and breast pumping (Reisman & Goldstein, 2018), the nutritional and immunological profile of chest/breast milk under these conditions has not been studied. Therefore, patients need to be informed about the risks and benefits of this approach to child feeding (Reisman & Goldstein, 2018).

### Statement 16.6

**We recommend medical providers discuss contraception methods with transgender and gender diverse people who engage in sexual activity that can result in pregnancy.**

Many TGD individuals may retain reproductive capacity, and they (if they retain a uterus, ovaries, and tubes) or their sexual partners (for sperm producing individuals) may experience unplanned pregnancies (James et al., 2016; Light et al., 2014; Moseson, Fix et al., 2020). Therefore, intentional family planning counseling, including contraception and abortion conducted in gender-expansive ways is needed (Klein, Berry-Bibee et al., 2018; Obedin-Maliver, 2015; Stroumsa & Wu, 2018). TGD people AFAB may not use contraception due to an erroneous assumption that testosterone is a reliable form of contraception (Abern & Maguire, 2018; Ingraham et al., 2018; Jones, Wood et al., 2017; Potter et al., 2015). However, based on current understanding, testosterone should not be considered a reliable form of contraception because of the impact of its incomplete suppression of the hypothalamic-pituitary-adrenal axis (Krempasky et al., 2020). Furthermore, pregnancies have occurred while individuals are amenorrheic due

to testosterone use, which may outlast active periods of administration (Light et al., 2014). Pregnancy can also occur in TGD people after long-term testosterone use (at least up to 10 years), although the effect on oocytes and baseline fertility is still unknown (Light et al., 2014).

TGD people AFAB may use a variety of contraceptive methods (Abern & Maguire, 2018; Bentsianov et al., 2018; Bonnington et al., 2020; Chrisler et al., 2016; Cipres et al., 2017; Jones, Wood et al., 2017; Krempasky et al., 2020; Light et al., 2018).These methods may be used explicitly for pregnancy prevention, menstrual suppression, abnormal bleeding, or other gynecological needs (Bonnington et al., 2020; Chrisler et al., 2016; Krempasky et al., 2020; Schwartz et al., 2019). Contraceptive research gaps within this population are profound. No studies have examined how the use of exogenous androgens (e.g., testosterone) may modify the efficacy or safety profile of hormonal contraceptive methods (e.g., combined estrogen and progestin hormonal contraceptives, progestin-only based contraceptives) or non-hormonal and barrier contraceptive methods (e.g., internal and external condoms, non-hormonal intrauterine devices, diaphragms, sponges, etc.).

Gender diverse individuals who currently have a penis and testicles may engage in sexual activity with individuals who have a uterus, ovaries, and tubes of any gender. Gender diverse people who have a penis and testicles can produce sperm even while on gender-affirming hormones (i.e., estrogen), and although semen parameters are diminished among those who are currently using or who have previously used gender-affirming hormones, azoospermia is not complete and sperm activity is not totally suppressed (Adeleye et al., 2019; Jindarak et al., 2018; Kent et al.,

2018). Therefore, contraception needs to be considered if pregnancy is to be avoided in penis-in-vagina sexual activity between a person with a uterus, ovaries, and tubes and one with a penis and testicles, irrespective of the use of gender-affirming hormones by either partner. Currently, contraceptive methods available for use by the sperm-producing partner are primarily mechanical barriers (i.e., external condoms, internal condoms), permanent sterilization (i.e., vasectomy), and gender-affirming surgery (e.g., orchiectomy, which also results in sterilization). Contraceptive counseling that considers sperm producing, egg producing, and gestating partners (as relevant) is recommended.

Statement 16.7

**We recommend providers who offer pregnancy termination services ensure procedural approaches are gender-affirming and serve transgender people and those of diverse genders.**

Unplanned pregnancies and abortions have been reported among TGD individuals with a uterus (Abern & Maguire, 2018; Light et al., 2014; Light et al., 2018; Moseson, Fix et al., 2020) and documented through surveys of abortion-providing facilities (Jones et al., 2020). However, the population-based epidemiology of abortion provision and the experiences and preferences of TGD individuals AFAB undergoing abortion still represents a critical gap in research (Fix et al., 2020; Moseson, Fix et al., 2020; Moseson, Lunn et al., 2020). Nonetheless, given that pregnancy capacity exists among many TGD people and pregnancies may not always be planned or desired, access to safe, legal, and gender-affirming pregnancy medical and surgical termination services is necessary.



## CHAPTER 17 Sexual Health

Sexual health has a profound impact on physical and psychological well-being, regardless of one's sex, gender, or sexual orientation. However, stigma about sex, gender and sexual orientation influences individual's opportunities to live out their sexuality and to receive appropriate sexual health care. Specifically, in most societies, cisnormativity and heteronormativity lead to the assumption that all people are cisgender and heterosexual (Bauer et al., 2009), and that this combination is superior to all other genders and sexual orientations (Nieder, Güldenring et al., 2020; Rider, Vencill et al., 2019). Hetero-cis-normativity negates the complexity of gender, sexual orientation, and sexuality and disregards diversity and fluidity. This is all the more important since sexual identities, orientations, and practices of transgender and gender diverse (TGD) people are characterized by an enormous diversity (Galupo et al., 2016; Jessen et al., 2021; Thurston & Allan, 2018; T'Sjoen et al., 2020). Likewise, a strong cross-cultural tendency toward allonormativity—the assumption that all people experience sexual attraction or interest in sexual activity—negates the diverse experiences of TGD people, especially those who locate themselves on the asexual spectrum (McInroy et al., 2021; Mollet, 2021; Rothblum et al., 2020).

The World Health Organization (WHO, 2010) emphasizes sexual health depends on respect for the sexual rights of all people, including the right to express diverse sexualities and to be treated respectfully, safely, and with freedom from discrimination and violence. Sexual health discourses have focused on agency and body autonomy, which include consent, sexual pleasure, sexual satisfaction, partnerships, and family life (Cornwall & Jolly, 2006; Lindley et al., 2021). In light of this, the WHO defines sexual health as "a state of physical, emotional, mental, and social well-being in relation to sexuality and not merely the absence of disease, dysfunction, or infirmity. Sexual health requires a positive and respectful approach to sexuality and sexual relationships as well as the possibility of having pleasurable and safe sexual experiences, free of coercion, discrimination, and violence. For sexual health to be

attained and maintained, the sexual rights of all persons must be respected, protected, and fulfilled" (WHO, 2006, p. 5). This includes individuals on the asexual spectrum, who may not experience sexual attraction to others but may still choose to be sexual at times (e.g., via self-stimulation) and/or experience interest in forming and building romantic relationships (de Oliveira et al., 2021).

