# EXHIBIT 66

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    BRIANNA BOE, et al.,            )

6            Plaintiffs,            )

7                                   )

8    UNITED STATES OF AMERICA,      )

9          Intervenor Plaintiff,)  Civil Action No.

10         v.                      )  2:22-cv-184-LCB

11   HON. STEVE MARSHALL, in his    )

12   official capacity as           )

13   Attorney General, of the       )

14   State of Alabama, et al.,      )

15           Defendants.           )

16              The deposition of ARON JANSSEN, M.D.,

17   called for examination, taken pursuant to the

18   Federal Rules of Civil Procedure of the United

19   States District Courts pertaining to the taking of

20   depositions, taken before KRISTIN C. BRAJKOVICH, a

21   Certified Shorthand Reporter, CSR. No. 84-3810, of

22   said state, at Suite 3800, 110 North Wacker Drive,

23   Chicago, Illinois, on the 12th day of April, A.D.

24   2024, at 9:00 a.m.

Page 2

1 PRESENT:

2

3    KING & SPALDING LLP,

4    (10 North Wacker Drive, Suite 3800,

5    Chicago, Illinois 60606,

6    1-312-995-6333), by:

7    MR. BRENT P. RAY,

8    bray@kslaw.com, and

9    MS. KATHERINE VESSELS,

10   kvessels@kslaw.com,

11        appeared on behalf of Plaintiffs;

12

13   UNITED STATES DEPARTMENT OF JUSTICE,

14   (150 M Street NE,

15   Washington, DC 20002,

16   1-202-598-0083), by:

17   MR. JAMES FLETCHER,

18   james.fletcher@usdoj.gov,

19        appeared via Zoom on behalf of

20        Intervenor Plaintiff;

21

22

23

24

Page 3

1 PRESENT (Continued):

2

3    COOPER & KIRK,

4    (1523 New Hampshire Ave., N.W.,

5    Washington, DC 20036,

6    1-202-220-9621), by:

7    MR. JOHN D. RAMER,

8    jramer@cooperkirk.com,

9        appeared on behalf of Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23 REPORTED BY:  KRISTIN C. BRAJKOVICH,

24        CSR No. 84-3810.

Page 4

1                 I N D E X
2 WITNESS            EXAMINATION
3 ARON JANSSEN, M.D.
4    By Mr. Ramer            5
5
6         E X H I B I T S
7 NUMBER                PAGE
8 Janssen Deposition Exhibit 1   Document   51
  Janssen Deposition Exhibit 2   Document   51
9 Janssen Deposition Exhibit 3   Document   54
  Janssen Deposition Exhibit 4   Document   78
10 Janssen Deposition Exhibit 5   Document   85
   Janssen Deposition Exhibit 6   Document   87
11 Janssen Deposition Exhibit 7   Document  123
   Janssen Deposition Exhibit 8   Document  137
12 Janssen Deposition Exhibit 9   Document  154
   Janssen Deposition Exhibit 10  Document  179
13 Janssen Deposition Exhibit 11  Document  182
   Janssen Deposition Exhibit 12  Document  191
14 Janssen Deposition Exhibit 13  Document  209
   Janssen Deposition Exhibit 14  Document  241
15 Janssen Deposition Exhibit 15  Document  247
   Janssen Deposition Exhibit 16  Document  250
16 Janssen Deposition Exhibit 17  Document  265
   Janssen Deposition Exhibit 18  Document  274
17 Janssen Deposition Exhibit 19  Document  280
   Janssen Deposition Exhibit 20  Document  282
18
19
20
21
22
23
24

Page 5

1        (WHEREUPON, the witness was duly

2        sworn.)

3            ARON JANSSEN, M.D.,

4 called as a witness herein, having been first duly

5 sworn, was examined and testified as follows:

6            EXAMINATION

7 BY MR. RAMER:

8    Q.   Good morning, Dr. Janssen.  My name is

9 John Ramer.  I represent the defendants in this

10 case, and I know you have been deposed before.

11 It's going to be the typical drill.

12        I'll ask you questions, ask for verbal

13 responses.  We'll try not to talk over one another.

14 If at any point you need a break, let me know.  I

15 just ask that you answer any pending questions.

16 And I'm otherwise going to try to shoot for a break

17 on the hour.

18        If you don't understand any of my

19 questions, please just let me know.  Otherwise,

20 I'll assume that you understood them.  Does that

21 make sense?

22    A.   It makes sense.

23    Q.   Dr. Janssen, are you an expert?

24    A.   I'm an expert in some things, yes.

2 (Pages 2 - 5)

Page 6

1    Q.   In what field or fields are you an
2 expert?
3    A.   I'm a child adolescent psychiatrist and
4 an expert in the field of transgender mental
5 health.
6    Q.   Anything else?
7    A.   Suicide, anxiety, systems of care
8 delivery.
9    Q.   Anything beyond those?
10    A.   I would say those are kind of most of my
11 areas of expertise.
12    Q.   And you are testifying in this case as
13 an expert, correct?
14    A.   Yes.
15    Q.   And you do not intend to testify about
16 material beyond the opinions that you have offered
17 in your reports, correct?
18    A.   That is correct.
19    Q.   And you have been deposed as an expert
20 before, correct?
21    A.   Yes.
22    Q.   And did you give truthful testimony
23 during those depositions?
24    A.   I did.

Page 7

1    Q.   And you testified at a hearing in Texas
2 last year, correct?
3    A.   The terminology, I might not get
4 100 percent correct if it was a hearing or a court,
5 whatever it was.  I testified, yes.
6    Q.   And did you give truthful testimony at
7 that proceeding?
8    A.   I did.
9    Q.   And what did you do to prepare for this
10 deposition?
11    A.   I reviewed my reports, and I continue to
12 stay up-to-date on the extant literature.
13    Q.   And did you review any documents in
14 particular?
15    A.   Just my reports that I had submitted.
16    Q.   And did you speak with anybody in
17 preparation for this deposition?
18    A.   Only our lawyers.
19    Q.   Anybody else?
20    A.   No.
21    Q.   And, Dr. Janssen, where do you practice?
22    A.   I practice here in Chicago.  I'm an
23 associate professor of child and adolescent
24 psychiatry at Northwestern University and vice

Page 8

1 chair of clinical affairs at the Pritzker
2 Department of Child and Adolescent Psychiatry at
3 the Ann and Robert H. Lurie Children's Hospital of
4 Chicago.
5    Q.   As part of your clinical practice, do
6 you practice as part of a multidisciplinary clinic?
7    A.   I do, yes.
8    Q.   And what kind of providers are in that
9 clinic?
10    A.   It depends upon the clinic in question.
11 Relevant to the work that I'm doing that lends
12 itself to my expertise in transgender health, our
13 gender clinic includes psychiatrists,
14 psychologists, social workers, adolescent medicine
15 physicians, endocrinologists.
16    Q.   And how many other -- or how many
17 psychiatrists or psychologists are at part of the
18 clinic?
19    A.   I would have to go through my -- the
20 roster to give you an exact number.  I don't have
21 it off the top of my head.
22    Q.   Is it fewer than ten?
23    A.   Yes.
24    Q.   And are you -- as a -- let me back up.

Page 9

1         Is it fair to refer to psychiatrists and
2 psychologists as mental health professionals?
3    A.   Yes.
4    Q.   As a mental health professional, what is
5 your role in the clinic?
6    A.   I served multiple roles in the clinic.
7 As the psychiatrist, my primary role in this clinic
8 is seeing youth with co-occurring mental health
9 conditions that require medication management or
10 more complex care.
11    Q.   And you said that you were an expert in
12 child and adolescent psychiatry.  How do you define
13 who is a child and who is an adolescent?
14    A.   There are multiple different definitions
15 that we might use.  The distinction is going to be
16 more important, depending upon what the question
17 is.  Generally speaking, as somebody who trained in
18 adult psychiatry and child and adolescent
19 psychiatry, there's some diffuse definitions that
20 mix between childhood, adolescence, and adulthood.
21    Q.   In this field, is it fair to say that a
22 child is somebody who is pre-Tanner Stage 2?
23    A.   In the context of making a diagnosis of
24 gender dysphoria and that there is gender dysphoria

1 in children and gender dysphoria in adolescents,
2 that differentiation is based upon pubertal status,
3 but there are different processes for evaluating
4 cognitive development that are different from
5 Tanner staging.
6      Q.   And for adolescents, in terms of making
7 a diagnosis, do you have a line between an
8 adolescent and an adult?
9      A.   Making a diagnosis of what?
10     Q.   Gender dysphoria.
11     A.   The technical definition of the
12 diagnosis of gender dysphoria includes adolescents
13 and adulthood.  Really, it's more based upon the
14 individual that you are assessing in terms of their
15 capacity to understand the various processes, their
16 ability to provide accurate information, family
17 involvement, et cetera.
18     Q.   Okay.  For purposes of today, when I
19 refer to child or children, let's assume that I'm
20 referring to pre-Tanner Stage 2 patients.  Does
21 that make sense?
22     A.   That makes sense, and if I am confused
23 about it later, I will clarify.
24     Q.   And for adolescents, if I'm referring --

1 let me start again.
2         When I'm referring to adolescents today,
3 I'll be referring to Tanner Stage 2 up to age 19.
4 Does that make sense?
5      A.   Sure.
6      Q.   Do you personally diagnose patients with
7 gender dysphoria?
8      A.   Yes.
9      Q.   Do you or the other mental health
10 professionals at your clinic see all of the
11 patients at the clinic who are being considered for
12 pubertal suppression?
13     A.   The work flow for our clinic is that all
14 of the patients considered for puberty suppression
15 are seen by a mental health professional within our
16 clinic.  They are not always the treating provider
17 of mental health care but do assessments in that
18 role.
19     Q.   Can you explain the distinction between
20 the treating provider and the assessor?
21     A.   Sure.  For example, there are some kids
22 who have co-occurring mental health disorders that
23 require therapeutic interventions.  Some of those
24 therapeutic interventions are done by mental health

1 professionals in the community and in our clinic,
2 but all patients who are evaluated are done so in a
3 multidisciplinary way that includes a mental health
4 professional.
5      Q.   And that assessment is done by mental
6 health professionals in your clinic; is that right?
7      A.   Correct.
8      Q.   And is the same true for patients who
9 are being considered for cross-sex hormones?
10     A.   Yes.
11     Q.   Have you ever practiced in Alabama?
12     A.   No.
13     Q.   Are you aware of any gender clinics in
14 Alabama?
15     A.   I know of the existence of one at the
16 University of Alabama, but I'm not familiar with
17 its workings.
18     Q.   And is that the University of Alabama
19 Birmingham, sometimes shortened to UAB?
20     A.   I have seen it written as UAB, so I
21 assume that is the case.
22     Q.   Have you ever been to that clinic?
23     A.   No, I have not.
24     Q.   Do you have any firsthand knowledge of

1 that clinic's practices?
2      A.   No.
3      Q.   Do you personally recommend that
4 patients receive puberty blockers as a treatment
5 for gender dysphoria?
6      A.   When that is medically indicated, yes.
7      Q.   And is the same true for cross-sex
8 hormones?
9      A.   When it is indicated, yes.
10     Q.   And is the same true for surgeries?
11     A.   When it is indicated, yes.
12     Q.   The purpose of recommending these
13 interventions is to reduce gender dysphoria,
14 correct?
15     A.   Correct.
16     Q.   And so one would judge the efficacy of
17 those interventions based on their ability to
18 reduce gender dysphoria, correct?
19       MR. RAY:  Object to form.
20 BY THE WITNESS:
21     A.   The measurement of the severity of
22 gender dysphoria is one outcome that we would be
23 tracking as a result of these interventions.  We
24 also want to understand functioning, quality of

1 life, impact on co-occurring mental health
2 conditions, general wellness, a sense of comfort,
3 et cetera.
4 BY MR. RAMER:
5    Q.   If an intervention improves quality of
6 life but does not reduce gender dysphoria, is the
7 intervention an effective treatment for gender
8 dysphoria?
9    A.   That sounds like a hypothetical.  That
10 is not something that I have encountered in my
11 clinical practice, so I'm not sure how to answer
12 that question.
13    Q.   Well, I guess take it as a hypothetical.
14 If hypothetically an intervention improved quality
15 of life but did not reduce gender dysphoria, is
16 that treatment an effective treatment for gender
17 dysphoria?
18    MR. RAY:  Object to form.
19 BY THE WITNESS:
20    A.   It depends upon how we are measuring
21 efficacy and what the discussions that you have had
22 with your patients and families have been.  Here is
23 what our goal is.  If we have achieved that goal,
24 that treatment is generally effective.

1       I have just never seen in practice that
2 we see significant changes in quality of life that
3 are not also paired with improvements in severity
4 of gender dysphoria.
5 BY MR. RAMER:
6    Q.   Have you ever seen that in a study?
7    A.   Not that I recall, but I can't recall
8 all of the details of every study that I have read.
9    Q.   When did you first begin treating
10 minors -- sorry.
11       When did you first begin treating
12 children and adolescents with gender dysphoria?
13    A.   In my residency training was when I
14 first had exposure to and had treatment
15 relationships with gender-diverse young people.
16    Q.   And in approximately what year was that?
17    A.   Probably that would be 2008, 2007,
18 somewhere in there.
19    Q.   And when was the first time you
20 diagnosed a child with gender dysphoria?
21    A.   I could not recall off the top of my
22 head the very first time I made that diagnosis.
23    Q.   Do you know what year it would have
24 been?

1    A.   Sometime between 2007 and 2011.
2    Q.   And is the same true for diagnosing
3 adolescents with gender dysphoria?
4    A.   The same would be true, yes.
5    Q.   When was the first time you recommended
6 that a patient receive puberty blockers as a
7 treatment for gender dysphoria?
8    A.   Well, I first started my gender clinic
9 after completing my fellowship in 2011, so it's
10 likely that 2011 was the first time I had made that
11 recommendation independent of any supervisors.
12    Q.   And is the same true for cross-sex
13 hormones as a treatment for gender dysphoria?
14    A.   Yes.
15    Q.   Is the same true for recommending that a
16 minor -- sorry.  Let me restart.
17       Is the same true for recommending a
18 child or adolescent to pursue a social transition
19 as a treatment for gender dysphoria?
20    A.   The same is likely true, yes.
21    Q.   Have you ever recommended that an
22 adolescent patient receive surgery as a treatment
23 for gender dysphoria?
24    A.   I have, yes.

1    Q.   What kind of surgery?
2    A.   The majority of the surgeries that I
3 have assessed for and made the recommendation for
4 for somebody under 18 is for top surgery or chest
5 masculinization surgery.
6    Q.   Have you ever recommended any other
7 types of surgery for an adolescent as a
8 treatment --
9    A.   Yes.  Very likely, yes.
10    Q.   And what other types?
11    A.   Vaginoplasty.
12    Q.   Do you recall the age of the patient
13 that you recommended?
14    A.   If I'm remembering correctly, 17.
15    Q.   And was it only one?
16    A.   From my recollection, yes.
17    Q.   Approximately how many of your patients
18 are minors who have been diagnosed with gender
19 dysphoria?
20    A.   That is a hard question to know off the
21 top of my head.  I would really have to go back and
22 review because many of the patients that I started
23 seeing as minors, I continue to see and are now
24 adults.  But between the 300 and 500 folks that I

5 (Pages 14 - 17)

1 have seen with gender dysphoria, probably
2 80 percent of them are children or adolescents.
3     Q.   Do you have patients who are diagnosed
4 with gender dysphoria during childhood?
5     A.   Yes.
6     Q.   Do you have patients who are diagnosed
7 with gender dysphoria during adolescence?
8     A.   Yes.
9     Q.   In your clinic, which instance is more
10 prevelant?
11     A.   Diagnosis in adolescence is more
12 prevalent, but that is, in part, due to the format
13 and structure of the clinic.
14     Q.   What do you mean by that?
15     A.   So our clinic is a multidisciplinary
16 clinic, and one of the options that is provided to
17 patients that allow for -- that lead to patients
18 seeking out our care is access to the medical and
19 surgical interventions, which are not interventions
20 that are appropriate for or indicated for
21 non-adolescents.  When I was working in New York in
22 my clinic, it was a clinic that was situated within
23 the department of psychiatry, it was mental health
24 focused, so I saw more youth or children at that

1 point than I do here in my clinic in Chicago.
2     Q.   And I'm sorry if my question was
3 unclear.  I guess I was trying to ask about when
4 the patients were diagnosed with gender dysphoria
5 as opposed to just the makeup of your clinic.  Does
6 that make sense, or is the answer the same?
7     A.   The answer is the same, but I can
8 clarify, which is to say that many people get a
9 diagnosis when they are seeking care.  And so they
10 do not receive a diagnosis, even though the
11 symptoms may have been present, until that care has
12 been sought, so it would not be surprising that
13 most people are getting a diagnosis of gender
14 dysphoria in adolescence, even though many of them
15 have had symptoms from early childhood that had
16 been impairing.  Does that make sense?
17     Q.   Yes.  And what is your basis for knowing
18 that they would have had symptoms from childhood?
19     A.   The initial step of care is a
20 comprehensive evaluation that includes an
21 assessment of early childhood symptoms.
22     Q.   If I use the phrase "natal male," you
23 can assume that I'm trying to describe the same
24 thing that someone else might describe as a male

1 assigned at birth.  Does that make sense?
2     A.   Yes.
3     Q.   And the same thing for natal female and
4 female assigned at birth.  Does that make sense?
5     A.   It does.
6     Q.   Of your patients, do you know
7 approximately how many are natal males and how many
8 are natal females?
9     A.   No.  I would have to go back and review
10 my records.
11     Q.   Do you have any estimate?
12     A.   No, I don't.
13     Q.   Is it 50/50?
14     MR. RAY:  Object to form.
15 BY THE WITNESS:
16     A.   I don't have an estimate.
17 BY MR. RAMER:
18     Q.   Although you can't recall the precise
19 ratio now, has the ratio been stable throughout
20 your years of treating minors for gender dysphoria?
21     A.   I'm not exactly sure the question that
22 you are asking.  And I don't want this to sound
23 evasive, but it really depends upon the milieu in
24 which you are practicing.  So in early childhood,

1 as an example, you are going to typically see more
2 natal males in your terminology who are presenting
3 for care than natal females.
4         And in a multidisciplinary clinic where
5 medical interventions are part of the primary
6 reason for seeking care, you are typically going to
7 see a more 50/50 or more predominant natal female
8 split.  So my exposure to the ratios of patient
9 populations that I'm seeing is going to be more
10 dependent upon the milieu of practice as opposed to
11 some demographic change or prevalence change over
12 time.
13         Our clinic in Chicago has more -- as an
14 entirety of the clinic, more assigned females at
15 birth or natal females than natal males.  I don't
16 recall off the top of my head what my ratio is.
17     Q.   Outside of the clinic, have you ever
18 conducted a study that observed an increase over
19 time in the ratio of natal females to natal males?
20     A.   I have not personally conducted any
21 study on that.
22     Q.   Have you ever authored an article that
23 observed an increase over time in the ratio of
24 natal females to natal males?

1    A.   I would have to go back and read
2  everything that I have read, and I have read a lot
3  over the years.  Certainly, it has been commented
4  on in the literature that in the gender clinics
5  that have been tracking patients over time, that
6  they have seen an increased rate of natal females
7  presenting for care.
8    Q.   Do you agree that the reasons for
9  variations in that ratio remain unknown?
10    A.   Unknown is a bit of a tricky word for
11  me.  That implies that there's two categories,
12  known and unknown.  We know some things.  We don't
13  know everything about the ratio change.
14    Q.   Do you think that we know enough to make
15  informed decisions about why the ratio is changing?
16    A.   I think we have enough to generate
17  hypotheses that are testable through the process of
18  peer-reviewed science.
19    Q.   And once you test a hypothesis, what is
20  the result?
21    A.   The result -- I mean, in all of academic
22  medicine, we are never really satisfied with a
23  result, which is why in generally every systematic
24  review or study that is looking at the literature,

1  one of the recommendations is, we need more
2  research.  Because we don't like a period in
3  science; we like an ellipses or a comma.  There's
4  always more to learn, so we want to make sure that
5  we are continuously evolving our capacity to be
6  able to provide the best and up-to-date information
7  to the patients as they make decisions about their
8  care.
9    Q.   What hypothesis do you think explains
10  the change in the ratio?
11    A.   From my read of the literature and my
12  experience working with these patients, at least a
13  healthy chunk of the reason that we are seeing an
14  increase in this rate is that there's access to
15  treatment that didn't exist before.
16    Q.   So the idea is that this has always been
17  the ratio and it's just being revealed more now?
18    A.   The best evidence that I have seen, is
19  that the ratio of transgender adults between
20  assigned females at birth and assigned males at
21  birth, so natal males and natal females, has
22  generally always been 50/50.  And that has not
23  changed.  What has changed is who is presenting for
24  care, not who exists in the world.

1    Q.   Does that 50/50 ratio hold for children?
2    A.   In the large national samples we have,
3  there have not been anything that I would say is
4  quality, in terms of looking at identity rates in
5  childhood.  What we have is the diagnosis of gender
6  dysphoria, which is a different thing all together,
7  but it's hard to say.  We don't know for sure, but
8  it's likely to hold up in childhood because gender
9  identity is a staple phenomenon.  And if it's 50/50
10  in adulthood, it's most likely to be 50/50 in
11  childhood.
12    Q.   You don't think that there's a greater
13  proportion of natal males to natal females in the
14  childhood group?
15    A.   Historically in the clinics that have
16  done work with gender-diverse youth, if we look at
17  the 1990s and early 2000s, the predominant folks
18  who were presenting for care prior to puberty were
19  natal males, and those ratios changed from site to
20  site and over time it reduced.  That speaks to a
21  complex phenomenon, which I'm happy to get into
22  but --
23    Q.   Minority stress?
24    A.   It's less about who exists as a

1  transgender or gender-diverse child and who
2  presents for care.
3    Q.   When you first began recommending that
4  adolescent patients receive cross-sex hormones as a
5  treatment for gender dysphoria in 2011, did you do
6  so for individuals who identified as nonbinary?
7    A.   I would have to review my notes to know
8  for sure.
9    Q.   Is there any reason to think that you
10  would not have done so for an individual who
11  identified as nonbinary?
12    A.   The terminology has changed and evolved
13  over time, and how patients self-identified is
14  certainly given now in terms of the words that are
15  used.  So whether a patient used gender nonbinary
16  or gender queer or some other term, I would have to
17  go back and see.
18        The population of patients that I was
19  seeing early on, I was not seeing a lot of gender
20  binary folks, but the diagnosis of gender dysphoria
21  requires that there is an incongruence between the
22  assigned sex at birth.  And one's gender identity
23  does not require that you have a binary identity in
24  order to make the diagnosis.

7 (Pages 22 - 25)

1    Q.   And my question is not so much as a
2  factual matter what you were doing in 2011.  It's
3  more as a matter of theory.  Was there any reason
4  you would not have recommended cross-sex hormones
5  to an individual who did identify as nonbinary back
6  in 2011?
7    A.   I mean, there are reasons to not
8  recommend gender-affirming hormones for folks who
9  are nonbinary and folks who are transgender.  It's
10  an individualized assessment that has a set of
11  criteria that need to be met in order for you to
12  make that recommendation.
13       So on the individual basis, there are a
14  number of reasons why you would not make that
15  recommendation, but just on the whole of being
16  nonbinary is not one of those reasons.
17    Q.   And the same is true for puberty
18  blockers?
19    A.   Correct.
20    Q.   And the same is true for surgery?
21    A.   Correct.
22    Q.   And the same is true for social
23  transition?
24    A.   Correct.

1  treatment for gender dysphoria, did you require
2  that those individuals also receive psychotherapy?
3    A.   No, I did not.  They were required to
4  have a mental health evaluation, and some required
5  psychotherapy as a part of the process, but it was
6  not a requirement for all patients.
7    Q.   Is the same true for puberty blockers?
8    A.   Yes.
9    Q.   And the same is true for surgery?
10    A.   Yes.
11    Q.   And the same was true for social
12  transition?
13    A.   Yes.
14    Q.   When you first began recommending that
15  adolescent patients receive cross-sex hormones as a
16  treatment for gender dysphoria, did you use age
17  limits?
18    A.   I mean, the short answer is no.  The
19  guidelines have always been meant to be applied
20  flexibly, so there were not hard age limits that
21  were utilized.
22    Q.   And is the same true for other medical
23  interventions?
24    A.   Correct.

1    Q.   When you first began recommending that
2  adolescent patients receive cross-sex hormones as a
3  treatment for gender dysphoria, did you ever
4  recommend cross-sex hormones for a patient who did
5  not previously undergo pubertal suppression?
6    A.   Yes.
7    Q.   When you first began recommending that
8  adolescent patients receive cross-sex hormones as a
9  treatment for gender dysphoria, did you ever
10  recommend cross-sex hormones for a patient who did
11  not identify as transgender until adolescence?
12    A.   I would have to go back and review my
13  notes, but that is not an uncommon process for
14  there to be some sense of differentness in
15  childhood but come to a recognition of a
16  transgender gender identity with the distress that
17  often comes with puberty.
18    Q.   So you would not have deemed someone who
19  did not identify as transgender until adolescence
20  as ineligible for cross-sex hormones; is that
21  right?
22    A.   Correct.
23    Q.   When you first began recommending that
24  adolescent patients receive cross-sex hormones as a

1    Q.   When you first began recommending that
2  adolescent patients receive puberty blockers as a
3  treatment for gender dysphoria, did you require
4  that those patients also subsequently receive
5  cross-sex hormones?
6    A.   No, there's no requirement for that.
7    Q.   And there never was; is that right?
8    A.   There has never been a requirement.
9  Deciding whether or not to pursue gender-affirming
10  hormones is a different decision, and it's a
11  different assessment process than the decision
12  whether to start puberty-blocking agents.
13    Q.   And the same is true for an adolescent
14  patient who is receiving cross-sex hormones with
15  respect to subsequently receiving surgery, correct?
16    A.   Every patient and family makes an
17  individualized plan.
18    Q.   When you first began recommending
19  puberty blockers as a treatment for gender
20  dysphoria, what evidence were you relying on?
21    A.   I was relying on the evidence from the
22  peer-reviewed literature.
23    Q.   Can you explain what literature?
24    A.   Sure.  The best data that we had came

Page 30

1  from primarily the Dutch and Toronto clinics that
2  had followed these patients longitudinally over
3  time.
4      Q.   If I refer to the Dutch protocol, do you
5  understand in this field that I would be referring
6  to the protocol used by the researchers in the
7  Dutch clinic?
8      A.   Yes.  I visited the Dutch clinic as a
9  part of preparing for my clinic to open, and so I
10  understood what their processes were at the time.
11  The word "Dutch protocol" has been used in
12  different ways by different people to describe
13  different things, so when I talk about the Dutch
14  protocol, I'm talking about my personal experience,
15  having seen the clinic, which is different than how
16  it has often been referred to in popular press in
17  particular.
18      Q.   Is the protocol that you are referring
19  to different from what they described in their
20  studies?
21      A.   No.  What they described in their
22  studies is an accurate description of the Dutch
23  protocol.
24      Q.   So in your opinion, in 2011 there was

Page 31

1  sufficient evidence to conclude that giving
2  adolescents puberty blockers was effective for
3  treating gender dysphoria, correct?
4      A.   As a scientist, I hate concluding
5  anything, but the preponderance of the evidence
6  suggested at the time that it is safe, effective,
7  and appropriate intervention.
8      Q.   And you were recommending that
9  intervention?
10      A.   I was, yes.
11      Q.   And the same -- I'll just ask.
12          And, in your opinion, back in 2011,
13  there was sufficient evidence to conclude that
14  giving adolescents cross-sex hormones was effective
15  treatment for gender dysphoria, correct?
16      A.   Yes.
17      Q.   At that time, do you think that we had a
18  full understanding of the impact of these
19  interventions from a medical perspective?
20      A.   I don't think that we will ever have a
21  full understanding of the impact of any medical
22  intervention ever.  There's always more to learn
23  and more to study.  We have more data now than we
24  did then.  I anticipate in ten years, we'll have

Page 32

1  even more data and more understanding.
2      Q.   Does the data now matter, if you already
3  reached the conclusion that it was -- the evidence
4  was sufficient to actually recommend these
5  treatments for real patients?
6      A.   It would matter if the data that has
7  been subsequently published contradicted what led
8  to those conclusions in the first place.
9      Q.   Back in 2011, if someone had said to you
10  that little is known about the long-term effects of
11  hormonal interventions in minors with gender
12  dysphoria, what would you have said to them?
13      A.   I would say, Can you define "little"?
14      Q.   How would you define it, if somebody
15  said, Do we know a lot, do we know a little?  What
16  would you have said back in 2011?
17      A.   I would say back in 2011, we had similar
18  amounts of data for this intervention as we had for
19  many other interventions that we routinely use in
20  childhood and in child mental health.
21      Q.   Can you provide some of those examples?
22      A.   Sure.  The data on most interventions in
23  childhood is sometimes scant, so as an example,
24  getting information from parents about their

Page 33

1  children's childhood and how symptoms developed in
2  childhood, there's virtually no evidence to support
3  that as an intervention or as a part of the
4  assessment process.
5          It does not mean that it's not
6  appropriate.  It's pretty common sense, that we
7  want to get a historical view of a child over time,
8  but there's no published literature on that.  So we
9  can't say, if you ask that question, What is the
10  long-term effect of asking parents about childhood
11  symptoms or childhood evaluations?  We don't have
12  an answer for that.  But, nevertheless, this is the
13  bedrock of the field that I work in.
14      Q.   When you say "we don't have an answer
15  for that," can you just explain why we don't have
16  an answer for that?
17      A.   Because there have not been studies to
18  look specifically at that question.
19      Q.   Why haven't there been?
20      A.   In part, because many of the benefits
21  are self-evident.
22      Q.   Could you elaborate on what you mean by
23  that?
24      A.   Yeah.  So and a part of doing an

9 (Pages 30 - 33)

Page 34

1 evaluation on a child, an adolescent, or an adult,
2 and as somebody who is trained in all three, one of
3 the advantages that those of us who train in child
4 and adolescent psychiatry have over adult
5 psychiatrists is that we actually have training in
6 early childhood assessment.
7        But gathering a clear history of early
8 childhood symptoms, early childhood behaviors,
9 early childhood engagements, early childhood
10 relational patterns helps us understand and predict
11 some of these over time.
12    Q.   Sorry.  I guess my question was, Why do
13 we not have studies about the long-term effects?
14 And did I understand your answer to be, Because the
15 benefits are self-evident?
16    A.   The benefits of gathering a full
17 developmental history are self-evident and have
18 always been a part of the mental health field.
19 Just because something has not been studied does
20 not mean that it's not effective.  That is the
21 point I'm trying to make.  Does that make sense?
22    Q.   I think so.  Do you think that there's a
23 lack of studies assessing the long-term effects of
24 hormonal interventions in minors with gender

Page 35

1 dysphoria because the field is so new?
2    A.   No.  I think there are longitudinal
3 studies that have looked at long-term exposures to
4 gender-affirming hormones over time.  There have
5 been cohorts that have been studied upwards of 20
6 to 30 years at this point that had exposures to
7 this in childhood, and there have always been adult
8 transgender patients who have accessed care in some
9 form or another in childhood that patients -- that
10 folks have followed.
11        And there's also really strong
12 longitudinal data, particularly coming out of
13 northern Europe in the adult population.
14    Q.   What study are you referring to that has
15 20 to 30 years' data for children or adolescents?
16    A.   The Dutch cohort has been followed for
17 at least 20 years.
18    Q.   Do you know how large that cohort is?
19    A.   It started with 40 to 70 patients, from
20 my recollection, but I would have to look at the
21 studies to be certain.
22    Q.   Are there any studies with a larger
23 cohort that follow patients for 20 years or more?
24    A.   The studies that are funded now are

Page 36

1 certainly hoping to do that with much larger
2 numbers.
3    Q.   But, currently, the answer is no?
4    A.   Currently, there's a lot of adult
5 studies that have significantly more than those
6 patients.
7    Q.   Back in 2011, do you agree that patients
8 and families had to weigh risks and benefits of
9 these interventions with only limited available
10 evidence?
11    A.   I would disagree, I think, with the
12 premise of that question.  Every decision that you
13 make in terms of medicine requires a discussion of
14 the risks, benefits, and alternatives that are
15 known and a discussion of potential unknown risks,
16 benefits, and alternatives.
17    Q.   So what premise are you disputing?
18    A.   I don't know the word "limited" and what
19 that refers to in this context.
20    Q.   Do you think there are interventions for
21 which we have more available evidence than others?
22    A.   Yes.
23    Q.   Do you think there are interventions for
24 which we have limited available evidence?

