# EXHIBIT 79

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5

6

7      CIVIL ACTION NO.:  2:22-cv-184-LCB

8

9      BRIANNA BOE, et al.,

10            Plaintiffs,

11      UNITED STATES OF AMERICA,

12            Intervenor Plaintiff,

13

14      v.

15

16      HON. STEVE MARSHALL, et al.,

17            Defendants.

18

19

20        REMOTE VIDEOCONFERENCE DEPOSITION

21              TESTIMONY OF:

22            DEVIN CAUGHEY, Ph.D.

23              May 1, 2024

Page 2

1    A P P E A R A N C E S
2    (all via remote videoconference)
3
4    FOR THE PLAINTIFFS:
5
6    James Fletcher, Esq.
7    Kaitlin Toyama, Esq.
8    Andrew Rogers, Esq.
9    DEPARTMENT OF JUSTICE
10   CIVIL RIGHTS DIVISION
11   150 M Street, NE
12   Washington, D.C.  20002
13   james.fletcher@usdoj.gov
14
15   Cynthia Cheng-Wun Weaver, Esq.
16   HUMAN RIGHTS CAMPAIGN
17   1640 Rhode Island Avenue, NW
18   Washington, D.C.  20036
19   cynthia.weaver@hrc.org
20
21
22
23

Page 3

1    A P P E A R A N C E S (continued)
2
3    FOR THE DEFENDANTS:
4
5    Christopher Mills, Esq.
6    SPERO LAW
7    557 East Bay Street, Suite 22251
8    Charleston, South Carolina  29413
9    cmills@spero.law
10
11
12   ALSO PRESENT:
13
14   Elizabeth Rodriguez-Ross, Esq., GLAD
15
16
17
18
19
20
21
22
23

Page 4

1              I N D E X
2
3    EXAMINATION BY:          PAGE NO.
4    Mr. Mills                8
5    Mr. Fletcher             335
6
7
8
9
10
11       E X H I B I T S
12
13   FOR THE DEFENDANTS:
14   Exhibit 4   Codebook Policies      214
15   Exhibit 5   "The Policy Effects of the   162
16       Partisan Composition of State
17       Government"
18   Exhibit 7   Freedom in the 50 States,   206
19       Sixth Edition
20   Exhibit 15  Dynamic Democracy (excerpt)  115
21   Exhibit 16  "Measuring LGBTQ Policy    237
22       Environment in the American
23       States," Scott LaCombe

Page 5

1    Exhibit 19  "Policy Preferences and   142
2        Policy Change: Dynamic
3        Responsiveness in the
4        American States, 1936-2014"
5    Exhibit 20  SB184               47
6    Exhibit 21  Rebuttal Expert Testimony of  15
7        Devin Caughey, PhD
8    Exhibit 24  Freedom in the 50 States,  203
9        Fifth Edition
10   Exhibit 25  "The Dynamics of State Policy 115
11       Liberalism, 1936-2014"
12   Exhibit 28  HB130 Engrossed          295
13   Exhibit 29  "State Rep. Butler: We're all 300
14       pretending transgender
15       behavior is normal -- 'Up
16       until Obama, it was a mental
17       defect, and he kind of
18       popularized it'"
19   Exhibit 30  "Huntsville father's Facebook 302
20       post on biological male
21       'Butch coded space queer'
22       Space Camp worker goes viral
23

2 (Pages 2 - 5)

Page 6
1   Exhibit 31  "Being transgender no longer  316
2       a 'mental disorder': APA"
3   Exhibit 32  HB391                         318
4   Exhibit 34  "The top 10 Alabama political 328
5       stories of 2023"
6   Exhibit 37  Whatley Amendment To SB10    170
7   Exhibit 38  "Father of transgender       187
8       daughter tells Alabama
9       lawmakers treatment ban is
10      misguided"
11  Exhibit 39  "Alabama Senate passes bill  175
12      banning transgender
13      treatments for minors"
14  Exhibit 40  Video, Alabama Senate        228
15      Healthcare Committee
16  Exhibit 41  House Video                  231
17  Exhibit 42  House SB184 Roll Call,        81
18      LegiScan
19  Exhibit 43  Senate SB184 Roll Call,       84
20      LegiScan
21  Exhibit 44  FAQ WHO development of a     271
22      guideline on the health of
23      trans & gender diverse people

Page 7
1   Exhibit 47  "Top Trans Doctors Blow the  275
2       Whistle on 'Sloppy' Care"
3   Exhibit 48  Video, Capital Journal       227
4   Exhibit 49  "Alabama governor signs      260
5       'Don't Say Gay' trans care
6       and bathroom ban bills"
7   Exhibit 51  "Confounding in Survey       196
8       Experiments"
9   Exhibit 54  "England Bans Puberty        274
10      Blockers For Minors"

Page 8
1   I, Lane C. Butler, a Court
2   Reporter and Notary Public, State of
3   Alabama at Large, acting as Notary,
4   certify that on this date, pursuant to
5   the Federal Rules of Civil Procedure,
6   there came before me via remote
7   videoconference from Cambridge,
8   Massachusetts, commencing at
9   approximately 9:04 a.m. Eastern, on the
10  1st day of May, 2024, DEVIN CAUGHEY,
11  Ph.D., witness in the above cause, for
12  oral examination, whereupon the following
13  proceedings were had:
14
15      DEVIN CAUGHEY, Ph.D.,
16   having first been duly sworn,
17   was examined and testified as follows:
18
19  EXAMINATION BY MR. MILLS:
20   Q.  Could you state your name for
21  the record.
22   A.  Devin Caughey.
23   Q.  And have you given deposition

Page 9
1   testimony before?
2    A.  I have not.
3    Q.  Okay.  Well, so the way this
4   works is I'll ask questions, and you can
5   answer them.  If you don't understand the
6   question, just let me know.  If you need
7   a break, just let me know.  I'll aim to
8   take breaks, you know, every hour to hour
9   and a half.  But if you need another
10  break, that's totally fine.
11      If you could -- and I will try
12  to as well -- remember to speak slowly
13  enough for the court reporter and answer
14  verbally, that would be helpful.
15      Were you able to set up the
16  Veritext Exhibit Share?
17   A.  I believe I was, yes.
18   Q.  Okay.  Great.  To simplify
19  things, most of the time, I'll probably
20  just share my screen with the exhibit and
21  just look at the relevant portions with
22  you.  But if you need to look at other
23  aspects of a document or we run into any

1    issues with screen sharing, you can use
2    the Exhibit Share as a backup.
3        A.  Sounds good.
4        Q.  What did you do to prepare for
5    today's deposition?
6        A.  I met with the attorneys I'm
7    working with at the Department of Justice
8    on several occasions, maybe five or six
9    occasions, and I reviewed my report.
10       Q.  Did you review any other
11   documents for -- in preparation for the
12   deposition?
13       A.  No, I did not.
14       Q.  And did you discuss the
15   deposition with anyone other than your
16   counsel?
17       A.  No.
18       Q.  Do you have any papers there
19   with you today related to the case?
20       A.  The only document I have is my
21   report.
22       Q.  Okay.  When I refer to SB184,
23   you understand that will be a reference

1    to the law as enacted by Alabama in 2022
2    regulating the use of medical gender
3    transition interventions in minors?
4        A.  I do.
5        Q.  Okay.  How did you come to be
6    involved in this case?
7        A.  I was approached by the
8    Department of Justice asking if I would
9    be interested in serving as an expert
10   witness in this case.
11       Q.  And how did they know to contact
12   you?
13       A.  I don't know exactly, but I had
14   had conversations in the preceding maybe
15   two years, starting two years previous,
16   two years ago, or perhaps more, with the
17   Department of Justice about -- more
18   generally, about the possibility of my
19   serving as an expert witness for the
20   Department.  So I -- my understanding is
21   that I was sort of already in their
22   system, in a sense.
23       Q.  And were those conversations

1    about Alabama's case or other cases?
2        A.  They weren't specific to any
3    case.
4        Q.  Were they about this issue of
5    medical gender transition interventions
6    in minors or other issues?
7            MR. FLETCHER:  I object on the
8    grounds of privilege and instruct the
9    witness not to answer to the extent the
10   question calls for discussions between
11   the expert and the United States counsel
12   with regards to any case.
13       Q.  And how did they know to contact
14   you two years ago?
15       A.  I don't know exactly.  I believe
16   that one of my colleagues at MIT had
17   suggested my name to -- one of my
18   colleagues who has also served as an
19   expert suggested my name as someone who
20   would be qualified, or well-suited for
21   this sort of work.
22       Q.  And did that colleague suggest
23   your name in the context of cases

1    involving medical gender transition
2    interventions or other types of cases?
3        A.  I don't know.  I don't know the
4    content of his conversation.
5        Q.  And have you ever considered
6    being an expert for the Department of
7    Justice in cases not involving medical
8    gender transition intervention?
9        A.  By "considered," do you -- can
10   clarify what you mean by "considered"?
11       Q.  Sure.  Have you served as an
12   expert in other cases for the Department
13   of Justice?
14       A.  No.
15       Q.  When were you first contacted
16   about becoming involved in this Alabama
17   case?
18       A.  I don't recall the date off the
19   top of my head, but if I had to guess, it
20   was in February of this year or perhaps
21   -- no.  It might have been slightly
22   earlier, maybe January.  I don't recall
23   exactly.

Page 14

1    Q.  But it was 20- -- it was during
2  the calendar year of 2024?
3    A.  I believe so, but I suppose it
4  could have been at the end of 2023.
5    Q.  And what is your understanding
6  of the purpose of your testimony?
7    A.  To rebut, to rebut, provide a
8  rebuttal report for the defense reports,
9  certain defense reports.
10    Q.  And what's your understanding of
11  what you are rebutting?
12    A.  I am -- well, first, in terms of
13  which reports, I am focusing -- or I
14  focused my rebuttal on the reports of
15  Drs. Kaliebe, Cantor, and Nangia and --
16  although some of -- I also reviewed
17  materials from some other experts, but I
18  focused on those experts.  And on my -- I
19  focused on rebutting their contention
20  that SB184 and gender-affirming care bans
21  for minors in general are motivated by --
22  are motivated exclusively by a desire to
23  protect minors from experimental or

Page 15

1  potentially dangerous medical treatments.
2    Q.  Did you speak to anyone in the
3  state of Alabama in the process of
4  forming your opinions in this case?
5    A.  I did not.
6    Q.  I'm going to be showing you your
7  report if I can get that to happen.  This
8  is the expert report you provided in this
9  case.  Is that right?
10    A.  That's correct.
11    Q.  Okay.  And this is your
12  signature here at the end?
13    A.  That is correct.
14    Q.  Okay.  I'm going to introduce
15  this as Exhibit 21.
16        Here on page 30, paragraph 61,
17  you say, "Defendants' expert reports make
18  almost no reference to the state of
19  Alabama or to SB184 specifically."  You
20  still agree with that statement?
21  (Exhibit 21 was marked for identification
22  and is attached.)
23    A.  I do.

Page 16

1    Q.  Okay.  And if you could look at
2  footnote 24 here.  And I can -- I can go
3  down to the other page whenever.
4    A.  I see it.
5    Q.  Okay.  So you say, "The primary
6  exception to the national focus is Dr.
7  Cantor's quotation of plaintiff expert
8  Dr. Ladinsky's contention that SB184
9  'will cause serious harms to my patients
10  as well as other transgender youth in
11  Alabama.'"  And then on the next page,
12  you say, "However, although Dr.
13  Ladinsky's claim refers specifically to
14  Alabama, Dr. Cantor's response to it is,
15  like the rest of his report, couched in
16  general terms."
17        Do you still agree with that
18  statement?
19    A.  I do.
20    Q.  So no defendant expert has
21  opined as to the intent of any Alabama
22  legislator in voting for or against
23  SB184; correct?

Page 17

1    A.  I did not notice any such
2  contentions in -- specific to the
3  intentions of the Alabama Legislature --
4  the Alabama Legislature in the reports
5  that I reviewed.
6    Q.  And no defendant expert has
7  opined as to the intent of the Alabama
8  governor in signing SB184; correct?
9    A.  I did not notice any such
10  references in the reports I reviewed.
11    Q.  And so you are not rebutting in
12  this report any opinion of a defendant
13  expert as to the intent of the Alabama
14  Legislature or governor in passing SB184?
15    A.  Can you repeat that question,
16  please?
17    Q.  Yes.  In your report in this
18  case, you are not rebutting any opinion
19  of a defendant expert as to the intent of
20  the Alabama Legislature or governor in
21  passing SB184; correct?
22    A.  I don't think that's entirely
23  correct.

1    Q.  Well, you just testified that
2  you are not aware of any defendant expert
3  opining as to the intent of the
4  legislature or the governor in passing
5  SB184; correct?
6    A.  I didn't -- I opined that -- or
7  I said that I didn't notice any specific
8  references to the Alabama Legislature or
9  the Alabama governor.  That's correct.
10    Q.  And so you are not -- you are
11  not opining as to the defendants'
12  experts' opinions specifically as to the
13  intent of the Alabama Legislature or the
14  Alabama governor in passing SB184; right?
15    A.  The way I would characterize it
16  is that the defendants' experts are
17  putting forward a general justification
18  for bans on gender-affirming care for
19  minors that applies at least to all
20  states if not beyond them and that that
21  justification and implicit contention as
22  to the motivations for such bans includes
23  Alabama, or it included -- it's meant to

1  include Alabama and cover Alabama even if
2  evidence specific to Alabama was not
3  prominently referenced in their reports.
4    Q.  And which defendant expert
5  opined as to the intent of any state
6  legislature in passing SB184?
7    A.  All three -- all three defense
8  reports that I focused on put forward or
9  advanced a justification for SB184.  And
10  as my report shows, this justification
11  also was at least partially adopted by
12  the legislature itself.  So I view my
13  report as responding to that -- that
14  justification for bans on
15  gender-affirming care for minors.
16    Q.  But the defendant expert reports
17  that you're responding to do not claim
18  that the Alabama Legislature adopted the
19  justifications that you say those expert
20  reports put forward for SB184; correct?
21    A.  I do not -- I believe it is
22  correct that they do not state that the
23  legislature adopted their justifications.

1    Q.  So no defendant expert has
2  opined as to the reasons Alabama enacted
3  SB184; correct?
4    A.  I'm sorry.  Say that one more
5  time?
6    Q.  Yeah.  No defendant expert has
7  opined as to the reasons Alabama enacted
8  SB184; correct?
9    A.  I think I would characterize
10  that slightly differently.  I would say
11  that -- as I previously said, that
12  they're advancing a justification for
13  such bans that doesn't explicitly
14  reference the state of Alabama but is
15  meant to include it.  And so that's the
16  way I would -- I would put it.
17    Q.  You say "meant to include it."
18  Did you talk to the defendants' experts?
19    A.  I did not.
20    Q.  So, how do you know what a text
21  that doesn't mention Alabama is meant to
22  do?
23    A.  It's couched in terms that

1  include the conditions that pertain in
2  Alabama.
3    Q.  You can't identify a single
4  sentence in any defendant expert report
5  that opines as to the reasons Alabama
6  enacted SB184; correct?
7    A.  A single sentence referencing
8  Alabama specifically?
9    Q.  That's correct.
10    A.  I would say that I can identify
11  many sentences that -- well, the whole --
12  all of the reports are primarily intended
13  to advance a justification for
14  gender-affirming care bans for minors
15  that apply to Alabama and are certainly
16  intended to include Alabama as a case.
17  But it is correct that the reports
18  themselves very rarely mention Alabama
19  specifically.  So in that narrow sense, I
20  can't point to a specific sentence that
21  -- referencing Alabama that makes that
22  claim.
23    Q.  So just to clarify, you can't

Page 22

1  point to a specific sentence opining as
2  to the reasons Alabama enacted SB184?
3     A.  I can't point to a specific
4  sentence referencing Alabama
5  specifically; however, I can -- I regard
6  the reports in general as covering
7  Alabama in their -- including Alabama as
8  a case under their -- that they're meant
9  to include Alabama as a case.  In other
10  words -- sorry.  You go ahead.
11     Q.  Could you identify the sentences
12  where you believe the defendants' experts
13  provide the reasons Alabama enacted
14  SB184?
15     A.  I would need to see the defense
16  reports.
17     Q.  You don't reference those
18  sentences in your report?
19     A.  I see.  Let me consult my
20  report.  Could I consult my report to see
21  whether the quotations I have are
22  sufficient to answer your question?
23     Q.  Sure.

Page 23

1     A.  I have my report here next to
2  me.  Would you prefer that I look at your
3  copy or look at the copy online?
4     Q.  You can look at your copy.
5  That's probably easier.
6     A.  Okay.  Thanks.
7        (Witness reviews document.)
8     A.  Can you remind me what
9  specifically you are -- you asked me to
10  find a specific sentence referencing
11  something, and could you clarify?
12     Q.  Yeah.  Of the defendant expert
13  -- the sentence you believe where a
14  defendant expert opines as to the reasons
15  Alabama enacted SB184.
16     A.  I regard, or I interpret each of
17  these reports as intended to, among other
18  things, argue, or opine that gender
19  dysphoria should not be treated with
20  gender- -- what is called -- with the
21  sorts of treatments prohibited by SB184,
22  but particularly hormonal, surgical
23  treatments for minors, because they are

Page 24

1  experimental, because they are, quote,
2  lacking in evidence of mental health
3  improvement.
4        There are many other examples
5  that I could -- like specific quotations
6  of the dangers involved in -- the
7  putative dangers involved in
8  gender-affirming care that I could put
9  forward in addition to -- and so anyway,
10  those two quotations I just had were from
11  Nangia page 87 and Cantor page 74.
12  But -- and -- but to take a step back,
13  these reports are arguments against, or
14  are -- and their whole purpose is a
15  justification for why gender-affirming
16  care is an experimental and potentially
17  dangerous set of medical treatments that
18  should therefore be prohibited.
19        So I can point you to specific
20  sentences that support that overall
21  contention.  For example, on page 7 of
22  Kaliebe's report, his claim that
23  gender-affirming care is an

Page 25

1  endorsement -- the endorsement of
2  gender-affirming care by medical
3  associations was due to politicization of
4  the issue and not -- in efforts to
5  silence scientific debate and not to a
6  genuine scientific consensus in favor of
7  those -- of those treatments.  So those
8  are examples of the specific claims that
9  the reports used to build their general
10  argument.
11     Q.  And those explanations set forth
12  those experts' own views of SB184;
13  correct?
14     A.  Is Christopher frozen?  Oh, I'm
15  sorry.  I think I might have lost --
16     Q.  Yeah.  You may have frozen for a
17  minute.  Yeah, that's fine.
18        Those sentences you just gave --
19     A.  I'm sorry.  Can you -- I'm
20  sorry.  What -- I lost you for a moment
21  there.  What did you just say?
22     Q.  The sentences you just read gave
23  the experts' own views --

7 (Pages 22 - 25)

Page 26

1     THE COURT REPORTER:  Do you want
2  to go off the record, Christopher?
3     MR. MILLS:  Sure.
4  (Discussion held off the record.)
5  Q.  (By Mr. Mills) So those
6  sentences you just referred to from the
7  defendants' expert reports, they set
8  forth the defendants' experts' own views
9  about SB184; correct?  Sorry.  I'll
10  restart.
11     The sentences you just referred
12  to from the defendants' experts' reports
13  set forth their own views about laws like
14  SB184; correct?
15  A.  They are -- the sentences that I
16  referenced were specifically about
17  gender-affirming care as a set of medical
18  treatments, and so I -- those particular
19  sentences, I would need to review them in
20  more detail to see exactly the context
21  for them, but they certainly were
22  referencing gender-affirming care for --
23  as medical treatments, the kinds of

Page 27

1  treatments that are covered by SB184.
2  Q.  And so to go back to my
3  question, you are unable to identify a
4  sentence in the defendants' expert
5  reports opining as to the reasons Alabama
6  specifically enacted SB184.  Is that
7  right?
8  A.  It is correct that I -- there
9  are -- that I haven't identified any
10  sentences that specifically reference
11  Alabama providing a justification for
12  gender-affirming care bans.
13  Q.  And no defendant expert has
14  opined as to the procedures Alabama
15  followed in enacting SB184.  Is that
16  right?
17  A.  As far as I know, that is -- in
18  terms of the defense reports that I
19  reviewed, that is correct.
20  Q.  So you're not rebutting any
21  defense opinion on the procedures Alabama
22  followed in enacting SB184?
23  A.  That is correct.

Page 28

1  Q.  And you're also not rebutting
2  any defendant expert's opinion as to the
3  history of regulations pertaining to
4  transgender issues in Alabama.  Is that
5  right?
6  A.  It is correct that the defense
7  experts don't make any direct claims
8  about the history of transgender
9  regulations or -- in Alabama.
10  Q.  And so you're not rebutting any
11  defendants' expert's opinion as to the
12  history of transgender regulations in
13  Alabama; correct?
14  A.  That is correct.
15  Q.  And you're not rebutting any
16  defendant expert opinion as to the
17  history of LGBT regulations in Alabama;
18  correct?
19     (Witness reviews document.)
20  A.  I do think that some of the
21  reports -- some of the claims of the
22  reports that -- the defense reports that
23  refer to the general rise of gender

Page 29

1  dysphoria and responses to it -- and
2  appropriate responses to it are at least
3  related to those questions, or those
4  issues that -- the issue of how
5  transgender and LGBT persons and rights
6  are treated by the government, by the
7  government of Alabama, and by
8  implication, governments such as
9  Alabama's.
10  Q.  Could you identify a sentence in
11  any defendant expert reports that opines
12  about the history of regulations
13  pertaining to LGBT issues in Alabama
14  specifically?
15  A.  There aren't any question -- or
16  aren't any sentences that I could
17  identify that refer to Alabama
18  specifically.
19  Q.  And you agree that different
20  states have different histories of
21  regulations pertaining to LGBT issues?
22  A.  There are differences across
23  states in how they regulate LGBT rights,

8 (Pages 26 - 29)

Page 30

1  yes.
2     Q.  So you aren't rebutting any
3  defendant expert opinion as to Alabama's
4  history of regulations pertaining to LGBT
5  issues?
6     A.  Could you repeat that, please.
7     Q.  So you aren't rebutting any
8  defendant expert opinion as to the -- as
9  to Alabama's history of regulations
10  pertaining to LGBT issues?
11    A.  As I said, the defense experts'
12  claims are cast in general terms that in
13  many cases could be said, or should be
14  read as applying to the United States or
15  states in general, among them Alabama.
16  So I don't -- despite the lack of
17  specific references to Alabama, I do
18  think that many -- some of the statements
19  that are contained in the reports are
20  meant to apply to all states, or the
21  country as a whole including Alabama.
22    Q.  And which sentence in
23  defendants' expert reports discusses any

Page 31

1  history of regulations pertaining to LGBT
2  issues?
3     A.  So I can reference -- so for
4  example, Dr. Kaliebe provides a
5  discussion of the rise of transgender --
6  or of what he refers to as rapid-onset
7  gender dysphoria as a nationwide or even
8  international phenomenon.  And several of
9  the reports opine as to the appropriate
10  response to -- appropriate responses to
11  gender dysphoria, that gender dysphoria,
12  for example, requires compassionate care
13  and that the appropriate standard for
14  medical treatment is psychosocial
15  supports and psychotherapy.  In those
16  statements, for example, the experts are
17  opining about a general phenomenon and
18  the appropriate responses to it including
19  the appropriate medical responses to it,
20  what should be considered standard, what
21  should be considered acceptable.
22    Q.  Those statements said nothing
23  about the history of regulations

Page 32

1  pertaining to LGBT issues, did they?
2     A.  They're relevant to that history
3  insofar as medical treatments are
4  regulated by the government and standards
5  of care are influenced by government --
6  government regulations.  And they're
7  putting forward a position on how the
8  phenomenon of rapid-onset gender
9  dysphoria should be responded to.
10    Q.  So I'll ask my question again.
11  None of those sentences said anything
12  about the history of regulations
13  pertaining to LGBT issues, did they?
14    A.  So I would -- I do not agree
15  with that characterization, certainly not
16  of the overall reports.  If you could --
17  for example, I believe Dr. Kaliebe
18  references regulation of conversion
19  therapy, or at least one of the reports
20  does, and more generally, the history of
21  experimental medical treatments of
22  various sorts.  So in order to answer
23  this question very specifically, I think

Page 33

1  I would need to review those reports in
2  more detail.  I do not have the
3  quotations at hand here in my report.
4     Q.  So you do not discuss any
5  expert -- sorry.  I'll start over.
6        You do not discuss in your
7  report any expert's -- defense expert's
8  opinion as to the history of regulations
9  pertaining to LGBT issues?
10    A.  Did you say I do not discuss in
11  my report?  Is that what you said?
12    Q.  That's right.
13    A.  I don't have any -- other than
14  the quotes that I mentioned earlier
15  about -- the quotes I mentioned earlier
16  about rapid-onset gender dysphoria and
17  the appropriate responses thereto, those
18  are related to questions of how LGBT
19  rights are regulated by the government;
20  however, I don't have any other -- I
21  don't believe that my report, although I
22  can review it, contains any direct --
23  other direct references to the history of

Page 34

1  LGBT -- the regulation of LGBT, I believe
2  you -- was it history of LGBT regulations
3  or rights?
4     Q.  Yeah.  Regulations pertaining to
5  LGBT issues.
6     A.  Uh-huh.
7     Q.  So you aren't rebutting any
8  claim about the history of regulations
9  pertaining to LGBT issues in Alabama.  Is
10 that right?
11    A.  I don't think that's correct
12 insofar as the arguments that the defense
13 experts make apply to Alabama.
14 They're --
15    Q.  But I thought you just said they
16 don't opine as to the history of
17 regulations pertaining to LGBT issues.
18 Maybe I'll ask this a different way.
19       Does any defense expert opine as
20 to any other law in Alabama's history or
21 bill in Alabama's history?
22    A.  I don't think they specifically
23 reference.  I don't know for sure.  I

Page 35

1  would need to review the reports to
2  ensure that I was entirely correct on
3  this.  There are references, at least
4  indirect references, to medical
5  regulation in those reports.  But as far
6  as I can recall now, I do not believe
7  there are any references to any other --
8  specific references to Alabama laws or
9  regulations.
10    Q.  And your report doesn't quote
11 any defendants' expert referring to any
12 specific law or regulation in Alabama
13 other than SB184; correct?
14    A.  I don't have any direct quotes
15 of Alabama -- from the expert reports
16 referencing specific laws or regulations
17 in Alabama.  I believe that's correct.
18    Q.  Or paraphrases?
19    A.  I don't believe I have any
20 paraphrases of statements that directly
21 reference laws or regulations in Alabama.
22    Q.  You aren't rebutting any of the
23 defendants' experts' opinions as to the

Page 36

1  actual motivation behind SB184's
2  enactment; correct?
3     A.  I regard the expert reports as
4  providing a justification for the passage
5  of laws such as SB184, justifications
6  that were also adopted in part by the
7  supporters, the legislative supporters of
8  SB184 specifically.  So although the
9  reports do not specifically make claims
10 about why this bill was passed, it
11 provide -- they provide an argument for
12 why similar regulations generally should
13 be passed.
14    Q.  Your report offers an opinion as
15 to why this bill was passed; correct?
16    A.  It does offer an opinion about
17 why this bill was passed.
18    Q.  So that opinion does not rebut
19 any of defendants' experts' opinions as
20 to the actual motivation behind SB184's
21 enactment; correct?
22    A.  No.  I think that the general
23 arguments put forward by the defense

Page 37

1  experts for the passage of these laws in
2  general apply in the specific case of
3  Alabama.
4     Q.  So you think the justifications
5  given by the defense experts were the
6  actual motivation behind SB184's
7  enactment?
8     A.  Can you say that again?  I'm
9  sorry.  I missed the --
10    Q.  Yeah.  So you're saying you
11 believe that the justifications given by
12 the defense experts were the actual
13 motivation behind SB184's enactment?
14    A.  No.  I don't -- not the
15 exclusive motivation.  However, similar
16 justifications, certainly, some -- not
17 certainly, but it is possible that, or
18 probable that similar motivations were at
19 play for legislative supporters, but more
20 importantly, that similar justifications
21 were put forward.
22    Q.  I had understood your opinion in
23 this case to be that the justifications

10 (Pages 34 - 37)

Page 38

offered by the defendants' experts were not the actual motivations behind SB184's enactment. Is that correct?
A. My opinion in this case is that the sorts of justifications put forward by the defense experts provide a partial, and I would say highly partial, presentation of the motivations and understood -- and purposes of the bill and that an examination of the broader context reveals that they are not the -- certainly not the sole motivation, but the evidence suggests not the predominant one either.
Q. Could you identify a sentence from any defendants' expert's opinion as to the actual motivations behind SB184's enactment?
A. I can refer you back to some of my previous --
Q. I'm not asking about the general.
A. Yeah.

Page 39

Q. I'm asking about the actual motivations of SB184's enactment.
A. Well, continuing to stipulate that I think that the general arguments made in favor of gender-affirming care are meant to be read as applying and are meant to imply -- or should be read as applying to the specific case of SB184, I -- I cannot point to a specific sentence. There are no specific sentences in the expert reports that refer to SB184 specifically or the motivations of the Alabama Legislature specifically.
Q. So again, you aren't responding to any specific defendant expert opinion as to the actual motivation behind SB184?
A. Insofar as SB184 is an example of a broader class of legislation, I believe that I am responding to justifications for it.
Q. But you just said that your opinion as to their general

Page 40

justifications do not wholly explain the actual motivations of SB184. In fact, I think that's the whole thrust of your opinion in this case. So I'm asking, where in defendants' experts' reports that you're rebutting is the actual motivation behind SB184?
A. Where specifically? Well, the argument is woven throughout the reports. They are --
Q. The actual motivation?
A. The actual motivation of -- when you say "actual motivation," you mean actual motivation of the Alabama Legislature?
Q. That's right.
A. The reports offer a general justification for bans on gender-affirming care and put forward an understanding of the purposes of such bans and, as such, advance an explanation for the passage of -- or a justification for the passage of such bans in general

Page 41

terms that could be read as applying to Alabama, but they do not specifically opine as to the motivations of the Alabama Legislature in passing SB184.
Q. So you are rebutting any specific opinion as to the motivation of Alabama's enactment of SB184; correct?
A. I am not rebutting any opinion that specifically references SB184 or the Alabama Legislature's motivations in passing it.
Q. You are not offering an opinion on any discriminatory impact of SB184. Is that right?
A. As I understand your question, discriminatory impact -- well, let me -- could you please clarify what you mean by "discriminatory impact"?
Q. You don't know of any person affected by SB184 since it took effect. Is that right?
A. A name of a specific person? I don't know a name of a specific person in

1    part because of the -- I don't know the
2    name of a specific person, no.
3        Q.   You mentioned that Scott LaCombe
4    provided research assistance.  What did
5    he do?
6        A.   He did the sort of standard work
7    that a research assistant does in my
8    field, primarily collecting and
9    organizing datasets, or data on things
10   such as state policies, searching for
11   sources, doing -- in both academic
12   literature and other secondary sources
13   that I asked him -- on topics that I
14   asked him to look into, that sort of
15   thing.
16       Q.   And who is compensating him?
17       A.   I believe that the Department of
18   Justice is.
19           MR. MILLS:  And, Counsel,
20   defendants would request copies of any
21   communications from Mr. LaCombe with
22   facts or data that the expert used in
23   arriving at his opinion.

1           MR. FLETCHER:  I'll object on
2    the record for any request for
3    communications on the grounds of
4    privilege.
5           MR. MILLS:  That's squarely
6    within Rule 26.  We can discuss later,
7    and we'll issue a subpoena if needed.
8        Q.   Did you interview or talk to
9    anyone other than counsel and Mr. LaCombe
10   in preparation for your report?
11       A.   No.
12       Q.   Do transgender people have
13   gender dysphoria?
14       A.   I don't -- I'm not a medical
15   expert, so I don't have an opinion on
16   that.
17       (Discussion held off the record.)
18       Q.   (By Mr. Mills) Before this case,
19   you had never done any work related to
20   medical gender transition of minors.  Is
21   that right?
22       A.   That is correct.  No -- I
23   suppose it depends what you mean by work.

