# EXHIBIT 81



# FREEDOM IN THE 50 STATES

### AN INDEX OF PERSONAL AND ECONOMIC FREEDOM

**SIXTH EDITION | 2021**

**WILLIAM P. RUGER AND JASON SORENS**

**Exhibit**
007

CATO INSTITUTE

1

## ABOUT THE SIXTH EDITION

This 2021 edition of *Freedom in the 50 States* presents a completely revised and updated ranking of the American states on the basis of how their policies promote freedom in the fiscal, regulatory, and personal realms.

This edition again improves on the methodology for weighting and combining state and local policies to create a comprehensive index. Authors William Ruger and Jason Sorens introduce many new policy variables suggested by readers and changes in the broader policy environment (for example, vaping regulations). More than 230 policy variables and their sources remain available to the public on our website for the study (www.freedominthe50states.org).

In the 2021 edition, the authors have updated their findings to

- Provide the most up-to-date freedom index yet, including scores as of January 1, 2020.

- Add a new section analyzing how state COVID-19 responses have affected freedom since the pandemic began. This section also discusses significant policy changes and trends since the data cutoff, ensuring that readers have a strong sense of the state of freedom in the states today.

- Refresh their analysis of how the policies driving income growth and interstate migration have changed pre- and post–Great Recession.

In addition to providing the latest rankings as of the beginning of 2020, the 2021 edition provides annual data on economic and personal freedoms and their components back to 2000 (and for some variables, back to 1937 and up through the start of 2021).

Published by the Cato Institute and accompanied by demographic and economic data on each state, *Freedom in the 50 States* is an essential desk reference for anyone interested in state policy and in advancing a better understanding of a free society.

www.freedominthe50states.org

Where liberty dwells, there is my country.

—Benjamin Franklin

# FREEDOM IN THE 50 STATES

An Index of Personal and Economic Freedom

Sixth Edition

William P. Ruger
Jason Sorens



Copyright 2021 © William P. Ruger, Jason Sorens, and the Cato Institute.
All rights reserved.

Cover design and art direction by Jon Meyers.
Book design by Melina Yingling Enterline.
Printed in the United States of America.

To reach the authors of this publication or ask questions about state and local
policy, please contact the Cato Institute at 202-789-5200 or pr@cato.org.

ISBN: 978-1-952223-26-6 (paperback)
ISBN: 978-1-952223-27-3 (ebook)

Library of Congress Cataloging-in-Publication Data available.

Cato Institute
1000 Massachusetts Avenue, NW
Washington, DC 20001
www.cato.org

Disclaimer: The views and opinions expressed in this book are solely those of the authors
and do not necessarily reflect the position of Stand Together, the Charles Koch Institute, the
U.S. Navy, Saint Anselm College, or any other organization associated with them.

# CONTENTS

| | |
|---|---:|
| **Introduction** | 1 |
| | |
| **Part 1: Dimensions of Freedom** | 14 |
| Fiscal Policy | 17 |
| Overall Fiscal Policy Ranking | 34 |
| Regulatory Policy | 37 |
| Overall Regulatory Policy Ranking | 60 |
| Overall Economic Freedom Ranking | 64 |
| Personal Freedom | 67 |
| Overall Personal Freedom Ranking | 98 |
| Overall Freedom Ranking | 102 |
| | |
| **Part 2: Politics of Freedom** | 118 |
| | |
| **Part 3: Freedom State by State** | 150 |
| | |
| Appendix A: Dimension, Category, and Variable Weights | 276 |
| Appendix B: Alternative Indexes | 280 |
| Further Reading | 300 |
| Acknowledgments | 302 |
| About the Authors | 303 |

# INTRODUCTION

**T**his study ranks the American states according to how their public policies affect individual freedoms in the economic, social, and personal spheres. Updating, expanding, and improving on the five previous editions of *Freedom in the 50 States*, the 2021 edition examines state and local government intervention across a wide range of policy categories—from taxation to debt, from eminent domain laws to occupational licensing, and from drug policy to educational choice.

For this new edition, we have added several more policy variables while improving the way we measure land-use regulation, minimum-wage regulation, and (for the alternative indexes) abortion policy. Our time series now covers the 20 years in the period 2000–2019. Finally, we continue to investigate the causes and consequences of freedom with detailed, up-to-date methods.

We began this project to fill a need: *Freedom in the 50 States* was the first index at any level to measure both economic and personal freedoms and remains the only index to do so at the state level. We also strive to make it the most comprehensive and definitive source for economic freedom data on the American states.

Measuring freedom is important because freedom is valuable to people. It is both a means to their flourishing or "life projects" and an end in itself. At the very least, it is valuable to those whose choices are restricted by public policy. Although the United States has made great strides toward respecting each individual's rights regardless of race, sex, age, or sexual preference, some individuals face growing threats to their interests in some jurisdictions. Those facing more limits today include smokers, builders and buyers of affordable housing, aspiring professionals wanting to ply a trade without

8

paying onerous examination and education costs, and less-skilled workers priced out of the market by minimum-wage laws. Moreover, although the rights of some have increased significantly in certain areas, for the average American, freedom has declined generally because of federal policy that includes encroachment on policies that states controlled 20 years ago.

In the American system, even "benefit to others" cannot justify trampling on certain freedoms. Books may not be banned simply because the ideas and arguments they present offend some readers. Racial segregation would be unjustified even in the unlikely event it was somehow considered efficient. Likewise, state and local governments ought to respect basic rights and liberties, such as the right to practice an honest trade or the right to make lifetime partnership contracts, whether or not respecting these rights "maximizes utility." Some infringements on these rights may seem relatively small, almost harmless, or only symbolically significant, such as laws that allow police to build automated license plate databases that track drivers, or laws that authorize DNA collection from nonviolent arrestees without a court hearing. Nevertheless, even minor infringements on freedom can erode the respect for fundamental principles that underlie our liberties. The idea of respecting the moral dignity of individuals through the legal protection of their rights is underrated, and its erosion by thinking of people abstractly or primarily as members of groups underappreciated. This index measures the extent to which states respect or disrespect these basic rights and liberties; in doing so, it captures a range of policies that threaten to chip away at the liberties we enjoy.

Our index encompasses both economic and personal freedoms because the two sets of freedoms are complementary. A state scoring high in economic freedom but not in personal freedom—a hypothetical American Singapore—would not be a really free state in the way the liberal tradition understands it. Nor would a state high in personal freedom but low in economic freedom—an American Argentina—provide the liberal conditions necessary for human flourishing in the broadest sense.

Even to economist Milton Friedman, a mere "economic freedom index" would not be a real freedom index. In his 1962 book *Capitalism and Freedom*, Friedman explores the connection between economic and political freedoms, finding that political freedom in the absence of economic freedom is unlikely to last. He writes, "It is a mark of the political freedom of a capitalist society that men can openly advocate and work for socialism,"[1] while a socialist society does not permit the reverse.

Similarly, at the state level, Americans will derive more value from their

---

1   Milton Friedman, "The Relation between Economic Freedom and Political Freedom," chapter 1 in *Capitalism and Freedom* (Chicago: University of Chicago Press, 1962), p. 16.

economic freedom the more extensive are their personal freedoms, and vice versa. That does not mean that states scoring high on a particular dimension of freedom—fiscal, regulatory, or personal—will also score high on the others, but Friedman's work suggests that the different dimensions of freedom are most valuable in combination.

Several different audiences have found the information and analysis in this book useful. We believe this book will continue to be valuable to the following readers:

- State legislators and governors, their staffs, and local policymakers interested in liberty can use the data and rankings to see where their states stand relative to other states and to determine where real improvements can be made. Although policymakers are better situated than we are to make precise judgments about the benefits of specific legislation, this book does offer reform ideas tailored to each state. These ideas are contained in the state profiles located at the end of the study.
- Scholars can use the index to model politics and policy outcomes in areas such as economic growth and migration. These data are also a valuable resource for teachers and students, providing easy access to information that can be used for policy analysis or statistical projects.[2]
- Businesses considering new investment opportunities or relocation can use the data to analyze state tax and regulatory regimes and the relative openness and toleration that attract highly productive employees.
- Reporters can use the data to understand their states' policy debates in a national context. They could also use them to hold elected officials accountable for infringements on freedoms and state performance.
- Individual citizens can use the data to better understand what their state governments are doing and thus be better-informed participants in the democratic process. The data are also useful to those seeking to move to a freer state, something we have observed anecdotally as happening more and more.

This book scores all 50 states on their overall respect for individual freedom, and also on their respect for three dimensions of freedom considered separately: fiscal policy, regulatory policy, and personal freedom. To calculate these scores, we weight public policies according to the estimated costs

---

2.   See our State Policy Database at http://www.statepolicyindex.com or footnote 18 in this book for citations of research using the data.

that individuals suffer when government restricts their freedoms. However, we happily concede that different people value aspects of freedom differently. Hence, our website provides the raw data and weightings so that interested readers can construct their own freedom rankings; this information is available at www.freedominthe50states.org.

## DEFINING FREEDOM

"Freedom" is a moral concept. What most people mean by freedom is the ability to pursue one's ends without unjust interference from others. Of course, reasonable people can disagree about what counts as unjust interference, and it is also controversial whether freedom in this sense ought to trump other desiderata, such as social welfare, equality of outcome, or equity. These questions cannot be answered in a value-neutral way, but citizens and policymakers must try to answer them nonetheless. We are forthright about our moral philosophy so that we can be precise about what counts as "freedom" for us, but we recognize that others may define freedom differently. We have made the data and weights available online so that people can alter our index to fit their own conceptions of freedom. We consider it an open, but interesting, question whether freedom is in any way related to indicators of aggregate social welfare, such as income growth and migration. Part 2 takes up this question in more detail.

We ground our conception of freedom on an individual rights framework. In our view, individuals should not be forcibly prevented from ordering their lives, liberties, and property as they see fit, as long as they do not infringe on the rights of others.[3] This understanding of freedom follows from the natural rights liberal thought of John Locke, Immanuel Kant, and Robert Nozick, but it is also consistent with the rights-generating rule utilitarianism of Herbert Spencer and others.[4] From the Declaration of Independence, through the struggles for the abolition of slavery, and up to the 20th century, this conception of freedom was the traditional one in the United States. As Justice Louis Brandeis wrote in his 1928 dissent in *Olmstead v. United States,* "The makers of our Constitution . . . conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."[5]  In the context of the modern state, this philosophy engenders a set of normative policy prescriptions that political theorist Norman Barry

---

3.  We recognize that children and the mentally incompetent must be treated differently from mentally competent adults, and also that some rights may not be alienated even by consenting adults.

4.  See John Locke, *Second Treatise of Civil Government;* Immanuel Kant, *Foundations of the Metaphysics of Morals;* Robert Nozick, *Anarchy, State, and Utopia* (New York: Basic Books, 1974); and Herbert Spencer, *Social Statics, or the Conditions Essential to Happiness Specified, and the First of Them Developed* (London: John Chapman, 1851)

5.  *Olmstead v. United States,* 277 U.S. 438 (1928).

11

characterized as "a belief in the efficiency and morality of unhampered markets, the system of private property, and individual rights—and a deep distrust of taxation, egalitarianism, compulsory welfare, and the power of the state."[6]

In essence, this index attempts to measure the extent to which state and local public policies conform to this ideal regime of maximum, equal freedom.[7] For us, the fundamental problem with state intervention in consensual acts is that it violates people's rights. To paraphrase Nozick, in a free society the government permits and protects both capitalist and noncapitalist acts between consenting adults.[8] Should individuals desire to "tie their own hands" and require themselves to participate in social insurance, redistributive, or paternalist projects, they should form voluntary communities for these purposes.[9]

Those who endorse the "law of equal freedom" at the heart of classical liberalism and the political order espoused in this index do not necessarily reject the notion of "constraints." Neither the liberal order nor even the libertarian approach requires that one take an ethically or normatively neutral stance about how people use their freedom. For instance, it is perfectly consistent to reject "libertinism" ("do whatever you want so long as you do not hurt anyone else, whether it be snorting cocaine or engaging in casual sex") and even make strong moral claims about the proper way to live a virtuous, flourishing life without sacrificing one's credentials as a friend of liberty.[10] Libertarianism does not imply libertinism, and the two may even stand in some tension, if Steven Pinker is correct that the "civilizing process" has encouraged the adoption of new moral and mannerly constraints to allow people to interact more peacefully with each other without Leviathan.[11] Supporting the right of consenting adults to use drugs or of bakers to contract with bakeries to employ them more than 60 hours a week does not require judging those behaviors to be wise or even morally justified. Therefore, the freedom index makes no claim about the wisdom or morality of the behaviors that states should allow adults to pursue freely. It is left to philosophers, theologians, and all of us as

6   Norman Barry, "The Concept of 'Nature' in Liberal Political Thought," *Journal of Libertarian Studies 8*, no. 1 (1986), 16n2

7   The "equal freedom" that persons enjoy in a free society is, for us, equality of rights and equality before the law, not equality of opportunities or "positive freedom." On positive freedom, see Isaiah Berlin, "Two Concepts of Liberty," in *Four Essays on Liberty* (Oxford: Oxford University Press, 1969).

8   Nozick, *Anarchy, State, and Utopia*, p. 163.

9   Almost all real-world governments do not constitute voluntary communities because their constitutions do not enjoy the unanimous consent of the governed. Homeowners' associations, by contrast, do in theory fit into this category.

10  Elsewhere we define libertinism more specifically as "radically indifferent to the choices that people make with their freedom. This line of thinking holds that as long as an act is consensual and respects at least one truth—the inviolability of the person's fundamental right to choose how to use his or her person and property—not only should the law not get involved, but there is also no ground for moral criticism of the act." See William Ruger and Jason Sorens, "The Case for 'Virtue Libertarianism' Over Libertinism," Reason.com, June 9, 2016.

11  Steven Pinker, *The Better Angels of Our Nature: Why Violence Has Declined* (New York: Viking, 2011).

moral agents to make arguments about the legitimacy of particular moral constraints.[12] However, we think the evidence of human experience strongly suggests that freedom is more likely to survive if there is a supportive moral ecology that emphasizes respect for the moral dignity of all people, the importance of personal responsibility (including an active concern about minimizing negative externalities), thrift, probity, temperance, benevolence, courage (which in this world might mean opposing "safetyism" and the "precautionary principle"), humility, and other traditional and bourgeois virtues.

Although our belief in limited government and a free society is based on the moral dignity of each human being, empirical evidence suggests that the protection of individual rights tends to foster economic growth and the coinciding improvements in people's living standards. Economist Robert Lawson explains the relationship between economic freedom and economic growth:

> Numerous studies have shown that countries with more economic freedom grow more rapidly and achieve higher levels of per-capita income than those that are less free. Similarly, there is a positive relationship between changes in economic freedom and the growth of per-capita income. Given the sources of growth and prosperity, it is not surprising that increases in economic freedom and improvements in quality of life have gone hand in hand during the past quarter of a century.[13]

We also recognize that freedom, properly understood, can be threatened as much by the weakness of the state as by overbearing state intervention. Individuals are less free when they have reason to fear private assaults and depredations, and a just government punishes private aggression vigorously. However, this book focuses on threats to individual liberty originating in the state. Therefore, we do not code the effectiveness of state governments in reducing rights violations. For instance, we do not calculate measures of the efficacy of state police and courts or of violent and property crime rates.[14] Thus, our "freedom index" does not in theory capture all aspects of

12   We consider ourselves to be "virtue libertarians" (a term we have adopted as the result of many conversations over the years about our particular "conservative libertarian" brand of ethical and political thinking)—espousing strong support for a libertarian political order but also strong convictions about what a flourishing, moral life demands and how we ought to use our freedom (with proper humility, of course, about our ability to know with any certainty what the best life is for any individual or for people in general). We also think that certain behaviors are more consistent than others with the preservation and security of a free society. Our approach owes much to the work of Frank Meyer, Albert J. Nock, and Walter Block.

13   Robert A. Lawson, "Economic Freedom and the Wealth and Well-Being of Nations," in *The Annual Proceedings of the Wealth and Well-Being of Nations, 2009–2010*, vol. 2, ed. Emily Chamlee-Wright and Jennifer Kodl (Beloit, WI: Beloit College Press, 2010), pp. 65–80.

14   Measuring the efficacy and justice of criminal penalties, arrest procedures, and so forth with regard to deterrence, proportionality, retribution, rehabilitation, and the like is an extremely complex endeavor that deserves a lengthy treatment on its own. See Richard A. Posner, *The Economics of Justice* (Cambridge, MA: Harvard University Press, 1981). See, for example, the CIRI Human Rights Dataset, http://ciri.binghamton.edu.

13

freedom, and we encourage readers to use our scores in conjunction with other indicators when assessing government effectiveness or quality of life. At the same time, we do attempt to capture the extent of "overcriminalization" by states, as well as the extent to which state civil liability systems put property rights at risk.

Our definition of freedom presents specific challenges on some high-profile issues. Abortion is a critical example. According to one view, a fetus is a rights-bearing person, and abortion is therefore almost always an aggressive violation of individual rights that ought to be punished by law. The opposite view holds a fetus does not have rights, and abortion is a permissible exercise of an individual liberty, which entails that legal regulation of abortion is an unjust violation of a woman's rights. A third view holds that a fetus gains personhood and rights at some threshold during its development, and at that point legal regulation is pro tanto justified. Rather than take a stand on one pole or the other (or anywhere between), we have not included the policy in the main freedom index. We have coded the data on state abortion restrictions and made them available online at http://www.statepolicyindex.com, and *Freedom in the 50 States* has a section that includes alternative indexes based on three of many possible state abortion regimes.

Another example is the death penalty. Some argue that murderers forfeit their own right to life, and therefore state execution of a murderer does not violate a basic right to life. Others contend that the right to life can never be forfeited, or that the state should never risk taking away all the rights of innocent individuals by falsely convicting them. State sentencing policies short of the death penalty could also be debated, such as lengthy periods of solitary confinement. We personally have serious reservations about some of these punishments, but we do not include them in the freedom index, although we have coded the death penalty data and made them available online at http://www.statepolicyindex.com.

It is important to note that the freedom index stands within the mainstream tradition in social science of measuring normatively desired phenomena, such as democracy,[15] civil liberties,[16] and human rights.[17] Clearly, our index will have intrinsic interest for classical liberals and libertarians. However, nonlibertarian social scientists will also benefit from the index because it is an open question how individual liberty relates to phenomena such as economic growth, migration, and partisan politics in the American states. In the same way, political scientists may value democracy for its own sake; however, they can also research empirically what causes democracy and

15.   See, for example, the Polity IV Project, http://www.systemicpeace.org/polity/polity4.htm.

16.   See, for example, the Freedom House Indicators, http://www.freedomhouse.org.

17.   See, for example, the CIRI Human Rights Dataset, http://www.humanrightsdata.com/p/data-documentation.html.

14

how democracy affects other phenomena. In fact, a broad range of social scientists and policy analysts have already used this index to investigate a range of interesting questions, including the effects on growth, migration, corruption, entrepreneurship, accident death rates, veterans' earnings, and state bond ratings.[18]

## CREATING THE INDEX

We started this project by collecting data on more than 230 state and local public policies affecting individual freedom as previously defined. For data other than taxes and debt, we code laws enacted as of January 1, 2020 (even if they come into force later). We also code these variables for 2000–2019 and, in some cases, for prior years. For taxes and debt, the latest available data covering states come from fiscal year (FY) 2020 and for local governments from FY 2019, which for most states ran from July 2019 to June 2020. To create a fiscal policy index, we assume that FY 2020 local debt, assets, and taxes are equal to FY 2019 local debt, assets, and taxes, whereas we have actual FY 2020 data for the state level. For each year's freedom index, we use tax and debt data from the subsequent fiscal year because state budgets are enacted in the year before. Thus, the most recent fiscal year featured in the index is FY 2020, because it represents the budget that had been enacted as of December 31, 2019, in each state.

For a few variables in the index that we do not have available for every year, we have to carry forward or back or interpolate the data for these policies to include them. The master spreadsheet available at http://freedominthe50states.org includes comment fields explaining exactly what was done in each of these cases.

The index also includes variables that do not differ across states for particular years. Usually, this lack of variation is a result of policies being nationalized at the federal level. Sometimes, this centralizing process occurs in a pro-freedom direction, as when the Supreme Court struck down Chicago's

18.   Noel D. Johnson et al., "Corruption, Regulation, and Growth: An Empirical Study of the United States," *Economics of Governance* 15, no. 1 (2014); 51–69; Richard J. Cebula, "The Impact of Economic Freedom and Personal Freedom on Net In-Migration in the US: A State-Level Empirical Analysis, 2000 to 2010," *Journal of Labor Research* 35, no. 1 (2014); 88–103; Nicholas Apergis, Oguzhan C. Dincer, and James E. Payne, "Live Free or Bribe: On the Causal Dynamics between Economic Freedom and Corruption in US States," *European Journal of Political Economy* 28, no. 2 (2012); 215–26; Rick Weber and Benjamin Powell, "Economic Freedom and Entrepreneurship: A Panel Study of the United States," *American Journal of Entrepreneurship* 6, no. 1 (2013); 67–87; Leland K. Ackerson and S. V. Subramanian, "Negative Freedom and Death in the United States," *American Journal of Public Health* 100, no. 11 (2010); 2163–64; Alberto Dávila and Marie T. Mora, "Terrorism and Patriotism: On the Earnings of US Veterans Following September 11, 2001," *American Economic Review* 102, no. 3 (2012), 261–66; Ariel R. Belasen, Rik W. Hafer, and Shrikant P. Jategaonkar, "Economic Freedom and State Bond Ratings," *Contemporary Economic Policy* 33, no. 4 (2015); 668–77; Wenchi Wei, "Fiscal Slack, Rule Constraints, and Government Corruption," *Public Administration Review* (2021); Joshua C. Hall, Donald J. Lacombe, and Timothy M. Shaughnessy, "Economic Freedom and Income Levels across U.S. States: A Spatial Panel Data Analysis," *Contemporary Economic Policy* 37, no. 1 (2019); 40–49; Dean Stansel and Meg Tuszynski, "Sub-National Economic Freedom: A Review and Analysis of the Literature," *Journal of Regional Analysis and Policy* 48, no. 1 (2017); 61–71.

gun ban and several states' sodomy laws, but more often it occurs in an anti-freedom direction, as when the Patient Protection and Affordable Care Act (PPACA) legislated health insurance community rating, guaranteed issue, prior approval of premiums, and an individual health insurance mandate nationwide. The last policy, the individual mandate, has since been ended by Congress. This is the only example in our data set in which Congress explicitly decentralized a policy to the states and increased freedom. Federalization of state policies has now happened frequently enough over our time series that we continue to include for the second time in the history of this study alternative freedom indexes that exclude all policies that were federalized at any point (see Appendix B). These indexes are particularly useful for investigating the freedom impact of state-level policymakers, rather than the freedom environment enjoyed by state residents.

The top-level data used for creating the index are available in a download-able spreadsheet at http://freedominthe50states.org. However, to obtain details on data sources and the construction of indexes (such as the eminent domain reform and renewable fuels standards indexes), interested readers should navigate to http://statepolicyindex.com and download the policy category spreadsheets. Each variable in the top-level spreadsheet has a code, such as "adebtpia" (state and local debt divided by adjusted personal income). The first letter of that code corresponds to the particular spreadsheet where its details may be found. Thus, "adebtpia" comes from the "a_fiscal_20.xls" spreadsheet for fiscal policies. Quite often, these spreadsheets contain additional policies not included in the freedom index, as well as data for additional years when available. Some state and local tax and spending data are available annually back to FY 1977 and quinquennially back to FY 1957. Some alcohol policies are available from 1937.

Because we want to score states on composite indexes of freedom, we need a way to weight and aggregate individual policies. One popular method for aggregating policies is "factor" or "principal component" analysis, which weights variables according to how much they contribute to the common variance—that is, how well they correlate with other variables.

Factor analysis is equivalent to letting politicians weight the variables, because correlations among variables across states will reflect the ways that lawmakers systematically prioritize certain policies. Partisan politics is not always consistent with freedom (e.g., states with more marijuana freedom offer less tobacco freedom; indeed, the correlation between tobacco freedom and marijuana freedom is −0.56, which is quite strong). The index resulting from factor analysis would be an index of "policy ideology," not freedom.[19]

19    Jason Sorens, Fait Muedini, and William P. Ruger, "U.S. State and Local Public Policies in 2006: A New Database," *State Politics and Policy Quarterly* 8, no. 3 (2008): 309–26.

Factor analysis is also not justified if important variables do not line up with a clear ideological position but have a major effect on freedom. That is in fact the case. Occupational licensing is neither more nor less prevalent in conservative versus progressive states. The lawsuit environment is also only weakly related to state ideology. In a factor-analysis approach, these variables would be discounted, but they are important variables in our study because of their economic impact.

Another approach, used in the Fraser Institute's "Economic Freedom of North America," is to weight each category equally, and then to weight variables within each category equally.[20] This approach assumes that the variance observed within each category and each variable is equally important. In the large data set used for the freedom index, such an assumption would be wildly implausible. We feel confident that, for instance, tax burden should be weighted more heavily than court decisions mandating that private malls or universities allow political speech.

To create the freedom index, we weight variables according to the value of the freedom affected by a particular policy to those people whose freedoms are at stake. Each variable receives a dollar estimate, representing the financial, psychological, and welfare benefits of a standardized shift of the variable in a pro-freedom direction to those people who enjoy more freedom. We base these values on estimates derived from the scholarly literature in economics and public policy that quantifies the effects of policies on behavior.

The "freedom value" of each variable represents the benefits only to those people whose freedoms have been respected. We do not include the benefits to those who wish to take away freedoms. For instance, private companies may benefit from receiving eminent domain transfers, but we count only the costs to those whose property has been taken away.

We do so because we do not want to create a utilitarian calculus. An index of social welfare is not the same as an index of freedom. We leave it an open question whether deprivations of freedom have net social benefits or costs. Of course, the costs of these deprivations to their victims would be *part* of a utilitarian calculus, but we do not want to foreclose future empirical research on whether government intervention that classical liberals consider unjust might nevertheless have some beneficial social consequences.

Our approach shares something in common with John Rawls's famous criticism of utilitarianism:

> As an interpretation of the basis of the principles of justice, classical utilitarianism is mistaken. It *permits* one to argue, for example, that slavery is unjust on the grounds that the

---

20.   "Economic Freedom of North America. 2020," Fraser Institute, 2021

advantages to the slaveholder as slaveholder do not counterbalance the disadvantages to the slave and to society at large burdened by a comparatively inefficient system of labor. Now the conception of justice as fairness, when applied to the practice of slavery with its offices of slaveholder and slave, would not allow one to consider the advantages of the slaveholder in the first place. . . . The gains accruing to the slaveholder, assuming them to exist, cannot be counted as in any way mitigating the injustice of the practice.[21]

That is precisely our position, not only with regard to the extreme example of slavery, but also to the more mundane but equally systematic deprivations of freedom in contemporary American society. Therefore, we count only the disadvantages to victims of government action.

In addition, we have techniques for including second-order victims in our calculations, who may not lose property or freedom directly, but who can be expected to suffer fear of having their rights violated in the future ("if they can do that to X, they can do that to me"). We discuss some of these techniques in the relevant sections that follow. Our raw data contain comments describing in detail the justification for each variable's weight and citing relevant sources.

Consistent with the method used in the fifth edition of the index, the value of the freedom affected by a given policy represents the dollar-terms value of the freedom to potential victims if a one-standard-deviation change in that variable were imposed nationwide. That common standard allows us to compare variables with each other and sum their costs. When we discuss the values of a particular freedom or, equivalently, the victim costs of restrictions on that freedom, we are referring to that metric. The following two equations express how each variable is standardized and then compiled to build the freedom index.

$$(1) \quad z_i = (-) \ \frac{(x_i - \overline{x})}{s_x}$$

$$(2) \quad f_i = \sum_{z=1}^{Z} z_i \frac{v_z}{\Sigma V}$$

The standardized variables $z \in Z$ represent the standard deviations freer than the mean of the raw variable x that each state $i$ is. The negative operator applies when higher values on the raw variable (for instance, cigarette

---

21.   John Rawls, "Justice as Fairness," *The Philosophical Review* 67, no. 2 (1958): 187–88 (emphasis in original).

taxes per pack) represent less freedom. The freedom score for each state $f_i$ is a weighted sum of values on the standardized policy variables, where the share of each variable's freedom value $v \in V$ in the sum of all variables' freedom values is the weight.

Again, the value of a freedom represents not just financial benefits, but consumer surplus, psychological benefits, and so on. These estimates are based on economic and policy research, but admittedly that research does not always allow very precise, certain estimates. We lack the resources to conduct in-depth statistical analysis on the social and economic consequences of each of the 178 top-level variables in the data set. Absent that capability for precision, our aim in this edition was to construct weights that are accurate within an order of magnitude. Using dollar values derived from the literature imposes greater discipline on our weighting choices than a rougher, more qualitative assessment of individual policies' significance like that used in the first two editions of this index.

With plausible variable weights, quantifying freedom permits researchers to investigate the relationship between freedom and other desiderata quantitatively and to judge changes in freedom over time objectively, rather than anecdotally. Measurements of freedom will improve as scientific estimates of the relative values of different freedoms improve, but taking the first step toward an objective assessment of different freedoms' values is essential to the social-scientific enterprise.

Thus, our index of freedom should be understood to represent each state's relative respect for freedom, as reflected in the value enjoyed by the "average" person who would otherwise be deprived of the freedoms we measure. However, each individual will value different policies differently, and for that reason, again, we encourage readers to apply their own weights and personalize the freedom index at http://www.freedominthe50states.org. Readers can download the master spreadsheet to create their own weights for each variable. We have used Excel's "comment" function to annotate important information about how variables were coded and weighted and what particular columns and rows mean. To investigate how any particular variable was created or coded, anyone can download the constellation of policy category spreadsheets at http://statepolicyindex.com. Variables and the policy category spreadsheets are named with an initial letter so as to make their location clear. For instance, debt as a percentage of income, "adebtpia," is found in the fiscal policy spreadsheet, "a_fiscal_20.xls." The individual policy category spreadsheets contain a "metadata" worksheet with detailed information on data sources.

20

# PART I
# DIMENSIONS OF FREEDOM

F or the purposes of the freedom index, this book identifies three overarching "dimensions" of freedom and further divides each dimension into categories composed of one or more of the variables used to generate the state scores and rankings. Following our objective weighting system described in the Introduction, variables in the fiscal policy dimension end up with 30.4 percent of the summed freedom values of all variables for the average state, variables in the regulatory policy dimension with 34.9 percent, and variables in the personal freedom dimension with 33.2 percent.[22] Taken individually, the categories may interest readers on core topics of concern, such as taxation, state debt, health insurance regulations, restrictions on alcohol sales, and so on. The following sections explain how each category was constructed and earned its respective weight within the index. Together, these categories make up the overall rankings, found in the section, "Overall Freedom Ranking."

22.   Because of the way we weight local taxation, the weights for the fiscal dimension vary by state. They range from 29.0 percent (for the state with the most competing jurisdictions) to 31.1 percent (for the state with the fewest competing jurisdictions). For further explanation, see the section titled "Local Taxation."

# FISCAL POLICY

**T**he fiscal policy dimension (Figure 1) consists of six variables: (a) state tax revenues, (b) government consumption, (c) local tax revenues, (d) government employment, (e) government debt, and (f) cash and security assets, each of which earns a significant weight because of its importance. The tax, debt, and assets variables are measured for each fiscal year, whereas the employment and consumption variables come from different sources and are available for the calendar year.

In the first three editions, we included fiscal decentralization (ratio of local to state taxation) as a separate variable. In the past three editions, we have done something more sophisticated. We have separated state and local taxation and assigned different weights to the two. See the following section for details.

**FIGURE 1** Fiscal Policy Weights



State Taxation **11.7%**

Government Consumption **8.2%**

Local Taxation **8.0%**

Government Employment **2.0%**

Government Debt **0.3%**

Cash & Security Assets **0.2%**

DIMENSIONS OF FREEDOM   17

24

# STATE TAXATION

**11.7%**   State and local tax burdens are measured by calculating
state and local tax revenues as a percentage of each state's
adjusted personal income, excluding taxes on motor fuel, mineral sever-
ance, alcohol sales, and tobacco sales.[23] Gas taxes are excluded because their
freedom impact is contestable. To some extent, these taxes approximate
user fees that are paid roughly in proportion to road use by the user, unlike
other taxes.[24] Some states have higher gas tax revenues simply because
their residents drive more, which is appropriate in a "user pays" system. Gas
taxes could also represent a policy choice by states separable from simply
paying for the roads. We take no stand here on the question of the optimal
gas tax. Severance taxes on natural resources such as hydrocarbons, miner-
als, and timber are excluded because they are paid by energy, mining, and
timber companies that pass the costs on to consumers worldwide, not just
to residents of the state where they operate. Alcohol and tobacco sales taxes
are excluded because they are included in the personal freedom dimension.
Personal income is the denominator because it represents the size of each
state's economy: it statistically correlates better with state and local reve-
nues and expenditures than any other commonly used measure of economic
size, such as gross domestic product (GDP).[25]

Adjusted personal income—which is personal income plus capital gains
plus taxable pensions and annuities minus supplements to wages and sala-
ries—is used to make our denominator as close as possible to the popular but
infrequently updated tax burden measure from the Tax Foundation.[26] The
taxation variables therefore roughly represent the average tax burden that
state taxpayers face.

We weight tax burden under the assumption that some taxpayers would
consent to pay their full tax burden conditional on others doing the same,
and some of what those taxes pay for does not diminish and may even
enhance freedom (e.g., protection of rights). Some even advocate a higher
tax burden, to pay for services they value.

To adjust for consented-to taxation, we take the following steps. First,
we assume that the current tax burden in each state represents the ideal
point of the median voter. Positive theories of democracy suggest that this

23.   The Census Bureau taxation measures used here exclude user fees (such as state university tuition) from the tax
      category, but include business, motor vehicle license, and alcohol license fees, which is appropriate for the freedom
      index.

24.   Some people would argue that gas taxes that merely pay for roads are too low, because a higher gas tax could
      discourage pollution, a negative externality. Others would argue that some states' existing gas taxes are too high,
      because state governments often divert them to nonroad uses.

25.   When total spending and total taxes are regressed on personal income, gross domestic product, and earnings by
      place of work, only the first correlates positively with the fiscal variables.

26.   Liz Malm and Gerald Prante, "Annual State-Local Tax Burden Ranking FY 2011," Tax Foundation, April 2, 2014.

25

is as good a guess as any about where public opinion lies.[27] Then, half of the voters would prefer a higher tax burden (and the services it would finance), and half would prefer a lower tax burden. Right away, we can slash the tax burden weight in half, because half of the voters nationally would not see the taxes they currently pay as any diminution of their freedom at all.

Now, this move assumes that the median-dollar taxpayer is the same as the median voter. That is unlikely to be the case. In fact, the median-dollar taxpayer is likely to be somewhat wealthier than the median voter and thus more ideologically conservative and more hostile to taxation. Thus, if anything, slashing the tax burden in half on these grounds is slightly too aggressive. We discuss our solution to this problem in the following section.

Before we solve for that issue, we continue with the exposition. Of at least half of the taxpayers who would prefer a lower tax burden, most would not see all of the taxes they pay as a diminution of their freedom. That is, conditional on others doing the same (absent the collective action problem), they would be fully willing to pay a lower tax burden that is greater than zero. To illustrate the logic, assume a normal probability density function over possible tax burdens, as seen in Figure 2.

On the x-axis of Figure 2 is tax burden, and on the y-axis is the proportion of the population corresponding to a particular view on tax burden. Fifty percent of the curve lies to the left or right of the mean of the tax burden distribution, which is 9.5, the actual national mean of state plus local tax burden. (We have drawn the curve under the assumption of a standard deviation of 2.375, a fourth of the mean, but nothing that follows hinges on this assumption. Note that the standard deviation of voters' views on taxation should be significantly greater than the standard deviation of actual state tax burdens, because each state tax burden roughly represents a median of a distribution.)

This means more simply that, we guess, half of the voters are satisfied with tax burdens of 9.5 percent or higher, while half of the voters prefer tax burdens below 9.5 percent. Taxes take away the freedom of only the second group. Also, the vast majority of the second group does not want to get rid of all taxes. Only part of their tax burden reduces their freedom.

How much of their tax burden is a loss of freedom? We could imagine a "loss curve" that looks like a mirror image of the left side of the normal density function. In other words, those who want zero taxation will see all 9.5 percent of income taxed away as a loss of freedom; those who want taxation of 2.5 percent of income will see 7.0 percent of income taxed away as a loss of freedom, and so on. Half of all the taxes that people who prefer lower taxes pay does not take away their freedom, if we assume a normal distribu-

---

27   Anthony Downs, *An Economic Theory of Democracy* (New York: Harper, 1957).

26



**FIGURE 2** Normal Curve with Median at 9.5

tion of preferences over taxes. (The area under the loss curve is 0.5, like the area under the left side of the normal curve.) So only 4.75 percent of personal income, in total, is a loss to those who prefer lower taxation. We can divide the tax burden's weight by 2 again, or by 4 in total. Then, we multiply by 1.1 to account for the fact that the median taxpayer is richer than, and likely more anti-tax than, the median voter. Finally, we multiply by 0.94 because the federal deduction for state and local taxes returned before the Tax Cuts and Jobs Act of 2017, on average, 6.0 percent of state and local taxes paid to taxpayers. When data become available on the impact of that legislation on the value of the state and local tax deduction from 2019 forward (when the change in the deductibility went into effect), we will weight the tax variables higher because of the reduction of federal deductibility in the act.

The values in Table 1 represent the number of standard deviations better (lower tax) than the 2000–2019, 50-state average. Vermont looks abnormally poor on state taxes and good on local taxes because the state classifies all of the property tax as a state tax, even though towns do have some control over the local rate. Because we reward states for fiscal decentralization, the net effect is to depress Vermont's fiscal policy and overall freedom score somewhat.

**TABLE 1**

| Rank | State | State Tax Burden Score, 2019 |
|---|---|---|
| 1. | Alaska | 2.83 |
| 2. | New Hampshire | 1.95 |
| 3. | Texas | 1.61 |
| 4. | Florida | 1.60 |
| 5. | South Dakota | 1.52 |
| 6. | Wyoming | 1.52 |
| 7. | Tennessee | 1.15 |
| 8. | Colorado | 1.04 |
| 9. | Missouri | 0.97 |
| 10. | Georgia | 0.80 |
| 11. | South Carolina | 0.80 |
| 12. | Oklahoma | 0.71 |
| 13. | Ohio | 0.64 |
| 14. | Louisiana | 0.55 |
| 15. | Montana | 0.52 |
| 16. | Virginia | 0.48 |
| 17. | Alabama | 0.43 |
| 18. | Arizona | 0.36 |
| 19. | North Dakota | 0.33 |
| 20. | Washington | 0.28 |
| 21. | Pennsylvania | 0.26 |
| 22. | Nebraska | 0.25 |
| 23. | Illinois | 0.12 |
| 24. | North Carolina | 0.11 |
| 25. | Idaho | 0.08 |
| 26. | Nevada | 0.05 |
| 27. | Michigan | −0.10 |
| 28. | Maryland | −0.13 |
| 29. | Indiana | −0.16 |
| 30. | Massachusetts | −0.27 |
| 31. | Oregon | −0.28 |
| 32. | Rhode Island | −0.31 |
| 33. | Kentucky | −0.33 |
| 34. | Connecticut | −0.37 |
| 35. | Utah | −0.37 |
| 36. | New Jersey | −0.38 |
| 37. | Kansas | −0.40 |
| 38. | Wisconsin | −0.42 |
| 39. | Iowa | −0.45 |
| 40. | New Mexico | −0.48 |
| 41. | Maine | −0.63 |
| 42. | New York | −0.64 |
| 43. | West Virginia | −0.71 |
| 44. | Mississippi | −0.85 |
| 45. | California | −0.94 |
| 46. | Arkansas | −1.05 |
| 47. | Minnesota | −1.95 |
| 48. | Delaware | −2.05 |
| 49. | Vermont | −2.92 |
| 50. | Hawaii | −3.46 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# GOVERNMENT CONSUMPTION

**8.2%**

The government consumption variable (Table 3) represents spending on government operations (wages and salaries and goods and services for the state's own use). We use this variable because new research suggests that government consumption crowds out private-sector income growth, even when it is funded by rents, such as federal grants or mineral revenues, rather than by taxation or debt.

A large literature exists on the size of government and economic growth. Bergh and Henrekson survey the literature and find a robust association of government spending with subsequent growth in rich countries: for every additional percentage point of GDP in government spending, annual average growth declines by at least 0.05 percentage points.[28]  This correlation is in addition to the effects of taxation. We look at the effects of a standard-deviation increase in government consumption and investment as a share of personal income over 10 years, assuming the 0.05-percentage-point relationship. We calculate the discounted forgone growth over 10 years assuming a social discount rate of 5 percent. (Using a finite time horizon is necessary to impose finiteness on the number, but endogenous growth theory also suggests that the growth rate benefit of any exogenous variable dissipates eventually when per capita income reaches a new steady state—this is likely to happen over the course of a business cycle.) Then, we divide by two because government employment presumably captures some of the same effects that other studies find via government spending, and we want to avoid double-counting.

28.   A. Bergh and M. Henrekson, 2011, "Government Size and Growth: A Survey and Interpretation of the Evidence," *Journal of Economic Surveys* 25, no. 5 (2011): 872–97.

**TABLE 2**

| Rank | State | Government Consumption Score | | Rank | State | Government Consumption Score |
|------|-------|---------------|---|------|-------|---------------|
| 1. | Florida | 1.89 | | 26. | Arizona | 0.61 |
| 2. | Pennsylvania | 1.87 | | 27. | Kentucky | 0.55 |
| 3. | Connecticut | 1.86 | | 28. | Louisiana | 0.44 |
| 4. | New Hampshire | 1.85 | | 29. | California | 0.44 |
| 5. | Massachusetts | 1.74 | | 30. | Wisconsin | 0.42 |
| 6. | Maryland | 1.50 | | 31. | Utah | 0.38 |
| 7. | Virginia | 1.23 | | 32. | Vermont | 0.31 |
| 8. | New Jersey | 1.22 | | 33. | Kansas | 0.20 |
| 9. | Nevada | 1.18 | | 34. | Hawaii | 0.17 |
| 10. | Tennessee | 1.18 | | 35. | North Carolina | 0.04 |
| 11. | Indiana | 1.11 | | 36. | Washington | 0.00 |
| 12. | Illinois | 1.08 | | 37. | Alabama | −0.04 |
| 13. | Maine | 1.06 | | 38. | North Dakota | −0.10 |
| 14. | Minnesota | 1.05 | | 39. | New York | −0.23 |
| 15. | South Dakota | 1.04 | | 40. | West Virginia | −0.27 |
| 16. | Colorado | 1.04 | | 41. | Oregon | −0.50 |
| 17. | Michigan | 1.04 | | 42. | Iowa | −0.54 |
| 18. | Georgia | 1.02 | | 43. | Delaware | −0.62 |
| 19. | Missouri | 0.97 | | 44. | South Carolina | −0.68 |
| 20. | Rhode Island | 0.93 | | 45. | Nebraska | −0.85 |
| 21. | Texas | 0.80 | | 46. | Oklahoma | −0.88 |
| 22. | Idaho | 0.77 | | 47. | Mississippi | −0.89 |
| 23. | Arkansas | 0.70 | | 48. | New Mexico | −1.68 |
| 24. | Montana | 0.67 | | 49. | Wyoming | −2.00 |
| 25. | Ohio | 0.64 | | 50. | Alaska | −2.48 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# LOCAL TAX

**8.0%**   We separate local taxation to take account of fiscal decentralization. Fiscal decentralization affects freedom in that when more taxes are raised at the local level, residents may have more choice over their tax burden and public services. They can more easily vote with their feet—that is, move to a jurisdiction with their preferred policy mix—at the local level than the state level.

But that very ability to foot-vote varies not just by how much revenue is raised at the local level, but by the number of local jurisdictions. If local governments are spatially large, it is difficult for residents to exercise choice. When a city like Houston annexes other independent municipalities, it becomes more difficult for movers to the area to choose a jurisdiction to their liking. Hawaii's single statewide school district prevents parents from moving to a district where they think the schools are better run. Because the relevant decision for a homeowner is typically over local jurisdictions within driving distance to a place of employment, the metric for variety of choice that we use is the effective number of local jurisdictions per square mile of privately owned land (we exclude publicly owned land because it is presumably not developable), in log points (the natural log is taken to deal with skewness and to capture diminishing marginal effects).

"Effective number of local jurisdictions" counts up the weighted sum of general-purpose local governments in each state, where the weights are the percentage of local tax revenue raised by each local government tier. For instance, if a state has 10 counties and 100 municipalities, and counties raise 40 percent of local taxes while municipalities raise 60 percent, then the state's effective number of local jurisdictions is 10*0.4+100*0.6=64. We then divide that number by the number of square miles of private land in the state, then take the natural logarithm to reduce skew in the distribution. (This also helps large states like Nevada and Texas relative to the New England states.)

The variable for the effective number of local jurisdictions per square mile determines the weight on the local taxation variable, which therefore varies by state. It is the only variable in the index with a weight that varies by state. (The weight for local taxation reported in Figure 1 is the average for all 50 states over the 2000–2019 period.) The idea here is that high decentralization (high local taxation relative to state taxation) matters less when there are fewer jurisdictions per square mile and matters more when there are more. Specifically, we multiply the standard taxation weight by 0.75 for the state with the most jurisdictions per square mile (New Jersey) and give a hypothetical state with no local governments the full taxation weight,

then arrange the other states linearly according to their effective number of jurisdictions per square mile. In New Jersey, we are assuming that local taxation is only three-quarters the restriction on freedom that state taxation is. In Hawaii, the most territorially centralized state, local taxation is almost the same as state taxation—the prospective homeowner has virtually no local exit option, so local taxes are only a little more likely than state taxes to reflect distinctive local preferences.

Local tax collections come from the most recent fiscal year data released by the Census Bureau (FY 2019). The numbers here represent the combined formula incorporating both the level of local taxation and the weight as determined by the number of competing local jurisdictions. As a result, the numbers in Table 2 are not directly comparable to the figures for state-level taxation already given.

33

**TABLE 3**

| Rank | State | Local tax burden score incorporating decentralization |
|---|---|---|
| 1. | Vermont | 0.161 |
| 2. | Arkansas | 0.144 |
| 3. | Delaware | 0.134 |
| 4. | Tennessee | 0.103 |
| 5. | Idaho | 0.101 |
| 6. | Indiana | 0.098 |
| 7. | Michigan | 0.077 |
| 8. | West Virginia | 0.069 |
| 9. | Alabama | 0.068 |
| 10. | Minnesota | 0.066 |
| 11. | Kentucky | 0.063 |
| 12. | North Carolina | 0.055 |
| 13. | Mississippi | 0.054 |
| 14. | Massachusetts | 0.052 |
| 15. | Oklahoma | 0.047 |
| 16. | Nevada | 0.045 |
| 17. | Montana | 0.040 |
| 18. | Wyoming | 0.040 |
| 19. | Wisconsin | 0.040 |
| 20. | Florida | 0.035 |
| 21. | Pennsylvania | 0.024 |
| 22. | Utah | 0.021 |
| 23. | Connecticut | 0.016 |
| 24. | Georgia | 0.010 |
| 25. | Hawaii | 0.010 |
| 26. | New Mexico | 0.009 |
| 27. | North Dakota | 0.004 |
| 28. | Arizona | 0.003 |
| 29. | Washington | −0.003 |
| 30. | South Carolina | −0.008 |
| 31. | California | −0.009 |
| 32. | Missouri | −0.010 |
| 33. | Kansas | −0.011 |
| 34. | Oregon | −0.013 |
| 35. | South Dakota | −0.014 |
| 36. | Virginia | −0.015 |
| 37. | Iowa | −0.019 |
| 38. | Rhode Island | −0.019 |
| 39. | New Jersey | −0.028 |
| 40. | Ohio | −0.040 |
| 41. | Maine | −0.054 |
| 42. | Louisiana | −0.056 |
| 43. | New Hampshire | −0.060 |
| 44. | Illinois | −0.066 |
| 45. | Colorado | −0.069 |
| 46. | Maryland | −0.070 |
| 47. | Alaska | −0.073 |
| 48. | Texas | −0.094 |
| 49. | Nebraska | −0.115 |
| 50. | New York | −0.227 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# GOVERNMENT EMPLOYMENT

**2.0%** We also include government employment, which can crowd out employment in the private sector (see Table 4). To the extent that government-run enterprises are less efficient than private ones, government employment costs the local economy. Economists Jim Malley and Thomas Moutos use a cointegration framework on time-series data from Sweden and find that a 1 percent increase in government employment is associated with a 0.43 percent decrease in private employment. Economist Evi Pappa uses U.S. state data and also finds that aggregate employment does not increase at moments when government employment does, implying substantial crowding out in the short run and presumably in the long run as well.[29]

According to the Malley-Moutos elasticity estimate applied to state data from 2009, an aggregate disemployment effect occurred from an increase in government employment that year. Although that might be true, it seems like an aggressive assumption. After all, government employment is very high in Sweden; thus, its marginal effect there might be more negative than its marginal effect just about anywhere else.

Instead, following Pappa's results, the freedom index assumes a net-zero effect on total employment from an increase in state and local employment. The private disemployment effect of a one-standard-deviation increase in the ratio of government to private employment, as of 2015, would be 3.81 million nationwide. Average wage per job in the United States in early 2016 was $49,630. The index assumes that compensation equals marginal productivity and that government jobs are only 90 percent as productive as private jobs. The victim cost of a nationwide, one-standard-deviation increase in the government employment ratio is therefore 3.81 million times $49,630 divided by 10, or $18.9 billion. We divide that figure by 2 because government consumption presumably captures some of the same dynamics, and we want to avoid double-counting.

Government employment is available on a calendar-year basis from the Bureau of Economic Analysis.

29.  Jim Malley and Thomas Moutos, "Does Government Employment 'Crowd Out' Private Employment? Evidence from Sweden," *Scandinavian Journal of Economics* 98, no. 2 (1996): 289–302; Evi Pappa, "The Effects of Fiscal Shocks on Employment and the Real Wage," *International Economic Review* 50, no. 1 (2009): 217–44.

**TABLE 4**

| Rank | State | Government Employment Score |
|------|-------|------------------------------|
| 1. | Nevada | 2.17 |
| 2. | Florida | 2.13 |
| 3. | Pennsylvania | 1.83 |
| 4. | Massachusetts | 1.83 |
| 5. | Rhode Island | 1.54 |
| 6. | New Hampshire | 1.34 |
| 7. | Tennessee | 1.30 |
| 8. | Georgia | 1.20 |
| 9. | Arizona | 1.19 |
| 10. | Illinois | 1.13 |
| 11. | Connecticut | 1.12 |
| 12. | Michigan | 1.11 |
| 13. | Texas | 1.07 |
| 14. | New Jersey | 1.07 |
| 15. | Maryland | 1.06 |
| 16. | Indiana | 0.99 |
| 17. | California | 0.98 |
| 18. | Ohio | 0.94 |
| 19. | Oregon | 0.94 |
| 20. | Minnesota | 0.90 |
| 21. | Missouri | 0.84 |
| 22. | Utah | 0.80 |
| 23. | Delaware | 0.78 |
| 24. | Maine | 0.74 |
| 25. | New York | 0.64 |
| 26. | Colorado | 0.63 |
| 27. | Wisconsin | 0.62 |
| 28. | Virginia | 0.41 |
| 29. | Vermont | 0.41 |
| 30. | Idaho | 0.40 |
| 31. | Louisiana | 0.39 |
| 32. | Kentucky | 0.37 |
| 33. | Hawaii | 0.35 |
| 34. | North Carolina | 0.31 |
| 35. | Montana | 0.30 |
| 36. | Nebraska | 0.29 |
| 37. | South Dakota | 0.19 |
| 38. | Washington | 0.12 |
| 39. | Arkansas | 0.02 |
| 40. | South Carolina | −0.02 |
| 41. | Iowa | −0.06 |
| 42. | North Dakota | −0.19 |
| 43. | Alabama | −0.36 |
| 44. | Kansas | −0.66 |
| 45. | Oklahoma | −0.68 |
| 46. | Mississippi | −1.32 |
| 47. | West Virginia | −1.36 |
| 48. | Alaska | −1.78 |
| 49. | New Mexico | −1.86 |
| 50. | Wyoming | −2.21 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

36

# GOVERNMENT DEBT

**0.3%**  The problem with state and local debt, above a modest
level, is that it worsens credit ratings and increases yields
paid on government bonds.[30]  Current interest payments are already includ-
ed in the state taxation variable. The problem with additional interest paid
because of default risk is that it does not provide any additional services,
and therefore we do not imagine that any taxpayers can consent to it, unlike
interest paid that reflects pure time preference.

James Poterba and Kim Rueben give readily interpretable coefficient
estimates for our purposes. They find that a percentage-point increase
in state debt as a share of personal income is associated with roughly a
100-basis-point increase in bond yield. The annual value of the additional
interest payments generated by this increase in interest rate on the debt is
therefore $-(0.01 \times debt)$. Like state and local taxes, we adjust this figure for
federal deductibility.

For debt, we use the latest fiscal year data from the Census Bureau (FY
2019).

---

30.   James M. Poterba and Kim Rueben, "State Fiscal Institutions and the U.S. Municipal Bond Market," in *Fiscal Institu-
tions and Fiscal Performance*, ed. James M. Poterba (Chicago: University of Chicago Press, 1999), pp. 181–208; Craig
L. Johnson and Kenneth A. Kriz, "Fiscal Institutions, Credit Ratings, and Borrowing Costs," *Public Budgeting and
Finance* (2005): 84–103.

**TABLE 5**

| Rank | State | Government Debt Score | Rank | State | Government Debt Score |
|------|-------|----------------------|------|-------|----------------------|
| 1. | Wyoming | 2.69 | 26. | Wisconsin | 0.47 |
| 2. | Idaho | 2.19 | 27. | Missouri | 0.43 |
| 3. | North Carolina | 1.80 | 28. | Indiana | 0.43 |
| 4. | Montana | 1.54 | 29. | Colorado | 0.39 |
| 5. | Oklahoma | 1.52 | 30. | South Carolina | 0.39 |
| 6. | Florida | 1.49 | 31. | West Virginia | 0.35 |
| 7. | Georgia | 1.32 | 32. | Minnesota | 0.29 |
| 8. | New Hampshire | 1.30 | 33. | Kansas | 0.23 |
| 9. | Iowa | 1.23 | 34. | Louisiana | 0.16 |
| 10. | Mississippi | 1.20 | 35. | Nevada | 0.11 |
| 11. | Maine | 1.17 | 36. | Pennsylvania | 0.09 |
| 12. | Tennessee | 0.97 | 37. | Oregon | 0.07 |
| 13. | Virginia | 0.92 | 38. | New Mexico | 0.04 |
| 14. | Maryland | 0.89 | 39. | Connecticut | −0.07 |
| 15. | South Dakota | 0.88 | 40. | Massachusetts | −0.22 |
| 16. | Vermont | 0.84 | 41. | California | −0.24 |
| 17. | Arizona | 0.83 | 42. | Washington | −0.25 |
| 18. | Arkansas | 0.80 | 43. | Texas | −0.36 |
| 19. | Alabama | 0.78 | 44. | Rhode Island | −0.39 |
| 20. | Nebraska | 0.72 | 45. | North Dakota | −0.50 |
| 21. | Delaware | 0.70 | 46. | Hawaii | −0.75 |
| 22. | Michigan | 0.66 | 47. | Alaska | −0.77 |
| 23. | New Jersey | 0.57 | 48. | Illinois | −0.86 |
| 24. | Utah | 0.56 | 49. | Kentucky | −1.54 |
| 25. | Ohio | 0.48 | 50. | New York | −1.59 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

DIMENSIONS OF FREEDOM   31

# CASH AND SECURITY ASSETS

**0.2%**

Including state and local debt in the freedom index gives an incomplete picture without data on state and local financial assets. To weight this variable, which is also measured as a share of adjusted personal income, we estimate the coefficients on debt and cash and security assets in a time-series cross-sectional regression model of Standard and Poor's credit ratings of state governments. Both coefficients were statistically significant in the expected direction. A one-unit increase in state and local debt was associated with a 6.4-point increase in riskiness on a 0 to 9 scale, while a one-unit increase in cash and security assets was associated with a 0.76-point decrease (improvement). Cash and security assets are less valuable for credit rating than debt is harmful because these assets are often illiquid, tied up in trusts. We use these relative coefficient estimates to weight cash and security assets relative to debt.

39

**TABLE 6**

| Rank | State | Cash and Security Assets Score | | Rank | State | Cash and Security Assets Score |
|------|-------|-------------------------------|---|------|-------|-------------------------------|
| 1. | Alaska | 7.24 | | 26. | Iowa | −0.24 |
| 2. | North Dakota | 2.73 | | 27. | Utah | −0.25 |
| 3. | Wyoming | 1.99 | | 28. | Pennsylvania | −0.25 |
| 4. | New Mexico | 0.99 | | 29. | Kansas | −0.26 |
| 5. | Montana | 0.00 | | 30. | Florida | −0.26 |
| 6. | Texas | −0.01 | | 31. | Tennessee | −0.28 |
| 7. | Ohio | −0.04 | | 32. | Arizona | −0.28 |
| 8. | South Dakota | −0.08 | | 33. | Illinois | −0.28 |
| 9. | Oregon | −0.08 | | 34. | Arkansas | −0.28 |
| 10. | Louisiana | −0.09 | | 35. | New York | −0.30 |
| 11. | Rhode Island | −0.09 | | 36. | Michigan | −0.30 |
| 12. | Nebraska | −0.13 | | 37. | Maine | −0.31 |
| 13. | Hawaii | −0.17 | | 38. | Nevada | −0.32 |
| 14. | Indiana | −0.18 | | 39. | Alabama | −0.33 |
| 15. | Missouri | −0.18 | | 40. | Mississippi | −0.34 |
| 16. | Delaware | −0.18 | | 41. | Washington | −0.34 |
| 17. | West Virginia | −0.19 | | 42. | Virginia | −0.35 |
| 18. | Colorado | −0.19 | | 43. | New Hampshire | −0.37 |
| 19. | Idaho | −0.19 | | 44. | Massachusetts | −0.40 |
| 20. | Vermont | −0.20 | | 45. | New Jersey | −0.41 |
| 21. | Kentucky | −0.21 | | 46. | Wisconsin | −0.43 |
| 22. | Minnesota | −0.21 | | 47. | Georgia | −0.44 |
| 23. | South Carolina | −0.22 | | 48. | Connecticut | −0.47 |
| 24. | California | −0.22 | | 49. | North Carolina | −0.48 |
| 25. | Oklahoma | −0.22 | | 50. | Maryland | −0.51 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

## OVERALL FISCAL POLICY RANKING

**30.4%** The fiscal policy ranking is available in Table 7. Although the former number-one state New Hampshire continues to improve gradually on fiscal policy, Florida and Tennessee have leapfrogged it with some truly eye-popping improvements. Time will tell whether data revisions will adjust this picture, but for now it seems that government consumption in Florida has fallen from 10.8 percent in 2009 to 7.9 percent of income in Florida in just 10 years, while state and local taxes have also fallen, and the government employment ratio has fallen by close to 3 percentage points. Some of this improvement is likely a result of Florida's rapidly rebounding economy since the Great Recession and Florida's fiscal discipline. Tennessee's improvement is less significant, but the state has brought down its debt ratio quite a bit.

Because the two taxation variables make up a large share of fiscal policy's weight, it is unsurprising that low-tax states dominate the top of the fiscal policy rankings, while high-tax states fall at the bottom. In Table 7, the numbers represent the number of weighted standard deviations each state is above the average. For instance, New York's 2019 score of −0.307 means that even if New York were exactly average on regulatory policy and personal freedom (garnering a total score of 0 on them), it would still be, on average, a third of a standard deviation less free than the average for every policy.

A state that is one standard deviation better than average on every single policy will end up with an overall freedom score of 1.0, and a state that is one standard deviation worse than average on every single policy will end up with an overall freedom score of −1.0. Since fiscal policy represents less than a third of the overall index, New York's score of −0.307 means that it is on average more than a standard deviation worse than average on every fiscal policy.

**TABLE 7**

| Rank | State | Overall Fiscal Policy Score, 2019 |
|------|-------|-----------------------------------|
| 1. | Florida | 0.430 |
| 2. | Tennessee | 0.370 |
| 3. | New Hampshire | 0.357 |
| 4. | South Dakota | 0.263 |
| 5. | Pennsylvania | 0.251 |
| 6. | Georgia | 0.222 |
| 7. | Missouri | 0.208 |
| 8. | Massachusetts | 0.206 |
| 9. | Indiana | 0.199 |
| 10. | Nevada | 0.198 |
| 11. | Idaho | 0.195 |
| 12. | Texas | 0.187 |
| 13. | Michigan | 0.182 |
| 14. | Montana | 0.174 |
| 15. | Virginia | 0.159 |
| 16. | Colorado | 0.158 |
| 17. | Connecticut | 0.155 |
| 18. | Arizona | 0.128 |
| 19. | Alabama | 0.116 |
| 20. | Ohio | 0.114 |
| 21. | North Carolina | 0.089 |
| 22. | Arkansas | 0.088 |
| 23. | Kentucky | 0.079 |
| 24. | Maryland | 0.068 |
| 25. | Illinois | 0.063 |
| 26. | Louisiana | 0.060 |
| 27. | Rhode Island | 0.059 |
| 28. | New Jersey | 0.058 |
| 29. | Oklahoma | 0.054 |
| 30. | Wisconsin | 0.046 |
| 31. | North Dakota | 0.041 |
| 32. | Washington | 0.039 |
| 33. | South Carolina | 0.038 |
| 34. | Alaska | 0.036 |
| 35. | Utah | 0.034 |
| 36. | Wyoming | 0.028 |
| 37. | Maine | −0.015 |
| 38. | Kansas | −0.047 |
| 39. | Minnesota | −0.049 |
| 40. | West Virginia | −0.056 |
| 41. | California | −0.056 |
| 42. | Oregon | −0.060 |
| 43. | Iowa | −0.106 |
| 44. | Delaware | −0.131 |
| 45. | Mississippi | −0.134 |
| 46. | Vermont | −0.136 |
| 47. | Nebraska | −0.142 |
| 48. | New Mexico | −0.214 |
| 49. | New York | −0.307 |
| 50. | Hawaii | −0.369 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

DIMENSIONS OF FREEDOM   35

Figure 3 shows how the average fiscal policy score has changed for all 50 states since 2000. It appears that states' fiscal policies have improved since the Great Recession, mostly because of declining tax burdens and spending cuts.

**FIGURE 3** State Average Fiscal Policy Scores over Time



# REGULATORY POLICY

The regulatory policy dimension includes categories for (a) land-use freedom and environmental policy, (b) health insurance freedom, (c) labor-market freedom, (d) lawsuit freedom, (e) occupational freedom, (f) miscellaneous regulations that do not fit under another category (such as certificate-of-need requirements), and

(g) cable and telecommunications freedom. Figure 4 shows the weights for health insurance policies now controlled by the federal government (8.1 percent) and for only those health insurance policies that states can still control after the PPACA (0.8 percent), altogether summing to 8.9 percent of the index.

**FIGURE 4** Regulatory Policy Weights



Land Use **11.6%**

Health Insurance (Pre-PPACA) **8.1%**

Labor Market **4.8%**

Lawsuits **3.2%**

Occupations **2.6%**

Miscellaneous **2.5%**

Cable & Telecom **1.1%**

Health Insurance (Post-PPACA) **0.8%**

DIMENSIONS OF FREEDOM   37

The calculated freedom scores do not allow weights to vary by year, even when variation across states disappears. In other words, a variable continues to contribute to the weights even in years when it no longer contributes to differences across states because every state has the same policy. Including this type of variable allows for intertemporal comparisons. That happened when the PPACA passed, and states could no longer choose whether to have community rating, guaranteed issue, and the individual mandate. As a result of our methodological choice, the data show the PPACA as a large negative shock to all states' regulatory policy. However, for the second time, this edition of the study also develops an alternative, chain-linked index in the downloadable data that includes only policies that have never at any time been federalized. We do not put this ranking in the text because it is really for comparisons over time rather than across states, and the 2019 values on this chain-linked index correlate perfectly with the 2019 values on the regular index.

This regulatory policy dimension does not include regulations with a mainly paternalistic justification; those regulations are placed under the personal freedom dimension. They include laws such as private and home-school regulations and smoking bans.

To take into account the wider, unmeasured costs of insecure rights, this index increases the weights on variables representing policies encoded in state constitutions or the federal Constitution. It does so because the fact that a policy has been encoded within a constitution is prima facie evidence that the policy is widely considered to affect a "fundamental" freedom—a freedom with consequences for the security of the citizenry that extend beyond citizens under its immediate purview.

Within the regulatory policy dimension, the weights of certain variables are boosted as follows:

1. The victim cost/freedom value is multiplied by 2 if a closely related policy is encoded in the U.S. Constitution, or has been recognized by at least some courts as relating to a fundamental right. Examples of such policies include eminent domain reform, rent control, regulatory taking restrictions, and mandatory permission of political speech on private property, which we view as compelled speech implicating the First Amendment.

2. The victim cost/freedom value is multiplied by 1.5 if the policy is encoded in state constitutions but not the federal Constitution and has not otherwise been recognized judicially as a fundamental right. Right-to-work laws are the only such policies in the regulatory dimension.

We believe this sort of boost is necessary to capture the particular impor-
tance Americans have attached to certain fundamental freedoms, even if
it necessarily involves an element of judgment. Freedoms are more funda-
mental the more widely people consider them part of their flourishing and
autonomy, and policies potentially infringing on them are therefore subject
to stricter judicial scrutiny than policies that would restrict freedoms that,
while potentially valuable, are not as fundamental.[31]  By relying on existing
judicial interpretations of fundamental rights, the freedom index avoids at
least one possible source of subjectivity as it "upgrades" these policies.

---

31.   Legal Information Institute, "Fundamental Right," Cornell University Law School, August 19, 2010.

DIMENSIONS OF FREEDOM   39

47

# LAND-USE FREEDOM AND ENVIRONMENTAL POLICY

**11.6%**   The category for land-use freedom and environmental
policy includes eminent domain rules, land-use regulations,
renewable portfolio standards, and regulations requiring employers to let
their employees bring guns onto company-owned parking lots. Most of its
weight comes from three variables: local rent control laws (5.3 percent of
the overall index) and two indexes of residential land-use regulations, also
known as zoning (together 5.0 percent of the index). One of the zoning
indexes is derived from an index built by researchers at the Wharton School
of Business.[32] Their original index is available for only two years. We use
changes in state cost of living, Partisan Voting Index, accommodation GDP,
and effective number of local jurisdictions to impute values for this vari-
able over the entire time series. The other zoning index derives from two
Harvard economists, is based on appellate court rulings, and does vary over
time but is a "noisier" (more specifically, the same mean and expectation
but a larger variance) measure of zoning.[33] According to the best evidence,
a one-standard-deviation increase in residential zoning restrictions would
directly cost victims more than $13 billion a year, if imposed nationwide.[34]
Rather than impose such costs, states should allow property owners to solve
most land-use externalities with various contractual arrangements, such as
homeowners associations, or at most what Dartmouth economist William
Fischel calls "good housekeeping" zoning.[35]

Renewable portfolio standards (RPS), which mandate that power com-
panies buy certain proportions of their energy from (usually) wind and solar
sources, are worth 1.0 percent of the overall index. Our variable tracks the
stringency of these requirements. The average RPS raises electricity prices
by 0.8–0.9 percent, with bigger effects likely for more stringent programs.[36]
To promote cleaner electric generation, states could help limit pollution that
creates significant, direct, negative externalities through means other than
command-and-control regulations.

32.   Joseph Gyourko, Albert Saiz, and Anita Summers, "A New Measure of the Local Regulatory Environment for Hous-
      ing Markets: The Wharton Residential Land Use Regulatory Index," *Urban Studies* 45, no. 3 (2008): 693–729.

33.   Peter Ganong and Daniel Shoag, "Why Has Regional Income Convergence in the US Declined?," *Journal of Urban
      Economics* 102 (2017): 76–90.

34.   Edward L. Glaeser, Joseph Gyourko, and Raven Saks, "Why Is Manhattan So Expensive? Regulation and the Rise
      in Housing Prices," *Journal of Law and Economics* 48, no. 2 (2005): 331–69; Stephen Malpezzi, "Housing Prices,
      Externalities, and Regulation in US Metropolitan Areas," *Journal of Housing Research* 7, no. 2 (1996): 209–41.

35.   William A. Fischel, *Zoning Rules!* (Cambridge, MA: Lincoln Institute of Land Policy, 2015).

36.   Cliff Chen, Ryan Riser, and Mark Bollinger, "Weighing the Costs and Benefits of State Renewables Portfolio Stan-
      dards in the United States: A Comparative Analysis of State-Level Policy Impact Projections," *Renewable & Sustain-
      able Energy Reviews* 13 (2009): 552–66; Jenny Heeter et al., "A Survey of State-Level Cost and Benefit Estimates of
      Renewable Portfolio Standards," technical report, National Renewable Energy Laboratory, Golden, CO, May 2014.

The remainder of this category takes into account whether compensation or an economic assessment is required before a regulatory taking, an index of eminent domain reform; whether companies must allow employees' guns on their property; and whether free speech is mandated on private property. (The federal courts require compensation for regulatory takings only when they destroy the value of the affected land; therefore, states were coded only for having protections stronger than the federal one.) It may surprise readers that eminent domain reform comprises only 0.1 percent of the freedom index, given that it affects a fundamental right, and given how salient the issue was—especially among property rights advocates—following the Supreme Court's *Kelo* decision.[37]  However, the estimated victim cost of eminent domain abuse is relatively low, at roughly $1 billion a year ($500 million without the "constitutional weight" boost), though admittedly this may underestimate losses due to insecurity of tenure, attorneys' fees, opportunity costs of legal challenges, and so on.[38]  It is worth noting that most states that have reformed eminent domain have kept open a wide "blight loophole" that could still allow public takings for private interests. Therefore, the eminent domain index has been coded to take blight reform into account, as well as the incorporation of eminent domain restrictions into the state constitution.

Both of the final two variables have to do with property rights: laws banning employers from banning guns from certain company property such as parking lots, and laws mandating free speech on private property. We hold that businesses may permissibly require employees to leave guns at home, just as we defend the right of malls and community associations to prohibit any or all political messages. That view might perplex some gun rights advocates. However, the only consistent property rights–respecting position is that gun rights stop at the boundary of someone else's property; to think otherwise is to impose one's own view on others without their consent. Although symbolically significant, however, these policies do not generally cause severe inconvenience to their victims and therefore are not worth much in the index.

37.   See *Kelo v. City of New London*, 545 U.S. 469 (2005).

38.   "Building Empires, Destroying Homes: Eminent Domain Abuse in New York," Institute for Justice, October 2009.

**TABLE 8**

| Rank | State | Land-Use Freedom and Environmental Policy Score | | Rank | State | Land-Use Freedom and Environmental Policy Score |
|---|---|---|---|---|---|---|
| 1. | Alabama | 0.050 | | 26. | Wisconsin | 0.007 |
| 2. | Georgia | 0.046 | | 27. | Illinois | 0.005 |
| 3. | Oklahoma | 0.046 | | 28. | Alaska | 0.004 |
| 4. | Virginia | 0.042 | | 29. | Utah | 0.004 |
| 5. | Arkansas | 0.042 | | 30. | Idaho | −0.001 |
| 6. | Kentucky | 0.039 | | 31. | Colorado | −0.006 |
| 7. | Iowa | 0.038 | | 32. | Pennsylvania | −0.007 |
| 8. | Nebraska | 0.038 | | 33. | New Mexico | −0.007 |
| 9. | Kansas | 0.038 | | 34. | Massachusetts | −0.016 |
| 10. | North Dakota | 0.037 | | 35. | Nevada | −0.017 |
| 11. | West Virginia | 0.036 | | 36. | Minnesota | −0.020 |
| 12. | Texas | 0.033 | | 37. | Delaware | −0.023 |
| 13. | Louisiana | 0.031 | | 38. | Montana | −0.039 |
| 14. | South Dakota | 0.031 | | 39. | Washington | −0.045 |
| 15. | Missouri | 0.031 | | 40. | New Hampshire | −0.047 |
| 16. | Tennessee | 0.030 | | 41. | Connecticut | −0.061 |
| 17. | South Carolina | 0.030 | | 42. | Rhode Island | −0.061 |
| 18. | Indiana | 0.026 | | 43. | Maine | −0.090 |
| 19. | Ohio | 0.024 | | 44. | Hawaii | −0.145 |
| 20. | Michigan | 0.021 | | 45. | Vermont | −0.173 |
| 21. | Florida | 0.021 | | 46. | New York | −0.224 |
| 22. | North Carolina | 0.015 | | 47. | California | −0.257 |
| 23. | Mississippi | 0.014 | | 48. | Maryland | −0.265 |
| 24. | Wyoming | 0.013 | | 49. | New Jersey | −0.292 |
| 25. | Arizona | 0.010 | | 50. | Oregon | −0.293 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# HEALTH INSURANCE FREEDOM

**8.1%**    The PPACA (Obamacare) nationalized most health insur-
ance regulation. In our "headline" index, we treat such
nationalizations of policies that states formerly controlled as changes in
state policies. We do so because our primary purpose is to measure freedom
as citizens experience it, not as state legislators enact it. This choice allows
us to compare the state of freedom over time, using the same policies. We do
the same thing with certain gun laws and with sodomy laws, which have also
been nationalized (in a pro-freedom direction).

All states are now required to have a small-group-adjusted community
rating (2.3 percent of the index), individual market-adjusted community rat-
ing (0.4 percent), individual market-guaranteed issue (0.6 percent), bans on
elimination riders (<0.1 percent), mandated external review of grievances
(<0.1 percent), small-group prior approval of rates (0.5 percent), nongroup
prior approval of rates (0.1 percent), and certain "essential benefits" man-
dates (1.8 percent). States are still able to vary somewhat on the extent of
mandated benefits (0.5 percent), standing referrals to specialists (<0.1 per-
cent), direct access to specialists (0.3 percent), and bans on financial incen-
tives to providers from insurers (<0.1 percent). The individual health insur-
ance mandate (2.4 percent) was federalized but then, in a rare exception
to the historical norm, was returned to the states. Some states (California,
Massachusetts, New Jersey, and Rhode Island) have enacted their own indi-
vidual mandates since that time.

Community rating and the individual mandate get the highest weights
because they represent a large transfer of wealth from the healthy to the
unhealthy, approximately $10 billion a year.[39] State-level mandated cover-
ages raise premium costs for consumers. In this edition, we have exten-
sively reviewed statutes to determine the onset of all the particularly costly
mandated benefits, such as in vitro fertilization and occupational therapy,
by state. The HMO regulations have low victim costs because public back-
lash against particular practices, such as financial incentives to providers,
drove them from the marketplace even before laws were passed.[40] In this
case, public opinion drove both market practice and state law. Nevertheless,
research suggests that public opinion on this issue may be misinformed. In
their heyday in the 1990s, when many of the now widely banned practices
were widespread, HMOs successfully suppressed health care costs.[41]

---

39   These numbers are derived from estimates in Mark V. Pauly and Bradley Herring, "Risk Pooling and Regulation:
     Policy and Reality in Today's Individual Health Insurance Market," *Health Affairs* 26, no. 3 (2007): 770–79.

40   Mark A. Hall, "The Death of Managed Care: A Regulatory Autopsy," *Journal of Health Politics, Policy, and Law* 30, no.
     3 (2005): 427–52.

41   Maxim L. Pinkovskiy, "The Impact of the Managed Care Backlash on Health Care Costs: Evidence from State Regula-
     tion of Managed Care Cost Containment Practices," October 17, 2013.

**TABLE 9**

| Rank | State | Health Insurance Freedom Score | Rank | State | Health Insurance Freedom Score |
|------|-------|-------------------------------|------|-------|-------------------------------|
| 1. | Idaho | −0.028 | 23. | Tennessee | −0.039 |
| 1. | Nebraska | −0.028 | 23. | Washington | −0.039 |
| 1. | North Dakota | −0.028 | 28. | Arizona | −0.039 |
| 4. | Delaware | −0.029 | 28. | Florida | −0.039 |
| 4. | Kansas | −0.029 | 28. | Missouri | −0.039 |
| 6. | Mississippi | −0.032 | 28. | New York | −0.039 |
| 6. | South Dakota | −0.032 | 28. | North Carolina | −0.039 |
| 6. | Wyoming | −0.032 | 28. | Pennsylvania | −0.039 |
| 9. | Iowa | −0.032 | 34. | Virginia | −0.041 |
| 10. | Oklahoma | −0.033 | 35. | Ohio | −0.041 |
| 10. | South Carolina | −0.033 | 36. | Alaska | −0.043 |
| 10. | Wisconsin | −0.033 | 37. | Colorado | −0.043 |
| 13. | Vermont | −0.033 | 38. | Maine | −0.043 |
| 14. | Michigan | −0.035 | 38. | New Mexico | −0.043 |
| 15. | Nevada | −0.037 | 40. | Utah | −0.045 |
| 16. | Hawaii | −0.037 | 41. | Maryland | −0.045 |
| 17. | Illinois | −0.037 | 42. | Arkansas | −0.047 |
| 17. | Minnesota | −0.037 | 42. | Connecticut | −0.047 |
| 19. | Georgia | −0.039 | 44. | West Virginia | −0.048 |
| 19. | Indiana | −0.039 | 45. | Montana | −0.051 |
| 19. | Louisiana | −0.039 | 45. | Texas | −0.051 |
| 19. | New Hampshire | −0.039 | 47. | California | −0.079 |
| 23. | Alabama | −0.039 | 48. | Rhode Island | −0.087 |
| 23. | Kentucky | −0.039 | 49. | Massachusetts | −0.091 |
| 23. | Oregon | −0.039 | 50. | New Jersey | −0.097 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# LABOR-MARKET FREEDOM

**4.8%**   Right-to-work laws make up nearly half of the labor regulation category and more than 2 percent of the entire freedom index. They are valued at over $10 billion a year.[42] Right-to-work laws are controversial among libertarians because they override collective bargaining contracts reached between employers and employee unions, allowing employers to hire workers who do not pay agency fees to a union. Then again, right-to-work laws can be justified as a means of employer and employee self-defense against the mechanisms of the Wagner Act (the National Labor Relations Act), which essentially allows an "agency shop" to form if a majority of workers votes in favor of this action.

From the libertarian point of view, the Wagner Act violates the fundamental freedom of association and basic property rights, and right-to-work laws somewhat restore those freedoms, because few employers would voluntarily agree to an agency shop in the absence of the Wagner Act. Although right-to-work laws violate the rights of some workers and employers, they restore freedom of association to a far greater number. In an ideal world, both the National Labor Relations Act and right-to-work laws would be repealed, and employees and employers would be free to negotiate as they saw fit, collectively or individually.

For those who disagree with our logic, we have produced alternative indexes to the freedom index that exclude right-to-work laws (see Appendix B).

Other policy variables in this category, in descending order of importance, are short-term disability insurance requirements (costs being lower labor productivity[43] and administrative expenses for businesses[44]), the legalization and enforcement of worker noncompete agreements (costs being the transfer of income from stockholders to top executives and firms' underinvestment in worker productivity[45]), state minimum-wage laws (Kaitz index adjusted for median wages), policies dealing with workers' compensation (funding mechanisms and mandated coverages), requirements for employer verification of legal resident status, stricter-than-federal private employment discrimination laws (smoker status, marital status, age, and others), and mandated paid family leave.

42.   Steven E. Abraham and Paula B. Voos, "Right-to-Work Laws: New Evidence from the Stock Market," *Southern Economic Journal* 67, no. 2 (2000): 345–62; David T. Ellwood and Glenn Fine, "The Impact of Right-to-Work Laws on Union Organizing," *Journal of Political Economy* 95, no. 2 (1987): 250–73; William J. Moore, "The Determinants and Effects of Right-to-Work Laws: A Review of the Recent Literature," *Journal of Labor Research* 19, no. 3 (1998): 445–69; Robert Krol and Shirley Svorny, "Unions and Employment Growth: Evidence from State Economic Recoveries," *Journal of Labor Research* 28 (2007): 525–35.

43.   John Bound et al., "The Welfare Implications of Increasing Disability Insurance Benefit Generosity," *Journal of Public Economics* 88 (2004): 2487–514.

44.   In other words, the funding mechanism (taxation) does not count here; it counts as part of the tax burden.

45.   Mark J. Garmaise, "Ties That Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment," *Journal of Law, Economics, and Organization* 27, 2 (2011): 376–425.

**TABLE 10**

| Rank | State | Labor-Market Freedom Score | | Rank | State | Labor-Market Freedom Score |
|---|---|---|---|---|---|---|
| 1. | Texas | 0.048 | | 26. | Oklahoma | −0.002 |
| 2. | Virginia | 0.041 | | 27. | New Hampshire | −0.010 |
| 3. | Kansas | 0.039 | | 28. | North Dakota | −0.016 |
| 3. | Iowa | 0.039 | | 29. | Pennsylvania | −0.017 |
| 3. | Wisconsin | 0.039 | | 30. | Minnesota | −0.019 |
| 3. | Indiana | 0.039 | | 31. | Delaware | −0.021 |
| 7. | Mississippi | 0.038 | | 32. | Illinois | −0.024 |
| 7. | Alabama | 0.038 | | 33. | Montana | −0.025 |
| 9. | Tennessee | 0.038 | | 34. | Alaska | −0.025 |
| 10. | Georgia | 0.036 | | 35. | New Mexico | −0.026 |
| 11. | North Carolina | 0.036 | | 36. | Missouri | −0.026 |
| 12. | Utah | 0.034 | | 37. | Vermont | −0.030 |
| 13. | Florida | 0.034 | | 38. | Ohio | −0.032 |
| 14. | Kentucky | 0.032 | | 39. | Connecticut | −0.032 |
| 15. | Idaho | 0.032 | | 40. | Maryland | −0.034 |
| 16. | South Carolina | 0.030 | | 41. | Massachusetts | −0.035 |
| 17. | Louisiana | 0.030 | | 42. | Maine | −0.037 |
| 18. | Nebraska | 0.029 | | 43. | Colorado | −0.040 |
| 19. | Nevada | 0.028 | | 44. | Oregon | −0.043 |
| 20. | South Dakota | 0.027 | | 45. | Washington | −0.055 |
| 21. | Michigan | 0.026 | | 46. | New Jersey | −0.057 |
| 22. | Arkansas | 0.023 | | 47. | Hawaii | −0.062 |
| 23. | West Virginia | 0.023 | | 48. | Rhode Island | −0.069 |
| 24. | Wyoming | 0.018 | | 49. | New York | −0.070 |
| 25. | Arizona | 0.005 | | 50. | California | −0.105 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# LAWSUIT FREEDOM

**3.2%**   Deciding tort claims among private parties is an important function of a decentralized legal system that provides justice to victims of the unjust, harmful acts of others. In an efficient civil liability system, the costs that defendants have to pay are merely compensation for wrongs and not a limitation on their freedom. Moreover, the liability insurance costs that businesses have to pay reflect, in an efficient system, the likelihood that they will impose harms on others.

In practice, however, the United States' civil liability system imposes vastly higher costs on everyone than every other developed country's system does.[46] Moreover, the costs of the system vary widely by state. In fact, it is more appropriate to think of there being 50 separate civil liability systems in the United States than one national system, and "bad" state systems can impose significant costs above those necessary to remedy wrongs. That is especially the case when defendants are from another state.[47]

The civil liability index captures risks and costs to property and contract freedoms that businesses must pass on to consumers as higher prices. Unfortunately for consumers—and that means everyone—tort abuse's overall cost to the economy is quite high. In fact, according to policy analysts Lawrence McQuillan, Hovannes Abramyan, and Anthony Archie, the nationwide "tort tax" amounts to $328 billion annually in direct costs and $537 billion annually in indirect costs.[48] Not all of those indirect costs are relevant to this variable in our index: administration costs show up in state spending and taxation, and the costs of lost innovation (42 percent of all tort costs according to McQuillan, Abramyan, and Archie) seem too higher-order to be included here. That is consistent with our overall approach, since we do not include the cost of economic growth forgone for any other regulatory variable.

One of the most significant improvements to the index we made in the fourth edition has to do with state civil liability systems. The freedom index includes a single variable, an index of how plaintiff-friendly each state's civil liability system is, which depends in turn on eight variables. We use principal component analysis to find the common variance among each of those: (a) ratings of lawsuit climate by businesses,[49] (b) partisan

46    For a good overview, see the contributions to F. H. Buckley (ed.), *The American Illness: Essays on the Rule of Law* (New Haven, CT: Yale University Press, 2013).

47    For evidence, see Alexander Tabarrok and Eric Helland, "Court Politics: The Political Economy of Tort Awards," *Journal of Law and Economics* 42, no. 1 (1999): 157–88.

48    Lawrence J. McQuillan, Hovannes Abramyan, and Anthony P. Archie. *Jackpot Justice: The True Cost of America's Tort System* (San Francisco: Pacific Research Institute, 2007).

49    See *Ranking the States: A Survey of the Fairness and Reasonableness of State Liability Systems,* U.S. Chamber Institute for Legal Reform.

elections for the supreme court, (c) partisan elections for trial courts, (d) lawyer concentration index, (e) legal services share of GDP, (f) blanket punitive or noneconomic damages cap, (g) burden of proof for conduct justifying punitive damages, and (h) joint and several liability abolition.

Even though the U.S. tort system is largely at the state level, certain nationwide features affect the tort environment in every state. Even the "best" state will have a "tort tax" of some kind. Moreover, a state's poor tort environment affects out-of-state defendants, creating an interjurisdictional externality.[50] Nevertheless, Nicole Crain and others find that adopting all recommended tort reforms could reduce a state's tort losses by 49 percent and annual insurance premiums by 16 percent.[51] Using an econometric model of insurance costs and tort system perceptions, Paul Hinton, David McKnight, and Ronald Miller find a potential reduction in tort costs ranging from $20 million in Vermont to $5.3 billion in California, due to comprehensive tort reform.[52] We use their estimates to come up with an estimate of how nationwide tort reform amounting to a standard-deviation change on our variable would affect liability insurance premiums. Then, we divide by 0.55 to take into account deadweight loss and costs of legal representation, which are 45 percent of the tort tax (excluding administration and lost innovation costs) according to McQuillan, Abramyan, and Archie.

50.   Tabarrok and Helland, "Court Politics."

51.   Nicole V. Crain et al., "Tort Law Tally: How State Tort Reforms Affect Tort Losses and Tort Insurance Premiums," Pacific Research Institute (April 2009).

52.   Paul J. Hinton, David McKnight, and Ronald I. Miller, "Determinants of State Tort Costs: The Predictive Power of the Harris State Liability Systems Ranking Study," NERA Economic Consulting (October 2012).

**TABLE II**

| Rank | State | Lawsuit Freedom Score |
|------|-------|----------------------:|
| 1. | New Hampshire | 0.063 |
| 2. | Nebraska | 0.053 |
| 3. | North Dakota | 0.051 |
| 4. | Alaska | 0.047 |
| 5. | South Dakota | 0.041 |
| 6. | Idaho | 0.040 |
| 7. | Iowa | 0.038 |
| 8. | Oklahoma | 0.035 |
| 9. | South Carolina | 0.035 |
| 10. | Michigan | 0.034 |
| 11. | Utah | 0.033 |
| 12. | Arkansas | 0.032 |
| 13. | Kansas | 0.031 |
| 14. | Wyoming | 0.030 |
| 15. | Colorado | 0.028 |
| 16. | Mississippi | 0.028 |
| 17. | Tennessee | 0.028 |
| 18. | Indiana | 0.027 |
| 19. | Arizona | 0.025 |
| 20. | Oregon | 0.024 |
| 21. | Nevada | 0.023 |
| 22. | Wisconsin | 0.021 |
| 23. | Maine | 0.016 |
| 24. | Hawaii | 0.015 |
| 25. | North Carolina | 0.015 |
| 26. | Kentucky | 0.014 |
| 27. | Montana | 0.012 |
| 28. | Georgia | 0.011 |
| 29. | Washington | 0.007 |
| 30. | Vermont | 0.004 |
| 31. | Florida | 0.002 |
| 32. | Virginia | 0.001 |
| 33. | New Jersey | 0.000 |
| 34. | Texas | −0.001 |
| 35. | Rhode Island | −0.003 |
| 36. | West Virginia | −0.004 |
| 37. | California | −0.004 |
| 38. | Maryland | −0.006 |
| 39. | Connecticut | −0.007 |
| 40. | Ohio | −0.008 |
| 41. | Massachusetts | −0.009 |
| 42. | Delaware | −0.010 |
| 43. | Minnesota | −0.012 |
| 44. | New Mexico | −0.018 |
| 45. | Alabama | −0.024 |
| 46. | Missouri | −0.028 |
| 47. | Pennsylvania | −0.050 |
| 48. | Louisiana | −0.053 |
| 49. | New York | −0.073 |
| 50. | Illinois | −0.077 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# OCCUPATIONAL FREEDOM

**2.6%**   The prevalence of occupational licensing is difficult to measure. Some of the literature uses listings of licensed occupations by state at America's Career InfoNet,[53] but we have found those listings to be highly unreliable, often excluding certain licensed occupations or including others that are privately certified, not regulated by the government. We use two redundant measures of the prevalence of licensure to reduce measurement error.

Our first measure of licensure prevalence is a weighted sum for 64 occupations, where each occupation's weight is its proportion of the total employment in those 64 occupations. A second measure is available only for 2014, 2016, 2017, and 2019, and it is carried back and interpolated to other years. It counts the number of mentions of certain phrases in each state's statutes, such as "shall not practice." We do find that these two variables correlate together modestly ($r=0.30$). These two variables together are worth about 1.6 percent of the index, with each apportioned half of the weight.

We also include sunrise and sunset provisions for occupational licensing. But because of a lack of evidence regarding their effectiveness, they are worth less than 0.1 percent of the index. (*Sunrise* refers to independent review requirements before a new licensing board is created; *sunset* refers to automatic expiration of licensing boards after several years so that the legislature must reauthorize them.)

The remaining occupational freedom variables have to do with medical scope of practice. Nurse practitioner scope of practice is the most important, making up 0.8 percent of the index. Dental hygienist independent practice is worth 0.1 percent of the index, followed by two more minor variables: membership in the Nurse Licensure Compact and physician assistant prescription authority.

---

53.   For instance, Morris M. Kleiner and Alan B. Krueger, "The Prevalence and Effects of Occupational Licensing," *British Journal of Industrial Relations* 48 (4) (2010): 676–87.

TABLE 12

| Rank | State | Occupational Freedom Score | Rank | State | Occupational Freedom Score |
|---|---|---|---|---|---|
| 1. | Idaho | 0.026 | 26. | West Virginia | −0.004 |
| 2. | Wyoming | 0.021 | 27. | Kentucky | −0.005 |
| 3. | Colorado | 0.021 | 28. | Washington | −0.006 |
| 4. | Rhode Island | 0.019 | 29. | Indiana | −0.007 |
| 5. | Vermont | 0.019 | 30. | Michigan | −0.008 |
| 6. | Hawaii | 0.018 | 31. | Georgia | −0.009 |
| 7. | New Hampshire | 0.014 | 32. | Nevada | −0.010 |
| 8. | Nebraska | 0.014 | 33. | South Carolina | −0.010 |
| 9. | Kansas | 0.014 | 34. | Pennsylvania | −0.010 |
| 10. | Alaska | 0.012 | 35. | Oklahoma | −0.011 |
| 11. | Missouri | 0.008 | 36. | Oregon | −0.011 |
| 12. | Maine | 0.007 | 37. | Arkansas | −0.012 |
| 13. | Montana | 0.007 | 38. | Tennessee | −0.012 |
| 14. | Connecticut | 0.006 | 39. | Alabama | −0.012 |
| 15. | Utah | 0.006 | 40. | North Carolina | −0.015 |
| 16. | Minnesota | 0.006 | 41. | New York | −0.016 |
| 17. | Arizona | 0.005 | 42. | Louisiana | −0.017 |
| 18. | New Mexico | 0.005 | 43. | Florida | −0.018 |
| 19. | Delaware | 0.004 | 44. | New Jersey | −0.019 |
| 20. | Iowa | 0.003 | 45. | Ohio | −0.020 |
| 21. | Mississippi | 0.000 | 46. | Maryland | −0.021 |
| 22. | South Dakota | −0.001 | 47. | Virginia | −0.023 |
| 23. | Massachusetts | −0.001 | 48. | Illinois | −0.024 |
| 24. | North Dakota | −0.003 | 49. | California | −0.041 |
| 25. | Wisconsin | −0.003 | 50. | Texas | −0.048 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# MISCELLANEOUS REGULATORY FREEDOM

**2.5%**  Miscellaneous regulations include, in declining order of importance, certificate-of-need requirements for new hospital construction, auto insurance rate filing requirements, homeowner's insurance rate filing requirements, general unfair-pricing and sales-below-cost laws, price-gouging laws, rate classification prohibitions for some classes of insurance, membership in the Interstate Insurance Product Regulation Compact, direct-to-consumer auto sales, minimum markup and sales-below-cost laws for gasoline, moving company entry regulations, and mandatory product labeling laws.

Certificate-of-need regulations land their first-place slot in this category on the basis of the over \$3 billion in extra costs they impose on hospitals, customers, and potential market entrants.[54] Next come state personal auto insurance rate filing requirements. These regimes range from Massachusetts's old "fixed and established" system (scrapped in 2008), in which all car insurance premiums were dictated by law, to no rate-filing requirement whatsoever in Wyoming. A one-standard-deviation change on this −1 to 4 scale, about 1.2 points, would be worth \$2 billion nationwide. The main problem with strict rate regulation regimes is that they encourage insurers to stop insuring some drivers altogether, forcing those drivers to find coverage in a state-guaranteed, "residual" market.[55]

Homeowner's insurance rate filing regulations range from "prior approval" to "no file." A one-standard-deviation shift on this variable would be worth \$1.3 billion nationwide. The Interstate Insurance Product Regulation Compact makes it easier to sell the same life insurance policy or annuity across state lines. Prohibitions on the use of certain criteria for insurance rating purposes—such as age, gender, territory, and credit rating—redistribute wealth from low risks to high risks and drive some consumers out of the market altogether.

Price-gouging laws, which have gained in popularity recently, try to repeal the laws of supply and demand. They impose price controls on necessary products after disasters, making them even scarcer by disincentivizing supply and incentivizing demand.[56] According to W. David Montgomery, Robert Baron, and Mary Weisskopf, a price-gouging law on gasoline could be expected to reduce economic welfare by at least \$1.9 billion in the wake of a

54.   Christopher J. Conover and Frank A. Sloan, "Does Removing Certificate-of-Need Regulations Lead to a Surge in Health Care Spending?," *Journal of Health Politics, Policy, and Law* 23, no. 3 (1998): 455–81; Jon M. Ford and David L. Kaserman, "Certificate-of-Need Regulation and Entry: Evidence from the Dialysis Industry," *Southern Economic Journal* 59, no. 4 (1993): 783–91; Patrick A. Rivers, Myron D. Fottler, and Mustafa Zeedan Younis, "Does Certificate of Need Really Contain Hospital Costs in the United States?," *Health Education Journal* 66, no. 3 (2007): 229–44.

55.   Scott E. Harrington and Helen I. Doerpinghaus, "The Economics and Politics of Automobile Insurance Rate Classification," *Journal of Risk and Insurance* 60, no. 1 (1993): 59–84.

56.   Michael Giberson, "The Problem with Price Gouging Laws," *Regulation*, Spring 2011, pp. 48–53.

major disaster on the scale of Hurricanes Rita and Katrina.[57]

Mandatory product-labeling laws include (a) genetically modified organism (GMO) labeling requirements on food (now federalized) and (b) California's unique law mandating disclosure of potential carcinogens, which has a much bigger impact than GMO labeling (about $17 million per year in settlement costs alone[58]). We exclude this mandatory labeling law variable from our chain-linked index because of the federal preemption law on GMO labeling requirements.

57.   W. David Montgomery, Robert A. Baron, and Mary K. Weisskopf, "Potential Effects of Proposed Price Gouging Legislation on the Cost and Severity of Gasoline Supply Interruptions," *Journal of Competition Law and Economics* 3, no. 3 (2007): 357–97.

58.   Michael L. Marlow, "Too Much (Questionable) Information?," *Regulation*, Winter 2013–14: pp. 20–28.

**TABLE 13**

| Rank | State | Miscellaneous Regulatory Freedom Score | | Rank | State | Miscellaneous Regulatory Freedom Score |
|------|-------|------|---|------|-------|------|
| 1. | Arizona | 0.031 | | 26. | Alaska | 0.002 |
| 2. | Wyoming | 0.030 | | 27. | Indiana | 0.001 |
| 3. | Idaho | 0.026 | | 28. | North Dakota | 0.000 |
| 4. | Utah | 0.024 | | 29. | Delaware | −0.001 |
| 5. | New Mexico | 0.021 | | 30. | Rhode Island | −0.003 |
| 6. | New Hampshire | 0.020 | | 31. | Connecticut | −0.003 |
| 7. | Kansas | 0.017 | | 32. | Montana | −0.005 |
| 7. | Texas | 0.017 | | 33. | Maine | −0.005 |
| 9. | Wisconsin | 0.017 | | 34. | Pennsylvania | −0.005 |
| 10. | Illinois | 0.016 | | 35. | California | −0.005 |
| 11. | Minnesota | 0.014 | | 36. | Arkansas | −0.006 |
| 12. | Colorado | 0.012 | | 37. | Washington | −0.007 |
| 13. | Nevada | 0.008 | | 38. | Mississippi | −0.008 |
| 14. | Kentucky | 0.007 | | 39. | Michigan | −0.010 |
| 14. | Vermont | 0.007 | | 40. | Alabama | −0.013 |
| 16. | Iowa | 0.007 | | 41. | New Jersey | −0.014 |
| 17. | Nebraska | 0.005 | | 42. | Maryland | −0.014 |
| 17. | Ohio | 0.005 | | 43. | Tennessee | −0.015 |
| 19. | Missouri | 0.004 | | 44. | Louisiana | −0.017 |
| 20. | Georgia | 0.004 | | 45. | West Virginia | −0.017 |
| 20. | Oregon | 0.004 | | 46. | South Carolina | −0.018 |
| 20. | Virginia | 0.004 | | 47. | New York | −0.018 |
| 23. | Oklahoma | 0.003 | | 48. | Hawaii | −0.019 |
| 24. | South Dakota | 0.003 | | 49. | Massachusetts | −0.020 |
| 25. | Florida | 0.003 | | 50. | North Carolina | −0.020 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

64

# CABLE AND TELECOM FREEDOM

**1.1%**  The least important category in the regulatory policy dimension is cable and telecommunications market freedom. It is important to note that these are the only public utility regulation areas included in the freedom index, because some utility "deregulation" is not truly deregulatory, as in the case of pro-competitive "reregulation" that has restructured electricity and natural gas markets in certain states. Although these services are important for household budgets, it is not at all clear that "deregulation" results in a net increase in individual freedom. The utilities are all characterized by physical connections to the consumer. Because of the monopoly element in transmission (parallel connections are judged infeasible), even under deregulation governments maintain "common carrier" regulations that require the regulated owner of the transmission grid to allow open access to competing providers at a regulated price. The transmission grid then becomes a "commons" with no profit incentive for the owner to expand, upgrade, or maintain the network. In many cases, retail competition is tightly managed by state governments to prevent anticompetitive manipulation of the market. For these reasons, many analysts insist on the term *restructuring* as opposed to *deregulation* for these industries.[59]

Telecommunications deregulation accounts for roughly two-thirds of the weight for this category, and the remainder is accounted for by statewide cable franchising, which eases the entry of telecom firms into the video cable market.[60]

59.  Peter Van Doren and Jerry Taylor, "Rethinking Electricity Restructuring," Cato Institute Policy Analysis no. 530, November 30, 2004, https://www.cato.org/policy-analysis/rethinking-electricity-restructuring.

60.  Adam Summers, "Cable Franchise Reform: Deregulation or Just New Regulators?," *Freeman* 57, no. 3 (2007): 31–34; Cecil Bohanon and Michael Hicks, "Statewide Cable Franchising and Broadband Connections," Digital Policy Institute, Ball State University,  2010.

**TABLE 14**

| Rank | State | Cable and Telecom Freedom Score | Rank | State | Cable and Telecom Freedom Score |
|------|-------|--------------------------------|------|-------|--------------------------------|
| 1. | Kansas | 0.016 | 20. | Montana | 0.009 |
| 1. | Texas | 0.016 | 20. | Maine | 0.009 |
| 1. | Wisconsin | 0.016 | 20. | Pennsylvania | 0.009 |
| 1. | Illinois | 0.016 | 20. | Mississippi | 0.009 |
| 1. | Nevada | 0.016 | 20. | Alabama | 0.009 |
| 1. | Iowa | 0.016 | 31. | Idaho | 0.008 |
| 1. | Ohio | 0.016 | 31. | Rhode Island | 0.008 |
| 1. | Missouri | 0.016 | 31. | California | 0.008 |
| 1. | Georgia | 0.016 | 34. | Wyoming | 0.000 |
| 1. | Virginia | 0.016 | 34. | New Mexico | 0.000 |
| 1. | Florida | 0.016 | 34. | Minnesota | 0.000 |
| 1. | Indiana | 0.016 | 34. | South Dakota | 0.000 |
| 1. | Delaware | 0.016 | 34. | Alaska | 0.000 |
| 1. | Arkansas | 0.016 | 39. | Arizona | −0.001 |
| 1. | Michigan | 0.016 | 39. | Vermont | −0.001 |
| 1. | Tennessee | 0.016 | 39. | Connecticut | −0.001 |
| 1. | Louisiana | 0.016 | 39. | New Jersey | −0.001 |
| 1. | South Carolina | 0.016 | 39. | Hawaii | −0.001 |
| 1. | North Carolina | 0.016 | 44. | Oregon | −0.008 |
| 20. | Utah | 0.009 | 44. | Oklahoma | −0.008 |
| 20. | New Hampshire | 0.009 | 44. | Washington | −0.008 |
| 20. | Colorado | 0.009 | 44. | Maryland | −0.008 |
| 20. | Kentucky | 0.009 | 44. | West Virginia | −0.008 |
| 20. | Nebraska | 0.009 | 44. | New York | −0.008 |
| 20. | North Dakota | 0.009 | 44. | Massachusetts | −0.008 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

## OVERALL REGULATORY POLICY RANKING

**34.9%**   As with fiscal policy, states that rank highest on regulatory policy are mostly conservative, but they tilt toward midwestern more than southern. In general, these are "good-government" states that score well on variables such as the liability system variable. Regulatory policy remains a key element in economic growth, as Part II, "Politics of Freedom," later in the book will show.  But both fiscal and regulatory policy are highly correlated; thus, it is hard to disentangle which policy variable is doing most of the work to explain economic growth in the states.

We validate our regulatory policy measure by examining its correlation to small businesses' ratings of their states' regulatory environments. Thumbtack.com conducts an annual survey of independent businesses in each state, funded by the Kauffman Foundation.[61]  We average each state's rank out of 45 for 2012, 2013, and 2014 (5 states lack data). Smaller numbers are better, indicating a higher rank. The correlation between the 2014 regulatory index score and Thumbtack.com's regulatory survey rank is -0.70, a strong negative correlation that suggests that our index captures most of what small businesses think about when it comes to regulations that affect their business.

61.   The survey is available at https://www.thumbtack.com/survey.

**TABLE 15**

| Rank | State | Overall Regulatory Policy Score | Rank | State | Overall Regulatory Policy Score |
|------|-------|-------------------------------|------|-------|-------------------------------|
| 1. | Kansas | 0.126 | 26. | North Carolina | 0.007 |
| 2. | Nebraska | 0.120 | 27. | Alaska | −0.002 |
| 3. | Iowa | 0.110 | 28. | Colorado | −0.019 |
| 4. | Idaho | 0.103 | 29. | West Virginia | −0.022 |
| 5. | Wyoming | 0.080 | 30. | Missouri | −0.034 |
| 6. | South Dakota | 0.069 | 31. | Louisiana | −0.049 |
| 7. | Georgia | 0.066 | 32. | Ohio | −0.056 |
| 8. | Utah | 0.066 | 33. | Delaware | −0.064 |
| 9. | Wisconsin | 0.064 | 34. | Minnesota | −0.068 |
| 10. | Indiana | 0.064 | 35. | New Mexico | −0.068 |
| 11. | Kentucky | 0.058 | 36. | Montana | −0.093 |
| 12. | North Dakota | 0.051 | 37. | Pennsylvania | −0.120 |
| 13. | South Carolina | 0.050 | 38. | Illinois | −0.126 |
| 14. | Arkansas | 0.049 | 39. | Maine | −0.143 |
| 15. | Mississippi | 0.048 | 40. | Connecticut | −0.145 |
| 16. | Tennessee | 0.047 | 41. | Washington | −0.155 |
| 17. | Michigan | 0.044 | 42. | Massachusetts | −0.181 |
| 18. | Virginia | 0.041 | 43. | Rhode Island | −0.197 |
| 19. | Arizona | 0.037 | 44. | Vermont | −0.207 |
| 20. | Oklahoma | 0.031 | 45. | Hawaii | −0.232 |
| 21. | Florida | 0.018 | 46. | Oregon | −0.368 |
| 22. | Texas | 0.013 | 47. | Maryland | −0.395 |
| 23. | Nevada | 0.012 | 48. | New York | −0.450 |
| 24. | New Hampshire | 0.011 | 49. | New Jersey | −0.482 |
| 25. | Alabama | 0.009 | 50. | California | −0.486 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

Figure 5 shows how average regulatory policy has changed over time, when federalized policies such as the PPACA are excluded. Unlike with fiscal policy, states' have not sustained their gains on regulatory policy since the Great Recession. Occupational freedom, land-use freedom, and labor-market freedom have declined since 2016, whereas lawsuit freedom and cable and telecom freedom have improved. Minimum-wage increases were particularly problematic. Were we to include federalized policies, the drop would be even larger in 2012 when the PPACA took effect, more than wiping out even the temporary gains at the state level.

**FIGURE 5** State Average Regulatory Policy Scores Over Time



# OVERALL ECONOMIC FREEDOM RANKING

Although we believe that a composite freedom index that includes both economic and personal freedoms is most valuable and best represents the actual state of freedom in the states, readers may wish to compare and contrast the states solely on their overall economic freedom, particularly for the purposes of empirical analysis of income growth. We invite researchers to use the economic freedom variable as a tool for investigating income growth and related phenomena. Economic freedom is calculated as the sum of the fiscal and regulatory freedom indexes.

We validate our economic freedom index by correlating it to state scores for taxes and regulations as rated by chief executives of for-profit companies for *Chief Executive* magazine.[62] We use the average Chief Executive scores for 2013 and 2014 for all 50 states. The correlation between our economic freedom index and chief executives' ratings is 0.74, indicating an extremely strong relationship between what we measure as economic freedom and what entrepreneurs are concerned about when it comes to state policy.[63]

---

62.   The rankings were announced on *Chief Executive's* website, http://chiefexecutive.net, but are no longer available.

63.   We also correlated chief executives' ratings to the Economic Freedom of North America (EFNA) index, as measured in 2012 (latest available year) for the subnational level. That correlation is 0.67, strong but not as strong as the correlation between our index and chief executives' ratings. EFNA also has a weaker correlation with the Thumbtack.com survey results than our index. EFNA and our economic freedom index correlate at a moderately strong 0.59.

## TABLE 16

| Rank | State | Overall Economic Freedom Score | Rank | State | Overall Economic Freedom Score |
|------|-------|-------------------------------|------|-------|-------------------------------|
| 1. | Florida | 0.449 | 26. | Montana | 0.081 |
| 2. | Tennessee | 0.417 | 27. | Kansas | 0.079 |
| 3. | New Hampshire | 0.367 | 28. | Ohio | 0.058 |
| 4. | South Dakota | 0.332 | 29. | Alaska | 0.034 |
| 5. | Idaho | 0.298 | 30. | Massachusetts | 0.025 |
| 6. | Georgia | 0.288 | 31. | Louisiana | 0.011 |
| 7. | Indiana | 0.263 | 32. | Connecticut | 0.010 |
| 8. | Michigan | 0.227 | 33. | Iowa | 0.004 |
| 9. | Nevada | 0.210 | 34. | Nebraska | −0.022 |
| 10. | Texas | 0.200 | 35. | Illinois | −0.063 |
| 11. | Virginia | 0.200 | 36. | West Virginia | −0.078 |
| 12. | Missouri | 0.174 | 37. | Mississippi | −0.086 |
| 13. | Arizona | 0.165 | 38. | Washington | −0.116 |
| 14. | Colorado | 0.139 | 39. | Minnesota | −0.117 |
| 15. | Arkansas | 0.137 | 40. | Rhode Island | −0.138 |
| 16. | Kentucky | 0.137 | 41. | Maine | −0.158 |
| 17. | Pennsylvania | 0.131 | 42. | Delaware | −0.195 |
| 18. | Alabama | 0.125 | 43. | New Mexico | −0.282 |
| 19. | Wisconsin | 0.110 | 44. | Maryland | −0.327 |
| 20. | Wyoming | 0.108 | 45. | Vermont | −0.343 |
| 21. | Utah | 0.100 | 46. | New Jersey | −0.424 |
| 22. | North Carolina | 0.096 | 47. | Oregon | −0.428 |
| 23. | North Dakota | 0.092 | 48. | California | −0.543 |
| 24. | South Carolina | 0.088 | 49. | Hawaii | −0.601 |
| 25. | Oklahoma | 0.085 | 50. | New York | −0.757 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

Figure 6 shows the evolution of state average economic freedom over time, excluding federalized policies. Economic freedom declined in the early 2000s, recovered briefly, took another hit in 2009, and then grew to new heights by 2017 before a modest decline since then. The upswing was consistent with what Figures 4 and 5 show: rapidly improving state fiscal policies after 2011 and a less consistent but still large average improvement in regulatory policy until 2016. We worry that the recent downward dip could be a sign of a future trend toward greater interventionism in the economy—and a greater barrier to economic recovery in the aftermath of the COVID-19 pandemic.

**FIGURE 6**  State Average Economic Freedom Scores over Time



# PERSONAL FREEDOM

**T**he personal freedom versus paternalism dimension (Figure 7) consists of the following categories: (a) incarceration and arrests for victimless crimes, (b) gambling freedom, (c) gun rights, (d) marriage freedom, (e) educational freedom, (f) tobacco freedom, (g) alcohol freedom, (h) marijuana freedom, (i) asset forfeiture, (j) other mala prohibita and miscellaneous civil liberties, (k) travel freedom, and (l) campaign finance freedom. Weighting these categories is a challenge because the observable financial impacts of these policies often do not include the full harms to victims.

**FIGURE 7** Personal Freedom Weights



Incarcerations & Arrests **6.7%**

Gambling Freedom **4.2%**

Gun Rights **4.1%**

Marriage Freedom **3.2%**

Educational Freedom **3.0%**

Tobacco Freedom **2.7%**

Alcohol Freedom **2.6%**

Marijuana Freedom **2.4%**

Asset Forfeiture **2.0%**

Campaign Finance Freedom **0.1%**

*Mala Prohibita* **1.2%**

Travel Freedom **1.1%**

With some assumptions, one can use results in the academic literature to measure, for instance, the lost consumer surplus from marijuana prohibition, or even to make a plausible guess at the disutility incurred by a year in prison. However, it is much more difficult to measure the risks prohibitionist policies pose to individuals who are not imprisoned—especially those who may not even engage in the activity prohibited, but who legitimately fear further restrictions on their freedoms.

An example may help illustrate the problem. Imagine two countries, each the size of the United States. In Country A, the average tax rate is 1 percent (of income) lower than in Country B, but unlike Country B, Country A prohibits the practice of a minor religion—say, Zoroastrianism. Assuming personal income of $12 trillion, as in the United States, the lower tax rate in Country B allows for more freedom worth $28 billion a year, by the method of calculation used in this book.

Now suppose that 10,000 Zoroastrians go to prison for their beliefs. There are few estimates of the cost of prison, including opportunity cost and psychological harms, but the estimates that exist range between $30,000 and $50,000 per year for the average prisoner.[64] Taking the higher figure, the prohibition of Zoroastrianism is found to have a victim cost of approximately $500 million per year: far, far lower than the benefit of lower taxes.

Is the country with slightly lower taxes, but with a blatant infringement of religious freedom, truly freer? Surely, the calculation above has missed some very significant costs to freedom from the infringement of religious liberty. This calculation is related to the discussion of fundamental rights in the "Regulatory Policy" section earlier. Freedom to believe (or disbelieve) in any religion and freedom to practice peacefully (or refuse to practice) any religion seem to be freedoms that every person rationally desires. They are fundamental rights. Many personal freedoms have this character, and it needs to be recognized in the freedom index.

Therefore, the index applies constitutional weights to personal freedoms—as with regulatory policies—but uses different values, because the direct, measurable costs to victims of policies that infringe on personal freedoms are generally a smaller percentage of true costs than the direct, measurable costs to victims of regulatory policies. Put another way, measuring the economic consequences that regulatory policies have on their full victim class is a relatively simple procedure, but the full costs of policies that infringe on personal freedoms are measurable only in part. Further, as mentioned in the discussion of fiscal policy, taxes and economic regulations do not necessarily infringe on the rights of all apparent victims, unlike policies

---

64.   John J. Donohue, "Assessing the Relative Benefits of Incarceration: The Overall Change over the Previous Decades and the Benefits on the Margin," in *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, ed. Steven Raphael and Michael Stoll (New York: Russell Sage Foundation, 2008); Innocence Project, "Compensating the Wrongly Convicted," https://www.innocenceproject.org/compensating-wrongly-convicted/.

that affect personal freedoms.

Again, the index takes constitutional provisions relating to certain freedoms as prima facie evidence of a freedom's "basicness," indicating that the full victim class should be thought of as quite broad. Therefore, variables relating to fundamental, high-salience rights are multiplied by a factor of 10, on the basis of their inclusion in the federal Constitution. Variables relating to rights specified only in at least one state constitution are multiplied by a factor of 5. Variables that receive the "constitutional weights" are noted in the relevant discussion of each. There is of course nothing magical about these numbers, but they bring the personal freedom dimension into rough parity with the fiscal and regulatory policy dimensions as one-third of the overall index. In this edition, personal freedom is of slightly less weight than the regulatory dimension and 3 percent more than fiscal policy.

The following sections introduce each category within the personal freedom dimension, in order of weight.

# INCARCERATION AND ARRESTS FOR VICTIMLESS CRIMES

**6.7%**

The most heavily weighted category in the personal freedom dimension is the law enforcement statistics category, which consists of data on incarceration rates adjusted for violent and property crime rates,[65] nondrug victimless crimes arrests, the drug enforcement rate, and two variables new to the fifth edition—(a) driver's license suspensions for drug offenses and (b) prison collect phone call rates. This category is worth a bit over one-fifth of the personal freedom index. Given that the United States is frequently lambasted for having more prisoners per capita than almost every other country, and that the incarceration rate varies widely across states, it is perhaps no surprise that this category should be so important. The personal freedom dimension also includes laws that create or reduce victimless crimes in other categories, such as marijuana, gun, and prostitution laws. Our philosophy for assigning weights to these categories is to consider the forgone consumer and producer surplus due to prohibitions, while we consider within the law enforcement statistics category the costs of arrest and prison time. Given our earlier discussion of virtue libertarianism, it is important to remember that consumer and producer surplus are economic concepts rather than moral judgments that would assign any approbation to the activities themselves.

A one-standard-deviation nationwide reduction in incarceration rates adjusted for crime rates would yield about $17 billion in new value for prisoners. This figure excludes the fiscal benefits of incarcerating fewer people.

A similar reduction in drug arrests per reported drug user would benefit arrestees by $8.7 billion. Other victimless crimes arrests are calculated in two different ways, since there is no direct, state-by-state measure of the number of people who engage in these activities, as there is for drug arrests. Instead, the index takes the arrests of people over 18 for weapons, prostitution, gambling, loitering, and liquor law violations as a percentage of the population and as a percentage of total arrests. The former figure is an imperfect measure of the risk of a citizen's being arrested for one of these offenses (except that states may differ in the percentage of citizens who engage in these activities), whereas the latter is more of a measure of police priorities. Both variables are equally weighted and together amount to $5.8 billion of benefit to potential arrestees.

65  The adjustment involves regressing the incarceration rate on violent and property crime rates and taking the residuals. States with high scores will be those that lock up more people than would be expected given their crime rates.

The cost to drug offenders of a nationwide policy of driver's license suspensions, which typically last six months or more, would be in the neighborhood of $350 million. A standard-deviation change in the 15-minute collect phone call rate, $1.65, would roughly extract $51 million from prisoners' families if implemented nationwide.



**TABLE 17**

| Rank | State | Incarceration and Arrests for Victimless Crimes Score | | Rank | State | Incarceration and Arrests for Victimless Crimes Score |
|---|---|---|---|---|---|---|
| 1. | Massachusetts | 0.134 | | 26. | Nebraska | 0.020 |
| 2. | Rhode Island | 0.116 | | 27. | Pennsylvania | 0.015 |
| 3. | Maine | 0.110 | | 28. | Montana | 0.015 |
| 4. | Vermont | 0.107 | | 29. | Alabama | 0.014 |
| 5. | Hawaii | 0.087 | | 30. | West Virginia | 0.010 |
| 6. | Minnesota | 0.086 | | 31. | Nevada | 0.010 |
| 7. | Alaska | 0.085 | | 32. | South Carolina | 0.004 |
| 8. | Washington | 0.078 | | 33. | Indiana | 0.003 |
| 9. | New Hampshire | 0.073 | | 34. | Ohio | 0.002 |
| 10. | Connecticut | 0.071 | | 35. | Tennessee | 0.001 |
| 11. | New York | 0.059 | | 36. | Wisconsin | 0.000 |
| 12. | New Jersey | 0.054 | | 37. | Florida | −0.006 |
| 13. | New Mexico | 0.051 | | 38. | Missouri | −0.008 |
| 14. | Utah | 0.047 | | 39. | Virginia | −0.012 |
| 15. | Iowa | 0.039 | | 40. | Georgia | −0.016 |
| 16. | Colorado | 0.036 | | 41. | Idaho | −0.020 |
| 17. | California | 0.036 | | 42. | Kentucky | −0.021 |
| 18. | Oregon | 0.034 | | 43. | Arizona | −0.021 |
| 19. | Maryland | 0.032 | | 44. | Texas | −0.026 |
| 20. | North Carolina | 0.032 | | 45. | Oklahoma | −0.034 |
| 21. | Illinois | 0.029 | | 46. | Arkansas | −0.037 |
| 22. | Michigan | 0.026 | | 47. | South Dakota | −0.047 |
| 23. | Kansas | 0.026 | | 48. | Wyoming | −0.049 |
| 24. | North Dakota | 0.023 | | 49. | Louisiana | −0.061 |
| 25. | Delaware | 0.023 | | 50. | Mississippi | −0.062 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# GAMBLING FREEDOM

**4.2%**   Annual nationwide commercial casino revenues minus
payouts ("win") are over $40 billion,[66] so gambling is big
business. Unfortunately, no state has a free market in gaming enterprises,
but an oligopolistic, state-licensed system at least permits more freedom
than a total ban.

We include casino revenue data in the freedom index. We have obtained
these data from the University of Nevada Las Vegas (UNLV) Center for
Gaming Research and state regulatory boards' annual reports. The freedom
index uses the Australian Productivity Commission's admittedly flawed[67]
method (but a creditable and unique attempt) for deriving the consumer
surplus, as follows:

$$S = \frac{p(1-t)q}{2e}$$

where S is the surplus, $p(1-t)q$ is price including tax times quantity, and e is the
price elasticity of demand, assumed to be –1.3 following the academic litera-
ture and the Australian Productivity Commission's estimate for nonproblem
gamblers.[68] Thus, the total gambling revenues figure is divided by 2.6 to get the
consumer surplus. We also take 30 percent off for problem gamblers, whose
consumer surplus might be zero (an aggressive assumption). In addition, we
take two-thirds off the figure to account for interstate spillovers: gambling lib-
eralization on the margin does not increase consumer surplus or revenue much
because the national gambling market is almost saturated. For the freedom
index, producer surplus is irrelevant because the producer side of the industry
is heavily oligopolistic or monopolistic because of state control.

Apart from casino win, we also include dichotomous variables measur-
ing whether states have legalized noncasino forms of gambling: pari-mutuel
wagering, charitable gaming, and slot or video machines outside casinos. Some
states put those revenue figures online, but we have been unable to obtain com-
plete data, hence the dichotomous variables. Using the data we do have, howev-
er, we can roughly estimate the impact of legalization in each of those areas on
consumer surplus. Slot and video machines seem to be far more popular than
pari-mutuel wagering or charitable gaming. The revenues from slot machines
are mind-boggling to these authors, who have little interest in this form of
gambling and more than a little disapprobation. In 2016, sparsely populated
Montana raked in a whopping $400 million a year in gross revenue minus

66.   "United States Commercial Casino Gaming: Monthly Revenues," UNLV Center for Gaming Research.

67.   Brian Dollery and John Storer, "Assessing the Impact of Electronic Gaming Machines: A Conceptual Critique of the
      Productivity Commission's Methodology," Gambling Research 20, no. 1 (2008), 1–12.

68.   "Estimating Consumer Surplus," Australasian Gaming Council. https://web.archive.org/web/20130426072651/
      www.austgamingcouncil.org.au/images/pdf/eLibrary/2330.pdf.

payouts, amounting to nearly $500 for every man, woman, and child. Clearly, quite a few Montanans are paying many thousands of dollars a year for the privilege of playing these games.

Although the aforementioned gambling variables are worth a combined 4.0 percent of the index, the remaining variables in this category have very small weights. A social gambling exception and whether "aggravated gambling" is a felony each make up 0.02 percent of the freedom index. Express prohibitions on internet gambling, which are redundant on federal prohibitions, are worth less than 0.01 percent.

## TABLE 18

| Rank | State | Gambling Freedom Score | Rank | State | Gambling Freedom Score |
|------|-------|------------------------|------|-------|------------------------|
| 1. | Nevada | 0.154 | 26. | Florida | −0.013 |
| 2. | Louisiana | 0.048 | 27. | Oklahoma | −0.013 |
| 3. | West Virginia | 0.035 | 27. | Minnesota | −0.014 |
| 4. | Pennsylvania | 0.033 | 27. | Connecticut | −0.014 |
| 5. | Maryland | 0.032 | 27. | California | −0.014 |
| 6. | Illinois | 0.032 | 27. | Alabama | −0.014 |
| 7. | South Dakota | 0.028 | 32. | Texas | −0.014 |
| 8. | Montana | 0.025 | 32. | Nebraska | −0.014 |
| 9. | Oregon | 0.025 | 32. | Idaho | −0.014 |
| 10. | Virginia | 0.025 | 32. | Kentucky | −0.014 |
| 11. | Mississippi | 0.018 | 32. | Arizona | −0.014 |
| 12. | Rhode Island | 0.004 | 32. | Arkansas | −0.014 |
| 13. | Iowa | 0.001 | 32. | Wyoming | −0.014 |
| 14. | Delaware | 0.000 | 39. | Washington | −0.014 |
| 15. | Indiana | −0.003 | 40. | North Dakota | −0.014 |
| 16. | New Jersey | −0.004 | 41. | New Hampshire | −0.015 |
| 17. | Missouri | −0.006 | 42. | South Carolina | −0.015 |
| 18. | Ohio | −0.009 | 43. | Wisconsin | −0.015 |
| 19. | Michigan | −0.009 | 44. | Vermont | −0.015 |
| 20. | New Mexico | −0.009 | 44. | Alaska | −0.015 |
| 21. | Colorado | −0.010 | 44. | North Carolina | −0.015 |
| 22. | Kansas | −0.010 | 47. | Tennessee | −0.015 |
| 23. | Maine | −0.011 | 47. | Georgia | −0.015 |
| 24. | New York | −0.011 | 49. | Hawaii | −0.016 |
| 25. | Massachusetts | −0.012 | 50. | Utah | −0.016 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

DIMENSIONS OF FREEDOM   73

# GUN RIGHTS

**4.1%**

Gun rights have risen across editions of the index because of new research suggesting that the price elasticity of demand for carry permits is rather low, implying high consumer surplus. Still, most of the weight of this category is because of the boost these policies receive from state and federal constitutional protection.

Only some firearms policies trigger Second Amendment scrutiny, and those are the only ones to get the full "times 10" constitutional weighting factor. We follow recent case law in our judgments on this point. On the one hand, the U.S. Supreme Court decisions in *D.C. v. Heller*[69] and *McDonald v. Chicago*[70] held that federal, state, and local governments are not allowed to ban gun ownership for self-defense purposes altogether, and state and federal appeals court decisions have also held that the Second Amendment protects a right to carry a firearm outside the home. On the other hand, the Supreme Court has opined that the U.S. Constitution permits bans on certain types of firearms and reasonable regulations on how someone may qualify to carry a weapon for self-defense. However, since the Louisiana Constitution provides that all firearms-related restrictions should be subject to strict scrutiny, we apply a "times 5" constitutional weighting factor to all those firearms policies not receiving the "times 10" boost. Variables falling into this latter category include concealed-carry permit costs, concealed-carry permit terms, restrictions on multiple purchases of handguns, licensing or regulation of gun dealers, universal background checks, registration of firearms, locking device requirements, ammunition microstamping, duty-to-retreat laws, and laws relating to National Firearms Act weapons (machine guns, sound suppressors, short-barreled rifles, short-barreled shotguns, and "any other weapon"). We eliminated non-powder-gun regulations in this edition of the index because of the lack of data.

The most significant variable in the gun rights category is the concealed-carry index, which takes into account shall-issue versus may-issue, carry in vehicles, local preemption, and the scope of places where concealed carry is allowed (1.9 percent of the freedom index). Concealed-carry permit cost (0.5 percent of the index) comes next. The existence of a local gun ban—which only Illinois had, until struck down in *McDonald v. Chicago*—is worth 0.4 percent. At about 0.3 percent of the index, we find our index of firearms owner licensing requirements and waiting periods on firearms purchases. At 0.2 percent of the index is the term of carry permits.

Other variables included in this category—and worth far less than those discussed in the previous paragraph—are our index of open-carry laws,

69    *D.C. v. Heller*, 554 U.S. 570 (2008).
70    *McDonald v. Chicago*, 561 U.S. 742 (2010).

training requirements for carry permits, stricter-than-federal minimum age to purchase firearms, assault weapons bans, duty-to-retreat laws ("castle doctrine"), restrictions on multiple purchases, locking-device requirements, dealer licensing, registration of firearms, ballistic identification or microstamping requirements, "design safety standards" (bans on cheap handguns), large-capacity magazine bans, laws regarding Class III weapons, retention of sales records, and .50-caliber rifle bans.

**TABLE 19**

| Rank | State | Gun Rights Score | Rank | State | Gun Rights Score |
|------|-------|------------------|------|-------|------------------|
| 1. | Kansas | 0.044 | 26. | Indiana | 0.015 |
| 2. | New Hampshire | 0.044 | 27. | Montana | 0.014 |
| 3. | Idaho | 0.043 | 28. | Ohio | 0.014 |
| 3. | Arizona | 0.043 | 29. | Nevada | 0.013 |
| 5. | Vermont | 0.042 | 30. | South Carolina | 0.013 |
| 6. | West Virginia | 0.037 | 31. | Texas | 0.013 |
| 6. | Mississippi | 0.037 | 32. | Louisiana | 0.012 |
| 6. | Kentucky | 0.037 | 33. | New Mexico | 0.012 |
| 6. | Wyoming | 0.037 | 34. | Michigan | 0.012 |
| 10. | South Dakota | 0.037 | 35. | North Carolina | 0.010 |
| 11. | North Dakota | 0.036 | 36. | Iowa | 0.009 |
| 12. | Missouri | 0.036 | 37. | Minnesota | 0.009 |
| 13. | Alaska | 0.036 | 38. | Florida | 0.006 |
| 14. | Maine | 0.035 | 39. | Washington | 0.004 |
| 15. | Arkansas | 0.034 | 40. | Nebraska | −0.003 |
| 16. | Oklahoma | 0.034 | 41. | Illinois | −0.009 |
| 17. | Pennsylvania | 0.021 | 42. | Delaware | −0.027 |
| 18. | Utah | 0.020 | 43. | New York | −0.035 |
| 19. | Wisconsin | 0.019 | 44. | Connecticut | −0.039 |
| 20. | Colorado | 0.017 | 45. | Maryland | −0.042 |
| 21. | Alabama | 0.017 | 46. | Rhode Island | −0.042 |
| 22. | Oregon | 0.016 | 47. | New Jersey | −0.047 |
| 23. | Georgia | 0.016 | 48. | Massachusetts | −0.048 |
| 24. | Tennessee | 0.016 | 49. | California | −0.054 |
| 25. | Virginia | 0.015 | 50. | Hawaii | −0.077 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# MARRIAGE FREEDOM

**3.2%**

Most of the weight of the marriage freedom category is tied to the availability of same-sex partnerships, whether civil unions or marriage. The remainder is tied to waiting periods and blood test requirements, availability of cousin marriage and covenant marriage, and sodomy laws, which were struck down by the Supreme Court in 2003. In our view, state governments should treat marriage as a contract that is "registered" or "recorded," rather than a personal status that is "licensed."

States that prohibited same-sex couples from entering private contracts that provide the benefits of marriage (whether termed "marriages" or "civil unions") clearly took away an important contract right from such couples. Some states merely refrained from providing a convenient mechanism, such as civil unions or marriage, for same-sex couples to make contracts covering inheritance, hospital visitation, medical power of attorney, and so on. Other states went further and expressly prohibited any private contracts intended to provide benefits equivalent to marriage. For instance, the Virginia Constitution states, "This Commonwealth and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance, or effects of marriage." Such state laws are sometimes called "super-DOMAs," after the federal Defense of Marriage Act. Other states that, by statute or constitution, prohibited all marriage-like private contracts for same-sex couples are Alabama, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Michigan, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and Wisconsin (which is a curious example of a state that has limited domestic partnerships but also a super-DOMA, banning contracts offering benefits "equal to marriage").

Now that the Supreme Court has nationalized same-sex marriage, those distinctions among states are irrelevant. The 2019 ranking on this variable is driven mostly by cousin marriage, which at 0.2 percent of the index is more important than covenant marriage and vastly more important than blood tests and waiting periods.[71]

The freedom index has long used an estimate that the freedom to marry is worth about $2,500 per year to same-sex couples, and that about 900,000 couples would take advantage of this opportunity when it became available nationwide.[72] Those estimates have proved reliable in subsequent research. Over 1 million Americans are now in same-sex marriages.[73]

71.   Although cousin marriage is rare, bans on the practice receive the constitutional weight of 10 because they prevent certain couples from marrying altogether. Covenant marriage, waiting periods, and blood tests, by contrast, do not receive the constitutional weight.

72.   M. V. Lee Badgett, "The Economic Value of Marriage for Same-Sex Couples," *Drake Law Review* 58 (2010): 1081–116.

73.   Census Bureau, "U.S. Census Bureau Releases CPS Estimates of Same-Sex Households," (November 19), news release no. CB19-TPS.51. November 19, 2019. For 2016, see Richard Wolf, "Gay Marriages Up 33% in Year Since Supreme Court Ruling," *USA Today*.

**TABLE 20**

| Rank | State | Marriage Freedom Score | Rank | State | Score |
|------|-------|------:|------|-------|------:|
| 1. | Alabama | 0.028 | 26. | Wisconsin | 0.025 |
| 1. | California | 0.028 | 27. | Louisiana | 0.025 |
| 1. | Colorado | 0.028 | 28. | Idaho | 0.022 |
| 1. | Connecticut | 0.028 | 28. | Kentucky | 0.022 |
| 1. | Georgia | 0.028 | 28. | Minnesota | 0.022 |
| 1. | Hawaii | 0.028 | 28. | Mississippi | 0.022 |
| 1. | New Mexico | 0.028 | 28. | Missouri | 0.022 |
| 1. | North Carolina | 0.028 | 28. | Montana | 0.022 |
| 1. | Rhode Island | 0.028 | 28. | Nebraska | 0.022 |
| 1. | Tennessee | 0.028 | 28. | Nevada | 0.022 |
| 1. | Vermont | 0.028 | 28. | New Hampshire | 0.022 |
| 1. | Virginia | 0.028 | 28. | North Dakota | 0.022 |
| 13. | South Carolina | 0.028 | 28. | Ohio | 0.022 |
| 14. | Maryland | 0.028 | 28. | Oklahoma | 0.022 |
| 15. | Arizona | 0.028 | 28. | South Dakota | 0.022 |
| 16. | Alaska | 0.028 | 28. | West Virginia | 0.022 |
| 16. | Florida | 0.028 | 28. | Wyoming | 0.022 |
| 16. | Massachusetts | 0.028 | 43. | Delaware | 0.022 |
| 16. | New Jersey | 0.028 | 44. | Iowa | 0.022 |
| 20. | New York | 0.027 | 44. | Kansas | 0.022 |
| 21. | Indiana | 0.025 | 44. | Michigan | 0.022 |
| 21. | Maine | 0.025 | 44. | Oregon | 0.022 |
| 21. | Utah | 0.025 | 44. | Pennsylvania | 0.022 |
| 24. | Illinois | 0.025 | 44. | Texas | 0.022 |
| 25. | Arkansas | 0.025 | 44. | Washington | 0.022 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# EDUCATIONAL FREEDOM

**3.0%**

The single most important educational freedom variable is the index of tax credit and deduction laws for private education (1.1 percent of the whole index). We have assumed that the average "broad-eligibility" program has a per-student benefit of about $3,250. We use research on the price elasticity of demand for private schooling to estimate the number of families that would take advantage of this type of program if it were available nationwide, and we come up with an estimate of 7.5 million.[74] We also add a small bonus ($20 per student) to those students remaining in public schools, with the idea that their families also benefit slightly from the mere availability of more choice. Together, those estimates imply that moving nationwide from a situation of no tax credit scholarships to broad-eligibility programs would benefit families about $14.5 billion a year.

Other important variables for educational freedom include publicly funded voucher law size and scope, mandatory state licensure of private school teachers, mandatory state or local approval of private schools, years of compulsory schooling, and extent of private school curriculum control. Vouchers are worth less than tax credit scholarship funds because extant programs are generally more narrowly targeted and come with more strings attached. Since the closing of our data, West Virginia has enacted a broad-eligibility education savings account bill; such a policy will have a heavy weight in our index given how we calculate variable weightings (something we noted in the fifth edition of the index).

Less significant are public school choice ("open enrollment" policies), mandatory registration of private schools, existence of a homeschool law, homeschool curriculum control, homeschool teacher qualifications, homeschool standardized testing, homeschool notification index, and homeschool record-keeping index. All the homeschool variables combined make up 0.13 percent of the index. Their weight is small because few students are homeschooled (though the COVID-19 pandemic educational experience may have permanently increased the homeschool population), and the variance in state policies is not as significant in the post-2000 period as it was in the 1980s.

Educational freedom is an area in which states continue to be active in a generally positive direction. In the fifth edition, we noted that we expected several states would climb in the rankings in this edition of the index. That has now been borne out. For instance, in 2017, New Hampshire passed a law allowing all school districts to adopt a private school choice program for stu-

---

74.   Andrew Coulson, "Choosing to Save: The Fiscal Impact of Education Tax Credits on the State of Nevada," Nevada Policy Research Institute, January 12, 2009, https://www.npri.org/issues/publication/choosing-to-save.

dents in grades not covered by a school district's own schools. In 2021, New Hampshire went even further, which should improve its ranking even more by the next edition.

## TABLE 21

| Rank | State | Educational Freedom Score | Rank | State | Educational Freedom Score |
|------|-------|------------|------|-------|------------|
| 1. | Arizona | 0.058 | 26. | Kansas | 0.003 |
| 2. | Florida | 0.045 | 27. | Idaho | 0.001 |
| 3. | Indiana | 0.042 | 28. | Tennessee | −0.001 |
| 4. | Georgia | 0.036 | 29. | New Jersey | −0.002 |
| 5. | New Hampshire | 0.033 | 30. | Missouri | −0.002 |
| 6. | North Carolina | 0.028 | 31. | Delaware | −0.003 |
| 7. | Illinois | 0.027 | 32. | Colorado | −0.003 |
| 8. | Virginia | 0.026 | 33. | Texas | −0.004 |
| 9. | Wisconsin | 0.024 | 34. | New Mexico | −0.004 |
| 10. | Louisiana | 0.021 | 35. | Oregon | −0.005 |
| 11. | Oklahoma | 0.018 | 36. | New York | −0.005 |
| 12. | Pennsylvania | 0.017 | 37. | Kentucky | −0.005 |
| 13. | Rhode Island | 0.017 | 38. | California | −0.005 |
| 14. | Montana | 0.015 | 39. | Alaska | −0.006 |
| 15. | Vermont | 0.013 | 40. | West Virginia | −0.007 |
| 16. | Mississippi | 0.012 | 41. | Connecticut | −0.007 |
| 17. | Ohio | 0.011 | 42. | Massachusetts | −0.010 |
| 18. | Iowa | 0.010 | 43. | Hawaii | −0.010 |
| 19. | South Carolina | 0.007 | 44. | Wyoming | −0.011 |
| 20. | Minnesota | 0.007 | 45. | Maine | −0.012 |
| 21. | Nevada | 0.006 | 46. | Maryland | −0.015 |
| 22. | Utah | 0.006 | 47. | Nebraska | −0.015 |
| 23. | Alabama | 0.005 | 48. | Michigan | −0.017 |
| 24. | South Dakota | 0.004 | 49. | Washington | −0.022 |
| 25. | Arkansas | 0.004 | 50. | North Dakota | −0.023 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# TOBACCO FREEDOM

**2.7%**   In the tobacco freedom category, representing 2.7 percent of the index, we consider the effect of cigarette taxes, minimum legal sale age of 21, smoking and vaping bans (in privately owned workplaces, restaurants, and bars), flavored electronic cigarette bans, vending machine bans, and internet sales regulations on freedom. The vaping variables are new to this sixth edition of the index.

Cigarette taxes are the most important variable in this category. A $1-per-pack tax increase is associated with about a 16.7 percent increase in the price of a pack.[75] Nobel Prize–winning economist Gary S. Becker and his colleagues calculate that the long-run price elasticity of demand for cigarettes is about −0.75.[76] In 2010, 303 billion cigarettes were sold in the United States, typically at 20 cigarettes per pack.[77] These facts are sufficient to calculate the deadweight loss (dividing by 2 under the assumption of perfectly elastic supply) and the total cost to consumers. As with alcohol taxes, we divide the latter element by 2.5 to capture the fact that taxes have the conditional consent of some taxpayers, but not by 4 as we did for general taxes (see discussion in the "Fiscal Policy" section), because "sin taxes" disproportionately hit consumers of these products, who are more likely to be opposed to high taxes on the goods they consume.

Economics professor Michael L. Marlow examines the consequences of Ohio's comprehensive smoking ban for its losers. State and local governments issued 33,347 citations, with an average expense of about $1,250 per citation (given that each cited location averaged about five citations).[78] Extrapolating from Ohio's population supplies the national numbers for the freedom index.

The second set of costs from smoking bans has to do with lost business and the associated disutility to smokers. There is an unfortunate lack of good studies with quasi-random treatment; however, a reasonable assumption is that the costs of bans must be at least as high as (and possibly much greater than) the fines establishments are willing to risk to permit smoking. Thus, a simple approach is to multiply an estimate of this amount by 2.5, assuming that the lost revenue is slightly greater than the fines businesses are willing to incur. Because bars are affected by smoking bans much more than restaurants and workplaces are, we assign 80 percent of the weight to

75.   Ann Boonn, "State Cigarette Excise Tax Rates and Rankings," Campaign for Tobacco-Free Kids, Washington, December 18, 2012, http://www.tobaccofreekids.org/research/factsheets/pdf/0097.pdf.

76.   Gary S. Becker, Michael Grossmann, and Kevin M. Murphy, "Rational Addiction and the Effect of Price on Consumption," *American Economic Review* 81, no. 2 (1991): 237–41.

77.   "Economic Facts about U.S. Tobacco Production and Use," Centers for Disease Control and Prevention, November 15, 2012, http://www.cdc.gov/tobacco/data_statistics/fact_sheets/economics/econ_facts/.

78.   Michael L. Marlow, "The Economic Losers from Smoking Bans," *Regulation*, Summer 2010, pp. 14–19, http://www.cato.org/sites/cato.org/files/serials/files/regulation/2010/6/regv33n2-4.pdf.

smoking bans in bars and 10 percent each to the latter bans.

Banning 18- to 20-year-olds from buying tobacco products nationwide could eliminate about $5 billion of annual sales. Assuming the price elasticity of demand is –0.2, the lost consumer surplus is about 2.5 times that.

Banning flavored electronic cigarettes is worth 0.2 percent of the index. Flavored electronic cigarette bans reduce overall e-cigarette sales. Because of technological change, we apply a time-varying weight. Massachusetts's flavored vape ban appears to have reduced sales 24 percent.[79] Another economic impact study predicts a more than 58 percent drop in sales from a federal ban.[80] We average these figures to get a cross-elasticity of substitution of –0.41. We consider both the lost consumer surplus and the deadweight loss of a flavor ban. According to one source, the U.S. e-cigarette market was worth $12.8 billion in 2020.[81] The vape market was about $2.5 billion in 2014.[82] It apparently doubled each year between 2010 and 2014, and we assume it doubled back to 2008, which we use as the first year of vaping. In the preregulation era, nontobacco flavors made up to 86 percent of vape sales.[83] Recently, federal regulation has driven nonmenthol and nontobacco flavors out of the market. E-cigarette sales remain strong, suggesting that flavor bans are not nearly as severe as total bans. However, flavor bans do seem to drive youth toward cigarette smoking.[84]

Vending machine bans, vaping bans, and internet sales regulations are together worth less than 0.1 percent of the index.

79.  Patrick Gleason, "One State's Flavored Tobacco & Vape Ban Is a Cautionary Tale for the Nation," *Forbes*, January 31, 2021.

80.  John Dunham, "The Economic Impact of a Ban on Flavored Vapor Products," memorandum to Vapor Technology Association, November 21, 2019.

81.  "United States E-Cigarette and Vape Market," Expert Market Research, December 2020.

82.  "Activities of the Cigarette Companies," Chapter 4 in *E-Cigarette Use among Youth and Young Adults: A Report of the Surgeon General* (Atlanta: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, 2016), https://www.ncbi.nlm.nih.gov/books/NBK538679/.

83.  Dunham, "Economic Impact of a Ban on Flavored Vapor Products."

84.  Ed Cara, "San Francisco's Flavored Vape Ban Linked to More Teen Smoking, Study Finds," Gizmodo, May 25, 2021.

**TABLE 22**

| Rank | State | Tobacco Freedom Score | | Rank | State | Tobacco Freedom Score |
|---|---|---|---|---|---|---|
| 1. | Georgia | 0.019 | | 25. | Michigan | −0.008 |
| 2. | Wyoming | 0.016 | | 27. | Kansas | −0.012 |
| 3. | South Carolina | 0.015 | | 28. | Wisconsin | −0.015 |
| 4. | Mississippi | 0.015 | | 29. | Arkansas | −0.022 |
| 5. | North Carolina | 0.015 | | 30. | Texas | −0.028 |
| 6. | Idaho | 0.014 | | 31. | Virginia | −0.031 |
| 7. | North Dakota | 0.013 | | 32. | Maryland | −0.036 |
| 8. | Tennessee | 0.013 | | 33. | Maine | −0.037 |
| 9. | Nebraska | 0.012 | | 34. | Ohio | −0.038 |
| 10. | Alabama | 0.010 | | 35. | Pennsylvania | −0.041 |
| 11. | Kentucky | 0.010 | | 36. | Delaware | −0.041 |
| 12. | Indiana | 0.009 | | 37. | Colorado | −0.047 |
| 13. | Louisiana | 0.008 | | 38. | Minnesota | −0.052 |
| 14. | Missouri | 0.007 | | 39. | Rhode Island | −0.054 |
| 15. | West Virginia | 0.007 | | 40. | Vermont | −0.055 |
| 16. | Florida | 0.004 | | 41. | Hawaii | −0.056 |
| 17. | Iowa | 0.002 | | 42. | Oregon | −0.057 |
| 18. | Nevada | 0.001 | | 43. | New Jersey | −0.064 |
| 19. | South Dakota | −0.002 | | 44. | Alaska | −0.064 |
| 20. | Oklahoma | −0.002 | | 45. | California | −0.067 |
| 21. | New Hampshire | −0.003 | | 46. | Washington | −0.068 |
| 22. | Montana | −0.004 | | 47. | Connecticut | −0.072 |
| 23. | Utah | −0.004 | | 48. | Massachusetts | −0.086 |
| 24. | New Mexico | −0.007 | | 49. | New York | −0.108 |
| 25. | Arizona | −0.008 | | 50. | Illinois | −0.126 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# ALCOHOL FREEDOM

**2.6%** The alcohol distribution system ("control"—which means that the state has a monopoly on distribution—versus "license"—which means that the state licenses distributors) makes up almost 1.0 percent of the whole index on its own. Research shows that state distribution of alcohol imposes significant costs on consumers in time and inconvenience.[85]

The freedom index assumes a "full-price elasticity" (including formal and informal prices) of −0.2 for all alcohol types, which is similar to what has been discovered in the literature cited earlier. Reducing consumption of alcohol by 5 percent with a state monopoly, according to University of California, Los Angeles professors Stanley I. Ornstein and Dominique M. Hanssens, therefore implies a 25 percent "tax" due to transaction cost. According to the U.S. Department of Agriculture, packaged alcoholic beverage sales in 2010 amounted to $91 billion. If all such sales had to go through state monopolies, then one might expect a transaction-cost "tax" of close to $23 billion.[86]

Blue laws (bans on Sunday sales) would, if implemented nationwide, reduce consumer welfare by over $4.5 billion and are worth 0.4 percent of the index. Preventing wine, spirits, or in a few states even beer from being sold in grocery stores has a similar cost. Taxes on beer, wine, and spirits each make up 0.2–0.3 percent of the index as a whole, followed by direct wine shipment bans, keg registration and bans, and "happy hour" bans. Mandatory server training, worth less than 0.01 percent of the index, rounds out this category.

With its strong brewing industry, it is no surprise that Wisconsin finishes first in this ranking. Nor is Utah's last-place finish shocking.

85.   Stanley I. Ornstein and Dominique M. Hanssens, "Alcohol Control Laws and the Consumption of Distilled Spirits and Beer," *Journal of Consumer Research* 12, no. 2 (1985): 200–213.

86.   Björn Trolldal and William Ponicki, "Alcohol Price Elasticities in Control and License States in the United States, 1982–1999," *Addiction* 100, no. 8 (2005): 1158–65. Our comparison here is from minimum to maximum values for this variable.

**TABLE 23**

| Rank | State | Alcohol Freedom Score | | Rank | State | Alcohol Freedom Score |
|------|-------|------:|---|------|-------|------:|
| 1. | Wisconsin | 0.019 | | 26. | South Carolina | 0.004 |
| 2. | Missouri | 0.019 | | 27. | Tennessee | 0.003 |
| 3. | Arizona | 0.018 | | 28. | Georgia | 0.003 |
| 4. | Nevada | 0.018 | | 29. | Maine | 0.002 |
| 5. | Indiana | 0.018 | | 30. | Rhode Island | 0.001 |
| 6. | California | 0.018 | | 31. | Delaware | 0.001 |
| 7. | Louisiana | 0.016 | | 32. | West Virginia | 0.001 |
| 8. | South Dakota | 0.016 | | 33. | Minnesota | 0.001 |
| 9. | Illinois | 0.015 | | 34. | Kansas | 0.000 |
| 10. | Texas | 0.015 | | 35. | Iowa | 0.000 |
| 11. | New Mexico | 0.014 | | 36. | Ohio | 0.000 |
| 12. | Massachusetts | 0.013 | | 37. | New Hampshire | −0.001 |
| 13. | Hawaii | 0.013 | | 38. | Arkansas | −0.002 |
| 14. | Colorado | 0.011 | | 39. | Alaska | −0.004 |
| 15. | Nebraska | 0.011 | | 40. | North Carolina | −0.004 |
| 16. | Wyoming | 0.011 | | 41. | Oregon | −0.004 |
| 17. | Florida | 0.010 | | 42. | Virginia | −0.005 |
| 18. | North Dakota | 0.010 | | 43. | Kentucky | −0.006 |
| 19. | New Jersey | 0.010 | | 44. | Mississippi | −0.007 |
| 20. | New York | 0.009 | | 45. | Alabama | −0.011 |
| 21. | Connecticut | 0.008 | | 46. | Montana | −0.015 |
| 22. | Maryland | 0.008 | | 47. | Vermont | −0.015 |
| 23. | Oklahoma | 0.008 | | 48. | Idaho | −0.020 |
| 24. | Michigan | 0.004 | | 49. | Pennsylvania | −0.021 |
| 25. | Washington | 0.004 | | 50. | Utah | −0.061 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# MARIJUANA FREEDOM

**2.4%**   Marijuana freedom has been on the rise in the states for many years now, and states such as Vermont, Maine, and Massachusetts have risen in the rankings since the fifth edition because of policy changes in a pro-freedom direction. As mentioned earlier in the section "Incarceration and Arrests for Victimless Crimes," we consider here only the lost consumer and producer surplus due to prohibition, not the costs of arrests and incarceration.

Recent work has yielded inconsistent findings on marijuana policy and consumption. Rand Corporation economist Rosalie Liccardo Pacula and her coauthors[87] find that marijuana penalties have a small impact on marijuana use among youth (a one-standard-deviation increase in minimum jail time is associated with a 1.2 percent decline in annual risk of use), but "decriminalization" or "depenalization" as such retains a small (about 2 to 3 percent) effect even when these penalty variables are controlled for, which the authors cannot explain. In a different study, Pacula and others[88] find that reduced penalties for users increase consumption and therefore price, resulting in higher profits for sellers. They also calculate that prohibition probably doubles the price of a pound of marijuana, at least (adding $200 to $300 to the cost).

A reasonable estimate of the amount of marijuana sold in the United States in a year is 50 million pounds.[89] Unfortunately, absolutely no evidence exists on the consequences of supplier penalties. We conservatively assume total seller profits of $200 per pound (including compensation for risk). We estimate the new consumer surplus conservatively, assuming a price elasticity of demand of −0.2 (like alcohol) and unit elasticity of supply.

Looking at decriminalization of small-scale possession first, we assume this policy boosts consumption by 3 percent, which implies a transaction-cost tax of roughly 15 percent. We then calculate the deadweight loss and the forgone producer surplus, assuming a price per pound of $330. This underestimate is small because decriminalization also correlates with strength of criminal penalties, which Pacula and others[90] find affect consumption. Moving from criminalization to decriminalization nationwide should then increase consumer and producer welfare by about $2.3 billion. Our coding of this variable assumes that the benefits of full legalization of possession are

87.   Rosalie Liccardo Pacula, Jamie F. Chriqui, and Joanna King, "Marijuana Decriminalization: What Does It Mean in the United States?," NBER Working Paper no. 9690, National Bureau of Economic Research, Cambridge, MA, May 2003.

88.   Rosalie Liccardo Pacula et al., "Risks and Prices: The Role of User Sanctions in Marijuana Markets," NBER Working Paper no. 13415, National Bureau of Economic Research, Cambridge, MA, September 2007.

89.   Jon Gettman, "Lost Taxes and Other Costs of Marijuana Laws," DrugScience.org, 2007.

90.   Pacula et al., "Marijuana Decriminalization."

about five times as large.

The most important variable in the marijuana freedom category is our index of medical marijuana laws, which takes into account the scope of qualifying conditions, the maximum amount permitted, whether home cultivation is permitted, and whether dispensaries are permitted. Pacula and others find that some features of medical marijuana laws, such as home cultivation and (especially) dispensaries, may increase overall consumption, but their results are not easily interpretable in a supply-and-demand model, nor are they generally statistically significant.[91] Other research has found no effect on consumption.[92] But several studies now seem to show that legal dispensaries result in lower prices by shifting out the supply curve. Wen, Hockenberry, and Cummings find that allowing nonspecific pain as a reason for medical marijuana recommendations increases use by those over age 21 significantly.[93] The bottom line is that the total effect of medical marijuana laws on consumption is modest, probably a bit more than decriminalization, but much is unknown. We choose a weight for this variable of 1.5 times that for decriminalization.

The next most important variable is the maximum penalty for a single marijuana offense not involving a minor, which in some states is life in prison. Such penalties depress supply and raise price. We also include whether high-level possession or cultivation of cannabis is a misdemeanor or felony and any mandatory minimum sentence for "low-level" cultivation or sale. All these variables are assumed together to have a similar effect on decriminalization of possession.

The next most important variable is whether some recreational cannabis sales are legal. Recreational sales of marijuana in Colorado—the first state to implement legal recreational sales—have not decreased medical marijuana sales.[94] It is unclear what the effect has been on total sales—that is, whether legalization simply reduces the black market or also increases total consumption. Even under the former scenario, the big increase in recreational sales over time suggests that many consumers benefit by buying on the legal market rather than the black market. In the 12 months through June 2015, legal recreational sales amounted to about $450 million in Colorado. Assume 20 percent of that reflects producer costs (a common statistic is that in the absence of prohibition and any taxes, the price of marijuana would fall by

91. Rosalie Liccardo Pacula et al., "Assessing the Effects of Medical Marijuana Laws on Marijuana and Alcohol Use: The Devil Is in the Details," NBER Working Paper no. 19302, National Bureau of Economic Research, Cambridge, MA, August 2013.

92. Rosalie Liccardo Pacula and Eric L. Sevigny, "Marijuana Legalization Policies: Why We Can't Learn Much from Policy Still in Motion," Journal of Policy Analysis and Management 33, no. 1 (2014): 212–21.

93. Hefei Wen, Jason M. Hockenberry, and Janet R. Cummings, "The Effect of Medical Marijuana Laws on Adolescent and Adult Use of Marijuana, Alcohol, and Other Substances," Journal of Health Economics 42, issue C (2015): 64–80.

94. Ricardo Baca, "Colorado Pot Sales Spike in June, Top $50 Million for First Time," Cannabist, August 13, 2015, http://www.thecannabist.co/2015/08/13/colorado-marijuana-taxes-recreational-sales-june-2015-50-million/39384/.

DIMENSIONS OF FREEDOM    87

80 percent). The remainder reflects producer and consumer surplus. We assume one-quarter of that surplus is due to the legalization of sales specifically, rather than possession and cultivation. After adjusting to national population, we estimate then that legalizing some marijuana sales would create $5.4 billion of benefit nationally.

Finally, we consider the effect of *Salvia divinorum* bans within this category. A 2006 study found that 750,000 people used salvia that year, compared with 26 million marijuana users per year.[95] Therefore, we add together all the marijuana weights and multiply by 0.75/26. An objection to this strategy is that the variance among states is greater on salvia policy, so this weight understates the importance of the policy (in no state is marijuana completely unregulated). On the other hand, the per-user quantity of salvia consumed is surely much lower than that for marijuana, so this weight may overstate the importance of the policy. Because we cannot assess the relative magnitudes of these biases, we simply assume that they cancel out. Salvia bans are therefore worth less than 0.1 percent of the index.

95.   National Survey on Drug Use and Health, "Use of Specific Hallucinogens: 2006," *NSDUH Report,* February 14, 2008, https://roar.nevadaprc.org/public/resources/1127.

**TABLE 24**

| Rank | State | Marijuana Freedom Score | | Rank | State | Marijuana Freedom Score |
|------|-------|-------------------------|---|------|-------|-------------------------|
| 1. | California | 0.076 | | 26. | Arkansas | 0.005 |
| 2. | Maine | 0.066 | | 27. | Connecticut | 0.005 |
| 3. | Alaska | 0.061 | | 28. | New York | 0.003 |
| 4. | Massachusetts | 0.059 | | 29. | West Virginia | 0.003 |
| 5. | Oregon | 0.058 | | 30. | Pennsylvania | 0.002 |
| 6. | Michigan | 0.058 | | 31. | New Jersey | 0.002 |
| 7. | Colorado | 0.054 | | 32. | Florida | 0.001 |
| 8. | Nevada | 0.052 | | 33. | North Carolina | −0.006 |
| 9. | Washington | 0.051 | | 34. | Idaho | −0.007 |
| 10. | Illinois | 0.047 | | 35. | Indiana | −0.007 |
| 11. | Vermont | 0.042 | | 36. | Kansas | −0.008 |
| 12. | Maryland | 0.021 | | 37. | Louisiana | −0.008 |
| 13. | Hawaii | 0.016 | | 38. | Wisconsin | −0.009 |
| 14. | New Hampshire | 0.015 | | 39. | Kentucky | −0.009 |
| 15. | New Mexico | 0.013 | | 40. | Wyoming | −0.010 |
| 16. | Oklahoma | 0.013 | | 41. | Nebraska | −0.010 |
| 17. | Delaware | 0.012 | | 42. | Mississippi | −0.010 |
| 18. | Missouri | 0.012 | | 43. | South Dakota | −0.011 |
| 19. | Utah | 0.011 | | 44. | South Carolina | −0.011 |
| 20. | Rhode Island | 0.010 | | 45. | Iowa | −0.012 |
| 21. | Ohio | 0.009 | | 46. | Tennessee | −0.014 |
| 22. | North Dakota | 0.009 | | 47. | Georgia | −0.014 |
| 23. | Arizona | 0.008 | | 48. | Texas | −0.015 |
| 24. | Montana | 0.007 | | 49. | Alabama | −0.017 |
| 25. | Minnesota | 0.006 | | 50. | Virginia | −0.017 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# ASSET FORFEITURE

**2.0%**   Civil asset forfeiture is the government's ability to take a
person's property by accusing him or her of a crime. Often
the seized cash or proceeds of auctioning the property accrue to the seizing
agency, providing incentives for "policing for profit." Typically, the person
whose property is seized must file suit and prove innocence to get the prop-
erty back. Both federal and state and local law enforcement engage in asset
forfeiture.

We measure not only state laws, including the extent to which a few
states limit federal "adoption" of state-initiated forfeiture cases, but also
the amount of "equitable-sharing" revenue state and local law enforcement
receives from the Department of Justice in each state. A standard-deviation
change in equitable-sharing forfeitures nationwide amounts to $4.6 billion.
We give state forfeiture laws the same weight even though we have no con-
sistent data on state-level forfeitures.

97

**TABLE 25**

| Rank | State | Asset Forfeiture Score | | Rank | State | Asset Forfeiture Score |
|------|-------|------------------------|---|------|-------|------------------------|
| 1. | New Mexico | 0.056 | | 26. | Arkansas | 0.011 |
| 2. | South Dakota | 0.051 | | 27. | Mississippi | 0.010 |
| 3. | Wisconsin | 0.038 | | 28. | Indiana | 0.010 |
| 4. | New Hampshire | 0.036 | | 29. | Michigan | 0.010 |
| 5. | Nebraska | 0.035 | | 30. | Nevada | 0.009 |
| 6. | North Dakota | 0.032 | | 31. | Illinois | 0.007 |
| 7. | Colorado | 0.030 | | 32. | Oklahoma | 0.004 |
| 8. | Missouri | 0.026 | | 33. | Alabama | 0.003 |
| 9. | California | 0.025 | | 34. | Louisiana | 0.002 |
| 10. | Connecticut | 0.024 | | 35. | New York | 0.002 |
| 11. | Iowa | 0.023 | | 36. | West Virginia | 0.002 |
| 12. | Pennsylvania | 0.022 | | 37. | Delaware | 0.002 |
| 13. | Oregon | 0.021 | | 38. | Virginia | 0.001 |
| 14. | Arizona | 0.021 | | 39. | Texas | −0.001 |
| 15. | Utah | 0.020 | | 40. | South Carolina | −0.002 |
| 16. | Florida | 0.018 | | 41. | Idaho | −0.002 |
| 17. | Ohio | 0.018 | | 42. | Massachusetts | −0.003 |
| 18. | Wyoming | 0.018 | | 43. | Tennessee | −0.003 |
| 19. | North Carolina | 0.015 | | 44. | Washington | −0.003 |
| 20. | Maryland | 0.014 | | 45. | New Jersey | −0.004 |
| 21. | Vermont | 0.014 | | 46. | Kentucky | −0.008 |
| 22. | Montana | 0.014 | | 47. | Georgia | −0.009 |
| 23. | Minnesota | 0.014 | | 48. | Alaska | −0.009 |
| 24. | Hawaii | 0.013 | | 49. | Kansas | −0.009 |
| 25. | Maine | 0.012 | | 50. | Rhode Island | −0.029 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

## MALA PROHIBITA

**1.2%**
The term *mala prohibita* refers to acts defined as criminal in statute, even though they are not harms in common law (*mala in se*). This category is a grab bag of mostly unrelated policies, including raw milk laws, fireworks laws, prostitution laws, physician-assisted suicide laws, religious freedom restoration acts, rules on taking DNA samples from criminal suspects without a probable cause hearing, trans-fat bans, state equal rights amendments, mixed martial arts legalization, and, new to this edition, bans on racial preferences in the public sector.[96]

Of these, the policies with the greatest potential cost to victims are racial preferences in the public sector (more than half of this category), prostitution prohibition, and trans-fat bans.

The biggest effect of state affirmative action bans appears to be in public university admissions.[97] White and Asian enrollment appears to grow about 5 percent when affirmative action is banned. The annual benefit to these students of attending a preferred college is probably on the order of, say, $5,000—that is, a fraction of typical public tuition.

If Nevada-style policies legalizing but regulating brothels were in effect nationwide, the industry would garner an estimated $5 billion in revenue, a comparatively small sum compared with other vice industries, such as alcohol, gambling, tobacco, and even marijuana.[98]

After racial preferences in the public sector and prostitution prohibition, the next most important is California's restaurant trans-fat ban, which, if implemented nationwide, would cost consumers—at a reasonable estimate—more than $3.5 billion worth of pleasure a year.[99] Next is the legalization of raw milk, then legalization of mixed martial arts, followed closely by fireworks laws. Then comes physician-assisted suicide, which receives the "times five" constitutional weighting factor, since the Montana Constitution has been held to protect a right thereto. Rounding out this category, in order, are state equal rights amendments, state DNA database laws, and religious freedom restoration acts.

---

96    To be clear, we do not necessarily condone prostitution, but we defend the rights of willing adults to engage in consensual exchange of sex. We completely condemn all nonconsensual sex trafficking as unjust and deserving of legal prohibition.

97    Hayley Munguia, "Here's What Happens When You Ban Affirmative Action in College Admissions," FiveThirtyEight.com, December 9, 2015.

98    Daria Snadowsky, "The Best Little Whorehouse Is Not in Texas: How Nevada's Prostitution Laws Serve Public Policy and How Those Laws May Be Improved," *Nevada Law Journal* 6, no. 1 (2005): 217–19.

99    Gary Becker, "Comment on the New York Ban on Trans Fats," Becker-Posner Blog, December 21, 2006, https://www.becker-posner-blog.com/2006/12/comment-on-the-new-york-ban-on-trans-fats--becker.html.

TABLE 26

| Rank | State | *Mala Prohibita* Score | Rank | State | *Mala Prohibita* Score |
|---|---|---|---|---|---|
| 1. | Nebraska | 0.026 | 26. | Arkansas | −0.002 |
| 2. | Arizona | 0.026 | 26. | Mississippi | −0.002 |
| 3. | Oklahoma | 0.026 | 28. | Kentucky | −0.002 |
| 4. | Michigan | 0.026 | 28. | Tennessee | −0.002 |
| 5. | California | 0.019 | 30. | Minnesota | −0.002 |
| 6. | Washington | 0.014 | 30. | New York | −0.002 |
| 7. | New Hampshire | 0.013 | 32. | Idaho | −0.002 |
| 8. | Florida | 0.011 | 33. | Virginia | −0.002 |
| 9. | Nevada | 0.008 | 34. | Wisconsin | −0.002 |
| 10. | Oregon | −0.001 | 35. | Iowa | −0.002 |
| 11. | Pennsylvania | −0.001 | 36. | Massachusetts | −0.002 |
| 12. | New Mexico | −0.001 | 37. | Kansas | −0.002 |
| 13. | Maine | −0.001 | 38. | New Jersey | −0.002 |
| 14. | Wyoming | −0.001 | 39. | Maryland | −0.003 |
| 15. | Colorado | −0.001 | 40. | Alabama | −0.003 |
| 16. | Connecticut | −0.001 | 41. | Louisiana | −0.003 |
| 17. | Vermont | −0.001 | 42. | North Carolina | −0.003 |
| 18. | Utah | −0.002 | 42. | West Virginia | −0.003 |
| 19. | Hawaii | −0.002 | 44. | South Dakota | −0.003 |
| 19. | Montana | −0.002 | 45. | Georgia | −0.003 |
| 21. | Illinois | −0.002 | 46. | Delaware | −0.003 |
| 22. | South Carolina | −0.002 | 47. | North Dakota | −0.003 |
| 23. | Missouri | −0.002 | 48. | Rhode Island | −0.003 |
| 24. | Alaska | −0.002 | 49. | Indiana | −0.003 |
| 25. | Texas | −0.002 | 50. | Ohio | −0.004 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# TRAVEL FREEDOM

**1.1%**   Two variables—the use and retention of automated license plate reader data and the availability of driver's licenses to those without Social Security numbers (such as undocumented workers)—together make up about half of the travel freedom category's total weight in the index.

There are about 11.1 million undocumented immigrants in the United States, and we assume that 60 percent of them would be willing to get driver's licenses, slightly lower than the rate of licensed drivers in the general population. We then assume the mean value of a license per driver per year is $750. For automated license plate readers, we assume that the average driver—of whom there are 210 million in the United States—would be willing to pay $15 a year to avoid being subject to their unlimited use.

Seat belt laws are weighted on the basis of estimated costs of tickets. A fingerprint or thumbprint requirement for a driver's license is worth slightly less.

Suspicionless sobriety checkpoints invade privacy and create anxiety among those stopped and searched. Extrapolating from two different sources, we estimate about 9 million drivers a year are searched at sobriety checkpoints nationwide, or would be if checkpoints were legal nationwide. We assume a cost of $20 per driver searched in lost time, privacy, and anxiety. We multiply the variable by 5 because some state constitutions prohibit these checkpoints.

After that come uninsured/underinsured motorist insurance coverage requirements, motorcycle helmet laws, open-container laws, and bans on driving while using a cell phone, in that order.

These variables were included in previous editions of *Freedom in the 50 States,* and some of them generated a fair number of comments by readers and audience members at public presentations. In particular, it was argued that some of these variables seem to be justified on the grounds of enhancing public safety. But not every measure that enhances public safety is morally justifiable—consider random searches of pedestrians. A preferable approach would use penalties for "distracted driving" of whatever cause, rather than a blanket ban on using a handheld phone while driving, which does not always pose a risk to others. Likewise, it would be better to focus on penalties for drunk driving rather than punishing people for having opened beverage containers in their vehicles, another behavior that does not necessarily pose a direct risk to others. In states with a federally conforming open-container law, having an unsealed but closed wine bottle on the floor of the passenger side of a car is sufficient to trigger a misdemeanor violation and possible jail time.

No state does extremely well on travel freedom. Utah scores at the top despite having sobriety checkpoints, an open-container law, and a primary-enforcement seat belt law, because it is one of the few states allowing someone to obtain a driver's license without a Social Security number and places some limits on automated license plate reader data retention and, unlike number two Vermont, does not mandate underinsured motorist coverage.

**TABLE 27**

| Rank | State | Travel Freedom Score | Rank | State | Travel Freedom Score |
|------|-------|------------|------|-------|------------|
| 1. | Utah | 0.010 | 26. | Tennessee | −0.002 |
| 2. | Vermont | 0.009 | 27. | Arizona | −0.002 |
| 3. | Colorado | 0.008 | 28. | Virginia | −0.002 |
| 4. | Nevada | 0.007 | 29. | Georgia | −0.002 |
| 5. | California | 0.007 | 30. | Alaska | −0.003 |
| 6. | Maryland | 0.007 | 30. | Iowa | −0.003 |
| 7. | Washington | 0.007 | 30. | Michigan | −0.003 |
| 8. | New Hampshire | 0.007 | 33. | Rhode Island | −0.003 |
| 9. | Delaware | 0.006 | 34. | Wisconsin | −0.003 |
| 10. | New Mexico | 0.006 | 35. | North Dakota | −0.003 |
| 11. | Oregon | 0.005 | 35. | South Dakota | −0.003 |
| 12. | Connecticut | 0.005 | 37. | Missouri | −0.003 |
| 13. | Montana | 0.004 | 38. | North Carolina | −0.004 |
| 14. | Illinois | 0.003 | 39. | Massachusetts | −0.004 |
| 15. | New York | 0.002 | 40. | Indiana | −0.004 |
| 16. | Hawaii | 0.000 | 40. | Kentucky | −0.004 |
| 17. | Arkansas | 0.000 | 42. | Nebraska | −0.004 |
| 18. | Maine | −0.001 | 43. | South Carolina | −0.005 |
| 19. | Idaho | −0.001 | 44. | Mississippi | −0.005 |
| 19. | Wyoming | −0.001 | 45. | New Jersey | −0.006 |
| 21. | Minnesota | −0.002 | 46. | Alabama | −0.006 |
| 22. | Florida | −0.002 | 46. | Louisiana | −0.006 |
| 22. | Oklahoma | −0.002 | 48. | Kansas | −0.006 |
| 24. | Ohio | −0.002 | 49. | West Virginia | −0.007 |
| 24. | Pennsylvania | −0.002 | 50. | Texas | −0.007 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# CAMPAIGN FINANCE

**0.1%**

Citizens should have the right to express and promote their political opinions in a democracy, including their support for or opposition to candidates for office. By regulating contributions to parties and candidates, governments effectively limit citizens' ability to spread their ideas.

The campaign finance policy category covers public financing of campaigns and contribution limits (individuals to candidates, individuals to parties, an index of individuals to political action committees [PACs] and PACs to candidates, and an index of individuals to PACs and PACs to parties). Although these policies receive "constitutional weights" boosting them by a factor of 10 because of their First Amendment implications, they receive low weights even so because little evidence exists that current contribution limits significantly reduce private actors' involvement in politics, unless the limits are extremely low (and Vermont's extremely low limits were struck down by the U.S. Supreme Court in 2006).[100]

Also, there just is not much money in state elections, even in states without contribution limits. According to the National Institute on Money in State Politics, in the past three election cycles nationwide individual contributions to state legislative candidates amounted to about $850 million per two-year cycle, or less than $3 per person in the country.[101] Finally, even being prevented from making, say, a $1,000 donation to a candidate does not result in a $1,000 loss to the frustrated donor because the donor can put those funds to a different use. The freedom index assumes a utility loss equivalent to 10 percent of the planned contribution when calculating victim cost. In sum, the nationwide victim losses from state campaign finance restrictions come to a figure in the tens of millions of dollars a year, at most.

100.   *Randall v. Sorrell*, 548 U.S. 230 (2006).
101.   National Institute on Money in State Politics website, http://www.followthemoney.org.

103

**TABLE 28**

| Rank | State | Campaign Finance Freedom Score | | Rank | State | Campaign Finance Freedom Score |
|------|-------|------|---|------|-------|------|
| 1. | Indiana | 0.001 | | 26. | Missouri | 0.000 |
| 1. | Mississippi | 0.001 | | 27. | Maine | 0.000 |
| 1. | Nebraska | 0.001 | | 28. | Arkansas | 0.000 |
| 1. | North Dakota | 0.001 | | 29. | Delaware | 0.000 |
| 1. | Oregon | 0.001 | | 30. | Arizona | 0.000 |
| 1. | Pennsylvania | 0.001 | | 31. | Vermont | 0.000 |
| 1. | Texas | 0.001 | | 32. | North Carolina | 0.000 |
| 8. | Alabama | 0.001 | | 33. | Wisconsin | 0.000 |
| 8. | Virginia | 0.001 | | 34. | Illinois | 0.000 |
| 10. | Iowa | 0.001 | | 35. | South Carolina | 0.000 |
| 10. | Utah | 0.001 | | 36. | Rhode Island | 0.000 |
| 12. | Wyoming | 0.000 | | 37. | Maryland | 0.000 |
| 13. | South Dakota | 0.000 | | 38. | California | 0.000 |
| 14. | Nevada | 0.000 | | 39. | West Virginia | 0.000 |
| 15. | Tennessee | 0.000 | | 40. | Hawaii | 0.000 |
| 16. | Georgia | 0.000 | | 41. | Kansas | 0.000 |
| 17. | Michigan | 0.000 | | 42. | Louisiana | 0.000 |
| 18. | New Mexico | 0.000 | | 43. | New Jersey | 0.000 |
| 19. | New York | 0.000 | | 44. | Alaska | 0.000 |
| 20. | Idaho | 0.000 | | 45. | New Hampshire | −0.001 |
| 21. | Montana | 0.000 | | 46. | Oklahoma | −0.001 |
| 22. | Washington | 0.000 | | 47. | Kentucky | −0.001 |
| 23. | Florida | 0.000 | | 48. | Massachusetts | −0.001 |
| 24. | Ohio | 0.000 | | 49. | Connecticut | −0.001 |
| 25. | Minnesota | 0.000 | | 50. | Colorado | −0.001 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

# OVERALL PERSONAL FREEDOM RANKING

**33.2%**   The top states in the personal freedom dimension tend to be more western and northeastern, while the bottom states are either socially conservative and southern or mid-Atlantic and liberal. As in past editions, we find a strong rural–urban division.  One reason for the rural–urban relationship is likely voters' fears of crime, which leads them to support harsh policing and prosecutorial tactics, stricter drug and gun laws, and more limits on civil liberties. However, no statistical relationship exists between personal freedom and actual violent crime rates (however, it is weakly negatively correlated with property crime rates). It is well known that public perceptions of crime can diverge widely from the truth.[102]  An alternative explanation is that there are more negative externalities of personal behavior in urban settings. But if that were the case, one would also expect urbanized states to have more economic regulation and higher taxation, and they do not. Socially conservative states tend to restrict alcohol, gambling, marijuana, and marriage freedoms but permit greater freedom in education and have more respect for gun rights and for private property on smoking policy.

102.   Lydia Saad, "Perceptions of Crime Problem Remain Curiously Negative," Gallup, October 22, 2007; Mark Warr, "Public Perception of Crime Remains Out of Sync with Reality, Criminologist Contends," University of Texas, November 10, 2008.

## TABLE 29

| Rank | State | Overall Personal Freedom Score | | Rank | State | Overall Personal Freedom Score |
|------|-------|-------|---|------|-------|-------|
| 1. | Nevada | 0.302 | | 26. | California | 0.069 |
| 2. | New Hampshire | 0.225 | | 27. | Pennsylvania | 0.068 |
| 3. | Maine | 0.190 | | 28. | Utah | 0.056 |
| 4. | Vermont | 0.167 | | 29. | Louisiana | 0.055 |
| 5. | New Mexico | 0.159 | | 30. | Illinois | 0.049 |
| 6. | Arizona | 0.157 | | 31. | Kansas | 0.047 |
| 7. | Colorado | 0.123 | | 32. | Maryland | 0.045 |
| 8. | Michigan | 0.122 | | 33. | Rhode Island | 0.045 |
| 9. | Oregon | 0.118 | | 34. | Georgia | 0.043 |
| 10. | Alaska | 0.108 | | 35. | South Carolina | 0.037 |
| 11. | Indiana | 0.105 | | 36. | Mississippi | 0.029 |
| 12. | Florida | 0.104 | | 37. | Alabama | 0.028 |
| 13. | North Dakota | 0.103 | | 38. | Virginia | 0.026 |
| 14. | West Virginia | 0.100 | | 39. | Tennessee | 0.024 |
| 15. | Missouri | 0.100 | | 40. | Ohio | 0.022 |
| 16. | North Carolina | 0.097 | | 41. | Wyoming | 0.020 |
| 17. | Montana | 0.096 | | 42. | Idaho | 0.016 |
| 18. | South Dakota | 0.093 | | 43. | Connecticut | 0.007 |
| 19. | Iowa | 0.090 | | 44. | Arkansas | 0.005 |
| 20. | Nebraska | 0.081 | | 45. | Kentucky | −0.001 |
| 21. | Wisconsin | 0.081 | | 46. | Hawaii | −0.002 |
| 22. | Minnesota | 0.076 | | 47. | Delaware | −0.008 |
| 23. | Oklahoma | 0.075 | | 48. | New Jersey | −0.036 |
| 24. | Washington | 0.073 | | 49. | Texas | −0.046 |
| 25. | Massachusetts | 0.069 | | 50. | New York | −0.056 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

Figure 8 shows state average personal freedom scores over time. This chain-linked index excludes such federalized policies as same-sex marriage, sodomy laws, and removal of local gun bans. After personal freedom dropped nationwide between 2000 and 2008, partially due to a wave of new tobacco restrictions, it has grown even more substantially since 2010, due in large part to ballot initiatives loosening marijuana regulations, to the spread of legal gambling, and to legislative criminal justice and asset forfeiture reforms. If we were to plot the average personal freedom scores, including federalized scores, the improvement in personal freedom would be even more dramatic, as judicial engagement on personal freedoms has generally enhanced rather than reduced them. We hope that the small dip in 2019 is merely noise in a larger trend. However, a growing paternalistic mindset, exacerbated by the COVID-19 pandemic and often characterized by excessive deference to "experts," could spell trouble ahead in those policy areas where the secular progressive consensus of those who dominate the commanding heights does not already favor liberalization (such as prostitution and marijuana).

**FIGURE 8**  State Average Personal Freedom Scores Over Time



## OVERALL FREEDOM RANKING

### TABLE 30

| Rank | State | Overall Freedom Score | | | | |
|------|-------|----------------------|--|--|--|--|
| 1. | New Hampshire | 0.592 | 26. | Wyoming | 0.128 |
| 2. | Florida | 0.552 | 27. | Kansas | 0.127 |
| 3. | Nevada | 0.511 | 28. | South Carolina | 0.125 |
| 4. | Tennessee | 0.441 | 29. | Iowa | 0.094 |
| 5. | South Dakota | 0.425 | 30. | Massachusetts | 0.094 |
| 6. | Indiana | 0.368 | 31. | Ohio | 0.080 |
| 7. | Michigan | 0.349 | 32. | Louisiana | 0.066 |
| 8. | Georgia | 0.330 | 33. | Nebraska | 0.059 |
| 9. | Arizona | 0.322 | 34. | Maine | 0.032 |
| 10. | Idaho | 0.313 | 35. | West Virginia | 0.022 |
| 11. | Missouri | 0.274 | 36. | Connecticut | 0.017 |
| 12. | Colorado | 0.262 | 37. | Illinois | −0.013 |
| 13. | Virginia | 0.226 | 38. | Minnesota | −0.041 |
| 14. | Pennsylvania | 0.200 | 39. | Washington | −0.043 |
| 15. | North Dakota | 0.195 | 40. | Mississippi | −0.057 |
| 16. | North Carolina | 0.192 | 41. | Rhode Island | −0.093 |
| 17. | Wisconsin | 0.190 | 42. | New Mexico | −0.123 |
| 18. | Montana | 0.177 | 43. | Vermont | −0.176 |
| 19. | Oklahoma | 0.160 | 44. | Delaware | −0.203 |
| 20. | Utah | 0.156 | 45. | Maryland | −0.282 |
| 21. | Texas | 0.155 | 46. | Oregon | −0.311 |
| 22. | Alabama | 0.153 | 47. | New Jersey | −0.460 |
| 23. | Arkansas | 0.143 | 48. | California | −0.474 |
| 24. | Alaska | 0.141 | 49. | Hawaii | −0.603 |
| 25. | Kentucky | 0.136 | 50. | New York | −0.813 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

109

# OVERALL
# FREEDOM RANKING

The weighted sum of all the variables is used to produce the overall freedom ranking of the states. The overall freedom scores rate states on how free they are relative to other states. A score of 1 would correspond to a state's being one standard deviation above average in every single variable, although in reality, every state scores better on some variables and worse on others. A score of 0 would be equivalent to a state's being absolutely average on every variable, and a score of −1 to a state's being one standard deviation below average on every variable. Table 30 presents the overall freedom rankings as of year-end 2019.

New Hampshire, Florida, and Nevada are the freest states in the country and now significantly outpace their peers. States that have always done well in our index—such as Tennessee, South Dakota, Indiana, and Arizona—also find themselves in the top 10. New York is the least free state again, as it has been in every version of the index and every year covered by this index since 2000. Hawaii has fallen enough to put itself well below California now. New Jersey and Oregon round out the bottom five. Because states' freedom scores represent their situation at the beginning of the year 2020, they include changes made by legislatures that in most states were elected in November 2018. Figure 9 shows the evolution of the top and bottom states over time using the chain-linked index, so that it focuses specifically on decisions made by state governments and voters.

New Hampshire is once again the freest state in the Union. In 2000, on the full index, Nevada was number one, just ahead of New Hampshire. Florida was the freest in the fifth edition, published in 2018. But the Granite State, which first claimed the top spot in 2011, regained the crown in this edition. However, it did so not because of Florida's becoming less free but because of greater gains by New Hampshire. Historically, freedom in New Hampshire declined substantially with the legislatures elected in 2006 and 2008, then recovered all the ground it lost in those years in the legislature elected in 2010. The legislature elected in 2012 diminished freedom slightly, but the 2014-elected legislature then increased it again even more, as we expect will be the case with the 2020-elected legislature given its wide-ranging freedom-enhancing policy changes. Today, absolute freedom in the

Granite State stands above the level it did in 2000.

Florida's rise since 2009 has been nothing short of stunning. Most states have improved on freedom in that time if federalized policies are excluded; however, Florida's post-2010 improvement has been the third greatest in the United States (after Wisconsin and Michigan). Florida's improvement has lain almost entirely in fiscal policy, where the numbers tell a consistent story: government consumption, local taxes, state taxes, debt, and government employment have all fallen as a share of the private economy. The only area of deterioration in fiscal policy has been liquid assets, which have fallen slightly. Clearly, Florida's state leadership deserves great credit for making freedom a priority over the past decade, and it shows.

Nevada comes in just behind Florida at number three. It has been a consistent top-five state, though others have leapfrogged it in relative terms since 2000. Freedom in Nevada declined with the legislatures elected in 2006, but it has bounced back strongly since then. Overall freedom there today is nearly as high as it was in 2000. Most notably, Nevada is the number-one state on personal freedom, which fits the stereotype. In fact, it has always been the number-one state on that dimension. Twenty-nineteen was the first year in which Nevada has been in the top 10 on economic freedom since 2006. So Nevada's ranking isn't just due to its less personally paternalistic ways.

Tennessee is the fourth-freest state, just ahead of South Dakota. Their rankings are largely due to high scores on economic freedom. Tennessee, for example, is number two on economic freedom, due mainly to its tax policies. But it ranks 39th on personal freedom. Thus, it is the stereotypical "red state," though the general stereotype is oftentimes false. South Dakota is similar, coming in at number four on economic freedom and number 18 on personal freedom. It bottomed out on the latter in 2010 and has been rising notably since in relative and absolute terms.

Residents of these top five states have much to be proud of, and the rest of us should be more willing to look to states like New Hampshire, Florida, Nevada, Tennessee, and South Dakota as models to emulate. One interesting thing about this top five is that they have similar levels of freedom despite substantial differences on other margins.

When it comes to the bottom states, we see that the Empire State has consistently placed last by a wide margin. The difference between the scores for New York, New Hampshire, and Florida corresponds to one and one-third standard deviations on every single variable. New York also performs poorly across the board, ranking at or near the bottom in all three dimensions of freedom. Thus, New Yorkers feel the heavy hand of government in every area of their lives. Is it any wonder that people are fleeing the state in droves? According to the U.S. Census Bureau's components of population



**FIGURE 9** Freedom Evolution of Selected States

change data, about 1.4 million people, on net, fled New York for other states between 2010 and 2019, a whopping 7.1 percent of the state's 2010 population.[103] In calendar year 2019 alone, 185,000 more people moved from New York to another state than moved in.[104] That occurred pre-COVID-19. We expect that 2020 will be even worse, especially given the policy responses

103.   "State Population Totals and Components of Change: 2010–2019," U.S. Census Bureau, 2021.
104.   "State-to-State Migration Flows," U.S. Census Bureau, 2021.

DIMENSIONS OF FREEDOM   105

from state and local leaders that alienated many, failed to contain the crisis, and harmed key parts of the economy. The only reason that New Yorkers haven't noticed the great emptying out of the state is its still positive international in-migration. Foreign immigration represents a source of population growth for New York, but overall population growth remains well below the national average. Indeed, its international migration also lags California, Florida, and Texas.

Hawaii is no paradise when it comes to freedom. The Aloha State has declined gradually since the Great Recession, and that decline is even more precipitous once we take into account the effects of its native son's PPACA, because Hawaii formerly had one of the most free-market health insurance systems in the country. Fiscal policy accounts for most of Hawaii's decline, due to big increases in tax burden in 2011 and 2012, as well as additional increases in fiscal policy burdens in 2018 and 2019 (tax increases in 2021 will continue its woes into the next edition). Land-use, labor, and property and casualty insurance regulations have also gotten tougher since 2013. Since 2011, real income and income per capita growth have fallen behind the rest of the country, and Hawaii's real per capita income is below the level of West Virginia's.

California lives up to its big government reputation, coming in as the third-worst state for freedom. Its overall freedom (even controlling for federalization of some policies in an anti-freedom direction) has declined substantially since 2000, owing to declines in regulatory policy that have swamped improvements in personal freedom. State taxation rose substantially from 2011 to 2014, then leveled off. Local taxes, debt, government consumption, and government employment have all fallen since the Great Recession. That has helped improve fiscal policy, especially in the years 2009 to 2011. From 2000 to 2012, California had the worst real personal income growth performance of any state other than Michigan. Since then, the economy has recovered somewhat. California's personal freedom grew from 2008 to 2016, but other states have improved even faster in that dimension. Given some policy and cultural trends, we expect Sacramento to further burden state-level freedom ahead and undermine its natural economic advantages.

New Jersey is just above California and substantially worse than Oregon at number 46. It has actually fallen faster than California in the period from 2000 to 2019. It appears to want to join New York rather than outcompete it on the freedom margin. New Jersey is 49th on regulatory policy and 48th on personal freedom. Although it is in the middle on fiscal policy, taxes have risen since 2016 but are not yet as high as New York's. We would expect some further convergence unless a different mindset emerges across the state.

Figure 10 plots each state's personal freedom score against its economic freedom score. There appears to be a small positive correlation between personal and economic freedom, but it is not statistically significant. Most of the top states on overall freedom do well on both economic and personal freedoms. However, a few states in the top 10 still do relatively poorly on personal freedom but outstandingly well on economic freedom, such as Tennessee, South Dakota, and Georgia.

The outlier states are instructive. In the bottom part of the lower-right quadrant, we see economically freer, personally less-free states, such as Idaho, South Dakota, Georgia, Texas, Alabama, Kentucky, Arkansas, Virginia, and Tennessee. Texas is a paradigmatic case, finishing second to last in personal freedom despite a top-10 economic freedom score. Texans may be unhappy with their weak personal freedom showing, but it reflects poor criminal justice policies and the fact that the Lone Star State is increasingly behind the curve on cannabis, education, and gambling freedoms.

Oklahoma is an especially interesting case. It was a classic, stereotypical red state, performing well on economic freedom but poorly on personal freedom. However, since 2017, it has gained substantially on personal freedom (gun rights, marijuana and alcohol freedom, and criminal justice reform), whereas economic freedom has stagnated relatively. Given its openness to policy innovation, Oklahoma could stand to turn its attention to economic matters and outcompete neighbors like Texas and Kansas (which is great on regulatory policy but quite poor on fiscal policy).

**FIGURE 10** Economic and Personal Freedom in 2019



ECONOMIC FREEDOM, 2019

114

In the upper-right quadrant are economically and personally free states, such as New Hampshire, Nevada, Arizona, Indiana, Michigan, and Florida. Far out on the bottom left is New York, which scores quite poorly on both economic and personal freedoms. New Jersey and Hawaii are not as extreme as New York on economic freedom but still score quite badly on economic freedom as well as personal freedom. Finally, in the upper-left quadrant are Vermont, Maine, New Mexico, California, and Oregon, which are performing poorly on economic freedom but doing a bit better on personal freedom (or, in the case of New Mexico, Vermont, and Maine, a lot better). These are the stereotypical left-liberal states that do well on personal freedom but are economically collectivist. Generally, then, conservative states do better than left-liberal states on economic freedom, and rural/western/New England states do better than urban/southern/mid-Atlantic states on personal freedom.

Figure 11 shows the evolution of nonfederalized overall freedom scores over time. There is a pronounced J-shape since 2000, with the upward trend beginning in 2011. When we include federalized policies, the average state score in 2019 is almost identical to the score in 2000. Thus, federal subversion of state autonomy has on balance been detrimental to the freedom that citizens experience since 2000. Indeed, in general, economic freedom has declined in the United States since 2000, but the blame for this trend essentially belongs on the federal government, not state and local governments.[105]

**FIGURE 11** State Average Overall Freedom Over Time

115

## CHANGE OVER TIME

The following list pulls out the most improved and worsened states from year-end 2018 to year-end 2019 (Table 31). It is important to recognize that short-term changes will be caused by a great deal of noise in the fiscal data that may or may not be due to significant policy changes, especially since our FY 2020 tax data are estimates that exclude minor categories of taxation (and changes in local taxation since FY 2019). Nonetheless, it is worth noting which states saw the most change in individual freedom in the period covered by our newest data.

South Dakota is our most improved state in that short window, driven by both economic and personal freedom policy changes. Like most states after the decentralization of the individual health insurance mandate, South Dakota allowed the mandate to lapse. It also passed constitutional carry while benefiting from gradual fiscal policy and incarceration and arrest rate improvements. Florida, Missouri, and Michigan are all right behind South Dakota; in fact, all four states cluster at the top.

The last list showing changes over time (Table 32) highlights the big picture since our first comprehensive set of data in 2000, and is limited to non-federalized policies. Thus, this list covers policies from year-end 2000 until year-end 2019. We have data for every year between those dates.

Over this long period, Florida is the biggest gainer, followed closely by Michigan. As previously discussed, Florida's rise has been remarkable. It has gained primarily in the fiscal policy category, where the numbers tell a consistent story: government consumption, local taxes, state taxes, debt, and government employment have all fallen as a share of the private economy. It has also improved on personal freedom and gained relatively on regulatory policy (even as it has declined absolutely).

Michigan is also a fascinating story. A Rust Belt state with declining fortunes in the American consciousness, it has actually liberalized its economy in ways similar to Wisconsin and Indiana. The vast majority of its rise has come since 2012. Regulatory reforms such as passing a right-to-work law in that year have helped. It has also improved on fiscal policy, going from 34th in 2009 to 13th today. Its overall economic score was 18th in 2000 and today stands at 8th. Personal freedom has seen an even larger relative uptick. It is now 8th overall, moving up remarkably since 2000 when it was 31st in the country. It improved on guns and alcohol policy, legalized marijuana, banned racial preferences in public services, and improved on incarceration and arrest rates.

116

## TABLE 31

| Rank | State | Freedom Growth, 2018–2019 |
|------|-------|---------------------------|
| 1. | South Dakota | 0.086 |
| 2. | Florida | 0.085 |
| 3. | Missouri | 0.081 |
| 4. | Michigan | 0.080 |
| 5. | Connecticut | 0.077 |
| 6. | Kentucky | 0.070 |
| 7. | Idaho | 0.067 |
| 8. | New Hampshire | 0.065 |
| 9. | Oklahoma | 0.063 |
| 10. | Louisiana | 0.062 |
| 11. | Tennessee | 0.061 |
| 12. | Iowa | 0.059 |
| 13. | North Carolina | 0.057 |
| 14. | South Carolina | 0.055 |
| 15. | Kansas | 0.055 |
| 16. | Indiana | 0.052 |
| 17. | Georgia | 0.050 |
| 18. | Alabama | 0.050 |
| 19. | Pennsylvania | 0.049 |
| 20. | Mississippi | 0.047 |
| 21. | Maine | 0.044 |
| 22. | Nevada | 0.044 |
| 23. | Wisconsin | 0.041 |
| 24. | New York | 0.040 |
| 25. | Nebraska | 0.035 |
| 26. | Arkansas | 0.034 |
| 27. | Wyoming | 0.032 |
| 28. | Texas | 0.030 |
| 29. | Alaska | 0.030 |
| 30. | North Dakota | 0.030 |
| 31. | Arizona | 0.029 |
| 32. | Minnesota | 0.027 |
| 33. | Colorado | 0.024 |
| 34. | Montana | 0.017 |
| 35. | Ohio | 0.017 |
| 36. | Hawaii | 0.017 |
| 37. | Vermont | 0.017 |
| 38. | West Virginia | 0.014 |
| 39. | Maryland | 0.011 |
| 40. | Washington | 0.002 |
| 41. | Illinois | 0.002 |
| 42. | Delaware | −0.005 |
| 43. | Virginia | −0.012 |
| 44. | Utah | −0.023 |
| 45. | California | −0.025 |
| 46. | New Jersey | −0.034 |
| 47. | Rhode Island | −0.035 |
| 48. | Massachusetts | −0.037 |
| 49. | New Mexico | −0.061 |
| 50. | Oregon | −0.192 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

117

TABLE 32

| Rank | State | Freedom Growth, 2000–2019 | | Rank | State | Freedom Growth, 2000–2019 |
|---|---|---|---|---|---|---|
| 1. | Florida | 0.364 | | 26. | Pennsylvania | 0.081 |
| 2. | Michigan | 0.350 | | 27. | North Dakota | 0.076 |
| 3. | Wisconsin | 0.322 | | 28. | Nebraska | 0.068 |
| 4. | Oklahoma | 0.321 | | 29. | New Hampshire | 0.067 |
| 5. | Georgia | 0.291 | | 30. | Kansas | 0.058 |
| 6. | Idaho | 0.258 | | 31. | Maine | 0.051 |
| 7. | Arizona | 0.248 | | 32. | Colorado | 0.043 |
| 8. | New Mexico | 0.210 | | 33. | Virginia | 0.041 |
| 9. | Ohio | 0.204 | | 34. | Nevada | 0.013 |
| 10. | South Carolina | 0.203 | | 35. | Minnesota | 0.011 |
| 11. | Missouri | 0.188 | | 36. | Mississippi | 0.010 |
| 12. | Utah | 0.181 | | 37. | Illinois | 0.007 |
| 13. | South Dakota | 0.172 | | 38. | Rhode Island | −0.014 |
| 14. | Alaska | 0.164 | | 39. | Washington | −0.023 |
| 15. | Montana | 0.159 | | 40. | Maryland | −0.029 |
| 16. | Texas | 0.134 | | 41. | Massachusetts | −0.029 |
| 17. | Louisiana | 0.131 | | 42. | Iowa | −0.031 |
| 18. | Alabama | 0.129 | | 43. | Connecticut | −0.047 |
| 19. | Kentucky | 0.127 | | 44. | California | −0.098 |
| 20. | West Virginia | 0.122 | | 45. | Delaware | −0.189 |
| 21. | Tennessee | 0.120 | | 46. | New York | −0.229 |
| 22. | Wyoming | 0.118 | | 47. | New Jersey | −0.234 |
| 23. | North Carolina | 0.112 | | 48. | Vermont | −0.253 |
| 24. | Arkansas | 0.100 | | 49. | Oregon | −0.280 |
| 25. | Indiana | 0.093 | | 50. | Hawaii | −0.290 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

Hawaii is our biggest loser over the two-decade period. As noted earlier, its tax burden increased and its fiscal freedom has declined. Land-use, labor, and property and casualty insurance regulations have gotten tougher since 2013, while its real income and income per capita growth have fallen behind the rest of the country.

Oregon and Vermont are the next states that have declined the most. Vermont provides a dramatic contrast with the freest state, its neighbor to the east, New Hampshire. Although many people outside of the Northeast confuse the two, Vermont is "Bizarro New Hampshire" or "Upside-Down New Hampshire" when it comes to freedom. Beginning in 1997, Vermont's school funding system was dramatically altered in such a way as to cause a big increase in fiscal centralization. Property taxes are now considered a state tax rather than a local tax, although towns still have some control over the rate. More importantly, taxes have continued to go up despite the "fix." State taxes have risen from 8.0 percent to 9.8 percent of the tax base (excluding motor fuel and alcohol and tobacco taxes), while local taxes have fallen only from 2.4 percent to 2.1 percent since 2000. Government employment and consumption have risen slightly as a percentage of the economy. Regulatory policy has also gotten much worse, with the vast majority of the losses concentrated in land-use and environmental regulation. As near as we can tell using our admittedly imperfect data, residential building restrictions have tightened enormously. One reflection of that is the frequency of the term "land use" in appellate court decisions; that frequency is now much higher, when divided by population, in Vermont than anywhere else. Vermont has enacted one of the country's most costly renewable portfolio standards. Personal freedom has also not grown much over this period despite marijuana freedom increasing substantially. Most of the country has gained more in this area. Gun rights have declined slightly, while a large tobacco freedom decline has effectively cancelled out its freedom-enhancing change on cannabis. This latter point we find particularly rich given its hypocrisy from the public health standard that drove tobacco restrictionism.

Last, it is worth pointing out policy areas that have received significant attention throughout the 2000–2019 period. Tobacco policy is the most notable area in which state policies have become more restrictive of personal freedom, with significant increases in taxes, as well as greater and greater restrictions on where one can smoke. Laws dealing with domestic partnerships, civil unions, and gay marriage also changed dramatically, especially in the years 2010–2015. Criminal justice reforms have swept the country at both the federal and state levels. In fact, they became pretty much a transpartisan consensus issue where little opposition existed before the summer of 2020 created some turbulence in the air (especially on policing).

Civil asset forfeiture reform stands out here, as well as criminal penalties affected by criminal justice reform efforts. Marijuana laws are undergoing rapid liberalization, first in states with citizen ballot initiatives. Gun laws and educational policies have been gradually liberalized across the country, and state bans on direct-to-consumer wine shipments have been removed in many places.

On the regulatory side, eminent domain reform occurred in some fashion in most states following the infamous *Kelo v. City of New London* decision by the U.S. Supreme Court in 2005. Several states have recently enacted right-to-work laws, and there is still some space for further change across the country (including New Hampshire). Policies dealing with new technologies—such as DNA databases, electronic cigarettes, and automated license plate readers—have also seen change. Twenty-nineteen, in particular, saw some changes in a few states on concealed carry, which bucked what we might have thought in light of prominent mass shootings. A quite significant arena for policy change occurred in the sports and online gambling area since the fifth edition, with many states jumping on the betting freedom bandwagon. Several states also repealed Sunday sales blue laws since our fifth edition to go along with more legalized marijuana, including some in 2020 and 2021 that wouldn't be captured here but would in the seventh edition. One might speculate that this is part of a trend of greater "lifestyle libertinism" over time—which has certainly benefited our political economy but it could be viewed with a jaundiced eye from the perspective of other values, such as overall human flourishing (especially if the arm of the state increases in other ways simultaneously, perhaps even related to that cultural trend). Of course, it could be that more Americans have simply come to appreciate that toleration is a better tool than legal punishment for promoting personal responsibility or at least a healthier relationship between the state and society.

One ongoing feature of policy change is the displacement of state discretion with federal mandates, for both good and ill with regard to pure individual liberty (leaving aside the damage done to federalism, a long-term institutional bulwark of freedom). Federal courts have forced states to liberalize gun laws, sodomy laws, and marriage laws, though in all those areas state governments were reforming long before the federal courts chose to intervene conclusively. In health insurance regulation, all three branches of the federal government have acted in concert to dramatically raise the regulatory threshold, mostly via the PPACA. States may still choose to regulate health insurance even more tightly than the federal government, but they may not choose more market-oriented models of regulation. There has been one important exception to this trend: the individual health insurance mandate of Obamacare was stripped by Congress.

Leaving aside the cases where there has been liberalization at the federal level, centralization is a dangerous trend. For one thing, it reduces the ability of federalism as an institutional system to check government overreach. For another, it makes it harder for citizens to find freedom by voting with their feet, as they cannot go anywhere for different and better policies unless they emigrate.

## CONSTRUCT VALIDITY AND ROBUSTNESS

In this edition of the index, we test the construct validity and robustness of our overall freedom measure by examining correlations in overall freedom measures across editions (for the year 2006, which appears in all editions). Between the second and third editions, we switched from an impressionistic to a quantified, "victim cost" method for weighting variables. Nevertheless, the correlation between the sixth-edition and first-edition scores for 2006 overall freedom is a hefty 0.82. The correlation between third- and fifth-edition scores is 0.88. These extremely high correlation coefficients suggest that the overall freedom ranking is robust to within-reason perturbations of weights on the variables and addition and subtraction of variables.

## INDEX OF CRONYISM

As in the fourth edition, we present a "freedom from cronyism" state ranking that takes into account blatantly anti-competitive regulations: (a) general sales below cost/minimum markup law, (b) sales below cost/minimum markup law for gasoline, (c) certificate of public convenience and necessity for household goods movers, (d) direct auto sales bans, (e) certificate of need for hospital construction, (f) all occupational licensing variables, (g) eminent domain laws, (h) bans on direct shipment of wine, and (i) alcohol sales blue laws.

Table 33 shows how the states come out on cronyism in 2019 (higher values/lower rankings indicate less cronyism). The numbers in the table represent the weights of each variable multiplied by the standardized value (number of standard deviations greater than the mean). As noted in the previous section, a state that is one standard deviation better—freer—than the average on every single policy will score 1 on overall freedom. Because the index of cronyism draws on a subset of the freedom index, the values in this table fall within a much smaller range. Idaho's score of 0.046, therefore, means that, taking cronyist policies into account, Idaho's positions on those issues contribute 0.046 to its overall freedom score. Idaho is the least cronyist state. The freedom from cronyism index can be found in the "Regulatory" tab of the spreadsheet at http://freedominthe50states.org.

121

**TABLE 33**

| Rank | State | Freedom from Cronyism Score |
|------|-------|------------------------------|
| 1. | Idaho | 0.046 |
| 2. | New Hampshire | 0.036 |
| 3. | Wyoming | 0.035 |
| 4. | Colorado | 0.033 |
| 5. | Arizona | 0.027 |
| 6. | Kansas | 0.026 |
| 7. | New Mexico | 0.023 |
| 8. | Minnesota | 0.019 |
| 9. | Vermont | 0.019 |
| 10. | South Dakota | 0.018 |
| 11. | Alaska | 0.015 |
| 12. | Hawaii | 0.013 |
| 13. | Rhode Island | 0.011 |
| 14. | Utah | 0.011 |
| 15. | North Dakota | 0.010 |
| 16. | Missouri | 0.009 |
| 17. | Nebraska | 0.008 |
| 18. | Wisconsin | 0.007 |
| 19. | Connecticut | 0.005 |
| 20. | Iowa | 0.004 |
| 21. | Delaware | 0.002 |
| 22. | Pennsylvania | 0.001 |
| 23. | Maine | 0.001 |
| 24. | Montana | 0.000 |
| 25. | Mississippi | 0.000 |

| Rank | State | Freedom from Cronyism Score |
|------|-------|------------------------------|
| 26. | Nevada | −0.005 |
| 27. | Indiana | −0.006 |
| 28. | Michigan | −0.006 |
| 29. | Massachusetts | −0.006 |
| 30. | Oregon | −0.007 |
| 31. | Washington | −0.007 |
| 32. | West Virginia | −0.010 |
| 33. | Georgia | −0.010 |
| 34. | Kentucky | −0.013 |
| 35. | Oklahoma | −0.013 |
| 36. | Florida | −0.014 |
| 37. | Tennessee | −0.016 |
| 38. | Virginia | −0.018 |
| 39. | New York | −0.018 |
| 40. | North Carolina | −0.018 |
| 41. | South Carolina | −0.018 |
| 42. | New Jersey | −0.019 |
| 43. | Alabama | −0.020 |
| 44. | Louisiana | −0.021 |
| 45. | Ohio | −0.022 |
| 46. | Illinois | −0.022 |
| 47. | Maryland | −0.025 |
| 48. | Arkansas | −0.028 |
| 49. | California | −0.028 |
| 50. | Texas | −0.030 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

We compare our cronyism scores with state corruption scores based on a survey of statehouse journalists.[106] The correlation between 2019 cronyism and 2007 corruption is –0.35, indicating that states scoring higher on freedom from cronyism score lower on corruption. In other words, cronyist states are more corrupt. The correlation weakens when cronyism is measured around the same time as corruption, perhaps implying a causal path from corruption to cronyism rather than vice versa.

**FIGURE 12**  Relationship Between Lobbyist Ratio and Cronyism



LOG LOBBYIST-TO-LEGISLATOR RATIO

We also compare our cronyism scores with state lobbyist-to-legislator ratios from the mid-2000s.[107] The correlation between the two is –0.32, indicating that states with more lobbyists relative to legislators a decade ago are more cronyist today. (Again, the correlations weaken when they are measured closer together in time.) Figure 12 shows how the freedom from cronyism index relates to the logged number of lobbyists per legislator for all 49 states for which lobbyist data are available (Nevada is excluded).

When freedom from cronyism is regressed on both corruption and lobbyist ratio, each independent variable enters the equation with a negative sign and is statistically significant. We do not know whether corruption and lobbying cause cronyism, or vice versa, but the statistical relationship suggests

106.   Bill Marsh, "Illinois Is Trying. It Really Is. But the Most Corrupt State Is Actually . . . ." *New York Times,* December 14, 2008.

107.   Center for Public Integrity, "Ratio of Lobbyists to Legislators 2006," December 21, 2007; updated May 19, 2014.

123

a connection, the plausibility of which in turn increases our confidence in the validity of the cronyism index.

In Part 2, we will take a closer look at the causes and consequences of freedom, as well as important changes in state policies during the pandemic years 2020 and 2021.

# PART 2
# POLITICS OF FREEDOM

I n this part, we consider the causes and conse-
quences of freedom in the states. We also provide
an up-to-date qualitative assessment of freedom
across the 50 states that takes into account policy
changes since our data cutoff for the quantitative
analysis.

More specifically, we first examine the relation-
ship between public opinion and freedom. Next, we
consider the consequences of freedom for economic
growth and migration. We follow with some observa-
tions about the political economy of freedom at the
state level. Finally, we discuss policy changes made
across the states in 2020 and the first half of 2021, as
well as how responses to COVID-19 at the state and
local levels affected freedom.

## PUBLIC OPINION AND FREEDOM

We now move to analyzing in a more systematic fashion the relationship between public opinion ideology—as measured by presidential election results by state—and economic, personal, and overall freedom.

Figure 13 is a scatterplot of economic freedom in 2000 against presidential voting in 1996. (We chose presidential elections before the year that the policy is measured, because we think a lag exists between changes in public opinion and changes in law.) The x-axis measures the number of percentage points to the left of each state's popular vote, summing up Democratic and Green vote shares for the state minus the same for the country as a whole. We see a strong negative relationship between leftward lean in the electorate and economic freedom. However, strongly conservative states are no more economically free on average than mildly conservative or centrist states, such as Tennessee, New Hampshire, Missouri, and Florida.

**FIGURE 13** Partisanship and Economic Freedom in 2000



DEMOCRATIC AND GREEN LEAN, 1996

127

Figure 14 shows the same scatterplot for 2019, allowing us to see how the relationship between ideology and economic freedom has changed over the entire range of our time series. The relationship between ideology and freedom looks curvilinear again. We noted in the fourth edition that West Virginia looked like a big outlier, having moved substantially to the right since 2000. If right-wing ideology leads to more economic freedom, economic freedom should rise in West Virginia in future years. However, other low-income, southern states tend not to do well on economic freedom (e.g., Mississippi, Arkansas, and Kentucky), suggesting that West Virginia's room for improvement may be limited.

In fact, West Virginia did improve on economic freedom, and it is now a much smaller outlier.

**FIGURE 14**  Partisanship and Economic Freedom in 2019



Figure 15 plots personal freedom in 2000 against partisan lean in 1996. The relationship between partisanship and personal freedom in that year was extremely noisy. Slightly right-of-center Nevada topped the charts, followed by slightly left-of-center Maine and Vermont. Centrist West Virginia, New Hampshire, and Oregon followed. Left-leaning Maryland and Illinois did poorly, but they were joined by deeply conservative Nebraska, Oklahoma, and Alabama. The only southern state that was much above average was North Carolina.

**FIGURE 15** Partisanship and Personal Freedom in 2000



DEMOCRATIC AND GREEN LEAN, 1996

Figure 16 shows the relationship between partisanship and personal freedom at the end of our time series. Now, centrist states enjoy an apparent advantage on personal freedom, and the relationship is much noisier than the one between partisanship and economic freedom. Southern states no longer perform as relatively poorly as they have in the past, and because personal freedom has improved over time, few states remain below the post-2000 average.





FIGURE 16 Partisanship and Personal Freedom in 2019

Figure 17 puts economic and personal freedom together to show how partisanship relates to overall freedom. Again, we see a curvilinear relationship in which conservative and moderate states do much better than strongly left ones. New York sits in a class of its own at the bottom of the scale. It is actually quite remarkable how different it is from other states with regard to freedom, which we chalk up to policy ideology more than anything special about New York in relation to its urbanism or other factors. (Political scientists understand policy ideology as the relative orientation of a state's policies on the left–right spectrum, observed as a correlation across policy domains[109].) In other words, New York is a strongly left-of-center state, and most strongly left-of-center states do quite poorly on freedom. If we imagine a regression line among just the observations to the right of zero on the x-axis, it would slope sharply downward, and New York would sit comfortably on or near that line. The more surprising performances come from Rhode Island and Massachusetts in this period, whose freedom scores are not as low as their ideology would predict. The presence of New York City alone cannot account for New York's outlier position because other urban states or states with megacities perform significantly better.

109.   Robert Erikson, Gerald Wright, and John McIver. *Statehouse Democracy: Public Opinion and Policy in the American States* (New York: Cambridge University Press, 1993).





**FIGURE 17** Partisanship and Overall Freedom in 2000

Figure 18 shows the overall freedom and partisanship relationship at the end of our time series. A distinct and tighter negative relationship exists between leftward tilt and overall freedom. However, the outliers are still noteworthy. New York is still abysmal even for a strongly left-wing state. Wyoming, West Virginia, Mississippi, Louisiana, and Nebraska all under-perform other conservative states. California and Hawaii aptly represent the stereotype of progressive states. Florida, New Hampshire, and Nevada significantly outperform the rest of the center, while Massachusetts does better than one would expect for such a progressive state.



**FIGURE 18** Partisanship and Overall Freedom in 2019

131

To study the dynamics of public opinion and freedom over time, we regressed, for each state, its overall freedom score on partisanship (Democratic and Green lean) from four years ago. (For years between presidential elections, we linearly interpolate partisanship.) The regression includes year dummies and assumes state fixed effects, and it covers the years from 2000 to 2019. The fixed-effects specification forces the regression to focus on over-time change within each state.[109] The results are shown in Table 34.

**TABLE 34**

**Partisanship and Overall Freedom: Difference-in-Differences Estimates**

| Variable | Coefficient | Std. Error |
|---|---|---|
| $Partisanship_{t-4}$ | −0.0056 | 0.029 |
| $R^2$ (within) | 34.0% | |
| N | 1,000 | |

Note: Assumes clustered standard errors. $R^2$ = proportion of the total variance explained by the model.

The statistically significant results suggest that when public opinion in a state moves left, freedom falls somewhat. For instance, if a state begins 2 percentage points to the left of the national median voter in presidential elections, then moves 6 percentage points to the left, the predicted change in freedom four years in the future is $4 \times -0.0056 = -0.022$. That is a fairly modest but not unimportant change, about the difference between Illinois and Connecticut in 2019.

## FREEDOM, MIGRATION, AND GROWTH

America is a land of immigrants. Indeed, immigrants throughout America's history have boarded ships (and eventually planes) in droves to escape tyranny and to breathe the cleaner air of a nation founded on the idea of individual freedom. Sometimes that story is dramatic, as when the Puritans hurriedly left Europe to realize greater religious liberty or when Vietnamese boat people escaped murderous communist oppression to start anew in the New World. Other times it is less stark, as in the case of a German family fed up with the modern paternalist state and looking for a place to build a business and to raise a family or in the case of Mexican migrants looking for the better economic opportunities afforded by a freer economy.

109.   Despite Nickell bias, we also tried including a lagged dependent variable, but it was not statistically significant.

Unsurprisingly, given our foreign ancestors, it is also the case that we are a land of internal migrants. According to a Gallup poll, approximately one in four Americans "have moved from one city or area within their country to another in the past five years."[110] That factor puts the United States (with countries like New Zealand and Finland) in the top ranks globally for internal mobility (the worldwide average is 8 percent).

But why do those Americans move? They certainly aren't moving one step ahead of oppressive regimes and violence like those fleeing recently from Syria, Venezuela, or Zimbabwe. More likely they move for reasons like economic opportunity and locational amenities, such as better weather or beaches. But freedom might matter too when it comes to internal migration, given the differences across the 50 states we identify in the first part of this study. Those differences aren't as severe as those between the United States and the least free countries of the world. But they are meaningful, especially considering that New York is far less free than the average state, while other states also score substantially worse or better than others.

But do Americans value freedom as we define it? One way to try to answer that question is to analyze the relationship between freedom and net interstate migration—that is, the movement of people between states. If, all else being equal, Americans prefer to move to freer states, that would be evidence in favor of the hypothesis that Americans value freedom. In other words, it looks at preferences revealed by behavior rather than mere expressed views. That does not mean that people are responding directly to changes in policy, packing up moving vans, and heading from New York to New Hampshire or the Dakotas. But it could be that they are moving within their region to freer places like Pennsylvania and New Jersey.

We try to answer the question posed in the previous paragraph by examining the statistical correlations between freedom at particular moments and net interstate migration over several subsequent years. Figures 19–24 plot states' net migration rates from July 1, 2000, to July 1, 2010, and from July 1, 2010, to July 1, 2019, against their overall, economic, and personal freedom scores in 2000 and 2010, respectively. This division essentially splits our sample in half and roughly separates pre– and post–Great Recession periods. The net migration rate is defined as the number of people moving *to* a state *from* other states minus the number of people moving from that state to other states, divided by the initial resident population of the state. The migration data are from the Census Bureau's "components of population change" tables. These figures represent a simple "first cut" at the question. They do not control for any other factors that might drive migration.

110   Neil Esipova, Anita Pugliese, and Julie Ray, "381 Million Adults Worldwide Migrate within Countries," Gallup, May 15, 2013.

133

Figure 19 shows the relationship between overall freedom and net migration over the earlier period from 2000 to 2010. It shows a strong relationship between the starting level of freedom and subsequent net migration, suggesting that people are moving to freer states. We can see that from the example of New York, which suffered the worst net outmigration of any state—8.8 percent of its 2000 population—and is also the least free state. Louisiana is obviously anomalous because Hurricane Katrina drove away hundreds of thousands of people, resulting in large net outmigration despite an average level of freedom. At the top end, Nevada and Arizona are big outliers in net in-migration, as Americans during this period were flocking to the so-called sand states because of their supposedly desirable climates.[111] Those anomalies illustrate the importance of controlling for potential confounders.

**FIGURE 19** Overall Freedom and Net Domestic Migration, 2000–2010



OVERALL FREEDOM, 2000

Figure 20 shows the relationship between year-end 2010 freedom and migration over the next nine years. We see less evidence of amenity-driven migration over this period, which includes the aftermath of the Great Recession. However, warm states like the Carolinas, Arizona, Nevada, and Texas lie mostly above the line of best fit, whereas cold states like Alaska, New Hampshire, Illinois, and South Dakota lie mostly below that line. The relationship between freedom and net migration appears equally strong in both the earlier and later periods.

111.   Thomas Davidoff, "Supply Elasticity and the Housing Cycle of the 2000s," *Real Estate Economics* 41, no. 4 (2013): 793–813.

134



**FIGURE 20** Overall Freedom and Net Domestic Migration, 2010–2019

Figure 21 shows the relationship between economic freedom and net migration in the first half of our period of analysis. Again, a strong relationship exists between economic freedom and in-migration.

**FIGURE 21** Economic Freedom and Net Domestic Migration, 2000–2010



135

Figure 22 shows how economic freedom in 2010 relates to subsequent migration. The line of best fit expresses a strong, positive relationship between a state's economic freedom at the beginning of the period and subsequent in-migration. North Dakota lies significantly above the regression line in part because of its discovery of shale oil and gas. Michigan lies significantly below the regression line mostly because of the travails of its automobile-manufacturing industry in international markets.

**FIGURE 22** Economic Freedom and Net Domestic Migration, 2010–2019



Figure 23 moves to personal freedom. Here, we do not find as strong a relationship between freedom and migration as we found for overall freedom and economic freedom. The line of best fit is nearly flat, implying a weak relationship between personal freedom and net migration. Recall that personal freedom correlates slightly negatively with economic freedom. If economic freedom is a more important driver of net in-migration than personal freedom, the bivariate relationship between personal freedom and migration expressed here will probably be biased downward.

136



**FIGURE 23** Personal Freedom and Net Domestic Migration, 2000–2010

Figure 24 shows the relationship between personal freedom at the end of 2010 and subsequent net migration. The line of best fit is again nearly flat, indicating a weak relationship. However, economic freedom is an important confounder.



**FIGURE 24** Personal Freedom and Net Domestic Migration, 2010–2019

137

To deal with confounding variables that affect migration, we turn to multiple regression analysis, which allows us to control for factors such as climate. Doing so permits us to meet the most obvious challenge to our conclusions about the relationship between freedom and migration patterns among the states. In previous editions, we have found a positive relationship between each dimension of freedom and migration, although regulatory policy has been related to net migration solely through the channels of cost of living and economic growth. In other words, a lighter regulatory touch may improve the productivity of the economy, but low taxes and personal freedom seem to be amenities that the marginal migrant values for their own sake.

In this edition, we are again able to look at how freedom associates with net migration in two different time periods. By looking at how later-period freedom relates to migration and growth, we are making a kind of "out of sample" prediction from our prior results. Previous results of preregistered models showed that personal freedom dropped in significance as a driver of migration after the Great Recession, but all three dimensions of freedom positively correlated with the subsequent net in-migration during the first eight years of the 21st century. This time, we compare results for the 2000–2010 period with those for the 2010–2019 period.

We present results from two types of estimations: monadic and matched neighbors. The monadic regressions simply compare all 50 states with each other. The matched-neighbors regressions subtract the weighted average of neighboring states' values (on migration, freedom, and controls) from each state's value. The weights are the distances between the "centroids" (geographic centers) of each state. The purpose of these regressions is to examine whether freedom has a stronger effect on in-migration when neighboring states are more different on freedom. We expect that a freer state surrounded by less free states will attract more migrants than a freer state surrounded by equally free states, all else being equal.

Table 35 presents seven regression equations of net migration over the 2000–2010 period.[112] The tables display coefficients and standard errors. A rough rule of thumb for statistical significance is that when the ratio of the coefficient to the standard error is greater than two, the coefficient is statistically significant at the 95 percent confidence level; however, statistical significance is best thought of as a continuum rather than a switch.

The first equation simply regresses the net migration rate on the three dimensions of freedom, which are measured as averages for the years 2000 to 2004. Fiscal, regulatory, and personal freedom are all independently, positively, statistically significantly correlated with net in-migration. Model (2) adds cost of living in 2000, as measured by William Berry, Richard Fording, and Russell Hanson.[113] Cost of living is potentially a bad control, because regulatory policy, especially land-use freedom, can influence migration through the channel of cost of living. Model (3) adds accommodation GDP per capita, which proxies the size of the tourist industry. States with bigger hospitality sectors appear to attract more migrants, presumably because they have more locational amenities. Model (4) controls for capital stock per worker from Gasper Garofalo and Steven Yamarik.[114] Model (5) adds the percentage of state population age 65 and older. Model (6) adds the violent crime rate. Finally, model (7) adds population-weighted annual heating degree days—a measure of how cold a climate is—and area-weighted statewide average annual precipitation.

Except for cost of living, adding each of those controls does not substantially affect the statistical estimates of the correlation between fiscal, regulatory, and personal freedom, on the one hand, and net migration, on the other hand. The coefficient on regulatory freedom does fall when cost of living is added, a post-treatment collider: states lower on regulatory freedom suffer from higher cost of living, which is the more immediate cause of lower in-migration.

Table 36 performs the same set of analyses on the 2010–2019 data, with freedom variables measured as the average of 2010 through 2013 values. Again, fiscal and regulatory freedom look like important drivers of interstate migration over this period, whereas personal freedom loses much of its importance, as we expected. The last, personal freedom, also looks less important for migration in 2010–2019 than in 2000–2010. The relationship between fiscal and regulatory freedom, on the one hand, and migration, on the other hand, looks robust to the addition of controls.

---

112.   As in the fourth edition, we tried dropping the outlier case of Louisiana, with only trivial differences in results.

113.   William D. Berry, Richard C. Fording, and Russell L. Hanson, "An Annual Cost of Living Index for the American States, 1960–1995," *Journal of Politics* 62, no. 2 (2000): 550–67.

114.   Gasper A. Garofalo and Steven Yamarik, "Regional Growth: Evidence from a New State-by-State Capital Stock Series," *Review of Economics and Statistics* 84, no. 2 (2002): 316–23.

TABLE 35

## Monadic Estimates of Freedom and Migration, 2000–2010

| Variable | (1) Coef. (SE) | (2) Coef. (SE) | (3) Coef. (SE) | (4) Coef. (SE) | (5) Coef. (SE) | (6) Coef. (SE) | (7) Coef. (SE) |
|---|---|---|---|---|---|---|---|
| Fiscal freedom | 0.94 (0.50) | 1.39 (0.40) | 0.90 (0.45) | 0.82 (0.51) | 1.03 (0.50) | 0.90 (0.45) | 1.42 (0.53) |
| Regulatory freedom | 2.77 (0.58) | 1.29 (0.56) | 2.65 (0.55) | 3.01 (0.76) | 2.70 (0.56) | 3.06 (0.54) | 2.44 (0.59) |
| Personal freedom | 2.09 (0.74) | 2.41 (0.66) | 1.41 (0.61) | 2.33 (0.86) | 2.08 (0.71) | 2.68 (0.65) | 1.91 (0.57) |
| Cost of living | | −4.03 (0.97) | | | | | |
| Accom-modations | | | 1.35 (0.58) | | | | |
| Capital per worker | | | | 0.55 (0.72) | | | |
| Retirees | | | | | −0.55 (0.67) | | |
| Violent crime | | | | | | 1.40 (0.52) | |
| Heating degree days | | | | | | | −1.50 (0.97) |
| Precipitation | | | | | | | −1.37 (0.76) |
| Constant | 0.75 (0.61) | −1.84 (0.66) | 0.64 (0.56) | 0.69 (0.60) | 0.78 (0.60) | 0.48 (0.50) | 0.94 (0.58) |
| $R^2$ | 36.3% | 50.8% | 40.6% | 37.1% | 37.6% | 45.2% | 44.4% |

Note: All independent variables are standardized to mean zero and variance one. Robust standard errors. Coef. = coefficient; $R^2$ = proportion of the total variance explained by the model; SE = standard error.

## TABLE 36

### Monadic Estimates of Freedom and Migration, 2010–2019

| Variable | (8) Coef. (SE) | (9) Coef. (SE) | (10) Coef. (SE) | (11) Coef. (SE) | (12) Coef. (SE) | (13) Coef. (SE) | (14) Coef. (SE) |
|---|---|---|---|---|---|---|---|
| Fiscal freedom | 1.17 (0.53) | 1.18 (0.53) | 1.20 (0.53) | 1.05 (0.50) | 1.16 (0.53) | 1.12 (0.51) | 1.46 (0.53) |
| Regulatory freedom | 1.81 (0.51) | 1.60 (1.00) | 1.79 (0.51) | 2.07 (0.57) | 1.82 (0.51) | 1.83 (0.49) | 1.54 (0.50) |
| Personal freedom | 1.46 (0.53) | 1.47 (0.54) | 1.26 (0.59) | 1.66 (0.58) | 1.46 (0.55) | 0.66 (0.64) | 1.26 |
| Cost of living | | −0.24 (0.84) | | | | | |
| Accom-modations | | | 0.37 (0.37) | | | | (0.47) |
| Capital per worker | | | | 0.57 (0.60) | | | |
| Retirees | | | | | 0.14 (0.82) | | |
| Violent crime | | | | | | 0.66 (0.64) | |
| Heating degree days | | | | | | | −1.05 (0.76) |
| Precipitation | | | | | | | −1.09 (0.53) |
| Constant | 0.91 (0.58) | 0.91 (0.60) | 0.84 (0.59) | 0.92 (0.57) | 0.91 (0.60) | 0.95 (0.58) | 0.37 (0.49) |
| $R^2$ | 30.3% | 30.4% | 31.0% | 31.6% | 30.4% | 32.4% | 36.2% |

Note: All independent variables are standardized to mean zero and variance one. Robust standard errors. Coef. = coefficient; $R^2$ = proportion of the total variance explained by the model; SE = standard error.

Table 37 presents the results for the 2000–2010 period when we match each state to its neighbors, on the (true) assumption that migration flows between neighboring states are greater than they are between distant states. These matched-neighbor results are somewhat sharper than the monadic results. They suggest that fiscal and regulatory freedom drive migration even when cost of living is controlled. As expected, more costly states repel migrants, whereas states with locational amenities attract them. Model (17)—which controls for cost of living and accommodations GDP per capita—and model (18)—which controls for the previous two plus capital per worker—explain more than two-thirds of all the variance in relative-to-neighbors net migration across all 50 states as measured by $R$-squared.

**TABLE 37**

### Matched-Neighbors Estimates of Freedom and Migration, 2000–2010

| Variable | (15) Coef. (SE) | (16) Coef. (SE) | (17) Coef. (SE) | (18) Coef. (SE) |
|---|---|---|---|---|
| Fiscal freedom | 0.90 (0.44) | 1.53 (0.47) | 1.60 (0.40) | 1.46 (0.40) |
| Regulatory freedom | 2.97 (0.89) | 2.36 (0.76) | 1.85 (0.62) | 2.20 (0.78) |
| Personal freedom | 1.95 (0.56) | 1.56 (0.56) | 0.81 (0.45) | 0.85 (0.45) |
| Cost of living | | −6.4 (2.0) | −7.5 (1.6) | −7.7 (1.7) |
| Accom-modations | | | 1.7 (0.3) | 1.8 (0.4) |
| Capital per worker | | | | 0.48 (0.51) |
| Constant | −0.34 (0.54) | −0.4 (0.47) | −0.46 (0.42) | −0.29 (0.46) |
| $R^2$ | 54.2% | 64.7% | 70.8% | 71.3% |

Note: All independent variables are standardized to mean zero and variance one. Robust standard errors. Coef. = coefficient; $R^2$ = proportion of the total variance explained by the model; SE = standard error.

Table 38 presents the matched-neighbors results for the 2010–2019 period. All variables have smaller coefficients, due in part to the fact that absolute rates of net migration were lower during this period compared with the previous period. $R$-squareds are also lower, showing that net migration was simply less predictable during this period, presumably because of idiosyncratic shocks that state economies suffered during the Great Recession. Fiscal freedom is again robustly related to net in-migration, and personal freedom is nearly statistically significant in all models. Regulatory freedom appears less important to migration in this period, but the standard errors are apparently inflated, possibly owing to multicollinearity.

**TABLE 38**

**Matched-Neighbors Estimates of Freedom and Migration, 2010–2019**

| Variable | (19) Coef. (SE) | (20) Coef. (SE) | (21) Coef. (SE) | (22) Coef. (SE) |
|---|---|---|---|---|
| Fiscal freedom | 1.07 (0.47) | 1.19 (0.52) | 1.26 (0.56) | 0.96 (0.49) |
| Regulatory freedom | 1.26 (0.75) | 0.73 (1.07) | 0.48 (1.22) | 1.11 (1.15) |
| Personal freedom | 1.34 (0.56) | 1.12 (0.52) | 0.93 (0.56) | 0.90 (0.51) |
| Cost of living | | −0.93 (0.95) | −1.12 (1.03) | −1.8 (1.2) |
| Accommodations | | | 0.3 (0.37) | 0.63 (0.41) |
| Capital per worker | | | | 1.19 (0.77) |
| Constant | −0.25 (0.51) | −0.30 (0.54) | −0.32 (0.55) | 0.12 (0.52) |
| $R^2$ | 31.5% | 33.0% | 33.7% | 38.0% |

Note: All independent variables are standardized to mean zero and variance one. Robust standard errors. Coef. = coefficient; $R^2$ = proportion of the total variance explained by the model; SE = standard error.

Our migration models do not control for state economic growth, which is endogenous (more migration of workers will induce higher economic growth). It is plausible that regulatory freedom, in particular, influences migration almost entirely by affecting the economic climate (cost of living and growth), rather than as a direct amenity. Few workers are likely to study different states' labor laws or tort liability systems before deciding where to live, but it is quite plausible that businesses do so when deciding where to invest.

Therefore, we now turn to analyzing the statistical relationship between economic growth in each state and its economic freedom. The dependent variable in these regression equations is annual real personal income growth. The Bureau of Economic Analysis has produced real personal income estimates for the 2008–2019 period at the state level, using state-specific price indexes. We present four models, all with region dummies and two with year dummies in addition. Two of the models include economic freedom, and the other two separate out the fiscal and regulatory indexes (Table 39).

TABLE 39

### Economic Freedom and Real Personal Income Growth Estimates, 2008–2019

| Variable | (23) Coef. (SE) | (24) Coef. (SE) | (25) Coef. (SE) | (26) Coef. (SE) |
|---|---|---|---|---|
| Economic freedom | 0.012 (0.004) | | 0.0074 (0.0032 | |
| Fiscal freedom | | 0.009 (0.011) | | 0.010 (0.006) |
| Regulatory freedom | | 0.015 (0.018) | | 0.003 (0.007) |
| Region dummies? | Yes | Yes | Yes | Yes |
| Year dummies? | No | No | Yes | Yes |
| $R^2$ | 62.1% | 62.0% | 76.6% | 76.7% |

Note: Coef. = coefficient; $R^2$ = proportion of the total variance explained by the model; SE = standard error.

144

The results show that economic freedom is positively associated with subsequent income growth. A one-point increase in economic freedom is associated with a percentage point increase of between 0.7 and 1.2 in the growth rate of personal income the following year. Since the average personal income growth rate in the data set is 2.1 percent, and the standard deviation of growth rates is 2.6 percent (i.e., 0.026), this effect is substantial. Although fiscal and regulatory freedom are not individually significant in their models, a test that results in the linear combination of their coefficients being zero rejects the null in each case.

In conclusion, there is robust evidence that economic freedom is associated with subsequent income growth, even when we control for the previous year's rate of growth and region and year fixed effects. Part of the reason fiscal and regulatory policy scores correlate with greater in-migration may be that a good economic policy regime promotes economic growth, which in turn attracts investment and workers.

## POLICY CHANGES SINCE JANUARY 2020, INCLUDING THOSE RELATED TO COVID-19

### GENERAL POLICY CHANGES

Finally, we discuss policy changes made across the states in 2020 and the first half of 2021, as well as how responses to COVID-19 at the state and local levels affected freedom. Given that the ongoing COVID-19 pandemic has affected freedom across the country since our data cutoff—even if only temporarily in some cases—we find it valuable to describe policy changes that have occurred at the state and local levels since that time. In the past, we have tried to capture major policy changes that occurred after our data cutoff in the state profiles, and readers can also find them here in this edition.

As always, we do not try to shoehorn up-to-date data from some variables into the index, given that some other variables have a lag in availability, such as fiscal and criminal justice data. Our goal is to capture the state of freedom at a particular slice in time. However, we think it is worth capturing these changes in a qualitative way in this section so that readers will have as up-to-date an understanding of the state of freedom in the states as possible. So what follows is not only a COVID-19-specific discussion, but also a broader discussion of the policy changes of 2020 and 2021.

We turn first to relating policy changes more broadly, with a focus on those policies that fall within the purview of the index, and then we deal with policies dealing specifically with COVID-19. We can observe simultaneous pro-freedom and anti-freedom trends around the country in different policy domains. Some of these trends predated the pandemic, whereas oth-

ers seem more likely to have been a reaction either to the pandemic itself or to the changing economic and social conditions it has brought about.

Pro-freedom trends can be observed in domains such as school choice, criminal justice and policing, drug reform, alcohol laws, gambling laws, and tax policy. This last trend has been facilitated in part by federal profligacy, so that it is hard to say whether Americans in general have enjoyed a true tax cut—taking into account the growth in the future tax burden due to federal spending increases—from the pandemic years.

Anti-freedom trends are visible in labor laws and tobacco and e-cigarette policies. Land-use freedom has become a hot topic as housing costs have escalated, and some positive state-level reforms have occurred. However, it is unclear at best whether these initial efforts to break the housing logjam clear much of the ever-deepening thicket of local zoning regulations.

Turning first to fiscal policy, we see several states that have cut income tax rates. In 2021, 10 states reduced individual income taxes, and 5 states reduced corporate income taxes.[115] Most states cutting income taxes also simplified their tax structures. The most significant overall cuts in tax burden occurred in Idaho, Nebraska, New Hampshire, Ohio, Oklahoma, and Wisconsin. By eliminating the interest and dividends tax, New Hampshire will become the ninth state without an individual income tax. The pandemic also reduced tax collections initially because of the decline in economic activity.[116] A number of states tapped their rainy-day funds, allowing them to avoid raising taxes.[117] However, fiscal 2021 revenues mostly came in above projections, allowing a few states to cut taxes in 2021.[118] The most significant tax increases came from states that took advantage of the *Wayfair* decision to enact sales taxes on out-of-state internet retailers: as of June 2021, all states that have a general sales tax have made this change. Washington also enacted a new capital gains tax, even though it lacks a general income tax.[119] New York raised its top marginal income tax rate significantly, though the change applies only to those earning more than $25 million in a year.[120] Many states also increased government spending, particularly because the CARES Act and American Rescue Plan together shoveled more than $600 billion into states and localities.[121] Readers will rightly worry that states—and those

115. Tax Foundation, "States Respond to Strong Fiscal Health with Income Tax Reforms," July 15, 2021, https://taxfoundation.org/2021-state-income-tax-cuts/.

116. National Association of State Budget Officers, *The Fiscal Survey of States: Fall 2020* (Washington: NASBO, 2020), p. 54.

117. Barb Rosewicz, Justin Theal, and Joe Fleming, "States' Total Rainy Day Funds Fall for First Time Since Great Recession," The Pew Charitable Trusts, May 21, 2021.

118. National Association of State Budget Officers, *The Fiscal Survey of States: Spring 2021* (Washington: NASBO, 2021), p. 52.

119. Melissa Santos, "Eight Big Things the Washington State Legislature Passed in 2021," Crosscut.com, April 26, 2021.

120. "New York State: Tax Measures in 2021 Budget Agreement," KPMG, April 7, 2021.

121. Richard McGahey, "Why Didn't Covid-19 Wreck State and City Budgets? Federal Spending," *Forbes*, September 1, 2021.

groups and individuals who benefit from the spending (at the cost of the forgotten man, the federal taxpayer now and in the future)—will get hooked on this federal "drug" and try to maintain at least some of this spending.

In the area of regulatory policy, we have seen significant changes to health insurance regulation and labor regulation in several states, as well as some efforts at opening up housing production. Licensing regulations were sometimes suspended temporarily to permit telehealth across state lines, but most of those changes were not permanent. New technologies like virtual currencies continue to attract legislative attention.

In the field of labor regulation, 25 states have increased their minimum wages since the closing date on our study: Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Illinois, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, Ohio, Oregon, Rhode Island, South Dakota, Vermont, Virginia, and Washington. Several Democrat-controlled states also enacted or expanded mandatory paid sick leave, paid family leave, and restrictions on independent contractor status.[122] Colorado enacted paid sick leave and equal pay regulation. Connecticut created a paid family leave program. California expanded its existing family leave program and mandated racial and sexual diversity on corporate boards. Maine created a general paid leave mandate. Massachusetts enacted paid family leave.[123] New York enacted paid sick leave. Virginia tightened restrictions on independent contractors and noncompete agreements. Washington also expanded exemptions from noncompetes. New Jersey "banned the box" for private employers, and New York City and St. Louis have done so at the local level.[124]

In the area of health insurance regulation, Washington pioneered a state-level public option plan that was passed in 2019 and went into effect in 2021, with Colorado and Nevada following suit in 2021. In all three states, the "public option" is really a government-controlled, public–private partnership rather than a fully government-run insurer.[125] As Pew noted earlier this year: "The early results from Washington state's experiment are disappointing. In many parts of the state, premiums for the public option plans cost more than premiums for comparable commercial plans. Many of the state's hospitals have refused to take part in the public option, prompting lawmakers to introduce more legislation this year to force participation if there

122. Susan Gross Sholinsky et al., "Roadmap to Compliance: Major Employment Laws Effective as of January 2021 and Beyond," *Act Now Advisory*, Epstein Becker Green, January 26, 2021.

123. Heather St. Clair and Bruce Sarchet, "New State Employment Laws Set to Take Effect on January 1, 2021," Littler Mendelson, November 9, 2020.

124. New York City Council, Law 2021/004, prohibiting discrimination based on one's arrest record, pending criminal accusations of criminal convictions, enacted January 10, 2021, File #: Int 1314-2018; City of St. Louis, Ordinance 71074, effective January 1, 2021.

125. Dylan Scott, "The Public Option Is Now a Reality in 3 States," Vox, June 17, 2021.

147

aren't sufficient health insurance options in a geographic area. And consumer buy-in is also meager."[126] We will need to include this policy choice in any subsequent edition of this index.

State-level housing legislation does not figure directly in the index, but the goal of most state legislation on this topic is to loosen up local restrictions, which should eventually make an observable difference in our data. Important legislation includes California's accessory dwelling unit laws of 2020 and 2021, which are expected to ease the construction of thousands of new units.[127] New Hampshire enacted a similar law in 2017. Oregon essentially banned single-family zoning in cities in 2019, requiring residential districts in cities of at least 10,000 people to allow duplexes.[128]

Cryptocurrency is an emerging area of regulation at both state and federal levels. Wyoming has gone furthest to define new legal regimes for crypto firms, and in 2021 it recognized decentralized autonomous organizations as legal entities.[129] In 2017, New Hampshire expressly exempted cryptocurrency from state regulation.[130] At the other extreme, New York requires a state license for crypto firms.

Occupational licensing was also an area of at least temporary liberalization during the pandemic. Many states moved to allow audio-only telemedicine and to relax licensure requirements for out-of-state providers.[131] Florida, North Carolina, and Wyoming were the only states not to legalize audio-only telehealth.[132] Maryland had one of the broadest reforms for health care practitioners, allowing all health care professionals the authority to work beyond their current scope of practice in health care facilities. New York enacted a more limited reform for select professionals. Eight states—Idaho, Maine, Michigan, Missouri, New Hampshire, New York, Pennsylvania, and Texas—waived or modified licensing requirements for all professionals. Nurse practitioners specifically received expanded scope of practice in Kentucky, Louisiana, New Jersey, New York, Wisconsin, and other states that did not previously grant it.[133] Fifteen states enacted reforms

126.   Michael Ollove, "3 States Pursue Public Option for Health Coverage as Feds Balk," The Pew Charitable Trusts, July 22, 2021.

127.   Californians for Homeownership website, www.caforhomes.org

128.   Laurel Wamsley, "Oregon Legislature Votes to Essentially Ban Single-Family Zoning," NPR, July 1, 2019.

129.   Heather Morton, "Cryptocurrency 2021 Legislation," National Conference of State Legislatures, May 14, 2021.

130.   Jennifer L. Moffitt, "The Fifty U.S. States and Cryptocurrency Regulations," CoinATMRadar, July 27, 2018.

131.   Iris Hentze, "COVID19: Occupational Licensing during Public Emergencies," National Conference of State Legislatures, October 30, 2020, www.ncsl.org/research/labor-and-employment/covid-19-occupational-licensing-in-public-emergencies.aspx; Ethan Bayne, Conor Norris, and Edward J. Timmons, "A Primer on Emergency Occupational Licensing Reforms for Combating COVID-19," policy brief, Mercatus Center at George Mason University, Arlington, VA, March 26, 2020.

132.   Julia Raifman et al., "COVID-19 US State Policy Database," www.openicpsr.org/openicpsr/project/119446/version/V129/view.

133.   Sara Heath, "Mass. Law Expands Nurse Scope of Practice, Patient Access to Care," PatientEngagementHIT, January 5, 2021; "Scope of Practice—Nurse Practitioners," American Academy of Family Physicians, March 2021, www.aafp.org/dam/AAFP/documents/advocacy/workforce/scope/BKG-Scope-NursePractitioners.pdf.

allowing out-of-state licensed medical professionals to get a temporary license to practice in-state. Several states that had previously not allowed pharmacists to administer vaccines changed their laws to permit it.[134]

In the area of personal freedom, we see major legislative action in education, drugs (including alcohol), tobacco, guns, criminal justice, and gambling over the past two years. Most of that action, but not all, has been in a pro-freedom direction.

Turning first to drugs, the trend toward liberalization has continued. Arizona, Connecticut, Montana, New Jersey, New Mexico, New York, South Dakota, and Virginia have legalized recreational marijuana in 2020 or 2021.[135] Alabama legalized medical marijuana, and Louisiana decriminalized possession of up to 14 grams. Texas now allows low-THC medical marijuana.[136] Oregon was the first state in the country to decriminalize small-scale possession of all drugs. Oregon was also the first state to legalize medical psilocybin.[137] A growing number of states are authorizing medical research into psychedelics.[138]

In the wake of George Floyd's death, states moved to enact policing reforms that had been brewing for years as part of the larger criminal justice reform effort. Many states banned the use of chokeholds, including California, Colorado, Delaware, Indiana, Iowa, Louisiana, Massachusetts, Minnesota, Nevada, New Hampshire, New York, Oregon, Texas, Utah, Vermont, Virginia, and Wisconsin.[139] Tennessee and Illinois were previously the only states to ban the practice.[140] More significantly, New Mexico has banned the defense of qualified immunity for public employees, and Colorado has ended it for police officers (in 2020).[141] Another common reform has been to limit the circumstances under which police officers may use deadly force and to require officers to intervene when they observe excessive use of force.

In other criminal justice news, Maine became the fourth state to abolish civil asset forfeiture,[142] and Arizona moved to require a criminal conviction before civil forfeiture proceedings.[143] The Maine law also prohibits

134. Kelsie George. "Pharmacists Boosting Access to COVID Vaccine." *State Legislatures Magazine*. May 18, 2021.
135. "2021 Marijuana Policy Reform Legislation." Marijuana Policy Project. June 22, 2021.
136. "Texas Medical Marijuana." State of Texas. 2021. Texas.gov.
137. "The Complete Guide to Psychedelic Legalization." Psychedelic Invest. 2021.
138. Joyce E. Cutler. "Texas the Latest State to Legalize Psychedelic Medical Research." Bloomberg Law. June 23, 2021.
139. National Conference of State Legislatures. "Legislative Responses for Policing—State Bill Tracking Database," NCSL, June 16, 2021.
140. Farnoush Amiri, Colleen Slevin, and Camille Fassett. "Floyd Killing Prompts Some States to Limit or Ban Chokeholds." AP News. May 23, 2021.
141. Brooke Seipel. "Colorado Governor Signs Sweeping Police Reform Bill Ending Qualified Immunity, Banning Chokeholds." *The Hill*. June 19, 2020.
142. C. J. Ciaramella. "Maine Becomes 4th State to Repeal Civil Asset Forfeiture." Reason.com. July 14, 2021.
143. C. J. Ciaramella. "Arizona Legislature Passes Bill Requiring Convictions for Asset Forfeiture." Reason.com. April 29, 2021.

149

equitable sharing participation, giving it the best forfeiture laws in the nation. Minnesota made more modest changes.[144]

Red states continue to adjust their gun laws in a pro-freedom direction. In 2021, five states enacted constitutional carry: Iowa, Montana, Tennessee, Texas, and Utah. Arkansas adopted Stand Your Ground,[145] whereas Ohio adopted a more limited version preventing civil liability.[146] Colorado's supreme court specified no duty to retreat in a recent decision. Meanwhile, blue states went in the other direction. Virginia adopted a package of significant changes, including universal gun registration, safe storage regulation, a one-gun-a-month limit, and red flag seizures.[147] Cities are now allowed to ban guns on their property. Colorado also enacted a safe storage law.

Alcohol laws were at least temporarily liberalized during the pandemic in many states and localities as drinking establishments and breweries suffered from the restrictions and reduced demand for public socializing that occurred from March 2020 through the summer of 2021. Michigan, Nevada, New Mexico, North Dakota, South Dakota, and Utah were the only states *not* to allow restaurants to serve takeout alcohol. Thirty-two states further allowed restaurants to deliver alcohol. Normally, liquor licensees must get permission to expand outdoor dining from state agencies, but states passed legislation allowing them to expand outdoor dining with only local zoning approval (e.g., Arkansas 2021 Act 705). New Jersey expanded the period during which seasonal retail consumption license holders could sell alcohol (A.B. 4589). The success of these policies for consumers suggests the policies should stick, and perhaps many states will make their temporary legislation permanent, especially since the fears promoted for decades by the "Bootlegger and Baptist" coalition did not play out.

The year 2021 became the "year of school choice" in the wake of widespread parent dissatisfaction with public school remote learning. The most significant changes included the enactment of a new tax-credit scholarship in Arkansas and the establishment of educational savings accounts in Florida, Indiana, Kentucky, Missouri, New Hampshire, and West Virginia.[148] Numerous states expanded existing tax-credit scholarship programs. Many states are also, through legislation or court decisions, expanding existing school choice programs to religious schools.

144. Stephen Montemayor, "Changes to Minnesota's Civil Asset Forfeiture Laws Pass Legislature," *Star Tribune*, July 3, 2021.

145. Monisha Smith, "Gun Laws—Good and Bad—Are Changing in States across the Country: Here's What's Going into Effect in July 2021," Everytown for Gun Safety, July 1, 2021.

146. Senate Bill 175, Ohio Legislature, signed into law January 4, 2021.

147. Jackie DeFusto, "Five New Gun Control Laws Take Effect July 1 in Virginia," WRIC.com, June 28, 2021.

148. "The Year of School Choice," American Federation for Children, May 16, 2021.

150

Online sports betting took off in a big way in the last few years because of the innovations of DraftKings and related apps and websites. As of mid-2021, 27 states had legalized online sports betting, a complete turnaround from 2018 when only Nevada had done so.[149]

As we have seen throughout the pandemic, when government gets out of the way, businesses and professionals rush to provide goods and services that consumers demand, such as sidewalk and parking space dining (parking spaces are oversupplied because of government parking minimums), alcohol to go, in-person private schooling, and telehealth. Will state and local governments take notice and keep these consumer-friendly policies, or will they go back to satisfying entrenched interests with regulatory barriers unresponsive to consumer needs?

## COVID-19-RELATED POLICIES

Fellow classical liberals have diverse views on the appropriate policy responses to infectious diseases. In principle, it is clear that intentionally or negligently exposing others to a serious infectious disease is a violation of their freedom. Even unknowingly exposing others is a regrettable act that should be prevented if possible. Behaviors that pose serious risks to others in this way constitute a significant, direct, negative externality. Therefore, there is room for coercive public policies to prevent or punish such acts.

But what kind of policy response is appropriate? Classical liberals can understandably disagree on the thresholds of risk at which coercion becomes justifiable. Activities that create a risk of transmitting a deadly and highly contagious disease presumably merit more sanction than activities that create a risk of transmitting a usually harmless and only mildly contagious disease. Thus, extreme action such as bans on travel and quarantines may well have been justified in early modern cities to prevent the spread of plague, given its contagion and fatal consequences during the era. COVID-19 lies more at the other end of the spectrum from early modern plague, fatal only to a small minority (under 2 percent of those infected by every estimate) and moderately contagious ($R_0$ below measles but above influenza).[150]

Moreover, risk isn't always obvious when a new threat emerges, and a varied range of responses can help society learn the true level of risk and how to mitigate it. In those situations of uncertainty, decentralized and deliberative processes, rather than top-down and bureaucratic ones, are most needed. For these reasons, we are skeptical of open-ended gubernatorial emergency powers, such as those exercised in some states during the pandemic.

149   "State by State Legal Sports Betting Guide," SportsBetting.Legal.

150.   "COVID-19 Pandemic Planning Scenarios," Centers for Disease Control and Prevention, March 19, 2021.

151

Thus, the most extreme COVID-19 policies, such as mandatory stay-at-home orders, do not appear in hindsight to have been justified given what we now know about its deadliness and contagion. Had policymakers known the full characteristics and consequences of COVID-19, they would have realized that mandatory stay-at-home orders were excessive. Defenders of the policy might admit that while it turned out not to have been desirable, the lack of knowledge early in the pandemic meant that lockdown was the safer choice and, thus, the caution was warranted. However, the knowledge problem cuts both ways. States clearly did not know what the negative consequences of lockdowns would be for the economy, education, mental health, and crime, to name a few apparent downstream effects. Even if the early lockdowns could be justified, state legislators could still be faulted for the extent to which they delegated emergency powers to executives. Moreover, the governments that enacted second-wave lockdowns in late 2020 and early 2021 should have known better. There is a legitimate debate to be had, however, about policies such as mask mandates and vaccine incentives.

Turning to state policies, a small number of states, to their credit, avoided mandatory lockdowns in 2020: Arkansas, Iowa, Nebraska, North Dakota, South Dakota, Utah, and Wyoming.[151] Some states maintained lockdowns long after it was apparent that they were not needed to "flatten the curve," most notably California and New Mexico. Most lockdowns were short-lived, however: "By mid-May, all 50 states had begun the process of easing restrictions, seeking a balance between reopening economies and protecting public health."[152] Mandatory stay-at-home orders may have reduced infection rates in 2020,[153] but few studies examine the tradeoffs of the policy, such as the long-run effects on death rates relative to other, more focused protection policies.[154]

Moreover, stay-at-home orders may have gotten more attention than they deserve, compared with other policies. For example, every state but South Dakota closed restaurants, bars, movie theaters, gyms, and hair salons for several weeks or months in 2020.[155] (Casinos and liquor stores got special treatment; only 22 states closed casinos, and only one state—Nevada—closed liquor stores.) Some states required quarantine for individuals entering the state. Thirty-one states suspended elective medical procedures. Iowa,

151. "States That Issued Lockdown and Stay-at-Home Orders in Response to the Coronavirus (COVID-19) Pandemic, 2020," Ballotpedia.

152. Rachel Treisman, "How Is Each State Responding to COVID-19?," NPR, December 4, 2020.

153. Renan C. Castillo, Elena D. Staguhn, and Elias Weston-Farber, "The Effect of State-Level Stay-at-Home Orders on Covid-19 Infection Rates," American Journal of Infection Control 48, no. 8 (2020): 958–60; M. Keith Chen et al., "Causal Estimation of Stay-at-Home Orders on SARS-CoV-2 Transmission," working paper, arXiv.org, May 11, 2020.

154. Shanwen Luo, Kwok Ping Tsang, and Zichao Yang, "The Impact of Stay-at-Home Orders on US Output: A Network Perspective," April 20, 2020.

155. Raifman et al., "State Policy Database."

Mississippi, and New Mexico suspended elective medical procedures a second time, during the winter of 2020/21. Some states shut down in-person private schooling in addition to public schooling.[156] Some states limited the size of outdoor gatherings, including but not limited to California, Colorado, Connecticut, Delaware, Hawaii, Maine, Massachusetts, Michigan, New Jersey, New York, North Carolina, Pennsylvania, and Vermont. Given what we now know about how COVID-19 is spread, these restrictions seem pointless at best.

In 2021, mask mandates have been the pandemic policy of choice, not business closures. (As noted earlier, this kind of restriction on freedom may be justifiable—at least, it seems there is scope for reasonable debate on the question.) As of September 2021, seven states had mask mandates for indoor places that applied even to vaccinated individuals: Hawaii, Illinois, Louisiana, Nevada, New Mexico, Oregon, and Washington.[157] Many localities in the other 43 states also had mask mandates. The only states never to have had a mask mandate are Arizona, Florida, Georgia, Idaho, Missouri, Nebraska, Oklahoma, South Carolina, South Dakota, and Tennessee.[158]

Another policy to have emerged recently, with a very clear anti-freedom orientation, is prohibitions on vaccination requirements by private institutions. According to Ballotpedia, "20 states—Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Missouri, Montana, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming"—ban vaccination requirements in the private sector.[159]

In the wake of lengthy, pandemic-related public emergencies, sometimes granting governors unilateral powers to implement widespread shutdowns of the private economy, legislatures have taken a second look at gubernatorial emergency powers.[160] The most significant changes occurred where strongly Republican legislatures faced off against Democratic governors, as in Kentucky and Pennsylvania. Kentucky's legislature limited the governor's emergency orders to 30 days unless extended by the legislature and required the governor to seek approval from the attorney general when issuing orders that suspend statutes during an emergency. Pennsylvania adopted constitutional amendments limiting emergency declarations to 21 days unless extended by the legislature and allowed the Pennsylvania General Assembly to pass resolutions terminating emergencies (i.e., without legislation that would require a governor's signature).

156.   "US Appeals Court Sides with KY Governor in Closing Schools," *Lexington Herald Leader*, November 29, 2020.
157.   Andy Markowitz, "State-by-State Guide to Face Mask Requirements," AARP, September 16, 2021.
158.   Raifman et al., "State Policy Database."
159.   "State Government Policies about Vaccine Requirements (Vaccine Passports)," Ballotpedia.
160.   "Changes to State Emergency Power Laws in Response to the Coronavirus (COVID-19) Pandemic, 2020–2021," Ballotpedia.

As noted in the prior section, many pro-freedom trends were prompted by the pandemic, particularly in the areas of education, health care licensing, and alcohol takeout and delivery. The lockdowns were mostly short-lived, and it seems unlikely that states will return to them. Thus, despite the initial overreaction of most states to the pandemic, the American states can generally be credited with reasonable, freedom-respectful responses to the pandemic in the long run, especially compared with international governments. To be sure, not a single state distinguished itself with a consistently pro-freedom orientation throughout the pandemic, but many states have now an essentially free-market approach to pandemic policies, letting private institutions lead the way and discover how best to manage what is rapidly becoming an endemic part of our life as a species.

## CONCLUSIONS

In the first section of the book, we built and justified our index of freedom across the 50 states in the period 2000–2019. Our index of freedom can be broken down into three dimensions: fiscal freedom, regulatory freedom, and personal freedom. Fiscal and regulatory freedoms together we dub "economic freedom."

It turns out that economic freedom is more often found in more conservative states that tend to vote Republican in presidential elections, although exceptions exist, and the relationship was weaker in 2000 than it is now. Personal freedom is all over the map. It doesn't seem to have any relationship with more or less conservative or progressive states. The relationship is just noisier and more uncertain than that between ideology and economic freedom.

Another reason that freedom tends to prosper in some places and falter in others is institutional design. Much research has been conducted on the effects of institutions on government spending across countries,[161] as well as on institutions and the dynamics of policy change in the American states.[162] Variables of interest include size of the legislature, gubernatorial power, professionalization of the legislature, fiscal decentralization, term limits, and initiative and referendum. In theory, institutions could have consistent effects on individual liberty in one direction or the other, but it is more likely that most institutions affect freedom positively in some areas and negatively in others. For instance, popular initiatives have helped pass strict tax limitation rules, such as Colorado's Taxpayer Bill of Rights, but have also allowed

---

161   See, for instance, Torsten Persson and Guido Tabellini, *The Economic Effects of Constitutions* (Cambridge, MA: MIT Press, 2003).

162   See, for instance, Charles R. Shipan and Craig Volden, "Bottom-Up Federalism: The Diffusion of Antismoking Policies from U.S. Cities to States," *American Journal of Political Science* 50, no. 4 (2006): 825–43.

massive spending increases to become law, such as Florida's 2002 initiative requiring that universal prekindergarten be offered throughout the state and a 2000 initiative requiring construction of a high-speed rail system to connect Florida's five major cities.

Although macro phenomena like partisan lean and corruption have a big impact on freedom, we must not discount the role of political entrepreneurs and individual activists at the state and local levels. The late Jerry Kopel, a Colorado legislator and activist, authored the original "sunrise" and "sunset" legislation for occupational licensing agencies and maintained a website where he kept a close watch on licensing regulation.[163] Quite probably because of Kopel's indefatigable efforts, Colorado remains among the highest-rated states in the nation for occupational freedom.

Next, we examine the consequences of freedom for migration and economic growth. We find strong evidence that states with more freedom attract more residents. We can be especially confident of the relationships between economic freedom (both a lighter fiscal impact and the regulatory impact of government policy) and net in-migration; both were statistically significant in every model we ran. Personal freedom was significant in 21 of 22 models, and the only model in which it was not significant controlled for violent crime and found a positive relationship between violent crime and in-migration, which seems likely to be spurious. More important than statistical significance, the estimates suggested that the effects of each dimension of freedom on in-migration are economically significant as well.[164]

One channel by which economic freedom affects in-migration is by increasing economic growth. We found a robust relationship between economic freedom in one year and income growth in the next. It was impossible, however, to disentangle the relative contributions of fiscal and regulatory policy from this result, as the two are positively correlated with each other.

Freedom is not the only determinant of personal satisfaction and fulfillment, but as our analysis of migration patterns shows, it makes a tangible difference for people's decisions about where to live. Moreover, we fully expect people in the freer states to develop and benefit from the kinds of institutions (such as symphonies and museums) and amenities (such as better restaurants and cultural attractions) seen in some of the older cities on the coast, and in less free states such as California and New York, as they grow and prosper. Indeed, urban development expert and journalist Joel Kotkin recently made a similar point about the not-so-sexy urban areas that

---

163.   See Jerry Kopel's website: jerrykopel.com

164.   On the distinction between economic and statistical significance, see Stephen T. Ziliak and Deirdre N. McCloskey, *The Cult of Statistical Significance: How the Standard Error Costs Us Jobs, Justice, and Lives* (Ann Arbor: University of Michigan Press, 2008).

were best situated to recover from the 2008–2009 economic downturn:

> Of course, none of the cities in our list competes right now
> with New York, Chicago, or L.A. in terms of art, culture,
> and urban amenities, which tend to get noticed by journal-
> ists and casual travelers. But once upon a time, all those
> great cities were also seen as cultural backwaters. And
> in the coming decades, as more people move in and open
> restaurants, museums, and sports arenas, who's to say
> Oklahoma City can't be Oz?[165]

These things take time, but the same kind of dynamic freedom enjoyed in Chicago or New York in the 19th century—that led to their rise—might propel places in the middle of the country to be a bit hipper to those with urbane tastes.

Lastly, we would stress that the variance in liberty at the state level in the United States is quite small in the global context. Even New York provides a much freer environment for the individual than most countries. There are no Burmas or North Koreas among the American states. Still, our federal system allows states to pursue different policies in a range of important areas. The policy laboratory of federalism has been compromised by central-ization, most recently in health insurance, but it is still functioning. We saw the capacity of states to innovate in the direction of freedom nearly a decade ago when Colorado and Washington legalized recreational marijuana. More recently, Arizona's experiments in occupational licensing universality, New Hampshire's Housing Appeals Board, and the expansion of new forms of online gambling in many states show that this capacity is still very much alive.

Regardless of one's views about freedom as we define it, the informa-tion this study provides should prove useful to those looking for a better life. As Americans—especially those who are currently less fortunate—grow richer in future years, quality of life will matter more to residence deci-sions, whereas the imperative of higher-paying employment will decline by comparison. For many Americans, living under laws of which they approve is a constituent element of the good life. As a result, we should expect more ideological "sorting" of the kind economist and geographer Charles Tiebout foresaw. High-quality information on state legal and policy environments will matter a great deal to those seeking an environment friendlier to indi-vidual liberty.

165.   Joel Kotkin, "Welcome to Recoveryland: The Top 10 Places in America Poised for Recovery," November 9, 2010, joelkotkin.com.

# PART 3
# FREEDOM STATE BY STATE

T he following state profiles contain (a) a chart of each state's personal, economic, and overall freedom rankings over time (because these are ranks, *lower* numbers are better); (b) key facts on each state; (c) a descriptive analysis of each state's freedom situation; and (d) three specific policy recommendations that would increase freedom in each state. We have chosen policy recommendations that would have the greatest effects on the state's freedom score, consistent with its political environment. For instance, urging New York to pass a right-to-work law would be futile, but eliminating rent control through state legislation might be more feasible. The discussions for each state represent the policy environment as of our data cutoff date, although we have attempted to note some of the most significant policy changes that occurred after that date.

158

# KEY TO THE PROFILES

T he following profiles contain some basic information about each state, including the state's freedom rankings over time and various institutional, political, demographic, and economic indicators of interest. The next page provides a brief description of each element contained in the profiles, keyed to the sample profile below. It also supplies more information about the variables we have chosen to include.



*sample profile*

159

## I. STATE ID

### State Name

State profiles appear in alphabetical order. The District of Columbia and unincorporated organized territories are not included in this index.

### State Rankings

Each state's overall rank for 2019 is displayed prominently at the top of the spread, next to the state name. A chart below the state name presents the state's segmented, historical rankings for each year from 2000 to 2019.

## 2. PARTY CONTROL

This section provides information on party control of the legislature and governorship between 2017 and 2021. Red indicates Republican control; blue indicates Democratic control. The table also gives the name of the governor. Unified party control of the legislature and governor's office allows observers to ascribe responsibility for policy actions to the party in control. One topic for political science research is how unified Republican, unified Democratic, and divided state governments affect the policy environment on fiscal, regulatory, and personal freedom issues.

## 3. POLICY RECOMMENDATIONS

There are three policy recommendations for each state, corresponding to the three dimensions of freedom: fiscal policy, regulatory policy, and personal freedom, in that order. We considered three criteria as we decided which policy recommendations to include in this book:

1. **Importance.** The recommended policy change would result in a significant boost to the state's freedom score.

2. **Anomalousness.** The policy change would correct a significant deviation of the state's policies from national norms.

3. **Feasibility.** The policy change would likely prove popular, taking into account the state's ideological orientation and the political visibility of the issue.

## 4. ANALYSIS

The analysis section of each state profile begins with an introduction and then discusses fiscal, regulatory, and personal freedom issues in the state, in that order.

# ALABAMA

**2019 RANK**
## 22nd





FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| | R | D | 2021 | 2019 | 2017 |
|---|---|---|---|---|---|
| **GOVERNOR** | | | Ivey | Ivey | Ivey |
| **SENATE** | | | | | |
| **HOUSE OF REP.** | | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Encourage the privatization of hospitals and utilities to bring government employment down closer to the national average. Private utility monopolies will, however, require careful rate regulation.

**Regulatory:** Allow independent practice by nurse practitioners and dental hygienists within the scope of their training.

**Personal:** Continue to reduce incarceration rates with thorough sentencing reform, including abolishing mandatory minimums for nonviolent offenses and lowering maximum sentences for marijuana and other victimless crimes.

## ANALYSIS

As a socially conservative Deep South state, it is unsurprising that Alabama does much better on economic freedom than on personal freedom. But three of its four neighbors do substantially better on economic freedom (Florida, Georgia, and Tennessee), with only Mississippi doing worse. Alabama's overall freedom level has risen since a trough in 2012, and over that time it has gradually gained 10 places in the ranks. Its biggest one-year gains in freedom came in 2015, 2013, and 2019, in that order, but if we ignore federalized policies, the only significant one-year gain came in 2013.

Alabama has always been one of the lowest-taxed states in the country. Its combined state and local tax collections, excluding motor fuel and severance, were an estimated 8.2 percent of adjusted personal income in fiscal year (FY) 2020. State-level taxes fell quickly in the early stages of the Great Recession and have increased little since then. Local taxes crept up a bit over the 2000–2008 period but have fallen off since highs reached during the Great Recession. Alabama has a moderate degree of choice in local government. Municipalities are more important than counties, but counties are still important, and municipalities are not numerous enough to give Alabama even one competing jurisdiction per 100 square miles.

Alabama's debt burden is fairly low. However, public employment is high because of publicly owned utilities and hospitals.

On regulatory policy, Alabama does especially well on land-use and labor policy. However, it does well below average on its tort system and certain cronyist policies. Local zoning has a light touch, allowing the housing supply to rise elastically with the state's growing population. Alabama enjoys a right-to-work law, no minimum wage, and liberal workers' com-

pensation mandates. Unfortunately, the state passed an E-Verify mandate on employers in 2011/12 and prevents employers from banning guns in company parking lots. Alabama has made some moves to improve its civil liability system, but it could do some further reform. The state has not abolished joint and several liability, for instance.

Alabama suffers from too many cronyist regulations on business and occupation entry. Like several other southern states, Alabama has a strong lobby for physicians and dentists that has prevented nurse practitioners and dental hygienists from practicing independently. The state has a certificate-of-need requirement for hospital construction. Personal automobile and homeowner's insurance rates require the insurance commissioner's prior approval. Alabama has a long-standing anti-price-gouging law that will create real harm if the state is ever struck by a major natural disaster. The state also bans sales of below-cost gasoline.

The state remains well below average on personal freedom despite benefiting from the Supreme Court's *Obergefell* decision, which had the effect of nullifying Alabama's prohibition on all same-sex partnership contracts.[166] It has improved in other ways too, though, as noted in the next paragraph.

Alabama was long below average for conservative states on gun rights, but in 2013/14 it moved to shall-issue on concealed carry, and permit costs are low. Alcohol regulations have gradually loosened over time, but the state still has some of the highest beer and spirits taxes in the country, along with local blue laws. It still bans direct wine shipment despite a 2017 attempt in the state senate to allow it. The state has done nothing to reform its cannabis laws; it is possible to receive life imprisonment for a single marijuana trafficking offense not involving minors or a school

166   *Obergefell v. Hodges*, 135 S. Ct. 2584.

zone. Alabama long had a much higher incarceration rate than the national average, even adjusting for its violent and property crime rates. But since 2014, that rate has come down substantially. Alabama's police do not actually pursue arrests for victimless crimes very vigorously. The state continues to suspend driver's licenses for drug offenses unrelated to driving. Despite substantially reducing its prison collect call rate in 2015, the state still has one of the highest rates in the country. Alabama does much better than average on tobacco freedom because of low taxes and relatively lenient smoking bans on private property. The state is mediocre on educational freedom but did enact a modest private scholarship tax-credit law in 2013/14.

163

# ALASKA

**2019 RANK**
## 24th





## PARTY CONTROL

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Dunleavy | Dunleavy | Walker, Ind. |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

■ R   ■ D

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending in the areas of grossest overspending relative to national averages: education, corrections, administration (especially financial administration and public buildings), housing and community development spending, and "miscellaneous commercial activities." Use the proceeds to reduce the corporate income tax permanently, helping the economy diversify away from energy.

**Regulatory:** Enact a right-to-work law to attract manufacturing investment.

**Personal:** Reform asset forfeiture to require a criminal conviction before forfeiture and to require Department of Justice equitable sharing proceeds to follow the same procedure.

## ANALYSIS

Alaska is an unusual state because of its enormous oil and gas reserves and revenues. Its fiscal policy scores fluctuate wildly depending on the global price of oil. With the end of the commodity boom in the 2000s, corporate income tax collections plummeted in Alaska, and the state buffered the decline with large withdrawals from its enormous rainy-day fund. Alaska has by far the highest cash-to-liability ratio of any state.[167] Since 2017, state-level revenues have rebounded, making it look like a deteriorating fiscal policy position. In reality, the true long-term stance of Alaskan fiscal policy is likely about average, and it has improved since the 2000s when the size of government was clearly bigger.

Alaska's enviable net asset position has also made for something of a "resource curse" in the state's expenditures. Of the employed population in Alaska, 15 percent work in state or local government, nearly 2 standard deviations above average—but it was nearly 17 percent back in 2002. Government consumption is similarly high. Although local taxes outstrip state taxes (which are quite low)—lately by a wide margin—local jurisdictions are so consolidated that virtually no choice exists among local government options.

Despite its attractive overall fiscal situation, or perhaps because of it, Alaska does poorly on several important regulatory policy indicators and does middling overall. The labor market is far more regulated than one would expect for such a conservative state. There is no right-to-work law; the state has strict workers' compensation mandates and a high minimum wage ($10.34 per hour in 2020). Many occupations are licensed in Anchorage and Fairbanks, where about half of the state's population lives. On the one hand, insurance is pretty heavily regulated. On the other hand, Alaska gives a good bit of practice freedom to nurses and dental hygienists, does not zone out low-cost housing, and has one of the nation's best civil liability systems (an area in which the state has improved a great deal during the past 25 years).

As one of the country's most libertarian states, Alaska has always done well on personal freedom and reached the top 10 in 2016 for the first time since 2001. Drug arrests are quite low (1.5 standard deviations below average); crime-adjusted incarceration is below the national average and, like most places, dropping; marijuana is legal; homeschooling is unregulated; and gun rights are secure (for instance, concealed carry of handguns does not require a license). However, the state used to have one of the most anti-gay-marriage laws in the nation, forbidding even private partnership contracts for same-sex couples. (Of course, *Obergefell* federalized the issue and overturned such laws.) The state's civil asset forfeiture law is among the worst in the country, which probably accounts for why local police do not bother to ask the Department of Justice to "adopt" many cases. The burden of proof is on the owner of the property to prove innocence, property is subject to forfeiture from mere probable cause, and the proceeds largely go to law enforcement. Sales of all alcohol, even beer, are prohibited in grocery stores. Alcohol taxes, especially for beer, are also among the highest in the country. Gambling freedom is low, and the cigarette tax is high at $2 per pack in 2019 ($5 a pack in Juneau). There is no helmet law for motorcyclists.

---

167.   Eileen Norcross, "Ranking the States by Fiscal Condition," Mercatus Research, Mercatus Center at George Mason University, Arlington, VA, July 2015.

# ARIZONA

**2019 RANK**
## 9th





FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| R    D        | 2021  | 2019  | 2017  |
| ------------- | ----- | ----- | ----- |
| **GOVERNOR**  | Ducey | Ducey | Ducey |
| **SENATE**    |       |       |       |
| **HOUSE OF REP.** |   |       |       |

## POLICY RECOMMENDATIONS

**Fiscal:** Provide an easy procedure for small groups of neighborhoods to incorporate new municipalities, either out of unincorporated areas or out of existing cities. Keep state aid to localities at a low level to allow local jurisdictions to provide different levels and mixes of public goods according to the desires of their residents.

**Regulatory:** Provide for full competition in telecommunications and cable, allowing different wireline and wireless companies to attract customers without service mandates, price controls, or local franchising exactions.

**Personal:** Legalize for-profit casinos and card games.

167

## ANALYSIS

Arizona has moved up in the overall rankings during the past two decades, improving considerably on personal freedom while maintaining above-average performance on economic freedom. It has lost ground consistently on regulatory policy but is still ranked in the top 20.

Fiscal policy has typically been more of a problem than regulatory policy, but the two have converged over the years. State and local taxes are 8.9 percent of adjusted personal income, well below average. Although local taxes are around the national average, state-level taxes are reasonably low. The state depends heavily on sales taxes, permitting generally low individual and business income taxes. Arizona has very little scope for choice among local jurisdictions. Although municipalities are more important than counties, there are only 91 municipalities in the whole state. Debt and government consumption are below average, and government employment is a lot better than average, at only 10.5 percent of the private sector.

On regulatory policy, Arizona is one of the best in the country with regard to anti-cronyism. In most industries, business entry and prices are quite liberalized. However, occupational licensing has ratcheted up substantially over time. The state has no certificate-of-need laws for hospital construction or movers. The right-to-work law probably attracts manufacturing businesses, and the state passed statewide cable franchising in 2018. It has a

higher-than-federal minimum wage that has risen significantly because of Proposition 206, which was passed by popular vote in 2016. That law meant a rise from $8.05 per hour to $10 per hour, with subsequent increases to $10.50 per hour in 2018, $11 per hour in 2019, and $12 per hour in 2020. It also has an E-Verify mandate. Although land-use regulation tightened in the 1990s and early 2000s, a regulatory takings initiative may have curbed its growth a little since 2006.

Arizona's personal freedom improvements are due to growing gun rights ("constitutional carry" passed in 2009/10); a medical marijuana law; school vouchers (passed in 2011/12); declining victimless crime arrests; the abolition of its sodomy law because of the Supreme Court decision in *Lawrence v. Texas*;[168] the judicial legalization of same-sex marriage; liberalization of its wine shipment laws; and a significant asset forfeiture reform in 2017. On the other side of the ledger, incarceration rates are still quite high, climbing relatively consistently until reaching their peak in 2014 and then moving down slightly after that. Arizona's cigarette taxes are higher than average, and smoking bans have become comprehensive and airtight. (The latter, like the state's minimum wage, is explained in part by the ballot initiative, which really does result in some observable "tyranny of the majority.") There are local vaping bans. The state banned driving while talking or texting on a handheld cell phone in 2019. Not much change has been observed in alcohol freedom, where the state is better than average, or gambling freedom, where the state is worse than average.

---

168   *Lawrence v. Texas*, 539 U.S. 558 (2003).

# ARKANSAS

**2019 RANK**
## 23rd





## PARTY CONTROL

| | R ■ | D ■ | 2021 | 2019 | 2017 |
|---|---|---|---|---|---|
| **GOVERNOR** | | | Hutchinson | Hutchinson | Hutchinson |
| **SENATE** | | | | | |
| **HOUSE OF REP.** | | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut the state sales and use tax, which is high. Let local governments vary property taxes to meet local needs and desires, reducing state aid for education and other purposes.

**Regulatory:** Roll back occupational licensing. Some occupations that could be deregulated include sanitarians, title abstractors, interpreters, dietitians and nutritionists, pharmacy technicians, veterinary technologists, opticians, athletic trainers, occupational therapist assistants, massage therapists, private detectives, security guards, landscaping contractors, tree trimmers (locally), funeral apprentices, collection agents, 911 dispatchers, tree injectors, construction contractors, security alarm installers, well drillers, mobile home installers, and boiler operators.

**Personal:** Enact a generous tax credit for contributions to private scholarships for K–12 education.

## ANALYSIS

Arkansas has been mediocre on economic freedom for most of the past two decades, but it improved on regulatory policy in the early 2010s and on fiscal policy in the past four years, restoring the state nearly to heights not seen since George W. Bush's first term. Arkansas has ranked consistently worse than most states on personal freedom, declining substantially relative to others since 2007 and receiving very little bump from the Supreme Court's legalization of same-sex marriage in 2015.

Arkansas's tax burden is about average, but the state is highly fiscally centralized. State taxes are way above the national average, and local taxes are way below. The overall tax burden has drifted downward since FY 2014. Debt is low, but government employment at 13.1 percent of private employment is high (though declining consistently since 2010). Government gross domestic product (GDP) has fallen from 11.3 percent of income in 2013 to 9.9 percent in 2019.

Arkansas does well on land use despite its unreformed eminent domain laws. Still, our proxies for zoning stringency show a growth in such restrictions over time. The state has above-average labor-market freedom, although it began regular minimum-wage increases in 2014 because of a popular initiative; minimum wage stands at $11 as of 2021. The state has a problem with cronyism, especially on entry and price controls. The

extent of occupational licensing is more than a standard deviation worse than the national average. Hospital construction requires a certificate of need, the state has an anti-price-gouging law, and also a general law against "unfair pricing" or sales below cost. However, Arkansas does better than most other southern states, and indeed better than the national average, on its civil liability regime. Like most other states, it did not replace the federal government's health insurance individual mandate and, therefore, saw a bump up on health insurance freedom in 2019.

Arkansas is one of the worst states in the country on criminal justice policies. Its crime-adjusted incarceration rate is more than a standard deviation worse than the national average and has not come down much recently, while its drug enforcement rate has moved in the wrong direction. It also suspends driver's licenses for those with drug offenses unrelated to driving. In contrast, it has improved significantly on gun rights with the adoption of constitutional carry for both concealed and open carry in 2018. Marijuana laws are largely unreformed, although voters did pass a medical marijuana initiative in 2016. Arkansas deviates little from the average on many personal freedom policies. School choice remains an opportunity for improvement, given the state's fiscal centralization (education funding comes substantially from the state), its generally conservative ideological orientation, and its minority student populations. A voucher program for students with disabilities was adopted in 2017.

170

# CALIFORNIA



**2019 RANK**
## 48th



FISCAL

REGULATORY

PERSONAL

OVERALL

2000  2005  2010  2015  2020

**YEAR**

RANK

## PARTY CONTROL

| ■ R    ■ D | 2021 | 2019 | 2017 |
|------------|------|------|------|
| **GOVERNOR** | Newsom | Newsom | Brown |
| **SENATE** | | | |
| **ASSEMBLY** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending in the areas of health and hospitals, public welfare operations, and employee retirement. Use the proceeds to reduce indebtedness.

**Regulatory:** Liberalize the housing market with targeted preemption, incentives, and institutional changes.

**Personal:** Expand legal gambling. California's political culture is unlikely to have many qualms about gaming, but legalizing nontribal casinos would require a constitutional amendment.

## ANALYSIS

California is one of the least free states in the country, largely because of its long-standing poor performance on economic freedom. However, California's economic freedom has improved since the late 2000s and, perhaps as a result, so has its economic performance. California has long suffered from a wide disparity between its economic freedom and personal freedom ranking, but it is not as if the state is a top performer in the latter dimension. Indeed, it is quite mediocre on personal freedom, although its recent decline in rank has more to do with other states catching up and passing it than any backsliding in the state itself.

Despite Proposition 13, California is one of the highest-taxed states in the country. California's combined state and local tax collections were 10.9 percent of adjusted personal income. Moreover, because of the infamous *Serrano*[169] decision on school funding, California is a fiscally centralized state. Local taxes are about average nationally, whereas state taxes are well above average. But the fiscal situation in California is much better now than in the 2000s, and the state's government employment is now much lower than the national average, at 11.0 percent of private employment. Government GDP has fallen from 12.3 percent of income in 2009 to 10.3 percent in 2019.

Regulatory policy is more of a problem for the state than fiscal policy. California is one of the worst states on land-use freedom. Some cities have rent control, new housing supply is tightly restricted in the coastal areas despite high demand, and eminent domain reform has been nugatory. The state even mandates speech protections in privately owned shopping malls. Labor law is anti-employment,

with no right-to-work law, high minimum wages, strict workers' compensation mandates, mandated short-term disability insurance, stricter-than-federal anti-discrimination law, and prohibitions on consensual noncompete agreements. Occupational licensing is extensive and strict, especially in construction trades. The state is tied for worst in nursing practice freedom. The state's mandatory cancer labeling law (Proposition 65) has significant economic costs.[170] California is one of the worst states for consumers' freedom of choice in homeowner's and automobile insurance. On the plus side, the state has no certificate-of-need law for new hospitals and has made some moves to deregulate cable and telecommunications, and the civil liability regime has improved gradually during the past 14 years.

California is a classic left-wing state on social issues. Gun rights are among the weakest in the country and have been weakened consistently over time. It was one of the first states to adopt a smoking ban on private property, which was further tightened in 2016. Cigarette taxes were hiked substantially in 2017. It has adopted strict, anti-scientific vaping bans and bans on flavored e-cigarettes (locally and under 21 statewide). California was an early leader on cannabis liberalization and retains that position today with full legalization. Alcohol is not as strictly regulated as in most other states, and booze taxes are relatively low. Physician-assisted suicide was legalized in 2015. Private school choice programs are nonexistent, but private schools and homeschools are mostly lightly regulated. Incarceration and drug arrest rates used to be higher than average but have fallen over time, especially since 2010. The state was a leader in marriage freedom, adopting same-sex partnerships and then civil unions fairly early.

169.  *Serrano v. Priest*, 5 Cal.3d 584 (1971).
170.  David R. Henderson, "Proposition 65: When Government Cries Wolf," *Econlog*, April 14, 2013.

# COLORADO

**2019 RANK**
**12th**





- FISCAL
- REGULATORY
- PERSONAL
- OVERALL

## PARTY CONTROL

| ■ R    ■ D     | 2021  | 2019  | 2017         |
|----------------|-------|-------|--------------|
| GOVERNOR       | Polis | Polis | Hickenlooper |
| SENATE         |       |       |              |
| HOUSE OF REP.  |       |       |              |

## POLICY RECOMMENDATIONS

**Fiscal:** Trim spending on airports, general administration, and parks and recreation (a category that excludes conservation lands), where spending is above the national average. Build up the rainy-day fund and cut taxes.

**Regulatory:** Remove remaining barriers to entry and competitive pricing, such as property and casualty rate classification restrictions, the drug price-gouging law, household goods mover licensing, and the sales-below-cost law.

**Personal:** Require all equitable sharing revenues from the Department of Justice to follow state-level procedures for civil asset forfeiture.

## ANALYSIS

Colorado has long been one of America's freer states, but it falls out of the top 10 in this edition. It does best on personal and fiscal freedom. Since 2006, we note an increasing divergence: falling economic freedom and rising personal freedom, both of which roughly cancel each other out.

Colorado's overall state and local tax burden is an estimated 8.9 percent of adjusted personal income, lower than the national average. State-level taxes have remained more or less constant during the past 20 years, with some gyrations due more to economic fluctuations than policy changes. Local tax revenues have also remained roughly steady and seem to be less sensitive to economic downturns than state revenues. Although fiscal decentralization is high when measured as the ratio of local to state taxes, there isn't much choice of local government, given the importance of counties and the paucity of incorporated cities. Debt has fallen below average after peaking in FY 2010. State and local employment is lower than average and has dipped to 11.7 percent of private employment from a high of 12.8 percent less than a decade ago. But it is still higher than it was in 2000.

Colorado ranks fifth on freedom from cronyism, although it is below average on regulatory policy as a whole. It earns its good ranking in our cronyism index because of its relatively open occupational licensing system, including broad scope of practice for health care professionals and lack of a certificate-of-need law for hospitals. However, occupational freedom declined noticeably in 2019 (pharmacy technicians and athletic trainers were licensed, and restrictive statutory language increased). Colorado also requires household goods movers to get certificates of public convenience and necessity, prohibits price increases for pharmaceuticals during emergencies, and proscribes all "unfair" pricing in gasoline specifically and in other industries. Its legal regime for torts is much better than average. In 2013/14, the state deregulated telecommunications somewhat, though it still lacks statewide video franchising. It is a little below average on labor-market freedom, with no right-to-work law and a high minimum wage (because of a 2016 voter-approved amendment, the state saw regular increases through 2020 until it reached $12 per hour and is now adjusted for cost of living). Colorado's land-use freedom has declined modestly, and its renewable portfolio standard for electricity is much stricter than the national average and probably results in higher rates.

Colorado started out personally freer than the average state in 2000 and is now among the personally freest states. It has led the way with the legalization of the cultivation and sale of recreational marijuana, which occurred in stages from 2012 to 2014. Legal gambling and gun rights are above average, although the qualifications for carry licensure are fairly strict, and large-capacity firearm magazines are banned. Its beer, wine, and spirits taxes are much better than average. In 2018, beer was allowed into grocery stores. State asset forfeiture law is good, and equitable sharing participation has fallen in recent years. Crime-adjusted incarceration rates are about the national average, but drug arrests are low. The state enacted civil unions in 2013 and then was judicially granted same-sex marriage in 2014. Voters approved physician-assisted suicide in 2016. Educational freedom is somewhat below average, as the state has no private school choice programs. But the state has long enjoyed public school choice. As noted in the post-2020 update in Part 2, Colorado has become the first state to end qualified immunity across the board.

# CONNECTICUT



**2019 RANK**
## 36th



FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| ■ R   ■ D | | | | |
| **GOVERNOR** | | Lamont | Lamont | Malloy |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Build up sinking and rainy-day funds and pay down debt to reduce the interest burden.

**Regulatory:** Enact statewide restrictions on eminent domain.

**Personal:** Legalize recreational marijuana.

## ANALYSIS

Connecticut has been on a long, slow decline in freedom. As recently as 2009 it was in the top 20, but it is now flirting with the bottom 10. It suffers most from having consistently stifling regulatory policy that drags down its economic freedom ranking while—perhaps surprisingly for a New England "blue" state— also performing relatively poorly on personal freedom as other states have leapfrogged it.

After getting hit hard by the Great Recession, state revenues have bounced back strongly, and the state's fiscal policy score has suffered somewhat. Most of the decline in the state's fiscal policy rank is exaggerated by this phenomenon and by the fact that other states have passed it by, rather than Connecticut actually falling in an absolute sense. Although Connecticut residents enjoy broad scope of choice among local governments, state government tax collections are about 40 percent greater than local tax collections, making the choice of local government less valuable. Government GDP and employment have fallen over the long run, relative to private-sector equivalents, and are well below national averages. Meanwhile, debt has risen to 20.0 percent of income and is now about average, whereas cash and security assets are below average at 9.6 percent of income.

Connecticut does poorly in most areas of regulatory policy. Exclusionary zoning is common. Renewable portfolio standards are tight, keeping electric rates high. The state has a minimum wage; the legislature has repeatedly raised it, resulting in a rate of $12 per hour as of 2021. The state also lacks a right-to-

work law. Like most states, Connecticut has declined over time on occupational freedom. However, in 2013/14, the state legalized independent nurse practitioner practice with prescription authority, a significant achievement. Price regulation in the property and casualty market became more interventionist from 2011 to 2016 but has now eased again. The civil liability system is mediocre. Cable franchising moved to the state level in 2007, but telecommunications has not been deregulated significantly yet.

On personal freedom, Connecticut has improved over the years in absolute terms, although it dipped slightly in 2019. However, it has not kept up with other states and has slipped in the rankings. Despite Connecticut's gun manufacturing tradition, firearms are strictly regulated. The state decriminalized low-level possession of cannabis and enacted a medical marijuana law in 2011/12. Alcohol taxes are relatively low, and alcohol blue laws were finally repealed in 2012. The state has no private school choice programs. Cigarette taxes are sky-high ($4.35 a pack in 2021), and smoking bans, except for private workplaces, are tight. Vaping was added to that ban in 2015. Crime-adjusted incarceration rates have fallen consistently since 2007 but are still higher than those of other New England states. Victimless crime arrests are much lower than the national average. Asset forfeiture was reformed in 2017. The state legalized same-sex marriage in 2007/8. Travel freedom has declined since the fourth edition because of new requirements for uninsured and underinsured coverage, but driver's licenses have been available since 2013 to residents without Social Security numbers.

176

# DELAWARE

2019 RANK
## 44th





## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Carney | Carney | Carney |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Reduce state-level taxes and education spending. Delaware is one of the freest-spending states in the country on education. Allow local governments to pick up more of the school spending out of their own fiscal resources.

**Regulatory:** Liberalize land-use regulation with targeted preemption, incentives, and institutional reforms.

**Personal:** Eliminate or significantly limit civil asset forfeiture, consistent with reform trends across the country aimed at protecting the individual property rights of innocent people before conviction.

## ANALYSIS

How the mighty have fallen! Once a stalwart near the top of economic freedom indexes, Delaware has lost tremendous ground during the past 20 years. It now ranks in or near the bottom third on all three dimensions of freedom, earning its 44th place by all-around poor performance. Part of the reason for this low ranking is that the state had one of the most free-market health insurance systems before the enactment of the Patient Protection and Affordable Care Act (PPACA), and so it suffered disproportionately because of the federal law. Moreover, its much-touted advantage on corporate law is now significantly overstated.

On fiscal policy, Delaware has floundered ever since the mid-2000s. The overall tax burden, at about 10.9 percent of personal income, is worse than average, and the state is highly fiscally centralized with most of the tax burden at the state level. With 1.6 competing jurisdictions per 100 square miles, Delawareans would stand to benefit were the state to allow more tax space for local governments. Debt and public employment are better than average and have improved of late, but government GDP share and cash and security assets have gone the other way.

Delaware has been getting worse on regulatory policy and is below average in most regulatory policy categories. Labor law is fairly anti-employment, with a minimum wage (though not too high compared with other blue states) and no right to work. Occupational freedom is mediocre, with dental hygienists and nurse practitioners lacking sufficient practice freedom. The state has certificate-of-need laws for hospitals. Land-use regulation ratcheted up significantly in

the 2000–2010 period, as have renewable portfolio standards for utilities. For a long time, the state's insurance commissioners treated property and casualty insurance rates under "prior approval" contrary to statute, according to the Insurance Information Institute, but they have recently been following the law, which is "file and use."[171] The state remains one of a handful that have not joined the Interstate Insurance Product Regulation Compact. Even the state's vaunted liability system has actually deteriorated since 2000 to merely average, we find. The state has enacted no tort reforms, and the size of the legal sector has grown, whether measured in number of lawyers or share of GDP. In 2019, the state enacted a plastic bag ban despite the policy's known health and environmental costs.[172]

Delaware is below the national average in personal freedom. It is below average on gun rights; the biggest problem area is the "may-issue" regime for concealed-carry licensing. Gambling freedom is higher than the national average, and the state was at the forefront of legal online gambling for its own residents. There are no private school choice programs, but homeschooling is easy. Smoking bans are comprehensive, and cigarette taxes were about average until 2017, when the rate was increased 60 cents to $2.10 per pack. The state's medical cannabis law was expanded in 2011/12, and low-level possession was decriminalized in 2015. Alcohol taxes, already a bit lower than average, have eroded over time because of inflation. However, the state bans direct wine shipments. Delaware is roughly average on the overall incarceration and arrests category, but the state's civil asset forfeiture law is tied for worst in the country, with few protections for innocent owners.

---

171  See the "Metadata" tab of the n_reg_15.xls spreadsheet.

172  "Sustainable Shopping: Which Bag Is Best?," National Geographic Society, July 10, 2020; Bag the Ban, "Plastic Bags Are the Healthier Option—for Families and the Environment," American Recyclable Plastic Bag Alliance, 2019.

# FLORIDA

**2019 RANK**
## 2nd





- FISCAL
- REGULATORY
- PERSONAL
- OVERALL

RANK: 1, 10, 20, 30, 40, 50

YEAR: 2000, 2005, 2010, 2015, 2020

## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | DeSantis | DeSantis | Scott |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Decentralize taxing and spending powers from counties to municipalities and make it easy for municipalities to control their own school districts. More choice of local government should make Floridians freer.

**Regulatory:** Reform the occupational licensing system to free residents who are currently stymied by those barriers to entry and opportunity. Candidates for deregulation include farm labor contractors, interior designers, medical and clinical laboratory technologists, pharmacy technicians, dispensing opticians, funeral attendants, and bill and account collectors.

**Personal:** Enact the following criminal justice reforms: (a) close the loophole allowing seizure of cash and monetary instruments without an arrest and close the equitable sharing end run around state forfeiture law; and (b) end driver's license suspensions for drug convictions unrelated to driving, as most of the country has done, and provide "safety valves" from mandatory minimum sentences.

## ANALYSIS

Lacking an individual income tax and featuring a hot climate, Florida has long enjoyed substantial in-migration of well-off retirees. But as we've noted in the past, the state attracts more than seniors, as others vote with their feet for good weather and the increased opportunity afforded by Florida's freer society. Florida does especially well on economic freedom, and even more so on fiscal policy. Indeed, it is our top state on both. Regulatory policy is improved but mediocre compared with the fiscal side. Florida's personal freedom has lagged in the past; however, it has improved a lot since 2014.

Florida's state-level tax collections are more than 1.5 standard deviations below the national average, whereas its local tax collections are a little lower than average. Florida's fiscal decentralization does not offer a great deal of choice to homeowners, however, because the state has only about half an effective competing jurisdiction per 100 square miles. Government consumption and debt are lower than average. Government employment is much below average, falling from 11.2 percent of private employment in 2010 to 8.3 percent in 2019.

Florida's regulatory policy is middling relative to other states but has improved in absolute terms, leaving aside federalized policies. Despite the temptations posed by high housing demand, homeowners have been unable to enact exclusionary zoning on anything like the levels of California or New Hampshire. Our two measures of local zoning give a split judgment on just how restrictive Florida is. Land-use regulation appears to be a major political issue, but the courts have tools to restrain local governments, as the state has a particularly strong regulatory takings law. Florida has gone further than just about any other state to tighten criteria for eminent domain. It does have a law restricting employers from banning guns on certain company property, such as

parking lots, which violates employers' property rights. Labor law is also above average because of a right-to-work law, but the state has a minimum wage ($10 per hour in 2021). Regulations on managed health care plans are among the worst in the country, with standing referrals, direct access to specialists, and a ban on financial incentives to providers. Cable and telecommunications are partially deregulated. The civil liability system is better than average and has improved significantly since the 2000s. As we long recommended, the state finally reformed its homeowner's insurance sector along competitive lines in 2017, and it also opened up auto insurance rate setting slightly in 2018. On the other side of the ledger, the state is far below average on occupational freedom and has a certificate-of-need law for hospitals. Physician assistants are now free to prescribe, but nurse practitioners and dental hygienists are not yet free from independent practice limitations.

After falling relative to other states for a decade, Florida has improved its personal freedom score with big jumps in 2014 and 2015. It is now well above average. Part of this bump was because of the Supreme Court's nationalization of same-sex marriage. Before that decision, Florida did not recognize any kind of same-sex partnership, and it banned private contracts similar to marriage with a super-DOMA (Defense of Marriage Act). Florida also reformed its civil asset forfeiture regime in 2016, including requiring proof "beyond a reasonable doubt" for forfeitures. On the downside, the state's crime-adjusted incarceration rate has fallen a bit from its high but is still a lot worse than average (although criminal justice reform efforts promise help on that front). Arrests for victimless crimes have fallen significantly. Florida is one of the top states for educational freedom, although homeschool regulations remain substantial. The cannabis regime is largely unreformed despite recent liberalization of medical marijuana policy (which we recommended in the fourth edition), whereas alcohol is

180

lightly regulated despite beer and wine taxes being a bit high. Gun rights are mediocre and became more restrictive in 2018, as the state has waiting periods for handguns, local dealer licensing, and virtually no open carry. It does have a "Stand Your Ground" law and protects the right to use sound suppressors. Tobacco freedom is middling. Automated license plate reader data use and retention have been partially reformed. The state takes DNA from arrestees without a probable cause hearing.

182

# GEORGIA

**2019 RANK**
## 8th





FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Kemp | Kemp | Deal |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Phase out state-level business subsidies and prohibit them at the local level.

**Regulatory:** Liberalize health care professions even more: (a) permit independent nurse practitioner practice with prescription authority, (b) allow dental hygienists to clean teeth wholly independently of dentist supervision, and (c) allow physician assistants to prescribe on all schedules.

**Personal:** Reform civil asset forfeiture by putting the burden of proof on the government, requiring evidence beyond a reasonable doubt that the property was the product of criminal activity, sending forfeiture proceeds to the general fund, and requiring all equitable sharing revenues to meet state standards.

183

## ANALYSIS

Georgia has been one of the fastest-growing southern states, likely because of its strong performance on economic freedom. Economic freedom also drove the state's high overall freedom ranking. However, the state performs poorly on personal freedom despite some consistent absolute improvements since 2006 (even without considering the post-*Obergefell* bump because of the federalization of marriage policy).

State and local taxes were 8.3 percent of adjusted personal income, well below the national average. At 4.6 percent of personal income, state tax collections are significantly below the national average, whereas local taxes—3.7 percent of income—are average. Like most southern states, Georgia has fewer than one effective competing local government per 100 square miles, which reduces the benefit from its fiscal decentralization. Government consumption and debt are substantially lower than average. Government employment used to be around the national average, but Georgia has brought it down from 13.2 percent of private employment in 2010 to 10.4 percent in 2019, more than a standard deviation better than average.

Like other conservative southern states, Georgia does well on labor and land-use policy. It has a right-to-work law, no minimum wage, relaxed workers' compensation regulations, and moderate zoning. It has deregulated telecommunications and enacted statewide video franchising. Unlike some other states in its neighborhood, however, Georgia also enjoys a relatively good civil liability system. The one regulatory policy area where Georgia does somewhat poorly is occupational freedom. The extent of licensing grew most significantly in 2011 and 2014, and health care professions face generally tight scope-of-practice rules, though Georgia joined the Nurse Licensure Compact and gave dental hygienists some independent practice freedom in 2017. The state also maintains certificate-of-need laws for hospitals and moving companies.

On personal freedom, Georgia is about what one would expect from a conservative southern state. Its incarceration rates are very high, even adjusted for crime rates, although victimless crime arrests have fallen and are lower than average. Civil asset forfeiture is unreformed, though equitable sharing has declined in recent years, as in most other states. The burden of proof remains on innocent owners, all proceeds go to law enforcement, and some actions require only probable cause to show that the property is subject to forfeiture. It is one of the worst states for cannabis and gambling. Yet, it is one of the best states for educational freedom, scores well on gun rights, and lightly regulates tobacco use compared with most other states. It has the lowest cigarette taxes as of 2021. It was one of the worst states for marriage freedom, but the state has benefited from the *Obergefell* decision.

184



# HAWAII

**2019 RANK**
## 49th





## PARTY CONTROL

| | R ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| **GOVERNOR** | | Ige | Ige | Ige |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Local government looks quite inefficient. The state spends far more than the national average on air transportation, sanitation and sewerage, parks and recreation, public buildings, health and hospitals, and interest payments. Cut spending in these areas and cut local taxes.

**Regulatory:** Relax the state's extreme land-use regulations. Allow residential uses on land deemed "agricultural," and eliminate either state or county review, which are duplicative.

**Personal:** Legalize sale and possession of recreational marijuana.

185

## ANALYSIS

Hawaii has long had one of the lowest levels of economic freedom in the country, but it has also slid behind on personal freedom. Thus, it isn't surprising that Hawaii is now the second least-free state in the Union. Even with its huge locational rents, Hawaii has experienced a net outflow of residents to the rest of the United States since at least the beginning of the past decade.

Hawaii's fiscal policy is decidedly tax and spend. State-level taxes rose from an already high estimated 8.3 percent of personal income in FY 2009 to 10.5 percent in FY 2020. Local government also taxes at a very high level given how little it has to do (state government runs schools). Government debt is much higher than the national average. Government employment is at about the national average, as is government GDP share.

Hawaii does poorly in almost every area of regulatory policy, but its two worst categories are land-use and labor-market freedom. It has among the strictest restrictions on residential building in the country. Eminent domain abuse is unchecked by law. Fortunately, the state doesn't have rent control, despite discussions in the legislature. It has a minimum wage that was fairly modest at $7.25 per hour as recently as 2014, but it has been raised on a schedule since then and now stands at $10.10 per hour in 2021. It has no right-to-work law, and it has strict workers' compensation mandates, a short-term disability insurance mandate, and a stricter-than-federal anti-discrimination law. Hawaii is about average for occupational freedom. It has a hospital certificate-of-need requirement, strict insurance regulations, a price-gouging law, and a general "unfair sales" law

(you are not allowed to sell at prices that are "too low"). We show a sustained and substantial improvement in the quality of Hawaii's civil liability system, which rose from about average in 2000 to well above average by 2017. This result came about because of increasing scores on the Chamber of Commerce survey of businesses and shrinkage in the size of the legal sector relative to the economy, whether measured by number of lawyers or legal services share of GDP.

Hawaii is now one of the worst states on personal freedom despite being one of the better states in the incarceration and victimless crimes category. It enjoys incarceration and drug enforcement rates that are well below average, while other victimless crime arrest rates have also improved. Hawaii has a worse-than-average civil asset forfeiture law. Tobacco freedom is among the lowest in the country, with extremely high cigarette taxes, draconian smoking bans on private property, and significant local e-cigarette regulation. The state has virtually no legal gambling, other than social home games. It has a long-standing and permissive medical cannabis law, but implementation was slow, with dispensary sales starting only in 2017 following a law passed in 2015. Possession was finally decriminalized in 2019. Alcohol freedom is better than average, especially with grocery store sales of wine and spirits and no state involvement in distribution, but beer taxes are high. The protection of gun rights is the worst in the country. It is virtually impossible to get a concealed-carry license, all Class III weapons are banned, there is comprehensive registration and purchase permitting of firearms, dealers are licensed, "assault weapons" are banned, large-capacity firearm magazines are banned, and so on. Hawaii does not require helmets for adult motorcycle riders.



# IDAHO

**2019 RANK**
## 10th





FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| R | D | | | |
| **GOVERNOR** | | Little | Little | Otter |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Comprehensively decentralize power by making it easy for new municipalities to incorporate and secede from existing ones, shifting responsibilities from counties to municipalities, freeing up local property tax–varying power, and reducing state aid to schools so that localities rely on their own tax base. The last move will also allow the state to cut taxes, particularly the general sales tax, which will give localities more tax room.

**Regulatory:** Make workers' compensation insurance voluntary and privatize the state fund.

**Personal:** Eliminate or reduce mandatory minimums for nonviolent offenses to reduce the incarceration rate. Allow currently imprisoned offenders to petition for release under the new guidelines.

187

## ANALYSIS

Idaho is one of the most economically and socially conservative states in the country. As a result, it is perhaps unsurprising that it is a top-10 state for economic freedom and a bottom-10 state for personal freedom. The state continues to enjoy substantial in-migration, primarily from the less free West Coast. It is also one of the least cronyist states in the Union.

Idaho's fiscal policy has been improving over time, but it remains a weak spot in certain respects. State-level tax collections as a share of income have settled consistently below 6.0 percent in the 2010s, at least half a percentage point below where they averaged in the first decade of the century. Local taxes are well below the national average at 2.8 percent of adjusted personal income. Local governments are territorially large: Idaho has only about one effective competing jurisdiction per 400 square miles. Government debt is 2 standard deviations below the national average. Government GDP share has shrunk from 12.1 percent of income in 2000 to 9.8 percent in 2019. However, government employment is about average.

Idaho does well across the board on regulatory policy, earning its second-place ranking. It is one of the best states for occupational freedom, but since 2009, the state has begun to license more occupations. Nurse practitioner independence is protected, and physician assistants have full prescribing authority. It is one of the very best states for insurance freedom. There is no certificate-of-need requirement for hospitals or moving companies, and direct auto sales are legal under some conditions. In 2018, Idaho repealed its "sales below cost" laws. The state's civil liability system is one of the best, and the state also scores well above average on labor law, with a right-to-work law. Workers' compensation mandates, though, are strict. Despite its huge influx of new residents during the past two decades, Idaho held the line on land-use controls for a long time. But it is middling relative to other states, and we have seen evidence that new building restrictions have started to come into force since 2006. The state has done little to curb eminent domain abuse. Statewide video franchising was enacted in 2012, and telecommunications rate review was liberalized in 2005.

Idaho is among the worst states outside the Deep South on criminal justice policy. Crime-adjusted incarceration rates are nearly a standard deviation above the historical national average, and the drug enforcement rate is high and rising. Nondrug victimless crime arrests are better than average, suggesting that the state's biggest problem is sentencing. Idaho is also much less free than average for alcohol and gambling. Taxes on spirits are especially high. Tobacco freedom is much higher than average: cigarette taxes are low, and the state has no smoking ban for bars. Homeschooling and private schooling are almost unregulated, but the state has no private school choice programs. It has a religious freedom restoration act. Gun rights are much better than average, and they improved in 2015 when the state passed legislation allowing concealed carry without a permit for residents over 21 years of age and in 2018 when the legislature specified no duty to retreat when engaging in self-defense outside the home. The state does have a stricter-than-federal minimum age to possess firearms.

# ILLINOIS



**2019 RANK**
## 37th



- FISCAL
- REGULATORY
- PERSONAL
- OVERALL

**RANK** (1, 10, 20, 30, 40, 50)

**YEAR** (2000, 2005, 2010, 2015, 2020)

## PARTY CONTROL

■ R    ■ D

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| GOVERNOR | Pritzker | Pritzker | Rauner |
| SENATE | | | |
| HOUSE OF REP. | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Reform the retirement systems of localities to reduce local taxes, which are sky-high.

**Regulatory:** Reform the civil liability system by capping punitive damages, setting the standard for punitive damages at "beyond a reasonable doubt," and abolishing joint and several liability.

**Personal:** If serious about reducing smoking, preempt local flavored e-cigarette sales bans and vaping bans in bars and restaurants.

189

## ANALYSIS

Illinois used to be a relatively decent state for economic freedom, although it almost always did much better on fiscal policy than on regulatory policy. But the state has lost some of that edge while also, not surprisingly, losing some of its economic vitality; its well-publicized woes with employee retirement spending threaten to drive local taxes and debt higher. It is also one of the most cronyist states. Illinois did post one of the most dramatic improvements in personal freedom rankings we have ever seen between 2011 and 2017, and there is some sign that the fiscal situation has stabilized.

In FY 2020, Illinois's state-level taxes were about at 21st-century historic averages for the state, at 5.6 percent of adjusted personal income, and down from highs posted six and seven years before. The bigger problem is that local taxes are among the worst in the country, at 5.1 percent of income. However, residents have a good choice among local jurisdictions, with almost two effective competing governments per 100 square miles. The overall tax burden is 10.7 percent, much higher than average. Government GDP is quite a bit lower than the national average, but debt is quite high at 23.7 percent today, well above the average (although down from its height during the Great Recession), and cash and security assets are mediocre and have slid somewhat recently. Government employment, at 10.6 percent of private employment, remains significantly below the national average.

Regulatory policy has been a drag on Illinois's rankings throughout the time series. After California, it is the most cronyist state in America. It does reasonably well on land-use and insurance freedom but quite poorly on civil liability and occupational and labor freedom. Illinois's land-use freedom, generally

a strength, has declined over time as it has pretty much everywhere else in the face of growing local zoning restrictions. The state's minimum wage at $11.00 an hour is now higher than it has ever been since 2000 as a percentage of the median wage. Unlike its neighbors, Illinois is not a right-to-work state. Renewable portfolio standards have been gradually tightened, raising electricity rates. In 2017, the state removed all telecom wireline regulatory authority. It had already enacted statewide video franchising. Licensing is extensive, but most of that growth occurred between 2002 and 2007. Nurse practitioners are highly constrained. Direct auto sales for Tesla were legalized in 2013/14. The state has been a fixture on the list of "judicial hellholes," with Madison and Cook Counties listed in 2017/18.[173] Illinois is one of the few states that have apparently not improved their tort systems at all during the past two decades.

Illinois was long our bête noire on personal freedom, but that has dramatically changed with federal court decisions that have overturned some extreme restrictions on gun rights, the legalization of same-sex marriage, marijuana reform, and the availability of driver's licenses to people without Social Security numbers. It is now comfortably in the middle of the pack. Illinois's new concealed-carry law, begrudgingly enacted by the legislature, is technically shall-issue but remains one of the country's strictest. The state still has local "assault weapon" and large-capacity firearm magazine bans, waiting periods for gun purchases, background checks for private sales, permitting of buyers for some weapons, local registration of some firearms, mandatory locking devices, and so on. Even fireworks are heavily regulated. Alcohol freedom is better than average, with no state role in distribution and wine and spirits available in grocery stores. Beer and wine taxes are decent, but spirits taxes are high. Formerly one of the most restrictive states for cannabis, Illinois

---

173.   Judicial Hellholes program website, www.judicialhellholes.org. Also see *Judicial Hellholes 2017–2018* (Washington: American Tort Reform Foundation, 2017).

became the very first to legalize cultivation and sale through the legislative process (as opposed to ballot initiative) in 2019. Legal gambling is expansive, and the state is near the top in this category. Educational freedom is reasonably good, as virtually no restrictions are placed on homeschools or private schools. And the state has intradistrict school choice and expanded a tax deduction law for parents' educational expenses in 2017. Smoking bans are comprehensive, and cigarette taxes are among the very highest anywhere ($7.16 per pack in Chicago). Civil asset forfeiture was partially reformed in 2017. Illinois is in the middle of the pack on incarceration and arrests for the victimless crime category. Drug arrest rates are now below the national historical average after having been more than 5 standard deviations higher as recently as 2007.

# INDIANA

**2019 RANK**
## 6th





| | FISCAL |
| REGULATORY |
| PERSONAL |
| OVERALL |

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| ■ R  ■ D | | | | |
| **GOVERNOR** | | Holcomb | Holcomb | Holcomb |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Reduce debt and sales and income taxes by cutting spending on health and hospitals, housing, libraries, and interest on the debt, areas where Indiana spends more than average.

**Regulatory:** Allow independent nurse practitioner practice with full prescription authority.

**Personal:** Decriminalize marijuana possession.

193

## ANALYSIS

Indiana has quietly built a record as one of America's freest states and the freest state in the Great Lakes region, though Michigan is now close. Hoosiers enjoy top scores on all three dimensions of freedom, with regulatory policy a particular area of excellence. Although it has still experienced small net outmigration to the rest of the country during the past 20 years, its record in that department has been better than that of any other of the eight Great Lakes states, and its economic growth has been better than all its neighbors' for at least a decade.

Although Indiana's fiscal policy deteriorated quite a bit between FY 2001 and FY 2005, it has made a good recovery since then. Local taxes have fallen from 4.6 percent of income in FY 2010 to 2.7 percent in FY 2020, and state taxes have edged down as well. Government debt, GDP, and employment have fallen during that period, but so have cash and security assets.

Although the PPACA disproportionately harmed the state because of its previously fairly free-market health insurance policies, Indiana has maintained the elements of a solid regulatory policy as far as it can. Land-use freedom is high overall, although one of our two proxies of local zoning restrictions shows substantial, unabated growth in stringency since 2000. The state also prohibits employers from banning guns on certain company property, and it could do more to reform eminent domain. The state passed right-to-work legislation in 2012 and has resisted increasing the minimum wage above the federal mark since 2010. It is a model state for telecommunications deregulation. Occupational freedom is extensive, though

not for second-line health care professions. The state did legalize some autonomy for dental hygienists in 2018 and joined the Nurse Licensure Compact in 2019. Unfortunately, Indiana adopted a new certificate-of-need law for hospitals in 2018; it already had one for moving companies. Insurance freedom is above average. Direct auto sales, which were previously allowed under some circumstances, have now been completely banned. The civil liability system shows steady improvement during the past decade and is slightly better than average.

Indiana has more personal freedom than most other conservative states. It was forced to legalize same-sex marriage in 2014 but never had an oppressive super-DOMA. Gun rights are fairly secure, especially for concealed carry, but the state has stricter-than-federal minimum age limits for possession and dealer licensing. The ban on short-barreled shotguns was eliminated in 2015. Victimless crime arrests are fairly low, but the incarceration rate is higher than average, adjusted for crime rates. Educational freedom is excellent, and the state posted major gains in 2011 with a new statewide voucher law and a limited scholarship tax-credit law. The state's civil asset forfeiture law is fairly good, although it is sometimes circumvented through equitable sharing. Smoking bans have not gone quite as far as in other states. Marijuana freedom is virtually nonexistent, but alcohol freedom has been improving consistently in the past few years. The state now has direct-to-consumer wine shipments, and it legalized off-premises Sunday sales and happy hours in 2018, while alcohol taxes are low. Casino gambling has fallen off over time, perhaps reflecting regulatory barriers to innovation in this sector.

194



# IOWA

**2019 RANK**
## 29th





FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| ■ R    ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Reynolds | Reynolds | Reynolds |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Trim spending in areas where the state spends more than the national average—education (especially higher education), hospitals, highways, parking lots, and sanitation—and use the savings to trim property, sales, income, and motor vehicle license taxes.

**Regulatory:** Repeal certificate-of-need requirements for new hospital construction and for moving companies.

**Personal:** Adopt constitutional carry and legalize Class III weapons.

## ANALYSIS

Like other midwestern states, Iowa has long been a standout on regulatory freedom. Even though the state has moved right in recent years, it is one of just a few states whose fiscal situation has deteriorated during the past decade. As a result, its fiscal policy ranking has cratered. Not so long ago, Iowa was a top-10 state on overall freedom, but its competitive policy advantages have faded.

Both state and local tax burdens are above average in Iowa. Iowans pay 10.6 percent of adjusted personal income to government, similar to the figure in California. The state tax burden rose from 5.7 percent in FY 2011 to 6.4 percent in FY 2020. Government GDP share is higher now than in 2000 (12.0 percent versus 11.5 percent). Debt is quite low, however. Government employment is about average: 13.3 percent of private employment in 2016.

Iowa has consistently stood out as a leading state on regulatory policy. Land-use freedom is much better than average, although the state hasn't done as much as some others about eminent domain for private gain, and like everywhere else, local zoning has become tighter. It is a right-to-work state without a minimum wage, and workers' compensation–mandated coverages were liberalized slightly in 2008. Unlike most other states, Iowa doesn't mandate standing referrals or direct access to specialists in health plans. In 2017, telecom wireline regulatory authority was fully removed, and the state has statewide video franchising as well. Occupational freedom is about average and

has fallen over time because of the licensing of new occupations, especially between 2005 and 2009 and again in 2016. Iowa has certificate-of-need laws for hospital construction and moving companies. Insurance freedom rose with a switch back to "use and file" in 2018. The civil liability system is rated well above average and has generally improved.

On the personal freedom side, incarceration and victimless crime arrest rates are now about average, as other states have caught up with Iowa's previously relatively liberal approach. Iowa suspends driver's licenses for drug offenses unrelated to driving but has low prison collect call rates. Educational freedom is somewhat high because the state has a long-standing tax-credit scholarship program as well as interdistrict public school choice. Homeschooling was significantly liberalized in 2013. However, private schools are tightly regulated, with mandatory state approval, teacher licensure, and detailed curriculum control. Gambling freedom is high, and the state legalized some online betting in 2019. Marijuana freedom is sharply limited; a single marijuana offense not involving minors can carry up to 50 years of prison time. For a rural state, Iowa does not do very well on gun freedoms compared with most other states, but it has liberalized in recent years. Sound suppressors were legalized in 2016 and Stand Your Ground was enacted in 2017. Open carry requires a license, and the state has a stricter-than-federal minimum age to purchase a firearm. Iowa has no legal requirement for motorcyclists to wear a helmet. Alcohol freedom is mediocre because of state involvement in wholesaling and high distilled spirits taxes.

# KANSAS

2019 RANK
## 27th





## PARTY CONTROL

| R     D |  | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| **GOVERNOR** |  | Kelly | Kelly | Brownback |
| **SENATE** |  |  |  |  |
| **HOUSE OF REP.** |  |  |  |  |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on hospitals, where the state spends more than twice as much as the national average, as a percentage of income. Also cut spending on education, public buildings, libraries, and utilities, areas where the state spends a little more than the average. Cuts could be made in part through privatizations of hospitals and utilities. Reduce government employment to bring it closer to the national average.

**Regulatory:** Legalize independent nurse practitioner practice with full prescription authority, join the Nurse Licensure Compact, and enact a nursing consultation exception for interstate practice.

**Personal:** Follow the successful 2018 passage of transparency requirements with aggressive civil asset forfeiture reform consistent with the state's moderate criminal justice regime by mandating a criminal conviction before property can be forfeited.

## ANALYSIS

Kansas has had a turbulent freedom record of late, bouncing around quite a bit year to year. Although the state tumbled 16 places on the overall freedom ranking between 2014 and 2019, the actual absolute loss in overall freedom was quite small. However, most other states gained significantly in freedom during this period. Whereas personal freedom and regulatory policy have been buoyant, fiscal policy has deteriorated since 2015.

Kansas made national news with its fiscal policy in 2013/14. The state's tax cuts were large and reduced the state tax burden from 5.5 percent of income to 5.1 percent, but the next year's tax hikes bumped that figure back up to 5.4 percent, just under the national average. Then, further tax increases in FY 2019 and FY 2020 boosted the tax burden to 6.2 percent of income, higher than the national average. Kansas's local tax burden (4.0 percent of income) is right at the national average. Thus, Kansas is today a high-tax state. Government employment is much higher than average (14.7 percent of private employment). Government consumption and investment is about average, at 10.7 percent of income, and hasn't changed much in a decade. Government debt peaked at 27.0 percent of income in FY 2010 and is now down around 18.0 percent, just under the national average.

Kansas is again our number one state on regulatory policy, as it has been through most of the past two decades. Land-use freedom is high, even though local zoning restrictions have grown. The state had enacted stricter-than-normal renewable portfolio standards in 2009, presumably as a sop to the wind industry, but those standards were made voluntary by legislation passed in 2015. Kansas has a right-to-work law and no state-level minimum wage, but it does have a law limiting employers from banning guns in company parking lots. The civil liability system is much better than average. In 2011, a major telecommunications deregulation bill passed. Occupational freedom is traditionally high,

except for nurses. By any measure, the extent of licensing is just about the lowest in the country. The state has no hospital certificate-of-need law. It has a price-gouging law, as well as a Depression-era law licensing moving companies. Kansas has none of the optional health insurance mandates we track in the PPACA era.

Kansas has been better than most other conservative states on criminal justice, but the incarceration rate has crept up a bit over time. Its victimless crime arrest rates, though, have edged down. The state doesn't suspend driver's licenses for drug offenses unrelated to driving, and its prison collect call rate is relatively affordable. Marijuana sentencing policies are actually milder than in most states, but the state has made no progress on more thoroughgoing reform. Social gambling is still illegal, but the state has casinos now. Kansas is still the best state in the country for gun rights. Permitless open carry was legalized in 2013, and permitless concealed carry was enacted in 2015. Educational freedom is about average after improving in 2013/14 with a new, albeit modest, tax-credit scholarship law. However, nonsectarian private schools are tightly regulated: they must get state approval and must hire only licensed teachers. Smoking bans are comprehensive, but cigarette taxes are not very high by today's standards. Localities haven't yet banned the sale of flavored e-liquids. Alcohol is much less regulated than it was in the days when Kansas banned bars, and taxes are low. But you still can't get wine or spirits in grocery stores, and there are local blue laws. The state liberalized the sale of stronger beer in grocery stores in 2017. Its civil asset forfeiture regime has improved, especially with the 2018 passage of sound transparency requirements, but it is still one of the worst in the country. The state takes in more than the average state in civil asset forfeiture equitable sharing funds. Kansas's personal freedom ranking benefited from having been forced to legalize same-sex marriage, a move that also overturned the state's oppressive super-DOMA law.

# KENTUCKY

**2019 RANK**
## 25th





FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

| | R | D | 2021 | 2019 | 2017 |
|---|---|---|---|---|---|
| **GOVERNOR** | | | Beshear | Bevin | Bevin |
| **SENATE** | | | | | |
| **HOUSE OF REP.** | | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** To reduce debt, tighten the rules for municipal bond issuance and cut spending, particularly on higher education, central staff, hospitals, highways, parking lots, and the Office of Unemployment Insurance.

**Regulatory:** Improve the health care system for consumers and practitioners alike by removing the certificate-of-need law and by expanding independent practice freedom for nurse practitioners, dental hygienists, and physician assistants.

**Personal:** Reform sentencing for nonviolent offenders with an eye toward reducing the incarceration rate to the national average, while also enacting a medical marijuana law.

199

## ANALYSIS

Kentucky has long been middling on economic freedom and low on personal freedom, but between 2015 and 2018 it made noticeable gains on economic freedom. As a result, Kentucky cracked the top half of the overall freedom ranking in 2019 for the first time since 2000.

Fiscal policy moved up strongly between 2013 and 2018. Local taxes have held steady at a low rate of 3.1 percent of adjusted income, and state taxes have also remained consistent at a high level of 6.2 percent of adjusted income since 2013. That means the state is very fiscally centralized. Government debt is also extremely high, at about 27.0 percent of adjusted personal income. It ranks second worst in the country after New York. The fiscal policy gains, therefore, have come almost entirely from a fall in government employment (from 13.5 percent to 12.3 percent of private employment since 2013) and in government GDP share (from 11.7 percent to 10.1 percent since 2013). The repeal of the prevailing wage law in 2017, which we recommended in the fifth edition, may have helped here.

Land-use freedom is relatively broad in Kentucky, although eminent domain for private gain remains mostly unreformed, and zoning restrictions have grown. The state has no minimum wage, and it enacted (as we suggested in the fourth edition) a right-to-work law at the beginning of 2017. The state has done more than most other low-income

states to maintain reasonable standards for lawsuits, although punitive damages have not been reformed. Occupational freedoms are mediocre, and the state has a hospital certificate-of-need law. Property and casualty rate setting was liberalized substantially in 2018. A court struck down the state's anti-competitive regulations on moving companies in 2013/14. Telecom wireline regulatory authority was removed in 2017, but the state still has local cable franchising.

Kentucky has a lot of room for growth on personal freedom despite the bump from the *Obergefell* decision because the state had a super-DOMA in force. Otherwise, it has remained largely stagnant relative to other states. An exception is on gun rights, where constitutional carry (2019) substantially grew the state's score. Incarceration rates are very high and have actually risen a bit, although victimless crime arrest rates have moved down since the late aughts. Civil asset forfeiture is a big problem: state law is largely unreformed, and agencies participate enthusiastically in equitable sharing takings. Cigarette taxes were hiked in 2018, but otherwise tobacco (and vaping) freedom remains relatively good. Educational and alcohol freedom scores are low, whereas marijuana and gambling freedoms are extremely limited. With alcohol, Kentucky has local blue laws, very high beer and wine taxes, a total ban on direct wine shipment, and no wine or spirits in grocery stores. With education, the state has no private school choice programs, and it recently expanded mandatory schooling to 12 years. Some raw milk sales are allowed.

# LOUISIANA



**2019 RANK**
## 32nd



## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Edwards | Edwards | Edwards |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending in areas well above the national average: employee retirement, water transportation (the state spends five times as much as a share of personal income as Texas and more than twice as much as Mississippi), parks and recreation, public welfare operations, hospitals, employment security administration, fire protection, and general administration. Use the proceeds to cut the sales tax, one of the nation's highest.

**Regulatory:** Abolish judicial elections and enact punitive damages reforms.

**Personal:** Follow localities and decriminalize small-scale possession of marijuana at the state level.

194   FREEDOM IN THE 50 STATES

## ANALYSIS

Louisiana used to be one of the least economically free states in the South, but it has improved significantly on fiscal policy since 2008. The state is now in the middle of the pack on both economic freedom and personal freedom.

Louisiana's state-level tax burden stood at 5.0 percent of income in FY 2020, a bit below the national average and an increase over its 21st-century low of 4.1 percent in FY 2012. The major increase occurred in FY 2018. Meanwhile, local taxes have remained around the 21st-century historic average for the state, at 4.5 percent of income, a bit higher than the national average. Louisianans have little choice of local government, with only about one competing jurisdiction per 200 square miles of territory. Government debt is about average and has fallen slightly since recent peaks during the Great Recession. Government employment has fallen significantly, from 17.0 percent of private employment in 2000 to 12.3 percent today.

Louisiana is one of the better states for both land-use and labor-market freedom. Zoning is light but growing. The state has a right-to-work law and no minimum wage. A telecommunications deregulation bill was enacted in 2013/14, and the state has long had statewide video franchising. Then again, occupational freedom is notoriously bad in Louisiana (as of this writing, it is still the only state to license florists—out of a concern for public health and safety, no doubt). Nurses and dental hygienists have very little freedom of practice, but physician assistants gained additional prescription authority in 2018. The state has a hospital certificate-of-need law, but moving companies do not have to get a "certificate of public convenience and necessity" to open. An "unfair" pricing ban exists for prices that are too low, and a "price-gouging" ban exists for prices that are too

high. Homeowner's insurance rates became more subject to regulatory control in 2018. Needless to say, Louisiana is one of the most cronyist states. Louisiana's court system has long been terrible no matter how you measure it (including enacted tort reforms, survey ratings, and the size of the legal sector).

On personal freedom, Louisiana hasn't seen the improvements enjoyed by other states, although it did receive a bump from the *Obergefell* decision. It was dragged down for this edition by being the second-worst state on criminal justice policy, but this represents an improvement over 2016, when it was the worst.[174] Crime-adjusted incarceration rates are extremely high despite getting better since 2016; the state is 1.6 standard deviations above the national mean for our entire data set. Drug arrests are also high and have not improved despite localities such as New Orleans decriminalizing low-level possession.[175] Louisiana remains subpar for marijuana freedom but did cautiously expand medical marijuana in 2019. The state's asset forfeiture law is worse than average. It remains a fairly good state for tobacco freedom, but smoking bans in bars were passed for the first time in 2013/14, and taxes went up in 2016. Louisiana is also a standout on educational freedom, with some public school choice, a very limited voucher law, and an expansive tax-credit scholarship program. However, private school teachers must be licensed. Gambling freedom is extensive. Alcohol freedom is high, with moderately taxed wine and spirits widely available, and the state has eliminated the restriction on direct wine shipping. Gun rights are about average, as the state makes it almost impossible to get a Class III weapon, concealed carry is weighed down with limitations, the permit cost for concealed carry is high, and a stricter-than-federal minimum age exists for possession.

---

174. Julia O'Donoghue, "Here's How Louisiana Sentencing Laws Are Changing under Criminal Justice Reform," *Times-Picayune*, June 26, 2017.

175. "New Orleans: Marijuana Arrests Plummet Post-Decriminalization," NORML, April 12, 2018.



# MAINE

2019 RANK
## 34th





| | FISCAL | REGULATORY | PERSONAL | OVERALL |

## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Mills | Mills | LePage |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on public welfare, financial administration, the employment security administration, public buildings, and housing and community development. Maine is one of the most free-spending states on public welfare, financial administration, and employment security operations in the country, and it also spends much more than average on public buildings and housing and community development. Also cut individual and corporate income taxes.

**Regulatory:** Roll back exclusionary zoning and enact a housing appeals board like New Hampshire's to route regulatory disputes away from the slow court system.

**Personal:** Sell off the state liquor stores and replace the markup with a transparent ad valorem tax, as Washington has done. Maine could try to compete with New Hampshire on convenience, even if not on price.

## ANALYSIS

Maine has long been one of the freest states in the country personally and one of the least free economically—the opposite of states such as Alabama and Idaho. Between 2009 and 2016, the state fell further behind on fiscal policy, which contributed to a relative decline in overall freedom. Since 2014, absolute freedom has risen in Maine, with the biggest gains occurring in 2015, 2016, and 2017.

Maine's taxes have long been high, crushing taxpayers overall at 11.4 percent of adjusted personal income and earning the state rankings in the bottom 10 for both state and local taxes. State taxes have fallen from their heights in the mid-2000s around 7.4 percent of adjusted personal income but are still painful for taxpayers at 6.6 percent today. Local taxes are 4.8 percent, again high relative to national norms. Mainers have slightly less choice of local government than other New Englanders, but more than most Americans. Government debt is very low, at 13.3 percent of income, but cash and security assets are also on the low side, at 14.0 percent of income. Government employment is down to 11.5 percent of private employment (from a peak of 12.9 percent in 2010), and government consumption plus investment is now just 9.3 percent of income, below the national average.

Maine was long a poor state on regulatory freedom, always staying in the bottom 10 until 2016. Since 2014, it has improved slightly. It is one of the most regulated states for land use. The court cases measure shows it as the worst in the country and getting worse all the time, whereas the Wharton Residential Land Use Regulation Index (WRLURI) suggests some improvement since 2005. Maine has one of the most extreme renewable portfolio standards in the country, by our measure (bested in 2019 by Vermont). Maine enacted a substantially higher minimum wage in 2018 (rising further to $12.15 in 2021) and has no right-to-work law. Telecom wireline regula-

tory authority has been removed (in 2016). Different measures of occupational freedoms give a conflicting picture of that policy, but there is no doubt that Maine allows more scope of practice to second-line health professions than just about any other state. Freedom from abusive lawsuits is above average and has improved steadily over time. The state has a certificate-of-need law for hospitals but not one for movers. It has a price-gouging law and a general law against sales below cost. So remember not to price your goods either higher or lower than the state legislature deems acceptable.

Maine is a leading state for criminal justice. It has very low incarceration rates—2 standard deviations better than the national average—and a better-than-average civil asset forfeiture law. Prison collect call rates, though, are high. Maine is a progressive state despite its sound gun laws (including concealed carry without a permit, enacted in 2015); it therefore allows marijuana rights (recreational possession became legal for adults over 21 years of age in 2016 and sale in 2019) and same-sex marriage (legalized by ballot initiative in 2012). It is, in brief, a very civil libertarian state. However, tobacco consumers will face punishingly high taxes ($2 a pack in 2021) and have been evicted from commercial private property by penalty of law. Educational freedom is also low despite having a limited voucher program. The state regulates private schools to the hilt: teacher licensing, detailed curriculum control, and state approval. However, some towns can "tuition out" to private schools, a form of voucher law that has been on the books for decades. Limited public school choice was enacted in 2011/12. We also show gambling freedom increasing over time, as the legal industry has expanded. Alcohol freedom is about average because of state monopolization of wine and spirits retailing, not to mention high beer taxes. Distilled spirits markups were raised substantially in 2018. But raw milk sales are legal.

# MARYLAND

**2019 RANK**
## 45th





FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

■ R   ■ D

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Hogan | Hogan | Hogan |
| **SENATE** | | | |
| **HOUSE OF DELEGATES** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Trim spending in areas noticeably above national averages, such as housing and community development, fire protection, public buildings, parks and recreation, and sanitation. Cut local property taxes.

**Regulatory:** End rent control.

**Personal:** Allow sales of wine and spirits in grocery stores statewide.

## ANALYSIS

Maryland is one of the least free states in the country, and it has had this status since the beginning of our time series in 2000. It performs especially poorly on regulatory policy and has also slipped considerably on fiscal policy since 2000. It does enjoy locational rents from its proximity to Washington, D.C. One bright spot for the state is that its personal freedom rank has gradually increased over time from its cellar-dwelling slot in 2000.

Maryland's overall tax burden is higher than average at 10.6 percent of income and has risen over time, especially in 2012 and 2016. Local taxes are much higher than average at 4.7 percent of adjusted personal income, while state taxes are a bit above at 5.9 percent. This situation would make for a favorable degree of fiscal decentralization, but Marylanders do not have much choice in local government, with only one competing jurisdiction per 200 square miles. It is less indebted than other states, though it also enjoys a lower cash and security balance and features lower government employment at 10.8 percent of private employment, as well as very low government GDP share at 8.5 percent of income. In general, the state's debt and asset position has deteriorated since the aughts, whereas government GDP and employment have improved a bit.

Maryland is the third-worst state on the most important component of regulatory policy, land-use freedom. Zoning restrictions are extensive, eminent domain abuse is mostly unchecked, and some local rent control exists. Its renewable portfolio standard has become consistently worse. At least it doesn't mandate free speech on private property. The state enacted a new minimum wage in 2013, and as a ratio to median wage it has risen most years since then (it is $11.75 per hour as of 2021). Maryland has no right-to-work law. Health insurance mandates are extensive.

Telecommunications regulation is unreformed. Occupational freedom is extremely low. By one measure (index of statutory mentions of regulatory keywords), Maryland has one of the highest figures for licensed occupations in the country, and it is one of the most cronyist states. However, nurse practitioners were freed for independent practice in 2015, and physician assistants and dental hygienists have some freedom as well. Maryland has a hospital certificate-of-need law but no such law for movers. Personal auto rates became more tightly regulated ("prior approval") in 2018. The state has both general and gasoline-focused laws against sales below cost. Its tort system is only about average, and unlike most states, it has shown no improvement since the early 2000s.

Reform efforts have helped improve Maryland's criminal justice score. The state passed the Justice Reinvestment Act in 2016, which eliminated mandatory minimums and reduced sentences for certain drug offenses. Crime-adjusted incarceration rates are now finally well below the 21st-century national average. The drug enforcement rate fell from 13.2 percent at its peak in 2007 to its to-date low of 4.0 percent in 2019. The state's asset forfeiture regime has traditionally been slightly above average, but it got significantly better in 2016 with reform that required government to provide "clear and convincing evidence" to seize property. Smoking bans are comprehensive, and cigarette taxes are high, encouraging smuggling. Tobacco prohibition was enacted for adults under 21 in 2019. Educational freedom is among the lowest in the country. Homeschools and private schools are tightly regulated, the latter more so (mandatory state approval and teacher licensing). The state raised the years of compulsory schooling from 11 to 12 in 2014 and then to 13 in 2017. However, it did enact a limited voucher law in 2016. Maryland raised its travel freedom score by allowing people without Social Security numbers to get driver's licenses in 2013/14. It also raised

206

its marijuana freedom score substantially by enacting a "real" medical marijuana law and decriminalizing small-scale possession. Alcohol freedom is decent because of privatization and low taxes; however, beer taxes were hiked substantially during 2011–2014. Direct wine shipments are legal. The state has sharply limited firearms freedom, and it is now a bottom-five state in this category. It mandates locking devices, registers handgun owners, requires licensing with safety training for handgun purchasers, licenses dealers, bans possession for those under 21 years of age, bans certain types of guns and magazines, and makes it extremely difficult to get permission to carry in public. Gambling freedom is substantial, and the industry has grown in recent years.

# MASSACHUSETTS



**2019 RANK**
**30th**



| | FISCAL |
| | REGULATORY |
| | PERSONAL |
| | OVERALL |

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| ■ R | ■ D | | | |
| **GOVERNOR** | | Baker | Baker | Baker |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Massachusetts spends more than twice the national average on housing and community development. It also spends a great deal on public welfare operations, interest payments, and miscellaneous commercial activities. Cut these areas and pay down debt and build up cash assets.

**Regulatory:** Repeal outdated and cronyist regulations, such as the price-gouging law, the sales-below-cost laws, moving company licensure, and the certificate-of-need law for hospitals.

**Personal:** Make the civil asset forfeiture regime consistent with its top criminal justice score by requiring a criminal conviction before forfeiture and banning equitable sharing that does not comply with this standard.

## ANALYSIS

Massachusetts has long had a better economic policy regime than one would expect given its strongly left-of-center electorate, and one of the better records on personal freedom, particularly for criminal justice. It suffers, though, from an onerous regulatory system and some relative decline on personal freedom that has harmed its overall ranking.

On fiscal policy, the nickname "Taxachusetts" is a bit of a misnomer. Massachusetts's overall tax burden is just slightly higher than average, although individual income taxes are among the highest in the country. Massachusetts residents have ample choice of local government, more than four every 100 square miles. Government debt is high, at about 20.5 percent of personal income, but has fallen 11 percentage points since FY 2009. Cash and security assets have fallen 8 percentage points of income, however, during that same period, wiping out most of those gains. Government employment is among the lowest in the country, at 9.0 percent of the private workforce, and government consumption is also low.

On the most important category of regulatory policy, land-use regulation, Massachusetts is worse than average, although our two indicators of zoning stringency give somewhat conflicting judgments. By one measure (court cases), zoning stringency has grown over time but is still better than average, but by the other (WRLURI-based imputation), it has fallen over time but is still worse than average. Renewable portfolio standards have grown rather high. Eminent domain for private gain is completely unrestrained. The state has consistently had a higher-than-federal minimum wage, and that rate is now one of the highest in the country, at $13.50 per hour in 2021. Workers' compensation coverage mandates are extreme, though employers have great freedom of choice in funding them, and there is no right-to-work law. A mandatory paid leave program was enacted in 2018. Telecommunications have not been deregulated. Occupational freedom is about average in Massachusetts, although nurses

enjoy little freedom in the state. Property and casualty insurance remains tightly regulated, and the state has a certificate-of-need law for hospitals, as well as an anti-price-gouging law, licensure of moving companies, and both general and gasoline-focused sales-below-cost laws. The civil liability system is subpar but has improved over time, although not because of any particular statutory or institutional reforms.

Massachusetts is our top state for criminal justice. It has long locked up fewer of its residents than the vast majority of other states. It also arrests fewer people for drugs and other victimless crimes than most other places. Since 2016, it no longer suspends licenses for nondriving drug offenses, and prison phone call rates are low (and went down in 2016). However, its asset forfeiture law is among the worst in the country, putting the burden of proof on innocent owners, giving proceeds to law enforcement, and requiring only probable cause for showing the property is subject to forfeiture. Massachusetts scores highly for cannabis freedom, with a comparatively liberal medical marijuana law enacted in 2011/12 and a recreational use law enacted in 2016 (but implementation was delayed until 2018). The Second Amendment is nearly a dead letter in Massachusetts: the state tries to make guns as expensive as possible (locking mandates; dealer licensing; license to purchase any gun, with safety training) and virtually prohibits carry in public. It is the third-worst state for tobacco freedom, with comprehensive smoking bans and punishingly high cigarette taxes ($3.51 a pack after having been raised again in 2013/14). Educational freedom is low. Homeschooling parents have to jump through many hoops and must meet detailed curriculum guidelines. Private schools are subject to government approval. Casino gambling has expanded, and with it the state's gambling freedom score has risen. The state's alcohol freedom score improved in 2013 because of the repeal of the direct wine shipping ban, but wine in grocery stores remains subject to mind-numbingly complex rules undoubtedly designed for some obscure political purpose. Alcohol taxes are lower than average.

# MICHIGAN

2019 RANK
## 7th





FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| ■ R ■ D | | | | |
| **GOVERNOR** | | Whitmer | Whitmer | Snyder |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on higher education, health, and sewerage, which is much higher than average. Use the proceeds to reduce income and property taxes.

**Regulatory:** Allow full nurse practitioner independent practice and prescription authority, and join the Nurse Licensure Compact.

**Personal:** Enact a liberal tax-credit scholarship or educational savings account (ESA) program for private education.

211

## ANALYSIS

Michigan has been hit hard by global economic conditions despite its relatively decent economic policies. Unfortunately, Great Lakes states cannot afford merely "decent" policies; they must be outstanding to overcome the headwinds they face in global markets and to compete with neighboring states, such as Indiana. Encouragingly, Michigan's fiscal policy has improved over time, and its personal freedom ranking has rocketed upward since 2014.

Michigan's local tax burden is relatively low, probably because of a school finance centralization accomplished by ballot initiative in the 1990s. The state tax burden has historically been higher than the national average, but it fell substantially in the late 2000s and now stands at 5.9 percent of adjusted personal income. Government debt has also fallen somewhat since 2008 and is now below average at 15.9 percent of income. Government employment fell from 13.3 percent of the private workforce in 2009 to 10.6 percent today. Government consumption plus investment divided by adjusted income has fallen from 12.1 percent in 2009 to 9.3 percent in 2019. Michiganders do have reasonable freedom of choice among local governments, with about one per 100 square miles, but the centralization of school finance has made this choice less significant.

Michigan's land-use and energy freedom is a little above average. It has little zoning restriction, but it has ratcheted up renewable portfolio standards since 2011. It also has a fairly high minimum wage for the local economy. A right-to-work law was enacted in 2012. Freedom from abusive lawsuits has

been better than average in Michigan since 2000, and like most states it has improved over time. Occupational freedom is about average but has declined since 2008 because of new occupations being licensed. Regulations are fairly anti-nursing. Michigan deregulated telecommunications fully in 2014. Personal auto lines moved to prior approval of rates in 2019.

On criminal justice policy, Michigan arrests somewhat fewer than average for victimless crimes, but it has a slightly above-average incarceration rate. Those rates have been stable over time. The state passed criminal justice reform measures in 2017; incarceration rates did drop in 2018 and 2019, and the effects of the reform are likely to be long-term. The asset forfeiture law is better than average thanks to 2015 and 2019 reforms, but equitable sharing is still a significant end run around state law. Smoking bans are comprehensive, and cigarette taxes are fairly high. Educational freedom is among the lowest in the country. Although homeschools are scarcely regulated, private schools face many barriers. There are no private school choice programs, and compulsory schooling has extended to 12 years since 2009. The state does better than the median on gambling freedom, and aggravated gambling is no longer a felony as of 2016. A constitutional ban on all racial preferences in public services has been in effect since 2006. Travel freedom also grew a bit when the state repealed its motorcycle helmet law in 2012. Marijuana recreational sale and possession were legalized by ballot initiative in 2018. Alcohol and firearms freedoms are only about average, with spirits taxes a bit high and mandatory registration of some firearms.

212

# MINNESOTA



**2019 RANK**
## 38th



FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| **R**  **D** | | | | |
| **GOVERNOR** | | Walz | Walz | Dayton |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Trim spending on public welfare, parking lots, natural resources, unemployment compensation, and parks and recreation, areas in which the state spends much more than average. Reduce taxes on individual income and selective sales, which are above national norms.

**Regulatory:** Deregulate telecommunications and cable entry and pricing.

**Personal:** Allow beer, wine, and spirits in grocery stores.

213

## ANALYSIS

Minnesota is a classic "blue state" in that it scores well above average on personal freedom and below average on economic freedom. However, it has fallen relative to other states on personal freedom since 2006 as others have caught up and surpassed it.

Minnesota is fiscally centralized, with low local taxes (3.1 percent of adjusted personal income) and high state taxes (8.4 percent). Overall, the tax burden is high at 11.5 percent. On public employment and government consumption, the state performs better than average, while debt and liquid assets are right around average.

On the most important category in regulatory policy, land-use and environmental freedom, Minnesota is average. The state suffers from strict renewable portfolio standards that consistently got worse from 2010 to 2015. Zoning restrictions look about average, or slightly worse, but both of our measures suggest the state hasn't gotten much worse over time, unlike most other states. On labor policy, the state is below average, lacking a right-to-work law that all of its neighbors enjoy. Minnesota passed a minimum-wage law in 2014 that increased the rate every subsequent year until 2016 and then indexed it to inflation, though it remains not too high relative to the median wage. Workers' compensation funding was liberalized slightly in 2011/12. The state moved to partially deregulate telecommunications in 2015, as we recommended in previous editions of this study, but cable remains untouched. Occupational freedom is above average; the state passed an extensive nurse practitioner freedom-of-practice law in 2014, but we show big increases in statutory restrictive language

in 2015, 2016, and 2017, despite sunrise and sunset provisions. The state lacks a hospital certificate-of-need law and various other cronyist policies, but it does have sales-below-cost laws for gasoline and retailers generally. Its court system is highly rated, but in 2018 the state appeared on the list of "judicial hellholes" for the first time.

Minnesota scores above average on personal freedom largely because of its sound criminal justice policies, and it was helped in the past in relative terms by its marriage freedom (it enacted same-sex marriage in 2013). But the state performs poorly in a number of other categories. The incarceration rate is well below the national average but rose from 2000 to 2015, before falling back a bit. The drug arrest rate is lower than average and getting lower, while arrests for other victimless crimes have fallen even more rapidly. The state's asset forfeiture law was reformed in 2013, and equitable sharing participation has been low. The state, in bipartisan fashion, enacted limits on the use of license plate readers in 2015. Minnesota is mediocre on marijuana freedom, enacting a strictly limited medical marijuana program in 2014 and enjoying decriminalization. Tobacco freedom took a big hit in 2013 with a hike in the cigarette tax and an inflation indexing provision (that was ended by the legislature as of 2017). Educational freedom is slightly above average despite some private and home-school regulation, because of interdistrict public school choice, a modest tax-credit/deduction law, and compulsory schooling of only 10 years. Alcohol freedom is mediocre because of taxes and limits on grocery sales, but the state did finally repeal blue laws in 2017. Minnesota rose to average on gun policy by legalizing silencers in 2015.

214

# MISSISSIPPI



**2019 RANK**
## 40th



FISCAL

REGULATORY

PERSONAL

OVERALL

**RANK**

**YEAR**

## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Reeves | Bryant | Bryant |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on health and hospitals, where Mississippi is the third-most liberal-spending state, and also on education, natural resources, highways, and public welfare operations, where the state spends well more than the national average, as a share of the economy. Reduce government employment, and reduce state taxes, especially on sales and business income.

**Regulatory:** Liberalize insurance by moving to a "no-file" system like Wyoming's.

**Personal:** Enact a broad-eligibility ESA or tax-credit scholarship program.

215

## ANALYSIS

Mississippi is a typical Deep South state in that its economic freedom far outstrips its personal freedom. But the state's worst dimension is actually fiscal policy, and its economic policies are worse than those of all its neighbors, including Alabama and Louisiana.

Mississippians' overall tax burden is a bit above average nationally at 10.0 percent, but local taxes are quite low. This fiscal centralization goes along with a lack of choice among local government (fewer than 0.4 per 100 square miles). Debt is much lower than average, but government employment and GDP share are far higher than average. State and local employment is 16.2 percent of private-sector employment.

Like most southern states, Mississippi does well on land-use and labor-market freedom. In 2011/12, it also finally enacted a limited eminent domain reform. However, local land-use restrictions have grown significantly over time. Mississippi has no minimum wage and has a right-to-work law. It also lacks stricter-than-federal anti-discrimination in employment protections. However, it does have an E-Verify mandate and restricts property owners from banning guns in parking lots. Health insurance mandates are modest. In 2011/12, a telecommunications deregulation bill was passed, but the state lacks statewide cable franchising. Occupational licensing is less extensive than average, but nurses and dental hygienists enjoy little practice freedom. The state strictly regulates insurance rates, hospital construction, moving companies, and pricing during disasters. Its civil liability system used to be much worse than average, but it is now actually quite better than average. The state reformed punitive damages and abolished joint and several liability in 2002 and 2004.

Personal freedom has gone up in Mississippi, even leaving aside the federalization of marriage policy. However, it suffers from a notoriously awful criminal justice system despite a dip in incarcerations after 2014. The state imprisons its population at a rate of 1.5 standard deviations above the national average, even adjusting for its high crime rate. Drug arrests are very high. Other victimless crime arrests are average or below, depending on measurement. The state asset forfeiture law is not terrible, but it doesn't matter because local law enforcement enthusiastically pursues adoptions from the Department of Justice (except in 2019, which might prove to be a blip). Marijuana law is illiberal. You can get a life sentence for a single marijuana offense not involving minors. Mandatory minimums exist for low-level cultivation. the "decriminalization law" is a ruse because local governments may criminalize possession, and the mostly harmless psychedelic *Salvia divinorum* is also banned. Gun laws used to be stricter than might be expected but are now some of the best in the country. Permitless open carry was reinstated in 2013/14; and permitless concealed carry was enacted in 2016. There is no duty to retreat, and silencers are now permitted. Alcohol freedom is below average. The state monopolizes liquor stores, wine direct shipping is banned, and wine and spirits are unavailable in grocery stores. Legal gambling is more open than in the average state. Educational freedom is about average. A very limited voucher law was enacted in 2011/12 and liberalized since, but public school choice is extremely thin. Tobacco freedom is above average, as smoking bans leave plenty of exceptions, and cigarette taxes are not too high. The state banned same-sex marriage at the end of 2014, but the *Obergefell* decision has since eliminated that restriction.

# MISSOURI

2019 RANK
## 11th





FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| ■ R   ■ D | | | | |
| GOVERNOR | | Parson | Parson | Greitens |
| SENATE | | | | |
| HOUSE OF REP. | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Clamp down on the more than 1,000 special districts, which local governments form to get around tax and debt limitations and which local voters find hard to monitor. Dissolve as many as possible and make it difficult to form new ones.

**Regulatory:** Improve labor and occupational freedom by securing the right to work while promoting independent practice freedom for nurses, physician assistants, and dental hygienists.

**Personal:** Pass strict anti-circumvention reform to eliminate the equitable sharing loophole in the state's civil asset forfeiture laws that costs Missourians millions.[176]

176.   Nick Sibilla, "Loophole Lets Missouri Cops Keep Millions in Forfeiture Funds (and Away from Schools)," Institute for Justice website, March 2017, http://ij.org/loophole-lets-missouri-cops-keep-millions-forfeiture-funds/.

217

## ANALYSIS

Missouri is one of the country's freer states, but in recent years it has run the risk of falling back into the middle of the pack. Its slide in regulatory policy is most worrisome, especially because it is not merely relative but is absolute as well, including and excluding federalized policies.

Missouri's local taxes are a bit above average (4.1 percent of adjusted personal income), but state taxes are well below average (4.4 percent of income), making for high fiscal decentralization. In addition, Missourians have some choice in local government, with more than one effective competing jurisdiction per 100 square miles. We show that state taxes have fallen since FY 2007 and overall taxes are less than average. Government consumption plus investment and employment is also below average, whereas debt and cash and security assets are about average.

We see good evidence of continued backsliding on regulatory policy. The state has adopted a modest renewable portfolio standard and has done little to limit eminent domain for private gain. But overall land-use policy is above average. Local zoning is quite loose compared with other states. The state adopted a right-to-work law in 2017, as we suggested in the fourth edition, but a statewide referendum then blocked it. Missouri's minimum wage was hiked in 2018. The state does above average on occupational licensing, although our two main measures of licensure extent point in very different directions. Freedom is limited for nurses, physician assistants, and dental hygienists. The civil liability

system remains below average and went backward between 2013 and 2015. Insurance rate-setting freedom is fairly high. Cable and telecommunications are fully liberalized.

Missouri has a fairly strict approach to criminal justice, involving long sentences that lead to an incarceration rate that is well above average and a high level of arrests for drugs. It does better when it comes to other victimless crimes. It also has a low prison phone rate and wisely avoids suspending driver's licenses for nondriving drug offenders. The incarceration rate did notably fall between 2017 and 2019. The state's asset forfeiture law is one of the best in the country, but it is frequently circumvented through equitable sharing. An extensive medical marijuana law was adopted in 2018, but you can still get life in prison for a single marijuana offense not involving minors. Same-sex marriage was banned in 2014, but the *Obergefell* decision trumped that restriction. Missouri is a good state for gambling, alcohol, and tobacco freedoms. Cigarette and alcohol taxes are notably low, and smoking bans are more moderate than in other states, although several localities (including St. Louis city and county) did pass a minimum legal sale age increase to 21 for tobacco products in 2016. Gun rights were slightly better than average in 2015 and got better in 2016 after substantial reform (something we called for in the fourth edition of this study). The state secured the right not to retreat from attackers in public during 2016 and allowed for permitless concealed carry. Raw milk sales are legal, whereas seat belts and motorcycle helmets are required by law.

# MONTANA

**2019 RANK**
## 18th





- FISCAL
- REGULATORY
- PERSONAL
- OVERALL

## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Gianforte | Bullock | Bullock |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Trim spending on public welfare operations, public buildings, health, employment security administration, central staff, and financial administration, which are all substantially above national averages.

**Regulatory:** Montana is surrounded by right-to-work states. Enact a similar law that does not violate freedom of association, like the one proposed in the "Labor-Market Freedom" section of this book (see page 46-47).

**Personal:** Abolish all mandatory minimum sentences for victimless crimes and reduce maximum sentences significantly.

## ANALYSIS

Residents of Big Sky country enjoy ample personal freedom and good fiscal policy, but regulatory policy has seen a worrying, long-term decline in both absolute and relative terms. It will be welcome if a tiny turnup for the absolute score of regulatory freedom in 2019 was the beginning of a positive trend.

Montana's tax burden is well below the national average. State taxes have held steady during the past several years at about 5.0 percent of adjusted personal income. Local taxes spiked in FY 2009 but then settled down to about 3.1 percent of income shortly thereafter. They've trended up slightly during the past few years to nearly 3.2 percent after nearly hitting 3.0 in FY 2017. Montanans have virtually no choice in local government, as counties control half of local taxes. Montana's debt burden has fallen from 19.9 percent of income in FY 2007 to 11.5 percent now. Government employment and consumption have fallen since the Great Recession and are now slightly better than national historical averages. Overall, Montana posted consistent gains on fiscal policy up to 2017 but has fallen back slightly since in relative and absolute terms.

Land-use freedom and environmental policy have deteriorated since 2007. Building restrictions are now more onerous than average. Eminent domain reform has not gone far. The state's renewable portfolio standards are among the toughest in the country, raising the cost of electricity. The state has a fairly high minimum wage for its median wage level. Overall, Montana is one of the least free states when it comes to the labor market. Health insurance mandates are extremely expensive. Montana has among the most extensive occupational licensing

regimes. However, nurses and physician assistants enjoy substantial practice freedom. Cable franchising is still local, but telecom wireline authority has been fully deregulated. Insurance freedom is middling, as the state imposes some restrictions on rating criteria but has gone to "file and use" for most lines. It joined the Interstate Insurance Product Regulation Compact in 2013/14. Montana has a general ban on sales below cost, and medical facilities and moving companies both face entry barriers. The state's lawsuit freedom is slightly above average (less vulnerable to abusive suits).

Montana is one of the best states for gun rights, but constitutional carry postdates our study. Montana also does well on gambling, where it has an unusual, competitive model for video terminals that does not involve casinos. On criminal justice, Montana is above average. Drug arrests are more than 1 standard deviation below the national average, but the incarceration rate is about average when adjusted for crime rates. The state is schizophrenic on cannabis, with a reasonably liberal medical marijuana program but also the possibility of a life sentence for a single cannabis offense not involving minors and a one-year mandatory minimum for any level of cultivation. Montana reformed its terrible asset forfeiture law in 2015 but has not touched the equitable sharing loophole. Tobacco and alcohol freedoms are subpar, with draconian smoking bans, higher-than-average cigarette taxes, and state monopoly of liquor stores. Educational freedom is slightly better than average, with fairly light regulation of private schools and home-schools and, since 2015, a strictly limited tax-credit scholarship law. The state was forced to legalize same-sex marriage in 2014, and its oppressive super-DOMA was, therefore, also overturned.

# NEBRASKA



**2019 RANK**
## 33rd



FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| R    D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Ricketts | Ricketts | Ricketts |
| **LEGISLATURE\*** | nonpartisan | nonpartisan | nonpartisan |
| **n/a** | n/a | n/a | n/a |

\*Nebraska has a unicameral legislature.

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on education, which is far higher than average, especially spending on salaries. Trim utilities, sales, and income taxes.

**Regulatory:** Repeal the certificate-of-need requirement for hospital construction.

**Personal:** Preempt local regulation of firearms sales, possession, and carrying.

## ANALYSIS

Nebraska is a state of extremes within our economic freedom dimension. It is the second-best state on regulatory power but 47th on fiscal policy. Like other Great Plains states, Nebraska has usually had very good regulatory policy. Kansas is the only state in the country that outranks it on that margin. But Cornhuskers have long suffered from poor fiscal policy, and it's only worsened in the past few years. Fortunately for Nebraskans, the state has gone from 48th on personal freedom in 2000 to 20th today.

Nebraska is relatively fiscally decentralized but relatively highly taxed, with somewhat lower-than-average state tax revenues (about 5.4 percent of adjusted personal income, a drop from 6.0 percent in FY 2006) and much higher than average local tax revenues (5.2 percent of income). Nebraskans have little choice of local governments, limiting the benefits of this approach—the state has only 0.46 effective competing jurisdictions per 100 square miles. Debt is lower than average but so are assets. Public employment is just above average, whereas government GDP share is quite a bit higher than average at 12.5 percent.

Nebraska does very well on the most important regulatory policy category, land-use and environmental freedom. However, it has not done much to check eminent domain for private gain. On labor policy, it is above average because of a right-to-work law and flexible workers' compensation funding rules, but it enacted a high minimum wage in 2014. Health insurance freedom is extensive and tied for best in the nation, with few mandated benefits outside the PPACA essential benefits and with a light touch on managed care. Nebraska does better than average on occupational freedom but has slipped on keeping occupational licensing in check. In 2015, nurse practitioners gained full practice authority, while 2018 saw new sunrise legislation strengthening the prior law. The state has long had one of the best civil liability

systems in the country. It has a certificate-of-need law for hospital construction. Telecommunications have been deregulated but cable has not.

Nebraska is only middling on criminal justice policy. Incarceration rates have generally been low, but they have increased over time, unlike in some other above-average states. Drug arrest rates have been high, but they have come down pretty steadily (with a one-year blip up in 2019). Victimless crime arrests have been moving in the right direction for a while and are now near countrywide averages. That is a far cry from the sky-high rates two decades ago. The legislature finally enacted a comprehensive asset forfeiture reform in 2016, one of the best in the country. Nebraska is fourth worst on educational freedom. Controls are high, including detailed annual reporting requirements and notifications for homeschoolers, and nonsectarian private schools are subject to mandatory approval and teacher licensing. The state has no private school choice programs. Gambling freedom is mediocre; even social gaming isn't allowed. Sports betting appeared to get the green light in 2020, but putting regulations in place around it has bogged down the process. Travel freedom is below average. Gun rights are woefully behind what you'd expect in a red state. There is no constitutional carry. Some of Nebraska's lower scores on firearms policies come from special provisions for Omaha or general lack of preemption. Marijuana policy is also well below average. You can still get life in prison as a maximum sentence for a single pot offense. There is no medical marijuana law. However, Nebraska is solidly above average on alcohol and tobacco freedom. Like other states with the ballot initiative, the nonsmoking majority of Nebraska has foisted on private business owners fully comprehensive smoking bans, but tobacco taxes are below average. Alcohol taxes are similarly low. Since 2008, the state has had a constitutionally entrenched ban on governmental racial discrimination, such as affirmative action. Raw milk sales are legal.

# NEVADA

**2019 RANK**
## 3rd





FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

■ R   ■ D

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Sisolak | Sisolak | Sandoval |
| **SENATE** | | | |
| **ASSEMBLY** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on air transportation, employment security administration, public buildings, and parks and recreation. Use the proceeds to trim sales and miscellaneous minor taxes. Nevada spends far more than the national average on police, but that may be warranted given the nature of its social and economic model.

**Regulatory:** Deregulate occupations such as epidemiologists, environmental health specialists, title plant personnel, interior designers, sign language interpreters, clinical laboratory technologists, pharmacy technicians, veterinary technologists, opticians, athletic trainers, massage therapists, security guards, landscaping contractors, child-care workers, bill and account collectors, well drillers, alarm installers, taxi drivers, and crane operators.

**Personal:** Abolish private school teacher licensing, state approval of private schools, and detailed curriculum requirements.

216   FREEDOM IN THE 50 STATES

## ANALYSIS

Unsurprisingly, Nevada is consistently one of the top states for personal freedom. But it is a top-five freest state overall as well, coming in third. It does so through a top-10 score on overall economic freedom to go along with its No. 1 ranking on personal freedom. The Great Recession greatly damaged Nevada's fiscal position, so we should through a top expect the COVID-19 pandemic to cause some dip for 2020–2021 despite a recent upswing in the state as the gambling sector rebounded.[177]

Nevada's fiscal policy worsened between the beginning of our data set in 2000 and 2014, a fact that might have something to do with a 2003 state supreme court decision setting aside the part of the state constitution that required a supermajority for tax increases.[178] But it's basically been improving overall since 2014, though still nowhere near where it was in the early 2000s. State-level taxes have gone up from a low of 5.2 percent of adjusted personal income in FY 2004, bouncing around in the middle to high fives since, and settling at almost 5.7 percent today. Local taxes were steady at between 3.3 percent and 3.5 percent of income for most of the past decade but are now at 3.1 percent. Nevadans have virtually no choice of local governments given the importance of territorially vast counties. Government employment is super low relative to the national average, and government consumption is also well below average. This remains true after both spiked during the Great Recession. Government debt peaked at nearly 30.0 percent at that point in 2009, but it has come down since and is now only 18.8 percent of income (unfortunately, still above the national average). Cash and security assets are below average.

After years of deterioration, Nevada's regulatory policy rebounded in 2013 because of a variety of factors. As one of the Sand States attracting huge net in-migration in the 1990s and early 2000s, Nevada retained some degree of land-use freedom. But it is getting steadily worse and now places 35th. Renewable portfolio standards are quite high and rising, affecting the cost of electricity. Nevada does have a right-to-work law but also has a minimum wage, which was hiked further in 2015 and again in 2019 (with scheduled bumps out to 2024). Cable and telecommunications have been liberalized. Occupational freedom declined dramatically between 2000 and 2006 because of the expansion of licensing. It has suffered another expansion during the past half decade. A bright spot is, in 2013, nurse practitioners' gaining the right of independent practice with full prescription authority. Insurance freedom expanded in 2018 due to reform of laws regarding prior approval of rates and forms. In 2011/12, the state had joined the Interstate Insurance Product Regulation Compact. Nevada has certificate-of-need requirements for hospitals and household goods movers. Direct auto sales were partially legalized in 2013. The court system is above average and has been improving since 2013 as the state gradually moved off the "judicial hellhole" list.

Nevada is No. 1 for gambling freedom (no surprise), and it is the only state with legal prostitution (local option). However, on criminal justice policy, Nevada is more of a mixed bag. Nondrug victimless crime arrests were high but have fallen over time, and it is possible that they are overstated because of Nevada's high tourist population. The incarceration rate is about average for its crime prevalence and has been trending in the right direction. Drug arrests are low. The civil asset forfeiture regime is mediocre following a small reform in 2015. Marijuana was legalized in 2016 by initiative, and now it is a top state for marijuana freedom. Gun rights are middling relative to other states. Extensive

177   "Las Vegas Roars Back to Life with Record Gambling Win," Voice of America, August 29, 2021.
178   Michael J. New, "Judicial Nonsense in Nevada," Cato Institute, August 8, 2003.

background checks were enacted in 2019. Open carry is extensive, but there is no permitless concealed carry. Nevada is one of the top states for alcohol freedom, with fully private wholesaling and retailing, low taxes, no blue laws, legal direct wine shipping, and wine and spirits in grocery stores. In 2013, the state enacted a law giving illegal immigrants access to driver's licenses, which outweighs its 2011 move to ban handheld cell phone use in increasing overall travel freedom. Nevada is a bit above average on educational freedom. Private schools are tightly regulated, facing mandatory state approval, mandatory teacher licensing, and detailed private school curriculum control. However, the state has a broad tax-credit scholarship, enacted in 2015. Even tobacco is not as tightly controlled as one would expect from a state with the ballot initiative, although taxes were raised significantly in 2015. Nevadans may still light up in bars with permission of the owner.

226

# NEW HAMPSHIRE

**2019 RANK**
## 1st



FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

2000   2005   2010   2015   2020

**YEAR**

## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Sununu | Sununu | Sununu |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Local governments need to get a handle on school spending and taxes. State government may be able to help by moving town meetings and local elections to coincide with state elections, boosting turnout and diluting the political power of insiders.

**Regulatory:** Pass a right-to-work law that is consistent with free association, as described in the text.

**Personal:** Legalize more forms of private gambling that pay out at a higher ratio than the state lottery and therefore, even for anti-gambling advocates, should be considered less exploitative.

227

## ANALYSIS

In the fifth edition of the index, Florida had overtaken New Hampshire as the freest state. This time, New Hampshire has regained the crown as the freest state in the Union. In the more distant past, New Hampshire had a huge lead over the rest of the country on fiscal policy, a lead that partly dissipated between 2000 and 2008 because of big increases in local property taxes, which were in turn driven by growth in education spending. It has rebounded quite a bit in absolute terms but has been eclipsed by Florida and Tennessee on the fiscal front. New Hampshire grabs the top spot overall because it does well in both economic freedom (third) and personal freedom (second), something that is also true of Florida but is not the case for Tennessee. It could be a challenge for rivals to catch New Hampshire next time because of policy changes in 2021 in a pro-freedom direction, including tax cuts and the passage of the education freedom accounts program. The "New Hampshire Advantage" could get even stronger within New England. The three states of northern New England pose a stark contrast in economic policies and, for most of the late 20th and early 21st centuries, economic outcomes.

New Hampshire's overall tax burden is well below the national average at 8.1 percent. The state government taxes less than any other state but Alaska. We show a decline in state taxes as a share of adjusted personal income from a high of 3.8 percent in FY 2002 to 3.0 percent today. Meanwhile, local taxes have risen from 3.7 percent of income in FY 2001 to 5.1 percent in FY 2019 (which is down from a high of 5.6 percent in FY 2012). New Hampshire is, therefore, a highly fiscally decentralized state. Granite Staters have quite a wide choice in local government, with 2.8 competing jurisdictions per every 100 square miles. Government debt (12.7 percent), consumption (7.9 percent), and employment (10.1 percent) are all much lower

than average, and in all these categories we see improvements since 2010, especially on the debt side. However, cash and security assets are below average and have been dropping.

New Hampshire's regulatory outlook is not so sunny. However, it is still an above-average state and improving relative to its past when a decade ago it ranked in the mid-30s. The Granite State's primary sin is exclusionary zoning. Both measures suggest that New Hampshire is among the more regulated states, although one measure shows improvement since 2005 relative to other states. Part of the problem might be the absence of a regulatory takings law. However, the eminent domain law is strong. The state has a renewable portfolio standard. On labor-market freedom, New Hampshire is below average primarily because of the absence of a right-to-work law and of any exceptions to the workers' compensation mandate. New Hampshire has no state-level minimum wage. Health insurance mandates are low, but the state mandates direct access to specialists, hobbling managed care. A telecommunications deregulation bill was passed in 2011/12, but the state has not yet adopted statewide video franchising. The state is above average on occupational freedom solely because the health professions enjoy broad scope of practice; the extent of licensing grew significantly during the 2000s and continued in the past half decade. Insurance freedom is generally better than average, except for some rate classification prohibitions. The hospital certificate-of-need law was abolished in 2011/12, but that only became effective in 2016. Household goods movers are still licensed. There are no price-gouging or sales-below-cost laws. New Hampshire is one of the least cronyist states. The state's civil liability system is far above the national average; punitive damages were abolished long ago.

New Hampshire is quite personally free. Incarceration rates are low but rose sig-

nificantly around 2011, only to get better again during the past few years. Drug arrest rates are also low but had moved up during 2011–2016 before falling again. Nondrug victimless crime arrests are down substantially after being only about average for years. The state enacted a significant asset forfeiture reform in 2016 and is among the top states. Tobacco freedom is below average, as taxes are fairly high, and smoking bans are extensive. The state now has a limited anti-vaping law. Educational freedom is extensive in the Granite State. A liberal tax-credit scholarship law was enacted in 2012 and a local-option voucher law in 2018, raising the state significantly above average on educational freedom even though compulsory schooling lasts 12 years, and private schools require state approval. A 2021 expanded ESA will help the state improve its ranking in this category. Because New Hampshire has only charitable gambling, it scores well below average in the gambling freedom category. Its ranking should improve because of the 2020 legalization of sports betting. Cannabis freedom is above average, helped by the 2017 decriminalization law but dragged down by an inability to fully legalize. Alcohol freedom is about average; the state monopolizes liquor retail and wine wholesale, but the effective tax rate is extremely low. Wine (but not spirits) is in grocery stores. It is one of the two best states in the country for gun rights. The constitutional carry bill enacted in 2017 helped here. New Hampshire has neither a seat belt law nor a motorcycle helmet law.

# NEW JERSEY



**2019 RANK**
## 47th



FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

🟥 R   🟦 D

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Murphy | Murphy | Christie |
| **SENATE** | | | |
| **GENERAL ASSEMBLY** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on the "miscellaneous" category and employee retirement, areas in which New Jersey spends a lot more than average. Income, utilities, and property taxes are abnormally high and could be cut.

**Regulatory:** End rent control, especially given its unintended consequences on housing quality and quantity.

**Personal:** Fully free wine sales from the currently arcane regulatory system.

231

## ANALYSIS

About 60 years ago, New Jersey was considered a tax haven. It grew wealthy under that regime, but during the past decade it has dwelt in the bottom five for economic freedom. It still does relatively well on fiscal policy, but it is a regulatory nightmare and performs poorly on personal freedom as well. As long as it is better than New York on fiscal policy and not much worse than Connecticut, it will probably continue to get tax refugees from that state, but more New Yorkers now move to Florida than to New Jersey.

New Jersey's state-level taxes were basically average (5.7 percent of adjusted income) for many years but have crept up in the past two and are now above average at 6.3 percent. Local taxes have gone the other way, trending downward to 5.3 percent (but still well above the national average of 3.9 percent). The combined tax rate is quite high relative to the rest of the country but still lower than New York's. New Jerseyans have more choice of local government than residents of any other state, with 6.3 effective competing jurisdictions per 100 square miles, which may imply that many residents are content with high local taxes and services. Government debt has now fallen to a slightly below average level (16.4 percent of income), but cash and security assets are well below average too (11.2 percent of income). The government employment ratio and government GDP share have both improved significantly since the Great Recession and are better than average.

Land-use freedom is quite limited in New Jersey, with only Oregon faring worse. The state lets cities adopt rent control, and local zoning rules are often highly exclusionary, even though the state is no longer a destination. It has mandated speech on private property such as malls and community associations. Renewable portfolio standards are among the highest in the country, raising electric rates. In 2013, the state adopted a minimum wage that has suffered big hikes recently. Labor-market freedom was already bad because of strict workers' compensation rules, mandated short-term disability

insurance, mandated paid family leave, no right-to-work law, and a stricter-than-federal anti-discrimination law. Health insurance mandates are extensive. In 2018, New Jersey even legislated a state-level individual health insurance mandate. New Jersey has had no telecommunications deregulation, but it has statewide video franchising. Occupational licensing is more extensive than average, and it has worsened since 2017. In 2013, nurse practitioner freedom of independent practice was abolished despite more states going the other direction. Insurance rate regulation is strict, and the state has a price-gouging law, which Governor Chris Christie deployed after Hurricane Sandy to devastating effect.[79] The Tesla sales model was recently legalized. The civil liability system is somewhat better than average.

New Jersey personal freedom is limited, coming in third worst. Criminal justice has been a rare high point for the state, ranking 12th. Incarceration and victimless crime arrests, drug and nondrug, have all fallen since 2000, but drug arrests were spiking until a dip during the past two years. The state did slash prison collect phone call rates in 2015 and stopped suspending driver's licenses for non-driving drug offenses in 2019. Asset forfeiture, however, has been reformed little. New Jersey is a bad state for tobacco freedom, travel freedom, and gun rights, but is decent on gambling (perhaps not as good as might be expected). The state was a pioneer in sports betting. The picture on educational freedom is mixed. Homeschools and private schools are barely regulated, but Milton Friedman's home state has no public or private school choice programs. Cannabis freedom was mixed but will improve significantly with the passage (and fulfillment) of Question 1 in 2020 and follow-on legislation, which will legalize marijuana. Alcohol freedom is a bit above average, but the state interferes here too. Taxes are modest, but direct wine shipment is tightly regulated, and the rules on when a grocery store may sell wine are complicated—perhaps to create a "tollbooth" where state politicians can extract rents. Fireworks freedom improved in 2017, and physician-assisted suicide was legalized in 2019.

179.  Matthew Yglesias. "Miles-Long Gasoline Lines in New Jersey Show the Case for 'Price Gouging.'" *Slate*, November 1, 2012.

# NEW MEXICO



**2019 RANK**
## 42nd



FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| **GOVERNOR** | | Lujan Grisham | Lujan Grisham | Martinez |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

R ☐ D ☐

## POLICY RECOMMENDATIONS

**Fiscal:** Trim spending on police and fire, corrections, education, general administration, public buildings, hospitals, parks and recreation, public welfare, sanitation and sewerage, and employee retirement, which are all much higher than the national average, as a share of income. Cut the gross receipts tax.

**Regulatory:** Promote tort reform since the state performs poorly on lawsuit freedom, creating a drag on its economy.

**Personal:** Enact a generous private tax-credit scholarship program.

233

## ANALYSIS

New Mexico has long had far more personal freedom than economic freedom, but it has never fully turned it around economically despite some movement in the right direction in absolute terms since 2000 on fiscal policy. Still, it remains mired at 48th place on fiscal policy, with a 35th-place ranking on regulatory policy. With a 43rd-best score on economic freedom as a whole, its 5th-best ranking on personal freedom can't keep it out of the bottom 10 states in overall freedom.

New Mexico's overall tax burden of 10.0 percent of adjusted personal income is just above the national average of 9.6 percent. State taxes came in at 6.3 percent, which was a recent high after the rate had dropped into the high fives for most of the past decade (with some bouncing around) and had come down to 5.1 percent in FY 2019. The big one-year jump in FY 2020 was due to a package of tax increases in 2019. Local taxes have risen from 2.7 percent of income in FY 2000 to 3.6 percent in FY 2019. That growing fiscal decentralization does little for choice in government, however, as the state has fewer than one competing jurisdiction per 100 square miles. Government debt and employment ballooned during the Great Recession and is still much higher than average. However, both have come down from those peaks. Cash and security assets are robust. New Mexico's big problems are government consumption and employment, each of which are approaching 2 standard deviations higher than national norms.

New Mexico has slid on land-use freedom and is now below average. Zoning regulations have significantly tightened over time, and the state has implemented relatively strict renewable portfolio standards. It long ago did eminent domain reform. The state has had a minimum wage for some time, but it was not extremely high until 2018. There is no general right-to-work law. Health insurance freedom is low because of costly mandates and bans on man-

aged care gatekeeping models. In 2013/14, the state passed a telecommunications deregulation bill, but it has not implemented statewide video franchising. The extent of occupational licensing skyrocketed between 2006 and 2009, then jumped again in 2016. Nurses enjoy broad scope-of-practice freedom. Insurance freedom has been fairly high since reforms enacted in 2009/10. There is no certificate-of-need law for hospital construction. Otherwise cronyist regulation is limited, besides licensing for moving companies and a ban on direct-to-consumer auto sales. The civil liability system is much worse than average, and the state has done little to address the problem.

New Mexico's personal freedom is where it stands out from the pack. It has solid criminal justice policies, coming in at 13th. Victimless crime arrests, drug and nondrug, are low, as are incarceration rates. The state's asset forfeiture law is the best in the country, since putting limits on equitable sharing in 2015. Cannabis, alcohol, and travel freedoms are all strong suits for New Mexico, although the state isn't a leader in any of those areas. However, marijuana was legalized in 2021, so that should substantially help its ranking on marijuana policy. Gambling freedom is limited but it's still a top-20 state. From 2013 to 2017, physician-assisted suicide was legalized, but that is a tiny part of our index. The state is one of just two to have both a broad religious freedom restoration act and a broad equal rights amendment (Connecticut is the other). Tobacco and educational freedoms are weak spots in a top state. Students are required to go to school for 13 years, the most in the country, and the state has no choice programs apart from public school open enrollment. Cigarette taxes are high, and smoking bans are extensive. New Mexico has avoided raising the minimum age. It also performs weakly on gun rights, coming in 33rd. The state does well on open carry, but still has no permitless concealed carry. The state has no motorcycle helmet law.

234

# NEW YORK

**2019 RANK**
## 50th





## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| ■ R  ■ D | | | | |
| GOVERNOR | | Cuomo | Cuomo | Cuomo |
| SENATE | | | | |
| ASSEMBLY | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on hospitals, highways, housing, public buildings, public welfare, education, corrections, fire, sanitation and sewerage, employee retirement, and "miscellaneous," which are all above national averages. Cut all taxes and pay down debt.

**Regulatory:** Abolish the housing anchor that is rent control.

**Personal:** Slash cigarette taxes, which are so high as to be almost tantamount to prohibition.

235

## ANALYSIS

New York has been the least free state in the country for a long time. In fact, the Empire State has been the worst state for freedom in every year since our data set began in 2000. Economic freedom is the most significant weakness, but the state has not kept up with the rest of the country on personal freedom either. It belies the "blue" state stereotype in that it is No. 50 on economic freedom *and* personal freedom.

The only fiscal policy area where New York is not below average is the ratio of government to private employment, where the state has actually improved significantly since the early 2000s. It now stands at 11.7 percent, a smidge below the national average. The government GDP ratio has scarcely fallen during that same period, suggesting that New York pairs relatively low government employment with high salaries and benefits for public employees. New York's local tax burden has fallen recently but is twice that of the average state: 7.9 percent of income in FY 2019—a dramatic rise from the early 2000s, when it was less than 7.0 percent. However, New Yorkers have ample choice in local government: 4.1 competing jurisdictions per 100 square miles. The state tax burden—at a projected 6.6 percent of income in FY 2020—is also higher than the national average. Combined state and local taxes are crushing. Debt is down from years past but is still the highest in the country at 27.4 percent of income, and liquid assets are roughly half that, at 14.2 percent of income.

New York is no longer the worst state on regulatory policy as it has jumped all the way up to 48th—although it is still close to New Jersey and California as the worst regulatory environments. Land-use freedom is very low, primarily because of the economically devastating rent control law in New York City. Eminent domain remains unreformed. The state has an onerous renewable portfolio standard, though local zoning is fairly moder-

ate compared with surrounding states. The state enacted a minimum wage in 2013/14, and it has gotten worse since. New York also has a short-term disability insurance mandate and, as of 2016, paid family leave. Cable and telecommunications are unreformed. Occupational freedom is a bit subpar, but nurse practitioners did gain some independence in 2013/14 that has since disappeared. Insurance freedom is a mixed bag. The state has stayed out of the Interstate Insurance Product Regulation Compact, but freedom for property and casualty insurers to set rates was dumped after briefly gaining them in 2013/14. State rate classification prohibitions were newly created in 2018. The civil liability system looks poor, but we may underrate it slightly because of the state's large legal sector.

New York is the worst state on personal freedom, and yet its criminal justice policies are reasonably decent. While drug arrests are about average, nondrug victimless crime arrests are quite low. Incarceration rates are below average and declining. The state was one of only a few to impose the loss of a driver's license as a punishment for nondriving drug crimes, but that ended in 2019. Prison phone call rates have always been low. Local law enforcement enthusiastically participates in equitable sharing, even though the state law imposes only modest limits in the first place. Tobacco freedom is the second worst in the country because of smoking bans and stratospheric taxes ($5.85 a pack, only topped by Illinois's absurd $7.16 a pack rate). Since 2014, localities have enacted total prohibition of tobacco sales for 18- to 20-year-olds, followed by the state itself in 2019. Naturally, the state also has a vaping ban. New York is perhaps the worst state for homeschoolers, and it has no private school choice programs and only a meager public program. Sparklers were legalized in 2015, and mixed martial arts competitions in 2016. Gambling freedom is better than average; casinos were introduced in 2005, and sports

betting is now legal. Cannabis freedom is slightly above average in this index, as the state enacted a limited medical law in 2014, but marijuana was legalized in 2021. Therefore, the state is certain to rise in the next edition. Alcohol freedom is a bit above average, with modest taxes, but grocery stores can't sell wine. Gun rights are hedged about with all kinds of restrictions, but it is possible with some effort to get a concealed-carry license in some parts of the state. Raw milk sales are illegal, but driver's licenses were made available to illegal immigrants in 2019, suggesting even New York paternalism has its limits.

237

# NORTH CAROLINA

**2019 RANK**
## 16th



FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| ▇ R ▇ D | | | | |
| **GOVERNOR** | | Cooper | Cooper | Cooper |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on hospitals, possibly through privatization, which is more than twice the national average as a percentage of income. Build up the rainy-day fund or trim individual income taxes further.

**Regulatory:** Eliminate all rate regulations on property and casualty insurance, and fully free direct-to-consumer auto dealerships while they are at it.

**Personal:** Allow fully legal internet sports betting.

239

## ANALYSIS

North Carolina is a rapidly growing southern state with a reasonably good economic freedom profile and an even better record on personal freedom, especially when compared with its neighbors. Although it has improved of late on its fiscal policy scores, it has slipped a bit on regulatory policy.

North Carolina gradually improved its fiscal policies from FY 2011 to FY 2020. State taxes fell from 6.1 percent of adjusted personal income to 5.6 percent, right around the national average. Local taxes have also declined, moving from 3.5 percent of income to 3.2 percent, seven-tenths of a percentage point below the national average. Government consumption and employment fell, but they are still a bit above the national average. Government debt and financial assets are well below the national average at 10.2 percent and 9.5 percent, respectively.

Despite large in-migration, North Carolina has disdained excessive controls on the housing supply. Yet it has slowly declined on land-use freedom since 2000. It has never effectively reformed eminent domain and has a significant renewable portfolio standard. Labor law is good and has been fairly stable since the beginning of our time series. The state has no minimum wage, a right-to-work law, and relatively relaxed workers' compensation rules, but it enacted an E-Verify mandate in 2011. Regulation has killed off the managed care model for non-large-group health insurance, but mandates are low. Cable and telecommunications have been liberalized. Occupational freedom is a weak spot, especially for the health professions. A sunrise review requirement for occupational licensing proposals was scrapped in 2011, and licensing has grown consistently. North

Carolina is one of the worst states for insurance freedom. It has a large residual market for personal automobile and homeowner's insurance because of strict price controls and rate classification prohibitions. It also has a price-gouging law and a minimum-markup law for gasoline. Entry is restricted for medical facilities and moving companies. North Carolina's civil liability system has improved over time and is now about average.

North Carolina has one of the best criminal justice regimes in the South, though nationally it is only 20th on this margin. Incarceration and both its victimless and drug crime arrest rates are all below average. The state has no state-level civil asset forfeiture, but local law enforcement frequently does an end run around the law through the Department of Justice's equitable sharing program. Revenues are down, though. Gun rights are more restricted than in many other southern states, with carry licenses somewhat costly to obtain yet hedged with limitations. Plus, buying a pistol requires a permit, local dealers must be licensed, background checks are required for private sales, and most Class III weapons are difficult to obtain (sound suppressors were legalized in 2014). Alcohol freedom is low because of state liquor stores and somewhat high markups and taxes. The state also introduced limited mandatory training for servers in 2018. Marijuana has not been liberalized apart from a 1970s-era decriminalization law. Gambling freedom is quite low. Not even social gaming is legal. The state is No. 6 on educational freedom because of a 2013 voucher law that survived the court and relatively light regulation. North Carolina is also—as might be expected—a top-five state for tobacco freedom, largely due to reasonable taxes and workplace freedom, but not freedom in bars or restaurants.

240

# NORTH DAKOTA

**2019 RANK**
## 15th



- FISCAL
- REGULATORY
- PERSONAL
- OVERALL

RANK: 1, 10, 20, 30, 40, 50

YEAR: 2000, 2005, 2010, 2015, 2020

## PARTY CONTROL

■ R    ■ D

|  | 2021 | 2019 | 2017 |
|---|---|---|---|
| GOVERNOR | Burgum | Burgum | Burgum |
| SENATE |  |  |  |
| HOUSE OF REP. |  |  |  |

## POLICY RECOMMENDATIONS

**Fiscal:** Enhance fiscal decentralization and choice among local governments with different policies by cutting state taxes and aid to local schools and allowing local towns to vary property tax to meet school funding needs. The state tax in greatest need of cutting is the sales tax.

**Regulatory:** Allow employers to purchase workers' compensation insurance from any willing seller, or to self-fund, and allow certain businesses to opt out entirely.

**Personal:** Eliminate teacher licensing, mandatory state approval, and detailed curriculum requirements for private schools, and reduce the notification and record-keeping burdens on homeschooling families.

## ANALYSIS

After a stretch of years in which its relative overall freedom ranking declined from 12th to 25th, North Dakota has seen steady absolute gains during the past six years and is now at 15th nationally. There remains the most room for improvement on fiscal policy, where it is a middling 31st.

North Dakota's state-level tax burden fell to its lowest level in our time series, 4.6 percent of adjusted income, in FY 2018. But it has jumped up in the past two years to 5.3 percent. The local tax burden remained static for many years but has crept up significantly during the past three. It is now at 4.1 percent, above the national average and 1.3 percent above its low of 2.8 percent in FY 2014. Clearly, the trend is not heading in the right direction. North Dakotans do have substantial choice of local government: 1.7 per 100 square miles. State debts have risen lately after some years of decline; financial assets continue to be built up. Government consumption and employment have risen from their respective 2012 and 2014 lows, but they are still lower than they were in the early and mid-2000s. So far, there is little sign of the resource curse that has struck Alaska and Wyoming. But these numbers are still higher than the national averages and should be brought down.

Most Great Plains states have good regulatory policies, and North Dakota is no exception, although it falls behind its southern neighbor. Land use is lightly regulated, and the state ranks in the top 10 on this margin. North Dakotans can be proud that their state has one of the strongest limits on eminent domain abuse in the country. The state has a right-to-work law and no state-level minimum wage. However, North Dakota has a monopoly state fund for workers' compensation insurance and has long had an employment discrimination law. When it comes to health insurance regulation still under state control, North Dakota is tied with Idaho and Nebraska for No. 1 in the nation, with

none of the most expensive mandates and with a light touch on managed care plans. Telecommunications was deregulated more fully in 2015, but cable remains unreformed. Occupational licensing in North Dakota has crept up, but nurses and physician assistants enjoy ample freedom of practice. There is no sunset review law. Insurance freedom is low because of prior approval of rates and lack of membership in the Interstate Insurance Product Regulation Compact. There is no certificate-of-need law for hospitals, but there is one for moving companies. The state has a general "unfair sales" act and a minimum markup for gasoline. The civil liability system is third best in the country.

North Dakota's criminal justice policies are generally good because of the low incarceration rate, though they aren't as good as they used to be. However, victimless crime arrests are high even though they have come down over the years. The drug arrest rate has risen substantially and steadily during the past 20 years. The state's civil asset forfeiture law was among the worst in the country until a 2019 reform, but local law enforcement rarely participates in equitable sharing. Prison phone call rates were curtailed radically in 2017. Smoking bans were intensified in 2012, but cigarette taxes are below average. Vaping bans started early here. With just a few exceptions, gun rights are strong in North Dakota. Those exceptions have mostly to do with Class III weapons. The state adopted constitutional carry in 2017. Alcohol freedom is generally good, but wine and spirits are available in grocery stores only when put into a separate enclosure. A reasonably effective medical marijuana law was enacted by initiative in 2016, and partial decriminalization was passed in 2019. Gambling freedom is low, but fireworks freedoms are decent. North Dakota remains the very worst state in the country for educational freedom. Private schools and homeschools are both more harshly regulated than anywhere else, and the state has no private or public school choice.



# OHIO

2019 RANK
## 31st





| | FISCAL |
| | REGULATORY |
| | PERSONAL |
| | OVERALL |

## PARTY CONTROL

■ R    ■ D

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| GOVERNOR | DeWine | DeWine | Kasich |
| SENATE | | | |
| HOUSE OF REP. | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Trim spending on housing and community development, sanitation and sewerage, education, and employee retirement, areas where Ohio spends more than the average state. Cut property taxes.

**Regulatory:** Look at Indiana as a model "Rust Belt" state with regard to regulatory policy, and reform Ohio's regulatory system according to that model. For instance, consider liberalizing the workers' compensation system and rolling back occupational licensing. Adopt a right-to-work law in line with Indiana and Michigan.

**Personal:** Abolish mandatory minimum sentences for nonviolent offenses, with an eye toward reducing the incarceration rate to a level more consistent with its crime rate.

## ANALYSIS

Ohio is a thoroughly mediocre state when it comes to freedom. It is 20th on fiscal policy but really needs to do a lot better on both regulatory (32nd) and personal freedom (40th). It should trouble Buckeyes that their state's policy regime is significantly worse than that of other Great Lakes states that have been reforming, such as Indiana, Michigan, and Wisconsin.

Ohio's taxes are about at the national average overall. But it is more fiscally decentralized than the average state. Local taxes add up to about 4.7 percent of adjusted personal income, while state taxes sit at a projected 4.9 percent of income in FY 2020. The latter have been in decline since a high of 6.2 percent in FY 2005. The discovery of shale gas has allowed Ohio to raise severance taxes and essentially shift some of its tax burden to consumers of natural gas throughout North America. State and local debt, government consumption, and public employment are all lower than average and in long-term decline.

On the most important regulatory policy category, land-use and environmental freedom, Ohio does well, though it has slowly declined. Zoning has a light touch, but the trend is in the wrong direction according to at least one of our sources, and renewable portfolio standards exist but are very low. Labor-market freedom is a problem area for Ohio. Eminent domain reform could have gone further. The state has a minimum wage that is getting worse, no right-to-work law, and strict workers' compensation coverage and funding rules. Health insurance mandates are costly. Cable and telecommunications have been liberalized. The average of different

measures suggests that in Ohio, the extent of occupational licensing is greater than average and has been growing. Nursing scope of practice is the most restricted in the country, but at least dental hygienists and physician assistants have been freed. The state has a hospital certificate-of-need law, and household moving companies are restricted, but price regulation in most markets is limited. Insurance rating was liberalized somewhat in 2015 but then restricted again somewhat in 2018. The civil liability system has bounced around over time and is now below average.

Ohio has a higher-than-average crime-adjusted incarceration rate, and it has risen over time, albeit with some slight decline lately. Meanwhile, victimless crime arrest rates are lower than average and have fallen over time. A significant asset forfeiture reform was enacted in 2016; it could be improved even further, but right now Ohio is above average in this category. Driver's licenses stopped being suspended for non-driving drug offenses in 2016, and a year earlier, prison phone call rates were slashed dramatically. A limited medical marijuana law was enacted in 2015, and the state already enjoys limited decriminalization. Gun rights are better than average but still mediocre. Casinos were legalized in 2012, but sports betting wasn't as of December 1, 2021. Educational freedom is above average mostly because of a statewide voucher program, but private schools and homeschools are sharply regulated despite mandatory private school registration ending in 2016. Tobacco freedom is limited, with draconian smoking bans in place for a decade and an increased minimum age for purchase. Alcohol, gambling, and travel freedom are middling.

244

# OKLAHOMA

**2019 RANK**
## 19th





## PARTY CONTROL

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Stitt | Stitt | Fallin |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Reduce the bloated government payroll. The proceeds could be applied to shaving the sales tax.

**Regulatory:** Legalize nurse practitioner independent practice with full prescription authority.

**Personal:** Eliminate mandatory minimum sentences for victimless offenses.

245

## ANALYSIS

Oklahoma is among the most improved states for the 2000–2019 period, with some regression in 2015–2016 and then a return to the upswing more recently. It used to be a bottom-10 state for overall freedom and second worst for personal freedom. Now the Sooner State is about average on both because of rising personal freedom and declining relative economic freedom. It is now 19th in overall freedom.

Oklahoma is one of the lowest-taxed states in America. However, it is also fiscally centralized. Local taxation is about 3.3 percent of adjusted personal income, whereas state taxation is 4.7 percent. Yet Oklahomans should beware that both of the taxes have risen during the past few years. State and local debt is much lower than average (11.6 percent of adjusted income), but so are financial assets of state and local governments (16.1 percent of adjusted income). Government employment is much higher than average (15.2 percent of private employment), and government GDP share is also high (14.7 percent of income).

Land-use regulation is light in Oklahoma; in fact, it is a top-three state despite not restraining eminent domain for private gain and banning employers from prohibiting guns in their own parking lots. Labor law is average, with a right-to-work law and no state-level minimum wage. However, some backsliding took place in 2016 after a 2014 repeal of mandated workers' compensation coverage. Moreover, the state has an above-federal anti-discrimination law and a long-standing ban on noncompete agreements. Telecommunications and cable have gone unreformed. Occupational licensing has grown over time and is more extensive than average. Nurses' practice freedom is mixed, with nurses losing any autonomous practice in 2014, but the state did join the Nurse Licensure Compact in 2017. Physician assistants and dental hygienists are relatively free. Insurance freedom is high, with rate filing liberalized in 2010. However, rate classification prohibitions were reenacted in 2018 after

being eliminated in 2013/14. The state does have both general and gasoline-focused prohibitions on sales below cost, a price-gouging law, a certificate-of-need law for both medical facilities and moving company licensing, and a ban on Tesla's direct-sales model. The court system is relatively good because of tort reforms in the 1990s and early 2000s.

Oklahoma is a mass-incarcerating state, and federal data show the situation worsened significantly in the 2013–2015 period. It is modestly better than this today, though still quite bad. Despite that, victimless crime arrests as a percentage of all arrests declined from about 2005 to 2012, then edged up again slightly to the present. The decline has been steady as a percentage of the population. Drug arrests have bounced around. Civil asset forfeiture reform has not gone far, but revenues are down. A life sentence is still possible for a single cannabis offense not involving minors. The mandatory minimum sentence is two years for even small-scale cultivation. The state enacted a medical marijuana reform in 2018. For a state without a government liquor monopoly, Oklahoma does average on alcohol freedom. It has a near-total ban on direct wine shipment, and a ban on all alcohol sales but wine in grocery stores. The state passed mandatory server training in 2018, but blue laws and happy hour bans were eliminated. Casino gambling was legalized in 2005, but social gambling is still illegal. Educational freedom has grown recently, with a very limited voucher law in 2010 and a modest tax benefit for contributions to private scholarship funds enacted in 2011/12. Homeschools and private schools are virtually unregulated, and a statute was enacted in 2016 codifying the existing homeschool legal regime. Tobacco freedom was relatively good but has declined to below average with a substantial tax increase in 2018. The state was forced to legalize same-sex marriage, suspending its super-DOMA, in 2014. Gun laws are a high point, with the state coming in 16th. Constitutional carry passed in 2019. Raw milk sales are legal, and there is an affirmative action ban in public services.

# OREGON

**2019 RANK**
## 46th





- FISCAL
- REGULATORY
- PERSONAL
- OVERALL

## PARTY CONTROL

| | R ■ | D ■ | 2021 | 2019 | 2017 |
|---|---|---|---|---|---|
| GOVERNOR | | | Brown | Brown | Brown |
| SENATE | | | | | |
| HOUSE OF REP. | | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut fire protection, financial control and general administration, employee retirement, health and hospitals, and public welfare current operations to levels consistent with national norms. Cut individual income and property taxes.

**Regulatory:** Eliminate occupational licensing for farm labor contractors, environmental science technicians, dietitians, pharmacy technicians, massage therapists, private detectives, landscaping contractors, well-drilling contractors, low-power installers, locksmiths, crane operators, and other occupations.

**Personal:** Follow Washington's lead and privatize the distilled spirits retail industry.

247

## ANALYSIS

Oregon used to have some advantages compared with its less free southern neighbor, California. However, it has become more and more like the Golden State over time. That has not been good for the freedom of Oregonians. Oregon was ranked as high as 32nd back in 2007. Today, it is 46th. Oregon is among the worst states on economic freedom but despite a relative slide remains a top-10 state on personal freedom.

Oregon's fiscal ranking has been roughly the same since the Great Recession, when it dropped significantly and entered the bottom 10 states. State taxes for FY 2020 come in at 6.1 percent of adjusted income, above the national average, and significantly higher than they were a decade ago. Local taxes have dropped during that time and are now near the national average at about 4.0 percent of income. Oregonians have little choice of local government, with just 0.43 effective competing jurisdictions per 100 square miles. Government debt has come down but is still higher than average. State and local employment is lower than average, whereas government GDP share is higher.

Land use has been a controversial issue in Oregon, and the Beaver State is indeed more regulated in this department than all other states. It's been quite onerous for years and continues to get worse. The state also ratcheted up its renewable portfolio standard in 2014. It does have both compensation and economic assessments for takings. And new to 2019 is local rent control. By contrast, the state legislature has recently taken steps to preempt single-family local zoning rules.[180] Oregon's labor policy is generally anti-employment, with one of the highest minimum wages in the country relative to the median wage, no right-to-work law, and comprehensive workers' compensation mandates. In 2019, the state added paid family leave. Telecommunications and cable remain unreformed. The managed care model of health insurance has been virtually banned

since 2003, but mandated benefits are modest. Several independent measures show that Oregon licenses far more occupations than most other states. However, health professions' practice freedom is moderate. Insurance freedom grew years ago with an end to rating classification prohibitions and the joining of the Interstate Insurance Product Regulation Compact. The state has an anti-price-gouging law, household moving certification, and certificate-of-need requirements for hospitals. The civil liability system looks a bit better than the national average.

Oregon's criminal justice policy does not quite match the state's live-and-live reputation. It is only 18th on incarceration and arrests. Incarceration rates are pretty average, but drug and victimless crime arrests have come down substantially during the past decade to above average levels. Marijuana liberty is expansive, but that is not the case for freedom to buy distilled spirits, which are available only in extremely expensive government stores. Beer taxes, though, are low. Civil asset forfeiture has been fairly restricted since 2005, and law enforcement does not often circumvent state law through equitable sharing. Tobacco freedom is extremely limited, with extensive smoking bans that are comprehensive and airtight. The state also has new vaping bans and has increased the minimum age to purchase. But taxes haven't been terrible. Gun rights are better than one might expect from a left-of-center state, but in 2007 open carry was regulated. Illegal immigrants can now get driver's licenses again, but travel freedom remains low because of bans on handheld cell phones and open containers, seat belt and helmet laws, and mandatory underinsured driver coverage. Physician-assisted suicide is legal. Fireworks are highly regulated. Educational freedom is low because of a total lack of school choice policies (even public school open enrollment), but private schools and homeschools are regulated with a light touch. Oregonians are free to gamble using video slot machines and to bet on sports.

---

180.   Laurel Wamsley, "Oregon Legislature Votes to Essentially Ban Single-Family Zoning," NPR, July 1, 2019.



# PENNSYLVANIA

**2019 RANK**
## 14th



| | FISCAL | REGULATORY | PERSONAL | OVERALL |

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| R | D | | | |
| **GOVERNOR** | | Wolf | Wolf | Wolf |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Reduce spending, especially on parking lots, public buildings, public welfare operations, and employee retirement benefits, which are high by national standards. Reduce numerous minor taxes that are relatively high by national standards.

**Regulatory:** Free nurses through increasing independent practice authority for nurse practitioners and joining the Nurse Licensure Compact.

**Personal:** Unburden private schools and homeschools from paternalistic regulations.

249

## ANALYSIS

The Keystone State is freer than all its neighbors. At No. 14 in our ranking, it is also better than most states in the country. Pennsylvania does particularly well on fiscal policy, where it is a top-five state. Regulatory policy drags down the commonwealth's economic freedom score and is an area ripe for improvement.

Fiscal policy is the dimension where Pennsylvania has done best. Pennsylvania's tax burden is about average, but the state is a bit more fiscally decentralized than average, with local governments making up a larger share of the total tax take. The tax burden has declined slightly since 2000. Pennsylvanians have ample choice of local government, with more than 4.9 effective competing jurisdictions per 100 square miles. State and local debt is higher than average, and financial assets are lower, but public employment is much lower than average (9.0 percent of the private workforce), and so is government GDP (7.9 percent of adjusted income).

Pennsylvania ranks a woeful 37th on regulatory policy. It is mediocre on land-use freedom. However, it is better than most northeastern states, a fact that economist William Fischel attributes to the state supreme court's one-time willingness to strike down minimum lot sizes and other zoning regulations that have exclusionary intent.[181] One of our measures (WRLURI based) shows slight improvement in zoning over time, whereas the other (court cases) shows marked deterioration. The state is not as bad as most other northeastern states on labor-market regulation, but it lacks a right-to-work law and has avoided raising the minimum wage above federal minimums. Pennsylvania has banned managed care health coverage since the 1990s, but insurance mandates are relatively low. By most measures, occupational licensing is not very extensive in Pennsylvania, but nurses enjoy little practice freedom.

Insurance freedom is low, with prior approval of homeowner's insurance rates and rating classification prohibitions. In 2016, personal automobile insurance rates were slightly liberalized, but this reform was clawed back in 2018. The state has a general sales-below-cost law and an anti-price-gouging law. The civil liability system is much worse than the national average. The state has partisan judicial elections and has made only timid efforts at tort reform.

Pennsylvania's criminal justice policy is a mixed bag. Rising crime-adjusted incarceration rates bottomed out in 2009–2013 before getting slightly better since, whereas nonviolent victimless crime arrests have been down since 2004–2005. Drug arrests rates have also gotten better during the past decade. Civil asset forfeiture was reformed for 2017 and is now the 12th best in the country. Pennsylvania finally enacted a modest medical marijuana law in the 2015/16 session but has not decriminalized low-level possession. Gun rights are much better respected than in many other states, with carry licenses affordable and not terribly restricted, all Class III weapons legal, and a right to defend oneself in public legally recognized in 2011. Since legalizing casinos in 2007, Pennsylvania has risen to become one of the best states in the country for gambling liberty—except for home poker games. It has also legalized sports betting. Then again, Pennsylvania is one of the worst states for alcohol freedom. A notoriously inefficient state bureaucracy monopolizes wine and spirits. Wine markups are especially high, and even beer is prohibited in the physical space of grocery stores. However, direct wine shipments were legalized in 2016. On education, Pennsylvania has a long-standing and liberal tax-credit scholarship program, but private schools and homeschools are tightly regulated. Smoking bans have gone far but are not total. Cigarette taxes, though, are draconian at $2.60 a pack.

---

181   William A. Fischel, *The Homevoter Hypothesis: How Home Values Influence Local Government Taxation, School Finance, and Land-Use Policies* (Cambridge, MA: Harvard University Press, 2001), p. 213.

250

# RHODE ISLAND



**2019 RANK**
## 41st



FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| ■ R      ■ D       | 2021     | 2019     | 2017     |
|--------------------|----------|----------|----------|
| **GOVERNOR**       | McKee    | Raimondo | Raimondo |
| **SENATE**         |          |          |          |
| **HOUSE OF REP.**  |          |          |          |

## POLICY RECOMMENDATIONS

**Fiscal:** Cut spending on public buildings, housing, public welfare operations, and employee retirement, all areas in which state and local governments spend abnormally high amounts. The savings could be applied to reductions in selective sales and individual income taxes.

**Regulatory:** Reform land-use regulations, perhaps through an Arizona-style regulatory takings compensation requirement combined with eminent domain reform.

**Personal:** Legalize cultivation, sale, and possession of recreational marijuana.

## ANALYSIS

Rhode Island has long been a fairly typical deep-blue state with ample personal freedom and weak economic freedom, but that has changed lately, as Rhode Island has not kept up with the rest of the country's growing personal freedom. It is now only middling on personal freedom, coming in 33rd. Unfortunately for Rhode Islanders, the state's regulatory freedom weighs down their economic freedom ranking, where it comes in 40th. It is also one of the few states that has lost overall freedom since both 2000 and 2018.

Rhode Island's fiscal policy is slightly subpar. State and local taxes are high, coming in at a combined 10.9 percent compared with a national average of 9.6 percent. Local taxes are particularly problematic. Government debt is excessive, while financial assets are below the national average. The state does benefit from government consumption and employment that are well below the national average. With nearly four effective competing jurisdictions per 100 square miles, Rhode Island affords its residents quite a bit of choice among localities.

Rhode Island's regulatory policy score has been essentially static—and bad—during the past two decades, setting aside the effects of federal health law. Land-use freedom is low because of exclusionary zoning and eminent domain abuse, and at least one of our indicators suggests it has steadily worsened since the early 2000s (another suggests some mild improvement during the past few years). Renewable portfolio standards are high. Labor policy is also anti-employment, with a high minimum wage; no right-to-work law; a short-term disability insurance mandate; a stricter-than-federal anti-discrimination law; and, since 2013/14, a paid family leave mandate. Health insurance freedom is poor and even includes a state-level individual mandate. Cable and telecommunications have been liberalized. Occupational licensing

extent is about average, but freedom of practice for health care paraprofessionals is quite high. A price-gouging law was enacted in 2011/12, and the state has long had a general ban on "unfair(ly low) prices." Medical facilities and moving companies face entry restrictions. But a "Tesla law" was passed in 2018 allowing some direct-to-consumer auto sales. Freedom from abusive lawsuits is a bit below average but has improved slightly during the past two decades.

Rhode Island has the second-best criminal justice system in the country, only trailing Massachusetts. Incarceration rates are well below average, as are drug and nondrug victimless crime arrests. Unfortunately, the state has not sufficiently reformed civil asset forfeiture, and—although a big equitable sharing payout somewhat skews Rhode Island's scores on that variable—evidence suggests that local law enforcement participated eagerly in the program even before that payout and since. The state has a fairly extensive medical cannabis law, and low-level possession of cannabis was decriminalized in 2012. However, it is still possible to get life imprisonment for a single marijuana offense not involving minors. The state was working toward legalization in 2021, with some hope that a special session could see legislation pass this year. Gambling freedom is high, unless you want to play poker with friends in your own home. Internet gambling was liberalized in 2018. A tax-credit scholarship law and repeal of private school teacher licensing passed in 2011/12, bringing the state's educational freedom above average. The state would benefit from another burst of reform. Tobacco freedom is one of the lowest in the country because of sky-high cigarette taxes (well over $3 a pack) and comprehensive smoking bans. It now has vaping bans as well. Alcohol freedom is mediocre, with decent tax rates but bans on almost all direct wine sales. Gun laws are extremely restrictive but have not changed much since 2000.

252

# SOUTH CAROLINA

**2019 RANK**
## 28th



| | FISCAL |
| REGULATORY |
| PERSONAL |
| OVERALL |

## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| ■ R   ■ D | | | | |
| **GOVERNOR** | | McMaster | McMaster | McMaster |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Hospital spending as a share of income is nearly three times the national average, and public employment is also abnormally high. These problems could be solved by privatization and cuts. Cut the sales tax.

**Regulatory:** South Carolina was one of the states where a certificate-of-need law for health care facilities was suspended in reaction to COVID-19.[182]  Permanently abolish certificate-of-need laws and other barriers to meeting consumer needs.

**Personal:** Pass a medical marijuana bill similar to one that Republican legislators have proposed in the past.

182.   Angela C. Erickson, "States Are Suspending Certificate of Need Laws in the Wake of COVID-19 but the Damage Might Already Be Done," Pacific Legal Foundation, January 11, 2021.

## ANALYSIS

South Carolina has traditionally done better on economic freedom than on personal freedom. The court-ordered legalization of same-sex marriage gave South Carolina a big spike in personal freedom in 2014, but other states quickly followed, and that relative advantage was undone (although obviously not the improvement in freedom in an absolute sense). The split between economic freedom and personal freedom rankings survives, but the difference isn't as great as one might expect. This factor is due to South Carolina's less-than-stellar fiscal policy, where it ranks 33rd. The state's overall freedom has grown since 2000 and during the past two years, in an absolute sense.

As one of the states more dependent on the federal government, the Palmetto State gets by with high government employment and consumption and a relatively low tax burden. Local taxes are average, but state taxes—at a projected 4.6 percent of adjusted personal income in FY 2020—are below the 5.7 percent national average for 2000–2019. South Carolina enjoyed big tax cuts in the mid- to late 2000s according to our measure. Government GDP share of income has fallen steadily from its 2009 high, as has government employment. But they are both still much too high. Debt remains above average but since FY 2010 has fallen a remarkable 12.1 percentage points of adjusted income, even though cash and security assets have fallen 2.0 points during that same period.

South Carolina's regulatory policy has improved noticeably over time, ignoring the PPACA impact. Much of that improvement is because of tort reforms in 2005 and 2011 and an improving civil liability system, in which confidence continues to increase according to the latest data. Land-use freedom is decent but steadily declining because of more restrictions. Fortunately, eminent domain reform has gone far, and the state has avoided a mandatory renewable portfolio standard. Labor law is generally good, with no state-level minimum wage and a right-to-work law,

but the state did enact an E-Verify mandate in 2008. Health insurance mandates are lower than average. Cable and telecommunications have been liberalized. Occupational licensing grew further and is starting to look like a real problem for the state, even in comparison with the rest of the country. Nurses enjoy only a little practice freedom. Insurance freedom is a bit subpar, and the state went backward to prior approval. South Carolina also regulates prices for gasoline, general retailers, and in emergencies. It has entry barriers to hospitals and moving companies.

South Carolina's criminal justice policies are not much like the Deep South. Incarceration and victimless crime arrest rates have been more or less average—and improving of late. Drug arrests have been a different story and remain worse than average. Asset forfeiture abuse has not been curbed, but participation in equitable sharing has declined with regard to revenue. Cannabis penalties are somewhat harsh, and South Carolina's inability to keep up with changes in other states places it in the bottom 10. For example, it doesn't have medical marijuana. Gun rights are reasonably broad but as of our data cutoff, they were below the level enjoyed in Pennsylvania or even blue Oregon. Recent changes should improve the situation, as 2021 saw the enactment of legislation that allows concealed-carry permit holders to open carry while also eliminating the cost of a concealed-carry permit.[183] However, the state resisted a constitutional carry amendment. Educational freedom is slightly above average. Private schools and homeschools are harshly regulated, and school choice programs have only a modest tax benefit. Tobacco freedom is above average, as smoking bans on private property contain exceptions, and cigarette taxes are low. The state was forced to legalize same-sex marriage in 2014, overturning its super-DOMA banning private contracts for gay couples. Alcohol freedom is middling, with beer taxes remarkably high. Automated license plate readers are totally unregulated, but raw milk sales are allowed. There is little legal gambling freedom, even for sports betting.

---

183.   "South Carolina: Open Carry & Free CWP Bill to Go into Effect," Institute for Legislative Action, National Rifle Association, August 13, 2021.



# SOUTH DAKOTA

**2019 RANK**
**5th**

## PARTY CONTROL

| | R | D | 2021 | 2019 | 2017 |
|---|---|---|---|---|---|
| **GOVERNOR** | | | Noem | Noem | Daugaard |
| **SENATE** | | | | | |
| **HOUSE OF REP.** | | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Trim spending on employment security administration, natural resources, and parks and recreation, areas far above national averages. Eliminate the bank franchise tax.

**Regulatory:** Amend the constitution to require a supermajority (say, 60 percent) to pass any new regulatory infringement on the rights of private citizens through the initiative process. This change could help with both labor-market and tobacco freedom.

**Personal:** Reform asset forfeiture to place the burden of proof on the government, not on innocent owner claimants, and direct funds to the treasury, not to the seizing departments.

255

## ANALYSIS

South Dakota was once the stereotypical deep-red state that performed really well on economic freedom but poorly on personal freedom. However, this isn't true today—and it wasn't always true anyway. In the early 2000s, it was in the middle of the pack and even rose all the way to 17th on personal freedom in 2004. But then it slid relative to other states all the way to 39th by 2013 and 42nd in 2014. However, South Dakota has been on the upswing since then, moving to 29th in 2015. It then went from 27th in 2018 to 18th in the most recent year. It is little wonder considering its consistently stellar across-the-board economic performance that South Dakota remains one of the top-five freest states.

South Dakota's fiscal policy is excellent. The state has one of the lowest tax burdens in the country, although it has risen slightly at both state and local levels since a decade ago. State taxation is extremely low at 3.6 percent, with local taxation at 4.2 percent. It is also relatively fiscally decentralized, and South Dakotans do have some choice among local jurisdictions (1.3 effective jurisdictions per 100 square miles). State and local debt is well below the national average, but cash and security assets are low. Public employment is now above the national average at 12.7 percent of private employment, but this has more to do with other states getting better; South Dakota's ratio of public to private employment has shrunk slightly since 2016. The government GDP share of income is low at 9.3 percent. We register a fairly significant reduction in debt since FY 2009, but assets have also fallen during that time.

South Dakota's regulatory policy is well above average, but it has actually declined a bit, even discounting the PPACA, since 2000. Land-use freedom is sound, with eminent domain reform passed long ago; the state has avoided renewable portfolio standards. However, the state has no compensation for regulatory takings, and land-use restrictions have gone up. Labor law is generally good because of right-to-work and other provisions, but a very high (for the local market)

minimum wage was enacted by ballot initiative in 2014. South Dakota is one of the best states for health insurance freedom, with only a handful of the costliest mandates and few restrictions on the managed care model. Telecommunications has been liberalized, but statewide video franchising has not been enacted. Multiple indicators suggest that occupational licensing has grown, and the state is no longer better than average here. Nursing practice freedom is subpar but liberalized slightly in 2016. Insurance freedom is mediocre, as the state has held out against the Interstate Insurance Product Regulation Compact and has enacted a rate classification prohibition. However, the state is mercifully free of a variety of other cronyist entry and price regulations, including a certificate-of-need law. The state's civil liability system is above average and has improved over time.

South Dakota's criminal justice policies are excessively strict from our point of view. For its crime rate, it imprisons more than it should. Drug arrests are well above national norms. However, the victimless crime arrest rate dipped significantly from 2018 to 2019, no matter how it is measured, and is part of a longer trend in the right direction. Asset forfeiture is virtually unreformed, though local law enforcement does not participate much in equitable sharing. Prison phone call rates were more than halved in 2015/16. Cannabis law is harsher than in most states, though not the harshest. Medical marijuana was passed in 2020. Gambling freedom is extensive and will get more so now that sports betting was legalized in 2020 for in-person and internet betting. Private school and homeschool regulations are not as burdensome as those of the neighbor to the north, and the legislature enacted a limited private scholarship tax benefit in 2016. Smoking bans are extreme, with vaping bans added in 2019. South Dakota is one of the best states in the country for gun rights and has improved in absolute terms since the fifth edition, with the passage of constitutional carry in 2019. Alcohol freedom is also fairly extensive, and the ban on direct shipment of wine was repealed in 2015.

# TENNESSEE



**2019 RANK**
## 4th



FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| | R | D | 2021 | 2019 | 2017 |
|---|---|---|---|---|---|
| **GOVERNOR** | | | Lee | Lee | Haslam |
| **SENATE** | | | | | |
| **HOUSE OF REP.** | | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Separate spending and tax committees in the legislature, a reform shown to correspond to lower spending over time. Sales taxes are high and could be cut.

**Regulatory:** Repeal the price-gouging law and all minimum-markup laws.

**Personal:** Deregulate private schools and homeschools by removing mandatory approval and teacher licensing for private schools and relaxing annual notification requirements for homeschoolers.

257

## ANALYSIS

Tennessee has long been one of the economically freest states, largely because of its outstanding fiscal policies, but it also used to be one of the personally freest states in the South. That edge disappeared as it became a more stereotypical red state. As a result, Tennessee fell from third in overall freedom in 2001 to seventh in 2012. It has recovered some ground since and is now fourth overall in this year's index.

The Volunteer State lacks an income tax, and both state and local tax collections fall well below the national average. We show state-level taxes falling from 5.1 percent of adjusted personal income in FY 2007 to 4.2 percent in FY 2014, then rising to 4.4 percent in FY 2017 and falling to a low of 4.1 percent in the latest data. This shift compares to a national average in FY 2020 of 5.7 percent. Local taxes were already below the national average of 3.7 percent in FY 2009, but they fell off a cliff to only 2.5 percent of income now. State and local debt is low at 14.3 percent of income. Government consumption and investment is low at 9.1 percent of income and has been falling for a decade. Government employment is only 10.2 percent of private employment, a big drop since 2010 as the job market has recovered.

Tennessee's land-use regulations are flexible, and the state has a regulatory takings law. However, eminent domain reform has not gone far. The state put into place a law preventing employers from banning guns on certain company property in 2015. Tennessee is in the top 10 for labor-market freedom, with a right-to-work law, no minimum wage, and relaxed workers' compensation rules. Unfortunately, E-Verify was mandated in 2011. The managed care model of health coverage has been effectively banned. Mandates are low. Cable and telecommunications have

been liberalized. On the downside, the extent of occupational licensure looks rather high, though different indicators give different pictures. Nurse practitioners lost whatever independent scope of practice they had in 2010, but dental hygienists gained some in 2013. The state marginally loosened insurance rate regulation in 2009/10 but restrictions came back in 2018. The state has general and gasoline-specific minimum-markup laws, as well as an anti-price-gouging law, household mover licensing, and a certificate-of-need law for medical facilities. The civil liability system improved to above average with reforms in 2011 to punitive damages.

Tennessee's criminal justice policies have been improving the past few years, though it still ranks outside the top 30. The crime-adjusted incarceration rate rose steadily from 2000 to 2011 but has been on a downward trend since. It is still above average, but the past two years have seen a good drop. Drug arrest rates and victimless crime arrest rates are also moving in the right direction. The latter is below average. Asset forfeiture is mostly unreformed, but equitable sharing revenue is going in the right direction. Cannabis laws are strict, though a very limited medical marijuana law was enacted in 2021. Tennessee is mediocre on gun rights in our index, but its passage of permitless handgun carry in 2021 has significantly expanded gun freedom in the state. The new Smith & Wesson presence will provide a positive interest group force in the state. Alcohol freedom is now above average because of blue law relaxation in 2017/18. Beer taxes remain excessive. The state has little gambling, though it now has sports betting as of 2019. Educational freedom is slightly below average, but a voucher program was passed in 2019. Private schools and home-schools face significant regulatory burdens. Tobacco freedom is a bit better than average, with relatively low taxes, but new regulations on internet purchase appeared in 2017.

258

# TEXAS

2019 RANK
## 21st





| | FISCAL |
| | REGULATORY |
| | PERSONAL |
| | OVERALL |

RANK: 1, 10, 20, 30, 40, 50

YEAR: 2000, 2005, 2010, 2015, 2020

## PARTY CONTROL

| ■ R    ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Abbott | Abbott | Abbott |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Tighten the rules for municipal annexation and make municipal secession easy to provide Texans with more choice in local government. Decentralize county responsibilities to the municipal level.

**Regulatory:** Pass a law allowing direct-to-consumer auto sales so that Texans can more easily take advantage of the new Tesla auto plant being built in Austin.[184]

**Personal:** Enact a general educational savings account plan similar to the one enacted in Nevada in 2015.[185]

184.   Mitchell Clark, "Teslas Made in Texas Will Likely Have to Leave the State before Texans Can Buy Them," *The Verge* (blog), May 30, 2021.

185.   See Kent Grusendorf and Nate Sherer, "How ESAs Can Keep Texas the Land of the Free and Home of the Brave," policy brief, Texas Public Policy Foundation, January 2016.

## ANALYSIS

Texas talks a good game about freedom but could stand to deliver a more freedom-oriented policy regime. It comes in only at 21st in this edition, rescued largely by its top-10 economic freedom score, and it has never been higher than 15th overall. The problem is that Texas has always been a less free state for personal freedom and now is the second-worst state on that margin despite some absolute improvement over time. Its economic freedom is likely one reason it hasn't slipped out of the top half states and why it's been such a job-producing and population-attracting machine. It does especially well on fiscal policy where it ranks 12th. It is also a solidly above-average state on regulatory policy, but not as good as one might expect at 22nd.

Texas's fiscal policy is very good. It is a fiscally decentralized state, with local taxes at about 4.9 percent of adjusted personal income, above the national average, and state taxes at about 3.5 percent of income, quite far below the national average of 5.7 percent. However, Texans have little choice of local government, with only 0.39 jurisdictions per 100 square miles. State and local debt is above average at 21.2 percent of income, with the biggest problem being local debt burdens, but the overall debt burden has come down noticeably since FY 2010. Public employment has fallen to significantly below average, at 10.7 percent of private employment, and government share of GDP is only 9.7 percent, below the national average of 10.3 percent. If Texas could get a handle on local taxes and debt, it could improve on its top-10 economic freedom score and become an even greater economic powerhouse.

Texas's land-use freedom keeps housing abundant and affordable, but it has slipped a bit lately. The state has a renewable portfolio standard, but it has not been raised in years. Texas is our top state for labor-market freedom. Workers' compensation coverage is optional for employers; most employees are covered, but not all. The state has a right-to-work law, no minimum wage, and a federally consistent anti-discrimination law. Cable and telecommunications have been liberalized. However, health insurance mandates are way above average, and the gatekeeper model of managed care has been banned. The individual health insurance mandate was removed federally in 2019 and was not replaced at the state level. The extent of occupational licensing is high, but the state enacted a sunrise review requirement for new licensure proposals in 2013. Time will tell whether it is at all effective. Nurse practitioners enjoy no freedom of independent practice. Texas does not have many cronyist entry and price regulations, but it does have a price-gouging law, and Tesla's direct sales model is still illegal. Texas suffered a marked deterioration in homeowner's insurance regulation in 2015, resulting in a large residual market, but the state reformed it back to file and use in 2018. The civil liability system used to be terrible, but now it is merely below average. The state abolished joint and several liability in 2003, but it could do more to cap punitive damages and end political parties' role in judicial elections.

Personal freedom is abysmally low in Texas, especially given how we operationalize it. Criminal justice policies are generally aggressive, but reforms have been ongoing in the state for some time. Even controlling for crime rates, the incarceration rate is far above the national average but has been improving. Drug arrests have fallen over time and are now about average for the user base. Nondrug victimless crime arrests have also fallen over time and are now much below the national average. This change would seem to show the power of the criminal justice reform efforts. Asset forfeiture is mostly unreformed, but law enforcement participation in equitable sharing has declined with regard to revenues. Cannabis laws are harsh. A single offense not involving minors can carry a life sentence. Even cultivating a tiny amount car-

ries a mandatory minimum of six months. In 2013/14, the state banned the mostly harmless psychedelic *Salvia divinorum*. Medical marijuana was further expanded in 2021. Travel freedom is low. The state takes a fingerprint for driver's licenses and does not regulate automated license plate readers. It has little legal gambling; sports betting remains illegal. Texas has no private school choice programs, but at least private schools and homeschools are basically unregulated. Tobacco freedom is moderate, as smoking bans have not gone as far as in other states. But the state did add a minimum age of purchase increase in 2019. Gun rights have been moderately above average, but the state wasn't even in the top half of the states despite Texas's reputation. Open carry was legalized in 2015. The big positive reform came in 2021 with the passage of constitutional carry. Alcohol freedom is above average, with taxes low. Texas has virtually no campaign finance regulations.

262



# UTAH

**2019 RANK**
## 20th





## PARTY CONTROL

| ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Cox | Herbert | Herbert |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Build up cash reserves and retire state debt.

**Regulatory:** Eliminate occupational licensing for taxi drivers and chauffeurs, funeral attendants, occupational therapist assistants, recreational therapists, interpreters and translators, and other occupations. Enact mandatory sunrise review for new licensing proposals, ideally with consumer and professional economist representation.

**Personal:** Introduce "backpack funding" to free children and their caregivers to pursue their education as they see fit.

## ANALYSIS

Utah is a top-10 state on regulatory freedom but has slipped in absolute and relative terms on fiscal policy, sinking back to where it was in 2014 after some years of improvement in terms of absolute scores. Personal freedoms are a mixed bag, consistent with the state's religious and ideological background.

Utah's overall tax burden is a bit above average. We show a dramatic drop in state revenues with the onset of Great Recession, which haven't quite been replaced. In fact, further tax cuts were enacted in FY 2014. But state tax burden climbed a lot in FY 2020 compared with the previous year and decade, moving higher to 6.2 percent, above the national average. Local taxes, meanwhile, have remained generally steady at 3.7 percent, right below the national average rate of 3.9 percent of adjusted personal income. Utahans have little choice among local governments, just 0.38 jurisdictions per 100 square miles. Government GDP share was about average, but debt, government employment, and assets were all lower than average. Employment has been improving since 2011, moving from 13.0 percent to 11.5 percent.

Utah does well on regulatory policy overall, coming in eighth. It slipped a bit from 2012 to 2016, but it has improved slightly in absolute and relative terms since then. On land-use freedom, the Beehive State is much better than average, but it appears to be tightening zoning rules over time. Eminent domain reform was watered down in 2007. Labor is solid but not at the very top. The state has a right-to-work law but no minimum wage. However, a new anti-discrimination law was passed in 2016, and the state has had mandated E-Verify for private hires since 2010. Utah changed workers' compensation for the better in 2017. Managed care is legally feasible, but the legislature enacted a costly mandated benefit for in vitro fertilization in 2014. The individual health insurance mandate was removed federally in 2019 and not replaced at the state level. As everywhere, occupational licensing has increased over time. Nursing freedom is better than average, and dental hygienists obtained a limited

right to initiate treatment without dentist authorization in 2015. Insurance freedom is among the best in the country, with "use and file" for most property and casualty lines, long-standing membership in the Interstate Insurance Product Regulation Compact, and no rating classification prohibitions. The state has a price-gouging law and a sales-below-cost law for gasoline on the books. However, its general sales-below-cost law was repealed in 2007/8, and direct auto sales were legalized in 2018. There is no hospital certificate-of-need law or moving company licensing. Utah's civil liability system is better than average and moving in the right direction. It also further deregulated telecommunications in 2017 by removing wireline regulatory authority.

On personal freedom, Utah does surprisingly well given its reputation for paternalism. Moreover, it has been improving over the years and is creeping up toward the top half of the country. The Beehive State does well on gun rights, travel freedom (where it is first in the nation), educational liberty (except for the school choice component of that category), and campaign finance freedom, but quite poorly on alcohol, gambling, and tobacco. The state was also very bad on marriage, but it was forced to legalize same-sex marriage in 2014, a move that also overturned its super-DOMA prohibiting gay partnership contracts. Alcohol and gambling controls are draconian, where the state is 50th in both categories (and causing lots of Utah license plates to be seen at border town casinos). The state has no motorcycle helmet law. It improved on marijuana policy in 2018 because of medical marijuana reform. Utah also does generally well on criminal justice policy. Its crime-adjusted incarceration rate is below the national average and has generally moved down since 2005. Nondrug victimless crime arrests used to be way above average but have come down below national norms, even as drug arrests have risen and hit highs. The state used to have an excellent asset forfeiture law, but it has been successively weakened, most recently in 2013/14. But it remains quite decent on this issue and should improve given a reform bill that passed in 2021.

# VERMONT

**2019 RANK**
## 43rd





## PARTY CONTROL

| | R   D | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| **GOVERNOR** | | Scott | Scott | Scott |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Undo the past two decades of centralization with a constitutional amendment limiting state government responsibility for education. Return property tax–varying power and school budgeting power fully to towns and reduce state aid to a low level. Use the proceeds to cut income taxes.

**Regulatory:** Enact regulatory takings compensation or other measures to deter excessively restrictive local zoning.

**Personal:** Move to a pro-choice and pro-competition position on alcohol sales while stopping the slide left on gun rights.

## ANALYSIS

Vermont's economic policies are much worse than its social policies. Indeed, it is a stereotypical blue state. It is among the worst states on economic freedom, doing poorly on both fiscal and regulatory aspects, but among the best on personal freedom.

Vermont is one of the highest-tax states in the country. It also looks extremely fiscally centralized, with state government taking 9.8 percent of adjusted personal income and local government taking just 2.1 percent. However, this statistic is overstated, because Vermont counts the property tax as a state tax, even though towns have some discretion over the rate at which it is set locally. Vermonters would benefit from decentralization of tax and spending authority, as they have 3.3 effective competing jurisdictions per 100 square miles, well above the national average. Government debt is below average, but so are cash and security assets. Government share of GDP and public employment are slightly above average.

Vermont had a moment from about 2007 to about 2011 when it was doing better on regulatory policy. However, it fell consistently after that until 2018 when it bottomed out at 45th. It is among the worst states on land-use and energy freedom, and one measure of local building restrictions based on the prevalence of the term "land use" in appellate court decisions shows a dramatic escalation in restrictiveness since 2000. The other measure—using the WRLURI survey and imputation forward and backward with cost-of-living data—shows improvement since 2005. The state has done little to restrain eminent domain for private gain. One of the toughest renewable portfolio standards in the country was enacted in 2016. On labor policy, the state has a very high minimum wage compared with local market wages, and

it has been rising since 2010. Vermont does not have a right-to-work law. Health insurance mandated benefits are low, but managed care has been hobbled by several measures. The state legislature authorized single-payer health insurance, but the executive branch declined to implement the law, so we do not code this law in our index. Cable has been liberalized. Occupational freedom is one of the bright spots for Vermont for this dimension. It is better than the national average and comes in fifth. For instance, Vermont is one of only four states that do not license massage therapists. Vermont has sunrise review for new licensing proposals, and it is one of the few states with such a requirement to have taken it seriously, as evidenced by the review reports posted online.[186] Nurse practitioners gained full independent practice authority in 2011/12. Insurance freedom is excellent, with a "use and file" system for most property and casualty lines, long-standing membership in the Interstate Insurance Product Regulation Compact, and no rating classification prohibitions. In general, Vermont is one of the least cronyist states. However, the state has a hospital certificate-of-need law, and in 2013/14, it enacted an anti-science and anti-consumer GMO (genetically modified organism) labeling law, since preempted by Congress. Its civil liability system is mediocre; the state has passed no tort reforms.

Vermont ranks fifth for gun rights—but it has slid in the rankings since the fifth edition of the freedom index. It has passed a large-capacity ammunition magazine ban, increased the minimum age to purchase a firearm, and expanded background checks. Silencers were legalized in 2015. Vermont is one of the lowest states for alcohol freedom, with a state monopoly over wine and spirits retail and beer wholesaling. It is one of the better noninitiative states for cannabis, with decriminalization and a reasonably broad medical law. Legalization of personal pos-

---

186   "Sunrise Review," Office of Vermont Secretary of State, https://sos.vermont.gov/opr/regulatory/regulatory-review/.

session and cultivation has only made it freer (and the legalization of commercial sales occurred after our data cutoff). However, maximum penalties are rather high, high-level possession is a felony, and salvia was banned in 2011. Vermont took some travel freedom with one hand and gave back more with the other in 2013/14, enacting a primary handheld cell phone ban, which research has shown to be useless, but also letting illegal immigrants get driver's licenses and placing some limits on automated license plate readers (which sunset in 2015 and were then reenacted in 2016). Vermont has almost no legal gambling. Physician-assisted suicide was enacted in 2013. The state does well on educational freedom because some towns are allowed to "tuition out" students, a century-old practice approximating a voucher law. Homeschool regulations are fairly tough. Tobacco freedom is extremely low, with airtight smoking bans, vending machine and internet purchase restrictions, and high cigarette taxes. In 2019, it became stricter by moving up the minimum age of purchase to 21. The incarceration rate is below average for its crime rate, and victimless crime arrests are very low. Prison phone rates dropped by half in 2016 and then nearly half again in 2018. Vermont has one of the better asset forfeiture laws, but it was weakened in 2015, and equitable sharing provides an easy path to circumvention. Still, the state continues to perform well on this margin. Vermont has always been a legislative leader in marriage freedom and today retains its place with no waiting periods, blood tests, or ban on cousin marriage.

# VIRGINIA

2019 RANK
## 13th





FISCAL

REGULATORY

PERSONAL

OVERALL

RANK

YEAR

## PARTY CONTROL

| | ■ R   ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| GOVERNOR | | Northam | Northam | McAuliffe |
| SENATE | | | | |
| HOUSE OF DELEGATES | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Transfer spending responsibilities and taxation authority from counties to municipalities.

**Regulatory:** Legalize independent practice with full prescriptive authority for nurse practitioners, adopt a nursing consultation exception for interstate practice, and allow dental hygienists to clean teeth without dentist supervision.

**Personal:** Reform sentencing for nonviolent offenses with an eye toward reducing the incarceration rate to the national average in the long term.

## ANALYSIS

Virginia has historically been a conservative southern state. However, one would be hard-pressed to call it that today despite some lingering policy advantages on the economic side. For the first time since 1993, Democrats won unified control of the state government in 2019 when they took the House and Senate to go along with a Democratic governor. And that Democratic Party is a very different one today than it was then when more conservative southern Democrats were still around.

Virginia has usually done much better on economic freedom than on personal freedom. That remains the case. However, we record slight relative declines in the rankings on both margins. Some significant improvement in personal freedom has taken place over time since its nadir a bit more than a decade ago. But it remains a low-ranking state as other states have liberalized more. It slid considerably in 2019 on fiscal policy, a worrying trend given the possibility of continued unified government in Richmond.

Virginia is a somewhat fiscally decentralized state with an average local tax burden (about 4.0 percent of adjusted income) and a below-average—but rising in FY 2020—state tax burden (5.0 percent of income). Virginians' choice in local government is subpar, with just 0.5 competing jurisdictions per 100 square miles; the reason for this is that counties raise much more in taxes than municipalities. Government debt is low, but so are cash and security assets. Government employment is a bit higher than average, and government share of GDP is much lower than average. Those policies do not show much change over time.

Virginia's land-use freedom is generally good. Indeed, it ranks fourth despite local zoning rules tightening slightly in recent years, reportedly especially in the northern part of the state. Eminent domain reform has been effective. Labor law is well above average,

and the state comes in as our second best in the country, with right to work, no minimum wage, fairly relaxed workers' compensation rules, a federally consistent anti-discrimination law, no E-Verify, no paid family leave or short-term disability mandate, and enforcement of noncompete agreements. Health insurance mandates have long been much higher than the national average. Cable and telecommunications have been liberalized. Occupational licensing is more extensive than in the average state. Nurses and dental hygienists enjoy little practice freedom. Insurance freedom is below average, and Virginia has a certificate-of-need law, a price-gouging law, and mover licensing. Some direct-to-consumer automobile sales were legalized in 2015/16. The civil liability system is about average.

Virginia's criminal justice policies are subpar but at least are no longer worsening. Victimless crime arrest rates are below average, but incarceration rates are still high. Asset forfeiture was slightly reformed in 2016. The state's approach to cannabis producers and consumers has been draconian, but things have changed since our data cutoff. Medical marijuana laws were reformed in 2020, and adult marijuana possession and personal cultivation were legalized in 2021. Sales will follow in 2024. Virginia is average for gun rights but passed a slate of restrictions in 2020, including universal background checks. As Virginia turns more solidly Democratic, this could augur a further slide. Alcohol freedom is subpar but improved in the early 2000s as some regulations were withdrawn. State liquor store markups are still huge, and spirits taxes are high. The state has not had much legal gambling. But there was some liberalization of slot/video games in 2018, online sports betting became legal in 2021, and new casinos are on the way with expanded gaming in the state. Educational freedom is a bright spot for Virginia, growing substantially in 2011/12 with a tax-credit scholarship law. There is still room for cutting regulations on private schoolers and home-

schoolers. For a state with Virginia's history, it might be surprising that tobacco freedom is not very strong—the state only ranks 31st. Cigarette taxes are average, but respect for the property rights of private workplaces still exists. It recently increased the minimum age of sale to 21. The state was forced to legalize same-sex marriage in 2014, which also overturned the state's oppressive super-DOMA banning all relationship-style contracts between two gay people. The state allows cousin marriage but does not have covenant marriages.

271

# WASHINGTON



**2019 RANK**
## 39th



FISCAL

REGULATORY

PERSONAL

OVERALL

## PARTY CONTROL

| ■ R    ■ D | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Inslee | Inslee | Inslee |
| **SENATE** | | | |
| **HOUSE OF REP.** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Enact strict, *ex post* balanced budget requirements to bring state debt down over time. Build up the rainy-day fund.

**Regulatory:** Better protect property rights by enacting further-reaching eminent domain reform and reducing centralized land-use planning by repealing or amending the Growth Management Act and the Shoreline Management Act.

**Personal:** Repeal teacher licensing and mandatory state approval and registration for private schools, ease the annual testing requirement for homeschoolers, and require homeschooling parents to keep only a record of attendance, not teaching materials.

## ANALYSIS

Washington doesn't perform well on any dimension of freedom but managed to avoid the bottom 10 states overall in 2019 after dipping to 10th worst in 2017. Although Washington has had one of the more regulated economies in the United States for a long time, it has benefited from the fact that California and Oregon have had the same. However, it is a far cry from comparative regulatory heaven in neighboring Idaho. Washington is barely a top-half state in personal freedom.

Washington lacks an income tax; as a result, its fiscal policy is fairly good. Localities raise just below the national average in taxes, 3.8 percent of adjusted income. State government, meanwhile, raises 5.3 percent of income, also a little below the national average. Washingtonians enjoy little choice in local government, just 0.37 jurisdictions per 100 square miles. Government debt is higher than the national average but has come down recently. Cash and security assets are lower than average. Public employment and government share of GDP have come down substantially since 2009, partly because of economic growth rather than policy change.

Washingtonians do not enjoy much freedom to use their own land. Local and regional zoning and planning rules have become quite strict. Eminent domain abuse is almost unchecked. Renewable portfolio standards have been tightened. Washington is one of the worst states on labor-market freedom. It lacks a right-to-work law, limits choices for workers' compensation programs, and has extremely high minimum wages relative to its wage base. It added paid family leave in 2017. Managed care is hobbled by standing referral and direct access mandates. Cable and telecommunications have not been liberalized. Occupational licensing has become

much more extensive than the national average. The state's sunrise commission law has proved useless. However, nurse practitioners, dental hygienists, and physician assistants enjoy broad scope of practice. Insurance freedom is quite poor because of prior approval of rates and rating classification prohibitions. Washington did rescind its rate classification prohibitions for some classes of insurance in 2019. The civil liability system is mediocre.

Washington's criminal justice policies are among the best in the nation. Incarceration and victimless crime arrest rates are far below national averages and fell substantially even before marijuana legalization. The state also reduced the cost of prison phone calls by nearly half in 2016. It is a top state for marijuana freedom. However, the state has done virtually nothing about civil asset forfeiture abuse. Marriage freedom is low because of a waiting period and lack of cousin and covenant marriage. Gun laws aren't terrible for a left-leaning state. The state has legalized some Class III weapons in recent years. However, in 2018, it did reimpose a firearms waiting period on some guns. Years ago, Washington increased its alcohol freedom to average from well below by privatizing state liquor stores and allowing spirits in grocery stores. However, taxes on distilled spirits are the highest in the country. Illegal immigrants have been able to get driver's licenses for a long time. The state is fairly mediocre on gambling freedom and prohibits online gaming. Physician-assisted suicide and raw milk sales are legal. Educational freedom is substandard, with some of the toughest licensing, approval, testing, and record-keeping requirements for private schools and homeschools in the country. Smoking bans are comprehensive, and tobacco taxes are extremely high. New restrictions on electronic cigarettes and an increase in minimum age for legal sale to 21 occurred in 2019.

273

# WEST VIRGINIA



**2019 RANK**
## 35th



| | FISCAL |
| | REGULATORY |
| | PERSONAL |
| | OVERALL |

## PARTY CONTROL

■ R   ■ D

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Justice | Justice | Justice |
| **SENATE** | | | |
| **HOUSE OF DELEGATES** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Reduce state employment, especially in general administration, highways, and public welfare. Further reduce the business income tax.

**Regulatory:** Return nurse practitioner scope of practice freedom.

**Personal:** Reform sentencing by abolishing mandatory minimums for nonviolent offenses, with an eye toward reducing the incarceration rate to its 2000 level.

274

## ANALYSIS

West Virginia has usually done better on personal freedom than on economic freedom, but we show the lines converging as the state's public opinion has grown more conservative and Republican. In short, West Virginia is improving its relative ranking on fiscal and regulatory policy while declining on relative personal freedom (it was 4th in 2000, but is 14th today). However, the state is still lagging mightily on fiscal policy. Still, it has seen an above-average overall growth of freedom since 2000.

The Mountaineer State's overall tax burden is right about average, but it is centralized at the state level. The state takes about 6.7 percent of adjusted income, a significant decline since FY 2006, when it peaked at 7.9 percent, while local governments take 3.0 percent, a figure that has risen a touch during the same period. There are 0.7 effective competing jurisdictions per 100 square miles. State and local debt and financial assets are both low and have fallen somewhat over time, which we show as a slight net gain for freedom. Government employment is way above average, at 16.3 percent of private employment. Government share of GDP is also high (11.5 percent of income) but has fallen during the past decade.

Land-use freedom is broad in West Virginia. Eminent domain was partially reformed in 2006, and a takings law is on the books. Labor-market freedom is better than average despite a minimum wage. West Virginia became a right-to-work state in 2016. West Virginia is one of the very worst states for health insurance regulation and has virtually made the managed care model illegal. Mandates are especially plentiful. Neither telecommunications nor cable has been liberalized. Occupational freedom is a bit below average, both in extent of licensure and in scope of practice for second-line health professions. In an unusual reversal, nurse practitioners lost scope of practice in 2015. But the state became a member of the Nurse

Licensure Compact in 2017. Insurance rate-setting freedom is restricted because of prior approval requirements. The state has a hospital certificate-of-need law, a price-gouging law, and a general unfair-sales law. Household goods moving companies were freed from needing a certificate of convenience and necessity in 2017. The civil liability system is still worse than average, but a significant tort reform in 2015 has improved the situation.

West Virginia used to lock up fewer of its residents than most other states, but that is no longer the case. It has gotten consistently worse during the past two decades until a recent two-year move in the right direction. Drug arrests have also risen over time as a share of the user base, but a significant decline took place from 2017 to 2019. Arrests for victimless crimes have been falling for some time. Asset forfeiture is essentially unreformed but, like most states, equitable sharing got significantly better since the fifth edition. Prison phone call rates were dramatically reduced in 2015. Cannabis laws improved in 2017 with passage of a medical marijuana bill. But laws are still harsh. Even low-level cultivation or sale carries a mandatory minimum of two years in prison. West Virginia is one of the best states for gun rights, buttressed by a constitutional carry law in 2016. And despite state involvement in alcohol distribution, it is also better than average for alcohol freedom. The seat belt law was upgraded to primary in 2013, and an open-container law was enacted in 2015, reducing travel freedom. The state has ample opportunities to gamble, including authorization for internet gambling, which came in 2018. Indeed, it is the third-best state for gambling freedom. Yet, social gambling remains illegal. West Virginia doesn't do well on educational freedom in this index, but it enacted a broad eligibility education savings account bill that will significantly help the state in the next edition. Private schools and homeschools are fairly heavily regulated. Tobacco freedom is only average after a big cigarette tax hike in 2016.

# WISCONSIN



**2019 RANK**

## 17th



- FISCAL
- REGULATORY
- PERSONAL
- OVERALL

## PARTY CONTROL

| | R | D | | |
|---|---|---|---|---|
| | | | 2021 | 2019 | 2017 |

| | 2021 | 2019 | 2017 |
|---|---|---|---|
| **GOVERNOR** | Evers | Evers | Walker |
| **SENATE** | | | |
| **ASSEMBLY** | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Reduce the income tax burden while continuing to cut spending on employee retirement and government employment.

**Regulatory:** Abolish price controls.

**Personal:** Reform the state's marijuana laws consistent with reforms carried out across the nation, including decriminalizing possession.

276

## ANALYSIS

Wisconsin is one of the most improved states since 2000, and a great deal of the credit for that goes to a rise in personal freedom, not just economic freedom. The Badger State was 48th in the country in personal freedom as recently as 2010 but has steamed all the way to 21st since then.

In economic freedom, Wisconsin performs better on regulatory policy—where it is a top-10 state—than fiscal policy. It still has higher-than-average taxes, but they have fallen gradually since 2012, more at the local level than the state level. State taxes are projected to be 6.3 percent of adjusted personal income in FY 2020, whereas local taxes stood at 3.7 percent of income in FY 2020, slightly below the national average. Wisconsinites have ample choice among local governments, with more than two effective competing jurisdictions per 100 square miles. State and local debt has fallen almost continuously since FY 2007, but state and local financial assets have also fallen. Government employment is below average at 11.8 percent after peaking in FY 2010 at nearly 13.0 percent. Government share of GDP is 10.4 percent of adjusted income, essentially at the national average but lower than it has been every year except 2018. Wisconsin has generally seen definite improvement on fiscal policy since 2010, partly because of economic growth and partly because of policy changes. In 2018, Wisconsin's fiscal policy score was at its highest level in our whole time series, but it slipped slightly in 2019, absolutely but not relatively.

On regulatory policy, we do not see much change in recent years. Regulatory freedom grew in 2015 because of a right-to-work law, but the policy environment at the state level has been fairly stable since. The state ranks right in the middle of the pack on land-use freedom; local zoning has not gotten out of hand, though it has grown some since 2000. The state has a renewable portfolio standard, which was toughened in 2015. Apart from a

right-to-work law, Wisconsin was already reasonably good on labor-market policy. Health insurance regulation is a bit better than average because of low mandates. Cable and telecommunications have been liberalized. Occupational licensing increased dramatically between 2000 and 2006 and has been relatively stable since; still, the state is about average overall on extent of licensure. Nurse practitioners enjoy no independent practice freedom. Insurance freedom is generally good, at least for property and casualty lines. The state has no certificate-of-need law for hospitals. It has a price-gouging law, and it also has controversial, strictly enforced minimum-markup laws for gasoline and general retailers. The civil liability system is above average and improved significantly since 2010 because of a punitive damages cap.

Wisconsin is a below-average-ranking state on criminal justice policies at 36th. The incarceration rate is right where it was 20 years ago, after getting better about 10 years ago and then worsening. Nondrug victimless crime arrests have dropped. The state's asset forfeiture regime is among the best in the country. Equitable sharing revenues are significantly lower than average. Tobacco freedom is low because of airtight smoking bans and high taxes. The state even has local vaping bans. Educational freedom grew significantly in 2013/14 with the expansion of vouchers. However, private schools are relatively tightly regulated. There is little legal gambling, even in social contexts. Cannabis law is unreformed. Wisconsin remains the best state for alcohol freedom, with no state role in distribution, no keg registration, low taxes (especially on beer—imagine that), no blue laws, legal happy hours, legal direct wine shipment, and both wine and spirits in grocery stores. The state is now better than average on gun rights after the legislature passed a shall-issue concealed-carry license a year ago (one of the last states in the country to legalize concealed carry) and repealed a waiting period in 2015. There is no duty to retreat.

# WYOMING

**2019 RANK**
## 26th





## PARTY CONTROL

| | | 2021 | 2019 | 2017 |
|---|---|---|---|---|
| **R** **D** | | | | |
| **GOVERNOR** | | Gordon | Gordon | Mead |
| **SENATE** | | | | |
| **HOUSE OF REP.** | | | | |

## POLICY RECOMMENDATIONS

**Fiscal:** Privatize hospitals and cut health spending to reduce government employment and consumption and allow sales taxes to be cut. Wyoming spends far more on health and hospitals as a share of its economy than any other state.

**Regulatory:** Let employers buy workers' compensation coverage from any willing seller. Consider privatizing the state fund.

**Personal:** Adopt individualism in education by adopting a "backpack funding" model.

278

## ANALYSIS

As a highly resource-dependent state, Wyoming's fiscal situation can fluctuate greatly from year to year, causing some volatility in its freedom scores over time. However, its overall freedom ranking has stayed relatively stable during the past three years, ending up in the middle of the pack each year. The Equality State is in the bottom third on fiscal policy and the bottom 10 on personal freedom, but its overall ranking is salvaged by a top-five showing on regulatory policy.

With favorable trust and corporate privacy laws and no income taxes of any kind, Wyoming is as good a place to park your wealth as any other state. Cowboy Staters derive a much larger share of their gross income from capital gains than the average American. Wyoming is a relatively fiscally decentralized state, especially for its small population. Excluding mineral severance, motor fuel, alcohol, and tobacco revenues, state taxes come to a projected 3.6 percent of adjusted income in FY 2020, well below the national average of 5.7 percent and a big decline from FY 2009, when Wyoming state taxes peaked at 5.9 percent. Local taxes stand at about 3.2 percent of income, slightly below the national average of 3.9 percent. However, Wyomingites have little choice in local government as counties are the locus of most taxation, thus squandering the advantages of fiscal decentralization. Government debt is the lowest in the country (a mere 5.6 percent of income), and liquid assets are huge (73.6 percent of income), but state and local employment is enormous (18.25 percent of private employment—a significant dip over its high of 19.6 in 2010 but still an increase over 2008, when it was 17.7 percent), and so is government share of income (14.4 percent). Like Alaska, then, Wyoming personifies the blessings and curses of abundant energy and mineral wealth: low taxes, extremely high reserves, and bloated budgets and public payrolls.

Wyoming does above average on land-use freedom but hasn't reformed eminent domain much. Labor law is generally good, with no minimum wage, a right-to-work law, and enforcement of noncompete agreements, but employers must obtain workers' compensation coverage from a monopoly state fund, and anti-discrimination law goes beyond the federal minimum. Health insurance mandates are lower than most states post-PPACA, and the managed care model is still viable. A telecommunications deregulation bill was passed in 2013/14, but there is no statewide video franchising. Occupational licensing has grown over time but is still well below the national average. Nurse practitioners and physician assistants enjoy broad scope of practice, but dental hygienists only enjoy the right to practice with a collaborative agreement with a dentist, enacted in 2017. Wyoming is the best state for insurance freedom, lacking price controls on property and casualty lines. Its price-gouging law was repealed many years ago, but it still has a Depression-era "unfair sales act" on the books. Its civil liability system is good, even though the state has not reformed punitive damages at all.

Wyoming's criminal justice policies are similar to those of Louisiana or Mississippi. Incarceration and drug arrest rates are high and have generally risen over time, but nondrug victimless crime arrests have fallen over time and are now only slightly higher than average. A timid asset forfeiture reform was enacted in 2016, but state law is still worse than average. However, Wyoming is better than average on equitable sharing. Cannabis laws are predictably bad, though not among the very harshest. However, unlike many other states across the country, Wyoming hasn't seen fit to liberalize in any meaningful way. Wyoming is one of the very best states for gun rights, having passed constitutional carry in 2010. Now that the state in 2018 passed a no duty to retreat in public law, not just in the home as it was, the only areas where it could improve involve

removing location restrictions for carrying. Alcohol freedom is a bit above average despite state liquor stores because taxes are so low. Gambling freedom is below average, but the state does have pari-mutuel wagering, social gambling, and charitable games. It legalized sports betting in 2021. Education freedom is below average, which might be surprising given its individualistic sensibilities. Nonsectarian private schools are strictly regulated, and there are no private school choice programs. One upside is that homeschooling is explicitly permitted by statute. Tobacco freedom is above average, as smoking bans admit some exceptions. Cigarettes can be purchased on the internet, and vaping is only locally banned in restaurants, bars, and workplaces. Retail raw milk sales were legalized in 2015. Cousin marriage is illegal, but blood tests and waiting periods are not required for marriage.

## APPENDIX A

# DIMENSION, CATEGORY, AND VARIABLE WEIGHTS

Key:
Dimension
     Category
         Policy Variable

FISCAL POLICY: 30.4%
     State taxation: 11.7%
     Local taxation: 6.6%–8.7%
     Government consumption and investment: 8.2%
     Government employment: 2.0%
     Government debt: 0.3%
     Cash and security assets: 0.2%

REGULATORY POLICY: 34.9%
     Land-use freedom: 11.6%
         Local rent control: 5.3%
         "Land use" court mentions: 2.5%
         Wharton Residential Land Use Regulatory Index: 2.5%
         Renewable portfolio standards: 1.0%
         Regulatory takings compensation: 0.1%
         Eminent domain reform index: 0.1%
         Parking lot gun mandate: 0.01%
         Mandated free speech on private property: <0.01%

     Health insurance freedom: 8.9%
         Individual health insurance mandate: 2.4%
         Community rating, small groups: 2.3%
         Health insurance mandates index: 2.3%
         Individual guaranteed issue: 0.6%
         Small group rate review: 0.5%
         Community rating, individuals: 0.4%
         Direct access to specialists mandated: 0.3%
         Individual rate review: 0.1%
         Standing referrals mandated: 0.03%
         Individual policies, elimination riders banned: 0.02%
         Mandated external grievance review: 0.02%
         Financial incentives to providers banned: 0.01%

     Labor-market freedom: 4.8%
         General right-to-work law: 2.5%
         Short-term disability insurance: 0.9%
         Noncompete agreements permitted: 0.8%
         Minimum wage: 0.6%

Workers' compensation funding regulations: 0.5%
Workers' compensation coverage regulations: 0.2%
Employer verification of legal status: 0.1%
Employee anti-discrimination law: 0.01%
Paid family leave: <0.01%

Lawsuit freedom: 3.2%

Occupational freedom: 2.6%
Nurse practitioner independence index: 0.8%
Employment-weighted licensure: 0.8%
Regulatory keywords in statutes: 0.8%
Dental hygienist scope of practice: 0.1%
Sunrise commissions: 0.1%
Physician assistant prescribing authority: 0.04%
Nurse Licensure Compact membership: 0.03%
Sunset review: 0.02%

Miscellaneous regulatory freedom: 2.5%
Certificate-of-need requirements for hospitals: 0.7%
Rate filing requirements, personal auto insurance: 0.5%
Rate filing requirements, homeowner's insurance: 0.3%
Anti-price-gouging laws: 0.2%
General sales-below-cost laws: 0.2%
Rate classification prohibitions: 0.2%
Interstate Insurance Product Regulation Compact: 0.1%
Sales-below-cost law for gasoline: 0.1%
Direct auto sales: 0.1%
Moving company entry regulation: 0.02%
Mandatory labeling law: 0.01%

Cable and telecommunications: 1.1%
Telecommunications deregulation: 0.7%
Statewide cable franchising: 0.3%

PERSONAL FREEDOM: 33.2%
Incarceration and arrests: 6.7%
Crime-adjusted incarceration rate: 3.6%
Drug enforcement rate: 1.9%
Arrests for nondrug victimless crimes, % of population: 0.6%
Arrests for nondrug victimless crimes, % of all arrests: 0.6%
Driver's license suspensions for drug offenses: 0.04%
Prison collect phone call rate: 0.01%

Gambling: 4.2%
Casino and racino win (revenue): 2.7%
Slot/video games outside casinos: 1.3%
Pari-mutuel wagering: 0.03%
Aggravated gambling felony: 0.02%
Social gambling allowed: 0.02%

Charitable gambling: 0.01%
Express prohibition on internet gambling: <0.01%

Guns: 4.1%

Concealed-carry index: 1.9%
Initial permit cost: 0.5%
Local gun ban: 0.4%
Firearms licensing index: 0.3%
Waiting period for purchases: 0.3%
Initial permit term: 0.2%
Open-carry index: 0.1%
Training or testing requirement: 0.1%
Stricter minimum age: 0.1%
Assault weapons ban: 0.05%
No duty to retreat: 0.04%
Registration of firearms: 0.03%
Dealer licensing: 0.02%
Built-in locking devices: 0.02%
Restrictions on multiple purchases: 0.02%
Background checks for private sales: 0.02%
Design safety standards: 0.01%
Machine guns: 0.01%
Ballistic identification: 0.01%
Retention of sales records: 0.01%
Short-barreled shotguns: 0.01%
Short-barreled rifles: 0.01%
Large-capacity firearm magazine bans: <0.01%
Sound suppressor: <0.01%
.50 caliber ban: <0.01%

Marriage: 3.2%

Same-sex partnership index: 1.8%
Super-DOMAs: 0.8%
Sodomy laws: 0.3%
Cousin marriage: 0.2%
Covenant marriage: 0.1%
Blood test required: 0.01%
Waiting period: 0.01%

Education: 3.0%

Tax credit/deduction law for scholarships/expenses: 1.1%
Publicly funded voucher law: 0.7%
Mandatory licensure, private school teachers: 0.5%
Mandatory state approval, private schools: 0.2%
Compulsory school years: 0.2%
Curriculum control, private schools: 0.1%
Public school choice: 0.1%
Curriculum control, homeschools: 0.04%
Record-keeping requirements, homeschools: 0.03%
Standardized testing requirements, homeschools: 0.03%

Notification requirements, homeschools: 0.02%
Teacher qualifications, homeschools: 0.01%
Mandatory registration, private schools: <0.01%
Homeschooling statute: <0.01%

Tobacco: 2.7%

Cigarette tax: 1.8%
Minimum legal sale age 21: 0.5%
Smoking ban, bars: 0.2%
Internet purchase regulations: 0.05%
Flavored vape ban: 0.04%*
Smoking ban, private workplaces: 0.02%
Smoking ban, restaurants: 0.02%
Vending machine regulations: 0.02%
Vaping ban on private property: <0.01%*

Alcohol: 2.6%

Alcohol distribution control: 1.0%
Off-premises sales in grocery stores: 0.4%
Blue law index: 0.4%
Spirits taxes: 0.3%
Wine taxes: 0.2%
Beer taxes: 0.2%
Direct wine shipment ban: 0.1%
Keg registration/ban: 0.1%
Happy hour ban: 0.02%
Mandatory server training: <0.01%

Marijuana: 2.4%

Medical marijuana index: 1.0%
Possession decriminalization/legalization: 0.6%
Maximum marijuana penalty: 0.3%
Sales legalization: 0.2%
Marijuana misdemeanor index: 0.2%
Mandatory minimums: 0.1%
Salvia ban: 0.1%

Asset forfeiture: 2.0%

State asset forfeiture law, aggregate score: 1.0%
Moving average of equitable sharing revenue: 1.0%

*Mala prohibita* and civil liberties: 1.2%

Affirmative action ban: 0.7%
Prostitution legal: 0.2%
Trans-fat bans: 0.1%
Raw milk legal: 0.1%
Mixed martial arts legal: 0.05%
Fireworks laws: 0.04%
Equal Rights Amendment: 0.03%

* Indicates average weight for time-varying weights.

Physician-assisted suicide legal: 0.03%
DNA database index: 0.01%
Religious freedom restoration act: 0.01%

Travel: 1.1%

Automated license plate readers: 0.3%
Driver's licenses for illegal immigrants: 0.3%
Seat belt laws: 0.1%
Fingerprint for driver's license: 0.1%
Sobriety checkpoints: 0.1%
Motorcycle helmet law: 0.1%
Uninsured/underinsured motorist coverage mandate: 0.1%
Handheld cell phone ban: 0.01%

Campaign finance: 0.1%

Individual contributions to candidates: 0.03%
Individual contributions to parties: 0.02%
Grassroots political action committee contributions to candidates: 0.01%
Grassroots political action committee contributions to parties: 0.01%
Public financing: <0.01%

Note: Because of rounding, percentages listed do not sum to exactly 100. Because of how we weight the local taxation variable, the weights for the fiscal policy dimension range from 29.0 (New Jersey) to 31.1 (Hawaii). For more on this, see "Local Taxation" under "Fiscal Policy" in Part 1.

## APPENDIX B

# ALTERNATIVE INDEXES

This appendix gives alternative freedom indexes based on the exclusion of right-to-work laws and the inclusion of various positions on abortion policy.

## LABOR-MARKET FREEDOM—ALTERNATIVE INDICES

The first set of alternative indexes excludes right-to-work laws. Consequently, new rankings are generated for labor policy, regulatory freedom, economic freedom, and overall freedom.

TABLE B1

| Rank | State | Labor-Market Freedom without Right-to-Work Laws, 2019 | | | |
|------|-------|-------|------|------|-------|
| 1. | Texas | 0.022 | 26. | Illinois | −0.001 |
| 2. | Virginia | 0.015 | 27. | Montana | −0.002 |
| 3. | Indiana | 0.013 | 28. | Alaska | −0.002 |
| 4. | Iowa | 0.013 | 29. | New Mexico | −0.003 |
| 5. | Kansas | 0.013 | 30. | Missouri | −0.003 |
| 6. | Wisconsin | 0.013 | 31. | Arkansas | −0.003 |
| 7. | New Hampshire | 0.013 | 32. | West Virginia | −0.003 |
| 8. | Alabama | 0.012 | 33. | Vermont | −0.007 |
| 9. | Mississippi | 0.012 | 34. | Wyoming | −0.008 |
| 10. | Tennessee | 0.012 | 35. | Ohio | −0.010 |
| 11. | Georgia | 0.010 | 36. | Connecticut | −0.010 |
| 12. | North Carolina | 0.010 | 37. | Maryland | −0.012 |
| 13. | Utah | 0.008 | 38. | Massachusetts | −0.013 |
| 14. | Florida | 0.008 | 39. | Maine | −0.014 |
| 15. | Kentucky | 0.006 | 40. | Colorado | −0.017 |
| 16. | Pennsylvania | 0.006 | 41. | Arizona | −0.021 |
| 17. | Idaho | 0.006 | 42. | Oregon | −0.021 |
| 18. | Minnesota | 0.004 | 43. | Oklahoma | −0.028 |
| 19. | South Carolina | 0.004 | 44. | Washington | −0.032 |
| 20. | Louisiana | 0.004 | 45. | New Jersey | −0.034 |
| 21. | Nebraska | 0.003 | 46. | Hawaii | −0.039 |
| 22. | Nevada | 0.002 | 47. | North Dakota | −0.042 |
| 23. | Delaware | 0.002 | 48. | Rhode Island | −0.046 |
| 24. | South Dakota | 0.001 | 49. | New York | −0.047 |
| 25. | Michigan | 0.000 | 50. | California | −0.083 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

## TABLE B2

| Rank | State | Regulatory Policy without Right-to-Work Laws, 2019 | Rank | State | |
|------|-------|------|------|-------|------|
| 1. | Kansas | 0.100 | 26. | Texas | −0.013 |
| 2. | Nebraska | 0.094 | 27. | Nevada | −0.014 |
| 3. | Iowa | 0.084 | 28. | Alabama | −0.017 |
| 4. | Idaho | 0.076 | 29. | North Carolina | −0.019 |
| 5. | Wyoming | 0.054 | 30. | Ohio | −0.033 |
| 6. | South Dakota | 0.043 | 31. | Delaware | −0.041 |
| 7. | Georgia | 0.040 | 32. | Minnesota | −0.045 |
| 8. | Utah | 0.040 | 33. | New Mexico | −0.045 |
| 9. | Wisconsin | 0.038 | 34. | West Virginia | −0.049 |
| 10. | Indiana | 0.038 | 35. | Montana | −0.070 |
| 11. | New Hampshire | 0.034 | 36. | Louisiana | −0.075 |
| 12. | Kentucky | 0.032 | 37. | Pennsylvania | −0.097 |
| 13. | North Dakota | 0.024 | 38. | Illinois | −0.103 |
| 14. | South Carolina | 0.024 | 39. | Maine | −0.120 |
| 15. | Arkansas | 0.023 | 40. | Connecticut | −0.122 |
| 16. | Mississippi | 0.022 | 41. | Washington | −0.132 |
| 17. | Alaska | 0.021 | 42. | Massachusetts | −0.158 |
| 18. | Tennessee | 0.021 | 43. | Rhode Island | −0.174 |
| 19. | Michigan | 0.018 | 44. | Vermont | −0.184 |
| 20. | Virginia | 0.015 | 45. | Hawaii | −0.209 |
| 21. | Arizona | 0.011 | 46. | Oregon | −0.345 |
| 22. | Oklahoma | 0.005 | 47. | Maryland | −0.372 |
| 23. | Colorado | 0.004 | 48. | New York | −0.427 |
| 24. | Florida | −0.008 | 49. | New Jersey | −0.459 |
| 25. | Missouri | −0.011 | 50. | California | −0.463 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

288

TABLE B3

| Rank | State | Economic Freedom without Right-to-Work Laws, 2019 | | | |
|------|-------|-------|------|------|------|
| 1. | Florida | 0.423 | 26. | South Carolina | 0.062 |
| 2. | Tennessee | 0.391 | 27. | Oklahoma | 0.059 |
| 3. | New Hampshire | 0.390 | 28. | Alaska | 0.057 |
| 4. | South Dakota | 0.306 | 29. | Kansas | 0.053 |
| 5. | Idaho | 0.272 | 30. | Massachusetts | 0.048 |
| 6. | Georgia | 0.262 | 31. | Connecticut | 0.033 |
| 7. | Indiana | 0.236 | 32. | Louisiana | −0.015 |
| 8. | Michigan | 0.201 | 33. | Iowa | −0.022 |
| 9. | Missouri | 0.197 | 34. | Illinois | −0.040 |
| 10. | Nevada | 0.184 | 35. | Nebraska | −0.048 |
| 11. | Texas | 0.174 | 36. | Washington | −0.093 |
| 12. | Virginia | 0.174 | 37. | Minnesota | −0.094 |
| 13. | Colorado | 0.162 | 38. | West Virginia | −0.104 |
| 14. | Pennsylvania | 0.154 | 39. | Mississippi | −0.112 |
| 15. | Arizona | 0.139 | 40. | Rhode Island | −0.115 |
| 16. | Arkansas | 0.111 | 41. | Maine | −0.135 |
| 17. | Kentucky | 0.111 | 42. | Delaware | −0.172 |
| 18. | Montana | 0.104 | 43. | New Mexico | −0.259 |
| 19. | Alabama | 0.099 | 44. | Maryland | −0.304 |
| 20. | Wisconsin | 0.084 | 45. | Vermont | −0.320 |
| 21. | Wyoming | 0.082 | 46. | New Jersey | −0.401 |
| 22. | Ohio | 0.081 | 47. | Oregon | −0.405 |
| 23. | Utah | 0.074 | 48. | California | −0.520 |
| 24. | North Carolina | 0.070 | 49. | Hawaii | −0.578 |
| 25. | North Dakota | 0.065 | 50. | New York | −0.734 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

**TABLE B4**

| Rank | State | Overall Freedom without Right-to-Work Laws, 2019 | | Rank | State | Overall Freedom without Right-to-Work Laws, 2019 |
|---|---|---|---|---|---|---|
| 1. | New Hampshire | 0.615 | | 26. | Kentucky | 0.110 |
| 2. | Florida | 0.526 | | 27. | Ohio | 0.103 |
| 3. | Nevada | 0.485 | | 28. | Wyoming | 0.102 |
| 4. | Tennessee | 0.414 | | 29. | Kansas | 0.101 |
| 5. | South Dakota | 0.399 | | 30. | South Carolina | 0.099 |
| 6. | Indiana | 0.342 | | 31. | Iowa | 0.068 |
| 7. | Michigan | 0.323 | | 32. | Maine | 0.055 |
| 8. | Georgia | 0.304 | | 33. | Louisiana | 0.040 |
| 9. | Missouri | 0.297 | | 34. | Connecticut | 0.040 |
| 10. | Arizona | 0.296 | | 35. | Nebraska | 0.032 |
| 11. | Idaho | 0.287 | | 36. | Illinois | 0.010 |
| 12. | Colorado | 0.284 | | 37. | West Virginia | −0.004 |
| 13. | Pennsylvania | 0.223 | | 38. | Minnesota | −0.018 |
| 14. | Montana | 0.200 | | 39. | Washington | −0.020 |
| 15. | Virginia | 0.200 | | 40. | Rhode Island | −0.070 |
| 16. | North Dakota | 0.169 | | 41. | Mississippi | −0.083 |
| 17. | North Carolina | 0.166 | | 42. | New Mexico | −0.100 |
| 18. | Alaska | 0.164 | | 43. | Vermont | −0.153 |
| 19. | Wisconsin | 0.164 | | 44. | Delaware | −0.180 |
| 20. | Oklahoma | 0.134 | | 45. | Maryland | −0.259 |
| 21. | Utah | 0.130 | | 46. | Oregon | −0.288 |
| 22. | Texas | 0.129 | | 47. | New Jersey | −0.437 |
| 23. | Alabama | 0.126 | | 48. | California | −0.451 |
| 24. | Massachusetts | 0.117 | | 49. | Hawaii | −0.580 |
| 25. | Arkansas | 0.117 | | 50. | New York | −0.790 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

## ABORTION POLICY—ALTERNATIVE INDEXES

In this edition of the freedom index, abortion remains excluded from the main scores and rankings, given our discussion at the beginning of the book. However, we have again developed alternative abortion policy indexes here, which feed into personal freedom and overall freedom, should readers wish to personalize their results according to their view of the relation between abortion policy and freedom. The first alternative index is a pro-life abortion policy ("freedom from abortion") index. For this alternative index, more state restrictions on abortion are always pro-freedom, as is the lack of state subsidies for abortion through Medicaid.

The second alternative index is a moderately pro-choice abortion policy index. For this index, restrictions on late-term abortions and lack of subsidies for abortion are pro-freedom, although for a different reason from pro-lifers in the latter case (respect for conscience), whereas restrictions on early-term abortions are anti-freedom. For the moderately pro-choice index, restrictions on abortion that apply mostly but not entirely to late-term abortions and parental involvement laws for minors' abortions do not count at all.

Finally, the third alternative index is a strong pro-choice abortion policy index. For this alternative index, all limits on abortion are anti-freedom, and subsidies for abortion do not count.

We devised weights for policies on the assumption that for a pro-lifer, the estimated, measurable value of an aborted fetus's life is $3 million (caveat: this is an actuarial-type estimate, but we consider the moral value of life—whenever life begins—to be truly unmeasurable and view policies relating to unjust killings to be an insoluble problem for any index, including those of human rights and civil liberties internationally). The $3 million figure derives from a rough estimate of $5 million to $7 million for the statistical value of an adult life. Many or most fetuses are aborted naturally by the mother's body, so the value of a fetus's life should be about half that of an adult.

For pro-choicers, the value of the freedom to abort depends on the "consumer surplus" (in economic jargon, this term means the difference between what consumers would have paid and what they actually paid) derived from the observed price elasticity of demand for abortion, multiplied by the "constitutional weight" of 10, consistent with our methodology for the rest of the index. We derive the estimate of $5 million from a high-end estimate of the statistical value of an average human life ($7.5 million), multiplied by two-thirds because young fetuses of the age when abortion typically occurs are naturally aborted by the mother's body roughly one-third of the time.[187]  This is, obviously, merely a

187   Binyamin Appelbaum, "As U.S. Agencies Put More Value on a Life, Businesses Fret," *New York Times*, February 16, 2011; Mayo Clinic, "Diseases and Conditions: Miscarriage" web page, www.mayoclinic.org/diseases-conditions/pregnancy-loss-miscarriage/basics/definition/con-20033827; WebMD, "Pregnancy and Miscarriage" web page, www.webmd.com/baby/guide/pregnancy-miscarriage.

ballpark figure based on actuarial-type estimates. Moreover, we admit that this type of economic language and reasoning can be difficult, sterile, limiting, and perhaps even less accurate than we'd like (though it is hard to calculate in other ways consistent with the overarching methodology of the index).

The policies included in these alternative indexes are as follows: requirement that abortions be performed by a licensed physician (1.3 percent of overall pro-life freedom, 0.01 percent of overall moderate pro-choice freedom, 0.01 percent of strong pro-choice freedom); requirement that some abortions be performed in hospitals (0.01 percent pro-life, 0 percent moderate, 0.01 percent strong pro-choice); requirement that some abortions involve a second physician (0.01 percent pro-life, 0 percent moderate, 0.01 percent strong pro-choice); gestational limit on abortions (0.3 percent pro-life, 0.4 percent moderate, 0.02 percent strong pro-choice); partial-birth abortion ban (0.03 percent pro-life, 0.04 percent moderate, <0.01 percent strong pro-choice); public funding of abortion (4.4 percent pro-life, 0.1 percent moderate, 0.2 percent strong pro-choice); restrictions on private insurance coverage of abortion (14.4 percent pro-life, 0.1 percent moderate, 0.1 percent strong pro-choice); state-mandated waiting periods (4.7 percent pro-life, 0.1 percent moderate, 0.1 percent strong pro-choice); and parental notification and consent laws (2.0 percent pro-life, 0 percent moderate, 0.02 percent strong pro-choice).

Interestingly, for a pro-lifer who relies on these parameters, abortion policy is worth a full 27.2 percent of overall freedom. If you believe that the life of the marginal (in the economic sense) aborted fetus is worth (again, statistically, not morally) about half that of any other human being, then you must think of abortion as by far the most important policy states can control. You should be close to a single-issue voter. By contrast, moderate and strong pro-choicers should be far less interested in abortion policy. For moderates, abortion policy is worth 0.7 percent of overall freedom, whereas for strong pro-choicers, abortion policy should be worth only about 0.3 percent of overall freedom. Why is the freedom to abort worth so little? The evidence suggests that abortion demand in economic terms may be quite price-elastic, implying that the consumer surplus is low. We offer these alternative indexes of this very difficult moral, political, and methodological issue as a preliminary attempt rather than the definitive word on this issue and hope they will be treated in that light.

TABLE B5

| Rank | State | Freedom from Abortion (Pro-Life Index), 2019 |
|---|---|---|
| 1. | Indiana | 0.473 |
| 1. | Missouri | 0.473 |
| 1. | Oklahoma | 0.473 |
| 4. | Kansas | 0.473 |
| 5. | Michigan | 0.473 |
| 5. | North Dakota | 0.473 |
| 5. | Texas | 0.473 |
| 5. | Utah | 0.473 |
| 9. | Idaho | 0.473 |
| 10. | Kentucky | 0.472 |
| 11. | Nebraska | 0.472 |
| 12. | Arizona | 0.051 |
| 12. | Ohio | 0.051 |
| 12. | South Carolina | 0.051 |
| 12. | Tennessee | 0.051 |
| 12. | Virginia | 0.051 |
| 17. | Arkansas | 0.051 |
| 17. | Louisiana | 0.051 |
| 19. | Mississippi | 0.051 |
| 20. | Alabama | 0.051 |
| 20. | Pennsylvania | 0.051 |
| 22. | North Carolina | 0.050 |
| 22. | Wisconsin | 0.050 |
| 24. | South Dakota | 0.027 |
| 25. | Georgia | 0.027 |
| 26. | West Virginia | −0.009 |
| 27. | Rhode Island | −0.044 |
| 27. | Wyoming | −0.044 |
| 29. | Florida | −0.067 |
| 29. | Minnesota | −0.067 |
| 31. | Delaware | −0.068 |
| 31. | Iowa | −0.068 |
| 33. | Colorado | −0.075 |
| 34. | Nevada | −0.092 |
| 35. | New Hampshire | −0.109 |
| 36. | Massachusetts | −0.137 |
| 37. | Maryland | −0.162 |
| 38. | Hawaii | −0.186 |
| 38. | New York | −0.186 |
| 38. | Washington | −0.186 |
| 41. | New Mexico | −0.192 |
| 42. | New Jersey | −0.192 |
| 43. | Alaska | −0.193 |
| 44. | Illinois | −0.197 |
| 45. | Montana | −0.220 |
| 46. | Connecticut | −0.220 |
| 47. | California | −0.221 |
| 47. | Maine | −0.221 |
| 49. | Oregon | −0.228 |
| 49. | Vermont | −0.228 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

293

**TABLE 06**

|  |  | Moderate Pro-Choice Abortion Policy |  |  |  |
|---|---|---|---|---|---|
| Rank | State | Index, 2019 | Rank | State |  |
| 1. | Delaware | 0.004 | 23. | Wisconsin | 0.002 |
| 1. | Florida | 0.004 | 27. | Hawaii | 0.001 |
| 1. | Iowa | 0.004 | 27. | Maryland | 0.001 |
| 1. | Nevada | 0.004 | 27. | Massachusetts | 0.001 |
| 1. | Rhode Island | 0.004 | 27. | New York | 0.001 |
| 1. | Wyoming | 0.004 | 27. | Washington | 0.001 |
| 7. | Montana | 0.003 | 32. | Indiana | 0.000 |
| 8. | Arizona | 0.002 | 32. | Kansas | 0.000 |
| 8. | Arkansas | 0.002 | 32. | Michigan | 0.000 |
| 8. | Georgia | 0.002 | 32. | Missouri | 0.000 |
| 8. | Louisiana | 0.002 | 32. | North Dakota | 0.000 |
| 8. | Mississippi | 0.002 | 32. | Oklahoma | 0.000 |
| 8. | Ohio | 0.002 | 32. | Texas | 0.000 |
| 8. | South Carolina | 0.002 | 32. | Utah | 0.000 |
| 8. | South Dakota | 0.002 | 40. | Minnesota | −0.001 |
| 8. | Tennessee | 0.002 | 41. | Idaho | −0.001 |
| 8. | Virginia | 0.002 | 41. | Kentucky | −0.001 |
| 18. | West Virginia | 0.002 | 41. | Nebraska | −0.001 |
| 19. | California | 0.002 | 44. | New Hampshire | −0.005 |
| 19. | Connecticut | 0.002 | 45. | Colorado | −0.006 |
| 19. | Illinois | 0.002 | 46. | New Mexico | −0.007 |
| 19. | Maine | 0.002 | 47. | Oregon | −0.008 |
| 23. | Alabama | 0.002 | 47. | Vermont | −0.008 |
| 23. | North Carolina | 0.002 | 49. | Alaska | −0.008 |
| 23. | Pennsylvania | 0.002 | 49. | New Jersey | −0.008 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

294

**TABLE B7**

| Rank | State | Strong Pro-Choice Abortion Policy Index, 2019 |
|------|-------|---------------------------------------------|
| 1. | Oregon | 0.002 |
| 1. | Vermont | 0.002 |
| 3. | Alaska | 0.002 |
| 4. | New Jersey | 0.002 |
| 5. | New Mexico | 0.002 |
| 6. | New Hampshire | 0.002 |
| 7. | Colorado | 0.002 |
| 8. | California | 0.002 |
| 8. | Maine | 0.002 |
| 10. | Connecticut | 0.002 |
| 11. | Montana | 0.002 |
| 12. | Hawaii | 0.002 |
| 12. | New York | 0.002 |
| 12. | Washington | 0.002 |
| 15. | Nevada | 0.002 |
| 16. | Illinois | 0.002 |
| 17. | Delaware | 0.001 |
| 17. | Iowa | 0.001 |
| 17. | Maryland | 0.001 |
| 20. | Florida | 0.001 |
| 21. | Rhode Island | 0.001 |
| 21. | Wyoming | 0.001 |
| 23. | Massachusetts | 0.001 |
| 24. | West Virginia | −0.001 |
| 25. | Minnesota | −0.001 |
| 26. | Georgia | −0.001 |
| 27. | South Dakota | −0.001 |
| 28. | North Carolina | −0.001 |
| 28. | Wisconsin | −0.001 |
| 30. | Alabama | −0.001 |
| 30. | Pennsylvania | −0.001 |
| 32. | Mississippi | −0.001 |
| 33. | Arkansas | −0.001 |
| 33. | Louisiana | −0.001 |
| 35. | Arizona | −0.001 |
| 35. | Ohio | −0.001 |
| 35. | South Carolina | −0.001 |
| 35. | Tennessee | −0.001 |
| 35. | Virginia | −0.001 |
| 40. | Nebraska | −0.004 |
| 41. | Kentucky | −0.004 |
| 42. | Idaho | −0.004 |
| 43. | Michigan | −0.004 |
| 43. | North Dakota | −0.004 |
| 43. | Texas | −0.004 |
| 43. | Utah | −0.004 |
| 47. | Kansas | −0.004 |
| 48. | Indiana | −0.004 |
| 48. | Missouri | −0.004 |
| 48. | Oklahoma | −0.004 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

**TABLE B8**

| Rank | State | Pro-Life Personal Freedom, 2019 |
|------|-------|-------|
| 1. | Michigan | 0.595 |
| 2. | Indiana | 0.579 |
| 3. | North Dakota | 0.576 |
| 4. | Missouri | 0.573 |
| 5. | Nebraska | 0.553 |
| 6. | Oklahoma | 0.548 |
| 7. | Utah | 0.529 |
| 8. | Kansas | 0.520 |
| 9. | Idaho | 0.488 |
| 10. | Kentucky | 0.471 |
| 11. | Texas | 0.427 |
| 12. | Nevada | 0.210 |
| 13. | Arizona | 0.208 |
| 14. | North Carolina | 0.147 |
| 15. | Wisconsin | 0.131 |
| 16. | South Dakota | 0.120 |
| 17. | Pennsylvania | 0.119 |
| 18. | New Hampshire | 0.115 |
| 19. | Louisiana | 0.106 |
| 20. | West Virginia | 0.091 |
| 21. | South Carolina | 0.088 |
| 22. | Mississippi | 0.080 |
| 23. | Alabama | 0.078 |
| 24. | Virginia | 0.077 |
| 25. | Tennessee | 0.075 |
| 26. | Ohio | 0.074 |
| 27. | Georgia | 0.069 |
| 28. | Arkansas | 0.056 |
| 29. | Colorado | 0.048 |
| 30. | Florida | 0.037 |
| 31. | Iowa | 0.022 |
| 32. | Minnesota | 0.009 |
| 33. | Rhode Island | 0.001 |
| 34. | Wyoming | −0.024 |
| 35. | Maine | −0.031 |
| 36. | New Mexico | −0.033 |
| 37. | Vermont | −0.061 |
| 38. | Massachusetts | −0.068 |
| 39. | Delaware | −0.076 |
| 40. | Alaska | −0.085 |
| 41. | Oregon | −0.110 |
| 42. | Washington | −0.113 |
| 43. | Maryland | −0.117 |
| 44. | Montana | −0.124 |
| 45. | Illinois | −0.148 |
| 46. | California | −0.152 |
| 47. | Hawaii | −0.188 |
| 48. | Connecticut | −0.214 |
| 49. | New Jersey | −0.229 |
| 50. | New York | −0.242 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

296

**TABLE B9**

| Rank | State | Moderate Pro-Choice Personal Freedom, 2019 |
|------|-------|-------|
| 1. | Nevada | 0.306 |
| 2. | New Hampshire | 0.220 |
| 3. | Maine | 0.192 |
| 4. | Arizona | 0.159 |
| 5. | Vermont | 0.159 |
| 6. | New Mexico | 0.152 |
| 7. | Michigan | 0.122 |
| 8. | Colorado | 0.117 |
| 9. | Oregon | 0.110 |
| 10. | Florida | 0.108 |
| 11. | Indiana | 0.105 |
| 12. | North Dakota | 0.103 |
| 13. | West Virginia | 0.102 |
| 14. | Missouri | 0.100 |
| 15. | Alaska | 0.099 |
| 16. | Montana | 0.098 |
| 17. | North Carolina | 0.098 |
| 18. | South Dakota | 0.096 |
| 19. | Iowa | 0.094 |
| 20. | Wisconsin | 0.082 |
| 21. | Nebraska | 0.080 |
| 22. | Minnesota | 0.075 |
| 23. | Oklahoma | 0.075 |
| 24. | Washington | 0.075 |
| 25. | California | 0.071 |
| 26. | Massachusetts | 0.071 |
| 27. | Pennsylvania | 0.070 |
| 28. | Louisiana | 0.057 |
| 29. | Utah | 0.056 |
| 30. | Illinois | 0.051 |
| 31. | Rhode Island | 0.048 |
| 32. | Kansas | 0.047 |
| 33. | Maryland | 0.047 |
| 34. | Georgia | 0.045 |
| 35. | South Carolina | 0.039 |
| 36. | Mississippi | 0.032 |
| 37. | Alabama | 0.029 |
| 38. | Virginia | 0.029 |
| 39. | Tennessee | 0.026 |
| 40. | Ohio | 0.025 |
| 41. | Wyoming | 0.024 |
| 42. | Idaho | 0.014 |
| 43. | Connecticut | 0.008 |
| 44. | Arkansas | 0.008 |
| 45. | Hawaii | −0.001 |
| 46. | Kentucky | −0.003 |
| 47. | Delaware | −0.004 |
| 48. | New Jersey | −0.044 |
| 49. | Texas | −0.046 |
| 50. | New York | −0.055 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

297

## TABLE B10

| Rank | State | Strong Pro-Choice Personal Freedom, 2019 | | Rank | State | Strong Pro-Choice Personal Freedom, 2019 |
|---|---|---|---|---|---|---|
| 1. | Nevada | 0.303 | | 26. | Massachusetts | 0.071 |
| 2. | New Hampshire | 0.227 | | 27. | Pennsylvania | 0.067 |
| 3. | Maine | 0.192 | | 28. | Louisiana | 0.054 |
| 4. | Vermont | 0.169 | | 29. | Utah | 0.052 |
| 5. | New Mexico | 0.161 | | 30. | Illinois | 0.051 |
| 6. | Arizona | 0.156 | | 31. | Maryland | 0.046 |
| 7. | Colorado | 0.125 | | 32. | Rhode Island | 0.046 |
| 8. | Oregon | 0.120 | | 33. | Kansas | 0.044 |
| 9. | Michigan | 0.118 | | 34. | Georgia | 0.042 |
| 10. | Alaska | 0.110 | | 35. | South Carolina | 0.036 |
| 11. | Florida | 0.105 | | 36. | Mississippi | 0.028 |
| 12. | Indiana | 0.101 | | 37. | Alabama | 0.027 |
| 13. | West Virginia | 0.100 | | 38. | Virginia | 0.025 |
| 14. | North Dakota | 0.100 | | 39. | Tennessee | 0.023 |
| 15. | Montana | 0.097 | | 40. | Ohio | 0.021 |
| 16. | Missouri | 0.096 | | 41. | Wyoming | 0.021 |
| 17. | North Carolina | 0.096 | | 42. | Idaho | 0.012 |
| 18. | South Dakota | 0.092 | | 43. | Connecticut | 0.008 |
| 19. | Iowa | 0.092 | | 44. | Arkansas | 0.004 |
| 20. | Wisconsin | 0.079 | | 45. | Hawaii | −0.001 |
| 21. | Nebraska | 0.077 | | 46. | Kentucky | −0.005 |
| 22. | Minnesota | 0.075 | | 47. | Delaware | −0.007 |
| 23. | Washington | 0.075 | | 48. | New Jersey | −0.034 |
| 24. | Oklahoma | 0.071 | | 49. | Texas | −0.050 |
| 25. | California | 0.071 | | 50. | New York | −0.055 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

**TABLE B11**

| Rank | State | Pro-Life Overall Freedom, 2019 | | Rank | State | Pro-Life Overall Freedom, 2019 |
|---|---|---|---|---|---|---|
| 1. | Indiana | 0.841 | | 26. | South Carolina | 0.176 |
| 2. | Michigan | 0.821 | | 27. | Ohio | 0.132 |
| 3. | Idaho | 0.786 | | 28. | Louisiana | 0.117 |
| 4. | Missouri | 0.747 | | 29. | Wyoming | 0.084 |
| 5. | North Dakota | 0.668 | | 30. | Iowa | 0.027 |
| 6. | Oklahoma | 0.634 | | 31. | West Virginia | 0.013 |
| 7. | Utah | 0.629 | | 32. | Mississippi | −0.006 |
| 8. | Texas | 0.627 | | 33. | Montana | −0.043 |
| 9. | Kentucky | 0.608 | | 34. | Massachusetts | −0.043 |
| 10. | Kansas | 0.600 | | 35. | Alaska | −0.051 |
| 11. | Nebraska | 0.531 | | 36. | Minnesota | −0.108 |
| 12. | Tennessee | 0.492 | | 37. | Rhode Island | −0.137 |
| 13. | Florida | 0.485 | | 38. | Maine | −0.189 |
| 14. | New Hampshire | 0.483 | | 39. | Connecticut | −0.204 |
| 15. | South Dakota | 0.452 | | 40. | Illinois | −0.210 |
| 16. | Nevada | 0.420 | | 41. | Washington | −0.228 |
| 17. | Arizona | 0.373 | | 42. | Delaware | −0.271 |
| 18. | Georgia | 0.357 | | 43. | New Mexico | −0.315 |
| 19. | Virginia | 0.277 | | 44. | Vermont | −0.404 |
| 20. | Pennsylvania | 0.250 | | 45. | Maryland | −0.443 |
| 21. | North Carolina | 0.243 | | 46. | Oregon | −0.538 |
| 22. | Wisconsin | 0.241 | | 47. | New Jersey | −0.652 |
| 23. | Alabama | 0.203 | | 48. | California | −0.694 |
| 24. | Arkansas | 0.194 | | 49. | Hawaii | −0.788 |
| 25. | Colorado | 0.187 | | 50. | New York | −0.999 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

## TABLE B12

| Rank | State | Pro-Life Overall Freedom, No Right-to-Work Laws, 2019 | | | |
|------|-------|------|------|------|------|
| 1. | Indiana | 0.815 | 26. | Ohio | 0.155 |
| 2. | Michigan | 0.795 | 27. | South Carolina | 0.150 |
| 3. | Missouri | 0.770 | 28. | Louisiana | 0.091 |
| 4. | Idaho | 0.760 | 29. | Wyoming | 0.058 |
| 5. | North Dakota | 0.641 | 30. | Iowa | 0.000 |
| 6. | Oklahoma | 0.608 | 31. | West Virginia | −0.013 |
| 7. | Utah | 0.603 | 32. | Montana | −0.020 |
| 8. | Texas | 0.601 | 33. | Massachusetts | −0.020 |
| 9. | Kentucky | 0.582 | 34. | Alaska | −0.028 |
| 10. | Kansas | 0.573 | 35. | Mississippi | −0.032 |
| 11. | New Hampshire | 0.506 | 36. | Minnesota | −0.085 |
| 12. | Nebraska | 0.504 | 37. | Rhode Island | −0.114 |
| 13. | Tennessee | 0.466 | 38. | Maine | −0.166 |
| 14. | Florida | 0.459 | 39. | Connecticut | −0.181 |
| 15. | South Dakota | 0.426 | 40. | Illinois | −0.187 |
| 16. | Nevada | 0.394 | 41. | Washington | −0.205 |
| 17. | Arizona | 0.347 | 42. | Delaware | −0.248 |
| 18. | Georgia | 0.331 | 43. | New Mexico | −0.292 |
| 19. | Pennsylvania | 0.273 | 44. | Vermont | −0.381 |
| 20. | Virginia | 0.251 | 45. | Maryland | −0.420 |
| 21. | North Carolina | 0.217 | 46. | Oregon | −0.515 |
| 22. | Wisconsin | 0.215 | 47. | New Jersey | −0.629 |
| 23. | Colorado | 0.210 | 48. | California | −0.671 |
| 24. | Alabama | 0.177 | 49. | Hawaii | −0.765 |
| 25. | Arkansas | 0.168 | 50. | New York | −0.976 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

300

**TABLE B13**

| Rank | State | Moderate Pro-Choice Overall Freedom, 2019 |
|---|---|---|
| 1. | New Hampshire | 0.587 |
| 2. | Florida | 0.556 |
| 3. | Nevada | 0.515 |
| 4. | Tennessee | 0.443 |
| 5. | South Dakota | 0.428 |
| 6. | Indiana | 0.368 |
| 7. | Michigan | 0.348 |
| 8. | Georgia | 0.333 |
| 9. | Arizona | 0.325 |
| 10. | Idaho | 0.312 |
| 11. | Missouri | 0.274 |
| 12. | Colorado | 0.256 |
| 13. | Virginia | 0.228 |
| 14. | Pennsylvania | 0.201 |
| 15. | North Dakota | 0.195 |
| 16. | North Carolina | 0.194 |
| 17. | Wisconsin | 0.192 |
| 18. | Montana | 0.180 |
| 19. | Oklahoma | 0.160 |
| 20. | Utah | 0.156 |
| 21. | Texas | 0.154 |
| 22. | Alabama | 0.154 |
| 23. | Arkansas | 0.145 |
| 24. | Kentucky | 0.135 |
| 25. | Alaska | 0.133 |

| Rank | State | |
|---|---|---|
| 26. | Wyoming | 0.132 |
| 27. | South Carolina | 0.127 |
| 28. | Kansas | 0.126 |
| 29. | Iowa | 0.098 |
| 30. | Massachusetts | 0.096 |
| 31. | Ohio | 0.083 |
| 32. | Louisiana | 0.068 |
| 33. | Nebraska | 0.057 |
| 34. | Maine | 0.034 |
| 35. | West Virginia | 0.024 |
| 36. | Connecticut | 0.018 |
| 37. | Illinois | −0.012 |
| 38. | Washington | −0.041 |
| 39. | Minnesota | −0.042 |
| 40. | Mississippi | −0.054 |
| 41. | Rhode Island | −0.089 |
| 42. | New Mexico | −0.130 |
| 43. | Vermont | −0.184 |
| 44. | Delaware | −0.199 |
| 45. | Maryland | −0.280 |
| 46. | Oregon | −0.319 |
| 47. | New Jersey | −0.468 |
| 48. | California | −0.472 |
| 49. | Hawaii | −0.601 |
| 50. | New York | −0.812 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

## TABLE B14

**Moderate Pro-Choice Overall Freedom, No Right-to-Work Laws, 2019**

| Rank | State | | Rank | State | |
|------|-------|-------|------|-------|-------|
| 1. | New Hampshire | 0.610 | 26. | Kentucky | 0.109 |
| 2. | Florida | 0.530 | 27. | Ohio | 0.106 |
| 3. | Nevada | 0.489 | 28. | Wyoming | 0.106 |
| 4. | Tennessee | 0.417 | 29. | South Carolina | 0.101 |
| 5. | South Dakota | 0.401 | 30. | Kansas | 0.100 |
| 6. | Indiana | 0.342 | 31. | Iowa | 0.072 |
| 7. | Michigan | 0.322 | 32. | Maine | 0.057 |
| 8. | Georgia | 0.307 | 33. | Louisiana | 0.042 |
| 9. | Arizona | 0.299 | 34. | Connecticut | 0.041 |
| 10. | Missouri | 0.297 | 35. | Nebraska | 0.031 |
| 11. | Idaho | 0.286 | 36. | Illinois | 0.011 |
| 12. | Colorado | 0.279 | 37. | West Virginia | −0.002 |
| 13. | Pennsylvania | 0.224 | 38. | Washington | −0.018 |
| 14. | Montana | 0.203 | 39. | Minnesota | −0.019 |
| 15. | Virginia | 0.202 | 40. | Rhode Island | −0.066 |
| 16. | North Dakota | 0.169 | 41. | Mississippi | −0.080 |
| 17. | North Carolina | 0.168 | 42. | New Mexico | −0.107 |
| 18. | Wisconsin | 0.166 | 43. | Vermont | −0.161 |
| 19. | Alaska | 0.156 | 44. | Delaware | −0.176 |
| 20. | Oklahoma | 0.134 | 45. | Maryland | −0.257 |
| 21. | Utah | 0.130 | 46. | Oregon | −0.296 |
| 22. | Texas | 0.128 | 47. | New Jersey | −0.445 |
| 23. | Alabama | 0.128 | 48. | California | −0.449 |
| 24. | Arkansas | 0.119 | 49. | Hawaii | −0.578 |
| 25. | Massachusetts | 0.119 | 50. | New York | −0.789 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

302

TABLE B15

| Rank | State | Strong Pro-Choice Overall Freedom, 2019 | Rank | State | Strong Pro-Choice Overall Freedom, 2019 |
|------|-------|-----------------------------------------|------|-------|-----------------------------------------|
| 1. | New Hampshire | 0.594 | 26. | Wyoming | 0.129 |
| 2. | Florida | 0.554 | 27. | South Carolina | 0.124 |
| 3. | Nevada | 0.513 | 28. | Kansas | 0.123 |
| 4. | Tennessee | 0.439 | 29. | Iowa | 0.096 |
| 5. | South Dakota | 0.424 | 30. | Massachusetts | 0.095 |
| 6. | Indiana | 0.364 | 31. | Ohio | 0.079 |
| 7. | Michigan | 0.345 | 32. | Louisiana | 0.065 |
| 8. | Georgia | 0.329 | 33. | Nebraska | 0.055 |
| 9. | Arizona | 0.321 | 34. | Maine | 0.034 |
| 10. | Idaho | 0.309 | 35. | West Virginia | 0.021 |
| 11. | Missouri | 0.270 | 36. | Connecticut | 0.018 |
| 12. | Colorado | 0.264 | 37. | Illinois | −0.012 |
| 13. | Virginia | 0.225 | 38. | Washington | −0.041 |
| 14. | Pennsylvania | 0.199 | 39. | Minnesota | −0.042 |
| 15. | North Carolina | 0.191 | 40. | Mississippi | −0.058 |
| 16. | North Dakota | 0.191 | 41. | Rhode Island | −0.092 |
| 17. | Wisconsin | 0.189 | 42. | New Mexico | −0.121 |
| 18. | Montana | 0.179 | 43. | Vermont | −0.174 |
| 19. | Oklahoma | 0.157 | 44. | Delaware | −0.201 |
| 20. | Utah | 0.153 | 45. | Maryland | −0.280 |
| 21. | Alabama | 0.151 | 46. | Oregon | −0.308 |
| 22. | Texas | 0.151 | 47. | New Jersey | −0.458 |
| 23. | Alaska | 0.144 | 48. | California | −0.472 |
| 24. | Arkansas | 0.142 | 49. | Hawaii | −0.601 |
| 25. | Kentucky | 0.132 | 50. | New York | −0.812 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

## TABLE B16

**Strong Pro-Choice Overall Freedom, No Right-to-Work Laws, 2019**

| Rank | State | | Rank | State | |
|------|-------|------|------|-------|------|
| 1. | New Hampshire | 0.617 | 26. | Kentucky | 0.106 |
| 2. | Florida | 0.528 | 27. | Wyoming | 0.103 |
| 3. | Nevada | 0.487 | 28. | Ohio | 0.102 |
| 4. | Tennessee | 0.413 | 29. | South Carolina | 0.097 |
| 5. | South Dakota | 0.398 | 30. | Kansas | 0.097 |
| 6. | Indiana | 0.338 | 31. | Iowa | 0.070 |
| 7. | Michigan | 0.319 | 32. | Maine | 0.057 |
| 8. | Georgia | 0.303 | 33. | Connecticut | 0.041 |
| 9. | Arizona | 0.295 | 34. | Louisiana | 0.039 |
| 10. | Missouri | 0.293 | 35. | Nebraska | 0.029 |
| 11. | Colorado | 0.287 | 36. | Illinois | 0.011 |
| 12. | Idaho | 0.283 | 37. | West Virginia | −0.005 |
| 13. | Pennsylvania | 0.222 | 38. | Washington | −0.018 |
| 14. | Montana | 0.202 | 39. | Minnesota | −0.019 |
| 15. | Virginia | 0.199 | 40. | Rhode Island | −0.069 |
| 16. | Alaska | 0.167 | 41. | Mississippi | −0.084 |
| 17. | North Carolina | 0.165 | 42. | New Mexico | −0.098 |
| 18. | North Dakota | 0.165 | 43. | Vermont | −0.151 |
| 19. | Wisconsin | 0.163 | 44. | Delaware | −0.178 |
| 20. | Oklahoma | 0.130 | 45. | Maryland | −0.257 |
| 21. | Utah | 0.126 | 46. | Oregon | −0.285 |
| 22. | Alabama | 0.125 | 47. | New Jersey | −0.435 |
| 23. | Texas | 0.125 | 48. | California | −0.449 |
| 24. | Massachusetts | 0.118 | 49. | Hawaii | −0.578 |
| 25. | Arkansas | 0.115 | 50. | New York | −0.789 |

Note: States with the same rank are tied. States with different scores may appear identical due to rounding.

304

# FURTHER READING

## FEDERALISM AND DECENTRALIZATION

Buchanan, James M. "Federalism as an Ideal Political Order and an Objective for Constitutional Reform." *Publius* 25 (Spring 1995): 19–27, Reprinted in *The Collected Works of James M. Buchanan*. Vol. 18, pp. 67–78. Indianapolis: Liberty Fund, 2001.

Fischel, William A. *The Homevoter Hypothesis: How Home Values Influence Local Government Taxation, School Finance, and Land-Use Policies*. Cambridge, MA: Harvard University Press, 2001.

Nozick, Robert. "Utopia." Part III of *Anarchy, State, and Utopia*. New York: Basic Books, 1974.

Somin, Ilya. "Foot Voting, Federalism, and Political Freedom." In *NOMOS LV: Federalism and Subsidiarity*, edited by James E. Fleming and Jacob T. Levy. New York: New York University Press, 2014.

Storing, Herbert J., and Murray Dry, eds. *The Anti-Federalist: Writings by the Opponents of the Constitution*. Chicago: University of Chicago Press, 1985.

Tabarrok, Alexander. "Arguments for Federalism." Speech given at the Hastings Law School, University of California, San Francisco. September 20, 2001.

Tiebout, Charles, "A Pure Theory of Local Expenditures." *Journal of Political Economy* 64 (1956): 416–24.

Weingast, Barry R. "The Economic Role of Political Institutions: Market-Preserving Federalism and Economic Development." *Journal of Law, Economics, and Organization* 11, no. 1 (Spring 1995): 1–31.


## STATE POLITICS AND POLICY

Enns, Peter K., and Julianna Koch. "Public Opinion in the U.S. States: 1956–2010." *State Politics and Policy Quarterly* 13, no. 3 (2013): 349–72.

Erikson, Robert S., Gerald C. Wright, and John P. McIver. *Statehouse Democracy: Public Opinion and Policy in the American States*. Cambridge: Cambridge University Press, 1993.

Gelman, Andrew. *Red State, Blue State, Rich State, Poor State: Why Americans Vote the Way They Do*. Princeton, NJ: Princeton University Press, 2008.

Sorens, Jason, Fait Muedini, and William Ruger. "U.S. State and Local Public Policies in 2006: A New Database." *State Politics and Policy Quarterly* 8, no. 3 (2008): 309–26.

Tausanovitch, Chris, and Christopher Warshaw. "Measuring Constituent Policy Preferences in Congress, State Legislatures, and Cities." *Journal of Politics* 75, no. 2 (2013): 330–42.


## THE RELATIONSHIP BETWEEN LIBERTY AND VIRTUE

Block, Walter. "Libertarianism and Libertinism." *Journal of Libertarian Studies* 11, no. 1 (Fall 1994): 117–28.

Meyer, Frank S. "The Locus of Virtue." In *In Defense of Freedom and Related Essays*. Indianapolis: Liberty Fund, 1996, pp. 128–48.

Nock, Albert Jay. "On Doing the Right Thing." *American Mercury*, November 1924. Reprinted in *The State of the Union: Essays in Social Criticism*, ed. Charles H. Hamilton. Indianapolis: Liberty Press, 1991.

Gillespie, Nick, William Ruger, Jason Sorens, Steven Horowitz, Deirdre McCloskey, and Katherine Mangu-Ward. "Libertarianism, Yes! But *What Kind* of Libertarianism? Virtue vs. Libertinism, or a Reason Debate on Liberty, License, Coercion, and Responsibility." *Reason.com*, June 9, 2016.

Smith, Adam. *The Theory of Moral Sentiments*. 1759.

## RENT SEEKING

Krueger, Anne O. "The Political Economy of the Rent-Seeking Society." *American Economic Review* 64, no. 3 (June 1974): 291–303.

Olson, Mancur. *The Rise and Decline of Nations: Economic Growth, Stagflation, and Social Rigidities*. New Haven, CT: Yale University Press, 1982.

Tullock, Gordon. "The Welfare Costs of Tariffs, Monopolies and Theft." *Western Economic Journal* 5, no. 3 (June 1967): 224–32.

## PERSONAL FREEDOM

Locke, John. "A Letter Concerning Toleration." 1689. http://oll.libertyfund.org/?option=com _staticxt&staticfile=show.php%3Ftitle=764&chapter=80887&layout=html&Itemid=27.

Mill, John Stuart. "Of the Liberty of Thought and Discussion." Chapter 2 in *On Liberty*. 1859.

Ruger, William. "Why Tolerance Is Different than Acceptance: Let Ideas, Debate, and Freedom Bloom." *The Federalist*, August 18, 2015. http://thefederalist.com/2015/08/18/why -tolerance-is-different-than-acceptance/.

## FREEDOM AND JUSTICE

Boaz, David. *The Libertarian Mind: A Manifesto for Freedom*. New York: Simon & Schuster, 2015.

Buchanan, James M. "Classical Liberalism and the Perfectibility of Man." In *Why I, Too, Am Not a Conservative: The Normative Vision of Classical Liberalism*, pp. 11–21. Cheltenham, UK: Elgar, 2005.

Friedman, Milton. *Capitalism and Freedom*. Chicago: University of Chicago Press, 1962.

Kant, Immanuel. "On the Common Saying: 'This May Be True in Theory, but It Does Not Apply in Practice.'" 1793.

Locke, John. *Second Treatise of Civil Government*. 1690.

Madison, James. "Property." *National Gazette*, March 29, 1792. http://teachingamericanhistory .org/library/index.asp?document=600.

Nozick, Robert. "State-of-Nature Theory, or How to Back into a State without Really Trying" and "Beyond the Minimal State?" Parts I and II of *Anarchy, State, and Utopia*. New York: Basic Books, 1974.

Spencer, Herbert, *Social Statics, or the Conditions Essential to Happiness Specified, and the First of Them Developed*. London: John Chapman, 1851.

## ACKNOWLEDGMENTS

We wish to acknowledge our sincere gratitude to all those who have read, commented on, and helped improve our study in past years. A partial list of those to whom we owe a particular debt of thanks includes David Boaz, Jacob Levy, Dylan McLean, Claire Morgan, Fait Muedini, John Samples, Ilya Somin, Dean Stansel, Varrin Swearingen, Alison Winters, Ken Zuver, everyone at the Mercatus Center at George Mason University who did such an excellent job producing and promoting the first three editions of this index, and everyone at the Cato Institute who has helped us put out this and the previous two editions, along with countless, unnamable readers and listeners who have approached us at events or emailed us their questions and comments.

## ABOUT THE AUTHORS

William Ruger is Vice President for Research and Policy at the
Charles Koch Institute and Vice President for Research at the Charles
Koch Foundation. He was previously an Associate Professor in the
Department of Political Science at Texas State University. Ruger earned
his PhD in politics from Brandeis University and an AB from the College
of William and Mary. His scholarship has appeared in a number of
academic journals, including *International Studies Quarterly*, *Civil
Wars*, and *Armed Forces and Society*. He is the author of the biography
*Milton Friedman* and a coauthor of two books on state politics, includ-
ing *Freedom in the 50 States*. Ruger has written op-eds for a number of
outlets, such as the *New York Times*, the *Washington Post*, and *Foreign
Affairs*, and he has been interviewed frequently for television and radio,
appearing on MSNBC, CNN, and Fox News. Ruger is a veteran of the
war in Afghanistan and an officer in the U.S. Navy (Reserve Component).
Ruger was nominated by President Donald Trump to serve as the U.S.
Ambassador to the Islamic Republic of Afghanistan, and was appointed
by the president to the Fulbright Foreign Scholarship Board in 2020. He
lives with his wife and two sons in Virginia.

Jason Sorens is Director of the Center for Ethics in Society at Saint
Anselm College and received his PhD in political science from Yale
University in 2003. He has researched and written more than 20 peer-
reviewed journal articles and a book, *Secessionism* (McGill–Queen's
University Press). His research has focused on independence move-
ments around the world, the theory and practice of fiscal federalism,
and subnational economic policymaking. He has founded two non-
profits, the Free State Project (www.fsp.org) and Ethics and Economics
Education (www.e3ne.org). He lives with his wife and daughters in New
Hampshire.

## ABOUT THE CATO INSTITUTE

The Cato Institute is a public policy research organization—a think tank—dedicated to the principles of individual liberty, limited government, free markets and peace. Its scholars and analysts conduct independent, non-partisan research on a wide range of policy issues.

Founded in 1977, Cato owes its name to *Cato's Letters,* a series of essays published in 18th- century England that presented a vision of society free from excessive government power. Those essays inspired the architects of the American Revolution. And the simple, timeless principles of that revolution—individual liberty, limited government, and free markets— turn out to be even more powerful in today's world of global markets and unprecedented access to information than Jefferson or Madison could have imagined. Social and economic freedom is not just the best policy for a free people, it is the indispensable framework for the future.



DEVIN CAUGHEY &
CHRISTOPHER WARSHAW

# DYNAMIC DEMOCRACY



PUBLIC OPINION, ELECTIONS,
AND POLICYMAKING IN THE
AMERICAN STATES

Exhibit
0015

314

# *Dynamic Democracy*

**Public Opinion, Elections, and
Policymaking in the American States**

DEVIN CAUGHEY AND
CHRISTOPHER WARSHAW

The University of Chicago Press
Chicago and London

The University of Chicago Press, Chicago 60637
The University of Chicago Press, Ltd., London
© 2022 by The University of Chicago
All rights reserved. No part of this book may be used or reproduced in any manner
whatsoever without written permission, except in the case of brief quotations in
critical articles and reviews. For more information, contact the University of Chicago
Press, 1427 E. 60th St., Chicago, IL 60637.
Published 2022
Printed in the United States of America

31 30 29 28 27 26 25 24 23 22    1 2 3 4 5

ISBN-13: 978-0-226-82220-4 (cloth)
ISBN-13: 978-0-226-82222-8 (paper)
ISBN-13: 978-0-226-82221-1 (e-book)
DOI: https://doi.org/10.7208/chicago/9780226822211.001.0001

Library of Congress Cataloging-in-Publication Data

Names: Caughey, Devin, author. | Warshaw, Christopher, author.
Title: Dynamic democracy : public opinion, elections, and policymaking in the
    American states / Devin Caughey and Christopher Warshaw.
Other titles: Chicago studies in American politics.
Description: Chicago : The University of Chicago Press, 2022. | Series: Chicago
    studies in American politics | Includes bibliographical references and index.
Identifiers: LCCN 2022012450 | ISBN 9780226822204 (cloth) | ISBN 9780226822228
    (paperback) | ISBN 9780226822211 (ebook)
Subjects: LCSH: Political participation—United States. | Political activists—
    United States. | United States—Politics and government.
Classification: LCC JK1764 .C395 2022 | DDC 323/.0420973—dc23/eng/20220422
LC record available at https://lccn.loc.gov/2022012450

♾ This paper meets the requirements of ANSI/NISO Z39.48-1992 (Permanence of Paper).

1   Introduction
    1.1   Plan of the Book

2   Measurement: Public Opini
    2.1   The Challenge of Measur
    2.2   Data and Measures
        2.2.1   Policy and Survey L
        2.2.2   Measures of State P
    2.3   Summary
    2.A   Technical Appendix on M
        2.A.1   Issue-Specific Opini
        2.A.2   Ideological Summar
        2.A.3   Commonalities amc

3   Preferences: Partisanship anc
    3.1   Partisan and Ideological T
        3.1.1   Partisanship
        3.1.2   Ideology
        3.1.3   Evolution and Stabil
    3.2   The Alignment of Ideology
    3.3   The Ideological Nationaliz
    3.4   Summary

4   Policies: The Outputs of State
    4.1   Trends in State Policy Ideo
    4.2   Policy, Preferences, and Par

5   Parties: The Policy Effects of P
    5.1   Theoretical Framework
    5.2   Policy Effects of Party Cont
    5.3   Regression Discontinuity Es
    5.4   Dynamic Panel Estimates
    5.5   How Much Does Party Con
    5.6   Summary

two domains. We show that while mass ideology and policy ideology have always been correlated, mass partisanship and party control of government have only come into alignment with them in the last few decades.

Chapter 5 examines the relationship between state policies and the partisan control of state offices from a causal perspective. Using various approaches, it demonstrates that Democratic (relative to Republican) control of state offices has always caused state policies to shift leftward, especially on economics, but the causal effect of party control has roughly doubled since the 1980s. We find evidence that the increase in party effects is rooted in the ideological divergence between the mass constituencies of the two parties within states.

Chapter 6 considers determinants of elections to state offices. It shows that although partisan loyalties and national tides exert powerful effects on state-level elections, there is still substantial room for candidates and incumbents to shape their electoral fortunes. Relatively extreme candidates perform more poorly at the polls, and electorates seem to hold incumbents accountable by balancing against the majority party. These phenomena incentivize candidates and parties to adapt ideologically to their constituencies, which helps explain why mass ideology only weakly predicts shifts in party control. Together, the selection of moderate candidates and the incentives to avoid extreme policy-making are important sources of negative feedback in state politics.

Chapter 7 reaches a question at the heart of this work: How responsive is state policymaking to citizens' policy preferences? We begin by showing that the conservatism of elected officials is correlated with the conservatism of their electorates, both within parties and in the aggregate. We then demonstrate that the conservatism of state policies does respond dynamically to mass conservatism but that this responsiveness is incremental rather than instantaneous. Policy responsiveness is also substantially, if not predominantly, mediated by the adaptation of incumbent officials rather than partisan turnover. Policy responsiveness has increased over time, and it has been consistently weaker in southern states. Though the effects of mass ideology are small in the short term, over the long term they are much larger.

Chapter 8 considers the quality of representation from another angle, policy *proximity*: the match between state policies and citizens' preferences on individual policies. We first show that although states are highly responsive to issue-specific opinion, policy representation is often biased. Policy bias is more often conservative than liberal, but this is largely explained by bias toward the status quo. We also find that the average policy in our data set matches opinion majorities about 60 percent of the time, with proximity improving the longer a policy has been on the political agenda.

Chapter 9 examines thr
picture painted by the prec
of the Jim Crow South, legis
populous districts, and the
document the damage caus
mocracy in the states, which
particular, all three not only
also undermine policy repres

Chapter 10, the final emp
reforms affect voter turnout, 
tation. Across a mix of libera
citizen governance, voting pr
tions—we find few reliably es
work lead to more conservati
others can we conclude that t

Chapter 11 concludes the
consideration of its theoretic
discuss the limitations of our
about the quality of American
form, and the future of state p

exclude more fundamental institutions, such as the structure and powers of government offices, as well as the internal rules of state legislative chambers. Finally, on a more ad hoc basis, we exclude policies with direct effects on elections and representation, such as laws governing voting or districting. Beyond these restrictions, we defined the universe of state policies broadly to encompass a wide range of policy instruments (taxes, expenditures, mandates, prohibitions) and issue domains (economic, cultural, racial). As a consequence, the universe we examine includes a mix of dichotomous, ordinal, and continuous policies on issues ranging from abortion and education to gun control and civil rights.

From this universe, we sought to construct as large and as representative a sample of comparable policies as possible. Collecting a large number of policies was important to avoid basing general inferences on a small or unrepresentative subset of policies. To generate a list of potential policies, we canvassed a wide range of sources, including books and articles on state politics, legal surveys of state policies, state party platforms, governors' biographies, state-specific political histories, and government and interest-group websites. Based on this list, we collected data on the policies in place in each state and year from a wide variety of secondary sources, including government, academic, and interest-group publications as well as from state statutes themselves. Our data set covers the years 1935 to 2020, though for some policies we have data going back decades earlier. After excluding policies not applicable to all states, such as regulation of ocean beaches, and (with few exceptions) those for which data were available for fewer than five years, we are left with a total of 186 distinct policies. We classified 115 of these policies as economic, 62 as cultural, and 9 as racial. Given the constraints of data availability, we cannot claim to have constructed a random sample of state policies, but we are confident that the data set is broadly representative of available data on the salient policy activities of US states.[11]

Although our policy data set as a whole covers all eighty-six years between 1935 and 2020, this is not true of each individual policy. We were able to collect data in every year for only eleven policies. The policy data's uneven availability across time can be seen clearly in figure 2.1, which for space reasons includes a random sample of seventy economic policies, and figure 2.2, which includes all sixty-two cultural policies. On average, a given policy is measured in thirty-four out of eighty-six years. In the typical year, data are available for forty-two economic policies, with a minimum of twenty-nine per year, and for twenty-seven cultural policies, with a minimum of ten per year. Across all 15,996 policy-year combinations, 60 percent are missing data.



FIGURE 2.2. Temporal distribution of data on state cultural policies.

Measuring policy preferer

challenges as measuring

As with state policies, we

ences. This is more probler

dispute the very existence

standards of logical consi

We employ a less strict d

mean an individual's tend

posal) with some degree o

Even under this loose

survey questions often exh

instability.[14] Particularly

question wording can affe

known example: in the mi

ing on "assistance to the pc

spending on "welfare" was

results better captures the

with Dependent Children

fects are rare, their exister

responses to any given sur

policy.[17] In addition, wher

careful to collapse into a si

similarly across polls that

do not, then we might cor

real differences in mass pr

Our data set itself is bu

American National Electi

(GSS), and the Cooperativ

the hundreds of commerci

Public Opinion Research.

of 296 distinct survey iter

issues, and 44 related to r

ions of 1.5 million distinct

race data set, a quarter mil

an auxiliary data set of pai

2019, the sample size in the

around 12,000; for the cult

median 8,000.

26                                                          CHAPTER TWO

TABLE 2.2 Illustrative cultural policies in five states, 1940 and 2020

*Cultural Policies (1940)*

|                          | NJ    | PA    | IA    | NE   | OK   |
|--------------------------|-------|-------|-------|------|------|
| Corporal Punishment Ban  | 1     | 0     | 0     | 0    | 0    |
| Gun Dealer Licenses      | 1     | 1     | 0     | 0    | 0    |
| Female Jurors Allowed    | 1     | 1     | 1     | 0    | 0    |
| No Alcohol Prohibition   | 1     | 1     | 1     | 1    | 0    |
| Cultural Policy Conservatism | −1.76 | −0.85 | −0.06 | 0.79 | 1.63 |

*Cultural Policies (2020)*

|                                 | NJ    | ME    | WI    | KS       | OK   |
|---------------------------------|-------|-------|-------|----------|------|
| No Open Carry Gun Law           | 1     | 0     | 0     | 0        | 0    |
| Medicaid Covers Abortion        | 1     | 1     | 0     | 0        | 0    |
| No Religious Freedom Restoration Act | 1 | 1     | 0     | 0        | 0    |
| Allows Local LGBT Protections   | 1     | 1     | 1     | 1        | 0    |
| Ban on LGBT Hiring Discrimination | LGBT | LGBT | LGB   | by govt. | none |
| Cultural Policy Conservatism    | −2.86 | −1.74 | −0.01 | 0.99     | 2.01 |

1940 and 2020. The tables include a mix of dichotomous, ordinal, and (in the case of the economic domain) continuous policies. Some of the dichotomous policies separate ideologically extreme states from the others. In 1940, only the most economically liberal states, such as New York, provided direct aid for urban housing, and only the most conservative, such as Mississippi, did not have a workers compensation program. Analogously, in 2020, only very culturally liberal states such as New Jersey did not have an open-carry law, and only very conservative ones such as Oklahoma prohibited local LGBT antidiscrimination ordinances. Other policies, such as female jury service in 1940 and right-to-work laws in 2020, divided states more evenly. But all the dichotomous policies in the tables have a certain threshold that separates all states with the law and all states without. (In the language of item response theory, items whose threshold is high have a large "difficulty" parameter.) The fact that each of these items has a threshold that perfectly separates ones and zeros is a sign that they are well described by a single latent dimension.

Similarly, ordinal policies monotonically increase or decrease across each table. For example, in 2020, New Jersey and Maine both had laws prohibiting employment discrimination based on LGBT status; the next most liberal state in this regard, Wisconsin, had a law that protected homosexual but not transgender workers; Kansas's protections applied only to employees of the state itself; and Oklahoma had no protections at all. That same year, New York, Minnesota, and Virginia each had mandatory renewable energy standards, Utah had voluntary ones, and Mississippi had no such standards. The

MEASUREMENT

two continuous policies,
dent Children (ADC) an
programs, also decline w
efits break the monotonic
a state's policy conservat
have. This is particularly
licensing requirements fo
policies exhibit errors. Fo
policies but rather aggreg
to-conservative direction

Figure 2.6 conducts a
level mass conservatism a
vey items were chosen be
conservatism—their "disc
ory (IRT)—is close to the a
about half the items in our





FIGURE 2.6. Mass conservatism and i
indicate the estimated percentage of res
sue, with 95 percent confidence interval.
size across all polls in that year that con

| IA | NE | OK |
|---|---|---|
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 1 | 0 | 0 |
| 1 | 1 | 0 |
| −0.06 | 0.79 | 1.63 |

| WI | KS | OK |
|---|---|---|
| ɔ | 0 | 0 |
| ɔ | 0 | 0 |
| ɪ | 0 | 0 |
| ɪ | 1 | 0 |
| LGB | by govt. | none |
| −0.01 | 0.99 | 2.01 |

ɔus, ordinal, and (in the
ɔme of the dichotomous
he others. In 1940, only
ɔrk, provided direct aid
such as Mississippi, did
ɔusly, in 2020, only very
ɪave an open-carry law,
prohibited local LGBT
ɪs female jury service in
nore evenly. But all the
eshold that separates all
guage of item response
ïculty" parameter.) The
ɛctly separates ones and
latent dimension.
or decrease across each
ɪoth had laws prohibit-
ɪs; the next most liberal
ed homosexual but not
ɪly to employees of the
. That same year, New
ɛenewable energy stan-
no such standards. The

two continuous policies, which index the generosity of states' Aid to Dependent Children (ADC) and Temporary Assistance for Needy Families (TANF) programs, also decline with policy conservatism, though Utah's TANF benefits break the monotonic pattern. This exception is indicative of the fact that a state's policy conservatism does not perfectly predict what policies it will have. This is particularly true of policies that are not very ideological (e.g., licensing requirements for real estate agents), but even strongly ideological policies exhibit errors. Fortunately, our main goal is not predicting individual policies but rather aggregating many policies to estimate the general liberal-to-conservative direction of states' policymaking in a given domain.

Figure 2.6 conducts a similar exercise for the relationship between state-level mass conservatism and public opinion on specific issues. These survey items were chosen because the strength of their relationship with mass conservatism—their "discrimination," in the language of item response theory (IRT)—is close to the average across all items.[28] According to our model, about half the items in our data set are more ideological than these ones, and





FIGURE 2.6. Mass conservatism and issue-specific opinion on a sample of survey items. Vertical axes indicate the estimated percentage of respondents in a state who supported the liberal position on the issue, with 95 percent confidence interval. Plot titles indicate the year the issue was surveyed and the sample size across all polls in that year that contain the item.

TABLE 8.1 Policies in policy proximity data set

| Policy | Proximity Span | % State-Years with Policy | % Public Support |
|---|---|---|---|
| *Abortion Policies* | | | |
| Emergency contraception | 2005–2018 | 80 | 52 |
| Counseling required | 1992–2010 | 35 | 87 |
| Abortion ban (pre-Roe) | 1967–1973 | 74 | 15 |
| Medicaid for abortion | 1981–2020 | 31 | 36 |
| Parental consent for abortion | 1989–2020 | 40 | 77 |
| Parental notification required | 1983–2010 | 47 | 82 |
| Partial-birth abortion ban | 1996–2000 | 19 | 63 |
| Ultrasounds required | 2019–2020 | 30 | 53 |
| Waiting period for abortion | 1992–2020 | 44 | 76 |
| *Drug and Crime Policies* | | | |
| Abolish death penalty | 1941–2020 | 22 | 33 |
| Decriminalization of marijuana | 1973–2020 | 25 | 34 |
| Medical marijuana | 2001–2020 | 36 | 82 |
| Smoking ban—restaurants | 1995–2020 | 40 | 56 |
| Alcohol prohibition laws | 1936–2020 | 2 | 23 |
| *Education Policies* | | | |
| Charter schools | 1999–2020 | 81 | 77 |
| Corporal punishment in schools | 1954–2020 | 31 | 43 |
| Moment of silence required | 1985–2020 | 23 | 59 |
| School vouchers | 1992–2020 | 17 | 49 |
| Ten Commandments in schools | 1999–2020 | 12 | 69 |
| *Environmental Policies* | | | |
| California car emissions standard | 2002–2020 | 25 | 73 |
| Endangered species act | 2011–2014 | 94 | 66 |
| Greenhouse gas cap | 2006–2020 | 21 | 70 |
| Renewable portfolio standard | 2009–2020 | 74 | 68 |
| Solar tax credit | 2001–2020 | 64 | 77 |
| *Gambling Policies* | | | |
| Casinos allowed | 1951–2020 | 18 | 49 |
| Lottery allowed | 1964–2020 | 55 | 72 |
| *Gay Rights Policies* | | | |
| Public accommodations discrimination ban | 1977–2020 | 21 | 63 |
| Civil unions | 2000–2013 | 17 | 55 |
| Job discrimination protections | 1977–2020 | 29 | 63 |
| Hate crimes ban—gays | 2000–2018 | 54 | 74 |
| Housing discrimination | 1977–2020 | 21 | 63 |
| Joint adoption for gay couples | 1993–2014 | 16 | 44 |
| Same-sex marriage | 2000–2013 | 6 | 41 |
| Sodomy ban | 1977–2003 | 45 | 51 |

CHAPTER EIGHT

trend.[28] The slopes differ widely across policies. A substantial number, including gay adoption, school vouchers, and casinos, traverse the upper-left and lower-right quadrants, indicating declining congruence over time. Most policies, however, improve their congruence over time. On average, congruence increases by three percentage points each decade; over the course of eight decades, it would be predicted to improve by twenty-four points.

Again, selection bias likely attenuates this estimate. A policy such as same-sex civil unions, for example, was not polled until it became controversial, and, because it was federalized by the US Supreme Court, it exited our data set before states had fully responded to increases in public support. More generally, policies related to gay rights illustrate the nonlinear patterns in congruence generated when public opinion undergoes large and rapid change. In the 1980s, large majorities in nearly every state opposed extending full rights to homosexuals and same-sex couples, and state policies reflected these preferences almost perfectly. These issues thus exhibited high levels of agreement and near-universal congruence. Over the next several decades, public support for gay rights increased rapidly, decreasing agreement and congruence in the short term as policy lagged behind public opinion. Eventually, however, policymaking began to catch up, and by the 2010s policy proximity on gay rights was again on the upswing.

Our analyses also highlight a few issue areas where policy has been persistently out of step with public opinion. Some are cases where intense and well-organized interest groups are pitted against broad but less committed opinion majorities. Gun control is a prime example. Despite their long time on the agenda, gun policies such as assault weapon bans, prepurchase waiting periods, and background checks are among the most incongruent in our data set (see figure 8.4). All have supermajority support in the public but are opposed by powerful groups like the National Rifle Association and its highly engaged membership base.[29] Another incongruent cluster of policies includes moral issues such as abortion (e.g., bans on "partial birth" procedures) and religious expression in schools (e.g., allowing schools to post the Ten Commandments), on which policy has usually been more liberal than the public prefers. Incongruence on these issues probably stems less from asymmetries in organization or intensity than from the fact that those opposed to them have higher income and education levels and thus greater political influence.[30] These examples make it clear that persistently poor representation, while not the norm, definitely occurs on some issues, and these representational deficits are linked to political inequalities across social groups.

PROXIMITY

8

As the last two chapters have en cess. State governments respond incrementally rather than instant means that policy is difficult to c of step with what the public dem over time. Among policies that ha decades, state policy is congruen time. On most issues, the democr is a short-term phenomenon. In t its will.

Even over the long term, howe perfect. Not only are some policie resentational deficits seem to be sy American democracy more genera can democracy that we now turn o



ns. Second, rather than analyzing
zens, we have focused on the ag-
nely, state publics. By strengthen-
-specific noise, this double aggre-
ite policies and (especially) mass
l incoherence of issue-specific in-
ised approach to measurement, it
al patterns in all fifty states across

ntribution: our analysis of time-
though many studies of represen-
iese dimensions of variation, ex-
iation, especially over such a long
everal benefits. From a method-
nploy statistical models, particu-
tronger basis for causal infer-
or time-series data alone. More
iow representation unfolds over
n, and even how policy outputs
iur nearly century-long perspec-
r of state politics is not static but
iental trajectories and historical

ew perspectives on state politics
ing accounts. In line with more
nd that state policy responsive-
cemeal. Due in large part to the
en large shifts in public opinion
ho only faintly in states' policy
the probability that a politically
y opinion is, in the short term,

that a snapshot perspective on
. Policy responsiveness may be
long term many small changes
our statistical estimates, it may
hifts in the mass public are fully
erful correlation between opin-
itially greater congruence with
ults vindicate Robert Erikson,

Gerald Wright, and John McIver's *Statehouse Democracy*, whose finding of a strong cross-sectional correlation between mass and policy liberalism can be explained as the equilibrium outcome of the dynamic processes we document.[3]

In other respects, however, this book has also revealed the limitations of any single model of state politics, *Statehouse Democracy* included. Many of the puzzles that Erikson, Wright, and McIver so elegantly resolved no longer exist. Relying on data from around 1980, near the end of a period of unusually decentralized and depolarized politics, these authors highlighted the almost nonexistent relationship between states' partisan and ideological orientations as well as the large ideological variation across states within each party. These observations undergird their depiction of state parties as highly responsive to state median voters and state publics as equally responsive to the positions of the parties in their state.

Our data confirm their conclusions but reveal them to be unusual relative to state politics before and especially after. Since the 1980s, mass policy preferences in different domains have become strongly aligned with each other as well as with partisan preferences and electoral outcomes. Indeed, Democratic and Republican identifiers now diverge strongly within states while exhibiting little ideological variation across states. State policies, though already more aligned than mass preferences, followed a similar trajectory. Moreover, the causal effects of party control on state policies, which probably reached their nadir in the 1970s and 1980s, have grown sharply in the subsequent decades. As indicated by the large policy shifts in Wisconsin after the Republican takeover of 2010 and in Virginia after the Democratic one of 2019, it is no longer plausible to claim, even to a first approximation, that pressures to converge on the median voter cause the two parties to enact similar policies when they control state government.[4]

At the same time, however, *Statehouse Democracy*'s emphasis on parties' responsiveness to their electorates retains a great deal of truth. Even the increased partisan effects on policy evident in recent years pale relative to the policy differences across states. As noted earlier, one of the advantages of focusing on policy outcomes rather than, say, roll-call votes is that the latter tend to exaggerate differences between parties and downplay areas of relative consensus. Indeed, we find little evidence that partisan turnover is the primary mechanism by which mass preferences influence state policies—largely because, net of partisanship, mass policy preferences are weakly related to electoral shifts. Rather, it appears that due to the electoral incentives we document in chapter 6, politicians in each party feel strong pressure to adapt preemptively to public opinion. The paradoxical consequence is that although

electoral competition is key to incentivizing responsiveness, fairly little of the public's influence over state policymaking is exerted through the actual outcome of elections. Though consistent with much research emphasizing politicians' anticipation of voter sanctions,[5] this conclusion is strikingly at odds with the prominent view that "citizens affect public policy—insofar as they affect it at all—almost entirely by voting out one partisan team and replacing it with another."[6]

### 11.1 Normative Implications

How, then, should we evaluate the quality of democracy in the states and, by extension, in America at large? On the whole, our findings are reassuring, though not entirely so. We find that, in broad strokes and over the long term, the public exerts a powerful influence over the general direction of state policymaking. Such responsiveness is often considered the sine qua non of democracy,[7] if not its very definition,[8] and without evidence of it we would have good reason to doubt that American democracy is functioning as it ought to. Of course, influence does not necessarily imply fine-grained control, and indeed we find that in the short run policies are often out of step with majority opinion. But again, policy proximity tends to increase the longer a policy is on the agenda. Moreover, policies with lopsided support tend to fall off the political (and polling) agenda, biasing the survey data toward controversial policies more likely to be incongruent. In sum, even by the demanding standard of popular control, state-level democracy seems to function better than pessimistic accounts suggest.

There are, however, grounds for concern as well. For one thing, the time lag between opinion change and policy response is not unproblematic. Opponents of, say, antisodomy laws or legal abortion may find only small comfort in the knowledge that the injustices they seek to rectify will be overturned a generation hence. The normative reassurance we offer is also limited by our near-exclusive focus on the *average* citizen. As a consequence, our finding that states respond dynamically to their publics does not rule out unequal responsiveness to citizens in different income or racial groups, as a number of other studies have found.[9]

Moreover—and not unrelatedly—our evidence suggests that the quality of democracy is uneven across states. Like the "brown spots" identified by Guillermo O'Donnell in many nominally democratic countries, states in the American South in particular seem to represent their citizens less well than do states in other regions.[10] The policies of southern states are more conservative than those of non-southern states with comparable publics, and the

---

match between policies and pul
policies over time, this represer
the hangover from its long histc
through the mid-twentieth cent
democracy have only partially e

This relatively sanguine expla
the statistical evidence is not cc
lower to this day in the South,
prising, for there are good reas
political equality to African Ar
South did not instantly endow t
White southerners. Southern Blɛ
converge with that of southern
and turnout among Latino soutl
the regional average.[12] For their
higher levels of antagonism tov
country.[13]

Just as important, perhaps, i
of the region. Especially in Deep
sippi, the population roughly cl
one (mostly Black) and a larger
this unusually skewed distributi
relevant quantity from a theoreti
to the right of the average. The ef
discrepancy's interaction with th
itself dominated by Whites, now c
Democrats are confined to semij
like Virginia are exceptions, mo
governed by "conservative Demc
publicans elected by whites."[16] A
receive weaker representation tha

Finally, it is worth noting tha
South lives on in sometimes sub
policies themselves, the most imp
also offer permanent institutional
coalitions.[17] A chief example is stɛ
ployment contracts that require e
As we and others have argued, sɛ
Democrats, and liberal policyma:
acy has a right-to-work law, and



esponsiveness, fairly little of the
exerted through the actual out-
uch research emphasizing poli-
conclusion is strikingly at odds
t public policy—insofar as they
one partisan team and replacing

ications

democracy in the states and, by
le, our findings are reassuring,
l strokes and over the long term,
e general direction of state poli-
sidered the sine qua non of de-
out evidence of it would have
:racy is functioning as it ought
imply fine-grained control, and
are often out of step with major-
s to increase the longer a policy
sided support tend to fall off the
arvey data toward controversial
n, even by the demanding stan-
:y seems to function better than

as well. For one thing, the time
nse is not unproblematic. Oppo-
on may find only small comfort
k to rectify will be overturned a
e we offer is also limited by our
As a consequence, our finding
olics does not rule out unequal
ie or racial groups, as a number

idence suggests that the quality
the "brown spots" identified by
mocratic countries, states in the
sent their citizens less well than
outhern states are more conser-
th comparable publics, and the

match between policies and public opinion is lower. Given the persistence of policies over time, this representational deficit is likely at least partly due to the hangover from its long history of authoritarianism and racial oppression through the mid-twentieth century,[11] which the decades since its transition to democracy have only partially erased.

This relatively sanguine explanation, however, is not fully satisfying. Though the statistical evidence is not conclusive, policy responsiveness seems to be lower to this day in the South, at least on economic issues. This is unsurprising, for there are good reasons to suspect that the extension of formal political equality to African Americans and other racial minorities in the South did not instantly endow them with political influence equal to that of White southerners. Southern Blacks' turnout in presidential elections did not converge with that of southern Whites until the early twenty-first century, and turnout among Latino southerners remains almost twenty points below the regional average.[12] For their part, southern Whites continue to display higher levels of antagonism toward Blacks than do Whites elsewhere in the country.[13]

Just as important, perhaps, is the extent of racial polarization in much of the region. Especially in Deep South states such as Alabama and Mississippi, the population roughly clusters around two modes: a smaller liberal one (mostly Black) and a larger conservative one (nearly all White). Due to this unusually skewed distribution, the median citizen—arguably the most relevant quantity from a theoretical point of view[14]—is actually substantially to the right of the average. The effects of this discrepancy are magnified by the discrepancy's interaction with the two-party system. The Republican Party, itself dominated by Whites, now dominates nearly every southern state, while Democrats are confined to semipermanent minority status.[15] Though states like Virginia are exceptions, most southern states have shifted from being governed by "conservative Democrats elected by whites to conservative Republicans elected by whites."[16] As a result, we find that Blacks continue to receive weaker representation than Whites in southern states.

Finally, it is worth noting that the institutional legacy of the Jim Crow South lives on in sometimes subtle ways. In some cases, these legacies are policies themselves, the most important of which are not merely "sticky" but also offer permanent institutional advantages for certain political actors and coalitions.[17] A chief example is state right-to-work laws, which prohibit employment contracts that require employees to join or contribute to a union. As we and others have argued, such laws persistently disadvantage unions, Democrats, and liberal policymaking. Every state in the former Confederacy has a right-to-work law, and all except Louisiana adopted it before the

Measuring LGBTQ Policy Environment in the American States

Scott LaCombe[1]

**Terms: LGBTQ & transgender**

This project presents a novel dataset tracking LGBTQ policies in the United States. The past decade, and in particular the past 2 years, has seen a dramatic rise in policies expanding or restricting the rights of LGBTQ populations in the American states. To understand this rise, this paper collected data on hundreds of proposed and adopted policies in the American states to generate a continuous measure of the status of LGBTQ rights in the American States to get a more systematic understanding of the policy environment. We then use an IRT model to scale states based on how permissive or restrictive they are across a variety of policy areas including education, health care, and civil rights protections. This research has important implications for understanding the rapidly changing policy environment for LGBTQ rights, as well as understanding how public opinion is translated into policy on topics concerning vulnerable populations. To our knowledge, this is the most comprehensive dataset of LGBTQ policies to date, with over 1,400 pieces of legislation tracked so far.

---

[1] Assistant Professor of Government and Statistical and Data Sciences, Smith College, slacombe@smith.edu



1

## Introduction

Since 2015, and particularly since 2020, there has been a swell of policy-making activity both expanding and restricting LGBTQ rights. Given the nationalization of politics (Hopkins 2018) and growing polarization between the states (Caughey and Warshaw 2016), it is no surprise that the states are diverging significantly when it comes to protections on LGBTQ rights.  In Florida, transgender residents cannot go to the bathroom aligned with their gender in government-owned buildings, whereas they would be confronted with no such problems in Massachusetts. Transgender minors in Oklahoma are unable to access proper healthcare because medical providers would immediately lose their license for providing gender-affirming care but in Oregon gender-affirming care cannot be denied by insurance providing it is medically necessary. While recent work to build comprehensive measures of a state's LGBTQ policy environment has yielded important insights into diagnosing what is driving this divergence (Movement Advancement Project 2020, Taylor et al 2020), we see a clear need for overtime data that studies not only the policies that passed but also what policies *don't*.

To fill this gap, we have started collecting data on all legislative proposals expanding or restricting LGBTQ rights, beginning in 2023, with the goal of releasing a dataset spanning from 2010-2023. Using data from Legiscan, the Movement Advancement Project, and the ACLU, in 2023 alone, we have identified over 1300 proposals, including over 200 adoptions across distinct policies topic-coded by a group of research assistants.

After introducing the preliminary dataset, we then use an Item Response Theory (IRT) model to generate a measure of LGBTQ policy openness to provide an example of the insights we hope this dataset will provide to activists and scholars alike. We find that more liberal public opinion and Democratic control is associated with more open policies, whereas Republican

2

control is associated with more restrictive policies. We find that nationally the policy environment became much more open from 2010-2016, but has since stabilized with far slower movement.  As we continue to build these data our goal is to expand this measure of policy openness to incorporate dozens of additional policies.

**Policy Context- LGBTQ Policies in the American States**

<u>A Brief History of LGBTQ Policies</u>

We are witnessing a new wave of anti-LGBTQ policy adoptions in some states accompanied by a rush of favorable policy adoptions in others. Wins and losses for LGBTQ rights occur most frequently at the state level with rare decisive federal events, often Supreme Court decisions, disrupting state-level policy adoptions. Federalism allows states to have substantive policy discussions regarding LGBTQ rights, which has produced both regressive and progressive LGBTQ policy movements (Taylor et al., 2021).

Most LGBTQ policy adoptions occur at the state level due to the gridlock associated with passing policies at the federal level. Given Republican's reliance on Evangelical voters, who generally do not support expanded rights for LGBTQ people, for electoral success (Cambell, Monson, 2008), passing any inclusive LGBTQ legislation at the federal level is difficult so long as Republicans control at least one chamber of Congress (Taylor et al, 2021). LGBTQ policies can be described as a "double-edged issue" where focusing on one side to motivate voters often motivates the opposing side, creating a difficult environment for legislators focusing on LGBTQ issues. (Campbell and Monson, 2008).

Initiating a nationwide debate on marriage equality in 1993,  Hawaii's high court ruled in *Baehr v. Lewin* that barriers to marriage are discriminatory (Courson, 1994). This case was a first of its kind and spurred states across the country into action. Utah implemented the first

state-level Defense Against Marriage Act (DOMA) in 1995. In 1996, the federal government passed its own Defense Against Mariage Act, creating a policy environment conducive to vertical diffusion as states began to enact more same-sex marriage bans (Lewis, 2011). Yet this era did not solely see the restriction of LGBT rights. In 2003, Massachusetts' Judicial Court decided that the state constitution grants gays and lesbians the right to marriage, ruling that limiting gay and lesbian unions to civil union status rather than marriage created a separate and equal status for the gay and lesbian community. That same year, the Supreme Court overturned state sodomy bans, thus legalizing same-sex relations in every state.

In 2004 13 states passed same sex marriage bans via ballot initiative, followed by several more states in 2005 and 2006. Throughout the 2000s and early 2010s, there was significant activity at the state level regarding same-sex marriage, with states using their legislatures, ballot measures, and state supreme courts to definitively ban or allow same-sex marriage or civil unions for same-sex couples (*Same-Sex Marriage, State by State,* 2015). By 2014, state supreme courts were increasingly active on the issue in both directions, and the 6th Circuit Court upheld state-level same-sex marriage bans as constitutional, paving the way for a Supreme Court decision on the issue.

2015 marked a substantial change in LGBTQ policy, as the Supreme Court case O*bergefell v. Hodges* legalized same-sex marriage in all fifty states (*Same-Sex Marriage, State by State,* 2015). However, since same-sex marriage could no longer be used as a motivational tool for voters, state legislators moved on to other policy areas, as seen in North Carolina's passage of a bathroom ban for transgender people in 2016 (Public Facilities Privacy and Safety Act, 2016). Although this ban on transgender people's ability to use the bathroom aligned with their gender identity was short-lived, it marked a new focus in the area of LGBTQ policy. By

4

2020, state-level policies aimed at the LGBTQ community became increasingly focused on transgender people, especially children, and the idea of the LGBTQ community posing a threat to children in general. This trend continues into 2023, with an increasingly large volume of anti-transgender legislation being proposed every year. This policy area is highly polarized, with Democrats increasingly supporting expansions of LGBTQ rights and Republican opposition growing, even if the face of public attitudes growing increasingly supportive of the LGBTQ community (Bishin et al 2020; Krimmel et al 2016). Polarization at the national level has made federal policy changes rare, and often focused on the courts to make rulings (Taylor et al 2021), leading to much of the policymaking being concentrated at the state and local levels.

LGBTQ Policies in Context

The rapid proposal of so many policies leads to questions about the extent to which we can use existing theories of policy adoption to explain this area's rapid growth. Unlike economic policies that might be focused on gaining a comparative advantage (Shipan and Volden 2008), we argue these policies more clearly fit under the umbrella of morality policies. Morality policies, or policies that regulate social norms or evoke strong moral responses, are widely used in the political arena to engage voters (Mooney & Lee, 1995). This is because discussion and engagement with morality policy has no information barrier, and is heavily influenced by tradition, religious beliefs, and moral values. Anyone can reasonably consider themselves an expert in morality policy, resulting in such issues having high salience (Haider-Markel & Meier, 1996). For the above reasons, LGBTQ policies are widely considered a type of morality policy (Wendell & Tatalovich, 2023; Cravens III, 2019)

LGBTQ policy is categorized as a "two-sided" morality policy, like abortion, as it "provokes a legitimate debate between competing advocacy coalitions" (Wendell & Tatalovich,

2023). Because of LGBTQ policy's characterization as a morality policy, research of LGBTQ policy is of use to scholars seeking to understand the broader morality policy landscape. Additionally, much of the engagement surrounding LGBTQ policies occurs via social media (Human Rights Campaign & Center for Countering Digital Hate, 2022), which may provide researchers insight into political dynamics on social media.

It is notable, however, that LGBTQ policy differs from other two-sided morality policies in the sense that LGBTQ identity is an innate characteristic, rather than an action or cognisant social decision.  Because of this, LGBTQ advocacy organizations characterize LGBTQ policy as a civil rights issue as opposed to a moral issue (Haider-Markel & Meier, 1996).  The competing frames around LGBTQ mean that existing explanations using morality policy might be less applicable to LGBTQ policies. LGBTQ policy is further distinct due to the dramatic change in public opinion over a short period of time. From 2000 to 2020, support for same-sex marriage went from a super majority opposing it to supporting it (McCarthy, 2023). We argue that just as abortion policy straddles multiple policy areas and frames such as morality policy, health care, and civil rights (Kreitzer 2015), there is a need to develop a distinct framework for understanding LGBTQ policies and understand how evolving public opinion has altered the policy environment.

LGBTQ Policies and Public Policy

Given the unique history of the LGBTQ policy environment, and that this policy area falls at the intersection of morality policy, civil rights, and in many cases healthcare, we argue that these policies represent an opportunity for researchers to test theories of public policy from a variety of perspectives. First, while there has been significant progress in building large-N policy databases to track general patterns of policy diffusion (Boehmke and Skinner 2012; Boehmke et

6

al 2021; Boushey, 2010), questions remain over the extent to which these findings apply generally across policy areas. At the same time, single policy studies within a policy area lead to further questions of generalizability. Therefore, we follow in a similar vein to research attempting to bring a large-N analysis to specific topic areas such as abortion (Kreitzer 2016) or interstate compacts (Karch et al 2016).

Additionally, LGBTQ policies represent a clear test case of how democracies treat vulnerable minority groups. Are institutions such as direct democracy designed to build responsiveness being used to remove rights and protections for marginalized groups? Lastly, given the dramatic rise in legislation both expanding and restricting LGBTQ rights in recent years, we see a clear need to systematically measure and track activity occurring in the states. Does the legalization of same-sex marriage nationally in 2015 represent a punctuating event (Baumgartner and Jones) that disrupted the state policy environment? Or is the trend more of a gradual rise that received little media or scholarly attention until recently? These are just a sample of the questions we hope to answer by collecting this data.

**Data Collection and Summary Statistics**

The primary goal of the project is to construct a comprehensive dataset of legislative proposals and policy adoptions across the states to track the diverse regulations of LGBTQ rights. The initial focus was to manually search Legiscan's 2023 data for all states to identify and categorize all proposed pieces of legislation. This search yielded over 120 policies across ten policy areas, including sports, medical care, education, anti-discrimination, and legal recognition. In all, the processes resulted in 1376  policies, including 210 that were passed by the state legislatures. We were able to optimize the initial collection process to target specific keywords

and phrases, as we sought to track policy adoptions only going back in time.[7] If a bill contains multiple distinct policies (for example, a gender-affirming care ban for minors and a ban on requiring educators to use a student's preferred pronouns) they are recorded as distinct observations.

We further extended our data collection process by incorporating policies tracked by the ACLU's LGBTQ Policy Tracking Project and the Movement Advancement Project's project tracking LGBTQ policies. After a pilot search using these resources, we developed a series of search terms to use when browsing thousands of state legislative proposals on Legiscan (see appendix). In addition to tracking information about the bill, we tracked how far it made it through the legislative process and information about the bill sponsor (including sponsor partisanship). We also topic-coded policies into the following topic areas: sports, medical, education, legal recognition, public presence, discrimination, safety, economics, families, economics, and other, and coded policies as restrictive, expansive, or neutral on LGBTQ rights. We have nearly completed the data collection process for 2023, and are now moving to 2022 and have already noted a large cutoff in the number of adoptions, suggesting that 2023 is a year with unprecedented policy attention to LGBTQ rights.

For the 2023 data, out of the 1376 policies identified in 2023, 836 (60.7%) were identified as restrictive, 515 (37.4%) as expansive, and 25 (1.8%) as neutral. When constrained to only policy adoptions (210 as of December 1, 2023), we again find more restrictive policies (70%) being adopted than expansive (27%) or neutral (2.3%).  Figures 1 and 2 display the geographic distribution of both expansive and restrictive policies. With the exception of Texas[8],

---

[7] While we see clear value in collecting data on proposals, not just adoptions, our over time data collection process is solely for adoptions to aid in the construction of our measure of the LGBTQ policy environment.

[8] Texas's higher number of expansive proposals are due to a high number of bills sponsored by Democrats, none of which were adopted by the state.

the states with the most expansive policy proposals are disproportionately liberal and governed by Democrats. Massachusetts, New York, and California stand out as legislatures with the most expansionary proposals.

Figure 2 shows the distribution of restrictive policies is almost a mirror image of the expansive map. Texas again stands out as a state with a lot of proposals, but other states also emerge such as South Carolina and Iowa. Overall, restrictive proposals appear to be geographically concentrated in the South and in states governed by Republican legislatures, although there is notable heterogeneity with states such as Georgia or Louisiana seeing relatively few policies. Taken together, these maps present a policy context where the states diverge significantly with respect to LGBTQ policies.

## Figure 1: Distribution of Expansive Policy Proposal, 2023[9]



---

## Figure 2: Distribution of Restrictive Policies



Figure 3 shows the distribution of policy adoptions in 2023. Republican-led states appear to have the most policymaking activity, and Florida stands out as a particularly active state in 2023, with 16 adoptions, all of which are coded as restricting LGBTQ rights.  These descriptive maps suggest that while the environment is heterogeneous, there is disproportionate policy-making activity going on in Republican-led states, and the universe of adopted policies is more restrictive than introduced legislation.

**Figure 3: Maps of 2023 LGBTQ Policy Adoptions by State**



Figure 4 presents the distribution of topic areas in the 2023 data. Education and Healthcare dominate the policy agenda, which is consistent with extensive coverage of state "Don't Say Gay" bills and gender-affirming care bans proposed in many states. Public presence policies include those that ban drag shows in public places or in the presence of a minor, or other similar decency laws that regulate public spaces, and is the third most common topic area. The category other refers to a group of policies that did not fit into the other categories, and are disproportionately policies regulating inclusive practices (changed state laws to have gender-neutral language) or were more procedural than substantive in nature.  This policy area is seeing intense activity across a variety of topics, and policy-making activity can be found in any region of the country.

11

**Figure 4: 2023 Bill Proposals by Topic Area**



**Measuring LGBTQPolicy Environment**

We next turn to a brief application using these data to demonstrate how they can be a resource to policy scholars and political scientists alike. While there has been significant media attention given to the rise in LGBTQ policy restrictions and expansions at the state level, our search of the literature yielded little systematic data on the policy-making environment overall. Much of the research evaluates the adoption of specific policies, such as same-sex marriage bans (Lewis 2011), the ability to change birth certificates to reflect someone's gender identity (Taylor, Tadlock, and Poggione 2014), or anti-sodomy laws (Haider-Markel 2010). While these studies provide important insights across a variety of important issues, less attention has been given to a comprehensive measure of the collective state of LGBTQ policies in the state. Some recent work

12

has recognized this gap and the Movement Advancement Project (2020) has produced an additive scale using a variety of restrictive and inclusive policies that are strongly related to state public opinion (Taylor, Tadlock, and Poggione 2014).  While this scale provides immense insights, we see a need for a time-varying measure using a non-additive approach.

First, a time-varying scale can help us better understand both national and subnational trends to better examine the factors that lead to the expansion or restriction of LGBTQ rights. In particular, a time-varying measure allows researchers to leverage time itself such as using lagged public opinion to explore whether opinion drives policy, or if policy drives opinion. Secondly, an additive scale assumes that all indicators have similar influences on the overall policy environment.  Latent variable analysis has long been a tool used by scholars to operationalize measures that cannot be directly observed such as democracy (Treier and Jackman 2008), particularly when many indicators contribute to the same underlying concept (Coppedge, Alvarez and Ladonado 2008). So, for example, a same-sex marriage ban would be weighted equally to a policy segregating high school sports leagues by assigned sex at birth. By taking an Item Response Theory (IRT) approach (Demars 2010; Youn-Jeng Choi & Abdullah Asilkalkan 2019), we can allow each policy to have a unique contribution to the underlying concept of the openness of a state's LGBTQ policy environment.

Data

To generate a scale of LGBTQ openness, we first collected data on 14 different policies adopted from 2000-2023. Our goal was to collect data on policies similar to those collected by the Movement Advancement Project including those regulating marriage, access to gender affirm care, gender identity, and legal protections against discrimination on the basis of gender identity or sexual orientation. Our list of policies is smaller than those used by organizations such as

MAP to generate a longer time series, but we are continuing to work to expand the list of policies over time. Our ultimate goal with this project is to generate a scale using many more policies than the ones used in this application, but we used the 2023 data collection process to help guide our decisions on the preliminary policies to collect information on.

Our unit of analysis is state-year, and we generate binary indicators for each state noting whether it has a particular policy in any given year. We anchor the scale by coding some policies such as gender-affirming care bans and bathroom bans as clearly restrictive of LGBTQ rights as negative, whereas the legalization of same-sex marriage and adoption of anti-discrimination ordinances are coded as positive. We include separate indicators for same-sex marriage bans and same-sex legalization because many states in this period have neither. Even if same-sex marriage was de facto banned, the act of formally banning it represents a distinct policy action from simply having no defined policy.

We use the *MIRT* package (Chalmers 2012) to assess the number of conditions, items to include, and estimate scores for each state. We find that the underlying concept, which we label LGBTQ Openness, is unidimensional. After assessing the initial model, we used the 12 policies found in Table 1 to estimate a state's LGBTQ openness. As can be seen in this table, the factor loads for the first 5 policies are very high, and in the anticipated direction. States with the least open policy environment banned same-sex marriage, adopted "Don't Say Gay" laws, enhanced religious liberty protections to allow for discrimination on the basis of sexual orientation if it violates one's religious beliefs, criminalized same-sex relations, and banned gender-affirming care to summarize a few key takeaways. The loadings for several items are extremely strong, which suggests the underlying concept is clearly defined.

## Table 1: Factor Loadings

| Policy | Factor Loading |
|---|---|
| Don't Say Gay Law | -.886 |
| Same-Sex marriage ban | -.956 |
| Enhanced Religious Liberty Protections | -925 |
| Decriminalizing same-sex relations (Sodomy ban repeal) | .964 |
| Legalizing same-sex marriage | .973 |
| Gender-Affirming Car Ban for Minors | .473 |
| Require Surgery for Legal Gender Change | .161 |
| LGBTQ anti-Discrimination protection | .572 |
| Laws preempting local governments from adopting anti-Discrimination ordinances protecting LGBTQ | -.261 |
| Gender-neutral option on legal documents | .597 |
| No surgery required to legally change gender | .328 |
| Ban on changing gender on birth certificates | -.450 |

We use these loadings to scale states by their policy openness. Scores are standardized with a mean of 0, and higher levels represent a more open LGBTQ policy environment. Figure 5 shows the mean score by year. While the average is negative in the year 2000, we see a national decrease in policy openness as states ban same-sex marriage in the early to mid-2000s. This trend continued to decrease until it reached a national low in 2006 and began a rapid increase from 2010 to 2015 (nearly a 1 standard deviation increase in openness) as public attitudes rapidly shifted and states began adopting more expansive policies. We see this trend slow and begin to stall out by 2018, and scores have remained relatively stable since then, although there is still a

small, positive change. From a face validity standpoint, these results are consistent with trends of LGBTQ backsliding in the 2000s followed by major societal shifts in the 2010s in favor of LGBTQ rights, with some evidence of a slowdown in progress since 2020 as opponents of the 2015 Obergefell decision were able to organize a potential backlash. Whether we have reached a new equilibrium or are currently in a zenith of LGBTQ protections remains to be seen.

## Figure 5: Average LGBTQ Openness Score by State



For a face validity test, we compare our measure to the most recent Movement Advancement Project's tally of a state's sexual orientation and gender identity policies. The data-generating processes are distinct for both measures, so a direct comparison of scales is not possible. However, they are measuring similar underlying concepts, so we expect geographic patterns to be similar. To more directly compare scores we convert both quantitative measures into quartiles, and plot the states by their relative score in Figures 6 and 7, with darker shades indicating more open states, and lighter shades more restrictive ones.  Both measures identify 9

of the same twelve states with the most open policies, and share similar geographic patterns. States in the Northeast and West Coast generally have more open policy environments, whereas those in the South tend to score lower by both measures. It is important to note that many of these policies are currently being debated and adopted, so these scores are fluid, but overall our measure is related (correlation of .68, p<.05).

**Figure 6: 2023 LGBTQ IRT Estimates (Openness Score) by Quartile**



**Figure 7: 2023 MAP Policy Tally by Quartile**



The descriptive data presents a powerful picture in of itself, but we also aim to systematically analyze what factors lead to a more open or restrictive policy environment. We hypothesize that more liberal public opinion will be positively related to more open LGBTQ policy, while unified GOP control will be associated with more restrictive policy on average. To measure public opinion we use Caughey and Warshaw's (2018) measure of mass social public liberalism. These estimates were generated using hundreds of surveys across many social topic areas to generate a state-level measure of social liberalism. Higher values indicate a more liberal public, and negative values a more conservative public. We use binary indicators for partisan control. To better understand how public opinion and partisanship may work in tandem, we also interact the measure of public liberalism with party control. We hypothesize that increased

liberalism will decrease the restrictive effect of unified Republican control while increasing the size of the positive effect of Democratic control on openness.

We include control variables for state income per capita (standardized), population (standardized), and the percentage of a state's population that is evangelical. We use a two way fixed effects model, with fixed effects for state and year to control for temporal trends and unmodeled variation in the states. We lag mass liberalism so that the previous year's public opinion predicts the next year's policy outputs. After including the covariates mentioned we have time-series cross-sectional data for all states from 2000-2015.[10]

**Results**

Table 2 shows the results for both models, with model 1 showing the additive specification, and model two including the interactions between public opinion and party control. Beginning with model 1, we find support for both hypotheses. States with more socially liberal populations see more open LGBTQ policies. A one-standard-deviation increase in liberalism is associated with a .23 standard deviation increase in openness. This effect is significantly larger than either partisanship measure. We also find that unified GOP control of a state government is associated with more restrictive LGBT policies, while unified democratic governments see more open policies as expected.

Except for income, the control variables operate similarly in direction and statistical significance. More populous states have somewhat less open policies, and as expected a larger evangelical population is associated with more restrictive policies. Depending on the specification, a state's income per capita is either unrelated or positively related to openness.

---

[10] We used Caughey and Warshaw's measure of public opinion despite its more limited time coverage because the measure tracks opinion on issues directly related to our policies. We also estimated parallel models with the Lagodney et al (2023) measure of policy mood for 2000-2020 and found the same results for both hypotheses in terms of direction and statistical significance.

**Table 2: Two-Way Fixed Effects Model Predicting LGBT Policy Openness[11]**

|  | Model 1 | Model 2 |
|---|---|---|
| Mass Social Liberalism | 0.23** | 0.31*** |
|  | (0.08) | (0.06) |
| Unified GOP | -0.12* | 0.01 |
|  | (0.05) | (0.06) |
| Liberalism*GOP |  | -0.31*** |
|  |  | (0.09) |
| Unified Dem | 0.16*** | 0.20** |
|  | (0.04) | (0.07) |
| Liberalism*Dem |  | -0.02 |
|  |  | (0.06) |
| Population | -0.64* | -0.07*** |
|  | (0.26) | (0.02) |
| Income Per Cap | 0.02 | 0.22*** |
|  | (0.10) | (0.05) |
| Evangelical % | -.01* | -.01*** |
|  | (0.00) | (0.00) |
| Intercept | -1.97*** | -0.20 |
|  | (0.26) | (0.11) |
| $R^2$ | 0.75 | 0.56 |
| Adj. $R^2$ | 0.72 | 0.55 |
| Num. obs. | 782 | 782 |

$^{***}p < 0.001$; $^{**}p < 0.01$; $^{*}p < 0.05$

Model 2 shows that the relationship might be more complicated than simply partisanship. While social liberalism still has a large, positive, and significant association with LGBTQ policy openness, the base term for GOP control is insignificant. The interaction between GOP control

---

[11] Model includes fixed effects for state and year

and liberalism shows that GOP control essentially negates the effect of liberalism, meaning that liberal public opinion is less likely to move policy in a more open direction if the government is controlled by the GOP. On the other hand, we again find evidence that Democratic governments are associated with more open policies, and this effect is not moderated by mass opinion. Taken together, these results show there is a clear asymmetry in how the parties are making policy. In unified Democratic governments, more liberal public opinion leads to more open policy, while in Republican governments opinion is unrelated to policy. The adjusted r-squared drops notably from model 1 to model 2, meaning the additive model does a better job explaining variation in the policy environment.

These results help explain some of the descriptive data explored above.  Going back to Figure 6, the states with the highest openness scores are those that generally have the highest levels of social policy liberalism, and almost every state in the top quartile has a Democratic trifecta. On the other hand, the states in the bottom quartile almost all have a Republican trifecta but vary considerably in their social policy liberalism score. New Hampshire and Pennsylvania have considerably more liberal mass publics than Mississippi, Alabama, or Louisiana, but they have overwhelmingly been governed by a GOP-controlled legislature for the last few decades. Our findings are consistent with Taylor et al's (2020) work finding that liberalism is associated with more LGBTQ protections, while GOP control is negatively associated with the MAP score. We have shown these results hold a much larger time period than previously studied.

**Conclusion**

This project seeks to introduce a new dataset of LGBTQ policies in the American states. The 21st century has seen dramatic changes in the LGBTQ policy environment and public opinion related to this policy area. Until 2003 same sex relations were illegal in 14 states, but by

2015 same-sex marriage was legal nationwide. At the same time, recent reporting suggests that we may be in the midst of a backlash to this progress as some states seek to roll back protections or add new restrictions, particularly around transgender rights. This is a salient topic area with considerable attention at the national, state, and local level. We see a clear need for comprehensive, over-time data on both policy proposals and adoptions for a variety of reasons.

First, work from organizations such as the ACLU and MAP have been vital in taking the temperature of the policy environment. For activists and scholars alike, these data have provided new insights into how and why these policies are adopted. Secondly, by including not just adoptions, but also policy proposals, we can test questions related to how the policy process can block or allow for more moderate or extreme policies to be adopted. Thirdly, there are a host of questions in both the policy diffusion and policy responsiveness literature that could be applied to these data. Do LGBTQ policies have a distinct policy network? Are majoritarian institutions helping or hurting LGBTQ rights? Given the dramatic change in public attitudes towards homosexuality (Taylor et al 2018) to what extent are states responding more quickly or slowly to new public preferences? Do we see higher instances of the coercion mechanism (Shipan and Volden 2008) given the high-profile court rulings of the 21st century such as Lawrence v. Texas and Obergefell v Hodges? We see these policies as situated in a unique space, interacting with morality policies, healthcare, education, and civil rights. Additionally, this is a policy area with little federal policymaking (Bishin, Freebourn, and Teten 2021) so much of the variation occurs at the state level.

We therefore collected a dataset on over 1300 policy proposals and  210 adoptions in the 2023 legislative session, and are continuing to collect more data from previous sessions after developing a procedure for systematically identifying policies regulating LGBTQ rights. We find

that the 2023 environment is heterogeneous, but that there is more restrictive than expansive policy activity both in proposals and adoptions. To show the utility of these data we tracked the adoption of 14 policies from 2000-2023 to use an IRT model to scale states by their LGBTQ openness. We find that public opinion is strongly related to LGBTQ openness, with more liberal public opinion being associated with more open policies. Party control also is associated with the policy environment, with Republican governance being associated with more restrictive policies, and Democratic control with more open ones. These findings are consistent with existing research showing that the states play a large role in the LGBTQ policy environment and that this environment is heavily fragmented. If polarization continues to deepen, we expect to see the states to continue to diverge along partisan and ideological lines.

One limitation encountered by this data collection process is how to measure de facto versus de jure policies. For example, Massachusetts has allowed non-binary citizens to use an "X" for their gender on drivers licenses since at least 2019, but this was not codified as law until 2023. Similarly, many states had de facto bans on same-sex marriage prior to formally banning it in the mid-2000s. Furthermore, like abortion policy, the courts have played an outsized role in the spread of these policies. Often, states were forced to adopt policies they otherwise would not have without coercion from the federal government. We view identifying a way to incorporate de facto restrictions or expansions of LGBTQ policies as an important, but challenging component of producing these data.

As we continue with the data collection process, we see several important future directions for extending this research. First, we plan on continuing a comprehensive over-time collection of LGBTQ policies so that the scale of LGBTQ policy openness can include many of the policies we identified in 2023. We now have a framework for searching for policies, and once

23

our collection process is complete we hope that our data will be a resource for scholars and activists alike.

# Bibliography

Bishin, Benjamin G., Justin Freebourn, and Paul Teten. "The power of equality? Polarization and collective mis-representation on gay rights in Congress, 1989–2019." *Political Research Quarterly* 74.4 (2021): 1009-1023.

Boushey, G. (2010). *Policy diffusion dynamics in America*. Cambridge University Press.

Campbell, D. E., & Monson, J. Q. (2008). The Religion Card: Gay Marriage and the 2004 Presidential Election. Public Opinion Quarterly, 72(3), 399–419. https://doi.org/10.1093/poq/nfn032

Caughey, D., & Warshaw, C. (2016). The dynamics of state policy liberalism, 1936–2014. *American Journal of Political Science*, *60*(4), 899-913.

Caughey, D., & Warshaw, C. (2018). Policy preferences and policy change: Dynamic responsiveness in the American states, 1936–2014. *American Political Science Review*, *112*(2), 249-266.

Chalmers, R. P. (2012). mirt: A multidimensional item response theory package for the R environment. *Journal of statistical Software*, *48*, 1-29.

Coppedge, Michael, Angel Alvarez, and Claudia Maldonado. "Two persistent dimensions of democracy: Contestation and inclusiveness." *The Journal of Politics* 70, no. 3 (2008): 632-647.

Courson, M. K. (1994). Baehr v. Lewin: Hawaii Takes a Tentative Step to Legalize Same-Sex Marriage. 24.

Cravens, R. G. (2015). Morality politics and municipal LGBTQpolicy adoption. *State and Local Government Review*, *47*(1), 15–25. https://doi.org/10.1177/0160323x15575185

DeMars, C. (2010). Item response theory. Oxford University Press.

Flores, A. R., Langton, L., Meyer, I. H., & Romero, A. P. (2020). Victimization rates and traits of sexual and gender minorities in the United States: Results from the National Crime Victimization Survey, 2017. *Science Advances*, *6*(40). https://doi.org/10.1126/sciadv.aba6910

Haider-Markel, D. P. (2010). *Out and running: Gay and lesbian candidates, elections, and policy representation*. Georgetown University Press.

Haider-Markel, D. P., & Meier, K. J. (1996). The politics of gay and lesbian rights: Expanding the scope of the conflict. *The Journal of Politics*, *58*(2), 332–349. https://doi.org/10.2307/2960229

Hopkins, D. J. (2018). *The increasingly United States: How and why American political*

*behavior nationalized*. University of Chicago Press.

Human Rights Campaign & Center for Countering Digital Hate. (2022). *Digital Hate: Social Media's Role In Amplifying Dangerous Lies About LGBTQ+ People*. https://hrc-prod-requests.s3-us-west-2.amazonaws.com/CCDH-HRC-Digital-Hate-Report-2022-single-pages.pdf

Karch, Andrew, et al. "Policy diffusion and the pro-innovation bias." *Political Research Quarterly* 69.1 (2016): 83-95.

Kreitzer, R. J. (2015). Politics and morality in state abortion policy. *State Politics & Policy Quarterly*, *15*(1), 41-66.

Krimmel, K., Lax, J. R., & Phillips, J. H. (2016). Gay rights in congress: Public opinion and (mis) representation. *Public Opinion Quarterly*, *80*(4), 888-913.

Lagodny, J., Jones, R., Koch, J., & Enns, P. K. (2023). A validation and extension of state-level public policy mood: 1956–2020. *State Politics & Policy Quarterly*, *23*(4), 359-372.

Lewis, D. C. (2011). Direct democracy and minority rights: Same‑sex marriage bans in the US states. *Social science quarterly*, *92*(2), 364-383.

McCarthy, J. (2023, July 7). *U.S. same-sex marriage support holds at 71% high*. Gallup.com. https://news.gallup.com/poll/506636/sex-marriage-support-holds-high.aspx

Mooney, C. Z., & Lee, M.-H. (1995). Legislative morality in the American states: The case of pre-roe abortion regulation reform. *American Journal of Political Science*, *39*(3), 599. https://doi.org/10.2307/2111646

Movement Advancement Project. 2020. Snapshot: LGBTQEquality by state.

Public Facilities Privacy and Security Act, North Carolina General Assembly, 2nd Special Session (2016). https://www.ncleg.gov/BillLookUp/2015E2/H2

Same-Sex Marriage, State by State. (2015, June 26). Pew Research Center's Religion & Public Life Project. https://www.pewresearch.org/religion/2015/06/26/same-sex-marriage-state-by-state-1/

Shipan, C. R., & Volden, C. (2008). The mechanisms of policy diffusion. *American journal of political science*, *52*(4), 840-857.

Taylor, J. K., Haider-Markel, D. P., & Lewis, D. C. (2018). *The remarkable rise of transgender rights*. University of Michigan Press.

Taylor, J. K., Lewis, D. C., & Haider-Markel, D. P. (2020). LGBTQ Policy and Fragmented Federalism in the US. *State and Local Government Review*, *52*(4), 255-265.

26

Taylor, J. K., Tadlock, B. L., & Poggione, S. (2014). State LGBTQrights policy outliers: Transsexual birth certificate amendment laws. *American Review of Politics*, *34*, 245-270.

Treier, S., & Jackman, S. (2008). Democracy as a latent variable. *American Journal of Political Science*, *52*(1), 201-217.

Wendell, D. G., & Tatalovich, R. (2023). Status politics is the origin of morality policy. Politics and the Life Sciences, 42(2), 306–315. doi:10.1017/pls.2023.11

Choi, Y. J., & Asilkalkan, A. (2019). R packages for item response theory analysis: Descriptions and features. *Measurement: Interdisciplinary research and perspectives*, *17*(3), 168-175.

27

**Appendix**

### Procedures for Using Legiscan Search

**A quick note on workflow in Legiscan:** On the left of each bill row, there is a checkbox and a magnifying glass.  By clicking the checkbox on one or more bills and scrolling to the top of the page, you can change these magnifying glasses into minus signs by clicking "Bulk Bill Updates w/ Selected" → "Monitoring" → "Ignore" → "Apply All Bulk Changes"  This will add the minus sign to the bill permanently, no matter where you encounter it in a search.  This allows you to mark which bills you've already looked at, and not have to check bills multiple times when they come up in multiple keyword searches.  (Note: There are other options for monitoring/marking bills, but the "ignore" feature is the only one included in the free version of Legiscan.)

**Search Terms:** All of the following terms (which have been compiled by a very slay guy named Avery) should be searched in the "Full Text Search" bar on the left of the page.  This allows you to find relevant bills without having to scroll through a list of all the bills proposed in a state. **This specific order of search terms is ideal**, as it generally frontloads work and makes it easier to go through a state quickly. You will find the first 2-3 search terms get 90% or more of the relevant bills so then you can quickly go through the remaining search terms.

1. **Sex NOT Offender, Gender:** Make sure NOT is in all caps so Legiscan filters out all the sex offender bills. On the off chance there is a bill that classifies lgbtq people/gender affirming care providers/drag performers as sex offenders/committing a sex offense it should be found using the gender or prurient interest search terms.

2. **Gender Identity, Sexual Orientation, Male, Female:** Should have come up in step 1 but doesn't hurt to double check.

3. **Lesbian, Gay, Transgender, Homosexual, LGBT, LGBTQ, Sports:** Some of these bills may be resolutions, which we are not recording.  **DO NOT** search the word "trans" by itself, you will get mostly legislation regarding transportation or trans fats.

4. **Prurient, Grooming, Moral, Morality, Conscience, Drag:** Sometimes search terms like "moral" come up with a lot of irrelevant legislation (lots of regulations on gambling/alcohol), but it should be pretty obvious what's relevant so they're quick to get through.

5. **Parental Rights Counseling, Parental Consent:** These searches will bring up lots of bills related to parental rights that *could* be used to hurt LGBT+ people, but we only want to include bills that **explicitly mention LGBT+ people** or bills that constitute **forced outing** (when people are required/encouraged to out LGBT+ children to their parents/guardians).

**Do Not Include:**

28

- **Resolutions**: These generally have a different name than other bills (ie JR34 instead of HB34—Look for the R) and are more about making a statement rather than implementing a change. A lot of pride month bills are joint resolutions so be on the lookout for that.
- **Non-substantive changes**: If a bill that has nothing to do with LGBTQrights has a diversity/inclusion statement, but no other changes/impacts for the LGBTQcommunity don't include it. Data privacy bills that mention sexual orientation as protected health data but offer no other substantive changes should not be included.
- **Anti-porn legislation:** This can be hard to tell sometimes, especially since a lot of coded language can be used in these bills. In general, if the sole purpose of the bill is to keep minors from being able to access porn/explicit materials then don't include it, even if it uses phrases like "prurient interest". A lot of times these bills will have detailed descriptions on what is considered obscene, and it should be pretty clear it's about porn and not queer people. If it is more vague and talks more about community values/morals, doesn't provide detailed definitions on what is considered obscene, and could potentially be used to censor queer people, then include it/bring it up for discussion .For example, I read a lot of bills regulating porn online to make it harder for minors to access. These bills had very specific definitions of porn that included depicting sexual acts, nudity, etc, while a potentially coded anti-LGBTQbill I would include would state that minors cannot be exposed to anything that goes against the "prurient interest" but left the definition vague enough to include queer people or drag preformers
- **Amendments that are not relevant to relevant laws**: These are not too common but for example, I had a bill that amended regulations regarding genders of people allowed in high school locker rooms. The already existing law segregated locker rooms by biological sex, but the amendment added an exception for coaches of the opposite sex to enter their team's locker room, which isn't really relevant to this project. A lot of times the ACLU will accidentally tag these bills so be on the lookout for that.
- **Duplicate bills**: If two bills are identical (or very close to being identical), they may be recorded on one line.  Record the bill that made it the farthest in the normal way, and then add the duplicate in the "notes" column.  If both bills made it the same distance, record the bill that was proposed earliest.  Duplicates are often found in cases where the exact same bill has been proposed in both the state house and the state senate.
- **Anti DEI bills that just deal with race/sex**: Only include anti DEI/CRT bills that define DEI efforts as including gender identity/sexual orientation, not ones that are just general or just mention race/sex.

If you are not sure if a piece of legislation is relevant or not based on the very short summary Legiscan gives, it is best to err on the side of caution and  open it and search for the words "Gender, Sex, Sexual orientation, etc" in the bill itself. Then skim the parts of the bill containing those words, and it should be obvious if you need to read the whole thing.

**When in doubt, add a bill and discuss it with others, it is easier to remove bills than to find them again.**

*American Political Science Review* (2018) 112, 2, 249–266
doi:10.1017/S0003055417000533 © American Political Science Association 2017

# Policy Preferences and Policy Change: Dynamic Responsiveness in the American States, 1936–2014

DEVIN CAUGHEY   *Massachusetts Institute of Technology*
CHRISTOPHER WARSHAW   *George Washington University*

*U*sing eight decades of data, we examine the magnitude, mechanisms, and moderators of dynamic responsiveness in the American states. We show that on both economic and (especially) social issues, the liberalism of state publics predicts future change in state policy liberalism. Dynamic responsiveness is gradual, however; large policy shifts are the result of the cumulation of incremental responsiveness over many years. Partisan control of government appears to mediate only a fraction of responsiveness, suggesting that, contrary to conventional wisdom, responsiveness occurs in large part through the adaptation of incumbent officials. Dynamic responsiveness has increased over time but does not seem to be influenced by institutions such as direct democracy or campaign finance regulations. We conclude that our findings, though in some respects normatively ambiguous, on the whole paint a reassuring portrait of statehouse democracy.

What drives policy change? The full answer is surely complex, involving, among other things, turnover in government personnel, the emergence of new policy problems, and the availability of potential solutions (e.g., Kingdon 1995). But in a democracy, policy change should also be driven by citizens' policy preferences: elected officials should respond to public opinion by moving policy in its direction. Dynamic responsiveness of this kind can be thought of as a minimal standard for democratic representation. If policy change has no empirical relationship with mass preferences, then it is unlikely that citizens exercise the kind of control over government that lies at the core of democratic theory.[1]

Devin Caughey is an Associate Professor (without tenure), Department of Political Science, Massachusetts Institute of Technology, 77 Massachusetts Avenue, Room E53-463, Cambridge, MA 02139-4301 (devin.caughey@gmail.com).

Christopher Warshaw is an Assistant Professor, Department of Political Science, George Washington University, 2115 G Street NW, Monroe Hall 440, Washington, DC 20052 (cwarshaw@gmail.com).

Replication files for this article can be downloaded from Caughey, Devin, Warshaw, Christopher. 2017. Replication data for "Policy Preferences and Policy Change: Dynamic Responsiveness in the American States, 1936–2014," doi:10.7910/DVN/K3QWZW, Harvard Dataverse. We thank Bob Erikson, Martin Gilens, Seth Hill, Luke Keele, Thad Kousser, Jeffrey Lax, Justin Phillips, Jim Stimson, Yiqing Xu; seminar participants at Columbia University, Washington University–St. Louis, Texas A&M, Georgetown University, George Washington University, and Princeton University; and panelists at the 2014 American Political Science Association Conference and 2016 State Politics Conference for feedback on previous versions of this manuscript. We appreciate the excellent research assistance of Melissa Meek, James Dunham, Robert Pressel, Meg Goldberg, Kelly Alexander, Aneesh Anand, Tiffany Chung, Emma Frank, Joseff Kolman, Mathew Peterson, Steve Powell, Charlotte Swasey, Lauren Ullmann, and Amy Wickett. We also appreciate the willingness of Carl Klarner to generously share data. We are grateful for research support from the dean of the School of Humanities, Arts, and Social Sciences at MIT. All mistakes, however, are our own.

Received: December 7, 2016; revised: June 27, 2017; accepted: October 20, 2017. First published online: November 29, 2017.

[1] We use the term *dynamic responsiveness* instead of *dynamic representation* (Stimson, MacKuen, and Erikson 1995) to distinguish responsiveness from alternative measures of representation, such as proximity or congruence (Achen 1978). Responsiveness is often con-

Dynamic responsiveness has been documented primarily at the national level, especially in the United States but also in Canada and the United Kingdom. National policymaking has been shown to respond both to policy-specific changes in mass opinion (Page and Shapiro 1983) and to the public's overall "policy mood"—its global preference for more or less government activity (Stimson, MacKuen, and Erikson 1995; Soroka and Wlezien 2010). Moreover, responsiveness to public mood has been found to operate through two main channels: *partisan selection* (the election of candidates of one partisan type rather than another) and *adaptation* (driven primarily by elected officials' anticipation of voter sanctions). While the dynamic responsiveness literature leaves plenty of room for policy determinants other than public opinion, the seemingly robust relationship between mass preferences and policy change offers reassuring evidence of citizens' influence over government policies.

These optimistic conclusions, however, have been subject to trenchant critiques. Achen and Bartels (2016, 456), for example, argue that the impact of adaptation pales relative to the effect of partisan control of government offices. They thus conclude that "citizens affect public policy—insofar as they affect it at all—almost entirely by voting out one partisan team and replacing it with another," that is, through partisan selection. Indeed, notwithstanding the contrary arguments of Stimson, MacKuen, and Erikson (1995), the prevailing scholarly view is that partisan selection dominates adaptation as a mechanism of responsiveness in the United States—and in recent decades, increasingly so (Levitt 1996; Ansolabehere, Snyder, and Stewart 2001; Lee, Moretti, and Butler 2004; Poole 2007; Fowler and Hall 2017). This has in turn raised normative concerns about "leapfrog representation" by partisan extremists, whose actions may be responsive to, but are rarely congruent with, the preferences of the relatively moderate

sidered the hallmark of democracy (Dahl 1971), though it is not by itself a sufficient condition. For other necessary conditions, see, e.g., Dahl (1989).

Exhibit
0019

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

Devin Caughey and Christopher Warshaw

public (Bafumi and Herron 2010; see also Poole and Rosenthal 1984; Lax and Phillips 2012).

To some degree, these divergent conclusions stem from differences in research design. Most studies that emphasize ideological adaptation examine how policy-making responds to mass opinion in a single country over time (e.g., Stimson, MacKuen, and Erikson 1995; Soroka and Wlezien 2010; but see Kousser, Lewis, and Masket 2007). By contrast, work that stresses the dominance of partisan selection is overwhelmingly cross-sectional, typically examining roll-call voting in a single legislature.[2] Each approach has its advantages and limitations. Time-series studies have the advantage of being explicitly dynamic in orientation and also of focusing on government policies, which are arguably the ultimate metric of representation. But due to the inherent limitations of time-series analysis (small samples, model dependence, etc.), the results of within-country studies tend to be somewhat fragile. For their part, cross-sectional studies tend to have large sample sizes and often employ stronger identification strategies, such as regression-discontinuity (RD) designs. But they too are limited by their focus on within-legislature variation in roll-call voting or other forms of position-taking, which means that they cannot detect governments' *collective* responsiveness to popular preferences (Weissberg 1978).

The U.S. states offer potentially fertile ground for overcoming these limitations. By examining 50 states over many years, we can employ combined time-series–cross-sectional (TSCS) analyses that avoid many of the pitfalls of either approach on its own. Moreover, by using state policies as the outcome of interest, we can explore how public opinion influences not only the positions politicians take, but what governments actually *do*. A further advantage of state politics is that variation across states provides a natural point of comparison or benchmark for assessing the substantive magnitude of dynamic responsiveness.

Notwithstanding these methodological attractions, the U.S. states present something of a hard case for dynamic responsiveness. Due to fiscal federalism and other constraints on state governments, structural and economic conditions may dominate public opinion as determinants of state policies (Dye 1966; Oates 1972). Moreover, the lower salience of state politics and increasing nationalization of elections mean that state elections are powerfully affected by national tides, undermining the direct accountability relationship between state-level officials and their electorates (Rogers 2016; Hopkins forthcoming). Thus, despite the "awesome" cross-sectional association between the liberalism of state policies and publics (Erikson, Wright, and McIver 1993; see also Gray et al. 2004; Lax and Phillips 2012), public opinion may be only one relatively minor causal factor among the many that explain *change* in state policies (see Ringquist and Garand 1999). Finally, studying dynamic responsiveness in the states presents

formidable measurement challenges, for doing so requires yearly summaries of policy outputs and public preferences in each state over many decades.

Fortunately, recent methodological advances have made such an analysis possible. Using newly developed models for estimating the ideological orientation of state publics and policies, we construct dynamic measures of mass and government policy liberalism in each year between 1936 and 2014. Our mass liberalism scores, estimated separately for economic and social issue domains, are based on a dataset of approximately 1.5 million individuals' responses to over 300 domestic policy questions. From the same dataset, we also derive analogous time series of party identification (PID) in each state-year. The government policy liberalism scores, also estimated separately for economic and social policies, are based on an annual dataset of nearly 150 continuous and categorical state policies. Combining these measures with data on party control of state offices, we use a series of dynamic panel models to examine the extent of state-level dynamic responsiveness as well as its mediators and moderators.

Our analyses reveal that on both economic and (especially) social issues, the policy liberalism of state publics is a robust predictor of future changes in the liberalism of state policies. In other words, when a state's citizens are comparatively liberal, its policies tend to become more liberal relative to other states. Dynamic responsiveness is gradual, however. Large policy shifts are the result of the cumulation of incremental responsiveness over many years. Mass liberalism also predicts the election of more Democratic officials, though less strongly than does the state-level balance of mass PID. Democratic control of state government in turn leads to more liberal policies, suggesting that partisan selection does indeed mediate dynamic responsiveness. But we also find that policy reacts directly to citizen liberalism, holding constant the party that controls the government. This suggests that adaptation is an important, and perhaps dominant, mechanism of dynamic responsiveness.

In addition to examining the mediators of the opinion–policy relationship, we also investigate what factors moderate this relationship. Our most robust finding is that dynamic responsiveness has increased over time, on both social and economic issues. We find that the cross-sectional relationship between opinion and policy has always been stronger outside the South, and we find some evidence of differential dynamic responsiveness between regions as well, though primarily in recent decades. We also consider various laws and institutions thought to influence representation—including suffrage restrictions, campaign contribution limits, direct democracy, and legislative professionalism—but find no reliable evidence that they moderate dynamic responsiveness.

We close our article with a discussion of the normative implications of our findings. This is a difficult issue, for dynamic responsiveness is but one indicator of the quality of representation and, under some circumstances, an increase in responsiveness may even degrade other indicators, such as proximity or con-

---

[2] For instance, even though the data used by Ansolabehere, Snyder, and Stewart (2001) cover many decades, their analysis essentially consists of a sequence of cross-sectional regressions.

250

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

gruence (Achen 1978; Matsusaka 2001; Bafumi and Herron 2010; Lax and Phillips 2012). We conclude, however, that our findings are, on the whole, normatively positive. In addition to being powerfully related to citizen policy liberalism at any point in time, state policy liberalism is also responsive on the margin to shifts in public preferences. Given the many reasons for doubting the existence of policy voting and responsiveness (Achen and Bartels 2016)—reasons that are, if anything, more compelling at the state than the national level—the mere existence of state-level dynamic responsiveness is reassuring. On the other hand, the magnitude of opinion-induced policy changes should not be exaggerated. At least in the short term, within-state shifts are small relative to policy differences across states at a given point in time. States' relative policy liberalism thus does not swing wildly from year to year, but rather evolves incrementally over time.

## THEORETICAL FRAMEWORK

As a theoretical framework for our analysis, we sketch a dynamic model of representation, building on the work of Achen (1978) and others. In our framework, ideological variation is assumed to be one-dimensional within a given policy domain. We presume that governments respond on the margin to mass preferences, making policy more liberal when the public moves left and more conservative when it moves right. Such responsiveness does not imply, however, that policies are necessarily congruent with mass preferences. Rather, due to factors ranging from state governments' resource constraints to inequality of policy influence across citizens, policies may be systematically biased relative to what the average citizen desires. Nor is responsiveness necessarily proportionate; governments may respond by moving policy less than the public desires, or alternatively they may overreact to public opinion and oscillate between extreme policy positions.

Furthermore, in our model—and here we depart from cross-sectional models like Achen's—responsiveness need not be immediate. This acknowledges the numerous sources of status-quo bias in policymaking, including the prevalence of budgetary incrementalism, the veto power of pivotal legislators, limited space on the political agenda, and incumbents' insulation from midterm removal. Together, these barriers conspire to make it difficult to overturn existing policies. Thus, even if elected officials are perfectly representative, they will often be unable to bring all policies immediately in line with new configurations of mass preferences. Rather, a sudden one-time change in mass liberalism will be incorporated incrementally into policy liberalism, as in each year the state updates a portion of its policies. Eventually, if mass opinion remains stable, this model predicts that the state will reach a new policy equilibrium that reflects both the influence of the mass public and the persistent sources of policymaking bias in that state. In short, a dynamic model of representations implies that responsiveness should be incremental, with modest short-term effects potentially cumulating into large long-run differences.[3]

## Mechanisms

In a representative democracy, there are two main mechanisms by which mass publics can influence policymaking, which we refer to as *selection* and *adaptation* (compare Miller and Stokes 1963; Stimson, MacKuen, and Erikson 1995; Fearon 1999). In the selection mechanism, citizens influence government policymaking by electing candidates whose ideological type best represents their views. In the contemporary American two-party system, this generally entails choosing between Democrats and Republicans—that is, *partisan selection*. For partisan selection to be an effective channel for responsiveness, a two-step process is required. First, mass liberalism must affect which party wins elections. Second, the partisan outcome of elections must affect policy liberalism. Partisan selection is thus the part of mass liberalism's effect on policy that is mediated by party control of government offices.

Adaptation, by contrast, is the portion of responsiveness not mediated by party control—that is, with party control held constant. Most theoretical work on adaptation has focused on individual incumbents' incentives to avoid electoral sanctions by responding preemptively to public sentiment (Downs 1957; Mayhew 1974; Kingdon 1989; Snyder and Ting 2003). In principle, such individual-level adaptation can result in perfect responsiveness without the replacement of a single incumbent (and thus without any change in party control). As we define it in this article, however, adaptation also encompasses within-party turnover: the replacement of moderate incumbents with more extreme members of the same party, or vice versa.

On the whole, the empirical literature on responsiveness emphasizes the dominance of selection over adaptation (Levitt 1996; Ansolabehere, Snyder, and Stewart 2001; Lee, Moretti, and Butler 2004; Poole 2007; but see Stimson, MacKuen, and Erikson 1995; Kousser, Lewis, and Masket 2007). There is certainly ample evidence for the second step in the selection mechanism, partisan effects on policy. At the state level, for example, electing Democrats rather than Republicans leads to much more liberal legislative representation and to modestly more liberal state policies (Shor and McCarty 2011; Caughey, Tausanovitch, and Warshaw 2017; Caughey, Warshaw, and Xu 2017; Fowler and Hall 2017). In the legislature, partisan effects on policy seem to be driven predominantly by shifts in majority control, with the size of the majority having little independent effect on policy (Caughey, Warshaw, and Xu

---

[3] It should be noted that our model of dynamic responsiveness differs from those of Stimson, MacKuen, and Erikson (1995) and Soroka and Wlezien (2010) in that we define mass liberalism as a measure of absolute preference. They, by contrast, conceptualize policy "mood" as a preference for policy *change*—that is, for more or less government than is currently being provided (see Stimson 1991). Their model thus implies that mood, being partly a function of current policy, should respond "thermostatically" to policy changes, whereas no such negative feedback loop is implied by our model.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

Devin Caughey and Christopher Warshaw

2017). The evidence for the first step—mass liberalism's effect on elections—is less robust, especially in studies of dynamic responsiveness. Achen and Bartels, for example, stress the fragility and model-dependence of the evidence for partisan selection in national politics, leading them to conclude that mass policy preferences "are of relatively little importance in determining who wins" elections (2016, 46). Though there is less empirical work on the subject, the dynamic relationship between mass liberalism and election outcomes is likely to be even weaker in the states, where electoral shifts are dominated by exogenous national conditions (Rogers 2016). In short, notwithstanding the evidence for party effects, it is unclear how much of state policy responsiveness is mediated through party control.

On the other hand, there is reason to believe that adaptation is a more important mechanism of state policy responsiveness than the existing literature suggests. Most existing studies focus on roll-call voting in a single legislature, which means that they cannot measure *collective* responsiveness to public opinion. Thus, if a state public moves to the right and all officials respond equally to this shift, a comparison of state legislators' roll-call votes will not detect any adaptation, only cross-sectional ideological differences between legislators.[4] The relatively few studies that examine opinion effects on policy rather than roll calls, whether in cross section (Erikson, Wright, and McIver 1993) or time series (Erikson, MacKuen, and Stimson 2002), tend to find greater evidence for responsiveness unmediated by party control. In sum, we expect adaptation to be a more important mechanism of state policy responsiveness than the more general literature on responsiveness suggests.

### Variation Across Issue Domains

Nearly all studies that have found strong evidence of state-level policy responsiveness either employ general measures of liberalism–conservatism that combine different policy domains (e.g., Erikson, Wright, and McIver 1993) or else focus almost exclusively on social policies (e.g., Lax and Phillips 2009, 2012). What evidence there is for responsiveness on economic issues tends to be somewhat weaker (Pacheco 2013).[5] This is not surprising, for there are several reasons to expect states to be less responsive on economic than social issues.

First, states tend to have less policymaking discretion on economic issues. Federal and state governments share responsibility over many policy areas, and a large share of state government monies come from the federal government (Pew Charitable Trusts 2016), which is largely unresponsive to shifts in state-level public opinion. State taxing and spending choices are also constrained by economic competition with other jurisdictions. Thus, regardless of their citizens' preferences, states can increase taxes and regulations only so much before businesses and higher-income citizens vote with their feet by moving to other states (Oates 1972; Bailey and Rom 2004).

Economic and social issues differ at the mass level as well. Because social policies tend to be more symbolic than technical and to concern ends rather than means, they are more likely than economic policies to be "easy" issues for citizens. Citizens are thus likely to find it easier to "calculate relative positioning of parties and candidates" on social issues (Carmines and Stimson 1980, 82). Citizens' policy preferences on social issues are also likely to be more stable and coherent than their economic preferences, making it easier for politicians to discern signal from noise in public opinion.[6] In short, because social policies are both more amenable to state control and easier for citizens to understand, we should expect state-level responsiveness to be stronger on social than economic issues.

### Institutional Moderators

In addition to varying across issue domains, dynamic responsiveness may also vary across institutional and other contexts. Indeed, as Lax and Phillips (2012, 158) note, "many of the largest debates in the state politics literature involve which, if any, institutional features of state government enhance or undercut the relationship between policy and opinion." We explore this possibility by examining four sets of institutions that might moderate state policy responsiveness.

The past eight decades have witnessed large changes in the institutional structure of American democracy, none more important than the 1960s-era dismantlement of *suffrage restrictions*, mainly in Southern states (Key 1949; Mickey 2015). These restrictions both changed the demographic and ideological composition of the electorate and reduced voter turnout overall (Kousser 1974; Springer 2014). As a result, one might hope and expect that the elimination of undemocratic institutions in the South led to greater responsiveness to citizens' policy preferences in those states. On the other hand, there is recent evidence to suggest that the one-party South was not obviously less responsive to the eligible electorate than the two-party North (Caughey forthcoming). Since the preferences of different social groups tend to move in parallel with one another (Page and Shapiro 1992), dynamic responsiveness to one group often implies responsiveness to the public as a whole (Stimson 2009). To the extent that this is true, then the elimination of suffrage-restricting institutions may not have had a substantial effect on dynamic responsiveness in the South.

There are also reasons to believe that *campaign contribution limitations* may influence policy

---

https://doi.org/10.1017/9781009315401700533 Published online by Cambridge University Press

[4] This is true unless the scaling bridges legislators' ideal points across time using comparable roll-call votes, which is rarely done (for an exception, see Bailey 2007).

[5] In her study of state welfare and education spending, Pacheco (2013, 319) notes that "conclusions regarding dynamic policy representation [i.e., responsiveness] vary depending on model specification" and are not robust to the inclusion of year fixed effects.

[6] See Przeworski, Stokes, and Manin (1999, 8–9) on responsiveness as the relationship between signals (expressions of public preferences) and policies (authoritative government decisions).

responsiveness by affecting politicians' incentives to focus on the preferences of the median voter. Indeed, contributions from corporations and wealthy individuals could incentivize elected officials to focus more on their opinions than the opinion of the median voter (Bartels 2008; Gilens 2012). We therefore expect limits on campaign contributions to increase the responsiveness of policy to public opinion. Several previous studies have examined the direct effect of campaign finance limits on state legislators' ideology (Barber 2016; La Raja and Schaffner 2015) and state policy (Besley and Case 2003; Werner and Coleman 2013), but no previous study has examined the effect of campaign finance rules on the responsiveness of state policies to public opinion.

Another set of institutions that possibly improve responsiveness are reforms designed to enhance what might be called *citizen governance*, such as direct democracy and term limits. Direct democracy might do so by giving citizens the ability to circumvent elected officials and enact their preferred policy through the ballot box (Matsusaka 2008). In addition, the threat of the initiative may lead elected officials to change their behavior to preempt future ballot measures (Gerber 1996). Finally, even if elected officials do not actively seek to preempt future initiatives, the results of initiatives may help them learn about voter preferences (Matsusaka 2008). Despite sound theoretical reasons to expect that direct democracy might improve responsiveness, empirical studies of its effects have been ambiguous.[7]

Term limits might increase responsiveness by inducing greater turnover among legislators. This could lead to the election of legislators who better reflect constituents' (current) preferences. On the other hand, term limits could lead to shirking, particularly among legislators not planning to seek another office (Clark and Williams 2014). It could also lead to less experienced legislators, which might reduce their capacity to assess and respond to public opinion. Term limits may also reduce incentives to respond to public opinion by limiting the value of a seat in the legislature (Kousser 2005). There have been few empirical studies of the effect of term limits on representation, but one recent study finds that cross-sectional responsiveness is stronger in states with term limits (Lax and Phillips 2012).

Finally, *legislative professionalism* may affect state governments' responsiveness to public opinion. Some states, such as California, have very professional legislatures that resemble the U.S. Congress, whereas others, such as Vermont, have part-time legislators that meet for only a few weeks a year (Squire 1992, 2007). Professional chambers can use their resources to assess changes in mass opinion. Also, there are greater incentives for lawmakers in professional chambers to be responsive to the public to retain office (Maestas 2000). As a result, we might expect states with more professionalized legislatures to be more responsive to public opinion. Two recent studies find that states with higher levels of legislative professionalism are more responsive to public opinion (Pacheco 2013; Lax and Phillips 2012), while another recent study finds no effect on responsiveness (Lax and Phillips 2009).

## MODELING STRATEGY

Achen (1978) argues that citizens' influence over the government can be measured by the expected difference in government outputs associated with a given difference in the preferences of the average citizen—that is, the regression slope, which he labels *responsiveness*.[8] Defined this way, responsiveness is a descriptive quantity: it simply captures the covariation between citizens' preferences and governmental outputs. Due to data limitations, most previous studies have focused on this cross-sectional link between the mass public's policy preferences and government policy. But a major problem with cross-sectional analyses of representation is that it is very difficult to rule out the possibility that some third, unmeasured characteristic of states—its political culture, for example—confounds the relationship between mass liberalism and policy liberalism, or even the possibility that policy liberalism causes mass liberalism.

The normative significance of responsiveness, however, largely hinges on whether the relationship is causal—that is, on whether government outputs would have differed had citizens' preferences been different.[9] Estimating responsiveness in a causal sense requires isolating exogenous variation in citizens' preferences, a tall order indeed. Nevertheless, such causal inferences can be made more credible by exploiting temporal variation in citizens' preferences. As Stimson, MacKuen, and Erikson (1995, 543) note, representation is a process that is "inherently structured in time." We therefore follow Stimson, MacKuen, and Erikson (1995) and Soroka and Wlezien (2010) in examining the dynamic relationship between mass liberalism and policy liberalism, accounting for policy liberalism's recent history.

Where we depart from these authors is in our use of TSCS data. A time-series–cross-sectional approach offers considerable advantages over a purely time-series

---

[7] Some studies find that direct democracy enhances responsiveness, at least in some policy areas (Arceneaux 2002; Gerber 1996; Matsusaka 2010), while other studies find that it has no effect on responsiveness (Monogan, Gray, and Lowery 2009; Lascher, Hagen, and Rochlin 1996; Lax and Phillips 2009, 2012; Tausanovitch and Warshaw 2014).

[8] More precisely, Achen (1978) defines *responsiveness* as both the intercept and slope of the regression, where the intercept indexes the "bias" of the electoral system (492) Since the intercept in our application has no natural meaning, we focus only on the regression slope, as do most studies of responsiveness. Achen also focuses on the opinions of elected representatives rather than on policy outputs, but there is no difficulty in extending his conception of responsiveness to the latter. As noted by Achen and more recently by Matsusaka (2001), greater responsiveness does not necessarily imply government outputs more proximate to or congruent with public preferences.
[9] This is not to deny that responsiveness in a descriptive sense is also interesting and important. At the very least, the empirical covariation between preferences and policy provides a normative benchmark for the representativeness of a political system.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

253

Devin Caughey and Christopher Warshaw

one. It enables us to estimate a dynamic panel model that includes not only a lagged dependent variable (LDV), as a typical time-series model would, but also state and year fixed effects (FEs). The state and year FEs enable us to rule out two threats to causal inference that time-series data alone cannot: time-invariant state-specific confounders and year-specific shocks that affect all states equally (Angrist and Pischke 2009).[10] In substantive terms, the state FEs in particular can be interpreted as capturing the policymaking bias unique to each state. The inclusion of an LDV is also very important, however, for past policies are just the sort of time-varying state-specific confounders that FEs alone cannot account for.[11] Including an LDV also enables us to analyze how mass liberalism affects policy liberalism over both the short and the long term. In sum, while our dynamic panel model cannot rule out all confounders of the opinion–policy relationship, it provides a firmer basis for causal inference than either time-series or cross-sectional analysis alone.

Before describing the details of data and measures, we note a final important element of our empirical strategy, which is to account for the measurement error in our key variables. The main independent and dependent variables in this study—mass liberalism and policy liberalism in each issue domain—are latent quantities whose values must be inferred rather than directly observed. Measurement error in latent variables can bias point estimates and standard errors. Thus, in all of our regression analyses, we account for measurement error in these variables (as well as in PID) using a technique known as the "method of composition" or "propagated uncertainty" (Tanner 1996, 52; Treier and Jackman 2008, 215–6; Kastellec et al. 2015, 791–2).[12] The main consequence of these adjustments is to attenuate the estimated effects of mass liberalism by about one-third relative to the unadjusted estimates (see Supplementary Appendix E).

## DATA AND MEASURES

This section describes the data and measures we use in our analysis. For summary statistics on our key variables, see Supplementary Appendix C.

### Mass Policy Preferences

Estimating the relationship between mass preferences and state policies requires measures of each construct for each state in each year. A major difficulty with obtaining such annual measures is that, although thousands of Americans have been surveyed on their policy preferences in each year since 1936, the specific survey

questions asked have been sparsely and unevenly distributed across time. Moreover, there are often small samples available in any particular year, particularly for smaller states. These challenges make it practically impossible to examine policy-specific responsiveness at the state level over any long time span. The most ambitious existing effort is Pacheco's (2013) analysis of the responsiveness of state education and welfare spending to public preferences for more spending, issues where state-level polling has been particularly dense in the period she covers (1977–2000). Even so, to address sparse survey samples Pacheco smooths the state estimates with multilevel regression coupled with a 5-year moving average, which improves the reliability of estimates in smaller states but dampens yearly fluctuations in state opinion (see also Pacheco 2011). Aside from Pacheco (2013), all other studies have dealt with the problem of sparse survey data by using proxies for mass policy preferences derived from ideological self-identification, presidential vote, or the roll-call records of the state congressional delegation (e.g., Erikson, Wright, and McIver 1993; Levitt 1996; Berry et al. 1998).

We take an alternative approach: inferring the latent policy liberalism of state publics by aggregating responses to many distinct policy questions across many polls. We do so using a dynamic, hierarchical group-level item-response model (Caughey and Warshaw 2015; see Supplementary Appendix for more details). While conceptually similar to the estimates of "public policy mood" estimated by Stimson (1991) at the national level and by Enns and Koch (2013) in the states, our mass liberalism measures differ from mood in two respects.[13] First, mood is a relative measure; it captures whether the public wants more or less government, relative to what is currently provided. By contrast, our mass liberalism estimates are based only on policy questions that do not explicitly or implicitly reference the policy *status quo* and are thus intended as measures of absolute, not relative, liberalism. This is important because the overwhelming majority of survey questions in our data pertain either to national policy or to policy in the abstract, not state policies specifically. Our conception of mass liberalism as an absolute measure is thus primarily a practical concession to the available polling data.

A second difference is that we estimate mass liberalism separately for economic and social issues (compare Treier and Hillygus 2009; Stimson, Thiébaut, and Tiberj 2012).[14] We do so because mass policy preferences across domains have exhibited distinct temporal

---

[10] Dynamic panel models suffer from finite-sample bias (Nickell 1981), but when the number of time periods is large, as it is in our case, the bias is a minor concern (Beck and Katz 2011).

[11] State FEs explain only a small amount of additional variation once lagged policy liberalism is controlled for. While an $F$ test easily rejects the hypothesis that state FEs add no explanatory power, a Lagrange multiplier test yields ambiguous conclusions.

[12] See Supplementary Appendix D for more details.

[13] These works use Stimson's Dyad Ratios algorithm to estimate policy mood. McGann (2014) observes that the Dyad Ratios algorithm has several unappealing features, most notably its ideological asymmetry and its lack of a grounding in a coherent individual-level model. As an alternative, he proposes a group-level IRT model for national mood that is similar to the approach we take. Whereas McGann (2014) captures only longitudinal variation, however, the dynamic, hierarchical group-level IRT model accommodates cross-sectional and over-time variation within a common framework.

[14] We also considered estimating liberalism on racial issues as well, but found that the relative paucity of survey questions in this domain made it difficult to estimate racial liberalism over a long time span.

254

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

dynamics and were, until recently, only weakly correlated. This is true not only at the level of individuals, whose lack of issue constraint is well known, but also at the level of geographic or partisan groups, who typically exhibit much more ideological structure than individuals. Thus, while treating mass liberalism as unidimensional is often a reasonable approximation in contemporary American politics (see, e.g., Jessee 2009; Tausanovitch and Warshaw 2013), the long time span of our study makes it much less tenable.

To estimate mass liberalism in each domain, we rely on a dataset of survey responses to over 300 domestic policy questions spread across nearly 1,000 public-opinion surveys fielded between 1936 and 2014. Overall, the responses of nearly 1.5 million distinct individuals are represented in the data. This dataset includes nearly all policy questions asked on U.S. national surveys in more than 1 year and the vast majority of questions asked for only a single year, particularly early in the time period when policy questions were sparse. It includes canonical academic surveys, such as the American National Election Study and the General Social Survey, as well as hundreds of polls from commercial polling organizations such as Gallup, CBS News/NYTimes, ABC News/Washington Post, and many others. Out of the 3,846 state-years in our dataset, 95% contain at least some opinion data on social issues, and 98% contain at least some data on economic opinion.

As noted above, we estimate economic and social liberalism separately. The economic questions cover issues such as taxes, social welfare, and labor regulation. The social questions include ones about alcohol, abortion, gay rights, women's rights, school prayer, and other cultural (but not racial) issues. To ensure the comparability of our estimates over time, we use question series with consistent question wording, substantive meaning, and response categories as bridge items. While no individual survey item is asked consistently between 1936 and 2014, there are many survey questions that are asked consistently for shorter periods of time. These items glue our estimates from one time period together with our estimates for other time periods. Since almost all these surveys also include a question about PID, we use the same dataset to estimate the proportions of Democrats, Republicans, and Independents in each state-year.

To construct our measure of mass liberalism, we first used a dynamic group-level IRT model to estimate annual average liberalism in groups defined by state, race, and urban residence.[15] Then, using data from the U.S. Census (Ruggles et al. 2010), we poststratified the group estimates to match the groups' proportions in the state population to produce estimates of average liberalism in each state-year. Finally, to aid interpretability of the estimates, we standardized them within each

Monte Carlo iteration to have a mean of 0 and a variance of 1 across state-years.

Figure 1 maps our estimates of mass social and economic liberalism in 1940, 1975, and 2010. The cross-sectional patterns are generally quite sensible—New York and Massachusetts are always among the most liberal states, and states like Utah and South Dakota among the most conservative. However, it is worth noting that Southern states are typically more conservative on the social dimension than the economic dimension. Moreover, consistent with Erikson, Wright, and McIver's (2006) conclusion that state publics have changed relatively little in terms of ideological identification, we find that mass policy liberalism in the states has also remained fairly stable, shifting substantially in only a few states. These exceptions include Vermont, which has become more liberal on both dimensions, as well as several Southern and Western states, such as Idaho and Louisiana, which have become more conservative.

## State Policies

We next require a measure of the liberalism of state policies. For consistency with our domain-specific measures of mass liberalism, we separate state policy liberalism by domain as well, using the measures of economic and social policy liberalism estimated by Caughey and Warshaw (2016). It is worth noting, however, that throughout the period we examine, there has consistently been a much higher correlation between the liberalism of states' economic and social *policies* than between the economic and social liberalism of state mass publics.

These measures of domain-specific policy liberalism are based on a total of nearly 150 individual state policies. The scores are estimated using a dynamic Bayesian factor-analytic model for mixed data, which allows the inclusion of both continuous and ordinal indicators of state policy.[16] The policy dataset underlying the policy liberalism scores is designed to include all politically salient state policy outputs on which comparable data are available for at least 5 years.[17] The economic dimension covers a wide range of policy areas, including social welfare (e.g., AFDC/TANF benefit levels), taxation (e.g., income tax rates), labor (e.g., right-to-work), and the environment (e.g., state endangered species acts). The social dimension includes women's rights (e.g., jury service for women), morals legislation (e.g., anti-sodomy laws), family planning (e.g., ban on partial birth abortion), religion (e.g., public schools can

---

[15] We estimate the IRT model using the R package dgo (Dunham, Caughey, and Warshaw 2016). Supplementary Appendix A provides more details on the model estimation procedure and Supplementary Appendix B provides evidence for the validity of the estimates.

[16] The model, which extends that of Quinn (2004), is dynamic in that policy liberalism is estimated separately in each year and the policy-specific intercepts (or "difficulties") are allowed to drift over time. If, instead, the intercepts are held constant, the policies of all states are estimated to have become substantially more liberal, especially before the 1980s. Each policy's factor loading (or "discrimination"), which captures how "ideological" the policy is, is held constant over time.

[17] Unlike many studies, the dataset explicitly excludes social outcomes (e.g., infant mortality rates) as well as more fundamental government institutions (e.g., legislative term limits).

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

Devin Caughey and Christopher Warshaw

FIGURE 1.   Mass Liberalism by State, 1940–2010. Darker shading indicates more conservative opinion. To accentuate the color contrasts, the estimates in this figure are standardized within year.



(a) Mass Social Liberalism

(b) Mass Economic Liberalism

post the Ten Commandments), criminal justice (e.g., death penalty), and drugs (e.g., marijuana decriminalization).

## Institutions

Our data on potential institutional moderators of dynamic responsiveness are drawn from various sources. We obtained data on suffrage restrictions (poll taxes and literacy tests) from Springer (2014). We drew our data on campaign finance regulations (limits on the contributions of individuals, corporations, and unions) from a wide range of sources. These include state statutes, academic analyses (Stratmann and Aparicio-Castillo 2006; La Raja and Schaffner 2014), various editions of *The Book of the States* and the FEC's *Analysis of Federal and State Campaign Finance Law*, and other reference works (e.g., Ford 1955; Alexander and Denny 1966). Data on reforms intended to enhance citizen governance (direct democracy and term limits) were obtained from Matsusaka (2008) and from the National Conference of State Legislatures. There are no existing measures of legislative professionalism that span our entire time period.[18] Thus, we construct a simple proxy for legislative professionalism using the natural log of the number of days that each state legislature is in session during a 2-year period based on data from

the *The Book of the States*.[19] Data on the partisanship of state officials comes from Klarner (2013).

## RESPONSIVENESS: CROSS-SECTIONAL AND DYNAMIC

We now turn to the relationship between mass liberalism and the liberalism of government policies. We begin with a cross-sectional analysis typical of most studies of responsiveness. Figure 2 plots the state-level relationship between mass liberalism and policy liberalism separately by policy domain (social and economic), time period (before and since 1972), and region (South and non-South). States' mass and government liberalism have been standardized within years and then averaged across years within period, so these relationships can be interpreted roughly as the average cross-sectional responsiveness in each domain, period, and region.

Figure 2 reveals several noteworthy patterns. First, in the period before 1972, when disenfranchisement and lack of partisan competition were still very much live issues in Southern states, mass and government policy liberalism were essentially uncorrelated within

[18] This is largely due to the fact that data on staff and budgets are not readily available before the 1970s.

[19] Data on legislative days were missing for 15% of state-term dyads. We linearly interpolated the (logged) missing values within states using the R package Amelia (Honaker, King, and Blackwell 2011). The cross-sectional correlation between our measure of professionalism and the more holistic measures from Squire (2007) is 0.7.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press



**FIGURE 2.** Cross-sectional Relationship between Mass and Government Policy Liberalism, by Region, Era, and Issue Domain.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

that region.[20] By contrast, in the more democratic non-South, government policy liberalism has always had a robust relationship with mass liberalism. The relationship in the non-South has strengthened somewhat over time, with the correlation increasing from 0.6 to

---

[20] Mickey (2015) argues that the democratization of the former Confederacy was not complete until 1972. For the classic critique of the South's one-party system, see chapter 14 of Key (1949).

0.8 on both social and economic issues. (These correlations and subsequent regression estimates are all corrected for measurement error.) On social issues the cross-sectional correlation has increased in the South as well (to 0.6 in the post-1972 period), but the economic policies of Southern states remain essentially uncorrelated with public opinion as well as substantially more conservative than those of non-Southern states.

Devin Caughey and Christopher Warshaw

---

**TABLE 1.   Cross-sectional and dynamic responsiveness, by issue domain and region. XS = pooled cross-sectional regression; FE = two-way fixed effects; LDV = lagged dependent variable; DP = dynamic panel. In all specifications, year intercepts are allowed to vary by region. Standard errors are clustered by state and are robust to autocorrelation. Variables are scaled to have a standard deviation of 1. Estimates are corrected for measurement error. Bold coefficients are statistically significant at the 10% level.**

| | DV: Domain-Specific Policy Liberalism ($t$) | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Social | | | | Economic | | | |
| | XS (1) | FE (2) | LDV (3) | DP (4) | XS (5) | FE (6) | LDV (7) | DP (8) |
| Mass Liberalism$_{t-1}$ | **.867** (.116) | **.306** (.081) | **.043** (.008) | **.037** (.009) | **.637** (.099) | **.261** (.068) | **.023** (.006) | **.014** (.008) |
| Mass Lib$_{t-1}$ × *South* | −.431 (.203) | .269 (.168) | −**.025** (.015) | −.011 (.023) | −**.688** (.138) | −**.287** (.091) | −.017 (.013) | −.006 (.015) |
| Policy Liberalism$_{t-1}$ | | | **.971** (.007) | **.934** (.016) | | | **.976** (.005) | **.931** (.011) |
| Year × South FEs | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| State FEs | No | Yes | No | Yes | No | Yes | No | Yes |
| Observations | 3,854 | 3,854 | 3,854 | 3,854 | 3,854 | 3,854 | 3,854 | 3,854 |
| Adjusted R² | .541 | .801 | .973 | .973 | .541 | .793 | .971 | .971 |

These regional differences in cross-sectional responsiveness can also be seen in columns (1) and (4) of Table 1, which report estimates of cross-sectional responsiveness on social and economic issues, respectively, averaged over the entire 1936–2014 period. All the variables in this table are scaled within iteration to have a standard deviation (SD) of 1 across state-years. As the main effect of *Mass Liberalism$_{t-1}$* in column (1) indicates, outside the South there is nearly a one-to-one cross-sectional relationship between mass and policy liberalism on social issues: a 1-SD difference on one is associated with a 0.87-SD difference in the other. On economic issues, the opinion–policy relationship in the non-South is only modestly weaker. But as the interactions with *South* show, cross-sectional responsiveness on social issues is about half as strong in the South as in the non-South, and on economic issues is wholly absent.

Quite a different conclusion emerges, however, if we examine responsiveness from a dynamic rather than cross-sectional perspective. A first cut at such an over-time perspective is provided by columns (2) and (5) of Table 1, which report the results of specifications that include FEs for state as well as year. These specifications capture the opinion–policy relationship within states net of national trends, thus eliminating the influence of time-invariant state-specific confounders. The estimates indicate that, in both regions, state-years in which mass liberalism was higher than average for that state also tended to have higher-than-average policy liberalism. Taken at face value as causal estimates, the coefficients from the two-way FE model are strikingly large. They imply that in the non-South, a 1-SD change in mass liberalism

has an immediate effect of 0.31 SDs on social policy liberalism and 0.26 SDs on economic policy liberalism. On economic issues, the opinion–policy relationship again disappears in the South, but on social issues it is, if anything, stronger than in the non-South.

These inferences, however, hinge on the standard assumptions of two-way FE models, notably that there are no state-specific time-varying confounders. One very obvious such confounder is past state policies, which influence future policies in the direct sense of being path dependent and difficult to change. The responsiveness estimates in column (3) and (6), which control for lagged policy liberalism instead of state FEs, are an order of magnitude smaller in magnitude. As indicated by the lag coefficients, policy liberalism in both domains is powerfully predicted by its past values (though both lag coefficients are clearly less than 1, indicating mean-reversion). Adding state FEs back in, as in columns (4) and (8), shrinks the estimates only a little further. Nevertheless, all specifications supply evidence that non-Southern states are responsive to their publics. Although the regional interactions in the dynamic panel models are statistically insignificant, we also cannot reject the hypothesis of zero responsiveness in the South, especially on economic issues (we explore this further in our discussion of moderators below).

Consistent with our expectations regarding differences across policy domains, the substantive magnitude of dynamic responsiveness appears to be greater on social than economic issues. Averaging across regions, the dynamic panel model estimates a standardized opinion effect of 0.035 (SE = 0.009) for social policy as compared to 0.013 (0.007) for economic policy. That is,

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

the estimated policy effect of a 1-SD difference in mass opinion is almost three times as large on social issues as on economic ones. Even on social issues, however, the immediate effect of mass liberalism is still an order of magnitude smaller than what the two-way FE estimates naively imply.[21]

Due to policy liberalism's strong persistence over time, however, the long-term effects of mass liberalism are much larger than the immediate effect. One way to see this is to calculate the long-run multiplier of *Mass Liberalism*$_{t-1}$, which can be interpreted as the total effect of a permanent one-unit increase in mass liberalism over all future time periods (De Boef and Keele 2008, 191). On social issues, the estimated long-run multiplier of *Mass Liberalism*$_{t-1}$ is 0.57 (SE = 0.16) in the non-South and 0.38 (0.33) in the South. On economic issues, the analogous estimates are 0.20 (0.11) for the non-South and 0.12 (0.21) for the South. That is, if the public of a non-Southern state suddenly became 1 unit more liberal on social issues, we would expect the state's social policy liberalism to eventually settle at a new equilibrium 0.57 units above its old equilibrium (assuming no national trends in social liberalism).[22] The effect would occur gradually, however. It would take more than a decade, for example, for 50% of the long-run effect to be realized, and half a century for 95% to be realized. Note that compared to the immediate dynamic effects of *Mass Liberalism*, the long-run effects are much closer in magnitude to the cross-sectional relationships reported in Table 1. This is consistent with the hypothesis that the strong contemporaneous correlation between state policy and opinion is the product of the long-term, gradual accumulation of incremental policy responses to mass preferences.

## MECHANISMS: PARTISAN TURNOVER AND ADAPTATION

As noted earlier, dynamic responsiveness to popular preferences can occur by two main mechanisms: partisan selection and adaptation. Partisan selection is a two-step process. First, voters' liberalism must affect their probability of electing candidates of one party or another. Second, the newly elected officials must implement different policies than their opponents would have. In short, if greater liberalism in the public causes the election of more Democrats, and electing more Democrats causes policies to become more liberal, then partisan selection mediates the effect of opinion on policy. Adaptation, by contrast, is that portion of dynamic responsiveness not mediated by the selection of candidates of one party or another, but rather is the result of officials in each party responding directly to shifts in public sentiment. In sum, evaluating the relative importance of partisan selection and adap-

tation entails estimating three causal effects: the effect of mass liberalism on party control of government, the effect of party control on policy liberalism, and the effect of mass liberalism on policy liberalism with party control held constant.

We begin our empirical analysis with the first effect, that of mass liberalism on party control. To measure the latter concept, we create indicators for whether the Democratic Party controls the governorship, the lower house of the state legislature, and the upper house. We combine these indicators into a single summative index of *Democratic Control*, normalized to range from 0 to 1.[23] Except in rare circumstances, *Democratic Control* can change only in years following state elections, which in all but four states occur in even years. We therefore subset to years that follow a state house election, estimating the effect on *Democratic Control* of mass liberalism in the preceding election year.

Table 2 summarizes the results of this analysis, which employs a dynamic panel specification similar to Table 1. As indicated by the coefficients for *Democratic Control*$_{t-1}$ in the bottom row, the partisan composition of the legislature is moderately autocorrelated, but not nearly as much so as policy, suggesting a fairly strong tendency towards alternation in party control over time.[24] More relevant to our purposes here, the first and second rows of Table 2 show that *Mass Liberalism*$_{t-1}$ (that is, in the most recent election year) has a modest effect on changes in party control. A 1-SD difference in mass social liberalism increases *Democratic Control*$_t$ by 0.05 (column 1), and an analogous increase in economic liberalism does so by 0.02 (column 2), though the 95% confidence interval of the latter estimate includes zero. When mass social and economic liberalism are included in the same specification (column 3), their estimated coefficients remain stable, and their sum (0.06, SE = 0.02) remains clearly positive.

One potential concern with these results is that the apparent effect of mass liberalism may be confounded by Democratic PID. That is, the proportion of Democratic identifiers in the public may affect both mass liberalism and voters' willingness to elect Democrats. Column (4) assesses this possibility by controlling for *Mass Democratic PID*$_{t-2}$, the year before mass liberalism is measured. *Mass Democratic PID*$_{t-2}$ clearly has a powerful effect on *Democratic Control*$_t$, increasing the proportion of government controlled by Democrats by 0.11 for each SD change.[25] Accounting for mass PID reduces the magnitude and statistical significance of both mass liberalism coefficients, to the point where the

---

[21] Supplementary Appendix G shows the robustness of these results to other model specifications.

[22] This equilibrium is the point at which the effect of *Mass Liberalism* is exactly counterbalanced by the mean-reverting impact of the lagged dependent variables.

[23] We focus on legislative control rather than seat share because, in dynamic models, the Democratic share of all legislative seats is not a significant predictor of policy liberalism. Controlling for legislative seat share does not qualitatively affect our conclusions.

[24] This is consistent with the finding that a party that narrowly wins the governorship (Folke and Snyder 2012) or state legislature (Feigenbaum, Fouirnaies, and Hall 2017) tends to lose seats in the next election.

[25] These estimates account for measurement error in the PID estimates. Note that *Mass Democratic PID*$_{t-2}$ cannot affect *Democratic Control*$_{t-1}$ because the latter is determined by the election in year $t-3$.

https://doi.org/10.1017/S0003055411700533 Published online by Cambridge University Press

Devin Caughey and Christopher Warshaw

---

**TABLE 2.   Effect of mass policy preferences and partisanship on partisan turnover. The data have been subsetted to years following state house elections, which in most states are odd years. Standard errors are clustered by state and are robust to autocorrelation. The Democratic Control Index ranges from 0 to 1. Other variables are scaled to have a standard deviation of 1 across state-years.**

|  | DV: Democratic Control Index ($t$) | | | |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| Mass Social Lib$_{t-1}$ | **.048** |  | **.046** | .021 |
|  | (.018) |  | (.017) | (.017) |
| Mass Econ Lib$_{t-1}$ |  | .018 | .012 | −.0003 |
|  |  | (.014) | (.013) | (.014) |
| Mass Dem PID$_{t-2}$ |  |  |  | **.107** |
|  |  |  |  | (.015) |
| Dem Control$_{t-1}$ | **.656** | **.660** | **.651** | **.562** |
|  | (.040) | (.037) | (.037) | (.032) |
| Year FEs | Yes | Yes | Yes | Yes |
| State FEs | Yes | Yes | Yes | Yes |
| Observations | 1,688 | 1,688 | 1,688 | 1,436 |
| Adjusted $R^2$ | .710 | .708 | .710 | .719 |

estimated effect of mass economic liberalism is essentially zero. Clearly, mass partisanship is a much more powerful predictor of partisan turnover than is mass liberalism.

Nevertheless, together the preceding analyses suggest that mass liberalism does increase the odds that the Democrats will control state government.[26] For partisan selection to be a mechanism of dynamic responsiveness, however, the partisan composition of the government must also affect the liberalism of state policies. As many classic studies of state politics emphasize, the cross-sectional relationship between Democratic control and policy liberalism is actually close to 0, or even negative (e.g., Erikson, Wright, and McIver 1993). But more recent analyses employing panel and RD designs have confirmed that Democratic control of the governorship or legislature modestly increases the liberalism of state policies (e.g., Brown 1995; Caughey, Warshaw, and Xu 2017).

We replicate this latter finding in columns (1) and (5) of Table 3, which show the effect of *Democratic Control$_t$* on *Policy Liberalism$_t$* in the economic and social domains, respectively. (For this analysis we use the full sample of years.) In both domains, going from full Republican to full Democratic control of the elected branches increases domain-specific policy liberalism in that year by 0.05–0.07 SDs.[27] Such complete switches in party control are rare, however. The SD of Demo-

cratic control is 0.39, which corresponds to a shift in approximately one of the three government institutions that compose the index. By this standard, the effect of Democratic control is roughly comparable to that of mass liberalism. The standardized effect of Democratic control is 0.02 for social policy and 0.03 for economic, about the same size as the standardized effect of mass liberalism in each domain.

To assess the degree to which the effect of opinion on policy is mediated by party control (that is, through the mechanism of partisan selection), we rely on three complementary analyses. The first is to simply multiply the estimated effects of mass liberalism on Democratic control and Democratic control on policy liberalism. This method estimates the mediated effect to be 0.0027 (SE = 0.0011) for social policy and 0.0013 (0.0010) for economic. These estimates are about 7–11% of the total effects of mass liberalism reported in columns (2) and (6) of Table 3. Similar results are obtained if we use a different method: subtracting the controlled direct effect of *Mass Liberalism$_{t-1}$* (column 3/7) from its estimated total effect (column 2/6).[28]

Finally, the same basic pattern appears if we hold Democratic control fixed by design rather than through statistical control. We do this by comparing dynamic responsiveness in years that follow an election, when party control could conceivably change, with years not following an election, when it will generally be the same as in the previous year. Responsiveness in years where only adaptation is possible is captured by the coefficients labeled "Mass Lib$_{t-1}$ (No Elec$_{t-1}$)" in columns (4) and (8). Responsiveness on economic issues is estimated to be slightly stronger after an

---

[26] In supplementary analyses, we found a fair degree of heterogeneity in these estimates across time and region. As in the responsiveness analyses reported in the next section, we found that mass liberalism's effect on Democratic control was unambiguously positive only for non-Southern states in the era since 1972.

[27] These dynamic-panel estimates are similar in magnitude to the electoral RD estimates of the effects of Democratic governors and state legislatures reported in Caughey, Warshaw, and Xu (2017).

[28] The results are qualitatively identical if we also control for Democratic seat share in the legislature.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

**TABLE 3.   Partisan selection and adaptation as mechanisms of dynamic responsiveness. Standard errors are clustered by state and are robust to autocorrelation. The Democratic Control Index ranges from 0 to 1. Other variables are scaled to have a standard deviation of 1 across state-years. Bold coefficients are significant at the 10% level.**

| | DV: Domain-Specific Policy Liberalism ($t$) | | | | | | | |
| | Social | | | | Economic | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Dem Control$_t$ | **.056** (.011) | | **.049** (.010) | | **.070** (.012) | | **.069** (.012) | |
| Mass Lib$_{t-1}$ | | **.034** (.008) | **.029** (.009) | | | **.012** (.007) | .011 (.007) | |
| Mass Lib$_{t-1}$ (No Elec$_{t-1}$) | | | | **.037** (.009) | | | | .009 (.008) |
| Mass Lib$_{t-1}$ (Elec$_{t-1}$) | | | | **.030** (.010) | | | | .015 (.009) |
| Policy Lib$_{t-1}$ | **.944** (.013) | **.941** (.013) | **.937** (.014) | **.941** (.014) | **.922** (.012) | **.930** (.012) | **.918** (.012) | **.931** (.012) |
| Year FEs | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| State FEs | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 3,632 | 3,854 | 3,632 | 3,854 | 3,632 | 3,854 | 3,632 | 3,854 |
| Adjusted R$^2$ | .973 | .973 | .974 | .973 | .971 | .971 | .972 | .971 |

election, but the opposite is true for social issues. The economic estimates lose also statistical significance when we split the sample. The essential point, however, is that the coefficient estimates for election and non-election years are very similar to each other and to their counterparts in columns (3) and (7).

Given the imprecision of the mediation estimates and the strong assumptions required to interpret them causally, we should not focus too much on their exact magnitude. It is nevertheless striking how little support the mediation analyses provide for partisan selection as a mechanism of responsiveness. This is true not because party control has no policy effects—they are in fact quite large and robust—but rather because mass liberalism is only weakly related to shifts in party control. These results thus leave substantial scope for responsiveness in the absence of changes in party control. It is also worth noting that the final analysis, by examining nonelection years separately, implicitly holds constant each party's internal composition as well as the between-party balance of power. The fact that this analysis yields results very similar to those from controlling explicitly for party control suggests that within-party turnover does not account for much of dynamic responsiveness.[29] Thus, while we cannot determine exactly how important within-party turnover is, the evidence supports the hypothesis that the adaptation of reelection-motivated incumbents to shifts in public sentiment is an important, and perhaps the dominant, mechanism of responsiveness.

## HETEROGENEITY: TIME, REGION, AND INSTITUTIONS

In addition to operating through multiple mechanisms, dynamic responsiveness may also be stronger under certain conditions than others. In other words, there may be factors that moderate the effect of opinion on policy. Here we examine six such factors: time, region, suffrage restrictions, campaign contribution limits, reforms designed to enhance citizen participation in government, and legislative professionalism. Unlike time and region, the last four moderators are institutions that could potentially be manipulated to influence the quality of responsiveness. We emphasize, however, that the interaction effects in the analysis below are purely correlational, and nothing about the research design ensures that the effects are not confounded by other attributes of the states where these institutions were adopted. Moreover, an increase in responsiveness due to a particular institution does not necessarily imply that it makes policy more congruent with mass preferences (Matsusaka 2001). Instead, greater responsiveness could indicate overreactions to constituent preferences (Erikson, Wright, and McIver 1993, 93–4).

That being said, it is nonetheless interesting and important to assess whether and how dynamic responsiveness differs across contexts. The first context we examine is historical era. Has dynamic responsiveness increased over time? The answer seems to be yes.[30]

---

[29] If it did, we would expect the effect of mass liberalism in years following an election to be substantially larger than the effect in all years conditional on party control.

[30] This conclusion relies on the assumption that the mass and policy liberalism scales are comparable across years. We believe this assumption is more plausible for these measures than for other

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

TABLE 4.   Moderators of dynamic responsiveness. Standard errors are clustered by state and are robust to autocorrelation. Continuous variables are scaled to have a standard deviation of 1 across state-years. Bold coefficients are significant at the 10% level.

| | DV: Domain-Specific Policy Liberalism ($t$) | | | | | |
| | Social | | | Economic | | |
| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Mass Liberalism$_{t-1}$ | **.040** | **.040** | **.049** | **.017** | **.021** | **.020** |
| | (.009) | (.009) | (.013) | (.008) | (.008) | (.009) |
| Mass Lib$_{t-1}$ × Pre-1972 | **−.035** | −.021 | −.030 | −.019 | **−.022** | −.020 |
| | (.016) | (.018) | (.023) | (.012) | (.013) | (.014) |
| Mass Lib$_{t-1}$ × South | | −.020 | −.010 | | −.019 | **−.024** |
| | | (.013) | (.020) | | (.012) | (.014) |
| Mass Lib$_{t-1}$ × Pre-1972 × South | | −.017 | −.030 | | .019 | .027 |
| | | (.036) | (.041) | | (.020) | (.023) |
| Suffrage Restriction | | | .017 | | | .003 |
| | | | (.013) | | | (.014) |
| Suff Restrict × Mass Lib$_{t-1}$ | | | .010 | | | −.0004 |
| | | | (.019) | | | (.012) |
| Contribution Limits | | | −.001 | | | −.0003 |
| | | | (.003) | | | (.004) |
| Contrib Limit × Mass Lib$_{t-1}$ | | | .001 | | | .004 |
| | | | (.003) | | | (.003) |
| Citizen Government | | | −.008 | | | −.004 |
| | | | (.017) | | | (.015) |
| Citizen Gov't × Mass Lib$_{t-1}$ | | | −.001 | | | .008 |
| | | | (.010) | | | (.008) |
| Legislative Days (Logged) | | | .007 | | | −.009 |
| | | | (.009) | | | (.006) |
| Leg Days × Mass Lib$_{t-1}$ | | | .001 | | | −.007 |
| | | | (.009) | | | (.007) |
| Policy Liberalism$_{t-1}$ | **.936** | **.933** | **.921** | **.929** | **.926** | **.920** |
| | (.014) | (.014) | (.018) | (.013) | (.013) | (.015) |
| Year FEs | Yes | Yes | Yes | Yes | Yes | Yes |
| State FEs | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 3,854 | 3,854 | 3,552 | 3,854 | 3,854 | 3,552 |
| Adjusted $R^2$ | .973 | .973 | .969 | .971 | .971 | .970 |

We can see this most clearly in columns (1) and (4) of Table 4, which interact *Mass Liberalism*$_{t-1}$ with an indicator for years before 1972. On both social and economic issues, dynamic responsiveness appears to be stronger after 1972. In fact, the point estimates for the earlier period are close to 0.

Why might dynamic responsiveness have increased over time? One natural hypothesis is that it was driven by the democratization of the South, which was not fully democratic until the early 1970s (Mickey 2015). Surprisingly, we actually find little firm evidence for this conjecture. This can be seen in columns (2) and (5), which include a three-way interaction between mass liberalism, era, and region. The estimates in the second row, which now capture temporal differences in the non-South only, are of similar magnitude to those in columns (1) and (4). The coefficients in the third row indicate that responsiveness has been lower in the South even in the post-1972 period. Moreover, the triple interaction in the fourth row provides no firm evidence that the regional gap in dynamic responsiveness was once larger than it is now. In fact, column (5) seems to suggest that, on economic issues, Southern and non-Southern states were once about equally

commonly used latent scales. What bridges NOMINATE scores between congresses, for example, is not repeated votes on the same bills, but rather assumptions about whether and how members of Congress change ideologically over time (Poole and Rosenthal 2007). By contrast, the bridging assumption in our analysis is that the discrimination parameters of survey questions and state policies repeated across years are constant over time. That is, the degree to which a question or policy distinguishes liberal and conservative states is assumed to be the same in every year. This is the same assumption that is implicitly invoked by studies that compare responsiveness on a single issue over time. Supplementary Appendix F provides further evidence that these results are not driven by differential measurement error across time.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

(un)responsive, whereas in recent years dynamic responsiveness has increased in the non-South but not in the South.[31]

One possible response to this puzzling finding is that undemocratic institutions such as poll taxes were not confined to Southern states, nor did all Southern states employ these devices over the entire pre-1972 period. It would be better, therefore, to examine the moderating effects of suffrage restrictions directly. By the same token, states have adopted numerous other reforms designed to limit the influence of money in politics and enhance citizens' participation in policymaking. State legislatures have also generally become more professionalized over time, though at different rates, and this too may have influenced responsiveness.

To assess these possibilities, we examine whether the effect of *Mass Liberalism*$_{t-1}$ is moderated by three indices of related policies—suffrage restrictions (poll tax and literacy test), campaign contribution limits, and citizen governance (direct democracy and term limits)—and by the number of days a legislature spends in session (a proxy for professionalism). We present the analysis of these policies as indices (all centered at 0) to ameliorate the multiplicity problem of testing many interaction effects. On the whole, we find little evidence that any of the institutions we consider moderate the effect of opinion on policy. Controlling for era and region, none of eight index interactions is statistically significant.[32] Essentially the same picture emerges if we analyze each institution individually (see Supplementary Appendix H).[33]

In sum, our main findings are that the dynamic effect of opinion on policy is definitely stronger in the present era than it was before 1972, and that, in the modern era, dynamic responsiveness seems to be stronger in non-Southern states. We find little evidence that any institution that we examined moderates dynamic responsiveness. Given that the interaction effects are essentially correlational estimates, however, we should not draw firm conclusions either way about the *causal* effect of these institutions. It is possible, for example, that reforms such as contribution limits are implemented precisely to counteract a particularly unresponsive state government, masking these reforms' positive effects. Thus, while our results suggest that previous studies may overstate the responsiveness-enhancing effects of

these institutional reforms, this is clearly an area where more research is needed.

## DISCUSSION

What do our findings suggest about the character and functioning of American democracy? At the most basic level, they indicate that state policymaking responds to mass policy preferences, though more strongly on social than economic issues and more so now than in the past. Given the particularly high barriers to responsiveness in state politics—limited state control over some policies, the competitive constraints of federalism, citizens' inattentiveness to state politics—this fact alone should provide a counterweight to more pessimistic accounts of American democracy. Our results also call into question an emerging scholarly sense, approaching a consensus, that partisan selection is the dominant if not exclusive means by which voters affect government policies. Manifestations of this quasi-consensus can be seen in theoretical work that stresses candidates' inability to commit to moderate policies (e.g., Alesina 1988; Besley and Coate 1997), causal analyses that find little evidence of adaptation or convergence in Congress (e.g., Lee, Moretti, and Butler 2004; Fowler and Hall 2016), and studies that emphasize the "leapfrog" nature of representation in the contemporary United States (e.g., Bafumi and Herron 2010; Lax and Phillips 2012). By contrast, our finding that adaptation is a major and perhaps the dominant mechanism of responsiveness is consistent with classic studies that emphasize politicians' attentiveness to public sentiment and their capacity and incentives to adapt to shifts in mass opinion (e.g., Mayhew 1974; Arnold 1990; Stimson, MacKuen, and Erikson 1995).

It should be emphasized that partisan selection is a comparatively minor mechanism of responsiveness not because party control has no policy effects, but rather because mass policy preferences explain relatively little of the variation in party fortunes. In other words, both public opinion and party control affect state policies, but variation in one is not strongly related to the other. This suggests an important qualification to the dim view, expressed by Achen and Bartels (2016) and others, that the apparently weak relationship between mass liberalism and partisan fortunes implies that citizens have little influence over government policies. Rather, mass liberalism and party control seem to exert fairly independent, and roughly equally important, effects on policy change. This pattern is consistent with Erikson et al.'s (1993) "statehouse democracy" model, in which the platforms of Democratic and Republican parties in a given state diverge from one another (resulting in partisan effects on policy) but are roughly centered on the state's median voter (resulting in adaptation). Contrary to some fears, however, neither party control nor mass liberalism seems to cause dramatic swings in policymaking. Even a full switch in party control, for example, changes policy liberalism in the short term by less than a tenth of an SD. In general, large shifts in policy liberalism occur only through the

---

[31] However, when we subsample our opinion data to ensure equal sample sizes across time and rerun the models in Table 4, the results suggest that, on economic issues, responsiveness has increased roughly equally across regions (see Online Appendix F). We thus view these regional differences with some skepticism.

[32] Controlling for mass liberalism's interactions with era and region is important because the latter strongly predict the likelihood of adopting the reforms we consider and thus proxy for the numerous other factors that vary across time and geography that might confound the institutional interactions. However, if we drop these controls, we do find some suggestive evidence consistent with the hypotheses that campaign finance regulations and citizen governance reforms may enhance responsiveness on economic issues.

[33] We find suggestive evidence that union contribution bans might increase responsiveness on the economic domain. But we find no other significant effects for other individual institutions.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

263

Devin Caughey and Christopher Warshaw

compounding of many small responses to party control and mass preferences. It is the cumulation of such incremental changes over many decades that arguably accounts for the strong cross-sectional relationship between opinion and policy.

In these respects, then, our findings provide some reassurance regarding the health of American democracy. In other respects, however, our analyses are indeterminate or even pessimistic. First, since our measures of mass and state policy liberalism are not on the same scale, we cannot directly evaluate whether state policies are congruent with mass preferences at any given moment (cf. Achen 1978; Matsusaka 2001; Lax and Phillips 2012). In particular, the fact that state policymaking is responsive on the margin does not preclude the existence of ideological bias in state policies. Indeed, the persistent gap in policy liberalism between Southern and non-Southern states with similar mass publics (see Figure 2) implies that the policies of at least one set of states are systematically biased in a liberal or conservative direction. Relatedly, our results do not rule out the possibility of differential responsiveness across subsets of the population, such as racial minorities or the poor (e.g., Gilens 2012). Finally, our analysis of institutional moderators, though hardly the final word on the subject, suggests little reason for faith in institutional reforms, at least among those that have been widely implemented at the state level, as a means of increasing (or decreasing) dynamic responsiveness.

## SUPPLEMENTARY MATERIAL

To view supplementary material for this article, please visit https://doi.org/10.1017/S0003055417000533.

Replication material can be found on Dataverse at https://doi.org/10.7910/DVN/K3QWZW.

## REFERENCES

Achen, Christopher H. 1978. "Measuring Representation." *American Journal of Political Science* 22 (3): 475–510.

Achen, Christopher H., and Larry M. Bartels. 2016. *Democracy for Realists: Why Elections Do Not Produce Responsive Government*. Princeton, NJ: Princeton University Press.

Alesina, Alberto. 1988. "Credibility and Policy Convergence in a Two-Party System with Rational Voters." *American Economic Review* 78 (4): 796–805.

Alexander, Herbert E., and Laura L. Denny. 1966. *Regulation of Political Finance*. Berkeley, CA and Princeton, NJ: Institute of Governmental Studies, University of California, Berkeley and Citizens' Research Foundation.

Angrist, Joshua David, and Jörn-Steffen Pischke. 2009. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton, NJ: Princeton University Press.

Ansolabehere, Stephen, James M. Snyder Jr., and Charles Stewart III. 2001. "Candidate Positioning in U.S. House Elections." *American Journal of Political Science* 45 (1): 136–59.

Arceneaux, Kevin. 2002. "Direct Democracy and the Link between Public Opinion and State Abortion Policy." *State Politics & Policy Quarterly* 2 (4): 372–87.

Arnold, R. Douglas. 1990. *The Logic of Congressional Action*. New Haven, CT: Yale University Press.

Bafumi, Joseph, and Michael C. Herron. 2010. "Leapfrog Representation and Extremism: A Study of American Voters and Their Members in Congress." *American Political Science Review* 104 (3): 519–42.

Bailey, Michael A. 2007. "Comparable Preference Estimates across Time and Institutions for the Court, Congress, and Presidency." *American Journal of Political Science* 51 (3): 433–48.

Bailey, Michael A., and Mark Carl Rom. 2004. "A Wider Race? Interstate Competition across Health and Welfare Programs." *Journal of Politics* 66 (2): 326–47.

Barber, Michael J. 2016. "Ideological Donors, Contribution Limits, and the Polarization of American Legislatures." *Journal of Politics* 78 (1): 296–310.

Bartels, Larry M. 2008. *Unequal Democracy: The Political Economy of the New Gilded Age*. Princeton, NJ: Princeton University Press.

Beck, Nathaniel, and Jonathan N. Katz. 2011. "Modeling Dynamics in Time-Series–Cross-Section Political Economy Data." *Annual Review of Political Science* 14: 331–52.

Berry, William D., Evan J. Ringquist, Richard C. Fording, and Russell L. Hanson. 1998. "Measuring Citizen and Government Ideology in the American States, 1960–93." *American Journal of Political Science* 42 (1): 327–48.

Besley, Timothy, and Anne Case. 2003. "Political Institutions and Policy Choices: Evidence from the United States." *Journal of Economic Literature* 41 (1): 7–73.

Besley, Timothy, and Stephen Coate. 1997. "An Economic Model of Representative Democracy." *Quarterly Journal of Economics* 112 (1): 85–114.

Brown, Robert D. 1995. "Party Cleavages and Welfare Effort in the American States." *American Political Science Review* 89 (1): 23–33.

Carmines, Edward G., and James A. Stimson. 1980. "The Two Faces of Issue Voting." *American Political Science Review* 74 (1): 78–91.

Caughey, Devin. Forthcoming. *The Unsolid South: Mass Politics and National Representation in an Exclusionary One-Party Enclave*. Princeton, NJ: Princeton University Press.

Caughey, Devin, Chris Tausanovitch, and Christopher Warshaw. 2017. "Partisan Gerrymandering and the Political Process: Effects on Roll-Call Voting and State Policies." *Election Law Journal*. (Symposium on Partisan Gerrymandering and the Efficiency Gap). Prepublished. doi:10.1089/elj.20170452.

Caughey, Devin, and Christopher Warshaw. 2015. "Dynamic Estimation of Latent Opinion Using a Hierarchical Group-Level IRT Model." *Political Analysis* 23 (2): 197–211.

Caughey, Devin, and Christopher Warshaw. 2016. "The Dynamics of State Policy Liberalism, 1936–2014." *American Journal of Political Science* 60 (4): 899–913.

Caughey, Devin, Christopher Warshaw, and Yiqing Xu. 2017. "Incremental Democracy: The Policy Effects of Partisan Control of State Government." *Journal of Politics* 79 (4): 1–17.

Clark, Jennifer Hayes, and R. Lucas Williams. 2014. "Parties, Term Limits, and Representation in the U.S. States." *American Politics Research* 42 (1): 171–93.

Dahl, Robert A. 1971. *Polyarchy: Participation and Opposition*. New Haven, CT: Yale University Press.

Dahl, Robert A. 1989. *Democracy and Its Critics*. New Haven, CT: Yale University Press.

De Boef, Suzanna, and Luke Keele. 2008. "Taking Time Seriously." *American Journal of Political Science* 52 (1): 184–200.

Downs, Anthony. 1957. *An Economic Theory of Democracy*. New York: Harper & Row.

Dunham, James, Devin Caughey, and Christopher Warshaw. 2016. *dgo: Dynamic Estimation of Group-Level Opinion*. R package version 0.2.3. https://jamesdunham.github.io/dgo/.

Dye, Thomas R. 1966. *Politics, Economics, and the Public: Political Outcomes in the American States*. Chicago: Rand McNally.

Enns, Peter K., and Julianna Koch. 2013. "Public Opinion in the U.S. States: 1956 to 2010." *State Politics & Policy Quarterly* 13 (3): 349–72.

Erikson, Robert S., Michael B. MacKuen, and James A. Stimson. 2002. *The Macro Polity*. New York: Cambridge University Press.

Erikson, Robert S., Gerald C. Wright, and John P. McIver. 1993. *Statehouse Democracy: Public Opinion and Policy in the American States*. New York: Cambridge University Press.

Erikson, Robert S., Gerald C. Wright, and John P. McIver. 2006. "Public Opinion in the States: A Quarter Century of Change and Stability." In *Public Opinion in State Politics*, ed. Jeffrey E. Cohen, 229–53. Palo Alto, CA: Stanford University Press.

Fearon, James D. 1999. "Electoral Accountability and the Control of Politicians: Selecting Good Types versus Sanctioning Poor Per-

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

formance." In *Democracy, Accountability, and Representation*, eds. Adam Przeworski, Susan Carol Stokes, and Bernard Manin, 55–97 New York: Cambridge University Press.

Feigenbaum, James J., Alexander Fouirnaies, and Andrew B. Hall. 2017 "The Majority Party Disadvantage: Revising Theories of Legislative Organization." *Quarterly Journal of Political Science* 12 (3): 269–300.

Folke, Olle, and James M. Snyder 2012. "Gubernatorial Midterm Slumps." *American Journal of Political Science* 56 (4): 931–48.

Ford, Pamela S. 1955. *Regulation of Campaign Finance*. Bureau of Public Administration, University of California.

Fowler, Anthony, and Andrew B. Hall. 2016. "The Elusive Quest for Convergence." *Quarterly Journal of Political Science* 11 (1): 131–49.

Fowler, Anthony, and Andrew B. Hall. 2017. "Long-Term Consequences of Election Results." *British Journal of Political Science* 47 (2): 351–72.

Gerber, Elisabeth R. 1996. "Legislative Response to the Threat of Popular Initiatives." *American Journal of Political Science* 40 (1): 99–128.

Gilens, Martin. 2012. *Affluence and Influence: Economic Inequality and Political Power in America*. Princeton, NJ: Princeton University Press.

Gray, Virginia, David Lowery, Matthew Fellowes, and Andrea McAtee. 2004. "Public Opinion, Public Policy, and Organized Interests in the American States." *Political Research Quarterly* 57 (3): 411–20.

Honaker, James, Gary King, and Matthew Blackwell. 2011. "Amelia II: A Program for Missing Data." *Journal of Statistical Software* 45 (7): 1–47. http://www.jstatsoft.org/v45/i07/.

Hopkins, Daniel J. Forthcoming. *The Increasingly United States: How and Why American Political Behavior Nationalized*. Chicago: University of Chicago Press.

Jessee, Stephen A. 2009. "Spatial Voting in the 2004 Presidential Election." *American Political Science Review* 103 (1): 59–81.

Kastellec, Jonathan P., Jeffrey R. Lax, Michael Malecki, and Justin H. Phillips. 2015. "Polarizing the Electoral Connection: Partisan Representation in Supreme Court Confirmation Politics." *Journal of Politics* 77 (3): 787–804.

Key, Jr., V. O. 1949. *Southern Politics in State and Nation*. New York: Knopf.

Kingdon, John W. 1989. *Congressmen's Voting Decisions*. Ann Arbor: University of Michigan Press.

Kingdon, John W. 1995. *Agendas, Alternatives, and Public Policies*. 2nd ed. New York: HarperCollins.

Klarner, Carl. 2013. *State Partisan Balance Data, 1937–2011*. http://hdl.handle.net/1902.1/20403.

Kousser, J. Morgan. 1974. *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South*. New Haven, CT: Yale University Press.

Kousser, Thad. 2005. *Term Limits and the Dismantling of State Legislative Professionalism*. New York: Cambridge University Press.

Kousser, Thad, Jeffrey B. Lewis, and Seth E. Masket. 2007. "Ideological Adaptation? The Survival Instinct of Threatened Legislators." *Journal of Politics* 69 (3): 828–43.

La Raja, Raymond J., and Brian F. Schaffner. 2014. "The Effects of Campaign Finance Spending Bans on Electoral Outcomes: Evidence from the States about the Potential Impact of *Citizens United v. FEC*." *Electoral Studies* 33 (March): 102–14.

La Raja, Raymond J., and Brian F. Schaffner. 2015. *Campaign Finance and Political Polarization: When Purists Prevail*. Ann Arbor: University of Michigan Press.

Lascher, Edward L., Michael G. Hagen, and Steven A. Rochlin. 1996. "Gun Behind the Door? Ballot Initiatives, State Policies and Public Opinion." *Journal of Politics* 58 (3): 760–75.

Lax, Jeffrey R., and Justin H. Phillips. 2009. "Gay Rights in the States: Public Opinion and Policy Responsiveness." *American Political Science Review* 103 (3): 367–86.

Lax, Jeffrey R., and Justin H. Phillips. 2012. "The Democratic Deficit in the States." *American Journal of Political Science* 56 (1): 148–66.

Lee, David S., Enrico Moretti, and Matthew J. Butler. 2004. "Do Voters Affect or Elect Policies? Evidence from the U.S. House." *Quarterly Journal of Economics* 119 (3): 807–59.

Levitt, Steven D. 1996. "How Do Senators Vote? Disentangling the Role of Voter Preferences, Party Affiliation, and Senator Ideology." *American Economic Review* 86 (3): 425–41.

Maestas, Cherie. 2000. "Professional Legislatures and Ambitious Politicians: Policy Responsiveness of State Institutions." *Legislative Studies Quarterly* 25 (4):663–90.

Matsusaka, John G. 2001. "Problems with a Methodology Used to Evaluate the Voter Initiative." *Journal of Politics* 63 (4): 1250–56.

Matsusaka, John G. 2008. *For the Many or the Few: The Initiative, Public Policy, and American Democracy*. Chicago: University of Chicago Press.

Matsusaka, John G. 2010. "Popular Control of Public Policy: A Quantitative Approach." *Quarterly Journal of Political Science* 5 (2): 133–67.

Mayhew, David R. 1974. *Congress: The Electoral Connection*. New Haven, CT: Yale UP.

McGann, Anthony J. 2014. "Estimating the Political Center from Aggregate Data: An Item Response Theory Alternative to the Stimson Dyad Ratios Algorithm." *Political Analysis* 22 (1): 115–29.

Mickey, Robert W. 2015. *Paths Out of Dixie: The Democratization of Authoritarian Enclaves in America's Deep South*. Princeton, NJ: Princeton University Press.

Miller, Warren E., and Donald E. Stokes. 1963. "Constituency Influence in Congress." *American Political Science Review* 57 (1): 45–56.

Monogan, James, Virginia Gray, and David Lowery. 2009. "Public Opinion, Organized Interests, and Policy Congruence in Initiative and Noninitiative U.S. States." *State Politics & Policy Quarterly* 9 (3): 304–24.

Nickell, Stephen. 1981. "Biases in Dynamic Models with Fixed Effects." *Econometrica* 49 (1): 1417–26.

Oates, Wallace E. 1972. *Fiscal Federalism*. New York: Harcourt Brace Jovanovich.

Pacheco, Julianna. 2011. "Using National Surveys to Measure Dynamic U.S. State Public Opinion: A Guideline for Scholars and an Application." *State Politics & Policy Quarterly* 11 (4): 415–39.

Pacheco, Julianna. 2013. "The Thermostatic Model of Responsiveness in the American States." *State Politics & Policy Quarterly* 13 (3): 306–32.

Page, Benjamin, and Robert Shapiro. 1983. "Effects of Public Opinion on Policy." *American Political Science Review* 77 (1): 175–90.

Page, Benjamin, and Robert Shapiro. 1992. *The Rational Public: Fifty Years of Trends in Americans' Policy Preferences*. Chicago: University of Chicago.

Pew Charitable Trusts. 2016. *Fact Sheet: Share of States' Budgets From Federal Grants Stabilizes*. http://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2016/08/share-of-states-budgets-from-federal-grants-stabilizes.

Poole, Keith T. 2007. "Changing Minds? Not in Congress!" *Public Choice* 131 (3): 435–51.

Poole, Keith T., and Howard Rosenthal. 1984. "The Polarization of American Politics." *Journal of Politics* 46 (4): 1061–79.

Poole, Keith T., and Howard Rosenthal. 2007. *Ideology & Congress*. New Brunswick, NJ: Transaction Publishers.

Przeworski, Adam, Susan Carol Stokes, and Bernard Manin, eds,. 1999. *Introduction to Democracy, Accountability, and Representation*. New York: Cambridge University Press.

Quinn, Kevin M. 2004. "Bayesian Factor Analysis for Mixed Ordinal and Continuous Responses." *Political Analysis* 12 (4): 338–53.

Ringquist, Evan J., and James C. Garand. 1999. Policy Change in the American States. In *American State and Local Politics: Directions for the 21st Century*, eds. Ronald E. Weber and Paul Brace. New York: pn , 268–99.

Rogers, Steven. 2016. "National Forces in State Legislative Elections." *ANNALS of the American Academy of Political and Social Science* 667 (September): 207–25.

Ruggles, Steven, J. Trent Alexander, Katie Genadek, Ronald Goeken, Matthew B. Schroeder, and Matthew Sobek. 2010. *Integrated Public Use Microdata Series: Version 5.0 [Machine-readable database]*. Minneapolis: University of Minnesota.

Shor, Boris, and Nolan McCarty. 2011. "The Ideological Mapping of American Legislatures." *American Political Science Review* 105 (3): 530–51.

Snyder, Jr., James M., and Michael M. Ting. 2003. "Roll Calls, Party Labels, and Elections." *Political Analysis* 11 (4): 419–44.

Soroka, Stuart, and Christopher Wlezien. 2010. *Degrees of Democracy: Politics, Public Opinion, and Policy*. New York: Cambridge University Press.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

265

Devin Caughey and Christopher Warshaw

Springer, Melanie Jean. 2014. *How the States Shaped the Nation: American Electoral Institutions and Voter Turnout, 1920–2000*. Chicago: University of Chicago Press.

Squire, Peverill. 1992. "Legislative Professionalization and Membership Diversity in State Legislatures." *Legislative Studies Quarterly* 17 (1): 69–79.

Squire, Peverill. 2007. "Measuring State Legislative Professionalism: The Squire Index Revisited." *State Politics & Policy Quarterly* 7 (2): 211–27.

Stimson, James A. 1991. *Public Opinion in America: Moods, Cycles, and Swings*. Boulder, CO: Westview.

Stimson, James A. 2009. "Perspectives on Unequal Democracy: The Political Economy of the New Gilded Age." *Perspectives on Politics* 7 (1): 151–3.

Stimson, James A., Michael B. MacKuen, and Robert S. Erikson. 1995. "Dynamic Representation." *American Political Science Review* 89 (3): 543–65.

Stimson, James A., Cyrille Thiébaut, and Vincent Tiberj. 2012. "The Evolution of Policy Attitudes in France." *European Union Politics* 13 (2): 293–316.

Stratmann, Thomas, and Francisco J. Aparicio-Castillo. 2006. "Competition Policy for Elections: Do Campaign Contribution Limits Matter?" *Public Choice* 127 (1): 177–206.

Tanner, Martin A. 1996. *Tools for Statistical Inference Methods for the Exploration of Posterior Distributions and Likelihood Functions*. 3rd ed. New York: Springer.

Tausanovitch, Chris, and Christopher Warshaw. 2013. "Measuring Constituent Policy Preferences in Congress, State Legislatures and Cities." *Journal of Politics* 75 (2): 330–42.

Tausanovitch, Chris, and Christopher Warshaw. 2014. "Representation in Municipal Government." *American Political Science Review* 108 (3): 605–41.

Treier, Shawn, and D. Sunshine Hillygus. 2009. "The Nature of Political Ideology in the Contemporary Electorate." *Public Opinion Quarterly* 73 (4): 679–703.

Treier, Shawn, and Simon Jackman. 2008. "Democracy as a Latent Variable." *American Journal of Political Science* 52 (1): 201–17.

Weissberg, Robert. 1978. "Collective vs. Dyadic Representation in Congress." *American Political Science Review* 72 (2): 535–47.

Werner, Timothy, and John J. Coleman. 2013. "Assessing the Potential Effects of Citizens United: Policy and Corporate Governance in the States." Paper prepared for the Meeting of the Public Choice Society, New Orleans, LA. http://users.polisci.wisc.edu/coleman/wernercolemanpcs2013.pdf.

https://doi.org/10.1017/S0003055417000533 Published online by Cambridge University Press

1    SB184

2    216600-4

3    By Senators Shelnutt and Allen

4    RFD: Healthcare

5    First Read: 03-FEB-22


Exhibit
0020

1    SB184

2

3

4    <u>ENROLLED</u>, An Act,

5           Relating to public health; to prohibit the

6    performance of a medical procedure or the prescription of

7    medication, upon or to a minor child, that is intended to

8    alter the minor child's gender or delay puberty; to provide

9    for exceptions; to provide for disclosure of certain

10   information concerning students to parents by schools; and to

11   establish criminal penalties for violations; and in connection

12   therewith would have as its purpose or effect the requirement

13   of a new or increased expenditure of local funds within the

14   meaning of Amendment 621 of the Constitution of Alabama of

15   1901, as amended by Amendment 890, now appearing as Section

16   111.05 of the Official Recompilation of the Constitution of

17   Alabama of 1901, as amended.

18   BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

19          Section 1. This act shall be known and may be cited

20   as the Alabama Vulnerable Child Compassion and Protection Act

21   (V-CAP).

22          Section 2. The Legislature finds and declares the

23   following:

24          (1) The sex of a person is the biological state of

25   being female or male, based on sex organs, chromosomes, and

SB184

1   endogenous hormone profiles, and is genetically encoded into a

2   person at the moment of conception, and it cannot be changed.

3       (2) Some individuals, including minors, may

4   experience discordance between their sex and their internal

5   sense of identity, and individuals who experience severe

6   psychological distress as a result of this discordance may be

7   diagnosed with gender dysphoria.

8       (3) The cause of the individual's impression of

9   discordance between sex and identity is unknown, and the

10  diagnosis is based exclusively on the individual's self-report

11  of feelings and beliefs.

12      (4) This internal sense of discordance is not

13  permanent or fixed, but to the contrary, numerous studies have

14  shown that a substantial majority of children who experience

15  discordance between their sex and identity will outgrow the

16  discordance once they go through puberty and will eventually

17  have an identity that aligns with their sex.

18      (5) As a result, taking a wait-and-see approach to

19  children who reveal signs of gender nonconformity results in a

20  large majority of those children resolving to an identity

21  congruent with their sex by late adolescence.

22      (6) Some in the medical community are aggressively

23  pushing for interventions on minors that medically alter the

24  child's hormonal balance and remove healthy external and

SB184

1    internal sex organs when the child expresses a desire to
2    appear as a sex different from his or her own.

3              (7) This course of treatment for minors commonly
4    begins with encouraging and assisting the child to socially
5    transition to dressing and presenting as the opposite sex. In
6    the case of prepubertal children, as puberty begins, doctors
7    then administer long-acting GnRH agonist (puberty blockers)
8    that suppress the pubertal development of the child. This use
9    of puberty blockers for gender nonconforming children is
10   experimental and not FDA-approved.

11             (8) After puberty blockade, the child is later
12   administered "cross-sex" hormonal treatments that induce the
13   development of secondary sex characteristics of the other sex,
14   such as causing the development of breasts and wider hips in
15   male children taking estrogen and greater muscle mass, bone
16   density, body hair, and a deeper voice in female children
17   taking testosterone. Some children are administered these
18   hormones independent of any prior pubertal blockade.

19             (9) The final phase of treatment is for the
20   individual to undergo cosmetic and other surgical procedures,
21   often to create an appearance similar to that of the opposite
22   sex. These surgical procedures may include a mastectomy to
23   remove a female adolescent's breasts and "bottom surgery" that
24   removes a minor's health reproductive organs and creates an

1   artificial form aiming to approximate the appearance of the
2   genitals of the opposite sex.

3       (10) For minors who are placed on puberty blockers
4   that inhibit their bodies from experiencing the natural
5   process of sexual development, the overwhelming majority will
6   continue down a path toward cross-sex hormones and cosmetic
7   surgery.

8       (11) This unproven, poorly studied series of
9   interventions results in numerous harmful effects for minors,
10  as well as risks of effects simply unknown due to the new and
11  experimental nature of these interventions.

12      (12) Among the known harms from puberty blockers is
13  diminished bone density; the full effect of puberty blockers
14  on brain development and cognition are yet unknown, though
15  reason for concern is now present. There is no research on the
16  long-term risks to minors of persistent exposure to puberty
17  blockers. With the administration of cross-sex hormones comes
18  increased risks of cardiovascular disease, thromboembolic
19  stroke, asthma, COPD, and cancer.

20      (13) Puberty blockers prevent gonadal maturation and
21  thus render patients taking these drugs infertile. Introducing
22  cross-sex hormones to children with immature gonads as a
23  direct result of pubertal blockade is expected to cause
24  irreversible sterility. Sterilization is also permanent for
25  those who undergo surgery to remove reproductive organs, and

SB184

1    such persons are likely to suffer through a lifetime of

2    complications from the surgery, infections, and other

3    difficulties requiring yet more medical intervention.

4         (14) Several studies demonstrate that hormonal and

5    surgical interventions often do not resolve the underlying

6    psychological issues affecting the individual. For example,

7    individuals who undergo cross-sex cosmetic surgical procedures

8    have been found to suffer from elevated mortality rates higher

9    than the general population. They experience significantly

10   higher rates of substance abuse, depression, and psychiatric

11   hospitalizations.

12        (15) Minors, and often their parents, are unable to

13   comprehend and fully appreciate the risk and life

14   implications, including permanent sterility, that result from

15   the use of puberty blockers, cross-sex hormones, and surgical

16   procedures.

17        (16) For these reasons, the decision to pursue a

18   course of hormonal and surgical interventions to address a

19   discordance between the individual's sex and sense of identity

20   should not be presented to or determined for minors who are

21   incapable of comprehending the negative implications and

22   life-course difficulties attending to these interventions.

23        Section 3. For the purposes of this act, the

24   following terms shall have the following meanings:

1          (1) MINOR. The same meaning as in Section 43-8-1,
2     Code of Alabama 1975.
3          (2) PERSON. Includes any of the following:
4          a. Any individual.
5          b. Any agent, employee, official, or contractor of
6     any legal entity.
7          c. Any agent, employee, official, or contractor of a
8     school district or the state or any of its political
9     subdivisions or agencies.
10          (3) SEX. The biological state of being male or
11     female, based on the individual's sex organs, chromosomes, and
12     endogenous hormone profiles.
13          Section 4. (a) Except as provided in subsection (b),
14     no person shall engage in or cause any of the following
15     practices to be performed upon a minor if the practice is
16     performed for the purpose of attempting to alter the
17     appearance of or affirm the minor's perception of his or her
18     gender or sex, if that appearance or perception is
19     inconsistent with the minor's sex as defined in this act:
20          (1) Prescribing or administering puberty blocking
21     medication to stop or delay normal puberty.
22          (2) Prescribing or administering supraphysiologic
23     doses of testosterone or other androgens to females.
24          (3) Prescribing or administering supraphysiologic
25     doses of estrogen to males.

1      (4) Performing surgeries that sterilize, including

2  castration, vasectomy, hysterectomy, oophorectomy,

3  orchiectomy, and penectomy.

4      (5) Performing surgeries that artificially construct

5  tissue with the appearance of genitalia that differs from the

6  individual's sex, including metoidioplasty, phalloplasty, and

7  vaginoplasty.

8      (6) Removing any healthy or non-diseased body part

9  or tissue, except for a male circumcision.

10      (b) Subsection (a) does not apply to a procedure

11  undertaken to treat a minor born with a medically verifiable

12  disorder of sex development, including either of the

13  following:

14      (1) An individual born with external biological sex

15  characteristics that are irresolvably ambiguous, including an

16  individual born with 46 XX chromosomes with virilization, 46

17  XY chromosomes with under virilization, or having both ovarian

18  and testicular tissue.

19      (2) An individual whom a physician has otherwise

20  diagnosed with a disorder of sexual development, in which the

21  physician has determined through genetic or biochemical

22  testing that the person does not have normal sex chromosome

23  structure, sex steroid hormone production, or sex steroid

24  hormone action for a male or female.

25      (c) A violation of this section is a Class C felony.

1           Section 5. No nurse, counselor, teacher, principal,

2   or other administrative official at a public or private school

3   attended by a minor shall do either of the following:

4           (1) Encourage or coerce a minor to withhold from the

5   minor's parent or legal guardian the fact that the minor's

6   perception of his or her gender or sex is inconsistent with

7   the minor's sex.

8           (2) Withhold from a minor's parent or legal guardian

9   information related to a minor's perception that his or her

10   gender or sex is inconsistent with his or her sex.

11           Section 6. Except as provided for in Section 4,

12   nothing in this act shall be construed as limiting or

13   preventing psychologists, psychological technicians, and

14   master's level licensed mental health professionals from

15   rendering the services for which they are qualified by

16   training or experience involving the application of recognized

17   principles, methods, and procedures of the science and

18   profession of psychology and counseling.

19           Section 7. Nothing in this section shall be

20   construed to establish a new or separate standard of care for

21   hospitals or physicians and their patients or otherwise

22   modify, amend, or supersede any provision of the Alabama

23   Medical Liability Act of 1987 or the Alabama Medical Liability

24   Act of 1996, or any amendment or judicial interpretation of

25   either act.

SB184

1        Section 8. If any part, section, or subsection of
2    this act or the application thereof to any person or
3    circumstances is held invalid, the invalidity shall not affect
4    parts, sections, subsections, or applications of this act that
5    can be given effect without the invalid part, section,
6    subsection, or application.

7        Section 9. This act does not affect a right or duty
8    afforded to a licensed pharmacist by state law.

9        Section 10. Although this bill would have as its
10   purpose or effect the requirement of a new or increased
11   expenditure of local funds, the bill is excluded from further
12   requirements and application under Amendment 621, as amended
13   by Amendment 890, now appearing as Section 111.05 of the
14   Official Recompilation of the Constitution of Alabama of 1901,
15   as amended, because the bill defines a new crime or amends the
16   definition of an existing crime.

17       Section 11. This act shall become effective 30 days
18   following its passage and approval by the Governor, or its
19   otherwise becoming law.

SB184

_____

President and Presiding Officer of the Senate


_____

Speaker of the House of Representatives


SB184
Senate 23-FEB-22
I hereby certify that the within Act originated in and passed
the Senate, as amended.

                              Patrick Harris,
                              Secretary.

_____


House of Representatives
Passed: 07-APR-22

_____


By: Senator Shelnutt

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; *et al.*,

      Plaintiffs,

and

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

     v.

STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; *et al.*,

      Defendants.

Case No. 2:22-cv-184-LCB-CWB

Honorable Liles C. Burke

**PLAINTIFF-INTERVENOR UNITED STATES' DISCLOSURE OF REBUTTAL EXPERT TESTIMONY OF DEVIN CAUGHEY, PHD**

**Exhibit 0021**

1

# TABLE OF CONTENTS

ANALYSES AND OPINIONS ................................................................7

Defendants' expert reports ...........................................................7

Summary of opinions ....................................................................8

Pattern of discrimination .............................................................9

    LGBT policies before Obergefell ............................................10

    Transgender policies since Obergefell ....................................13

    Recent anti-LGBT legislation in Alabama ...............................24

Legislative history of SB184 ......................................................29

    Origins of SB184 ....................................................................30

    Justifications for SB184 ..........................................................32

    Opposition to SB184 and foreseeability of harm .....................36

CONCLUSION ............................................................................39

REFERENCES ............................................................................42

I, Devin Caughey, PhD, hereby declare and state as follows:

1.      I have been retained by counsel for the United States (U.S.) as an expert in connection with the above-captioned litigation.

2.      I have actual knowledge of the matters stated in this report. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

3.      I am a professor of political science at the Massachusetts Institute of Technology. I hold a B.A. in History from Yale University, an M.Phil. in Historical Studies from Cambridge University, and an M.A. and Ph.D. in Political Science from the University of California–Berkeley. My M.Phil. and Ph.D. dissertations focused on the politics of the American South in the early to mid-twentieth century.

4.      As a professor of political science at MIT, I teach undergraduate and PhD-level classes on American politics (e.g., American Political Institutions), research design (e.g., Political Science Scope and Methods), and statistics (e.g., Bayesian Measurement Models).

5.      I have published 17 peer-reviewed articles and three academic books, primarily on topics related to U.S. state and national politics as well as political methodology. My first book, *The Unsolid South* (Princeton University Press, 2018), examined public opinion, electoral competition, and congressional representation in the one-party South. My third, *Dynamic Democracy* (with

Christopher Warshaw, University of Chicago Press, 2022), analyzed the dynamic interplay between public opinion and state policymaking between the 1930s and 2020s.

6.      My work in these areas has been the recipient of numerous awards, including the American Political Science Association (APSA) awards for best dissertation on politics and history, best article on state politics and policy, and best books on state politics and policy and on political organizations and parties.

7.      I have served in various leadership positions in my field. I am a member of the executive councils of APSA's State Politics and Policy Section as well as its Politics and History Section. I serve on the advisory board of the Consortium on American Political Economy. I am also currently co-editor of *The Forum: A Journal of Applied Research in Contemporary Politics*.

8.      The information provided regarding my professional background, experiences, publications, and presentations is detailed in my curriculum vitae (CV), which is attached as **Exhibit A**.

9.      I am being compensated at an hourly rate of $350 for my work on this case. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

10.      I have previously served as an expert witness in the following cases: *Graham v. Adams*, 22-CI-47 (Ky. Cir. Ct., Franklin Cnty.); *Carter v. Chapman*,

464 MD 2021 (Pa. Cmmnwealth Ct.); and *Clarno v. Fagan*, 21-cv-40180 (Or. Cir. Ct., Marion Cnty.).

11.     In addition, in 2022 I testified before the Pennsylvania Legislative Reapportionment Commission regarding the Pennsylvania state senate map.

12.     I was engaged by the U.S. Department of Justice to provide an expert rebuttal opinion in connection with the above-captioned litigation. Specifically, I was asked to rebut Defendants' experts' claims that Alabama Senate Bill 184 (SB184) is not intended to discriminate on the basis of sex or transgender status, but rather to protect minors from "experimental treatments" (Nangia 2023, 87) [1] that have been subject to inappropriate "politicization" (Kaliebe 2023, 27).

13.     In preparing this rebuttal report, I reviewed the expert reports and supplemental reports of Dr. James Cantor, Dr. Kristopher Kaliebe, and Dr. Geeta Nangia.

14.     In preparing this rebuttal report, I have relied on my years of relevant experience, as detailed in my CV (attached as Exhibit A), and on the materials listed therein. I have reviewed the sources cited throughout this rebuttal report and listed in the References section of this report, which include some of the documents produced by the U.S. as part of discovery. The materials I have relied

---

[1] This citation refers to page 87 of Dr. Nangia's initial expert report dated 2023. Unless otherwise noted, I use this citation format throughout this report.

upon in preparing this report are the same types of materials that experts in political science regularly rely upon when forming opinions on the subject. These materials include news reports, videos of hearings, interest-group websites, academic datasets, and information on specific bills from the Alabama Legislature and LegiScan, all of which are publicly available information.[2] In addition, I relied on research assistance from Dr. Scott Lacombe, an assistant professor of Government at Smith College, which is also typical in my field. All analyses and opinions are my own.

15.     I reserve the right to revise and supplement the opinions expressed in this rebuttal report or the bases for them if any new information becomes available in the future or in response to statements or issues that may arise in my area of expertise. I may further supplement these opinions in response to information produced in discovery or in response to additional information from Defendants' or Private Plaintiffs' experts.

16.     Based on an assessment of the political context and legislative history of SB184 as well as my expertise in political science, I offer the opinions set forth below.

---

[2] A few sources I relied on were accessed through MIT's subscriptions to scholarly or journalistic publications, such as the online news database Factiva.

# ANALYSES AND OPINIONS

## **Defendants' expert reports**

17.     This rebuttal responds primarily to the reports of three experts for Defendants: Cantor (2023), Kaliebe (2023), and Nangia (2023).[3]

18.     Defendants' expert reports cover several key premises of Defendants' positions:

- that human beings are naturally "sexually dimorphic", comprising two sexes with distinct physical characteristics (Kaliebe 2023, 11);

- that rates of "rapid-onset gender dysphoria" have "sky-rocketed" over the last decade as a result of "a spread of ideology combined with technologically induced contagion effects" (Kaliebe 2023, 7, 13);[4]

- that gender dysphoria is a serious condition requiring "compassionate care" in the form of "psychosocial supports and psychotherapy" (Nangia 2023, 87; Kaliebe 2023, 52);

---

[3] Although this rebuttal responds to these three defense experts primarily, other defense experts make similar assertions. See, for example, Hruz (2023), pages 7–8 (sex as biologically determined binary), 74–75 ("rapid onset"), 123 (GAC "experimental"), and 122 (American Academy of Pediatrics is "politically influenced"); Laidlaw (2023), pages 3 (sex as biologically determined binary), 48 (social contagion), 15 (GAC "experimental"), and 41–43 (politicization of medical associations); and Lappert (2023), page 25 (GAC "experimental").

[4] On pages 11–12, Kaliebe (2023) asserts that "Long-standing scholarly consensus exists confirming that direct social contagion…affects health such as cardiac disease (Christakis 2013)," which is presumably a reference to the Christakis and Fowler (2013) article in his bibliography. It should be noted that the central research underpinning this supposed "consensus," Christakis and Fowler's analyses of obesity contagion in the Framingham Heart Study, has recently been shown to be based on faulty statistical methods (Ogburn et al. 2024).

- that the treatments involved in gender-affirming care are prohibited because they are "experimental" (Nangia 2023, 87), "lacking causal evidence of mental health improvement" (Cantor 2023, 74); and

- that medical professional associations' endorsement of these treatments is the consequence of the efforts of "[s]mall numbers of advocate physicians" to "politicize[]" the issue and "silence [scientific] debate" (Kaliebe 2023, 7).

## **Summary of opinions**

- In recent years, Alabama has been on the forefront of considering and adopting newly salient policies that restrict transgender rights across many fronts. This continues the state's long history of hostility to LGBT rights.

- Adoption of a gender-affirming care (GAC) ban for minors is predicted almost perfectly by a state's hostility towards transgender rights in other domains.

- Adoption of a GAC ban for minors is inversely related to states' paternalism in healthcare generally.

- Sex, gender identity, and transgender status were central to the legislature's understanding of the purpose of SB184.

- The supporters of SB184 in the legislature viewed it as part of a multifaceted defense of essentialist understandings of sex and gender against the threat of "gender dysphoria".

- Despite SB184's nominal focus on hormone and surgical treatments, the legislature explicitly declined to exempt psychotherapeutic treatments from the bill's restrictions, which is consistent with a general hostility to gender nonconformity per se.

- The legislature had ample opportunity to learn of the opposition of transgender Alabamians, along with their parents, physicians, and teachers, and thus should have foreseen the harms that SB184 would cause.

**Pattern of discrimination**

19.     Defendants' expert reports emphasize that their opposition to gender-affirming care (GAC) is based on "compassion[]" (Nangia 2023, 87) rather than animus toward transgender people. While this may be true of the experts personally, the state of Alabama has a long history of restricting the rights of transgender persons and other sexual minorities, even relative to the standards of the time. This section documents Alabama's pattern of LGBT discrimination and provides evidence that anti-LGBT bias and not other factors best explain the state's adoption of SB184.

20.     The 2015 *Obergefell* decision is often seen as a dividing line in states' LGBT policymaking. "With the marriage question seemingly settled, gender identity became the next theater in the battle over LGBTQ rights" (Carlisle 2022; see also Mezey 2020, 494). Before 2015, relatively few state policies addressed transgender rights specifically, but the rights of transgender persons were subsumed under gay rights generally.[5] For this reason, this section first examines

---

[5] Historically, transgender rights and gay rights have been closely linked, not least because the sexual identity and sexual orientation have often been conflated with one another, both in the public mind and by policy makers (Chauncey 1994; Canaday 2009).

state policies on gay rights generally before 2015 and then transgender policies specifically since 2015.

### LGBT policies before *Obergefell*

21.    Across the nation, state policies towards the LGBT population have become much less restrictive over the past half century. Prohibitions such as criminalization of sodomy have been repealed or struck down by courts, and new rights, such as protections against employment discrimination, have been created and broadened. Alabama has shared in this trend towards the expansion of rights for the LGBT population. Nevertheless, at each point in time, it has consistently been among the states with the most restrictions on LGBT rights.[6]

22.    Alabama's pattern of hostility to LGBT rights can be measured systematically using data from Caughey and Warshaw (2022, 14–16), which contains yearly information on states' adoption of 186 distinct policies.[7] Of these

---

[6] This has also been true of the U.S. South generally, but even within that region Alabama is an outlier (Barth 2021).

[7] The Caughey-Warshaw dataset is the most comprehensive time-series–cross-sectional dataset of U.S. state policies. It covers 186 public policies that can be coded comparably across states. For each year between 1929 and 2020, the dataset indicates the policy choice that each state made. For example, for the policy sodomy criminalization, the dataset indicates whether or not each state criminalized sodomy in each year. If all states had the same value for a policy in a given year, as was true of sodomy criminalization after 2005, that policy-year combination is dropped from the dataset.

policies, a subset of 13 relate to LGBT rights and were in place in any state between 1992 and 2014 (the year before *Obergefell*):

- Sodomy criminalization
- Fostering by same-sex couples
- Joint adoption by same-sex couples
- LGBT credit antidiscrimination law
- LGBT employment antidiscrimination law
- LGBT hate crimes law
- LGBT housing antidiscrimination law
- LGBT panic defense prohibition
- LGBT public accommodations antidiscrimination law
- Conversion therapy ban
- Preemption of local LGBT antidiscrimination ordinances
- Preemption of local LGBT antidiscrimination ordinances related to education
- Same-sex marriage

23.     The Caughey-Warshaw dataset pre-codes these policies to indicate whether or to what degree the policy was in place in each state-year.[8] A policy appears in the dataset only for years when there was cross-state variation on that policy. Thus, for example, sodomy criminalization does not appear in the dataset after 2003, when all such laws were invalidated by the U.S. Supreme Court, eliminating variation across states on this policy. The number of policies available per year ranges from six to 11.

_____

[8] Of the 13 policies, 6 encode ordinal gradations in policy positions, and the remainder are dichotomous indicators for the presence or absence of the policy in question.

24.     To summarize each state's general orientation towards LGBT rights, I code whether or not it took a relatively restrictive position on each of the above policies in each year.[9] Then, for each year, I calculated the proportion of policies on which the state took that position.

25.     For example, in 2010 Alabama took a restrictive position on all nine policies available in that year, yielding a hostility score of 100%. The next year, Alabama had restrictive positions on 10 out of 11 policies, the exception being preemption of local LGBT antidiscrimination ordinances, which appears in the Caughey-Warshaw dataset for the first time that year. Thus, Alabama's score in 2011 dropped from 100% to 90.9%.

26.     Even after this drop in hostility to LGBT rights, however, Alabama remained tied for the highest proportion of anti-LGBT policies of any state. In fact, in no year between 1992 and 2014 did another state score higher than Alabama. Only South Carolina matched Alabama's consistency of restricting LGBT rights.

---

[9] A relatively restrictive position is defined as being more restrictive than the average across state-years.



*Figure 1: Selected states' hostility to LGBT rights, based on data on 13 policies from Caughey and Warshaw (2022).*

27.     Alabama's relative restrictiveness on LGBT rights is illustrated in *Figure 1*. The figure compares Alabama to the average state (dashed line) as well as to the 10th-, 30th-, and 50th-most hostile states (Arkansas, Nevada, and New Jersey). This comparison starkly illustrates Alabama's consistent history as an outlier with respect to restrictions on LGBT rights.

**Transgender policies since *Obergefell***

28.     Since *Obergefell*, the focus of LGBT policymaking, both nationally and in Alabama, has shifted toward transgender-related issues. In some states, this shift has manifested in the expansion of rights for transgender persons, such as when gender identity protections are added to nondiscrimination laws that previously covered only sexual orientation (Taylor, Haider-Markel, and Lewis

2021, 584). Even more salient, however, has been the rapid emergence of state policies that impose restrictive regulations on gender identity and transgender persons.

29.    LaCombe (2024) has identified six transgender-restrictive policies whose incidence can be compared systematically across states:[10]

- **Antidiscrimination Preemption**: Does the state have any sort of law preempting local antidiscrimination protections based on sexual orientation and/or gender identity?
- **Don't Say Gay**: Does the state restrict discussion of sexual orientation and/or gender identity in the classroom?
- **No Gender Change**: Does the state not allow residents to change their legal gender?
- **Bathroom Ban**: Does the state have a law that requires individuals to use the bathroom that corresponds to their assigned sex at birth?
- **Sports Ban**: Does the state have a law that blocks transgender athletes from participating in sports in the gender congruent with their gender identity?
- **GAC Ban Minor**: Has the state enacted a ban on gender-affirming care for minors?

30.    These policies were rare or unheard of before 2015, but several have exploded in prevalence in the last few years. As such, they provide useful indicators of the "cutting edge" of policymaking restricting transgender rights. No

---

[10] LaCombe (2024) also considers rights-expanding policies as well as policies that cover sexual orientation but not gender. The procedure used to select policies is described in the paper's appendix. The analysis in this report includes only policies that restrict transgender rights.

state has all six policies, but several states, including Alabama (which has four), are considering adopting restrictive legislation not already on their books.[11]



*Figure 2: Prevalence of six transgender-restrictive policies across states, 2015–2023. Hollow points indicate years in which Alabama did not have the policy in question.*

31.    *Figure 2* plots the number of states with each policy on its books in each year between 2015 and 2023. Only one of these policies, "don't say gay" laws, was adopted anywhere before 2005, and only by a single state (Alabama).[12]

---

[11] As is discussed below, SB92 (2024) would prohibit Alabamians from changing their legal gender.

[12] In 1991, Alabama enacted a curricular law forbidding the portrayal of homosexuality in a positive light. This law was repealed in 2022 and replaced with HB322, which censors discussions of sexual orientation or gender identity through 5th grade ("Alabama HB322" 2022).

Prohibiting gender-affirming care for minors is the most recent of these policies to arrive on the state policy agenda, but its prevalence has sky-rocketed.

32.     When a state adopts one of these transgender-restrictive policies, it also tends to adopt others.[13] In particular, the adoption of a GAC ban is strongly predicted by how many other transgender-restrictive policies a state has already adopted.

33.     To summarize a state's propensity to adopt transgender-restrictive policies, I created a "transgender restriction index," defined as a count of how many such policies (other than banning GAC for minors) a state has adopted. The index theoretically ranges from zero to five, but its maximum empirical value is four. Alabama's score is three. The proportion of states banning GAC for minors as a function of their transgender restriction score is depicted in *Figure 3*.

---

[13] In 2023, for example, the six policies had a Cronbach's alpha (a common measure of inter-item reliability ranging from 0 to 1) value of 0.82.



*Figure 3: Percentage of states banning GAC for minors at different values of the transgender restriction index, in 2023. The index is the total number of transgender-restrictive policies (other than banning GAC for minors) that have been adopted by the state.*

34.     As of 2023, 25 states had adopted none of these policies, giving them a gender-regulation score of zero. Among these 25 states, only 8% prohibited GAC for minors. The percentage rises to 70% among states with a score of one, to 83% with a score of two, and to 100% with a score of three or more. In other words, states' stance on GAC bans is almost perfectly predicted by its regulation of gender identity in other spheres. A score of three, such as Alabama's, is sufficient to ensure adoption of a GAC ban for minors, and a score of zero is nearly sufficient to guarantee non-adoption.

### *Healthcare paternalism*

35.     The foregoing analysis suggests that a major, if not predominant, factor explaining a state's adoption of a GAC ban for minors is the state's aggressiveness in regulating gender identity and transgender rights. The reports of Defendants' experts, however, put forward an alternative explanation: the state's interest in protecting citizens from "experimental" and "unproven" medical treatments supported by "low-quality evidence" (Cantor 2023, 74; Nangia 2023, 79; Kaliebe 2023, 7). On this view, Alabama's GAC policy is a form of "healthcare paternalism": a limitation on a person's healthcare choices motivated by concern for that person's welfare (Schramme 2015; cf. Dworkin 1974).[14]

36.     As this section will show, Alabama's policies exhibit low healthcare paternalism relative to other states and correspondingly high healthcare freedom. That Alabama has nonetheless adopted a ban on GAC for minors while more-paternalistic states generally have not suggests that Alabama's ban is not driven by healthcare paternalism, but rather by the hostility to transgender rights demonstrated in the preceding section.

---

[14] Note that as defined here, "healthcare paternalism" is distinct from (and broader than) "medical paternalism," which is typically defined with respect to the relationship between physicians and patients.

37.     U.S. states vary in the balance they strike between protecting citizens and allowing them to make their own healthcare decisions—that is, between healthcare paternalism and healthcare freedom. One aspect of healthcare freedom is what Ruger and Sorens (2013) call "health insurance freedom." These authors measure health insurance freedom based on rate restrictions, insurance mandates, and other factors limiting the choices of health care consumers and providers. They assign a rank to each state, ranging from most free (1) to most paternalistic (50). Alabama is ranked number four, indicating a very low degree of health insurance paternalism and correspondingly high health insurance freedom (Ruger and Sorens 2013, 32–33).[15]

38.     Another aspect of healthcare paternalism that is more closely related to GAC bans are state laws restricting patients' choices about the medical treatments they receive. Arguably the most direct analogue to a ban on GAC are limits on access to experimental therapies that have not yet been approved by the FDA. According to the Goldwater Institute, 41 states have relaxed this restriction with a "right to try" law, which permits patients with life-threatening conditions to access experimental therapies ("Right to Try in Your State" 2024).

---

[15] I use the 2013 version of Ruger and Sorens's scores rather than the 2021 version because, as these authors explain, the Patient Protection and Affordable Care Act "nationalized most health insurance regulation," compressing variation across states (Ruger and Sorens 2021, 44). The 2013 scores are thus a better measure of states' orientation on this issue.

39.     Vaccination requirements involve a similar tradeoff between paternalism and freedom, and states make different choices about them as well. A total of 16 states allow exceptions from vaccine mandates for personal reasons, and 45 allow exceptions for religious reasons ("States with Religious and Philosophical Exemptions from School Immunization Requirements" 2023). Finally, five states, including Alabama, have added a "healthcare freedom amendment" to their state constitutions that protects the right of residents to make their own healthcare decisions (Dinan 2013, 2138). Together with right-to-try laws, these three policy choices provide a rough indication of a state's general stance on paternalism versus freedom in healthcare.

40.     As I did with restrictions on transgender rights, I create an index of healthcare paternalism by counting how many of these four paternalistic policies a state has:

- No right to try
- No personal vaccine exception
- No religious vaccine exception
- No healthcare freedom amendment[16]

---

[16] I used the following sources to code states' adoption of these policies: "Right to Try in Your State" (2024), "States with Religious and Philosophical Exemptions from School Immunization Requirements" (2023), Dinan (2013), and Yeargain (2023). Note that the Florida healthcare freedom provision mentioned in Yeargain (2023) is statutory, not constitutional, and thus I do not code Florida as having a healthcare freedom amendment.

41.     Of these four policies, Alabama lacks only a personal vaccine exemption, giving it a score of one. Thus, as was the case with health insurance paternalism, Alabama ranks very low on the healthcare paternalism index (i.e., very high in healthcare freedom).

42.     The strong positive relationship between the transgender restriction index and adoption of GAC bans for minors depicted in *Figure 3* is consistent with the claim that such bans in general, and SB184 in particular, are rooted in a restrictive stance towards gender identity and transgender persons. The alternative explanation, that SB184 is rooted in paternalistic concern regarding experimental treatments, does not fare nearly so well.

43.     If healthcare paternalism rather than transgender restrictionism were the primary driver of GAC bans for minors, we would expect such bans to be rare in less-paternalistic states and common in highly paternalistic ones. In fact, the reverse is true. States with a right-to-try law, for example, ban GAC for minors at a rate of 56%. By contrast, none of the (relatively paternalistic) states that lack such a law have adopted a GAC ban.[17]

44.     This negative relationship is documented more systematically in *Figure 4*, which plots the proportion of states banning GAC for minors at different

---

[17] These percentages are derived from a crosstabulation of state adoption of GAC bans and right-to-try laws, using the data sources described above.

values of the health paternalism index. As the figure shows, the greater a state's

healthcare paternalism, the *less* likely it is to ban GAC for minors. States like

Alabama with two or fewer paternalistic policies have well over a 50% chance of

banning GAC for minors, but states with three or more restrictions have almost no

chance of doing so.



*Figure 4: Percentage of states banning GAC for minors at different values of the healthcare paternalism index, in 2023. The index is the total number of policies a state has adopted restricting healthcare freedom (other than banning GAC for minors).*

45.     *Figure 5* tells a similar story with using Ruger and Sorens's health

insurance freedom scale. Each point indicates the proportion of states with GAC

bans for minors in a given range of health insurance freedom ranks. States such as

Alabama ranked between one and 10, meaning that they score highly on health

insurance freedom, have about a 50% chance of banning GAC for minors. This

proportion is roughly steady until we reach the 10 most paternalistic states (ranks 41–50), of which none have adopted such a ban.



*Figure 5: Proportion of states banning GAC by health insurance freedom rank (Rugers and Sorens 2013). Lower ranks indicate greater freedom and higher ranks greater paternalism.*

46.     In short, the national pattern of state GAC adoptions offers no support for Defendants' experts' suggestion that Alabama's GAC ban reflects an especially cautious attitude toward experimental medical treatments. While this may be Defendants' experts' own justifications, it does not accord with the statistical evidence that a state's orientation toward transgender persons, but *not* its degree of healthcare paternalism, strongly predicts its adoption of GAC bans for minors.[18]

_____

[18] Multivariate regression analysis confirms these conclusions. In a cross-state logistic regression of *adoption of GAC for minors* on *transgender restriction index*, *healthcare paternalism index*,

### Recent anti-LGBT legislation in Alabama

47.     Defendants' experts present SB184 as a specific response to the "recent rise in transgender and non-binary identification among young people" and the attendant "push for 'affirmative treatment' for gender dysphoria" (Kaliebe 2023, 7, 28). This claim neglects the broader political context in Alabama, which has witnessed an explosion of proposed and enacted legislation targeting LGBT persons generally and the transgender population specifically.

### *Conscience laws*

48.     As was the case nationally, the 2015 *Obergefell* decision prompted a flurry of policy responses in Alabama. For example, after the legalization of same-sex marriage in Alabama, about a half dozen of the state's probate judges—among them Rep. Wes Allen, who later sponsored the House version of SB184—began refusing to issue marriages licenses so they would not have to issue them to same-sex couples.[19] In 2019, the legislature responded to this situation by passing SB69, which replaces marriage licenses with certificates that do not require a judge's signature ("Alabama SB69" 2019).

---

and *Rugers-Sorens health insurance freedom rank*, only *transgender restriction index* has a positive and statistically significant coefficient estimate.

[19] Rep. Allen defended his refusal to sign marriage licenses with the statement, "I believe marriage is between a man and a woman" (Associated Press 2019).

49.    The Alabama Legislature also enacted several other "conscience laws," which allow individuals and organizations to decline to serve LGBT clients for religious, ideological, or other reasons.[20] Alabama's conscience laws include:

- HB24 (2017), which permits state-licensed child welfare agencies to refuse service to certain populations ("Alabama HB24" 2017);

- HB95 (2017), which permits medical providers to refuse to provide certain types of care or serve certain populations ("Alabama HB95" 2017); and

- SB261 (2023), which forbids the state from entering into contracts with companies that boycott other businesses based upon social standards ("Alabama SB261" 2023).

50.    The cumulative effect of these three laws is to make it easier for private individuals and organizations to discriminate against the LGBT population. Not only do HB24 and HB95 explicitly permit such discrimination, but SB261 attempts to shield discriminatory individuals and organizations from economic pressure from other firms. Thus, even in wake of *Obergefell*, Alabama continues to pass laws restricting LGBT rights.

### *Anti-transgender legislation*

51.    In particular, transgender Alabamians have been subject to a multifaceted legislative assault. These efforts have extended far beyond GAC for

---

[20] Over the past decade, conscience laws have become a major component of religious conservatives' political reaction to expansions of LGBT rights (Wilcox 2021, 61–62).

minors to include rights restrictions that have nothing to do with healthcare or

children. Rather, many evince a clear hostility to transgender status or gender non-

conformity per se. The fact that SB184 emerged in the context of a broad assault

on the transgender community reinforces the evidence in the "Pattern of

Discrimination" section that SB184 was rooted primarily in concerns about sex,

gender identity, and transgender status.

52.     The most recent episode in this legislative assault is a controversy

around a transgender employee at the U.S. Space and Rocket Center in Huntsville.

Merely upon learning of this employee's existence, state Rep. Mack Butler

announced that was planning to expand the "don't say gay" bill he was sponsoring

(HB130) to cover the Center. "[W]e've got a problem," Butler explained, "because

federal law says you can't ban people because of gender identity….But we've got

to use some common sense. We literally do this all the time in schools—doing

background checks and things like that." Transgender identification "was always a

mental defect," he continued. Transgender persons "can pretend all they

want….But I do not believe they need to be in charge of children" (Poor 2024).

53.     Rep. Mack's remarks are indicative of the breadth of Alabama's

assault on transgender rights and the degree to which they are rooted in hostility

toward transgender persons for their gender identity per se. This assault has been

manifested in a flurry of enacted and proposed legislation targeting the transgender community across multiple domains.

54.     In 2021, Alabama passed HB 391, a transgender sports ban for K–12 students. Then, in 2022, "the Legislature approved numerous pieces of legislation targeting transgender youth" (Mealins 2023). In addition to SB184, the legislature passed HB322, which defines sex as male or female as listed on one's original birth certificate; requires public school students to use facilities that correspond to their sex assigned at birth; and forbids classroom discussion or instruction of sexual orientation or gender identity in a manner that is not "age or developmentally appropriate" ("Alabama HB322" 2022). The lead sponsors of SB184 were also active supporters of HB322.[21]

55.     Alabama's flood of legislation targeting transgender community did not abate after 2022. According to the *Montgomery Advertiser*, "Alabama politicians target LGBTQ+ people" was one of the "top…political stories of 2023" as well (Lyman 2024). The new laws included HB261, which extended Alabama's transgender sports ban to college students (i.e., non-minors over the age of 18).

---

[21] Rep. Wes Allen was a sponsor of HB322 in the House, and the Senate amendment to HB322 prohibiting age-inappropriate instruction was offered by Sen. Shay Shelnutt ("Alabama HB322" 2022; Shelnutt 2022).

56.     Several additional transgender-related bills have been introduced in

the legislature in the past year:

- HB401, which would expand the definition of "sexual conduct" with respect to distribution of materials to minors to include "male or female impersonators" ("Alabama HB401" 2023);

- SB92, which defines sex as a fixed binary and requires state agencies collecting vital statistics to categorize transgender or non-binary individuals according to their sex assigned at birth ("Alabama SB92" 2024);

- HB111, which like SB92 would define sex as a fixed binary and require collection of vital statistics to reflect sex assigned at birth ("Alabama HB111" 2024);

- SB129, which would require public universities to designate restrooms based on sex assigned at birth ("Alabama SB129" 2024); and

- HB130, which would extend Alabama's "don't say gay" ban through twelfth grade and makes not exemptions based on developmental appropriateness ("Alabama HB130" 2024).

57.     Taken together, this wave of anti-transgender activity provides

important context for the specific legislative history of SB184 discussed below.

SB184 is not an isolated piece of legislation targeted at a particular set of medical

procedures, but rather one bill among many targeting transgender persons in

multiple domains. Importantly, several of the above bills target transgender status

or gender non-conformity per se, and several, such as HB261 and SB92, have

nothing to do with minors under the age of 18. SB184 thus emerged in the context of a multifaceted legislative assault on the transgender population.

**Legislative history of SB184**

58.     This section reviews the legislative history of SB184. In political science, legislative histories are a standard means of understanding patterns of support and opposition to the legislation in question, the legislators' goals and states of mind as they considered the legislation, and the public rationales and justifications they offered in defense of their positions.[22] I have conducted analyses of legislative history in my own academic work (see, e.g., Caughey 2018, 91–101). This section is not intended to provide a comprehensive history of SB184, but rather to highlight relevant aspects of the political context missing from the defense reports.

59.     As is typical of political science analyses of this kind, my legislative history of SB184 draws on a wide variety of sources, all of which are in the public domain. These include scholarly articles, journalistic accounts and interviews, materials from interest groups and nonprofit organizations, recordings of legislative hearings, and the official records of the Alabama Legislature.[23] To

---

[22] For a classic example, see Douglas and Hackman (1938).

[23] The Alabama Legislature's official record of SB184 is limited to basic information on the bill's progression through the legislative process, which I accessed through the search engine at Alabama Legislature (2024). The Alabama Legislature does not archive recordings or transcripts

account for policy diffusion across states (Walker 1969), I consider the roots of SB184 in the activities of legislators and activists in other states. My focus, however, is on the public justifications and debate over SB184, which provide insight into both the bill's intended purposes and the information on its likely consequences available to the Legislature as it considered the bill.

60.     The legislative history of SB184 yields two primary conclusions. First, concerns about sex, gender identity, and transgender status were central to the Legislature's understanding of the purposes of SB184. Second, given the information available to it about the opposition of transgender Alabamians and those close to them, the Legislature had ample opportunity to learn about the harms SB184 would cause to the population it targeted.

**Origins of SB184**

61.     Defendants' expert reports make almost no reference to the state of Alabama or to SB184 specifically. Rather, they are couched in terms applicable to the United States generally, if not the entire "economically advanced Western world" (Kaliebe 2023, 7).[24] This broad frame of reference is in keeping with the

---

of legislative hearings and debate, so I relied on a subset of recordings that have been archived by nongovernmental entities and made available to the public.

[24] The primary exception to the national focus in the defense reports is Dr. Cantor's quotation of plaintiff expert Dr. Ladinsky's contention that SB184 "will cause serious harms to my patients as well as other transgender youth throughout Alabama" (quoted by Cantor 2023, 118). However,

nationwide scope of the coordinated movement to ban GAC for minors, of which the SB184 is only one instance among many (Astor 2023; Kirkpatrick 2023; Pauly 2023).

62.     Nationally, the first proposal to ban GAC for minors was introduced in 2019 by Rep. Fred Deutsch of the South Dakota House of Representatives. Although Deutsch's "Vulnerable Child Compassion and Protection Act" (VCAP) failed to pass, it served as a template for efforts in other states.[25] In 2021, Arkansas became the first state to successfully pass a statute banning GAC for minors, and since then 22 more states have passed one, though many have not yet been implemented due to legal challenges (Movement Advancement Project 2024).

63.     Alabama's first version of VCAP was introduced to the state House and Senate on February 20, 2020 by Rep. Wes Allen and Sen. Shay Shelnutt, respectively.[26] Consistent with his having been influenced by the example of the

---

although Dr. Ladinsky's claim refers specifically to Alabama, Dr. Cantor's response to it is, like the rest of his report, couched in general terms.

[25] As one anti-GAC activist in Alabama wrote to Rep. Deutsch: "You successfully inspired, encouraged and counseled numerous VCAP [sic] efforts around the country. You established the ideal witness list that we are all still following in our individual states…And, most importantly you connected us all to each other" (Pauly 2023).

[26] Versions of VCAP were introduced in three successive sessions of the Alabama Legislature before finally passing. The corresponding bill numbers are HB303 and SB219 (2020), HB1 and SB10 (2021), and HB266, HB150, SB5, and SB184 (2022). In 2020, Rep. Allen was the lead sponsor of HB303 and Sen. Shelnutt was the lead sponsor of SB219 ("SB219" 2020; "HB303" 2020). SB184 lists Rep. Allen and Sen. Shelnutt as the only sponsors ("SB184" 2022, 1).

2019 Deutsch bill in South Dakota, Rep. Allen stated that he only "started researching this issue [GAC] at the end of…2019" (Dailey 2020), and Sen. Shelnutt was "not aware of the issue until the bill was presented to him" (Cason 2021c).

### Justifications for SB184

64.    Like Defendants' expert reports, the justifications of SB184's supporters place heavy emphasis on the "safety" and "protect[ion]" of children—a framing often used by advocates of restricting transgender rights.[27] They also stress the "experimental" status of GAC treatments, a rhetorical strategy of playing up scientific uncertainty common in debates over such bills (Wuest and Last 2024).[28]

65.    Just as important, however, are themes of sex, gender identity, and transgender status, which were central to the legislature's understanding of the purpose of the bill. Not only were these themes prominent in supporters' justifications for SB184, but the Legislature also rejected an attempt to exempt psychotherapy from the ban on GAC ("Whatley Amendment to SB10" 2021). This the bill was not narrowly targeted at a specific set of "experimental" medical

---

[27] Re experts, see Nangia (2023, 87) and Cantor (2023, *i* and *passim*). Re SB184's supporters, see the opening sentences of Allen (2020) and Shelnutt (2020). Re the use of "safety and security" frames in other contexts, see Tadlock (2014).

[28] Re the "experimental" status of GAC for minors, see Cantor (2023, *iii*) and Dailey (2020).

procedures but rather was concerned with regulating gender identity in a broader sense.

66.    It is common for justifications of GAC bans and other restrictions on transgender rights to invoke the essentialist view that "sex and gender are identical, simplistic and dichotomous concepts" (Martin and Rahilly 2023, 740).[29] Moreover, such restrictions are sometimes framed as "means of combating the growth of gender dysphoria" or "gender variance itself" (Martin and Rahilly 2023, 745–6). In other words, restrictions on transgender rights have been justified as responses to a general social phenomenon, what some GAC ban proponents call "transgenderism" (Chait 2023).

67.    The sex- and gender-related justifications used to defend SB184 are consistent with these general patterns. First, an essentialist view of sex permeated legislative discussions of the bill. Rep. Allen, for example, stated "I have a biblical worldview that we're all made in the image of God and there are only two sexes, male and female…. [W]hen a person is born male, they're male. When a person is born female, they're female" (Cason 2021a). While denying that his GAC bill was "discriminatory and hateful," Allen said he supported a transgender sports ban as

---

[29] "Gender essentialism" is the "belief that males and females are born with distinctively different natures, determined biologically rather than culturally. This involves an equation of gender and sex" (D. Chandler and Munday 2011).

well, arguing that "boys need to compete against boys, and females need to compete against females" (Dailey 2020).

68.     Similarly, when signing the bill, Gov. Kay Ivey stated "I believe very strongly that if the Good Lord made you a boy, you are a boy, and if he made you a girl, you are a girl" (Alfonseca 2022). This is consistent with SB184's own assertion, "The Legislature finds and declares [that]…[t]he sex of a person is the biological state of being female or male…, and is genetically encoded into a person at the moment of conception, and it cannot be changed" ("SB184" 2022, 1–2). Such statements are evidence that concerns about defending a certain conception of sex were central to the bill's purpose.

69.     These concerns were closely tied to the relationship between sex and gender. Banning GAC for minors, Rep. Allen argued, is about protecting children who are "confused about their gender identity" (Allen 2020). The bill's supporters characterized discrepancies between sex and gender identity as "gender dysphoria," which Sen. Shelnutt defined as "Someone thinks they should be a girl if they're a boy or thinks they should be a boy if they're a girl." He added, "There's no medical condition that these kids have. It's just in their mind" (Cason 2021c).

70.     Rep. Allen claimed to favor "therapeutic treatment" for transgender youth in place of GAC (Allen 2020). The legislature, however, explicitly declined

to exempt psychotherapeutic counseling from SB184's restrictions. In a voice vote, the Senate rejected an amendment by Sen. Tom Whatley clarifying that the bill was not meant to limit the therapeutic discretion of psychologists or counselors ("Whatley Amendment to SB10" 2021).

71.     Sen. Shelnutt said he opposed the amendment because it would allow those counseling transgender minors to reinforce a gender identity contrary to that assigned at birth. "We don't want them affirming that, 'Hey yeah, you're right, you should be a boy if you are a born a female,'" he explained (Chandler 2021). The legislature's rejection of this amendment suggests that it viewed the targets of SB184 to extend beyond a specific set of "experimental" medical procedures to include any therapies that might validate or encourage gender nonconformity or transgender identification. This view is reflected in the final language of SB184 itself, which prohibits actions that "affirm the minor's perception of his or her gender or sex, if that perception is inconsistent with the minor's biological sex" ("SB184" 2022, 6).

72.     That SB184 was viewed as part of a larger effort to reinforce traditional categories of sex and gender is also suggested by Gov. Ivey's remarks in "Identity," a 2022 campaign advertisement. "Some things are just facts," said Ivey. "Summer's hot, the ocean's big, and gender is a question of biology, not identity." A voiceover continued: "That's why Ivey banned transgender youth

sports, banned left-wing sexual propaganda from our schools, and made it a felony for transgender surgery on children in Alabama" (Kay Ivey for Governor 2022).

**Opposition to SB184 and foreseeability of harm**

73.　This section reviews the justifications of SB184's opponents. Its coverage is necessarily selective, as the state of Alabama does not archive official transcripts or recordings of legislative hearings or debates. I have attempted to review all publicly available documentation, including video recordings and transcripts as well as journalistic summaries, on the debate over SB184 and its precursors.

74.　Throughout the debate over SB184, its legislative supporters had ample opportunity to hear objections from those it putatively aimed to help—Alabamians with a gender identity different from their assigned sex—as well as from parents, medical providers, and others with particular knowledge of and interest in the welfare of transgender youth.  SB184's supporters thus had good reason to anticipate the harm that that the bill's passage would cause to the transgender population.

75.　From the beginning of its legislative journey, SB184's sponsors were aware of the criticism of the bill from the transgender community and their allies. As noted above, in March 2020 an interviewer asked Rep. Allen to respond to the

charge that the bill was "discriminatory and hateful" to those who are transgender, which Rep. Allen denied (Dailey 2020).

76.    In legislative hearings for SB184, transgender Alabamians who had received the treatments the bill would ban expressed their gratitude for having done so. Monroe Smith, for example, praised the "slow and steady process" of GAC and asserted that if he had been denied access to it as a minor:

> I would not be the successful young man I am today. I'm grateful I'm not just another percentage point that makes up the staggering number of transgender youth who are turned away from medically necessary and affirming healthcare, fall victim to depression, social isolation, and suicide (Alabama Senate Healthcare Committee 2022).

77.    In the same hearing, Quentin Bell, another transgender man, also emphasized the harm the SB184 would cause to transgender youth (Alabama Senate Healthcare Committee 2022).

78.    Parents of transgender minors expressed similar convictions. In a 2021 hearing, police sergeant David Fuller, praised the care his transgender daughter had received from the University of Alabama at Birmingham:

> They made sure it was baby steps. It's been a five-year process now and they haven't pushed anything on us. Just the opposite. And they are angels to me. And as a police officer, you're asking me to someday put handcuffs on these people that are heroes in my life?… Please don't ask me to do that (Cason 2021b).

79.     Jeff White asserted that his transgender daughter would be "forced into psychological desolation" by SB184 (Alabama Senate Healthcare Committee 2022).

80.     Physicians who cared for transgender patients reinforced these conclusions. Dr. Nola Jean Earnest observed that:

> 86% of [transgender patients] will have think about suicide—have suicidal ideations—and over half of them will attempt it. So when parents come to me afraid of losing their child, they have something to be afraid of. If we do not affirm these patients…studies show that if you trivialize the experience of a teenager they are more likely to commit self harm (Alabama Senate Healthcare Committee 2022).

81.     Laura Stiller, a high school teacher from Montgomery who had taught more than 25 transgender students over her career, characterized a precursor to SB184 as "an attack on parental and individual rights" and Rep. Allen's justifications for it "false, manipulative, and mean-spirited" (Stiller 2020).

82.     By their own admission, Rep. Allen and Sen. Shelnutt had given little thought to the issue until shortly before they introduced their proposed ban.[30] In fact, both professed to be "shocked" to learn that gender-affirming care was being

---

[30] As noted, Allen said he started researching GAC in late 2019, and Sen. Shelnutt claimed not to have heard of it "until the bill presented to him," which was probably around the same time (Dailey 2020; Cason 2021c).

practiced in Alabama (Allen 2020; Shelnutt 2020), and Sen. Shelnutt admitted that he had never spoken to a young person who was transgender (Chandler 2021).

83.     Given their prior lack of familiarity with GAC, SB184's sponsors' initial impression that the bill would help rather than harm transgender youth may be understandable. Less plausible, however, is the notion that after two years of testimony from transgender Alabamians and those close to them, they would have remained unaware of the harm it would cause.

## CONCLUSION

84.     Defendants' experts' reports justify their support for SB184 on the grounds of protecting young people from potentially dangerous medical treatments. My report has shown that this was far from the primary purpose of the legislation. Rather, concerns about sex, gender identity and nonconformity, and transgender status were central to the legislative history and intent of SB184.

85.     Like Defendants' experts, the legislative sponsors and supporters of SB184 have defended the bill as aiming to help "gender dysphoric" minors—that is, young people whose gender identity does not conform to the sex they were assigned at birth. They present SB184's restrictions on the freedom of transgender youth, along with their parents and physicians, as serving the best interests of a population too young to make choices for themselves.

86.     Some of the support for SB184 may well stem from such paternalistic compassion for transgender youth. Alabama's long history of restricting LGBT rights, and more recently transgender rights, across many domains argues however against this as the prime motivation. So does the fact that states' hostility towards LGBT rights, and not the paternalism of their healthcare policies, near-perfectly predicts whether they ban GAC for minors. And finally so does SB184's place in the broader context of a multifaceted assault on transgender Alabamians.

87.     The justifications employed by legislative supporters of SB184 make it clear that concerns about sex, gender identity, and transgender status were central to their understanding of the bill's purpose. Moreover, they viewed it as part of a larger effort to combat "gender dysphoria" and promote essentialist notions of sex and gender.

88.     The legislative debate over SB184 gave the legislature ample opportunity to learn of the harms anticipated by the people it targets. The recipients of gender-affirming care, as well as their parents, doctors, and teachers, spoke of their gratitude for GAC and the psychological and physical harms that it averted. The legislature had all the information it needed to foresee the harms SB184 would cause.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: April 1, 2024

DEVIN CAUGHEY, PhD

# REFERENCES

"Alabama HB111." 2024. LegiScan. *https://legiscan.com/AL/bill/HB111/2024*.

"Alabama HB130." 2024. LegiScan. *https://legiscan.com/AL/bill/HB130/2024*.

"Alabama HB24." 2017. LegiScan. *https://legiscan.com/AL/bill/HB24/2017*.

"Alabama HB322." 2022. LegiScan. *https://legiscan.com/AL/text/HB322/2022*.

"Alabama HB401." 2023. LegiScan. *https://legiscan.com/AL/bill/HB401/2023*.

"Alabama HB95." 2017. LegiScan. *https://legiscan.com/AL/text/HB95/id/1498841*.

Alabama House Judiciary Committee. 2022. "House Judy Committee - 3/2/2022, 1:34:28 PM." Vimeo. March 2, 2022. *https://vimeo.com/683940881/4edaeefda2*.

Alabama Legislature. 2024. "BILLS - SEACH ALL SESSIONS." *https://alison.legislature.state.al.us/bill-search?tab=3*.

"Alabama SB129." 2024. LegiScan. *https://legiscan.com/AL/bill/SB129/2024*.

"Alabama SB261." 2023. LegiScan. *https://legiscan.com/AL/bill/SB261/2023*.

"Alabama SB69." 2019. LegiScan. *https://legiscan.com/AL/bill/SB69/2019*.

"Alabama SB92." 2024. LegiScan. *https://legiscan.com/AL/text/SB92/2024*.

Alabama Senate Healthcare Committee. 2022. "Committee Recording - 12 Pm - 2/9/2022, 12:00:37 PM." Vimeo. February 9, 2022. *https://vimeo.com/675565353/99cfbd4ffe*.

Alfonseca, Kiara. 2022. "Alabama Governor Signs 'Don't Say Gay,' Trans Care and Bathroom Ban Bills." ABC News. April 8, 2022. *https://perma.cc/XT7T-8RPJ*.

Allen, Wes. 2020. "Rep Wes Allen: INTRODUCES VCAP BILL." YouTube. February 26, 2020. *https://youtu.be/p0piq-5LjP0?si=3h2EnzEg79g8eeNX*.

Associated Press. 2019. "Alabama Lawmakers Pass Workaround Bill on Same-Sex Marriage." *NBC News*, May 24, 2019. *https://perma.cc/HD9X-GQU6*.

Astor, Maggie. 2023. "G.O.P. State Lawmakers Push a Growing Wave of Anti-Transgender Bills." *New York Times*, January. *https://www.nytimes.com/2023/01/25/us/politics/transgender-laws-republicans.html*.

Barth, Jay. 2021. "The American South and LGBT Politics." In *The Oxford Encyclopedia of LGBT Politics and Policy*, edited by Donald P. Haider-Markel, 1:41–51. New York: Oxford University Press.

Bishin, Benjamin G., Thomas J. Hayes, Matthew B. Incantalupo, and Charles Anthony Smith. 2021. *Elite-Led Mobilization and Gay Rights: Dispelling the Myth of Mass Opinion Backlash*. University of Michigan Press.

Canaday, Margot. 2009. *The Straight State: Sexuality and Citizenship in Twentieth-Century America*. Princeton, NJ: Princeton University Press.

Cantor, James. 2023. "Expert Report of James Cantor, Ph.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Carlisle, Madeleine. 2022. "Inside the Right-Wing Movement to Ban Trans Youth from Sports." *Time*, May 16, 2022. *https://time.com/6176799/trans-sports-bans-conservative-movement/*.

Cason, Mike. 2021a. "Alabama Lawmakers Again Seek to Ban Transgender Treatments for Minors." *AL.com*, January 6, 2021. *https://www.al.com/news/2021/01/alabama-lawmakers-again-seek-to-ban-transgender-treatments-for-minors.html*.

———. 2021b. "Father of Transgender Daughter Tells Alabama Lawmakers Treatment Ban Is Misguided." *AL.com*, February 10, 2021. *https://perma.cc/ME23-C6SZ*.

———. 2021c. "Alabama Senate Passes Bill Banning Transgender Treatments for Minors." *AL.com*, March 2, 2021. *https://perma.cc/LGH3-VRNX*.

Caughey, Devin. 2018. *The Unsolid South: Mass Politics and National Representation in a One-Party Enclave*. Princeton, NJ: Princeton University Press.

Caughey, Devin, and Christopher Warshaw. 2022. *Dynamic Democracy: Public Opinion, Elections, and Policymaking in the American States*. Chicago: University of Chicago Press.

Chait, Jonathan. 2023. "CPAC Speaker Urges Eradication of Trans Rights: 'There Can Be No Middle Way in Dealing with Transgenderism. It Is All or Nothing.'" *New York Magazine*, March 6, 2023. *https://nymag.com/intelligencer/2023/03/michael-knowles-at-cpac-urges-eradication-of-trans-rights.html*.

Chandler, Daniel, and Rod Munday. 2011. "Gender Essentialism." In *A Dictionary of Media and Communication*. Oxford University Press. *https://www.oxfordreference.com/view/10.1093/acref/9780199568758.001.0001/acref-9780199568758-e-1089.*

Chandler, Kim. 2021. "Alabama Senate Approves Treatment Ban for Trans Kids." *Associated Press*, March 2, 2021. *https://apnews.com/general-news-c7645e8aaff7a769fa13b9b5aeb26cc1.*

Chauncey, George, Jr. 1994. *Gay New York: Gender, Urban Culture, and the Making of the Gay Male World, 1890–1930.* New York: Basic Books.

Dailey, Don. 2020. "Capitol Journal: Season 13, Episode 32." Alabama Public Television. *https://video.aptv.org/video/march-10-2020-dcnp7b/.*

Dinan, John. 2013. "State Constitutional Amendments and Individual Rights in the Twenty-First Century." *Albany Law Review* 76 (4): 2105–40.

Douglas, Paul H., and Joseph Hackman. 1938. "The Fair Labor Standards Act of 1938 I." *Political Science Quarterly* 53 (4): 491–515.

Dworkin, Gerald. 1974. "Paternalism." *The Monist* 56 (1): 64–84.

Haider-Markel, Donald, Jami Taylor, Andrew Flores, Daniel Lewis, Patrick Miller, and Barry Tadlock. 2019. "Morality Politics and New Research on Transgender Politics and Public Policy." *The Forum* 17 (1): 159–81.

"HB303." 2020. The Alabama Legislature. *https://alison.legislature.state.al.us/files/pdfdocs/SearchableInstruments/2020RS/PrintFiles/HB303-Int.pdf.*

Hruz, Paul W. 2023. "Expert Report of Paul W. Hruz, M.D., PH.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Kaliebe, Kristopher. 2023. "Expert Report of Kristopher Kaliebe, M.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Kay Ivey for Governor. 2022. "Identity." YouTube. May 12, 2022. *https://youtu.be/BRoZLk9cmYQ?si=6gr-1vH4BpupCiS1.*

Kirkpatrick, David D. 2023. "The Next Targets for the Group That Overturned Roe." *The New Yorker*, October 2, 2023.

*https://www.newyorker.com/magazine/2023/10/09/alliance-defending-freedoms-legal-crusade*.

LaCombe, Scott J. 2024. "Measuring LGBTQ Policy Environment in the US States." Paper presented at the Southern Political Science Association Annual Conference, New Orleans, LA, January 10–13, 2024. *https://www.scottlacombe.com/uploads/1/2/0/5/120596042/lacombe_measuring.pdf*.

Laidlaw, Michael K. 2023. "Expert Report of Michael K. Laidlaw, M.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Lappert, Patrick W. 2023. "Expert Report of Patrick W. Lappert, M.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Lewis, Daniel C., Jami K. Taylor, Brian DiSarro, and Mathew L. Jacobsmeier. 2014. "Is Transgender Policy Different? Policy Complexity, Policy Diffusion, and LGBT Nondiscrimination Law." *Transgender Rights and Politics: Groups, Issue Framing, and Policy Adoption*, 155–88.

Lombardi, Emilia. 2021. "The Evolution of Transgender Politics in the United States." In *The Oxford Encyclopedia of LGBT Politics and Policy*, edited by Donald P. Haider-Markel, 1:522–38. New York: Oxford University Press.

Lyman, Brian. 2024. "Picks for the Top 10 Alabama Political Stories of 2023." *Montgomery Advertiser*, January 7, 2024, Factiva.

Martin, Kimberly, and Elizabeth Rahilly. 2023. "Value Frames in Discourse Supporting Transgender Athlete Bans." *Discourse & Society* 34 (6): 732–51.

Mealins, Evan. 2023. "Legislature: What to Watch for in 2023 Session: Grocery Taxes, Schools, Prisoners on Agenda." *Montgomery Advertiser*, March 6, 2023, Factiva.

Mezey, Susan Gluck. 2020. "Transgender Policymaking: The View from the States." *Publius: The Journal of Federalism* 50 (3): 494–517.

Movement Advancement Project. 2024. "Healthcare Laws and Policies: Bans on Best Practice Medical Care for Transgender Youth." March 22, 2024. *https://www.lgbtmap.org/equality-maps/healthcare/youth_medical_care_bans*.

Nangia, Geeta. 2023. "Expert Report of Geeta Nangia, M.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Ogburn, Elizabeth L., Oleg Sofrygin, Iván Díaz, and Mark J. van der Laan. 2024. "Causal Inference for Social Network Data." *Journal of the American Statistical Association* 119 (545): 597–611. *https://doi.org/10.1080/01621459.2022.2131557*.

Pauly, Madison. 2023. "Inside the Secret Working Group That Helped Push Anti-Trans Laws Across the Country: Leaked Emails Give a Glimpse of the Religious-Right Networks Behind Transgender Health Care Bans." *Mother Jones*, March 8, 2023. *https://www.motherjones.com/politics/2023/03/anti-trans-transgender-health-care-ban-legislation-bill-minors-children-lgbtq/*.

Poor, Jeff. 2024. "State Rep. Butler: 'We're All Pretending' Transgender Behavior Is Normal — 'Up Until Obama, It Was Always a Mental Defect, and He Kind of Popularized It'." *1819 News*, March. *https://1819news.com/news/item/state-rep-butler-were-all-pretending-transgender-behavior-is-normal-up-until-obama-it-was-always-a-mental-defect-and-he-kind-of-popularized-it*.

"Right to Try in Your State." 2024. Goldwater Institute. *http://righttotry.org/in-your-state/*.

Ruger, Wiliam P., and Jason Sorens. 2013. *Freedom in the 50 States: An Index of Personal and Economic Freedom*. Arlington, Virginia: Mercatus Center, George Mason University.

———. 2021. *Freedom in the 50 States: An Index of Personal and Economic Freedom*. 6th ed. Washington, DC: Cato Institute.

"SB184." 2022. The Alabama Legislature. *https://alison.legislature.state.al.us/files/pdfdocs/SearchableInstruments/2022RS/PrintFiles/SB184-Enr.pdf*.

"SB219." 2020. The Alabama Legislature. *https://alison.legislature.state.al.us/files/pdfdocs/SearchableInstruments/2020RS/PrintFiles/SB219-Int.pdf*.

Schramme, Thomas, ed. 2015. *New Perspectives on Paternalism and Health Care*. Springer.

Shelnutt, Shay. 2020. "Sen. Shelnutt Introduces the AL Vulnerable Child Compassion and Protection Act (VCAP)." YouTube. February 26, 2020. *https://www.youtube.com/watch?v=Xg3Gb_iS2tY&t=3s*.

———. 2022. "Shelnutt Amendment to HB322." The Alabama Legislature. *https://www.legislature.state.al.us/pdf/SearchableInstruments/2022RS/PrintFiles/2 19979-1.pdf.*

"States with Religious and Philosophical Exemptions from School Immunization Requirements." 2023. National Conference of State Legislatures. August 3, 2023. *https://www.ncsl.org/health/states-with-religious-and-philosophical-exemptions-from-school-immunization-requirements.*

Stiller, Laura. 2020. "Message to Rep. Wes Allen: HB1 Is an Attack on Transgendered Youths and Parental Rights." *Montgomery Advertiser*, October 7, 2020. *https://perma.cc/772D-ZUD5.*

Tadlock, Barry L. 2014. "Issue Framing and Transgender Politics: An Examination of Interest Group Websites and Media Coverage." In *Transgender Rights and Politics: Groups, Issue Framing, and Policy Adoption*, edited by Jami K. Taylor and Donald P. Haider-Markel, 25–48. Ann Arbor: University of Michigan Press.

Taylor, Jamie K., Donald P. Haider-Markel, and Daniel C. Lewis. 2018. *The Remarkable Rise of Transgender Rights*. Ann Arbor: University of Michigan Press.

Taylor, Jamie K., Donald P. Haider-Markel, and Daniel C. Lewis. 2020. "LGBTQ Policy and Fragmented Federalism in the US." *State and Local Government Review* 52 (4): 255–65.

Taylor, Jamie K., Donald P. Haider-Markel, and Daniel C. Lewis. 2021. "Federalism and LGBT Politics and Policy in the United States." In *The Oxford Encyclopedia of LGBT Politics and Policy*, edited by Donald P. Haider-Markel, 1:577–89. New York: Oxford University Press.

Trumbull, Den. 2020. "Dr Trumbull, Pediatrician, Founder/Past President Amer. College of Pediatrics Urges Passage of VCAP." YouTube. February 26, 2020. *https://www.youtube.com/watch?v=uHdHSvXTuu0.*

Van Meter, Quentin. 2020. "Dr Van Meter, Pediatric Endocrinologist & Pediatrician Urges Passage of VCAP (Senate Hearing)." YouTube. February 26, 2020. *https://youtu.be/WNOgEY0bIS0?si=yhVqi4UPrw6tH8Uy.*

Walker, Jack L. 1969. "The Diffusion of Innovations among the American States." *American Political Science Review* 63 (3): 880–99.

"Whatley Amendment to SB10." 2021. *https://www.legislature.state.al.us/pdf/SearchableInstruments/2021RS/PrintFiles/2 11110-1.pdf.*

Wilcox, Clyde. 2021. "Anti-LGBT and Religious Right Movements in the United States." In *The Oxford Encyclopedia of LGBT Politics and Policy*, edited by Donald P. Haider-Markel, 1:51–66. New York: Oxford University Press.

League of Women Voters of Alabama. 2023. "The Alabama Channel." League of Women Voters of Alabama Education Fund. 2023. *https://www.thealabamachannel.org*.

Wuest, Joanna, and Briana S. Last. 2024. "Agents of Scientific Uncertainty: Conflicts over Evidence and Expertise in Gender-Affirming Care Bans for Minors." *Social Science & Medicine* 344: 116533.

Yeargain, Quinn. 2023. "How Attacks Against Obamacare Turned into Tools to Protect Abortion Access." *Bolts Magazine*, March 3, 2023. *https://boltsmag.org/abortion-access-and-measures-against-obamacare-ohio-wyoming/*.

EXHIBIT A

# Devin Caughey

Last updated: April 1, 2024

Massachusetts Institute of Technology
Department of Political Science
E53-463, Cambridge, MA 02139

*Email*: devin.caughey@gmail.com
*Phone*: (703) 999-8822
*Web*: http://devincaughey.com

## Academic Appointments

**Massachusetts Institute of Technology,** Cambridge, MA

| | |
|---|---|
| 2023– | *Professor*, Department of Political Science |
| 2020–23 | *Associate Professor (with Tenure)*, Department of Political Science |
| 2017–20 | *Silverman Family Career Development Associate Professor (without Tenure)*, Department of Political Science |
| 2013–17 | *Assistant Professor*, Department of Political Science |
| 2012 | *Instructor*, Department of Political Science |

**Princeton University,** Princeton, NJ

| | |
|---|---|
| 2016–17 | *Visiting Associate Research Scholar*, Center for the Study of Democratic Politics, School of Public and International Affairs |

## Education

**University of California–Berkeley,** Berkeley, CA

| | |
|---|---|
| 2012 | Ph.D. in Political Science (chair: Eric Schickler) |
| | *Thesis*: "Congress, Public Opinion, and Representation in the One-Party South, 1930s–1960s" |
| 2007 | M.A. in Political Science |

**Cambridge University, Clare College,** Cambridge, UK

| | |
|---|---|
| 2006 | M.Phil. in Historical Studies (supervisor: Anthony Badger) |

**Yale University,** New Haven, CT

| | |
|---|---|
| 2004 | B.A. in History (*cum laude*, with distinction in the major) |

## Monographs

2022 Devin Caughey and Chrisopher Warshaw. 2022. *Dynamic Democracy: Public Opinion, Elections, and Policymaking in the American States.* Chicago: University of Chicago Press (248 pages)

  ∗ Virginia Gray award for best book on state politics and policy (winner)

2020 Devin Caughey, Adam J. Berinsky, Sara Chatfield, Erin Hartman, Eric Schickler, and Jasjeet J. Sekhon. 2020. *Target Estimation and Adjustment Weighting for Survey Nonresponse and Sampling Bias.* Elements in Quantitative and Computational Methods for the Social Sciences. Cambridge, UK: Cambridge University Press. https://doi.org/10.1017/9781108879217 (112 pages).

2018 Devin Caughey. 2018. *The Unsolid South: Mass Politics and National Representation in a One-Party Enclave.* Princeton, NJ: Princeton University Press (240 pages).

  ∗ Leon Epstein Award for best book on political organizations and parties (winner)
  ∗ Allan Sharlin Award for outstanding book in social science history (honorable mention)
  ∗ Reviews: *The Nation, Journal of Politics, Perspectives on Politics, Political Science Quarterly* and *Journal of Southern History*

## Refereed Articles

forth. [17]  Devin Caughey, Allan Dafoe, Xinran Li, and Luke Miratrix. 2023. "Randomisation Inference Beyond the Sharp Null: Bounded Null Hypotheses and Quantiles of Individual Treatment Effects." Forthcoming, *Journal of the Royal Statistical Society Series B: Statistical Methodology,* https://doi.org/10.48550/arXiv.2101.09195.

2020 [16]  Devin Caughey, Michael C. Dougal, and Eric Schickler. 2020. "Policy and Performance in the New Deal Realignment: Evidence from Old Data and New Methods." *Journal of Politics* 82 (2): 494–508. https://doi.org/10.1086/707305.

2019 [15]  Devin Caughey, Tom O'Grady, and Christopher Warshaw. 2019. "Policy Ideology in European Mass Publics, 1981–2016." *American Political Science Review* 113 (3): 674–693. https://doi.org/10.1017/S0003055419000157.

[14]  Devin Caughey and Mallory Wang. 2019. "Dynamic Ecological Inference for Time-Varying Population Distributions Based on Sparse, Irregular, and Noisy Marginal Data." *Political Analysis* 27 (3): 388–396. https://doi.org/10.1017/pan.2019.4.

2018 [13]  Allan Dafoe, Baobao Zhang, and Devin Caughey. 2018. "Information Equivalence in Survey Experiments." *Political Analysis* 26 (4): 399–416. http://dx.doi.org/10.1017/pan.2018.9.

[12]  Devin Caughey, James Dunham, and Christopher Warshaw. 2018. "The Ideological Nationalization of Partisan Subconstituencies in the American States." *Public Choice* 176 (1–2): 133–151. http://dx.doi.org/10.1007/s11127-018-0543-3.

[11]  Devin Caughey and Christopher Warshaw. 2018. "Policy Preferences and Policy Change: Dynamic Responsiveness in the American States, 1936–2014." *American Political Science Review* 112 (2): 249–266. http://dx.doi.org/10.1017/S0003055417000533.

2017  [10]  Devin Caughey, Chris Tausanovitch, and Christopher Warshaw. 2017. "Partisan Gerrymandering and the Political Process: Effects on Roll-Call Voting and State Policies." *Election Law Journal* 16, no. 4 (Symposium on Partisan Gerrymandering and the Efficiency Gap): 453–469. http://dx.doi.org/10.1089/elj.2017.0452.

    ∗ Cited by appellees' briefs in *Whitford v. Gill* (2017) and *Rucho v. Common Cause* (2018), U.S. Supreme Court

[9]  Devin Caughey, Christopher Warshaw, and Yiqing Xu. 2017. "Incremental Democracy: The Policy Effects of Partisan Control of State Government." *Journal of Politics* 79 (4): 1–17. http://dx.doi.org/10.1086/692669.

[8]  Devin Caughey, Allan Dafoe, and Jason Seawright. 2017. "Nonparametric Combination (NPC): A Framework for Testing Elaborate Theories." *Journal of Politics* 79 (2): 688–701. http://dx.doi.org/10.1086/689287.

2016  [7]  Devin Caughey and Christopher Warshaw. 2016. "The Dynamics of State Policy Liberalism, 1936–2014." *American Journal of Political Science* 60 (4): 899–913. http://dx.doi.org/10.1111/ajps.12219.

    ∗ Winner, APSA State Politics Section Best Journal Article Award

[6]  Devin Caughey and Eric Schickler. 2016. "Substance and Change in Congressional Ideology: NOMINATE and Its Alternatives." *Studies in American Political Development* 30 (2): 128–146. http://dx.doi.org/10.1017/S0898588X16000092.

[5]  Allan Dafoe and Devin Caughey. 2016. "Honor and War: Southern U.S. Presidents and the Effects of Concern for Reputation." *World Politics* 68 (2): 341–381. http://dx.doi.org/10.1017/S0043887115000416.

2015  [4]  Devin Caughey and Christopher Warshaw. 2015. "Dynamic Estimation of Latent Opinion Using a Hierarchical Group-Level IRT Model." *Political Analysis* 23 (2): 197–211. http://dx.doi.org/10.1093/pan/mpu021.

    ∗ Reprinted in Robert J. Frazese Jr., ed. 2017. *Advances in Political Methodology.* Elgar.

[3]  Rosa Arboretti, Eleonora Carrozzo, and Devin Caughey. 2015. "A Rank-based Permutation Test for Equivalence and Non-inferiority." *Italian Journal of Applied Statistics* 25 (1): 81–92. http://sa-ijas.stat.unipd.it/sites/sa-ijas.stat.unipd.it/files/05_1.pdf.

2011  [2]  Devin Caughey and Jasjeet S. Sekhon. 2011. "Elections and the Regression Discontinuity Design: Lessons from Close U.S. House Races, 1942–2008." *Political Analysis* 19 (4): 385–408. http://dx.doi.org/10.1093/pan/mpr032.

    ∗ Winner, Warren Miller Prize and *Political Analysis* Editors' Choice Award
    ∗ Reprinted in Robert J. Franzese, ed. 2015. *Quantitative Research in Political Science.* SAGE.

[1]  Eric Schickler and Devin Caughey. 2011. "Public Opinion, Organized Labor, and the Limits of New Deal Liberalism, 1936–1945." *Studies in American Political Development* 25 (2): 1–28. http://dx.doi.org/10.1017/S0898588X11000101.

## Non-Refereed Publications

2022  Devin Caughey. 2022a. Review of *A Troubled Birth: The 1930s and American Public Opinion*, by Susan Herbst. *Perspectives on Politics* 20 (3): 1102–1104. https://doi.org/10.1017/S1537592722001724.

Devin Caughey. 2022b. Review of *How the Tea Party Captured the GOP: Insurgent Factions in American Politics*, by Rachel M. Blum. *Party Politics* 28 (3): 587–588. https://doi.org/10.1177/13540688221081896.

2021   Devin Caughey and Eric Schickler. 2021. "The Democratic-CIO Alliance: The Benefits of Friendship." *Labor: Studies in Working-Class History* 18 (3): 120–125. https://doi.org/10.1215/15476715-9061521.

2020   Devin Caughey and Sara Chatfield. 2020. "Causal Inference and American Political Development: Contrasts and Complementarities." *Public Choice* 185:359–376. https://doi.org/10.1007/s11127-019-00694-4.

2019   Devin Caughey and Christopher Warshaw. 2019. "Public Opinion in Subnational Politics." *Journal of Politics* 81, no. 1 (Symposium on Subnational Policymaking): 352–363. https://doi.org/10.1086/700723.

2017   Devin Caughey and Eric Schickler. 2017. "Keith Poole, Ideology Scores, and the Study of Congressional Development." *The Legislative Scholar: The Newsletter of the Legislative Studies Section of the American Political Science Association* 2 (2): 37–42. http://legislativestudies.org/wp-content/uploads/2017/11/legislative_scholar_fall_2017.pdf.

## Software

2017   James Dunham, Devin Caughey, and Christopher Warshaw. 2017. *dgo: Dynamic Estimation of Group-Level Opinion*. R package. https://CRAN.R-project.org/package=dgo.

2015   Devin Caughey. 2015. *NPC: Nonparametric Combination of Hypothesis Tests*. R package. http://CRAN.R-project.org/package=NPC.

2014   Devin Caughey. 2014. "`FisherSens` and `SumTestSens`." In *rbounds: Perform Rosenbaum bounds sensitivity tests for matched and unmatched data*. R package. Creator and maintainer: Luke J. Keele. http://CRAN.R-project.org/package=rbounds.

## Grants and Fellowships

2016–17   Visiting Scholar Fellowship, Center for the Study of Democratic Politics, Princeton University

2015   PolMeth Thematic Methodology Meeting Grant ($14,250); with Stephen Jessee, Alex Tahk, Christopher Warshaw, and Teppei Yamamoto; for "Improving Spatial Models" conference, MIT, May 1–2

2011   Mike Synar Graduate Research Fellowship, Institute of Governmental Studies, UC-Berkeley

2010   Clogg Scholarship Award, Society for Political Methodology and ICPSR Summer Program in Quantitative Methods in Social Research

2009–11   NSF Integrated Graduate Education Research and Training (IGERT) Program Fellowship in Politics, Economics, Psychology, and Public Policy

2008   NSF Graduate Research Fellowship (honorable mention)

## Awards and Honors

| | |
|---|---|
| 2024 | APSA State Politics & Policy Section Virginia Gray Book Award, with Chris Warsaw, for *Dynamic Democracy* |
| 2019 | APSA Political Organizations and Parties Section Leon Epstein Outstanding Book Award (2017–2018), for *The Unsolid South* |
| | Social Science History Association Allan Sharlin Memorial Book Award (honorable mention), for *The Unsolid South* |
| 2017 | APSA State Politics & Policy Section Best Journal Article Award, with Chris Warshaw, for "The Dynamics of State Policy Liberalism, 1936–2014" |
| 2015 | APSA award for best paper on state politics and policy presented at the 2014 annual meeting, with Chris Warshaw, for "Dynamic Representation in the American States, 1960–2012" |
| 2014 | APSA Walter Dean Burnham Award for best dissertation in the field of Politics and History |
| 2012 | Warren Miller Prize for best article published in *Political Analysis*, with Jasjeet S. Sekhon, for "Elections and the Regression Discontinuity Design" |
| | *Political Analysis* Editors' Choice Award, with Jasjeet S. Sekhon, for "Elections and the Regression Discontinuity Design" |
| | Kenneth E. Boulding Award for best graduate student paper presented at an International Studies Association meeting, with Allan Dafoe, for "Honor and War" |
| 2008 | Outstanding Graduate Student Instructor Award, UC-Berkeley Graduate Council |

## Conference Papers

| | |
|---|---|
| 2022 | Elissa Berwick and Devin Caughey. 2022. "Multidimensional Latent Ideology in Spanish Regions." Paper presented at the Society for Political Methodology Summer Meeting, Washington University, St. Louis, MO, July 22, 2022. |
| 2019 | Devin Caughey and Sara Chatfield. 2019. "Causal Inference and American Political Development: Contrasts and Complementarities." Paper presented at the Causal Inference & American Political Development Conference, University of Southern California, Los Angeles, CA, January 10, 2019. |
| 2018 | Devin Caughey, Hiroto Katsumata, and Teppei Yamamoto. 2018b. "Item Response Theory for Conjoint Survey Experiments." Paper presented at the annual meeting of the American Political Science Association, Boston, MA, August 30, 2018. |
| | Devin Caughey, Hiroto Katsumata, and Teppei Yamamoto. 2018a. "Item Response Theory for Conjoint Experiments." Paper presented at the summer meeting of the Society for Political Methodology, Brigham Young University, Provo, UT, July 21, 2018. |
| | Elissa Berwick and Devin Caughey. 2018. "Multidimensional Latent Preferences from Sparse Survey Data: A Group-Level Dynamic IRT Model for Spanish Regions." Poster presented at the summer meeting of the Society for Political Methodology, Brigham Young University, Provo, UT, July 20, 2018. |

2017    Devin Caughey and Christopher Warshaw. 2017. "Dynamic Responsiveness in the American States, 1936–2014." Paper presented at the workshop *How Do Politicians Learn?*, Princeton University, Princeton, NJ, May 17, 2017.

Devin Caughey and Erin Hartman. 2017. "Target Selection as Variable Selection: Using the Lasso to Select Auxiliary Vectors for the Construction of Survey Weights." Paper presented at the Annual Meeting of The Society for Political Methodology, University of Wisconsin–Madison, Madison, WI, July 13, 2017.

Allan Dafoe, Baobao Zhang, and Devin Caughey. 2017. "Confounding in Survey Experiments: Diagnostics and Solutions." Paper presented at the workshop *A Perfect Match? Comparative Political Economy and Conjoint Analysis*, University of Zurich, Zurich, Switzerland, January 9, 2017.

2016    Devin Caughey. 2016a. "Exclusion and Responsiveness: Congressional Representation in the One-Party South." Paper presented at the American-British-Canadian Political Development Workshop, University of Toronto, Toronto, Canada, September 30, 2016.

Devin Caughey, James Dunham, and Christopher Warshaw. 2016b. "The Ideological Nationalization of Mass Partisanship: Policy Preferences and Partisan Identification in State Publics, 1946–2014." Paper presented at the APSA Annual Meeting, Philadelphia, PA, September 3, 2016.

Devin Caughey and Sara Chatfield. 2016. "Creating a Constituency for New Deal Liberalism: The Policy Feedback Effects of the Tennessee Valley Authority." Paper presented at the APSA Annual Meeting, Philadelphia, PA, September 1, 2016.

Devin Caughey, Allan Dafoe, and Luke Miratrix. 2016. "Beyond the Sharp Null: Permutation Tests Actually Test Heterogeneous Effects." Paper presented at the summer meeting of the Society for Political Methodology, Rice University, Houston, TX, July 22, 2016.

Devin Caughey and Erin Hartman. 2016. "Target Selection as Variable Selection: Using the Lasso to Select Auxiliary Vectors for the Construction of Survey Weights." Paper presented at the MPSA Annual Meeting, Chicago, IL, April 6, 2016.

Devin Caughey, James Dunham, and Christopher Warshaw. 2016a. "Polarization and Partisan Divergence in the American Public, 1946–2012." Paper presented at the MPSA Annual Meeting, Chicago, IL, April 2, 2016.

Devin Caughey. 2016b. "Representation without Parties: Reconsidering the One-Party South, 1930–62." Paper presented at the SPSA Annual Meeting, San Juan, PR, January 8, 2016.

2015    Devin Caughey, Tom O'Grady, and Christopher Warshaw. 2015. "Ideology in the European Mass Public: A Dynamic Perspective." Paper presented at the General Conference of the European Consortium for Political Research, Montreal, Canada, August 25, 2015.

Allan Dafoe, Baobao Zhang, and Devin Caughey. 2015. "Confounding in Survey Experiments." Paper presented at the Annual Meeting of The Society for Political Methodology, University of Rochester, Rochester, NY, July 23, 2015.

2014    Allan Dafoe, Baobao Zhang, and Devin Caughey. 2014. "Confounding in Survey Experiments." Paper presented at the APSA Annual Meeting, Washington, DC, August 29, 2014.

Devin Caughey. 2014. "Representation without Parties: Reconsidering the One-Party South, 1930–62." Paper presented at the APSA Annual Meeting, Washington, DC, August 28, 2014.

Devin Caughey and Christopher Warshaw. 2014a. "Dynamic Representation in the American States, 1960–2012." Paper presented at the APSA Annual Meeting, Washington, DC, August 28, 2014.

∗ Winner, APSA award for best paper on state politics and policy

Devin Caughey and Christopher Warshaw. 2014b. "The Policy Effects of Partisan Control of State Governorships." Paper presented at the Conference on State Political Institutions and the Executive Branch, Washington, DC, August 27, 2014.

Devin Caughey and Mallory Wang. 2014. "Bayesian Population Interpolation and Lasso-Based Target Selection in Survey Weighting." Paper presented at the Annual Meeting of The Society for Political Methodology, University of Georgia, Athens, GA, July 24, 2014.

Devin Caughey and Eric Schickler. 2014. "Structure and Change in Congressional Ideology: NOMINATE and Its Alternatives." Paper presented at the Congress and History Conference, University of Maryland, College Park, June 11, 2014.

2013    Devin Caughey, Michael Dougal, and Eric Schickler. 2013. "The Policy Bases of the New Deal Realignment: Evidence from Public Opinion Polls, 1936–1952." Paper presented at the APSA Annual Meeting, Chicago, IL, August 31, 2013.

Devin Caughey, Allan Dafoe, and Jason Seawright. 2013a. "Testing Elaborate Theories in Political Science: Nonparametric Combination of Dependent Tests." Paper presented at the APSA Annual Meeting, Chicago, IL, August 29, 2013.

Devin Caughey and Christopher Warshaw. 2013. "Dynamic Estimation of Latent Opinion from Sparse Survey Data Using a Group-Level IRT Model." Paper presented at the Annual Meeting of The Society for Political Methodology, University of Virginia, Charlottesville, VA, July 20, 2013.

Devin Caughey, Allan Dafoe, and Jason Seawright. 2013b. "Testing Elaborate Theories in Political Science: Nonparametric Combination of Dependent Tests." Paper presented at the MPSA Annual Meeting, Chicago, IL, April 20, 2013.

2012    Devin Caughey. 2012a. "Participation and Contestation in the One-Party South: Sources of Ideological Diversity in the 'Southern Bloc'." Paper presented at the MIT American Politics Conference, Cambridge, MA, September 21, 2012.

Devin Caughey. 2012b. "Participation and Contestation in the One-Party South: Sources of Ideological Diversity in the 'Southern Bloc'." Paper presented at the WPSA Annual Meeting, Portland, OR, March 22, 2012.

2011    Devin Caughey. 2011. "The Mass Basis of the 'Southern Imposition': Labor Unions, Public Opinion, and Representation, 1930s–1940s." Paper presented at the APSA Annual Meeting, Seattle, WA, September 3, 2011.

Allan Dafoe and Devin Caughey. 2011. "Honor and War: Using Southern Presidents to Identify Reputational Effects in International Conflict." Paper presented at the ISA Annual Meeting, Montreal, Quebec, March 17, 2011.

∗ Winner, ISA Kenneth E. Boulding Award for best graduate student paper

2010    Allan Dafoe and Devin Caughey. 2010. "Honor, Reputation, and War: Using Southern Presidents to Identify the Effect of Culture on International Conflict Behavior." Paper presented at the APSA Annual Meeting, Washington, DC, September 3, 2010.

Eric Schickler and Devin Caughey. 2010. "Public Opinion, Organized Labor, and the Limits of New Deal Liberalism, 1936–1945." Paper presented at the APSA Annual Meeting, Washington, DC, September 2, 2010.

2009    Devin Caughey. 2009. "Pro-Incumbent Bias in Close Elections: Implications for Regression Discontinuity Designs." Poster presented at the Annual Meeting of The Society for Political Methodology, Yale University, New Haven, CT, July 29, 2009.

Devin Caughey, Sara Chatfield, and Adam Cohon. 2009. "Defining, Mapping, and Measuring Bureaucratic Autonomy." Paper presented at the MPSA Annual Meeting, Chicago, IL, April 4, 2009.

2007    Devin Caughey. 2007. "Responding to the Roosevelt Reconstruction: Southern Senators, the Supreme Court, and the New Deal Coalition." Paper presented at the UC-Berkeley Political Science Graduate Student Conference, May 2, 2007.

## Invited Talks

2023    University of Massachusetts, Amherst (March 8) "Dynamic Democracy: Public Opinion, Elections, and Policymaking in the American States"

2021    Harvard Law School (February 17): "Dynamic Democracy: Citizens, Politicians, and Policymaking in the American States"

2020    Harvard University (March 6): "Dynamic Democracy: Citizens, Politicians, and Policymaking in the American States"

University of Rochester (February 7): "Dynamic Democracy: Citizens, Politicians, and Policymaking in the American States"

2019    Columbia University (October 15): "Item Response Theory for Conjoint Experiments"

2018    University of California, Los Angeles (October 29): "Creating a Constituency for New Deal Liberalism: The Political Effects of the Tennessee Valley Authority, 1933–1962"

2017    Northwestern University (January 27): "Policy and Performance in the New Deal Realignment"

2016    Princeton University (November 17): "Dynamic Responsiveness in the American States"

Johns Hopkins University (March 24): "The Selectoral Connection in the One-Party South"

2015    Yale University (September 17): "Beyond the Sharp Null: Permutation Tests of Bounded Null Hypotheses"

2014    Boston University (November 14): "Representation without Parties: Reconsidering the One-Party South"

Harvard University, Applied Statistics Seminar (November 5): "Bayesian Population Interpolation and Lasso-Based Target Selection in Survey Weighting"

Dartmouth College (April 22): "The Dynamics of State Policy Liberalism, 1956–2012"

Ohio State University (April 18): "The Dynamics of State Policy Liberalism, 1956–2012"

2013    University of Chicago, Harris School (November 14): "A Dynamic Model of Public Opinion, with Applications to Realignment and Representation in the Wake of the New Deal"

Princeton University (October 24): "A Dynamic Model of Public Opinion, with Applications to Realignment and Representation in the Wake of the New Deal"

University of Illinois (September 13): "A Dynamic Model of Public Opinion, with Applications to Realignment and Representation in the Wake of the New Deal"

Yale University (January 16): "Congress, Public Opinion, and Representation in the One-Party South, 1930s–1960s"

2011    Pennsylvania State University, New Faces in Political Methodology Conference (April 30): "Regression-Discontinuity Designs and Popular Elections: Implications of Pro-Incumbent Bias in Close U.S. House Races"

# Advising

### Graduate

| | |
|---|---|
| 2022– | Cory Adkins, MIT (dissertation committee member) |
| 2022– | Kirsten Walters, Harvard (dissertation committee member) |
| 2022– | Angie Jo, MIT (dissertation committee member) |
| 2022– | Esteban Fernandez, MIT (dissertation committee member) |
| 2020– | Chloe Wittenberg, MIT (dissertation committee member) |
| 2019–22 | Zeyu (Chris) Peng, MIT (dissertation co-chair) |
| 2018–20 | Clara Vandeweerdt, MIT (dissertation committee member) |
| 2017–20 | Nicolas Dumas, MIT (dissertation committee member) |
| 2017–20 | Olivia Bergman, MIT (dissertation committee member) |
| 2016–20 | Baobao Zhang, Yale (external dissertation committee member) |
| 2018–19 | Sam Hoar, MIT (master's thesis committee member) |
| 2018–19 | Elissa Berwick, MIT (dissertation committee member) |
| 2016–19 | Megan Goldberg, MIT (dissertation committee member) |
| 2013–18 | James Dunham, MIT (dissertation committee member) |
| 2013–17 | James Conran, MIT (dissertation committee member) |

### Undergraduate

| | |
|---|---|
| 2020–21 | Darya Guettler, MIT (thesis advisor) |
| 2017–18 | Sarah Melvin, MIT (thesis advisor) |

# Teaching

| | |
|---|---|
| 2023–24 | Spring<br>   17.202: American Political Institutions (graduate)<br>   17.270: American Political Development (graduate)<br>Fall<br>   17.S950: Bayesian Measurement Models (graduate) |
| 2022–23 | Spring<br>   17.202: American Political Institutions (graduate)<br>Fall<br>   17.20: Introduction to American Politics (undergraduate)<br>   17.850: Political Science Scope and Methods (graduate) |
| 2021–22 | Spring<br>   17.270: American Political Development (graduate)<br>   17.S950: Bayesian Measurement Models (graduate)<br>Fall<br>   17.850: Political Science Scope and Methods (graduate) |
| 2020–21 | Fall<br>   17.263: Electoral Politics (undergraduate)<br>   17.830: Empirical Methods in Political Economy (graduate)<br>   17.850: Political Science Scope and Methods (graduate) |
| 2019–20 | Spring<br>   17.202: American Political Institutions (graduate)<br>Fall<br>   17.20: Introduction to American Politics (undergraduate)<br>   17.850: Political Science Scope and Methods (graduate) |
| 2018–19 | Spring<br>   17.20: Introduction to American Politics (undergraduate)<br>   17.S951: Political Representation in American Politics (graduate) |
| 2017–18 | Spring<br>   17.202: American Political Institutions (graduate)<br>Fall<br>   17.20: Introduction to American Politics (undergraduate)<br>   17.850: Political Science Scope and Methods (graduate) |
| 2015–16 | Spring<br>   17.20: Introduction to American Politics (undergraduate)<br>   17.S918: Southern Politics since 1863 (undergraduate) |
| 2014–15 | Spring<br>   17.20: Introduction to American Politics (undergraduate)<br>   17.202: American Political Institutions (graduate) |
| 2013–14 | Spring<br>   17.S918: Southern Politics since 1863 (undergraduate)<br>Fall<br>   17.150: The American Political Economy in Comparative Perspective (graduate)<br>   17.20: Introduction to American Politics (undergraduate) |
| 2012–13 | Spring<br>   17.20: Introduction to American Politics (undergraduate)<br>Fall<br>   17.263/264: Electoral Politics (undergraduate/graduate) |

# Service

## *Department*

| | |
|---|---|
| 2023–24 | Chair, Graduate Admissions Committee |
| 2023–24 | Chair, Politics and Computing Search Committee |
| 2022–23 | Chair, Graduate Admissions Committee |
| 2021–22 | Chair, Open-Field Senior Search Committee |
| 2020–21 | Graduate Program Committee / Diversity, Equity, and Inclusion Working Group |
| 2019–20 | Comparative Politics Search Committee |
| 2018–19 | Admissions/Financial Aid Committee |
| | American Politics Search Committee |
| 2017–18 | Political Science Concentration Advisor |
| | Undergraduate Program Committee |
| 2015–16 | Admissions/Financial Aid Committee |
| | Undergraduate Program Committee |
| 2014–15 | Undergraduate Program Committee |
| 2013–14 | American Politics Search Committee |

## *University*

| | |
|---|---|
| 2023–25 | Member, SHASS Education Advisory Committee |
| 2022– | SHASS representative, Committee on Nominations |
| 2020– | SHASS lead, Schwarzman College of Computing Common Ground Standing Committee |
| 2017–19 | Faculty Fellow, MIT SHASS Burchard Scholars Program |

## *Professional Organizations*

| | |
|---|---|
| 2023–25 | Member, executive council, APSA State Politics and Policy Section |
| 2023 | Member, selection committee, Gladys M. Kammerer Award, APSA |
| 2022–24 | Member, executive council, APSA Politics and History Section |
| 2022 | Member, selection committee, Miller Prize, Society for Political Methodology |
| 2020– | Member, advisory board, Consortium on American Political Economy |
| 2019– | Coordinator, Pioneer Valley American Political Development Reading Group |
| 2019 | Member, host committee, 36th annual meeting of the Society for Political Methodology |
| 2017 | Member, selection committee, Miller Prize, Society for Political Methodology |
| 2014 | Member, selection committee, Miller Prize, Society for Political Methodology |

|      | Member, selection committee, PolMeth Graduate Student Poster Award, Society for Political Methodology |
|------|------|
| 2013 | Member, selection committee, Miller Prize, Society for Political Methodology |
|      | Member, selection committee, V. O. Key Award, Southern Political Science Association |
| 2012 | Member, selection committee, Mary Parker Follett Award, APSA Politics and History Section |

## *Journals*

### Editing

| 2022– | Co-editor, *The Forum: A Journal of Applied Research in Contemporary Politics* |
|------|------|

### Reviewing

*American Journal of Political Science*
*American Political Science Review*
*American Politics Research*
*American Sociological Review*
*British Journal of Political Science*
*Conflict Management and Peace Science*
*Contemporary Economic Policy*
*European Journal of Political Economy*
*Journal of Conflict Resolution*
*Journal of Electoral Studies*
*Journal of Experimental Political Science*
*Journal of Health Politics, Policy and Law*
*Journal of Law, Economics, and Organization*
*Journal of Political Economy*
*Journal of Politics*
*Journal of Public Policy*

*Journal of Research on Educational Effectiveness*
*Legislative Studies Quarterly*
*Observational Studies*
*Party Politics*
*Perspectives on Politics*
*Political Analysis*
*Political Behavior*
*Political Research Quarterly*
*Political Science Research and Methods*
*Proceedings of the Nat'l Academy of Sciences*
*Quarterly Journal of Political Science*
*Regional & Federal Studies*
*State Politics & Policy Quarterly*
*Statistics and Public Policy*
*Studies in American Political Development*

## *Publishers*

### Reviewing

Chapman & Hall                                   Oxford University Press

# Consulting

## *Redistricting*

| 2022 | Expert testimony re Kentucky house map, *Graham v. Adams* |
|------|------|
| 2022 | Expert report re Pennsylvania senate map, Legislative Reapportionment Commission hearings |
| 2022 | Expert testimony re Pennsylvania congressional map, *Carter v. Chapman* |
| 2021 | Expert testimony re Oregon congressional map, *Clarno v. Fagan* |