# EXHIBIT 82



**2018 EDITION**

# FREEDOM IN THE 50 STATES

AN INDEX OF PERSONAL AND ECONOMIC FREEDOM

FIFTH EDITION

WILLIAM P. RUGER AND
JASON SORENS

CATO

**Exhibit
0024**



Illustration: Joanna Andreasson

2018 EDITION

# FREEDOM IN THE 50 STATES

## AN INDEX OF PERSONAL AND ECONOMIC FREEDOM

FIFTH EDITION

WILLIAM P. RUGER AND
JASON SORENS

CATO INSTITUTE

## ABOUT THE FIFTH EDITION

This 2018 edition of *Freedom in the 50 States* presents a completely revised and updated ranking of the American states on the basis of how their policies promote freedom in the fiscal, regulatory, and personal realms.

This edition again improves on the methodology for weighting and combining state and local policies to create a comprehensive index. Authors William Ruger and Jason Sorens introduce many new policy variables suggested by readers. More than 230 policy variables and their sources are now available to the public on a new website for the study. Scholars, policymakers, and concerned citizens can assign new weights to every policy and create customized indices of freedom or download the data for their own analyses.

In the 2018 edition, the authors have updated their findings to

- Improve estimates of the "freedom value" of each policy (the estimated dollar value of each freedom affected to those who enjoy it);
- Provide the most up-to-date freedom index yet, including scores as of December 31, 2016;
- Include state and local cash and security assets as a factor partially offsetting debt burdens;
- Significantly expand policies affecting business and personal freedom, including new variables for land-use regulation, health insurance freedom, the collateral costs of arrest and incarceration, and gambling freedom;
- Refine the index of cronyism and update results on how states' cronyist regulations correlate with corruption and interest group power; and
- Analyze how the policies driving income growth and interstate migration have changed pre– and post–Great Recession.

In addition to providing the latest rankings for year-end 2016, the 2018 edition provides annual data on economic and personal freedom and their components back to 2000.

Published by the Cato Institute and accompanied by demographic and economic data on each state, *Freedom in the 50 States* is an essential desk reference for anyone interested in state policy and in advancing a better understanding of a free society.

www.freedominthe50states.org

3

# CONTENTS

**Introduction**                                                                  1

**Part 1: Dimensions of Freedom**                                               14

    Fiscal Policy                                          17

    Overall Fiscal Policy Ranking                          34

    Regulatory Policy                                      39

    Overall Regulatory Policy Ranking                      62

    Overall Economic Freedom Ranking                       66

    Personal Freedom                                       71

    Overall Personal Freedom Ranking                      102

    Overall Freedom Ranking                               106

    Index of Cronyism                                     117

**Part 2: Politics of Freedom**                                               120

**Part 3: Freedom State by State**                                            146

    Appendix A: Dimension, Category, and Variable Weights   256

    Appendix B: Alternate Indices                         262

    Further Reading                                       282

    Acknowledgments                                       285

    About the Authors                                     287

We dedicate this book to sincere friends of
federalism and individual freedom.

Where liberty dwells, there is my country.

—Benjamin Franklin

# INTRODUCTION

This study ranks the American states according to how their public policies affect individual freedoms in the economic, social, and personal spheres. Updating, expanding, and improving on the four previous editions of *Freedom in the 50 States*, the 2018 edition examines state and local government intervention across a wide range of policy categories—from taxation to debt, from eminent domain laws to occupational licensing, and from drug policy to educational choice.

For this new edition, we have added several more policy variables; improved the way we measure tax burden, fiscal decentralization, fiscal solvency, gambling policy, land-use regulation, minimum wage regulation, and health insurance mandates; and improved the innovative, objective system for weighting individual variables introduced in the third edition. For the first time, we offer annual data going back to the year 2000, providing a valuable resource for researchers investigating the causes and consequences of changes in freedom. Our time series now covers the 17 years in the period 2000–2016. Finally, we continue to investigate the causes and consequences of freedom with detailed, up-to-date methods.

We began this project to fill a need: *Freedom in the 50 States* was the first index to measure both economic and personal freedom and remains the only index to do so at the state level. We also strive to make this the most comprehensive and definitive source for economic freedom data on the American states.

Measuring freedom is important because freedom is valuable to people. At the very least, it is valuable to those whose choices are restricted by public policy. Although the United States has made great strides toward respecting each individual's rights regardless of race, sex, age, or sexual

preference, some individuals face growing threats to their interests in some jurisdictions. Those facing more limits today include smokers, builders and buyers of affordable housing, aspiring professionals wanting to ply a trade without paying onerous examination and education costs, and less-skilled workers priced out of the market by minimum wage laws.

In the American system, even "benefit to others" cannot justify trampling on certain freedoms. Books may not be banned simply because the ideas and arguments they present offend some readers. Racial segregation would be unjustified even in the unlikely event it was somehow considered efficient. Likewise, state and local governments ought to respect basic rights and liberties, such as the right to practice an honest trade or the right to make lifetime partnership contracts, whether or not respecting these rights "maximizes utility." Some infringements on these rights may seem relatively small, almost harmless, or only symbolically significant, such as laws that allow police to build automated license plate databases that track drivers, or laws that authorize DNA collection from nonviolent arrestees without a court hearing. Nevertheless, even minor infringements on freedom can erode the respect for fundamental principles that underlie our liberties. This index measures the extent to which states respect or disrespect these basic rights and liberties; in doing so, it captures a range of policies that threaten to chip away at the liberties we enjoy.

Our index encompasses both economic and personal freedoms because the two sets of freedoms are complementary. A state scoring high in economic freedom but not in personal freedom—a hypothetical American Singapore—would not be a really free state in the way the liberal tradition understands it. Nor would a state high in personal freedom but low in economic freedom—an American Argentina—provide the liberal conditions necessary for human flourishing in the broadest sense.

Even to economist Milton Friedman, a mere "economic freedom index" would not be a real freedom index. In his 1962 book *Capitalism and Freedom,* Friedman explores the connection between economic and political freedoms, finding that political freedom in the absence of economic freedom is unlikely to last. He writes, "It is a mark of the political freedom of a capitalist society that men can openly advocate and work for socialism,"[1] while a socialist society does not permit the reverse.

Similarly, at the state level, Americans will derive more value from their economic freedom the more extensive are their personal freedoms, and vice versa. This does not mean that states scoring highly on a particular dimension of freedom—fiscal, regulatory, or personal—will also score highly

on the others, but Friedman's work suggests that the different dimensions of freedom are most valuable in combination.

Several different audiences have found the information and analysis in this book useful. We believe this book will continue to be valuable to the following readers:

- State legislators and governors, their staffs, and local policymakers interested in liberty can use the data and rankings to see where their states stand relative to other states and to determine where real improvements can be made. Although policymakers are better situated than we are to make precise judgments about the benefits of specific legislation, this book does offer reform ideas tailored for each state. These ideas are contained in the state profiles located at the end of the study.
- Scholars can use the index to model politics and policy outcomes in areas such as economic growth and migration. These data are also a valuable resource for teachers and students, providing easy access to information that can be used for policy analysis or statistical projects.[2]
- Businesses considering new investment opportunities or relocation can use the data to analyze state tax and regulatory regimes and the relative openness and toleration that attract highly productive employees.
- Reporters can use the data to understand their states' policy debates in a national context. They could also use them to hold elected officials accountable for infringements on freedoms and state performance.
- Individual citizens can use the data to better understand what their state governments are doing and thus be better-informed participants in the democratic process. The data are also useful to those seeking to move to a freer state.

This book scores all 50 states on their overall respect for individual freedom, and also on their respect for three dimensions of freedom considered separately: fiscal policy, regulatory policy, and personal freedom. To calculate these scores, we weight public policies according to the estimated costs that individuals suffer when government restricts their freedoms. However, we happily concede that different people value aspects of freedom differently. Hence, our website provides the raw data and weightings so that interested readers can construct their own freedom rankings; this information is available at www.freedominthe50states.org.

---

1.   Milton Friedman, "The Relation Between Economic Freedom and Political Freedom," chapter 1 in *Capitalism and Freedom* (Chicago: University of Chicago Press, 1962), p. 16.

2.   See http://www.statepolicyindex.com or footnote 18 in this book for citations of research using the data.

## DEFINING FREEDOM

"Freedom" is a moral concept. What most people mean by freedom is the ability to pursue one's ends without unjust interference from others. Of course, reasonable people can disagree about what counts as unjust interference, and it is also controversial whether freedom in this sense ought to trump other desiderata such as social welfare. These questions cannot be answered in a value-neutral way, but citizens and policymakers must try to answer them nonetheless. We are forthright about our moral philosophy so that we can be precise about what counts as "freedom" for us, but we recognize that others may define freedom differently. We have made the data and weights available online so that people can alter our index to fit their own conceptions of freedom. We consider it an open, but interesting, question whether freedom is in any way related to indicators of aggregate social welfare such as income growth and migration. Chapter 5 takes up this question in more detail.

We ground our conception of freedom on an individual rights framework. In our view, individuals should not be prevented from ordering their lives, liberties, and property as they see fit, so long as they do not infringe on the rights of others.[3] This understanding of freedom follows from the natural-rights thought of John Locke, Immanuel Kant, and Robert Nozick, but it is also consistent with the rights-generating rule utilitarianism of Herbert Spencer and others.[4] From the Declaration of Independence, through the struggles for the abolition of slavery, and up to the 20th century, this conception of freedom was the traditional one in the United States. As Justice Louis Brandeis wrote in his 1928 dissent in *Olmstead v. United States*, "The makers of our Constitution ... conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."[5] In the context of the modern state, this philosophy engenders a set of normative policy prescriptions that political theorist Norman Barry characterized as "a belief in the efficiency and morality of unhampered markets, the system of private property, and individual rights—and a deep distrust of taxation, egalitarianism, compulsory welfare, and the power of the state."[6]

In essence, this index attempts to measure the extent to which state and local public policies conform to this ideal regime of maximum, equal freedom.[7] For us, the fundamental problem with state intervention in consensual acts is that it violates people's rights. To paraphrase Nozick, in a free society the government permits and protects both capitalist and noncapitalist acts between consenting adults.[8] Should individuals desire to "tie their own hands" and require themselves to participate in social insurance, redistributive, or paternalist projects, they should form voluntary communities for these purposes.[9]

Those who endorse the "law of equal freedom" at the heart of libertarianism and the political order espoused in this index do not necessarily reject the notion of "constraints." Neither the liberal order nor the libertarian approach requires that one take an ethically or normatively neutral stance about how people use their freedom. For instance, it is perfectly consistent to reject "libertinism" ("do whatever you want so long as you do not hurt anyone else, whether it be snorting cocaine or engaging in casual sex") and even make strong moral claims about the proper way to live a virtuous, flourishing life without sacrificing one's credentials as a friend of liberty.[10] Libertarianism does not imply libertinism, and the two may even stand in some tension, if Steven Pinker is correct that the "civilizing process" has encouraged the adoption of new moral and mannerly constraints to allow people to interact more peacefully with each other without Leviathan.[11] Supporting the right of consenting adults to use drugs or of bakers to contract with bakeries to employ them for more than 60 hours a week does not require judging those behaviors to be wise or even morally justified. Therefore, the freedom index makes no claim about the wisdom or morality of the behaviors that states should allow adults to pursue freely. It is left to philosophers, theologians, and all of us as moral agents to make arguments about the legitimacy of particular moral constraints.[12]

---

3. We recognize that children and the mentally incompetent must be treated differently from mentally competent adults, and also that some rights may not be alienated even by consenting adults.

4. See John Locke, *Second Treatise of Civil Government*; Immanuel Kant, *Foundations of the Metaphysics of Morals*; Robert Nozick, *Anarchy, State, and Utopia* (New York: Basic Books, 1974); and Herbert Spencer, *Social Statics, or the Conditions Essential to Happiness Specified, and the First of Them Developed* (London: John Chapman, 1851).

5. *Olmstead v. United States*, 277 U.S. 438 (1928).

6. Norman Barry, "The Concept of 'Nature' in Liberal Political Thought," *Journal of Libertarian Studies 8*, no. 1 (1986): 16n2.

7. The "equal freedom" that persons enjoy in a free society is, for us, equality of rights and equality before the law, not equality of opportunities or "positive freedom." On positive freedom, see Isaiah Berlin, "Two Concepts of Liberty," in *Four Essays on Liberty* (Oxford: Oxford University Press, 1969).

8. Nozick, *Anarchy, State, and Utopia*, p. 163.

9. Almost all real-world governments do not constitute voluntary communities because their constitutions do not enjoy the unanimous consent of the governed. Homeowners' associations, by contrast, do in theory fit into this category.

10. Elsewhere we define libertinism more specifically as "radically indifferent to the choices that people make with their freedom. This line of thinking holds that as long as an act is consensual and respects at least one truth—the inviolability of the person's fundamental right to choose how to use his or her person and property—not only should the law not get involved, but there is also no ground for moral criticism of the act." See William Ruger and Jason Sorens, "The Case for 'Virtue Libertarianism' Over Libertinism," Reason.com, June 9, 2016.

11. Steven Pinker, *The Better Angels of Our Nature: Why Violence Has Declined* (New York: Viking, 2011).

12. We consider ourselves to be "virtue libertarians" (a term we have adopted as the result of many conversations over the years about our particular "conservative libertarian" brand of ethical and political thinking)—espousing strong support for a libertarian political order but also strong convictions about what a flourishing, moral life demands and how we ought to use our freedom (with proper humility, of course, about our ability to know with any certainty what the best life is for any individual or for people in general). We also think that certain behaviors are more consistent than others with the preservation and security of a free society. Our approach owes much to the work of Frank Meyer, Albert J. Nock, and Walter Block.

Although our belief in limited government and a free society is based on the moral dignity of each human being, empirical evidence suggests that the protection of individual rights tends to foster economic growth and the coinciding improvements in people's living standards. Economist Robert Lawson explains the relationship between economic freedom and economic growth:

> Numerous studies have shown that countries with more economic freedom grow more rapidly and achieve higher levels of per-capita income than those that are less free. Similarly, there is a positive relationship between changes in economic freedom and the growth of per-capita income. Given the sources of growth and prosperity, it is not surprising that increases in economic freedom and improvements in quality of life have gone hand in hand during the past quarter of a century.[13]

We also recognize that freedom, properly understood, can be threatened as much by the weakness of the state as by overbearing state intervention. Individuals are less free when they have reason to fear private assaults and depredations, and an appropriate government punishes private aggression vigorously. However, this book focuses on threats to individual liberty originating in the state. Therefore, we do not code the effectiveness of state governments in reducing rights violations. For instance, we do not calculate measures of the efficacy of state police and courts or of violent and property crime rates.[14] Thus, our "freedom index" does not capture all aspects of freedom, and we encourage readers to use our scores in conjunction with other indicators when assessing government effectiveness or quality of life. At the same time, we do attempt to capture the extent of "overcriminalization" by state, as well as the extent to which state civil liberty systems put property rights at risk.

Our definition of freedom presents specific challenges on some high-profile issues. Abortion is a critical example. According to one view, a fetus is a rights-bearing person, and abortion is therefore almost always an aggressive violation of individual rights that ought to be punished by law. The opposite view holds that a fetus does not have rights, and abortion is a permissible exercise of an individual liberty, which entails that legal regulation of abortion is an unjust violation of a woman's rights. A third view holds that a fetus gains

personhood and rights at some threshold during its development, and at that point legal regulation is *pro tanto* justified. Rather than take a stand on one pole or the other (or anywhere between), we have not included the policy in the official freedom index. We have coded the data on state abortion restrictions and made them available online at http://www.statepolicyindex.com, and as in the last edition of the book, we have added a section that includes alternative indices based on three of many possible state abortion regimes.

Another example is the death penalty. Some argue that murderers forfeit their own right to life, and therefore state execution of a murderer does not violate a basic right to life. Others contend that the right to life can never be forfeited, or that the state should never risk taking away all the rights of innocent individuals by falsely convicting them. State sentencing policies short of the death penalty could also be debated, such as lengthy periods of solitary confinement. We personally have serious reservations about some of these punishments, but we do not include them in the freedom index, although we have coded the death penalty data and made them available online at http://www.statepolicyindex.com.

The freedom index stands within the mainstream tradition in social science of measuring normatively desired phenomena, such as democracy,[15] civil liberties,[16] and human rights.[17] Clearly, our index will have intrinsic interest for classical liberals and libertarians. However, nonlibertarian social scientists will also benefit from the index, because it is an open question how individual liberty relates to phenomena such as economic growth, migration, and partisan politics in the American states. In the same way, although political scientists may value democracy for its own sake, they can also research empirically what causes democracy and how democracy affects other phenomena. In fact, a broad range of social scientists and policy analysts have already used this index to investigate a range of interesting questions, including the effects on growth, migration, corruption, entrepreneurship, accident death rates, veterans' earnings, and state bond ratings.[18]

---

13. Robert A. Lawson, "Economic Freedom and the Wealth and Well-Being of Nations," in *The Annual Proceedings of the Wealth and Well-Being of Nations*, 2009–2010, vol. 2, ed. Emily Chamlee-Wright and Jennifer Kodl (Beloit, WI: Beloit College Press, 2010), pp. 65–80.

14. Measuring the efficacy and justice of criminal penalties, arrest procedures, and so forth with regard to deterrence, proportionality, retribution, rehabilitation, and the like is an extremely complex endeavor that deserves a lengthy treatment on its own. See Richard A. Posner, *The Economics of Justice* (Cambridge, MA: Harvard University Press, 1981).  See, for example, the CIRI Human Rights Dataset, http://ciri.binghamton.edu.

15. See, for example, the Polity IV Project, http://www.systemicpeace.org/polity/polity4.htm.

16. See, for example, the Freedom House indicators, http://www.freedomhouse.org.

17. See, for example, the CIRI Human Rights Dataset, http://www.humanrightsdata.com/p/data-documentation.html.

18. Noel D. Johnson, William Ruger, Jason Sorens, and Steven Yamarik, "Corruption, Regulation, and Growth: An Empirical Study of the United States," *Economics of Governance* 15, no. 1 (2014): 51–69; Richard J. Cebula, "The Impact of Economic Freedom and Personal Freedom on Net In-Migration in the US: A State-Level Empirical Analysis, 2000 to 2010," *Journal of Labor Research* 35, no. 1 (2014): 88–103; Nicholas Apergis, Oguzhan C. Dincer, and James E. Payne, "Live Free or Bribe: On the Causal Dynamics Between Economic Freedom and Corruption in US States," *European Journal of Political Economy* 28, no. 2 (2012): 215–26; Rick Weber and Benjamin Powell, "Economic Freedom and Entrepreneurship: A Panel Study of the United States," *American Journal of Entrepreneurship* 1 (2013): 67–87; Leland K. Ackerson and S. V. Subramanian, "Negative Freedom and Death in the United States," *American Journal of Public Health* 100, no. 11 (2010): 2163–64; Alberto Dávila and Marie T. Mora, "Terrorism and Patriotism: On the Earnings of US Veterans Following September 11, 2001," *American Economic Review* 102, no. 3 (2012), 261–66; A. R. Belasen, R. W. Hafer, and S. P. Jategaonkar, "Economic Freedom and State Bond Ratings," *Contemporary Economic Policy* 33, no. 4 (2015): 668–77.

## CREATING THE INDEX

We started this project by collecting data on more than 230 state and local public policies affecting individual freedom as it is defined above. For data other than taxes and debt, we code laws enacted as of December 31, 2016 (even if they come into force later). We also code these variables for 2000–2015 and, in some cases, for prior years. For taxes and debt, the latest available data covering both state and local governments come from fiscal year (FY) 2014, which for most states ran from July 2013 to June 2014. However, we have actual state tax collections for FY 2015 and FY 2016, and in part for FY 2017 (sales and income taxes) as well. By assuming constant local debt, financial assets, and taxation levels, we can get an estimated value of state plus local debt, financial assets, and tax burdens for the recent years. We can also get provisional data for FY 2017 by incorporating changes in state government sales and individual and corporate income tax revenues. For each year's freedom index, we use tax and debt data from the subsequent fiscal year because state budgets are enacted in the year before.

There are some variables in the index that we do not have available for every year. We have to carry forward or back or interpolate the data for these policies to include them. The master spreadsheet available at http://freedominthe50states.org includes comment fields explaining exactly what was done in each of these cases.

The index also includes variables that do not differ across states for particular years. Usually, this lack of variation is a result of policies being nationalized at the federal level. Sometimes, this centralizing process occurs in a pro-freedom direction, as when the Supreme Court struck down Chicago's gun ban and several states' sodomy laws, but more often it occurs in an anti-freedom direction, as when the Patient Protection and Affordable Care Act (PPACA) legislated health insurance community rating, guaranteed issue, prior approval of premiums, and an individual health insurance mandate nationwide. Federalization of state policies has now happened frequently enough over our time series that for the first time, in this edition of the book we develop alternative freedom indices that exclude all policies that were federalized at any point (see Appendix B). These indices are particularly useful for investigating the freedom impact of state-level policymakers, rather than the freedom environment enjoyed by state residents.

The top-level data used for creating the index are available in a downloadable spreadsheet at http://freedominthe50states.org. However, to obtain details on data sources and the construction of indices (such as the eminent domain reform and renewable fuels standards indices), interested readers should navigate to http://statepolicyindex.com and download the policy category spreadsheets. Each variable in the top-level spreadsheet has

a code, such as "adebtpia" (state and local debt divided by adjusted personal income). The first letter of that code corresponds to the particular spreadsheet where its details may be found. Thus, "adebtpia" comes from the "a_ fiscal_17.xls" spreadsheet for fiscal policies. Quite often, these spreadsheets contain additional policies not included in the freedom index, as well as data for additional years when available. Some state and local tax and spending data are available annually back to FY 1977 and quinquennially back to FY 1957. Some alcohol policies are available from 1937.

Because we want to score states on composite indices of freedom, we need a way of "weighting" and aggregating individual policies. One popular method for aggregating policies is "factor" or "principal component" analysis, which weights variables according to how much they contribute to the common variance—that is, how well they correlate with other variables.

Factor analysis is equivalent to letting politicians weight the variables, because correlations among variables across states will reflect the ways that lawmakers systematically prioritize certain policies. Partisan politics is not always consistent with freedom (e.g., states with more marijuana freedom offer less tobacco freedom). The index resulting from factor analysis would be an index of "policy ideology," not freedom.[19]

Factor analysis is also not justified if important variables do not line up with a clear ideological position but have a major effect on freedom. That is in fact the case. Occupational licensing is neither more nor less prevalent in conservative versus progressive states. The lawsuit environment is also not related to state ideology. In a factor-analysis approach, these variables would be discounted, but they are important variables in our study because of their economic impact.

Another approach, employed in the Fraser Institute's "Economic Freedom of North America," is to weight each category equally, and then to weight variables within each category equally.[20] This approach assumes that the variance observed within each category and each variable is equally important. In the large data set used for the freedom index, such an assumption would be wildly implausible. We feel confident that, for instance, tax burden should be weighted more heavily than court decisions mandating that private malls or universities allow political speech.

To create the freedom index, we weight variables according to the value of the freedom affected by a particular policy to those people whose freedoms are at stake. Each variable receives a dollar estimate, representing the financial, psychological, and welfare benefits of a standardized shift of the variable in a pro-freedom direction to those people who enjoy more free-

dom. We base these values on estimates derived from the scholarly literature in economics and public policy that quantifies the effects of policies on behavior.

The "freedom value" of each variable represents the benefits only to those people whose freedoms have been respected. We do not include the benefits to those who wish to take away freedoms. For instance, private companies may benefit from receiving eminent domain transfers, but we count only the costs to those whose property has been taken away.

We do so because we do not want to create a utilitarian calculus. An index of social welfare is not the same as an index of freedom. We leave it an open question whether deprivations of freedom have net social benefits or costs. Of course, the costs of these deprivations to their victims would be part of a utilitarian calculus, but we do not want to foreclose future empirical research on whether government intervention that classical liberals consider unjust might nevertheless have some beneficial social consequences.

Our approach shares something in common with John Rawls's famous criticism of utilitarianism:

> As an interpretation of the basis of the principles of justice, classical utilitarianism is mistaken. It permits one to argue, for example, that slavery is unjust on the grounds that the advantages to the slaveholder as slaveholder do not counterbalance the disadvantages to the slave and to society at large burdened by a comparatively inefficient system of labor. Now the conception of justice as fairness, when applied to the practice of slavery with its offices of slaveholder and slave, would not allow one to consider the advantages of the slaveholder in the first place. . . . The gains accruing to the slaveholder, assuming them to exist, cannot be counted as in any way mitigating the injustice of the practice.[21]

That is precisely our position, not only with regard to the extreme example of slavery, but also to the more mundane but equally systematic deprivations of freedom in contemporary American society. Therefore, we count only the disadvantages to victims of government action.

In addition, we have techniques for including second-order victims in our calculations, who may not lose property or freedom directly, but who can be expected to suffer fear of having their rights violated in the future ("if they can do that to X, they can do that to me"). We discuss some of these techniques in the relevant sections below. Our raw data contain comments describing in detail the justification for each variable's weight and citing rel-

evant sources.

Consistent with the method employed in the previous edition of the index, the value of the freedom affected by a given policy represents the dollar-terms value of the freedom to potential victims if a one-standard-deviation change in that variable were imposed nationwide. That common standard allows us to compare variables with each other and sum their costs. When we discuss the values of a particular freedom or, equivalently, the victim costs of restrictions on that freedom, we are referring to that metric. The two equations that follow express how each variable is standardized and then compiled to build the freedom index.

The standardized variables $z$   $Z$ represent the standard deviations freer

$$(1) \quad z_i = (-) \ \frac{(x_i - \bar{x})}{s_x}$$

$$(2) \quad f_i = \sum_{z\,=\,1}^{Z} z_i \ \frac{v_z}{\sum V}$$

than the mean of the raw variable $x$ that each state $i$ is. The negative operator applies when higher values on the raw variable (for instance, cigarette taxes per pack) represent less freedom. The freedom score for each state $f_i$ is a weighted sum of values on the standardized policy variables, where the share of each variable's freedom value $v$   $V$ in the sum of all variables' freedom values is the weight. $\in$

Again, the value of a freedom represents not just financial benefits, but consumer surplus, psychological benefits, and so on. These estimates are based on economic and policy research, but admittedly that research does not always allow very precise, certain estimates. We lack the resources to conduct in-depth statistical analysis on the social and economic consequences of each of the 176 top-level variables in the data set. Absent that capability for precision, our aim in this edition was to construct weights that are accurate within an order of magnitude. Using dollar values derived from the literature imposes greater discipline on our weighting choices than a rougher, more qualitative assessment of individual policies' significance like that used in the first two editions of this index.

With plausible variable weights, quantifying freedom permits researchers to investigate the relationship between freedom and other desiderata quantitatively and to judge changes in freedom over time objectively, rather than anecdotally. Measurements of freedom will improve as scientific estimates of the relative values of different freedoms improve, but taking the first step

---

21.   John Rawls, "Justice as Fairness," *The Philosophical Review* 67, no. 2 (1958): 187–88.

toward an objective assessment of different freedoms' values is essential to the social-scientific enterprise.

Thus, our index of freedom should be understood to represent each state's relative respect for freedom, as reflected in the value enjoyed by the "average" person who would otherwise be deprived of the freedoms we measure. However, each individual will value different policies differently, and for that reason, again, we encourage readers to apply their own weights and personalize the freedom index at http://www.freedominthe50states.org. Readers can download the master spreadsheet to create their own weights for each variable. We have used Excel's "comment" function to annotate important information about how variables were coded and weighted and what particular columns and rows mean. To investigate how any particular variable was created or coded, anyone can download the constellation of policy category spreadsheets at http://statepolicyindex.com. Variables and the policy category spreadsheets are named with an initial letter so as to make their location clear. For instance, debt as a percentage of income, "adebtpia," is found in the fiscal policy spreadsheet, "a_fiscal_17.xls." The individual policy category spreadsheets contain a "metadata" worksheet with detailed information on data sources.

## PART I

# DIMENSIONS OF FREEDOM

For the purposes of the freedom index, this book identifies three overarching "dimensions" of freedom and further divides each dimension into categories composed of one or more of the variables used to generate the state scores and rankings. Following our objective weighting system described in the Introduction, variables in the fiscal policy dimension end up with 30.4 percent of the summed freedom values of all variables for the average state, variables in the regulatory policy dimension with 34 percent, and variables in the personal freedom dimension with 34.1 percent.[22] Taken individually, the categories may interest readers on core topics of concern, such as taxation, state debt, health insurance regulations, restrictions on alcohol sales, and so on. The following sections explain how each category was constructed and earned its respective weight within the index. Together, these categories make up the overall rankings, found in the next chapter.

22. Because of the manner in which we weight local taxation, the weights for the fiscal dimension vary by state. They range from 28.9 percent (for the state with the most competing jurisdictions) to 31.1 percent (for the state with the fewest competing jurisdictions). For further explanation, see the section titled "Local Taxation."

# FISCAL POLICY

The fiscal policy dimension consists of six variables: (a) state tax revenues, (b) government consumption, (c) local tax revenues, (d) government employment, (e) government debt, and (f) cash and security assets, each of which earns a significant weight because of its importance (see Figure 1). The tax, debt, and assets variables are measured for each fiscal year, whereas the employment and consumption variables come from different sources and are available for the calendar year.

In the first three editions, we included fiscal decentralization (ratio of local to state taxation) as a separate variable. In this edition and in the fourth edition, we have done something more sophisticated. We have separated state and local taxation and assigned different weights to the two. See the following section for details.



**FIGURE 1** Fiscal Policy Weights



State Taxation **11.6%**

Government Consumption **8.2%**

Local Taxation **8.0%**

Government Employment **2.0%**

Government Debt **0.3%**

Cash & Security Assets **0.2%**

# STATE TAXATION

**11.6%** State and local tax burdens are measured by calculating state and local tax revenues as a percentage of each state's adjusted personal income, excluding taxes on motor fuel, mineral severance, alcohol sales, and tobacco sales.[23]  Gas taxes are excluded because they approximate user fees (they are paid roughly in proportion to use by the user, unlike other taxes).[24]  Mineral severance taxes are excluded because they are paid by energy companies that pass the costs on to consumers worldwide, not just to residents of the state where they operate. Alcohol and tobacco sales taxes are excluded because they are included in the personal freedom dimension. Personal income is the denominator because it represents the size of each state's economy: it statistically correlates better with state and local revenues and expenditures than any other commonly used measure of economic size, such as gross domestic product (GDP).[25]

Adjusted personal income, which is personal income plus capital gains plus taxable pensions and annuities minus supplements to wages and salaries, is used to make our denominator as close as possible to the popular but infrequently updated tax burden measure from the Tax Foundation.[26]  The taxation variables therefore roughly represent the average tax burden that state taxpayers face.

We weight tax burden under the assumption that some taxpayers would consent to pay their full tax burden conditional on others doing the same, and some of what those taxes pay for does not diminish and may even enhance freedom (e.g., protection of rights). Some even advocate a higher tax burden, to pay for services they value.

To adjust for consented-to taxation, we take the following steps. First, we assume that the current tax burden in each state represents the ideal point of the median voter. Positive theories of democracy suggest that this is as good a guess as any about where public opinion lies.[27] Then, half of the voters would prefer a higher tax burden (and the services it would finance), and half would prefer a lower tax burden. Right away, we can slash the tax burden weight in half, because half of the voters nationally would not see the taxes they currently pay as any diminution of their freedom at all.

Now, this move assumes that the median-dollar taxpayer is the same as the median voter. That is unlikely to be the case. In fact, the median-dollar taxpayer is likely to be somewhat wealthier than the median voter and thus more ideologically conservative and more hostile to taxation. Thus, if anything, slashing the tax burden in half on these grounds is slightly too aggressive. We discuss our solution to this problem in the following section.

Before we solve for that issue, we continue with the exposition. Of at least half of the taxpayers who would prefer a lower tax burden, most would not see all of the taxes they pay as a diminution of their freedom. That is, conditional on others doing the same (absent the collective action problem), they would be fully willing to pay a lower tax burden that is greater than zero. To illustrate the logic, assume a normal probability density function over possible tax burdens, as seen in Figure 2.

On the x-axis of Figure 2 is tax burden, and on the y-axis is the proportion of the population corresponding to a particular view on tax burden. Fifty percent of the curve lies to the left or right of the mean of the tax burden distribution, which is 9.5, which is the actual national mean of state plus local tax burden. (We have drawn the curve under the assumption of a standard deviation of 2.375, a fourth of the mean, but nothing that follows hinges on this assumption. Note that the standard deviation of voters' views on taxation should be significantly greater than the standard deviation of actual state tax burdens, because each state tax burden roughly represents a median of a distribution.)



**FIGURE 2**  Normal Curve with Median at 9.5

---

23.   The Census Bureau taxation measures used here exclude user fees (such as state university tuition) from the tax category, but include business, motor vehicle license, and alcohol license fees, which is appropriate for the freedom index.

24.   Some people would argue that gas taxes that merely pay for roads are too low, because a higher gas tax could discourage pollution, a negative externality. Others would argue that some states' existing gas taxes are too high, because state governments often divert them to nonroad uses.

25.   When total spending and total taxes are regressed on personal income, gross domestic product, and earnings by place of work, only the first correlates positively with the fiscal variables.

26.   Liz Malm and Gerald Prante, "Annual State-Local Tax Burden Ranking FY 2011," Tax Foundation, April 2, 2014, http://taxfoundation.org/article/annual-state-local-tax-burden-ranking-fy-2011.

27.   Anthony Downs, *An Economic Theory of Democracy* (New York: Harper, 1957).

What this means more simply is that, we guess, half of the voters are satisfied with tax burdens of 9.5 percent or higher, while half of the voters prefer tax burdens below 9.5 percent. Taxes take away the freedom of only the second group. Also, the vast majority of the second group does not want to get rid of all taxes. Only part of their tax burden reduces their freedom.

How much of their tax burden is a loss of freedom? We could imagine a "loss curve" that looks like a mirror image of the left side of the normal density function. In other words, those who want zero taxation will see all 9.5 percent of income taxed away as a loss of freedom; those who want taxation of 2.5 percent of income will see 7 percent of income taxed away as a loss of freedom, and so on. Half of all taxes that people who prefer lower taxes pay does not take away their freedom, if we assume a normal distribution of preferences over taxes. (The area under the loss curve is 0.5, like the area under the left side of the normal curve.) So only 4.75 percent of personal income, in total, is a loss to those who prefer lower taxation. We can divide the tax burden's weight by two again, or by four in total. Then, we multiply by 1.1 to account for the fact that the median taxpayer is richer than, and likely more anti-tax than, the median voter. Finally, we multiply by 0.94 because the federal deduction for state and local taxes returns, on average, 6 percent of state and local taxes paid to taxpayers. In future years, the weights on the tax variables will rise because of the reduction of federal deductibility in the Tax Cuts and Jobs Act of 2017.

The values in Table 1 represent the number of standard deviations better (lower tax) than the 2000–2016, 50-state average. Vermont looks abnormally poor on state taxes and good on local taxes because the state classifies all of the property tax as a state tax, even though towns do have some control over the local rate. Because we reward states for fiscal decentralization, the net effect is to depress Vermont's fiscal policy and overall freedom score somewhat.

<div style="text-align:right">

**TABLE 1**

</div>

| Rank | State | State Tax Burden Score, 2016 | Rank | State | State Tax Burden Score, 2016 |
|---|---|---|---|---|---|
| 1. | Alaska | 2.74 | 26. | North Carolina | 0.09 |
| 2. | New Hampshire | 2.04 | 27. | New Jersey | 0.06 |
| 3. | Florida | 1.68 | 28. | Nevada | 0.05 |
| 4. | Texas | 1.67 | 29. | New Mexico | 0.04 |
| 5. | Wyoming | 1.63 | 30. | Connecticut | 0.02 |
| 6. | South Dakota | 1.41 | 31. | Maryland | −0.04 |
| 7. | Colorado | 1.20 | 32. | Rhode Island | −0.10 |
| 8. | Oklahoma | 1.05 | 33. | Massachusetts | −0.17 |
| 9. | Tennessee | 0.96 | 34. | Oregon | −0.19 |
| 10. | North Dakota | 0.95 | 35. | Michigan | −0.23 |
| 11. | Missouri | 0.90 | 36. | Indiana | −0.23 |
| 12. | South Carolina | 0.81 | 37. | Idaho | −0.28 |
| 13. | Virginia | 0.81 | 38. | Wisconsin | −0.35 |
| 14. | Louisiana | 0.74 | 39. | West Virginia | −0.42 |
| 15. | Georgia | 0.74 | 40. | Kentucky | −0.43 |
| 16. | Montana | 0.73 | 41. | Iowa | −0.47 |
| 17. | Arizona | 0.68 | 42. | Maine | −0.63 |
| 18. | Alabama | 0.59 | 43. | New York | −0.68 |
| 19. | Nebraska | 0.50 | 44. | Mississippi | −0.70 |
| 20. | Ohio | 0.46 | 45. | California | −0.86 |
| 21. | Washington | 0.44 | 46. | Delaware | −1.18 |
| 22. | Pennsylvania | 0.37 | 47. | Arkansas | −1.23 |
| 23. | Illinois | 0.24 | 48. | Minnesota | −1.93 |
| 24. | Kansas | 0.19 | 49. | Vermont | −2.77 |
| 25. | Utah | 0.10 | 50. | Hawaii | −2.90 |

Note: States with different scores may appear identical due to rounding.

# GOVERNMENT CONSUMPTION

## 8.2%

Government consumption (Table 2), which represents spending on government operations (wages and salaries and goods and services for the state's own use), has returned to the index in this edition. The reason for its return is that we have come across new research suggesting that government consumption crowds out private-sector income growth, even when it is funded by rents, such as federal grants or mineral revenues, rather than by taxation or debt.

There is a large literature on the size of government and economic growth. Bergh and Henrekson (2011) survey the literature and find a robust association of government spending with subsequent growth in rich countries: for every additional percentage point of GDP in government spending, annual average growth declines by at least 0.05 percentage points.[28] This correlation is in addition to the effects of taxation. We look at the effects of a standard-deviation increase in government consumption and investment as a share of personal income over 10 years, assuming the 0.05-percentage-point relationship. We calculate the discounted forgone growth over 10 years assuming a social discount rate of 5 percent. (Using a finite time horizon is necessary to impose finiteness on the number, but endogenous growth theory also suggests that the growth rate benefit of any exogenous variable dissipates eventually when per capita income reaches a new steady state—this is likely to happen over the course of a business cycle.) Then we divide by two because government employment presumably captures some of the same effects that other studies find via government spending and we want to avoid double-counting.

**TABLE 2**

| Rank | State | Government Consumption Score |
|------|-------|------------------------------|
| 1. | Pennsylvania | 1.69 |
| 2. | New Hampshire | 1.65 |
| 3. | Florida | 1.64 |
| 4. | Connecticut | 1.54 |
| 5. | Massachusetts | 1.53 |
| 6. | Indiana | 1.39 |
| 7. | Maryland | 1.32 |
| 8. | Colorado | 1.25 |
| 9. | Illinois | 1.10 |
| 10. | Virginia | 1.07 |
| 11. | Tennessee | 0.98 |
| 12. | Rhode Island | 0.96 |
| 13. | Minnesota | 0.88 |
| 14. | Texas | 0.81 |
| 15. | New Jersey | 0.80 |
| 16. | Michigan | 0.78 |
| 17. | Missouri | 0.77 |
| 18. | Maine | 0.75 |
| 19. | Georgia | 0.74 |
| 20. | Nevada | 0.64 |
| 21. | South Dakota | 0.62 |
| 22. | Ohio | 0.55 |
| 23. | Louisiana | 0.53 |
| 24. | Arkansas | 0.45 |
| 25. | Montana | 0.42 |
| 26. | Arizona | 0.34 |
| 27. | Idaho | 0.33 |
| 28. | Kansas | 0.29 |
| 29. | Wisconsin | 0.25 |
| 30. | North Dakota | 0.24 |
| 31. | Hawaii | 0.19 |
| 32. | Kentucky | 0.11 |
| 33. | California | 0.11 |
| 34. | Utah | 0.07 |
| 35. | Vermont | 0.03 |
| 36. | North Carolina | −0.01 |
| 37. | Washington | −0.09 |
| 38. | Alabama | −0.14 |
| 39. | Oregon | −0.21 |
| 40. | New York | −0.35 |
| 41. | Delaware | −0.40 |
| 42. | West Virginia | −0.51 |
| 43. | Iowa | −0.53 |
| 44. | Oklahoma | −0.58 |
| 45. | Nebraska | −0.76 |
| 46. | South Carolina | −0.86 |
| 47. | Mississippi | −0.88 |
| 48. | New Mexico | −1.95 |
| 49. | Alaska | −2.11 |
| 50. | Wyoming | −2.20 |

Note: States with different scores may appear identical due to rounding.

---

28. A. Bergh and M. Henrekson, 2011, "Government Size and Growth: A Survey and Interpretation of the Evidence," *Journal of Economic Surveys* 25, no. 5 (2011): 872–97.

# LOCAL TAXATION

**8.0%** We separate local taxation to take account of fiscal decentralization. Fiscal decentralization affects freedom in that when more taxes are raised at the local level, residents may have more choice over their tax burden and public services. They can more easily vote with their feet—that is, move to a jurisdiction with their preferred policy mix—at the local level than the state level.

But that very ability to foot-vote varies not just by how much revenue is raised at the local level, but by how many local jurisdictions there are. If local governments are spatially large, it is difficult for residents to exercise choice. When a city like Houston annexes other independent municipalities, it becomes more difficult for movers to the area to choose a jurisdiction to their liking. Hawaii's single statewide school district prevents parents from moving where they think the schools are better run. Because the relevant decision for a homeowner is typically over local jurisdictions within driving distance to a place of employment, the metric for variety of choice that we use is the effective number of local jurisdictions per square mile of privately owned land (we exclude publicly owned land because it is presumably not developable), in log points (the natural log is taken to deal with skewness and capture diminishing marginal effects).

"Effective number of local jurisdictions" counts up the weighted sum of general-purpose local governments in each state, where the weights are the percentage of local tax revenue raised by each local government tier. For instance, if a state has 10 counties and 100 municipalities, and counties raise 40 percent of local taxes while municipalities raise 60 percent, then the state's effective number of local jurisdictions is $10 \times 0.4 + 100 \times 0.6 = 64$. We then divide that number by the number of square miles of private land in the state, then take the natural logarithm to reduce skew in the distribution. (This also helps large states like Nevada and Texas relative to the New England states.)

The variable for the effective number of local jurisdictions per square mile determines the weight on the local taxation variable, which therefore varies by state. It is the only variable in the index with a weight that varies by state. (The weight for local taxation reported in Figure 1 is the average for all 50 states over the 2000–2016 time period.) The idea here is that high decentralization (high local taxation relative to state taxation) matters less when there are fewer jurisdictions per square mile and more when there are more. Specifically, we multiply the standard taxation weight (on which more below) by 0.75 for the state with the most jurisdictions per square mile (New Jersey) and give a hypothetical state with no local governments the full taxation weight, then arranging the other states linearly according to their effective number of jurisdictions per square mile. In New Jersey, we are assuming that local taxation is only three-quarters the restriction on freedom that state taxation is. In Hawaii, the most territorially centralized state, local taxation is almost the same as state taxation—the prospective homeowner has virtually no local exit option, so local taxes are only a little more likely than state taxes to reflect distinctive local preferences.

Local tax collections come from the most recent fiscal-year data released by the Census Bureau (FY 2015). The numbers here represent the combined formula incorporating both the level of local taxation and the weight as determined by the number of competing local jurisdictions. As a result, the numbers in Table 3 are not directly comparable to the figures for state-level taxation already given.

## TABLE 3

| Rank | State | Local Tax Burden Score Incorporating Decentralization, 2011 |
|------|-------|------:|
| 1. | Vermont | 0.17 |
| 2. | Arkansas | 0.15 |
| 3. | Delaware | 0.14 |
| 4. | North Dakota | 0.09 |
| 5. | Idaho | 0.09 |
| 6. | Oklahoma | 0.07 |
| 7. | Indiana | 0.07 |
| 8. | Alabama | 0.07 |
| 9. | Minnesota | 0.07 |
| 10. | West Virginia | 0.07 |
| 11. | Michigan | 0.07 |
| 12. | Mississippi | 0.06 |
| 13. | Kentucky | 0.06 |
| 14. | Massachusetts | 0.05 |
| 15. | Tennessee | 0.05 |
| 16. | North Carolina | 0.05 |
| 17. | Montana | 0.05 |
| 18. | Florida | 0.03 |
| 19. | Hawaii | 0.03 |
| 20. | Wisconsin | 0.03 |
| 21. | New Mexico | 0.02 |
| 22. | Nevada | 0.02 |
| 23. | Connecticut | 0.02 |
| 24. | Pennsylvania | 0.01 |
| 25. | Utah | 0.01 |
| 26. | Washington | 0.01 |
| 27. | Kansas | 0.01 |
| 28. | California | 0.00 |
| 29. | Arizona | 0.00 |
| 30. | South Dakota | 0.00 |
| 31. | Missouri | −0.01 |
| 32. | South Carolina | −0.01 |
| 33. | Virginia | −0.01 |
| 34. | Iowa | −0.02 |
| 35. | Georgia | −0.02 |
| 36. | Oregon | −0.02 |
| 37. | Rhode Island | −0.04 |
| 38. | New Jersey | −0.04 |
| 39. | Wyoming | −0.04 |
| 40. | Ohio | −0.05 |
| 41. | Colorado | −0.05 |
| 42. | Alaska | −0.06 |
| 43. | Louisiana | −0.07 |
| 44. | New Hampshire | −0.07 |
| 45. | Maine | −0.07 |
| 46. | Illinois | −0.07 |
| 47. | Maryland | −0.07 |
| 48. | Texas | −0.08 |
| 49. | Nebraska | −0.10 |
| 50. | New York | −0.26 |

Note: States with different scores may appear identical due to rounding.

19

# GOVERNMENT EMPLOYMENT

**2.0%** We also include government employment, which can crowd out employment in the private sector (see Table 4). To the extent that government-run enterprises are less efficient than private ones, government employment costs the local economy. Economists Jim Malley and Thomas Moutos use a cointegration framework on time-series data from Sweden and find that a 1 percent increase in government employment is associated with a 0.43 percent decrease in private employment. Economist Evi Pappa uses U.S. state data and also finds that aggregate employment does not increase at moments when government employment does, implying substantial crowding out in the short run and presumably in the long run as well.[29]

According to the Malley–Moutos elasticity estimate applied to state data from 2009, there was an aggregate disemployment effect from an increase in government employment that year. Although that might be true, it seems like an aggressive assumption. After all, government employment is very high in Sweden; thus, its marginal effect there might be more negative than its marginal effect just about anywhere else.

Instead, following Pappa's results, the freedom index assumes a net zero effect on total employment from an increase in state and local employment. The private disemployment effect of a one-standard-deviation increase in the ratio of government to private employment, as of 2015, would be 3.81 million nationwide. Average wage per job in the United States in early 2016 was $49,630. The index assumes that compensation equals marginal productivity and that government jobs are only 90 percent as productive as private jobs. The victim cost of a nationwide, one-standard-deviation increase in the government employment ratio is therefore 3.81 million times $49,630 divided by 10, or $18.9 billion. We divide that figure by two because government consumption presumably captures some of the same dynamics and we want to avoid double-counting.

Government employment is available on a calendar-year basis from the Bureau of Economic Analysis.

TABLE 4

| Rank | State | Government Employment Score | | Rank | State | Government Employment Score |
|---|---|---|---|---|---|---|
| 1. | Nevada | 2.04 | | 26. | Colorado | 0.60 |
| 2. | Florida | 1.93 | | 27. | Wisconsin | 0.55 |
| 3. | Massachusetts | 1.78 | | 28. | Vermont | 0.40 |
| 4. | Pennsylvania | 1.75 | | 29. | Kentucky | 0.34 |
| 5. | Rhode Island | 1.63 | | 30. | Virginia | 0.32 |
| 6. | New Hampshire | 1.22 | | 31. | Louisiana | 0.30 |
| 7. | Tennessee | 1.17 | | 32. | Hawaii | 0.23 |
| 8. | Illinois | 1.15 | | 33. | South Dakota | 0.23 |
| 9. | Michigan | 1.13 | | 34. | Nebraska | 0.21 |
| 10. | Connecticut | 1.07 | | 35. | Idaho | 0.17 |
| 11. | Maryland | 1.00 | | 36. | Montana | 0.10 |
| 12. | Georgia | 1.00 | | 37. | North Carolina | 0.03 |
| 13. | New Jersey | 0.98 | | 38. | Iowa | 0.02 |
| 14. | Ohio | 0.96 | | 39. | Washington | −0.02 |
| 15. | Arizona | 0.96 | | 40. | Arkansas | −0.17 |
| 16. | California | 0.95 | | 41. | North Dakota | −0.24 |
| 17. | Indiana | 0.91 | | 42. | South Carolina | −0.32 |
| 18. | Minnesota | 0.89 | | 43. | Alabama | −0.41 |
| 19. | Oregon | 0.84 | | 44. | Kansas | −0.46 |
| 20. | Texas | 0.82 | | 45. | Oklahoma | −0.81 |
| 21. | Missouri | 0.75 | | 46. | Mississippi | −1.58 |
| 22. | New York | 0.70 | | 47. | West Virginia | −1.58 |
| 23. | Maine | 0.70 | | 48. | Alaska | −2.00 |
| 24. | Utah | 0.69 | | 49. | New Mexico | −2.16 |
| 25. | Delaware | 0.68 | | 50. | Wyoming | −2.73 |

Note: States with different scores may appear identical due to rounding.

---

[29]   Jim Malley and Thomas Moutos, "Does Government Employment 'Crowd Out' Private Employment? Evidence from Sweden," *Scandinavian Journal of Economics* 98, no. 2 (1996): 289–302; Evi Pappa, "The Effects of Fiscal Shocks on Employment and the Real Wage," *International Economic Review* 50, no. 1 (2009): 217–44.

# GOVERNMENT DEBT

**0.3%**

The problem with state and local debt, above a modest level, is that it worsens credit ratings and increases yields paid on government bonds.[30] Current interest payments are already included in the state taxation variable. The problem with additional interest paid because of default risk is that it does not provide any additional services, and therefore we do not imagine that any taxpayers can consent to it, unlike interest paid that reflects pure time preference.

Poterba and Rueben give readily interpretable coefficient estimates for our purposes. They find that a percentage-point increase in state debt as a share of personal income is associated with roughly a 100-basis-point increase in bond yield. The annual value of the additional interest payments generated by this increase in interest rate on the debt is therefore $-(0.01 \times debt)$. Like state and local taxes, we adjust this figure for federal deductibility.

For debt, we use the latest fiscal year data from the Census Bureau (FY 2015).

**TABLE 5**

| Rank | State | Government Debt Score | | Rank | State | Government Debt Score |
|------|-------|------------------------|---|------|-------|------------------------|
| 1. | Wyoming | 2.67 | | 26. | Utah | 0.25 |
| 2. | Idaho | 1.83 | | 27. | Michigan | 0.17 |
| 3. | Oklahoma | 1.66 | | 28. | Missouri | 0.11 |
| 4. | Montana | 1.48 | | 29. | Minnesota | 0.09 |
| 5. | North Carolina | 1.34 | | 30. | Connecticut | 0.09 |
| 6. | Iowa | 1.14 | | 31. | New Jersey | 0.04 |
| 7. | Mississippi | 1.07 | | 32. | Indiana | 0.03 |
| 8. | Georgia | 1.05 | | 33. | New Mexico | −0.10 |
| 9. | Maine | 1.00 | | 34. | Colorado | −0.12 |
| 10. | South Dakota | 0.95 | | 35. | Oregon | −0.15 |
| 11. | North Dakota | 0.94 | | 36. | California | −0.19 |
| 12. | Arkansas | 0.93 | | 37. | Louisiana | −0.20 |
| 13. | New Hampshire | 0.83 | | 38. | Pennsylvania | −0.24 |
| 14. | Vermont | 0.80 | | 39. | Kansas | −0.35 |
| 15. | Virginia | 0.79 | | 40. | Washington | −0.47 |
| 16. | Maryland | 0.74 | | 41. | Texas | −0.51 |
| 17. | Florida | 0.71 | | 42. | Massachusetts | −0.59 |
| 18. | West Virginia | 0.69 | | 43. | Hawaii | −0.62 |
| 19. | Alabama | 0.53 | | 44. | Rhode Island | −0.70 |
| 20. | Tennessee | 0.52 | | 45. | Illinois | −0.73 |
| 21. | Nebraska | 0.44 | | 46. | Nevada | −0.80 |
| 22. | Wisconsin | 0.40 | | 47. | Alaska | −0.83 |
| 23. | Ohio | 0.36 | | 48. | South Carolina | −0.85 |
| 24. | Delaware | 0.28 | | 49. | Kentucky | −1.02 |
| 25. | Arizona | 0.26 | | 50. | New York | −2.16 |

Note: States with different scores may appear identical due to rounding.

---

30. James M. Poterba and Kim Rueben, "State Fiscal Institutions and the U.S. Municipal Bond Market," in *Fiscal Institutions and Fiscal Performance*, ed. James M. Poterba (Chicago: University of Chicago Press, 1999), pp. 181–208; Craig L. Johnson and Kenneth A. Kriz, "Fiscal Institutions, Credit Ratings, and Borrowing Costs," *Public Budgeting and Finance* (2005): 84–103.

# CASH AND SECURITY ASSETS

**0.2%** Including state and local debt in the freedom index gives an incomplete picture without data on state and local financial assets, which are included in this edition of the index for the first time. To weight this variable, which is also measured as a share of adjusted personal income, we estimate the coefficients on debt and cash and security assets in a time-series cross-sectional regression model of Standard and Poor's credit ratings of state governments. Both coefficients were statistically significant in the expected direction. A one-unit increase in state and local debt was associated with a 6.4-point increase in riskiness on a zero to nine scale, while a one-unit increase in cash and security assets was associated with a 0.76-point decrease (improvement). Cash and security assets are less valuable for credit rating than debt is harmful because these assets are often illiquid, tied up in trusts. We use these relative coefficient estimates to weight cash and security assets relative to debt.

TABLE 6

| Rank | State | Cash and Security Assets Score | | Rank | State | Cash and Security Assets Score |
|------|-------|-------------------------------|---|------|-------|-------------------------------|
| 1. | Alaska | 6.57 | | 26. | Iowa | −0.26 |
| 2. | Wyoming | 2.14 | | 27. | Arkansas | −0.27 |
| 3. | North Dakota | 1.34 | | 28. | Hawaii | −0.28 |
| 4. | New Mexico | 0.90 | | 29. | Arizona | −0.28 |
| 5. | Montana | 0.03 | | 30. | Michigan | −0.29 |
| 6. | Louisiana | −0.01 | | 31. | California | −0.29 |
| 7. | Texas | −0.08 | | 32. | New York | −0.30 |
| 8. | Rhode Island | −0.09 | | 33. | Illinois | −0.30 |
| 9. | South Dakota | −0.09 | | 34. | Maine | −0.31 |
| 10. | Ohio | −0.10 | | 35. | Oklahoma | −0.31 |
| 11. | Delaware | −0.15 | | 36. | Tennessee | −0.31 |
| 12. | Indiana | −0.18 | | 37. | Massachusetts | −0.33 |
| 13. | Missouri | −0.18 | | 38. | New Hampshire | −0.34 |
| 14. | Idaho | −0.18 | | 39. | Wisconsin | −0.35 |
| 15. | Nebraska | −0.18 | | 40. | Utah | −0.36 |
| 16. | Minnesota | −0.21 | | 41. | Alabama | −0.36 |
| 17. | Oregon | −0.21 | | 42. | Mississippi | −0.37 |
| 18. | South Carolina | −0.22 | | 43. | Nevada | −0.39 |
| 19. | Colorado | −0.22 | | 44. | Virginia | −0.39 |
| 20. | Kentucky | −0.23 | | 45. | Washington | −0.39 |
| 21. | West Virginia | −0.23 | | 46. | New Jersey | −0.41 |
| 22. | Florida | −0.24 | | 47. | Georgia | −0.42 |
| 23. | Vermont | −0.24 | | 48. | North Carolina | −0.46 |
| 24. | Kansas | −0.25 | | 49. | Connecticut | −0.49 |
| 25. | Pennsylvania | −0.26 | | 50. | Maryland | −0.50 |

Note: States with different scores may appear identical due to rounding.

22

# OVERALL FISCAL POLICY RANKING

**30.0%** The fiscal policy ranking is available in Table 7. Although former number-one state New Hampshire continues to improve gradually on fiscal policy, Florida has now leapfrogged it with some truly eye-popping improvements. Time will tell whether data revisions will adjust this picture, but for now it seems that government consumption has fallen from 10.7 percent to 8.6 percent of income in Florida in just seven years, while state and local taxes have also fallen, and the government employment ratio has fallen by two percentage points. Some of this improvement is likely a result of Florida's rapidly rebounding economy and a lag in its revenue collections and state spending.

Because the two taxation variables make up a large share of fiscal policy's weight, it is unsurprising that low-tax states dominate the top of the fiscal policy rankings, while high-tax states fall at the bottom. In Table 7, the numbers represent the number of weighted standard deviations each state is above the average. For instance, New York's 2016 score of −0.36 means that even if New York were exactly average on regulatory policy and personal freedom (garnering a total score of zero on them), it would still be, on average, a third of a standard deviation less free than the average for every policy.

A state that is one standard deviation better than average on every single policy will end up with an overall freedom score of 1, and a state that is one standard deviation worse than average on every single policy will end up with an overall freedom score of −1. Since fiscal policy represents less than a third of the overall index, New York's score of −0.36 means that it is on average more than a standard deviation worse than average on every fiscal policy.

### TABLE 7

| Rank | State | Overall Fiscal Policy Score, 2016 | Rank | State | Overall Fiscal Policy Score, 2016 |
|---|---|---|---|---|---|
| 1. | Florida | 0.403 | 26. | Alaska | 0.060 |
| 2. | New Hampshire | 0.332 | 27. | Rhode Island | 0.060 |
| 3. | Tennessee | 0.263 | 28. | Washington | 0.055 |
| 4. | Pennsylvania | 0.230 | 29. | Maryland | 0.053 |
| 5. | North Dakota | 0.222 | 30. | New Jersey | 0.051 |
| 6. | South Dakota | 0.218 | 31. | Utah | 0.044 |
| 7. | Texas | 0.200 | 32. | Kansas | 0.043 |
| 8. | Colorado | 0.199 | 33. | Arkansas | 0.039 |
| 9. | Massachusetts | 0.188 | 34. | Kentucky | 0.020 |
| 10. | Indiana | 0.176 | 35. | Wisconsin | 0.015 |
| 11. | Virginia | 0.175 | 36. | South Carolina | 0.004 |
| 12. | Missouri | 0.174 | 37. | Delaware | −0.021 |
| 13. | Montana | 0.173 | 38. | Oregon | −0.046 |
| 14. | Connecticut | 0.167 | 39. | West Virginia | −0.054 |
| 15. | Georgia | 0.150 | 40. | Maine | −0.063 |
| 16. | Oklahoma | 0.136 | 41. | Minnesota | −0.064 |
| 17. | Michigan | 0.127 | 42. | California | −0.072 |
| 18. | Arizona | 0.123 | 43. | Wyoming | −0.074 |
| 19. | Alabama | 0.121 | 44. | Nebraska | −0.100 |
| 20. | Nevada | 0.113 | 45. | Iowa | −0.113 |
| 21. | Idaho | 0.092 | 46. | Mississippi | −0.123 |
| 22. | Louisiana | 0.070 | 47. | Vermont | −0.138 |
| 23. | Ohio | 0.069 | 48. | New Mexico | −0.180 |
| 24. | Illinois | 0.066 | 49. | Hawaii | −0.291 |
| 25. | North Carolina | 0.060 | 50. | New York | −0.360 |

Note: States with different scores may appear identical due to rounding.

Figure 3 shows how the average fiscal policy score has changed for all 50 states since 2000. It appears that states' fiscal policies have improved since the Great Recession, mostly because of declining tax burdens and spending cuts.

**FIGURE 3**  State Average Fiscal Policy Scores over Time



24

# REGULATORY POLICY

The regulatory policy dimension includes categories for land-use freedom and environmental policy, health insurance freedom, labor-market freedom, lawsuit freedom, occupational freedom, miscellaneous regulations that do not fit under another category (such as certificate of need requirements), and cable and telecommunications freedom. Figure 4 shows the weights for health insurance policies now controlled by the federal government (8 percent) and for only health insurance policies that states can still control after the PPACA (0.8 percent), altogether summing to 8.8 percent of the index.

**FIGURE 4**  Regulatory Policy Weights



Land Use **11.1%**

Health Insurance (Pre-PPACA) **8.0%**

Labor Market **4.9%**

Lawsuits **3.3%**

Occupations **2.6%**

Miscellaneous **2.4%**

Cable & Telecom **0.9%**

Health Insurance (Post-PPACA) **0.8%**

The calculated freedom scores do not allow weights to vary by year, even when variation across states disappears. In other words, a variable continues to contribute to the weights even in years when it no longer contributes to differences across states because every state has the same policy. Including this type of variable allows for intertemporal comparisons. That happened when the PPACA passed, and states could no longer choose whether to have community rating, guaranteed issue, and the individual mandate. As a result of our methodological choice, the data show the PPACA as a large negative shock to all states' regulatory policy. However, for the first time, this edition of the study also develops an alternative, chain-linked index in the downloadable data that includes only policies that have never at any time been federalized. We do not put this ranking in the text because it is really for comparisons over time rather than across states, and the 2016 values on this chain-linked index correlate perfectly with the 2016 values on the regular index.

This regulatory policy dimension does not include regulations with a mainly paternalistic justification; those regulations are placed under the personal freedom dimension. They include laws such as private and homeschool regulations and smoking bans.

To take into account the wider, unmeasured costs of insecure rights, this index increases the weights on variables representing policies encoded in state constitutions or the federal Constitution. It does so because the fact that a policy has been encoded within a constitution is prima facie evidence that the policy is widely considered to affect a "fundamental" freedom—a freedom with consequences for the security of the citizenry that extend beyond citizens under its immediate purview.

Within the regulatory policy dimension, the weights of certain variables are boosted as follows:

1. The victim cost/freedom value is multiplied by two if a closely related policy is encoded in the U.S. Constitution, or has been recognized by at least some courts as relating to a fundamental right. Examples of such policies include eminent domain reform, rent control, regulatory taking restrictions, and mandatory permission of political speech on private property, which we view as compelled speech implicating the First Amendment.

2. The victim cost/freedom value is multiplied by 1.5 if the policy is encoded in state constitutions but not the federal Constitution and has not otherwise been recognized judicially as a fundamental right. Right-to-work laws are the only such policies in the regulatory dimension.

We believe this sort of boost is necessary to capture the particular importance Americans have attached to certain fundamental freedoms, even if it necessarily involves an element of judgment. Freedoms are more fundamental the more widely people consider them part of their flourishing and autonomy, and policies potentially infringing on them are therefore subject to stricter judicial scrutiny than policies that would restrict freedoms that, while potentially valuable, are not as fundamental.[31] By relying on existing judicial interpretations of fundamental rights, the freedom index avoids at least one possible source of subjectivity as it "upgrades" these policies.

31.   Legal Information Institute, "Fundamental Right," Cornell University Law School, August 19, 2010, http://www.law .cornell.edu/wex/fundamental_right.  When total spending and total taxes are regressed on personal income, gross domestic product, and earnings by place of work, only the first correlates positively with the fiscal variables.

# LAND-USE FREEDOM AND ENVIRONMENTAL POLICY

**11.1%** The category for land-use freedom and environmental policy includes eminent domain rules, land-use regulations, renewable portfolio standards, and regulations requiring employers to let their employees bring guns onto company-owned parking lots. Most of its weight comes from three variables: local rent control laws (5.3 percent of the overall index) and two indices of residential land-use regulations, also known as zoning (together, 4.8 percent of the index). One of the zoning indices is derived from an index built by researchers at the Wharton School of Business.[32] Their original index does not vary over time. We use changes in state cost of living, Partisan Voting Index, accommodation GDP, and effective number of local jurisdictions to impute values for this variable over the entire time series. The other zoning index derives from two Harvard economists, is based on appellate court rulings, and does vary over time but is a "noisier" measure of zoning.[33] According to the best evidence, a one-standard-deviation increase in residential zoning restrictions would directly cost victims more than $13 billion a year, if imposed nationwide.[34] Rather than impose such costs, states should allow property owners to solve most land-use externalities with various contractual arrangements, such as homeowners' associations, or at most what Dartmouth economist William Fischel calls "good housekeeping" zoning.[35]

Renewable portfolio standards (RPS), which mandate that power companies buy certain proportions of their energy from (usually) wind and solar sources, are worth 0.7 percent of the overall index. Our variable tracks the stringency of these requirements. The average RPS raises electricity prices by 0.8–0.9 percent, with bigger effects likely for more stringent programs.[36] To promote cleaner electricity generation, states could help limit pollution that creates significant, direct, negative externalities through means other than command-and-control regulations.

32.   Joseph Gyourko, Albert Saiz, and Anita Summers, "A New Measure of the Local Regulatory Environment for Housing Markets: The Wharton Residential Land Use Regulatory Index," *Urban Studies* 45, no. 3 (2008): 693–729.

33.   Peter Ganong and Daniel Shoag, "Why Has Regional Income Convergence in the US Declined?," *Journal of Urban Economics* 102 (2017): 76–90.

34.   Edward L. Glaeser, Joseph Gyourko, and Raven Saks, "Why Is Manhattan So Expensive? Regulation and the Rise in Housing Prices," *Journal of Law and Economics* 48, no. 2 (2005): 331–69; Stephen Malpezzi, "Housing Prices, Externalities, and Regulation in US Metropolitan Areas," *Journal of Housing Research* 7, no. 2 (1996): 209–41.

35.   William A. Fischel, *Zoning Rules!* (Cambridge, MA: Lincoln Institute of Land Policy, 2015).

36.   Cliff Chen, Ryan Riser, and Mark Bollinger, "Weighing the Costs and Benefits of State Renewables Portfolio Standards in the United States: A Comparative Analysis of State-Level Policy Impact Projections," *Renewable & Sustainable Energy Reviews* 13 (2009): 552–66; Jenny Heeter et al., "A Survey of State-Level Cost and Benefit Estimates of Renewable Portfolio Standards," technical report, National Renewable Energy Laboratory, Golden, CO, May 2014.

The remainder of this category takes into account whether compensation or an economic assessment is required before a regulatory taking, an index of eminent domain reform; whether companies must allow employees' guns on their property; and whether free speech is mandated on private property. (The federal courts require compensation for regulatory takings only when they destroy the value of the affected land; therefore, states were coded only for having protections stronger than the federal one.) It may surprise readers that eminent domain reform comprises only 0.2 percent of the freedom index, given that it affects a fundamental right, and given how salient the issue was—especially among property rights advocates—following the Supreme Court's *Kelo* decision.[37]  However, the estimated victim cost of eminent domain abuse is relatively low, at roughly $1 billion a year ($500 million without the "constitutional weight" boost), though admittedly this may underestimate losses due to insecurity of tenure, attorneys' fees, opportunity costs of legal challenges, and so on.[38]  It is worth noting that most states that have reformed eminent domain have kept open a wide "blight loophole" that could still allow public takings for private interests. Therefore, the eminent domain index has been coded to take blight reform into account, as well as the incorporation of eminent domain restrictions into the state constitution.

Both of the final two variables have to do with property rights: laws banning employers from banning guns from certain company property such as parking lots, and laws mandating free speech on private property. We hold that businesses may permissibly require employees to leave guns at home, just as we defend the right of malls and community associations to prohibit any or all political messages. That view might perplex some gun rights advocates. However, the only consistent property rights–respecting position is that gun rights stop at the boundary of someone else's property; to think otherwise is to impose one's own view on another without his or her consent. Although symbolically significant, however, these policies do not generally cause severe inconvenience to their victims and therefore are not worth much in the index.

**TABLE 8**

| Rank | State | Land-Use Freedom and Environmental Policy Score | Rank | State | Land-Use Freedom and Environmental Policy Score |
|---|---|---|---|---|---|
| 1. | Alabama | 0.063 | 26. | Michigan | 0.018 |
| 2. | South Carolina | 0.059 | 27. | Idaho | 0.017 |
| 3. | Oklahoma | 0.058 | 28. | Illinois | 0.014 |
| 4. | Tennessee | 0.057 | 29. | Wyoming | 0.013 |
| 5. | West Virginia | 0.057 | 30. | Wisconsin | 0.006 |
| 6. | Kansas | 0.056 | 31. | New Mexico | 0.004 |
| 7. | Arkansas | 0.056 | 32. | Colorado | −0.006 |
| 8. | Indiana | 0.052 | 33. | Delaware | −0.007 |
| 9. | Louisiana | 0.052 | 34. | Pennsylvania | −0.009 |
| 10. | Texas | 0.051 | 35. | Minnesota | −0.009 |
| 11. | Mississippi | 0.051 | 36. | Alaska | −0.016 |
| 12. | Virginia | 0.048 | 37. | Massachusetts | −0.024 |
| 13. | Georgia | 0.047 | 38. | Montana | −0.027 |
| 14. | Kentucky | 0.047 | 39. | Rhode Island | −0.048 |
| 15. | Iowa | 0.045 | 40. | Connecticut | −0.049 |
| 16. | Missouri | 0.044 | 41. | Washington | −0.063 |
| 17. | Nebraska | 0.043 | 42. | New Hampshire | −0.084 |
| 18. | South Dakota | 0.039 | 43. | Oregon | −0.120 |
| 19. | Florida | 0.038 | 44. | Maine | −0.139 |
| 20. | North Carolina | 0.034 | 45. | Hawaii | −0.144 |
| 21. | Arizona | 0.032 | 46. | New York | −0.194 |
| 22. | Utah | 0.031 | 47. | California | −0.195 |
| 23. | North Dakota | 0.029 | 48. | Vermont | −0.221 |
| 24. | Ohio | 0.026 | 49. | Maryland | −0.221 |
| 25. | Nevada | 0.025 | 50. | New Jersey | −0.270 |

Note: States with different scores may appear identical due to rounding.

---

37.   See Kelo v. City of New London, 545 U.S. 469 (2005).
38.   "Building Empires, Destroying Homes: Eminent Domain Abuse in New York," Institute for Justice, October 2009, http://www.ij.org/images/pdf_folder/other_pubs/buildingempires.pdf.

# HEALTH INSURANCE FREEDOM

## 8.8%

TABLE 9

The PPACA (Obamacare) nationalized most health insurance regulation. In our "headline" index, we treat such nationalizations of policies formerly controlled as changes in state policies. We do so because our primary purpose is to measure freedom as citizens experience it, not as state legislators enact it. This choice allows us to compare the state of freedom over time, using the same policies. We do the same thing with certain gun laws and with sodomy laws, which have also been nationalized (in a pro-freedom direction).

All states are now required to have small-group adjusted community rating (2.4 percent of the index), individual market-adjusted community rating (0.4 percent), individual market-guaranteed issue (0.6 percent), bans on elimination riders (<0.1 percent), mandated external review of grievances (<0.1 percent), the individual health insurance mandate (2.3 percent), small-group prior approval of rates (0.5 percent), nongroup prior approval of rates (0.1 percent), and certain "essential benefits" mandates (1.7 percent). States are still able to vary somewhat on the extent of mandated benefits (0.5 percent), standing referrals to specialists (<0.1 percent), direct access to specialists (0.3 percent), and bans on financial incentives to providers from insurers (<0.1 percent).

Community rating and the individual mandate get the highest weights because they represent a large transfer of wealth from the healthy to the unhealthy, approximately $10 billion a year.[39] State-level mandated coverages raise premium costs for consumers. In this edition, we have extensively reviewed statutes to determine the onset of all the particularly costly mandated benefits, such as in vitro fertilization and occupational therapy, by state. The HMO regulations have low victim costs because public backlash against particular practices, such as financial incentives to providers, drove them from the marketplace even before laws were passed.[40] In this case, public opinion drove both market practice and state law. Nevertheless, research suggests that public opinion on this issue may be misinformed. In their heyday in the 1990s, when many of the now widely banned practices were widespread, HMOs successfully suppressed health care costs.[41]

| Rank | State | Health Insurance Freedom Score | | Rank | State | Health Insurance Freedom Score |
|------|-------|-------------------------------|---|------|-------|-------------------------------|
| 1. | Wyoming | −0.084 | | 26. | Kentucky | −0.103 |
| 2. | Idaho | −0.092 | | 27. | Oregon | −0.103 |
| 3. | Nebraska | −0.092 | | 28. | Tennessee | −0.103 |
| 4. | North Dakota | −0.092 | | 29. | Washington | −0.103 |
| 5. | California | −0.092 | | 30. | Arizona | −0.103 |
| 6. | Delaware | −0.092 | | 31. | Florida | −0.103 |
| 7. | Kansas | −0.092 | | 32. | Missouri | −0.103 |
| 8. | Mississippi | −0.096 | | 33. | New York | −0.103 |
| 9. | South Dakota | −0.096 | | 34. | North Carolina | −0.103 |
| 10. | Iowa | −0.096 | | 35. | Pennsylvania | −0.103 |
| 11. | Oklahoma | −0.096 | | 36. | Virginia | −0.105 |
| 12. | South Carolina | −0.096 | | 37. | Massachusetts | −0.105 |
| 13. | Wisconsin | −0.096 | | 38. | Ohio | −0.105 |
| 14. | Vermont | −0.096 | | 39. | Alaska | −0.106 |
| 15. | Michigan | −0.098 | | 40. | Colorado | −0.107 |
| 16. | Nevada | −0.100 | | 41. | Maine | −0.107 |
| 17. | Rhode Island | −0.100 | | 42. | New Mexico | −0.107 |
| 18. | Hawaii | −0.100 | | 43. | Utah | −0.108 |
| 19. | Illinois | −0.101 | | 44. | Maryland | −0.109 |
| 20. | Minnesota | −0.101 | | 45. | Arkansas | −0.110 |
| 21. | Georgia | −0.102 | | 46. | Connecticut | −0.110 |
| 22. | Indiana | −0.102 | | 47. | New Jersey | −0.111 |
| 23. | Louisiana | −0.102 | | 48. | West Virginia | −0.111 |
| 24. | New Hampshire | −0.102 | | 49. | Montana | −0.115 |
| 25. | Alabama | −0.103 | | 50. | Texas | −0.115 |

Note: States with different scores may appear identical due to rounding.

39. These numbers are derived from estimates in Mark V. Pauly and Bradley Herring, "Risk Pooling and Regulation: Policy and Reality in Today's Individual Health Insurance Market," *Health Affairs* 26, no. 3 (2007): 770–79.

40. Mark A. Hall, "The Death of Managed Care: A Regulatory Autopsy," *Journal of Health Politics, Policy, and Law* 30, no. 3 (2005): 427–52.

41. Maxim L. Pinkovskiy, "The Impact of the Managed Care Backlash on Health Care Costs: Evidence from State Regulation of Managed Care Cost Containment Practices," November 13, 2012, http://economics.mit.edu/files/8448.

# LABOR-MARKET FREEDOM

**4.9%**

Right-to-work laws make up nearly half of the labor regulation category and more than two percent of the entire freedom index. They are valued at over $10 billion a year.[42] Right-to-work laws are controversial among libertarians because they override collective bargaining contracts reached between employers and employee unions, allowing employers to hire workers who do not pay agency fees to a union. On the other hand, right-to-work laws can be justified as a means of employer and employee self-defense against the mechanisms of the Wagner Act (the National Labor Relations Act), which essentially allows an "agency shop" to form if a majority of workers votes in favor.

From the libertarian point of view, the Wagner Act violates the fundamental freedom of association and basic property rights, and right-to-work laws somewhat restore those freedoms, because few employers would voluntarily agree to an agency shop in the absence of the Wagner Act. Although right-to-work laws violate the rights of some workers and employers, they restore freedom of association to a far greater number. In an ideal world, both the National Labor Relations Act and right-to-work laws would be repealed, and employees and employers would be free to negotiate as they saw fit, collectively or individually.

For those who disagree with our logic, we have produced alternative indices to the freedom index that exclude right-to-work laws (see Appendix B).

Other policy variables in this category, in descending order of importance, are short-term disability insurance requirements (costs being lower labor productivity[43] and administrative expenses for businesses[44]), the legalization and enforcement of worker noncompete agreements (costs being the transfer of income from stockholders to top executives and firms' underinvestment in worker productivity[45]), policies dealing with workers' compensation (funding mechanisms and mandated coverages), state minimum-wage laws (figures adjusted for mean private wages), requirements for employer verification of legal resident status, stricter-than-federal private employment discrimination laws (smoker status, marital status, age, and others), and mandated paid family leave.

42. Steven E. Abraham and Paula B. Voos, "Right-to-Work Laws: New Evidence from the Stock Market," *Southern Economic Journal* 67, no. 2 (2000): 345–62; David T. Ellwood and Glenn Fine, "The Impact of Right-to-Work Laws on Union Organizing," *Journal of Political Economy* 95, no. 2 (1987): 250–73; William J. Moore, "The Determinants and Effects of Right-to-Work Laws: A Review of the Recent Literature," *Journal of Labor Research* 19, no. 3 (1998): 445–69; Robert Krol and Shirley Svorny, "Unions and Employment Growth: Evidence from State Economic Recoveries," *Journal of Labor Research* 28 (2007): 525–35.

43. John Bound et al., "The Welfare Implications of Increasing Disability Insurance Benefit Generosity," *Journal of Public Economics* 88 (2004): 2487–514.

44. In other words, the funding mechanism (taxation) does not count here; it counts as part of the tax burden.

45. Mark J. Garmaise, "Ties That Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment," *Journal of Law, Economics, and Organization* 27, 2 (2011): 376–425.

**TABLE 10**

| Rank | State | Labor-Market Freedom Score |
|------|-------|---------------------------|
| 1. | Texas | 0.048 |
| 2. | Virginia | 0.041 |
| 3. | Wisconsin | 0.041 |
| 4. | Indiana | 0.039 |
| 5. | Iowa | 0.039 |
| 6. | Kansas | 0.039 |
| 7. | Alabama | 0.038 |
| 8. | Tennessee | 0.038 |
| 9. | Mississippi | 0.037 |
| 10. | Georgia | 0.036 |
| 11. | North Carolina | 0.036 |
| 12. | Florida | 0.036 |
| 13. | Kentucky | 0.032 |
| 14. | Louisiana | 0.032 |
| 15. | Idaho | 0.032 |
| 16. | Nevada | 0.032 |
| 17. | Arkansas | 0.030 |
| 18. | South Carolina | 0.030 |
| 19. | Michigan | 0.029 |
| 20. | South Dakota | 0.027 |
| 21. | Utah | 0.027 |
| 22. | Nebraska | 0.025 |
| 23. | West Virginia | 0.021 |
| 24. | Wyoming | 0.018 |
| 25. | Oklahoma | 0.014 |
| 26. | Arizona | 0.012 |
| 27. | New Hampshire | −0.010 |
| 28. | North Dakota | −0.016 |
| 29. | Illinois | −0.016 |
| 30. | Missouri | −0.017 |
| 31. | Pennsylvania | −0.017 |
| 32. | Delaware | −0.017 |
| 33. | New Mexico | −0.017 |
| 34. | Maine | −0.025 |
| 35. | Montana | −0.025 |
| 36. | Alaska | −0.026 |
| 37. | Minnesota | −0.026 |
| 38. | Connecticut | −0.027 |
| 39. | Maryland | −0.029 |
| 40. | Ohio | −0.031 |
| 41. | Colorado | −0.031 |
| 42. | Massachusetts | −0.032 |
| 43. | Vermont | −0.033 |
| 44. | Oregon | −0.040 |
| 45. | New Jersey | −0.047 |
| 46. | Washington | −0.048 |
| 47. | New York | −0.060 |
| 48. | Hawaii | −0.061 |
| 49. | Rhode Island | −0.063 |
| 50. | California | −0.100 |

Note: States with different scores may appear identical due to rounding.

## LAWSUIT FREEDOM

**3.3%** Deciding tort claims among private parties is an important function of a decentralized legal system that provides justice to victims of the unjust, harmful acts of others. In an efficient civil liability system, the costs that defendants have to pay are merely compensation for wrongs and not a limitation on their freedom. Moreover, the liability insurance costs that businesses have to pay reflect, in an efficient system, the likelihood that they will impose harms on others.

In practice, however, the United States' civil liability system imposes vastly higher costs on everyone than every other developed country's system does.[46] Moreover, the costs of the system vary widely by state. In fact, it is more appropriate to think of there being 50 separate civil liability systems in the United States than one national system, and "bad" state systems can impose significant costs above those necessary to remedy wrongs. That is especially the case when defendants are from another state.[47]

The civil liability index captures risks and costs to property and contract freedoms that businesses must pass on to consumers as higher prices. Unfortunately for consumers—and that means everyone—tort abuse's overall cost to the economy is quite high. In fact, according to policy analysts Lawrence J. McQuillan, Hovannes Abramyan, and Anthony P. Archie, the nationwide "tort tax" amounts to $328 billion annually in direct costs and $537 billion annually in indirect costs.[48] Not all of those indirect costs are relevant to this variable in our index: administration costs show up in state spending and taxation, and the costs of lost innovation (42 percent of all tort costs according to McQuillan, Abramyan, and Archie) seem too higher-order to be included here. That is consistent with our overall approach, since we do not include the cost of economic growth forgone for any other regulatory variable.

One of the most significant improvements to the index we made in the last edition has to do with state civil liability systems. The freedom index includes a single variable, an index of how plaintiff-friendly each state's civil liability system is, which depends in turn on eight variables. We use principal component analysis to find the common variance among each of those: (a) ratings of lawsuit climate by businesses,[49] (b) partisan elections

---

46. For a good overview, see the contributions to F. H. Buckley (ed.), *The American Illness: Essays on the Rule of Law* (New Haven, CT: Yale University Press, 2013).

47. For evidence, see Alexander Tabarrok and Eric Helland, "Court Politics: The Political Economy of Tort Awards," *Journal of Law and Economics* 42, no. 1 (1999): 157–88.

48. Lawrence J. McQuillan, Hovannes Abramyan, and Anthony P. Archie, *Jackpot Justice: The True Cost of America's Tort System* (San Francisco: Pacific Research Institute, 2007).

49. See U.S. Chamber Institute for Legal Reform, *Ranking the States: A Survey of the Fairness and Reasonableness of State Liability Systems* (September 2017), http://www.instituteforlegalreform.com/uploads/pdfs/Harris-2017 -Executive-Summary-FINAL.pdf.

for the supreme court, (c) partisan elections for trial courts, (d) lawyer concentration index, (e) legal services share of GDP, (f) blanket punitive or noneconomic damages cap, (g) burden of proof for conduct justifying punitive damages, and (h) joint and several liability abolition.

Even though the U.S. tort system is largely at the state level, certain nationwide features affect the tort environment in every state. Even the "best" state will have a "tort tax" of some kind. Moreover, a state's poor tort environment affects out-of-state defendants, creating an interjurisdictional externality.[50] Nevertheless, Crain et al. find that adopting all recommended tort reforms could reduce a state's tort losses by 49 percent and annual insurance premiums by 16 percent.[51] Using an econometric model of insurance costs and tort system perceptions, Hinton, McKnight, and Miller find a potential reduction in tort costs ranging from $20 million in Vermont to $5.3 billion in California, due to comprehensive tort reform.[52] We use their estimates to come up with an estimate of how nationwide tort reform amounting to a standard-deviation change on our variable would affect liability insurance premiums. Then, we divide by 0.55 to take into account deadweight loss and costs of legal representation, which are 45 percent of the tort tax (excluding administration and lost innovation costs) according to McQuillan, Abramyan, and Archie.

**TABLE II**

| Rank | State | Lawsuit Freedom Score | Rank | State | Lawsuit Freedom Score |
|---|---|---|---|---|---|
| 1. | New Hampshire | 0.066 | 26. | Vermont | 0.014 |
| 2. | Nebraska | 0.060 | 27. | Montana | 0.014 |
| 3. | North Dakota | 0.050 | 28. | New Jersey | 0.012 |
| 4. | Alaska | 0.044 | 29. | Maryland | 0.011 |
| 5. | Colorado | 0.039 | 30. | Kentucky | 0.010 |
| 6. | Iowa | 0.038 | 31. | Minnesota | 0.006 |
| 7. | Idaho | 0.038 | 32. | Washington | 0.003 |
| 8. | Kansas | 0.031 | 33. | Delaware | 0.001 |
| 9. | South Carolina | 0.031 | 34. | Florida | 0.001 |
| 10. | Wisconsin | 0.030 | 35. | Ohio | −0.001 |
| 11. | Tennessee | 0.029 | 36. | Rhode Island | −0.007 |
| 12. | South Dakota | 0.029 | 37. | Connecticut | −0.007 |
| 13. | Wyoming | 0.027 | 38. | Virginia | −0.008 |
| 14. | Mississippi | 0.026 | 39. | Massachusetts | −0.009 |
| 15. | Arkansas | 0.022 | 40. | Michigan | −0.010 |
| 16. | Nevada | 0.021 | 41. | California | −0.010 |
| 17. | Indiana | 0.021 | 42. | Missouri | −0.026 |
| 18. | Utah | 0.020 | 43. | New Mexico | −0.031 |
| 19. | Arizona | 0.020 | 44. | Alabama | −0.034 |
| 20. | Hawaii | 0.019 | 45. | Texas | −0.035 |
| 21. | Oregon | 0.018 | 46. | West Virginia | −0.042 |
| 22. | Georgia | 0.018 | 47. | Pennsylvania | −0.044 |
| 23. | Oklahoma | 0.017 | 48. | Louisiana | −0.068 |
| 24. | North Carolina | 0.016 | 49. | Illinois | −0.080 |
| 25. | Maine | 0.015 | 50. | New York | −0.081 |

Note: States with different scores may appear identical due to rounding.

50. Tabarrok and Helland, "Court Politics."

51. Nicole V. Crain et al., "Tort Law Tally: How State Tort Reforms Affect Tort Losses and Tort Insurance Premiums," Pacific Research Institute (April 2009).

52. Paul J. Hinton, David McKnight, and Ronald I. Miller, "Determinants of State Tort Costs: The Predictive Power of the Harris State Liability Systems Ranking Study," NERA Economic Consulting (October 2012).

# OCCUPATIONAL FREEDOM

**2.6%** The prevalence of occupational licensing is difficult to measure. Some of the literature uses listings of licensed occupations by state at America's Career InfoNet,[53] but we have found those listings to be highly unreliable, often excluding certain licensed occupations or including others that are privately certified, not regulated by the government. We use two redundant measures of the prevalence of licensure to reduce measurement error.

Our first measure of licensure prevalence is a weighted sum for 64 occupations, where each occupation's weight is its proportion of the total employment in those 64 occupations. A second measure is available only for 2014 and 2016 and is carried back and interpolated to other years. It counts the number of mentions of certain phrases in each state's statutes, such as "shall not practice." We do find that these two variables correlate together modestly ($r = 0.27$). These two variables together are worth about 1.5 percent of the index, with each apportioned half of the weight.

We also include sunrise and sunset provisions for occupational licensing, but because of a lack of evidence regarding their effectiveness, they are worth less than 0.1 percent of the index. ("Sunrise" refers to independent review requirements before a new licensing board is created; "sunset" refers to automatic expiration of licensing boards after several years so that the legislature must reauthorize them.)

The remaining occupational freedom variables have to do with medical scope of practice. Nurse practitioner scope of practice is the most important, making up 0.8 percent of the index. Dental hygienist independent practice is worth 0.1 percent of the index, followed by two more minor variables: membership in the nurse licensure compact and physician assistant prescription authority.

**TABLE 12**

| Rank | State | Occupational Freedom Score | | Rank | State | Occupational Freedom Score |
|------|-------|------|---|------|-------|------|
| 1. | Colorado | 0.025 | | 26. | West Virginia | −0.003 |
| 2. | Idaho | 0.025 | | 27. | Kentucky | −0.003 |
| 3. | Vermont | 0.024 | | 28. | Wisconsin | −0.004 |
| 4. | Wyoming | 0.023 | | 29. | Pennsylvania | −0.004 |
| 5. | Rhode Island | 0.021 | | 30. | Oregon | −0.005 |
| 6. | Nebraska | 0.019 | | 31. | Washington | −0.006 |
| 7. | Minnesota | 0.019 | | 32. | Michigan | −0.006 |
| 8. | Hawaii | 0.014 | | 33. | Georgia | −0.006 |
| 9. | Kansas | 0.014 | | 34. | Oklahoma | −0.007 |
| 10. | Maine | 0.013 | | 35. | Indiana | −0.008 |
| 11. | Alaska | 0.012 | | 36. | Arkansas | −0.008 |
| 12. | New Hampshire | 0.011 | | 37. | North Carolina | −0.010 |
| 13. | Arizona | 0.009 | | 38. | South Carolina | −0.011 |
| 14. | New Mexico | 0.009 | | 39. | Tennessee | −0.012 |
| 15. | Utah | 0.009 | | 40. | Alabama | −0.012 |
| 16. | Montana | 0.008 | | 41. | New York | −0.016 |
| 17. | Missouri | 0.007 | | 42. | Virginia | −0.017 |
| 18. | Connecticut | 0.006 | | 43. | Maryland | −0.018 |
| 19. | Mississippi | 0.005 | | 44. | Louisiana | −0.018 |
| 20. | Iowa | 0.004 | | 45. | New Jersey | −0.018 |
| 21. | North Dakota | 0.004 | | 46. | Florida | −0.021 |
| 22. | Massachusetts | 0.002 | | 47. | Ohio | −0.023 |
| 23. | Delaware | −0.001 | | 48. | Illinois | −0.027 |
| 24. | South Dakota | −0.002 | | 49. | Texas | −0.037 |
| 25. | Nevada | −0.002 | | 50. | California | −0.040 |

Note: States with different scores may appear identical due to rounding.

53.   For instance, Morris M. Kleiner and Alan B. Krueger, "The Prevalence and Effects of Occupational Licensing," *British Journal of Industrial Relations* 48 (4) (2010): 676–87.

# MISCELLANEOUS REGULATORY FREEDOM

**2.4%** Miscellaneous regulations include, in declining order of importance, certificate of need requirements for new hospital construction, auto insurance rate filing requirements, homeowner's insurance rate filing requirements, general unfair-pricing and sales-below-cost laws, price-gouging laws, rate classification prohibitions for some classes of insurance, membership in the Interstate Insurance Product Regulation Compact, direct-to-consumer auto sales, minimum markup and sales-below-cost laws for gasoline, moving company entry regulations, and mandatory product labeling laws.

Certificate-of-need regulations land their first-place slot in this category on the basis of the over $3 billion in extra costs they impose on hospitals, customers, and potential market entrants.[54]  Next come state personal auto insurance rate filing requirements. These regimes range from Massachusetts's old "fixed and established" system (scrapped in 2008), in which all car insurance premiums were dictated by law, to no rate-filing requirement whatsoever in Wyoming. A one-standard-deviation change on this −1 to 4 scale, about 1.2 points, would be worth $2 billion nationwide. The main problem with strict rate regulation regimes is that they encourage insurers to stop insuring some drivers altogether, forcing those drivers to find coverage in a state-guaranteed, "residual" market.[55]

Homeowner's insurance rate filing regulations range from "prior approval" to "no file." A one-standard-deviation shift on this variable would be worth $1.3 billion nationwide. The Interstate Insurance Product Regulation Compact makes it easier to sell the same life insurance policy or annuity across state lines. Prohibitions on the use of certain criteria for insurance rating purposes—such as age, gender, territory, and credit rating—redistribute wealth from low risks to high risks and drive some consumers out of the market altogether.

Price-gouging laws, which have gained in popularity recently, try to repeal the laws of supply and demand.[56]  They impose price controls on necessary products after disasters, making them even scarcer by disincentivizing supply and incentivizing demand.  According to W. David Montgomery, Robert Baron, and Mary Weisskopf, a price-gouging law on gasoline could be

54. Christopher J. Conover and Frank A. Sloan, "Does Removing Certificate-of-Need Regulations Lead to a Surge in Health Care Spending?," *Journal of Health Politics, Policy, and Law* 23, no. 3 (1998): 455–81; Jon M. Ford and David L. Kaserman, "Certificate-of-Need Regulation and Entry: Evidence from the Dialysis Industry," *Southern Economic Journal* 59, no. 4 (1993): 783–91; Patrick A. Rivers, Myron D. Fottler, and Mustafa Zeedan Younis, "Does Certificate of Need Really Contain Hospital Costs in the United States?," *Health Education Journal* 66, no. 3 (2007): 229–44.

55. Scott E. Harrington and Helen I. Doerpinghaus, "The Economics and Politics of Automobile Insurance Rate Classification," *Journal of Risk and Insurance* 60, no. 1 (1993): 59–84.

56. Michael Giberson, "The Problem with Price Gouging Laws," *Regulation*, Spring 2011: pp. 48–53.

expected to reduce economic welfare by at least $1.9 billion in the wake of a major disaster on the scale of Hurricanes Rita and Katrina.[57]

Mandatory product-labeling laws include (a) genetically modified organism (GMO) labeling requirements on food (now federalized) and (b) California's unique law mandating disclosure of potential carcinogens, which has a much bigger impact than GMO labeling (about $17 million per year in settlement costs alone[58]). We exclude this mandatory labeling law variable from our chain-link index because of the federal preemption law on GMO labeling requirements.

**TABLE 13**

| Rank | State | Miscellaneous Regulatory Freedom Score | Rank | State | Miscellaneous Regulatory Freedom Score |
|---|---|---|---|---|---|
| 1. | Arizona | 0.029 | 26. | Maryland | −0.001 |
| 2. | Wyoming | 0.028 | 27. | Michigan | −0.002 |
| 3. | Utah | 0.022 | 28. | Georgia | −0.003 |
| 4. | New Mexico | 0.022 | 29. | Nevada | −0.003 |
| 5. | New Hampshire | 0.021 | 30. | Kentucky | −0.004 |
| 6. | Idaho | 0.021 | 31. | Montana | −0.005 |
| 7. | Minnesota | 0.018 | 32. | Louisiana | −0.005 |
| 8. | Indiana | 0.018 | 33. | Maine | −0.005 |
| 9. | Wisconsin | 0.017 | 34. | Arkansas | −0.005 |
| 10. | South Dakota | 0.016 | 35. | Rhode Island | −0.005 |
| 11. | Ohio | 0.015 | 36. | California | −0.006 |
| 12. | Colorado | 0.012 | 37. | New York | −0.007 |
| 13. | Texas | 0.012 | 38. | Mississippi | −0.008 |
| 14. | Kansas | 0.012 | 39. | Tennessee | −0.008 |
| 15. | Illinois | 0.010 | 40. | Delaware | −0.009 |
| 16. | Vermont | 0.008 | 41. | Florida | −0.010 |
| 17. | Nebraska | 0.006 | 42. | Washington | −0.010 |
| 18. | Missouri | 0.004 | 43. | South Carolina | −0.011 |
| 19. | Oregon | 0.004 | 44. | Connecticut | −0.012 |
| 20. | Virginia | 0.004 | 45. | Alabama | −0.013 |
| 21. | Alaska | 0.003 | 46. | New Jersey | −0.013 |
| 22. | Pennsylvania | 0.003 | 47. | West Virginia | −0.017 |
| 23. | Iowa | 0.002 | 48. | Hawaii | −0.018 |
| 24. | Oklahoma | 0.001 | 49. | Massachusetts | −0.019 |
| 25. | North Dakota | 0.001 | 50. | North Carolina | −0.020 |

Note: States with different scores may appear identical due to rounding.

57.   W. David Montgomery, Robert A. Baron, and Mary K. Weisskopf, "Potential Effects of Proposed Price Gouging Legislation on the Cost and Severity of Gasoline Supply Interruptions," *Journal of Competition Law and Economics* 3, no. 3 (2007): 357–97.
58.   Michael L. Marlow, "Too Much (Questionable) Information?," *Regulation*, Winter 2013–14: pp. 20–28.

# CABLE AND TELECOM FREEDOM

**0.9%**

The least important category in the regulatory policy dimension, with the exception of the health insurance post-PPACA, is cable and telecommunications market freedom. It is important to note that these are the only public utility regulation areas included in the freedom index, because some utility "deregulation" is not truly deregulatory, as in the case of pro-competitive "reregulation" that has restructured electricity and natural gas markets in certain states. Although these services are important for household budgets, it is not at all clear that "deregulation" results in a net increase in individual freedom. The utilities are all characterized by physical connections to the consumer. Because of the monopoly element in transmission (parallel connections are judged infeasible), even under deregulation governments maintain "common carrier" regulations that require the regulated owner of the transmission grid to allow open access to competing providers at a regulated price. The transmission grid then becomes a "commons" with no profit incentive for the owner to expand, upgrade, or maintain the network. In many cases, retail competition is tightly managed by state governments to prevent anticompetitive manipulation of the market. For these reasons, many analysts insist on the term "restructuring" as opposed to "deregulation" for these industries.[59]

Telecommunications deregulation accounts for roughly two-thirds of the weight for this category, and the remainder is accounted for by statewide cable franchising, which eases the entry of telecom firms into the video cable market.[60]

**TABLE 14**

| Rank | State | Cable and Telecom Freedom Score | Rank | State | Cable and Telecom Freedom Score |
|---|---|---|---|---|---|
| 1. | Arkansas | 0.013 | 23. | Kentucky | 0.005 |
| 1. | California | 0.013 | 23. | Maine | 0.005 |
| 1. | Florida | 0.013 | 23. | Minnesota | 0.005 |
| 1. | Georgia | 0.013 | 23. | Mississippi | 0.005 |
| 1. | Idaho | 0.013 | 23. | Montana | 0.005 |
| 1. | Illinois | 0.013 | 23. | Nebraska | 0.005 |
| 1. | Indiana | 0.013 | 23. | New Hampshire | 0.005 |
| 1. | Iowa | 0.013 | 23. | New Mexico | 0.005 |
| 1. | Kansas | 0.013 | 23. | North Dakota | 0.005 |
| 1. | Louisiana | 0.013 | 23. | Oklahoma | 0.005 |
| 1. | Michigan | 0.013 | 23. | Oregon | 0.005 |
| 1. | Missouri | 0.013 | 23. | Pennsylvania | 0.005 |
| 1. | Nevada | 0.013 | 23. | South Dakota | 0.005 |
| 1. | North Carolina | 0.013 | 23. | Utah | 0.005 |
| 1. | Ohio | 0.013 | 23. | West Virginia | 0.005 |
| 1. | Rhode Island | 0.013 | 23. | Wyoming | 0.005 |
| 1. | South Carolina | 0.013 | 42. | Alaska | −0.001 |
| 1. | Tennessee | 0.013 | 42. | Connecticut | −0.001 |
| 1. | Texas | 0.013 | 42. | Hawaii | −0.001 |
| 1. | Vermont | 0.013 | 42. | New Jersey | −0.001 |
| 1. | Virginia | 0.013 | 46. | Arizona | −0.008 |
| 1. | Wisconsin | 0.013 | 46. | Maryland | −0.008 |
| 23. | Alabama | 0.005 | 46. | Massachusetts | −0.008 |
| 23. | Colorado | 0.005 | 46. | New York | −0.008 |
| 23. | Delaware | 0.005 | 46. | Washington | −0.008 |

Note: States with the same rank are tied.

59.  Peter Van Doren and Jerry Taylor, "Rethinking Electricity Restructuring," Cato Institute Policy Analysis no. 530, November 30, 2004, http://www.cato.org/pub_display.php?pub_id=2609.

60.  Adam Summers, "Cable Franchise Reform: Deregulation or Just New Regulators?," *Freeman* 57, no. 3 (2007): 31–34; Cecil Bohanon and Michael Hicks, "Statewide Cable Franchising and Broadband Connections," Digital Policy Institute, Ball State University,  2010.

# OVERALL REGULATORY POLICY RANKING

**34.0%** As with fiscal policy, states that rank highest on regula-
tory policy are mostly conservative, but they tilt toward
midwestern more than southern. In general, these are "good-government"
states that score well on variables such as the liability system variable. As
the "Politics of Freedom" chapter will show, regulatory policy is the most
important policy variable in terms of explaining economic growth in the
states. Although it is worth only about 10 percent more than fiscal policy in
the index, it is more important over the long run for explaining economic
growth patterns across the states.

We validate our regulatory policy measure by examining its correla-
tion to small businesses' ratings of their states' regulatory environments.
Thumbtack.com conducts an annual survey of independent businesses in
each state, funded by the Kauffman Foundation.[61] We average each state's
rank out of 45 for 2012, 2013, and 2014 (5 states lack data). Smaller numbers
are better, indicating a higher rank. The correlation between 2014 regulatory
index score and Thumbtack.com regulatory survey rank is −0.74, a strong
negative correlation that suggests that our index captures most of what
small businesses think about when it comes to regulations that affect their
business.

TABLE 15

| Rank | State | Overall Regulatory Policy Score | | Rank | State | Overall Regulatory Policy Score |
|------|-------|-------|---|------|-------|-------|
| 1. | Kansas | 0.072 | | 26. | Texas | −0.063 |
| 2. | Nebraska | 0.067 | | 27. | Missouri | −0.077 |
| 3. | Idaho | 0.054 | | 28. | Minnesota | −0.087 |
| 4. | Iowa | 0.045 | | 29. | West Virginia | −0.089 |
| 5. | Indiana | 0.032 | | 30. | Alaska | −0.090 |
| 6. | Wyoming | 0.031 | | 31. | New Hampshire | −0.092 |
| 7. | Mississippi | 0.020 | | 32. | Louisiana | −0.096 |
| 8. | South Dakota | 0.018 | | 33. | Ohio | −0.107 |
| 9. | South Carolina | 0.014 | | 34. | New Mexico | −0.113 |
| 10. | Tennessee | 0.014 | | 35. | Delaware | −0.120 |
| 11. | Wisconsin | 0.007 | | 36. | Montana | −0.144 |
| 12. | Utah | 0.006 | | 37. | Pennsylvania | −0.168 |
| 13. | Georgia | 0.001 | | 38. | Illinois | −0.187 |
| 14. | Arkansas | −0.003 | | 39. | Rhode Island | −0.189 |
| 15. | Oklahoma | −0.007 | | 40. | Massachusetts | −0.195 |
| 16. | Arizona | −0.008 | | 41. | Connecticut | −0.200 |
| 17. | Nevada | −0.015 | | 42. | Washington | −0.235 |
| 18. | Kentucky | −0.016 | | 43. | Oregon | −0.239 |
| 19. | North Dakota | −0.019 | | 44. | Maine | −0.243 |
| 20. | Virginia | −0.023 | | 45. | Vermont | −0.291 |
| 21. | North Carolina | −0.034 | | 46. | Hawaii | −0.292 |
| 22. | Florida | −0.047 | | 47. | Maryland | −0.376 |
| 23. | Alabama | −0.056 | | 48. | California | −0.431 |
| 24. | Michigan | −0.057 | | 49. | New Jersey | −0.448 |
| 25. | Colorado | −0.062 | | 50. | New York | −0.468 |

Note: States with different scores may appear identical due to rounding.

61.   The survey is available at https://www.thumbtack.com/survey.

Figure 5 shows how average regulatory policy has changed over time, when federalized policies such as the PPACA are excluded. As with fiscal policy, we see substantial improvement in states' regulatory environments since the mid-2000s. Were we to include federalized policies, there would instead be a large drop in 2012 when the PPACA took effect, more than wiping out all gains at the state level.

States have improved most in their lawsuit freedom and cable and telecommunications freedom since 2000, followed by miscellaneous regulation and labor-market freedom. Land-use freedom has dramatically declined, on average, and this trend partly explains the decline in regulatory freedom in 2015 and 2016.

**FIGURE 5**  State Average Regulatory Policy Scores Over Time



# OVERALL ECONOMIC FREEDOM RANKING

Although we believe that a composite freedom index that includes both economic and personal freedom is most valuable and best represents the actual state of freedom in the states, readers may wish to compare and contrast the states solely in terms of their overall economic freedom, particularly for the purposes of empirical analysis of income growth. We invite researchers to use the economic freedom variable as a tool for investigating income growth and related phenomena. Economic freedom is calculated as the sum of the fiscal and regulatory freedom indices.

We validate our economic freedom index by correlating it to state scores for taxes and regulations as rated by chief executives of for-profit companies for *Chief Executive* magazine.[62] We use the average scores for 2013 and 2014 for all 50 states. The correlation between our economic freedom index and chief executives' ratings is 0.74, indicating an extremely strong relationship between what we measure as economic freedom and what entrepreneurs are concerned about when it comes to state policy.[63]

**TABLE 16**

| Rank | State | Overall Economic Freedom Score | | Rank | State | Overall Economic Freedom Score |
|---|---|---|---|---|---|---|
| 1. | Florida | 0.356 | | 26. | Kentucky | 0.004 |
| 2. | Tennessee | 0.277 | | 27. | Massachusetts | −0.007 |
| 3. | New Hampshire | 0.240 | | 28. | Louisiana | −0.026 |
| 4. | South Dakota | 0.236 | | 29. | Alaska | −0.030 |
| 5. | Indiana | 0.208 | | 30. | Nebraska | −0.033 |
| 6. | North Dakota | 0.203 | | 31. | Connecticut | −0.033 |
| 7. | Georgia | 0.152 | | 32. | Ohio | −0.037 |
| 8. | Virginia | 0.152 | | 33. | Wyoming | −0.043 |
| 9. | Idaho | 0.146 | | 34. | Iowa | −0.067 |
| 10. | Texas | 0.137 | | 35. | Mississippi | −0.103 |
| 11. | Colorado | 0.137 | | 36. | Illinois | −0.121 |
| 12. | Oklahoma | 0.129 | | 37. | Rhode Island | −0.129 |
| 13. | Kansas | 0.115 | | 38. | Delaware | −0.141 |
| 14. | Arizona | 0.115 | | 39. | West Virginia | −0.144 |
| 15. | Nevada | 0.098 | | 40. | Minnesota | −0.151 |
| 16. | Missouri | 0.097 | | 41. | Washington | −0.180 |
| 17. | Michigan | 0.070 | | 42. | Oregon | −0.285 |
| 18. | Alabama | 0.065 | | 43. | New Mexico | −0.293 |
| 19. | Pennsylvania | 0.062 | | 44. | Maine | −0.306 |
| 20. | Utah | 0.050 | | 45. | Maryland | −0.323 |
| 21. | Arkansas | 0.036 | | 46. | New Jersey | −0.396 |
| 22. | Montana | 0.029 | | 47. | Vermont | −0.429 |
| 23. | North Carolina | 0.027 | | 48. | California | −0.503 |
| 24. | Wisconsin | 0.022 | | 49. | Hawaii | −0.582 |
| 25. | South Carolina | 0.018 | | 50. | New York | −0.828 |

Note: States with different scores may appear identical due to rounding.

---

62. The rankings were announced on *Chief Executive's* website, http://chiefexecutive.net, but are no longer available.

63. We also correlated chief executives' ratings to the Economic Freedom of North America (EFNA) index, as measured in 2012 (latest available year) for the subnational level. That correlation is 0.67, strong but not as strong as the correlation between our index and chief executives' ratings. EFNA also has a weaker correlation with the Thumbtack.com survey results than our index. EFNA and our economic freedom index correlate at a moderately strong 0.59.

Figure 6 shows the evolution of state average economic freedom over time, excluding federalized policies. Economic freedom declined in the early 2000s, recovered briefly, took another hit in 2009, and then grew to new heights by 2015. This latter upswing is consistent with what was shown in Figures 4 and 5: rapidly improving state fiscal policies after 2011 and a less consistent but still large average improvement in regulatory policy since then.

**FIGURE 6**  State Average Economic Freedom Scores over Time



40

# PERSONAL FREEDOM

The personal freedom versus paternalism dimension (Figure 7) consists of the following categories: (a) incarceration and arrests for victimless crimes, (b) gun rights, (c) gambling freedom, (d) marriage freedom, (e) educational freedom, (f) alcohol freedom, (g) asset forfeiture, (h) marijuana freedom, (i) tobacco freedom, (j) travel freedom, (k) campaign finance freedom, and (l) other *mala prohibita* and miscellaneous civil liberties. Weighting these categories is a challenge because the observable financial impacts of these policies often do not include the full harms to victims.



**FIGURE 7**  Personal Freedom Weights

Incarcerations & Arrests **8.2%**

Gun Rights **4.5%**

Gambling Freedom **3.8%**

Marriage Freedom **3.4%**

Educational Freedom **2.8%**

Alcohol Freedom **2.6%**

Asset Forfeiture **2.6%**

Marijuana Freedom **2.0%**

Tobacco Freedom **1.8%**

Campaign Finance Freedom **0.1%**

*Mala Prohibita* **1.2%**

Travel Freedom **1.1%**

With some assumptions, one can use results in the academic literature to measure, for instance, the lost consumer surplus from marijuana prohibition, or even to make a plausible guess at the disutility incurred by a year in prison. However, it is much more difficult to measure the risks prohibitionist policies pose to individuals who are not imprisoned—especially those who may not even engage in the activity prohibited, but who legitimately fear further restrictions on their freedoms.

An example may help illustrate the problem. Imagine two countries, each the size of the United States. In Country A, the average tax rate is 1 percent (of income) lower than in Country B, but unlike Country B, Country A prohibits the practice of a minor religion—say, Zoroastrianism. Assuming personal income of $12 trillion, as in the United States, the lower tax rate in Country B allows for more freedom worth $28 billion a year, by the method of calculation used in this book.

Now suppose that 10,000 Zoroastrians go to prison for their beliefs. There are few estimates of the cost of prison, including opportunity cost and psychological harms, but the estimates that exist range between $30,000 and $50,000 per year for the average prisoner.[64] Taking the higher figure, the prohibition of Zoroastrianism is found to have a victim cost of approximately $500 million per year: far, far lower than the benefit of lower taxes.

Is the country with slightly lower taxes but a blatant infringement of religious freedom truly freer? Surely, the calculation above has missed some very significant costs to freedom from the infringement of religious liberty. This calculation is related to the discussion of fundamental rights in the "Regulatory Policy" section above. Freedom to believe (or disbelieve) in any religion and freedom to practice peacefully (or refuse to practice) any religion seem to be freedoms that every person rationally desires. They are fundamental rights. Many personal freedoms have this character, and it needs to be recognized in the freedom index.

Therefore, the index applies constitutional weights to personal freedoms—as with regulatory policies—but uses different values, because the direct, measurable costs to victims of policies that infringe on personal freedoms are generally a smaller percentage of true costs than the direct, measurable costs to victims of regulatory policies. Put another way, measuring the economic consequences regulatory policies have on their full victim class is a relatively simple procedure, but the full costs of policies that infringe on personal freedoms are measurable only in part. Further, as mentioned in the discussion of fiscal policy, taxes and economic regulations

do not necessarily infringe on the rights of all apparent victims, unlike policies that affect personal freedoms.

Again, the index takes constitutional provisions relating to certain freedoms as prima facie evidence of a freedom's "basicness," indicating that the full victim class should be thought of as quite broad. Therefore, variables relating to fundamental, high-salience rights are multiplied by a factor of 10, on the basis of their inclusion in the federal Constitution. Variables relating to rights specified only in at least one state constitution are multiplied by a factor of 5. Variables that receive the "constitutional weights" are noted in the relevant discussion of each. There is of course nothing magical about these numbers, but they bring the personal freedom dimension into rough parity with the fiscal and regulatory policy dimensions as one-third of the overall index. In this edition, personal freedom is of slightly more weight than the regulatory dimension and almost 4 percent more than fiscal policy.

The following sections introduce each category within the personal freedom dimension, in order of weight.

64. John J. Donohue, "Assessing the Relative Benefits of Incarceration: The Overall Change over the Previous Decades and the Benefits on the Margin," in *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, ed. Steven Raphael and Michael Stoll (New York: Russell Sage Foundation, 2008); Innocence Project, "Compensating the Wrongly Convicted," https://www.innocenceproject.org/compensating-wrongly-convicted/.

# INCARCERATION AND ARRESTS FOR VICTIMLESS CRIMES

**8.2%**

The most heavily weighted category in the personal freedom dimension is the law enforcement statistics category, which consists of data on incarceration rates adjusted for violent and property crime rates,[65] nondrug victimless crimes arrests, the drug enforcement rate, and two variables new to this edition—(a) driver's license suspensions for drug offenses and (b) prison collect phone call rates. This category is worth nearly one-quarter of the personal freedom index. Given that the United States is frequently lambasted for having more prisoners per capita than almost every other country, and that the incarceration rate varies widely across states, it is perhaps no surprise that this category should be so important. The personal freedom dimension also includes laws that create or reduce victimless crimes in other categories, such as marijuana, gun, and prostitution laws. Our philosophy for assigning weights to these categories is to consider the forgone consumer and producer surplus due to prohibitions, while we consider within the law enforcement statistics category the costs of arrest and prison time.

A one-standard-deviation nationwide reduction in incarceration rates adjusted for crime rates would yield about $17 billion in new value for prisoners. This figure excludes the fiscal benefits of incarcerating fewer people.

A similar reduction in drug arrests per reported drug user would benefit arrestees by $5.8 billion. Other victimless crimes arrests are calculated in two different ways, since there is no direct, state-by-state measure of the number of people who engage in these activities, as there is for drug arrests. Instead, the index takes the arrests of people over 18 for weapons, prostitution, gambling, loitering, and liquor law violations as a percentage of the population and as a percentage of total arrests. The former figure is an imperfect measure of the risk of a citizen's being arrested for one of these offenses (except that states may differ in the percentage of citizens who engage in these activities), whereas the latter is more of a measure of police priorities. Both variables are equally weighted and together amount to $4 billion of benefit to potential arrestees.

The cost to drug offenders of a nationwide policy of driver's license suspensions, which typically last six months or more, would be in the neighborhood of $350 million. A standard-deviation change in the 15-minute collect phone call rate, $1.59, would roughly extract $50 million from prisoners' families if implemented nationwide.

65. The adjustment involves regressing the incarceration rate on violent and property crime rates and taking the residuals. States with high scores will be those that lock up more people than would be expected given their crime rates.

TABLE 17

| Rank | State | Incarceration and Arrests for Victimless Crimes Score | | Rank | State | Incarceration and Arrests for Victimless Crimes Score |
|---|---|---|---|---|---|---|
| 1. | Massachusetts | 0.137 | | 26. | Nebraska | −0.003 |
| 2. | Rhode Island | 0.134 | | 27. | Delaware | −0.004 |
| 3. | Maine | 0.125 | | 28. | Illinois | −0.004 |
| 4. | Minnesota | 0.099 | | 29. | Michigan | −0.005 |
| 5. | Washington | 0.096 | | 30. | Wisconsin | −0.007 |
| 6. | Alaska | 0.094 | | 31. | Indiana | −0.008 |
| 7. | Hawaii | 0.090 | | 32. | Pennsylvania | −0.010 |
| 8. | Vermont | 0.081 | | 33. | Ohio | −0.016 |
| 9. | New Hampshire | 0.066 | | 34. | South Carolina | −0.020 |
| 10. | New York | 0.055 | | 35. | Tennessee | −0.022 |
| 11. | New Mexico | 0.052 | | 36. | Georgia | −0.029 |
| 12. | Utah | 0.050 | | 37. | Virginia | −0.033 |
| 13. | New Jersey | 0.047 | | 38. | Kentucky | −0.034 |
| 14. | Iowa | 0.042 | | 39. | Florida | −0.035 |
| 15. | Connecticut | 0.041 | | 40. | Alabama | −0.042 |
| 16. | North Dakota | 0.039 | | 41. | Missouri | −0.045 |
| 17. | North Carolina | 0.030 | | 42. | Arizona | −0.049 |
| 18. | Montana | 0.030 | | 43. | Idaho | −0.050 |
| 19. | Kansas | 0.028 | | 44. | Arkansas | −0.051 |
| 20. | California | 0.025 | | 45. | Wyoming | −0.058 |
| 21. | Colorado | 0.022 | | 46. | Texas | −0.063 |
| 22. | Maryland | 0.021 | | 47. | Oklahoma | −0.083 |
| 23. | Oregon | 0.010 | | 48. | South Dakota | −0.086 |
| 24. | West Virginia | −0.001 | | 49. | Mississippi | −0.089 |
| 25. | Nevada | −0.002 | | 50. | Louisiana | −0.112 |

Note: States with different scores may appear identical due to rounding.

# GUN RIGHTS

**4.5%** Gun rights are worth more in this edition of the index because of new research suggesting that the price elasticity of demand for carry permits is rather low, implying high consumer surplus. Still, most of the weight of this category is because of the boost these policies receive from state and federal constitutional protection.

Only some firearms policies trigger Second Amendment scrutiny, and those are the only ones to get the full "times 10" constitutional weighting factor. We follow recent case law in our judgments on this point. U.S. Supreme Court decisions in *D.C. v. Heller*[66] and *McDonald v. Chicago*[67] held that federal, state, and local governments are not allowed to ban gun ownership for self-defense purposes altogether, and state and federal appeals court decisions have also held that the Second Amendment protects a right to carry a firearm outside the home. On the other hand, the Supreme Court has opined that the U.S. Constitution permits bans on certain types of firearms and reasonable regulations on how someone may qualify to carry a weapon for self-defense. However, since the Louisiana constitution provides that all firearms-related restrictions should be subject to strict scrutiny, we apply a "times 5" constitutional weighting factor to all those firearms policies not receiving the "times 10" boost. Variables falling into this latter category include concealed-carry permit costs, concealed-carry permit terms, non-powder gun regulations, restrictions on multiple purchases of handguns, licensing or regulation of gun dealers, universal background checks, registration of firearms, locking device requirements, ammunition microstamping, duty-to-retreat laws, and laws relating to National Firearms Act weapons (machine guns, sound suppressors, short-barreled rifles, short-barreled shotguns, and "any other weapon").

The most significant variable in the gun rights category is the concealed-carry index, which takes into account shall-issue versus may-issue, carry in vehicles, local preemption, and the scope of places where concealed carry is allowed (2.2 percent of the freedom index). Concealed-carry permit cost (0.5 percent of the index) comes next. The existence of a local gun ban—which only Illinois had, until struck down in *McDonald v. Chicago*—is worth 0.4 percent. At about 0.4 percent of the index we find our index of firearms owner licensing requirements and waiting periods on firearms purchases. At 0.2 percent of the index is the term of carry permits.

Other variables included in this category, and worth far less than those discussed in the previous paragraph, are our index of open-carry laws, training requirements for carry permits, stricter-than-federal minimum age

to purchase firearms, assault weapons bans, duty-to-retreat laws ("Castle Doctrine"), restrictions on multiple purchases, locking-device requirements, dealer licensing, registration of firearms, ballistic identification or microstamping requirements, "design safety standards" (bans on cheap handguns), large-capacity magazine bans, laws regarding Class III weapons, retention of sales records, and 50-caliber rifle bans.

**TABLE 18**

| Rank | State | Gun Rights Score | | Rank | State | Gun Rights Score |
|---|---|---|---|---|---|---|
| 1. | Kansas | 0.054 | | 26. | Ohio | 0.017 |
| 2. | Vermont | 0.052 | | 27. | Nevada | 0.017 |
| 3. | Arizona | 0.052 | | 28. | North Dakota | 0.016 |
| 4. | Idaho | 0.052 | | 29. | Texas | 0.016 |
| 5. | Mississippi | 0.045 | | 30. | Louisiana | 0.016 |
| 6. | West Virginia | 0.045 | | 31. | New Mexico | 0.015 |
| 7. | Wyoming | 0.045 | | 32. | Michigan | 0.015 |
| 8. | Missouri | 0.044 | | 33. | Oklahoma | 0.014 |
| 9. | Alaska | 0.044 | | 34. | South Carolina | 0.014 |
| 10. | Maine | 0.043 | | 35. | North Carolina | 0.014 |
| 11. | New Hampshire | 0.028 | | 36. | Arkansas | 0.013 |
| 12. | Pennsylvania | 0.025 | | 37. | Minnesota | 0.013 |
| 13. | Utah | 0.024 | | 38. | Iowa | 0.012 |
| 14. | South Dakota | 0.023 | | 39. | Florida | 0.009 |
| 15. | Wisconsin | 0.022 | | 40. | Nebraska | −0.001 |
| 16. | Colorado | 0.021 | | 41. | Illinois | −0.007 |
| 17. | Alabama | 0.020 | | 42. | Delaware | −0.030 |
| 18. | Oregon | 0.020 | | 43. | New York | −0.037 |
| 19. | Tennessee | 0.020 | | 44. | Connecticut | −0.041 |
| 20. | Georgia | 0.020 | | 45. | Rhode Island | −0.044 |
| 21. | Kentucky | 0.019 | | 46. | Maryland | −0.046 |
| 22. | Indiana | 0.018 | | 47. | New Jersey | −0.051 |
| 23. | Washington | 0.018 | | 48. | Massachusetts | −0.051 |
| 24. | Virginia | 0.017 | | 49. | California | −0.057 |
| 25. | Montana | 0.017 | | 50. | Hawaii | −0.083 |

Note: States with different scores may appear identical due to rounding.

66.  D.C. v. Heller, 554 U.S. 570 (2008).
67.  McDonald v. Chicago, 561 U.S. 742 (2010).

# GAMBLING FREEDOM

**3.8%** Annual nationwide commercial casino revenues minus payouts ("win") are about $40 billion,[68] so gambling is big business. Unfortunately, no state has a free market in gaming enterprises, but an oligopolistic, state-licensed system at least permits more freedom than a total ban.

We are able for the first time to include casino revenue data in the freedom index. We have obtained these data from the UNLV Center for Gaming Research and state regulatory boards' annual reports. The freedom index uses the Australian Productivity Commission's admittedly flawed[69] method (but a creditable and unique attempt) for deriving the consumer surplus, as follows:

$$S = \frac{p(1-t)q}{2e}$$

where $S$ is the surplus, $p(1-t)q$ is price including tax times quantity, and $e$ is the price elasticity of demand, assumed to be −1.3 following the academic literature and the Australian Productivity Commission's estimate for nonproblem gamblers.[70] Thus, the total gambling revenues figure is divided by 2.6 to get the consumer surplus. We also take 30 percent off for problem gamblers, whose consumer surplus might be zero (an aggressive assumption). In addition, we take two-thirds off the figure to account for interstate spillovers: gambling liberalization on the margin does not increase consumer surplus or revenue much because the national gambling market is almost saturated. For the purposes of the freedom index, producer surplus is irrelevant because the producer side of the industry is heavily oligopolistic or monopolistic because of state control.

Apart from casino win, we also include dichotomous variables measuring whether states have legalized noncasino forms of gambling: pari-mutuel wagering, charitable gaming, and slot or video machines outside casinos. Some states put those revenue figures online, but we have been unable to obtain complete data, hence the dichotomous variables. Using the data we do have, however, we can roughly estimate the impact of legalization in each of those areas on consumer surplus. Slot and video machines seem to be far more popular than pari-mutuel wagering or charitable gaming. The revenues from slot machines are mind-boggling to these authors, who have little interest in this form of gambling. Tiny Montana rakes in a whopping $400 million a year in gross revenue

minus payouts, amounting to nearly $500 for every man, woman, and child. Clearly, quite a few Montanans are paying many thousands of dollars a year for the privilege of playing these games.

While the aforementioned gambling variables are worth a combined 3.8 percent of the index, the remaining variables in this category have very small weights. A social gambling exception and whether "aggravated gambling" is a felony each make up 0.02 percent of the freedom index. Express prohibitions on internet gambling, which are redundant on federal prohibitions, are worth less than 0.01 percent.

TABLE 19

| Rank | State | Gambling Freedom Score | | Rank | State | Score |
|---|---|---|---|---|---|---|
| 1. | Nevada | 0.080 | | 26. | Oklahoma | 0.008 |
| 2. | Louisiana | 0.069 | | 27. | Alabama | −0.024 |
| 3. | Illinois | 0.063 | | 28. | California | −0.024 |
| 4. | West Virginia | 0.063 | | 29. | Connecticut | −0.024 |
| 5. | Maryland | 0.060 | | 30. | Minnesota | −0.024 |
| 6. | South Dakota | 0.051 | | 31. | Texas | −0.024 |
| 7. | Mississippi | 0.030 | | 32. | Arizona | −0.024 |
| 8. | Iowa | 0.027 | | 33. | Arkansas | −0.024 |
| 9. | Indiana | 0.026 | | 34. | Idaho | −0.024 |
| 10. | Pennsylvania | 0.026 | | 35. | Kentucky | −0.024 |
| 11. | New Jersey | 0.025 | | 36. | Nebraska | −0.024 |
| 12. | Missouri | 0.024 | | 37. | Virginia | −0.024 |
| 13. | Rhode Island | 0.023 | | 38. | Wyoming | −0.024 |
| 14. | Maine | 0.023 | | 39. | Washington | −0.024 |
| 15. | Ohio | 0.022 | | 40. | North Dakota | −0.024 |
| 16. | Michigan | 0.022 | | 41. | New Hampshire | −0.025 |
| 17. | Delaware | 0.022 | | 42. | South Carolina | −0.025 |
| 18. | New York | 0.021 | | 43. | Wisconsin | −0.025 |
| 19. | Colorado | 0.020 | | 44. | Alaska | −0.025 |
| 20. | Kansas | 0.016 | | 45. | North Carolina | −0.025 |
| 21. | New Mexico | 0.016 | | 46. | Vermont | −0.025 |
| 22. | Montana | 0.015 | | 47. | Georgia | −0.025 |
| 23. | Oregon | 0.015 | | 48. | Tennessee | −0.025 |
| 24. | Florida | 0.014 | | 49. | Hawaii | −0.026 |
| 25. | Massachusetts | 0.008 | | 50. | Utah | −0.026 |

Note: States with different scores may appear identical due to rounding.

68. UNLV Center for Gaming Research, "United States Commercial Casino Gaming: Monthly Revenues," http://gaming.unlv.edu/reports/national_monthly.pdf.

69. Brian Dollery and John Storer, "Assessing the Impact of Electronic Gaming Machines: A Conceptual Critique of the Productivity Commission's Methodology," *Gambling Research* 20, no. 1 (2008): 1–12.

70. Australasian Gaming Council, "Estimating Consumer Surplus," http://www.austgamingcouncil.org.au/images/pdf /eLibrary/2330.pdf.

## MARRIAGE FREEDOM

**3.4%** Most of the weight of the marriage freedom category is tied to the availability of same-sex partnerships, both civil unions and marriage. The remainder is tied to waiting periods and blood test requirements, availability of cousin marriage and covenant marriage, and sodomy laws, which were struck down by the Supreme Court in 2003. In our view, state governments should treat marriage as a contract that is "registered" or "recorded," rather than a personal status that is "licensed."

States that prohibited same-sex couples from entering private contracts that provide the benefits of marriage (whether termed "marriages" or "civil unions") clearly took away an important contract right from such couples. Some states merely refrained from providing a convenient mechanism, such as civil unions or marriage, for same-sex couples to make contracts covering inheritance, hospital visitation, medical power of attorney, and so on. Other states went further and expressly prohibited any private contracts intended to provide benefits equivalent to marriage. For instance, the Virginia constitution states that "this Commonwealth and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance, or effects of marriage." These state laws are sometimes called "super-DOMAs," after the federal Defense of Marriage Act. Other states that, by statute or constitution, prohibited all marriagelike private contracts for same-sex couples are Alabama, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Michigan, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and Wisconsin (which is a curious example of a state that had limited domestic partnerships but also a super-DOMA, banning contracts offering benefits "equal to marriage").

Now that the Supreme Court has nationalized same-sex marriage, those distinctions among states are irrelevant. The 2016 ranking on this variable is driven mostly by cousin marriage, which at 0.2 percent of the index is more important than covenant marriage and vastly more important than blood tests and waiting periods.[71]

---

71. Although cousin marriage is rare, bans on the practice receive the constitutional weight of 10 because they prevent certain couples from marrying altogether. Covenant marriage, waiting periods, and blood tests, by contrast, do not receive the constitutional weight.

The freedom index has long used an estimate that the freedom to marry is worth about $2,500 per year to same-sex couples, and that about 900,000 couples would take advantage of this opportunity when it became available nationwide.[72]  Those estimates have proven reliable in subsequent research. Nearly 1 million Americans are now in same-sex marriages.[73]

In previous editions of the index, we gave states equal scores on this variable for same-sex civil unions and marriage, considering the difference to have been somewhat terminological at the time. However, after the Supreme Court decision striking down the federal Defense of Marriage Act (*United States v. Windsor*, 570 U.S. 744 [2013]), a window of time opened up in which states with full same-sex marriage actually afforded those couples greater freedom than available under civil unions because the federal government was required to extend certain rights to married couples that it did not have to extend to civil unions, such as exemption from inheritance tax. Therefore, in this edition and in the fourth edition of the index, we have given a small benefit to states that enacted same-sex marriage vis-à-vis same-sex civil unions, even as we advocate, like many other libertarians, that government cease to define "marriage" at all.

TABLE 20

| Rank | State | Marriage Freedom Score | | Rank | State | Marriage Freedom Score |
|---|---|---|---|---|---|---|
| 1. | Alabama | 0.044 | | 26. | Wisconsin | 0.041 |
| 1. | California | 0.044 | | 27. | Louisiana | 0.041 |
| 1. | Colorado | 0.044 | | 28. | Idaho | 0.038 |
| 1. | Connecticut | 0.044 | | 28. | Kentucky | 0.038 |
| 1. | Georgia | 0.044 | | 28. | Minnesota | 0.038 |
| 1. | Hawaii | 0.044 | | 28. | Mississippi | 0.038 |
| 1. | New Mexico | 0.044 | | 28. | Missouri | 0.038 |
| 1. | North Carolina | 0.044 | | 28. | Nebraska | 0.038 |
| 1. | Rhode Island | 0.044 | | 28. | Nevada | 0.038 |
| 1. | Tennessee | 0.044 | | 28. | New Hampshire | 0.038 |
| 1. | Vermont | 0.044 | | 28. | North Dakota | 0.038 |
| 1. | Virginia | 0.044 | | 28. | Ohio | 0.038 |
| 13. | South Carolina | 0.044 | | 28. | Oklahoma | 0.038 |
| 14. | Maryland | 0.044 | | 28. | South Dakota | 0.038 |
| 15. | Arizona | 0.044 | | 28. | West Virginia | 0.038 |
| 16. | Alaska | 0.044 | | 28. | Wyoming | 0.038 |
| 16. | Florida | 0.044 | | 42. | Delaware | 0.038 |
| 16. | Massachusetts | 0.044 | | 43. | Iowa | 0.038 |
| 16. | New Jersey | 0.044 | | 43. | Kansas | 0.038 |
| 20. | New York | 0.043 | | 43. | Michigan | 0.038 |
| 21. | Indiana | 0.041 | | 43. | Oregon | 0.038 |
| 21. | Maine | 0.041 | | 43. | Pennsylvania | 0.038 |
| 21. | Utah | 0.041 | | 43. | Texas | 0.038 |
| 24. | Illinois | 0.041 | | 43. | Washington | 0.038 |
| 25. | Arkansas | 0.041 | | 50. | Montana | 0.038 |

Note: States with the same rank are tied.

72.  M. V. Lee Badgett, "The Economic Value of Marriage for Same-Sex Couples," *Drake Law Review* 58 (2010): 1081–116.
73.  Richard Wolf, "Gay Marriages Up 33% in Year Since Supreme Court Ruling," *USA Today*, June 22, 2016, https://usat .ly/2nnMicG.

# EDUCATIONAL FREEDOM

**2.8%**

The single most important educational freedom variable is the index of tax credit and deduction laws for private education (1 percent of the whole index). The average "broad-eligibility" program has a per-student benefit of about $3,250. We use research on the price elasticity of demand for private schooling to estimate the number of families that would take advantage of this type of program if it were available nationwide, and we come up with an estimate of 7.5 million.[74] We also add a small bonus ($20 per student) to those students remaining in public schools, with the idea that their families also benefit slightly from the mere availability of more choice. Together, those estimates imply that moving nationwide from a situation of no tax credit scholarships to broad-eligibility programs would benefit families about $14.5 billion a year.

Other important variables for educational freedom include publicly funded voucher law size and scope, mandatory state licensure of private school teachers, mandatory state or local approval of private schools, years of compulsory schooling, and extent of private school curriculum control. Vouchers are worth less than tax credit scholarship funds because extant programs are generally more narrowly targeted and come with more strings attached. Were a state to enact general, unrestricted school choice, such a policy would have a heavy weight in our ranking.

Less significant are public school choice ("open enrollment" policies), mandatory registration of private schools, existence of a homeschool law, homeschool curriculum control, homeschool teacher qualifications, homeschool standardized testing, homeschool notification index, and homeschool record-keeping index. All the homeschool variables combined make up 0.13 percent of the index. Their weight is small because not many students are homeschooled, and the variance in state policies is not as significant in the post-2000 period as it was in the 1980s.

Educational freedom is an area in which states continue to be active in a generally positive direction, and we expect several states to climb in the ranking in the next edition of the index. For instance, in 2017 New Hampshire passed a law allowing all school districts to adopt a private school choice program for students in grades not covered by a school district's own schools.

TABLE 21

| Rank | State | Educational Freedom Score | | Rank | State | Educational Freedom Score |
|------|-------|-----|---|------|-------|-----|
| 1. | Arizona | 0.059 | | 26. | Idaho | 0.002 |
| 2. | Florida | 0.046 | | 27. | Missouri | 0.000 |
| 3. | Indiana | 0.043 | | 28. | Arkansas | −0.001 |
| 4. | Georgia | 0.037 | | 29. | New Jersey | −0.001 |
| 5. | Louisiana | 0.029 | | 30. | Texas | −0.002 |
| 6. | North Carolina | 0.029 | | 31. | Delaware | −0.002 |
| 7. | Virginia | 0.027 | | 32. | Colorado | −0.002 |
| 8. | Wisconsin | 0.025 | | 33. | Oregon | −0.002 |
| 9. | New Hampshire | 0.021 | | 34. | New Mexico | −0.003 |
| 10. | Rhode Island | 0.019 | | 35. | Kentucky | −0.004 |
| 11. | Oklahoma | 0.019 | | 36. | California | −0.004 |
| 12. | Pennsylvania | 0.018 | | 37. | New York | −0.004 |
| 13. | Montana | 0.016 | | 38. | Alaska | −0.005 |
| 14. | Vermont | 0.015 | | 39. | Hawaii | −0.005 |
| 15. | Mississippi | 0.013 | | 40. | West Virginia | −0.006 |
| 16. | Illinois | 0.013 | | 41. | Connecticut | −0.006 |
| 17. | Ohio | 0.012 | | 42. | Massachusetts | −0.009 |
| 18. | Iowa | 0.011 | | 43. | Maine | −0.009 |
| 19. | South Carolina | 0.008 | | 44. | Wyoming | −0.010 |
| 20. | Nevada | 0.008 | | 45. | Tennessee | −0.012 |
| 21. | Minnesota | 0.008 | | 46. | Maryland | −0.012 |
| 22. | Utah | 0.007 | | 47. | Nebraska | −0.014 |
| 23. | Alabama | 0.006 | | 48. | Michigan | −0.016 |
| 24. | Kansas | 0.004 | | 49. | Washington | −0.021 |
| 25. | South Dakota | 0.003 | | 50. | North Dakota | −0.022 |

Note: States with different scores may appear identical due to rounding.

---

74. Andrew Coulson, "Choosing to Save: The Fiscal Impact of Education Tax Credits on the State of Nevada," Nevada Policy Research Institute, January 12, 2009, https://www.npri.org/issues/publication/choosing-to-save.

# ALCOHOL FREEDOM

**2.6%** The alcohol distribution system ("control"—which means that the state has a monopoly on distribution—versus "license"—which means that the state licenses distributors) makes up almost 1 percent of the whole index on its own. Research shows that state distribution of alcohol imposes significant costs on consumers in time and inconvenience.[75]

The freedom index assumes a "full-price elasticity" (including formal and informal prices) of −0.2 for all alcohol types, which is similar to what has been discovered in the literature cited above. Reducing consumption of alcohol by 5 percent with a state monopoly, according to University of California, Los Angeles professors Stanley I. Ornstein and Dominique M. Hanssens, therefore implies a 25 percent "tax" due to transaction cost. According to the U.S. Department of Agriculture, packaged alcoholic beverage sales in 2010 amounted to $91 billion. If all such sales had to go through state monopolies, then one might expect a transaction-cost "tax" of close to $23 billion.[76]

Blue laws (bans on Sunday sales) would, if implemented nationwide, reduce consumer welfare by over $4.5 billion and are worth 0.4 percent of the index. Preventing wine, spirits, or in a few states even beer from being sold in grocery stores has a similar cost. Taxes on beer, wine, and spirits each make up 0.2–0.3 percent of the index as a whole, followed by direct wine shipment bans, keg registration/bans, and "happy hour" bans. Mandatory server training, worth less than 0.01 percent of the index, rounds out this category.

With its strong brewing industry, it is no surprise that Wisconsin finishes first in this ranking. Nor is Utah's last-place finish shocking.

<div style="text-align:right">

**TABLE 22**

</div>

| Rank | State | Alcohol Freedom Score | | Rank | State | Alcohol Freedom Score |
|---|---|---|---|---|---|---|
| 1. | Wisconsin | 0.019 | | 26. | Washington | 0.003 |
| 2. | Missouri | 0.019 | | 27. | Georgia | 0.003 |
| 3. | Arizona | 0.019 | | 28. | Delaware | 0.003 |
| 4. | Nevada | 0.018 | | 29. | Kansas | 0.001 |
| 5. | California | 0.018 | | 30. | Rhode Island | 0.001 |
| 6. | Louisiana | 0.018 | | 31. | Iowa | 0.000 |
| 7. | South Dakota | 0.016 | | 32. | Ohio | 0.000 |
| 8. | Illinois | 0.015 | | 33. | New Hampshire | 0.000 |
| 9. | Texas | 0.015 | | 34. | Arkansas | −0.001 |
| 10. | New Mexico | 0.014 | | 35. | North Carolina | −0.004 |
| 11. | Hawaii | 0.013 | | 36. | Oregon | −0.005 |
| 12. | Massachusetts | 0.013 | | 37. | Alaska | −0.005 |
| 13. | Nebraska | 0.012 | | 38. | Virginia | −0.005 |
| 14. | North Dakota | 0.011 | | 39. | Maine | −0.005 |
| 15. | Florida | 0.010 | | 40. | Kentucky | −0.006 |
| 16. | New Jersey | 0.010 | | 41. | Mississippi | −0.006 |
| 17. | New York | 0.010 | | 42. | Tennessee | −0.007 |
| 18. | Maryland | 0.009 | | 43. | Minnesota | −0.009 |
| 19. | Connecticut | 0.008 | | 44. | Oklahoma | −0.010 |
| 20. | Indiana | 0.008 | | 45. | Alabama | −0.011 |
| 21. | Colorado | 0.008 | | 46. | Montana | −0.015 |
| 22. | Wyoming | 0.006 | | 47. | Vermont | −0.016 |
| 23. | South Carolina | 0.004 | | 48. | Idaho | −0.020 |
| 24. | Michigan | 0.004 | | 49. | Pennsylvania | −0.021 |
| 25. | West Virginia | 0.004 | | 50. | Utah | −0.060 |

Note: States with different scores may appear identical due to rounding.

75.   Stanley I. Ornstein and Dominique M. Hanssens, "Alcohol Control Laws and the Consumption of Distilled Spirits and Beer," *Journal of Consumer Research* 12, no. 2 (1985): 200–213.

76.   Björn Trolldal and William Ponicki, "Alcohol Price Elasticities in Control and License States in the United States, 1982–1999," *Addiction* 100 (2005): 1158–65. Our comparison here is from minimum to maximum values for this variable.

# ASSET FORFEITURE

**2.6%** Civil asset forfeiture is the government's ability to take a person's property by accusing him or her of a crime. Often the seized cash or proceeds of auctioning the property accrue to the seizing agency, providing incentives for "policing for profit." Typically, the person whose property is seized must file suit and prove innocence to get the property back. Both federal and state and local law enforcement engage in asset forfeiture.

We measure not only state laws, including the extent to which a few states limit federal "adoption" of state-initiated forfeiture cases, but also the amount of "equitable sharing" revenue state and local law enforcement receives from the Department of Justice in each state. A standard-deviation change in equitable-sharing forfeitures nationwide amounts to $5.9 billion. We give state forfeiture laws the same weight even though we have no consistent data on state-level forfeitures.

TABLE 23

| Rank | State | Asset Forfeiture Score | | Rank | State | Asset Forfeiture Score |
|------|-------|-----------------------|---|------|-------|-----------------------|
| 1. | New Mexico | 0.076 | | 26. | North Dakota | −0.002 |
| 2. | Nebraska | 0.053 | | 27. | Iowa | −0.002 |
| 3. | New Hampshire | 0.045 | | 28. | South Dakota | −0.002 |
| 4. | Missouri | 0.041 | | 29. | Idaho | −0.002 |
| 5. | Ohio | 0.033 | | 30. | Oklahoma | −0.002 |
| 6. | California | 0.032 | | 31. | Arizona | −0.003 |
| 7. | Maryland | 0.029 | | 32. | Texas | −0.003 |
| 8. | Oregon | 0.027 | | 33. | Alabama | −0.003 |
| 9. | Montana | 0.026 | | 34. | West Virginia | −0.003 |
| 10. | Florida | 0.026 | | 35. | New Jersey | −0.003 |
| 11. | North Carolina | 0.025 | | 36. | Kentucky | −0.004 |
| 12. | Connecticut | 0.024 | | 37. | Pennsylvania | −0.004 |
| 13. | Colorado | 0.021 | | 38. | Tennessee | −0.005 |
| 14. | Maine | 0.017 | | 39. | Washington | −0.005 |
| 15. | Vermont | 0.015 | | 40. | Hawaii | −0.005 |
| 16. | Minnesota | 0.014 | | 41. | South Carolina | −0.006 |
| 17. | Indiana | 0.012 | | 42. | Arkansas | −0.008 |
| 18. | Wisconsin | 0.010 | | 43. | Delaware | −0.009 |
| 19. | Utah | 0.010 | | 44. | Alaska | −0.009 |
| 20. | Mississippi | 0.009 | | 45. | Illinois | −0.009 |
| 21. | Michigan | 0.008 | | 46. | Kansas | −0.009 |
| 22. | Nevada | 0.006 | | 47. | Massachusetts | −0.010 |
| 23. | Wyoming | 0.004 | | 48. | New York | −0.010 |
| 24. | Louisiana | 0.001 | | 49. | Georgia | −0.011 |
| 25. | Virginia | 0.001 | | 50. | Rhode Island | −0.102 |

Note: States with different scores may appear identical due to rounding.

# MARIJUANA FREEDOM

**2.0%**

Marijuana freedom has been on the rise in the states for the last few years, and states such as Vermont, Maine, and Massachusetts will rise in the ranking in the next edition. As mentioned earlier in the section "Incarceration and Arrests for Victimless Crimes," we consider here only the lost consumer and producer surplus due to prohibition, not the costs of arrests and incarceration.

Recent work has yielded inconsistent findings on marijuana policy and consumption. Rand Corporation economist Rosalie Liccardo Pacula and her coauthors[77] find that marijuana penalties have a small impact on marijuana use among youth (a one-standard-deviation increase in minimum jail time is associated with a 1.2 percent decline in annual risk of use), but "decriminalization" or "depenalization" as such retains a small (about 2 to 3 percent) effect even when these penalty variables are controlled for, which the authors cannot explain. In a different study, Pacula and her colleagues[78] find that reduced penalties for users increase consumption and therefore price, resulting in higher profits for sellers. They also calculate that prohibition probably doubles the price of a pound of marijuana, at least (adding $200 to $300 to the cost).

A reasonable estimate of the amount of marijuana sold in the United States in a year is 50 million pounds.[79] Unfortunately, there is absolutely no evidence on the consequences of supplier penalties. We conservatively assume total seller profits of $200 per pound (including compensation for risk). We estimate the new consumer surplus conservatively, assuming a price elasticity of demand of −0.2 (like alcohol) and unit elasticity of supply.

Looking at decriminalization of small-scale possession first, we assume this policy boosts consumption by 3 percent, which implies a transaction-cost tax of roughly 15 percent. We then calculate the deadweight loss and the forgone producer surplus, assuming a price per pound of $330. This underestimate is small because decriminalization also correlates with strength of criminal penalties, which Pacula et al.[80] find affect consumption. Moving from criminalization to decriminalization nationwide should then increase consumer and producer welfare by about $2.3 billion. Our coding of this variable assumes that the benefits of full legalization of possession are about five times as large.

The most important variable in the marijuana freedom category is our index of medical marijuana laws, which takes into account the scope of qualifying conditions, the maximum amount permitted, whether home cultivation is permitted, and whether dispensaries are permitted. Pacula et al. find that some features of medical marijuana laws, such as home cultivation and (especially) dispensaries, may increase overall consumption, but their results are not easily interpretable in a supply-and-demand model, nor are they generally statistically significant.[81] Other research has found no effect on consumption.[82] But several studies now seem to show that legal dispensaries result in lower prices by shifting out the supply curve. Wen, Hockenberry, and Cummings find that allowing nonspecific pain as a reason for medical marijuana recommendations increases use by those over age 21 significantly.[83] The bottom line is that the total effect of medical marijuana laws on consumption is modest, probably a bit more than decriminalization, but much is unknown. We choose a weight for this variable of 1.5 times that for decriminalization.

The next most important variable is the maximum penalty for a single marijuana offense not involving a minor, which in some states is life in prison. These penalties depress supply and raise price. We also include whether high-level possession or cultivation of cannabis is a misdemeanor or a felony and any mandatory minimum sentence for "low-level" cultivation or sale. All these variables are assumed together to have a similar effect on decriminalization of possession.

The next most important variable is whether some recreational cannabis sales are legal. Recreational sales of marijuana in Colorado, the first state to implement legal recreational sales, have not decreased medical marijuana sales.[84] It is unclear what the effect has been on total sales—that is, whether legalization simply reduces the black market or also increases total consumption. Even under the former scenario, the big increase in recreational sales over time suggests that many consumers benefit by buying on the legal market rather than the black market. In the 12 months through June 2015, legal recreational sales amounted to about $450 million in Colorado. Assume 20 percent of that reflects producer costs (a common statistic is that in the absence of prohibition and any taxes, the price of marijuana would fall by 80 percent). The remainder reflects producer and consumer surplus.

---

77.   Rosalie Liccardo Pacula et al., "Marijuana Decriminalization: What Does It Mean in the United States?," NBER Working Paper no. 9690, National Bureau of Economic Research, Cambridge, MA, May 2003, http://www.nber.org/papers/w9690.

78.   Rosalie Liccardo Pacula et al., "Risks and Prices: The Role of User Sanctions in Marijuana Markets," NBER Working Paper no. 13415, National Bureau of Economic Research, Cambridge, MA, September 2007, http://www.nber.org/papers/w13415.

79.   Jon Gettman, "Lost Taxes and Other Costs of Marijuana Laws," DrugScience.org, 2007, http://www.drugscience.org/Archive/bcr4/5Supply.html.

80.   Pacula et al., "Marijuana Decriminalization."

81.   Rosalie Liccardo Pacula et al., "Assessing the Effects of Medical Marijuana Laws on Marijuana and Alcohol Use: The Devil Is in the Details," NBER Working Paper no. 19302, National Bureau of Economic Research, Cambridge, MA, August 2013.

82.   Rosalie Liccardo Pacula and Eric L. Sevigny, "Marijuana Legalization Policies: Why We Can't Learn Much from Policy Still in Motion," *Journal of Policy Analysis and Management* 33, no. 1 (2014): 212–21.

83.   Hefei Wen, Jason M. Hockenberry, and Janet R. Cummings, "The Effect of Medical Marijuana Laws on Adolescent and Adult Use of Marijuana, Alcohol, and Other Substances," *Journal of Health Economics* 42, issue C (2015): 64–80.

84.   Ricardo Baca, "Colorado Pot Sales Spike in June, Top $50 Million for First Time," *Cannabist*, August 13, 2015, http://www.thecannabist.co/2015/08/13/colorado-marijuana-taxes-recreational-sales-june-2015-50-million/39384/.

We assume one-quarter of that surplus is because of the legalization of sales specifically, rather than possession and cultivation. After adjusting for national population, we estimate then that legalizing some marijuana sales would create $5.4 billion of benefit nationally.

Finally, we consider the effect of *Salvia divinorum* bans within this category. A 2006 study found that 750,000 people used salvia in that year, compared with 26 million marijuana users per year.[85]  Therefore, we add together all the marijuana weights and multiply by 0.75/26. An objection to this strategy is that the variance among states is greater on salvia policy, so this weight understates the importance of the policy (in no state is marijuana completely unregulated). On the other hand, the per-user quantity of salvia consumed is surely much lower than for marijuana, so this weight may overstate the importance of the policy. Because we cannot assess the relative magnitudes of these biases, we simply assume that they cancel out. Salvia bans are therefore worth less than 0.1 percent of the index.



TABLE 24

| Rank | State | Marijuana Freedom Score | | Rank | State | Marijuana Freedom Score |
|---|---|---|---|---|---|---|
| 1. | California | 0.063 | | 26. | Pennsylvania | 0.003 |
| 2. | Alaska | 0.060 | | 27. | New Jersey | 0.003 |
| 3. | Oregon | 0.058 | | 28. | Florida | 0.002 |
| 4. | Washington | 0.057 | | 29. | North Carolina | −0.003 |
| 5. | Colorado | 0.054 | | 30. | Idaho | −0.004 |
| 6. | Nevada | 0.050 | | 31. | Utah | −0.004 |
| 7. | Maine | 0.026 | | 32. | Kansas | −0.005 |
| 8. | Massachusetts | 0.021 | | 33. | Indiana | −0.005 |
| 9. | Maryland | 0.019 | | 34. | West Virginia | −0.006 |
| 10. | Vermont | 0.015 | | 35. | Wisconsin | −0.006 |
| 11. | Michigan | 0.013 | | 36. | Kentucky | −0.006 |
| 12. | New Mexico | 0.012 | | 37. | Wyoming | −0.007 |
| 13. | Delaware | 0.012 | | 38. | Nebraska | −0.007 |
| 14. | Illinois | 0.011 | | 39. | Mississippi | −0.007 |
| 15. | Ohio | 0.010 | | 40. | South Dakota | −0.008 |
| 16. | Hawaii | 0.010 | | 41. | South Carolina | −0.008 |
| 17. | Rhode Island | 0.010 | | 42. | Iowa | −0.009 |
| 18. | New York | 0.009 | | 43. | Tennessee | −0.011 |
| 19. | New Hampshire | 0.008 | | 44. | Georgia | −0.011 |
| 20. | Arizona | 0.008 | | 45. | Texas | −0.012 |
| 21. | Minnesota | 0.007 | | 46. | Missouri | −0.012 |
| 22. | Connecticut | 0.007 | | 47. | Louisiana | −0.013 |
| 23. | Montana | 0.006 | | 48. | Alabama | −0.014 |
| 24. | Arkansas | 0.006 | | 49. | Oklahoma | −0.014 |
| 25. | North Dakota | 0.004 | | 50. | Virginia | −0.014 |

Note: States with different scores may appear identical due to rounding.

---

85.   National Survey on Drug Use and Health, "Use of Specific Hallucinogens: 2006," *NSDUH Report,* February 14, 2008, http://archive.samhsa.gov/data/2k8/hallucinogens/hallucinogens.htm.

# TOBACCO FREEDOM

**1.8%** In the tobacco freedom category, representing 1.8 percent of the index, we consider the effect of cigarette taxes, minimum legal sale age of 21, smoking bans (in privately owned workplaces, restaurants, and bars), vending machine bans, and internet sales regulations on freedom.

Cigarette taxes are the most important variable in this category. A $1-per-pack tax increase is associated with about a 16.7 percent increase in the price of a pack.[86] Nobel Prize–winning economist Gary S. Becker and his colleagues calculate that the long-run price elasticity of demand for cigarettes is about −0.75.[87] In 2010, 303 billion cigarettes were sold in the United States, typically at 20 cigarettes per pack.[88] These facts are sufficient to calculate the deadweight loss (dividing by two under the assumption of perfectly elastic supply) and the total cost to consumers. As with alcohol taxes, we divide the latter element by 2.5 to capture the fact that taxes have the conditional consent of some taxpayers, but not by 4 as we did for general taxes (see discussion in the "Fiscal Policy" section), because "sin taxes" disproportionately hit consumers of these products, who are more likely to be opposed to high taxes on the goods they consume.

Economics professor Michael L. Marlow examines the consequences of Ohio's comprehensive smoking ban for its losers. State and local governments issued 33,347 citations, with an average expense of about $1,250 per citation (given that each cited location averaged about five citations).[89] Extrapolating from Ohio's population supplies the national numbers for the freedom index.

The second set of costs from smoking bans has to do with lost business and the associated disutility to smokers. There is an unfortunate lack of good studies with quasi-random treatment; however, a reasonable assumption is that the costs of bans must be at least as high as (and possibly much greater than) the fines establishments are willing to risk to permit smoking. Thus, a simple approach is to multiply an estimate of this amount by 2.5, assuming that the lost revenue is slightly greater than the fines businesses are willing to incur. Because bars are affected by smoking bans much more than restaurants and workplaces are, we assign 80 percent of the weight to smoking bans in bars and 10 percent each to the latter bans.

Banning 18- to 20-year-olds from buying tobacco products nationwide could eliminate about $5 billion of annual sales. Assuming the price elasticity of demand is −0.2, the lost consumer surplus is about 2.5 times that.

Vending machine and internet sales regulations are together worth less than 0.1 percent of the index.

86. Ann Boonn, "State Cigarette Excise Tax Rates and Rankings," Campaign for Tobacco-Free Kids, Washington, DC, December 13, 2012, http://www.tobaccofreekids.org/research/factsheets/pdf/0097.pdf.

87. Gary S. Becker, Michael Grossmann, and Kevin M. Murphy, "Rational Addiction and the Effect of Price on Consumption," *American Economic Review* 81, no. 2 (1991): 237–41.

88. "Economic Facts about U.S. Tobacco Production and Use," Centers for Disease Control and Prevention, November 15, 2012, http://www.cdc.gov/tobacco/data_statistics/fact_sheets/economics/econ_facts/.

89. Michael L. Marlow, "The Economic Losers from Smoking Bans," *Regulation*, Summer 2010, pp. 14–19, http://www.cato.org/sites/cato.org/files/serials/files/regulation/2010/6/regv33n2-4.pdf.

**TABLE 25**

| Rank | State | Tobacco Freedom Score | | Rank | State | Tobacco Freedom Score |
|------|-------|------|---|------|-------|------|
| 1. | Georgia | 0.013 | | 26. | New Mexico | −0.008 |
| 2. | Virginia | 0.012 | | 27. | Delaware | −0.009 |
| 3. | Idaho | 0.011 | | 28. | Ohio | −0.009 |
| 4. | Kentucky | 0.011 | | 29. | New Hampshire | −0.009 |
| 5. | Wyoming | 0.010 | | 30. | Montana | −0.010 |
| 6. | South Carolina | 0.010 | | 31. | Utah | −0.010 |
| 7. | Mississippi | 0.009 | | 32. | Alaska | −0.011 |
| 8. | North Carolina | 0.009 | | 33. | Maine | −0.014 |
| 9. | Alabama | 0.008 | | 34. | Arizona | −0.014 |
| 10. | North Dakota | 0.008 | | 35. | Maryland | −0.014 |
| 11. | Tennessee | 0.008 | | 36. | Michigan | −0.014 |
| 12. | Nebraska | 0.006 | | 37. | Kansas | −0.018 |
| 13. | Arkansas | 0.004 | | 38. | Pennsylvania | −0.020 |
| 14. | Colorado | 0.003 | | 39. | Wisconsin | −0.022 |
| 15. | Oklahoma | 0.003 | | 40. | New Jersey | −0.024 |
| 16. | Indiana | 0.003 | | 41. | California | −0.025 |
| 17. | Missouri | 0.003 | | 42. | Illinois | −0.028 |
| 18. | Louisiana | 0.002 | | 43. | Minnesota | −0.028 |
| 19. | West Virginia | 0.001 | | 44. | Washington | −0.029 |
| 20. | Florida | −0.002 | | 45. | Vermont | −0.030 |
| 21. | Texas | −0.002 | | 46. | Rhode Island | −0.039 |
| 22. | Iowa | −0.004 | | 47. | Connecticut | −0.041 |
| 23. | Oregon | −0.005 | | 48. | Massachusetts | −0.049 |
| 24. | Nevada | −0.005 | | 49. | Hawaii | −0.060 |
| 25. | South Dakota | −0.008 | | 50. | New York | −0.062 |

Note: States with different scores may appear identical due to rounding.

# MALA PROHIBITA

## 1.2%

The term *mala prohibita* refers to acts defined as criminal in statute, even though they are not harms in common law (*mala in se*). This category is a grab bag of mostly unrelated policies, including raw milk laws, fireworks laws, prostitution laws, physician-assisted suicide laws, religious freedom restoration acts, rules on taking DNA samples from criminal suspects without a probable cause hearing, trans-fat bans, state equal rights amendments, mixed martial arts legalization, and, new to this edition, bans on racial preferences in the public sector.[90]

Of these, the policies with the greatest potential cost to victims are racial preferences in the public sector (more than half of this category), prostitution prohibition, and trans-fat bans.

The biggest effect of state affirmative action bans appears to be in public university admissions.[91] White and Asian enrollment appears to grow about 5 percent when affirmative action is banned. The annual benefit to these students of attending a preferred college is probably on the order of, say, $5,000—that is, a fraction of typical public tuition.

If Nevada-style policies legalizing but regulating brothels were in effect nationwide, the industry would garner an estimated $5 billion in revenue, a comparatively small sum compared with other vice industries such as alcohol, gambling, tobacco, and even marijuana.[92]

After racial preferences in the public sector and prostitution prohibition, next most important is California's restaurant trans-fat ban, which, if implemented nationwide, would cost consumers—at a reasonable estimate—more than $3.5 billion worth of pleasure a year.[93] Next is the legalization of raw milk, then legalization of mixed martial arts, followed closely by fireworks laws. Then comes physician-assisted suicide, which receives the "times five" constitutional weighting factor, since the Montana constitution has been held to protect a right thereto. Rounding out this category, in order, are state equal rights amendments, state DNA database laws, and religious freedom restoration acts.

**TABLE 26**

| Rank | State | *Mala Prohibita* Score | | Rank | State | Score |
|------|-------|------------------------|---|------|-------|-------|
| 1. | Nebraska | 0.027 | | 26. | Kentucky | −0.002 |
| 2. | Arizona | 0.027 | | 26. | Tennessee | −0.002 |
| 3. | Oklahoma | 0.027 | | 28. | Indiana | −0.002 |
| 4. | Michigan | 0.026 | | 29. | Maine | −0.002 |
| 5. | California | 0.020 | | 29. | Minnesota | −0.002 |
| 6. | Washington | 0.014 | | 31. | Idaho | −0.002 |
| 7. | New Hampshire | 0.013 | | 32. | Virginia | −0.002 |
| 8. | Florida | 0.012 | | 33. | Wisconsin | −0.002 |
| 9. | Nevada | 0.008 | | 34. | Massachusetts | −0.002 |
| 10. | New Mexico | 0.001 | | 35. | Kansas | −0.002 |
| 11. | Oregon | 0.000 | | 36. | New York | −0.002 |
| 12. | Wyoming | −0.001 | | 37. | Maryland | −0.002 |
| 13. | Colorado | −0.001 | | 38. | Alabama | −0.002 |
| 14. | Pennsylvania | −0.001 | | 39. | Louisiana | −0.002 |
| 15. | Connecticut | −0.001 | | 40. | West Virginia | −0.002 |
| 16. | Vermont | −0.001 | | 41. | South Dakota | −0.002 |
| 17. | Utah | −0.001 | | 42. | Georgia | −0.002 |
| 18. | Montana | −0.001 | | 43. | Hawaii | −0.003 |
| 19. | Illinois | −0.001 | | 44. | North Dakota | −0.003 |
| 20. | South Carolina | −0.001 | | 45. | Rhode Island | −0.003 |
| 21. | Missouri | −0.002 | | 46. | North Carolina | −0.003 |
| 21. | Texas | −0.002 | | 47. | Iowa | −0.003 |
| 23. | Alaska | −0.002 | | 48. | Ohio | −0.003 |
| 24. | Arkansas | −0.002 | | 49. | Delaware | −0.004 |
| 24. | Mississippi | −0.002 | | 50. | New Jersey | −0.004 |

Note: States with the same rank are tied.

90. To be clear, we do not necessarily condone prostitution, but we defend the rights of willing adults to engage in consensual exchange of sex. We completely condemn all nonconsensual sex trafficking as unjust and deserving of legal prohibition.

91. Hayley Munguia, "Here's What Happens When You Ban Affirmative Action in College Admissions, FiveThirtyEight, December 9, 2015, https://fivethirtyeight.com/features/heres-what-happens-when-you-ban-affirmative-action-in-college-admissions/.

92. Daria Snadowsky, "The Best Little Whorehouse Is Not in Texas: How Nevada's Prostitution Laws Serve Public Policy, and How Those Laws May Be Improved," *Nevada Law Journal* 6 (2005): 217–19.

93. *The Becker-Posner Blog*, "Comment on the New York Ban on Trans Fats," blog entry by Gary Becker, December 21, 2006, http://www.becker-posner-blog.com/2006/12/comment-on-the-new-york-ban-on-trans-fats--becker.html.

# TRAVEL FREEDOM

**1.1%** Two variables—the use and retention of automated license plate reader data and the availability of driver's licenses to those without Social Security numbers (such as undocumented workers)—together make up about half of the travel freedom category's total weight in the index.

There are about 11.1 million undocumented immigrants in the United States, and we assume that 60 percent of them would be willing to get driver's licenses, slightly lower than the rate of licensed drivers in the general population. We then assume the mean value of a license per driver per year is $750. For automated license plate readers, we assume that the average driver, of whom there are 210 million in the United States, would be willing to pay $15 a year to avoid being subject to their unlimited use.

Seat belt laws are weighted on the basis of estimated costs of tickets. A fingerprint or thumbprint requirement for a driver's license is worth slightly less.

Suspicionless sobriety checkpoints invade privacy and create anxiety among those stopped and searched. Extrapolating from two different sources, we estimate about 9 million drivers a year are searched at sobriety checkpoints nationwide, or would be if checkpoints were legal nationwide. We assume a cost of $20 per driver searched in lost time, lost privacy, and anxiety. We multiply the variable by five because some state constitutions prohibit these checkpoints.

After that come uninsured/underinsured motorist insurance coverage requirements, motorcycle helmet laws, open-container laws, and bans on driving while using a cell phone, in that order.

These variables were included in previous editions of *Freedom in the 50 States*, and some of them generated a fair amount of comments by readers and audience members at public presentations. In particular, it was argued that some of these variables seem to be justified on the grounds of enhancing public safety. But not every measure that enhances public safety is morally justifiable—consider random searches of pedestrians. A preferable approach would use penalties for "distracted driving" of whatever cause, rather than a blanket ban on using a handheld phone while driving, which does not always pose a risk to others. Likewise, it would be better to focus on penalties for drunk driving rather than punishing people for having opened beverage containers in their vehicles, another behavior that does not necessarily pose a direct risk to others. In states with a federally conforming open-container law, having an unsealed but closed wine bottle on the floor of the passenger side of a car is sufficient to trigger a misdemeanor violation and possible jail time.

No state does extremely well on travel freedom. Utah scores at the top despite having sobriety checkpoints, an open-container law, and a primary-enforcement seat belt law, because it is one of the few states allowing someone to obtain a driver's license without a Social Security number and places some limits on automated license plate reader data retention and, unlike number two Vermont, does not mandate underinsured motorist coverage.

**TABLE 27**

| Rank | State | Travel Freedom Score | | Rank | State | Travel Freedom Score |
|------|-------|----------------------|---|------|-------|----------------------|
| 1. | Utah | 0.010 | | 26. | Virginia | −0.003 |
| 2. | Vermont | 0.009 | | 27. | Alaska | −0.003 |
| 3. | Colorado | 0.008 | | 27. | Iowa | −0.003 |
| 4. | Nevada | 0.007 | | 27. | Michigan | −0.003 |
| 5. | California | 0.007 | | 27. | Rhode Island | −0.003 |
| 6. | Maryland | 0.007 | | 31. | Wisconsin | −0.003 |
| 7. | Washington | 0.007 | | 32. | North Dakota | −0.003 |
| 8. | New Hampshire | 0.007 | | 32. | South Dakota | −0.003 |
| 9. | Delaware | 0.006 | | 34. | Missouri | −0.004 |
| 10. | New Mexico | 0.006 | | 35. | North Carolina | −0.004 |
| 11. | Connecticut | 0.005 | | 36. | Massachusetts | −0.004 |
| 12. | Illinois | 0.005 | | 37. | Indiana | −0.004 |
| 13. | Hawaii | 0.004 | | 37. | Kansas | −0.004 |
| 14. | Arkansas | 0.003 | | 37. | Kentucky | −0.004 |
| 15. | Maine | 0.002 | | 40. | Nebraska | −0.005 |
| 16. | Idaho | 0.000 | | 41. | South Carolina | −0.005 |
| 16. | Wyoming | 0.000 | | 42. | Mississippi | −0.005 |
| 18. | Minnesota | −0.001 | | 43. | Oregon | −0.005 |
| 19. | Florida | −0.001 | | 44. | New Jersey | −0.006 |
| 19. | Oklahoma | −0.001 | | 45. | Alabama | −0.006 |
| 21. | Arizona | −0.002 | | 45. | Georgia | −0.006 |
| 21. | Montana | −0.002 | | 45. | Louisiana | −0.006 |
| 21. | Ohio | −0.002 | | 48. | New York | −0.007 |
| 21. | Pennsylvania | −0.002 | | 48. | West Virginia | −0.007 |
| 25. | Tennessee | −0.002 | | 50. | Texas | −0.007 |

Note: States with the same rank are tied.

# CAMPAIGN FINANCE

**0.1%** Citizens should have the right to express and promote their political opinions in a democracy, including their support for or opposition to candidates for office. By regulating contributions to parties and candidates, governments effectively limit citizens' ability to spread their ideas.

The campaign finance policy category covers public financing of campaigns and contribution limits (individuals to candidates, individuals to parties, an index of individuals to political action committees [PACs] and PACs to candidates, and an index of individuals to PACs and PACs to parties). Although these policies receive "constitutional weights" boosting them by a factor of 10 because of their First Amendment implications, they receive low weights even so because there is not much evidence that current contribution limits significantly reduce private actors' involvement in politics, unless the limits are extremely low (and Vermont's extremely low limits were struck down by the U.S. Supreme Court in 2006).[94]

Also, there just is not much money in state elections, even in states without contribution limits. According to the National Institute on Money in State Politics, in the last three election cycles, nationwide individual contributions to state legislative candidates amounted to about $850 million per two-year cycle, or less than $3 per person in the country.[95] Finally, even being prevented from making, say, a $1,000 donation to a candidate does not result in a $1,000 loss to the frustrated donor because the donor can put those funds to a different use. The freedom index assumes a utility loss equivalent to 10 percent of the planned contribution when calculating victim cost. In sum, the nationwide victim losses from state campaign finance restrictions come to a figure in the tens of millions of dollars a year, at most.

TABLE 28

| Rank | State | Campaign Finance Freedom Score | Rank | State | Campaign Finance Freedom Score |
|------|-------|-------|------|-------|-------|
| 1. | Indiana | 0.001 | 26. | Ohio | 0.000 |
| 1. | Mississippi | 0.001 | 27. | North Carolina | 0.000 |
| 1. | Missouri | 0.001 | 28. | Illinois | 0.000 |
| 1. | Nebraska | 0.001 | 29. | South Carolina | 0.000 |
| 1. | North Dakota | 0.001 | 30. | South Dakota | 0.000 |
| 1. | Oregon | 0.001 | 31. | New York | 0.000 |
| 1. | Pennsylvania | 0.001 | 32. | Michigan | 0.000 |
| 1. | Texas | 0.001 | 33. | Maryland | 0.000 |
| 9. | Virginia | 0.001 | 34. | California | 0.000 |
| 10. | Alabama | 0.001 | 35. | Delaware | 0.000 |
| 10. | Iowa | 0.001 | 36. | Louisiana | 0.000 |
| 10. | Utah | 0.001 | 37. | Vermont | 0.000 |
| 13. | Wyoming | 0.000 | 38. | Rhode Island | −0.001 |
| 14. | Nevada | 0.000 | 39. | Kansas | −0.001 |
| 15. | New Mexico | 0.000 | 40. | New Jersey | −0.001 |
| 16. | Tennessee | 0.000 | 41. | Hawaii | −0.001 |
| 17. | Georgia | 0.000 | 42. | Alaska | −0.001 |
| 18. | Idaho | 0.000 | 43. | New Hampshire | −0.001 |
| 19. | Montana | 0.000 | 44. | Oklahoma | −0.001 |
| 20. | Washington | 0.000 | 45. | Wisconsin | −0.001 |
| 21. | Florida | 0.000 | 46. | West Virginia | −0.001 |
| 22. | Minnesota | 0.000 | 47. | Kentucky | −0.001 |
| 23. | Maine | 0.000 | 48. | Massachusetts | −0.001 |
| 24. | Arkansas | 0.000 | 49. | Colorado | −0.001 |
| 25. | Arizona | 0.000 | 50. | Connecticut | −0.001 |

Note: States with the same rank are tied.

94.   *Randall v. Sorrell*, 548 U.S. 230 (2006).
95.   National Institute on Money in State Politics website, http://www.followthemoney.org.

# OVERALL PERSONAL FREEDOM RANKING

**34.1%** The top states in the personal freedom dimension tend to be more western and northeastern, while the bottom states are mostly socially conservative and southern. In past editions, we have found a strong rural–urban division, but that factor has diminished with the new weights, particularly on gun rights and asset forfeiture. One reason for the rural–urban relationship is likely voters' fears of crime, which leads them to support harsh policing and prosecutorial tactics, stricter drug and gun laws, and more limits on civil liberties. However, no statistical relationship exists between personal freedom and actual crime rates. It is well known that public perceptions of crime can diverge widely from the truth.[96] An alternative explanation is that there are more negative externalities of personal behavior in urban settings. But if that were the case, one would also expect urbanized states to have more economic regulation and higher taxation, and they do not. Socially conservative states tend to restrict alcohol, gambling, marijuana, and marriage freedoms but permit greater freedom in education and have more respect for gun rights and for private property on smoking policy.

**TABLE 29**

| Rank | State | Overall Personal Freedom Score |
|------|-------|-------------------------------|
| 1. | Maine | 0.246 |
| 2. | Nevada | 0.226 |
| 3. | New Mexico | 0.225 |
| 4. | Colorado | 0.197 |
| 5. | New Hampshire | 0.192 |
| 6. | Alaska | 0.183 |
| 7. | Vermont | 0.159 |
| 8. | Washington | 0.155 |
| 9. | Oregon | 0.152 |
| 10. | Indiana | 0.134 |
| 11. | Florida | 0.125 |
| 12. | West Virginia | 0.125 |
| 13. | Montana | 0.121 |
| 14. | Arizona | 0.116 |
| 15. | Minnesota | 0.115 |
| 16. | Maryland | 0.114 |
| 17. | North Carolina | 0.111 |
| 18. | Iowa | 0.110 |
| 19. | Missouri | 0.108 |
| 20. | Ohio | 0.103 |
| 21. | Kansas | 0.101 |
| 22. | Illinois | 0.098 |
| 23. | California | 0.097 |
| 24. | Massachusetts | 0.096 |
| 25. | Michigan | 0.089 |

| Rank | State | Overall Personal Freedom Score |
|------|-------|-------------------------------|
| 26. | Nebraska | 0.084 |
| 27. | North Dakota | 0.063 |
| 28. | Pennsylvania | 0.054 |
| 29. | Wisconsin | 0.052 |
| 30. | Louisiana | 0.042 |
| 31. | Rhode Island | 0.042 |
| 32. | Utah | 0.040 |
| 33. | New Jersey | 0.039 |
| 34. | Mississippi | 0.036 |
| 35. | Georgia | 0.032 |
| 36. | Delaware | 0.024 |
| 37. | South Dakota | 0.022 |
| 38. | Virginia | 0.021 |
| 39. | Connecticut | 0.015 |
| 40. | New York | 0.015 |
| 41. | South Carolina | 0.014 |
| 42. | Wyoming | 0.005 |
| 43. | Idaho | 0.001 |
| 44. | Oklahoma | −0.002 |
| 45. | Tennessee | −0.014 |
| 46. | Kentucky | −0.016 |
| 47. | Arkansas | −0.021 |
| 48. | Hawaii | −0.021 |
| 49. | Alabama | −0.023 |
| 50. | Texas | −0.044 |

Note: States with different scores may appear identical due to rounding.

96.   Lydia Saad, "Perceptions of Crime Problem Remain Curiously Negative," Gallup, October 22, 2007, http://www.gallup.com/poll/102262/perceptions-crime-problem-remain-curiously-negative.aspx; University of Texas, "Public Perception of Crime Remains Out of Sync with Reality, Criminologist Contends," November 10, 2008, https://news.utexas.edu/2008/11/10/crime.

Figure 8 shows state average personal freedom scores over time. This is the chain-linked index excluding federalized policies such as same-sex marriage, sodomy laws, and removal of local gun bans. After personal freedom dropped nationwide between 2000 and 2008, partially due to a wave of new tobacco restrictions, it has grown even more substantially since 2010, due in large part to ballot initiatives loosening marijuana regulations, to the spread of legal gambling, and to legislative criminal justice and asset forfeiture reforms. If we were to plot the average personal freedom scores including federalized scores, the improvement in personal freedom would be even more dramatic, as judicial engagement on personal freedoms has generally enhanced rather than reduced them.

**FIGURE 8**  State Average Personal Freedom Scores Over Time



**OVERALL FREEDOM RANKING**

TABLE 30

| Rank | State | Overall Freedom Score | | Rank | State | Overall Freedom Score |
|------|-------|-----------------------|---|------|-------|-----------------------|
| 1. | Florida | 0.481 | | 26. | Nebraska | 0.051 |
| 2. | New Hampshire | 0.432 | | 27. | Iowa | 0.042 |
| 3. | Indiana | 0.342 | | 28. | Alabama | 0.042 |
| 4. | Colorado | 0.334 | | 29. | South Carolina | 0.032 |
| 5. | Nevada | 0.324 | | 30. | Louisiana | 0.016 |
| 6. | North Dakota | 0.266 | | 31. | Arkansas | 0.015 |
| 7. | Tennessee | 0.264 | | 32. | Kentucky | −0.012 |
| 8. | South Dakota | 0.258 | | 33. | Connecticut | −0.018 |
| 9. | Arizona | 0.231 | | 34. | West Virginia | −0.019 |
| 10. | Kansas | 0.216 | | 35. | Illinois | −0.023 |
| 11. | Missouri | 0.205 | | 36. | Washington | −0.026 |
| 12. | Georgia | 0.184 | | 37. | Minnesota | −0.036 |
| 13. | Virginia | 0.173 | | 38. | Wyoming | −0.039 |
| 14. | Michigan | 0.158 | | 39. | Maine | −0.060 |
| 15. | Alaska | 0.153 | | 40. | Mississippi | −0.066 |
| 16. | Montana | 0.150 | | 41. | New Mexico | −0.068 |
| 17. | Idaho | 0.147 | | 42. | Rhode Island | −0.087 |
| 18. | North Carolina | 0.138 | | 43. | Delaware | −0.117 |
| 19. | Oklahoma | 0.127 | | 44. | Oregon | −0.133 |
| 20. | Pennsylvania | 0.116 | | 45. | Maryland | −0.209 |
| 21. | Texas | 0.093 | | 46. | Vermont | −0.270 |
| 22. | Utah | 0.091 | | 47. | New Jersey | −0.357 |
| 23. | Massachusetts | 0.089 | | 48. | California | −0.406 |
| 24. | Wisconsin | 0.074 | | 49. | Hawaii | −0.604 |
| 25. | Ohio | 0.066 | | 50. | New York | −0.813 |

Note: States with different scores may appear identical due to rounding.

# OVERALL FREEDOM RANKING

The weighted sum of all the variables is used to produce the overall freedom ranking of the states. The overall freedom scores rate states on how free they are relative to other states. A score of 1 would correspond to a state's being one standard deviation above average in every single variable, although in reality, every state scores better on some variables and worse on others. A score of 0 would be equivalent to a state's being absolutely average on every variable, and a score of −1 to a state's being one standard deviation below average on every variable. Table 30 presents the overall freedom rankings as of year-end 2016.

Florida and New Hampshire now significantly outpace the rest of the top five states, which are clustered together: Indiana, Colorado, and Nevada. States that have always done well in our index—such as the Dakotas, Arizona, and Tennessee—again find themselves in the top 10. New York is the least free state, as it has been in every version of the index and every year of this index since 2000. Hawaii has fallen enough to put itself well under California now. New Jersey and Vermont round out the bottom five. Because states' freedom scores represent their situation at the beginning of the year 2017, they include changes made by legislatures that in most states were elected in November 2014. Figure 9 shows the evolution of the top and bottom states over time using the chain-link index, so that it focuses specifically on decisions made by state governments and voters. Note that the legend arranges the top five states in descending order of their 2016 scores and the bottom five in ascending order of their 2016 scores.

The Granite State began at number one at the start of our time series in 2000, ahead of Tennessee, which is no longer in the top five. Freedom in New Hampshire declined substantially with the legislatures elected in 2006 and 2008, then recovered all the ground it lost in those years in the legislature elected in 2010. The legislature elected in 2012 diminished freedom slightly, but the 2014-elected legislature then increased it again even more. Today freedom stands at the level it did in 2001.

Florida's rise since 2009 has been nothing short of stunning. While most states have improved on freedom in that time if federalized policies are excluded, Florida's post-2010 improvement has been the third greatest in

the United States (after Wisconsin and Alaska). Florida's improvement has lain almost entirely in fiscal policy, where the numbers tell a consistent story: government consumption, local taxes, state taxes, debt, and government employment have all fallen as a share of the private economy. The only area of deterioration in fiscal policy has been liquid assets, which have fallen slightly.

Indiana has risen to the number three slot with slow and steady reform. The Hoosier State began well enough in 2000 (third place), but the legislature elected in 2002 brought down the freedom score significantly. Freedom climbed back during the legislatures elected in 2008 and 2010. Educational freedom is one area in which Indiana has truly been a national leader in recent years.

Colorado was in sixth place on freedom in 2000 and managed to avoid the problems most other states had in the first half of the 2000s. By 2008, Colorado was up to third on the chain-link index. By the end of 2009, freedom had fallen enough to knock the Centennial State into seventh on this metric. The legislatures elected in 2010 and 2012 did much to get Colorado back on track, though they also had some help from the ballot initiative. At the end of 2013 and 2014, Colorado was second on personal freedom, the state's best-ever place. (It is now down to fourth, but only because other states have improved more since then.)

Nevada was the number-two state on freedom from 2002 to 2005. But after the 2006 elections, it began to drop dramatically, due almost entirely to falling fiscal policy scores. By 2011, it was down to 11th on the chain-link index. Since then, it has clawed its way back into the top five, due mostly to improvement in personal freedom, on which Nevada rose from seventh in 2012 to second today. Marijuana legalization, driver's privilege cards for the undocumented, a tax credit scholarship law, and moderate but sustained declines in incarceration and victimless crimes arrest rates are major factors in that growth.

Residents of these states have much to be proud of, and the rest of us should be more willing to look to states like Florida, New Hampshire, Indiana, and Colorado as models to emulate. When it comes to the bottom states, we see that the Empire State has consistently placed last by a wide margin. The difference between the scores for New York and Florida corresponds to one and a third standard deviations on every single variable. New York also performs poorly across the board, ranking at or near the bottom in all three dimensions of freedom. Thus, New Yorkers feel the heavy hand of government in every area of their lives. Is it any wonder that people are fleeing the state in droves? According to Internal Revenue Service state-to-state migration data, about 1.3 million people, on net, fled New York for other states between 2000 and 2012, 9.3 percent of the state's 2000 population (the



**FIGURE 9**  Freedom Evolution of Selected States

IRS's measure of "people" is exemptions claimed on tax filings). In calendar year 2015–16 alone, 166,000 more people moved from New York to another state than moved in.[97] Foreign immigration still represents a source of population growth for New York, but overall population growth remains well below the national average.

We continue to watch California's resurgence with interest. From 2000 to 2012, California had the worst real personal income growth performance of any state other than Michigan. Since then, the economy has recovered somewhat. We also show that California's fiscal policy has improved substantially since 2011 due to reductions in government consumption and employment, debt, and local tax burden. Some of this improvement started even earlier; local tax burden began to decline in 2009. California's personal freedom has also grown, but other states have improved even faster in that dimension.

Hawaii is a more cautionary tale. The Aloha State has declined gradually since the Great Recession, and this decline is even more precipitous once we take into account the effects of the PPACA, because Hawaii formerly had one of the most free-market health insurance systems in the country. Fiscal policy accounts for about half of the decline, due to big tax increases in 2011 and 2012. Land-use, labor, and property and casualty insurance regulations have also gotten tougher since 2013. Since 2011, real income and income per capita growth have lagged the rest of the country, and Hawaii's real per capita income is now at about the level of that of West Virginia.

Figure 10 plots each state's personal freedom score against its economic freedom score. There is no statistical relationship between personal and economic freedom; they are uncorrelated. The top states on overall freedom are all states that do well on both economic and personal freedom. However, there are still a few states in the top 10 that do relatively poorly on personal freedom but outstandingly well on economic freedom, such as Tennessee and the Dakotas.

The outlier states are instructive. In the bottom part of the lower-right quadrant, we see economically freer, personally less-free states such as Idaho, South Dakota, Oklahoma, Georgia, Texas, Alabama, and Tennessee. Texas is a paradigmatic case, finishing last in personal freedom despite a top-10 economic freedom score. Texans may be unhappy with their last-place personal freedom showing, but it reflects poor criminal justice policies and the fact that the Lone Star State is increasingly behind the curve on marijuana, education, and gambling freedoms. In the upper-right quadrant are economically and personally free states such as New Hampshire, Colorado, Nevada, Indiana, and Florida. Far out on the bottom left is New York, which scores quite poorly on both economic and personal freedom.



**FIGURE 10** Economic and Personal Freedom in 2016

New Jersey and Hawaii are not as extreme as New York on economic freedom but still score quite badly on economic freedom as well as personal freedom. Finally, in the upper-left quadrant are Vermont, Maine, New Mexico, California, Oregon, and Maryland, which are performing poorly on economic freedom but doing a bit better on personal freedom (or, in the case of New Mexico and Maine, a lot better). These are the stereotypical left-liberal states that do well on personal freedom but are economically collectivist. Generally, then, conservative states do better than left-liberal states on economic freedom, and rural/western/New England states do better than urban/southern/mid-Atlantic states on personal freedom.

Figure 11 shows the evolution of nonfederalized overall freedom scores over time. There is a pronounced J-shape since 2000, with the upward trend beginning in 2011. When we include federalized policies, the average state score in 2016 is slightly below the score in 2000. Thus, federal subversion of state autonomy has on balance been detrimental to the freedom that citizens experience since 2000. Indeed, in general, economic freedom has declined in the United States since 2000, but the blame for this trend essentially belongs on the federal government, not state and local governments.[98]

---

97.   Internal Revenue Service, "SOI Tax Stats—Migration Data—2015–2016," https://www.irs.gov/statistics/soi-tax-stats-migration-data-2015-2016.

98.   James Gwartney, Robert Lawson, and Joshua Hall, "Economic Freedom of the World: Lessons for the U.S.," *Huffington Post*, September 25, 2011, http://www.huffingtonpost.com/james-gwartney/economic-freedom-of-the-w_b_980441.html.

**FIGURE 11** State Average Overall Freedom Over Time



## CHANGE OVER TIME

The following list pulls out the most improved and worsened states from year-end 2014 to year-end 2016, using the nonfederalized index (Table 31). It is important to recognize that short-term changes will be caused by a great deal of noise in the fiscal data that may or may not be due to significant policy changes, especially since our FY 2017 tax data are estimates that exclude minor categories of taxation (and changes in local taxation since FY 2015). Nonetheless, it is worth noting which states saw the most change in individual freedom in the period covered by our newest data.

New Hampshire is our most improved state, driven by civil asset forfeiture reform, expansion of the medical marijuana law, and the abolition of the certificate of need law for new medical facilities. On the downside, land-use regulation continues to intensify, even though the state is already one of the worst in this area. Since the closing date of this study, marijuana decriminalization and constitutional carry have further expanded Granite Staters' personal freedom.

West Virginia is our second most improved state, primarily due to growth in regulatory freedom. The Mountaineer State passed a far-reaching package of tort reforms, telecommunications deregulation, and right-to-work laws. A phased minimum wage hike hit back in the other direction, as did backsliding on lawsuit freedom. (West Virginia's improvement was unsurprising to us. At a business presentation in Toronto in 2015, one of the authors forecasted that West Virginia would be a state to watch for future improvements given changes in its political environment.)

Kentucky's main improvements came in regulatory policy. Right-to-work and a measured decline in the extent of licensed occupations were the most important changes. Fiscal policy also improved somewhat, and government consumption and employment had modest declines.

Ohio saw a noticeable improvement in personal freedom, apart from same-sex marriage, which does not count in Table 31. The Buckeye State passed a far-reaching forfeiture reform bill and a new, highly limited medical marijuana law. Fiscal policy also improved slightly across the board.

The last list showing changes over time (Table 32) highlights the big picture since our first comprehensive set of data in 2000. Thus, this list covers policies from year-end 2000 until year-end 2016. In this edition, we now have data for every year between those dates.

Over this long period, Oklahoma is by far the biggest gainer. The state posted tremendous gains on regulatory policy in 2001 and then continued to improve gradually every single year thereafter to 2014, falling back slightly since 2014. The state also improved massively on fiscal policy in 2011, 2012, and 2013. On personal freedom, the state improved almost every year, seeing the only significant reversal in the years 2013, 2014, and 2015. Tax credit scholarships (2011) and a voucher program for students with disabilities (2009) boosted the state's educational freedom. The state is even beginning to shed its civil-authoritarian reputation as local police departments reduce their participation in asset forfeiture equitable sharing, and it has cut its drug enforcement rate significantly since 2000 (although it has risen again somewhat since 2011). A 2012 prison reform bill (the Justice Reinvestment Initiative, HB 3052) and a 2015 law (the Justice Safety Valve Act, HB 1518) should begin to reduce the state's future incarceration rate by giving judges more flexibility over sentencing and drug treatment options and separating minor parole offenders from the general prison population. Federal courts have struck down the state's sodomy law and same-sex marriage ban (which was a super-DOMA prohibiting all marriagelike private contracts), although these improvements do not show up in the score reported in the table, which excludes federalized policies.

Vermont is our biggest loser over this 16-year period. Beginning in 1997, Vermont's school funding system was dramatically altered in such a way as to cause a big increase in fiscal centralization. Property taxes are now considered a state tax rather than local tax, although towns still have some control over the rate. More importantly, taxes have continued to go up despite the "fix." State taxes have risen from 8.2 to 9.7 percent of the tax base (excluding motor fuel and alcohol and tobacco taxes), while local taxes have fallen only from 2.5 to 2 percent since 2000. Government employment and consumption have risen as a percentage of the economy. Regulatory

## TABLE 31

| Rank | State | Freedom Growth, 2015–16 | | Rank | State | Freedom Growth, 2015–16 |
|---|---|---|---|---|---|---|
| 1. | New Hampshire | 0.071 | | 26. | Connecticut | 0.001 |
| 2. | West Virginia | 0.069 | | 27. | New York | 0.001 |
| 3. | Kentucky | 0.054 | | 28. | Texas | 0.000 |
| 4. | Ohio | 0.047 | | 29. | Rhode Island | 0.000 |
| 5. | Nevada | 0.045 | | 30. | Tennessee | −0.001 |
| 6. | Nebraska | 0.041 | | 31. | Georgia | −0.002 |
| 7. | North Dakota | 0.039 | | 32. | Alabama | −0.002 |
| 8. | Mississippi | 0.036 | | 33. | Indiana | −0.003 |
| 9. | Maryland | 0.031 | | 34. | Utah | −0.003 |
| 10. | Minnesota | 0.023 | | 35. | Arizona | −0.005 |
| 11. | Florida | 0.019 | | 36. | Wisconsin | −0.005 |
| 12. | Arkansas | 0.016 | | 37. | Michigan | −0.005 |
| 13. | Delaware | 0.015 | | 38. | Colorado | −0.006 |
| 14. | Montana | 0.015 | | 39. | Washington | −0.007 |
| 15. | North Carolina | 0.014 | | 40. | New Jersey | −0.008 |
| 16. | Missouri | 0.011 | | 41. | South Dakota | −0.008 |
| 17. | Illinois | 0.011 | | 42. | Maine | −0.010 |
| 18. | Oklahoma | 0.009 | | 43. | Oregon | −0.010 |
| 19. | Pennsylvania | 0.008 | | 44. | Kansas | −0.012 |
| 20. | New Mexico | 0.007 | | 45. | Idaho | −0.015 |
| 21. | Massachusetts | 0.007 | | 46. | Iowa | −0.015 |
| 22. | Wyoming | 0.006 | | 47. | Hawaii | −0.015 |
| 23. | Virginia | 0.004 | | 48. | Alaska | −0.034 |
| 24. | California | 0.004 | | 49. | Louisiana | −0.049 |
| 25. | South Carolina | 0.002 | | 50. | Vermont | −0.059 |

Note: States with different scores may appear identical due to rounding.

## TABLE 32

| Rank | State | Freedom Growth, 2000–16 | | Rank | State | Freedom Growth, 2000–16 |
|---|---|---|---|---|---|---|
| 1. | Oklahoma | 0.340 | | 26. | North Carolina | 0.079 |
| 2. | New Mexico | 0.299 | | 27. | Nevada | 0.077 |
| 3. | Florida | 0.291 | | 28. | South Dakota | 0.075 |
| 4. | Wisconsin | 0.278 | | 29. | Arkansas | 0.055 |
| 5. | Ohio | 0.270 | | 30. | Wyoming | 0.053 |
| 6. | Alaska | 0.261 | | 31. | Virginia | 0.050 |
| 7. | Michigan | 0.243 | | 32. | Kentucky | 0.049 |
| 8. | North Dakota | 0.228 | | 33. | Washington | 0.046 |
| 9. | Georgia | 0.219 | | 34. | Minnesota | 0.034 |
| 10. | Arizona | 0.202 | | 35. | Pennsylvania | 0.033 |
| 11. | Louisiana | 0.198 | | 36. | Illinois | 0.018 |
| 12. | Kansas | 0.196 | | 37. | Connecticut | 0.004 |
| 13. | Idaho | 0.184 | | 38. | California | −0.001 |
| 14. | South Carolina | 0.182 | | 39. | Tennessee | −0.011 |
| 15. | Montana | 0.172 | | 40. | Maine | −0.013 |
| 16. | Utah | 0.165 | | 41. | Oregon | −0.017 |
| 17. | Texas | 0.158 | | 42. | Delaware | −0.032 |
| 18. | Missouri | 0.158 | | 43. | Iowa | −0.047 |
| 19. | Colorado | 0.151 | | 44. | Rhode Island | −0.049 |
| 20. | Indiana | 0.106 | | 45. | New Hampshire | −0.050 |
| 21. | Nebraska | 0.104 | | 46. | Massachusetts | −0.082 |
| 22. | West Virginia | 0.102 | | 47. | New York | −0.162 |
| 23. | Mississippi | 0.102 | | 48. | New Jersey | −0.170 |
| 24. | Maryland | 0.098 | | 49. | Hawaii | −0.218 |
| 25. | Alabama | 0.098 | | 50. | Vermont | −0.279 |

Note: States with different scores may appear identical due to rounding.

policy has also gotten much worse, with the vast majority of the losses concentrated in land-use and environmental regulation. As near as we can tell using our admittedly imperfect data, residential building restrictions have tightened enormously. One reflection of this is the frequency of the term "land use" in appellate court decisions; that frequency is now much higher, when divided by population, in Vermont than anywhere else. Vermont has also enacted one of the country's most costly renewable portfolio standards.

Last, it is worth pointing out policy areas where there has been significant attention throughout the 2000–2016 period. Tobacco policy is the most notable area in which state policies have become more restrictive of personal freedom, with significant increases in taxes as well as greater and greater restrictions on where one can smoke. Laws dealing with domestic partnerships, civil unions, and gay marriage also changed dramatically, especially in the years 2010–15. Marijuana laws are undergoing liberalization, first in states with citizen ballot initiatives. Gun laws and educational policies have been gradually liberalized across the country, and state bans on direct-to-consumer wine shipments have been removed in many places. On the regulatory side, eminent domain reform occurred in some fashion in most states following the infamous *Kelo v. City of New London* decision by the U.S. Supreme Court in 2005. Several states have recently enacted right-to-work laws, and this area seems likely to remain active. Policies dealing with new technologies, such as DNA databases and automated license plate readers, are new issues and will continue to evolve.

One ongoing feature of policy change is the displacement of state discretion with federal mandates, for both good and ill in terms of pure individual liberty (leaving aside the damage done to federalism, a long-term institutional bulwark of freedom). Federal courts have forced states to liberalize gun laws, sodomy laws, and marriage laws, though in all those areas state governments were reforming long before the federal courts chose to intervene conclusively. In health insurance regulation, all three branches of the federal government have acted in concert to dramatically raise the regulatory threshold, mostly via the PPACA. States may still choose to regulate health insurance even more tightly than the federal government, but they may not choose more market-oriented models of regulation. Leaving aside the cases where there has been liberalization at the federal level, centralization is a dangerous trend. For one thing, it reduces the ability of federalism as an institutional system to check government overreach. For another, it makes it harder for citizens to find freedom by voting with their feet, as they cannot go anywhere for different and better policies unless they emigrate.

## CONSTRUCT VALIDITY AND ROBUSTNESS

In this edition of the index, we test the construct validity and robustness of our overall freedom measure by examining correlations in overall freedom measures across editions (for the year 2006, which appears in all editions). Between the second and third editions, we switched from an impressionistic to a quantified, "victim cost" method for weighting variables. Nevertheless, the correlation between the fifth-edition and first-edition scores for 2006 overall freedom is a hefty 0.83. The correlation between third- and fifth-edition scores is 0.88. These extremely high correlation coefficients suggest that the overall freedom ranking is robust to within-reason perturbations of weights on the variables and addition and subtraction of variables.

## INDEX OF CRONYISM

As in the fourth edition, we present a "freedom from cronyism" state ranking that takes into account blatantly anti-competitive regulations: (a) general sales below cost/minimum markup law, (b) sales below cost/minimum markup law for gasoline, (c) certificate of public convenience and necessity for household goods movers, (d) direct auto sales bans, (e) certificate of need for hospital construction, (f) all occupational licensing variables, (g) eminent domain laws, (h) bans on direct shipment of wine, and (i) alcohol sales blue laws.

Table 33 shows how the states come out on cronyism in 2016 (higher values/lower rankings indicate less cronyism). The numbers in the table represent the weights of each variable multiplied by the standardized value (number of standard deviations greater than the mean). As noted in the previous chapter, a state that is one standard deviation better—freer—than the average on every single policy will score 1 on overall freedom. Because the index of cronyism draws on a subset of the freedom index, the values in this table fall within a much smaller range. Colorado's score of 0.036, therefore, means that, taking cronyist policies into account, Colorado's positions on those issues contribute 0.036 to its overall freedom score. Colorado is the least cronyist state. The freedom from cronyism index can be found in the "Regulatory" tab of the spreadsheet at http://freedominthe50states.org.

We compare our cronyism scores with state corruption scores based on a survey of statehouse journalists.[99]  The correlation between 2016 cronyism and 2007 corruption is −0.35, indicating that states scoring higher on freedom from cronyism score lower on corruption. In other words, cronyist states are more corrupt. The correlation weakens when cronyism is measured around the same time as corruption, perhaps implying a causal path from corruption to cronyism rather than vice versa.

We also compare our cronyism scores with state lobbyist-to-legislator

**TABLE 33**

| Rank | State | Freedom from Cronyism Score | | Rank | State | Freedom from Cronyism Score |
|---|---|---|---|---|---|---|
| 1. | Colorado | 0.036 | | 26. | Montana | −0.001 |
| 2. | Idaho | 0.036 | | 27. | Delaware | −0.001 |
| 3. | Wyoming | 0.032 | | 28. | Oregon | −0.003 |
| 4. | New Hampshire | 0.031 | | 29. | Georgia | −0.004 |
| 5. | Minnesota | 0.030 | | 30. | Kentucky | −0.006 |
| 6. | Kansas | 0.028 | | 31. | Michigan | −0.006 |
| 7. | Arizona | 0.025 | | 32. | Massachusetts | −0.006 |
| 8. | New Mexico | 0.025 | | 33. | Washington | −0.009 |
| 9. | Utah | 0.022 | | 34. | West Virginia | −0.011 |
| 10. | Vermont | 0.021 | | 35. | Alabama | −0.014 |
| 11. | Nebraska | 0.016 | | 36. | Virginia | −0.014 |
| 12. | North Dakota | 0.015 | | 37. | North Carolina | −0.015 |
| 13. | South Dakota | 0.014 | | 38. | South Carolina | −0.017 |
| 14. | Alaska | 0.012 | | 39. | Oklahoma | −0.017 |
| 15. | Rhode Island | 0.012 | | 40. | Tennessee | −0.018 |
| 16. | Indiana | 0.007 | | 41. | Arkansas | −0.019 |
| 17. | Hawaii | 0.007 | | 42. | New Jersey | −0.019 |
| 18. | Mississippi | 0.006 | | 43. | Florida | −0.019 |
| 19. | Missouri | 0.005 | | 44. | New York | −0.020 |
| 20. | Pennsylvania | 0.005 | | 45. | Texas | −0.021 |
| 21. | Maine | 0.004 | | 46. | Ohio | −0.022 |
| 22. | Wisconsin | 0.004 | | 47. | Louisiana | −0.024 |
| 23. | Connecticut | 0.003 | | 48. | Maryland | −0.024 |
| 24. | Iowa | 0.002 | | 49. | Illinois | −0.027 |
| 25. | Nevada | 0.000 | | 50. | California | −0.030 |

Note: States with different scores may appear identical due to rounding.

ratios from the mid-2000s.[100] The correlation between the two is −0.32, indicating that states with more lobbyists relative to legislators a decade ago are more cronyist today. (Again, the correlations weaken when they are measured closer together in time.) Figure 12 shows how the freedom from cronyism index relates to the logged number of lobbyists per legislator for all 49 states for which lobbyist data are available (Nevada is excluded).

When freedom from cronyism is regressed on both corruption and lobbyist ratio, each independent variable enters the equation with a negative sign and is statistically significant.

**FIGURE 12** Relationship Between Lobbyist Ratio and Cronyism



LOG LOBBYIST-TO-LEGISLATOR RATIO

FREEDOM FROM CRONYISM

99.   Bill Marsh, "Illinois Is Trying. It Really Is. But the Most Corrupt State Is Actually. . .," *New York Times*, December 14, 2008, http://www.nytimes.com/2008/12/14/weekinreview/14marsh.html.

100.  Center for Public Integrity, "Ratio of Lobbyists to Legislators 2006," December 21, 2007, http://www.publicintegrity.org/2007/12/21/5913/ratio-lobbyists-legislators-2006.

# PART 2
# POLITICS OF FREEDOM

In this chapter, we consider the causes and consequences of freedom in the states. First, we examine the relationship between public opinion and freedom. Next, we consider the consequences of freedom for economic growth and migration. Finally, we sum up with some observations about the political economy of freedom at the state level.

## PUBLIC OPINION AND FREEDOM

We now move to analyzing in a more systematic fashion the relationship between public opinion ideology—as measured by presidential election results by state—and economic, personal, and overall freedom.

Figure 13 is a scatterplot of economic freedom in 2000 against presidential voting in 1996. (We choose presidential elections before the year that the policy is measured, because we think there is a lag between changes in public opinion and changes in law.) The x-axis measures the number of percentage points to the left of each state's popular vote, summing up Democratic and Green vote shares for the state minus the same for the country as a whole. We see a strong negative relationship between leftward lean in the electorate and economic freedom. However, strongly conservative states are no more economically free on average than mildly conservative or centrist states, such as Tennessee, New Hampshire, Missouri, and Florida.

**FIGURE 13** Partisanship and Economic Freedom in 2000



Figure 14 shows the same scatterplot for 2016, allowing us to see how the relationship between ideology and economic freedom has changed over the entire range of our time series. The relationship between ideology and freedom looks curvilinear again. We noted in the fourth edition that West Virginia now looks like a big outlier, having moved substantially to the right since 2000. If right-wing ideology leads to more economic freedom,

economic freedom should rise in West Virginia in future years. However, other poor, southern states tend not to do well on economic freedom (e.g., Mississippi, Arkansas, and Kentucky), suggesting West Virginia's room for improvement may be limited.

In fact, West Virginia did improve on economic freedom, and it is now a much smaller outlier.

**FIGURE 14** Partisanship and Economic Freedom in 2016



Figure 15 plots personal freedom in 2000 against partisan lean in 1996. The relationship between partisanship and personal freedom in that year was extremely noisy. Slightly left-of-center Maine topped the charts, followed by centrist West Virginia and left-wing Vermont. Left-leaning Maryland and Illinois did badly, but they were outdone by deeply conservative Oklahoma and Alabama. All New England states except Connecticut were near the top.



**FIGURE 15** Partisanship and Personal Freedom in 2000

Figure 17 puts economic and personal freedom together to show how partisanship relates to overall freedom. Again, we see a curvilinear relationship in which conservative and moderate states do much better than strongly left ones. New York sits in a class of its own at the bottom of the scale.



**FIGURE 17** Partisanship and Overall Freedom in 2000

Figure 16 shows the relationship between partisanship and personal freedom at the end of our time series. Now, left-liberal states enjoy a clearer advantage on personal freedom, but the relationship is still much noisier than the one between partisanship and economic freedom. Six of the bottom seven states on personal freedom are southern (Hawaii is the only exception).



**FIGURE 16** Partisanship and Personal Freedom in 2016

Figure 18 shows the overall freedom and partisanship relationship at the end of our time series. A distinct negative relationship exists between leftward tilt and overall freedom. However, the outliers are still noteworthy. New York is still abysmal even for a strongly left-wing state. Wyoming, West Virginia, Kentucky, Mississippi, and Arkansas all underperform other conservative states. Colorado, Nevada, and especially Florida and New Hampshire outperform the center. Massachusetts does better than one would expect for such a progressive state.

**FIGURE 18** Partisanship and Overall Freedom in 2016



To study the dynamics of public opinion and freedom over time, we regressed, for each state, its overall freedom score on partisanship (Democratic and Green lean) from four years ago. (For years between presidential elections, we linearly interpolate partisanship.) The regression includes year dummies and assumes state fixed effects, and it covers the years from 2000 to 2016. The fixed-effects specification forces the regression to focus on over-time change within each state.[101] The results are shown in Table 34.

**TABLE 34**

Partisanship and Overall Freedom: Difference-in-Differences Estimates

| Variable | Coefficient | Std. Error |
|---|---|---|
| Partisanship$_{t-4}$ | −0.0045 | 0.0010 |
| $R^2$ (within) | 23.2% | |
| N | 850 | |

*Note: Panel-corrected standard errors reported.*

101.   Despite Nickell bias, we also tried including a lagged dependent variable, but it was not statistically significant.

The statistically significant results suggest that when public opinion in a state moves left, freedom falls somewhat. For instance, if a state begins at 2 percentage points to the left of the national median voter in presidential elections, then moves 6 percentage points to the left, the predicted change in freedom four years in the future is 4 × −0.0045 = −0.018. That is a fairly small change, about the difference between Kentucky and Washington in 2016.

## FREEDOM, MIGRATION, AND GROWTH

America is a land of immigrants. Indeed, immigrants throughout America's history have boarded ships (and eventually planes) in droves to escape tyranny and to breathe the cleaner air of a nation founded on the idea of individual freedom. Sometimes that story is dramatic, as when the Puritans hurriedly left Europe to realize greater religious liberty or when Vietnamese boat people escaped murderous communist oppression to start anew in the New World. Other times, it is less stark, as in the case of a German family fed up with the modern paternalist state and looking for a place to build a business and raise a family or in the case of Mexican migrants looking for the better economic opportunities afforded by a freer economy.

Unsurprisingly, given our foreign ancestors, it is also the case that we are a land of internal migrants. According to a Gallup poll, approximately one in four Americans "have moved from one city or area within their country to another in the past five years."[102] That factor puts the United States (with countries like New Zealand and Finland) in the top ranks globally in terms of internal mobility (the worldwide average is 8 percent).

But why do those Americans move? They certainly aren't moving one step ahead of oppressive regimes and violence like those fleeing recently from Syria, Venezuela, or Zimbabwe. More likely they move for reasons like economic opportunity and locational amenities, such as better weather or beaches. But freedom might matter too when it comes to internal migration, given the differences across the 50 states we identify in the first chapter of this study. Those differences aren't as severe as those between the United States and the least free countries of the world. But they are meaningful, especially considering that New York is far less free than the average state, while other states also score substantially worse or better than others.

But do Americans value freedom as we define it? One way to try to answer that question is to analyze the relationship between freedom and net interstate migration—that is, the movement of people between states. If, all else being equal, Americans prefer to move to freer states, that would

102.   Neli Esipova, Anita Pugliese, and Julie Ray, "381 Million Adults Worldwide Migrate within Countries," Gallup, May 15, 2013, http://www.gallup.com/poll/162488/381-million-adults-worldwide-migrate-within-countries.aspx.

be evidence in favor of the hypothesis that Americans value freedom. In other words, it looks at preferences revealed by behavior rather than mere expressed views. That does not mean that people are responding directly to changes in policy, packing up moving vans, and heading from New York to New Hampshire or the Dakotas. But it could be that they are moving within their region to freer places like Pennsylvania and New Jersey.

We try to answer the question posed in the previous paragraph by examining the statistical correlations between freedom at particular moments and net interstate migration over several subsequent years. Figures 19 to 24 plot states' net migration rates from January 1, 2001, to January 1, 2008, and from January 1, 2008, to January 1, 2017, against their overall, economic, and personal freedom scores in 2000 and 2007, respectively. This division essentially splits our sample in half and separates pre– and post–Great Recession periods. The net migration rate is defined as the number of people moving to a state from other states minus the number of people moving from that state to other states, divided by the initial resident population of the state. The migration data are from the Census Bureau's "components of population change" tables. These figures represent a simple "first cut" at the question. They do not control for any other factors that might drive migration.

Figure 19 shows the relationship between overall freedom and net migration over the earlier period, 2001 to 2008 , including a line of best fit. It shows a strong relationship between the starting level of freedom and subsequent net migration, suggesting that people are moving to freer states. We can see that from the example of New York, which suffered the worst net outmigration of any state, 8.2 percent of its 2001 population, and is also the least free state. Louisiana is obviously anomalous because Hurricane Katrina drove away hundreds of thousands of people, resulting in large net outmigration despite an average level of freedom. At the top end, Nevada and Arizona are big outliers in net inmigration, as Americans during this period were flocking to the so-called sand states because of their supposedly desirable climates.[103] Those anomalies illustrate the importance of controlling for potential confounders.

Figure 20 shows the relationship between year-end 2007 freedom and migration over the next nine years. We see less evidence of amenity-driven migration over this period, which includes the financial crisis, housing bust, and Great Recession. However, warm states like the Carolinas, Arizona, Nevada, and Texas still lie above the line of best fit, while cold states like Alaska, New Hampshire, Illinois, and Michigan lie below that line. The relationship between freedom and net migration appears equally strong in both the earlier and later periods.

103.   Thomas Davidoff, "Supply Elasticity and the Housing Cycle of the 2000s," *Real Estate Economics* 41, no. 4 (2013): 793–813.



**FIGURE 19**  Overall Freedom and Net Domestic Migration, 2001–2008



**FIGURE 20**  Overall Freedom and Net Domestic Migration, 2008–2017

Figure 21 shows the relationship between economic freedom and net migration in the first half of our period of analysis. Again, there is a strong relationship between economic freedom and inmigration.

**FIGURE 21** Economic Freedom and Net Domestic Migration, 2001–2008



**FIGURE 22** Economic Freedom and Net Domestic Migration, 2008–2017



Figure 22 shows how economic freedom in 2007 relates to subsequent migration. The line of best fit expresses a strong, positive relationship between a state's economic freedom at the beginning of the period and subsequent inmigration. North Dakota lies significantly above the regression line in part because of its discovery of shale oil and gas. Michigan lies significantly below the regression line mostly because of the travails of its automobile-manufacturing industry in international markets.

Figure 23 moves to personal freedom. Here, we do not find the same relationship between freedom and migration that we found for overall freedom and economic freedom. The line of best fit is essentially flat, implying no relationship between personal freedom and net migration. Recall that personal freedom correlates slightly negatively with economic freedom. If economic freedom is a more important driver of net inmigration than personal freedom, the bivariate relationship between personal freedom and migration expressed here will probably be biased downward.

**FIGURE 23** Personal Freedom and Net Domestic Migration, 2001–2008



Figure 24 shows the relationship between personal freedom at the end of 2007 and subsequent net migration. The line of best fit is again essentially flat, indicating no relationship. However, economic freedom is an important confounder.

**FIGURE 24** Personal Freedom and Net Domestic Migration, 2008–2017



To deal with confounding variables that affect migration, we turn to multiple regression analysis, which allows us to control for factors such as climate. In previous editions, we have found a positive relationship between each dimension of freedom and migration, although regulatory policy has been related to net migration solely through the channels of cost of living and economic growth. In other words, a lighter regulatory touch may improve the productivity of the economy, but low taxes and personal freedom seem to be amenities that the marginal migrant values for their own sake.

In this edition, we are again able to look at how freedom associates with net migration in two different time periods. By looking at how later-period freedom relates to migration and growth, we are making a kind of "out of sample" prediction from our prior results. Prior to data collection for the fourth edition, Jason Sorens preregistered on Twitter an expectation that personal freedom and taxation (the dominant component of fiscal policy) would be less important for migration in the period of the Great Recession and its aftermath, as Americans have started to migrate less for amenities during this period of economic turbulence.[104]

We present results from three types of estimations: monadic, matched-neighbors, and dyadic. The monadic regressions simply compare all 50 states with each other. The matched-neighbors regressions subtract the weighted average of neighboring states' values (on migration, freedom, and controls) from each state's value. The weights are the distances between the "centroids" (geographic centers) of each state. The purpose of these regressions is to examine whether freedom has a stronger effect on inmigration when neighboring states are more different on freedom. We expect that a freer state surrounded by less-free states will attract more migrants than a freer state surrounded by equally free states, all else equal. Finally, the dyadic models compare state-to-state migration across all state pairs, excluding Alaska and Hawaii.[105] We expect that the bigger the difference in freedom between any two states, the larger the migration flow from the less free of the pair to the freer of the pair, all else equal.

Table 35 presents seven regression equations of net migration over the 2001–8 period.[106] The tables display coefficients and standard errors. A rough rule of thumb for statistical significance is that when the ratio of the coefficient to the standard error is greater than two, the coefficient is statistically significant at the 95-percent confidence level; however, statistical significance is best thought of as a continuum rather than a switch.

The first equation simply regresses net migration rate on the three dimensions of freedom, which are measured as averages for the years 2000 to 2004. Fiscal, regulatory, and personal freedom are all independently, positively, statistically significantly correlated with net inmigration. Model (2) adds cost of living in 2000, as measured by Berry, Fording, and Hanson.[107] Cost of living is potentially a bad control, because regulatory policy, especially land-use freedom, can influence migration through the channel of cost of living. Model (3) adds accommodation GDP per capita, which proxies the size of the tourist industry. States with bigger hospitality sectors appear to attract more migrants, presumably because they have more locational amenities. Model (4) controls for capital stock per worker from Garofalo and Yamarik.[108] Model (5) adds the percentage of state population age 65 or older. Model (6) adds the violent crime rate. Finally, model (7) adds

104.  Jason Sorens, Twitter post, June 12, 2015, 12:22 p.m., https://twitter.com/JasonSorens/status/609440605157105664; Jason Sorens, Twitter post, June 12, 2015, 12:22 p.m., https://twitter.com/JasonSorens/status/609440752121311232; Jason Sorens, Twitter post, June 12, 2015, 12:23 p.m., https://twitter.com/JasonSorens/status/609440996598935552.

105.  Alaska and Hawaii are excluded because their distance dampens interstate migration to and from these states. However, the results are quite similar when they are included.

106.  As in the fourth edition, we tried dropping the outlier case of Louisiana, with only trivial differences in results.

107.  William B. Berry, Richard C. Fording, and Russell L. Hanson, "An Annual Cost of Living Index for the American States, 1960–1995," *Journal of Politics* 62, no. 2 (2000): 550–67.

108.  Gasper G. Garofalo and Steven Yamarik, "Regional Growth: Evidence from a New State-by-State Capital Stock Series," *Review of Economics and Statistics*, 84, no. 2, 316–23.

TABLE 35

**Monadic Estimates of Freedom and Migration, 2001–2008**

| Variable | (1) Coef. (SE) | (2) Coef. (SE) | (3) Coef. (SE) | (4) Coef. (SE) | (5) Coef. (SE) | (6) Coef. (SE) | (7) Coef. (SE) |
|---|---|---|---|---|---|---|---|
| Fiscal freedom | 1.06 (0.55) | 1.47 (0.50) | 0.94 (0.45) | 1.04 (0.56) | 1.17 (0.58) | 1.07 (0.52) | 1.56 (0.60) |
| Regulatory freedom | 2.54 (0.60) | 1.36 (0.58) | 2.43 (0.55) | 2.58 (0.74) | 2.48 (0.57) | 2.81 (0.60) | 2.13 (0.56) |
| Personal freedom | 1.24 (0.61) | 1.67 (0.62) | 0.81 (0.50) | 1.27 (0.72) | 1.29 (0.64) | 1.72 (0.71) | 1.26 (0.57) |
| Cost of living | | −3.50 (0.94) | | | | | |
| Accom- modations | | | 1.98 (0.56) | | | | |
| Capital per worker | | | | 0.09 (0.64) | | | |
| Retirees | | | | | −0.60 (0.66) | | |
| Violent crime | | | | | | 1.11 (0.53) | |
| Heating degree days | | | | | | | −1.59 (0.96) |
| Precipitation | | | | | | | −1.64 (0.87) |
| Constant | 0.75 (0.61) | −1.69 (0.73) | 0.72 (0.53) | 0.75 (0.62) | 0.78 (0.62) | 0.57 (0.56) | 0.94 (0.60) |
| $R^2$ | 28.0% | 39.9% | 41.0% | 28.0% | 29.3% | 34.1% | 39.2% |

*Note: All independent variables are standardized to mean zero and standard deviation one. Robust standard errors. Coef. = coefficient; $R^2$ = proportion of the total variance explained by the model; SE = standard error.*

population-weighted annual heating degree days—a measure of how cold a climate is—and area-weighted statewide average annual precipitation.

Adding each of those controls does not substantially affect the statistical estimates of the correlation between fiscal, regulatory, and personal freedom, on the one hand, and net migration, on the other. The coefficient on regulatory freedom does fall when cost of living is added, a posttreatment collider: states lower on regulatory freedom suffer from higher cost of living, which is the more immediate cause of lower inmigration. Personal freedom does indeed look much less important for migration in 2008–17 than in 2001–8.

Table 36 performs the same set of analyses on the 2008–17 data, with freedom variables measured as the average of 2007 through 2011 values. Again, fiscal and regulatory freedom look like important drivers of interstate migration over this period, while personal freedom loses much of its importance, as we expected. The relationship between fiscal and regulatory freedom, on the one hand, and migration, on the other, looks robust to the addition of controls.

Table 37 presents the results for the 2001–8 period when we match each state to its neighbors, on the (true) assumption that migration flows between neighboring states are greater than they are between distant states. These matched-neighbor results are somewhat sharper than the monadic results. They suggest that regulatory freedom drives migration even when cost of living is controlled. As expected, more costly states repel migrants, while states with locational amenities attract them. Models (17) and (18) explain more than two-thirds of all the variance in relative-to-neighbors net migration across all 50 states. The fact that the results sharpen when we match neighboring states to each other implies that the regression model reflects an underlying causal relationship.

Table 38 presents the matched-neighbors results for the 2008–17 period. All variables have smaller coefficients, due in part to the fact that absolute rates of net migration were lower during this period compared with the previous period. $R$-squareds are also lower, showing that net migration was simply less predictable during this period, presumably because of idiosyncratic shocks that state economies suffered during the Great Recession. Fiscal freedom is again robustly related to net inmigration. Regulatory and personal freedom seem quite a bit less important for net migration during this period, but there is a great deal of uncertainty about the estimates on these variables.

Table 39 shows the results of our state-to-state migration estimates. The benefit of using "nondirected dyads," to use the jargon, is that we get many

**TABLE 36**

**Monadic Estimates of Freedom and Migration, 2008–2017**

| Variable | (8) Coef. (SE) | (9) Coef. (SE) | (10) Coef. (SE) | (11) Coef. (SE) | (12) Coef. (SE) | (13) Coef. (SE) | (14) Coef. (SE) |
|---|---|---|---|---|---|---|---|
| Fiscal freedom | 1.05 (0.42) | 1.06 (0.42) | 1.10 (0.42) | 1.03 (0.41) | 1.08 (0.41) | 1.04 (0.42) | 1.35 (0.43) |
| Regulatory freedom | 1.64 (0.44) | 1.39 (0.75) | 1.61 (0.44) | 1.71 (0.50) | 1.63 (0.44) | 1.62 (0.42) | 1.30 (0.46) |
| Personal freedom | 0.70 (0.49) | 0.68 (0.50) | 0.59 (0.50) | 0.76 (0.54) | 0.71 (0.51) | 0.83 (0.51) | 0.55 (0.48) |
| Cost of living | | −0.34 (0.71) | | | | | |
| Accom-modations | | | 0.45 (0.21) | | | | |
| Capital per worker | | | | 0.17 (0.53) | | | |
| Retirees | | | | | −0.14 (0.64) | | |
| Violent crime | | | | | | 0.51 (0.44) | |
| Heating degree days | | | | | | | −0.93 (0.63) |
| Precipitation | | | | | | | −1.21 (0.46) |
| Constant | 0.26 (0.54) | 0.33 (0.54) | 0.23 (0.54) | 0.24 (0.54) | 0.28 (0.56) | 0.50 (0.35) | 0.37 (0.49) |
| $R^2$ | 27.8% | 28.1% | 29.3% | 27.9% | 27.9% | 29.8% | 36.2% |

*Note: All independent variables are standardized to mean zero and standard deviation one. Robust standard errors. Coef. = coefficient; $R^2$= proportion of the total variance explained by the model; SE = standard error.*

**TABLE 37**

**Matched-Neighbors Estimates of Freedom and Migration, 2001–2008**

| Variable | (15) Coef. (SE) | (16) Coef. (SE) | (17) Coef. (SE) | (18) Coef. (SE) |
|---|---|---|---|---|
| Fiscal freedom | 0.89 (0.46) | 1.48 (0.47) | 1.46 (0.36) | 1.32 (0.37) |
| Regulatory freedom | 3.09 (0.87) | 2.44 (0.71) | 1.79 (0.54) | 2.15 (0.70) |
| Personal freedom | 1.10 (0.45) | 0.79 (0.44) | 0.45 (0.40) | 0.52 (0.40) |
| Cost of living | | −6.7 (1.8) | −7.5 (1.4) | −7.8 (1.5) |
| Accom-modations | | | 2.0 (0.3) | 2.1 (0.3) |
| Capital per worker | | | | 0.51 (0.47) |
| Constant | −0.24 (0.55) | −0.34 (0.47) | −0.46 (0.40) | −0.27 (0.42) |
| $R^2$ | 49.2% | 61.7% | 72.7% | 73.3% |

*Note: All independent variables are standardized to mean zero and standard deviation one. Robust standard errors. Coef. = coefficient; $R^2$= proportion of the total variance explained by the model; SE = standard error.*

TABLE 38
TABLE 39

**Matched-Neighbors Estimates of Freedom and Migration, 2008–2017**

| Variable | (19) Coef. (SE) | (20) Coef. (SE) | (21) Coef. (SE) | (22) Coef. (SE) |
|---|---|---|---|---|
| Fiscal freedom | 1.30 (0.44) | 1.47 (0.50) | 1.49 (0.51) | 1.31 (0.43) |
| Regulatory freedom | 0.74 (0.60) | 0.02 (0.87) | −0.23 (0.98) | 0.18 (0.87) |
| Personal freedom | 0.77 (0.49) | 0.44 (0.52) | 0.31 (0.55) | 0.33 (0.49) |
| Cost of living | | −1.6 (0.9) | −1.8 (1.0) | −2.2 (1.2) |
| Accom-modations | | | 0.47 (0.24) | 0.66 (0.36) |
| Capital per worker | | | | 0.81 (0.60) |
| Constant | −0.04 (0.42) | −0.13 (0.44) | −0.16 (0.45) | 0.13 (0.44) |
| $R^2$ | 31.8% | 37.5% | 39.0% | 42.0% |

*Note: All independent variables are standardized to mean zero and standard deviation one. Robust standard errors. Coef. = coefficient; $R^2$= proportion of the total variance explained by the model; SE = standard error.*

**Dyadic Estimates of Freedom and Migration**

| Variable | (23) Coef. (SE) | (24) Coef. (SE) | (25) Coef. (SE) | (26) Coef. (SE) | (27) Coef. (SE) | (28) Coef. (SE) | (29) Coef. (SE) | (30) Coef. (SE) |
|---|---|---|---|---|---|---|---|---|
| Fiscal freedom | 0.014 (0.007) | 0.027 (0.006) | 0.026 (0.006) | 0.023 (0.006) | 0.018 (0.006) | 0.018 (0.006) | 0.019 (0.006) | 0.023 (0.005) |
| Regulatory freedom | 0.047 (0.007) | 0.022 (0.006) | 0.022 (0.006) | 0.027 (0.007) | 0.024 (0.005) | 0.023 (0.007) | 0.020 (0.007) | 0.009 (0.006) |
| Personal freedom | 0.015 (0.006) | 0.026 (0.006) | 0.024 (0.006) | 0.024 (0.006) | 0.009 (0.006) | 0.009 (0.006) | 0.006 (0.007) | 0.021 (0.005) |
| Cost of living | | −0.052 (0.008) | −0.052 (0.008) | −0.026 (0.007) | | −0.001 (0.006) | −0.005 (0.006) | −0.017 (0.007) |
| Accom-modations | | | 0.005 (0.004) | −0.005 (0.006) | | | 0.006 (0.004) | −0.007 (0.004) |
| Capital per worker | | | | −0.004 (0.006) | | | | 0.013 (0.006) |
| Retirees | | | | 0.002 (0.006) | | | | −0.004 (0.005) |
| Violent crime | | | | −0.012 (0.007) | | | | −0.014 (0.005) |
| Heating degree days | | | | −0.042 (0.013) | | | | −0.048 (0.007) |
| Precip-itation | | | | −0.013 (0.007) | | | | −0.012 (0.004) |
| Constant | −0.001 (0.008) | 0.0001 (0.006) | 0.0001 (0.006) | 0.001 (0.006) | 0.003 (0.008) | 0.003 (0.008) | 0.003 (0.008) | 0.004 (0.005) |
| $R^2$ | 9.6% | 16.3% | 16.4% | 19.4% | 9.1% | 9.1% | 9.4% | 23.5% |

*Note: All independent variables are standardized to mean zero and standard deviation one. Robust standard errors. Coef. = coefficient; $R^2$= proportion of the total variance explained by the model; SE = standard error.*

more observations, preventing the regression models from being statistically underpowered. As a result, we are able to include all the control variables that we expect might be related to migration within the same equation. These data come from the Internal Revenue Service (IRS), and for the same period as the Census Bureau data used previously, the correlation between the two is an extremely tight 0.98. However, the IRS data end on January 1, 2016. Models (23) through (26) cover the 2001–8 period, and models (27) through (30) cover the 2008–16 period. The dependent variable, net migration rate, is measured for each pair of states and represents the net migration from one state to the other divided by the summed initial populations of both

states, times 200. Each observation is weighted by the distance between the two states' centroids, because farther-apart states have less migration between them and therefore display lower residuals (heteroscedasticity). The freedom variables are measured as an average of the first four or five years of each time series (2000–2003 and 2007–2011).

The additional statistical power helps us see that personal freedom and regulatory freedom are indeed related to net migration, at least in the 2001–8 period but likely in the later period as well. Both variables are strongly statistically significant in models (23) through (26), and regulatory policy is also strongly significant in models (27) through (29), just dropping below significance in model (30), while personal freedom reaches significance in model (30). Amenity-driven migration seems to be just as important in the 2008–16 period as in 2001–8, contrary to the findings of the fourth edition, possibly because the economy had recovered sufficiently by 2015 and 2016 to reinvigorate amenity-driven moves.

Because the independent variables are all standardized to mean zero and standard deviation one, we can interpret the coefficients on the freedom variables as follows. In 2001–8, a one-standard-deviation increase in fiscal freedom for state $i$ over state $j$ is expected to increase migration from the latter to the former by 0.023 percent of the average of their populations. For instance, a change in Vermont's 2000 fiscal policy to New Hampshire's in the same year (three standard deviations) should increase migration from Vermont to New Hampshire by 0.07 percent of the average of their populations (about 600 people). Over the same period, the same sort of change in regulatory freedom should boost net migration by 0.027 percentage points of population, and the same sort of change in personal freedom should boost net migration by 0.024 percentage points of population. For example, a switch from Illinois's to Indiana's personal freedom in 2000, about two standard deviations, should boost migration over the next seven years from Illinois to Indiana by about 0.05 percentage points of the average of their populations.

In 2008–16, the effect of a one-standard-deviation change in 2007–10 fiscal freedom is 0.023 percentage points of the average of a dyad's populations, while the effect of a one-standard-deviation change in 2007–10 personal freedom is 0.021 percentage points of the average of a dyad's populations. As already noted, regulatory freedom's direct effect on migration in the later period is trivial, but its indirect effect, through cost of living, is substantial.

Our migration models do not control for state economic growth, which is endogenous (more migration of workers will induce higher economic growth). It is plausible that regulatory freedom, in particular, influences migration almost entirely by affecting the economic climate (cost of living

and growth), rather than as a direct amenity. Few workers are likely to study different states' labor laws or tort liability systems before deciding where to live, but it is quite plausible that businesses do so when deciding where to invest.

Therefore, we now turn to analyzing the statistical relationship between economic growth in each state and its economic freedom. The dependent variable in these regression equations is real personal income growth on an annualized basis. For the inflation measure, we use the state-by-state cost of living indicator from Berry, Fording, and Hanson in 2000 and the Bureau of Economic Analysis (BEA) indicator in 2008 and 2015. Where necessary, we join the two time series through the one year in which they overlap, 2007 (see the f_land_17.xls spreadsheet for details). We run two sets of models, one on the years 2000–2015 and another on the years 2008–15, for which we can rely solely on the new BEA time series of real state personal income. To calculate growth rates, we use the annual average personal income figures from the start and the end of each series.

The results are shown in Table 40. For each time period, we regress growth on each dimension of freedom and, consistently with the literature on this topic, dummies for each Census region, and then we introduce two controls: cost of living and capital per worker. A joint test that the summed coefficients on fiscal and regulatory freedom are zero rejects the null at greater than 95 percent confidence in every model reported below except model (28). Since the two variables are highly correlated with each other, this test is necessary to see whether economic freedom in general is associated with growth, and, it turns out, it is. However, in the 2000–2015 period as a whole, cost of living may mediate the causal relationship between economic freedom and growth.

The Great Recession upended the geographic patterns of economic growth in the United States. In general, however, we do see a relationship between economic freedom and higher income growth, especially when we focus on the regulatory component of economic freedom as a driver of cost of living.

TABLE 40

**Economic Freedom and Real Personal Income Growth Estimates**

| Variable | (31) Coef. (SE) | (32) Coef. (SE) | (33) Coef. (SE) | (34) Coef. (SE) |
|---|---|---|---|---|
| Fiscal freedom | −0.03 (0.06) | 0.06 (0.08) | 0.17 (0.11) | 0.15 (0.12) |
| Regulatory freedom | 0.33 (0.07) | 0.10 (0.12) | −0.02 (0.10) | 0.10 (0.17) |
| Personal freedom | −0.05 (0.09) | −0.14 (0.09) | −0.12 (0.10) | −0.08 (0.10) |
| Cost of living | | −0.63 (0.23) | | 0.14 (0.11) |
| Capital per worker | | −0.19 (0.13) | | 0.04 (0.16) |
| Northeast | 2.1 (0.1) | 2.0 (0.1) | 1.4 (0.2) | 1.3 (0.2) |
| Midwest | 2.2 (0.3) | 1.9 (0.3) | 1.7 (0.3) | 1.7 (0.4) |
| South | 2.5 (0.1) | 1.7 (0.3) | 1.5 (0.1) | 1.5 (0.1) |
| West | 2.5 (0.1) | 2.0 (0.2) | 2.2 (0.1) | 2.1 (0.1) |
| Time period | 2000–2015 | 2000–2015 | 2008–2015 | 2008–2015 |
| $R^2$ | 95.7% | 96.3% | 89.1% | 89.4% |

*Note: All independent variables are standardized to mean zero and standard deviation one. Robust standard errors. Coef. = coefficient; $R^2$= proportion of the total variance explained by the model; SE = standard error.*

## CONCLUSIONS

In the first section of the book, we built and justified our index of freedom across the 50 states in the time period 2000–2016. Our index of freedom can be broken down into three dimensions: fiscal freedom, regulatory freedom, and personal freedom. Fiscal and regulatory freedoms together we dub "economic freedom."

It turns out that economic freedom and personal freedom have different origins and effects. Economic freedom is more often found in more conservative states that tend to vote Republican in presidential elections, although there are exceptions, and the relationship was weaker in 2000 than it is now. Personal freedom tends to be higher in more progressive states, by contrast, but this relationship is even noisier and more uncertain than that between ideology and economic freedom.

Another reason that freedom tends to prosper in some places and falter in others is institutional design. Much research has been conducted on the effects of institutions on government spending across countries,[109] as well as on institutions and the dynamics of policy change in the American states.[110] Variables of interest include size of the legislature, gubernatorial power, professionalization of the legislature, fiscal decentralization, term limits, and initiative and referendum. In theory, institutions could have consistent effects on individual liberty in one direction or the other, but it is more likely that most institutions affect freedom positively in some areas and negatively in others. For instance, popular initiatives have helped pass strict tax limitation rules, such as Colorado's Taxpayer Bill of Rights (TABOR), but have also allowed massive spending increases to become law, such as Florida's 2002 initiative requiring that universal prekindergarten be offered throughout the state and a 2000 initiative requiring construction of a high-speed rail system to connect all of Florida's five major cities.

While macro phenomena like partisan lean and corruption have a big impact on freedom, we must not discount the role of political entrepreneurs and individual activists at the state and local levels. The late Jerry Kopel, a Colorado legislator and activist, authored the original "sunrise" and "sunset" legislation for occupational licensing agencies and maintained a website where he kept a close watch on licensing regulation.[111] Quite probably because of Kopel's indefatigable efforts, Colorado remains among the highest-rated states in the nation for occupational freedom.

Finally, we examine the consequences of freedom for migration and economic growth. We find strong evidence that states with more freedom

109.   See, for instance, Torsten Persson and Guido Tabellini, The Economic Effects of Constitutions (Cambridge, MA: MIT Press, 2003).

110.   See, for instance, Charles R. Shipan and Craig Volden, "Bottom-Up Federalism: The Diffusion of Antismoking Policies from U.S. Cities to States," *American Journal of Political Science* 50, no. 4 (2006): 825–43.

111.   See Jerry Kopel's website, http://www.jerrykopel.com/.

attract more residents. We can be especially confident of the relationships between economic freedom (both a lighter fiscal impact and regulatory impact of government policy) and net inmigration; both were statistically significant in almost every model we ran (26 out of 30). Personal freedom also attracts residents, but the relationship was weaker.

The channel by which regulatory freedom attracts residents is lower cost of living and higher economic growth. Over longer time series, regulatory freedom seems to be the bigger driver of subsequent income growth.

Freedom is not the only determinant of personal satisfaction and fulfillment, but as our analysis of migration patterns shows, it makes a tangible difference for people's decisions about where to live. Moreover, we fully expect people in the freer states to develop and benefit from the kinds of institutions (such as symphonies and museums) and amenities (such as better restaurants and cultural attractions) seen in some of the older cities on the coast, in less-free states such as California and New York, as they grow and prosper. Indeed, urban development expert and journalist Joel Kotkin recently made a similar point about the not-so-sexy urban areas that are best situated to recover from the economic downturn:

> Of course, none of the cities in our list competes right now with New York, Chicago, or L.A. in terms of art, culture, and urban amenities, which tend to get noticed by journalists and casual travelers. But once upon a time, all those great cities were also seen as cultural backwaters. And in the coming decades, as more people move in and open restaurants, museums, and sports arenas, who's to say Oklahoma City can't be Oz?[112]

These things take time, but the same kind of dynamic freedom enjoyed in Chicago or New York in the 19th century—that led to their rise—might propel places in the middle of the country to be a bit more hip to those with urbane tastes.

Lastly, we would stress that the variance in liberty at the state level in the United States is quite small in the global context. Even New York provides a much freer environment for the individual than the majority of countries. There are no Burmas or North Koreas among the American states. Still, our federal system allows states to pursue different policies in a range of important areas. The policy laboratory of federalism has been compromised by centralization, most recently in health insurance, but is still functioning. Indeed, Colorado, Washington, Alaska, Oregon, Massachusetts, Maine, Nevada, and

California have proven how robust this laboratory can be even in the face of federal power when they liberalized their marijuana laws over the last six years.

Regardless of one's views about freedom as we define it, the information this study provides should prove useful to those looking for a better life. As Americans—especially those who are currently less fortunate—grow richer in future years, quality of life will matter more to residence decisions, while the imperative of higher-paying employment will decline by comparison. For many Americans, living under laws of which they approve is a constituent element of the good life. As a result, we should expect more ideological "sorting" of the kind economist and geographer Charles Tiebout foresaw.[113] High-quality information on state legal and policy environments will matter a great deal to those seeking an environment friendlier to individual liberty.

---

112.   Joel Kotkin, "Welcome to Recoveryland: The Top 10 Places in America Poised for Recovery," November 8, 2010, http://www.joelkotkin.com/content/00320-welcome-recoveryland-top-10-places-america-poised-recovery.

113.   Charles Tiebout, "A Pure Theory of Local Expenditures," *Journal of Political Economy* 64 (1956): 416–24.

# PART 3

# FREEDOM STATE BY STATE

**T**he following state profiles contain (a) a chart of each state's personal, economic, and overall freedom rankings over time (because these are ranks, lower numbers are better); (b) key facts on each state; (c) a descriptive analysis of each state's freedom situation; and (d) three specific policy recommendations that would increase freedom in each state. We choose policy recommendations that would have the greatest effects on the state's freedom score, consistent with its political environment. For instance, urging New York to pass a right-to-work law would be futile, but eliminating rent control through state legislation might be more feasible. The discussions for each state represent the policy environment as of our data cutoff date, although we have attempted to note some of the most significant policy changes that occurred after that date.

# KEY TO THE PROFILES

The following profiles contain some basic information about each state, including the state's freedom rankings over time and various institutional, political, demographic, and economic indicators of interest. The next few pages provide a brief description of each element contained in the profiles, keyed to the sample profile opposite. They also supply more information about the variables we have chosen to include.



*sample spread*

## 1. STATE ID

### State Name

State profiles appear in alphabetical order. The District of Columbia and unincorporated organized territories are not included in this index.

### State Rankings

Each state's overall rank for 2016 is displayed prominently at the top of the spread, next to the state name. A chart below the state name presents the state's segmented, historical rankings for each year from 2000 to 2016.

## 2. DEMOGRAPHICS

Population
Net Migration Rate

## 3. FISCAL FACTORS

State Taxes, Percent of Personal Income
Local Taxes, Percent of Personal Income
Partisan Lean, 2016

## 4. INCOME AND WEALTH

Real Per Capita Personal Income
Real Personal Income Growth, CAGR (compound annual growth rate)

## 5. ANALYSIS

The analysis section of each state profile begins with an introduction and then discusses fiscal, regulatory, and personal freedom issues in the state, in that order.

## 6. POLICY RECOMMENDATIONS

There are three policy recommendations for each state, corresponding to the three dimensions of freedom: fiscal policy, regulatory policy, and personal freedom, in that order. We considered three criteria as we decided which policy recommendations to include in this book:

1. **Importance.** The recommended policy change would result in a significant boost to the state's freedom score.

2. **Anomalousness.** The policy change would correct a significant deviation of the state's policies from national norms.

3. **Feasibility.** The policy change would likely prove popular, taking into account the state's ideological orientation and the political visibility of the issue.

# ALABAMA

2016 RANK

## 28th



FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

1
10
20
30
40
50

2000   2005   2010   2015

**YEAR**

## POLICY RECOMMENDATIONS

• **Fiscal:** Encourage the privatization of hospitals and utilities to bring government employment down closer to the national average. Private utility monopolies will, however, require careful rate regulation.

• **Regulatory:** Improve the civil liability system by tightening or abolishing punitive damages and abolishing joint and several liability.

• **Personal:** Reduce incarceration rate with thorough sentencing reform, including abolishing mandatory minimums for nonviolent offenses and lowering maximum sentences for marijuana offenses and other victimless crimes.



Population, 2017
**4,874,747**

Net Migration Rate
**2.0%**



State Taxes, Percent of Personal Income, FY 2017
**5.00%**

Local Taxes, Percent of Personal Income, FY 2015
**3.05%**

Partisan Lean, 2016
**R +14.3**



Real Per Capita Personal Income, 2016, in 2009 $
**$40,689**

Real Personal Income Growth, CAGR, 2000–15
**2.4%**

## ANALYSIS

Alabama's overall freedom ranks just 28th in the country. As a socially conservative Deep South state, it is unsurprising that Alabama does much better on economic freedom than on personal freedom. But three of its four neighbors do substantially better on economic freedom (Florida, Tennessee, and Georgia), with only Mississippi doing worse. Alabama's overall freedom level has remained essentially flat since year-end 2014, the end date for our data in the fourth edition, while it has improved a bit since 2000 even in terms of nonfederalized policies.

Alabama has always been one of the lowest-taxed states in the country. Its combined state and local tax collections, excluding motor fuel and severance, were an estimated 8 percent of adjusted personal income in fiscal year 2017. State-level taxes fell quickly in the early stages of the Great Recession and have not increased much since then. Local taxes crept up a bit over the 2000–2008 period but have fallen off since highs reached during the Great Recession. Alabama has a moderate degree of choice in local government. Municipalities are more important than counties, but counties are still important, and municipalities are not numerous enough to give Alabama even one competing jurisdiction per 100 square miles.

Alabama's debt burden is fairly low. However, public employment is high because of publicly owned utilities and hospitals.

On regulatory policy, Alabama does especially well on land-use and labor policy. In fact, it scores first in that area. However, it does well below average on its tort system and certain cronyist policies. Indeed, it ranks 35th in our cronyism index. Local zoning has a light touch, allowing the housing supply to rise elastically with the state's growing population. Alabama enjoys a right-to-work law, no

minimum wage, and liberal workers' compensation mandates. Unfortunately, the state passed an E-Verify mandate on employers in 2011–12 and prevents employers from banning guns in company parking lots. Alabama has made some moves to improve its civil liability system, but it could do further reforms. The standard of evidence for punitive damages remains unreformed. The state has not abolished joint and several liability.

Alabama suffers from too many cronyist regulations on business and occupation entry. Like several other southern states, Alabama has a strong physicians' and dentists' lobby that has prevented nurse practitioners and dental hygienists from practicing independently. The state has a certificate-of-need requirement for hospital construction. Personal automobile and homeowner's insurance rates require the insurance commissioner's prior approval. Alabama has a long-standing anti-price-gouging law that will create real harm if the state is ever struck by a major natural disaster. The state also bans sales below cost of gasoline.

The state is one of the worst in the country on personal freedom, despite benefiting from the Supreme Court's *Obergefell* decision, which had the effect of nullifying Alabama's prohibition on all same-sex partnership contracts.[114]

Alabama was long below average for conservative states on gun rights, but in 2013–14 it moved to shall-issue on concealed carry, and permit costs are low. Alcohol regulations have gradually loosened over time, but the state still has some of the highest beer and spirits taxes in the country, along with local blue laws. It has above-average wine taxes and a ban on direct wine shipment (despite a 2017 attempt in the state senate to allow it). The state has done nothing to reform its cannabis laws; it is possible to receive life imprisonment for a single marijuana trafficking offense not

114.   Obergefell v. Hodges, 135 S. Ct. 2584.

involving minors or a school zone. Alabama has a much higher incarceration rate than the national average, even adjusting for its violent and property crime rates. However, its police are actually not very vigorous in pursuit of arrests for victimless crimes. The state continues to suspend driver's licenses for drug offenses not related to driving. Despite substantially reducing its prison collect call rate in 2015, the state still has one of the highest rates in the country. Alabama does much better than average on tobacco freedom because of low taxes and relatively lenient smoking bans on private property. The state is mediocre on educational freedom but did enact a modest private scholarship tax credit law in 2013–14.

# ALASKA

2016 RANK
## 15th



FISCAL    REGULATORY    PERSONAL    OVERALL

RANK

YEAR

## POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending in the areas of grossest over-spending relative to national averages: education (for which Alaska has the highest spending-to-income ratio in the nation), corrections, administration (especially financial administration and public buildings), housing and community development spending, and "miscellaneous commercial activities." Use the proceeds to reduce the corporate income tax permanently, helping the economy to diversify away from energy.

• **Regulatory:** Enact a right-to-work law to attract manufacturing investment.

• **Personal:** Reform asset forfeiture to require a criminal conviction before forfeiture and to require Department of Justice equitable sharing proceeds to follow the same procedure.



Population, 2017
**739,795**

Net Migration Rate
**–7.1%**



State Taxes, Percent
of Personal Income, FY 2017
**2.05%**

Local Taxes, Percent
of Personal Income, FY 2015
**4.50%**

Partisan Lean, 2016
**R +10.7**



Real Per Capita Personal
Income, 2016, in 2009 $
**$47,831**

Real Personal Income
Growth, CAGR, 2000–15
**3.1%**

## ANALYSIS

Alaska is an unusual state because of its enormous oil and gas reserves and revenues. Its fiscal policy scores fluctuate wildly depending on the global price of oil. With the end of the 2000s' commodity boom, corporate income tax collections plummeted in Alaska, and the state buffered the decline with large withdrawals from its enormous rainy-day fund. Alaska has by far the highest cash-to-liability ratio of any state.[115]

Alaska's enviable net asset position has also made for something of a "resource curse" in the state's expenditures. Of the employed population in Alaska, 17.9 percent work in state or local government, nearly two standard deviations above average. Government consumption is similarly high. Although local taxes outstrip state taxes (which are quite low)—lately by a wide margin—local jurisdictions are so consolidated that there is virtually no choice among local government options.

Despite its attractive overall fiscal situation, or perhaps because of it, Alaska does poorly on several important regulatory policy indicators and does middling overall. The labor market is far more regulated than one would expect for such a conservative state. There is no right-to-work law; the state has strict workers' compensation mandates and a high minimum wage ($9.84 per hour in 2018). Many occupations are licensed in Anchorage and Fairbanks, where about half of the state's population lives. Insurance is pretty heavily regulated. On the other hand, Alaska gives a good bit of practice freedom to nurses and dental hygienists, does not zone out low-cost housing, and has one of the nation's best civil liability systems (an area in which the state has improved a great deal over the past 16 years).

As one of the country's most libertarian states, Alaska has always done well on personal freedom and actually improved into a top-five state over the past few years. Drug arrests are quite low (a standard deviation and a half below average); crime-adjusted incarceration is below the national average; marijuana is legal; homeschooling is unregulated; and gun rights are secure (for instance, concealed carry of handguns does not require a license). However, the state used to have one of the most anti-gay-marriage laws in the nation, forbidding even private partnership contracts for same-sex couples. (Of course, *Obergefell* federalized the issue and overturned these laws.) The state's civil asset forfeiture law is among the worst in the country, which probably accounts for why local police do not bother to ask the Department of Justice to "adopt" many cases. The burden of proof is on the owner of the property to prove innocence, property is subject to forfeiture on the basis of mere probable cause, and the proceeds largely go to law enforcement. Sales of all alcohol, even beer, are prohibited in grocery stores. Alcohol taxes, especially for beer, are also among the highest in the country. Gambling freedom is low, and the cigarette tax is high at $2 per pack in 2018. There is no helmet law for motorcyclists.

115. Eileen Norcross, "Ranking the States by Fiscal Condition," Mercatus Research, Mercatus Center at George Mason University, Arlington, VA, July 2015.

# ARIZONA

2016 RANK

## 9th



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Provide an easy procedure for small groups of neighborhoods to incorporate new municipalities, either out of unincorporated areas or out of existing cities. Keep state aid to localities at a low level to allow local jurisdictions to provide different levels and mixes of public goods according to the desires of their residents.

• **Regulatory:** Provide for full competition in telecommunications and cable, allowing different wireline and wireless companies to attract customers without service mandates, price controls, or local franchising exactions.

• **Personal:** Legalize for-profit casinos and card games.



Population, 2017
**7,016,270**

Net Migration Rate
**18.9%**



State Taxes, Percent of Personal Income, FY 2017
**4.88%**

Local Taxes, Percent of Personal Income, FY 2015
**3.75%**

Partisan Lean, 2016
**R +3.2**



Real Per Capita Personal Income, 2016, in 2009 $
**$38,265**

Real Personal Income Growth, CAGR, 2000–15
**3.1%**

## ANALYSIS

Arizona has moved up in the overall rankings over the last two decades, improving considerably on personal freedom while maintaining above average performance on economic freedom. It has lost ground consistently on regulatory policy but is still ranked in the top 20.

Fiscal policy has typically been more of a problem than regulatory policy, but the two have converged over the years. State and local taxes are 8.7 percent of adjusted personal income, well below average. Although local taxes are around the national average, state-level taxes are reasonably low. The state depends heavily on sales taxes, permitting generally low individual and business income taxes. Arizona has very little scope for choice among local jurisdictions. Although municipalities are more important than counties, there are only 91 municipalities in the whole state. Debt and government consumption are below average, and government employment is a lot better than average, at only 11.2 percent of the private sector.

On regulatory policy, Arizona is laudably one of the best in the country in terms of anti-cronyism. In most industries, business entry and prices are quite liberalized and occupational licensing has ratcheted up substantially over time. There are no certificate-of-need laws for hospital construction or movers. The right-to-work law probably attracts manufacturing businesses, but the state has done little to promote competition in telecommunications and cable. It has a higher-than-federal minimum wage that has risen significantly because of Proposition 206, passed by popular vote in 2016. That law meant a rise from $8.05 per hour to $10 per hour, with subsequent increases to $10.50 per hour in 2018, $11 per hour in 2019, and $12 per hour in 2020. It also has an E-Verify mandate. Although land-use regulation tightened in the 1990s and early 2000s, a regulatory taking initiative may have curbed its growth a little since 2006.

Arizona's personal freedom improvements are due to growing gun rights ("constitutional carry" passed in 2009–10); a medical marijuana law; school vouchers (passed in 2011–12); declining victimless crime arrests; the abolition of its sodomy law, due to Supreme Court decision in *Lawrence v. Texas*; the judicial legalization of same-sex marriage; and liberalizing its wine shipment laws. On the other side of the ledger, incarceration rates are still quite high, climbing relatively consistently until reaching their peak in 2014 and then moving down slightly after that. Arizona's cigarette taxes are higher than average, and smoking bans have become comprehensive and airtight. (The latter, like the state's minimum wage, is explained in part by the ballot initiative, which really does result in some observable "tyranny of the majority.") Not much change has been observed in alcohol freedom, where the state is better than average, or gambling freedom, where the state is worse than average.

# ARKANSAS

**2016 RANK**

## 31st



FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Cut the state sales and use tax, which is high. Let local governments vary property taxes to meet local needs and desires, reducing state aid for education and other purposes.

• **Regulatory:** Roll back occupational licensing. Some occupations that could be deregulated include sanitarians, title abstractors, interpreters, dietitians and nutritionists, pharmacy technicians, veterinary technologists, opticians, athletic trainers, occupational therapist assistants, massage therapists, private detectives, security guards, landscaping contractors, tree trimmers (locally), funeral apprentices, collection agents, 911 dispatchers, tree injectors, construction contractors, security alarm installers, well drillers, mobile home installers, and boiler operators.

• **Personal:** Enact a generous tax credit for contributions to private scholarships for K–12 education.



Population, 2017
**3,004,279**

Net Migration Rate
**3.1%**



State Taxes, Percent
of Personal Income, FY 2017
**7.51%**

Local Taxes, Percent
of Personal Income, FY 2015
**2.10%**

Partisan Lean, 2016
**R +14.6**



Real Per Capita Personal
Income, 2016, in 2009 $
**$41,371**

Real Personal Income
Growth, CAGR, 2000–15
**3.1%**

### ANALYSIS

Arkansas has been mediocre on economic freedom since 2000, although it has improved relative to other states on regulatory policy while declining on fiscal policy. It has ranked consistently worse than most states on personal freedom, declining substantially relative to others since 2005 and receiving very little bump from the Supreme Court's legalization of same-sex marriage in 2015.

Arkansas's tax burden is about average, but the state is highly fiscally centralized. State taxes are way above the national average, and local taxes are way below. Debt is low, but government employment at 13.7 percent of private employment is high (though declining consistently since 2010).

Arkansas does well on land-use despite its unreformed eminent domain laws. It has above-average labor-market freedom, although it began regular minimum-wage increases in 2014 because of a popular initiative; minimum wage stands at $8.50 as of 2018. The state has a problem with cronyism, especially on entry and price controls. The extent of occupational licensing is more than a standard deviation worse than the national average. Hospital construction requires a certificate of need, the state has an anti-price-gouging law, and there is also a general law against "unfair pricing" or sales below cost. However, Arkansas does better than most other southern states, and indeed better than the national average, on its civil liability regime. The state has also started to deregulate telecommunications and cable.

Arkansas is one of the worst states in the country on criminal justice policies. Its crime-adjusted incarceration rate is more than a standard deviation worse than the national average, and its drug enforcement rate has moved in the wrong direction. It also suspends driver's licenses for those with drug offenses unrelated to driving. On the other hand, it does a bit worse on gun rights than one might expect from a conservative state, with heavy training requirements. However, it did expand where concealed-carry permit holders could carry in 2017. Marijuana laws are largely unreformed, although voters did pass a medical marijuana initiative in 2016. However, the implementation of that initiative has been delayed into 2018. Arkansas does not deviate much from the average on many personal freedom policies. School choice remains an opportunity for improvement, given the state's fiscal centralization (so there's not much choice among public schools), its generally conservative ideological orientation, and its minority student populations.

# CALIFORNIA

**2016 RANK**
## 48th





Population, 2017
**39,536,653**

Net Migration Rate
**–6.0%**



FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

2000   2005   2010   2015

**YEAR**



State Taxes, Percent
of Personal Income, FY 2017
**6.98%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.85%**

Partisan Lean, 2016
**D +14.4**



Real Per Capita Personal
Income, 2016, in 2009 $
**$44,562**

Real Personal Income
Growth, CAGR, 2000–15
**1.8%**

## POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending in the areas of health and hospitals, housing and community development, and employee retirement, where it is above the national average, and use the proceeds to reduce indebtedness.

• **Regulatory:** Penalize localities with exclusionary zoning by withholding state housing funds. Reduce the ability of residents to force local referenda on new housing developments.

• **Personal:** Expand legal gambling. California's political culture is unlikely to have many qualms about gaming, but legalizing nontribal casinos would require a constitutional amendment.

## ANALYSIS

California is one of the least free states in the country, largely because of its long-standing poor performance on economic freedom. Given this, it is likely no surprise that the Golden State is the most cronyist state in the union. It has long suffered from a wide disparity between its economic freedom and personal freedom ranking, but it is not as if the state is a top performer in the latter dimension. Indeed, it is quite mediocre on personal freedom.

Despite Proposition 13, California is one of the highest-taxed states in the country. California's combined state and local tax collections were 10.8 percent of adjusted personal income. Moreover, because of the infamous *Serrano* decision on school funding, California is a fiscally centralized state. Local taxes are about average nationally, while state taxes are well above average. Government debt is high, at 20.9 percent of personal income. The state's government employment is lower than the national average, at 11.2 percent of private employment.

Regulatory policy is even more of a problem for the state than fiscal policy. California is one of the worst states on land-use freedom. Some cities have rent control, new housing supply is tightly restricted in the coastal areas despite high demand, and eminent domain reform has been nugatory. The state even mandates speech protections in privately owned shopping malls. Labor law is anti-employment, with no right-to-work law, high minimum wages, strict workers' compensation mandates, mandated short-term disability insurance, stricter-than-federal anti-discrimination law, and prohibitions on consensual noncompete agreements.

Occupational licensing is extensive and strict, especially in construction trades. The state is tied for worst in nursing practice freedom. The state's mandatory cancer labeling law (Proposition 65) has significant economic costs.[116] California is one of the worst states for consumers' freedom of choice in homeowner's and automobile insurance. On the plus side, there is no certificate-of-need law for new hospitals, there have been some moves to deregulate cable and telecommunications, and the civil liability regime has improved gradually over the past 14 years.

California is a classic left-wing state on social issues. Gun rights are among the weakest in the country and have been weakened consistently over time. It was one of the first states to adopt a smoking ban on private property, but other states have since leapfrogged California in their restrictiveness, and tobacco taxes are actually a bit lower than average. California was an early leader on cannabis liberalization, fell behind in recent years, and has again become the top state for marijuana freedom with the 2016 passage of Proposition 64 legalizing the cultivation, sale, and possession of marijuana. Alcohol is not as strictly regulated as in most other states and taxes on alcohol are relatively low. Physician-assisted suicide was legalized in 2015. Private school choice programs are nonexistent, and the state risks falling behind its neighbors Nevada and Arizona as an education entrepreneur. There is some public school choice, and homeschooling is moderately regulated. Incarceration and drug arrest rates used to be higher than average but have fallen over time, especially since 2010. The state is a leader in marriage freedom, adopting same-sex partnerships and then civil unions fairly early (although it gained same-sex marriage only recently).

116.   David R. Henderson, "Proposition 65: When Government Cries Wolf," Econlog, April 14, 2013, http://econlog .econlib.org/archives/2013/04/proposition_65_1.html.

# COLORADO



**2016 RANK**

## 4th

FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

2000    2005    2010    2015

**YEAR**

### POLICY RECOMMENDATIONS

• **Fiscal:** Trim spending on local parks, a category that excludes conservation lands. The state spends 50 percent more than the national average (as a share of the economy) on local parks. Also trim spending on utilities, interest on the debt, health and hospitals, and airports, which are a little above the national average. Reduce taxes in these areas.

• **Regulatory:** Reduce government barriers to opportunity by joining all of the state's neighbors except for New Mexico and becoming a right-to-work state. Also abolish remaining entry restrictions, such as those on moving companies.

• **Personal:** Require all equitable sharing revenues from the Department of Justice to follow state-level procedures for civil asset forfeiture.



Population, 2017
**5,607,154**

Net Migration Rate
**11.1%**



State Taxes, Percent
of Personal Income, FY 2017
**4.17%**

Local Taxes, Percent
of Personal Income, FY 2015
**4.47%**

Partisan Lean, 2016
**D +0.5**



Real Per Capita Personal
Income, 2016, in 2009 $
**$45,806**

Real Personal Income
Growth, CAGR, 2000–15
**2.1%**

### ANALYSIS

Colorado has long been one of America's freer states, and it is a top-five state in this edition. It does best on personal and fiscal freedom. However, it underperforms on regulatory freedom and has dipped over the course of our study on this dimension (although less dramatically when excluding federalized policies).

Colorado's overall state and local tax burden is an estimated 8.6 percent of adjusted personal income, lower than the national average. State-level taxes have crept upward a bit since their 21st-century low in FY 2009, but the past two years have seen slight decreases. Local tax revenues, meanwhile, have fallen from their peaks in 2009. Although fiscal decentralization is high when measured as the ratio of local to state taxes, there isn't much choice of local government, given the importance of counties and the paucity of incorporated cities. Debt has fallen to about average after peaking in FY 2010. State and local employment is lower than average and has dipped to 12 percent of private employment from a high of 12.8 percent less than a decade ago. But it is still higher than it was in 2000.

Colorado is our number-one state on freedom from cronyism, although it is below average on regulatory policy as a whole. It earns its top ranking in our cronyism index because of its relatively open occupational licensing system, including broad scope of practice for health care professionals and lack of a certificate-of-need law for hospitals. However, Colorado does require household goods movers to get certificates of public convenience and necessity, prohibits price increases for pharmaceuticals during emergencies, and proscribes all "unfair" pricing in gasoline specifically and in other industries. Its legal regime for torts is much better than average. In 2013–14 the state deregulated telecommunications somewhat, though it still lacks statewide video franchising. It is a little below average on labor-market freedom, with no right-to-work law and a high minimum wage (because of a 2016 voter-approved amendment, the state will see regular increases through 2020 until it reaches $12 per hour and then will be adjusted on the basis of the cost of living). Colorado's land-use freedom has declined significantly, and its renewable portfolio standard for electricity is much stricter than the national average and probably results in higher rates.

Colorado started out personally freer than the average state in 2000 and is now among the personally freest states. It has led the way with recreational cannabis legalization, which occurred in stages from 2012 to 2014. Legal gambling and gun rights are above average, although the qualifications for carry licensure are fairly strict. Its beer, wine, and spirits taxes are much better than average. Travel freedom is relatively high, with no motorcycle helmet law. Colorado's asset forfeiture law is good, though local agencies frequently circumvent it with equitable sharing. Crime-adjusted incarceration rates are above the national average, but drug arrests are relatively low. The state legalized civil unions in 2013 and then was judicially granted same-sex marriage in 2014. Voters approved physician-assisted suicide in 2016. Educational freedom is somewhat below average, as there are no private school choice programs. But the state has long enjoyed public school choice.

87

# CONNECTICUT

2016 RANK
## 33rd





FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR

## POLICY RECOMMENDATIONS

• **Fiscal:** Cut individual income taxes, which are much higher than average. Housing and "miscellaneous" government spending categories are higher than the national average and could likely be trimmed.

• **Regulatory:** Enact statewide restrictions on eminent domain.

• **Personal:** Reduce the incarceration rate to match regional levels by reducing maximum sentences and eliminating mandatory minimums for nonviolent crimes.[117]



Population, 2017
**3,588,184**

Net Migration Rate
**–7.3%**



State Taxes, Percent of Personal Income, FY 2017
**5.80%**

Local Taxes, Percent of Personal Income, FY 2015
**4.30%**

Partisan Lean, 2016
**D +6.9**



Real Per Capita Personal Income, 2016, in 2009 $
**$57,554**

Real Personal Income Growth, CAGR, 2000–15
**1.7%**

## ANALYSIS

Connecticut is a middling state that is below average on overall freedom and falls about halfway between its freer neighbor, Massachusetts, and its less free one, Rhode Island. It suffers most from having consistently stifling regulatory policy that drags down its economic freedom ranking while, perhaps surprisingly for a New England "blue" state, also performing relatively poorly on personal freedom as other states have leapfrogged it.

After getting hit hard by the Great Recession, state finances have bounced back, along with the state's fiscal policy score. Although Connecticut residents enjoy broad scope of choice among local governments, state government tax collections are about 33 percent greater than local tax collections, making the choice of local government less valuable. As a share of the economy, state-level taxation has fallen substantially since FY 2013, and local taxes have also come down from their Great Recession peak. Debt now hovers around 20 percent of personal income.

Connecticut does poorly in most areas of regulatory policy. Exclusionary zoning is common. Renewable portfolio standards are tight, keeping electric rates high. The state has a minimum wage; the legislature enacted a law in 2014 that raised it every year for four years, resulting in a rate of $10.10 per hour as of 2018. The legislature is threatening to increase the minimum wage again, to $15 per hour. The state also lacks a right-to-work law. Connecticut was once a leader in occupational openness, but the state grew dramatically more closed between 2000 and 2012;

by one measure, 2016 was its worst year yet. However, in 2013–14, the state legalized independent nurse practitioner practice with prescription authority, a significant achievement. Price regulation in the property and casualty market has become more interventionist over time. The civil liability system is mediocre. Cable was deregulated a decade ago.

On personal freedom, Connecticut has improved over the years in absolute terms, although it has dipped slightly since its 2014 peak. However, it has not kept up with other states and has slipped in the rankings. Despite Connecticut's gun manufacturing tradition, firearms are strictly regulated. The state decriminalized low-level possession of cannabis and enacted a medical marijuana law in 2011–12. As of this writing, the legislature is earnestly considering recreational marijuana legalization. Alcohol taxes are relatively low, and alcohol blue laws were finally repealed in 2012. The state has no private school choice programs, but it does have interdistrict public school choice. Cigarette taxes are sky-high ($4.35 a pack in 2018), and smoking bans, except for private workplaces, are tight. The state's asset forfeiture law and practice are better than average. Crime-adjusted incarceration rates are around the national average but are much higher than those of other New England states. Victimless crime arrests are much lower than the national average. The state legalized same-sex marriage in 2007–8. Travel freedom declined since the fourth edition because of new requirements for uninsured and underinsured coverage, but driver's licenses have been available since 2013 to residents without Social Security numbers.

---

117.   For a list of Connecticut crimes for which there are mandatory minimum sentences, see Terrance Adams, "Crimes with Mandatory Minimum Sentences: Updated and Revised," Office of Legislative Research, Connecticut General Assembly, Hartford, February 5, 2013, https://www.cga.ct.gov/2013/rpt/2013-R-0103.htm.

# DELAWARE

**2016 RANK**
## 43rd



FISCAL    REGULATORY    PERSONAL    OVERALL

| | |
|---|---|

**YEAR**



Population, 2017
**961,939**

Net Migration Rate
**9.1%**



State Taxes, Percent
of Personal Income, FY 2017
**7.47%**

Local Taxes, Percent
of Personal Income, FY 2015
**2.39%**

Partisan Lean, 2016
**D +5.4**



Real Per Capita Personal
Income, 2016, in 2009 $
**$43,223**

Real Personal Income
Growth, CAGR, 2000–15
**2.1%**

## POLICY RECOMMENDATIONS

• **Fiscal:** Reduce state-level taxes and education spending. Delaware is one of the freest-spending states in the country on education. Allow local governments to pick up more of the school spending out of their own fiscal resources.

• **Regulatory:** Liberalize insurance laws by moving to a "use and file" system for property and casualty rates and life insurance forms, and join the IIPRC.

• **Personal:** Eliminate or significantly limit civil asset forfeiture, consistent with reform trends across the country aimed at protecting the individual property rights of innocent people prior to conviction.

## ANALYSIS

Since the early 2000s, Delaware has lost a lot of ground across the board relative to the rest of the country. It now ranks in the bottom third on all three dimensions of freedom, earning its 43rd place by overall poor performance. Part of the reason for this low ranking is that the state had one of the most free-market health insurance systems before the enactment of the Patient Protection and Affordable Care Act (PPACA), and so it suffered disproportionately because of the federal law. Moreover, its much-touted advantage on corporate law is significantly overstated.

On fiscal policy, Delaware is below average but improved from its relative trough several years ago. The overall tax burden, at about 9.8 percent of personal income, is worse than average, and the state is highly fiscally centralized with most of the tax burden at the state level. With 1.6 competing jurisdictions per 100 square miles, Delawareans would stand to benefit were the state to allow more tax space for local governments. Debt and public employment are about average.

Delaware has been getting worse on regulatory policy and is below average on most regulatory policy categories. Labor law is fairly anti-employment, with a minimum wage and no right-to-work. Occupational freedom is mediocre, with dental hygienists and nurse practitioners unable to practice independently. The state has certificate-of-need laws for hospitals. Land-use regulation ratcheted up significantly in the 2000–2010

period, as have renewable portfolio standards for utilities. The state's insurance commissioner treats property and casualty insurance rates under "prior approval" contrary to statute, according to the Insurance Information Institute.[118] The state remains one of a handful that have not joined the Interstate Insurance Product Regulation Compact (IIPRC). Even the state's vaunted liability system has actually deteriorated since 2000 to merely average, we find. The state has enacted no tort reforms, and the size of the legal sector has grown, whether measured in number of lawyers or share of GDP.

Delaware is below the national average in personal freedom. The state is mediocre on gun rights; the biggest problem area is the "may-issue" regime for concealed-carry licensing. Gambling freedom is higher than the national average, and the state was at the forefront of legal online gambling for its own residents. There are no private school choice programs, but homeschooling is easy. Smoking bans are comprehensive, and cigarette taxes were about average until 2017, when the rate was increased 60 cents to $2.10 per pack. The state's medical cannabis law was expanded in 2011–12, and low-level possession was decriminalized in 2015. Alcohol taxes, already a bit lower than average, have eroded over time because of inflation. However, the state bans direct wine shipments. Delaware is roughly average on the overall incarceration and arrests category, but the state's civil asset forfeiture law is tied for worst in the country, with few protections for innocent owners.

---

118.   See the "Metadata" tab of the n_reg_15.xls spreadsheet.

89



# FLORIDA

**2016 RANK**

## 1st

FISCAL    REGULATORY    PERSONAL    OVERALL



RANK

YEAR

## POLICY RECOMMENDATIONS

• **Fiscal:** Trim spending on sanitation and sewerage, public parks, parking lots, public utilities, and air transportation, which are all higher as a share of income than the national average. Use the proceeds to cut general and utility sales taxes.

• **Regulatory:** Reform the occupational licensing system to free residents who are currently stymied by those barriers to entry and opportunity. Candidates for deregulation include farm labor contractors, interior designers, medical and clinical laboratory technologists, pharmacy technicians, dispensing opticians, funeral attendants, and bill and account collectors.

• **Personal:** Enact the following criminal justice reforms: (a) close the loophole allowing for seizure of cash and monetary instruments without an arrest, and close the equitable sharing end-run around state forfeiture law; and (b) end driver's license suspensions for non-driving-related drug convictions, as most of the country has done, and provide "safety valves" from mandatory minimum sentences.



Population, 2017

**20,984,400**

Net Migration Rate

**13.6%**



State Taxes, Percent of Personal Income, FY 2017

**3.49%**

Local Taxes, Percent of Personal Income, FY 2015

**3.48%**

Partisan Lean, 2016

**R +1.0**



Real Per Capita Personal Income, 2016, in 2009 $

**$41,623**

Real Personal Income Growth, CAGR, 2000–15

**3.0%**

## ANALYSIS

Lacking an individual income tax and featuring a hot climate, Florida has long enjoyed substantial migration of well-off retirees. But as we've noted in the past, the state attracts more than seniors, as others vote with their feet for good weather and the increased opportunity afforded by Florida's freer society. Florida does especially well on economic freedom, especially on fiscal policy. Indeed, it is our top state on both. Regulatory policy is improved but mediocre in comparison to the fiscal side. Florida's personal freedom has lagged in the past; however, it has improved a lot over the past two years.

Florida's state-level tax collections are more than a standard deviation and a half below the national average, while its local tax collections are about average. Florida's fiscal decentralization does not offer a great deal of choice to homeowners, however, because the state has only about half an effective competing jurisdiction per 100 square miles. Government consumption and debt are lower than average. Government employment is much below average, falling from 11.2 percent of private employment in 2010 to 9 percent in 2016.

Florida's regulatory policy is middling relative to other states but has gotten better in absolute terms, leaving aside federalized policies. Despite the temptations posed by high housing demand, homeowners have not been able to enact exclusionary zoning on anything like the levels of California or New Hampshire. Our two measures of local zoning give a split judgment on just how restrictive Florida is. Land-use regulation appears to be a major political issue, but the courts have tools to restrain local governments, as the state has a particularly strong regulatory takings law. Florida has gone further than just about any other state to tighten criteria for eminent domain. It does have a law restricting employers from banning guns on certain company property, such as parking lots, which violates employers' property rights. Labor law is also above average because of a right-to-work law, but the state has a minimum wage ($8.25 per hour in 2018). Regulations on managed care plans are among the worst in the country, with standing

referrals, direct access to specialists, and a ban on financial incentives to providers. Cable and telecommunications are partially deregulated. The civil liability system is better than average and has improved significantly since the 2000s. On the other side of the ledger, the state is far below average on occupational freedom (it is in the bottom five), the state has a certificate-of-need law for hospitals, and the homeowner's insurance market is among the most regulated and dysfunctional in the country. Physician assistants are now free to prescribe, but nurse practitioners and dental hygienists are not yet free from independent practice limitations.

After falling relative to other states for a decade, Florida has improved its personal freedom ranking over the past two years while enjoying an absolute improvement over the last six years. It is now well above average. Part of this bump was because of the Supreme Court's nationalization of same-sex marriage. Before that decision, Florida did not recognize any kind of same-sex partnership and it banned private contracts amounting to marriage with a super-DOMA. Florida also reformed its civil asset forfeiture regimes, including requiring proof "beyond a reasonable doubt" for forfeitures. On the downside, the state's crime-adjusted incarceration rate has fallen a bit from its high but is still a lot worse than average (although criminal justice reform efforts promise help on that front). Drug arrests are also high despite declining lately, but arrests for other victimless crimes have fallen substantially. Florida is one of the top states for educational freedom, although homeschool regulations remain substantial. The cannabis regime is largely unreformed despite recent liberalization of medical marijuana policy (which we recommended in the fourth edition), while alcohol is lightly regulated despite beer and wine taxes being a bit high. Gun rights are mediocre and became more restrictive in 2018, as the state has waiting periods for handguns, local dealer licensing, and virtually no open carry. It does have a "stand your ground" law and protects the right to use sound suppressors. Tobacco freedom is middling. Automated license plate reader data use and retention have been partially reformed.

# GEORGIA

**2016 RANK**

## 12th



| FISCAL | REGULATORY | PERSONAL | OVERALL |



**Population, 2017**

## 10,429,379

Net Migration Rate

## 8.7%



State Taxes, Percent
of Personal Income, FY 2017

## 4.80%

Local Taxes, Percent
of Personal Income, FY 2015

## 4.13%

Partisan Lean, 2016

## R +3.5



Real Per Capita Personal
Income, 2016, in 2009 $

## $41,407

Real Personal Income
Growth, CAGR, 2000–15

## 2.5%

## POLICY RECOMMENDATIONS

• **Fiscal:** Phase out state-level business subsidies and
prohibit them at the local level.

• **Regulatory:** Liberalize health care professions: permit
independent nurse practitioner practice with prescrip-
tion authority, join the Nurse Licensure Compact, allow
dental hygienists to clean teeth independently of
dentist supervision, and allow physician assistants to
prescribe on all schedules.

• **Personal:** Reform civil asset forfeiture by putting the
burden of proof on the government, requiring evidence
beyond a reasonable doubt that the property was the
product of criminal activity, sending forfeiture pro-
ceeds to the general fund, and requiring all equitable
sharing revenues to meet state standards.

## ANALYSIS

Georgia has been one of the fastest-growing
southern states, likely because of its
strong performance on economic freedom.
Economic freedom also drove the state's high
overall freedom ranking. However, the state
performs poorly on personal freedom despite
some consistent absolute improvements
since 2006 (even without considering the
post-*Obergefell* bump because of the feder-
alization of marriage policy).

State and local taxes were 8.9 percent of
adjusted personal income, well below the
national average. At 4.8 percent of personal
income, state tax collections are signifi-
cantly below the national average, while local
taxes—4.1 percent of income—are above
average. Like most southern states, Georgia
has fewer than one effective competing
local government per 100 square miles,
which reduces the benefit from its fiscal
decentralization. Government consumption
and debt are substantially lower than aver-
age. Government employment used to be
around the national average, but Georgia has
brought it down from 13.2 percent of private
employment in 2010 to 11.1 percent in 2016, a
full standard deviation better than average.

Like other conservative southern states,
Georgia does well on labor and land-use
policy. It has a right-to-work law, no minimum
wage, relaxed workers' compensation regula-
tions, and moderate zoning. It has partially
deregulated telecommunications and enact-
ed statewide video franchising. Unlike some

other states in its neighborhood, however,
Georgia also enjoys a relatively good civil
liability system. In 2007–8 the state relaxed
the approval process for automobile insur-
ance rates, but it regressed in 2015. The one
regulatory policy area where Georgia does
poorly is occupational freedom. The extent of
licensing is a bit less broad than the national
average, and health care professions face
generally tight scope-of-practice rules. The
state also maintains certificate-of-need laws
for hospitals and moving companies.

On personal freedom, Georgia is about
what one would expect from a conservative
southern state. Its incarceration rates are very
high, even adjusted for crime rates, although
victimless crime arrests have fallen and are
better than average. Georgia reformed civil
asset forfeiture modestly in 2015, but it still
performs quite poorly in this category, par-
ticipating much more than average in fed-
eral equitable sharing. The burden of proof
remains on innocent owners, all proceeds
go to law enforcement, and some actions
require only probable cause to show that the
property is subject to forfeiture. It is one of
the worst states for cannabis and gambling.
On the other hand, it is one of the best states
for educational freedom, scores well on gun
rights, and lightly regulates tobacco use
compared with most other states. As of 2018,
Georgia has the second lowest cigarette
taxes in the country. It was one of the worst
states for marriage freedom, but the state
has benefited since the fourth edition from
the *Obergefell* decision.

# HAWAII

**2016 RANK**
## 49th



FISCAL  REGULATORY  PERSONAL  OVERALL

RANK

1
10
20
30
40
50

2000    2005    2010    2015

**YEAR**



Population, 2017
**1,427,538**

Net Migration Rate
**−5.9%**



State Taxes, Percent
of Personal Income, FY 2017
**9.81%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.35%**

Partisan Lean, 2016
**D +16.1**



Real Per Capita Personal
Income, 2016, in 2009 $
**$38,514**

Real Personal Income
Growth, CAGR, 2000–15
**1.9%**

## POLICY RECOMMENDATIONS

• **Fiscal:** Local government looks quite inefficient. The state spends far more than the national average on air transportation, sanitation and sewerage, parks and recreation, public buildings, health and hospitals, interest payments, and "miscellaneous." Cut spending in these areas and local taxes.

• **Regulatory:** Relax the state's extreme land-use regulations. Allow residential uses on land deemed "agricultural," and eliminate either state or county review, which are duplicative.

• **Personal:** Legalize sale and possession of recreational marijuana.

## ANALYSIS

Hawaii has long had one of the lowest levels of economic freedom in the country, but it has continued to slide behind on personal freedom. Thus, it isn't surprising that Hawaii is now the 2nd least free state in the Union. Even with its huge locational rents, Hawaii has experienced a net outflow of residents to the rest of the United States since at least the beginning of last decade. The outflow continued and got even worse in 2016–17.

Hawaii's fiscal policy is decidedly tax and spend. State-level taxes rose from an already high estimated 8.3 percent of personal income in FY 2009 to 9.8 percent in FY 2017. Local government also taxes at a very high level given how little it has to do. Estimated local taxes were 3.4 percent of personal income in FY 2017, only slightly below the national average, even though there are no local schools (education is a state government responsibility). Government debt is much higher than the national average. Government employment is at about the national average.

Hawaii does badly in almost every area of regulatory policy, but its two worst categories are land-use and labor-market freedom. It has among the strictest restrictions on residential building in the country. Eminent domain abuse is unchecked by law. Fortunately, the state doesn't have rent control, despite discussions in the legislature. It has a minimum wage that was fairly modest at $7.25 per hour as recently as 2014, but it has been raised on a schedule since then and now stands at $10.10 per hour in 2018. It has no right-to-work law, and it has strict workers' compensation mandates, a short-term disability insurance mandate, and a stricter-than-federal antidiscrimination law. Hawaii's occupational entry is much more regulated than the national average, and the state has very little scope-of-practice freedom for second-line health care professionals, a hospital certificate-of-need requirement, strict insurance regulations, a price-gouging law, and a general "unfair sales" law (you are not allowed to sell at prices that are "too low"). Nurse practitioners now have full independent practice authority. However, we do show a sustained and substantial improvement in the quality of Hawaii's civil liability system, which rose from above average in 2000 to well above average by 2016. This result came about because of increasing scores in the Chamber of Commerce survey of businesses and shrinkage in the size of the legal sector relative to the economy, whether measured by number of lawyers or legal services' share of GDP.

Hawaii is now one of the worst states on personal freedom, despite being a top state in the incarceration and victimless crime category. It enjoys incarceration and drug enforcement rates that are well below average, while other victimless crime arrest rates have also improved. Hawaii performs below average on civil asset forfeiture. Tobacco freedom is among the lowest in the country, with extremely high cigarette taxes ($3.20 per pack in 2018), draconian smoking bans on private property, and complete prohibition for adults ages 18 to 20. There is virtually no legal gambling, other than home social games. The state has a long-standing and permissive medical cannabis law, but implementation was slow, with dispensary sales only starting in 2017 following a law passed in 2015. It has made no other moves to liberalize marijuana laws in the past decade. Alcohol freedom is better than average, especially with grocery store sales of wine and spirits and no state involvement in distribution, but beer taxes are high. The protection of gun rights is the worst in the country. It is virtually impossible to get a concealed-carry license, all Class III weapons are banned, there is comprehensive registration and purchase permitting of firearms, dealers are licensed, "assault weapons" are banned, large-capacity magazines are banned, and so on. Hawaii does not require helmets for adult motorcycle drivers.

92

# IDAHO



**2016 RANK**

## 17th

FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

2000   2005   2010   2015

**YEAR**

## POLICY RECOMMENDATIONS

• **Fiscal:** Comprehensively decentralize power by making it easy for new municipalities to incorporate and secede from existing ones, shifting responsibilities from counties to municipalities, freeing up local property tax-varying power, and reducing state aid to schools so that localities rely on their own tax base. The last move will also allow the state to cut taxes, particularly the general sales tax, which will give localities more tax room.

• **Regulatory:** Allow dental hygienists to initiate treatment without a dentist's authorization.

• **Personal:** Eliminate or reduce mandatory minimums for nonviolent offenses to reduce the incarceration rate. Allow currently imprisoned offenders to petition for release under the new guidelines.



Population, 2017
**1,716,943**

Net Migration Rate
**13.2%**



State Taxes, Percent of Personal Income, FY 2017
**6.18%**

Local Taxes, Percent of Personal Income, FY 2015
**2.78%**

Partisan Lean, 2016
**R +20.4**



Real Per Capita Personal Income, 2016, in 2009 $
**$38,477**

Real Personal Income Growth, CAGR, 2000–15
**2.8%**

## ANALYSIS

Idaho is one of the most economically and socially conservative states in the country. As a result, it is perhaps unsurprising that it is a top-10 state for economic freedom and a bottom-10 state for personal freedom. Nevertheless, the state continues to enjoy substantial inmigration, primarily from the less-free West Coast. It is also one of the least cronyist states in the Union.

Idaho's fiscal policy has been improving over time, but it remains a weak spot in certain respects and has suffered some dip from its best performance. State-level tax collections as a share of income have risen to their highest level since 2007, now standing at 6.2 percent. That is above the national average and almost half a percent higher than the 21st-century low enjoyed in 2011. Local taxes, however, are well below the national average, at 2.8 percent of adjusted personal income. Local governments are territorially large: there is only about one effective competing jurisdiction per 400 square miles. Government debt is well below the national average, leading to a number-two ranking in that category. However, government employment is about average.

Idaho does well across the board on regulatory policy, earning its second-place ranking. It is one of the best states for occupational freedom, but since 2009 the state has begun to license more occupations. Nurse practitioner independence is protected, and physician's assistants have full prescribing authority. It is one of the very best states for insurance freedom. There is no certificate-of-need requirement for hospitals or moving companies, and direct auto sales were legalized in 2013–14. However, Idaho does have a general "sales below cost" law. The state's civil liability system is one of the best, and the state also scores well above average on labor law, with a right-to-work law. Workers' compensation mandates, though, are strict. Despite its huge influx of new residents over the past two decades, Idaho held the line on land-use controls for a long time. But it is middling relative to other states, and we have seen evidence that new building restrictions have started to come into force since 2006. The state has not done much to curb eminent domain abuse. Statewide video franchising was enacted in 2012.

Idaho is among the worst states outside the Deep South on criminal justice policy. Crime-adjusted incarceration rates are more than a standard deviation above the national average, and the drug enforcement rate is high and rising. Victimless crime arrests are better than average, showing that the state's biggest problem is sentencing. The state is also much less free than average for alcohol and gambling. Taxes on spirits are especially high. Tobacco freedom is much higher than average: cigarette taxes are low, and there is no smoking ban for bars. Homeschooling and private schooling are almost unregulated, but the state has no private school choice programs. It has a religious freedom restoration act. Gun rights are much better than average and improved in 2015 when the state passed legislation allowing concealed carry without a permit for residents over 21 years of age. The state does have a weak law on self-defense in public and a stricter-than-federal minimum age to possess firearms.

# ILLINOIS

**2016 RANK**
## 35th



| FISCAL | REGULATORY | PERSONAL | OVERALL |
|--------|-----------|----------|---------|



Population, 2017
**12,802,023**

Net Migration Rate
**–10.1%**



State Taxes, Percent
of Personal Income, FY 2017
**5.50%**

Local Taxes, Percent
of Personal Income, FY 2015
**5.21%**

Partisan Lean, 2016
**D +7.5**



Real Per Capita Personal
Income, 2016, in 2009 $
**$47,302**

Real Personal Income
Growth, CAGR, 2000–15
**1.8%**

## POLICY RECOMMENDATIONS

• **Fiscal:** Reform the retirement systems of localities to reduce local taxes, which are sky-high.

• **Regulatory:** Reform the civil liability system by capping punitive damages, setting the standard for punitive damages at "beyond a reasonable doubt," and abolishing joint and several liability.

• **Personal:** Resist efforts to increase gun control and to add new restrictions to an already onerous tobacco control regime.

## ANALYSIS

Illinois used to be a relatively decent state for economic freedom, although it almost always did much better on fiscal policy than on regulatory policy. But the state has lost some of that edge while also, not surprisingly, losing some of its economic vitality; its well-publicized woes with employee retirement spending threaten to drive local taxes and debt higher. It is also one of the most cronyist states. Illinois did post one of the most dramatic improvements in personal freedom rankings we have ever seen, from 2011 to 2015, with an even more impressive consistent rise in absolute gains from 2008 to 2015.

Illinois's state-level taxes are currently about at 21st-century historic averages for the state, at 5.5 percent of adjusted personal income, and down from highs posted five years ago. This tax burden is slightly lower than the national average. The biggest problem is that local taxes are among the worst in the country, at 5.2 percent of income. However, residents have good choice among local jurisdictions, with almost two effective competing governments per 100 square miles. The overall tax burden is 10.7 percent, much higher than average. Government consumption is actually a full standard deviation better than average, but debt is quite high at 23.7 percent today, well above the average (although down from its height during the Great Recession). Government employment, at 10.7 percent of private employment, remains significantly below the national average.

Regulatory policy has been a drag on Illinois's rankings throughout the time series. After California, it is the most "cronyist" state in America. It does reasonably well on land-use and insurance freedom but quite poorly on civil liability and occupational freedom. We do not show very many changes on regulatory policy over the past decade, other than liberalization of telecommunications and cable, a ban on employers restricting guns on certain company property such as parking lots, and the recent partial freeing of restrictions on dental hygienists. The state has a slightly higher-than-federal minimum wage at $8.25 per hour in 2018, but Chicago's is even higher at $12 per hour (and is set to rise to $13 in 2019). Unlike its neighbors, Illinois is not a right-to-work state. Renewable portfolio standards have been gradually tightened, raising electricity rates. Direct auto sales for Tesla were legalized in 2013–14. The state has been a fixture on the list of "judicial hellholes," with Madison and Cook counties listed in 2017–18.[119]

Illinois was long our bête noir on personal freedom, but that has dramatically changed with federal court decisions that have overturned some extreme restrictions on gun rights, the legalization of same-sex marriage, marijuana reform, and the availability of driver's licenses without Social Security numbers. It is now comfortably in the middle of the pack. Illinois's new concealed-carry law, begrudgingly enacted by the legislature, is technically shall-issue but remains one of the country's strictest. The state still has local "assault weapon" and large-capacity magazine bans, waiting periods for gun purchases, background checks for private sales, permitting of buyers for some weapons, local registration of some firearms, mandatory locking devices, and so on (it could get worse in 2018 given recent legislative action). Alcohol freedom is better than average, with no state role in distribution and wine and spirits available in grocery stores. Beer and wine taxes are decent. However, there are local blue laws, and spirits taxes are relatively high. The happy hour ban was repealed and mandatory server

119. Judicial Hellholes program website, ATR Foundation, http://www.judicialhellholes.org/archives/; also see "Judicial Hellholes 2017–2018," report from ATR Foundation, http://www.judicialhellholes.org/wp-content/uploads/2017/12/judicial-hellholes-report-2017-2018.pdf.

training added in 2015. Formerly one of the most restrictive states for cannabis, the state now has a medical marijuana law and has decriminalized low-level possession. Despite a ban on handheld cell phones, travel freedom grew in 2013–14 because of the driver's license bill. Legal gambling is expansive, and the state is near the top in this category. Educational freedom is reasonably good, as there are virtually no restrictions on homeschools or private schools, and there is intradistrict school choice and a small tax deduction law for parents' educational expenses. Smoking bans are comprehensive, and cigarette taxes are high (though other states have leapfrogged them of late). Civil asset forfeiture is open to abuse. Illinois is in the middle of the pack on incarceration and arrests for the victimless crime category. Drug arrest rates are still extremely high but have come down significantly since 2005.

# INDIANA



2016 RANK

## 3rd



FISCAL    REGULATORY    PERSONAL    OVERALL

RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Reduce debt and sales and income taxes by cutting spending on health and hospitals, libraries, and interest on the debt, areas where Indiana spends more than the national average.

• **Regulatory:** Allow independent nurse practitioner practice with full prescription authority, join the Nurse Licensure Compact, and legalize independent dental hygienist practice.

• **Personal:** Legalize happy hours and decriminalize low-level marijuana possession.



Population, 2017
**6,666,818**

Net Migration Rate
**−1.3%**



State Taxes, Percent
of Personal Income, FY 2017
**6.15%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.10%**

Partisan Lean, 2016
**R +11.3**



Real Per Capita Personal
Income, 2016, in 2009 $
**$43,180**

Real Personal Income
Growth, CAGR, 2000–15
**2.1%**

## ANALYSIS

Indiana has quietly built a record as one of America's freest states and the freest state by a wide margin in the Great Lakes region. Hoosiers enjoy top scores on all three dimensions of freedom, with regulatory policy a particular area of excellence. Although it has still experienced small net outmigration to the rest of the country over the past 17 years, its record in that department has been better than that of any other of the eight Great Lakes states, and its economic growth has been better than all its neighbors' for at least a decade.

Although Indiana's fiscal policy deteriorated quite a bit between FY 2000 and FY 2009, it has made a good recovery since then. Local taxes have fallen from 4.7 percent of income in FY 2010 to 3.1 percent in FY 2015, and state taxes have edged down as well. Government debt has also fallen over that period. State and local government employment is substantially smaller than the national average, as is government consumption.

Although the PPACA disproportionately harmed the state because of its previously fairly free-market health insurance policies, Indiana has maintained the elements of a solid regulatory policy as far as it can. Land-use freedom is high by any measure, although it could be more consistently principled if it didn't stop employers from banning guns in their parking lots. The state passed right-to-work legislation in 2012 and has resisted increasing the minimum wage above the federal mark. It is a model state for tele-communications deregulation. Occupational freedom is extensive, though not for second-line health care professions. The state did legalize greater prescribing authority by physician assistants in 2013. There is no hospital certificate-of-need requirement, although there is such a requirement for moving companies. Insurance freedom is above average, and the state has recently allowed direct Tesla sales. The civil liability system shows steady improvement over the past decade.

Indiana has more personal freedom than most other conservative states. It was forced to legalize same-sex marriage in 2014 but never had an oppressive super-DOMA. Gun rights are fairly secure, especially for concealed carry, but the state has stricter-than-federal minimum age limits for possession and dealer licensing. The ban on short-barreled shotguns was eliminated in 2015. Victimless crime arrests are fairly low, but the incarceration rate is a bit higher than average, adjusted for crime rates. Educational freedom is excellent, and the state posted major gains in 2011 with a new statewide voucher law and a limited scholarship tax credit law. State civil asset forfeiture law is fairly good, although it is often circumvented through equitable sharing. Legal gambling is extensive. Smoking bans have not gone quite as far as in other states. Marijuana freedom is virtually nonexistent, but alcohol freedom has been improving consistently in the past few years. The state now has direct-to-consumer wine shipments and it reformed off-premises Sunday sales in 2018, and alcohol taxes are low.

# IOWA

**2016 RANK**

## 27th





Population, 2017
**3,145,711**

Net Migration Rate
**−2.3%**

FISCAL   REGULATORY   PERSONAL   OVERALL



YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Trim spending on areas where the state spends more than the national average—education, hospitals, highways, and sanitation—and use the savings to trim property, sales, income, and motor vehicle license taxes.

• **Regulatory:** Repeal certificate-of-need requirements for new hospital construction and for moving companies.

• **Personal:** Amend the constitution to protect the individual right to bear arms, and apply strict scrutiny to future attempts to restrict gun rights.



State Taxes, Percent of Personal Income, FY 2017
**6.49%**

Local Taxes, Percent of Personal Income, FY 2015
**4.27%**

Partisan Lean, 2016
**R +6.6**



Real Per Capita Personal Income, 2016, in 2009 $
**$46,230**

Real Personal Income Growth, CAGR, 2000–15
**2.5%**

### ANALYSIS

Iowa has long stood out above other center-left states on economic freedom, especially regulatory freedom. It benefited from this policy regime, federal farm subsidies, and the 2002–8 global commodity boom to post impressive growth in the last decade and a half. Indeed, not so long ago it was a top-10 state on overall freedom. However, Iowa's competitive policy advantages have faded. It is now a middling state overall because of an absolute decline in fiscal freedom and a relative slide down from its high ranking on personal freedom.

State and local taxes have both been going up in Iowa, with the state now substantially above average on both. Iowans pay 10.8 percent of adjusted personal income to government. Debt is quite low. Government employment is about average: 13.3 percent of private employment in 2016.

Iowa has consistently stood out as a leading state on regulatory policy. Land-use freedom is ample, although the state hasn't done as much as some others about eminent domain for private gain. It is a right-to-work state without a minimum wage, and worker's compensation mandated coverages were liberalized slightly in 2007–8. Telecommunications and cable have long been partially deregulated. Occupational freedom is about average and has fallen over time because of the licensing of new occupations. Iowa has certificate-of-need laws for hospital construction and moving companies. Insurance

freedom fell with a switch to "file and use" in 2007–8. The civil liability system is rated well above average and has generally improved.

Incarceration and victimless crime arrest rates are lower than average. Iowa suspends driver's licenses for drug offenses not related to driving but has low prison collect call rates. Educational freedom is high because the state has a long-standing tax credit scholarship program as well as interdistrict public school choice. Homeschooling was significantly liberalized in 2013–14. However, private schools are tightly regulated, with mandatory state approval, teacher licensure, and detailed curriculum control. Gambling freedom is high, and the industry has generally grown over time. Marijuana freedom is sharply limited; a single marijuana offense not involving minors can carry up to 50 years of prison time. For a rural state, Iowa does not do very well on gun freedoms, though it improved in 2009–10 and again recently; it is currently a bottom-third state. Class III weapons are banned, even though their ownership is tightly regulated federally. Open carry requires a license, and the state has a stricter-than-federal minimum age to purchase a firearm. Recent improvements include the legalization of sound suppressors in 2016 and passage of a "stand your ground" law in 2017. Iowa has had same-sex marriage since 2009 because of a court decision. There is no legal requirement for motorcyclists to wear a helmet. Alcohol freedom is mediocre because of state involvement in wholesaling and high distilled spirits taxes.

# KANSAS

2016 RANK
## 10th



FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

2000   2005   2010   2015

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending on health and hospitals and public buildings, areas where the state spends far more than the national average. Also cut spending on education, libraries, unemployment insurance, and utilities, areas where the state spends a little more than the national average. Cuts could be made in part through privatizations of hospitals and utilities. Reduce government employment closer to the national average.

• **Regulatory:** Legalize independent nurse practitioner practice with full prescription authority, join the Nurse Licensure Compact, and enact a nursing consultation exception for interstate practice.

• **Personal:** Follow the successful 2018 passage of transparency requirements with aggressive civil asset forfeiture reform consistent with the state's moderate criminal justice regime, by mandating a criminal conviction before property can be forfeited.



Population, 2017
**2,913,123**

Net Migration Rate
**−5.6%**



State Taxes, Percent of Personal Income, FY 2017
**5.57%**

Local Taxes, Percent of Personal Income, FY 2015
**3.75%**

Partisan Lean, 2016
**R +11.4**



Real Per Capita Personal Income, 2016, in 2009 $
**$47,221**

Real Personal Income Growth, CAGR, 2000–15
**2.7%**

### ANALYSIS

Kansas has steadily trended upward in relative overall freedom since the mid-2000s. It has been a top-10 state for a few years, thanks in large part to its superior regulatory policy ranking. Contrary perhaps to the stereotype of "red" states, it has performed reasonably well on personal freedom and has ranked relatively higher on that dimension than on fiscal policy for more than a decade.

Kansas made national news with its fiscal policy in 2013–14. The state's tax cuts were large and reduced the state tax burden to 5.1 percent of income, but the next year's tax hikes bumped that figure back up to 5.6 percent, just under the national average. Kansas's local tax burden (3.8 percent of income) is also slightly less than the national average. Kansans do not have much choice among local governments: there is only one for every 200 square miles across the state. Government employment is much higher than average (14.4 percent of private employment). Government debt peaked at 27 percent of income in FY 2010 and is now down around 21 percent, still much too high.

Kansas is our number-one state on regulatory policy and one of the best in our freedom from cronyism subindex. Land-use freedom is high. The state had enacted stricter-than-normal renewable portfolio standards in 2009, presumably as a sop to the wind industry, but these standards were made voluntary by legislation passed in 2015. It has a right-to-work law and no state-level minimum wage, but it does have a law limiting employers from banning guns in company parking lots. The civil liability system is much better than average. In 2011–12 a telecommunications deregulation bill passed. Occupational freedom is traditionally high, except for nurses, but licensing did jump up a bit a decade ago. There is no

hospital certificate-of-need law. The state has a price-gouging law, as well as a Depression-era law licensing moving companies.

Kansas has been better than most other conservative states on criminal justice, but the incarceration rate has crept up a bit over time. Its victimless crime arrest rates, though, have edged down. The state doesn't suspend driver's licenses for drug offenses unrelated to driving, and its prison collect call rate is relatively low. Marijuana sentencing policies are actually milder than in most states (and reduced slightly in 2016 and 2017), but the state has made little progress on more thoroughgoing reform. Social gambling is still illegal, but the state has casinos now. Kansas is the best state in the country for gun rights. Permitless open carry was legalized in 2013, and permitless concealed carry was enacted in 2015. Educational freedom is about average after improving in 2013–14 with a new, albeit modest, tax credit scholarship law. However, nonsectarian private schools are tightly regulated: they must get state approval and must hire only licensed teachers. Smoking bans are comprehensive, but cigarette taxes are relatively low. Alcohol is much less regulated than it was in the days when Kansas banned bars, and taxes are low. But you still can't get wine or spirits in grocery stores, and there are local blue laws. The state liberalized the sale of stronger beer in grocery stores in 2017. The state's civil asset forfeiture regime has improved, especially with the 2018 passage of sound transparency requirements, but it is still one of the worst in the country. The state takes in more than the average state in civil asset forfeiture equitable sharing funds. Kansas's personal freedom ranking benefited from having been forced to legalize same-sex marriage, a move that also overturned the state's oppressive super-DOMA law.

# KENTUCKY



## 2016 RANK
## 32nd



FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** To reduce debt, tighten the rules for municipal bond issuance and cut spending, particularly on grants to local school districts, employee compensation (repeal the prevailing wage law), and retirement.

• **Regulatory:** Improve the health care system for consumers and practitioners alike by removing the certificate-of-need law for hospitals and expanding independent practice freedom for nurse practitioners, dental hygienists, and physician assistants.

• **Personal:** Reform sentencing for nonviolent offenders with an eye toward reducing the incarceration rate to the national average, while also enacting a medical marijuana law.



Population, 2017
**4,454,189**

Net Migration Rate
**1.7%**



State Taxes, Percent
of Personal Income, FY 2017
**6.42%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.24%**

Partisan Lean, 2016
**R +15.7**



Real Per Capita Personal
Income, 2016, in 2009 $
**$40,161**

Real Personal Income
Growth, CAGR, 2000–15
**2.2%**

## ANALYSIS

Kentucky is a middle-of-the-pack state on economic freedom and a stereotypical conservative state on personal freedom. It has seen some improvement in regulatory policy but has suffered from a pretty steady relative decline on fiscal policy over the last decade and a significant slide on personal freedom since 2000. Local taxes are low in Kentucky (3.2 percent of income), but state taxes are high (6.4 percent), although the latter are substantially lower than 15 years ago. That means the state is very fiscally centralized. Government debt is also extremely high, at about 25 percent of adjusted personal income, but down from its heights during the Great Recession. Still, it ranks second worst in the country after New York. Government employment is about average and is actually at its 21st century low at 12.5 percent of private sector employment.

Land-use freedom is ample in Kentucky, although eminent domain for private gain remains mostly unreformed. The state has no minimum wage, and it enacted (as we suggested in the fourth edition) a right-to-work law at the beginning of 2017. The state has done more than most other low-income states to maintain reasonable standards for lawsuits, although punitive damages have not been reformed. Insurance and occupational freedoms are mediocre, and the state has a hospital certificate-of-need law. Nurse practitioners' limited freedom of independent practice was revoked in 2011–12. However, a court did strike down the state's anti-competitive regulations on moving companies in 2013–14. Some telecommunications deregulation has taken place, but there is still local cable franchising.

Kentucky has a lot of room for growth on personal freedom despite the *Obergefell* decision giving it a bump because the state had a super-DOMA in force. Otherwise, it has remained largely stagnant relative to other states. Incarceration rates are very high, although victimless crime arrest rates have moved down substantially. Drug arrests are still a bit above average but nowhere near the heights of 2006–8, when arrests amounted to about 15 percent of the monthly reported drug-using population. Civil asset forfeiture has improved but is still a problem. Tobacco freedoms and gun rights seem quite secure, however. Educational and alcohol freedom scores are low, while marijuana and gambling freedoms are extremely limited. With alcohol, the state has local blue laws, very high beer and wine taxes, a total ban on direct wine shipment, and no wine or spirits in grocery stores. With education, there are no private school choice programs, and the state recently expanded mandatory schooling to 12 years. Some raw milk sales are allowed.

# LOUISIANA



### 2016 RANK
## 30th





Population, 2017
**4,684,333**

---

Net Migration Rate
**−8.0%**

FISCAL   REGULATORY   PERSONAL   OVERALL



State Taxes, Percent
of Personal Income, FY 2017
**4.80%**

---

Local Taxes, Percent
of Personal Income, FY 2015
**4.64%**

---

Partisan Lean, 2016
**R +9.9**



Real Per Capita Personal
Income, 2016, in 2009 $
**$42,337**

---

Real Personal Income
Growth, CAGR, 2000–15
**2.9%**

### POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending in areas well above the national average: employee retirement, water transportation (the state spends five times as much as a share of personal income as Texas and more than twice as much as Mississippi), parks and recreation, housing and community development, health and hospitals, corrections, and general administration. Use the proceeds to cut the sales tax, one of the nation's highest.

• **Regulatory:** Abolish judicial elections and enact punitive damages reforms.

• **Personal:** Follow localities and decriminalize small-scale possession of marijuana at the state level.

## ANALYSIS

Louisiana used to be one of the least economically free states in the South, but it has improved significantly on fiscal policy since 2008. The state is now in the middle of the pack on both economic and personal freedom.

State-level taxes are now just a projected 4.8 percent of personal income, a significant decline from a peak of 6.5 percent in FY 2007. But this is a bump up from recent lows and is a troubling sign. Meanwhile, local taxes have remained around the 21st century historic average for the state, at 4.6 percent of income. Louisianans don't have much choice of local government, with only about one competing jurisdiction per 200 square miles of territory. Government debt is about average and has fallen slightly since recent peaks during the Great Recession. Government employment has fallen significantly, from 17 percent of private employment in 2000 to 12.7 percent today.

Louisiana is one of the better states for both land-use and labor-market freedom. Zoning is light. The state has a right-to-work law and no minimum wage. A telecommunications deregulation bill was enacted in 2013–14, and the state has long had statewide video franchising. On the other hand, occupational freedom is notoriously bad in Louisiana (as of this writing, it is still the only state to license florists—out of a concern for public health and safety, no doubt). Nurses and dental hygienists have very little freedom of practice. The state has a hospital certificate-of-need law, but moving companies do not have to get a "certificate of public convenience and necessity" to open. There is an "unfair" pricing ban and a "price-gouging" ban. Needless to say, Louisiana is one of the most cronyist states. Louisiana's court system has long been terrible no matter how you measure it (enacted tort reforms, survey ratings, size of the legal sector).

On personal freedom, Louisiana hasn't seen the improvements in personal freedom enjoyed by other states, although it did receive a bump from the *Obergefell* decision. It was dragged down for this edition by being the worst state on criminal justice policy. However, it passed substantial reform in 2017 that should improve its ranking (some of which we called for in the fourth edition).[120] Crime-adjusted incarceration rates are extremely high despite getting slightly better over the last five years; the state is 2.1 standard deviations above the national mean for our entire data set. Drug arrests are also quite high and increased in 2015–16. However, that rate should improve in given localities like New Orleans decriminalizing low-level possession.[121] Louisiana is one of the worst states for marijuana freedom (although this could change in the next edition given possible pending reforms). The state does have a limited medical marijuana law. The state's asset forfeiture law was strengthened slightly in 2007–8, but the state remains worse than average on its asset forfeiture regime. It remains a fairly good state for tobacco freedom, but smoking bans in bars were passed for the first time in 2013–14 and taxes went up in 2016. Louisiana is also a standout on educational freedom, with public school choice, a limited voucher law, and an expansive tax credit scholarship program. However, private school teachers have to be licensed. Gambling freedom is extensive, and the industry has grown over time. Alcohol freedom is high, with moderately taxed wine and spirits widely available, and the state has eliminated the restriction on direct wine shipping. Gun rights are about average, as the state makes it almost impossible to get a Class III weapon, concealed carry is weighed down with limitations, the permit cost for concealed carry is high, and there is a stricter-than-federal minimum age for possession.

120. "Here's How Louisiana Sentencing Laws Are Changing under Criminal Justice Reform," *Times-Picayune*, October 13, 2017, http://www.nola.com/politics/index.ssf/2017/06/louisiana_crime_sentences_chan.html.
121. "New Orleans: Marijuana Arrests Plummet Post-Decriminalization," NORML website, April 12, 2018, http://norml.org/news/2018/04/12/new-orleans-marijuana-arrests-plummet-post-decriminalization.

# MAINE

2016 RANK
## 39th



FISCAL    REGULATORY    PERSONAL    OVERALL

RANK: 1, 10, 20, 30, 40, 50

YEAR: 2000, 2005, 2010, 2015

## POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending on public welfare and housing and community development. Maine is one of the most free-spending states on public welfare in the country, and it also spends much more than average on housing and community development. Also cut individual and corporate income taxes.

• **Regulatory:** Roll back exclusionary zoning, perhaps by allowing state veto of local zoning ordinances that limit housing supply.

• **Personal:** Sell off the state liquor stores and replace the markup with a transparent ad valorem tax, as Washington has done. Maine will never be able to compete with New Hampshire prices anyway; perhaps it can compete on convenience.



Population, 2017
**1,335,907**

Net Migration Rate
**2.6%**



State Taxes, Percent of Personal Income, FY 2017
**6.69%**

Local Taxes, Percent of Personal Income, FY 2015
**5.06%**

Partisan Lean, 2016
**D +0.7**



Real Per Capita Personal Income, 2016, in 2009 $
**$40,570**

Real Personal Income Growth, CAGR, 2000–15
**1.7%**

## ANALYSIS

Maine has long been one of the freest states in the country personally and one of the least free economically—the opposite of states like Alabama and Idaho. Between 2011 and 2014, the state declined even further on fiscal policy, which contributed to a relative decline in overall freedom.

Maine's taxes have long been high, crushing taxpayers overall at 11.7 percent of adjusted personal income and earning the state rankings in the bottom 10 for both state and local taxes. State taxes have fallen from their heights in the mid-2000s around 7.5 percent of adjusted personal income but are still painful for taxpayers at 6.7 percent today. Local taxes are 5.1 percent, again high relative to national norms. Mainers have slightly less choice of local government than other New Englanders, but more than most Americans. Government debt is low, at 14.7 percent of income, and government employment is down to 11.8 percent of private employment (from a peak of 12.9 percent in 2010).

Maine has been a consistently poor state on regulatory freedom since 2000, always staying in the bottom 10. It is one of the most regulated states for land use. Indeed, we show that exclusionary zoning leaped upward in Maine between 2000 and 2006 and has risen further since then. Maine has one of the most extreme renewable portfolio standards in the country, by our measure (bested in 2016 by Vermont). Maine enacted a substantially higher minimum wage in 2016 (which will keep going up until it hits $12 per hour in 2020), and there is no right-to-work law. In 2011–12 a telecommunications deregulation bill was passed. Different measures of occupational freedoms give a conflicting picture of that policy, but there is no doubt that Maine allows more scope of practice to second-line health professions than just about any other state. Freedom from abusive lawsuits is above average in Maine and has improved steadily over time. The state has a certificate-of-need law for hospitals but not one for movers. It has a price-gouging law and a general law against sales below cost. So Mainers must remember not to price their goods either higher or lower than the state legislature deems acceptable.

Maine is a leading state for criminal justice. It has very low incarceration rates—two standard deviations better than the national average—and a better-than-average civil asset forfeiture law. Prison collect call rates, though, are high. Maine is a progressive state with sound gun laws (including concealed carry without a permit, enacted in 2015), marijuana rights (recreational use became legal for adults over 21 years of age in 2017), and same-sex marriage (legalized by ballot initiative in 2012). It is, in brief, a very civil libertarian state. However, tobacco consumers will face extraordinarily high taxes ($2 a pack in 2018) and have been evicted from commercial private property by penalty of law. Educational freedom is also low despite having a limited voucher program. The state regulates private schools to the hilt: teacher licensing, detailed curriculum control, and state approval. However, some towns can "tuition out" to private schools, a form of voucher law that has been on the books for decades. Limited public school choice was enacted in 2011–12. We also show gambling freedom increasing over time, as the legal industry has expanded. Alcohol freedom is below average because of state monopolization of wine and spirits retailing, not to mention high beer taxes. But raw milk sales are legal.

# MARYLAND



2016 RANK
## 45th



FISCAL    REGULATORY    PERSONAL    OVERALL



RANK

2000    2005    2010    2015

**YEAR**

### POLICY RECOMMENDATIONS

• **Fiscal:** Trim spending in areas noticeably above national averages, such as housing and community development, corrections, parking lots, and sanitation. Cut individual income and property taxes.

• **Regulatory:** End rent control.

• **Personal:** Allow sales of wine and spirits in grocery stores statewide.



Population, 2017
## 6,052,177

Net Migration Rate
## −3.9%



State Taxes, Percent of Personal Income, FY 2017
## 5.87%

Local Taxes, Percent of Personal Income, FY 2015
## 4.75%

Partisan Lean, 2016
## D +12.5



Real Per Capita Personal Income, 2016, in 2009 $
## $47,936

Real Personal Income Growth, CAGR, 2000–15
## 2.4%

## ANALYSIS

Maryland is one of the least free states in the country, and it has had this status since the beginning of our time series in 2000. It performs especially poorly on regulatory policy and has also slipped considerably on fiscal policy since 2000. It does enjoy locational rents from its proximity to Washington, D.C. One bright spot for the state is that its personal freedom rank has gradually increased over time from its cellar-dwelling score in 2000.

Maryland's overall tax burden is below average, contributing to the state's fiscal policy slide. Local taxes are much higher than average at 4.75 percent of adjusted personal income, while state taxes are a bit above at 5.9 percent. This would make for a favorable degree of fiscal decentralization if state taxes weren't also high. However, Marylanders do not have much choice in local government, with only one competing jurisdiction per 200 square miles. It is less indebted than other states and also features lower government employment at 11.1 percent of private employment.

Maryland is the second worst state on the most important component of regulatory policy, land-use freedom. Zoning restrictions are extensive, eminent domain abuse is mostly unchecked, and there is some local rent control. Its renewable portfolio standard has become consistently worse. At least it doesn't mandate free speech on private property. The state enacted a new minimum wage in 2013 and the figure has risen each year since then (it is $10.10 per hour as of the summer of 2018). Maryland has no right-to-work law. Occupational freedom is extremely low. By one measure (index of statutory mentions of regulatory keywords), Maryland has one of the highest figures for licensed occupations in the country and is one of the most cronyist states. However, nurse practitioners were freed for independent practice in 2015. Cable and telecommunications have not been deregulated. It has a hospital certificate-of-need law but no such law for movers. Maryland has both general and gasoline-focused laws against sales below cost. Its tort system is only about average.

Maryland is an average state on criminal justice, the most important category of personal freedom, but its recent reform efforts should help it rise in future rankings. The state's asset forfeiture regime has traditionally been slightly above average, but it got significantly better in 2016 with reform that required government to provide "clear and convincing evidence" to seize property. The state also passed the Justice Reinvestment Act, which eliminated mandatory minimums and reduced sentences for certain drug offenses. Crime-adjusted incarceration rates are a bit better than the national average, and drug arrest rates, which have been well above average, continue to fall from the heights of the mid-2000s and are now about average. Prison collect call rates are quite high. Smoking bans are comprehensive, and cigarette taxes are quite high ($2 a pack in 2018), encouraging smuggling. Educational freedom is among the lowest in the country. Homeschools and private schools are tightly regulated, the latter more so (mandatory state approval and teacher licensing). The state raised the years of compulsory schooling from 11 to 12 in 2013–14. However, it did enact a limited voucher law in 2016. Maryland raised its travel freedom score by allowing people without Social Security numbers to get driver's licenses in 2013–14. It also raised its marijuana freedom score substantially by enacting a "real" medical marijuana law and decriminalizing small-scale possession. Alcohol freedom is decent because of privatization and low taxes; however, beer taxes were hiked substantially in 2011–14. Direct wine shipments are legal. The state has sharply limited firearms freedom and it is now a bottom-five state in this category. It mandates locking devices, registers handgun owners, requires licensing with safety training for handgun purchasers, licenses dealers, bans possession for those under 21 years of age, bans certain types of guns and magazines, and makes it extremely difficult to get permission to carry in public. Gambling freedom has expanded.

# MASSACHUSETTS



**2016 RANK**

## 23rd



FISCAL   REGULATORY   PERSONAL   OVERALL



Population, 2017
**6,859,819**

Net Migration Rate
**−5.9%**

State Taxes, Percent
of Personal Income, FY 2017
**6.05%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.96%**

Partisan Lean, 2016
**D +12.4**



Real Per Capita Personal
Income, 2016, in 2009 $
**$53,860**

Real Personal Income
Growth, CAGR, 2000–15
**1.9%**

### POLICY RECOMMENDATIONS

• **Fiscal:** Massachusetts spends more than twice the national average on housing and community development. It also spends a great deal on interest payments and miscellaneous commercial activities. Cut these areas and pay down debt.

• **Regulatory:** Repeal outdated and cronyist regulations, such as the price-gouging law, the sales-below-cost laws, moving company licensure, and the certificate-of-need law for hospitals.

• **Personal:** Make the civil asset forfeiture regime consistent with its top criminal justice score by requiring a criminal conviction prior to forfeiture and banning equitable sharing that does not comply with this standard.

### ANALYSIS

Massachusetts has long had a better economic policy regime than one would expect given its strongly left-of-center electorate, and one of the better records on personal freedom, particularly for criminal justice. It suffers, though, from an onerous regulatory system and some relative decline on personal freedom that has harmed its overall ranking.

On fiscal policy, the nickname "Taxachusetts" is a bit of a misnomer. Massachusetts's overall tax burden is just slightly higher than average, although individual income taxes are among the highest in the country. Massachusetts residents have ample choice of local government, more than four every 100 square miles. Government debt is high, at about 23 percent of personal income, but has fallen 9 percentage points since FY 2009. Government employment is among the lowest in the country, at 9.3 percent of the private workforce, and government consumption is also low.

On the most important category of regulatory policy, land-use regulation, Massachusetts is worse than average, although our two indicators of zoning stringency give somewhat conflicting judgments. Renewable portfolio standards have grown rather high. Eminent domain for private gain is completely unrestrained. The state has consistently had a higher-than-federal minimum wage, and that rate is now one of the highest in the country, at $11 per hour in 2018. Worker's compensation coverage mandates are extreme, though employers have great freedom of choice in funding them, and there is no right-to-work law. The state passed a telecommunications deregulation bill in 2013–14. Occupational freedom is about average in Massachusetts, although nurses enjoy little freedom in the state. Personal automobile insurance remains tightly regulated, and the state has a certificate-of-need law for hospitals, as well as an anti-price-gouging law, licensure of moving companies, and both general and gasoline-focused sales-below-cost laws. The civil liability system is subpar but has improved over time, although not because of any particular statutory or institutional reforms.

Massachusetts is our top state for criminal justice. It has long locked up fewer of its residents than the vast majority of other states. It also arrests fewer people for drugs and other victimless crimes than most other places. It does not suspend licenses for nondriving drug offenses, and prison phone call rates are low (and went down in 2016). However, its asset forfeiture law is among the worst in the country, putting the burden of proof on innocent owners, giving proceeds to law enforcement, and requiring only probable cause for showing the property is subject to forfeiture. Massachusetts scores highly for cannabis freedom, with a comparatively liberal medical marijuana law enacted in 2011–12 and a recreational use law enacted in 2016 (but implementation was delayed until 2018). The Second Amendment is virtually a dead letter in Massachusetts: the state tries to make guns as expensive as possible (locking mandates; dealer licensing; license to purchase any gun, with safety training) and nearly prohibits carry in public. It is the third-worst state for tobacco freedom, with comprehensive smoking bans and punishingly high cigarette taxes ($3.51 a pack after having been raised again in 2013–14). Local laws in many spots increase the minimum age of purchase to 21. Educational freedom is low. Homeschooling parents have to jump through many hoops and must meet detailed curriculum guidelines. Private schools are subject to government approval. Casino gambling has expanded, and with it the state's gambling freedom score has risen. The state's alcohol freedom score improved in 2013 because of the repeal of the direct wine shipping ban, but wine in grocery stores remains subject to mind-numbingly complex rules undoubtedly designed for some obscure political purpose. Alcohol taxes are lower than average.

# MICHIGAN

2016 RANK
## 14th





FISCAL   REGULATORY   PERSONAL   OVERALL



Population, 2017
**9,962,311**

Net Migration Rate
**–7.7%**

State Taxes, Percent
of Personal Income, FY 2017
**6.13%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.19%**

Partisan Lean, 2016
**R +1.0**



Real Per Capita Personal
Income, 2016, in 2009 $
**$42,931**

Real Personal Income
Growth, CAGR, 2000–15
**1.2%**



## POLICY RECOMMENDATIONS

• **Fiscal:** Repeal Proposal A, cutting the state sales tax and state school aid and giving localities the freedom to determine school budgets once again.

• **Regulatory:** Eliminate the parties' role in nominating judicial candidates, and enact tort reforms (such as abolishing punitive damages) to improve the tort system.

• **Personal:** Enact a liberal tax credit scholarship program for private education.

## ANALYSIS

Michigan has been hit hard by global economic conditions despite its relatively decent economic policies. Unfortunately, Great Lakes states cannot afford merely "decent" policies; they have to be outstanding to overcome the headwinds they face in global markets and to compete with neighboring states such as Indiana. Michigan's fiscal policy has shown the biggest improvement.

Michigan's local tax burden is relatively low, probably because of a school finance centralization accomplished by ballot initiative in the 1990s. The state tax burden has historically been higher than the national average, but it fell substantially in the early 2000s and now stands at 6.1 percent of adjusted personal income. Government debt has also fallen somewhat since 2008 and is now about average at 19 percent. Government employment fell from 13.3 percent of the private workforce in 2009 to 10.8 percent today. Michiganders do have reasonable freedom of choice among local governments, with about one per 100 square miles, but the centralization of school finance has made this choice less significant.

Michigan's land-use and energy freedom is middling. It does not have much zoning restriction, but it has ratcheted up renewable portfolio standards since 2010. It also has a relatively high minimum wage for the local economy that has only gotten worse. A right-to-work law was enacted in 2012. Freedom from abusive lawsuits has been worse than average in Michigan since 2000, but it has improved since 2008, though not because of any statutory or institutional change. Occupational freedom is about average but has declined since 2008 because of new occupations being licensed. Michigan has had deregulated telecommunications and cable since 2006.

Michigan is a mediocre state for personal freedom, although it did receive a bump from the federalization of marriage policy that removed its super-DOMA banning same-sex partnerships of all kinds. On criminal justice policy, Michigan arrests somewhat fewer than average for victimless crimes, but it has a fairly high incarceration rate. Those rates have been stable over time. The state passed criminal justice reform measures in 2017. The asset forfeiture law is better than average thanks to a 2015 reform, but it is frequently circumvented and requires further improvement. Smoking bans are comprehensive, and cigarette taxes are high at $2 per pack in 2018. Educational freedom is among the lowest in the country. Although homeschools are scarcely regulated, private schools face many barriers. There are no private school choice programs, and compulsory schooling has extended to 12 years since 2009. The state does score a bit above average for gambling freedom, an area that grew in 2011–12, and aggravated gambling is no longer a felony as of 2016. Travel freedom also grew a bit when the state repealed its motorcycle helmet law in 2013–14. The state scores better than average on cannabis freedom because it has had a reasonably broad medical marijuana law since 2008. Alcohol and firearms freedoms are only about average, with spirits taxes a bit high.

# MINNESOTA

2016 RANK
## 37th





FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Trim spending on public welfare, parking lots, natural resources, unemployment compensation, and parks and recreation, areas in which the state spends much more than average. Reduce taxes on individual income and selective sales (excluding alcohol, tobacco, and utilities), which are above national norms.

• **Regulatory:** Deregulate telecommunications and cable entry and pricing.

• **Personal:** Allow beer, wine, and spirits in grocery stores.



Population, 2017
**5,576,606**

Net Migration Rate
**–1.6%**



State Taxes, Percent of Personal Income, FY 2017
**8.48%**

Local Taxes, Percent of Personal Income, FY 2015
**3.10%**

Partisan Lean, 2016
**R +1.4**



Real Per Capita Personal Income, 2016, in 2009 $
**$48,283**

Real Personal Income Growth, CAGR, 2000–15
**2.5%**

## ANALYSIS

Minnesota is a classic "blue state" in that it scores well above average on personal freedom and below average on economic freedom. However, it has fallen relative to other states on personal freedom since 2006 as others have caught up and surpassed it.

Minnesota is fiscally centralized, with low local taxes (3.1 percent of adjusted personal income) and high state taxes (8.5 percent). Overall, the tax burden is high at 11.6 percent. On public employment and government consumption, the state performs above average.

On the most important category in regulatory policy, land-use and environmental freedom, Minnesota is average. The state suffers from strict renewable portfolio standards that consistently got worse from 2010–15 before clawing back a bit in 2016. On labor policy the state is below average, lacking a right-to-work law that all of its neighbors enjoy. Minnesota passed a minimum wage law in 2014 that increased the rate every subsequent year up to 2016 and then indexed it to inflation (it is $9.65 in 2018). Workers' compensation funding was liberalized slightly in 2011–12. The state moved to deregulate telecommunications in 2015 (which we recommended in previous editions of this study), but cable remains untouched. Occupational freedom is above average; the state passed an extensive nurse practitioner freedom-of-practice law in 2014. The state lacks a hospital certificate-of-need law and various other cronyist policies, but it does have sales-below-cost laws for gasoline and retailers generally. Its court system is highly rated and has improved over time.

Minnesota scores above average on personal freedom largely because of its sound criminal justice policies, and it was helped in the past in relative terms by its marriage freedom (it enacted same-sex marriage in 2013). But the state performs poorly in a number of other categories. The incarceration rate is well below the national average but has risen over time (in 2000, it was three standard deviations lower than average!). The drug arrest rate is lower than average and getting lower, while arrests for other victimless crimes are a bit higher than average, but falling. The state's asset forfeiture law was reformed in 2013, but without getting a handle on equitable sharing its impact will be limited. The state, in bipartisan fashion, enacted limits on the use of license plate readers in 2015. Minnesota is basically average on marijuana freedom, enacting a strictly limited medical marijuana program in 2014. Tobacco freedom took a big hit in 2013 with a hike in the cigarette tax (it is $3.04 a pack in 2018) and an inflation indexing provision (that was ended by the legislature as of 2017); Minnesota is now a bottom-10 state in this category. Educational freedom is slightly above average despite some private and homeschool regulation, because of interdistrict public school choice, a modest tax credit/deduction law, and compulsory schooling of only 10 years. Alcohol freedom is subpar, but Minnesota rose to average on gun policy by legalizing silencers in 2015. After the closing date of our study, the state ended alcohol blue laws, but it still does not even allow beer in grocery stores.

# MISSISSIPPI



2016 RANK
## 40th





Population, 2017
## 2,984,100

Net Migration Rate
## –3.4%

FISCAL    REGULATORY    PERSONAL    OVERALL





State Taxes, Percent
of Personal Income, FY 2017
## 6.79%

Local Taxes, Percent
of Personal Income, FY 2015
## 3.10%

Partisan Lean, 2016
## R +8.7



Real Per Capita Personal
Income, 2016, in 2009 $
## $37,222

Real Personal Income
Growth, CAGR, 2000–15
## 2.3%

## POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending on health and hospitals, where Mississippi is the third most liberal-spending state, and also on education and public welfare, where the state spends well more than the national average, as a share of the economy. Reduce government employment, and reduce state taxes, especially on sales and business income.

• **Regulatory:** Liberalize insurance by moving to a "no-file" system like Wyoming's.

• **Personal:** Reduce incarceration by abolishing mandatory minimums for nonviolent offenses and allowing prisoners to petition for clemency under the new rules.

## ANALYSIS

Mississippi is a typical Deep South state in that its economic freedom far outstrips its personal freedom. But the state's worst dimension is actually fiscal policy, and its economic policies are worse than those of all its neighbors, including Louisiana and Alabama. Personal freedom in the state is no longer terrible.

Mississippians' overall tax burden is a bit above average nationally at 9.9 percent, but local taxes are quite low. This fiscal centralization goes along with a lack of choice among local government (less than 0.4 per 100 square miles). Debt is much lower than average, but government employment and consumption are far higher than average. State and local employment is 17.7 percent of private sector employment.

Like most southern states, Mississippi does well on land-use and labor-market freedom. In 2011–12 it also finally enacted a limited eminent domain reform. It has no minimum wage and has a right-to-work law. However, it does have an E-Verify mandate and restricts property owners from banning guns in parking lots. In 2011–12 a telecommunications deregulation bill was passed, but the state lacks statewide cable franchising. Occupational licensing is less extensive than average, but nurses and dental hygienists enjoy little practice freedom. The state strictly regulates insurance rates, hospital construction and moving companies' rates, and pricing during disasters. Its civil liability system used to be much worse than average, but it is now actually quite a bit better than average. The state reformed punitive damages and abolished joint and several liability in 2002 and 2004.

Personal freedom has gone up in Mississippi, even leaving aside the federalization of marriage policy. However, it suffers from a notoriously awful criminal justice system despite a decrease in incarceration in 2016. The state imprisons its population at a rate one and a half standard deviations above the national average, even adjusting for its high crime rate. Drug arrests are very high and have actually gone up recently after falling for years from their 2008 high. Other victimless crime arrests are below average. The state asset forfeiture law is mediocre, but it doesn't matter anyway because local law enforcement enthusiastically pursues adoptions from the Department of Justice. The state did reform its civil asset forfeiture law in 2017. Marijuana law is illiberal. One can get a life sentence for a single marijuana offense not involving minors. There are mandatory minimums for low-level cultivation, the "decriminalization law" is a ruse because local governments may criminalize possession, and the mostly harmless psychedelic Salvia divinorum is also banned. Gun laws used to be stricter than might be expected but are now some of the best in the country. Permitless open carry was reinstated in 2013–14, and permitless concealed carry was enacted in 2016. There is no duty to retreat, and silencers are now permitted. Alcohol freedom is below average. The state monopolizes liquor stores, wine direct shipping is banned, and wine and spirits are unavailable in grocery stores. Legal gambling is more open than in the average state. Educational freedom is about average. A very limited voucher law was enacted in 2011–12 and liberalized since, but public school choice is extremely thin. Tobacco freedom is above average, as smoking bans leave plenty of exceptions, and cigarette taxes are not too high. The state banned same-sex marriage at year-end 2014, but the *Obergefell* decision has since eliminated that restriction. Raw milk sales were legalized since our fourth edition.

# MISSOURI

2016 RANK
## 11th





FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

YEAR

## POLICY RECOMMENDATIONS

• **Fiscal:** Health and hospitals spending is fairly high, but otherwise Missouri's spending is about average across the board. Localities need to exercise more fiscal restraint, consistent with state government's approach.

• **Regulatory:** Improve labor and occupational freedom by securing the right to work while promoting independent practice freedom for nurses, physician's assistants, and dental hygienists.

• **Personal:** Pass strict anti-circumvention reform to eliminate the equitable sharing loophole in the state's civil asset forfeiture laws that costs Missourians millions.[122]



Population, 2017
**6,113,532**

Net Migration Rate
**−0.3%**



State Taxes, Percent
of Personal Income, FY 2017
**4.57%**

Local Taxes, Percent
of Personal Income, FY 2015
**4.20%**

Partisan Lean, 2016
**R +10.3**



Real Per Capita Personal
Income, 2016, in 2009 $
**$43,445**

Real Personal Income
Growth, CAGR, 2000–15
**2.1%**

## ANALYSIS

Missouri is one of the country's freer states, but in recent years it has run the risk of falling back into the middle of the pack. Its slide in regulatory policy is most worrisome, especially because it is not merely relative but is absolute as well, including and excluding federalized policies.

Missouri's local taxes are a bit above average (4.2 percent of adjusted personal income), but state taxes are well below average (4.6 percent of income), making for reasonably high fiscal decentralization. In addition, Missourians have some choice in local government, with more than one effective competing jurisdiction per 100 square miles. We show that state taxes have fallen since FY 2007 and overall taxes are less than average. Government consumption and employment are also below average, while debt and cash and security assets are about average.

We see a little evidence of continued backsliding on regulatory policy. The state has adopted renewable portfolio standards, which have a bigger footprint since they began and add to the cost of electric bills. But overall land-use policy is above average. Local zoning is quite loose, and eminent domain requirements were tightened slightly in 2013–14, although they remain substandard. The state adopted a right-to-work law in 2017 (as we suggested in the fourth edition), but implementation has been delayed pending a statewide referendum on it. Missouri's minimum wage was increased above the federal minimum in 2012, and it is $7.85 per hour as of 2018. The state does above average on occupational licensing,

although our two main measures of licensure extent point in slightly different directions. Freedom is limited for nurses, physician's assistants, and dental hygienists. The civil liability system remains below average. Insurance rate-setting freedom is fairly high. Cable and telecommunications are somewhat liberalized.

Missouri has a fairly strict approach to criminal justice, involving long sentences that lead to an incarceration rate that is well above average and a high level of arrests for drugs. It does better when it comes to other victimless crimes. It also has a low prison phone rate and wisely avoids suspending driver's licenses for nondriving drug offenders. The state's asset forfeiture law is one of the best in the country, but it is frequently circumvented through equitable sharing. The marijuana regime is almost wholly unreformed, although 2018–19 could bring substantial changes. Same-sex marriage was banned in 2014, but the Obergefell decision trumped that restriction. Missouri is a good state for gambling, alcohol, and tobacco freedoms. Cigarette and alcohol taxes are notably low, and smoking bans are more moderate than in other states, although several localities (including St. Louis city and county) did pass a minimum legal sale age increase to 21 for tobacco products in 2016. Gun rights were slightly better than average in 2015 and got better in 2016 after substantial reform (something we called for in the fourth edition of this study). The state secured the right not to retreat from attackers in public during 2016 and allowed for permitless concealed carry. Raw milk sales are legal, while seat belts and motorcycle helmets are required by law.

122.   Nick Sibila, "Loophole Lets Missouri Cops Keep Millions in Forfeiture Funds (and Away from Schools)," Institute for Justice website, March 2017, http://ij.org/loophole-lets-missouri-cops-keep-millions-forfeiture-funds/.

# MONTANA

2016 RANK
## 16th



FISCAL    REGULATORY    PERSONAL    OVERALL



RANK

YEAR

## POLICY RECOMMENDATIONS

• **Fiscal:** Decentralize program responsibility and taxation authority from counties to municipalities, and make it easy for neighborhoods to incorporate.

• **Regulatory:** Montana is surrounded by right-to-work states. It should enact a similar law that does not violate freedom of association, like the one proposed in the "Labor-Market Freedom" section of this book.

• **Personal:** Abolish all mandatory minimum sentences for victimless crimes, and reduce maximum sentences significantly.



Population, 2017
**1,050,493**

Net Migration Rate
**8.5%**



State Taxes, Percent
of Personal Income, FY 2017
**4.79%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.15%**

Partisan Lean, 2016
**R +12.1**



Real Per Capita Personal
Income, 2016, in 2009 $
**$41,457**

Real Personal Income
Growth, CAGR, 2000–15
**3.0%**

## ANALYSIS

Residents of Big Sky country enjoy ample personal freedom and good fiscal policy, but regulatory policy has seen a worrying, long-term decline in both absolute and relative terms.

Montana's tax burden is well below the national average. State taxes have held steady over the last several years at about 5 percent of adjusted personal income. Local taxes spiked in FY 2009 but have settled down since to about 3.2 percent of income. Montanans have virtually no choice in local government, as counties control half of local taxes. Montana's debt burden has fallen from 20.2 percent of income in FY 2007 to 12.2 percent now. Government employment and consumption have fallen since the Great Recession and are now slightly better than average. Overall, Montana has posted consistent gains on fiscal policy over the time period we analyze.

Land-use freedom and environmental policy have deteriorated since 2007. Building restrictions are now more onerous than average. Eminent domain reform has not gone far. The state's renewable portfolio standards are among the toughest in the country, raising the cost of electricity. The state has a fairly high minimum wage for its median wage level. Overall, Montana is one of the least free states when it comes to the labor market. Health insurance mandates are extremely expensive. Montana has gone from one of the least regulated states for occupational licensing in 2000 to one of the more regulated today. However, licensing was trimmed in 2016, and nurses enjoy substantial practice

freedom. Insurance freedom is middling, as the state imposes some restrictions on rating criteria but has gone to "file and use" for most lines. It joined the Interstate Insurance Product Regulation Compact in 2013–14. There is a general ban on sales below cost, and medical facilities and moving companies both face entry barriers. On lawsuit freedom it is slightly above average (less vulnerable to abusive suits).

Montana is one of the better states for gun rights, although it has fairly extensive limits on where one may carry within cities. Montana also does well on gambling, where it has an unusual, competitive model for video terminals that does not involve casinos. On criminal justice, Montana is above average. Drug arrests are more than one standard deviation below the national average, but the incarceration rate is about average, when adjusted for crime rates. The state is schizophrenic on cannabis, with a reasonably liberal medical marijuana program but also the possibility of a life sentence for a single cannabis offense not involving minors and a one-year mandatory minimum for any level of cultivation. Montana reformed its terrible asset forfeiture law in 2015 but has not touched the equitable sharing loophole. Tobacco and alcohol freedoms are subpar, with draconian smoking bans, higher-than-average cigarette taxes, and state monopoly liquor stores. Educational freedom is slightly better than average, with fairly light regulation of private schools and homeschools and, since 2015, a strictly limited tax credit scholarship law. The state was forced to legalize same-sex marriage in 2014, and its oppressive super-DOMA was therefore also overturned.

# NEBRASKA

2016 RANK
## 26th





Population, 2017
## 1,920,076

FISCAL   REGULATORY   PERSONAL   OVERALL

Net Migration Rate
## −3.0%



RANK

2000   2005   2010   2015

**YEAR**



State Taxes, Percent
of Personal Income, FY 2017
## 5.14%

Local Taxes, Percent
of Personal Income, FY 2015
## 5.10%

Partisan Lean, 2016
## R +14.3



Real Per Capita Personal
Income, 2016, in 2009 $
## $50,043

Real Personal Income
Growth, CAGR, 2000–15
## 3.0%

## POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending on education, which is far higher than average, especially spending on salaries. Trim utilities sales and income taxes.

• **Regulatory:** Repeal the certificate-of-need requirement for hospital construction. In 2016 this move would have raised Nebraska to first place in regulatory freedom and to 28th (from 30th) on economic freedom.

• **Personal:** Preempt local regulation of firearms sales, possession, and carrying. Even South Dakota–like gun laws, hardly outside the regional mainstream, would have raised Nebraska six places on personal freedom and two places on overall freedom in 2016.

## ANALYSIS

Like other Great Plains states, Nebraska has usually had very good regulatory policy. It benefited from the commodity boom, federal farm subsidies, and its own policy regime during the 2000s and early 2010s, posting one of the highest growth rates in the country. However, it has lagged Colorado, Wyoming, and Iowa since 2011.

Nebraska is relatively fiscally decentralized but relatively high-taxed, with somewhat lower-than-average state tax revenues (about 5.1 percent of adjusted personal income, a drop from 6 percent in FY 2006) and higher-than-average local tax revenues (5.1 percent of income). Nebraskans do not have much choice of local governments, limiting the benefits of this approach—the state has only 0.44 effective competing jurisdictions per 100 square miles. Debt, assets, and public employment are about average, while government GDP share is higher than average.

Nebraska does very well on the most important regulatory policy category, land-use and environmental freedom. However, it has not done much to check eminent domain for private gain. On labor policy it is above average because of a right-to-work law and flexible workers' compensation funding rules, but it enacted a high minimum wage in 2014. Health insurance freedom is extensive, with few mandated benefits outside the ACA essential benefits and with a light touch on managed care. Nebraska does a little better than average in keeping occupational licensing in check, and in 2015 nurse practitioners gained full practice authority. The state has long had one of the best civil liability systems in the country. The state has a certificate-of-need law for hospital construction.

Nebraska is only middling on criminal justice policy. Incarceration rates have generally been low, but they have increased over time. Drug and victimless crime arrests, by contrast, have been high, but they have come down over time (though drug arrests are spiking now). The legislature finally enacted a comprehensive asset forfeiture reform in 2016, one of the best models in the country. Educational, gambling, travel, firearms, and cannabis freedoms are all below average. However, Nebraska is solidly above average on alcohol policy and a bit above average on tobacco freedom. Like other states with the ballot initiative, the nonsmoking majority of Nebraska has foisted on private business owners fully comprehensive smoking bans, but tobacco taxes are below average. Most of Nebraska's lower scores on firearms policies come from special provisions for Omaha or general lack of preemption. Homeschoolers are not tightly regulated apart from detailed annual reporting requirements, but nonsectarian private schools are subject to mandatory approval and teacher licensing. There are no private school choice programs. Since 2008, the state has had a constitutionally entrenched ban on governmental racial discrimination.

# NEVADA

2016 RANK

## 5th



FISCAL    REGULATORY    PERSONAL    OVERALL

RANK

2000    2005    2010    2015

YEAR

## POLICY RECOMMENDATIONS

• **Fiscal:** Cut air transportation, employment security administration, public buildings, and parks and recreation. Use the proceeds to trim sales and miscellaneous minor taxes. Nevada spends far more than the national average on police, but this may be warranted given the nature of its social and economic model.

• **Regulatory:** Deregulate occupations such as epidemiologists, environmental health specialists, title plant personnel, interior designers, sign language interpreters, clinical laboratory technologists, pharmacy technicians, veterinary technologists, opticians, athletic trainers, massage therapists, security guards, landscaping contractors, child-care workers, bill and account collectors, well drillers, alarm installers, taxi drivers, and crane operators.

• **Personal:** Abolish private school teacher licensing, state approval of private schools, and detailed curriculum requirements.



Population, 2017
**2,998,039**

Net Migration Rate
**25.1%**



State Taxes, Percent of Personal Income, FY 2017
**5.76%**

Local Taxes, Percent of Personal Income, FY 2015
**3.49%**

Partisan Lean, 2016
**R +1.2**



Real Per Capita Personal Income, 2016, in 2009 $
**$40,510**

Real Personal Income Growth, CAGR, 2000–15
**2.7%**

## ANALYSIS

Unsurprisingly, Nevada is consistently one of the top states for personal freedom. However, the Great Recession, which was more severe only in Illinois and North Carolina, greatly damaged Nevada's fiscal position.

Nevada's fiscal policy has worsened since 2002, a fact that might have something to do with a 2003 state supreme court decision setting aside part of the state constitution, which required a supermajority for tax increases.[123] State-level taxes have gone up from a low of 5.1 percent of adjusted personal income in FY 2009 to about 5.8 percent today, while local taxes have remained steady at 3.4 to 3.5 percent of income. Nevadans have virtually no choice of local governments, given the importance of territorially vast counties. Government employment and consumption are now well below average after spiking during the recession, and government debt is coming down, though still well above average (and above where it was in 2000) at 24.1 percent of income. Cash and security assets are a bit below average at about half of the level of state and local debt.

After years of deterioration, Nevada's regulatory policy rebounded in 2013 because of a variety of factors. As one of the sand states attracting huge net immigration in the 1990s and early 2000s, Nevada has retained an admirable degree of land-use freedom. However, renewable portfolio standards are quite high and rising, affecting the cost of electricity. Nevada does have a right-to-work law but also has a minimum wage, which was hiked further in 2015. Cable and telecommunications have been liberalized. Occupational freedom declined dramatically between 2000 and 2006 because of the expansion of licensing, but in 2013 nurse practitioners gained the right of independent practice with full prescription authority. Insurance freedom

is low because of prior approval of rates and forms, but the state joined the Interstate Insurance Product Regulation Compact in 2011–12. The state has certificate-of-need requirements for hospitals and household goods movers. Direct auto sales were partially legalized in 2013. The court system is about average and improved in 2013 and 2015 as the state gradually moved off the "judicial hellhole" list.

Nevada is number one for gambling freedom (no surprise), and it is the only state with legal prostitution (local option). However, on criminal justice policy Nevada is more of a mixed bag. Nondrug victimless crime arrests are high but have fallen over time, and it is possible that they are overstated because of Nevada's high tourist population. The incarceration rate is about average for its crime prevalence. The civil asset forfeiture regime is mediocre following a small reform in 2015. Marijuana was legalized in 2016 by initiative. Gun rights are extensive and have generally gained over time. Nevada is one of the top states for alcohol freedom, with fully private wholesaling and retailing, low taxes, no blue laws, legal direct wine shipping, and wine and spirits in grocery stores. In 2013, the state enacted a law giving illegal immigrants access to driver's licenses, which outweighs its 2011 move to ban handheld cell phone use in increasing overall travel freedom. Nevada is now mediocre for educational freedom. Private schools are tightly regulated, facing mandatory state approval, mandatory teacher licensing, and detailed private school curriculum control. However, the state has a broad tax credit scholarship, enacted in 2015. Even tobacco is not as tightly controlled as one would expect from a state with the ballot initiative, although taxes were raised in 2015. Nevadans may still light up in bars with permission of the owner.

123.   Michael J. New, "Judicial Nonsense in Nevada," Cato Institute, August 8, 2003, http://www.cato.org/publications /commentary/judicial-nonsense-nevada.

# NEW HAMPSHIRE

**2016 RANK**

## 2nd



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK: 1, 10, 20, 30, 40, 50

YEAR: 2000, 2005, 2010, 2015

## POLICY RECOMMENDATIONS

• **Fiscal:** : Local governments need to get a handle on school spending and taxes. State government may be able to help by moving town meetings and local elections to coincide with state elections, boosting turnout and diluting the political power of insiders.

• **Regulatory:** Review local zoning ordinances, and strike down those that increase the price of new housing beyond that needed to pay for the cost of new infrastructure.

• **Personal:** Legalize more forms of private gambling that pay out at a higher ratio than the state lottery and therefore, even for anti-gambling advocates, should be considered less exploitative.



Population, 2017
## 1,342,795

Net Migration Rate
## 2.9%



State Taxes, Percent of Personal Income, FY 2017
## 3.01%

Local Taxes, Percent of Personal Income, FY 2015
## 5.34%

Partisan Lean, 2016
## R +1.4



Real Per Capita Personal Income, 2016, in 2009 $
## $47,837

Real Personal Income Growth, CAGR, 2000–15
## 1.8%

## ANALYSIS

Despite big improvements in recent years, New Hampshire—the second freest state—has been overtaken by Florida. In the more distant past, New Hampshire had a huge lead over the rest of the country on fiscal policy, a lead that dissipated between 2000 and 2008 because of big increases in local property taxes, which were in turn driven by growth in education spending. The three states of northern New England pose a stark contrast in economic policies and, for most of the late 20th and early 21st centuries, economic outcomes.

New Hampshire's state government taxes less than any other state but Alaska. We show a decline in state taxes as a share of adjusted personal income from 3.7 percent in FY 2000 to a projected 3 percent today. Meanwhile, local taxes have risen from 3.9 percent of income in FY 2000 to 5.3 percent in FY 2015. New Hampshire is therefore a highly fiscally decentralized state. Granite Staters have quite a wide choice in local government, with two and a half competing jurisdictions per every 100 square miles. Government debt, consumption, and employment are all much lower than average, and in all these categories we see improvements since 2010. However, cash and security assets are below average and have been dropping.

New Hampshire's regulatory outlook is not so sunny. Its primary sin is exclusionary zoning. It is generally agreed that the Granite State is one of the four worst states in the country for residential building restrictions. Part of the problem might be the absence of a regulatory taking law. However, the eminent domain law is strong. On labor-market freedom, New Hampshire is below average primarily because of the absence of a right-to-work law and of any exceptions to the workers' compensation mandate. New Hampshire has no state-level minimum wage. Health insurance mandates are low, but the state mandates direct access to specialists, hobbling managed care. A telecommunica-tions deregulation bill was passed in 2011–12, but the state has not yet adopted statewide video franchising. The state is above average on occupational freedom solely because the health professions enjoy broad scope of practice; the extent of licensing grew significantly during the 2000s—and more recently in 2016—and the state is now worse than average on most indicators of licensing extent. Insurance freedom is generally better than average, except for some rate classification prohibitions. The hospital certificate-of-need law was abolished in 2011–12, but that only became effective in 2016. Household goods movers are still licensed. There are no price-gouging or sales-below-cost laws. New Hampshire is one of the least cronyist states. The state's civil liability system is far above the national average; punitive damages were abolished long ago.

New Hampshire is personally relatively free. Incarceration rates and drug arrest rates are low but rose significantly after 2011. Nondrug victimless crime arrests are only about average. The state enacted a significant asset forfeiture reform in 2016. Tobacco freedom is below average, as taxes are fairly high and smoking bans are extensive. A liberal tax credit scholarship law was enacted in 2012, raising the state above average on educational freedom, even though there is no public school choice, compulsory schooling lasts 12 years, and private schools require state approval. Because the state has only charitable gambling, it scores well below average in the gambling freedom category. Cannabis freedom is only about average. The 2017 decriminalization law does not yet show up in the index. Alcohol freedom is about average; the state monopolizes liquor retail and wine wholesale, but the effective tax rate is extremely low. Wine (but not spirits) is in grocery stores. It is one of the best states in the country for gun rights, especially when it comes to lack of restrictions on open and concealed carry. The constitutional carry bill enacted in 2017 does not yet show up in the index.

# NEW JERSEY



**2016 RANK**

## 47th



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending on the "miscellaneous" category, employee retirement, and unemployment compensation, all areas in which New Jersey spends a lot more than average. Income, utilities, and property taxes are abnormally high and could be cut.

• **Regulatory:** End rent control. This move would have raised New Jersey four places on economic freedom in 2016.

• **Personal:** Decriminalize low-level cannabis possession, and make high-level possession a misdemeanor. These reforms would have raised New Jersey three places on personal freedom, even ignoring the benefits for incarceration and arrest rates.



Population, 2017

**9,005,644**

Net Migration Rate

**–10.0%**



State Taxes, Percent of Personal Income, FY 2017

**5.73%**

Local Taxes, Percent of Personal Income, FY 2015

**5.53%**

Partisan Lean, 2016

**D +6.9**



Real Per Capita Personal Income, 2016, in 2009 $

**$48,984**

Real Personal Income Growth, CAGR, 2000–15

**1.4%**

## ANALYSIS

About 60 years ago, New Jersey was considered a tax haven. It grew wealthy under that regime, but over the last decade it has dwelt in the bottom five for economic freedom. As long as it is better than New York, it will probably continue to get tax refugees from that state, but more New Yorkers now move to Florida than to New Jersey.

New Jersey's state-level taxes are basically average (5.7 percent of adjusted income), while local taxes are much higher than average (5.5 percent). New Jerseyans have more choice of local government than residents of any other state, with 5.6 effective competing jurisdictions per 100 square miles, which may imply that many residents are content with high local taxes and services. Government debt has now fallen to an average level (19.7 percent of income), but cash and security assets are well below average (11.2 percent of income). Government employment ratio and government GDP share have both improved significantly since the Great Recession and are better than average. As a result, in 2016 New Jersey was a clearly above-average state for fiscal policy for the first time since 2003.

Land-use freedom is quite limited in New Jersey. The state lets cities adopt rent control, and local zoning rules are often highly exclusionary, even though the state has been losing population for years. Renewable portfolio standards are among the highest in the country, raising electric rates. In 2013, the state adopted a minimum wage. Labor-market freedom was already bad because of strict workers' compensation rules, mandated short-term disability insurance, mandated paid family leave, no right-to-work law, and a stricter-than-federal anti-discrimination law. Health insurance mandates are extensive. New Jersey has had no telecommunications deregulation, but there is statewide video franchising. Occupational licensing is more extensive than average. In 2013, nurse practitioner freedom of independent practice was abolished. Insurance rate regulation is strict, and the state has a price-gouging law, which Governor Christie deployed after Hurricane Sandy to devastating effect.[124] The Tesla sales model was recently legalized. The civil liability system is somewhat better than average.

New Jersey has improved over time on personal freedom, but so have other states, leaving it still worse than average. Incarceration and victimless crime arrests, drug and nondrug, have all fallen since 2000, but drug arrests are currently spiking. Individuals can lose their driver's licenses for non-driving-related drug offenses. The state did slash prison collect phone call rates in 2015. Asset forfeiture, however, has not been reformed very much. New Jersey is a bad state for tobacco freedom, travel freedom, and gun rights, but it is a good state for gambling. The picture on educational freedom is mixed. Homeschools and private schools are barely regulated, but there are no public or private school choice programs. Cannabis freedom is similarly mixed. The state has a limited medical cannabis law, but otherwise it has done nothing to reduce penalties. Alcohol freedom is a bit above average, but the state interferes here too. Direct wine shipment is tightly regulated, and the rules on when a grocery store may sell wine are complicated—perhaps to create a "tollbooth" where state politicians can extract rents.

124.  Matthew Yglesias, "Miles-Long Gasoline Lines in New Jersey Show the Case for 'Price Gouging,'" Slate, November 1, 2012, http://www.slate.com/blogs/moneybox/2012/11/01/gas_lines_in_new_jersey_the_state_needs_more_price_gouging.html.

# NEW MEXICO

**2016 RANK**

## 41st







FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Trim spending on police and fire, corrections, education, general administration, public buildings, health and hospitals, parks and recreation, public welfare, sanitation and sewerage, and employee retirement, which are all much higher than the national average, as a share of income. Cut the gross receipts tax.

• **Regulatory:** Roll back occupational licenses, such as those for sign language interpreters, dietitians, dietetic technicians, pharmacy technicians, veterinary technicians, athletic trainers, massage therapists, private detectives, security guard companies, funeral attendants, collection and repossession agencies and managers, emergency dispatchers, construction contractors, well-drilling contractors, security and fire alarm installers, boiler operators, and crane operators.

• **Personal:** Enact a generous private scholarship tax credit program.



Population, 2017
**2,088,070**

Net Migration Rate
**–1.6%**



State Taxes, Percent
of Personal Income, FY 2017
**5.78%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.48%**

Partisan Lean, 2016
**D +0.4**



Real Per Capita Personal
Income, 2016, in 2009 $
**$37,145**

Real Personal Income
Growth, CAGR, 2000–15
**2.4%**

## ANALYSIS

New Mexico has long had far more personal freedom than economic freedom, but it has started to do a little better on economic freedom as well, despite its move from being a "purple" state to a "blue" one. If it would get a serious grip on government spending, New Mexico could be among the freest states in the country.

New Mexico's overall tax burden is right at the national average of 5.8 percent of adjusted personal income. We show significant declines in state-level taxes over time, from 6.7 percent of income in FY 2008. Local taxes have risen, but not as much, from 2.7 percent of income in FY 2000 to 3.5 percent in FY 2015. That growing fiscal decentralization does not do much for choice in government, however, as there is less than one competing jurisdiction per 100 square miles. Government debt ballooned during the Great Recession but has started to come down again. Cash and security assets are robust. New Mexico's big problems are government consumption and employment, each of which is two standard deviations higher than national norms.

New Mexico is about average on land-use freedom. Zoning regulations have tightened over time, and the state has implemented relatively strict renewable portfolio standards. The state has long had a minimum wage, but it is not extremely high. Health insurance freedom is low because of costly mandates and bans on managed-care gate-keeping models. In 2013–14, the state passed a telecommunications deregulation bill, but it has not implemented statewide video franchising. The extent of occupational licensing skyrocketed between 2006 and 2009 but has been almost steady since. Nurses enjoy broad scope-of-practice freedom. Insurance freedom has been fairly high since reforms enacted in 2009–10. There is no certificate-of-need law for hospital construction. Otherwise, cronyist regulation is limited, besides licensing for moving companies and a ban on direct-to-consumer auto sales. The civil liability system is much worse than average, and the state has done little to address the problem.

New Mexico's criminal justice policies stand out from the pack. Victimless crime arrests, drug and nondrug, are low, as are incarceration rates. The state's asset forfeiture law is the best in the country, since 2015 putting limits on equitable sharing. Gambling, cannabis, alcohol, firearms, and travel freedoms are all strong suits for New Mexico, although the state isn't a leader in any of those areas. In 2013, physician-assisted suicide was legalized, but this is a tiny part of our index. The state is one of just two to have both a broad religious freedom restoration act and a broad equal rights amendment (Connecticut is the other). Tobacco and educational freedoms are weak spots. Students are required to go to school for 13 years, the most in the country, and there are no choice programs apart from public school open enrollment. Cigarette taxes are high, and smoking bans are extensive.

# NEW YORK

2016 RANK
## 50th



FISCAL    REGULATORY    PERSONAL    OVERALL



RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending on hospitals, housing, public buildings, public welfare, education, corrections, police and fire, sanitation and sewerage, employee retirement, and "miscellaneous," which are all above national averages. Cut all taxes, and pay down debt.

• **Regulatory:** Abolish rent control. This move could have raised New York to 45th, ahead of Vermont and New Jersey, on regulatory policy.

• **Personal:** Slash cigarette taxes, which are so high as to be almost tantamount to prohibition.



Population, 2017
**19,849,399**

Net Migration Rate
**–14.1%**



State Taxes, Percent of Personal Income, FY 2017
**6.75%**

Local Taxes, Percent of Personal Income, FY 2015
**8.50%**

Partisan Lean, 2016
**D +11.3**



Real Per Capita Personal Income, 2016, in 2009 $
**$46,416**

Real Personal Income Growth, CAGR, 2000–15
**1.7%**

### ANALYSIS

New York has been the least free state in the country for a long time. Economic freedom is the most significant weakness, but the state has not kept up with the rest of the country on personal freedom either.

The only fiscal policy area where New York is not below average is the ratio of government to private employment, where the state has actually improved significantly since the early 2000s. The government GDP ratio has scarcely fallen over that same time period, suggesting that New York pairs relatively low government employment with high salaries and benefits for public employees. New York's local tax burden is twice that of the average state: 8.5 percent of income in FY 2015. This is a dramatic rise from the early 2000s, when it was 7 percent. However, New Yorkers have ample choice in local government: 2.9 competing jurisdictions per 100 square miles. The state tax burden, at a projected 6.8 percent of income in FY 2017, is also higher than the national average. Debt is the highest in the country at 31.2 percent of income, and liquid assets are less than half that, at 14.2 percent of income.

New York is also the worst state on regulatory policy, although here it is at least within striking distance of number 49. Land-use freedom is very low, primarily because of the economically devastating rent control law in New York City. Local zoning is actually fairly moderate compared with surrounding states not named "Pennsylvania." Renewable portfolio standards are high. The state enacted a minimum wage in 2013–14 and also has a short-term disability insurance mandate. Cable and telecommunications are unreformed. Occupational freedom is a bit subpar, but nurse practitioners did gain some independence in 2013–14. Insurance freedom is a mixed bag (the state has stayed out of the Interstate Insurance Product Regulation Compact), but property and casualty insurers gained some freedom to set rates in 2013–14. The civil liability system looks poor, but we may underrate it slightly because of the state's large legal sector.

New York's criminal justice policies are reasonably decent. While drug arrests are about average, nondrug victimless crime arrests are quite low. Incarceration rates are below average. Unfortunately, the state is one of only a few to impose loss of a driver's license as a punishment for non-driving-related drug crimes. Local law enforcement enthusiastically participates in equitable sharing, even though the state law imposes only modest limits in the first place. Tobacco freedom is the worst in the country because of smoking bans and stratospheric taxes ($4.30 a pack in 2015 dollars in 2016). Since 2014, localities have actually enacted total prohibition for 18- to 20-year-olds. New York is perhaps the worst state for homeschoolers, and it has no private or public school choice programs. Sparklers were legalized in 2015 and mixed martial arts competitions in 2016. Gambling freedom is better than average; casinos were introduced in 2005. Cannabis freedom is now slightly above average, as the state enacted a limited medical marijuana law in 2014. Alcohol freedom is a bit above average, but grocery stores can't sell wine. Gun rights are hedged about with all kinds of restrictions, but it is possible with some effort to get a concealed-carry license in some parts of the state.

# NORTH CAROLINA

**2016 RANK**

## 18th



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending on hospitals, which is very high by national standards, possibly through privatization. Build up the rainy-day fund or trim individual income taxes further.

• **Regulatory:** Eliminate all rate regulations on property and casualty insurance. These reforms would have raised North Carolina seven places on regulatory policy and three places on economic freedom.

• **Personal:** Introduce a tax credit scholarship program for families of nondisabled students.



Population, 2017
**10,273,419**

Net Migration Rate
**12.3%**



State Taxes, Percent of Personal Income, FY 2017
**5.69%**

Local Taxes, Percent of Personal Income, FY 2015
**3.33%**

Partisan Lean, 2016
**R +2.7**



Real Per Capita Personal Income, 2016, in 2009 $
**$42,020**

Real Personal Income Growth, CAGR, 2000–15
**2.9%**

## ANALYSIS

North Carolina is a rapidly growing southern state with a reasonably good economic freedom profile and an even better record on personal freedom, especially when compared with its neighbors.

North Carolina gradually improved its fiscal policies from 2011 to 2016. State taxes fell from 6.2 percent of adjusted personal income to a projected 5.7 percent, right around the national average. Local taxes have held steady over that period at 3.3 percent of income, seven-tenths of a percentage point below the national average. Debt and government consumption and employment fell, but so did financial assets.

Despite large immigration, North Carolina has disdained excessive controls on the housing supply. Eminent domain was never effectively reformed. Labor law is good, with no minimum wage, a right-to-work law, and relatively relaxed workers' compensation rules, but an E-Verify mandate was enacted in 2011. Regulation has killed off the managed care model for non-large-group health insurance. Cable and telecommunications have been liberalized. Occupational freedom is a weak spot, especially for the health professions. A sunrise review requirement for occupational licensing proposals was scrapped in 2011. North Carolina is one of the worst states for insurance freedom. It has a large residual market for personal automobile and homeowner's insurance because of strict price controls and rate classification prohibitions. It also has a price-gouging law and a minimum-markup law for gasoline. Entry is restricted for medical facilities and moving companies. North Carolina's civil liability system has improved over time and is now about average.

North Carolina has one of the best criminal justice regimes in the South. Incarceration and victimless crime arrest rates are all below average. There is no state-level civil asset forfeiture, but local law enforcement frequently does an end-run around the law through the Department of Justice's equitable sharing program. Gun rights are more restricted than in many other southern states, with carry licenses somewhat costly to obtain and hedged with limitations. Plus, buying a pistol requires a permit, there is local dealer licensing, background checks are required for private sales, and most Class III weapons are difficult to obtain (sound suppressors were legalized in 2014). Alcohol freedom is mediocre because of state liquor stores and somewhat high markups and taxes. Marijuana has not been liberalized apart from a 1970s-era decriminalization law. Gambling freedom is quite low. School choice was introduced in 2014, but only for students with disabilities. Tobacco freedom is about average because of reasonable taxes and workplace freedom (but not freedom in bars or restaurants).

# NORTH DAKOTA

**2016 RANK**
## 6th



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR
2000   2005   2010   2015

### POLICY RECOMMENDATIONS

• **Fiscal:** Enhance fiscal decentralization and choice among local governments with different policies by cutting state taxes and aid to local schools and allowing local towns to vary property tax to meet school funding needs. The state tax in greatest need of cutting is the sales tax.

• **Regulatory:** Allow employers to purchase workers' compensation insurance from any willing seller, or to self-fund, and allow certain businesses to opt out entirely. These reforms could raise North Dakota four places on regulatory policy and one place on economic freedom.

• **Personal:** Eliminate teacher licensing, mandatory state approval, and detailed curriculum requirements for private schools, and reduce the notification and record-keeping burdens on homeschooling families.



Population, 2017
**755,393**

Net Migration Rate
**3.3%**



State Taxes, Percent of Personal Income, FY 2017
**4.49%**

Local Taxes, Percent of Personal Income, FY 2015
**3.01%**

Partisan Lean, 2016
**R +20.8**



Real Per Capita Personal Income, 2016, in 2009 $
**$54,213**

Real Personal Income Growth, CAGR, 2000–15
**4.6%**

## ANALYSIS

As predicted in the fourth edition of this index, the shale gas boom has finally raised North Dakota's fiscal policy scores. Amazingly, mineral severance taxes have for several years brought in as much to state coffers as all taxes do to both state and local government in the average state, measured as a percentage of personal income.

In FY 2017, North Dakota's state-level tax burden fell to its lowest level in our time series, 4.5 percent of adjusted income. Local tax burden has remained more static but well below the national average at 3 percent of income. North Dakota looks fiscally quite centralized, which is unfortunate because North Dakotans do have substantial choice of local government: 1.7 per 100 square miles. State debts have been paid down gradually, and financial assets built up. Government consumption and employment have risen from their respective 2012 and 2014 lows, but they are still lower than they were in the early and mid-2000s. So far there is little sign of the "resource curse" that has struck Alaska and Wyoming.

Most Great Plains states have good regulatory policies, and North Dakota is no exception, although it falls behind its southern neighbor. Land use is lightly regulated, and the state has one of the strongest limits on eminent domain abuse in the country. The state has a right-to-work law and no state-level minimum wage. However, North Dakota has a monopoly state fund for workers' compensation insurance. When it comes to health insurance regulation still under state control,

North Dakota is tied with Idaho and Nebraska for second best, with none of the most expensive mandates and with a light touch on managed-care plans. Our sources give a split judgment on the extent of occupational licensing in North Dakota, but nurses and physician assistants enjoy ample freedom of practice. Insurance freedom is low because of prior approval of rates and lack of membership in the Interstate Insurance Product Regulation Compact. There is no certificate-of-need law for hospitals, but there is one for moving companies. The state has a general "unfair sales" act. The civil liability system is one of the best in the country.

North Dakota's criminal justice policies are generally good because of the low incarceration rate. However, victimless crime arrests are extremely high. The state's civil asset forfeiture law is among the worst in the country, but local law enforcement rarely participates in equitable sharing. Smoking bans were intensified in 2012, but cigarette taxes are below average. With just a few exceptions, gun rights are strong in North Dakota. Those exceptions mostly have to do with Class III weapons and assorted barriers to concealed and especially open carry. Alcohol freedom is generally good, but wine and spirits are available in grocery stores only when put into a separate enclosure. A reasonably effective medical marijuana law was enacted by initiative in 2016. Gambling freedom is low. North Dakota is the very worst state in the country for educational freedom. Private schools and homeschools are both more harshly regulated than those anywhere else, and the state has no private or public school choice.



# OHIO

2016 RANK
## 25th



Population, 2017
**11,658,609**

FISCAL   REGULATORY   PERSONAL   OVERALL

Net Migration Rate
**−4.9%**





State Taxes, Percent
of Personal Income, FY 2017
**5.19%**

Local Taxes, Percent
of Personal Income, FY 2015
**4.82%**

Partisan Lean, 2016
**R +5.0**

## POLICY RECOMMENDATIONS

• **Fiscal:** Trim spending on housing and community development, sanitation, police, education, and employee retirement, areas where Ohio spends more than the average state. Cut property taxes.

• **Regulatory:** Look at Indiana as a model "Rust Belt" state with regard to regulatory policy, and reform Ohio's regulatory system according to that model. For instance, consider liberalizing the workers' compensation system and rolling back occupational licensing. Adopt a right-to-work law in line with Indiana and Michigan.

• **Personal:** Abolish mandatory minimum sentences for nonviolent offenses, with an eye to reducing the incarceration rate to a level more consistent with its crime rate.



Real Per Capita Personal
Income, 2016, in 2009 $
**$45,176**

Real Personal Income
Growth, CAGR, 2000–15
**1.9%**

## ANALYSIS

Relative to other states, Ohio has improved just slightly on economic freedom since 2008, but its policy regime is worse than that of other Great Lakes states that have been reforming, such as Indiana, Michigan, and Wisconsin.

Ohio is a little more fiscally decentralized than the average state. Local taxes add up to about 4.8 percent of adjusted personal income, while state taxes sit at a projected 5.2 percent of income in FY 2017. The discovery of shale gas has allowed Ohio to raise severance taxes and essentially shift some of its tax burden to consumers of natural gas throughout North America. State and local debt, government consumption, and public employment are all lower than average and in long-term decline.

On the most important regulatory policy category, land-use and environmental freedom, Ohio does well. Zoning has a light touch, and renewable portfolio standards exist but are very low. Labor-market freedom is a problem area for Ohio. The state has a minimum wage, no right-to-work law, and strict workers' compensation coverage and funding rules.

Health insurance mandates are costly. Cable and telecommunications have been liberalized. The average of different measures suggests that in Ohio, the extent of occupational licensing is greater than average and grew in 2016. Nursing scope of practice is the most restricted in the country. The state has a hospital certificate-of-need law, but price regulation in most markets is limited. Insurance rating was liberalized somewhat in 2015. The civil liability system has improved over time and is now about average.

Ohio has a higher-than-average crime-adjusted incarceration rate, and it has risen over time. Meanwhile, victimless crime arrest rates are lower than average and have fallen over time. A significant asset forfeiture reform was enacted in 2016; it could be improved even further, but right now Ohio is above average in this category. A limited medical marijuana law was recently enacted, and the state already enjoys limited decriminalization. Gun rights are better than average. Casinos were legalized in 2012. Educational freedom is above average mostly because of a statewide voucher program, but private schools and homeschools are sharply regulated. Draconian smoking bans have been in place for a decade.

# OKLAHOMA

2016 RANK
## 19th



FISCAL   REGULATORY   PERSONAL   OVERALL



**Population, 2017**
**3,930,864**

**Net Migration Rate**
**2.0%**



**State Taxes, Percent of Personal Income, FY 2017**
**4.36%**

**Local Taxes, Percent of Personal Income, FY 2015**
**3.01%**

**Partisan Lean, 2016**
**R +20.2**



**Real Per Capita Personal Income, 2016, in 2009 $**
**$43,458**

**Real Personal Income Growth, CAGR, 2000–15**
**3.6%**

## POLICY RECOMMENDATIONS

• **Fiscal:** Reduce the government payroll. The proceeds could be applied to shaving the sales tax.

• **Regulatory:** Legalize nurse practitioner independent practice with full prescription authority, join the Nurse Licensure Compact, and pass a nursing consultation exception for interstate practice. These reforms would have raised Oklahoma four places on regulatory policy, to 11th place.

• **Personal:** Eliminate mandatory minimum sentences for victimless offenses.

## ANALYSIS

As noted earlier in this book, Oklahoma is the most improved state for the 2000–2016 period, with some regression since 2014. Moreover, while the Sooner State's personal freedom lags its economic freedom, it has made significant progress on both dimensions.

Oklahoma is one of the lowest-taxed states in America. However, it is also fiscally centralized. Local taxation is about 3 percent of adjusted personal income, while state taxation is 4.4 percent. State and local debt is much lower than average (11.3 percent of adjusted income), but so are financial assets of state and local governments (13.8 percent of adjusted income). Government employment is much higher than average (15.2 percent of private employment), and government GDP share is also high (12.3 percent of income).

Land-use regulation is light in Oklahoma, although the state has not restrained eminent domain for private gain and bans employers from prohibiting guns in their own parking lots. Labor law is excellent, with a right-to-work law, no state-level minimum wage, a federally consistent anti-discrimination law, and the 2014 repeal of mandated workers' compensation coverage. However, the state has a long-standing ban on noncompete agreements. Occupational licensing has grown over time and is more extensive than average. Nurses' practice freedom remains fairly restricted, and nurse practitioners actually lost their autonomy entirely in 2015.

Insurance freedom is high, and rating classification prohibitions were eliminated in 2013–14. The state does have both general and gasoline-focused prohibitions on sales below cost, a price-gouging law, a certificate-of-need law for medical facilities, moving company licensing, and a ban on Tesla's direct-sales model. The court system is relatively good because of tort reforms in the 1990s and early 2000s.

Oklahoma is a mass-incarcerating state, and federal data show the situation worsened significantly in 2013. Despite this, victimless crime arrests have been declining since about 2005. Civil asset forfeiture reform has not gone far. It is still possible to get a life sentence for a single cannabis offense not involving minors. There is a two-year mandatory minimum sentence for even small-scale cultivation. For a state without a government liquor monopoly, Oklahoma does poorly on alcohol freedom. There are statewide blue laws, a happy hour ban, a total ban on direct wine shipment, and a ban on all alcohol sales in grocery stores. Casino gambling was legalized in 2005. Educational freedom has grown recently, with a very limited voucher law in 2010 and a modest tax benefit for contributions to private scholarship funds enacted in 2011–12. Homeschools and private schools are virtually unregulated, and a statute was enacted in 2016 codifying the existing homeschool legal regime. Tobacco freedom is relatively good, although new smoking restrictions in bars surfaced in 2013–14. The state was forced to legalize same-sex marriage, suspending its super-DOMA, in 2014.

# OREGON

2016 RANK
## 44th



FISCAL    REGULATORY    PERSONAL    OVERALL



### POLICY RECOMMENDATIONS

• **Fiscal:** Cut police and fire, financial control and general administration, employee retirement, health and hospitals, and public welfare to levels consistent with national norms. Cut individual income and property taxes.

• **Regulatory:** Eliminate occupational licensing for farm labor contractors, environmental science technicians, dietitians, pharmacy technicians, massage therapists, private detectives, landscaping contractors, well-drilling contractors, low-power installers, locksmiths, crane operators, and other occupations.

• **Personal:** Follow Washington's lead and privatize the distilled spirits industry.



Population, 2017
**4,142,776**

Net Migration Rate
**10.5%**



State Taxes, Percent
of Personal Income, FY 2017
**6.07%**

Local Taxes, Percent
of Personal Income, FY 2015
**4.14%**

Partisan Lean, 2016
**D +3.5**



Real Per Capita Personal
Income, 2016, in 2009 $
**$41,266**

Real Personal Income
Growth, CAGR, 2000–15
**1.9%**

## ANALYSIS

Oregon has generally had higher freedom than its neighbors to the north and south, and has reaped the benefits. Like all the Pacific states except Hawaii, it has enjoyed robust economic growth since 2011, but it has not quite matched Washington's performance.

Oregon's state taxes collapsed during the Great Recession but bounced back quickly. Taxes were raised in FY 2014 and FY 2017 and are now a projected 6.1 percent of adjusted income, above the national average. Local taxes have been more or less steady over that time and are now about 4.1 percent of income. Oregonians have little choice of local government, with just 0.27 effective competing jurisdictions per 100 square miles. Government debt has come down but is still higher than average. State and local employment is lower than average, while government GDP share is higher. From a better-than-average fiscal policy in FY 2000, Oregon now looks subpar in this dimension.

Land use has been a controversial issue in Oregon, and the Beaver State is indeed more regulated in this department than most other states, with a further round of development tightening apparently occurring since 2009. The state ratcheted up its renewable portfolio standard in 2014. Oregon's labor policy is generally anti-employment, with one of the highest minimum wages in the country relative to the median wage, no right-to-work law, and comprehensive workers' compensation mandates. The managed care model of health insurance has been virtually banned since 2003, but mandated benefits are modest. Several independent measures show

that Oregon licenses far more occupations than most other states. However, health professions' practice freedom is moderate. Insurance freedom has grown over the last four years with an end to rating classification prohibitions and the joining of the Interstate Insurance Product Regulation Compact. The civil liability system looks a bit better than the national average.

Oregon's criminal justice policy does not quite match the state's live-and-let-live reputation. Incarceration rates are a bit higher than average, but victimless crime arrests have come down substantially over the past several years to a roughly average level. Marijuana liberty is expansive, but this is not the case for freedom to buy distilled spirits, which are available only in extremely expensive government stores. Civil asset forfeiture has been fairly restricted since 2005, and law enforcement does not often circumvent state law through equitable sharing. Gun rights are better than one might expect from a left-of-center state, but in 2007 open carry was regulated. Illegal immigrants can now get driver's licenses, but travel freedom remains low because of bans on handheld cell phones and open containers; seat belt and helmet laws; and mandatory underinsured driver coverage. Physician-assisted suicide is legal. Fireworks are highly regulated. Educational freedom is low because of a total lack of school choice policies (even public school open enrollment), but private schools and homeschools are regulated with a light touch. Smoking bans are comprehensive and airtight. Oregonians are free to lose vast amounts of money on video slot machines, and they do.

# PENNSYLVANIA



2016 RANK
## 20th



Population, 2017
## 12,805,537

Net Migration Rate
## –2.0%



State Taxes, Percent
of Personal Income, FY 2017
## 5.30%

Local Taxes, Percent
of Personal Income, FY 2015
## 4.52%

Partisan Lean, 2016
## R +0.8



Real Per Capita Personal
Income, 2016, in 2009 $
## $46,672

Real Personal Income
Growth, CAGR, 2000–15
## 2.0%



FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

2000   2005   2010   2015

YEAR

## POLICY RECOMMENDATIONS

- **Fiscal:** Reduce spending, especially on parking lots, public buildings, and employee retirement benefits, which are high by national standards. Reduce numerous minor taxes that are relatively high by national standards.

- **Regulatory:** Improve the civil liability system by abolishing punitive damages and joint and several liability, and by ending partisan elections to the state supreme court.

- **Personal:** Privatize and break up the state liquor monopoly.

## ANALYSIS

The Keystone State is freer than all its neighbors, but it has declined relative to the rest of the country since the late 2000s.

Fiscal policy is the dimension where Pennsylvania has done best. Pennsylvania's tax burden is about average, but the state is a bit more fiscally decentralized than average, with local governments making up a larger share of the total tax take. The tax burden has declined slightly since 2000. Pennsylvanians have ample choice of local government, with more than 4.4 effective competing jurisdictions per 100 square miles. State and local debt is higher than average (and financial assets lower), but public employment is much lower than average (9.4 percent of the private workforce), and so is government GDP (8.5 percent of adjusted income).

Pennsylvania fell quite a bit on regulatory policy in 2011, but it has improved slightly since then, if we ignore the federal health law. It does reasonably well on land-use freedom, especially for a northeastern state, a fact that economist William Fischel attributes to the state supreme court's willingness to strike down minimum lot sizes and other zoning regulations that have exclusionary intent.[125] However, our data show slight deterioration on the zoning measures since 2006. The state is not as bad as most other northeastern states on labor-market regulation, but it lacks a right-to-work law, and a new anti-discrimination law was enacted in the 2015–16 session. Pennsylvania has banned managed care health coverage since the 1990s. By most measures, occupational licensing is not very extensive in Pennsylvania, but nurses

enjoy little practice freedom. Insurance freedom is low, with "prior approval" of homeowner's insurance rates and rating classification prohibitions. In 2016, personal automobile insurance rates were slightly liberalized. The state has a general sales-below-cost law and an anti-price-gouging law. The civil liability system is much worse than the national average. The state has partisan judicial elections and has made only timid efforts at tort reform.

Pennsylvania's criminal justice policy has worsened over time, at least as measured by crime-adjusted incarceration rates. Nonviolent victimless crime arrests are down since 2004, however. Civil asset forfeiture is mostly unreformed. Pennsylvania finally enacted a modest medical marijuana law in the 2015–16 session but has not decriminalized low-level possession. Gun rights are much better respected than in many other states, with carry licenses affordable and not terribly restricted, all Class III weapons legal, and a right to defend oneself in public, legally recognized in 2011. Since legalizing casinos in 2007, Pennsylvania has risen to become one of the best states in the country for gambling liberty (except for home poker games). On the other hand, Pennsylvania is one of the worst states for alcohol freedom. A notoriously inefficient state bureaucracy monopolizes wine and spirits. Wine markups are especially high, and even beer is prohibited in grocery stores. However, direct wine shipments were legalized in 2016. On education, Pennsylvania has a long-standing, liberal tax credit scholarship program, but private schools and homeschools are tightly regulated. Smoking bans have gone far but are not total.

---

125.   William A. Fischel, *The Homevoter Hypothesis: How Home Values Influence Local Government Taxation, School Finance, and Land-Use Policies* (Cambridge, MA: Harvard University Press, 2001), p. 282.

# RHODE ISLAND

**2016 RANK**

## 42nd



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR
2000   2005   2010   2015

### POLICY RECOMMENDATIONS

• **Fiscal:** Cut spending on public buildings, housing, public welfare, and employee retirement, all areas in which state and local governments spend abnormally high amounts. The savings could be applied to reductions in selective sales and individual income taxes.

• **Regulatory:** Reform land-use regulations, perhaps through an Arizona-style regulatory taking compensation requirement combined with eminent domain reform.

• **Personal:** Legalize cultivation, sale, and possession of recreational cannabis.



Population, 2017
**1,059,639**

Net Migration Rate
**−7.5%**



State Taxes, Percent of Personal Income, FY 2017
**5.96%**

Local Taxes, Percent of Personal Income, FY 2015
**5.12%**

Partisan Lean, 2016
**D +6.7**



Real Per Capita Personal Income, 2016, in 2009 $
**$45,795**

Real Personal Income Growth, CAGR, 2000–15
**1.8%**

## ANALYSIS

Rhode Island has long been a fairly typical "deep blue" state in ample personal freedom and weak economic freedom, but that has changed lately, as Rhode Island has not kept up with the rest of the country's growing personal freedom.

Rhode Island's fiscal policy is slightly subpar. Government debt and local taxes are particularly high, while state taxes and financial assets are around the national average, and government consumption and employment are well below the national average. The growing economy has allowed the latter two ratios to fall further in 2015 and 2016. With four effective competing jurisdictions per 100 square miles, Rhode Island affords its residents quite a bit of choice among localities.

Rhode Island's regulatory policy score has been essentially static over the last decade and a half, setting aside the effects of the federal health law. Land-use freedom is low because of exclusionary zoning and eminent domain abuse, and indications are that it has gotten worse since the early 2000s. Renewable portfolio standards are high. Labor policy is also anti-employment, with a high minimum wage, no right-to-work law, a short-term disability insurance mandate, a stricter-than-federal anti-discrimination law, and, since 2013–14, a paid family leave mandate. Health insurance freedom is about average. Cable and telecommunications have been liberalized. Occupational licens-

ing extent is about average, but freedom of practice for health care paraprofessionals is quite high. A price-gouging law was enacted in 2011–12, and the state has long had a general ban on "unfair(ly low) prices." Medical facilities and moving companies face entry restrictions. Freedom from abusive lawsuits is a bit below average.

Rhode Island has one of the best criminal justice systems in the country. Incarceration rates are well below average, as are drug and nondrug victimless crime arrests. Unfortunately, the state has not sufficiently reformed civil asset forfeiture, and, although a big equitable sharing payout somewhat skews Rhode Island's scores on that variable, evidence suggests that local law enforcement participated eagerly in the program even before that payout. The state has a fairly extensive medical cannabis law, and low-level possession of cannabis was decriminalized in 2012. However, it is still possible to get life imprisonment for a single marijuana offense not involving minors. Gambling freedom is high unless you want to play poker with friends in your own home. A tax credit scholarship law and repeal of private school teacher licensing passed in 2011–12, bringing the state's educational freedom above average. Tobacco freedom is one of the lowest in the country because of sky-high cigarette taxes (well over $3 a pack) and comprehensive smoking bans. Gun laws are extremely restrictive but have not changed much since 2000.

# SOUTH CAROLINA

**2016 RANK**

## 29th



FISCAL    REGULATORY    PERSONAL    OVERALL



### POLICY RECOMMENDATIONS

• **Fiscal:** Prune state employment, and cut spending on health and hospitals, which is more than double the national average. Cut the sales tax.

• **Regulatory:** Abolish the price-gouging law and all sales-below-cost/minimum-markup/unfair-sales laws. These reforms would have raised the state two places on overall freedom in 2016.

• **Personal:** Revise the state's asset forfeiture laws to make it more difficult for the government to seize assets, and reduce the government's incentive to do so by lowering the percentage of proceeds that go to law enforcement. Ban equitable sharing with the Department of Justice so that the federal government does not ignore state law.



Population, 2017
**5,024,369**

Net Migration Rate
**14.2%**



State Taxes, Percent of Personal Income, FY 2017
**4.69%**

Local Taxes, Percent of Personal Income, FY 2015
**4.00%**

Partisan Lean, 2016
**R +7.8**



Real Per Capita Personal Income, 2016, in 2009 $
**$39,613**

Real Personal Income Growth, CAGR, 2000–15
**3.0%**

## ANALYSIS

South Carolina has traditionally done better on economic freedom than on personal freedom. The court-ordered legalization of same-sex marriage gave South Carolina a big spike on personal freedom in 2014, but other states quickly followed and that relative advantage was undone (although obviously not the improvement in freedom in an absolute sense).

As one of the states more dependent on the federal government, the Palmetto State gets by with high government employment and consumption and a relatively low tax burden. Local taxes are average, but state taxes, at a projected 4.7 percent of adjusted personal income in FY 2017, are below the national average for 2000–2016 of 5.8 percent. South Carolina enjoyed big tax cuts in the mid- to late 2000s, according to our measure. Government GDP share of income has fallen steadily from its 2009 high, as has government employment. Debt remains high but since FY 2010 has fallen 4.8 percentage points of adjusted income, even though cash and security assets have fallen 2 points over that same period.

South Carolina's regulatory policy has improved noticeably over time, ignoring the ACA impact. Much of that is because of tort reforms in 2005 and 2011 and an improving civil liability system, in which confidence continues to increase according to the latest data. Land-use freedom is extensive, and eminent domain reform has gone far. Labor law is generally good with no state-level minimum wage and a right-to-work law, but the state did enact an E-Verify mandate in 2008. Health insurance mandates are lower than average. Cable and telecommunications have been liberalized. Occupational licensing grew further in 2016 and is starting to look like a real problem for the state, even in comparison with the rest of the country. Nurses enjoy only a little practice freedom. Insurance freedom is a bit subpar, and the state regulates prices for gasoline, general retailers, and in emergencies. There are entry barriers to medical facilities and moving companies.

South Carolina's criminal justice policies are not much like the Deep South. Incarceration and victimless crime arrest rates are more or less average. Asset forfeiture abuse has not been curbed. Cannabis penalties are somewhat harsh but not as draconian as in some other states. Gun rights are reasonably broad but probably below the level enjoyed in, say, Pennsylvania. Open carry is illegal in most places, dealers are licensed, and there is a stricter-than-federal minimum age for possession. Educational freedom is mediocre. Private schools and homeschools are tightly, even harshly, regulated, and there is only a modest tax benefit for school choice programs. Tobacco freedom is above average, as smoking bans on private property contain exceptions, and cigarette taxes are low. The state was forced to legalize same-sex marriage in 2014, overturning its super-DOMA banning private contracts for gay couples. Beer taxes are remarkably high. Automated license plate readers are totally unregulated. There is little legal gambling.

# SOUTH DAKOTA

2016 RANK
## 8th



FISCAL    REGULATORY    PERSONAL    OVERALL



Population, 2017
## 869,666

Net Migration Rate
## 2.5%



State Taxes, Percent
of Personal Income, FY 2017
## 3.87%

Local Taxes, Percent
of Personal Income, FY 2015
## 4.15%

Partisan Lean, 2016
## R +17.3



Real Per Capita Personal
Income, 2016, in 2009 $
## $49,243

Real Personal Income
Growth, CAGR, 2000–15
## 3.4%

## POLICY RECOMMENDATIONS

• **Fiscal:** Trim spending on employment security administration, natural resources, and parks and recreation, areas far above national averages. Eliminate the business income tax.

• **Regulatory:** Amend the constitution to require a supermajority (say, 60 percent) to pass any new regulatory infringement on the rights of private citizens through the initiative process. This could help with both labor-market and tobacco freedom.

• **Personal:** Reform asset forfeiture to place the burden of proof on the government, not on innocent owner claimants, and direct funds to the treasury, not to the seizing departments. A Nebraska-style reform would have raised South Dakota a whopping 10 places on personal freedom in 2016.

## ANALYSIS

South Dakota is a quintessential "deep red" state with a vast gulf between its economic freedom and its personal freedom. The state has been growing like gangbusters for at least 20 years, but lawmakers might also consider whether man can live by money alone.

South Dakota's fiscal policy is excellent. The state has one of the lowest tax burdens in the country, although it has risen slightly at both state and local levels since 2012. It is also relatively fiscally decentralized, and South Dakotans do have some choice among local jurisdictions (1.2 effective ones per 100 square miles). State and local debt is well below the national average, but cash and security assets are not particularly strong. Public employment is just below the national average, at 12.8 percent of private employment, and the government GDP share of income is also low, at 10.3 percent. We register a fairly significant reduction in debt since FY 2009, but assets have also fallen over that time.

South Dakota's regulatory policy is also well above average, but it has improved only a little, discounting the PPACA, since 2000. Land-use freedom is extensive, and housing supply is elastic, but there is no compensation for regulatory takings. Labor law is generally good because of right-to-work and other provisions, but a very high (for the local market) minimum wage was enacted by ballot initiative in 2014. South Dakota is one of the best states for health insurance freedom, with only a handful of the most costly mandates and few restrictions on the managed care model. Telecommunications has been liberalized, but statewide video franchising has not been enacted. Multiple indicators suggest that occupational licensing grew in 2016, and the state is no longer better than average here. Nursing practice freedom is subpar. Insurance freedom is mediocre, as the state has held out against the Interstate Insurance Product Regulation Compact and has enacted a rate classification prohibition. However, the state is mercifully free of a variety of other cronyist entry and price regulations, including a certificate-of-need law. The state's civil liability system is above average and has improved slightly over time.

South Dakota's criminal justice policies are excessively strict from our point of view. For its crime rate, it imprisons more than it should. Drug and other victimless crime arrests are all above national norms, however measured. Asset forfeiture is virtually unreformed, though local law enforcement does not participate much in equitable sharing. Cannabis law is harsher than in most states, though not the harshest. The state takes DNA samples from nonviolent misdemeanant suspects without any judicial process. Gambling freedom is extensive unless you want to do it on the internet. Private school and home-school regulations are not as burdensome as those of the neighbor to the north, and in 2016 the legislature enacted a limited private scholarship tax benefit. Smoking bans are extreme, and tobacco taxes are relatively high. South Dakota is one of the best states in the country for gun rights. Alcohol freedom is also fairly extensive, and in 2015 the ban on direct shipment of wine was repealed.

# TENNESSEE

2016 RANK

## 7th





Population, 2017
**6,715,984**

FISCAL    REGULATORY    PERSONAL    OVERALL



Net Migration Rate
**7.7%**



State Taxes, Percent
of Personal Income, FY 2017
**4.49%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.33%**

Partisan Lean, 2016
**R +13.7**



Real Per Capita Personal
Income, 2016, in 2009 $
**$43,496**

Real Personal Income
Growth, CAGR, 2000–15
**2.6%**

## POLICY RECOMMENDATIONS

• **Fiscal:** Separate spending and tax committees in the legislature, a reform shown to correspond to lower spending over time. Sales taxes are high and could be cut.

• **Regulatory:** Repeal the price-gouging law and all minimum-markup laws. This reform could have raised Tennessee above South Carolina and Mississippi on regulatory policy.

• **Personal:** Deregulate private schools and home-schools by removing mandatory approval and teacher licensing for private schools and relaxing annual notification requirements for homeschoolers.

## ANALYSIS

Tennessee has long been one of the economically freest states, largely because of its fiscal policies, but it also used to be one of the personally freest states in the South. No longer is that true. As a result, the state has fallen from second in overall freedom in 2001 to seventh today.

The Volunteer State lacks an income tax, and both state and local tax collections fall below the national average. We show state-level taxes falling from 5.1 percent of adjusted personal income in FY 2007 to 4.3 percent in FY 2014 and then back up to 4.5 percent in FY 2017. Local taxes have also fallen a bit since 2006, from about 3.7 to 3.3 percent of income. State and local debt is low, at 17.2 percent of income, and so is government consumption and investment, at 9.7 percent of income. Government employment is only 10.7 percent of private employment, a big drop since 2010 as the job market has recovered.

Tennessee's land-use regulations are flexible, and the state has a regulatory takings law. However, eminent domain reform has not gone far. Tennessee is in the top 10 for labor-market freedom, with a right-to-work law, no minimum wage, relaxed workers' compensation rules, and a federally consistent anti-discrimination law. Unfortunately, E-Verify was mandated in 2011. The managed care model of health coverage has been effectively banned. Cable and telecommunications have been liberalized. On the downside, the extent of occupational licensure looks rather high, though different indicators give different pictures (they agree on an increase in 2016, however). Nurse practitioners lost whatever independent scope of practice they had in 2010, but dental hygienists gained some in 2013. The state marginally loosened insurance rate regulation in 2009–10. There are general and gasoline-specific minimum markup laws, as well as an anti-price-gouging law, household mover licensing, and a certificate-of-need law for medical facilities. The civil liability system improved to above average with reforms in 2011 to punitive damages.

Tennessee's criminal justice policies have deteriorated over time. The crime-adjusted incarceration rate has risen inexorably since 2000 and is now above average. Drug arrest rates have risen even more dramatically and are now well above the national average. Asset forfeiture is mostly unreformed. Cannabis laws are strict. Tennessee is one of the best states for gun rights, but the rules around open carry are fairly strict. The state improved here in 2016 with a cut in the cost of a lifetime carry permit. Alcohol freedom is below average because of the blue laws and very high beer taxes, which were raised in 2013 to $1.08 a gallon in 2008 dollars and then again to $1.17 in 2015. The state has little gambling. Educational freedom is low: there are no private or public school choice programs, and private schools and homeschools face significant regulatory burdens. Tobacco freedom is a bit better than average.

# TEXAS

**2016 RANK**

## 21st



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Tighten the rules for municipal annexation and make municipal secession easy, to provide Texans with more choice in local government. Decentralize county responsibilities to the municipal level.

• **Regulatory:** Relegalize managed care health insurance, and roll back mandated benefits like in vitro fertilization coverage and reimbursement for acupuncturists and chiropractors. Those measures will reduce health care and coverage costs and would have raised Texas from just below average to above average on regulatory policy.

• **Personal:** Enact a general educational savings account plan similar to the one enacted in Nevada in 2015.[126]



Population, 2017
**28,304,596**

Net Migration Rate
**8.5%**



State Taxes, Percent of Personal Income, FY 2017
**3.51%**

Local Taxes, Percent of Personal Income, FY 2015
**4.72%**

Partisan Lean, 2016
**R +5.2**



Real Per Capita Personal Income, 2016, in 2009 $
**$43,148**

Real Personal Income Growth, CAGR, 2000–15
**3.9%**

## ANALYSIS

Texas is one of the economically freest and personally least free states in the country. Its economic freedom is likely one reason it has been such a job-producing and population-attracting machine. The Lone Star State boasts the second-highest real income growth rate in the United States since 2008 (2.8 percent annualized).

Texas's fiscal policy is very good. It is a fiscally decentralized state, with local taxes at about 4.7 percent of adjusted personal income, above the national average, and state taxes at about 3.5 percent of income, far below the national average. However, Texans don't have much choice of local government, with only 0.33 jurisdictions per 100 square miles. State and local debt is above average (with the biggest problem being local debt burdens), at 22.6 percent of income, but it has come down noticeably since FY 2010. Public employment has fallen significantly below average, at 11.8 percent of private employment, and government share of GDP is only 10 percent, below the national average of 11.3 percent.

Texas's land-use freedom keeps housing abundant and affordable. The state has a renewable portfolio standard, but it has not been raised in years. Texas is our top state for labor-market freedom. Workers' compensation coverage is optional for employers; most employees are covered, but not all. The state has a right-to-work law, no minimum wage, and a federally consistent anti-discrimination law. Cable and telecommunications have been liberalized. However, health insurance mandates are way above average, and the gatekeeper model of managed care has been banned. The extent of occupational licensing is high, but the state in 2013 enacted a sunrise review requirement for new licensure proposals. Time will tell whether it is at all effective. Nurse practitioners enjoy no freedom of independent practice. Texas does not have many cronyist entry and price regulations, but it does have a price-gouging law, and Tesla's direct sales model is still illegal. We also show a marked deterioration in homeowner's insurance regulation in 2015, resulting in a large residual market. The civil liability system used to be terrible, but now it is merely below average. The state abolished joint and several liability in 2003, but it could do more to cap punitive damages and end parties' role in judicial elections.

Personal freedom is relatively low in Texas. Criminal justice policies are generally aggressive, but tentative reforms have begun. Even controlling for crime rates, the incarceration rate is far above the national average but has recently improved slightly. Drug arrests have fallen a bit over time but are still above average for the user base. Nondrug victimless crime arrests have also fallen over time and are now below the national average. Asset forfeiture is mostly unreformed, and law enforcement frequently participates in equitable sharing. Cannabis laws are harsh. A single offense not involving minors can carry a life sentence. Even cultivating a tiny amount carries a mandatory minimum of six months. In 2013–14, the state banned the mostly harmless psychedelic Salvia divinorum. Travel freedom is low. The state takes a fingerprint for driver's licenses and does not regulate automated license plate readers. It does not have much legal gambling. There are no private school choice programs, but at least private schools and homeschools are basically unregulated. Tobacco freedom is moderate, as smoking bans have not gone as far as in other states. Gun rights are moderately above average. Open carry was legalized in 2015. Alcohol freedom is above average, with taxes low. Texas has virtually no campaign finance regulations.

126.   On this, see Kent Grusendorf and Nate Sherer, "How ESAs Can Keep Texas the Land of the Free and Home of the Brave," policy brief, Texas Public Policy Foundation, Austin, Texas, January 2016, http://www.texaspolicy.com /library/doclib/PB-How-ESAs-Can-Keep-Texas-the-Land-of-the-Free-and-Home-of-the-Brave.pdf.

# UTAH



2016 RANK
## 22nd

FISCAL  REGULATORY  PERSONAL  OVERALL





Population, 2017
**3,101,833**

Net Migration Rate
**4.6%**



State Taxes, Percent
of Personal Income, FY 2017
**5.68%**

Local Taxes, Percent
of Personal Income, FY 2015
**3.81%**

Partisan Lean, 2016
**R +21.1**



Real Per Capita Personal
Income, 2016, in 2009 $
**$38,142**

Real Personal Income
Growth, CAGR, 2000–15
**3.2%**

## POLICY RECOMMENDATIONS

• **Fiscal:** Build up cash reserves and retire state debt.

• **Regulatory:** Eliminate occupational licensing for taxi drivers and chauffeurs, funeral attendants, occupational therapist assistants, recreational therapists, interpreters and translators, and other occupations. Enact mandatory sunrise review for new licensing proposals, ideally with consumer and professional economist representation.

• **Personal:** Restore the civil asset forfeiture law that Utahns originally enacted in 2000.

## ANALYSIS

Utah's fiscal policies are good and have generally improved over time, despite some volatility in the 2008–12 years. Regulatory freedom took a big hit with the ACA in 2012, as with most states, but in fact other regulatory policies also worsened between 2009 and 2014 (recovering slightly since then). Personal freedoms are a mixed bag, consistent with the state's religious and ideological background. Since 2008, the state has been the fourth fastest-growing in the United States, after North Dakota, Texas, and Colorado.

Utah's tax burden is a bit below average. We show a dramatic drop in state revenues with the onset of the Great Recession, which was never replaced. In fact, there were further tax cuts in FY 2014. Local taxes, meanwhile, have remained generally steady right around the national average rate of 3.8 percent of adjusted personal income. Utahns don't have much choice among local governments, just 0.38 per 100 square miles. Government GDP share, debt, assets, and employment are all about average, but generally improving in 2015 and 2016.

Utah does well on regulatory policy overall despite some decline over time. On land-use freedom, the Beehive State is much better than average, but it appears to be tightening zoning rules over time. Eminent domain reform was watered down in 2007. Labor law is solid but not at the very top. The state has a right-to-work law but no minimum wage. However, a new anti-discrimination law was passed in 2016, and the state has mandated E-Verify for private hires since 2010. Managed care is legally feasible, but the legislature enacted a costly mandated benefit for in vitro fertilization in 2014. As everywhere, occupational licensing has increased over time, but sources differ on whether it is more or less extensive than elsewhere. Nursing freedom is better than average, and dental hygienists obtained a limited right to initiate treatment without dentist authorization in 2015. Insurance freedom is among the best in the country, with "use and file" for most property and casualty lines, long-standing membership in the Interstate Insurance Product Regulation Compact, and no rating classification prohibitions. The state has a price-gouging law and a sales-below-cost law for gasoline, but its general sales-below-cost law was repealed in 2007–8. There is no hospital certificate-of-need law or moving company licensing. Utah's civil liability system is better than average.

On personal freedom, Utah unsurprisingly does well on gun rights, travel freedom, educational liberty (except for the school choice component of that category), and campaign finance freedom, but quite poorly on alcohol, cannabis, gambling, and tobacco. The state was also very bad on marriage, but it was forced to legalize same-sex marriage in 2014, a move that also overturned its super-DOMA prohibiting gay partnership contracts. Utah actually does generally well on criminal justice policy. Its crime-adjusted incarceration rate is below the national average, although it has crept up since 2011. Nondrug victimless crime arrests used to be way above average but have come down to national norms, even as drug arrests have risen, especially in the last four years. The state used to have an excellent asset forfeiture law, but it has been successively weakened, most recently in 2013–14. Utah has recently moved to require fingerprints from drivers when they get their licenses.

# VERMONT

**2016 RANK**
## 46th





**Population, 2017**
## 623,657

**Net Migration Rate**
## –1.9%

FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

2000   2005   2010   2015

**YEAR**



**State Taxes, Percent of Personal Income, FY 2017**
## 9.65%

**Local Taxes, Percent of Personal Income, FY 2015**
## 2.02%

**Partisan Lean, 2016**
## D +9.7



**Real Per Capita Personal Income, 2016, in 2009 $**
## $44,611

**Real Personal Income Growth, CAGR, 2000–15**
## 2.0%

## POLICY RECOMMENDATIONS

• **Fiscal:** Undo the last two decades of centralization with a constitutional amendment limiting state government responsibility for education. Return property tax–varying power and school budgeting power fully to towns, and reduce state aid to a low level. Use the proceeds to cut income taxes.

• **Regulatory:** Enact regulatory takings compensation or other measures to deter excessively restrictive local zoning.

• **Personal:** Introduce choice and competition into alcohol sales.

## ANALYSIS

Vermont's economic policies are generally much worse than its social policies, but it has taken some time for the economic toll to be realized. Vermont's growth in the 2000s was good, but real income growth has been in the bottom 10 in the United States since 2008.

Vermont is one of the highest-tax states in the country. It also looks extremely fiscally centralized, with state government taking 9.7 percent of adjusted personal income and local government taking just 2 percent. However, this statistic is overstated, because Vermont counts the property tax as a state tax, even though towns have some discretion over the rate at which it is set locally. Vermonters would benefit from decentralization of tax and spending authority, as they have 3.3 effective competing jurisdictions per 100 square miles, well above the national average. Government debt is below average, but so are cash and security assets. Government share of GDP is average, and public employment is lower than average.

Vermont has fallen all the way to 48th on land-use and energy freedom, and one measure of local building restrictions based on "land use" prevalence in appellate court decisions shows a dramatic escalation in restrictiveness since 2000. The other measure, based on the Wharton Residential Land Use Regulation Index survey and imputation forward and backward with cost-of-living data, also shows deterioration, but at a more measured pace. The state has not done much to restrain eminent domain for private gain. One of the toughest renewable portfolio standards in the country was enacted in 2016. On labor policy, the state has a very high minimum wage compared with local market wages, and it has been rising since 2008. Health insurance mandated benefits are low, but

managed care has been hobbled by several measures. The state legislature authorized single-payer health insurance, but the executive branch declined to implement the law, so we do not code this law in our index. Cable and telecommunications have been liberalized. Occupational freedom is better than the national average. For instance, Vermont is one of only five states that do not license massage therapists. Vermont has sunrise review for new licensing proposals, and it is one of the few states with such a requirement to have taken it seriously, as evidenced by the review reports posted online.[127] Nurse practitioners gained full independent practice authority in 2011–12. Insurance freedom is excellent, with a "use and file" system for most property and casualty lines, long-standing membership in the Interstate Insurance Product Regulation Compact, and no rating classification prohibitions. In general, Vermont is one of the least cronyist states. However, the state has a hospital certificate-of-need law, and in 2013–14 it enacted an anti-science and anti-consumer GMO labeling law, since preempted by Congress. Its civil liability system is mediocre; the state has passed no tort reforms.

Vermont is our number-two state for gun rights. The only policies it could improve are in providing an optional carry license for reciprocity with other states and specifying no duty to retreat. Silencers were legalized in 2015. Vermont is one of the lowest states for alcohol freedom, with a state monopoly over wine and spirits retail and beer wholesaling. It is one of the better noninitiative states for cannabis, with decriminalization and a reasonably broad medical law. (The recently passed legalization law for personal possession does not yet show up in our index.) However, maximum penalties are rather high, high-level possession is a felony, and salvia was banned in 2011. Vermont took travel freedom with one hand and gave back more

---

127.  "Sunrise Review," Office of Vermont Secretary of State, https://www.sec.state.vt.us/professional-regulation/sunrise -review.aspx.

with the other in 2013–14, enacting a primary handheld cell phone ban, which research has shown to be useless, but also letting illegal immigrants get licenses and placing some limits on automated license plate readers (which sunset in 2015 and were then reenacted in 2016). Vermont has almost no legal gambling. Physician-assisted suicide was enacted in 2013. The state does well on educational freedom because some towns are allowed to "tuition out" students, a century-old practice approximating a voucher law. Homeschool regulations are fairly tough. Tobacco free-

dom is extremely low, with airtight smoking bans, vending machine and internet purchase restrictions, and high cigarette taxes. The incarceration rate is below average for its crime rate, and victimless crime arrests are very low. Vermont has one of the better asset forfeiture laws, but it was weakened in 2015 and equitable sharing provides an easy path to circumvention. The state has always been a legislative leader in marriage freedom and today retains its place with no waiting periods, blood tests, or ban on cousin marriage.

# VIRGINIA

2016 RANK

## 13th





FISCAL   REGULATORY   PERSONAL   OVERALL

RANK

1
10
20
30
40
50

2000   2005   2010   2015

**YEAR**

### POLICY RECOMMENDATIONS

• **Fiscal:** Transfer spending responsibilities and taxation authority from counties to municipalities.

• **Regulatory:** Legalize independent practice with full prescriptive authority for nurse practitioners, adopt a nursing consultation exception for interstate practice, and allow dental hygienists to clean teeth without dentist supervision.

• **Personal:** Reform sentencing for nonviolent offenses with an eye to reducing the incarceration rate to the national average in the long term.



Population, 2017
**8,470,020**

Net Migration Rate
**1.6%**



State Taxes, Percent
of Personal Income, FY 2017
**4.70%**

Local Taxes, Percent
of Personal Income, FY 2015
**4.04%**

Partisan Lean, 2016
**D +1.4**



Real Per Capita Personal
Income, 2016, in 2009 $
**$46,856**

Real Personal Income
Growth, CAGR, 2000–15
**2.7%**

## ANALYSIS

As a historically conservative southern state, Virginia has usually done much better on economic freedom than on personal freedom. However, we record some significant improvements in personal freedom in recent years, along with a decline in regulatory policy. Due in part to rising cost of living, Virginia has had a mediocre growth rate since 2008, though still better than neighbors Maryland, North Carolina, West Virginia, and Kentucky (but not Tennessee).

Virginia is a somewhat fiscally decentralized state with an average local tax burden (about 4 percent of adjusted income) and a below-average state tax burden (4.7 percent of income, a moderate decline from FY 2007). Virginians' choice in local government is subpar, with just half a competing jurisdiction per 100 square miles; the reason for this is that counties raise much more in taxes than municipalities. Government debt is low, but so are cash and security assets. Government employment is a bit lower than average, and government share of GDP is much lower than average. Those policies do not show much change over time.

Virginia's land-use freedom is generally good, although local zoning rules have tightened slightly in recent years, reportedly especially in the northern part of the state. Eminent domain reform has been effective. Labor law is well above average, with right-to-work, no minimum wage, fairly relaxed workers' compensation rules, a federally consistent anti-discrimination law, no E-Verify, no paid family leave or short-term disability mandate, and

enforcement of noncompete agreements. Health insurance mandates have long been much higher than the national average. Cable and telecommunications have been liberalized. Occupational licensing is more extensive than in the average state. Nurses and dental hygienists enjoy little practice freedom. Insurance freedom is a bit above average, but Virginia has a certificate-of-need law, a price-gouging law, and mover licensing. Some direct-to-consumer automobile sales were legalized in 2015–16. The civil liability system is about average.

Virginia's criminal justice policies are subpar but at least are no longer worsening. Victimless crime arrest rates are below average, but incarceration rates are high. Asset forfeiture was slightly reformed in 2016. The state's approach to cannabis producers and consumers is draconian. Even low-level cultivation gets a year-long mandatory minimum sentence, and it is possible to get a life sentence for a single marijuana offense not involving minors. Virginia is one of the better states for gun rights. Alcohol freedom is subpar but improved in the early 2000s as some regulations were withdrawn. State liquor store markups are still huge. The state does not have much legal gambling. Educational freedom grew substantially in 2011–12 with a tax credit scholarship law. Tobacco freedom is better than average, with comparatively low cigarette taxes and respect for the property rights of private workplaces. The state was forced to legalize same-sex marriage in 2014, which also overturned the state's oppressive super-DOMA banning all relationship-style contracts between two gay people.

# WASHINGTON

2016 RANK

## 36th




Population, 2017

### 7,405,743

FISCAL   REGULATORY   PERSONAL   OVERALL



### POLICY RECOMMENDATIONS

• **Fiscal:** Enact strict, *ex post* balanced budget requirements to bring state debt down over time. Build up the rainy-day fund.

• **Regulatory:** Better protect property rights by enacting further-reaching eminent domain reform and reducing centralized land-use planning by repealing or amending the Growth Management Act and the Shoreline Management Act.

• **Personal:** Repeal teacher licensing and mandatory state approval and registration for private schools, ease the annual testing requirement for homeschoolers, and require homeschooling parents to keep only a record of attendance, not teaching materials.

Net Migration Rate

### 8.3%



State Taxes, Percent of Personal Income, FY 2017

### 5.19%

Local Taxes, Percent of Personal Income, FY 2015

### 3.70%

Partisan Lean, 2016

### D +5.2



Real Per Capita Personal Income, 2016, in 2009 $

### $46,863

Real Personal Income Growth, CAGR, 2000–15

### 2.2%

## ANALYSIS

Although Washington has had one of the more regulated economies in the United States for a long time, it has benefited from the fact that other West Coast states have had the same. Since 2006, we show decent gains in personal freedom and fiscal policy, along with modest losses on regulatory policy.

Washington lacks an income tax, and as a result its fiscal policy is fairly good. Localities raise just below the national average in taxes, 3.7 percent of adjusted income. State government, meanwhile, raises 5.2 percent of income, also a little below the national average. Despite recent incorporations, Washingtonians do not enjoy much choice in local government, just 0.37 per 100 square miles. Government debt is higher than the national average but has come down recently. Cash and security assets are lower than average. Public employment and government share of GDP are now almost down to the national average, having come down substantially since 2009, partly because of economic growth rather than policy change.

Washingtonians do not enjoy much freedom to use their own land. Local and regional zoning and planning rules have become quite strict. Eminent domain abuse is almost unchecked. Renewable portfolio standards have been tightened. Washington is one of the worst states on labor-market freedom. It lacks a right-to-work law, limits choices for workers' compensation programs, and has extremely high minimum wages relative to its wage base. Managed care is hobbled by standing referral and direct access mandates. Cable and telecommunications have not been liberalized. Occupational licensing has become much more extensive than the national average. The state's sunrise commission law has proven useless. However, nurse practitioners, dental hygienists, and physician assistants enjoy broad scope of practice. Insurance freedom is quite poor because of prior approval of rates and rating classification prohibitions. The civil liability system is mediocre.

Washington's criminal justice policies are among the best in the nation. Incarceration and victimless crime arrest rates are far below national averages and fell substantially even before marijuana legalization. However, the state has done virtually nothing about civil asset forfeiture abuse. Marriage freedom is low because of a waiting period and lack of cousin and covenant marriage. Gun laws are quite good, especially for a left-leaning state. The state has legalized some Class III weapons in recent years. Washington increased its alcohol freedom to average from well below by privatizing state liquor stores and allowing spirits in grocery stores. However, taxes on distilled spirits are the highest in the country. Illegal immigrants have been able to get driver's licenses for a long time. The state is fairly mediocre on gambling freedom and prohibits online gaming. Physician-assisted suicide is legal. Educational freedom is substandard, with some of the toughest licensing, approval, testing, and record-keeping requirements for private schools and homeschools in the country. Smoking bans are comprehensive, and tobacco taxes are extremely high.

# WEST VIRGINIA



**2016 RANK**

## 34th



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

2000   2005   2010   2015

**YEAR**

## POLICY RECOMMENDATIONS

- **Fiscal:** Reduce state employment, especially in general administration, highways, and public welfare. Further reduce the business income tax.

- **Regulatory:** Abolish price controls.

- **Personal:** Reform sentencing by abolishing mandatory minimums for nonviolent offenses, with an eye to reducing the incarceration rate to its 2000 level.

Population, 2017
**1,815,857**

Net Migration Rate
**−0.6%**



State Taxes, Percent of Personal Income, FY 2017
**6.40%**

Local Taxes, Percent of Personal Income, FY 2015
**3.09%**

Partisan Lean, 2016
**R +21.8**



Real Per Capita Personal Income, 2016, in 2009 $
**$37,906**

Real Personal Income Growth, CAGR, 2000–15
**2.1%**

## ANALYSIS

West Virginia has usually done better on personal freedom than on economic freedom, but we show the lines converging as the state's public opinion has grown more conservative and Republican. Since 2006, the state has lagged Pennsylvania and Ohio in economic growth.

The Mountain State's overall tax burden is a little lower than average, but it is centralized at the state level. The state takes about 6.4 percent of adjusted income, a significant decline since FY 2006, when it peaked at 8.1 percent, while local governments take 3.1 percent, a figure that has risen a touch over the same period. There are 0.7 effective competing jurisdictions per 100 square miles. State and local debt and financial assets are both low and have fallen over time, which we show as a slight net gain for freedom. Government employment is way above average, at 16.9 percent of private employment. Government share of GDP is also high (12.2 percent of income) but has fallen since 2013.

Land-use freedom is broad in West Virginia. Labor-market freedom is better than average despite a minimum wage, because of an effective workers' compensation reform in 2007–8 and a right-to-work law in 2016. West Virginia is one of the very worst states for health insurance regulation and has virtually made the managed care model illegal.

Telecommunications was liberalized in 2015. Occupational freedom is a bit below average, both in extent of licensure and in scope of practice for second-line health professions. In an unusual reversal, nurse practitioners lost scope of practice in 2015. Insurance rate-setting freedom is restricted because of prior-approval requirements. The state has a hospital certificate-of-need law, a price-gouging law, and a general unfair-sales law. The civil liability system is still worse than average, but a significant tort reform in 2015 has improved the situation.

West Virginia used to lock up fewer of its residents than most other states, but that is no longer the case. Drug arrests have also risen over time as a share of the user base. Asset forfeiture is essentially unreformed. Cannabis laws are harsh. Even low-level cultivation or sale carries a mandatory minimum of two years in prison. West Virginia is one of the best states for gun rights, buttressed by 2016's constitutional carry law, and despite state involvement in alcohol distribution, it is also better than average for alcohol freedom. The seat belt law was upgraded to primary in 2013, and an open-container law was enacted in 2015, reducing travel freedom. There are ample opportunities to gamble in West Virginia. Private schools and homeschools are fairly heavily regulated, and there is no school choice. Tobacco freedom is only average after a big cigarette tax hike in 2016.

# WISCONSIN

2016 RANK
## 24th



FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR

### POLICY RECOMMENDATIONS

• **Fiscal:** Reduce the income tax burden while continuing to cut spending on employee retirement and government employment.

• **Regulatory:** Abolish price controls.

• **Personal:** Eliminate teacher licensing and mandatory state approval for private schools.



Population, 2017
**5,795,483**

Net Migration Rate
**−1.5%**



State Taxes, Percent
of Personal Income, FY 2017
**6.32%**

Local Taxes, Percent
of Personal Income, FY 2015
**4.01%**

Partisan Lean, 2016
**R +1.6**



Real Per Capita Personal
Income, 2016, in 2009 $
**$45,679**

Real Personal Income
Growth, CAGR, 2000–15
**2.1%**

## ANALYSIS

Wisconsin is one of the most improved states since 2010, but a great deal of the credit for that goes to a rise in personal freedom, not just economic freedom.

The Badger State still has higher-than-average taxes, but they have fallen gradually since 2012, more at the local level than the state level. State taxes are projected to be 6.3 percent of adjusted personal income in FY 2017, while local taxes stood at 4 percent of income in FY 2015, right at the national average. Wisconsinites have ample choice among local governments, with more than two effective competing jurisdictions per 100 square miles. State and local debt has fallen almost continuously since FY 2007, but state and local financial assets have also fallen. Government employment is below average and, after spiking in 2010, has fallen back almost to its 2007 nadir. Government share of GDP is 10.9 percent of adjusted income, marginally lower than the national average and lower than it has been every year since 2000. Overall, Wisconsin has seen definite improvement on fiscal policy since 2010, partly because of economic growth and partly because of policy changes. In 2015, Wisconsin's fiscal policy score was actually a bit better than the national average and at its highest level in our whole time series.

On regulatory policy, we do not see much change in recent years. Regulatory freedom grew in 2015 because of a right-to-work law, but the increase was less than the decline that occurred between 2008 and 2011. Land-use freedom is a bit better than average; local zoning has not gotten out of hand, though it has grown some since 2007. The state has a renewable portfolio standard, which was toughened in 2015. Apart from a right-to-work law, Wisconsin was already

reasonably good on labor-market policy. Health insurance regulation is a bit better than average because of low mandates. Cable and telecommunications have been liberalized. Occupational licensing increased dramatically between 2000 and 2006; still, the state is about average overall on extent of licensure. Nurse practitioners enjoy no independent practice freedom. Insurance freedom is generally good, at least for property and casualty lines. The state has a price-gouging law, and it also has controversial, strictly enforced minimum-markup laws for gasoline and general retailers. The civil liability system is above average and improved significantly since 2010 because of a punitive damages cap.

Wisconsin is below average on criminal justice policies, but it has improved substantially since 2010 because of local policing strategies. The incarceration rate has fallen, as have nondrug victimless crime arrests. The state's asset forfeiture law is one of the more reasonable in the country, although it could still stand improvement, and equitable sharing revenues tend to be lower than average as well. Tobacco freedom is extremely low because of airtight smoking bans and high taxes. Educational freedom grew significantly in 2013–14 with the expansion of vouchers. However, private schools are relatively tightly regulated. There is little legal gambling, even in social contexts. Cannabis law is unreformed. Wisconsin is the best state for alcohol freedom, with no state role in distribution, no keg registration, low taxes (especially on beer—imagine that), no blue laws, legal happy hours, legal direct wine shipment, and both wine and spirits in grocery stores. The state is now better than average on gun rights after the legislature passed a shall-issue concealed-carry license (one of the last states in the country to legalize concealed carry) and repealed a waiting-period law.

# WYOMING

## 2016 RANK
## 38th





Population, 2017

**579,315**

FISCAL   REGULATORY   PERSONAL   OVERALL



RANK

YEAR

Net Migration Rate

**2.8%**



State Taxes, Percent
of Personal Income, FY 2017

**3.56%**

Local Taxes, Percent
of Personal Income, FY 2015

**4.19%**

Partisan Lean, 2016

**R +26.2**



Real Per Capita Personal
Income, 2016, in 2009 $

**$51,634**

Real Personal Income
Growth, CAGR, 2000–15

**3.8%**

## POLICY RECOMMENDATIONS

• **Fiscal:** Privatize hospitals to reduce government employment and consumption and allow sales taxes to be cut. Wyoming spends far more on health and hospitals as a share of its economy than any other state.

• **Regulatory:** Let employers buy workers' compensation coverage from any willing seller. Consider privatizing the state fund.

• **Personal:** Reduce "policing for profit" by limiting equitable sharing, directing forfeiture revenues to the general fund, and putting the burden of proof on the government.

## ANALYSIS

As a highly resource-dependent state, Wyoming's fiscal situation fluctuates greatly from year to year, causing unusual volatility in its freedom scores. Improving regulatory policy can be a way to diversify the economy, and the Equality State could also stand to improve on personal freedom, where it is well below average.

With favorable trust and corporate privacy laws and no income taxes of any kind, Wyoming is as good a place to park your wealth as any other state. Cowboy Staters derive a much larger share of their gross income from capital gains than other Americans. Wyoming is a relatively fiscally decentralized state, especially for its small population. Excluding mineral severance, motor fuel, alcohol, and tobacco revenues, state taxes come to a projected 3.6 percent of adjusted income in FY 2017, well below the national average and a big decline from FY 2009, when they peaked at 5.9 percent. Local taxes stand at about 4.2 percent of income, slightly above the national average. However, Wyomingites have little choice in local government as counties are the locus of most taxation, thus squandering the advantages of fiscal decentralization. Government debt is the lowest in the country (a mere 6 percent of income), and liquid assets are huge (77.8 percent of income), but state and local employment is enormous (19.5 percent of private employment—a big increase over 2008, when it was 17.8 percent), and so is government share of GDP (15 percent). Like Alaska, then, Wyoming personifies the blessings and curses of abundant energy and mineral wealth: low taxes, extremely high reserves, and bloated budgets and public payrolls.

Wyoming does well on land-use freedom but hasn't reformed eminent domain much. Labor law is generally good, with no minimum wage, a right-to-work law, and enforcement of noncompete agreements, but employers must obtain workers' compensation coverage from a monopoly state fund,

and anti-discrimination law goes beyond the federal minimum. Health insurance mandates are lower than average, and the managed care model is still viable. A telecommunications deregulation bill was passed in 2013–14, but there is no statewide video franchising. Occupational licensing has grown over time but is still well below the national average. Nurse practitioners and physician assistants enjoy broad scope of practice, but dental hygienists do not. Wyoming is the best state for insurance freedom, lacking price controls on property and casualty lines. Its price-gouging law was repealed many years ago, but it still has a Depression-era "unfair sales act" on the books. Repealing the latter could vault Wyoming to first place as least cronyist state. Its civil liability system is good, even though the state has not reformed punitive damages at all.

Wyoming's criminal justice policies are similar to those of a Mississippi or Alabama. Incarceration and drug arrest rates are high and have generally risen over time, but non-drug victimless crime arrests have fallen over time and are now only slightly higher than average. A timid asset forfeiture reform was enacted in 2016, but state law is still worse than average. Cannabis laws are predictably bad, though not among the very harshest. Wyoming is one of the very best states for gun rights, having passed constitutional carry in 2010. The only areas where it could improve involve removing location restrictions for carry and specifying no duty to retreat in public, not just in the home as now. Alcohol freedom is a bit above average despite state liquor stores, because taxes are so low. Gambling freedom is below average, but the state does have pari-mutuel wagering and charitable games. Nonsectarian private schools are strictly regulated, and there are no private school choice programs. Tobacco freedom is above average, as smoking bans admit some exceptions. Retail raw milk sales were legalized in 2015. Cousin marriage is illegal, but blood tests and waiting periods are not required for marriage.

**APPENDIX A**

# DIMENSION, CATEGORY, AND VARIABLE WEIGHTS

Key:
Dimension
    Category
        Policy Variable

FISCAL POLICY: 30.4%
    State taxation: 11.6%
    Local taxation: 8.8%
    Government consumption and investment: 8.2%
    Government employment: 2%
    Government debt: 0.3%
    Cash and security assets: 0.2%

REGULATORY POLICY: 34.0%
    Land-use freedom: 11.1%
        Local rent control: 5.3%
        "Land use" court mentions: 3.2%
        Wharton Residential Land Use Regulatory Index: 1.6%
        Renewable portfolio standards: 0.7%
        Regulatory taking compensation: 0.2%
        Eminent domain reform index: 0.2%
        Parking lot gun mandate: 0.01%
        Mandated free speech on private property: <0.01%

    Health insurance freedom: 8.8%
        Community rating: small groups: 2.4%
        Individual health insurance mandate: 2.3%
        Health insurance mandates index: 2.2%
        Individual guaranteed issue: 0.6%
        Small group rate review: 0.5%
        Community rating: individuals: 0.4%
        Direct access to specialists mandated: 0.3%
        Individual rate review: 0.1%

        Standing referrals mandated: 0.03%
        Individual policies: elimination riders banned: 0.02%
        Mandated external grievance review: 0.02%
        Financial incentives to providers banned: 0.01%

    Labor-market freedom: 4.9%
        General right-to-work law: 2.5%
        Short-term disability insurance: 0.9%
        Noncompete agreements permitted: 0.8%
        Minimum wage: 0.6%
        Workers' compensation funding regulations: 0.5%
        Workers' compensation coverage regulations: 0.2%
        Employer verification of legal status: 0.1%
        Employee anti-discrimination law: 0.01%
        Paid family leave: <0.01%

    Lawsuit freedom: 3.3%

    Occupational freedom: 2.6%
        Nurse practitioner independence index: 0.8%
        Employment-weighted licensure: 0.8%
        Regulatory keywords in statutes: 0.8%
        Dental hygienist scope of practice: 0.1%
        Sunrise commissions: 0.06%
        Physician assistant prescribing authority: 0.04%
        Nurse Licensure Compact membership: 0.03%
        Sunset review: 0.02%

    Miscellaneous regulatory freedom: 2.4%
        Certificate of need for hospitals: 0.8%
        Rate filing requirements: personal auto insurance: 0.4%
        Rate filing requirements: homeowner's insurance: 0.3%
        Anti-price-gouging laws: 0.2%
        General sales-below-cost laws: 0.2%
        Rate classification prohibitions: 0.2%
        Interstate Insurance Product Regulation Compact: 0.1%
        Sales-below-cost law for gasoline: 0.1%
        Direct auto sales: 0.1%

Moving company entry regulation: 0.02%
Mandatory labeling law: 0.01%

Cable and telecommunications: 0.9%
Telecommunications deregulation: 0.6%
Statewide cable franchising: 0.3%

PERSONAL FREEDOM: 34.1%
Incarceration and arrests: 8.2%
Crime-adjusted incarceration rate: 4.9%
Drug enforcement rate: 2%
Arrests for nondrug victimless crimes, % of population: 0.6%
Arrests for nondrug victimless crimes, % of all arrests: 0.6%
Driver's license suspensions for drug offenses: 0.04%
Prison collect phone call rate: 0.01%

Guns: 4.5%
Concealed-carry index: 2.2%
Initial permit cost: 0.5%
Local gun ban: 0.4%
Firearms licensing index: 0.3%
Waiting period for purchases: 0.3%
Initial permit term: 0.2%
Open-carry index: 0.1%
Training or testing requirement: 0.1%
Stricter minimum age: 0.1%
Assault weapons ban: 0.05%
No duty to retreat: 0.04%
Dealer licensing: 0.02%
Built-in locking devices: 0.02%
Restrictions on multiple purchases: 0.02%
Background checks for private sales: 0.02%
Registration of firearms: 0.01%
Design safety standards: 0.01%
Machine guns: 0.01%
Ballistic identification: 0.01%
Retention of sales records: 0.01%
Large-capacity magazine bans: <0.01%

Sound suppressor: <0.01%
Short-barreled shotguns: <0.01%
Short-barreled rifles: <0.01%
.50 caliber ban: <0.01%

Gambling: 3.8%
Casino and racino wins: 2.4%
Slot/video games outside casinos: 1.3%
Pari-mutuel wagering: 0.03%
Aggravated gambling felony: 0.02%
Social gambling allowed: 0.02%
Charitable gambling: 0.01%
Express prohibition on internet gambling: <0.01%

Marriage: 3.4%
Same-sex partnership index: 2%
Super-DOMAs: 0.8%
Sodomy laws: 0.3%
Cousin marriage: 0.2%
Covenant marriage: 0.1%
Blood test required: 0.01%
Waiting period: 0.01%

Education: 2.8%
Tax credit/deduction law for scholarships/expenses: 1%
Publicly funded voucher law: 0.6%
Mandatory licensure, private school teachers: 0.5%
Mandatory state approval, private schools: 0.2%
Compulsory school years: 0.2%
Curriculum control, private schools: 0.1%
Public school choice: 0.1%
Curriculum control, homeschools: 0.04%
Record-keeping requirements, homeschools: 0.03%
Standardized testing requirements, homeschools: 0.03%
Notification requirements, homeschools: 0.02%
Teacher qualifications, homeschools: 0.01%
Mandatory registration, private schools: <0.01%
Homeschooling statute: <0.01%

Alcohol: 2.6%

    Alcohol distribution control: 0.9%

    Off-premises sales in grocery stores: 0.4%

    Blue law index: 0.4%

    Spirits taxes: 0.3%

    Wine taxes: 0.2%

    Beer taxes: 0.2%

    Direct wine shipment ban: 0.2%

    Keg registration/ban: 0.1%

    Happy hour ban: 0.02%

    Mandatory server training: <0.01%

Asset forfeiture: 2.6%

    State asset forfeiture law, aggregate score: 1.3%

    Moving average of equitable sharing revenue: 1.3%

Marijuana: 2%

    Medical marijuana index: 0.8%

    Possession decriminalization/legalization: 0.5%

Maximum marijuana penalty: 0.2%

Marijuana misdemeanor index: 0.1%

    Sales legalization: 0.1%

    Mandatory minimums: 0.1%

    Salvia ban: 0.1%

Tobacco: 1.8%

    Cigarette tax: 1.3%

    Minimum legal sale age 21: 0.7%

    Smoking ban, bars: 0.2%

    Internet purchase regulations: 0.05%

    Smoking ban, private workplaces: 0.03%

    Smoking ban, restaurants: 0.02%

    Vending machine regulations: 0.02%

*Mala prohibita* and civil liberties: 1.2%

    Affirmative action ban: 0.7%

    Prostitution legal: 0.2%

Trans-fat bans: 0.1%

Raw milk legal: 0.1%

Mixed martial arts legal: 0.1%

Fireworks laws: 0.04%

Equal Rights Amendment: 0.03%

Physician-assisted suicide legal: 0.03%

DNA database index: 0.01%

Religious freedom restoration act: 0.01%

Travel: 1.1%

    Automated license plate readers: 0.3%

    Driver's licenses for illegal immigrants: 0.3%

Seat belt laws: 0.1%

    Fingerprint for driver's license: 0.1%

    Sobriety checkpoints: 0.1%

    Motorcycle helmet law: 0.1%

    Uninsured/underinsured motorist coverage mandate: 0.1%

Handheld cell phone ban: 0.01%

Campaign finance: 0.1%

    Individual contributions to candidates: 0.03%

    Individual contributions to parties: 0.02%

    Grassroots political action committee contributions to candidates: 0.01%

    Grassroots political action committee contributions to parties: 0.01%

Public financing: <0.01%

*Note: Because of rounding, percentages listed do not sum to exactly 100. Because of how we weight the local taxation variable, the weights for the fiscal policy dimension range from 28.2 (New Jersey) to 30.4 (Hawaii). For more on this, see "Local Taxation" under "Fiscal Policy" in the first chapter.*

# APPENDIX B

# ALTERNATIVE INDICES

This appendix gives alternative freedom indices based on the exclusion of right-to-work laws and the inclusion of various positions on abortion policy.

## LABOR-MARKET FREEDOM—ALTERNATIVE INDICES

The first set of alternative indices excludes right-to-work laws. Consequently, new rankings are generated for labor policy, regulatory freedom, economic freedom, and overall freedom.

<div style="float:right;background:#b0b0b0;color:white;padding:4px 12px;">TABLE B1</div>

| Rank | State | Labor-Market Freedom without Right-to-Work Laws, 2016 |
|------|-------|-------------------------------------------------------|
| 1. | Texas | 0.021 |
| 2. | Virginia | 0.015 |
| 3. | Wisconsin | 0.014 |
| 4. | Indiana | 0.013 |
| 5. | Iowa | 0.013 |
| 6. | Kansas | 0.013 |
| 7. | New Hampshire | 0.012 |
| 8. | Alabama | 0.011 |
| 9. | Tennessee | 0.011 |
| 10. | Mississippi | 0.011 |
| 11. | Georgia | 0.009 |
| 12. | North Carolina | 0.009 |
| 13. | Florida | 0.009 |
| 14. | Illinois | 0.006 |
| 15. | Missouri | 0.006 |
| 16. | Kentucky | 0.006 |
| 17. | Louisiana | 0.006 |
| 18. | Pennsylvania | 0.006 |
| 19. | Delaware | 0.006 |
| 20. | Idaho | 0.005 |
| 21. | New Mexico | 0.005 |
| 22. | Nevada | 0.005 |
| 23. | Arkansas | 0.003 |
| 24. | South Carolina | 0.003 |
| 25. | Michigan | 0.002 |
| 26. | South Dakota | 0.000 |
| 27. | Utah | 0.000 |
| 28. | Nebraska | −0.002 |
| 29. | Maine | −0.002 |
| 30. | Montana | −0.003 |
| 31. | Alaska | −0.004 |
| 32. | Minnesota | −0.004 |
| 33. | Connecticut | −0.004 |
| 34. | West Virginia | −0.006 |
| 35. | Maryland | −0.007 |
| 36. | Ohio | −0.009 |
| 37. | Wyoming | −0.009 |
| 38. | Colorado | −0.009 |
| 39. | Massachusetts | −0.010 |
| 40. | Vermont | −0.010 |
| 41. | Oklahoma | −0.013 |
| 42. | Arizona | −0.015 |
| 43. | Oregon | −0.017 |
| 44. | New Jersey | −0.024 |
| 45. | Washington | −0.026 |
| 46. | New York | −0.038 |
| 47. | Hawaii | −0.039 |
| 48. | Rhode Island | −0.041 |
| 49. | North Dakota | −0.043 |
| 50. | California | −0.078 |

Note: States with different scores may appear identical due to rounding.

 **TABLE B2**

| Rank | State | Regulatory Policy without Right-to-Work Laws, 2016 | | Rank | State | |
|---|---|---|---|---|---|---|
| 1. | Kansas | 0.045 | | 26. | New Hampshire | −0.070 |
| 2. | Nebraska | 0.040 | | 27. | Florida | −0.074 |
| 3. | Idaho | 0.027 | | 28. | Alabama | −0.083 |
| 4. | Iowa | 0.019 | | 29. | Michigan | −0.084 |
| 5. | Indiana | 0.005 | | 30. | Ohio | −0.084 |
| 6. | Wyoming | 0.004 | | 31. | Texas | −0.090 |
| 7. | Mississippi | −0.006 | | 32. | New Mexico | −0.091 |
| 8. | South Dakota | −0.009 | | 33. | Delaware | −0.098 |
| 9. | South Carolina | −0.013 | | 34. | West Virginia | −0.116 |
| 10. | Tennessee | −0.013 | | 35. | Montana | −0.121 |
| 11. | Wisconsin | −0.020 | | 36. | Louisiana | −0.123 |
| 12. | Utah | −0.021 | | 37. | Pennsylvania | −0.146 |
| 13. | Georgia | −0.025 | | 38. | Illinois | −0.165 |
| 14. | Arkansas | −0.030 | | 39. | Rhode Island | −0.167 |
| 15. | Oklahoma | −0.034 | | 40. | Massachusetts | −0.173 |
| 16. | Arizona | −0.035 | | 41. | Connecticut | −0.178 |
| 17. | Colorado | −0.040 | | 42. | Washington | −0.213 |
| 18. | Nevada | −0.042 | | 43. | Oregon | −0.217 |
| 19. | Kentucky | −0.043 | | 44. | Maine | −0.220 |
| 20. | North Dakota | −0.046 | | 45. | Vermont | −0.269 |
| 21. | Virginia | −0.050 | | 46. | Hawaii | −0.269 |
| 22. | Missouri | −0.055 | | 47. | Maryland | −0.353 |
| 23. | North Carolina | −0.060 | | 48. | California | −0.409 |
| 24. | Minnesota | −0.065 | | 49. | New Jersey | −0.426 |
| 25. | Alaska | −0.068 | | 50. | New York | −0.446 |

Note: States with different scores may appear identical due to rounding.

 **TABLE B3**

| Rank | State | Economic Freedom without Right-to-Work Laws, 2016 | | Rank | State | |
|---|---|---|---|---|---|---|
| 1. | Florida | 0.329 | | 26. | Alaska | −0.008 |
| 2. | New Hampshire | 0.262 | | 27. | South Carolina | −0.009 |
| 3. | Tennessee | 0.250 | | 28. | Connecticut | −0.011 |
| 4. | South Dakota | 0.209 | | 29. | Ohio | −0.015 |
| 5. | Indiana | 0.181 | | 30. | Kentucky | −0.023 |
| 6. | North Dakota | 0.176 | | 31. | Louisiana | −0.053 |
| 7. | Colorado | 0.159 | | 32. | Nebraska | −0.060 |
| 8. | Georgia | 0.125 | | 33. | Wyoming | −0.070 |
| 9. | Virginia | 0.125 | | 34. | Iowa | −0.094 |
| 10. | Idaho | 0.119 | | 35. | Illinois | −0.098 |
| 11. | Missouri | 0.119 | | 36. | Rhode Island | −0.107 |
| 12. | Texas | 0.110 | | 37. | Delaware | −0.118 |
| 13. | Oklahoma | 0.102 | | 38. | Minnesota | −0.129 |
| 14. | Kansas | 0.088 | | 39. | Mississippi | −0.130 |
| 15. | Arizona | 0.088 | | 40. | Washington | −0.158 |
| 16. | Pennsylvania | 0.084 | | 41. | West Virginia | −0.170 |
| 17. | Nevada | 0.072 | | 42. | Oregon | −0.263 |
| 18. | Montana | 0.051 | | 43. | New Mexico | −0.271 |
| 19. | Michigan | 0.043 | | 44. | Maine | −0.283 |
| 20. | Alabama | 0.038 | | 45. | Maryland | −0.300 |
| 21. | Utah | 0.023 | | 46. | New Jersey | −0.374 |
| 22. | Massachusetts | 0.016 | | 47. | Vermont | −0.407 |
| 23. | Arkansas | 0.009 | | 48. | California | −0.481 |
| 24. | North Carolina | 0.000 | | 49. | Hawaii | −0.560 |
| 25. | Wisconsin | −0.005 | | 50. | New York | −0.805 |

Note: States with different scores may appear identical due to rounding.

## TABLE B4

| Rank | State | Overall Freedom without Right-to-Work Laws, 2016 | Rank | State | Overall Freedom without Right-to-Work Laws, 2016 |
|---|---|---|---|---|---|
| 1. | New Hampshire | 0.454 | 26. | Nebraska | 0.024 |
| 2. | Florida | 0.454 | 27. | Iowa | 0.016 |
| 3. | Colorado | 0.357 | 28. | Alabama | 0.015 |
| 4. | Indiana | 0.315 | 29. | South Carolina | 0.006 |
| 5. | Nevada | 0.298 | 30. | Connecticut | 0.004 |
| 6. | North Dakota | 0.239 | 31. | Illinois | 0.000 |
| 7. | Tennessee | 0.237 | 32. | Washington | −0.003 |
| 8. | South Dakota | 0.231 | 33. | Louisiana | −0.011 |
| 9. | Missouri | 0.227 | 34. | Arkansas | −0.012 |
| 10. | Arizona | 0.204 | 35. | Minnesota | −0.013 |
| 11. | Kansas | 0.189 | 36. | Maine | −0.037 |
| 12. | Alaska | 0.175 | 37. | Kentucky | −0.039 |
| 13. | Montana | 0.172 | 38. | New Mexico | −0.045 |
| 14. | Georgia | 0.157 | 39. | West Virginia | −0.046 |
| 15. | Virginia | 0.146 | 40. | Rhode Island | −0.065 |
| 16. | Pennsylvania | 0.139 | 41. | Wyoming | −0.065 |
| 17. | Michigan | 0.131 | 42. | Mississippi | −0.093 |
| 18. | Idaho | 0.121 | 43. | Delaware | −0.094 |
| 19. | Massachusetts | 0.112 | 44. | Oregon | −0.111 |
| 20. | North Carolina | 0.111 | 45. | Maryland | −0.186 |
| 21. | Oklahoma | 0.100 | 46. | Vermont | −0.248 |
| 22. | Ohio | 0.089 | 47. | New Jersey | −0.335 |
| 23. | Texas | 0.066 | 48. | California | −0.383 |
| 24. | Utah | 0.064 | 49. | Hawaii | −0.581 |
| 25. | Wisconsin | 0.048 | 50. | New York | −0.791 |

Note: States with different scores may appear identical due to rounding.

## ABORTION POLICY—ALTERNATIVE INDICES

In this edition of the freedom index, abortion remains excluded from the main scores and rankings, given our discussion at the beginning of the book. However, we have again developed alternative abortion policy indices here, which feed into personal freedom and overall freedom, should readers wish to personalize their results according to their view of the relation between abortion policy and freedom. The first alternative index is a pro-life abortion policy ("freedom from abortion") index. For this alternative index, more state restrictions on abortion are always pro-freedom, as is the lack of state subsidies for abortion through Medicaid.

The second alternative index is a moderately pro-choice abortion policy index. For this index, restrictions on late-term abortions and lack of subsidies for abortion are pro-freedom, although for a different reason from pro-lifers in the latter case (respect for conscience), whereas restrictions on early-term abortions are anti-freedom. For the moderately pro-choice index, restrictions on abortion that apply mostly but not entirely to late-term abortions and parental involvement laws for minors' abortions do not count at all.

Finally, the third alternative index is a strong pro-choice abortion policy index. For this alternative index, all limits on abortion are anti-freedom, and subsidies for abortion are pro-freedom.

We devised weights for policies on the assumption that for a pro-lifer, the estimated, measurable value of an aborted fetus's life is $5 million (caveat: this is an actuarial-type estimate, but we consider the moral value of life—whenever life begins—to be truly unmeasurable and view policies relating to unjust killings to be an insoluble problem for any index, including those of human rights and civil liberties internationally). For pro-choicers, the value of the freedom to abort depends on the "consumer surplus" (in economic jargon, this term means the difference between what consumers would have paid and what they actually paid) derived from the observed price elasticity of demand for abortion, multiplied by the "constitutional weight" of 10 consistent with our methodology for the rest of the index. We derive the estimate of $5 million from a high-end estimate of the statistical value of an average human life ($7.5 million), multiplied by two-thirds because young fetuses of the age when abortion typically occurs are naturally aborted by the mother's body roughly one-third of the time.[128] This is, obviously, merely a ballpark figure based on actuarial-type estimates. Moreover, we admit that this type of economic language and reasoning can be difficult, sterile, limiting, and perhaps even less accurate than we'd like (though it is hard to calculate in other ways consistent with the overarching methodology of the index).

128.  Binyamin Appelbaum, "As U.S. Agencies Put More Value on a Life, Businesses Fret," New York Times, February 16, 2011, https://www.nytimes.com/2011/02/17/business/economy/17regulation.html; Mayo Clinic, "Diseases and Conditions: Miscarriage," https://www.mayoclinic.org/diseases-conditions/pregnancy-loss-miscarriage/basics/definition/con-20033827; WebMD, "Pregnancy and Miscarriage," https://www.webmd.com/baby/guide/pregnancy-miscarriage.

The policies included in these alternative indices are as follows: abortions must be performed by a licensed physician (2% of overall pro-life freedom, 0.01% of overall moderate pro-choice freedom, 0.01% of strong pro-choice freedom), some abortions must be performed in hospitals (0.02% pro-life, 0% moderate, 0.01% strong pro-choice), some abortions require involvement of a second physician (0.02% pro-life, 0% moderate, 0.01% strong pro-choice), gestational limit on abortions (0.4% pro-life, 0.6% moderate, 0.02% strong pro-choice), partial-birth abortion ban (0.04% pro-life, 0.06% moderate, <0.01% strong pro-choice), public funding of abortion (6.3% pro-life, 0.1% moderate, 0.2% strong pro-choice), restrictions on private insurance coverage of abortion (19.1% pro-life, 0.1% moderate, 0.1% strong pro-choice), state-mandated waiting periods (6.6% pro-life, 0.1% moderate, 0% strong pro-choice), and parental notification and consent laws (2.9% pro-life, 0% moderate, 0.02% strong pro-choice).

Interestingly, for a pro-lifer, abortion policy is worth a full 37.4% of overall freedom. If you believe that the life of the marginal (in the economic sense) aborted fetus is worth (again, statistically, not morally) about the same as that of any other human being, then you must think of abortion as by far the most important policy states can control. You should be close to a single-issue voter. By contrast, moderate and strong pro-choicers should be far less interested in abortion policy. For moderates, abortion policy is worth 1% of overall freedom, while for strong pro-choicers, abortion policy should be worth only about 0.5% of overall freedom. Why is the freedom to abort worth so little? The evidence suggests that abortion demand in economic terms may be quite price-elastic, implying that the consumer surplus is low. We offer these alternative indices of this very difficult moral, political, and methodological issue as a preliminary attempt rather than the definitive word on this issue and hope they will be treated in that light.

TABLE B5

| Rank | State | Freedom from Abortion (Pro-Life Index), 2016 |
|---|---|---|
| 1. | Indiana | 0.699 |
| 1. | Oklahoma | 0.699 |
| 3. | Kansas | 0.698 |
| 4. | Utah | 0.698 |
| 5. | Michigan | 0.698 |
| 5. | North Dakota | 0.698 |
| 7. | Idaho | 0.698 |
| 7. | Missouri | 0.698 |
| 9. | Kentucky | 0.697 |
| 10. | Nebraska | 0.697 |
| 11. | Ohio | 0.093 |
| 11. | South Carolina | 0.093 |
| 11. | Virginia | 0.093 |
| 14. | Arkansas | 0.093 |
| 14. | Louisiana | 0.093 |
| 16. | Mississippi | 0.092 |
| 16. | Tennessee | 0.092 |
| 18. | Alabama | 0.092 |
| 18. | Pennsylvania | 0.092 |
| 20. | North Carolina | 0.092 |
| 21. | Texas | 0.091 |
| 22. | South Dakota | 0.058 |
| 23. | Georgia | 0.058 |
| 24. | Wisconsin | 0.023 |
| 25. | Arizona | −0.042 |
| 26. | Wyoming | −0.043 |
| 27. | Florida | −0.077 |
| 27. | Minnesota | −0.077 |
| 29. | Iowa | −0.078 |
| 30. | Colorado | −0.088 |
| 31. | Rhode Island | −0.094 |
| 32. | Nevada | −0.112 |
| 33. | Delaware | −0.112 |
| 33. | Maine | −0.112 |
| 35. | New Hampshire | −0.137 |
| 36. | West Virginia | −0.163 |
| 37. | Massachusetts | −0.178 |
| 38. | Maryland | −0.213 |
| 39. | Hawaii | −0.247 |
| 40. | New Mexico | −0.256 |
| 41. | Alaska | −0.257 |
| 42. | Illinois | −0.263 |
| 43. | Montana | −0.296 |
| 44. | New York | −0.297 |
| 45. | Connecticut | −0.297 |
| 46. | California | −0.297 |
| 46. | Washington | −0.297 |
| 48. | New Jersey | −0.307 |
| 49. | Oregon | −0.308 |
| 49. | Vermont | −0.308 |

Note: States with the same rank are tied.

## TABLE B6

**Moderate Pro-Choice Abortion Policy Index, 2016**

| Rank | State | | Rank | State | |
|------|-------|---|------|-------|---|
| 1. | Rhode Island | 0.005 | 23. | Texas | 0.003 |
| 2. | Delaware | 0.005 | 23. | Wisconsin | 0.003 |
| 2. | Florida | 0.005 | 28. | Hawaii | 0.003 |
| 2. | Iowa | 0.005 | 28. | Maryland | 0.003 |
| 2. | Maine | 0.005 | 28. | Massachusetts | 0.003 |
| 2. | Nevada | 0.005 | 31. | Arizona | 0.002 |
| 2. | Wyoming | 0.005 | 32. | Indiana | 0.002 |
| 8. | Montana | 0.005 | 32. | Kansas | 0.002 |
| 9. | Arkansas | 0.004 | 32. | Michigan | 0.002 |
| 9. | Georgia | 0.004 | 32. | North Dakota | 0.002 |
| 9. | Louisiana | 0.004 | 32. | Oklahoma | 0.002 |
| 9. | Mississippi | 0.004 | 32. | Utah | 0.002 |
| 9. | Ohio | 0.004 | 38. | West Virginia | 0.001 |
| 9. | South Carolina | 0.004 | 39. | Minnesota | 0.000 |
| 9. | South Dakota | 0.004 | 40. | Idaho | 0.000 |
| 9. | Tennessee | 0.004 | 40. | Kentucky | 0.000 |
| 9. | Virginia | 0.004 | 40. | Missouri | 0.000 |
| 18. | California | 0.003 | 40. | Nebraska | 0.000 |
| 18. | Connecticut | 0.003 | 44. | New Hampshire | −0.009 |
| 18. | Illinois | 0.003 | 45. | Colorado | −0.011 |
| 18. | New York | 0.003 | 46. | New Mexico | −0.012 |
| 18. | Washington | 0.003 | 47. | New Jersey | −0.013 |
| 23. | Alabama | 0.003 | 47. | Oregon | −0.013 |
| 23. | North Carolina | 0.003 | 47. | Vermont | −0.013 |
| 23. | Pennsylvania | 0.003 | 50. | Alaska | −0.013 |

Note: States with the same rank are tied.

## TABLE B7

**Strong Pro-Choice Abortion Policy Index, 2016**

| Rank | State | | Rank | State | |
|------|-------|---|------|-------|---|
| 1. | Oregon | 0.005 | 26. | Wyoming | −0.001 |
| 1. | Vermont | 0.005 | 27. | Wisconsin | −0.003 |
| 3. | New Jersey | 0.005 | 28. | Georgia | −0.003 |
| 4. | Alaska | 0.005 | 29. | South Dakota | −0.003 |
| 5. | New Mexico | 0.005 | 30. | Texas | −0.003 |
| 6. | California | 0.005 | 31. | North Carolina | −0.003 |
| 6. | Washington | 0.005 | 32. | Alabama | −0.003 |
| 8. | Connecticut | 0.005 | 32. | Pennsylvania | −0.003 |
| 9. | New York | 0.005 | 34. | Mississippi | −0.003 |
| 10. | Montana | 0.005 | 34. | Tennessee | −0.003 |
| 11. | Hawaii | 0.005 | 36. | Arkansas | −0.003 |
| 12. | Illinois | 0.005 | 36. | Louisiana | −0.003 |
| 13. | Maryland | 0.005 | 38. | Ohio | −0.003 |
| 14. | Massachusetts | 0.004 | 38. | South Carolina | −0.003 |
| 15. | West Virginia | 0.003 | 38. | Virginia | −0.003 |
| 16. | Minnesota | 0.002 | 41. | Nebraska | −0.006 |
| 17. | Arizona | 0.002 | 42. | Kentucky | −0.006 |
| 18. | New Hampshire | 0.000 | 43. | Idaho | −0.006 |
| 19. | Colorado | 0.000 | 43. | Missouri | −0.006 |
| 20. | Delaware | 0.000 | 45. | Michigan | −0.006 |
| 20. | Maine | 0.000 | 45. | North Dakota | −0.006 |
| 22. | Nevada | 0.000 | 47. | Utah | −0.006 |
| 23. | Iowa | 0.000 | 48. | Kansas | −0.006 |
| 24. | Florida | 0.000 | 49. | Indiana | −0.006 |
| 25. | Rhode Island | 0.000 | 49. | Oklahoma | −0.006 |

Note: States with the same rank are tied.

**TABLE B8**

| Rank | State | Pro-Life Personal Freedom, 2016 | | Rank | State | |
|------|-------|--------------------------------|---|------|-------|---|
| 1. | Indiana | 0.832 | | 26. | Arkansas | 0.071 |
| 2. | Missouri | 0.806 | | 27. | Alabama | 0.069 |
| 3. | Kansas | 0.799 | | 28. | New Hampshire | 0.054 |
| 4. | Michigan | 0.787 | | 29. | Florida | 0.048 |
| 5. | Nebraska | 0.781 | | 30. | Texas | 0.047 |
| 6. | North Dakota | 0.761 | | 31. | Minnesota | 0.038 |
| 7. | Utah | 0.739 | | 32. | Iowa | 0.032 |
| 8. | Idaho | 0.699 | | 33. | New Mexico | −0.031 |
| 9. | Oklahoma | 0.697 | | 34. | West Virginia | −0.038 |
| 10. | Kentucky | 0.681 | | 35. | Wyoming | −0.039 |
| 11. | North Carolina | 0.203 | | 36. | Rhode Island | −0.052 |
| 12. | Ohio | 0.196 | | 37. | Alaska | −0.074 |
| 13. | Pennsylvania | 0.146 | | 38. | Massachusetts | −0.082 |
| 14. | Louisiana | 0.135 | | 39. | Delaware | −0.088 |
| 15. | Maine | 0.134 | | 40. | Maryland | −0.099 |
| 16. | Mississippi | 0.128 | | 41. | Washington | −0.143 |
| 17. | Virginia | 0.114 | | 42. | Vermont | −0.149 |
| 18. | Nevada | 0.114 | | 43. | Oregon | −0.156 |
| 19. | Colorado | 0.109 | | 44. | Illinois | −0.165 |
| 20. | South Carolina | 0.107 | | 45. | Montana | −0.175 |
| 21. | Georgia | 0.090 | | 46. | California | −0.200 |
| 22. | South Dakota | 0.080 | | 47. | New Jersey | −0.268 |
| 23. | Tennessee | 0.079 | | 48. | Hawaii | −0.268 |
| 24. | Arizona | 0.075 | | 49. | Connecticut | −0.282 |
| 25. | Wisconsin | 0.075 | | 50. | New York | −0.282 |

Note: States with different scores may appear identical due to rounding.

**TABLE B9**

| Rank | State | Moderate Pro-Choice Personal Freedom, 2016 | | Rank | State | |
|------|-------|--------------------------------------------|---|------|-------|---|
| 1. | Maine | 0.251 | | 26. | Nebraska | 0.084 |
| 2. | Nevada | 0.231 | | 27. | North Dakota | 0.065 |
| 3. | New Mexico | 0.214 | | 28. | Pennsylvania | 0.057 |
| 4. | Colorado | 0.187 | | 29. | Wisconsin | 0.055 |
| 5. | New Hampshire | 0.183 | | 30. | Rhode Island | 0.047 |
| 6. | Alaska | 0.170 | | 31. | Louisiana | 0.047 |
| 7. | Washington | 0.158 | | 32. | Utah | 0.042 |
| 8. | Vermont | 0.146 | | 33. | Mississippi | 0.041 |
| 9. | Oregon | 0.139 | | 34. | Georgia | 0.036 |
| 10. | Indiana | 0.135 | | 35. | Delaware | 0.029 |
| 11. | Florida | 0.130 | | 36. | South Dakota | 0.027 |
| 12. | Montana | 0.125 | | 37. | New Jersey | 0.026 |
| 13. | West Virginia | 0.125 | | 38. | Virginia | 0.026 |
| 14. | Arizona | 0.119 | | 39. | South Carolina | 0.019 |
| 15. | Maryland | 0.116 | | 40. | Connecticut | 0.018 |
| 16. | Minnesota | 0.116 | | 41. | New York | 0.018 |
| 17. | Iowa | 0.115 | | 42. | Wyoming | 0.010 |
| 18. | North Carolina | 0.114 | | 43. | Idaho | 0.001 |
| 19. | Missouri | 0.108 | | 44. | Oklahoma | 0.000 |
| 20. | Ohio | 0.108 | | 45. | Tennessee | −0.009 |
| 21. | Kansas | 0.103 | | 46. | Kentucky | −0.016 |
| 22. | Illinois | 0.101 | | 47. | Arkansas | −0.017 |
| 23. | California | 0.100 | | 48. | Hawaii | −0.019 |
| 24. | Massachusetts | 0.099 | | 49. | Alabama | −0.020 |
| 25. | Michigan | 0.090 | | 50. | Texas | −0.041 |

Note: States with different scores may appear identical due to rounding.

**TABLE B10**

| Rank | State | Strong Pro-Choice Personal Freedom, 2016 |
|---|---|---|
| 1. | Maine | 0.246 |
| 2. | New Mexico | 0.231 |
| 3. | Nevada | 0.226 |
| 4. | Colorado | 0.198 |
| 5. | New Hampshire | 0.192 |
| 6. | Alaska | 0.188 |
| 7. | Vermont | 0.164 |
| 8. | Washington | 0.159 |
| 9. | Oregon | 0.157 |
| 10. | Indiana | 0.128 |
| 11. | West Virginia | 0.127 |
| 12. | Montana | 0.126 |
| 13. | Florida | 0.124 |
| 14. | Arizona | 0.118 |
| 15. | Maryland | 0.118 |
| 16. | Minnesota | 0.117 |
| 17. | Iowa | 0.109 |
| 18. | North Carolina | 0.109 |
| 19. | Illinois | 0.103 |
| 20. | Missouri | 0.102 |
| 21. | California | 0.102 |
| 22. | Ohio | 0.100 |
| 23. | Massachusetts | 0.100 |
| 24. | Kansas | 0.095 |
| 25. | Michigan | 0.083 |
| 26. | Nebraska | 0.078 |
| 27. | North Dakota | 0.058 |
| 28. | Pennsylvania | 0.051 |
| 29. | Wisconsin | 0.050 |
| 30. | New Jersey | 0.045 |
| 31. | Rhode Island | 0.041 |
| 32. | Louisiana | 0.039 |
| 33. | Utah | 0.035 |
| 34. | Mississippi | 0.033 |
| 35. | Georgia | 0.029 |
| 36. | Delaware | 0.024 |
| 37. | Connecticut | 0.020 |
| 38. | New York | 0.020 |
| 39. | South Dakota | 0.019 |
| 40. | Virginia | 0.018 |
| 41. | South Carolina | 0.011 |
| 42. | Wyoming | 0.004 |
| 43. | Idaho | −0.004 |
| 44. | Oklahoma | −0.008 |
| 45. | Tennessee | −0.017 |
| 46. | Hawaii | −0.017 |
| 47. | Kentucky | −0.022 |
| 48. | Arkansas | −0.024 |
| 49. | Alabama | −0.026 |
| 50. | Texas | −0.047 |

Note: States with different scores may appear identical due to rounding.

**TABLE B11**

| Rank | State | Pro-Life Overall Freedom, 2016 |
|---|---|---|
| 1. | Indiana | 1.040 |
| 2. | North Dakota | 0.964 |
| 3. | Kansas | 0.914 |
| 4. | Missouri | 0.902 |
| 5. | Michigan | 0.856 |
| 6. | Idaho | 0.845 |
| 7. | Oklahoma | 0.826 |
| 8. | Utah | 0.789 |
| 9. | Nebraska | 0.748 |
| 10. | Kentucky | 0.685 |
| 11. | Florida | 0.403 |
| 12. | Tennessee | 0.356 |
| 13. | South Dakota | 0.316 |
| 14. | New Hampshire | 0.294 |
| 15. | Virginia | 0.266 |
| 16. | Colorado | 0.246 |
| 17. | Georgia | 0.241 |
| 18. | North Carolina | 0.230 |
| 19. | Nevada | 0.212 |
| 20. | Pennsylvania | 0.208 |
| 21. | Arizona | 0.190 |
| 22. | Texas | 0.184 |
| 23. | Ohio | 0.159 |
| 24. | Alabama | 0.134 |
| 25. | South Carolina | 0.125 |
| 26. | Louisiana | 0.108 |
| 27. | Arkansas | 0.108 |
| 28. | Wisconsin | 0.097 |
| 29. | Mississippi | 0.026 |
| 30. | Iowa | −0.036 |
| 31. | Wyoming | −0.082 |
| 32. | Massachusetts | −0.088 |
| 33. | Alaska | −0.104 |
| 34. | Minnesota | −0.113 |
| 35. | Montana | −0.146 |
| 36. | Maine | −0.172 |
| 37. | Rhode Island | −0.181 |
| 38. | West Virginia | −0.182 |
| 39. | Delaware | −0.229 |
| 40. | Illinois | −0.286 |
| 41. | Connecticut | −0.315 |
| 42. | Washington | −0.323 |
| 43. | New Mexico | −0.324 |
| 44. | Maryland | −0.421 |
| 45. | Oregon | −0.441 |
| 46. | Vermont | −0.578 |
| 47. | New Jersey | −0.664 |
| 48. | California | −0.703 |
| 49. | Hawaii | −0.851 |
| 50. | New York | −1.110 |

Note: States with different scores may appear identical due to rounding.

**TABLE B12**

**TABLE B13**

| Rank | State | Pro-Life Overall Freedom, No Right-to-Work Laws, 2016 |
|---|---|---|
| 1. | Indiana | 1.014 |
| 2. | North Dakota | 0.937 |
| 3. | Missouri | 0.925 |
| 4. | Kansas | 0.887 |
| 5. | Michigan | 0.829 |
| 6. | Idaho | 0.818 |
| 7. | Oklahoma | 0.799 |
| 8. | Utah | 0.762 |
| 9. | Nebraska | 0.721 |
| 10. | Kentucky | 0.658 |
| 11. | Florida | 0.377 |
| 12. | Tennessee | 0.329 |
| 13. | New Hampshire | 0.317 |
| 14. | South Dakota | 0.290 |
| 15. | Colorado | 0.269 |
| 16. | Virginia | 0.239 |
| 17. | Pennsylvania | 0.231 |
| 18. | Georgia | 0.215 |
| 19. | North Carolina | 0.203 |
| 20. | Nevada | 0.186 |
| 21. | Ohio | 0.182 |
| 22. | Arizona | 0.163 |
| 23. | Texas | 0.157 |
| 24. | Alabama | 0.107 |
| 25. | South Carolina | 0.099 |
| 26. | Louisiana | 0.082 |
| 27. | Arkansas | 0.081 |
| 28. | Wisconsin | 0.070 |
| 29. | Mississippi | −0.001 |
| 30. | Iowa | −0.062 |
| 31. | Massachusetts | −0.066 |
| 32. | Alaska | −0.082 |
| 33. | Minnesota | −0.091 |
| 34. | Wyoming | −0.109 |
| 35. | Montana | −0.124 |
| 36. | Maine | −0.150 |
| 37. | Rhode Island | −0.159 |
| 38. | Delaware | −0.207 |
| 39. | West Virginia | −0.209 |
| 40. | Illinois | −0.263 |
| 41. | Connecticut | −0.293 |
| 42. | Washington | −0.301 |
| 43. | New Mexico | −0.301 |
| 44. | Maryland | −0.399 |
| 45. | Oregon | −0.419 |
| 46. | Vermont | −0.556 |
| 47. | New Jersey | −0.642 |
| 48. | California | −0.681 |
| 49. | Hawaii | −0.828 |
| 50. | New York | −1.088 |

Note: States with different scores may appear identical due to rounding.

| Rank | State | Moderate Pro-Choice Overall Freedom, 2016 |
|---|---|---|
| 1. | Florida | 0.486 |
| 2. | New Hampshire | 0.423 |
| 3. | Indiana | 0.343 |
| 4. | Nevada | 0.329 |
| 5. | Colorado | 0.323 |
| 6. | Tennessee | 0.268 |
| 7. | North Dakota | 0.268 |
| 8. | South Dakota | 0.263 |
| 9. | Arizona | 0.233 |
| 10. | Kansas | 0.218 |
| 11. | Missouri | 0.205 |
| 12. | Georgia | 0.188 |
| 13. | Virginia | 0.178 |
| 14. | Michigan | 0.160 |
| 15. | Montana | 0.154 |
| 16. | Idaho | 0.147 |
| 17. | North Carolina | 0.141 |
| 18. | Alaska | 0.140 |
| 19. | Oklahoma | 0.129 |
| 20. | Pennsylvania | 0.119 |
| 21. | Texas | 0.096 |
| 22. | Utah | 0.092 |
| 23. | Massachusetts | 0.092 |
| 24. | Wisconsin | 0.077 |
| 25. | Ohio | 0.071 |
| 26. | Nebraska | 0.051 |
| 27. | Iowa | 0.048 |
| 28. | Alabama | 0.045 |
| 29. | South Carolina | 0.037 |
| 30. | Louisiana | 0.020 |
| 31. | Arkansas | 0.019 |
| 32. | Kentucky | −0.012 |
| 33. | Connecticut | −0.015 |
| 34. | West Virginia | −0.018 |
| 35. | Illinois | −0.020 |
| 36. | Washington | −0.023 |
| 37. | Wyoming | −0.033 |
| 38. | Minnesota | −0.035 |
| 39. | Maine | −0.054 |
| 40. | Mississippi | −0.062 |
| 41. | New Mexico | −0.079 |
| 42. | Rhode Island | −0.082 |
| 43. | Delaware | −0.112 |
| 44. | Oregon | −0.146 |
| 45. | Maryland | −0.206 |
| 46. | Vermont | −0.284 |
| 47. | New Jersey | −0.370 |
| 48. | California | −0.403 |
| 49. | Hawaii | −0.601 |
| 50. | New York | −0.810 |

Note: States with different scores may appear identical due to rounding.

**TABLE B14**

Moderate Pro-Choice Overall Freedom, No Right-to-Work Laws, 2016

| Rank | State | | Rank | State | |
|------|-------|------|------|-------|------|
| 1. | Florida | 0.459 | 26. | Nebraska | 0.024 |
| 2. | New Hampshire | 0.445 | 27. | Iowa | 0.021 |
| 3. | Colorado | 0.346 | 28. | Alabama | 0.018 |
| 4. | Indiana | 0.317 | 29. | South Carolina | 0.010 |
| 5. | Nevada | 0.303 | 30. | Connecticut | 0.007 |
| 6. | Tennessee | 0.241 | 31. | Illinois | 0.002 |
| 7. | North Dakota | 0.241 | 32. | Washington | 0.000 |
| 8. | South Dakota | 0.236 | 33. | Louisiana | −0.006 |
| 9. | Missouri | 0.227 | 34. | Arkansas | −0.007 |
| 10. | Arizona | 0.206 | 35. | Minnesota | −0.013 |
| 11. | Kansas | 0.191 | 36. | Maine | −0.032 |
| 12. | Montana | 0.177 | 37. | Kentucky | −0.039 |
| 13. | Alaska | 0.162 | 38. | West Virginia | −0.045 |
| 14. | Georgia | 0.161 | 39. | New Mexico | −0.057 |
| 15. | Virginia | 0.151 | 40. | Rhode Island | −0.060 |
| 16. | Pennsylvania | 0.141 | 41. | Wyoming | −0.060 |
| 17. | Michigan | 0.133 | 42. | Mississippi | −0.089 |
| 18. | Idaho | 0.121 | 43. | Delaware | −0.089 |
| 19. | Massachusetts | 0.114 | 44. | Oregon | −0.124 |
| 20. | North Carolina | 0.114 | 45. | Maryland | −0.184 |
| 21. | Oklahoma | 0.102 | 46. | Vermont | −0.261 |
| 22. | Ohio | 0.093 | 47. | New Jersey | −0.348 |
| 23. | Texas | 0.069 | 48. | California | −0.380 |
| 24. | Utah | 0.066 | 49. | Hawaii | −0.579 |
| 25. | Wisconsin | 0.050 | 50. | New York | −0.788 |

Note: States with different scores may appear identical due to rounding.

**TABLE B15**

Strong Pro-Choice Overall Freedom, 2016

| Rank | State | | Rank | State | |
|------|-------|------|------|-------|------|
| 1. | Florida | 0.480 | 26. | Nebraska | 0.045 |
| 2. | New Hampshire | 0.432 | 27. | Iowa | 0.042 |
| 3. | Indiana | 0.336 | 28. | Alabama | 0.039 |
| 4. | Colorado | 0.334 | 29. | South Carolina | 0.029 |
| 5. | Nevada | 0.324 | 30. | Louisiana | 0.013 |
| 6. | Tennessee | 0.261 | 31. | Arkansas | 0.012 |
| 7. | North Dakota | 0.260 | 32. | Connecticut | −0.013 |
| 8. | South Dakota | 0.255 | 33. | West Virginia | −0.017 |
| 9. | Arizona | 0.233 | 34. | Kentucky | −0.018 |
| 10. | Kansas | 0.210 | 35. | Illinois | −0.018 |
| 11. | Missouri | 0.199 | 36. | Washington | −0.021 |
| 12. | Georgia | 0.181 | 37. | Minnesota | −0.034 |
| 13. | Virginia | 0.170 | 38. | Wyoming | −0.039 |
| 14. | Alaska | 0.158 | 39. | Maine | −0.060 |
| 15. | Montana | 0.155 | 40. | New Mexico | −0.063 |
| 16. | Michigan | 0.153 | 41. | Mississippi | −0.069 |
| 17. | Idaho | 0.142 | 42. | Rhode Island | −0.088 |
| 18. | North Carolina | 0.135 | 43. | Delaware | −0.117 |
| 19. | Oklahoma | 0.121 | 44. | Oregon | −0.128 |
| 20. | Pennsylvania | 0.113 | 45. | Maryland | −0.204 |
| 21. | Massachusetts | 0.094 | 46. | Vermont | −0.265 |
| 22. | Texas | 0.090 | 47. | New Jersey | −0.352 |
| 23. | Utah | 0.085 | 48. | California | −0.401 |
| 24. | Wisconsin | 0.072 | 49. | Hawaii | −0.599 |
| 25. | Ohio | 0.063 | 50. | New York | −0.808 |

Note: States with different scores may appear identical due to rounding.

## TABLE B16

| Rank | State | Strong Pro-Choice Overall Freedom, No Right-to-Work Laws, 2016 |
|------|-------|------|
| 1. | New Hampshire | 0.454 |
| 2. | Florida | 0.453 |
| 3. | Colorado | 0.357 |
| 4. | Indiana | 0.309 |
| 5. | Nevada | 0.297 |
| 6. | Tennessee | 0.234 |
| 7. | North Dakota | 0.234 |
| 8. | South Dakota | 0.229 |
| 9. | Missouri | 0.221 |
| 10. | Arizona | 0.206 |
| 11. | Kansas | 0.183 |
| 12. | Alaska | 0.181 |
| 13. | Montana | 0.177 |
| 14. | Georgia | 0.154 |
| 15. | Virginia | 0.143 |
| 16. | Pennsylvania | 0.136 |
| 17. | Michigan | 0.126 |
| 18. | Massachusetts | 0.116 |
| 19. | Idaho | 0.115 |
| 20. | North Carolina | 0.108 |
| 21. | Oklahoma | 0.094 |
| 22. | Ohio | 0.086 |
| 23. | Texas | 0.063 |
| 24. | Utah | 0.058 |
| 25. | Wisconsin | 0.045 |
| 26. | Nebraska | 0.018 |
| 27. | Iowa | 0.015 |
| 28. | Alabama | 0.013 |
| 29. | Connecticut | 0.009 |
| 30. | Illinois | 0.004 |
| 31. | South Carolina | 0.003 |
| 32. | Washington | 0.002 |
| 33. | Minnesota | −0.011 |
| 34. | Louisiana | −0.014 |
| 35. | Arkansas | −0.015 |
| 36. | Maine | −0.037 |
| 37. | New Mexico | −0.040 |
| 38. | West Virginia | −0.043 |
| 39. | Kentucky | −0.045 |
| 40. | Rhode Island | −0.065 |
| 41. | Wyoming | −0.066 |
| 42. | Delaware | −0.095 |
| 43. | Mississippi | −0.096 |
| 44. | Oregon | −0.106 |
| 45. | Maryland | −0.182 |
| 46. | Vermont | −0.243 |
| 47. | New Jersey | −0.329 |
| 48. | California | −0.378 |
| 49. | Hawaii | −0.577 |
| 50. | New York | −0.786 |

Note: States with different scores may appear identical due to rounding.

# FURTHER READING

## FEDERALISM AND DECENTRALIZATION

Buchanan, James M. "Federalism as an Ideal Political Order and an Objective for Constitutional Reform." *Publius* 25 (Spring 1995): 19–27. Reprinted in *The Collected Works of James M. Buchanan*. Vol. 18, pp. 67–78. Indianapolis: Liberty Fund, 2001.

Fischel, William A. *The Homevoter Hypothesis: How Home Values Influence Local Government Taxation, School Finance, and Land-Use Policies*. Cambridge, MA: Harvard University Press, 2001.

Nozick, Robert. "Utopia." Part III of *Anarchy, State, and Utopia*. New York: Basic Books, 1974.

Somin, Ilya. "Foot Voting, Federalism, and Political Freedom." In *NOMOS LV: Federalism and Subsidiarity*, edited by James E. Fleming and Jacob T. Levy. New York: New York University Press, 2014.

Storing, Herbert J., and Murray Dry, eds. *The Anti-Federalist: Writings by the Opponents of the Constitution*. Chicago: University of Chicago Press, 1985.

Tabarrok, Alexander. "Arguments for Federalism." Speech given at the Hastings Law School, University of California, San Francisco. September 20, 2001. http://www.independent.org/issues/article.asp?id=485.

Tiebout, Charles. "A Pure Theory of Local Expenditures." *Journal of Political Economy* 64 (1956): 416–24.

Weingast, Barry R. "The Economic Role of Political Institutions: Market-Preserving Federalism and Economic Development." *Journal of Law, Economics, and Organization* 11, no. 1 (Spring 1995): 1–31.

## STATE POLITICS AND POLICY

Enns, Peter K., and Julianna Koch. "Public Opinion in the U.S. States: 1956–2010." *State Politics and Policy Quarterly* 13, no. 3 (2013): 349–72.

Erikson, Robert S., Gerald C. Wright, and John P. McIver. *Statehouse Democracy: Public Opinion and Policy in the American States*. Cambridge: Cambridge University Press, 1993.

Gelman, Andrew. *Red State, Blue State, Rich State, Poor State: Why Americans Vote the Way They Do*. Princeton, NJ: Princeton University Press, 2008.

Sorens, Jason, Fait Muedini, and William Ruger. "U.S. State and Local Public Policies in 2006: A New Database." *State Politics and Policy Quarterly* 8, no. 3 (2008): 309–26.

Tausanovitch, Chris, and Christopher Warshaw. "Measuring Constituent Policy Preferences in Congress, State Legislatures, and Cities." *Journal of Politics* 75, no. 2 (2013): 330–42.

## THE RELATIONSHIP BETWEEN LIBERTY AND VIRTUE

Block, Walter. "Libertarianism and Libertinism." *Journal of Libertarian Studies* 11, no. 1 (Fall 1994): 117–28.

Meyer, Frank S. "The Locus of Virtue." In *In Defense of Freedom and Related Essays*. Indianapolis: Liberty Fund, 1996, pp. 128–48.

Nock, Albert Jay. "On Doing the Right Thing." *American Mercury*, November 1924. Reprinted in *The State of the Union: Essays in Social Criticism*, ed. Charles H. Hamilton. Indianapolis: Liberty Press, 1991.

Ruger, William, and Jason Sorens. "The Case for 'Virtue Libertarianism' Over Libertinism." Reason.com, June 9, 2016, https://reason.com/archives/2016/06/09/libertarianism-yes-but-what-kind-of-libe.

Smith, Adam. *The Theory of Moral Sentiments*. 1759.

## RENT SEEKING

Krueger, Anne O. "The Political Economy of the Rent-Seeking Society." *American Economic Review* 64, no. 3 (June 1974): 291–303.

Olson, Mancur. *The Rise and Decline of Nations: Economic Growth, Stagflation, and Social Rigidities*. New Haven, CT: Yale University Press, 1982.

Tullock, Gordon. "The Welfare Costs of Tariffs, Monopolies and Theft." *Western Economic Journal* 5, no. 3 (June 1967): 224–32.

## PERSONAL FREEDOM

Locke, John. "A Letter Concerning Toleration." 1689. http://oll.libertyfund.org/?option=com_staticxt&staticfile=show.php%3Ftitle=764&chapter=80887&layout=html&Itemid=27.

Mill, John Stuart. "Of the Liberty of Thought and Discussion." Chapter 2 in *On Liberty*. 1859.

Ruger, William. "Why Tolerance Is Different than Acceptance: Let Ideas, Debate, and Freedom Bloom." *The Federalist*, August 18, 2015. http://thefederalist.com/2015/08/18/why-tolerance-is-different-than-acceptance/.

## FREEDOM AND JUSTICE

Boaz, David. *The Libertarian Mind: A Manifesto for Freedom*. New York: Simon & Schuster, 2015.

Buchanan. James M. "Classical Liberalism and the Perfectibility of Man." In *Why I, Too, Am Not a Conservative: The Normative Vision of Classical Liberalism*, pp. 11–21. Cheltenham, UK: Elgar, 2005.

Friedman, Milton. *Capitalism and Freedom*. Chicago: University of Chicago Press, 1962.

Kant, Immanuel. "On the Common Saying: 'This May Be True in Theory, but It Does Not Apply in Practice.'" 1793.

Locke, John. *Second Treatise of Civil Government*. 1690.

Madison, James. "Property." *National Gazette*, March 29, 1792. http://teachingamericanhistory.org/library/index.asp?document=600.

Nozick, Robert. "State-of-Nature Theory, or How to Back into a State without Really Trying" and "Beyond the Minimal State?" Parts I and II of *Anarchy, State, and Utopia*. New York: Basic Books, 1974.

Spencer, Herbert. *Social Statics, or the Conditions Essential to Happiness Specified, and the First of Them Developed*. London: John Chapman, 1851.

## ACKNOWLEDGMENTS

We wish to acknowledge our sincere gratitude to all those who have read, commented on, and helped to improve our study in past years. A partial list of those to whom we owe a particular debt of thanks includes David Boaz, Jacob Levy, Dylan McLean, Claire Morgan, Fait Muedini, John Samples, Ilya Somin, Dean Stansel, Varrin Swearingen, Alison Winters, Ken Zuver, everyone at the Mercatus Center at George Mason University who did such an excellent job producing and promoting the first three editions of this index, and everyone at the Cato Institute who has helped us put out this and the fourth edition, along with countless, unnameable readers and listeners who have approached us at events or emailed us their questions and comments.

## ABOUT THE AUTHORS

William Ruger is Vice President for Research and Policy at the Charles Koch Institute and Vice President for Research at the Charles Koch Foundation. He was previously an Associate Professor in the Department of Political Science at Texas State University. Ruger earned his PhD in Politics from Brandeis University and an AB from the College of William and Mary. His scholarship has appeared in a number of academic journals, including *International Studies Quarterly, Civil Wars,* and *Armed Forces and Society.* He is the author of the biography *Milton Friedman* and a coauthor of two books on state politics, including *Freedom in the 50 States.* Ruger has written op-eds for a number of outlets, such as the *New York Times, USA Today,* and *Foreign Affairs,* and he has been interviewed frequently for television and radio, appearing on MSNBC, CNN, and Fox News. Ruger is a veteran of the war in Afghanistan and an officer in the U.S. Navy (Reserve Component). He lives with his wife and two sons in Virginia.

Jason Sorens is a lecturer in the Department of Government at Dartmouth College and received his PhD in political science from Yale University in 2003. He has researched and written more than 15 peer-reviewed journal articles and a book, *Secessionism* (McGill-Queens University Press). His research has focused on independence movements around the world, the theory and practice of fiscal federalism, and subnational economic policy-making. He has founded two nonprofits, the Free State Project (www.fsp.org) and Ethics and Economics Education (www.e3ne.org). He lives with his wife and daughter in New Hampshire.



151



The Dynamics of State Policy Liberalism, 1936—2014

Author(s): Devin Caughey and Christopher Warshaw

Source: *American Journal of Political Science*, OCTOBER 2016, Vol. 60, No. 4 (OCTOBER 2016), pp. 899–913

Published by: Midwest Political Science Association

Stable URL: https://www.jstor.org/stable/24877462

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Midwest Political Science Association* is collaborating with JSTOR to digitize, preserve and extend access to *American Journal of Political Science*

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

Exhibit
0025

# The Dynamics of State Policy Liberalism, 1936–2014

**Devin Caughey**    Massachusetts Institute of Technology
**Christopher Warshaw**    Massachusetts Institute of Technology

**Abstract:** *Applying a dynamic latent-variable model to data on 148 policies collected over eight decades (1936–2014), we produce the first yearly measure of the policy liberalism of U.S. states. Our dynamic measure of state policy liberalism marks an important advance over existing measures, almost all of which are purely cross-sectional and thus cannot be used to study policy change. We find that, in the aggregate, the policy liberalism of U.S. states steadily increased between the 1930s and 1970s and then largely plateaued. The policy liberalism of most states has remained stable in relative terms, though several states have shifted considerably over time. We also find surprisingly little evidence of multidimensionality in state policy outputs. Our new estimates of state policy liberalism have broad application to the study of political development, representation, accountability, and other important issues in political science.*

**Replication Materials:** The data, code, and any additional materials required to replicate all analyses in this article are available on the *American Journal of Political Science* Dataverse within the Harvard Dataverse Network, at: http://dx.doi.org/10.7910/DVN/ZXZMJB.

"Change," Chandler, Chandler, and Vogler (1974, 108) noted four decades ago, "is both methodologically and substantively critical for any theory of policy." This is true both of the determinants of government policies, such as shifts in public mood or changes in the eligible electorate (e.g., Husted and Kenny 1997; Stimson, MacKuen, and Erikson 1995), and of policy feedback on political and social outcomes (e.g., Campbell 2012; Wlezien 1995). Theories of all these phenomena rely explicitly or implicitly on models of policy change. Moreover, many of the most ambitious theories focus not on individual policies or policy domains, but on the character of government policy as a whole. In short, most theories of policymaking are both *dynamic* and *holistic:* they are concerned with changes in the general orientation of government policy.

Unfortunately, the literature on U.S. state politics, perhaps the most vibrant field for testing theories of policymaking, relies almost exclusively on policy indicators that are either measured at a single point in time (e.g., Wright, Erikson, and McIver 1987) or else cover only a partial subset of state policy outputs (e.g., Besley and Case 2003).[2] Static measures are poorly suited to studying causes of policy change over time (Jacoby and Schneider 2009; Lowery, Gray, and Hager 1989; Ringquist and Garand 1999). And while domain-specific measures may provide useful summaries of some aspects of state policy, such as welfare spending (Moffitt 2002) or gay rights (Lax and Phillips 2009), they are at best imperfect proxies for what is often the outcome of interest, the overall orientation of state policy.

In this article, we develop a holistic yearly summary of the ideological orientation of state policies, which we refer to as state *policy liberalism*. This measure is based on a unique data set of 148 policies, which covers nearly eight decades (1936–2014) and includes policy domains

Devin Caughey is Assistant Professor, Department of Political Science, Massachusetts Institute of Technology, 77 Massachusetts Avenue, Cambridge, MA 02139 (caughey@mit.edu). Christopher Warshaw is Assistant Professor, Department of Political Science, Massachusetts Institute of Technology, 77 Massachusetts Avenue, Cambridge, MA 02139 (cwarshaw@mit.edu).

We appreciate the excellent research assistance of Melissa Meek, Kelly Alexander, Aneesh Anand, Tiffany Chung, Emma Frank, Joseff Kolman, Mathew Peterson, Steve Powell, Charlotte Swasey, Lauren Ullmann, and Amy Wickett. We also appreciate the willingness of Frederick Boehmke and Carl Klarner to generously share their data. We are grateful for research support from the dean of the School of Humanities, Arts, and Social Sciences at MIT. All mistakes, however, are our own.

[1]To our knowledge, the only existing holistic yearly summary of state policies is Jacoby and Schneider's (2009) measure of particularistic versus collective state spending priorities between 1982 and 2005. As we discuss below, our measures differ substantially in time coverage, conceptual interpretation, and the data used to construct them.

[2]Both the policy data and our policy liberalism estimates will be made available to the public upon publication of this article.

*American Journal of Political Science,* Vol. 60, No. 4, October 2016, Pp. 899–913

©2015, Midwest Political Science Association    DOI: 10.1111/ajps.12219

899

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

ranging from social welfare to abortion to civil rights.[2] Based on these data, we estimate policy liberalism in each year using a dynamic Bayesian latent-variable model designed for a mix of continuous, ordinal, and dichotomous policy indicators. This measurement model enables us to make use of many indicators of policy liberalism, thus substantially reducing measurement error on the estimates of our construct of interest.

Despite the disparate policy domains covered by our data set, allowing for additional latent policy dimensions does little to improve the predictive accuracy of the model. This suggests that contrary to previous claims (e.g., Sorens, Muedini, and Ruger 2008), a single latent dimension suffices to capture the systematic variation in state policies. Consistent with this conclusion, our dynamic measure is highly correlated with existing cross-sectional measures of state policy liberalism as well as with issue-specific ideological scales.

Substantively, we find that while U.S. states as a whole have drifted to the left (i.e., they have increasingly adopted liberal policies), most have remained ideologically stable in relative terms. Across our entire time series, the most conservative states are in the South, whereas California, New York, Massachusetts, and New Jersey are always among the most liberal. The relative policy liberalism of a few states, however, has changed substantially. Several Midwestern and Mountain states have become considerably more conservative relative to the rest of the nation, whereas most of the Northeast has become more liberal.

Our new dynamic estimates can be used to study a wide variety of possible questions, many of which are not easily investigated using cross-sectional measures. Potential topics of study include the short- and long-term determinants of policy outputs, such as economic development, political institutions, mass policy preferences, and electoral outcomes. Our policy liberalism scores can also be used as an independent variable, as a means of examining policy feedback or other consequences of policy change. Our measure thus opens new avenues of research on representation, accountability, political development, and other important issues in political science.

The remainder of the article is organized as follows. We begin by defining the concept of policy liberalism and situating it in the literature on U.S. state politics and policy. Next, we describe our policy data set, our measurement model, and our yearly estimates of state policy liberalism. We then provide evidence for the validity of our measure. We show that it is highly correlated with existing measures of policy liberalism and related concepts. In the online supporting information, we also show that a one-dimensional scale adequately accounts for systematic policy variation across states. The penultimate section

discusses potential applications of our measure, and the final section concludes.

## Measuring State Policies

Studies of state policy generally employ one of two measurement strategies: They either consider policy separately using policy-specific indicators, or they construct composite measures intended to summarize the general orientation of state policies within or across domains (Jacoby and Schneider 2014, 568). Among studies in the first camp, some have focused on whether or not states have particular policies. Lax and Phillips (2009), for example, examine the representational congruence between a series of dichotomous state gay rights policies and state opinion majorities. Other studies have employed continuous policy-specific indicators, such as welfare expenditures (Husted and Kenny 1997), tax rates (Besley and Case 2003), or minimum wages (Leigh 2008), which potentially have greater sensitivity to differences between states. Whether dichotomous or continuous, policy-specific measures are appropriate when the research question is limited to a particular policy area. However, they are suboptimal as summary measures of the general orientation of state policies, though this is how they are often used.[3]

For this reason, a number of scholars have sought to combine information from multiple policies, using factor analysis or other dimension reduction methods to summarize them in terms of one or more dimensions of variation. Dimension reduction has several advantages over policy-specific measures. First, from a statistical point of view, using multiple indicators for a latent trait usually reduces measurement error on the construct of interest, often substantially (Ansolabehere, Rodden, and Snyder 2008; Hofferbert 1966). Second, many concepts require multiple indicators to adequately represent the full content or empirical domain of the concept. For example, the concept of liberalism, in its contemporary American meaning, encompasses policy domains ranging from social welfare to environmental protection to civil rights. A measure of liberalism based on only a subset of these domains would thus fare poorly

[3]Lax and Phillips (2009, 369) claim that "using...policy-specific estimates" allows them to "avoid problems of inference that arise when policy and opinion lack a common metric." On a policy-by-policy basis, this is probably true. But evaluating congruence on state policy in general, or even just in the domain of gay rights, requires that the policy-specific estimates of congruence be weighted or otherwise mapped onto a single dimension. Thus, dimension reduction must occur at some point, whether at the measurement stage or later in the analysis.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

in terms of content validation (Adcock and Collier 2001, 538–40). A final benefit is parsimony. If a single measure can predict variation in disparate domains, then we have achieved an important desideratum of social science: "explaining as much as possible with as little as possible" (King, Keohane, and Verba 1994, 29).

Different works have identified different traits or dimensions underlying state policies. Walker (1969), for example, creates an "innovation score" that captures the speed with which states adopt new programs. Sharkansky and Hofferbert (1969) identify two latent factors that structure variation in state policies, as do Sorens, Muedini, and Ruger (2008). Hopkins and Weber (1976) uncover a total of five. But primarily, the state politics literature has focused on a single left–right policy dimension (e.g., Gray et al. 2004; Hofferbert 1966; Klingman and Lammers 1984; Wright, Erikson, and McIver 1987). As a number of studies have confirmed, states with minimal restrictions on abortion tend to ban the death penalty, regulate guns more tightly, offer generous welfare benefits, and have progressive tax systems, and vice versa for states with more restrictive abortion laws. Following Wright, Erikson, and McIver (1987), we label this dimension *policy liberalism*.

What is policy liberalism? We conceptualize liberalism not as a logically coherent ideology, but as a set of ideas and issue positions that, in the context of American politics, "go together" (Converse 1964). Relative to conservatism, liberalism involves greater government regulation and welfare provision to promote equality and protect collective goods, and less government effort to uphold traditional morality and social order at the expense of personal autonomy. Conversely, conservatism places greater emphasis on the values of economic freedom and cultural traditionalism (e.g., Ellis and Stimson 2012, 3–6). Although the definitions of liberalism and conservatism have evolved over time, with civil rights and then social issues becoming more salient relative to economics (Ladd 1976, 589–93), these ideological cleavages have existed in identifiable form since at least the mid-20th century (Noel 2014; Schickler 2013).

There are several things to note about this definition of policy liberalism. First, it is comprehensive, in that it covers most if not all domains of salient policy conflict in American domestic politics.[4] This is not to say that policy liberalism explains all variation in state policy, or that all policies are equally structured by this latent dimension. But it is a concept that attempts to summarize, holistically, all the policy outputs of a state. Second, we define policy liberalism solely in terms of state policies themselves.

By contrast, some previous measures (e.g., Hopkins and Weber 1976; Sharkansky and Hofferbert 1969) incorporate societal outcomes like infant mortality rates and high school graduation rates, muddying the distinction between government policies and socioeconomic conditions (Sorens, Muedini, and Ruger 2008).

A final characteristic of our conceptualization of policy liberalism, which is particularly crucial for our purposes, is that it is dynamic. Unlike, say, state political culture (Elazar 1966), which changes slowly if at all, policy liberalism can and does vary across time in response to changes in public opinion, partisan control, and social conditions. Defining policy liberalism as a time-varying concept is hardly controversial, but it does conflict with previous operationalizations of this concept, all of which are cross-sectional. Cross-sectional measures are problematic for two reasons. First, many are based on data from a long time span—over a decade, in the case of Wright, Erikson, and McIver (1987)—averaging over possibly large year-to-year changes in state policy (Jacoby and Schneider 2001). More importantly, cross-sectional measures preclude the analysis of policy change, which not only is theoretically limiting, but also is inimical to strong causal inference since the temporal order of the variables cannot be established (Lowery, Gray, and Hager 1989; Ringquist and Garand 1999).

To our knowledge, the only existing time-varying measure that provides a holistic summary of state policy outputs is the measure of policy spending priorities developed by Jacoby and Schneider (2009).[5] This measure, available annually between 1982 and 2005, is estimated with a spatial proximity model using data on the proportions of state budgets allocated to each of nine broad policy domains (e.g., corrections, education, welfare). Jacoby and Schneider interpret their measure as capturing the relative priority that states place on collective goods versus particularized benefits, an important concept in the theoretical literature on political economy (e.g., Persson and Tabellini 2006) as well as in empirical work on state politics (e.g., Gamm and Kousser 2010).

Despite both being holistic yearly policy measures, policy liberalism and policy priorities differ in important ways. As Jacoby and Schneider emphasize, policy liberalism and policy priorities are conceptually distinct; indices of policy liberalism "simply do not measure the same thing" as their policy priorities scale (2009, 19). For example, the policy priorities scale is not intended to capture "*how much* states spend" but rather "how states divide up their yearly pools of available resources" (Jacoby and Schneider 2009, 4). Consequently, variation in the size

---

[4] We do not include foreign policy in the domain of policy liberalism because states typically do not make foreign policy.

[5] For a cross-sectional implementation of this measure, see Jacoby and Schneider (2001).

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

of government, which lies at the heart of most liberal–conservative conflict (e.g., Meltzer and Richard 1981; Stimson 1991), is orthogonal to their measure. Another salient difference is that the policy priorities scale is based solely on state spending data. This endows their measure with a direct and intuitive interpretation, but at the cost of excluding taxes, mandates, prohibitions, and other non-spending policies that shape the lives of citizens in equally important ways. Our policy liberalism measure resolves this trade-off differently, emphasizing broad policy coverage at the possible expense of intuitive interpretation.

In summary, there is no existing time-varying measure of state policy liberalism, one of the central concepts of state politics. Nearly all existing summaries of state policy orientations are cross-sectional. Those that are dynamic either examine policy liberalism in a particular policy area or, in the case of Jacoby and Schneider's (2009) policy priorities scale, measure a different concept entirely. Thus, what is required is a measurement strategy that summarizes the global ideological orientation of state policies using time-varying data that capture the full empirical domain of policy liberalism.

# Policy Data

As Jacoby and Schneider (2014) observe, composite measures of policy liberalism risk tautology if they are derived from policy indicators selected for their ideological character. Although the resulting scale may be a valid measure of policy liberalism, selection bias in the component indicators undermines any claim that state policies vary along a single dimension. For this reason, we sought to make our data set of state policies as comprehensive as possible, so as to allow ideological structure to emerge from the data rather than imposing it a priori. Given resource constraints and data limitations, we cannot claim to have constructed a random sample of the universe of state policies (if such a thing is even possible). We are confident, however, that our data set is broadly representative of the policy outputs of states across a wide range of domains. (For complete details on the policies in our data set, see the supporting information.)

Our data set consists of 148 distinct policies, and at least 43 policies are available in every year. To be included, a policy had to meet the following criteria. First, it had to be a policy *output* rather than a policy *outcome* (i.e., an aspect of the social environment affected by policy) or a government *institution* (i.e., one of the basic structures or rules of the government). For example, we excluded state incarceration and infant mortality rates, which we considered outcomes. We also excluded indicators for whether states had particular legislative rules or government agencies, which we classified as institutions.[6] Second, the policy had to be politically salient.[7] To identify salient policies, we canvassed books and articles on state politics, legal surveys of state policies, state party platforms, governors' biographies, state-specific political histories, and government and interest-group websites. Third, the policies had to be comparable across all states. Many environmental, parks, and farm policies, for example, are not comparable across states due to fundamental differences in state geography (e.g., coastal versus noncoastal). Some policies we normalized by an appropriate baseline to make them more comparable.[8] Finally, in keeping with our focus on dynamics, data on a given policy had to be available in comparable form in at least five different years.

The actual policy data themselves were obtained from many different sources, including government documents, the *Book of the States*, interest-group publications, and various secondary sources.[9] Over four-fifths of the policies are ordinal (primarily dichotomous), but the 26 continuous variables provide disproportionate information because they differentiate more finely between states.[10] The policy domains covered by the data set include

- abortion (e.g., parental notification requirements for minors)
- criminal justice (e.g., the death penalty)
- drugs and alcohol (e.g., marijuana decriminalization)

---

[6] The data set used in this article excludes electoral policies as well. We do this for the pragmatic reason that scholars may want to use our measure to examine the effect of such policies.

[7] This salience criterion is partly pragmatic since it is easier to obtain data on salient policies. Notwithstanding this emphasis, our data set still contains significant variation in the level of salience across policies. Our measurement model does not directly take this variation in salience into account, but rather weights policies according to how well they discriminate on the latent dimension. Empirically, variation in lower-salience policies such as firework bans and bicycle helmet laws does tend to be more idiosyncratic (i.e., less discriminating), and thus these policies contribute less to our scale.

[8] We converted all monetary expenditure and welfare benefit policies into 2012 dollars. We also adjusted for cost-of-living differences between states (Berry, Fording, and Hanson 2000).

[9] In general, we tried to obtain primary sources for each policy indicator. When this proved impossible, we obtained multiple secondary sources to corroborate the information about each policy in our database.

[10] We standardized each continuous policy to ensure that the scales were comparable across policy areas.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

Case 2:22-cv-00184-LCB-CWB    Document 558-32    Filed 05/27/24    Page 158 of 248

- education (e.g., per-pupil education spending, ban on corporal punishment)
- the environment (e.g., protections for endangered species)
- civil rights (e.g., fair employment laws, gay marriage)
- gun control (e.g., handgun registration)
- labor (e.g., right-to-work laws)
- social welfare (e.g., AFDC/TANF benefits)
- taxation (e.g., income tax rates)

and miscellaneous other regulations, such as fireworks bans and bicycle helmet laws.[11]

To validate the comprehensiveness of our data set, we can compare its coverage to other data sets that were constructed for different purposes. For example, our policies cover 17 of the 20 non-electoral policy areas contained in Sorens, Muedini, and Ruger's (2008) state policy database. Similarly, seven of the eight policy categories in the *National Survey of State Laws*, a lengthy legal compendium of "the most-asked about and controversial" state statutes, are represented in our data set (Leiter 2008, xii).[12] Our data also include 40 of the 56 policy outputs in Walker's (1969) policy innovation data set and 21 of the 34 non-electoral policies examined by Lax and Phillips (2011).[13] The overlap between these last three data sets and ours is particularly significant because none of the three were constructed for the purpose of studying the ideological structure of state policies. Even Sorens, Muedini, and Ruger (2008), who do analyze policy in ideological terms, conceive of state policies as varying along two dimensions. In sum, our data set, while not a random sample of the universe of policies, is broadly representative of available data on the salient policy activities of U.S. states.

## Measurement Model

We use the policy data set described above to construct yearly measures of state policy liberalism. Like most previous work on the subject, we treat policy liberalism as a latent variable whose values can be inferred from observed policy indicators. Our latent-variable model (LVM), however, offers several improvements over previous measurement strategies, most of which have relied on factor analysis applied to cross-sectional data. First, we use a Bayesian LVM, which, unlike classical factor analysis, provides straightforward means of characterizing the uncertainty of the latent scores and also easily handles missing data by imputing estimates on the fly (Jackman 2009, 237–8). Second, most of our policy indicators are dichotomous variables, a poor fit for a factor-analytic model, which assumes that the observed indicators are continuous. We therefore follow Quinn (2004) and specify a mixed LVM that models continuous indicators with a factor-analytic model and ordinal (including dichotomous) variables with an item response model. Third, our measurement model is dynamic, both in that it allows policy liberalism to vary by year and in that it specifies a dynamic linear model that links the measurement model between periods.[14]

We parameterize policy liberalism as a latent trait $\theta_{st}$ that varies across states and years. For each state $s$ and year $t$, we observe a mix of $J$ continuous and ordinal policies, denoted $\boldsymbol{y}_{st} = (y_{1st}, \ldots, y_{jst}, \ldots, y_{Jst})$, whose distribution is governed by a corresponding vector of latent variables $\boldsymbol{y}_{st}^*$. We model $\boldsymbol{y}_{st}^*$ as a function of policy liberalism ($\theta_{st}$) and item specific parameters $\boldsymbol{\alpha}_t = (\alpha_{1t}, \ldots, \alpha_{jt}, \ldots, \alpha_{Jt})$ and $\boldsymbol{\beta} = (\beta_1, \ldots, \beta_j, \ldots, \beta_J)$,

$$\boldsymbol{y}_{st}^* \sim N_J(\boldsymbol{\beta}\theta_{st} - \boldsymbol{\alpha}_t, \ \boldsymbol{\Psi}), \tag{1}$$

where $N_J$ indicates a $J$-dimensional multivariate normal distribution and $\boldsymbol{\Psi}$ is a $J \times J$ covariance matrix. In

---

[11]A reviewer raised the concern that taxation levels and other fiscal policies might reflect states' fiscal centralization in addition to their policy liberalism. In the South, for example, taxing and spending have historically been centralized at the state level, whereas, relatively speaking, local governments in New England have been more fiscally active. Since fiscal centralization is negatively correlated with policy liberalism, the influence of centralization attenuates policy liberalism differences across states. In light of this concern, it is important to interpret our policy liberalism scores as measuring the liberalism of *state government policies*, not of all policy outputs produced in a state (i.e., by local as well as state governments).

[12]The categories are business and consumer, criminal, education, employment, family, general civil, real estate, and tax. There are no real estate laws in our data set because we could not locate comparable time-varying data on these laws.

[13]The remaining policies are missing either because time-varying data were not available or because the policies are not sufficiently comparable across states.

---

[14]All of the policies in our model are available in multiple years, which helps bridge the model over time. A potential concern, however, is whether we have enough policies to adequately bridge the model across periods with large disjunctures in our sample of state policies. There is a particularly large disjunction in our sample of policies in the late 1960s and early 1970s due to the federalization of a variety of antidiscrimination policies, as well as changes to federal social security law. To evaluate the plausibility of our bridging assumption during this time period, we estimated our scale separately before and after 1970, and we compare each set of estimates with the pooled estimates that we present in the article. The correlation between our separately scaled estimates from the 1930–69 period and our pooled estimates of policy liberalism is 0.95. The separately scaled estimates from 1970 to 2014 are correlated with our pooled estimates at 0.98. This analysis suggests that the pooled model is accurately capturing the ramifications of any disjunctures in state policies during the 1960s and 1970s.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

this application, we assume $\Psi$ to be diagonal, but this assumption could be relaxed to allow for correlated measurement error across variables. Note that $\alpha_{jt}$, which is analogous to the "difficulty" parameter in the language of item response theory, varies by year $t$, whereas the "discrimination" $\beta_j$ is assumed to be constant across time.

We accommodate data of mixed type via the function linking latent and observed variables. If policy $j$ is continuous, we assume $y^*_{jst}$ is directly observed (i.e., $y_{jst} = y^*_{jst}$), just as in the conventional factor analysis model. If policy $j$ is ordinal, we treat the observed $y_{jst}$ as a coarsened realization of $y^*_{jst}$ whose distribution across $K_j > 1$ ordered categories is determined by a set of $K_j + 1$ thresholds $\tau_j = (\tau_{j0}, \ldots, \tau_{jk}, \ldots, \tau_{jK_j})$. Following convention, we define $\tau_{j0} \equiv -\infty$, $\tau_{j1} \equiv 0$, and $\tau_{jK_j} \equiv \infty$, and we set the diagonal elements of $\Psi$ that correspond to ordinal variables equal to 1. As in an ordered probit model, $y_{jst}$ falls into category $k$ if and only if $\tau_{j,k-1} < y^*_{jst} \leq \tau_{jk}$. Thus, for ordinal variable $j$, the conditional probability that $y^*_{jst} \sim N(\beta_j \theta_{st} - \alpha_{jt}, \; 1)$ is observed as $y_{jst} = k$ is

$$\Pr\left(\tau_{j,k-1} < y^*_{jst} \leq \tau_{jk} \mid \beta_j \theta_{st} - \alpha_{jt}\right)$$
$$= \Pr(y^*_{jst} \leq \tau_{jk} \mid \beta_j \theta_{st} - \alpha_{jt})$$
$$\quad - \Pr(y^*_{jst} \leq \tau_{j,k-1} \mid \beta_j \theta_{st} - \alpha_{jt})$$
$$= \Phi(\tau_{jk} - [\beta_j \theta_{st} - \alpha_{jt}])$$
$$\quad - \Phi(\tau_{j,k-1} - [\beta_j \theta_{st} - \alpha_{jt}]), \qquad (2)$$

where $\Phi$ is the standard normal cumulative distribution function (CDF) (Fahrmeir and Raach 2007, 329). In the dichotomous case, where there are $K_j = 2$ categories ("0" and "1"), the conditional probability that $y_{jst}$ falls in the second category (i.e., "1") is

$$\Pr\left(\tau_{j1} < y^*_{jst} \leq \tau_{j2} \mid \beta_j \theta_{st} - \alpha_{jt}\right]$$
$$= \Phi(\tau_{j2} - [\beta_j \theta_{st} - \alpha_{jt}]) - \Phi(\tau_{j1} - [\beta_j \theta_{st} - \alpha_{jt}])$$
$$= \Phi(\beta_j \theta_{st} - \alpha_{jt}), \qquad (3)$$

which is identical to the conventional probit item response model (Quinn 2004, 341).

We allow $\alpha_{jt}$ to vary by year to account for the fact that many policies, such as segregation laws, trend over time toward universal adoption or nonadoption. The simplest way to deal with this problem is to estimate the difficulty parameters anew in each year. A more general approach, however, which pools information about $\alpha_{jt}$ over time, is to model the evolution of $\alpha_{jt}$ with a dynamic linear model (DLM; Jackman 2009, 471–74). In this application, we use a local-level DLM, which models $\alpha_{jt}$ using a "random walk" prior centered on $\alpha_{j,t-1}$:

$$\alpha_{jt} \sim N(\alpha_{j,t-1}, \; \sigma_\alpha^2). \qquad (4)$$

If there are no new data for an item in period $t$, then the transition model in Equation (4) acts as a predictive model, imputing a value for $\alpha_{jt}$. The transition variance $\sigma_\alpha^2$ controls the degree of smoothing over time. Setting $\sigma_\alpha^2 = \infty$ is equivalent to estimating $\alpha_{jt}$ separately each year, and $\sigma_\alpha^2 = 0$ is the same as assuming no change over time. We take the more agnostic approach of estimating $\sigma_\alpha^2$ from the data, while also allowing it to differ between continuous and ordinal variables.

The parameters in an LVM cannot be identified without restrictions on the parameter space (e.g., Clinton, Jackman, and Rivers 2004). In the case of a one-dimensional model, the direction, location, and scale of the latent dimension must be fixed a priori. We identify the location and scale of the model by postprocessing the latent response of state policy liberalism to be standard normal. We fix the direction of the model by constraining the sign of a small number of the item parameters (Bafumi et al. 2005).[15] We further constrain the polarity by assigning an informed prior to the policy measure for four states in year $t = 0$ (Martin and Quinn 2002).[16] For the prior on the innovation parameter $\sigma_\alpha$, we use a half-Cauchy distribution with a mean of 0 and a scale of 2.5 (Gelman 2006). The difficulty and discrimination parameters are drawn from normal distributions with a mean of 0 and a standard deviation of 10. We estimated the model using the program Stan, as called from R (R Core Team 2013; Stan Development Team 2013).[17] Running the model for 1,000 iterations (the first 500 used for adaptation) in each of four parallel chains proved sufficient to obtain satisfactory samples from the posterior distribution.

---

[15] Specifically, we constrain continuous measures of state spending to have a positive discrimination parameter, which implies that more liberal states spend more money. We also constrain the polarity of seven dichotomous items. The discrimination of Equal Rights Amendment ratification, minimum wage for women, anti-injunction, fair employment and prevailing wage laws are constrained to be positive, whereas the discrimination of right-to-work laws and bans on interracial marriage are constrained to be negative.

[16] Note that we started the model in 1935 ($t = 0$) and discarded the first year of estimates. As a result, the informed priors on $\theta$ for four states in year $t = 0$ have little effect on the estimates of state policy liberalism that we report in our analysis. We assign a N(1, $0.2^2$) prior on $\theta_{s0}$ to New York, a N(1.5, $0.2^2$) prior on $\theta_{s0}$ to Massachusetts, and a N($-1.5$, $0.2^2$) prior for Georgia and South Carolina. Other states are given diffuse priors for $\theta_{st}$.

[17] Stan is a C++ library that implements the No-U-Turn sampler (Hoffman and Gelman n.d.), a variant of Hamiltonian Monte Carlo that estimates complicated hierarchical Bayesian models more efficiently than alternatives such as BUGS.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

Case 2:22-cv-00184-LCB-CWB   Document 558-32   Filed 05/27/24   Page 160 of 248

FIGURE 1   **Geographic Distribution of Government Policy Liberalism in 1940, 1975, and 2010**



*Note:* Darker shading indicates liberalism; lighter shading indicates conservatism. The estimates have been centered and standardized in each year to accentuate the shading contrasts.

## Estimates of State Policy Liberalism

Estimating our measurement model using the policy data described earlier produces a measure of the policy liberalism of each state in each year 1936–2014. When interpreting these estimates, one should bear in mind that the model allows the difficulty parameters $\alpha_t$ to evolve over time. As a result, aggregate ideological shifts common to all states will be partially assigned to the policy difficulties. Since states did adopt increasingly liberal policies over this period, the model partially attributes this trend to the increasing difficulty of conservative policies (and increasing "easiness" of liberal ones). If we modify the model so as to hold the item difficulties constant over time, the policies of all U.S. states are estimated to have become substantially more liberal, especially between the 1930s and 1970s.[18] We use a time-varying model instead because it helps avoid the interpretational difficulties of assuming that policies have the same substantive meaning across long stretches of time. The price of this flexibility is that states' policy liberalism scores are comparable over time primarily in a relative sense.

Figure 1 maps state policy liberalism in 1940, 1975, and 2010. As is clear from this figure, the geographic distribution of policy liberalism has remained remarkably stable, despite huge changes in the distribution of mass partisanship, congressional ideology, and other political variables over the past seven decades. Throughout the period, southern states such as Mississippi have had the most conservative policies. This holds not only on civil rights, but also on taxes, welfare, and a host of social issues. By contrast, the most liberal states have consistently

been in the Northeast, Pacific, and Great Lakes regions. New York, for example, has long had among the most liberal tax and welfare policies in the nation, and it was also one of the first states to adopt liberal policies on cultural issues such as abortion, gun control, and gay rights.

The overall picture of aggregate stability, however, masks considerable year-to-year fluctuation in policy liberalism as well as major long-term trends in certain states. These details can be discerned more easily in Figure 2, which plots the yearly time series of four states—Mississippi, Idaho, Vermont, and New York—along with the average policy liberalism across all states. As this figure illustrates, states' policy liberalism can change substantially between years. Such changes are a product of explicit policy revisions as well as of policy "drift" relative to other states (cf. Hacker 2004). In general, these changes tend to be fluctuations around a stable mean, but the policy liberalism of some states has trended consistently in one direction or another.

For example, until the mid-1960s, Vermont's policies were a bit more conservative than the average state, but since then, Vermont's policies have become steadily more liberal relative to the nation. Whereas it had been a laggard in passing racial antidiscrimination laws in the 1950s and 1960s, in more recent decades, Vermont has been at the forefront of adopting gay marriage and other rights for homosexuals. Its welfare benefits and regulatory policies exhibited a similar evolution. The liberalizing trajectory of Vermont and other Northeastern states, such as Delaware and Maryland, has made the region's policies much more unifomly liberal than they once were. By contrast, several Midwestern, Mountain, and Southern states have followed the opposite trajectory. Idaho, for example, became much more conservative over this period. During the 1930s to 1950s, Idaho actually had some of the most generous welfare benefits in the nation, but by the early 2000s it was among the least generous.

[18]In these years, U.S. states expanded their welfare responsibilities and tax bases while loosening a variety of social restrictions. This aggregate trend toward more liberal policies largely ceased after 1980.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

**FIGURE 2　Policy Liberalism of Selected States, 1936–2014**



These states' shifts in policy liberalism have tracked the evolution of their presidential partisanship. For instance, in the presidential election of 1936, the first year in our data set, Maine and Vermont were the only two states carried by the Republican candidate Alf Landon. By the 2012 election, both states were substantially more Democratic than average. The opposite is true of the Mountain West, which transformed from Democratic-leaning to solidly Republican. On the whole, the 2010 map in Figure 1 matches contemporanous state partisanship much better than the earlier maps do, primarily because the South's shift to the Republicans finally aligned its partisanship to match its consistently conservative state policies.[19]

## Measurement Validity

Having illustrated the face validity of the policy liberalism estimates, we now conduct a more systematic validation of our measure. We begin with convergent validation (Adcock and Collier 2001), documenting the very strong cross-sectional relationships between our estimates and existing measures of policy liberalism. We then turn to construct validation, demonstrating that our policy liberalism scale is also highly correlated with measures

of theoretically related concepts, such as presidential partisanship.[20]

### Convergent Validation

If our estimates provide a valid measure of policy liberalism, they should be strongly related to other (valid) measures of the same concept. Since ours is the first time-varying measure of state policy liberalism, we must content ourselves with examining the cross-sectional relationship between our measure and ones developed by other scholars at various points in time. Figure 3 plots the cross-sectional relationships between our measure of policy liberalism and six existing measures:

- "liberalness"/"welfare orientation" rank circa 1957 (Hofferbert 1966)[21]
- welfare-education liberalism in 1962 (Sharkansky and Hofferbert 1969)[22]
- policy liberalism circa 1973 (Klingman and Lammers 1984)[23]
- policy liberalism circa 1980 (Wright, Erikson, and McIver 1987)[24]

---

[19]Though the South has always been the most conservative region, it has become more uniformly so over time. In the 1930s, for example, Louisiana's welfare benefits were roughly equivalent to those of several northern states, but they gradually became less generous over the next few decades. Louisiana also waited longer than any other southern state to pass a durable right-to-work law, but it finally did so in 1976 (Louisiana passed a right-to-work law in 1954 but repealed it in 1956; Canak and Miller 1990).

[20]In the supporting information, we also show that our policy liberalism scale is strongly related to domain-specific policy measures, and that the predictive fit of the model barely increases if a second dimension is added to the measurement model. Overall, this evidence corroborates our claim that a one-dimensional model adequately captures the systematic variation in state policies, and that this dimension is properly interpreted as policy liberalism.

[21]This index is based on mean per-recipient expenditures for 1952–61 for aid to the blind, old age assistance, unemployment compensation, expenditure for elementary and secondary education, and aid to dependent children. We compare Hofferbert's (1966) scale with our measure of state policy liberalism in 1957 since this is the midpoint of the years he includes in his index.

[22]This index is based on about 20 education and welfare policies. Note, however, that this index also includes several social outcomes, such as school graduation rates.

[23]This index is based on data measured at a variety of points between 1961 and 1980 on state innovativeness, antidiscrimination policies, monthly payments for Aid to Families with Dependent Children (AFDC), the number of years since ratification of the Equal Rights Amendment for Women, the number of consumer-oriented provisions, and the percentage of federal allotment to the state for Title XX social services programs actually spent by the state. We compare Klingman and Lammers's (1984) scale with our measure of state policy liberalism in 1973 since this is the midpoint of the years they include in their index.

[24]This measure is based on state education spending, the scope of state Medicaid programs, consumer protection laws, criminal justice provisions, whether states allowed legalized gambling, the number of years since ratification of the Equal Rights Amendment for Women, and the progressivity of state tax systems. We compare Wright, Erikson, and McIver's (1987) scale with our measure of state policy liberalism in 1980 since this is roughly the midpoint of the years they include in their index.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

**Figure 3   Convergent Validation: Relationships between Our Policy Liberalism Estimates and Six Existing Measures.**



*Note*: Fitted lines indicate loess curves.

- policy liberalism in 2000 (Gray et al. 2004)[25]
- policy liberalism in 2006 (Sorens, Muedini, and Ruger 2008)[26]

Each panel plots the relationship between our policy liberalism estimates (horizontal axis) and one of the six existing measures listed above. A loess curve summarizes each relationship, and the bivariate correlation is given on the left side of each panel.

[25]This index is based on state firearms laws, state abortion laws, welfare stringency, state right-to-work laws, and the progressivity of state tax systems.

[26]This is the first principal component uncovered by Sorens, Muedini, and Ruger's (2008) analysis of over 100 state policies. They label this dimension "policy liberalism" and give the label "policy urbanism" to the second principal component.

Notwithstanding measurement error and differences in data sources, our estimates are highly predictive of other measures of policy liberalism. The weakest correlation, 0.76 for Hofferbert (1966), is primarily the result of a few puzzling outliers (Washington, for example, is the seventh most conservative state on Hofferbert's measure, whereas Wyoming is the ninth most liberal). In addition, all the relationships are highly linear. The only partial exception is for Sorens, Muedini, and Ruger (2008), whose measure of policy liberalism does not discriminate as much between southern states as our measure, resulting in a flat relationship at the conservative end of our scale.

In short, the very strong empirical relationships between our policy liberalism scale and existing measures of the same concept provide compelling evidence for the validity of our measure. It is worth noting that most of the

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

FIGURE 4   **The Relationship between State Policy Liberalism and the Conservatism of the Median Member of the Lower House of the State Legislature, 1996–2008**



existing scales were constructed explicitly with the goal of differentiating between liberal and conservative states. Thus, their tight relationship with our measure, which is based on a much more comprehensive policy data set and was estimated without regard to the ideological content of the policy indicators,[27] suggests in particular that we are on firm ground in calling our latent dimension "policy liberalism."

## Construct Validation

The purpose of construct validation is to demonstrate that a measure conforms to well-established hypotheses relating the concept being measured to other concepts (Adcock and Collier 2001, 542–43). One such hypothesis is that the liberalism of a state's policies is strongly related to the liberalism of its state legislature, though due to factors such as legislative gridlock the relationship may not be perfect (e.g., Krehbiel 1998). To measure legislative liberalism on a common scale, we rely on Shor and McCarty's (2011) estimates of the conservatism of mem-

[27]This is true except for the hard coding required to identify the latent scale.

bers of state legislative lower houses. As Figure 4 demonstrates for presidential years between 1996 and 2008, states with more liberal policies tend to have less conservative median legislators. Due possibly to the lingering Democratic advantage in southern state legislatures, the relationship at the conservative end of the policy spectrum is fairly flat, though by 2008 the relationship had become much more linear. The correlation between legislative conservatism and policy liberalism has also strengthened over time, from −0.51 in 1996 to −0.80 in 2008.

An analogous pattern of increasing association over time can be seen in an examination of the relationship between policy liberalism and Democratic presidential vote share. It is natural to hypothesize that both presidential vote and state policy liberalism are responsive to the party and policy preferences of mass publics and thus should be correlated at the state level. Since the anomalously Democratic partisanship of the "Solid South" would distort this relationship, we focus on the non-South only. Even without southern states, however, policy liberalism and presidential vote are only weakly related in the early part of the period, as Figure 5 shows. The correlation jumped to 0.57 in 1960 and continued to increase gradually through 2012, when it reached nearly 0.9. This increasing association

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

**FIGURE 5**  The Relationship between State Policy Liberalism and Democratic Presidential Vote Share, 1936–2012 (Non-South Only)



This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

Case 2:22-cv-00184-LCB-CWB   Document 558-32   Filed 05/27/24   Page 165 of 248

FIGURE 6   The Relationship between Policy Liberalism and Policy
Priorities in Selected Years, 1982–2005



between policy liberalism and presidential vote mirrors the growing alignment of party identification, policy preferences, and presidential vote at the mass level (Fiorina and Abrams 2008, 577–82). The analysis of presidential vote thus provides further evidence for the validity of our policy liberalism scale. At the same time, however, it suggests the limitations of presidential vote share as a proxy for mass preferences before the 1960s, even in the non-South (contra, e.g., Canes-Wrone, Brady, and Cogan 2002).

Finally, we examine the relationship between our policy liberalism measure and its closest analogue, Jacoby and Schneider's (2009) policy priorities scale. As we emphasize above, policy liberalism and policy priorities are different concepts. Moreover, the theoretical relationship between policy liberalism and preference for collective over particularistic spending is not self-evident. Nevertheless, Jacoby and Schneider convincingly argue that U.S. states tend to target particularized policies at needy

constituencies. Consistent with that expectation, they find a moderately negative cross-sectional correlation between policy liberalism and preference for collective goods.

Based on a similar analysis, we too find policy liberalism and policy priorities to be negatively correlated, on the order of −0.5. As Figure 6 shows, their relationship attenuated somewhat between 1982 and 2005. Also, like Jacoby and Schneider (2009, 18–20), we find that nonlinearity in the measures' relationship contributes to the weak correlation: Their association is much stronger among relatively liberal and particularistic states than on the conservative/collective-good end of the spectrum. This seems to be driven in part by southern states, which always anchor the conservative end of our scale but seem to favor particularistic spending. The sources of this discrepancy between the two measures—perhaps differences in political culture, budgetary decentralization, or economic need—could be an interesting topic for future research.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

## Substantive Applications

Our dynamic measure of policy liberalism opens up multiple avenues of research not possible with cross-sectional measures. Most obviously, as we have shown, it permits descriptive analyses of the ideological evolution of state policies over long periods of time. But the availability of a dynamic measure also facilitates causal analyses that incorporate policy liberalism as an outcome, treatment, or control variable. In particular, because it is available for each state-year, our measure can be used in time-series–cross-sectional (TSCS) research designs, which leverage variation across both units and time. The fact that our estimates are available for nearly 80 years is especially valuable because TSCS estimators can perform poorly unless the number of time units is large (Nickell 1981).

For example, scholars could examine how the cross-sectional relationship between state public opinion and policy liberalism has evolved over time (Burstein 2003), estimate the state-level relationship between changes in opinion and changes in policy (cf. Stimson, MacKuen, and Erikson 1995), or analyze how interest groups or electoral institutions moderate the opinion–policy link (cf. Gray et al. 2004; Lax and Phillips 2011). Scholars could also evaluate the policy effects of electoral outcomes or the partisan composition of state government (cf. Besley and Case 2003; Erikson, Wright, and McIver 1989; Kousser 2002; Leigh 2008).

An alternative approach would be to analyze policy liberalism as a cause rather than an effect. For example, one prominent view is that citizens respond "thermostatically" to changes in policy by moving in the ideologically opposite direction (Wlezien 1995). A related perspective argues that voters compensate for partisan effects on policy through partisan balancing (e.g., Alesina, Londregan, and Rosenthal 1993; Erikson 1988). Other scholars, however, highlight the positive feedback effects of policy changes (e.g., Campbell 2012; Pierson 1993). Our policy liberalism estimates open up ways of adjudicating among these theories using state-level TSCS designs.

## Conclusion

This article has addressed a major gap in the state politics literature: the lack of a measure of state policy liberalism that varies across time. Using a data set covering 148 policies and a latent-variable model designed for a mix of ordinal and continuous data, we have generated estimates of the policy liberalism of every state in every year for the past three-quarters of a century. As indicated

by their high correlations with existing measures of state policy liberalism as well as with domain-specific indices, our estimates exhibit strong evidence of validity as a measure of policy liberalism.

Our yearly estimates of policy liberalism are illuminating for their own sake, revealing historical patterns in the development of state policymaking that would be hard to discern otherwise. But they also open up research designs that leverage temporal variation in state policies to explore questions involving the causes and effects of policy outcomes. These topics include the policy effects of public mood, electoral outcomes, interest groups, and institutions, as well as the consequences of policy change on political attitudes and behavior.

The relevance of this article extends well beyond the field of state politics. In addition to facilitating the study of topics of general significance, our measurement model could be applied to policymaking by local governments (cf. Tausanovitch and Warshaw 2014) as well as in cross-national studies.[28] Even more generally, our dynamic approach to measurement helps to illustrate the value of data-rich, time-varying measures of important political concepts like policy liberalism.

## References

Adcock, Robert, and David Collier. 2001. "Measurement Validity: A Shared Standard for Qualitative and Quantitative Research." *American Political Science Review* 95(3): 529–46.

Alesina, Alberto, John Londregan, and Howard Rosenthal. 1993. "A Model of the Political Economy of the United States." *American Political Science Review* 87(1): 12–33.

Ansolabehere, Stephen, Jonathan Rodden, and James M. Snyder, Jr. 2008. "The Strength of Issues: Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting." *American Political Science Review* 102(2): 215–32.

Bafumi, Joseph, Andrew Gelman, David K. Park, and Noah Kaplan. 2005. "Practical Issues in Implementing and Understanding Bayesian Ideal Point Estimation." *Political Analysis* 13(2): 171–87.

Berry, William D., Richard C. Fording, and Russell L. Hanson. 2000. "An Annual Cost of Living Index for the American States, 1960–1995." *Journal of Politics* 62(2): 550–67.

Besley, Timothy, and Anne Case. 2003. "Political Institutions and Policy Choices: Evidence from the United States." *Journal of Economic Literature* 41(1): 7–73.

Burstein, Paul. 2003. "The Impact of Public Opinion on Public Policy: A Review and an Agenda." *Political Research Quarterly* 56(1): 29–40.

---

[28]Of course, given the diversity of policy systems, political structures, and economic contexts, this kind of extension would be difficult. At the very least, it would be important to apply care to ensure that the substantive meaning of policies is similar in each country.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

Campbell, Andrea Louise. 2012. "Policy Makes Mass Politics." *Annual Review of Political Science* 15: 333–51.

Canak, William, and Berkeley Miller. 1990. "Gumbo Politics: Unions, Business, and Louisiana Right-to-Work Legislation." *Industrial and Labor Relations Review* 43: 258–71.

Canes-Wrone, Brandice, David W. Brady, and John F. Cogan. 2002. "Out of Step, Out of Office: Electoral Accountability and House Members' Voting." *American Political Science Review* 96(1): 127–40.

Chandler, Marsha, William Chandler, and David Vogler. 1974. "Policy Analysis and the Search for Theory." *American Politics Research* 2(1): 107–18.

Clinton, Joshua, Simon Jackman, and Douglas Rivers. 2004. "The Statistical Analysis of Roll Call Data." *American Political Science Review* 98(2), 355–70.

Converse, Philip E. 1964. "The Nature of Belief Systems in Mass Publics." In *Ideology and Discontent*, ed. David E. Apter, London: Free Press, 206–61.

Elazar, Daniel Judah. 1966. *American Federalism: A View from the States.* New York: Crowell.

Ellis, Christopher, and James A. Stimson. 2012. *Ideology in America.* New York: Cambridge University Press.

Erikson, Robert S. 1988. "The Puzzle of Midterm Loss." *Journal of Politics* 50(4): 1011–29.

Erikson, Robert S., Gerald C. Wright, and John P. McIver. 1989. "Political Parties, Public Opinion, and State Policy in the United States." *American Political Science Review* 83(3): 729–50.

Erikson, Robert S., Gerald C. Wright, and John P. McIver. 1993. *Statehouse Democracy: Public Opinion and Policy in the American States.* New York: Cambridge University Press.

Fahrmeir, Ludwig, and Alexander Raach. 2007. "A Bayesian Semiparametric Latent Variable Model for Mixed Responses." *Psychometrika* 72(3): 327–46.

Fiorina, Morris P., and Samuel J. Abrams. 2008. "Political Polarization in the American Public." *Annual Review of Political Science* 11(1): 563–88.

Gamm, Gerald, and Thad Kousser. 2010. "Broad Bills or Particularistic Policy? Historical Patterns in American State Legislatures." *American Political Science Review* 104(1): 151–170.

Gelman, Andrew. 2006. "Prior Distributions for Variance Parameters in Hierarchical Models." *Bayesian Analysis* 1(3): 515–33.

Gray, Virginia, David Lowery, Matthew Fellowes, and Andrea McAtee. 2004. "Public Opinion, Public Policy, and Organized Interests in the American States." *Political Research Quarterly* 57(3): 411–20.

Hacker, Jacob S. 2004. "Privatizing Risk without Privatizing the Welfare State: The Hidden Politics of Social Policy Retrenchment in the United States." *American Political Science Review* 98(2): 243–60.

Hofferbert, Richard I. 1966. "The Relation between Public Policy and Some Structural and Environmental Variables in the American States." *American Political Science Review* 60(1): 73–82.

Hoffman, Matthew D., and Andrew Gelman. 2015. "The No-U-Turn Sampler: Adaptively Setting Path Lengths in Hamiltonian Monte Carlo." *Journal of Machine Learning Research* 15(1): 1593–1623.

Hopkins, Anne H., and Ronald E. Weber. 1976. "Dimensions of Public Policies in the American States." *Polity* 8(3): 475–89.

Husted, Thomas A., and Lawrence W. Kenny. 1997. "The Effect of the Expansion of the Voting Franchise on the Size of Government." *Journal of Political Economy* 105(1): 54–82.

Jackman, Simon. 2009. *Bayesian Analysis for the Social Sciences.* Hoboken, NJ: Wiley.

Jacoby, William G., and Saundra K. Schneider. 2001. "Variability in State Policy Priorities: An Empirical Analysis." *Journal of Politics* 63(2): 544–68.

Jacoby, William G., and Saundra K. Schneider. 2009. "A New Measure of Policy Spending Priorities in the American States." *Political Analysis* 17(1): 1–24.

Jacoby, William G., and Saundra K. Schneider. 2014. "State Policy and Democratic Representation." In *The Oxford Handbook of State and Local Government*, ed. Donald P. Haider-Markel. Oxford, UK: Oxford University Press, 561–583.

King, Gary, Robert Keohane, and Sidney Verba. 1994. *Designing Social Inquiry.* Princeton, NJ: Princeton University Press.

Klingman, David, and William W. Lammers. 1984. "The 'General Policy Liberalism' Factor in American State Politics." *American Journal of Political Science* 28(3): 598–610.

Kousser, Thad. 2002. "The Politics of Discretionary Medicaid Spending, 1980–1993." *Journal of Health Politics, Policy and Law* 27(4): 639–72.

Krehbiel, Keith. 1998. *Pivotal Politics: A Theory of U.S. Lawmaking.* Chicago: University of Chicago Press.

Ladd, Jr., Everett Carll. 1976. "Liberalism Upside Down: The Inversion of the New Deal Order." *Political Science Quarterly* 91(4): 577–600.

Lax, Jeffrey R., and Justin H. Phillips. 2009. "Gay Rights in the States: Public Opinion and Policy Responsiveness." *American Political Science Review* 103(3): 367–86.

Lax, Jeffrey R., and Justin H. Phillips. 2011. "The Democratic Deficit in the States." *American Journal of Political Science* 56(1): 148–66.

Leigh, Andrew. 2008. "Estimating the Impact of Gubernatorial Partisanship on Policy Settings and Economic Outcomes: A Regression Discontinuity Approach." *European Journal of Political Economy* 24(1): 256–68.

Leiter, Richard A., (Ed.) 2008. *National Survey of State Laws.* Detroit, MI: Gale.

Lowery, David, Virginia Gray, and Gregory Hager. 1989. "Public Opinion and Policy Change in the American States." *American Politics Research* 17(1): 3–31.

Martin, Andrew D., and Kevin M. Quinn. 2002. "Dynamic Ideal Point Estimation via Markov Chain Monte Carlo for the U.S. Supreme Court, 1953–1999." *Political Analysis* 10(2): 134–53.

Meltzer, Allan H., and Scott F. Richard. 1981. "A Rational Theory of the Size of Government." *Journal of Political Economy* 89(5): 914–27.

Moffitt, Robert. 2002. "*Welfare Benefits Data Base.*" Johns Hopkins University, Department of Economics. http://www.econ2.jhu.edu/people/moffitt/datasets.html.

Nickell, Stephen. 1981. "Biases in Dynamic Models with Fixed Effects." *Econometrica* 49(6): 1417–26.

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

Noel, Hans. 2014. *Political Ideologies and Political Parties in America*. New York: Cambridge University Press.

Persson, Torsten, and Guido Tabellini. 2006. "Electoral Systems and Economic Policy." In *The Oxford Handbook of Political Economy*, ed. Donald A. Wittman and Barry R. Weingast. New York: Oxford University Press, 725–38.

Pierson, Paul. 1993. "When Effect Becomes Cause: Policy Feedback and Political Change." *World Politics* 45(4): 595–628.

Quinn, Kevin M. 2004. "Bayesian Factor Analysis for Mixed Ordinal and Continuous Responses." *Political Analysis* 12(4): 338–53.

R Core Team. 2013. *R: A Language and Environment for Statistical Computing*. Vienna, Austria: R Foundation for Statistical Computing. http://www.R-project.org/.

Ringquist, Evan J., and James C. Garand. 1999. "Policy Change in the American States." In *American State and Local Politics: Directions for the 21st Century*, ed. Ronald E. Weber and Paul Brace. New York: Chatham House, Seven Bridges Press, 268–99.

Schickler, Eric. 2013. "New Deal Liberalism and Racial Liberalism in the Mass Public, 1937–1968." *Perspectives on Politics* 11(1): 75–98.

Sharkansky, Ira, and Richard I. Hofferbert. 1969. "Dimensions of State Politics, Economics, and Public Policy." *American Political Science Review* 63(3): 867–79.

Shor, Boris, and Nolan McCarty. 2011. "The Ideological Mapping of American Legislatures." *American Political Science Review* 105(3): 530–51.

Sorens, Jason, Fait Muedini, and William P. Ruger. 2008. "U.S. State and Local Public Policies in 2006: A New Database." *State Politics & Policy Quarterly* 8(3): 309–26.

Stan Development Team. 2013. *Stan: A C++ Library for Probability and Sampling, Version 1.3*. http://mc-stan.org/.

Stimson, James A. 1991. *Public Opinion in America: Moods, Cycles, and Swings*. Boulder, CO: Westview Press.

Stimson, James A., Michael B. MacKuen, and Robert S. Erikson. 1995. "Dynamic Representation." *American Political Science Review* 89(3): 543–65.

Tausanovitch, Chris, and Christopher Warshaw. 2014. "Representation in Municipal Government." *American Political Science Review* 108(3): 605–41.

Walker, Jack L. 1969. "The Diffusion of Innovations among the American States." *American Political Science Review* 63(3): 880–99.

Wlezien, Christopher. 1995. "The Public as Thermostat: Dynamics of Preferences for Spending." *American Journal of Political Science* 39(4): 981–1000.

Wright, Gerald C., Robert S. Erikson, and John P. McIver. 1987. "Public Opinion and Policy Liberalism in the American States." *American Journal of Political Science* 31(4): 980–1001.

# Supporting Information

Additional Supporting Information may be found in the online version of this article at the publisher's website:

- Description of State Policies
- Dimensionality

This content downloaded from
128.195.71.208 on Tue, 16 Apr 2024 21:16:07 +00:00
All use subject to https://about.jstor.org/terms

**HB130 ENGROSSED**



1   HB130

2   YUXP22N-2

3   By Representatives Butler, Lipscomb, Kiel, Standridge,

4   Whorton, Stadthagen, Paschal, Ingram, Gidley

5   RFD: Education Policy

6   First Read: 07-Feb-24

**Exhibit 0028**

**HB130 Engrossed**



1

2

3

4

5

6                              A BILL

7                          TO BE ENTITLED

8                             AN ACT

9

10        Relating to education; to amend Section 16-40A-5, Code

11   of Alabama 1975; to prohibit certain classroom instruction in

12   kindergarten through the eighth grade related to gender

13   identity or sexual orientation in public K-12 schools; and to

14   prohibit the display of certain flags and insignia in public

15   K-12 schools.

16   BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

17        Section 1. Section 16-40A-5, Code of Alabama 1975, is

18   amended to read as follows:

19        "§16-40A-5

20        (a) An individual or group of individuals providing

21   classroom instruction to students in kindergarten through the

22   ~~fifth~~eighth grade at a public K-12 school shall not engage in

23   classroom discussion or provide classroom instruction

24   regarding sexual orientation or gender identity in a manner

25   that is not age appropriate or developmentally appropriate for

26   students in accordance with state standards.

27        (b) No teacher, or other public K-12 employee, may

28   display a flag or other insignia relating to or representing



**HB130 Engrossed**

29  sexual orientation or gender identity in a classroom or on the

30  property of a public K-12 school.

31          (b) (c) The State Board of Education shall adopt rules

32  for the implementation and enforcement of this section."

33          Section 2. This act shall become effective October 1,

34  2024.

**HB130 Engrossed**



```
35
36
37                        House of Representatives


38    Read for the first time and referred ................07-Feb-24
39    to the House of Representatives
40    committee on Education Policy
41
42    Read for the second time and placed ................21-Mar-24
43    on the calendar:
44     1 amendment
45
46    Read for the third time and passed  ................23-Mar-24
47    as amended
48
49    Yeas 74
50    Nays 25
51    Abstains 2
52
53                              John Treadwell
54                              Clerk
55
```

Case 2:22-cv-00184-LCB-CWB   Document 558-32   Filed 05/27/24   Page 173 of 248

4/24/24, 10:04 AM          State Rep. Butler: 'We're all pretending' transgender behavior is normal — 'Up until Obama, it was always a mental defect, and h…





# State Rep. Butler: 'We're all pretending' transgender behavior is normal – 'Up until Obama, it was always a mental defect, and he kind of popularized it'

Jeff Poor | 03.15.24

Exhibit
0029



*Source: Facebook*

## Share

 FACEBOOK

 TWITTER

✉ EMAIL

During a Thursday appearance on Birmingham radio Truth 101.1 WXJC's "Priority Talk," State Rep. Mack Butler (R-Rainbow City) discussed his legislation to expand the prohibition of the discussion of sexual orientation and gender identity in K-5 classrooms to K-12 classrooms.

He also discussed how his legislation would apply to the Space Camp controversy.

According to Butler, it would prohibit the discussion of these topics in schools, including Space Camp.

"[W]e're going to add an amendment that will just expand it to apply to Space Camp, as well," Butler said. "But if the schools and/or Space Camp are not already engaging in discussions of sexual identity or sexual orientation, then no harm, no foul. Nothing changes. Some people have not been real happy about this. They're telling me this isn't happening, so why are they upset about this not happening."

"But sadly, this is the world we live in," he continued. "They always want to go have story time with the children. They always want to perform for the children. If they would go to the nursing homes, the assisted living facilities, none of us would say a word. We're not worried about adults seeing such as that. But protect the children."

The Etowah County Republican also took issue with the concept of so-called transgenderism, arguing that "common sense" should apply in this situation.

**SEE ALSO: <u>State Rep. Mack Butler proposes solution to transgender Space Camp worker</u>**

"Literally, we've got a problem because federal law says you can't ban people because of gender identity," Butler explained. "But we've got to use some common sense. We literally do this all the time in schools — doing background checks and things like that. I am all for this young man, who thinks he is a woman, being employed — working the gift shop, doing something else. But being with children I am concerned about."

"I know we're all pretending that this is normal, this is natural," he continued. "You've got doctors saying this is real. But up until Obama, it was always a mental defect. And he kind of popularized it. And some of it is a fad that is almost becoming a religion with some of these people. You know, we absolutely love these people. We don't want to hurt anybody or offend anybody. They can pretend all they want. We don't have to pretend with them. But I do not believe they need to be in charge of children."

*Jeff Poor is the editor in chief of 1819 News and host of "The Jeff Poor Show," heard Monday-Friday, 9 a.m.-noon on Mobile's [FM Talk 106.5](#). To connect or comment, email [jeff.poor@1819News.com](#) or follow him on Twitter [@jeff_poor](#).*

*Don't miss out! [Subscribe to our newsletter](#) and get our top stories every weekday morning.*

Tags:  alabama news   mack butler   greg davis   transgender law

## Trending



Feud erupts between the House and Senate — Both bodies refuse votes on the other's bills

READ NOW →

Case 2:22-cv-00184-LCB-CWB   Document 558-32   Filed 05/27/24   Page 177 of 248

4/24/24, 10:04 AM                    State Rep. Butler: 'We're all pretending' transgender behavior is normal — 'Up until Obama, it was always a mental defect, and h…



Tuberville, Britt split on aid package sending $60 billion to Ukraine — 'A slap in the face to the Americans who sent us here to represent them'

READ NOW →



Bridge builder: Taxpayers getting a good deal on Baldwin County bridge buy

READ NOW →



Limestone Correctional warden and wife arrested at home for manufacturing Psilocybin mushrooms

READ NOW →

Case 2:22-cv-00184-LCB-CWB   Document 558-32   Filed 05/27/24   Page 178 of 248

4/24/24, 10:04 AM                    State Rep. Butler: 'We're all pretending' transgender behavior is normal — 'Up until Obama, it was always a mental defect, and h…



Jessica Taylor: Women should be furious about
Biden's Title IX changes

READ NOW →

..

## THE 1819 NEWSLETTER

Enter your email below to get our top stories delivered
straight to your inbox every weekday morning.

EMAIL ADDRESS

Sign me up

Latest                    Features                    Privacy

News                     Podcast                     Careers

Opinion                  Radio

Politics                 Events

1819 News
PO Box 1812
Birmingham, AL 35201

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

**Exhibit 0030**

RISE TO THE MOMENT OF TRUTH        WEDNESDAY, APRIL 24, 2024

# Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

Craig Monger | 03.11.24



Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



*(Photos via Facebook)*

## Share

FACEBOOK
TWITTER
EMAIL

A Huntsville father's incensed social media post is going viral after discovering a worker at Huntsville's U.S. Space and Rocket Center Space Camp is a biological man with a colorful social media.

==A Facebook post from Huntsville-based Clay Yarbrough that has circulated around social media states that Yarbrough was planning on sending his daughter to space camp before discovering that a self-identified transgender individual, Molly Bowman, would act as team lead and a hall monitor in the girls' dormitories.==



Clay Yarbrough
about 2 months ago

I just need everyone to see this and know whats going on at space camp at

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

US Space and Rocket Center. My daughter was planning on going to space camp next week but we have just found out that this freak is a team lead and a hall monitor in the girls dorms and at times could be allowed to be alone in the halls at night. This is a man that claims to be a woman, and they allow it. I want it to spread, so I don't want to put too much on here. If you need more info, just read all the comments below. Also, this is not hearsay I spoke directly to the VP/Director of Space Camp, and she confirmed this was true. Read comments below at the vile things he has posted on social media.



The post eventually blew up, getting shared thousands of times across the platform.

Yarbrough also showed screenshots that appear to be from Bowman's Twitter page. The page is private. However, screenshots from the Twitter page contain pictures of Bowman in space camp regalia, along with a lot of sexual commentary.

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



Yarbrough told 1819 News he was planning to send his daughter to the space camp when Bowman's identity was revealed. Yarbrough claimed he heard stories from other parents, who claimed that Bowman had access to female floors in previous camps.

"All I thought was that [Bowman] was a hall monitor, but then I heard that he had walked into the girl's room," Yarbrough told 1819 News. "I thought that was extreme; I wouldn't think that kind of thing would happen at space camp."

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

In a recorded conversation between Yarbrough and Space Camp vice president Robin Soprano, Bowman was confirmed as an employee and that Bowman would have access to the girls' floor. Through the nearly nine-minute conversation, Soprano gave evasive answers to Yarbrough's questions.

During the call, Soprano stated that there are specifically male and female floors but continued to give evasive answers when explicitly asked about Bowman's level of access.

*Partial transcript as follows:*

SOPRANO: "I have only females that go to the female floor."

YARBROUGH: "Is that specific person allowed to go to the female floor? If they identify as a female, are they allowed on that floor?"

SOPRANO: "Sir, these are not questions that we can ask our staff specifically in the way that you're asking them. I can assure you that we are following all the state and federal laws."

Yarbrough further asked unambiguously, "Is Molly Bowman allowed on female floors?"

"I have an employee by the name that you have stated; that's as much as I can share with you right now" Soprano responded.

When Yarbrough pressed further, Soprano doubled down on declining to answer precisely.

"I am just telling you that I'm not going to give you specifics about any employees," Soprano stated.

Bowman's Twitter page is replete with sexualized content, along with photos of him in his space camp regalia with the caption, "Butch coded space queer."

**WARNING: Graphic language**

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



Nova loves you
"My son is completely fine"
Erm... your daughter doesn't understand bra sizes....
Nova loves you
How is everyine else still using Twitter on this
Tweets on Twitter. Blue birds are my favourite logo.
7:01
5G
Nova loves you
21.8K posts
Follow
Posts
Replies
Media
Likes
Nova loves you
8/3/23
Years ago I ordered like 10 of these stickers from
and today, I placed the last one in my collection.
Next week I get to start teaching kids about



Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



7:03
5G
Nova loves you
21.8K posts
Follow
Posts
Replies
Media
Likes
105
47K
60K
2.3M
Nova loves you @Novacada... 7/30/23
I just really want a girl just punch me in the face...... Like hickeys are great... but fucking gimme a black eye...... knock me the fuck out so I can wake up with my head on her thighs.... Fuck!
1
Nova loves you reposted
Trans catgirl Camila
RETWEET IF YOU LOVE LESBIANISM OR IF YOU THINK THAT



Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



Nova loves you
I love that since the terrible rebrand, I've been spending less time on Twitter.......due most to the fact that i can't find the app on my Home Screen anymore..... Thanks Elon /s
Nova loves you
Based.
Mike Lindblom
WA Democrats ask Buttigieg for $200M to plan Canada-Seattle-Portland bullet train
seattletimes.com/seattle-news/t...
Nova loves you
PLEASE, DO NOT THE CAT
Why you should have...
tasty



Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



hiding it around the apartment to see how long
it takes the other to find it.
6:34
LTE
Nova loves you
21.8K posts
Follow
Posts
Replies
Media
Likes
Nova loves you reposted
CARRION @yeaggot · 12/24/23
I like having a dick in a girl way,,, but I want a cunt in a boy way,,,
18
287
50K
Nova loves you @Novacad... · 12/25/23
So... the story goes that I once said "I don't need a ring, I need a sword." So my partner pulls out this larp sword and gets down on one knee
I SAID YES BTW



Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



Bowman's LinkedIn page describes his role at the space camp as facilitating "hands-on space-themed educational experiences for campers aged 9-18. I collaborate with diverse teams to develop and execute space-related curriculum, aligning activities with camp goals and educational standards."

Soprano did not immediately respond to 1819 News' request for comment on Bowman or his role at the space camp.

The Facebook post grabbed the attention of U.S. Sen. Tommy Tuberville (R-Auburn) and U.S. Reps. Dale Strong (R-Monrovia), Gary Palmer (R-Hoover) and Robert Aderholt (R-Haleyville).

It is imperative that Space Camp remains a safe place for children to learn and

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

> grow in STEM education to become the next generation of scientists, engineers, and astronauts.
>
> ⬇ My full statement below: pic.twitter.com/NUsMSXOesK
>
> — Coach Tommy Tuberville (@SenTuberville) March 11, 2024

In a statement provided to 1819 News, Strong called for Bowman's removal while the center conducted a safety review.

"The U.S. Space and Rocket Center has long been a champion in promoting a science-based education in North Alabama," Strong said. "As an educational institution for our nation's children, it is critical that it put their safety and wellbeing first. I call on the Center to immediately remove this individual and open a safety review to consider the potential harm and damages they have inadvertently caused children."

Aderholt said that, while the Space Camp was not in his district, many of his constituents attend regularly.

> pic.twitter.com/g45GvsItgh
>
> — Robert Aderholt (@Robert_Aderholt) March 11, 2024

Palmer called the situation at the Rocket Center "unacceptable."

> The situation currently unfolding at @SpaceCampUSA is unacceptable. When parents send their kids to Space Camp in Alabama, they should be confident they are going to a safe, educational environment.
>
> Space Camp should have the safety of our children as their first priority.
>
> — Gary Palmer (@USRepGaryPalmer) March 11, 2024

*To connect with the author of this story or to comment, email craig.monger@1819news.com.*

*Don't miss out! Subscribe to our newsletter and get our top stories every weekday morning.*

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

Tags:

space and rocket center

alabama news

huntsville

tommy tuberville

dale strong



## Trending

House Floor



Feud erupts between the House and Senate — Both bodies refuse votes on the other's bills

READ NOW →

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

Britt tuberville

[Tuberville, Britt split on aid package sending $60 billion to Ukraine — 'A slap in the face to the Americans who sent us here to represent them'](#)
READ NOW →

[Limestone Correctional warden and wife arrested at home for manufacturing Psilocybin mushrooms](#)
READ NOW →

[Bridge builder: Taxpayers getting a good deal on Baldwin County bridge buy](#)
READ NOW →

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

[Jessica Taylor: Women should be furious about Biden's Title IX changes](#)

[READ NOW →](#)

..

## THE 1819 NEWSLETTER

| Email address |
| --- |

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral



Latest

News

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

Opinion

Politics

Features

Podcast

Radio

Events

Privacy

Careers

1819 News PO Box 1812 Birmingham, AL 35201

Huntsville father's Facebook post on biological male 'Butch coded space queer' Space Camp worker goes viral

MSNBC

# Being transgender no longer a 'mental disorder': APA

The American Psychiatric Association has revised its Diagnostic and Statistical Manual of Mental Disorders and it  no longer lists being transgender as a

Exhibit
0031





Dec. 4, 2012, 2:36 PM EST

**By Traci Lee, Traci G. Lee**

The American Psychiatric Association has revised its *Diagnostic and Statistical Manual of Mental Disorders* and it  no longer lists being transgender as a mental disorder, among other changes announced this past weekend.

Transgender people will now be diagnosed with "gender dysphoria," which means emotional stress related to gender identity."Gender identity disorder" had been listed as a mental disorder since the third edition of the *DSM* more than 20 years ago.

In an interview with *The Advocate*, APA member Jack Drescher explained the new revision, saying, "All psychiatric diagnoses occur within a cultural context. We know there is a whole community of people out there who are not seeking medical attention and live between the two binary categories. We wanted to send the message that the therapist's job isn't to pathologize."

The classification of "transgender" as a mental disorder has been used in the past to prove that being transgender is a psychological problem that can be treated. In one case, the Associated Press cited over the summer, a transgender woman was at risk of losing the children she fathered before her transition.

**Recommended**



WHY IS THIS HAPPENING?
**Discussing the origins of the universe with Marcelo Gleiser**



WHY IS THIS HAPPENING?
**WITHpod Live with Chris Hayes and Rachel Maddow**

"The argument is that one criteria for terminating parental rights is if one parent has a severe, chronic mental illness that might be harmful to the child," psychiatrist Dan Karasic told the *AP*. "A lawyer is apparently using that to argue that because the person is trans and has a diagnosis of GID, she should have her parental rights terminated."

Homosexuality was also considered a mental disorder by the APA until 1973. The *DSM-5* is scheduled to be released in May of 2013.

*Revisit Melissa's April discussion below about* *being transgender in America.*

## You May Like

Sponsored Links

### Carter's Size 2T Toddler Boys Athletic Mesh Shorts Grey

cartersus

**Buy now**

### What Are the Best-Looking SUVs Of The Year? Take A Look

BestSearches | Search Ads

**Learn More**

by Taboola

Taboola Feed

### Nike Shox NZ White - 378341-110

eBay US | Sponsored

**Shop**

### Carter's Size 4T Toddler Boys Pull-On Mesh Shorts Black

He will earn extra credit in gym class with these cute mesh shorts, featuring a functional drawstring for the perfect fit.

cartersus | Sponsored

**Buy now**

### 'What have we done?': Lawrence examines shocking Trump evidence revealed in trial

MSNBC's Lawrence O'Donnell examines the unlikelihood that Donald Trump testifies in his own criminal trial, especially after prosecutors presented new evidence showing his alleged…

MSNBC.com

### Little Planet Size 5T Toddler Great Outdoors Recycled Windbreaker Waterfall Green

Fashioned with recycled materials and lined in jersey, this colorblock windbreaker will be the cold weather go-to for your little girl or little boy. Made with heirloom quality and perfect …

cartersus | Sponsored

**Buy now**

### Nike Shox NZ 'White University Red' 378341-110

eBay US | Sponsored

**Shop**

### 70 Light Blue Twinkle 5mm Wide Angle Conical LED Christmas Lights

5 mm Wide Angle Conical - 70 Bulb Count, 4" Spacing - Blue - Twinkle - Green Wire • Brand: Pro Christmas™ • Bulb Style: 5 mm Wide Angle Conical. 1 in every 5th bulb twinkles on an…

Christmas Designers | Sponsored

**Shop now**

### Trump forsaken by family? Attorneys paint him as 'family man' while he stands alone at trial

Donald Trump colluded to "kill" stories and influence the 2020 election, the prosecution said on Monday in the Stormy Daniels hush money case opening arguments. Joy Reid and her …

MSNBC.com

### "The Springer" Limited Edition: White with Navy Accents - XXL / White with Navy Accents

Our signature athletic fit dress shirt crafted from performance stretch fabrics . "The Springer" limited edition: white with navy accents    dress shirt is a versatile and timeless dress shirt …

State & Liberty | Sponsored

**Buy now**

### Here's How To Fly Business Class For The Price of Economy

GoSearches | Sponsored

### Twinkly Music Dongle USB Interface - Wifi - Gen II

Twinkly™ Music Dongle - Wi-Fi - Gen II • Brand: Twinkly™ • Generation II • Sound Source: equipped with a sensitive digital microphone. • Compatibility: Twinkly Home products and …

Christmas Designers | Sponsored

**Shop now**

## 'He wrote all of it down?': Prosecutors claim to have handwritten notes of Trump hush money scheme

In their opening statement, prosecutors in Donald Trump's New York criminal trial describe a document with notes in the margin, handwritten by former Trump Org CFO Allen …

MSNBC.com

## The Everywhere Bag In Coast Blue

The Everywhere Bag is the standard size of our best-selling silhouette, with a full wraparound zip opening to give easy access to the spacious main compartment. It features a trolley …

Away | Sponsored

Buy now



```
1    HB391

2    209872-3

3    By Representatives Stadthagen, Pringle, Kitchens, Lipscomb,

4    Estes, Nordgren, Mooney, Marques, Shaver, Sorrells, Meadows,

5    Shedd, Wood (D), Brown (C), Reynolds, Fincher, Moore (P),

6    Smith, Sorrell, Standridge, Oliver, Isbell, South, Wingo,

7    Sullivan, Stringer, Garrett, Hurst, Robertson, Kiel, Hanes,

8    Bedsole and Ledbetter

9    RFD: Education Policy

10   First Read: 10-FEB-21
```

**Exhibit 0032**

HB391

1

2     ENROLLED, An Act,

3              Relating to public K-12 schools; to provide that no

4     public K-12 school may participate in, sponsor, or provide

5     coaching staff for interscholastic athletic events at which

6     athletes are allowed to participate in competition against

7     athletes who are of a different biological gender, unless the

8     event specifically includes both biological genders.

9     BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

10             Section 1. The Legislature finds and declares the

11    following:

12             (1) Physical differences between biological males

13    and biological females have long made separate and

14    sex-specific sports teams important so that female athletes

15    can have equal opportunities to compete in sports.

16             (2) Physical advantages for biological males

17    relevant to sports include, on average, a larger body size

18    with more skeletal muscle mass, a lower percentage of body

19    fat, and greater maximal delivery of anaerobic and aerobic

20    energy than biological females.

21             (3) Even at young ages, biological males typically

22    score higher than biological females on cardiovascular

23    endurance, muscular strength, muscular endurance, and speed

24    and agility. These differences become more pronounced during

25    and after puberty as biological males produce higher levels of

HB391

1   testosterone. On average, biological male athletes are bigger,

2   faster, stronger, and more physically powerful than their

3   biological female counterparts. This results in a significant

4   sports performance gap between the sexes.

5        (4) Studies have shown that the benefits that

6   natural testosterone provides to biological male athletes is

7   not significantly diminished through the use of testosterone

8   suppression. Testosterone suppression in biological males does

9   not result in a level playing field between biological male

10  and biological female athletes.

11       (5) Because of the physical differences between

12  biological males and biological females, having separate

13  athletic teams based on the athletes' biological sex reduces

14  the chance of injury to biological female athletes and

15  promotes sex equality. It provides opportunities for

16  biological female athletes to compete against their peers

17  rather than against biological male athletes, and allows

18  biological female athletes to compete on a fair playing field

19  for scholarships and other athletic accomplishments.

20       Section 2. (a) A (a)(1) Except as provided in

21  subsection (b), a public K-12 school may not participate in,

22  sponsor, or provide coaching staff for interscholastic

23  athletic events within the state in Alabama that are either

24  scheduled by or conducted under the authority of any athletic

25  association of the state that permits or allows participation

HB391

1   in athletic events <u>within the state</u> conducted exclusively for

2   males by any individual who is not a biological male ~~as~~

3   ~~indicated on a the original birth certificate~~ or participation

4   in athletic events <u>within the state</u> conducted exclusively for

5   females by any individual who is not a biological female ~~as~~

6   ~~indicated on a the original birth certificate~~.

7           (2) <u>A public K-12 school may not allow a biological</u>

8   <u>female to participate on a male team if there is a female team</u>

9   <u>in a sport. A public K-12 school may never allow a biological</u>

10  <u>male to participate on a female team.</u>

11          (b) This section does not apply to athletic events

12  at which both biological males and biological females are

13  permitted or allowed to participate.

14          Section 3. This act shall become effective on the

15  first day of the third month following its passage and

16  approval by the Governor, or its otherwise becoming law.

HB391

1

2

_____

Speaker of the House of Representatives

_____

President and Presiding Officer of the Senate

House of Representatives

    I hereby certify that the within Act originated in and was passed by the House 18-MAR-21.

                Jeff Woodard
                Clerk

| | | |
|---|---|---|
| Senate | 15-APR-21 | Amended and Passed |
| House | 15-APR-21 | Concurred in Senate Amendment |

# Montgomery Advertiser

CONTRIBUTORS | Opinion  *This piece expresses the views of its author(s), separate from those of this publication.*

# The top 10 Alabama political stories of 2023

**Brian Lyman** ALABAMA REFLECTOR

Published 4:06 a.m. CT Jan. 7, 2024 | **Updated 4:06 a.m. CT Jan. 7, 2024**

I've often encouraged young journalists to come to Alabama.

Mostly because we need young, dedicated reporters. But also because there's never a slow news cycle here.

2023 was no exception. Here are my picks for the major stories of the year.

## 10. Tuberville military holds

U.S. Sen. Tommy Tuberville launched a 10-month blockade of military promotions in February in protest of a Defense Department policy compensating women in the military for travel expenses for reproductive care, including abortion. The stance drew criticism from both Democrats and Republicans and failed to wring any concessions from the Pentagon over the policy. Tuberville ended the blockade on Dec. 19.

## 9. Pre-K director forced out

Gov. Kay Ivey in April forced out Pre-K Director Barbara Cooper, claiming that a textbook used to train teachers used "woke" concepts. An Alabama Reflector review of the book found that it encouraged teachers to be aware of the diverse backgrounds of students and create welcoming environments for them. A later public records request showed Cooper had removed the book a week before her ouster.

## 8. Grocery tax reduction

Amid lobbying from groups on the left and right, and with an unusual coalition of Democratic and Republican lawmakers, the Legislature approved the first cut in the state's _____ groceries since the Legislature created the levy in 1939. The bill cut the state s_____

**Exhibit 0034**

from 4% to 3%, froze local grocery tax rates and opened the door to a future reduction if the Education Trust Fund budget grows significantly.

## 7. Alabama Crime Victims Compensation Commission funding

Set up to help crime victims with expenses, the commission drew protests this year over long wait times for compensation. Officials cited falling revenues from fines and fees as a reason for the waits. Ivey and the Legislature gave the commission about $2.5 million in new funding to begin addressing the backlog.

## 6. Medical cannabis battles

The Alabama Medical Cannabis Commission faced major controversy over its attempts to award licenses for the production of medical cannabis in the state. The board rescinded its first round of awards after AMCC personnel found significant issues with scoring applications. A second round led to lawsuits alleging Open Meetings Act violations and a restraining order from a judge. The commission awarded a third round of licenses in December, but even if these awards withstand litigation, actual production could take months.

## 5. Prison crisis

Three years after the U.S. Department of Justice sued Alabama over violence in men's prisons, the crisis shows no signs of abating. The Equal Justice Initiative said at least four people were killed at Elmore Correctional Facility this year, and there have been regular reports of violence, including an inmate getting a gun at Donaldson Correctional Facility near Bessemer. Legislators have shown little interest in addressing the crisis, putting their faith in the construction of two new prisons, one of which will cost more than $1 billion.

## 4. Book battles

Right-wing organizations challenged books on shelves around the state, part of a broader national campaign attacking books with LGBTQ+ themes. The complaints got the ear of Gov. Kay Ivey, who ordered the Alabama Public Library Service in October to make local library funding contingent on conforming to policies pushed by Alabama Republican Party chair John Wahl, a member of the APLS. The attempts to remove books drew a swift counterattack from members of those communities. The battles were particularly fierce in Prattville, where the local board resigned amid disagreements over board appointments.

## 3. Alabama politicians target LGBTQ+ people

The attacks on LGBTQ+ Alabamians didn't stop at books. The Legislature approved a law effectively banning transgender people from playing college sports in the state. A three-judge panel earlier this year allowed Alabama's ban on gender-affirming care to go into effect, a decision currently under appeal.

More bills targeting the community are likely this year. A senator also plans to introduce legislation to change the governance of the Alabama Department of Archives and History because the department hosted a program on LGBTQ+ history in June.

## 2. Dadeville shooting

Four people were killed and at least 28 wounded after gunfire erupted at a party in Dadeville on April 15. Prosecutors charged six people, aged 15 to 20, in connection with the shooting. Alabama has one of the highest rates of death from firearms in the country, but the Legislature did not take up any bills addressing gun access.

The tragedy occurred weeks after a storm did major damage to the nearby town of Camp Hill, where several victims lived. It took weeks for Camp Hill to secure federal aid.

## 1. Redistricting

An unexpected court decision led to an unprecedented Alabama congressional map and what could be one of the nation's highest-profile races in 2024. In June, the U.S. Supreme Court upheld a lower court ruling directing Alabama to draw new congressional maps, holding that a map approved in 2021 made it impossible for Black voters to elect their preferred leaders.

The Alabama Legislature in July refused to do so, approving a map that fell well short of the court orders. Republican legislators acknowledged their plan was to change Justice Brett Kavanaugh's vote from earlier in the year, and the state's appeal hinged on him doing so. But the U.S. Supreme Court refused to hear the state's new challenge.

In October, the federal court approved a new congressional map creating a majority-Black 7th Congressional District in western Alabama, and a new 2nd Congressional District that is 49% Black. The 2nd district race has drawn 19 candidates — 11 Democrats and eight Republicans — ahead of March's primary.

The top 10 Alabama political stories of 2023

*Brian Lyman is the editor of Alabama Reflector. He has covered Alabama politics since 2006, and worked at the Montgomery Advertiser, the Press-Register and The Anniston Star. His work has won awards from the Associated Press Managing Editors, the Alabama Press Association and Robert F. Kennedy Center for Human Rights. He lives in Auburn with his wife, Julie, and their three children.*

*Alabama Reflector is part of States Newsroom, an independent nonprofit website covering politics and policy in state capitals around the nation.*

1    211110-1 : n : 03/02/2021 : AHP / CMG LSA2021-21413

2

3    WHATLEY AMENDMENT TO SB10

4

5

6

7

8              On page 5, after line 24, insert a new Section 6 to

9    read as follows, and renumber each subsequent section

10   accordingly:

11             Section 6. Nothing in this act shall be construed as

12   limiting or preventing psychologists, psychological

13   technicians, and professional counselors from rendering the

14   services for which they are qualified by training or

15   experience involving the application of recognized principles,

16   methods, and procedures of the science and profession of

17   psychology and counseling.

**Exhibit
0037**



Subscribe

**NEWS**

# Father of transgender daughter tells Alabama lawmakers treatment ban is misguided

Updated: Feb. 10, 2021, 7:50 p.m. | Published: Feb. 10, 2021, 7:45 p.m.



David Fuller, a sergeant with the Gadsden Police Department, tells the Alabama House Judiciary Committee about his experiences as a single father with a transgender daughter.

   

Exhibit
0038

By **Mike Cason | mcason@al.com**

Alabama lawmakers today heard from supporters and opponents of a bill <u>that would make it a felony</u> to prescribe puberty-blocking drugs or hormones as transgender therapies for minors with gender dysphoria.

They heard from doctors on both sides of the debate and from an 80-year-old who said he came to regret sex reassignment surgery and helps others with the same regrets.

None made a stronger impression than a father who said he could not comprehend penalizing the medical professionals who have helped him and his transgender daughter navigate a difficult journey.

Lawmakers are considering a bill by Rep. Wes Allen, R-Troy, called the Alabama Vulnerable Child Compassion and Protection Act. Eight people spoke at the public hearing before the Alabama House Judiciary Committee. The committee did not vote on the bill and plans to do so in two weeks.

A similar bill, by Sen. Shay Shelnutt, R-Trussville, won approval today in the Senate Healthcare Committee. Allen and Shelnutt proposed the same bills last year.

David Fuller, a sergeant with the Gadsden Police Department, said he was raising three boys as a single dad after his wife died. At age 16, one came out as transgender.

"To say I was shocked was an understatement," Fuller said.

But Fuller, who said he's been in law enforcement for 27 years, said he quickly learned that his child needed his support and expert help. He said they found that at UAB.

"They made us feel like we weren't alone, that we were normal in an abnormal situation and they could help us," Fuller said. "And they didn't push anything on us. Just the opposite. They reeled us in at every step.

"They made sure it was baby steps. It's been a five-year process now and they haven't pushed anything on us. Just the opposite. And they are angels to me. And as a police officer, you're asking me to someday put handcuffs on these people that are heroes in my life? ... Please don't ask me to do that."

Allen said he understands there are children with gender dysphoria but said he was surprised to learn that minors receive puberty blockers and hormone therapy in Alabama.

"We should help those children with therapeutic treatment from qualified mental health professionals and not allow these young minors' bodies to be permanently damaged," Allen said.

Dr. Den Trumbull, a Montgomery pediatrician, has the same concerns. Trumbull urged lawmakers to pass Allen's bill, calling transgender medical treatments for minors "child abuse."

Trumbull said it's not uncommon for children to have periods of confusion about their gender identity. But Trumbull said that goes away for the vast majority as they get older. He said parents should make sure they reinforce their child's identity with their biological sex, rather than encourage the opposite. Teenagers lack the maturity to make life-changing decisions, such as receiving cross-sex therapy, he said.

"Our gender confused children need help. But not this form of misguided therapy," Trumbull said.

Walt Heyer, 80, told the committee that his sex reassignment surgery in 1983 was a mistake. Heyer said he traced his gender confusion to his grandmother putting him in dresses at age 4. He said he now runs a website to help people who regret their transgender treatments and surgeries.

"We need to protect our children," Heyer said. "We don't need to be giving them hormone therapy. They can deal with these other things when they're adults and can understand the consequences. And the consequences are severe and irreversible."

But Dr. Morissa Ladinsky, associate professor of pediatrics at UAB Medicine, said medical treatments are part of established, evidence-based standards of care that promote good health for transgender youth. She said transgender people make up about 1.5% of the population.

"They're real. They're ordinary and loving people. Just their inner sense of gender may differ from their sex assigned at birth," Ladinsky said.

Ladinsky said some become aware of that in childhood but for many those feelings aren't clear until around puberty.

"These youth are not mentally ill. They're not jumping on a trend," she said.

Ladinsky said transgender surgeries are never performed on children. She said medications are never prescribed lightly.

"Folks, there are not pediatricians traveling around Alabama just writing hormone prescriptions for minors," she said.

If you purchase a product or register for an account through a link on our site, we may receive compensation. By using this site, you consent to our User Agreement and agree that your clicks, interactions, and personal information may be collected, recorded, and/or stored by us and social media and other third-party partners in accordance with our Privacy Policy.



Subscribe

NEWS

# Alabama Senate passes bill banning transgender treatments for minors

Updated: Mar. 02, 2021, 4:41 p.m. | Published: Mar. 02, 2021, 3:27 p.m.



Parents and other advocates protest against a bill that would ban puberty blockers and hormones as transgender treatments for minors.

   

**Exhibit 0039**

By <u>Mike Cason | mcason@al.com</u>

The Alabama Senate today passed a bill that would ban puberty-blocking, hormone medications, and surgeries as transgender treatments for people under age 19.

The bill, passed by a vote of 23-4. It moves to the House of Representatives, which has a similar bill.

Sen. Shay Shelnutt, R-Trussville, the sponsor of the Vulnerable Child Compassion and Protection Act, began discussion of his bill today by reading a couple of definitions of gender dysphoria. Then he gave his own.

"What is gender dysphoria?" Shelnutt said. "I looked it up. According to the Mayo Clinic. It's a feeling of discomfort or distress that might occur in people who have gender identify different from their sex at birth. Another definition is a term that describes a sense of unease that a person may have whose gender identity differs from their birth sex.

"My definition: Someone thinks they should be a girl if they're a boy or thinks they should be a boy if they're a girl," Shelnutt said. "Science shows that children that are going through this gender dysphoria, most of them mature or grow out of this stage if they are given the chance. So why is (this bill) needed? It's just to stop these surgeries and these drugs on our children. It's to protect our children. That's my simple explanation."

Parents and advocates <u>lobbied against the bill</u> at a State House rally today. The Alabama Chapter of the American Academy of Pediatrics opposes the bill. In a position statement, the organization said surgeries are not done on minors and that puberty-blockers and hormones are used as part of an evidence-based standard of care.

Sen. Bobby Singleton, D-Greensboro, said the legislation would interfere with how families and medical professionals can help children struggling with gender dysphoria.

"We don't want the state in our business," Singleton said. "But we want to put the state into the family all the time."

Singleton predicted the law would be challenged in a federal court lawsuit like the abortion ban the Legislature passed in 2019.

Shelnutt said he was not aware of the issue until the bill was presented to him more than a year ago.

"I didn't think this was going on in Alabama, had no idea," Shelnutt said. "I've been educated since then. I just think it's wrong for this to happen to children. Children aren't mature enough to make this decision on on surgeries and drugs. The whole point is to

protect kids."

Shelnutt said he was not aware of any transgender surgeries happening in Alabama but wanted to make sure none did.

Asked about the opposition of the Alabama Chapter of the American Academy of Pediatrics, Shelnutt said he has heard from pediatricians who support his bill.

"Just because an association opposes it doesn't mean pediatrics doctors in Alabama oppose it," Shelnutt said. "I've talked to many of them."

The four senators who voted against the bill were Singleton, Billy Beasley, D-Clayton; Vivian Davis Figures, D-Mobile; and Rodger Smitherman, D-Birmingham.

Beasley, a pharmacist, noted that the bill would make it a felony for him to fill a prescription for puberty-blocking medications or hormones for a minor. If the bill becomes law, any violation of it would be a Class C felony, punishable by up to 10 years in prison.

"I think that's just wrong," Beasley said. "This bill needs to go away."

Singleton proposed an amendment to remove the criminal penalty from the bill, but it was rejected by a vote of 21-5.

Sen. Tom Whatley, R-Auburn, proposed an amendment to say that it would not prohibit or limit psychologists and professional counselors from doing their jobs. The Senate rejected it at Shelnutt's request.

Shelnutt said he wants children with gender dysphoria to get help but not be counseled in a way that affirms their gender identity conflict.

"There's no medical diagnosis," Shelnutt said. "There's no medical condition that these kids have. It's just in their mind."

If you purchase a product or register for an account through a link on our site, we may receive compensation. By using this site, you consent to our User Agreement and agree that your clicks, interactions, and personal information may be collected, recorded, and/or stored by us and social media and other third-party partners in accordance with our Privacy Policy.

## THIS 5 Min Quiz Tells You What Your Body Actually Needs To Lose Weight

**Noom** | Sponsored

Learn More



# Roll Call: AL SB184 | 2022 | Regular Session
## Alabama Senate Bill 184 *(Prior Session Legislation)*

For additional roll call votes on Alabama SB184 please see the Vote List

**Bill Title:** Public health, minors, biological male or female, sexual state, practices to alter or affirm minor's sexual identity or perception such as prescribing puberty blocking medication or surgeries, prohibited, exceptions, nurses and school personnel not to withhold information from parents, violations a Class C felony

**Spectrum:** Partisan Bill (Republican 2-0)

**Status:** *(Passed)* 2022-04-07 - Assigned Act No. 2022-289. [SB184 Detail]

**Text:** Latest bill text (Enrolled) [PDF]

## Vote: Motion to Read a Third Time and Pass Roll Call 957

| Vote | Tally | Democrat | Republican |
|------|-------|----------|------------|
| Yea | 66 | 2 | 64 |
| Nay | 28 | 26 | 2 |
| Not Voting | 1 | - | 1 |
| Absent | 7 | - | 7 |
| *TOTAL* | *102* | *28* | *74* |

## Result: Passed

| Name | Yea | Nay | NV | Absent | Financial | Encyclopedia | Biography |
|------|-----|-----|----|--------|-----------|--------------|-----------|
| Rep. Alexander, Louise [D] | | ✖ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Allen, Wes [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Almond, Cynthia [R] | | ✖ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Baker, Alan [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Ball, Mike [R] | | | | 🔜 | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Bedsole, Russell [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Blackshear, Chris [R] | | | | 🔜 | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Boyd, Barbara Bigsby [D] | | ✖ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Bracy Jr., Napoleon [D] | | ✖ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Brown, Chip [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Brown, K.L. "Koven" [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Carns, Jim [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Chestnut, Prince [D] | | ✖ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Clarke, Adline Cecline [D] | | ✖ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Clouse, Steve [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Coleman-Evans, Merika [D] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Collins, Terri [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Crawford, Danny [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Daniels, Anthony [D] | | ✖ | | | FollowTheMoney | Ballotpedia | VoteSmart |

**Exhibit 0042**

Roll Call: AL SB184 | 2022 | Regular Session | LegiScan

| Name | Yea | Nay | NV | Absent | Financial | Encyclopedia | Biography |
|---|---|---|---|---|---|---|---|
| Rep. Dismukes, Will [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Drake, Dickie [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Drummond, Barbara [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Easterbrook, Brett [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Ellis, Corley [R] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. England, Christopher John [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Estes, Tracy [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Farley, Allen [R] | | | | ⇥ | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Faulkner, David [R] | | | | ⇥ | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Faust Sr., Joe [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Fincher, Bob [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Forte, Berry [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Garrett, Danny [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Gaston, Victor [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Givan, Juandalynn "Lee Lee" [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Gray, Jeremy [Mr Eyg] [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Greer, Lynn [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Grimsley, Dexter [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Hall, Laura [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Hanes Jr., James "Tommy" T. [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Harbison, Corey [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Hassell, Kenyatte [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Hill, Jim [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Hollis, Rolanda [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Holmes, Mike [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Howard, Ralph A. [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Hurst, Stephen "Steven" W. [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Ingram, Reed [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Isbell, Gil F. [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Jackson, Thomas "Action" E. [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Jones Jr., Mike [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Jones, Sam [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Kiel, Jamie [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Kitchens, Wes [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Lawrence, Kelvin J. [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Ledbetter, Nathaniel [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Lee, Paul W. [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Lipscomb, Craig [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Lovvorn, Joe [R] | | | | ⇥ | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Marques, Rhett [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. McCampbell, Artis "A J" [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. McClammy, Patrice "Penni" [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. McCutcheon, Mac [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. McMillan, Steve [R] | | | | ⇥ | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Meadows, Charlotte [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |

Roll Call: AL SB184 | 2022 | Regular Session | LegiScan

| Name | Yea | Nay | NV | Absent | Financial | Encyclopedia | Biography |
|------|-----|-----|-----|--------|-----------|--------------|-----------|
| Rep. Mooney, Arnold [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Moore, Mary [D] | | ✘ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Moore, Parker Duncan [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Morris, TaShina [D] | | ✘ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Oliver, Ed [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Paschal, Kenneth [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Pettus, Phillip [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Pringle, Chris [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Rafferty, Neil [D] | | ✘ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Reynolds, Rex [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Rich, Kerry [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Robbins, Ben [R] | | | | 🏃 | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Robertson, Proncey [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Rogers Jr., John W. [D] | | ✘ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Sanderford, Howard [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Scott, Roderick "Rod" [D] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Sells, Chris [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Shaver, Ginny [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Shedd, Randall [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Shiver, Harry [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Simpson, Matt [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Smith, Ivan "Van" [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Sorrell, Andrew [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Sorrells, Jeff [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. South, Kyle [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Stadthagen, Scott [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Standridge, David [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Stringer, Shane [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Sullivan, Rodney [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Treadaway, Allen [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Wadsworth, Timothy R. [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Warren, Pebblin W. [D] | | ✘ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Whitt, Andy [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Whorton, Ritchie [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Wilcox, Margie [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Wingo, Rich [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Wood, Debbie Hamby [R] | | | ❓ | | FollowTheMoney | Ballotpedia | VoteSmart |
| Rep. Wood, Randy [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |



# Roll Call: AL SB184 | 2022 | Regular Session
# Alabama Senate Bill 184 *(Prior Session Legislation)*

For additional roll call votes on Alabama SB184 please see the Vote List

**Bill Title:** Public health, minors, biological male or female, sexual state, practices to alter or affirm minor's sexual identity or perception such as prescribing puberty blocking medication or surgeries, prohibited, exceptions, nurses and school personnel not to withhold information from parents, violations a Class C felony

**Spectrum:** Partisan Bill (Republican 2-0)

**Status:** *(Passed)* 2022-04-07 - Assigned Act No. 2022-289. [SB184 Detail]

**Text:** Latest bill text (Enrolled) [PDF]

## Vote: Motion to Read a Third Time and Pass Roll Call 383

| Vote | Tally | Democrat | Republican |
|------|-------|----------|------------|
| Yea | 24 | - | 24 |
| Nay | 6 | 6 | - |
| Not Voting | - | - | - |
| Absent | 5 | 2 | 3 |
| *TOTAL* | *35* | *8* | *27* |

## Result: Passed

| Name | Yea | Nay | NV | Absent | Financial | Encyclopedia | Biography |
|------|-----|-----|----|--------|-----------|--------------|-----------|
| Sen. Albritton, Greg [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Allen, Gerald H. [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Barfoot, Will [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Beasley, William "Billy" M. [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Butler, Tom [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Chambliss Jr., Clyde [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Chesteen, Donnie [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Coleman-Madison, Linda [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Dunn, Priscilla [D] | | | | ↴ | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Elliott, Chris [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Figures, Vivian Davis [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Givhan, Sam [R] | | | | ↴ | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Gudger, Garlan [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Hatcher, Kirk [D] | | ✗ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Holley, Jimmy W. [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Jones, Andrew [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Livingston, Steve [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Marsh, Del [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. McClendon, Jim [R] | ✓ | | | | FollowTheMoney | Ballotpedia | VoteSmart |

**Exhibit 0043**

| Name | Yea | Nay | NV | Absent | Financial | Encyclopedia | Biography |
|------|-----|-----|----|--------|-----------|--------------|-----------|
| Sen. Melson, Tim [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Orr, Arthur [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Price, Randy [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Reed, Greg J. [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Roberts, Dan [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Sanders-Fortier, Malika [D] | | | | ➡ | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Scofield, Clay [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Sessions, David [R] | | | | ➡ | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Shelnutt, Shay [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Singleton, Bobby D. [D] | | ✘ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Smitherman, Rodger M. [D] | | ✘ | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Stutts, Larry [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Waggoner, J. T. "Jabo" [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Weaver, April C. [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Whatley, Thomas M. [R] | | | | ➡ | FollowTheMoney | Ballotpedia | VoteSmart |
| Sen. Williams, Jack W. [R] | ✔ | | | | FollowTheMoney | Ballotpedia | VoteSmart |

228



Posted on 15 January 2024

**Frequently Asked Questions (FAQ)**

**WHO development of a guideline on the health of trans and gender diverse people**

**15 January 2024**

---

1. **Why is a technical guideline on the health of trans and gender diverse people needed?**

- Trans and gender diverse people encounter specific challenges that negatively impact their access to quality health services, quality of life and life expectancy, violating their right to health and associated rights, such as the right to free, informed consent to medical interventions. This guideline has a specific focus on adults and will not address issues relating to children and adolescents.

- Trans and gender diverse people often face barriers to accessing health care services, including stigma and discrimination in health care settings.  This can have serious impacts on their health. Many settings also lack policies to facilitate access to inclusive and gender affirming care. Trans and gender diverse people experience a high burden of mental health issues (including suicide) and often experience high levels of violence. Thus, there is an urgent need for the health sector to consider ways to provide more inclusive, acceptable and effective health care for trans and gender diverse people.

- This proposed guideline is guided by WHO's mandate to enable the attainment of the highest possible level of health and well-being for all.

- The guideline will reflect the principles of human rights, gender equality, universality and equity. It is aligned with and responds to WHO's mandate to work for all people, the effort to reach the furthest behind first, and a commitment to leave no one behind. The guideline also contributes to ensuring universal health coverage (UHC).

- Additionally, the guideline aims to contribute to reaching the goals of the 2015 Joint Statement of 14 UN agencies, including WHO, pledging to protect all people from discrimination and violence on the grounds of gender identity and/or gender expression, as well as the 2017 United Nations Joint Statement committing to eliminate discrimination in healthcare settings, including discrimination based on gender identity and gender expression.

**Exhibit 0044**

**2.  Why is this guideline needed now?**

- The midterm review of the Sustainable Development Goal (SDG) agenda, including SDG 3 "Ensure healthy lives and promote well-being for all at all ages", has brought renewed attention and commitment to the global goal of universal health coverage.

- This proposed guideline builds on more than 10 years of WHO work on trans and gender diverse people's health. This includes:

  - The International Statistical Classification of Diseases and Related Health Problems (ICD), which in its 11th edition included changes to reflect scientific understanding of sexual health, gender identity and gender incongruence. The ICD-11 was endorsed by WHO Member States in 2019 and published in January 2022.
  - Guidelines related to HIV, viral hepatis and sexually transmitted infections (STIs), which include good practice statements on the enabling environments that are essential to curb these epidemics among this disproportionately affected group of people.
  - Guidelines related to self-care interventions that recognize the importance of gender equality, rights in delivery of gender affirming care, and reducing discrimination.

- There is an increasing body of scientific evidence highlighting the unmet health needs of trans and gender diverse persons, due to stigma, discrimination, violence, and other human rights violations, including in the health care settings.

- Trans and gender diverse people are entitled to the full protection of their human rights, as specified in international human rights instruments. Human rights include, but are not limited to, the right to equal enjoyment of rights and non-discrimination; security of person and privacy; recognition and equality before the law; the right to the highest attainable standard of mental and physical health; education; employment and just and favourable conditions of employment; freedom of movement; peaceful assembly and association; freedom from arbitrary arrest and detention, and from cruel and inhumane treatment; and protection from violence. States have an obligation to ensure that the above rights are enjoyed without discrimination of any kind, including on grounds of race, language, national or social origin, political or other opinion, sex, age, religion, disability, marital status or other status.  United Nations human rights treaty bodies have repeatedly held that sexual orientation, gender identity and sex characteristics are prohibited grounds of discrimination under international law.

- Some countries have laws, regulations, policies and practices that present barriers to equal access to health care for trans and gender diverse people.  A number of countries criminalize gender identity in a de facto manner, by criminalizing cross-dressing or impersonation of the opposite sex. For trans and gender diverse people, the lack of legal gender recognition is a key barrier to access to health services, in addition to the full enjoyment of other rights, such as freedom of movement, and right to adequate housing, education and employment. Harmful practices include forced anal examinations, which are used to investigate or punish alleged same-sex behaviour between consenting men or transgender women. These legal barriers have

measurable, detrimental effects on the health of trans and gender diverse people, as shown by research.

**3.   What will the guideline cover?**

- This guideline will review evidence of the impact of specific interventions and on that basis provide recommendations for enhancing the health of specifically, adult, trans and gender diverse people, , and their access and utilization of health services.
- Interventions to be assessed include:
  - the provision of gender affirming care services for trans and gender diverse adults in a clinical setting;
  - health workers' training and education approaches related to providing gender inclusive care for adults;
  - specific provisions of gender identity recognition laws, policies and administrative procedures that may affect the health and wellbeing of adult trans and gender diverse people; and
  - provisions of health policies aimed at facilitating gender inclusive health care for adults.
- The guidelines will also inform existing WHO recommendations that support health services and health workers in providing empathetic and evidence-based clinical care to trans and gender diverse people that addresses their needs, who experience interpersonal violence.

**4.   How was the scope decided?**

- The scope was based on requests of some WHO Member States and on the outcomes of a stakeholder consultation held in 2022 with experts in transgender health and representatives from the affected communities from all WHO geographic regions.  From the initial consultations, it was agreed that the scope should focus on adults and not on children/adolescents.

**5.   Why will the guideline only cover adults and not also children or adolescents?**
- The scope will cover adults only and not address the needs of children and adolescents, because on review, the evidence base for children and adolescents is limited and variable regarding the longer-term outcomes of gender affirming care for children and adolescents.

**6.   What do we mean by 'trans and gender diverse people'?**
- "Trans and gender diverse people" is an umbrella term for those whose gender identity, roles or expression do not conform to the norms and expectations traditionally associated with the sex assigned to them at birth; it includes people who are transsexual, transgender, or otherwise gender nonconforming or gender incongruent. Transgender people may self-identify as transgender, female, male, trans woman or trans man, transsexual or one of many other gender nonconforming identities. They may express their genders in a variety of masculine, feminine and/or androgynous ways.
- See WHO's <u>frequently asked questions on health and sexual diversity</u> for further information.

7. **What are the definitions of gender affirming and gender inclusive care used in this guideline process?**

- In line with the 11th edition of the WHO International Classification of Diseases and Related Health Problems (ICD-11), gender-affirming health care can include any single or combination of a number of social, psychological, behavioural or medical (including hormonal treatment or surgery) interventions designed to support and affirm an individual's gender identity. Of note, these new technical guidelines on the health of trans and gender diverse people will not consider surgical interventions.

- Gender inclusive care refers to gender diverse people's inclusion in, and access to, all forms of health care, free of stigma and discrimination, facilitated by health policy, laws and/or health interventions.

8. **What is the timeline for this process?**

- 2021: Establishment of an internal WHO steering group and the contracting of the first of two independent and experienced guideline methodologists to impartially guide the process, including the formulation of recommendations.

- 2022: A stakeholder consultation (including with Member States) was conducted to define the scope of this guideline, which led to the identification of the three areas of focus: service delivery approaches, health workforce training, and health policy.  A detailed proposal for the guideline was submitted and approved by the WHO Guideline Review Committee.

- 2023: Evidence synthesis was initiated; the preliminary list and biographies of 14 proposed Guideline Development Group (GDG) members was published on the WHO website for public consultation; and an updated list of 21 proposed GDG members, with additions primarily of public health policy experts from Ministries of Health, was published for a further period of public consultation (extended until 2 February 2024).  In December 2023, one member of the proposed GDG list asked to be removed due to scheduling conflicts.

9. **What are the criteria for selection of the GDG members?**

- The standard criteria for the selection of technical experts for the GDG include (a) technical expertise in the subject matter as defined in the scope of the approved guidelines proposal; (b) geographic representation; (c) gender diversity; (d) representatives of people affected by the guidelines;  and (e) end users (i.e., people who will use the guidelines such as health policy makers and health professionals).

- In the specific case of this guideline, the following profiles were considered for the members of the GDG:

- o   expertise in gender affirming health care, health workforce, violence response, mental health, law, public health policy, and human rights;

- o   geographic representation;

- o   gender diversity;

- o   trans and gender diverse individuals (as subject matter experts and/or as representatives of those affected by the guidelines); and

- o   health policy-makers and health professionals working in the field of trans and gender diverse health (end users)

- All GDG members act in their own technical capacity and do not represent their affiliated organizations. Their work is unpaid.

**10.  How were the proposed GDG members selected for this guideline?**

- The selection was informed by both participants of the stakeholder consultation meeting held in early 2022 and by WHO technical staff, including those in Regional Offices.
- The proposal for GDG composition has been approved by the WHO Guideline Review Committee.
- The proposed GDG membership along with relevant biographies was announced for rounds of public notice and comment, in line with WHOs policy for managing conflicts of interest of external experts, in June and December 2023. Following a wide-ranging set of feedback, WHO is further extending the submission of feedback on the GDG membership until 2 February 2024. All comments should be sent to hiv-aids@who.int by this deadline.

**11.  What are WHO normative guidelines?**

- WHO guidelines aim to support Member States in implementing evidence-based interventions to update health policies and achieve health outcomes for populations. They do not constitute binding commitments and Member States choose whether to apply and adapt them to their context.

**12.  What is the process for developing WHO guidelines?**

- The WHO guideline development strictly adheres to a robust and evidence-based process as detailed in the WHO handbook for guideline development and is overseen by an independent internal review Committee charged to ensure these processes are followed.

- The process includes the defining of the scope, the development of key research questions (using the PICO format), commissioning of  systematic reviews of the literature by WHO looking at the impact of selected interventions on specific health outcomes and their risks and benefits. The results of these reviews are summarized and assessed for certainty or quality of evidence and risk of bias, using established and internationally recognized '*Grading of Recommendations Assessment, Development and Evaluation*' (GRADE) and the '*Confidence in the Evidence from*

233

*Reviews of Qualitative Research*' (GRADE-CERQual) methodologies; and a Guideline Development Group (GDG) of external experts is established.

- Standard criteria for the selection of technical experts for the GDG include (a) technical expertise in the subject matter that is defined in the scope of the approved guidelines proposal; (b) geographic representation; (c) gender diversity; (d) representatives of people affected by the guidelines; and (e) end users (i.e., people who will use the guidelines, such as health policy-makers and health professionals).  Biographies are then made public for feedback before the GDG is finalized.

- Once the GDG is established, it is presented with the summarized results of the reviews addressing each research question as well as with evidence related to:
  - o values and preferences of the users and beneficiaries of the recommendations;
  - o feasibility of implementation with a focus in low- and middle-income countries;
  - o economic implications (e.g. costs, cost-benefits, etc.); and
  - o human rights and ethical implications.

- The GDG is systematically guided through the evidence-to-decision process by an independent methodologist, and decisions regarding the recommendations are reached by consensus.
- Once the recommendations are finalised by the GDG, they are subject to further external expert peer review, and the full guideline is subsequently submitted for review and approval by the WHO Guideline Review Committee, following the process outlined in the WHO handbook for guideline development.

- The time to development of a guideline varies depending on the scope, availability and volume of evidence and resources, but can take between 6 months and two years. All guidelines are subject to external peer review for accuracy and implement-ability.

13. **How are conflicts of interest of Guideline Development Group (GDG) members managed?**

- Conflicts of interests are managed following standard WHO procedures, notably its Declaration of Interest (DOI) policy for external experts.  According to this policy, members of WHO Guideline Development Groups are required to declare any (intellectual or financial) interest that might affect their objectivity and independence and/or create an unfair or competitive advantage. They are screened through a series of background checks performed by the WHO Secretariat, and through a period of public notice and comment.

- Any significant disclosed interest identified through these processes is reviewed by the Secretariat (including as appropriate, in consultation with the WHO Office of Compliance, Risk Management and Ethics) to determine if a conflict of interest exists, and what, if any measures (ranging from conditional participation, partial or full exclusion) are required.

  WHO reserves the right to review the declaration of interests (DOIs) and if a new interest becomes apparent, WHO shall at all times manage that conflict of interest, including adjusting membership of a GDG.

3/13/24, 3:52 PM — Top Trans Doctors Blow the Whistle on 'Sloppy' Care | The Free Press



# THE FREE PRESS

**EXTRA!**
*Get your tickets now for our next live debate in Dallas on April 11: Should the U.S. Shut Its Borders?*

*Wednesday, March 13, 2024*                                      *3:52 PM*

### FOR FREE PEOPLE

HOME | WITCH TRIALS | HONESTLY | SUPPORT US | COMMUNITY | SHOP | CAREERS | EVENTS | ARCHIVE | ABOUT | 🔍



Dr. Marci Bowers performs gender reassignment surgery in Trinada's Mount San Rafael Hospital. (Glenn Asakawa/The Denver Post via Getty Images)

## Top Trans Doctors Blow the Whistle on 'Sloppy' Care

*In exclusive interviews, two prominent providers sound off on puberty blockers, 'affirmative' care, the inhibition of sexual pleasure, and the suppression of dissent in their field.*

**By Abigail Shrier**
October 4, 2021

For nearly a decade, the vanguard of the transgender-rights movement — doctors, activists, celebrities and transgender influencers — has defined the boundaries of the new orthodoxy surrounding transgender medical care: What's true, what's false, which questions can and cannot be asked.

They said it was perfectly safe to give children as young as nine puberty blockers and insisted that the effects of those blockers were "fully reversible." They said that it was the job of medical professionals to help minors to transition. They said it was not their job to question the wisdom of transitioning, and that anyone who did — including parents — was probably transphobic. They said that any worries about a social contagion among teen girls was nonsense. And they never said anything about the distinct possibility that blocking puberty, coupled with cross-sex hormones, could inhibit a normal sex life.

Their allies in the media and Hollywood reported stories and created content that reaffirmed this orthodoxy. Anyone who dared disagree or depart from any of its core tenets, including young women who publicly detransitioned, were inevitably smeared as hateful and accused of harming children.

But that new orthodoxy has gone too far, according to two of the most prominent providers in the field of transgender medicine: Dr. Marci

Subscribe

**Exhibit 0047**

235

Bowers, a world-renowned vaginoplasty specialist who operated on reality-television star Jazz Jennings; and Erica Anderson, a clinical psychologist at the University of California San Francisco's Child and Adolescent Gender Clinic.

In the course of their careers, both have seen thousands of patients. Both are board members of the World Professional Association for Transgender Health (WPATH), the organization that sets the standards worldwide for transgender medical care. And both are transgender women.

Earlier this month, Anderson told me she submitted a co-authored op-ed to The New York Times warning that many transgender healthcare providers were treating kids recklessly. The Times passed, explaining it was "outside our coverage priorities right now."

Over the past few weeks, I have spoken at length to both women about the current direction of their field and where they feel it has gone wrong. On some issues, including their stance on puberty blockers, they raised concerns that appear to question the current health guidelines set by WPATH — which Bowers is slated to lead starting in 2022.

WPATH, for instance, recommends that for many gender dysphoric and gender non-conforming kids, hormonal puberty suppression begin at the early stages of puberty. WPATH has also insisted since 2012 that puberty blockers are "fully reversible interventions."

When I asked Anderson if she believes that psychological effects of puberty blockers are reversible, she said: "I'm not sure." When asked whether children in the early stages of puberty should be put on blockers, Bowers said: "I'm not a fan."

When I asked Bowers if she still thought puberty blockers were a good idea, from a surgical perspective, she said: "This is typical of medicine. We zig and then we zag, and I think maybe we zigged a little too far to the left in some cases." She added "I think there was naïvete on the part of pediatric endocrinologists who were proponents of early [puberty] blockade thinking that just this magic can happen, that surgeons can do anything."

I asked Bowers whether she believed WPATH had been welcoming to a wide variety of doctors' viewpoints — including those concerned about risks, skeptical of puberty blockers, and maybe even critical of some of the surgical procedures?

"There are definitely people who are trying to keep out anyone who doesn't absolutely buy the party line that everything should be affirming, and that there's no room for dissent," Bowers said. "I think that's a mistake."

<div align="center">✦   ✦   ✦</div>

Bowers is not only among the most respected gender surgeons in the world but easily one of the most prolific: she has built or repaired more than 2,000 vaginas, the procedure known as vaginoplasty. She rose to celebrity status appearing on the hit reality-television show "I Am Jazz," which catalogues and choreographs the life of Jazz Jennings, arguably the country's most famous transgender teen.

In January 2019, Jeanette Jennings threw her famous daughter a "Farewell to Penis" party. Over a million viewers looked in on guests feasting on meatballs and miniature wieners in the Jennings' Mediterranean-style Florida home. Family and friends cheered as Jazz sliced into a penis-

<div align="center">236</div>

shaped cake. The rather complicated upcoming procedure came to seem as little more than a Sweet Sixteen.

By that point, Jazz was already Time magazine's top 25 most influential teen, the co-author of a bestselling children's book and the inspiration for a plastic doll. She had served as youth ambassador to the Human Rights Campaign, and she had about one million Instagram followers. Hers was no longer just a personal story but an advertisement for a lifestyle and an industry.

On the day of the procedure — dutifully recorded for Instagram — Jazz's sister, Ari, teasingly wiggled a sausage in front of the camera. As Jazz was about to be wheeled into the operating room, she snapped her fingers and said, "Let's do this!"

The vaginoplasty she underwent is what surgeons call a "penile inversion," in which surgeons use the tissue from the penis and testicles to create a vaginal cavity and clitoris. With grown men, a penile inversion was eminently doable. With Jazz, it was much more difficult.

Like thousands of adolescents in America treated for gender dysphoria (severe discomfort in one's biological sex), Jazz had been put on puberty blockers. In Jazz's case, they began at age 11. So at age 17, Jazz's penis was the size and sexual maturity of an 11-year-old's. As Bowers explained to Jazz and her family ahead of the surgery, Jazz didn't have enough penile and scrotal skin to work with. So Bowers took a swatch of Jazz's stomach lining to complement the available tissue.

At first, Jazz's surgery seemed to have gone fine, but soon after she said experienced "crazy pain." She was rushed back to the hospital, where Dr. Jess Ting was waiting. "As I was getting her on the bed, I heard something go pop," Ting said in an episode of "I Am Jazz." Jazz's new vagina  — or neovagina, as surgeons say — had split apart.

❖      ❖      ❖

Gender dysphoria, which Jazz had suffered from since age two, is very real, and by all accounts, excruciating. For the nearly 100-year diagnostic history of gender dysphoria, it overwhelmingly afflicted boys and men, and it began in early childhood (ages two to four). According to the DSM-V, the latest edition of the historical rate of incidence was .01 percent of males (roughly one in 10,000).

For decades, psychologists treated it with "watchful waiting" — that is, a method of psychotherapy that seeks to understand the source of a child's gender dysphoria, lessen its intensity, and ultimately help a child grow more comfortable in her own body.

Since nearly seven in 10 children initially diagnosed with gender dysphoria eventually outgrew it — many go on to be lesbian or gay adults — the conventional wisdom held that, with a little patience, most kids would come to accept their bodies. The underlying assumption was children didn't always know best.

But in the last decade, watchful waiting has been supplanted by "affirmative care," which assumes children do know what's best. Affirmative care proponents urge doctors to corroborate their patients' belief that they are trapped in the wrong body. The family is pressured to help the child transition to a new gender identity — sometimes having been told by doctors or activists that, if they don't, their child may eventually commit suicide. From there, pressures build on parents to

begin concrete medical steps to help children on their path to transitioning to the "right" body. That includes puberty blockers as a preliminary step. Typically, cross-sex hormones follow and then, if desired, gender surgery.

The widespread use of puberty blockers can be traced to the Netherlands. In the mid-1990s, Peggy Cohen-Kettenis, a psychologist in Amsterdam who had studied young people with gender dysphoria, helped raise awareness about the potential benefits of blockers — formerly used in the chemical castration of violent rapists. Pharmaceutical companies were happy to fund studies on the application of blockers in children, and, gradually, what's called the Dutch Protocol was born. The thinking behind the protocol was: Why make a child who has suffered with gender dysphoria since preschool endure puberty, with all its discomforts and embarrassments, if that child were likely to transition as a young adult? Researchers believed blockers' effects were reversible — just in case the child did not ultimately transition.

Cohen-Kettenis later grew doubtful about that initial assessment. "It is not clear yet how pubertal suppression will influence brain development," she wrote in the European Journal of Endocrinology in 2006. Puberty is not merely a biochemical development; it is also "a psycho-social event that occurs in concert with one's peers," Doctor William Malone, an endocrinologist and member of the Society for Evidence Based Gender Medicine, told me. Hormones do not merely stimulate sex organs during puberty; they also shower the brain.

But at the very moment when Dutch researchers were beginning to raise concerns about puberty blockers, American health providers discovered it. In 2007, the Dutch Protocol arrived at Boston Children's Hospital, one of the preeminent children's hospitals in the nation. It would soon become the leading course of treatment for all transgender-identified children and adolescents in the United States. One of them was Jazz Jennings.

◆   ◆   ◆

In 2012, a surgeon implanted a puberty blocker called Supprelin in Jazz's upper arm to delay the onset of facial hair and the deepening of her voice, among other things. Without these conventional masculine features, it would be easier, down the road, for doctors to make her look more feminine — more like the budding young woman she felt she was deep inside.

At the time, doctors knew less than they do now about the effects of puberty blockers. "When you enter a field like this where there's not a lot of published data, not a lot of studies, the field is in its infancy, you see people sometimes selling protocols like puberty blockers in a dogmatic fashion, like, 'This is just what we do,'" Bowers told me.

Once an adolescent has halted normal puberty and adopted an opposite-sex name, Bowers said: "You're going to go socially to school as a girl, and you've made this commitment. How do you back out of that?"

Another problem created by puberty blockade — experts prefer "blockade" to "blockage" — was lack of tissue, which Dutch researchers noted back in 2008. At that time, Cohen-Kettenis and other researchers noted that, in natal males, early blockade might lead to "non-normal pubertal phallic growth," meaning that "the genital tissue available for vaginoplasty might be less than optimal."

But that hair-raising warning seems to have been lost in the trip across the Atlantic.

238

Many American gender surgeons augment the tissue for constructing neovaginas with borrowed stomach lining and even a swatch of bowel. Bowers draws the line at the colon. "I never use the colon," she said. "It's the last resort. You can get colon cancer. If it's used sexually, you can get this chronic colitis that has to be treated over time. And it's just in the discharge and the nasty appearance and it doesn't smell like vagina."

The problem for kids whose puberty has been blocked early isn't just a lack of tissue but of sexual development. Puberty not only stimulates growth of sex organs. It also endows them with erotic potential. "If you've never had an orgasm pre-surgery, and then your puberty's blocked, it's very difficult to achieve that afterwards," Bowers said. "I consider that a big problem, actually. It's kind of an overlooked problem that in our 'informed consent' of children undergoing puberty blockers, we've in some respects overlooked that a little bit."

Nor is this a problem that can be corrected surgically. Bowers can build a labia, a vaginal canal and a clitoris, and the results look impressive. But, she said, if the kids are "orgasmically naïve" because of puberty blockade, "the clitoris down there might as well be a fingertip and brings them no particular joy and, therefore, they're not able to be responsive as a lover. And so how does that affect their long-term happiness?"

Few, if any, other doctors acknowledge as much. The Mayo Clinic, for instance, does not note that permanent sexual dysfunction may be among puberty blockers' risks. St. Louis Children's Hospital doesn't mention it, either. Oregon Health & Science University Children's Hospital and University of California at San Francisco don't. Nor was there any mention of sexual dysfunction in a recent New York Times story, "What Are Puberty Blockers?"

Jack Turban, the chief fellow in child and adolescent psychiatry at Stanford University School of Medicine, wrote, in 2018: "The only significant side effect is that the adolescent may fall behind on bone density."

But lack of bone density is often just the start of the problem. Patients who take puberty blockers almost invariably wind up taking cross-sex hormones — and this combination tends to leave patients infertile and, as Bowers made clear, sexually dysfunctional.

On an episode of "I Am Jazz," Jazz revealed that she had never experienced an orgasm and may never be able to. But she remains optimistic. "I know that once I fall in love and I really admire another individual that I'm going to want to have sex with them," Jazz said at 16, in an episode that aired in July of 2017.

In the year after her operation, Jazz would require three more surgeries, and then defer Harvard College for a year to deal with her depression. In 2021, she opened up about a binge-eating disorder that caused her to gain nearly 100 pounds in under two years.

Jazz has insisted she has "no regrets" about her transition. (I reached out to Jazz for an interview and never heard back). But subjecting patients to a course of serious interventions that cannot be scrutinized — even by experts — without one risking being tarred as anti-trans seems unlikely to be in anyone's best interest.

Bowers told me she now finds early puberty blockade inadvisable. "I'm not a fan of blockade at Tanner Two anymore, I really am not," she told me, using the clinical name of the moment when the first visible signs of

puberty manifest. "The idea all sounded good in the very beginning," she said. "Believe me, we're doing some magnificent surgeries on these kids, and they're so determined, and I'm so proud of so many of them and their parents. They've been great. But honestly, I can't sit here and tell you that they have better — or even as good — results. They're not as functional. I worry about their reproductive rights later. I worry about their sexual health later and ability to find intimacy."

Bowers knows what the loss of fertility and sexual intimacy might entail: She has three children, all born before she transitioned, and she spent a decade tending to victims of female genital mutilation. "Those women, a lot of them experience broken relationships because they cannot respond sexually," she said. "And my fear about these young children who never experience orgasm prior to undergoing surgery are going to reach adulthood and try to find intimacy and realize they don't know how to respond sexually."

◆      ◆      ◆

In 2007, the year the U.S. began implementing the Dutch Protocol, the U.S. had one pediatric gender clinic, and it overwhelmingly served patients like Jazz: natal males who expressed discomfort in their bodies in the earliest stages of childhood. (At age 2, Jazz reportedly asked Jeanette when the good fairy would turn him into a girl. Jazz's own social transition did not appear to proceed from peer influence and predated social media.)

Today, the U.S. has hundreds of gender clinics. Most patients are not natal males, like Jazz, but teenage girls. I wrote a book about these girls, "Irreversible Damage," which was based on interviews with them and their families. Peer influence and exposure to trans influencers on social media play an outsized role in their desire to escape womanhood. Unlike the patients of the Dutch Protocol, who were screened for other mental health comorbidities, these young women almost always suffer from severe anxiety and depression or other significant mental health problems — and those problems are often overlooked or ignored.

When public health researcher and former Brown University Professor Lisa Littman dubbed this phenomenon "rapid onset gender dysphoria" in 2018, the university apologized for her paper and ultimately pushed her out. Activists called the hypothesis of a social contagion among teen girls a "poisonous lie used to discredit trans people."

But Littman's research about the sudden spike in teen girl trans-identification has become increasingly difficult to deny: A recent survey by the American College Health Association showed that, in 2008, one in 2,000 female undergraduates identified as transgender. By 2021, that figure had jumped to one in 20.

While both Anderson and Bowers pointed out that "ROGD" has yet to be accepted as a diagnosis, Anderson said: "At our clinic at UCSF, for two years now running, we're running two to one natal females to natal males." Two to one.

"As for this ROGD thing," Bowers said, "I think there probably are people who are influenced. There is a little bit of 'Yeah, that's so cool. Yeah, I kind of want to do that too.'"

Anderson agreed that we're likely to see more regret among this teenage-girl population. "It is my considered opinion that due to some of the — let's see, how to say it? what word to choose? — due to some of the, I'll call it just 'sloppy,' sloppy healthcare work, that we're going to have more young

adults who will regret having gone through this process. And that is going to earn me a lot of criticism from some colleagues, but given what I see — and I'm sorry, but it's my actual experience as a psychologist treating gender variant youth — I'm worried that decisions will be made that will later be regretted by those making them."

What, exactly, was sloppy about the healthcare work? "Rushing people through the medicalization, as you and others have cautioned, and failure — *abject* failure — to evaluate the mental health of someone historically in current time, and to prepare them for making such a life-changing decision," Anderson said.

I asked Bowers about the rise of detransitioners, young women who have come to regret transitioning. Many said they were given a course of testosterone on their first visit to a clinic like Planned Parenthood. "When you have a female-assigned person and she's feeling dysphoric, or somebody decides that she's dysphoric and says your eating disorders are not really eating disorders, this is actually gender dysphoria, and then they see you for one visit, and then they recommend testosterone — red flag!" Bowers said. "Wake up here."

*Abigail Shrier is the author of "Irreversible Damage," which the Economist named one of the best books of 2020. Read more of her work at her newsletter, The Truth Fairy.*

**If you appreciate our reporting, please support us by becoming a paid subscriber today:**

| Type your email... | Subscribe |

Wednesday, March 13, 2024

## Comments 230

Write a comment...

Steven N.   Oct 4, 2021

At 2 years old, Jazz did not experience gender dysphoria. Jazz's parents did.

♡ LIKE (231)   💬 REPLY   ⬆ SHARE

14 replies

ThinkPieceOfPie   Oct 4, 2021

They're not creating a vagina by inverting a penis, anymore than a surgeon is creating a younger person by performing a facelift. At best it's a facsimile, at worst it's a disaster--the necessity for follow up surgeries is very high, from 40-60%, with as noted, limited function. Of course, a child doesn't understand what is at risk when they are 2, or 4 or 11. As Abigail has written elsewhere, some of these adolescent girls having breast amputated & taking testosterone haven't had a first kiss.

♡ LIKE (196)   💬 REPLY   ⬆ SHARE

4 replies

See all comments

## Latest



3/13/24, 3:52 PM                    Top Trans Doctors Blow the Whistle on 'Sloppy' Care | The Free Press



**Union Lawyers Call Jewish Colleagues 'Deranged' and 'Fascist'**

FRANCESCA BLOCK and ELI LAKE

MAR 13      210      201



**A Right Royal Mystery**

OLIVER WISEMAN

MAR 13      0      1 comment



**Trump's TikTok Flip-Flop. A Weed Debate. Another Presidential Contender.**

OLIVER WISEMAN

MAR 13      208      247



**Don't Blame Legalized Weed for Society's Woes**

KATHERINE MANGU-WARD

MAR 12      31      78

# THE FREE PRESS

𝕏   ⧉   f   ⬜

Privacy · Terms · Collection notice
© 2024 The Free Press

242

 **abcNEWS**    VIDEO    LIVE    SHOWS    ELECTIONS    538    SHOP    ⋮⋮⋮    🔍    🔔    LOG IN    |    Stream on hu

# Alabama governor signs 'Don't Say Gay,' trans care and bathroom ban bills

Alabama is one of several Republican-led states backing such bills.

By **Kiara Alfonseca**

April 8, 2022, 6:37 PM

🌐  ✕  ✉  🔗

**Exhibit 0049**



**The Alabama State House building stands in Montgomery, Ala., June 7, 2012.**
Mickey Welsh/AP, FILE

In the latest salvo of legislation targeting LGBTQ youth, Alabama Gov. Kay Ivey has signed into law two bills banning transgender health care for minors and teaching about gender identity and sexual orientation in kindergarten through fifth grade.

The Alabama legislature passed the two bills focusing on transgender youth a day prior. SB 184 bans gender-affirming care, while HB 322 bans trans students from using bathrooms and locker rooms that align with their gender identity. HB 322 also limits LGBTQ content in classrooms due to a last-minute amendment.

SB 184, the Vulnerable Child Protection Act, states that anyone who provides gender-affirming care -- including puberty blockers, hormone therapy or physical gender-affirming surgeries -- to anyone under 18 could be convicted of a felony and face up to 10 years in prison and a $15,000 fine.

Several Alabama physicians has said the legislation is riddled with misinformation about how gender-affirming care actually affects children.

"When lawmakers attempt to practice medicine with a life without a license, they realize quickly that there was a lot more they didn't understand than what they thought they did," Morissa Ladinsky, an associate professor of pediatrics at the University of Alabama at Birmingham, previously told ABC News.



Jodi Womack holds a sign that reads "We Love Our Trans Youth" during a rally at the Alabama State Ho...                    **Show more** ⌄
Julie Bennett/Getty Images, FILE

For instance, the bill would ban minors from receiving gender-affirming "surgical procedures," but in Alabama, such surgeries aren't allowed until a patient reaches the age of legal majority for medical decisions, which is 19.

The legislation also makes the claim that puberty blockers can cause infertility or other health risks. According to Ladinsky, these potential side effects only present real risks after puberty and are not a risk to youth taking puberty blockers.

"I believe very strongly that if the Good Lord made you a boy, you are a boy, and if he made you a girl, you are a girl," Ivey said in a statement after signing the bill into law. "We should especially protect our children from these radical, life-altering drugs and surgeries when they are at such a vulnerable stage in life. Instead, let us all focus on helping them to properly develop into the adults God intended them to be."

---

MORE: Trans sports ban vetoed by Kentucky governor →

---

The bill's sponsor, Republican Sen. Shay Shelnutt, has called gender-affirming health care "child abuse."

"We don't want parents to be abusing their children. We don't want to make that an option, because that's what it is; it's child abuse. This is just to protect children," Shelnutt said Feb. 23 on the state Senate floor.

4/24/24, 10:56 PM                    Alabama governor signs 'Don't Say Gay,' trans care and bathroom ban bills - ABC News



Sen. Shay Shelnutt debates transgender bills during the legislative session in the senate chamber at th...      **Show more** ⌄
Montgomery Advertiser via The USA Today Network

Courtney Roark, the Alabama policy & movement building director for the youth-led reproductive rights nonprofit URGE, slammed the bill's passage as an attack on bodily autonomy for trans youth and their families.

"In yet another attack on our bodies, our autonomy, and our desire to live happy and healthy lives, Alabama politicians have passed and signed into law a bill that would criminalize doctors, principals, teachers, school counselors and nurses for providing gender-affirming care and support to trans and non-binary youth," Roark said. "Trans and non-binary youth in our state and across the country already face extraordinary barriers to accessing the liberated and joyous lives they deserve."

HB 322 would require students in public K-12 schools to only use bathrooms and locker rooms that correspond with their assigned sex at birth.

Alabama state Rep. Scott Stadthagen, the sponsor of the bill, said the bill does not target transgender students.

"Almost every school district in this state is dealing with this issue with opposite genders wanting to use opposite bathrooms," Stadthagen has said in debate. "I find this to be a safety issue. It is for protection of our students."

245



Debate on transgender bills is held during the legislative session in the senate chamber at the Alabama...

Montgomery Advertiser via USA Today Network

**Show more** ⌄

"Here in Alabama, men use the men's room, and ladies use the ladies' room -- it's really a no brainer," Ivey said in a statement. "This bill will also ensure our elementary school classrooms remain free from any kind of sex talk."

An amendment to this bill would also prohibit classroom instruction or discussion on sexual orientation or gender identity for students in kindergarten through the fifth grade in public K-12 schools. The language mirrors the controversial so-called "Don't Say Gay" bills popping up across the country.

Ivey took issue with that characterization, saying in a statement, "Let me be clear to the media and opponents who like to incorrectly dub this the 'Don't Say Gay' amendment: That is misleading, false and just plain wrong. We don't need to be teaching young children about sex. We are talking about five-year-olds for crying out loud. We need to focus on what matters – core instruction like reading and math."

---

MORE: Oklahoma, Arizona sign transgender sports bans into law →

---

LGBTQ suicide awareness group The Trevor Project condemned the passage of such bills.

"On likely the last day of Alabama's legislative session, lawmakers have added last-minute votes to push the most extreme anti-transgender agenda we've seen to date -- all within a matter of hours," said Sam Ames, director of advocacy and government affairs for The Trevor Project.

"These policies are not only cruel and unnecessary, they are unpopular among a majority of Americans," they continued. "Criminalizing doctors, isolating trans youth from their support systems and stigmatizing conversations around LGBTQ identity will only fuel more bullying, anxiety and suicide risk among these youth."

## Related Topics

4/24/24, 10:56 PM                    Alabama governor signs 'Don't Say Gay,' trans care and bathroom ban bills - ABC News

LGBTQ

**abc** NEWS

ABC News Network | About Nielsen Measurement | Children's Online Privacy Policy | Contact Us | Do Not Sell or Share My Personal Information | Interest-Based Ads | Privacy Policy |
Terms of Use | Your US State Privacy Rights
© 2024 ABC News

247