# EXHIBIT 123

**CULTURE WARS** | FEB. 7, 2016

# How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired

By Jesse Singal



Dr. Kenneth Zucker, a psychologist, is pictured at the Center for Addiction and Mental Health in Toronto in 2006. Zucker encourages children to be content with their gender. (Jim Ross/The New York Times) Photo: Jim Ross/The New York Times/Redux

On paper, Dr. Kenneth Zucker isn't the sort of person who gets suddenly and unceremoniously fired. For decades, the 65-year-old psychologist had led the Child Youth and Family Gender Identity Clinic (GIC), in Toronto, one of the most well-known clinics in the world for children and adolescents with gender dysphoria — that is, the feeling that the body they were born with doesn't fit their true gender identity. Zucker had built up quite a CV during his time leading the clinic: In addition to being one of the most frequently cited names in the research literature on gender dysphoria and gender-identity development, and the editor of the prestigious journal *Archives of Sexual Behavior*, he took a leading role helping devise diagnostic and treatment guidelines for gender dysphoric and transgender individuals. He headed the group which developed the DSM-5's criteria for its "gender dysphoria" entry, for example, and also helped write the most recent "standards of care" guidelines for the World Professional Association for Transgender Health — one of the bibles for clinicians who treat transgender and gender-dysphoric patients.

An impressive career, yes, but it's doubtful any of this gave him much comfort on December 15. That was when he was called in from vacation for an 8:30 a.m. meeting with his employer, the Centre for Addiction and Mental Health (CAMH), one of the largest mental health and addiction research hospitals in Canada. Given the long-brewing investigation of his clinic by the hospital, it's unlikely Zucker was feeling optimistic about what awaited him in downtown Toronto.

The GIC, which operates out of CAMH, pronounced "Cam-H," had been standing firm against a changing tide in the world of psychological treatment for children with gender dysphoria. The "gender-affirmative" approach, which focuses on identifying young transgender children and helping them socially transition — that is, express their gender to others through their everyday clothes, name changes, or other means — has been on the rise in recent years, and has become the favored protocol of many activists and clinicians. GIC clinicians, who saw clients between ages 3 and 18, had a much more cautious stance on social transitioning for their younger clients — they believed that in many cases, it was preferable to first "help children feel comfortable in their own bodies," as they often put it, since in the GIC's view gender is quite malleable at a young age and gender dysphoria will likely resolve itself with time.

Many activists see this approach as a rejection of young children's transgender identities, and Zucker as its regressive standard-bearer. As a result, the GIC had been tarred for years as a "conversion" or "reparative" therapy clinic — terms which conjure images of outfits operated out of backwoods shacks in the Bible Belt. Responding to what felt like a surge in this line of criticism from activists, CAMH had agreed in February of 2015 to commission an External Review that would evaluate the clinic's operations, and possibly, Zucker and his staffers knew, determine its future. CAMH had already taken actions suggesting that that future might be dim: In June of 2014, the hospital closed the GIC's approximately 80-family waitlist (for being too long, administrators said), and about two months before Zucker's vacation was interrupted, the clinic's only other full-time staffer, the psychologist Dr. Hayley Wood, was laid off on her first day back from maternity leave. (Wood declined to comment for this article.)

And now, the meeting: According to a source close to Zucker, he was met at CAMH by Christina Bartha, executive director of the hospital's Underserved Populations Program. She gave the psychologist a three-ring binder: the long-awaited External Review. Bartha instructed Zucker to read it in her presence, and to offer up any comments he had about it. Not far into the report, Zucker told Bartha that he had noticed a factual error. Bartha responded that the review would be posted on the hospital's website that afternoon, as-is — no changes. Zucker continued reading and saw that the reviewers had interviewed a handful of activists and clinicians who had claimed that the GIC was

engaging in conversion therapy; that photos were taken of patients without their consent and then disseminated; and that former clients said they felt traumatized and ashamed as a result of their time there. Then, Zucker got to a truly bizarre allegation: A former patient, at the time an adolescent transitioning from female to male who was seeking a sex-reassignment surgery referral, said that Zucker had asked him to take his shirt off, laughed when he had done so, and then told him, "You're a hairy little vermin!" The incident had never happened. Zucker looked at Bartha and, in disbelief, said something like, "So, you are going to post this on the website?" Yes, Bartha responded. Meaning that in a few hours, Zucker's many detractors would read about how he had cruelly mocked the body of a young trans person.

Zucker told Bartha there was no point in continuing the exercise. Sometime around 9:00 or 9:15, Bartha left, and she was replaced by a human resources staffer who informed Zucker that he was fired, effective immediately. He was told it wouldn't be a good idea for him to retrieve his coat and keys from his office — someone would grab them for him. Zucker was presented with materials on how to find a new job, and that was that. (Zucker's attorney, John Adair, confirmed this account of his dismissal, while a CAMH spokeswoman and Bartha didn't respond to a request for comment. Through Adair, Zucker otherwise declined to comment for this article.)

For transgender activists in North America and around the world, the ouster of one of their biggest enemies in the field of mainstream sex research was a spectacular victory. Sweeter still, they found out later that day that CAMH would be "winding down" the GIC entirely, with an eye toward eventually retooling and reopening it with input from its critics. Years of activism, years of hearing and telling stories about what Zucker's clinic did to vulnerable, gender-questioning young people, had finally paid off. The activists had won what seemed like a satisfying end to a simple, sad story. "Infamous Reparative Therapy Clinic For Transgender Youth Set To Close" trumpeted ThinkProgress. "Hooray! A Big, Bad Conversion Therapy Clinic For Trans Youth In Canada Is Shutting Down," went the MTV headline. Good prevailed over evil, in other words. Those innocent children would never suffer again.

Zucker, his colleagues, and their many allies in the world of academic sex research see things differently. To them, the real scandal here is how CAMH responded to a sustained campaign of political pressure: by allowing a vital scientific question — vital not only to gender-dysphoric and transgender young people, but to anyone who is a parent or will one day become one — to be decided by activists on the basis of flimsy, anonymous allegations. They think the activists' claims about the clinic are unfounded, and argue that the controversy has more to do with adult agendas than with genuine concern for gender-dysphoric children and youth. As Dr. Jack Drescher, a psychiatrist with a research focus on gender-identity issues, explained in an email, this fight resembles many other culture-war battles: "[C]hildren serve as proxies for the competing value systems of adults." Indeed, some parents of GIC patients feel that as a result of the clinic's closing, their children have been cut off from a place that was — despite rumors to the contrary — a safe, nurturing environment for young people to explore their emerging gender identities.

The External Review, Zucker's allies believe, was just a sloppily executed pretense for submitting to political pressure. "There was likely a desire on the part of the [CAMH] administration to close the clinic, and the review was designed to allow them to do just that," wrote Dr. Susan Bradley, who founded the GIC in 1975 before handing the reins over to Zucker about a decade later, in an email.

And if you look closely at what really happened — if you read the review (which CAMH has now pulled off of its website), speak with the activists who effectively wrote large swaths of it, examine the scientific evidence, and talk to former GIC clinicians and the parents of patients they worked with, it's hard not to come to an uncomfortable, politically incorrect conclusion: Zucker's defenders are right. This was a show trial.

