# EXHIBIT 124

Colin Wright

# Anatomy of a Scientific Scandal

Under pressure, a journal once notable for its courage retracts a major paper on the social roots of gender-related distress—all over a minor, inconsistently applied technicality.

/ Eye on the News / The Social Order                                    Jun 12 2023

The scientific method is the best way for humans to investigate phenomena, acquire new knowledge, and correct mistaken beliefs. Scientific journals play a vital role in this process, encouraging rational, evidence-based debate and the pursuit of truth above all. But since the inner workings of these journals remain largely opaque, citizens, policymakers, and science journalists can struggle to discern when politics has compromised a given publication—especially when ideological agendas are couched in scientific language and given the veneer of scientific authority.

Medical journals writ large are on the brink of such ideological capture, if they haven't already succumbed to it. Findings that contradict the prevailing "gender-affirming" model of care for transgender-identifying youth, or offer even mild critiques, have become nearly impossible to publish. Still, rare exceptions exist, including the *Archives of Sexual Behavior* (*ASB*), a journal published by Springer Nature. This publication has distinguished itself by its willingness to facilitate viewpoint diversity in gender medicine—until now.

An alarming recent event highlights the vulnerability of the scientific endeavor to politics. *ASB* is a primary target for activist researchers who will not tolerate dissent from their views, and a months-long campaign by activists to pressure Springer Nature into retracting an *ASB* paper that they didn't like has culminated in success. While the activists' desire to censor inconvenient research should come as no surprise, Springer Nature's capitulation to their demands represents a profound betrayal of scientific integrity and the publisher's commitment to truth.

The paper in question, "Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases," was authored by researchers Suzanna Diaz (a pseudonym) and Michael Bailey and published in *ASB* on March 29. Rapid Onset Gender Dysphoria (ROGD), a newly proposed pathway to gender dysphoria, was first described by the researcher Lisa Littman in 2018; the theory may help explain the documented surge in cases of gender dysphoria among adolescents and young adults who had previously exhibited no gender-related issues. Littman proposed and provided supporting evidence that social factors have at least partly caused the surge, especially among girls.

Such a hypothesis might appear plausible, or at least a straightforward empirical matter to be decided through evidence-based examination. But it violates the dominant narrative favored by medicalization

1

activists that the rise in trans identities stems from an increase in societal acceptance of "gender diversity." Evidence supporting ROGD would call into question the "gender-affirming" model of care, an approach premised on the notion that kids can know their "gender identity" from very early on and will rarely, if ever, change their minds about it. This philosophical belief system, which flies in the face of centuries of accumulated wisdom on human development, has been pithily summarized with the phrase: "trans kids know who they are." The affirmative model guides health-care providers to "affirm" (i.e., agree with) a child's self-declared identity and facilitate access to hormones and surgeries, all in order to align the child's body with his or her felt gender identity. Consequently, activists have exerted intense efforts to undermine ROGD research at every opportunity.

Littman's 2018 paper generated intense backlash from activists, who successfully pressured the journal that published her findings (*PLoS One*) to take the unusual step of initiating a second round of post-publication peer review. The paper was republished with a "correction" that offered a more detailed explanation of its methodology, specifically focusing on its dependency on parental reports, and a clarification that ROGD is not a clinical diagnosis. Importantly, however, the paper's central conclusions concerning the probable role of social influences remained unchanged. Activists repeatedly disrupted further attempts by Littman to explore ROGD using online surveys.

But Diaz and Bailey's new paper lent further credence to the ROGD hypothesis. They examined parental reports of 1,655 potential ROGD cases through an online survey. The sample size dwarfed that of Littman's original study, which was based on 256 parental reports. This data bolstered Littman's findings about the onset of gender dysphoria after puberty, predominantly in girls, in conjunction with preexisting mental-health conditions, heavy social-media usage, and peer influence. They also corroborated Littman's 2018 finding that an overwhelming majority (90 percent) of concerned parents are politically progressive, undermining the common narrative that criticisms and concerns about gender affirmation originate in conservatism.

What else did the paper find? In the sample, gender dysphoria manifests approximately two years earlier in females compared with males. Females are more than twice as likely to pursue social transition. However, among those who experienced gender dysphoria for at least one year, males were more likely to undergo hormonal interventions. Moreover, a majority of parents reported feeling coerced by gender specialists to affirm their child's new identity and endorse his or her transition. Parents who facilitated their child's social transition reported that the child's mental health "deteriorated considerably after social transition," and that their relationship with their child suffered.

