1                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
2                        NORTHERN DIVISION

3

4      BRIANNA BOE, et al.,           *
                                      *
5             Plaintiffs,             *   2:22-cv-00184-LCB
                                      *   May 23, 2024
6      vs.                            *   Montgomery, Alabama
                                      *   9:30 a.m.
7      STEVE MARSHALL, et al.,        *
                                      *
8             Defendants.             *
       ****************************

9

10

11              TRANSCRIPT OF STATUS CONFERENCE
            BEFORE THE HONORABLE LILES C. BURKE
12               UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21
       Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
22     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
         and Procedures Vol. VI, Chapter III, D.2.  Transcript
23                produced by computerized stenotype.

24

25

                    *CHRISTINA K. DECKER, RMR, CRR*
                     Federal Official Court Reporter
                256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                          APPEARANCES

 2
        FOR THE PLAINTIFFS:
 3      Samuel H. Franklin, Esq.
        M. Christian King, Esq.
 4      Harlan I. Prater, Esq.
        Melody Hurdle Eagan, Esq.
 5      Jeffrey P. Doss, Esq.
        LIGHTFOOT, FRANKLIN & WHITE, LLC
 6      The Clark Building
        400 20th Street North
 7      Birmingham, Alabama 35203

 8      Kaitlin N Toyama, Esq.
        United States Department of Justice
 9      Civil Rights Division
        950 Pennsylvania Avenue, NW
10      Washington, DC 20530
        202-353-5311
11      Kaitlin.toyama@usdoj.gov

12      Stephen D Wadsworth, Esq.
        US Attorney's Office for the Middle District of Alabama
13      131 Clayton Street
        Montgomery, AL 36104
14      334-223-7280
        Stephen.wadsworth@usdoj.gov

15

16      FOR THE DEFENDANT:
        James W. Davis, Esq.
17      Edmund LaCour, Esq.
        Alexander Barrett Bowdre, Esq.
18      OFFICE OF THE ATTORNEY GENERAL
        501 Washington Avenue
19      P.O. Box 300152
        Montgomery, Alabama 36130-0152
20      (334) 242-7300

21

22      RESPONDENTS:
        Barry Alan Ragsdale, Esq.
23      Robert S. Vance, III, Esq.
        Dominick Feld Hyde, P.C.
24      Litigation
        1130 22nd St S - Ste 4000
25      Birmingham, AL 35205
        205-536-8888
        BRagsdale@dfhlaw.com
```

```
 1          Brannon Buck, Esq.
            BADHAM & BUCK, LLC
 2          2001 Park Place North, Suite 500
            Birmingham, AL 35203 Bobby Segall
 3
            Robert D. Segall, Esq.
 4          Shannon Holliday, Esq.
            COPELAND FRANCO
 5          444 South Perry Street
            P.O.Box 347
 6          Montgomery, Alabama 36101

 7          April A. Otterberg, Esq.
            JENNER & BLOCK
 8          353 N. Clark Street
            Chicago, IL 60654-3456
 9          (312) 222 9350

10          W. Neil Eggleston, Esq.
            KIRKLAND & ELLIS, LLP
11          1301 Pennsylvania Avenue, N.W.
            Washington, D.C. 20004
12
            Byron Pacheco, Esq.
13          KIRKLAND & ELLIS, LLP
            601 Lexington Avenue
14          New York, NY 10022
            United States
15          (212) 446-4800

16          Bruce F. Rogers, Esq.
            BAINBRIDGE, MIMS, ROGERS & SMITH LLP
17          The Luckie Building, Suite 415
            600 Luckie Drive
18          Birmingham, Alabama 35223
            205-879-1100
19
            John M. Ugai, Esq.
20          Katherine Palkoski, Esq.
            FARELLA BRAUN AND MARTEL
21          One Bush Street
            Suite 900
22          San Francisco, CA 94104
            415.954.4400
23
            Michael Shortnacy, Esq.
24          KING & SPALDING
            633 W. Fifth Street
25          Suite 1600
            Los Angeles, California 90071
```

1          COURTROOM DEPUTY:  Deena Harris

2

3          COURT REPORTER:  Christina K. Decker, RMR, CRR

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          (In open court:)

3          THE COURT:  Please be seated.

4     All right.  Good morning, everybody.

5     So I don't think we have to make this into a long hearing.

6 I'm going to leave all of the arguments about the Q&A document

7 production until next week, and so we will just hold off on the

8 objections until I have briefs and all that.

9     Today I think what we will cover is the motion to stay.

10     Also I'll sit down with each attorney and their respective

11 respondent just to talk about how they think their hearing will

12 go.

13     And then we will touch on the motion to reconsider on the

14 issue of the experts.

15     And then if there is something else that we need to take

16 up we will, but I would say let's just pick up the motion to

17 stay right now and start marching forward.

18          MR. DOSS:  Yes, Your Honor.

19          THE COURT:  How long do you need, Mr. Doss?

20          MR. DOSS:  Pardon?

21          THE COURT:  How long do you need on this?

22          MR. DOSS:  Not long at all I don't think.

23          THE COURT:  All right.

24          MR. DOSS:  Jeff Doss for the private plaintiffs.

25     I think at the end of the day, Your Honor, this is a

purely discretionary call for the Court.  This is a matter of
scheduling.  The parties have completed extensive discovery in
this case, dozens of depositions have been taken, lots of
experts, party discovery, thousands of pages of documents.

The case is ready, but there's a potential for further
appellate development.  And I think everyone in this courtroom
recognizes that possibility.  There exists a current circuit
split that will likely grow larger as time goes on, as cases
like this work their way through the Fourth, Seventh, and Ninth
Circuits.  And there are three cert petitions currently
spending at the Supreme Court.

The central question in those -- presented by those cert
petitions is what is the appropriate standard of review.  The
Sixth Circuit agreed with the Eleventh Circuit that it should
be rational basis.  The question then becomes is this sex
discrimination subject to heightened scrutiny, which changes
the entire analysis and how the evidence is viewed.

It was scheduled for the Supreme Court's conference last
week.  Orders were entered this past Monday by the Supreme
Court.  Those petitions were neither granted nor denied.  It's
been scheduled for the Supreme Court's conference again today
with orders to be entered by the Supreme Court on Tuesday.  We
may see a grant or a denial at that point from the Supreme
Court.

What the Supreme Court is likely to do at this point is

anyone's guess.  Whether they are to hear this case, we don't
know.  There's a possibility.  There is certainly a circuit
split that we think will get larger as time goes on.

We also have the Eleventh Circuit en banc rehearing
petition pending.  We filed that motion in the fall of 2023
following the panel's decision in this case.  What we know is
that the mandate was withheld, and there's been no ruling to
date.

The state has suggested that a dissent is likely in the
works.  I would say maybe, possibly.  That may be in fact
what's happening.  It may be that the votes aren't there for an
en banc rehearing and certain judges wish to dissent.  That
could be.

It could also be the Eleventh Circuit doesn't want to get
ahead of its skis.  Knowing that these petitions are pending at
the Supreme Court, the Eleventh Circuit may not want to
activate the machinery of an en banc rehearing if the Supreme
Court's going to take up the case.

So what we would submit, Your Honor, is the law is in
effect right now.  Whether we defer summary judgment briefing
on this -- on these issues until we see whether or not there
have been further appellate developments, we think that would
make sense.  It would be an efficient way of dealing with this
and doing it only once.

And, you know, if the state would -- if Your Honor would

1   like for us to proceed with expert briefing on *Daubert* motions,

2   for example, we would be fine doing that, getting the case even

3   further ready for final disposition one way or another.

4          THE COURT:  Well, there's no reason we can't just

5   continue on track and be trial ready, right?  We can be trial

6   ready on the regular track, but still recognize that we're

7   going to have to move the date at some point.

8          MR. DOSS:  Yes, Your Honor.  And I think the issue is

9   whether summary judgment is filed sooner rather than later.

10          THE COURT:  Understood.  Anything else?

11          MR. DOSS:  No, Your Honor.  That's all we have.

12          THE COURT:  Who's got this for the state?

13          MR. LACOUR:  I do, Your Honor.

14          THE COURT:  So Mr. Doss's argument is pretty darn

15   persuasive, Mr. LaCour.  The law is in effect.  We have got a

16   lot of unknowns out there.  We are going to have a two-week

17   trial.  Tell me why I shouldn't push this to October just to

18   see what comes down.

19          MR. LACOUR:  Well, Your Honor, we don't see it as all

20   that persuasive if you actually look at the case law that

21   governs when a stay is granted.  They need to show, first,

22   likelihood of success.

23       The Eleventh Circuit, in cases like Gissendaner, makes

24   clear that that is governed under current Eleventh Circuit

25   precedent, not under a pending cert petition or even a granted

1    cert petition.  The current precedent is that rational basis

2    applies.  And it's our view that under rational basis, that

3    summary judgment should be entered in this case.

4        We have been working to meet the original deadline in the

5    seventh amended scheduling order.  We intend to file our

6    summary judgment motion this coming Monday in accordance with

7    that order, a 30-page brief that lays out the evidence that we

8    have gathered.

9        As Mr. Doss recognized, we have gathered a lot of

10   evidence.  We have done a lot of work over the last two years

11   to build the case to rebut the claims that they came in making

12   in this court two years ago at the preliminary injunction

13   stage.  And we think that we have developed a very robust

14   record that will make it very easy for this Court to find any

15   number of rational bases upon which the legislature could have

16   based its legislative judgment that kids should not be getting

17   these life-altering treatments, but instead should wait until

18   the age of majority.

19       We agree with Your Honor that we should continue to make

20   this case trial ready.  I think part of that is filing the

21   summary judgment motions.  I don't see any basis really for

22   halting that.  We are 99 percent of the way done with this

23   case.

24       Something that's a bit extraordinary about the stay

25   request, having looked at all the cases cited by the United

1   States and by the plaintiffs in their multiple briefs seeking

2   stays, both back six-and-a-half months ago when the United

3   States sought a stay in December of 2023, and now the latest

4   stay motions and briefs, is that it's not usually plaintiffs

5   who are seeking to halt their own cases.  Usually, it's the

6   defendant trying to slow things down.

7       But they were the ones who activated the machinery of

8   justice.  They are the ones who came in here in late April of

9   2022 and said we need a decision right away.  And then we were

10  given not even two weeks to try to build our own case before

11  the preliminary injunction hearing happened.

12      And it seems like a bit of a playbook for the plaintiffs

13  and for the United States.  Keep in mind, the United States is

14  a party, not just here in this Court, but also in the Middle

15  District of Tennessee.  They filed the cert petition to the

16  U.S. Supreme Court.  And it seemed to work fairly well for them

17  to show up, demand breakneck pace litigation at the preliminary

18  injunction stage, proceed under euphemisms about

19  gender-affirming care and appeals to authority like WPATH, say

20  trust the experts in the white lab coats, don't trust the rubes

21  in the legislature to make these sorts of judgments.  And now

22  they're going to the Supreme Court again, or they're going to

23  the Supreme Court now.

24      In their cert petition, I think no fewer than seven times

25  they cite to the guidelines -- guidelines, guidelines,

1   guidelines.  And they say there's overwhelming evidence on page

2   7 of the cert petition, and can pull this all off the Supreme

3   Court's docket, and the U.S. v. Skrmetti.  Page 6, they say

4   don't worry about the kids.  Guidelines say that these

5   treatments are only appropriate when they are able to provide

6   informed consent.

7        And then if you compare those statements with the evidence

8   that we have submitted to you under seal, on pages 15 and 19 of

9   our response to plaintiffs' stay motion -- I am not going to

10  discuss the evidence in open court unless the Court rules that

11  that evidence can be made public at this time.  But -- or if

12  the Court were to close the proceeding to just the lawyers and

13  the parties, I would be happy to discuss it in more detail.

14  But you can look at the evidence and compare it to the

15  statements the United States has made to the Supreme Court and

16  determine whether that full record is really being presented to

17  the U.S. Supreme Court.

18        So I think that kind of gets back to some of the things

19  that Mr. Doss was saying just a moment ago is we don't know

20  what will happen.  We don't know why the Court has -- the U.S.

21  Supreme Court has rescheduled multiple times the cert petitions

22  and then reconferenced them for a second time today.

23        We don't know what the Eleventh Circuit is doing.  And it

24  very well may be that they're waiting for this case or waiting

25  for some other case that has years' worth of evidentiary

1  development as opposed to days' worth of evidentiary

2  development.

3       And so by halting this case for potentially a year or

4  more -- because keep in mind even if cert were granted this

5  very minute, we're unlikely -- they're not going to get

6  arguments over the summer.  The Court is about to wrap up the

7  term.  We will have arguments at earliest sometime in the fall

8  with a decision probably not coming down until June of 2025.

9       And that ties back in to some of the potential prejudice

10  and also the fact that that is -- they've not -- the plaintiffs

11  have not borne their heavy burden of showing that even that set

12  of circumstances is likely to happen or likely to improve

13  judicial efficiency because, one, there are standing issues in

14  the Tennessee and Kentucky cases.  You can look at the briefs

15  in opposition that both Tennessee and Kentucky raised -- filed

16  where they raised some serious potential standing problems that

17  the plaintiffs might have in those cases.

18       So we could wait until June of 2025 only to find that the

19  issue is not decided by the Court at all.  We could also wait

20  until June of 2025, 13 months from now, to find out that

21  rational basis is the test and we've waited all this time --

22            THE COURT:  Isn't this all really just we're reading

23  tea leaves?  We're trying to do our best to make an educated

24  guess about what's going to go on here, though?  I mean, by in

25  three months, the -- we could get a mandate from the Eleventh

1   Circuit on this case, the Supreme Court could deny cert on

2   these others.  I don't necessarily think all of those things

3   are likely.

4          MR. LACOUR:  Right.

5          THE COURT:  Do I think the Eleventh Circuit is going

6   to sit en banc and reverse what they did?  I don't think so,

7   but they sure could.  You know, I guess my question would just

8   be, what's the harm in bumping this three months and just

9   seeing what happens to develop, because then we're going to

10  have a -- what I don't want to do is have a two-week trial and

11  the standard changes even slightly, and then we're right back

12  at square one.

13     I think I said this the last time, but, you know, it is

14  certainly possible that I could get reversed twice on this case

15  if I hear it again.  And I think once is enough.  I would kind

16  of like to have some guidance.

17     So give me your thoughts on all of that.

18          MR. LACOUR:  We're trying to provide the guidance,

19  Your Honor.

20     But I would say, for one thing, had we listened to the

21  United States' pleas for a stay six months ago, we would be

22  worse off, not better off today because we would have paused

23  all of this discovery that we have now completed.

24     Second, again, I would urge you to at least consider

25  summary judgment motions in the -- with the goal of getting the

1    case trial ready.  And if you decide that this is not a case

2    that can be decided on summary judgment, under binding Eleventh

3    Circuit precedent, well, then at that time, we can revisit the

4    question of whether we want to go through the cost of trial.

5        But I think the costs of deciding a 30-page motion for

6    summary judgment are far lesser than the costs of having -- you

7    and your clerks have to come down here for two whole weeks and

8    be in here for ten hours a day.  Briefing can happen any hour

9    of the day that -- often late into the night in our office at

10   least, I'm sure in your chambers, too, sometimes.

11          THE COURT:  And I'm not slowing -- I'm not putting the

12   brakes on any of your motion practice or any of that at all.

13   The only thing I'm suggesting is, you know, before we dedicate

14   time and resources to a merits hearing, maybe we ought to just

15   wait a little bit longer.  We know -- we know there is a lot of

16   balls in the air right now.  I'd like to see at least one of

17   them come down.  But I'm not -- I mean, I'm also not interested

18   in, you know, just saying, hey, we will reset this until next

19   summer and see what happens.  I am not suggesting that by any

20   means.

21          MR. LACOUR:  Right.

22       Well, and I think that's very helpful clarification

23   because, again, we do think that this is a case that should

24   resolve on summary judgment.

25       As I mentioned, we intend to comply with the governing

scheduling order and not take the extra two weeks that you have

granted to both sides to file summary judgment motions. We

have been working to meet that deadline. We do want to get

this issue resolved. We have poured a lot of time and effort

into building this record, into defending this law.

We would like to have the cloud of illegality raised. And

we think we are entitled to that in the normal course.

And, again, we do think respectfully that Your Honor will

be able to rule on summary judgment in our favor.

THE COURT: Right. And the one thing I do want to

know just so I'm clear on it is, is I know you say the state

does suffer prejudice if I continue this, but -- or stay this.

Help me to understand that because the law is in effect.

You know, there's absolutely no impediment to the state's

enforcement of the law right now.

What is the true prejudice if I wait a few more weeks or

months to see what guidance we may get?

MR. LACOUR: Two forms, Your Honor. One is that we

have devoted a tremendous amount of time to building this

record and getting ready to end this case. And if everything

is paused for another 13 months, or if Tennessee and Kentucky

are not granted, or do not resolve the issue, and then we're

waiting for Arkansas, and then we're waiting for Oklahoma, and

then we're waiting for South Carolina, I think that at some

point, when is it our turn to finally get justice from this

1   Court?

2        But with that, there are risks that plaintiffs will age

3   out.  One plaintiff already has aged out.  There are risks that

4   lawyers from either in our office or from our outside counsel

5   or witnesses may move on.  We're going to have to retain --

6   continue to retain experts and keep them around to make sure

7   that they're ready for trial.  If some of them move on, we are

8   going to have to get new experts, and that's going to be

9   costly, as well.

10        THE COURT:  I am sympathetic.  I have clerks moving on

11   that have me in the exact same position.  I understand.

12        MR. LACOUR:  Yes.  So there are those sort of

13   litigation costs and the prejudice that comes from that.  And

14   then we do think that there's potential prejudice, too, with,

15   again, sort of this, like the appellate courts potentially

16   deciding these weighty issues that could affect the laws in 25

17   different states.  Those courts are trying to do it based on

18   this artificially limited preliminary injunction record that

19   the United States now is pushing to the U.S. Supreme Court as

20   we speak.

21        And we don't think it tells the whole story.  And we

22   think -- I mean, the United States is a party here, too, so

23   they have access to everything that you have seen and

24   everything that we have seen.  And we don't think that they are

25   telling the whole story to the Supreme Court.  I think there's

prejudice to us, there's prejudice to the public interest in

truth if the courts are proceeding with a blindered view or

artificially limited view of the facts on the ground.  And so

-- and then if the Court ultimately issues the decision based

on a set of facts that is not actually the whole story, then

that could be prejudice to us and 24 other states who have

decided that kids should wait until they're grownups before

they make these irreversible decisions that are going to affect

their lives forever.

     So those are the two main concerns.  I think they're

alleviated if the Court does grant summary judgment for us.  We

think that can be done fairly quickly.

     And then the plaintiffs will be free and the United States

will be free to take a final judgment to the Eleventh Circuit.

They can seek initial hearing en banc if they would like to.

There's precedent for that from the Florida felon voting case

back in 2020 where there was a P.I. decision that was -- a P.I.

was granted against Florida, they appealed and lost at the

panel stage.  They went back, they lost at final judgment.  And

then they sought initial hearing en banc in the Jones case.

They received initial hearing en banc from that final judgment,

and then they ended up winning the initial hearing en banc.

     Then there's also the opportunity under Supreme Court Rule

11 to seek cert before judgment where they could ask the

Supreme Court to skip over the Eleventh Circuit, take their

case immediately.  And there's ample precedent for that, too,
just from last term.  If you look at the Students For Fair
Admission v. Harvard, and Students For Fair Admission vs. UNC,
that's what happened there.

The Harvard case was a little bit ahead of the UNC case
that had already gone from district court to First Circuit and
then had been pending for many months on the Supreme Court's
docket.  Then the UNC case was decided.  And SFFA sought cert
before judgment, Supreme Court granted that and heard those
two cases together at the same time, which had the benefit of
providing the Court robust records from two different courts
when they were trying to decide that very important issue of
whether affirmative action in college admissions violated the
Equal Protection Clause.

So, again, I do think, as Mr. Doss said, we don't know why
they're waiting.  But they may be waiting for us because no
other court in the country -- many, many states now have passed
laws like Alabama's.  No other court in the country has
available to it the extensive record that we have built.  And
it took us a lot of time, lot of motions practice, motions to
compel to get documents from WPATH, motions to compel to get
documents from the United States who entered as a party and
then said they weren't subject to the obligations of discovery
of a party.  Motions just to get the plaintiffs' medical
records after the plaintiffs came in at the preliminary

1   injunction stage and said, everything's going great for us.
2   And then we said, well, can we see the records to prove it?
3   They said, that's totally irrelevant whether these are actually
4   helping us.  We had to come to you to get that evidence.  But
5   we have it all now.
6        And so we think it's time for this case to come to a close
7   and then to move on.  And it's -- again, we have got 99 percent
8   of the work done.
9        As the U.S. said when they were seeking a stay back in
10  December, and this is from the close of their stay brief, they
11  recognized that when stay requests have been made, courts have
12  declined to grant stays when, quote, most of the work has
13  already been done, closed quote.  That's page 12 of their brief
14  from December 4th.
15       They asked the Court to grant a stay because much of the
16  work has not been done.  But now look at where we are.  Most of
17  the work has been done.  And so we have asked for you to
18  consider -- at a minimum, consider our motion for summary
19  judgment that we are going to file on Monday before deciding
20  whether or not to stay further proceedings in this case.
21       If the Court sees fit to move the trial back for now, we
22  don't have a serious problem with that as long as it's not
23  interminable.  But because, again, we do think that this case
24  is one under governing Eleventh Circuit precedent that should
25  be decided on summary judgment.

