1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF ALABAMA
2                           NORTHERN DIVISION

3

4        BRIANNA BOE, et al.,          *
                                       *
5                Plaintiffs,           *    2:22-cv-00184-LCB
                                       *    May 28, 2024
6        vs.                           *    Birmingham, Alabama
                                       *    10:30 a.m.
7        STEVE MARSHALL, et al.,       *
                                       *
8                Defendants.           *
         ****************************

9

10

11                    TRANSCRIPT OF STATUS CONFERENCE
                  BEFORE THE HONORABLE LILES C. BURKE
12                     UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21
         Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
22       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
            and Procedures Vol. VI, Chapter III, D.2.  Transcript
23                  produced by computerized stenotype.

24

25

<pre>
 1                          APPEARANCES

 2

     FOR THE PLAINTIFFS:
 3   M. Christian King, Esq.
     LIGHTFOOT, FRANKLIN & WHITE, LLC
 4   The Clark Building
     400 20th Street North
 5   Birmingham, Alabama 35203

 6

     RESPONDENTS:
 7   Barry Alan Ragsdale, Esq.
     Robert S. Vance, III, Esq.
 8   Dominick Feld Hyde, P.C.
     Litigation
 9   1130 22nd St S - Ste 4000
     Birmingham, AL 35205
10   205-536-8888
     BRagsdale@dfhlaw.com
11

12   Brannon Buck, Esq.
     Christopher Driver, Esq.
13   BADHAM & BUCK, LLC
     2001 Park Place North, Suite 500
14   Birmingham, AL 35203 Bobby Segall

15   Robert D. Segall, Esq.
     Shannon Holliday, Esq.
16   COPELAND FRANCO
     444 South Perry Street
17   P.O.Box 347
     Montgomery, Alabama 36101

18   Bruce F. Rogers, Esq.
     BAINBRIDGE, MIMS, ROGERS & SMITH LLP
19   The Luckie Building, Suite 415
     600 Luckie Drive
20   Birmingham, Alabama 35223
     205-879-1100
21

22

     COURT REPORTER:   Christina K. Decker, RMR, CRR
23                     Federal Official Court Reporter
                       101 Holmes Avenue, NE
24                     Huntsville, Alabama 35801
                       (256) 506-0085
25
</pre>

**P R O C E E D I N G S**

1

2         (In open court:)

3         THE COURT:  All right.  I know I have got kind of a

4    joint response on the Q&A.  Do both of you want to talk?  Is

5    only one of you going to argue?  Or what's the game plan on

6    this?

7         MR. BUCK:  Your Honor, I'm Brannon Buck for respondent

8    Kathleen Hartnett.  I am going to take the principal role in

9    arguing, and for whatever I mess up, Barry may stand up and bat

10   cleanup for me.

11        THE COURT:  All right.

12        MR. BUCK:  If that's okay with you.

13        THE COURT:  It's fine.

14    How long do you think you need to argue?

15        MR. BUCK:  I'm not sure.  I guess it may depend on how

16   many questions you have.  10, 15 minutes.

17        THE COURT:  All right.  I'm going to have a lot of

18   questions, actually.  But I will let you get through your

19   argument before I start asking them.

20        MR. BUCK:  Okay, Your Honor.

21    Your Honor, first --

22        MR. RAGSDALE:  I want -- to the extent I don't argue,

23   obviously, any questions you have for me, I will be happy to

24   answer.

25        THE COURT:  I do have a questions, and I may have

1  more, depending on what I hear today.

2         MR. RAGSDALE:  Thank you, Your Honor.

3         MR. BUCK:  Your Honor, we appreciate this opportunity

4  to brief this issue and the chance to have oral argument today.

5  I find myself in the unenviable position of it feels like in a

6  way arguing with the Court about the applicability about the

7  crime-fraud exception.

8      And I just want to say up front as I've said before, we

9  all respect the Court's authority, and I certainly mean no

10  disrespect to Your Honor or the Court in presenting these

11  arguments today.

12     The respondents are all deeply troubled that there is a

13  concern that a crime or a fraud was committed here or it could

14  have been committed here.

15     We explained in our brief why -- our view as to why the

16  respondents were not under a court order to produce the Q&A

17  document.  We appreciate that this Court has now ordered its

18  production.

19         THE COURT:  And, look, you know, I mean, in my

20  previous order, I -- look, I'm going to ask you some questions

21  about this, you know.  I don't see that the panel ever vacated

22  that order to produce.

23     But my order to produce this Q&A was not based on anything

24  the panel did.  It was an independent new order to produce.

25         So, you know, I do have some questions about that with the

1  panel, but, you know, I frankly view what the panel did as

2  mostly irrelevant to where we are right now.

3         MR. BUCK:  And that's exactly where I was going.  And

4  unless you want to hear further from us on that, I was just

5  going to dive into the application of the crime-fraud

6  exception.

7         THE COURT:  Why don't you do that?  I will have some

8  questions about, you know, what we have said about what the

9  panel did.  But, no, go ahead and dive into that, and you can

10  address anything about the panel when we get to my questions.

11         MR. BUCK:  Certainly, Your Honor.

12     So, first, let me talk just a moment about the Q&A

13  document.  I know you have read our filing, so feel free to

14  move me along if you feel like I'm repeating things you have

15  already read or heard.

16     But the panel entered its order instituting this

17  proceeding on May 10th.  And the order set a hearing on

18  May 20th, ten days later.

19     The Walker respondents immediately retained Barry Ragsdale

20  to represent them in the proceeding.  And as part of that short

21  period of time, that eight or ten-day period of time,

22  Mr. Ragsdale directed his clients, the Walker respondents, to

23  draft the Q&A to help him prepare for that May 20th hearing.

24     The document is, as it has been described in the numerous

25  declarations and in argument before this Court, a list of

1  questions that the Walker counsel believed might be -- might
2  come up or be relevant to the proceedings and the responsive
3  facts.

4       It was not prepared in anticipation of testimony.  Prior
5  to the May 20th hearing, neither counsel nor the respondents
6  expected to be sworn in to give testimony at that proceeding.
7  And there were comments to that effect on the record, as the
8  Court well knows.

9       The May 10th order said that the hearing was to allow the
10  panel to inquire about the issues raised by counsel's actions.
11  It didn't specifically mention testimony.  And it also did not
12  invoke sequestration at that point in time.  It was not until
13  at the May 20th -- really the end of the May 20th hearing that
14  the panel invoked sequestration among the various respondents.

15       And so Mr. Ragsdale in a very short period of time needed
16  to understand the facts and the history of the underlying
17  proceedings and to be prepared to answer questions.  And the
18  Q&A document was developed collectively for that purpose.

19       And Mr. Ragsdale -- at that May 20th hearing, Mr. Ragsdale
20  and Mr. Segall both were candid with the panel about their
21  discussions with counsel collectively before the May 20th
22  hearing.  And I've got printed, and I am happy to hand this to
23  Your Honor.  I'm sure you have already read it.

24       On pages 79 and 80 of that May 20th hearing -- and I will
25  just read a little bit from this -- Mr. Segall, on page 79:  As

with any client I've ever had in my lifetime, I've had

attorney-client privileged communications with every one of --

and then Judge Proctor chimes in:  We're not going to be asking

about any communications with anyone who's appeared in a

representative capacity.

    Mr. Segall:  Okay.  Well, Justice Harwood just mentioned,

I'm going to ask whether you've had any conversations about

facts and testimony.  And I've discussed facts with every

lawyer I represent.  Judge Proctor says, I expect you would.

No.  But what we're -- I think what Justice Harwood -- and I

listened to him, and I think he appropriately made this point.

It's not what counsel have discussed.  It's what colleagues

have discussed.

    And then on page 80, Judge Proctor said, So to be clear,

Justice Harwood has no intention of asking about any

communications anyone has had with your lawyer, or your firm,

or organization's lawyer.

    And Mr. Ragsdale responded, And just so the record is

clear, I also talked to my clients about what we anticipated,

in terms of questions that would be asked, and what those facts

were.  And we did both in an effort to make sure that we had

all the facts and that there were not some discrepancy that we

didn't know about.  In addition to that, that was done

collaboratively.

    And Judge Proctor says:  Here's the advantage you have.

1   All three of us practiced law before we did this.  We

2   understand what your responsibilities and activities would have

3   been, and we're not trying to get into the middle of those.

4        And so there was no effort, Your Honor, to sort of conceal

5   or hide from the panel that counsel had discussed potential

6   questions that might be raised and the related facts.  And as I

7   just read, the panel expressed no concerns about the

8   description of that preparation.

9        I don't think this is in question, but the Q&A document

10  constitutes a privileged communication.  It was a communication

11  made by clients to their counsel in confidence for the purpose

12  of securing legal advice and assistance.  And that is exactly

13  the definition that is used by the Eleventh Circuit in the 2020

14  case of Knox v. Roper.

15       It was prepared at Mr. Ragsdale's request.  Again, it was

16  a list of questions and answers to prepare for the hearing.

17  And it was the basis of discussions between counsel and

18  clients, the respondents in preparation for that hearing.

19       So I will turn to the application of the crime-fraud

20  exception privilege.

21       As the Eleventh Circuit said in the Drummond case, the

22  crime-fraud exception is an exception that in rare

23  circumstances, and I quote that, applies when communications

24  are, quote, made in furtherance of an ongoing or future crime

25  or fraud.

1          THE COURT:  And we're using the term crime fraud, but
2    just really what we're actually talking about is the Eleventh
3    Circuit has extended that just to misconduct, right?

4          MR. BUCK:  I don't read the cases that way, Your
5    Honor.

6          THE COURT:  Really?

7          MR. BUCK:  I really don't.  I read the cases as being
8    very specific.

9      And the two-part test in the In Re Grand Jury
10   investigation case from the Eleventh Circuit states that in
11   order to invoke the exception -- and this is -- this is the --
12   basically the same two-part test that the U.S. Supreme Court
13   has handed down and that has been adopted by virtually every
14   circuit.

15     The first part of the test is that there must be a prima
16   facie showing that the client was engaged in criminal or
17   fraudulent conduct when he sought the advice of counsel, was
18   planning to commit a crime or fraud when he sought the advice
19   of counsel, or committed a crime or fraud after receiving the
20   advice.

