## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **BRIANNA BOE**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-184-LCB** |
| | ) | |
| **STEVE MARSHALL**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Last October, a three-judge panel unanimously found "without hesitation" that eleven attorneys (the "Respondents") had purposefully attempted to subvert the orderly administration of justice by judge-shopping. (Doc. 339 at 51) In reaching that conclusion, the Panel unanimously rejected the Respondents' explanations, unanimously discredited their testimony, and unanimously found that one Respondent—who was under oath—lied to them outright. (Doc. 339).

A few weeks ago, the Court learned of a document that some of the Respondents (the "*Walker* team") had created before they first gave testimony to the Panel. This "Q&A Document" was based on the *Walker* team's collective knowledge, and it contained answers to questions they expected the Panel to ask them. As part of their hearing prep, drafts of the document were circulated to each member of the team.

On May 17, 2024, the Court ordered Respondents James Esseks, LaTisha Faulks, Carl Charles, and Kathleen Hartnett and Non-Respondent Milo Inglehart to e-mail that document to its chambers' address for an *in camera* review. Since the facts support a good faith belief by a reasonable person that the document might lose any applicable privilege protections under the crime-fraud exception, the Court concluded that an *in camera* review was necessary. If the review shows the document to be irrelevant or the exception inapplicable, they were told, the Court will not consider it for any purpose.

Even though "disclos[ing]" the allegedly privileged document to the district court for *in camera* review to "determin[e] the merits of a claim of privilege does *not* have the legal effect of terminating the privilege," even though the Supreme Court has long "approved the practice of requiring parties who seek to avoid disclosure of documents to make the documents available for *in camera* inspection," and even though that "practice is *well established in the federal courts*," *United States v. Zolin*, 491 U.S. 554, 568–69 (1989) (emphasis added), the Respondents opposed the order on privilege grounds. After responses and an emergency petition to the Eleventh Circuit, the Court stayed its order, granted the Respondents leave to submit briefs, and heard argument.

Having now carefully considered the Respondents' briefs, their arguments at the hearings of May 20 and May 28, and the controlling law, the Court rejects their

arguments as unsupported by law or fact. Respondents Esseks, Faulks, Charles, and Hartnett are therefore **ORDERED** to produce the Q&A Document by **June 18, 2024 at 5:00 p.m.**

This order supersedes the May 17 order (Doc. 527), which is **VACATED**.

## I.    FACTUAL BACKGROUND

On Friday, April 8, 2022, Governor Kay Ivey signed into law the Alabama Vulnerable Child Compassion and Protection Act, which criminalized gender-affirming medical treatments for transgender youths. The law was immediately challenged by two teams of plaintiffs. In the Northern District of Alabama, Dr. Morissa J. Ladinsky, Dr. Hussein D. Abdul-Latif, Robert Roe, and Jane Doe sued the Governor, the Attorney General, and the district attorneys for Shelby and Jefferson counties in a case styled *Ladinsky v. Ivey*. Compl., 5:22-cv-447-LCB (N.D. Ala. April 8, 2022), ECF 1. In the Middle District of Alabama, Jeffrey Walker, Lisa Walker, H.W., Jeffrey White, Christa White, and C.W. sued the Attorney General and the district attorneys for Limestone and Lee counties in a case styled *Walker v. Marshall*. Compl., 5:22-cv-480-LCB (N.D. Ala. April 11, 2022), ECF 1.

*Ladinsky* was docketed on the morning of April 11, 2022 and randomly assigned to Judge Anna M. Manasco. Compl., 5:22-cv-447-LCB (N.D. Ala. April 8, 2022), ECF 1. Early that afternoon, Judge Manasco recused, Order of Recusal, 5:22-cv-447-LCB (N.D. Ala. April 11, 2022), ECF 2, and the case was randomly

reassigned to Magistrate Judge Staci G. Cornelius, Not. of Reassignment, 5:22-cv-447-LCB (N.D. Ala. April 11, 2022), ECF 3. The parties did not consent to dispositive jurisdiction by a Magistrate Judge, and so three days later *Ladinsky* was randomly reassigned once more to Judge Annemarie Carney Axon. Not. of Reassignment, 5:22-cv-447-LCB (N.D. Ala. April 14, 2022), ECF 11.

Meanwhile, on April 12, 2022, *Walker* was docketed in the Middle District and randomly assigned to Chief Judge Emily C. Marks. Compl., 5:22-cv-480-LCB (N.D. Ala. April 11, 2022), ECF 1. That day after business hours, the *Walker* plaintiffs filed a motion to reassign the case to Judge Myron H. Thompson, who previously presided over a case called *Corbitt v. Taylor*. Pls.' Mot. to Reassign to Judge Myron H. Thompson, 5:22-cv-480-LCB (N.D. Ala. April 12, 2022), ECF 8. Minutes later, the *Walker* plaintiffs moved for a temporary restraining order or preliminary injunction to block enforcement of the Act. Pls.' Mot. for TRO or Prelim. Inj., 22-cv-480-LCB (N.D. Ala. April 12, 2022), ECF 9. Before filing that motion, counsel for the *Walker* plaintiffs took steps to steer the case to Judge Thompson—including marking the case related to *Corbitt* on the case's civil cover sheet and calling Judge Thompson's chambers to let him know they'd soon be moving for a preliminary injunction. (Doc. 339 at 6).

The next day, Chief Judge Marks entered an order to show cause why *Walker* should not be transferred to the Northern District of Alabama, where *Ladinsky*, the

first-filed action, was pending. Order, 5:22-cv-480-LCB (N.D. Ala. April 13, 2022), ECF 3.

Around 9:00 p.m. the day after, counsel for *Walker* plaintiffs responded to the order to show cause, withdrew their motion to reassign *Walker* to Judge Thompson, and indicated that the plaintiffs' interest was "in the expeditious injunction of the unconstitutional law they challenge," so they would "seek to pursue their motion for this preliminary relief expeditiously in the Northern District." Pls.' Resp. to Order to Show Cause, 5:22-cv-480-LCB (N.D. Ala. April 14, 2022), ECF 18.

The central events in the case history, however, took place on Friday, April 15. That morning, Chief Judge Marks transferred *Walker* to the Northern District of Alabama, "mak[ing] no finding on the issues of consolidation" with *Ladinsky*. Order at 2, 5:22-cv-480-LCB (N.D. Ala. April 15, 2022), ECF 20. Upon transfer to the Northern District, *Walker* was docketed in the Northeastern Division because no division had been designated and the only parties named in the suit from that district resided there. (Doc. 339 at 7). At docketing, *Walker* was randomly assigned to this Court, 5:22-cv-480-LCB (N.D. Ala. April 15, 2022), ECF 21, and at 4:07 p.m. that day, the Court set the matter for a status conference first thing the next business day. Order, 5:22-cv-480-LCB (N.D. Ala. April 15, 2022), ECF 22.

At 4:41 Friday afternoon, given *Walker*'s pending motion for a preliminary injunction and the pressing claims for injunctive relief raised in *Ladinsky*, Judge

Axon transferred *Ladinsky* to this Court "[i]n the interest of efficiency and judicial economy," Order, 5:22-cv-447-LCB (N.D. Ala. April 15, 2022), ECF 14.[1]

At 6:25 that evening, the *Walker* plaintiffs voluntarily dismissed their case under Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. Pls.' Not. of Vol. Dismissal, 5:22-cv-480-LCB (N.D. Ala. April 15, 2022), ECF 23. Nine minutes later, the *Ladinsky* plaintiffs did too. (*Ladinsky* Doc. 15). Pls.' Not. of Vol. Dismissal, 5:22-cv-447-LCB (N.D. Ala. April 15, 2022), ECF 15.

Sometime the next day, one of the lead attorneys for the *Ladinsky* plaintiffs, Melody Eagan, told a reporter that her team "plan[ned] to refile immediately,"[2] a statement she reiterated to a different media outlet the next Monday.[3] And sure enough, *Ladinsky* counsel filed a new lawsuit on April 19, 2022, in the Middle District of Alabama with a new slate of plaintiffs.[4] (Doc. 1). Since it had presided over *Walker* and *Ladinsky*, this Court was reassigned the new case two days later under "the authority of the Court to manage the district court docket, promote the

---

[1] Judge Axon was presiding over a criminal trial with multiple issues and defendants.

