# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| Brianna Boe, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | |
| Hon. Steve Marshall, in his official | ) | |
| capacity as Attorney General of the | ) | **REDACTED COPY;** |
| State of Alabama, *et al.*, | ) | **ORIGINAL SUBMITTED** |
| | ) | **UNDER SEAL** |
| *Defendants*. | ) | |

## PLAINTIFF-INTERVENOR UNITED STATES OF AMERICA'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN TESTIMONY BY DOCTORS JAMES CANTOR, FARR CURLIN, PAUL HRUZ, KRISTOPHER KALIEBE, MICHAEL LAIDLAW, PATRICK LAPPERT, GEETA NANGIA, AND ANGELA THOMPSON

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

LEGAL STANDARD ..........................................................................4

ARGUMENT ......................................................................................6

    I.     Expert Opinions About Gender-Affirming Surgery Are Irrelevant and Unhelpful, and Should be Excluded Because Plaintiffs Are Not Challenging S.B. 184's Prohibition on Surgery..................................................................................7

    II.    This Court Should Exclude Dr. Cantor's Testimony Regarding Pediatrics, Endocrinology, or the Development of WPATH's Clinical Guidelines Because They Exceed the Scope of His Expertise or Are Improper Motive Opinions that Are Not the Product of a Reliable Methodology............................................8

        A.    Dr. Cantor is Not Qualified to Opine on Pediatrics, Endocrinology, or the Development of Clinical Guidelines Because He Is a Clinical Psychologist Who Primarily Treats Adults. ..................................................9

        B.    Dr. Cantor's Opinions About WPATH Include Improper Motive Opinion and Are Not the Product of Any Reliable Methodology. ..................................................10

    III.   This Court Should Exclude Dr. Curlin's Opinions on Gender-Affirming Care for Minors or the Ability of Minors to Consent to Such Care Because He Is an Internist Who Treats Only Adult Patients and Thus Is Not Qualified to Render Such Opinions.................................................................................11

    IV.   This Court Should Exclude Dr. Hruz's Opinions Regarding Gender Dysphoria and His Opinions About Plaintiffs' Medical Treatment.........................................................14

        A.    Dr. Hruz, as a Pediatric Endocrinologist Who Has Never Diagnosed or Treated Gender Dysphoria, Is Not Qualified to Opine on Issues Related to the Diagnosis and Treatment of Gender Dysphoria.....................................14

        B.    Dr. Hruz's Opinions About the Treatment of Plaintiffs in His Supplemental Report Lack an Adequate Factual Basis.................................................................15

    V.    This Court Should Exclude Dr. Kaliebe's Opinions Regarding His "Social Contagion" Hypothesis, His Personal Views on the Perceived Politicization of Gender-Affirming Care, or the Motives of WPATH and HHS. .........................................17

A.   Dr. Kaliebe Is Not Qualified to Offer His "Social Contagion" Hypothesis or His Personal Views About the "Politicization" of Gender-Affirming Care Because He Has Minimal Experience With Gender Dysphoria And Does Not Provide Gender-Affirming Care. ................... 17

B.   Dr. Kaliebe's Opinions Regarding WPATH and HHS Are Unreliable and Unhelpful Because They Are Based on a Review of Emails Without Applying Any Particular Expertise or Methodology and Are Improper Motive Opinions. .......................................................... 21

VI.   This Court Should Exclude Dr. Laidlaw's Opinions on Gender-Affirming Care for Minors and Its Potential Consequences, the Development of Clinical Guidelines for Gender-Affirming Care, and Plaintiffs' Medical Treatment. ........................ 24

A.   Dr. Laidlaw, an Endocrinologist Who Has Never Treated Anyone Under 19 for Gender Dysphoria, Is Not Qualified to Opine on Gender-Affirming Care for Minors or Its Potential Consequences or the Development of Clinical Guidelines Related to Gender-Affirming Care. 25

B.   Dr. Laidlaw's Opinions About Private Plaintiffs' Treatment Are Not Based on Sufficient Facts or Data to Be Reliable. ..................................................................... 26

C.   Dr. Laidlaw's Opinions Regarding the Purported "Political Influence" on WPATH Are Unreliable and Unhelpful Because They are Based on His Review of Emails Without Applying any Relevant Expertise or Methodology and Are Improper Motive Opinions. ....... 27

VII.   This Court Should Exclude Dr. Lappert's Opinions in Their Entirety Because He Is Not Qualified to Opine on Any Relevant Topics. ........................................................... 29

VIII. This Court Should Exclude Dr. Nangia's Opinions Regarding Non-Psychiatric Treatments for Gender Dysphoria, the Ability of Minors to Assent or Consent to Gender-Affirming Care, and the Private Plaintiffs' Medical Treatment. .................................... 31

A.   Dr. Nangia Is Not Qualified to Opine on the Medical Treatment of Gender Dysphoria, Including the Ability of Minors to Assent or Consent to Gender-Affirming Care Because She Lacks Experience in the Non-Psychiatric Aspects of the Treatment of Gender Dysphoria. .................................................................... 31

B.      Dr. Nangia's Opinions About the Private Plaintiffs' Medical Treatment Are Not Based on Sufficient Facts and Data to Be Reliable........................................................ 32

IX.   Dr. Thompson, an Obstetrician Gynecologist with No Experience in Fertility Preservation for Individuals Receiving Gender-Affirming Care, Is Not Qualified to Opine on Hormonal Treatment or Other Medical Issues Beyond Her Area of Expertise. ...................................................................................33

CONCLUSION ......................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Am. Key Corp. v. Cole Nat'l Corp.*,
   762 F.2d 1569 (11th Cir. 1985) ........................................................................13

*Brandt v. Rutledge*,
   677 F. Supp. 3d 877 (E.D. Ark. 2023) ........................................................1, 14

*Cooper v. Smith Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) ...................................................................... 16, 33

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (U.S. 1993) ..............................................................................5

*Doe v. Ladapo*,
   676 F. Supp. 3d 1205 (N.D. Fla. 2023) ........................................................2, 14

*Doe v. Ladapo*,
   No. 4:23cv114-RH-MAF, 2024 WL 2947123 (N.D. Fla. June 11, 2024) ............2

*Eknes-Tucker v. Gov. of Ala.*,
   80 F.4th 1205 (11th Cir. 2023) ................................................................ 3, 4, 8

*Eknes-Tucker v. Marshall*,
   603 F. Supp. 3d 1131 (M.D. Ala. 2022) ...................................................... 2, 3, 4

*Haller v. AstraZeneca Pharmaceuticals, LP*,
   598 F. Supp. 2d 1271 (M.D. Fla. 2009) ...................................................... 16, 33

*Hamilton v. Louisville Cartage Co.*,
   Civil Action No. 5:23-cv-00241-TES, 2024 WL 2303889 (M.D. Ga. May 21,
   2024) ..................................................................................................16

*Harvey v. Novartis Pharmaceutical Corp.*,
   894 F. Supp. 2d 1206 (N.D. Ala. 2012) ............................................................34

*Higgins v. Koch Dev. Corp.*,
   794 F.3d 697 (7th Cir. 2015) ..........................................................................33

*In re Polypropylene Carpet Antitrust Litig.*,
   93 F. Supp. 2d 1348 (N.D. Ga. 2000) ..............................................................13

*Kadel v. Folwell*,
   620 F. Supp. 3d 339 (M.D.N.C. 2022) ........................................................2, 15

*Koe v. Noggle*,
   688 F. Supp. 3d 1321 (N.D. Ga. 2023) ...................................................... 1, 10, 15

*Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*,
   772 F.3d 1352 (11th Cir. 2014) ........................................................ 5, 9, 12, 20

*Lowery v. Sanofi-Aventis LLC*,
   No. 7:18-cv-376, 2021 WL 872620 (N.D. Ala. Mar. 9, 2021) ............................34

*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013) ...................................................................... 10, 21

