# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Intervenor Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No. 2:22-cv-184-LCB |
| | ) |
| HON. STEVE MARSHALL, in his | ) |
| Official capacity as Attorney General, | ) |
| of the State of Alabama, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

## SUPPLEMENTAL EXPERT REPORT OF
## DR. FARR CURLIN, M.D.

# Table of Contents

I.     CREDENTIALS ................................................................................................... 1

II.    MATERIALS REVIEWED .................................................................................... 2

III.   QUESTIONS ADDRESSED................................................................................. 2

IV.    SUMMARY OF OPINIONS................................................................................. 3

V.     THE SCIENTIFIC CONTEXT RELEVANT TO ETHICAL ANALYSIS. ................................. 5

       A.    The hoped-for benefits from MGT are unproven................................. 5

       B.    The risks of harm from MGT are substantial and serious. ................. 7

       C.    The fact that a particular intervention is medically indicated for one condition in one
       population does not imply that it is medically or ethically defensible for a different condition
       in a different population................................................................................ 8

       D.    The fact that GD is listed as a disorder in the Diagnostic and Statistical Manual of Mental
       Disorders (DSM 5) does not imply that GD marks a disorder of the body that warrants MGT in
       minors. ..................................................................................................... 9

       E.    Statements by U.S. medical and advocacy organizations do not establish that MGT is
       medically necessary. ................................................................................ 10

       F.    If WPATH allowed the SOC 8 development process to be influenced by financial and
       other non-medical considerations, then WPATH's Standards of Care report is unreliable not
       only because it is contradicted by the evidentiary base, but also because it is the product of
       ethical misconduct. .................................................................................. 11

       G.    The problematic influence of fear and intimidation on the scientific discourse relating to
       responses to gender dysphoria. ............................................................. 12

VI.    APPLICATION OF PRINCIPLES OF MEDICAL ETHICS TO THE STATE OF SCIENTIFIC
KNOWLEDGE CONCERNING THE BENEFITS, HARMS, AND RISKS OF MGT. ................................. 13

       A.    The state of evidence does not support the conclusion that the ethical principle of
       equipoise forbids withholding MGT from minors, including in studies in which a control group
       does not receive MGT............................................................................... 13

       B.    An Institutional Review Board that approved the expanded clinical trial apparently
       advocated by the FDA would likely be violating its ethical obligations.................................... 15

       C.    Large and well-resourced medical systems have violated ethical principles by engaging in
       large-scale prescription of unproven therapies without undertaking well-designed research
       to evaluate safety and efficacy. ............................................................. 17

VII.   THE POSSIBILITY OF MEANINGFUL INFORMED CONSENT TO MGT FOR MINORS IS
DOUBTFUL................................................................................................................. 18

       A.    Doctors do not possess and are not providing information sufficient to enable children or
       parents to make "informed" decisions..................................................... 18

B.   It has not been shown that minors are able to comprehend and reasonably evaluate the risks and lifelong implications of MGT. ................................................................................... 18

C.   There is evidence that many minors who are subjected to MGT cannot meet the informed consent requirement of "voluntariness." ................................................................. 20

D.   The fact that MGT is *wanted* by minors and their parents is not sufficient to justify MGT, medically or ethically. ....................................................................................................... 21

E.   Parental consent cannot satisfy the doctor's ethical obligation to obtain informed, comprehending, voluntary consent. ..................................................................................... 22

Appendix A: Bibliography and Other Materials Considered ........................................................ 26

Appendix B: Curriculum Vitae of Dr. Farr Curlin, MD ................................................................ 29

I.      **CREDENTIALS**

1.      I am the Josiah C. Trent Professor of Medical Humanities in the Trent Center for Bioethics, Humanities, and History of Medicine, and Professor in the Department of Medicine, at Duke University. I am also Co-Director of the Theology, Medicine, and Culture Initiative at Duke Divinity School and Senior Fellow in Duke University's Kenan Institute for Ethics. Prior to joining the Duke University faculty in January 2014, I served on the faculty of the University of Chicago.

2.      I am licensed to practice medicine and maintain medical licensure in the State of North Carolina. I am an internist with board certification in Internal Medicine, as well as subspecialty board certification in Hospice and Palliative Medicine. From 2001 to 2013, I practiced general internal medicine, maintaining an outpatient primary care clinic from 2001 to 2008, and attending on the inpatient wards at the University of Chicago Hospitals from 2003 until I moved to Duke University at the end of 2013. Since January 2014, I have served as a palliative medicine consultant and hospice physician at Duke University.

3.      I completed a fellowship in clinical medical ethics at the University of Chicago, and I have served on the medical ethics faculties of the University of Chicago and Duke University for 19 years, providing clinical ethics consultations (at the University of Chicago), attending regular ethics case conferences, teaching medical ethics, and completing research studies and other scholarly work regarding medical ethics. In addition, I was named to the Greenwall Foundation Faculty Scholars Program in Bioethics, through which, over the subsequent decade, I met numerous times with a community of leading scholars in bioethics.

4.      My work on medical ethics has included peer-reviewed publications, invitations to lecture at universities nationwide and internationally, and being asked to speak as an expert before national advisory bodies. I have received awards in bioethics. My training, research, and experience give me familiarity with professional ethical norms regarding clinical medicine—their content, history, and application to clinical contexts, including the context of "gender affirmation." As reflected in my CV, I have published an academic book that addresses, and have given invited talks at a major medical school concerning, ethical issues surrounding transgender medicine.

5.      In addition, I completed a two-year postdoctoral fellowship in health services research at the University of Chicago, and I have spent a substantial portion of my time since then conducting and publishing empirical research, including research on physicians' attitudes and practices regarding controversial practices. This training and experience give me added expertise in interpreting and applying scientific data to clinical contexts. My credentials and experience are

documented in further detail in my curriculum vitae, which I attach as Appendix B to this Report.

6.     This report presents my independent, expert opinions based on my study, training, and experience as a physician, biomedical ethicist, and health services researcher; my review of relevant scholarly literature; and my discussions over the years with colleagues in medicine and bioethics. I do not speak herein for Duke University, nor is the affidavit intended to represent the opinions or policies of Duke University. I am being compensated for my time spent on this matter at a rate of $500 per hour, and $250 per hour for time spent on travel required to give testimony.

7.     My most recent curriculum vitae, which lists my publications and my testimony provided within the last four years, is provided as Appendix B to this Report.

## II.   MATERIALS REVIEWED

8.     As part of my preparation of this report, I have reviewed the materials listed in Appendix A to this Report.

## III.   QUESTIONS ADDRESSED

9.      Dr. McNamara has asserted that "no institutional review board would approve a research protocol on a randomized control trial in essential medical treatment for gender dysphoria because of the established science which demonstrates the efficacy of treatment with transitioning medications." (McNamara Report 20-21.) Similarly, Dr. Antommaria states that "For randomized trials to be ethical, clinical equipoise must exist; that is, there must be uncertainty about whether the efficacy of the intervention or the control is greater." He asserts that a randomized trial in which the control group does not receive puberty blockers or cross-sex hormones would be unethical. (Antommaria Report 15-16.)

10.     More recently, the Intervenor United States, through its agency the FDA, has issued a letter stating that it would be "reasonable" to include males down to age 13 in a clinical trial of cross-sex administration of estradiol as a medicalized gender transition ("MGT") treatment,[1] while suggesting that such a trial need not include a placebo control.[2] Meanwhile, the American Academy of Pediatrics (AAP), which has submitted an amicus brief in this case and which issued the 2018 "Policy Statement" which Plaintiffs and their experts have cited to this Court, recently

---

[1] In this report I use the term "medicalized gender affirmation" to refer to the use of puberty blockers and cross-sex hormones in patients experiencing gender dysphoria.
[2] https://www.statnews.com/2023/11/28/fda-gender-affirming-care-estrogen-approval/.

submitted a brief in another litigation addressing restrictions on MGT for minors in which the AAP asserted:

> '[I]n transgender clinical research individual randomized controlled trials (RCTs) may not always be feasible or ethically acceptable.' Sari L. Reisner et al., Advancing Methods for U.S. Transgender Health Research, 23(2) Curr. Opin. Endocrinal Diabetes Obes. 198, 199 (2016). With preexisting guidelines that recommend gender-affirming care for those with gender dysphoria, randomized controlled trials would violate the principle of equipoise, which safeguards the rights of individual trial participants. Richard J. Lilford & Jennifer Jackson, Equipoise and the Ethics of Randomization, 88 J. R. Soc. Med. 552, 552 (1995).[3]

11.   Plaintiffs will likely claim that this letter from the FDA and this statement from the AAP support their experts' contention that it is unethical to withhold medical transition from minors.

12.   I have been asked to give my expert opinion regarding whether withholding medicalized "gender affirmation" or "gender transition" treatments (MGT) from minors, whether to provide a control arm in a clinical experiment, or out of concern for potential harm to the patients, is consistent with the principle of equipoise in clinical research and other well-established principles of medical ethics.

## IV.   SUMMARY OF OPINIONS

13.   While I set out my opinions throughout this report, I summarize here key aspects of those opinions.

14.   I take as a premise, based on the science reviewed and the opinions offered by Drs. Cantor and Laidlaw, that the mental health benefits that are claimed to justify the administration of medicalized gender affirmation treatments to minors are currently unproven and disputed among informed observers. Position statements from professional associations cannot substitute for scientific evidence.

15.   I also take it as a premise, based on the science reviewed and the opinions offered by Drs. Cantor and Laidlaw, that the known or reasonably anticipated harms to children and adolescents from MGT treatments are substantial and serious, threatening sterilization, failure to develop healthy sexual

---

[3] Brief of Amicus Curiae American Academy of Pediatrics submitted to the Supreme Court in *Williams et al. v. Skrmetti* (No. 23-466) on Petition for a Writ of Certiorari, dated December 4, 2023, at 22 n. 72.

response, impaired neurological (brain) development, and multiple other harms to bodily health.

16.     There is not a consensus among medical professionals that MGT is beneficial or suitable for minors. This is amply supported by the published literature and the evaluations and position statements of a number of national health authorities of respected jurisdictions. Further, I know from my own experience and that of professional peers that both what is said and what is published in this field is severely distorted by what is sometimes referred to as a "cancel culture," with professionals fearing for their reputations and even their employment and livelihoods if they criticize or raise concerns about administration of MGT to minors, whether in scientific publications or in public discussion.

17.     It is not possible to conclude that it is known beyond "equipoise" that MGT is on the whole beneficial for minors who suffer from gender dysphoria. Therefore, the ethical principle of equipoise does not prohibit including control groups that receive only psychological counseling but not MGT in studies to evaluate the benefits and harms of MGT. Nor is there a basis to assert that it is unethical to withhold MGT from minors in a clinical setting *outside* the context of formal clinical experimentation.

18.     On the contrary, for multiple reasons there is a serious question whether it is allowable, under accepted principles of medical ethics, to administer MGT to minors. Based on the descriptions of the available science provided by Dr. Cantor, Dr. Laidlaw, and position statements from national health authorities, it appears that animal studies that could give meaningful information about potential harms of MGT (including sterilization, brain development, bone development, and cardiovascular health) have not yet been done; that well-designed studies to evaluate both harms and efficacy have not been conducted; and that plans for careful long-term monitoring and management of reasonably anticipated risks of such disruptions of natural hormone levels and bodily maturation and function have not been identified and followed.

19.     Further, it is not at all clear that meaningful informed consent for administration of MGT to minors can be obtained. There are strong reasons to doubt that minors can adequately appreciate and appropriately weigh the lifetime implications of sterilization, loss of sexual response, impaired neural development, and the other potential health and relational impacts identified in the literature, nor is it apparent that doctors possess (much less consistently disclose) adequate scientific information about these risks to enable anyone to make meaningfully informed decisions. Nor do ethical principles give parents unfettered power to provide effective consent on behalf of their children for medical interventions that pose such severe risks of irreversible harm to the bodily health of the child (including sterilization) in the absence of a countervailing and imminent threat of

bodily harm from a medical condition to be treated. No such imminent threat exists in the case of minors who experience gender dysphoria.

## V.     THE SCIENTIFIC CONTEXT RELEVANT TO ETHICAL ANALYSIS.

### A.     <u>The hoped-for benefits from MGT are unproven.</u>

20.     I have read the descriptions of the state of knowledge provided in the expert reports submitted by Drs. Cantor and Laidlaw. I have been asked to and do assume that the descriptions of the articles and studies that they provide are accurate for purposes of forming my opinions provided in this case. On that basis, it is evident that multiple respected health authorities and sources have recently opined that the safety and efficacy of hormonal interventions to treat gender dysphoria in minors remain uncertain and unproven. While I rely on Dr. Cantor's and Dr. Laidlaw's descriptions of the scientific literature, I have myself also reviewed the illustrative examples that I summarize below.

21.     An extensive review commissioned by England's National Health Service and chaired by eminent pediatrician Dr. Hilary Cass concluded that there has been "very limited research on the sexual, cognitive, or broader developmental outcomes" from the use of puberty blockers for gender dysphoria (Cass 2022 at 19), that it is an unanswered question "whether the evidence for the use and safety of [puberty blockers] is strong enough as judged by reasonable clinical standards" (Cass 2022 at 37), and that "the available evidence was not strong enough to form the basis of a policy position" with regard to use of both puberty blockers and cross-sex hormones in minors (Cass 2022 at 35).

22.     Systematic reviews of the safety and efficacy of puberty blockers and cross-sex hormones as treatment for gender dysphoria in minors have been conducted by the England National Institute for Health & Care Excellence (NICE). These reviews concluded that available clinical evidence of efficacy and safety in the relevant population is uniformly of "very low quality." (Cantor ¶¶ 79-84.) "Very low quality" within the GRADE system of evaluation of medical information means: "We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of effect." (GRADE Handbook at 13 (Section 5).)

23.     In 2022, the Swedish National Board of Health commissioned its own systematic review and concluded that "the evidence on treatment efficacy and safety is still insufficient and inconclusive for all reported outcomes," and that "[f]or adolescents with gender incongruence, the . . . risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." (Cantor ¶¶ 28, 86; Swedish Socialstyrelsen Support 2022 at 10-12.)

24.     In 2022, Norway's Healthcare Investigation Board (Ukom) concluded that "The knowledge base, especially research-based knowledge for gender-affirming treatment (hormonal and surgical), is insufficient and the long-term effects are little known" and that "This applies particularly to the teenage population." (Cantor ¶ 30-31; Ukom 2023, Summary and Section 7.)

25.     In 2020, the Finnish Council for Choices in Health Care in Finland concluded that medical transition of minors "is an experimental practice." (Cantor ¶ 169, quoting COHERE Recommendation (2020) translation.) Dr. Riittakerttu Kaltiala, Chief Psychiatrist in the Department of Adolescent Psychiatry at Finland's Tampere University Hospital, has recently stated that young people who received MGT were "deteriorating" rather than "thriving," that her clinic has observed gender dysphoria spreading like a "social contagion" among teenage girls, and that increasing numbers of patients have begun returning to their clinic saying that they now regret their transition. (Kaltiala 2023b [Free Press Interview].)

26.     Even the WPATH organization, which strongly advocates for medical transition of minors, repeatedly acknowledges the absence of vital science in its recently released and self-designated "Standard of Care" version 8 (SOC 8). The SOC 8 notes that a 2014 Dutch study "is the only study that followed youth from early adolescence... through young adulthood" (SOC 8 at S46) and "It is not clear if deviations from [the age and mental and social health screening requirements of the Dutch study approach] would lead to the same or different outcomes" (at S65). It also acknowledges that, "Despite the slowly growing body of evidence supporting the effectiveness of early medical intervention, the number of studies is still low, and there are few outcome studies that follow youth into adulthood." It adds, "A key challenge in adolescent transgender care is the quality of evidence evaluating the effectiveness of medically necessary gender-affirming medical and surgical treatments." (at S45-46.)

27.     Studies summarized by Drs. Cantor and Laidlaw likewise document serious uncertainty about the efficacy and safety of MGT as a treatment for gender dysphoria. (Cantor ¶¶ 148-154, 178-201; Laidlaw ¶¶ 90-175.)

28.     For example, a study from the Tavistock and Portman clinic in the UK found, "Relative to the time point before beginning puberty suppression, there were no significant changes in any psychological measure, from either the patients' or their parents' perspective." (Cantor ¶ 186.)

29.     Multiple other studies have found persistently high suicide rates after MGT. (Cantor ¶ 149.) A cohort study of minors by Kuper et al. found that suicidal ideation, suicidal attempts, and non-suicidal self-injury all went up after starting MGT (Cantor ¶ 1521), and, "No studies have documented any reduction in suicide rates in minors (or any population) as a result of medical transition" (Cantor ¶ 148), a fact acknowledged by WPATH (Cantor ¶ 150).

