# EXHIBIT 5

Farr Curlin                                                    April 8, 2024

Page 1

1              UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4     _____

5     BRIANNA BOE, et al.,

6              Plaintiffs,

7        v.                            Case No.

8     UNITED STATES OF AMERICA,        2:22-cv-00184-LCB

9              Intervenor Plaintiff,

10       v.

11    HON. STEVE MARSHALL, in his

12    official capacity as Attorney

13    General of the State of

14    Alabama, et al.,

15             Defendants.

16    _____

17

18

19

20

21

22       Job No. CS6629188

Farr Curlin                                                    April 8, 2024

1    VIDEOCONFERENCE DEPOSITION OF FARR CURLIN, M.D.

2  DATE:          Monday, April 8, 2024

3  TIME:          9:03 a.m.

4  LOCATION:     Remote Proceeding

5        Durham, NC 27710

6  REPORTED BY:  Christopher Friebe

7  JOB NO.:      6629188

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1        A P P E A R A N C E S

2  ON BEHALF OF INTERVENOR PLAINTIFF UNITED STATES OF

3  AMERICA:

4    AMIE MURPHY, ESQUIRE (by videoconference)

5    Department of Justice Civil Rights Division,

6    Housing and Civil Enforcement Section

7    Washington, D.C. 20530

8    amie.murphy2@usdoj.gov

9    (202) 353-1285

10

11  ON BEHALF OF DEFENDANTS HON. STEVE MARSHALL, ET AL.:

12    ROGER BROOKS, ESQUIRE (by videoconference)

13    Alliance Defending Freedom

14    44180 Riverside Parkway

15    Lansdowne, VA 20176

16    rbrooks@adflegal.org

17    (202) 393-8690

18

19  ALSO PRESENT:

20    Renee Williams, U.S. DOJ (by videoconference)

21    Cynthia Weaver, Private Plaintiff's Counsel (by

22    videoconference)

1           I N D E X

2  EXAMINATION:                    PAGE

3    By Ms. Murphy                 8

4

5           E X H I B I T S

6  NO.          DESCRIPTION          PAGE

7  Exhibit 1    Dr. Curlin's CV        15

8  Exhibit 2    Dr. Curlin's Expert Report    16

9  Exhibit 3    Book: "The Way of Medicine"    78

10  Exhibit 4    Article: "Young Adult Psychological

11        Outcome After Puberty Suppression

12        And Gender Reassignment"    119

13  Exhibit 5    Article: "Sex Reassignment:

14        Outcomes and Predictors of

15        Treatment for Adolescent and Adult

16        Transsexuals"         120

17  Exhibit 6    Article: " Association of

18        Gender-Affirming Hormone Therapy

19        With Depression, Thoughts of

20        Suicide, and Attempted Suicide

21        Among Transgender and Nonbinary

22        Youth"             122

1           E X H I B I T S (Cont'd)

2  NO.          DESCRIPTION          PAGE

3  Exhibit 7    Article: "Access to

4        Gender-Affirming Hormones

5        During Adolescence and Mental

6        Health Outcomes Among

7        Transgender Adults"      123

8  Exhibit 8    Reuters Article      163

9  Exhibit 9    Article: "In Vitro Fertilization

10        Outcomes in a Mouse Model of

11        Gender-Affirming Hormone Therapy

12        In Transmasculine Youth"    185

13  Exhibit 10    Article: "Puberty Suppression

14        Followed by Testosterone Therapy

15        Does Not Impair Reproductive

16        Potential in Female Mice"    187

17

18        QUESTIONS INSTRUCTED NOT TO ANSWER

19        PAGE     LINE

20        101      3

21        103      6

22

2 (Pages 2 - 5)

Farr Curlin                                                                  April 8, 2024

1        P R O C E E D I N G S
2             THE REPORTER:  Good morning.  My name
3    is Christopher Friebe; I am the reporter assigned by
4    Veritext to take the record of this proceeding.  We
5    are now on the record at 9:03 a.m.
6             This is the deposition of Dr. Farr
7    Curlin taken in the matter of Brianna Boe, et al., and
8    United States of America vs. Honorable Steve Marshall,
9    in his official capacity as Attorney General of the
10   State of Alabama on Monday, April 8, 2024, at Durham,
11   North Carolina.
12            I am a notary authorized to take
13   acknowledgments and administer oaths in Michigan.
14   Parties agree that I will swear in the witness
15   remotely.
16            Additionally, absent an objection on
17   the record before the witness is sworn, all parties
18   and the witness understand and agree that any
19   certified transcript produced from the recording of
20   this proceeding:
21        - is intended for all uses permitted
22            under applicable procedural and

1            evidentiary rules and laws in the
2            same manner as a deposition recorded
3            by stenographic means; and
4        - shall constitute written stipulation
5            of such.
6            At this time will the counsel please
7    identify yourselves for the record?
8             MS. MURPHY:  This is Amie Murphy,
9    representing the United States.
10            MR. BROOKS:  Roger Brooks, with the
11   Alliance Defending Freedom, representing the
12   defendants.
13            THE REPORTER:  Thank you.  Hearing no
14   objection, I will now swear in the witness.
15            Please raise your right hand.
16   WHEREUPON,
17            DR. FARR CURLIN,
18   called as a witness and having been first duly sworn
19   to tell the truth, the whole truth, and nothing but
20   the truth, was examined and testified as follows:
21            THE REPORTER:  Thank you.
22            Counsel, you may now proceed.

1            MS. MURPHY:  Thank you.
2                 EXAMINATION
3    BY MS. MURPHY:
4        Q    Good morning, Dr. Farr Curlin.  As was
5    noted, my name is Amie Murphy, and I represent the
6    United States in this matter.  Have you had your
7    deposition taken before?
8        A    I have.
9        Q    How many times?
10       A    I don't know.
11       Q    More than ten?
12       A    Probably more than ten.  I'm not certain.
13       Q    That's fine.  When was the last time, just
14   approximately, that you had your deposition taken?
15       A    A couple of months ago.
16       Q    Okay.  Well, in that case, I'm going to
17   dispense with my usual spiel, where I remind you that
18   you're under oath, and I'm sure you're aware of that.
19   But the one thing I will say is that if you do need a
20   break at any time during this deposition, we will take
21   breaks, but if you need one at an unscheduled time,
22   just let me know and as long as there's no question

1    pending we can take a break and go off the record.
2    Understood?
3        A    Yes, I understand that.
4        Q    Did you bring any documents with you to your
5    deposition today?
6        A    No, I did not bring any documents, but I do
7    have from my attorney here, my CV and my report in
8    hard copy.
9        Q    And are there any notations, handwritten
10   notations, on either your CV or the copy of your
11   report that you have in front of you?
12       A    No, there are no handwritten notes.
13       Q    Okay.  And does that appear to be a true and
14   correct copy of the CV and report that you submitted
15   in this case?
16       A    Yes, it does appear to be a -- the copy of
17   the CV and the report that I submitted in this case.
18       Q    And since we're not in the same room, can
19   you just tell me if there's any other documents in
20   front of you?
21       A    No, there are no other documents in front of
22   me.

Farr Curlin
April 8, 2024

Page 10

1 Q   Okay.  Did you do anything to prepare for
2 today's deposition?
3 A   Yes, I did.
4 Q   What did you do?
5 A   I reviewed my report in detail, and I
6 reviewed some of the documents I cite in the report.
7 I also met with Mr. Brooks to talk about the
8 deposition process, and -- and then I reviewed my
9 note -- not my notes, but my highlighted areas on my
10 report again.
11 Q   And apart from the lawyers in this case, did
12 you speak with anyone in preparation for your
13 deposition?
14 A   No, I did not.
15 Q   So before we go any further, I want to make
16 sure we have the same understanding on some terms that
17 I'm going to use throughout this deposition.  So
18 first, let's talk about gender dysphoria.  How would
19 you define gender dysphoria?
20 A   I define gender dysphoria as dysphoria
21 experienced at the perception that one's secondary sex
22 characteristics are at odds with one's own sense of

Page 11

1 gender.
2 Q   And since you used the term dysphoria in
3 your definition, can you explain what you mean by
4 dysphoria?
5 A   Dysphoria means just bad feeling.  So
6 it's -- it's some collection of sadness, anxiety,
7 being upset, feeling bad.  It -- it's a broad term.
8 Q   And when did you become familiar with the
9 term gender dysphoria?
10 A   I -- I don't recall when I first became
11 familiar with the term.
12 Q   Would you say that it was in the context of
13 your clinical practice that you became familiar with
14 the term?
15 A   No, I would not say it was in the context of
16 my clinical practice.
17 Q   So what's your recollection there?
18 A   I'm sorry, what -- what do you mean what is
19 my recollection there?
20 Q   Sorry, that was a bad question.  So what do
21 you recall about your becoming familiar with the term
22 gender dysphoria?

Page 12

1 A   What I recall is through my work as a
2 medical ethicist at some point years ago, becoming
3 aware that there was the phenomenon of gender
4 dysphoria and there were ethical questions that were
5 being raised about how to respond to that.  How to
6 understand it.
7 Q   And are you familiar with the definition in
8 the DSM-5 text revision version of gender dysphoria?
9 A   I couldn't cite it chapter and verse, but I
10 am familiar with it in the sense that I have reviewed
11 it and know the -- that there is such definition.
12 Q   And are you aware whether the condition
13 described as gender dysphoria has ever been known by
14 another term?
15 MR. BROOKS:  Objection.
16 A   I -- I am aware that terms used in this
17 context regarding self-perceived gender and -- and
18 what that perception implies have been shifting and
19 changing over time.  I do not recall what term was
20 used before gender dysphoria.
21 Q   Okay.  In that case, can we agree when I use
22 the term gender dysphoria, I'm referring to the

Page 13

1 condition that's described in the DSM-5-TR for
2 purposes of this deposition?
3 A   Since you want me to accept that that's the
4 definition you're using, would you read that
5 definition to me?
6 Q   I can, although I am actually -- what don't
7 we do this?  Why don't we go with your understanding
8 of the term gender dysphoria for purposes of this
9 deposition?  Does that make sense?
10 A   I think so, yes.
11 Q   I think so, too.  In your report, you refer
12 to medicalized gender transition treatment or NGT.
13 You use this acronym throughout your report; correct?
14 A   Yes, I use that abbreviation throughout the
15 report.
16 Q   And how do you define NGT?
17 A   As I think I said in the report, I define it
18 as -- I use the abbreviation to refer to the use of
19 puberty-blocking drugs and cross-sex hormones as
20 treatments for gender dysphoria.
21 Q   And are you aware of the term
22 gender-affirming care?

4 (Pages 10 - 13)

Farr Curlin                                                      April 8, 2024

Page 14

1   A    Yes, I am aware of the term gender-affirming
2   care.
3   Q    And how would you define that?
4   A    Gender-affirming care is a euphemism that
5   has been used to refer, for example, in, as I recall,
6   in the Rhafferty-authored piece by the American
7   Academy of Pediatrics, to an approach that takes the
8   perception of one's secondary sex characteristics
9   being at odds with one's gender identity, so called,
10  to be rightly responded to through medicalization
11  through either -- through puberty-blocking hormones
12  and/or cross-sex hormones.
13  Q    So can you explain to me what the difference
14  is between those two terms?
15       MR. BROOKS:  Objection.
16  A    Gender-affirming care is a euphemism.  It's
17  imprecise, insofar as it does not specify whether
18  medicine is involved and it does not specify what one
19  takes the gender to be.  Medicalized gender transition
20  is an abbreviation I use in this report to not have to
21  repeat multiple times puberty-blocking hormones and
22  cross-sex hormones used in the context of perception

Page 15

1   of one's secondary sex characteristics being at odds
2   with one's perceived gender identify.
3        The key idea is that medicalized specifies
4   that you're taking that perception and treating it as
5   a medical problem, to which medical interventions,
6   namely this -- puberty-blocking drugs and cross-sex
7   hormones are -- are the appropriate responses.
8   Q    Now that we -- I'd like to start with a
9   couple questions from your CV.
10       MS. MURPHY:  So I'd like to mark as
11  Exhibit 1, a copy of Dr. Curlin's CV.
12       (Exhibit 1 was marked for
13       identification.)
14       MS. MURPHY:  I'm just marking a copy of
15  the CV.  Do I need to have Andrew pull it up in order
16  to do that?
17       THE REPORTER:  No, you can just tell me
18  you want it marked, and then it's up to you if you
19  want to show it or not.  Then basically you only need
20  to introduce it as an exhibit if you want it attached
21  to the transcript.
22       MS. MURPHY:  So I do want to introduce

Page 16

1   it as an exhibit.
2   BY MS. MURPHY:
3   Q    And, Dr. Curlin, I believe you have a copy
4   of your CV in front of you.  And you indicated that
5   it's the same as the copy that you submitted with your
6   report.  I submit to you that that's the only copy we
7   have of your CV, so that's the one that I'd like to
8   mark as Exhibit 1 in this case.
9        I have some questions on it.  If you would
10  like to refer to it to answer my questions, that's
11  fine with me.  As we sit here today, are there any
12  changes that you would make to the copy of the CV that
13  we've marked as Exhibit 1?
14  A    There are no changes as of when it was sent
15  to you that I would propose to add.
16       MS. MURPHY:  Okay.  And then now
17  similarly, I'd like to mark a copy of Dr. Curlin's
18  expert report that he submitted in this case as
19  Exhibit 2.
20       (Exhibit 2 was marked for
21       identification.)
22  //

Page 17

1   BY MS. MURPHY:
2   Q    And, you know, we don't need to pull it up
3   right now, but I ask that since it sounds like you
4   have a copy that you submitted to us in this case and
5   I submit to you that that's the copy that we'd like to
6   mark as Exhibit 2, that if you want to refer to your
7   report as I am asking questions about particular
8   paragraphs, that's fine.  I understand that you have
9   it in front of you; correct?
10  A    Yes, that's correct.
11  Q    Excellent.  Same question I asked about your
12  CV.  Are there any changes that you would make to your
13  report as we sit here today?
14  A    No, there are no changes that I would make.
15  Q    Okay.  So turning first to your CV, you
16  obtained your undergraduate degree in biology from UNC
17  Chapel Hill; correct?
18  A    Yes, I obtained my undergraduate degree in
19  biology from UNC Chapel Hill.
20  Q    And during your undergraduate studies, did
21  you complete any coursework on psychology?
22  A    I do not recall.  Let me say I do not recall

5 (Pages 14 - 17)

Farr Curlin                                                                April 8, 2024

Page 18

1  what the coursework was.  I know I had some -- some
2  introduction to psychology, but I don't remember the
3  details.
4      Q    Do you recall whether any portion of that
5  class related to gender identity?
6      A    I do not recall whether it related to gender
7  identity.
8      Q    And do you recall whether any portion of
9  that class or classes that you took in psychology
10  related to psychology specific to adolescents?
11      A    I do not recall that in any detail.
12      Q    And during the same timeframe, did you
13  complete any coursework on psychiatry?
14      A    As an undergraduate, I had no coursework
15  specifically on psychiatry.
16      Q    So after undergrad, you attended medical
17  school at UNC Chapel Hill; is that correct?
18      A    Yes.  After undergraduate, I went to medical
19  school at the University of North Carolina at Chapel
20  Hill.
21      Q    What made you choose to go to medical
22  school?

Page 19

1      A    Well, it's complex and I don't profess to
2  fully understand why, but I was conscious of finding
3  that the work of attending to those who are sick is
4  intrinsically valuable, meaningful.  I had observed it
5  to be such in the practice of my grandfather, who was
6  a general surgeon, and my father who was an
7  obstetrician/gynecologist.
8          And I found that I enjoyed the study of the
9  sciences, particularly the sciences relevant to human
10  experience, and that I enjoy the humanities.  And that
11  medicine was a field that allowed me -- invited me to
12  commit myself to something worthwhile to something
13  that was objectively good, namely preserving and
14  restoring the health of human beings, that was
15  intellectually interesting, and my -- my interest with
16  respect to science and with respect to the humanities.
17          And for all those reasons, and I'm sure many
18  others, I chose to pursue becoming a physician.
19      Q    And you started to touch on this a bit, but
20  if you could elaborate, what is your view on the
21  purpose of medicine?
22      A    My view on the purpose of medicine is that

Page 20

1  medicine's intrinsic and constituent purpose is
2  preserving and restoring the patient's health.
3  Insofar as one reasonably can, responsive also to the
4  broader demands of morality, of ethics.
5      Q    And how long have you held that view?
6      A    Two my knowledge, I've held that view
7  throughout my life.
8      Q    Can you point to anything that influenced
9  your thinking on that subject?
10      A    Well, I watched the work of my father, as a
11  physician.  I saw family members being cared for by
12  medical professionals.  I myself, on some rare
13  occasions, was under the ministrations of medical
14  professionals.  I read stories about medical
15  professionals.  And all of that, I think, reflected
16  the reality that the thing that makes medical
17  professionals medical professionals is that they are
18  attending to those whose health is threatened or
19  diminished or injured in some way and seeking, insofar
20  as they reasonably can, to preserve and restore their
21  health.
22      Q    And as you describe that goal, would you say

Page 21

1  that that is in line with the teachings in medical
2  school?
3      A    Well, it's really too broad of a question to
4  answer.  There are lots of teachings in medical
5  school.  But generally, yes, that is consistent with
6  the teachings of medical school.  There are some
7  teachings that are made in some medical schools by
8  some medical educators that I think are not consistent
9  with that understanding.
10      Q    How so?
11          MR. BROOKS:  Objection.
12      A    Well, sometimes medical -- medical educators
13  will suggest that the goal of medicine is to do what
14  patients want.  And that if a patient wants something,
15  then the physicians have a professional obligation to
16  provide it, so long as they're not violating the law.
17  That's one example.
18      Q    And do you agree or disagree with that
19  example?
20      A    With the view I just described, I disagree.
21      Q    Going back to the coursework that you did in
22  medical school.  Did you complete any coursework on

6 (Pages 18 - 21)

Farr Curlin                                                                    April 8, 2024

Page 22

1  psychology?

2      A   I recall that we had coursework on

3  psychology, but I don't recall the details.

4      Q   And did any of that coursework specifically

5  involve diagnosing mental health conditions?

6      A   We did have coursework, yes, on diagnosing

7  mental health conditions.

8      Q   And were these courses that were part of the

9  general path to a degree in medicine, or were they

10  so-called electives?

11      A   Well, there were both types of courses, but

12  certainly our required coursework included coursework

13  on diagnosing mental health conditions.

14      Q   And did you take any coursework on top of

15  that, like maybe some electives?

16      A   I don't recall.

17      Q   Did any of the coursework that you completed

18  involve discussion of gender identity?

19      A   I don't recall any coursework during medical

20  school talking about what you -- using the language of

21  gender identify.  I, of course, don't know what you

22  mean when you say "gender identity," but I do not

Page 23

1  recall that language being used in our coursework in

2  medical school.

3      Q   What's your understanding of the term

4  "gender identity"?

5      A   My understanding is that term is used by

6  different people in different ways.  I don't -- I

7  don't use the term if I can avoid it, because I --

8  it's so non-specific, particularly in the context like

9  this.

10      Q   Okay.  Did any of the coursework that you

11  completed in psychology involve any discussion of

12  diagnosing gender dysphoria?

13      A   I don't have any memory of the coursework in

14  medical school including coursework on diagnosis of

15  gender dysphoria.

16      Q   Did you take any courses in psychiatry?

17      A   Yes, as I said before, we had courses

18  involving psychiatry.

19      Q   Now apart from what we've already discussed,

20  did you take any other courses that included any

21  discussion of gender dysphoria?

22      A   I do not recall.

Page 24

1      Q   So at some point I assume you completed

2  clinical rotations as part of medical school.

3      A   Yes, as part of medical school I completed

4  clinical rotations.

5      Q   What did you do your rotations in?

6      A   I'm sorry, I didn't understand what you

7  said.  Can you repeat that?

8      A   Let me ask this first.  How many rotations

9  did you do?

10      A   I don't recall the number of rotations that

11  we did.

12      Q   What type of rotations did you do and in

13  what area were your rotations?

14      A   As best as I can recall, during our first

15  clinical year, third year of medical school, we did

16  rotations in internal medicine, surgery, obstetrics

17  and gynecology, psychiatry, family medicine, and

18  pediatrics.  And there may have been something else

19  that I don't remember at this moment.

20      Q   And did you choose which rotations to do?

21      A   In that first clinical year, we had very

22  little choice.  I don't recall if we had some choice

Page 25

1  on the margins, but for the most part, no.

2      Q   Okay.  And did you do a second year of

3  clinical rotations?

4      A   Yes, I did a fourth year of medical school,

5  which includes clinical rotations.

6      Q   And what were the rotations that you

7  completed that year?

8      A   Likewise, I don't recall, except I know I

9  did rotations in internal medicine, particularly.

10      Q   And do you recall whether any of the

11  patients that you saw during your rotations had a

12  diagnosis of gender dysphoria?

13      A   I don't recall seeing a patient who had what

14  today would be called gender dysphoria.  At least not

15  one that was coded as such clinically.

16      Q   And during that time did you see a patient

17  who had concerns over their gender identity?

18      A   Depends on what you mean by the term "gender

19  identity."

20      Q   Did any patients express concerns, distress,

21  over the congruence of their sense of their sex and

22  the sex that they were assigned at birth?

7 (Pages 22 - 25)

Page 26

1    A    I -- I don't recall.

2    Q    So after medical school, you completed your

3  residency at University of Chicago; correct?

4    A    Yes.  After medical school I completed a

5  residency in internal medicine at the University of

6  Chicago.

7    Q    And what is internal medicine?

8    A    Internal medicine is a discipline of

9  clinical medicine that focuses on non-surgical

10  conditions and treatments of adults.

11    Q    So when you say "adults," is that anyone

12  over the age of 18?

13    A    With respect to the clinical practice, the

14  boundary is essentially someone who is physically

15  mature.  So we don't have a sharp boundary on the age.

16  But -- but we don't generally take care of children.

17    Q    Okay, understood.  Can it sometimes include

18  adolescents?

19    A    On rare occasions.

20    Q    What made you choose internal medicine?

21    A    I was attracted to the comprehensiveness and

22  "systematicness" of the culture of internal medicine

Page 27

1  and the way that internal medicine was characterized

2  by trying to understand all that comes into a

3  patient's experience of illness, the way that it

4  blends, psychology, and physiology, and clinical

5  judgment in areas of uncertainty.  It involves

6  longitudinal relationships with patients.

7         I was attracted by the way it -- it

8  characteristically seeks to understand root causes of

9  peoples' illnesses and to try to thoroughly

10  investigate, to try to understand the contributors to

11  complex medical experiences that patients have.  And I

12  was attracted to some of the teachers I had in

13  internal medicine who were, to me, exemplars of a good

14  physician.

15    Q    Okay.  What types of conditions did you

16  treat during your residency?

17    A    Well, I treated all manner of conditions,

18  accepting that I did not conduct any major surgery.  I

19  saw pretty much -- well, I saw all manner of other

20  conditions.

21    Q    Does that include mental health conditions?

22    A    Yes, it definitely includes mental health

Page 28

1  conditions.

2    Q    So as an internal medicine physician, do you

3  diagnose mental health conditions?

4    A    Yes.  We frequently diagnose mental health

5  conditions in internal medicine.

6    Q    During your residency, can you describe the

7  patient population that you treated?

8    A    I can only describe it in broad strokes

9  because it was so diverse.  But it was adult patients

10  who were experiencing illnesses of one form or another

11  in both the out -- I saw them in both the outpatient

12  and the inpatient context.  The conditions ranged all

13  over the map.

14    Q    And were any of the patients that you saw

15  diagnosed with gender dysphoria?

16    A    I don't recall any patient specifically that

17  carried a diagnosis of what today is called gender

18  dysphoria.

19    Q    Were there any patients who displayed

20  symptoms that you would consider similar to the

21  symptoms described by gender dysphoria?

22    A    There were certainly patients who had

Page 29

1  perceptions of their body as being unwanted.  Features

2  of their body being things they didn't want and that

3  they wished were different.

4    Q    And did you treat those patients for that

5  condition?

6    A    I would, in those cases -- and here I'm

7  speaking generally; I'm not speaking about a

8  particular case.  But I would have expressed sympathy

9  and then sought to discern first was there anything

10  wrong with their body medically and -- or whether it

11  was their perception of their body that was -- that

12  was disordered.  And if it were the latter, I would

13  seek to reassure them that their -- best I could tell,

14  there was not a problem with the health of their body

15  and help them go on as best they could, despite the

16  experience of wishing their body were different.

17    Q    And am I correct that you've never made, or

18  at least during that timeframe, you didn't make a

19  diagnosis of gender dysphoria?

20    A    To -- to the best of my recollection, I

21  never made a diagnosis of gender dysphoria.

22    Q    And as you described those symptoms in

8 (Pages 26 - 29)

Farr Curlin                                                    April 8, 2024

Page 30

1  answering my last question, was there a diagnosis that
2  you made to describe those symptoms?
3         MR. BROOKS:  Objection, calls for
4  speculation.
5     A   Yeah, I -- I would have to think of a
6  particular case, and I don't have detailed memories of
7  particular cases from 25 years ago.
8     Q   Okay.  Moving on to the fellowships that you
9  completed after your residency.  The first was the
10 Robert Wood Johnson Clinical Scholars program;
11 correct?
12    A   Yes, that's -- the first fellowship I
13 completed after residency was the Robert Wood Johnson
14 Clinical Scholars Program.
15    Q   And how long was that program?
16    A   That program was two years.
17    Q   And can you describe what the program
18 entailed?
19    A   The Robert Wood Johnson Clinical Scholars
20 Program was a program that allowed competitive
21 applicants who were selected to spend two years
22 developing their own area of scholarship regarding

Page 31

1  health services, which is a term that encompasses,
2  effectively, all of the practice of medicine except
3  for the biomedical scientific piece.
4         So whether that's epidemiology, policy,
5  ethics, questions of how healthcare is distributed,
6  and so on.  And the -- effectively, what we did was
7  begin to study the topic we were interested in with
8  mentors, who were supported by the -- the -- the
9  program, and take coursework and gain other training
10 that would help us do the kind of scholarship that we
11 proposed to do with rigor and with methodological and
12 analytical excellence.  And basically learn how to
13 become and begin to become what in medicine are called
14 clinician investigators.
15    Q   Can you define that term for me, please?
16 Clinical -- sorry, go ahead.
17    A   The -- a clinician investigator is someone
18 trained as a clinician and generally who continues to
19 practice as a clinician, who also is trained as and
20 practices as an investigator, a researcher, a scholar
21 of some form.
22    Q   Okay.  And you said that students in this

Page 32

1  program chose an area to focus on.  What was your area
2  that you chose?
3     A   I chose to focus on what characteristics of
4  persons and characteristics of their experiences
5  result in them working in underserved communities.
6  That's how I began my -- my fellowship.  And then over
7  the course of the first year of my fellowship, I moved
8  to seeking to understand how religious commitments
9  feature in -- in decisions to work among the
10 underserved.  And then with the encouragement of my
11 mentors, to study the religious characteristics of
12 physicians and to look more broadly at how those
13 characteristics account for, empirically, differences
14 in physicians, clinical practices, and in their --
15 their beliefs regarding their practices of medicine.
16    Q   And did your work culminate in a written
17 publication?
18    A   Yes, the work culminated in a number of
19 written publications.
20    Q   And are those listed on your CV?
21    A   Yes, they are, to my knowledge.
22    Q   Can you point to them, please?

Page 33

1     A   Point to them how?
2     Q   Tell me what they are.
3     A   Oh.  Are you asking specifically the
4  publications that emerged from the work -- that
5  emerged during my fellowship or that emerged
6  eventually from the work in my fellowship?
7     Q   Start with the former.
8     A   Okay.  So my first paper, peer-reviewed
9  paper, number 1 on my CV, is one.  And I actually
10 don't recall, because I don't have the date in front
11 of me, whether number 2 came out while I was still a
12 fellow or after I had joined the faculty.
13    Q   Okay.  And these are on page 7 of your CV;
14 correct?
15    A   Page 12.
16    Q   Let me make sure.  Okay, all right, I got it
17 now.  So numbers 1 and 2 on page 12?
18    A   That's correct.  And I am checking to see if
19 any of the non-peer-reviewed publications occurred
20 during my fellowship, and I do not believe they did.
21    Q   You indicated that you did clinical work
22 related to that fellowship.  Is that listed under your

9 (Pages 30 - 33)

Farr Curlin                                                April 8, 2024

Page 34

1 clinical practice in your CV?  Let me ask it a
2 different way.
3        Is that the Lawndale Christian Health
4 Center?
5    A   When I was -- during my time as a fellow, as
6 a Robert Wood Johnson clinical scholar, I did see
7 patients at the Lawndale Christian Health Center.
8 Federally funded community health center on the west
9 side of Chicago.
10    Q   Okay.  I'm going to ask a couple questions
11 about that in a bit, but first a couple questions
12 about the second fellowship that you did at the
13 MacLean Center for Medical Ethics.  You completed a
14 fellowship there from 2003 to 2004; is that right?
15    A   That's right.  That's the MacLean Center for
16 Clinical Medical Ethics, just to be precise.  And yes,
17 I completed that from 2003 to 2004.
18    Q   And actually, before I get more details on
19 that, when did you first become interested in the area
20 of clinical medical ethics?
21    A   I don't recall.  I think I was always
22 interested in ethics of medicine.

Page 35

1    Q   Was there a particular motivation for your
2 interest in that area?
3    A   Well, I -- I wanted to practice good
4 medicine and avoid practicing bad medicine.  I found
5 reasoning about how we ought to practice, interesting,
6 stimulating, and worthwhile.  So that was all -- I
7 don't have memory of that not being the case at any
8 point in my medical training.
9    Q   So going back to the fellowship, can you
10 describe what that was about?
11    A   The MacLean Center for Clinical Medical
12 Ethics fellowship is a premier training program,
13 primarily for physicians, started by Mark Siegler, The
14 University of Chicago.  And its focus is on -- it's a
15 part-time fellowship that I completed during my first
16 year on faculty, and its focus is on training fellows
17 in the history of medical ethics, as that field came
18 to be self-consciously and developed from the -- the
19 1960s to present, introducing them to the key
20 participants in that field, to the key arguments made,
21 concepts used, the legal cases that have had import,
22 and so on.  All with an emphasis on the kinds of

Page 36

1 issues that emerge from clinical practice of medical
2 practitioners, rather than on issues such as, let's
3 say, environmental ethics that are not -- that don't
4 emerge directly from clinical medicine.
5    Q   And during that fellowship, did you have a
6 specific area of focus?
7    A   No.  That fellowship was -- my focus was on
8 learning the field of medical ethics.
9    Q   And is the -- I'm sorry, you pronounce it
10 MacLean?
11    A   I pronounce it MacLean.
12    Q   Okay.  I apologize.  I'm from Virginia, and
13 the next town over is spelled the same but pronounced
14 MacLean.  So in my head I keep confusing the two.
15        Is the MacLean Center secular or is there a
16 religious affiliation?
17    A   The MacLean Center has no religious
18 affiliation.
19    Q   And your fellowship, did it have a religious
20 focus?
21    A   No, I completed the MacLean Center Clinical
22 Medical Ethics fellowship, and so it had no religious

Page 37

1 focus, although religious ideas were addressed insofar
2 as they were part of the ideas at stake in medical
3 ethics.
4    Q   Okay.  So then after that fellowship, you
5 participated in the Summer Institute for Survey
6 Research Methods; correct?
7    A   That's correct, yes.  I --
8    Q   And what --
9    A   -- Summer Institute for Survey Research
10 Methods at the University of Michigan.
11    Q   And what was that --
12    A   Sorry, repeat that, please?
13    Q   What was the program about?
14    A   That program is designed to equip people who
15 are using survey research methodologies in their
16 empirical research, to -- to do so expertly and using
17 the best available methods.
18    Q   And what was your purpose in completing that
19 program?
20    A   I had, at that point, begun to study
21 physicians' religious characteristics and how those
22 are associated with their clinical practices and ideas

10 (Pages 34 - 37)

Page 38

1  about their practices and was beginning to use and
2  intended to further use survey research methods.  And
3  so I went and completed that Summer program to get
4  further training on how to do that well.  That being
5  conduct well-designed surveys that can answer the
6  questions one was trying to answer.
7      Q    And then in 2008, you participated in the
8  Palliative Care Education and Practice program;
9  correct?
10     A    Yes.  I completed the Palliative Care
11 Education and Practice program at Harvard University,
12 yes.
13     Q    And can you describe that program?
14     A    That program was designed for people in
15 academic institutions who were practicing palliative
16 medicine, to give them further training and cohort
17 regarding palliative medicine and all of its various
18 dimensions, including how to teach palliative
19 medicine.
20     Q    What prompted your interest in palliative
21 medicine?
22     A    I practiced general internal medicine for

Page 39

1  the first several years out of training, and at some
2  point it dawned on me that the context of clinical
3  practice in which I most came alive was in caring for
4  very sick people, and particularly people who were
5  facing the limits of medicine or at the end of life.
6  And that I enjoyed helping them negotiate the clinical
7  ethical challenges of such situations, and I enjoyed
8  teaching students and other trainees about that,
9  and -- and then when palliative medicine as a field
10 began to mature and it first came to University of
11 Chicago, I was one of those who raised my hand, so to
12 speak, to join a group of folks who were learning that
13 practice and developing that discipline at the
14 University of Chicago.
15     Q    How would you define palliative medicine?
16     A    Palliative medicine is that subspecialty of
17 medicine that develops particular expertise regarding
18 and focuses clinically on the relief of difficult and
19 health-diminishing symptoms.
20     Q    Is palliative care the same as hospice care?
21     A    Palliative care is not the same as hospice
22 care, no.

Page 40

1      Q    How does it differ?
2      A    So palliative medicine, which is the term I
3  will use as it's more precise, again, is defined, I
4  think, in the way I described.  People experience
5  difficult symptoms with advanced illness of all sorts,
6  and that's what palliative medicine does, is address
7  those symptoms, and address the -- the challenging
8  clinical decisions that have to be made as one deals
9  with advanced illness.
10         Hospice, by contrast, is a way of
11 structuring how medicine is organized and paid for.
12 And in the case of hospice, it is for patients who
13 have, according to the judgment of at least two
14 physicians, a prognosis of six months or less to live.
15 Hospice is a way that the remaining care they receive
16 can be organized and financed.
17         So in one sense, hospice is -- is an
18 insurance benefit of Medicare that has corollaries and
19 private insurance benefits, but it's fundamentally a
20 way of organizing medical care.  And that medical care
21 includes palliative medicine, but it includes other
22 aspects of medicine also.

Page 41

1      Q    Got it.  So apart from any continuing
2  medical education that you may have completed, have we
3  discussed all the training that you have completed
4  with respect to -- let me withdraw that.  That was a
5  bad question.
6          Apart from any continuing medical education
7  that you may have completed, have we discussed all
8  medical-related training that you've received?
9      A    Well, yes and no.  Yes, that's the extent of
10 the formal education courses, other than various ad
11 hoc and continuing medical education-related courses.
12 But the training regarding clinical medicine is --
13 goes on in multiple ways that are not limited to such
14 coursework.
15     Q    Understood.  So other than what we've
16 already discussed, have you completed any specialized
17 training in psychology?
18     A    Well, I have participated in and completed
19 conferences and symposia that address psychology
20 relevant to medicine innumerable times over the course
21 of my clinical practice.  So in that respect -- so I
22 have done that.

11 (Pages 38 - 41)

Farr Curlin                                                              April 8, 2024

Page 42

1    Q    And are all of the symposia and conferences
2  that you're referring to there, are they listed on
3  your CV?
4    A    No, they are not listed on my CV.  It's not
5  customary to list such things on one's CV.
6    Q    Do any of those conferences or symposia that
7  you're referring to relate to the issue of gender
8  dysphoria?
9    A    Yes.  I don't recall how many, but yes.
10    Q    And would you say that there were more
11  than -- let me ask it this way.
12        Were there any symposium or conferences that
13  were specifically about the issue of gender dysphoria?
14    A    Yes, there were.  And I likewise don't
15  recall how many.
16    Q    And you don't remember any of the names of
17  these conferences or symposia?
18    A    I -- I remember one, for example, was put on
19  by the leader of the so-called gender clinic here at
20  Duke University.
21    Q    And approximately when was that that you
22  attended that -- was it a conference or was it a

Page 43

1  symposia?
2    A    It was a -- it was a mid-day conference.
3  And I don't recall how many years ago that was.
4    Q    Can you describe the subjects that were
5  discussed during that conference?
6    A    I recall that the subject of gender
7  dysphoria was discussed, as well as the subject of
8  puberty blockade and cross-sex hormones.  I know that
9  much, but I don't recall more details.
10    Q    And was the focus of that discussion or
11  those discussions, was it aimed at achieving a certain
12  purpose?
13    A    I -- I can't speculate about what the
14  purpose was that those who put on that conference were
15  trying to achieve.
16    Q    Were the presenters opposed to prescribing
17  those types of treatments for patients with gender
18  dysphoria?
19    A    In that conference, no, they were not
20  opposed.
21    Q    Were they in favor of prescribing those
22  types of treatments for someone with gender dysphoria?

Page 44

1        MR. BROOKS:  Objection.
2    A    To the best of my recollection, they were
3  presenting why they thought such -- what they were
4  doing and why they thought such puberty blockade and
5  cross-sex hormones was a good thing to do for certain
6  patients.
7    Q    Okay.  And I know that you said that you
8  can't remember when this was, but what was your
9  employment at the time?
10    A    I was here at Duke University.
11    Q    Okay.  Have you attended any other
12  conferences or symposia related to the issue of gender
13  dysphoria?
14    A    Yes, I have.  My pause is to try -- is
15  because the -- the language of conferences is -- is
16  somewhat imprecise within the world of medicine.  We
17  are having meetings and discussions frequently about
18  the issues that arise in clinical medicine and
19  clinical ethics.  But yes, I've had other context
20  where -- that focused on the issue of gender
21  dysphoria.
22    Q    Okay.  But you're referring more to meetings

Page 45

1  or discussions, not necessarily conferences dedicated
2  to that topic?
3        MR. BROOKS:  Objection.
4    A    So I'm -- I recall -- well, right now I
5  recall one other meeting that -- well, two meetings
6  that were called specifically to focus on that
7  subject.
8    Q    And was this also while you were at Duke?
9    A    Yes, this was while I was at Duke.
10    Q    And what was the focus of those meetings?
11    A    Both of these meetings are described in my
12  expert report.  One was a meeting -- the people
13  gathered by the Greenwall Foundation Faculty Scholars
14  Program last fall and focused on ethical questions
15  that remain regarding -- I'd have to look at my report
16  to remember the precise title, but regarding
17  medicalization of -- of -- medicalized responses to
18  gender dysphoria.
19        The second was a -- a faculty conference of
20  the faculty of the Transfer for Bioethics, Humanities,
21  and History of Medicine to talk about similar
22  questions.

12 (Pages 42 - 45)

Farr Curlin                                                                                          April 8, 2024

Page 46

1    Q   Okay. And when you say that they're listed
2  in your report, are you talking about the CV portion
3  of your report or are you talking about the body of
4  your report?
5    A   I'm talking about the body of my report.
6    Q   Okay. I know it may take you a minute to
7  look through, but could you direct me to the portion
8  of your report where you discuss these?
9        MR. BROOKS: And Counsel, if we could
10 take a short break in the near future, that would be
11 great.
12       MS. MURPHY: Sure.
13       THE WITNESS: If you look at paragraph
14 49 and 50, I refer to these two meetings.
15       MS. MURPHY: Okay. Counsel, if you
16 want to take a short break, now is a good time. Would
17 you say you want five minutes, ten minutes?
18       MR. BROOKS: Every time anybody says
19 five, it takes ten. So let's just do that.
20       MS. MURPHY: I agree. Okay.
21       MR. BROOKS: All right.
22       THE REPORTER: All right, the time is

Page 47

1  10:16 a.m. We are now off the record.
2        (Off the record.)
3        THE REPORTER: The time is 10:26 a.m.
4  We are now back on the record.
5  BY MS. MURPHY:
6    Q   Okay. Dr. Curlin, I'm going to move on to
7  just a couple questions about your clinical practice.
8  It looks like you began your clinical practice in
9  2001, as a primary care internist at the Lawndale
10 Christian Health Center; is that correct?
11   A   Well, I began my clinical practice in
12 training. We have -- had a continuity clinic. But I
13 continued it post-training in that context.
14   Q   Got it. So where is the Lawndale Christian
15 Health Center located?
16   A   The Lawndale Christian Health Center is
17 located on the west side of Chicago, not far from the
18 Cook County Jail, in the -- right at the juncture
19 between the North Lawndale and South Lawndale
20 neighborhoods.
21   Q   And what prompted your decision to work
22 there?

Page 48

1    A   I had been drawn to Chicago as a place to
2  train because I wanted to work among the underserved
3  and had heard about the pioneering work among the
4  undeserved led by the Lawndale Christian Health
5  Center. And I spoke Spanish and my fiance, soon to be
6  wife, spoke Spanish, and we could live in a
7  Spanish-speaking inner-city neighborhood while
8  learning from physicians who were -- had devoted their
9  lives to practicing medicine among the underserved.
10 And so I chose to live there while training at the
11 University of Chicago, and then was able to negotiate
12 being able to see patients there during my fellowship.
13   Q   And can you tell me about the mission of
14 that center?
15   A   I don't recall the mission exactly, but I
16 know it has something to do with something like
17 showing the love of Christ through caring for patients
18 with excellence. Something like that.
19   Q   And what role did Christianity play in the
20 care that patients received in the clinic?
21   A   Well, it -- it was the primary motivation
22 for these physicians and nurses to work with a

Page 49

1  population of patients that was marginalized with
2  respect to healthcare resources because of their
3  economic and other forms of poverty, including their
4  immigration status. And so it was strongly motivated
5  by a Christian vision of our common humanity, that
6  everyone being made in the image of God has dignity,
7  and that those who are poor receive what in the
8  Christian condition is often called the
9  preferential -- preferential option for the poor,
10 meaning they deserve particular regard, particular
11 emphasis, particular priority.
12       And so that whole vision of caring well for
13 people who characteristically struggle to find good
14 medical care was grounded in that Christian tradition.
15   Q   And were choices in treatment options
16 influenced by Christian values?
17   A   I'm sure they were in any number of ways.
18 For example, you know, people would go the extra mile
19 to make sure the patients were able to be seen by
20 specialists that they otherwise could not be seen by
21 because of those same Christian values I just
22 described.

13 (Pages 46 - 49)

Farr Curlin                                                                April 8, 2024

Page 50

1    They would seek to make sure that all that
2 is -- all that good medicine rightly ordered makes
3 available to us was seen as something that should be
4 made available to those -- to the least of these, to
5 use that theological language, to those who -- who
6 need it most.  And they were committed to that.
7    Q    And just before we go on, you've used the
8 term "good medicine" a couple times so far today, and
9 I'm wondering if you can give me a definition of what
10 you mean by "good medicine."
11    A    You know, for philosophical reasons, no,
12 there's -- there's no way to define the term
13 could -- good more basically.  That -- that is -- but
14 the idea just means that there are -- among those
15 things that people who put themselves forward as
16 medical practitioners and the institutions that put
17 themselves forward as medical institutions do, not all
18 is good.  And part of the challenge of being human,
19 and specifically being a medical practitioner, is to
20 discern that which is consistent with medicine rightly
21 understood and -- and with the patient's health
22 rightly understood, and with the requirements of -- of

Page 51

1 morality, of ethics rightly understood from that which
2 is not.
3         So for example, it is standard that
4 hospitals would and physicians would refuse to see
5 people who had Medicaid.  And that would be the sort
6 of things that for many people at Lawndale Christian
7 Health Center was an example of not good medicine and
8 a kind of corruption of medical institutions.
9    Q    Understood. So what patients did the
10 Lawndale Christian Health Center serve? Age, just in
11 general, what patients did they serve?
12    A    They served all -- all patients that showed
13 up, which included every -- every manner of patient.
14    Q    So children through adult?
15    A    Yes, children through adult.
16    Q    And did providers only treat Christians?
17    A    No.  As I said, they -- they saw everyone
18 who showed up.  They were committed to not
19 distinguishing between patients, except insofar as
20 patients needed medical care.
21    Q    And did providers treat any transgender
22 patients?

Page 52

1    A    I'm sure they did, but I -- I did not see
2 any and so I don't -- I can't say with certainty.
3    Q    But there was no policy against treating the
4 transgender patients?
5    A    No.  In fact, had there been a policy it
6 would have been that we treat anyone and everyone,
7 including anyone who shows up with a genuine medical
8 need that we can be helpful with.
9    Q    And were patients asked about their
10 religious affiliation on any forms or by the provider?
11    A    They, I'm sure, often were.  I don't
12 remember the details of how they were asked.  It's
13 customary across medicine to ask about religious
14 affiliation as part of taking a history.
15    Q    At that practice, were there any policies
16 dictating certain treatments that would not be
17 provided to patients?
18    A    There were no treatments that I'm aware of
19 that -- that were recognized as legitimate medical
20 treatments, treatments that respond to medical need,
21 that were opposed by that clinic.
22    Q    Why do you say it that way?

Page 53

1         MR. BROOKS:  Objection.
2    A    Well, you know, as I've already mentioned,
3 there are things done by people who put themselves
4 forward as medical practitioners and that are offered
5 by institutions that put themselves forward as medical
6 institutions that are not good.  And I don't remember
7 there being a policy, but there were -- it was widely
8 understood that if a patient asked for something that
9 was not something consistent with good medicine,
10 that -- that the medical practitioner would
11 respectfully decline to participate on what the
12 patient requested.
13    Q    Can you think of any examples of those types
14 of treatments?
15    A    The -- I can think of two.  One would be
16 assistance in hastening one's death or causing one's
17 death.  And another would be what we would call
18 elective abortion.
19    Q    And is the reason for not providing those
20 treatments based on Christian values?
21    A    The reason for not providing those
22 treatments are based on values that are not specific

14 (Pages 50 - 53)

Farr Curlin
April 8, 2024

Page 54

1 to Christianity. Specifically, the ancient and
2 enduring, I think, when people are thinking well and
3 practicing well, commitment to not causing the death
4 of any -- any patient.
5    Q    And so would, and I'll be specific, would
6 prescribing puberty blockers or cross-sex hormones for
7 someone with gender dysphoria, would that fall under
8 the category of treatments that would not be provided?
9    A    I don't recall -- I actually don't know. I
10 haven't been to Lawndale Christian Health Center in
11 more than 20 years, and so I don't know.
12    Q    What was your role when you practiced there?
13    A    My role was as an outpatient primary care
14 physician.
15    Q    And I know that you've said that the clinic
16 treated all patients. At that time, did you treat
17 children and adolescents? In addition to adults, I
18 should say.
19    A    I only saw physically mature adolescents,
20 and that was a minority of the patients that I saw.
21    Q    And were you practicing internal medicine?
22    A    Yes, I was practicing internal medicine.

Page 55

1    Q    Did you treat anyone with a diagnosis or who
2 displayed symptoms of gender dysphoria?
3          MR. BROOKS: Objection, compound
4 question.
5    A    I don't recall.
6    Q    Did you ever diagnose anyone with that
7 condition while working at the Lawndale Christian
8 Health Center?
9    A    I have no memory of doing so.
10    Q    Did any of your patients express concerns
11 related to their gender identity?
12    A    I don't recall whether any of my patients
13 expressed concerns about how their secondary sex
14 characteristics aligned with their own perception of
15 their gender.
16    Q    The next place you practiced was at
17 University of Chicago Primary Care Group; is that
18 correct?
19    A    Yes, that's the next place I practiced
20 outpatient medicine.
21    Q    And on your CV, you list primary care
22 physician, whereas at Lawndale you described your

Page 56

1 title as primary care internist. Is there a
2 distinction to be made there or?
3    A    There's no distinction that has substance.
4 I was a primary care physician at both places, and I
5 was an internal medicine physician at both places.
6    Q    And at the Primary Care Group, were you
7 seeing patients in a clinic setting?
8    A    Yes, I was seeing patients in an outpatient
9 clinic setting.
10    Q    And what patients did you see when you
11 worked there?
12    A    I saw all manner of patients that presented
13 to the clinic, with all manner of complaints and
14 concerns, with a focus on adults.
15    Q    And can you give me some examples of the
16 types of conditions that you treated?
17    A    I treated conditions such as chronic pain,
18 fatigue, sleeplessness, depression, anxiety, erectile
19 dysfunction, hypertension, diabetes,
20 hypercholesterolemia, thyroid disorders,
21 osteoarthritis, rheumatoid disorders, kidney disease,
22 and that's not comprehensive but that's an

Page 57

1 example -- that's a list of some examples.
2    Q    And in that setting, did you treat anyone
3 with a diagnosis of gender dysphoria?
4    A    I have no memory of treating someone in that
5 context who carried a diagnosis of gender dysphoria.
6    Q    And did you treat anyone who expressed
7 symptoms that are characteristic of gender dysphoria?
8    A    I don't recall. I imagine I did, but I
9 don't recall specifics.
10    Q    Did you ever recommend medical treatment to
11 a patient who expressed gender dysphoria symptoms,
12 related to the gender dysphoria?
13          MR. BROOKS: Objection, lack of
14 foundation.
15    A    I'd want to know what medical treatment you
16 have in mind, but I -- as I said, I don't recall
17 treating anyone who carried a diagnosis of gender
18 dysphoria. And so similarly, I don't have any
19 recollection of specific treatment.
20    Q    Okay. And am I correct that during that
21 same time period, beginning in 2003, you were also the
22 attending physician at University of Chicago Hospital?

15 (Pages 54 - 57)

Farr Curlin                                                                    April 8, 2024

Page 58

1    A   Yes, I was also an attending physician on

2  the general medicine service at the University of

3  Chicago Hospitals.

4    Q   And did you ever encounter any patients with

5  gender dysphoria in that setting?

6    A   I am confident that I did, but I don't have

7  specific memories of particular patients.

8    Q   Do you have a specific memory of prescribing

9  puberty blockers to somebody with gender dysphoria?

10    A   No, I have no memory of prescribing puberty

11  blockers to someone with a diagnosis of gender

12  dysphoria.

13    Q   And what about cross-sex hormones?

14    A   I have no memory of prescribing cross-sex

15  hormones to a patient.

16    Q   On your CV, you also describe an ethics

17  consult service.  What do you mean by that?

18    A   At the University of Chicago, I served as

19  one of the attending physicians on the clinical ethics

20  consult service.

21    Q   And is that similar to what you would call

22  the ethics committee?

Page 59

1    A   At the University of Chicago, the consult

2  service self-consciously does not call itself a

3  committee.  In part, emphasize that the goal for that

4  consult service is to help clinicians think well about

5  the issues they face and make clinical judgments that

6  are consistent with their ethical obligations, rather

7  than defer that to a committee.  But we called it

8  the -- the clinical ethics consult service.

9    Q   Got it.  And what was your role on the

10  consult service?

11    A   The months that I was the primary attending,

12  I would go -- when an ethics consult was called, I

13  would go to see those who called the consult and any

14  people involved in the situation for which the ethics

15  consult emerged.  I would often do that with one of

16  our fellows in clinical medical ethics.

17        And would gather data relevant to clinical

18  ethical reasoning about that case and then would draw

19  on what I took to be relevant sources that speak to

20  the clinical ethical questions raised by that case,

21  and put together a one to two-page description of the

22  case and then would present that case to the remainder

Page 60

1  of the faculty and trainees, usually 20 to 30 people,

2  at our weekly clinical ethics case conference to

3  invite them to reason with us and with the people

4  involved in the clinical care for which the case

5  emerged.

6        And would, based on that discussion, then --

7  and my own expertise and the resources that were

8  relevant and the facts that are relevant, we then

9  write a consultation note which would be placed in the

10  chart, which would be my opinions and my

11  recommendations to those involved regarding how they

12  might proceed and for what reasons.

13    Q   And was that note provided to the person who

14  requested the consult?

15    A   Well, it was -- became part of the medical

16  record.  So anybody who had access to the medical

17  record would have access to the note.

18    Q   And how many months were you the primary

19  attending?

20    A   Typically, one to two months per year.

21    Q   Okay.  And when you weren't serving as the

22  primary, were you still serving a role -- what was

Page 61

1  your role when you weren't serving as the primary?

2  How would you describe that?

3    A   My role with respect to the clinical ethics

4  consult service would be to go to the -- when my

5  schedule allowed, to go to the two-hour clinical

6  ethics case conference and participate in that

7  dialogue about the -- the cases that were live at that

8  time.

9    Q   And was it only physicians who could request

10  a consult, or could family or patients request

11  consults also?

12    A   Anyone could request a consult.

13    Q   And was there a particular process that they

14  had to follow to request a consult?

15    A   I don't recall the details, but there were

16  not really hoops to jump through.  It was just if

17  there was a question, whoever became aware of the

18  question was able to ask for an ethics consult, and

19  then it was well known across the hospital how to --

20  how to ask for an ethics consult, and then we would be

21  paged.

22    Q   Can you give me some examples of some of the

16 (Pages 58 - 61)

Page 62

1  types of questions that were posed?

2      A   I can give you a few examples of questions

3  that were posed, but in broad strokes as I don't

4  remember the details of any case these years later.

5  We had cases in which a patient had obviously

6  diminished capacity to reason and to think about some

7  choice for which they, under the law, had authority to

8  make a decision.  And we would be asked to weigh in on

9  whether they had sufficient capacity to make the

10  particular question or the particular judgment that

11  was facing them.

12      And if they didn't, why?  How could that be

13  restored?  And if it could not be restored, who would

14  be the property surrogates to turn to and what

15  standards would bind the decisions that a surrogate

16  would make, and are those standards different from the

17  standards that would bind a patient themselves?

18      We had questions about the care of children,

19  where either families sought some intervention that

20  the physicians did not think was consistent with good

21  medicine.  How a physician should proceed in such a

22  case.

Page 63

1      We had cases in which the physicians thought

2  that some intervention for children was important, and

3  then we would think about whether it was sufficiently

4  important or sufficiently medically necessary that the

5  physicians had authority to override the wishes of the

6  pediatric patient and/or their patients.  And if so,

7  how should they do that and what are -- what's the

8  limit of that -- the scope of that authority?

9      We had, I remember a case in which there was

10  a young woman who sought assisted reproductive

11  technologies because she had not gotten pregnant.  And

12  the question was should that be offered to her since

13  she was, in this case as I recall, 18 or 19 years old

14  and did not have a consistent partner and seemed to

15  have a life that was -- that was unstable.

16      The question was is this good medicine to

17  facilitate this young woman getting pregnant?  There

18  were questions about whether it would be unjust to not

19  permit that for her if they were permitting it for

20  other people who sought that in different

21  circumstances.  And then questions about when,

22  effectively, that kind of discrimination is justified

Page 64

1  discrimination on the basis of medical differences and

2  when it's unjustified discrimination on the basis of

3  differences that should not restrict peoples' care.

4  Those are just some examples.

5      Q   And when faced with those types of

6  questions, did you draw upon Christianity in order to

7  provide advice?

8      A   When faced with those questions, I would

9  draw on, as my colleagues would, the ethical norms and

10  values and goods and standards that are relevant to

11  that case, none of which were specifically affiliated

12  with or emerging from Christianity.  Although, many of

13  them are embraced by and, you know, endorsed by

14  Christianity, Judaism, Islam, and other religious

15  traditions.

16      Q   And did you ever provide consult on a

17  question involving gender dysphoria?

18      A   I do not recall -- I do not recall if we did

19  or not.

20      Q   I assume, from your publications, you're

21  Christian; correct?

22      A   I am a Christian, yes.

Page 65

1      Q   What denomination?

2      A   I'm a part of the Anglican Church of North

3  America.

4      Q   And how long have you been part of the

5  Anglican Church?

6      A   I have been part of the Anglican Church of

7  North America about ten years.

8      Q   And are you still practicing?

9      A   Practicing what?

10      Q   Do you still practice religion with the

11  Anglican Church of North America?

12      MR. BROOKS:  Objection to the form of

13  the question.

14      A   Yeah, I don't know what you mean by

15  practicing.  I am a Christian, and I participate

16  regularly in Christian worship services in a church

17  that's part of the Anglican Church of North America.

18      Q   With respect to your work on the consult

19  service, did you ever counsel anyone to take a course

20  of action that would not align with Christian values?

21      A   I am not aware of any -- any such case, nor

22  am I aware of -- I would need to think of a case and

17 (Pages 62 - 65)

Page 66

1  I -- in which what would be recommended ethically
2  contradicts Christian teaching.
3      Q    Would you say that providing puberty
4  blockers or cross-sex hormones for the treatment of
5  gender dysphoria is against Christian values?
6      A    Medicalized gender transition, I -- I think
7  contradicts a number of ethical norms, as I've
8  described, or at least appears to, as I've described
9  in my expert report.  And insofar as Christianity, as
10  other traditions, embraces some of those values, then
11  at least that far it would contradict Christian
12  values.
13      Q    So just to wrap up the questions I have
14  about your clinical practice, have we discussed all
15  the encounters with persons displaying symptoms of
16  gender dysphoria that you've had in your clinical
17  practice that you can recall?
18          MR. BROOKS:  Objection.
19  A   No, I don't think we have.
20  Q   How many are there that come to mind?
21  A   There is -- I am -- have memory of
22  peripherally being involved in care of -- well, let me

Page 67

1  say this.  I have clear memories of one patient whom I
2  cared for as a palliative medicine physician who was a
3  male who had a perceived -- self-perceived gender of
4  female.
5      Q    And what was your treatment related to with
6  this patient?
7      A    The medical care that this patient needed as
8  he was suffering from an advanced cancer.
9      Q    Was that individual receiving cross-sex
10  hormones?
11      A    Yes.  Not -- not prescribed by me, but yes,
12  he was receiving those.
13      Q    He was still receiving a prescription from a
14  different physician; correct?
15      A    Correct.  As best I can recall.  I was
16  brought in as a specialist consultant regarding
17  palliative medicine needs, and the patient was
18  receiving those -- had been receiving those as an
19  outpatient and was continuing to receive those during
20  the hospitalization when I saw the patient.
21      Q    Are there any other encounters with patients
22  with gender dysphoria that you can recall?

Page 68

1      A    I -- I don't recall other specific patients
2  that have been under my direct clinical care.
3      Q    Switching topics.  Are you familiar with the
4  Alliance for Hippocratic Medicine?
5      A    Yes, I am somewhat familiar with the
6  Alliance for Hippocratic Medicine.
7      Q    What is that alliance?
8      A    The Alliance for Hippocratic Medicine, to
9  the best of my knowledge, is an alliance of several
10  medical organizations, including the Christian Medical
11  and Dental Association, the Catholic Medical
12  Association, the American College of Pediatricians, I
13  believe it's called, and the American Association of
14  Pro-Life Obstetrician/Gynecologists, and I believe I
15  couple of other organizations that have formed an
16  alliance to contend for what they take to be norms
17  consistent with Hippocratic medicine.
18      Q    Are you a member of that organization?
19      A    I am not a member of that organization
20  directly, although I don't know if -- if there are
21  memberships specifically to that organization.
22      Q    Are you involved in that organization in any

Page 69

1  way?
2      A    I am not.  I was a speaker, a plenary
3  speaker, for that organization's -- one of its opening
4  events.  And -- but otherwise, I have not been
5  involved with it.
6      Q    What about the Society for Hippocratic
7  Medicine?
8          MR. BROOKS:  Objection to the form of
9  the question.
10      A    I don't know what the Society for
11  Hippocratic Medicine is.  I'm not sure to what you're
12  referring.
13      Q    Do you have involvement in an organization
14  that is called by a name that includes Hippocratic
15  medicine?
16      A    I'll help you out here.  I am involved in an
17  association called the Hippocratic Society.
18      Q    Tell me about that.  What is the purpose of
19  the Hippocratic Society?
20      A    The purpose of the Hippocratic Society is to
21  form clinicians in the practice and pursuit of good
22  medicine.

18 (Pages 66 - 69)

Farr Curlin                                                    April 8, 2024

Page 70

1    Q   And what is your role with that
2 organization?
3    A   I am the president of that organization.
4    Q   When was that organization formed?
5    A   It was formed, as best I recall, summer of
6 2023.
7    Q   Did you have a role in founding that
8 organization?
9    A   Yes, I was one of the founders.
10    Q   Do they have a website?
11    A   We do not yet have a website, no.
12    Q   How many members do you have?
13    A   We don't have any formal membership
14 structure at this point.
15    Q   We talked about this in another context
16 earlier, but within the context of the Hippocratic
17 Society, how do you define good medicine?
18    A   The Hippocratic Society does not define good
19 medicine, but is committed to the proposition that
20 there -- that a central responsibility of clinical
21 practitioners is to discern good medicine from that
22 which is not good, and make reasonable judgments in

Page 71

1 that respect and to follow those judgments.  And so we
2 are committed to fostering civil, open, vigorous
3 debate about all manner of questions that arise
4 regarding what medicine, our profession, properly
5 understood requires of us and what our commitments and
6 obligations to patients requires of us.
7    Q   What role does morality play in the practice
8 of good medicine?
9    A   Well, the concept "good" is the central
10 concept of ethics or morality.  So insofar as one is
11 considering, as a medical practitioner, what one ought
12 to do and what one ought not to do, what is better and
13 what is worse with respect to one's own actions or the
14 actions of others, one is addressing morality or
15 ethics.
16    Q   So in that same context, what role does
17 autonomy play?  Patient autonomy?
18    A   Patient autonomy is -- and I should say
19 here, I'm not speaking for the Hippocratic Society,
20 which has no policy on this question.  Oh, I should
21 stop there, in fact.  What was your -- what is it
22 you're asking?

Page 72

1    Q   In your view, what role does autonomy play
2 in the practice of good medicine?
3    A   In my view, autonomy is an important
4 concern, insofar as it is a concern that signals that
5 part of being human is to have -- when humans are
6 flourishing, is to have and exercise moral agency, and
7 also to indicate that whenever there's a decision to
8 be made among more than one person, as is the case
9 with virtually all clinical decisions, we have to
10 understand properly the scope and limits of the
11 authority of those involved.
12        And autonomy is characteristically raised
13 within medicine to refer specifically patient autonomy
14 and to emphasize the importance of honoring a
15 patient's authority, within its proper scope.
16    Q   And when you say "proper scope," what is the
17 property scope?
18    A   Well, the most important point is that
19 patients have authority to refuse any medical
20 proposal.  And by that I mean patients who have such
21 authority, which is typically adult patients who have
22 cognitive capacity to understand what decision they're

Page 73

1 making.  They have authority to refuse any medical
2 proposal, even ones that physicians are -- think are
3 really important.
4    Q   Do they also have the authority to receive
5 treatment that is legal to provide but the physician
6 is morally against?
7    A   So there's a few different questions packed
8 up in that, so can you re-ask it maybe with one -- one
9 at a time?
10    Q   Sure.  If a physician is morally opposed to
11 treatment, a particular type of treatment, but that
12 type of treatment is legal to provide, is a patient
13 entitled to receive that treatment?
14        MR. BROOKS:  Objection.
15    A   You still have a couple questions tied up
16 together there, but say this much.  The corollary of
17 the authority to refuse any medical proposal is
18 the -- the authority to consent to medical proposals.
19 And so we have this important concept and practice of
20 informed consent, which is very foundational to
21 medical practice and medical ethics.
22        Informed consent does not imply informed

19 (Pages 70 - 73)

Farr Curlin                                                    April 8, 2024

Page 74

1 demand.  In other words, whether a physician is
2 obligated to provide an intervention that a patient
3 seeks is -- it depends on the situation.  But the
4 patient seeking it does not make it something the
5 physician is obliged to provide.
6    Q    And can physicians deny treatment to a
7 patient, a treatment that is legal, because they are
8 morally opposed to providing it?
9    A    What's the question?
10    Q    Can a physician ethically deny treatment to
11 a patient that is requesting the treatment, and the
12 treatment is legal, can they ethically deny providing
13 that treatment because they are morally opposed to it?
14    A    There are many cases in which a good
15 physician will refuse a request that a patient makes
16 for a legal intervention, on the basis of the judgment
17 that to provide what the patient seeks would be to
18 contradict the physician's professional obligations to
19 the patient and to the profession.
20    Q    Have you published any work on gender
21 dysphoria?
22    A    I have published a peer-reviewed book on

Page 75

1 medical ethics that includes a chapter in which we
2 address medicalized gender transition.
3    Q    And is that book "The Way of Medicine"?
4    A    Yes, that book is "The Way of Medicine."
5    Q    Any other publications regarding gender
6 dysphoria?
7    A    I can't recall if I mentioned gender
8 dysphoria in other publications.
9    Q    Have you presented at any conferences on the
10 topic of gender dysphoria?
11    A    Yes, I have presented on the topic of gender
12 dysphoria, and specifically what I -- you referred to
13 as medicalized gender transition, at a couple of
14 conferences.
15    Q    And are those conferences listed in your CV?
16    A    I have to look to see.
17    Q    Okay.
18    A    Yeah, so on page 6 of my CV, number 70 is
19 one of those presentations.  And on page 7, number
20 107, is the second.
21    Q    Okay.  The first one that you mentioned on
22 page 6, you said that was number 70.  That's "Gender

Page 76

1 Transition Services: Progress or Medical Hubris?"  Can
2 you tell me about what the focus of that presentation
3 was and what -- tell me about the focus of that
4 presentation.
5    A    I don't remember the details here seven
6 years later, but it was a talk in which I recognized
7 the rationale that was being used in public to justify
8 medicalized gender transition and then raised what I
9 took to be some important ethical concerns about such
10 practices.
11    Q    And who was the audience of that
12 presentation?
13    A    That was at the 29th Annual Dorothy J.
14 MacLean Fellows Conference on Clinical Medical Ethics,
15 at the University of Chicago.  The audience is made up
16 of primarily alumni of that fellowship, of which there
17 are, I believe, more than 200.  As well as members of
18 the University of Chicago community who are interested
19 in medical ethics.
20    Q    And then the second one that you mentioned
21 is number 107 on page 7. That one, it looks like the
22 title is "Detransitioners, civil discourse, and the

Page 77

1 silence of clinical ethics."  Can you describe that
2 presentation?
3    A    That presentation was a kind of updating of
4 where we were now six years later, and in that case,
5 again, raising some of the ethical concerns that I
6 have about this practice.  I and others have about
7 this practice.  As well as commenting on the problem
8 of the absence of civil discourse about the topic
9 because of the sort of cancel culture and the fear
10 that people have of speaking out about their concerns.
11    Q    And who was the audience for that
12 presentation?
13    A    So that was a talk within an academic
14 year-long series on medical ethics, and the people who
15 come to that are a mixture of faculty and fellows in
16 the MacLean Center for Clinical Medical Ethics, as
17 well as broader members of the medical community who
18 are interested in the topic of that particular
19 session.
20    Q    In your report, you mention that you've been
21 invited to give talks at a major medical school on the
22 ethics surrounding transgender medicine.  What medical

20 (Pages 74 - 77)

Page 78

1 school is that?

2    A   That's the University of Chicago.

3    Q   And is that instance listed on your CV?

4    A   Yes, that's the number 107.

5    Q   Okay.  What do you mean by "transgender

6 medicine"?

7    A   I mean what I in my report describe as

8 medicalized gender transition, plus insofar as

9 relevant, surgical interventions that likewise seek to

10 refashion human anatomy to align with some appearance

11 that's more consistent with what the patient perceives

12 as consistent with their -- their -- their gender.

13    Q   Turning to your book, "The Way of Medicine,"

14 we have a downloaded copy of that book that I would

15 like to mark as an exhibit, but I want you to take a

16 look at it as well.

17       MS. MURPHY:  So first off, I'd like to

18 mark the copy of "The Way of Medicine" that we

19 downloaded as Exhibit 3.

20       (Exhibit 3 was marked for

21       identification.)

22       MR. BROOKS:  And let me ask, Counsel,

Page 79

1 is Exhibit 3 a copy of the entire book or selected

2 portions?

3       MS. MURPHY:  It's a copy of the entire

4 book.  But I would appreciate if Dr. Curlin takes a

5 moment to look at it and tell us if he disagrees that

6 that's the entire book.

7       MR. BROOKS:  I'll have to open a folder

8 in which I have put those downloaded files.  There it

9 is.  Now it has, according to the top of the PDF, it

10 has 130 pages.  I am guessing that you'd rather make a

11 representation than ask Dr. Curlin to check 130 pages?

12       MS. MURPHY:  That's correct.  I mean,

13 all I'm asking is that he, you know, acknowledge that

14 there's a downloaded copy of the book.  We represent

15 that this is a copy that was provided to us by a

16 particular library, so it should be a true and correct copy of

17 the book.

18       THE WITNESS:  I have never seen a

19 downloaded copy of our book, and our book in print has

20 more than 130 pages.  So I can't say for certain that

21 all the pages are included in this downloaded copy,

22 but I know that sometimes downloaded books are

Page 80

1 paginated differently, so.

2 BY MS. MURPHY:

3    Q   Well, for purposes of your deposition, I'd

4 like to refer to this copy.  And if there comes an

5 issue where you believe that anything in this book is

6 inaccurate, we can deal with that at a later time.

7 Make sense?

8    A   I think so.

9    Q   Okay.  And it could very well be that the

10 page references and stuff aren't even necessary to my

11 questions.  What motivated you to write this book?

12    A   Christopher Tollefsen and I had taught for

13 several years a one-week seminar on medical ethics.

14 And through the teaching of it, over the course of

15 that time we came to the mutual conviction that it

16 would be useful to write a book together about our

17 take on medicine and medical ethics and the key

18 questions that we address in the book.

19    Q   And your book presents two models as ways to

20 look at medicine; right?

21    A   It does.  It presents -- well, it presents

22 two models as conceding that they're -- that's a

Page 81

1 simplification for the purposes of considering these

2 two different patterns of understanding medicine and

3 practicing medicine.

4    Q   Fair.  But one of these models you refer to

5 as the provider of services model; correct?

6    A   Yes, we refer to one model as the provider

7 of services model.

8    Q   And can you describe the provider of

9 services model?

10    A   The provider of services model is a way of

11 understanding and practicing medicine that takes

12 medical practitioners to be fundamentally providers of

13 services, whose obligation is to make available

14 interventions that are technologically possible and

15 that are permitted by the law relevant to that

16 particular jurisdiction, so that those interventions,

17 whatever they are, can be used according to the

18 judgment of the patient to pursue and open-ended and

19 ultimately subjective notion of patient wellbeing.

20 That is known within this way of thinking, primarily

21 by what the patient asks for and what the patient says

22 is important to them.

21 (Pages 78 - 81)

Farr Curlin                                                April 8, 2024

Page 82

1   Q    And is this primarily how medical schools
2   train students?
3   A    In our judgment, medical schools have tended
4   to emphasize, to a problematic degree, this way of
5   understanding medicine.
6   Q    And your book also provides an alternative
7   view of looking at medicine, and you refer to that as
8   the way of medicine; right?
9   A    Yes, we refer to our account of medicine and
10  medical ethics as the way of medicine.
11  Q    How would you describe the way of medicine?
12  A    The way of medicine is an understanding and
13  practice of medicine that takes medicine to be
14  fundamentally a moral practice, in pursuit of a
15  particular good.  Namely, the human good of human
16  health.  And does so pursuing that good in particular
17  persons, and governed by the requirements of -- of
18  what can be called natural law or morality at large,
19  ethics, but also with attention to the particular
20  ethical requirements of a practice that is devoted to
21  attending to those who are sick and seeking to
22  preserve and restore their health.

Page 83

1   Q    And between those two models, is the way of
2   medicine the preferred model to practice, in your
3   view?
4   A    In my opinion, the way of medicine is a more
5   reasonable account of -- of what physicians reasonably
6   and rightfully profess.
7   Q    Why is that your preferred way of looking at
8   medicine?
9   A    Well, there's a number of reasons, but
10  it's -- prefer it because we believe it's truer and
11  more adequate to the reality of what patients
12  experience and what practitioners reasonably profess.
13  That in fact to -- that in fact it cannot follow that
14  because a patient has, as they do have, authority to
15  refuse any medical proposal and has authority to
16  consent to reasonable proposals that physicians make.
17  It cannot follow that they have a -- a right to demand
18  a medical practitioner's interventions that contradict
19  their own health or otherwise would involve the
20  practitioner in contradicting the requirements of
21  ethics, the requirements of morality at large, or the
22  requirements specific to the practice of medicine.

Page 84

1       And so the way of medicine is more adequate
2   to the reality of what makes medical practitioners
3   medical practitioners is that -- versus some other
4   kind of practitioner is that they show up to and --
5   and offer themselves in response to threats to the
6   health of or injuries to the health of -- of other
7   persons, and they seek expertly to remedy those
8   injuries and -- and to promote health of patients.
9   What makes us physicians is not that we provide stuff
10  that people want, but in fact that we are healers.
11  Q    So is it fair to say that your clinical
12  practice is guided by that model?
13  A    Yes, insofar as what we've described there
14  is -- is what we take to be a reasonable account of
15  what all medical practitioners, when they're thinking
16  well and practicing well, are guided by.  And -- and
17  yes, I -- insofar as I am aware, I try to practice
18  according to the norms we describe there, which we
19  take to be universal norms when they're properly
20  understood.
21  Q    And so does that mean that at least in part,
22  your clinical practice relies on your sense of

Page 85

1   morality?
2   A    So it -- it's not possible for any medical
3   practitioner to practice medicine without relying on
4   their sense of morality, except by making themselves
5   mercenary and just doing whatever people tell them to
6   do.  So it's -- it's I think absolutely intrinsic to
7   medicine that a medical practitioner practices
8   according to their judgments regarding what ethics
9   requires.
10  Q    And would you agree that individuals' sense
11  of what is good and what is bad differs?
12  A    Well, to some extent.  People -- well,
13  clearly, people have disagreements about what ethics
14  requires.  I'll say that much.
15  Q    And are there certain treatments that you
16  would not recommend, based on your values?
17  A    I would not recommend any treatment, except
18  insofar as I believe that treatment is a reasonable
19  medical proposal.
20  Q    If you had the training to do so, would you
21  recommend puberty blockers to an adolescent to treat
22  gender dysphoria?

22 (Pages 82 - 85)

Page 86

1    MR. BROOKS:  Objection, lack of
2 foundation.
3    A   Yeah, I -- I haven't, I believe, offered
4 opinions about what I might do in some speculative
5 future or with particular cases.  I'm not -- I'm not
6 willing to under oath try to imagine that and give an
7 opinion about that on the fly.
8        MS. MURPHY:  It's fairly typical to ask
9 hypothetical questions in this instance.  Mr. Brooks,
10 are you instructing your client not to answer?
11       MR. BROOKS:  Well, he has answered, and
12 I'm certainly not going to instruct him to offer
13 opinions under oath that he doesn't feel comfortable,
14 that he doesn't feel that he has informed opinions on.
15 He has no obligation to do so.
16 BY MS. MURPHY:
17   Q   So is it that you don't know what you would
18 do in that situation, or is it that you don't wish to
19 provide an answer for that question?
20   A   In clinical medicine, we always take into
21 account all the particularities of a given case.  In
22 my expert report, I've -- I've indicated a number of

Page 87

1 reasons why I was -- it is doubtful in any particular
2 case that I would come to the judgment that cross-sex
3 hormones or blocking -- blocking puberty on the basis
4 of dysphoria is a reasonable medical proposal.  But
5 I -- I cannot say what I would do in a particular case
6 until I know, you know, the -- the facts of the case.
7   Q   Fair enough.  When you say that it's
8 doubtful that you would do so, is that doubt based on
9 your sense of morality?
10   A   The doubtfulness is based on my
11 understanding of the ethical norms, including the
12 norms specific to the practice of medicine, and as
13 I've described in my report.
14   Q   Is it your belief that humans can only be
15 male or female?
16   A   It is my belief that humans are, as a
17 species of mammals, are male or female.  That we
18 have -- there are only two sexes that make possible
19 reproduction, and that's something we share with other
20 animals.
21   Q   And so what type of treatment, if any, would
22 you recommend to a patient who exhibited extreme

Page 88

1 distress over the congruence between their perception
2 of their gender and their anatomical assignment to a
3 particular sex?
4        MR. BROOKS:  Objection.
5   A   I -- I don't -- I don't know, as I haven't
6 been in -- I haven't had a patient with that precise
7 presentation.
8   Q   Under the provider services model, a
9 physician practicing under the provider of services
10 model, would you agree that that provider would be
11 obligated to provide puberty blockers in response to a
12 patient who is experiencing gender dysphoria and
13 wanted to stop puberty?
14       MR. BROOKS:  Objection, incomplete
15 hypothetical.
16   A   As I wrote in our book, in my judgment,
17 medicalized gender transition is strongly influenced
18 by what we call the provider of services model,
19 insofar as it takes the perception and subjective
20 account of wellbeing of the patient, namely what the
21 patient desires, to be -- to establish the goal that
22 medical practitioners are obligated to pursue.

Page 89

1        And just insofar -- in that respect, we
2 think it is emblematic of the influence of what we
3 call the provider of services model.
4   Q   And when you refer to the patient's opinion
5 on what they need as subjective, would you agree that
6 morality is also subjective?
7   A   I would not, no.
8   Q   Can you elaborate a bit on that?
9        MR. BROOKS:  Objection.
10   A   Can you ask the question again or
11 differently?
12   Q   Sure.  Is morality objective or subjective?
13   A   Well, ethics at root must be objective, it
14 must be real, or else the entire moral life of human
15 beings is a sham.  Now it also is the case that it's
16 hard to discern and there are ambiguities and
17 disagreements about what ethics requires, about what
18 morality requires, about what's good and not good.
19        And the -- one does not assess ethics in the
20 same way one assesses how much someone weighs, for
21 example.  But ethics is -- at root, must be objective
22 for there to be any point in having an argument about

23 (Pages 86 - 89)

Farr Curlin                                                                    April 8, 2024

Page 90

1  how we ought to live.

2     Q   So do you agree that under the way of

3  medicine, that it would be contrary to health to

4  provide puberty blockers to stop puberty in somebody

5  who is experiencing gender dysphoria?

6        MR. BROOKS:  Objection, lack of

7  foundation.

8     A   Can you repeat the question?

9     Q   Sure.  Under the way of medicine, would it

10  be contrary to health to provide medicalized gender

11  transition treatment?

12     A   So as -- as I noted as well in my report, it

13  appears that, and as we've noted in the book, it

14  appears that it does.  That is to say that insofar as

15  medicalized gender transition contradicts the healthy

16  development of secondary sex characteristics that go

17  along with the kind of theme the patient is a male or

18  a female human organism, it appears to contradict the

19  patient's health.

20     Q   And so is it your opinion that any attempt

21  by a physician to align an adolescent's physical

22  characteristics with their perceived gender identity

Page 91

1  is unethical?

2     A   I -- I can't speak to any intervention.

3  You'd have to give me a particular intervention to

4  consider, or a particular kind of case.

5     Q   Sure.  With respect to puberty blockers,

6  would it be unethical for a physician to prescribe

7  puberty blockers to stop puberty?

8     A   In what case?

9     Q   In an individual with gender dysphoria.

10     A   So again, I -- I can't opine to a specific

11  case and all the things that might bear on that, but

12  it -- for the reasons I outline in my report, it seems

13  doubtful that cross-sex hormones can be reasonably

14  understood as consistent with the patient's health,

15  insofar as they contradict healthy physiologic norms

16  with respect to sex hormones for a person of that

17  person's sex.

18        MR. BROOKS:  Counsel, if we could

19  sometime soon take a break for a few minutes and then

20  run one more stretch before lunch, that would be good.

21        MS. MURPHY:  You're east coast time;

22  right?

Page 92

1     A   MR. BROOKS:  We are.

2        MS. MURPHY:  Okay.  Why don't we just

3  break for lunch at 12:30?  How does that sound?

4        MR. BROOKS:  Well, I would appreciate a

5  short break sooner than that.

6        MS. MURPHY:  Okay.  Let me just finish

7  up --

8        MR. BROOKS:  Yes, yes.

9        MS. MURPHY:  -- and then we'll take a

10  quick break.

11        MR. BROOKS:  Okay.

12  BY MS. MURPHY:

13     Q   Would you say that it would be immoral for a

14  physician to prescribe puberty blockers to stop

15  puberty in an individual with gender dysphoria?

16        MR. BROOKS:  Objection.

17     A   As I noted before, I can't say for a

18  specific case until I know that -- all the details of

19  that case and -- to make a judgment about that.  But

20  for the reasons I outlined in my report, it seems to

21  me doubtful that -- that it can be consistent with

22  medical ethics to block the healthy sexual development

Page 93

1  of a patient on the basis of the fact that this

2  patient perceives their healthy sexual development to

3  be at odds with their -- their sense of wellbeing.

4     Q   In your book, you mentioned that you've

5  never made peace with the notion of separating

6  personal from professional.  Does that sound correct?

7     A   That sounds correct, taken in the proper

8  context.

9     Q   What do you mean by that?  What's the proper

10  context?

11     A   I mean the context of what I said in the

12  book.

13        MS. MURPHY:  I'm trying to pull it up,

14  but I think I'm going to need a minute to do so.  So

15  why don't we take a ten-minute break?  Or could we do

16  a five-minute break?

17        MR. BROOKS:  We'll try to be back

18  sooner than ten.

19        MS. MURPHY:  Okay, excellent.

20        MR. BROOKS:  It'll show up on the

21  screen when it says we're here, but five should

22  probably do it.

24 (Pages 90 - 93)

Page 94

1        MS. MURPHY:  All right, thank you.

2        THE REPORTER:  Okay.  The time is 11:50

3  a.m.  We are now off the record.

4        (Off the record.)

5        THE REPORTER:  The time is 11:57 a.m.

6  We are now back on the record.

7        MS. MURPHY:  Thank you.

8  BY MS. MURPHY:

9    Q    Dr. Curlin, can you please turn to page 8 of

10  your book?

11        MR. BROOKS:  And you refer to the

12  online edition that you asked him to look at; correct?

13        MS. MURPHY:  Correct.

14        THE WITNESS:  I -- I have turned there.

15  BY MS. MURPHY:

16    Q    Okay.  In the last paragraph on that page,

17  it says, "I've never made peace with the notion of

18  separating the personal from the professional."

19  Correct?

20    A    I see that it says that, and it's important

21  that it says that in the context of clarifying that

22  all medical practitioners are personally obligated to

Page 95

1  make judgments about what their profession and other

2  demands of ethics require of them and to practice

3  according to that judgment.  And that what I was

4  pointing out was, spuriously, people here and there

5  have suggested that because someone, say like myself,

6  embracing a long-standing norm, for example don't kill

7  your patient, that somehow they're imposing their

8  personal values on what should be a professional

9  practice.  And I was highlighting that that is

10  logically problematic for a number of reasons.

11    Q    So is it fair to say that your own sense of

12  morality guides your professional opinions?

13        MR. BROOKS:  Objection.

14    A    My professional opinions are based upon my

15  professional education and understanding and judgment

16  about what ethics, broadly and medical ethics

17  specifically, requires of medical practitioners.

18    Q    Is there a difference between ethics and

19  morality?

20    A    There's no substantive difference between

21  the two.  Or certainly not in the way that I'm using

22  the terms and philosophers and ethicists generally

Page 96

1  have used the terms in their -- in their reasoning and

2  in their writing.

3    Q    Understood.  Turning back to your report, in

4  paragraph 5 you state that you've spent a substantial

5  portion of your time conducting and publishing

6  empirical research, including research on physicians'

7  attitudes and practices regarding controversial

8  practices; correct?

9    A    Give me a moment.

10    A    Sure.

11    A    I was taking down the image of the book.

12  Can you repeat the question?

13    Q    Sure.  It says in paragraph 5 that you've

14  spent a substantial portion of your time conducting

15  and publishing empirical research, including research

16  on physicians' attitudes and practices regarding

17  controversial practices; correct?

18    A    Yes, that's correct.

19    Q    And how do you define "controversial

20  practices"?

21    A    Practices about which there is public

22  controversy.  But public here, I mean there are

Page 97

1  arguments made in print or in public settings about

2  what one ought to do and what one ought not to do, and

3  we find that there are significant disagreements on

4  the question.

5    Q    So do you consider a diagnosis of gender

6  dysphoria to be controversial?

7    A    I do not consider a diagnosis of gender

8  dysphoria, if by that you mean a diagnosis of a person

9  experiencing distress and discomfort and bad feeling

10  relating to a perception that their secondary sex

11  characteristics are at odds with what they perceive

12  their gender, I don't consider that to be a

13  controversial diagnosis, no.

14    Q    Okay.  But do you consider the practice of

15  prescribing puberty blockers or cross-sex hormones for

16  the treatment of gender dysphoria to be controversial?

17    A    I do consider medicalized gender transition,

18  as described in my report, to be controversial.

19    Q    Do you consider it a controversial treatment

20  for patients of any age?

21    A    I -- I do consider it to be a controversial

22  treatment, period, but particularly controversial with

25 (Pages 94 - 97)

Page 98

1  respect to minors.

2       Q   Okay.  So are there instances, like for

3  particular patients, where you would not consider it

4  to be a controversial treatment?

5            MR. BROOKS:  Objection.

6       A   Yeah, I would have to -- you'd have to give

7  me a specific scenario you have in mind.

8       Q   Well, that's my question.  Are there

9  particular patients where it would be appropriate to

10  prescribe medicalized gender treatment?

11           MR. BROOKS:  Objection.

12      A   I -- I -- I don't know.  I would -- again, I

13  would have to have a particular case that you have in

14  mind, or at least you can describe in a little more

15  detail a particular kind of case.

16      Q   I think that answers my question.  Have you

17  conducted any empirical research on physicians'

18  attitudes on diagnosing gender dysphoria?

19      A   Not that I recall.

20      Q   And have you done any empirical research on

21  physicians' attitudes for providing medicalized gender

22  transition treatment?

Page 99

1       A   Not that I recall.

2       Q   Have you ever served on an institutional

3  review board?

4       A   I have not served on an institutional review

5  board.

6       Q   Have you ever provided ethical guidance to

7  an institutional review board?

8       A   I -- I don't recall specifically whether I

9  did or didn't, but I may have as part of our -- my

10  work as a faculty member in the McClean Center for

11  Clinical Medical Ethics, and likewise here at Duke.

12  I -- I can't recall if it was specifically an

13  institutional review board that was asking for input

14  on a particular case.

15      Q   How did you become involved in this case?

16      A   I believe Mr. Brooks originally reached out

17  to me to ask if we could have a conversation about

18  potentially serving as an expert witness.

19      Q   When did that conversation occur?

20      A   I don't recall exactly, but sometime -- best

21  of my recollection, sometime in the fall of 2023.

22      Q   And were you retained shortly thereafter?

Page 100

1       A   Not -- well, depends on what you mean by

2  "shortly."  I believe I was retained in December, but

3  it may have been November of 2023.

4       Q   You've been retained as an expert witness in

5  cases prior to this one; right?

6       A   Yes, I've been retained as an expert witness

7  in cases prior to this one.

8       Q   Have you ever opined on anything related to

9  gender dysphoria?

10      A   To my knowledge, I have not opined directly

11  about gender dysphoria, or more specifically, prior to

12  this case I do not believe I've been asked to address,

13  as a central question, ethical issues raised by

14  medicalized gender transition.

15      Q   Okay.  Turning to your report, paragraph 28.

16  I'm sorry, I meant page 28.  Page 28 of your report.

17  That's a list of other materials that you considered

18  with respect to preparing this report; correct?

19      A   Yes, it appears to be so, yes.

20      Q   And who provided you those materials?

21      A   Either Mr. Brooks or another of the

22  attorneys for the State of Alabama.

Page 101

1       Q   And did those attorneys ask you to consider

2  any materials that are not listed here?

3            MR. BROOKS:  Objection.  I'll instruct

4  the witness not to answer questions about

5  communications with attorneys.

6  BY MS. MURPHY:

7       Q   Are there any materials that you were asked

8  to --

9            MS. MURPHY:  I'm going to ask that

10  question again because I don't believe that's covered

11  by attorney-client privilege.  I'm not asking about

12  the substance of those communications; I'm asking

13  about the materials that were provided or asked to be

14  reviewed.

15           MR. BROOKS:  I'm going to give the same

16  instruction.

17           MS. MURPHY:  Mr. Brooks, are you

18  contending that the materials provided to the expert

19  in this case are protected by attorney-client

20  privilege?

21           MR. BROOKS:  All I'm saying is that

22  communications between the expert and myself, or other

Page 102

1 counsel for Alabama, are work product and he's not
2 going to answer questions about their substance. Your
3 question goes to the substance, potentially, of such
4 communications.
5        MS. MURPHY: No. I specifically said
6 that my question does not involve -- I'm not asking
7 about the substance of those communications. I'm
8 asking what he was asked to review.
9        MR. BROOKS: I disagree with your
10 characterization that that doesn't go to the substance
11 of communications. I don't propose to argue. I have
12 instructed the witness not to answer that question.
13       MS. MURPHY: I mean, I think we're
14 probably going to have to see -- in that case, I
15 reserve the right to reopen this deposition and ask
16 about the materials that were provided to the witness,
17 if a Court decides that that's not privileged, which I
18 believe that they will.
19 BY MS. MURPHY:
20     Q   Dr. Curlin, did you review anything beyond
21 what is listed on page 28 or what is listed in your
22 bibliography in order to prepare the report?

Page 103

1     A   Not that I recall.
2     Q   And I am anticipating an objection here, but
3 for the record I'd also like to ask did the defendants
4 ask you to review any materials that are not listed
5 here?
6        MR. BROOKS: Yes, the same instruction.
7 BY MS. MURPHY:
8     Q   Paragraph 20 of your report, if you could
9 turn to that for a moment. In paragraph 20, it says
10 that you were asked to assume that the descriptions of
11 the articles and studies provided by Drs. Cantor and
12 Laidlaw are accurate; is that right?
13    A   I was asked to assume that the descriptions
14 of the articles and studies that they are accurate,
15 for purposes of my opinions provided in this case.
16    Q   Got it. And who asked you to make that
17 assumption?
18    A   Mr. Brooks.
19    Q   And were you asked to assume anything else
20 for purposes of preparing this report?
21    A   Not that I recall.
22    Q   Did you make any other assumptions when

Page 104

1 preparing this report?
2     A   Not that I recall.
3     Q   Have you been hired by Mr. Brooks in the
4 past to work on any of his other cases?
5        MR. BROOKS: Objection.
6     A   I was hired by the Alabama, as I recall
7 Attorney General's Office. But I do not recall having
8 been hired by that office in any case in the past,
9 although I -- I can't be certain without looking
10 through my whole list of cases.
11    Q   And do you have a personal or professional
12 relationship with anyone involved in this case, apart
13 from your retention as an expert?
14    A   I had a collegial relationship with Dr.
15 Antomaria.
16    Q   Anyone else?
17    A   Not that I recall.
18    Q   Okay. Can you turn to paragraph 14 of your
19 report, please? It says here that, quote, "I take as
20 a premise, based on the science reviewed and the
21 opinions offered by Drs. Cantor and Laidlaw, that the
22 mental health benefits that are claimed to justify the

Page 105

1 administration of medicalized gender affirmation
2 treatments to minors are currently unproven and
3 disputed among informed observers." Is that correct?
4     A   That's what I wrote, yes.
5     Q   And are you referring to science that you
6 reviewed on your own, or is that the science that Drs.
7 Cantor and Laidlaw reviewed?
8     A   I am referring to the science that they
9 reviewed, within which I reviewed or that I refer to
10 directly in the -- or in the -- the notes and in
11 the -- the report itself.
12    Q   Okay. Are you saying that you reviewed all
13 the studies that they cited in their reports?
14    A   I am not saying that.
15    Q   You reviewed only the ones that are cited in
16 your bibliography; is that correct?
17    A   I did review the ones cited in my
18 bibliography, and I do not know of reviewing others
19 that are not cited.
20    Q   Got it. And with respect to Dr. Cantor's
21 report, what steps did you take to ensure that his
22 opinions were valid?

Farr Curlin
April 8, 2024

Page 106

1    A   I -- as I noted, I -- I was asked to take,
2  as a premise, that -- that the -- the -- the review,
3  the descriptions of the -- the science in Cantor and
4  Laidlaw's report was accurate, for the purposes of
5  forming my opinion.  I reviewed some of the -- some of
6  the documents that they referred to directly and --
7  but I did not attempt to give a professional opinion
8  or judgment on the -- the full scope of the review of
9  the literature.
10   Q   And is that the same with respect to the
11 information that was in Dr. Laidlaw's report?
12   A   Yes, the same with Dr. Laidlaw's report.
13   Q   Did you consider the credentials of Drs.
14 Cantor and Laidlaw when deciding to rely on their
15 reports?
16   A   As I said, I was asked to take as a premise
17 that these reports were accurate in their description
18 of the literature, and I did that.
19   Q   Is it customary in medical ethics to take
20 others' work as a premise, without conducting
21 independent evaluation of that work?
22   A   It is when you're asking a specific question

Page 107

1  conditional on that description being accurate.  So
2  yes, just that far, yes.
3    Q   And so just to be clear, with respect to
4  paragraph 14, you didn't conduct any independent
5  assessment of the evidence that Drs. Cantor and
6  Laidlaw relied upon to draw your conclusion; did you?
7    A   As I said, I reviewed a number of the items
8  that they reviewed in their reports, and just that
9  far.  I did my own review.  But I was not attempting
10 to give an expert opinion about the -- the whole of
11 the medical literature on these questions.
12   Q   And when you say "informed observes," what
13 do you mean by "informed observers"?
14   A   I mean that observers meaning those who are
15 paying attention to this issue, and informed meaning
16 people who are generally regarded as having the kind
17 of expertise to -- that would distinguish them from a
18 layperson in giving an opinion about this -- this
19 issue or these issues.
20   Q   So in this particular instance, who would
21 you say qualifies as an informed observer?
22   A   I can't be comprehensive right here by

Page 108

1  memory, but certainly people like the experts that are
2  involved in England and Sweden and Finland and
3  Denmark, in reviewing the data and conducting their
4  own systematic reviews of the data and making
5  judgments about what the implications of the -- the --
6  that review are.
7    Q   I noticed that you happened to leave out the
8  United States.  Would you consider experts here within
9  the United States to be informed observers?
10   A   It depends on which person you're referring
11 to, but being in the United States does not keep one
12 from becoming an informed observer.
13   Q   Is it your opinion that experts who believe
14 that medicalized gender transition treatment is
15 ethical or not informed observers?
16   A   No, that is not my position.  Otherwise,
17 they could not be disputed if there were not
18 disagreement and dispute among informed observers.
19   Q   Okay.  In paragraph 15, you say, "I also
20 take it as a premise, based on the science reviewed
21 and the opinions offered by Drs. Cantor and Laidlaw,
22 that the known or reasonably anticipated harms to

Page 109

1  children and adolescents from MGT treatments are
2  substantial and serious, threatening sterilization,
3  failure to develop healthy sexual response, impaired
4  neurological" -- or brain -- "development, and
5  multiple other harms to bodily health."  Is that
6  correct?
7    A   Yes, that's what I wrote.
8    Q   And are you referring to the science that
9  you reviewed or the science that Drs. Cantor and
10 Laidlaw reviewed?
11        MR. BROOKS:  Objection.
12   A   I'm referring to their description of the
13 science that they reviewed.
14   Q   Did you review any science beyond what Drs.
15 Cantor and Laidlaw reviewed in order to draw your
16 conclusion with respect to paragraph 15?
17   A   Not that I recall.
18   Q   And what do you mean here when you say
19 "threatening sterilization"?
20   A   Let me -- if I may, I want to make sure I
21 didn't misspeak.  I -- I have continued to review
22 science as it comes out, and I don't recall when their

28 (Pages 106 - 109)

Farr Curlin                                                    April 8, 2024

Page 110

1 review stopped.  So in fact, the study by Glintborg
2 and Kaltiala, those two different studies, I can't
3 recall if Laidlaw, for example, referred to those in
4 Laidlaw's report.  So I -- I don't recall, beyond
5 those two, whether I reviewed further studies since
6 the scope of their report was drawn.
7     Q   Okay.  But I think you testified earlier
8 that everything that you reviewed for purposes of
9 formulating the opinions in your report were either
10 listed in your bibliography or in the page that has
11 the materials considered; correct?
12    A   Correct, to the best of my recollection.
13    Q   And so you didn't review anything beyond
14 those materials for purposes of formulating your
15 opinion for paragraph 15; right?
16    A   Not to the best of my recollection.
17    Q   Okay.  So going back to threatening
18 sterilization, what do you mean by that?
19        MR. BROOKS:  Sorry, Counsel, your voice
20 dropped out.  Just some computer issue.  Just if you'd
21 restate that.
22        MS. MURPHY:  Sure.

Page 111

1 BY MS. MURPHY:
2     Q   What do you mean by "threatening
3 sterilization"?
4     A   I mean threatening to render the patient
5 incapable of reproduction.
6     Q   And can you be more specific about what
7 aspect of MGT would you assert threatened
8 sterilization?
9        MR. BROOKS:  Objection.
10    A   So I know as a physician that human
11 reproduction depends on sexual maturation.  And so to
12 block sexual maturation, as puberty-blocking hormones
13 do intentionally, can result in infertility or
14 sterilization.
15    Q   And what do you --
16    A   And I also -- I mean, I know that as a
17 baseline, but I also know that Dr. Cantor and Dr.
18 Laidlaw cited studies that indicate that that is a
19 real risk of this treatment.
20    Q   And what do you mean when you say impaired
21 neurological brain development?
22    A   Say again?

Page 112

1     Q   What do you mean by impaired neurological or
2 brain development?
3     A   Can you point me to where you're referring?
4     Q   Sure.  That's still in paragraph 15.
5     A   I'm referring there to Dr. Cantor and
6 Laidlaw's description of science that suggests that
7 brain development is itself dependent on, in certain
8 respects, on puberty and sexual maturation.  And that
9 the blocking of such puberty and sexual maturation
10 blocks that aspect of neurological and brain
11 development that comes with puberty and sexual
12 maturation.
13    Q   And what aspect of MGT would threaten
14 impaired neurological development?
15    A   My understanding is that that aspect which
16 involves blocking -- particularly, which involves
17 blocking the hormones that make -- that stimulate and
18 facilitate and make possible healthy development of
19 secondary sex characteristics that come along in
20 puberty.
21    Q   And also in that paragraph, what do you mean
22 when you say "multiple other harms to bodily health"?

Page 113

1 What are those harms?
2     A   That was to include, as I list at paragraph
3 35, lifetime lack of orgasm and sexual function, an
4 adverse effect acknowledged by Marci Bowers, current
5 president of WPATH.  Reduced bone development,
6 especially in male-to-female transition.  Harm to
7 psychosocial development.  And increased
8 cardiovascular risk, osteoporosis, and
9 hormone-dependent cancers.
10    Q   Okay.  Moving to paragraph 18.  Within this
11 paragraph, you refer to available science.  What
12 available science are you referring to here?
13    A   As I say there, the available science
14 provided by Dr. Cantor, Dr. Laidlaw, and -- well,
15 that's the available science I'm referring to.
16    Q   And again, you didn't conduct an independent
17 assessment of science.  This is the science that was
18 reviewed by Drs. Cantor and Laidlaw, and that if they
19 cited it and you listed it in your bibliography, that
20 you reviewed?
21        MR. BROOKS:  Objection.  Compound
22 question.

29 (Pages 110 - 113)

Farr Curlin                                                    April 8, 2024

Page 114

1   A   Yeah, that's --

2   Q   It's a long question.

3   A   Too many questions.

4   Q   Did you review any science beyond that which

5   was reviewed by Drs. Cantor and Laidlaw?

6   A   Not to my knowledge, recollection.

7          MS. MURPHY: Mr. Brooks, this would not

8   be a terrible breaking point if we want to break for

9   lunch, because I was going to transition to a

10   different part of the report. Is this a good time?

11         MR. BROOKS: Up to the witness.

12         THE WITNESS: Sounds good to me.

13         MR. BROOKS: He said yes. Thumbs up

14   for lunch.

15         MS. MURPHY: Okay, excellent. Is a

16   half an hour enough?

17         THE WITNESS: That's a little short.

18   Probably -- probably 40 minutes would do it.

19         MS. MURPHY: Okay, that's fine with me.

20   So 40 minutes, let's say -- well, I have 12:32.

21         MR. BROOKS: Quarter after?

22         THE WITNESS: Yeah, let's do 1:15.

Page 115

1          MS. MURPHY: That's fine.

2          THE REPORTER: All right. The time is

3   12:32 p.m. We're now off the record.

4          (Off the record.)

5          THE REPORTER: The time is 1:21 p.m.

6   We are now back on the record.

7          MS. MURPHY: Thank you.

8   BY MS. MURPHY:

9   Q   Dr. Curlin, if you could turn to paragraph

10   20 of your report?

11   A   Okay.

12   Q   Okay. In that paragraph it says that you've

13   "read the descriptions of the state of knowledge

14   provided in the expert reports submitted by Drs.

15   Cantor and Laidlaw." Correct?

16   A   Yes.

17   Q   And could you describe what you mean as "the

18   state of knowledge"?

19         MR. BROOKS: Objection.

20   A   I mean that this is a description of what is

21   known with respect to scientific evidence regarding

22   medicalized gender transition.

Page 116

1   Q   And so does that include studies that

2   suggest that medical transition is safe? Or is it

3   only studies that say that medical transition is

4   unsafe?

5          MR. BROOKS: Objection.

6   A   To my knowledge, it includes all medical

7   studies that are looking at the -- or intends to

8   include all studies that are looking at harms and

9   purported benefits of medicalized gender transition.

10   Q   And did Drs. Cantor and Laidlaw review all

11   such studies?

12         MR. BROOKS: Objection.

13   A   I don't know.

14   Q   Apart from the studies that you cited in

15   your report, did you review any additional studies

16   regarding the efficacy of gender-affirming care?

17   A   Not that I recall.

18   Q   Moving onto paragraph 27.

19   A   Let me -- I want to make sure I'm correct.

20   I can't remember that if I cited Chen, et al.'s study

21   in the New England Journal of Medicine, but I have

22   that -- reviewed that at some point in this process.

Page 117

1   I remember that.

2   Q   Did you review it prior to preparing and

3   submitting your report?

4   A   I had reviewed it prior to being called as a

5   witness in this case and then again during this

6   process.

7   Q   Okay, I'm sorry. Just to clarify. When you

8   say being called as a witness, do you mean you

9   reviewed it prior to being retained as a witness?

10   A   Yes.

11   Q   Okay. So in paragraph 27, you say, "Studies

12   summarized by Drs. Cantor and Laidlaw likewise

13   document serious uncertainty about the efficacy and

14   safety of MGT as a treatment for gender dysphoria."

15   Correct?

16   A   That is what I wrote, yes.

17   Q   And have you read any studies that have

18   found that gender-affirming medical care is

19   efficacious and safe?

20   A   I have read studies -- reports of studies

21   where the authors allege that medicalized gender

22   transition is efficacious and safe.

30 (Pages 114 - 117)

Farr Curlin                                                                          April 8, 2024

Page 118

1    Q   And what studies are those?

2    A   Well, the Chen study, to the best of my

3 recollection, the authors claimed at the end of their

4 report that medicalized gender transition was

5 effective, beneficial.  And I've read the Rhafferty

6 report, which was not collecting data, but is one of

7 the reports that's referred to in this case.  I know

8 that in that report, Rhafferty alleges that

9 medicalized gender transition is effective and safe,

10 or least to the best of my recollection.

11        And I -- I know I've read some other reports

12 over the years, but I don't remember the -- the

13 details at this point.

14   Q   For what reason did you not cite the Chen

15 study in your report?

16   A   Well, I -- Cantor and Laidlaw -- well, I

17 know Cantor refers to Chen's study.  I can't recall if

18 Laidlaw did as well.  And the description of Cantor

19 about that study, as best I recall, aligned with my

20 own impression of the study.  And so I didn't cite

21 that -- didn't -- I -- I don't know why further that I

22 didn't cite that particularly.

Page 119

1        MS. MURPHY:  All right.  At this point,

2 I'd like to mark Exhibit 4, and I'll just state for

3 the record that this is a study by de Vries, titled

4 "Young Adult Psychological Outcome After Puberty

5 Suppression and Gender Reassignment."

6        (Exhibit 4 was marked for

7        identification.)

8        THE WITNESS:  One moment.

9        MS. MURPHY:  Sure.  Just let me know

10 when you have it pulled up.

11        THE WITNESS:  I do.  Is the author, the

12 first author, Annelou?

13        MS. MURPHY:  Yes.  Correct, that's it.

14 BY MS. MURPHY:

15   Q   Dr. Canter, have you reviewed this study

16 before?

17   A   Dr. Curlin, you mean.

18   Q   I'm sorry.  Dr. Curlin.

19   A   I don't recall reviewing this directly.

20   Q   And do you agree that this is a longitudinal

21 study about the effectiveness of puberty blockers to

22 treat gender dysphoria in adolescents?

Page 120

1        MR. BROOKS:  Objection.  The witness

2 has just testified he hasn't seen this document.  He

3 has, you know, a quarter of a page up on a screen

4 here.

5        MS. MURPHY:  Fair enough.

6 BY MS. MURPHY:

7    Q   So just to confirm, for the sake of good

8 order, you didn't review this study prior to drafting

9 your report; correct?

10   A   Not that I recall.

11        MS. MURPHY:  At this point, I want to

12 mark Exhibit Number 5, and this is the study that was

13 by Smith, and it's called, "Sex Reassignment: Outcomes

14 and Predictors of Treatment for Adolescent and Adult

15 Transsexuals."

16        (Exhibit 5 was marked for

17        identification.)

18 BY MS. MURPHY:

19   Q   Can you pull that one up?  And just let me

20 know whenever you have it pulled up, please.

21   A   I have it pulled up.

22   Q   And, Dr. Curlin, have you reviewed this

Page 121

1 study?

2    A   I do not recall having reviewed this study.

3    Q   And so is it correct then that this is not a

4 study that you considered in preparing your report?

5    A   As I -- as I said in the report, I took the

6 description by Cantor and Laidlaw on the state of the

7 evidence.  And I don't recall offhand whether this was

8 one of the studies they reviewed.  But I took that to

9 be accurate, for the purposes of the questions I was

10 asked to consider.  And for that reason, no, I did

11 not.

12   Q   Okay.  If you don't mind just turning to

13 paragraph 29 of your report.  In paragraph 29, you

14 cite Dr. Cantor's conclusion that "No studies have

15 documented any reduction in suicide rates in minors or

16 any population as a result of medical transition."  Is

17 that correct?

18   A   Yes, I cite Dr. Cantor and -- and his

19 observation that that's a fact acknowledged by WPATH.

20   Q   And am I correct to assume that you didn't

21 do any independent research on this topic?

22   A   That's correct.  I -- as instructed, I took

Page 122

1 the reports of Cantor and Laidlaw to be accurate with
2 respect to their description of the science in this
3 regard.
4          MS. MURPHY:  Okay.  I would like to
5 mark as Exhibit 6, the study by Green, and that's the
6 one that's titled, "Association of Gender-Affirming
7 Hormone Therapy With Depression, Thoughts of Suicide,
8 and Attempted Suicide Among Transgender and Nonbinary
9 Youth."
10         (Exhibit 6 was marked for
11         identification.)
12         MS. MURPHY:  And if you may --
13         MR. BROOKS:  Give us a moment here.
14         THE WITNESS:  Yeah, sorry.
15         MS. MURPHY:  Yeah.
16         THE WITNESS:  Okay, I have that study
17 by Green up on the screen.
18 BY MS. MURPHY:
19    Q    And is this a study that you're familiar
20 with?
21    A    I don't have memory of reviewing this study
22 directly.

Page 123

1    Q    And what do you mean by "directly"?
2    A    Meaning I did not independently look at this
3 study.  I took the description by Cantor and Laidlaw
4 to be accurate for the purposes of describing
5 the -- the state of knowledge in this area.
6    Q    Okay.  So you've never reviewed this study?
7    A    As I said.
8          MS. MURPHY:  Okay.  Then I would like
9 to mark as Exhibit 7, a study by Turban, and this one
10 is titled, "Access to Gender-Affirming Hormones During
11 Adolescence and Mental Health Outcomes Among
12 Transgender Adults."
13         (Exhibit 7 was marked for
14         identification.)
15 BY MS. MURPHY:
16    Q    And I'd appreciate it if you can pull that
17 one up too, please.
18    A    I have the study, the first author of which
19 is Jack Turban, up on the screen.
20    Q    Okay.  And are you aware of this study?
21    A    I'm aware of this study, insofar as it was
22 referred to in the reviews by at least -- by Dr.

Page 124

1 Cantor and -- and/or Dr. Laidlaw, but I have not
2 reviewed it directly.
3    Q    Okay.  What is your understanding of the
4 outcome of this study?
5    A    I -- I don't recall.
6    Q    Turning to paragraph 30 of your report.
7 Okay.  Here you talk about a study that you reviewed
8 by Glintborg, and this is a study that is described in
9 Dr. Cantor's supplemental report; correct?
10    A    That's my -- yes, that's my recollection.
11    Q    Okay.  And just so we're all on the same
12 page, this is the study that's entitled
13 "Gender-Affirming Treatment and Mental Health
14 Diagnosis in Danish Transgender Persons: A Nationwide
15 Register-Based Cohort Study."
16    A    I need to look at the -- my endnotes to see
17 if that's the title.
18    Q    Sure.
19    A    This is the Glintborg study?
20    Q    Yes.
21    A    So I have "Gender-Affirming Treatment and
22 Mental Health Diagnosis in Danish Transgender Persons:

Page 125

1 A Nationwide Register-Based Cohort Study."
2    Q    Okay.  So just to confirm, you reviewed this
3 study yourself; correct?
4    A    That's correct.
5    Q    And in this study, how did the researchers
6 measure participants' mental health?
7    A    I -- I don't recall the details.  I'd have
8 to look back through the study.
9    Q    Okay.  And do you recall whether the
10 researchers reviewed medical files of the patients?
11    A    I -- I don't recall the details of how the
12 study were done -- was done.
13    Q    Okay.  What conclusions did you draw from
14 your review of this study?
15    A    That the study intended to include the
16 medical records of all individuals in Denmark
17 diagnosed with gender dysphoria or gender incongruence
18 from 2000 to 2021.  That included about 3,800
19 patients, among whom a little more than 2,000
20 underwent medicalized gender transition.  And that the
21 study found that prescriptions of psychoactive
22 medications increased rather than decreased after the

32 (Pages 122 - 125)

Farr Curlin                                                          April 8, 2024

Page 126

1  start of medicalized gender transition, and they
2  remained elevated across multiple years.
3           It also found that measures of negative
4  mental health compared against controls were -- "were
5  stable after initiation of gender-affirming hormone
6  treatment, without sign of decrease after date for
7  first prescription of gender-affirming hormone." That
8  was a quote from the -- from the authors themselves.
9  Which is, in my words, that the mental health of the
10 patients who received medicalized gender transition
11 did not, on average, improve as a result of or
12 following initiation of medicalized gender transition.
13      Q   But the study did not conclude that the
14 mental health declined after initiation of treatment;
15 correct?
16      A   That's my recollection, that -- that it did
17 not, except insofar as being on more psychoactive
18 medications may be a proxy for having greater mental
19 healthcare problems.
20      Q   I'm sorry, can you point to the portion of
21 the study which says that they were on more
22 psychoactive medications?

Page 127

1           MR. BROOKS: Objection. The witness
2  doesn't have the study in front of him.
3  BY MS. MURPHY:
4       Q   In that case -- well, let me ask you this.
5  Dr. Curlin, can you answer that question without the
6  study in front of you?
7       A   I think you asked me to point to it, and no,
8  I cannot point to it without it being in front of me.
9  I do include a page number in my citation there.
10          MS. MURPHY: Okay. We can pull up the
11 study. But I'm sorry, I'm going to ask the court
12 reporter to read back my question.
13          THE WITNESS: Sure.
14          THE REPORTER: All right, just a
15 moment.
16          (The reporter repeated the record as
17          requested.)
18 BY MS. MURPHY:
19      Q   Dr. Curlin, when you say "more psychoactive
20 medications," do you mean more medications in number
21 or an increase in dosage?
22      A   I -- I don't recall the details, but what I

Page 128

1  wrote was that prescriptions of psychoactive
2  medications increased rather than decreased after the
3  start of medicalized gender transition and remained
4  elevated across multiple years. So that was my --
5  that was my understanding from reading the study.
6       Q   Okay. Now in your clinical experience, when
7  a patient is undergoing treatment for a condition and
8  the treatment appears to be working, is that an
9  indication that the treatment should be stopped?
10          MR. BROOKS: Objection.
11      A   Just -- I want to note that there seems to
12 be a hidden premise, so I just want to specify it's a
13 false premise, which is that that's what we're
14 describing in this case or that's what my opinion is
15 describing in this case.
16          So generally speaking, that a treatment is
17 working is not necessarily evidence that that
18 treatment should be stopped. Sometimes it is, if you
19 expect that -- that treatment restores health and is
20 not required to -- to sustain health. It would depend
21 on the case and the condition.
22      Q   This study did not conclude that patients

Page 129

1  receiving gender-affirming care were worse than before
2  treatment; correct?
3           MR. BROOKS: Objection.
4       A   My understanding was it concluded that
5  there -- they did not improve, which is -- but I
6  didn't -- but I -- and that their -- their measures of
7  negative mental health did not worsen. They remained
8  stable "after initiation of gender-affirming hormone
9  treatment, without sign of decrease after date for
10 first prescription of gender-affirming hormone."
11 That's a quotation of the authors.
12      Q   Got it. So in paragraph 31 of your report,
13 and I apologize, I don't know I'm going to pronounce
14 this correctly, but you mention a study by Kaltiala.
15          THE REPORTER: Can you spell that?
16          MS. MURPHY: K-A-L-T-I-A-L-A.
17          THE REPORTER: Thank you.
18 BY MS. MURPHY:
19      Q   And this was a 2003 study; correct?
20      A   That's -- that's correct.
21      Q   And just to confirm once again, this is a
22 study that you reviewed; right?

                                        33 (Pages 126 - 129)

Farr Curlin                                                                April 8, 2024

Page 130

1    A    I did review that, yes.

2    Q    And how do the researchers in this study
3    measure participants' mental health?

4    A    I -- I don't recall in detail.  I only
5    recall what -- what I summarized here or what I
6    specified here.

7    Q    Okay.  And this study did not conclude that
8    the patients receiving gender-affirming care were
9    worse than before treatment; right?

10    A    It did not conclude, to the best of my
11    recollection, that they were worse as measured by need
12    for psychiatric treatment.  So on that -- in that one
13    specific outcome, that it concluded that they, like
14    the Glintborg study, they did not -- following
15    medicalized gender transition, their need for
16    psychiatric treatment did not go down.

17    Q    And was that measured by the number of
18    contacts they had with mental health providers?

19    A    I don't recall how -- what -- what the
20    specific proxy was for need for psychiatric treatment.

21    Q    And can you say definitively, based on this
22    study, that because they continued to have contact

Page 131

1    with mental health providers that their mental health
2    condition stayed the same?

3    A    No, I can't say that definitively.  We can
4    only say that this proxy for need for psychiatric
5    treatment did not improved after medicalized gender
6    transition.

7    Q    Based simply on the fact that they continued
8    to see a mental health provider?

9    A    If that was -- again, as I said a moment
10    ago, I don't recall the -- how they measured that,
11    whether that was number of visits to psychiatric
12    providers or number of prescriptions or frequency of
13    visits, I don't recall what the proxy was.

14    Q    Okay.  Paragraph 33 of your report, if you
15    wouldn't mind turning to that, please.

16    A    I'm there.

17    Q    Okay.  And here you say, "All of this
18    contradicts the plaintiffs' claim that MGT is
19    medically necessary, since an intervention cannot be
20    said to be medically necessary if the benefits of the
21    intervention are unproven, or indeed are cast into
22    serious doubt by the most recent large-scale studies."

Page 132

1    Correct?

2    A    That is what I said, yes.

3    Q    Okay.  Are you aware that every major
4    medical association in the United States supports
5    gender-affirming care?

6         MR. BROOKS:  Objection, lack of
7    foundation.

8    A    I don't know about every major medical
9    association.

10    Q    Are you aware that the American Medical
11    Association supports gender-affirming care in
12    adolescents?

13         MR. BROOKS:  Same objection.  Assumes
14    facts not in evidence.

15    A    I am aware that at least some statement by
16    some arm of the American Medical Association has
17    expressed support for medicalized gender transition.

18    Q    And what about the American Academy of
19    Pediatrics?  Are you aware that they have supported
20    gender-affirming care for adolescents?

21         MR. BROOKS:  Objection.

22    A    I am aware of the -- the position statement

Page 133

1    authored by Rhafferty, which was put forward as a
2    statement of the American Academy of Pediatrics and
3    was quite enthusiastic about medicalized gender
4    transition.

5    Q    And are you aware that the American
6    Psychiatric Association supports gender-affirming
7    care?

8         MR. BROOKS:  Objection, assumes facts
9    not in evidence.

10    A    I don't recall that, but I don't have memory
11    that that's not the case.

12    Q    So going back to the portion of your report
13    that I just read, paragraph 33, how do you determine
14    whether a particular treatment is medically necessary?

15    A    It depends to some extent on the situation,
16    but by medically necessary I mean that there is
17    sufficient evidence that there's a threat to the
18    patient's health that is eminent and that the
19    intervention in question, we have reasonable certainty
20    that it is an intervention that is likely to benefit
21    the patient by preventing the threat to the patient's
22    health or resolving that threat, and there are no

34 (Pages 130 - 133)

Farr Curlin                                                                    April 8, 2024

Page 134

1 other confounding factors that might, you know, change
2 that judgment.
3     Q   And when you talk about threats to patient
4 health, are you including threats to their mental
5 health as well?
6     A   Toward any aspect of their health.
7     Q   And just to be clear, that includes their
8 mental health?
9     A   It would include their mental health.  Yes,
10 it would include their mental health.
11     Q   Now if a particular treatment is not
12 medically necessary, is it your opinion that that
13 treatment should be criminalized?
14         MR. BROOKS:  Objection.
15     A   I have not testified to that effect, and --
16 and no, that is not my testimony.
17     Q   Now if a particular treatment is not
18 medically necessary, should it be made unavailable to
19 patients --
20         MR. BROOKS:  Objection.
21 BY MS. MURPHY:
22     Q   -- regardless of their belief that they

Page 135

1 would benefit from it?
2     A   To clarify, my point here is that the
3 plaintiffs have not shown that this intervention is
4 medically necessary.  It does not follow that anything
5 that is not medically necessary must then be
6 criminalized.  Whether a particular intervention
7 should be prohibited and by whom is -- depends on a
8 lot of factors.
9         But the point here is -- which I take to be
10 a pretty straightforward point, is that the plaintiffs
11 have not shown that medicalized gender transition is
12 medically necessary in any reasonable understanding of
13 that term.
14     Q   You would agree that you have not reviewed
15 all available evidence on the safety and efficacy of
16 gender-affirming care; correct?
17     A   I have not attempted to review all of the
18 available evidence regarding medicalized gender
19 transition.
20     Q   And is it your opinion that there are no
21 negative health consequences of delaying or denying
22 gender-affirming treatment?

Page 136

1     A   I have not testified to that effect, and
2 that is not my opinion.  I -- I don't -- I'd have to
3 think that through and consider -- consider details
4 that I can't consider here on the fly.
5     Q   Okay.  Are you offering an opinion that
6 gender-affirming medical care is unproven?
7     A   It's my opinion that if the state of the
8 evidence is as described by Dr. Cantor and Laidlaw,
9 then medicalized gender transition is very clearly
10 unproven with respect to the hoped-for outcomes that
11 its proponents claim it brings about.
12     Q   In paragraph 33, you refer to recent
13 large-scale studies.  Which studies are you referring
14 to?
15     A   I don't recall exactly what I was referring
16 to when I wrote this, but I -- I know it included the
17 Glintborg and Kaltiala study.  I think it also
18 includes the -- the large-scale systematic reviews
19 conducted by a number of different bodies of experts.
20     Q   Moving on to paragraph 34.  And it says
21 here, "While the benefits of MGT for minors are at
22 best unproven, the evidence summarized by Drs. Cantor

Page 137

1 and Laidlaw also indicates that MGT in minors poses
2 risk of objective, often irreversible, harms to
3 health, while also requiring life-long dependence on
4 medical interventions."  Is that correct?
5     A   That's what I wrote there, yes.
6     Q   And what evidence are you referring to here?
7     A   I'm talking about the evidence summarized by
8 Drs. Cantor and Laidlaw.
9     Q   Okay.  What do you mean by "life-long
10 dependence on medical interventions"?
11     A   Well, I'm thinking here specifically of the
12 fact that cross-sex hormones principle, if someone
13 sustains a desire to suppress their ordinary healthy
14 sexual -- secondary sex characteristics, to my
15 knowledge, requires ongoing administration of those
16 hormone indefinitely.
17     Q   Is it uncommon for healthy individuals to
18 require medication for the rest of their life?
19     A   It is exceptionally uncommon, and I at the
20 moment can't think of another situation in which
21 people who are healthy, according to the standard
22 medical norms, take some kind of drug for lifelong

35 (Pages 134 - 137)

Farr Curlin                                    April 8, 2024

Page 138

1 that counteracts and contradicts that ordinary healthy
2 development and expression, particularly when those
3 interventions carry known significant adverse side
4 effects.
5     Q    Turning to paragraph 36 of your report.  In
6 this paragraph, you cite to the 2021 article by the
7 Karolinska Institute; is that right?
8     A    Give me a moment.
9     Q    Sure.
10    A    Okay.  And what is your question?
11    Q    Sure.  Did you read this article?
12    A    I can't recall.  I may have.
13    Q    Okay.  Then do you recall what it's about?
14    A    Just --I only recall the part that I've
15 cited here.
16    Q    And so we're on the same page, the part that
17 you cited, it says, "In light of the above, and based
18 on the precautionary principle, which should always be
19 applied, it has been decided that hormonal treatments,
20 i.e. puberty blocking and cross-sex hormones, will not
21 be initiated in gender dysphoric patients under the
22 age of 16."  Correct?

Page 139

1         MR. BROOKS:  Objection.  You've read
2 only part of the quote in the paragraph.
3     A    I did that -- what you read is a part of
4 what I quoted in this paragraph.
5     Q    Okay.  And do you know what specific studies
6 the clinic based their decision to limit care on?
7     A    I only know that they -- as best I recall,
8 they took into account -- review of the available
9 scientific evidence that was commissioned by Sweden's
10 National Board of Health, and that that review had
11 concluded that hormonal interventions in minors are
12 fraught with extensive -- I'm sorry, actually, I don't
13 know if it was that review or if it was the leading
14 clinic itself that concluded that hormonal
15 interventions in minors are fraught with extensive and
16 irreversible adverse consequences, such as
17 cardiovascular disease, osteoporosis, infertility,
18 increased cancer risk, and thrombosis.
19    Q    And are you aware that the clinic placed
20 some limitations on providing gender-affirming care
21 but they did not discontinue the use of
22 gender-affirming care in adolescents altogether?

Page 140

1         MR. BROOKS:  Objection.
2     A    I -- I am not aware of what they did.  In
3 fact, I only know what they said here, which was that
4 they would not initiate gender dysphoric patients --
5 that they would not initiate medicalized gender
6 transition in gender dysphoric patients under the age
7 of 16.
8         MR. BROOKS:  And, Counsel, let me just
9 step in.  It is the classic after lunch period, and I
10 want to encourage the witness to speak up.  Always a
11 problem at two o'clock in the afternoon.
12        MS. MURPHY:  Sure.
13 BY MS. MURPHY:
14    Q    And, Dr. Curlin, are you aware that in
15 Sweden, gender-affirming care for adults and youth is
16 fully paid for by the National Health System?
17        MR. BROOKS:  Objection, assumes facts
18 not in evidence.
19    A    I don't have any knowledge about that that I
20 recall.
21    Q    Okay.  If you could, please turn to
22 paragraph 38 of your report.

Page 141

1     A    I'm there.
2     Q    Okay.  In that paragraph you state that MGT
3 induces hormone levels that are abnormal; right?
4     A    Which paragraph is this?
5     Q    Paragraph 38.
6     A    Okay, hang on one second.
7     Q    It's the last line of that paragraph.
8     A    Okay, I've -- I see the paragraph.
9     Q    Okay.  What do you mean by "abnormal"?
10    A    I mean that it induces levels that are not
11 found in healthy persons of that sex, of the sex of
12 the patient, and which if they were found are a sign
13 of ill health, of disease, of disorder, in every
14 context -- in every other context.
15    Q    And do you agree, though, that individual
16 hormone levels vary between members of the same sex?
17    A    They vary to some extent.
18    Q    And so how would you describe normal hormone
19 levels then?
20    A    Well, I can't cite to you what the actual
21 normal range is within two standard deviations for age
22 and sex-matched groups, but a normal hormone level is

36 (Pages 138 - 141)

Page 142

1 one that you characteristically find in people whose
2 health -- whose bodies are well working, who -- who
3 are healthy and don't have a disorder that affects the
4 production of hormones.  And medicalized gender
5 transition, cross-sex hormones, induces levels that
6 are not found normally.
7     Q    Okay.  So a woman who is undergoing
8 perimenopause, which is a normal, healthy transition,
9 would taking hormone replacement drugs be considered
10 inducing abnormal hormone levels?
11     A    I don't know what hormone levels are induced
12 by hormone-replacement therapy in that clinical
13 context, but I know that it's not a level of
14 testosterone that is induced by cross-sex hormones in
15 someone who's a female sex, in that context.
16     Q    And what's the basis for your opinion that
17 MGT induces hormone levels that are abnormal?
18     A    It's my knowledge, from my medical training,
19 of sex hormones in males and females, and also the
20 descriptions of medicalized gender transition by those
21 proponents of medicalized gender transition, as to
22 what they're seeking to induce.

Page 143

1     Q    Turning to page 9, if you're not already
2 there, the subheading there says, "The fact that GD is
3 listed as a disorder in the Diagnostic and Statistcal
4 Manual of Mental Disorders, DSM-5, does not imply that
5 GD marks a disorder of the body that warrants MGT in
6 minors."  Correct?
7     A    That's right.  That's what I wrote.
8     Q    Okay.  But you agree that gender dysphoria
9 is listed in the DSM-5 as a disorder?
10     A    I do understand that gender dysphoria is
11 listed in the DSM-5 as a disorder.  Specifically as a
12 mental disorder.
13     Q    Okay.  And what do you mean by "disorder of
14 the body"?
15     A    A disorder of the body.  I'm not sure how
16 much more simple to make that.
17     Q    Well, let me ask this.  Does a disorder of
18 the body include mental health disorders?
19     A    So because human beings are human animals,
20 in an important sense, all human disorders are bodily
21 disorders.  But here what I'm highlighting is that
22 gender dysphoria is recognized as a mental disorder.

Page 144

1 Having a mental disorder of, in this case, that
2 involves your perception, one's perception of their
3 secondary sex characteristics, does not imply that one
4 has a medical disorder with respect to those secondary
5 sex characteristics.  There's nothing wrong in that
6 case with the secondary sex characteristics, medically
7 speaking.
8     Q    Okay.  Who is capable of making a diagnosis
9 of gender dysphoria?
10     A    I don't have a formed opinion on that
11 question.
12     Q    Okay.  Do you have an understanding of the
13 goals of the interventions that are prescribed
14 occasionally for gender dysphoria?
15     A    It depends on which descriptions you mean.
16     Q    Let's take puberty.
17     A    Which interventions do you mean?
18     Q    Sure.  Let's take, for instance, puberty
19 blockers.  What is the goal of that intervention when
20 prescribed for gender dysphoria?
21     A    My understanding is, based on the
22 descriptions of the plaintiffs' experts and

Page 145

1 descriptions otherwise of folks who practice these
2 interventions, the goal is to prevent the -- the
3 secondary sex characteristics that are normally going
4 to develop in puberty in a person of that sex from
5 developing.
6     Q    And what is your understanding of the goals
7 of prescribing cross-sex hormones for individuals with
8 gender dysphoria?
9     A    My understanding is that the -- the goal of
10 those who are prescribing such hormones is to induce
11 development of secondary sex characteristics that are
12 more like, insofar as possible, more like the expected
13 secondary sex characteristics in a healthy person of
14 the opposite sex.
15     Q    Okay.  Moving onto paragraph 40, and there
16 you refer to gender dysphoria as a disorder of
17 perception; is that correct?
18     A    Give me a second.
19     Q    Sure.
20     A    Okay.  Can you repeat your question?
21     Q    Sure.  You refer to gender dysphoria as a
22 disorder of perception; correct?

Farr Curlin                                                                 April 8, 2024

1    A   I can't recall if I specifically said it's a
2  disorder of perception, but I do describe it as a --
3  as a condition in which the person suffering it
4  perceives their secondary sex characteristics as being
5  at odds with their wellbeing.  And -- and that in this
6  case, the -- those secondary sex characteristics are,
7  at least in the typical case to my understanding, are
8  objectively healthy and expected secondary sex
9  characteristics for a person of their sex.
10    Q   And so you refer to it the sixth line up
11  from the bottom of that paragraph.  You refer to it as
12  a disordered perception; correct?
13    A   I see that, yes.  And just insofar as I've
14  described, I -- in my judgment, it is objectively
15  disordered in that respect.
16    Q   Okay.  Is disordered perception a term used
17  in the DSM-5?
18    A   I -- I can't recall.  It's certainly been
19  used in my clinical training.
20    Q   Okay.  Moving on to paragraph 42.  Just let
21  me know when you get there.
22    A   I'm there.

1    Q   Okay.  In the second sentence you say,
2  "Indeed, the health authorities and independent bodies
3  that have systematically reviewed the scientific
4  evidence regarding MGT in minors have concluded that
5  evidence is insufficient to justify the conclusion
6  that MGT improves even mental health outcomes."
7  Correct?
8    A   That's correct.
9    Q   And what did you review to make this
10  conclusion?
11    A   The -- the reports by Cantor and Laidlaw,
12  and then I reviewed some of those reports by experts
13  in England and Finland, Denmark myself.
14    Q   Okay.  In that --
15    A   Actually, I don't recall if it was Denmark.
16  England, Sweden, Finland.
17    Q   Okay.  And in that latter category of
18  research that you just described, those are all
19  documents that you've cited in your report; correct?
20    A   I -- I cited them or they were cited by
21  Cantor and Laidlaw.
22    Q   Okay.  And what health authorities or

1  independent bodies are you referring to?
2          MR. BROOKS:  Objection, asked and
3  answered.
4    A   Yeah.  I don't remember the exact names,
5  except the abbreviation for the English authority is
6  the -- that did the systematic review is the -- is
7  NICE.  But I -- there was also a Swedish body that did
8  a systematic review.  As I recall, also one done in
9  Finland.  And it -- it was bodies -- those bodies and
10  perhaps others that are referred to in the reports by
11  Cantor and Laidlaw.
12    Q   Okay.  Now in paragraph 43, is it fair to
13  say that you take issue with the guidelines issued by
14  the Endocrine Society?
15    A   I can't answer that question.  That's -- I
16  don't know what it means to take issue, and I don't
17  know which guidelines you're talking about.
18    Q   Do you have an opinion on the guidelines
19  issued by the Endocrine Society?
20          MR. BROOKS:  Objection.
21    A   So I took, as I was asked, to be accurate,
22  the reports by Cantor and Laidlaw and their summary,

1  and Cantor described the Endocrine Society guidelines
2  as not relying on any systematic review of evidence of
3  efficacy of any form of treatment for gender
4  dysphoria.  I take that to be a true statement.  I
5  have not tried to go through the Endocrine Society's
6  citations and verify that.
7    Q   Okay.  And is that the same for the
8  guidelines issued by WPATH?
9    A   That's correct.  I took to be accurate, for
10  the purposes of my -- of the questions I was asked,
11  Cantor and Laidlaw's description of the review
12  conducted by WPATH.
13    Q   And what about the American Academy of
14  Pediatrics 2018 policy statement?
15    A   The same.
16    Q   Okay.  Turning now to paragraph 44, please.
17    A   I'm there.
18    Q   Okay.  It says here that your "own review of
19  SOC 8 indicates WPATH has problematically minimized
20  the doctor's responsibility to exercise independent
21  judgment and fiduciary responsibility to guide patient
22  care for minors."  Correct?

38 (Pages 146 - 149)

Farr Curlin                                                April 8, 2024

Page 150

1     A    Yes, that's correct.

2     Q    And can you describe your reasoning behind

3  this conclusion?

4     A    I think I make it plain in my -- in my

5  report.

6     Q    Okay.  Well then, you know, simply for

7  purposes of this deposition, can you summarize that

8  for me, please?

9     A    Sure.  The problem is that WPATH, in its SOC

10  8, uses language of the importance of -- well, give me

11  a second and I'll tell you precisely.

12        Okay, so in paragraph 84 of my report, I

13  write, "In its Standards of Care, version 8, WPATH

14  suggests that gaps in evidence demonstrating the

15  safety and efficacy of MGT should not prevent the use

16  of MGT in adolescents" -- quote -- "given the ethics

17  of self-determination in care."

18        The new guidelines also emphasize,

19  quote -- or a, quote, "right to bodily and mental

20  integrity, autonomy, and self-determination."  And a

21  punitive need for healthcare practitioners to, quote,

22  "match the treatment approach to the specific needs of

Page 151

1  patients, particularly their goals for gender identity

2  and expression."

3        And the problem is that the medical

4  ethics -- the standard within the practice of medicine

5  and medical ethics with respect to decision making for

6  minors is self-consciously and specifically not

7  governed by self-determination.  And so the WPATH is

8  effectively appealing to a concept that has relevance

9  with respect to the autonomy of adults, but has long

10  been understood to not apply as a -- as a governing

11  concept in the care of children.

12        And -- and to appeal to that as -- to appeal

13  to that concept which doesn't apply to overcome the

14  absence of evidence for efficacy is, I think deeply

15  problematic.

16     Q    All right.  Dr. Curlin, I'm sorry, you

17  probably said this correctly, but I just want to

18  clarify for the record.  I believe you were reading

19  from paragraph 84 of your report; correct?

20     A    Yes, I was.

21     Q    Okay.  I think I heard 85, but regardless,

22  just so it's clear, it was 84.

Page 152

1     A    Well, in -- in 85 I had, "Much has been made

2  of the importance of autonomy, but the ethical

3  standard for medical decision-making with respect to

4  minors is decidedly not self-determination."  And then

5  I go on to explain the basis for that statement.

6     Q    Okay.  Can you describe, for the purposes of

7  this deposition, why it is that you believe that

8  self-determination does not apply to adolescents?

9     A    Adolescents, as minors, have long been

10  understood as among what we call, in the field of

11  medical ethics, vulnerable populations.  The -- as the

12  Belmont Report put it, respect for autonomy involves

13  effectively respecting the authority of adults, but it

14  also involves protecting those who don't have that

15  level of autonomy, which among whom have always

16  been -- included children.

17        So doctors have a fiduciary relationship to

18  children to consider what is in the best interest of

19  children, without respect in many cases to -- or

20  notwithstanding, I should say, in many cases

21  children's opinions about what is in their best

22  interest.

Page 153

1     Q    And so let me make sure I understand this

2  correctly.  Are you saying that children's opinions

3  should play no role in decisions about treatment?

4     A    I have not said that.  I've said, as I do in

5  my report, that the children -- a child's opinion that

6  a particular intervention is good for them is not

7  sufficient to -- to justify that intervention.  That

8  intervention must be reasonably understood by the

9  physician on -- on some kind of reasonable basis to

10  actually be conducive to the medical benefit to

11  the -- benefit of the health of that child.

12        That's a -- that's the fundamental

13  obligation of the physician.  And so whereas adults

14  have more degrees of freedom to ask for and to consent

15  to interventions that are not necessarily good for

16  their health, under the law and under this principle

17  of respect for autonomy, children do not have that

18  same authority.

19     Q    But in the case of MGT, it's the parents who

20  are asked to provide consent for treatment; correct?

21     A    My understanding is the parents are asked to

22  provide consent, and the children are asked formally

Farr Curlin                                                April 8, 2024

Page 154

1  to provide assent.  But the language of
2  self-determination with respect to children
3  contradicts that very idea of the parents providing
4  consent and the children providing assent.  If it were
5  in fact the case that the key concept here is
6  self-determination, then we would seek consent from
7  children.  We don't do that in medicine, except in
8  some specific situations.
9      Q   Okay.  Is that your only criticism of SOC 8
10  or are there others?
11          MR. BROOKS:  Objection.
12      A   No, I would not say that is my only
13  criticism.
14      Q   Do you agree that SOC 8 is a set of clinical
15  guidelines?
16          MR. BROOKS:  Objection.
17      A   Yeah, I -- I -- I don't -- I don't know if I
18  would call SOC 8 a set of clinical guidelines, as
19  opposed to a -- other things that it also purports to
20  be, including a summary of reviews of data and so on.
21      Q   Would you characterize SOC 8 as standard of
22  care?

Page 155

1      A   I would not.
2      Q   Do you agree that clinical guidelines exist
3  for treating a variety of types of conditions in
4  pediatrics?
5      A   Because I do not practice clinical
6  pediatrics, I am not often reviewing clinical
7  guidelines for pediatrics.  But to my knowledge, there
8  are clinical guidelines of various forms regarding
9  healthcare for children.
10      Q   And is it your opinion that relying on
11  clinical guidelines, as you say, minimizes the
12  doctor's responsibility to exercise independent
13  judgment?
14      A   Where -- can I ask where you're pointing to?
15      Q   Sure, we're going back to paragraph 44.
16      A   Actually, no, that -- that sentence which
17  states, "My own review of SOC 8 indicates WPATH has
18  problematically minimized the doctor's responsibility
19  to exercise independent judgment and fiduciary
20  responsibility to guide patient care for minors," is
21  my interpretation of their emphasis on this importance
22  of self-determination.

Page 156

1      Q   I see, okay.
2      A   And their emphasis on according with the
3  patient's goals, for a minor.
4      Q   Okay.  So I noticed that whenever you said,
5  in answer to that question, you said patient goals and
6  you put them in what's commonly referred to as air
7  quotes.  Can I ask if there was any meaning that you
8  ascribe to that for -- what meaning was there when you
9  put that term in air quotes?
10      A   I, in that case, was not using those as air
11  quotes, though I concede that that is the sign for air
12  quotes.  I meant that to indicate that I actually
13  quoted them as saying, as I -- as I note in my
14  paragraph 84.  There's a -- there's a punitive need
15  for healthcare practitioners to, quote, "match the
16  treatment approach to the specific needs of the
17  patients" -- comma -- "particularly their goals for
18  their identity and expression."
19      Q   Okay.  Thank you for that clarification.
20  Now in that same paragraph 44, you also discuss Drs.
21  Cantor and Laidlaw's conclusions about conflicts of
22  interests that they say exist among WPATH committee

Page 157

1  members; correct?
2      A   I do refer to their -- their conclusion that
3  there were substantial financial conflicts of
4  interest.
5      Q   Okay.  And did you do any independent
6  research on whether there existed financial conflicts
7  of interest among the committee members of WPATH?
8      A   No, as -- no, I did not.  I took -- as I
9  said, I think here explicitly, insofar as these
10  descriptions, and by that I mean these descriptions by
11  Cantor and Laidlaw, insofar as they're accurate, then
12  WPATH ignored significant conflicts of interest and
13  violated accepted principles of medical ethics.  I did
14  not seek to do my own research to find if -- if Cantor
15  and Laidlaw's conclusions were accurate.
16      Q   Okay.  And so it is your opinion that
17  individuals who developed SOC 8 had direct financial
18  conflicts of interest?
19      A   It is my opinion that if the descriptions by
20  Cantor and Laidlaw are true, then yes, they did.
21      Q   Is it your opinion that clinicians who
22  practice in a particular field should never be

40 (Pages 154 - 157)

Page 158

1 involved in developing clinical guidelines for that
2 field?
3     A   No, that is not my opinion.
4     Q   In this instance, why would the
5 participation among experts in developing these
6 guidelines be a conflict of interest?
7     A   A conflict of interest exists where the
8 persons who are being looked to, to render what is
9 expected to be an impartial judgment about, in this
10 case a medical intervention, stand to benefit
11 financially if people take their description to
12 be -- to be accurate or authoritative.
13        And so that you can have conflicts of
14 interest that -- that do not disqualify someone from
15 serving as an expert.  In fact, sometimes you cannot
16 really get adequate expertise without involving some
17 people who have some conflicts of interest.
18        But it's important, when there is a conflict
19 of interest, to note it, be candid and forthcoming
20 about it, and to take measures to -- to manage or
21 compensate for that, for example by having people
22 involved who do not have that conflict of interest and

Page 159

1 subjecting the -- the judgments of those who do to
2 review by those who don't.  And so -- and there are
3 other methods to manage conflicts of interest.
4     Q   Okay.  And is it your opinion that those
5 things that you say should be done where there are
6 conflicts of interest or potential conflicts of
7 interest were not done here by WPATH?
8     A   It's my opinion that if the descriptions by
9 Cantor and Laidlaw are accurate, that they --
10 those -- those conflicts of interest were not handled
11 as they should have been.
12     Q   In what way?
13     A   Well, first, in that the conflict of
14 interest was not mentioned in the report.  That's a
15 big deal in medicine.  That's -- that's one.  Second,
16 that outside experts and perspectives on the standard
17 writing process who do not have conflicts of interest
18 were not, if Cantor and Laidlaw's description is
19 accurate, were not included.  And at least -- yeah,
20 were not included.  Those -- that's a second problem.
21     Q   Are there any others?
22     A   There may be, but for example, if it's the

Page 160

1 case that people writing the standards have been
2 taking into account how what they vote might bear on
3 whether physicians were reimbursed for medicalized
4 gender transition, that is a very problematic conflict
5 of interest.
6     Q   Just to clarify, when you talk about
7 reimbursement, are you talking about reimbursement for
8 providing care?
9     A   I'm talking about insurance reimbursement
10 for medicalized gender transition.
11     Q   Okay.  So any physician who receives
12 insurance reimbursement for providing medical
13 transition should not be involved in the development
14 of the standards?
15        MR. BROOKS:  Objection.
16     A   That's not what I said.  In fact, that
17 directly contradicts what I said.  It could be helpful
18 to include them, particularly if they are the ones
19 that have certain kinds of expertise that don't --
20 others don't have.  But that they have a conflict,
21 such conflict of interest needs to be disclosed and
22 there needs to be a plan for how to manage that, to

Page 161

1 ensure the public, who of course can't know what's
2 going on behind doors, that the conclusions are not
3 motivated by pecuniary interests of those writing the
4 guidelines.
5     Q   Thank you, Doctor.
6     A   But -- but are -- but are motivated by a
7 dispassionate assessment of the data.
8     Q   Turning now to paragraph 48 of your report.
9     A   I'm there.
10     Q   In that paragraph, you refer to a report
11 that was published by Reuters.  It was "an
12 investigative report documenting both growing concerns
13 among physicians about MGT, as well as intense
14 backlash that clinicians, experts, and patients
15 themselves have received when they voice such
16 concerns."  That's how you describe that report;
17 correct?
18     A   That is what I wrote there, as I read it
19 now.
20     Q   Okay.  You read that report; correct?
21     A   I did read that report, yes.
22     Q   Okay.  And that report also refers to

Farr Curlin                                                    April 8, 2024

Page 162

1  threats of violence against providers of
2  gender-affirming care; correct?
3       A   I don't recall.
4       Q   Okay.  And the authors of that article were
5  not arguing that gender-affirming care should be
6  criminalized; were they?
7       A   I do not recall them arguing that.
8       Q   In fact, that article, the authors state
9  that understanding the reasons that some transgender
10 people quit treatment is key to improving it; correct?
11      A   I don't have the article in front of me, but
12 if you can show it to me I'm happy to read along next
13 to you.
14      Q   Sure.
15          MS. MURPHY:  Andrew, can you pull up
16 that article?  We can go ahead and mark it as an
17 exhibit.  It was not one that --
18          MR. BROOKS:  Yes.
19          MS. MURPHY:  Yeah, okay.  And I believe
20 that that would make it, I guess, Exhibit 8?
21          THE REPORTER:  Correct.
22          MS. MURPHY:  Okay.

Page 163

1          (Exhibit 8 was marked for
2           identification.)
3          MR. BROOKS:  Ruin your numbering.
4          THE REPORTER:  And what is this exhibit
5  going to be labeled as?
6          MS. MURPHY:  Well, we can label it
7  Reuters article.
8          THE REPORTER:  Did you say writer's
9  article?
10         MS. MURPHY:  You know, I never know how
11 to pronounce this.
12         THE WITNESS:  I think you pronounced it
13 correctly the first time.
14         MR. BROOKS:  Reuters, R-E-U-T-E-R-S.
15         THE REPORTER:  Thank you.
16         MS. MURPHY:  I'm originally from
17 Pennsylvania, so sometimes people dispute my
18 pronunciation of things.  It's not uncommon.
19 BY MS. MURPHY:
20      Q   Okay.  So looking at what we've now marked
21 as Exhibit 8, and actually referring to that first
22 paragraph there, it says, "Understanding the reasons

Page 164

1  some transgender people quit treatment is key to
2  improving it, especially for the rising number of
3  minors seeking to medically transition, experts say."
4  Am I reading that right?
5       A   Yes.  So experts, some experts anyway, I
6  take it, are saying that it's important to understand
7  the reason some transgender people quit, in order to,
8  in their judgment, improve treatment.
9       Q   So is it fair to say that this article was
10 not arguing that gender-affirming care should be made
11 unavailable?
12         MR. BROOKS:  Objection.
13      A   This is an investigative study by Reuters, a
14 special report.  I don't recall that they were making
15 strong recommendations one way or the other on
16 medicalized gender transition.  They were shining
17 light on, as I said, growing concerns among physicians
18 about the practice, and as well as some intense
19 backlash that those who were starting to raise such
20 questions and concerns were receiving when they voiced
21 those concerns.
22         MR. BROOKS:  And let me just be clear

Page 165

1  on the record that what is in front of the witness so
2  far is simply the headline title of this article on a
3  shared screen.
4          MS. MURPHY:  Yeah, fair enough.
5  BY MS. MURPHY:
6       Q   Okay.  So moving on.  All that fuss for just
7  one question.  Moving on to paragraph 49 of your
8  report, Dr. Curlin.
9       A   Yes.
10      Q   And actually, paragraphs 49 and 50.  You
11 mention medical ethicists and practitioners who've
12 expressed their fear about speaking up about their
13 concerns with gender-affirming care; is that right?
14      A   Yes.
15      Q   And are you talking about specific
16 colleagues of yours in this instance?
17      A   Yes, although I am not going to name those
18 who talked about this in the context who understood it
19 to be confidential.
20      Q   Understood.  Did any of these colleagues say
21 that any acts of violence were committed against them
22 for their views?

Farr Curlin

April 8, 2024

Page 166

1    A    Not that I recall, no.
2    Q    And did any of them say that they've been
3  threatened with acts of violence for their views?
4    A    Not that I recall, no.  They were --
5    Q    Did any of them --
6    A    No, they just expressed concern that you
7  can't bring this up; I'd lose my job.  That sort of
8  concern.
9    Q    And did any of them actually lose employment
10  based on their views?
11    A    To my knowledge, no, although the unifying
12  report among these meetings was that I was, I, Farr
13  Culin, was the only one who had actually spoken up
14  publicly about these concerns.  Meaning the only one
15  among those in these gatherings.
16    Q    Sure.  And what gatherings are you talking
17  about?
18    A    The gathering at the Greenwall Faculty
19  Scholars Program when we had a hot topic discussion,
20  bioethics dilemmas in the care of transgender minors.
21  And the gathering of faculty of the Trent Center for
22  Bioethics, Humanities & History of Medicine here at

Page 167

1  Duke.
2    Q    Okay.
3        MR. BROOKS:  And, Counsel,
4  notwithstanding that we got back late from lunch,
5  we're rolling up towards an hour and a half, and when
6  it's convenient for you to take a break that'd be
7  great.
8        MS. MURPHY:  Sure.  I was going to try
9  to make it another half an hour, but we can take a
10  brief break now if that's --
11        MR. BROOKS:  That'd be good.
12        MS. MURPHY:  Okay, excellent.  Let's do
13  that.  Take your time.  Ten minutes?
14        MR. BROOKS:  Or less.
15        THE WITNESS:  Less.
16        MS. MURPHY:  All right, thanks.
17        THE REPORTER:  All right.  The time is
18  2:47 p.m.  We are now off the record.
19        (Off the record.)
20        THE REPORTER:  The time is 2:54 p.m.
21  We are now back on the record.
22        MS. MURPHY:  Thank you.

Page 168

1  BY MS. MURPHY:
2    Q    Dr. Curlin, in paragraph 51, can you turn to
3  that, please?
4    A    Did you say 51?
5    Q    I did.
6    A    Okay, I'm there.
7    Q    Now in that paragraph, you mention that you
8  were cancelled from giving a talk at Michigan State
9  University; correct?
10    A    That's correct.
11    Q    And what was that talk supposed to be about?
12    A    To be about spirituality and medicine.
13    Q    But it was not about gender-affirming care
14  in any way; right?
15    A    No.
16    Q    Okay.  And who --
17    A    But I was told by the organizers, when they
18  cancelled the talk the very day of the talk as I was
19  boarding the plane, we're cancelling this because
20  students have said that you have been critical of --
21  of gender transition, and they have said they -- they
22  cannot be in a room with someone who's been critical.

Page 169

1  Something to that effect.
2    Q    And did the organizer -- well, let me ask
3  you this.  Who was the intended audience for this
4  talk?
5    A    To my knowledge, the intended audience was
6  the medical students of Michigan State University.
7    Q    Okay.  And the organizer who told you that
8  your talk had been cancelled, did she tell you in
9  specific what views the students were referring to?
10  And by that I mean not a characterization of your
11  views, but where they were expressed.  So were they
12  referring to a particular article or another talk that
13  you gave?  Anything in specific?
14        MR. BROOKS:  Objection.
15    A    As best I recall, it was that they had found
16  the YouTube video of my talk earlier at the University
17  of Chicago in 2017.
18    Q    Okay.  And then am I correct that you did
19  not get on a plane?
20    A    That's correct.  I did not get on the plane.
21    Q    And was the talk rescheduled?
22    A    It -- not initially, but after some back and

43 (Pages 166 - 169)

Page 170

1  forth rescheduled for later that spring.  And then it
2  was cancelled again, and it has been rescheduled for
3  June of this year.
4      Q    Okay.  Why was it cancelled for the second
5  time?
6      A    I was told that the dean of the -- the
7  acting dean of the medical school was concerned that
8  there could be protests and so on that would distract
9  from graduation events.
10     Q    And was he specific about the type of
11 protest that he was concerned about?
12     A    Not that I recall.  I just got the
13 impression they were worried there would be some kind
14 of kerfuffle by the students that would distract from
15 graduation.
16     Q    Okay.  And did he say that he thought that
17 the protest would involve your views of
18 gender-affirming care?
19     A    I don't remember what he said exactly, but
20 it was clear that that was -- my understanding was
21 that that was clearly the concern.
22     Q    Okay.  And why is that the case?

Page 171

1      A    Because that's what the person who I was
2  speaking with, who was not the dean but the chair of
3  the department of family medicine, was what she
4  relayed to me.
5      Q    Okay.  And you said that that has been
6  rescheduled a second time?
7      A    That's correct.
8      Q    Okay.  And that date hasn't come to pass
9  yet?
10     A    That's correct.
11     Q    Okay.  Referring back to that same
12 paragraph, at the end it says, "All of this makes
13 evident that fear is muzzling open expression of
14 widespread and growing dissent within the medical
15 community regarding MGT."  Correct?
16     A    That's what I wrote, yes.
17     Q    What do you mean by "muzzling"?
18     A    By muzzling I mean it is -- a muzzle is
19 something that pins the mouth closed on a dog, so it's
20 a metaphor for the way that fear is keeping people
21 from opening their mouths and speaking what they
22 understand or raising concerns that have occurred to

Page 172

1  them.  Expressing in public what they are thinking.
2  Fear is preventing that from happening.
3      Q    Okay.  And have you felt fear about
4  expressing your views on gender-affirming care?
5      A    I have, yes.
6      Q    In what instance?
7      A    I -- I've had anxiety about writing essays
8  that I maybe should have written by now and -- and
9  attempted to publish, notwithstanding the difficulties
10 of doing so because of this -- this -- this kind of
11 ideological conformity and cancel culture of -- of
12 voicing concerns about the -- the practice and the way
13 it seems to contradict, in many cases as least,
14 important guidelines that have -- ethical guidelines
15 that have kept medicine from going too much astray.
16     Q    And what is that fear about?  What are you
17 afraid will happen if you write the essays or further
18 express your views on the subject?
19     A    Well, I'm afraid that I will be subjected to
20 vitriolic email campaigns that students will organize
21 to call for sanctioning of me in some fashion.  That
22 colleagues whom I respect, who really are just going

Page 173

1  on about their lives and working on important topics
2  not relating to this, will all of a sudden find their
3  association with me to be a -- a mark against them
4  in -- in many corners.
5          That it'll be difficult to find assistants
6  to work for me, because if they work for me early in
7  their career they might be marked as somehow not on
8  the right side of this issue, and therefore will find
9  their job prospects diminished.  That kind of -- those
10 kinds of consequences.
11     Q    When you say "students," are you talking
12 about the students at Duke?
13     A    I'm talking about students at Duke, but --
14 but elsewhere also.  I mean, I was at the University
15 of Chicago, and without naming names, I spoke with
16 people in training who have appreciated my work and
17 expressed that they would be absolutely terrified to
18 speak up about their concerns about this in medical
19 training, because if it was known they might not be
20 able to match at prestigious programs.
21         So that -- that -- that is the -- the level
22 of concern, which accords with, of course, the reports

44 (Pages 170 - 173)

Page 174

1 from Hilary Cass and Dr. Kaltiala and the Reuters
2 report. It accords with those expressed in the closed
3 doors of the Greenwall Foundation. People are
4 concerned that they would be isolated, and effectively
5 the good work that they're up to -- as happened in my
6 case with the Michigan State talk, will be rendered
7 something that can't be taken seriously because of
8 this association with an issue that's so -- so
9 carefully surveilled by those who are -- don't want
10 objections to be raised.
11    Q    And are you aware that there have been
12 threats of violence against providers of
13 gender-affirming care?
14    A    I -- I don't remember where I heard that,
15 but I'm aware that that has been reported.
16    Q    Did you have any --
17    A    I just want to say, and I obviously would
18 condemn such threats of violence.
19    Q    Sure. Did you have any reservations about
20 providing testimony in this case?
21    A    I did, yes.
22    Q    Turning now to paragraph 52.

Page 175

1    A    I'm there.
2    Q    Okay. And here you talk about Beauchamp and
3 Childress' description of clinical equipoise; correct?
4    A    Yes.
5    Q    And that definition refers to ta community
6 of reasonable physicians; right?
7    A    That's right.
8    Q    How would you define a community of
9 reasonable physicians in the case of gender-affirming
10 care?
11    A    This would include those physicians,
12 otherwise reasonable, who have taken the time to
13 consider the evidence of benefits and arms of
14 medicalized gender transition and had a chance to, in
15 light of that, make a judgment about whether
16 medicalized gender transition -- whether we reasonable
17 are uncertain as to whether the intervention itself is
18 better or worse than available treatments that do not
19 include that intervention.
20    Q    So would that include physicians who
21 prescribe those types of treatments currently?
22    A    It -- it certainly does not exclude them.

Page 176

1    Q    And what about a physician who is aware of
2 the research on gender-affirming care but doesn't
3 treat adolescents?
4    A    What about them?
5    Q    Would they be included in this discussion of
6 what's reasonable?
7    A    Yes, I think they would, so long as they
8 have the expertise sufficient to understand the kind
9 of research that's been done, the outcomes that have
10 been assessed, the character of the intervention, and
11 the evidence that's available, yes.
12    Q    Okay. What about doctors who are trained to
13 make that type of diagnosis but are philosophically
14 opposed to providing that type of treatment? Should
15 they be included in the discussion of what's
16 reasonable?
17    A    Well, here we're talking about specifically
18 the question of clinical equipoise. And so whether
19 one is philosophically opposed or not, or
20 philosophically disposed to this intervention, the key
21 question is whether one has the capacity to consider a
22 reasonable -- to a reasonable extent, the data that's

Page 177

1 available regarding purported benefits and purported
2 harms of any intervention including this one, and come
3 to a -- a judgment as to whether there is uncertainty
4 about -- reasonable uncertainty about which -- whether
5 the treatment is superior or inferior to other --
6 the -- the standard of care that does not include that
7 intervention.
8    Q    Okay, turning to paragraph 54.
9    A    I'm there.
10    Q    Okay. Now this one you say, "As the above
11 summaries make clear, the community of reasonable
12 clinicians, as well as the international community of
13 relevant experts, is at best genuinely uncertain about
14 whether MGT is to be preferred to standard" --
15 physiotherapeutic -- "treatment without MGT."
16 Correct?
17         MR. BROOKS: Objection. You said
18 physiotherapeutic when I think the term is
19 psychotherapeutic, and in this case maybe the
20 difference matters.
21         MS. MURPHY: Absolutely. Thank you for
22 making that correction.

Farr Curlin

April 8, 2024

Page 178

BY MS. MURPHY:

1 BY MS. MURPHY:

2    Q    Same question, substituting the word
3 psychotherapeutic for the word that I used,
4 physiotherapeutic.

5    A    That is what I write there, yes.

6    Q    Okay.  Now you've conducted empirical
7 research on physicians' attitudes and practices
8 regarding controversial practices; correct?

9    A    I have, yes.

10    Q    And you consider administering
11 gender-affirming care to be controversial; correct?

12    A    I do, yes.

13    Q    And so to support your opinion in paragraph
14 54, did you conduct any empirical research on
15 physicians' attitudes and practices regarding
16 gender-affirming care?

17    A    I did not.  It was unnecessary to do so, but
18 I did not.

19    Q    And what do you mean that it was
20 unnecessary?

21    A    So I already know and am in dialogue with
22 the community of reasonable clinicians, or at least

Page 179

1 reasonable representatives of that community, enough
2 to know that it is, at best, genuinely uncertain about
3 whether MGT is to be preferred to standard
4 psychotherapeutic treatment without MGT, particularly
5 for minors.

6        And I know from the reports of Cantor and
7 Laidlaw, as well as the reports of -- from England and
8 Sweden and Finland and elsewhere of these expert
9 bodies that it is, at best, genuinely uncertain
10 whether MGT is to be preferred to standard
11 psychotherapeutic treatment without MGT.  So it
12 wouldn't -- there was no need to try to do a survey to
13 understand the answer to that question.

14    Q    Okay.  In paragraph 55, you say there that
15 "IRBs do not defer to clinicians' judgment about
16 equipoise."  Correct?

17    A    I do, yes.

18    Q    What's the basis for that opinion?

19    A    The basis for that is my training regarding
20 IRBs, my experience submitting proposals to IRBs, and
21 having arguments with IRBs, and my experience as part
22 of the faculty of ethics at the University of Chicago

Page 180

1 and Duke, where -- as well as many conferences on
2 research ethics in which it has been apparent and
3 obvious that IRBs don't take clinicians' judgment for
4 granted, they want to see the evidence that justifies
5 that judgment, because of course often the physicians
6 or investigators studying some intervention are the
7 most enthusiastic about the -- you know, what they
8 hope for from that intervention.

9    Q    Okay.  So is it fair to say that an IRB will
10 make an independent assessment of whether or not there
11 is clinical equipoise?

12    A    It is certain that they should, and in my
13 experience they do.

14        MS. MURPHY:  Okay.  Now it is
15 approximately 3:15, and I would appreciate taking a
16 short break and going off the record for just
17 approximately 15 minutes.

18        THE WITNESS:  Sure.  Come back at 3:30?
19 That sound right?

20        MS. MURPHY:  3:30 sounds good.  Thank
21 you.

22        THE REPORTER:  The time is 3:14 p.m.

Page 181

1 We are now off the record.

2        (Off the record.)

3        THE REPORTER:  The time is 3:30 p.m.
4 We are now back on the record.

5 BY MS. MURPHY:

6    Q    Okay.  Dr. Curlin, if you can turn to page
7 15 of your report, if you're not there already.

8    A    I'm there.

9    Q    Okay.  And on page 15 you state that, "An
10 institutional review board that approved the expanded
11 clinical trial apparently advocated by the FDA would
12 likely be  violating its ethical obligations."
13 Correct?

14    A    That's what I wrote, yes.

15    Q    Okay.  And what clinical trial are you
16 referred to here?

17    A    I am referring to a proposed clinical trial
18 about which the FDA wrote a letter in response to the
19 investigator's questions and which is listed as
20 production documents HHS01699732-0619991.

21    Q    Okay.  And can you describe the documents
22 within that production that you reviewed?

46 (Pages 178 - 181)

Farr Curlin                                                    April 8, 2024

Page 182

1    MR. BROOKS:  And, Counsel, I have been
2  told, and I can check this myself, but one of my
3  colleagues going to get this document recently said
4  there's a typo in the Bates range.  Let me read into
5  the record the Bates range of the document to make
6  sure there is no unclarity on that.
7    That is HHS-0169973 through 991.
8    MS. MURPHY:  Okay.
9    THE WITNESS:  Could you repeat your
10  question?
11  BY MS. MURPHY:
12  Q  Sure.  Can you describe the documents that
13  you reviewed that fall within that now narrowed
14  document production?
15  A  I can in general terms.  I would have to
16  look at it to -- to recall the details.  But it was a
17  response by the FDA, or at least some branch of the
18  FDA, to inquiries made by investigators regarding a
19  proposed clinical research plan that involved using
20  estrogen as a cross-sex hormone as a part of
21  medicalized gender transition.  And they had put a few
22  questions to the FDA and asked for preliminary

Page 183

1  guidance on those, and the FDA was responding to those
2  questions.
3  Q  Okay.  Just to clarify, you read a document
4  that was drafted by the FDA?
5  A  That was my understanding from the document.
6  Q  Okay.  And after reviewing that document, is
7  it still your belief that the FDA was advocating for
8  the expansion of the proposed clinical trial?
9  A  It -- it was -- I use the term apparently
10  advocated, because it was not crystal clear what the
11  FDA was ultimately suggesting.  But insofar as it
12  appeared to -- the FDA's response appeared to suggest
13  that the FDA would see as appropriate, not including
14  an active control arm in testing estrogen for
15  adolescents.  It seemed to me that that was -- would
16  be violating ethical obligations, for the reasons laid
17  out in my report.
18  Q  Got it.  And you've never participated in an
19  IRB considering an expanded clinical trial such as the
20  one proposed in that instance; correct?
21  A  I have never served on an IRB, as I said at
22  the outset.  I have been invited to, but thankfully

Page 184

1  have succeeded in declining the invitation to this
2  point.
3  Q  And are there any other documents that you
4  relied on for your conclusion that the FDA was
5  considering expanding the clinical trial?
6  A  No.  Except that there was an initial news
7  report that suggested an interpretation of this
8  document, but I -- my opinion is based on the document
9  itself.
10  Q  Okay.  Turning now to paragraph 67 of your
11  report.
12  A  I'm there.
13  Q  Okay.  Here you note that animal study is
14  relevant to the safety of gender-affirming care -- now
15  I'm paraphrasing -- that can be done have not been
16  done.  Is that a fair representation of what you
17  assert?
18  A  That's -- the evidence that I've seen so far
19  suggests they have not been done.  And the -- the
20  plaintiffs have not indicated that they have been
21  done.
22  Q  Are you aware that two groups of researchers

Page 185

1  have developed mouse models to examine
2  gender-affirming medical care?
3  A  I am not aware of that.
4  Q  So you're not aware that both of those
5  studies showed that female mice are capable of
6  fertility following treatment with puberty blockers
7  and testosterone?
8    MR. BROOKS:  Objection, assumes facts
9  not in evidence.
10  A  I -- I -- I don't recall reading these
11  studies at all, so I can't comment further about them
12  unless you want me to look at them.
13    MS. MURPHY:  Sure.  So why don't we
14  mark as Exhibit 9, the study that we -- I think we
15  have this as the document descriptor, "In Vitro
16  Fertilization Outcomes in a Mouse Model of
17  Gender-Affirming Hormone Therapy in Transmasculine
18  Youth."
19    (Exhibit 9 was marked for
20    identification.)
21    THE WITNESS:  You already sent that one
22  in the email?

47 (Pages 182 - 185)

Farr Curlin                                                                                    April 8, 2024

Page 186

1        MS. MURPHY:  We did.

2        THE WITNESS:  Okay, one moment.  The

3 first author is Cynthia Dela Cruz?

4        MS. MURPHY:  Let me be sure of that.

5 Yes, that's the one I'm referring to.  I'd like to

6 mark that one as Exhibit 9.

7 BY MS. MURPHY:

8    Q   Dr. Curlin, have you seen this study prior

9 to today?

10   A   Not -- not to the best of my recollection.

11   Q   Okay.  So it's fair to say that you didn't

12 consider this when drafting your report?

13   A   Except insofar as this was reviewed by Drs.

14 Cantor and Laidlaw, I did not.  If -- if they reviewed

15 it, then I read their review and considered that

16 summary, but I otherwise did not review this.

17       MS. MURPHY:  Okay.  And then I'd like

18 to turn now to an exhibit that I'd like to mark as

19 Exhibit 10, and this one, the title of the study is,

20 "Puberty Suppression Followed by Testosterone Therapy

21 Does Not Impair Reproductive Potential in Female

22 Mice."

Page 187

1        (Exhibit 10 was marked for

2         identification.)

3 BY MS. MURPHY:

4    Q   Just let me know if you've located it.

5    A   I've located it.  I, of course, can only

6 read the title at this point.  I mean, I could read

7 more if you give me time to, but I've -- I've only

8 read the title at this point.

9    Q   Okay.  So you've never reviewed this study

10 prior to today; correct?

11   A   I have not reviewed it directly, and my only

12 knowledge of it would be if it was reviewed by Drs.

13 Cantor and/or Dr. Laidlaw.

14   Q   Okay.  You can set that aside at this point

15 if you'd like.  Moving on to paragraph 71 of your

16 report.

17   A   I'm there.

18   Q   Okay.  And here you say that, "The absence

19 of well-designed and controlled studies makes it

20 impossible to give minors and their parents

21 information sufficient to consider their consent duly

22 informed."  Correct?

Page 188

1    A   That's right.

2    Q   And are you aware that there's a lack of

3 randomized controlled studies in many areas of

4 pediatrics?

5    A   I am aware of that, yes.

6    Q   And for instance, are you aware that there

7 have been no randomized controlled studies regarding

8 when a child can return to sports after a spinal cord

9 injury?

10   A   I -- I was not aware of that, but I don't

11 know anything to contradict that.

12   Q   So assuming that that's true, is it your

13 opinion that parents cannot make an informed choice

14 regarding when their child can return to sports after

15 a spinal cord injury?

16   A   No, that is not my opinion.

17   Q   In what instance can parents make an

18 informed choice on their children's care when there

19 have not been randomized controlled studies?

20   A   Each -- each particular kind of intervention

21 in each particular clinical scenario has to be

22 considered.  And so for example, it may well be that

Page 189

1 there have not been randomized controlled trials of

2 whether we should set broken bones that are --

3 comminuted fractures, let's just say.  And that does

4 not mean that we don't have sufficient knowledge of --

5 of bones, how they heal, and -- and what can be

6 expected from setting the bone and what the

7 implications would be of not setting it in order to

8 know enough to give consent to having the bone set, in

9 my judgment.

10       The challenge with medicalized gender

11 transition, as with any kind of, as the Belmont Report

12 puts it -- I think it's the Belmont Report or

13 Beauchamp and Childress, a kind of radical, new

14 procedure is that it -- it is different in many

15 respects from the ordinary situations in which parents

16 are asked to give consent.

17   Q   How so?  How is it different?

18   A   Well, it's different insofar as we're asking

19 parental consent and patient assent to something which

20 the patients in this case cannot reasonably imagine or

21 understand, by virtue of specifically the fact that

22 they've not gone through puberty, and that the

48 (Pages 186 - 189)

Farr Curlin
April 8, 2024

Page 190

1  intervention is going to block features of human life
2  that are dependent on going through puberty.
3      So unlike most conditions, in this case the
4  intervention itself blocks the development of the
5  cognitive and emotional maturation which makes someone
6  capable of giving their own consent when they're an
7  adult, for example.
8      Second one is that in most cases we have
9  good reason to believe that the information, or at
10  least absent countervailing evidence, we have -- we
11  can expect that the information given by the
12  practitioners is -- has a reasonable basis. Whereas
13  by their own concession and description, the
14  plaintiffs in this case and those promoting
15  gender -- medicalized gender transition, are not
16  acknowledging to family members what all of these
17  experts who disagree with them, like those in -- in
18  multiple other countries, have the conclusions they've
19  come to with respect to the evidence.
20      So that in itself gives an unusual situation
21  in which we now, based on their own testimony, their
22  own writing, we now have reason to believe that

Page 191

1  patients and their parents will not receive a true
2  accounting of the state of the evidence with respect
3  to this intervention from those who offer this
4  intervention.
5      Third, in this case, unlike most cases where
6  parents are giving consent, the intervention itself
7  contradicts the -- the norms of health that guide
8  physicians' actions and fiduciary responsibilities in
9  other cases.
10      So if a doctor was saying what we're going
11  to do is we're going to break your child's leg out of
12  an experiment we have, an idea that's going to help
13  them all on the whole better in some way, then we'd
14  want -- we'd have a much higher bar for requiring
15  that -- that practitioner to show that breaking the
16  leg was going to have the hoped-for benefit and was
17  going to not impose disproportionate harms.
18      I think that's something parallel here,
19  insofar as what the intervention does is contradict
20  the healthy sexual development -- or the healthy
21  development of secondary sex characteristics for a
22  child of that sex.

Page 192

1      So those are just -- those are some of the
2  problems that make this practice particularly
3  ethically problematic, and which raise the bar for
4  or -- or put greater onus on those who would -- who
5  would offer this treatment to -- to have a reasonable
6  basis for coming to the conclusion that this
7  intervention will bring about benefits that are at
8  least proportionate to the foreseen harms.
9      And since, as is this case, they have not
10  shown that the hoped-for benefits, namely benefits
11  with respect to mental health, are achieved. And we
12  do know with great certainty that the intervention
13  brings a whole host of adverse side effects. I don't
14  believe they've met -- they've met the requirement
15  of -- of -- of getting -- of there being -- being able
16  to give children information and their parents
17  information sufficient to -- to -- to give duly
18  informed consent.
19  Q   To clarify one of things that you said, what
20  is the basis for your opinion that parents are not
21  informed of any research where you may assert that the
22  research concluded that there were no benefits or that

Page 193

1  gender-affirming care was harmful?
2  A   So the -- the -- as I understand them, the
3  plaintiffs themselves and those whom they're referring
4  to in the publications like that of Rhafferty and
5  others, say explicitly these interventions are safe
6  and they're beneficial.
7      And that seems to me, on the basis of the
8  state of the evidence, if Cantor and Laidlaw's reports
9  are accurate, is not a true description of -- of these
10  interventions. They cannot reasonably be described as
11  safe without a lot of other qualification and
12  description. The kinds of adverse side effects they
13  have. And they cannot be described as beneficial, it
14  seems to me, with respect to outcomes that are -- the
15  hoped-for outcomes, yet anyway.
16  Q   And what is the basis for your belief that
17  parents are not given information about the health
18  risks of gender-affirming care?
19  A   I'm not testifying that they're not given
20  any information about health risks. I'm just saying
21  that it seems to me, from what the plaintiffs
22  themselves have said, that they represent to patients

49 (Pages 190 - 193)

Farr Curlin

April 8, 2024

Page 194

1 and their families that this is a safe intervention
2 and that it is likely to benefit.  And they couldn't
3 do it in good conscious and ethically if they did
4 not -- if they weren't persuaded that was the case.
5        But the -- the state of the evidence, if
6 described accurately by Cantor and Laidlaw, suggests
7 that they are mistaken in their -- in their
8 conclusions regarding the state of the evidence.  And
9 that is the conclusion, of course, that multiple
10 international bodies of experts have come to.  That in
11 fact it's not safe, or not safe enough to justify
12 doing it except perhaps in certain conditions of
13 research.
14    Q    Okay.  Moving to page 18.  On page 18 you
15 state it's not been shown that minors are able to
16 comprehend and reasonably evaluate the risks and
17 lifelong implications of MGT.  Correct?
18    A    I do, yes.
19    Q    Is it your opinion that a minor can never
20 assent to gender-affirming medical care?
21    A    It's not my opinion about any particular
22 case.  It is my opinion that the plaintiffs have not

Page 195

1 shown that -- based on what they've shown, based on
2 the evidence available, it is doubtful that a minor
3 can have sufficient understanding and intellectual
4 maturity to give informed assent to this particular
5 practice.
6    Q    Under what conditions could a minor assent
7 to gender-affirming care?  What is necessary for that
8 to be possible?
9        MR. BROOKS:  Objection, calls for
10 speculation.
11    A    Yeah.  I'm not sure that it is possible.
12 I'm not sure that it is possible.
13    Q    Have you read the SOC 8's criteria for how
14 providers obtain assent and consent from parents?
15    A    I read the SOC 8 guidelines.  I don't recall
16 the details about that particular issue.
17    Q    Are you aware that the guidelines state that
18 it's important for healthcare providers to assess the
19 cognitive and emotional maturity of adolescents?
20    A    That sounds familiar.  I -- I believe I
21 mentioned that in my report somewhere.
22    Q    Is it your opinion that healthcare providers

Page 196

1 are unable to make that assessment?
2    A    What assessment?
3    Q    An assessment of the emotional capacity --
4 emotional maturity and cognitive maturity of an
5 adolescent who is deciding on treatment with respect
6 to gender-affirming care.
7    A    It's my opinion that the plaintiffs have not
8 shown good reason to be confident that minors can have
9 such maturity.  Sufficient maturity to -- to
10 comprehend medicalized gender transition.
11    Q    And have you conducted any research on
12 obtaining informed consent from parents regarding
13 treatment of minors?
14    A    Empirical research?
15    Q    Any type of research.
16    A    Sure, I've -- I've conducted research, for
17 example for this report, regarding what -- what are
18 the characteristic standards within the -- the field
19 of pediatrics regarding informed consent for minors.
20    Q    Apart from that, have you done any research
21 in that area?
22    A    I've not conducted empirical research in

Page 197

1 that area.  I have, over the years, conducted research
2 within the fields of medical ethics, writing on
3 informed consent, which included -- included
4 scholarship regarding consent for minors.
5    Q    Is that something that's listed in your CV?
6    A    No.  By research here I mean I have studied
7 it, I have looked up authorities, I've read books,
8 I've gone to lectures, and talked to colleagues, and
9 so on.
10    Q    Got it.  I should have been more clear.  So
11 have you drafted any peer-reviewed studies in this
12 area?
13    A    I have not written any peer-reviewed papers
14 on informed consent among children, to my
15 knowledge -- to my recollection.
16    Q    Turning to paragraph 84.  Just let me know
17 when you're there.
18    A    I'm there.
19    Q    And here you're referring to the SOC 8 when
20 you say, "The new guidelines also emphasize a right to
21 bodily and mental integrity, autonomy, and
22 self-determination."  Is that right?

50 (Pages 194 - 197)

Page 198

1     A   That's right.

2     Q   And we talked a bit about this earlier, but
3  I just have a couple additional questions on it.  How
4  would you define autonomy in medicine?

5     A   So I have a chapter on this in my book.
6  Autonomy is a term that's been used in a number of
7  different ways.  And the word autonomy means
8  self-rule.  Autonomous is rule by the self.  That was
9  particularly popularized by Immanuel Kant, to refer to
10  the -- the person who is genuinely reasonable, is a
11  person who is a law to themselves.  They act only
12  insofar as they believe morality require -- ethics
13  requires them to act.

14          Autonomy has come to be used in modern times
15  because of the influence of what we describe as the
16  provider of services model.  Often, it's come to be
17  understood as emphasizing a person's right to have --
18  to live life according to their own terms.  Not so
19  much -- whereas the original understanding was to be
20  autonomous is to follow the moral law, now in many
21  corners people use the term to mean you follow your
22  own -- your own desires.

Page 199

1          So to my -- to my -- in my view, my
2  judgment, autonomy rightly understood is a word --
3  within medicine, is a word that's used to indicate a
4  person's authority to make judgments about what is
5  going to happen to them.

6          And that's particularly expressed in the
7  principal of informed consent, where respect for
8  autonomy requires only acting on a patient insofar as
9  one has their consent, their -- their informed
10  consent.  So that's how I would describe autonomy.

11     Q   And to clarify the testimony that you gave
12  earlier, is it your belief that children do not have
13  the right to autonomy or that it is impossible for
14  them to have autonomy with respect to medical
15  decisions?

16     A   So the way you phrased that question shows
17  the confusion in the way the term is used.  Autonomy
18  is not something -- properly understood, it's not
19  something you talk about as something to which you
20  have a right.  It is an ethical value which calls for
21  respect from others.

22          It is my testimony that children do not have

Page 200

1  authority to make clinical decisions for themselves,
2  except in -- in certain situations.  But generally
3  speaking, they do not have authority.  And that means
4  respect for their autonomy does not require -- or does
5  not imply that you treat them as having authority to
6  tell you what should be done and should not be done
7  for them medically.

8     Q   Okay.  So in your opinion, what role should,
9  if any, an adolescent or child's view play in making a
10  medical decision?

11     A   It depends very much on the situation, on
12  the medical decision that's at stake, on how grave the
13  threat to health is that the child faces, on how
14  likely it is that medicine holds some intervention
15  that can resolve that threat.  And -- and what it is
16  in fact that the patient -- that the child wants.

17          So insofar as possible, pediatricians can
18  and do, and family doctors, those who take care of
19  children, can and do seek to respectfully interact
20  with a child so that they gain their assent to what is
21  medically necessary.

22          But it -- they don't -- there's no medically

Page 201

1  necessary intervention that I can think of for which
2  physicians proceed by asking the child what do you
3  want.  Rather, they would say this is what we need to
4  do and here's why, and how can we negotiate a way
5  forward that involves your assent and cooperation.

6     Q   Now in that same paragraph, paragraph 84.
7  You also state that "The language in SOC 8 ignores the
8  potential conflict between the needs of the patient
9  and their goals."  Correct?

10     A   I do, yes.

11     Q   Can you elaborate a bit on that?  Tell me
12  what you mean?

13     A   What I mean is just that the physician's
14  proper concern, particularly with respect to children,
15  is the medical needs of the patient.  The
16  health-related needs, not the child's goals.  And the
17  needs have preeminence and priority.

18          Ideally, one can pursue addressing the
19  child's health needs and medical needs in a way that
20  doesn't contradict the child's goals, but the goals
21  are not the point for physicians.

22     Q   Okay.  Turning now to paragraph 94.

51 (Pages 198 - 201)

Farr Curlin                                                                April 8, 2024

1    A    I'm there.

2    Q    And actually, if you wouldn't mind, just

3 taking a brief look.  What I'm referring to is

4 actually paragraphs 94 through 96.

5    A    Okay.  Give me a second.  Okay, I'm ready.

6    Q    I want to focus on the portion of your

7 opinion that refers to eminent bodily harm.  And in

8 your medical practice, do you draw a distinction

9 between mental and physical health?

10    A    I -- I -- I do, insofar as that's helpful

11 for clarifying what a person is -- what kind of

12 diminishment or defect or injury to a person's health

13 they're experiencing, yes.

14    Q    Would you agree that individuals routinely

15 accept risks to their physical health in order to

16 improve their mental health?

17    A    I don't -- I -- I would want to know more

18 about what you have in mind before agreeing or

19 disagreeing with that.

20    Q    So for instance, certain mental health

21 medications come with risks to physical health; would

22 you agree?

1    A    Yes, I agree with that.

2    Q    But there are certain instances where

3 individuals are experiencing mental distress and it's

4 determined that a medical for their mental health is

5 worth the risks to their physical health; correct?

6    A    Yes, that's correct.

7    Q    So it's not your assertion that medication

8 should never be prescribed when there's risks to

9 physical health; correct?

10    A    No, of course not.  You could -- you could

11 hardly prescribe anything if that were the standard.

12 What's so strikingly different about medicalized

13 gender transition is that it does not address the

14 mental health issue.  Rather, it turns its attention

15 to manipulating the body in ways that contradict

16 health, in hopes that that will have a side effect of

17 or an effect of improving mental health outcomes.  So

18 it -- it acts actually here as well, directly in

19 contradiction to the ordinary way that mental health

20 is treated.

21    Q    And when you say that it has been shown that

22 there are no improvements to mental health, you're

1 referring to the studies that are cited in your report

2 and the ones that were summarized by Drs. Cantor and

3 Laidlaw?

4    A    Well, here what I mean is puberty blocking

5 drugs have no indication for mental health.  They have

6 no physiological rationale.  They are not directed

7 directly at mental health.  They're not directed at

8 dysphoria.  No one who has dysphoria generally takes

9 puberty blockers to treat their dysphoria, and lots of

10 people have dysphoria of all different kinds.

11        So the point here is that they don't treat

12 dysphoria directly; they treat the body to change its

13 characteristics, in hopes that that will result in

14 improvements in dysphoria.  That's not the way

15 psychoactive medications characteristically are used.

16    Q    Understood.  Turning to paragraph 97 of your

17 report.  Here you state that "Plaintiffs' experts do

18 not remotely establish that the necessary conditions

19 justifying such procedures exist in the case of GD and

20 MGT, especially for minors."  Correct?

21    A    That's correct.

22    Q    And which experts are you specifically

1 referring to?

2    A    I'm referring to all of them together.  None

3 of them has established this, either individually or

4 as a group.

5    Q    Okay.  And which of Plaintiffs' experts

6 reports have you reviewed?

7    A    I read the report of -- I read the second

8 amended complaint, and I read the report of Meredithe

9 McNamara, and I --

10        THE REPORTER:  Sorry, could you repeat

11 that?  You cut out for a second.

12        THE WITNESS:  So I first read the

13 second amended complaint, and then I read the report

14 of Meredithe McNamara, dated February 8, 2023.  I also

15 read the report of Armand Antomaria, dated February

16 13, 2023.  And I read one other report.  Those are the

17 only two, apparently, I wrote down, so -- and I don't

18 recall another.

19 BY MS. MURPHY:

20    Q    Okay.  So is your opinion on what

21 Plaintiffs' experts have or have not established based

22 on only those either two or three reports that you

52 (Pages 202 - 205)

Farr Curlin

1 reviewed?

2    A   It is based on the reports that I reviewed,

3 yes.

4    Q   One clarifying question before we move on.

5    A   Oh, actually, hang on.  I also reviewed

6 the -- wait, I may be confusing this case with

7 another.  I think I am.  So that --

8    Q   Okay.  Going back to, this is something we

9 talked about this morning, the Hippocratic Society.

10 Can you tell me when you founded the Hippocratic

11 Society?

12    A   To the best of my recollection, it was in

13 summer of 2023.

14    Q   And is the founding of the Hippocratic

15 Society in any way motivated by the work that you've

16 done with respect to gender-affirming care?

17    A   No, not self-consciously anyway.

18       MS. MURPHY:  I am nearly finished.  And

19 so what I'd like to do is just take a couple minutes

20 off the record to review my notes.  So why don't we

21 say five minutes?

22       MR. BROOKS:  That's fine.

1       THE REPORTER:  The time is 4:14 p.m.

2 We are now off the record.

3       (Off the record.)

4       THE REPORTER:  The time is 4:21 p.m.

5 We are now back on the record.

6       MS. MURPHY:  Thank you.

7 BY MS. MURPHY:

8    Q   Dr. Curlin, I just have some concluding

9 questions.  If you were called to testify in this

10 case, does Exhibit 2, which we marked as your report,

11 represent your complete opinion that you were asked to

12 provide in this case?

13       MR. BROOKS:  Objection.

14    A   I'm not certain what you mean by "complete

15 opinion," but it does represent my opinion in this

16 case.

17    Q   Is there anything that you would add that is

18 not currently written in your report?

19       MR. BROOKS:  Objection.

20    A   Not that I'm aware of at the moment.

21    Q   And have you completed all the work

22 necessary, in your point of view, in order to draw the

1 conclusions that you made in this case?

2       MR. BROOKS:  Objection.

3    A   I have -- yes, I believe I have.

4    Q   Are there any portions of your report that

5 you would like to amend or retract at this moment in

6 time?

7    A   No, there -- there are not any portions I

8 would like to amend or retract.

9       MS. MURPHY:  Okay.  Dr. Curlin, I want

10 to thank you for your time today.  That concludes my

11 portion of the questioning.  I'm not sure if anyone

12 else has any questions for Dr. Curlin, but I'm

13 finished.

14       MR. BROOKS:  Anybody else from the

15 plaintiffs' side?

16       MS. WILLIAMS:  No questions on my end.

17 Thank you.

18       MR. BROOKS:  And I have no questions

19 for the witness.

20       THE REPORTER:  All right.  Before we go

21 off the record, I'd just like to go over transcript

22 orders.

1       MS. MURPHY:  Sure.

2       MR. BROOKS:  On behalf of the defense,

3 I believe that the State of Alabama has a standing

4 order through Veritext, and I don't propose to modify

5 that.

6       THE REPORTER:  Do you have any

7 preference on delivery method?

8       MR. BROOKS:  Like I say, I don't

9 actually know the details of the standing order, and I

10 don't propose to modify it.

11       THE REPORTER:  Okay.  And then, Amie,

12 would you like to order a copy of the transcript?

13       MS. MURPHY:  So similarly, I believe we

14 have a standing order as well, and I'm just going

15 to -- if Andrew knows of anything different, he can

16 chime in and tell me, but just an emailed copy

17 directed to me is fine.

18       THE REPORTER:  In that case, the time

19 is 4:23 p.m.  We are now off the record.

20       (Signature waived.)

21       (Whereupon, at 4:23 p.m., the

22       proceeding was concluded.)

Farr Curlin                                                    April 8, 2024

Page 210

1        CERTIFICATE OF DEPOSITION OFFICER

2        I, CHRISTOPHER FRIEBE, the officer before

3   whom the foregoing proceedings were taken, do hereby

4   certify that any witness(es) in the foregoing

5   proceedings, prior to testifying, were duly sworn;

6   that the proceedings were recorded by me and

7   thereafter reduced to typewriting by a qualified

8   transcriptionist; that said digital audio recording of

9   said proceedings are a true and accurate record to the

10  best of my knowledge, skills, and ability; that I am

11  neither counsel for, related to, nor employed by any

12  of the parties to the action in which this was taken;

13  and, further, that I am not a relative or employee of

14  any counsel or attorney employed by the parties

15  hereto, nor financially or otherwise interested in the

16  outcome of this action.

17  Dated:

18  April 19, 2024

19  

20                    CHRISTOPHER FRIEBE

21                 Notary Public in and for the

22                    State of Michigan

Page 211

1        CERTIFICATE OF TRANSCRIBER

2        I, NICHOLE RYAN, do hereby certify that this

3   transcript was prepared from the digital audio

4   recording of the foregoing proceeding, that said

5   transcript is a true and accurate record of the

6   proceedings to the best of my knowledge, skills, and

7   ability; that I am neither counsel for, related to,

8   nor employed by any of the parties to the action in

9   which this was taken; and, further, that I am not a

10  relative or employee of any counsel or attorney

11  employed by the parties hereto, nor financially or

12  otherwise interested in the outcome of this action.

13  Dated:

14  April 19, 2024

15

16

17                    NICHOLE RYAN

18

19

20

21

22

54 (Pages 210 - 211)

Farr Curlin

April 8, 2024

[& - 67]

Page 1

| & | | | |
|---|---|---|---|

| & | 166:22 |
|---|---|

| 0 |
|---|

**00184** 1:8
**0169973** 182:7

| 1 |
|---|

**1** 4:7 15:11,12
16:8,13 33:9
33:17
**10** 5:13 186:19
187:1
**101** 5:20
**103** 5:21
**107** 75:20
76:21 78:4
**10:16** 47:1
**10:26** 47:3
**119** 4:12
**11:57** 94:5
**12** 33:15,17
**120** 4:16
**122** 4:22
**123** 5:7
**12:30** 92:3
**12:32** 114:20
115:3
**13** 205:16
**130** 79:10,11
79:20
**14** 104:18
107:4
**15** 4:7 108:19
109:16 110:15
112:4 180:17
181:7,9

**16** 4:8 138:22
140:7
**163** 5:8
**18** 26:12 63:13
113:10 194:14
194:14
**185** 5:12
**187** 5:16
**19** 63:13
210:18 211:14
**1960s** 35:19
**1:15** 114:22
**1:21** 115:5

| 2 |
|---|

**2** 4:8 16:19,20
17:6 33:11,17
207:10
**2,000** 125:19
**20** 54:11 60:1
103:8,9 115:10
**200** 76:17
**2000** 125:18
**2001** 47:9
**2003** 34:14,17
57:21 129:19
**2004** 34:14,17
**2008** 38:7
**2017** 169:17
**20176** 3:15
**2018** 149:14
**202** 3:9,17
**2021** 125:18
138:6
**2023** 70:6
99:21 100:3
205:14,16
206:13

**2024** 2:2 6:10
210:18 211:14
**20530** 3:7
**22822** 211:16
**25** 30:7
**27** 116:18
117:11
**27710** 2:5
**28** 100:15,16
100:16 102:21
**29** 121:13,13
**29th** 76:13
**2:22** 1:8
**2:47** 167:18
**2:54** 167:20

| 3 |
|---|

**3** 4:9 5:20
78:19,20 79:1
**3,800** 125:18
**30** 60:1 124:6
**31** 129:12
**32793** 210:19
**33** 131:14
133:13 136:12
**34** 136:20
**35** 113:3
**353-1285** 3:9
**36** 138:5
**38** 140:22
141:5
**393-8690** 3:17
**3:14** 180:22
**3:15** 180:15
**3:30** 180:18,20
181:3

| 4 |
|---|

**4** 4:10 119:2,6
**40** 114:18,20
145:15
**42** 146:20
**43** 148:12
**44** 149:16
155:15 156:20
**44180** 3:14
**48** 161:8
**49** 46:14 165:7
165:10
**4:14** 207:1
**4:21** 207:4
**4:23** 209:19,21

| 5 |
|---|

**5** 4:13 12:8
13:1 96:4,13
120:12,16
143:4,9,11
146:17
**50** 46:14
165:10
**51** 168:2,4
**52** 174:22
**54** 177:8
178:14
**55** 179:14

| 6 |
|---|

**6** 4:17 5:21
75:18,22 122:5
122:10
**6629188** 2:7
**67** 184:10

| 7 | a |
|---|---|

**7**   5:3 33:13
75:19 76:21
123:9,13
**70**   75:18,22
**71**   187:15
**78**   4:9

**8**

**8**   2:2 4:3 5:8
6:10 94:9
149:19 150:10
150:13 154:9
154:14,18,21
155:17 157:17
162:20 163:1
163:21 195:15
197:19 201:7
205:14
**8's**   195:13
**84**   150:12
151:19,22
156:14 197:16
201:6
**85**   151:21
152:1

**9**

**9**   5:9 143:1
185:14,19
186:6
**94**   201:22
202:4
**96**   202:4
**97**   204:16
**991**   182:7
**9:03**   2:3 6:5

**a.m.**   2:3 6:5
47:1,3 94:3,5
**abbreviation**
13:14,18 14:20
148:5
**ability**   210:10
211:7
**able**   48:11,12
49:19 61:18
173:20 192:15
194:15
**abnormal**
141:3,9 142:10
142:17
**abortion**   53:18
**above**   138:17
177:10
**absence**   77:8
151:14 187:18
**absent**   6:16
190:10
**absolutely**   85:6
173:17 177:21
**academic**
38:15 77:13
**academy**   14:7
132:18 133:2
149:13
**accept**   13:3
202:15
**accepted**
157:13
**accepting**
27:18
**access**   5:3
60:16,17

123:10
**accords**   173:22
174:2
**account**   32:13
82:9 83:5
84:14 86:21
88:20 139:8
160:2
**accounting**
191:2
**accurate**
103:12,14
106:4,17 107:1
121:9 122:1
123:4 148:21
149:9 157:11
157:15 158:12
159:9,19 193:9
210:9 211:5
**accurately**
194:6
**achieve**   43:15
**achieved**
192:11
**achieving**
43:11
**acknowledge**
79:13
**acknowledged**
113:4 121:19
**acknowledging**
190:16
**acknowledg...**
6:13
**acronym**   13:13
**act**   198:11,13
**acting**   170:7
199:8

**action**   65:20
210:12,16
211:8,12
**actions**   71:13
71:14 191:8
**active**   183:14
**acts**   165:21
166:3 203:18
**actual**   141:20
**actually**   13:6
33:9 34:18
54:9 139:12
147:15 153:10
155:16 156:12
163:21 165:10
166:9,13 202:2
202:4 203:18
206:5 209:9
**ad**   41:10
**add**   16:15
207:17
**addition**   54:17
**additional**
116:15 198:3
**additionally**
6:16
**address**   40:6,7
41:19 75:2
80:18 100:12
203:13
**addressed**   37:1
**addressing**
71:14 201:18
**adequate**   83:11
84:1 158:16
**adflegal.org**
3:16

administer
6:13
administering
178:10
administration
105:1 137:15
adolescence
5:5 123:11
adolescent 4:15
85:21 120:14
196:5 200:9
adolescent's
90:21
adolescents
18:10 26:18
54:17,19 109:1
119:22 132:12
132:20 139:22
150:16 152:8,9
176:3 183:15
195:19
adult 4:10,15
28:9 51:14,15
72:21 119:4
120:14 190:7
adults 5:7
26:10,11 54:17
56:14 123:12
140:15 151:9
152:13 153:13
advanced 40:5
40:9 67:8
adverse 113:4
138:3 139:16
192:13 193:12
advice 64:7
advocated
181:11 183:10

advocating
183:7
affects 142:3
affiliated 64:11
affiliation
36:16,18 52:10
52:14
affirmation
105:1
affirming 4:18
5:4,11 13:22
14:1,4,16
116:16 117:18
122:6 123:10
124:13,21
126:5,7 129:1
129:8,10 130:8
132:5,11,20
133:6 135:16
135:22 136:6
139:20,22
140:15 162:2,5
164:10 165:13
168:13 170:18
172:4 174:13
175:9 176:2
178:11,16
184:14 185:2
185:17 193:1
193:18 194:20
195:7 196:6
206:16
afraid 172:17
172:19
afternoon
140:11
age 26:12,15
51:10 97:20

138:22 140:6
141:21
agency 72:6
ago 8:15 12:2
30:7 43:3
131:10
agree 6:14,18
12:21 21:18
46:20 85:10
88:10 89:5
90:2 119:20
135:14 141:15
143:8 154:14
155:2 202:14
202:22 203:1
agreeing
202:18
ahead 31:16
162:16
aimed 43:11
air 156:6,9,10
156:11
al 1:5,14 3:11
6:7
al.'s 116:20
alabama 1:2,14
6:10 100:22
102:1 104:6
209:3
align 65:20
78:10 90:21
aligned 55:14
118:19
alive 39:3
allege 117:21
alleges 118:8
alliance 3:13
7:11 68:4,6,7,8

68:9,16
allowed 19:11
30:20 61:5
alternative
82:6
altogether
139:22
alumni 76:16
ambiguities
89:16
amend 208:5,8
amended 205:8
205:13
america 1:8 3:3
6:8 65:3,7,11
65:17
american 14:6
68:12,13
132:10,16,18
133:2,5 149:13
amie 3:4 7:8
8:5 209:11
amie.murphy2
3:8
analytical
31:12
anatomical
88:2
anatomy 78:10
ancient 54:1
andrew 15:15
162:15 209:15
anglican 65:2,5
65:6,11,17
animal 184:13
animals 87:20
143:19

[annelou - associated]

annelou 119:12
annual 76:13
answer 5:18
16:10 21:4
38:5,6 86:10
86:19 101:4
102:2,12 127:5
148:15 156:5
179:13
answered
86:11 148:3
answering 30:1
answers 98:16
anticipated
108:22
anticipating
103:2
antomaria
104:15 205:15
anxiety 11:6
56:18 172:7
anybody 46:18
60:16 208:14
anyway 164:5
193:15 206:17
apart 10:11
23:19 41:1,6
104:12 116:14
196:20
apologize
36:12 129:13
apparent 180:2
apparently
181:11 183:9
205:17
appeal 151:12
151:12

appealing
151:8
appear 9:13,16
appearance
78:10
appeared
183:12,12
appears 66:8
90:13,14,18
100:19 128:8
applicable 6:22
applicants
30:21
applied 138:19
apply 151:10
151:13 152:8
appreciate
79:4 92:4
123:16 180:15
appreciated
173:16
approach 14:7
150:22 156:16
appropriate
15:7 98:9
183:13
approved
181:10
approximately
8:14 42:21
180:15,17
april 2:2 6:10
210:18 211:14
area 24:13
30:22 32:1,1
34:19 35:2
36:6 123:5
196:21 197:1

197:12
areas 10:9 27:5
188:3
argue 102:11
arguing 162:5
162:7 164:10
argument
89:22
arguments
35:20 97:1
179:21
arm 132:16
183:14
armand 205:15
arms 175:13
article 4:10,13
4:17 5:3,8,9,13
138:6,11 162:4
162:8,11,16
163:7,9 164:9
165:2 169:12
articles 103:11
103:14
ascribe 156:8
aside 187:14
asked 17:11
52:9,12 53:8
62:8 94:12
100:12 101:7
101:13 102:8
103:10,13,16
103:19 106:1
106:16 121:10
127:7 148:2,21
149:10 153:20
153:21,22
182:22 189:16
207:11

asking 17:7
33:3 71:22
79:13 99:13
101:11,12
102:6,8 106:22
189:18 201:2
asks 81:21
aspect 111:7
112:10,13,15
134:6
aspects 40:22
assent 154:1,4
189:19 194:20
195:4,6,14
200:20 201:5
assert 111:7
184:17 192:21
assertion 203:7
assess 89:19
195:18
assessed
176:10
assesses 89:20
assessment
107:5 113:17
161:7 180:10
196:1,2,3
assigned 6:3
25:22
assignment
88:2
assistance
53:16
assistants
173:5
assisted 63:10
associated
37:22

Farr Curlin

April 8, 2024

[association - basis]

Page 5

| association | attitudes 96:7 | autonomous | **b** |
|---|---|---|---|
| 4:17 68:11,12 | 96:16 98:18,21 | 198:8,20 | **b** 4:5 5:1 |
| 68:13 69:17 | 178:7,15 | **autonomy** | **back** 21:21 |
| 122:6 132:4,9 | **attorney** 1:12 | 71:17,17,18 | 35:9 47:4 |
| 132:11,16 | 6:9 9:7 101:11 | 72:1,3,12,13 | 93:17 94:6 |
| 133:6 173:3 | 101:19 104:7 | 150:20 151:9 | 96:3 110:17 |
| 174:8 | 210:14 211:10 | 152:2,12,15 | 115:6 125:8 |
| **assume** 24:1 | **attorneys** | 153:17 197:21 | 127:12 133:12 |
| 64:20 103:10 | 100:22 101:1,5 | 198:4,6,7,14 | 155:15 167:4 |
| 103:13,19 | **attracted** 26:21 | 199:2,8,10,13 | 167:21 169:22 |
| 121:20 | 27:7,12 | 199:14,17 | 171:11 180:18 |
| **assumes** | **audience** 76:11 | 200:4 | 181:4 206:8 |
| 132:13 133:8 | 76:15 77:11 | **available** 37:17 | 207:5 |
| 140:17 185:8 | 169:3,5 | 50:3,4 81:13 | **backlash** |
| **assuming** | **audio** 210:8 | 113:11,12,13 | 161:14 164:19 |
| 188:12 | 211:3 | 113:15 135:15 | **bad** 11:5,7,20 |
| **assumption** | **author** 119:11 | 135:18 139:8 | 35:4 41:5 |
| 103:17 | 119:12 123:18 | 175:18 176:11 | 85:11 97:9 |
| **assumptions** | 186:3 | 177:1 195:2 | **bar** 191:14 |
| 103:22 | **authored** 14:6 | **average** 126:11 | 192:3 |
| **astray** 172:15 | 133:1 | **avoid** 23:7 35:4 | **based** 53:20,22 |
| **attached** 15:20 | **authoritative** | **aware** 8:18 | 60:6 85:16 |
| **attempt** 90:20 | 158:12 | 12:3,12,16 | 87:8,10 95:14 |
| 106:7 | **authorities** | 13:21 14:1 | 104:20 108:20 |
| **attempted** 4:20 | 147:2,22 197:7 | 52:18 61:17 | 124:15 125:1 |
| 122:8 135:17 | **authority** 62:7 | 65:21,22 84:17 | 130:21 131:7 |
| 172:9 | 63:5,8 72:11 | 123:20,21 | 138:17 139:6 |
| **attempting** | 72:15,19,21 | 132:3,10,15,19 | 144:21 166:10 |
| 107:9 | 73:1,4,17,18 | 132:22 133:5 | 184:8 190:21 |
| **attended** 18:16 | 83:14,15 148:5 | 139:19 140:2 | 195:1,1 205:21 |
| 42:22 44:11 | 152:13 153:18 | 140:14 174:11 | 206:2 |
| **attending** 19:3 | 199:4 200:1,3 | 174:15 176:1 | **baseline** 111:17 |
| 20:18 57:22 | 200:5 | 184:22 185:3,4 | **basically** 15:19 |
| 58:1,19 59:11 | **authorized** | 188:2,5,6,10 | 31:12 50:13 |
| 60:19 82:21 | 6:12 | 195:17 207:20 | **basis** 64:1,2 |
| **attention** 82:19 | **authors** 117:21 | | 74:16 87:3 |
| 107:15 203:14 | 118:3 126:8 | | 93:1 142:16 |
| | 129:11 162:4,8 | | |

152:5 153:9
179:18,19
190:12 192:6
192:20 193:7
193:16
**bates** 182:4,5
**bear** 91:11
160:2
**beauchamp**
175:2 189:13
**becoming**
11:21 12:2
19:18 108:12
**began** 32:6
39:10 47:8,11
**beginning** 38:1
57:21
**begun** 37:20
**behalf** 3:2,11
209:2
**beings** 19:14
89:15 143:19
**belief** 87:14,16
134:22 183:7
193:16 199:12
**beliefs** 32:15
**believe** 16:3
33:20 68:13,14
76:17 80:5
83:10 85:18
86:3 99:16
100:2,12
101:10 102:18
108:13 151:18
152:7 162:19
190:9,22
192:14 195:20
198:12 208:3

209:3,13
**belmont**
152:12 189:11
189:12
**beneficial**
118:5 193:6,13
**benefit** 40:18
133:20 135:1
153:10,11
158:10 191:16
194:2
**benefits** 40:19
104:22 116:9
131:20 136:21
175:13 177:1
192:7,10,10,22
**best** 24:14
29:13,15,20
37:17 44:2
67:15 68:9
70:5 99:20
110:12,16
118:2,10,19
130:10 136:22
139:7 152:18
152:21 169:15
177:13 179:2,9
186:10 206:12
210:10 211:6
**better** 71:12
175:18 191:13
**beyond** 102:20
109:14 110:4
110:13 114:4
**bibliography**
102:22 105:16
105:18 110:10
113:19

**big** 159:15
**bind** 62:15,17
**bioethics** 45:20
166:20,22
**biology** 17:16
17:19
**biomedical**
31:3
**birth** 25:22
**bit** 19:19 34:11
89:8 198:2
201:11
**blends** 27:4
**block** 92:22
111:12 190:1
**blockade** 43:8
44:4
**blockers** 54:6
58:9,11 66:4
85:21 88:11
90:4 91:5,7
92:14 97:15
119:21 144:19
185:6 204:9
**blocking** 13:19
14:11,21 15:6
87:3,3 111:12
112:9,16,17
138:20 204:4
**blocks** 112:10
190:4
**board** 99:3,5,7
99:13 139:10
181:10
**boarding**
168:19
**bodies** 136:19
142:2 147:2

148:1,9,9
179:9 194:10
**bodily** 109:5
112:22 143:20
150:19 197:21
202:7
**body** 29:1,2,10
29:11,14,16
46:3,5 143:5
143:14,15,18
148:7 203:15
204:12
**boe** 1:5 6:7
**bone** 113:5
189:6,8
**bones** 189:2,5
**book** 4:9 74:22
75:3,4 78:13
78:14 79:1,4,6
79:14,17,19,19
80:5,11,16,18
80:19 82:6
88:16 90:13
93:4,12 94:10
96:11 198:5
**books** 79:22
197:7
**bottom** 146:11
**boundary**
26:14,15
**bowers** 113:4
**brain** 109:4
111:21 112:2,7
112:10
**branch** 182:17
**break** 8:20 9:1
46:10,16 91:19
92:3,5,10

93:15,16 114:8
167:6,10
180:16 191:11
**breaking** 114:8
191:15
**breaks** 8:21
**brianna** 1:5 6:7
**brief** 167:10
202:3
**bring** 9:4,6
166:7 192:7
**brings** 136:11
192:13
**broad** 11:7
21:3 28:8 62:3
**broader** 20:4
77:17
**broadly** 32:12
95:16
**broken** 189:2
**brooks** 3:12
7:10,10 10:7
12:15 14:15
21:11 30:3
44:1 45:3 46:9
46:18,21 53:1
55:3 57:13
65:12 66:18
69:8 73:14
78:22 79:7
86:1,9,11 88:4
88:14 89:9
90:6 91:18
92:1,4,8,11,16
93:17,20 94:11
95:13 98:5,11
99:16 100:21
101:3,15,17,21

102:9 103:6,18
104:3,5 109:11
110:19 111:9
113:21 114:7
114:11,13,21
115:19 116:5
116:12 120:1
122:13 127:1
128:10 129:3
132:6,13,21
133:8 134:14
134:20 139:1
140:1,8,17
148:2,20
154:11,16
160:15 162:18
163:3,14
164:12,22
167:3,11,14
169:14 177:17
182:1 185:8
195:9 206:22
207:13,19
208:2,14,18
209:2,8
**brought** 67:16

**c**

**c** 3:1 6:1
**call** 53:17
58:21 59:2
88:18 89:3
152:10 154:18
172:21
**called** 7:18
14:9 22:10
25:14 28:17
31:13 42:19

45:6 49:8 59:7
59:12,13 68:13
69:14,17 82:18
117:4,8 120:13
207:9
**calls** 30:3 195:9
199:20
**campaigns**
172:20
**cancel** 77:9
172:11
**cancelled** 168:8
168:18 169:8
170:2,4
**cancelling**
168:19
**cancer** 67:8
139:18
**cancers** 113:9
**candid** 158:19
**canter** 119:15
**cantor** 103:11
104:21 105:7
106:3,14 107:5
108:21 109:9
109:15 111:17
112:5 113:14
113:18 114:5
115:15 116:10
117:12 118:16
118:17,18
121:6,18 122:1
123:3 124:1
136:8,22 137:8
147:11,21
148:11,22
149:1,11
156:21 157:11

157:14,20
159:9,18 179:6
186:14 187:13
193:8 194:6
204:2
**cantor's** 105:20
121:14 124:9
**capable** 144:8
185:5 190:6
**capacity** 1:12
6:9 62:6,9
72:22 176:21
196:3
**cardiovascular**
113:8 139:17
**care** 13:22 14:2
14:4,16 26:16
38:8,10 39:20
39:20,21,22
40:15,20,20
47:9 48:20
49:14 51:20
54:13 55:17,21
56:1,4,6 60:4
62:18 64:3
66:22 67:7
68:2 116:16
117:18 129:1
130:8 132:5,11
132:20 133:7
135:16 136:6
139:6,20,22
140:15 149:22
150:13,17
151:11 154:22
155:20 160:8
162:2,5 164:10
165:13 166:20

168:13 170:18
172:4 174:13
175:10 176:2
177:6 178:11
178:16 184:14
185:2 188:18
193:1,18
194:20 195:7
196:6 200:18
206:16
**cared**  20:11
67:2
**career**  173:7
**carefully**  174:9
**caring**  39:3
48:17 49:12
**carolina**  6:11
18:19
**carried**  28:17
57:5,17
**carry**  138:3
**case**  1:7 8:16
9:15,17 10:11
12:21 16:8,18
17:4 29:8 30:6
35:7 40:12
59:18,20,22,22
60:2,4 61:6
62:4,22 63:9
63:13 64:11
65:21,22 72:8
77:4 86:21
87:2,5,6 89:15
91:4,8,11
92:18,19 98:13
98:15 99:14,15
100:12 101:19
102:14 103:15

104:8,12 117:5
118:7 127:4
128:14,15,21
133:11 144:1,6
146:6,7 153:19
154:5 156:10
158:10 160:1
170:22 174:6
174:20 175:9
177:19 189:20
190:3,14 191:5
192:9 194:4,22
204:19 206:6
207:10,12,16
208:1 209:18
**cases**  29:6 30:7
35:21 61:7
62:5 63:1
74:14 86:5
100:5,7 104:4
104:10 152:19
152:20 172:13
190:8 191:5,9
**cass**  174:1
**cast**  131:21
**category**  54:8
147:17
**catholic**  68:11
**causes**  27:8
**causing**  53:16
54:3
**center**  34:4,7,8
34:13,15 35:11
36:15,17,21
47:10,15,16
48:5,14 51:7
51:10 54:10
55:8 77:16

99:10 166:21
**central**  70:20
71:9 100:13
**certain**  8:12
43:11 44:5
52:16 79:20
85:15 104:9
112:7 160:19
180:12 194:12
200:2 202:20
203:2 207:14
**certainly**  22:12
28:22 86:12
95:21 108:1
146:18 175:22
**certainty**  52:2
133:19 192:12
**certificate**
210:1 211:1
**certified**  6:19
**certify**  210:4
211:2
**chair**  171:2
**challenge**
50:18 189:10
**challenges**  39:7
**challenging**
40:7
**chance**  175:14
**change**  134:1
204:12
**changes**  16:12
16:14 17:12,14
**changing**  12:19
**chapel**  17:17
17:19 18:17,19
**chapter**  12:9
75:1 198:5

**character**
176:10
**characteristic**
57:7 196:18
**characteristic...**
27:8 49:13
72:12 142:1
204:15
**characteristics**
10:22 14:8
15:1 32:3,4,11
32:13 37:21
55:14 90:16,22
97:11 112:19
137:14 144:3,5
144:6 145:3,11
145:13 146:4,6
146:9 191:21
204:13
**characterizati...**
102:10 169:10
**characterize**
154:21
**characterized**
27:1
**chart**  60:10
**check**  79:11
182:2
**checking**  33:18
**chen**  116:20
118:2,14
**chen's**  118:17
**chicago**  26:3,6
34:9 35:14
39:11,14 47:17
48:1,11 55:17
57:22 58:3,18
59:1 76:15,18

78:2 169:17
173:15 179:22
**child** 153:11
188:8,14
191:22 200:13
200:16,20
201:2
**child's** 153:5
191:11 200:9
201:16,19,20
**children** 26:16
51:14,15 54:17
62:18 63:2
109:1 151:11
152:16,18,19
153:5,17,22
154:2,4,7
155:9 192:16
197:14 199:12
199:22 200:19
201:14
**children's**
152:21 153:2
188:18
**childress** 175:3
189:13
**chime** 209:16
**choice** 24:22,22
62:7 188:13,18
**choices** 49:15
**choose** 18:21
24:20 26:20
**chose** 19:18
32:1,2,3 48:10
**christ** 48:17
**christian** 34:3
34:7 47:10,14
47:16 48:4

49:5,8,14,16
49:21 51:6,10
53:20 54:10
55:7 64:21,22
65:15,16,20
66:2,5,11
68:10
**christianity**
48:19 54:1
64:6,12,14
66:9
**christians**
51:16
**christopher** 2:6
6:3 80:12
210:2,20
**chronic** 56:17
**church** 65:2,5
65:6,11,16,17
**circumstances**
63:21
**citation** 127:9
**citations** 149:6
**cite** 10:6 12:9
118:14,20,22
121:14,18
138:6 141:20
**cited** 105:13,15
105:17,19
111:18 113:19
116:14,20
138:15,17
147:19,20,20
204:1
**city** 48:7
**civil** 3:5,6 71:2
76:22 77:8

**claim** 131:18
136:11
**claimed** 104:22
118:3
**clarification**
156:19
**clarify** 117:7
135:2 151:18
160:6 183:3
192:19 199:11
**clarifying**
94:21 202:11
206:4
**class** 18:5,9
**classes** 18:9
**classic** 140:9
**clear** 67:1
107:3 134:7
151:22 164:22
170:20 177:11
183:10 197:10
**clearly** 85:13
136:9 170:21
**client** 86:10
101:11,19
**clinic** 42:19
47:12 48:20
52:21 54:15
56:7,9,13
139:6,14,19
**clinical** 11:13
11:16 24:2,4
24:15,21 25:3
25:5 26:9,13
27:4 30:10,14
30:19 31:16
32:14 33:21
34:1,6,16,20

35:11 36:1,4
36:21 37:22
39:2,6 40:8
41:12,21 44:18
44:19 47:7,8
47:11 58:19
59:5,8,16,17
59:20 60:2,4
61:3,5 66:14
66:16 68:2
70:20 72:9
76:14 77:1,16
84:11,22 86:20
99:11 128:6
142:12 146:19
154:14,18
155:2,5,6,8,11
158:1 175:3
176:18 180:11
181:11,15,17
182:19 183:8
183:19 184:5
188:21 200:1
**clinically** 25:15
39:18
**clinician** 31:14
31:17,18,19
**clinicians** 59:4
69:21 157:21
161:14 177:12
178:22 179:15
180:3
**closed** 171:19
174:2
**coast** 91:21
**coded** 25:15
**cognitive** 72:22
190:5 195:19

196:4
**cohort** 38:16
124:15 125:1
**colleagues** 64:9
165:16,20
172:22 182:3
197:8
**collecting**
118:6
**collection** 11:6
**college** 68:12
**collegial**
104:14
**come** 66:20
77:15 87:2
112:19 171:8
177:2 180:18
190:19 194:10
198:14,16
202:21
**comes** 27:2
80:4 109:22
112:11
**comfortable**
86:13
**coming** 192:6
**comma** 156:17
**comment**
185:11
**commenting**
77:7
**comminuted**
189:3
**commissioned**
139:9
**commit** 19:12
**commitment**
54:3

**commitments**
32:8 71:5
**committed**
50:6 51:18
70:19 71:2
165:21
**committee**
58:22 59:3,7
156:22 157:7
**common** 49:5
**commonly**
156:6
**communicati...**
101:5,12,22
102:4,7,11
**communities**
32:5
**community**
34:8 76:18
77:17 171:15
175:5,8 177:11
177:12 178:22
179:1
**compared**
126:4
**compensate**
158:21
**competitive**
30:20
**complaint**
205:8,13
**complaints**
56:13
**complete** 17:21
18:13 21:22
207:11,14
**completed**
22:17 23:11

24:1,3 25:7
26:2,4 30:9,13
34:13,17 35:15
36:21 38:3,10
41:2,3,7,16,18
207:21
**completing**
37:18
**complex** 19:1
27:11
**compound**
55:3 113:21
**comprehend**
194:16 196:10
**comprehensive**
56:22 107:22
**comprehensi...**
26:21
**computer**
110:20
**concede** 156:11
**conceding**
80:22
**concept** 71:9
71:10 73:19
151:8,11,13
154:5
**concepts** 35:21
**concern** 72:4,4
166:6,8 170:21
173:22 201:14
**concerned**
170:7,11 174:4
**concerns** 25:17
25:20 55:10,13
56:14 76:9
77:5,10 161:12
161:16 164:17

164:20,21
165:13 166:14
171:22 172:12
173:18
**concession**
190:13
**conclude**
126:13 128:22
130:7,10
**concluded**
129:4 130:13
139:11,14
147:4 192:22
209:22
**concludes**
208:10
**concluding**
207:8
**conclusion**
107:6 109:16
121:14 147:5
147:10 150:3
157:2 184:4
192:6 194:9
**conclusions**
125:13 156:21
157:15 161:2
190:18 194:8
208:1
**condemn**
174:18
**condition**
12:12 13:1
29:5 49:8 55:7
128:7,21 131:2
146:3
**conditional**
107:1

conditions  22:5
22:7,13 26:10
27:15,17,20,21
28:1,3,5,12
56:16,17 155:3
190:3 194:12
195:6 204:18
conducive
153:10
conduct  27:18
38:5 107:4
113:16 178:14
conducted
98:17 136:19
149:12 178:6
196:11,16,22
197:1
conducting
96:5,14 106:20
108:3
conference
42:22 43:2,5
43:14,19 45:19
60:2 61:6
76:14
conferences
41:19 42:1,6
42:12,17 44:12
44:15 45:1
75:9,14,15
180:1
confident  58:6
196:8
confidential
165:19
confirm  120:7
125:2 129:21

conflict  158:6,7
158:18,22
159:13 160:4
160:20,21
201:8
conflicts
156:21 157:3,6
157:12,18
158:13,17
159:3,6,6,10
159:17
conformity
172:11
confounding
134:1
confusing
36:14 206:6
confusion
199:17
congruence
25:21 88:1
conscious  19:2
194:3
consciously
35:18 59:2
151:6 206:17
consent  73:18
73:20,22 83:16
153:14,20,22
154:4,6 187:21
189:8,16,19
190:6 191:6
192:18 195:14
196:12,19
197:3,4,14
199:7,9,10
consequences
135:21 139:16

173:10
consider  28:20
91:4 97:5,7,12
97:14,17,19,21
98:3 101:1
106:13 108:8
121:10 136:3,3
136:4 152:18
175:13 176:21
178:10 186:12
187:21
considered
100:17 110:11
121:4 142:9
186:15 188:22
considering
71:11 81:1
183:19 184:5
consistent  21:5
21:8 50:20
53:9 59:6
62:20 63:14
68:17 78:11,12
91:14 92:21
constituent
20:1
constitute  7:4
consult  58:17
58:20 59:1,4,8
59:10,12,13,15
60:14 61:4,10
61:12,14,18,20
64:16 65:18
consultant
67:16
consultation
60:9

consults  61:11
cont'd  5:1
contact  130:22
contacts
130:18
contend  68:16
contending
101:18
context  11:12
11:15 12:17
14:22 23:8
28:12 39:2
44:19 47:13
57:5 70:15,16
71:16 93:8,10
93:11 94:21
141:14,14
142:13,15
165:18
continued
47:13 109:21
130:22 131:7
continues
31:18
continuing
41:1,6,11
67:19
continuity
47:12
contradict
66:11 74:18
83:18 90:18
91:15 172:13
188:11 191:19
201:20 203:15
contradicting
83:20

**contradiction**
203:19
**contradicts**
66:2,7 90:15
131:18 138:1
154:3 160:17
191:7
**contrary** 90:3
90:10
**contrast** 40:10
**contributors**
27:10
**control** 183:14
**controlled**
187:19 188:3,7
188:19 189:1
**controls** 126:4
**controversial**
96:7,17,19
97:6,13,16,18
97:19,21,22
98:4 178:8,11
**controversy**
96:22
**convenient**
167:6
**conversation**
99:17,19
**conviction**
80:15
**cook** 47:18
**cooperation**
201:5
**copy** 9:8,10,14
9:16 15:11,14
16:3,5,6,12,17
17:4,5 78:14
78:18 79:1,3

79:14,15,16,19
79:21 80:4
209:12,16
**cord** 188:8,15
**corners** 173:4
198:21
**corollaries**
40:18
**corollary** 73:16
**correct** 9:14
13:13 17:9,10
17:17 18:17
26:3 29:17
30:11 33:14,18
37:6,7 38:9
47:10 55:18
57:20 64:21
67:14,15 79:12
79:16 81:5
93:6,7 94:12
94:13,19 96:8
96:17,18
100:18 105:3
105:16 109:6
110:11,12
115:15 116:19
117:15 119:13
120:9 121:3,17
121:20,22
124:9 125:3,4
126:15 129:2
129:19,20
132:1 135:16
137:4 138:22
143:6 145:17
145:22 146:12
147:7,8,19
149:9,22 150:1

151:19 153:20
157:1 161:17
161:20 162:2
162:10,21
168:9,10
169:18,20
171:7,10,15
175:3 177:16
178:8,11
179:16 181:13
183:20 187:10
187:22 194:17
201:9 203:5,6
203:9 204:20
204:21
**correction**
177:22
**correctly**
129:14 151:17
153:2 163:13
**corruption**
51:8
**counsel** 3:21
7:6,22 46:9,15
65:19 78:22
91:18 102:1
110:19 140:8
167:3 182:1
210:11,14
211:7,10
**counteracts**
138:1
**countervailing**
190:10
**countries**
190:18
**county** 47:18

**couple** 8:15
15:9 34:10,11
47:7 50:8
68:15 73:15
75:13 198:3
206:19
**course** 22:21
32:7 41:20
65:19 80:14
161:1 173:22
180:5 187:5
194:9 203:10
**courses** 22:8,11
23:16,17,20
41:10,11
**coursework**
17:21 18:1,13
18:14 21:21,22
22:2,4,6,12,12
22:14,17,19
23:1,10,13,14
31:9 41:14
**court** 1:1
102:17 127:11
**covered** 101:10
**credentials**
106:13
**criminalized**
134:13 135:6
162:6
**criteria** 195:13
**critical** 168:20
168:22
**criticism** 154:9
154:13
**cross** 13:19
14:12,22 15:6
43:8 44:5 54:6

58:13,14 66:4
67:9 87:2
91:13 97:15
137:12 138:20
142:5,14 145:7
182:20
**cruz** 186:3
**crystal** 183:10
**cs6629188** 1:22
**culin** 166:13
**culminate**
32:16
**culminated**
32:18
**culture** 26:22
77:9 172:11
**curlin** 2:1 6:7
7:17 8:4 16:3
47:6 79:4,11
94:9 102:20
115:9 119:17
119:18 120:22
127:5,19
140:14 151:16
165:8 168:2
181:6 186:8
207:8 208:9,12
**curlin's** 4:7,8
15:11 16:17
**current** 113:4
**currently**
105:2 175:21
207:18
**customary**
42:5 52:13
106:19
**cut** 205:11

**cv** 1:8 4:7 9:7
9:10,14,17
15:9,11,15
16:4,7,12
17:12,15 32:20
33:9,13 34:1
42:3,4,5 46:2
55:21 58:16
75:15,18 78:3
197:5
**cynthia** 3:21
186:3

**d**

**d** 4:1 6:1
**d.c.** 3:7
**danish** 124:14
124:22
**data** 59:17
108:3,4 118:6
154:20 161:7
176:22
**date** 2:2 33:10
126:6 129:9
171:8
**dated** 205:14
205:15 210:17
211:13
**dawned** 39:2
**day** 43:2
168:18
**de** 119:3
**deal** 80:6
159:15
**deals** 40:8
**dean** 170:6,7
171:2

**death** 53:16,17
54:3
**debate** 71:3
**december**
100:2
**decided** 138:19
**decidedly**
152:4
**decides** 102:17
**deciding**
106:14 196:5
**decision** 47:21
62:8 72:7,22
139:6 151:5
152:3 200:10
200:12
**decisions** 32:9
40:8 62:15
72:9 153:3
199:15 200:1
**decline** 53:11
**declined**
126:14
**declining** 184:1
**decrease** 126:6
129:9
**decreased**
125:22 128:2
**dedicated** 45:1
**deeply** 151:14
**defect** 202:12
**defendants**
1:15 3:11 7:12
103:3
**defending** 3:13
7:11
**defense** 209:2

**defer** 59:7
179:15
**define** 10:19,20
13:16,17 14:3
31:15 39:15
50:12 70:17,18
96:19 175:8
198:4
**defined** 40:3
**definitely**
27:22
**definition** 11:3
12:7,11 13:4,5
50:9 175:5
**definitively**
130:21 131:3
**degree** 17:16
17:18 22:9
82:4
**degrees** 153:14
**dela** 186:3
**delaying**
135:21
**delivery** 209:7
**demand** 74:1
83:17
**demands** 20:4
95:2
**demonstrating**
150:14
**denmark** 108:3
125:16 147:13
147:15
**denomination**
65:1
**dental** 68:11
**deny** 74:6,10
74:12

denying   135:21
department
   3:5 171:3
depend   128:20
dependence
   137:3,10
dependent
   112:7 113:9
   190:2
depends   25:18
   74:3 100:1
   108:10 111:11
   133:15 135:7
   144:15 200:11
deposition   2:1
   6:6 7:2 8:7,14
   8:20 9:5 10:2,8
   10:13,17 13:2
   13:9 80:3
   102:15 150:7
   152:7 210:1
depression
   4:19 56:18
   122:7
describe   20:22
   28:6,8 30:2,17
   35:10 38:13
   43:4 58:16
   61:2 77:1 78:7
   81:8 82:11
   84:18 98:14
   115:17 141:18
   146:2 150:2
   152:6 161:16
   181:21 182:12
   198:15 199:10
described
   12:13 13:1

21:20 28:21
29:22 40:4
45:11 49:22
55:22 66:8,8
84:13 87:13
97:18 124:8
136:8 146:14
147:18 149:1
193:10,13
194:6
describing
   123:4 128:14
   128:15
description   4:6
   5:2 59:21
   106:17 107:1
   109:12 112:6
   115:20 118:18
   121:6 122:2
   123:3 149:11
   158:11 159:18
   175:3 190:13
   193:9,12
descriptions
   103:10,13
   106:3 115:13
   142:20 144:15
   144:22 145:1
   157:10,10,19
   159:8
descriptor
   185:15
deserve   49:10
designed   37:14
   38:5,14 187:19
desire   137:13
desires   88:21
   198:22

despite   29:15
detail   10:5
   18:11 98:15
   130:4
detailed   30:6
details   18:3
   22:3 34:18
   43:9 52:12
   61:15 62:4
   76:5 92:18
   118:13 125:7
   125:11 127:22
   136:3 182:16
   195:16 209:9
determination
   150:17,20
   151:7 152:4,8
   154:2,6 155:22
   197:22
determine
   133:13
determined
   203:4
detransitioners
   76:22
develop   109:3
   145:4
developed
   35:18 157:17
   185:1
developing
   30:22 39:13
   145:5 158:1,5
development
   90:16 92:22
   93:2 109:4
   111:21 112:2,7
   112:11,14,18

113:5,7 138:2
145:11 160:13
190:4 191:20
191:21
develops   39:17
deviations
   141:21
devoted   48:8
   82:20
diabetes   56:19
diagnose   28:3
   28:4 55:6
diagnosed
   28:15 125:17
diagnosing
   22:5,6,13
   23:12 98:18
diagnosis   23:14
   25:12 28:17
   29:19,21 30:1
   55:1 57:3,5,17
   58:11 97:5,7,8
   97:13 124:14
   124:22 144:8
   176:13
diagnostic
   143:3
dialogue   61:7
   178:21
dictating   52:16
differ   40:1
difference
   14:13 95:18,20
   177:20
differences
   32:13 64:1,3
different   23:6,6
   29:3,16 34:2

62:16 63:20
67:14 73:7
81:2 110:2
114:10 136:19
189:14,17,18
198:7 203:12
204:10 209:15
**differently**
80:1 89:11
**differs** 85:11
**difficult** 39:18
40:5 173:5
**difficulties**
172:9
**digital** 210:8
211:3
**dignity** 49:6
**dilemmas**
166:20
**dimensions**
38:18
**diminished**
20:19 62:6
173:9
**diminishing**
39:19
**diminishment**
202:12
**direct** 46:7
68:2 157:17
**directed** 204:6
204:7 209:17
**directly** 36:4
68:20 100:10
105:10 106:6
119:19 122:22
123:1 124:2
160:17 187:11

203:18 204:7
204:12
**disagree** 21:18
21:20 102:9
190:17
**disagreeing**
202:19
**disagreement**
108:18
**disagreements**
85:13 89:17
97:3
**disagrees** 79:5
**discern** 29:9
50:20 70:21
89:16
**discipline** 26:8
39:13
**disclosed**
160:21
**discomfort**
97:9
**discontinue**
139:21
**discourse**
76:22 77:8
**discrimination**
63:22 64:1,2
**discuss** 46:8
156:20
**discussed**
23:19 41:3,7
41:16 43:5,7
66:14
**discussion**
22:18 23:11,21
43:10 60:6
166:19 176:5

176:15
**discussions**
43:11 44:17
45:1
**disease** 56:21
139:17 141:13
**disorder**
141:13 142:3
143:3,5,9,11
143:12,13,15
143:17,22
144:1,4 145:16
145:22 146:2
**disordered**
29:12 146:12
146:15,16
**disorders**
56:20,21 143:4
143:18,20,21
**dispassionate**
161:7
**dispense** 8:17
**displayed**
28:19 55:2
**displaying**
66:15
**disposed**
176:20
**disproportio...**
191:17
**dispute** 108:18
163:17
**disputed** 105:3
108:17
**disqualify**
158:14
**dissent** 171:14

**distinction**
56:2,3 202:8
**distinguish**
107:17
**distinguishing**
51:19
**distract** 170:8
170:14
**distress** 25:20
88:1 97:9
203:3
**distributed**
31:5
**district** 1:1,2
**diverse** 28:9
**division** 1:3 3:5
**doctor** 161:5
191:10
**doctor's** 149:20
155:12,18
**doctors** 152:17
176:12 200:18
**document**
117:13 120:2
182:3,5,14
183:3,5,6
184:8,8 185:15
**documented**
121:15
**documenting**
161:12
**documents** 9:4
9:6,19,21 10:6
106:6 147:19
181:20,21
182:12 184:3
**dog** 171:19

Farr Curlin                                                    April 8, 2024

**doing** 44:4 55:9
85:5 172:10
194:12
**doj** 3:20
**doors** 161:2
174:3
**dorothy** 76:13
**dosage** 127:21
**doubt** 87:8
131:22
**doubtful** 87:1,8
91:13 92:21
195:2
**doubtfulness**
87:10
**downloaded**
78:14,19 79:8
79:14,19,21,22
**dr** 4:7,8 6:6
7:17 8:4 15:11
16:3,17 47:6
79:4,11 94:9
102:20 104:14
105:20 106:11
106:12 111:17
111:17 112:5
113:14,14
115:9 119:15
119:17,18
120:22 121:14
121:18 123:22
124:1,9 127:5
127:19 136:8
140:14 151:16
165:8 168:2
174:1 181:6
186:8 187:13
207:8 208:9,12

**drafted** 183:4
197:11
**drafting** 120:8
186:12
**draw** 59:18
64:6,9 107:6
109:15 125:13
202:8 207:22
**drawn** 48:1
110:6
**dropped**
110:20
**drs** 103:11
104:21 105:6
106:13 107:5
108:21 109:9
109:14 113:18
114:5 115:14
116:10 117:12
136:22 137:8
156:20 186:13
187:12 204:2
**drug** 137:22
**drugs** 13:19
15:6 142:9
204:5
**dsm** 12:8 13:1
143:4,9,11
146:17
**duke** 42:20
44:10 45:8,9
99:11 167:1
173:12,13
180:1
**duly** 7:18
187:21 192:17
210:5

**durham** 2:5
6:10
**dysfunction**
56:19
**dysphoria**
10:18,19,20,20
11:2,4,5,9,22
12:4,8,13,20
12:22 13:8,20
23:12,15,21
25:12,14 28:15
28:18,21 29:19
29:21 42:8,13
43:7,18,22
44:13,21 45:18
54:7 55:2 57:3
57:5,7,11,12
57:18 58:5,9
58:12 64:17
66:5,16 67:22
74:21 75:6,8
75:10,12 85:22
87:4 88:12
90:5 91:9
92:15 97:6,8
97:16 98:18
100:9,11
117:14 119:22
125:17 143:8
143:10,22
144:9,14,20
145:8,16,21
149:4 204:8,8
204:9,10,12,14
**dysphoric**
138:21 140:4,6

**e**

**e** 3:1,1 4:1,5
5:1 6:1,1
163:14,14
**earlier** 70:16
110:7 169:16
198:2 199:12
**early** 173:6
**east** 91:21
**economic** 49:3
**edition** 94:12
**education** 38:8
38:11 41:2,6
41:10,11 95:15
**educators** 21:8
21:12
**effect** 113:4
134:15 136:1
169:1 203:16
203:17
**effective** 118:5
118:9
**effectively** 31:2
31:6 63:22
151:8 152:13
174:4
**effectiveness**
119:21
**effects** 138:4
192:13 193:12
**efficacious**
117:19,22
**efficacy** 116:16
117:13 135:15
149:3 150:15
151:14

either   9:10
  14:11 62:19
  100:21 110:9
  205:3,22
elaborate
  19:20 89:8
  201:11
elective   53:18
electives   22:10
  22:15
elevated   126:2
  128:4
email   172:20
  185:22
emailed   209:16
emblematic
  89:2
embraced
  64:13
embraces
  66:10
embracing
  95:6
emerge   36:1,4
emerged   33:4,5
  33:5 59:15
  60:5
emerging
  64:12
eminent   133:18
  202:7
emotional
  190:5 195:19
  196:3,4
emphasis   35:22
  49:11 155:21
  156:2

emphasize   59:3
  72:14 82:4
  150:18 197:20
emphasizing
  198:17
empirical
  37:16 96:6,15
  98:17,20 178:6
  178:14 196:14
  196:22
empirically
  32:13
employed
  210:11,14
  211:8,11
employee
  210:13 211:10
employment
  44:9 166:9
encompasses
  31:1
encounter   58:4
encounters
  66:15 67:21
encourage
  140:10
encouragement
  32:10
ended   81:18
endnotes
  124:16
endocrine
  148:14,19
  149:1,5
endorsed   64:13
enduring   54:2
enforcement
  3:6

england   108:2
  116:21 147:13
  147:16 179:7
english   148:5
enjoy   19:10
enjoyed   19:8
  39:6,7
ensure   105:21
  161:1
entailed   30:18
enthusiastic
  133:3 180:7
entire   79:1,3,6
  89:14
entitled   73:13
  124:12
environmental
  36:3
epidemiology
  31:4
equip   37:14
equipoise
  175:3 176:18
  179:16 180:11
erectile   56:18
es   210:4
especially
  113:6 164:2
  204:20
esquire   3:4,12
essays   172:7,17
essentially
  26:14
establish   88:21
  204:18
established
  205:3,21

estrogen
  182:20 183:14
et   1:5,14 3:11
  6:7 116:20
ethical   12:4
  39:7 45:14
  59:6,18,20
  64:9 66:7 76:9
  77:5 82:20
  87:11 99:6
  100:13 108:15
  152:2 172:14
  181:12 183:16
  199:20
ethically   66:1
  74:10,12 192:3
  194:3
ethicist   12:2
ethicists   95:22
  165:11
ethics   20:4
  31:5 34:13,16
  34:20,22 35:12
  35:17 36:3,8
  36:22 37:3
  44:19 51:1
  58:16,19,22
  59:8,12,14,16
  60:2 61:3,6,18
  61:20 71:10,15
  73:21 75:1
  76:14,19 77:1
  77:14,16,22
  80:13,17 82:10
  82:19 83:21
  85:8,13 89:13
  89:17,19,21
  92:22 95:2,16

95:16,18 99:11
106:19 150:16
151:4,5 152:11
157:13 179:22
180:2 197:2
198:12
**euphemism**
14:4,16
**evaluate**
194:16
**evaluation**
106:21
**events** 69:4
170:9
**eventually** 33:6
**evidence** 107:5
115:21 121:7
128:17 132:14
133:9,17
135:15,18
136:8,22 137:6
137:7 139:9
140:18 147:4,5
149:2 150:14
151:14 175:13
176:11 180:4
184:18 185:9
190:10,19
191:2 193:8
194:5,8 195:2
**evident** 171:13
**evidentiary** 7:1
**exact** 148:4
**exactly** 48:15
99:20 136:15
170:19
**examination**
4:2 8:2

**examine** 185:1
**examined** 7:20
**example** 14:5
21:17,19 42:18
49:18 51:3,7
57:1 89:21
95:6 110:3
158:21 159:22
188:22 190:7
196:17
**examples** 53:13
56:15 57:1
61:22 62:2
64:4
**excellence**
31:12 48:18
**excellent** 17:11
93:19 114:15
167:12
**except** 25:8
31:2 51:19
85:4,17 126:17
148:5 154:7
184:6 186:13
194:12 200:2
**exceptionally**
137:19
**exclude** 175:22
**exemplars**
27:13
**exercise** 72:6
149:20 155:12
155:19
**exhibit** 4:7,8,9
4:10,13,17 5:3
5:8,9,13 15:11
15:12,20 16:1
16:8,13,19,20

17:6 78:15,19
78:20 79:1
119:2,6 120:12
120:16 122:5
122:10 123:9
123:13 162:17
162:20 163:1,4
163:21 185:14
185:19 186:6
186:18,19
187:1 207:10
**exhibited** 87:22
**exist** 155:2
156:22 204:19
**existed** 157:6
**exists** 158:7
**expanded**
181:10 183:19
**expanding**
184:5
**expansion**
183:8
**expect** 128:19
190:11
**expected**
145:12 146:8
158:9 189:6
**experience**
19:10 27:3
29:16 40:4
83:12 128:6
179:20,21
180:13
**experienced**
10:21
**experiences**
27:11 32:4

**experiencing**
28:10 88:12
90:5 97:9
202:13 203:3
**experiment**
191:12
**expert** 4:8
16:18 45:12
66:9 86:22
99:18 100:4,6
101:18,22
104:13 107:10
115:14 158:15
179:8
**expertise** 39:17
60:7 107:17
158:16 160:19
176:8
**expertly** 37:16
84:7
**experts** 108:1,8
108:13 136:19
144:22 147:12
158:5 159:16
161:14 164:3,5
164:5 177:13
190:17 194:10
204:17,22
205:5,21
**explain** 11:3
14:13 152:5
**explicitly** 157:9
193:5
**express** 25:20
55:10 172:18
**expressed** 29:8
55:13 57:6,11
132:17 165:12

166:6 169:11
173:17 174:2
199:6
**expressing**
172:1,4
**expression**
138:2 151:2
156:18 171:13
**extensive**
139:12,15
**extent** 41:9
85:12 133:15
141:17 176:22
**extra** 49:18
**extreme** 87:22

**f**

**face** 59:5
**faced** 64:5,8
**faces** 200:13
**facilitate** 63:17
112:18
**facing** 39:5
62:11
**fact** 52:5 71:21
83:13,13 84:10
93:1 110:1
121:19 131:7
137:12 140:3
143:2 154:5
158:15 160:16
162:8 189:21
194:11 200:16
**factors** 134:1
135:8
**facts** 60:8 87:6
132:14 133:8
140:17 185:8

**faculty** 33:12
35:16 45:13,19
45:20 60:1
77:15 99:10
166:18,21
179:22
**failure** 109:3
**fair** 81:4 84:11
87:7 95:11
120:5 148:12
164:9 165:4
180:9 184:16
186:11
**fairly** 86:8
**fall** 45:14 54:7
99:21 182:13
**false** 128:13
**familiar** 11:8
11:11,13,21
12:7,10 68:3,5
122:19 195:20
**families** 62:19
194:1
**family** 20:11
24:17 61:10
171:3 190:16
200:18
**far** 47:17 50:8
66:11 107:2,9
165:2 184:18
**farr** 2:1 6:6
7:17 8:4
166:12
**fashion** 172:21
**father** 19:6
20:10
**fatigue** 56:18

**favor** 43:21
**fda** 181:11,18
182:17,18,22
183:1,4,7,11
183:13 184:4
**fda's** 183:12
**fear** 77:9
165:12 171:13
171:20 172:2,3
172:16
**feature** 32:9
**features** 29:1
190:1
**february**
205:14,15
**federally** 34:8
**feel** 86:13,14
**feeling** 11:5,7
97:9
**fellow** 33:12
34:5
**fellows** 35:16
59:16 76:14
77:15
**fellowship**
30:12 32:6,7
33:5,6,20,22
34:12,14 35:9
35:12,15 36:5
36:7,19,22
37:4 48:12
76:16
**fellowships**
30:8
**felt** 172:3
**female** 5:16
67:4 87:15,17
90:18 113:6

142:15 185:5
186:21
**females** 142:19
**fertility** 185:6
**fertilization**
5:9 185:16
**fiance** 48:5
**fiduciary**
149:21 152:17
155:19 191:8
**field** 19:11
35:17,20 36:8
39:9 152:10
157:22 158:2
196:18
**fields** 197:2
**files** 79:8
125:10
**financed** 40:16
**financial** 157:3
157:6,17
**financially**
158:11 210:15
211:11
**find** 49:13 97:3
142:1 157:14
173:2,5,8
**finding** 19:2
**fine** 8:13 16:11
17:8 114:19
115:1 206:22
209:17
**finish** 92:6
**finished** 206:18
208:13
**finland** 108:2
147:13,16
148:9 179:8

Farr Curlin

April 8, 2024

**first**  7:18 10:18
11:10 17:15
24:8,14,21
29:9 30:9,12
32:7 33:8
34:11,19 35:15
39:1,10 75:21
78:17 119:12
123:18 126:7
129:10 159:13
163:13,21
186:3 205:12
**five**  46:17,19
93:16,21
206:21
**flourishing**
72:6
**fly**  86:7 136:4
**focus**  32:1,3
35:14,16 36:6
36:7,20 37:1
43:10 45:6,10
56:14 76:2,3
202:6
**focused**  44:20
45:14
**focuses**  26:9
39:18
**folder**  79:7
**folks**  39:12
145:1
**follow**  61:14
71:1 83:13,17
135:4 198:20
198:21
**followed**  5:14
186:20

**following**  18:17
126:12 130:14
185:6
**follows**  7:20
**foregoing**
210:3,4 211:4
**foreseen**  192:8
**form**  28:10
31:21 65:12
69:8,21 149:3
**formal**  41:10
70:13
**formally**
153:22
**formed**  68:15
70:4,5 144:10
**former**  33:7
**forming**  106:5
**forms**  49:3
52:10 155:8
**formulating**
110:9,14
**forth**  170:1
**forthcoming**
158:19
**forward**  50:15
50:17 53:4,5
133:1 201:5
**fostering**  71:2
**found**  19:8
35:4 117:18
125:21 126:3
141:11,12
142:6 169:15
**foundation**
45:13 57:14
86:2 90:7
132:7 174:3

**foundational**
73:20
**founded**
206:10
**founders**  70:9
**founding**  70:7
206:14
**fourth**  25:4
**fractures**  189:3
**fraught**  139:12
139:15
**freedom**  3:13
7:11 153:14
**frequency**
131:12
**frequently**  28:4
44:17
**friebe**  2:6 6:3
210:2,20
**front**  9:11,20
9:21 16:4 17:9
33:10 127:2,6
127:8 162:11
165:1
**full**  106:8
**fully**  19:2
140:16
**function**  113:3
**fundamental**
153:12
**fundamentally**
40:19 81:12
82:14
**funded**  34:8
**further**  10:15
38:2,4,16
110:5 118:21
172:17 185:11

210:13 211:9
**fuss**  165:6
**future**  46:10
86:5

**g**

**g**  6:1
**gain**  31:9
200:20
**gaps**  150:14
**gather**  59:17
**gathered**  45:13
**gathering**
166:18,21
**gatherings**
166:15,16
**gd**  143:2,5
204:19
**gender**  4:12,18
5:4,11 10:18
10:19,20 11:1
11:9,22 12:3,8
12:13,17,20,22
13:8,12,20,22
14:1,4,9,16,19
14:19 15:2
18:5,6 22:18
22:21,22 23:4
23:12,15,21
25:12,14,17,18
28:15,17,21
29:19,21 42:7
42:13,19 43:6
43:17,22 44:12
44:20 45:18
54:7 55:2,11
55:15 57:3,5,7
57:11,12,17

58:5,9,11
64:17 66:5,6
66:16 67:3,22
74:20 75:2,5,7
75:10,11,13,22
76:8 78:8,12
85:22 88:2,12
88:17 90:5,10
90:15,22 91:9
92:15 97:5,7
97:12,16,17
98:10,18,21
100:9,11,14
105:1 108:14
115:22 116:9
116:16 117:14
117:18,21
118:4,9 119:5
119:22 122:6
123:10 124:13
124:21 125:17
125:17,20
126:1,5,7,10
126:12 128:3
129:1,8,10
130:8,15 131:5
132:5,11,17,20
133:3,6 135:11
135:16,18,22
136:6,9 138:21
139:20,22
140:4,5,6,15
142:4,20,21
143:8,10,22
144:9,14,20
145:8,16,21
149:3 151:1
160:4,10 162:2

162:5 164:10
164:16 165:13
168:13,21
170:18 172:4
174:13 175:9
175:14,16
176:2 178:11
178:16 182:21
184:14 185:2
185:17 189:10
190:15,15
193:1,18
194:20 195:7
196:6,10
203:13 206:16
**general** 1:13
6:9 19:6 22:9
38:22 51:11
58:2 182:15
**general's** 104:7
**generally** 21:5
26:16 29:7
31:18 95:22
107:16 128:16
200:2 204:8
**genuine** 52:7
**genuinely**
177:13 179:2,9
198:10
**getting** 63:17
192:15
**give** 38:16 50:9
56:15 61:22
62:2 77:21
86:6 91:3 96:9
98:6 101:15
106:7 107:10
122:13 138:8

145:18 150:10
187:7,20 189:8
189:16 192:16
192:17 195:4
202:5
**given** 86:21
150:16 190:11
193:17,19
**gives** 190:20
**giving** 107:18
168:8 190:6
191:6
**glintborg** 110:1
124:8,19
130:14 136:17
**go** 9:1 10:15
13:7 18:21
29:15 31:16
49:18 50:7
59:12,13 61:4
61:5 90:16
102:10 130:16
149:5 152:5
162:16 208:20
208:21
**goal** 20:22
21:13 59:3
88:21 144:19
145:2,9
**goals** 144:13
145:6 151:1
156:3,5,17
201:9,16,20,20
**god** 49:6
**goes** 41:13
102:3
**going** 8:16
10:17 21:21

34:10 35:9
47:6 86:12
93:14 101:9,15
102:2,14
110:17 114:9
127:11 129:13
133:12 145:3
155:15 161:2
163:5 165:17
167:8 172:15
172:22 180:16
182:3 190:1,2
191:10,11,12
191:16,17
199:5 206:8
209:14
**good** 6:2 8:4
19:13 27:13
35:3 44:5
46:16 49:13
50:2,8,10,13
50:18 51:7
53:6,9 62:20
63:16 69:21
70:17,18,21,22
71:8,9 72:2
74:14 82:15,15
82:16 85:11
89:18,18 91:20
114:10,12
120:7 153:6,15
167:11 174:5
180:20 190:9
194:3 196:8
**goods** 64:10
**gotten** 63:11
**governed** 82:17
151:7

governing
151:10
graduation
170:9,15
grandfather
19:5
granted 180:4
grave 200:12
great 46:11
167:7 192:12
greater 126:18
192:4
green 122:5,17
greenwall
45:13 166:18
174:3
grounded
49:14
group 39:12
55:17 56:6
205:4
groups 141:22
184:22
growing
161:12 164:17
171:14
guess 162:20
guessing 79:10
guidance 99:6
183:1
guide 149:21
155:20 191:7
guided 84:12
84:16
guidelines
148:13,17,18
149:1,8 150:18
154:15,18

155:2,7,8,11
158:1,6 161:4
172:14,14
195:15,17
197:20
guides 95:12
gynecologist
19:7
gynecologists
68:14
gynecology
24:17

h

h 4:5 5:1
half 114:16
167:5,9
hand 7:15
39:11
handled 159:10
handwritten
9:9,12
hang 141:6
206:5
happen 172:17
199:5
happened
108:7 174:5
happening
172:2
happy 162:12
hard 9:8 89:16
harm 113:6
202:7
harmful 193:1
harms 108:22
109:5 112:22
113:1 116:8

137:2 177:2
191:17 192:8
harvard 38:11
hastening
53:16
head 36:14
headline 165:2
heal 189:5
healers 84:10
health 5:6
19:14 20:2,18
20:21 22:5,7
22:13 27:21,22
28:3,4 29:14
31:1 34:3,7,8
39:19 47:10,15
47:16 48:4
50:21 51:7,10
54:10 55:8
82:16,22 83:19
84:6,6,8 90:3
90:10,19 91:14
104:22 109:5
112:22 123:11
124:13,22
125:6 126:4,9
126:14 128:19
128:20 129:7
130:3,18 131:1
131:1,8 133:18
133:22 134:4,5
134:6,8,9,10
135:21 137:3
139:10 140:16
141:13 142:2
143:18 147:2,6
147:22 153:11
153:16 191:7

192:11 193:17
193:20 200:13
201:16,19
202:9,12,15,16
202:20,21
203:4,5,9,14
203:16,17,19
203:22 204:5,7
healthcare
31:5 49:2
126:19 150:21
155:9 156:15
195:18,22
healthy 90:15
91:15 92:22
93:2 109:3
112:18 137:13
137:17,21
138:1 141:11
142:3,8 145:13
146:8 191:20
191:20
heard 48:3
151:21 174:14
hearing 7:13
held 20:5,6
help 29:15
31:10 59:4
69:16 191:12
helpful 52:8
160:17 202:10
helping 39:6
hereto 210:15
211:11
hhs 182:7
hhs0169973...
181:20

Farr Curlin

[hidden - important]

**hidden**  128:12
**higher**  191:14
**highlighted**
  10:9
**highlighting**
  95:9 143:21
**hilary**  174:1
**hill**  17:17,19
  18:17,20
**hippocratic**
  68:4,6,8,17
  69:6,11,14,17
  69:19,20 70:16
  70:18 71:19
  206:9,10,14
**hired**  104:3,6,8
**history**  35:17
  45:21 52:14
  166:22
**hoc**  41:11
**holds**  200:14
**hon**  1:11 3:11
**honorable**  6:8
**honoring**  72:14
**hoops**  61:16
**hope**  180:8
**hoped**  136:10
  191:16 192:10
  193:15
**hopes**  203:16
  204:13
**hormonal**
  138:19 139:11
  139:14
**hormone**  4:18
  5:11 113:9
  122:7 126:5,7
  129:8,10

137:16 141:3
141:16,18,22
142:9,10,11,12
142:17 182:20
185:17
**hormones**  5:4
13:19 14:11,12
14:21,22 15:7
43:8 44:5 54:6
58:13,15 66:4
67:10 87:3
91:13,16 97:15
111:12 112:17
123:10 137:12
138:20 142:4,5
142:14,19
145:7,10
**hospice**  39:20
39:21 40:10,12
40:15,17
**hospital**  57:22
61:19
**hospitalization**
67:20
**hospitals**  51:4
58:3
**host**  192:13
**hot**  166:19
**hour**  61:5
114:16 167:5,9
**housing**  3:6
**hubris**  76:1
**human**  19:9,14
50:18 72:5
78:10 82:15,15
89:14 90:18
111:10 143:19
143:19,20

190:1
**humanities**
  19:10,16 45:20
  166:22
**humanity**  49:5
**humans**  72:5
  87:14,16
**hypercholest...**
  56:20
**hypertension**
  56:19
**hypothetical**
  86:9 88:15

### i

**i.e.**  138:20
**idea**  15:3 50:14
  154:3 191:12
**ideally**  201:18
**ideas**  37:1,2,22
**identification**
  15:13 16:21
  78:21 119:7
  120:17 122:11
  123:14 163:2
  185:20 187:2
**identify**  7:7
  15:2 22:21
**identity**  14:9
  18:5,7 22:18
  22:22 23:4
  25:17,19 55:11
  90:22 151:1
  156:18
**ideological**
  172:11
**ignored**  157:12

**ignores**  201:7
**illness**  27:3
  40:5,9
**illnesses**  27:9
  28:10
**image**  49:6
  96:11
**imagine**  57:8
  86:6 189:20
**immanuel**
  198:9
**immigration**
  49:4
**immoral**  92:13
**impair**  5:15
  186:21
**impaired**  109:3
  111:20 112:1
  112:14
**impartial**
  158:9
**implications**
  108:5 189:7
  194:17
**implies**  12:18
**imply**  73:22
  143:4 144:3
  200:5
**import**  35:21
**importance**
  72:14 150:10
  152:2 155:21
**important**  63:2
  63:4 72:3,18
  73:3,19 76:9
  81:22 94:20
  143:20 158:18
  164:6 172:14

Farr Curlin

April 8, 2024

173:1 195:18
**impose** 191:17
**imposing** 95:7
**impossible**
187:20 199:13
**imprecise**
14:17 44:16
**impression**
118:20 170:13
**improve**
126:11 129:5
164:8 202:16
**improved**
131:5
**improvements**
203:22 204:14
**improves** 147:6
**improving**
162:10 164:2
203:17
**inaccurate**
80:6
**incapable**
111:5
**include** 26:17
27:21 113:2
116:1,8 125:15
127:9 134:9,10
143:18 160:18
175:11,19,20
177:6
**included** 22:12
23:20 51:13
79:21 125:18
136:16 152:16
159:19,20
176:5,15 197:3
197:3

**includes** 25:5
27:22 40:21,21
69:14 75:1
116:6 134:7
136:18
**including**
23:14 38:18
49:3 52:7
68:10 87:11
96:6,15 134:4
154:20 177:2
183:13
**incomplete**
88:14
**incongruence**
125:17
**increase**
127:21
**increased**
113:7 125:22
128:2 139:18
**indefinitely**
137:16
**independent**
106:21 107:4
113:16 121:21
147:2 148:1
149:20 155:12
155:19 157:5
180:10
**independently**
123:2
**indicate** 72:7
111:18 156:12
199:3
**indicated** 16:4
33:21 86:22
184:20

**indicates** 137:1
149:19 155:17
**indication**
128:9 204:5
**individual** 67:9
91:9 92:15
141:15
**individually**
205:3
**individuals**
85:10 125:16
137:17 145:7
157:17 202:14
203:3
**induce** 142:22
145:10
**induced** 142:11
142:14
**induces** 141:3
141:10 142:5
142:17
**inducing**
142:10
**inferior** 177:5
**infertility**
111:13 139:17
**influence** 89:2
198:15
**influenced** 20:8
49:16 88:17
**information**
106:11 187:21
190:9,11
192:16,17
193:17,20
**informed** 73:20
73:22,22 86:14
105:3 107:12

107:13,15,21
108:9,12,15,18
187:22 188:13
188:18 192:18
192:21 195:4
196:12,19
197:3,14 199:7
199:9
**initial** 184:6
**initially** 169:22
**initiate** 140:4,5
**initiated**
138:21
**initiation** 126:5
126:12,14
129:8
**injured** 20:19
**injuries** 84:6,8
**injury** 188:9,15
202:12
**inner** 48:7
**innumerable**
41:20
**inpatient** 28:12
**input** 99:13
**inquiries**
182:18
**insofar** 14:17
20:3,19 37:1
51:19 66:9
71:10 72:4
78:8 84:13,17
85:18 88:19
89:1 90:14
91:15 123:21
126:17 145:12
146:13 157:9
157:11 183:11

| | | | |
|---|---|---|---|
| 186:13 189:18 191:19 198:12 199:8 200:17 202:10 | **intellectually** 19:15 **intended** 6:21 38:2 125:15 169:3,5 | **interpretation** 155:21 184:7 **intervenor** 1:9 3:2 | **investigate** 27:10 **investigative** 161:12 164:13 |
| **instance** 78:3 86:9 107:20 144:18 158:4 165:16 172:6 183:20 188:6 188:17 202:20 | **intends** 116:7 **intense** 161:13 164:18 **intentionally** 111:13 | **intervention** 62:19 63:2 74:2,16 91:2,3 131:19,21 133:19,20 135:3,6 144:19 | **investigator** 31:17,20 **investigator's** 181:19 **investigators** 31:14 180:6 |
| **instances** 98:2 203:2 | **interact** 200:19 **interest** 19:15 35:2 38:20 | 153:6,7,8 158:10 175:17 175:19 176:10 | 182:18 **invitation** 184:1 |
| **institute** 37:5,9 138:7 **institutional** 99:2,4,7,13 181:10 | 152:18,22 157:4,7,12,18 158:6,7,14,17 158:19,22 159:3,6,7,10 | 176:20 177:2,7 180:6,8 188:20 190:1,4 191:3 191:4,6,19 192:7,12 194:1 | **invite** 60:3 **invited** 19:11 77:21 183:22 **involve** 22:5,18 23:11 83:19 |
| **institutions** 38:15 50:16,17 51:8 53:5,6 | 159:14,17 160:5,21 **interested** 31:7 | 200:14 201:1 **interventions** 15:5 78:9 | 102:6 170:17 **involved** 14:18 59:14 60:4,11 |
| **instruct** 86:12 101:3 **instructed** 5:18 102:12 121:22 | 34:19,22 76:18 77:18 210:15 211:12 **interesting** | 81:14,16 83:18 137:4,10 138:3 139:11,15 144:13,17 | 66:22 68:22 69:5,16 72:11 99:15 104:12 108:2 158:1,22 |
| **instructing** 86:10 | 19:15 35:5 **interests** | 145:2 153:15 193:5,10 | 160:13 182:19 **involvement** |
| **instruction** 101:16 103:6 **insufficient** 147:5 | 156:22 161:3 **internal** 24:16 25:9 26:5,7,8 26:20,22 27:1 | **intrinsic** 20:1 85:6 **intrinsically** 19:4 | 69:13 **involves** 27:5 112:16,16 144:2 152:12 |
| **insurance** 40:18,19 160:9 160:12 | 27:13 28:2,5 38:22 54:21,22 56:5 | **introduce** 15:20,22 **introducing** | 152:14 201:5 **involving** 23:18 64:17 158:16 |
| **integrity** 150:20 197:21 | **international** 177:12 194:10 | 35:19 **introduction** | **irb** 180:9 183:19,21 |
| **intellectual** 195:3 | **internist** 47:9 56:1 | 18:2 | **irbs** 179:15,20 179:20,21 |

Farr Curlin

April 8, 2024

180:3

**irreversible**
137:2 139:16

**islam** 64:14

**isolated** 174:4

**issue** 42:7,13
44:12,20 80:5
107:15,19
110:20 148:13
148:16 173:8
174:8 195:16
203:14

**issued** 148:13
148:19 149:8

**issues** 36:1,2
44:18 59:5
100:13 107:19

**it'll** 93:20
173:5

**items** 107:7

**j**

**j** 76:13

**jack** 123:19

**jail** 47:18

**job** 1:22 2:7
166:7 173:9

**johnson** 30:10
30:13,19 34:6

**join** 39:12

**joined** 33:12

**journal** 116:21

**judaism** 64:14

**judgment** 27:5
40:13 62:10
74:16 81:18
82:3 87:2
88:16 92:19

95:3,15 106:8
134:2 146:14
149:21 155:13
155:19 158:9
164:8 175:15
177:3 179:15
180:3,5 189:9
199:2

**judgments**
59:5 70:22
71:1 85:8 95:1
108:5 159:1
199:4

**jump** 61:16

**juncture** 47:18

**june** 170:3

**jurisdiction**
81:16

**justice** 3:5

**justified** 63:22

**justifies** 180:4

**justify** 76:7
104:22 147:5
153:7 194:11

**justifying**
204:19

**k**

**k** 129:16

**kaltiala** 110:2
129:14 136:17
174:1

**kant** 198:9

**karolinska**
138:7

**keep** 36:14
108:11

**keeping** 171:20

**kept** 172:15

**kerfuffle**
170:14

**key** 15:3 35:19
35:20 80:17
154:5 162:10
164:1 176:20

**kidney** 56:21

**kill** 95:6

**kind** 31:10
51:8 63:22
77:3 84:4
90:17 91:4
98:15 107:16
137:22 153:9
170:13 172:10
173:9 176:8
188:20 189:11
189:13 202:11

**kinds** 35:22
160:19 173:10
193:12 204:10

**know** 8:10,22
12:11 17:2
18:1 22:21
25:8 43:8 44:7
46:6 48:16
49:18 50:11
53:2 54:9,11
54:15 57:15
64:13 65:14
68:20 69:10
79:13,22 86:17
87:6,6 88:5
92:18 98:12
105:18 111:10
111:16,17

116:13 118:7
118:11,17,21
119:9 120:3,20
129:13 132:8
134:1 136:16
139:5,7,13
140:3 142:11
142:13 146:21
148:16,17
150:6 154:17
161:1 163:10
163:10 178:21
179:2,6 180:7
187:4 188:11
189:8 192:12
197:16 202:17
209:9

**knowledge**
20:6 32:21
68:9 100:10
114:6 115:13
115:18 116:6
123:5 137:15
140:19 142:18
155:7 166:11
169:5 187:12
189:4 197:15
210:10 211:6

**known** 12:13
61:19 81:20
108:22 115:21
138:3 173:19

**knows** 209:15

**l**

**l** 129:16,16

**label** 163:6

Farr Curlin                                                    April 8, 2024

**labeled** 163:5
**lack** 57:13 86:1
  90:6 113:3
  132:6 188:2
**laid** 183:16
**laidlaw** 103:12
  104:21 105:7
  106:14 107:6
  108:21 109:10
  109:15 110:3
  111:18 113:14
  113:18 114:5
  115:15 116:10
  117:12 118:16
  118:18 121:6
  122:1 123:3
  124:1 136:8
  137:1,8 147:11
  147:21 148:11
  148:22 157:11
  157:20 159:9
  179:7 186:14
  187:13 194:6
  204:3
**laidlaw's** 106:4
  106:11,12
  110:4 112:6
  149:11 156:21
  157:15 159:18
  193:8
**language** 22:20
  23:1 44:15
  50:5 150:10
  154:1 201:7
**lansdowne**
  3:15
**large** 82:18
  83:21 131:22

  136:13,18
**late** 167:4
**law** 21:16 62:7
  81:15 82:18
  153:16 198:11
  198:20
**lawndale** 34:3
  34:7 47:9,14
  47:16,19,19
  48:4 51:6,10
  54:10 55:7,22
**laws** 7:1
**lawyers** 10:11
**layperson**
  107:18
**lcb** 1:8
**leader** 42:19
**leading** 139:13
**learn** 31:12
**learning** 36:8
  39:12 48:8
**leave** 108:7
**lectures** 197:8
**led** 48:4
**leg** 191:11,16
**legal** 35:21
  73:5,12 74:7
  74:12,16
**legitimate**
  52:19
**letter** 181:18
**level** 141:22
  142:13 152:15
  173:21
**levels** 141:3,10
  141:16,19
  142:5,10,11,17

**library** 79:16
**life** 20:7 39:5
  63:15 68:14
  89:14 137:3,9
  137:18 190:1
  198:18
**lifelong** 137:22
  194:17
**lifetime** 113:3
**light** 138:17
  164:17 175:15
**likely** 133:20
  181:12 194:2
  200:14
**likewise** 25:8
  42:14 78:9
  99:11 117:12
**limit** 63:8
  139:6
**limitations**
  139:20
**limited** 41:13
**limits** 39:5
  72:10
**line** 5:19 21:1
  141:7 146:10
**list** 42:5 55:21
  57:1 100:17
  104:10 113:2
**listed** 32:20
  33:22 42:2,4
  46:1 75:15
  78:3 101:2
  102:21,21
  103:4 110:10
  113:19 143:3,9
  143:11 181:19
  197:5

**literature**
  106:9,18
  107:11
**little** 24:22
  98:14 114:17
  125:19
**live** 40:14 48:6
  48:10 61:7
  90:1 198:18
**lives** 48:9 173:1
**located** 47:15
  47:17 187:4,5
**location** 2:4
**logically** 95:10
**long** 8:22 20:5
  21:16 30:15
  65:4 77:14
  95:6 114:2
  137:3,9 151:9
  152:9 176:7
**longitudinal**
  27:6 119:20
**look** 32:12
  45:15 46:7,13
  75:16 78:16
  79:5 80:20
  94:12 123:2
  124:16 125:8
  182:16 185:12
  202:3
**looked** 158:8
  197:7
**looking** 82:7
  83:7 104:9
  116:7,8 163:20
**looks** 47:8
  76:21

Farr Curlin

April 8, 2024

**lose** 166:7,9
**lot** 135:8
  193:11
**lots** 21:4 204:9
**love** 48:17
**lunch** 91:20
  92:3 114:9,14
  140:9 167:4

**m**

**m.d.** 2:1
**maclean** 34:13
  34:15 35:11
  36:10,11,14,15
  36:17,21 76:14
  77:16
**made** 18:21
  21:7 26:20
  29:17,21 30:2
  35:20 40:8
  49:6 50:4 56:2
  72:8 76:15
  93:5 94:17
  97:1 134:18
  152:1 164:10
  182:18 208:1
**major** 27:18
  77:21 132:3,8
**make** 10:15
  13:9 16:12
  17:12,14 29:18
  33:16 49:19
  50:1 59:5 62:8
  62:9,16 70:22
  74:4 79:10
  80:7 81:13
  83:16 87:18
  92:19 95:1

103:16,22
109:20 112:17
112:18 116:19
143:16 147:9
150:4 153:1
162:20 167:9
175:15 176:13
177:11 180:10
182:5 188:13
188:17 192:2
196:1 199:4
200:1
**makes** 20:16
  50:2 74:15
  84:2,9 171:12
  187:19 190:5
**making** 73:1
  85:4 108:4
  144:8 151:5
  152:3 164:14
  177:22 200:9
**male** 67:3
  87:15,17 90:17
  113:6
**males** 142:19
**mammals**
  87:17
**manage** 158:20
  159:3 160:22
**manipulating**
  203:15
**manner** 7:2
  27:17,19 51:13
  56:12,13 71:3
**manual** 143:4
**map** 28:13
**marci** 113:4

**marginalized**
  49:1
**margins** 25:1
**mark** 15:10
  16:8,17 17:6
  35:13 78:15,18
  119:2 120:12
  122:5 123:9
  162:16 173:3
  185:14 186:6
  186:18
**marked** 15:12
  15:18 16:13,20
  78:20 119:6
  120:16 122:10
  123:13 163:1
  163:20 173:7
  185:19 187:1
  207:10
**marking** 15:14
**marks** 143:5
**marshall** 1:11
  3:11 6:8
**match** 150:22
  156:15 173:20
**matched**
  141:22
**materials**
  100:17,20
  101:2,7,13,18
  102:16 103:4
  110:11,14
**matter** 6:7 8:6
**matters** 177:20
**maturation**
  111:11,12
  112:8,9,12
  190:5

**mature** 26:15
  39:10 54:19
**maturity** 195:4
  195:19 196:4,4
  196:9,9
**mcclean** 99:10
**mcnamara**
  205:9,14
**mean** 11:3,18
  22:22 25:18
  50:10 58:17
  65:14 72:20
  78:5,7 79:12
  84:21 93:9,11
  96:22 97:8
  100:1 102:13
  107:13,14
  109:18 110:18
  111:2,4,16,20
  112:1,21
  115:17,20
  117:8 119:17
  123:1 127:20
  133:16 137:9
  141:9,10
  143:13 144:15
  144:17 157:10
  169:10 171:17
  171:18 173:14
  178:19 187:6
  189:4 197:6
  198:21 201:12
  201:13 204:4
  207:14
**meaning** 49:10
  107:14,15
  123:2 156:7,8
  166:14

| | | | |
|---|---|---|---|
| **meaningful** | 72:19 73:1,17 | 76:8 78:8 | 22:9 24:16,17 |
| 19:4 | 73:18,21,21 | 88:17 90:10,15 | 25:9 26:5,7,8,9 |
| **means** 7:3 11:5 | 75:1 76:1,14 | 97:17 98:10,21 | 26:20,22 27:1 |
| 50:14 148:16 | 76:19 77:14,16 | 100:14 105:1 | 27:13 28:2,5 |
| 198:7 200:3 | 77:17,21,22 | 108:14 115:22 | 31:2,13 32:15 |
| **meant** 100:16 | 80:13,17 81:12 | 116:9 117:21 | 34:22 35:4,4 |
| 156:12 | 82:1,3,10 | 118:4,9 125:20 | 36:4 38:16,17 |
| **measure** 125:6 | 83:15,18 84:2 | 126:1,10,12 | 38:19,21,22 |
| 130:3 | 84:3,15 85:2,7 | 128:3 130:15 | 39:5,9,15,16 |
| **measured** | 85:19 87:4 | 131:5 132:17 | 39:17 40:2,6 |
| 130:11,17 | 88:22 92:22 | 133:3 135:11 | 40:11,21,22 |
| 131:10 | 94:22 95:16,17 | 135:18 136:9 | 41:12,20 44:16 |
| **measures** | 99:11 106:19 | 140:5 142:4,20 | 44:18 45:21 |
| 126:3 129:6 | 107:11 116:2,3 | 142:21 160:3 | 48:9 50:2,8,10 |
| 158:20 | 116:6 117:18 | 160:10 164:16 | 50:20 51:7 |
| **medicaid** 51:5 | 121:16 125:10 | 175:14,16 | 52:13 53:9 |
| **medical** 12:2 | 125:16 132:4,8 | 182:21 189:10 | 54:21,22 55:20 |
| 15:5,5 18:16 | 132:10,16 | 190:15 196:10 | 56:5 58:2 |
| 18:18,21 20:12 | 136:6 137:4,10 | 203:12 | 62:21 63:16 |
| 20:13,14,16,17 | 137:22 142:18 | **medically** | 67:2,17 68:4,6 |
| 21:1,4,6,7,8,12 | 144:4 151:3,5 | 29:10 63:4 | 68:8,17 69:7 |
| 21:12,22 22:19 | 152:3,11 | 131:19,20 | 69:11,15,22 |
| 23:2,14 24:2,3 | 153:10 157:13 | 133:14,16 | 70:17,19,21 |
| 24:15 25:4 | 158:10 160:12 | 134:12,18 | 71:4,8 72:2,13 |
| 26:2,4 27:11 | 165:11 169:6 | 135:4,5,12 | 75:3,4 77:22 |
| 34:13,16,20 | 170:7 171:14 | 144:6 164:3 | 78:6,13,18 |
| 35:8,11,17 | 173:18 185:2 | 200:7,21,22 | 80:17,20 81:2 |
| 36:1,8,22 37:2 | 194:20 197:2 | **medicare** 40:18 | 81:3,11 82:5,7 |
| 40:20,20 41:2 | 199:14 200:10 | **medication** | 82:8,9,10,11 |
| 41:6,8,11 | 200:12 201:15 | 137:18 203:7 | 82:12,13,13 |
| 49:14 50:16,17 | 201:19 202:8 | **medications** | 83:2,4,8,22 |
| 50:19 51:8,20 | 203:4 | 125:22 126:18 | 84:1 85:3,7 |
| 52:7,19,20 | **medicalization** | 126:22 127:20 | 86:20 87:12 |
| 53:4,5,10 | 14:10 45:17 | 127:20 128:2 | 90:3,9 116:21 |
| 57:10,15 59:16 | **medicalized** | 202:21 204:15 | 151:4 154:7 |
| 60:15,16 64:1 | 13:12 14:19 | **medicine** 4:9 | 159:15 166:22 |
| 67:7 68:10,10 | 15:3 45:17 | 14:18 19:11,21 | 168:12 171:3 |
| 68:11 71:11 | 66:6 75:2,13 | 19:22 21:13 | 172:15 198:4 |

199:3 200:14

**medicine's**
20:1

**meeting** 45:5
45:12

**meetings** 44:17
44:22 45:5,10
45:11 46:14
166:12

**member** 68:18
68:19 99:10

**members** 20:11
70:12 76:17
77:17 141:16
157:1,7 190:16

**membership**
70:13

**memberships**
68:21

**memories** 30:6
58:7 67:1

**memory** 23:13
35:7 55:9 57:4
58:8,10,14
66:21 108:1
122:21 133:10

**mental** 5:5 22:5
22:7,13 27:21
27:22 28:3,4
104:22 123:11
124:13,22
125:6 126:4,9
126:14,18
129:7 130:3,18
131:1,1,8
134:4,8,9,10
143:4,12,18,22
144:1 147:6

150:19 192:11
197:21 202:9
202:16,20
203:3,4,14,17
203:19,22
204:5,7

**mention** 77:20
129:14 165:11
168:7

**mentioned**
53:2 75:7,21
76:20 93:4
159:14 195:21

**mentors** 31:8
32:11

**mercenary**
85:5

**meredithe**
205:8,14

**met** 10:7
192:14,14

**metaphor**
171:20

**method** 209:7

**methodologi...**
31:11

**methodologies**
37:15

**methods** 37:6
37:10,17 38:2
159:3

**mgt** 109:1
111:7 112:13
117:14 131:18
136:21 137:1
141:2 142:17
143:5 147:4,6
150:15,16

153:19 161:13
171:15 177:14
177:15 179:3,4
179:10,11
194:17 204:20

**mice** 5:16
185:5 186:22

**michigan** 6:13
37:10 168:8
169:6 174:6
210:22

**mid** 43:2

**middle** 1:2

**mile** 49:18

**mind** 57:16
66:20 98:7,14
121:12 131:15
202:2,18

**minimized**
149:19 155:18

**minimizes**
155:11

**ministrations**
20:13

**minor** 156:3
194:19 195:2,6

**minority** 54:20

**minors** 98:1
105:2 121:15
136:21 137:1
139:11,15
143:6 147:4
149:22 151:6
152:4,9 155:20
164:3 166:20
179:5 187:20
194:15 196:8
196:13,19

197:4 204:20

**minute** 46:6
93:14,15,16

**minutes** 46:17
46:17 91:19
114:18,20
167:13 180:17
206:19,21

**mission** 48:13
48:15

**misspeak**
109:21

**mistaken** 194:7

**mixture** 77:15

**model** 5:10
81:5,6,7,9,10
83:2 84:12
88:8,10,18
89:3 185:16
198:16

**models** 80:19
80:22 81:4
83:1 185:1

**modern** 198:14

**modify** 209:4
209:10

**moment** 24:19
79:5 96:9
103:9 119:8
122:13 127:15
131:9 137:20
138:8 186:2
207:20 208:5

**monday** 2:2
6:10

**months** 8:15
40:14 59:11
60:18,20

moral  72:6
82:14 89:14
198:20
morality  20:4
51:1 71:7,10
71:14 82:18
83:21 85:1,4
87:9 89:6,12
89:18 95:12,19
198:12
morally  73:6
73:10 74:8,13
morning  6:2
8:4 206:9
motivated  49:4
80:11 161:3,6
206:15
motivation
35:1 48:21
mouse  5:10
185:1,16
mouth  171:19
mouths  171:21
move  47:6
206:4
moved  32:7
moving  30:8
113:10 116:18
136:20 145:15
146:20 165:6,7
187:15 194:14
multiple  14:21
41:13 109:5
112:22 126:2
128:4 190:18
194:9
murphy  3:4 4:3
7:8,8 8:1,3,5

15:10,14,22
16:2,16 17:1
46:12,15,20
47:5 78:17
79:3,12 80:2
86:8,16 91:21
92:2,6,9,12
93:13,19 94:1
94:7,8,13,15
101:6,9,17
102:5,13,19
103:7 110:22
111:1 114:7,15
114:19 115:1,7
115:8 119:1,9
119:13,14
120:5,6,11,18
122:4,12,15,18
123:8,15 127:3
127:10,18
129:16,18
134:21 140:12
140:13 162:15
162:19,22
163:6,10,16,19
165:4,5 167:8
167:12,16,22
168:1 177:21
178:1 180:14
180:20 181:5
182:8,11
185:13 186:1,4
186:7,17 187:3
205:19 206:18
207:6,7 208:9
209:1,13
mutual  80:15

muzzle  171:18
muzzling
171:13,17,18

**n**

n  3:1 4:1 6:1
name  6:2 8:5
69:14 165:17
names  42:16
148:4 173:15
naming  173:15
narrowed
182:13
national
139:10 140:16
nationwide
124:14 125:1
natural  82:18
nc  2:5
near  46:10
nearly  206:18
necessarily
45:1 128:17
153:15
necessary  63:4
80:10 131:19
131:20 133:14
133:16 134:12
134:18 135:4,5
135:12 195:7
200:21 201:1
204:18 207:22
need  8:19,21
15:15,19 17:2
50:6 52:8,20
65:22 89:5
93:14 124:16
130:11,15,20

131:4 150:21
156:14 179:12
201:3
needed  51:20
67:7
needs  67:17
150:22 156:16
160:21,22
201:8,15,16,17
201:19,19
negative  126:3
129:7 135:21
negotiate  39:6
48:11 201:4
neighborhood
48:7
neighborhoods
47:20
neither  210:11
211:7
neurological
109:4 111:21
112:1,10,14
never  29:17,21
79:18 93:5
94:17 123:6
157:22 163:10
183:18,21
187:9 194:19
203:8
new  116:21
150:18 189:13
197:20
news  184:6
ngt  13:12,16
nice  148:7
nichole  211:2
211:17

non  23:8 26:9
  33:19
nonbinary  4:21
  122:8
norm  95:6
normal  141:18
  141:21,22
  142:8
normally  142:6
  145:3
norms  64:9
  66:7 68:16
  84:18,19 87:11
  87:12 91:15
  137:22 191:7
north  6:11
  18:19 47:19
  65:2,7,11,17
northern  1:3
notary  6:12
  210:21
notations  9:9
  9:10
note  10:9 60:9
  60:13,17
  128:11 156:13
  158:19 184:13
noted  8:5 90:12
  90:13 92:17
  106:1
notes  9:12 10:9
  105:10 206:20
noticed  108:7
  156:4
notion  81:19
  93:5 94:17
notwithstand...
  152:20 167:4

172:9
november
  100:3
number  24:10
  32:18 33:9,11
  49:17 66:7
  75:18,19,22
  76:21 78:4
  83:9 86:22
  95:10 107:7
  120:12 127:9
  127:20 130:17
  131:11,12
  136:19 164:2
  198:6
numbering
  163:3
numbers  33:17
nurses  48:22

**o**

o  6:1
o'clock  140:11
oath  8:18 86:6
  86:13
oaths  6:13
objection  6:16
  7:14 12:15
  14:15 21:11
  30:3 44:1 45:3
  53:1 55:3
  57:13 65:12
  66:18 69:8
  73:14 86:1
  88:4,14 89:9
  90:6 92:16
  95:13 98:5,11
  101:3 103:2

104:5 109:11
  111:9 113:21
  115:19 116:5
  116:12 120:1
  127:1 128:10
  129:3 132:6,13
  132:21 133:8
  134:14,20
  139:1 140:1,17
  148:2,20
  154:11,16
  160:15 164:12
  169:14 177:17
  185:8 195:9
  207:13,19
  208:2
objections
  174:10
objective  89:12
  89:13,21 137:2
objectively
  19:13 146:8,14
obligated  74:2
  88:11,22 94:22
obligation
  21:15 81:13
  86:15 153:13
obligations
  59:6 71:6
  74:18 181:12
  183:16
obliged  74:5
observation
  121:19
observed  19:4
observer
  107:21 108:12

observers
  105:3 107:13
  107:14 108:9
  108:15,18
observes
  107:12
obstetrician
  19:7 68:14
obstetrics
  24:16
obtain  195:14
obtained  17:16
  17:18
obtaining
  196:12
obvious  180:3
obviously  62:5
  174:17
occasionally
  144:14
occasions
  20:13 26:19
occur  99:19
occurred  33:19
  171:22
odds  10:22
  14:9 15:1 93:3
  97:11 146:5
offer  84:5
  86:12 191:3
  192:5
offered  53:4
  63:12 86:3
  104:21 108:21
offering  136:5
offhand  121:7
office  104:7,8

| | | | |
|---|---|---|---|
| **officer** 210:1,2 | 141:2,6,8,9 | **once** 129:21 | **opinions** 60:10 |
| **official** 1:12 | 142:7 143:8,13 | **one's** 10:21,22 | 86:4,13,14 |
| 6:9 | 144:8,12 | 14:8,9 15:1,2 | 95:12,14 |
| **oh** 33:3 71:20 | 145:15,20 | 42:5 53:16,16 | 103:15 104:21 |
| 206:5 | 146:16,20 | 71:13 144:2 | 105:22 108:21 |
| **okay** 8:16 9:13 | 147:1,14,17,22 | **ones** 73:2 | 110:9 152:21 |
| 10:1 12:21 | 148:12 149:7 | 105:15,17 | 153:2 |
| 16:16 17:15 | 149:16,18 | 160:18 204:2 | **opposed** 43:16 |
| 23:10 25:2 | 150:6,12 | **ongoing** 137:15 | 43:20 52:21 |
| 26:17 27:15 | 151:21 152:6 | **online** 94:12 | 73:10 74:8,13 |
| 30:8 31:22 | 154:9 156:1,4 | **onus** 192:4 | 154:19 176:14 |
| 33:8,13,16 | 156:19 157:5 | **open** 71:2 79:7 | 176:19 |
| 34:10 36:12 | 157:16 159:4 | 81:18 171:13 | **opposite** |
| 37:4 44:7,11 | 160:11 161:20 | **opening** 69:3 | 145:14 |
| 44:22 46:1,6 | 161:22 162:4 | 171:21 | **option** 49:9 |
| 46:15,20 47:6 | 162:19,22 | **opine** 91:10 | **options** 49:15 |
| 57:20 60:21 | 163:20 165:6 | **opined** 100:8 | **order** 15:15 |
| 75:17,21 78:5 | 167:2,12 168:6 | 100:10 | 64:6 102:22 |
| 80:9 92:2,6,11 | 168:16 169:7 | **opinion** 83:4 | 109:15 120:8 |
| 93:19 94:2,16 | 169:18 170:4 | 86:7 89:4 | 164:7 189:7 |
| 97:14 98:2 | 170:16,22 | 90:20 106:5,7 | 202:15 207:22 |
| 100:15 104:18 | 171:5,8,11 | 107:10,18 | 209:4,9,12,14 |
| 105:12 108:19 | 172:3 175:2 | 108:13 110:15 | **ordered** 50:2 |
| 110:7,17 | 176:12 177:8 | 128:14 134:12 | **orders** 208:22 |
| 113:10 114:15 | 177:10 178:6 | 135:20 136:2,5 | **ordinary** |
| 114:19 115:11 | 179:14 180:9 | 136:7 142:16 | 137:13 138:1 |
| 115:12 117:7 | 180:14 181:6,9 | 144:10 148:18 | 189:15 203:19 |
| 117:11 121:12 | 181:15,21 | 153:5 155:10 | **organism** |
| 122:4,16 123:6 | 182:8 183:3,6 | 157:16,19,21 | 90:18 |
| 123:8,20 124:3 | 184:10,13 | 158:3 159:4,8 | **organization** |
| 124:7,11 125:2 | 186:2,11,17 | 178:13 179:18 | 68:18,19,21,22 |
| 125:9,13 | 187:9,14,18 | 184:8 188:13 | 69:13 70:2,3,4 |
| 127:10 128:6 | 194:14 200:8 | 188:16 192:20 | 70:8 |
| 130:7 131:14 | 201:22 202:5,5 | 194:19,21,22 | **organization's** |
| 131:17 132:3 | 205:5,20 206:8 | 195:22 196:7 | 69:3 |
| 136:5 137:9 | 208:9 209:11 | 200:8 202:7 | **organizations** |
| 138:10,13 | **old** 63:13 | 205:20 207:11 | 68:10,15 |
| 139:5 140:21 | | 207:15,15 | |

Farr Curlin

April 8, 2024

organize
172:20

organized
40:11,16

organizer
169:2,7

organizers
168:17

organizing
40:20

orgasm   113:3

original   198:19

originally
99:16 163:16

osteoarthritis
56:21

osteoporosis
113:8 139:17

ought   35:5
71:11,12 90:1
97:2,2

outcome   4:11
119:4 124:4
130:13 210:16
211:12

outcomes   4:14
5:6,10 120:13
123:11 136:10
147:6 176:9
185:16 193:14
193:15 203:17

outline   91:12

outlined   92:20

outpatient
28:11 54:13
55:20 56:8
67:19

outset   183:22

outside   159:16

overcome
151:13

override   63:5

own   10:22
30:22 55:14
60:7 71:13
83:19 95:11
105:6 107:9
108:4 118:20
149:18 155:17
157:14 190:6
190:13,21,22
198:18,22,22

**p**

p   3:1,1 6:1

p.m.   115:3,5
167:18,20
180:22 181:3
207:1,4 209:19
209:21

packed   73:7

page   4:2,6 5:2
5:19 33:13,15
33:17 59:21
75:18,19,22
76:21 80:10
94:9,16 100:16
100:16 102:21
110:10 120:3
124:12 127:9
138:16 143:1
181:6,9 194:14
194:14

paged   61:21

pages   79:10,11
79:20,21

paginated   80:1

paid   40:11
140:16

pain   56:17

palliative   38:8
38:10,15,17,18
38:20 39:9,15
39:16,20,21
40:2,6,21 67:2
67:17

paper   33:8,9

papers   197:13

paragraph
46:13 94:16
96:4,13 100:15
103:8,9 104:18
107:4 108:19
109:16 110:15
112:4,21 113:2
113:10,11
115:9,12
116:18 117:11
121:13,13
124:6 129:12
131:14 133:13
136:12,20
138:5,6 139:2
139:4 140:22
141:2,4,5,7,8
145:15 146:11
146:20 148:12
149:16 150:12
151:19 155:15
156:14,20
161:8,10
163:22 165:7

168:2,7 171:12
174:22 177:8
178:13 179:14
184:10 187:15
197:16 201:6,6
201:22 204:16

paragraphs
17:8 165:10
202:4

parallel   191:18

paraphrasing
184:15

parental
189:19

parents   153:19
153:21 154:3
187:20 188:13
188:17 189:15
191:1,6 192:16
192:20 193:17
195:14 196:12

parkway   3:14

part   22:8 24:2
24:3 25:1
35:15 37:2
50:18 52:14
59:3 60:15
65:2,4,6,17
72:5 84:21
99:9 114:10
138:14,16
139:2,3 179:21
182:20

participants
35:20 125:6
130:3

participate
53:11 61:6

65:15
**participated**
37:5 38:7
41:18 183:18
**participation**
158:5
**particular** 17:7
29:8 30:6,7
35:1 39:17
49:10,10,11
58:7 61:13
62:10,10 73:11
77:18 81:16
82:15,16,19
86:5 87:1,5
88:3 91:3,4
98:3,9,13,15
99:14 107:20
133:14 134:11
134:17 135:6
153:6 157:22
169:12 188:20
188:21 194:21
195:4,16
**particularities**
86:21
**particularly**
19:9 23:8 25:9
39:4 97:22
112:16 118:22
138:2 151:1
156:17 160:18
179:4 192:2
198:9 199:6
201:14
**parties** 6:14,17
210:12,14
211:8,11

**partner** 63:14
**pass** 171:8
**past** 104:4,8
**path** 22:9
**patient** 21:14
25:13,16 28:7
28:16 51:13
53:8,12 54:4
57:11 58:15
62:5,17 63:6
67:1,6,7,17,20
71:17,18 72:13
73:12 74:2,4,7
74:11,15,17,19
78:11 81:18,19
81:21,21 83:14
87:22 88:6,12
88:20,21 90:17
93:1,2 95:7
111:4 128:7
133:21 134:3
141:12 149:21
155:20 156:5
189:19 199:8
200:16 201:8
201:15
**patient's** 20:2
27:3 50:21
72:15 89:4
90:19 91:14
133:18,21
156:3
**patients** 21:14
25:11,20 27:6
27:11 28:9,14
28:19,22 29:4
34:7 40:12
43:17 44:6

48:12,17,20
49:1,19 51:9
51:11,12,19,20
51:22 52:4,9
52:17 54:16,20
55:10,12 56:7
56:8,10,12
58:4,7 61:10
63:6 67:21
68:1 71:6
72:19,20,21
83:11 84:8
97:20 98:3,9
125:10,19
126:10 128:22
130:8 134:19
138:21 140:4,6
151:1 156:17
161:14 189:20
191:1 193:22
**patterns** 81:2
**pause** 44:14
**paying** 107:15
**pdf** 79:9
**peace** 93:5
94:17
**pecuniary**
161:3
**pediatric** 63:6
**pediatricians**
68:12 200:17
**pediatrics** 14:7
24:18 132:19
133:2 149:14
155:4,6,7
188:4 196:19
**peer** 33:8,19
74:22 197:11

197:13
**pending** 9:1
**pennsylvania**
163:17
**people** 23:6
37:14 38:14
39:4,4 40:4
45:12 49:13,18
50:15 51:5,6
53:3 54:2
59:14 60:1,3
63:20 77:10,14
84:10 85:5,12
85:13 95:4
107:16 108:1
137:21 142:1
158:11,17,21
160:1 162:10
163:17 164:1,7
171:20 173:16
174:3 198:21
204:10
**peoples** 27:9
64:3
**perceive** 97:11
**perceived**
12:17 15:2
67:3,3 90:22
**perceives** 78:11
93:2 146:4
**perception**
10:21 12:18
14:8,22 15:4
29:11 55:14
88:1,19 97:10
144:2,2 145:17
145:22 146:2
146:12,16

Farr Curlin

**perceptions**
29:1
**perimenopause**
142:8
**period** 57:21
97:22 140:9
**peripherally**
66:22
**permit** 63:19
**permitted** 6:21
81:15
**permitting**
63:19
**person** 60:13
72:8 91:16
97:8 108:10
145:4,13 146:3
146:9 171:1
198:10,11
202:11
**person's** 91:17
198:17 199:4
202:12
**personal** 93:6
94:18 95:8
104:11
**personally**
94:22
**persons** 32:4
66:15 82:17
84:7 124:14,22
141:11 158:8
**perspectives**
159:16
**persuaded**
194:4
**phenomenon**
12:3

**philosophers**
95:22
**philosophical**
50:11
**philosophical...**
176:13,19,20
**phrased** 199:16
**physical** 90:21
202:9,15,21
203:5,9
**physically**
26:14 54:19
**physician**
19:18 20:11
27:14 28:2
54:14 55:22
56:4,5 57:22
58:1 62:21
67:2,14 73:5
73:10 74:1,5
74:10,15 88:9
90:21 91:6
92:14 111:10
153:9,13
160:11 176:1
**physician's**
74:18 201:13
**physicians**
21:15 32:12,14
35:13 37:21
40:14 48:8,22
51:4 58:19
61:9 62:20
63:1,5 73:2
74:6 83:5,16
84:9 96:6,16
98:17,21 160:3
161:13 164:17

175:6,9,11,20
178:7,15 180:5
191:8 201:2,21
**physiologic**
91:15
**physiological**
204:6
**physiology**
27:4
**physiotherap...**
177:15,18
178:4
**piece** 14:6 31:3
**pins** 171:19
**pioneering**
48:3
**place** 48:1
55:16,19
**placed** 60:9
139:19
**places** 56:4,5
**plain** 150:4
**plaintiff** 1:9
3:2
**plaintiff's** 3:21
**plaintiffs** 1:6
131:18 135:3
135:10 144:22
184:20 190:14
193:3,21
194:22 196:7
204:17 205:5
205:21 208:15
**plan** 160:22
182:19
**plane** 168:19
169:19,20

**play** 48:19 71:7
71:17 72:1
153:3 200:9
**please** 7:6,15
31:15 32:22
37:12 94:9
104:19 120:20
123:17 131:15
140:21 149:16
150:8 168:3
**plenary** 69:2
**plus** 78:8
**point** 12:2 20:8
24:1 32:22
33:1 35:8
37:20 39:2
70:14 72:18
89:22 112:3
114:8 116:22
118:13 119:1
120:11 126:20
127:7,8 135:2
135:9,10 184:2
187:6,8,14
201:21 204:11
207:22
**pointing** 95:4
155:14
**policies** 52:15
**policy** 31:4
52:3,5 53:7
71:20 149:14
**poor** 49:7,9
**popularized**
198:9
**population**
28:7 49:1
121:16

**populations**
152:11
**portion** 18:4,8
46:2,7 96:5,14
126:20 133:12
202:6 208:11
**portions** 79:2
208:4,7
**posed** 62:1,3
**poses** 137:1
**position** 108:16
132:22
**possible** 81:14
85:2 87:18
112:18 145:12
195:8,11,12
200:17
**post** 47:13
**potential** 5:16
159:6 186:21
201:8
**potentially**
99:18 102:3
**poverty** 49:3
**practice** 11:13
11:16 19:5
26:13 31:2,19
34:1 35:3,5
36:1 38:8,11
39:3,13 41:21
47:7,8,11
52:15 65:10
66:14,17 69:21
71:7 72:2
73:19,21 77:6
77:7 82:13,14
82:20 83:2,22
84:12,17,22

85:3 87:12
95:2,9 97:14
145:1 151:4
155:5 157:22
164:18 172:12
192:2 195:5
202:8
**practiced**
38:22 54:12
55:16,19
**practices** 31:20
32:14,15 37:22
38:1 76:10
85:7 96:7,8,16
96:17,20,21
178:7,8,15
**practicing** 35:4
38:15 48:9
54:3,21,22
65:8,9,15 81:3
81:11 84:16
88:9
**practitioner**
50:19 53:10
71:11 83:20
84:4 85:3,7
191:15
**practitioner's**
83:18
**practitioners**
36:2 50:16
53:4 70:21
81:12 83:12
84:2,3,15
88:22 94:22
95:17 150:21
156:15 165:11
190:12

**precautionary**
138:18
**precise** 34:16
40:3 45:16
88:6
**precisely**
150:11
**predictors** 4:14
120:14
**preeminence**
201:17
**prefer** 83:10
**preference**
209:7
**preferential**
49:9,9
**preferred** 83:2
83:7 177:14
179:3,10
**pregnant** 63:11
63:17
**preliminary**
182:22
**premier** 35:12
**premise** 104:20
106:2,16,20
108:20 128:12
128:13
**preparation**
10:12
**prepare** 10:1
102:22
**prepared** 211:3
**preparing**
100:18 103:20
104:1 117:2
121:4

**prescribe** 91:6
92:14 98:10
175:21 203:11
**prescribed**
67:11 144:13
144:20 203:8
**prescribing**
43:16,21 54:6
58:8,10,14
97:15 145:7,10
**prescription**
67:13 126:7
129:10
**prescriptions**
125:21 128:1
131:12
**present** 3:19
35:19 59:22
**presentation**
76:2,4,12 77:2
77:3,12 88:7
**presentations**
75:19
**presented**
56:12 75:9,11
**presenters**
43:16
**presenting**
44:3
**presents** 80:19
80:21,21
**preserve** 20:20
82:22
**preserving**
19:13 20:2
**president** 70:3
113:5

Farr Curlin

April 8, 2024

**prestigious** 173:20

**pretty** 27:19 135:10

**prevent** 145:2 150:15

**preventing** 133:21 172:2

**primarily** 35:13 76:16 81:20 82:1

**primary** 47:9 48:21 54:13 55:17,21 56:1 56:4,6 59:11 60:18,22 61:1

**principal** 199:7

**principle** 137:12 138:18 153:16

**principles** 157:13

**print** 79:19 97:1

**prior** 100:5,7 100:11 117:2,4 117:9 120:8 186:8 187:10 210:5

**priority** 49:11 201:17

**private** 3:21 40:19

**privilege** 101:11,20

**privileged** 102:17

**pro** 68:14

**probably** 8:12 93:22 102:14 114:18,18 151:17

**problem** 15:5 29:14 77:7 140:11 150:9 151:3 159:20

**problematic** 82:4 95:10 151:15 160:4 192:3

**problematica...** 149:19 155:18

**problems** 126:19 192:2

**procedural** 6:22

**procedure** 189:14

**procedures** 204:19

**proceed** 7:22 60:12 62:21 201:2

**proceeding** 2:4 6:4,20 209:22 211:4

**proceedings** 210:3,5,6,9 211:6

**process** 10:8 61:13 116:22 117:6 159:17

**produced** 6:19

**product** 102:1

**production** 142:4 181:20 181:22 182:14

**profess** 19:1 83:6,12

**profession** 71:4 74:19 95:1

**professional** 21:15 74:18 93:6 94:18 95:8,12,14,15 104:11 106:7

**professionals** 20:12,14,15,17 20:17

**prognosis** 40:14

**program** 30:10 30:14,15,16,17 30:20,20 31:9 32:1 35:12 37:13,14,19 38:3,8,11,13 38:14 45:14 166:19

**programs** 173:20

**progress** 76:1

**prohibited** 135:7

**promote** 84:8

**promoting** 190:14

**prompted** 38:20 47:21

**pronounce** 36:9,11 129:13 163:11

**pronounced** 36:13 163:12

**pronunciation** 163:18

**proper** 72:15 72:16 93:7,9 201:14

**properly** 71:4 72:10 84:19 199:18

**property** 62:14 72:17

**proponents** 136:11 142:21

**proportionate** 192:8

**proposal** 72:20 73:2,17 83:15 85:19 87:4

**proposals** 73:18 83:16 179:20

**propose** 16:15 102:11 209:4 209:10

**proposed** 31:11 181:17 182:19 183:8,20

**proposition** 70:19

**prospects** 173:9

**protected** 101:19

**protecting** 152:14

**protest** 170:11 170:17

Farr Curlin

April 8, 2024

**protests** 170:8

**provide** 21:16
64:7,16 73:5
73:12 74:2,5
74:17 84:9
86:19 88:11
90:4,10 153:20
153:22 154:1
207:12

**provided** 52:17
54:8 60:13
79:15 99:6
100:20 101:13
101:18 102:16
103:11,15
113:14 115:14

**provider** 52:10
81:5,6,8,10
88:8,9,10,18
89:3 131:8
198:16

**providers**
51:16,21 81:12
130:18 131:1
131:12 162:1
174:12 195:14
195:18,22

**provides** 82:6

**providing**
53:19,21 66:3
74:8,12 98:21
139:20 154:3,4
160:8,12
174:20 176:14

**proxy** 126:18
130:20 131:4
131:13

**psychiatric**
130:12,16,20
131:4,11 133:6

**psychiatry**
18:13,15 23:16
23:18 24:17

**psychoactive**
125:21 126:17
126:22 127:19
128:1 204:15

**psychological**
4:10 119:4

**psychology**
17:21 18:2,9
18:10 22:1,3
23:11 27:4
41:17,19

**psychosocial**
113:7

**psychotherap...**
177:19 178:3
179:4,11

**puberty** 4:11
5:13 13:19
14:11,21 15:6
43:8 44:4 54:6
58:9,10 66:3
85:21 87:3
88:11,13 90:4
90:4 91:5,7,7
92:14,15 97:15
111:12 112:8,9
112:11,20
119:4,21
138:20 144:16
144:18 145:4
185:6 186:20
189:22 190:2

204:4,9

**public** 76:7
96:21,22 97:1
161:1 172:1
210:21

**publication**
32:17

**publications**
32:19 33:4,19
64:20 75:5,8
193:4

**publicly** 166:14

**publish** 172:9

**published**
74:20,22
161:11

**publishing**
96:5,15

**pull** 15:15 17:2
93:13 120:19
123:16 127:10
162:15

**pulled** 119:10
120:20,21

**punitive**
150:21 156:14

**purported**
116:9 177:1,1

**purports**
154:19

**purpose** 19:21
19:22 20:1
37:18 43:12,14
69:18,20

**purposes** 13:2
13:8 80:3 81:1
103:15,20
106:4 110:8,14

121:9 123:4
149:10 150:7
152:6

**pursue** 19:18
81:18 88:22
201:18

**pursuing** 82:16

**pursuit** 69:21
82:14

**put** 42:18
43:14 50:15,16
53:3,5 59:21
79:8 133:1
152:12 156:6,9
182:21 192:4

**puts** 189:12

---

**q**

**qualification**
193:11

**qualified** 210:7

**qualifies**
107:21

**quarter** 114:21
120:3

**question** 8:22
11:20 17:11
21:3 30:1 41:5
55:4 61:17,18
62:10 63:12,16
64:17 65:13
69:9 71:20
74:9 86:19
89:10 90:8
96:12 97:4
98:8,16 100:13
101:10 102:3,6
102:12 106:22

113:22 114:2
127:5,12
133:19 138:10
144:11 145:20
148:15 156:5
165:7 176:18
176:21 178:2
179:13 182:10
199:16 206:4
**questioning**
208:11
**questions**   5:18
12:4 15:9 16:9
16:10 17:7
31:5 34:10,11
38:6 45:14,22
47:7 59:20
62:1,2,18
63:18,21 64:6
64:8 66:13
71:3 73:7,15
80:11,18 86:9
101:4 102:2
107:11 114:3
121:9 149:10
164:20 181:19
182:22 183:2
198:3 207:9
208:12,16,18
**quick**   92:10
**quit**   162:10
164:1,7
**quite**   133:3
**quotation**
129:11
**quote**   104:19
126:8 139:2
150:16,19,19

150:21 156:15
**quoted**   139:4
156:13
**quotes**   156:7,9
156:11,12

**r**

**r**   3:1 6:1
163:14,14
**radical**   189:13
**raise**   7:15
164:19 192:3
**raised**   12:5
39:11 59:20
72:12 76:8
100:13 174:10
**raising**   77:5
171:22
**randomized**
188:3,7,19
189:1
**range**   141:21
182:4,5
**ranged**   28:12
**rare**   20:12
26:19
**rates**   121:15
**rather**   36:2
59:6 79:10
125:22 128:2
201:3 203:14
**rationale**   76:7
204:6
**rbrooks**   3:16
**reached**   99:16
**read**   13:4
20:14 115:13
117:17,20

118:5,11
127:12 133:13
138:11 139:1,3
161:18,20,21
162:12 182:4
183:3 186:15
187:6,6,8
195:13,15
197:7 205:7,7
205:8,12,13,15
205:16
**reading**   128:5
151:18 164:4
185:10
**ready**   202:5
**real**   89:14
111:19
**reality**   20:16
83:11 84:2
**really**   21:3
61:16 73:3
158:16 172:22
**reason**   53:19
53:21 60:3
62:6 118:14
121:10 164:7
190:9,22 196:8
**reasonable**
70:22 83:5,16
84:14 85:18
87:4 133:19
135:12 153:9
175:6,9,12,16
176:6,16,22,22
177:4,11
178:22 179:1
190:12 192:5
198:10

**reasonably**
20:3,20 83:5
83:12 91:13
108:22 153:8
189:20 193:10
194:16
**reasoning**   35:5
59:18 96:1
150:2
**reasons**   19:17
50:11 60:12
83:9 87:1
91:12 92:20
95:10 162:9
163:22 183:16
**reassignment**
4:12,13 119:5
120:13
**reassure**   29:13
**recall**   11:10,21
12:1,19 14:5
17:22,22 18:4
18:6,8,11 22:2
22:3,16,19
23:1,22 24:10
24:14,22 25:8
25:10,13 26:1
28:16 33:10
34:21 42:9,15
43:3,6,9 45:4,5
48:15 54:9
55:5,12 57:8,9
57:16 61:15
63:13 64:18,18
66:17 67:15,22
68:1 70:5 75:7
98:19 99:1,8
99:12,20 103:1

103:21 104:2,6
104:7,17
109:17,22
110:3,4 116:17
118:17,19
119:19 120:10
121:2,7 124:5
125:7,9,11
127:22 130:4,5
130:19 131:10
131:13 133:10
136:15 138:12
138:13,14
139:7 140:20
146:1,18
147:15 148:8
162:3,7 164:14
166:1,4 169:15
170:12 182:16
185:10 195:15
205:18
**receive** 40:15
49:7 67:19
73:4,13 191:1
**received** 41:8
48:20 126:10
161:15
**receives** 160:11
**receiving** 67:9
67:12,13,18,18
129:1 130:8
164:20
**recent** 131:22
136:12
**recently** 182:3
**recognized**
52:19 76:6
143:22

**recollection**
11:17,19 29:20
44:2 57:19
99:21 110:12
110:16 114:6
118:3,10
124:10 126:16
130:11 186:10
197:15 206:12
**recommend**
57:10 85:16,17
85:21 87:22
**recommenda...**
60:11 164:15
**recommended**
66:1
**record** 6:4,5,17
7:7 9:1 47:1,2
47:4 60:16,17
94:3,4,6 103:3
115:3,4,6
119:3 127:16
151:18 165:1
167:18,19,21
180:16 181:1,2
181:4 182:5
206:20 207:2,3
207:5 208:21
209:19 210:9
211:5
**recorded** 7:2
210:6
**recording** 6:19
210:8 211:4
**records** 125:16
**reduced** 113:5
210:7

**reduction**
121:15
**refashion**
78:10
**refer** 13:11,18
14:5 16:10
17:6 46:14
72:13 80:4
81:4,6 82:7,9
89:4 94:11
105:9 113:11
136:12 145:16
145:21 146:10
146:11 157:2
161:10 198:9
**references**
80:10
**referred** 75:12
106:6 110:3
118:7 123:22
148:10 156:6
181:16
**referring** 12:22
42:2,7 44:22
69:12 105:5,8
108:10 109:8
109:12 112:3,5
113:12,15
136:13,15
137:6 148:1
163:21 169:9
169:12 171:11
181:17 186:5
193:3 197:19
202:3 204:1
205:1,2
**refers** 118:17
161:22 175:5

202:7
**reflected** 20:15
**refuse** 51:4
72:19 73:1,17
74:15 83:15
**regard** 49:10
122:3
**regarded**
107:16
**regarding**
12:17 30:22
32:15 38:17
39:17 41:12
45:15,16 60:11
67:16 71:4
75:5 85:8 96:7
96:16 115:21
116:16 135:18
147:4 155:8
171:15 177:1
178:8,15
179:19 182:18
188:7,14 194:8
196:12,17,19
197:4
**regardless**
134:22 151:21
**register** 124:15
125:1
**regularly** 65:16
**reimbursed**
160:3
**reimbursement**
160:7,9,12
**relate** 42:7
**related** 18:5,6
18:10 33:22
41:8,11 44:12

55:11 57:12
67:5 100:8
201:16 210:11
211:7
**relating**  97:10
173:2
**relationship**
104:12,14
152:17
**relationships**
27:6
**relative**  210:13
211:10
**relayed**  171:4
**relevance**
151:8
**relevant**  19:9
41:20 59:17,19
60:8,8 64:10
78:9 81:15
177:13 184:14
**relied**  107:6
184:4
**relief**  39:18
**relies**  84:22
**religion**  65:10
**religious**  32:8
32:11 36:16,17
36:19,22 37:1
37:21 52:10,13
64:14
**rely**  106:14
**relying**  85:3
149:2 155:10
**remain**  45:15
**remainder**
59:22

**remained**
126:2 128:3
129:7
**remaining**
40:15
**remedy**  84:7
**remember**  18:2
24:19 42:16,18
44:8 45:16
52:12 53:6
62:4 63:9 76:5
116:20 117:1
118:12 148:4
170:19 174:14
**remind**  8:17
**remote**  2:4
**remotely**  6:15
204:18
**render**  111:4
158:8
**rendered**  174:6
**renee**  3:20
**reopen**  102:15
**repeat**  14:21
24:7 37:12
90:8 96:12
145:20 182:9
205:10
**repeated**
127:16
**replacement**
142:9,12
**report**  4:8 9:7
9:11,14,17
10:5,6,10
13:11,13,15,17
14:20 16:6,18
17:7,13 45:12

45:15 46:2,3,4
46:5,8 66:9
77:20 78:7
86:22 87:13
90:12 91:12
92:20 96:3
97:18 100:15
100:16,18
102:22 103:8
103:20 104:1
104:19 105:11
105:21 106:4
106:11,12
110:4,6,9
114:10 115:10
116:15 117:3
118:4,6,8,15
120:9 121:4,5
121:13 124:6,9
129:12 131:14
133:12 138:5
140:22 147:19
150:5,12
151:19 152:12
153:5 159:14
161:8,10,12,16
161:20,21,22
164:14 165:8
166:12 174:2
181:7 183:17
184:7,11
186:12 187:16
189:11,12
195:21 196:17
204:1,17 205:7
205:8,13,15,16
207:10,18
208:4

**reported**  2:6
174:15
**reporter**  6:2,3
7:13,21 15:17
46:22 47:3
94:2,5 115:2,5
127:12,14,16
129:15,17
162:21 163:4,8
163:15 167:17
167:20 180:22
181:3 205:10
207:1,4 208:20
209:6,11,18
**reports**  105:13
106:15,17
107:8 115:14
117:20 118:7
118:11 122:1
147:11,12
148:10,22
173:22 179:6,7
193:8 205:6,22
206:2
**represent**  8:5
79:14 193:22
207:11,15
**representation**
79:11 184:16
**representatives**
179:1
**representing**
7:9,11
**reproduction**
87:19 111:5,11
**reproductive**
5:15 63:10
186:21

**[request - reviewed]**

request 61:9,10
61:12,14 74:15
requested
53:12 60:14
127:17
requesting
74:11
require 95:2
137:18 198:12
200:4
required 22:12
128:20
requirement
192:14
requirements
50:22 82:17,20
83:20,21,22
requires 71:5,6
85:9,14 89:17
89:18 95:17
137:15 198:13
199:8
requiring
137:3 191:14
rescheduled
169:21 170:1,2
171:6
research 37:6,9
37:15,16 38:2
96:6,6,15,15
98:17,20
121:21 147:18
157:6,14 176:2
176:9 178:7,14
180:2 182:19
192:21,22
194:13 196:11
196:14,15,16

196:20,22
197:1,6
researcher
31:20
researchers
125:5,10 130:2
184:22
reservations
174:19
reserve 102:15
residency 26:3
26:5 27:16
28:6 30:9,13
resolve 200:15
resolving
133:22
resources 49:2
60:7
respect 19:16
19:16 26:13
41:4,21 49:2
61:3 65:18
71:1,13 89:1
91:5,16 98:1
100:18 105:20
106:10 107:3
109:16 115:21
122:2 136:10
144:4 146:15
151:5,9 152:3
152:12,19
153:17 154:2
172:22 190:19
191:2 192:11
193:14 196:5
199:7,14,21
200:4 201:14
206:16

respectfully
53:11 200:19
respecting
152:13
respects 112:8
189:15
respond 12:5
52:20
responded
14:10
responding
183:1
response 84:5
88:11 109:3
181:18 182:17
183:12
responses 15:7
45:17
responsibilities
191:8
responsibility
70:20 149:20
149:21 155:12
155:18,20
responsive
20:3
rest 137:18
restate 110:21
restore 20:20
82:22
restored 62:13
62:13
restores 128:19
restoring 19:14
20:2
restrict 64:3
result 32:5
111:13 121:16

126:11 204:13
retained 99:22
100:2,4,6
117:9
retention
104:13
retract 208:5,8
return 188:8
188:14
reuters 5:8
161:11 163:7
163:14 164:13
174:1
review 99:3,4,7
99:13 102:8,20
103:4 105:17
106:2,8 107:9
108:6 109:14
109:21 110:1
110:13 114:4
116:10,15
117:2 120:8
125:14 130:1
135:17 139:8
139:10,13
147:9 148:6,8
149:2,11,18
155:17 159:2
181:10 186:15
186:16 206:20
reviewed 10:5
10:6,8 12:10
33:8,19 74:22
101:14 104:20
105:6,7,9,9,12
105:15 106:5
107:7,8 108:20
109:9,10,13,15

110:5,8 113:18
113:20 114:5
116:22 117:4,9
119:15 120:22
121:2,8 123:6
124:2,7 125:2
125:10 129:22
135:14 147:3
147:12 181:22
182:13 186:13
186:14 187:9
187:11,12
197:11,13
205:6 206:1,2
206:5

**reviewing**
105:18 108:3
119:19 122:21
155:6 183:6

**reviews** 108:4
123:22 136:18
154:20

**revision** 12:8

**rhafferty** 14:6
118:5,8 133:1
193:4

**rheumatoid**
56:21

**right** 7:15 17:3
33:16 34:14,15
45:4 46:21,22
47:18 80:20
82:8 83:17
91:22 94:1
100:5 102:15
103:12 107:22
110:15 115:2
119:1 127:14

129:22 130:9
138:7 141:3
143:7 150:19
151:16 164:4
165:13 167:16
167:17 168:14
173:8 175:6,7
180:19 188:1
197:20,22
198:1,17
199:13,20
208:20

**rightfully** 83:6

**rightly** 14:10
50:2,20,22
51:1 199:2

**rights** 3:5

**rigor** 31:11

**rising** 164:2

**risk** 111:19
113:8 137:2
139:18

**risks** 193:18,20
194:16 202:15
202:21 203:5,8

**riverside** 3:14

**robert** 30:10,13
30:19 34:6

**roger** 3:12 7:10

**role** 48:19
54:12,13 59:9
60:22 61:1,3
70:1,7 71:7,16
72:1 153:3
200:8

**rolling** 167:5

**room** 9:18
168:22

**root** 27:8 89:13
89:21

**rotations** 24:2
24:4,5,8,10,12
24:13,16,20
25:3,5,6,9,11

**routinely**
202:14

**ruin** 163:3

**rule** 198:8,8

**rules** 7:1

**run** 91:20

**ryan** 211:2,17

**s**

**s** 3:1 4:5 5:1
6:1 163:14

**sadness** 11:6

**safe** 116:2
117:19,22
118:9 193:5,11
194:1,11,11

**safety** 117:14
135:15 150:15
184:14

**sake** 120:7

**sanctioning**
172:21

**saw** 20:11
25:11 27:19,19
28:11,14 51:17
54:19,20 56:12
67:20

**saying** 101:21
105:12,14
153:2 156:13
164:6 191:10
193:20

**says** 46:18
81:21 93:21
94:17,20,21
96:13 103:9
104:19 115:12
126:21 136:20
138:17 143:2
149:18 163:22
171:12

**scale** 131:22
136:13,18

**scenario** 98:7
188:21

**schedule** 61:5

**scholar** 31:20
34:6

**scholars** 30:10
30:14,19 45:13
166:19

**scholarship**
30:22 31:10
197:4

**school** 18:17,19
18:22 21:2,5,6
21:22 22:20
23:2,14 24:2,3
24:15 25:4
26:2,4 77:21
78:1 170:7

**schools** 21:7
82:1,3

**science** 19:16
104:20 105:5,6
105:8 106:3
108:20 109:8,9
109:13,14,22
112:6 113:11
113:12,13,15

Farr Curlin                                                                    April 8, 2024

113:17,17
114:4 122:2
**sciences**  19:9,9
**scientific**  31:3
115:21 139:9
147:3
**scope**  63:8
72:10,15,16,17
106:8 110:6
**screen**  93:21
120:3 122:17
123:19 165:3
**second**  25:2
34:12 45:19
75:20 76:20
141:6 145:18
147:1 150:11
159:15,20
170:4 171:6
190:8 202:5
205:7,11,13
**secondary**
10:21 14:8
15:1 55:13
90:16 97:10
112:19 137:14
144:3,4,6
145:3,11,13
146:4,6,8
191:21
**section**  3:6
**secular**  36:15
**see**  25:16 33:18
34:6 48:12
51:4 52:1
56:10 59:13
75:16 94:20
102:14 124:16

131:8 141:8
146:13 156:1
180:4 183:13
**seeing**  25:13
56:7,8
**seek**  29:13 50:1
78:9 84:7
154:6 157:14
200:19
**seeking**  20:19
32:8 74:4
82:21 142:22
164:3
**seeks**  27:8 74:3
74:17
**seemed**  63:14
183:15
**seems**  91:12
92:20 128:11
172:13 193:7
193:14,21
**seen**  49:19,20
50:3 79:18
120:2 184:18
186:8
**selected**  30:21
79:1
**self**  12:17
35:18 59:2
67:3 150:17,20
151:6,7 152:4
152:8 154:2,6
155:22 197:22
198:8,8 206:17
**seminar**  80:13
**sense**  10:22
12:10 13:9
25:21 40:17

80:7 84:22
85:4,10 87:9
93:3 95:11
143:20
**sent**  16:14
185:21
**sentence**  147:1
155:16
**separating**
93:5 94:18
**series**  77:14
**serious**  109:2
117:13 131:22
**seriously**  174:7
**serve**  51:10,11
**served**  51:12
58:18 99:2,4
183:21
**service**  58:2,17
58:20 59:2,4,8
59:10 61:4
65:19
**services**  31:1
65:16 76:1
81:5,7,9,10,13
88:8,9,18 89:3
198:16
**serving**  60:21
60:22 61:1
99:18 158:15
**session**  77:19
**set**  154:14,18
187:14 189:2,8
**setting**  56:7,9
57:2 58:5
189:6,7
**settings**  97:1

**seven**  76:5
**several**  39:1
68:9 80:13
**sex**  4:13 10:21
13:19 14:8,12
14:22 15:1,6
25:21,22 43:8
44:5 54:6
55:13 58:13,14
66:4 67:9 87:2
88:3 90:16
91:13,16,17
97:10,15
112:19 120:13
137:12,14
138:20 141:11
141:11,16,22
142:5,14,15,19
144:3,5,6
145:3,4,7,11
145:13,14
146:4,6,8,9
182:20 191:21
191:22
**sexes**  87:18
**sexual**  92:22
93:2 109:3
111:11,12
112:8,9,11
113:3 137:14
191:20
**sham**  89:15
**share**  87:19
**shared**  165:3
**sharp**  26:15
**shifting**  12:18
**shining**  164:16

short 46:10,16
  92:5 114:17
  180:16
shortly 99:22
  100:2
show 15:19
  84:4 93:20
  162:12 191:15
showed 51:12
  51:18 185:5
showing 48:17
shown 135:3
  135:11 192:10
  194:15 195:1,1
  196:8 203:21
shows 52:7
  199:16
sick 19:3 39:4
  82:21
side 34:9 47:17
  138:3 173:8
  192:13 193:12
  203:16 208:15
siegler 35:13
sign 126:6
  129:9 141:12
  156:11
signals 72:4
signature
  209:20 210:19
  211:16
significant 97:3
  138:3 157:12
silence 77:1
similar 28:20
  45:21 58:21
similarly 16:17
  57:18 209:13

simple 143:16
simplification
  81:1
simply 131:7
  150:6 165:2
sit 16:11 17:13
situation 59:14
  74:3 86:18
  133:15 137:20
  190:20 200:11
situations 39:7
  154:8 189:15
  200:2
six 40:14 77:4
sixth 146:10
skills 210:10
  211:6
sleeplessness
  56:18
smith 120:13
soc 149:19
  150:9 154:9,14
  154:18,21
  155:17 157:17
  195:13,15
  197:19 201:7
society 69:6,10
  69:17,19,20
  70:17,18 71:19
  148:14,19
  149:1 206:9,11
  206:15
society's 149:5
somebody 58:9
  90:4
somewhat
  44:16 68:5

soon 48:5
  91:19
sooner 92:5
  93:18
sorry 11:18,20
  24:6 31:16
  36:9 37:12
  100:16 110:19
  117:7 119:18
  122:14 126:20
  127:11 139:12
  151:16 205:10
sort 51:5 77:9
  166:7
sorts 40:5
sought 29:9
  62:19 63:10,20
sound 92:3
  93:6 180:19
sounds 17:3
  93:7 114:12
  180:20 195:20
sources 59:19
south 47:19
spanish 48:5,6
  48:7
speak 10:12
  39:12 59:19
  91:2 140:10
  173:18
speaker 69:2,3
speaking 29:7
  29:7 48:7
  71:19 77:10
  128:16 144:7
  165:12 171:2
  171:21 200:3

special 164:14
specialist 67:16
specialists
  49:20
specialized
  41:16
species 87:17
specific 18:10
  23:8 36:6
  53:22 54:5
  57:19 58:7,8
  68:1 83:22
  87:12 91:10
  92:18 98:7
  106:22 111:6
  130:13,20
  139:5 150:22
  154:8 156:16
  165:15 169:9
  169:13 170:10
specifically
  18:15 22:4
  28:16 33:3
  42:13 45:6
  50:19 54:1
  64:11 68:21
  72:13 75:12
  95:17 99:8,12
  100:11 102:5
  137:11 143:11
  146:1 151:6
  176:17 189:21
  204:22
specifics 57:9
specified 130:6
specifies 15:3
specify 14:17
  14:18 128:12

speculate   43:13
speculation
  30:4 195:10
speculative
  86:4
spell   129:15
spelled   36:13
spend   30:21
spent   96:4,14
spiel   8:17
spinal   188:8,15
spirituality
  168:12
spoke   48:5,6
  173:15
spoken   166:13
sports   188:8,14
spring   170:1
spuriously   95:4
stable   126:5
  129:8
stake   37:2
  200:12
stand   158:10
standard   51:3
  137:21 141:21
  151:4 152:3
  154:21 159:16
  177:6,14 179:3
  179:10 203:11
standards
  62:15,16,17
  64:10 150:13
  160:1,14
  196:18
standing   95:6
  209:3,9,14

start   15:8 33:7
  126:1 128:3
started   19:19
  35:13
starting   164:19
state   1:13 6:10
  96:4 100:22
  115:13,18
  119:2 121:6
  123:5 136:7
  141:2 162:8
  168:8 169:6
  174:6 181:9
  191:2 193:8
  194:5,8,15
  195:17 201:7
  204:17 209:3
  210:22
statement
  132:15,22
  133:2 149:4,14
  152:5
states   1:1,8 3:2
  6:8 7:9 8:6
  108:8,9,11
  132:4 155:17
statistcal   143:3
status   49:4
stayed   131:2
stenographic
  7:3
step   140:9
steps   105:21
sterilization
  109:2,19
  110:18 111:3,8
  111:14

steve   1:11 3:11
  6:8
stimulate
  112:17
stimulating
  35:6
stipulation   7:4
stop   71:21
  88:13 90:4
  91:7 92:14
stopped   110:1
  128:9,18
stories   20:14
straightforwa...
  135:10
stretch   91:20
strikingly
  203:12
strokes   28:8
  62:3
strong   164:15
strongly   49:4
  88:17
structure   70:14
structuring
  40:11
struggle   49:13
students   31:22
  39:8 82:2
  168:20 169:6,9
  170:14 172:20
  173:11,12,13
studied   197:6
studies   17:20
  103:11,14
  105:13 110:2,5
  111:18 116:1,3
  116:7,8,11,14

116:15 117:11
117:17,20,20
118:1 121:8,14
131:22 136:13
136:13 139:5
185:5,11
187:19 188:3,7
188:19 197:11
204:1
study   19:8 31:7
  32:11 37:20
  110:1 116:20
  118:2,15,17,19
  118:20 119:3
  119:15,21
  120:8,12 121:1
  121:2,4 122:5
  122:16,19,21
  123:3,6,9,18
  123:20,21
  124:4,7,8,12
  124:15,19
  125:1,3,5,8,12
  125:14,15,21
  126:13,21
  127:2,6,11
  128:5,22
  129:14,19,22
  130:2,7,14,22
  136:17 164:13
  184:13 185:14
  186:8,19 187:9
studying   180:6
stuff   80:10
  84:9
subheading
  143:2

subject   20:9
   43:6,7 45:7
   172:18
subjected
   172:19
subjecting
   159:1
subjective
   81:19 88:19
   89:5,6,12
subjects   43:4
submit   16:6
   17:5
submitted   9:14
   9:17 16:5,18
   17:4 115:14
submitting
   117:3 179:20
subspecialty
   39:16
substance   56:3
   101:12 102:2,3
   102:7,10
substantial
   96:4,14 109:2
   157:3
substantive
   95:20
substituting
   178:2
succeeded
   184:1
sudden   173:2
suffering   67:8
   146:3
sufficient   62:9
   133:17 153:7
   176:8 187:21

189:4 192:17
   195:3 196:9
sufficiently
   63:3,4
suggest   21:13
   116:2 183:12
suggested   95:5
   184:7
suggesting
   183:11
suggests   112:6
   150:14 184:19
   194:6
suicide   4:20,20
   121:15 122:7,8
summaries
   177:11
summarize
   150:7
summarized
   117:12 130:5
   136:22 137:7
   204:2
summary
   148:22 154:20
   186:16
summer   37:5,9
   38:3 70:5
   206:13
superior   177:5
supplemental
   124:9
support   132:17
   178:13
supported   31:8
   132:19
supports   132:4
   132:11 133:6

supposed
   168:11
suppress
   137:13
suppression
   4:11 5:13
   119:5 186:20
sure   8:18 10:16
   19:17 33:16
   46:12 49:17,19
   50:1 52:1,11
   69:11 73:10
   89:12 90:9
   91:5 96:10,13
   109:20 110:22
   112:4 116:19
   119:9 124:18
   127:13 138:9
   138:11 140:12
   143:15 144:18
   145:19,21
   150:9 153:1
   155:15 162:14
   166:16 167:8
   174:19 180:18
   182:6,12
   185:13 186:4
   195:11,12
   196:16 208:11
   209:1
surgeon   19:6
surgery   24:16
   27:18
surgical   26:9
   78:9
surrogate
   62:15

surrogates
   62:14
surrounding
   77:22
surveilled
   174:9
survey   37:5,9
   37:15 38:2
   179:12
surveys   38:5
sustain   128:20
sustains   137:13
swear   6:14
   7:14
sweden   108:2
   140:15 147:16
   179:8
sweden's   139:9
swedish   148:7
switching   68:3
sworn   6:17
   7:18 210:5
sympathy   29:8
symposia   41:19
   42:1,6,17 43:1
   44:12
symposium
   42:12
symptoms
   28:20,21 29:22
   30:2 39:19
   40:5,7 55:2
   57:7,11 66:15
system   140:16
systematic
   108:4 136:18
   148:6,8 149:2

systematically 147:3
systematicness 26:22

**t**

t  4:5 5:1 129:16 163:14
ta  175:5
take  6:4,12 8:20 9:1 22:14 23:16,20 26:16 31:9 46:6,10 46:16 65:19 68:16 78:15 80:17 84:14,19 86:20 91:19 92:9 93:15 104:19 105:21 106:1,16,19 108:20 135:9 137:22 144:16 144:18 148:13 148:16 149:4 158:11,20 164:6 167:6,9 167:13 180:3 200:18 206:19
taken  6:7 8:7 8:14 93:7 174:7 175:12 210:3,12 211:9
takes  14:7,19 46:19 79:4 81:11 82:13 88:19 204:8
talk  10:7,18 45:21 76:6

77:13 124:7 134:3 160:6 168:8,11,18,18 169:4,8,12,16 169:21 174:6 175:2 199:19
talked  70:15 165:18 197:8 198:2 206:9
talking  22:20 46:2,3,5 137:7 148:17 160:7,9 165:15 166:16 173:11,13 176:17
talks  77:21
taught  80:12
teach  38:18
teachers  27:12
teaching  39:8 66:2 80:14
teachings  21:1 21:4,6,7
technological... 81:14
technologies 63:11
tell  7:19 9:19 15:17 29:13 33:2 48:13 69:18 76:2,3 79:5 85:5 150:11 169:8 200:6 201:11 206:10 209:16
ten  8:11,12 46:17,19 65:7 93:15,18

167:13
tended  82:3
term  11:2,7,9 11:11,14,21 12:14,19,22 13:8,21 14:1 23:3,5,7 25:18 31:1,15 40:2 50:8,12 135:13 146:16 156:9 177:18 183:9 198:6,21 199:17
terms  10:16 12:16 14:14 95:22 96:1 182:15 198:18
terrible  114:8
terrified 173:17
testified  7:20 110:7 120:2 134:15 136:1
testify  207:9
testifying 193:19 210:5
testimony 134:16 174:20 190:21 199:11 199:22
testing  183:14
testosterone 5:14 142:14 185:7 186:20
text  12:8
thank  7:13,21 8:1 94:1,7 115:7 129:17

156:19 161:5 163:15 167:22 177:21 180:20 207:6 208:10 208:17
thankfully 183:22
thanks  167:16
that'd  167:6,11
theme  90:17
theological 50:5
therapy  4:18 5:11,14 122:7 142:12 185:17 186:20
thing  8:19 20:16 44:5
things  29:2 42:5 50:15 51:6 53:3 91:11 154:19 159:5 163:18 192:19
think  13:10,11 13:17 20:15 21:8 30:5 34:21 40:4 53:13,15 54:2 59:4 62:6,20 63:3 65:22 66:6,19 73:2 80:8 85:6 89:2 93:14 98:16 102:13 110:7 127:7 136:3,17 137:20 150:4 151:14,21

157:9 163:12
176:7 177:18
185:14 189:12
191:18 201:1
206:7

**thinking**   20:9
54:2 81:20
84:15 137:11
172:1

**third**   24:15
191:5

**thoroughly**
27:9

**thought**   44:3,4
63:1 170:16

**thoughts**   4:19
122:7

**threat**   133:17
133:21,22
200:13,15

**threaten**
112:13

**threatened**
20:18 111:7
166:3

**threatening**
109:2,19
110:17 111:2,4

**threats**   84:5
134:3,4 162:1
174:12,18

**three**   205:22

**thrombosis**
139:18

**thumbs**   114:13

**thyroid**   56:20

**tied**   73:15

**time**   2:3 7:6
8:13,20,21
12:19 25:16
34:5 35:15
44:9 46:16,18
46:22 47:3
54:16 57:21
61:8 73:9 80:6
80:15 91:21
94:2,5 96:5,14
114:10 115:2,5
163:13 167:13
167:17,20
170:5 171:6
175:12 180:22
181:3 187:7
207:1,4 208:6
208:10 209:18

**timeframe**
18:12 29:18

**times**   8:9 14:21
41:20 50:8
198:14

**title**   45:16 56:1
76:22 124:17
165:2 186:19
187:6,8

**titled**   119:3
122:6 123:10

**today**   9:5 16:11
17:13 25:14
28:17 50:8
186:9 187:10
208:10

**today's**   10:2

**together**   59:21
73:16 80:16
205:2

**told**   168:17
169:7 170:6
182:2

**tollefsen**   80:12

**took**   18:9 59:19
76:9 121:5,8
121:22 123:3
139:8 148:21
149:9 157:8

**top**   22:14 79:9

**topic**   31:7 45:2
75:10,11 77:8
77:18 121:21
166:19

**topics**   68:3
173:1

**touch**   19:19

**toward**   134:6

**towards**   167:5

**town**   36:13

**tr**   13:1

**tradition**   49:14

**traditions**
64:15 66:10

**train**   48:2 82:2

**trained**   31:18
31:19 176:12

**trainees**   39:8
60:1

**training**   31:9
35:8,12,16
38:4,16 39:1
41:3,8,12,17
47:12,13 48:10
85:20 142:18
146:19 173:16
173:19 179:19

**transcriber**
211:1

**transcript**   6:19
15:21 208:21
209:12 211:3,5

**transcriptionist**
210:8

**transfer**   45:20

**transgender**
4:21 5:7 51:21
52:4 77:22
78:5 122:8
123:12 124:14
124:22 162:9
164:1,7 166:20

**transition**
13:12 14:19
66:6 75:2,13
76:1,8 78:8
88:17 90:11,15
97:17 98:22
100:14 108:14
113:6 114:9
115:22 116:2,3
116:9 117:22
118:4,9 121:16
125:20 126:1
126:10,12
128:3 130:15
131:6 132:17
133:4 135:11
135:19 136:9
140:6 142:5,8
142:20,21
160:4,10,13
164:3,16
168:21 175:14
175:16 182:21

189:11 190:15
196:10 203:13
**transmasculine**
5:12 185:17
**transsexuals**
4:16 120:15
**treat** 27:16
29:4 51:16,21
52:6 54:16
55:1 57:2,6
85:21 119:22
176:3 200:5
204:9,11,12
**treated** 27:17
28:7 54:16
56:16,17
203:20
**treating** 15:4
52:3 57:4,17
155:3
**treatment** 4:15
13:12 49:15
57:10,15,19
66:4 67:5 73:5
73:11,11,12,13
74:6,7,10,11
74:12,13 85:17
85:18 87:21
90:11 97:16,19
97:22 98:4,10
98:22 108:14
111:19 117:14
120:14 124:13
124:21 126:6
126:14 128:7,8
128:9,16,18,19
129:2,9 130:9
130:12,16,20

131:5 133:14
134:11,13,17
135:22 149:3
150:22 153:3
153:20 156:16
162:10 164:1,8
176:14 177:5
177:15 179:4
179:11 185:6
192:5 196:5,13
**treatments**
13:20 26:10
43:17,22 52:16
52:18,20,20
53:14,20,22
54:8 85:15
105:2 109:1
138:19 175:18
175:21
**trent** 166:21
**trial** 181:11,15
181:17 183:8
183:19 184:5
**trials** 189:1
**tried** 149:5
**true** 9:13 79:16
149:4 157:20
188:12 191:1
193:9 210:9
211:5
**truer** 83:10
**truth** 7:19,19
7:20
**try** 27:9,10
44:14 84:17
86:6 93:17
167:8 179:12

**trying** 27:2
38:6 43:15
93:13
**turban** 123:9
123:19
**turn** 62:14 94:9
103:9 104:18
115:9 140:21
168:2 181:6
186:18
**turned** 94:14
**turning** 17:15
78:13 96:3
100:15 121:12
124:6 131:15
138:5 143:1
149:16 161:8
174:22 177:8
184:10 197:16
201:22 204:16
**turns** 203:14
**two** 14:14 20:6
30:16,21 36:14
40:13 45:5
46:14 53:15
59:21 60:20
61:5 80:19,22
81:2 83:1
87:18 95:21
110:2,5 140:11
141:21 184:22
205:17,22
**type** 24:12
73:11,12 87:21
170:10 176:13
176:14 196:15
**types** 22:11
27:15 43:17,22

53:13 56:16
62:1 64:5
155:3 175:21
**typewriting**
210:7
**typical** 86:8
146:7
**typically** 60:20
72:21
**typo** 182:4

**u**

**u** 163:14
**u.s.** 3:20
**ultimately**
81:19 183:11
**unable** 196:1
**unavailable**
134:18 164:11
**unc** 17:16,19
18:17
**uncertain**
175:17 177:13
179:2,9
**uncertainty**
27:5 117:13
177:3,4
**unclarity** 182:6
**uncommon**
137:17,19
163:18
**under** 6:22
8:18 20:13
33:22 54:7
62:7 68:2 86:6
86:13 88:8,9
90:2,9 138:21
140:6 153:16

Farr Curlin                                          April 8, 2024

**[under - violating]**                                    Page 52

153:16 195:6
**undergoing**
  128:7 142:7
**undergrad**
  18:16
**undergraduate**
  17:16,18,20
  18:14,18
**underserved**
  32:5,10 48:2,9
**understand**
  6:18 9:3 12:6
  17:8 19:2 24:6
  27:2,8,10 32:8
  72:10,22
  143:10 153:1
  164:6 171:22
  176:8 179:13
  189:21 193:2
**understanding**
  10:16 13:7
  21:9 23:3,5
  81:2,11 82:5
  82:12 87:11
  95:15 112:15
  124:3 128:5
  129:4 135:12
  144:12,21
  145:6,9 146:7
  153:21 162:9
  163:22 170:20
  183:5 195:3
  198:19
**understood**  9:2
  26:17 41:15
  50:21,22 51:1
  51:9 53:8 71:5
  84:20 91:14

96:3 151:10
152:10 153:8
165:18,20
198:17 199:2
199:18 204:16
**underwent**
  125:20
**undeserved**
  48:4
**unethical**  91:1
  91:6
**unifying**
  166:11
**united**  1:1,8
  3:2 6:8 7:9 8:6
  108:8,9,11
  132:4
**universal**  84:19
**university**
  18:19 26:3,5
  35:14 37:10
  38:11 39:10,14
  42:20 44:10
  48:11 55:17
  57:22 58:2,18
  59:1 76:15,18
  78:2 168:9
  169:6,16
  173:14 179:22
**unjust**  63:18
**unjustified**
  64:2
**unnecessary**
  178:17,20
**unproven**
  105:2 131:21
  136:6,10,22

**unsafe**  116:4
**unscheduled**
  8:21
**unstable**  63:15
**unusual**  190:20
**unwanted**  29:1
**updating**  77:3
**upset**  11:7
**usdoj.gov**  3:8
**use**  10:17 12:21
  13:13,14,18,18
  14:20 23:7
  38:1,2 40:3
  50:5 139:21
  150:15 183:9
  198:21
**used**  11:2
  12:16,20 14:5
  14:22 23:1,5
  35:21 50:7
  76:7 81:17
  96:1 146:16,19
  178:3 198:6,14
  199:3,17
  204:15
**useful**  80:16
**uses**  6:21
  150:10
**using**  13:4
  22:20 37:15,16
  95:21 156:10
  182:19
**usual**  8:17
**usually**  60:1

| **v** |
| --- |

**v**  1:7,10

**va**  3:15
**valid**  105:22
**valuable**  19:4
**value**  199:20
**values**  49:16,21
  53:20,22 64:10
  65:20 66:5,10
  66:12 85:16
  95:8
**variety**  155:3
**various**  38:17
  41:10 155:8
**vary**  141:16,17
**verify**  149:6
**veritext**  6:4
  209:4
**verse**  12:9
**version**  12:8
  150:13
**versus**  84:3
**video**  169:16
**videoconfere...**
  2:1 3:4,12,20
  3:22
**view**  19:20,22
  20:5,6 21:20
  72:1,3 82:7
  83:3 199:1
  200:9 207:22
**views**  165:22
  166:3,10 169:9
  169:11 170:17
  172:4,18
**vigorous**  71:2
**violated**  157:13
**violating**  21:16
  181:12 183:16

violence   162:1
   165:21 166:3
   174:12,18
virginia   36:12
virtually   72:9
virtue   189:21
vision   49:5,12
visits   131:11,13
vitriolic   172:20
vitro   5:9
   185:15
voice   110:19
   161:15
voiced   164:20
voicing   172:12
vote   160:2
vries   119:3
vs   6:8
vulnerable
   152:11

w

wait   206:6
waived   209:20
want   10:15
   13:3 15:18,19
   15:20,22 17:6
   21:14 29:2
   46:16,17 57:15
   78:15 84:10
   109:20 114:8
   116:19 120:11
   128:11,12
   140:10 151:17
   174:9,17 180:4
   185:12 191:14
   201:3 202:6,17
   208:9

wanted   35:3
   48:2 88:13
wants   21:14
   200:16
warrants   143:5
washington   3:7
watched   20:10
way   4:9 20:19
   27:1,3,7 34:2
   40:4,10,15,20
   42:11 50:12
   52:22 69:1
   75:3,4 78:13
   78:18 81:10,20
   82:4,8,10,11
   82:12 83:1,4,7
   84:1 89:20
   90:2,9 95:21
   159:12 164:15
   168:14 171:20
   172:12 191:13
   199:16,17
   201:4,19
   203:19 204:14
   206:15
ways   23:6
   41:13 49:17
   80:19 198:7
   203:15
we've   16:13
   23:19 41:15
   84:13 90:13
   163:20
weaver   3:21
website   70:10
   70:11
week   80:13

weekly   60:2
weigh   62:8
weighs   89:20
wellbeing
   81:19 88:20
   93:3 146:5
went   18:18
   38:3
west   34:8 47:17
who've   165:11
widely   53:7
widespread
   171:14
wife   48:6
williams   3:20
   208:16
willing   86:6
wish   86:18
wished   29:3
wishes   63:5
wishing   29:16
withdraw   41:4
witness   6:14,17
   6:18 7:14,18
   46:13 79:18
   94:14 99:18
   100:4,6 101:4
   102:12,16
   114:11,12,17
   114:22 117:5,8
   117:9 119:8,11
   120:1 122:14
   122:16 127:1
   127:13 140:10
   163:12 165:1
   167:15 180:18
   182:9 185:21
   186:2 205:12

208:19 210:4
woman   63:10
   63:17 142:7
wondering
   50:9
wood   30:10,13
   30:19 34:6
word   178:2,3
   198:7 199:2,3
words   74:1
   126:9
work   12:1 19:3
   20:10 32:9,16
   32:18 33:4,6
   33:21 47:21
   48:2,3,22
   65:18 74:20
   99:10 102:1
   104:4 106:20
   106:21 173:6,6
   173:16 174:5
   206:15 207:21
worked   56:11
working   32:5
   55:7 128:8,17
   142:2 173:1
world   44:16
worried   170:13
worse   71:13
   129:1 130:9,11
   175:18
worsen   129:7
worship   65:16
worth   203:5
worthwhile
   19:12 35:6
wpath   113:5
   121:19 149:8

Farr Curlin

**[wpath - youtube]**

149:12,19
150:9,13 151:7
155:17 156:22
157:7,12 159:7
**wrap** 66:13
**write** 60:9
80:11,16
150:13 172:17
178:5
**writer's** 163:8
**writing** 96:2
159:17 160:1
161:3 172:7
190:22 197:2
**written** 7:4
32:16,19 172:8
197:13 207:18
**wrong** 29:10
144:5
**wrote** 88:16
105:4 109:7
117:16 128:1
136:16 137:5
143:7 161:18
171:16 181:14
181:18 205:17

**x**

**x** 4:1,5 5:1

**y**

**yeah** 30:5
65:14 75:18
86:3 98:6
114:1,22
122:14,15
148:4 154:17
159:19 162:19
165:4 195:11

**year** 24:15,15
24:21 25:2,4,7
32:7 35:16
60:20 77:14
170:3
**years** 12:2 30:7
30:16,21 39:1
43:3 54:11
62:4 63:13
65:7 76:6 77:4
80:13 118:12
126:2 128:4
197:1
**young** 4:10
63:10,17 119:4
**youth** 4:22
5:12 122:9
140:15 185:18
**youtube** 169:16

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.