Scientific attention to the sexual experiences and behaviors of TGD people has grown in recent years (Gieles et al., 2022; Holmberg et al., 2019; Klein & Gorzalka, 2009; Kloer et al., 2021; Mattawanon et al., 2021; Stephenson et al., 2017; Tirapegui et al., 2020; Thurston & Allan, 2018). This expansion within the literature reflects a sex-positive framework (Harden, 2014), a framework that recognizes both the positive aspects such as sexual pleasure (Laan et al., 2021) and potential risks associated with sexuality (Goldhammer et al., 2022; Mujugira et al., 2021). Studies of TGD people's sexuality, however, often lack validated measures, an appropriate control group, or a prospective design (Holmberg et al., 2019). Additionally, most focus exclusively on sexual functioning (Kennis et al., 2022), and thus neglecting sexual satisfaction and broader operationalizations of sexual pleasure beyond functioning. The effects of current TGD-related medical treatments on sexuality are heterogeneous (Özer et al., 2022; T'Sjoen et al., 2020), and there has been little research on the sexuality of TGD adolescents (Bungener et al., 2017; Maheux et al., 2021; Ristori et al., 2021; Stübler & Becker-Hebly, 2019; Warwick et al., 2022). While sex-positive approaches to counseling and treatment for sexual difficulties experienced by TGD individuals have been proposed (Fielding, 2021; Jacobson et al., 2019; Richards, 2021), to date there is insufficient research on the effectiveness of such interventions. Focusing on the promotion of sexual health, the World Association for Sexual Health (WAS) asserts the importance of sexual pleasure and considers self-determination, consent, safety, privacy, confidence, and the ability to communicate and negotiate sexual relations as major facilitators (Kismödi et al., 2017). WAS asserts sexual pleasure is integral to sexual rights and human rights (Kismödi et al., 2017). To contribute to

---

**Statements of Recommendations**

17.1- We recommend health care professionals who provide care to transgender and gender diverse people acquire the knowledge and skills needed to address sexual health issues (relevant to their care provision).

17.2- We recommend health care professionals who provide care to transgender and gender diverse people discuss the impact of gender-affirming treatments on sexual function, pleasure, and satisfaction.

17.3- We recommend health care professionals who provide care to transgender and gender diverse people offer the possibility of including the partner(s) in sexuality-related care, if appropriate.

17.4- We recommend health care professionals counsel transgender and gender diverse people about the potential impact of stigma and trauma on sexual risk behavior, sexual avoidance, and sexual functioning.

17.5- We recommend any health care professional who offers care that may impact sexual health provide information, ask about the expectations of the transgender and gender diverse individual and assess their level of understanding of possible changes.

17.6-We recommend health care professionals who provide care to transgender and gender diverse people counsel adolescents and adults regarding prevention of sexually transmitted infections.

17.7- We recommend health care professionals who provide care to transgender and gender diverse people follow local and World Health Organization guidelines for human immunodeficiency virus/sexual transmitted infections (HIV/STIs) screening, prevention, and treatment.

17.8- We recommend health care professionals who provide care to transgender and gender diverse people address concerns about potential interactions between antiretroviral medications and hormones.

---

the sexual health of TGD people, health care professionals (HCPs) need both transgender-related expertise and sensitivity (Nieder, Güldenring et al., 2020). With the goal of improving sexual health care for TGD people to an ethically-sound, evidence-based and high-quality level, HCPs must provide their health services with the same care (i.e., with transgender-related expertise), respect (i.e., with transgender-related sensitivity), and investment in sexual pleasure and sexual satisfaction as they provide for cisgender people (Holmberg et al., 2019).

In many societies, nonconforming gender expressions can elicit strong (emotional) reactions, including in HCPs. Thus, when initiating a health-related contact or establishing a therapeutic relationship, a nonjudgmental, open and welcoming manner is most likely ensured when HCPs reflect on their emotional, cognitive, and interactional reactions to the person (Nieder, Güldenring et al., 2020). In addition, transgender-related expertise refers to identifying the impact the TGD person's intersectional identities and experiences of marginalization and stigma may have had on their whole self (Rider, Vencill et al., 2019). To adequately address the specific physical, psychological, and social conditions of TGD people, HCPs must be aware these conditions are generally overlooked due to hetero-cis-normativity, lack of knowledge, and lack of skills (Rees et al., 2021). It is important to consider cultural norms in relation to sexuality. For example, in some African cultures, the idea of sex as taboo restricts the number of acceptable terms to be used when taking a sexual history (Netshandama et al., 2017). Culturally respectful language can facilitate talking openly about one's sexual history and reduce ambiguity or shame (Duby et al., 2016). In addition, HCPs must be sensitive to the history of (mis)use of sexual identity and orientation as a gatekeeping function to exclude transgender people from gender-affirming health care (Nieder & Richter-Appelt, 2011; Richards et al., 2014). The following recommendations aim to improve sexual health care for TGD people.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 17.1

**We recommend health care professionals who provide care to transgender and gender diverse people acquire the knowledge and skills to address sexual health issues (relevant to their care provision).**

It is important HCPs addressing the sexual health of TGD people be familiar with commonly used terminology (see Chapter 1—Terminology) and invite those seeking care to explain terms with which the provider may not be familiar. In this context, it is also important HCPs (are

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH      S165

prepared to) take a sexual history and offer treatment (according to their competencies) in a gender-affirming way with a sex-positive approach (Centers for Disease Control, 2020; Tomson et al., 2021). However, HCP's should apply greater importance to the terminology that the TGD person uses for their own body over more traditionally accepted or used medical terminology (Wesp, 2016). When talking about sexual practices, it is advisable to focus on body parts (e.g., "Do you have sex with people with a penis, people with a vagina, or both?"; ACON, 2022) and what role they play in their sexuality (e.g., "During Sex, do any parts of your body enter your partners body, such as their genitals, anus, or mouth?"; ACON, 2022).