Page 37

1    A.   Yes.
2    Q.   Back in 2011, do you think that the
3 intervention of pubertal suppression for gender
4 dysphoria had only limited available evidence?
5    A.   Again, it requires a comparison group.
6 Limited as compared to the evidence for statins and
7 cholesterol reduction, yes.  Limited in terms of
8 the impact of Zoloft on generalized anxiety
9 disorder, maybe not.
10    Q.   Back in 2011, if someone had said that
11 the long-term consequences of social transition for
12 prepubertal children raises potential concerns,
13 would you have agreed with them?
14    MR. RAY:  Object to form.
15 BY THE WITNESS:
16    A.   So it really is going to depend upon the
17 context.  As a child and adolescent psychiatrist
18 and somebody who works in this field, I'm having
19 individualized discussions that review risks,
20 benefits, and alternatives.  Concern to me is that
21 it's a meaningless word.  Concern, I have concern
22 in positive ways, I have concern in negative ways.
23        So if the question is negative impacts
24 of social transition, that is a separate question

Page 38

1 than thinking about long-term concerns.
2 BY MR. RAMER:
3     Q.   If someone had said that there are
4 negative impacts of social transition, would you
5 have agreed with them?
6     A.   I would not because it's not supported
7 by the literature or my personal experience working
8 with patients who have socially transitioned.
9     Q.   Do you think there's any concern that
10 prepubertal children who have socially transitioned
11 may feel boxed in to their affirmed gender
12 identities?
13     A.   That has not been my experience working
14 with youth who have socially transitioned.
15     Q.   How do you know?
16     A.   Because I talk to them about it and I
17 ask them about it, and I have had patients who have
18 stopped socially transitioning.
19     Q.   Because they were feeling boxed in?
20     A.   No, because they felt their identity
21 resolved in a way that was aligned with their sex
22 assigned at birth as opposed to misaligned with
23 their sex assigned at birth.
24     Q.   When you say that you ask them about it,

Page 39

1 would you ever expect a patient to say,
2 Dr. Janssen, I feel boxed in by my social
3 transition?
4     A.   I would not anticipate that they would
5 use that language, but I would ask about it as a
6 part of our assessment of the intervention.  With
7 any intervention that we are recommending, one of
8 the goals that we have is to assess the efficacy of
9 that intervention.  Have there been any anticipated
10 benefits that you were hoping for?  Have there been
11 any unanticipated consequences that you had not
12 imaged?  How has that been for you?  What is that
13 like?  Is it the right decision?
14           All of that is continuously reassessed
15 as a part of this process.
16     Q.   If a social transition is affecting the
17 patient's understanding of gender though, would the
18 patient even be aware?
19     A.   I don't know what you mean by
20 "understanding of gender."
21     Q.   What do you understand us to have been
22 talking about when we are talking about being boxed
23 in?
24     A.   It really is an individual experience,

Page 40

1 and it could mean a lot of things to a lot of
2 different people, which is why in the abstract it's
3 very hard to have a discussion about it.  If I have
4 a patient who sits here and says, Yeah, I am very
5 confident.  I was assigned female at birth.  I'm
6 very confident in my male identity.  Sometimes I
7 wish I could wear a dress every once in a while.
8 Does that mean boxed in?  They have never used that
9 language, but that is going to be a discussion that
10 I have that is very individualized to that one
11 patient and that one clinical encounter.  In the
12 abstract, I just don't know what that means.
13     Q.   Do you think the concept of a social
14 transition increasing the likelihood of persistence
15 is completely unsubstantiated?
16     A.   The data that we have primarily comes
17 from a Steensma study out of the Dutch clinic that
18 looked at factors that impact persistence and
19 desistance.  Persistence and desistance is very
20 specific in terms of how it's defined, and it's
21 been misused in many, many ways because there is a
22 specific definition to persistence, which is that a
23 child who has a diagnosis of gender dysphoria in
24 childhood who passed Tanner Stage 2 of puberty,

Page 41

1 when their body begins to develop, no longer meets
2 criteria for that diagnosis.  That is the
3 definition of desistance.  It's been used to
4 describe a whole bunch of other things, but in this
5 article by Steensma, factors that affect
6 persistence.  People -- children who presented to
7 care and having already socially transitioned were
8 more likely to be in that persistent group, where
9 they had the diagnosis in childhood, and by the
10 time they hit adolescence and puberty, Tanner
11 Stage 2, they continued to meet criteria for the
12 diagnosis.
13           When I talked with Tomas about this and
14 in the literature itself, the theory is not that
15 social transition caused persistence of gender
16 identity but more likely that the kids who had more
17 severe distress, more clarity around identity, were
18 more likely to be in that persistent group and were
19 also the kids who were more likely to have socially
20 transitioned prior to initiation of care at the
21 clinic.
22     Q.   By "Tomas," did you mean Steensma?
23     A.   Correct.
24     Q.   Do you think that there is any chance

11 (Pages 38 - 41)

Page 42

1 that social transition might cause persistence?
2     A.   I think that is a testable hypothesis,
3 and it's not been one that has been borne out by
4 the literature thus far.
5     Q.   When we have been discussing the Dutch
6 protocol or the Dutch clinic, the main research
7 from that are the two de Vries studies, correct?
8     A.   There's been a -- they are a very
9 productive group, so there's been much more than
10 the two de Vries studies.  Those are the ones that
11 have certainly got the most attention.
12     Q.   Do you agree that there are limitations
13 to all of those studies?
14     A.   There's limitations to every study, yes.
15     Q.   What are the limitations in those
16 studies?
17     A.   I wish it had been a bigger cohort.  I
18 wish there had been more clear measurements of
19 functioning and quality of life.  I wish at the
20 time that we had measurements of body congruence.
21 I wish we had more clear measurements of family
22 acceptance rates.
23     Q.   Why do you wish it was a bigger cohort?
24     A.   Bigger is almost always better in terms

Page 43

1 of these kinds of studies.  The larger cohort you
2 have, not only does it support the intervention
3 more effectively, but you are also powered to
4 differentiate subgroups within your study
5 population to understand, are there some subgroups
6 that benefit more from this intervention or others.
7     Q.   And did you mention measurements of body
8 congruence?
9     A.   I did, yes.
10     Q.   What do you mean by that?
11     A.   Well, certainly from the Chin study,
12 body congruence seems to predict some of the
13 benefits on mental health that come with
14 transition, so alignment with the body,
15 satisfaction with the body.  I think if we had a
16 clear understanding of that from 20 years ago, it
17 would have helped.  More is always better, even if
18 it would not have changed the conclusions or the
19 interventions.
20     Q.   In the de Vries studies, did they not
21 measure body congruence?
22     A.   In the de Vries studies, from my
23 recollection -- and, again, unless I had it in
24 front of me, I don't want to comment on specifics

Page 44

1 of the study, and so I'm commenting from my
2 recollection of working with them over time.
3         They used what was then called the body
4 image scale, which has some -- which is not the
5 most effective tool, in my opinion.
6     Q.   Why is it not the most effective tool?
7     A.   It was not designed for this population
8 specifically.
9     Q.   What was it designed for?
10     A.   I don't recall the specifics of the
11 origin of the body image scale, so I could not tell
12 you.
13     Q.   But you know it was not designed for
14 this?
15     A.   Yes.
16     Q.   And is the body image scale different
17 from the UGDS?
18     A.   Yes.  The Utrecht Gender Dysphoria Scale
19 is upright.
20     Q.   Do you think that is a valid measurement
21 for gender dysphoria?
22     A.   I think it's a valid measure.  I think
23 there's probably refinements in it that would
24 improve its utility, but it's what we had at the

Page 45

1 time.
2     Q.   What kind of refinements would improve
3 its utility?
4     A.   Language that is more up-to-date,
5 ability to characterize more nonbinary identities
6 in distress.
7     Q.   Okay.  Switching gears a little bit.
8 You helped author the WPATH, that is W-P-A-T-H,
9 Standards of Care 8, correct?
10     A.   Yes.
11     Q.   If I refer to those as the SOC 8, will
12 you know what I'm referring to?
13     A.   I will.
14     Q.   Can you tell me what the SOC 8 are?
15     A.   The standards of care are a document
16 that compiles the most recent and up-to-date
17 literature in the field of transgender health to
18 make evidence-based recommendations for care.
19     Q.   Are all of the individuals who helped
20 author the SOC 8 experts in the field of
21 transgender medicine?
22     A.   No.  Because there were also sections on
23 the law, other sections that involve things outside
24 of medicine.

12 (Pages 42 - 45)

Page 46

1    Q.   Are all of the individuals who helped
2  author the SOC 8 chapters related to medicine
3  experts in the field of transgender medicine?
4    A.   I was involved in two of the chapters,
5  the child and adult mental health chapters.  There
6  were experts -- all of the folks who were involved
7  in the drafting of those two chapters were experts
8  in the field of transgender health.
9    Q.   You are unable to say that authors of
10  the other chapters are experts in the field of
11  transgender medicine?
12    MR. RAY:  Object to form.
13  BY THE WITNESS:
14    A.   Based upon the criteria for selection of
15  authors, that would be my assumption, but I was not
16  involved in the other chapters, so I could not tell
17  you specifically every person who was involved.
18  BY MR. RAMER:
19    Q.   So you think there's a chance that
20  people were drafting chapters of the SOC 8 related
21  to medicine who were not experts in the field of
22  transgender medicine; is that correct?
23    MR. RAY:  Object to form.
24

Page 47

1  BY THE WITNESS:
2    A.   I would not say that that is correct.
3  In previous depositions, it has been asked of me
4  that patients or family members who were involved
5  in the process were not experts, and I think that
6  there are individuals who have expertise outside of
7  medicine that allow us to refine our medical
8  knowledge in such a way that we understand how it
9  can be best applied in a community-based setting.
10    Q.   Are the listed authors of the adolescent
11  chapter in the SOC 8 experts in the field of
12  transgender medicine?
13    A.   I was a member of the child chapter, not
14  the adolescent chapter.
15    Q.   I understand.  I'm asking, are the
16  listed authors of the adolescent chapter of the
17  SOC 8 experts in the field of transgender medicine?
18    A.   I would be happy to review those list of
19  authors, if you have it, and let you know.  I don't
20  recall off the top of my head every author on the
21  adolescent chapter.
22    Q.   Are you offering opinions based on
23  recommendations made in the adolescent chapter of
24  the SOC 8?

Page 48

1    A.   I'm making recommendations as an expert
2  in the field of transgender health.  The WPATH
3  standards of care represent one piece of the extant
4  literature in the field, not the entirety of my
5  utilization of the literature to make
6  recommendations.
7    Q.   So you are unable -- sorry.
8         As you sit here, you cannot say the
9  listed authors of the adolescent chapter of the
10  SOC 8 are experts?
11    MR. RAY:  Object to form.
12  BY THE WITNESS:
13    A.   The folks that I know who are on the
14  adolescent chapter are experts in the field.  I
15  don't have the entire roster of every author in
16  front of me, so I can't say with certainty that all
17  of the authors are.  However, in order to be a
18  member of the committee that writes this, you had
19  to have a degree of expertise.
20  BY MR. RAMER:
21    Q.   Are the SOC 8 evidence-based guidelines?
22    A.   They are.
23    Q.   Every part of the SOC 8 is
24  evidence-based?

Page 49

1    A.   The format of the SOC 8 is that there
2  are statements and then supporting text that
3  provides context to those statements.  All of the
4  statements that were included were evidence-based
5  statements.  The context and the text descriptions
6  around those statements did not necessarily go
7  through that same process that the other statements
8  did.
9    Q.   What makes a statement evidence-based?
10    A.   Because they were based upon the review
11  of the literature.
12    Q.   When you say "based upon the review of
13  the literature," what do you mean by that?
14    A.   It means reading and reviewing all of
15  the peer-reviewed scientific evidence that existed
16  in support of the options for interventions for
17  transgender patients, individuals with gender
18  dysphoria, and making recommendations based upon
19  the summarization of that extant literature.
20    Q.   So by the authors reading the literature
21  and then summarizing it and making recommendations,
22  your view is that makes those recommendations
23  evidence-based; is that right?
24    A.   The subsequent stage after generation of

13 (Pages 46 - 49)

Page 50

1  the statements was to go through a Delphi process
2  in which there are several rounds of revisions
3  using experts in the field to support or reject the
4  various proposed statements. The Delphi process is
5  an evidence-based process for building consensus
6  around clinical topics.
7      Q.   Do you think that there's a distinction
8  between statements that are evidence-based and
9  statements that are consensus-based?
10     A.   Expert consensus is a form of evidence.
11 There's overlap in that Venn diagram, but it's not
12 a circle.
13     MR. RAMER:  When -- actually, we are probably
14 at a good -- we have been going for about an hour.
15 Is now a good time to stop and go off the record?
16     THE WITNESS:  Sure.
17     MR. RAY:  Take about a ten-minute break or so?
18     MR. RAMER:  Yeah, that works for me.
19         (WHEREUPON, a recess was had.)
20 BY MR. RAMER:
21     Q.   Dr. Janssen, could you please state what
22 your role was in helping draft the SOC 8?
23     A.   I was an author as a part of the adult
24 mental health chapter and the child chapter.

Page 51

1      Q.   I'm going to hand you what has been
2  marked as Janssen Exhibit 1 that says Chapter 7,
3  Children, at the top. And your opposing -- or your
4  counsel has copies.
5          (WHEREUPON, a certain document was
6          marked Janssen Deposition Exhibit
7          No. 1, for identification.)
8  BY MR. RAMER:
9      Q.   Is this the Children chapter that you
10 helped draft?
11     A.   Yep.
12         (WHEREUPON, a certain document was
13         marked Janssen Deposition Exhibit
14         No. 2, for identification.)
15 BY MR. RAMER:
16     Q.   And I'm now going to hand you what has
17 been marked as Janssen Exhibit 2. It says, Chapter
18 18, Mental Health at the top, and is this the
19 mental health chapter that you helped draft?
20     A.   Yes, it is.
21     Q.   How did you come to be an author for
22 these two chapters?
23     A.   I don't actually know what the specifics
24 were on the WPATH side. I submitted an application

Page 52

1  with my CV, experience, publications, and from what
2  I recall, the chapter leads worked with the editors
3  of the document in selecting the authors to
4  participate.
5      Q.   And do you recall who the chapter lead
6  was for the Children chapter?
7      A.   Amy Tishelman.
8      Q.   And do you recall who the chapter lead
9  was for the Mental Health chapter?
10     A.   Dan Karasik.
11     Q.   Can you provide just an overview of the
12 drafting process?
13     A.   Sure. I can talk about the drafting
14 process for the two chapters, which generally
15 involved weekly or bimonthly hour-long meetings
16 over the course of several years in which we
17 reviewed literature, posed questions, had vigorous
18 debates, reviewed the statements, re-reviewed the
19 statements, drafted text, redrafted the text, over
20 and over again over a long period of time.
21     Q.   And those weekly or biweekly meetings,
22 were those in person?
23     A.   These were virtual.
24     Q.   And in addition to those meetings, how

Page 53

1  did you and your co-authors typically communicate
2  with one another throughout the drafting process?
3      A.   It really depended upon the person.
4  Primarily, I would assume e-mail, but we met
5  frequently enough that a lot of the meat of the
6  discussion happened in the actual meetings.
7      Q.   And so returning to Exhibit 1, the
8  Children chapter, how did you select the articles
9  that are cited here?
10     A.   The articles cited were the ones that
11 were used to generate the statements and were
12 selected based upon applicability, quality of
13 evidence.
14     Q.   And was it just a function of you and
15 the co-authors selecting the studies that you
16 thought were applicable?
17     A.   It was reviewing all of the studies that
18 we are aware of that had been published on the
19 specific topics that we were in charge of making
20 recommendations for.
21     Q.   When you say "all of the studies that
22 you were aware of," how do you maintain awareness
23 of studies?
24     A.   Me personally or the field at large?

14 (Pages 50 - 53)

Page 54

1    Q.   You personally.
2    A.   Me personally, I have Google Scholar
3  alerts set up and review several of the journals.
4         (WHEREUPON, a certain document was
5         marked Janssen Deposition Exhibit
6         No. 3, for identification.)
7  BY MR. RAMER:
8    Q.   I'm now going to hand you what has been
9  marked as Janssen Exhibit 3.  It says, Appendix A,
10 Methodology at the top.  Does this appear to be
11 Appendix A to the SOC 8?
12   A.   It does.
13   Q.   And does this appendix discuss the
14 methodology used to create the SOC 8?
15   A.   It does.
16   Q.   On the first page of this chapter, which
17 says, S247 at the top, in the left column, first
18 paragraph, third sentence.  I'm just going to read
19 it and ask if I read it correctly.  It says,
20 Evidence-based guidelines include recommendations
21 intended to optimize patient care and are informed
22 by a systematic review of evidence and an
23 assessment of the benefits and the harms of
24 alternative care options.  Did I read that

Page 55

1  correctly?
2    A.   You did.
3    Q.   For the Children chapter, did you or
4  your co-authors seek a systematic review of
5  evidence?
6    A.   It depends upon what you mean by
7  "systematic review."
8    Q.   What do you understand the term
9  "systematic review" to mean in the field of
10 reviewing medical literature?
11   A.   There's at least two, if not more,
12 definitions of systematic review.  There's a
13 systematic review which typically follows a
14 predetermined format.  There are various different
15 predetermined formats that can exist for a
16 published scientific or systematic review versus a
17 more colloquial systematic review, which involves
18 review of the extant literature, between when SOC 7
19 was published and when the SOC 8 was published.
20   Q.   And this refers to a systematic review
21 of evidence, so let's assume it's referring to the
22 first type of systematic review that you referenced
23 and --
24   A.   I don't know if that is fair to assume

Page 56

1  that that is correct.
2    Q.   So you think that this sentence is
3  potentially using the phrase "a systematic review
4  of evidence" in a colloquial sense?
5    A.   The editors of the document, so the
6  primary three or four -- I'm trying to remember
7  now -- editors of the document were the ones who
8  created the methodology, so you would have to ask
9  them about their specific use of this term and what
10 they meant for it.
11   Q.   And so as drafters of the Children
12 chapter, did you perform a systematic review?
13   A.   In a colloquial sense, certainly.  We
14 reviewed all of the extant literature that we had.
15 We ran into the problem with a systematic review in
16 a more formalized sense for many of the
17 recommendations in childhood because of what I had
18 mentioned earlier in terms of a lack of publication
19 around the importance of involving a parent in the
20 evaluation of a child as an example.
21   Q.   For the mental health chapter, did you
22 or your co-authors conduct a formal systematic
23 review?
24   A.   I don't actually recall.  We did a

Page 57

1  review of all of the extant literature that had
2  been published on the topic since the last revision
3  of the SOC 7.  I don't recall if Dan had led a more
4  formalized systematic review process or not.
5    Q.   Who do you mean by "Dan"?
6    A.   Dan Karasik, the chapter lead.
7    Q.   So same page, right column, fifth bullet
8  down.  It refers to using the involvement of an
9  independent body from a reputable university to
10 help develop the methodology and undertake
11 independent systematic literature reviews where
12 possible.  Do you see that?
13   A.   I do.
14   Q.   How does one determine whether a
15 systematic literature review is possible?
16   A.   I would not be testifying here as an
17 expert in study design or methodology.  Karen
18 Robinson was the evidence review lead who was, if
19 I'm recalling correctly, at Johns Hopkins.  You
20 would have to ask her in terms of what those
21 specific criterion are.
22   Q.   But you did not conduct a formal
23 systematic review for the Children chapter because
24 there were not enough studies, correct?

Page 58

1    A.   I was never going to be in a position to
2  conduct the formalized systematic review.  That was
3  not the role of the authors on the chapter.
4    Q.   No, but earlier we were discussing, did
5  you perform a formal systematic review, and please
6  correct me if I'm misunderstanding.  I thought you
7  said you did not conduct one because part of the
8  problem was that there were not studies that were
9  relevant to the particular statements; is that
10  right?
11    A.   I apologize, and I'm getting into
12  semantics.  We reviewed in a systematic way all of
13  the extant literature on the impacts of gender care
14  on childhood in preparation for the writing of this
15  chapter.  It did not go through the noncolloquial
16  systematic review process, as led by the expert
17  from Johns Hopkins, to the best of my recollection.
18  It does not mean that we did not do it.
19    Q.   When you say "it does not mean that we
20  did not do it," what is the "it"?
21    A.   "It" being a systematic review of the
22  literature that existed in the time between the
23  publication of the Standards of Care 7 and then the
24  Standards of Care 8.

Page 59

1    Q.   And when you say "a systematic review"
2  in your answer just now, you are using it in the
3  colloquial sense, correct?
4    A.   Correct.
5    Q.   So still first page in Exhibit 3, left
6  column, second full paragraph.  Last sentence in
7  the paragraph, it refers to community members
8  completing conflict of interest declarations.  Do
9  you see that?
10    A.   I do see that.
11    Q.   Did you complete a conflict of interest
12  declaration?
13    A.   To the best of my recollection, I did.
14  I do them all of the time as part of being in
15  academic medicine, so the specific memory of doing
16  this one comparatively to the several that I have
17  to do every year is not something that I can recall
18  with specificity.
19    Q.   So you don't recall whether you reported
20  any conflicts?
21    A.   I did not report any conflicts because I
22  did not have any conflicts.
23    Q.   This next paragraph in Exhibit 3, about
24  halfway down, there's a sentence that I'll just

Page 60

1  read it and ask if I read it correctly.  It says,
2  Consensus of the final recommendations was attained
3  using a Delphi process that included all members of
4  the Standards of Care Revision Committee.  Do you
5  see that?
6    A.   I see that.
7    Q.   Could you explain what that is?
8    A.   The Delphi process?
9    Q.   Yes.
10    A.   Again, I'm not testifying as an expert
11  in study methodology, but, in general, a Delphi
12  process is an evidence-based way of finding
13  consensus around medical guidelines.
14    Q.   So you are not offering an opinion about
15  the significance of the Delphi process to the
16  SOC 8; is that right?
17    A.   I don't recall with 100 percent
18  certainty if that was a part of the declaration.
19  I'm happy to review my declaration to see if that
20  is something that I commented on.
21    Q.   But you are not an expert on the Delphi
22  process?
23    A.   I'm not an expert in the study design.
24    Q.   Does study design include using a Delphi

Page 61

1  process?
2    A.   Study design involves the psychometric
3  validation of a Delphi process and the statistical
4  power of the Delphi process.  It does not involve
5  utilization of the Delphi process or understanding
6  of how to use the Delphi process in establishment
7  of consensus-based guidelines.
8    Q.   Can you explain the utilization of the
9  Delphi process in the drafting of SOC 8?
10    A.   Yeah, in a very basic sense.  The
11  statements are generated.  They are provided to an
12  expert panel to review, accept or reject.  From
13  those initial edits, the statements are pared down
14  and refined to send to the experts to review a
15  second time.  Those that have a broad degree of
16  consensus, and this document, as you noted in your
17  paragraph that you read, 75 percent was required as
18  a threshold for allowing the statement to be
19  included.
20    Q.   When you referred to the expert panel
21  just now, are you referring to the individuals who
22  voted in the Delphi process?
23    A.   Correct.
24    Q.   Do you know who voted?

16 (Pages 58 - 61)

Page 62

1    A.    The individuals who voted, from my
2 recollection, were the guideline steering
3 committee, the chapter leads, and the chapter
4 authors.
5    Q.    Would you agree that everyone who voted
6 in the Delphi process was an expert in the field of
7 transgender medicine?
8    A.    An expert of some type or another, yes,
9 to my recollection.
10   Q.    Was the Delphi process required to
11 approve everything contained in the chapter?
12   A.    The Delphi process was required to
13 approve the statements.
14   Q.    So returning to Exhibit 1, the Children
15 chapter, on the third page of the chapter, which is
16 S69, am I correct in understanding that the Delphi
17 process was used to approve the statements that are
18 in the box on this page but not the supporting text
19 throughout the chapter?
20   A.    That is correct.
21   Q.    Did you vote in the Delphi process?
22   A.    Yes.
23   Q.    Did you vote on the statements for other
24 chapters?

Page 63

1    A.    Yes.
2    Q.    Can you describe how you would vote as a
3 practical matter.  If that is not clear -- can you
4 describe how you did it?
5    A.    There was an online portal.  The
6 specifics beyond that, I cannot recall.  There was
7 a space to approve, disapprove, provide comments,
8 but I don't recall.  It was several years ago at
9 this point, so I don't recall the specifics of what
10 that portal looked like.
11   Q.    Did you ever leave comments in the
12 Delphi process?
13   A.    I did.  I don't remember the specific
14 comments that I did, but I did make comments, yes.
15   Q.    And when you were voting, was it an up
16 or down vote, or was there some sort of grading as
17 well?
18   A.    My recollection is that it was a --
19 actually, I don't remember.
20   Q.    Did you vote on the statements in the
21 eunuch chapter?
22   A.    I don't recall not voting on any of the
23 chapters, but I don't remember specifically voting
24 for or against the specific statements in the

Page 64

1 eunuch chapter right now.
2    Q.    I would like to return to Exhibit 3, the
3 Appendix A, Methodology, and still on the first
4 page of the appendix, which is S247, the right
5 column, second bullet from the top refers to the
6 inclusion of diverse stakeholders.  Do you see
7 that?
8    A.    I see that.
9    Q.    Do you know what that is referring to?
10   A.    From my understanding, it's referring to
11 experts in the field that have lived experience.
12   Q.    Experts in the field who have lived
13 experience?
14   A.    From my understanding, yes.
15   Q.    Did you have any diverse stakeholders in
16 your chapter drafting process?
17   A.    Well, I would make the argument that all
18 of us in the chapter drafting process were diverse
19 stakeholders who represented a multidisciplinary,
20 multi-continental group of experts that have
21 experience working with transgender and
22 gender-diverse youth.
23   Q.    Do you think that is what this bullet is
24 referring to?

Page 65

1    A.    I did not write this bullet, so I can't
2 tell you what the thought process was for including
3 it.
4    Q.    I'm not asking you about the -- to go
5 inside the mind of the person that drafted this.
6 I'm asking your understanding as an author of the
7 SOC 8, do you think that where this is referring to
8 inclusion of diverse stakeholders, it's referring
9 to the group of individuals that you just
10 described?
11        MR. RAY:  Object to form.
12 BY THE WITNESS:
13   A.    As somebody who is not involved in the
14 formalization of the processes involved in
15 selecting people for the various chapters, I can
16 only make a guess.  One change between SOC 7 and
17 SOC 8 was that historically people with lived
18 experience were not a part of the process, and
19 having individuals with lived experience, people
20 with gender dysphoria, people with -- children with
21 gender dysphoria who have expertise in the field
22 provides an extra layer of understanding and
23 context that allows us to make more refined
24 statements appropriately for the patients that we

17 (Pages 62 - 65)

1 are working with.
2 BY MR. RAMER:
3     Q.    For the Children chapter, was there
4 anyone with lived experience who helped draft the
5 chapter that is not listed as an author?
6     A.    We had one person who was the parent of
7 a transgender child who ran an organization in the
8 UK supporting transgender youth.
9     Q.    What was that organization?
10     A.    It was called Mermaids.
11     Q.    And what was that individual's role in
12 the drafting process?
13     A.    She was a chapter author similar to the
14 other chapter authors in the field.
15     Q.    So I would like to move ahead --
16 sticking with Exhibit 3, move ahead to page S250,
17 and the right column and Section 3.9.  And the
18 first sentence after that says, Once the statements
19 passed the Delphi process, chapter members graded
20 each statement using a process adapted from the
21 grading of recommendations, assessment, development
22 and evaluations (GRADE) framework.  Do you see
23 that?
24     A.    Yes.

1     Q.    Did you do that?
2     A.    Did we grade our statements?  We did.
3 Primarily, the chapter authors working with the
4 leads were in charge of the nitty-gritty of that
5 process.
6     Q.    And you were a chapter author, correct?
7     A.    Yes.
8     Q.    Can you describe how that grading
9 process worked?
10     A.    From my recollection -- and, again, this
11 is my recollection, that we reviewed the
12 evidentiary support for the statements that we were
13 making and that the chapter leads, in discussion
14 with the editors, made that final determination
15 through some process that I was not privy to, as I
16 was not a chapter lead for either of them.
17     Q.    Can you kind of just walk me through how
18 you would grade the evidence, as this is
19 discussing?
20     A.    Again, this is separate from kind of the
21 acronym GRADE process.  How I would grade it in my
22 role as being an author on the chapter was
23 reviewing the specific scientific studies that we
24 were discussing as a part of the process of

1 developing and discussing as a committee the risks
2 or the pros, the cons, the limitations and the
3 benefits of the various study designs and whether
4 or not to include it as a part of the
5 recommendation process or not.
6     Q.    When you say that you are assessing the
7 various study designs, what do you mean?
8     A.    I mean, is it a case report with one
9 patient.  Is it a cohort study?  Is it a randomized
10 controlled trial?  What is the value of the study?
11 What are the limitations of the study?  What is
12 missing from the study?
13     Q.    What is the significance of the various
14 study designs that you just referenced of
15 randomized controlled trial, cohort study, or case
16 study?
17     A.    Simply to provide context to the type of
18 study that was done.
19     Q.    Did you assess the studies for bias?
20     A.    We did.
21     Q.    How did you do that?
22     A.    As a part of becoming a -- in my field,
23 I can only talk about my field as a physician, as
24 somebody who went through adult psychiatry training

1 and child psychiatry fellowship, learning how to
2 critically review scientific literature is
3 something that we are taught over the course of
4 many years.
5     Q.    Is it mostly a function of you reading
6 the study and determining whether you think that
7 there's a high degree of bias or not?
8     A.    That is a part of it, but part of being
9 able to ascertain bias is expertise in
10 understanding of the field.  I, as somebody who is
11 an expert in transgender health, have more capacity
12 to pick out things that might be missing or things
13 that might be biased in studies in my own field
14 than picking out bias in a study on ECMO in PICU
15 patients.  The capacity to pick out bias and
16 analyze studies in an effective way is benefitted
17 by individuals who have clinical and personal
18 experience working with the patient populations
19 that are being studied.
20     Q.    Can you provide an example where that
21 expertise would be beneficial in assessing the bias
22 of a study?
23     A.    I would probably defer to a specific
24 study.  If you would like me to look at a specific

Page 70

1  study, I'm happy to read it and kind of show how I
2  would go through that process.
3      Q.   I guess the -- what I'm struggling with
4  a little is, my understanding is -- correct me if
5  I'm wrong.  Assessing bias in a study has to do
6  with the design of the study, right?
7      A.   Not completely, no.
8      Q.   What am I missing?
9      A.   So assessing bias involves not just the
10 design of the study, how the authors are funded,
11 what is included but what is excluded, what are the
12 patient populations, how are they selected, how are
13 they reported on, how is the text describing what
14 they are reporting on generated, are there funding
15 sources that are questionable, and do the authors
16 provide any sorts of conflict of interest
17 disclosures that make you question whether or not
18 the studies are valid.
19     Q.   Are there tools that are used to assess
20 bias in individual studies?
21     A.   I'm not -- I don't know.
22     Q.   Have you ever heard of the Cochran
23 Methods Group?
24     A.   I have heard of them, but I'm not

Page 71

1  familiar with those processes.
2      Q.   Okay.  So then how did you -- I guess,
3  sorry.  So you did not use any tools to assess the
4  bias of the studies in your chapter; is that right?
5      A.   I did not use a tool to assess bias in
6  those studies in my chapter.
7      Q.   Did anyone review -- let me ask it this
8  way.
9           Once the authors settled on the grading
10 of the statements, did anyone review that grading?
11     A.   There was a review process that I was
12 not privy to.  The chapter leads worked with the
13 editors, from my recollection, to assign the final
14 recommendations.
15     Q.   So, basically, you lost visibility on
16 the grading process once it went up to the chapter
17 lead?
18     A.   I would say that is accurate, yes.
19     Q.   Among you and your co-authors, were
20 there ever disputes about the grading?
21     A.   There were discussions and robust debate
22 about what to include, but I don't recall
23 specifically if there was dissent around specific
24 statements being graded.

Page 72

1      Q.   Going back to Exhibit 1, the Children
2  chapter, and to page S69.  Since you lost
3  visibility on the grading process, as you say, were
4  you surprised about the final statements in the
5  chapter?
6      A.   I was not.
7      Q.   And looking at this box on page S69, it
8  looks like the statements 7.1 through 7.14 are all
9  we recommend; is that right?
10     A.   Yes.
11     Q.   And now going back to Exhibit 3, the
12 Methodology appendix, and going to S250, right
13 column halfway down?
14     A.   Uh-huh.
15     Q.   It says, The statements were classified
16 as strong recommendations, which were indicated by
17 "we recommend," for those interventions/
18 therapies/strategies where the evidence is of high
19 quality.  Do you see that?
20     A.   I see that.
21     Q.   Do you think that the evidence
22 supporting Statement 7.1 through 7.14 is all of
23 high quality?
24     A.   That is kind of a hard question to

Page 73

1  answer without context.  And, one, I want to go
2  back to the S250 in terms of the statements were
3  classified as strong recommendations because it
4  does not end at the evidence is high quality.  It
5  also includes, Estimate of effective and
6  intervention therapy or strategy, as in there's a
7  high degree of certainty that effects will be
8  achieved in practice.
9           Also, there are a few downsides of the
10 therapy, intervention, and strategy, and there's a
11 high degree of acceptance among providers and
12 patients for whom the recommendation applies.  If
13 we look at Statement 7.1 on page S69, it reads, We
14 recommend health care professionals working with
15 gender-diverse children receive training and have
16 expertise in gender development, in gender
17 diversity in children and possess a general
18 knowledge of gender diversity across the lifespan.
19          To develop so-called high-quality
20 evidence for that statement, in terms of comparing
21 individuals who do not have any expertise or
22 experience working with transgender youth to those
23 who do have expertise or experience in working with
24 transgender youth, would be to set up a study that

19 (Pages 70 - 73)

Page 74

1  has so many problems and ethical issues as to
2  render it meaningless.  And I think that there is
3  broad clinical consensus that having expertise in a
4  subject is important if you are going to treat
5  individuals with that condition.
6          We could imagine, for example, there's
7  no high-quality evidence to suggest that health
8  care professionals working with children with
9  cancer have training and expertise in cancer and in
10 cancer treatments and understand the impacts of
11 cancer across the lifespan.  There's similarly no
12 evidence to suggest that that has a high quality of
13 evidence in supporting it, but it's self-evident
14 because of the requirements involved in training
15 and the broad clinical consensus.
16         That is why it's a little bit tricky to
17 talk about it in a binary way of high-quality
18 evidence or not.  The presence of very rigorous and
19 very clear consensus among an expert body is an
20 element of high-quality evidence, and that is the
21 evidence that we are leaning on in supporting this
22 recommendation.
23     Q.   Okay.  So on S250, where it says that
24 all the "we recommend" statements were made where

Page 75

1  the evidence of high quality -- excuse me -- the
2  evidence is of high quality; is that accurate?
3      A.   I'm not -- I was not involved in that
4  process as -- in your language, I lost visibility,
5  so whether these are ors or ands that follow these
6  bullets, that is not something that I'm going to
7  know.
8      Q.   Okay.
9      A.   From my experience as an author and
10 somebody who works in the field, a lot of the
11 evidence that we are working with requires broad
12 clinical consensus.  Whether you call that high
13 quality or not, I think, is up for debate in the
14 field.
15     Q.   Sticking with Exhibit 3, going to S251,
16 right column, under 3.17.  It says, The final
17 document was presented to the WPATH board of
18 directors for approval and it was approved on the
19 20th of June 2022.  Do you see that?
20     A.   I see that.
21     Q.   And is that true?
22     A.   I do not know.  I was not a part of the
23 process of presenting this to the board.
24     Q.   Do you know if changes were made to the

Page 76

1  SOC 8 after June 2022?
2      A.   From my -- from what I can recall, there
3  were no changes made to the Children chapter or the
4  Mental Health chapter that I was involved in.
5      Q.   Were you aware of changes to any other
6  chapters to the SOC 8 after June 2022?
7      A.   I'm not.  I don't know one way or the
8  other.  I don't have a timeline in my head on when
9  things were finalized from the other chapters.  I
10 just know the experience of my -- my own.
11     Q.   And when you say "the experience of your
12 own," what do you mean?
13     A.   Meaning that from my recollection, there
14 were no changes made to the Children chapter or the
15 Mental Health chapter after we submitted.
16     Q.   And throughout the drafting of SOC 8,
17 you would not have been involved with any drafting
18 of the adolescent chapter; is that right?
19     A.   That is correct.  I was not involved in
20 the drafting of the adolescent chapter.
21     Q.   Were you ever involved with discussions
22 surrounding edits to the adolescent chapter?
23     A.   I don't recall certainly anything
24 formally within my role.  I knew people who are on

Page 77

1  the adolescent chapter.  Whether we had a
2  discussion about our shared experiences of writing
3  the SOC 8, I don't recall any specifics, but it
4  would not surprise me if I had conversations with
5  colleagues at some point.
6      Q.   When you say it would not surprise you
7  if you had conversations, you mean informal
8  conversations?
9      A.   Correct.
10     Q.   But you had no involvement in a more
11 formal capacity with edits to the Adolescent
12 chapter; is that correct?
13     A.   That's correct.
14     Q.   Okay.  Switching gears.  Do you agree
15 that not all people who identify as transgender
16 experience gender dysphoria?
17     A.   Yes, I would agree with that.
18     Q.   Do you agree that not all people who
19 experience gender dysphoria identify as
20 transgender?
21     A.   Yes, I would agree with that as well.
22     Q.   Is gender a social construct?
23     A.   Social constructs influence the
24 experience and understanding of gender in

20 (Pages 74 - 77)

Page 78

1 culturally bound ways.
2    Q.   What do you mean by that?
3    A.   Well, gender is a bit of a messy
4 construct. The way that I define gender, at least
5 the way that I most often tend to teach about it,
6 is that we have identity aspects of gender, we have
7 culturally bound social roles that influence
8 gender, and we have relationship to the body, which
9 influences gender. All three of those things are
10 components of what we call gender.
11    Q.   If somebody defined transgender youth as
12 those whose gender identity does not conform to
13 culturally-defined expectations for their
14 designated sex at birth, would you agree with that
15 definition?
16    A.   I would have to see the context in which
17 that was written to tell you.
18    MR. RAMER: I ask the court reporter to mark
19 this document.
20         (WHEREUPON, a certain document was
21          marked Janssen Deposition Exhibit
22          No. 4, for identification.)
23    MR. RAY: Counsel, do you have a copy for us
24 too?