1    I had never done any expert witness work,
2    if that's what you mean.
3        Q.   What other work had you done?
4        A.   Some of my general academic work
5    and research covers areas that are
6    related to that.
7        Q.   Have you ever published an
8    article focused on LGBT laws or policies?
9        A.   LGBT laws and policies are an
10   important component of several of my
11   published articles.  For example, on my
12   2019, I think, American Political Science
13   Review article on policy ideology in
14   Europe, one of the applications is
15   understanding the relationship between
16   public opinion, or cultural conservatism
17   in the public and LGBT-related
18   policymaking.
19       Q.   That opinion, though -- that
20   article is not focused solely on LGBT
21   laws or policies?
22       A.   Not solely focused, no.
23       Q.   And you've never published any

1    article solely focused on LGBT laws or
2    policies?
3        A.   Not focused solely on those, no.
4        Q.   How many pages of the article
5    you just mentioned were about LGBT laws
6    or policies?
7        A.   That particular article, or
8    would you like me to --
9        Q.   Yeah, that particular one.
10       A.   Okay.  That's -- I'm not sure
11   off the top of my head, but probably a
12   couple of pages.
13       Q.   And how long was the article,
14   roughly?
15       A.   You know, I'll look at my CV if
16   it's okay so that I can give you a
17   precise --
18       Q.   It's okay.  It's okay.  We'll
19   move on.
20           You've never published an
21   article focused on the legislative intent
22   behind a certain bill, have you?
23       A.   An article on the legislative

Page 46

1    intent behind a certain bill.  I have not
2    published an article focusing on
3    legislative intent.  It does appear in
4    one of my books.
5        Q.   And you've never published an
6    article focused on the legislative
7    history of a certain bill?
8        A.   I would say the same -- the same
9    answer applies.
10       Q.   You've never published an
11   article about the concept of what you
12   call anti-LGBT bias?
13       A.   Again, are you referring to an
14   article that is focused solely on that
15   subject?
16       Q.   That's right.
17       A.   I don't have any -- I have never
18   published an article that focuses solely
19   on that subject, no.
20       Q.   You've never taught a course
21   focused on determining legislative intent
22   behind a certain bill.  Is that right?
23       A.   An entire course on that

Page 47

1    subject, no.
2        Q.   I'm going to show you SB184,
3    which I'm marking as Exhibit 20.  Sorry.
4    Give me just one second.
5    (Exhibit 20 was marked for identification
6    and is attached.)
7        A.   Yeah.
8        Q.   Can you see it?
9        A.   I can, yes.
10       Q.   Okay.  And you would agree this
11   is the Alabama law that we're discussing
12   and that your report is about here?
13       A.   That's what it appears to be,
14   yes.
15       Q.   And you've reviewed it in
16   preparation for your report?
17       A.   I don't believe -- oh, do you
18   mean while I -- not -- yes.  In
19   preparation for my report, yes.  Not in
20   preparation for this deposition, though.
21       Q.   Sure.  So I'm going down to
22   Section 2 here.  "The Legislature finds
23   and declares" is how we start.

Page 48

1        A.   Yes.
2        Q.   And then it lists -- let's see
3    -- a number -- a number of items.  I was
4    hoping you could read through those
5    and -- and sorry.  You would agree that
6    these are the legislative findings here
7    in Section 2?
8        A.   That's what they appear to be.
9        Q.   I was going to ask if you could
10   review these 16 findings, and my question
11   is going to be whether, in your capacity
12   as an expert in this case, you are
13   disputing the correctness of any of these
14   findings.  So I can scroll down whenever
15   you need me to.
16       A.   Sure.  Would you like me to read
17   them out loud or read them to myself?
18       Q.   You can just read them to
19   yourself.
20       A.   Okay.
21          (Witness reviews document.)
22       A.   Can you scroll down to (3)?
23   Thank you.

Page 49

1          (Witness reviews document.)
2        A.   Can you scroll down to the next
3    page?
4          (Witness reviews document.)
5        A.   Can you scroll down to number
6    (9), please?
7          (Witness reviews document.)
8        A.   Can you scroll down to number
9    (11), please?
10         (Witness reviews document.)
11       A.   Can you scroll down to the next
12   page?
13         (Witness reviews document.)
14       A.   It ends with (16).  Is that
15   correct?
16       Q.   That's right.
17       A.   Let me just read (16) one more
18   time, and then I'll be done.
19       Q.   Sure.
20         (Witness reviews document.)
21       A.   Okay.  I have read items (1)
22   through (16).
23       Q.   So my question is whether, in

13 (Pages 46 - 49)

Page 50

1  your capacity as an expert in this case,
2  you are disputing the correctness of any
3  of these findings.
4      A.  No.
5      Q.  You have no evidence that any
6  legislator who voted for SB184
7  disbelieves any of these findings, do
8  you?
9      A.  I have no evidence that any
10  legislator who voted for the bill
11  disbelieves them.  Is that what you said?
12      Q.  That's right.
13      A.  Could you scroll back up to some
14  of the earlier ones?  I just want to make
15  sure I remember.  You can keep scrolling
16  up.  Thank you.  Keep scrolling, please.
17  You can stop, actually.
18      Q.  Yeah.
19      (Witness reviews document.)
20      A.  I think it's fair to say that
21  some of the remarks of -- or the remarks
22  of some of the legislative supporters of
23  SB184 are somewhat at variance with this

Page 51

1  characterization of -- as I'm reading it
2  here, the sort of medicalized
3  characterization of what is referred to
4  as gender dysphoria based on -- so I'm
5  not sure that it's entirely fair to say
6  that I have no evidence that none of the
7  -- that none of the legislative
8  supporters of SB184 disagree with any of
9  these statements.
10      Q.  Which legislator who voted for
11  the bill, in your view, disbelieved one
12  of these findings?
13      A.  I'm referring to my report if
14  that's okay.
15      Q.  That's fine.
16      A.  Thank you.
17      (Witness reviews document.)
18      A.  Well, I believe that some of
19  Mack Butler's statements, Representative
20  Mack Butler's statements, particularly
21  his suggestion that individuals with
22  gender dysphoria are pretending, or
23  transgender-identified persons are

Page 52

1  pretending is inconsistent with the --
2  some of -- items maybe, (2) and (3) here.
3      Q.  Other than Representative
4  Butler, are you testifying that any other
5  legislator who voted for SB184
6  disbelieved any of these findings?
7      A.  I am not -- I don't have any
8  affirmative evidence that I can think of
9  right now that is contrary to that -- or
10  that -- sorry.  I don't have any
11  affirmative evidence that I can refer to
12  you right now that suggests that other --
13  I guess I -- well, actually, let me
14  rephrase that.
15      I think that some of -- let me
16  -- I'm sorry.  Let me review my report,
17  and then I will give you a more precise
18  answer.  One sec.
19      (Witness reviews document.)
20      A.  The -- I think some of the
21  remarks of Senator Shelnutt are also, in
22  some respects, inconsistent with items
23  (2) and (3) here, which present gender

Page 53

1  dysphoria as a medical diagnosis and --
2  yes.
3      Q.  So other than Representative
4  Butler and Senator Shelnutt, you aren't
5  testifying that any other legislature --
6  legislator who voted for the bill
7  disbelieved any of these findings?
8      A.  I don't have any affirmative
9  evidence, I don't think, on any other
10  legislators.
11      Q.  Can protecting the health and
12  safety of children be a legitimate state
13  interest?
14      A.  I don't -- I think that "a
15  legitimate state interest" is a legal
16  term, so I don't have an opinion on that
17  specifically.  But protecting children,
18  just speaking as a political scientist,
19  is certainly a value or a motivation
20  behind -- or a justification behind many
21  pieces of legislation and laws.
22      MR. FLETCHER:  Counsel, we've
23  been going about an hour and fifteen.  Is

Page 54

1  this a good time for a break?
2      MR. MILLS: Just one or two more
3  if that works, and then we can take a
4  break. Does that work?
5      MR. FLETCHER: Is that okay with
6  the witness?
7      THE WITNESS: That's fine with
8  me, yeah.
9    Q.  If these findings we just talked
10 about are correct, would it be reasonable
11 for a nonbiased legislator to vote for
12 SB184?
13   A.  I'm sorry. Can you -- the
14 findings we're talking about -- oh, the
15 findings in the -- that we were reading
16 through in SB184. Would it be reasonable
17 if they -- if it were correct?
18     MR. FLETCHER: I'm going to
19 object to form of the question.
20   Q.  You can answer.
21   A.  I would -- I don't have an
22 opinion on that, whether it would be
23 reasonable, particularly without knowing

Page 55

1  the broader context. I think that -- so
2  yeah. I don't have an opinion on the
3  reasonableness of making that decision,
4  but particularly without having a fuller
5  context of what other facts of the
6  case -- or the facts of the legislation
7  in question were.
8    Q.  All right.
9      MR. MILLS: Yeah. Now's a good
10 time for a break, I think.
11       (Break taken.)
12   Q.  (By Mr. Mills) All right. Could
13 you name a member of the Alabama
14 Legislature when SB184 was passed?
15   A.  Sure. Senator Shay Shelnutt.
16   Q.  And could you name another?
17   A.  Senator Wes Allen.
18   Q.  And another?
19   A.  I don't know if I can name very
20 many others off the top of my head.
21   Q.  How many members of the Alabama
22 House are there?
23   A.  I actually don't recall off the

Page 56

1  top of my head.
2    Q.  And how many members of the
3  Alabama Senate are there?
4    A.  I don't recall off the top of my
5  head.
6    Q.  What was the vote on SB184 in
7  the house?
8    A.  I don't remember exactly.
9    Q.  What about in the senate?
10   A.  I don't remember.
11   Q.  Have you ever talked to a person
12 who was a member of the Alabama
13 Legislature when SB184 was passed?
14   A.  I have not.
15   Q.  Have you ever talked to Governor
16 Ivey?
17   A.  I have not.
18   Q.  So other than Representative
19 Allen and Senator Shelnutt, you don't
20 know how any other member of the Alabama
21 Legislature voted on SB184. Is that
22 right?
23   A.  I don't remember off the top of

Page 57

1  my head. I have reviewed the roll call
2  vote, but I don't remember off the top of
3  my head the names of individual members
4  and how they voted.
5    Q.  And you don't know why any other
6  member of the Alabama Legislature voted
7  or opposed SB184. Is that right?
8    A.  I have certain information about
9  -- I can draw inferences about their --
10 the legislature's understanding of the
11 bill based on the statements of various
12 legislators as well as the larger
13 context, but I don't know for sure. I
14 don't think anybody knows for sure why
15 they do things.
16   Q.  So putting aside, again,
17 Representative Allen and Senator
18 Shelnutt, you don't have any evidence of
19 the subjective motivations of any other
20 member of the Alabama Legislature in
21 voting on SB184. Is that right?
22   A.  The -- no. Well, first of all,
23 I have -- the quotations that I reference

15 (Pages 54 - 57)

Page 58

1 including by Representative Mack Butler,
2 is it, are -- those are the specific
3 quotations that I included in my report
4 and that are available at the top of my
5 head. But I take those to be indicative
6 of what the legislature in general -- the
7 sorts of motivations and understandings
8 that were -- that members of the
9 legislature were putting forward.
10 Q. Okay. So setting aside those
11 three people now -- Allen, Butler, and
12 Shelnutt -- you don't have any other --
13 you don't know why any other specific
14 member of the Alabama Legislature
15 supported or opposed SB184. Is that
16 right?
17 A. Off the top of my head, I can't
18 name any other legislators, but I have
19 reviewed hearings and news reports and
20 public statements by other -- that
21 included statements by other members.
22 But I don't -- I can't name them off the
23 top of my head.

Page 59

1 Q. So this question isn't asking
2 you to name them. I'm asking whether you
3 know why any other member of the Alabama
4 Legislature voted for or against SB184.
5 A. I don't know for sure why
6 anybody voted for -- for or against the
7 bill.
8 Q. Do you agree that what motivates
9 one legislator to say something about a
10 statute is not necessarily what motivates
11 others in voting on it?
12 A. Can you repeat that again.
13 Q. Do you agree that what motivates
14 one legislator to say something about a
15 statute is not necessarily what motivated
16 others to enact it?
17 A. If I understand your question,
18 you're -- let me repeat it so -- I'll
19 tell you how I understand your question,
20 and then I'll answer it.
21 Your question is whether what
22 one person says -- whether what motivates
23 one person to say what they -- something

Page 60

1 about a bill is necessarily the same as
2 the -- what motivates someone else to
3 vote for the bill --
4 Q. That is correct.
5 A. -- as I -- and no, it is not
6 necessarily the same.
7 Q. Do you think that legislators
8 balance competing interests when they
9 vote on a bill?
10 A. I think they often do, yes.
11 Q. Do you think their choice to
12 vote one way means that they ignored
13 interests going the other way?
14 A. Not necessarily.
15 Q. What method of determining
16 legislative intent did you use in this
17 case?
18 A. I wouldn't -- there's no one
19 term for -- well, I actually didn't --
20 sorry. Let me take a step back there.
21 I don't think I opined on -- I
22 didn't opine on the legislative intent
23 behind the bill or determine -- I didn't

Page 61

1 determine the legislative intent, so I
2 didn't -- I can't speak to the method I
3 would have used to do that.
4 Q. So you're not offering an
5 opinion on the legislative intent behind
6 SB184?
7 A. I'm offering an opinion on the
8 understandings -- the legislators'
9 understanding of the purposes of the bill
10 and of the considerations and motivations
11 that they brought to bear in considering
12 it.
13 Q. And what is the difference
14 between that and legislative intent?
15 A. As I understand it, legislative
16 intent has a specific legal meaning.
17 Q. Okay. So, can we say
18 "legislative purpose"? If I say that,
19 would that be consistent with how you
20 understand your opinion?
21 A. The understandings of the
22 legislative -- the purpose of the
23 legislation, yes, that would be

Page 62

1  understood.
2     Q.  Okay.  So, what method of
3  determining legislative purpose did you
4  use in this case?
5     A.  Understandings of the
6  legislative purpose, I would say,
7  understandings of the purpose -- I would
8  say understandings of the purposes of the
9  bill.  I would say a combination of
10  methods.  You might say I -- in political
11  science, you might say I took a
12  multi-method approach that combined
13  evidence, speech evidence from in the
14  hearing -- in the course of -- from
15  legislative supporters of the bill, of
16  the -- of their justifications for it,
17  both before the legislature and before
18  the public, as well as contextual
19  evidence, for example, on the broader
20  context, the broader political context in
21  Alabama, as well as the broader national
22  context in the enactment of such bills
23  in -- nationwide.

Page 63

1     Q.  And where did that method come
2  from?
3     A.  That's a standard set of
4  approaches in -- or a standard approach
5  in the discipline of political science,
6  combining various pieces of often
7  quantitative and qualitative evidence to
8  evaluate competing explanations for a
9  particular political outcome or a
10  particular -- or evaluating different
11  hypotheses.
12     Q.  And have you used this method
13  before?
14     A.  My work often involves this sort
15  of multi-method approach.
16     Q.  To determine an understanding of
17  legislative purpose?
18     A.  To determine, or to evaluate
19  competing explanations for the
20  understandings and motivations of
21  legislators, yes.
22     Q.  And which of your papers or
23  other works uses this method to determine

Page 64

1  legislative purpose behind a particular
2  law?
3     A.  The -- clarifying, again, that I
4  mean understandings of the purpose of
5  the -- of the law, the most extended --
6  the most similar set of analyses occurs
7  in my book The Unsolid South and in
8  reviewing the legislative histories
9  behind the passage of various pieces of
10  or non-passage -- the legislative debates
11  over various pieces of legislation.  But
12  different elements of the -- the specific
13  methods that I -- or methods that I used
14  in doing this appear in many of my works.
15     Q.  And what is the error rate of
16  that method?
17     A.  The error rate?  Can you give me
18  a sense of what you mean by the error
19  rate?
20     Q.  How would you understand error
21  rate in statistics?
22     A.  Well, in statistics, error --
23  one way of -- in statistics, there are

Page 65

1  usually two kinds of errors.  There's a
2  Type I error and Type II error and -- or
3  false negative and false positive.  And
4  so there are really often considered, in
5  that context, two kinds of error rates.
6     Q.  So, what would each of those
7  error rates be for this method?
8     A.  Outside of a very well-defined
9  statistical context, it's not possible to
10  precisely characterize the rate of making
11  a Type II versus Type I error, but I also
12  would -- I think that the -- that kind of
13  -- what that's called, a frequentist
14  approach to statistical probability, or
15  to probability.  I actually don't think
16  that that is an appropriate way --
17  appropriate standard to apply in this
18  context.
19     Q.  Are you saying this method could
20  never produce an incorrect answer?
21     A.  No.
22     Q.  But you don't know how likely it
23  is that the method would produce an

17 (Pages 62 - 65)

Page 66

1  incorrect answer?
2      A.   I don't think that -- I don't
3  think that it is possible to precisely
4  measure how -- what the probability of
5  making an incorrect answer is, whether in
6  this context or, actually, in -- but in
7  many contexts as well.  But particularly,
8  I don't think it -- and specifically, I
9  don't think it's possible to precisely
10 characterize in this context.
11     Q.   You keep referring to
12 understandings of the purposes of the
13 law.  What do you mean?  Whose
14 understandings?
15     A.   I mean the legislature as a
16 whole's understanding as expressed
17 collectively as well as the
18 understandings of the particular
19 legislators who supported SB184 as well
20 as the governor who signed it.
21     Q.   So, do you believe that a
22 multi-member body like the Alabama
23 Legislature has a collective intent?

Page 67

1      A.   I don't have an opinion on
2  intent specifically, but I do believe
3  that it is possible to characterize the
4  collective understandings of -- the
5  purposes of a collective body, reasonably
6  characterize them based on pieces of
7  evidence, various pieces of evidence.
8      Q.   Is one of those pieces of
9  evidence the law that they enact?
10     A.   Sure.  That can be one piece of
11 evidence, yes.
12     Q.   What other pieces of evidence
13 would you consider?
14     A.   The various -- the public
15 justifications and explanations they
16 provided, that individual legislators
17 provided, as well as contextual evidence
18 based on what appear to be the factors
19 more generally that predict adoption of
20 such -- of such legislation.
21     Q.   Here, you wouldn't say that the
22 three members' statements you refer to
23 show the collective intent of the 140

Page 68

1  members of the Alabama Legislature, would
2  you?
3      A.   As I said, I don't -- I'm not
4  opining on the -- specifically on the
5  legislative intent of the -- of the
6  legislature.
7      Q.   You wouldn't say that the three
8  members' statements you've identified
9  demonstrate the understandings of the
10 purposes of the law of the other over 130
11 members of the Alabama Legislature?
12     A.   I would say that they provide --
13 they provide evidence and are informative
14 regarding the understandings of the
15 legislature and of other supporters and
16 are consistent with -- yeah, I think that
17 they are informative regarding the
18 legislature as a whole as well as other
19 supporters.
20     Q.   How do you know that other
21 supporters agreed with those statements?
22     A.   I don't know for -- I don't know
23 for certain that each individual one

Page 69

1  does.  But my review of the general
2  coverage of the -- of the -- journalistic
3  coverage of the -- of these debates as
4  well as legislative hearings that I
5  watched didn't provide me with any reason
6  to doubt that these were informative
7  about the motivations or understandings
8  of other legislators.
9      Q.   If you had to pick what you
10 believe to be the most telling evidence
11 that the legislature had a discriminatory
12 purpose in enacting SB184, what would it
13 be?
14     A.   If I had to pick -- if I had to
15 pick the single most telling piece of
16 evidence that the -- well, to be clear, I
17 am not opining on the discriminatory
18 purpose of the -- or of the bill.  But in
19 the -- so I am a little unsure about how
20 I should answer that.  If I -- yeah, I'm
21 unsure about how to answer that.
22     Q.   Sure.  So you're not opining in
23 this case that the Alabama Legislature

18 (Pages 66 - 69)

Page 70

1 had a discriminatory purpose in enacting
2 SB184?
3    A.  In the -- here, I think my -- I
4 am a little unsure how to interpret
5 "discriminatory" in this context.  In the
6 narrow sense of discriminating, making
7 distinctions between different segments
8 of the population, I -- if understood
9 that way, I can offer an opinion on
10 whether -- on discrimination but perhaps
11 not in a legal sense of discrimination.
12    Q.  Broadly speaking, what is the
13 opinion you are offering in this case?
14    A.  That the -- I have a number of
15 opinions, so is it okay if I -- I would
16 like to go through them more
17 systematically.
18       I am offering -- opining that
19 Alabama has a long and consistent history
20 of being relatively -- or enacting
21 relatively restrictive policies towards
22 LGBT rights and in more recent years has
23 been at the forefront of restricting

Page 71

1 transgender rights on a variety of
2 fronts.  The adoption of gender-affirming
3 care bans in particular, or
4 gender-affirming care bans for minors in
5 particular at the state level in U.S.
6 states is very well predicted by a
7 state's general stance on LGBT rights, or
8 transgender rights specifically, in other
9 domains but not well predicted by states'
10 paternalism in healthcare and the degree
11 of restrictiveness on an individual's
12 healthcare choices.
13       The questions of, or issues
14 relating to sex, gender identity,
15 transgender status were central to the
16 legislature's understanding of the
17 purpose of the law and that legislative
18 supporters of SB184 considered it to be
19 part of a broader effort to combat or
20 address gender dysphoria or -- and defend
21 more essentialist understandings of the
22 relationship between gender and sex; that
23 the -- that the legislature explicitly

Page 72

1 rejected an amendment clarifying that the
2 law's restrictions are not meant to apply
3 to psychotherapeutic treatments, which is
4 consistent with the law being --
5 expressing a more general hostility to
6 gender nonconformity as opposed to
7 targeting a very specific set of medical
8 procedures and interventions; and
9 finally, that in their deliberations and
10 in hearings related to the bill, as well
11 -- as well as in the public discussion
12 related to the bill, the legislature
13 heard from transgender Alabamians, their
14 parents, their medical providers, their
15 teachers about the potential harms of the
16 bill and thus had the opportunity to
17 foresee those harms as understood by that
18 community.
19    Q.  Are you testifying that the
20 Alabama Legislature enacted SB184 with an
21 anti-transgender purpose?
22    A.  I believe -- I am testifying
23 that the -- that central to many of --

Page 73

1 supporters, or supporters' understanding
2 of the purpose of the bill was addressing
3 the problem of gender dysphoria or
4 transgender status and in a -- and they
5 viewed it as part of a more general
6 attempt to address that problem or target
7 that population.
8    Q.  So, are you testifying that the
9 legislature intended to target the LG- --
10 the transgender population through SB184?
11    A.  If by "target" you mean -- or I
12 mean -- by "target," I mean the
13 population, or the problem towards which
14 the bill was aimed, its target population
15 was those people with transgender
16 identification or more generally those
17 with gender identities that did not
18 conform to their sex assigned at birth.
19    Q.  And are you testifying that the
20 legislature enacted SB184 to help that
21 population of minors with gender
22 dysphoria?
23    A.  I do believe that that is a

19 (Pages 70 - 73)

Page 74

1  possible motivation for some, one of --
2  one of -- or some legislators.
3     Q.  And in your capacity as an
4  expert in this case, are you testifying
5  that that was not the Alabama
6  Legislature's motivation in enacting
7  SB184?
8     A.  Referring again to the
9  understandings of the -- the purposes of
10  the bill, as an expert, I think it is
11  possible that multiple motivations were
12  at play.  But I believe that an important
13  -- so I think -- I do agree that --
14  sorry.
15        I think multiple motivations
16  could have been, or were at play, but
17  that hostility to LGBT rights and
18  transgender rights specifically is more
19  consistent with the broader evidence --
20  or is consistent with the broader
21  evidence and the understanding of why --
22  or the legislators' understanding of the
23  purposes of the bill.

Page 75

1     Q.  So to go back to my original
2  question, if you had --
3     A.  Yeah.
4     Q.  -- to pick what you believe to
5  be the most telling evidence that
6  hostility to LGBT rights or transgender
7  rights is the best explanation for the
8  bill, what would that single piece of
9  evidence be?
10     A.  I don't think this is a case
11  where a single piece of evidence is
12  dispositive, so I regard my argument as
13  -- or that opinion as resting on many
14  pieces of evidence that link together in
15  ways that are difficult to separate.  I
16  would point to a combination -- no,
17  that's a --
18     Q.  I didn't ask for a dispositive
19  piece of evidence.  I asked for what you
20  think the single most telling piece of
21  evidence would be.
22     A.  Okay.
23     Q.  So if you can't answer that,

Page 76

1  just tell me.  But --
2     A.  Yeah.  I think --
3     Q.  -- that's my question.
4     A.  I think that's -- I don't think
5  I can answer that about a question in --
6  a single piece of evidence in isolation.
7     Q.  The Alabama Legislature followed
8  all constitutional procedures in enacting
9  SB184; correct?
10        MR. FLETCHER:  Object to form.
11     Q.  You can answer.
12     A.  I don't have an opinion on that.
13  I don't know.
14     Q.  You're not testifying as an
15  expert in this case that the Alabama
16  Legislature did not follow all
17  constitutional procedures in enacting
18  SB184, are you?
19     A.  By "constitutional procedures,"
20  can you be more precise about what you
21  mean by that?
22     Q.  Yeah.  You know, how a bill
23  becomes a law under the Alabama

Page 77

1  constitution.  Are you testifying as an
2  expert in this case that the Alabama
3  Legislature and governor did not follow
4  all of the Alabama constitutional
5  procedures in enacting SB184 into law?
6     A.  As I understand it, the
7  procedures followed by the legislature
8  and the governor followed the procedures
9  put forward in the Alabama law, or
10  Alabama constitution.
11     Q.  And you aren't aware of any
12  departures from the normal legislative
13  procedures in enacting this legislation.
14  Is that right?
15     A.  The only -- the only one that I
16  could possibly count, as I understand it,
17  consideration of an earlier iteration of
18  SB184 was interrupted by COVID.  So I do
19  believe there were some departures from
20  normal procedures as a result of that.
21  But apart from that, I'm not aware of
22  anything else.
23     Q.  The legislature held many

Page 78

1 hearings over several years on the topic
2 at issue in SB184. Is that right?
3    A.  Yes.
4    Q.  And it took extensive testimony
5 from all sides on this topic. Is that
6 right?
7    A.  That's my understanding, yes.
8    Q.  Do you agree that the members of
9 the Alabama Legislature were representing
10 their constituents' views when they voted
11 on SB184?
12    A.  I don't know for sure. I can't
13 -- I can't opine as to whether they were
14 representing their views.
15    Q.  Do you have any reason to
16 believe they were not representing their
17 views?
18    A.  In -- it is -- other than -- the
19 general pattern based on my own, you
20 know, research and experience and
21 expertise, I know that it is often the
22 case that individual legislators or even
23 states will enact policies that are not

Page 79

1 supported by a majority of their
2 constituents. So I think given that
3 general possibility, I think there's a
4 strong possibility that in this
5 particular instance, at least some
6 legislators and possibly the legislature
7 as a whole were out of step with public
8 opinion. But I have no specific evidence
9 to -- with regard to SB184.
10    Q.  And in your capacity as an
11 expert in this case, you are not
12 testifying that the Alabama Legislature
13 was not representing constituent views
14 when they voted on SB184?
15    A.  I am not testifying to that,
16 yes.
17    Q.  How many people do you know who
18 live in Alabama?
19    A.  Currently? I don't know.
20    Q.  Anyone?
21    A.  Yes.
22    Q.  You do know someone who lives in
23 Alabama?

Page 80

1    A.  Yes.
2    Q.  How many people?
3    A.  I don't know off the top of my
4 head.
5    Q.  Less than five?
6    A.  I've certainly met more than
7 five.
8    Q.  When was the last time you
9 talked to someone who lives in Alabama?
10    A.  Who lives in Alabama? I can't
11 recall.
12    Q.  Have you ever been to Alabama?
13    A.  Yes.
14    Q.  How many times?
15    A.  I think twice, three times
16 maybe.
17    Q.  And when was the most recent
18 time?
19    A.  Maybe 15 years ago.
20    Q.  All right. I'm going to be
21 showing you what I'm marking as Exhibit
22 42. Now, this is a document from
23 LegiScan. That was a source you relied

Page 81

1 on in your report. Is that right?
2 (Exhibit 42 was marked for identification
3 and is attached.)
4    A.  It is.
5    Q.  And this is the house roll call
6 vote on SB184. Is that right?
7    A.  Let me take a moment to see. It
8 does appear to be, yes.
9    Q.  And you would agree that SB184
10 was passed by the house by a large
11 majority. Is that right?
12    A.  Yes.
13    Q.  I can scroll down. Could you
14 identify those persons who voted yes who
15 you believe were motivated by a hostility
16 toward LGBT or transgender rights?
17       (Witness reviews document.)
18    A.  Will you scroll up again?
19       (Witness reviews document.)
20    A.  No. I can't speak to the
21 motivations of any of the specific
22 legislators, definitively anyway, to
23 the -- to the motivations of any specific

Page 82

1    legislator.
2        Q.   Representative Butler isn't on
3    this roll call vote, is he?
4        A.   No.
5        Q.   And do you know why that is?
6        A.   I think he maybe didn't enter
7    the legislature until 2020, until after
8    the roll call perhaps.
9        Q.   So his views would have no
10   relevance to SB184's enactment.  Is that
11   right?
12       A.   I disagree with that.  No.
13       Q.   You think a person who was not
14   in the Alabama Legislature's views shed
15   light on the Alabama Legislature's
16   understanding of the bill's purposes?
17       A.   I do.  In the direct -- in the
18   indirect sense of providing information
19   on the general context for the
20   consideration -- the general political
21   and legislative context for the bill.
22       Q.   You didn't quote any other
23   person in the state of Alabama for this

Page 83

1    general context?
2        A.   I didn't quote anyone else for
3    the general context.  I think my
4    quotations of Senators Allen -- or sorry,
5    Senator Shelnutt and Representative Allen
6    also provide information on the general
7    context, as well as some of my quotations
8    of -- from news reports or other -- or
9    hearings and editorials that provide
10   information on the context.
11       Q.   So putting aside the governor
12   and the legislators and Mack Butler, you
13   didn't identify any other statements by
14   constituents related to SB184 that you
15   believe demonstrate hostility to LGBT or
16   transgender rights?
17       A.   Any other statements that --
18       Q.   Yes.
19       A.   -- demonstrate hostility to
20   transgender rights?  I'm sorry.  Can you
21   repeat that?  Sorry.  Say it again.
22       Q.   It's okay.  We'll move on.
23            I'm showing you now what I've

Page 84

1    marked as Exhibit 43.  This is from the
2    same source that you relied on.  Would
3    you agree this is the senate roll call
4    vote on SB184?
5    (Exhibit 43 was marked for identification
6    and is attached.)
7        A.   Yes.
8        Q.   And you would agree that it also
9    passed by a large majority?
10       A.   Yes.
11       Q.   And as with the house, are you
12   able to identify any persons who voted
13   yes who you believe voted based on a
14   hostility towards LGBT or transgender
15   rights?
16       A.   You said -- did you say "based
17   on"?
18       Q.   Yes.
19       A.   Is that the term you used?
20            I can't speak to the individual
21   motivations of -- you know, definitively
22   to the individual motivations or what
23   they were based on.  But I can say, for

Page 85

1    example, with respect to Senator
2    Shelnutt, that his -- well, the -- his
3    statements evinced a skepticism toward
4    and a hostility in the sense of
5    opposition to gender nonconformity.
6        Q.   Anyone else on the list?
7        A.   I have no -- I can't speak
8    directly to -- specifically to the other
9    members off the top of my head, no.
10       Q.   How many minutes of legislative
11   hearings and debates occurred for SB184
12   and its house companion bill, SB266?
13       A.   I don't know.
14       Q.   How many minutes of those
15   debates or hearings occurred for SB184's
16   predecessor bills?
17       A.   I don't know.
18       Q.   And how many minutes of the
19   hearings or debates on SB184 and its
20   house companion bill, HB266, did you
21   watch in real time?
22       A.   I watched none of them in real
23   time.