\*\*\*

3

In 2016, there's fairly solid agreement about the proper course of treatment for otherwise healthy, stable young people who have persistent gender dysphoria, and who are either approaching puberty or older than that: You help them transition to their true gender. The process is different from person to person, but for an 11-year-old, it might include a round of puberty-blocking hormones to prevent the development of secondary sex characteristics and buy time to figure out the best course of transition, followed by the administration of male or female hormones, and, later on, possibly sex-reassignment surgery or surgeries.

With kids who are still years away from the onset of puberty, though, there's a charged controversy about what's best. That's because here, two seemingly conflicting truths collide: Trans people deserve to have their identities recognized and respected; and research suggests that most gender-dysphoric kids will, in the long run, end up identifying as cisgender. In other words, a sizable percentage of them aren't transgender in the same, usually permanent way trans adults are.

Clinicians who work with gender-dysphoric kids operate on unsteady ground, then. Do you accept the idea that many young kids really *are* trans, or assume that their dysphoria is likely to dissipate as they grow older? At the moment, the prevailing trend is toward the former, which is known as a "gender-affirmative" approach (the GIC's approach doesn't really have its own name). The basic idea is that it's important to identify trans kids at a young age and provide them with a relatively seamless path toward a social transition. "When it comes to treating kids who have reached puberty and beyond, there aren't that many differences in the way we practice," said Dr. Diane Ehrensaft, director of Mental Health and founding member of the Child and Adolescent Gender Center in San Francisco, and a leading practitioner of the gender-affirmative approach. "But when you back up to children who haven't reached puberty, we part ways completely."

There's *some* agreement. Everyone thinks, for example, that kids can get confused about the difference between gender identity and gender expression. A boy might wrongly decide that since he doesn't like football and girls also don't like football, he must be a girl. Dr. Johanna Olson-Kennedy, who works at Children's Hospital Los Angeles and is another leading gender-affirmative clinician, said that sometimes interviews with new gender-questioning clients reveal, pretty quickly, that they aren't trans. "And it's clear, it's clear," she said. "I think that once you see hundreds and hundreds of kids you get a feeling for kids that are and kids that aren't."

So to Olson-Kennedy and other like-minded clinicians, some kids *are* expressing a deep-seated identity that needs to be affirmed. How do you make this vital distinction? The gender-affirmers have a key phrase: if a child is "insistent, persistent, and consistent" in signalling over an extended period that they were assigned the wrong gender at birth, that's a strong indication they're transgender. And to Ehrensaft, the *way* children express this can also offer valuable clues: There's a meaningful distinction between a natal (biologically male) boy saying "I *am* a girl" as opposed to "I *wish* I were a girl." Kids who are actually trans, in Ehrensaft's view, are also "not happy with the bodies they have and are distressed that God got it wrong or their parents got it wrong." "That's just a profile," she said. "It's not set in stone. But it's a profile, the indicators that this child is transgender, not just uncomfortable with the gender mores of the culture."

GIC clinicians, on the other hand, believe that statements about gender identity have important diagnostic value in understanding a child, but *aren't* solid evidence of a stable underlying gender identity — though it depends a bit on age. All else being equal, the younger a kid is, the less solidified their gender identity is and the less face-value information their statements about it convey.

In a 2012 *Journal of Homosexuality* article, Zucker and his colleagues described their approach as "A Developmental, Biopsychosocial Model for the Treatment of Children with Gender Identity Disorder," referring to the DSM-IV's name for the condition now known as gender dysphoria. You might notice that that this mouthful of a description tilts pretty heavily toward the nurture side of the nature-nurture equation. That's because the authors believe that messages from family, peers, and society do a huge amount of the work of helping form, reinforce, and solidify gender identities, and that at young ages these identities tend to be quite malleable. There's great potential for confusion. A young boy might notice his new baby sister getting more attention than he is, and start dressing like a girl in a bid to be noticed. His parents, not knowing what to do, might go along with this, inadvertently reinforcing the notion that he's a girl — a notion which, according to the GIC model, probably doesn't come from a deep-seated kernel of gender identity, but rather mostly from social reinforcement and family dynamics.

GIC clinicians, then, put much less faith in the linguistic clues that Ehrensaft and others view as meaningful, and much more in the power of external influences to spark or contribute to childhood gender dysphoria — even gender dysphoria that is, well, insistent, persistent, and consistent. "Sometimes it will take years for gender dysphoria to resolve and for kids to be able to look back and say it doesn't fit anymore," one former GIC clinician, who didn't want to be named, told me. "My sample size is not huge, but I've had many kids who have been quite insistent and have felt as though it" — meaning a transgender identity — "didn't fit within several years."

Since from the standpoint of GIC clinicians it was not always straightforward to ascertain the factors contributing to gender dysphoria, the assessment process there was rather comprehensive — usually three visits entailing in-depth psychological evaluations of patient and parents alike. Parents were sometimes encouraged to tweak family tendencies and habits that could be contributing to their child's distress, which ruffled some feathers. (The idea that a child with gender dysphoria even *needs* a full psychological examination is now seen as inappropriate by some.)

In defending their approach, Zucker and his colleagues point frequently to the small but consistent body of research suggesting that something like three-quarters of children with gender dysphoria will "desist" — they'll eventually come to feel comfortable with their natal gender (and will also, relative to the general population, have an increased likelihood of eventually identifying as gay or bisexual). Some trans activists have howled at this claim — they believe that desistance is a transphobic myth entirely. But while these activists (and some researchers)* have tried to poke holes in the consistent findings about gender-dysphoria desistance, they just haven't come up with scientifically convincing explanations for why the studies would all be wrong, and all in the same way. (Some skeptics argue that these studies lump in many kids who aren't *that* gender dysphoric and who therefore weren't going to become trans anyway, but that's just not true, especially when it comes to the more recent samples.)

Because of all of this, the GIC operated from a fundamentally different stance than its gender-affirmative counterparts. All else being equal, clinicians there viewed it as preferable for a child to become comfortable with his or her natal gender rather than for them to socially transition, since once a social transition is underway, it becomes self-reinforcing — children naturally respond to the messages they get from parents and peers and society. If the child was probably going to desist anyway, why nudge them prematurely toward accepting a cross-gender identity? "There are clinics in Britain, Germany, France and in the US who follow a similar approach," Bradley, the GIC's founder, said in an email. "We may have been one of the oldest and largest." That said, the GIC did frequently help patients, particularly older ones, transition to and live as their felt gender, providing a wide range of services that included hormone referrals. (In discussing this controversy, I'm oversimplifying a bit, leaving out a middle-ground approach known as "watchful waiting." The basic idea is to take a more passive role, to attempt to simply observe a child's developing preferences and behavior in a supportive manner rather than intervene. The GIC clinicians I spoke with questioned this idea on a basic conceptual level, because to them it implies a false neutrality. If your child insists on

dressing up as a girl every day, and you "watchfully wait" by allowing them to continue to do so, they believe you're effectively reinforcing the behavior. "What does that even mean?" asked Dr. Allison Owen-Anderson, a psychologist at the Toronto District School Board who spent 10 years at the GIC as a student and full-time staff psychologist, of this approach. "How do they operationalize 'watchful waiting'? People need to answer questions" about how to respond to their children, she said.)