These findings are crucial. They provide further corroboration to a growing body of evidence supporting the ROGD theory, indicating the need for a new, specialized treatment approach for youth with gender-related distress. Clinicians widely acknowledge the existence of this new cohort. Anna Hutchinson, formerly a leading therapist in the United Kingdom's Gender Identity Development Service, clearly

described a trend of adolescents "without any notable symptom history [of gender dysphoria] prior to or during the early stages of puberty." "Littman's description [of ROGD] aligns with our clinical experiences from within the consulting room," she said. Most recently, England's public health authority, the National Health Service, just issued new treatment specifications warning about treating youth with late-onset gender dysphoria medically, noting that "there is even greater uncertainty in terms of the supporting clinical evidence base, less established clinical practice and less known about the natural history of gender dysphoria" for this novel patient group.

The suppression of research into ROGD undermines scientific inquiry into a live matter of urgent public concern. It prevents doctors and clinicians from basing their prescribed treatments on evidence as opposed to ideology. As Diaz and Bailey found, however, the activist drive for suppression is constant and aggressive.

On April 18, only weeks after the paper was published, Bailey received a list of questions from the executive committee of the International Academy of Sex Research (IASR) about the Institutional Review Board (IRB) ethics-approval process at Northwestern University, where Bailey works. The following day, a message from IASR's Executive Committee began circulating on its listserv notifying recipients of "significant concerns about the ethical conduct and integrity of the editorial process" at *ASB*. Members were told that IASR was consulting with the journal's editor and its publisher, Springer Nature, to address these concerns.

Springer Nature reached out to Bailey on April 28. "Some questions have been raised about the article," the publisher wrote, "and we are investigating them together with our Research Integrity Group." The email's focus was entirely on the IRB ethics approval process obtained before publication, which is a formal procedure that applies to all proposed research on human subjects to ensure it is conducted ethically and that participants are properly safeguarded. Springer asked Bailey to "provide details regarding the protocol you submitted to your IRB for evaluation and any relevant documentation regarding the evaluation process."

Two weeks later, on May 5, an open letter addressed to both the IASR and Springer Nature was published. The letter called for the removal of Kenneth Zucker from his position as editor-in-chief at *ASB* in response to his decision to publish Diaz and Bailey's study. The letter had 100 main signatories, including Marci Bowers, president of the World Professional Association for Transgender Health, and a slew of other academics and medical professionals. All threatened that they would "no longer submit to the journal, act as peer reviewers, or serve in an editorial capacity until Dr Zucker is replaced with an editor who has a demonstrated record of integrity on LGBTQ+ matters and, especially, trans matters." Specifically, the letter asserted that Zucker's decision to publish the study "threatens the foundations of research ethics" because the paper's authors had not obtained IRB ethics approval before data collection and publication.

3

That same day, FAIR in Medicine, a nonpartisan professional network that advocates "the highest ethical standards in medical practice," sponsored a counter-letter. This document underscored their support for Dr. Kenneth Zucker and called for an "academically robust and unbiased editorial process" at ASB and the "uninterrupted publication" of Diaz and Bailey's study. Rather than capitulating to activists' "censorious demands," FAIR in Medicine urged for an "open debate about the paper." The counter-letter garnered over 2,000 signatures, including notable figures such as Stanford health professor Jay Bhattacharya, New York University psychologist Jonathan Haidt, and ROGD researcher Lisa Littman, among others.

Bailey promptly addressed the concerns regarding IRB ethics approval. The initial survey data used in the study, he explained, was gathered by the paper's lead author, the pseudonymous Diaz, who is not affiliated with an institution that requires IRB approval for such a project. Moreover, Northwestern's IRB representative informed Bailey that, though the IRB could not retrospectively approve the pre-collected data, it would permit him to coauthor a paper on those data provided they were expunged of all personal identifiable information. Significantly, Springer's own policy explicitly states that in situations where "a study has not been granted ethics committee approval prior to commencing. . . . The decision on whether to proceed to peer review in such cases is at the Editor's discretion." Thus, all efforts to undermine the study or discredit Zucker's decision to review and publish it on the grounds of IRB considerations appeared futile.