```
 1          THE COURT:  Understood.  Understood.

 2      Well, let's do this.  I do want to think about your

 3  arguments a little bit more, so especially where we are on

 4  summary judgment.

 5      I do think -- let's get our calendars out and look at

 6  October the 27th for those -- the two weeks beginning on

 7  Monday, October 28th, and see if that works to pencil it in.

 8      Anybody have a serious conflict on either side with that

 9  date?

10          MR. DOSS:  No, Your Honor.

11          MS. TOYAMA:  No, Your Honor.

12          THE COURT:  All right.  Excellent.

13      All right.  That may cover that issue.  So I know we have

14  got some other issues we have got to bring up in our side case

15  to this.  But anything else, Mr. LaCour, from the state that we

16  need to consider today?

17          MR. LACOUR:  I think that's it, Your Honor.

18          THE COURT:  All right.  Thank you.

19      All right.

20          MR. DAVIS:  Judge?

21          THE COURT:  Yes.

22          MR. DAVIS:  May I ask, do you need the state for any

23  of the rest of these proceedings?

24          THE COURT:  I don't.  You're welcome to leave if you

25  want to.
```

```
1              MR. DAVIS:  We will ask to be excused.

2              THE COURT:  You are excused.  Thank you.

3              GENERAL MARSHALL:  Thank you, sir.

4              THE COURT:  All right.  Mr. Prater, let me talk to you

5      just for a minute.  I want to address one issue from the last

6      hearing.

7          You quoted some language that I gave you in the last

8      hearing when I was answering your question about the specific

9      rule under Shaygan that the respondents may have violated,

10     whether it was abstract -- an abstract judge-shopping concept

11     or some particular rule.  And I spoke off the cuff and said the

12     Eleventh Circuit doesn't have clear guidance on it.  But there

13     is clear guidance from the Eleventh Circuit that judge shopping

14     is prohibited.