21     That's the first step.  So it is all couched, Your Honor,
22   in terms of a crime or a fraud.

23     The second part of that test is there must be a showing
24   that the attorney's assistance was obtained in furtherance of a
25   crime or a fraud.

1         And in the first step, the prima facie case step, that is

2    met -- excuse me -- if the first step, the prima facie case

3    step is met, then the Court may coordinate an in camera

4    inspection of the material as part of that second step in

5    determining whether the attorney's assistance was obtained in

6    furtherance of the crime or fraud.

7         And this two-step process, at least according to all the

8    cases we have read, applies in every proceeding.  It's not just

9    in traditional cases with opposing parties.

10        As the Eleventh Circuit explained in the Cox vs. U.S.

11   Steel case, before engaging in an in camera review to determine

12   the applicability of the crime-fraud exception, there must be a

13   factual basis to support a good faith belief by a reasonable

14   person that a crime or fraud was committed.

15        And so that prima facie case, Your Honor, requires

16   evidence that would establish the elements of some fraud or

17   criminal violation that was ongoing or about to be committed.

18   That's from the Grand Jury investigation case.  And it must be

19   based on fact, not mere allegations.

20        And I would just add, Your Honor, just a comment from the

21   U.S. Supreme Court in the Upjohn case, quote, an uncertain

22   privilege, or one which purports to be certain but results in

23   widely varying application by the courts, is little better than

24   no privilege at all.

25        And so, Your Honor, here, I don't think there's any

1    concern that a crime has been committed by all the respondents,

2    the Walker respondents' counsel.  I think we are talking about

3    a fraud.  And in this instance, it would be a fraud upon the

4    Court.

5        The May 17th order found that a -- found a prima facie

6    showing that the Walker respondents were engaged in or planning

7    to engage in fraudulent conduct.  It doesn't mention a crime.

8        It went on to say the panel did not credit much of the

9    story that Walker counsel told in their testimony.  And Your

10   Honor in that order said that the Court needs to determine

11   whether the Walker respondents coordinated materially omissive

12   or otherwise misleading testimony to the panel.

13       So what we're talking about here, Your Honor, is fraud, a

14   fraud upon the Court.  And the Eleventh Circuit has been clear

15   on what constitutes a fraud upon the Court.

16       In the Travelers Indemnity vs. Gore case, the Eleventh

17   Circuit said, a fraud upon the Court embraces only that species

18   of fraud which does or attempts to, defiles the Court itself,

19   or is a fraud perpetrated by officers of the Court so that the

20   judicial machinery cannot perform in the usual manner its

21   impartial task of adjudging cases.

22       In the Redstone -- excuse me -- the Russell vs. Redstone

23   Federal Credit Union case, more recently in 2017, the Eleventh

24   Circuit said, only the most egregious misconduct, such as

25   bribery of a judge or members of the jury, or the fabrication

1  of evidence by a party in which an attorney is implicated, will

2  constitute a fraud upon the Court.

3      The Drummond case, which this Court is imminently familiar

4  with, dealt with, among other things, a fraud upon the Court.

5  And in that specific case, in the lower court, Judge Proctor

6  described specific detailed accounts of witness bribery and

7  suborning perjury.

8      So a fraud upon the Court is more than merely testifying

9  falsely.  The Eleventh Circuit said in the Travelers v. Gore

10 case, perjury does not rise to a level of fraud upon the Court.

11 And the Tenth Circuit has said, nondisclosure to the Court of

12 facts allegedly pertinent to the matter before it will not

13 ordinarily rise to the level of fraud upon the Court.

14     And so, Your Honor, I'll turn now to the fact that, in our

15 view, there was no fraud committed here by the Walker

16 respondents.  If you recall before the May 20th hearing, as I

17 said earlier, there was no sequestration order entered in that

18 May 10th order or by the panel before the May 20th hearing.

19     But even if Rule 16 had somehow automatically applied --

20 and it doesn't, because it must be invoked -- the rule allows

21 parties to a proceeding to be present during all testimony.

22     And the joint representation and common interest

23 privileges allow parties to confer confidentially with one

24 other and with counsel.  No one -- not the respondents or their

25 counsel -- had any inkling that they might be doing something

1   wrong when they collectively communicated to prepare for the

2   May 20th hearing.

3        Once the panel invoked sequestration, the Walker

4   respondents complied, both in preparing their declarations and

5   in giving their testimony, and they swore an oath and said

6   that.  They also swore an oath to tell the truth.  And there

7   are simply no facts to find that these lawyers did not testify

8   truthfully.

9        Even before sequestration, the junior lawyers testified to

10  Judge Harwood that they were instructed to tell the truth, and

11  were not told how to answer specific questions.

12       And if you look, Your Honor, at the testimony of the

13  Walker respondents, they did not give identical answers to

14  every question.  But they also did not provide materially

15  conflicting testimony with the one exception being that of

16  Mr. Charles's testimony about the call to chambers.

17       So here, unlike the Drummond case and other cases that

18  have invoked the crime-fraud exception, there have been no

19  specific findings of fraud.  Neither the panel nor this Court

20  has identified any specific instances of fraud or false

21  testimony, save for the one instance involving Mr. Charles.

22            THE COURT:  Wouldn't perjury rise to the level of a

23  crime?

24            MR. BUCK:  Your Honor, certainly, it would.

25  Certainly, it would.  And that's why I say save for the one

1   instance involving Mr. Charles, which, you know, he was the

2   only respondent who testified about that call the way he did,

3   which also indicates that -- you know, is also an indication,

4   Your Honor, that there was not some testimony script relating

5   to that particular issue.

6       I would also say, Your Honor, that neither the panel nor

7   the Court has identified any specific material discrepancies in

8   the Walker counsel testimony.  The panel in its report made ten

9   findings of misconduct, but none of them are findings of fraud.

10      I do want to address the panel's footnote expressing a

11  general concern about a lack of candor.

12      First of all, that footnote cites to Mr. Esseks's response

13  to a hypothetical question.  In response to that hypothetical

14  question, he was not testifying about facts.  He was

15  speculating as to what he would have done if the circumstances

16  had been different.

17      Fraud, however, must be based on objective statements of

18  fact that can be empirically judged as true or false.  That's

19  from the Next Century Communications case cited in our brief

20  from the Northern District of Georgia.

21      And this Court, or a court in this district, the Northern

22  District of Alabama, has said that the witness's opinion about

23  an event that did not occur is mere speculation and is not a

24  fact.  That is the Brim vs. Midland Credit case.

25      In addition, Your Honor, with respect to that footnote,

1  the panel, in realtime, during the hearing repeatedly praised

2  some of the Walker attorneys, including Kathleen Hartnett, for

3  being forthcoming and candid.

4       And, Your Honor, I would say this:  As to any general

5  finding of lack of candor, the Alabama pattern jury

6  instructions provide some context here.

7       In Section 103 of the jury instructions, there's an

8  instruction to the jury.  And in my experience, these jury

9  instructions are commonly used in federal court.

10       Section 103 of those jury instructions charges to the

11  jury, quote, you may accept or reject any part of the testimony

12  of any witness and accept only the testimony you consider

13  worthy of belief.

14       So juries decide witness credibility and candor every day.

15  All the time.

16       And we would have a fraud on the Court in virtually every

17  case if the test was whether the trier of fact decided that a

18  witness was not credible or lacked candor.  That just simply

19  isn't the standard for the fraud associated with the

20  crime-fraud exception.

21       Your Honor, I would also respectfully just point out a bit

22  of an inconsistency that the respondents are facing here, and

23  that is this:  The Court is pointing to both unidentified

24  discrepancies in the testimony among the respondents, but also

25  criticizing the respondents and their counsel for synthesizing

1   testimony as a basis for invoking the crime-fraud exception as

2   you compare the report -- excuse me -- the show cause order and

3   the May 17th order.

4        So the bottom line here, Your Honor, is that there simply

5   has been no facts to show and no reasonable basis to believe

6   that the Walker counsel sought the advice of counsel as part of

7   an ongoing crime of fraud.  And, therefore, there is no

8   basis -- no prima facie case and no basis to consider an in

9   camera review here, to order an in camera review here.

10       Now, Your Honor, just on that topic, on the in camera

11  review, although we believe it's not warranted or justified

12  here -- and I mentioned this, Your Honor, at our Zoom hearing a

13  week or so ago -- if an in camera review is ordered, we would

14  submit, Your Honor, that it should be ordered to be performed

15  by a special master for the following reasons:  First, it would

16  prevent the possibility of prejudice, which is critically

17  important here for a few reasons.

18       First, in this instance, the judge is the trier of fact.

19  And the allegations at issue are that the respondents committed

20  a fraud on the Court that will be on the very Court that will

21  be deciding the sanctions issue.

22       And the case involves concerns about Your Honor -- excuse

23  me -- involves concerns about judge shopping stemming from a

24  dismissal after the case or the cases were assigned to Your

25  Honor.

1        So for that reason, we think that sending any in camera

2   review to a special master would prevent the possibility of

3   prejudice.

4        Second, assignment to a special master would alleviate the

5   appearance of any partiality and ensure impartiality.

6        And, third, as we've talked about, there's precedent in

7   the Northern District under the Drummond case and in the

8   scholarly literature that we have cited in our brief for using

9   special masters, particularly in a non-jury proceeding.

10       So, Your Honor, I know you will have questions.  But in

11  closing, I would just say, again, we would submit there are no

12  facts showing that these lawyers sought the advice of counsel

13  in order to commit a fraud.  The respondents had a right to

14  have confidential communications with their attorneys.

15       The panel was told about the collective preparation and

16  repeatedly assured the respondents and their counsel that their

17  communications were privileged and confidential.  The panel

18  made no finding or even mention of fraud by the respondents.

19  And we just simply think there is no basis to pierce the

20  privilege.

21       If Your Honor disagrees and overrules our position, we

22  would ask that the Court stay the production deadline to allow

23  for appellate review of these issues, Your Honor.

24            THE COURT:  Mr. Ragsdale, do you want to pick up right

25  here?  Did you have anything you wanted to add to that?

1          MR. RAGSDALE:  Can I say one thing?

2          THE COURT:  Sure.

3          MR. RAGSDALE:  And then obviously answer any questions

4    that you have.