[2] Paul Gattis, "Lawsuits Seeking To Overturn New Alabama Transgender Law Dropped, Could Be Refiled." AL.com (Apr. 16, 2022, 5:43 p.m.), https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html.

[3] *See* Brian Lyman, "Attorney: Plaintiffs Challenging Alabama's Ban On Transgender Medicine Plan New Case." Montgomery Adviser (Apr. 18, 2022, 11:34 a.m.), https://www.montgomeryadvertiser.com/story/news/2022/04/18/plaintiffs-challenging-alabamaban-transgender-medicine-plan-new-case-sb-184-kay-ivey-lawsuit/7355576001/.

[4] Namely, Rev. Paul A. Eknes-Tucker, and pseudonymous plaintiffs Brianna Boe, James Zoe, Megan Poe, Kathy Noe, Dr. Jane Moe, and Dr. Rachel Koe, who sued the Governor, the Attorney General, the district attorneys for Montgomery, Cullman, Lee, and Jefferson counties, and the district attorney for the 12th Judicial Circuit.

orderly and expeditious disposition of cases, and reassign a case to a judge who presided over a prior-related case." (Doc. 3).

By then, the Court had denied *Walker*'s motion for temporary restraining order as moot and closed the case. Order, 5:22-cv-480-LCB (N.D. Ala. April 18, 2022), ECF 24. In its closing order, the Court observed that the filing activity and media statements surrounding the two cases "could give the appearance of judge shopping," and it warned that such a practice risked creating "an appearance of impropriety in the judicial system." *Id.* at 3. With this admonition, the Court directed the Clerk of Court to forward a copy of its order to the chief judge of each federal district court in Alabama. *Id.* at 3-4.

On review of the order, the Chief Judges independently concluded that counsel's filing activity and media statements warranted an investigation, and on May 10, they empaneled three district judges—one from each district—to conduct an inquiry. Invoking the district court's "inherent authority to address lawyer conduct that abuses the judicial process," the Panel summoned all thirty-nine attorneys who had signed *Walker*, *Ladinsky*, or this case to appear ten days later for the purpose of "inquir[ing] about the issues raised by counsel's action" and whether they had purposefully sought to subvert the random case-assignment procedures for the Northern and Middle Districts of Alabama. Order at 5, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. May 10, 2022), ECF 1.

7

On the first day of the hearings, the Panel categorized the attorneys based on their knowledge of and roles in the decision-making behind *Walker* and *Ladinsky* and divided them into three groups: (1) attorneys with knowledge but no input; (2) attorneys with knowledge and input; and (3) leaders and decision-makers. (Doc. 339 at 11). To streamline the inquiry, the Panel charged the Honorable Justice R. Bernard Harwood with taking testimony from the first group of attorneys, including testimony on whether they had "received any instructions or special coaching on what [they were] supposed to say in [the] hearing." Tr. Evidentiary Hr'g at 75-76, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. October 10, 2023), ECF 75.

During this questioning, a *Walker* attorney named Zoë Helstrom testified that she'd "had conversations about . . . potential questions that, if we were to be asked questions, we might encounter and what the facts were in terms of . . . each question." Tr. Evidentiary Hr'g at 34, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. November 2, 2023), ECF 98. Another *Walker* attorney, Milo Inglehart, testified that he and others reviewed a "Q&A document" by counsel to prepare for the inquiry:

> JUSTICE HARWOOD: Okay. You heard me earlier on say that one of the questions the judges had wanted me to ask, has anyone coached you or suggested to you any testimony you should give? That is, if you were asked a certain question, here's what you should say?
>
> MILO INGLEHART: I don't think so. Not quite like that. We met with our counsel, Barry, a few times who sort of explained to us what he thought might generally—
>
> JUSTICE HARWOOD: Barry Ragsdale?

MILO INGLEHART: Barry Ragsdale, yeah. Sorry, sir. We didn't get specific things to say. There was a sort of Q and A document that was circulated, I think, last night for us or maybe a draft was circulated earlier in the week, but the final version was circulated last night that kind of walked through, like, things they think might come up or like— yeah, just to sort of prep folks.

And beyond that, Lynly and Dale and I were going to have a meeting on Thursday night—no. Sorry—on Wednesday night, but it ended up getting canceled. So I just ended up going to the group calls and looking over the document.

JUSTICE HARWOOD: Okay. When you say "Q and A," "A" would be the answers. Was there a suggestion, all right. If you're asked this question, here's the answer to use?

MILO INGLEHART: Usually it was sort of like—I'm trying to remember. I just looked over it last night—like, outlining, like—like, general—it wasn't like a word-for-word thing, but like things that might be useful to touch on or like—yeah.

JUSTICE HARWOOD: All right.

Tr. Evidentiary Hr'g at 54-55, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. November 2, 2023), ECF 98.

Of the twenty-one *Walker* attorneys interviewed, only Mr. Inglehart disclosed the existence of the Q&A Document.

On July 8, the Panel ordered twenty-one of the respondents—thirteen from *Ladinsky*, eight from *Walker*—to file *in camera* declarations and "make full, complete, and transparent disclosure[s] of [their] participation in and knowledge of" the eight topics listed in the order, one of which concerned those respondents' preparations for the inquiry's first hearing. Order at 2-3, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. 2022 July 8, 2022), ECF 22. Specifically, each respondent was

ordered to disclose "[a]ny knowledge [he or she] [has] that relates to (1) preparation for the hearing in this matter (including circulation of any Q & A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing." *Id.* at 3. Mr. Inglehart was also ordered to "attach a copy of the Q & A sheet referenced at the May 20 proceeding." *Id.* at 2 n.1.

Six days before the submissions were due, the *Walker* team sought a protective order that would "prevent[] the disclosure of any information related to their preparations with counsel for the May 20, 2022 hearing that is protected by the attorney-client privilege and the attorney work product doctrine, including the 'Q & A' document referenced in the Panel's July 8, 2022 Order." Mot. Protective Order at 1, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. July 21, 2022), ECF 34. As grounds for their motion, counsel argued that there was "an irreconcilable conflict" between the Panel's role investigating the respondents' conduct and the task of reviewing "the strategy, mental impressions, and thought processes" of the respondents' counsel, so an *in camera* review "would be inconsistent with the core function of the attorney client privilege, the attorney work product doctrine, as well as basic norms of due process and fairness." *Id.* at 7-8.

The Panel rejected their arguments on the ground that the Panel was "comprised of judges, not party-opponents" and denied their motion. Order at 3, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. July 25, 2022), ECF 41. The Panel noted

that the "July 8, 2022 Order ma[de] clear" that "the Panel [was] not seeking the disclosure of privileged *communications*"; that, "[t]o the extent the materials that must be disclosed to the Panel [were] work product, all disclosures [were] to be made *in camera*"; and that "*Walker* Counsel's Motion for Protective Order (Doc. # 34) [was] **DENIED.**" *Id.* at 4.

Mr. Inglehart nevertheless refused to produce the Q&A Document for *in camera* review at the "advice and direction of counsel," Barry Ragsdale.[5] Decl. Milo R. Inglehart at 10, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. October 11, 2023), ECF 80-15.[6]

Two months later, the Panel excused twenty-one of the respondents from the inquiry (including Mr. Inglehart) and "release[d] them from any obligation under the May 10, 2022 and July 8, 2022 orders. Order, *In re Vague*, 2:22-mc-3977-LCB

---

[5] Respondents contend the Panel exempted the Q&A from production as a privileged communication, so no one violated the July 8 order. Perhaps the fairest way to characterize the exchange with the Panel over the Q&A is this: On July 8, 2022, the Panel ordered Mr. Inglehart to produce the Q&A for *in camera* review. The *Walker* Respondents opposed the order, moved for permission not to produce it, and were denied relief. At the same time, the Panel clarified that the respondents' declarations as to their "knowledge" of the eight topics listed in the July 8 order needn't include "privileged *communications*" about those topics, while work product, like the Q&A, would still need to be turned over for *in camera* review. After this, Mr. Ragsdale unilaterally decided that Mr. Inglehart could avoid producing the Q&A Document anyway—even though the Panel had just rejected counsel's arguments that the attorney-client privilege or the work-product doctrine shielded it from disclosure—because the July 25 order exempted "privileged *communications*" from disclosure in the respondents' declarations. Even though the Panel denied the request for a protective order, Mr. Inglehart nonetheless withheld the Q&A document as privileged at his counsel's advice.