*Moore, v. Intuitive Surgical, Inc.*,
   995 F.3d 839 (11th Cir. 2021) ....................................................................... 12, 20
*Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) ..........................................................................7
*Tillman v. C.R. Bard. Inc.*,
   96 F. Supp. 3d 1307 (M.D. Fla. 2015) ......................................................... 11, 22
*Trasylol Prods. Liab. Litig.*,
   709 F. Supp. 2d 1323 (S.D. Fla. 2010).............................................................22
*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) .................................................................. 4, 5, 6

**Statutes**

Ala. Code §§ 26-26-4(a)(4)-(6).............................................................................7
Ala. Code §§ 26-26-4.............................................................................................3
Alabama Vulnerable Child Compassion and Protection Act, Ala. Code §§ 26-26-1
   to -9 (2022) ......................................................................................................3

**Rules**

Fed. R. Evid. 702 ........................................................................................ 5, 18, 19
Fed. R. Evid. 702(a). ............................................................................................6
Fed. R. Evid. 702(b)...........................................................................................26

**EXHIBITS**

|  | Exhibit |
|---|---|
| Cantor Report | U.S. Ex. 1 |
| Cantor Deposition Transcript (Under Seal) | U.S. Ex. 2 |
| Cantor Supplemental Report | U.S. Ex. 3 |
| Curlin Report | U.S. Ex. 4 |
| Curlin Deposition Transcript | U.S. Ex. 5 |
| Hruz Report | U.S. Ex. 6 |
| Hruz Deposition Transcript | U.S. Ex. 7 |
| Hruz Supplemental Report (Under Seal) | U.S. Ex. 8 |
| Kaliebe Report | U.S. Ex. 9 |
| Kaliebe Deposition Transcript (Under Seal) | U.S. Ex. 10 |
| Kaliebe Supplemental Report | U.S. Ex. 11 |
| Laidlaw Report | U.S. Ex. 12 |
| Laidlaw Deposition Transcript (Under Seal) | U.S. Ex. 13 |
| Laidlaw First Supplemental Report (Under Seal) | U.S. Ex. 14 |
| Laidlaw Second Supplemental Report (Under Seal) | U.S. Ex. 15 |
| Lappert Report | U.S. Ex. 16 |
| Lappert Deposition Transcript | U.S. Ex. 17 |
| Nangia Report | U.S. Ex. 18 |
| Nangia Deposition Transcript (Under Seal) | U.S. Ex. 19 |
| Nangia First Supplemental Report (Under Seal) | U.S. Ex. 20 |
| Nangia Second Supplemental Report (Under Seal) | U.S. Ex. 21 |
| Thompson Report | U.S. Ex. 22 |
| Thompson Deposition Transcript | U.S. Ex. 23 |
| Cantor Supplemental Report Appendix A | U.S. Ex. 24 |

## **INTRODUCTION**

This Court should exclude certain testimony by Defendants' experts, including opinions that exceed the scope of the witness' expertise, improperly opine on motive or intent, lack an adequate factual basis, or pertain to topics not at issue in this case. Each of Defendants' experts seek to opine on issues beyond their areas of expertise. They also offer opinions irrelevant to issues remaining in this case, including opinions about surgery, an intervention that is not part of the claims alleged by Private Plaintiffs or the United States. Furthermore, opinions about the intent or motive of the World Professional Association for Transgender Health ("WPATH") and the U.S. Department of Health and Human Services ("HHS") are so methodologically unreliable that they are not admissible. Among other defects, these opinions merely repeat hearsay without applying any particular methodology or expertise and rely on grossly inadequate factual bases.

For similar reasons, district courts in Georgia, Florida, and North Carolina have excluded or limited the testimony of several of Defendants' experts. *See Koe v. Noggle*, 688 F. Supp. 3d 1321, 1336 n.11, 1351 n.26, 1352 n.28 (N.D. Ga. 2023) (doubting Dr. Hruz's objectivity, giving some of Dr. Cantor's views "less weight," and finding certain opinions by Dr. Laidlaw to be unreliable); *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 914-16 (E.D. Ark. 2023) (finding that Drs. Hruz and Lappert "were unqualified to offer relevant expert testimony and offered unreliable

testimony"); *Doe v. Ladapo*, 676 F. Supp. 3d 1205, 1211 n.8, n.9 (N.D. Fla. 2023) (casting doubt on qualifications of Dr. Lappert and not crediting Dr. Hruz); *Doe v. Ladapo*, No. 4:23cv114-RH-MAF, 2024 WL 2947123 at *13 n.19 (N.D. Fla. June 11, 2024) (finding that Drs. Laidlaw, Hruz, and Lappert "testified not based on their professional expertise but based on their ideology" and "have little or no experience treating transgender patients and no specialized training in the field");[1] *Kadel v. Folwell*, 620 F. Supp. 3d 339, 363-65, 368-69 (M.D.N.C. 2022), *aff'd* 100 F.4th 122 (4th Cir. 2024) (en banc) (limiting the testimony of Drs. Hruz and Lappert).

This Court should do the same. And indeed, this Court already determined that the opinions of Dr. Cantor should be afforded very little weight. *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1143 (M.D. Ala. 2022), *rev'd on other grounds*, 80 F.4th 1205 (11th Cir. 2023).

Excluding opinions by experts that exceed their qualifications, use unreliable methodology, and rely on insufficient information to render a reliable opinion will ensure that the trial is informed by competent testimony. The Court should grant the United States' motion to streamline the presentation of evidence at trial.

---

[1] The court did not identify these experts by name in the opinion, but cited to the testimonies of Drs. Laidlaw, Hruz, and Lappert from the preliminary injunction hearing and trial of *Dekker v. Weida*, No. 4:22-cv-325 (N.D. Fla. May 22, 2023), ECF Nos. 62 at 40 (Dr. Laidlaw), 238 at 193-95 (Dr. Hruz), and 239 at 129-31 (Dr. Lappert).

## BACKGROUND

The United States filed a complaint in intervention in this case asserting that the Alabama Vulnerable Child Compassion and Protection Act, Ala. Code §§ 26-26-1 to -9 (2022) ("S.B. 184") violates the Equal Protection Clause of the Fourteenth Amendment. Am. Compl. In Intervention, ECF No. 92. S.B. 184 makes it a felony to "engage in or cause" certain gender-affirming procedures and treatments for transgender minors, while allowing other minors to receive the same procedures and treatments. Ala. Code §§ 26-26-4.

This Court previously granted Private Plaintiffs' and the United States' motions for a preliminary injunction barring the enforcement of S.B. 184 after a three-day hearing. *Eknes-Tucker*, 603 F. Supp. 3d 1131. Plaintiffs and the United States collectively offered three experts with expertise and experience in treating adolescents with gender dysphoria. *Id.* at 1141-43; *Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1215-17 (11th Cir. 2023). The United States also offered as additional support "various organizations' medical policy statements and guidelines," including a set of clinical guidelines referred to as the "Standards of Care" ("SOC-7") developed by WPATH. *Eknes-Tucker*, 80 F.4th at 1216-17.[2] In granting the preliminary injunction, this Court found that S.B. 184 makes a sex-

---

[2] After the preliminary injunction hearing, WPATH issued its Standards of Care, Version 8 ("SOC-8").

based classification and that the law could not survive heightened scrutiny. *Eknes-Tucker*, 603 F. Supp. 3d at 1146-48, 1151. The Eleventh Circuit vacated that decision, holding that the law should instead be judged under a rational basis standard "unless the regulation were a pretext for invidious discrimination against" transgender individuals. *Eknes-Tucker*, 80 F.4th at 1229-30.

Now, Defendants seek to offer opinions of eight experts to support their purported justifications for S.B. 184. *See* Defs.' Mot. Summ. J. Br. Supp., ECF No. 561 (citing to experts' reports as support). Alabama's eight experts collectively offer 15 reports offering wide-ranging and overlapping opinions regarding the efficacy, risks, and ethics of providing gender-affirming care to minors.