30.     I also reviewed two large and very recent studies discussed in Dr. Cantor's supplemental report dated February 2, 2024. The first (Glintborg 2023) examined the medical records of all individuals in Denmark diagnosed with gender dysphoria or gender incongruence from 2000 through 2021 (3812 patients, among whom 2089 underwent MGT). That study found that prescriptions of psychoactive medications increased rather than decreased after the start of MGT and remained elevated across multiple years. (Glintborg 2023 at. 341.) It also found that measures of negative mental health, compared against controls, "were stable after initiation of gender-affirming hormone treatment, without sign of decrease after date for first prescription of gender-affirming hormone." (at 342:2.) That is, the mental health of the patients who received MGT did not improve on average.

31.     The second study (Kaltiala 2023) examined the medical records of persons who had contacted the national gender identity service of Finland between 1996 and 2019 (3665 persons) and compared them to age and sex-matched controls. That study found that the need for psychiatric treatment did not go down after MGT interventions. (Kaltiala 2023 at 2:1.) The authors referenced similar findings from an earlier study and noted, "Their findings and ours do not suggest that medical GR interventions resolve psychiatric morbidity among people experiencing gender distress." (at 6:1.)

32.     Finally, I have reviewed the expert reports of Drs. McNamara, Antommaria, and Ladinsky and note that none of those reports cite any study that has found that medical transition reduced suicides in any population.

33.     All of this contradicts the plaintiffs' claim that MGT is medically necessary, since an intervention cannot be said to be medically necessary if the benefits of the intervention are unproven, or indeed are cast into serious doubt by the most recent large-scale studies.

**B.     <u>The risks of harm from MGT are substantial and serious.</u>**

34.     While the benefits of MGT for minors are at best unproven, the evidence summarized by Drs. Cantor and Laidlaw also indicates that MGT in minors poses risk of objective, often irreversible, harms to health, while also requiring life-long dependence on medical interventions.[4]

---

[4] McNamara writes, "The overwhelming majority of adolescents who receive transitioning medications continue to do so as adults." (McNamara at 23.)

35.     Risks of harm recognized in the literature include:

    a.  Sterilization (Cantor ¶¶ 206-207; Laidlaw ¶¶ 90-98, 157-159);

    b.  Lifetime lack of orgasm and sexual function (Cantor ¶ 208)—an adverse effect acknowledged by Marci Bowers, current president of WPATH (Cantor ¶ 209; Laidlaw ¶¶ 99-100);

    c.  Potential adverse effects on neurological and cognitive development (Cass Review Letter 2022 at 6; Cantor ¶¶ 210-214);

    d.  Reduced bone development, especially in male to female transition (Cantor ¶¶ 217 – 220; Laidlaw ¶¶ 101-112), the long-term effects of which have not been studied;

    e.  Harm to psychosocial development (Laidlaw ¶¶ 114-117); and

    f.  "Increased cardiovascular risk, osteoporosis, and hormone dependent cancers." (Cass 2022 at 36; Cantor ¶ 224; Laidlaw ¶¶ 126-129.)

36.     The leading Swedish pediatric gender clinic, following a systematic review of the available scientific evidence commissioned by Sweden's National Board of Health, concluded that hormonal interventions in minors are "fraught with extensive and irreversible adverse consequences such as cardiovascular disease, osteoporosis, infertility, increased cancer risk, and thrombosis," and that "In light of the above, and based on the precautionary principle, which should always be applied, it has been decided that hormonal treatments (i.e., puberty blocking and cross-sex hormones) will not be initiated in gender dysphoric patients under the age of 16." (Karolinska 2021, cited in Cantor ¶ 27.)

**C.     The fact that a particular intervention is medically indicated for one condition in one population does not imply that it is medically or ethically defensible for a different condition in a different population.**

37.     The plaintiffs' experts have suggested that because the drugs used in MGT have been used to treat conditions such as precocious puberty and complete androgen insensitivity syndrome, it is unjust to prevent their use in minors with GD. But the plaintiffs' experts are comparing apples and oranges.

38.     While treatments for precocious puberty and complete androgen insensitivity syndrome aim to preserve and restore healthy development of secondary sex characteristics, MGT intentionally blocks healthy development of those characteristics. As Dr. Cantor notes, the former aim "to bring the patient within healthy norms", while the latter "is applied precisely to take the patient outside of healthy norms." (Cantor ¶ 276.) Similarly, while the Court noted that

"Doctors have also long used hormone therapies for patients whose natural hormone levels are below normal" (Opinion and Order dated 05/13/22, at 18), MGT contradicts this medical pattern; rather than correcting hormone levels that are abnormal, it induces hormone levels that are abnormal.

39.    Dr. McNamara asserts that MGT in minors is safe, because puberty blockers have long been prescribed "in adolescents with cancer who need menstrual suppression as they undergo marrow-ablative chemotherapy." (McNamara at 13.) But as Dr. McNamara concedes, "puberty blockers are used in these patients to protect their gonads from toxicity induced by chemotherapy as a means of fertility preservation", whereas, by contrast, MGT directly hinders and suppresses healthy gonadal development and function, harming fertility. In one case, the drugs have medicinal effects; in the case of MGT, the drugs have toxic effects. As a result, the ethical analysis is entirely different and opposite.

### D.    The fact that GD is listed as a disorder in the Diagnostic and Statistical Manual of Mental Disorders (DSM 5) does not imply that GD marks a disorder of the body that warrants MGT in minors.

40.    McNamara notes that the DSM 5 identifies GD as a disorder. (McNamara at 15.) But the DSM is a manual specifically of what it terms "*mental* disorders" created by the American Psychiatric Association; it does not identify or provide diagnostic criteria for medical illnesses. The Plaintiffs have not identified any other "mental disorder" for which the indicated treatment is to block or damage the development of healthy organs and functions. On the contrary, MGT in minors contradicts ordinary medical standards with respect to disorders of perception. The person suffering GD perceives their objectively healthy secondary sex characteristics as not compatible with their mental self-perception and therefore needing to be suppressed. MGT problematically takes the minor's mental perception as sufficient reason to treat healthy anatomy and physiology as if it were diseased, thereby contradicting medicine's ordinary regard for the healthy body as its standard. To my knowledge, in no other case do we treat a disordered perception by treating normal physiology and anatomy as diseased. We do not, for example, prescribe hand soap to children who, because of obsessive compulsive disorder, misperceive their hands as needing to be washed repeatedly. We do not lock children indoors who, because of agoraphobia, fear going outside. We do not encourage fasting in patients with anorexia nervosa.

41.    Indeed, there is one historical precedent where doctors have removed or damaged healthy tissue attempting to treat mental disorders—that is, performing lobotomies on patients who suffered from mental illnesses, including schizophrenia, depression, melancholy, and obsessive-compulsive disorder. As with MGT, "The treatment was introduced … despite the fact that little research had been carried out on its effects." (Torkildsen 2022.) As with MGT, in the absence of adequate scientific data, many people "were convinced that lobotomy reduced

suffering." As with MGT, "those who promoted the method, were driven by idealism and a strongly held belief that their treatment alleviated suffering," and they "gave overwhelmingly positive reviews of the efficacy of the treatment, while grossly under-communicating its adverse effects." Lobotomy has come to be seen "as one of the greatest mistakes in modern medicine" (Torkildsen 2022)—a prominent example of a collective scientific and ethical misstep by the medical profession that harmed many patients. In my opinion, MGT is likely to be judged the same, not least because it treats a disorder of perception as if it were a disorder of the body, harming the healthy body in efforts to reduce mental suffering.

### E.     Statements by U.S. medical and advocacy organizations do not establish that MGT is medically necessary.

42.     As already summarized above, ample objective evidence demonstrates dissensus regarding MGT across the community of experts and clinicians. Indeed, the health authorities and independent bodies that have systematically reviewed the scientific evidence regarding MGT in minors have concluded that evidence is insufficient to justify the conclusion that MGT improves even mental health outcomes. Indeed, the recent large studies from Denmark and Finland have found that mental and behavioral disorders do not decrease after MGT. (Glintborg 2023 at 341, Kaltiala 2023 at 1.)

43.     In contrast to these reviews of evidence, "The Endocrine Society guidelines do not rely on any systematic review of evidence of efficacy of any form of treatment for gender dysphoria." (Cantor ¶ 256.) The AAP's 2018 policy statement, "unique among the major medical associations in being the only one to endorse an affirmation-on-demand policy" (Cantor ¶ 257), was authored by one physician and likewise was not based on a systematic review of available evidence. The policy statement cited no new evidence to justify offering MGT rather than therapy and watchful waiting, and the statement is contradicted by the very reports it cited. (Cantor ¶ 257.) Meanwhile, "the systematic review on which WPATH based its standards for minors included exactly one study on puberty blockers and three studies on cross-sex hormones. All other references represent cherry-picked citations of studies rejected by its own systematic process. Moreover, even among the four studies in WPATH's review, three were rejected by the Swedish review, due to the low quality of the science they contained." (Cantor ¶ 250.) WPATH likewise cited no reference or rationale to justify removing minimum age restrictions for MGT.

**F.**   **If WPATH allowed the SOC 8 development process to be influenced by financial and other non-medical considerations, then WPATH's Standards of Care report is unreliable not only because it is contradicted by the evidentiary base, but also because it is the product of ethical misconduct.**

44.     My own review of SOC 8 indicates WPATH has problematically minimized the doctor's responsibility to exercise independent judgment and fiduciary responsibility to guide patient care for minors. In addition, Cantor and Laidlaw conclude that the WPATH committee members who participated in creating SOC 8 were subject to direct financial conflicts of interest as the guidelines would likely impact their own income (more procedures permitted, and increased insurance coverage, and their liability risk. (Laidlaw ¶ 187; Cantor Supp. ¶ 102-115, 119.) Insofar as these descriptions are accurate, then WPATH ignored significant conflicts of interest and violated accepted principles of medical ethics.

45.     Beauchamp and Childress note:

> A conflict of interest exists when an impartial observer would determine that a professional's judgments, decisions, or actions are at risk of being unduly influenced by his or her personal interests, such as financial interests … The risk is that the professional's personal interests will create temptations, biases, and the like that will lead to a breach of role responsibilities through judgments, decisions, and actions other than those reasonably expected in the role. The reasonable expectation is that clinicians will seek the patient's welfare and respect his or her rights, that researchers will pursue objective and valid results, and so forth. A conflict of interest poses a risk that the professional in question will compromise these expectations and thereby damage patients' interests and rights, distort research, or teach trainees in a biased way. (Beauchamp and Childress at 328.)

46.     As this explanation makes plain, it is beyond dispute that clinicians who practice (and are paid for) MGT have a conflict of interest in assessing whether MGT is supported by the evidence. It is problematic that this conflict of interest was neither mentioned in the SOC 8 report nor managed by including outside experts and perspectives in the standard-writing process. Insofar as changes in the recommendations were motivated not by dispassionate assessment of the data but by concern to protect clinicians' financial interests or professional reputations, or to further political or litigation agendas, that clearly "damage[s] patients' interests and rights, distort[s] research" and promulgates standards "in a biased way." All of this contradicts professional ethical norms and undermines trust in the medical profession. As Beauchamp and Childress also write, "Health care professions specify and enforce obligations for their members, thereby seeking to ensure that persons

who enter into relationships with these professionals will find them competent and trustworthy." (Beauchamp and Childress at 7.)  If WPATH permitted its standard-development process to be dominated by individuals with a direct financial interest in providing the services covered by that document, without disclosing those conflicts of interest, then WPATH is neither competent nor trustworthy regarding its evaluations or advocacy of MGT.

### G. The problematic influence of fear and intimidation on the scientific discourse relating to responses to gender dysphoria.

47.     When confronted with claims of "medical consensus," the Court needs to be aware that social pressure and fear of censure within the United States medical and academic communities is affecting both what is published about MGT and the willingness of doctors to voice concerns about MGT.

48.     Reuters recently published an investigative report documenting both growing concerns among physicians about MGT as well as intense backlash that clinicians, experts, and patients themselves have received when they voice such concerns. (Respaut 2022.)

49.     I know from personal conversations with many medical ethicists and practitioners that doctors are afraid to speak up for fear of both social and employment repercussions, a problem also described by colleagues in Europe (Cass 28, Kaltiala 2023b).[5] I recently participated in a meeting of the Greenwall Faculty Scholars Program in Bioethics, which brings together a community of leading bioethicists nationwide. The meeting included a closed-door session titled, "Hot Topic: Bioethics Dilemmas in the Care of Transgender Minors." In that session, several colleagues voiced concerns, including a number of the ethical concerns I have raised in this report. Colleagues also expressed reservations about raising these concerns in public, for fear of being treated as a bigot or someone who is insensitive to the needs of people experiencing GD. This pattern reflects what the Cass report also reported in the UK, that clinicians there "are afraid of the consequences of ['taking a mental health approach to formulating a differential diagnosis'] in relation to gender distress because of the pressure to take a purely affirmative approach." (Cass 48.)

50.     In December 2023 I participated in a meeting of the faculty of Duke University's Trent Center for Bioethics, Humanities & History of Medicine focused on this topic. In that meeting several faculty members voiced similar concerns about MGT and similar fears about speaking up. In November 2023 I gave an invited

---

[5] Kaltiala writes: "… health providers were failing to speak up. I understood this silence. Anyone, including physicians, researchers, academics, and writers, who raised concerns about the growing power of gender activists, and about the effects of medically transitioning young people, were subjected to organized campaigns of vilification and threats to their careers." (Kaltiala 2023b.)

lecture on this topic at the University of Chicago's MacLean Center for Clinical Medical Ethics, and there more than one colleague told me that they feared speaking up about their concerns regarding MGT, and that they had observed that other colleagues at the University, when they learned of the topic, had sought to have me disinvited prior to the lecture. After the lecture an undergraduate student waited until everyone who wanted to talk to me had left, and then came up and quietly thanked me for speaking up about the ethical problems with MGT for minors. She said that she had been on the pathway to MGT a few years before, but as she had gone through puberty she slowly had come to grips with being a woman and now calls herself a desister.

51.     Both medical students and faculty at Duke University, where I am employed, have told me that they fear voicing concerns about MGT, and I probably would not have felt able to voice my own concerns were I not tenured. Having voiced my concerns, I was cancelled from giving a talk on an unrelated topic at Michigan State University spring of 2022, because students alleged that they would not feel safe listening to me lecture on that topic due to the concerns I had expressed elsewhere about MGT. I have found resistance to hosting public dialogue and debate about the topic even among colleagues that agree that MGT is ethically problematic. All of this makes evident that fear is muzzling open expression of widespread and growing dissent within the medical community regarding MGT.

## VI.    APPLICATION OF PRINCIPLES OF MEDICAL ETHICS TO THE STATE OF SCIENTIFIC KNOWLEDGE CONCERNING THE BENEFITS, HARMS, AND RISKS OF MGT.

### A.    The state of evidence does not support the conclusion that the ethical principle of equipoise forbids withholding MGT from minors, including in studies in which a control group does not receive MGT.

52.     Benjamin Freedman, the bioethicist who first promoted the concept of equipoise in clinical research, has written, "The ethics of clinical research requires equipoise — a state of genuine uncertainty on the part of the clinical investigator regarding the comparative therapeutic merits of each arm in a trial." (Freedman 1987.) In their respected textbook, *Principles of Biomedical Ethics*, Beauchamp and Childress note that "[t]he community of reasonable physicians is … in a state of 'clinical equipoise'" when "No one knows, prior to conducting the research, whether it is more advantageous to be in the control group or in the experimental group … No patient, then, will receive something known to be less effective or to have a higher risk than an available alternative." (Beauchamp and Childress 2012 at 335.) Notably, clinical equipoise depends on both foreseen benefits and foreseen harms.

53.     To conclude that the principle of equipoise <u>forbids</u> an "untreated" "active control" arm in a clinical study of MGT, one would have to conclude that it is known as a matter of medical science that MGT brings about benefits that outweigh known or foreseeable but unstudied harms, and that those benefits cannot be

achieved by some other "established effective intervention" which could be included in the "active control." (Beauchamp and Childress at 336.) In the case of GD, such an active control (also called the "active comparator" (Cantor ¶ 265)) could include any customary psychotherapeutic interventions. Since large studies find that MGT does not lead to improved mental health outcomes, it is incorrect to assert that *not* offering MGT is contradicted by the principle of equipoise.

54.   Importantly—and contrary to what Dr. Antommaria suggests (Antommaria at 10)—whether clinical equipoise exists is not determined by what any one clinician or group of clinicians or investigators believes. Nor, contrary to the American Academy of Pediatrics, can the physician's ethical obligation to determine the existence (or absence) of clinical equipoise based on the available science be obviated by "preexisting guidelines that recommend gender-affirming care." (AAP amicus brief, *Williams v. Skrmetti*, supra n. 3.) Rather, clinical equipoise exists when, "[o]n the basis of the available evidence" (Beauchamp and Childress at 335), "there is genuine uncertainty within the expert medical community—not necessarily on the part of the individual investigator—about the preferred treatment" (Freedman 1987). As the above summaries make clear, the community of reasonable clinicians, as well as the international community of relevant experts, is at best genuinely uncertain about whether MGT is to be preferred to standard psychotherapeutic treatment without MGT. This is confirmed by the fact that multiple international bodies of experts have described MGT as "experimental." (Cantor ¶ 168-172.)[6]

55.   Plaintiffs' assertions that it would be unethical to do clinical research with an arm that does not receive MGT are thus unsupported. I see assertions but no science cited by Plaintiffs' experts that should cause an Institutional Review Board (IRB) to reject a clinical trial in which the active control does not include MGT. IRBs do not defer to clinicians' judgment about equipoise, much less to those who are most enthusiastic about some intervention. When IRBs are fulfilling their role, they require clinicians and researchers to show sufficient evidence to justify their beliefs.