### Statement 17.2

**We recommend health care professionals who provide care to transgender and gender diverse people discuss the impact of gender-affirming treatments on sexual function, pleasure, and satisfaction.**

To achieve gender-affirming care, it is crucial HCPs providing transition-related medical interventions be sufficiently informed about the possible effects on sexual function, pleasure, and satisfaction (T'Sjoen et al., 2020). Since clinical data indicate that TGD people score significantly lower in sexual pleasure compared to cisgender individuals, this is even more important (Gieles et al., 2022). If the HCP cannot provide information about the effects of their treatment on sexual function, pleasure, and satisfaction, they are at least expected to refer the individual to someone qualified to do so. If the sexuality-related effects of their treatment are unknown, HCPs should inform their patients accordingly. As introduced above, the sexuality of TGD people often challenges heteronormative views. Nevertheless, there is a large amount of literature (e.g., Bauer, 2018; Laube et al., 2020; Hamm & Nieder, 2021; Stephenson et al., 2017) highlighting the spectrum character of sexuality that does not fit into expectations of what male and female sexuality entails (neither cis- nor transgender), let alone that of gender diverse people (e.g., non-binary, agender, genderqueer). Thus, these aspects should be carefully considered by HCPs as

cisnormativity, heteronormativity, and transition-related medical interventions, all have a strong impact on sexual health.

Sexual pleasure has been well documented as a factor in improving sexual, mental, and physical health outcomes (Anderson, 2013). Next to sexual function, HCPs providing sexual health care must address sexual pleasure and satisfaction as a key factor within sexual health. Historically sexual health care has been disease focused, and this is particularly true for research and clinical practice in working with TGD patients. Although competent sexual health care regarding HIV and STIs is necessary, integration of valuing sexual pleasure of TGD patients is also necessary. Calls for integrating sexual pleasure as a focal point in STI prevention education and interventions rest on the understanding that pleasure is a motivator of behavior (Philpott et al., 2006). TGD people are concerned about their sexual pleasure and need HCPs who are knowledgeable about the diversity of sexual practices and anatomical functioning particular to TGD health care.

### Statement 17.3

**We recommend health care professionals who provide care to transgender and gender diverse people offer the possibility of including the partner(s) in sexuality-related care, if appropriate.**

When appropriate and relevant to clinical concerns, inclusion of a sexual and/or romantic partner(s) in sexual health care decision-making can increase TGD patients' sexual well-being and satisfaction outcomes (Kleinplatz, 2012). TGD people may choose a range of transition-related medical interventions, and these interventions may have mixed results in shifting experiences of anatomical dysphoria (Bauer & Hammond, 2015). When discussing the impact of medical interventions on sexual functioning, pleasure, and satisfaction, inclusion of partner(s) can increase knowledge of potential changes and encourage communication between partners (Dierckx et al., 2019). Because the process of transitioning is often not a completely solitary endeavor, the inclusion of sexual and/or romantic partners in transition-related health care can facilitate the process of "co-transitioning" (Lindley et al., 2020;

S166   E. COLEMAN ET AL.

Siboni et al., 2022; Theron & Collier, 2013) and can also support sexual growth and adjustment both in the individual as well as in the relationship. Social and psychological barriers to sexual functioning and pleasure, including experiences of gender dysphoria, stigmatization, lack of sexual and relationship role models, and limited skills, can have negative impacts on overall sexual health (Kerckhof et al., 2019). Supportive, gender-affirming sexual communication between partners improves sexual satisfaction outcomes for TGD people (Stephenson et al., 2017; Wierckx, Elaut et al., 2011).

Inclusion of sexual and/or romantic partners offers an additional opportunity to set realistic expectations, disseminate helpful and accurate information, and facilitate gender-affirming positive communication related to sexual health. Ultimately, however, it is important to recognize individual choices related to gender health and transition are the patients to make, not a partner's decision. It is important the inclusion of partners in sexual health-related care occur only when appropriate and as desired by patients. Contraindications might include interpersonal dynamics that are abusive or violent, in which case patient safety overrides partner involvement. Finally, it is critical HCPs treat all people in an affirming and inclusive manner, including sexual and romantic partners. This means, for example, monitoring and addressing assumptions and potential biases about the gender or sexual orientation of a patient's partner(s) or a patient's relationship structure.

Statement 17.4

**We recommend health care professionals counsel transgender and gender diverse people about the potential impact of stigma and trauma on sexual risk behavior, sexual avoidance, and sexual functioning.**

The TGD community is disproportionately impacted by stigma, discrimination, and violence (de Vries et al., 2020; European Union Agency for Fundamental Rights, 2020; McLachlan, 2019). These experiences are often traumatic in nature (Burnes et al., 2016; Mizock & Lewis, 2008) and can create barriers to sexual health, functioning, and pleasure (Bauer & Hammond, 2015). For example, stigmatizing narratives about

transgender sexualities can increase dysphoria and sexual shame, increasing potential avoidance of the sexual communication needed for safety and optimizing pleasure (Stephenson et al., 2017). Research demonstrates stigma, a history of sexual violence, and body image concerns can negatively impact sexual self-esteem and agency, for example the ability to assert what is pleasurable or to negotiate condom use (Clements-Nolle et al., 2008; Dharma et al., 2019). Additionally, gender dysphoria can be exacerbated by past trauma experiences and ongoing trauma-related symptoms (Giovanardi et al., 2018). It may be difficult for some TGD individuals to engage sexually using the genitals with which they were born, and they may choose to avoid such stimulation altogether, disrupting arousal and/or orgasmic processes (Anzani et al., 2021; Bauer & Hammond, 2015; Iantaffi & Bockting, 2011) or result in complex feelings about orgasm (Chadwick et al., 2019). HCPs providing gender-affirming counseling and interventions must be knowledgeable about the spectrum of sexual orientations and identities (including asexual identities and practices) to avoid assumptions based in heteronormative, cisnormative, allonormative modes of behavior or satisfaction while also affirming the potential impacts of stigma and trauma on sexual health and pleasure (Nieder, Güldenring et al., 2020). Some level of disconnect or dissociation may at times be present, particularly in the case of acute trauma symptoms (Colizzi et al., 2015). It is important HCPs be aware of these potential impacts on sexual health, functioning, pleasure, and satisfaction, so they may refer patients as needed to trauma-informed sexual counselors, mental health providers, or both, who may be of further assistance and may also normalize and validate TGD patients exploring multiple diverse pathways of healing and accessing sexual pleasure.