Page 79

1    MR. RAMER: Sure.
2 BY MR. RAMER:
3    Q.   So the court reporter has handed you
4 what has been marked as Janssen Exhibit 4. Do you
5 recognize this article?
6    A.   I do.
7    Q.   Are you an author on this article?
8    A.   I am.
9    Q.   And the first sentence says, Transgender
10 and gender-diverse (TGD) youth are those whose
11 gender identity or expression does not conform to
12 culturally-defined expectations for their
13 designated sex at birth. Do you see that?
14    A.   I do.
15    Q.   And is that statement accurate?
16    A.   With the inclusion of the word
17 "gender-diverse," yes, it is.
18    Q.   What difference does that make to what I
19 previously asked you?
20    A.   Most people define transgender as an
21 incongruence between sex assigned at birth and
22 current identity, that there's a specific identity
23 question at play. Whereas, gender diversity is
24 more inclusive of social constructs of gender and

Page 80

1 gender expression, gendered expectations,
2 et cetera.
3    Q.   But here you say that transgender and
4 gender-diverse youth are those whose gender
5 identity or expression does not conform to
6 culturally-defined expectations, right?
7    A.   That is what is written, yes.
8    Q.   Why do you say that is what is written?
9 Do you disagree with the meaning of the sentence?
10    A.   No, I don't disagree with the meaning of
11 the sentence. I can tell you what I mean by the
12 sentence.
13    Q.   Please.
14    A.   Which is that transgender includes those
15 who have diversity of gender identity that is in
16 some way incongruent with their sex assigned at
17 birth, and those who are gender diverse sometimes
18 are transgender but oftentimes just transgress
19 expected social behaviors and engagements or
20 expressions that are culturally known.
21    Q.   Where it says the identity does not
22 conform to culturally-defined expectations, what
23 does that mean?
24    A.   Typically, what that is meaning is that

Page 81

1 there's an incongruence between the sex assigned at
2 birth and the affirmed identity of the individual.
3    Q.   So are you saying the sex assigned at
4 birth is the culturally-defined expectation in that
5 context?
6    A.   I would say in almost all contexts, the
7 cultural expectation of somebody assigned male at
8 birth is to develop a male identity.
9    Q.   You use the DSM-5 to diagnose patients
10 with gender dysphoria, correct?
11    A.   Correct.
12    Q.   Would you ever recommend puberty
13 blockers for a patient who does not satisfy the
14 diagnostic criteria of the DSM-5?
15    A.   Specifically for gender dysphoria?
16    Q.   Yes.
17    A.   No. Gender dysphoria is a required
18 diagnosis to make the recommendation of
19 puberty-blocking agents specifically for gender
20 dysphoria.
21    Q.   And the same is true for cross-sex
22 hormones as a treatment for gender dysphoria,
23 correct?
24    A.   The diagnosis of gender dysphoria is a

21 (Pages 78 - 81)

Page 82

1  required element of that process?
2     Q.   And the same is true for surgery,
3  correct?
4     A.   Correct.
5     Q.   Do you think it would be inappropriate
6  for a mental health provider to recommend these
7  interventions for a patient who does not satisfy
8  the diagnostic criteria of the DSM-5?
9     A.   I would really need to know the
10 specifics and the specific context for that
11 recommendation before making any judgments.
12    Q.   In what situation would it be
13 appropriate to do that?
14    A.   It's hard for me to say because it feels
15 very hypothetical.  I have worked with some
16 therapists who don't like the diagnosis of gender
17 dysphoria, so maybe the patient has met all of the
18 diagnostic criteria for gender dysphoria, but the
19 individual working with that patient does not like
20 using that diagnosis.  There might be a context for
21 that.
22    Q.   My question was about satisfying the
23 diagnostic criteria, not so much labelling the
24 diagnosis.  So the question is, would it be

Page 83

1  inappropriate for a mental health provider to
2  recommend puberty blockers as a treatment for
3  gender dysphoria if the patient does not satisfy
4  the diagnostic criteria of the DSM-5?
5     A.   The current standards of care recommend
6  that a diagnosis of gender dysphoria be met prior
7  to the initiation of puberty blockers.
8     Q.   Do you think it would require that?
9     A.   I do personally, yes.
10    Q.   Why?
11    A.   A diagnosis of gender dysphoria or
12 gender dysphoria not otherwise specified is the
13 framework by which most of the studies that have
14 been done in this population hangs on, so the best
15 evidence that we have is that these treatments are
16 effective for youth with that diagnosis.
17    Q.   Why don't you use the ICD-11?
18    A.   I do use the ICD-11.
19    Q.   Would you ever recommend puberty
20 blockers as a treatment for gender dysphoria in a
21 patient who satisfied the diagnosis for gender
22 incongruence under the ICD-11 but did not satisfy
23 the diagnostic criteria for gender dysphoria under
24 the DSM-5?

Page 84

1     A.   I use the ICD in the context of billing
2  and not in the context of clinical care.  In the
3  process of clinical care, we are using the
4  diagnosis of gender dysphoria to make
5  recommendations.
6     Q.   Is there any substantive difference
7  between the definition of gender dysphoria under
8  the DSM-5 and gender incongruence under the ICD-11?
9     A.   I'm more familiar with the DSM-5
10 criteria for gender dysphoria than the specific
11 criteria listed under the ICD for gender
12 incongruence.  One substantive difference is that
13 gender dysphoria is listed in the DSM as a
14 psychiatric condition and gender incongruence is
15 not.
16    Q.   Do you recall, does gender incongruence
17 require the presence of distress associated with
18 the incongruence?
19    A.   I would be happy to review the ICD-11
20 criteria, if you have it.
21    Q.   But as you sit here, you don't know the
22 answer to that?
23    A.   Yeah, as I don't use the ICD in everyday
24 clinical practice, so it's not something that I can

Page 85

1  recall.
2     Q.   Do you agree that the DSM-5 requires the
3  presence of distress to make the diagnosis?
4     A.   Yes.
5         (WHEREUPON, a certain document was
6          marked Janssen Deposition Exhibit
7          No. 5, for identification.)
8  BY MR. RAMER:
9     Q.   And the court reporter is handing you
10 Janssen Exhibit 5, and does this appear to be the
11 definition of gender incongruence from the ICD-11?
12    A.   I would assume so, yes.
13    Q.   And so do you agree that this definition
14 does not require the presence of distress?
15    A.   If you give me a moment, I'll read it.
16 The word "distress" is not used.
17    Q.   So an individual can be diagnosed with
18 gender incongruence under the ICD-11 even though
19 the individual is not experiencing distress,
20 correct?
21    A.   Distress is a term that -- it's a term
22 of art, and if we look at the gender incongruence
23 in childhood definition as an example, it includes
24 a strong desire to be of a different gender than

22 (Pages 82 - 85)

1 the assigned sex, a strong dislike on the child's
2 part of his or her sexual anatomy or anticipated
3 secondary sex characteristics and/or a strong
4 desire for the primary and/or anticipated secondary
5 sex characteristics that match the experience
6 gender.
7          Strong dislike does not sound like
8 distress in the context of this definition.  The
9 way that this looks clinically is highly
10 distressing for most of the patients that have --
11 that meet all of these characteristics, but the
12 distress is often inherent into that dislike and
13 that incongruence, so it's often implied, even if
14 it is not a specific term that is used in this
15 definition.
16     Q.   Does the gender incongruence for
17 adolescents require the strong dislike that you
18 just discussed?
19     A.   Again, there's a difference between the
20 pragmatic approach to this work and what is
21 specifically documented.  It does not specifically
22 say, Distress is a required element, the way that
23 it does in the DSM-5.
24     Q.   Do you diagnose gender dysphoria in

1 children?
2     A.   Yes.
3          (WHEREUPON, a certain document was
4          marked Janssen Deposition Exhibit
5          No. 6, for identification.)
6 BY MR. RAMER:
7     Q.   The court reporter has handed you what
8 has been marked as Janssen Exhibit 6, and it says,
9 Diagnostic and Statistical Manual of Mental
10 Disorders on the first page; is that right?
11     A.   That is correct.
12     Q.   And then I'll just represent to you,
13 this is an excerpt from that.  It's not the entire
14 DSM that has been produced as an exhibit.
15          On the second page of this exhibit, do
16 you see the diagnostic criteria for gender
17 dysphoria in children?
18     A.   Yes.
19     Q.   And in Part A, it refers to a marked
20 incongruence between one's experience/expressed
21 gender and assigned gender; is that right?
22     A.   Yes.
23     Q.   How does one determine whether an
24 incongruence is marked or not?

1     A.   Again, it's a term of art.  Is it
2 consistent, what is the degree of distress, and is
3 it supported by additional criteria that are listed
4 between -- that are labelled 1 through 8.
5     Q.   And why does the DSM require six months'
6 duration of this marked incongruence?
7     A.   It requires a consistency of identity
8 incongruence and distress in order to approve
9 specificity of the diagnosis.
10     Q.   Why -- sorry.  Why does the length of
11 time matter?
12     A.   There's a difference between transient
13 questioning of one's identity and a consistent
14 incongruence over time.
15     Q.   And six months is how you determine
16 whether it's transient or consistent?
17     A.   That is the amount that is required for
18 the diagnosis.  In practice, we typically see much
19 longer time periods of consistent incongruence.
20     Q.   Do you ever see the transient
21 incongruence that you referenced?
22     A.   Yes.
23     Q.   What does that look like in clinical
24 practice?

1     A.   In clinical practice, you have
2 individuals who are wondering and questioning their
3 gender identity in a way that is misaligned with
4 their sex assigned at birth, but after further
5 explanation or exploration, don't consistently
6 continue to have that incongruence experienced.
7     Q.   In Criterion 6 here, what are typically
8 masculine toys?
9     A.   That is culturally bound, so it's going
10 to depend upon the cultural context in which that
11 child is raised.
12     Q.   So in the culture here, what is a
13 typically masculine toy?
14     A.   It's a -- as an example, I'm dating
15 myself, but GI Joe, sports, wrestling.  These are
16 kind of things that are stereotypically associated
17 with boys more so than girls.
18     Q.   And rough and tumble play, would that be
19 like the wrestling you just mentioned?
20     A.   Sure.
21     Q.   Why is that part of the criterion for
22 gender dysphoria in boys?
23     A.   How much time do you have?
24     Q.   I would say five and a half hours, but

1 I'm not inviting you to --
2     A.   For me to answer this question
3 accurately would probably take about an hour to
4 kind of go through the developmental processes of
5 gender, so I will try to tailor it and narrow it
6 down to just a minute or two, which is to say that
7 development is a nonlinear process, and the
8 multiple aspects of gender identity development
9 happen over time in different ways for different
10 people.  So some youth who in adulthood are clearly
11 transgender, stably transgender, have been
12 transgender --
13     THE REPORTER:  Sorry.
14 BY THE WITNESS:
15     A.   Oh, slower.  I have to fit it into a
16 minute.
17         Some youth who as adults have been
18 transgender forever, can point to experiences in
19 childhood in which they were not 100 percent clear
20 around identity, and yet had some digressions or
21 transgressions of expected gender norms in
22 childhood that predated the conscious awareness
23 that their identity was incongruent with their sex
24 assigned at birth.  I don't know that I'm trans.  I

1 just know that I like being around boys.  I like
2 doing all of the things that boys are doing, and
3 that is -- that is what feels good to me.
4         So in childhood prior to development of
5 the metacognitive processes that are required to
6 investigate one's identity, label one's identity,
7 we have stand-ins that are gender role based
8 behaviors that point us in a direction that maybe
9 there's something happening here when it comes to
10 gender.
11         It is one criteria but not all criteria.
12 And you did not ask this question, but I'm going to
13 answer this question, which is to say that one of
14 the changes between DSM-IV and DSM-5 requires a 1,
15 which is the strong desire to be the other gender
16 or an insistence that one is of the other gender.
17 So a core sense of difference or incongruence
18 between one's expressed identity and one's assigned
19 identity is integral to the diagnosis of gender
20 dysphoria in childhood.
21     Q.   So then going to the next page where it
22 lists the diagnostic criteria for gender dysphoria
23 in adolescents and adults.  Do you see that?
24     A.   I do.

1     Q.   Down in Criterion 6, it refers to a
2 strong conviction that one has the typical feelings
3 and reactions of the other gender or some
4 alternative gender different from one's assigned
5 gender.  Do you see that?
6     A.   I do.
7     Q.   And what are the typical feelings of the
8 female gender?
9     A.   I do not ascribe to be able to
10 articulate what are typical feelings of the entire
11 female gender across all cultures and contexts.
12 What I'm going to be asking in my clinical
13 assessments is, What is this like for your family
14 in your culture, in your context?  What are your
15 archetypes for female reactions, behaviors,
16 expectations, and what have been your experiences
17 in that realm.  What feels the same?  What feels
18 different?
19         It's much more nuanced and
20 context-driven discussion than it appears to be
21 just by reading the text alone.
22     Q.   And so you ask the patient, What do you
23 think the typical feelings of the female gender
24 are?  And then ask, Do you feel those feelings?  Or

1 how does it work?
2     A.   It's hopefully slightly less clumsy than
3 that.  Typically, the patient has self-identified
4 experiences.  They are telling their story.  Tell
5 me about your experience.  Tell me what you are
6 looking for.  Tell me about what childhood was like
7 for you.  Tell me about your family.  Tell me about
8 the women in your family.  Tell me about the men in
9 your family.
10         Typically, when we are working with
11 older adolescents and adults, open-ended questions
12 elicit more content than close-ended questions.
13 And so part of the job of us as mental
14 professionals and in our training is to be able to
15 adapt our interview processes to be able to elicit
16 the most information in order to make these
17 diagnoses.  If it were just about the check boxes,
18 we could send people forms and give good care based
19 upon the responses to those forms.
20         But good mental health care requires
21 looking at nuance, looking at responses, body
22 reactions, context, cultural phenomenon, et cetera.
23     Q.   It seems though that if you do it that
24 way, through asking them to tell you about these

Page 94

1 various things, that then it does fall to you to
2 decide, is this a typical feeling of the other
3 gender or not?
4      A.   In some ways it falls to the diagnosing
5 provider to assign whether or not a diagnostic
6 criteria has been met or not.  My point is that
7 the -- there's not one way of meeting this
8 criteria, that that is going to be culturally and
9 family bound based upon the expectations of that
10 patient.
11      Q.   The expectations about what the typical
12 feelings are for the other gender?
13      A.   Correct.  It's going to be different
14 here than it is in Afghanistan, than it is in
15 New York City, than it is in Toronto.
16      Q.   And so when you are diagnosing children
17 here, you are taking into account the typical
18 feelings of genders here in Chicago?
19      A.   No, because that is not a requirement
20 for the diagnosis of gender dysphoria in children.
21 For adolescents and adults, this is one of the
22 diagnostic criteria, and we are asking about more
23 microsystems.  It's not what is different in
24 Chicago, but it's more what is your understanding

Page 95

1 of what this means and what it means in your family
2 and what it means in your community.
3      Q.   So then it does sound like it's -- the
4 patient says, This is how I think females act --
5 let me restart.  The patient says, This is how --
6 these are the typical feelings of this particular
7 gender, and I have those feelings too, therefore I
8 satisfy this criterion?
9      A.   That is closer.  Yes, it is.  This is
10 how the women in my life respond in these
11 situations, and I find myself responding and
12 reacting in that kind of way as well.  Again, it's
13 one part of a whole.
14           On its own, it's not a particularly
15 meaningful construct, but when wrapped into the
16 rest of the diagnostic criteria, particularly the
17 incongruence, it's one data point among many that
18 we are gathering.
19      Q.   Do you think the DSM-5 improperly
20 pathologizes gender nonconformity?
21      A.   I don't.  I don't.
22      MR. RAMER:  We have been going for about an
23 hour, so let's go off the record.
24           (WHEREUPON, a recess was had.)

Page 96

1 BY MR. RAMER:
2      Q.   Dr. Janssen, do you think that
3 transgender identity has a biological basis?
4      A.   I do.
5      Q.   And what do you mean by that?
6      A.   It's complicated.  There's multiple
7 factors that are involved in transgender identity.
8 Probably -- I would point to the lived experience
9 of transgender people over eons and the fact that
10 transgender people have always existed despite many
11 attempts to change identities over time, and none
12 have proved successful.
13      Q.   When you say "multiple factors
14 involved," what do you mean by that?
15      A.   I mean, there's certainly implications
16 that there's biological components that predict
17 identity, that there are components that have to do
18 with hormonal milieu, particularly in utero.  There
19 are components of social experience and family
20 systems that influence how you express or
21 experience gender identity.
22           It's a complex multifactorial process,
23 which is why in psychiatry in particular, we tend
24 to approach our patients with a biopsychosocial

Page 97

1 formulation, meaning that -- really to capture the
2 essence of an individual's experience, we have to
3 understand the biological, psychological, and
4 social factors that influence the experience of
5 whatever distress is leading the patient to seek
6 care.
7      Q.   When you say that there are biological
8 components that predict identity, are you saying
9 that we are able to predict identity by examining
10 some sort of biological component?
11      A.   No.  There's no evidence to suggest that
12 we have a universal predictive machine that can
13 predict identity.  It's much more complex than
14 that.  But there are studies that have looked at
15 some of the biological constructs that are shared
16 among transgender individuals.
17      Q.   And what were they looking at, like
18 brain scans?
19      A.   Brain scans, brain imaging mostly.
20      Q.   Anything else?
21      A.   Twin studies.
22      Q.   And when did you reach the conclusion
23 that transgender identity has a biological basis?
24      A.   I don't think that I could tell you a

25 (Pages 94 - 97)

Page 98

1 specific date on that, but as I have been doing my
2 research, it has certainly been consistent with
3 what I have seen published and what I have
4 experienced in working with the patients that I
5 have had the privilege of being able to work with.
6    Q.  And was the basis for the conclusion the
7 studies that we just mentioned about brain scans
8 and twin studies and anything else?
9    A.  I think there's more to it than just
10 that. I think from a kind of literature review,
11 part of it is recognizing the amount of conversion
12 type interventions that many trans folks have been
13 exposed to in childhood that were unsuccessful.
14 The life histories and the reported life histories
15 of transgender adults in discussing their early
16 childhood experiences. The personal experiences
17 that I have had with patients who describe their
18 feelings and their experiences with identity in a
19 much more deterministic way, despite multiple
20 factors that might influence it one way or the
21 other, but the identity persists nevertheless. All
22 of these things come together for me to make that
23 conclusion.
24    Q.  Do you think that there's enough

Page 99

1 literature to provide a clear understanding of the
2 biological components of gender identity?
3    A.  I don't think biological components of
4 gender identity are sufficient in addressing the
5 complex needs and opportunities of our transgender
6 and gender-diverse patients. Just having a
7 biological underpinning of identity alone is not
8 going to be sufficient to recognize the whole
9 person that is in your office with you, and those
10 whole person's needs, wants, desires, hopes, fears,
11 challenges.
12    Q.  Is gender identity determined at birth?
13    A.  Gender identity is also a bit of a
14 complicated term that many people think about in
15 different ways. My expert testimony from my
16 recall, recollection from the statement --
17    Q.  And just for the record, is that your
18 expert report in front of you?
19    A.  Yes, it is.
20      -- is that there's an innate piece to
21 gender identity. There are factors that influence
22 the experience and expression of that gender
23 identity over time, but there is an innate
24 component of gender identity that is relatively

Page 100

1 fixed. Saying whether or not it exists at birth or
2 not, I think, is not aligned with developmental
3 processes that we understand developmental
4 processes to engage with. That an understanding of
5 one's identity can change over time but that does
6 not mean that it was not innate or fixed in some
7 way.
8    Q.  So the understanding of one's identity
9 is distinct from the gender identity itself; is
10 that right?
11    A.  That is correct.
12    Q.  And the gender identity itself is
13 innate; is that right?
14    A.  Correct.
15    Q.  And you think that that is fixed, right?
16    A.  Correct.
17    Q.  Do you think that gender identity is
18 informed by cultural -- excuse me.
19      Do you think that gender identity is
20 informed by culturally-defined expectations?
21    A.  I think that is a component of how
22 people understand and experience and express their
23 gender identity.
24    Q.  Again, you are drawing a distinction

Page 101

1 between the identity itself and their understanding
2 and expression of that identity; is that right?
3    A.  Yes.
4    Q.  And so the identity itself is not
5 informed by culturally-defined expectations; is
6 that right?
7    A.  I would say that it's not wholly
8 defined, that there is an element of gender
9 identity that is innate, yes, but it is primarily
10 the experience and expression of that gender
11 identity that is informed by cultural factors.
12    Q.  Is gender identity partly informed by
13 culturally-defined expectations?
14    A.  Sure. Because what it means to be of a
15 particular gender is different from one culture to
16 the next.
17    Q.  And if that is true, how can identity
18 also be biological?
19    A.  Let me see if I can figure out an
20 analogy or a metaphor that might make sense. And I
21 do and have taught on sexual orientation
22 development as well, so that is kind of where my
23 brain is going.
24      In the world of sexual orientation

26 (Pages 98 - 101)

1 development, sexual orientation or your sense of
2 attractiveness is something that we know is fixed.
3 That is something that is inherent. What you do
4 with those attractions is very different and how
5 you label those attractions is very different. In
6 an environment where it is unsafe to identify as a
7 gay person, as an example, you are going to have
8 people who have same sex sexual attractions who
9 nevertheless do not identify as gay or affirm
10 themselves as gay or behave in such a manner that
11 would label themselves as gay. Does it mean that
12 there are less gay people? No. It means that he
13 cultural milieu is such that it influences how one
14 is able to express the identity.
15      So with gender identity, there's a fixed
16 gender identity. There are factors that make
17 expression of that identity more and less safe,
18 more and less valid with more and less
19 consequences, and those factors influence that
20 expression of the gender identity. It does not
21 express or change the innate incongruence that is
22 present for transgender individuals.
23      Q.   So the gender identity itself, as
24 distinct from gender expression or understanding,

1 is not shaped by culture, right?
2      A.   Yeah. I would say that there's an
3 element of gender identity that is independent of
4 culture.
5      Q.   When you say "an element of gender
6 identity," what do you mean?
7      A.   Well, let me just talk about my clinical
8 experience. When I'm working with patients and we
9 are doing an assessment, it does not parse in such
10 a neat way. I don't have patients who describe,
11 Here is my gender identity, this is the element of
12 my gender identity that is influenced, this is how
13 I experience it in this kind of particular format.
14      When we are putting it in these parsed
15 kind of scientific terms, it's less relevant to the
16 patient's experience who talk about, This is how it
17 has felt to me, these are the cultural factors that
18 have informed how I feel and how I experience it.
19 These are the cultural factors and family factors
20 that influence how I express it, what feels
21 meaningful and important and valuable to me. It's
22 just a bit of a dichotomy that does not exist in
23 clinical practice.
24      Q.   I guess where I'm just getting a little

1 confused is, we are distinguishing between gender
2 identity, gender expression, gender understanding,
3 but then you are also referring to elements of
4 gender identity. And when you are doing that, are
5 you referring to only that first category, or are
6 you describing gender expression and gender
7 understanding as an element of gender identity?
8      A.   There's no way to put gender identity in
9 a vacuum. If there were, there would be a fixed
10 state of gender identity. But all of these factors
11 exist, and they are always co-occurring with this
12 core sense of development.
13      So I guess what I'm trying to say is
14 that there's a fixed element of gender identity.
15 How that gets expressed is culturally bound.
16      Q.   Okay. So can a person's gender identity
17 change?
18      A.   I don't think so, no.
19      Q.   And so gender identity is static?
20      A.   Yes.
21      Q.   And gender identity is not a choice?
22      A.   Gender identity is not a choice.
23      Q.   Is gender expression a choice?
24      A.   Yes.

1      Q.   And is the type of secondary sex
2 characteristics that a person desires a form of
3 gender expression?
4      A.   It can be for some people, yes.
5      Q.   Can it ever not be?
6      A.   There are certainly some individuals who
7 are less distressed by secondary sex
8 characteristics than others.
9      Q.   And how did you reach the conclusion
10 that a person's gender identity cannot change?
11      A.   That has been through my clinical
12 experience and a review of the literature.
13      Q.   Can you elaborate on what you have seen
14 in the literature and you have seen in your
15 clinical experience that led you to the conclusion
16 that a person's gender identity cannot change?
17      A.   Sure. We have unfortunately decades of
18 experience of clinicians who have tried to change
19 both sexual orientation and gender identity without
20 success, and with reports of individuals who have
21 gone through those types of treatments with an
22 attempt to change gender identity, have experienced
23 those treatments as quite harmful and at times
24 destructive.

27 (Pages 102 - 105)

1        So I think that provides support for my
2   conclusions that there's a fixed and unchangeable
3   element of gender identity.  Personally and in
4   clinical experience, I have worked with countless
5   adolescents, adults who wish to God they were not
6   transgender and have made every attempt possible to
7   not be, and yet the identity persists.  So that
8   supports it to me.
9        Q.   The first thing you were talking about,
10  is that colloquially known as conversion therapy?
11       A.   Correct, yes.
12       Q.   Do you see a distinction between someone
13  using conversion therapy to try to change someone's
14  gender identity and another individual's gender
15  identity organically changing?
16       A.   Well, the premise of the question sounds
17  like people's gender identity changes.  I think
18  people's understanding of gender identity and their
19  expression of that gender identity changes over
20  time.  I don't think it's a -- that fixed element
21  of gender identity is not something that changes
22  with psychotherapeutic intervention or with
23  conversion efforts.
24       Q.   What about just naturally as the person

1   grows?
2        A.   No.  Understanding evolution of -- how
3   you understand it and how you express it certainly
4   changes over time.
5        Q.   And so this is a hypothetical.  If you
6   have a natal female adolescent who identifies as a
7   male, is diagnosed with gender dysphoria, and two
8   years later the same individual says she now
9   identifies as a female and does not have gender
10  dysphoria, that person's gender identity has not
11  changed; is that right?
12       A.   Correct.
13       Q.   Only the individual's gender expression
14  has changed, right?
15       A.   And their understanding of their gender,
16  yes.
17       Q.   Okay.  And how do you know that?
18       A.   How do I know it?  "Knowing" is a term
19  that I don't like because it's not something that I
20  use in my day-to-day practice.  This is the
21  conclusion that I have come to from the review of
22  the literature and my experience working with these
23  patients.  I think to know something means that
24  there's a period at the end of that sentence as

1   opposed to continuously wanting to understand what
2   patients' experiences are.  And, in general, that
3   is my philosophy of care is, I work with the
4   patients that I'm working with, and I want them to
5   tell me about their experiences and what it means
6   to them.  So it's not a question that I feel like I
7   have a clear sense of knowing how to answer.
8        Q.   What in the literature or your clinical
9   practice lends support to this dichotomy between
10  gender identity and gender expression?
11       A.   I would go back to the same things that
12  I have discussed before, that there have been
13  countless efforts to change core gender identity
14  that have been unsuccessful.
15       Q.   Why can't those efforts be seen as
16  efforts to change gender expression?
17       A.   Because oftentimes the gender expression
18  does change and yet the core incongruence between
19  assigned gender and experienced gender are not
20  resolved.
21       Q.   When you say the gender expression
22  changes in response to conversion therapy, I mean,
23  that is effectively a compelled change, right?
24       A.   Not always, no.  I have had patients,

1   and it is not uncommon for patients to seek out
2   conversion efforts voluntarily.  Many people are
3   highly distressed by the concept of having a trans
4   identity and seek out efforts to change it.
5        Q.   So in the hypothetical of the natal
6   female adolescent who identifies as male and then
7   subsequently identifies as female, what is the
8   individual's gender identity?
9        A.   I could not tell you.
10       Q.   Why not?
11       A.   One, the individual patient is going to
12  have to tell me, but, two, they are now my patient
13  and there's a lot more than just two data points
14  that go into understanding an assessment of gender
15  identity.  It's a much more complicated evaluation
16  that we are doing with an actual patient.
17       Q.   If I said it's not possible to predict
18  with certainty a child's ultimate gender identity,
19  given what you have said about gender identity
20  today, is that statement even comprehensible?
21       A.   I would wholeheartedly agree with that
22  statement.  I'm not in the position of being a
23  psychic who can predict the future.  That is not
24  the job that I have as somebody who makes an

Page 110

1 assessment of these children.
2          My job is to assess the history and make
3 a diagnosis of gender dysphoria and understand the
4 individual's identity in the context of
5 biopsychosocial factors.
6    Q.   Why is it predicting the future, if you
7 are trying to determine the child's ultimate gender
8 identity as opposed to figuring out what the
9 biologic, static gender identity is presently?
10   A.   Because children don't live in vacuums.
11 They live in families and cultures that influence
12 how they understand and experience and whether they
13 are able to or whether they want to make changes in
14 how they express that over time.
15   Q.   Does gender identity evolve?
16   A.   One's understanding of it can evolve
17 over time.  The change in how one expresses it can
18 evolve over time.
19   Q.   But gender identity cannot evolve over
20 time?
21   A.   Yes.
22   Q.   Are you familiar with the term
23 "detransition"?
24   A.   Yes.

Page 111

1    Q.   And what is your understanding of that
2 term?
3    A.   The term "detransition" means different
4 things to different people, and it's one of the
5 biggest challenges in talking about detransition
6 because nobody is working from the same definition.
7    Q.   What is your definition?
8    A.   I don't have a specific definition
9 because what I'm going to ask is, patients who have
10 gone through a process, to name and describe what
11 that process is rather than ascribe a term to it
12 that may or may not apply to them.
13          In general, most people are referring to
14 detransitioned as a person who has made steps
15 towards typically medical transition that have
16 opted to stop medical transition.  Some people
17 refer to just those who have had surgical
18 transition.  Some people refer to it, those who
19 have had social transition.  Some people refer to
20 it who have made no steps towards transition at
21 all.  Some people include people who have a
22 tremendous amount of distress and some people do
23 not.
24          So there's probably ten plus cohorts of

Page 112

1 individuals that are classified colloquially as
2 detransitioners that probably don't belong
3 together.
4    Q.   But in all of those cases, what is
5 really happening is just the individual's gender
6 expression or gender understanding is changing,
7 right?
8    A.   Not necessarily, no.
9    Q.   What else could be going on?
10   A.   Oftentimes what we see are people
11 stopping treatment because they lack access to it.
12 They lose access to it.  Their insurance changes.
13 Their family is unsupportive.  They are in a work
14 environment that does not allow gender transition
15 safely.  They have other things going on in their
16 life that are pressing.
17          There's a lot of other reasons that
18 individuals stop transitioning other than my
19 experience and my culturally bound experience of my
20 expression of gender has changed.
21   Q.   But nobody has ever detransitioned
22 because their gender identity has changed, right?
23   A.   Well, what I have testified to is that
24 there's an innate piece of gender identity that is

Page 113

1 not changeable.
2    Q.   So it seemed like the answer then has to
3 be yes?
4    A.   I think that is correct.
5    Q.   Do you agree that gender is a spectrum?
6    A.   Yeah, I do.
7    Q.   Can you just explain what that means?
8    A.   Sure.  So there's a range of intensity
9 and valence of gender identity across the spectrum
10 between masculinity and femininity, between male
11 and female, and even within our bodies, there's a
12 range of hormonal expression, there's a range of
13 how our genitals look.
14   Q.   And do you agree that an adolescent can
15 be diagnosed with gender dysphoria even if the
16 adolescent does not identify as the other gender?
17   A.   Yes.  There are alternative gender
18 categories that many adolescents may use to
19 describe their sense of incongruence.
20   Q.   So, for example, an individual who
21 identifies as nonbinary can still be diagnosed with
22 gender dysphoria, correct?
23   A.   That is correct.
24   Q.   And if medically indicated, it would

29 (Pages 110 - 113)

Page 114

1 still be appropriate to recommend puberty blockers
2 for cross-sex hormones for that individual,
3 correct?
4     A.   If after an assessment that is done with
5 the expected elements of that assessment, by the
6 people who are appropriate for doing that
7 assessment, and it's indicated to be medically
8 necessary, yes, it is indicated in those
9 situations.
10    Q.   And what do the secondary sex
11 characteristics of a nonbinary person look like?
12    A.   Secondary sex characteristics are
13 determined by the hormonal milieu, not by the
14 identity.
15    Q.   How is that responsive -- what do you
16 mean by that?
17    A.   It depends upon -- for a person with a
18 nonbinary identity, unless I know how much
19 testosterone or estrogen that they have in their
20 system, I have no way of predicting what their
21 secondary sex characteristics would be.
22    Q.   If you have -- this is a hypothetical.
23 If you have a natal male adolescent who is
24 suffering from severe psychological distress

Page 115

1 because he desires more masculine secondary sex
2 characteristics, would you recommend testosterone
3 for that patient?
4     MR. RAY:  Object to form.
5 BY THE WITNESS:
6     A.   As somebody who is working with kids
7 with gender dysphoria and gender-diverse identities
8 in your hypothetical, somebody who is assigned male
9 at birth who has an identity of male does not have
10 an incongruence between assigned sex at birth and
11 gender identity and, thus, would not meet criteria
12 for A1 of gender dysphoria and would not --
13 necessarily would not be eligible for treatments
14 for gender dysphoria if the diagnosis of gender
15 dysphoria is not present.
16 BY MR. RAMER:
17    Q.   How would you treat that patient for
18 their severe distress?
19    A.   It's a hypothetical patient that I have
20 never encountered in all of my clinical practice.
21    Q.   Given your experience, if this
22 hypothetical patient was presented to you, how
23 would you go about it?
24    MR. RAY:  Object to the form.

Page 116

1 BY THE WITNESS:
2     A.   It has never occurred to me.  If a
3 patient comes in and experiences distress, I'm
4 going to do an assessment and understand where that
5 distress comes from.  I can't really speak to
6 specifics unless I have an actual patient in front
7 of me with whom I have done a biopsychosocial
8 formulation in order to make a diagnosis and a
9 treatment plan that is effective for the specific
10 needs of that individual patient.
11    Q.   Why can a natal male be diagnosed with
12 gender dysphoria only if the incongruence leads to
13 desire for more feminine secondary sex
14 characteristics?
15    A.   The diagnosis of gender dysphoria is
16 inherently based on the incongruence between sex
17 assigned at birth and identity.
18    Q.   Do you think that the distinction
19 between male assigned at birth and nonbinary is an
20 incongruence?
21    A.   I do.
22    Q.   How is that different from what I'm
23 describing?
24    A.   Because it's a different

Page 117

1 characterization.  Patients describe it as
2 incredibly different.
3     Q.   What do you mean by that?
4     A.   There's an incongruence, that it's not a
5 matter of degree as in your hypothetical.  I'm a
6 man, but I wish I were more masculine is different
7 than, I'm not a man and everybody thinks that I'm a
8 man.  That is a separate experience and a separate
9 category that is aligned with a diagnosis of gender
10 dysphoria.  Whereas, your hypothetical likely would
11 not be.
12    Q.   But if gender is a spectrum as opposed
13 to binary, I don't see how that conclusion can
14 hold.
15    A.   I guess I'm confused by the question.
16    Q.   So is there anything in between
17 nonbinary and identifying as a male?
18    A.   It depends upon who you are asking.
19 Many people have different terms to describe
20 different experiences.  Practically speaking, when
21 I'm working with adolescents in particular, I'm
22 asking for them to describe their own terms, and
23 what is important about the DSM-5 diagnostic
24 criteria for gender dysphoria is a lot of things.