22 (Pages 82 - 85)

Page 86

1    Q.   So for your opinion in this
2  case, you relied on a subset of
3  recordings by nongovernmental entities?
4  Is that right?
5    A.   In some cases, the -- it is --
6  in all cases, the recordings themselves
7  were archived by non- -- nongovernmental
8  entities, as far as I know.  The
9  recordings themselves were generated, at
10 least in some cases, by governmental
11 entities.
12   Q.   But Alabama does not archive
13 transcripts or recordings of legislative
14 hearings or debates.  Is that right?
15   A.   As far as I know.
16   Q.   And the recordings that you
17 relied on, how many of them were there?
18   A.   The recordings that I relied on?
19 I don't know off the top of my head, but
20 I can refer to my report to list -- to
21 count the numbers that I cited in this
22 report.
23   Q.   Do you know what proportion of

Page 87

1  the overall debates or hearings those
2  recordings capture?
3    A.   I don't know the exact
4  proportion, no.
5    Q.   So your testimony is based on an
6  unknown portion of legislative debate;
7  right?
8    A.   An unknown portion.  I reviewed
9  enough to feel confident that a range of
10 views were expressed.  So I wouldn't say
11 that the portion was entirely unknown.
12   Q.   Well, you just testified that --
13 when I asked what portion of the overall
14 debates did those recordings capture,
15 that you didn't know.  So your testimony
16 is thus based on an unknown portion of
17 debates; correct?
18   A.   Well, I believe you asked me
19 what proportion I had watched, and I said
20 I didn't know exactly, I think.  And then
21 I think you asked me, or I understood you
22 as asking me whether -- what portion,
23 which I took to be a less -- not a

Page 88

1  precise number but a kind of more general
2  sense of the -- you know, a more
3  qualitative statement about how much of
4  the debate I was able to view.  And in
5  that sense, I don't think that's entirely
6  unknown in the sense that I was able to
7  view arguments in favor and against the
8  bill.
9    Q.   And how do you know what you
10 reviewed was representative of the
11 overall debate?
12   A.   I don't know if it's perfectly
13 representative.
14   Q.   This is not how you would
15 analyze a legislative debate in an ideal
16 world, is it?
17   A.   In an ideal world?  In an ideal
18 world, I would -- no.  I would have --
19 have infinite information.
20       THE COURT REPORTER:  I'm sorry.
21 You would have what information?
22       THE WITNESS:  Infinite.  Sorry.
23   Q.   How does your analysis take this

Page 89

1  limitation into effect?
2    A.   Into account?
3    Q.   Yeah.  Sorry.
4    A.   Okay.  By bringing together --
5  this is what political science research
6  is always like.  In fact, it's what
7  scientific research is always like.  You
8  have -- you don't have infinite
9  resources.  You don't have infinite data.
10 You don't have infinite information.
11 What you try to do is bring together
12 multiple sources of information with
13 different limitations and different
14 advantages to come up with the most
15 reliable inference.
16   Q.   You cannot provide a
17 comprehensive legislative history of
18 SB184 or its predecessor bills; correct?
19   A.   By "comprehensive," I think a
20 comprehensive history would be
21 impractical and impossible in any
22 circumstance, but I am able to provide a
23 comprehensive history of its

Page 90

1  consideration, you know, formal
2  consideration in the legislature and
3  progression through the legislative
4  process and as well as of its precursor
5  bills and able to provide a sufficient
6  context for the broader legislative
7  context or legislative history beyond the
8  formal progression for my purposes.
9      Q.  In paragraph 58, you say, "This
10  section is not intended to provide a
11  comprehensive history of SB184."  Are you
12  now testifying otherwise?
13      A.  No.
14      Q.  Did you review the physical
15  notes that accompanied SB184?
16      A.  I believe I did.
17      Q.  What did they say?
18      A.  I don't recall.
19      Q.  You didn't consider that in your
20  analysis?
21      A.  It was not an important part of
22  my analysis.
23      Q.  What year did medical gender

Page 91

1  transition interventions in minors come
2  into use in the United States?
3      A.  I don't know the exact year.
4      Q.  Do you know approximately what
5  year?
6      A.  When the -- I don't know when
7  the first -- I don't know when the first
8  medical intervention for minor or -- I
9  also -- I think it might hinge exactly on
10  how you're defining -- what was the term
11  you used?  Medical intervention?  Sorry.
12      Q.  Medical gender transition
13  interventions in minors.
14      A.  Medical gender trans--  I
15  don't think I have a precise enough
16  handle on what exactly that means to give
17  a guess.  But I don't know when the very
18  first such intervention -- or such
19  treatment was applied.
20      Q.  What year did the use of puberty
21  blockers or cross-sex hormones for the
22  treatment of gender dysphoria in minors
23  come into common use in the United

Page 92

1  States?
2      A.  Into common use?
3      Q.  Yeah.
4      A.  I don't know if you would
5  consider it common today, but it has
6  certainly become much more common in the
7  last decade.
8      Q.  And the same question for
9  Alabama.  Do you know what year those
10  treatments came into common use in
11  Alabama?
12      A.  Well, I don't know if they're in
13  common use in Alabama, so I can't -- I --
14  I -- I don't know.  But I also don't know
15  exactly what you mean by "common use."
16      Q.  All right.  What about use in
17  general of more than five people?
18      A.  I don't know.
19      Q.  As far as you know, puberty
20  blockers and cross-sex hormones to treat
21  gender dysphoria in minors was not
22  regularly used in Alabama until at least
23  2015.  Is that right?

Page 93

1      A.  I believe that it has become
2  more common in the last decade, so that
3  is approximately -- certainly is more --
4  more common in the last decade than it
5  was previously if it was even used at all
6  previously.
7      Q.  Is gender identity the same as
8  sexual orientation?
9      A.  In a -- well, as you know, I'm
10  not a -- I'm not a psychologist or -- but
11  as it's understood in a political sense,
12  gender identity and sexual orientation
13  are distinct but closely related to one
14  another and have often been conflated in
15  the public mind as well as in scientific
16  understandings.
17      Q.  SB184 does not regulate any
18  issues pertaining to sexual orientation.
19  Is that right?
20      A.  It doesn't directly regulate
21  sexual orientation, no, as far as --
22      Q.  Your term -- your report uses
23  the term "anti-LGBT bias."

Page 94

1    A.   Uh-huh.
2    Q.   What does that mean?
3    A.   Can you refer to the specific
4  spot where I used it?  I can look it up
5  in the report if you can just tell me the
6  page, or you can show me.
7    Q.   So paragraph 19, page 9 would be
8  a typical example.
9    A.   Oh, sorry.  Paragraph 19.
10    Q.   At the end of the paragraph.
11      (Witness reviews document.)
12    A.   Yes.  What do I mean by it in
13  that particular context?
14    Q.   Yes.
15    A.   I mean opposition to or -- yeah.
16  I mean opposition or hostility towards
17  LGBT persons, so lesbian, gay, bisexual,
18  transgender persons, or hostility to
19  providing expansive rights for those
20  individuals.
21    Q.   What is "bias" as you use that
22  term?
23    A.   By that term, I mean a stance,

Page 95

1  favorable or unfavorable, towards a group
2  or their -- or their rights, their legal
3  -- their legal --
4    Q.   Is it the same as -- is it the
5  same as hatred of LGBT persons?
6    A.   No, it's not the same as hatred.
7    Q.   Is it the same as animus against
8  LGBT persons?
9    A.   No, it is not the same.
10    Q.   How do you determine anti-LGBT
11  bias?
12    A.   In this context, I am referring
13  specifically to a state's sort of general
14  policymaking stance towards LGBT
15  individuals and whether it is relatively
16  favorable to their rights and their
17  status.  So in -- it is a judgment based
18  on the effect and meaning of the policies
19  and -- the policies that are relevant in
20  that context.
21    Q.   So by "anti-LGBT bias," you do
22  not mean a purpose to discriminate
23  against LGBT persons based on their

Page 96

1  status as LGBT?
2    A.   Some of the laws that are
3  referred to in this case have I believe
4  been found to, in a legal sense, be
5  discriminating.  But here, I mean more
6  generally a stance that does -- that
7  evinces a greater or lesser favorability
8  or expansive interpretation of the rights
9  of LGBT individuals.
10    Q.   Is every legislator's vote
11  against a policy supported by some LGBT
12  persons an expression of anti-LGBT bias?
13    A.   An expression of that?  No.
14    Q.   How many LGBT persons would need
15  to support a policy for that to be true?
16    A.   The -- my judgment here is not
17  based solely on the patterns of support
18  or opposition to a policy, or not
19  primarily based on that, but rather on
20  the meaning of the policy itself.
21    Q.   Does opposing a state religious
22  freedom restoration act show
23  anti-religion bias, as you use the term

Page 97

1  "bias"?
2    A.   Anti-religion?  Can you tell me
3  a little bit -- can you be more precise
4  about the content of the provisions that
5  you have in mind?  The --
6    Q.   You're familiar with state
7  religious freedom restoration acts.
8    A.   I am, although --
9    Q.   Correct?
10    A.   -- I am not -- I'm not exactly
11  sure if it is a single standardized text.
12  So, can you give me a more precise sense
13  of the amendment you have in mind?
14    Q.   Sure.  So let's take a state law
15  that subjects to -- strict scrutiny is
16  the legal term but just say more
17  intensive review any state law or
18  regulation that places a burden on
19  religious exercise.  Does opposing that
20  type of law show anti-religion bias?
21    A.   If the -- taken by itself, it's
22  very difficult to evaluate.  As you've --
23  you know, as you know, the -- there are

25 (Pages 94 - 97)

Page 98

1    multiple considerations at play in any
2    given law, so I -- to answer that
3    question I would need -- I think to
4    answer that question more confidently, I
5    think I would need to know more about the
6    larger political context.
7        Q.   You said there are many
8    considerations at issue for a particular
9    law.  Is that true of SB184?
10       A.   I think that is often the case,
11   yes.  Oh, and I think it is quite
12   possible that it was the case in -- in
13   SB184.
14       Q.   Your report uses the term
15   "sexual minority."  How do you define
16   that term?
17       A.   I mean that to mean -- in that
18   context, I mean -- I think -- well, let
19   me -- let me refer to the exact context
20   so that I can be precise.  Can you tell
21   me where that is?
22       Q.   It's also in paragraph 19.
23       A.   Okay.  Thank you.

Page 99

1        Q.   The second to last sentence.
2        (Witness reviews document.)
3        A.   By sexual minorities, I mean --
4    in this context, I mean individuals whose
5    -- I meant this sort of as an
6    encompassing term to include minorities
7    whose sexual orientation and/or gender
8    presentation or gender identity does not
9    conform with the dominant or majority --
10   dominant majority standard or -- yeah.
11       Q.   And are sexual minorities, as
12   you defined it, included in your use of
13   the term "LGBT"?
14       A.   Yeah.  Yes.  I -- yes.  They --
15   it is -- LGBT is -- I would consider
16   those to be not exactly but roughly
17   synonymous.
18       Q.   So your use of "LGBT" isn't
19   necessarily limited to just lesbian, gay,
20   bisexual, transgender.
21       A.   Right.
22       Q.   It includes other sexual
23   minorities?

Page 100

1        A.   I would say that, yeah, those
2    are categories that are sort of like
3    well-established categories that are easy
4    to say, but they're also -- yeah.  So
5    there are gradations or other categories
6    that I think might be included.
7        Q.   And sexual minorities generally
8    would be included in that?
9        A.   Would be included -- I think
10   that they're very highly overlapping
11   categories.  That's what I would say.
12       Q.   And in Obergefell, the Supreme
13   Court said that viewing marriage as "a
14   gender-differentiated union of man and
15   woman" is a view that "long has been held
16   and continues to be held in good faith by
17   reasonable and sincere people here and
18   throughout the world."
19           Do you agree with that
20   statement?
21       A.   I don't have an opinion on -- is
22   it -- I don't have an opinion on that
23   statement.

Page 101

1        Q.   Do you believe that the only
2    reason to support laws restricting
3    marriage to between one man and one woman
4    is anti-LGBT bias?
5        A.   The only reason?  No.  It is
6    possible that someone could not have any
7    bias against LGBT people and nevertheless
8    support that.
9        Q.   Your report -- and this is on
10   page 12 at the top -- uses the term "LGBT
11   rights."  How did you determine those
12   rights?
13       A.   Those rights.  I didn't
14   determine the rights per se, but I --
15   like in the sense of an exhaustive list
16   of or definition of such rights.  But the
17   -- I took the -- I think we're refer --
18   I'm sorry.  Are we referring to the
19   specific policies, LGBT policies in
20   Figure 1, for example?
21       Q.   I'm just asking, you know,
22   generally.  You use this term "LGBT
23   rights" in several different analyses

26 (Pages 98 - 101)

Page 102

1   here including Figure 1, and I'm just
2   asking what it means.
3       A.  I see.  That's -- in -- that's a
4   common way in political science of
5   referring to the claims and legal
6   statuses of -- or legal claims and
7   statuses of LGBT individuals and the
8   protections to which they're entitled
9   under the law.
10      Q.  And how did you determine which
11  laws restrict LGBT rights?
12      A.  Of the laws included in this --
13  in this index, taking the index as --
14  taking the policies as given, how did I
15  code them?
16      Q.  No, no, no.  I mean you say "a
17  relatively restrictive position."  How
18  did you decide that a particular law
19  restricts LGBT rights?
20      A.  In there, it was based on a --
21  using -- based on my expertise as a
22  political scientist but based on the sort
23  -- of the literature, the larger academic

Page 103

1   literature on how to think about --
2   interpret these laws.  So it was based on
3   an interpretation of the meaning of the
4   laws in question and whether they were
5   relatively restrictive towards or
6   relatively expansive towards LGBT rights
7   as well as sort of, in a supplementary
8   way, the empirical relationship among
9   these laws.
10      Q.  Laws that restrict marriage to
11  two human persons discriminate against
12  those who wish to enter marriages
13  involving three or more people.  Is that
14  right?
15      A.  In --
16          MR. FLETCHER:  I'm going to
17  object to form.
18      Q.  You can answer.
19      A.  In the sense of -- not using the
20  legal definition of discriminate but in
21  the simple meaning of discriminate in the
22  sense of making distinctions between, the
23  law does make distinctions between unions

Page 104

1   between two people and three or more
2   people.
3       Q.  And it prohibits those people
4   who want to enter a marriage involving
5   three or more people; correct?
6       A.  It prohibits those marriages,
7   yes.
8       Q.  Laws that restrict marriage to
9   two human persons also discriminate
10  against those who wish to enter -- or
11  sorry.  I'll rephrase.
12          Laws that restrict marriage to
13  two human persons also prohibit marriages
14  by those who wish to enter a marriage
15  involving a nonhuman animal.  Is that
16  right?
17      A.  They -- I -- that's a harder
18  question for me to answer.  You're saying
19  discriminate against those marriages
20  or --
21      Q.  Against those people who want to
22  enter marriages involving a nonhuman
23  animal.

Page 105

1       A.  That does make -- it makes
2   distinctions among those kinds of unions,
3   or those proposed unions.  But I think
4   now we may be stretching the definition
5   of -- like it may be a category mistake
6   to refer to those as unions, so I'm not
7   sure it makes sense to refer to that as
8   even discriminating.
9       Q.  Those people who wish to enter
10  marriages involving three or more people
11  or involving a nonhuman animal are sexual
12  minorities.  Is that right?
13      A.  They were not the reference that
14  I was thinking about when I wrote "sexual
15  minorities"; however, I could imagine a
16  definition of sexual minorities that
17  was -- that would be defined so as to
18  include them.
19      Q.  In fact, your definition of
20  sexual minority would include them,
21  wouldn't it?
22      A.  I'd have to think about that.  I
23  don't know if I -- it's not something

27 (Pages 102 - 105)

1    that I fully considered, so. But I'd
2    certainly think a reasonable case could
3    be made.
4        Q. So laws that restrict marriage
5    to two human persons exhibit anti-LGBT
6    bias as you've defined the terms. Is
7    that right?
8        A. I don't think that's fair.
9        Q. Why not?
10       A. Well, I think LGBT and sexual
11   minorities are slightly different.
12   They're not exactly coterminous with one
13   another. And when I wrote -- certainly,
14   when I wrote LGBT, I wasn't -- that's --
15   I did not mean that necessarily to
16   indicate laws -- so yeah. So you said
17   laws that restrict marriage to two human
18   persons?
19       Q. Right.
20       A. I don't think it would be fair
21   to say that that, at least on its face,
22   restricts -- at least without further
23   context of the -- on the law, restricts

1    the rights of LGBT individuals.
2        Can I just put in a request for
3    a break at some point when it's
4    convenient for you?
5        Q. Sure. Yeah. I've just got a
6    couple more --
7        A. Okay.
8        Q. -- on this, and then we can take
9    a break.
10       In your analysis that we started
11   to speak about here of pre-Obergefell
12   laws, you excluded all policies that
13   involved identical policies across the
14   states. Is that right?
15       A. I didn't exclude them. They are
16   not included in the dataset that I was
17   using.
18       Q. You designed the dataset?
19       A. I helped. Well, I collaborated.
20   My collaborator and I created the
21   dataset, yes.
22       Q. So you excluded all the laws
23   that involved identical policies across

1    all states; right?
2        A. In the -- if we're being clear,
3    that I'm -- in my academic work prior to
4    this -- prior to this, my work on this
5    deposition, my collaborator and I for
6    that project did not include identical
7    policies that were identical across all
8    states.
9        Q. And so your analysis in this
10   case also excludes all laws that involved
11   identical policies across all states;
12   right?
13       A. In that particular context, yes.
14       Q. Right. And that choice was
15   arbitrary. Is that right?
16       A. No.
17       Q. It removes data points that
18   would suggest that Alabama's policies are
19   in line with those of other states,
20   doesn't it?
21       A. It does remove policies where
22   Alabama has the same policies as other
23   states.

1        Q. And the effect of that exclusion
2    would be to make Alabama's deviation from
3    other states' policies appear greater
4    than it is. Is that right?
5        A. No, I don't think so. It would
6    -- it would -- I mean, it depends on what
7    you mean by "appear." Do you mean appear
8    as in appear in a figure or -- I don't
9    think it's fair to say it would make them
10   appear if properly interpreted.
11       Q. Would Figure 1 on page 13, would
12   the lines be more close -- would the
13   lines be closer together if you included
14   policies -- laws that involved identical
15   policies across all states?
16       A. Well, let me clarify first what
17   "policy" means in this context. So a
18   policy is a policy option, so -- in this
19   particular context. So a given policy,
20   you can have different -- you can take
21   different policy options; right?
22       And so in some cases, having a
23   particular policy option means not having

Page 110

1   a law on something; right?  So this isn't
2   the case where there's an identical -- I
3   make this distinction because there's not
4   an -- there's not a one-to-one
5   relationship between a particular piece
6   of legislation and having a particular
7   policy on the books.  So for that reason,
8   there's no -- so I just wanted to clarify
9   that.
10       So this -- if you included
11  policy, say, designed as -- if you had a
12  sort of universal policy option that you
13  were defining sort of separately from
14  whether there's variation across states
15  and you included them in the denominator
16  of this figure, it would change the
17  number, so the numeric score of the
18  different states, by compressing all
19  states closer to the center, but it
20  wouldn't change the order of the states.
21  And if you expanded the -- if you just
22  simply fit the -- if you fit the scale of
23  the figure to match the empirical range

Page 111

1   of the data, it wouldn't change the
2   figure tremendously, I don't think.
3   Q.  So the effect of excluding
4   identical treatment across all the states
5   is to make state incongruence appear
6   greater.  Correct?
7   A.  I wouldn't use the word
8   "incongruence," no.
9   Q.  Why not?
10  A.  Well, I don't know what you mean
11  by "incongruence."  Incongruent with
12  what?
13  Q.  The other states.
14  A.  Ah.  I think it would change the
15  meaning of the scale in question.  So
16  if -- an interpretation of that scale
17  that was attentive to the change in
18  meaning wouldn't change the -- wouldn't
19  change the interpretation of the relative
20  positioning of the states and how
21  different they are from each other.  But
22  if -- yeah.  So I don't think that a
23  proper interpretation of that revised

Page 112

1   scale would -- would -- in terms of
2   the -- yeah.  I don't think a proper
3   interpretation of that revised scale
4   would materially change the
5   interpretation of the relative
6   positioning of the states.
7       MR. FLETCHER:  Are we ready for
8   a break, Counsel?
9       MR. MILLS:  Sure.
10      (Break taken.)
11  Q.  (By Mr. Mills) Your analysis of
12  pre- and post-Obergefell policies
13  involves a series of policy-specific
14  indicators; right?
15  A.  Yes.
16  Q.  And your overall dataset
17  includes 186 policies.  Is that right?
18  A.  I'm sorry.  You -- this was --
19  this is the -- you're referring to the
20  dataset that -- that I used for -- that
21  undergirded Figure 1 pre- --
22  pre-Obergefell; right?
23  Q.  That's right.

Page 113

1   A.  Okay.  I don't remember the
2   exact number of policies, but it's in
3   that neighborhood.
4   Q.  All right.  And you don't know
5   what proportion of all state policies
6   that is, do you?
7   A.  I think that defining the
8   universe of state policies is, I would
9   say, perhaps an impossible task and
10  perhaps not even a well-defined quantity.
11  And certainly, I've never seen an attempt
12  in the political science literature to
13  define it, so I don't -- so it's -- it
14  is -- I don't know if it's fair to
15  say that it's a -- I don't know if I can
16  precisely characterize how -- what
17  proportion of all policies it is, but it
18  is the most representative and expansive
19  policy dataset of its sort.
20  Q.  So my question was, you don't
21  know what proportion of all state
22  policies that is?
23  A.  Well, and my answer to that is

29 (Pages 110 - 113)

Page 114

1  that if the denominator to a proportion
2  is not a well-defined quantity, you can't
3  say -- be said to know or not know it. I
4  don't think it's well defined.
5      Q.  If you don't know the
6  denominator, your testimony is that you
7  can't say whether you know the
8  proportion?
9      A.  No.  It's not that I don't know
10  the denominator.  I don't know if the
11  denominator is a well-defined quantity.
12     Q.  So by necessity, you don't know
13  the number of the denominator; correct?
14     A.  This may be --
15     Q.  Well, we'll move on.
16     A.  Yeah.
17     Q.  We'll move on.  The point is you
18  did not -- this is not a comprehensive
19  set of all state policies; correct?
20     A.  It is not a comprehensive set of
21  all state policies, no.
22     Q.  I'd like to show you now what
23  I'm going to mark as Exhibit 15, which is

Page 115

1  -- are some pages from your most recent
2  book.  Oh, boy, here we go.  Sorry.
3  There we go.
4      This is the cover of a book you
5  recently published; right?
6  (Exhibit 15 was marked for identification
7  and is attached.)
8      A.  It is.
9      Q.  Okay.  And these are just a few
10  excerpts from that book.
11     A.  Sure.
12     Q.  I'm going to go down -- you know
13  what?  Sorry, give me one second.
14     A.  Yeah.  Take your time.
15     Q.  We are going to come back to
16  that one in just a minute.  I had
17  actually intended to show you a different
18  dynamics article, which I'm marking as
19  Exhibit 25.  All right.  There we go.
20     This is an article you published
21  about -- or that relies on the dataset
22  we've been talking about; right?
23  (Exhibit 25 was marked for identification

Page 116

1  and is attached.)
2      A.  Yeah.  An earlier version of the
3  same dataset, yes.
4      Q.  Yeah.  And here on page 900 of
5  the article, the highlighted portion, you
6  say, "This measurement model enables us
7  to make use of many indicators of policy
8  liberalism, thus substantially reducing
9  measurement error on the estimates of our
10  construct of interest."
11     How many policies would you
12  consider necessary to sufficiently reduce
13  measurement error?
14     A.  And there's no magic number,
15  cutoff.  It depends on many factors.
16     Q.  Would five be enough?
17     A.  It certainly could be enough for
18  certain purposes, yes.
19     Q.  Measurement error at 5 policies
20  would be far higher than at 140 policies.
21  Is that right?
22     A.  It depends on the quality of the
23  individual indicators and their -- the

Page 117

1  strength of their relationship with the
2  quantity of interest.
3      Q.  Taking 5 policies that you --
4  from this broader dataset would involve a
5  higher measurement error than taking 140
6  policies from the dataset?
7      A.  If I took five policies at -- if
8  I sampled five policies at random from
9  the dataset and made an indicator, or a
10  measure out of those, that subset
11  relative to the whole, that would
12  certainly, in expectation, be a noisier
13  indicator, yes -- a noisier measure.
14  Sorry.
15     Q.  By "noisier," you mean
16  measurement error would be higher?
17     A.  Yes.
18     Q.  So going back to your book, here
19  -- this is Exhibit 15.  On page 5 here,
20  this highlighted statement says, "Given
21  the constraints of data availability, we
22  cannot claim to have constructed a random
23  sample of state policies."

Page 118

1    Do you still agree with that
2 statement?
3    A.  I do still agree.
4    Q.  And that is also true of the
5 pre-Obergefell 13 policies you rely on in
6 this case; it's not a random sample of
7 state policies?
8    A.  It's not a random sample of all
9 state policies, no.
10    Q.  Your book, this book, uses the
11 term "policy-year combinations."
12    A.  Yes.
13    Q.  You'd agree that the overall
14 dataset is missing about 60 percent of
15 the data for all policy-year
16 combinations?
17    A.  I don't recall the exact number,
18 but it is -- that sounds like a -- I do
19 believe we give the exact number in the
20 book, so that sounds in the ballpark.
21    Q.  Okay.  And your overall --
22 sorry.  I'll move this for a second.
23    And your overall dataset labels

Page 119

1 all the policies you discuss here as
2 cultural policies.  Is that right?
3    A.  These are all a subset of
4 cultural policies, yes.
5    Q.  And in a typical year in your
6 overall dataset, data are available for
7 only 27 of your 62 cultural policies.  Is
8 that right?
9    A.  I don't recall the number off
10 the top of my head.
11    Q.  Does that sound wrong?
12    A.  It doesn't strike me as
13 obviously wrong, no.
14    Q.  All right.  Both your overall
15 dataset and the datasets here are
16 restricted to state positive statutory
17 laws.  Is that right?
18    A.  Can you say that -- "state
19 positive statutory laws," is that what
20 you said?
21    Q.  Right.  Right.  You know, those
22 written statutes.
23    A.  Yes.  They're -- yes.  They're

Page 120

1 intended to be granted in statutory law,
2 yeah.
3    Q.  And except --
4    A.  Written statutes.
5    Q.  Except for the Healthcare
6 Freedom amendment, all the other policy
7 indicators do not include constitutional
8 provisions.  Is that right?
9    A.  In that dataset?
10    Q.  In the ones you're using in this
11 case.
12    A.  Oh, the ones I'm using in this
13 case?
14    Q.  Well, I mean, both.
15    A.  Let me answer with respect to
16 the -- the policies I'm using in this
17 case, some of which come from the dataset
18 that we have been talking about, I
19 believe that is correct, that all the
20 policies are statutory except for the
21 constitutional amendment to which you
22 referred.
23    Q.  And the policies also do not

Page 121

1 include administrative regulations;
2 correct?
3    A.  That is correct.  They're not
4 intended to, anyway.  Yes.
5    Q.  They don't include tort law?
6    A.  No tort law.  Correct.
7    Q.  And they don't include court
8 decisions?
9    A.  That's correct.  Except insofar
10 as -- a court decision can render a --
11 you know, a statutory policy inoperable
12 or -- or -- you know, and therefore can
13 remove it from the dataset.
14    Q.  Did you --
15    A.  So for example, like a Supreme
16 Court decision could declare all, for
17 example, anti-sodomy laws
18 unconstitutional.
19    Q.  But if a lower court invalidated
20 a particular state law, did you factor
21 that into your coding here or not?
22    A.  That is -- I don't -- I don't
23 recall off the top of my head how we --

Page 122

1  what our coding decision was for state
2  court decisions that rendered a law --
3  you know, that struck down a law. I
4  don't recall off the top of my head.
5     Q.  Your overall dataset and your
6  datasets that you used here do not
7  include anything about legislative
8  intent. Is that right?
9     A.  The datasets themselves are
10  composed solely of the laws and their --
11  and a coding of their sort of -- a coding
12  of their -- of what policy option that
13  the law -- or the policy indicated.
14    Q.  So they don't include votes on
15  specific policies; right?
16    A.  Not the dataset that we're
17  talking about, no.
18    Q.  Or legislative history?
19    A.  The dataset itself doesn't
20  include anything on legislative history.
21    Q.  And you don't know the
22  subjective intent of any legislator who
23  voted for or against the 186 policies in

Page 123

1  the 50 states; right?
2     A.  Off the top of my head, I don't,
3  but I am sure there are instances where
4  it is reasonably clear.
5     Q.  Do you think what a legislator
6  -- you just said "reasonably clear." Do
7  you think when a legislator votes for a
8  law that contains an explanation of the
9  law, that is a reasonably clear
10  explanation of the legislator's intent?
11    A.  On its own, no. I think that
12  one would have to have -- I think there
13  are circumstances where it is reasonably
14  clear where an individual legislator
15  explained their reasoning in a way that
16  was, in the context, credible. The text
17  of the law would be but one piece of
18  evidence about that individual
19  legislator's state of mind.
20    Q.  I'd like to go back to one of
21  your book pages. This is Exhibit 15
22  again, page 27. Here, the highlighted
23  portion, "our main goal is not predicting

Page 124

1  individual policies but rather
2  aggregating many policies to estimate the
3  general liberal-to-conservative direction
4  of states' policymaking in a given
5  domain."
6        So that was the main goal of
7  your overall dataset. Is that right?
8     A.  That's the main goal of this
9  measurement strategy described in this
10  chapter.
11    Q.  But your pre-Obergefell dataset
12  in this case attempts to predict an
13  individual policy. Is that right?
14    A.  You're referring to my report
15  now?
16    Q.  Yes.
17    A.  Yes. I used policymaking -- or
18  used measures of states' policy
19  orientation to predict adoption of
20  gender-affirming care bans.
21    Q.  So, what differences in analysis
22  did you undertake in this case to change
23  your goal?

Page 125

1     A.  Well, the goal changed;
2  therefore, the analyses changed, so it
3  was not the other way around. But in
4  this -- in this book, our goal was to
5  understand the relationship -- I mean,
6  one of the broad goals of the book is to
7  understand the relationship between the
8  broad sort of ideological position or the
9  relative conservatism -- or liberalism is
10  the term we use -- of the -- of the
11  public in a given domain, the
12  relationship between that and the general
13  liberalism or conservatism of states'
14  policymaking in that domain. So that was
15  the goal in -- or one of the primary
16  goals of this book, and that necessitated
17  a particular set of analytic choices,
18  many. And the goal in this report was
19  different.
20    Q.  What was the goal in this
21  report?
22    A.  Well, the overall goal of this
23  report was to rebut the defense experts'

32 (Pages 122 - 125)

1   contention that -- and the -- that the
2   SB184 and gender-affirming care bans in
3   general were motivated by -- the
4   predominant motivation was a
5   paternalistic regard for the welfare --
6   protect -- to protect minors from
7   experimental medical treatments.  And as
8   part of rebutting that, the analysis that
9   we're referring to, the policy analysis
10   that we're referring to here used
11   policymaking in other related areas to
12   predict adoption of the -- of the policy
13   in question.
14   Q.  And when you began this case,
15   you started with the assumption that the
16   defendants' experts were wrong?
17   A.  I didn't start with that
18   assumption, no.
19   Q.  Going to page -- let's see.
20   Figure 2.2 on Exhibit 15.  Here, you list
21   62 cultural policies.  This doesn't
22   include all the 13 policies in your
23   pre-Obergefell dataset here, does it?