GIC clinicians were wary of too-early transitions in part because they might necessitate later *de*-transition back to a child's natal gender. This marks another point of significant disagreement with many gender-affirmers. Ehrensaft and Olson-Kennedy both reject the idea that there's much downside to this. "Everybody seems very anxious" about de-transitioning, said Ehrensaft, but there's no irreversible medical intervention that early on, anyway — it's just nail polish, clothes, and stuff like that. "We don't have any data to indicate that that would necessarily be problematic," she said. "What we do have data to indicate is, what makes it difficult if kids change their mind is the social reaction to that."

That's a distinction GIC clinicians don't recognize. "I totally disagree with that," said the anonymous former clinician of the idea that de-transitioning isn't a big deal. When kids socially transition, she explained, their parents not only become their champions to teachers and other parents, but also often start engaging in trans advocacy that comes to define them in important ways. If the child starts to sense that their dysphoria is desisting, they're faced with either sticking with a gender identity that no longer feels like it fits or telling their parents, as the clinician put it, "This whole life that you've created for yourself as an advocate, I don't want to be part of that anymore." There's also, of course, the fact that schools and family members are part of the process too, so de-transitioning requires notifying *them* as well. In this view, a too-early transition really might limit a child's future options because of the social or familial costs of transitioning back. And eventually, as a kid gets older, the prospect of nontrivial medical procedures to help them physically transition enters the picture.

So how did the GIC attempt to help kids feel more comfortable with their bodies? Owen-Anderson explained that the expression/identity dichotomy was key. If a boy "didn't like rough and tumble [play] … and really enjoyed playing with sort of stereotypically feminine toys, and there seemed to be a real rigidity around that — so that means *I need to be girl* — then that wasn't conceptualized as healthy," she said. "It's a black-and-white, concrete viewpoint." In cases like these, the therapist would help the child better understand the shades of gray: What you *do* doesn't necessarily dictate who you *are*. For younger clients, play therapy was the backbone of these efforts. "It wasn't clinician-directed, what the kid should be thinking or doing," said Owen-Anderson. "It was question-asking around how to explore those aspects, but also allowing the child to lead, to see where they led you in terms of exploring their internal world through play."

Honest critics of the GIC wouldn't disagree with any of these practices, which formed a sizable chunk of the clinic's activities. What they did disagree with, and rather vehemently, was the fact that Zucker and his colleagues would sometimes work with parents to try to nudge kids to play with a wider range of toys, find like-minded peers of the same gender rather than only hang out with children of the other gender, or spend less time wearing certain types of clothes. To Owen-Anderson and other former GIC clinicians, such "limit-setting" goes back to the question of rigidity and self-reinforcing behavior. If a little kid decides that since he is gentle and enjoys playing with dolls, he must be a girl, and then his parents allow him to only dress like a girl and exclusively play with other girls, that identity is going to reinforce itself. Limits helped prevent this rigidity from setting in, went the thinking. (It's important to note that in many cases, particularly ones where children had already socially transitioned by the time they arrived at the clinic, Zucker and his colleagues didn't utilize this approach at all.) GIC clinicians told me that one common limit-setting approach would be to work with parents to help a gender-dysphoric boy find other gentle, less aggressive boys to hang

out with, rather than spend all his time with girls. And a GIC parent told me that when she explained to GIC clinicians that her little boy was obsessed with a Barbie book and insisted it be read to him at every bedtime, they suggested a new routine of reading him that book, and then reading him another book after.

Countless critics have argued that what went on at the GIC was far more draconian than this — one activist, for example, claimed that according to GIC protocol, "parents must shame or punish feminine boys who play with dolls, make art using pink or purple colors, draw pictures of girls, or seek out girls as playmates." But if you look around, there's little solid evidence of this. One of the only accounts I found that came anywhere close to describing such a strict approach was a 2008 NPR story in which the reporter, Alix Spiegel, explained that Carol, the mom of a young natal male GIC patient obsessed with "girl" toys, was given firm instructions by Zucker:

> [T]o treat Bradley, Zucker explained to Carol that she and her husband would have to radically change their parenting. Bradley would no longer be allowed to spend time with girls. He would no longer be allowed to play with girlish toys or pretend that he was a female character. Zucker said that all of these activities were dangerous to a kid with gender-identity disorder. He explained that unless Carol and her husband helped the child to change his behavior, as Bradley grew older, he likely would be rejected by both peer groups. Boys would find his feminine interests unappealing. Girls would want more boyish boys. Bradley would be an outcast.
>
> Carol resolved to do her best. Still, these were huge changes. By the time Bradley started therapy he was almost 6 years old, and Carol had a house full of Barbie dolls and Polly Pockets. She now had to remove them. To cushion the blow, she didn't take the toys away all at once; she told Bradley that he could choose one or two toys a day.

Bradley responded to this all, Spiegel reported, in a heartbreaking way: by hoarding his dwindling supply of girl-toys everywhere he could, and drawing photos of the "toys and interests he no longer had access to." It sounds bad, but Carol herself now doesn't think this story accurately captures her GIC experience, which she speaks of glowingly (more on this later). "I don't know where we would be without Dr. Zucker," she told Science of Us.

To the clinic's most ardent detractors, it doesn't necessarily matter whether or not the limits were absolute, anyway. Many of them believe that even moderate limit-setting with regard to gendered activities, dress, or peers could traumatize children by interfering with their expression of their gender identity. Naturally, former GIC clinicians dispute the idea that they were harming their clients. "A child not wanting something nice to end is not the same as being traumatized by it," wrote Dr. Devita Singh, a clinical psychologist whose dissertation (PDF) was based on her time at the GIC and tracked the long-term outcomes of former patients there, in an email. "A parent would not simply extend the amount of time a child spends watching TV simply because the child is upset, especially if the parent is making that decision in the best developmental interest of the child."

Critics of the clinic find such comparisons offensive. Failing to affirm a child's gender identity, they argue, is a vastly different — and more serious — act than telling them they can't watch TV or wear a dinosaur costume to school. GIC clinicians view this as a conceptual error: The critics are conflating sexual *orientation* — which can't be changed, which is part of the reason we view attempts to mess with it it as unethical — and gender *identity*, which they say isn't some hardwired thing, but is instead formed from a variety of factors. "You're not born with a certain gender identity," said Owen-Anderson, "so it's not as though it's an expression of some innate factor." Ehrensaft and Olson-Kennedy disagree: Both think that even very young kids have a *real* gender identity inside them, though the two clinicians differ on the specifics. (There isn't any solid scientific evidence to support this view, though that doesn't preclude future discoveries, of course.)

So Zucker and his colleagues can't even agree with their critics on basic terms and definitions — on what a "reparative therapy" accusation even *means* in the context of childhood gender identity. Had CAMH decided to investigate all this in an open-minded, careful, scientifically informed way, and had the hospital done so transparently, it would have benefited everyone.