So the pressure campaign changed tactics. On May 23, Springer sent an email to Diaz and Bailey thanking them for responding to its previous questions, but also informing them that the paper would nevertheless be retracted "due to noncompliance with our editorial policies around consent":

> The participants of the survey have not provided written informed consent to participate in scholarly research or to have their responses published in a peer reviewed article. Additionally, they have not provided consent to publish to have their data included in this article.

Diaz and Bailey were given until May 26 to provide a written response expressing their agreement or disagreement with both the retraction and its phrasing. This response, Springer had said, would then be incorporated into the retraction notice. To be clear, Springer wasn't inviting Diaz and Bailey to contest the retraction decision; it was merely offering a chance to reflect the authors' stance on the matter.

The activist playbook here was simple: get the Diaz and Bailey paper retracted over a technicality, then spin the retraction as an invalidation of the study's main findings. Such a tactic was successfully used on Littman's 2018 ROGD paper; the journal's decision to re-review the paper and issue a "correction" has been repeatedly and disingenuously leveraged by proponents of "gender-affirming" care to declare the study "debunked."

A retraction of Diaz and Bailey's study could have an even more disastrous effect. It would not only cause the retraction of an important contribution to the ongoing scientific debate over transgender identification among youth but also signal the ideological capture of a scientific publishing giant that controls hundreds of journals that shape our knowledge base.

With so much on the line, Diaz and Bailey fought back. On May 25, Bailey penned a comprehensive [appeal letter](#) to Springer editors, highlighting the irrationality of their impulsive and "capricious decision" to retract his paper—an act he perceives as an attempt to "silence the critical conversation around gender issues." In Bailey's view, this retraction not only threatens to inflict professional, reputational, and financial harm upon him but also undermines Springer Nature's pivotal role "as a source for fair, unbiased publication of scholarly articles addressing the urgent gender issues facing society today." He further exhorted Springer to resist external influences, assess the highlighted issues objectively, and realign with the journal's core mission of "advancing discovery."

Bailey raised three major objections to Springer's decision to retract the paper. First, he contested the grounds for retraction as an ever-changing "moving target." Initially, Springer's concern hinged on a potential ethics violation arising from the absence of IRB approval brought to its attention by activists. When this challenge proved to be without merit, the focus abruptly shifted to concerns about the informed consent of the study's participants.

Second was Springer's assertion that the study's participants did not provide "written consent to participate in scholarly research or to have their responses published in a peer reviewed article." As Bailey explained, the parents who took part in the survey were enthusiastic about contributing data related to ROGD, given the scarcity of information on this novel presentation of gender dysphoria. The introduction of the survey, taken by all participating parents, mentions the dearth of data on the topic and the need for parents to "seek out this information on our own" to "help us gain a better understanding" of this new phenomenon. Upon completion of the survey, parents were informed that their "answers will help us gain a better understanding of which children are more vulnerable to Rapid Onset Gender Dysphoria and what we can do to help them better." The data, parents were told, would be made public [online](#) once a sufficiently large sample size was achieved.

The parents were not only eager to provide information to enhance understanding of ROGD but also well-aware that the anonymized results would be published online. Bailey emphasized in his rebuttal: "The sole intent of parental participation in the survey was to inform the scientific community about the novel presentation of gender dysphoria among youth with no prior history of the condition."

Despite this, Springer chose to disregard the spirit of the consent requirement. Consent for the publication of anonymized data on a public website, it alleged, does not equate to consent for that data's publication in a scholarly peer-reviewed article. But consenting to have one's data published on a website managed by

5

unskilled volunteers is a much bigger risk than having one's information managed and published by an academic publisher staffed with dedicated professionals trained in thorough data analyses and human subject protections. As Bailey stated:

> Had the participants originally consented to only participate in future peer-reviewed academic research, but later their responses appeared on a non-academic website with much lower quality standards, one could claim that the original consent was invalid. However, in this case, just the opposite happened—the respondents' wishes were respected with additional quality standards in place. To be clear, the consent matched the intended use of the data provided.

It strains credulity to think that the participants' consent does not extend to a situation in which their data are being handled with more care and caution than what they had initially agreed to.

Third and finally, Bailey pointed out Springer's inconsistent application of their putative consent policy. He cited "a slew of 'scholarly publications' [by Springer] based on survey research in which the respondents did not provide explicit permission for 'scholarly research' use—and often apparently did not provide consent for any research purpose at all." Examples included at least six publications using data from a health survey conducted by the American College Health Association that "included intensely personal questions relating [to] substance use, sexual behaviors, and other highly sensitive topics." Additionally, at least seven publications used data from a Youth Behavior Risk Survey (YRBS), and no fewer than six used data from the 2015 United States Transgender Survey (USTS). Bailey found these studies after a cursory skim of the literature, suggesting that many more such instances exist.