15         When I said otherwise, I really just meant that the Court,

16     the Eleventh Circuit has never had the opportunity to consider

17     the appropriate measure of sanctions for that conduct, not that

18     the conduct was prohibited.  And so just to make sure we're

19     clear on the record, I want to read into the record exactly

20     what the Eleventh Circuit has said about judge shopping in

21     BellSouth.

22         "It is clear that the Kleiner standard, and not the

23     Schlumberger standard, applies where the conduct at issue

24     threatens the orderly administration of justice.  We have no

25     difficulty concluding that a contrivance to interfere with the
```

judicial assignment process constitutes a threat to the orderly administration of justice.  Every court considering attempts to manipulate the random assignment of judges has considered it to constitute a disruption of the orderly standard administration of justice.

"In McCuin, the Fifth Circuit held that permitting such manipulation would bring the judicial system itself into disrepute and would permit unscrupulous litigants and lawyers to thwart our system of judicial administration.

"This Court, in Robinson, expressed the obvious concern with respect to the effects of such manipulation and judge shopping on the proper administration of justice.

"The Second Circuit's decision in FCC, supra, implicitly recognized such manipulation is disruptive of the orderly administration of justice; the Court used its inherent power to disqualify a lawyer in order to preserve the neutral and random assignment of judges to cases.

"Similarly, the Supreme Court of Michigan, in Fried, emphatically condemned such manipulation.  It is prejudicial to the administration of justice because it is an undue interference with the proper assignment of cases."

So it's very clear to me under any reading of BellSouth, that the Eleventh Circuit has held that a contrivance to interfere be a judicial assignment of process is prohibited conduct.

1    I might just point out that in her Senate Judiciary

2    Committee hearing, Judge Nancy Abudu was specifically asked

3    about judge shopping, and as she, you know, as that time, she

4    was the supervisor to one of the respondents here, and her

5    answer was that judge shopping, quote, undermines what should

6    be a fair and impartial process where no matter which judge you

7    appear before, you should feel you should have a meaningful

8    opportunity to be heard.

9    So I just wanted to clear that up.  I do think that's an

10   unbelievably bright line of guidance from the Eleventh Circuit.

11   And, again, I gave you an off-the-cuff answer, but what I

12   really meant was we just don't have anything from them that

13   says what -- what is an appropriate measure of sanctions for

14   particularized conduct.

15   So just wanted to make -- wanted to get that clear.

16        MR. PRATER:  I appreciate that, Your Honor.  Thank

17   you.

18        THE COURT:  Absolutely.  Absolutely.

19   All right.  Let's talk about our motion that's still out

20   there regarding reconsideration of my order on experts.  Who's

21   going to handle that?

22        MR. KING:  Chris King for Ms. Eagan and Mr. Doss.

23   I think there are two motions.  We filed one of them.

24        THE COURT:  Right.

25        MR. KING:  And it has to do with Greg Joseph.

1          THE COURT:  Uh-huh.

2          MR. KING:  We provided as an offer of proof in

3    connection with our motion his declaration.

4      Mr. Joseph is the author of the seminal treatise on

5    attorney sanctions.  And he's on the board of directors of the

6    Moore's Federal Practice.  I don't think there's any question

7    about his qualifications.

8      I believe the Court's concern, as I understand it, was

9    that you were concerned that he would be wading into what the

10   law is, and that the Court thought that that would not be a

11   subject of appropriate expert evidence.

12     And in our motion to reconsider that, we cited the

13   Finkelstein case with which I know the Court is familiar.  In

14   that case, a lawyer was sanctioned by sending what was

15   characterized as a very rude letter to his opposition.  And

16   what that lawyer did in response was to submit evidence from

17   four attorneys about the reasonableness of his conduct.

18     And, of course, any -- any declaration from an attorney is

19   going to have some law sprinkled in it.  But the attorneys

20   focused on the reasonableness of the conduct, which is -- you

21   know, when you deal with sanctions, you're looking at a

22   subjective bad faith standard, as the Court knows from the

23   voluminous briefing it's received.

24     So the Eleventh Circuit there reversed the sanction and

25   said -- and was approving of the fact that the respondent had

1    submitted those four affidavits.

2         Following up on that, also cited in our paperwork, is the

3    Thomas case.  And in the Thomas case, the Eleventh Circuit

4    upheld a sanction against a lawyer, because in part, at least,

5    they said that that lawyer, unlike the Finkelstein lawyer, did

6    not come forward with evidence of the reasonableness of the

7    attorney's conduct.

8         If you take a look at -- and I know the Judge ruled before

9    without the benefit of having seen Mr. Joseph's declaration,

10   but if the Court takes a look at that declaration, the Court

11   will see that Mr. Joseph is very careful to say, I'm not trying

12   to tell the Court what the law is.  I'm just commenting on the

13   reasonableness of these lawyers' conduct in light of the fact,

14   for instance, that the only two circuit courts in the U.S. who

15   have considered a dismissal under Rule 41 have said, it's an

16   unfettered right.

17        And he goes through the reasons.  And he cites a bunch of

18   local rules, how other courts have decided to deal with this

19   issue.  They've dealt with it by local rule.  Most of the time

20   saying, if you dismiss without prejudice as you're allowed to

21   do under Rule 41, then if you re-file, it goes back to the same

22   judge.

23        So that's the way other local rules have dealt with

24   this -- what we say is the unfettered right under Rule 41 to

25   dismiss.

1        So he points all that out and says, in light of what's out

2   there about this topic, his opinion is that it was reasonable

3   for these lawyers, even assuming taking everything the panel

4   found as true, which he does, that it was reasonable for these

5   lawyers to conclude that they did have the right to do this.

6        Now, we believe that's good evidence for the Court to

7   consider.  And we would urge that, especially in light of the

8   Finkelstein and Thomas cases, that the Court reconsider its

9   order excluding that and allow that declaration.

10            THE COURT:  Thank you.

11       Mr. Ragsdale, how long did it take you to get your car

12   this morning?

13            MR. RAGSDALE:  A long time.  I wasn't sure we were

14   going to make it.  But I was encouraged by the fact that you

15   were behind us.

16            THE COURT:  That's right.

17            MR. RAGSDALE:  As usual, Mr. King did a better job

18   than I could of explaining that.

19       We read those Eleventh Circuit cases as, at a minimum,

20   approving consideration of these kind of expert affidavits and

21   potentially requiring it.

22            THE COURT:  Uh-huh.

23            MR. RAGSDALE:  And so that's why we've asked -- now

24   that we have gotten Professor Green.  We submitted the

25   affidavit declaration of Professor Green.  There's an

1    additional issue with us, obviously, is that we have to address

2    client consent issue, and we think that that also would be

3    helpful for the Court to see the broad scope of how that's

4    interpreted across.

5         And, again, it's not to try to preach to the Court what

6    the law is, but rather to try to demonstrate that the conduct

7    of our clients was reasonable under the circumstances.  And we

8    think those declarations provide some help.  You may look at

9    them and decide they provide no help, but we think they are at

10   least something that should be considered by the Court.

11             THE COURT:  Understood.

12             MR. RAGSDALE:  Thank you.  Unless you have any

13   questions.

14             THE COURT:  I don't.  I don't at this point.

15             MR. BUCK:  Your Honor, Brannon Buck for Kathleen

16   Hartnett.  Just for the record, we also had a motion relating

17   to an expert Professor Clark Cunningham.  And we adopted the

18   same arguments, and I will do so again here today.

19        The only thing I would add, Your Honor, that we argued in

20   our papers was that there's case law that says when the judge

21   is sitting as the trier of fact, that the gate-keeping

22   function -- when there is no jury in the box, the gate-keeping

23   function is lessened in that situation, and as one of the

24   factors that the Court may want to consider in deciding whether

25   to allow this evidence.

1     And some of those cases speak specifically to when you've

2 got an expert who is admittedly bumping into legal issues,

3 because we understand particularly when there's a jury in the

4 box that testimony from an expert that is offering a legal

5 opinion or a legal conclusion is typically prohibited.  But

6 when there's no jury and it's simply a bench trial, there's

7 case law that says that that standard is relaxed, and we just

8 pointed that out to Your Honor in our papers.

9     And we also believe that Professor Cunningham's -- his

10 opinions, which touch on many of the same issues but also talk

11 about some of the tension that -- in the rules that these

12 lawyers were under in terms of the duties to their clients to

13 advocate and try to achieve the objective, that that needs to

14 be factored in and weighed in terms of evaluating the

15 reasonableness of their conduct.

16        THE COURT:  Anybody else want to be heard on this

17 issue?

18     Well, let me say this:  I'm not really prepared to make a

19 ruling on this today.  I've certainly read your filings, but I

20 would like to take a little bit longer to dig a little bit

21 deeper into and consider some of the arguments.  So let me

22 think about that, stay that issue a little more, and I will get

23 a ruling out as quickly as I can.

24     All right.  I think that gets us to just sitting down

25 informally with each of you and your client.

1          What I would like to do is just sit down individually with

2     everybody informally.  I do think it probably needs to be on

3     the record at this point.

4          Some folks, I may have some questions for, just in

5     preparation for the show cause hearing, but I don't intend to

6     put anybody under oath or anything like that today.

7          And I also, you know, I just want to lay out with each of

8     you what I think the process would generally be, see how long

9     you think you need from your end, what that might look like.

10    And, you know, to the extent that any of you have any

11    suggestions for your own hearing, I'm wide open to listening to

12    those.

13         So, again, my -- you know, what my preference would be

14    would just to be individually sit down with everybody in this

15    conference room one by one.  It will be on the record.

16         I don't -- I'm not sequestering anybody.  I'm not going to

17    hide the record from anybody, you know.  You all will be

18    welcome to read anybody else's transcript if you want to.

19         Does everybody think that is a good way to do it?

20              MR. BUCK:  That's good for Ms. Hartnett, Your Honor.

21              MR. PRATER:  Yes, sir, Your Honor, for Mr. Doss and

22    Ms. Eagan.

23              THE COURT:  Okay.  So everybody's good with that?

24              MR. RAGSDALE:  Yes, Your Honor.  The only question I

25    have is we've got three clients that are generally in the same

boat.  Obviously, there's one exception.  Do you think we could
take them at the same time, or do you want to take them
individually, or --

THE COURT:  I don't have strong feelings either way,
Mr. Ragsdale.

MR. RAGSDALE:  Okay.  I will confer with them, if
that's all right.

THE COURT:  No, no.  That's perfectly fine.

Let's take a ten-minute break, and then we will come back
and start on that.

(Recess.)

(In-chambers conference with Mr. Rogers and
Mr. Shortnacy:)

THE COURT:  All right.  So really I just want this to
be informal.  Y'all can tell me anything you want to, or not
tell me anything you want to.

My thoughts on this would just be, you know, begin the
hearing by letting your client say whatever he wants to.  You
to make any arguments that you want to.  I definitely will
have, you know, a lot of questions myself, and then, you know,
probably will just end with you again could ask your client
some questions and make any arguments that you want.  That's my
informal thought.  But I'm wide open to yours.

MR. ROGERS:  I think we're accommodating to Your Honor
on that.  What you're suggesting is that he would be under oath

1   and testifying again?  Would it be an evidentiary hearing?  Or

2   when you ask questions, is that sort of lawyer and Michael

3   trying to respond to your questions?  I'm sort of trying to

4   understand.

5          THE COURT:  Yeah.  He would be under oath.  It would

6   be a show cause hearing.  So definitely under oath.  And

7   just -- honestly, it will probably just be me asking follow-up

8   questions to help me understand the prior testimony and the

9   record and that sort of stuff.

10         MR. ROGERS:  Yes, sir.  And you would have no concern

11  if we wanted to ask questions of our client?

12         THE COURT:  None.

13         MR. ROGERS:  Yes, sir.

14         THE COURT:  I actually would expect that.

15         MR. ROGERS:  Well, I wish I had done it in front of

16  the panel, but I didn't, and that's my mistake.  So I may do

17  that to help Your Honor see the full context of the decisions

18  that were made and what role, if any, Michael had.

19         THE COURT:  Right.  Right.  So, you know, and let me

20  say this:  You know, not prejudging anything, I don't know

21  exactly what all will come out, but obviously, let's just say

22  the worst evidence probably does not surround your client.

23         MR. ROGERS:  We understand.  With a twinkle in my eye,

24  I was going to ask Your Honor to go ahead and grant my motion

25  to dismiss Michael because it's unopposed.

 1              THE COURT:  I understand.

 2              MR. ROGERS:  But I say that with a twinkle in my eye,

 3    and I understand.  And we're here to help Your Honor get to the

 4    right place.  And, obviously, he's given substantial testimony

 5    in a declaration, and you've got our response.

 6              THE COURT:  I do.  Anything today -- because, you

 7    know, I don't have any specific questions for you.  I may well

 8    for other respondents just, you know, to help me prepare for

 9    that show cause hearing, but anything about your prior

10    testimony that you want to change or supplement, or anything

11    you want to tell me today?  That's just up to you.  You are not

12    under oath.

13              MR. SHORTNACY:  Yeah.  Well, I wanted you to hear from

14    me.  I believe I acted in good faith.  I was involved in this

15    case because I wanted to do good for people who are vulnerable.

16    I wanted to stick up for them because they don't have

17    representation typically.

18         And, you know, the facts of this case, I was on a phone

19    call where a decision was made to dismiss this case.  And in

20    that phone call, my contribution was to ask for reconsideration

21    to Judge Axon.  And I accepted the recommendation of my

22    co-counsel on the rest.

23         So I will make that clear.  But maybe I offer that to help

24    Your Honor understand my mindset, because I think that's good

25    evidence for you to know.  And that's the focus, I think, of my

1    involvement in what's been put in the order to show cause.

2         There are a number of other issues that I have no

3    knowledge of -- Walker, counsel, and so on and so forth.  So

4    that may help Your Honor focus what I think are, you know,

5    salient issues for me.

6              THE COURT:  Right.  Right.

7         All right.  Anything else y'all want to cover?

8              MR. ROGERS:  No, Your Honor.  And thank you again for

9    accommodating us.

10        So June 24th, I think is our day.  Monday.

11             THE COURT:  Monday; is that right?

12        How long do you envision this going from your side?

13             MR. ROGERS:  We would be reasonably short, I would

14   think.  Obviously, subject to Your Honor's desire to go deeper

15   and wider, but Michael's involvement was to be on a phone call

16   on the afternoon of Friday, April 15th, and that's -- that

17   implicates Your Honor's look at the conduct.

18             THE COURT:  Uh-huh.

19             MR. ROGERS:  That's it.  He hadn't even been admitted

20   to practice here.  He didn't sign anything.

21        And Michael's experience is outside of the state of

22   Alabama, but he brought on very strong, very capable and highly

23   professional co-counsel, as you know.

24        So I don't think we would be -- I mean, my point in saying

25   that is to say it's really pretty much laser focused on that