5          Good morning, Your Honor.  Barry Ragsdale.

6          I feel like I need to say this.  I've been practicing law

7    coming up on 40 years.  I have never, never advised a client to

8    lie to a court, or to shade their testimony, or to leave things

9    out that are material or relevant.  To the contrary, just as I

10   did in this case, I tell clients, tell the truth, answer the

11   questions, be honest.

12         In addition, Judge, in 40 years, I have never, ever

13   advised a client to defy a court order.  And we were not going

14   to defy the panel's order.

15         If the panel would have gone forward and ordered us to

16   produce that document on that day in August, we were going to

17   do exactly what we did here, which is either produce the

18   document or seek protection from the Eleventh Circuit.  At no

19   time was Mr. Ingelhart going to defy the court order and take

20   chances on how the panel would be treated.

21         Judge, I just felt I needed to say that.  And I will

22   answer questions, if you want to start with Mr. Buck --

23         THE COURT:  Understood.  I do want to start with

24   Mr. Buck, but I will have a few questions for you.

25         All right.  Mr. Buck, the first document filed after I

1   issued the show cause order was Ms. Hartnett's response on

2   emergency motion for a status conference, Document 28.

3      Do you remember that.

4         MR. BUCK:  Yes, Your Honor.

5         THE COURT:  Did you draft that document?

6         MR. BUCK:  I was certainly involved in the drafting of

7   it, Your Honor.

8         THE COURT:  All right.  The first thing I want to ask

9   about the panel's order to produce the Q&A document.  Let's

10  walk through that history.

11      After the panel ordered the production of the document,

12  there was a motion for a protective order pertaining to its

13  production.  The motion sought relief in a protective order

14  preventing the disclosure of privileged communications and

15  attorney work product contemplated by the panel's work,

16  including the Q&A document.

17      That motion was denied, correct?

18        MR. BUCK:  The motion for protective order was denied.

19  But there was some clarifying language in that order, Your

20  Honor.

21        THE COURT:  But it was denied, the protective order

22  was denied?

23        MR. BUCK:  Yes, Your Honor.

24        THE COURT:  All right.  You suggested that the panel

25  did require production of the Q&A because, quote, as made clear

1  in the July 25th, 2022, order, it was not seeking privileged

2  communications.

3      But the full quote on page 4 reads, quote, As the

4  July 8th, 2022, order Document 22, makes clear, the panel is

5  not seeking the disclosure of privileged communications.  To

6  the extent the materials that must be disclosed to the panel

7  are work product, all disclosures are to be made in camera.

8      So to be clear, the July -- the July 8th, 2022, order

9  referred to here was the order that compelled production of the

10 Q&A, right?

11         MR. BUCK:  Yes, Your Honor.

12         THE COURT:  So you're saying the panel clarified its

13 order to produce the Q&A by saying that the order, quote, makes

14 clear that it wasn't requiring its production in the first

15 place?

16         MR. BUCK:  Your Honor, our reading of that was that,

17 number one, it made clear that attorney-client communications

18 were not required to be produced.  And that's why Mr. Ingelhart

19 filed his response, saying that --

20         THE COURT:  Well, let's look at the next sentence.

21 That's where the panel denied the motion for a protective

22 order, right?

23         MR. BUCK:  I'm not looking at it, but, yes, Your

24 Honor.

25         THE COURT:  So let me just be clear.  You're saying

1 the panel denied the motion for an order preventing the Q&A's

2 production.  But, at the same time, and without naming the Q&A

3 or referencing it at all, it granted the relief in the motion

4 it denied?

5          MR. BUCK:  Well, there was other relief I think sought

6 in that motion.  And there were other, you know, aspects --

7 there were about -- if I recall, four or five numbered

8 paragraphs at the end of that order that laid out exactly what

9 was being ordered.

10      But, Your Honor, the counsel and the respondents had

11 always maintained that that was -- that the Q&A document was an

12 attorney-client privileged communication.  And that's why they

13 were up front with the panel and said we are not producing it

14 for that reason.  Mr. Ragsdale filed a declaration to that

15 effect, as well.

16      So it wasn't something that they were trying to conceal or

17 hide from the panel or hope that the panel just simply would

18 forget.  I mean, they were up front that we read the order to

19 excuse the submission of that particular document.

20          THE COURT:  Well, let's fast forward that.

21      More than three months after that order was denied, the

22 protective order, Judge Proctor said the panel understood it

23 had not, quote, made you, end quote, produce the document.

24 Correct?

25          MR. BUCK:  Yes, Your Honor.

1          THE COURT:  All right.  Did the panel take any steps
2    to enforce its order?  I don't think they did.
3          MR. BUCK:  Well, Your Honor, in addition --
4          THE COURT:  Hang on.  Thereafter, the panel didn't
5    take any steps to enforce its order, right?
6          MR. BUCK:  Your Honor, once that November 3rd
7    statement was made on the record, and even before that, Your
8    Honor, I believe both counsel and the respondents thought that
9    this issue was over and done with.
10         THE COURT:  I thoroughly looked through the record,
11   and I can find no order that vacates their motion -- their
12   order to produce that Q&A.
13       Is there such an order vacating the previous order that
14   I'm missing?
15         MR. BUCK:  Your Honor, I don't know the word vacate is
16   used, but I would point your attention to the panel order of
17   September 23rd.
18       As you recall, and as this Court has acknowledged, in both
19   its May 17th order, and I think in our prior hearing,
20   Mr. Ingelhart was the one respondent who was ordered initially
21   to produce that document.
22       And in the May 23rd -- excuse me -- September 23rd order,
23   the panel dismissed Mr. Ingelhart and released him from any
24   obligation under the July 8th order.  And that July 8th order
25   was the order that initially had required him to produce that

 1  document.

 2      So our read of the September 23rd order is that -- just

 3  what it says, that Mr. Ingelhart was released from that

 4  obligation.  And then, obviously, you had the November 3rd

 5  hearing and the comment from Judge Proctor as the panel chair,

 6  that we felt like was material, as well.

 7      THE COURT:  And I know that I said this at the

 8  beginning, but let me say it again.

 9      You understand that my order to produce the Q&A was not a

10  sanction for a previous failure to produce.  It was a

11  free-standing order to produce it now, but mindful that it had

12  not been produced when the panel requested it the first time.

13      MR. BUCK:  I do understand that, Your Honor.  I think

14  we all understood that.  We also understood your May 17th order

15  to show cause why it wasn't previously produced, which is why

16  we ran through the history as we read it.

17      THE COURT:  All right.  I saw a lot of citations in

18  your brief.  But as far as I could tell -- and I'm talking

19  about privilege and crime fraud.

20      As far as I could tell, they were for propositions of

21  general applicability.  I was looking for a case that held or

22  even suggested that an in camera review was not the proper way

23  to proceed to determine whether a document was protected by

24  privilege.  I did not see such a case in your brief.

25      Do you have one?

1              MR. BUCK:  Your Honor, I think all the cases we cited

2      on this issue provide that an in camera review is appropriate

3      only after that prima facie showing is met; that is, a showing

4      with facts or evidence that would lead a reasonable person to

5      believe that counsel was engaged in furtherance of

6      committing -- or as part of committing a crime or fraud.

7          And so all the cases say that's the initial step, that

8      then enables a court to move to the in camera review.  And our

9      position --

10             THE COURT:  Let's talk general practice.  And I have

11     been at this for a fair time.  I know you have, too.

12         You know, generally, the way it works is if there's a

13     privilege dispute in the case and the judge is sitting as the

14     finder of fact, the judge takes a look at the document in

15     camera, and if the privilege applies -- privilege doesn't

16     apply, he considers the document.  If the privilege does apply,

17     the judge sets the document aside and doesn't consider it for

18     any purpose or disclose it to any other parties in the

19     litigation.

20         I mean, would you agree with me that is the general and

21     ordinary practice of how that works?

22             MR. BUCK:  If the party or, in this case, the Court

23     can present facts or has presented facts that would lead a

24     reasonable person to believe that a crime or fraud had been

25     committed in connection with the retention or advice received

1   from counsel.

2       And so that's the first step, Your Honor, that we point to

3   as being a critical first step that until -- until the Court

4   makes a decision -- and maybe the Court has made that decision.

5   We would respectfully disagree with it.

6       But unless the Court has decided that a reasonable

7   person -- that there are facts to support a belief that a

8   reasonable person that the advice of counsel was sought in

9   connection with the commission of a crime or fraud, then you

10  don't move to in camera review.  We think that that's what the

11  law is clear on, Your Honor.

12      THE COURT:  So I know you have said in your briefing

13  that -- and we'll get more in detail in a minute -- that if an

14  in camera review is done, it should be done apparently by

15  somebody who is not a federal judge in Alabama, correct?

16      MR. BUCK:  That -- that would be our submission to the

17  Court, Your Honor, yes.  Just because the unique circumstances

18  of this particular case and the fact that all the federal

19  judges in the state of Alabama, according to several statements

20  of the panel on the record, were involved in decisions relating

21  to the panel, and receiving live feeds of testimony, and have

22  essentially sort of supervised or at least monitored the

23  proceedings here.

24      THE COURT:  So, ironically, when you were making

25  argument to me last Thursday on your expert's proposed

1   testimony and whether it should be admitted, you argued -- and

2   I am going to give you your quote -- when the judge -- quote,

3   when the judge is sitting as the trier of fact, the

4   gate-keeping function is lessened.

5        And your motion on the point cited a case that said --

6   and, again, I am quoting -- quote, courts have repeatedly

7   recognized that the gate-keeper doctrine was designed to

8   protect juries, and is largely irrelevant in the context of a

9   bench trial.

10        Do you have a case that contradicts that proposition?

11             MR. BUCK:  Your Honor, that -- you are exactly right.

12   That was my statement.  That was our statement in our brief.

13   But that applies in the expert witness arena.

14        And particularly in those cases where an expert might be

15   giving testimony or opinions that might bump up against sort of

16   legal opinions or legal conclusions.  And what those cases say

17   is that the Court, as opposed to the jury, has the ability

18   because of its, you know, legal training and expertise to

19   decipher when an expert is crossing that line into providing a

20   legal opinion or a legal conclusion.