[6] Mr. Ragsdale represented the whole *Walker* team at least until he filed this notice of objections. A few days afterwards, however, Ms. Hartnett hired her own attorney, Brannon Buck, who has represented her ever since. (Doc. 568 at 54).

(M.D. Ala. September 23, 2022), ECF 59. Mr. Inglehart never produced the Q&A

Document.

In the Panel's final hearing on November 3, 2022, the Panel acknowledged in

a dialogue with counsel for some of the *Ladinsky* attorneys, Bobby Segall, that it had

not enforced its production order:

> MR. SEGALL: [A]t the beginning of the August 3-4 [hearing], the parties asked for a continuing objection on the basis of privilege. I would like—which you granted. You denied, but you denied the objections.
>
> JUDGE PROCTOR: We overruled the objection, but we gave you the right to assert the objection globally on these matters.
>
> MR. SEGALL: Right. And I would like to be treated as having made a similar objection on August 3, 4. And I would also, Your Honor, like for today's purposes to have a continuing objection on the basis of all the privileges that have been mentioned, work product, attorney-client, common interest, joint client, et cetera.
>
> JUDGE PROCTOR: And that's the interesting road we've kind of navigated, it seems, in this matter is we started off with a limited waiver where the parties came in and—I'm not sure you said this, but other counsel said this—that we don't have anything to hide, we're going to be cards up, we're going to explain this decision to you. And I think even—what I recall was even when Judge Burke convened the initial status conference in *Eckness-Tucker*, Mr. Doss and Ms. Eagan were prepared to explain to him all the decisions that were made about this.
>
> On the other hand, we certainly understand we've not made you provide us documents, the Q & A sheet, the talking points that Doss was going to use either here or before Judge Burke at that hearing. So we're all right with y'all asserting anything we're not actually saying is work product we're reserving our work product objections. But I thought that there had been a decision to be somewhat candid with the Court about why these decisions were made. Am I missing the boat on my recollection here?

Tr. Evidentiary Hr'g at 4-5, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. October 10, 2023), ECF 79.

Ultimately, the Panel issued an exhaustive 53-page Final Report of Inquiry that unanimously found "without hesitation" that eleven of the *Walker* and *Ladinsky* attorneys "purposefully attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama." (Doc. 339 at 51.) The Panel enumerated ten specific categories of misconduct (Doc. 339 at 51-52), and it found that one member of the *Walker* team, Mr. Carl Charles, intentionally misled the Panel in sworn testimony about a call he made to the chambers of Judge Thompson (*id.* at 20). The Panel then referred the matter to the undersigned to proceed as appropriate. *Id.* at 52.

On May 17, 2024, after (1) reviewing the record, (2) learning that the Panel never received the Q&A Document, and (3) independently concluding that an *in camera* review of the document was necessary and appropriate, the Court ordered Respondents James Esseks, LaTisha Faulks, Carl Charles, and Kathleen Hartnett and Non-Respondent Milo Inglehart to produce the Q&A Document by May 20 at 5:00 p.m. (Doc. 527).

The next day, Hartnett responded to the Court's order and filed an emergency motion for a status conference and stay of the production deadline. (Doc. 528). The day after saw four filings: a response to the order from Esseks, Faulks, and Charles

(Doc. 529), a joinder in Hartnett's motion from the same three Respondents (Doc. 531), a motion from Mr. Inglehart to be excused from the directives of the Court's order (Doc. 530), and a notice from Hartnett of her intent to file an emergency motion to stay and petition for writ of mandamus in the Eleventh Circuit. (Doc. 532).

On the morning of May 20, the Court set the matter for a status conference at 1:30 the same afternoon. (Doc. 533). Before the hearing began, Hartnett filed her petition for a writ of mandamus with the U.S. Court of Appeals for the Eleventh Circuit, soon thereafter filing her notice with the Court. (Doc. 534). After hearing from the Respondents at the status conference, the Court stayed the deadline to produce the Q&A Document and allowed additional briefing, setting the matter for further argument on May 28. A few days later, the Court extended the stay to allow the Respondents to file briefing and orally argue the issue. (Doc. 548). The Respondents filed joint briefing (Doc. 552), and on May 28, the Court heard argument on the matter.

## II.   DISCUSSION

After careful consideration of the Respondents' briefs, their arguments at the hearings of May 20 and 28, and the controlling law, the Court concludes that the Respondents must submit the Q&A Document for *in camera* review to determine whether the crime-fraud exception deprives it of any privilege protections that might

otherwise apply. The Court finds without question that the facts support a prima facie showing that the crime-fraud exception will apply.

The Respondents have filed three responses, an emergency petition for writ of mandamus in the Eleventh Circuit, and, after the Court stayed the production deadline, a joint brief on the crime-fraud exception. Through these filings, the Respondents make three main arguments—none of them supported by the law or the facts.

First, they claim the Panel either never ordered the Q&A Document to be produced or released them from any order to produce it. This argument is irrelevant (because the Court independently ordered the Respondents to produce the Q&A Document) and wrong (because they misunderstand the Panel's previous orders). Second, the Respondents contend that the attorney-client privilege and work-product doctrine shield the Q&A Document even from *in camera* review. This argument fails because the facts support prima facie showing that the crime-fraud exception deprives the document of any privilege protection. Finally, the Respondents insist that any *in camera* review of the Q&A Document should be conducted by a special master because they cannot depend on this Court (or any federal district judge in the State of Alabama) to conduct a fair and impartial *in camera* review. Citing neither case nor doctrine of law, the Respondents buttress this claim with quotations cherry-picked from two practitioners' articles. This final contention also fails, not only

because it rests on sheer conjecture but because it contradicts current black-letter law and the centuries-old practice of *in camera* review.

### A. The Respondents' briefs before this Court and the Eleventh Circuit have misrepresented the case history.

The Court is doubtless vested with the inherent authority to order the Respondents to produce the Q&A Document, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991), but the history of the proceedings supplies the relevant context for its first order to do so. After reviewing the record, the Court learned that the Q&A Document was never disclosed to the Panel. Given its apparent relevance and the Court's prima facie finding about the crime-fraud exception, the Court independently and of its own authority ordered both Mr. Inglehart and the *Walker* Respondents to produce it for *in camera* review. As the order made plain, that production was to be for the limited purpose of determining whether the crime-fraud exception would defeat any protections the Q&A Document might otherwise enjoy; it would not be disclosed to anyone nor used in these proceedings unless the *in camera* review—and further briefing and argument from the Respondents—confirmed that the crime-fraud exception defeated the protections of the attorney-client privilege and work-product doctrine. The order rested on nothing in the record save the record's absence of the Q&A. It was neither enforcing the Panel's order of July 8, 2022 to produce the document nor sanctioning Mr. Inglehart or the Respondents for violating it.

**B.    Neither the attorney-client privilege nor the work-product doctrine shields the Q&A Document from *in camera* review.**

As noted in the Court's previous order, the Q&A Document is even more relevant now than when the Panel first ordered its disclosure. The Court must decide whether sanctions are appropriate for each of the four *Walker* Respondents, a task that calls for assessing whether the *Walker* Respondents simply recollected events differently when they testified to the Panel or coordinated their testimony to mislead the Panel about their conduct. Put differently, the Court's assessment of whether each *Walker* Respondent acted in good faith or bad faith requires an *in camera* review of the Q&A Document.

**i.    The Q&A Document is relevant to the task of determining whether sanctions are warranted for Esseks, Faulks, Charles, and Hartnett.**

The Q&A Document is indisputably relevant to the Court's ultimate task of deciding whether to sanction the *Walker* Respondents. The Panel's findings of misconduct came after six months of hearings, voluminous filings, ample argument, and nearly a year of consideration. In addition to ten enumerated findings of judge-shopping misconduct, the Panel made 34 pages of factual findings based on the testimony of all thirty-nine responding attorneys, some of which concerned the *Walker* Respondents' failure to secure their permission from their clients before dismissing the case and their lack of candor to the Panel. Citing testimony from Esseks as one example of many, the Panel found "*Walker* counsel's candor on the

17

whole [was] concerning." (Doc. 339. at 18 n.3). It also found that Charles, a member of the *Walker* team, had "deliberately misled the Panel" about a phone call he made to Judge Thompson's chambers. *Id.* at 20.