## **LEGAL STANDARD**

Trial courts perform a critical gatekeeping function in assessing whether expert testimony is admissible. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).[3] To fulfill its gatekeeping role, a court must apply a three-part test to determine whether proffered expert testimony is admissible under Federal Rule of Evidence 702: (1) whether the expert is qualified to competently testify as

---

[3] Though somewhat relaxed, this gatekeeping role still applies in bench trials. *See, e.g.*, *United States v. Brown,* 415 F.3d 1257, 1268-70 (11th Cir. 2005) (noting that the concern about "dumping a barrage of questionable scientific evidence on a jury" is not present in a bench trial before assessing whether the district court abused its discretion in admitting certain expert testimony in a bench trial); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) (stating that in a bench trial "the *Daubert* standards of relevance and reliability for scientific evidence must nevertheless be met.").

to the matters they intend to address (the "qualifications" prong); (2) whether the expert's methodology is sufficiently reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (U.S. 1993) (the "reliability" prong); and (3) whether the expert's testimony will help the factfinder understand the evidence or determine a fact in issue (the "helpfulness" prong). *Id.* The proponent of expert testimony bears the burden of establishing that the proffered testimony meets each of these requirements. *Id.*

Under the first prong, the proponent bears the burden to show that the expert "is qualified to testify competently regarding the matters he intends to address." *Id.* at 1260. An expert may be qualified by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. "Expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368-69 (11th Cir. 2014) (affirming trial court's exclusion of expert who sought to offer opinions "in an area that he did not otherwise specialize in" and that he developed "expressly for purposes of testifying").

With regard to the reliability requirement, courts assess "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Frazier*, 387 F.3d at 1262. "These factors

are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Id.*

Finally, expert opinion is unhelpful if it does not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63.

## ARGUMENT

This Court should preclude Defendants' proffered experts from testifying in several respects. At the outset, any expert opinion about adverse consequences of gender-affirming surgery is irrelevant and therefore unhelpful to the trier of fact because Plaintiffs are not challenging Alabama's prohibition on surgical interventions. Further, there are independent grounds to limit the scope of each of Defendants' expert witnesses' proffered testimony. As detailed below, each of Defendants' experts intends to testify regarding subject matter they are unqualified to opine on because it lies outside their limited area of expertise. In addition, this Court should preclude the experts from testifying about the alleged intent or

motivations of WPATH and HHS because their opinions are both unsupported by any reliable methodology and unhelpful to the trier of fact. Finally, Defendants' experts cannot testify about the adequacy of Private Plaintiffs' medical treatment because they did not rely upon sufficient facts or data to render a reliable opinion, as they never spoke to any Private Plaintiff or any of their treating healthcare providers.

**I.     Expert Opinions About Gender-Affirming Surgery Are Irrelevant and Unhelpful, and Should be Excluded Because Plaintiffs Are Not Challenging S.B. 184's Prohibition on Surgery.**

Because Alabama's prohibition on gender-affirming surgery is not at issue in this case, the Court should exclude as irrelevant any opinion testimony about the ethics of surgical interventions, the potential adverse consequences of surgery, or the sufficiency of the scientific evidence supporting surgery as a treatment for gender dysphoria. Such opinions are unhelpful because they "do[] not relate to any issue in the case." *Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1347 (11th Cir. 2003). Section 4 of S.B. 184 prohibits a range of gender-affirming medical interventions, including surgeries that "sterilize" or "artificially construct tissue with the appearance of genitalia that differs from the individual's sex." Ala. Code §§ 26-26-4(a)(4)-(6). But, as recognized by this Court at the preliminary injunction hearing and subsequently by Defendants themselves, Plaintiffs are not challenging S.B. 184's prohibitions on surgical interventions. May 4, 2022 Mot.

Hr'g Tr., ECF No. 103 at 40:2-9 (acknowledgement by Plaintiffs' counsel), 65:2-5

(acknowledgement by Defendants' counsel); *Eknes-Tucker*, 80 F.4th at 1215

("Plaintiffs represented that they were no longer challenging the portions of section

4 that ban surgical intervention, i.e., subsections (a)(4)-(6)"). Nonetheless, four of

Defendants' experts opine on issues related to surgery: Dr. Hruz (U.S. Ex. 6 ¶ 131

(discussing "flaws" in studies supporting gender-affirming care, some of which

relate to surgery)); Dr. Laidlaw (U.S. Ex. 12 ¶¶ 160-175, 228-35)); Dr. Lappert

(U.S. Ex. 16 ¶¶ 35-62 (discussing "Characteristics of Gender Affirmation

Surgeries")); and Dr. Nangia (U.S. Ex. 18 ¶¶ 154-62 (discussing her views

regarding consent, including for surgical transition for minors)). Any expert

testimony about the potential harms, ethics, or the evidentiary basis of gender-

affirming surgery are irrelevant to Plaintiffs' claims or any defenses to those

claims and should be excluded as unhelpful.

## II.     This Court Should Exclude Dr. Cantor's Testimony Regarding Pediatrics, Endocrinology, or the Development of WPATH's Clinical Guidelines Because They Exceed the Scope of His Expertise or Are Improper Motive Opinions that Are Not the Product of a Reliable Methodology.

This Court should exclude Dr. Cantor's proffered opinions regarding child

psychiatry, endocrinology, and the development of the clinical guidelines for

treating gender dysphoria in pediatric patients for two main reasons. First, Dr.

Cantor is not qualified to opine on these subjects because he is a clinical

psychologist who primarily treats adults. Second, his opinions on the development of WPATH's clinical guidelines are unreliable and unhelpful because they are not the product of any reliable methodology and are opinions about motive or intent.

### A. Dr. Cantor is Not Qualified to Opine on Pediatrics, Endocrinology, or the Development of Clinical Guidelines Because He Is a Clinical Psychologist Who Primarily Treats Adults.

Dr. Cantor seeks to opine on many matters beyond the scope of his limited expertise in adult psychology. Dr. Cantor is not a medical doctor, U.S. Ex. 2 19:20-25, does not prescribe medications, *id.* 20:13-15, and does not treat patients under the age of 16, *id.*13: 3-7; 44:11-12. He is a clinical psychologist whose patients are typically 30-35 years old, *id.* 13:8-13, and he makes no "income from the assessment or clinical treatment of children . . . . ," *id.* 44:11-12. Nonetheless, he seeks to opine on medical care that he has never provided. U.S. Ex. 1 ¶¶ 59-93 *and* 156-238 (opining on the quality of evidence supporting such medical care), 94-104 *and* 239-58 (opining on the development of clinical guidelines for medical care he has never provided), 156-164 (discussing evidentiary support for medical care he has never provided); U.S. Ex. 3 ¶¶ 96-120 (discussing the development of WPATH's clinical guidelines for providing medical care he has never provided). Dr. Cantor's experience as a clinical psychologist treating adult patients does not qualify him as an expert about matters beyond adult psychology. *See Lebron*, 772 F.3d at 1368-69 (affirming trial court's decision to exclude expert who sought to

offer opinions "in an area that he did not otherwise specialize in" and that he developed "expressly for purposes of testifying"); *Koe*, 588 F. Supp. 3d at 1352 n.28 (giving little weight to Dr. Cantor's opinions about "the medical conclusions that can reasonably be drawn from the evidence for the treatment of gender dysphoria in minors" because he "is not a physician and has no experience treating gender dysphoria in youth as such."). The Court should preclude Dr. Cantor from providing testimony that exceeds his expertise.

### B. Dr. Cantor's Opinions About WPATH Include Improper Motive Opinion and Are Not the Product of Any Reliable Methodology.