56.   Moreover, that such studies can be ethical is evidenced by the fact that multiple countries, including the United Kingdom, have now announced policy changes to provide MGT only as part of formal research protocols. (Cantor ¶¶ 168, 170, 266.) Even pioneers of MGT have called for such research, with Dr. de Vries writing recently that "rigorous longitudinal outcomes studies that provide evidence about whether this approach [MGT in minors] is effective and safe are needed" and

---

[6] See also a 2023 article published in one of the world's most prestigious medical journals, the *British Journal of Medicine*, that was entitled, "Gender dysphoria in young people is rising and so is professional disagreement." (Block 2023.)

that "Future studies that *compare outcomes with different care models are needed.*" (de Vries 2023 at 276; cited Cantor ¶ 283 (italics added).)

57.     Thus, even if a trial cannot be randomized or blinded as a practical matter, the principles of medical ethics do not preclude a carefully constructed trial that includes an arm comprised of patients with GD who undergo psychotherapeutic care but do not undergo hormonal intervention.

### B.     An Institutional Review Board that approved the expanded clinical trial apparently advocated by the FDA would likely be violating its ethical obligations.

58.     As I have summarized above, multiple international reviews of the available evidence have concluded that MGT has not been shown to improve mental health outcomes. Without reliable evidence of better mental health outcomes than achieved by psychotherapy alone, the known or reasonably foreseeable harms of MGT cannot be reasonably accepted. That is to say, the condition of equipoise not only does not forbid *withholding* MGT, it likely forbids *offering* MGT until and unless appropriately conducted research generates evidence that MGT is likely to generate health benefits that are at least proportionate to its known harms. Based on the reviews of the published evidence provided by Drs. Cantor and Laidlaw, such reliable evidence is lacking at present.

59.     A clinical trial of MGT on minors would likely violate other accepted principles of medical ethics as well.

60.     The Nuremberg Code, adopted after World War II in response to the human experimentation performed by medical doctors under the Nazi regime, is one of the foundational and internationally accepted statements of key principles of medical ethics pertaining to experimentation on humans. Paragraph 3 of the Nuremberg Code states:

> "The experiment should be so designed and <u>based on the results of animal experimentation</u> and a knowledge of the natural history of the disease or other problem under study, that the anticipated results will justify the performance of the experiment."

61.     One point of this principle is that if a proposed treatment poses potential risks that could be explored through experiments on animals, then those animal experiments should be done before the treatment is tested on humans.

62.     Animal experiments would be possible with respect to many widely recognized risks of puberty blockers and cross-sex hormones. For example, Chen (2020) validates the ability to do useful animal studies of effects of hormones on brain development, writing, "studies in rodents show ovarian hormones, acting during puberty, program cognitive flexibility by exerting long-lasting effects on

excitatory-inhibitory balance in the pre-frontal cortex . . . [and] testosterone, acting during puberty, programs the ability to adapt behavior as a function of social experience." (Chen 2020 at 253:2a.) Animal studies might also help to clarify whether and under what conditions MGT-induced sterilization is reversible; whether suppressed bone development leads to later fractures or other complications; and how MGT impacts cardiovascular health over time. To my knowledge, such studies have not been undertaken. A responsible IRB recalling the Nuremberg Code would want to know what animal studies were feasible, which had been done, and (if true) why feasible studies had not been done, before approving clinical trials of MGT on humans.

63.    Another universally respected statement of principles of medical ethics is the Declaration of Helsinki, first adopted by the World Medical Association in 1964, and periodically updated since then. Paragraphs 17 and 18 of the Helsinki Declaration state that it is unethical to undertake any human experiments without first conducting a "careful assessment of predictable risks" and reaching a well-grounded conclusion that all of those risks "can be satisfactorily managed." (Helsinki Declaration ¶¶ 17, 18.)

64.    A trial that subjects adolescents to MGT does not meet these standards insofar as the available science does not enable a conclusion that "predictable risks" of MGT in adolescents—including sterilization, negative impact on neurodevelopment, and negative impact on bone and cardiovascular strength—can be "satisfactorily managed."

65.    A third respected statement of principles of medical ethics is the Belmont Report, published in 1979 by the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, authorized by the National Research Act of 1974. The Belmont Report states that prior to administration of experimental treatments to humans:

> "there should first be a determination of the validity of the presuppositions of the research; then the nature, probability and magnitude of risk should be distinguished with as much clarity as possible. … It should also be determined whether an investigator's estimates of the probability of harm or benefits are reasonable, as judged by known facts or other available studies."

> "When research involves significant risk of serious impairment, review committees should be extraordinarily insistent on the justification of the risk (looking usually to the likelihood of benefit to the subject . . . .)" (Belmont Report § C.2.)

66.     There can be no doubt that the known or potential harms of MGT discussed in the literature by knowledgeable observers—including sterilization, impairment of brain development, permanent deprivation of sexual response, and impaired bone development—constitute "risk of serious impairment." Further, the known facts and available studies as reviewed by Drs. Cantor and Laidlaw indicate that assertions that the benefits of MGT outweigh the potential harms are not empirically justified given the existing scientific record.

67.     In my opinion, the plaintiffs have not met the bar of justifying the risk associated with MGT insofar as: the evidence to date does not support the claim that MGT brings mental health benefits; animal studies relevant to safety that can be done have not been done; there has not been "careful assessment of predictable risks," and no plan for how all the known risks "can be satisfactorily managed" has been identified.

### C.     Large and well-resourced medical systems have violated ethical principles by engaging in large-scale prescription of unproven therapies without undertaking well-designed research to evaluate safety and efficacy.

68.     As the Helsinki Declaration states, a physician, in certain circumstances, may reasonably use an unproven intervention in the treatment of an individual patient, but "This intervention should subsequently be made the object of research, designed to evaluate its safety and efficacy. In all cases, new information must be recorded and, where appropriate, made publicly available." (Helsinki Declaration ¶ 37.) The Belmont Report likewise states, "in order to determine whether ['radically new procedures'] are safe and effective it is the responsibility of medical practices committees . . . to insist that a major innovation be incorporated into a formal research project at an early stage." (Belmont Report Part A.)

69.     It follows that well-resourced academic medical centers with affiliated clinics where unproven MGT interventions are being clinically deployed bear a responsibility under these respected codes of medical ethics to sponsor research capable of investigating the harms and benefits of those interventions. Of course, such research must itself satisfy ethical principles. For example, thorough animal experimentation might be the only ethically justified experimentation given the present state of knowledge. (See above.) At the very least, academic medical centers are obligated to undertake long-term follow-up—into adulthood—of minors undergoing these unproven and "radically new" interventions. This they have not done (or at least, have not yet published), as evidenced by numerous systematic reviews concluding that there is very little evidence regarding the long-term effects of these interventions, and the evidence that exists is of very low quality.

**VII.     THE POSSIBILITY OF MEANINGFUL INFORMED CONSENT TO MGT FOR MINORS IS DOUBTFUL.**

70.     The Belmont Report further states that respect for persons requires that research can only be conducted ethically if the subjects have given *informed consent*. In 1982, soon after the Belmont Report was published, the principle of informed consent was applied to clinical medicine in another landmark government report, *Making Health Care Decisions*. Since then, the principle and practice of informed consent has been uniformly established across the domains both of clinical research and clinical medicine. Beauchamp and Childress write, "Virtually all prominent medical and research codes and institutional rules of ethics now hold that physicians and investigators must obtain the informed consent of patients and subjects prior to a substantial intervention." (Health Care Decisions at 121.) The Belmont Report notes "widespread agreement" that informed consent requires the presence of sufficient "information, comprehension and voluntariness." (Belmont Report § C:1.) In my opinion, minors cannot give duly informed consent to MGT, because it is doubtful that any of these three conditions of informed consent can be met.

**A.     Doctors do not possess and are not providing information sufficient to enable children or parents to make "informed" decisions.**

71.     The absence of well-designed and controlled studies makes it impossible to give minors and their parents information sufficient to consider their consent duly informed, and the plaintiffs' experts by their own admission are misinforming patients regarding that fact. "*Caveat emptor*" does not meet the bar required for consent to be duly informed within clinical medicine and clinical research. It is not enough to say "we don't know" without doing the careful, incremental research to generate information needed for a consent to be duly informed. Moreover, by their own admission the plaintiffs' experts do not disclose to minor patients and their parents that the evidence base does not support their claims of benefit from MGT. As such, by their own admission, they are misinforming minors and their parents who are considering MGT, and therefore contradicting the first condition on which informed consent depends.

**B.     It has not been shown that minors are able to comprehend and reasonably evaluate the risks and lifelong implications of MGT.**

72.     It is doubtful that minors have the intellectual maturity to sufficiently *comprehend* the decision to undergo MGT and the potentially life-long consequences that decision will bring.

73.     It is well recognized that the ability to evaluate and balance risk and reward, to consider long-term as well as short-term implications, and to make prudent and well-considered decisions is not well developed in children and

adolescents. WPATH's recently published SOC 8 acknowledges problems with minors' immature capacity for judgment, noting, "adolescence is . . . often associated with increased risk-taking behaviors" (SOC 8 at S44), and "Adolescents often experience a sense of urgency that stems from hypersensitivity to reward, and their sense of timing has been shown to be different from that of older individuals" (SOC 8 at S44). Beauchamp and Childress likewise note that immaturity hinders adequate understanding. (Beauchamp and Childress 2012 at 131.) For this reason among others, with few exceptions minors are *not* considered capable of granting informed consent to medical interventions. (Katz 2016 at e1, e9.)

74.    Minors seem particularly incapable of comprehending the long-term implications of MGT, insofar as those implications involve relationships and experiences that come only with adulthood. As I have noted above, MGT brings lifetime physical and social implications including risks of impaired brain development, sterilization, and loss of sexual response. These risks cannot be adequately comprehended by children insofar as these risks relate specifically to aspects of human life that go with being an adult and are outside the life experience of children.

75.    Moreover, one form of MGT—puberty blockers—*by design* blocks the mental, physical, and emotional maturation of puberty which may be essential for a child to come in time to comprehend decisions of this magnitude. (Cantor ¶ 214.) Dr. Cantor notes that "Blocking puberty blocks the awareness of sexuality and sexual orientation that can play an important role in the individual's understanding of gender identity" (Cantor ¶ 234), and "for all children, blocking puberty necessarily blocks the onset of adult sexual interest, sexual arousal, and sexual response which are part of 'the usual process of sexual orientation and gender identity development'" (Cantor ¶ 235, quoting Cass 2022 at 38).

76.    In connection with the comprehensive review commissioned by the English National Health Service, Dr. Cass wrote, "We do not fully understand the role of adolescent sex hormones in driving the development of both sexuality and gender identity through the early teen years, so by extension we cannot be sure about the impact of stopping these hormone surges on psychosexual and gender maturation. We therefore have no way of knowing whether, rather than buying time to make a decision, puberty blockers may disrupt that decision-making process." (Cass Review Letter 2022 at 5.)

77.    It is ethically problematic when the treatment in question—puberty blockers—not only cannot be comprehended adequately by minors, but also prevents the otherwise healthy development of their capacity to comprehend such decisions. This is all the more true for younger children, "[g]iven the highly reliable, repeatedly replicated finding that childhood-onset gender dysphoria resolves with puberty for the large majority of children," and that "the evidence indicates that

blocking a child's puberty blocks the child's natural maturation that itself would
resolve the dysphoria." (Cantor ¶ 159.)

78.     With respect to adolescents, WPATH's SOC 8 states that "decision-
making regarding gender affirming medical treatments that have life-long
consequences requires thoughtful, future-oriented thinking by the adolescent."
(SOC 8 at S63.) However, neither WPATH nor any other source referenced by
plaintiffs' experts establishes that minors, whether pre-pubertal or adolescent, are
*able* to meaningfully comprehend and reasonably evaluate the risks and lifelong
implications of MGT.

**C.     There is evidence that many minors who are subjected to MGT cannot meet
the informed consent requirement of "voluntariness."**

79.     The opening statement of the Nuremberg Code declares,

> The voluntary consent of the human subject is absolutely
> essential. This means that the person involved should have
> legal capacity to give consent; should be so situated as to be
> able to exercise free power of choice, without the intervention
> of any element of force, fraud, deceit, duress, over-reaching, or
> other ulterior form of constraint or coercion; and should have
> sufficient knowledge and comprehension of the elements of the
> subject matter involved, as to enable him to make an
> understanding and enlightened decision.

80.     As the Nuremberg Code indicates, voluntariness depends on adequate
information and comprehension ("*sufficient knowledge and comprehension of the
elements of the subject matter involved*"), both of which, as already noted, are
doubtful in the case of minors considering MGT. But voluntariness also depends on
freedom from controlling influences, both external and internal.

81.     With respect to external influences, minors obviously are commonly
under the controlling influence of parents, which I will address below. In addition, a
number of international experts have indicated concern that the rapid increase in
prevalence of GD, especially among adolescent females, reflects undue influence of
social pressure. WPATH's recently published SOC 8 itself acknowledges, "For a
select subgroup of young people, susceptibility to social influence impacting gender
may be an important differential to consider." (SOC 8 at S45.)

82.     Beauchamp and Childress note that in addition to external controlling
influences, "no less important to autonomy are internal influences on the person,
such as those caused by mental illness. All of these conditions can limit
voluntariness." (Beauchamp and Childress 2012 at 105; see also id. at 138.) Dr.
Cantor documents ample evidence that a high proportion of minors experiencing GD
suffer from mental illnesses. (Cantor ¶ 160-162.) These mental illnesses constitute

an internal controlling influence that can prevent genuine voluntariness. As WPATH itself recognizes, "A young person's mental health challenges may impact their conceptualization of their gender development history and gender identity-related needs, the adolescent's capacity to consent, and the ability of the young person to engage in or receive medical treatment," and "The adolescent's mental health concerns . . . may interfere with diagnostic clarity [and] capacity to consent . . .". (SOC 8 at S62.) WPATH also recently admitted that "autistic/neurodivergent transgender youth represent a substantial minority subpopulation" of those seeking medical transition. (SOC 8 at S50.)

83.     Despite the serious obstacle posed by mental health conditions to genuine voluntariness in decision-making by a minor, WPATH's SOC 8 is problematically unclear as to how these conditions will be addressed prerequisite to any MGT. Instead, it refers to an undefined "biopsychosocial assessment" (SOC 8 at S50), and only calls for known mental health concerns to be "addressed" rather than resolved before accepting consent (or assent) as voluntary (SOC 8 at S62). SOC 8 provides no guidance grounded on empirical evidence as to how or when consent/assent given by a minor who suffers from a mental health condition could be determined to be voluntary.

### D.     The fact that MGT is *wanted* by minors and their parents is not sufficient to justify MGT, medically or ethically.

84.     WPATH's revisions of guidelines to eliminate or minimize the doctor's responsibility regarding decision-making with respect to MGT violate accepted principles of medical ethics. In its Standards of Care, version 8, WPATH suggests that gaps in evidence demonstrating the safety and efficacy of MGT should not prevent the use of MGT in adolescents "given the ethics of self-determination in care." (SOC 8 at S45.) The new guidelines also emphasize a "right to bodily and mental integrity, autonomy, and self-determination,"[7] and a putative need for healthcare practitioners to "[m]atch the treatment approach to the specific needs of patients, particularly their goals for gender identity and expression." (SOC 8 at S21.) This language ignores the potential conflict with MGT between "bodily integrity" and "self-determination," as well the conflict between the "needs of patients" and "their goals."

85.     Much has been made of the importance of autonomy, but the ethical standard for medical decision-making with respect to minors is decidedly not "self-determination." Rather, as noted in the AAP Committee on Bioethics Report, "Informed Consent in Decision- Making in Pediatric Practice" (Katz 2016), the

---

[7] Among the "General Principles" asserted by WPATH are: "Respect universal human rights including the right to bodily and mental integrity, autonomy and self-determination; freedom from discrimination, and the right to the highest attainable standard of health." (SOC 8 at S21.)

physician acts in a fiduciary relationship with the child, governed by "the duties to protect and promote health-related interests of the child and adolescent ... [, and] these duties may conflict with the parent's or patient's wishes." (Katz 2016 at e2.) Parents likewise have "an ethically parallel fiduciary obligation" (e2) to promote the child's best interests, whether or not that corresponds with what the child wants. "Historically and legally," the AAP report continues, "medical decision-making in children has centered on the best-interest standard, which directs the surrogate to maximize benefits and minimize harms to the minor." (e6) "A reliance on individual liberties and autonomy in the pediatric patient", the AAP report notes, "is not realistic or legally accepted." (e2)

86.   By appealing to self-determination to justify MGT for minors, WPATH is putting the onus on children to make clinical decisions that they haven't information, comprehension, or authority to make, and thereby retreating from physicians' ethical obligations to protect children—a class of vulnerable subjects—from interventions that subject children to risks and harms without clear evidence of proportionate medical benefit.