Statement 17.5

**We recommend any health care professional who offers care that may impact sexual health provide information, ask about the expectation of the transgender and gender diverse individual, and assess their level of understanding of possible changes.**

Transition-related care can affect sexual function, pleasure, and satisfaction, both in positive and negative ways (Holmberg et al., 2018; Kerckhof et al., 2019; Thurston & Allan, 2018; Tirapegui et al., 2020). On the positive side, gender-affirming care can help TGD people improve their sexual functioning and increase their sexual pleasure and satisfaction (Kloer et al., 2021; Özer et al., 2022; T'Sjoen et al., 2020). On the negative side, however, data indicate problematic sexual health outcomes due to hormonal and surgical treatments (Holmberg et al., 2018; Kerckhof et al., 2019, Stephenson et al., 2017; Weyers et al., 2009). Transition-related hormones may affect mood, sexual desire, the ability to have an erection and ejaculation, and genital tissue health, which in turn can impact sexual function, pleasure and sexual self-expression (Defreyne, Elaut et al., 2020; Garcia & Zaliznyak, 2020; Kerckhof et al., 2019; Klein & Gorzalka, 2009; Wierckx, Elaut et al., 2014). TGD people who wish to use their original genital anatomy for penetrative sex may benefit from medications that address sexual health side effects of hormone therapy, such as erectile dysfunction, medications for TGD persons taking estrogen or antiandrogens, and topical estrogen and/or moisturizers for TGD persons experiencing vaginal atrophy or dryness due to testosterone therapy.

Sexual desire, arousal, and function may also be affected by the use of psychotropic drugs (Montejo et al., 2015). As some TGD people are prescribed medication to treat depression (Heylens, Elaut et al., 2014), anxiety (Millet et al., 2017) or other mental health concerns (Dhejne et al., 2016), their potential side effects on sexual health should be considered.

Many gender-affirming surgeries can have significant effects on erogenous sensation, sexual desire and arousal as well as sexual function and pleasure. The impact of these changes for patients may be mixed (Holmberg et al., 2018). Chest surgeries (breast reduction, mastectomy, and breast augmentation) and body contouring surgeries, for example, may offer desired changes in form and appearance thereby reducing psychological distress that can disrupt sexual functioning but may adversely affect erogenous sensation (Bekeny et al., 2020; Claes et al., 2018; Rochlin

et al., 2020). Genital surgeries in particular can potentially affect sexual function and pleasure in adverse ways, although they are likely to be experienced positively as the patient's body becomes more aligned with their gender, potentially opening new avenues for sexual pleasure and satisfaction (Hess et al., 2018; Holmberg et al., 2018; Kerckhof et al., 2019).

There are numerous examples of this in the extant literature:

- Surgery may result in a decrease, a total loss, or a possible increase in erogenous stimulation and/or experienced sensation compared with the patient's presurgery anatomy (Garcia, 2018; Sigurjónsson et al., 2017).
- A particular surgical option may be associated with specific limitations to sexual function that may manifest immediately, in the future, or at both timepoints, and which patients should consider before finalizing their choice when considering different surgical options (Frey et al., 2016; Garcia, 2018; Isaacson et al., 2017).
- Postsurgical complications can adversely affect sexual function by either decreasing the quality of sexual function (e.g., discomfort or pain with sexual activity) or by precluding satisfactory intercourse (Kerckhof et al., 2019; Schardein et al., 2019).

In general, satisfaction with any medical treatment is heavily influenced by the patient's expectations (Padilla et al., 2019). Furthermore, when patients have unrealistic expectations before treatment, they are much more likely to be dissatisfied with the outcome, their care, and with their HCP (Padilla et al., 2019). Therefore, it is important to both provide patients with adequate information about their treatment options and to understand and consider what is important to the patient with regard to outcomes (Garcia, 2021). Finally, it is important the HCP ensure patients understand the potential adverse effects of a treatment on their sexual function and pleasure so that a well-informed decision can be made. This is relevant for both meeting the standard of informed consent (i.e.,

discussion and understanding) and for providing an opportunity to offer further clarification to patients and, if desired, to their partners (Glaser et al., 2020).

### Statement 17.6

**We recommend health care professionals who provide care to transgender and gender diverse people counsel adolescents and adults regarding prevention of sexually transmitted infections.**

The WHO (2015) recommends HCPs implement brief sexuality-related communication in primary care for all adolescents and adults. Therefore, TGD persons who are sexually active or considering sexual activity may benefit from sexuality-related communication or counseling for the purpose of HIV/STI prevention. These conversations are particularly important as TGD persons are disproportionately impacted by human immunodeficiency virus (HIV) and other sexually transmitted infections (STIs) relative to cisgender persons (Baral et al., 2013; Becasen et al., 2018; Poteat et al., 2016). However, few data are available for non-HIV STIs, such as chlamydia, gonorrhea, syphilis, viral hepatitis, and herpes simplex virus (Tomson et al., 2021). The United Nations Joint Programme on HIV/AIDS estimates transgender women are 12 times more likely than other adults to be living with HIV (UNAIDS, 2019). A meta-analysis estimated a pooled global HIV prevalence of 19% among transgender women who have sex with men (Baral et al., 2013). HIV/STI risk is concentrated among TGD subgroups at the confluence of multiple biological, psychological, interpersonal, and structural vulnerabilities. In particular, transfeminine persons who have sex with cisgender men, belong to minoritized racial/ethnic groups, live in poverty, and engage in survival sex work are at elevated HIV/STI risk (Becasen et al., 2018; Poteat et al., 2015; Poteat et al., 2016). Less is known about HIV/STI risk among transgender men or gender diverse persons AFAB. Small studies in high-income countries indicate a laboratory-confirmed HIV prevalence of 0-4% among transmasculine people (Becasen et al., 2018; Reisner & Murchison, 2016). Almost no research has been conducted with transmasculine people who have sex with cisgender men in high-HIV-prevalence countries. Despite limited epidemiologic data, transmasculine persons who have sex with cisgender men frequently report HIV/STI risk related to receptive vaginal and/or anal sex (Golub et al., 2019; Reisner et al., 2019; Scheim et al., 2017) and may be more susceptible to HIV acquisition from vaginal intercourse than (pre-menopausal) cisgender women due to hormone-related vaginal atrophy.

HCPs will need to supplement general guidelines by developing the knowledge and skills needed for discussing sexual health issues with TGD people, such as the use of gender-affirming language (see Statement 17.1 in this chapter). It is critical HCPs avoid assumptions about HIV/STI risk based solely on a patient's gender identity or anatomy. For example, many transgender people are not sexually active, and TGD persons may use prosthetics or toys for sex. To provide appropriate prevention counseling, HCPs should inquire about the specific sexual activities TGD people engage in, and the body parts (or prosthetics) involved in those activities (ACON, 2022). Well-prepared HCPs (including, but not limited to mental health providers) may also engage in in-depth counseling with their patients to address the underlying drivers of HIV/STI risk (see Statement 17.3 in this chapter).