30 (Pages 114 - 117)

Page 118

1 Among them, that there is an incongruence between
2 the assigned sex at birth and the identity.
3        There's not alignment but that there's
4 incongruence, and that there is distress and
5 impairment, that that is an integral part of the
6 diagnosis.  There's lots of people with distress
7 that don't have the incongruence.  There's fewer
8 people who have incongruence without the distress,
9 but that also can happen, as we talked about at the
10 beginning.
11     Q.   So taking into account the gender
12 spectrum that you described earlier and you have a
13 male assigned at birth, gender dysphoria can only
14 run one way, which is toward the feminine end of
15 the spectrum; is that right?
16     A.   So there's multiple categories that go
17 into gender.  There's gender identity, which is the
18 piece that you are assessing in terms of the
19 incongruence.  You are assigned this sex at birth,
20 you are assigned male at birth, some incongruence
21 with that is required.
22        That is different from gender role or
23 gender-based expression.  These are the culturally
24 bound elements of gender that define what

Page 119

1 masculinity and femininity are in the United States
2 versus anywhere else in any other culture.  The
3 concept of masculinity is culturally bound as a
4 phenomenon.  What is masculine is different in one
5 culture compared to the next.  That is separate
6 from the concept of gender identity, which is, by
7 the definition of gender dysphoria, incongruent
8 with the sex assigned at birth.
9        You can have people who have a gender
10 identity as more feminine who, nevertheless, have a
11 more masculine appearance that their gender
12 role-based behaviors are separate from their gender
13 identity.  But to make a diagnosis of gender
14 dysphoria, there's an incongruence between the sex
15 assigned at birth and that core gender identity.
16     Q.   And for a natal male, the incongruence
17 you are discussing has to go in the feminine
18 direction on the spectrum; isn't that right?
19     A.   Or towards a nonbinary or a gender
20 direction.  It has to go away from male.
21     Q.   Do you agree research has not been
22 conclusive about what percentage of youth will
23 eventually experience a desire to detransition?
24     A.   I think there's very little that is

Page 120

1 conclusive, so, yes, I would agree with that
2 statement.
3     Q.   Do you think that we have good evidence
4 about what percentage of youth will eventually
5 experience a desire to detransition?
6     A.   The best evidence that we have from
7 longitudinal studies as well as from large
8 population-based studies show that the rates of
9 people who regret their transition or stop their
10 transition are incredibly low.
11     Q.   Do you see a distinction between
12 describing the best evidence that we have and
13 describing evidence sufficient to make a confident
14 decision about an outcome?
15     A.   Well, I can't make any decisions other
16 than with the best evidence that we have, so that
17 statement will always be true, whether that is
18 today, whether that is 40 years from now.  I'm
19 always going to be making a decision based upon the
20 best evidence that we have.
21     Q.   Could there ever be a situation where
22 there's some evidence but you don't think it is
23 enough to warrant recommending a particular
24 intervention?

Page 121

1     A.   Sure.
2     Q.   What is an example?
3     A.   Off the top of my head, use of ketamine
4 for adolescents with bipolar disorder, there's some
5 evidence but probably not enough right now for me
6 to make a recommendation for it in my practice.
7     Q.   And why not?
8     A.   In part because there has not been a
9 long track record of published data in the field,
10 only a year or two of actual study.
11     Q.   And the risk could be extreme or
12 something, or what is on the other side?
13     A.   Yeah, potentially.  Yeah, that the risks
14 are less well-known.
15     Q.   And what would it take for you to feel
16 confident prescribing ketamine as that treatment?
17     A.   Probably nothing because that is not the
18 population of patients that I typically would work
19 with.  I feel lucky to be in an academic
20 environment, so in these contexts, it's about
21 finding people who have actual clinical experience
22 working in this population who are doing some of
23 the research and can start building some of the
24 evidence base to support this.

31 (Pages 118 - 121)

1     Q.   Do you agree that adolescence plays a
2  role in the crystallization of one's gender
3  identity?
4     A.   For some people, yes.
5     Q.   And what do you mean by that?
6     A.   There's no one correct trajectory to
7  come to a transgender identity.  Some people come
8  to it as early as 2 to 3, have real clear
9  recognition and expression of gender identity.
10 Other people don't come to recognize their
11 transgender or gender-diverse identity until late
12 into adulthood, so there's no one right way of
13 going through this process.  That is what I mean by
14 it.
15    Q.   And have you ever heard the phrase
16 "gender identity development"?
17    A.   Sure.
18    Q.   And what is your understanding of that
19 phrase?
20    A.   My understanding of that phrase is that
21 is a complex biosocial process that involves
22 multiple developmental tasks over multiple areas
23 over multiple time points.
24    Q.   I'm sorry.  I missed you toward the end.

1  Could you repeat that?
2     A.   Multiple areas, multiple time points via
3  psychosocial developments.
4     Q.   Do you agree that the etiologic process
5  of gender identity development is unclear?
6     A.   I think it's not fully explicated.
7  There are elements that are clear.
8         (WHEREUPON, a certain document was
9         marked Janssen Deposition Exhibit
10        No. 7, for identification.)
11 BY MR. RAMER:
12    Q.   All right.  And the court reporter has
13 handed you what has been marked as Exhibit 7, and
14 it says, Expert Report of Aron Janssen on the
15 front; is that right?
16    A.   It does say that, yes.
17    Q.   And is this the expert report that you
18 submitted in this case?
19    A.   It looks like it, yes.
20    Q.   And on page 10, you refer to something
21 you discussed briefly today, where you talk about
22 conducting an assessment for each patient, correct?
23    A.   Uh-huh, correct.
24    Q.   And is this assessment required by the

1  SOC 8?
2     A.   It depends upon the context.
3     Q.   How so?
4     A.   A mental health assessment is required
5  if one is considering one of the medical
6  interventions for adolescents.
7     Q.   And so a provider has to conduct this
8  assessment before recommending puberty blockers as
9  a treatment for gender dysphoria, correct?
10    A.   That is correct.
11    Q.   And same for cross-sex hormones for
12 adolescents, correct?
13    A.   Correct.
14    Q.   And same for surgery for adolescents,
15 correct?
16    A.   Correct.
17    Q.   And is the assessment for adults the
18 same as the assessment for adolescents?
19    A.   It depends upon the context.  In some
20 clinics the assessment for adults is the same, and
21 in our clinic, as an example, we see young adults
22 and our assessment process is the same.
23    Q.   And just as a general matter, what is
24 the purpose of this assessment?

1     A.   As a general matter, the purpose of the
2  assessment is to, one, evaluate the mental health
3  of the individual who is seeking care, assess
4  whether or not a diagnosis of gender dysphoria is
5  present, assess the impact of the diagnosis of
6  gender dysphoria on the individual's functioning,
7  assess whether any co-occurring mental health
8  disorders or mental illnesses are present and what
9  role, if any, they have on the experience and
10 understanding of that individual's gender identity,
11 that you are understanding the family and social
12 context in which this patient lives, that you are
13 understanding what the patient is hoping for in
14 seeking out care, and eventually to the point where
15 one is understanding the expectations of whether or
16 not a patient can and does understand the risks,
17 benefits, and alternatives of that intervention as
18 well as in the case of children and adolescents,
19 whether the decision maker, most of the time being
20 a parent, is aligned with the child's -- or child's
21 preferences and wishes and is able to provide an
22 informed consent to whatever intervention that you
23 are recommending after discussion of those risks,
24 benefits, and alternatives.

32 (Pages 122 - 125)

Page 126

1   Q.   And do you think the assessment requires
2 a discussion of all of those things that you just
3 listed?
4   A.   I do, yes.
5   Q.   And in your clinic, are the mental
6 health professionals responsibile for performing
7 the initial assessment?
8   A.   It depends upon which route the
9 individuals are entering the clinic.  The majority
10 of the patients who enter our clinic do so in a
11 multidisciplinary assessment, where there are
12 medical and mental health providers together in the
13 assessment.
14   Q.   Would there ever be an assessment where
15 there is not a mental health provider involved?
16   A.   There's any kind of assessment one could
17 imagine, but in terms of what is recommended as a
18 part of the standard of care, if you were
19 considering a medical intervention as an
20 adolescent, a mental health evaluation is a
21 requirement of that process.  Where it fits in the
22 process, there's a fair amount of variability.
23   Q.   I guess my question is, who conducts
24 that assessment that you were just describing?

Page 127

1   A.   For children and adolescents, primarily
2 that is mental health providers.
3   Q.   But not exclusively?
4   A.   I can't speak to how practice happens
5 throughout the entirety of the world but that has
6 been the experience in all of the clinics that
7 I have talked to and all of the clinicians that I
8 have worked with over the years.
9   Q.   When you say "that has been the
10 experience," you mean that the mental health
11 provider is the one conducting this assessment that
12 we are discussing in your report?
13   A.   Correct.
14   Q.   Under the SOC 8, does it have to be a
15 mental health professional who conducts this
16 assessment?
17   A.   I would have to review the specific
18 assessment chapter and the adolescent chapter to
19 make a fierce determination that I was certain of.
20 It requires a qualified mental health professional
21 for assessment of the mental health needs in
22 children, yes.
23   Q.   And for adolescents, do you think that
24 the assessor should be a mental health

Page 128

1 professional?
2   A.   I do, yes, but part of what we recognize
3 is that this is a global context in which we work,
4 and so there are going to be other countries that
5 don't have access to mental health professionals.
6 In the United States, do I think that a mental
7 health professional should be a part of the
8 assessment?  Yes, I do.
9   Q.   And how long does an adequate assessment
10 take?
11   A.   It depends upon the complexity of the
12 child and the system in which they live.
13   Q.   What is the shortest assessment that you
14 have ever conducted?
15   A.   The shortest assessment that I have ever
16 conducted in what context?
17   Q.   The context that we are talking about.
18 What do you mean?  The context of assessing an
19 adolescent for pubertal suppression.
20   A.   I mean, that helps, right, because that
21 is a specific context.  I have patients consult
22 with me and are not interested in treatments other
23 than information, and that is going to be a shorter
24 assessment or valuation time than somebody who is

Page 129

1 seeking out a medical intervention.
2       The shortest assessment that I have done
3 for puberty blockers probably is, if I were to
4 guess, on the order of four to six hours over
5 several sessions.
6   Q.   Do you think that it would be possible
7 to adequately assess all of the items that you
8 described that are part of the assessment in
9 60 minutes?
10   A.   Sometimes, yes.
11   Q.   But that has never happened for you?
12   A.   It has not happened for me, in part
13 because of how my clinic is structured.  The times
14 in which it would happen would be individuals that
15 have had ongoing mental health treatment by a
16 provider over an extended period of time in which
17 those of us who are doing the final assessment are
18 in a consultative role with those individuals.
19   Q.   So what you are describing is a
20 situation where an individual has been working with
21 a mental health provider outside of the clinic,
22 then the individual comes to the multidisciplinary
23 clinic and you don't -- basically, you don't have
24 to start from ground zero, is that the point?

33 (Pages 126 - 129)

Page 130

1    A.   Correct.  It's about -- there's not any
2  magic about the time spent.  It's about the content
3  of the assessment, and there's a lot in there.  And
4  some people are more efficient than others, some
5  have outside providers that can gather a lot of
6  information ahead of time.  Others do not, and so
7  length of time is going to be incredibly variable
8  from one clinic practice to another.
9         The important part is that the
10  components of the assessment that are required to
11  make a recommendation are made, and whatever time
12  that takes is the time that it should take.
13    Q.   At your clinic, do you ever receive
14  letters of -- "recommendation" may not be the right
15  word, but letters from mental health professionals
16  outside of the clinic recommending a patient for
17  pubertal suppression, for example?
18    A.   Yes.
19    Q.   And do you take those letters at face
20  value, or do you inspect the basis for the
21  conclusions in them?
22    A.   Our process at our clinic is that we
23  liaise with the community therapists that are
24  writing that letter to have a discussion about the

Page 131

1  content of the letter and to vet the practice and
2  the assessment processes that these patients have
3  undergone.
4    Q.   Do you think that that's a best
5  practice?
6    A.   I think it's a best practice.  It's not
7  a required element, but it's what we have come to
8  as believing is in the best of interest of the
9  patient.
10    Q.   Have you ever recommended puberty
11  blockers as a treatment for gender dysphoria after
12  just one meeting with a patient?
13    A.   I cannot recall all of my patient
14  encounters.
15    Q.   But that is not outside of the realm of
16  possibility?
17    MR. RAY:  Object to form.
18  BY THE WITNESS:
19    A.   I think in the context of a patient who
20  had already been under care with a qualified gender
21  health provider, who had already made a decision
22  and was looking for a second opinion, it is
23  conceivable in that hypothetical that I might
24  recommend it after one session.

Page 132

1  BY MR. RAMER:
2    Q.   What about outside of that context?
3    A.   That would be atypical for me.
4    Q.   But you can't say it has never happened?
5    A.   I would have to go through hundreds and
6  hundreds of charts to say with certainty, so I
7  don't know, is the honest answer.
8    Q.   And you may have mentioned this earlier,
9  but besides the patient as part of this assessment
10  process, who else are you talking to?
11    A.   Relevant informants, whomever they may
12  be.  Our process is to speak to as many people as
13  we can, so certainly primary caregivers, whomever
14  that may be.
15         Whenever possible in child mental
16  health, kids live in systems, so how they are
17  responding when they are at home is different than
18  how they are responding when they are at school,
19  which is different than how they are responding on
20  sports teams and religious contexts.  So we want to
21  gather as much information about the different
22  systems that a child is engaged with.
23         At a minimum, we require parent
24  involvement, but at a maximum, often we are

Page 133

1  incorporating information from school, community
2  leaders, et cetera.
3    Q.   Other care providers, outside of the
4  clinic?
5    A.   Yeah, and other therapists, other
6  physicians.  Anybody who has context to provide, we
7  welcome.
8    Q.   Do you ever talk to teachers?
9    A.   Yes.
10    Q.   Siblings?
11    A.   Yes.
12    Q.   And do you typically receive the
13  patient's medical records from the other providers?
14    A.   These days typically the medical records
15  are accessible via the electronic medical record,
16  so when they have provided us consent for us to
17  review outside records, we will review those.
18    Q.   Do you require that as part of your
19  treatment of a patient?
20    A.   That outside medical records are
21  reviewed?
22    Q.   That you are able to access and review
23  their medical records.
24    A.   It's not a required element and is not

34 (Pages 130 - 133)

Page 134

1 often relevant, but when it's relevant, we will do
2 everything that we can to obtain consent. I have
3 never had an issue with anybody not providing
4 consent to looking at old records.
5      Q.   Switching gears a little bit. As a
6 theoretical matter, are you familiar with the
7 distinction between an informed consent model of
8 care and an assessment model of care?
9      A.   That is -- it's a false dichotomy. To
10 me, as I hear that question, it implies that
11 informed consent does not have an assessment, and
12 informed consent is discussing a treatment option
13 where you are reviewing the risks, benefits,
14 alternatives, expected impact, expected downsides
15 and capacity to consent, all of which requires an
16 assessment.
17      Q.   What about a distinction -- are you
18 familiar with the distinction between an informed
19 consent model of care and a gatekeeping model of
20 care?
21      A.   All of these are kind of colloquial
22 terms to describe different models of health care
23 delivery more specifically within the adult care
24 space.

Page 135

1      Q.   Why more specifically within the adult
2 care space?
3      A.   The recommendations are such that for a
4 child and adolescent who is seeking out medical
5 interventions, that a mental health assessment by a
6 qualified mental health provider is a required
7 element of this care. For adults seeking medical
8 interventions, sometimes an informed consent
9 process in which there is no mental health
10 professional doing the assessment is a standard
11 work flow.
12      Q.   In your view, is one model better than
13 the other?
14      A.   I think it's context dependent. I think
15 some models work better for some people and some
16 models work better for others.
17      Q.   For treating gender dysphoria, is one
18 model better than the other?
19      A.   It's person dependent, not diagnosis
20 dependent.
21      Q.   Is it person dependent for treating
22 gender dysphoria in adolescents as well?
23      A.   In adolescents, the recommendations from
24 the standards of care is that a mental health

Page 136

1 professional do an assessment of the patient prior
2 to initiation of care, and that is my practice as
3 well.
4      Q.   And do you think that -- I mean, I guess
5 have you ever used the term "gatekeeping" to
6 describe a model of care?
7      A.   I have not.
8      Q.   Do you think that the SOC 8
9 represents -- well, I guess would it be a false
10 dichotomy to even ask the question of whether the
11 SOC 8 represents an informed consent model or an
12 assessment model?
13      A.   It would be a false dichotomy. The
14 SOC 8 recommends assessment occur prior to
15 initiation of any medical care regardless of age
16 and requires a mental health assessment by a
17 qualified mental health assessor to be done prior
18 to initiation of any medical care for an
19 adolescent.
20      Q.   Do you think that the SOC 8 places
21 mental health providers in the role of gatekeeper?
22      A.   I reject the term, so no.
23
24

Page 137

1           (WHEREUPON, a certain document was
2           marked Janssen Deposition Exhibit
3           No. 8, for identification.)
4 BY MR. RAMER:
5      Q.   And the court reporter has handed you
6 what has been marked as Exhibit 8; is that right?
7      A.   Yes.
8      Q.   And Exhibit 8 is an article entitled
9 Readiness Assessments for Gender-Affirming Surgical
10 Treatments, A Systematic Scoping Review of
11 Historical Practices and Changing Ethical
12 Considerations; is that right?
13      A.   That is right.
14      Q.   And did you help author this?
15      A.   I did.
16      Q.   And at the bottom of page 1, I'm just
17 going to read this last sentence that carries over
18 onto the next page, and I'll first ask if I read it
19 correctly.
20           It says, We identified a trend across
21 successive iterations of the guidelines in both
22 reducing stigma against TGD individuals and shift
23 in ethical considerations from do no harm to the
24 core principle of patient autonomy. Did I read

35 (Pages 134 - 137)

1 that correctly?

2   A.   I'm not seeing where that is.

3   Q.   So on page 1 of the --

4   A.   Got it.  It went over to the next page.

5   Q.   Yeah.  Sorry.

6   A.   Got it.  Yes.

7   Q.   And can you explain what you meant by a

8 shift in ethical considerations from do no harm to

9 the core principle of patient autonomy?

10   A.   Sure.  So this is more specific to adult

11 care than it is to the care of children and

12 adolescents and is in reference to the changing

13 recommendations of standards of care prior to being

14 able to access medical or surgical interventions.

15       As an example, in previous iterations of

16 the standards of care developed by WPATH, so moving

17 from WPATH 6 or standards of care 6 to 7, one of

18 the things that changed was prior to any initiation

19 of care there was what was called a "real life

20 test," meaning that individuals had to live for two

21 years in their preferred gender role prior to

22 consideration of many of the interventions.

23       There was no evidence to support the

24 need for living in one's desired gender role for

1 that specific period of time and also required

2 therapeutic interventions that were not often

3 indicated.  In that context, providing a sense of

4 do no harm, ensuring that patients could jump

5 through as many hoops as possible over an extremely

6 long period of time, was in contradiction with many

7 of the patients' experience who during that

8 two-year period were very clear and likely would

9 have benefited from interventions within that

10 process.

11       That was recognized and a reflection of

12 both patient experience in the extant literature

13 that was reviewed in the transition from SOC 6 to

14 SOC 7 to remove a lot of those standards and focus

15 on the recognition that most patients, when

16 provided with accurate information about decisions,

17 can make informed decisions about their care.

18   Q.   And so what is the ethical consideration

19 of do no harm?  I understand that you described

20 what prior requirements were and that, in your

21 view, those were unnecessary and even harmful; is

22 that right?

23   A.   I would say so, yes.

24   Q.   But in this sentence, you are talking

1 about the ethical consideration of do no harm, and

2 you are contrasting it with the core principle of

3 patient autonomy.  So it seems like this sentence

4 is less in the concrete and more in the theory of

5 ethics.  Do you think that I'm misunderstanding

6 that?

7   A.   No.  I think that you are correct, that

8 it's more situated within the theory of ethics.

9   Q.   Okay.  So on page 2, the next sentence,

10 it says, This has helped reduce barriers to care

11 and connect more people who desire it to

12 gender-affirming care, GAC, but in these authors'

13 opinions does not go far enough in reducing

14 barriers.  Did I read that correctly?

15   A.   You read that correctly.

16   Q.   Do you think that there needs to be a

17 further shift in ethical considerations from do no

18 harm towards the core principle of patient

19 autonomy?

20   A.   What I mean in this sentence is that

21 there should not be unnecessary barriers to

22 accessing evidence-based effective and safe care.

23   Q.   But is an unnecessary barrier

24 necessarily serving the ethical consideration of do

1 no harm?

2   A.   There are many barriers that have no

3 relationship whatsoever to the ethical principle of

4 do no harm.

5   Q.   And here you are talking about the

6 ethical principle, and you are saying that there

7 needs to be a shift from the ethical principle of

8 do no harm toward the core principle of patient

9 autonomy, right?

10   A.   My read -- and I wrote this a long time

11 ago, and I was not the primary author.  My read of

12 this is that what does not go far enough is the

13 reduction of barriers.

14   Q.   And this is written in October -- sorry.

15 This was published in October of 2022, correct?

16   A.   Correct.

17   Q.   And when you say that you were not the

18 primary author, what is the point of that

19 statement?

20   A.   In the typical processes of scientific

21 peer-reviewed literature, the primary author is the

22 person who does the majority of the actual drafting

23 of the text.

24   Q.   But did you approve of the submitted

Page 142

1 version?
2     A.   I did, yeah.
3     Q.   And now sticking with this Exhibit 8, I
4 would like to go to page 12.  And the right column
5 below Discussion and below Changing Standards, it's
6 about three-quarters of the way down.  There is a
7 sentence that begins with, Requiring TGD people to
8 have.  Just let me know when you --
9     A.   I see it.
10     Q.   Okay.  And it says, Requiring TGD people
11 to have a diagnosis at all to obtain care, no
12 matter the terminology used is pathologizing.  The
13 practice of requiring a diagnosis continues to put
14 mental health and other medical providers in the
15 position of gatekeeping.  Continuing the vestigial
16 historical focus on confirming a person's gender
17 identity rather than trusting that TGD people
18 understand their identities better than providers
19 do.  Did I read that correctly?
20     A.   You did.
21     Q.   Do you think it is wrong to require a
22 diagnosis before transgender individuals receive
23 medical interventions?
24     A.   I do not.

Page 143

1     Q.   I'm sorry?
2     A.   I do not.
3     Q.   Do you think the practice of requiring a
4 diagnosis puts mental health providers in the
5 position of gatekeeping?
6     A.   Not inherently, no.
7     Q.   What do you mean "not inherently"?
8     A.   When it's done appropriately and with
9 reduced barriers, having a mental health assessment
10 particularly for children and adolescents, which is
11 a requirement, opens more doors than it closes.
12     Q.   What do you mean "opens more doors than
13 it closes"?
14     A.   Meaning an affirming assessment can help
15 to identify strengths, weaknesses of any
16 individual, address any co-occurring issues that
17 may be present that may impact the success of care.
18 As a psychiatrist and somebody who is a mental
19 health professional, I don't believe that inherent
20 in having a mental health professional be involved
21 in your life is stigmatizing.  That is what I mean.
22     Q.   Do you think that applying the criteria
23 of the DSM-5 continues the vestigial historical
24 focus on confirming a person's gender identity?

Page 144

1     A.   I think it's complicated, and I think
2 that many people have different opinions, including
3 the authors of this paper in terms of how firmly
4 they would agree or disagree with that statement.
5 I think in adulthood in particular, that there had
6 historically been a significant number of barriers
7 that had been placed in the way of accessing care
8 that was safe and effective that has led to
9 significant harms.
10     Q.   So you would not advocate for the
11 removal of a diagnosis under the DSM-5 as a
12 requirement for medical interventions for gender
13 dysphoria, correct?
14     A.   I would not.  I think there's -- it's
15 not an easy discussion, and I think it's a very
16 complex one.  I have had patients who say having
17 this diagnosis is stigmatizing, that it's not for
18 you to decide who I am and how I'm feeling, and I
19 have had patients say, It's incredibly affirming
20 for me to have a diagnosis that describes how I'm
21 feeling and the distress that I have.
22          And so I think it's an evolving process
23 that we will understand with lived experience being
24 our guide in terms of how best to talk about and

Page 145

1 situate this diagnosis in an individual's
2 experience.
3     Q.   Sticking with Exhibit 8, I would like to
4 go to page 13, and right column, first full
5 paragraph, first sentence says, As understanding
6 around the experiences of TGD individuals has
7 evolved over time, the emphasis has shifted from
8 the reliance on a nonmaleficence towards elevating
9 patient autonomy as the guiding principle of care.
10 Did I read that correctly?
11     A.   I don't see where that is, but you read
12 it well.
13     Q.   I appreciate that.  So page 13, right
14 column.
15     A.   Okay.
16     Q.   First full paragraph, first sentence.
17     A.   Yes, you read that correctly.
18     Q.   And do you think that patient autonomy
19 should be the guiding principle of care for
20 adolescents with gender dysphoria?
21     A.   Inherent in the care of children and
22 adolescents is a complex dynamic between patient
23 autonomy and caregiver rights, and in the world of
24 child and adolescent care, this is a much muddier

37 (Pages 142 - 145)

Page 146

1 context than it is for adults.  And so autonomy and
2 care delivery, when we are talking about children
3 and adolescents, including the autonomy of the
4 parent and the caregiver, who ultimately has the
5 decisional capacity for these interventions in
6 addition to respecting the autonomy of the
7 individual patient regardless of age.
8       Q.    And so I understand that in the context
9 of treating adolescents with gender dysphoria, you
10 are taking into account the autonomy of both the
11 caregiver and the adolescent.  Is that what you are
12 saying?
13      A.    Correct.
14      Q.    And my question though is, is patient
15 autonomy the guiding principle of that care?
16      A.    I think it's more complicated than that.
17      Q.    How so?
18      A.    Because we are working with
19 development -- the ethical principles not just of
20 autonomy but of beneficence, nonmaleficence.
21 Justice often gets left out in discussions of
22 medical ethics, but it's an important piece.  But
23 what we are doing in individual care is assessing
24 the specific intrafamilial dynamics and making

Page 147

1 recommendations based upon our comprehensive
2 psychosocial assessment.
3           Depending upon who is in the room with
4 us and what the dynamics are is going to guide how
5 we are going to approach it.  We are always going
6 to keep all of our medical ethical principles in
7 mind as we are making decisions, but we want to
8 understand what a child is thinking, feeling, and
9 experiencing.  And having that as a guiding
10 principle is incredibly valuable, but it's not
11 ultimately going to be the only thing that is
12 considered when deciding on a care plan.
13      Q.    So you are saying that it's -- you are
14 saying that patient autonomy in the context of
15 treating adolescents with gender dysphoria is a
16 guiding principle of care but not the guiding
17 principle of care; is that right?
18      A.    Yeah, this specific article is about
19 adult care primarily.
20      Q.    Okay.
21      A.    As an example, in a very concrete
22 clinical way, I have had patients with a diagnosis
23 of gender dysphoria for whom a medical intervention
24 would likely have been beneficial, and the

Page 148

1 adolescent is very clear about wanting to make a
2 decision and the parents say no.  Respecting the
3 autonomy of a patient without taking into
4 consideration the parents' wishes as well as legal
5 responsibility for the child, is not something that
6 happens.  We don't prescribe a course of treatment
7 without somebody legally capable of providing
8 consent.
9       MR. RAY:  Counsel, we have been going for
10 about an hour, and lunch is here.
11      MR. RAMER:  Perfect.  We'll go off the record.
12      MR. RAY:  Okay.
13           (WHEREUPON, a recess was had.)
14 BY MR. RAMER:
15      Q.    Dr. Janssen, we left off touching on the
16 concept of informed consent a little bit.  I just
17 want to ask some more questions about that.
18           As a mental health professional, is it
19 your job to ensure that the patient can provide
20 informed consent for a particular intervention?
21      A.    That really depends upon the context.
22      Q.    So in the context of an adolescent
23 diagnosed with gender dysphoria and you are
24 considering pubertal suppression, as the mental

Page 149

1 health professional, is it your role to ensure that
2 the patient can provide informed consent for that
3 intervention?
4       A.    Ultimately, the informed consent for the
5 medical intervention is done by the medical
6 provider who is prescribing the specific indication
7 in question.  That said, as a part of the mental
8 health assessment, we are also independently
9 assessing for capacity to provide informed consent,
10 which is the caregivers, but the adolescents are
11 providing assent so understanding the risks,
12 benefits, alternatives, and expected outcomes of
13 the intervention.
14      Q.    And for informed assent, is what you
15 just said -- how would you characterize what
16 constitutes informed assent, the understanding of
17 those enumerated items?
18      A.    That is correct.
19      Q.    And as a general matter, how do you
20 determine whether a patient is able to provide
21 informed assent in this context?
22      A.    In this context, part of that goes back
23 to the training that I have had as a mental health
24 provider in terms of gauging accuracy of responses,

38 (Pages 146 - 149)

1 being able to ensure that the patient can restate
2 what the risks, benefits, and alternatives are,
3 that they are providing thoughtfulness, nuance, and
4 consideration that the expectations of the
5 intervention are realistic and that there's a sense
6 of capacity to challenge thoughts and beliefs.
7     Q. So returning to Exhibit 1, which is the
8 Children chapter of the SOC 8. I would like to go
9 to page S75 and the right column, and there's a
10 list of bullets there about items that can be
11 discussed with gender-diverse children and their
12 families and caregivers. Do you see that?
13     A. I do.
14     Q. And do you discuss these items with your
15 patients?
16     A. It depends upon which patients and what
17 the context is for these discussions.
18     Q. How could the context be different, that
19 you would not discuss these things?
20     A. Not all patients I'm assessing for
21 particular interventions or for gender dysphoria in
22 particular.
23     Q. So when you do have a child patient who
24 has been diagnosed with gender dysphoria and you

1 are assessing them for pubertal suppression, would
2 you discuss these topics?
3     A. Yes, I would discuss these topics.
4     Q. And let's take one as an example. The
5 third bullet down says, The impact of medical
6 interventions on later sexual functioning and
7 infertility. Do you see that?
8     A. I do.
9     Q. And do you discuss that with your child
10 patients who have been diagnosed with gender
11 dysphoria for whom pubertal suppression may be
12 medically indicated?
13     A. Yes.
14     Q. And what do you say to them about that?
15     A. Probably we don't have time here today
16 to go into the full depth of these discussions, and
17 the efficacy of these discussions are improved when
18 they are brought into the context of the way that
19 patients can best understand.
20     But, in essence, the discussions are
21 about what is known about the potential risks of
22 fertility loss with the medications that postdate
23 use of puberty-blocking agents and a discussion
24 about fertility wishes in the future, how stable

1 those wishes are, how realistic those thoughts are,
2 the possibility for change of those wishes over
3 time, discussions about the potential risks of the
4 intervention.
5     Q. For someone who is not a child
6 psychologist, can you explain, how do you actually
7 communicate information like that, which seems very
8 complicated, to a prepubescent child?
9     A. Well, typically we are not having these
10 discussions with prepubescent children because
11 prepubescent children are not eligible for the
12 intervention of puberty blockers, but we do speak
13 about fertility issues with some prepubertal
14 children, depending upon the context. A lot of it
15 is about eliciting understanding of the children
16 themselves, about how their bodies work, what parts
17 of their bodies do what, how they understand it,
18 how babies are made, and what their thoughts are
19 about their family.
20     When we are talking about the
21 adolescents who have entered at least Tanner
22 Stage 2 of puberty and are considering this
23 intervention, typically the discussions are more
24 detailed.

1     Q. And just to confirm, this statement,
2 7.11, this is in regards to prepubertal children,
3 correct?
4     A. Correct. This entire chapter was about
5 prepubertal children.
6     Q. And so you would discuss the impact of
7 medical interventions on later sexual functioning
8 and fertility with prepubertal children to comply
9 with Statement 7.11, right?
10     A. As the child approaches gender, the
11 statement recommends that we, as health care
12 providers, provide information about potential
13 gender-affirming medical interventions and the
14 effects of these interventions, yes.
15     Q. I think you may have said, As the child
16 approaches gender. Did you mean, As the child
17 approaches puberty?
18     A. Yes, as the child approaches puberty.
19 Thank you.
20     Q. And still on S75, right column, and the
21 bullets, the fifth bullet down, so two bullets
22 below the one that we were previously discussing.
23     Do you discuss the current lack of
24 clinical data in certain areas related to the

Page 154

1 impacts of puberty suppression?

2    A.   Yes.

3    Q.   And what are the areas related to the

4 impact of puberty suppression for which we

5 currently lack clinical data?

6    A.   The primary areas in which we are

7 talking about this are around fertility.  That is

8 the primary area.

9    Q.   Anything else?

10    A.   In a typical discussion, when we are

11 talking with the parent and their family around

12 puberty suppression in particular, we talk about a

13 number of known and unknown risks, including on

14 fertility, including on cognition, cognitive

15 development.

16        (WHEREUPON, a certain document was

17        marked Janssen Deposition Exhibit

18        No. 9, for identification.)

19 BY MR. RAMER:

20    Q.   Dr. Janssen, our court reporter has

21 handed you what has been marked as Exhibit 9, and

22 it says, Chapter 6, Adolescents, at the top.  Do

23 you see that?

24    A.   I do.

Page 155

1    Q.    And does this appear to be the

2 Adolescents chapter of the SOC 8?

3    A.    Yes, it does.

4    Q.    I would like to go to page S61

5 and on this page, do you see that's there's

6 Statement 6.12C?

7    A.    Yes.

8    Q.    Do you know what this statement is

9 generally discussing?

10    A.    Capacity to provide assent for care.

11    Q.    And do you use this statement and the

12 supporting text to guide you in obtaining an

13 assessment of the capacity for informed consent or

14 assent?

15    A.    I'll have to read the supporting text to

16 tell you that.

17    Q.    So you might depart from the text that

18 is in Statement 6.12.C?

19    A.    I could not tell you unless I read the

20 full supporting text, which I'm happy to do.

21    Q.    I guess my question is more simpler,

22 which is just, as you sit here, you can't say, Yes,

23 I follow all the supporting text of Statement

24 6.12.C; is that correct?

Page 156

1    A.   I would have to read it, what all of the

2 supporting text asks.

3    Q.   Left column, same page, and the second

4 paragraph in Statement 6.12.C.  I'll just read the

5 first sentence.  It says, A necessary step in the

6 informed consent/assent process is for considering

7 gender-affirming medical care -- sorry.  I'm going

8 to restart.