1   A.  I believe it does.
2   Q.  It does?
3   A.  I believe it does.
4   Q.  You don't know?
5   A.  I -- that's -- my understanding
6   is I believe it does, yeah.
7   Q.  How did you choose the 13
8   policies to include in your
9   pre-Obergefell dataset here?
10   A.  By "here," you mean in my
11   report?
12   Q.  That's right.
13   A.  There were a certain set of
14   policies, state policies in the dataset
15   that were classified as gay rights
16   policies.  They have a -- they were
17   classified as -- or LGBT rights policies.
18   And I chose all the policies that fell
19   into that category.
20   Q.  And who designated them as LGBT
21   policies to begin with?
22   A.  A combination of myself and my
23   coauthor working on creating this -- we

1   created -- we created this dataset over
2   the course of many years but made that
3   designation.
4   Q.  That choice to designate 13
5   policies as LGBT policies was not
6   peer-reviewed, was it?
7   A.  Choices aren't -- no -- single
8   choices aren't peer-reviewed, but.
9   Q.  So the answer is no?
10   A.  Well, the choice was not that
11   the -- I think it's fair to say that the
12   choice was ratified by peer review as
13   part of a larger project.
14   Q.  What other scholars have used
15   these 13 policies to analyze the motives
16   of a given legislature when passing a
17   particular law?
18   A.  To analyze the motives?  I don't
19   know off the top of my head.
20   Q.  Do you know of any?
21   A.  I don't.  I don't know.
22   Q.  So you don't know of any?
23   A.  I don't -- I don't -- I can't

1   affirmatively think of a -- other --
2   other scholars who have used these
3   policies to opine on the motivations of
4   other legislators, but I wouldn't be
5   surprised if someone did.  They've been
6   used by a number of scholars.
7   Q.  What is the Type I and Type II
8   error rate of your choice of 13 laws?
9   A.  I don't think a Type II/Type I
10   error rate is a very -- is a well-defined
11   concept in this context.
12   Q.  So there's no error rate of your
13   selection of 13 laws?
14   A.  Error rate with respect to what?
15   Q.  You think these 13 laws
16   perfectly encompass LGBT policies?
17   A.  By "perfectly encompass," do you
18   mean include all LGBT-related policies?
19   No.
20   Q.  Nor are they a perfectly random
21   sample of all LGBT policies; correct?
22   A.  That is correct.
23   Q.  Do each of these 13 laws show

Page 130

1  anti-LGBT bias?
2     A.  Each of these 13 laws that I
3  include are indicators of a state's
4  relative hostility to or favorability
5  towards LGBT rights and the status of LG-
6  -- -- the legal status of LGBT
7  individuals.
8     Q.  Is there any reason other than
9  hostility towards LGBT rights or peoples
10 that a person could support what you
11 labeled the "restrictive position" on
12 each of these 13 laws?
13    A.  I think in any -- it is
14 definitely possible that -- that someone
15 to -- for there to be other motivations
16 at play.
17    Q.  How many other reasons could
18 exist?
19    A.  I don't know if you can count,
20 depending on how broadly you define
21 "reasons," but there are many -- and for
22 any given one of these laws and for any
23 given vote on these laws, any -- you

Page 131

1  know, any number of arbitrary factors or
2  idiosyncratic factors could be at play.
3     Q.  How many reasons to vote for
4  these laws other than hostility towards
5  LGBT persons did you consider?
6     A.  Did I consider in what context?
7     Q.  Arriving at your opinion in this
8  case.
9     A.  For voting for these laws?  I
10 used these laws -- I'm sorry.  So, did
11 you say how many other motivations for --
12 sorry.  Can you repeat the question?
13    Q.  Yeah.  You said there were many
14 reasons other than hostility towards LGBT
15 persons a person could support what you
16 labeled the "restrictive position" on
17 each of these laws.  And I'm asking, how
18 many of those other reasons did you
19 consider?
20    A.  I didn't consider those
21 motivations in selecting these laws.
22 Like these laws are meant to be an
23 indicator of a state's general propensity

Page 132

1  to restrict or expand LGBT rights and the
2  status of LGBT persons.  So
3  considerations of the motivations of the
4  legislators that passed these laws did
5  not enter into my decisions about whether
6  to include them.
7     Q.  I'm not asking about whether to
8  include them.  I'm asking -- you say that
9  having all of them shows hostility toward
10 LGBT rights, and I'm asking what other
11 reasons did you consider for a -- in
12 terms of why a person could support what
13 you labeled the "restrictive position" on
14 each of these laws?
15    A.  So I think if something can --
16 these -- my decision to include these
17 policies and use them as indicators of
18 hostility to LGBT rights didn't hinge
19 upon judgments about the reasons that any
20 given legislator passed them.  They're
21 simply an indicator of -- they're simply
22 indicators of the state's actual policies
23 towards LGBT individuals and whether they

Page 133

1  were relatively restrictive or relatively
2  expansive.
3     Q.  Again, I'm not asking how you
4  picked them originally.  I'm asking how
5  you jumped from picking them to your
6  conclusion that having them shows
7  hostility toward LGBT persons.
8     A.  Well, hostility towards LGBT
9  rights I think is probably a more
10 accurate way of saying it.  But this --
11 what I would say is it's an indicator of
12 a state's more general propensity to
13 legislate on the basis of LGBT -- sorry,
14 to restrict LGBT rights.  And the
15 indicators were chosen because they are
16 substantively based -- you know, this is
17 the sort of thing that we do in political
18 science.  When we want to create an index
19 of some concept, we look for indicators
20 that are related substantively to that
21 context, and we make judgments about how
22 to combine them.
23    Q.  So under your testimony, there

34 (Pages 130 - 133)

Page 134

1  are many reasons other than hostility
2  toward transgender rights a person could
3  support what you label the restrictive
4  positions of each of these laws, but
5  having each of -- having all of these
6  laws shows the hostility toward LGBT
7  rights?
8      A.  So there are, as I said, many
9  idiosyncratic reasons why an individual
10  legislator could --
11     Q.  That wasn't my question.
12     A.  No.  I'm answering your
13  question.  Can I finish, or do you want
14  to rephrase your question?
15     Q.  You can finish.  But if we
16  continue being evasive, I'm going to have
17  to ask your counsel if we can extend this
18  deposition to another day.
19         MR. FLETCHER:  Counsel, allow
20  the witness to answer your question as it
21  stands.
22         MR. MILLS:  The witness has
23  given this same answer multiple times,

Page 135

1  and I'm going to object and strike it as
2  nonresponsive.
3         MR. FLETCHER:  You want to
4  repeat your question?
5         MR. MILLS:  I think he knows
6  what the question is.
7      A.  So what I was going to explain
8  was that there are many -- many factors
9  that could affect individual legislators'
10  response and -- but also that could
11  influence the enactment of any given
12  policy.  And the advantage of combining
13  them together is that you net out those
14  idiosyncratic factors to isolate more
15  clearly the signal that -- or the concept
16  that -- or the factor that unites all of
17  them.
18         So I believe your question was
19  about -- so I hope that answers your
20  question, but if you --
21     Q.  (By Mr. Mills) So even if
22  there's a release -- a reason that is not
23  hostility toward LGBT rights to support

Page 136

1  each of these other laws, supporting all
2  of them proves hostility toward LGBT
3  rights.  Is that your testimony?
4      A.  It doesn't prove it, but it is
5  an indicat- -- taken together, it's a
6  reliable indicator of general -- of a
7  state's general policy hostility towards
8  LGBT rights.
9      Q.  Because you think there could be
10  no other reason to support each of these
11  13 laws?
12     A.  No.  That's not what I said.
13     Q.  Well, if there's a neutral
14  explanation to support each of the 13
15  laws and you haven't made any effort to
16  rule out those explanations, how could
17  you conclude that they show hostility
18  towards LGBT rights?
19     A.  Let me make sure I understand
20  what you say.  You said each of these
21  laws.  So, are you -- so in the scenario
22  you're imagining, there's -- I'll take
23  that as you're saying that in each of

Page 137

1  these cases, there was a different or an
2  alternative explanation for the adoption
3  of the law other than LGBT -- hostility
4  to LGBT rights.
5         I think -- first of all, I
6  think, empirically, that's unlikely, that
7  there would be 13 independent alternative
8  explanations.  But then -- but again, I
9  return to my point that the -- that
10  the -- this indicator is -- or this
11  measure is meant to capture a general
12  propensity to restrict LGBT rights in
13  general.  It's not premised on judgments
14  about the motivations behind individual
15  legislators' decisions to support them.
16     Q.  You said empirically unlikely,
17  but you also said you didn't consider any
18  reasons that someone might -- other
19  reasons that someone might support each
20  of these 13 laws.
21         On what basis do you say it's
22  empirically likely that someone could
23  support each of these other 13 laws on a

35 (Pages 134 - 137)

Page 138

1   basis that is not hostility toward LGBT
2   rights?
3        A.  I -- it sounded -- I was basing
4   that on my interpretation of your
5   question or where you said in each of
6   these laws, there was a -- I think you
7   said some -- I can't remember your exact
8   wording but something like alternative --
9   independent explanation or alternative
10  explanation or something.  And it -- if
11  -- what I would say is that it would be
12  unlikely that there would be just a
13  different alternative, like it could have
14  -- an explanation for each of -- 13
15  times, there would be an alternative
16  explanation.
17       But the other reason it's
18  unlikely is that these laws are hardly --
19  the states' stances on these laws are
20  highly correlated with one another, so
21  they form a reliable index, so they do
22  share -- they do create a reliable index
23  together.

Page 139

1        Q.  What does that have to do with
2   the reason they were enacted?
3        A.  Well, as I've said, my selection
4   of these is not -- is not based on
5   judgments about the -- I mean, if -- by
6   "reason," do you mean the motivations of
7   the legislature -- legislators involved?
8        Q.  By "reason," I mean whatever you
9   mean when you say "hostility towards LGBT
10  rights."  If you want to call it a
11  reason, if you want to call it a
12  motivation, if you want to call it
13  something else, I don't care.
14       A.  Yeah.
15       Q.  That's what you call it.  I'm
16  talking about reasons --
17       A.  Okay.
18       Q.  -- other than that.
19       A.  Okay.  So I would say that these
20  -- so okay.  So on their face, all of
21  these laws restrict transgender rights
22  fairly trans-- -- it is, I think, a
23  reasonable interpretation of each of

Page 140

1   these rights to take a position on a
2   relative favorability towards the status
3   of -- legal status of LGBT individuals.
4   And that is the -- substantively, the
5   primary -- so that's what -- that's like
6   the most natural interpretation on their
7   face.  And taken together, they form --
8   they're very highly correlated with one
9   another.  And so I think they provide a
10  very -- a reliable summary of a state's
11  general stance towards LGBT rights.
12       The source, the particular
13  source, like the motivations behind the
14  passage of individual laws could be --
15  there could be different factors at play
16  in each one.  But regardless of the
17  motivations or the reasons why the
18  legislature passed it in each individual
19  case, together they indicate a general
20  propensity or gen-- -- a state's general
21  stance towards LGBT rights.
22       Q.  Let's take laws restricting
23  minors from voting, driving, and getting

Page 141

1   a tattoo.  Does that prove that states
2   are motivated by anti-minor bias?
3        A.  No.  It doesn't prove -- I mean,
4   do you mean --
5        Q.  I'll rephrase.  Does that show
6   hostility toward minors' rights?
7        A.  I do think that states could be
8   relatively favorable or not towards
9   giving rights to minors.  That doesn't
10  tend to be a salient point of political
11  conflict.  So as a political scientist,
12  it's, sort of on its face, a less obvious
13  explanation for the passage of individual
14  laws or -- but it certainly is possible
15  for states to have -- take different
16  positions on that, and it's also possible
17  -- though I would have to investigate it
18  -- for those policies to hang together
19  enough to be highly -- associated with
20  one another enough to form a coherent
21  tendency in the state's policymaking.
22       Q.  So the difference is you can't
23  imagine that states could independently

36 (Pages 138 - 141)

1  decide to take what you label the
2  restrictive policy on each of these 13
3  laws for any reason apart from anti-LGBT
4  bias?
5      A.  It's not that I can't imagine
6  that they would do it for any other
7  reason.  It's just an indicator of their
8  general stance towards LGBT rights.  And
9  so -- no, sorry.  It's a -- yeah, it's a
10  measure of their stance on LGBT rights
11  and -- yeah, that's it.
12      Q.  I'm going to show you what I'm
13  marking as Exhibit 19, which is an
14  article you wrote with Christopher
15  Warshaw entitled "Policy Preferences and
16  Policy Change" -- sorry.  I'll show you
17  the first page.
18      This is an article you wrote and
19  published.  Is that right?
20  (Exhibit 19 was marked for identification
21  and is attached.)
22      A.  Correct.
23      Q.  All right.  Down here in

1  footnote 16, it says the model "is
2  dynamic in that policy liberalism is
3  estimated separately in each year and the
4  policy-specific intercepts are allowed to
5  drift over time.  If, instead, the
6  intercepts are held constant, the
7  policies of all states are estimated to
8  have become substantially more liberal,
9  especially before the 1980s."
10      You agree that you used the same
11  method here, restrictiveness analyzed in
12  each year and only relative to other
13  states' policies, in that year?
14      A.  Can you say that again?
15      Q.  Yeah.  So in this case, your
16  pre- and post-Obergefell analysis, you
17  used the same approach estimating
18  restrictiveness separately in each year
19  and only relative to other states'
20  policies in that year?
21      A.  In my report, you're referring
22  to?
23      Q.  That's right.

1      A.  No.  I don't think that's an
2  accurate characterization.
3      Q.  Why's that?
4      A.  I am at least -- well, if some
5  of -- I mean, you said relative to each
6  states' in each year, I think.  Is that a
7  term you used?
8      But the measures that I present
9  here are not relative measures.  They're
10  not normed by -- by the sub mean in each
11  year.  They're meant to be --
12      Q.  I said you estimated
13  restrictiveness relative to other states
14  policies in that year.  Correct?
15      A.  Oh, I see what you -- so the
16  reason I was hung up is your use of the
17  word "relative."
18      So I would say that I estimated
19  the restrictiveness of states' policies
20  in each year.  That would be -- yeah.
21  And so the -- and they do put states
22  relative to one another but in -- yeah.
23  So that is correct.  In a given year,

1  that is correct, yes.
2      Q.  Yeah.  I'm not trying to --
3      A.  Yeah.  No, it's okay.
4      Q.  So your models here in this
5  case, it's not -- restrictiveness is not
6  a matter of historical positions across
7  all state laws; correct?
8      A.  In this case, when I evaluate
9  how restrictive a state's policies are in
10  a given year, it depends only on the data
11  in that year.
12      Q.  And you excluded years in which
13  all states agreed?  Is that right?
14      A.  Excluded policy years in which
15  all states agreed.
16      Q.  Okay.  And controversial
17  policies are more likely to be subject to
18  disagreement among the states.  Is that
19  right?
20      A.  Yes.
21      Q.  Your analysis here didn't
22  include the federal government's laws.
23  Is that right?

37 (Pages 142 - 145)

Page 146

1    A.   "Here," you mean in the -- in
2   the case?
3    Q.   That's right.
4    A.   It doesn't explicitly include
5   them except insofar as federal -- mainly
6   federal court decisions affected what
7   laws were operable in each state.
8    Q.   On your pre-Obergefell dataset,
9   which of these 13 policies did the
10  federal government have in 2022?  In
11  other words, what would it have scored?
12   A.   I don't know off the top of my
13  head.
14   Q.   Does the federal government have
15  anti-LGBT bias?
16   A.   Does the federal government have
17  anti-LGBT bias?  What I would say -- does
18  it have -- what I would say is that --
19  that when I am referring to -- assuming
20  you mean as I use that term in this
21  report --
22   Q.   Yes.
23   A.   -- I would say that hostility

Page 147

1   towards -- anti-LGBT bias, I mean
2   primarily hostility towards the rights
3   and legal status of LGBT persons.  And
4   that's a relative term.  So there are --
5   one can always -- it's always possible
6   for -- so to say bias, you have to say
7   bias relative to what.  And so I -- are
8   you referring -- so in this case, I'm not
9   sure what -- the reference point for your
10  question about the federal government.
11  So, to what should I be comparing the
12  federal government to?
13   Q.   We'll move on.
14       If the Eleventh Circuit read a
15  federal law to prohibit employment
16  discrimination based on LGBT status in
17  2011, Alabama would have no need for an
18  LGBT employment antidiscrimination law.
19  Is that right?
20   A.   I don't know that that's true.
21   Q.   And yet you coded the absence of
22  an LGBT employment antidiscrimination law
23  as an LGBT-restrictive policy for

Page 148

1   Alabama?
2    A.   You're referring specifically to
3   -- are you -- just to make sure I
4   understand what you're referring to,
5   you're referring, in 2011, to whether
6   Alabama had a LGBT employment
7   antidiscrimination law?
8    Q.   Correct.
9    A.   And you're saying if the
10  Eleventh Circuit had struck that down --
11  or sorry, had prohibited discrimination
12  in employment, then that such a law would
13  be irrelevant or unnecessary?
14   Q.   Correct.
15   A.   I'm not sure that that's the
16  case.  I don't know the scope of the
17  decision that you're referring to.  I
18  don't know whether it was upheld by -- I
19  don't know its -- I don't know its legal
20  history, so I am -- I can't really opine
21  on that.
22   Q.   So you didn't consider that case
23  when coding the variables here; correct?

Page 149

1    A.   So in -- so first of all, these
2   variables were coded as part of a project
3   that predated the report, to be clear,
4   and as part of that coding process, we
5   did not invalidate -- we did not drop
6   that law as a result of the decision that
7   you're referring to.  Or that policy.
8   Drop that policy is what I should have
9   said.
10   Q.   The question wasn't whether you
11  would drop the policy.  The question was
12  whether you would code the absence of an
13  LGBT employment antidiscrimination law.
14   A.   No.  We did not recode it from
15  what the Alabama statute indicated.
16   Q.   So even though the absence of a
17  particular policy might be irrelevant in
18  reality because of a lower federal court
19  or state court decision, you didn't
20  consider that in your analysis?
21   A.   That is not how this dataset was
22  coded, no.
23   Q.   So --

Page 150

1    A.   Let me -- I'll be precise.  So
2  the dataset did not take into account --
3  did not change the coding of policies
4  based on a -- lower court decisions such
5  as the one you're referring to.
6    Q.   And that would -- you would
7  agree that that failure to consider case
8  law affecting these policies increases
9  the likelihood of error of relying on
10  your coding of these policies to state a
11  general approach to transgender rights?
12    A.   No, I don't agree with that.
13    Q.   Why would Alabama have needed to
14  pass an employment discrimination law if
15  the Eleventh Circuit had already
16  prohibited employment discrimination
17  based on LGBT status?
18    A.   I'm not saying that it needed
19  to, but it --
20    Q.   How could its failure to have
21  reflected its view on LGBT rights?
22    A.   Some states have passed such
23  laws; other states have not.  They do so

Page 151

1  for -- I'm not opining as to the need to
2  pass them or not, but they are
3  indicators, nevertheless, of the state's
4  general stance on LGBT policymaking.  I
5  think removing it from -- changing the
6  coding based on a higher court decision
7  would actually introduce more error in
8  measures of Alabama's general propensity
9  in this area to restrict LGBT rights than
10  it would not.
11    Q.   So you think Alabama's failure
12  to pass a law that would make no
13  practical difference to LGBT persons
14  demonstrates a hostility toward LGBT
15  rights?
16        MR. FLETCHER:  Object to form.
17    Q.   You can answer.
18    A.   So I disagree with the basis for
19  -- I don't grant the -- I don't know it
20  to be true that passing that law would
21  have made no difference to LGBT rights.
22  As I said, I don't know the scope of the
23  decision you're referring to or its --

Page 152

1  whether it would have remained in place.
2  States, for example -- yeah.  And -- but
3  even -- yes, I stand by the decision that
4  keeping that coding is a -- provides a
5  more reliable measure of a state's
6  general stance on LGBT rights than
7  changing the coding.
8    Q.   You think it's more reliable to
9  exclude the actual effects on LGBT people
10  in the state?
11        MR. FLETCHER:  Object to form.
12    Q.   You can answer.
13    A.   I think it's a more reliable
14  indicator of the state's -- the state
15  government's -- in this case, the State
16  of Alabama's -- general stance on LGBT
17  rights given that the decision came from
18  a federal circuit that includes multiple
19  states.
20    Q.   So in 2012, there was no reason
21  for Alabama not to pass an LGBT
22  employment antidiscrimination law other
23  than hostility towards LGBT rights?

Page 153

1    A.   No.
2    Q.   But you are saying that because
3  Alabama didn't use its scarce legislative
4  time to pass a virtue-signaling LGBT
5  employment nondiscrimination law in 2012
6  when that law would have had no effect
7  should be coded as restrictive?
8        MR. FLETCHER:  Object to form.
9        THE WITNESS:  Can I answer?
10        MR. FLETCHER:  Of course.
11    A.   Yes, I do think it should be
12  coded as restrictive.  Even if a -- even
13  if it is purely symbolic, it is an
14  indicator of -- which I don't grant in
15  this particular case --
16    Q.   So, why do you treat U.S.
17  Supreme Court decisions differently?
18    A.   Because they apply to all
19  states.  Well, first of all, as a
20  practical matter, this was a decision
21  made -- we made in the --
22    Q.   I'm asking about reliability.
23  Why do you treat U.S. Supreme Court

39 (Pages 150 - 153)

Page 154

1  decisions differently?
2       MR. FLETCHER:  Counsel, again,
3  allow the witness to answer your
4  question, and allow the witness the time
5  to answer your question accurately.
6       MR. MILLS:  Okay.  Would you
7  agree to a second day of depositions,
8  Counsel?
9       MR. FLETCHER:  Counsel, would
10  you allow the witness to answer your
11  question?
12       MR. MILLS:  If he'll answer it.
13    A.  Oh, okay.  So I believe you
14  were -- why do I treat -- why does the
15  dataset treat Supreme Court decisions
16  differently?  Because by -- those are
17  sort of a policy -- or sorry, a coding
18  decision made in the course of
19  constructing that dataset, in part, to --
20  because it applied to -- it applied to
21  all states; right?  So it wiped away
22  variation across states, but it also was
23  a practical decision so that we didn't

Page 155

1  continue to -- we didn't -- given that --
2  you know, given the finite resources of
3  the project, that we didn't collect
4  information on laws that had been
5  declared unconstitutional many years in
6  the past.  So that was a practical
7  decision in the face of research
8  considerations, but I think a reasonable
9  one in the context of dataset collection.
10    Q.  And that choice, if disregarding
11  the Eleventh Circuit decision makes your
12  analysis more reliable, then
13  incorporating Supreme Court decisions
14  makes your analysis less reliable;
15  correct?
16    A.  I wouldn't say -- first of all,
17  we have to say reliability for what
18  purpose.  Remember that --
19    Q.  You used the term.
20    A.  It's true.  And I just want to
21  be clear about what context I'm referring
22  to.
23       So in the context of this

Page 156

1  report, including that policy in -- as
2  passed by the legislature and not
3  changing the coding based on the Eleventh
4  Circuit, I do believe it provides a more
5  reliable indicator of the -- of the -- of
6  states' general stance on LGBT
7  policymaking.  But also, I -- there's a
8  value in adhering to a -- there's a
9  danger in making ad hoc decisions of that
10  sort, and I wanted to adhere to the
11  standards set forward in the dataset I
12  was using.
13    Q.  Is a state's failure to appeal
14  its same sex marriage prohibition after
15  Obergefell evidence of hostility towards
16  LGBT rights?
17    A.  I think it could be considered
18  an indicator of relative favorability
19  towards LGBT rights.
20    Q.  But you excluded that after
21  Obergefell?
22    A.  Well, it's not included in the
23  dataset.

Page 157

1    Q.  So you excluded it?
2    A.  It's not included in the
3  dataset, so I didn't include it in my
4  analysis.
5    Q.  In your pre-Obergefell analysis,
6  as you discussed, you excluded policies
7  any time all states agreed on a policy;
8  right?
9    A.  The data -- the dataset I used,
10  you're referring to the --
11    Q.  Yes.
12    A.  You're referring still to the
13  pre-Obergefell analysis?  Yes.
14    Q.  Right.  Sorry.  One second.
15       Do you view it as hostility
16  toward LGBT rights to allow agencies to
17  refuse same-sex foster parents for
18  religious reasons?
19    A.  I do believe that is an
20  indication of the relative weight that
21  states place on LGBT rights, yes.
22    Q.  Could there be other reasons for
23  a state to allow agencies to refuse

40 (Pages 154 - 157)

Page 158

1    same-sex foster parents for religious
2    reasons?
3        A.   Yes.  There could be multiple
4    reasons, yeah.
5        Q.   Are you aware that the Supreme
6    Court has held that agencies have their
7    own free exercise rights when working
8    with the state?
9        A.   I don't know what you're
10   referring to.
11       Q.   So no matter what a state's law
12   says, the free exercise clause may
13   guarantee foster agencies the right to
14   refuse certain parents for religious
15   reasons; correct?
16           MR. FLETCHER:  I'll object to
17   form.
18       Q.   You can answer.
19       A.   I don't know.  I don't have an
20   opinion on that.  I don't know.  I
21   don't --
22       Q.   You didn't consider that when
23   you coded state laws; correct?

Page 159

1        A.   I don't think I fully understood
2    what you were referring to.  But if the
3    -- if the -- if the -- if there were a
4    Supreme Court decision that struck down a
5    particular legislative provision or
6    statutory provision, I mean, then that
7    was incorporated into the policy -- or
8    the -- sorry.
9            If there was a Supreme Court
10   decision that imposed policy uniformity
11   across states, then that did affect the
12   coding of the laws; but otherwise, it did
13   not.
14       Q.   Your category of hate crimes, it
15   doesn't consider whether state juries, as
16   a matter of state common law, already
17   impose additional punishments for hate
18   crimes, does it?
19       A.   As a matter of state common law,
20   it doesn't take into account
21   state-by-state variation in the common
22   law.
23       Q.   Would you agree that Alabama's

Page 160

1    policies have become significantly more
2    liberal as an absolute matter over time?
3        A.   Are you referring to all of
4    their policy -- like their policies in
5    general?
6        Q.   Yes.
7        A.   All domains?
8        Q.   Yes.
9        A.   I think in many domains, that is
10   true, yes.  Most domains.
11       Q.   Including on LGBT issues?
12       A.   On LGBT issues, they have become
13   more liberal over time.  You used the
14   word -- I can't remember.  Did you say
15   "substantially" or -- I can't remember
16   what adjective you -- or sorry, adverb
17   you applied to.
18       Q.   I may have used "significantly,"
19   but you're welcome to --
20       A.   Okay.  Yeah.  I do believe they
21   have become more liberal over time.
22   Liberal in this context meaning more
23   favorable, or more expansive towards LGBT

Page 161

1    rights.
2        Q.   In one of your other works, you
3    talk about partisan effects.  And you
4    say: "Since about 1980, partisan effects
5    have grown rapidly:  electing Democrats
6    now has an unambiguously positive impact
7    on policy liberalism."
8            Do you still agree with that
9    statement?
10       A.   I do.
11       Q.   So I'm just going to show you
12   that article if I could.  Let's see if I
13   can get it up.
14           So this is an article you wrote
15   with others on the policy effects of the
16   partisan composition of state government.
17       A.   Yeah.
18       Q.   Is that right?
19       A.   It's a preprint of it.  Yeah.
20       Q.   Yeah.
21       A.   So I assume that this is the
22   same as the final draft.
23       Q.   And this is going to be marked

41 (Pages 158 - 161)

Page 162

1 as Exhibit 5. Let's see. Sorry. Let
2 me -- here we go.
3        Right at the top here, if you
4 can see it.
5        A. Uh-huh.
6        Q. The first sentence, "Evaluating
7 policy divergence between the parties
8 requires isolating the policy effects of
9 partisan composition from other
10 determinants of state policy; otherwise,
11 partisan effect estimates will be
12 biased."
13        And then if we could go back to
14 Exhibit 15, which is your book chapter
15 here. You say, "the causal effects of
16 party control on state policies, which
17 probably reached their nadir in the 1970s
18 and 1980s, have grown sharply in the
19 subsequent decades."
20        So you agree that partisan
21 effects may be a significant factor in
22 evaluating policy divergence?
23 (Exhibit 5 was marked for identification

Page 163

1 and is attached.)
2        A. Yes.
3        Q. And that, as you said in the
4 first article, failure to isolate those
5 effects could lead to biased results?
6        A. In specifically that -- you
7 mean -- sorry. "Failure to isolate those
8 effects," you mean the effects of party
9 control?
10        Q. That's right.
11        A. Yeah. That your -- yes. If you
12 don't isolate those effects from other
13 influences, your quantitative estimates
14 of the effects of party control might be
15 biased.
16        Q. And you would agree that
17 comprehensively evaluating policy
18 divergence between the states requires
19 isolating the policy effects of partisan
20 composition from other determinants of
21 state policy?
22        A. Could you -- when you say
23 "policy divergence," I just want to make

Page 164

1 sure I understand the context for that.
2        Q. Sure. I mean what you mean
3 whenever you say "policy divergence."
4        A. Got it. Yeah. So -- sorry. So
5 this is in the context of policy -- or
6 parties adopting different policy stances
7 and -- when in government. Yeah. So
8 sorry, repeat your question.
9        Q. So --
10        MR. FLETCHER: We're looking at
11 a small excerpt of Exhibit 5? Is that
12 right?
13        MR. MILLS: That's right.
14        MR. FLETCHER: Thank you.
15        MR. MILLS: Yeah.
16        Q. You'd agree that comprehensively
17 evaluating policy divergence between the
18 states requires isolating the policy
19 effects of partisan composition from
20 other determinants of state policy?
21        A. I think this is the source of my
22 confusion because in this case, it's
23 policy divergence between parties, not

Page 165

1 between states. So are you referring to
2 divergence between states or between
3 parties?
4        Q. Between states.
5        A. Oh. I don't think I agree with
6 your statement, so. But please ask it
7 one more time just -- I'm sorry. Please
8 ask it one more time.
9        Q. Sure. Would comprehensively
10 evaluating policy divergence between the
11 states require isolating the policy
12 effects of partisan composition from
13 other determinants of state policy?
14        A. No, I don't think so.
15        MR. FLETCHER: And we've been
16 going for over an hour now. Is this a
17 good time for a lunch break?
18        MR. MILLS: I'll be done with
19 this in just a minute.
20        MR. FLETCHER: Okay.
21        Q. You don't think partisan
22 composition is a determinant of state
23 policy?

42 (Pages 162 - 165)

Page 166

1    A.   No, I do think it is a
2  determinant of state policy.
3    Q.   And your analysis here doesn't
4  consider the policy effects of partisan
5  composition.  Is that right?
6    A.   "Here," you mean in my report?
7    Q.   That's right.
8    A.   It does not consider the effects
9  of party composition.
10        MR. MILLS:  Okay.  I think we
11  can go off the record now.
12          (Break taken.)
13    Q.   (By Mr. Mills) One of the bases
14  of your opinions in this case is that the
15  legislature in SB184 declined to adopt an
16  express exemption for psychotherapeutic
17  counseling; right?
18    A.   That is one of the facts cited
19  in my case, yeah.  Or in my brief or
20  report.  Sorry.
21    Q.   Sure.  So I'm just showing you
22  your report.  Is that working?
23    A.   Yes.

Page 167

1    Q.   Okay.  So this is your report,
2  Exhibit 21, that we discussed earlier.
3  Here at the bottom of the page 8 under
4  "Summary of opinions" you have, "Despite
5  SB184's nominal focus on hormone and
6  surgical treatments, the legislature
7  explicitly declined to exempt
8  psychotherapeutic treatments from the
9  bill's restrictions, which is consistent
10  with a general hostility to gender
11  nonconformity per se."
12        Do you still agree with that
13  statement?
14    A.   I do.
15    Q.   And this is one of your -- one,
16  two, three, four, five, six -- seven
17  summary of opinions; right?
18    A.   If that's the number, yes.  It's
19  one of the main bullet points.
20    Q.   Okay.  And then later in your
21  report, you talk about -- page 34 to 35,
22  paragraph 70 -- "Rep. Allen claimed to
23  favor 'therapeutic treatment'" -- et

Page 168

1  cetera, et cetera.  "The legislature,
2  however, explicitly declined to exempt
3  psychotherapeutic counseling from SB184's
4  restrictions.  In a voice vote, the
5  Senate rejected an amendment by Sen. Tom
6  Whatley clarifying that the bill was not
7  meant to limit the therapeutic discretion
8  of psychologists or counselors."
9        And so that amendment is what
10  you're talking about when you say that
11  the legislature in SB184 declined to
12  adopt an exemption for psychotherapeutic
13  counseling; right?
14    A.   That's the amendment, yes.
15    Q.   If they had adopted that
16  amendment exempting psychotherapy, would
17  you agree that that adoption would be
18  consistent with Representative Allen's
19  claim to favor therapeutic treatment for
20  transgender youth?
21    A.   I think I would agree with that,
22  yes.
23    Q.   And would that be some evidence

Page 169

1  suggesting that the legislature's
2  objection was not to transgender youth
3  per se as you say in page 8?
4        MR. FLETCHER:  Object to form.
5    A.   I don't think I say "transgender
6  youth per se."
7    Q.   I think the meaning is the same,
8  but I will say it just as you say it.
9  Would that be some evidence suggesting
10  that the legislature's objection was not
11  to gender nonconformity per se?
12    A.   If they had not -- if they had
13  not -- if they had adopted that
14  amendment, would that be evidence against
15  general hostility to gender nonconformity
16  per se?
17    Q.   Right.
18    A.   I do think I would have -- I
19  would have interpreted that evidence.
20  That would be one piece of evidence in
21  that regard, yeah.
22    Q.   Okay.  I am going to show you --
23  let's see if I can handle all these

Page 170

1  files -- what I'm going to mark as
2  Exhibit No. 37, and that's the Senator
3  Whatley Amendment that we were just
4  talking about.  Give me just one second.
5      Okay.  So you would agree that
6  this appears to be the Senator Whatley
7  amendment to -- that we were just
8  referring to and that your report
9  discusses?
10  (Exhibit 37 was marked for identification
11  and is attached.)
12      MR. FLETCHER:  And I'll note for
13  the record, we're looking at a zoomed-in
14  excerpt of a particular document,
15  Counsel.  To the extent it's necessary --
16      MR. MILLS:  This is the whole
17  document.
18      A.  Yeah.  It's very short.  This is
19  the Whatley Amendment, yeah.
20      Q.  Right.  Okay.  And then Section
21  6 here is the substance of the amendment.
22  It says, "Nothing in this act shall be
23  construed as limited or preventing

Page 171

1  psychologists" -- et cetera et cetera --
2  "from rendering the services for which
3  they are qualified by training or
4  experience involving the application of
5  recognized principles, methods, and
6  procedures of the science and profession
7  of psychology and counseling."
8      Is that right?
9      A.  That's what it says, yes.
10      Q.  Okay.  And do you know what
11  SB184 says about psychotherapy?
12      A.  I don't remember off the top of
13  my head exactly what it says.
14      Q.  Okay.  Does SB184 prohibit
15  psychotherapy?
16      MR. FLETCHER:  Object to form.
17      Q.  You can answer.
18      A.  Does it outright prohibit all
19  psychotherapy?  No.
20      Q.  Okay.  We'll go back to Exhibit
21  20, which I'll show you on the screen
22  again.  This is SB184 that we identified
23  earlier.  I'm just scrolling down to

Page 172

1  Section 6 of the enacted law.
2      A.  I see what you mean, yeah.
3      Q.  You'd agree this is
4  substantively identical to the Whatley
5  Amendment that you say the legislature
6  rejected?
7      A.  It does appear to be, yeah.
8      Q.  So when you said the legislature
9  declined to exempt psychotherapeutic
10  counseling from SB184's restrictions in
11  your report, that was incorrect, wasn't
12  it?
13      A.  I'm not entirely sure from this
14  context, so give me a second to think.
15      (Witness reviews document.)
16      A.  Thanks for your patience.  I'm
17  just trying to find the location in my
18  report where I refer to this.
19      (Witness reviews document.)
20      A.  Go ahead.  Oh, I'm sorry.  I
21  haven't answered.
22      This particular language is very
23  similar to the amendment, to the Whatley

Page 173

1  Amendment, yes, if not identical.
2      Q.  So your report was incorrect?
3      A.  I think -- can you scroll up to
4  page 6 of the -- of the bill?
5      Q.  Page 6?  Sure.
6      A.  Yeah.
7      (Witness reviews document.)
8      A.  It -- thank you.  Yes.  I think
9  that that same language was incorporated
10  into the final bill, so I think -- I
11  think that the final bill's -- the bill's
12  intentions should be read in its
13  totality.  But you're right.  It is
14  correct that the -- that amendment was
15  ultimately incorporated into the bill.
16      Q.  So your report was incorrect?
17      A.  I don't think it was -- it was
18  incorrect insofar as I indicated that
19  that language wasn't incorporated into
20  the final bill.
21      Q.  And would you retract that
22  bullet point summary opinion on page 8
23  that we read?