That wasn't what happened.

\*\*\*

It isn't entirely clear why activists' efforts to shut down the GIC and oust Zucker came to a head last year, but it was likely a confluence of factors. In January of 2015, a group from Rainbow Health Ontario, an influential local LGBT organization, brought their concerns over the GIC's practices to CAMH. On January 14, 2015, *NOW* magazine published an article by Jake Pyne, a trans activist and scholar who helped lead the charge against the GIC — he would later be interviewed by the co-authors of the External Review, and was also present at the meeting with Rainbow Health — that connected the GIC's practices to the high-profile, then-recent suicide of Leelah Alcorn, a 17-year-old trans woman who had been exposed to religiously oriented reparative therapy. There was also at least one online petition calling for Zucker to be fired (there had been others in the past), as well as further anti-GIC activism surrounding Bell Canada's annual Bell Let's Talk mental health awareness-raising event in late January. And in the summer, Ontario passed Bill 77, legislation that made it illegal to "provide any treatment that seeks to change the sexual orientation or gender identity of a person under 18 years of age." Although language exempting "services that provide… facilitation of a person's coping, social support or identity exploration or development" was inserted into Bill 77 and likely would have shielded the GIC from possible legal jeopardy, coverage of the legislation's debate and passage still helped spread allegations about the clinic.



Singh and Zucker at the 2011 International Academy of Sex Research conference in Los Angeles.

Whatever the causes, the climate was getting heated, and that might partially account for the gap between the February 5 announcement of the review and its commencement in June. Bradley, the GIC founder, said that at one point Dr. Peter Szatmari, a CAMH administrator and a consultant to the External Review, told her CAMH couldn't find people willing to serve on it, which Bradley took to mean that "it was too politically charged."

Eventually, CAMH tapped the psychiatrists Dr. Suzanne Zinck from Halifax and Dr. Antonio Pignatiello, who is Toronto-based. Those in the Zucker camp maintain that neither was sufficiently qualified to conduct a comprehensive review of the GIC. In a letter written by ten leading sex and gender researchers and eventually signed publicly by hundreds more and then sent to the CAMH Board of Trustees, the authors note that Zinck and Pignatiello have "no track record of empirical studies or other serious scholarship in childhood gender issues." Though it's an admittedly crude metric, Google Scholar appears to support this critique: A search for "'Kenneth Zucker' gender dysphoria" returns about 364 hits; similar searches for Zinck and Pignatiello return one and zero, respectively.

Whether or not the External Review's authors had the requisite expertise to do their jobs well, the review itself wasn't in-depth. According to the document, Zinck and Pignatiello spent about eight hours interviewing people — time spread among Zucker and his staffers and trainees, their colleagues elsewhere at CAMH, former patients and parents, and activists. There's no sign they observed any actual therapy sessions, and in a brief phone interview, Pignatiello confirmed to me that neither he nor Zinck contacted any of the eight GIC-sympathetic experts Zucker suggested to them.

The consensus among those who know Zucker is that while he's a gifted clinician and researcher, he isn't great at playing politics. He is, well, an old-school white male research scientist: "He responds to every question with a methodical three-part answer," noted Hanna Rosin in a 2008 article in *The Atlantic*, "often ending by climbing a chair to pull down a research paper he's written." Over the summer of 2015, more than one friend and colleague tried to explain to Zucker that he needed to defend himself more assertively (though he was in part stymied from doing so by a restrictive CAMH media policy). But while Zucker may lack certain self-preservation instincts, or may have wrongly believed his perch atop the sex-research hierarchy afforded him protection from activist pressure, a close reading of the External Review suggests none of this really mattered at that point. The review is a markedly unprofessional document that takes many of the worst claims about the GIC at face value — without bothering to check them.

\*\*\*

The most spectacular allegation found its way into the review via Pyne, who had remembered hearing it from "Adam," a trans man in his mid-30s. Pyne asked Adam if he'd be willing to talk to the reviewers, and Adam emailed his story about being called a "hairy little vermin" to Zinck in July. Pyne put me in touch with Adam, and we spoke about what he had gone through. He said the incident took place in the late 1990s, when he was about 17 or 18, toward the end of the process of determining whether he'd get a referral for sex-reassignment surgery (he wrote to Zinck that the incident had taken place about a decade ago, but he told me he was more confident that it had happened in the late 1990s). His account was peppered with specifics: that he had met with a staff psychologist, that he'd had to provide proof of "real-life experience" — documentation that he'd already been living as a male for some time — and that he'd dealt with a frustratingly rude receptionist at the clinic. He remembered the full names of the psychologist and the receptionist.

Adam told me that when he walked into a room to find out about his referral, Zucker and others were there — "Doctors, researchers, who knows?" he said. Zucker quickly asked him to take off his shirt, and Adam, confused by the request but understanding that the clinician making it held great power over his future, complied, at which point Zucker laughed and called him a "hairy little vermin."

As Science of Us reported two weeks ago, various details of Adam's account indicated that he couldn't have actually been victimized by Zucker. For one thing, the staffers he mentioned never worked in Zucker's clinic. For another, the scenario itself never would have happened, since Zucker's clinic never made surgery referrals (it did refer patients to the Adult Gender Identity Clinic at CAMH, which could later on refer them for surgery). Nor would a patient at Zucker's youth clinic have been asked to provide proof of (adult) real-life experience.

Eventually, Adam and I were able to determine that it had likely been a different clinician elsewhere who had made the offensive remark, though at first Adam was unsure and maintained that maybe it had been Zucker after all. The *eureka* moment came during an improvised photo lineup. At one point I sent Adam a recent photo of "Smith," the clinician who was the more likely culprit, without telling him who it was, renaming the file to avoid any giveaways. I asked Adam to open the attachment and tell me his reaction.

It was instantaneous. "Oh my gosh!" he said. "That second photo right there? Oh my God. Oh my God. Sorry. Yeah. Holy shit. Holy shit. Hold on, hold on. Why is that — oh my God. I, I, I feel — who is this, this one in the second photo? I feel like this is the guy." I told him it was Smith. "That's [Smith]? Okay, then it must have been [Smith]. Yeah, it was this man." Given Adam's inaccurate accusation of Zucker, I'm leaving certain details vague here to protect the identity of that other clinician (with whom I was unable to get in touch). But Adam is now sure that it wasn't

Zucker who made the offensive remark to him, and said he was planning on sending CAMH a note letting them know he had erred, though he didn't respond to a follow-up email asking him if he had.

All it took to debunk Adam's inflammatory claim was to listen to his story; almost immediately, details popped out that would have raised red flags for anyone familiar with the GIC. Some of those details, such as the name of the staff psychologist who didn't work with Zucker and the surgery-referral context, were in the very email Adam sent Zinck — he forwarded me her thank-you note and his email was beneath it. But the reviewers, Adam said, "did not go into it, they did not ask me questions, they did not contact me further" other than sending the thank-you note. (The surgery-referral reference also should have jumped out at anyone who read the External Review and was familiar with Zucker's clinic.)