The day after Bailey's appeal submission, Springer paused the retraction to deliberate internally. Soon after, Springer notified Bailey that it had "concluded that this retraction is necessary on the basis of lack of informed consent." Part of the proposed retraction notice reads, "The participants of the survey have not provided written informed consent to participate in scholarly research or to have their responses published in a peer reviewed article."

Surprisingly, Springer thanked Bailey for bringing to its attention the 19 other papers that appeared not to have obtained both written Consent to Participate and Consent to Publish from their survey participants. According to Springer, these studies were now being investigated. (In contrast with Bailey and Diaz's ROGD paper, investigation of ethics violations by authors supportive of "gender-affirming care" seem to take much longer: an investigation into an article by activist-researcher Jack Turban has been ongoing for more than a year.) Springer also dismissed Bailey's concern about potential damage to his reputation, stating that the retraction simply "reflects findings relating to the research itself and not the author/s conduct," and that it "is not intended to be punishment."

It was a startling response. Such retractions, regardless of their reasoning, are routinely exploited by activists to tarnish the reputation of the involved researchers. Lisa Littman's original paper on ROGD was merely "corrected," and no results or conclusions changed; nonetheless, she has been smeared relentlessly online and in the press. Brown University, Littman's employer at the time, felt compelled to affirm its "long-standing support for members of the trans community" in response to the paper's publication. One science writer critiqued Littman's study as "scientifically specious" and claimed that "ROGD provides political cover for those who wish to rollback trans rights and healthcare." The controversy even led to Littman losing her consulting job following demands for her dismissal by local clinicians.

Springer's acknowledgement that it is investigating the 19 papers that Bailey had highlighted sets a profound new precedent that could be devastating to the research community, especially concerning transgender research, as much of the existing literature is dependent on survey data unlikely to have garnered written consent both to participate and to have the research published in an academic journal.

In any case, many thousands of research papers published by Springer likely do not meet the standards that the Diaz and Bailey study is being arbitrarily held to. Take, for instance, Turban, a researcher often cited by proponents of the "gender affirmation" model of care. Turban published a study in a Springer journal discussing the unique inpatient needs and experiences of adolescents who identify as transgender. While the study's methods claim to have obtained informed consent to *participate* in the study, nowhere does it mention having obtained explicit permission "to have their responses published in a peer reviewed article," a requirement Springer now apparently deems necessary to apply retrospectively. Will Springer extend its scrutiny to Turban's paper, demanding documented proof of explicit written consent from every participant for the publication of their data?

It is unclear whether Springer truly comprehends the enormity of its decision to single out the Diaz and Bailey paper for retraction over a minor, inconsistently applied technicality.

Part of the problem with retracted papers is that the journal owns the copyright to the content, which makes it impossible for the authors to resubmit the article to another scientific publication. In this case, serendipity was on Bailey and Diaz's side. When they originally published with *ASB*, a grant from the Society for Evidence-Based Gender Medicine (SEGM)—a U.S.-based nonprofit professional organization committed to raising the bar on the quality of evidence in gender medicine—enabled the publication under a Creative Commons Attribution 4.0 International License. While Springer retains the copyright, this license "permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made."

In the wake of the retraction, Bailey and Diaz are re-submitting the manuscript to the *Journal of Open Inquiry in Behavioral Science* (JOIBS), a fledgling publication founded by scholars devoted to the principles

of "free inquiry and truth seeking" and the belief that ideas ought to be scrutinized rather than suppressed. Regrettably, among medical journals this commitment appears to be increasingly the exception, not the rule.

Colin Wright *is an evolutionary biologist and fellow at the Manhattan Institute.*

*Author's Note: The original version of this article failed to mention FAIR in Medicine's counter-letter, which significantly helped to raise awareness of the issue. I consider FAIR in Medicine an important ally, and my omitting them from the original story was a serious oversight.*

**Photo: Nebasin/iStock**

# / Donate

*City Journal* is a publication of the Manhattan Institute for Policy Research (MI), a leading free-market think tank. Are you interested in supporting the magazine? As a 501(c)(3) nonprofit, donations in support of MI and City Journal are fully tax-deductible as provided by law (EIN #13-2912529).