```
 1   phone call.
 2            THE COURT:  Right.  Right.
 3            MR. ROGERS:  And what, if any, wrongdoing occurred in
 4   that phone call.
 5            THE COURT:  Right.
 6            MR. ROGERS:  Or the results of that phone call.
 7            THE COURT:  Right.  All right.
 8       Okay.  Well, I think that clears it up.  I don't know that
 9   there's -- there's nothing else we need to talk to with the
10   whole group, is there?
11       I'll tell you what, let me say this:  Probably just in the
12   spirit of caution, because somebody may have a really bright
13   idea in one of these meetings that I have not thought of, why
14   don't we all just wait and -- when I finish these, we will come
15   back together as a group.  Somebody may have some suggestions.
16            MR. ROGERS:  Oh, I see what your question was based on
17   whether we can leave the courthouse or not.  We're here.  We
18   set aside the day.
19            MR. SHORTNACY:  We're here.
20            THE COURT:  Okay.  Got it.  Got it.  I still think we
21   should be out of here.  This should not take long.
22            MR. ROGERS:  We don't have reservations until 7:00.
23            (End of in-chambers conference with Mr. Rogers and
24       Mr. Shortnacy.)
25            (In-chambers conference with Mr. Buck and Ms. Hartnett:)
```

1          MR. BUCK:  Thank you for making time this morning.

2          THE COURT:  I thought we would just kind of informally

3    talk like this.  This would be my thought.  My thought would be

4    that, you know, your client, when we get to the hearing, could

5    tell me whatever she wants me to know.  You are welcome to ask

6    her questions.  I'm -- you make whatever legal arguments you

7    want to make.  I probably would have my own, you know, list of

8    questions.  And then probably end it by, you know, if there's

9    anything else that she wants to say, or any other argument you

10   want to make, that's my general view.

11       Do y'all have any thoughts?  Any different thoughts?

12          MR. BUCK:  Your Honor, no.  I mean, I think that's

13   fairly consistent.

14       If we could take just a moment, I would love to introduce

15   to you to Kathleen for just a moment.  And then -- if we can

16   talk about it for just a minute, just see if there is a path

17   forward here that's different than a final hearing.  And I

18   don't know if it's anything you might entertain, but I have

19   been racking my brain about, you know, a way forward here that

20   might be different than going down the sanctions road.  And if

21   you're willing to hear it, I would love to talk to you about

22   it.

23          THE COURT:  I'll listen to anything.

24          MR. BUCK:  Okay.  Okay.  Well, I mean, just, first of

25   all, Kathleen -- a Harvard law school graduate, clerked on the

1    Supreme Court, clerked on the D.C. circuit.  She was the deputy

2    U.S. Attorney General.  She is a partner at the Cooley firm,

3    which is an enormous, over a thousand-lawyer firm.  And she

4    heads up their appellate practice.  And she's got a national

5    commercial litigation practice.  You know, she is all over the

6    country representing health care clients, entertainment

7    clients, technology clients, Google, Zoom, Coinbase, Kaiser

8    Permanente, I mean all these clients.

9        So she has a very robust commercial litigation and

10   appellate practice.  And she's admitted in California, New

11   York, and D.C.  And the reason I mention that, Your Honor, is

12   because any sanction here, even a private reprimand, will

13   severely impact her ability to continue her practice the way --

14   as she now, you know, has -- the way she now conducts her

15   practice.

16       And so that's why I've been just trying to rack my brain

17   to see if there was anything, any other path forward that we

18   could delve into short of, you know, being at this final

19   hearing and having you have to make that decision.

20       And the one thing I had come up with, Your Honor, was --

21   is an idea that's kind of out of the box and not something I'm

22   sure you would agree to here on the spot, but maybe just

23   something to think about.

24       Number one, she's extraordinarily remorseful that her

25   actions and her conduct has led us to this place, that, you

1   know, that it gave the appearance of impropriety.  She is very

2   sorry for that, and she will tell you that herself.

3        She does not -- she did not and does not believe she ever

4   acted in bad faith.  And she would never have put her

5   professional reputation, which as you know, for most of us, our

6   professional reputations are about the most important asset we

7   have.  She would never have put that at risk to try to engineer

8   a particular judicial assignment.

9        But she recognizes that, you know, some of what happened

10  here gave the appearance that there was judge shopping going

11  on, but she certainly never believed that she was engaging in

12  any kind of judge shopping or anything inappropriate.

13       And part of the issue is that, you know, in the Middle

14  District and in the Northern District, there was -- there's no

15  set guidance, or at least in the Middle District there's no

16  clear rule on the marking related on the civil cover sheet.

17  And in both districts, there's no local rule on Rule 41 that

18  places conditions or restrictions on dismissals.

19       And so the idea that I had, Your Honor, just to throw out

20  there for your consideration, would be for Ms. Hartnett and

21  possibly other respondents to conduct a comprehensive survey of

22  local rules on both those topics and anything else that the

23  Court thought was applicable here, and make some -- maybe

24  submit a report that conducts an analysis -- you know, is an

25  analysis of those rules, and perhaps even make some

recommendations to the Court about different local rules that
might be adopted, or something that we could take a negative
situation, turn it into a positive, and have Kathleen and
possibly other respondents and her firm be of service to the
Court so that we could put the Court in a situation and lawyers
in a situation where this is less likely to happen again.

Because there's, you know, a clear rule on the civil cover
sheet, there's a clear rule about dismissals and what
restrictions or conditions the Court sees appropriate with
that.  And to turn this whole situation into more of a positive
outcome for the Court and for them and admittedly so that she
could avoid any kind of reprimand or a sanction.

THE COURT:  Right.  Let me say this:  Number one,
creative idea.  You know, I understand your suggestion.

I don't really think that's something that I can do,
except that I would say, you know, just because we're having a
show cause hearing doesn't mean that everybody walks away with
a sanction.

MR. BUCK:  Understood.

THE COURT:  And if I am looking at the sliding scale
here, your client is not on the high end of it, at least from
what I have seen so far.

MR. BUCK:  We certainly believe that, Your Honor.

THE COURT:  I think it's certainly possible that more
than one person walks away from this with nothing if they're

 1  honest in their testimony at the show cause hearing.

 2          MR. BUCK:  Yes, Your Honor.

 3          THE COURT:  You know?  And I'm not prejudging

 4  anything.  I am not saying your client is one of those.  I'm

 5  just saying, looking at the evidence that I have at this point,

 6  you know, I think that's a possibility, a distinct possibility

 7  unless, you know, something changes and I hear more, you know,

 8  as this process goes on.

 9          MR. BUCK:  Yes, Your Honor.

10      And I just wanted to throw out the idea to the extent you

11  had reviewed the record specific to Kathleen.

12          THE COURT:  And I have literally read through the

13  record several times now, and it's voluminous.

14          MR. BUCK:  It is.  It is vast.  It is massive.  I know

15  you know it better than I do at this point.  But to the extent

16  that you thought that perhaps there was a really good chance

17  that she might not be -- a sanction may not be warranted for

18  her and there was a possibility to avoid going through that

19  final hearing process, I thought this might be a mechanism to

20  have her and her firm, you know, be of service to the Court in

21  some way or to interface with the rules committee that the

22  Court has in place.

23          THE COURT:  Right.  Right.

24          MR. BUCK:  And have her do something constructive for

25  the Court as a way to sort of make amends for, you know, having

1  been involved in a situation that's led to this proceeding.

2         THE COURT:  Right.  No.  I understand.  I understand.

3    I think we just kind of are where we are now.  I

4  appreciate the suggestion.

5         MR. BUCK:  Sure.

6         THE COURT:  But I don't really see that as where we

7  are.  But, you know, look, I mean, everybody in this case

8  appears to have completely hit the panic button, and the tone

9  of this has gotten higher and higher and higher and continues

10  to get higher even to this moment, it seems like.

11    But, you know, I think everybody can see that I was fair

12  and impartial on the merits --

13         MR. BUCK:  Absolutely.

14         THE COURT:  -- of this case.

15         MR. BUCK:  Absolutely, and she will tell you that.

16         THE COURT:  So I want everybody to take a deep breath

17  and understand that I will be fair and impartial on this, as

18  well, you know.

19    So...

20         MR. BUCK:  Absolutely, Your Honor.

21    So, with regard to the final hearing, just a couple of

22  questions.  So do you anticipate if -- if you decide to grant

23  the expert testimony, would you like for experts to appear in

24  person, or do you just want to take the declarations -- I know

25  you haven't made a ruling on them.

1          THE COURT:  If I let them in, I would probably want

2     them just to give live testimony.

3          MR. BUCK:  All right.  That's good to know for

4     planning purposes.

5          THE COURT:  I'm not saying that 100 percent, but if I

6     grant that.  And, obviously, I have to get deeper into those.

7     I have read them.  But I need to give them some more thought

8     and consideration before I decide that issue.

9          MR. BUCK:  Understood.  Do you anticipate at the close

10    of that, after the -- whatever testimony is given from

11    Ms. Hartnett -- and I think we would like to reserve the right

12    for me to ask her some questions in addition to answering

13    whatever questions the Court has.  Do you envision sort of the

14    last thing happening there being sort of a closing statement

15    from her counsel, from me?

16         THE COURT:  If you want that.

17         MR. BUCK:  Okay.

18         THE COURT:  I don't have any firm rules about this,

19    you know.  I will let you -- you ask her some questions.  You

20    can make argument.  I will ask her some questions.  And so, you

21    know.

22         MR. BUCK:  Okay.

23         THE COURT:  I am not going to cut anybody off, or

24    anything like that.

25         MR. BUCK:  So in our conference on that Friday

1   afternoon from a little over a week ago, I think we -- you

2   decided that Kathleen and Mr. Shortnacy will be on June 24th.

3          THE COURT:  Right.

4          MR. BUCK:  Okay.  And there just hasn't been an order

5   entered, so I just wanted to make sure --

6          THE COURT:  Have we not?

7          MR. BUCK:  I don't believe there's been any -- unless

8   I overlooked it.  There's so many filings in this case.  I may

9   have overlooked it.  I may have -- sometimes the text orders

10   just come out, and I may have -- I may have overlooked it.  Do

11   you recall seeing that?

12          MS. HARTNETT:  I don't.

13          THE COURT:  It will be that day.  So if there's not an

14   order, we will get one out.  And I'm asking everybody this

15   question, so don't take this in any wrong way.  Obviously, I am

16   going through the record.  I'm going through the declarations,

17   everything.  And so is there anything that you want to add or

18   change about any of your testimony?

19          MS. HARTNETT:  No, Your Honor.

20          THE COURT:  Okay.

21          MS. HARTNETT:  I re-read it before today in the event

22   that we were going to have a conversation.  And as far as I

23   know, no.

24          THE COURT:  All right.  Fair enough.

25      All right.  Anything else?

1          MR. BUCK:  I don't believe so.  Well, actually one

2    last question.  Based on your -- the show cause order, she

3    needs to be here on that Thursday and Friday, as well.  I know

4    I can't be here.  But she can be here that Thursday and Friday

5    in addition to the Monday.

6          THE COURT:  Yes.

7          MR. BUCK:  Okay.  I just wanted to make sure you

8    wanted her here at the end of the week, as well.

9          THE COURT:  Yes.  And that's just because I don't know

10   what will develop.

11         MS. HARTNETT:  I was planning for it.

12         THE COURT:  Excellent.  Excellent.  All right.  Thank

13   you very much.

14         (End of in-chambers conference with Mr. Buck and

15      Ms. Hartnett.)

16         (In-chambers conference with Mr. Franklin, Mr. Prater,

17      Mr. King, and Ms. Eagan:)

18         THE COURT:  So here's my general thoughts on this, is,

19   you know, I would, at the show cause hearing, I would let, you

20   know, y'all lead off.  She could say whatever she wants to say,

21   thinks I need to know at that hearing.  Certainly allow y'all

22   to ask questions if you want to, make legal arguments.  Then I

23   will have some questions.  And then at the end of it, I would

24   let you -- if you have more redirect you want to do or

25   questions.