21        And, you know, in all due respect, Your Honor, we don't

22   think that line of cases applies to the privilege context.  I

23   mean, here, you are talking about invading, piercing the

24   attorney-client privilege, and the Court seeing confidential

25   communications between the, you know, counsel and the client

1    that pertain to, you know, the matters that the Court is going

2    to be deciding.

3         THE COURT:  Well, I guess what has me confused -- and

4    I'm -- you know, I am very careful that we're not giving

5    special treatment to people because they're lawyers that we

6    wouldn't give to ordinary citizens.

7         And, again, you cited to me honestly no authority other

8    than somebody thinks it would be a good idea that we should

9    have a special master, and that I or any other judge couldn't

10   act impartially.

11        So, you know, my concern is, are we advocating for a

12   different rule for lawyers, you know, than we would for anybody

13   else?

14        MR. BUCK:  I don't think it has anything to do with

15   the fact that the respondents here are lawyers.

16        If this Court were making a decision about the fate of a

17   nonlawyer, about whether they were going to be sanctioned in

18   some way by the Court, or, you know, the Court was looking to

19   impose some penalty, the same -- we would be making the same

20   arguments, Your Honor.

21        And the fact that the jury's not in the box and the judge

22   is sitting as the jury or the fact finder in this proceeding,

23   you know, it makes a big difference, in terms of who gets to

24   see or who should see, in our opinion, the privileged

25   communications, if an in camera review is performed.

1          THE COURT:  So, you know, the position apparently that

2   you and Mr. Ragsdale's clients are taking is that the Court is

3   not a neutral arbiter here.  And one of the cases you have

4   cited to me is Ruffalo.  And I have read its sister Shaygan in

5   the Eleventh Circuit.

6       And your quote is, The Court is acting as investigator,

7   prosecutor, judge, and jury all at once, and doing so in a

8   quasi-criminal proceeding.  And then you cite Ruffalo for that.

9       I have read Ruffalo over and over and over.  And it seems

10  to me that Ruffalo simply concerned routine procedural

11  safeguards, due process that attorneys are entitled to in a

12  misconduct proceeding.  And, you know, for instance, notice and

13  an opportunity to be heard.  That's what Ruffalo is about, and

14  even what Shaygan is about.

15      And it seems to me that, you know, the position you're

16  taking that the Court is not neutral, and basing that on

17  Ruffalo and Shaygan, is 500 more yards down the field than

18  those cases are.

19      Can you point me to language in Ruffalo or Shaygan that

20  says the Court is not a neutral arbiter?

21          MR. BUCK:  Well, Your Honor, I agree with Your Honor

22  that those cases deal with the due process rights of counsel

23  who are being subject -- potentially subject to sanctions.

24          THE COURT:  I mean, there's nothing in those cases

25  about any of the issues we are dealing with.  Those are

 1   straight up, hey, it's quasi criminal, you know.  Discipline

 2   could be imposed, so you have got to give due process.  That's

 3   all that these cases seem to say to me.

 4       Do they share any of the same issues that we're talking

 5   about here?

 6           MR. BUCK:  The crime-fraud exception was brought up in

 7   those cases.  No.  I mean, we cited those cases for the

 8   proposition that, in our view, this is a quasi-criminal

 9   proceeding where the Court is, in fact, acting as the, you

10   know, the prosecutor, judge, and decider of fact.

11           THE COURT:  I guess -- let me just say, do you have

12   any case that says the Court is not a neutral arbiter in an

13   attorney discipline or sanction matter?

14           MR. BUCK:  Well, Your Honor, we -- I mean, we think

15   that the Ruffalo and the other case, the Shaygan case, both

16   point to that conclusion, Your Honor.

17       Now, we certainly recognize that they weren't dealing with

18   the crime-fraud issue in those cases, but they were attorney

19   sanctions proceedings similar to what we have here.

20           THE COURT:  Is there a case that says I should have a

21   special master do this if we do an in camera review?  Is there

22   a case that says I should do that?

23           MR. BUCK:  Your Honor, we haven't been able to locate

24   a case.  I think this is just such an unusual circumstance.  We

25   haven't located a case where the Court says that that should

1   happen.  We did cite a South Carolina law review article, which

2   I understand is not a case.

3          THE COURT:  I have some questions on that, too.

4          MR. BUCK:  Okay.  We understand that is not a case.

5   But -- and then, you know, there is -- as I have said, the

6   Drummond case and others, there is precedent for referring an

7   in camera review to a special master.

8          THE COURT:  So clearly no case out there that says

9   it's reversible error not to have a special master in a

10  situation like this, just some policy arguments as to why I

11  should.

12         MR. BUCK:  Your Honor, my co-counsel may correct me on

13  this, but I am not aware of one.

14         THE COURT:  Right.  All right.  Let's dig deeper into

15  that.  Let's get down into detail.

16     Why do you say it would be preferable for me to have a

17  special master?  Let's dig deep into that.

18         MR. BUCK:  Sure, Your Honor.  I mean, three reasons.

19     One is -- and I fully appreciate what Your Honor's saying.

20  And I am not questioning the Court's credibility here.  But

21  this is simply a possibility.

22         THE COURT:  I mean, you know, it's very unusual to say

23  we should have a special master and tell a judge that he

24  basically can't decide an issue fairly or that he may be

25  biased, but then walk in at the same time and have absolutely

1  no legal authority for that proposition.

2        MR. BUCK:  Well, Your Honor, I am not sure we would

3  say there's no legal authority.  I grant you, I can't cite a

4  case that requires Your Honor to do that.

5      We just think that the unique nature of this case, given

6  the underlying circumstances, and the fact that Your Honor will

7  be deciding the fate of these lawyers on a judge-shopping

8  sanctions charge, where the dismissals were made once the case

9  got assigned to Your Honor, simply tilts the balance in favor

10 of having a third party conduct the in camera inspection.

11     And by doing so, it would produce -- or eliminate the

12 possibility of prejudice to Your Honor and to these respondents

13 of -- you know, based on the review of the contents of that

14 document.

15        THE COURT:  All right.  Let me draw your attention to

16 footnote 1 in the original filing, and part 4 of the most

17 recent brief, where you were saying I should appoint a special

18 master.

19     I mean, I assume you prepared that?

20        MR. BUCK:  Which filing, Your Honor?

21        THE COURT:  The original filing.  I am talking about

22 the footnote that refers to essentially no federal judge in the

23 state can hear this.

24        MR. BUCK:  Your Honor, I was involved in drafting

25 that, yes, Your Honor.

1        THE COURT:  Did you -- would you agree with that

2    statement that there's no federal judge in the state of

3    Alabama -- magistrate judge, U.S. district, or otherwise -- who

4    could be fair to your clients?

5        MR. BUCK:  Your Honor, our suggestion is simply that

6    because all the federal judges have been consulted about this

7    matter, that it would be preferable to assign it to an

8    independent lawyer or a judge outside of those --

9        THE COURT:  Again, the reason that you would do that

10   would be if there's some showing that for some reason a judge

11   could not be fair to you, you know?  Not making any policy

12   arguments.

13     I mean, your suggestion is sweeping.  It's a sweeping

14   statement that not a single federal district judge in the state

15   of Alabama can fairly and impartially conduct an in camera

16   review of that document to determine whether the crime fraud

17   exemption applies.

18     That's what you're saying, right?

19        MR. BUCK:  And, Your Honor, the basis for that were

20   the statements at the May 20th hearing that all the judges had

21   been consulted about this proceeding and they were all

22   monitoring the proceeding, they were all receiving a live feed

23   of the proceedings here.

24        THE COURT:  Well, that's really not what the

25   transcript said.  What the transcript said was that a couple of

1  judges were monitoring that on the live feed.

2       Judge Proctor did say that everybody was consulted before

3  this inquiry began, and that -- I'm probably misquoting the

4  transcript, but something along the lines of everybody had a

5  concern and thought this should be investigated.  But that's

6  all he said.  Right?

7       MR. BUCK:  Your Honor, he said that all -- as I

8  recall -- I am not looking at the transcript.

9       As I recall the transcript, Judge Proctor said that all

10  the judges in the three federal districts were consulted about

11  the assembly and institution of the panel, and that the live

12  feed was available to all of them.

13       Now, whether they were all, you know, that day monitoring

14  or thereafter monitoring the testimony, I don't know, but --

15       THE COURT:  I think Judge Proctor's quote says a

16  couple.

17       You know, we've got right now 13 U.S. district judges, one

18  vacancy, several senior, several magistrate.  Complete

19  speculation on my part, but it wouldn't surprise me to find out

20  that many of those judges are paying no attention to this case.

21       MR. BUCK:  Fair enough, Your Honor.  And we certainly

22  don't know for sure.

23       THE COURT:  But, again, I mean, let's take this one at

24  a time.  I mean, again, y'all have made the assertion that no

25  federal judge can be fair to you.  So let's start through this.

1      Judge Kristi DuBose in the Southern District.  Give me

2   each and every reason that you don't think she could be fair in

3   deciding this issue.

4      MR. BUCK:  Your Honor, I honestly can't go through and

5   identify -- I have never -- I don't even know that I have ever

6   met Judge DuBose.

7      And I don't have a -- the only reason we would point to

8   you and the reason for that footnote is, as I described, our

9   understanding from the statements from the panel at the

10   original May 20th hearing that all of the -- excuse me -- all

11   of the judges in the three federal districts were consulted

12   about the proceeding, and, therefore, in our view, as a best

13   practice, if the in camera inspection is going to occur, it

14   makes sense to pull in somebody that's had no contact with the

15   proceeding.

16      It's not -- if we left the impression, or if I stated

17   directly in that filing that they couldn't be fair, that was a

18   misstatement.  The intention here was to encourage the Court or

19   urge the Court to tap a judge or a special master, private

20   lawyer, special master who had had no connection to the

21   proceedings.

22      THE COURT:  All right.  I am going to give you an

23   opportunity to clean this up right here.

24      Federal district judges obviously swear an oath to be fair

25   and impartial.  So I gather -- I mean, are you saying that not

1   a single district judge in Alabama can honor their oath in this

2   case, or no?

3        MR. BUCK:  No, Your Honor, I'm not saying that.

4        THE COURT:  All right.  So you do believe that all

5   these judges could be fair and impartial, you would just rather

6   have somebody else who hadn't heard anything about this case;

7   is that fair?