Given the Panel's findings of misconduct, its express concerns about the Respondents' truthfulness, troubling inconsistencies and apparent misrepresentations in their testimony, and one prima facie case of perjury, the Court ordered the Respondents to show cause why they shouldn't be sanctioned for the judge-shopping misconduct identified by the Panel and the misrepresentations and non-disclosures described in the Panel's Report. (Docs. 406, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487 & 488). It also ordered the *Walker* Respondents to show cause why they shouldn't be sanctioned for failing to seek or secure their clients' consent before dismissing their case, (Docs. 406, 478, 479, 481 & 486), and Charles to show cause why he shouldn't be sanctioned for perjury. (Doc. 406 & 481).

In these proceedings, the Court is operating under its inherent power to sanction attorneys for bad faith conduct that "abuses the judicial process." *Chambers, Inc.*, 501 U.S. at 43-45. Against the backdrop of misconduct, misrepresentations, non-disclosure, and possible perjury set forth in the Panel's Report, the Q&A document is highly relevant to the task of determining whether sanctions are warranted for the *Walker* Respondents. The Court cannot know how

much weight to assign the document, if any, until it has reviewed its contents *in camera*, but there can be no question about its relevance.

Esseks's descriptions of the Q&A document (which counsel reaffirmed at the May 28 hearing) support this finding. According to Esseks's declaration, which was attached to the *Walker* Respondents' motion for protective order before the Panel, "*Walker* counsel worked closely with Mr. Ragsdale to provide information regarding the facts and circumstances" concerning the Panel's order to appear and "to assist Mr. Ragsdale in preparing for the May 20, 2022 hearing." Decl. James D. Esseks Supp. *Walker* Counsel's Mot. Protective Order at 2-3, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. 2022 July 21, 2022), ECF 34-1.

As part of those preparations, "Mr. Ragsdale directed *Walker* Counsel to prepare a document containing answers to potential questions they believed the Panel may ask about the events described in the May 10 Order." *Id.* Mr. Esseks understood the document to have been designed in part "to ensure that Mr. Ragsdale could prepare any senior members of *Walker* Counsel who might be required to address the Panel." *Id.* at 3. And to that end, "the senior members of *Walker* Counsel generated a list of potential questions and answers *based on their collective knowledge* of the events leading up to the May 20 hearing," after which they discussed the document with counsel and shared it with junior members of the team. *Id.* (emphasis added).

19

In further support of the document's relevance is the fact Mr. Esseks's co-counsel told a different story about the document's purpose. According to Mr. Inglehart, the Q&A Document "was circulated . . . just to sort of prep folks." Tr. Evidentiary Hr'g at 55, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. November 2, 2023), ECF 98. The Q&A Document, which Mr. Ragsdale circulated to him in drafts, "outlin[ed] . . . things that might be useful to touch on." *Id.* Mr. Inglehart discussed the Q&A document in response to questions about how he prepared *himself* (not Mr. Ragsdale or senior *Walker* lawyers) for the Panel hearing, and whether anyone suggested specific testimony to him. *See id.*

Mr. Esseks's declaration explains that the Q&A Document was based on counsel's "collective knowledge" and designed to "prepare any senior members of *Walker* Counsel who might be required to address the Panel," and it was reviewed by all members of the team before the first day of testimony. Decl. James D. Esseks Supp. *Walker* Counsel's Mot. Protective Order at 2-3, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. 2022 July 21, 2022), ECF 34-1. In tension with this is that Mr. Inglehart's testimony, which was given two months before Mr. Esseks's declaration, presents the troubling inconsistency that the document was in fact created to prepare *all* members of the *Walker* team for the hearing. *See* Tr. Evidentiary Hr'g at 55, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. November 2, 2023), ECF 98.

Ultimately, the Panel didn't credit *Walker* counsel's testimonial account of the facts. Even so, whether the *Walker* Respondents coordinated materially omissive or otherwise misleading testimony to the Panel is crucial to the Court's evaluation of those Respondents' good or bad faith and to its work to fix an appropriate sanction. Until it reviews the document, the Court cannot know whether it reflects a good faith attempt to prepare for a hearing, an orchestrated attempt to distract or mislead the Panel, or something else entirely. Whatever the document might show, it's now highly relevant to the Court's ultimate task.

        **ii.**    **If applicable, the crime-fraud exception will defeat any protections the Q&A Document would otherwise enjoy under attorney-client privilege or the work-product doctrine.**

The Respondents chiefly oppose producing the Q&A on the grounds that it's "classic attorney-client privileged material" and attorney work product, and, so they say, there's no basis for finding an exception to either protection. (Doc. 552 at 24). Assuming, for the moment, that the Respondents are right that the document is presumptively entitled to the protections of attorney-client privilege and the work-product doctrine, they are wrong that the story ends there. If the crime-fraud exception applies, then those protections yield. *See Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) (holding that "the crime-fraud exception removes the 'seal of secrecy' from attorney-client communications

or work product materials when they are made in furtherance of an ongoing or future crime or fraud").

The protections of the attorney-client and work-product privileges are "not absolute." *Drummond Co., Inc.*, 885 F.3d at 1335; *see also In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223 (11th Cir. 1987). "The crime-fraud exception removes the 'seal of secrecy' from attorney-client communications or work product materials when they are made in furtherance of an ongoing or future crime or fraud." *Drummond Co., Inc.*, 885 F.3d at 1335. The purpose of the exception is "to assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *Zolin*, 491 U.S. at 563 (cleaned up).

The crime-fraud exception applies only on a two-part showing. *Schroeder*, 842 F.2d at 1226. First, there must "be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice." *Id.* Second, there must "be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *Id.*

The evidentiary burden required to prove the first part is "a showing of evidence that, if believed by a trier of fact, would establish the elements of some

violation that was ongoing or about to be committed." *Id.* The showing must be anchored "in fact, for mere allegations of criminality are insufficient to warrant application of the exception." *Id.* For the second part, the document must be "related to the criminal or fraudulent activity established under the first [part]," bearing in mind that it remains unknown "precisely what the material will reveal or how useful it will be." *Id.* at 1227.

The Respondents have erroneously asserted that the Panel "suggested" or "appeared to believe" that the crime-fraud exception was inapplicable. More particularly, their joint brief asserts that "the Panel suggested that the crime-fraud exception may not be available in these proceedings at all," (Doc. 552 at 25 n.6), while their withdrawn mandamus petition claimed "the Panel appeared to believe that invocation of this exception was unavailable in the investigation due to the Panel's insistence that the investigation is a non-adversarial proceeding," (Doc. 534 at 21 n.6). The Panel simply observed that in these proceedings, there is no adversary to raise the issue of the crime-fraud exception—the Panel did not suggest, let alone find, that the exception could not apply. Order at 3, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. July 25, 2022), ECF 41. When pressed to reconcile the Panel's observation with the Respondents' argument, Ms. Hartnett's counsel conceded that the Court is empowered to raise the exception on its own. (Doc. 568 at 43-44).

### iii. The facts support the prima facie case necessary for an *in camera* review of the Q&A Document.

District courts routinely review privileged documents *in camera* to evaluate whether the crime-fraud exception applies. *See Schroeder*, 842 F.2d at 1226. And a district court's finding that *in camera* review of a privileged document is warranted on crime-fraud grounds does not mean the district court has conclusively found that a client has enlisted the attorney's help to commit a crime or fraud, since the evidentiary threshold for an *in camera* review is so much lower than the threshold for defeating the privilege. The former requires only "a factual basis adequate to support a good faith belief by a reasonable person" that the *in camera* review "may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572. The latter requires satisfaction of the two-part test discussed in Part II(B)(ii) above. *See Schroeder*, 842 F.2d at 1226.

So, in this case, the Court may review the Q&A Document *in camera* only if the facts "support a good faith belief by a reasonable person," *Zolin*, 491 U.S. at 572, that the review will turn up evidence of (1) a *prima facie* showing that any of the *Walker* Respondents were "engaged in criminal or fraudulent conduct when [they] sought the advice of counsel, that [they were] planning such conduct when [they] sought the advice of counsel, or that [they] committed a crime or fraud subsequent to receiving the benefit of counsel's advice"; and (2) the Q&A Document was "in furtherance of the criminal or fraudulent activity or was closely related to it,"

*Schroeder*, 842 F.2d at 1226. The Court may rely only on "evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Id.* This calls for a review of all the evidence that would support the putative crime or fraud.