Dr. Cantor's opinions based on WPATH's internal documents in Appendix A of the Cantor Supplemental Report, U.S. Ex. 24, are not the product of any particular methodology and are improper intent or motive opinions. Appendix A largely consists of reproductions of emails and other documents obtained in discovery in this case along with a narrative summary by Dr. Cantor. *E.g.*, U.S. Ex. 24 ¶¶ 121-131, 134. 136-39, 141, 145-46, 150-52. Appendix A to Dr. Cantor's supplemental report does not identify any particular methodology that Dr. Cantor applies to these documents, and it appears to serve merely as a conduit for hearsay. *See, e.g.*, *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.") (Quoting *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 666

(S.D.N.Y.)). To the extent Appendix A offers any opinions, they are not based on Dr. Cantor's expertise and are merely his personal views of individuals' intent, motivations, or state of mind. *E.g.*, U.S. Ex. 24 ¶¶ 133 ("Members of the WPATH Guideline Development Group [took actions] for the purposes of influencing courts and legislatures"), 135 ("we see these committee members working to further their own work"), 138 ("Dr. Rachel Levine strongly pressured WPATH . . . in order to assist with Administration political strategy"). Such opinions about "intent, state of mind, or motivations" are "outside the bounds of appropriate expert testimony." *Tillman v. C.R. Bard. Inc.*, 96 F. Supp. 3d 1307, 1326 (M.D. Fla. 2015). Because Dr. Cantor's opinions about WPATH and HHS are not the product of any methodology and are outside the bounds of appropriate expert opinion, the Court should not allow him to act as a mere conduit for hearsay to repeat and summarize emails and documents that, if admissible, could be competently interpreted by the factfinder without expert testimony.

**III.   This Court Should Exclude Dr. Curlin's Opinions on Gender-Affirming Care for Minors or the Ability of Minors to Consent to Such Care Because He Is an Internist Who Treats Only Adult Patients and Thus Is Not Qualified to Render Such Opinions.**

Dr. Curlin seeks to offer opinions about gender-affirming care for minors without any qualifying expertise. Dr. Curlin's experience as an internist who treats adult patients does not qualify him to testify about pediatrics or pediatric subspecialties, subjects which are outside of his practice area. *See, e.g., Moore v.*

*Intuitive Surgical, Inc.*, 995 F.3d 839, 857 (11th Cir. 2021) (stating that a gynecologist would be unqualified to testify regarding open-heart surgery or brain operation); *Lebron*, 772 F.3d at 1368-69. Dr. Curlin concedes that he does not practice pediatric medicine and has never prescribed puberty blockers or cross-sex hormones to someone with a diagnosis of gender dysphoria. U.S. Ex. 5 54:19-20, 58:8-15, 155:5-9. Nonetheless, much of Dr. Curlin's report opines on the benefits and risks of gender-affirming care. *E.g.*, U.S. Ex. 4 ¶¶ 14-17, 20-36, 38-39, 42, 66-67, 77. Dr. Curlin has some expertise in the ethics of palliative care and the influence of religion on the practice of medicine, with peer reviewed publications like "Can physicians' care be neutral regarding religion," and "Holy transgressions: Breaching the wall between public religion and patient care." U.S. Ex. 4 App'x B at 12-21. But this limited expertise does not extend to the ethics of providing gender-affirming care, a central aspect of his report. *E.g.*, U.S. Ex. 4 at 47-69 (discussing the "application of principles of medical ethics" to gender affirming care), 70-96 (opining on the "possibility of meaningful informed consent" for gender affirming care). In fact, he could only recall one ethical consult for a person with gender dysphoria—he was "peripherally . . . involved" in that case and consulted "regarding palliative medicine needs . . . ." U.S. Ex. 5 55:1-15, 57:4-9, 58:1-15, 64:16-19, 66:20-67:20.

Dr. Curlin's lack of expertise regarding gender-affirming care is confirmed by his extensive reliance on other experts to support his conclusions. *See generally id.* (citing Drs. Cantor and Laidlaw throughout); *see also id.* ¶ 14-15 (identifying "the opinions offered by Drs. Cantor and Laidlaw" as the bases for opinions about the benefits and harms of gender-affirming care). Experts may not "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000); *see also Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("[e]xpert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not."). Here, Dr. Curlin rests his opinions on those of Drs. Cantor and Laidlaw without performing any independent assessment of the evidence they relied upon. U.S. Ex. 5 105:20-106:12, 135:14-19, 107:3-11, 121:20-122:3, 178:13-18. He did not read the underlying studies that Drs. Cantor and Laidlaw relied upon, and instead bases his opinions on the descriptions Drs. Cantor and Laidlaw provided in their reports. *Id.* 104:18-105:14; 122:19-123:7; 123:20-124:2; 186:8-16; 187:9-13, 103:8-15, 108:19-109:13.

The Court should exclude Dr. Curlin's opinions because they exceed his expertise. In the absence of relevant expertise, it appears that Dr. Curlin is offering his strongly held personal moral judgments instead of ethical opinions formed

13

through the application of expertise. *E.g.*, *id.* 66:3-12 (stating that gender-affirming treatments "contradict Christian values"). As the *Ladapo* court recently stated about other experts, it appears Dr. Curlin is testifying "not based on [his] professional expertise but based on [his] ideology." *Ladapo*, 2024 WL 2947123 at *13 n.19. Given the absence of relevant expertise, the Court should exclude Dr. Curlin's opinions in their entirety.

## IV. This Court Should Exclude Dr. Hruz's Opinions Regarding Gender Dysphoria and His Opinions About Plaintiffs' Medical Treatment.

Dr. Hruz, although a pediatric endocrinologist, is unqualified to testify regarding the diagnosis and treatment of gender dysphoria in pediatric patients because of his lack of relevant experience or training. In addition, his proffered opinions regarding Private Plaintiffs' medical treatment should be excluded because they are not based on sufficient facts or data to be reliable.

### A. Dr. Hruz, as a Pediatric Endocrinologist Who Has Never Diagnosed or Treated Gender Dysphoria, Is Not Qualified to Opine on Issues Related to the Diagnosis and Treatment of Gender Dysphoria.

Dr. Hruz is not qualified to opine about the diagnosis and treatment of gender dysphoria because he has never diagnosed or treated it. *See Brandt*, 677 F. Supp. 3d at 914-16 (Hruz was "unqualified to offer relevant expert testimony and offered unreliable testimony"); *Ladapo*, 676 F. Supp. 3d at 1211 n.8 ("Dr. Hruz . . . generally testified as a deeply biased advocate, not as an expert sharing relevant evidence-based information and opinions. I do not credit his testimony.");

*Noggle*, 688 F. Supp. 3d at 1336 n.11 (finding that Dr. Hruz's previous statements "cast[] doubt on the objectivity of [his] testimony"). Dr. Hruz has never made a diagnosis of gender dysphoria, U.S. Ex. 7 67:7-9, but he opines on the subject. *See* U.S. Ex. 6 ¶¶ 55-58 ("Diagnosis"). He has never provided gender-affirming care to any transgender person, including prescribing puberty blockers or cross-sex hormones, U.S. Ex. 7 79:17-80:19; U.S. Ex. 6 ¶ 154, but opines on treatments for gender dysphoria as a general matter, U.S. Ex. 6 ¶¶ 59-93, and opines on Private Plaintiffs' specific treatments. U.S. Ex. 8. He also offers opinions about the ethical implications of gender dysphoria treatment he has never performed. U.S. Ex. 6, ¶¶ 106-118. As the *Kadel* court recognized, Dr. Hruz is "not qualified to offer expert opinions on the diagnosis of gender dysphoria, the [Diagnostic and Statistical Manual of Mental Disorders ("DSM")], gender dysphoria's potential causes, the likelihood that a patient will 'desist,' or the efficacy of mental health treatments." 620 F. Supp. 3d at 364. This Court should exclude any opinions by Dr. Hruz about the diagnosis and treatment of gender dysphoria, including the ethical implications of such treatment.