87.   For all of these reasons, it is doubtful that minors experiencing GD have sufficient information, comprehension, or voluntariness to make possible informed consent to MGT. If any minors do possess the level of comprehension and voluntariness required by ethical principles for a choice as momentous as undergoing MGT, I am aware of no evidence-based criteria for identifying those specific minors, and plaintiffs' experts cite none.

### E.    Parental consent cannot satisfy the doctor's ethical obligation to obtain informed, comprehending, voluntary consent.

88.   In many medical contexts, medical ethicists speak of obtaining "assent" from minors, while obtaining "consent" from the child's parents. (Katz 2016, e8) This combination of adolescent assent and parental consent, however, cannot cure the problems with informed consent to MGT.

89.   Children have long been considered a category of vulnerable subjects and therefore as deserving more protections. (Beauchamp and Childress at 63.)[8] For example, the Declaration of Helsinki requires that where a clinical trial or experiment involves "vulnerable groups and individuals", those patients must "receive specifically considered protection." (Helsinki Declaration ¶ 19.)

90.   In the clinical domain, the vulnerability of children is addressed in part by requiring both parents and physicians to act in ways that are reasonably consistent with the child's medical best interest. (Katz 2016 at e2, e12.) That is to

---

[8] See also HHS policy statement, "Vulnerable and Other Populations Requiring Additional Protections," available at https://grants.nih.gov/policy/humansubjects/policies-and-regulations/vulnerable-populations.htm.

say that whereas adults are given greater latitude to refuse even medically indicated and life-saving treatments, children and their parents generally are not.[9] In parallel, parents have much more latitude to accept experimental interventions and even interventions that contradict bodily health (e.g. cosmetic procedures, physician-assisted suicide) for themselves than they have latitude to accept such interventions for their children. (Katz 2016 at e5.)

91.     Because of the vulnerability of children, it is widely accepted that both physicians and the state are obligated to act as fiduciaries of children's best interests with respect to health, and if necessary to act *en loco parentis*. Just as parents are ethically obligated to prioritize the child's good over their own wishes, medical professionals are obligated to prioritize the child's best interest (where that involves the child's health) over the wishes of the parents. Beauchamp and Childress (at 221) describe such "paternalistic" actions as justified by the ethical principle of beneficence—the obligation to do good and promote the health of individuals, while protecting them from harm. The AAP report on informed consent comments:

> This parental responsibility for medical decision-making in caring for their child or young adult is not an absolute right, however, because the state also has a societal interest in protecting the child or young adult from harm and can challenge parental authority in situations in which the child or young adult is put at risk (the doctrine of *parens patriae*). Pediatric health care providers have legal and ethical duties to provide a standard of care that meets the pediatric patient's needs and not necessarily what the parents desire or request. (Katz 2016 at e5.)

92.     By definition, minors experiencing GD are vulnerable subjects, and all the more so in light of the already noted high prevalence of mental illness and other comorbidities among this population. As such, minors experiencing GD are owed protection from interventions that contradict their medical best interest—their health. Because MGT disrupts and contradicts bodily health in several ways, it is doubtful that physicians have ethical warrant to offer, or that parents have ethical authority to consent to, MGT in minors.

---

[9] Beauchamp and Childress note, "Courts have often allowed adult Jehovah's Witnesses, for example, to reject blood transfusions for themselves, while disallowing parental rejections of medically necessary blood transfusions for their children. Parents are also sometimes appropriately charged with child neglect when they fail to seek or permit potentially beneficial medical treatment recommended by physicians." (at 325)

93.     In addition, for the same reasons I have reviewed above, it is not possible to say that parents are receiving information about the implications of MGT sufficient to make any consent they might provide "informed."

94.     If persons suffering GD faced imminent bodily harm from their condition, and if there were no other way to respond but to deploy MGT, and if evidence from animal studies and carefully controlled human trials gave reason to anticipate benefits from MGT proportionate to known harms, then an adult could potentially give valid consent to MGT in knowledge of the absence of otherwise necessary information. But none of these conditions in fact have been met, and that makes it doubtful that the principle of informed consent within clinical medicine and clinical research can be met at all with respect to MGT, much less with MGT for minors.

95.     The fact that MGT creates a material risk (or even expectation) of sterilization and failure to develop healthy sexual response raises special ethical problems with accepting parental "consent" on behalf of the child.  With respect to loss of healthy sexual response, I note that our society strongly disapproves of clitoral mutilation of girls (denying them sexual response in their future adult lives) despite parental consent. Indeed, such "medical" procedures have been prohibited by law as a felony subject to imprisonment.[10]

96.     Sterilization has likewise long been recognized to raise special ethical issues. One systematic review found that a significant percentage of women who consent to sterilization at relatively young ages (under 30, in that study) later deeply regret that decision. (Curtis 2006; see also Burgart 2017; Hillis 1999.)  Given the possibility of regret and deprivation of what is considered a basic human right in other contexts, it is generally accepted that sterilizing procedures should only be performed on a minor when necessary to save his or her life. And even then, "The validity of parental consent to a sterilizing procedure can be challenged when the procedure could be safely postponed until the child can consent [i.e., when the child reaches adulthood], or where less-invasive alternatives are available." (Burgart 2017; Tamar-Mattis 2009.)

---

[10] https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/fact-sheet-on-female-genital-mutilation-or-cutting.html#:~:text=Violation%20of%20the%20law%20is,are%20prohibited%20under%20U.S.%20law.

97.     While medical procedures that impose substantial risk of serious harm are ethical in some settings, plaintiffs' experts do not remotely establish that the necessary conditions justifying such procedures exist in the case of GD and MGT, especially for minors.

98.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

This declaration was executed on February 2, 2024.

Farr A. Curlin, MD

## Appendix A: Bibliography and Other Materials Considered

Beauchamp, T.L.  and Childress, J.S., Principles of Biomedical Ethics, 7th edition (2013). Oxford University Press.

Block, J. (2023). Gender dysphoria in young people is rising and so is professional disagreement. *British Journal of Medicine,*2023: 380*,* 382.

Burgart, A.M., Strickland, J. et al. (2017). Ethical controversy about hysterectomy for a minor, *Pediatrics* 139:6, e20163992.

Cass, H. (2022, February). The Cass Review: Independent review of gender identity services for children and young people Interim report. National Health Service (NHS), UK.

Cass, H. (19 July 2022). Independent review of gender identity services for children and young people – further advice. Letter from H. Cass to J. Stewart, NHS England. *The Cass Review*.

Chen, D., Strang, J. F., Kulbuck, V. D., Rosenthal, S. M., Wallen, K., Waber, D. P., …Garofalo, R. (2020). Consensus parameter: Research methodologies to evaluate neurodevelopmental effects of pubertal suppression in transgender youth. *Transgender Health, 5,* 246–257.

COHERE Finland (Council for Choices in Health Care in Finland) (2020, June 16). Medical treatment methods for dysphoria associated with variations in gender identity in minors— Summary of a recommendation. [Translated] Retrieved from https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/ fa2054c5-8c35-8492-59d6- b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474

Coleman, E.,et al. (2022). WPATH standards of care for the health of transgender and gender diverse people, version 8 ("SOC 8")*. International Journal of Transgender Health* 2022, Vol.. 23, No. S1.

Curtis, K.M., Mohllajee, A.P.  et al. (2006). Regret following female sterilization at a young age: A Systematic Review, *Contraception* 73:205.

Freedman, B. (1987, July 16). Equipoise and the ethics of clinical research. *New England Journal of Medicine*, 317, 141–145.

Glintborg, D., Moller, J-J., Rubin, K. et al. (2023). Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study. *Eur. J. Endocrinology* 189:336-345.

GRADE Handbook, Quality of evidence definitions table. https://gdt.gradepro.org/app/handbook/handbook.html#h.wsfivfhuxv4r at Section 5.

Hillis, S.D., Marchbanks, P.A. et al. (1999). Poststerilization regret:  findings from the United States Collaborative Review of Sterilization, 93:6 *Obstetrics. & Gyn*. 93(6):889.

Kaltiala, R., Holttinen, T., Tuisku, K. (2023). Have the psychiatric needs of people seeking gender reassignment changed as their numbers increase? A register study in Finland. European Psychiatry.  doi.org/10.1192/j.eurpsy.2023.2471.

Kaltiala, R. (2023b). Gender-affirming care is dangerous. I know because I helped pioneer it. *The Free Press*.  https://www.thefp.com/p/gender-affirming-care-dangerous-finland-doctor, Oct. 20, 2023.

Karolinska Institute (March 2021). Policy change regarding hormonal treatment of minors with gender dysphoria at Tema Barn – Astrid Lindgren Children's Hospital.

Katz A., Webb S. (2016) AAP Committee on Bioethics: Informed Consent in Decision-Making in Pediatric Practice. *Pediatrics*. 2016;138(2):e20161485.

Nuremberg Code (1947).

Respaut, R., Terhune, C., Conlin, M. (2022). Why transitioners are crucial to the science of gender care. Reuters. https://www.reuters.com/investigates/special-report/usa-transyouth-outcomes/Reuters.

Swedish Socialstyrelsen (2022, Feb. 22). Uppdaterade rekommendationer för hormonbehandling vid könsdysfori hos unga. [*Updated recommendations for hormone therapy for gender dysphoria in young people.*] Retrieved from https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/uppdaterade-rekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/.

Swedish Socialstyrelsen (2020). The evolution of the diagnosis of gender dysphoria: prevalence, co-occurring psychiatric diagnoses and mortality from suicide. www.socialstyrelsen.se Article number 2020-2-6600.

Swedish Socialstyrelsen  (2022, February). Stöd, utredning och hormonbehandling vid könsinkongruens hos barn och ungdomar Delvis uppdatering av kunskapsstöd. [*Support, investigation and hormone treatment at gender incongruity in children and young people.*]  Available from https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-2-7774.pdf

Tamar-Mattis, A. (2009). Exploring gray areas in the law about DSD and sterilization, *Endocrine Today*, 2009 October ed., https://bit.ly/2YdAHNU).

Torkildsen, Ø. (2022). Lessons to be learnt from the history of lobotomy. Tidsskr Nor Legeforen. Available at: https://tidsskriftet.no/en/2022/12/essay/lessons-be-learnt-history-lobotomy

Ukom Norway (March 9, 2023). Patient safety for children and adolescents with gender incongruence. Unofficial translation.

U.S. Department of Health, Education, and Welfare (1979, Apr. 18).  Belmont Report: ethical principles and guidelines for the protection of human subjects of research, 44 *Fed. Reg.* 76, 21392–97 (Apr. 18, 1979). ("Belmont Report")

U.S. President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (1982). Making health care decisions: the ethical and legal implications of informed consent in the patient-practitioner relationship. U.S. Gov't Printing Office. ("Health Care Decisions")

World Medical Association (1964). Declaration of Helsinki: Ethical principles for medical research involving human subjects. ("Helsinki Declaration")

## Other Materials Considered

1.  Vulnerable Child Compassion and Protection Act (the "Act").

2.  Opinion and order granting preliminary injunction dated May 13, 2022 ("Order granting PI")

3.  Second Amended Complaint dated September 19, 2022.

4.  Expert Report of Meredithe McNamara, dated Feb 8, 2023

5.  Expert Report of Armand Antommaria, dated Feb 13, 2023

6.  Expert report of James Cantor, dated May 19, 2023

7.  Supplementary Expert Report of James Cantor, dated February 1, 2024 (Nonconfidential portions)

8.  Expert Report of Michael Laidlaw, dated May 19, 2023

9.  Supplementary Expert report of Michael Laidlaw, dated May 19, 2023

10.  Eleventh Circuit Court Opinion dated August 21, 2023

11.  Production documents HHS-0169973 to -0619991

**Appendix B: Curriculum Vitae of Dr. Farr Curlin, MD**

January 2024

# CURRICULUM VITAE

## Farr A. Curlin, MD

**EDUCATION AND TRAINING**

College:  University of North Carolina at Chapel Hill, BA with distinction, Biology, 1992
Medical School:  University of North Carolina School of Medicine, MD, 1998
Residency:  University of Chicago Hospitals in Internal Medicine, 1998 – 2001
Fellowship: Robert Wood Johnson Clinical Scholar, The University of Chicago, 2001-2003
Fellowship: MacLean Center for Clinical Medical Ethics, University of Chicago 2003-2004
Summer Institute for Survey Research Methods, University of Michigan – 2006
Program in Palliative Care Education and Practice, Harvard University – 2008

**BOARD CERTIFICATION**

Diplomate American Board of Internal Medicine 204781, 2001, 2011, 2022
Hospice and Palliative Medicine Certification (ABIM), 2010, 2022

**MEDICAL LICENSURE**

North Carolina License No: 2013-01944

**MEMBERSHIPS**

American Medical Association
American Society for Bioethics and Humanities

**ACADEMIC APPOINTMENTS:**

Duke University

| | |
|---|---|
| 2014 - | Josiah C. Trent Professor of Medical Humanities, Trent Center for Bioethics, Humanities & History of Medicine |
| 2014 - | Professor of Medicine, Center for Palliative Care, Section of General Internal Medicine, Department of Medicine |
| 2014 - | Professor and Co-Director, Theology, Medicine, and Culture Initiative, Duke Divinity School (tmc.divinity.duke.edu) |
| 2017 - | Senior Fellow, Kenan Institute for Ethics |

The University of Chicago:

| | |
|---|---|
| 2003 – 2005 | Instructor of Medicine, Section of General Internal Medicine |
| 2003 – 2006 | Associate Faculty, Robert Wood Johnson Foundation Clinical Scholars Program |
| 2004 – 2013 | Faculty, the MacLean Center for Clinical Medical Ethics |
| 2005 – 2010 | Assistant Professor of Medicine, Section of General Internal Medicine |
| 2009 – 2013 | Co-Director, Program on Medicine and Religion (pmr.uchicago.edu) |
| 2010 – 2013 | Associate Professor of Medicine, Section of General Internal Medicine |

**HONORS, AWARDS, SCHOLARSHIPS (selected)**

| | |
|---|---|
| 1989 | Valedictorian, Jackson Central Merry High School, Jackson, TN |
| 1989 | William Richardson Davie Scholar, University of North Carolina |
| 1992 | Phi Beta Kappa, University of North Carolina – Chapel Hill |
| 1995 | Herbert H. Fritz special merit award for scholastic excellence, UNC School of Medicine |
| 1995 | North Carolina Albert Schweitzer Fellowship Award |
| 1995 | Foreign Fellowship Award, UNC School of Medicine |

**Farr A. Curlin, MD**

1997    Alpha Omega Alpha Honor Medical Society, UNC School of Medicine
1998    Heusner Pupil Award, for showing "a great capacity to grasp the principles of science, to heal the sick, to comfort the troubled, to be humble before God." UNC School of Medicine
1998    Cecil G. Sheps Award in Social Medicine – chosen by the Department of Social Medicine as the graduating student who most embodies the department's ideals, UNC School of Medicine
1998    Terri Brenneman Award - for "the graduating student who has most demonstrated a commitment to the underserved." UNC School of Medicine
1998    Merck Award – chosen by the UNC faculty as one of four graduating students to be honored for their contributions to the medical school community, UNC School of Medicine
2000    Norris L. Brookens Award – chosen by the state chapter of the American College of Physicians as the Most Outstanding Internal Medicine Resident in Illinois
2003    John A. Oremus Memorial Scholar – MacLean Center for Clinical Medical Ethics, The University of Chicago
2006    Greenwall Foundation Faculty Scholar in Bioethics (2006-2009)
2007    Outstanding Physician Scientist Award. Central Society of Clinical Research and the Midwestern Section of the American Federation for Medical Research
2008    Early Career Development Award. Central Society for Clinical Research
2011    Arnold P. Gold Foundation Humanism in Medicine Award Nominee. Pritzker School of Medicine student body
2012    David B. Larson Fellowship in Health and Spirituality, The Library of Congress
2012    White Coat Ceremony Keynote Speaker, Pritzker School of Medicine, August 5
2014    Gold Humanism Honor Society Induction Ceremony Keynote Speaker, Pritzker School of Medicine, Chicago, IL. March 13
2017    Inaugural Robert D. Orr, MD, Lecture in Medical Ethics, University of Vermont, October 27
2018    The Steve Thorney Career Award for Spiritual Care, MD Anderson Cancer Center
2018    Paul Ramsey Award for Excellence in Bioethics, Paul Ramsey Institute
2019    Pellegrino Medal for Healthcare Ethics, Samford University
2021    Inaugural Lisio Family Lecture (medical ethics). Columbia University
2022    Educator of the Year, Christian Medical and Dental Associations
2023    Englehardt Award (bioethics), The Ohio State University Center for Bioethics and Medical Humanities