In all cases, HCPs should be sensitive to the collective and individual histories of TGD people (e.g., stereotypes and stigma about trans sexualities and gender dysphoria) and should explain to patients the reasons for sexuality-related inquiries and the voluntary nature of such inquiries. In discussing HIV/STI prevention, HCPs should refer to the full range of prevention options including barrier methods, post-exposure prophylaxis, pre-exposure prophylaxis, and HIV treatment to prevent onwards transmission (WHO, 2021). Trans-specific considerations for pre-exposure prophylaxis are addressed in Statement 17.8.

### Statement 17.7

**We recommend health care professionals who provide care to transgender and gender diverse people follow local and World Health Organization guidelines for human immunodeficiency virus/sexual transmitted infections (HIV/STIs) screening, prevention, and treatment.**

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH  S169

Like cisgender patients, TGD adolescents and adults should be offered screening for HIV/STIs in accordance with existing guidelines and based on their individual risk of HIV/STI acquisition, considering anatomy and behavior rather than gender identity alone. Where local or national guidelines are unavailable, WHO (2019a) offers global recommendations; more frequent screening is recommended for transgender people who have sex with cisgender men as a key population affected by HIV.

Gender-affirming genital surgeries and surgical techniques have implications for STI risks and screening needs, as outlined in recent guidelines from the US Centers for Disease Control (Workowski et al., 2021). For instance, transfeminine persons who have had penile inversion vaginoplasty using only penile and scrotal skin to line the vaginal canal are likely at lower risk of urogenital Chlamydia trachomatis (C. trachomatis) and Neisseria gonorrhoeae (N. gonorrhoeae), but newer surgical techniques that employ buccal or urethral mucosa or peritoneum flaps could in theory increase susceptibility to bacterial STIs relative to the use of penile/scrotal skin alone (Van Gerwen et al., 2021). Routine STI screening of the neovagina (if exposed) is recommended for all transfeminine persons who have had vaginoplasty (Workowski et al., 2021). For transmasculine persons who have had metoidioplasty with urethral lengthening, but not vaginectomy, testing for bacterial urogenital STIs should include a cervical swab because infections may not be detected in urine (Workowski et al., 2021).

Further, it is important for HCPs to offer testing at multiple anatomical sites as STIs in transgender patients are often extragenital (Hiransuthikul et al., 2019; Pitasi et al., 2019). Consistent with WHO (2020) recommendations, self-collection of samples for STI testing should be offered as an option, particularly if patients are uncomfortable or unwilling to undergo provider-collected sampling due to gender dysphoria, trauma histories, or both. Where relevant, integration of HIV/STI testing with regular serology used to monitor hormone therapy may better facilitate access to care (Reisner, Radix et al., 2016; Scheim & Travers, 2017).

Statement 17.8

**We recommend health care professionals who provide care to transgender and gender diverse people address concerns about potential interactions between antiretroviral medications and hormones.**

For TGD adolescents and adults at substantial risk of HIV infection (generally defined as an ongoing serodiscordant relationship or condomless sex outside of a mutually monogamous relationship with a known HIV-negative partner; WHO, 2017), pre-exposure prophylaxis (PrEP) is an important HIV prevention option (Golub et al., 2019; Sevelius et al., 2016; WHO, 2021). To encourage uptake of PrEP, in 2021 the US Centers for Disease Control recommended all sexually active adolescents and adults be informed about PrEP and offered it if requested (CDC, 2021). For treatment among people living with HIV, transgender-specific guidelines are available in some settings (e.g., Panel on Antiretroviral Guidelines for Adults and Adolescents, 2019).

For both HIV prevention and treatment, there are antiretroviral dosing and administration considerations specific to TGD persons. For oral PrEP, only daily dosing is currently recommended for TGD persons as studies demonstrating the effectiveness of event-driven PrEP with emtricitabine/tenofovir disoproxil fumarate (TDF) have been limited to cisgender men (WHO, 2019c). In addition, while emtricitabine/tenofovir alafenamide (TAF) is a new oral PrEP option, as of early 2022 it is not recommended for people at risk of HIV acquisition through receptive vaginal sex due to a lack of evidence (CDC, 2021). Finally, long-acting injectable formulations of both PrEP and HIV treatment are increasingly available (e.g., cabotegravir for PrEP), and while they are recommended for all patients who might benefit from injectable options, indicated injection sites (i.e., the gluteal muscle) may be unsuitable for individuals who have used soft tissue fillers (Rael et al., 2020).

There is little evidence supporting the occurrence of drug-drug interactions between gender-affirming hormones and PrEP medications. A few small studies, primarily relying on self-reported PrEP use, have shown reduced PrEP drug concentrations in transgender women undergoing hormone therapy, although

concentrations remained in the protective range (Yager & Anderson, 2020). A subsequent drug-drug interaction study using directly observed PrEP therapy failed to detect an impact of hormone therapy on PrEP drug concentrations in transgender women and found transgender women and men taking hormone therapy achieved high levels of protection against HIV infection (Grant et al., 2020). Most importantly, for many TGD people, no impact of PrEP on hormone concentrations has been detected. With regard to HIV treatment, specific antiretroviral medications may impact hormone concentrations; however, these can be managed by selecting alternative agents, monitoring and adjusting hormone dosing, or both (Cirrincione et al., 2020) as detailed in guidelines from the US Department of Health and Human Services (Panel on Antiretroviral Guidelines for Adults and Adolescents, 2019). Nevertheless, concerns about drug-drug interactions, particularly interactions that may limit hormone concentrations, represent a barrier to the implementation and adherence to antiretroviral therapy for HIV prevention or treatment (Radix et al., 2020; Sevelius et al., 2016). Therefore, it is advisable for HCPs to proactively address such concerns with those who are candidates for PrEP or HIV treatment. Integration of PrEP or HIV treatment with hormone therapy may further reduce barriers to implementation and adherence (Reisner, Radix et al., 2016). Integration may be achieved through colocation or through coordination with an HIV specialist if the primary care provider does not have the necessary expertise. Some TGD persons may benefit from standalone PrEP or sexual health services that provide greater privacy and flexibility, and thus differentiated service delivery models are needed (Wilson et al., 2021).

## CHAPTER 18 Mental Health

This chapter is intended to provide guidance to health care professionals (HCPs) and mental health professionals (MHPs) who offer mental health care to transgender and gender diverse (TGD) adults. It is not meant to be a substitute for chapters on the assessment or evaluation of people for hormonal or surgical interventions. Many TGD people will not require therapy or other forms of mental health care as part of their transition, while others may benefit from the support of mental health providers and systems (Dhejne et al., 2016).