9        A necessary step in the informed

10 consent/assent process for considering

11 gender-affirming medical care is a careful

12 discussion with qualified HCPs trained to assess

13 the emotional and cognitive maturity of

14 adolescents.  Did I ultimately read that correctly?

15    A.   You did.

16    Q.   And do you agree that you must assess

17 the emotional and cognitive maturity of adolescents

18 for purposes of informed assent for these

19 treatments?

20    A.   Yes.

21    Q.   How do you do that?

22    A.   That is, the decades of training that is

23 required to become a health care professional, in

24 part, trains you to make these kinds of

Page 157

1 assessments.

2    Q.   Have you ever had a patient whom you

3 deem lacks the cognitive maturity to provide

4 informed assent for one of these interventions?

5    A.   Yes.

6    Q.   Why?

7    A.   There have been a number of reasons,

8 including patients with developmental and

9 intellectual disabilities who lack the capacity to

10 grasp potential effectuating outcomes of these

11 medications or patients who had a treatable mental

12 health condition that temporarily impaired capacity

13 to consent.

14    Q.   If a patient tells you, I'm going to

15 kill myself if I don't receive puberty blockers, is

16 that patient capable of providing informed assent?

17    A.   It depends on the context.

18    Q.   What would you explore to determine

19 that?

20    A.   We want to understand in an as

21 evidence-based way as possible what the

22 individual's actual suicide risk is, so you would

23 want to get a sense of safety and about whether

24 there were any processes that impaired this

40 (Pages 154 - 157)

Page 158

1 individual's capacity to provide consent and
2 understanding of the specific interventions.  Was
3 it a statement that is -- is made as an exaggerated
4 attempt.  Is it communicating suicide attempt, or
5 is it communicating distress?  These are all
6 important things that we would evaluate as a part
7 of our assessment.
8     Q.    And just as a general matter of
9 assessing suicide risk, how do you do that?
10    A.    Well, there are a number of things that
11 you can do to assess suicide risk.  My preference,
12 although everybody has a different process for
13 doing assessment of suicide risk, is that there are
14 evidence based tools that can screen for suicide
15 risk and can assess for suicide risk and put
16 patients in a stratification of low, medium, or
17 high risk for following through.
18        This is at a clinical interview most
19 often that is done by qualified professionals, and
20 they can be mental health professionals but also
21 may be other medical professionals of other types.
22 These evaluations include co-occurring mental
23 health disorders, assessment of impulsivity,
24 assessment of access to means, assessment of the

Page 159

1 type of statements that are made, assessment of the
2 statements over time, assessment of risk factors,
3 resilience factors, protective factors, all of
4 which are predictive in one way or another.
5     Q.    And can you explain what a resilience
6 factor and a protective factor is?
7     A.    Yeah.  So if you have a family that
8 loves and supports you, that is a protective factor
9 for suicide.  If you have a family that does not,
10 that increases suicide risk.
11    Q.    And what about a resilience factor?
12    A.    Resilience factor that you have belief
13 in yourself, that you have good qualities, that you
14 have capacity to access care and help when
15 necessary.
16    Q.    Before you recommend cross-sex hormones
17 as a treatment for gender dysphoria in adolescent
18 patients, do you confirm that the patient has
19 experienced several years of persistent gender
20 diversity or incongruence?
21    A.    The diagnosis of gender dysphoria
22 requires six months in order to make that
23 diagnosis.  In practice, the vast majority of the
24 adolescent patients that I have worked with have

Page 160

1 experienced many, many years of persistent
2 symptoms.  So it's kind of asking a question that
3 does not really have a clear clinical correlate in
4 the real world.
5     Q.    I guess not so much as the diagnosis, my
6 question is about the actual intervention of
7 cross-sex hormones itself, and maybe the answer is
8 the same.
9        But what I was asking is, before you
10 recommend that intervention, assuming they have
11 already been diagnosed with gender dysphoria, do
12 you confirm that they have experienced several
13 years of persistent gender diversity or
14 incongruence?
15    A.    It's a bit of a muddy statement, and I
16 recognize where it comes from, but operationalizing
17 that is challenging.
18        In the assessment process prior to
19 initiating gender-affirming hormones for an
20 adolescent, we are evaluating for a diagnosis of
21 gender dysphoria, but we are also gathering a
22 gender history almost universally.  The patients
23 that I'm seeing that are interested in pursuing and
24 are appropriate for pursuing medical interventions

Page 161

1 have a history of gender diversity that predates
2 the six-month required time period for the
3 diagnosis of gender dysphoria.
4     Q.    And so your point is, it just does not
5 come up in practice, is what you are saying?
6     A.    Essentially, yes.
7     Q.    Do you think that it should be required
8 as a matter of theory?
9     A.    I do not because several years is
10 completely an operational criteria.  I don't know
11 what that means.
12    Q.    You don't know what "several years"
13 means?
14    A.    It's nonspecific in a way that is not
15 helpful and, in my opinion, not particularly tied
16 to published literature.
17    Q.    So sticking with Exhibit 9 and the same
18 page that we are on, S61, right column, about a
19 third of the way down there is a sentence that
20 begins with, Gender-diverse youth.  Do you see
21 that?
22    A.    Yes.
23    Q.    Gender-diverse youth should fully
24 understand the reversible, partially reversible,

Page 162

1 and irreversible aspects of a treatment as well as
2 the limits of what is known about certain
3 treatments, e.g., the impact of pubertal
4 suppression on brain development, and then there's
5 a citation.  Did I read that correctly?
6     A.   You read that correctly.
7     Q.   And do you ensure that your patients
8 fully understand these enumerated items?
9     A.   To the best of our ability, yes.
10    Q.   Who is the "our," in "the best of our
11 ability" there?
12    A.   Myself and the folks -- my colleagues.
13    Q.   When you are assessing the ability of an
14 adolescent to provide informed assent for puberty
15 blockers, do you also discuss the risks and
16 benefits associated with cross-sex hormones?
17    A.   It depends upon the context.  Sometimes
18 yes, sometimes no.
19    Q.   How do you determine when you do and
20 when you don't?
21    A.   It's clinically dependent, based upon
22 the presenting symptoms and the family dynamics at
23 the time.  Because we know that many individuals
24 who pursued puberty suppression go on to pursue

Page 163

1 gender-affirming hormones, I will typically include
2 almost universally discussions around fertility
3 treatment and potential impact on fertility of
4 gender-affirming hormones, not just the puberty
5 suppressions prior to initiation of that care.
6     Q.   And when wouldn't you do that?
7     A.   Specific to fertility, I do that for
8 everybody, but there are patients for whom there is
9 no clear indication that they are going to start
10 gender-affirming hormones and that discussion may
11 be a little bit premature.  Functionally, most of
12 the time people who are considering puberty
13 suppression have information and are curious about
14 potential options post puberty suppression, so,
15 again, functionally and actually the clinical work
16 that I do, it is most common that we are having
17 these discussions all at once.
18    Q.   So are there times when an adolescent is
19 about to begin pubertal suppression where you think
20 there is already a clear indication that the
21 adolescent will proceed to cross-sex hormones?
22    A.   There are hypotheses about that, yes.
23    Q.   What do you mean by that?
24    A.   Meaning, if we look at the Steensma

Page 164

1 article in terms of factors that protect
2 persistence, if we are working with kids prior to
3 puberty and they check every one of those criteria,
4 I'm not going to make an assumption that that kid
5 is going to follow in any one specific trajectory.
6 I'm working with the child individually, but
7 certainly they are likelier to be in a category
8 that -- a patient that persists through
9 adolescence, and the patients who persist through
10 adolescence are likelier to persist into adulthood.
11        So we have our history and clinical
12 experience that helps guide us in terms of making
13 predictions about who is likely to want to pursue
14 medication, but most of the time it's the patients
15 themselves that say, I want to think about this and
16 are bringing that to the floor.
17    Q.   When you are assessing -- when you are
18 assessing the capacity of an adolescent to provide
19 informed assent for puberty blockers, do you also
20 discuss the risks and benefits associated with
21 surgery?
22    A.   Not typically.
23    Q.   And do you ever?
24    A.   When assessing for surgery?

Page 165

1     Q.   No.  I'm sorry.  You said not typically
2 when you are assessing for puberty blockers, and I
3 guess the "typically" to me left open the
4 possibility that sometimes you do.  When assessing
5 for puberty blockers, you do discuss risks and
6 benefits of surgery; is that correct?
7     A.   Yes.
8     Q.   In what situation would you do that?
9     A.   As an example, for folks assigned male
10 at birth, you go on puberty blockers quite early.
11 Some of the surgical techniques for vaginoplasty
12 may be impacted by the lack of growth of penile
13 tissue that is often used in that process.
14        Recognizing that, for some individuals
15 who are blocked early in puberty, they may require
16 a different process or procedure if they opt to go
17 through that surgery.  Those are some times in
18 which we may consider a discussion, and that
19 discussion is most important to have with the
20 patient's parents at that point in terms of
21 potential impact on the care plan over time.
22    Q.   From your clinical experience, do you
23 think that most adolescents and parents view
24 pubertal suppression as the first in multiple steps

42 (Pages 162 - 165)

Page 166

1 in transitioning?
2     A.   It really is context dependent.  Some
3 yes, some no.
4     Q.   And going back to Exhibit 9 and the same
5 page, S61, and the same sentence we read about a
6 third of the way down, where it's discussing the
7 impact of pubertal suppression on brain
8 development.  Do you see that?
9     A.   Yes, I do.
10     Q.   What do you tell patients about the
11 impact of pubertal suppression on brain
12 development?
13     A.   Again, we have less time here than the
14 time that I would spend with my patients and their
15 parents in discussing all of the comprehensive
16 risks and benefits.  Typically, what I point to is
17 that we have some limited data that is mostly in
18 sheep about potential impacts of puberty
19 suppression agents on some aspects of cognitive
20 development and that there are going to be aspects
21 of cognitive development that we are not going to
22 know whether they are impacted by this intervention
23 or not.
24     Q.   And what do those sheep studies say?

Page 167

1     A.   I would have to go through the specific
2 sheep studies, but, generally, a potential impact
3 on executive functioning is -- from what I recall,
4 has been demonstrated.
5     Q.   And how do you explain that to an
6 adolescent?
7     A.   To an adolescent, it depends upon the
8 adolescent.  There's not a blanket.  It's part
9 of -- the reason that this is an individualized
10 process is because you are going to need to use the
11 level of description that is based and aligned with
12 how the adolescent can retain and understand
13 information.
14     Q.   As a clinician, does it concern you that
15 we lack evidence regarding the effect of pubertal
16 suppression on an individual's brain development?
17     A.   Can you define what you mean by
18 "concern"?  I wish we had more information.
19     Q.   You don't think that the lack of data on
20 the effect of pubertal suppression on an
21 individual's brain development is a reason to not
22 recommend pubertal suppression for adolescents?
23     A.   I got lost in the semantics there.
24     Q.   The triple negatives?

Page 168

1     A.   Yes.
2     Q.   I guess, you don't understand what it
3 means to be concerned about a lack of evidence
4 before recommending an intervention?
5     A.   It's just not aligned with how practice
6 works.  When we are considering puberty-blocking
7 medications, the option is not nothing happens on
8 the other side of not doing it.  The option is
9 puberty continues and you develop irreversible
10 changes in your body that are unaligned with one's
11 identity that cause tremendous amounts of distress,
12 and we have evidence that that kind of chronic
13 stress and exposure to stress also impacts
14 cognitive development in some known and some
15 unknown ways.
16         So we have a decision about puberty
17 blockers that have some study versus impact of
18 stress and distress that have some study.  So it's
19 a question of what is known and unknown about this
20 particular intervention on cognitive development
21 versus what is known and unknown about this
22 intervention of cognitive development.
23         And so it's a nuanced process, so I have
24 concern in terms of wishing that we had more

Page 169

1 complete information about impacts of
2 puberty-blocking medications on cognitive
3 development, and I wish we had more information and
4 I'm concerned about the information that we have
5 about impact of toxic stress on inflammation in the
6 brain and how that impacts cognitive development.
7     Q.   And given these two, you know,
8 considerations that you are weighing here, you
9 ultimately conclude that the better decision is to
10 pursue pubertal suppression, correct?
11     A.   I don't conclude anything.  My job is to
12 provide the families with the information required
13 to make a decision.  I'm happy to provide a
14 recommendation, but, ultimately, the decision is
15 theirs.  And based upon their understanding the
16 risks, benefits, and alternatives, they are making
17 a choice about how best to proceed.
18     Q.   But with respect to the competing
19 considerations that we were discussing, you are
20 willing to make a recommendation for pubertal
21 suppression, correct?
22     A.   Correct.  In the studies that we have of
23 individuals with gender dysphoria who receive
24 puberty blockers, their self-reported outcomes are

1 better than those who wished to have blockers and
2 did not have access to them.
3     Q.   Do you think it would be unreasonable
4 for somebody else to look at the same evidence and
5 say, I don't think that I'm -- I would not
6 recommend pubertal suppression, given these
7 competing considerations?
8     A.   I'm not sure what is meant by
9 "unreasonable."  Certainly, there are people who
10 come to different conclusions reading the same
11 literature that I have read.  I don't think that it
12 makes sense.  I would not see that as a reasonable
13 conclusion from the literature that exists in the
14 field.
15     Q.   Do you agree that it's unknown -- let me
16 start again, since we don't like the word "known"
17 and "unknown."
18         Do you agree that we do not have good
19 evidence about how long one can safely medically
20 suppress puberty during a time when an adolescent
21 is physiologically supposed to be going through
22 puberty?
23     A.   We have reams and reams of data of
24 patients who have been suppressed for periods of

1 time.  Is there a study that has looked at the
2 upper limit of how many years would be safe?  No,
3 there has not been that kind of study.
4         But that is not the process of clinical
5 care delivery or within the recommended standards
6 of care.  Most -- in practice, patients are not on
7 these medications indefinitely, and there are
8 recommendations made by my medical colleagues about
9 the amount of time that patients should be in
10 puberty suppression without some additional
11 hormone.  But that is not my field and not my area
12 of expertise that I would testify to.
13     Q.   Because you are not an endocrinologist?
14     A.   I'm not an endocrinologist.
15     Q.   Do you agree that puberty blockers could
16 disrupt an adolescent's gender exploration?
17     A.   No.
18     Q.   Do you agree that it's currently unknown
19 how puberty blockers affect the long-term metabolic
20 process?
21     A.   Metabolic process is not specific.
22 There's many, many, many things that fall under
23 metabolic processes.  Some are known, some are less
24 known.

1     Q.   Do you agree that there's a lack of data
2 examining the long-term outcomes of using puberty
3 blockers with adolescents as a treatment for gender
4 dysphoria?
5     A.   I would not agree.  I think we have
6 longitudinal data, particularly from the Dutch
7 cohort, of impacts of puberty suppression over the
8 long-term.
9     Q.   Is there anything outside of the data
10 from the Dutch clinic that would provide evidence
11 of long-term outcomes?
12     A.   The use of puberty suppression agents
13 was initially used in the treatment of central
14 precocious puberty, so there's data from those
15 patients in the long-term.
16     Q.   Apart from the data from the Dutch
17 clinic, is there any other data providing evidence
18 of long-term outcomes for using puberty suppression
19 as a treatment for gender dysphoria?
20     A.   There is increasing data that is being
21 published on that question every year.
22     Q.   Are you aware of any study examining the
23 potential negative psychosocial implications of not
24 initiating puberty with one's peers?

1     A.   I'm going to have to restate that in my
2 head a few times to make sure I'm getting this
3 right.
4     Q.   I can explain it in plain terms, which
5 is you have an adolescent who is diagnosed with
6 gender dysphoria, and there's discussion of
7 using -- pursuing pubertal suppression.
8         And the question is, does the -- has any
9 study examined whether there's any potential
10 negative psychosocial implication for this
11 individual to not be progressing through puberty at
12 the same time the individual's peers are
13 progressing through puberty?
14     MR. RAY:  Object to the form.
15 BY THE WITNESS:
16     A.   Got it.  So the way that I would think
17 about designing a study to get at that question
18 would be to look at outcomes of transgender adults
19 who did and did not have access to puberty
20 suppression agents and compare outcomes between
21 those two groups of people, those who wanted it and
22 did not have access versus those that wanted it and
23 did have access.
24         And those studies have been done, and

44 (Pages 170 - 173)

Page 174

1 what it has demonstrated is that those that wanted
2 it and had access to it, did better than those that
3 did not.
4 BY MR. RAMER:
5     Q.    What studies are you referring to, like
6 Dr. Turban's?
7     A.    Correct.
8     Q.    Do you know where the data for that came
9 from?
10    A.    That came from a national representative
11 sample of trans-identified adults in the United
12 States.
13    Q.    What do you tell your patients about the
14 expected benefits of cross-sex hormones as a
15 treatment for gender dysphoria?
16    A.    It's mostly a discussion, and as with
17 most things in working with adolescents, I like to
18 elicit their understanding of the potential
19 benefits as a first step and then refine the
20 discussion from there.
21         Most adolescents who are pursuing this
22 care have done a fair amount of research and often
23 are very clear about the potential benefits, but
24 the primary benefits of gender-affirming hormones

Page 175

1 is development of secondary sex characteristics
2 that are aligned with one's gender identity.
3     Q.    And do you tell them that is going to
4 improve their mental health?
5     A.    This is a point of frustration with me
6 in some of the studies because mental health is
7 used almost like a shibboleth of the entirety of
8 health and wellness as opposed to defining what is
9 specifically meant by which components of mental
10 health.  Gender dysphoria treatments treat gender
11 dysphoria.
12         We see occasional benefits on other
13 mental health symptoms, particularly mental health
14 symptoms that derive from the distress related to
15 the gender dysphoria, but many people have
16 independent mental health symptoms.  So when we
17 talk about mental health, we want to be specific
18 about which aspects of mental health we anticipate
19 will improve and which will not.
20         It is a part of my practice in the
21 informed consent process, in speaking with
22 adolescents and their parents, that if there are
23 other medical or mental health conditions that are
24 present, that my anticipation is not that the

Page 176

1 hormones will treat their underlying anxiety or
2 depression or suicidality or OCD or autism or ADHD,
3 that we have to have a wholistic look at a child
4 and understand what is the treatment plan for every
5 diagnosis that they have.
6     Q.    And can someone with psychosis provide
7 informed consent or informed assent for puberty
8 blockers as a treatment for gender dysphoria?
9     A.    Rates of psychosis among prepubertal and
10 Tanner Stage 2 youth are incredibly rare.
11 Significantly less than 0.1 percent of the
12 population experience psychosis at that age.  So
13 it's a bit of a theoretical question that does not
14 have a genuine correlate.
15         That said, there's many different
16 reasons.  Psychosis is a nonspecific symptom that
17 can be caused by many different etiologies.  The
18 majority of the etiologies of psychosis,
19 particularly in childhood, are time limited, often
20 substance induced, trauma related.
21         And even when there's a chronic
22 psychotic disorder, such as something like
23 schizophrenia or schizoaffective disorder or
24 bipolar disorder with psychotic features, the

Page 177

1 psychosis is typically limited to an episode of
2 illness and resolves completely when the illness is
3 complete.
4         When we are doing an assessment of an
5 individual with gender dysphoria who has severe
6 co-occurring mental health issues, part of the
7 assessment is recognizing how does the patient's
8 gender dysphoria and how have the symptoms of
9 gender dysphoria changed or not changed between
10 illness states and over time.  And the idea that a
11 patient who has once been psychotic cannot consent
12 is not accurate.
13         In fact, there's data from a number of
14 studies that have looked at our most severely ill
15 patient populations, including those that are in
16 state psychiatric institutions with chronic
17 psychotic disorders and even in a majority of those
18 cases, our most ill patients, most of them retain
19 capacity to consent for many of the procedures and
20 medications that they are prescribed.
21    Q.    So you would not treat psychosis as some
22 sort of bright line rule that would foreclose the
23 patient from receiving cross-sex hormones as a
24 treatment for gender dysphoria, correct?

45 (Pages 174 - 177)

Page 178

1    A.   In practice, psychosis in an adolescent
2  patient is something that we have to prioritize in
3  the treatment plan.  There have been times in which
4  the presence of psychosis has been a bright line
5  and has disallowed patients from being able to
6  safely access gender-affirming care, and there are
7  times where the psychosis is chronic, the patient
8  retains capacity to consent, the gender dysphoria
9  is present across both euthymic mood states and
10 bipolar mood states, psychotic processes and
11 nonpsychotic processes, and in those cases it's not
12 an absolute contraindication to proceed with
13 gender-affirming care as medical --
14 gender-affirming medical care.
15   Q.   And what data is there regarding the
16 potential impact of hormone treatment on psychotic
17 symptoms?
18   A.   There have been some reviews that have
19 looked at impact.  We have not seen -- there's not
20 a ton that is out there.  Most of it is in the
21 context of -- as an example, in the Klinefelter's
22 population, people who have low testosterone
23 syndromes, when given testosterone, actually
24 improve in psychotic symptoms, but there's not a

Page 179

1  ton of data that is out there.
2        (WHEREUPON, a certain document was
3        marked Janssen Deposition Exhibit
4        No. 10, for identification.)
5  BY MR. RAMER:
6    Q.   Dr. Janssen, the court reporter has
7  handed you what has been marked as Janssen
8  Exhibit 10, and it says, Chapter 8, Gender
9  Dysphoria and Autism Spectrum Disorders at the top;
10 is that right?
11   A.   That's correct.
12   Q.   Is this a chapter from a book that you
13 wrote?
14   A.   Yes, it is.
15   Q.   And you wrote this chapter, correct?
16   A.   I did, yeah.
17   Q.   In this chapter, you discuss a case
18 study of a patient who you labelled JM; is that
19 right?
20   A.   That's correct.
21   Q.   And was this a real patient?
22   A.   It is a conglomeration of a few real
23 patients.
24   Q.   What do you mean by that?

Page 180

1    A.   There are elements from one real
2  patient, elements from another real patient in
3  this.
4    Q.   How does that work?
5    A.   It's pretty typical for these kinds of
6  case discussions in terms of exculpating the point.
7  The majority of things are a real patient, yes.
8    Q.   And if we assume -- I guess for this
9  case study or case discussion to be relevant, we
10 could treat this as a hypothetical patient,
11 correct?
12   A.   Sure.  I would be happy to treat this
13 patient as a hypothetical patient.
14   Q.   And based on the first sentence here,
15 the first time you saw this hypothetical patient
16 was when the patient was 13 years old; is that
17 right?
18   A.   Correct.
19   Q.   And the patient had been diagnosed with
20 intellectual disability, correct?
21   A.   Yes.
22   Q.   And specifically had been determined to
23 have an IQ of 55; is that right?
24   A.   That's correct.

Page 181

1    Q.   And the patient was also diagnosed with
2  autism, correct?
3    A.   Yes.
4    Q.   And had been diagnosed with bipolar
5  disorder, correct?
6    A.   Correct.
7    Q.   And the patient was also in foster care
8  for a period of time, correct?
9    A.   Yes.
10   Q.   And on page 124, you say, The patient
11 was living in a residential treatment facility for
12 the past two years to manage his increasingly
13 unsafe behaviors at home, and that is on page 124,
14 second paragraph, third sentence?
15   A.   Uh-huh.
16   Q.   And what does that mean?
17   A.   Typically, that means aggression and/or
18 self-harm.
19   Q.   And what is a residential treatment
20 facility?
21   A.   A residential treatment facility is a
22 facility that provides psychiatric care in a
23 residential setting.
24

46 (Pages 178 - 181)

Page 182

1          (WHEREUPON, a certain document was
2          marked Janssen Deposition Exhibit
3          No. 11, for identification.)
4  BY MR. RAMER:
5     Q.   And the court reporter has handed you
6  what has been marked as Janssen Exhibit 11, and
7  that is entitled The Complexities of Treatment
8  Planning For Transgender Youth with Co-Occurring
9  Severe Mental Illness:  A Literature Review and
10 Case Study, correct?
11    A.   Correct.
12    Q.   And you helped author this, correct?
13    A.   That is correct.
14    Q.   And in here this must be a function of
15 bringing together multiple patients, but the
16 patient you discuss in this article is labelled JB;
17 is that right?
18    A.   Uh-huh.
19    Q.   But JB is different from JM; is that
20 right?
21    A.   Yeah.  Many of the elements are the
22 same, but, yes, it's a different case study.
23    Q.   And in Exhibit 11, going to page 2004,
24 which is the second page of the article.

Page 183

1     A.   Uh-huh.
2     Q.   Left column, first paragraph, about
3  halfway through, it says, He had periods of
4  aggression and fixation on enacting violence
5  towards his mother.  He was described as having a
6  degree of paranoia about his mother and -- excuse
7  me -- that was thought to be psychotic; is that
8  right?
9     A.   That's correct.
10    Q.   And same page, second paragraph, just
11 under halfway through, you note that the patient
12 had frequent pronoun reversals and used male or
13 female pronouns; is that right?
14    A.   Correct.
15    Q.   I would like to go back to Exhibit 10,
16 which is Chapter 8 of your book.
17    A.   Uh-huh.
18    Q.   I would like to go to page 125, and
19 first full paragraph, second sentence, you say, The
20 patient "could not understand why she could not
21 wear a ball gown in every context."  Is that right?
22    A.   Uh-huh.
23    Q.   But in your view, you think this patient
24 could fully understand the effects of pubertal

Page 184

1  suppression?
2     A.   If I may, I can kind of talk about --
3  even though these are composite cases, let me talk
4  about what typically happens with this degree of
5  complexity, which is that the assessment of
6  interventions for puberty suppression for these
7  kinds of patients typically occurs over the period
8  of months to years, that get condensed in a case
9  study to look like it was no time at all.
10         But the development and the elucidation
11 of the capacity to understand the potential
12 interventions took place over a much longer period
13 of time.
14    Q.   But, ultimately, you reached the
15 conclusion that this patient could fully understand
16 the effects of pubertal suppression, correct?
17    A.   Yes.
18    Q.   And you also reached the conclusion that
19 the patient could fully understand the effects of
20 cross-sex hormones?
21    A.   Yes, eventually.
22    Q.   And did you eventually reach the
23 conclusion that this patient could fully understand
24 the unknowns regarding the effects of pubertal

Page 185

1  suppression on brain development?
2     A.   To the degree that this individual could
3  understand that, yes.  The parent and the
4  caregiver, who was providing consent, recognized
5  and understood those risks as the person providing
6  the informed consent to this intervention.
7     Q.   But as part of informed assent, wouldn't
8  the patient also need to understand the unknowns
9  regarding the effect of pubertal suppression on
10 brain development?
11    A.   To their developmentally appropriate
12 level, the patient understood that there would be
13 potential impact, but that was about -- that was
14 clear, from my recollection.
15    Q.   Sorry.  At the end there you trailed.
16    A.   From my recollection, that was clear.
17    Q.   Would there ever be a situation where an
18 adolescent patient with gender dysphoria can
19 provide informed consent for hormones but you still
20 would not recommend them?
21    A.   Yes.
22    Q.   In what kind of situation?
23    A.   There's a number of different kinds of
24 situations.  If an individual does not have a

47 (Pages 182 - 185)

Page 186

1 diagnosis of gender dysphoria, that would be one
2 set. If there are co-occurring diagnoses that
3 interfere with the capacity to make a diagnosis of
4 gender dysphoria, that would be another reason. If
5 there are medical contraindications to the
6 intervention, that could be a different reason.
7    Q.   And has that ever happened in your
8 practice?
9    A.   Yes, it has.
10    Q.   Would there ever be a situation where an
11 adolescent patient with gender dysphoria cannot
12 provide informed assent for hormones but you would
13 still recommend them?
14    A.   No, not that I can think of.
15    Q.   Is the same true for puberty blockers?
16    A.   Capacity to understand the risks,
17 benefits, and alternatives is a required element of
18 the assessment.
19    Q.   So if the patient is unable to provide
20 informed assent, does that mean that the
21 interventions are not medically necessary?
22    A.   It means that they are not indicated.
23 It does not make a statement about necessity.
24 There are many things that are necessary that,

Page 187

1 nevertheless, people do not have access to.
2    Q.   Like what else?
3    A.   Well, I mean, my thought goes to a
4 patient of mine that I had that did not have gender
5 dysphoria that had leukemia and had a requirement,
6 a necessity to have a chemotherapeutic drug that he
7 did not respond well to and was allergic to. It
8 was a necessary intervention that, nevertheless, he
9 did not have access to.
10    Q.   Can you provide any examples where the
11 impediment to access is a lack of capacity to
12 provide informed assent as opposed to an allergy?
13    A.   Sure. I mean, patients who have
14 substance abuse disorders who are chronically
15 impaired are not going to be able to provide
16 consent in most situations while they are impaired
17 on substances.
18    Q.   But does that mean that they are not
19 able to access necessary medical care because they
20 are impaired?
21    A.   Yes.
22    Q.   So you wrote this chapter back in 2018,
23 correct?
24    A.   Which chapter?

Page 188

1    Q.   Sorry. Exhibit 10, Chapter 8.
2    A.   I mean, it was published in 2018. That
3 was a long labor, so I could have written it any
4 time between 2014 and 2018.
5    Q.   And do you know where this patient is
6 today?
7    A.   I moved from New York, so he's no
8 longer -- this kid is no longer under my care, or
9 the amalgamation of kids that formed these case
10 studies are no longer under my care.
11    Q.   So sticking with Exhibit 10, going to
12 page 126.
13    A.   Uh-huh.
14    Q.   The carryover paragraph, it's a little
15 over halfway down. It says, The reality is that
16 there is a different developmental process for
17 gender identity than for a child's normal
18 imaginative process of trying on different personas
19 and interests. Did I read that correctly?
20    A.   You did.
21    Q.   And could you explain what you are
22 saying there?
23    A.   Yeah, that there's a difference between
24 exploring identity and playing with expectations of

Page 189

1 gender than that core sense of gender identity,
2 that not all children who wear dresses are
3 transgender. Some just like to wear dresses.
4    Q.   And how did you reach that conclusion
5 that somebody who likes to wear a dress is not
6 transgender?
7    A.   With time.
8    Q.   I'm sorry?
9    A.   With time.
10    Q.   What do you mean by that?
11    A.   Meaning in prepubertal youth, you
12 observe but you are not intervening medically. And
13 you continue to observe over time, and particularly
14 when kids hit Tanner Stage 2, whether or not
15 there's distress or not.
16         And there's also been kids that I have
17 seen that parents have asked questions. Should I
18 be concerned that my boy is wearing a dress? And
19 the kid themselves has no questions about gender.
20 Like, no, I'm a boy, I just like wearing dresses,
21 it's fun to play. That is a different process,
22 right, and those kids are not assessed to have a
23 diagnosis of gender dysphoria. They are not
24 assumed to be transgender. But, again, with those

48 (Pages 186 - 189)

1 kids, I'm not assuming what your lifetime course is
2 going to be, but, certainly, there's no indication
3 to intervene with a diagnosis that does not exist.
4     Q.   So is it fair to say in this sentence,
5 you are also saying that there's a different
6 developmental process for gender identity than for
7 gender nonconforming interests?
8     A.   That is fair.
9     Q.   And how do you know that there's a
10 different developmental process?
11     A.   That's been studied over decades and
12 decades and decades.
13     Q.   Maybe it's lost on me because I don't
14 understand the term "developmental process," but
15 what does that mean here?
16     A.   So gender role based behaviors present
17 early on, and there's a number of factors that
18 influence gender role based behavior, so that whole
19 category of diagnostic criteria with the DSM that
20 allude towards rough and tumble play, playmate
21 preference, et cetera, those gender role based
22 behaviors emerge very early in childhood, prior to
23 most kids having a sense of differentness around
24 their identity.

1         There are these differential
2 developmental trajectories around gender, around
3 gender identity, around gender expression, around
4 playmate preference that all are on different
5 timelines.  That is the difference, and that is
6 partially at least what I believe I was getting to.
7 Sometime between 2014 -- ten and eight years ago.
8     Q.   I'm at a good stopping point, if you
9 want to take a break.
10     MR. RAY:  Sure.
11     MR. RAMER:  Go off the record.
12         (WHEREUPON, a recess was had and a
13         certain document was marked Janssen
14         Deposition Exhibit No. 12, for
15         identification.)
16 BY MR. RAMER:
17     Q.   Dr. Janssen, you have been handed what
18 has been marked as Janssen Exhibit 12 and at the
19 top, it says, Chapter 3, Transgender Adolescents
20 and Gender-Affirming Interventions:  Pubertal
21 Suppression, Hormones, Surgery, and Other
22 Pharmacological Interventions, correct?
23     A.   Yes.
24     Q.   And you helped write this, correct?

1     A.   I did.
2     Q.   And I would like to go to page 56, and
3 middle of the page, there's a new section entitled
4 Reversible Androgen Blocking and Menstrual
5 Suppression.  Do you see that?
6     A.   I see that, yes.
7     Q.   And am I correct in reading this part to
8 just generally be discussing the use of
9 interventions other than GnRHa to suppress the
10 effects of hormones released during puberty?
11     A.   To at least mitigate the impacts of the
12 distress caused by it, yes.
13     Q.   And in the first paragraph of the
14 section, the last sentence of that paragraph, I'll
15 just read it first.  It says, They may be
16 beneficial to use with adolescents who cannot
17 access GnRHa for either lack of insurance coverage
18 or parental consent reasons.  Did I read that
19 correctly?
20     A.   Correct.
21     Q.   What are you referring to when you say
22 "parental consent reasons"?
23     A.   Simply if you have a parent who does not
24 consent to use of GnRH analogues.