44 (Pages 170 - 173)

Page 174

1    A.  Let me review that opinion.  One
2  sec.
3      (Witness reviews document.)
4    A.  I think I would qualify it, yes.
5    Q.  Does that mean retract it?
6    A.  I would change it.
7    Q.  Because it's wrong as currently
8  stated?
9    A.  I would say that the statement
10  that the legislature explicit -- I mean,
11  the legislature did explicitly decline to
12  exempt therapeutic treatments from an
13  earlier version of the bill, but it did
14  not do so for SB184.  So I would retract
15  that part.
16    Q.  How did this error appear in
17  your report?
18    A.  I don't know exactly.  I know
19  how it -- the information was entered
20  into the report following the legislative
21  history of previous versions of the bill
22  as well as secondary coverage of the bill
23  and its precursors.  And that's -- I

Page 175

1  missed the inclusion of that language in
2  SB184 relative to SB10.
3    Q.  Did you read SB184 before
4  writing your report?
5    A.  I did.
6    Q.  And were you the one who wrote
7  in your report that the legislature
8  exempt -- declined to exempt
9  psychotherapeutic counseling from SB184's
10  restrictions?
11    A.  I did write that, yes.
12    Q.  I'd like to show you one of the
13  news articles you discuss in your report.
14  I'm going to be marking it as Exhibit 39.
15  And I will endeavor to share that.
16      Okay.  This is an article from
17  Alabama.com -- I believe it's a
18  Montgomery paper -- that you quoted and
19  cited in your report.  Do you recognize
20  the article?
21  (Exhibit 39 was marked for identification
22  and is attached.)
23    A.  Is this The Birmingham News or

Page 176

1  the Montgomery article?
2    Q.  I believe it's -- it is unclear
3  the way they have it listed.  It's one of
4  the Cason articles.  You call it Cason c,
5  I think.
6    A.  Got it.
7    Q.  2021c.  Let's see.  Yeah, AL.
8  Yeah, AL.com.
9      So on page 2 here are some
10  quotes from Senator Shay Shelnutt, some
11  of which you include.
12    A.  Yes.
13    Q.  So I believe you include this
14  first sentence that's highlighted, "My
15  definition," in your report?
16    A.  Yes.  That selection is from
17  that, I believe.
18    Q.  The remaining sentences say:
19  "Science shows that children that are
20  going through this gender dysphoria, most
21  of them mature or grow out of this stage
22  if they are given the chance.  So why is
23  (this bill) needed?  It's just to stop

Page 177

1  these surgeries and these drugs on our
2  children.  It's to protect our children.
3  That's my simple explanation."
4      You didn't include this
5  explanation from SB184's sponsor in your
6  report; right?
7    A.  That's correct.
8    Q.  The senator's -- what he calls
9  the simple explanation was that it
10  protects our children.  Is that right?
11    A.  That's what he says here, yeah.
12    Q.  Why didn't you include this
13  explanation in your report?
14    A.  The purpose of my report was to
15  provide information on aspects of the
16  political context and legislative history
17  of the bill that were neglected by -- and
18  the rationales for the bill that were
19  neglected by other sources, so I didn't
20  purport to include every -- every piece
21  of justification.  I also didn't feel it
22  was necessary to reiterate.  I already
23  acknowledged in my report that protection

Page 178

1  of children was a prominent theme in
2  justifications for the bill, so I didn't
3  feel it was necessary to add another
4  quote to demonstrate that.
5     Q.  Was Senator Shelnutt lying here
6  when he said that the simple explanation
7  for the bill was to protect our children?
8     A.  I don't know if he was lying or
9  not.
10    Q.  I'm going to go back to your
11 report.  This is Exhibit 21.  I think it
12 should have just showed up on your
13 screen, I hope.
14    A.  Yes.  I see it now.
15    Q.  Perfect.  Okay.  You can also
16 look at your copy, either way.
17       So this is on page 36, paragraph
18 75.  "From the beginning of its
19 legislative journey, SB184's sponsors
20 were aware of the criticism of the bill
21 from the transgender community and their
22 allies."
23       And then the sentence right

Page 179

1  before the one I just read from paragraph
2  74 at the end of that paragraph said,
3  "SB184's supporters thus had good reason
4  to anticipate the harm that the bill's
5  passage would cause to the transgender
6  population."
7       Do you agree that SB184's
8  sponsors and other legislators listened
9  to individuals on both sides of the
10 debate over SB184?
11    A.  Can you say that again?
12    Q.  Sure.  Would you agree that
13 SB184's sponsors and legislators who
14 voted on SB184 listened to individuals on
15 both sides of the debate over the bill?
16    A.  I am not -- when you say -- I'm
17 not confident that they listened in the
18 sense of attending to and giving their
19 attention to, but --
20    Q.  You agree that they heard?
21    A.  Yes.  I -- certainly, the
22 legislature as a whole heard from
23 supporters and critics.

Page 180

1     Q.  And you are not testifying that
2  because they sided with one side rather
3  than the other, the resulting bill
4  reflects hatred toward persons associated
5  with the losing side?
6     A.  No, I am not testifying to that,
7  no.
8     Q.  Would you say that claims of
9  harm or potential harm raised by
10 opponents of particular bills are pretty
11 common?
12    A.  Yes.
13    Q.  Your report doesn't mention any
14 statements made by non-legislator
15 proponents of the bill, does it?
16    A.  Non-legislator proponents.  No,
17 it does not, I don't think.
18    Q.  You didn't consider -- sorry.
19 Scratch that.
20       Did you consider any statements
21 made by people who said they were harmed
22 by medical gender transition
23 interventions?

Page 181

1     A.  Did I consider them?  I was
2  aware of such statements.
3     Q.  And you were aware that the
4  legislators heard such statements?
5     A.  I believe they did, yes.
6     Q.  Does your discussion here that
7  we just read in paragraphs 74 and 75
8  assume that criticisms of SB184 correctly
9  predicted what you call "the harm that
10 the bill's passage would cause to the
11 transgender population"?
12    A.  Correctly predicted?
13    Q.  That's right.
14    A.  I think -- I don't -- not being
15 -- I'm not a medical expert, so I can't
16 speak definitively on that, or
17 confidently on that, but -- yeah, so I
18 can't -- I can't speak confidently on
19 that.
20    Q.  So when you say the harm that it
21 would cause, you're not saying that that
22 harm was actually caused?
23    A.  Well, we don't know.  I'm not

46 (Pages 178 - 181)

Page 182

1  saying definitively that it was caused,
2  no.
3      Q.  So if I said SB supporters thus
4  had good reason to anticipate the
5  benefits that the bill's passage would
6  cause to the transgender population, you
7  wouldn't disagree with that statement
8  either?
9      A.  The way I would phrase it is
10  that the legislature had opportunity to
11  hear about the potential benefits of the
12  bill as well.
13      Q.  And you aren't assuming that the
14  bill's opponents were correct about the
15  harms they face while -- sorry.  Scratch
16  that.
17          So you aren't assuming that the
18  claims of harm or benefits were -- that
19  one or the other was obviously true at
20  the time of passage?
21      A.  Correct.  I'm not claiming that
22  one or the other was obviously true.
23      Q.  And you would agree that some

Page 183

1  people, including some people who are
2  transgender, might find SB184 beneficial?
3          MR. FLETCHER:  Object, form.
4          THE WITNESS:  But I can still
5  answer?
6          MR. FLETCHER:  Yes.
7      A.  That it's possible that some
8  individuals that are transgender might
9  find SB184 beneficial?  I believe that is
10  possible, yes.
11      Q.  Do you think that any child has
12  ever been harmed by medical gender
13  transition interventions in childhood?
14      A.  I don't know.
15      Q.  You've never heard of any person
16  claiming to be harmed by medical gender
17  transition interventions in childhood?
18      A.  I have heard -- I have heard
19  reference to such claims.
20      Q.  Did you hear such claims in your
21  review of the legislative hearings in
22  this case?
23      A.  I believe I did, yes.

Page 184

1      Q.  So, is it your testimony that
2  because legislators did not agree with
3  critics of the bill, they acted with
4  hostility towards LGBT persons?  Or
5  sorry.
6          Is it your testimony that
7  because legislators did not agree with
8  critics of the bill, they acted with
9  hostility towards LGBT rights?
10          MR. FLETCHER:  Object to form.
11      Q.  You can answer.
12      A.  The hostility to LGBT rights but
13  -- or specifically transgender rights in
14  this context doesn't -- is a conclusion
15  based on the totality of evidence, so it
16  doesn't rest on -- I believe you said
17  because they didn't agree with the
18  critics of the bill.
19          I believe that the criticisms of
20  the bill lobbied by members of the
21  transgender community likely to be
22  affected by the bill and others likely to
23  be directly affected by the bill is

Page 185

1  relevant to understanding its likely
2  consequences.  But my conclusion that it
3  was relatively hostile towards LGBT
4  rights or transgender rights specifically
5  does not rest on that single piece of
6  evidence.
7      Q.  And you ignored the fact that
8  supporters of SB184 also came from the
9  transgender community?
10      A.  I didn't ignore that fact, but
11  it is not highlighted in my report
12  because that's not the purpose of my
13  report.
14      Q.  You only wanted to show the
15  criticisms of SB184?
16      A.  My purpose in writing the report
17  was to concentrate on the aspects of the
18  legislative history that were missing
19  from and the purposes of the bill that
20  were -- the context for the bill that
21  were missing from other pieces of
22  information in the other expert reports.
23      Q.  You already said that the other

47 (Pages 182 - 185)

Page 186

1  expert reports had no legislative history
2  from SB184, so I guess I don't really
3  understand how that solves the problem.
4       Would you care to clarify why
5  you excluded testimony from SB184's
6  supporters who were members of the
7  transgender community?
8    A.  No.  The purpose of the report,
9  as I said and as we discussed earlier,
10  was -- the defense experts' reports put
11  forward a particular set of
12  justifications for the bill that -- and
13  the purpose of my report was to provide a
14  fuller context, especially the aspects of
15  the political context and the purposes of
16  the bill that were missing from those
17  reports.
18    Q.  I'm going to show you what I'm
19  marking as Exhibit 38, which is one of
20  the other AL.com exhibits that -- or
21  rather stories that you cite in your
22  report.  This is from February 10, 2021.
23  Do you recognize this article generally

Page 187

1  as something you discussed --
2    A.  I do.
3    Q.  -- in your report?
4  (Exhibit 38 was marked for identification
5  and is attached.)
6    A.  I do, yeah.
7    Q.  So this is on page 2 of the
8  exhibit.
9    A.  Yes.
10    Q.  Sorry.  Give me one second.
11    A.  Yeah, no problem.
12    Q.  I'm sorry.  On page 3 of the
13  exhibit, you see the highlighted
14  testimony there from someone who has
15  undergone sex reassignment surgery and
16  considered it to be detrimental to his
17  health.  Is that right?
18    A.  Yes.
19    Q.  All right.  Is there any law --
20  sorry.  Scratch that.
21    A.  Can I -- can I clarify my last
22  answer?  I see that Mr. Heyer said that
23  he regretted his sex reassignment

Page 188

1  surgery.  I don't know if it referred to
2  his -- specifically the health effects of
3  that, but he regretted it.
4    Q.  Sure.  Okay.  Back to your
5  report on pages 23 to 24.  This is
6  Exhibit 21, which you have in front of
7  her -- in front of you.  I'm looking
8  specifically at footnote 18, which is
9  about multivariate regression analysis.
10  Do you see that footnote?
11    A.  I do.
12    Q.  So you say, "only transgender
13  restriction index has a positive and
14  statistically significant coefficient
15  estimate."
16       Why is this information in the
17  footnote?
18    A.  Why is it in a footnote?  I
19  thought it was an important piece of
20  additional context that confirms the
21  evidence presented in the main text.
22    Q.  If it were important, why isn't
23  it in the main text?

Page 189

1    A.  I don't -- I guess I -- I don't
2  regard -- I mean, some things are just
3  easier to put in footnotes if they repeat
4  what is already said in the main text or
5  confirm, but I thought it was useful.
6    Q.  Why didn't you report the table
7  showing the results of your regression
8  analysis?
9    A.  I thought that it would be
10  easier to communicate via graphs than
11  with a regression table.
12    Q.  There's no graph that shows the
13  results of this regression analysis, is
14  there?
15    A.  Not directly, but the main
16  conclusion from the regression analysis,
17  which is that only -- only the
18  transgender restriction index is a
19  positive predictor of adoption of
20  gender-affirming care bans for minors,
21  is -- that main result is contained in
22  Figure, I think, 3.
23    Q.  Is it standard practice in your

48 (Pages 186 - 189)

1    field to conduct a regression analysis,
2    use the results of that analysis to
3    support your opinions, but not disclose
4    the actual figures from that analysis?
5        A.   It is occasionally.  It's common
6    to put supplementary -- refer to
7    supplementary analyses in footnotes that
8    confirm or -- yeah, the supplementary
9    analysis and footnotes, yes.
10       Q.   What other variables did you
11   control for in this regression?
12       A.   Just the three mentioned in the
13   footnote.
14       Q.   Is it your view that these are
15   the only three variables that could
16   affect a state's adoption of a law like
17   SB184?
18       A.   They're not the only possible
19   variables, no.
20       Q.   Is there any published article
21   that uses only these three variables to
22   determine the likelihood of an adoption
23   of a law like SB184?

1        A.   Just those three variables?
2        Q.   Correct.
3        A.   No, not that I'm aware of.
4        Q.   What is the error rate of using
5    only these three variables?
6        A.   What do you mean by "error
7    rate"?
8        Q.   What is the Type I error of
9    using these three variables?
10       A.   Under the -- you're referring to
11   under the assumption -- well, I -- that's
12   very vaguely stated.  But again, I don't
13   think it's precisely quantifiable.
14       Q.   What was the positive
15   coefficient estimate on transgender
16   restriction index from your regression?
17       A.   It was on the logit scale, which
18   is hard to interpret, or it was hard for
19   me to convey.  And I don't remember the
20   exact magnitude, but I believe it was
21   close to three.
22       Q.   And three would mean what?
23       A.   So taking for granted that I am

1    trying to remember this off the top of my
2    head, it would be -- one way to think
3    about it would be that at its maximum
4    slope, around 50 percent probability, the
5    slope of the -- relationship between
6    one additional transgender policy and the
7    probability of adoption would be very
8    close to three-fourths.  I think that
9    would be -- so that's the difference in
10   probability, which is a very strong
11   relationship.
12       Q.   And at what level of statistical
13   significance was this coefficient?
14       A.   Very statistically significant,
15   so a p-value of, I believe, less than
16   0.01.  But perhaps -- but I think perhaps
17   substantially smaller.
18       Q.   Did you run a regression in this
19   case before you finalized any of these
20   indexes?
21       A.   Did I run a regression before I
22   finalized the indices?
23       Q.   Yes.

1        A.   No.  I don't think so.
2        Q.   You don't claim -- you do not
3    claim that this regression analysis
4    proves causation, do you?
5        A.   What I would say is it sheds
6    light on the credibility of competing
7    explanations, which are -- which -- yeah,
8    competing explanations for the -- for the
9    passage of these laws.
10       Q.   So to go back to my question,
11   you do not claim this regression shows --
12   proves causation; correct?
13       A.   I wouldn't say "proves," no.
14       Q.   Using different numbers from the
15   health insurance freedom rank you used
16   could affect your regression results.  Is
17   that right?
18       A.   If the scores on -- if the state
19   scores were different, would it affect
20   the results?
21       Q.   That's right.
22       A.   It could -- it could change the
23   -- it could change the coefficient

Page 194

1    estimates. I don't know if it would
2    qualitatively change the conclusions, but
3    yes.
4        Q.   But it could?
5        A.   Possible.
6        Q.   The same for the other indices,
7    transgender restriction index, healthcare
8    paternalism index, changing those values
9    would change the results of the
10   regression; correct?
11       A.   It could change the precise
12   estimates of the coefficients, yeah.
13       Q.   What was the coefficient in your
14   regression analysis for healthcare
15   paternalism index?
16       A.   You're referring to the -- in
17   the -- in the trivariate -- multivariate
18   regression?
19       Q.   Yes.
20       A.   It was very close to zero.
21       Q.   Was it statistically
22   significant?
23       A.   It was not.

Page 195

1        Q.   You found no statistically
2    significant link between healthcare
3    paternalism index and what you call
4    adoption of GAC for minors that suggests
5    that there is no relationship between
6    those variables. Is that right?
7        A.   It suggests there's no
8    relationship once taking -- once having
9    taken into account transgender
10   restriction index.
11       Q.   So that is inconsistent with the
12   conclusion that adoption of a GAC ban for
13   minors is inversely related to states'
14   paternalism in healthcare generally?
15       A.   It's inversely related in a
16   bivariate sense but certainly not
17   positively related.
18       Q.   When you say "inversely related
19   in a bivariate sense," the point of your
20   regression, though, is that when you
21   control for other variables, it appears
22   there's no relationship. Isn't that what
23   your regression suggests?

Page 196

1        A.   That's right, so uh-huh.
2        Q.   What was the coefficient for the
3    health insurance freedom rank?
4        A.   I don't remember exactly, but it
5    was also statistically insignificant.
6        Q.   You don't know whether it was
7    positive or negative?
8        A.   I don't. But it was not
9    precisely estimated enough to conclude
10   either way.
11       Q.   All right. I'm going to show
12   you an article you co-wrote. I'm marking
13   this as Exhibit 51. Do you recognize
14   this article?
15   (Exhibit 51 was marked for identification
16   and is attached.)
17       A.   I do. It looks like a preprint
18   of --
19       Q.   Yes. Yes. It was a
20   presentation, I guess.
21       A.   I think, yeah, this is a -- yes.
22   This is a earlier version of an article I
23   published, yeah.

Page 197

1        Q.   Here on page 30 to 31, you have
2    several recommendations. You say,
3    "survey experiments can often be
4    confounded in ways similar to the
5    analogous observational studies. Best
6    practice for survey experiments is thus
7    similar to best practice for
8    observational studies." And then you
9    list seven sort of recommendations to
10   deal with potential confounding
11   variables.
12           You didn't employ any of these
13   recommendations in your regression design
14   here, did you?
15       A.   Well, first, I would say that
16   these are -- although they're drawing an
17   analogy to observational studies, this
18   is -- these are recommendations
19   specifically for the design of a survey
20   experiment. So I don't know if they're
21   directly implementable, but, for example,
22   probably the closest analog, or form is
23   number 4, controlling for confounders.

50 (Pages 194 - 197)

Page 198

1      I would also emphasize that the
2  context of this study is slightly -- or
3  the purposes of this study are slightly
4  different from a context of this report
5  in that the goal in this paper is
6  specifically focused on, or more -- more
7  focused on an unbiased estimation of
8  causal effects rather than adjudicating
9  among competing explanations, but.
10     Q.   So to go back to my question,
11  you didn't employ any of these
12  recommendations in your regression design
13  here; right?
14     A.   No.  I did.  And number 4 is
15  what I said I did.
16     Q.   And is it your testimony that
17  you controlled for all potential
18  confounding variables?
19     A.   It is not my contention that I
20  did that, no.
21     Q.   You didn't control for partisan
22  effects, did you?
23     A.   I did not control for

Page 199

1  partisanship, but I don't know if that
2  would be an appropriate thing to control
3  for.
4      Q.   You didn't consider it?
5      A.   It didn't seem to me to be an
6  appropriate thing to control for.
7      Q.   Why not?
8      A.   It didn't seem directly relevant
9  to adjudicating between the relative
10  importance of the factors at interest
11  here.
12     Q.   Is it your testimony that the
13  two major political parties do not differ
14  when it comes to laws implicating LGBT
15  issues?
16     A.   They do differ.
17     Q.   This regression, you would never
18  try and publish this in a peer-reviewed
19  article, would you?
20     A.   This regression --
21     Q.   That's right.
22     A.   -- on its own?
23     Q.   That's right.

Page 200

1      A.   I would feel comfortable having
2  a footnote such as this in a -- in a
3  peer-reviewed article.
4      Q.   So my question was whether you
5  would seek to publish the regression,
6  including the data and the results of the
7  regression, in a peer-reviewed article.
8      A.   So I take -- I'm trying to
9  answer your question in a way that makes
10  sense to me, which is I wouldn't publish
11  a regression by itself, but I would
12  publish -- I could include a regression
13  as part of a larger analysis, and I could
14  imagine including, very easily including
15  an analysis such as this in a
16  peer-reviewed article.
17     Q.   And you think your peers would
18  find this regression to be sufficiently
19  rigorous?
20     A.   For the purposes to which I am
21  putting it here, yes, I do.
22     Q.   The health insurance freedom
23  metric you use, SB184 has nothing to do

Page 201

1  with health insurance policies.  Is that
2  correct?
3      A.   It's not -- I mean, it certainly
4  is related to health insurance policies.
5  I'm sure that health insurance policies
6  are affected by what's legal in -- or
7  health insurance, what health insurance
8  will cover is affected by what's legal in
9  a given state.
10     Q.   And is that how the Cato
11  Institute's health insurance freedom rank
12  assessed health insurance freedom, by
13  what medical care was available in a
14  particular jurisdiction?
15     A.   It was a composite measure of a
16  number of different indicators, but they
17  primarily related to I believe
18  regulations of the health insurance
19  market.
20     Q.   And that's not what SB184 is;
21  correct?
22     A.   It's not directly related to
23  that, no.

51 (Pages 198 - 201)

Page 202

1    Q.  This metric you're using from
2  the Cato Institute has not been
3  peer-reviewed.  Is that right?
4    A.  I mean, pub- -- I am -- the
5  publication that I drew it from was not a
6  peer-reviewed publication.  The authors
7  of that article have published related
8  work in peer-reviewed journals.
9    Q.  All right.  As we discussed
10 earlier, SB184 was enacted in 2022.  Is
11 that right?
12   A.  I believe so, yes.
13   Q.  And you used the Cato
14 Institute's health insurance freedom rank
15 from 2013.  Is that right?
16   A.  That's correct.
17   Q.  Are you aware that the Cato
18 Institute's analysis was updated in 2016,
19 2018, and 2021?
20   A.  I was aware of that, yes.
21   Q.  But you used the 2013 version
22 which you said ranked Alabama number
23 four; right?

Page 203

1    A.  I did.
2    Q.  What was Alabama's ranking in
3  2018?
4    A.  In 2018?  I don't remember off
5  the top of my head.
6    Q.  I'd like to show you what I'm
7  marking as Exhibit 24.  This is the 2018
8  Cato Institute update of the analysis
9  from 2013.  Let me get it over to you.
10       Did you review these updated
11 versions of the reports when writing your
12 report in this case?
13 (Exhibit 24 was marked for identification
14 and is attached.)
15   A.  I looked for -- if I recall
16 correctly, I looked for -- I looked for
17 the more updated versions of the reports,
18 the ones that -- two of the ones that I
19 believe -- I think this is the case.  Two
20 of the ones that had been updated didn't
21 contain exactly the information that I
22 wanted, but a third one did contain an
23 updated, a later -- sorry.

Page 204

1        One of the publications here did
2  contain an updated score, but I think
3  it's just -- I believe it was the 2021
4  version.  But I decided to use the
5  earlier edition because Ruger and Sorens
6  indicate that the passage of the
7  Affordable Care Act rendered the most
8  recent measures less useful.
9    Q.  You'd agree they continued
10 calculating measures of Health Insurance
11 Freedom?
12   A.  I do believe they did, yes.
13   Q.  So here in the 2018 report, if
14 you can see it, you have the Health
15 Insurance Freedom scores from 2018.  I
16 can zoom in if you need me to.
17   A.  I see it, yeah.
18   Q.  You see that Alabama is ranked
19 25th in 2018?
20   A.  I do see that.
21   Q.  You didn't include that in your
22 report?
23   A.  I didn't because Ruger and

Page 205

1  Sorens said that the variation across
2  states was highly compressed, which you
3  can see in this table here.  There's very
4  little variation across states.
5    Q.  And the 2018 measurements would
6  be closer to what the 2022 situation on
7  the ground would be than your 2013
8  measure.  Is that right?
9    A.  It would be closer in time?  Is
10 that what you mean?
11   Q.  Closer in accuracy.
12   A.  I don't think closer in accuracy
13 from the purposes of this study, or for
14 this analysis.
15   Q.  Because you were looking for
16 something where Alabama was ranked low?
17     MR. FLETCHER:  Object.
18   A.  No.  Because I was looking for a
19 measure where the variation across states
20 wasn't artificially compressed by
21 national legislation.
22   Q.  I'm now showing you what I'm
23 marking as Exhibit 7, which is the 2017

52 (Pages 202 - 205)

Page 206

1   version of the Cato report.  You'd agree
2   this is the same report we've been
3   looking at updated for 2021?
4   (Exhibit 7 was marked for identification
5   and is attached.)
6       A.  Yes.
7       Q.  Okay.  And here on page 45 --
8   not on page 45.  Let's see.  Here we are.
9           Health insurance freedom, this
10  is the same metric you discuss in your
11  report.  Is that right?
12      A.  I believe so, yeah.
13      Q.  And here in Table 9, the authors
14  found -- this was in 2021 -- that Alabama
15  was ranked 23rd.  Is that right?
16      A.  Yes.
17      Q.  Tied for 20 -- tied for 23rd, I
18  should say.  So this -- this indicates a
19  median, or medium degree of health
20  insurance paternalism by 2021; right?
21      A.  Well, according to this
22  compressed measure, yes.
23      Q.  And if you use this ranking,

Page 207

1   that could affect the cross-state
2   logistic regression that you performed?
3       A.  It certainly could, yes.
4       Q.  It would also affect your graph
5   showing states' ranking alongside
6   adoption of laws like SB184; correct?
7       A.  It would certainly change it in
8   detail.  I'm not sure it would change it
9   in -- qualitatively.
10      Q.  Are you aware that Cato has now
11  published a 2023 report?
12      A.  I didn't -- I'm not sure I was
13  aware of what the -- when the last one
14  was.
15      Q.  But you didn't consider that
16  report, though, did you?
17      A.  I'm not -- I'm not sure.  When
18  was it?  I'm not sure.
19      Q.  Is not allowing minors to drive
20  vehicles until a certain age paternalism,
21  as you used the term?
22      A.  I think not allowing minors to
23  drive until a certain age could be

Page 208

1   motivated in part by paternalism.
2       Q.  Is the same true of not allowing
3   minors to drink alcohol?
4       A.  It could be, yeah.  That's at
5   least -- could be partly motivated by
6   paternalism, yes.
7       Q.  Alabama's law permits adults to
8   obtain medical gender transition
9   interventions; correct?
10      A.  Say that again.
11      Q.  Alabama's law permits adults to
12  obtain medical gender transition
13  interventions; right?
14      A.  As I understand it, yes.
15      Q.  And you didn't consider that
16  permission when devising your healthcare
17  paternalism index; correct?
18      A.  I didn't consider it.  I didn't
19  consider including it.
20      Q.  You didn't include it?
21      A.  I did not include it.
22      Q.  So your index of healthcare
23  paternalism that you created included

Page 209

1   four policies: no right to try, no
2   personal vaccine exemption, no religious
3   vaccine exemption, and no healthcare
4   freedom amendment.  Right?
5       A.  Yes.  I believe, yes.
6       Q.  It's on page 20 of your report
7   if you want to look at it.
8       A.  Yes, that's correct.
9       Q.  You chose these categories
10  arbitrarily?
11      A.  Not arbitrarily, no.
12      Q.  How did you pick them?
13      A.  Well, as is common in political
14  science, we -- I thought of a -- I was
15  interested in measuring a concept.  In
16  this case, I was interested in creating a
17  measure of a -- of healthcare paternalism
18  in domains other than -- unrelated to
19  transgender and LGBT rights generally to
20  provide a -- a -- to aim to create a
21  measure of that concept.  And so I
22  searched for readily available indicators
23  of that concept that would divide states

1    -- that would distinguish among states,
2    and in particular, distinguish among
3    states at various points in the -- in the
4    continuum of healthcare paternalism.  And
5    so I identified these policies as useful
6    indicators that I could create a scale
7    from and a measure.
8        Q.   No peer-reviewed study uses
9    these four specific categories.  Is that
10   right?
11       A.   That's correct.  To my
12   knowledge, there's no peer-reviewed study
13   that specifically measures healthcare
14   paternalism in state policymaking.
15       Q.   The first three categories are
16   state statutory laws.  Is that right?
17       A.   Yes.
18       Q.   They exclude judicial decisions?
19       A.   They do.
20       Q.   So if a judicial decision
21   required a religious vaccine exemption
22   but state statutory law does not, you
23   would still code the state as

1    parentalistic on that element?
2        A.   Yes.
3        Q.   The fourth category, healthcare
4    freedom amendment, considers only
5    constitutional law.  Is that right?
6        A.   Constitutionally --
7    constitutional provisions, yes.
8        Q.   None of these four categories of
9    policies are limited to children.  Is
10   that right?
11       A.   That's correct.
12       Q.   Is there any reason other than
13   healthcare paternalism a person could
14   take what you labeled a paternalistic
15   position on each of these categories?
16       A.   It's possible for there to be
17   multiple motivations, yes.
18       Q.   How did you decide to rule out
19   those other motivations?
20       A.   I didn't rule them out.
21       Q.   How did you decide, then, it was
22   sound to treat them as an indication of
23   paternalism?

1        A.   I think understanding their
2    meaning on their face, or, you know, the
3    meaning of these laws, they are -- each
4    one involves an important element of
5    paternalism or -- you know, versus -- or
6    a tradeoff between paternalistic and
7    libertarian choices.  And so on there,
8    taken together, I considered them to be a
9    reliable index of this concept.
10       Q.   Many vaccination requirements
11   are justified on the ground of negative
12   externalities; correct?
13       A.   Yes.
14       Q.   And that's because one person's
15   choice not to be vaccinated increases
16   others' likelihood of catching the
17   disease?
18       A.   Yes.
19       Q.   So a state's decision to require
20   vaccination or allow exemptions is not
21   purely a statement of its paternalism;
22   correct?
23       A.   I agree with that.

1        Q.   So at least two of your four
2    measures have a significant potential
3    reason for enactment other than
4    paternalism?
5        A.   Yes.
6        Q.   Why did you count -- sorry.
7    I'll phrase it another way.
8            If a state had a personal
9    vaccine exemption, they would not
10   necessarily need a religious vaccine
11   exemption.  Is that right?
12       A.   As I understand the coding of
13   these laws, that a personal vaccine
14   exemption encompasses a religious one.
15       Q.   So those two categories overlap?
16       A.   In the sense, they're nested.
17       Q.   But you counted them twice?
18       A.   Well, they're -- they separate
19   states at different ends of the -- of the
20   scale, so.  Many more states have a
21   religious exemption than a personal
22   exemption, so they are indicators of --
23   so for example, Alabama does not have a

1  personal vaccine exemption, so it
2  distinguish -- but it does have a
3  religious one, so it distinguishes from
4  different points on the scale.
5      Q.  Okay.  I'm going to show you
6  what I'm marking as Exhibit 4.  This is a
7  code book of the policies from your
8  broader dataset.  So on page 1, you list
9  abortion policies.  Access to
10 contraceptives is the first one you list
11 here.  Refusing to allow pharmacists to
12 dispense emergency contraception without
13 a prescription is an example of
14 healthcare paternalism as you've defined
15 it; correct?
16 (Exhibit 4 was marked for identification
17 and is attached.)
18     A.  I would have to think about
19 that.  So this is a policy that restricts
20 access to contraception or allows it.
21 Can you scroll over so I can see the --
22     Q.  Sure, sure.
23     A.  -- policy description?