----- Forwarded Message -----
**From:** "Zinck, Suzanne" ███████████████████████
**To:** ███████████████████████
**Sent:** Thursday, July 30, 2015 9:55 AM
**Subject:** Re: my experience at the gender clinic

Dear Mr. ████████

Thank you for the written submission describing your experiences at the Child &
Youth Gender Identity Clinic  at what is now CAMH.  I have shared your
submission with the other reviewer.  This information will be in summary in the
report and your confidentiality will be maintained.

Sincerely,

Suzanne Zinck, MD, FRCPC

On Jul 21, 2015, at 12:17 PM, ████████████████████████████
wrote:

> Hello Suzanne,
>
> I Hope this day finds you well!
>
> I am writing about my experience at the gender clinic.
> Approximately 10 years ago I went to the gender clinic at CAMH.  I
> met and had appointments with a few people including ████████████
> and Dr. Zucker and someone else.  At my final appointment where I
> was in I think Dr. Zuckers office  where I was about to find out if I got
> the approval,I went in and 3 people were there.  I recall Dr. Zucker
> asking me a few questions then him asking me to take my shirt off
> and when I did he laughed and said "you're a hairy little vermin!"
> Then he asked me if I wanted to know if I got the approval and then
> like as if it was a game he said it in a "playful" yet completely
> unprofessional manner " "goooing once gooooing twice aaaaand
> you got it!" I was anxious and just wanted to get out of there even
> though I was happy with my approval even though at that time they
> were not paying for it but putting people on a list in case it was re
> enlisted(also which Dr. Zucker said he didn't think it would ever get
> re enlisted /paid for by the Ontario government ever again). I felt
> weird and bothered about the indecent. Looking back now I now
> realize how inappropriate, hurtful, and unprofessional this was.   I
> just wanted to take the time to share this with you.  Thank you in
> advance for reading this.  If you have any questions feel free to
> contact me.
>
> Thank you,
>
> ████████████

The letter from Adam to Zinck.

This all may prove legally problematic for CAMH administrators or for the review's authors. "Under Canadian law it
may not be a sufficient defence to say that a defamatory statement was simply an 'allegation'," Peter A. Downard, a

senior counsel at the Toronto office of the Fasken Martineau law firm and a defamation expert, said in an email. If a court determines the claim "caused actual harm ... the defence will have to have a different and better answer." In that case, the defendants would have to prove that "reasonable steps to verify the accuracy of the defamatory statement [were taken], and that the defendant was fair to the person defamed, for example, by giving them an opportunity to comment." According to Downard, "[i]f a court is not satisfied on those points, everyone who participated in the publication may have liability exposure."

This possible libel is the most serious single problem with the External Review, but it's just one of many. It simply does not read, at any point, like a serious attempt to evaluate the Gender Identity Clinic, and it is riddled with sloppiness. From very early on, there are simple errors — CAMH's legal counsel is described as "Kristen Sharpe" four times in the document, when her actual name is Kristin Taylor, and the reviewers note that the clinic has been around for "approximately 30 years" when it was actually founded more than 40 years ago, in 1975. More importantly, Zinck and Pignatiello quote Zucker as stating that "70% of the children we see are sub-threshold for [gender dysphoria]." Whether Zucker misspoke or the authors mistranscribed, this is exactly backwards — 70 percent of the children at the GIC *did* meet the clinical criteria for the condition (a statistic mentioned in the 2008 article and confirmed to me by former GIC clinicians). If the reviewers believed that just 30 percent of them met the criteria — they didn't respond to an email about this — that would imply they fundamentally misunderstood what the clinic did and why it was treating most of its patients at all.

There's also a striking dearth of patient or parent voices. The GIC assessed more than 1,350 kids and adolescents in its decades of existence, a former clinician told me — tossing in a conservative estimate of parents, that's a pool of at least 2,600 patients and parents the reviewers could have drawn from to get firsthand accounts. Yet Zinck and Pignatiello appear to have spoken in person with just nine or ten GIC patients or parents, total — the in-person section of the External Review isn't written clearly enough for the number to be certain, but it's probably nine. They also corresponded with two more (only one an actual patient, we now know), for a total of 11. The seven parents Zinck and Pignatiello interviewed, as well as one teen former client, "only had positive feedback to give," though no specifics are provided in the report. Other than Adam's, there were only two complaints: A patient claimed Zucker said they were "too smart to be trans" — Zucker's lawyer declined to comment — and a parent said she felt dismissed by Zucker and that he didn't connect her to other resources.

Despite the near-absence of *verifiable* complaints, the document is larded with serious second-hand accusations delivered via Zinck and Pignatiello's interview subjects — the sorts of charges which aren't normally tossed about casually given that they can lead to potentially serious professional censure, or even legal action. In the review, anonymous clinicians who say they've worked with former GIC patients claim that many of those former patients "report traumatic experiences related to their assessment and have persistent, internalized shame about their gender identity and desires to express it that are related to their treatment"; that GIC clinicians performed cognitive and psychological testing without obtaining proper consent; and that they took photos of patients without consent, and, in one case, displayed photos of a client's painted nails at a transgender health conference. There's no evidence any of these claims were fact-checked — neither CAMH nor Zinck and Pignatiello responded to my emails asking about this, and according to two attendees at a recent internal CAMH meeting, an administrator there told staffers that the hospital did not think it would be appropriate to fact-check any of the report's claims given that it was conducted independently. And because CAMH insisted that many participants in the review be rendered anonymous, the claims feel watered-down: Zinck and Pignatiello are reporting that an anonymous clinician reported that an anonymous former patient reported that... (According to Pignatiello, the final version of the document they sent in was published on the website untouched by CAMH. There had been one or more prior rounds of edits starting around

late August, but he said those mostly involved CAMH's requests that many names be redacted, and that the hospital didn't try to intervene editorially beyond that).

Some of the accusations in the review may not even *be* accusations in the light of full context. The authors highlight that a patient-chart review "revealed a 9 year old patient being asked about what made him sexually excited during his... initial assessment," implying that this was inappropriate since the patient was in foster care and had experienced trauma. But oftentimes, foster homes and group homes would refer to the clinic young children who were exhibiting sexualized behavior. "We would never vaguely ask a child that age about their 'sexual fantasies,'" explained Owen-Anderson in an email, but there might be clinical reasons to ask a child why he or she had become aroused in a specific situation. The reviewers also criticize the GIC for using one-way mirrors — a standard practice in teaching hospitals that other CAMH clinics and offices continue to engage in.

In addition, Zinck and Pignatiello write that "the clinic's standardized assessment includes play therapy to assess and treat any anxiety and/or depression symptoms," and later criticize the GIC's use of play therapy as a means of treating anxiety. But several former GIC clinicians claimed that here the reviewers are flubbing two details about how the clinic operated. "I think assessment and therapy are being conflated by the reviewers," wrote Singh in an email. She said that play therapy "was not used as part of the assessment process," meaning the initial, in-depth assessment which often led to a slate of regular therapy sessions. And according to Owen-Anderson, while play therapy "was used as a way to explore a child's inner world" during regular sessions, it was simply "never used to treat anxiety." GIC clinicians did, of course, often employ other methods to help patients deal with anxiety (including by prescribing medication, in some cases).