```
 1        That's my general thought.  I'm open to your suggestions,
 2   though.
 3              MR. KING:  Judge, I think that sounds fine.
 4              THE COURT:  All right.  How long do you view this
 5   going for Ms. Eagan?
 6              MR. KING:  Well, we --
 7              THE COURT:  From your end.
 8              MR. KING:  We briefed the stew out of it.  And we
 9   would like the opportunity to make argument.  And part of that
10   depends on how many questions Your Honor has.  But and, you
11   know, what you want the argument to look like.  But I just
12   don't see us needing more than an hour.
13              THE COURT:  Okay.
14              MR. KING:  To do the whole thing.
15        Now, some of y'all may disagree.
16              MR. PRATER:  I think that's right.  We are not going
17   to present any more evidence other than our clients here, our
18   partners.
19              THE COURT:  Right.  Right.  Okay.
20              MR. KING:  And we will offer the expert declaration if
21   you let us.
22              THE COURT:  Right.  And let me think about that a
23   little bit more.  I have not had time to dedicate enough.
24              MR. KING:  Understood.
25              THE COURT:  There's been a lot filed in the last week
```

1  or two.

2          MR. KING:  I wasn't kidding.  We did brief the stew

3  out of it.

4          THE COURT:  So give me some more time to do my due

5  diligence on that.  And I promise I will make a decision on

6  that as quick as I can.

7          MR. PRATER:  Okay.

8          THE COURT:  I do have some questions for you today.

9  You are not under oath.  But just in preparation to help me

10  understand some things for the show cause hearing.

11          MS. EAGAN:  Yes, sir.

12          THE COURT:  And so, the first one is, I'm trying to

13  understand why Judge Axon was such a great draw on this case.

14  And I mean, you gave extensive answers on that.  But is there

15  anything you want to add to those reasons today that you

16  haven't already told the panel?

17          MS. EAGAN:  No, sir.  And I don't know if I would

18  classify her as such a great draw.  I had a positive reaction

19  to her as a draw for the reasons that I had indicated to the

20  panel.

21          THE COURT:  One thing that -- a theme that kind of

22  continued to come through not only from you but from others who

23  testified was Judge Axon has children, she's a mother, and that

24  seemed to repeat itself all the way through.  But I mean, most

25  of us in the Northern District have children.  So, you know,

 1   what about her family status -- how did that factor into the

 2   belief that she was a good draw?

 3        MS. EAGAN:  Well, I know Judge Axon because of the

 4   fact that our children are similar age.  Her son is a friend of

 5   my son's at the junior high.  But and, of course, then her

 6   husband is a law partner of my husband -- of my -- with my

 7   husband.  So I knew her personally from a standpoint of being a

 8   mother myself.

 9        I thought the issue of being able to make decisions for my

10   children on what would be the right medical care for them --

11   and, again, I am not saying this would be any different for a

12   father.  But to me, a mother, and just knowing her, I thought

13   that would speak to her an issue of, I would want to be able to

14   make decisions as to what was in the best interest of my

15   children, if she was faced with some issue and a doctor was

16   saying this is the established care and what we think is in the

17   best interest of your child.  So that was one of the reasons.

18        Another reason was because with her son who is a good

19   friend of my -- a friend of my son's, he at the time was

20   involved with Red Mountain Theatre, does musical theatre and

21   that sort of thing, as does my son, and I thought that with

22   the -- with that connection, that she may know children who may

23   be in the LGBTQ community or parents of children in the LGBTQ

24   community.  And so I thought that also might be something that

25   perhaps as she was -- you know, she may be empathetic towards

1  those parents and some of the issues they were facing.

2      So that really was what was going -- that went into the

3  equation, from my standpoint in feeling like she would be a

4  positive draw.

5          THE COURT:  So the knowledge about her husband, and

6  her son, was that -- and that social information, was that all

7  that you had that was relevant to her belief that she was a

8  good draw for your clients?

9          MS. EAGAN:  That -- yes, sir.  I mean, I don't think

10  there was anything else other just from that perspective I felt

11  like that she might be receptive to our clients.

12          THE COURT:  Well, let me be a little more precise.

13  Was there anything else about Judge Axon -- her husband, son,

14  or her daughter -- that influenced your decision?

15          MS. EAGAN:  No, sir.

16          THE COURT:  All right.  And I'm digging down here

17  because, again, the testimony is that you're advising lawyers

18  from around the country, and they all recall with specificity

19  that you thought she was a great draw.  And but the reasons

20  that you have given me for that don't seem entirely different

21  than things that could be said about many of the other judges,

22  as far as children and their activities, you know.  My child

23  has done theatre and all these things.  So I'm -- help me to

24  understand that a little bit better.

25          MS. EAGAN:  Judge, I mean, again, I don't think that I

 1  set her apart as a better draw than other judges in the

 2  Northern District necessarily at the time.  I mean, it was --

 3  it's just with my knowing Judge Axon and just with my thoughts

 4  as to -- again, it was me thinking she's a mom, she's like me,

 5  you know.  I thought that she just -- the reasons that I have

 6  stated are the reasons that I thought that she would be a judge

 7  that potentially would be receptive.  I didn't know how she

 8  would rule on these issues.  Clearly, Your Honor, I didn't know

 9  how you were going to rule on these issues.

10        THE COURT:  A lot of people didn't know.

11        MS. EAGAN:  And so, you know, I -- I didn't have a

12  crystal ball by any means.  But I just -- when I was thinking

13  through judges and their backgrounds, and just what I knew

14  about them, I felt like that she might be a good draw for us

15  from the standpoint of being receptive to our clients and the

16  claims.  And the basis of that is really what I indicated to

17  you and what I indicated to the panel.

18        THE COURT:  Right.  Right.

19     Well, I mean, I just want -- I want to be crystal clear as

20  we go into this show cause order.  You don't recall -- and you

21  definitely don't recall any other reason that factored into

22  your belief that Judge Axon was a great draw that influenced

23  you to give that advice to everyone else?  You've told me every

24  single reason, from the biggest reason to the smallest reasons?

25        MS. EAGAN:  I -- I don't remember any other reasons

1  that were in my mind.  And there are certainly not any in my

2  mind today, Judge.

3          THE COURT:  All right.  And I'm not trying to make

4  this uncomfortable.  I just want to make sure that the record

5  is absolutely clear that there is no other reason that

6  influenced you to say that Judge Axon was a great draw other

7  than what you have already told?

8          MS. EAGAN:  There's nothing else that I know of.

9          THE COURT:  All right.  All right.

10      One other thing that was in the record was there was a

11  concern that you -- that Judge Axon might recuse.  And

12  Mr. McCoy testified about conversations your team had about

13  that issue, that you had said it did not seem like Judge Axon

14  was going to recuse.

15      Do you recall making that observation?

16          MS. EAGAN:  I don't remember making --

17          THE COURT:  Do you remember sharing it with the group?

18          MS. EAGAN:  I don't remember that, Judge.  I'm not

19  saying I didn't.  But I don't remember that.

20          THE COURT:  All right.  Well, Mr. McCoy says that --

21  and I'll quote it -- he said that your reaction to the

22  substance of that call was to observe and share with the group

23  that it did not seem like Judge Axon was going to recuse.

24      So I guess my question to you would be:  What reason would

25  you think Judge Axon would have to recuse from this case?

```
 1          MS. EAGAN:  The only reason that I -- I had not
 2   appeared before Judge Axon.  I did not think that she
 3   considered our friendship to be one that would give grounds for
 4   recusal.  So if I was talking in any way about that, that would
 5   have been the only reason.  Just I had not appeared before her,
 6   so I didn't know if because of some sort of, you know, because
 7   of our friendship in the past, whether that might be some
 8   reason she would.  I didn't think she would.
 9          THE COURT:  Any other reason that you would consider,
10   even if it's a small one, that Judge Axon might recuse on this
11   case?
12          MS. EAGAN:  No, sir.
13          THE COURT:  All right.  That probably clears up what I
14   need to know.  I appreciate you taking some time to talk to me
15   about that.
16      Gentlemen, what else do we need to talk about today?  And,
17   again, I am open to your suggestions, your thoughts on this
18   hearing.
19          MR. FRANKLIN:  Could I say one thing?
20          THE COURT:  Absolutely.
21          MR. FRANKLIN:  I appreciate it.
22      As we were closing down the testimony before Judge
23   Proctor, and the panel asked us sort of how did we think the
24   next step, what the next step should be, how should we proceed,
25   I stood up and said to Judge Proctor that I was really trying
```

to speak in the context that had been laid out, that it was not
an adversary proceeding.  I was trying to say -- the biggest
frustration that I felt for my two partners who were caught up
in this was just a lack of understanding about what is -- what
is the standard?  What is the rule?  What is it that my lawyers
were supposed to have known in April of 2022, and then
deliberately and disobediently acted in a contrary fashion.

And I had asked the last witness just a short series of
questions tailored specifically to Rule 83(b), which was a rule
that I frankly was not familiar with.  There's not a lot of law
on it that I have been able to find.  And I said Rule 83(b)
says that no person -- it doesn't distinguish between lawyer,
it doesn't distinguish between parties.

It says no person should be disadvantaged or sanctioned
for violating any kind of rule, local rule, federal statute, or
standard of which they were unaware.  And I -- I literally
almost begged for -- tell us what the standard is.  And we had
a little bit of a back and forth.  I won't go into that.  But
bottom line was Judge Proctor said, you know, put in writing
what you would like us to do.  And we did -- Document Number
69, filed on November 8th.  And said, please identify the rule,
the standard.  And, of course, nothing happened thereafter
until the final report came out almost a year later.

And in your comments -- and I wasn't there, but I read the
transcript -- at one point in time, I -- and I am not going to

1  quote you, but I am going to try to say what I recall of it.
2  You said that a lawyer can't hide behind Rule 41 when it's in
3  violation of some other rule.

4      And this morning, as I understood your comments early on,
5  which I appreciated, you identified the BellSouth case.  The
6  BellSouth case is cited in the panel report.  There are four or
7  five cases cited in the block quote from BellSouth.  I've read
8  every single one of them.  And we have done our dead-level best
9  to try to distinguish the BellSouth case from the events that
10 we're dealing with here, Judge.  Done our best.  Read the case,
11 talked about it, briefed it.

12     The ultimate outcome of the case is that lawyers were
13 disqualified, not allowed to appear in the case.  That's how it
14 ended.  The Eleventh Circuit affirmed and said, you engaged in
15 a contrivance.  You knowingly hired a lawyer that you knew
16 would trigger a recusal.  There was a local rule on the books.
17 Judge Pointer, I think, had a lot to do with putting it in
18 place that said when that happens, when a party hires a law
19 firm where there's -- in that case, a several-year history of
20 people hiring a particular lawyer to force a recusal of Judge
21 Clemon, they said that is a contrivance.  That is a
22 manipulation, and it's not permissible, and you cannot appear
23 in the case.

24     Nobody was accused of bad faith.  Nobody was sanctioned
25 about it.

1       And I guess I just still say, what is it that the Court

2  sees that we're missing about the BellSouth case, and is there

3  anything that you can share with us about that as we anticipate

4  getting ready for this hearing?

5            THE COURT:  I really don't know what I could share

6  with you that I already haven't or that the panel did.

7       And, look, hey, this is what the show cause hearing is all

8  about, you know?  Everybody -- I think I surprised everybody

9  the first time I made a ruling on the merits of this argument.

10 I mean, y'all, I'm doing my absolute best to be fair to

11 everybody.

12      I have not made up my mind about this case or any certain

13 person.  I certainly see what the panel has given me and what

14 the evidence is.  My gosh, reading through this record is

15 voluminous.  I have been through many times all the testimony,

16 all the declarations.  So I don't know what to tell you.

17      I think BellSouth is very clear about judge shopping, as

18 are a lot of other cases.  I do recognize that the -- you know,

19 the Eleventh Circuit has just -- nobody has ever appealed a

20 sanctions case to them on this issue.  And so I don't know what

21 to tell you.

22      I think the conduct, at least as described in BellSouth,

23 is that judge shopping is prohibited.  But, no, I don't have

24 any clear guidance from the Eleventh Circuit, anyway.

25 Certainly other circuits have looked at this.  But I don't have

 1  clear guidance from them about, you know, if I were to

 2  sanction, what is an appropriate sanction, all those things.

 3      So and I have not decided that I am going to sanction any

 4  one of these respondents yet.  I know everybody has hit the

 5  panic button here, and the tone of this thing just seems to be

 6  going off the charts even to this hour.

 7      But, you know, I guess I will say I am going to give

 8  everybody a fair shake.

 9          MR. FRANKLIN:  Well, and I hope that what I said did

10  not escalate the tone.

11          THE COURT:  No.  Not at all.

12          MR. FRANKLIN:  Because I was trying to say it in the

13  same way that I had tried to say it to Judge Proctor.

14          THE COURT:  I took it no other way.

15          MR. KING:  And, Judge, we will, once again -- and we

16  appreciate it, because now as we understand it, that rule

17  standard that the show cause alleges we violated is BellSouth.

18      So we hear you on that.  And we'll address it in our

19  arguments.  We'll also address -- and part of this may be an

20  explanation for the, you know, the skyrocketing tone --

21          THE COURT:  Let me just jump in for a second.  It's

22  not only BellSouth, but BellSouth is the best example.  But go

23  ahead.

24          MR. KING:  All right.  So -- and so because we'll

25  argue about judge shopping is done every day.  It's done every

1   day.  And just because you call something judge shopping, and

2   our argument will be, you know, that doesn't answer the

3   question.  Judge, I judge shop every time I decide which court

4   to file in, which venue to file a case in, whether I file it --

5   which division I file in.  And we will talk about all of that.

6        But just one other thing, and we'll talk about this at the

7   hearing, as well.  But just to give the Court a preview,

8   this -- you were a lawyer, and you were a practicing lawyer.  I

9   know that.  This has been brutal for our law partners.

10        THE COURT:  And I understand that.

11        MR. KING:  It's been brutal.  And I think part of the

12   reason you have 130 years' worth of lawyers sitting here with

13   Melody is that this is incredibly important to not only our law

14   firm, but, more importantly, our law partners.

15        And so we've been trying to do what we can with the utmost

16   respect to the process, to make sure we have the right record,

17   and that we do everything we can to make the right arguments.

18   Because regardless of the outcome, it's already been a

19   punishment.  And we can assure the Court of one thing -- you

20   don't have to worry about these lawyers using Rule 41 to

21   dismiss a case and re-file it.  No matter what happens.

22        THE COURT:  I understand.

23        MS. EAGAN:  It won't happen again.

24        THE COURT:  I understand.  I understand.

25        Anything else y'all want to tell me or suggest or?

1          MS. EAGAN:  Can I say something?  Do y'all mind?

2      Judge, I just want to say this, and I have been wanting to

3  say this -- sorry.

4      I am truly sorry if I did something that the Court found

5  that was wrong or that the Court found somehow impugned y'all's

6  dignity or reputation, or that I did something that you felt

7  was wrong or offensive or that bothered you or that you felt

8  like was disrespectful for you.

9      What we did, I thought was allowed by the rules.  I did

10  not feel like we were doing anything that we didn't have a

11  right to do.

12     But I am truly sorry that this has ended up into this

13  two-year process or that Your Honor may feel badly -- may think

14  badly of me or something that I have done.  And I just wanted

15  to say that.

16         THE COURT:  I appreciate it.  Very much.  I appreciate

17  that you said that.  Very much.

18         MS. EAGAN:  And I'm sorry.

19         THE COURT:  No.  No need for an apology.  I understand

20  this is an emotional time.  And I appreciate your words.

21     Anything else?

22         MR. PRATER:  No, sir.  I assume you want to see

23  Mr. Doss, as well?

24         THE COURT:  I am.  I am.  If you want to stay here.

25     Ms. Eagan, I really do appreciate that you said that,