8        MR. BUCK:  Your Honor, our position is that one of the

9   major reasons to refer the in camera inspection to someone -- a

10  judge or a special master who has had no connection with this

11  proceeding -- is to, you know, avoid the potential or the

12  appearance of partiality in any way, shape, form, or fashion.

13     And that's -- that is the reason why we made that

14  suggestion in the footnote and in our papers that we filed on

15  Friday.

16       THE COURT:  Well, let me dig down a little further.

17     So are you saying that it would create the appearance of

18  partiality if myself or another Alabama judge decided that?

19       MR. BUCK:  Your Honor, all I'm saying is that Your

20  Honor obviously has been in the thick of this since the

21  beginning, and all the judges were consulted about the

22  institution of the panel.  And so we felt like it was best to

23  suggest that a --

24       THE COURT:  Let me big a little deeper.

25     So, you know, obviously, the panel has kicked off their

1  inquiry on judge shopping long before -- well, obviously long

2  before today.  But, obviously, that was moving forward almost

3  from the time this case got filed.  And yet I think -- I think

4  you would tell me that your clients all thought they had an

5  absolutely fair hearing in front of me on their preliminary

6  injunction.  Am I correct?

7        MR. BUCK:  No doubt, Your Honor.

8        THE COURT:  And, in fact, to my chagrin, when I was

9  reversed by the Eleventh Circuit, I issued a powerful ruling on

10  the merits in favor of your clients.  When I say clients, I'm

11  talking about you and Mr. Ragsdale, correct?

12        MR. BUCK:  Yes, Your Honor.  I am not intimately

13  familiar with the orders in the underlying proceedings, but I

14  have no reason to doubt that.

15        THE COURT:  All right.  So, obviously, if I am to

16  believe what the panel says, there were some respondents -- I

17  am not referring to any specific respondent -- there were

18  obviously some respondents who weren't so sure they could get a

19  fair shake in front of me going into this.

20        MR. BUCK:  And, Your Honor, I think they would be the

21  first to tell you they read the tea leaves wrong.

22        THE COURT:  Uh-huh.  So what has changed between now

23  and then that we're worried I can't make a fair decision?

24        MR. BUCK:  Your Honor, again, it's the nature of this

25  particular proceeding, where you have got lawyers who said what

1   they said about Your Honor, and that's all been put out in the

2   record, who expressed concerns about Your Honor's -- what they

3   thought was Your Honor's judicial philosophy, and then

4   ultimately took a dismissal with the allegations of judge

5   shopping arising thereafter.

6        And so, Your Honor, we just feel like this is sort of in a

7   personal space, so to speak, that makes it a little bit

8   different than your evaluation in ruling on the merits of the

9   underlying issues relating to the transgender medical care law.

10           THE COURT:  Now, look, Mr. Buck, I have been where you

11  are today.  I know this is uncomfortable.  I hope you are not

12  taking any of this personally.  But these are issues I have got

13  to dig through.

14           MR. BUCK:  Understood.

15           THE COURT:  You know?  But you should not be taking

16  this personally.  So I hope you understand that.

17           MR. BUCK:  No.  Understood.  I understand.

18           THE COURT:  All right.  Let's talk about these cites

19  for the issue that we should have a special master.

20       The first one comes from South Carolina law review

21  article, specifically a discussion of in camera reviews of the

22  crime-fraud exception to attorney-client privilege.  And I know

23  you are familiar with that, right?

24           MR. BUCK:  Yes, Your Honor.

25           THE COURT:  All right.  You cited this article for the

1  proposition that a judge reviewing privileged materials could

2  be, quote, prejudiced.  So I am quoting.

3      Quote, ideally any in camera review should be conducted by

4  a judge other than the one presiding over the case involving

5  the communications, or the Court should appoint a special

6  master to conduct that review.

7      That's what you cited to me, right?

8          MR. BUCK:  That's right, Your Honor.

9          THE COURT:  Just after that excerpt, though, that you

10  quoted, the author concludes that, quote, a court is not

11  required to delegate in camera review to another court or a

12  special master.

13      So don't you think it would have been fair to me to also

14  quote language in the same article that's adverse to your

15  opinion?

16          MR. BUCK:  Well, Your Honor, I don't read that as

17  adverse.  And I apologize if it came across that way.  We don't

18  read it as adverse.

19      And I have been candid with Your Honor that -- and

20  there's -- we don't try to take the position in the brief that

21  there is a case that requires that, that I am aware of.

22          THE COURT:  I am not worried about your candor,

23  Mr. Buck.  I am not worried about that.

24      I'm just saying, you know, hey, that's -- the sentence

25  right behind the one you have quoted says exactly the opposite

1  of the position you are taking.  I'm just asking about that.

2          MR. BUCK:  Well, Your Honor, respectfully, I wouldn't

3  say it's exactly the opposite.

4      I mean, what we have said is that we think the best

5  practice here would be to refer this to another judge or an

6  independent special master.  We haven't taken the position that

7  it's required.

8          THE COURT:  The author then writes that after a prima

9  facie showing of crime-fraud has been made -- and, again, I am

10 quoting -- quote, in most cases, the trial court will then

11 review the subject communications in camera to determine

12 whether crime-fraud exception applies.  The decision of whether

13 to conduct an in camera review is typically committed to the

14 trial court's discretion.  That certainly is the rule in

15 federal courts.

16     I mean, this author seems to be telling me exactly what I

17 have thought the law is.  I mean, you don't disagree with that

18 quote, do you?

19         MR. BUCK:  Your Honor, we don't disagree that once the

20 prima facie showing is met, that in the typical case, the Court

21 conducts an in camera inspection of the document or the

22 communication, and then makes a decision as to whether or not

23 it was made in furtherance of a crime or fraud.  And if that --

24 if that decision is made, that it, in fact, was, then the trier

25 of fact gets to see or hear the communication in question.

1            THE COURT:  Now, I know that there was a special

2     master in Drummond, but there's nothing in Drummond that

3     requires it or even suggests that's the way it should happen in

4     other cases, right?

5            MR. BUCK:  No, Your Honor.  I don't believe it

6     addresses why that decision was made.

7         Admittedly, Your Honor, in that particular case and

8     others, it's likely because of the amount of work involved in

9     reviewing what would be a massive amount of attorney-client

10    communications that had to be reviewed in a particular case.

11    That's candidly not the situation we have here.

12           THE COURT:  Just for the sake of argument, let's say

13    that I agreed with appointing a special master.

14        Is there -- now that we have had this discussion -- is

15    there any U.S. district judge in this state that you would say,

16    Judge, I think Judge so and so could be fair to my client, and

17    we are fine with that?

18           MR. BUCK:  Your Honor --

19           THE COURT:  I'm not saying I am going to.  I'm saying

20    if I did, is there one U.S. district judge or magistrate judge

21    in this state that you would say, I think that judge can be

22    fair to my client, Judge, we would be happy with that?

23           MR. BUCK:  Your Honor, first of all, I would like to

24    say that I am -- we are not taking the position about referral

25    to a special master on the basis that we don't think a

1   particular judge can be fair.

2       But to try to answer your question, Your Honor, I don't

3   have -- I have not picked out a particular judge.  The other

4   counsel may have an answer to that question.

5       It would seem to me that both the Middle and the Northern

6   District judges, a number of them were involved in the

7   underlying proceedings as the case has gotten reassigned.  The

8   Southern District judges were not.

9       I know Judge Beaverstock -- Chief Judge Beaverstock has

10  served on the panel.  And so it would seem to me that one of

11  the judges from the Southern District would be further removed

12  than perhaps the Middle District and the Northern District

13  judges.

14          THE COURT:  All right.  On page 13 of your brief, you

15  say the panel, quote, confirmed that there was no allegation of

16  crime-fraud exception in play.

17      Do you remember that quote.

18          MR. BUCK:  Your Honor, is this the brief that we filed

19  on Friday?

20          THE COURT:  Right.  Page 13.

21      You say the panel, quote, confirmed there was no

22  allegation of the crime-fraud exception in play.

23          MR. BUCK:  I will take your word for it.  I am not

24  seeing that at the moment, but I am not saying it's not in

25  there.

1          THE COURT:  All right.  The basis for that is a

2    quotation by the panel explaining that because this isn't a

3    regular civil case, there is not an adversary to raise the

4    crime-fraud exception.

5        So my question is:  Do you understand the difference

6    between a statement that there's not an adversary to raise the

7    exception, as opposed to a conclusion that there is no

8    allegation about the exception in play?

9          MR. BUCK:  I'm sorry, Your Honor.  I'm not -- I didn't

10   follow your question.

11         THE COURT:  Well, I'm just saying that the panel is

12   making the point that there's not an adversary to raise the

13   exception to.  They didn't conclude that there's no allegation

14   about the exception in play.

15         MR. BUCK:  Your Honor, I'm saying -- are you reading

16   from, Indeed, according to the panel's July 25th order, its

17   July 8th order already had made clear the privileged material

18   was not called for?

19       Am I reading the wrong part of that page.

20         THE COURT:  Let me pull this back up.

21         MR. BUCK:  I'm sorry.

22         THE COURT:  No problem.  We could be quoting

23   differently.  Let me look.

24       I tell you what, let's skip forward to footnote 6 on page

25   25, and that's what I'm looking at.  And that is your brief

1    that you filed last week.

2         Footnote 6, notably the panel suggested that the

3    crime-fraud exception may not be available in these proceedings

4    at all.  Again -- quote, again, this is not an adversarial

5    proceeding.  There is no opposing party to raise potential

6    exceptions to privilege or protection; for example, waiver or

7    the crime-fraud exception.

8         So it seems like you're mashing up these two principles.

9    Are you saying that in this proceeding, once you encamp the

10   privilege, there are literally no exceptions to it?

11        MR. BUCK:  No, Your Honor.  That's not what we are

12   saying.

13        I think our understanding of what the panel said was that

14   because -- the panel said there is no opposing party to raise

15   potential exceptions to privilege or protection; for example,

16   waiver or the crime-fraud exception.  That was an observation

17   made by the panel.

18        I don't think, Your Honor, our position is that the Court

19   can't raise it on its own, if that's -- if that's your

20   question.

21        THE COURT:  Okay.  Let's go back to page 13.  And it's

22   just above the bolded language about midway up the page.