The record establishes a factual basis adequate to support a good faith belief by a reasonable person that the crime-fraud exception applies to the Q&A Document on at least two independent grounds. First, the facts support a good faith belief by a reasonable person that Mr. Charles intentionally lied to the Panel, and perhaps committed perjury, which is a federal crime. Second, the facts support a good faith belief by a reasonable person that Esseks, Faulks, Charles, and Hartnett committed fraud on the court by coordinating testimony to mislead the Panel. The Court discusses each ground in turn.

**Perjury.** The findings set forth in the Panel's Report and the transcript from the May 20, 2022 hearing each independently support a prima facie case that Carl Charles perjured himself. On this issue, the first required showing is that there is a good-faith belief by a reasonable person that Mr. Charles committed perjury after "receiving the benefit of counsel's advice." *Schroeder*, 842 F.2d at 1226. That showing can be made by "evidence that, if believed by a trier of fact, would establish the elements" of perjury "that was ongoing or about to be committed." *Id.* There's no doubt that evidence exists here.

Under 18 U.S.C. § 1621, whoever—

> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

> **(2)** in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

Both the transcript and the Panel's findings show "(1) an oath authorized by a law of the United States, (2) taken before a competent tribunal, officer or person, and (3) a false statement wilfully made as to facts material to the hearing." *United States v. Hvass*, 355 U.S. 570, 574 (1958).

Mr. Charles was under oath, he was testifying before a competent tribunal of three federal district court judges convened at the direction of the Chief Judges of each District in the state, and the Panel found his testimony deliberately misleading on a material line of inquiry—namely, his call to Judge Thompson's chambers. (Doc. 339 at 20); Tr. Evidentiary Hr'g at 178-94, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. October 10, 2023), ECF 75.

The Panel's findings are worth quoting in full:

The Panel asked Charles multiple questions about his phone call to
Judge Thompson's chambers. He unequivocally and repeatedly
testified that he did not call judge's chambers. At the May 20 hearing,
Charles initially denied several times that he called Judge Thompson's
chambers. (May 20 Hearing Tr. at 178-79, 184-85, 187, 190-91).
Initially, the Panel first inquired of Charles generally if he made any
phone call to the Middle District. (*Id.* at 178). Next, the Panel asked if
he "call[ed] anyone's chambers about the assignment of the case."
(*Id.* at 179). Then the Panel specifically asked him three times whether
he spoke to any law clerk of any judge in the Middle District about
assignment of *Walker* to that judge or the potential for a motion for
temporary restraining order being filed in *Walker*. (*Id.* at 184-85, 187,
190-91). Each time, Charles responded that he never made any phone
call and testified that he "was incredibly certain" he would have
remembered if he did. (*Id.* at 191). But, shortly after the Panel read his
cell phone number to him, Charles asked if he could correct his earlier
answers and admitted that he did call Judge Thompson's chambers. (*Id.*
at 191-92). Charles's testimony is even more troubling given that he
made this statement while being questioned about his call to Judge
Thompson's chambers: "My pause is only because I am endeavoring to
be as candid as possible. I do not recall ever calling any chambers with
this request, Your Honor, at any point." (*Id.* at 179).

(Doc. 339 at 19). "The only reasonable reading of Charles's testimony," it

concluded, was that initially, Mr. Charles

deliberately misled [the] Panel about the phone call to Judge
Thompson's chambers—and continued to do so up until the moment in
his testimony that it became clear to him that the Panel was fully aware
of his call. It is inconceivable that, in light of all the circumstances
surrounding the call, Charles genuinely forgot about the phone call to
Judge Thompson's chambers.

*Id.* at 20.

To this Court, three key facts make Mr. Charles's testimony particularly

disturbing: (1) the fact that Judge Thompson was never assigned *Walker*, meaning

that Mr. Charles called the chambers of a judge who did not have the case; (2) Mr.

27

Charles's admission that he never called the chambers of Chief Judge Marks (who was assigned *Walker*) to alert her to a forthcoming emergency motion; and (3) Mr. Charles's apparent surprise that the Panel was aware of his call.[7] The Court is also mindful of the practical reality that the only reason to lie about a call to a judge's chambers to alert them to a forthcoming emergency motion is if the call was for an improper purpose; such an administrative call is not *per se* improper. In any event, there is no doubt that Mr. Charles's statements occurred after receiving the benefit of counsel's advice and after receipt, and perhaps review, of the Q&A Document.

The second part of the test is satisfied because the Q&A Document was prepared by and shared with *Walker* counsel (including Mr. Charles) and contained answers to give the Panel at the May 20, 2022 hearing—the very hearing at which Mr. Charles was found to have deliberately misled the Panel. To put a finer point on it: three federal judges believe in good faith that Mr. Charles intentionally lied to the Panel in sworn testimony at the May 20, 2022 hearing about his call to Judge

---

[7] JUDGE PROCTOR: It seems to me—I'm going to be unfair with you. I'm just telling you what I'm thinking here. This is not—this is Proctor being cards up. The phone number doesn't spark a recollection. The phone number sparks a realization that I have some information that you didn't think I had.

MR. CARL CHARLES: Your Honor, I did find it unusual that you had that. But then I tried to think about what we had to submit to this Court and had I listed that on other filings. And while you were asking—while Your Honors were asking me other questions, I was trying to think in my mind about the events of those two days.

Tr. Evidentiary Hr'g at 193, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. October 10, 2023), ECF 75.

Thompson's chambers. There is no basis to conclude that no reasonable person could believe in good faith that he potentially perjured himself. Likewise, there is no basis to conclude that an *in camera* review of the Q&A document would surely fail to turn up evidence that he intentionally lied to the court.

**Fraud on the Court**. It is a firmly established tenet of law that "[e]very district court 'has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.'" *In re E.I. DuPont De Nemours & Co.-Benlate Litig.*, 99 F.3d 363, 367 (11th Cir. 1996) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)); *accord JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 988 (11th Cir. 2017) (affirming the district court's invocation of the crime-fraud exception for a "massive fraud [on] the court").

Fraud on the court is a "species of fraud which does[,] or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1551 (11th Cir. 1985). Without more, neither fraud among parties, fraud that fails to "present[] a deliberate scheme to directly subvert the judicial process," nor fraud that can be exposed at trial, like perjury in an adversarial proceeding, rises to the level of fraud on the court. *Id.*

The facts support a good faith belief by a reasonable person that the Q&A Document will reveal evidence of a fraud on the court by Esseks, Faulks, Charles,

and Hartnett. The Panel's inquiry consumed substantial time and resources from three federal judges, who conducted an extensive investigation, reviewed voluminous evidence, and deliberated at great length about the Respondents' conduct. Ultimately, the Panel unanimously concluded that eleven attorneys, including the four *Walker* Respondents, purposefully attempted to circumvent the random case-assignment procedures for the Northern and Middle Districts of Alabama. (Doc. 339). In reaching that conclusion, the Panel discredited the testimony of the *Walker* Respondents that they did nothing wrong and had no wrongful intent. The Panel expressly proclaimed concern about *Walker* counsel's candor.

Taken together with four other facts—(1) the Panel's contemporaneous finding that one *Walker* Respondent (Mr. Charles) intentionally lied to the Panel about a material issue up until the moment it became clear he could not get away with it; (2) only one *Walker* attorney, Mr. Inglehart, disclosed the existence of the Q&A document; (3) Mr. Inglehart's statement that the Q&A document was circulated to all *Walker* counsel involved in the Panel inquiry; and (4) the conflict between Mr. Inglehart's testimony that he and his co-counsel reviewed the Q&A Document to prepare *themselves* for the hearing and other Respondents' contentions that the document was designed to prepare *Mr. Ragsdale* for the hearing (*compare* Tr. Evidentiary Hr'g at 54-55, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala.

November 2, 2023), ECF 98, *with* Decl. James D. Esseks Supp. *Walker* Counsel's

Mot. Protective Order at 1-2, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. 2022 July

21, 2022), ECF 34-1)—the Panel's disbelief of the *Walker* Respondents' testimony

supports a good faith belief by a reasonable person that an *in camera* review of the

Q&A document will reveal evidence that the *Walker* Respondents used that

document to coordinate materially misleading testimony to the Panel for the purpose

of frustrating the inquiry into whether those Respondents intentionally tried to

subvert the administration of justice by judge-shopping.