### B. Dr. Hruz's Opinions About the Treatment of Plaintiffs in His Supplemental Report Lack an Adequate Factual Basis.

The opinions included in Dr. Hruz's six-page supplemental report about the treatment of plaintiffs are not "based on sufficient facts or data" as required by Fed. R. Evid. 702(b), because he never spoke with plaintiffs or their healthcare

providers. In his supplemental report, Dr. Hruz offers observations about the

Private Plaintiffs' medical records that were available to him, though he has never

met the "plaintiffs in this case, their parents, or any of the medical personnel

involved in their medical care." U.S. Ex. 8 ¶ 1. Dr. Hruz acknowledges that

because of these limitations he cannot "make any assessment on the veracity of

psychiatric diagnoses and outcome reports." *Id.* Most of his report simply restates

the medical records, but the portions that opine on the Private Plaintiffs' treatment

are unreliable. Dr. Hruz opines that the "relative paucity of documented discussion

of known and potential medical complications . . . further substantiates my

opinions related to relative risk." *Id.* ¶ 9. A physician's review of medical records

without examining a patient, interviewing that patient, or speaking with the

patient's treating physician may be an insufficient basis for the specific opinion the

physician offers. *E.g.*, *Cooper v. Smith Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir.

2001) (affirming district court's exclusion of physician's opinion formed without a

physical examination or interviewing the patient); *Haller v. AstraZeneca*

*Pharmaceuticals, LP*, 598 F. Supp. 2d 1271, 1294-95 (M.D. Fla. 2009) (excluding

physician's opinion based only on the review of medical records); *Hamilton v.*

*Louisville Cartage Co.*, Civil Action No. 5:23-cv-00241-TES, 2024 WL 2303889,

at *5 (M.D. Ga. May 21, 2024) (excluding physician's testimony about damages

when the physician "neither spoke with nor received any information from any of

Plaintiff's treating physicians"). In this case, without interviewing the patient

and/or the treating professional, it is impossible for Dr. Hruz to know whether the

discussions of potential complications are not documented because they did not

happen or happened but were not documented. Thus his review of medical records

alone is not a sufficient basis for the opinions he seeks to offer.

**V.    This Court Should Exclude Dr. Kaliebe's Opinions Regarding His "Social Contagion" Hypothesis, His Personal Views on the Perceived Politicization of Gender-Affirming Care, or the Motives of WPATH and HHS.**

Dr. Kaliebe is not qualified to offer opinions on subjects such as his theories

regarding the spread of gender dysphoria or that the clinical guidelines regarding

gender-affirming care are informed by partisan politics instead of medicine

because he has limited experience diagnosing or treating gender dysphoria. In

addition, his opinions regarding the motives of WPATH and HHS are unhelpful.

**A. Dr. Kaliebe Is Not Qualified to Offer His "Social Contagion" Hypothesis or His Personal Views About the "Politicization" of Gender-Affirming Care Because He Has Minimal Experience With Gender Dysphoria And Does Not Provide Gender-Affirming Care.**

Dr. Kaliebe's opinions that gender dysphoria has been spread through

"social contagion" via the Internet and that medical associations' approaches to

gender-affirming care have been "politicized" are beyond the scope of his limited

expertise with gender dysphoria, and are not otherwise supported. *See* U.S. Ex. 9

¶¶ 26-55 (discussing "social contagion" theory), 81-174 (discussing perceived

"politicization" of medical care). Dr. Kaliebe opines that "the dramatic rise in minors presenting with gender dysphoria may be attributable to technologically induced contagion effects," and that "ideological and social factors underlie much of the recent increase in gender dysphoria in adolescents." U.S. Ex. 9 ¶¶ 42, 55. He likens the impact of social media on gender dysphoria to the ways that technology "has aided the spread of suicide contagion" or eating disorders such as anorexia. *Id.* ¶ 39. He also opines that medical associations' approaches to gender-affirming care have been "politicized" and are therefore suspect, U.S. Ex. 9 ¶¶ 81-174. In particular, he opines that WPATH's methodology to create SOC-8 was unsound because WPATH prioritized enforcing its "advocacy position." *Id.* ¶¶ 112-23. While an expert may sometimes testify relying "solely or primarily on experience," Fed. R. Evid. 702 (Advisory Comm. Notes), Dr. Kaliebe lacks the experience to qualify him to offer such opinions, and in the absence of relevant experience he does not otherwise support these opinions with reliable facts and data.

Dr. Kaliebe has insufficient relevant experience to support his social contagion theory. Dr. Kaliebe has only diagnosed gender dysphoria once or twice over the course of his career. U.S. Ex. 10 132:25-133:13. And, he has not "performed any original research establishing that social media is a major contributor to the rise in gender dysphoria in adolescents." U.S. Ex. 10 at 154:10-15. Thus, he is not "proposing to testify about matters growing naturally and

directly out of research [he] ha[s] conducted independent of the litigation" and is instead offering an opinion developed for purposes of testifying. Fed. R. Evid. 702 (Advisory Comm. Notes) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)). But he has not developed that opinion in a reliable way.

In the absence of experience, Dr. Kaliebe does not otherwise support his social contagion opinion. Dr. Kaliebe cites to studies documenting an increase in the number of referrals for gender dysphoria, U.S. Ex. 9 ¶¶ 29-30; a now-discredited study by Dr. Lisa Littman that "hypothesized," based on the results of a survey of lay people, that "'it is plausible" that perceptions of gender dysphoria could be "initiated, magnified, spread, and maintained'" via social contagion, *id.* ¶ 42; a paper noting that gender dysphoria is prevalent among males with video game or internet addiction, *id.* ¶ 46; Dr. Kaliebe's personal anecdotes about what he thinks "many psychiatrists in America" believe, *id.* ¶ 52; and informal polling at medical conferences suggesting that some psychiatrists believe gender identity may be "influenced by social media," *id.* ¶ 53-54. But much of the research supporting this theory has been discredited, including the research by Dr. Littman that relies on the reports of parents recruited from anti-transgender websites. U.S. Ex. 10 at 169:22-170:5; U.S. Ex. 7 at 139:21-141:8. In fact, the journal publishing her work required an extensive correction because of its misstatements. *See* Defs.'

MSJ Ex. 116 at S45. And, neither the American Psychiatric Association nor any other reputable professional organization has recognized the "rapid-onset gender dysphoria" central to Dr. Littman's work as a distinct clinical condition or diagnosis. U.S. Ex. 10 at 147:8-148:21; U.S. Ex. 2 at 78:11-79:19. Neither Dr. Kaliebe's expertise nor the factual basis he relies upon support his suggestion that much of the rise in gender dysphoria is the product of peer influence spread through social media.[4]

Dr. Kaliebe's views that medical associations' approaches to gender-affirming care have been "politicized" and are therefore suspect, U.S. Ex. 9 ¶¶ 81-174, are similarly beyond the scope of his expertise and not otherwise supported. The SOC-8 addresses issues of surgery and endocrinology, and Dr. Kaliebe acknowledges he is not a surgeon or an expert in endocrinology. U.S. Ex. 10 at 230:19-231:16. Dr. Kaliebe's expertise as a psychiatrist does not qualify him to opine on the substance of such guidelines beyond his area of practice. *E.g.*, *Moore*, 995 F.3d at 857; *Lebron*, 772 F.3d at 1368-69. Nor he is qualified to opine on issues related to the development of clinical guidelines in a general sense untied to his specific area of expertise, because his experience regarding the development of clinical guidelines is limited to developing the first draft of a section of

---

[4] Moreover, because even Dr. Kaliebe recognizes that gender dysphoria is a legitimate diagnosis, U.S. Ex. 10 at 146:23-25, his hypothesis that gender dysphoria is spread via social media is not helpful to the trier of fact.

psychiatric guidelines related to telepsychiatry in juvenile justice settings. U.S. Ex. 10 at 232:7-236:4. Again, in the absence of adequate relevant experience, he relies on insufficient support. He asserts as a basis for his opinions that he "ha[s] been told by a range of child psychiatrists" that they are unwilling to express their viewpoints, U.S. Ex. 9 ¶ 99; that "[i]n my experience most physicians are wary" of prescribing cross-sex hormones to minors, *id.* ¶ 87; and that "[m]ost psychiatrists are willing to admit we don't have enough research," *id.* ¶ 148. Some of the anecdotes are personal complaints about his peers' repeated rejections of his work. *E.g.*, *id.* ¶¶ 103-105 (discussing rejected presentation proposals); U.S. Ex. 10 at 211:10-212:14 (discussing another rejected presentation proposal). Dr. Kaliebe's limited expertise and his cited support are not adequate bases for him to offer his personal views about the "politicization" of gender-affirming care as expert opinion.