**REVIEW AND EDITORIAL EXPERIENCE**

**Ad hoc journal and book review**

Academic Medicine, American Journal of Bioethics, AJOB – Empirical Bioethics, American Journal of Hospice and Palliative Medicine, American Journal of Law and Medicine, American Journal of Psychiatry, Annals of Family Medicine, Annals of Internal Medicine, Archives of Internal Medicine, British Medical Journal, BMC Medical Education, Cancer, CHEST, CMAJ, Elsevier, Explore, Georgetown University Press, Harvard University Press, Health Affairs, International Journal of Psychiatry in Medicine, Johns Hopkins University Press, Journal of Christian Bioethics, Journal of Clinical Oncology, Journal of General Internal Medicine, Journal of Medical Ethics, Journal of Medicine and Philosophy, Journal of Oncology Practice, Journal of Pain and Symptom Management, Journal of Religion and Health, Journal of the Scientific Study of Religion, Lancet, Medical Care, Mayo Clinic Proceedings, Medical Journal of Australia, New England Journal of Medicine, Oxford University Press, Pediatrics, Perspectives in Biology and Medicine, Plos One, Social Science & Medicine, Southern Medical Journal, Stanford University Press, Theoretical Medicine and Bioethics, Zygon

**Farr A. Curlin, MD**

**Editorial experience**

| | |
|---|---|
| 2008 | Guest editor of special issue of *Theoretical Medicine and Bioethics*, focused on conscience and clinical practice, published 2008 |
| 2014 - | Editorial Board, *Perspectives in Biology and Medicine* |
| 2016 | Guest editor of special issue of *Christian Bioethics*, focused on setting the medicine in the context of a good and faithful life |
| 2019 | Guest editor of special issue of *Theoretical Medicine and Bioethics*, focused on defining and measuring death |
| 2019 | Guest editor of special issue of *Perspectives in Biology and Medicine*, focused on disputes about conscience in medicine |
| 2023 | Guest editor of special issue of *Christian Bioethics*, focused on moral and theological questions raised by medicalizing risk |

**CLINICAL PRACTICE**

| | |
|---|---|
| 2001 – 2003 | Primary Care Internist, Lawndale Christian Health Center |
| 2003 – 2008 | Primary Care Physician, University of Chicago Primary Care Group |
| 2003 – 2013 | General Internal Medicine attending physician. University of Chicago Hospitals. |
| 2004 – 2013 | Ethics consult service, University of Chicago |
| 2008 – 2013 | Associate Medical Director – Horizon Hospice Care, Chicago, IL |
| 2008 – 2013 | Palliative Medicine Consult Service. University of Chicago Hospital |
| 2014 – | Attending physician. Duke Hospice and Palliative Care |

**ADMINISTRATIVE LEADERSHIP / COMMITTEE WORK (selected)**

| | |
|---|---|
| 2000 – 2003 | Best Practices Project Steering Committee. The US Bureau of Primary Health Care and the Christian Community Health Fellowship |
| 2003 | Working group on the ethics of spirituality in medicine. George Washington Institute for Spirituality and Health and the Association of American Medical Colleges |
| 2006 – 2008 | Ethics Research Group. Division of Standards and Survey Methods. Joint Commission on Accreditation of Healthcare Organization |
| 2008 – 2013 | Founding Co-Director (with Daniel Sulmasy, MD, PhD), Program on Medicine and Religion, The University of Chicago. https://pmr.uchicago.edu |
| 2010 – 2015 | The Witherspoon Council on Ethics and the Integrity of Science. Member. |
| 2012 – 2015 | Bioethics and Christian Theology Affinity Group, Founding Co-Director (with Jeffrey Bishop). American Society for Bioethics and Humanities |
| 2014 – | Co-Director (with Warren Kinghorn, MD, ThD), Theology, Medicine, and Culture Initiative (TMC), Duke Divinity School. https://tmc.divinity.duke.edu |
| 2017 – 2020 | Founding Director, Arete Initiative, Kenan Institute for Ethics, Duke University |
| 2018 – 2021 | Provost's Advisory Committee for Online Education, Duke University |
| 2021 – 2023 | President's Advisory Committee on Institutional History, Duke University |

**INVITED EXTRAMURAL PRESENTATIONS (selected)**

1. Wabash College.  February 23, 2004. Crawfordsville, IN
2. Loyola University School of Law. March 21, 2004. Chicago, IL
3. Christian Community Health Fellowship Conference (keynote). Atlanta, GA, May 21, 2004.
4. Spirituality and Healthcare Dialogue. The University of Texas Medical Branch. March 30, 2005. Galveston, TX.
5. God in the clinic: Religion, medicine, and the dilemmas of "patient-centered care." Lee University, Cleveland, TN, October 4, 2005.

**Farr A. Curlin, MD**

6. Getting below the surface: The ethics of religious/spiritual interaction in the clinical encounter. Duke University, Durham, NC. October 6, 2005.
7. Program in Genetic Counseling. Northwestern University, February 6, 2006.
8. Duke University Center for Theology and Medicine, Durham, NC, June 22, 2006.
9. Annual Faith in Medicine Conference, (keynote) The Faith and Medicine Institute, Boston, MA, September 2, 2006.
10. Spirituality/Medicine Interface Conference (keynote). Southern Medical Association. Atlanta, GA, September 14-16, 2006.
11. Sr. Alice Potts Endowed Lectureship for Spirituality and Medicine, MD Anderson Cancer Center, Houston, TX, October 30, 2006.
12. 4th Annual Vincent C. DeStefano Memorial Conference. Memorial Hospital. South Bend, Indiana. June 13, 2007.
13. University of Michigan Ethics Conference, Ann Arbor, March 11, 2008.
14. Louise Kingston Endowed Lectureship in Spirituality and Medicine. Princeton University Medical Center, Princeton, NJ. April 1, 2008.
15. American Medical Association, Division of Medical Ethics. Chicago. May 30, 2008.
16. Christian Medical and Dental Associations National Conference (keynote). Bloomingdale, IL. June 19, 2008.
17. Patient Rights vs. Doctor Conscience. DeVos Medical Ethics Colloquy. (keynote, along with R. Alta Charo). Grand Rapids, MI. September 8, 2008.
18. Conscience and clinical practice. President's Council on Bioethics. September 11, 2008. https://bioethicsarchive.georgetown.edu/pcbe/transcripts/sept08/session3.html
19. The Role of Conscience in Medicine. (keynote) Center for Law, Health & Society, Georgia State University. Atlanta, GA. October 9, 2008
20. Religion, Science, and the Moral Life of Medicine. (keynote) Sentara 2008 Ethics Conference. Williamsburg, VA. November 7, 2008.
21. Controversial Bodies: How to View and Think about Plastinated Corpses. (keynote) University of Kansas Medical School and Center for Practical Bioethics. Kansas City, MO. December 5, 2008.
22. Medicine Grand Rounds, University of Saskatchewan College of Medicine, Saskatoon, CA. January 9, 2009.
23. David Larson, MD, Memorial Lecture, Society for Spirituality, Theology and Medicine Annual Conference. Durham, NC. June 5, 2009.
24. Veritas Forum. Mayo Clinic, Rochester, MN. September 23, 2009.
25. 8th Annual Contemporary Catholic Healthcare Ethics Conference. Stritch School of Medicine at Loyola University. October 9, 2009. Chicago, IL
26. Florida Hospital Annual Conference on Spirituality and Medicine. March 25, 2010. Orlando, FL
27. Spirituality and Medicine Conference. Brody School of Medicine. April 1, 2010. Greenville, NC
28. The Lupina Centre for Spirituality, Healthcare and Ethics at Regis College, University of Toronto. October 15/16, 2010
29. Children's of Minnesota Westgate Pediatric Ethics Forum, Minneapolis, MN. November 12, 2010
30. Grand Rounds. Methodist Hospital, and Lecture in the Religion and Public Life Program. James Baker Institute for Public Policy. Houston, TX. December 3, 2010.
31. International Institute of Restorative Reproductive Medicine (IIRRM). Dublin, Ireland. March 26, 2011.
32. Terminal Sedation and Active Euthanasia: What are the Boundaries? 3rd Annual Bioethics Symposium. (keynote) University of Wisconsin. Madison, WI. April 7, 2011

**Farr A. Curlin, MD**

33.  Where Religion, Policy, and Bioethics Meet: An Interdisciplinary Conference on Islamic Bioethics and End-of-Life Care. (keynote) University of Michigan. Ann Arbor, April 10, 2011
34.  Religion, Spirituality, and Mental Health (keynote). Loyola University Chicago. April 12, 2012
35.  Kluge Center, United States Library of Congress, Washington, DC. June 28, 2012
36.  26th Annual A. Kurt Weiss Lecture in Biomedical Ethics, University of Oklahoma Health Sciences Center. September 27, 2012
37.  Turner Conference on Faith and Medicine (keynote), Muncie, IN. October 10, 2012
38.  Allen M. Boyden, M.D, Memorial Lecture. Providence St. Vincent Medical Center. Portland, OR. November 8, 2012
39.  Speaking About the End of Life, Spiritual, Religious and Community Conversations (keynote). Mount Sinai Medical Center & Greater Miami Jewish Federation. December 4, 2012
40.  Ethics Grand Rounds. Loyola University Medical Center. January 8, 2013
41.  Workshop on Comparative Studies of Religion and Values among Healthcare Professionals. Freiburg Institute of Advanced Studies. Germany. February 20-22, 2013
42.  28th Annual Notre Dame Medical Ethics Conference. Notre Dame, IN. March 8-10, 2013
43.  Trent Center Lecture on Medical Humanities, Duke University. Durham, NC, April 17, 2013
44.  Reverend Edward J. Drummond, S.J. Lecture, Medicine Grand Rounds, Saint Louis University. May 10, 2013
45.  Association of Professional Chaplains national webinar journal club. May 14, 2013
46.  Institute of Medicine. Committee on Approaching Death: Addressing Key End of Life Issues. Houston. July 22, 2013
47.  Spirituality and Ethics in Health Care (keynote speaker). Catholic Health Partners. Cincinnati, OH. October 3, 2013
48.  Institute for Ethics and Culture Annual Conference. Notre Dame University. November 9, 2013
49.  Loyola University Annual Medical Ethics Conference. March 13, 2014
50.  Notre Dame Annual Medical Ethics Conference. March 21-23, 2014
51.  Physician Well-Being Conference. Adventist Health Care. Jacksonville, FL. April 11, 2014
52.  4th European Conference on Religion, Spirituality and Health (Keynote). Malta. May 23, 2014
53.  Harvard Lecture Series on Spirituality and Medicine, Harvard University. November 17-18, 2014
54.  Medicine Grand Rounds. Medical College of Virginia. Richmond, VA, February 19, 2015
55.  Institute for Faith and Learning. Baylor University. Waco, TX. September 11, 2015
56.  Annual Conference. MacLean Center for Clinical Medical Ethics. November 14, 2015
57.  2016 Conference on Medicine and Religion. Houston, TX. March 4, 2016.
58.  Reimagining Medicine Conference. Denver Institute for Faith and Work. April 6, 2016
59.  Hagop S. Mekhjian Lecture. The Ohio State University. Columbus, OH. September 15, 2016
60.  Ohio State University Center for Bioethics Annual Conference. September 16-17, 2016
61.  The Basil Society. UT Southwestern. Dallas, TX. September 24, 2016
62.  What is the place of sedation in care at the end of life? (symposium). The University of Chicago. October 14, 2016
63.  2016 MedConference. Florham Park, NJ. October 15, 2016
64.  Medical Ethics Grand Rounds. UNC School of Medicine. Chapel Hill, NC. November 3, 2016
65.  Schiltz Lecturer in the Medical Humanities, University of Kansas School of Medicine. Wichita, KS. January 12-13, 2017
66.  Weston Lecture. Augustine College. Ottawa, ON. March 16, 2017
67.  35th Annual MacLean Center Interdisciplinary Seminar Series on Reproductive Ethics. The University of Chicago. April 26, 2017
68.  Z. Stanley Stys Memorial Lecture. Princeton University Medical Center. May 23, 2017
69.  Robert D. Orr, MD, Lectureship. University of Vermont. October 27, 2017

**Farr A. Curlin, MD**

70. Gender Transition Services: Progress or Medical Hubris? The 29th Annual Dorothy J. MacLean Fellows Conference on Clinical Medical Ethics, University of Chicago. November 10, 2017
71. Grand Rounds, Department of Pediatrics. University of Illinois. Chicago, January 5, 2018
72. Grand Rounds, Department of Medicine, Medical College of Georgia. January 9, 2018
73. The Steve Thorney Life Career Award and Lecture in Spiritual Care, MD Anderson Cancer Center, Houston, TX, February 9, 2018
74. Provonsha Lecture. Loma Linda University. March 2, 2018
75. Thomistic Institute. Harvard University. April 23, 2018
76. Grand Rounds, Department of Obstetrics and Gynecology, Vanderbilt University. May 5, 2018
77. Holy Friendship Summit, Bristol, TN. May 18-19, 2018
78. Commencement Address. Trinity Academy of Raleigh. Raleigh, NC. May 26, 2018
79. Grand Rounds, Department of Medicine, Texas Tech University. November 8, 2018
80. Physician Assisted Suicide and Euthanasia: Theological and Ethical Responses (symposium): Georgetown University. November 9, 2018
81. Affirming Ethical Options for the Terminally Ill. Heritage Foundation. Washington, DC. March 11, 2019
82. Bioethics Grand Rounds. National Institutes of Health. April 3, 2019
83. Grand Rounds. Biomedical Ethics Research Program. Mayo Clinic. April 30, 2019
84. Center for Ethics and Culture, Notre Dame University. May 13, 2019
85. HEAL Institute, Samford University Center for Faith and Culture, September 6, 2019
86. King Institute for Faith and Culture, King University, Bristol, TN, September 16-17, 2019
87. 88th Annual Educational Conference. Catholic Medical Association. Nashville, TN. September 26, 2019
88. Thomistic Institute. Queen's University School of Medicine. Kingston, Ontario. October 9, 2019
89. Lehman Lecture in Medical Ethics. Allegheny College, Meadville, PA. February 18, 2020
90. Carol Carfang Nursing & Healthcare Ethics Conference. Tampa, FL. February 28, 2020
91. School of Civic and Economic Thought and Leadership. Arizona State University. June 15, 2020
92. McDonald Centre for Theology, Ethics & Public Life. Oxford University, UK. September 4, 2020
93. Hoover Lecture, York Hospital. York, PA. September 17, 2020
94. Program in Medical Ethics, Humanities, and Law. Western Michigan University Homer Stryker M.D. School of Medicine. October 7, 2020
95. 2021 Scholar in Residence. Union University. March 8-12.
96. Character and the Professions Conference (panelist). Wake Forest University. March 13, 2021
97. Inaugural Lisio Family Endowed Lectureship. Columbia University School of Medicine. September 20, 2021
98. Thomistic Institute, Yale University. November 3, 2021
99. MacLean Conference on Clinical Medical Ethics, University of Chicago, November 13, 2021
100. Thomistic Institute, Johns Hopkins Medical Institute, November 15, 2021
101. Maurice B. Siegel, M.D., Lecturer in Humanism and Medicine. Cedar's Sinai. January 19, 2022
102. John Collins Harvey Lecture, Pellegrino Center for Clinical Ethics, Georgetown University, February 25, 2022
103. Foglio Lecturer, Michigan State University School of Medicine. March 22-23, 2022 (rescheduled—now pending new date)
104. Veritas Forum at Harvard Medical School, May 23, 2022
105. Celebrating and Defending the Freedom to Care, Christian Medical and Dental Associations, Washington, D.C. January 2023

Farr A. Curlin, MD

106.   Conditions for corrosion: how are just healthcare practitioners made and lost? University of Oxford McDonald Centre for Theology, Ethics and Public Life, Oxford, UK. June 27-29, 2023

107.   Detransitioners, civil discourse, and the silence of clinical ethics. Annual Interdisciplinary Lecture Series, MacLean Center for Clinical Medical Ethics, University of Chicago. November 14, 2023

## PEER-REVIEWED PRESENTATIONS AT SCHOLARLY MEETINGS

1.   Holism or Evangelism? A consideration of religion in medicine. [Special session].  Robert Wood Johnson Clinical Scholars Program National Conference. Ft Lauderdale, FL, November 22, 2003.

2.   Religion and Health: Theological Limits and Concerns. [Panel presentation] American Society for Bioethics and Humanities. National Conference. Denver, CO. October 27, 2006.

3.   Religion, Conscience, and Controversial Clinical Practices. Central Society for Clinical Research/Midwestern Section American Federation for Medical Research. [Chosen as the top observational science abstract.] April 13, 2007. Chicago, IL.