Some studies have shown a higher prevalence of depression (Witcomb et al., 2018), anxiety (Bouman et al., 2017), and suicidality (Arcelus et al., 2016; Bränström & Pachankis, 2022; Davey et al., 2016; Dhejne, 2011; Herman et al., 2019) among TGD people (Jones et al., 2019; Thorne, Witcomb et al., 2019) than in the general population, particularly in those requiring medically necessary gender-affirming medical treatment (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1). However, transgender identity is not a mental illness, and these elevated rates have been linked to complex trauma, societal stigma, violence, and discrimination (Nuttbrock et al., 2014; Peterson et al., 2021). In addition, psychiatric symptoms lessen with appropriate gender-affirming medical and surgical care (Aldridge et al., 2020; Almazan and Keuroghlian; 2021; Bauer et al., 2015; Grannis et al., 2021) and with interventions that lessen discrimination and minority stress (Bauer et al., 2015; Heylens, Verroken et al., 2014; McDowell et al., 2020).

Mental health treatment needs to be provided by staff and implemented through the use of systems that respect patient autonomy and recognize gender diversity. MHPs working with transgender people should use active listening as a method to encourage exploration in individuals who are uncertain about their gender identity. Rather than impose their own narratives or preconceptions, MHPs should assist their clients in determining their own paths. While many transgender people require medical or surgical interventions or seek mental health care, others do not (Margulies et al., 2021). Therefore, findings from research involving clinical populations should not be extrapolated to the entire transgender population.

Addressing mental illness and substance use disorders is important but should not be a barrier to transition-related care. Rather, these interventions to address mental health and substance use disorders can facilitate successful outcomes from

---

### Statements of Recommendations

18.1- We recommend mental health professionals address mental health symptoms that interfere with a person's capacity to consent to gender-affirming treatment before gender-affirming treatment is initiated.

18.2- We recommend mental health professionals offer care and support to transgender and gender diverse people to address mental health symptoms that interfere with a person's capacity to participate in essential perioperative care before gender-affirmation surgery.

18.3- We recommend when significant mental health symptoms or substance abuse exists, mental health professionals assess the potential negative impact that mental health symptoms may have on outcomes based on the nature of the specific gender-affirming surgical procedure.

18.4- We recommend health care professionals assess the need for psychosocial and practical support of transgender and gender diverse people in the perioperative period surrounding gender- affirmation surgery.

18.5- We recommend health care professionals counsel and assist transgender and gender diverse people in becoming abstinent from tobacco/nicotine prior to gender-affirmation surgery.

18.6- We recommend health care professionals maintain existing hormone treatment if a transgender and gender diverse individual requires admission to a psychiatric or medical inpatient unit, unless contraindicated.

18.7- We recommend health care professionals ensure if transgender and gender diverse people need in-patient or residential mental health, substance abuse or medical care, all staff use the correct name and pronouns (as provided by the patient), as well as provide access to bathroom and sleeping arrangements that are aligned with the person's gender identity.

18.8- We recommend mental health professionals encourage, support, and empower transgender and gender diverse people to develop and maintain social support systems, including peers, friends, and families.

18.9- We recommend health care professionals should not make it mandatory for transgender and gender diverse people to undergo psychotherapy prior to the initiation of gender-affirming treatment, while acknowledging psychotherapy may be helpful for some transgender and gender diverse people.

18.10- We recommend "reparative" and "conversion" therapy aimed at trying to change a person's gender identity and lived gender expression to become more congruent with the sex assigned at birth should not be offered.

transition-related care, which can improve quality of life (Nobili et al., 2018).

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 18.1

**We recommend mental health professionals address mental health symptoms that interfere with a person's capacity to consent to gender-affirming treatment before gender-affirming treatment is initiated.**

Because patients generally are assumed to be capable of providing consent for care, whether the presence of cognitive impairment, psychosis, or other mental illness impairs the ability to give informed consent is subject to individual examination (Applebaum, 2007). Informed consent is central to the provision of health care. The health care provider must educate the patient about the risks, benefits, and alternatives to any care that is offered so the patient can make an informed, voluntary choice (Berg et al., 2001). Both the primary care provider or endocrinologist prescribing hormones and the surgeon performing surgery must obtain informed consent. Similarly, MHPs obtain informed consent for mental health treatment and may consult on a patient's capacity to give informed consent when this is in question. Psychiatric illness and substance use disorders, in particular cognitive impairment and psychosis, may impair an individual's ability to understand the risks and benefits of the treatment (Hostiuc et al., 2018). Conversely, a patient may also have significant mental illness, yet still be able to understand the risks and benefits of a particular treatment (Carpenter et al., 2000). Multidisciplinary communication is important in challenging cases, and expert consultation should be utilized as needed (Karasic & Fraser, 2018). For many patients, difficulty understanding the risks and benefits of a particular treatment can be overcome with time and careful explanation. For some patients, treatment of the underlying condition that is interfering with the capacity to

give informed consent—for example treating an underlying psychosis—will allow the patient to gain the capacity to consent to the required treatment. However, mental health symptoms such as anxiety or depressive symptoms that do not affect the capacity to give consent should not be a barrier for gender-affirming medical treatment, particularly as this treatment has been found to reduce mental health symptomatology (Aldridge et al., 2020).

Statement 18.2

**We recommend mental health professionals offer care and support to transgender and gender diverse people to address mental health symptoms that interfere with a person's capacity to participate in essential perioperative care before gender-affirmation surgery.**

The inability to adequately participate in perioperative care due to mental illness or substance use should not be viewed as an obstacle to needed transition care, but should be seen as an indication mental health care and social support be provided (Karasic, 2020). Mental illness and substance use disorders may impair the ability of the patient to participate in perioperative care (Barnhill, 2014). Visits to health care providers, wound care, and other aftercare procedures (e.g., dilation after vaginoplasty) may be necessary for a good outcome. A patient with a substance use disorder might have difficulty keeping necessary appointments to the primary care provider and the surgeon. A patient with psychosis or severe depression might neglect their wound or not be attentive to infection or signs of dehiscence (Lee, Marsh et al., 2016). Active mental illness is associated with a greater need for further acute medical and surgical care after the initial surgery (Wimalawansa et al., 2014).

In these cases, treatment of the mental illness or substance use disorder may assist in achieving successful outcomes. Arranging more support for the patient from family and friends or a home health care worker may help the patient participate sufficiently in perioperative care for surgery to proceed. The benefits of mental health treatments that may delay surgery should be weighed against the risks of delaying surgery and should

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH  S173

include an assessment of the impact on the patients' mental health delays may cause in addressing gender dysphoria (Byne et al., 2018).