1     Q.   So why would you recommend these
2 alternatives in a circumstance where a parent
3 refuses to consent to the use of GnRH analogues?
4     A.   To alleviate distress and improve
5 functioning.
6     Q.   Is the point that you do not need
7 parental consent to use these other interventions?
8     A.   No.  You need parental consent for those
9 other interventions for this purpose.  Effectively,
10 for this diagnosis, you still require parental
11 consent, but there are differential treatment plans
12 that parents can or can't consent to.  And it's not
13 uncommon for a parent who is not providing consent
14 to a GnRH agonist to provide consent for an oral
15 contraceptive pill that suppresses or reduces the
16 impact of menstruation.
17     Q.   Why would that -- in your experience,
18 where would that be the case?
19     A.   Sometimes it's just a matter of
20 familiarity.  Most adults are familiar with the
21 concept of oral contraceptive pills.
22     Q.   And so -- I'm sorry.  Go ahead.
23     A.   Go ahead.
24     Q.   So in this section, you are saying --

49 (Pages 190 - 193)

1 you are saying use these alternatives -- I guess
2 I'm just trying to understand, parental consent
3 reasons, and the answer is that by parental consent
4 reasons here, you are referring to parents who
5 would not consent to GnRHa analogues but would
6 consent to these other pharmacological
7 interventions; is that correct?
8    A.   Yes, that is correct.
9    Q.   And then the next paragraph, final
10 sentence, it says, Their effectiveness and safety
11 have not been studied in adolescents with gender
12 dysphoria.  However, anecdotally they have been
13 used clinically to help adolescents feel their
14 gender dysphoria is being addressed medically.  Did
15 I read that correctly?
16    A.   You read that correctly.
17    Q.   Are you describing a placebo effect
18 here?
19    A.   I am not.
20    Q.   And are you recommending the use of
21 these interventions even though you admit their
22 effectiveness and safety have not been studied?
23    A.   Recommendations of specific treatment
24 plans are only made to specific patients, so they

1 are context dependent.  The use of oral
2 contraceptive pills for the sake of menstrual
3 suppression, there exists wide data on the evidence
4 and safety of that as an intervention.
5    Q.   Then what do you mean when you say,
6 Their effectiveness and safety have not been
7 studied in adolescents with gender dysphoria?
8    A.   At the time of the writing of this
9 chapter, which was probably closer to 2014, there
10 was not a ton of data on the use of menstrual
11 suppression for gender dysphoria specifically, but
12 there had been decades and decades of data on the
13 use of menstrual suppression using oral
14 contraceptive pills in natal females.
15    Q.   And given -- or I should say, despite
16 the lack of study of the effectiveness and safety
17 of these interventions in adolescents with gender
18 dysphoria, you were comfortable writing in this
19 textbook chapter that these pharmacological
20 interventions can be used for treating gender
21 dysphoria, correct?
22    A.   The question is what is being treated
23 and what the goals of treatment are.  In these
24 particular cases, when you have a patient with

1 gender dysphoria who has severe distress from
2 menstruation, what we have is robust literature
3 supporting the use of oral contraceptive pills to
4 reduce the intensity, frequency, and duration of
5 menstruation.
6        The evidence for the robustness of that
7 effect is quite clear.  The evidence of safety and
8 efficacy of menstruation and suppression is quite
9 clear.  Whether it had been specifically studied in
10 this population, it still allows as a possible
11 option.  That said, I'm a psychologist.  I'm not an
12 endocrinologist or adolescent medicine physician,
13 so I'm not prescribing these medications.
14    Q.   But you would be in the position of
15 recommending them as a treatment for gender
16 dysphoria, correct?
17    A.   I would be in the position of
18 recommending that they speak with a medical
19 provider about their options.
20    Q.   But you would not further list what
21 options they should be speaking with their medical
22 provider about?
23    A.   I would be happy to provide what
24 potential options are out there to discuss.

1    Q.   And would you include these
2 pharmacological interventions on the list of
3 possible options to discuss?
4    A.   On menstrual suppression, yes.
5 Spironolactone is not something that I typically
6 recommend.
7    Q.   Did you ever typically recommend that?
8    A.   It's not a typical recommendation in the
9 context in which I practice.
10    Q.   Why is that?
11    A.   In part, because most individuals who
12 are seeking out care are doing so with the consent
13 of their parents, and often if are considering
14 puberty-blocking agents or have distress from the
15 impacts of testosterone, are typically opting to
16 proceed with gender -- or puberty suppression as
17 opposed to use of an adjunctive agent.
18    Q.   Do you agree that an older adolescent is
19 likely to have more developed executive functioning
20 skills to weigh the pros and cons of an
21 intervention, compared to a younger adolescent?
22    A.   There's not necessarily a whole robust
23 literature that says executive functioning is the
24 primary component of capacity to consent.

Page 198

1    Q.   I was just -- I was asking whether an
2  older adolescent is likely to have more developed
3  executive functioning skills to weigh the pros and
4  cons of an intervention compared to a younger
5  adolescent?
6    A.   I'm separating the two.  Do older
7  adolescents have more executive functioning skills?
8  Sometimes, but not always.  It depends upon the
9  individual adolescent.  There certainly have been
10  12-year-old adolescents who have highly -- highly
11  developed executive functioning skills, so that is
12  part one of your question.
13       Part two of your question implied that
14  the presence or absence of executive functioning is
15  what determines capacity to consent.  That is not
16  true.
17    Q.   If you have a patient who is an
18  adolescent, who is 16 years old, has been diagnosed
19  with gender dysphoria and desires a phalloplasty,
20  what would you do?
21    A.   I mean, this is a very complicated
22  question in terms of what the actual process looks
23  like, but a 16-year-old is not eligible for a
24  phalloplasty.  So we would talk about what their

Page 199

1  hopes are, what their embodiment goals are, what
2  the distress is, what they aim to achieve with the
3  phalloplasty, what they understand about a
4  phalloplasty, and what it's there and what it's
5  for.  What kinds of information that they are
6  gathering about a phalloplasty, so that if in five,
7  ten years, when it's available to them, that they
8  have information that is accurate and sourced from
9  appropriate areas.
10    Q.   If the individual is suffering distress
11  due to not being able to access a procedure like a
12  phalloplasty, how would you treat that distress?
13    A.   Empathy goes a long way.  So does
14  listening and a recognition that when the time is
15  right, if the patient meets qualifications for that
16  particular intervention, that they'll be able to
17  access that particular intervention.
18    Q.   And earlier we were discussing
19  something, it was real life, and I think the third
20  word was a T.  But, basically, living in role, for
21  lack of a better term.  What was the phrase that
22  you used earlier today?
23    A.   Real life test.
24    Q.   Do you require a prolonged period of

Page 200

1  living in role or a real life test before
2  recommending a medical intervention as a treatment
3  for gender dysphoria?
4    A.   No, I do not.
5    Q.   And why not?
6    A.   It's not practical for all people, and
7  even the terminology that was used in terms of a
8  real life test implies that the onus is on the
9  transgender individual to prove that their identity
10  is valid, which does not create a treatment
11  alliance that is effective in providing the support
12  that is necessary.
13       By and large, most people who do pursue
14  medical interventions do so in tandem or after
15  social transitions, but it's not possible for all
16  people to do that safely.
17    Q.   Why not?
18    A.   People live in hostile environments in
19  which they are targeted for their identities.
20    Q.   And do you have a particular -- I guess,
21  is it fair to say that you have a particular
22  specialty in assessing individuals with
23  co-occurring mental health conditions?
24    A.   Yes.

Page 201

1    Q.   And what percentage of your patients who
2  have been diagnosed with gender dysphoria have
3  co-occurring mental health conditions?
4    A.   Context is important.  In my clinical
5  work now, those are the only patients that I'm
6  seeing.  I'm only referred patients who have
7  co-occurring mental health disorders, so
8  100 percent of the patients.
9    Q.   Got it.  And that would suffer from
10  selection bias, you might say, in terms of
11  comparing to the other population?
12    A.   Correct.
13    Q.   And do you agree that research efforts
14  developing best practice guidelines for examining
15  the mental health needs of transgender youth remain
16  lacking?
17    A.   I'm not sure I know what you mean.
18  There's always room for improvement, but I would
19  not say that they are lacking.
20    Q.   And I would like to go back to
21  Exhibit 9, which is the Adolescence chapter of
22  SOC 8.
23    A.   Okay.
24    Q.   And I would like to go to S62, and the

51 (Pages 198 - 201)

Page 202

1 right column, Statement 6.12.D, and this statement
2 relates to assessing co-occurring mental health
3 conditions, correct?
4    A.   Yes, it does.
5    Q.   And the statement directs providers to
6 ensure that any co-occurring mental health
7 conditions do not "interfere with diagnostic
8 clarity"; is that right?
9    A.   I don't see where you are reading that,
10 but that sentiment is correct.
11    Q.   Just for the record, it's in the bold
12 below Statement 6.12.D. It says, The adolescent's
13 mental health concerns, if any, that may interfere
14 with diagnostic clarity, capacity to consent,
15 and/or gender-affirming medical treatments have
16 been addressed.
17    A.   That is correct.
18    Q.   And how could a co-occurring mental
19 health condition interfere with diagnostic clarity?
20    A.   A co-occurring mental health condition
21 could interfere with diagnostic clarity in a number
22 of ways. If it's okay, I'll give a patient
23 example.
24       One young person I treated who had

Page 203

1 bipolar disorder during acute manic episodes would
2 describe an identity of a woman in those periods,
3 and with resolution of the manic episode, that
4 identity resolved completely. If one was only
5 looking at a moment in time and not looking at the
6 entire context, this person may have met criteria
7 for gender dysphoria. It's part of the reason that
8 we have both the six-month duration criteria as
9 well as a caveat that it's not better explained by
10 another co-occurring mental health diagnosis.
11    Q.   Can family conflict potentially
12 influence an adolescent's assertion of gender
13 incongruence?
14    A.   How the gender incongruence is
15 expressed, experienced, and intervened on can
16 absolutely be influenced by family stress and
17 family conflict.
18    Q.   Can an individual's temperament and --
19 can an individual's temperament potentially
20 interfere with diagnostic clarity?
21    A.   I mean, temperament has a very specific
22 meaning in the world of child and adolescent mental
23 health. In my definition of temperaments, no, it
24 would not interfere with diagnostic clarity.

Page 204

1    Q.   What is your definition of temperament?
2    A.   There's four types of temperament that
3 are really defined by early childhood attachment.
4 But in the more colloquial sense of temperament,
5 part of the job of a mental health professional is
6 to learn how to build rapport across multiple
7 temperamental types. So I don't see how
8 temperament could interfere with diagnostic
9 clarity, at least in my experience.
10    Q.   Can an adolescent's cognitive ability
11 lead them to conflate gender identity, gender
12 expression, and sexual orientation?
13    A.   It may in some cases.
14    Q.   And if that happens, can it interfere
15 with diagnostic clarity?
16    A.   Not if you know what you are doing.
17    Q.   And suppose you have a patient with
18 psychotic spectrum symptoms, can gender dysphoria
19 ever stem from the psychosis?
20    A.   By definition, no.
21    Q.   What do you mean "by definition, no"?
22    A.   If you have symptoms of gender dysphoria
23 that are better explained by co-occurring mental
24 health issues, it's not gender dysphoria. You

Page 205

1 would not meet diagnostic criteria.
2    Q.   Well, why wouldn't you, if you have all
3 of the symptoms associated with it? You would
4 still meet the diagnostic criteria, wouldn't you?
5    A.   No. And let me just go back. Since we
6 have in the exhibits, the DSM, I think you might
7 have cut off the piece that is relevant.
8    Q.   That is Exhibit 6.
9    A.   Let me just double-check here. My
10 recollection was from the DSM-IV, which had a
11 specific callout that it's not better explained by
12 another co-occurring mental health diagnosis, but
13 it is a part of the assessment process to ensure
14 that if the symptoms are solely related to a
15 co-occurring mental health disorder, such as a
16 psychotic spectrum illness or a bipolar spectrum
17 illness, such as my example, that would not qualify
18 as a diagnosis of gender dysphoria.
19    Q.   And so how do you make that
20 determination of whether there is a better
21 explanation?
22    A.   Well, practically speaking, most of the
23 things that would present with gender dysphoria
24 symptoms outside of gender dysphoria that are

52 (Pages 202 - 205)

1 caused by a co-occurring mental health disorder
2 tend to be time limited and not exceed that
3 six-month period.
4        But our responsibilities, if we identify
5 co-occurring mental health issues, that we are not
6 ignoring them and that we are treating them.  And
7 when you treat those that lead to diagnostic
8 imprecision or a lack of clarity around the
9 diagnosis of gender dysphoria and the psychosis
10 resolves, if there's still gender dysphoria
11 present, it's not likely that it was related to the
12 underlying mental health condition.
13        And the opposite is true.  If the
14 psychosis resolves, you treat the co-occurring
15 mental health condition that was leading to a lack
16 of diagnostic specificity, and the symptoms of
17 gender dysphoria resolved and you know it was
18 secondary to that other co-occurring illness as
19 opposed to an independent entity.
20    Q.    But isn't part of the assessment that
21 you have to make that determination beforehand?
22    A.    No.
23    Q.    If psychosis might be the explanation,
24 it seems like the only way to confirm that would be

1 to treat the psychosis first, right?
2    A.    It depends.  History is our friend in
3 evaluations, and if you have a clear history from
4 multiple informants about a pattern of behavior and
5 a pattern of identity that is consistent and
6 predictable over time, that has a relationship to
7 the psychotic symptoms, you often have a lot of
8 that content and information prior to the
9 evaluation.
10        The important pieces, as a person who is
11 assessing for -- if we are talking about
12 recommendations for medical or surgical
13 interventions, you have to make a diagnosis of
14 gender dysphoria and understand how and if any
15 co-occurring mental health conditions are
16 interfering with that person's capacity to consent
17 to care or with the clarity around the diagnosis.
18        If you can get that in a brief
19 assessment, you can get that in a brief assessment.
20 If that requires multiple months of treatment and
21 care, it will take multiple months of treatment or
22 care.  Again, it's not about a specific time.  It's
23 about resolution of symptoms or resolution of the
24 lack of clarity.

1    Q.    And, I guess, what is -- how do you
2 determine once you have resolved the lack of
3 clarity?  Like how do you measure that?
4    A.    In part, by meeting the diagnostic
5 criteria.
6    Q.    Of gender dysphoria?
7    A.    If that is the question.  If the -- the
8 lack of diagnostic clarity is whether or not gender
9 dysphoria exists as a diagnosis, and then, yes, you
10 have to meet the criteria for gender dysphoria in
11 order to clarify that diagnosis.
12        If there is a developmental process or
13 developmental history that is complicated by
14 co-occurring mental health disorders, you gather a
15 very comprehensive history of those developmental
16 impacts, the mental illness, on the patient's
17 experience and expression of identity over time.
18 So it's not a very straightforward process in terms
19 of explaining it.  It takes time.  It takes careful
20 consideration.
21    Q.    And how do you know if you got it right?
22    A.    How do we know if we got it right?
23    Q.    Yeah.
24    A.    The same way we know if we got it right

1 for most of medicine.  You never make an
2 assumption, that you test the intervention and you
3 follow up to see is it working, is it not working,
4 which parts are working, which parts aren't.
5    Q.    But is it possible that the intervention
6 used to treat gender dysphoria could be more
7 intrusive than the intervention that would be used
8 to treat this other co-occurring mental health
9 condition that is interfering with diagnostic
10 clarity?
11    A.    It depends upon the condition.  Many, as
12 an example, of the psychotic spectrum illnesses
13 require treatment with antipsychotics that can
14 cause incredibly significant life altering symptoms
15 in that some cases never go away.
16    Q.    Sorry.  Say that part again.  I did not
17 catch what you were saying at the end there.
18    A.    There are risks to the treatments of
19 these co-occurring mental health conditions that
20 can cause lifetime impairments.
21        (WHEREUPON, a certain document was
22        marked Janssen Deposition Exhibit
23        No. 13, for identification.)
24

53 (Pages 206 - 209)

1 BY MR. RAMER:

2    Q.   Dr. Janssen, you have been handed what
3 has been marked as Exhibit 13, and it's Chapter 12,
4 Gender Dysphoria and Psychotic Spectrum Disorders;
5 is that correct?

6    A.   That's correct.

7    Q.   And did you help write this chapter?

8    A.   I did.

9    Q.   In this chapter you provide a case study
10 about a patient named Amy, correct?

11    A.   Yes.

12    Q.   Was this a real patient?

13    A.   An amalgamation of several patients,
14 mostly Dr. Ito's patients.

15    Q.   And is the information that you wrote in
16 this chapter truthful?

17    A.   Well, in a case report of this type,
18 this is not one specific patient, so truthful but
19 not completely accurate.

20    Q.   Do you know how many patients made up
21 Amy?

22    A.   No, I don't recall.

23    Q.   I would like to go to page 188, and a
24 few sentences down in this last paragraph, there's

1 a sentence starting with, We know.  And I'll just
2 read the sentence first, it says, We know that
3 accessing gender-affirming care improves quality of
4 life and diminishes GD, and without evidence to the
5 contrary, we can assume that it will also benefit
6 those with psychotic symptoms.  Did I read that
7 correctly?

8    A.   You did.

9    Q.   When you wrote this, what was the basis
10 for asserting that we know that accessing
11 gender-affirming care improves quality of life and
12 diminishes GD?

13    A.   The long-term studies of gender
14 dysphoria.

15    Q.   Out of the Dutch clinic?

16    A.   Not just with children but in adults,
17 particularly out of Belgium.

18    Q.   And what does it mean to say, We know an
19 intervention improves quality of life?

20    A.   There are measures of quality of life
21 that are looked at pre and post intervention, and
22 that post intervention quality of life improves.

23    Q.   Is saying that "we know this care
24 improves quality of life" the same as saying that

1 this care causes improved quality of life?

2    A.   In the context of a clinical case book,
3 language is going to be different than what it
4 would be in a peer-reviewed journal article.  This
5 is probably not language that I would use in a
6 peer-reviewed journal article because we would want
7 to make sure that we are supporting the evidence
8 with the citations, as appropriate.

9        But, colloquially, it's very clear that
10 interventions for gender dysphoria improve quality
11 of life when patients have access to it.

12    Q.   At this -- when you wrote this, if you
13 had been writing a peer-reviewed article, would
14 there have been sufficient evidence to say that
15 this care causes improved quality of life?

16    A.   We would say that studies demonstrate
17 that accessed evidence-based interventions for
18 gender dysphoria improve quality of life and
19 functional outcomes, including reduction of gender
20 dysphoria symptoms as measured by the Utrecht
21 Gender Dysphoria Scale and other symptom
22 inventories of gender dysphoria.

23    Q.   And so you think that at this time the
24 evidence was sufficient to make that statement that

1 you just said?

2    A.   Yes.

3    Q.   So sticking with that sentence, the
4 second half of it, you say, Without evidence to the
5 contrary, we can assume that it will also benefit
6 those with psychotic symptoms.  And do you
7 typically assume an intervention is safe as long as
8 there's no evidence to the contrary?

9    A.   I might dispute the premise.  I don't
10 think that I was talking about the safety but about
11 the efficacy.

12    Q.   Do you typically assume an intervention
13 is effective as long as there's no evidence to the
14 contrary?

15    A.   That is not a typical assumption outside
16 of the context of, if we know that an intervention
17 is effective for a large group of a population and
18 the clinical experience and the extant literature
19 to date do not demonstrate a significant
20 contraindication or reason why this evidence-based
21 intervention would not also be effective in this
22 specific population, yes.

23        To bring back your previous example,
24 menstrual suppression, we know, is efficacious at

1 expressing menstruation. We have no reason to
2 believe that it won't also be efficacious for
3 transgender individuals assigned female at birth in
4 expressing their menstruation as well.
5     Q.    And here you see no problem with
6 changing a variable as significance -- or as
7 significant as the presence of psychotic symptoms
8 in simply assuming the outcome will be the same?
9     A.    I don't assume the outcome would be the
10 same for these individuals. It's an individualized
11 intervention and an individualized assessment for
12 the sake of a case book. The recommendations are
13 to open up a discussion with patients who have
14 these symptoms, in addition to symptoms of gender
15 dysphoria, and not foreclose the possibility of
16 access to gender-affirming medical care for all
17 patients who have psychotic symptoms.
18     Q.    But in this sentence, you say, It will
19 also benefit those with psychotic symptoms. You
20 don't say, It will benefit some individuals with
21 psychotic symptoms, correct?
22     A.    I mean, as I read it, the implication of
23 that statement is that -- if you read the rest of
24 the case book, the only people who are going to

1 have access to these interventions are people who
2 have had an assessment and that their informed
3 consent process has been complete, that they have
4 the capacity to understand the risks, benefits, and
5 alternatives of the intervention, and that they are
6 likely to benefit from it, that it's medically
7 indicated.
8         If folks are not meeting that criteria
9 because of the psychotic symptoms, they are not
10 appropriate for care.
11     Q.    But isn't the question here not
12 necessarily about satisfying the criteria or
13 diagnostic clarity but, rather, whether these
14 particular interventions will benefit this
15 different patient population?
16     A.    I can't tell you with certainty what I
17 was thinking when I was writing this, but my
18 recollection in this chapter was that at the time
19 of practice, that many individuals with
20 co-occurring mental health disorders and gender
21 dysphoria were barred access to care without a full
22 investigation of their capacity to provide consent,
23 in part, because there were recommendations about
24 co-occurring mental health conditions that were

1 somewhat vague in the prevailing standards of care
2 at the time.
3     Q.    What was vague?
4     A.    In the Standards of Care 7, there was a
5 statement about if co-occurring mental health
6 conditions are present, they must be reasonably
7 well-controlled, and there was always a lot of
8 debate about what that means.
9     Q.    And now it says, Addressed?
10     A.    The change now is more towards whether
11 or not a co-occurring mental health condition
12 impairs with either diagnostic clarity or the
13 capacity to provide consent to treatment.
14     Q.    Did your practice change at all from the
15 SOC 7 to the SOC 8?
16     A.    It has changed. My practice changes
17 continuously, as I continue to update what we know
18 from the literature.
19     Q.    Did your practice of treating
20 co-occurring mental health conditions change at all
21 from when the SOC 7 was the reigning guideline to
22 when the SOC 8 was published?
23     A.    I mean, I would say that I have always
24 assertively treated co-occurring mental health

1 conditions and tried to create a treatment plan
2 that was aligned with evidence-based guidelines for
3 every diagnosis that I made for every patient that
4 I saw.
5     Q.    What did you think addressed meant --
6 I'm sorry. What did you think that reasonably
7 well-controlled meant?
8     A.    To me, reasonably well-controlled meant
9 that the diagnosis was not impairing or the --
10 excuse me. Let me back up.
11         To me reasonably well controlled meant
12 that the co-occurring mental health disorders did
13 not interfere with diagnostic clarity nor did it
14 interfere with the capacity of the patient to
15 understand the treatment that was provided and the
16 risks, benefits, and alternatives of that
17 treatment. So much more aligned with what the
18 current recommendation explicated.
19     Q.    And so you basically read that language
20 from SOC 7 to mean what it currently says in SOC 8;
21 is that fair?
22     A.    Correct.
23     Q.    Going back to Exhibit 13, same page, and
24 the sentence after the one that we were previously

1 discussing.  It says, As for nonmaleficence or the
2 concept of doing no harm, we must build a more
3 robust evidence base.  There's no compelling
4 evidence that estrogen or testosterone at usual
5 treatment doses is any more dangerous to those with
6 severe mental illness.  However, there is also no
7 compelling evidence that it is safe.  There's
8 simply no evidence either way.  Did I read that
9 correctly?
10    A.    You read that correctly.
11    Q.    You have recommended hormone treatment
12 for individuals with severe mental illness who have
13 gender dysphoria, correct?
14    A.    Yes.
15    Q.    Are you familiar with the term
16 "borderline personality disorder"?
17    A.    I am.
18    Q.    Is that sometimes referred to as BPD, as
19 a shorthand?
20    A.    Yes.
21    Q.    Have you ever diagnosed or treated BPD?
22    A.    Yes.
23    Q.    What is the treatment for BPD?
24    A.    The majority of the treatment for BPD or

1 at least the evidence-based treatments for BPD,
2 there's a number.  The one that I would most
3 typically refer my patients to is something called
4 dialectical behavioral therapy.
5    Q.    And what is that?
6    A.    It's difficult to explain.  It is a type
7 of intervention originally created by Marsha
8 Linehan that incorporates risk assessment, risk
9 reduction, mindfulness, group work, and
10 skills-based interventions to improve functioning
11 and mitigate risk.
12    Q.    And so what form do those interventions
13 take, for you as the mental health provider?  Like,
14 what do you do?
15    A.    I don't typically work with folks in DBT
16 presently.  At my last institution, I had patients,
17 as the psychiatrist, so I was not doing the
18 individual therapy or the group therapy for these
19 patients but doing the medication management for
20 these patients.  And not everybody in DBT has
21 borderline personality disorder and not all people
22 with borderline personality disorder benefit from
23 DBT.
24    Q.    Is DBT used for other mental health

1 conditions apart from BPD?
2    A.    Yes.
3    Q.    Does the treatment for BPD involve any
4 form of medical intervention?
5    A.    On occasion, yes.
6    Q.    And what type of medical intervention?
7    A.    Generally, psychiatric medication.
8    Q.    Have you ever had a patient who was
9 diagnosed with both BPD and gender dysphoria?
10    A.    I think so.  I don't recall with
11 100 percent certainty.  None of the patients under
12 my current care have both diagnoses.
13    Q.    If a patient had a diagnosis for both
14 BPD and gender dysphoria, would you deem that
15 patient ineligible for medical intervention for
16 treatment of the gender dysphoria?
17    A.    Well, first, it's important to note that
18 personality disorders, of which borderline
19 personality disorder is one, are not typically
20 diagnosed until adulthood, and as I'm mostly seeing
21 children and adolescents, there's not much of an
22 opportunity there.
23        Again, the goal with care is to
24 recognize if there's a co-occurring mental health

1 disorder present, regardless of what that diagnosis
2 is, is it interfering with diagnostic clarity and
3 capacity to consent?  For some patients with
4 borderline personality disorder, that answer is
5 yes.  It interferes with diagnostic clarity or
6 capacity to consent, and for others it's no.
7    Q.    And you said typically minors are not
8 diagnosed with BPD; is that correct?
9    A.    That's correct.
10    Q.    Why not?
11    A.    Because adolescence is a time of
12 consolidation of many different types of
13 identities, and personality disorders imply a
14 nearly static response to stressful events that are
15 maladaptive and dysfunctional.
16    Q.    Can you explain that last part in a
17 little more laymen's terms?
18    A.    Sure.  Many adolescents are --
19 classically think the world is ending and that only
20 they can understand their own problems and that
21 everything that happens to them is a disaster.
22 That is a pretty normal part of adolescent
23 development.
24        As an adult, that is not a typical

Page 222

1  response to life stressors, and if you are stuck in
2  that box where that is the only way that you can
3  respond to all situations, that is what defines a
4  personality disorder.  And in adolescence, part of
5  what would look like a borderline personality is
6  just a normal part of adolescence.
7      Q.   And does the diagnostic criteria for BPD
8  include a markedly and persistently unstable
9  self-image or sense of self?
10     A.   From my recollection, yes.
11     Q.   Does it also include recurrent suicidal
12 behavior?
13     A.   That is a criteria.  Not everybody has
14 that.
15     Q.   Have you ever considered the possibility
16 that an individual's identity disturbance for BPD
17 could be experienced as a disturbance in gender
18 identity?
19     A.   Yes.
20     Q.   Is BPD more common in natal females?
21     A.   I would have to go back and look at the
22 prevalence.  I'm not a BPD expert, but from my
23 recollection, yes.
24     Q.   Do you agree that a task of a mental

Page 223

1  health provider, when assessing a patient for
2  gender dysphoria, is to determine the relationship
3  between the patient's gender dysphoria and any
4  co-occurring mental health conditions?
5      A.   That is a task, not the only task.
6      Q.   And individuals with autism spectrum
7  disorders are more likely to have gender dysphoria,
8  correct?
9      A.   That is what the research has
10 demonstrated, yes.
11     Q.   And individuals with gender dysphoria
12 are more likely to have an ASD, correct?
13     A.   That is correct.
14     Q.   There is no agreed-upon etiology for
15 ASDs, correct?
16     A.   That is correct.
17     Q.   And there's no agreed-upon etiology for
18 gender dysphoria, correct?
19     A.   There is not one factor that people can
20 point to and say, This is it.
21     Q.   What is the nuance that you are drawing
22 there?
23     A.   I don't think there is a particular
24 nuance that I'm drawing.  Autism is a very

Page 224

1  complicated set of disorders under one umbrella.
2      Q.   And individuals with ASDs have
3  difficulties with what is called theory of mind,
4  correct?
5      A.   Many do, yes.
6      Q.   And does theory of mind have
7  implications for the development of gender
8  identity?
9      A.   Not that we know of.  It likely has
10 implications in the expression and understanding of
11 gender identity, but with no clarity around --
12 there's no evidence to support that it impacts core
13 gender identity.
14     Q.   What would be the implications for
15 understanding and awareness and expression of
16 gender?
17     A.   I mean, I can give some concrete
18 clinical examples, including, I think, one
19 amalgamation of a case that I presented, where an
20 individual socially transitioned in their mind but
21 did not change anything about their appearance and
22 could not understand why people did not recognize
23 and acknowledge that they had transitioned.
24         This individual lacked the capacity to

Page 225

1  recognize that making a momentous life change
2  without changing anything exterior would not be
3  automatically understood by the people in their
4  life.
5      Q.   Do you think it can be challenging to
6  distinguish between gender dysphoria and autism
7  spectral disorders?
8      A.   No, not for me.
9      Q.   That was my question.  So are you good
10 at it, was my next question?
11     A.   Yeah, I think so.  Yeah.
12     Q.   And how do you know that you are good at
13 that?
14     A.   I don't actually think that you have to
15 be very good at it to be able to differentiate it.
16 They are very different diagnostic entities.
17         The question and the overlap that most
18 people point to when they talk about a potential
19 struggle and diagnostic clarification is there is a
20 symptom of autism around restricted and repetitive
21 interests or behaviors.  Theoretically, one of
22 those interests could be around expressing feminine
23 gender roles, if you were assigned male at birth,
24 as most individuals with autism are.

57 (Pages 222 - 225)

Page 226

1        There's a very clear phenomenology of
2    how those kind of restricted interests look, but
3    it's very different than what you see for
4    transgender individuals who experience an
5    incongruence in their identity.
6        Q.   Can you unpack the word "phenomenology"
7    for me?
8        A.   Sure.  With many kids with autism, a
9    restricted interest is not just, I like trains and
10   I really like Thomas the Tank.  It is, I can tell
11   you every subway stop for the entire MTA, and I can
12   tell you what year the trains turn over, and I can
13   tell you how many cars in each train.  And if you
14   let me, I will talk about this for hours and hours
15   and hours, and even when I'm giving you a cue that
16   I am not interested anymore, I'm going to continue
17   to talk about it for hours and hours and hours such
18   that I drive away friends, people get exasperated
19   by me.  That is different, and that is not the
20   characterization of how trans people talk about
21   their experience of identity.  It's just a very
22   different phenomenology.
23       Q.   But could it ever center on gender, I
24   mean, that -- I'm sorry.  What is the phrase of

Page 227

1    the -- when we talk about something over and over?
2        A.   The restricted interests.
3        Q.   Could that ever center on gender?
4        A.   I think theoretically, it could, yes.
5        Q.   And when that happens, how do you
6    distinguish between that and gender dysphoria?
7        A.   Typically, when that happens and it's
8    just a restricted interest, you are not meeting
9    criteria for the other symptoms of gender
10   dysphoria.
11       Q.   Because -- or can you give me an example
12   of what you mean, like how you would not?  I guess,
13   to me, just hearing you describe it, if the
14   restricted interest was being the opposite gender,
15   it seems like you would come pretty close to
16   hitting all of the criteria as long as distress was
17   present?
18       A.   It's just not something that I have
19   heard reported or I have seen.  I have seen, I like
20   wearing dresses, I'm obsessed with Disney
21   princesses.  I have not seen that there's a
22   restricted interest that, I'm a girl.  That is not
23   something that I have seen.
24       Q.   Do you agree that the distress from

Page 228

1    gender dysphoria can take on different forms, such
2    as anxiety and depression?
3        A.   I agree that gender dysphoria can lead
4    to anxiety and depressive symptoms, which is
5    different than a diagnosis of an anxiety disorder
6    or a depressive disorder.
7        Q.   That is fair.  And I guess my question
8    is, I'm talking specifically about the distress
9    from the gender dysphoria, that takes on the form
10   of anxiety or depression.  Is that something that
11   can happen?
12       A.   Yes.
13       Q.   Do you agree that clinicians can adapt
14   evidence-based cognitive behavioral interventions
15   to address depression and anxiety in transgender
16   youth?
17       A.   We have been trying, yes.
18       Q.   Are you aware of any study researching
19   the effect of puberty blockers on neurodevelopment
20   in adolescents with neurodiverse characteristics?
21       A.   I guess it depends on what you mean by
22   "neuro development."
23       Q.   What would be your -- I'm sorry.  Go
24   ahead.

Page 229

1        A.   I mean, folks have looked at
2    neuropsychiatric functioning or IQ or general
3    cognitive development as a part of these
4    treatments.  The Dutch cohort had several patients
5    with autism or many patients with autism in it, and
6    they were followed longitudinally, but I am not
7    sure if that is exactly what you mean.
8        Q.   Do you know how many were -- you said
9    they had ASDs in the Dutch study?
10       A.   They did.
11       Q.   And do you know --
12       A.   I don't know how many off the top of my
13   head.
14       Q.   Have you ever diagnosed a patient with
15   an eating disorder?
16       A.   Yes.
17       Q.   Have you ever treated a patient with an
18   eating disorder?
19       A.   Yes.
20       Q.   What was the treatment?
21       A.   In the context of my role on the team,
22   mostly on providing the psychiatric medication
23   management of a patient with an eating disorder.
24       Q.   Would that patient also receive

58 (Pages 226 - 229)

1 psychotherapy?
2     A.   It depends on the kid.
3     Q.   What does it depend upon?
4     A.   Their willingness to participate and
5 their likeliness to respond.
6     Q.   What is -- you said that your role in
7 treating a patient with an eating disorder was
8 helping with medication; is that right?
9     A.   That's correct.
10     Q.   And what was the purpose of the
11 medication that you were providing?
12     A.   I don't see very many kids with eating
13 disorders, so the ones that I do see typically have
14 had co-occurring psychiatric disorders that would
15 be appropriate for treatment.
16     Q.   And so the medication that you were
17 providing was not to treat the eating disorder, it
18 was to treat the co-occurring psychiatric disorder;
19 is that correct?
20     A.   That is correct.
21     Q.   So then what treatment would the
22 individual have been receiving for the eating
23 disorder?
24     A.   There are some medications that are

1 indicated for the use of eating disorders.  That is
2 not my role and has not been my role on the
3 treatment team.  Most of the interventions are
4 therapeutic.
5     Q.   Have you ever had a patient diagnosed
6 with both gender dysphoria and an eating disorder?
7     A.   Yes.
8     Q.   And how do you go about treating that
9 patient?
10     A.   You treat -- it depends.  It's highly
11 individualized.  You are doing your full
12 assessment, and you are recognizing and trying to
13 parse the relationship between the eating disorder
14 and the gender dysphoria and you are treating both.
15         You get a sense of what are the
16 evidence-based interventions for eating disorders,
17 what are the evidence-based interventions for
18 gender dysphoria, and coming together with your
19 patient and family to prioritize a treatment plan
20 and order the interventions in a way that makes
21 sense for the family and for the patient.
22     Q.   Does having a patient with both of those
23 diagnoses make treatment more complex because part
24 of the treatment for the eating disorder is to help

1 the patient become comfortable with their body,
2 whereas, that goal could somehow conflict with the
3 treatment for gender dysphoria?
4     A.   I would not -- not necessarily.  It's
5 highly individualized.
6     Q.   For an adolescent with gender dysphoria,
7 would it be inappropriate to use psychotherapy with
8 the goal of helping the adolescent see that
9 medicalized transition may not be necessary?
10     A.   We have to provide significant context
11 to that question.  We have to do an assessment and
12 recognize what diagnoses are present, and what is
13 the treatment plan for those diagnoses.  When
14 there's a lack of clarity around a particular
15 diagnosis, sometimes the treatment plan is,
16 Continue to explore until there's clarity around a
17 diagnosis and a more concrete treatment plan can be
18 enacted.
19     Q.   Do you see a distinction between
20 conversion therapy and psychotherapy that is
21 conducted for the purpose of trying to help the
22 adolescent determine that medicalized transition
23 may not be necessary?
24     A.   The way that I understand conversion

1 therapy as being significantly different from
2 supportive psychotherapy for children who are
3 exploring gender identity is that conversion
4 therapy predisposes one outcome as preferable over
5 the other.  Namely, that a cis gender identity at
6 the end of treatment is the goal of treatment.
7         In gender-affirming care and in my
8 practice, I'm not privileging one outcome for the
9 other.  The outcome that I'm privileging is that
10 the individual that I'm working with develops a
11 nuanced and coherent sense of self, that their
12 co-occurring mental health disorders are treated,
13 that their functioning and quality of life
14 improves, regardless of the ultimate outcome of the
15 identity.
16         Based upon that assessment, we are going
17 to make evidence-based interventions based upon the
18 best available evidence that we have.  If after
19 that assessment, the best evidence suggests that a
20 medical intervention that is desired for and
21 requested by the patient is medically indicated, it
22 would not be appropriate for me to make a
23 recommendation for an intervention of psychotherapy
24 for which there is no evidence to support it.