1      (Witness reviews document.)
2      A.  I think it has an important -- I
3  don't -- I don't -- I would have to think
4  a little bit harder about the politics of
5  access to contraception.  But my
6  understanding of the motivation for many
7  of those laws, or anti-contraception laws
8  in general is concern for -- is regarding
9  -- is premised on -- it's similar to
10 abortion in the sense that the fertilized
11 egg is considered to be -- it's motivated
12 for concern with -- for the fertilized
13 egg, not necessarily for the person
14 seeking the contraception.
15     Q.  How about the next one?  Forced
16 counseling before abortions.
17     A.  I think that abortion has a
18 similar mixture of motivations, but with
19 usually the primary motivation being
20 regard for the well-being of the -- or
21 the welfare of the fetus.
22     Q.  You don't think one motivation
23 behind forced counseling before abortions

1  is protecting the woman's own long-term
2  mental and physical health?
3      A.  I don't consider that to be the
4  predominant motivation, no.
5      Q.  How did you decide that?
6      A.  That's based on my understanding
7  of the politics of abortion and the --
8  and how these laws are and these policies
9  are typically understood and debated in
10 American politics.
11     Q.  Vaccines are predominantly
12 paternalistic?
13     A.  I regarded them as a pure, more
14 -- a better indicator here.
15     Q.  A waiting period for abortion,
16 you don't think that can ever be
17 motivated by protecting the woman's own
18 long-term mental and physical health?
19     A.  I'm not saying that it couldn't
20 ever be motivated by that.
21     Q.  What about requiring an
22 ultrasound?
23     A.  Same answer.

1      Q.  If you had included any or all
2  of these abortion policies, your results
3  would have changed significantly,
4  wouldn't they have?
5      A.  I imagine that they would have.
6      Q.  Because Alabama has most, if not
7  all, of these policies?
8      A.  I believe so, yes.
9      Q.  So if you had included them,
10 Alabama's baseline would have been much
11 more paternalistic; correct?
12     A.  If I had regarded them as a good
13 -- a reasonable -- reliable indicators
14 of -- or good indicators of paternalism,
15 that's the case.
16     Q.  On page 1 here under "Drug &
17 Alcohol Policies," you include medical
18 marijuana.  In your healthcare
19 paternalism index here, you omitted
20 whether a state permits medical marijuana
21 from your measure of healthcare
22 paternalism; correct?
23     A.  I did.

Page 218

1    Q.  Even though whether a state
2  permits medical use of marijuana has an
3  aspect of healthcare paternalism?
4    A.  Yes, it does.
5    Q.  And that omission would affect
6  the rest of your analysis; correct?
7    A.  Yes.
8    Q.  On page 3, going down to
9  miscellaneous policies, you have
10  physician-assisted suicide?
11    A.  Yes.
12    Q.  That also -- that policy also
13  has an aspect of healthcare paternalism.
14  Would you agree?
15    A.  It has an aspect of it, yes.
16    Q.  And are you aware that Alabama
17  prohibits physician-assisted suicide?
18    A.  It does not surprise me to learn
19  that, no.
20    Q.  But you omitted this policy from
21  your analysis?
22    A.  I did not include it.  Correct.
23    Q.  Even though you had access to

Page 219

1  the data?
2    A.  Yes.
3    Q.  And this omission would affect
4  the rest of your analysis; right?
5    A.  Yes.  I would say -- I had
6  access to the data after 2019, but yes.
7    Q.  So you'd agree, then, that your
8  analysis does not comprehensively
9  consider Alabama's healthcare
10  paternalism?
11    A.  I don't know if I'd entirely
12  agree with that.
13    Q.  Are you testifying that your
14  analysis comprehensively considers
15  Alabama's healthcare paternalism through
16  these four categories?
17    A.  I think that there's a tradeoff
18  between the comprehensiveness of how many
19  indicators one includes and the quality
20  and interpretability of the resulting
21  index.  And what I would say is that all
22  of these policies involve -- or many of
23  these policies involve some mix of

Page 220

1  considerations and are indicators of
2  different -- different factors and -- but
3  I regard the index that I created to be a
4  useful and reliable one.
5    Q.  But you already testified that
6  all of your four categories also
7  implicate a mix of factors; correct?
8    A.  Did I?  A mix of factors?
9    Q.  They are not necessarily
10  motivated purely by paternalism?
11    A.  We were referring to the vaccine
12  requirements, I think, specifically.
13    Q.  You think the other categories
14  are only motivated by healthcare
15  paternalism?
16    A.  I regard them as more -- do I
17  think that they're only motivated by
18  healthcare paternalism?
19    Q.  That's right.
20    A.  You're talking about "No right
21  to try" and "No healthcare freedom
22  amendment"?
23    Q.  Correct.

Page 221

1    A.  I believe that they are
2  relatively -- there are certain many
3  motivations one could have for supporting
4  such laws, but I regard them as
5  reasonable indicators of healthcare
6  paternalism.
7    Q.  Are you aware of a healthcare
8  freedom amendment ever making a
9  difference in any judicial case in the
10  country?
11    A.  I believe that -- I believe that
12  it has been -- I believe that it has been
13  implicated in a few cases, yeah.
14    Q.  Which one?
15    A.  I believe that -- I'm not -- I'm
16  not confident, but I believe that there
17  was a case in which the -- there were
18  arguments made to -- or related to
19  abortion access.
20    Q.  Your healthcare paternal --
21  paternalism index does not prove
22  causation; correct?
23    A.  By itself, it doesn't prove

56 (Pages 218 - 221)

Page 222

1 causation, no.
2    Q.   It does not control for any
3 variables.  Is that right?
4    A.   It's an index.  It doesn't --
5 there's no way to control for things in
6 an index.
7    Q.   Your analysis does not consider
8 partisan effects?
9    A.   That's correct.  It doesn't
10 consider partisan effects.
11    Q.   Your analysis doesn't consider
12 whether states are conservative or
13 liberal?
14    A.   Whether they are conservative or
15 liberal in -- could you -- can you be
16 more precise what you mean by that?
17    Q.   Generally.  Whether they are
18 generally considered more conservative or
19 liberal.
20    A.   It does not include any general
21 measures of liberalism or conservatism of
22 the state, no.
23    Q.   You'd agree that based on how

Page 223

1 you defined your healthcare paternalism
2 index, relatively paternalistic states
3 are also relatively liberal.  Is that
4 right?
5    A.   I don't know that to be true
6 necessarily.  I don't -- relatively
7 paternalistic states in terms of
8 healthcare paternalism?
9    Q.   In terms of your index.
10    A.   Ah, in terms of my index of
11 healthcare paternalism?  There is -- I
12 believe it probably correlated with the
13 liberalism of the state, yes.
14    Q.   Looking only at your healthcare
15 paternalism index, that analysis is not
16 capable of proving that SB184 is rooted
17 in a restrictive stance toward gender
18 identity or transgender persons; correct?
19    A.   Can you repeat that?  I'm sorry.
20 Which analysis were you referring to?
21    Q.   Your healthcare paternalism
22 index.
23    A.   Yes.

Page 224

1    Q.   That analysis --
2    A.   Yeah, go ahead and go.
3    Q.   That analysis is not capable of
4 proving that SB184 is rooted in a
5 restrictive stance toward gender identity
6 or transgender persons; correct?
7    A.   If by that, you mean the
8 analysis that -- that includes both
9 healthcare paternalism and of -- and
10 transgender restrictionism, I -- I agree
11 that it doesn't prove causation.  It
12 merely informs our inferences about the
13 relative credibility of competing
14 explanations.
15    Q.   Would you submit this healthcare
16 paternalism index to a peer-reviewed
17 journal for publication?
18    A.   As it is, if I -- I would -- as
19 we've discussed, you don't just submit
20 a -- if I were -- if it were -- if we
21 were -- if I were submitting a paper that
22 was a stand-alone paper simply on
23 measuring healthcare paternalism or

Page 225

1 focused primarily on that, no, I would --
2 it would require much more elaborate
3 analysis, but I would feel comfortable in
4 including such an index in a -- as a
5 supplementary analysis in a peer-reviewed
6 journal, yes.
7    Q.   Your other analyses of pre- and
8 post-Obergefell laws are also not capable
9 of proving causation.  Is that right?
10    A.   Right.  If by "proving," you
11 mean conclusively proving, no.
12    Q.   They cannot even prove
13 correlation with any statistical
14 significance, can they?
15    A.   What do you mean by that?  You
16 mean the correlation between what?
17    Q.   For example, pre-Obergefell
18 policies and passage of SB184.
19    A.   Oh, I see.  Well, they certainly
20 can demonstrate a correlation between --
21 between relative restrictiveness on LGBT
22 rights and likelihood of passing -- and
23 passage of gender-affirming care bans.

57 (Pages 222 - 225)

1    Q.  How do you know that?
2    A.  How do I know that?  Based on my
3  understanding, based on my knowledge of
4  which states have gender-affirming care
5  bans and which states have -- score high
6  on LGBT rights restrictionism.
7    Q.  So you would say that would
8  prove correlation at what level of
9  statistical significance?
10    A.  I can't say that with such
11  precision.
12        MR. FLETCHER:  Counsel, we've
13  been going almost an hour fifteen.  Is
14  this a good time to take a break?
15        MR. MILLS:  Yeah.  This works
16  fine.
17          (Break taken.)
18    Q.  (By Mr. Mills) All right.  I'm
19  going to show you what I'm marking as
20  Exhibit 48.  This is a video that you
21  rely on in your report.  Let me see if
22  this is possible.
23        All right.  Can you see the

1  screen?
2  (Exhibit 48 was marked for identification
3  and is attached.)
4    A.  I can, yes.
5    Q.  Okay.  So I'll just play.
6          (Video playing.)
7    Q.  And then I'm just going to
8  fast-forward.
9        So what I'm showing you is the
10  video you relied on in your report that
11  was an interview with Representative
12  Allen.  Is that right?
13    A.  Yes.
14    Q.  Okay.  And did you watch this
15  entire video?
16    A.  I believe I did, or the entire
17  segment that included --
18    Q.  Sure.
19    A.  -- Representative Allen.
20    Q.  All right.  I am going to show
21  you another video that I'm marking as
22  Exhibit 40, and this is going to be the
23  video you rely on from a meeting of the

1  Alabama Senate Healthcare Committee.  If
2  you will give me just a second.  All
3  right.
4  (Exhibit 40 was marked for identification
5  and is attached.)
6          (Video playing.)
7    Q.  So this is the hearing from the
8  senate healthcare committee that you
9  discuss in your report.  Is that right?
10    A.  I believe so, yes.
11    Q.  And from what they just said, it
12  sounds like this was the third meeting on
13  SB184 in that committee?
14    A.  I know that they referenced this
15  is the third time that they'd -- I don't
16  know if they were referencing SB184
17  specifically or referencing a --
18  referencing earlier iterations of the
19  bill.
20    Q.  And you don't know what happened
21  in those two prior meetings that they
22  referred to here?
23    A.  I -- I don't believe so, no.

1    Q.  All right.  Your report
2  references only one other legislative
3  hearing or debate on SB184 in terms of a
4  video or transcript.  Is that right?
5    A.  I don't know if that's right.
6  There were at least two other videos, I
7  believe, that are referred to, both on
8  YouTube.
9    Q.  Yes.  That's where the video we
10  just watched came from.
11    A.  The one we just watched, didn't
12  that come from Vimeo?
13    Q.  I'm not actually positive.
14  Which YouTube reference are you referring
15  to?
16    A.  The one where Senator Shelnutt
17  introduces -- there are two.  Senator
18  Shelnutt introduces the Alabama
19  Vulnerable Child Compassion and
20  Protection Act.  That's under Shelnutt
21  2020.  And this is in the references.
22    Q.  Yeah.
23    A.  And then there's a similar one

Page 230

1 for Wes Allen, 2020. And there's also a
2 Alabama House Judiciary Committee
3 recording.
4 Q. Yes. That's the one we're going
5 to look at next.
6 A. Okay.
7 Q. The other two you just
8 mentioned, Allen and Shelnutt, those were
9 both from 2020, as you said. Is that
10 right?
11 A. I see. I see. So you're
12 referring -- I'm sorry. Okay. I believe
13 they were from 2020, yes.
14 Q. Okay.
15 A. So you're referring specifically
16 to legislative hearings for SB184
17 specifically?
18 Q. That's right.
19 A. I believe that those are the
20 only hearings -- or the only video of
21 those hearings that I referred to. Yes.
22 Q. Okay. So I'm just going to show
23 you what I'm marking as Exhibit 41, which

Page 231

1 is the house judiciary committee hearing
2 that you were just referring to.
3 (Exhibit 41 was marked for identification
4 and is attached.)
5 (Video playing.)
6 Q. So you'd agree that this was the
7 house judiciary -- one of the house
8 judiciary committee hearings for SB184
9 and its companion bill?
10 A. I believe so.
11 Q. And once again, it sounds like
12 there was a prior public hearing by this
13 committee. Is that right?
14 A. I didn't actually hear that, but
15 I will -- I believe that to be the case.
16 Q. Okay. And you didn't review a
17 video of that hearing. Is that right?
18 A. The previous hearing?
19 Q. That's right.
20 A. Correct. I don't believe so.
21 Q. Okay. I'm going to go to --
22 (Video playing.)
23 Q. So this is an exchange between

Page 232

1 Representative Allen and a committee
2 member who seems to oppose SB184. Is
3 that right?
4 A. Yes. That's what it sounds
5 like.
6 Q. And this committee member agreed
7 that Representative Allen's perception is
8 that the bill is simply to protect
9 children, didn't she?
10 A. Could you repeat that? She did
11 say "perception," but I don't know
12 exactly what she was referring to. Would
13 you mind just backing it up?
14 Q. Sure. Yeah. Let's see. I can
15 go back more if we need to. Let's see.
16 (Video playing.)
17 A. You're going to need to go back.
18 Q. Sorry. Did you say you needed
19 to go back further?
20 A. Could you just -- yeah, just 20
21 more seconds or something.
22 Q. Sure. Of course it's not going
23 to let me do that. Let's see.

Page 233

1 (Discussion held off the record.)
2 (Video playing.)
3 Q. (By Mr. Mills) So it goes on.
4 But my question is --
5 A. Yeah. I see the context. Can
6 you repeat your question, though?
7 Q. Yeah. So this committee member
8 who's disagreeing with -- apparently
9 disagreeing with Representative Allen on
10 the bill agrees that Representative
11 Allen's perception is that the bill is
12 simply to protect children. Is that
13 right?
14 A. I mean, I think that her remarks
15 could -- are somewhat open to
16 interpretation about what exactly she's
17 referring to as his perception and also
18 whether she's granting that or really
19 just sort of questioning it. But I think
20 that is certainly one -- one
21 interpretation of what -- what she said.
22 Q. Okay. For your dataset, after
23 2015, you created what you call a

Page 234

1  transgender restriction index.  Is that
2  right?
3      A.  Yes.
4      Q.  And you limited your
5  consideration to six policies that
6  purportedly restricted transgender
7  rights.  Is that right?
8      A.  Six -- yeah, six -- sorry.
9  Six -- six -- or sorry, five policies
10 that -- because it doesn't include
11 gender-affirming care for minors, that I
12 regarded as taking a position on the
13 relative expansiveness or restrictiveness
14 of transgender rights.
15     Q.  You omitted policies that
16 expanded transgender rights.  Is that
17 right?
18     A.  Yes.  They were not included in
19 this analysis.
20     Q.  Even though you included those
21 policies in your pre-Obergefell analysis?
22     A.  That's correct.
23     Q.  You also omitted policies about

Page 235

1  sexual orientation in this
2  post-Obergefell analysis.  Is that right?
3      A.  I tried to include the policies
4  that specifically related to -- or I
5  included policies that were specifically
6  related to transgender issues.  Some of
7  them have some overlap with LGBT rights
8  generally.
9      Q.  So your pre- and post-Obergefell
10 datasets use different assumptions and
11 data.  Is that fair?
12     A.  They use different data.  I
13 don't know what you mean by "different
14 assumptions," but they use different
15 data.
16     Q.  Well, I assume it's your
17 testimony that your pre -- that they
18 measure different things; otherwise, the
19 same policies would be included?
20     A.  The -- I what see you mean.
21 They measure, I would say, slightly
22 different -- slightly different things
23 but very highly related concepts.  But

Page 236

1  yes, this is a more specific measure of
2  just transgender restrictionism.
3      Q.  Your choice of which policies to
4  include in this dataset, these five
5  policies, that was not peer-reviewed.  Is
6  that right?
7      A.  My choice of what to include?
8  They were -- that choice was not
9  peer-reviewed, no.
10     Q.  And you're not aware of any
11 other analysis, published or otherwise,
12 that uses those five policies in a
13 similar way?
14     A.  In a similar way, I -- I am not
15 -- well, I know that the paper referred
16 to here by LaCombe, 2024, uses -- more
17 generally uses these policies for a
18 slightly more general analysis but not --
19 but I'm not aware of any paper that uses
20 just these five policies for the specific
21 purpose of measuring transgender
22 restrictionism.
23     Q.  And LaCombe's analysis doesn't

Page 237

1  use just those five policies.  Is that
2  right?
3      A.  It's a -- that's a subset of his
4  larger dataset, correct.
5      Q.  I'd like to show you the LaCombe
6  manuscript that you cite in your report
7  if I could.  I'm going to mark it as
8  Exhibit 16.  This is that manuscript;
9  correct?
10 (Exhibit 16 was marked for identification
11 and is attached.)
12     A.  I'm actually -- I assume so, but
13 I don't recognize it.  But I assume so.
14     Q.  Okay.  This manuscript has not
15 been published anywhere, has it, to your
16 knowledge?
17     A.  No.
18     Q.  It has not yet completed peer
19 review?  Is that right?
20     A.  That's correct.  I believe it
21 has been -- it has been presented at a
22 political science conference, but it has
23 not been published.

60 (Pages 234 - 237)

Page 238

1    Q.   Is there any other analysis of
2  which you're aware that relies on the
3  methodology he uses in this manuscript?
4    A.   The methodology in the
5  manuscripts or the methodology I used
6  using the data from the manuscript?
7    Q.   I'll rephrase.  Is there any
8  other analysis besides yours in this case
9  of which you're aware that uses the
10  approach that he uses in this manuscript?
11    A.   I guess I am a little confused
12  about what you mean by "the approach."
13  If the -- the general approach of
14  using --
15    Q.   Sure.  I'll rephrase.
16    A.   All right.
17    Q.   The dataset he creates for this
18  paper?
19    A.   Oh, okay.  I am not aware of any
20  other analysis that uses this particular
21  dataset.
22    Q.   And this dataset, it says here
23  at the bottom of this page, has over

Page 239

1  1,400 pieces of legislation?
2    A.   That's what it says there, yes.
3    Q.   And that's considerably more
4  than the five policies you analyzed here?
5    A.   Fourteen hundred is more than
6  five, yeah.
7    Q.   On page 2 to 3 here, he says at
8  the bottom of page 2, "We find that more
9  liberal public opinion and Democratic
10  control is associated with more open
11  policies, whereas Republican control is
12  associated with more restrictive
13  policies."
14        Were you aware of this finding?
15    A.   This particular finding?
16    Q.   That's right.
17    A.   That.  I mean, I'm aware of the
18  -- more generally, the relationship
19  between -- I mean, I'm aware of this
20  general pattern.
21    Q.   Your post-Obergefell analysis in
22  this case does not control for partisan
23  effects.  Is that right?

Page 240

1    A.   That's correct.
2    Q.   I'm going to page 7 of the
3  manuscript, the last full sentence.  This
4  just amplifies what we discussed earlier.
5  "In all, the processes resulted in 1376
6  policies, including 210 that were passed
7  by the state legislatures."
8        The group of five that you
9  analyzed here appears nowhere in this
10  manuscript.  Is that right?
11    A.   The group of five?  The six
12  policies up here as a subset of the
13  dataset that are restrictive.  I don't
14  know what you mean by this group of --
15  designating this group of five for a
16  separate analysis in this paper?
17    Q.   That's right.
18    A.   Not that I'm aware of.
19    Q.   Going to page 23, at the start
20  of this paragraph, the first full
21  paragraph:  "One limitation encountered
22  by this data collection process is how to
23  measure de facto versus de jure policies.

Page 241

1  For example, Massachusetts has allowed
2  non-binary citizens to use an 'X' for
3  their gender on drivers licenses since at
4  least 2019, but this was not codified as
5  law until 2023."  Then he gives some
6  other examples.
7        Your pre- and post-Obergefell
8  datasets are also limited by this fact.
9  Is that right?
10    A.   "This fact," the fact --
11    Q.   The difference between de facto
12  and de jure policies.
13    A.   To the extent -- I mean, I -- to
14  the extent that these -- that limitation
15  is inherited by the data I use from
16  this -- from this paper and to the extent
17  that that limitation is relevant to my
18  purposes here, I think it would, yes.
19    Q.   In your pre-Obergefell dataset,
20  you coded whether a state's Medicaid pays
21  for abortion, I believe?  Oh, sorry.  In
22  your larger dataset, your overall dataset
23  of 186 policies, you coded whether a

Page 242

1    state's Medicaid pays for abortion;
2    correct?
3        A.   In the Caughey-Warshaw dataset?
4        Q.   That's right.
5        A.   I believe so, yes.
6        Q.   In the post-2015 dataset in this
7    case, why didn't you code whether a
8    state's Medicaid pays for medical gender
9    transition for minors?
10       A.   It wasn't included in the
11   dataset.  Oh, that's not a -- I mean, for
12   this particular purpose, I was interested
13   in gender -- sorry,
14   transgender-restrictive policies, so I --
15   that wasn't -- I didn't regard that as --
16   especially for this -- for the purposes
17   of this analysis, I was interested in
18   just describing the rise of policies that
19   imposed new restrictive regulations on
20   transgender persons and gender identity,
21   so I didn't think that that counted under
22   that definition.
23       Q.   Why not?

Page 243

1        A.   I just -- why didn't I consider
2    it that?  Because these policies are
3    newer policies that are sort of novel,
4    newer policies that I would regard the --
5    it's not -- it just wasn't included in --
6    under that -- under that definition.
7    It's a policy that sounds -- that, as you
8    describe it, sounds more like a
9    rights-expanding policy.
10       Q.   So, how do you distinguish
11   between a state's refusal to pay for
12   medical gender transition for minors as
13   restrictive and a state's agreeing to pay
14   for Medicaid medical gender transition
15   for minors as not restrictive?
16       A.   In the -- it's not just that
17   there's -- that there's -- it's not just
18   that it's relatively restrictive or not.
19   These are new transgender-restrictive
20   policies that sort of -- that are
21   diffusing across states.  So that was the
22   focus of this analysis.
23       Q.   You performed no statistical

Page 244

1    analysis using only this transgender
2    restriction index, did you?
3        A.   Do you mean no statistical
4    analysis examining -- using -- you said
5    "using only"?
6        Q.   I mean, putting aside --
7        A.   That variable -- sorry.  Go
8    ahead.
9        Q.   Putting aside the regression
10   that we've already talked about.
11       A.   Okay.
12       Q.   And just looking at the
13   transgender restriction index, did you
14   perform anything that you would call
15   statistical analysis on that -- using
16   that index?
17       A.   The only one was I calculated --
18   I believe the only one I calculated -- I
19   mean, in addition to basic descriptive
20   statistics which are sprinkled throughout
21   the text, in footnote 13 I referred to
22   the Cronbach's alpha of these six
23   policies.

Page 245

1        Q.   And what does that tell us?
2        A.   That's a measure of the
3    intercorrelations of the -- of the items
4    and their -- thus their suitability for
5    -- it's often used as an indicator of the
6    suitability for composing an index.
7        Q.   But that doesn't show anything
8    about either correlation or causation
9    between the index and adopting what you
10   call a GAC ban?
11       A.   Correct.  That is -- well, it
12   does include -- yeah.  It's not -- it's
13   not directly designed to assess that
14   correlation.  In this index, does
15   include -- this analysis in footnote 13
16   does include gender -- GAC for minors as
17   part of the six items, so it is part of
18   that analysis and part of -- a component
19   of the Cronbach's alpha is the
20   correlation between any given item and
21   all the other items, so that is a
22   component of this analysis, but it is not
23   the focal conclusion from it.

62 (Pages 242 - 245)

Page 246

1    Q.   And that analysis, or Cronbach's
2  alpha doesn't control for any other
3  variables.  Is that right?
4    A.   No.  It's not intended to
5  control for other variables.
6    Q.   Your sample of six policies is
7  not a randomized sample, is it?
8    A.   A random sample of all -- all
9  policies, gender --
10 transgender-restrictive policies?  It's
11 -- I don't think there's a well-defined
12 universe from which to sample such
13 policies, but it is -- so it's not a
14 random sample.
15   Q.   And it necessarily doesn't
16 include everything in that universe?
17   A.   Yes.  Although I believe it is
18 reasonably complete, a reasonably
19 complete enumeration of policies that can
20 be coded comparably across states that
21 are transgender-restrictive policies.
22   Q.   Alabama scored a 3 out of 5 on
23 this index.  Is that right?

Page 247

1    A.   That's correct.
2    Q.   What was the average score among
3  all states?
4    A.   I don't know what the average
5  score was off the top of my head, but it
6  was probably somewhere between 1 and 2.
7    Q.   Why didn't you include that?
8    A.   It was just not a piece of
9  information I included.
10   Q.   On your graph on page 17, if you
11 have that in front of you.
12   A.   I do.
13   Q.   This is in your report, Exhibit
14 21.  It shows that nearly 10 percent of
15 states with no other laws you identified
16 as restrictive prohibited medical gender
17 transition in minors.  Is that right?
18   A.   Can you say that again?  I'm
19 sorry.  I missed it.
20   Q.   Sure.  According to this graph,
21 about 10 percent of states with no other
22 laws you identified as restrictive
23 prohibited medical gender transition in

Page 248

1  minors.  Is that right?
2    A.   Correct.  I believe it was 8
3  percent, exactly.
4    Q.   And were those states motivated
5  by hostility toward transgender persons?
6    A.   Were they motivated?  Were the
7  states motivated?  I can't speak to their
8  motivations.
9    Q.   But you're speaking to Alabama's
10 motivations?
11   A.   Well, I'm speaking to
12 specifically the context for the -- are
13 you -- are you referring to like what
14 their motivations were for adopting this
15 specific -- or not adopting a ban on
16 gender-affirming care?
17   Q.   No.  I'm referring to the 8
18 percent who did adopt.
19   A.   Oh, the 8 percent who did adopt.
20 I'm sorry.  I haven't done a detailed
21 analysis of those particular states, so I
22 can't -- I can't speak to them
23 specifically.

Page 249

1    Q.   Is the fact that some states
2  that scored a zero on your index also
3  adopted a ban, does that fact affect your
4  analysis of Alabama's motivation?
5    A.   Does the fact that some states
6  with zero -- two states, I believe, with
7  a score of zero did adopt such a ban,
8  does it affect my conclusions about
9  Alabama's motivations?
10   Q.   That's right.
11   A.   I mean, only insofar as they can
12 -- insofar as they contribute to the
13 overall pattern of the relationship
14 between transgender restrictions in
15 other arenas and probability of adopting
16 gender-affirming care bans.
17   Q.   I'm not sure I understand that
18 answer, so --
19   A.   I mean, they contribute to the
20 overall pattern in the data; right?
21 So -- and that's -- and it's the overall
22 pattern that I'm interpreting, or I'm
23 relying on in part to draw the

Page 250

1  conclusions about Alabama specifically.
2  So insofar as they can contribute to that
3  overall pattern, yes, they do affect my
4  inferences about Alabama.
5      Q.  And do they suggest that there
6  could be reasons other than hostility
7  toward transgender rights to adopt a ban
8  on what you call gender-affirming care?
9      A.  I would say that they point to
10  several possibilities.  One is that, as
11  we've already discussed, there are many
12  potential motivations that could be in
13  play at any given legislator or any given
14  bill, but they also point to the
15  transgender restriction index as being --
16  as, like any measure, not a perfect
17  measure of transgender restrictionism.
18  And in this -- yeah, not a perfect
19  measure of it.
20      Q.  Is adoption of what you call a
21  gender-affirming care ban for minors
22  predicted almost perfectly by a state's
23  conservatism more broadly?

Page 251

1      A.  I would imagine it is well
2  predicted and -- but I can't speak to the
3  exact predictiveness.
4      Q.  All of your analyses in this
5  case ignore a state's broad conservatism
6  or liberalism.  Is that right?
7      A.  They focus specifically on
8  transgender- or LGBT-related propensities
9  or regulation of healthcare, healthcare
10  paternalism.
11      Q.  So all of your analyses in this
12  case ignore a state's broad conservatism
13  or liberalism?
14      A.  They don't -- they don't take
15  that into account.
16      Q.  And this is a potential
17  confounding variable.  Is that right?
18      A.  It depends on what -- what we're
19  -- what we're speaking to here.  In this
20  particular case, I'm -- when you refer to
21  a confounder, you have to think about the
22  causal order of all -- the variables
23  involved and a confounder with respect to

Page 252

1  what.  The broader
2  liberalism/conservatism of a state is, in
3  part, a function of its position on or a
4  consequence of its position on
5  transgender -- transgender issues, LGBT
6  issues.
7      Q.  Could it also be that a state's
8  position on LGBT issues is a function of
9  a state's conservatism or liberalism?
10      A.  It could be.
11      Q.  You can't exclude that
12  possibility?
13      A.  I think they are -- yeah, I
14  can't -- I can't exclude the possibility
15  that -- I can't exclude that possibility
16  entirely.
17      Q.  Is it your testimony that
18  conservative -- conservatism in the
19  United States shows hostility towards
20  LGBT persons?
21      A.  By "conservatism," what do you
22  mean by that?
23      Q.  I mean what you mean in your

Page 253

1  papers when you talk about a state's
2  conservatism or liberalism.
3      A.  I think one aspect of -- I mean,
4  when we're referring to the state policy
5  conservatism, I think that one aspect of
6  state policy conservatism, one component
7  of it, or one determinant of it is a
8  state's position on LGBT issues and how
9  restrictive versus expansive they are.
10  So they are related to one another.
11      Q.  I'm specifically asking about
12  hostility towards LGBT persons.
13      A.  Oh.
14      Q.  Are conservatism --
15      A.  So I would say that a component
16  of, certainly an indicator of
17  conservatism, a component of conservatism
18  can be relative hostility towards LGBT
19  rights and the legal status of LGBT
20  individuals.
21      Q.  And can a component of
22  liberalism be hostility toward religious
23  exercise?

64 (Pages 250 - 253)

1    A.  I could imagine -- I could
2  imagine -- I could imagine liberalism
3  being defined in that way.  I don't know
4  if that's a fair characterization of it
5  in the United States.
6    Q.  But you think it's fair to say
7  conservatives are hostile towards LGBT
8  persons?
9    A.  Well, I didn't refer to
10  conservatives.  I was referring to state
11  policy conservatism in one, and I was
12  also referring to LGBT rights and legal
13  status.  And I do think it's fair to say
14  that a component of especially cultural
15  conservatism is a particular stance
16  towards the rights and legal status of
17  LGBT individuals.
18    Q.  And you disagree personally with
19  that aspect of conservatism?
20    A.  I'm not -- I don't have an
21  opinion on that.  That's not part of my
22  opinion in this case.
23    Q.  You're a Democrat?

1    A.  I believe I'm a registered
2  independent.
3    Q.  Who did you vote for in the last
4  election?  Presidential election.
5    A.  The last presidential election,
6  I voted for Joe Biden.
7    Q.  What about the one before that?
8    A.  I voted for -- what was that?
9  That was Joe -- that was Hillary Clinton.
10    Q.  The one before that?
11    A.  Barack Obama.
12    Q.  Have you ever voted for a
13  Republican at the federal level?
14    A.  I'm not sure.  I don't think so.
15    Q.  There are many reasons bills may
16  fail to pass.  Is that right?
17    A.  Yes.
18    Q.  Even bills that might be
19  supported by a majority of the state
20  legislature in theory may not be passed
21  because of procedural hurdles or
22  competing priorities.  Is that right?
23    A.  Yes.