Zinck and Pignatiello lay their cards on the table toward the end of the External Review: "The GIC's therapeutic focus on 'understanding why' someone is the way they are, is described by former patients, current therapists of former clients and parents as 'disturbing' and 'harmful'. One participant described that being told by a clinician that there is a need for ongoing treatment or assessment to 'understand why you are the way you are' is problematic in and of itself." This is in the section summarizing *their* concerns based on their interviews and research: Two professional psychiatrists are concerned that it's harmful or improper to help patients in a mental-health clinic understand why they are the way they are.

Finally, on the accusation that has clung to the GIC for years, Zinck and Pignatiello write that "We cannot state that the clinic does not practice reparative approaches (if not outright therapies) with respect to influencing gender identity development." They don't bother to explain how reparative therapy would even be defined in this context, which seems crucial given the bedrock debate over gender-identity development. The charge is left unresolved — but in a way which still *suggests* malfeasance — and not treated with an iota of the gravity it deserves.

\*\*\*

When CAMH found out that the most serious allegation in its External Review was false in late January, it responded by yanking the review offline but replacing it with a "Summary" of the document in which some of the potentially defamatory claims are excised. In one instance, the summary appears to retroactively alter one of the External Review's conclusions to make it more credible-sounding. The initial document noted that "The clinic was developed over 30 years ago, when play therapy was a dominant assessment and treatment modality in child and adolescent mental health clinics in North America and parts of Europe. The research knowledge and clinical guidelines have evolved and society's understanding and acceptance of the diversity of gender expression and identity have changed, but GIC's approach has not." In the Summary, that rather serious allegation of ossification is softened significantly:

"Research knowledge and clinical guidelines have evolved, particularly in the last five years." Nowhere in the original document is there any mention of a five-year period. And more importantly, nowhere in the Summary is it noted that the document being summarized was pulled offline for leveling a false accusation.

Even before Science of Us debunked the "hairy little vermin" claim, CAMH was attempting to de-emphasize the review's importance. Last month, I asked Kwame McKenzie, the hospital's Medical Director of Underserved Populations and the administrator who has been the public face of the decision to shut down the GIC, to explain a very confusing chart in the document that seems to accuse the GIC of potentially engaging in "reparative-type" activities, but in such a vague way that it's hard to understand what's going on. He said he wasn't sure what the chart meant, but suggested it was time to move on from the External Review. "You're trying to understand the chart in detail, and we're all moving on and trying to do something else," he said, telling me he'd check to see if the reviewers themselves had time to decrypt the chart for me (I never heard back). He said the review was "just one piece of advice. We have lots of other pieces of advice and experience that we use to make a decision."

One person who did seem to think the External Review was quite important was, well, McKenzie himself a couple months ago. The CAMH press release published December 15 started with the sentence "CAMH is announcing plans to change the gender identity services it provides to children and youth, following an independent clinical review of its Child Youth and Family (CYF) Gender Identity Clinic released today," and included an apology from McKenzie to the community. "As a clinician and also as a parent, hearing those sorts of comments and reading those sorts of testimonies is quite disturbing," McKenzie told Daily Xtra, a Canadian LGBT-focused newspaper, that day. The next day, he went on a Canadian Broadcasting Corporation show to discuss the situation, and in response to host Matt Galloway's first question — why he had apologized — McKenzie immediately jumped to the review's findings, and then referenced them repeatedly during the interview. "It always takes an external review to do things properly," he said at one point.

It's clear, then, that at the time of the shutdown, the External Review ensured that CAMH's decision would be framed in media coverage as having stemmed from an "independent" or "external" investigation — which it consistently was. The weight of that decision was shifted, at least partially, onto the shoulders of Zinck and Pignatiello.

So given the External Review's crucial role in the chain of events that led to the GIC's closure, it's worth asking exactly how it came to be so filled with what is basically gossip. One answer is that advocates virulently opposed to Zucker effectively wrote large chunks of it. Not literally, of course, but since Zinck and Pignatiello simply copied those advocates' claims into the document without — apparently — checking or pushing back on any of them, the outcome was more or less the same.

One of the activists interviewed was Pyne, who two weeks ago was served with paperwork from Zucker and his attorney indicating that they might sue him and the Toronto *Star* for defamation over a column he wrote for the paper, likely his claim that the GIC's approach "is now linked to a range of dismal outcomes, including a staggering rate of suicidal behaviour." (This is false.)

Two others contributors who, like Pyne, were rendered anonymous by CAMH, are LeeAndra Miller and Hershel Russell. Both are clinicians who ascribe to the GIC what feel like almost supernatural powers to harm anyone who comes too close to it. For instance, Pyne told me in an email that Miller "once said that in her local support group for trans youth, she can tell which ones have been to the CAMH clinic before they tell her. They are the ones with lasting shame problems, she says. The younger they went, the deeper the shame, she has said."

14

When I asked Miller to describe the problems she has encountered in the 70–80 former GIC patients she said she has worked with over the years (she has been practicing since 2000), she spoke for seven minutes straight, listing an array of jaw-dropping charges: In addition to the photo stuff, children were taught to be ashamed of themselves; the GIC drove a wedge between parents and children; and the GIC made its former patients too ashamed of their identities to seek out trans support services.

But there's some data which complicates the theory that the GIC was engaged in psychological brutality. For her dissertation research, Devita Singh cold-called 113 former patients or parents for whom she could track down their current contact information. Seventy percent agreed to come into the clinic to answer some follow-up questions, talk about their experiences, and so on, and another significant chunk provided at least "some follow-up data on [the patient's] gender identity and sexual orientation" via phone, as she writes. Singh argued in an email that "[s]uch willingness to return to the clinic and to contribute to the research does not fit with the criticisms being made of the GIC."

I asked Miller how she squared those numbers with the horror stories. One of her hypotheses concerned the fact that children at the GIC often didn't see Zucker himself during their regular sessions, but instead a staff psychologist or trainee. *Those* clinicians "are typically warm and caring," Miller explained. A lot of her former clients spoke highly of their GIC therapists, in fact. "But then there would also be these one-line — not one-line, but these moments where something *would* get said to them directly, right, that would sit in the sea of all the support and feeling cared about. And so this is what made a lot of the clients internalize those very negative messages." In this somewhat confusing view, the GIC offered its clients a "sea of... support" punctuated occasionally with traumatizing one-off comments.

Her other theory was that sometimes GIC patients themselves didn't even *know* they'd been traumatized by the clinic, at least not at first. People made to feel ashamed at a young age, she explained, "don't necessarily have the analysis that the reason they feel shame is because of different messages that have been given to them that they're not even that aware of that they've received until they unpacked it years later. How easy is it for people who are coming from that shame to actually voice complaints?" So the realization that the GIC had harmed a given patient can, for some of those patients, only be accessed after they "unpack" their feelings. In the case of Miller's patients, presumably she would help them do this unpacking — help them realize that they were traumatized at the GIC despite the fact that they themselves were unaware said traumatization had taken place.