```
 1   though.
 2           MS. EAGAN:  Thank you, Judge.
 3           MR. KING:  Melody, do you mind grabbing Jeff?
 4           MS. EAGAN:  I will get him.
 5           THE COURT:  Let's just take a five-minute break.
 6        (End of in-chambers conference with Mr. Franklin,
 7   Mr. Prater, Mr. King, and Ms. Eagan.)
 8           (Recess.)
 9           (In-chambers conference with Mr. Franklin, Mr. Prater,
10       Mr. King, and Mr. Doss:)
11           THE COURT:  All right.  As we were concluding that
12   hearing, Mr. Prater suggested either there might be an -- at
13   least an alternate way to look at this, and I asked him just to
14   hold that thought until we came back on the record.
15       And, Mr. Prater, I am just trying to make sure -- at this
16   point, I think we have just got to keep everything on the
17   record and make sure that, you know -- I don't want to be
18   unfair to anybody else, and I know you didn't mean anything at
19   all by that.
20           MR. PRATER:  No, sir, not at all.
21           THE COURT:  In fact, what I think is about to come out
22   of your mouth is probably a good faith thought.  So tell me
23   what you wanted me to know.
24           MR. PRATER:  I hope that it is, Your Honor.
25       This is -- you have seen and Mr. Franklin and Mr. King
```

1  have said has been extraordinarily difficult for our law

2  partners.  I know it's been difficult for you.  It's very

3  unfortunate to me that this has taken the course that it has

4  taken.  It's taken as long as it has taken.  The tension is

5  elevated extraordinarily sometimes.

6       And I think that that is a byproduct of when somebody has

7  their good name questioned, because we all know there's nothing

8  more important as a lawyer, a judge, than our good names.  And

9  I know that these two law partners of mine in no way ever

10  intended to impugn your good name or the good name of the

11  judiciary.  That's what they have devoted their professional

12  life to.

13       And so what I have been thinking about, Judge, is there a

14  way that this process can end in some sort of positive way for

15  these lawyers, for the bench, and the bar as a whole?  And

16  among the things that I thought about, and I don't think we

17  need to today get into what potential sanctions there may or

18  may not be.  I'm not going there.  There will be a time to talk

19  about that.

20       But I would like for you to think about something that I

21  have considered that may be a positive from all of this

22  difficulty.  And that is, I've been impressed by some of the

23  other courts, some of the other districts around the country

24  that have a local rule that deal with this.  And it's not a --

25  for those lawyers that are practicing in those districts -- an

1  exercise of having to interpret how Rule 41 may mesh with

2  BellSouth or a case like that.  It is a clear rule.  Some are

3  more clear than others, candidly.

4      And what I have thought about is that our lawyers, not

5  that the Court, not that the districts need any help, is that

6  we help craft a local rule that the judges can consider

7  implementing, and that we help educate the bar about that rule,

8  and we go to the Southern District and have a seminar, we go to

9  the Middle District and have a seminar, we -- in the Northern

10  District, we have a seminar to talk within the confines of the

11  public record, of course, and appropriateness, this experience,

12  and this is the rule that the Court has adopted to tend to it.

13      I don't know if that flies at all, Judge.  I'm just trying

14  to figure out a way that the tension of all of this can be

15  lessened, that you can find a way to do some good for the bench

16  and bar, frankly, short of potentially making examples of these

17  good people.

18          THE COURT:  I understand.

19          MR. PRATER:  And I think I know your heart pretty

20  well, Judge, that that's kind of your instinct generally.

21  And --

22          THE COURT:  Well, I certainly don't take any of this

23  lightly, you know.

24          MR. PRATER:  I understand that.

25          THE COURT:  I think I said at the outset, I don't --

1  you know, I don't have any desire to, you know, take a wrecking

2  ball to somebody, you know?

3           MR. PRATER:  Yes, sir.  And, again, I'm just trying to

4  think of a way that we can benefit our profession from this

5  unfortunate exercise.

6           THE COURT:  I'm not saying there isn't a way.  I don't

7  know if that is a way.  I don't know if that proposal is a way.

8           MR. PRATER:  And I don't know if it will appeal to

9  anybody other than me.

10          THE COURT:  Right.  Right.

11          MR. PRATER:  And I can't speak for any of the other

12  parties for this proceeding.

13          THE COURT:  Mr. Buck had a -- not the same, but a

14  slightly similar proposal.  So he had thought the same thing.

15          MR. PRATER:  Well, of course, I didn't have an

16  original thought, so I am not supposed to hear that.

17          THE COURT:  I am not saying absolutely not.  But that

18  particular path does not seem like a path at this point that we

19  could -- that we could go down.

20          MR. PRATER:  Do you have thoughts that you can share

21  of paths, Judge?  Because I have not really.  We're an open

22  book when it comes to trying figure out the right way to

23  conclude this.

24          THE COURT:  I honestly don't.  I haven't -- I really

25  have not given much thought to that, you know.

1    But, you know, if there are other thoughts you have on

2    that, I will listen to them, you know.

3         MR. PRATER:  Not right now, Judge.  We will talk some

4    more.  I appreciate your initial reaction to what I have been

5    thinking about.  And maybe between now and the June hearings,

6    we will have more.

7         THE COURT:  Right.

8         MR. PRATER:  It just seems to me to be a discussion

9    that should be had.

10        THE COURT:  Right.

11        MR. PRATER:  And should be shared between the bench

12   and the bar.

13        THE COURT:  Right.  And, you know, part of this is --

14   of course, the panel did their work.  As I told you, I have

15   been deep in this record for a long time.  But, you know, I am

16   going to get to hear live testimony from each one of these

17   folks myself.

18        MR. PRATER:  Yes, sir.

19        THE COURT:  And I will have lots of questions about

20   things they told the panel that I would like to clear up that

21   are uncertain to me.  And so, you know.

22        MR. PRATER:  And I'm sure none of these questions will

23   be objectionable in any way, right, Judge?

24        THE COURT:  I am certain.  I am certain.  Absolutely.

25        MR. FRANKLIN:  I had to object to a couple of Judge

1   Proctor's, but he was good natured about it.

2          THE COURT:  He is pretty good natured.  He absolutely

3   is.

4       Well, let me just start, and I asked everybody this

5   question:  Is there anything you want to add to or correct in

6   any of your testimony or declarations?

7          MR. DOSS:  I cannot think of anything, Your Honor.

8          THE COURT:  All right.  All right.

9       Well, I want to ask you some questions I asked Ms. Eagan

10  earlier.  Just because I'm -- the one thing I am having trouble

11  understanding is Ms. Eagan, when she talked to all of the

12  lawyers in the case, they all said that she said Judge Axon was

13  a great draw.  And she discussed a lot of reasons and you did,

14  too, on why Judge Axon was a great draw or a good draw.

15      And one of them was, well, Judge Axon has children.  You

16  know, that seemed to be a theme that everybody repeated.  Well,

17  you know, the Lightfoot folks thought Judge Axon was a great

18  draw because she had children, and she was a parent, et cetera,

19  et cetera.

20      But most of the judges on the Northern District and the

21  Middle District are parents and they have children.  So was

22  there something else about Judge Axon that factored into the

23  thought that she was a great draw?

24          MR. DOSS:  I may be mistaken, Your Honor, but I

25  actually don't think I was asked a question about that by the

 1  panel.

 2              THE COURT:  All right.

 3              MR. DOSS:  I don't think I testified one way or the

 4  other about my thoughts on Judge Axon.

 5              THE COURT:  And I'm really talking about what your law

 6  partner said, Ms. Eagan.  But I am assuming that you had

 7  discussions with her about this?

 8              MR. DOSS:  We did.  And I guess a little bit of

 9  background.

10      Before all of this started, I had a case in front of Judge

11  Axon for about a year and a half, and we were constantly in

12  front of her.  There was lots of motion practice.  There was

13  extensive discovery.  That was the experience I had with Judge

14  Axon.  I mean, it wasn't that I thought necessarily that Judge

15  Axon was a great draw one way or the other.  I knew -- it was a

16  known entity.  I knew what I was dealing with.

17      In terms of the discussions that Melody and I had, I mean,

18  I do remember Melody saying that I think maybe her kids knew

19  one another, or something like that.  I think she may have said

20  that, you know, as a mother, she would be maybe sympathetic to

21  these claims.

22      So I mean, it wasn't, if I recall correctly, Melody saying

23  because she's a parent, she is a great draw or a better draw

24  than anyone else.  It was just, here's our draw.  She's a

25  parent.  We think that that would make her a good draw for us.

 1          THE COURT:  So, like I have a child who is in theatre,

 2     too, but everybody didn't think I was maybe the best draw that

 3     they could have.  And I think you had a long case in front of

 4     me that you guys won and got a lot of favorable rulings.

 5          So help me to understand maybe a little bit more about why

 6     some of these parties were so afraid of me.

 7          MR. DOSS:  I think the issue is the constitutional

 8     question.  There are just fundamentally different ways of

 9     looking at the constitution, especially when we're talking

10     Equal Protection Clause, and the substantive Due Process

11     Clause.

12          And we saw with the Eleventh Circuit in this very case.  I

13     mean, the Eleventh Circuit had a very different approach to

14     interpreting the clause, the clauses at issue, than Your Honor

15     did.

16          I think our thought was -- and, again, if I could go back

17     in time, do this all over again, I would have a different

18     reaction.  But our thought at the time or at least my thought

19     at the time was given your background, you may be more

20     predisposed to think, I am going to take a very historical

21     approach to the Equal Protection Clause, which is what we saw

22     play out in the Eleventh Circuit.  We had the panel say,

23     transgender health care was unknown in the 1860s, and as a

24     result, it's not covered by the substantive due process

25     provision or the Equal Protection Clause.

1    So I mean, just philosophically, the best information we

2    had, best guess, we were wrong at the time, but best guess we

3    had at the time was probably less likely to be receptive to the

4    claims we were making.

5         THE COURT:  Got it.

6    So let me be a little more precise.  Was there anything

7    else about Judge Axon, her husband, her son, her daughter, that

8    would have factored in your belief or Ms. Eagan's belief that

9    Judge Axon was a great draw?

10        MR. DOSS:  No.  Not at all.  And in fact, my

11   experience was based upon that experience which was a case that

12   I had before her.  That's what I knew about her.

13        THE COURT:  Got it.

14   All right.  And y'all probably have already told him this.

15   But my view of this hearing is that, you know, you will have a

16   chance to tell me everything you want me to know.  Your lawyers

17   would.  I would -- I will probably have a lot of questions for

18   everybody.  And then I would let you and your lawyers have the

19   last word generally.

20   But if anybody's got any other ideas, I'm open to them.

21        MR. DOSS:  I mean, if I can -- this has been going on

22   two years, and it's like the elephant in the room.  And I

23   wanted to talk to you.

24        THE COURT:  Tell me anything you want me to know.

25        MR. DOSS:  But I just -- the one thing -- if I can

tell you anything and what I have been thinking this whole time
is as an attorney, my entire professional career, I have never
wanted to be the attorney that gets right up to the line or,
you know -- I don't ever want there to even be a question about
what I do professionally.  And so just even the question --
even the question being raised in this case or by Judge
Proctor, my former boss, it's devastating.

And I just don't want Your Honor to think my goal as a
lawyer is to be kind of within the rules but -- that's never
the goal.  And I would not have agreed to dismiss this case and
file our case if I thought that there was even a question.  I
would not.

I truly sincerely believed then that we had a right to do
what we had to do.  And it was the best decision we could make
under the circumstances.

Again, if I could go back in time, I probably would look
at the situation entirely differently.

One thing I do regret is we didn't wait.  Maybe wait just
until Monday and just see.  You know, it was the lesson of
sleep on it at the very least.  We should have done that.

And so, you know, I've never -- I've been in front of Your
Honor many times.  And I just -- I don't want you to think that
I did anything that was to disrespect you or violate any rules
or do anything like that.  I just -- that was never the
intention.  It was never the intention.  And I certainly

 1  understand how questions could get raised.  And I tried my best

 2  to answer them when we went through the panel proceeding.

 3      But I'm going to stop rambling.

 4          THE COURT:  No.  I appreciate what you said.

 5          MR. DOSS:  It's just -- like I said, it's been kind of

 6  the elephant in the room.  And I just wanted to at least say

 7  that to you for the past two years.

 8          THE COURT:  I appreciate it.  I appreciate it very

 9  much.

10          MR. DOSS:  I'm happy to answer any questions that you

11  have.

12          THE COURT:  And just to add a little light heartedness

13  to this, if you hadn't dismissed it, you would have gotten the

14  ruling you wanted two weeks earlier.

15          MR. DOSS:  True.  That's true.

16          THE COURT:  So anyway.  No.  Thank you for saying

17  that.

18      What else should we cover?  Have we done everything we

19  need to do?

20          MR. PRATER:  Yes, sir.

21          MR. KING:  Yeah.  I think we have done everything we

22  need to do, Your Honor.

23          MR. PRATER:  I think we have.

24          (End of in-chambers conference with Mr. Franklin,

25      Mr. Prater, Mr. King, and Mr. Doss.)

1              (In-chambers conference with Mr. Ugai, Ms. Balkoski,

2        Ms. Holliday, Mr. Segall, and Mr. Orr:)

3              THE COURT:  So here is -- this is just informal, you

4    know.  Any suggestions y'all have about the process I'll listen

5    to.

6        My general thought about this is, you know, open this up,

7    your client can say anything that he wants to say, thinks I

8    need to know, you know, expand or explain any testimony.