23        Starts with, The July 25th order -- this is your brief --

24   also reiterated the panel's view that it was conducting a

25   non-adversarial proceeding, and confirmed that there was no

1   allegation of crime-fraud exception in play.  That's what you

2   say.  The panel confirmed that there was no allegation of

3   crime-fraud exception in play.

4       And then you pull the quote that says -- from the panel

5   that says, there is no opposing party to raise potential

6   exceptions to privilege or protection; for example, waiver or

7   crime fraud.

8       Well, honestly, it -- that seems to be an absolute

9   misrepresentation or misstatement of what the panel said.  The

10   panel -- wouldn't you agree with me, the panel is not

11   confirming that there is no allegation of crime-fraud exception

12   in play.  They are just saying what they said.

13       There is no opposing party to raise potential exceptions

14   to privilege or protection; for example, waiver or the

15   crime-fraud exception.

16       In other words, they're making the point that they're a

17   neutral arbiter.

18          MR. BUCK:  Yes, Your Honor.

19       I mean, at that point, they were making the point that

20   they were a neutral arbiter.  And our read or understanding of

21   what they were saying is that the crime-fraud exception is not

22   being raised at this time.  There's no adverse party to raise

23   it, and they're a neutral party, so they're not raising it.

24       That was our understanding of the statement by the panel

25   on the record at that point in time.

1          THE COURT:  As I understand it from your brief, it's

2   basically that the panel's findings aren't a sufficient basis

3   for a prima facie case that crime-fraud might apply, because

4   those findings are merely unspecified findings and bare

5   accusations.

6       Now, I have read this record many times with great care.

7   And I've read the panel's 53-page report and findings many

8   times.  And I think we're all clear also that the panel's

9   findings aren't final.

10      You know, I have considered additional evidence.  I

11  reopened fact finding for any purpose.  And many of the

12  respondents have taken advantage of that.

13      But, you know, with a 53-page report from the panel making

14  very serious findings, how can you say that these are

15  unspecified and mere allegations at this point?

16         MR. BUCK:  They aren't specified as to a crime or

17  fraud.  I mean, there are, you know, detailed findings in that

18  report.

19      But in terms of what it takes to trigger the crime-fraud

20  exception, there is -- there's no finding in that report that

21  these respondents committed a fraud upon the Court or attempted

22  to commit a fraud upon the Court.  There are other findings of

23  misconduct or what the panel describes as misconduct.  But,

24  Your Honor, they're not of the type that invokes the

25  crime-fraud exception.  And that's our point.

1          THE COURT:  All right.  Now, and I know this is not

2   your client.  It's Mr. Ragsdale's client.  But we have got a

3   joint response here, and this is really almost a hypothetical.

4          You know, the position is taken that the panel is mistaken

5   about Mr. Charles, that he simply forgot rather than perjured

6   himself.  And, obviously, I assume I am going to hear from

7   Mr. Charles himself at the show cause order, and so I have an

8   opportunity to make up my own mind.

9          But, again, the position is, well, Mr. Charles simply

10  forgot rather than committing perjury.  Don't I have to assume

11  that's true, that your argument is true that he forgot rather

12  than perjured himself to accept what you say about crime-fraud?

13  Isn't that kind of circular?

14         MR. BUCK:  Well, Your Honor -- and I can let

15  Mr. Ragsdale speak to this, because he has probably given a lot

16  more thought to Mr. Charles's specific situation.

17         But what I would say, Your Honor, is that, you know, here

18  we're talking about piercing the privilege between counsel and

19  a lot more clients, a lot more respondents than just

20  Mr. Charles.

21         And the -- one of the issues of concern raised in Your

22  Honor's order of May 17th was the potential that the Q&A

23  document that's at issue here was an effort -- and this is my

24  word -- to synthesize the testimony, to get everybody on the

25  same script.

1          And if you think about Mr. Charles's testimony, as

2    compared with all the other lawyers who testified, it actually,

3    that particular -- on that particular issue, it actually shows

4    the opposite.  Mr. Charles clearly was not on a script because

5    everybody else, to my knowledge, readily acknowledged that a

6    call was made to chambers.

7          And so we think that piercing the privilege as to all

8    these other lawyers, as it relates to that one bit of testimony

9    from Mr. Charles, is, you know --

10          THE COURT:  Well, and that was my next question.

11          And, look, I'm not trying to get you and Mr. Ragsdale to

12    work a waiver.  That's not where I'm heading.  I'm treating

13    this as a hypothetical.

14          But if Carl Charles even potentially perjured himself,

15    isn't that enough for a prima facie case of fraud on the Court?

16          MR. BUCK:  Your Honor, I would be hard pressed to

17    argue with that.

18          But what I would say with that, Your Honor, is that would

19    then sort of lead to what we would suggest would be -- for that

20    limited issue, if the Q&A document was to be inspected for that

21    limited issue, to have some independent person review the Q&A

22    document to see if it speaks to that testimony or to that issue

23    in the testimony.

24          THE COURT:  Well, let's throw another hypothetical.

25          I have obviously not seen the document, so I don't know

1   what it says.  But let's assume purely for the sake of my

2   privilege questions that it says, quote, don't tell -- don't

3   anyone tell the panel about the call Carl made to Judge

4   Thompson's chambers.  Then Mr. Charles gets up and says he

5   forgot about the call.

6       Are you saying that even in that circumstance crime-fraud

7   would not apply?

8           MR. BUCK:  No, Your Honor.  What I'm suggesting is

9   that an independent party could review the document to see if

10  it says something of that nature.

11          THE COURT:  All right.  I'm going to throw the

12  football to you, now, Mr. Buck.

13      Tell me what circumstance you think crime-fraud could

14  apply to the document in question here.  And I know you say it

15  doesn't.  But, hypothetically, is there anything that could be

16  in that document that would support a finding that the

17  crime-fraud exception was triggered?

18          MR. BUCK:  Are you -- Your Honor, are you asking me to

19  comment on the contents of the document?

20          THE COURT:  No.  No.  I'm just saying not.  This is a

21  hypothetical.

22          MR. BUCK:  Okay.

23          THE COURT:  I'm not asking you -- I know you probably

24  know what's in the document.  I'm not asking you.

25      I'm saying, in a hypothetical world, you know, can you

1  imagine a set of facts where the contents of that document

2  would support a finding that crime-fraud exception was

3  triggered?

4          MR. BUCK:  Well, Your Honor, if we had a situation

5  here where there was, you know, some improper influence that

6  was attempted to be brought to bear on the panel or some

7  officer of the Court, and there was -- and a reasonable person

8  would believe that counsel was retained and advice sought in

9  connection with that type of improper influence, then those --

10 those attorney-client communications could be breached there.

11      But that's just simply not what we have here.  We have

12 lawyers who, you know, testified at length, filed lengthy

13 declarations.  And absolutely the panel took issue with their

14 conduct and found misconduct.

15      But it didn't find the type of conduct that gives rise to

16 the crime-fraud exception.  That privilege, Your Honor, we

17 submit remains intact.  And there was no action here that would

18 warrant piercing that privilege.

19          THE COURT:  Got it.

20      All right.  We have been going for a while, Mr. Buck.  You

21 have given me very -- you have been patient, as I have asked

22 you these questions.  I appreciate your answers.

23      Let's take a five-minute break and we will come back.

24          (Recess.)

25          THE COURT:  I do have more questions.  I don't like to

 1    run into anybody else's lunch hour.  I don't really like to run

 2    into mine, either.

 3        Why don't we take an hour and 10 minutes, and eat lunch

 4    and come back.  I don't think we will be here long.  But I

 5    don't want to hold you guys another 30 or 40 minutes and make

 6    everybody miserable.

 7        So let's do that.  Let's be back here at 1:20.  Does that

 8    give everybody enough time?

 9            (Recess.)

10            THE COURT:  All right.  So, by the way, I just want to

11    make sure you understand it from my order, you understand it

12    from the bench, you know, my intent with the Q&A is I will

13    review it in camera.

14        In the event that I thought it should be used under any

15    exception or theory of law, I absolutely would go back, give

16    everybody another chance to brief that issue on whatever basis

17    I was thinking, argue it.

18        In the event, you know, for whatever reason you thought

19    testimony was needed, I would allow that, as well.

20        I mean, I just want everybody to understand this is purely

21    an in camera review with all the important decisions to come

22    afterward.

23        Does anybody have any doubt about that or not understand

24    where I am on that?

25            MR. BUCK:  No, Your Honor.  I think we understand -- I

1  understand where you're coming from on that.  You know, my

2  point all along, and I think the point of our brief, the

3  primary point is that we don't think there's a prima facie

4  justification for in camera.

5          THE COURT:  Right.  And you've covered that.

6  Absolutely.

7      And on that issue -- you know, Mr. Ragsdale, let me say

8  this:  I appreciate your remarks at the podium very much.

9  Thank you for the assurances you gave the Court.

10     Honestly, though, you know, I'm looking at the

11 respondents' conduct in this inquiry, you know, not yours.

12     And so, you know, your reputation is excellent.  You are

13 well regarded.  Your reputation is good.  And so I don't want

14 you to interpret this as any sign of the Court's believing

15 something different.

16         MR. RAGSDALE:  I appreciate that, Your Honor.

17         THE COURT:  All right.  And so that's going to lead me

18 to my next kind of line of questioning, which is -- obviously,

19 I read Mr. Esseks's affidavit.  There's some talk of the Q&A,

20 you know, when some of the original junior associates are

21 talking to Judge Harwood on those early days of the hearing.

22 And then I've got some argument, obviously, in your brief about

23 how this document came to be created.

24     And so what I don't understand is -- and I am going to let

25 you correct anything I state that's wrong.

1        As I understand it, Mr. Ragsdale didn't create this

2   document.  He asked his then-respondent clients to create it

3   for him to help him understand, you know, here's some questions

4   that could be asked, here's the -- here's our answers.  And it

5   was generally based on their collective knowledge.

6        Am I getting anything wrong there?

7             MR. RAGSDALE:  I think that's accurate.

8        I have to say, Your Honor, I don't recall whether I made

9   any edits to the document.  I probably did not because it was

10  probably beyond my technological skill.  But it was essentially

11  that.