The Respondents contest the finding of a prima facie case of fraud on the court

on four grounds. First, they claim the evidence in this case comes nowhere "close to

establishing a crime or fraud." (Doc. 552 at 28). In this vein, the Respondents argued

at the May 28 hearing that "fraud upon the court is more than merely testifying

falsely," and that "[t]he Eleventh Circuit said in the *Travelers v. Gore* case [that]

perjury does not rise to the level of fraud upon the court." (Doc. 568 at 12).

This argument misstates the standard. To trigger an *in camera* review, all

that's required is evidence to support "a good faith belief by a reasonable person"

that the review will turn up evidence that would, in turn, establish a fraud on the

court. *Zolin*, 491 U.S. at 572. It's difficult to see how a unanimous finding by a Panel

of three judges that one Respondent lied, that they are "concern[ed]" about the

candor of his colleagues, and that they reject their testimony as unworthy of belief

does not evince a good faith belief by a reasonable person that there has been a coordinated attempt by officers of the court to frustrate the Court's investigative task. *See Travelers Indem. Co.*, 761 F.2d at 1551.

Moreover, the Respondents' *Travelers* argument ignores that the case's logic undermines the position they cite it for. *Travelers* concerned relief from a judgment under Rule 60 of the Federal Rules of Civil Procedure, which authorizes district courts to "entertain an independent action . . . to set aside a judgment for fraud on the court." *Travelers Indem. Co. v. Gore*, 761 F.2d 1549 (11th Cir. 1985). The *Travelers* court expressly rejected the plaintiff's contention that the fraud in that case—perjury by the defendant—"present[ed] a deliberate scheme to directly subvert the judicial process," because the fraud "primarily concern[ed] the two parties involved." *Id.* at 1552. For purposes of setting aside the judgment under Rule 60(b), perjury did "not constitute fraud upon the court" because an "opposing party is not prevented from fully presenting his case and raising the issue of perjury in the original action." *Id.* In the typical case,

> Perjury and fabricated evidence . . . can and should be exposed at trial, and the legal system encourages and expects litigants to root them out as early as possible. . . . Fraud on the court is therefore limited to the more egregious forms of subversion of the legal process, . . . those we cannot necessarily expect to be exposed to by the normal adversary process.

*Id.* Here, of course, there were no adversarial litigants to root out and expose untruths peddled to the Panel. These disciplinary proceedings are precisely the sort of case in

which "subversion of the legal process" cannot be exposed "by the normal adversary process." *Id.*

Second, the Respondents object that the Panel's Report "does not support a blanket conclusion that all *Walker* Respondents failed to testify truthfully or defrauded the Court." (Doc. 552 at 30-31). This is revisionist history. If the Panel had believed the *Walker* Respondents, it would not have found that they intentionally tried to manipulate random case assignment procedures for two districts in the state. Likewise, if the Panel had disbelieved only Mr. Charles or only Mr. Esseks, it (a) surely would have said so in its 53-page Report, and (b) would have excluded the other *Walker* Respondents from a finding of misconduct. At the outset of its factual findings, the Panel noted that its account cited only "representative testimony," and in the relevant footnote, it cited Esseks's testimony only by way of "example"—not as the sole grounds for its broader finding. (Doc. 339 at 16, 18 n.3).

Third, the Respondents contend that an adverse credibility finding is not enough to establish a prima facie case of the crime-fraud exception. They say that if it were enough, "then at least one party would lose privilege in virtually every case." (Doc. 552 at 31). Respondents ignore the nature of these proceedings. This is not an ordinary civil case in which a court simply disbelieved testimony about an important fact: here, a three-judge panel was investigating whether lawyers intentionally attempted to subvert the administration of justice by judge-shopping, unanimously

found that they did, unanimously disbelieved their explanations that they did not, unanimously expressed concern about their candor, and unanimously found that one lawyer lied outright. If this is not enough to open the door for an *in camera* review of the Q&A document, it is difficult to imagine what would suffice.

Fourth, the Respondents complain that the "Panel elsewhere expressly praised *Walker* Counsel's testimony." *Id.* at 32. Notably, their citation concerns only Hartnett, not all *Walker* counsel. This isolated praise does not overcome the findings in the Panel's Report. After all the evidence was in and the Panel had deliberated on the facts, it concluded that *Walker* counsel's candor was concerning, making no exception for Hartnett. (Doc. 339 at 18 n.3).

As to the second part of the test, the record supports a good faith belief by a reasonable person that the Q&A Document was created "in furtherance of . . . or was closely related to" the *Walker* Respondents' attempt to defraud the court. *Schroeder*, 842 F.2d at 1226. Mr. Esseks described the Q&A document as prepared by senior members of the *Walker* team, who "generated a list of potential questions and answers *based on their collective knowledge* of the events leading up to the May 20 hearing." Decl. James D. Esseks Supp. *Walker* Counsel's Mot. Protective Order at 1-2, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. 2022 July 21, 2022), ECF 34-1 (emphasis added). A reasonable person could believe in good faith that the Q&A document was the *Walker* team's effort to get their story straight before anyone

appeared in court, and that their story was less than the truth, the whole truth, and nothing but the truth.

In answer to the test's second part, the Respondents raise three further objections. First, they claim "that the only activity that the Q&A Document was created in 'furtherance' of was preparation for the May 20, 2022 hearing." (Doc. 552 at 32). Pressing the claim further, they insist that a prima facie case on these facts

> would mean that in every case where an individual accused of some form of misconduct hires a lawyer to prepare a defense and advocate on his or her behalf, there would be a risk that the accused's privileged communications with counsel could be breached based on the factfinder merely characterizing that advocacy as being in "furtherance" of the underlying accusations of misconduct.

*Id.* at 33. This argument also ignores the nature of this case. As explained above, it warps reality to describe this as an ordinary case involving an individual merely accused of misconduct. The Q&A Document bears on the issue whether licensed attorneys testified truthfully in response to questions about whether they intentionally tried to subvert the administration of justice by judge-shopping. The prima facie case here rests not on the underlying judge-shopping misconduct, but rather on the Respondents' apparent efforts to mislead the Panel in its investigation. And as already explained, the Q&A Document is not merely Mr. Ragsdale's advocacy—at least some of the *Walker* attorneys used it to prepare themselves to answer questions from the Panel at their first appearance.

Next, the *Walker* Respondents contend that "the Q&A Document could not have been in "furtherance" of fraudulent testimony given the uncontradicted evidence that Respondents did not believe they would be testifying at the May 20, 2022 hearing at all." *Id.* Several respondents, including Esseks in his declaration and Helstrom in her testimony, acknowledged that they understood they would likely have to answer questions that first day, so the Court understands their complaint to be that they didn't know they'd be under oath.[8]

Respondents cite no case that cleaves a difference between defrauding the court under oath and defrauding the court otherwise. Whether by sworn testimony or unsworn statements, defrauding the court is patently unethical behavior that erodes the very bedrock of our legal system. For purposes of assessing whether a reasonable person could believe in good faith that the *Walker* Respondents may have coordinated an attempt to mislead the Panel, the Court discerns no reason to assign any importance to what the *Walker* Respondents thought might happen at the hearing on May 20, 2022. There is nothing unusual about attorneys testifying under oath in an investigation into attorney misconduct.

---

[8] When pressed to explain "why nobody would expect there would be testimony, much less sworn testimony" when "a three-judge panel summons all these people for . . . an inquiry into whether there was judge shopping or not," Mr. Ragsdale conceded that "[i]n hindsight, it seems pretty naïve," and "maybe we should have foreseen it, and maybe it makes sense." (Doc. 568 at 63-65).

Finally, the Respondents object that "[m]erely discussing 'collective knowledge' about past events alone is not improper in the absence of a sequestration order, particularly as here where the undisputed purpose was to educate counsel for an upcoming hearing." *Id.* at 34 Here again, the *Walker* Respondents ignore their circumstances.

In the current posture of this case, the Court cannot be expected to take them at their word that the Q&A document was a mere discussion of past events. The Panel has now unanimously discredited these Respondents' testimony about those past events, and it has found that one of those Respondents intentionally lied, all in testimony about whether there was intentional judge-shopping. At a minimum, based on Esseks's declaration, the "discussion" was shared with the entire *Walker* team, and may have supplied them with answers about which they had no personal knowledge, or even prompted them to give such answers.