**B. Dr. Kaliebe's Opinions Regarding WPATH and HHS Are Unreliable and Unhelpful Because They Are Based on a Review of Emails Without Applying Any Particular Expertise or Methodology and Are Improper Motive Opinions.**

Dr. Kaliebe's supplemental report is not the product of any reliable methodology, as demonstrated by his failure to articulate any scientific methodology, and instead is used as a vehicle to report emails produced in discovery that may not otherwise be admissible. *See, e.g.*, *Marvel*, 726 F.3d at 136 ("[A] party cannot call an expert simply as a conduit for introducing hearsay under

the guise that the testifying expert used the hearsay as the basis of his testimony."). To the extent he offers opinions instead of merely reproducing or paraphrasing hearsay, he offers inadmissible opinions about WPATH's motives or intent when developing SOC-8. *See, e.g.*, *Tillman*, 96 F. Supp. 3d at 1326; *Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1338 (S.D. Fla. 2010).

Most of Dr. Kaliebe's supplemental report is dedicated to paragraphs that reproduce sentences from emails connected by his narrative or his characterization of the emails. *E.g.*, U.S. Ex. 11 ¶¶ 16, 17, 20-23, 27, 39-41, 48, 49, 51, 58-62, 65-71, 75-76, 81-83, 88-93, 96-98, 102-108, 110, 116, 130-37, 141-45, 151-52, 156-57. In fact, some of the paragraphs are lengthy block quotes of emails with a simple introductory sentence. *E.g.*, *id.* ¶¶ 80, 84, 85, 86, 94, 95.

But he applies no scientific methodology to this material, describing his methodology for forming opinions about this material as "reflecting on the documents," U.S. Ex. 10 27:17-28:6, or reviewing material and reporting on its contents, *id.* 38:1-15, 75:15-76:1, 79:11-17 (accepting characterization of his "overall methodology" as reading documents and reporting on their contents), 84:9-16. This unscientific method is not consistent with the work he does in his profession. *Id.* 97:4-10 (did not do a "psychiatric evaluation" of WPATH's leaders), 120:18-23 (does not review emails when treating patients), 236:10-22 (this is his first time reviewing an organization's internal emails regarding the

development of a standard of care), 19:8-10 (Dr. Kaliebe does not consider himself to be a historian). As such, Dr. Kaliebe does not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). While an expert may rely on hearsay, they may not serve as a mere "conduit for introducing hearsay" when, as here, the expert did not bring his "expertise to bear." *Marvel*, 726 F.3d at 135-36.

Unsurprisingly, because Dr. Kaliebe applies no real expertise or methodology, he arrives at opinions that would be within the scope of lay knowledge—unhelpful opinions about intent or motive. *E.g.*, *Tillman*, 96 F. Supp. 3d at 1326; *Trasylol Prods.*, 709 F. Supp. 2d at 1338. For example, he opines that organizations "intentionally misled the public." *E.g.*, U.S. Ex. 11 ¶ 24 (stating that organizations "intentionally misled the public"). And he offers his opinions on what WPATH's "goals" were when developing the SOC-8. *Id.* ¶ 55 ("One [goal] was to produce a document that would be useful to political and legal allies"). Such motive opinions are the crux of his report and appear throughout it.[5] The Court

---

[5] *E.g.*, U.S. Ex. 11 ¶¶ 13 ("WPATH appears comfortable excluding scholars based on ideology."), 18 (suggesting that organizations did not "prize[] truth and truth telling"), 39 ("This drastic reduction in mental healthcare requirements prior to transitioning appears intentional on behalf of the SOC-8 authors."), 40 ("at least some WPATH authors believe . . . "), 54 ("[T]he organization had other goals in crafting the standards"), 56 ("WPATH seeks to normalize and depathologize"), 59 ("Authors of SOC-8 made their legal and political goals explicit"), 61 ("To ensure its clinical guideline for medical professionals would be legally useful . . . ."), 72

should exclude these unreliable and unhelpful opinions about motive as "outside the bounds of appropriate expert testimony." *Tillman*, 96 F. Supp. 3d at 1326.

## VI. This Court Should Exclude Dr. Laidlaw's Opinions on Gender-Affirming Care for Minors and Its Potential Consequences, the Development of Clinical Guidelines for Gender-Affirming Care, and Plaintiffs' Medical Treatment.

Dr. Laidlaw is not qualified to opine on gender dysphoria in minors or the development of the clinical guidelines for treating dysphoria because he lacks relevant experience and expertise. His opinions regarding Plaintiffs' medical treatment should be excluded because they are not based on sufficient evidence to support his opinions. Finally, the Court should exclude his opinions about WPATH's perceived bias because they are based on unreliable methods and are unhelpful to the trier of fact.

---

("statements of medical necessity are primarily vehicles to justify insurance payments"), 73 ("there seems to be an attempt to simply declare . . . ."), 87 ("WPATH considered changing the statements solely to appease a political officer in the United States government."), 98 ("WPATH caved to outside political pressures . . . [and] treats it[s] Standards of Care as legislative or political documents, designed to ensure access-to-care and insurance coverage . . . ."), 112 ("HHS has conducted an ideologically and politically driven campaign to enshrine affirming care as clinical practice . . . ."), 149 ("HHS intentionally failed to [foster a diversity of perspectives] when it held its listening sessions to determine a future research agenda").

### A. Dr. Laidlaw, an Endocrinologist Who Has Never Treated Anyone Under 19 for Gender Dysphoria, Is Not Qualified to Opine on Gender-Affirming Care for Minors or Its Potential Consequences or the Development of Clinical Guidelines Related to Gender-Affirming Care.

Dr. Laidlaw is not "qualified to testify competently regarding the matters he intends to address"—the provision of gender-affirming care to minors or the development of clinical guidelines related to such care—because he has neither provided gender-affirming care to individuals under 19 nor received formal specialized training in such treatment. *Frazier*, 387 F.3d at 1260; *see also C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, No. 3:20-cv-06145-RJB, 2022 WL 17092846 at *4 (W.D. Wash. Nov. 21, 2022) (describing issue of Dr. Laidlaw's qualification as "a close question" in a bench trial because of his lack of experience treating gender dysphoria). He lacks relevant experience, as he has never treated anyone under the age of 19 for gender dysphoria. U.S. Ex. 12 ¶ 2; U.S. Ex. 13 at 55:1-24. He has never been "personally involved" in developing clinical guidelines. *Id.* 89:18-20. And he has no formal specialized training related to the medical treatment of transgender individuals. U.S. Ex. 13 at 30:4-7, 33:11-16, 40:2-11, 41:12-42:1, 42:17-45:14. His lack of relevant expertise renders him unqualified to offer his opinions on gender-affirming care and its evidentiary support, U.S. Ex. 12 ¶¶ 56-245, and the opinions in his second supplemental report

about the development of clinical guidelines for the treatment of gender dysphoria.

U.S. Ex. 15 ¶¶ 6-163.

### B. Dr. Laidlaw's Opinions About Private Plaintiffs' Treatment Are Not Based on Sufficient Facts or Data to Be Reliable.