4.   Does Conscience Have a Place in the Healthcare Encounter? [Panel presentation] American Society for Bioethics and Humanities. National Conference. Washington, DC. October 19. 2007

5.   Social and Ethical Implications of Supporting or Limiting a Right of Conscientious Refusal for Health Care Providers. [Panel presentation] American Society for Bioethics and Humanities. National Conference. October 15, 2009. Washington, DC.

6.   Whose outcomes? Which notion of health? Ethical issues in the measurement of religious experience and its relation to health. [Panel presentation] American Society for Bioethics and Humanities. National Conference. Washington, DC. October 18, 2009.

7.   Empirical research in bioethics: A toolkit for beginners. Pre-conference workshop. American Society for Bioethics and Humanities. National Conference. San Diego, CA. October 21, 2010

8.   Serving two masters? [Panel presentation] American Association for Hospice and Palliative Medicine Annual Assembly. February 11,2011

9.   Representing death, anticipating the corpse [Panel presentation]. American Society for Bioethics and Humanities. National Conference. Washington, DC. October 19, 2012

10.   Towards a new art of dying [Panel session]. 2013 Conference on Medicine and Religion. Chicago, IL. May 29, 2013

11.   Is traditional inpatient bioethics suited to outpatient settings? [panel] American Society for Bioethics and Humanities. National Conference. Atlanta, GA. October 26, 2013.

12.   Among all physicians, is there a physician? Irony and the practice of medicine. American Society for Bioethics and Humanities. National Conference. Atlanta, GA. October 26, 2013.

13.   "Do not be anxious ... about your body." Assessing contemporary primary care in light of the Sermon on the Mount. 2014 Conference on Medicine and Religion. Chicago, IL. March 8, 2014

14.   Pharmacist on the execution team [panel]. American Society for Bioethics and Humanities. National Conference. San Diego. October 18, 2014.

15.   Project on the Good Physician: Relevance of the Rationalist-Intuitionist Debate for Ethics and Professionalism in Medical Education. American Society for Bioethics and Humanities. National Conference. San Diego. October 18, 2014.

16.   Can Religion Find Its Voice at a Secular Deathbed? [panel] 2016 Conference on Medicine and Religion. Houston, TX. March 4-6.

17.   Doctor's Beliefs and Medical Practices: Transatlantic Comparisons. [panel] 2016 Conference on Medicine and Religion. Houston, TX. March 4-6.

18.   The Religion and Medicine of the Future:  An Orthodox Critique of Scientific Theology and Ecumenism. [panel] 2016 Conference on Medicine and Religion. Houston, TX. March 4-6.

19.   Reimagining Medicine: Theological Formation for Those with Vocations to Health Care. [panel] 2017 Conference on Medicine and Religion. Houston, TX. March 25.

20.   Solidarity with the suffering: Why physicians, *as physicians*, must oppose assisted suicide. International Congress on Law and Mental Health. Prague, Czech Republic. July 11, 2017

**Farr A. Curlin, MD**

21. Searching for a Foundation for Medicine that Christians Share with those who are not Christians [panel]. 2018 Conference on Medicine and Religion. St. Louis, MO. April 14.
22. Remembrance, Resilience, and Religious Formation in Medical Education: Two Case Studies [panel]. American Society for Bioethics and Humanities. National Conference. Pittsburgh. October 27, 2019
23. Improving Palliative and End-of-Life Care for African Americans: Remembering Dr. Richard Payne. [panel]. American Society for Bioethics and Humanities. National Conference. Pittsburgh. October 25, 2019
24. Is there a future for Hippocratic medicine? (panel) 2021 Conference on Medicine and Religion. March 23
25. Healing and Economy: The Question of Charity in a Secular Age (panel). 2021 Conference on Medicine and Religion. March 22
26. "Sufficient for the day is its own trouble": Medicalizing risk and the way of Jesus. 2022 Conference on Medicine and Religion. March 22
27. Secular medicine in the saeculum: An honored but humble servant. 2023 Conference on Medicine and Religion. March 13
28. Still Searching for Moral Certainty? The Physician-Patient Accommodation after 40 Years. 2023 Conference on Medicine and Religion. March 15


**CONFERENCES DIRECTED**

2008    Conscience and Clinical Practice: Medical Ethics in the Face of Moral Controversy. Hosted at the University of Chicago, March 18

2011    Practice and Profession: Setting Medicine in the Context of a Good and Faithful Life. University of Chicago, November 10.

2012    Responding to the Call of the Sick: Inaugural Conference on Medicine and Religion. May 23-25. Chicago. (with Daniel Sulmasy, MD, PhD)

2012    Judaism, Medicine, and the Formation of Clinicians. September 10, 2012. The University of Chicago (with Daniel Sulmasy, MD, PhD)

2013    What Does it Mean to *Care*? 2013 Conference on Medicine and Religion. Chicago. May 28-30. (with Daniel Sulmasy, MD, PhD)

2014    Responding to the limits and possibilities of the body. 2014 Conference on Medicine and Religion. Chicago. March 7-9. (with Daniel Sulmasy, MD, PhD)

2015    Spiritual Dimensions of Illness and Healing. 2015 Conference on Medicine and Religion. Cambridge, MA, March 6-8. (with Daniel Sulmasy, MD, PhD, and Michael Balboni, PhD)

2016    Approaching the Sacred: Science, Health, and Practices of Care. 2016 Conference on Medicine and Religion. Houston, TX. March 4-6. (with Michael Balboni, PhD)

2016 -   Practice and Presence: A Gathering for Christians in Health Care. Duke Divinity School. Durham, NC. (annual three day conference, with Warren Kinghorn, MD, PhD)

2017    Re-Enchanting Medicine. 2017 Conference on Medicine and Religion. Houston, TX. March 24-26. (with Michael Balboni, PhD)

2019    Theological Approaches to Persons in Pain. J.B. Duke Hotel & Conference Center. Durham, NC. March 28.

2019    "My pain is always with me"; Medicine & Faithful Responses to Suffering. 2019 Conference on Medicine and Religion. JB Duke Hotel & Conference Center. Durham, NC. March 29-31.

2021    2021 Conference on Medicine and Religion (Virtual). March 22-24.

2022    2022 Conference on Medicine and Religion, The Nines Hotel, Portland, OR. March 13-15.

**Farr A. Curlin, MD**

2022     Questioning Preventive Medicine: Is a Pound of Prevention Worth an Ounce of Cure? Duke University. May 17.


## TEACHING EXPERIENCE AND CURRICULUM DEVELOPMENT (selected)

### Undergraduates

| | |
|---|---|
| 2006 | Things, bodies, persons: Human goods in the technological era. Big Problems Course, The University of Chicago. (faculty, with J Lantos and D Brudney) |
| 2022 - | Medicine and Human Flourishing. Course for sophomores in "Transformative Ideas" series. Worked with primary instructor, Jose Gonzalez, to design course. |

### Medical Students

| | |
|---|---|
| 2002, 2003 | Medicine and Spirituality Course. University of Chicago. (guest lecture) |
| 2002, 2003 | National *Wit* Education Initiative. Discussion group facilitator. |
| 2003 – 2013 | Cultural competence in medicine. Preceptor |
| 2004 – 2006 | Committee for Medical Student Retreats, Co-created and co-directed sessions on humanism and medicine (90 students/session). |
| 2004 | Essentials of Physicianship. MS1 course. Small Group facilitator/instructor |
| 2004, 2005 | Spirituality and Healing in Medicine. medical student elective (course co-director). |
| 2004, 2006 | Clinical Skills 1C course. (lecture: Religion and the doctor-patient relationship). |
| 2005 – 2013 | Summer Research Program. (faculty mentor to 10 medical students) |
| 2005 – 2013 | Death, dissection, and doctor formation. (Annual lecture before MS1 cadaver lab) |
| 2005 – 2013 | Doctor-Patient Relationship course. (Core faculty and lecturer) |
| 2010 – 2013 | Physician Development and Formation. (Co-director of required small group discussion component of MS1 Gross Anatomy course) |
| 2015 – 2019 | MS2 Practice Course. Teach session(s) on the ethics of clinical decision-making, and on religion, spirituality, and medicine |
| 2019 – | Clinical Medical Ethics: What Would a Good Physician Do? (annual 8-week elective, now co-taught with Dr. Josh Briscoe) |

### Residents

| | |
|---|---|
| 2004 – 2013 | Internal Medicine Residency Morning Report. (Faculty discussant for 55 total sessions over 9 years, focused on cases with clinical ethical complexity) |

### Fellows

| | |
|---|---|
| 2004-5, 2007 | Research Proposal Design Workshop. Co-directed summer workshop for fellows in health services research and ethics. |
| 2004 – 2013 | MacLean Center for Clinical Medical Ethics Fellowship. Taught three sessions/year |
| 2006 – 2013 | Religious Traditions and Clinical Ethical Decisions. (director of annual, quarter-long seminar for fellows in clinical medical ethics and interested medical students) |
| 2010 – 2013 | Summer Program in Outcomes Research Training. Teach 90-minute session for clinical research fellows on Practical Survey Development and Design. |

### Divinity Students

| | |
|---|---|
| 2014 | Healing Arts: Suffering, Illness, and the Witness of the Church. Duke Divinity School. (course co-director, with Kinghorn and Barfield) |
| 2016 – | Health Care in Theological Context II (formerly *Theological Bioethics*). Semester-length course. Duke Divinity School |

## GRANT FUNDING
**Current:**

**Farr A. Curlin, MD**

1. Forming Distinguished Scholars for Christ across Academic Medicine
PI: Kinghorn (Curlin Co-Investigator)          Agency: McDonald Agape Fund
                                              Period: 1/1/23 – 12/31/26
This project gathers, mentors, and resources a network of outstanding colleagues from other major academic medical centers seeking to renew medicine through attention to its theological dimensions.


**Past:**
1. The integration of religion and spirituality in patient care among US physicians
PI: Curlin and Chin                Agency: The Greenwall Foundation
                                   Period: 07/01/02 – 06/30/04

Project conducted the first comprehensive national study of physician's religious characteristics and how those characteristics are associated with physicians' clinical practices.


2. Religious commitments and clinical engagements
PI: Curlin                         Agency: NCCAM
Type: K23 AT002749-01A1            Period: 10/01/05 – 09/30/10
Project developed a mixed-methods framework for assessing the religion-associated variations in physicians' self-reported and self-predicted practices in different clinical domains.


3. Variance on the margins of religion and medicine
PI: Curlin                         Agency: The Greenwall Foundation
                                   Period: 07/01/06 – 06/30/09

[Greenwall Foundation Faculty Scholar in Bioethics] Project refined a methodology for assessing religion-associated variance in physicians' self-reported and self-predicted practices, and applied that methodology to assess variations in physicians' approaches to sexual and reproductive health care.


4. Conscience and Clinical Practice: Medical Ethics in the Face of Moral Controversy
PI: Curlin                         Agency: The Greenwall Foundation
                                   Period: 01/01/08 – 06/30/09

Grant supported a conference on the place of the clinician's conscience in ethical practice, held at the University of Chicago on March 18, 2008.


5. The Chicago Program on Spirituality, Theology and Clinical Decision-Making
PI: Curlin                         Agency: The John Templeton Foundation
                                   Period: 10/01/08 – 09/30/12

This project established the Program on Medicine and Religion at the University of Chicago and supported four national physician surveys to assess religion-associated variations in physicians' practices related to 1) sexual and reproductive health care, 2) primary care mental and behavioral health care, 3) decision-making in advanced illness and end of life care, and 4) the doctor patient relationship and meaning in medicine.


6. Project on the Good Physician: A New Science of Virtues
PI: Curlin                         Agency: Arete Initiative, The University of Chicago
                                   Period: 3/1/10 – 2/28/12

**Farr A. Curlin, MD**

This grant supported a national longitudinal study of the moral and professional formation of American physicians over the course of medical training

7. Physician Heal Thyself: The University of Chicago Medicine and Religion Faculty Scholars Program
PI: Sulmasy (Curlin Co-PI)          Agency: The John Templeton Foundation
                                    Period: 7/1/12-6/30/15
Project established a Faculty Scholars Program in Medicine and Religion, funding eight junior faculty nationwide at 50% effort for two year tenures.

8. Toward Policies that Accommodate the Concerns of African Americans in Resolving Disputes about the Use of Life-Sustaining Technology
PI: Johnson (Curlin Co-I)          Agency: Greenwall Foundation
                                    Period: 3/1/2015 – 2/29/2017
This project examined the attitudes of African Americans toward futile treatments and futility policies.

9. Training Research-Literate Chaplains as Ambassadors for Spirituality and Health
PI: Fitchett and Cadge (Curlin Co-I)     Agency: John Templeton Foundation
                                          Period: 7/1/2015 - 6/30/19
This project advanced research literacy among the nation's health care chaplains.

10. Toward Effective Cooperation between Clinical and Other Community Stakeholders Committed to Stemming the Opioid Epidemic
PI: Curlin (McCarty Co-PI)          Agency: The Greenwall Foundation
                                    Period: 7/1/2019 – 6/30/2022
This project aims to 1) describe the barriers to institutional collaboration among those responding to the opioid epidemic; and 2) create policy recommendations for effective collaboration in efforts to stem the opioid epidemic.

11. The Arete Initiative at Duke University's Kenan Institute for Ethics
PI: Curlin                          Agency: Foundation for Excellence in Higher Education
                                    Period: 7/1/17 – 6/30/21
The Arete Initiative sponsors scholarship and learning opportunities focused on recovering and sustaining the virtues in contemporary life, especially in the workplace, the university, and the public square.

12. Fellowship in Theology, Medicine, and Culture
PI: Kinghorn (Curlin Co-Investigator)     Agency: The Issachar Fund
                                          Period: 7/1/15 – 12/31/22
Project invites students and practitioners in health professions, as well as others with full-time vocations to health-related contexts, to participate in a program of theological formation that will equip them for faithful, disciplined, and creative engagement with contemporary practices of health care.

13. Out of Our Meds? Building a Theological and Moral Framework for the Use of Medications
PI: Kinghorn (Curlin Co-Investigator)     Agency: McDonald Agape Fund
                                          Period: 2016 – 2022
This project conducts a series of five annual symposia on theological, ethical, and clinical questions raised by pharmaceutical prescribing.

**PUBLICATIONS**
**Original peer-reviewed scholarship**

11

**Farr A. Curlin, MD**

Books
Curlin FA, Tollefsen C. *The Way of Medicine: Ethics and the Healing Profession*. Notre Dame University Press; 2021.

Papers
1. Iwashyna TJ, Curlin FA, Christakis NA. Racial, ethnic and affluence differences in elderly patients' use of teaching hospitals. *J Gen Int Med*. 2002;17(9):696-703.

2. Hall DE, Curlin F, Koenig HG. When clinical medicine collides with religion. *Lancet*. 2003;362:S28-S29

3. Hall DE, Curlin FA. Can physicians' care be neutral regarding religion? *Academic Medicine*. 2004;79:677-679.

4. Curlin FA and Moschovis PP. Is religious devotion relevant to the doctor-patient relationship? *Journal of Family Practice*. 2004;53(8):632-640.

5. Curlin FA, Roach CJ, Gorawara-Bhat R, Lantos JD, Chin MH. When patients choose faith over medicine: Physician perspectives on religiously related conflict in the medical encounter. *Archives of Internal Medicine*. 2005;165(1):88-91

6. Curlin FA, Hall DE. Strangers or friends? A proposal for a new spirituality-in-medicine ethic. *J Gen Intern Med*. 2005;20(4):370-374.

   Editorial: Scheurich N. Spirituality, Medicine, and the Possibility of Wisdom. *J Gen Intern Med*. 2005;20(4):379-380.

7. Curlin FA, Lantos JD, Roach CJ, Sellergren SA, Chin MH. Religious characteristics of U.S physicians: A national survey. *J Gen Intern Med*. 2005;20(7):629-634.

8. Curlin FA, Roach CJ, Gorawara-Bhat R, Lantos JD, Chin MH. How are religion and spirituality related to health? A study of physicians' perspectives. *South Med J*. 2005; 98(8):761-6.

   Editorial: Daly CC. Religion and the attending physician's point-of-view. *South Med J*. 2005; 98(8):759

9. Gee L, Smucker D, Chin M, Curlin FA. Partnering together? A study of current relationships between faith-based community health centers and local religious congregations. *South Med J*. 2005; 98(12):1245-50

   Editorial: Flannelly KJ, Weaver AJ, Tannenbaum HP. What do we know about the effectiveness of faith-based health programs? *South Med J*. 2005; 98(12):1243-4.