### Statement 18.3

**We recommend when significant mental health symptoms or substance abuse exists, mental health professionals assess the potential negative impact mental health symptoms may have on outcomes based on the nature of the specific gender-affirming surgical procedure.**

Gender-affirming surgical procedures vary in terms of their impact on the patient. Some procedures require a greater ability to follow preoperative planning as well as engage in peri- and postoperative care to achieve the best outcomes (Tollinche et al., 2018). Mental health symptoms can influence a patient's ability to participate in the planning and perioperative care necessary for any surgical procedure (Paredes et al., 2020). The mental health assessment can provide an opportunity to develop strategies to address the potential negative impact mental health symptoms may have on outcomes and to plan support for the patient's ability to participate in the planning and care. Gender-affirming surgical procedures have been shown to relieve symptoms of gender dysphoria and improve mental health (Owen-Smith et al., 2018; van de Grift, Elaut et al., 2017). These benefits are weighed against the risks of each procedure when the patient and provider are deciding whether to proceed with the treatment. HCPs can assist TGD people in reviewing preplanning and perioperative care instructions for each surgical procedure (Karasic, 2020). Provider and patient can collaboratively determine the necessary support or resources needed to assist with keeping appointments for perioperative care, obtaining necessary supplies, addressing financial issues, and handling other preoperative coordination and planning. In addition, issues surrounding appearance-related and functional expectations, including the impact of these various factors on gender dysphoria, can be explored.

### Statement 18.4

**We recommend health care professionals assess the need for psychosocial and practical support**

of transgender and gender diverse people in the perioperative period surrounding gender-affirmation surgery.

Regardless of specialty, all HCPs have a responsibility to support patients in accessing medically necessary care. When HCPs are working with TGD people as they prepare for gender-affirming surgical procedures, they should assess the levels of psychosocial and practical support required (Deutsch, 2016b). Assessment is the first step in recognizing where additional support may be needed and enhancing the ability to work collaboratively with the individual to successfully navigate the pre-, peri-, and postsurgical periods (Tollinche et al., 2018). In the perioperative period, it is important to help patients optimize functioning, secure stable housing, when possible, build social and family supports by assessing their unique situation, plan ways of responding to medical complications, navigate the potential impact on work/income, and overcome additional hurdles some patients may encounter, such as coping with electrolysis and tobacco cessation (Berli et al., 2017). In a complex medical system, not all patients will be able to independently navigate the procedures required to obtain care, and HCPs and peer navigators can support patients through this process (Deutsch, 2016a).

### Statement 18.5

**We recommend health care professionals counsel and assist transgender and gender diverse people in becoming abstinent from tobacco/nicotine prior to gender-affirmation surgery.**

Transgender populations have higher rates of tobacco and nicotine use (Kidd et al., 2018). However, many are unaware of the well-documented smoking-associated health risks (Bryant et al., 2014). Tobacco consumption increases the risk of developing health problems (e.g., thrombosis) in individuals receiving gender-affirming hormone treatment, particularly estrogens (Chipkin & Kim, 2017).

Tobacco use has been associated with worse outcomes in plastic surgery, including overall complications, tissue necrosis, and the need for surgical revision (Coon et al., 2013). Smoking also increases the risk for postoperative infection (Kaoutzanis et al., 2019). Tobacco use has been shown to affect

the healing process following any surgery, including gender-related surgeries (e.g., chest reconstructive surgery, genital surgery) (Pluvy, Garrido et al., 2015). Tobacco users have a higher risk of cutaneous necrosis, delayed wound healing, and scarring disorders due to hypoxia and tissue ischemia (Pluvy, Panouilleres et al., 2015). In view of this, surgeons recommend stopping the use of tobacco/nicotine prior to gender-affirmation surgery and abstaining from smoking up to several weeks postoperatively until the wound has completely healed (Matei & Danino, 2015). Despite the risks, cessation may be difficult. Tobacco smoking and nicotine use is addictive and is also used as a coping mechanism (Matei et al., 2015). HCPs who see patients longitudinally before surgery, including mental health and primary care providers, should address the use of tobacco/nicotine with individuals in their care, and either assist TGD people in accessing smoking cessation programs or provide treatment directly (e.g., varenicline or bupropion).

Statement 18.6

**We recommend health care professionals maintain existing hormone treatment if a transgender and gender diverse individual requires admission to a psychiatric or medical inpatient unit, unless contraindicated.**

TGD people entering inpatient psychiatric, substance use treatment, or medical units should be maintained on their current hormone regimens. There is an absence of evidence supporting routine cessation of hormones prior to medical or psychiatric admissions. Rarely, a newly admitted patient may be diagnosed with a medical complication necessitating suspension of hormone treatment, for example an acute venous thromboembolism (Deutsch, 2016a). There is no strong evidence for routinely stopping hormone treatment prior to surgery, and the risks and benefits for each individual patient should be assessed before doing so (Boskey et al., 2018).

Hormone treatment has been shown to improve quality of life and to decrease depression and anxiety (Aldridge et al., 2020; Nguyen et al., 2018; Nobili et al., 2018; Owen-Smith et al., 2018, Rowniak et al., 2019). Access to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt (Bauer

et al., 2015). Halting a patient's regularly prescribed hormones denies the patient of these salutary effects, and therefore may be counter to the goals of hospitalization.

Some providers may be unaware of the low risk of harm and the high potential benefit of continuing transition-related treatment in the inpatient setting. A study of US and Canadian medical schools revealed that students received an average of 5 hours of LGBT-related course content over their entire four years of education (Obedin-Maliver et al., 2011). According to a survey of Emergency Medicine physicians, who are often responsible for making quick decisions about medications as patients are being admitted, while 88% reported caring for transgender patients, only 17.5% had received any formal training about this population (Chisolm-Straker et al., 2018). As education about transgender topics increases, more providers will become aware of the importance of maintaining transgender patients on their hormone regimens during hospitalization.

Statement 18.7

**We recommend health care professionals ensure if transgender and gender diverse people need inpatient or residential mental health, substance abuse, or medical care, all staff use the correct name and pronouns (as provided by the patient), as well as provide access to bathroom and sleeping arrangements that are aligned with the person's gender identity.**

Many TGD patients encounter discrimination in a wide range of health settings, including hospitals, mental health treatment settings, and drug treatment programs (Grant et al., 2011). When health systems fail to accommodate TGD individuals, they reinforce the longstanding societal exclusion many have experienced (Karasic, 2016). Experiences of discrimination in health settings lead to avoidance of needed health care due to anticipated discrimination (Kcomt et al., 2020).