59 (Pages 230 - 233)

1    Q.   I guess going back to the hypothetical
2  16-year-old adolescent who wants a phalloplasty but
3  is ineligible for it, so the treatment that you
4  would provide that individual is just to basically
5  buy time up until they age into the ability to
6  receive the phalloplasty; is that right?
7    A.   Yeah.  Hopefully you can help that
8  individual build resilience and skills for
9  tolerating distress.
10    Q.   How would you do that?
11    A.   Well, typically, given the patients that
12  I'm working with and my role on the team, I
13  refer to a really good therapist who does that, but
14  a lot of it is about building capacity and skills,
15  providing opportunities for an adolescent to feel
16  competent in domains, and part of that is when that
17  distress is related to gender dysphoria, in this
18  hypothetical 16-year-old who wants a phalloplasty,
19  typically that is not in isolation and there are
20  other aspects of therapeutic and medical care that
21  we can engage in at that age.
22    Q.   Shifting gears a little bit.  How do you
23  stay informed about developments in research?
24    A.   Me personally?

1    Q.   Yes.
2    A.   Partially, it's by reviewing articles,
3  and as the former associate editor of Transgender
4  Health, I get a lot of things that would come my
5  way.  But I have Google alerts set up for Google
6  Scholar, so when a paper with key words or authors
7  comes up, it pings into my inbox.  But I also work
8  with a multidisciplinary team that is constantly
9  updating their knowledge and reviewing the
10  literature, so we have a cohort of folks that we
11  work with to stay on top of things.
12    Q.   And it sounds like you get a lot of
13  alerts or opportunities to read articles?
14    A.   I do.
15    Q.   How do you determine which articles you
16  actually are going to read?
17    A.   It's quite variable.  It's quite
18  variable.  It really depends.  I can't say I have a
19  rubric.  Typically, if it's from a reputable
20  journal, I will prioritize it, but it really
21  depends.  If it seems interesting, if it seems
22  relevant, if I'm preparing a lecture or talk about
23  a specific aspect of the care, I'll go back and see
24  the relevant literature to that topic.  Otherwise,

1  it just depends.
2    Q.   And how do you determine whether an
3  article is reliable?
4    A.   You have to read it.
5    Q.   And when you are reading it, what are
6  you thinking about to determine the reliability of
7  the study?
8    A.   What is included, how is the study
9  designed, how did the authors talk about their
10  limitations, do the conclusions match the data as
11  presented, is there anything that is missing.
12  There's a lot of ways of doing that.
13    Q.   And this is a hypothetical.  If you have
14  a longitudinal study where adolescents with gender
15  dysphoria received cross-sex hormones and
16  psychotherapy and the adolescents showed improved
17  quality of life, do you think that study provides
18  evidence that cross-sex hormones improve quality of
19  life in adolescents with gender dysphoria?
20    A.   It would depend upon how the study was
21  designed and reviewing -- because in the world of
22  practice, we don't gauge treatment decisions based
23  upon one study.  We look at the entirety of the
24  literature and draw conclusions from that

1  experience and the experience that we have of
2  working with our patients to make the best possible
3  decisions that we can with and for our patients and
4  their families.
5    Q.   So let's suppose that you have 20
6  longitudinal studies where adolescents with gender
7  dysphoria receive cross-sex hormones and
8  psychotherapy and the adolescents showed improved
9  quality of life.  Do you think that those studies
10  provide evidence that cross-sex hormones improved
11  quality of life in adolescents with gender
12  dysphoria?
13    A.   It provides some evidence, but not
14  conclusive evidence.  One would hope that there
15  would be additional studies that could look at
16  impacts of lack of access to psychotherapy or lack
17  of access to hormones on quality of life outcomes
18  for those individuals.  Again, we have survey data
19  of adults that look at that, so these studies are
20  not done in isolation.
21        But in order to know whether or not a
22  particular study can draw conclusive evidence about
23  the impact of one intervention versus another, you
24  need multiple different types of studies in order

Page 238

1 to say that conclusively.
2    Q.   Do you think that we have conclusive
3 evidence about the efficacy of hormone therapy for
4 treating gender dysphoria in adolescents?
5    A.   The evidence that we have from the
6 studies that have done this rigorously has
7 consistently demonstrated improvements in gender
8 dysphoria and quality of life when given access to
9 care.
10    Q.   Would you describe it as conclusive
11 evidence?
12    A.   I would.  But, you know, in a world of
13 academic medicine, what I think of as conclusive is
14 probably different from what it's meant
15 colloquially.  I think there's enough evidence for
16 me to make a strong recommendation, but I continue
17 to review the literature and keep an open mind.
18    Q.   Are you aware of any studies
19 demonstrating that medical interventions alone are
20 effective in the treatment of gender dysphoria?
21    A.   I would have to look back at the
22 specific studies, particularly the recent studies
23 that have come out of the ForesiGHt NIH trial and
24 from Seattle Children's to see for sure.  I think

Page 239

1 certainly some of the patients in those cohorts did
2 not have psychotherapy and demonstrated benefit
3 from medical interventions.
4    Q.   Are you able to name any systematic
5 reviews relating to the treatment of gender
6 dysphoria that you have read?
7    A.   Can I name them, like the authors and
8 the --
9    Q.   Can you describe them?  Have you ever
10 read them?
11    A.   Yeah, I have read multiple systematic
12 reviews.
13    Q.   Like what?  Could you give some
14 examples?
15    A.   I wrote a systematic review.
16    Q.   On the treatment of gender dysphoria?
17    A.   Yeah.
18    Q.   And what was the title of that?
19    A.   I can't remember.  I would have to go
20 through my CV and look.
21    Q.   And what did you --
22    A.   This was on surgery, so it was in
23 adulthood.
24    Q.   And what about systematic reviews

Page 240

1 relating to the treatment of gender dysphoria in
2 adolescents?
3    A.   I have read several.  There have been
4 several that have been recently published.
5    Q.   Like what?
6    A.   I could not tell you the authors off the
7 top of my head.
8    Q.   Not the authors.  But is it coming from
9 a health authority?  Is it coming from researchers
10 somewhere or just --
11    A.   There have been a lot of systematic
12 reviews.  So I would be happy to do a Google
13 Scholar search and give you the ones that have been
14 published, but giving you the names of articles off
15 the top of my head, I am not able to do right now.
16    Q.   Do you recall what any of the analysis
17 was that came from those systematic reviews?
18    A.   I would be happy to comment on the
19 specific analyses of a specific systematic review.
20    Q.   Did you testify before the Florida Board
21 of Medicine in 2022?
22    A.   Yes.
23    Q.   And are you aware that the State of
24 Florida took steps to restrict the use of puberty

Page 241

1 blockers and cross-sex hormones as a treatment for
2 gender dysphoria in minors?
3    A.   Yes, I'm aware.
4    Q.   Did you ever investigate the evidentiary
5 basis for the board's decision?
6    A.   I believe so, yes.
7    Q.   And what did you think?
8    A.   I thought they drew the wrong
9 conclusions from the literature that exists.
10         (WHEREUPON, a certain document was
11         marked Janssen Deposition Exhibit
12         No. 14, for identification.)
13 BY MR. RAMER:
14    Q.   Dr. Janssen, you were just handed what
15 has been marked as Exhibit 14, Janssen Exhibit 14,
16 and the title is Effects of Gender-Affirming
17 Therapies in People With Gender Dysphoria:
18 Evaluation of the Best Available Evidence; is that
19 right?
20    A.   That is what it says.
21    Q.   Have you seen this document before?
22    A.   I could not tell you.  I don't see any
23 citation for where this might have been published.
24    Q.   Have you ever heard of Romina

61 (Pages 238 - 241)

1 Brignardello-Petersen?
2     A.   Not really, no.
3     Q.   If you see on the first page, the first
4 sentence, it says, We prepared this report to
5 fulfill a request from the Florida Agency for
6 Health Care Administration.  Do you see that?
7     A.   No, I'm not seeing where that is.  I
8 believe you, but I don't see where it is.
9     Q.   The first page under the introduction,
10 first sentence.
11     A.   Got it.  Yeah.
12     Q.   Does that refresh your recollection of
13 whether you have ever seen this before?
14     A.   No, it does not.  I don't recall.
15     Q.   And so do you -- sorry.
16     A.   I do not recall if I have read this
17 specific document.
18     Q.   Okay.  I would like to just go to
19 page 5. I'm going to ask you --
20     A.   I apologize.  Can I ask a question about
21 this?
22     Q.   Please.
23     A.   Because my read of this, just from the
24 introduction of this, this was not a peer-reviewed

1 document; is that correct?
2     Q.   You tell me.  Is it a peer-reviewed
3 document?
4     A.   It appears not to be a peer-reviewed
5 document, based upon how they are describing it.
6     Q.   And why is that significant?
7     A.   Because peer-review is an integral part
8 of the scientific process, particularly when folks
9 might not have experience or expertise in the field
10 about which they are describing.  I mean, I'm
11 having a hard time getting past the first two
12 sentences of Dr. Brignardello-Petersen's
13 qualifications, which demonstrate that she is a
14 dentist and an epidemiologist.
15     Q.   And were the SOC 8 peer-reviewed?
16     A.   They went through the Delphi process and
17 were published in a peer-reviewed journal, so yes.
18     Q.   You think -- sorry.  What do you mean by
19 that, when you say peer-reviewed?  How does the
20 typical peer-review process go?
21     A.   Articles are submitted to a journal.
22 They are sent to typically an associate editor, who
23 does the initial run-through to decide whether it's
24 appropriate enough to send out to for editing, and

1 then it's sent to reviewers who are experts in the
2 field who make comments and suggestions.  That is
3 typically how that process works.
4     Q.   And the idea there is that somebody who
5 was not involved with drafting the article is doing
6 the reviewing, correct?
7     A.   Yes, somebody with expertise in the
8 field who can comment on strengths and deficiencies
9 of a particular article.
10     Q.   Do you think that it's significant that
11 it's somebody who was not involved with drafting
12 the article?
13     A.   I think that is the best case scenario,
14 yes.  You can't have a typical peer-review process,
15 if you are reviewing your own work.
16     Q.   Did the SOC 8 go through a typical
17 peer-review process, as you just described it?
18     A.   I'm not on the editorial board for the
19 International Journal of Transgender Health, where
20 that was published, but typically things that I
21 have submitted to that journal or that I know that
22 people have submitted to that journal have gone
23 through a typical peer-review process.  But I'm not
24 a part of the editorial board, so I can't tell you

1 what the process was.
2     Q.   So you don't know whether SOC 8 was
3 peer-reviewed; is that correct?
4     A.   My assumption, given the fact that we
5 had a Delphi process with multiple peers reviewing
6 the other chapters and the chapters' statements,
7 that there were certainly elements of peer review
8 as a part of it.  My assumption would be that peer
9 review happened as a part of the publication, but I
10 don't know for sure.
11     Q.   And just going to page 5 on this, just
12 the conclusion, I'm just going to ask you one
13 question about it.
14         Toward the bottom, under 6, Conclusions,
15 it says, Due to the important limitations in the
16 body of evidence, there's great uncertainty about
17 the effects of puberty blockers, cross-sex
18 hormones, and surgeries in young people with gender
19 dysphoria.  This evidence alone is not sufficient
20 to support whether using or not using these
21 treatments.  Did I read that correctly?
22     A.   You did.
23     Q.   And do you disagree with that
24 conclusion?

Page 246

1    A.   I do.
2    Q.   And on what basis do you disagree?
3    A.   The extant literature and my clinical
4  experience.
5    MR. RAY:  Counsel, I think we have -- I'm
6  sorry.  I just observed that we have been going for
7  about 70 minutes?
8    MR. RAMER:  No, that is a good stopping point,
9  so go off the record.
10        (WHEREUPON, a recess was had.)
11 BY MR. RAMER:
12   Q.   Dr. Janssen, are you aware that health
13 authorities in the United Kingdom have taken steps
14 to restrict the use of puberty blockers and
15 cross-sex hormones for adolescents with gender
16 dysphoria?
17   A.   Yes, I'm aware.
18   Q.   And do you agree that the
19 recommendations of those health authorities depart
20 from the recommendations of the SOC 8?
21   A.   Yes.
22   Q.   Did you ever attempt to review the
23 evidentiary basis for those decisions?
24   A.   Most of the evidence that was reviewed

Page 247

1  in those decisions had been published already and
2  was subject to review by those of us who are on the
3  SOC 8 revision committee.
4    Q.   When you say "subject to review," what
5  do you mean by that?
6    A.   Most of the literature that has been
7  published in this field has been reviewed by those
8  of us on the committees that revise the standards
9  of care.
10   Q.   So did you read any of the systematic
11 reviews that were published by the UK's National
12 Institute for Health and Care Excellence?
13   A.   I think there were several.  Yes, I have
14 read some of them.  I would have -- I would have to
15 see the ones to be sure which ones I have read and
16 which ones I have not.
17        (WHEREUPON, a certain document was
18        marked Janssen Deposition Exhibit
19        No. 15, for identification.)
20 BY MR. RAMER:
21   Q.   Dr. Janssen, you have been given what
22 has been marked as Janssen Exhibit 15, that says,
23 Evidence Review, and then a title after Evidence
24 Review; is that correct?

Page 248

1    A.   Yes.
2    Q.   And do you recognize this document?
3    A.   I do.
4    Q.   And do you understand this to be a
5  systematic review?
6    A.   I recognize it as an evidence review.  I
7  would have to go into the details to see if this
8  was a systematic review.
9    Q.   What would you be looking for to
10 determine whether it's a systematic review?
11   A.   Description of the methodology of the
12 systematic review.
13   Q.   What is the methodology of a systematic
14 review?
15   A.   A systematic review typically is done by
16 somebody with expertise in the field who ahead of
17 time provides search terms and expectations for
18 inclusion and exclusion criteria for particular
19 research studies that are around a particular
20 question or outcome.  That is what I'm typically
21 looking for.
22   Q.   And then does a systematic review
23 typically assess individual studies for risk of
24 bias?

Page 249

1    A.   Typically, it's often a part of a
2  systematic review.
3    Q.   And is this -- I think you said this,
4  but just to confirm, is this document something
5  that you have read before?
6    A.   It is, but I believe this is the one
7  that was prepared in 2020, so it's been quite some
8  time since I read it.
9    Q.   And in what level of detail did you read
10 it, when you read it?
11   A.   Oh, I don't recall the level of detail
12 in which I read it.
13   Q.   Do you recall having a reaction to it?
14   A.   I do not.
15   Q.   Do you recall whether the review reaches
16 conclusions that you disagree with?
17   A.   I would have to read it to be sure.
18   Q.   And did you ever, when you first read
19 it, actually ever attempt to analyze the review's
20 methodology?
21   A.   It was 2020, so I can't recall.  There
22 was a lot going on in 2020.
23   Q.   Fair.  So I would like to go to page 45,
24 and halfway down the page, there's a conclusion,

Page 250

1 and then I'm going to read the first sentence under
2 the conclusion. The results of the studies that
3 reported impact on the critical outcomes of gender
4 dysphoria and mental health, depression, anger, and
5 anxiety, and the important outcomes of body image
6 and psychosocial impact, global and psychosocial
7 functioning in children and adolescents with gender
8 dysphoria are at very low certainty using modified
9 grade. Did I read that correctly?
10    A.    You read that correctly.
11    Q.    Do you agree that the evidence quality
12 for the use of puberty blockers to treat gender
13 dysphoria is very low on the grade scale?
14    A.    I'm not testifying as an expert on the
15 grade scale or on research methodology. I would
16 have to see the grade scale in order to apply its
17 methodology to the current extant literature.
18    Q.    Did you ever apply the grade scale to
19 any of the studies that you cite in your expert
20 reports?
21    A.    Not me personally, no.
22         (WHEREUPON, a certain document was
23         marked Janssen Deposition Exhibit
24         No. 16, for identification.)

Page 251

1 BY MR. RAMER:
2    Q.    Dr. Janssen, you have been handed what
3 has been marked as Exhibit 16, which is also an
4 evidence review similar to the one that we just
5 looked at, but this one is for gender-affirming
6 hormones, correct?
7    A.    That is correct.
8    Q.    And have you read this one before?
9    A.    I have read this one. I have not read
10 it since 2020. I don't recall if I had any
11 reactions to it, and I do not recall how closely I
12 read it.
13    Q.    Do you have any reason to doubt whether
14 the analysis in this document is reliable?
15    A.    Which part of the analysis? I have
16 reason to doubt some of the analysis.
17    Q.    And why?
18    A.    Well, in part, from just skimming
19 through the recent document that you showed me on
20 puberty suppression, there were logical leaps and
21 misappropriation of effects that were somewhat
22 concerning to me.
23    Q.    Can you elaborate? And feel free to
24 reference the document, if you would like. But

Page 252

1 what logical leaps are you referring to?
2    A.    Sure. In the section that you have
3 pointed out, the conclusion on page 31 of the
4 evidence review of gonadotropin-releasing hormones.
5    Q.    That is Exhibit 15, for the record.
6    A.    I guess it was not 31, but I will
7 paraphrase because I'm not going to be able to find
8 it quickly.
9         But reported a lack of evidence for the
10 impact of gender dysphoria but applied the evidence
11 was lacking for depression, anxiety, and
12 suicidality and not of the core gender dysphoria
13 symptoms. That leads me to believe that there's
14 some differentiation of how Dr. Cass is measuring
15 effect based upon symptom inventories that were not
16 designed to track core symptoms of gender
17 dysphoria.
18    Q.    Could you explain that a little more?
19    A.    Sure. I think in kind of plain
20 language, treatment for gender dysphoria aims to
21 improve gender dysphoria. Whether or not treatment
22 for gender dysphoria impacts measures that were
23 specifically designed for tracking the treatment of
24 major depressive disorder and anxiety disorders is

Page 253

1 not an appropriate outcome when we are looking at
2 the impact of a treatment specific for gender
3 dysphoria.
4         We should be looking at treatment
5 outcomes for gender dysphoria, quality of life,
6 body alignment, et cetera.
7    Q.    And those relate to the distress from
8 gender dysphoria? That is the point?
9    A.    Correct.
10    Q.    And the fault or the flaw that you are
11 describing is that, what did they assess?
12    A.    Depression, anxiety, suicidality.
13    Q.    Can the distress from gender dysphoria
14 ever be perceived as anxiety or depression?
15    A.    It certainly can exacerbate underlying
16 depressive, anxiety, and suicidality symptoms. The
17 diagnosis of depression, major depressive disorder,
18 a diagnosis of generalize anxiety disorder or
19 social anxiety disorder or separation anxiety
20 disorder is different from the symptoms of
21 depression, anxiety, and suicidality.
22    Q.    Can we go to Exhibit 7, which is your
23 expert report, and page 15, first full paragraph,
24 Gender dysphoria, by definition, is accompanied by

Page 254

1 clinically significant psychological stress.  That
2 distress can take on many different forms, e.g.,
3 anxiety, mood disorders, and depression and vary
4 greatly in severity resulting in co-occurring
5 conditions.
6        Can you explain the distinction between
7 what you say there and what you just said?
8    A.   Sure.  So there's a whole category of
9 disorders called adjustment disorders, meaning that
10 you can have symptoms of anxiety or depression
11 secondary to a life stressor that is separate from
12 a diagnosis of major depressive disorder or
13 generalized anxiety disorder.
14        Measurements that are looking at
15 diagnoses of depression and anxiety are not the
16 same as looking at outcomes of factors of mood or
17 anxiety adjustment secondary to diagnosis of gender
18 dysphoria.  It's a bit of an apples and oranges,
19 which makes it difficult to draw conclusions.
20        If I may, a majority of the data that
21 Dr. Cass is looking at to even make this false
22 assertion about the lack of relationship between
23 gender dysphoria and improvement, specifically
24 around mood, anxiety, and suicidality through the

Page 255

1 use of the CBCL, the Child Behavior Check List,
2 developed by Achenbach, which is, I think, about a
3 130-question screening document.  It's not a
4 document that is meant to be used as a substitute
5 for clinical practice.
6        And in my work back in New York, we
7 frequently used the CBCL as a screening instrument.
8 We don't use the CBCL in isolation.  The CBCL is
9 one part of a component.  We would never make a
10 diagnosis of depression, anxiety, or seek to define
11 somebody's functioning based upon the CBCL alone.
12        So it's concerning when I read -- and I
13 read this kind of broad generalization about impact
14 on -- of treatment on mood, anxiety, and
15 suicidality using solely something like a CBCL,
16 which is not designed to do that.
17    Q.   And what -- sorry -- in Exhibit 15 --
18 was it on the page that we were previously
19 discussing and you saw what you were describing?
20    A.   Yeah, it was in that conclusion
21 paragraph.  It looks like page 45.
22    Q.   45, yeah.  And can you point to where it
23 is that you are describing?
24    A.   Sure.  So the results of the studies

Page 256

1 that reported impact on the critical outcomes of
2 gender dysphoria and mental health, depression,
3 anger, and anxiety.
4        To me, that reads as, The critical
5 outcomes of gender dysphoria are the impacts on
6 depression, anxiety, and anger and not on core
7 gender dysphoria symptoms.
8    Q.   So what do you do with studies that
9 assess the effectiveness of pubertal suppression on
10 things like depression and anxiety and show
11 improvement in those areas but do not report the
12 findings with respect to gender dysphoria?  Are
13 those articles irrelevant?
14    A.   I have not seen those articles.  The
15 majority of the articles that I have seen, when
16 looking at outcomes specific to gender dysphoria,
17 have shown clear and consistent improvements of the
18 core symptoms of gender dysphoria with treatments
19 for gender dysphoria.
20    Q.   And the core symptoms of gender
21 dysphoria are?
22    A.   The symptoms of gender dysphoria that we
23 reviewed in the DSM-5.
24    Q.   Distress?

Page 257

1    A.   Distress.
2    Q.   And so does -- quality of life, is that
3 a measurement of distress?
4    A.   It can be.  Certainly your quality of
5 life is diminished by significant distress, and
6 when you have the privilege of working with these
7 patients, you hear these stories of distress that
8 are incredibly difficult to understand for folks
9 who are not living through it.  The description of
10 people who every day there is just torment that
11 people are describing.
12    Q.   So improvement in quality of life can be
13 a measurement of distress, but improvement in
14 depression cannot be a measure of distress
15 associated with gender dysphoria?
16    A.   It can be.  It's an element.  The
17 question is, do you substitute one for the other,
18 or do you recognize that this is one component of a
19 whole and provide and assign a degree of attention
20 or focus to this one specific symptom?  To me it
21 seems like Dr. Cass has substituted evidence for
22 improvement on depression and anxiety measures for
23 evidence of improvement for gender dysphoria, and I
24 don't think that is a fair comparison.

65 (Pages 254 - 257)

Page 258

1    Q.    And so if there were a study that was
2  assessing the effectiveness of puberty blockers or
3  cross-sex hormones and that study did not report on
4  improvements in gender dysphoria itself, but rather
5  on depression and anxiety, would that be -- would
6  that study be of diminished relevance?
7    A.    It depends upon the question, and if the
8  question is to puberty-blocking agents or the
9  intervention at hand, significantly impact these
10  measures and you have a clear sense of what those
11  measures are and what they are measuring, it's
12  absolutely valuable.  And there have been quite
13  valuable studies that have looked at that exact
14  question, but to say that an impact on -- if
15  there's not a demonstrable impact on improvements
16  in depression and anxiety, is not the same as
17  saying that those medications or those
18  interventions don't work for gender dysphoria.
19    Q.    But it's also not saying that they do
20  work for gender dysphoria?
21    A.    It depends upon the study, but yes.  You
22  can't make a statement about whether or not an
23  intervention is useful for gender dysphoria solely
24  based on depression or anxiety measures alone.

Page 259

1    Q.    And so going back to Exhibit 16, which
2  is the gender-affirming hormone systematic review.
3  I would like to go to page 13, and about halfway
4  down under Discussion, the third paragraph, first
5  full sentence says, The included studies have
6  relatively short follow-up with an average duration
7  of treatment with gender-affirming hormones between
8  around one year and 5.8 years.  Further studies
9  with a longer follow-up are needed to determine the
10  long-term effect of gender-affirming hormones for
11  children and adolescents with gender dysphoria.
12  Did I read that correctly?
13    A.    You did.
14    Q.    Do you agree that it would take longer
15  than 5.8 years for some of the effects associated
16  with these hormonal interventions to become
17  apparent?
18    A.    Averages can be rendered meaningless,
19  and so you really need to look at the individual
20  studies to recognize it.  If you had two studies or
21  three studies that followed these patients for
22  25 years but you happen to have a bunch of
23  fledgling gender programs start to release data
24  that all had been following their patients for one

Page 260

1  year, it would make the average quite low.  But it
2  does not diminish the value of the three studies
3  that have followed patients for 20, 25 years.  So
4  looking at just an average, I can't draw any
5  conclusion from this.
6    Q.    And the three studies that you were
7  talking about, was that the Dutch and Belgium, or
8  what was it?
9    A.    These were hypothetical studies.  I'm
10  saying, unless I know the studies and have a link
11  to the studies, that just seeing an average on its
12  own is not going to give me any information that is
13  useful.
14    Q.    Let's put it in the context of an
15  individual.  Do you agree that with an individual,
16  you will not have an understanding of what the
17  long-term effects of the hormonal interventions
18  will be within 5.8 years?
19    A.    Thankfully, on an individual level, we
20  have decades and decades and decades of experience
21  because transgender people have existed for a very
22  long time and have had access to this care for a
23  very long time.  So if we are looking at an
24  individual's experience of their own impact, we

Page 261

1  have many, many decades of personal experience and
2  individual experience to draw from.
3    Q.    You are talking about adults?
4    A.    Uh-huh.
5    Q.    So next paragraph, same page, it says,
6  Most studies included in this review did not report
7  comorbidities, physical or mental health, and no
8  study reported concomitant treatments in detail.
9  Did I read that correctly?
10    A.    You did.
11    Q.    What do you understand -- actually, I'll
12  read the second sentence as well.  Because of this,
13  it is not clear whether any changes seen were due
14  to gender-affirming hormones or other treatments
15  the participants may have received.  Did I read
16  that correctly?
17    A.    Yes, you did.
18    Q.    And what do you understand that
19  paragraph to be saying there?
20    A.    What do I understand it to be saying, or
21  what is my conclusion from that paragraph?
22    Q.    Both.
23    A.    Sure.  So what I mean it to say is that
24  in the published literature, the description of

66 (Pages 258 - 261)

Page 262

1 treatments that happened outside of the specific
2 study protocols were not included, and, thus, it's
3 difficult for an outside reviewer to make an
4 assessment of the potential impact of those
5 theoretical outside treatments on care.
6        My reaction, as I read it, is this is
7 part of the reason why we want people who have
8 experience in the field to do systematic reviews
9 because we can talk to some of the providers and
10 gather more information, whenever possible, to
11 understand what kind of treatments were happening.
12        I happen to know from the Dutch clinics
13 and the Belgium clinics that they have all of this
14 data, just that it was not published in the course
15 of these studies, and so there's a difference
16 between data that is not published and data that is
17 somehow nefariously hidden.
18    Q.   What data are you referring to?
19    A.   The other treatments that people had
20 access to during this care.
21    Q.   And what are the other treatments?
22    A.   You would have to ask the study sites,
23 that has that information, whether it was published
24 or not.

Page 263

1    Q.   But I thought you said you know it?
2    A.   No, not for all of the studies.  I'm
3 saying it is a knowable -- it is a knowable
4 question, but not one that Dr. Cass appeared to
5 investigate.
6    Q.   In the Dutch studies, do you think that
7 psychotherapy was a confounding variable?
8    A.   For what?
9    Q.   What do you mean, for what?
10    A.   For what outcome?
11    Q.   Gender dysphoria.
12    A.   There's many aspects of gender
13 dysphoria.  For the improvement of gender
14 dysphoria, is that your question?
15    Q.   I think so.  Can you answer that, if
16 that is the question?
17    A.   Confounding means, to me, involved in,
18 not necessarily causative of.  Do I think it was
19 confounding?  Not in particular.  I don't think
20 that the evidence supports that, but I think it's
21 certainly possible, in my experience, and I have a
22 bias as a mental health professional, that
23 generally therapy is a good thing and helps most
24 people understand and articulate experiences.

Page 264

1        But the data that we have that
2 supplements the Dutch data includes the
3 cross-sectional and also the survey-based data that
4 looks at people that did not have access to therapy
5 and people who had access to therapy but not to
6 medical interventions, and in those cases the
7 people who have access to therapy but not medical
8 interventions, when indicated, did worse and felt
9 worse.
10        So to me it's -- the preponderance of
11 the evidence, when you actually take it as a whole,
12 is that it's certainly not sufficient as a
13 treatment for gender dysphoria to do psychotherapy
14 alone when medical interventions are necessary.
15    Q.   When you say that they did worse just
16 now, are you referring to compared to the other
17 group?
18    A.   Yes.
19    Q.   Are you referring to the Costa study?
20    A.   It was the Costa study and the Turban
21 study.
22    Q.   The Turban study based on the USTS data?
23    A.   That is correct.
24    Q.   And are you aware that health

Page 265

1 authorities in Sweden have taken steps to restrict
2 the use of puberty blockers and cross-sex hormones
3 for adolescents with gender dysphoria?
4    A.   Yes.
5    Q.   And did you ever attempt to review the
6 evidentiary basis for those decisions?
7    A.   I have not read the Swedish reports that
8 I can recall, but it's possible that I have.  But,
9 again, similar to the Cass report, the underlying
10 data that all of these folks have been drawing from
11 has been published and reviewed.
12        (WHEREUPON, a certain document was
13        marked Janssen Deposition Exhibit
14        No. 17, for identification.)
15 BY MR. RAMER:
16    Q.   Dr. Janssen, you have been handed what
17 has been marked as Exhibit 17, and the title is A
18 Systematic Review of Hormone Treatment for Children
19 with Gender Dysphoria and Recommendations for
20 Research; is that correct?
21    A.   That is what it says.
22    Q.   And have you seen this article before?
23    A.   I have seen this article before.  I
24 can't recall when I read it.

67 (Pages 262 - 265)

1    Q.  And do you understand this to be a
2 systematic review commissioned by the Swedish
3 government?
4    A.  I don't see where it says it was
5 commissioned by the Swedish government, but if that
6 is what you are saying, I'm happy to stipulate
7 that.
8    Q.  We can put it on the record. Go to
9 2280, which is the second page of the study, and
10 the right column under 2.1, the first sentence
11 says, This systematic review originated from a
12 two-year commissioned work from the governmental
13 body of The Swedish Agency for Health Technology
14 Assessment and Assessment of Social Services, SBU;
15 is that right?
16    A.  Yes. That is what it says. I cannot
17 testify to being an expert on the governmental
18 structures of health care delivery in Sweden.
19    Q.  That is fair. On the same page, up
20 toward the top in the gray box, there's the
21 conclusion, and the first sentence says, Evidence
22 to assess the effects of hormone treatment on the
23 above fields in children with gender dysphoria is
24 insufficient. Do you see that?

1    A.  I see that.
2    Q.  And do you disagree with that
3 conclusion?
4    A.  I disagree with the structure of the
5 sentence. Insufficient for what? It's unclear.
6    Q.  Insufficient -- you don't think that
7 sentence is talking about whether the evidence is
8 sufficient to assess the effects of hormone
9 treatment?
10    A.  Yeah. It's not defined clearly to me.
11 If I were editing this paper, I would say,
12 Insufficient in what way? Please expand.
13    Q.  Going back to the first page, which is
14 2279. Again, in the gray box, the first category,
15 the aim says, The aim of this systematic review was
16 to assess the effects on psychosocial and mental
17 health, cognition, body composition, and metabolic
18 markers, hormone treatment in children with gender
19 dysphoria; is that right?
20    A.  That's correct.
21    Q.  So then if we go back to 2208 and read
22 the conclusion again, that says, Evidence to assess
23 the effects of hormone treatment on the above
24 fields in children with gender dysphoria is

1 insufficient. My question is, do you disagree with
2 that conclusion?
3    A.  So on page 2282, Section 3.3, the
4 authors define what outcomes they are looking at
5 for psychosocial and mental health. They identify
6 the CGAS, which is the Childrens Global Assessment
7 Scale, which is just a gestalt view of functioning,
8 and then they define the other things that we are
9 looking at, including the Child Behavior Checklist
10 and the Youth Self-Report, which are looking at
11 core symptoms of externalizing and internalizing
12 symptoms, primarily depression and anxiety. There
13 are no measures of gender dysphoria that are
14 included in psychosocial and mental health.
15 Working with patients, when they come and describe
16 their experience of gender dysphoria, gender
17 dysphoria symptoms significantly impact mental
18 health.
19     So when I read something that says it is
20 insufficient to demonstrate efficacy on mental
21 health but the measurements used are specifically
22 looking at depression and anxiety and not at gender
23 dysphoria, I think that is incomplete.
24    Q.  Do you know -- I mean, that paragraph

1 that you just read, that is the authors describing
2 the studies that were in the systematic review,
3 correct?
4    A.  That's correct.
5    Q.  Do you know what any of those studies
6 are that they are citing there?
7    A.  Going back through 14 through 19, I
8 would have to go back and look. Some of the
9 studies did not include and some of the studies did
10 include symptoms of gender dysphoria.
11    Q.  Is Footnote 14 the de Vries study?
12    A.  Yes.
13    Q.  Switching gears a little bit.
14    A.  So sorry. I apologize. To go back --
15    Q.  No, please.
16    A.  If we look at that table.
17    Q.  Which table?
18    A.  Table 1. Many of them do have
19 measurements of core symptoms of gender dysphoria,
20 and it's notable to me that the authors neglected
21 to include those in the analysis.
22    Q.  Which --
23    A.  Anything that says UGDS has a measure of
24 gender dysphoria.