1    Q.  Some state legislatures may be
2  out of session for long periods of time.
3  Is that right?
4    A.  Some -- it is true that some
5  legislatures may be out of session for
6  periods of time, yes.
7    Q.  How do your analyses in this
8  case take those reasons that bills may
9  fail into account?
10    A.  Take them into account?  You're
11  referring all of my analyses, or do you
12  have a -- are you talking --
13    Q.  All of them.
14    A.  All of them?  Well, one of the
15  reasons for combining multiple indicators
16  into a single index is to account for the
17  fact that no one indicator is often a
18  perfect measure of the concept of
19  interest, in part because there are -- as
20  you were referring to there, there might
21  be a bias towards the status quo that
22  makes it difficult to pass or that may
23  prevent the passage of a law in a

1  particular year or an idiosyncratic set
2  of circumstances may prevent the passage
3  of a bill in a particular year.  So
4  that's one of the reasons why it's
5  important to take into account the
6  multiple -- multiple indicators.  I would
7  also say that the legislative history of
8  SB184 takes this into account as well by
9  tracking the progress of similar bills in
10  previous sessions.
11    Q.  You are not testifying here as
12  to whether a majority of a state's
13  citizens or legislators support, in
14  theory, a particular policy, are you?
15    A.  "In theory"?  What do you mean
16  by that?
17    Q.  So you don't offer any opinion
18  polls as evidence in this case; right?
19    A.  No opinion polls, no.
20    Q.  And you don't offer any opinions
21  that legislators might have supported a
22  policy that nonetheless failed to pass?
23  In other words, when you code something,

Page 258

1  it's whether it passed or not. That's
2  it.
3      A.  Correct.
4      Q.  So, is it fair to say you're
5  using the bills -- sorry.  Is it fair to
6  say that using policies that might have
7  failed for many reasons is a crude proxy
8  for whether a state opposed that policy?
9      A.  I'm sorry.  Can you repeat that?
10     Q.  Yeah.  Is it fair to say that
11 you are using policies that might have
12 not been enacted for many reasons as a
13 crude proxy for whether a majority in a
14 state opposes that policy?
15     A.  I don't think that's fair to
16 say.  You're talking about a majority of
17 the public?
18     Q.  That's right.
19     A.  I don't -- I don't think that
20 I'm -- no.  I don't agree with that.
21     Q.  Why?
22     A.  Well, I'm using the policies as
23 an indicator of the government's general

Page 259

1  stance on and propensity to enact -- you
2  know, for example, to enact LGBT-related
3  rights, restrictions, not of the general
4  public's.
5      Q.  Okay.  But you would agree,
6  then, that you're using a failure to
7  enact a bill as a proxy for whether the
8  legislature opposes that policy?
9      A.  If I were treating -- I mean, so
10 the term "proxy" doesn't exactly have a
11 technical meaning, but a proxy is usually
12 used to -- I just want to be clear about
13 terms here.
14     So a proxy is usually used to
15 refer to a single indicator that has --
16 you know, is related to the concept of
17 interest but isn't considered to be sort
18 of a direct measure.  If I were referring
19 to a single one of these policies, I
20 think that it might be more accurate to
21 say that I was using a proxy.  But I
22 don't think that's a fair description of
23 the indices that I construct.

Page 260

1      Q.  I'd like to show you what I'm
2  going to mark as Exhibit 49.  This is an
3  article you cite in your report from ABC
4  News.  "Alabama governor signs 'Don't Say
5  Gay,' trans care and bathroom ban bills"
6  is the headline.  Do you recall this
7  article?
8  (Exhibit 49 was marked for identification
9  and is attached.)
10     A.  I recognize the author.  Let me
11 just -- can I -- I'm going to refer to
12 the --
13     Q.  Sure.
14     A.  -- my references and make sure I
15 have the same one.  Yes.
16     Q.  So I'm going down to page 2
17 here.  The highlighted portion, which
18 I'll make larger, is a quote from the
19 governor.  And you included this first
20 sentence in your report that's
21 highlighted.  You didn't include the
22 sentence that follows that said, "We
23 should especially protect our children

Page 261

1  from these radical, life-altering drugs
2  and surgeries when they are at such a
3  vulnerable stage in life."
4      You didn't include that in your
5  report; correct?
6      A.  The second statement?
7      Q.  That's right.
8      A.  I don't -- I'll have to -- it
9  doesn't look like I did, no.  I'm
10 referring to page 34 of my report where I
11 cite that source.  So I don't -- I don't
12 -- I did not include the second sentence,
13 it looks like.
14     Q.  Why did you omit it?
15     A.  For the same reason as indicated
16 before, that the -- in this context, I am
17 talking about the sex- and gender-related
18 justifications and particularly
19 essentialists' views of sex.  And so the
20 second part wasn't relevant to my
21 particular purposes in this -- in this
22 context.
23     Q.  Okay.  Was it also irrelevant to

66 (Pages 258 - 261)

Veritext Legal Solutions
877-373-3660                                      800.808.4958

Page 262

1   your determination of the governor's
2   motivation in signing SB184?
3       A.   As I've said, the purpose of
4   this report is to draw attention to the
5   considerations and understandings that
6   are under -- that are neglected in the
7   reports to which I'm rebutting and the
8   considerations that -- so additional
9   considerations to provide a particular --
10  provide a whole picture -- a more
11  complete picture of the whole context.
12  So I acknowledge that supporters place
13  heavy emphasis on the safety and
14  protection of children, and so I felt
15  that it was not necessary to belabor that
16  point.
17      Q.   How did you determine that
18  regulation of medical gender transition
19  interventions in minors imposes
20  restrictions on transgender rights?
21      A.   How did I determine that?
22  There, it's a -- I think that is a
23  reasonable interpretation of the effect

Page 263

1   of the bill.  It restricts the freedom of
2   action of a certain population, and that
3   population is transgender, and they're
4   attempting to exercise their -- what
5   might be considered a right to choose
6   their own medical care related to
7   transgender -- their transgender status.
8   So I think that is a reasonable reading
9   of the law.
10      Q.   Is it also a reasonable reading
11  of the law that by promoting the ability
12  of individuals to make an informed choice
13  once they're an adult about life-altering
14  surgeries promotes transgender rights?
15          MR. FLETCHER:  Object to form.
16      Q.   You can answer.
17      A.   That it promotes transgender
18  rights?
19      Q.   That's right.
20      A.   I don't think that is a
21  reasonable reading.
22      Q.   Why is that?
23      A.   I mean, one could argue from a

Page 264

1   paternalistic perspective that it
2   promotes the welfare of transgender
3   people, but I don't think couching it in
4   rights term makes very much sense in this
5   particular situation.
6       Q.   It could also promote their
7   autonomy; correct?
8       A.   I -- that doesn't seem -- I
9   don't see how that -- I don't see how
10  restricting choices is -- can reasonably
11  be read as promoting autonomy.
12      Q.   You don't think that adults know
13  more about their desire for future
14  fertility and sexual activity than a
15  ten-year-old?
16          MR. FLETCHER:  Object to form.
17      Q.   You can answer.
18      A.   I don't have a -- I don't have
19  an opinion on that.
20      Q.   So you can't envision any world
21  in which a regulation of medical gender
22  transition of minors promotes
23  individuals' autonomy?

Page 265

1       A.   I don't think that is the most
2   natural way of describing -- I don't
3   think that's a very natural way of
4   describing.  I can imagine an argument
5   that had that form, but I don't think
6   that -- you know, just thinking about it
7   as you're describing it now, it doesn't
8   sound like the most plausible way of
9   characterizing -- plausible way of
10  characterizing --
11      Q.   What about state prohibitions on
12  minors receiving tattoos?  Does that
13  impose restrictions on human rights?
14      A.   I suppose it -- it depends what
15  you mean by human rights.  I mean, if you
16  mean human rights in some sort of
17  codified way like the UN Charter or
18  something, I -- I don't know.  I do think
19  there -- it is a constraint on autonomy.
20  And so, do I think it's a violation of
21  human rights, restriction of human
22  rights?  I guess it depends on how one
23  defines -- how one is thinking about what

67 (Pages 262 - 265)

Page 266

1   human rights means in that context.
2       Q.   Well, you used the term
3   "transgender rights," so, you know.  The
4   tattoo law would apply to everyone's
5   rights, which is why I used human rights,
6   but that was --
7       A.   You mean sort of like youth
8   rights or something maybe might be a
9   better -- it could be.
10      Q.   Are you aware that the United
11  States government, who is paying you
12  here, is not challenging SB184's
13  restriction on surgical interventions for
14  transitioning minors?
15      A.   I'm sorry.  Say that again.  Am
16  I aware that it is not challenging?
17      Q.   SB184's restriction on surgical
18  interventions for transitioning minors.
19      A.   I don't know exactly what the
20  position of the government is in this --
21  in this particular case.  I don't know
22  exactly --
23      Q.   That is --

Page 267

1       A.   Go ahead.
2       Q.   That is the position.  Is -- in
3   your view, is that because the United
4   States government has hostility toward
5   LGBT rights?
6           MR. FLETCHER:  Object to form.
7       A.   When you say "because," that
8   would -- that makes it -- when one --
9   when you say "because," it makes it
10  sounds like that the primary explanation
11  for that is hostility to LGBT rights, and
12  I don't know enough about the context to
13  render judgment on that, but I would be
14  skeptical that that is the primary
15  explanation.
16      Q.   By defending SB184, am I
17  exhibiting hostility toward LGBT rights?
18          MR. FLETCHER:  Object to form.
19      Q.   You can answer.
20      A.   Well, when I'm referring to
21  hostility towards LGBT rights in the
22  context of my report, I'm referring to
23  government policies, and I'm not -- I'm

Page 268

1   not opining on citizens' own treatment
2   of -- certainly not ordinary citizens'
3   own treatment of or attitudes towards
4   LGBT individuals.  So in the context of
5   my report, I don't think it would make
6   sense to regard you personally as -- I
7   believe you said as displaying hostility
8   towards LGBT rights.
9       Q.   So you're not testifying that
10  any legislator in Alabama displayed
11  hostility towards LGBT rights in voting
12  on SB184?
13      A.   I think in expressing their --
14  in their support for particular pieces of
15  legislation and voting for it, I do think
16  it would be fair in that context to
17  characterize their actions as relatively
18  supportive of LGBT -- or relatively
19  supportive of LGBT rights versus
20  relatively unsupportive of expanding
21  them.  So I do think that that is a fair
22  characterization for legislators
23  considering a particular bill in the

Page 269

1   context of a lawmaking process.
2       Q.   I'm showing you --
3       A.   I don't have -- sorry.  Go
4   ahead.
5       Q.   Go ahead.
6       A.   No.  You go ahead.
7       Q.   I'm showing you what we
8   previously marked as Exhibit 16, which is
9   the LaCombe manuscript.  I'll show you
10  the top of it.  I'm on page 2, the fourth
11  sentence, starting with "Transgender
12  minors in Oklahoma are unable to access
13  proper healthcare because medical
14  providers would immediately lose their
15  license for providing gender-affirming
16  care."
17          So Mr. LaCombe views medical
18  gender transition intervention in minors
19  as "proper healthcare."  Correct?
20          MR. FLETCHER:  I'll just remind
21  the witness if he needs to review more of
22  the document, he should feel free to
23  request to do so.

Page 270

1    THE WITNESS:  Thanks.
2    A.  I can't speak to -- I can't
3 speak to Professor LaCombe's personal
4 views, but I think that is a reasonable
5 -- based on the context that I see here,
6 I think that is a reasonable
7 interpretation of what he means by
8 "proper healthcare," that he means that
9 to include gender-affirming care.
10    Q.  Do you view medical gender
11 transition in minors as proper
12 healthcare?
13    A.  I don't have an opinion on that.
14    Q.  You didn't note Mr. LaCombe's
15 bias in your report, did you?
16    MR. FLETCHER:  Object to form.
17    Q.  You can answer.
18    A.  Did I note his bias in my
19 report?
20    Q.  That's right.
21    A.  No.
22    Q.  Are you familiar with the World
23 Health Organization?

Page 271

1    A.  I am.
2    Q.  Okay.  I'm going to be showing
3 you what I've marked as Exhibit 44.  All
4 right.  So you'll see this is a
5 publication of the World Health
6 Organization dated January 15, 2024.
7 You -- I'm not trying to trick you here.
8 You do not -- I don't believe you cite
9 this in your report.
10 (Exhibit 44 was marked for identification
11 and is attached.)
12    A.  No.
13    Q.  Have you seen this document
14 before?
15    A.  I don't believe so.
16    Q.  Okay.  On page 3, under number
17 5, it says, "Why will the guideline" --
18 issued by the WHO -- "only cover adults
19 and not children or adolescents?"
20    And it says, "The scope will
21 cover adults only and not address the
22 needs of children and adolescents,
23 because on review, the evidence base for

Page 272

1 children and adolescents is limited and
2 variable regarding the longer-term
3 outcomes of gender affirming care for
4 children and adolescents."
5    So in at least as of January of
6 this year, the WHO believed that there
7 was limited -- limited evidence regarding
8 the longer term outcomes of
9 gender-affirming care for children and
10 adolescents; right?
11    A.  Based on the document that
12 you're giving me, which I don't -- I
13 don't know much about the context of this
14 document, but that seems to be a
15 reasonable reading of Point 5 on this --
16 on this page.
17    Q.  And you're not testifying in
18 your capacity as an expert that the WHO
19 is wrong here, are you?
20    A.  It is wrong -- it is wrong to
21 exclude from this review --
22    Q.  No.  That the WHO is wrong about
23 the evidence base for children and

Page 273

1 adolescents.
2    A.  No, I am not testifying about
3 that.
4    Q.  That statement about the
5 evidence base is consistent with SB184's
6 legislative findings.  Is that right?
7    A.  Consistent with?  My read of
8 those findings is that they emphasize --
9 they have a more negative cast than --
10 than this statement, which more
11 emphasizes the limitedness and the
12 variability of the evidence base.  So --
13    Q.  I don't think that --
14    A.  Go ahead.
15    Q.  Do you believe that the WHO has
16 hostility toward LGBT rights?
17    A.  Do I believe that the -- I don't
18 know, actually.  I'm not -- I'm not -- I
19 know that -- I'm not an expert on the
20 internal politics of the WHO, but I do
21 know -- so I can't really speak.  I
22 haven't -- I haven't done specific
23 research in that, so I don't really know.

69 (Pages 270 - 273)

Page 274

1    Q.   All right.  I'd like to show you
2  now what I'm going to mark as Exhibit 54,
3  which is a recent article from Forbes.
4          And you see the headline there,
5  "England Bans Puberty Blockers for
6  Minors"?
7    A.   I do.
8    Q.   And the date is updated April
9  18th, 2024?
10 (Exhibit 54 was marked for identification
11 and is attached.)
12   A.   I do.
13   Q.   Is England motivated by
14 hostility towards LGBT rights?
15   A.   England, the government of
16 England?
17   Q.   That's right.
18   A.   Without knowledge of this -- the
19 context for this -- for this decision, I
20 can't really speak to it.
21   Q.   You would agree that prohibiting
22 puberty blockers is one of the aspects of
23 SB184?

Page 275

1    A.   Yes.
2    Q.   Are you familiar with Marci
3  Bowers?
4    A.   I don't believe so.
5    Q.   She's the president of WPATH.
6  Are you familiar with WPATH?
7    A.   I believe I've heard of WPATH,
8  but I don't recall exactly what WPATH is.
9    Q.   All right.  According to Dr.
10 Bowers -- sorry.  I'll show you this
11 article so you can see it.
12   A.   Thank you.
13   Q.   This will be Exhibit 47.  So
14 this is an article in The Free Press that
15 has an interview with Dr. Bowers.  And
16 I'm going to scroll down to show you
17 pages 5 and 6 of this exhibit.
18 (Exhibit 47 was marked for identification
19 and is attached.)
20   A.   What's The Free Press?
21   Q.   I think it's an online news
22 site.
23   A.   I see.

Page 276

1    Q.   It's an article written by
2  Abigail Shrier.  Are you familiar with
3  her?
4    A.   No.
5    Q.   So Bowers is a -- is the
6  president of WPATH and a plastic surgeon
7  who does gender transition surgeries.
8  Here at the bottom of page 5, starting to
9  quote, "Bowers told me she now finds
10 early puberty blockade inadvisable."
11        And then a little bit further
12 down:  "Honestly, I can't sit here and
13 tell you that they" -- the results of
14 surgeries -- "have good or" -- "have
15 better -- or even as good -- results.
16 They're not as functional.  I worry about
17 their reproductive rights later.  I worry
18 about their sexual health later and
19 ability to find intimacy."
20        Dr. Bowers elsewhere says that
21 puberty blockade has a negative affect on
22 the ability to orgasm.
23        Do you think Dr. Bowers spoke

Page 277

1  out of a hostility for LGBT rights?
2        MR. FLETCHER:  Object to form.
3    Q.   You can answer.
4    A.   I don't really know anything
5  about the context for this, so I can't
6  speak to it.
7    Q.   According to Dr. Bowers,
8  preventing minors from obtaining puberty
9  blockers could lead to better long-term
10 surgical outcomes for transgender
11 persons; correct?
12        MR. FLETCHER:  Object to form.
13   Q.   You can answer.
14   A.   Preventing -- sorry.  Preventing
15 -- sorry.  You said preventing access to
16 puberty blockers could lead to better
17 long-term?
18   Q.   Surgical outcomes.
19   A.   Shoot.  I don't see where she
20 says that.  Blockade -- oh, blockade.
21     (Witness reviews document.)
22   A.   I mean, it's really hard for me
23 to interpret this out of context.  I'm

Page 278

1  sorry.
2     Q.  So you didn't consider the
3  possibility, again, that long-term
4  outcomes could be improved under a law
5  like SB184 for transgender persons?
6        MR. FLETCHER:  Object to form.
7     Q.  You can answer.
8     A.  I considered that possibility.
9     Q.  And did you agree with it or
10 disagree with it?
11    A.  I regarded it as a possibility.
12    Q.  Yet you coded SB184 as
13 restrictive of transgender rights?
14    A.  Yes.  I think that is a
15 reasonable coding.
16    Q.  Even though, in your view, it is
17 possible that SB184 could improve the
18 long-term lives of transgender people?
19       MR. FLETCHER:  Object to form.
20    A.  I think that those are separate
21 considerations, rights.  One could, I
22 believe, make an argument for almost any
23 rights restriction that it is in the best

Page 279

1  interest of or somehow serves -- is in
2  the -- would serve the welfare of the
3  person being restricted.  And I also
4  think that it is at least possible that
5  in many, many instances, such rights
6  restriction could benefit at least some
7  individuals whose rights are being
8  restricted.  So I think that is a
9  possibility in this case, but I think my
10 decision to code policies as being
11 restrictive of transgender rights was
12 based on my interpretation of their
13 effect, which was to constrain the
14 choices and restrict the rights of the
15 individuals involved separate from
16 whether those rights restrictions were in
17 the -- could be argued to be in the best
18 interest of the people involved.
19    Q.  Yet you still considered it
20 sound to use evidence of what you call
21 restricting transgender rights as proof
22 of hostility towards transgender rights?
23       MR. FLETCHER:  Form.

Page 280

1     A.  Well, I think restrict -- I
2  think that restricting is certainly
3  defensible, or I certainly think that
4  is -- I don't know the term you used, but
5  defensible or something -- to treat
6  actual restrictions on transgender rights
7  as evidence of hostility towards
8  transgender rights, yes.
9     Q.  Would you also agree that a
10 policy that leads to better outcomes for
11 transgender people would be a very
12 strange way to express hostility towards
13 transgender rights?
14       MR. FLETCHER:  Form.
15    A.  I believe that many rights
16 restrictions, and even in some
17 circumstances, overt -- I believe that
18 many rights restrictions are -- no, I --
19 sorry.  It would be a very strange way of
20 expressing hostility to transgender
21 rights if to -- to support a bill that
22 was -- support a policy that would lead
23 to better outcomes?  I think, setting

Page 281

1  aside or, you know, stipulating that
2  there's no -- it's not clear that SB184
3  would actually result in better outcomes.
4  I think it is often the case that rights
5  restrictions are motivated in such a way,
6  so I don't think that is especially
7  strange.
8     Q.  You keep changing the focus from
9  transgender persons to transgender
10 rights, so could you just clarify?  Are
11 you testifying to anything in any way in
12 any opinion about the Alabama
13 legislature's or the Alabama governor's
14 or the State of Alabama's hostility
15 toward transgender persons in enacting
16 SB184?
17    A.  Yes.  So the focus of my report
18 is on the -- on hostility -- on the
19 hostility to transgender rights, but the
20 -- at least some of the motivations of --
21 well, first of all, the bill itself is
22 part of a broader -- a broader political
23 context of a multifaceted effort to

71 (Pages 278 - 281)

Page 282

1  restrict transgender rights in a variety
2  of domains and that that is -- that
3  under -- that the -- part of the
4  motivation, part of the understanding of
5  the purposes of that broader effort, of
6  which SB184 is part, is to defend
7  against -- defend traditional -- or
8  sorry, essentialist notions of the
9  relationship between sex and gender and
10  against gender nonconformity, against
11  gender dysphoria, and against, you know,
12  what is sometimes called transgenderism
13  as a social phenomenon.  And at least
14  some of the statements of the legislative
15  supporters seemed hostile to the very
16  idea that -- the notion that someone
17  could be genuinely -- or deny the
18  legitimacy of identifying as or being
19  transgender.  So I think that they are --
20  there's a larger context in which SB184
21  is embedded that -- and part of that
22  context is hostility towards gender
23  nonconformity as a practice, as a social

Page 283

1  phenomenon per se.
2     Q.   And it's your testimony that a
3  policy that promotes long-term life
4  outcomes for transgender people shows
5  hostility toward transgender persons?
6        MR. FLETCHER:  Object to form.
7     A.   It is -- no, that is not my
8  opinion.  That in this -- are we talking
9  about a hypothetical policy that could --
10  that is -- that I -- you can tell me
11  with -- that I know with certainty would
12  promote the interests of someone, or are
13  we referring to SB184?
14     Q.   Well, you already testified that
15  you're not testifying as to the
16  scientific long-term effects of the
17  treatments at issue in SB184, but you
18  seem to be assuming, in offering your
19  opinion about hostility, that there are
20  not long-term positive effects for
21  transgender people.  So I'm asking you,
22  why did you make that assumption?
23        MR. FLETCHER:  Object to form.

Page 284

1     A.   It's in a -- I'm not making that
2  assumption.  I'm basing that on the
3  larger political context of a
4  multifaceted legislative effort to
5  regulate transgender individuals, many of
6  which have nothing or have little to do
7  or nothing to do with the putative
8  interests of transgender people in
9  particular.  So I think in the context,
10  in the larger political context, it's not
11  reasonable to assume, as you seem to be
12  doing, that SB184 is in the interest and
13  would serve the long-term best interests
14  of the transgender population.  But I'm
15  not opining definitively either way
16  regarding the medical effects of the
17  treatments.  I'm going to leave that to
18  the medical experts.
19     Q.   So when you keep going back to
20  the broader context, you are assuming
21  once again that all of those other
22  policies were only adopted based on the
23  same hostility that you theorize occurred

Page 285

1  here.
2        MR. FLETCHER:  Object to form.
3     Q.   Is that correct?
4        MR. FLETCHER:  Object to form.
5     A.   I'm not assuming that, no.
6        MR. FLETCHER:  Counsel, we've
7  been going for --
8     Q.   They could all be --
9        MR. MILLS:  I'm not finished.
10     Q.   So again, all of those other
11  policies could be justified on other
12  grounds other than hostility towards
13  transgender persons.  Is that right?
14        MR. FLETCHER:  Object to form.
15     A.   When -- anytime looking at any
16  individual policy in isolation, it's
17  possible without additional context to
18  argue that it could be motivated by
19  multiple considerations.  But here, we
20  see a pattern of -- of action, both in
21  terms of enacted policies and in terms of
22  legislative initiatives, as well as in
23  terms of the long-term orientation or

72 (Pages 282 - 285)

Page 286

1  tradition of policymaking in Alabama, and
2  taking that all together, I think that
3  even if it's possible in an individual
4  case to -- to offer an alternative
5  explanation, the idea that there is
6  nothing holding together all of these --
7  that these are separately motivated is
8  not plausible in light of the totality of
9  the evidence.
10      Q.  You didn't examine any other
11  individual policy you discuss for other
12  reasons that might explain their adoption
13  other than hostility towards transgender
14  rights; correct?
15      MR. FLETCHER:  Form.
16      A.  When you say I didn't examine, I
17  did examine, for example, whether
18  healthcare paternalism was a good
19  predictor --
20      Q.  I'm asking about other
21  individual policies.
22      A.  So other --
23      Q.  So let's take a sports ban.  You

Page 287

1  didn't consider whether a state might
2  rationally want to prohibit boys from
3  playing in girls' sports?
4      A.  By "boys," do you mean
5  biologically assigned at birth boys?
6      Q.  I mean biological boys.
7      MR. FLETCHER:  And I'll object
8  to the form.
9      MR. MILLS:  If you could stop
10  interrupting, Counsel.  None of these are
11  valid form objections.
12      Q.  You can answer.
13      A.  Okay.  The -- so the -- you're
14  asking whether I asked for -- in the case
15  of -- I believe it is -- there -- there
16  are multiple rationales that could be put
17  forward for any policy, and then there
18  are certainly policy -- rationales that
19  could be put forward for -- for -- excuse
20  me -- for a sports ban on transgender
21  athletes.
22      It's -- again, it's the pattern
23  of action across multiple -- across

Page 288

1  multiple domains that suggests that --
2  and also the fact that not all states --
3  many states have not adopted such -- such
4  policies.  Some -- many have, but many
5  haven't.  So it's not compelling, in my
6  view, to attribute it to factors that are
7  in some way common to all states.
8      Q.  And you say that even though
9  your report and opinion in this case does
10  not analyze any other reason for adoption
11  of any other policy domain that you
12  referred to?
13      A.  "Any other policy domain," you
14  mean -- you mean -- you're referring to
15  other policies aside from
16  gender-affirming care bans, I don't
17  consider other reasons for -- that they
18  might have been --
19      Q.  Correct.
20      A.  No.  I take them as -- for
21  example, in the case of restrictions on
22  LGBT rights, I take that to be an
23  indicator of a state's -- or sorry, a

Page 289

1  measure of a state's relative propensity
2  to engage to restrict those rights.  Yes.
3  I take them as a direct measure of that.
4      Q.  Okay.  I think your counsel is
5  asking for a break.  Sorry.  I just
6  wanted to get through that exchange.
7      A.  No.  That's okay.  That made
8  sense.
9          (Break taken.)
10      Q.  (By Mr. Mills) In paragraph 51
11  on page 26 of your report, you were
12  talking about Alabama legislation.  And
13  you say, "many evince a clear hostility
14  towards" -- "to transgender status or
15  gender nonconformity per se."
16          Which laws or bills are you
17  testifying evince a clear hostility
18  towards -- to transgender status or
19  gender nonconformity per se?
20          (Witness reviews document.)
21      A.  So I think in this context, I'm
22  referring to a -- more of a broader -- a
23  broader what you might say political

Page 290

movement or -- that -- that is expressed in various particular ways. Some of those ways -- one particular manifestation is in the form of SB184, which targets a particular set of medical treatments related to gender-affirming care. But there is a clear pattern of addressing or making it more -- lives more difficult or restricting the choices of transgender students -- or I mean, sorry, students or -- or transgender persons generally in many different contexts. So for example, HB322, which makes it more difficult to change one's sex, defines it as what's written on someone's birth certificate, that forbids any discussion of gender identity or sexual orientation as well; the transgender sports bans, not only for minors, but also for public college students. The remarks particularly of Mack Butler around his effort to expand restrictions on discussing transgender

Page 291

topics or gender identity in schools, his remarks evince a -- a -- opposition to or a hostility toward a transgender -- transgender persons in general, regarding transgender identification as a mental defect, and wanting to keep transgender people away from children, period. Similarly, HB401, which defines the definition of sexual conduct to include male or female impersonators, which can fairly straightforwardly be interpreted as including transgender individuals perhaps but certainly drag performers.

So I think it's not any one. I think that the strain of hostility to gender nonconformity is an important one that underlies many of these enacted bills but also the proposed legislation --

Q. So --

A. -- in various ways.

Q. Just to be more specific, you say "many evince a clear hostility to

Page 292

transgender status or gender nonconformity per se."

Does SB184 evince a clear hostility towards transgender status or gender nonconformity per se?

A. SB184? If considered in isolation, I would not consider it to be clear, but it's in the context of the larger -- in the context, reading in the context of other -- other legislative efforts as well as just the larger political context, I think it is -- it is certainly indicative of a gender -- of a general hostility towards transgender identification per se.

Q. So when you say, "many evince," you're not referring to individual things, you're just --

A. I'm referring to individual bills, and I'm referring to bills and legislative proposals that, on their -- in the context of all the others, provide evidence of hostility to gender

Page 293

nonconformity per se.

Q. But you don't say "in the context of all the others." You say, "many evince." That makes it sound like each one evinces a clear hostility. So is that true as to SB184, all of the bills you just mentioned, some of which were not enacted, the sports ban? Is that true as to each one of them?

A. So I would say that if you were viewing each one in isolation, the evidence would be less clear, that they -- they would be more ambiguous as to whether they are evincing hostility to transgender status per se. But --

Q. And that's because there are other reasons? Sorry.

A. That's because it's -- it's more -- it's more possible in an individual -- in examining an individual case to posit that there are other motivations at play here. The very absence of other efforts would be

Page 294

1　affirmative evidence that this is not a
2　part of a general targeting of
3　transgender persons or transgender
4　rights.  In general, it's about a very
5　specific set of circumstances.
6　　Q.  Let's talk about Representative
7　Butler.  Did Representative Butler amend
8　his bill HB130 to include the U.S. Space
9　& Rocket Center?
10　　A.  I actually don't know if he did
11　that.  I only know that he had announced
12　it or that he said he was planning to.
13　　Q.  You didn't investigate that?
14　　A.  Well, at the time of my writing
15　of this report, I hadn't seen information
16　indicating whether he had done that yet.
17　　Q.  And you still haven't?
18　　A.  I haven't updated my report
19　since writing it.
20　　Q.  I'd like to show you what I'm
21　marking as Exhibit 28, which is the
22　enacted version of the bill you were just
23　discussing, HB130.

Page 295

1　　So you agree this shows
2　engrossed to HB130, the bill by
3　Representative Butler and others, and
4　that's the bill you discuss in your
5　report?
6　(Exhibit 28 was marked for identification
7　and is attached.)
8　　A.  Yes.  Do you know what the date
9　is for this bill, or for this
10　engrossment?
11　　Q.  I could go down to the bottom.
12　　A.  Okay.  Great.  Thank you.
13　　Q.  Yeah.  So here we have in
14　Section 1 the substance of the bill,
15　which says that, "An individual or group
16　of individuals providing classroom
17　instruction," et cetera, "shall not
18　engage in classroom discussion or
19　instruction regarding sexual orientation
20　or gender identity in a manner that is
21　not age appropriate or developmentally
22　appropriate for students in accordance
23　with state standards."