15



The door to Zucker's office at the Gender Identity Clinic.

Russell offered a similar theory. He said he'd only worked with a few former GIC clients, but agreed with Miller's assessment that the clinic had produced a yearslong torrent of dysfunction among those clients — though in many cases they couldn't remember what had happened to them there since they were so young at the time. Russell said that one example of how the GIC's practices produced adults who, in his view, later developed deep senses of shame, had trouble engaging in sexual relationships, and grappled with various other problems had to do with the clinic's use of one-way mirrors: "Stories like, 'They had toys there that I knew were boys' toys, so I knew that was what I was supposed to play with, so I did, and then I saw a wig and I really wanted to check it out and I did just a minute but then I put it back but then I thought *Oh God, they're watching me — they're watching me*,'" he said. "Those kinds of stories." I wanted to make sure I had this right: Russell was saying that the act of offering a child a wide variety of toys to play with in a clinical setting is shame-inducing because the child can discern, on a deep level, that they are being judged for their toy choices on a gendered basis?

Yes, he confirmed — that was what he meant.

***

Maybe Singh's data leave something out. And the fact that some of the activists who helped write the External Review view Dr. Zucker as Dr. Evil's more evil cousin doesn't mean that they're necessarily wrong about the GIC having harmed its patients, of course. But overall, it just wasn't easy to find direct evidence that the GIC was doing what its critics claimed. As I reported this story, I repeatedly emphasized to Pyne, Russell, Miller, and Adam — all of whom are tapped into Ontario's LGBT activist and social networks in various ways — that it was important for me to get as many *first-hand* accounts of problems at the GIC as possible. These accounts failed to materialize. Other than Adam, Pyne connected me with one adult former patient and one parent of a former patient who said they had had bad experiences. The patient, who went to the GIC when he was 18, was upset by what he saw as a very in-depth assessment process and insensitive questions about his sexual history. These are common, valid complaints among

trans people who feel forced to interact with "gatekeeping" medical bureaucracies in order to gain access to services some of them view as life-saving, but they don't necessarily mean the GIC had engaged in wrongdoing — there are often clinically sound reasons for asking patients personal questions (in all settings, not just when it comes to transgender care). The parent, meanwhile, told me that Zucker's clinic had tried to force her transgender daughter to act more like a boy, but then sent me an assessment Zucker had written in which he said *exactly the opposite*: Since the child had already socially transitioned, limit-setting didn't make sense as an approach.

Parents who supported Zucker, on the other hand, seemed quite eager to reach out. I spoke with five mothers of GIC patients or former patients who went into CAMH to defend Zucker (out of the seven parents who did, total), and they told me all about their experiences with him and his clinic. None was happy about the closing, and none could point to any examples of Zucker or the other clinicians acting unprofessionally or disrespectfully. Their children, all but one in their teens or younger, are in very different places, reflecting the wide range of clients who were seen at the GIC, but all of them, their parents insisted, had been helped by the GIC and what they said was a nurturing, exploration-focused environment. Pyne had told me that parental transphobia might partially explain the popularity of the clinic, as well as its lengthy waitlist, but among these parents it didn't seem to be a factor: One mom (whose kid went to the GIC decades ago, and only briefly) had some old-fashioned views about transsexuality, but none of the other parents exhibited a whiff of discernible transphobia. One currently *has* a trans kid, and another has a 7-year-old without a set gender identity who may well end up identifying as trans in the years ahead.

The parents felt like they were offered only a perfunctory opportunity to defend Zucker — the report states they were given ten minutes each — and those whose children were still active GIC patients said they felt like they'd been suddenly cut off from a vital source of support for their kids. (Some of the moms wanted me to only use their first names or a nickname, while others wanted me to use fake names — fake names, which I also used for all the children, are in quotes.)

One mom, Merry, said CAMH had simply disappeared from sight rather than keep patients and their families in the loop. "I have not heard a word from them," she told me last month, and her daughter had missed a number of her weekly appointments. She complained that "no one has contacted us … So all this bullshit talk about transparency — there was no follow-through. I have not heard anything." Sam, another parent, agreed. "I'm pissed off," she said. Her son will likely be starting puberty-blockers in about a year, and the closure of the clinic could greatly complicate things. McKenzie assured me of the current patients that "nobody's left in a lurch — we would never do that," but when I ran that comment by Merry she called it "laughable." (Merry said that on January 27, CAMH finally initiated contact about figuring out options for her and her child — six weeks after suddenly cutting off their access to the GIC.)

"Amanda" said that while she was upset about CAMH's treatment of Zucker, she was more concerned for his younger colleagues, particularly Hayley Wood, the psychologist she said had changed her son's life by helping him learn how to express himself. "It's bad enough for Dr. Zucker, but maybe he was thinking of winding down his practice in a few years," she said. "But what about Hayley, who's just essentially starting out, and now her name is linked inextricably in the world of the Internet with this stuff, and with what turns out to be a completely untrue allegation? What about her? It just boggles the mind."

Then there's Carol, the mom from the NPR story, who exuded appreciation for Zucker. She said that the story she was featured in ignored the "outlying reasons why [Bradley] was also in therapy." Specifically, she said, Bradley had become extremely obsessional in his playing with dolls and dress-up clothes, making it increasingly difficult for him to socialize with anyone — even his two younger brothers. Zucker's approach for fixing the situation was to start at home: If Bradley could be weaned off the toys he was obsessed with and taught to enjoy some of the same gender-

17

neutral ones his brothers liked — Legos or toy animals — that could help reconnect him with his siblings, and, in turn, make it easier for him to develop friendships outside the home. Carol emphasized to me that none of the limitations were permanent —"the [girl] toys were all replaced with some more gender-neutral toys, and then we reintroduced all the toys," albeit slowly. She insisted that there "was never an attempt to skew him in the other direction and give him male-oriented toys. Never. It was more introduce him to neutral toys so he could socialize better with all kinds of kids, because he had become really uncomfortable with mixed peer groups."

In Carol's eyes, Zucker's approach worked. By age 8, Bradley's dysphoria had resolved itself — though it's impossible to say, of course, whether this was due to his time at the GIC — and over the years his social skills improved measurably. These days, he's a well-adjusted gay 13-year-old boy who is very involved with music (he and his mom talk about One Direction a lot). Carol said she also wanted to push back against the notion that Zucker imposed his views on parents. He "was very knowledgeable," she said, "but he also still allowed us to parent, and he wasn't saying 'You must ... do this or do that.'" (I corresponded with NPR's Spiegel about all of this, and I think the most likely explanation for the divide between her story and Carol's current understanding of her GIC experience is that at the time Spiegel spoke with Carol, Carol was dealing with the most stressful part of her son's therapeutic process, so certain nuances may not have been fully communicated.)

Overall, Carol said she appreciated how "protective" of her son Zucker was — it was important to the clinician that "the kids not be used as poster children for whatever cause was happening in the schools at the time, and I thought he was right — [Bradley's] still so young," she said. "He's still figuring things out — to be one way or another is sort of his personal journey. He doesn't need to be paraded around."