9        Y'all can say anything you want to.  I will probably have

10   some questions after that.  And then I'll just, you know, hand

11   it back to y'all to finish if there's anything you want to

12   clear up your client or anything you want to say in argument.

13             MR. SEGALL:  Are you talking about --

14             THE COURT:  Show cause.

15             MR. SEGALL:  -- show cause?

16             MR. UGAI:  In June.

17             THE COURT:  Yes.  One thing that I have tried to tell

18   everybody in this is despite the fact that the tone of this

19   just seems to be going up, up, up, and off the charts, as I

20   think I showed when we had the original hearing on the merits,

21   I'm just going to listen to the evidence and the law, and we'll

22   see where it takes me.  I don't have any preconceived notions

23   about anybody or what ought to happen or what ought not to

24   happen to them.

25       And then the other thing is, you know, at least as far as

1    the evidence that the panel has given me and that I have

2    reviewed -- and I know I am going to get more evidence at these

3    show cause hearings.  I mean, there is clearly a sliding scale

4    here.  And, you know, I fully expect that more than one of

5    these respondents may just walk away from this, you know.

6        And so I just want everybody to know, you know, this is --

7    I don't have any -- I have not made my mind up about anybody.

8    If everybody just comes in and just tells me the earnest truth,

9    that gets you a long way in front of me.

10       So anyway...

11           MR. UGAI:  All right.  Well, we sincerely appreciate

12   that.

13       I think, you know, that's certainly what we intend to do.

14   And I also appreciate you taking the time today.  I think it's

15   helpful to be able to touch base so we can prepare.

16       And part of that, I think what you have outlined, Your

17   Honor, makes a lot of sense to us, and we're in complete

18   agreement.

19       We would want the time I think to be as most helpful for

20   you as it can be, and so we would maybe -- you know, the panel

21   found that Mr. Orr was a non-decision maker, and then to be

22   honest, we have really -- I mean, I have read through it

23   several times and really looked for, and to the extent the

24   Court has any direction or any specific issues that they would

25   like us to prepare for or be able to address in that hearing,

1  that would be really helpful for us in a sense to be able to

2  make sure we can address any concerns that the Court has and

3  make it as --

4          MR. SEGALL:  Judge, I think along with what John is

5  saying is -- like John, I have searched to try to understand

6  why as the only non-decision maker that he was not a decision

7  maker in the dismissal.  He was not a decision maker in the

8  re-filing in the Middle District.  And we've -- if you could

9  shed some light for us on what the concern was that makes him

10 the sole non-decision maker, I think it would help us know what

11 to address at the show cause hearing.

12         THE COURT:  Right.  Right.  You know, I -- I will just

13 say this:  I probably shouldn't say anything more than what the

14 panel has already said until I hear, you know, what he has to

15 say at the show cause.  But I think if you just wed yourself to

16 that document from the panel, that would give you all the

17 guidance you need.

18     And, look, I have been through the declarations many

19 times.  I have read the record of the testimony many times.  Do

20 I view your client as not being at the top of culpability in

21 this?  From what I have read, absolutely.  So, you know.

22         MR. SEGALL:  Okay.

23         THE COURT:  You know, my initial impression, not

24 making any promises.  I have not prejudged this case, you know.

25 I don't see at this point that your client is in super hot

1  water.

2          MR. SEGALL:  Thank you, Judge.

3          MR. UGAI:  Appreciate that.

4          MR. ORR:  Appreciate that.

5          THE COURT:  Again, not prejudging any case, is it

6  possible that he walks away from this with zero sanction?  It

7  certainly is possible.

8          MR. SEGALL:  Thank you.

9          THE COURT:  So absolutely.

10          MR. UGAI:  Thank you.

11          MR. ORR:  Thank you.

12          THE COURT:  But I would want to see how this hearing

13  goes.

14          MR. UGAI:  Of course.  Yes.

15          THE COURT:  So anyway, y'all share any additional

16  thoughts that you have about this.

17          MR. SEGALL:  You -- if I heard you correctly, you are

18  going to call the respondents to testify, and you will ask them

19  questions?

20          THE COURT:  Well, I'm going to let them testify first

21  under your care, if you want to do it that way.  In other

22  words, if -- I am going to let them -- I am going to let y'all

23  have the first crack to stand up at the hearing and tell me --

24  you know, it's a show cause hearing.  I am calling on y'all to

25  show cause why I shouldn't take action, or not take action.

1    So I think y'all get the first swing.  So, and then I

2  would just have follow-up questions for your client after he's

3  told me everything he wants me to know and you have made the

4  arguments that you think I ought to have.

5            MR. SEGALL:  Sequence of events is what I'm -- so at

6  what point will oral argument come?  Because that's certainly

7  something that we want to do is --

8            THE COURT:  Right.  Probably best for the end.

9            MR. SEGALL:  Yeah.  After you have asked your

10  questions?

11            THE COURT:  Let your client tell me everything he

12  wants to tell me.  Let me ask questions.  If he has anything to

13  add after that, and then at the end probably --

14            MR. SEGALL:  The lawyers.

15            THE COURT:  Right.

16            MR. SEGALL:  Will the lawyers argue -- I assume they

17  will -- in open court in front of everybody?

18            THE COURT:  I would certainly think so.

19            MR. SEGALL:  To me, it will shorten their arguments to

20  hear what everybody else is saying.

21            THE COURT:  I agree.  I don't see any reason that

22  these could be closed at this point.

23            MR. SEGALL:  No.  I agree.  I agree with you.

24            THE COURT:  I think these have to be open hearings

25  and -- yeah.

1            MR. SEGALL:  Right.  Right.  Okay.

2            MR. UGAI:  No.  Those are my questions, too.

3       And that all makes sense.  I guess we would just ask if,

4  as you are reviewing things, if you have any questions for us

5  or want us to prepare on a certain issue or topic, we are

6  available, and we would be happy to chat or, you know, receive

7  any direction from the Court.

8            THE COURT:  No.  Understood.  Understood.

9       So fair enough.

10      Anything -- oh.  I have asked this of everybody, and so I

11  need to ask you:  Anything that you would change -- you want to

12  change about any of your previous testimony or anything that

13  you want to say to supplement any of that testimony?  Or

14  anything else you want to tell me?

15           MR. ORR:  No, Your Honor.  I would just reiterate

16  that, you know, as I indicated in my declarations, I'm very

17  sorry that my conduct indicated a lack of faith and

18  impartiality of this Court or the Alabama federal courts in

19  general, and that I didn't judge the strength of our case based

20  on the case law alone.  And just want to reiterate and so you

21  can see my sincerity and not just read it.

22           THE COURT:  I appreciate that.  I appreciate it.  And

23  I appreciate the way you worded that, which was not nuanced.

24  So I appreciate that.  I think -- as I told Mr. Doss when he

25  was in here earlier, if this case hadn't -- if this case had

 1   not been dismissed the first time, everybody would have gotten

 2   the ruling they wanted just two weeks earlier.

 3        So anyway.  Thank y'all.  I appreciate it.  And I guess we

 4   should do one of his clients again, so we are not doing too

 5   many change-ups here.

 6             MR. SEGALL:  Your Honor, maybe we ought to talk about

 7   Scott McCoy.

 8             THE COURT:  Right.  He's actually next on our list.

 9             MR. SEGALL:  Oh, oh.

10             (End of in-chambers conference with Mr. Ugai,

11        Ms. Balkoski, Ms. Holliday, Mr. Segall, and Mr. Orr.)

12             (In-chambers conference with Mr. Segall and Ms. Holliday

13        on behalf of Scott McCoy.)

14             MR. SEGALL:  The first thing I wanted to tell you was

15   Scott asked me to express his very deep gratitude for your

16   doing it.  I mean, our plan was for him to be here and he --

17   before he got your order, I mean, he was in constant -- contact

18   with his family.  His plan was to fly to Montgomery.  And I

19   actually think before your order came back, he was on the plane

20   flying to Montgomery.  But when he got your order, he just went

21   on to Kansas City.  And he appreciated it very much.

22             THE COURT:  I wouldn't do anything else.  So...

23             MR. SEGALL:  Well, I knew and he knew that it was

24   important to you because it was in your order that the

25   respondents be here, and so he wanted to be here is -- he was

1   relieved to be able to go be with his mom, but he did --

2          THE COURT:  Any change in her condition?

3          MR. SEGALL:  She's in ICU and she's on a --

4          MS. HOLLIDAY:  Feeding tube.

5          MR. SEGALL:  -- feeding tube.  But still stable.

6          MS. HOLLIDAY:  Whatever that means.

7          MR. SEGALL:  Yeah.  She's still stable.  That's what

8   they -- the last we talked to Scott.  So we really don't know

9   any more than that.

10          THE COURT:  Gotcha.

11      Well, you know, same process with Mr. McCoy as with the

12   others.

13      But was there anything that he was going to tell me today

14   that you want to tell me?

15          MR. SEGALL:  Well, there was one thing he was going to

16   say, and we could -- and truthfully, it was when we thought

17   this was going to be off the record.  I mean, we mentioned it

18   being off the record or, you know, that had come up at the

19   last --

20          THE COURT:  It did.  And I will tell you very

21   honestly, things have reached such a fever pitch, I am afraid

22   to do anything off the record in this case at this point, you

23   know?

24          MR. SEGALL:  No, no, I totally understand that.

25      I know that Scott had said to me that off the record is

1   exactly when he wanted to apologize to you -- personally to

2   you.  Not -- I mean, I think Asef said it well.  But Scott, as

3   you may remember, is the person or one of the people who

4   speculated that Your Honor may have reached out to get the

5   case.  And he recognizes how wrong he was about that.  He

6   didn't know you, didn't know you as a judge, a person, or

7   anything else.

8       He knew -- he knows that that's a character issue.  And

9   it's -- he wanted to say it -- not related to sanctions, not

10   having anything to do with whether he gets sanctions.  He

11   wanted to tell you that he was sincerely sorry about having

12   done that and not have it like on the record, as though he were

13   doing it for some purpose other than to convey to you his true

14   remorse about that.

15       And I'm sure if we questioned him as you've suggested, I'm

16   sure he will want to say that then.  But he would have said it

17   today.

18       THE COURT:  I understand.  No.  I appreciate that.

19   Appreciate that you have said that.

20       So...

21       MR. SEGALL:  And then you've said it, but let me make

22   sure I got this, okay?

23       THE COURT:  Right.

24       MR. SEGALL:  We hadn't made a final decision about

25   putting him on prior to you asking questions.  But my question

 1  is:  Do you care whether you ask him questions first or we ask

 2  him questions first?

 3            THE COURT:  I don't.

 4            MR. SEGALL:  Okay.  Because I was thinking your

 5  questions might prompt questions.

 6            THE COURT:  Right.

 7            MR. SEGALL:  But by the same token, we may decide we

 8  want him to tell you some stuff before you ask questions.  But

 9  I don't know which one we prefer.

10            THE COURT:  Right.  Right.  Right.

11        It doesn't matter to me.

12            MR. SEGALL:  Okay.

13            THE COURT:  Dealer's choice.

14            MR. SEGALL:  All right.  Thank you, Judge.

15            THE COURT:  Anything else?

16            MR. SEGALL:  I think -- you think -- you got anything,

17  Shannon?

18            THE COURT:  All right.  Who's next?

19            MR. SEGALL:  We have got two more.

20            THE COURT:  Right.  I was just seeing who the next one

21  is.  By the way, it's fine with me if we do them together.

22            MR. SEGALL:  I think that they prefer not to.

23            THE COURT:  Okay.  All right.  Well, then.

24            MR. SEGALL:  Jennifer Levi.

25            THE COURT:  Let's do Levi.

1              (In-chambers conference with Mr. Segall, Ms. Holliday,

2              Ms. Otterberg, and Ms. Levi:)

3              THE COURT:  So I've already talked to some of your

4    attorneys about this.  Really, I just wanted to kind of give

5    everybody an overview of how I see this happening, anybody's

6    got any suggestions, like, Judge, I don't want to do it that

7    way, let's do it this way, I will listen to them.

8         My view of this hearing is generally let you tell me

9    anything you want to know at the beginning.  I'll ask

10   questions.  Actually, Mr. Segall said he might want me to ask

11   questions first, depending on the case.  And it doesn't matter

12   to me how we do it, what order we take it in, and then we just

13   wrap up with any legal or argument that needs to be made.

14        The one question I do have is, you know, for each of your

15   four clients, how long do you think -- how long do you estimate

16   you would need on your side for that hearing?

17             MR. SEGALL:  Well, April is going to argue for

18   Jennifer.  And so --

19             THE COURT:  Okay.

20             MS. OTTERBERG:  Yeah, Your Honor.  Are you speaking

21   about the testimony --

22             THE COURT:  Right.

23             MS. OTTERBERG:  -- part?

24             THE COURT:  Right.  How long do you envision that your

25   end of this hearing would go?

1        MS. OTTERBERG:  I think on the testimony piece of it,

2   not long.  20 minutes, something like that.

3        THE COURT:  Got it.

4        MS. OTTERBERG:  And then in terms of the arguments, I

5   think what's most important to us is that we have sufficient

6   time to be responsive to Your Honor's questions that may arrive

7   in that context.  But I wouldn't -- you know, 20 minutes, half

8   hour for that, too, just consistent with whatever questions

9   Your Honor has.

10        THE COURT:  Got it.  Got it.

11     I asked everybody this question.  So not singling you out:

12   Anything that you want to add to or change about any of your

13   testimony or declarations?

14        MS. LEVI:  Not that I can think of, Your Honor, yeah.

15        THE COURT:  All right.  All right.  Excellent.

16   Anything else you want to say?

17        MS. LEVI:  Well, I mean, I do want to apologize to

18   this Court.  I'm really sorry for the time and attention that