12       I said, put together -- we know what the issues are.  Put

13  together what anticipated questions that I'm likely to get from

14  the panel.  And give me the facts that I can use to answer

15  those questions.  I think that's a fair description of it.

16            THE COURT:  Got it.  Got it.  All right.

17       Without asking the contents of the document at this point,

18  you know, can anybody give me an idea of how long this document

19  is?  What I'm looking at?  Or is that something you would

20  rather not say?

21            MR. RAGSDALE:  I don't mind telling you.  Can I count

22  pages?

23            THE COURT:  Absolutely.  Can I stand over your

24  shoulder while you do it?

25            MR. RAGSDALE:  Of course they're not numbered.  I

```
 1   would say maybe eight, ten pages.
 2          THE COURT:  Got it.  All right.
 3       And what Mr. Ragsdale's just said, is that also your
 4   understanding, Mr. Buck?
 5          MR. BUCK:  Yes, Your Honor.  And I think there's some
 6   other declarations in the record that talk about the
 7   development of that document, but I think they're all
 8   consistent.
 9          THE COURT:  One other thing.  And help me to
10   understand.  This is just kind of housekeeping for me to
11   understand how this all happened.  Obviously, all these events
12   I'm about to ask you about happened before I came into the
13   case.
14       Ms. Hartnett was originally represented by you,
15   Mr. Ragsdale, correct?
16          MR. RAGSDALE:  That's correct.  I represented all the
17   Walker respondents initially.
18          THE COURT:  All right.  And then help me understand
19   how at some point, then, she got Mr. Buck, and when that was
20   exactly.
21          MR. RAGSDALE:  To her credit, she hired Mr. Buck.  And
22   I don't know the exact date.  It was prior to the August
23   hearings.  I think it was in between the first May hearing, I
24   think after the status conference we had with that.  But before
25   the August -- I think that's right -- you were involved --
```

1          MR. BUCK:  Yes, Your Honor.  We got -- my firm got

2    retained literally in the two or three days before the

3    August 2nd hearing.  And I really think that, you know, Barry

4    had 20-some-odd clients at that point.

5          MR. RAGSDALE:  21.

6          MR. BUCK:  And I think the Cooley folks just felt like

7    this was a lot of clients to be dealing with for Barry all at

8    once, and they felt more comfortable having separate outside

9    counsel.

10         THE COURT:  Got it.  And I don't even need to know

11   that much.  I was really just looking for when did this happen.

12         MR. BUCK:  Yeah.  It was immediately prior to that

13   August 2nd hearing.

14         THE COURT:  Okay.  So I will be honest with you.  I

15   don't know exactly what I am going to do at this point.  I

16   probably think I have some fair ideas about part of it.  It

17   will take me a couple of days to come to conclusions and get

18   them -- to get them in writing.

19      I will say this:  I think that the back and forth that we

20   have had here today on the record is directly relevant in the

21   event that I don't grant you the relief that you want and you

22   file a writ of mandamus again.

23      So I would ask you, ask the parties -- under Rule

24   21(a)(2)(C) of the appellate procedure rules, I believe that

25   our back and forth today would be part of the record that would

1  be essential for the Eleventh Circuit to understand the matters

2  that are set forth in a petition.  I would ask you to include

3  this transcript with any mandamus, if we get to that point, and

4  if you get an order that you can't live with.

5         MR. BUCK:  Understood.  And that makes sense.

6         THE COURT:  All right.  Let me switch to Mr. Ragsdale

7  for a minute.

8     Good news for you, Mr. Ragsdale.  I have got like

9  5 percent of the questions for you that I had for Mr. Buck.

10        MR. RAGSDALE:  Thank goodness for the lunch break,

11  Your Honor.

12        THE COURT:  And, Mr. Buck, I also will say I

13  appreciate your patience as we walked through that.  It was an

14  exercise that was good for me to help me completely flesh out

15  your positions.

16    Okay.  Let's go to Mr. Ingelhart.  And I am confused.  Is

17  it Milo or Milo?

18        MR. RAGSDALE:  It's Milo.  I think in the south, it

19  would be Milo.  But he's not from the south, so it's Milo.

20        THE COURT:  This is confusing me because my

21  brother-in-law's name is Milo, and my godson's name is Milo,

22  so -- all right.  But I want to get everybody's name pronounced

23  the way they want it done.

24    All right.  So, as to Mr. Ingelhart, tell me what, if any,

25  position he has here today on this document.  Is he still --

1  you know, where is -- what's his position today?

2         MR. RAGSDALE:  Well, I guess you mean his argument

3  position.

4         THE COURT:  Right.

5         MR. RAGSDALE:  Yeah.

6      I think he takes the same position that my clients do,

7  which is that that was a privileged document produced not in

8  anticipation of litigation, but to prepare their lawyer.

9      Obviously, if he gets a court order from you ordering him

10 to produce it, we will do exactly what we planned to do before,

11 which is seek relief from the Eleventh Circuit.  If we cannot

12 get relief from the Eleventh Circuit, we will comply with your

13 order.

14        THE COURT:  Understood.  Understood.

15     So I take it he still has the document, just not in his

16 native form.  Tell me what that means.

17        MR. RAGSDALE:  The document itself, Judge, was -- let

18 me say this:  The only copy I have of it is a pdf.  And I am

19 already frankly down a road that I am going to have trouble

20 explaining technology.

21     But the copy I have is a pdf.  The only copy that I think

22 Mr. Ingelhart ever had was a pdf.  And if -- you know,

23 certainly, if he's ordered to produce that, he will produce it,

24 but he can't produce it in its native form.

25     We think there are other respondents that have been able

1   to identify the document in a form that would allow the native

2   production.

3           THE COURT:  Got it.  So help me understand.  Let's

4   just roll through the Walker respondents.

5       You know, what -- what form do each one of them have it

6   in?  Is it pdf for everybody?  Is it a paper copy for somebody?

7   Or --

8           MR. RAGSDALE:  I will be honest, Your Honor.  I have

9   not canvassed all -- what used to be 21 of my clients.  My --

10          THE COURT:  And I am really only talking about

11  these -- these, you know, the previous, you know, by my last

12  order that were affected.

13          MR. RAGSDALE:  None of -- I'm sorry.  I didn't meant

14  to interrupt you.

15          THE COURT:  No.

16          MR. RAGSDALE:  None of Mr. Esseks, Ms. Faulks, or

17  Mr. Charles have it in its native format.

18          THE COURT:  Okay.

19          MR. RAGSDALE:  They all have electronic pdf copies of

20  it.

21          THE COURT:  Okay.

22          MR. RAGSDALE:  I say they all do.  Both Ms. Faulks, I

23  think, as you know, and Mr. Charles have changed jobs.  That

24  was probably on their old computer.  But nobody's going to, you

25  know, argue about whether they have it or don't have it.  But

1  none of them have it in its native form.

2            THE COURT:  All right.

3            MR. RAGSDALE:  My understanding is it resides on some

4  computer in its native form.

5            THE COURT:  Which I assume would be a Word document?

6            MR. RAGSDALE:  I think that's correct.  Yes, sir.

7  Thank you.  Yes.  It's a Word doc -- it's a Word document that

8  exists on Google, I think.

9            THE COURT:  All right.

10           MR. BUCK:  Well, Your Honor, may I?  I may be able to

11 short circuit this.

12           THE COURT:  Absolutely.

13           MR. BUCK:  My understanding from speaking with

14 Ms. Hartnett about it is the document was a Word document, and

15 it still exists in Word form or format, and I believe there's

16 some metadata attached.  I don't know.  I don't understand

17 that, either.  But I think you can dig into the metadata of a

18 Word document.

19      And my understanding is at some point, it was at least

20 made available through some kind of shared file system.  I

21 don't know if it was Google or something else, but it still

22 exists.  She has access to it in Word form.

23      And with some -- I guess there's the ability to look at

24 the metadata in a Word document.  And that still exists and

25 could be made available.

1          THE COURT:  Got it.

2          MR. BUCK:  If that answers the Court's question.

3          THE COURT:  Anything you want to add to that,

4   Mr. Ragsdale?

5          MR. RAGSDALE:  No.  I think that's accurate.

6          THE COURT:  All right.  But Mr. Ingelhart right now is

7   joining in the objection to production.

8          MR. RAGSDALE:  He is, Your Honor, only because the

9   Court's reference to the previous order having been issued by

10  the panel.  He was the subject of that order.

11         THE COURT:  Right.

12         MR. RAGSDALE:  We obviously have filed a motion asking

13  that he be released from that.  We don't think it's

14  necessary -- the same paper copy or pdf that he has, I have.

15  But he does join in the request that he not be forced to

16  produce it.

17         THE COURT:  Got it.

18      I may be close to finished.  Let me look at a couple more

19  things here.

20      One question for you, Mr. Ragsdale.  At one point when I

21  opened fact finding, I think you had indicated in a preliminary

22  filing that you were going to file an affidavit regarding a

23  conversation you had with Mr. Charles.

24         MR. RAGSDALE:  Correct.

25         THE COURT:  But -- and I could be missing something

1  because this record is crazy.  But I don't see that that ever

2  got filed.

3              MR. RAGSDALE:  It did not, Your Honor.

4              THE COURT:  Okay.  You got any thoughts on that?

5              MR. RAGSDALE:  I do.  I do have some thoughts on that.

6        The issue there, Your Honor, was that the advice that I

7  gave to Mr. Charles to prepare him for that hearing I gave to

8  all 21 of my clients.  Not all 21 were excited about the

9  prospect of me potentially waiving the attorney-client

10  privilege by disclosing that.

11       I think Mr. Charles covered it, frankly, in his

12  declaration, as did I know Mr. Esseks in his, that we did not

13  anticipate testimony at that May 20th hearing.  We didn't think

14  that was going to happen.  We thought -- we had a whole plan

15  that lasted not very long at all about how we were going to

16  present to the panel.

17       And I do think -- I think it's relevant to Mr. Charles,

18  but I think it's also relevant here that I told those 21 people

19  that I didn't expect them to testify.  I was wrong.  Not the

20  first time, and probably won't be the last.

21       But that's significant, obviously, Your Honor, because

22  this document was not prepared in anticipation of testimony.

23  It was not prepared in anticipation that any of those 21

24  lawyers were going to go under oath and have to ask -- answer

25  detailed questions.