Moreover, the crime-fraud exception applies where an attorney's assistance "was used to cover up and perpetuate [a] crime or fraud." *In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998); *accord Drummond, Inc. v. Collingsworth*, No. 2:11-CV-3695-RDP, 2015 WL 13768169, at *28 (N.D. Ala. Dec. 7, 2015). The exception applies even when the attorney wasn't "aware of the illegality involved," as long as his assistance "furthered, or was intended by the client

to further, that illegality." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005).

In such cases, the clients' past misconduct merely supplies a motive for the ongoing or later fraud, the cover-up itself; it does not itself generate the basis for the exception. As discussed throughout this section, the Panel expressed grave doubts about *Walker* counsel's testimony and reached the troubling conclusion that one of them lied to cover up his call with Judge Thompson—a call the Panel considered judge-shopping misconduct. Accordingly, the facts support a good faith belief by a reasonable person that the Q&A Document was prepared in furtherance of the *Walker* team's attempt to cover up their past judge-shopping misconduct.

Moving on, the Panel's finding that Mr. Charles "deliberately misled the Panel" also provides a stand-alone evidentiary basis for a prima facie showing of fraud on the court. (Doc. 339 at 20). Put differently, the Panel's finding (and independently, the transcripts they rely on) support a prima facie case of perjury as a "crime," but they also suffice to show a prima facie case of fraud on the court under the separate heading of "fraud."

At the May 28 hearing, the Court raised the issue of Mr. Charles's misstatements. Counsel for Ms. Hartnett conceded that at least hypothetically, a good-faith belief by a reasonable person that an attorney had perjured himself supports a prima facie case that the crime-fraud exception may apply to a document

related to the potentially perjured testimony. (Doc. 568 at 47). Counsel for Mr. Charles disagreed, maintaining that under *Travelers Indem. Co. v. Gore* even a good faith belief by a reasonable person that an attorney has perjured himself is insufficient to trigger an *in camera* review of a document related to the alleged perjury—an argument the Court has already rebutted. In their withdrawn petition for a writ of mandamus, which was signed by both Ms. Hartnett's counsel and Mr. Charles's counsel, the Respondents claimed a "clear and indisputable right" to mandamus relief in part on the grounds that finding a prima-facie case for the crime-fraud exception's applicability to the Q&A Document was an abuse of discretion. (Doc. 534 at 20-25). The colloquy at the May 28 hearing, however, suggests that their right to relief was patently disputable—even among co-petitioners.

As to the second part, there is also "a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *Drummond Co., Inc.*, 885 F.3d at 1335. The Q&A Document was prepared by and shared with *Walker* counsel and contained answers to give the Panel at the May 20 hearing—the very hearing at which Charles gave the answers to the Panel that establish a prima facie case of perjury.

The Panel's finding that *Walker* counsel's candor was on the whole concerning and that Charles deliberately misled it, the transcript of Charles's testimony, Esseks's description of the Q&A, and Inglehart's description of the Q&A

plainly establish a "factual basis adequate to support a good faith belief by a reasonable person that *in camera* review" of the Q&A Document "may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572.

### iv. Given this prima-facie showing, the Court has discretion to review the Q&A Document *in camera* to determine whether the crime-fraud exception applies.

Once a showing has been made to establish a prima facie case the crime-fraud exception applies, "the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Zolin*, 491 U.S. at 572. When deciding whether to review a document *in camera*, the Court should consider

> the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through in camera review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*Id.* At "maybe eight, ten pages," (Doc. 568 at 52-53), the Q&A Document is hardly voluminous. And as the Court has already explained at length, the totality of circumstances in this case make the Q&A document highly relevant to the Court's task at hand and compel a good-faith belief that *in camera* review is likely to turn up evidence that the crime-fraud exception applies. In most cases, *in camera* review is a routine exercise. There is no reason for this case to be any different, and every reason to conduct such a review without further delay.

### v.   A special master is neither necessary nor appropriate for *in camera* review of the Q&A Document.

Even though district courts are vested with the "sound discretion" to review privileged documents *in camera* and routinely do so, *Zolin*, 491 U.S. at 572, the Respondents claim that "the only just option" for determining the Q&A Document's privileged status is to deviate from black-letter law and centuries of routine practice by appointing a special master to review it. (Doc. 552 at 39; *accord* Doc. 528 at 7). According to the Respondents, a standard-order *in camera* review of the document's claim to privilege would risk "poison[ing] the well by allowing the ultimate decisionmaker to review" the applicability of the crime-fraud exception (Doc. 552 at 38), which the Court understands to say that it would abuse its discretion by reviewing the document *in camera* itself. The risk of "prejudice" to their cause is so great, they say, that "the interests of justice strongly favor the appointment of a special master"; and that risk is so entrenched, they suggest, that the special master must be drawn from "outside the Alabama district courts." (Doc. 552 at 38; *see also* Doc. 528 at 7).

The Respondents cast this argument in four ways. First, they claim that this case presents the "typical factors" favoring special masters because of a "general risk" that factfinding judges "will be prejudiced by reviewing privileged material." (Doc. 552 at 37). Second, they contend that "the potential for prejudice" is "especially great" where the "underlying charge" is a fraud on the court. *Id.* Third,

they contend that district courts cease to be neutral decision-makers in attorney misconduct proceedings, so this case's very nature "makes the risk of prejudice especially acute." *Id.* Finally, they suggest that the Court cannot be fair or impartial because the "the allegations in this case are unavoidably personal." *Id.*

To begin with, this case is far from the typical case for appointing a special master. A special master is not needed to aid the Court in reviewing one 8-to-10 page document and deciding an issue within its core expertise: whether the crime-fraud exception defeats the Respondents' claims of privilege

More to the point, the Respondents' concerns of "a general risk" that privileged materials might prejudice factfinding judges in their ultimate decision-making is fundamentally misguided. (Doc. 552 at 37). A core assumption of our Anglo-American system of justice is that district courts sitting as factfinders are *never* prejudiced by inadmissible evidence—a point the Supreme Court has been making for at least 175 years:

> [W]here the court decides the fact and the law without the intervention of a jury, the admission of illegal testimony, even if material, is not of itself a ground for reversing the judgment, nor is it properly the subject of a bill of exceptions. If evidence appears to have been improperly admitted, the appellate court will reject it, and proceed to decide the case as if it was not in the record.

*United States v. King*, 48 U.S. 833, 854–55, 12 L. Ed. 934 (1849).

Nor has this principle eroded with time. More recently, the Supreme Court reiterated that "[i]n bench trials, judges routinely hear inadmissible evidence that

they are presumed to ignore when making decisions." *Harris v. Rivera*, 454 U.S. 339 (1981). And that's the law in this circuit, too. In a bench trial, for instance, a district judge is assumed to exclude "improper inferences from his mind in reaching a decision," because "[h]e is trained to recognize and to exclude those matters which the rules of evidence require be discarded." *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981);[9] *accord Health First, Inc. v. Hynes*, 628 F. App'x 723, 724 (11th Cir. 2016).

What's more, the Respondents acknowledge in arguments elsewhere in this case that the Court is not prejudiced by reviewing inadmissible evidence. In her motion re-urging the Court to consider the expert testimony of Mr. Clark Cunningham, Ms. Hartnett pressed the point that "[t]he 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." (Doc. 504) (citing *Deal v. Hamilton Cty. Bd. Of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004)). At the May 28 hearing, Ms. Hartnett's counsel argued for limiting the principle to "the expert witness arena," but that suggestion rests on nothing but air. (Doc. 568 at 26). Neither Ms. Hartnett nor any other Respondent has cited law for that principle, nor have they cited a statute or case that suggests (let alone holds) that

---

[9] Under *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), all Fifth Circuit decisions handed down before the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit.

parties suffer any prejudice when district courts review documents *in camera* to decide whether the crime-fraud exception will defeat a claim of privilege.

Ultimately, the Respondents cite no law contradicting this Court's ability to review evidence without being prejudiced by it, because none exists. Lacking binding and non-binding case law alike, the Respondents rely instead on cherry-picked commentary culled from one law review article and one practitioner's summary guide. While both these publications suggest (in passing) that courts should "ideally" delegate questions of privilege to another decision-maker, the legal expositions of the crime-fraud exception in these sources contradict the Respondents' central claim.