Dr. Laidlaw's supplemental report provides opinions about the Private

Plaintiffs' treatment that are not "based on sufficient facts or data" because he did

not review a complete set of records or interview the Private Plaintiffs. Fed. R.

Evid. 702(b). The supplemental report summarizes the contents of Private

Plaintiffs' medical records and provides Dr. Laidlaw's opinion that "a compelling

case that the benefits of [gender-affirming care] outweigh the significant and

substantial risks has not been made for the three plaintiffs discussed." U.S. Ex. 14

¶ 63. Dr. Laidlaw, however, formed that opinion without examining or speaking to

any Private Plaintiff or speaking to any of their treating physicians or healthcare

providers. U.S. Ex. 13 294:2-21, 293:13-18. Moreover, his report notes the many

documents he did not review. U.S. Ex. 14 ¶¶ 7(d) ("█████████████████

█████████" had not been made available), 38 ("the necessary records for review

are missing"), 42 ("█████████████████ cannot be found in the

medical records"), 46 (a "█████████████████" by a particular

provider was not available), 56 (unable to assess "█████████████

█████████████████████████"). Without reviewing a

complete set of records or interviewing the Private Plaintiffs, Dr. Laidlaw cannot

form a complete opinion of the benefits and risks of their medical care. Thus, his methodology of reviewing a limited set of medical records without any examination of the Private Plaintiffs is not a sufficient basis for his ultimate opinion that the benefits did not outweigh the risks for their treatment. *See, e.g.*, *Cooper*, 259 F.3d at 203 (affirming district court's exclusion of physician's opinion formed without a physical examination or interviewing the patient); *Haller*, 598 F. Supp. 2d at 1294-95 (excluding physician's opinion based only on the review of medical records).

### C. Dr. Laidlaw's Opinions Regarding the Purported "Political Influence" on WPATH Are Unreliable and Unhelpful Because They are Based on His Review of Emails Without Applying any Relevant Expertise or Methodology and Are Improper Motive Opinions.

The opinions in Dr. Laidlaw's second supplemental report are not admissible because they are not the product of any reliable methodology and instead are used as a vehicle to report emails produced in discovery that may not otherwise be admissible. *See, e.g.*, *Marvel*, 726 F.3d at 136 ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."). Much of Dr. Laidlaw's second supplemental report consists of summaries or reproductions of emails or other hearsay material without the application of any relevant expertise or methodology. *E.g.*, U.S. Ex. 15 ¶¶ 13-15, 37-39, 58, 60, 62, 63, 77, 79, 84, 85, 87-88, 91, 93, 94, 99, 105, 107, 110-11, 118-24, 128-33, 138-45, 147-53, 155-58. As

Dr. Laidlaw acknowledged, he lacks any experience in "reviewing emails and other documents among members of an organization that developed a clinical guideline." U.S. Ex. 13 161:5-9. Like Dr. Kaliebe, because Dr. Laidlaw did not bring any "expertise to bear" when reviewing the emails and hearsay, his report impermissibly serves as a mere "conduit for introducing hearsay." *Marvel*, 726 F.3d at 136.

To the extent he offers opinions instead of merely reproducing or paraphrasing hearsay, he offers unhelpful opinions about others' motives or intent that are not admissible expert opinions. *E.g.*, *Tillman*, 96 F. Supp. 3d at 1326; *Trasylol Prods.*, 709 F. Supp. 2d at 1338. His report includes conjecture about why entities took certain actions, including alleging that WPATH developed SOC-8 with the goals of "protect[ing] clinicians from liability" or ensuring that treatment would fit insurers' "medical necessity" requirements. U.S. Ex. 15 ¶¶ 6, 33. Much of the discussion of WPATH includes such motive or intent opinions.[6] In fact, the conclusion of the second supplemental report is almost entirely motive or intent opinions. *See id.* ¶¶ 160 ("███████████████████████████████

---

[6] *See* U.S. Ex. 15 ¶¶ 41 (███████████████████████████████████████ ███), 50 ("███████████████████████████████"), 76 (██████████████ ███████████████████), 112 ("██████████████████████████"), 114 ("███ █████████████"), 126 ("██████████████████████████"), 158 (████████ ███████████).



161 (asserting that "███████████████████████" was done "██████████

███████████████████"), and 162 (████████████████████████████████

███████████████████████████████). The Court should

exclude these unreliable and unhelpful opinions as "outside the bounds of

appropriate expert testimony." *Tillman*, 96 F. Supp. 3d at 1326.

## VII.   This Court Should Exclude Dr. Lappert's Opinions in Their Entirety Because He Is Not Qualified to Opine on Any Relevant Topics.

Dr. Lappert's opinions on surgery are irrelevant and his limited surgical

expertise does not qualify him to opine on the issues of psychology, psychiatry,

and endocrinology involved in his opinions about the "continuum of care" and

"watchful waiting." *E.g.*, *Moore*, 995 F.3d at 857; *Lebron*, 772 F.3d at 1368-69. As

the *Kadel* court recognized, "Lappert is not qualified to render opinions about the

diagnosis of gender dysphoria, its possible causes, the efficacy of the DSM, the

efficacy of puberty blocking medication or hormone treatments, the appropriate

standard of informed consent for mental health professionals or endocrinologists,

or any opinion on the non-surgical treatments obtained by Plaintiffs." 620 F. Supp.

3d at 368; *see also Brandt*, 677 F. Supp. 3d at 914-15 (Dr. Lappert does not meet

the requirements under *Daubert* because of his lack of experience related to gender

dysphoria and was "testifying more from a religious doctrinal standpoint rather

than that required of experts by *Daubert*."). As previously discussed, issues related

to surgery are irrelevant given that Plaintiffs are not challenging S.B. 184's prohibition on surgical interventions.

Dr. Lappert's report addresses some non-surgical issues, including the notion of gender-affirming care as "a continuum of care" that starts with mental health and hormonal treatment before proceeding inexorably toward surgery, U.S. Ex. 16 ¶¶ 27-34, and the idea of "watchful waiting," as an appropriate alternative mental health treatment, *id.* ¶¶ 54-62. But Dr. Lappert is not a pediatrician, endocrinologist, psychologist, or psychiatrist, U.S. Ex. 17 at 9:18-20, 12:8-10, 14:10-15, and is therefore not qualified to opine on those aspects of care necessarily involved in his "continuum of care" and "watchful waiting" opinions. He does not treat patients for mental health conditions or gender dysphoria. *Id.* 16:1-7; 24:8-10. Indeed, he has never prescribed puberty-blockers or cross-sex hormones for the treatment of gender dysphoria, *id.* 29:17-22, or even performed any gender affirmation surgery. U.S. Ex. 16 ¶ 2. In fact, the only treatments Dr. Lappert claims to have provided to transgender individuals are laser hair removal and skin care. U.S. Ex. 17 at 24:15-21. Dr. Lappert's expertise in surgery does not qualify him to opine on any relevant issues, and the Court should exclude his testimony in its entirety.

## VIII. This Court Should Exclude Dr. Nangia's Opinions Regarding Non-Psychiatric Treatments for Gender Dysphoria, the Ability of Minors to Assent or Consent to Gender-Affirming Care, and the Private Plaintiffs' Medical Treatment.

Dr. Nangia, as a psychiatrist without relevant expertise in the treatment of gender dysphoria, is not qualified to offer expert testimony on non-psychiatric treatments for gender dysphoria. In addition, her opinions on Private Plaintiffs' medical treatments are not based on sufficient facts and data to be reliable because she never examined or spoke with the Private Plaintiffs.

### A. Dr. Nangia Is Not Qualified to Opine on the Medical Treatment of Gender Dysphoria, Including the Ability of Minors to Assent or Consent to Gender-Affirming Care Because She Lacks Experience in the Non-Psychiatric Aspects of the Treatment of Gender Dysphoria.

Dr. Nangia does not have the non-psychiatric medical expertise to qualify her to offer opinions about aspects of the treatment of gender dysphoria beyond her area of specialization and the ability of minors and their parents to consent or assent to such treatment. *E.g.*, *Moore*, 995 F.3d at 857; *Lebron*, 772 F.3d at 1368-69. Dr. Nangia has never published or presented on the topics of gender dysphoria, U.S. Ex. 19 at 38:14-23; patient assent, *id.* 73:19-74:1; or the topic of study quality, *id.* 131:15-132:8. She is not an expert in endocrinology*, id.* 40:14-16, and has never been involved in the development of clinical guidelines, *id.* 198:15-18. Nonetheless, she seeks to opine on these matters that are beyond her expertise. *E.g.*, U.S. Ex. 18 ¶¶ 38-45 ("Medical Interventions and Associated Risks"), 61-114

("Informed Consent"), 115-135 ("Gender Dysphoria and Informed Consent in
Minors"), 154-62 ("Informed Consent is Not Attainable for Medical or Surgical
Transition in Minors"), 163-70 ("A Better and More Compassionate Approach is
Provision of Therapy Until Adulthood When Consent Can be Provided"). For
example, she seeks to opine that "almost one hundred percent of those taking
puberty blockers go on to receive cross-sex hormones," which she asserts will
"render a patient infertile," and that this risk of puberty blockers as a gateway to
more intensive treatment therefore must be fully appreciated by patients and
parents to provide informed consent. *Id.* ¶ 133. But her expertise as a psychiatrist
does not qualify her to opine on cross-sex hormones, puberty blockers, or more
intensive surgical treatments and the Court should exclude such opinions.

### B. Dr. Nangia's Opinions About the Private Plaintiffs' Medical Treatment Are Not Based on Sufficient Facts and Data to Be Reliable.

Dr. Nangia's review of a limited set of medical records without any
examination of the Private Plaintiffs is not a sufficient basis for her to offer what
should be individualized and context-specific opinions about the Private Plaintiffs'
treatment. Dr. Nangia's supplemental report discusses the medical records of the
five Private Plaintiffs before offering child-specific opinions, U.S. Ex. 20 ¶¶ 10-13,
20, 28-31, 38-41, 47-50, and overall opinions applicable to each plaintiff. *Id.* ¶¶ 51-
55. But, as Dr. Nangia acknowledges, she has not "met the five individual
plaintiffs in this case, their parents, or any of the medical personnel involved in

their medical care" and reviewed only those records available to her. *Id.* at 1. Yet, for each Private Plaintiff she offers an opinion that the individual is not able to provide informed consent or assent to medical transition. *Id.* ¶¶ 13, 20, 31, 41, 50. These opinions are not the type of highly individualized opinions that would constitute reliable expert evidence. Even Dr. Nangia recognizes that the assessment of emotional and cognitive maturity necessary to assess an individual's capacity to consent "can only be performed by a mental health professional who has taken the appropriate time and steps to provide a full biopsychosocial diagnostic evaluation as well as adequate follow up." *Id.* ¶ 53. As such, the review of medical records alone is an insufficient basis for the opinions she offers. *See, e.g.*, *Cooper*, 259 F.3d at 203  (affirming district court's exclusion of physician's opinion formed without a physical examination or interviewing the patient); *Haller*, 598 F. Supp. 2d at 1294-95 (excluding physician's opinion based only on the review of medical records).

## IX.   Dr. Thompson, an Obstetrician Gynecologist with No Experience in Fertility Preservation for Individuals Receiving Gender-Affirming Care, Is Not Qualified to Opine on Hormonal Treatment or Other Medical Issues Beyond Her Area of Expertise.

Dr. Thompson is not qualified to opine on the effects of hormonal treatments on pediatric patients or the topic of fertility preservation for minors who receive gender-affirming care because she has no experience providing such treatment. *See, e.g.*, *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015)

(excluding opinions of pulmonologist who had not previously treated the specific condition involved in that case); *Harvey v. Novartis Pharmaceutical Corp.*, 894 F. Supp. 2d 1206, 1210-12 (N.D. Ala. 2012) (an "experienced maxillofacial surgeon" was not qualified to opine on the cause of a particular condition of the jaw when he has never researched the issue and his practice does not involve assessing the cause of that condition); *Lowery v. Sanofi-Aventis LLC*, No. 7:18-cv-376, 2021 WL 872620 at *7-8 (N.D. Ala. Mar. 9, 2021) (excluding opinion of orthopedic surgeon about potential orthopedic causes of injury to an individual's knee when he had never performed any orthopedic procedure on a patient's knee). Dr. Thompson's current practice is taking care of patients in an acute hospital setting, U.S. Ex. 23 at 12:11-14, and she has only treated two patients who identify as transgender in the context of pregnancy and birth, *id.* 16:20-17:3, 18:4-22, both of whom were pregnant at the time. *Id.* 20:4-7. She has no experience providing gender-affirming care, *id.* 9:17-19, and has never prescribed puberty blockers for an adolescent patient, *id.* 10:12-14. She has never published any articles or made any presentations about gender dysphoria or its treatment. *Id.* 27:4-32:6. Dr. Thompson has never attempted to preserve the fertility of a child in early puberty seeking gender-affirming care. *Id.* 10:15-18. Nevertheless, she attempts to opine on the effects of hormonal treatments on minors, U.S. Ex. 22 ¶¶ 59-87, and the topic of fertility preservation for minors who undergo gender-affirming care, *id.* ¶¶ 88-120,

despite her lack of relevant expertise. This Court should not permit her to opine on the effects of hormonal treatments on pediatric patients or the topic of fertility preservation for minors who receive gender-affirming care.

## <u>CONCLUSION</u>

For these reasons, the United States requests that the Court exclude the above-referenced opinions by Defendants' experts.

Dated: June 24, 2024                          Respectfully submitted,

JONATHAN S. ROSS                     KRISTEN CLARKE
Acting United States Attorney          Assistant Attorney General
Middle District of Alabama              Civil Rights Division

PRIM F. ESCALONA                        CHRISTINE STONEMAN
United States Attorney                      Chief, Federal Coordination and Compliance
Northern District of Alabama            Section

JASON R. CHEEK                            COTY MONTAG (DC Bar No. 498357)
Chief, Civil Division                         Deputy Chief, Federal Coordination and
                                                    Compliance Section
MARGARET L. MARSHALL
Assistant U.S. Attorney                    RENEE WILLIAMS (CA Bar No. 284855)
U.S. Attorney's Office                      KAITLIN TOYAMA (CA Bar No. 318993)
Northern District of Alabama           Trial Attorneys
1801 Fourth Avenue North             United States Department of Justice
Birmingham, AL 35203                   Civil Rights Division
Tel.: (205) 244-2104                       Federal Coordination and Compliance Section
Margaret.Marshall@usdoj.gov        950 Pennsylvania Avenue NW – 4CON
                                                    Washington, DC 20530
STEPHEN D. WADSWORTH           Tel.: (202) 305-2222
Assistant United States Attorney      Renee.Williams3@usdoj.gov
U.S. Attorney's Office                      Kaitlin.Toyama@usdoj.gov
Middle District of Alabama
Post Office Box 197                         */s/ James Fletcher*
Montgomery, AL 36101-0197        JAMES V. FLETCHER (MD Bar No.

Tel.: (334) 223-7280                    1412160273)

Stephen.Wadsworth@usdoj.gov             Trial Attorney

United States Department of Justice

Civil Rights Division

Disability Rights Section

950 Pennsylvania Avenue NW – 4CON

Washington, DC 20530

Tel. (202) 598-0083

James.Fletcher@usdoj.gov

*Attorneys for Plaintiff-Intervenor United States of America*

36

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to counsel of record.

Respectfully submitted,

*/s/ James Fletcher*
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice

37