10. Curlin FA, Hall DE. Regarding Plan B: Science and politics cannot be separated. *Obstet Gynecol*. 2005;105(5):1148-50

11. Curlin FA, Chin MH, Sellergren SA, Roach CJ, Lantos JD. The association of physicians' religious characteristics with their attitudes and self-reported behaviors regarding religion and spirituality in the clinical encounter. *Med Care*. 2006;44:446-53

12. Curlin FA. Spirituality and lifestyle: what clinicians need to know. *South Med J*. 2006;99:1170-1.

13. Curlin FA, Serrano K, Baker M, Carricaburu S, Smucker D, Chin MH. Following the call: How providers make sense of their decisions to work in faith-based and secular urban community health centers. *J Health Care Poor Underserved*. 2006;17(4):944-957

14. Curlin FA, Lawrence RE, Chin MH, Lantos JD. Religion, conscience, and controversial clinical practices. *New England Journal of Medicine*. 2007;356(6):593-600

**Farr A. Curlin, MD**

Curlin FA, Lawrence RE, Lantos JD. Letters and author reply. Religion, conscience, and controversial clinical practices. *N Engl J Med*. 2007;356(18):1889-92

15. Curlin FA, Sellergren SA, Lantos JD, Chin MH. Physicians' observations and interpretations of the influence of religion and spirituality on health. *Arch Intern Med*. 2007;167(7):649-54

16. Curlin FA, Dugdale LS, Lantos JD, Chin MH. Do religious physicians disproportionately care for the underserved? *Annals of Family Medicine*. 2007;5(4):353-60.

17. Curlin FA, Odell S, Lawrence RE, Chin MH, Lantos JD, Meador KG, Koenig HG. The relationship between psychiatry and religion among US physicians. *Psychiatr Serv* 2007;58(9):1193-1198.

Curlin FA, Meador KG, Koenig HG. Psychiatrists and religious belief: reply. *Psychiatr Serv*. 2007;58(11):1500-1

18. Curlin FA, Lawrence RE, Odell S, Chin MH, Lantos JD, Koenig HG, Meador KG. Religion, spirituality, and medicine: psychiatrists' and other physicians' differing observations, interpretations, and clinical approaches. *Am J Psychiatry*. 2007;164(12):1825-31.

Editorial: Eichelman B. Religion, spirituality, and medicine. Am J Psychiatry 2007;164: 1774-1775

19. Lawrence RE, Curlin FA. Clash of definitions: Controversies about conscience in medicine. *American Journal of Bioethics*. 2007;7(12):10-4.

Lawrence RE, Curlin FA. Response to eleven peer commentaries regarding "Clash of Definitions: Controversies about Conscience in Medicine". *Am J Bioeth*. 2007;7(12):1-2.

20. Curlin FA, Nwodim C, Vance JL, Chin MH, Lantos JD. To die, to sleep: US physicians' religious and other objections to physician assisted suicide, terminal sedation, and withdrawal of life support. *Am J Hosp Palliat Care*. 2008;25(2):112-20.

21. Lantos JD, Curlin FA. Religion, conscience, and clinical decisions. *Acta Paediatr*. 2008;97(3):265-6.

22. Curlin FA, Dinner SN, Lindau ST. Of more than one mind: obstetrician-gynecologists' approaches to morally controversial decisions in sexual and reproductive healthcare. *J Clin Ethics*. 2008;19(1):11-21; discussion 22-3

Published as Feature article with the following editorials: 1) Howe EG. When, if ever, should caregivers provide moral advice? 2) Pellegrino ED. Commentary on 'Of More than One Mind.' 3) Chervenak FA, McCullough LB. Professional responsibility and individual conscience, and 4) Kozishek D, Bogdan-Lovis E. Beliefs, boundaries, and self-knowledge in professional practice.

23. Ishibashi KL, Koopmans J, Curlin FA, Alexander K, Ross LF. Paediatricians' attitudes and practices towards HPV vaccination. *Acta Paediatr*. 2008;97(11):1550-6

24. Tilburt JC, Kaptchuk TJ, Curlin FA, Emanuel EJ, Miller FG. Prescribing "placebo treatments": results of national survey of US internists and rheumatologists. *BMJ*. 2008;337:a1938

25. Ishibashi KL, Curlin FA, Alexander K, Koopmans J, Ross LF. Pediatricians are more supportive of HPV vaccination than are members of the general public. *South Med J*. 2008;101(12):1216-21.

26. Tilburt JC, Curlin FA, Kaptchuk TJ, Clarridge B, Bolcic-Jankovic D, Emanuel EJ, Miller FG. Alternative medicine research in clinical practice: a US national survey. *Arch Intern Med*. 2009;169(7):670-7.

27. Lawrence RE, Curlin FA. Autonomy, religion and clinical decisions: findings from a national physician survey. *J Med Ethics*. 2009;35(4):214-8.

**Farr A. Curlin, MD**

28. Curlin FA, Lawrence RE, Fredrickson J. An ethical façade? Medical students' miscomprehensions of substituted judgment. PLoS ONE. 2009;4(2):e4374.

29. Lawrence RE, Curlin FA. Physicians' beliefs about conscience in medicine: a national survey. *Acad Med*. 2009;84(9):1276-82.

30. Antiel RM, Curlin FA, James KM, Tilburt JC. Physicians' beliefs and U.S. health care reform—A national survey. *New England Journal of Medicine*. 2009 Oct 1;361(14):e23. Epub 2009 Sep.

31. Curlin FA, Rasinski KA, Kaptchuk TJ, Emanuel EJ, Miller FG, Tilburt JC. Religion, clinicians, and the integration of complementary and alternative medicines. *J Altern Complement Med*. 2009;15(9):987-94.

32. Fitchett G, Rasinski K, Cadge W, Curlin FA. Physicians' experience and satisfaction with chaplains: a national survey. Arch Intern Med. 2009;169(19):1808-10.

33. Manek NJ, Crowson CS, Ottenberg AL, Curlin FA, Kaptchuk TJ, Tilburt JC. What rheumatologists in the United States think of complementary and alternative medicine: Results of a national survey. *BMC Complement Altern Med*. 201028;10:5.

34. Bekelman DB, Curlin FA, Parry C, Yamashita T, Fairclough D, Wamboldt FS. A comparison of two spirituality instruments and their relationship to depression and quality of life in chronic heart failure *J Pain Symptom Manage*. 2010;39(3):515-2.

35. Tilburt JC, Miller FG, Jenkins S, Kaptchuk TJ, Clarridge B, Bolcic-Jankovic D, Emanuel EJ, Curlin FA. Factors that influence practitioners' interpretations of evidence from alternative medicine trials: a factorial vignette experiment embedded in a national survey. *Med Care*. 2010; 48(4):341-8.

36. Stulberg D, Lawrence RE, Schattuck J, Curlin FA. Religious hospitals and primary care physicians: Conflicts over policies for patient care. *J Gen Intern Med*. 2010;25(7):725-30.

37. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Obstetrician-gynecologists' beliefs about assisted reproductive technologies. *Obstetrics and Gynecology*. 2010;116(1):127-35.

38. Yoon JD, Rasinski K, Curlin FA. Moral controversy, directive counsel, and the doctor's role: Findings from a national survey of obstetrician-gynecologists. *Acad Med*. 2010;85(9):1475-81.

39. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Obstetrician-gynecologist physicians' beliefs about emergency contraception: A national survey. *Contraception*. 2010;82(4):324-30.

40. Yoon JD, Rasinski KA, Curlin FA. Conflict and emotional exhaustion in obstetrician-gynecologists: A national survey. *J Med Ethics*. 2010;36(12):731-5.

41. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Obstetrician-gynecologist physicians' views on contraception and natural family planning. *Am J Obstet Gynecol*. 2011;204:124.e1-7.

42. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Factors influencing physicians' advice about female sterilization: a national survey. *Human Reproduction*. 2011;26(1):106-11.

43. Antiel RM, Curlin FA, Hook CC, Tilburt JC. The impact of medical school oaths and other professional codes of ethics: results of a national physician survey. *Arch Intern Med*. 2011;171(5):469-71.

44. Lawrence RE, Curlin FA. The rise of empirical research in medical ethics: a MacIntyrean critique and proposal. *J Med Philos*. 2011;36(2):206-16.

45. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Adolescents, contraception, and confidentiality: a national survey of obstetrician-gynecologists. *Contraception*. 2011;84(3):259-65.

**Farr A. Curlin, MD**

46. Combs MP, Antiel RM, Tilburt JC, Mueller PS, Curlin FA. Conscientious refusals to refer: findings from a national physician survey. *J Med Ethics*. 2011;37(7):397-401.

47. Rasinski KA, Yoon JD, Kalad YG, Curlin FA. Obstetrician-gynecologists' opinions about conscientious refusal of a request for abortion: Results from a national vignette experiment. *J Med Ethics*. 2011;37(12):711-4.

48. Rasinski KA, Kalad YG, Yoon JD, Curlin FA. An assessment of US physicians' training in religion, spirituality and medicine. *Medical Teacher*. 2011;33(11):944-5.

49. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Obstetrician-gynecologists' beliefs about safe-sex and abstinence counseling. *Int J Gynaecol Obstet.* 2011;114(3):281-5.

50. Chung GS, Lawrence RE, Curlin FA, Arora V, Meltzer DO. Predictors of hospitalised patients' preferences for physician-directed medical decision-making. *J Med Ethics*. 2012;38(2):77-82.

51. Williams JA, Meltzer DO, Arora V, Chung G, Curlin FA. Attention to inpatients' religious and spiritual concerns: Predictors and association with patient satisfaction. *J Gen Int Med*. 2011;26(11):1265-71

52. Stern RM, Rasinski KA, Curlin FA. Jewish physicians' beliefs and practices regarding religion/spirituality in the clinical encounter. *J Relig Health.* 2011;50(4):806-17.

53. Stulberg DB. Dude AM, Dahlquist I, Curlin FA. Abortion provision among practicing obstetrician-gynecologists. *Obstet Gynecol.* 2011;118(3):609-14.

54. Harris L, Cooper A, Rasinski KA, Curlin FA, Lyerly AD. Obstetrician-gynecologists' objections to and willingness to help patients obtain an abortion. *Obstet Gynecol.* 2011;118(4):905-912.

55. Chung GS, Lawrence RE, Yoon JD, Rasinski KA, Curlin FA. Obstetrician-gynecologists' beliefs about when pregnancy begins. *Am J Obstet Gynecol.* 2012;206(2):132.e1-7

    Letter Reply: Chung GS, Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Am J Obstet Gynecol. 2012;207(5):e9-e10.

56. Lawrence RE, Rasinski KA, Yoon JD, Koenig HG, Meador KG, Curlin FA. Physicians' beliefs about faith-based treatments for alcoholism. *Psychiatric Serv*. 2012;63(6):597-604.

57. Sobecki JN, Curlin FA, Rasinski KA, and Lindau ST. What we don't talk about when we don't talk about sex: Results of a national survey of U.S. obstetrician/gynecologists. *J Sex Med* 2012;9:1285–94

58. Karches KE, Chung G, Arora V, Meltzer DO, Curlin FA. Religiosity, spirituality, and end of life planning: A single-site survey of medical inpatients. *J Pain Symptom Manage*. 2012;44(6):843-51

59. Antiel RM, Curlin FA, James KM, Sulmasy DP, Tilburt JC. Dignity in end of life care: results of a national survey of US physicians. *Journal of Pain and Symptom Management*. 2012;44(3):331-9

60. Stulberg DB, Dude AM, Dahlquist I, Curlin FA. Obstetrician–gynecologists, religious institutions, and conflicts regarding patient care policies. *Am J Obstet Gynecol*. 2012;207(1):73.e1-5

61. Lawrence RE, Rasinski KA, Yoon JD, Meador KG, Koenig HG, Curlin FA. Primary care physicians' and psychiatrists' approaches to treating mild depression. *Acta Psychiatr Scand*. 2012;126(5):385-392

62. Rasinski KA, Lawrence RE, Yoon JD, Curlin FA. A sense of calling and primary care physicians' satisfaction in treating smoking, alcoholism and obesity. *Arch Intern Med.* 2012;172(18):1423-4.

63. Shin JH, Yoon, JD, Rasinski KA, Koenig HG, Meador KG, Curlin FA. A spiritual problem? Primary care physicians' and psychiatrists' interpretations of medically unexplained symptoms. *J Gen Intern Med*. 2013;28(3):392-8

**Farr A. Curlin, MD**

64. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Physicians' beliefs about the nature of addiction: a survey of primary care physicians and psychiatrists. *Am J Addict*. 2013;22(3):255-60

65. Putman MS, Yoon JD, Rasinski KA, Curlin FA. Intentional sedation to unconsciousness at the end of life: Findings from a national physician survey. *J Pain Symptom Manage.* 2013;46(3):326-34.

    Authors' reply to Dirksen et al. Putman MS, Curlin FA. J Pain Symptom Manage. 2013;45(5):e2-3.

66. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Religion and anxiety treatments in primary care patients. *Anxiety Stress Coping.* 2013;26(5):526-38.

67. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Religion and beliefs about treating medically unexplained symptoms: a survey of primary care physicians and psychiatrists. *Int J Psych Med*. 45(1); 2013: 31-44.

68. Sheppe A, Nicholson R, Rasinski KA, Yoon JD, Curlin FA. Providing guidance to patients: physicians' views about the relative responsibilities of doctors and religious communities. *South Med J.* 2013;106(7):399-406

    Commentary: Perkins HS. South Med J. 2013;106(7):407-8

69. Combs MP, Rasinski KA, Yoon JD, Curlin FA. Substituted judgment in principle and practice: A national physician survey. *Mayo Clinic Proceedings*. 2013;88(7):666-73.

70. Tilburt JC, James K, Jenkins SM, Antiel RM, Curlin FA, Rasinski KA. "Righteous Minds" in health care: Measurement and explanatory value of social intuitionism in accounting for the moral judgments of U.S. physicians. *PLoS One*. 2013;8(9):e73379.

71. Antiel RM, Curlin FA. The moral psychology of rationing among physicians: The role of harm and fairness intuitions in physician objections to cost-effectiveness and cost-containment. *Philos Ethics Humanit Med.* 2013;8(1):13.

72. Padela AI, Curlin FA. Religion and disparities: Considering the influences of Islam on the health of American Muslims. *J Relig Health*. 2013;52(4):1333-45.

73. Wolenberg KM, Yoon JD, Rasinski KA, Curlin FA. Religion and United States physicians' opinions and self-predicted practices concerning artificial nutrition and hydration. *J Relig Health.* 2013;52(4):1051-65.

74. Putman MS, Yoon JD, Rasinski KA, Curlin FA. Directive counsel and morally controversial medical decision-making: Findings from two national surveys of primary care physicians. *J Gen Int Med.* 2014; 29(2):335-340.

    Commentary: Zehnder NG. J Gen Intern Med. 2013 Nov 6

75. Antiel RM, O'Donnell EP, James KM, Hardt JJ, Curlin FA, Tilburt JC. Physician opinion and the HHS contraceptive mandate. *AJOB Empirical Bioethics*. 2014;5(1):56-60

76. Cook AF, Arora VM, Rasinski KA, Curlin FA, Yoon JD. The prevalence of medical student mistreatment and its association with burnout. *Academic Medicine*. 2014;89(5):749-54

77. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Physician race and treatment preferences for depression, anxiety, and medically unexplained symptoms. *Ethn Health.* 2014;29:1-11.

78. Kim DT, Curlin FA, Wolenberg KM, Sulmasy DP. Religion in organized medicine: The Committee and Department of Medicine and Religion of the American Medical Association, 1961-1974. *Perspect Biol Med.* 2014;57(3):393-414

**Farr A. Curlin, MD**

79. Shim JM, Schneider J, Curlin FA. Patterns of user disclosure of complementary and alternative medicine (CAM) use. *Med Care*. 2014;52(8):704-8

80. Padela AI, Peek M, Johnson-Agbakwu CE, Hosseinian Z, Curlin F. Associations between religion-related factors and cervical cancer screening among Muslims in greater Chicago. *J Low Genit Tract Dis*. 2014;18(4):326-32.

81. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Primary care physicians' and psychiatrists' willingness to refer to religious mental health providers. *International Journal of Social Psychiatry*. 2014;60(7):627-36.

82. Lee RT, Barbo A, Lopez G, Melhem A, Lin H, Olopade OI, Curlin FA. National survey of US oncologists' knowledge, attitudes, and practice patterns regarding herb and supplement use by patients with cancer. *Journal of Clinical Oncology*. 2014;32(36):4095-101

83. Kim DT, Curlin FA, Wolenberg KM, Sulmasy DP. Back to the Future: The AMA and Religion, 1961-1974. *Academic Medicine*. 2014;89(12):1603-9.

      Wolenberg K, Kim D, Curlin F, Sulmasy D. In reply to Cayley. Acad Med. 2015;90(5):547

84. Lewis-Newby M, Wicclair M, Pope T, Rushton C, Curlin F, Diekema D, Durrer D, Ehlenbach W, Gibson-Scipio W, Glavan B, Langer RL, Manthous C, Rose C, Scardella A, Shanawani H, Siegel MD, Halpern SD, Truog RD, White DB. An official American Thoracic Society policy statement: managing conscientious objections in intensive care medicine. ATS Ethics and Conflict of Interest Committee. *Am J Respir Crit Care Med*. 2015;191(2):219-27.

85. Ravella KC, Curlin FA, Yoon JD. Medical school ranking and medical student vocational identity. *Teach Learn Med*. 2015; 27(2): 123-129

86. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA Psychiatrists' and primary care physicians' beliefs about overtreatment of depression and anxiety. *J Nerv Ment Dis*. 2015;203(2):120-5.

87. Smyre CL, Yoon JD, Rasinski KA, Curlin FA. Limits and responsibilities of physicians addressing spiritual suffering in terminally ill patients. *J Pain Symptom Manage*. 2015;49(3):562-9

88. Yoon JD, Shin JH, Nian AL, Curlin FA. Religion, sense of calling and the practice of medicine: Findings from a national survey of primary care physicians and psychiatrists. *Southern Medical Journal*. South Med J. 2015;108(3):189-95

89. Padela AI, Malik AY, Curlin FA, De Vries R. [Re]considering respect for persons in a globalizing world. *Developing World Bioethics*. 2015; 108(2):98–106

90. Padela AI, Murrar S, Adviento B, Liao C, Hosseinian Z, Peek M, Curlin FA. Associations between religion-related factors and breast cancer screening among American Muslims. *J Immigr Minor Health*. 2015;17(3):660-9.

91. Carey GB, Curlin FA, Yoon JD. Medical student opinions on character development in medical education: A national survey. *BMC Res Notes*. 2015;8:455.

92. Choi PJ, Curlin FA, Cox CE. "The patient is dying, please call the chaplain": The activities of chaplains in one medical center's intensive care units. *J Pain Symptom Manage*. 2015;50(4):501-6

93. Ernecoff NC, Curlin FA, Buddadhumaruk P, White DB. Health care professionals' responses to religious or spiritual statements by surrogate decision makers during goals-of-care discussions. *JAMA Intern Med*. 2015;175(10):1662-9

      Ernecoff NC, Curlin FA, White DB. Spiritual Care Providers and Goals-of-Care Discussions--Reply. *JAMA Intern Med*. 2016;176(2):279.

**Farr A. Curlin, MD**

94. Leffel GM, Oakes RA, Curlin FA, Yoon JD. Relevance of the rationalist-intuitionist debate for ethics and professionalism in medical education. *Adv Health Sci Educ Theory Pract.* 2015;20(5):1371-83

95. Yang YT, Curlin FA. Why physicians should oppose assisted suicide. *JAMA.* 2016;315(3):247-8

96. Curlin FA. What does *any* of this have to do with being a physician? Kierkegaardian irony and the practice of medicine. *Christian Bioethics.* 2016;22(1):62–79

97. Yoon JD, Daley BM, Curlin FA. The association between a sense of calling and physician well-being: A national study of primary care physicians and psychiatrists. *Acad Psychiatry.* 2017;41(2):167-173

98. Brauer SG, Yoon JD, Curlin FA. US Primary care physicians' opinions about conscientious refusal: A national vignette experiment. *J Med Ethics.* 2016;42(2):80-4.

99. Salmoirago-Blotcher E, Fitchett G, Leung K, Volturo G, Boudreaux E, Crawford S, Ockene I, Curlin F. An exploration of the role of religion/spirituality in the promotion of physicians' wellbeing in Emergency Medicine. *Prev Med Rep.* 2016;3:189-95.

100. Hodges LE, Tak HJ, Curlin FA, Yoon JD. Whistleblowing in medical school: A national survey on professionalism and peer accountability in medical students. *Acad Psychiatry.* 2016;40(3):530-3.

101. Ayeh DD, Tak HJ, Yoon JD, Curlin FA. US physicians' opinions about accommodating religiously based requests for continued life-sustaining treatment. *J Pain Symptom Manage.* 2016;51(6):971-8.

102. Padela AI, Huda A, Ahmed M, Hosseinian Z, Curlin F. Religious identity & workplace discrimination: A national survey of American Muslim physicians. *AJOB Empirical Bioethics.* 2016;7(3):149-159

103. Chung GS, Yoon JD, Rasinski KA, Curlin FA. US physicians' opinions about distinctions between withdrawing and withholding life-sustaining treatment. *J Relig Health.* 2016;55(5):1596-606

104. Prochaska MT, Putman MS, Tak HJ, Yoon JD, Curlin FA. US physicians overwhelmingly endorse hospice as the better option for most patients at the end of life. *Am J Hosp Palliat Care.* 2017;34(6):556-558

105. Putman MS, Tak HJ, Yoon JD, Curlin FA. Quality of life and recommendations for further care. *Crit Care Med.* 2016;44(11):1996-2002

106. Chung GS, Diaz MJ, Arora V, Meltzer DO, Curlin FA. Changes in health status and frequency of attending religious services among medical inpatients with repeat admissions. *Journal of Religion, Spirituality & Aging.* 2016;28(4):349-358

107. Hvidt NC, Kørup AK, Curlin FA, Baumann K, Frick E, Søndergaard J et al. The NERSH International Collaboration on Values, Spirituality and Religion in Medicine: Development of Questionnaire, Description of Data Pool, and Overview of Pool Publications. *Religions.* 2016;7(8):107. Available from DOI: 10.3390/rel7080107

108. Lee BM, Curlin FA, Choi PJ. Documenting presence: A descriptive study of chaplain notes in the intensive care unit. *Palliat Support Care.* 2017;15(2):190-196

109. Leffel BM, Oakes RA, Ham SA, Curlin FA, Yoon JD. Project on the Good Physician: A proposal for a moral intuitionist model of virtuous caring. *Teach Learn Med.* 2017;29(1):75-84

110. Yoon JD, Hunt NB, Ravella K, Jun C, Curlin FA. Physician burnout and the calling to care for the dying: A national survey. *Am J Hosp Palliat Care.* 2017;34(10):931-937

111. Tak HJ, Curlin FA, Yoon JD. Association of intrinsic motivating factors and markers of physician well-being: A national physician survey. *J Gen Intern Med.* 2017 Jul;32(7):739-746

**Farr A. Curlin, MD**

112. Brauer SG, Yoon JD, Curlin FA. Physician satisfaction in treating medically unexplained symptoms. *South Med J*. 2017;110(5):386-91

113. Hawking M, Curlin FA, Yoon JD. Courage and compassion: Virtues in caring for so-called "difficult" patients. *AMA Journal of Ethics*. 2017;19(4): 357-63

114. Putman MS, D'Alessandro A, Curlin FA, Yoon JD. Unilateral do not resuscitate orders: Physician attitudes and practices. *Chest*. 2017;152(1):224-225

115. Antiel R, Collura C, Flake A, Johnson M, Rintoul N, Lantos J, Curlin F, Tilburt J, Brown S, Feudtner C. Physician views regarding the benefits and burdens of prenatal surgery for myelomeningocele. *J Perinatol*. 2017;37(9):994-998

116. Hines H, Avile CJ, Rudakevych T, Curlin FA, Yoon JD. Physician perspectives on long-term relationships and friendships with patients: A national assessment. *South Med J*. 2017;110(11):679-684

117. Antiel RM, Flake AW, Johnson MP, Khalek N, Rintoul NE, Lantos JD, Curlin FA, Tilburt JC, Feudtner C. Specialty-based variation in applying maternal-fetal surgery trial evidence. *Fetal Diagn Ther*. 2017;42(3):210-217

118. Antiel RM, Flake AW, Collura C, Johnson M, Rintoul N, Lantos J, Curlin FA, Tilburt J, Brown SD, Feudtner C. Weighing the social and ethical considerations of maternal-fetal surgery. *Pediatrics*. 2017;140(6).

119. O'Connell TF, Ham S, Hart T, Curlin FA, Yoon JD. A national longitudinal survey of medical students' intentions to practice among the underserved. *Acad Med*. 2018;93(1):90-97

120. Smyre CL, Tak HJ, Dang A, Yoon JD, Curlin FA. Physicians' opinions on engaging patients' religious and spiritual concerns: A national survey. *J Pain Symptom Manage*. 2018;55(3):897-905

121. Frush B, Brauer SG, Yoon JD, Curlin FA. Physician decision-making in the setting of advanced illness: An examination of patient disposition and physician religiousness. *J Pain Symptom Manage*. 2018;55(3):906-912

122. Antiel RM, Curlin FA, Lantos JD, Collura CA, Flake AW, Johnson MP, Rintoul NE, Tilburt JC, Brown SD, Feudtner C. Attitudes of paediatric and obstetric specialists toward prenatal surgery for lethal and non-lethal conditions. *J Med Ethics*. 2018;44(4):234-238

123. Yoon JD, Ham SA, Reddy ST, Curlin FA. Role models' influence on specialty choice for residency training: A national longitudinal study. *J Grad Med Educ*. 2018;10(2):149-154

124. Sobowale K, Ham S, Curlin FA, Yoon JD. Personality traits are associated with academic achievement in medical school: A nationally representative study. *Acad Psychiatry*. 2018;42(3):338-345

125. Leffel GM, Oakes Mueller RA, Ham SA, Karches KE, Curlin FA, Yoon JD. Project on the Good Physician: Further Evidence for the Validity of a Moral Intuitionist Model of Virtuous Caring. *Teach Learn Med*. 2018;30(3):303-316

126. Frush B, Eberly JB, Curlin FA. What should physicians and chaplains do when a patient believes God wants him to suffer? *AMA J Ethics*. 2018;20(7):E613-620

127. Choi PJ, Curlin FA, Cox CE. Addressing religion and spirituality in the intensive care unit: A survey of clinicians. *Palliat Support Care*. 2018 Apr 30:1-6.

128. Stavig A, Yoon JD, Curlin FA. Taking societal cost into clinical consideration: US physicians' views. *AJOB Empirical Bioethics*. 2018 Jul-Sep;9(3):173-180

**Farr A. Curlin, MD**

129. Curlin FA. Palliative sedation: clinical context and ethical questions. *Theor Med Bioeth*. 2018 Jun;39(3):197-209

130. Blythe JA, Curlin FA. "Just do your job": technology, bureaucracy, and the eclipse of conscience in contemporary medicine. *Theor Med Bioeth*. 2018 Dec;39(6):431-452

131. Choi PJ, Chow V, Curlin FA, Cox CE. Intensive care clinicians' views on the role of chaplains. *J Health Care Chaplain*. 2018 Dec 5:1-10

132. Curlin FA, Tollefsen C. Conscience and the way of medicine. *Perspect Biol Med*. 2019;62(3):560-575

133. Blythe JA, Curlin FA. How Should Physicians Respond to Patient Requests for Religious Concordance? *AMA J Ethics.* 2019;21(6): E485-492

134. Antiel RM, Curlin FA, Persad G, White DB, Zhang C, Glickman A, Emanuel EJ, Lantos JD. Should pediatric patients be prioritized when rationing life-saving treatments during COVID-19 pandemic. *Pediatrics*. 2020;146(3):e2020012542.

135. Tollefsen C, Curlin FA. Solidarity, trust, and Christian faith in the doctor–patient relationship. *Christian Bioethics.* 2021; 27(1):14–29

136. Curlin FA, Tollefsen C. Medicine against suicide: Sustaining solidarity with those diminished by illness and debility. *Christian Bioethics*. 2021; 27(3): 250–263

138. Frush BW, Curlin FA. POINT: Is it ethically appropriate for physicians to offer to pray with patients in the ICU? Yes. Chest. 2022 Apr;161(4):882-884.

Frush BW, Curlin FA. Rebuttal From Drs Frush and Curlin. Chest. 2022 Apr;161(4):886-887.

137. Hvidt NC, Curlin F, Büssing A, Baumann K, Frick E, Søndergaard J, Nielsen JB, Lawrence R, Lucchetti G, Ramakrishnan P, Wermuth I, Hefti R, Lee E, Kørup AK. The NERSH Questionnaire and Pool of Data from 12 Countries: Development and Description. *J Relig Health*. 2022 Jun;61(3):2605-2630

139. Curlin F. "Sufficient for the day is its own trouble": Medicalizing risk and the way of Jesus. *Christian Bioethics.* 2023, 29(2):110-119.

140. Curlin FA. Responding wisely to persistent pain: Insights from patristic theology and clinical experience. *Christian Bioethics.* 2023 (in press)

141. Nicholson CP, Bodd MH, Sarosi E, Carlough MC, Lysaught MT, Curlin FA. The power of proximity: Toward an ethic of accompaniment in surgical care. *Hastings Center Report*. (in press, 2024)

Book chapters

1. Curlin FA. Social brains, spiritual medicine? In: The Chicago Social Brain Network. *Invisible Forces and Powerful Beliefs: Gravity, Gods, and Minds*. Upper Saddle River, New Jersey: FT Press; 2011
2. Curlin FA. Detachment has consequences: A note of caution from medical students' experiences of cadaver dissection. In: Lantos JD, ed. *Controversial Bodies: Ethical Issues in the Public Display of Plastinated Corpses*. Baltimore, MD: The Johns Hopkins University Press; 2011
3. Curlin FA. Hospice and palliative medicine's attempt at an art of dying. In Dugdale L, ed. *Dying in the Twenty-First Century: Toward a New Ethical Framework for the Art of Dying Well (Basic Bioethics)*. Cambridge MA: MIT Press; 2015

**Farr A. Curlin, MD**

4. Curlin FA. Religion and spirituality in medical ethics. In: Balboni M and Peteet J, eds. *Spirituality and Religion Within the Culture of Medicine: From Evidence to Practice.* New York: Oxford University Press; 2017

**Commentaries, Editorials, and Reviews**
1. Curlin FA. After harm: Medical error and the ethics of forgiveness. [book review] *BMJ*. 2005;331:1343
2. Curlin F, Burck RR. Patient counseling and matters of conscience. *Virtual Mentor*. 2005;7(5)
3. Curlin FA. Caution: Conscience is the limb on which medical ethics sits. *American Journal of Bioethics*. 2007;7(6): 30-32
4. Curlin FA, Roach CR. By intuitions differently formed: How doctors address spiritual issues in the clinical encounter. *American Journal of Bioethics*. 2007;7(7): 19-20
5. Lawrence RE, Curlin FA. Misplaced flexibility: Revise policies but cling to principles. *Am J Bioeth*. 2008;8(4):36-7.
6. Curlin FA. Conscience and clinical practice: Medical ethics in the face of moral controversy. *Theor Med Bioeth*. 2008;29(3):129-33.
7. Curlin FA. Commentary: A case for studying the relationship between religion and the practice of medicine. *Acad Med*. 2008;83(12):1118-20.
8. Curlin FA. Medicine's dance with death. [book review] *Public Discourse*. November 16, 2012. Available at: http://www.thepublicdiscourse.com/2012/11/6761/
9. Curlin FA. Holy transgressions: Breaching the wall between public religion and patient care. *Narrative Inquiry in Bioethics*. 2014;4(3):221-6.
10. Curlin FA, Meador KG. Setting medicine in the context of a faithful Christian life. *Christian Bioethics*. 2016;22(1): 1–4
11. Curlin FA, Powell K. Editors' Introduction: Examining deeper questions posed by disputes about conscience in medicine. *Perspect Biol Med*. 2019;62(3):379-382
12. Curlin F. Brain death: new questions and fresh perspectives. *Theor Med Bioeth*. 2019;40(5), 355-358
13. Curlin FA. On the opinions of US adults regarding religiously affiliated health care facilities. *JAMA Network Open*. 2019;2(12):e1919013
14. Curlin F, Scherz P. Theological and ethical problems with medicalizing risk. *Christian Bioethics*. 2023;29(2):105–109

**Letters to the editor, other**
1. Curlin FA. Euthanasia in severely ill newborns. *New England Journal of Medicine.* Jun 2 2005;352(22):2353-2355; author reply 2353-2355 [PMID 15938015]
2. Curlin FA. Talking through your epistemological hat. *Hastings Center Report*. 2006; 36(4):7-8; author reply 8
3. Lawrence R, Curlin F. Faith matters—but how? *Stillpoint* [Gordon College]. Fall 2007. 18-19
3. Sulmasy DP, Curlin F, Brungardt GS, Cavanaugh T. Justifying different levels of palliative sedation. *Ann Intern Med*. 2010 Mar 2;152(5):332-3; author reply 333

**Testimony as an expert witness in the previous four years**
1. *Whole Woman's Health v. Todd Rokita*, No. 1:18-cv-01904 (S.D. Ind.)
2. *Planned Parenthood v. Joseph Minor*, No. 2:19-cv-00238 (D. Utah)
3. *Bernard v. Indiana Licensing Board*, No. 1:19-cv-1660 (S.D. Ind.)
4. *All Options v. Attorney General of Indiana*, No 1:21-cv-1231 (S.D. Ind.)
5. *Estabrook v. Scott & White Hospital*, No. 18-002323-cv-272 (272nd D. Texas)
6. *PetitHomme v. Fairfax Neonatal Associates*, No. CL2020-07881 (Virginia)
7. *Sistersong v. State of Georgia,* No. 2022-CV-367796 (Superior Ct., Fulton County, GA)

**Farr A. Curlin, MD**

8. *Planned Parenthood v. Medical Licensing Board,* No. 53C06-2208-PL-001756 (Monroe County Circuit Ct, IN)