The experience of discrimination experienced by TGD individuals is predictive of suicidal ideation (Rood et al., 2015; Williams et al., 2021). Gender minority stress associated with rejection and nonaffirmation has also been associated with suicidality (Testa et al., 2017). Denial of access to gender appropriate bathrooms has been

associated with increased suicidality (Seelman, 2016). However, the use of chosen names for TGD people has been associated with lower depression and suicidality (Russell et al., 2018). Structural as well as internalized transphobia must be addressed to reduce the incidence of suicide attempts in TGD people (Brumer et al., 2015). To successfully provide care, health settings must minimize the harm done to patients because of transphobia by respecting and accommodating TGD identities.

Statement 18.8

**We recommend mental health professionals encourage, support, and empower transgender and gender diverse people to develop and maintain social support systems, including peers, friends, and families.**

While minority stress and the direct effects of discriminatory societal discrimination can be harmful to the mental health of TGD people, strong social support can help lessen this harm (Trujillo et al., 2017). TGD children often internalize rejection from family and peers as well as the transphobia that surrounds them (Amodeo et al., 2015). Furthermore, exposure to transphobic abuse may be impactful across a person's lifespan and may be particularly acute during the adolescent years (Nuttbrock et al., 2010).

The development of affirming social support is protective of mental health. Social support can act as a buffer against the adverse mental health consequences of violence, stigma, and discrimination (Bockting et al., 2013), can assist in navigating health systems (Jackson Levin et al., 2020), and can contribute to psychological resilience in TGD people (Bariola et al., 2015; Başar and Öz, 2016). Diverse sources of social support, especially LGBTQ + peers and family, have been found to be associated with better mental health outcomes, well-being, and quality of life (Bariola et al., 2015; Başar et al., 2016; Kuper, Adams et al., 2018; Puckett et al., 2019). Social support has been proposed to facilitate the development of coping mechanisms and lead to positive emotional experiences throughout the transition process (Budge et al., 2013).

HCPs can support patients in developing social support systems that allow them to be recognized and accepted as their authentic identity and help them cope with symptoms of gender dysphoria. Interpersonal problems and lack of social support have been associated with a greater incidence of mental health difficulties in TGD people (Bouman, Davey et al., 2016; Davey et al., 2015) and have been shown to be an outcome predictor of gender-affirming medical treatment (Aldridge et al., 2020). Therefore, HCPs should encourage, support, and empower TGD people to develop and maintain social support systems. These experiences can foster the development of interpersonal skills and help with coping with societal discrimination, potentially reducing suicidality and improving mental health (Pflum et al., 2015).

Statement 18.9

**We recommend health care professionals should not make it mandatory for transgender and gender diverse people to undergo psychotherapy prior to the initiation of gender-affirming treatment, while acknowledging psychotherapy may be helpful for some transgender and gender diverse people.**

Psychotherapy has a long history of being used in clinical work with TGD people (Fraser, 2009b). The aims, requirements, methods and principles of psychotherapy have been an evolving component of the Standards of Care from the initial versions (Fraser, 2009a). At present, psychotherapeutic assistance and counseling with adult TGD people may be sought to address common psychological concerns related to coping with gender dysphoria and may also help some individuals with the coming-out process (Hunt, 2014). Psychological interventions, including psychotherapy, offer effective tools and provide context for the individual, such as exploring gender identity and its expression, enhancing self-acceptance and hope, and improving resilience in hostile and disabling environments (Matsuno and Israel, 2018). Psychotherapy is an established alternative therapeutic approach for addressing mental health symptoms that may be revealed during the initial assessment or later during the follow-up for gender-affirming medical interventions. Recent research shows, although mental health symptoms are reduced following gender-affirming medical treatment, levels of anxiety remain high (Aldridge et al., 2020) suggesting psychological therapy can play a role in helping

individuals suffering from anxiety symptoms following gender-affirming treatment.

In recent years, the uses and potential benefits of specific psychotherapeutic modalities have been reported (Austin et al., 2017; Budge, 2013; Budge et al., 2021; Embaye, 2006; Fraser, 2009b; Heck et al., 2015). Specific models of psychotherapy have been proposed for adult transgender and nonbinary individuals (Matsuno & Israel, 2018). However, more empiric data is needed on the comparative benefits of different psychotherapeutic models (Catelan et al., 2017). Psychotherapy can be experienced by transgender persons as a fearful as well as a beneficial experience (Applegarth & Nuttall, 2016) and presents challenges to the therapist and to alliance formation when it is associated with gatekeeping for medical interventions (Budge, 2015).

Experience suggests many transgender and nonbinary individuals decide to undergo gender-affirming medical treatment with little or no use of psychotherapy (Spanos, 2021). Although various modalities of psychotherapy may be beneficial for different reasons before, during, and after gender-affirming medical treatments and varying rates of desire for psychotherapy have been reported during different stages of transition (Mayer et al., 2019), a requirement for psychotherapy for initiating gender-affirming medical procedures has not been shown to be beneficial and may be a harmful barrier to care for those who do not need this type of treatment or who lack access to it.

### Statement 18.10

**We recommend "reparative" and "conversion" therapy aimed at trying to change a person's gender identity and lived gender expression to become more congruent with the sex assigned at birth should not be offered.**

The use of "reparative" or "conversion" therapy or gender identity "change" efforts is opposed by many major medical and mental health organizations across the world, including the World Psychiatric Association, Pan American Health Organization, American Psychiatric and American Psychological Associations, Royal College of Psychiatrists, and British Psychological Society. Many states in the US have instituted bans on practicing conversion therapy with minors. Gender identity change efforts refers to interventions by MHPs or others that attempt to change gender identity or expression to be more in line with those typically associated with the person's sex assigned at birth (American Psychological Association, 2021).

Advocates of "conversion therapy" have suggested it could potentially allow a person to fit better into their social world. They also point out some clients specifically ask for help changing their gender identities or expressions and therapists should be allowed to help clients achieve their goals. However, "conversion therapy" has not been shown to be effective (APA, 2009; Przeworski et al., 2020). In addition, there are numerous potential harms. In retrospective studies, a history of having undergone conversion therapy is linked to increased levels of depression, substance abuse, suicidal thoughts, and suicide attempts, as well as lower educational attainment and less weekly income (Ryan et al., 2020; Salway et al., 2020; Turban, Beckwith et al., 2020). In 2021, the American Psychological Association resolutions states that "scientific evidence and clinical experience indicate that GICEs [gender identity change efforts] put individuals at significant risk of harm" (APA, 2021).

While there are barriers to ending gender identity "change" efforts, education about the lack of benefit and the potential harm of these practices may lead to fewer providers offering "conversion therapy" and fewer individuals and families choosing this option.