Page 270

1    Q.   And how is the UGDS used in the Dutch
2  studies?
3    A.   To track severity of gender dysphoria
4  symptoms over time.
5    Q.   Do you know specifically in the study
6  how they deployed it with the subjects?
7    A.   I don't know the frequency with which
8  they deployed it in their studies.  I would have to
9  look at the specific methodology of each published
10  study to know.
11    Q.   If they had flipped the UGDS scales for
12  the subjects, so let me just -- it's going to be a
13  longwinded explanation and then I'll ask the
14  question.
15         Suppose that when these subjects entered
16  the study, they gave natal males the UGDS
17  questionnaire that is intended for males, and then
18  after transition, they gave now transgender females
19  the UGDS scale or questionnaire for females.  Would
20  that tell us anything about the effect of the
21  treatment on gender dysphoria?
22    A.   I'm not sure I'm following the question.
23  It's not tracking the patient experience in any
24  meaningful way.  The appreciation and experience of

Page 271

1  individuals with gender dysphoria is because of the
2  incongruence, and so if you are having a measure
3  that you want to track longitudinally, you want to
4  use as much as possible the same measure over time.
5  So to switch measures at the end just does not make
6  sense psychometrically, but it also doesn't make
7  sense clinically for the actual clinical experience
8  of the patients and the questions that are asked in
9  the Utrecht Gender Dysphoria Scale.
10    Q.   Why does it not make sense clinically?
11    A.   Because it's not what the patients are
12  experiencing.
13    Q.   So how would you use it?  How would you
14  use the UGDS to measure the outcome when you are
15  testing the efficacy of pubertal suppression and
16  cross-sex hormones?
17    A.   The Utrecht Gender Dysphoria Scale -- I
18  can't say that I would vouch for it in all
19  situations for all people, but the Utrecht Gender
20  Dysphoria Scale measures severity, intensity, and
21  types of symptoms of gender dysphoria.  One would
22  hope that as you treat gender dysphoria, that
23  intensity of distress would improve over time.
24  That is what we are measuring with the Utrecht

Page 272

1  Gender Dysphoria Scale.
2    Q.   Is it a questionnaire?
3    A.   It's a guided questionnaire.  The
4  provider or the clinician fills it out.
5    Q.   And are there two forms of the guided
6  questionnaire, one for natal females and one for
7  natal males?
8    A.   That is correct.
9    Q.   So then how do you use that to measure
10  the improvement?  Which one do you give the patient
11  on the other side of the transition?
12    A.   The same as you did before.
13    Q.   The male one -- sorry.  If you had a
14  natal male, you will give them the male
15  questionnaire?
16    A.   Yes.
17    Q.   And then they will go through transition
18  and you would give them the male questionnaire
19  again?
20    A.   Yes.
21    Q.   Isn't -- wouldn't the male questionnaire
22  be asking them, How does it feel when people call
23  you a male, et cetera?
24    A.   We can -- if you have a copy, we could

Page 273

1  go through it, but that is not what the -- you
2  would have to go line by line and see how it
3  impacts it.  What it measures is severity of
4  distress in multiple different domains.  We would
5  anticipate that if a treatment is effective for
6  gender dysphoria, a degree of distress would
7  improve over time.  And if you more misalignment of
8  your body that leads to distress, that is going to
9  lead to an elevated score.  As you get more
10  congruence, less distress, your scores would go
11  down.
12    Q.   More congruence with what though?
13    A.   Congruence between your sense of self
14  and your lived experience and your body alignment.
15    Q.   But so you would be giving transgender
16  females the questionnaire that is written for natal
17  males, correct?
18    A.   Correct.  That is how the study was --
19  that is how the instrument was designed, so that is
20  the appropriate use of the instrument.  It was not
21  designed or tested to do the opposite, so it would
22  not be an appropriate use of that instrument.
23    Q.   So switching gears now.  Do you agree
24  that social media can play a powerful role in the

69 (Pages 270 - 273)

Page 274

1 contagion of suicidal behavior among youth?
2    MR. RAY:  Object to form.
3 BY THE WITNESS:
4    A.   We would have to break that down in
5 terms of what you mean by "contagion" and what you
6 mean by "powerful."
7 BY MR. RAMER:
8    Q.   We'll just do it this way, I guess.
9           (WHEREUPON, a certain document was
10          marked Janssen Deposition Exhibit
11          No. 18, for identification.)
12 BY MR. RAMER:
13    Q.   Dr. Janssen, you have been handed what
14 has been marked as Exhibit 18, and the title is,
15 Editorial:  Dialectical Behavior Therapy:  More is
16 Not Always Better When Different is Required,
17 correct?
18    A.   Yes.
19    Q.   Did you help author this?
20    A.   I did.
21    Q.   In the first paragraph towards the very
22 bottom, you discuss recent research suggesting the
23 powerful role of social media in supporting
24 contagion of suicidal behavior among youth,

Page 275

1 correct?
2    A.   Yes.
3    Q.   Can you explain what you mean by
4 "powerful" and "contagion" in that sentence?
5    A.   I would have to get the Sedgwick article
6 to tell you the specifics.
7    Q.   Can you clarify what you mean by that?
8    A.   That the authors of the Sedgwick article
9 documented their impact, the impact of social media
10 contagion on suicidality in youth, but they have
11 the details in that paper.  I don't have them here
12 in front of me.  I don't recall them specifically.
13    Q.   Do you think that social media plays a
14 role in supporting contagion suicidal behavior in
15 youth?
16    A.   It can certainly.
17    Q.   How so?
18    A.   There has actually been a robust amount
19 of evidence that how suicide is talked about can
20 influence whether or not members of a peer group
21 may act on concurrent suicidal thoughts.
22    Q.   What did the research tell us?
23    A.   Part of it -- I would have to go back
24 and look at all of the specifics, but by and large,

Page 276

1 from my recollection of the research, doing things
2 like having pictures of where the suicide happened,
3 overly extolling the victim of the death by
4 suicide, valorizing that patient, normalizing it
5 can increase the risk of others in the same social
6 network acting on suicidal thoughts.
7    Q.   Then same page, same column, the third
8 paragraph, the first sentence says, Contagion of
9 suicidal behavior among youth and their high level
10 of engagement with social media are particularly
11 concerning; is that right?
12    A.   Uh-huh.
13    Q.   So do you think that high level of
14 engagement with social media plays a role in the
15 contagion of suicidal behavior among youth?
16    A.   I think normalization of suicide in the
17 context of a social media space is not a positive
18 development.
19    Q.   Then two sentences later, it says,
20 Children now have in their pockets access to
21 communities and information that encourage
22 exploration of suicide and teach children how to
23 access more lethal means online, correct?
24    A.   Yes.

Page 277

1    Q.   And do you agree with that statement?
2    A.   I do.
3    Q.   So did you think that social media can
4 play a role in contagion of gender dysphoria among
5 youth?
6    A.   Of the diagnosis of gender dysphoria, I
7 do not.
8    Q.   Do you think that contagion of gender
9 dysphoria among youth and youth's level of
10 engagement with social media is concerning?
11    A.   I would not use the word "contagion" to
12 describe an identity development process.
13    Q.   Do you agree that minors have access to
14 communities and information that encourage
15 exploration of their gender?
16    A.   Yes.
17    Q.   Do you agree that minors have access to
18 communities and information that teach minors how
19 to access medical interventions for gender
20 transitioning?
21    A.   Yes.
22    Q.   For adults, do you agree that therapy or
23 mental health care should not be required as part
24 of the transition process?

70 (Pages 274 - 277)

Page 278

1    A.    That is context dependent.
2    Q.    And can you explain what the context is
3 that it depends upon?
4    A.    Yeah.  Psychotherapy is an intervention
5 like any other intervention, in that you have to
6 understand what are your treatment goals and what
7 are the risks and benefits and alternatives to that
8 treatment.
9         For some people, there are no treatment
10 goals that would be indicated for psychotherapy,
11 and in those cases psychotherapy is not indicated.
12    Q.    And that would not be the case -- do you
13 think that -- do you agree that mental health care
14 should not be required as part of the transition
15 process for adolescents?
16    A.    It's not indicated in all cases.  A
17 mental health evaluation is recommended as a part
18 of this process, but ongoing psychotherapy is not a
19 required element for all cases.
20    Q.    All right.  I would like to go back to
21 Exhibit 7, which is your report.  I would like to
22 go to page 3 and third paragraph, it looks like the
23 third sentence, you write, The WPATH SOC has been
24 recognized and adopted as the prevailing standard

Page 279

1 of care by the major professional associations,
2 medical and mental health providers in the United
3 States, including the American Medical Association,
4 American Academy of Pediatrics, and then a few
5 other organizations; is that right?
6    A.    Yes.
7    Q.    And how do you know that?
8    A.    From my recollection, it is from seeing
9 statements of endorsement.
10    Q.    You have seen statements of endorsement
11 from the American Medical Association of the WPATH
12 SOC 8?
13    A.    That is my recollection.
14    Q.    Is there any place where somebody in the
15 public could go find that statement and verify it?
16    A.    I do not know.
17    Q.    And you have also seen statements of
18 endorsement of the SOC 8 from the American Medical
19 Association?
20    A.    From my recollection, yes.
21    Q.    Go to page 9.  So on page 9, first full
22 paragraph, second sentence, you write, Following
23 transition transgender young people are often able
24 to reduce dosage of psychiatric medications,

Page 280

1 correct?
2    A.    Correct.
3    Q.    And is that based on your clinical
4 experience?
5    A.    Yeah.
6    Q.    Do you agree that the data in the
7 Glintborg study says the opposite?
8    A.    I would have to see the Glintborg study.
9    MR. RAY:  I bet he's got it.
10         (WHEREUPON, a certain document was
11         marked Janssen Deposition Exhibit
12         No. 19, for identification.)
13 BY MR. RAMER:
14    Q.    And you have been handed what has been
15 marked as Exhibit 19, and is this the supplemental
16 expert report that you submitted in this case?
17    A.    It is, yes.
18    Q.    I would like to go to page 7.
19    A.    Sure.
20    Q.    And just a few lines up from the bottom,
21 where you are describing the Glintborg study, you
22 say, Correspondingly, the proportion of transgender
23 individuals prescribed psychopharmacological agents
24 increased significantly from baseline to diagnosis;

Page 281

1 is that right?
2    A.    That's right.
3    Q.    And so do you agree that the data in
4 this study contradicts what you say in page 9 of
5 your report?
6    A.    I do not.
7    Q.    What is the distinction I'm missing?
8    A.    The distinction is between the
9 difference of a class effect and an individual
10 effect.  As a class of folks, transgender
11 individuals, just like any other individuals who
12 are required to have a mental health assessment,
13 are going to have identification of mental illness
14 that requires treatment, and you'll see increases
15 of rates of prescribing.
16         That is different from the question of,
17 in an individual who has psychiatric medication at
18 baseline, who has access to gender-affirming
19 treatments, whether that individual patient will
20 see improvements in mental health care, such that
21 they are able to see reduction of medication doses
22 or medication numbers.
23    Q.    So are you distinguishing between dosage
24 and number of prescribed agents?

71 (Pages 278 - 281)

Page 282

1    A.   Yes.
2    Q.   Still on page 9, you cite a study by
3 Diane Chen, correct?
4    A.   I do, yeah.
5         (WHEREUPON, a certain document was
6              marked Janssen Deposition Exhibit
7              No. 20, for identification.)
8 BY MR. RAMER:
9    Q.   And you have been handed what has been
10 marked as Exhibit 20, and about partway down this
11 first page, there's a title that says, Growing
12 Evidence and Remaining Questions in Adolescent
13 Transgender Care; is that right?
14   A.   Yes.
15   Q.   And the lead author of this editorial is
16 Annelou de Vries, correct?
17   A.   Yes.
18   Q.   And that is the de Vries who helped with
19 the Dutch studies, correct?
20   A.   That is correct.
21   Q.   And do you agree, de Vries is an expert
22 in the field of transgender medicine?
23   A.   I do.
24   Q.   And if you could go page 277, which is

Page 283

1 the third page, and you look at Footnote 1, this
2 editorial is discussing the Chen article that you
3 cite, correct?
4    A.   It is, yes.
5    Q.   And have you seen this before?
6    A.   I have.
7    Q.   Okay.  What did you think when you read
8 it?
9    A.   Oh, I don't recall what I thought about
10 when I read it.
11   Q.   I would like to go to page 276, and left
12 column, second full paragraph, second sentence, it
13 says, Although overall psychological functioning in
14 the study participants improved, there was
15 substantial variation among participants.  A
16 considerable number still had depression, anxiety,
17 or both at 24 months and two died by suicide.  Did
18 I read that correctly?
19   A.   You did, yeah.
20   Q.   And were you aware of these facts before
21 you cited the Chen article in your report?
22   A.   Yes.
23   Q.   And did these facts concern you?
24   A.   Death by suicide always concerns me.

Page 284

1    Q.   Do you think that -- does that concern
2 extend to the reliability of the study?
3    A.   It does not.
4    Q.   Why not?
5    A.   Because outcomes that are -- outcomes
6 such as this are not an indication of poor study
7 design.  Again, what we are looking at are the
8 outcomes that are studied and the interventions
9 based upon those outcomes.  Treatment of
10 suicidality is a different process than treatment
11 of gender dysphoria.
12   Q.   But does gender dysphoria lead to
13 suicidality?
14   A.   In my clinical experience, it's how many
15 of my patients describe it.
16   Q.   But does it -- apart from the
17 description, does gender dysphoria lead to
18 suicidality?
19   A.   So there's many reasons for suicidality,
20 and the good data that we have on adolescent
21 suicidality in particular demonstrate that the
22 majority of adolescents who die by suicide have no
23 co-occurring mental health disorders and yet they
24 die by suicide.

Page 285

1    Why do they die by suicide?  Because
2 there are in-the-moment challenges, distresses,
3 et cetera, plus access to lethal means, and that is
4 the combination that leads to death by suicide
5 among this population.
6         Reducing gender dysphoria does not
7 reduce access to lethal means nor does it reduce
8 access to adverse events that can often trigger
9 intense suicidal thoughts.  Evidence-based
10 interventions, like collaborative assessment and
11 management of suicidality or DBT are effective
12 interventions for suicidality.  Stanley Brown's
13 safety plan, lethal means counseling, these are
14 evidence-based interventions that reduce outcomes
15 of suicidality.
16        We would hope that some of the milieu
17 that leads to increased suicidal thinking would
18 improve with treatment of the gender dysphoria, but
19 we can't anticipate that treatment of dysphoria is
20 going to specifically treat suicidality because
21 it's a different phenomenology.
22   Q.   So same paragraph, two sentences later,
23 it says, However, other possible determinants of
24 outcomes were not reported, particularly the extent

72 (Pages 282 - 285)

Page 286

1 of mental health care provided throughout GAH
2 treatment. Did I read that correctly?
3     A.   You read that correctly.
4     Q.   And what is your understanding of what
5 de Vries is saying there?
6     A.   She's saying because it was not
7 reported, we can't really comment on it.
8     Q.   She's saying we can't comment on it, or
9 she's saying that this mental health care could be
10 a possible determinant of outcome?
11     A.   From my read of it, it's that we can't
12 draw any conclusions because it was not included in
13 the analysis.
14     Q.   And would that preclude drawing
15 conclusions about the medical interventions as
16 well?
17     A.   I don't think it would, no.
18     Q.   Why not?
19     A.   It's not how the study was designed.
20     Q.   What do you mean by that?
21     A.   You would have to go back and look at
22 the specific Chen study itself to review the
23 specifics of the study design.
24     Q.   But you think there's a zero percent

Page 287

1 chance that any improvements were due to mental
2 health care?
3     A.   Well, you are talking to a psychiatrist,
4 so I'm never going to say that there's a zero
5 percent impact. And I think that mental health
6 interventions are often incredibly beneficial, so I
7 would never say that it is a zero percent.
8     Q.   10 percent?
9     A.   I could not tell you. There's no
10 specific percentage that I would feel comfortable
11 without data.
12     Q.   Do you feel comfortable thinking that
13 the measures of improvements from the medical
14 interventions are attributable to the medical
15 interventions?
16     A.   When that is combined with the rest of
17 the extant literature with the clinical experience
18 and the reports of the patients that have been
19 through this process, as well as the other research
20 types that have looked at longer term outcomes,
21 yes, I feel confident that this reflects my
22 clinical experience in working with these patients.
23     Q.   And so just to confirm, you do not think
24 that de Vries is talking about mental health care

Page 288

1 as a possible confounding variable in this
2 sentence; is that correct?
3     A.   I think she is talking about, but it's
4 not possible to draw conclusions when the
5 description of the additional mental health care
6 delivery was not included in the analysis.
7     Q.   What do you think a confounding variable
8 is?
9     A.   Something that contributes to the
10 outcome.
11     Q.   And why is it labelled confounding?
12     A.   Because it's an additional element that
13 can potentially impact outcome.
14     MR. RAMER: Maybe take a short one, short
15 break, does that work?
16     MR. RAY: Absolutely.
17         (WHEREUPON, a recess was had.)
18     MR. FLETCHER: I was saying, the United States
19 is going to order a copy of the transcript,
20 whenever it's available.
21 BY MR. RAMER:
22     Q.   Dr. Janssen, I would like to go back to
23 Exhibit 7, which is your expert report, and,
24 specifically, I would like to go to page 15.

Page 289

1     A.   Okay.
2     Q.   And in the first full paragraph, kind of
3 a couple sentences from the bottom of that
4 paragraph, you say, The distress associated with
5 gender dysphoria can also amplify co-occurring
6 conditions that develop independently of the gender
7 dysphoria; is that correct?
8     A.   That is correct.
9     Q.   And can you just explain what you mean
10 by that?
11     A.   Sure. So a concrete example, you have
12 an adolescent with major depressive disorder. One
13 of the treatments for major depressive disorder is
14 called behavioral activation, essentially being
15 around people, doing things that you enjoy.
16         If the gender dysphoria is such that
17 your distress makes it feel uncomfortable to be
18 around friends or to go to school or to engage in
19 sports or other activities, then you don't have
20 access to that same degree of behavior activation,
21 and depressive symptoms can worsen.
22     Q.   Can symptoms from co-occurring
23 conditions that developed independently from gender
24 dysphoria ever amplify the distress associated with

73 (Pages 286 - 289)

Page 290

1 gender dysphoria?
2    A.   I think that's accurate.  I think more
3 often what we see in clinical practice is that the
4 co-occurring mental health disorders interfere with
5 the capacity to tolerate the distress from gender
6 dysphoria.
7    Q.   And in that situation, which issue do
8 you target first?
9    A.   That's not how it works in clinical
10 practice.  If a patient comes to me with ADHD and
11 depression, I'm going to treat both ADHD and
12 depression.
13    Q.   But what if the treatment of one would
14 help resolve and, thus, negate the need for the
15 treatment of the other?
16    A.   That is a part of your assessment that
17 you would do prior to initiating a treatment plan.
18 If your treatment plan and your agreement that you
19 have worked with your patient and family is to do
20 treatment consecutively as opposed to concurrently,
21 you test the efficacy of the treatment on the core
22 symptoms that you are working to improve.
23    Q.   Would you ever take into account the
24 degree of intrusiveness for the interventions for

Page 291

1 one versus the interventions for the other when
2 making that decision?
3    A.   The families make the decision, and
4 there's a number of factors that are involved that
5 families often draw from.  The intensity of the
6 intervention, the frequency of the intervention.
7 There's many, many factors that parents engage in
8 around making these decisions.
9    Q.   When you are making a recommendation, do
10 you ever take into account the intrusiveness of the
11 interventions for one versus the other when
12 deciding how to proceed?
13    A.   I offer and discuss what the
14 implications of all of the interventions are, so
15 that families can make an informed decision.
16    Q.   But you make a suggestion, don't you?
17    A.   I make a suggestion based upon the best
18 available evidence, but the suggestion is couched
19 within multiple options.
20    Q.   I guess I'm not sure I understand.  I
21 mean, when the family is coming to you, are you --
22 you don't just, like, say, Here is -- here are
23 these options, go forth and choose.  Don't you come
24 up with a suggestion of, Based on what I'm seeing

Page 292

1 and what I know, I think you should go this route,
2 these are other options you can consider?  Which
3 one sounds more accurate?
4    A.   Neither.  It's a collaborative
5 discussion that you have with the patients and
6 families, many of whom already come into care with
7 thoughts about what might be appropriate.  My job,
8 as a physician working with these patients and
9 their families, is to make my assessment and
10 provide the options of care.
11       I will often describe what level of
12 support for the various options that we have are.
13 Outside of the world of gender, this is not
14 different from patients that I'm treating with
15 depression or anxiety.  We know that for severe
16 depression, medication in addition to therapy is
17 what is recommended as the likeliest to improve
18 outcomes in the quickest way possible.
19       Many families don't want medication, and
20 so they opt not to do that.  So even though I might
21 make a recommendation, ultimately the decision is
22 the patient and the family's.
23    Q.   And when you say "describe the level of
24 support," are you referring to evidentiary support?

Page 293

1    A.   Yes.
2    Q.   So sticking with your declar- -- your
3 report, Exhibit 7, same page, towards the bottom,
4 you say, It is often seen that the gender dysphoria
5 would eclipse the person's co-occurring conditions.
6 Do you see that?
7    A.   I do.
8    Q.   What does it mean for one condition to
9 eclipse another?
10    A.   I think in the example that I gave about
11 a lack of access to behavioral activation because
12 of the gender dysphoria symptoms would be an
13 example of that.
14    Q.   Could you remind me of what behavioral
15 activation is?
16    A.   So if a patient needs to be out and
17 about, do some exercise, be with friends as a way
18 of treating depression, and they are not able to do
19 that because of gender dysphoria symptoms, it makes
20 it hard to treat the depression.
21    Q.   And in that situation -- it's a
22 hypothetical, I understand -- you would start with
23 treating the gender dysphoria as opposed to finding
24 ways to help with the activation; is that right?

Veritext Legal Solutions
877-373-3660                                          800.808.4958

1    A.    We would do it concurrently.
2    Q.    On the next page, you say -- first full
3 sentence on the page, you say, The increased
4 distress from their gender dysphoria would
5 translate to self-harm; is that correct?
6    A.    Yes, it can.  Yes.
7    Q.    You say "would"?
8    A.    Yes.  It would resort to negative coping
9 mechanisms, as an example, self-harm.  It's not --
10    Q.    So the i.e. should be an e.g.?  I mean,
11 not to be pedantic?
12    A.    No, please be pedantic.  Yes, it should
13 be an e.g. there.
14    Q.    So you do not think it has been
15 established that delaying treatment will cause
16 self-harm; is that right?
17    A.    If we are talking about individual or
18 population-based studies, there's a difference.
19 Absolutely in my clinical experience, I have seen
20 delays in accessing gender dysphoria medical
21 interventions leading to increased frequency and
22 severity of self-harm.  There have not been
23 published studies looking at large populations
24 because there has not been a study on rates of

1 self-harm in this context.
2    Q.    But, presumably, they would show that
3 based on the individual; is that right?
4    A.    We don't know.  That would be a testable
5 hypothesis that we would like to -- we would be
6 happy to study, but the studies have not yet been
7 done.
8    Q.    But you observed it in this individual?
9    A.    Yes.
10    Q.    And you can say that the delaying of the
11 treatment caused the self-harm?
12    A.    That has been the experience that I have
13 had clinically, yes.
14    Q.    Why would that not be guaranteed to hold
15 constant with a large population, if you have
16 concluded that it caused the self-harm?
17    A.    Because that is not how studies work.  I
18 have a hypothesis, and I would imagine that it
19 would hold up if we looked at a population of
20 patients who utilized self-harm as a maladaptive
21 coping tool for gender dysphoria.  My hypothesis
22 would be that withholding treatment for gender
23 dysphoria would likely exacerbate intensity and
24 frequency of self-harm.  But that is a testable

1 hypothesis, so I'm not going to presuppose what the
2 conclusion of a study is that has not yet been
3 done.
4    Q.    But then doesn't that also preclude you
5 from saying that in this individual, the delaying
6 of treatment caused the self-harm?
7    A.    No, because there's a difference between
8 individual evaluations and assessment, which is
9 core clinical care in a population-based study.
10    Q.    I guess I don't know -- my question
11 is -- why is the distinction between individual
12 versus population, as opposed to the distinction is
13 between deciding something has caused something
14 else and merely stating that you have observed this
15 association?
16    A.    There might be a distinction without a
17 difference here.  My patients have told me, I can't
18 manage this distress.  I can't wait any longer, and
19 I don't know what else to do and resort to
20 self-harm.  Those same patients I have seen improve
21 when they have access to the medical interventions
22 for gender dysphoria.  That is separate from
23 looking at a class of patients and doing
24 evaluations about an intervention on a class of

1 patients.
2    Q.    Do you think the use of pubertal
3 suppression to treat gender dysphoria is beyond
4 debate?
5    A.    Nothing is beyond debate.
6    Q.    Do you think that reasonable experts
7 could dispute that pubertal suppression is
8 effective for treating gender dysphoria?
9    A.    I mean, reasonableness and evaluating
10 reasonableness, I don't know how you want me to do
11 that.  I think that the evidentiary -- let me
12 figure out how to say this.
13         I think pairing the evidentiary support
14 with clinical experience, it would be hard to find
15 an expert who can reasonably combine those two
16 things and say that there is not robust support
17 that puberty blockers are safe and effective
18 treatments for gender dysphoria.
19    Q.    And is it the same answer for the use of
20 cross-sex hormones to treat gender dysphoria in
21 adolescents?
22    A.    Yes.
23    Q.    Okay.  Going to Exhibit 19, which is
24 your supplemental expert report, and page 4,

Page 298

1 paragraph 7 starts, and you are excusing the
2 Morandini study, but I have a question for you on
3 page 5, where that paragraph carries over.
4     A.   Uh-huh.
5     Q.   And I think it is relevant to what we
6 were discussing earlier, but I just want to make
7 sure that I understand the concept.
8         You are faulting -- so page 5, the end
9 of paragraph 7, last two sentences.  You are
10 faulting the Morandini study because the authors
11 used anxiety, depression, and suicidality measures
12 as opposed to gender dysphoria, correct?
13     A.   That is essentially correct, that the
14 authors have used those three criteria exclusively
15 as a definition for mental health, at the exclusion
16 of the core symptoms of mental health that the
17 intervention is aimed to be treating, which is
18 gender dysphoria.
19     Q.   And for that reason -- I guess, what if
20 they had included the measurements of gender
21 dysphoria and they were just neutral, no changes
22 either way?
23     A.   Then that would be useful information to
24 understand and to learn, and you would analyze the

Page 299

1 strengths and benefits of the study designed to be
2 able to give weight to that conclusion.
3     Q.   And next paragraph, next sentence, you
4 also fault the study for being a cross-sectional
5 design; is that right?
6     A.   Correct.
7     Q.   And what is the significance of that?
8     A.   I would not fault it for being a
9 cross-sectional design, so I would not say that
10 that is accurate.  So I apologize for saying yep to
11 that, but it comes with its own set of limitations.
12     Q.   And what kind of limitations?
13     A.   It's hard to prove causality in a
14 cross-sectional designed study, particularly in
15 this cross-sectional designed study that was
16 looking at indicators of mental health at the time
17 of initiation of care and not at the time of
18 completion of care.
19     Q.   Do you think that we have established
20 causation for the effectiveness -- sorry.  Let me
21 back up.
22         Given the state of the literature, do
23 you think that research has established causation
24 for the effectiveness of pubertal suppression in

Page 300

1 treating gender dysphoria?
2     A.   I think causation is a tricky word in
3 the medical literature.  I think that it took
4 decades of epidemiologic research to say
5 conclusively that smoking causes lung cancer, even
6 though the preponderance of the evidence was very
7 clear about that for many decades before the
8 statistical power was developed to be able to make
9 that very firm conclusion.
10        So the definition of causation or not is
11 a little bit tricky in this context.  Do we have a
12 preponderance of the evidence that suggests this is
13 safe and effective care for the core symptoms of
14 gender dysphoria and improves functioning and
15 quality of life?  Yes, we do.
16     Q.   And on pages -- sticking with
17 Exhibit 19, on pages 7 through 11.
18     A.   Uh-huh.
19     Q.   You analyze the Kaltiala and Glintborg
20 studies, correct?
21     A.   That is correct.
22     Q.   And are there any flaws in those studies
23 that you did not describe in your report?
24     A.   I'm sure there are, but --

Page 301

1     Q.   You are sure there are?
2     A.   There are flaws in every study.  I can't
3 categorize every single flaw of every single study,
4 but I would have to look at the studies again more
5 carefully.
6     Q.   And so when you say that you are sure
7 there are, that is just applicable to every study,
8 not something specific to Kaltiala and Glintborg;
9 is that correct?
10     A.   Correct.
11     Q.   Okay.  And are you a member of the
12 American Academy of Child and Adolescent
13 Psychiatry?
14     A.   Yes.
15     Q.   And the acronym for that, do you say
16 AACAP?
17     A.   AACAP.
18     Q.   Just AACAP?
19     A.   Yeah.
20     Q.   And in your role at AACAP, have you ever
21 interacted with Kristopher Kaliebe?
22     A.   Yes, I have.
23     Q.   In what context?
24     A.   He asked if I would be -- my initial

76 (Pages 298 - 301)

Page 302

1 interaction with him was when he asked if I would
2 be a discussant on a panel that he was proposing
3 for one of the AACAP annual meetings.
4    Q.   And what was the substance of that
5 discussion?
6    A.   The thing I remember most about that
7 discussion is his description of himself as
8 somebody with an interest in but not expertise in
9 gender dysphoria, and that -- it was a lovely
10 back-and-forth conversation about the state of
11 affairs in the world of gender dysphoria research,
12 and it was left with me saying that I would
13 consider being on the panel, depending upon the
14 content of the panel.
15    Q.   And what was the content that he wanted
16 to discuss?
17    A.   From my recollection, it was about
18 skepticism towards research in transgender health.
19    Q.   Did you read his expert report that he
20 submitted in this case?
21    A.   I did.
22    Q.   Did you read the part of the report that
23 suggests you suppressed a panel at an AACAP
24 conference?

Page 303

1    A.   I did read that.
2    Q.   And what is your response to that?
3    A.   It's not true.
4    Q.   Which part of it is not true?
5    A.   I would have to look at the specific
6 report to give you specifics on my response to it.
7    Q.   Do you remember him approaching you
8 about a panel?
9    A.   I was not involved in the selection of
10 any of the panels that he was involved in.
11    Q.   And do you think that members of AACAP
12 suppress ideas that they disagree with?
13    A.   No, I do not.
14    Q.   Are you familiar with the research of
15 Dr. Littman?
16    A.   Yes.
17    Q.   And what are your thoughts on the
18 articles that she has published?
19    A.   It depends upon the specific article.  I
20 think that her initial foray into the world of
21 transgender health research was low quality and
22 poorly designed and unethical.  The second one was
23 better but still had significant problems in
24 design.

Page 304

1    Q.   When you say "low quality," are you
2 using specific --
3    A.   Not a specific methodology or grading
4 criteria.
5    Q.   And did you review the medical records
6 of any of the plaintiffs in this case?
7    A.   No.
8    Q.   Are you a neurologist?
9    A.   No.  I'm boarded by the American -- the
10 ABPN.
11    Q.   And what is that?
12    A.   I'm trying to remember the specific
13 acronym.  American Board of Psychiatrists and
14 Neurologists.
15    Q.   And so are you only under the P part of
16 that acronym?
17    A.   We both get the same licensure, but, no,
18 I'm not a neurologist.
19    Q.   Are you a surgeon?
20    A.   No.
21    Q.   Are you a urologist?
22    A.   I am not.
23    Q.   Are you a gynecologist?
24    A.   I am not.

Page 305

1    Q.   Are you a bioethicist?
2    A.   I'm not.
3    Q.   Are you a social worker?
4    A.   I'm not.
5    MR. RAMER:  Dr. Janssen, I think that those
6 are all of the questions that I have for you.  I'll
7 thank you very much for your time, and I'll turn it
8 over to your counsel, if counsel has questions.
9    MR. RAY:  I don't have any questions.  I don't
10 also think that there was anything confidential --
11    MR. RAMER:  Correct.
12    MR. RAY:  -- today, so I don't think that we
13 need to mark the transcript.  The witness will
14 review and sign his transcript.  I really
15 appreciate everyone's time on a Friday.  Hope
16 everyone has safe travels home.
17    MR. RAMER:  Thank you.  Likewise.
18         FURTHER DEPONENT SAITH NOT.
19
20
21
22
23
24

77 (Pages 302 - 305)

**Page 306**

1 STATE OF ILLINOIS )
) SS:
2 COUNTY OF C O O K )
3
    I, KRISTIN C. BRAJKOVICH, a Certified
4 Shorthand Reporter of said state, do hereby
certify:
5
    That previous to the commencement of the
6 examination of the witness, the witness was duly
sworn to testify the whole truth concerning the
7 matters herein;
8    That the foregoing deposition transcript
was reported stenographically by me,
9 was thereafter reduced to typewriting under my
personal direction and constitutes a true record
10 of the testimony given and the proceedings had;
11    That the said deposition was taken
before me at the time and place specified;
12
    That I am not a relative or employee
13 or attorney or counsel, nor a relative or
employee of such attorney or counsel for any of
14 the parties hereto, nor interested directly or
indirectly in the outcome of this action.
15
    IN WITNESS WHEREOF, I do hereunto set my
16 hand and affix my seal of office at Chicago,
Illinois, this 3rd of May, 2024.
17
18
19
20
21    KRISTIN C. BRAJKOVICH
    C.S.R. Certificate No. 84-3810.
22
23
24

**Page 307**

1    DEPOSITION ERRATA SHEET
2 Our Assignment No. 6489437 | 5346
3 Case Caption:  Brianna Boe, United States of
4    America v. Hon. Steve Marshall,
5    et al.
6
7    DECLARATION UNDER PENALTY OF PERJURY
8
9    I declare under penalty of perjury that
10 I have read the entire transcript of my deposition
11 taken in the captioned matter or the same has been
12 read to me, and the same is true and accurate, save
13 and except for changes and/or corrections, if any,
14 as indicated by me on the DEPOSITION ERRATA SHEET
15 hereof, with the understanding that I offer these
16 changes as if still under oath.
17
18    Signed on the _____ day of
19 _____, 20_____.
20
21
22
23 _____
24    ARON JANSSEN, M.D.

**Page 308**

1    DEPOSITION ERRATA SHEET
2
3 Page No. _____Line No._____Change To:_____
4 Reason for Change:_____
5 Page No. _____Line No._____Change To:_____
6 Reason for Change:_____
7 Page No. _____Line No._____Change To:_____
8 Reason for Change:_____
9 Page No. _____Line No._____Change To:_____
10 Reason for Change:_____
11 Page No. _____Line No._____Change To:_____
12 Reason for Change:_____
13 Page No. _____Line No._____Change To:_____
14 Reason for Change:_____
15 Page No. _____Line No._____Change To:_____
16 Reason for Change:_____
17 Page No. _____Line No._____Change To:_____
18 Reason for Change:_____
19 Page No. _____Line No._____Change To:_____
20 Reason for Change:_____
21 Page No. _____Line No._____Change To:_____
22 Reason for Change:_____
23 SIGNATURE:_____DATE:_____
24    ARON JANSSEN, M.D.

**Page 309**

1    DEPOSITION ERRATA SHEET
2
3 Page No. _____Line No._____Change To:_____
4 Reason for Change:_____
5 Page No. _____Line No._____Change To:_____
6 Reason for Change:_____
7 Page No. _____Line No._____Change To:_____
8 Reason for Change:_____
9 Page No. _____Line No._____Change To:_____
10 Reason for Change:_____
11 Page No. _____Line No._____Change To:_____
12 Reason for Change:_____
13 Page No. _____Line No._____Change To:_____
14 Reason for Change:_____
15 Page No. _____Line No._____Change To:_____
16 Reason for Change:_____
17 Page No. _____Line No._____Change To:_____
18 Reason for Change:_____
19 Page No. _____Line No._____Change To:_____
20 Reason for Change:_____
21 Page No. _____Line No._____Change To:_____
22 Reason for Change:_____
23 SIGNATURE:_____DATE:_____
24    ARON JANSSEN, M.D.
6,Signature%>