Page 296

1　　A.  Is Section -- is the underlined
2　Section (b) also an inclusion in the --
3　is that also a change in the -- is the
4　underlined section the new section that's
5　being added to the statute?
6　　Q.  Do you know?
7　　A.  I don't.  But that's how I read
8　-- that would be how I would read this
9　document.  That's what I would assume,
10　but --
11　　Q.  Sure.  Yeah, that's fine.  So
12　that (b) is "No teacher, or other K-12
13　employee, may display a flag or other
14　insignia relating to or representing
15　sexual orientation or gender identity in
16　a classroom or on the property of a
17　public K-12 school."  And that's the end.
18　　So it doesn't include the U.S.
19　Space & Rocket Center?
20　　A.  This version of the bill doesn't
21　include it.
22　　Q.  And this bill would prohibit all
23　discussion and all insignia related to

Page 297

1　sexual orientation and gender identity
2　regardless of sexual orientation or
3　gender identity?
4　　A.  That's how I read this text,
5　that no teacher or public K-12 employee
6　may display a symbol -- a flag or other
7　symbol that -- relating to or
8　representing sexual orientation or gender
9　identity, which I would take to ban, say,
10　insignias that indicate a openness to or
11　tolerance of sexual orientation or gender
12　identity like a pride flag or something.
13　　Q.  It would also ban a cisgender
14　pride flag?
15　　A.  I actually don't know exactly
16　how it would be interpreted in context.
17　But by "cisgender pride flag," what are
18　you -- I'm not familiar with something
19　like that.  Is that a phenomenon?
20　　Q.  I'm just asking, is the bill
21　limited to expressions of support for
22　LGBT positions, or does it cover all
23　sexual orientations and all gender

75 (Pages 294 - 297)

Page 298

1  identities?
2      MR. FLETCHER:  Object to form.
3      A.  It's hard for me to know how
4  this would be interpreted in context.
5  But as you -- as you know, there are many
6  facially neutral -- or there are -- you
7  have to read the -- I don't know how this
8  would be applied in context, but I
9  imagine that the empirical impact of this
10  -- the actual binding impact of this law
11  would be towards restricting certain
12  displays of support for sexual -- for
13  LGBT identification.
14      Q.  You've never studied that?
15      A.  Have I -- I never studied that?
16  Well, I have studied --
17      Q.  You're saying empirical impacts
18  of HB130.
19      A.  I understand -- no.  I mean, I
20  am -- HB130 has not yet -- is only just
21  being -- been passed, so we can't study
22  it empirically now.  But I can make
23  judgments based on my understanding of

Page 299

1  American politics and on how these sorts
2  of restrictions, the likely impact of
3  these sorts of restrictions.  And so in
4  this case, I would have an expectation
5  about its likely impact.
6      Q.  Is there any reason a legislator
7  could support HB130 other than hostility
8  toward LGBT rights?
9      MR. FLETCHER:  Objection.
10      A.  Any other reason, is it
11  possible?  No obvious other reason.  When
12  you say -- I suppose there could be -- if
13  you're thinking about deeper reasons,
14  there could be a deeper reason for
15  someone being hostile to LGBT rights or
16  LGBT individuals or LGBT identities.
17  It's hard for me -- I'm having a hard
18  time thinking of an alternative
19  explanation that doesn't in some way
20  involve a hostility toward sexual
21  orientation or gender identity.  But it
22  does -- I could imagine such a law in a
23  different context having that effect.  It

Page 300

1  depends somewhat on the context of the
2  implementation of the law.
3      Q.  All right.  I'd like to show you
4  an article you cited in your report.  I'm
5  going to mark it as Exhibit 29.  And this
6  is from the -- I think it's called the
7  1819 News.
8  (Exhibit 29 was marked for identification
9  and is attached.)
10      A.  1819 News, yes.
11      Q.  Let me just pull that up.  Okay.
12  This is the -- this is the article you
13  cite in your report for your quotations
14  from Representative Butler.  Is that
15  right?
16      A.  I will have to check that.  Do
17  you know what --
18      Q.  Page 52 of your report.
19      A.  Page 52.  Thank you.  Oh, page
20  -- are you sure it's 52?
21      Q.  It might be paragraph 52.
22      A.  Oh, paragraph 52.
23      Q.  Yeah.  Sorry.  Paragraph 52.  My

Page 301

1  bad.  Article by Poor.
2      A.  Yeah, Poor.  I think -- yes.
3      Q.  This article -- I'll scroll down
4  a bit -- refers to a "Space Camp
5  controversy."  Your report doesn't
6  mention Space Camp.  Why is that?
7      A.  Space Camp, you mean -- I don't
8  know.
9      Q.  Do you know what the -- what
10  this -- this article says "the Space Camp
11  controversy."  Do you know what that is?
12      A.  I think I do, in broad terms.
13      Q.  And what's your understanding of
14  that controversy?
15      A.  My understanding is that there
16  was a controversy around the employment
17  of an employee at the U.S. Space & Rocket
18  Center and which holds, I suppose -- I
19  guess a Space Camp that I assume that --
20  I don't know much more about the details
21  off the top of my head other than there
22  was a transgender employee who was, I
23  suppose, I would guess was an employee of

76 (Pages 298 - 301)

1    the Space Camp or was working with the
2    Space Camp.
3       Q.   And it's your belief that the
4    controversy was just about that
5    individual's employee -- employment with
6    Space Camp?  Is that what you're
7    testifying?
8       A.   That was my understanding of the
9    -- and as well as more generally, their
10   proximity to children.
11      Q.   Okay.  I'm going to introduce
12   what I'm marking as Exhibit 30, which is
13   a previous news article from the 1819
14   News.  This is not one that you cite in
15   your report, to my knowledge.  This is
16   from March 2024.  You agree this appears
17   to be about the same controversy as the
18   last article we were just talking about?
19   (Exhibit 30 was marked for identification
20   and is attached.)
21      A.   I do believe this sounds like
22   the same controversy.
23      Q.   Okay.  So let's see.  Sorry.  I

1    know I'm jumping around.
2          So the highlighted portion here
3    on page 2, a Facebook post from a
4    Huntsville-based man that has circulated
5    around social media states that the
6    father -- the man "was planning to send
7    his daughter to space camp before
8    discovering that a self-identified
9    transgender individual, Molly Bowman,
10   would act as team lead and a hall monitor
11   in the girls' dormitories."
12         If I could go down to page 3.
13   "Screenshots from the Twitter page
14   contained pictures of Bowman in space
15   camp regalia, along with a lot of sexual
16   commentary."
17         Going on to page 4, this is a
18   quote from the father.  "All I thought
19   was that [Bowman] was a hall monitor, but
20   then I heard that he had walked into the
21   girl's room.  I thought that was
22   extreme."
23         And then the next page:  "In a

1    recorded conversation between Yarbrough
2    and Space Camp vice president Robin
3    Soprano, Bowman was confirmed as an
4    employee and that Bowman would have
5    access to the girls' floor.  Throughout
6    the nearly nine-minute conversation,
7    Soprano gave evasive answers to
8    Yarbrough's questions.  During the call,
9    Soprano stated that there were
10   specifically male and female floors, but
11   continued to give evasive answers when
12   explicitly asked about Bowman's level of
13   access."
14         If I could go down to the bottom
15   of that page 5.  "Bowman's Twitter page
16   is replete with sexualized content, along
17   with photos of him in his space camp
18   regalia with the caption 'Butch coded
19   space queer.'"
20         Two pages -- sorry.  Page 6
21   here, the tweet's apparently from the
22   employee.  "Somedays i just wish I was a
23   boy that had a pussy unstead a girl that

1    has a dick."
2          The next page, 7 to 8.
3    Yesterday [sic] "I ordered like 10 of
4    these stickers from @ellenfromnowon and
5    today, I placed the last one in my
6    collection.  Next week I get to start
7    teaching kids about space.  I hope they
8    see my edc notebook and feel proud to be
9    themselves in this big universe," with a
10   picture of a "gender is a universe"
11   rainbow sticker.
12         Page 9, you have a tweet about
13   apparently a sexual interaction which I'm
14   not going to read.
15         Page 13, you have a tweet, "I
16   want srs" -- which is evidently sex
17   reassignment surgery -- "because my dick
18   gives me super dysphoria.
19         "Also me: I want srs so I can
20   flex and get new kinds of piercings."
21         Were you aware of this material?
22      A.   "This material" meaning these
23   had I reviewed these -- these posts?

Page 306

1    Q.  Everything I just read from this
2   article.
3    A.  I was not aware of their
4   details, no.
5    Q.  You don't think it's relevant to
6   assess the reactions of individuals, what
7   they're reacting to?
8    A.  You mean -- I'm sorry.  Say that
9   again.  I don't think it's relevant, this
10  evidence is not relevant?  Is that what
11  you're asking?
12   Q.  You were assessing
13  Representative Butler's reactions to this
14  incident, and I'm asking, you don't think
15  it's relevant to assess what he was
16  reacting to?
17   A.  I would -- I mean, relevant.  I
18  do think it is -- I don't know if I would
19  have included this material in my report,
20  if that's what you mean.  I don't think
21  it's relevant to my conclusions here.
22   Q.  Do you believe that the only
23  basis on which to be concerned about this

Page 307

1   biological male and female spaces at
2   Space Camp is hostility toward LGBT
3   persons?
4    A.  Do I believe it's the only
5   reason?
6    Q.  That's right.
7    A.  I don't.  And it's not the only
8   possible reason, no.
9    Q.  Do you believe that the father
10  of this little girl who wanted to attend
11  Space Camp has expressed a reasonable
12  concern?
13   A.  One, it depends on the context
14  in which -- can you scroll back up to the
15  beginning of how the father describes the
16  interplay?  I also -- I'm just taking on
17  board that this -- that this article on
18  1819 News is an accurate description of
19  events.
20   Q.  You relied on 1819 News.  But
21  that's fine.  We can --
22   A.  I did.  And I felt comfortable
23  doing so because even though it has a --

Page 308

1   it has a right wing bias, it was -- I
2   didn't think that that bias would affect
3   the accuracy of transcripts, words that
4   were -- the context of the quote in which
5   I was quoting it.
6    Q.  And that's also why you relied
7   on liberal publications like Mother Jones
8   and the Movement Advancement Project?
9    A.  I actually relied on a mix of
10  liberal and conservative justifications,
11  and I made sure to evaluate them each in
12  the context of the reliability of what
13  information I was gleaning from them.
14   Q.  So my question was, do you
15  believe that the father --
16   A.  Yeah.  I was going to -- let me
17  just read this part.  I know you -- you
18  can ask your question again, but I just
19  wanted to read this again.
20   Q.  Sure.  Go ahead.
21    (Witness reviews document.)
22   A.  Thank you.  So ask your question
23  again.

Page 309

1    Q.  Yeah.  Do you believe that the
2   father of this little girl who wanted to
3   attend space camp has expressed a
4   reasonable concern?
5    A.  I don't know the context well
6   enough to know if this was reasonable or
7   not.
8    Q.  From what you've read.
9    A.  I really don't know enough.  But
10  from what it -- what it sounds like here,
11  Yarbrough first became concerned upon
12  learning that the person was transgender,
13  so that -- and then was prompted to
14  investigate further.  I don't know what
15  the policies of Space Camp are for
16  monitoring the social media accounts of
17  its employees and basing decisions on
18  employment based on those posts, but --
19  and so I really -- I can't say if this
20  particular concern is reasonable or not.
21   Q.  You would have no concerns
22  whatsoever with your daughter attending a
23  camp with this biological man on her

78 (Pages 306 - 309)

Page 310

1  sleeping floor?
2      A.  So -- so that's not part of my
3  testimony today.  But I do actually
4  happen to have a six-year-old daughter,
5  and I would feel comfortable.
6      Q.  Your report on page 26 says that
7  Representative Butler's comments came
8  "Merely upon learning of this employee's
9  existence."  That's not true, is it?
10     A.  That is -- my -- I don't know
11  whether that is -- I am not as -- I am
12  not confident that that is true.
13     Q.  Would you like to correct your
14  report?
15     A.  Is that something that I would
16  officially do?
17     Q.  I'm just asking if you would
18  like to do that on this point.
19     A.  If I were to delete a word, I
20  would delete "merely."
21     Q.  And you feel that that would
22  include all relevant context for
23  understanding your opinion?

Page 311

1      A.  I think that would be a
2  reasonable summary of the overall
3  context.  Perhaps I would include -- it's
4  possible that I would include a footnote
5  clarifying the specific context.
6      Q.  If we could go back to Exhibit
7  29, which -- did it go back on your
8  screen?
9      A.  I'm sorry.  Which one?
10     Q.  Go back to the earlier article.
11     A.  Yes.  1819 News, yeah.
12     Q.  Yeah.  I'm on page 3.  The first
13  highlighted portion is a quote by
14  Representative Butler:  "If the schools
15  and/or Space Camp are not already
16  engaging in discussions of sexual
17  identity or sexual orientation, then no
18  harm, no foul.  Nothing changes."
19         Do you agree with that
20  statement?
21         MR. FLETCHER:  Object to form.
22     A.  I don't agree with that change
23  -- I don't agree with that statement.

Page 312

1      Q.  Why not?
2      A.  I think that imposing explicit
3  regulations with penalties on a -- in a
4  particular situation can have a chilling
5  effect in ways that go beyond the, you
6  know, nominal target of the -- of the
7  regulation or the law.
8      Q.  The next highlighted portion
9  says:  "We're not worried about adults
10  seeing such as that.  But protect the
11  children."
12         You edited that quotation out of
13  your report.  Is that right?
14     A.  I didn't --
15         MR. FLETCHER:  Object to form.
16     A.  I didn't edit it out.  I
17  included other parts of it.  This is a
18  long article, and I included selected
19  parts that I thought were sufficient to
20  convey the meaning that I -- the
21  information that I wished to convey.  I
22  will, however -- if you return back --
23  would you return back to that -- that

Page 313

1  spot.
2         This larger context of this --
3  of this sentence, if I were to include
4  this sentence in the -- if I had wanted
5  to include this sentence in my report, I
6  would have included the whole paragraph,
7  which seems to suggest that the very act
8  of transgender people wanting to interact
9  with children is somehow nefarious.  So I
10  would want to include that whole context.
11     Q.  On page 4, the highlighted
12  portion says:  "We absolutely love these
13  people.  We don't want to hurt anybody or
14  offend anybody."
15         You think Representative Butler
16  is lying?
17     A.  Do I think that he's telling the
18  truth that we all absolutely love these
19  people?
20     Q.  That's right.
21     A.  "We"?  I don't even know who
22  "we" --
23     Q.  Okay.  Let's assume "we" is the

79 (Pages 310 - 313)

Page 314

1  royal "we," meaning him.  Do you think
2  that he's lying that he loves these
3  people?
4      A.  I don't know whether he's lying
5  or not or what's inside his head when he
6  made that statement.
7      Q.  You quote in your report the
8  previous part of this paragraph, not the
9  full paragraph, saying, "Up until Obama,
10  it was always a mental defect."
11      Do you know if Representative
12  Butler is correct that transgenderism was
13  classified as a mental health diagnosis
14  until 2012?
15      A.  I don't -- I don't know if
16  that's what he's referring to, but I -- I
17  don't know when it was -- you said what
18  was -- what was classified as a mental
19  health diagnosis?
20      Q.  Transgenderism.
21      MR. FLETCHER:  Object to form.
22      A.  Transgenderism was referred to
23  -- oh.  Oh, you mean -- I don't know what

Page 315

1  transgender -- that's not -- I don't
2  exactly know what transgenderism means in
3  this context.  I thought -- I don't think
4  of transgenderism as being a sort of
5  individual medical condition, but maybe
6  it has that meaning in some contexts.
7      Q.  I'd like to show you what I'm
8  going to mark as Exhibit 31.  This is an
9  article from MSNBC news.  The headline is
10  "Being transgender no longer a 'mental
11  disorder': APA," which is the American
12  Psychiatric Association.
13      This article, as you can see,
14  was published on December 4th, 2012.
15  "Transgender people," it says in the
16  second paragraph, "will now be diagnosed
17  with 'gender dysphoria.'"
18      "'Gender identity disorder,'" it
19  says, "has been listed as a mental
20  disorder since the third edition of the
21  DSM more than 20 years ago."
22      So Representative Butler was
23  correct that being transgender was

Page 316

1  classified as a mental health diagnosis
2  until 2012?
3  (Exhibit 31 was marked for identification
4  and is attached.)
5      MR. FLETCHER:  Object to form.
6      A.  I believe he used the word
7  "mental defect."  I don't think that is
8  synonymous with a mental health
9  diagnosis.
10      Q.  The DSM is called the Diagnostic
11  and Statistical Manual of Mental
12  Disorders.  Are you playing semantics,
13  Dr. Caughey?
14      MR. FLETCHER:  Object to form.
15      A.  I mean, I don't know -- am I
16  playing semantics?  I'm trying to be
17  accurate with my language and precise
18  about --
19      Q.  So you would agree that it was a
20  mental disorder until 2012?
21      A.  That's what you're telling me
22  based on -- I believe that if it was
23  changed in the -- by "it" here, I think

Page 317

1  we mean transgender identification was
2  classified in the DSM as a disorder.  I
3  don't know that for a fact.  I'm not an
4  expert in psychology.  So I -- but that's
5  my interpretation.  I think that's
6  reasonable.  I think that's what that
7  article said, but I don't know for sure.
8      Q.  But you included the remark "Up
9  until Obama, it was always a mental
10  defect" in an effort to make
11  Representative Butler out to be a bigoted
12  idiot; correct?
13      MR. FLETCHER:  Object to form,
14  Counsel.
15      Q.  You can answer.
16      A.  No.
17      Q.  Why did you include it?
18      A.  I included it in the context of
19  the other remarks as indication of -- as
20  indicators of Mack Butler's general
21  discomfort with or hostility towards the
22  notion of someone being transgender.
23  He's quoting this approvingly with the

Page 318

1  implication that, I suppose -- I don't
2  know why Obama is mentioned there, but I
3  assume that that sort of makes it sound
4  like it was a political decision to, and
5  not a medical one.  So it sounds like
6  he's casting legitimate -- or casting
7  aspersions on the -- or sorry.  He's
8  undermining the -- casting doubt on the
9  legitimacy of that diagnosis, or that
10  change in the DSM, if that's what he's
11  referring to.
12     Q.  I'd like to ask you about the
13  law that you mentioned.  This is HB391.
14  And I'm going to introduce that as
15  Exhibit 32.
16  (Exhibit 32 was marked for identification
17  and is attached.)
18     A.  HB391?
19     Q.  Yes.  And can you see that on
20  your screen?
21     A.  I can.
22     Q.  I'm going to scroll down to page
23  4 of this.  "A public K-12 school may not

Page 319

1  allow a biological female to participate
2  on a male team if there is a female team
3  in a sport.  A public K-12 school may
4  never allow a biological male to
5  participate on a female team."
6        This law doesn't refer to
7  transgender status; correct?
8     A.  Well, this particular sentence
9  does not.
10     Q.  It classifies only based on
11  biological sex.  Is that right?
12     A.  I mean, in the context of -- I
13  mean, the words here do not refer to
14  gender -- gender identity.  The larger
15  context, I think, is tied to that.
16     Q.  No matter what one's gender
17  identity is, one's participation is
18  classified by biological sex?
19     A.  In this -- in the two sentences
20  that you have highlighted here, there's
21  no mention of gender identity, so it is
22  based on biological -- so it depends on
23  how biological female is defined.  But --

Page 320

1  and that's linked, obviously, to the
2  official definitions of biological sex in
3  other -- in law and in other legislation.
4  But as it's -- there is -- the words here
5  don't refer to gender identity.
6     Q.  And this provision doesn't ban
7  anyone from playing sports.  Is that
8  correct?
9     A.  This -- I don't know.  I mean,
10  this -- this particular two sentences
11  that I see don't seem to --
12     Q.  You cited this bill in your
13  report; correct?
14     A.  Yes.
15     Q.  So, are you saying that you
16  don't know what's in the bill?
17     A.  Well, you just brung it up here,
18  and I couldn't --
19     Q.  Sure.  So Section 1 is findings.
20  You see that?
21     A.  Yeah.
22     Q.  And so we'll skip the findings
23  for now.  Section 2 is the operative --

Page 321

1        MR. FLETCHER:  Would you please
2  let the witness read the --
3        MR. MILLS:  Yeah.  I'm going
4  through it.  I'm going through it.
5        MR. FLETCHER:  Let the record
6  reflect the findings --
7        MR. MILLS:  No.  I'm not asking
8  about the findings.
9        MR. FLETCHER:  -- has time to
10  read the findings --
11        MR. MILLS:  I'm not asking about
12  the findings.
13        MR. FLETCHER:  You're asking
14  about the bill.  Obviously, the
15  findings --
16        MR. MILLS:  No.  I'm not asking
17  about the findings.  Please stop
18  interrupting or we're going to have to
19  continue this deposition for a second
20  day.  If the witness needs to know about
21  the findings, he can ask.  Please stop
22  interrupting, Counsel.
23     Q.  (By Mr. Mills)  You see 2(a), the

81 (Pages 318 - 321)

1  substantive provision here?
2      A.  I do.
3      Q.  There's not really many
4  additions or subtractions, which is why I
5  didn't focus on it.  But you're welcome
6  to look at it if that would be helpful.
7      A.  I've read it.  You can scroll
8  down.
9      Q.  And then you see the rest of the
10  bill here.
11      A.  Right.
12      Q.  So I've focused on the main
13  addition of HB391, which is number 2
14  here.
15      A.  Right.
16      Q.  But you agree it classifies
17  individuals' participation on teams by
18  biological sex; correct?
19      A.  Yes.
20          MR. FLETCHER:  Object.
21      A.  That's right.
22      Q.  And so when your report uses the
23  term "transgender sports ban," that

1  reflects your bias that men should be
2  able to play in women's sports.  Is that
3  right?
4          MR. FLETCHER:  Object to form,
5  Counsel.
6      Q.  You can answer.
7      A.  No.  No, it does not.  In my
8  references to particular sorts of
9  policies, I use sort of commonly --
10  common labels for them.  So for example,
11  for conscience laws, I refer to them as
12  conscience laws because that's how
13  they're commonly -- most commonly
14  referred to.  And the most common and
15  sort of shorthand for these sorts of laws
16  is transgender sports ban.  It's banning
17  -- yeah, that's the reason I use that
18  term.
19      Q.  By "common," you mean among --
20  among what group?
21      A.  I mean in the public discourse.
22      Q.  You think conservative groups
23  use the term "transgender sports ban"?

1      A.  I imagine that there are
2  differences in -- there are always going
3  to be differences in different groups.
4  And obviously, labels for laws are a --
5  are, for example, like the Vulnerable
6  Child and -- Compassion and Protection
7  Act, we refer to it as that because that
8  is the label that the -- that it has come
9  to be known by, but opponents of it don't
10  necessarily refer to it that way.
11      Q.  But you'd agree this law does
12  not actually ban anyone from playing
13  sports?
14      A.  If there's no -- my reading here
15  is if there's no male team available at a
16  public K through 12 school, there's no
17  carveout for a biological male being able
18  to participate on a female team.  So I
19  can imagine a circumstance in which a
20  biological male couldn't participate in
21  sports.
22      Q.  And you think that the reason
23  would be this law bans it, not because

1  there's not a team?
2      A.  Oh, well, that -- that there's
3  not a team?  Well, this -- this other --
4  absent the law, if I understand it
5  correctly, the male would be at least
6  legally permitted to participate on the
7  female team, but the law would prohibit
8  that, if I understand correctly.
9      Q.  Okay.  The law permits
10  biological females to participate on a
11  male team if there is no female team;
12  correct?
13      A.  That is -- I believe that's
14  correct, yeah.
15      Q.  Does this permission suggest
16  that something other than hostility
17  towards transgender persons motivated the
18  bill?
19      A.  That the -- the -- if the female
20  team -- that -- specifically that clause?
21      Q.  That's right.
22      A.  "Something other"?  I don't
23  think it undermines the -- treating this

Page 326

1    bill as an indicator of -- obviously, for
2    any law, there are multiple rationales,
3    multiple motivations. But I don't think
4    it really undermines the -- treating this
5    as an indicator of -- of relative
6    hostility towards transgender rights or
7    openness.
8       Q.  Even though it allows some
9    transgender participation on the other
10   biological sex team?
11      A.  Yeah. There's always -- every
12   -- you know, any policy choice is always
13   -- you can think of it as a point and a
14   space, you know, cut -- dividing -- it
15   could be more or less severe. So it's
16   not the most severe.
17      Q.  But it couldn't possibly be that
18   the Alabama Legislature wanted to protect
19   biological females from biological males
20   in sports; right?
21      A.  Did you say "it couldn't
22   possibly be"?
23      Q.  Yeah.

Page 327

1       A.  No. I think that's a possible
2    motivation for this law.
3       Q.  Caitlyn Jenner has supported
4    sex-based distinctions in sports leagues.
5    Why do you, a white cisgender male, know
6    better than Caitlyn Jenner why people
7    support or oppose boys in girls' sports?
8          MR. FLETCHER: Object to form.
9       Q.  You can answer.
10         MR. FLETCHER: Argumentative.
11      Q.  You can answer.
12         MR. FLETCHER: Completely
13   irrelevant.
14      Q.  You can answer.
15      A.  I'm sorry. Why do I know
16   better? Well, why do I -- sorry. Why do
17   I know better than Caitlyn Jenner what's
18   the -- what's the right policy in this
19   case? I'm not opining on what's the
20   right policy. I'm opining as a political
21   scientist on the interpretation of and
22   meaning of these laws, so.
23      Q.  So you think Caitlyn Jenner has

Page 328

1    hostility towards transgender persons?
2          MR. FLETCHER: Object to form,
3    mischaracterizes testimony,
4    argumentative.
5          MR. MILLS: Please stop
6    interrupting. You can say "objection"
7    and then be quiet.
8       A.  I don't -- I don't -- I don't
9    know very much about Caitlyn Jenner,
10   honestly. But I am resting my opinions
11   on this case on my training as a
12   political scientist, and in certain
13   respects, that gives me better expertise
14   than Caitlyn Jenner.
15      Q.  I'd like to show you an article
16   you cited in your report from the
17   Montgomery Advertiser. I'm going to mark
18   this as Exhibit 34. This is about the
19   top political stories of 2023.
20   (Exhibit 34 was marked for identification
21   and is attached.)
22      A.  I'm sorry. Did you say page 24?
23      Q.  No, no, no. Sorry. I'm

Page 329

1    introducing it as --
2       A.  Oh, I'm sorry.
3       Q.  And that's not even what I
4    meant. I'm introducing it as Exhibit 34.
5       A.  Got it.
6       Q.  So here is that article. This
7    is an article you relied on in your
8    report; correct?
9       A.  I believe so, yes.
10      Q.  So you relied on this opinion
11   piece from the Montgomery Advertiser in
12   forming your analysis?
13      A.  Yes. I -- this piece is an
14   opinion piece, and I relied on it, yes.
15      Q.  I'd like to scroll down to where
16   it talks about this law, apparently, on
17   page 3. You see the highlighted portion
18   there?
19      A.  Yes.
20      Q.  The last sentence -- the
21   headline number 3 is "Alabama politicians
22   target LGBTQ+ people." The third
23   sentence is, "A three-judge panel earlier

83 (Pages 326 - 329)

1    this year allowed Alabama's ban on
2    gender-affirming care to go into effect,
3    a decision currently under appeal."
4         Are you aware that the
5    three-judge panel decision referenced
6    here was the appellate decision in this
7    case?
8       A.  I was not aware of that.
9       Q.  Do you believe that that
10   decision was an attack on LGBTQ+ people
11   as this column suggests?
12      A.  The -- what I relied on this
13   piece for was highlighting the salience
14   of -- on legislation -- proposed
15   legislation and enacted legislation
16   targeting LGBT individuals.  So I don't
17   have an opinion on the decision in that
18   particular case.
19      Q.  Do you believe the three judges
20   who rendered that decision have hostility
21   toward LGBT rights?
22      A.  I don't have an opinion on that.
23      Q.  And do you believe that they

1    hate transgender people?
2       A.  I don't have an opinion on that.
3       Q.  The district judge in this case
4    allowed the State of Alabama to receive
5    internal e-mails from the federal
6    government, HHS.  Does he have an
7    anti-LGBT bias?
8       A.  I'm sorry.  Can you say that
9    again?  The district judge allowed
10   certain e-mails?
11      Q.  Allowed the defendants in this
12   case to receive internal e-mails from HHS
13   including from Admiral Rachel Levine.
14   Does the district judge have anti-LGBT
15   bias?
16      A.  And HHS in this context is
17   Department of Health and Human Services?
18      Q.  That's right.
19      A.  The U.S. Depart- --
20      Q.  That's right.
21      A.  I don't -- I don't have an -- I
22   don't have an opinion on that.
23      Q.  Do you believe that evangelical

1    Christians are bigoted?
2       A.  Do I -- do I believe that all --
3    that evangelical Christians are bigoted
4    across the board?  No.
5       Q.  You don't assert that your
6    analysis here proves that the Alabama
7    Legislature acted out of anti-transgender
8    bias, do you?
9       A.  Out of anti -- acted out of
10   anti-transgender bias.  I believe that --
11   you're talking about the passage of SB184
12   specifically?
13      Q.  That's right.
14      A.  I believe that -- that the --
15   that the passage of 184 -- or SB184 was
16   an expression -- was -- was an -- was
17   part of a larger effort targeting
18   transgender individuals or -- and
19   transgender rights specifically, and it
20   was designed or intended, as part of that
21   effort, to be a -- a -- the defense of
22   essentialists' understandings of sex and
23   gender, at least in part, and that was

1    understood to be part of the purpose of
2    the bill and that a -- that at least some
3    of the justifications for this larger
4    assault evince more general hostility
5    towards genre nonconformity per se.
6       Q.  I'd like to read you a quote.
7    "I believe marriage is between a man and
8    a woman.  I am not in favor of gay
9    marriage."
10         Does this statement evince
11   anti-LGBT bias?
12      A.  I do believe that it is -- well,
13   I don't know about that particular -- it
14   depends what the -- what the context for
15   "I believe that" -- the second statement,
16   "I believe that marriage is between a man
17   and a woman."  But in the larger context
18   for that quote, if I am recalling
19   correctly, if it's from Representative
20   Wes Allen -- is that correct?
21      Q.  Uh-huh.
22      A.  -- that it's in the context of
23   his declining to sign all marriage

Page 334

1   licenses out of an unwillingness to
2   participate in, or just give his legal
3   approbation to marriages between same-sex
4   couples.  And so taken in that context,
5   that is an expression of hostility to the
6   rights of LGBT or LG- -- you know,
7   same-sex couples.
8       Q.  When President Obama said the
9   same quote, it didn't evince anti-LGBT
10   bias?
11       MR. FLETCHER:  Counsel, I
12   believe we're at time.  Is that -- I
13   would like to request a time from the
14   court reporter.
15       THE COURT REPORTER:  We are past
16   seven hours.
17       MR. FLETCHER:  I'll have a
18   limited redirect.  If we could take a
19   five-minute break, that would ensure that
20   I can make it as efficient as possible
21   for us to get out of here.
22       (Break taken.)
23

Page 335

1   EXAMINATION BY MR. FLETCHER:
2       Q.  Good afternoon, Dr. Caughey.
3       A.  Good afternoon.
4       Q.  As you know, I'm James Fletcher,
5   representing the United States in this
6   matter.  I'm going to ask you some
7   questions in response to the testimony
8   you gave earlier.
9       Now, first of all, do you opine
10   on the legislative intent behind passing
11   SB184?
12       A.  No.
13       Q.  Do you opine on any legislators'
14   individual intent in passing SB184?
15       A.  No.
16       Q.  Do you opine on any legislator's
17   individual motivation in passing SB184?
18       A.  No.
19       Q.  Does your report opine on the
20   legislative findings of SB184?
21       A.  The legislative findings?  It
22   references one of the findings, but it
23   doesn't opine on their validity.

Page 336

1       Q.  And you testified earlier that
2   you're a political scientist.  Can you
3   just describe generally, what is it that
4   political scientists like you do?
5       A.  Well, I am a -- a political
6   scientist like me, I study primarily
7   American politics.  And in my research
8   role, I combine my background, knowledge,
9   and training on -- in political science,
10   both on the theoretical side and on the
11   substantive side, to -- with original
12   data collection and analyses of
13   qualitative data, quantitative data to --
14   for a variety of purposes.  Sometimes I
15   am just interested in measuring something
16   as well as I can.  But usually, I'm using
17   those measures to understand the
18   relationships between and -- and
19   understand the explanations or posit
20   explanations or evaluate explanations for
21   a particular political phenomenon.
22       Q.  And how does that compare to the
23   work you did for this report?

Page 337

1       A.  Largely very similar.  I did
2   background research in the scholarly
3   literature, in the secondary or
4   journalistic literature.  I did some
5   theoretical work conceptualizing relevant
6   variables, measuring those variables, and
7   evaluating the relationships between them
8   with an eye towards adjudicating between
9   different hypotheses or explanations,
10   rival explanations.
11       Q.  Okay.  And you testified earlier
12   about what was and was not included in
13   your healthcare paternalism index.  Do
14   you consider that index to be a reliable
15   indicator of the state's healthcare
16   paternalism?
17       A.  I do.
18       Q.  Why?
19       A.  It's composed of multiple items,
20   each of which is related to, or
21   conceptually related to -- conceptually
22   covers the -- the theoretical meaning of
23   paternalism.  But -- but in addition to

Page 338

1  that, by accumulating across four such
2  indicators that cover the range of --
3  that distinguish states at different
4  levels of paternalism, it provides us
5  with a useful and reliable way of
6  distinguishing states' relative weight
7  they put on medical paternalism versus
8  medical freedom.
9    Q.  Okay.  Thank you for your time
10  Doctor.
11       MR. FLETCHER:  And thank you,
12  Madam Court Reporter and counsel.  That
13  concludes my questioning.  I believe that
14  was five minutes or four minutes.  And we
15  can ask the court reporter.
16       THE COURT REPORTER:  Yeah.
17  4:23.
18       MR. MILLS:  Nothing further.
19
20       END OF DEPOSITION
21       (5:40 p.m. Eastern)
22
23

Page 339

1       C E R T I F I C A T E
2  STATE OF ALABAMA   )
3  COUNTY OF JEFFERSON )
4      I hereby certify that the above
5  and foregoing proceeding was taken down
6  by me by stenographic means, and that the
7  content herein was produced in transcript
8  form by computer aid under my
9  supervision, and that the foregoing
10  represents, to the best of my ability, a
11  true and correct transcript of the
12  proceedings occurring on said date at
13  said time.
14      I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action; nor am I in
17  anywise interested in the result of said
18  case.
19    /s/ Lane C. Butler
20    LANE C. BUTLER, RPR, CRR, CCR
21    CCR# 418 -- Expires 9/30/24
22    Commissioner, State of Alabama
23    My Commission Expires:  2/11/25

Page 340

1  Dr. Devin Caughey
2
3       May 13, 2024
4  RE:  Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.
5    5/1/2024, Dr. Devin Caughey (#6671365)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  LITSUP-GA@VERITEXT.COM
16   Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 341

1  Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.
2  Dr. Devin Caughey (#6671365)
3      E R R A T A S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Dr. Devin Caughey          Date
25

86 (Pages 338 - 341)

```
                                            Page 342
 1  Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.
 2  Dr. Devin Caughey (#6671365)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4    I, Dr. Devin Caughey, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____   _____
12  Dr. Devin Caughey            Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
```

Veritext Legal Solutions

877-373-3660                                          800.808.4958