\*\*\*

In Devita Singh's dissertation, she points out that "If it were possible to know with certainty whether a child with [gender dysphoria] will persist or desist, then the clinical approach [could] be modified to best match the child's needs." Were these categories easy to discern, it might make sense, for example, to shift future persisters onto the social-transition track relatively quickly, while helping the future desisters explore their gender identity, GIC-style, with an eye toward loosening their rigid concepts of gender.

At the moment, though, the research on all this is quite thin. "Insistent, persistent, and consistent" sounds like a reasonable way to tell kids who are "actually" trans from future desisters, but Singh notes in her dissertation that there's an extreme dearth of the sorts of careful long-term studies required to understand why some children desist and others don't. While there's some early, emerging evidence that severity of childhood gender dysphoria can predict persistence, some of it from Singh's dissertation, she also found in her research that plenty of GIC clients who exhibited rather severe gender dysphoria later went on to desist. So in the view of her and other GIC clinicians, there's nowhere near enough data for anyone to be making big decisions based solely or primarily on how insistent a 5-year-old is that they were born the wrong gender — especially given that these clinicians can also point to specific examples from their own professional experience of kids who appeared to be quite gender dysphoric at a specific point in time, but later grew up to be cisgender.

But the politics are racing ahead of the science anyway. It has simply been decided, in some quarters, that firm childhood statements of gender dysphoria are signals of real, meaningful identity, and need to be respected as such. In a sense, this is understandable: For decades trans adults have faced the potent, dehumanizing obstacle of denialism, of people telling them they aren't *really* who they say they are, that they're actually mentally ill or perverted or whatever

else. The problem is that there's solid scientific evidence — not infallible, but solid — to suggest that kids really *are* a different category.

As I was trying to reconcile the seemingly irreconcilable — one side telling me that the GIC was a nightmare factory that had traumatized multiple generations of Ontario's trans youth; the other side, including parents with firsthand experience, insisting that the GIC was a warm, nurturing environment in which children could explore the sometimes-tricky concept of gender identity under the guidance of empathetic clinicians — two of those parents' stories kept jumping out at me.

One was Amanda's. In the wake of her GIC experience, she disagrees with the trend toward believing that kids' statements about gender identity should necessarily be taken at face value rather than deeply explored or questioned.

In an email, she explained:

> I think I told you that the most important thing I learned from Dr. Zucker (during my weekly conversations with him) was the importance of asking "Why?" For instance, had I asked that when [my son] told me that he wanted to cut off his penis with a pair of scissors, who knows what I would have learned? But I didn't ask because I thought I knew precisely what he meant. Applying an adult perspective, and my own views on gender, I immediately concluded that that remark was a rejection of his birth gender. But maybe he had a urinary tract infection and his penis was sore. Or maybe he had been wearing a pair of pants that he had outgrown and they were uncomfortable in the crotch. Or maybe having a penis made him feel like he didn't fit in with his sisters and cousin, and he thought that if he looked more like them then they would all get along better instead of squabbling. Who knows. But we should at least have had the conversation. The same way we would if he had said "I'm sad" or "I'm angry."

Her experience was hard-earned. Amanda explained that after "Rory's" initial assessment, Zucker told her that he wasn't sure Rory's issues were actually attributable, at root, to a gender-identity issue, but that he was pretty sure Rory had autism spectrum disorder. To that point, Rory had received various other diagnoses, but this was the first time a clinician had diagnosed him with ASD, and "it was very helpful to have that information," Amanda said. After years of therapy with Hayley Wood — "it turned his life around," according to Amanda — Rory is an artsy boy with a YouTube channel who no longer has gender dysphoria.

"Rena's" experience was similar. Her daughter "Rachel" *insisted*, from a very young age, that she was a boy, and was absolutely obsessed with boy stuff. After assessing her at the GIC, Zucker referred Rachel to a regular therapist closer to home (the family lives far from Toronto) — not to attempt to "fix" her gender nonconformity, nor to nudge her toward transitioning, but rather to "work on her self-confidence and what she likes about herself," as Rena put it. That therapist didn't quite agree with Zucker's methods — she'd send Rena news clippings about young children who had socially transitioned, which Rena took as a none-too-subtle hint that that was her preferred approach — but, to her credit, Rena said she kept her personal beliefs out of her sessions with Rachel. Five years later, Rachel appears to have settled into a cisgender identity. Rena has some stark visual evidence of her daughter's trajectory: Each of the last five years, she has asked her to fill in a circle with three colors representing how much she feels like a girl, a boy, or a tomboy. "Last year," Rena told me, "it was just this speck that was a boy. And this year she sat there for quite some time, and then she came to me and said, 'There's no part of me that feels like a boy.'"

It's impossible to know what the treatment course would have been for these children if their parents had started their clinical journeys by going to a gender-affirmative specialist, rather than to the GIC. But Rena, for her part, is positive

that the advice would have been for Rachel to transition. "Absolutely," she said. "It would have cemented who she identified as instead of keeping the door open and allowing her to land in a different place from a maturity perspective, for her to be able to make the choice truly herself. I just think that that would have denied her the opportunity to make that choice."

It seems as though many parents, clinicians, and others face significant pressure to embrace the gender-affirmative approach these days. According to an influential strain of trans politics, Zucker's more nuanced, "Why?"-focused method is offensive. This sounds like a caricature, but right there in the External Review that helped get him fired and his clinic shuttered, two professional psychiatrists state that asking "why" is improper. What needs to be done is to accept the child for who they are, and anything less than that is ignorant, if not bigoted.

This places a heavy burden on parents who aren't sure who their children are, or who don't accept the notion that a 5-year-old, even an insistent and strong-willed one, has a set identity in the same way adults do. The current politics leave them behind, because their stories don't fit neatly into the binary in which trans identities are either accepted or rejected, full stop. There's no natural political grouping for parents of desisters, because desisting isn't an identity-politics lodestone in the way persisting is. "We're quieter," said Amanda of parents of kids whose gender dysphoria desists. "There are a bunch of us scattered around, and we're not acting collectively." As Merry put it, "I feel like sometimes there's no middle ground. You're either trans or you're not, and you can't be this kid who is just kind of exploring."

But the activists and clinicians celebrating the ouster of Zucker and the shuttering of his clinic *are* acting collectively, and to them all these questions are really just fronts for transphobia, the seeming complexities have been resolved, and it's time to move on. "The controversy is over, and at this point we are mopping up the pieces," said Russell. "There was a controversy. It's over. They lost."

*Samuel Lieberman contributed research.*

*\*This article has been corrected to show that the co-author of a Slate article critiquing the desistance literature was actually named Dr. Kristina Olson of the University of Washington, not, as originally stated, Dr. Johanna Kennedy-Olson.*

TAGS:  TRANSGENDER   CAMH   GENDER IDENTITY CLINIC   SEX   MORE

---

MOST POPULAR

1. Inside the Penis-Filler Boom

2. The Story of Bella Hadid's Keffiyeh Dress at Cannes