19   these proceedings have taken.  I have tremendously high regard

20   for this Court and for the judiciary.  I've never had or been a

21   part of disciplinary proceedings.  I've learned a lot in the

22   last two years.  I can assure you that my current and future

23   conduct would reflect what I have learned.  And, you know,

24   every intention to comply completely with all of the rules,

25   laws, and orders of the Court, so I really do apologize to this

1  Court.

2          THE COURT:  I appreciate that.

3      Anything else?

4          MS. OTTERBERG:  The only question I have, Your Honor,

5  is with respect to the testimony, is there any guidance you

6  want to give us, in terms of anything specific we ought to be

7  prepared to respond to?  Obviously, we will make the record and

8  do as best we can to be prepared to be responsive to Your

9  Honor's questions.  But I'm just sort of wondering if there's

10  anything specific you want us to --

11          THE COURT:  No.  I certainly would want you to address

12  what the panel specifically said about your client, and then

13  any -- and I think my show cause order was pretty specific.

14  So, no.  No surprises, you know.

15          MS. OTTERBERG:  Okay.  Thank you, Your Honor.

16          THE COURT:  If it's not in the panel's order and if

17  it's not in the show cause order, then it probably didn't

18  attract much of my attention.

19          MS. OTTERBERG:  Okay.  That's all.  Thank you.

20          MR. SEGALL:  Your Honor, you didn't ask me how long in

21  connection with Scott McCoy.

22          THE COURT:  Right.

23          MR. SEGALL:  So if we put him on either before or

24  after your questions, I would estimate 30 minutes.

25          THE COURT:  Gotcha.

 1          MR. SEGALL:  And argument I would estimate, which I'm

 2   considering this sort of a closing argument, our last plea to

 3   Your Honor.

 4          THE COURT:  Right.

 5          MR. SEGALL:  I would say 30 minutes plus whatever you

 6   ask, whatever it takes to answer your questions.

 7          THE COURT:  Understood.  Understood.  I don't -- I

 8   mean, I certainly will have questions for Ms. Levi, but I don't

 9   think -- I don't think it would be exhaustive, you know.

10          MR. SEGALL:  Well, I meant if during our oral argument

11   you were to say, Bobby, what did you just say, you know?

12          THE COURT:  That could happen.

13          MR. SEGALL:  I didn't understand a word of that.

14          THE COURT:  That could happen.

15          MR. SEGALL:  I know it.  That's what I am saying.  So

16   whatever time it takes me to explain that.

17          THE COURT:  Understood.  Understood.  No.  That's

18   good.  That's good.

19       And so I -- I'm hearing anything from 20 minutes to an

20   hour per respondent, so this may wind up, you know, not taking

21   as long as we were planning for, but anyway.

22          MR. SEGALL:  One last question.

23          THE COURT:  Yes.

24          MR. SEGALL:  It was my plan -- I am not sure about --

25   to attend -- you know, you set two of these for the first of

 1   the week.

 2            THE COURT:  Uh-huh.

 3            MR. SEGALL:  Is there any problem with us attending

 4   those?

 5            THE COURT:  I don't think so.

 6            MR. SEGALL:  The lawyers?

 7            THE COURT:  Huh-uh.  Huh-uh.  Nobody has suggested

 8   these be closed.  And I really don't think I can close them.

 9       So...

10            MR. SEGALL:  Okay.  Thank you, Judge.

11            THE COURT:  Absolutely.

12            (End of in-chambers conference with Mr. Segall,

13       Ms. Holliday, Ms. Otterberg, and Ms. Levi.)

14            (In-chambers conference with Mr. Segall, Ms. Holliday,

15       Ms. Otterberg, and Mr. Minter:)

16            THE COURT:  So just informal meeting, just going to

17   talk through this.  I shared with some of your attorneys

18   already.

19       You know, the way I view this hearing going is, you know,

20   really any way y'all want to do it, either you can tell me what

21   you want me to know first, or I will have some questions.  I

22   don't imagine I will have a huge list of questions for you, but

23   certainly will have many.

24            MR. MINTER:  Okay.

25            THE COURT:  Then your attorneys could ask any

 1  questions they want again, and then oral argument at the end.

 2  But as I have told them, I am open to any suggestion.  I don't

 3  have any hard firm views about this.

 4      So since we have already been through this before, I think

 5  we kinda of know what we're going to do.

 6          MS. OTTERBERG:  Yes, Your Honor.  Same as with respect

 7  to Ms. Levi, you know, we'll of course, present testimony.  And

 8  whether we go first or Your Honor goes first, I want to have

 9  some time to think about that and decide that in June.

10          THE COURT:  Certainly.

11          MS. OTTERBERG:  But, otherwise, then a chance for oral

12  argument or a closing or whatever you want to call it and be

13  responsive to Your Honor's questions.

14          THE COURT:  Absolutely.  Fair enough.

15      Anything -- I have asked everybody this question -- so

16  anything you want to change or add to your previous testimony

17  or declaration?

18          MR. MINTER:  No, sir.

19          THE COURT:  Okay.  All right.

20          MR. MINTER:  Yeah.

21          THE COURT:  Fair enough.  Anything else you want to

22  tell me?

23          MR. MINTER:  Well, I am glad to have a chance to tell

24  you.  I am so sorry for the burden this has put on you and the

25  other judges.  I mean, you know, I -- I believe in our legal

1   system with my whole heart.  And I take the responsibility and

2   the privilege of being a lawyer and officer of the court very

3   seriously.  It means a lot to me.  And I am sick that my

4   actions have caused you and others to question that and

5   question my integrity.  And, sir, I am very sorry.

6          THE COURT:  Thank you.  I appreciate you saying that

7   very much.

8       All right.  Well, anything else?

9          MR. SEGALL:  I don't think so, Your Honor.

10          THE COURT:  All right.

11          MS. OTTERBERG:  I think that's all.

12          (End of in-chambers conference with Mr. Segall,

13      Ms. Holliday, Ms. Otterberg, and Mr. Minter.)

14          (In-chambers conference with Mr. Ragsdale,

15      Mr. Eggleston, Mr. Pacheco, Mr. Vance, Mr. Esseks,

16      Ms. Faulks, and Mr. Charles:)

17          THE COURT:  All right.  So I really just wanted to

18   informally kind of talk through what I think this hearing looks

19   like, see from your end how long it should be.

20      My initial thoughts are to -- you know, when we get there,

21   let each of you -- you know, when your time comes to tell me

22   anything you think I ought to know either from your testimony

23   or anything additional or anything else.

24      Then I'm certain I will have questions for everybody,

25   probably, you know, a lot for some and not so many for others.

1    And then let your attorney, you know, ask anything, clear

2    anything up he thinks needs to be cleared up.  And then

3    obviously, I know each attorney will probably want to give some

4    argument at the end about, you know, what they think the law is

5    and what they think of any of the conduct.

6        All that said, I'm actually, you know -- I don't think

7    there's a set playbook to this.  And if anybody's got a

8    different idea or a different thought about this process, I

9    will listen to it.

10            MR. RAGSDALE:  I think that sounds good to us.  Judge,

11    obviously, we have given you more papers than probably should

12    be allowed, but we gave you a lot of that and a lot of

13    testimony.  And we certainly want to answer any questions.

14        But I think that approach makes sense, let each of our

15    folks talk to you because you haven't had a chance to hear from

16    them, right?

17            THE COURT:  Right.  Right.

18            MR. RAGSDALE:  And proceed the way you suggested makes

19    sense to us.

20            THE COURT:  Got it.  Got it.

21        All right.  And I'd ask everybody this, so don't take any

22    of this personally.  I will ask each of you:  Is there anything

23    in your testimony or declaration that you want to change or add

24    to?

25            MR. ESSEKS:  Your Honor, not on my part, James Esseks.

 1            THE COURT:  Okay.

 2            MS. FAULKS:  Tish Faulks, not on my part.

 3            THE COURT:  Okay.

 4            MR. CHARLES:  Carl Charles, not on my part.

 5            THE COURT:  Okay.  That may be it unless there's

 6   anything else your clients want to tell me or anything else the

 7   attorneys want to tell me.

 8            MR. RAGSDALE:  I don't, Judge.  I will sound like a

 9   broken record.  Obviously, we didn't re-file a case, and we

10   think that distinguishes us a little bit.

11            THE COURT:  That fact is not lost on me.

12            MR. RAGSDALE:  Okay.  You know I love the sound of my

13   own voice.

14            THE COURT:  I understand.  The

15   we-took-our-ball-and-went-home argument.  I'm hearing it.

16            MR. RAGSDALE:  Okay.  Would any of y'all like to add

17   anything to the judge?

18            MR. ESSEKS:  I would like to say one thing, Your

19   Honor.

20       Look, I recognize that the actions that I took and that we

21   took gave you and gave apparently every federal judge in

22   Alabama the impression that we were gaming the system or that

23   we were trying to.  And I deeply regret that, and I apologize

24   for that.  That was not our intent.  And I know that this has

25   put the Court through a lot of work and a lot of process.  And,

1  again, that was not our intention.  I apologize for that.

2          THE COURT:  I appreciate that.

3          MR. CHARLES:  Your Honor, I would just like to add,

4  too, and I did say this to the panel, but I appreciate the

5  opportunity to say it to you today that I did apologize to

6  them, and I apologize to you for my forgetfulness at the

7  May 20th hearing.  That was reflected in a variety of different

8  circumstances at the time.  But most importantly, Your Honor, I

9  did not lie, nor did I intentionally mislead the panel.  I took

10  very seriously the oath that they put us under, as I have taken

11  very seriously all the testimony we have presented to you

12  since.

13          THE COURT:  Thank you.

14          MS. FAULKS:  Your Honor, I am probably the person who

15  is -- who has said the least on the record in this matter.  I

16  was the legal director at ACLU at the time that this occurred.

17  I have a lot of regret for what everyone has experienced in

18  this.

19      Having the opportunity to have these fine lawyers come to

20  Alabama to support and assist me as a resident of Alabama as I

21  was seeking to make sure that folks knew that their concerns

22  were going to be addressed, I carry a lot of responsibility as

23  the host to these folks.

24      And the entire experience that we have had here is

25  unfortunate, but I think that we have all tried to act in good

1   faith.

2       This team took very seriously the work they were doing in

3   preparing the litigation.  And I think that what you have seen

4   from us in this process is a demonstration of the careful,

5   close attention that we have tried to pay to get it right.

6       I hope that it is not lost on this Court that the desire

7   to get it right looks messy.  But I have no doubt that both I

8   and my colleagues have tried to put the letter in the spirit of

9   the law.  And I apologize that that effort did not demonstrate

10  itself clearly to you and to the panel.

11      I am hopeful that we can close this out and move on to the

12  next step of doing the great work that the people of Alabama

13  need.

14          THE COURT:  All right.  I appreciate your words.

15      Something tells me in June, I will again hear that the

16  Walker counsel did not re-file.

17          MR. RAGSDALE:  I think I've heard you've heard it,

18  okay?

19          THE COURT:  Absolutely.  You can say it again.

20          MR. RAGSDALE:  Okay.

21          THE COURT:  All right.  Anything else that anybody

22  wants to say?  Do?

23      All right.  Excellent.

24      All right.

25          MR. RAGSDALE:  Appreciate your time.  Thank you,

1  Judge.

2           (End of in-chambers conference with Mr. Ragsdale,

3       Mr. Eggleston, Mr. Pacheco, Mr. Vance, Mr. Esseks,

4       Ms. Faulks, and Mr. Charles.)

5           (In open court:)

6           THE COURT:  All right.  Please be seated.

7       All right.  Well, I appreciate the opportunity to sit down

8  with everybody and walk through what we think these final

9  hearings will look like.  I think we have got a plan.

10      I kept everybody together because I thought we might get

11 some ideas about this and how it might could be a little bit

12 better.

13      I did get some good ideas about it.  And so I will just

14 say, you know, I think I had mentioned to most of you that,

15 hey, I will let you stand up and say what you want to say, then

16 I may have some questions for you, then let your attorneys ask

17 some questions then.

18      Mr. Segall suggested just the opposite, which is -- and

19 it's fine with me, so I am just going to tell everybody that.

20 I will -- if you want me to question your client first and then

21 you want your client to make a statement and you ask questions,

22 I will do it that way, too.  So just throw that out as another

23 option.  It does not matter to me who does the first

24 questioning or any of that.  And, obviously, I will give you

25 and your client the last word.

1        But I think that about covers it unless there's anything I

2   have left undone today.

3            MR. BUCK:  Your Honor, may I approach?

4            THE COURT:  Yes.

5            MR. BUCK:  Your Honor, I know we are not arguing this

6   today, and I don't want to.  I just wanted to give Your Honor a

7   heads up.

8        Because of the 5:00 p.m. Tuesday deadline on the Q&A

9   document submission, I think we are likely going to have to --

10  we withdrew the petition in the Eleventh Circuit, as Your Honor

11  may know.  I think we are probably going to have to re-file

12  that in advance of Tuesday.  And I didn't want Your Honor to be

13  surprised about that.

14           THE COURT:  Oh, I would not be surprised.

15           MR. BUCK:  And we will certainly withdraw it if we

16  don't need it.  But I just didn't want you to be surprised.

17  And I didn't want it to come across as unnecessarily trying to

18  ramp up the temperature, but I did want to just let you know

19  that's --

20           THE COURT:  I understand that.  I will say I did have

21  the opportunity to read that petition, and it's -- the tone of

22  it is pretty high.  There would obviously be many things in

23  there that I disagree with, without a doubt.  So the tone of it

24  is pretty high.

25           MR. BUCK:  Understood, Your Honor.  And we will take a

1    look at the tone.

2            THE COURT:  All right.  All right.

3        Okay.  Y'all have a good day.

4

5            (Whereupon, the above proceedings were concluded at

6        12:52 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

    I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.


<u>05-26-2024</u>

Christina K. Decker, RMR, CRR          Date

Federal Official Court Reporter

ACCR#:  255