1        THE COURT:  Well, and that brings up another question.

2     So if I go back and look at Mr. Ingelhart and then maybe a

3  Zoe Helstrom -- am I saying that right?

4        MR. RAGSDALE:  That's right.

5        THE COURT:  Okay.  Both of them -- and they say

6  different things.  But both of them sort of indicate that they

7  expected to get questions.

8     Is the issue that they got questions?  Because it seems

9  like people were expecting the panel to ask questions.

10 Certainly, you were preparing to answer them.

11    Is the issue, hey, we got asked questions and we weren't

12 prepared for that?  Or is the real issue we didn't expect to

13 have to give sworn answers?

14       MR. RAGSDALE:  No.  And I want to say, I don't know

15 where either one of those lawyers, young lawyers got the

16 impression that they were going to be -- we certainly

17 anticipated I was going to be asked questions.  And we

18 anticipated that our lead lawyers, Ms. Hartnett and Mr. Esseks,

19 were going to make a presentation which would likely produce

20 questions.

21    But I don't believe anybody believed that -- not only that

22 they wouldn't be put under oath, Your Honor, but that they were

23 not going to be asked detailed questions about the various

24 facts involved in that.

25    And, you know, the significance of that is, Judge,

1    frankly, I would have spent more than probably the 45 minutes I

2    spent with 21 lawyers if I anticipated that they were going to

3    have to testify, right?  You know the normal prep that goes

4    into getting anybody to testify, going over the general rules,

5    et cetera.

6         And so it's not an excuse.  It is partially excuse for

7    Mr. Charles, and we can put that aside for a moment.

8         But it is -- to me, it undermines the basic concept of

9    this document being produced in furtherance of an attempt to

10   defraud the Court.

11        THE COURT:  So let me read you what Zoe Helstrom says.

12   So Justice Harwood says, well, as you heard, there are a couple

13   of questions the Court has assigned me to ask and then pursue

14   as I see fit.  And then I'm just reading this out of your

15   brief.

16        The first is, have you been coached or instructed by

17   anybody about what you should or shouldn't say by way of,

18   quote, unquote, testimony in this hearing?

19        And so here's what Zoe Helstrom says.  Sure.  I think

20   beyond what our attorney mentioned, you know, we had

21   conversations about, like, potential questions that if we

22   were -- if we were to be asked questions we might encounter and

23   what the facts were in terms of, you know, each question, but

24   that's -- that's been it.

25        So it sure looks to me like Zoe Helstrom thought she was

1   going to get asked questions, and questions about the facts,

2   and wanted to be prepared for that.

3      Am I misreading anything?

4       MR. RAGSDALE:  I think you may be misreading the word

5   "we."  Our team collectively anticipated we were going to be

6   asked questions, particularly me, potentially the others.

7      I don't think she meant -- and, Judge, here's a perfect

8   example of, if I had been in that room when she gave that

9   testimony, I probably would have cross-examined her and said,

10   when you say, "we," are you talking about you personally?  And

11   I think that answer would have been no.

12      So I think -- I'm not going to tell you, you are

13   misreading it, but I think her use of the word "we" was not

14   specific to her or the other junior lawyers.

15      We never anticipated that these lawyers that played such a

16   minimal role in the decisions that we made in this case were

17   going to be individually questioned under oath, or otherwise,

18   as to the details.

19      I think if you instead, Judge --

20       THE COURT:  And help me understand that, too.  I mean,

21   a three-judge panel summons all these people for an ethics

22   inquiry, or -- it may be a bad term -- you know, an inquiry

23   into whether there was judge shopping or not.  Everybody comes.

24      I mean, help me to understand why nobody would be -- would

25   expect there would be testimony, much less sworn testimony.

1   That truly would be the beginning point for a panel that was

2   making such an inquiry would be to ask people why they did

3   things.

4       I mean, help me understand why nobody would think the

5   panel would ask them any questions.

6           MR. RAGSDALE:  In hindsight, it seems pretty naive.  I

7   can only tell you what we thought when we showed up on

8   May 20th.

9       There were 41 lawyers.  No way 41 lawyers were going to

10  testify in a single day.

11      At that point, we thought it was a single day, right?

12  Come and tell us.  It was not a show cause order, right?  They

13  wanted us to explain to them what happened.

14          THE COURT:  Right.

15          MR. RAGSDALE:  And we, I will tell you, to a person

16  believed that if we showed up and explained to these three

17  distinguished federal judges what actually had happened, and

18  the facts and circumstances behind what we thought at that

19  point the inquiry was about, that there would be no need for

20  sworn testimony.

21      I mean, as I said, two years later, that looks like I'm

22  the worst lawyer that ever walked the planet.  But at the time,

23  it made sense to us that if I could make a legal presentation

24  and an argument to the three-judge panel, along with the best

25  and frankly most-experienced lawyers in the state, and that our

two primary lead clients could explain their circumstances, we
frankly thought that would be the end of it.

I mean, as I said, with hindsight, that doesn't look like
a very smart call, but that's what we believed at the time.

We were surprised, and I think we put some of that in the
record, as well.  We were surprised when the young lawyers were
taken off and questioned under oath.  And we were surprised
when each one of our clients was going to have to testify.

As I said, maybe we should have foreseen it, and maybe it
makes sense.  There was no indication in the judges' -- the
panel's order that there was going to be sworn testimony, nor
was there any indication there wouldn't be.

But, and so that's how we found ourselves that morning
believing that all we had to do was explain what happened and
we would be okay.

THE COURT:  Got it.  Got it.

Okay.  I think I am fresh out of questions.

MR. RAGSDALE:  I should stop, but I won't.

THE COURT:  Okay.

MR. RAGSDALE:  Just a couple of things if I can,
Judge.

Number one, you made the point to Mr. Buck that because
you have an allegation of perjury involving Mr. Charles,
doesn't that get us to crime-fraud?

The Eleventh Circuit's directly spoken to that, and it's a

1  case we cited in our brief that perjury is not the kind of

2  fraud on the Court that lets you get past the attorney-client

3  privilege.

4      Those cases generally say -- by the way, that's the

5  Travelers case that we cite on page 26.

6          THE COURT:  And I think he's already made that

7  argument to me.

8          MR. RAGSDALE:  Okay.  Then I don't need to adjust him

9  on that.

10     I will say, Your Honor, I think it's important that what

11 we're collectively accused of doing doesn't rise to a level of

12 the kind of egregious fraud on the Court that the Eleventh

13 Circuit and other courts have allowed the invasion of the

14 attorney-client privilege.

15     And that's where I think the Court has to start with

16 drilling down on whether or not that meets the basic standard,

17 because it is undisputed from everybody that testified that

18 they were not told what to say, they were not told what not to

19 say, they were not coached into committing perjury or saying

20 anything that wasn't untrue.  And there's no evidence that

21 contradicts that.

22     I mean, the fact that Mr. Charles misspoke or potentially

23 allegedly committed perjury actually disproves the notion that

24 we created this document and tried to get everybody on the same

25 page, because that's not what it was about.

1          Lastly, Judge, I would say there's no evidence that my

2   services as a lawyer were used to further a fraud on the Court.

3   And that's a requirement of the crime-fraud exception.  It's

4   not just that your client might commit a fraud.

5          THE COURT:  Of course, I hear you, but we're just --

6   at this point, we're just talking about an in camera review,

7   you know?

8          MR. RAGSDALE:  I guess my point is, Judge, you never

9   get there.

10         THE COURT:  Well, I hear you, but Mr. Buck, I think,

11  made these arguments.  If there's a new argument that you want

12  to make to me that Mr. Buck didn't make, I will certainly

13  listen to you, but I think he adequately made those arguments.

14         MR. RAGSDALE:  An argument that I know he did not

15  make, if I might.

16         THE COURT:  Uh-huh.

17         MR. RAGSDALE:  Is we did not stand on the

18  attorney-client privilege; that is, our clients, did not stand

19  on the attorney-client privilege for the underlying alleged

20  misconduct -- judge shopping, et cetera.  We agreed that we

21  would testify about things that we said to our clients.

22      And, again, I am using "we," that the lawyers, respondents

23  in this case would say to their clients.  The line we drew was

24  between those respondents and their lawyers, not the underlying

25  part.

1          And that's very important, because Drummond makes that

2     distinction, as well.  That was a defamation case.  And what

3     the Eleventh Circuit said is, we're only dealing with

4     communications underlying the transaction.  We're not dealing

5     with communications between the lawyer and their lawyers, which

6     is what we're talking about here.

7          And the reason we're putting up such a fuss, Judge,

8     because you have asked this question before, is there something

9     so terrible in that document that we will all wither and die if

10    you look at it?  It's not.

11         But the principle of the attorney-client privilege is what

12    we are fighting about.  And that privilege should not be

13    invaded without good cause, and there is not good cause in this

14    case.

15              THE COURT:  Is there some fear that if you produce

16    this it would lead to the Court seeking other documents that

17    you might say are subject to privilege?

18              MR. RAGSDALE:  I'm not -- I would be lying if I told

19    you there wasn't some concern about that.

20              THE COURT:  Understood.

21              MR. RAGSDALE:  And not just documents, Judge.  Also

22    conversations.

23         And can I say one last thing?

24              THE COURT:  Yes.  Yes.

25              MR. RAGSDALE:  If you are right, and a mere

1    credibility determination is enough to invade attorney-client

2    privilege, that's going to be true in every case.  Every case,

3    some judge is going to say, you know, I don't really believe

4    what they're saying; therefore, that's a fraud on the Court,

5    and, therefore, I can invade the attorney-client privilege.  It

6    has no limits.

7         So I would ask the Court to at least think about a bigger

8    picture other than this case.  And I know the Court does that

9    in every case.

10            THE COURT:  No, no.  I hear your argument.

11        But the elephant in the room to me is that, you know, I've

12    got a three-judge panel that conducted days of hearings under

13    oath, and made 53 pages of findings.  And so I do think we're a

14    lot farther along than just in your average case.

15        So but I hear your arguments.  And I thank you.

16

17            (Whereupon, the above proceedings were concluded at

18        1:52 p.m.)

19

20

21

22

23

24

25

1                           <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11                                              <u>05-29-2024</u>

12   Christina K. Decker, RMR, CRR                  Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25