As both authors explain, "the rule in federal courts" is that district courts are vested with the sound discretion to review privileged communications *in camera* to determine whether the crime-fraud exception applies. *See* Douglas R. Richmond, *Understanding the Crime-Fraud Exception to the Attorney Client Privilege and Work Product Immunity*, 70 S.C.L.R. 1, 27-30 (2018); *accord* Thomas E. Spahn, *A Practitioner's Summary Guide to the Attorney-Client Privilege & the Work Product Doctrine*, 297–98 (2013) (observing that while "[s]ome courts decline to conduct *in camera* review," most do "in appropriate circumstances," and that "[c]ourts assessing the crime-fraud exception almost always undertake or consider *in camera* reviews.").

Second, the suggestion that this alleged "prejudice" is heightened when the "underlying charge" is a fraud on the court likewise lacks any basis in law. Again, the Respondents cite no authority for this proposition because none exists: the law simply does not recognize prejudice among district courts reviewing potentially privileged or irrelevant materials, no matter the underlying charge. The Respondents' suggestion makes even less sense given that "[e]very district court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *In re E.I. DuPont De Nemours & Co.-Benlate Litig.*, 99 F.3d 363, 367 (11th Cir. 1996).

Judges who sit as "the ultimate decisionmaker" are plainly empowered to conduct *in camera* reviews of potentially privileged communications. *See* FED. R. EVID. 104(a) ("The court *must* decide any preliminary question about whether . . . a privilege exists[] or evidence is admissible."). Judges frequently and regularly, in bench trials throughout the country, review inflammatory, privileged, and ultimately inadmissible evidence *in camera* before deciding the ultimate issue. Carried to its conclusion, the Respondents' countervailing logic would spell the end of bench trials: every evidentiary objection of privilege or prejudice would call for a second judge and a second-hand adjudication, the sheer volume of which would quickly cripple the courts.

Pushing their special-master argument to the brink, the Respondents insist that the appointment must be made "outside the Alabama district courts" because the risk of prejudice is endemic not just to this Court but to every federal judge in the state. (Doc. 552 at 36). The Respondents' contention that no judge in Alabama's federal judiciary is capable of fairly and impartially determining the Q&A Document's privileged status rests not on any law, but on two comments that the Panel made early in its inquiry—namely, (1) "a couple judges in the Northern District . . . wanted to monitor" the proceedings, and (2) "court personnel around the state" were concerned about the Respondents' conduct. (Doc. 552 at 36); (Doc. 528 at 7) (citing Tr. Evidentiary Hr'g at 9-10, *In re Vague*, 2:22-mc-3977-LCB (M.D. Ala. October 10, 2023), ECF 79).

Ms. Hartnett's counsel was asked at the May 28 hearing to explain why he believed that every federal district judge in the State of Alabama was incapable of honoring his or her oath under 28 U.S.C. § 453 and performing an impartial *in camera* review. Unable to give a reason, counsel conceded that the Respondents "were not taking the position" that the Court should refer the Q&A Document to a special master on the grounds that "[they] don't think a particular judge can be fair." (Doc. 568 at 33-41). What this statement concedes, of course, is an acknowledgement that every judge in the state—including this one—is indeed capable of conducting a fair and impartial *in camera* review.

Third, the Respondents argue that the Court is "manifestly not" a neutral arbiter. (Doc. 568 at 37). As Ms. Hartnett's counsel reaffirmed at the May 28 hearing, this theory derives from the Supreme Court's statement that state-disbarment proceedings "are adversary proceedings of a quasi-criminal nature." *In re Ruffalo*, 390 U.S. 544, 551 (1968). But this argument misrepresents *Ruffalo* up and down. *Ruffalo* neither concerned the district court's neutrality nor held that it "act[s] as investigator, prosecutor, judge, and jury all at once" in attorney-misconduct proceedings. (Doc. 568 at 37). The Supreme Court was considering the limited question of whether an attorney could be disbarred for conduct he did not know to be grounds for disbarment, and it holds only that attorneys charged with misconduct are entitled to procedural due process and notice of the charges against them. *In re Ruffalo*, 390 U.S. at 551-52. Although they were asked to provide one, the Respondents have cited no case holding that the nature of the proceedings or facts of a case ever vitiate a federal district court's neutrality or transform it into an adversary, nor has the Court found any in its exhaustive research.

These arguments all have one thing further in common: they presuppose that the Q&A Document is privileged or irrelevant. But if the document is relevant (it is) and the crime-fraud exception defeats any privilege the Respondents assert (and there's been a prima facie showing it will), then it would be wrong for the Court *not* to consider it. *See Gulf States Utilities Co.*, 635 F.2d at 519. Since the Court can

"exclude . . . improper inferences from his mind in reaching a decision," it would be "a useless procedure" to "exclude[e] relevant evidence on the basis of 'unfair prejudice.'" *Id.*

Finally, the Respondents allege that the Court is uniquely susceptible to prejudice because the record contains evidence that they tried to steer *Walker* away from him. Or as they put it, "the allegations in this case are unavoidably personal," since "there is no dispute that Respondents at times had concerns about Judge Burke." (Doc. 552 at 38-39). For the reasons discussed above, this argument is a legal non-starter. But it fails on the facts, too.

The Respondents have acknowledged that this Court honors its oath to "administer justice without respect to persons, and do equal right to the poor and to the rich, and [to] faithfully and impartially discharge and perform all the duties incumbent upon [him] as [judge] under the Constitution and laws of the United States," 28 U.S.C. § 453. (*See* Doc. 568 at 40-41). Whatever "concerns" they may have had about this Court, the Respondents would do well to remember that it granted the relief they'd sought in the first place and enjoined enforcement of the Alabama Vulnerable Child and Compassion Act. (Doc. 107).

## C.   FURTHER PROCEDURAL SAFEGUARDS

As the Court has reiterated throughout this order, the Q&A Document will be submitted solely for an *in camera* determination of whether the crime-fraud

exception applies. This submission "does not destroy the privileged nature of the contested communications." *Zolin*, 491 U.S. at 569. If the Court finds the Q&A Document to be irrelevant or otherwise privileged without exception after this review, it will consider it for no purpose, and that will be the end of the matter. If, on the other hand, the Court finds that the crime-fraud exception defeats the attorney-client privilege and work-product protections that the Respondents have asserted, it will give them full opportunity to brief the issue as they see fit and set the matter for further argument.

## D.   CONCLUSION

Judicial investigations into attorney misconduct are no doubt uncomfortable, but they are crucial for safeguarding the integrity of the justice system. The authority for such proceedings is clear: "[e]very district court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *In re E.I. DuPont De Nemours & Co.-Benlate Litig.*, 99 F.3d 363, 367 (11th Cir. 1996).

The Respondents have fought submission of the Q&A Document at every step. Their arguments appear all the more spurious given their insistence that the opposition "is really about . . . the sanctity of [the attorney-client] privilege" and nothing in the document will "shock [the] conscience." (Doc. 566 at 9). After all,

submission to the Court for *in camera* review would preserve the "sanctity" of the privilege that they champion. *Zolin*, 491 U.S. at 568, 572.

The Respondents have now had four weeks to locate the document, and the Court has reviewed their briefs, their arguments at the hearings of May 20 and 28, and the controlling law. After careful consideration, the Court **ORDERS** Respondents James Esseks, LaTisha Faulks, Carl Charles, and Kathleen Hartnett to submit the Q&A Document in its native format, with all metadata, by **June 18, 2024 at 5:00 p.m.** The Q & A document must be sent to the Court's chambers' address, burke_chambers@alnd.uscourts.gov.

Finally, the Court notes that if this were a close case in which the parties had a reasonable chance of prevailing on the merits of a petition for writ of mandamus, the Court would consider staying its deadline pending a ruling on any petition the Respondents might file. But the Respondents have enjoyed an extra three weeks to produce the document—even bringing it with them to the last hearing—and to make their case known through extensive briefing and hours of oral argument. After reviewing these materials, conducting its own rigorous research, and thoroughly reviewing the law and facts, the Court is persuaded that the Respondents have no meritorious arguments to raise in the Eleventh Circuit, much less a clear and indisputable legal right to relief. Further, final show-cause hearings are set to begin June 24, 2024, a date that has already been continued once, and it is important for

the parties and the Court alike that these disciplinary proceedings—which have spanned two years and involved four federal judges, dozens of lawyers, and hundreds of filings—come to rest. For that reason, the Court declines to stay the production deadline any further.

      **DONE** and **ORDERED** this June 14, 2024.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE