# EXHIBIT 11

CONFIDENTIAL - ATTORNEY'S EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

BRIANNA BOE, *et al.*,                )
                                       )
    *Plaintiffs*,              )
                                       )
UNITED STATES OF AMERICA,              )
                                       )
    *Intervenor Plaintiff*,    )
                                       )
v.                                     )   Civil Action No. 2:22-cv-184-LCB
                                       )
HON. STEVE MARSHALL, in his            )
Official capacity as Attorney General, )
of the State of Alabama, *et al.*,     )
                                       )
    *Defendants*.              )

## SUPPLEMENTAL EXPERT REPORT OF
## KRISTOPHER KALIEBE, M.D.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

## TABLE OF CONTENTS

Table of Contents ............................................................................................................. ii

Introduction ...................................................................................................................... 1

WPATH's History of Enforcing Ideological Conformity and Suppressing Dissent ..................... 2

    A.    USPATH cancelled Dr. Kenneth Zucker's research presentation based on the demands of transgender activists ............................................................... 3

    B.    WPATH "muzzles" clinicians who speak publicly about their concerns of "gender-affirming care" ................................................................................... 5

    C.    WPATH tries to silence researchers with whom it disagrees ............................ 12

    D.    The enforcement of ideological conformity excludes mainstream clinicians and scientists devoted to the scientific method ................................ 16

Ideology Trumps Science in WPATH's Standards of Care 8 ........................................................ 17

    A.    WPATH's ideological conformity introduced bias into Standards of Care 8 ............................................................................................................. 17

    B.    WPATH's rights-based ideology transformed Standards of Care 8 from a medical guideline to a political and legal document ...................................... 26

    C.    Politics and outside pressure directly influenced Standards of Care 8 ............. 34

    D.    WPATH's public advocacy efforts have conflicted with open, scientific inquiry ................................................................................................................. 45

Political Advocacy Influences Scientific Inquiry at the  U.S. Department of Health and Human Services ........................................................................................................................... 52

    A.    HHS solicits the views and listens to requests of ideologically aligned political advocacy organizations that promote "gender-affirming care" ........... 53

    B.    HHS refuses to conduct a systematic evidence review of treatments it endorses ............................................................................................................ 64

References .......................................................................................................................... 68

CONFIDENTIAL – ATTORNEY'S EYES ONLY

## INTRODUCTION

1.      Since my previous report, counsel for Defendants have provided me with documents they received in discovery from the World Professional Association for Transgender Health (WPATH) (BOEAL_WPATH_000001 through BOEAL_WPATH_101726) and the U.S. Department of Health and Human Services (HHS) (HHS_130127-29, HHS_0131894-97, HHS_0132964-65, HHS_016510-22, HHS_0137394, HHS_0137648-50, and HHS_0144565 through HHS_0169992). I understand these documents are protected by a protective order. I have been asked to provide a supplemental report based on my review of those documents, as well as developments in the field since my last report.

2.      Since my last report I have served as an expert witness in the following cases:

Testimony:

    a.  State of Florida v. Benjamin Smiley, Case No. CF 15 – 004903, CF 15 – 005388, December 11, 2023

    b.  State of Florida v. Jacob Randall Young, Case No. 2021CF001299CFAXWS-3, Circuit Court, Pasco County, Florida, July 6, 2023

Depositions:

    c.  K.C., et al, v. The Individual Members of the Medical Licensing Board of Indiana, in their official capacities, et al., Case No.  1:23-cv-00595-JHP-KMB, United States District Court, Indianapolis Division, June 1, 2023

    d.   State of Florida v. Jacob Randall Young, Case No. 2021CF001299CFAXWS-3, Circuit Court, Pasco County, Florida, June 30, 2023

    e.  Jennifer McCarthy and Shaun Byers, Case No. 2018DR – 001829, Circuit Court, Pinellas County, Florida, December 5, 2023.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

3.      Based on my review of the documents, my concerns in my initial report have been confirmed. These concerns include that gender medicine has become politicized, tribal, and ideological. Internal WPATH documents show that Standards of Care 8 (SOC-8) cannot be trusted to establish quality care for gender nonconforming youth. Documents from the United States Department of Health and Human Services (HHS) also show that this component of the federal government is actively promoting gender affirming treatments for youth, despite the fact that HHS has known for over 2 years that evidence does not support these treatments. HHS has also conducted itself in a politicized, irresponsible manner by failing to allow input from a full range of stakeholders.

4.      The World Health Organization (WHO) on January 15, 2024, confirmed that "the evidence base for children and adolescents is limited and variable regarding the longer-term outcomes of gender affirming care for children and adolescents." (WHO FAQ, p.3).

5.      The WHO thus has acknowledged what WPATH and HHS also know but will not admit to the public.

**WPATH'S HISTORY OF ENFORCING IDEOLOGICAL CONFORMITY AND SUPPRESSING DISSENT**

6.      Since its beginnings in 1979, WPATH—then known as the Harry Benjmain International Gender Dysphoria Association—has struggled to reconcile its goals of being *both* a scientific, medical organization studying gender dysphoria *and* an organization welcoming to, and supportive of, transgender persons. The founding committee was composed of five medical doctors, one psychologist, and "one transgender activist." The medical professionals formed the committee to author the initial Standards of Care. The activist was left off the committee by one vote, but included in the authorship of Standards of Care 2. (Matte 2009 pp.44, 48).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

7.    Since that time, it appears both that the activists have gained more control of WPATH and that the line between professional and activist has blurred. Transgender activists who are not medical professionals can attend and participate in WPATH meetings, and WPATH included transgender "stakeholders in the development of the SOC-8." (SOC-8 S247). While it is important for medical organizations to listen to the concerns of the patients they care for, WPATH has included activists without holding them to the basic expectations required for scholarly exchange. As I discussed in my initial report, the underpinnings of the scientific method include tolerating others' viewpoints, respecting a researcher's freedom to present and discuss data (even if one disagrees with it), attacking ideas rather than the person presenting the idea, and deferring to the academic process of knowledge creation through constructive disagreement. From my review of the WPATH documents produced in discovery, it appears that WPATH eschews these principles.

8.    WPATH has developed dogmas, taboos, and orthodoxies that favor transitioning and oppose barriers limiting access to transitioning treatments. In this atmosphere there is an exchange of ideas, but only within a constrained ideology. Many in WPATH push for conformity of opinion, rather than emphasizing the creation of an organization that values rigorous scientific exchange and a diversity of viewpoints. As one leader put it, WPATH's discursive goal seems to be, "As long as we all stick together and sing from the same hymn sheet trans people globally will receive the care they deserve!" (BOEAL_WPATH_061094). Examples abound.

**A.  USPATH cancelled Dr. Kenneth Zucker's research presentation based on the demands of transgender activists**

9.    As I wrote in my initial report, public reporting suggested that USPATH had caved to activists' demands by cancelling a presentation by renowned psychologist Kenneth Zucker at

CONFIDENTIAL – ATTORNEY'S EYES ONLY

the 2017 USPATH conference. (Kaliebe Report ¶ 121). The WPATH documents confirm this reporting and shed further light on WPATH's response.

10.     As background, Dr. Zucker ran a gender clinic in Toronto for decades, and his data showed that most of the gender dysphoric youth at his clinic outgrew their dysphoria. Given that data, Dr. Zucker emphasized "watchful waiting" rather than early transition. That position was mischaracterized by activists as "conversion therapy"; Zucker was fired and his clinic closed. In 2016, Zucker filed a defamation claim against the health center and two years later won a substantial settlement for defamation. The health center "apologize[d] without reservation to Dr. Zucker." (Canadian Press 2018).

11.     When Zucker began his panel presentation at the 2017 USPATH conference, activists interrupted and picketed, and the event had to be cancelled. (BOEAL_WPATH_064163). That evening, "a group of activists led by transgender women of color read aloud a statement in which they said the 'entire institution of WPATH' was 'violently exclusionary' because it 'remains grounded in cis-normativity and trans exclusion.'" (BOEAL_WPATH_064163). The activists made a number of demands, including that USPATH apologize for Zucker's mere presence at the conference. A video of that meeting, which WPATH appeared to confirm to the *New York Times* is authentic, is on YouTube: https://www.youtube.com/watch?v=rfgG5TaCzsk. (BOEAL_WPATH_064099).

12.     USPATH met the activists' demands, telling them: "We are very, very sorry." (BOEAL_WPATH_064099). USPATH cancelled Zucker's talk the next day (USPATH said it "could not guarantee his safety"), publicly "apologize[d] for the pain and disrespect" the "situation" caused "participants, especially those who identify as trans women of color," and promised to "include trans people of color, especially trans women of color, in the ongoing work of

CONFIDENTIAL – ATTORNEY'S EYES ONLY

WPATH" and "in every aspect of the organization." (BOEAL_101663). USPATH further emphasized that "Zucker was not 'invited' to present," but had submitted research to present and his proposal was reviewed by peers in the same discipline, and both of his applications "received very high scores." (BOEAL_WPATH_101661). USPATH promised the activists that it would "do all we can to ensure that similar events do not occur" in the future. (BOEAL_WPATH_101663).

13.     Although this event happened in 2017, it is instructive for what has come since. Rather than apologizing to the disruptive activists and meeting their every demand to cancel the presentations of a respected (if controversial-within-WPATH) scholar, a truly science-based organization would uphold rules of civil scholarly discourse by removing the harassers and apologizing *to Dr. Zucker*. USPATH leadership instead chose to reward the harassers with a roundtable discussion and a public apology promising not to let the same mistakes happen again—apparently meaning that it would no longer grade presentation applications by their merit but by the popularity of their positions or those of their authors. WPATH appears comfortable excluding scholars based on ideology rather than on the strength of their ideas or the evidence they bring. As Dr. Zucker wrote to the organization that cancelled him: "If there cannot be meaningful dialogue about complex issues at WPATH or USPATH, how can the organization consider itself to be 'Professional'?" (BEAL_WPATH_101671).

### B. WPATH "muzzles" clinicians who speak publicly about their concerns of "gender-affirming care"

14.     As I discussed in my initial report, public reporting suggested that USPATH had censured its outgoing president, the psychologist Erica Anderson, PhD, for going public with concerns that clinicians were fast-tracking gender dysphoric youth for hormonal and surgical treatments. (Kaliebe Report ¶ 122). Again, the WPATH documents have confirmed this to be true and shed further light on the episode.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

15.     In brief, on October 4, 2021, Abigail Shrier published an article called "Top Trans Doctors Blow the Whistle on 'Sloppy' Care." (Shrier 2021). In it, Shrier interviewed Anderson and Dr. Marci Bowers, a plastic surgeon who currently serves as president of WPATH. Anderson warned: "It is my considered opinion that due to some of the — let's see, how to say it? what word to choose? — due to some of the, I'll call it just 'sloppy,' sloppy healthcare work, that we're going to have more young adults who will regret having gone through this process. And that is going to earn me a lot of criticism from some colleagues, but given what I see — and I'm sorry, but it's my actual experience as a psychologist treating gender variant youth — I'm worried that decisions will be made that will later be regretted by those making them." When asked what "was sloppy about the healthcare work," Anderson elaborated: "Rushing people through the medicalization," and "failure — *abject* failure — to evaluate the mental health of someone historically in current time, and to prepare them for making such a life-changing decision." (Shrier 2021). Bowers like-wise worried that administering puberty blockers to gender dysphoric youth could be dangerous given that "there's not a lot of published data, not a lot of studies, the field is in its infancy, [and] you see people sometimes selling protocols like puberty blockers in a dogmatic fashion." Bowers continued: "I'm not a fan of [pubertal] blockade at Tanner Two anymore, I really am not." "The idea all sounded good in the very beginning," she said. "Believe me, we're doing some magnificent surgeries on these kids, and they're so determined, and I'm so proud of so many of them and their parents. They've been great. But honestly, I can't sit here and tell you that they have better — or even as good — results. They're not as functional. I worry about their reproductive rights later. I worry about their sexual health later and ability to find intimacy." (Shrier 2021).

16.    USPATH responded by formally censuring Anderson for speaking publicly about her concerns. (BOEAL_WPATH_026947-52). In a letter signed by the USPATH Board of Directors, USPATH faulted Anderson for "grant[ing] an interview in the lay press with an author with known biases regarding the care of transgender and gender diverse youth, during a period of intense politicization and when litigation is in progress in multiple US jurisdictions, where legislation aims to prohibit such care by statute." The Board concluded: "As such, the USPATH Board of Directors is serving you with this formal letter of reprimand for such actions."[1] Anderson (or someone else who received the letter – the names are redacted) complained that the Board provided "effectively no opportunity to discuss their concerns, as they met secretly and went straight to this letter which was presented to [Anderson] as fait accompli." (BOEAL_WPATH_026947-52).

17.    For Bowers's part, the WPATH president suggested to others that the "field is in its infancy—and I do think we may need a bit of a reset" (BEAL_WPATH_021908)—and encouraged WPATH leaders "not [t]o become so insular that we cannot offer meaningful discussion." (BOEAL_WPATH_021925). "We should have been covering these topics long ago as an organization because lives have been affected, not always positively," Bowers lamented. (BOEAL_WPATH_021925). Then, feeling "indelibly stained and already marginalized" within WPATH (BOEAL_WPATH_023348), Bowers drafted apology after apology to circulate to WPATH's upset members. (BOEAL_WPATH_0227150-20; BOEAL_WPATH_022898-903; BOEAL_WPATH_022920-21.) Eventually, after offering to resign, Bowers opted to "allow th[e] story to die off without any response." (BOEAL_WPATH_023348-49).

---

[1] Almost all of the documents produced by WPATH have all names redacted, including this one. It is clear from the context, however, that this letter was addressed to Anderson. Similar context suggests when a document is authored by Bowers.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

18.    An organization that prized truth and truth telling would have handled the episode differently. Rather than formally punishing Anderson and castigating Bowers for publicly raising concerns about "sloppy" care harming children, WPATH and USPATH could have praised their leaders for courageously speaking up to alert the public about harms to minors. They also could have prioritized patient care by investigating Anderson's concerns and advising doctors to focus on the mental healthcare needs of their patients. Instead, the opposite occurred.

19.    Despite USPATH's formal censure, Anderson continued to speak publicly about her concerns. In November 2021, Anderson co-authored an op-ed with another WPATH psychologist, Laura Edwards-Leeper, PhD, in the *Washington Post*: "The mental health establishment is failing trans kids." (Edwards-Leeper & Anderson 2021). That same month, Anderson gave an interview to *Medscape* raising similar concerns. Anderson emphasized that "[a]n evaluation for gender dysphoria requires a comprehensive picture of every young person, their journey, and a medical and psychological profile," and worried that many providers were "simply taking what the children say and running with it." (Ault 2021). "To simply act as if a child is a reliable reporter about this area but not nearly every other is preposterous," Anderson said.

20.    WPATH and USPATH leaders reacted negatively. One board member immediately e-mailed the other members: "Erica has now given another press interview on this topic, in which she re-affirmed her statements in the Shrier article, without notifying or consulting with the Board, even after her recent letter of reprimand. This requires action by the Board in my view. I will ask [redacted] to weigh in, but I would in the least want to consider removing her from her Past-President role and moving her to a member-at-large position. I am concerned that we have given Erica a reprimand yet she continues to speak to the press, and if we take no action then she has no dis-incentive to continue to do so." (BOEAL_WPATH_027549).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

21.     While considering whether to punish Anderson again for raising concerns publicly, the board members admitted internally they shared many of Anderson's worries. One member wrote:

> [G]oing on 'what the children say, as [redacted] put it, and on what we/parents/teachers observe in their behavior…there's no litmus test. And there's no assessment tool that captures all the ways internal signals can sometimes be misread as related to gender when they're not, or not completely, as can happen with borderline personality and other identity-related conditions, and which is occurring more often (in my observation) as trans-nonbinary identities are more visible, available and (yay) accepted. We're just beginning to see responsible, trans-led investigations on some of this, … but nothing yet to my knowledge that specifically addresses this weird moment we're in with kids/pandemic/social media.

(BOEAL_WPATH_027567) (first alteration in original).

Another member agreed: "To share my own thoughts on these subjects, I do agree with [redacted] and would go a step further to say that I do have concerns about how the door has swung away from more rigorous assessments in general over time. The reaction to restricted access and barriers has been a wave of treatment-on-demand clinics and proponents." (BOEAL_WPATH_027564). This board member also noted "that there has been a great deal of pressure placed on" the authors of the Assessment chapter of the Standards of Care 8 "and on the editors by a wing of the community who want to have everything done on demand or it is otherwise transphobic." (BOEAL_WPATH_027564).

In reply, another board member joined the chorus: "All I can say is, finally. I am glad to finally hear some sense of concern about the loosening of standards. It should be quite clear that as we have loosened standards and lost some control over the opportunistic nature of medicine in the US that we too started hearing increased concern of detransition/regret." (BOEAL_WPATH_027626). This board member was "alarmed by the call to censure [Anderson] yet again." (*Id.*) "For what, stating the concerns that [redacted] just expressed? The first step in

CONFIDENTIAL – ATTORNEY'S EYES ONLY

solving a problem is admitting you have one. Everyone, we have a problem." (*Id.*) "As a Board," this member concluded, "frank discussions need to be had." (*Id.*)

One member also admitted that "de/retransitioners have always been a part of my community, and to a lesser degree my medical practice." (BOEAL_WPATH_027628). "There's some idea that people either essentially are or are not trans that these people are running with, which is so dangerous to people who de/retransition, and not the idea that different genders fit people better at different times and those things are fluid." (*Id.*).

In response, one member called for a "USPATH task force" to "examine this issue by the numbers" by engaging "impartial experts in the field." (The member clarified that Lisa Littman—who has published studies on detransitioners and on the "Rapid-Onset Gender Dysphoria" hypothesis—would not qualify "given her recent appearance with Megyn Kelly.") The member also called for a "task force which will examine qualifications and training consideration." (BOEAL_WPATH_027550).

22.     Despite other board members agreeing with the substance of Anderson's public critique, and despite board members conveying their own concern and knowledge that harmful care was occurring, WPATH and USPATH once again failed to do the responsible thing. They never went public with their board members' concerns. They never publicly apologized to Anderson. To my knowledge, they have ignored calls to create a "task force" of impartial arbiters to investigate claims of harmful care in a rigorous and transparent manner. Instead, the organizations continued their attempt to silence whistleblowers from speaking publicly. WPATH proposed a new media policy for board members, which either Anderson or Bowers (the name is redacted) found "very troubl[ing]." (BOEAL_WPATH_027831). She wrote: "Dissent and diversity of opinion is generally considered a positive and shows the maturity of an organization, not a canned,

CONFIDENTIAL – ATTORNEY'S EYES ONLY

plastic veneer that puts out a happy face at all times." "This is a very unfortunate approach," she concluded, "and one I would not be comfortable with in its present form." (*Id.*) That was November 30, 2021. Nine days later, Anderson resigned from the USPATH Board of Directors. (BOEAL_WPATH_028313). The atmosphere didn't improve once Anderson left. After reading another public statement of concern Anderson gave in March 2023, one WPATH leader lamented: "What a lousy legacy Dr. Anderson is leaving. Casting doubt on the validity of TGD identities." (BOEAL_WPATH_092964). "Erica is a self serving slug." (*Id.*)

23.     As for Edwards-Leeper, she wrote an email to WPATH about the op-ed she and Anderson published in the *Washington Post* raising concerns of inadequate mental healthcare for adolescents suffering from gender dysphoria. She indicated that after the article was published, she received lots of feedback and that "[c]ountless providers have shared that they have been afraid to speak up about their concerns." (BOEAL_WPATH_027832). She continued: "There is a listserve I'm on (mostly pediatric trans medical doctors) and I've had medical and mental health providers from that group privately message, thanking me and telling me they are too afraid to share their feelings with the entire group. That group largely seems to be a dangerous echo chamber that is unable to engage in constructive and critical dialogue about the state of the field, which is incredibly worrisome." Edwards-Leeper contrasted that response with WPATH's: "I fear that WPATH's recent stance to shut down this conversation was a huge mistake." (BOEAL_WPATH_027832). In a follow-up email, she concluded: "My fear is that if WPATH continues to muzzle clinicians and relay the message to the public that they have no right to know about the debate, WPATH will become the bad guy and not the trusted source; it will undo all public credibility." (BOEAL_WPATH_027843).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

24.     Edwards-Leeper is right. While a few individual board members voiced their con-
cerns internally about various aspects of "gender-affirming care"—be it inadequate mental health
safeguards for gender dysphoric youth, the effect of puberty blockers on future sexual function or
fertility, "sloppy" care by physicians out to make a buck, or the unexplained rise in gender dys-
phoric teenaged girls—WPATH and USPATH as organizations "muzzled" clinicians who let the
public in on the debate. In doing so, the organizations violated the spirit of free inquiry and truth-
seeking, intentionally misled the public about the safety and efficacy of transitioning treatments,
and sent a clear message to its members: they may be able to whisper their concerns to one another
privately, but under no circumstances should they depart from the party line in their public state-
ments. This is antithetical to good science and puts tribalism and ideology above patient welfare.

### C.   WPATH tries to silence researchers with whom it disagrees

25.     WPATH's censorship is not only of its own members. Rather, as I explained in my
initial report, it has also sought to silence researchers with whom it disagreed—perhaps no one
more so than Dr. Lisa Littman. (Kaliebe Report ¶¶ 134-40). In brief, over the last decade-and-a-
half, there has been an enormous increase in transgender identification, and the new population
has significant mental health comorbidities and has moved to being predominately natal females.
In 2018, Littman published an article examining possible social elements involved in youth with-
out previous gender dysphoria now presenting as transgender. She used the phrase "rapid-onset
gender dysphoria," or "ROGD," to describe the phenomenon. While the fact of an increased gender
dysphoria population with a shift to female and increased comorbidities is not under any dispute,
many in the activist community panicked over data showing a possibility of social transmission or
influence of gender dysphoria. This led to attacks on Dr. Littman and frantic attempts to discredit
her work.

26.    Littman's article was published in August 2018. The next month, WPATH issued an official "position on 'Rapid-Onset Gender Dysphoria (ROGD),'" claiming that ROGD "constitutes nothing more than an acronym created to describe a *proposed* clinical phenomenon that may or may not warrant further peer-reviewed scientific investigation." (WPATH 2018). It later joined the "CAAPS Position Statement on Rapid Onset Gender Dysphoria," seeking "eliminating the use of Rapid-Onset Gender Dysphoria (ROGD) and similar concepts for clinical and diagnostic application" and claiming that "there is *no* evidence that ROGD aligns with the lived experiences of transgender children and adolescents." (CAAPS Statement, emphasis mine).

27.    Internally, a different story unfolded. WPATH was extremely concerned with controlling the language used to describe the enormous increase in transgender identifying young people; the concept of ROGD threatened to undermine WPATH's positions that gender identity is innate and biological rather than socially influenced. So publicly, ROGD had to be defeated. But privately, leaders acknowledged that ROGD is plausible. In one email chain, members (likely either board members or chapter authors of Standards of Care 8 – the redactions make it hard to tell) discuss the concept. "[I]ncreasing numbers are asking for medical affirming treatment," one wrote. "What the explanation for this increase is, is unknown and also methodologically challenging to study; social factors likely a play a role.. I do not like the word contagion, but these factors could also be recognition and increased social awareness." (BOEAL_WPATH_074672). Another member responded: "I couldn't agree with [redacted] more. We cannot outright dismiss the fact that social factors (also don't like the word contagion) impact identity development and decision making in adolescents." This member continued: the rise is "related to many things such as social factors. Some adolescents – who have certain psychological vulnerabilities – feel comfortable within a marginalized community space and come to feel it's a safe space for them. For others,

gender serves a different function, not necessarily one that is about their gender identity even though they may feel it is about their identity in the moment." (BOEAL_WPATH_074671).

28.    WPATH's public critique of ROGD continues. As I was writing my initial report, a controversy was brewing about an article published in the *Archives of Sexual Behavior* by Suzanna Diaz and J. Michael Bailey entitled "Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases." (Kaliebe Report ¶141-42). The authors surveyed over 1655 parents of gender dysphoric adolescents who answered questions about their child's gender dysphoria and gave answers that matched the ROGD hypothesis—the adolescent did not have a history of gender dysphoria in childhood, and the dysphoria was associated with social influences and/or psychological comorbidities. (Bailey & Diaz 2023). So again, many WPATH leaders attacked the article. Marci Bowers (WPATH's president), AJ Eckert (USPATH board member), Asa Radix (co-chair of SOC-8), and Colt St. Amand (SOC-8 contributing author), among others, wrote the International Academy of Sex Research (IASR) and Springer (the journal's publisher) to demand that they retract the article because "the article was published without Institutional Review Board (IRB) approval." (Open Letter 2023). Then they went a step further and threatened that they would "no longer submit to the journal, act as peer reviewers, or serve in an editorial capacity until" its editor—Dr. Ken Zucker—"is replaced with an editor who has a demonstrated record of integrity on LGBTQ+ matters and, especially, trans matters." The problems the letter writers had with Dr. Zucker appears to be as mentioned previously that data from his clinic when watchful watching and supportive therapy were provided show that the majority of patients had their gender dysphoria remit naturally. The authors considered this success "to be a form of conversion therapy." Also, as an editor Dr. Zucker upheld proper standards of discourse, rather than censoring scholarly exchange as hoped for by the letter writing activists. This desire for censorship is clear from their language as the

CONFIDENTIAL – ATTORNEY'S EYES ONLY

authors complained, Zucker had "collaborative proximity to individuals and groups who militate against access to gender-affirming care" because he allowed the Society for Evidence-Based Gender Medicine to pay "for the open access fee of numerous articles in *Archives of Sexual Behavior*." (Open Letter 2023).

29.     The critiques were unfounded, but the hostility toward Zucker is easy to understand as his clinical approach, research results, and integrity as a journal editor all directly threatened the tribal and ideological bubble of WPATH. As to the methodological critique, Bailey explained that IRB review was not needed because the primary author was not affiliated with an academic institution and Bailey had consulted his own institution's IRB and acted in accordance with its guidance. (Bailey Letter 2023). But the IRB complaint was not actually the problem—it was a ruse, an excuse to quash the paper. So when that failed, the activists, now joined by the journal's publisher due to the public controversy the paper had caused, shifted the goalposts: the authors had failed to get informed consent from the parents conducting the survey, even though they expressly told the parents that their answers would be published online. (Bailey Letter 2023). On that basis, the publisher retracted the article. (Bailey Retraction Note 2023).

30.     The Foundation Against Intolerance & Racism wrote a counter letter that espouses the principles WPATH should have embraced. (FAIR Letter 2023). As that letter noted, "[t]he appropriate action is to have an open debate about the paper—not to silence those whose views one finds disagreeable." "We fear that just like in the case of the original ROGD paper, the demands for retraction and sanctioning of Dr. Zucker, the Editor-in-Chief[,] are principally motivated by the ideological opposition to Diaz and Bailey's conclusion." "Ongoing attempts to silence any research into the explosion of teens who are now identifying as transgender only stands to hurt the very patients the activists are claiming to help—young gender nonconforming people."

CONFIDENTIAL – ATTORNEY'S EYES ONLY

**D. The enforcement of ideological conformity excludes mainstream clinicians and scientists devoted to the scientific method**

31.     The episodes recounted above demonstrate that WPATH is not an organization interested in publicly seeking truth or the best medical care for children and adolescents suffering from gender dysphoria. Instead, WPATH occupies a particular sliver of the medical community and it furthers that community's preferences (and financial interests). Even though members may raise concerns with one another privately, publicly they must all "sing from the same hymn sheet."

32.     This public ideological conformity has a number of downsides, and is antithetical to the operation of a scientifically guided organization. First, it excludes, by intention or default, moderate, middle-of-the-road clinicians and scientists. If Dr. Ken Zucker, who has devoted his life to caring for and studying patients with gender dysphoria, is not welcome at WPATH, then it's hard to imagine that anyone who is not already fully on board (or at least willing to parrot the party line publicly) with on-demand transitioning treatments for minors would be accepted. Any person interested in the treatment of gender non-conforming youth who observes fundamental errors in WPATH's viewpoints can see they would be treated with hostility for voicing their concerns at WPATH. This skews membership toward creating a group without constructive disagreement regarding the most critical issues of concern in youth gender medicine. (Kaliebe Report ¶¶ 56-80).

33.     Second, suppression of internal disagreement leads to the false appearance of consensus and established science. As documents from WPATH show, some of their members and leaders *agree* that the rise of gender dysphoria in adolescent females may have a social element to it. They *agree* that care in the United States can be sloppy. They *agree* that puberty blockers are often started too early and that this can have serious (and still unknown) effects for the child. They *agree* that mental health should be prioritized and that many practitioners in the United States are

CONFIDENTIAL – ATTORNEY'S EYES ONLY

not doing that. And yet WPATH will not let these clinicians speak publicly lest the public come to realize that the science is not settled.

34.     Third, the self-censorship affects the composition of WPATH's leaders. If only those who unquestioningly affirm "gender-affirming care" can speak loudly and proudly—while those who raise concerns must do so quietly and, when they do, are praised (privately) for having the courage to speak out—then the leadership will, over time, necessarily consist more and more of enthusiastic advocates. Those leaders will, in turn, select other affirmative clinicians and advocates to lead committees or author publications. Thus the cycle of activism turns, leaving the thoughtful and balanced clinicians left behind.

35.     None of this is good for science or medicine. And none of it is good for the youth who suffer from gender dysphoria, who need help, not activism, from medical organizations.

**IDEOLOGY TRUMPS SCIENCE IN WPATH'S STANDARDS OF CARE 8**

36.     A critical element of SOC 8 is reducing medical and mental health oversight from medical transition. Members of WPATH deride medical oversight and careful assessment as gatekeeping. They continue the move toward only minimal reference to the relationship between mental health status and transgender identity. There are few voices indicating that there is not research clarifying the intermixing of mental health problems and transgender identity, despite the well documented and longstanding acknowledgement and data that these co-occur and it is unclear which causes which and in whom. Stating this appears taboo within WPATH.

**A.  WPATH's ideological conformity introduced bias into Standards of Care 8**

37.     WPATH is an organization of self-selected lay people and professionals drawn to advocacy and gender medicine. This self-selection process introduces bias in the composition of

CONFIDENTIAL – ATTORNEY'S EYES ONLY

the organization. This is not acknowledged within internal documents, and members appear unaware of their own biases. A well-constructed clinical guideline would prioritize the search for truth, be open and transparent about ideological and self-selection bias, and acknowledge inconsistencies and unknowns in the science. In the following paragraphs I'll provide examples where WPATH's internal documents display the pressures exerted to loosen standards and move the SOC-8 farther away from responsible clinical practice.

### 1. "Medicine on Demand"

38.     Throughout the WPATH documents, a recurring theme is members and authors endeavoring to use "correct" language, downplay risks of harms of "gender-affirming care," and sideline scientific literature or researchers that cast doubt on WPATH's narrative that gender-affirming care is lifesaving, medically necessary, safe, and effective. In the previous version of the Standards of Care, one of the criteria to receive hormone therapy was that "significant medical or mental health concerns" "must be reasonably well-controlled" before beginning transitioning treatments. (SOC-7 34). Even this standard was poorly defined and open to interpretation by clinicians. But SOC-8 loosened this standard, recommending that mental health professionals only "address mental health symptoms that interfere with a person's capacity to consent to gender-affirming treatment before gender-affirming treatment is initiated." (SOC-8 S172). Again, as WPATH is a self-selected group of enthusiasts for medicalization, the fact that transgender identity might arise from treatable mental health concerns is unmentionable. As such, WPATH authors move to a standard whereby only if the patient is so extremely impaired that he or she cannot consent to transitioning treatment is that a patient's psychological or cognitive function a limit to access to medicalization.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

39.     This drastic reduction in mental healthcare requirements prior to transitioning appears intentional on behalf of the SOC-8 authors. Commenting on an earlier draft of SOC-8, one of the authors noted that "[t]here is a statement from the Assessment Chapter that is in conflict with the Mental Health Chapter." (BOEAL_WPATH_020179). The Assessment chapter had recommended that clinicians "ensure that any mental health conditions which could be a contraindication to, or hamper, gender affirming medical treatments" be "treated or reasonably well managed prior to the initiation of treatment." The author noted: "The 'treated or reasonably well managed' language harkens back to the 'reasonably well-controlled' language that has been so problematic in SOC 7." "The language we use in" the mental health chapter, the author explained, "makes it clearer that a condition does not have to be 'well-controlled' if the patient has capacity to consent and can participate adequately in perioperative care, with support."

40.     After the conflict was resolved (by the Assessment chapter caving to the reduced requirements of the Mental Health chapter), an author praised the result: "Thank you for your advocacy [redacted]. Here's to hoping healthcare professionals recognize it's their responsibility to facilitate all trans folx (particularly autistic and neurodivergent) to gain access via helping patients become prepared for the medical procedures rather than simply respond with a permission or restriction." (BOEAL_WPATH_021479). This comment displays that at least some WPATH authors believe it is healthcare professionals' "responsibility to facilitate all trans folx," even vulnerable individuals with neurocognitive disorders. Again, within WPATH, it too often is not a discussion of the evidence of outcomes within sub-populations but rather a viewpoint that "medicine on demand" is a civil right for those who identify as transgender. The problem is not just that "medicine on demand" contravenes historical medical ethics, but that WPATH is not honest that this is the viewpoint it promotes in practice.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

41.     In another loosening of standards, the idea that a well-documented and persistent gender incongruence is needed for medicalization was debated among SOC-8 authors. After the statement had already passed the Delphi consensus process, the authors of the adult assessment chapter proposed changing the language to clarify that a mental health professional should not determine whether a patient actually experienced gender incongruence. The "controversial statement in the assessment chapter" had required that "gender-affirming care" should be recommended only "when there is well-documented (according to local contexts) persistent gender incongruence." (BOEAL_WPATH_058204). The problem, apparently, was that the statement could "be read as if the assessor needs to assess whether a person 'is Trans' or not (whether they have Gender Incongruence). This has been highly criticized." One author in favor of changing the statement explained: "We feel that as assessors we should be happy to accept that the person has Gender Incongruence, but we want to make sure that this is marked and persistent (as per the requirement in ICD-11.)" The authors thus supported a new version that made "the emphasis, not on assessing gender incongruence, but on assessing that the gender incongruence is marked and persistent." (*Id.*) That version—in which the assessor evidently does not need to determine whether the patient actually experiences gender incongruence or what might be causing the gender incongruence—now appears in SOC-8. (SOC-8 S32)

42.     The WPATH approach does not contain room for skepticism regarding the causes of gender incongruence, and it appears to assume that all gender incongruence is psychologically healthy and should be supported. This extreme philosophy would affirm and medicalize those with severe personality disorders, level 3 autism, gender identity change after sexual assault, or internalized homophobia. Under the altered recommendation, none of these scenarios would matter so long as the patient reports persistent gender incongruence. Again, as above, this "medicine on

demand" approach can be argued for, but WPATH should be honest that they are implementing this theory without data in a variety of worrisome sub-populations. But WPATH does not do that, instead asserting that medicalization can almost always be clinically appropriate if desired by the patient. This theory is especially concerning with regards to children, adolescents, and young adults who remain in the process of identity development.

43.     Another example of this ideological viewpoint infecting the Standards of Care is when it comes to informed consent. Often, it appears that informed consent is a vehicle for providers to offer "medicine on demand" even when the evidence does not support a procedure as safe and effective. For instance, after Dr. Bowers publicly lamented that puberty blockers could limit surgical options and make a transitioning vaginoplasty much less likely to be successful, authors discussed how that concern should be addressed in SOC-8. One weighed in: "There isn't much published data on this topic. I don't think there is a one size fits all. I think informed consent is the way to go in terms of weighing the risks of early pubertal blockage vs amount of surgical material needed for vaginoplasty." (BOEAL_WPATH_021975). That is what SOC-8 did. (SOC-8 S119).

44.     Part of WPATH's emphasis to de-pathologize gender incongruence and emphasize the patient's right to desired treatment—regardless whether that treatment is safe and effective at treating gender dysphoria—could come from the voices WPATH listened to when creating its guideline. Rather than soliciting a broad range of perspectives, which would include physicians and researchers like Dr. Zucker, Dr. Littman, and others with a healthy skepticism of immediate medicalization, as well as input from schools, sports networks, legal systems, and other organizations, WPATH was insular in who it heard from. To serve as a contributor to SOC-8, one had to be a member of WPATH. (SOC-8 S248). And the most active voices commenting on the proposed

standards were from transgender activists and activist organizations, not from a full range of stake-holders. For instance, Transgender Europe commented on the draft guidelines that it was "[c]oncern[ed] about a continuation of a rooted pathologizing / gatekeeping perspective" by the draft's requirement that clinicians "only recommend gender affirming medical treatment requested by the patient when there is well-documented (according to local contexts) persistent gender in-congruence." (BOEAL_WPATH_028056). According to Transgender Europe, this statement evi-denced "[p]atholigisation and its consequence, gatekeeping," by "[a]ssuming that someone's iden-tity can come and go (thus the need for 'persistence')." As discussed above, WPATH responded to these concerns by loosening the mental health requirements.

### 2. Ethics in SOC-8

45.     It is noteworthy to me how little ethics are discussed in the communications at WPATH. It appears that WPATH initially contemplated for SOC-8 to include a chapter devoted to ethical considerations, but for whatever reason that chapter never made it to the final standards. (BOEAL_WPATH_073277).

46.     As a slide presentation by Jamison Green and Paula Neira confirm, however, WPATH was aware of a number of ethical quandaries it chose not to address in SOC-8. (BOEAL_WPATH_073280-073309). These ethical challenges would include, for example, the ethical trade-offs regarding legal recognition of gender identity versus legal recognition of biolog-ical sex. Nowhere does this issue appear to be explored, even though the dismantling of legal recognition of biological sex has profound implications for societies and individuals, including children. Likewise, there seems to be little (if any) discussion of the rights of women to have single-sex spaces, or that using self-identified gender rather than sex as a legal marker would likely

**CONFIDENTIAL – ATTORNEY'S EYES ONLY**

disproportionately affect women the most. The profound ethical trade-offs relating to legal recognition of gender identity in children and adolescents also did not seem to be explored, even though many aspects of this conflict are listed in a slide of the presentation Green and Neira gave: "Name Changes, Gender/Sex Marker on Documents, School Records & Transcripts, Diplomas." (BOEAL_WPATH_073281).

47.    When suggesting "Primary Resources," it is also notable that the presenters listed only one-sided advocacy groups:



## Primary Resources

- National Center for Transgender Equality, D.C. (www.transequality.org)
- Transgender Legal Defense and Education Fund, NYC, NY (www.tldef.org)
- ACLU – affiliates in every state + D.C. & Puerto Rico (www.aclu.org)
- National Center for Lesbian Rights , San Francisco & D.C. (www.nclrights.org)
- Lambda Legal , NY, ATL, L.A…. (www.lambdalegal.org)
- Southern Poverty Law Center, Montgomery, AL (www.splc.org)
- Transgender Law Center, Oakland, CA (www.transgenderlawcenter.org)

It is unclear whether the ethics, including potential harms, of using only advocacy groups as primary resources on legal and ethical topics was ever explored by WPATH. An organization that considers the full range of ethical issues would include a much broader range of resources.

48.    In the discussion notes for the slide, additional complexities are hinted at, asking reasonable questions such as:

23

CONFIDENTIAL – ATTORNEY'S EYES ONLY

- "How do we establish standards of care and good practices with a dearth of evidence-based scientific longitudinal data on TGE children?"

- "Can a young child know their gender enough to warrant social transitions?"

- "Does a child have to experience first stages of endogenous puberty to be able to fully ascertain their authentic gender identity?"

- "Does a youth who does not yet have a fully developed myelin sheath have the capacity to make informed decisions about irreversible or only partially reversible gender-affirming medical interventions (surgeries and hormones)?"

- "Can a youth receiving puberty blockers in Tanner Stage 2 considering direct follow-up with gender-affirming hormones have the foresight to assent to the foreclosure of ability to conceive a baby later in life?"

- "In a gender affirmative approach in which gender variations are perceived as healthy phenomena rather than disorders, is there justification for a mental health gender diagnosis for children and youth?"

- "In a gender affirmative approach in which gender variations are perceived as healthy phenomena, what are the ethics of engaging children in formal psychological testing to evaluate their gender status?"

- "What are the ethics of denying treatments assessed to be in the best interests of the child, possibly even life-saving, if parents do not consent to these treatments? If medical or government policies do not allow them?"

- "How do we attend to the new influx of gender-nonbinary youth requesting medical interventions desired to consolidate their unique gender selves, neither male nor female?"

CONFIDENTIAL – ATTORNEY'S EYES ONLY

(BOEAL_WPATH_073308).

49.    In an email concerning the presentation, another contributor asks: "Making decisions about blockers is a major challenge to families and clinicians—how do we propose puberty blockers (presumably leading to hormones and later surgery) to parents and their child in an informed way that considers aspects of future life that are almost unimaginable at age 9-10-11-12? Sex, reproduction, intimacy, aging, etc." (BOEAL_WPATH_076566).

50.    These are important and reasonable ethical questions, and it is clear that there are, at present, not anywhere enough data to provide firm answers to many of them. Certainly, reasonable people of goodwill can disagree about how to answer them. Thus, what seems most strange is that internally WPATH will list these as open questions, but in SOC-8 and in WPATH's public proclamations they nonetheless push for medicalized approaches to gender variant youth as if the ethical questions are settled by the state of the science in favor of medicalized transitioning.

51.    In another slide, a number of ethical questions are asked about how WPATH members should interact with one another: "What is protected speech? What are the limits of what we can discuss? Or cover in research? Eg., Reparative theory. How can we have civil but vigorous debate? Do we want an echo chamber? Should we seek out people we disagree with? What, if any, is the role of censorship and why? … What is meant by shout-out culture within WPATH? Rapid onset of gender identity ignites a storm – why?" (BOEAL_WPATH_073304).

52.    These, too, are important questions for WPATH to consider. But again, the doctors and parents who rely on the Standards of Care (and do not have access to WPATH's internal communications) would not know that these are live questions at WPATH. Only occasionally—

as when leaders like Erica Anderson speak publicly about their concerns with the WPATH affirm-ative care model (and are censured for doing so)—do those outside WPATH glimpse what an insular echo chamber it can be.

53.     It is also interesting to consider the ethical questions that are not mentioned. WPATH should also consider questions such as: Is it ethical to make hostile, ad hominem attacks towards those who do not agree regarding the evidence base for youth gender care? Is it ethical to overstate evidence and downplay risk of procedures that have lifelong consequences and are un-dertaken prior to full development? Is it ethical to dismiss scholars such as Dr. Zucker, whose research data indicates that supportive watchful waiting leads to resolution of gender dysphoria in the majority of treated youth? Is it ethical to ignore concerns within WPATH when members report that children may be harmed by the current type of care provided? If WPATH is discussing these questions, the public has no awareness of it. All they see is WPATH's sure pronouncements of a "consensus" among professionals that gender-affirming care is safe, effective, and medically nec-essary.

**B.  WPATH's rights-based ideology transformed Standards of Care 8 from a medical guideline to a political and legal document**

54.     Though WPATH claims that SOC-8 is an "[e]vidence-based guideline[]" that "in-clude[s] recommendations intended to optimize patient care that are informed by a thorough re-view of evidence," internal communications reveal that the organization had other goals in crafting the standards. (SOC-8 S8).

55.     One was to produce a document that would be useful to political and legal allies. This comports with the idea, present throughout SOC-8, that changing society at large is necessary because, according to WPATH, all gender identities are psychologically healthy and any dysphoria

CONFIDENTIAL – ATTORNEY'S EYES ONLY

associated with gender incongruence is the result of society's bigoted response. This is the "minority stress hypothesis": the theory that most or all of a trans-identified patient's psychological problems—depression, self-harm, anxiety, etc.—are caused by society, not a mental health condition associated with one's gender identity. As the SOC-8 puts it, while "[g]ender diversity is not a mental health disorder," "we know mental health can be adversely impacted for gender diverse children" "through gender minority stress." (SOC-8 S70). WPATH's mission is thus to change society to prioritize self-proclaimed gender identity over biological sex, such as by requiring schools to allow students to use sex-segregated bathrooms or play on sex-segregated sports teams based on their gender identity rather than their sex. (SOC-8 S76).

56.     In all this, there is a fundamental tension. WPATH is careful to emphasize that all gender expressions are normal and that "[g]ender incongruence is no longer seen as pathological or a mental disorder in the world health community." (SOC-8 S7). Throughout SOC-8, WPATH seeks to normalize and de-pathologize all gender identities, from cross-sex identification to non-binary to eunuch to identities "comprised of more than one gender identity simultaneously or at different times (e.g., bigender), who do not have a gender identity or have a neutral gender identity (e.g., agender or neutrois), have gender identities that encompass or blend elements of other genders (e.g., polygender, demiboy, demigirl), and/or who have a gender that changes over time (e.g., genderfluid)." (SOC-8 S80). According to WPATH, all of these identities are healthy and normal. Society can be welcoming to gender nonconforming people, reduce sex stereotypes and increase acceptance for a wider range of human sexuality without adopting WPATH's gender related theories into law or policy.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 1. Legal Advocacy in SOC-8

57.     Throughout the WPATH internal documents, there are references to drafting SOC-8 in a way that bolsters court cases. This goal of creating a court-advocacy document undermines the SOC-8 as a scientifically driven document. When SOC authors prioritize advocacy goals, it necessarily precludes honest portrayal of the limits of research, merits of alternative, less-invasive approaches, and the many unknowns and risks of the treatments SOC-8 recommends.

58.     One contributor to SOC-8 couldn't have been more frank: "Our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits." (BOEAL_WPATH_000991).

59.     Authors of SOC-8 made their legal and political goals explicit. As one wrote: "It is abundantly clear to me when I go to court on behalf of TGD individual[s] to secure access to medically necessary health care and other human/civil rights, as I will be doing in a class action lawsuit deposition in 2 weeks in NC[,] [t]he wording of our section for Version 7 has been critical to our successes, and I hope the same will hold for Version 8." (BOEAL_WPATH_020628). Another wrote to all SOC-8 chapters leads: "My hope with these SoC is that they land in such a way as to have serious effect in the law and policy settings that have affected us so much recently." (BOEAL_WPATH_036305).

60.     Another author was concerned "about language such as 'insufficient evidence,' 'limited data,' etc." in drafts of SOC-8, though not because the author thought that such language was inaccurate. (BOEAL_WPATH_020387). Rather, the author noted, such admissions—though true—would not be advantageous in court. The author explained: "I say this from the perspective of current legal challenges in the US. Groups in the US are trying to claim that gender-affirming

interventions are experimental and should only be performed under research protocols (this is based on two recent federal cases in which I am an expert witness). In addition, these groups already assert that research in this field is low quality (ie small series, retrospective, no controls, etc...). My specific concern is that this type of language (insufficient evidence, limited data, etc....) will empower these groups and reinforce their erroneous assertions." (BOEA_WPATH_020387).

61.     To ensure its clinical guideline for medical professionals would be legally useful, WPATH apparently sent it out for legal review (or at least planned to do so). According to the September 1, 2021, WPATH Executive Committee Agenda, possible reviewers WPATH considered included the ACLU, the Transgender Defense & Education Fund, and Lambda Legal. (BOEAL_WPATH_020327). These are all organizations that rely on WPATH's standards in court, including in this case. It would be extraordinary if those same lawyers had input into the very standards they promise courts are independently-constructed based on the best scientific evidence, not political considerations.

62.     Even authors of SOC-8 were uncomfortable with the legal review. As one wrote: "The SOC8 are clinical guidelines, based on clinical consensus and the latest evidence based medicine; I dont recall the Endocrine Guidelines going through legal review before publication, or indeed the current SOC?" (BOEAL_WPATH_019446). Another authors responded: "We had agreed long ago that we would send to the International advisory committee and for legal review." (BOEAL_WPATH_019456). A Board member weighed in: "We will discuss this in the Board and get back to you; and I will check what Rachel Levine's point of view is on these issues, when I meet with her next week." (BOEAL_WPATH_019455).

63.     These episodes are deeply concerning. In a well-constructed guideline that prioritized truth and patient welfare, political and legal considerations would not trump truth-telling or

CONFIDENTIAL – ATTORNEY'S EYES ONLY

scientific rigor. WPATH's push to create SOC-8 reflected financial, legal and even political consideration, undermining any consideration of SOC-8 as a document which should guide clinical care or which reflects the best available science.

### 2. "Medical Necessity"

64.    WPATH's rights-based ideology also transformed Standards of Care 8 from a medical guideline to a vehicle for ensuring insurance coverage by claiming medical necessity. While WPATH claims that SOC-8 is an "[e]vidence-based guideline[]" that "include[s] recommendations intended to optimize patient care that are informed by a thorough review of evidence," internal communications again reveal that the organization had other goals in crafting the standards. (SOC-8 S8). And once again, there is a fundamental tension between reporting the evidence and best practice (on the one hand) and manipulating the language and framing to justify medical interventions (on the other). WPATH recommends drastic medical interventions for adolescents, for instance, even though WPATH also assures that the adolescents have perfectly healthy and normal gender identities. That is, according to WPATH, while feeling incongruent with one's natural body is framed as healthy and normal, "historical and current stigma" creates the distress that warrant "various gender-affirming treatment options" like hormones and surgeries. (SOC-8 S7).

65.    Rather than helping a patient suffering from gender dysphoria (which, as even WPATH must admit, is a mental health disorder in the DSM-V) through standard mental health treatments, WPATH's apparent aim is to further "the individual's embodiment goals," as one author of the SOC-8 hormone chapter put it. (BOEAL_WPATH_026200). The SOC-8 itself asserts that "[t]ransgender and gender diverse (TGD) persons may require medically necessary gender-affirming hormone therapy (GAHT) to achieve changes consistent with their embodiment goals, gender identity, or both." (SOC-8 S110).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

66.     Given the goal of providing transitioning treatments to further someone's "embod-iment goals," the question for WPATH is how to ensure those treatments can be paid for. The answer is to declare them medically necessary so insurance would cover them. The authors of SOC-8 thus went out of their way to claim that the treatments are "medically necessary," while simultaneously claiming that there was no underlying pathology to treat. One of the authors of SOC-8 explained the tension: "Re: the definition of medical necessity – this is a definition from the AMA. It is pathologizing in the sense that medically necessary treatment is defined in part as treatment of an illness, injury, or disease. However, a definition of medical necessity, especially as understood in the US, is important here" to "help with appealing care denials" by insurance companies. (BOEAL_WPATH_062083).

67.     It thus appears that the authors did not view transitioning treatments to be "medi-cally necessary" in the traditional sense—to treat an "illness, injury, or disease"—but deemed the treatments "medically necessary" anyway for the express purpose of having insurance companies pay for them. Another email in the chain summed it up: "Medical necessity" is "at the center of all reimbursement for trans care in the US." (BOEAL_WPATH_061843).

68.     Authors of individual chapters were also encouraged to include statements of med-ical necessity for their recommendations. One author of SOC-8 wrote to the mental health chapter: "I hope SOC 8 can incorporate some language about medical necessity for insurance coverage or governmental provision of care.… I do independent medical review for people appealing their insurance denials to state regulatory bodies and clear language is important for this. The State of California at least looks to WPATH as the authority for determining medical necessity, and this is critical for facial feminization surgery especially, but coverage of any needed surgery, so the lan-guage is important. We don't want SOC 8 to take us backwards on this."

CONFIDENTIAL – ATTORNEY'S EYES ONLY

(BOEAL_WPATH_020166). The author continued: "The language we use in our chapter makes it clearer that a [comorbid psychological] condition does not have to be 'well-controlled'" for the transitioning treatments to be "medically necessary" so long as "the patient has capacity to consent and can participate adequately in perioperative quote care, with support."

69.    Another author agreed: "The concept of medical necessity is so critical for provision of healthcare to trans people in the US—prisons are required to provide medically necessary care, state laws require medically necessary care to be provided, insurance regulatory bodies and independent medical reviewers look at evidence for medical necessity in coverage decisions. There are important lawsuits happening right now in the US, one or more of which could go to the Supreme Court, on whether trans care is medically necessary vs experimental or cosmetic. I cannot overstate the importance of SOC 8 getting this right at this important time." (BOEAL_WPATH_020212).

70.    Another author, writing to the adolescent chapter: "[M]edical necessity for youth care—puberty blockers and chest surgery for trans masculine youth—is often challenged by US insurance companies. I wonder whether [redacted] and the adolescent committee might consider adding a medical necessity statement care of minors?" (BOEAL_WPATH_020214).

71.    Another author: "Establishing medical necessity is central to all healthcare provision in the US—and currently there are lawsuits in the US trying to reverse the provision of trans healthcare … the right wing in the US is trying to force us back to those years, or worse." (BOEAL_WPATH_061843). Concerningly, this author had no problem deriding as "right wing" and regressive anyone seeking evidence regarding the safety and efficacy of transitioning treatments or otherwise questioning SOC-8's claim for a massive expansion of medical necessity. As

CONFIDENTIAL – ATTORNEY'S EYES ONLY

already detailed, political demonization like this is precisely why SOC-8 is a political and ideological document rather than a reflection of science and quality clinical care.

72.     SOC-8 author comments regarding medical necessity thus make it clear that the various statements of medical necessity are primarily vehicles to justify insurance payments. They do not offer a balanced and evidence-based approach regarding long term clinical risk and benefits. At no time do the authors of SOC-8 detail a rationale or a systematic approach they utilized to determine whether any specific treatment is, or is not, medically necessary. There is no discussion of cost limitations or cost-versus-benefit comparisons of various procedures, for instance.

73.     Indeed, throughout SOC-8, there seems to be an attempt to simply declare that any medical treatment desired for transitioning is "medically necessary." The aim is clear: ensure payment for *all* transitioning treatments as medically necessary, without any justification proving the long-term value of the treatments, their costs versus their benefit, or their risks versus their harms. Over and over SOC-8 calls the transitioning treatments at issue "medically necessary." Much less time is spent showing how the recommendations actually meet that bar.

74.     The statement of medical necessity the authors landed on is staggeringly broad. It recommends a list of procedures as "medically necessary gender-affirming interventions," including, but "not limited to," "hysterectomy," "phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses," "vaginoplasty," "hair removal from the face, body, and genital areas," "gender-affirming facial surgery and body contouring," "voice therapy and/or surgery," "as well as puberty blocking medication and gender-affirming hormones." (SOC-8 S18). In essence, WPATH deemed practically any "embodiment goal" "medically necessary" so that insurance would cover them.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

75.     The broadness was intentional. As an author of the statement explained: "I think it is clear as a bell that the SOC8 refers to the necessity of treatment (in its broadest sense) of TGD people who pursue treatment (in its broadest sense) for their gender dysphoria (because it refers to the symptoms of distress – which is a very very broad category and one that any 'goodwilling' clinician can use for this purpose (or in the unescapable medical lingo we, as physicians are stuck with: those who fulfill a diagnosis of Gender Dysphoria and Gender Incongruence as per APA/WHO)." (BOEAL_WPATH_06026). The authors understood that as long as it is a "good-willing" physician, they will write SOC broad enough to justify payment.

### C.   Politics and outside pressure directly influenced Standards of Care 8

76.     WPATH went through lengths to formulate a standardized process to create SOC-8.  Yet the composition of the authorship of SOC-8 and the approach they used introduced significant bias into the document. As one member revealed in his or her disclosure, "Everyone involved in SOC process has a non-financial interest." (BOEAL_WPATH_001013). By requiring that all authors be members of WPATH, the organization did nothing to balance these obvious conflicts.

77.     With that said, WPATH did create a process with workgroups, stakeholder input, evidence review teams, and a predetermined methodology. There is evidence throughout the WPATH documents that the SOC-8 authors did not always follow this process, but at least they had one. Yet even after the process was complete and WPATH had published SOC-8, the organization caved to outside political pressures and deleted from the Standards the age minimums for pediatric transitioning surgeries as a direct result of advocacy by Admiral Rachel Levine, the Trevor Project, and the American Academy of Pediatrics (AAP).

78.     WPATH claims that SOC-8 was the result of a structured process, but when WPATH deleted the age minimums based on political considerations, it showed that outside influences were more important than sticking to the "evidence-based" process it had espoused. The episode also shows how AAP and the United States government became intertwined with the creation of SOC-8.

### 1.   Admiral Levine's Influence on SOC-8

79.     Admiral Rachel Levine was appointed as the Assistant Secretary for Health at HHS in March 2021. Within months, Levine was having regular meetings with WPATH officials about the development of SOC-8 and how WPATH and HHS could work together to accomplish their shared policy priorities.

80.     An email from August 12, 2021, entitled SOC-8, shows the degree of Levine's involvement, which WPATH members took "as a charge from the United States government":

Hi [redacted],

I just got off a very productive call with Rachel Levine. The failure of WPATH to be ready with SOC 8 is proving a barrier to optimal policy progress and she was eager to learn when SOC 8 might be published.

My view is that this should be taken as a charge from the United States government to do what is required to complete the project immediately.

I am happy to have a quick call to discuss nuance if that would be helpful. And she would be happy to speak as well if that might move things along.

(BOEAL_WPATH_081924).

81.     A week later, an author reported: "I am meeting with Rachel Levine and her team next week, as the US Department of Health is very keen to bring the trans health agenda forward." (BOEAL_WPATH_019314).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

82.     In August 2021, the WPATH executive committee discussed collaborating with Levine, including "asking about an announcement at the White House, inviting her to be keynote in Montreal 2022, and asking for her help to help with global dissemination of the SOC8." (BOEAL_WPATH_020314). The next month's meeting minutes confirm that Levine had "offered to help WPATH in any way she could," "said if an SOC8 launch at the White House was not possible, one at the Health Department is likely," and "will make an introduction to WHO and suggest they endorse/ratify the SOC8" (before Levine had even read SOC8). (BOEAL_WPATH_020658). Another update from October: "[Redacted] and I are in regular contact with [redacted], who has taken a personal interest in ensuring that the SOC8 gets completed and published at the earliest convenience, so that the US State Department of Health can use the SOC8 for its national policies." (BOEAL_WPATH_023924).

83.     By the end of May 2022, WPATH emailed Levine's staff to "convey the message to Admiral Levine that – as of today – the SOC8 has been completed." WPATH asked Levine for help "identify[ing] funds for both dissemination and funds to create and develop a free app to download the SOC8." (BOEAL_WPATH_062943). "[W]e count on you as a US Department for Health to assist us to disseminate the SOC8 as widely as is humanly possible in North America," WPATH told Levine.

84.     On July 1, 2022, an email entitled "Some Feedback from Member of Adm Levine's Staff," was sent to WPATH asking WPATH to drop the age minimums for adolescents:

> Dear EC, SOC8 Co-Chairs, and Adolescent Chapter Leads
>
> I just got off the phone with Sarah Boetang, who is Adm. Levine's chief of staff, she has been reviewing the guidelines and wanted to convey a concern that she has, as Sarah, not as an official response/review of the office. She knows that the Adm is continuing to comb through every word.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

She is amazed at the breadth and improvement and comprehensive nature of the entire document, her biggest concern is the section below in the Adolescent Chapter that lists specific minimum ages for treatment, she is confident, based on the rhetoric she is hearing in DC, and from what we have already seen, that these specific listing of ages, under 18, will result in devastating legislation for trans care. **She wonders if the specific ages can be taken out** and perhaps an adjunct document could be created that is published or distributed in a way that is less visible than the SOC8, is the way to go.

I told her I would be writing to all of you, and she is happy to discuss her opinion further, if needed. Please let me know how you want to proceed/respond/discuss.

All best,

[Redacted]

(BOEAL_WPATH_071455) (emphasis mine).

85.    The email concerning the suggestion from Levine's staff set off a number of responses and conversations in the next few days:

- "My concern from a scheduling and pre authorization process is that without specific age requirements, insurers may not grant authorization. I do understand Adm. Levine's concerns—I wonder if we should/could be less aggressive in lowering the age limits on certain procedures." (BOEAL_WPATH_071457).

- "Early on, we had discussions regarding whether or not we should list age limits for surgery. We identified advantages and disadvantages of both approaches. The consensus came down to listing ages. I would be glad to re-discuss in lieu of these comments—from [a] clinical care perspective, I am comfortable with the ages we have listed." (BOEAL_WPATH_017463).

- "If we don't put ages, the insurance companies specify 18 years old, hence the main reason to list the ages. I don't see how we can simply remove something that important from the document—without going through a Delphi—at this final stage of

CONFIDENTIAL – ATTORNEY'S EYES ONLY

the game. I wish that Adm Levine's office read this when they were posted for public review in December." (BOEAL_WPATH_071466_

- "This is a global document, not solely for the US. I am a little surprised that we would be asked to do this after all the care and endless discussions by experts to reach this consensus on ages for surgeries. Is Sarah a clinician/surgeon? I wouldn't make any change unless the relevant chapters found some new evidence to support change to 18." (BOEAL_WPATH_071469).

- "The only evidence we had for establishing this was expert opinion." (BOEAL_WPATH_071500).

- "Its disappointing that politics always trumps common sense and what is best for patients." (BOEAL_WPATH_071494).

- "[J]ust read the email trail, which I found disturbing for a number of reasons.… It is not appropriate to take any feedback from a nonmedical professional seriously. nothing is going to change in the SOC8. It is done!" (BOEAL_WPATH_071476).

86.     Later in July, the SOC-8 chairs sent an email to the Adolescent chapter authors to explain the situation and to summarize a meeting WPATH leaders had with Admiral Levine:

> The issue of ages and treatment has been quite controversial (mainly for surgery) and it has come up again.
>
> We sent the document to Admiral Levine, Minister of Health for the USA, for their views. We have a meeting on Zoom last week as she wanted to give us her feed-back. She liked the SOC-8 very much but she was very concerned that having ages (mainly for surgery) will affect access to health care for trans youth and maybe adults too. Apparently the situation in the USA is terrible and she and the Biden administration worried that having ages in the document will make matters worse. **She asked us to remove them**.
>
> We have the WPATH executive committee in this meeting and we explained to her that we could not just remove at this stage. So we have been thinking of solutions.

You may remember that ages in the document were a "suggestion" not a "recommendation" as we had no evidence to recommend that, but in the document it has become a "recommendation" as it is part of the criteria.

What is clear is that we don't want to remove the ages from the whole document, in fact, I thought that we needed to have the ages for young people to have access to care in the USA...

One solution we thought will be to make the ages criteria a "suggestion" as it is in the document attached. If we do this, in the overall criteria of the appendix we could also put them as a suggestion (as in the document attached) or remove them from the criteria all together but leave them in the chapter as a "suggestion."

The chairs would like to do this but we want to have your opinion.

(BOEAL_WPATH_072114) (emphasis mine).

87.     This statement from the chairs to the adolescent committee is very concerning. It shows SOC-8 included "recommendations" even though the authors "had no evidence to recommend" a specific course of treatment. It shows that, contrary to SOC-8's promise to use GRADE analysis to pair strong recommendations ("recommend") only with high-quality evidence, in fact it paired a strong recommendation with "no evidence" because it (somehow) became "part of the criteria." And it shows that, despite the statement having gone through the Delphi process, finalized, approved by the WPATH "experts," and crafted as a result of the evidence review (which in this case apparently found "no evidence" supporting it), WPATH considered changing the statement solely to appease a political official in the United States government.

88.     The adolescent chapter authors debated the proposal. They reported that they were "largely in favor of a compromise plan" that would "[m]inimize any risk that the guidelines would lead to *more* access challenges (e.g. legislative bans in this instance)," and provided the chairs of SOC-8 a "transcription of the conversation that our workgroup members had regarding the issue." (BOEAL_WPATH_072147). Some highlights from the conversation include:

CONFIDENTIAL – ATTORNEY'S EYES ONLY

- "I really think the main argument for ages is access/insurance. So the irony is that the fear is that ages will spark political attacks on access. ***I don't know how I feel about allowing US politics to dictate international professional clinical guidelines that went through Delphi***." (Emphasis mine).

- "I do agree that the Delphi situation is a key consideration. Could they send them through again? It is a large change, which I'm fine supporting, but it is weird because then we can never say that the adolescent chapter passed Delphi."

- "My sense is that the US, along with many other countries, is moving toward putting restrictions on youth seeking medical interventions and making the age requirement MUCH older. If our concern is with legislation (which I don't think it should be—we should be basing this on science and expert consensus if we're being ethical) wouldn't including the ages be helpful? Ie, it will be harder for states/countries to enact laws that go against the SOC. Plus, aren't the ages just a recommendation with room for adjusting in unique circumstances? I need someone to explain to me how taking out the ages will help in the fight against the conservative anti trans agenda."

- "[W]e have a very high up politician telling us that having the ages specified front and center would politically lead to more attacks and legislative efforts. I see no reason not to trust that assessment is accurate."

- "***I'm also curious how the group feels about us making changes based on current US politics***." (Emphasis mine).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

- "I think it's safe to say that we all agree and feel frustrated (at a minimum) that these political issues are even a thing and are impacting our own discussions and strategies."

- "[Y]es, it is frustrating to have to have politics in our brains as we make these decisions. But it is what it is!"

(BOEAL_WPATH_072147-49).

89.     Again, this conversation is concerning. The authors of the Adolescent chapter acknowledge that politics influenced the recommendations in SOC-8, but they justified it to themselves because caving to political pressure from the federal government would "help in the fight against the conservative anti trans agenda." (BOEAL_WPATH_072148).  Perhaps even more remarkable from a patient care perspective, none of the discussion concerned aspects one might hope clinicians writing a guideline involving irreversible surgeries for adolescents would consider. The authors do not discuss research concerning developmental decision making in youth or whether teenagers are generally mature enough to make decisions that would permanently and fundamentally change their bodies. Nor do they discuss the ages at which surgeries were offered in prior studies. Instead, the main consideration *for* the age recommendation was the main consideration for *downgrading* the age recommendation to a "suggestion": What position would best ensure insurance coverage and keep "conservative" legislation at bay?

90.     With Admiral Levine's input, the authors determined that downgrading the age restrictions to a "suggestion" would best meet their political considerations. (BOEAL_WPATH_072150). On August 5, 2022, WPATH wrote to Admiral Levine: "[W]e heard your comments regarding the minimal age criteria for transgender healthcare adolescents," and "[c]onsequently, we have made changes to the SOC8 in this respect." (BOEAL_WPATH-072964).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

The letter continued: "Given that the recommendations for minimal ages for the various gender affirming medical and surgical intervention are consensus-based, we could not remove them from the document. Therefore, we have made changes as to how the minimal ages are presented in the document. They are not a recommendation from the SOC-8 anymore, but they have been written only as suggested minimal ages as long as the adolescent fulfills all the criteria for gender affirming medical and surgical interventions."

## 2. AAP's Influence on SOC-8

91.     Following the episode with Admiral Levine, WPATH also heard from the Trevor Project, a nonprofit advocacy for LGBTQ+ youth, which was also "extremely concerned abou the age minimums." (BOEAL_WPATH_076525-26). "If what we've seen is accurate, this could have disastrous consequences for the work to protect basic healthcare for transgender youth." SOC-8 authors and the WPATH executive board emailed each other stating that "the SOC8 has been completed and is about to be released online," set to be published on September 6, 2022 "as agreed with [the] publisher." (BOEAL_WPATH_076549-50).

92.     The day before publication, on September 5, 2022, WPATH met with the American Academy of Pediatrics at AAP's request to discuss "issues" AAP's "expert panel" had with SOC-8. (BOEAL_WPATH_077704). WPATH assured AAP that "there may have to be compromises" to its "evidence-based" guideline.

93.     On September 8, AAP sent WPATH a formal letter signed by its president, Moira A. Szilagyi. AAP wrote that SOC-8 "includes several anti-transgender arguments, such as social contagion, rapid onset gender dysphoria, desistance/persistence, and others," and AAP encouraged WPATH to drop those discussions lest they "give[] validity to them." (BOEAL_WPATH_07707-08). AAP also demanded that WPATH drop the age minimums: "SOC8 recommendations for

CONFIDENTIAL – ATTORNEY'S EYES ONLY

gender-affirming surgery do not align with AAP policy. The AAP does not recommend surgery for minors except on an individualized, case-by-case basis with parental involvement and consent. Additionally, AAP experts agree SOC 8 lacks the evidence to justify the recommended surgery ages."

94.   WPATH SOC-8 authors reacted with surprise that the AAP would ask WPATH to change its consensus-based recommendation:

- "As far as I can tell they are asking for us to remove anything that it does not fit into their narrative.… The AAP guidelines that they mentioned so many times have a very weak methodology, written by few friends who think the same. … My view is that we should not remove 'ages' they are a suggestion, they have as much background evidence as many suggested statements, and they have been approved via Delphi and approved by the WPATH board." (BOEAL_WPATH_079582-83).

- "I have also read all the comments from the AAP and struggle to find any sound evidence-based argument(s) underpinning these. I am seriously surprised that 'reputable' association as the AAP is so thin on scientific evidence." (BOEAL_WPATH_079852)

- "I don't think the AAP representatives are WPATH members and looking at their names/qualifications/accreditation, they are very very junior clinicians/academics." (BOEAL_WPATH_079982).

95.   In an email on September 9, a WPATH author wrote an email explaining the situation:

In a nutshell, you likely saw the email that the SOC8 was going to be released by the biennial meeting (next week) in Montreal, particularly since we have GEI sessions and other sessions designed to train attendees on its release. Then you saw

another email regarding an inadvertent delay in the release. I'm writing about the reason why and this is top-level confidential, as you will see.

The American Academy of Pediatrics (AAP)—a MAJOR organization in the United States that is typically very pro-transhealth/gender affirming care—voiced its *opposition* to the SOC8, specifically due to aspects of the Adolescent chapter. Not only did they say they would not endorse the SOC, they indicated that they would *actively publicly oppose it*. They had several concerns, one of which was the age of criteria for minors…. They also disagree with verbiage on social factors and adolescent identity development.…

Clearly, if AAP were to publicly oppose the SOC8, it would be a major challenge for WPATH, SOC8, and trans youth access to care in the U.S.

(BOEAL_WPATH_079974). The author explained that "WPATH leadership" had already proposed "removing of ages verbiage."

96.     On September 10, WPATH informed AAP: "We have just finished our meeting and we have agreed to remove the ages and to add the sentence we agreed. I hope that by doing this AAP will be able to endorse the SOC8 or at least to support it." (BOEAL_WPATH_080863). Later that day, word came that in exchange for WPATH removing the age requirements from SOC-8, the AAP would not publicly oppose SO-8. (BOEAL_WPATH_081390). As an email from an SOC-8 editor to the WPATH Board explained, "This [was] the only way the SOC8 was not going to be opposed by the AAP." (BOEAL_WPATH_081502).

97.     Following the removal of the age minimums, WPATH leadership promptly sought for "all [to] get on the same exact page, and PRONTO." (BOEAL_WPATH_082401). Rather than tell the public what actually caused the last-minute changes to the SOC-8 clinical guideline, leaders crafted an alternative explanation that focused on "individualized care." (BOEAL_WPATH_082453). In response to an inquiry from the *Los Angeles Times*, WPATH also said that the age requirements were removed "and replaced by strengthened criteria to help guarantee that every transgender or gender diverse adolescent is getting their appropriate needs met at

44

CONFIDENTIAL – ATTORNEY'S EYES ONLY

the appropriate time." (BOEAL_WPATH_082485). This was not true. In response to AAP, WPATH deleted the age minimums. It did not add anything, and it certainly did not add "strength-ened criteria."

98.    There are a number of important lessons from this episode. One is that WPATH caved to outside political pressures and has never told the truth about what happened to the public or to clinicians who rely on the so-called "evidence and consensus-based" SOC-8 to treat gender dysphoric youth. Another is that, apparently, the age recommendations that were deleted had "as much background evidence as many suggested statements" in SOC-8—which another author pointed out was "no evidence." (BOEAL_WPATH_072114). The implication is that other recom-mendations in SOC-8 were also based on "no evidence" or something similar. A third takeaway is that many authors of SOC-8 view the AAP 2018 policy statement as untrustworthy and unreliable. And a fourth lesson is that, apparently, WPATH treats it Standards of Care as legislative or polit-ical documents, designed to ensure access-to-care and insurance coverage, combat "conservative" or "right-wing" legislation that would seek to curb that coverage based on the "no evidence" sup-porting the treatments.

## D.  WPATH's public advocacy efforts have conflicted with open, scientific inquiry

99.    WPATH and USPATH have provided a stream of narratives and talking points to activist and affirmative clinicians. Their language often expresses disdain for those who see the world of transitioning treatments differently. These press releases and public statements consist-ently appeal to emotion and an "us vs. them" mindset. USPATH and WPATH seem comfortable demonizing those who are not part of the ideological movement, who raise concerns with transi-tioning minors, or who point to scientific evidence that does not support WPATH's claims. Using activist rhetoric, WPATH press releases can be viewed as a "dog whistle" to direct the hostilities

of others who are political and ideologically aligned with WPATH. Their divisive rhetoric is inconsistent with the conduct of an organization guided by science. USPATH and WPATH also show a willingness to spread misinformation that supports their ideology.

100.    One example of the USPATH / WPATH style of engagement is their April 21, 2022 joint press release: "WPATH/USPATH Denounce Florida Department of Health for Harmful Guidelines Targeting Trans Youth." (WPATH/USPATH 2022). In April 2022, the Florida Department of Health issued a statement noting that "[s]ystematic reviews on hormonal treatment for young people show a trend of low-quality evidence, small sample sizes, and medium to high risk of bias" and that evidence regarding the "psychosocial and cognitive impact" of transitioning treatments for youth "is generally lacking." (Florida Dep't of Health 2022). The Department recommended that "[a]nyone under 18 should not be prescribed puberty blockers or hormone therapy" and that "[g]ender reassignment surgery should not be a treatment option for children or adolescents" The Department stated that its "guidelines are consistent with the federal Centers for Medicare and Medicaid Services age requirement for surgical and non-surgical treatment" and "in line with the guidance, reviews, and recommendations from Sweden, Finland, the United Kingdom, and France."

101.    Rather than engaging with the literature reviews the Department cited or the recommendations from other countries' health authorities, WPATH and USPATH urged its followers to dismiss the Department of Health as transphobic and acting in bad faith: "It is shameful to see yet another attack from a state that is laser-focused on targeting trans and LGBQ people for political gain." (WPATH/USPATH 2022). This divisive rhetoric from WPATH and USPATH is clearly politicized, alarmist, and tribal. Note the use of language: "Denounce," "Harmful," "Targeting," and "political gain." WPATH and USPATH ignore that people of good faith honestly

CONFIDENTIAL – ATTORNEY'S EYES ONLY

following the science could question WPATH's model of "gender-affirming care" and conclude instead, based on the systematic evidence reviews cited by the Department, that transitioning treatments should not be given to minors. To WPATH and USPATH, such a position necessarily come from prejudice and efforts to "target[] trans youth" "for political gain."

102.     One WPATH leader wrote a "12-point Strategic Plan to Advance Gender Affirming Care through strengthening the WPATH SOC-8" that provides insight into how some WPATH members and leaders view the relationship between their clinical guideline document and their advocacy efforts. (BOEAL_WPATH_091213-18). Circulated on February 7, 2023 (BOEAL_WPATH_091211), the plan laid out the problem it sought to address: "Trans health care is not only under attack by politicians, but by," among other entities, "academics and scientists who are naturally skeptical," "parents of youth who are caught in the middle of this controversy," "health care systems and insurance companies looking to limit health care costs," "a burgeoning demand for transgender health care with concomitant increase in access to healthcare," "increasing number of regret cases and individuals who are vocal in their transition process who are quick to blame clinicians for allowing themselves to transition despite an informed consent process," and—perhaps most concerningly—"***continuing pressure in health care to provide evidenced-based care***." (Emphasis mine).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Trans health care is not only under attack by politicians, but by:
- an unfortunate trend in the media to sensationalize conflict
- academics and scientists who are naturally skeptical
- well-funded advocacy organizations driven by conservative sexual and gender values whose sole aim is to limit access to trans health care
- parents of youth who are caught in the middle of this controversy
- continuing pressure in health care to provide evidenced-based care
- health care systems and insurance companies looking to limit health care costs
- a burgeoning demand for transgender health care with concomitant increase in access to health care,
- increasing number of regret cases and individuals who are vocal in their retransition process who are quick to blame clinicians for allowing themselves to transition despite an informed consent process

(BOEAL_WPATH_091213).

103.    It should go without saying that asking physicians to "provide evidenced-based care" is not an "attack," but the ethical obligation of health care professionals. Labeling it as such is not the hallmark of an organization devoted to open scientific inquiry, evidence-based care, and patient well-being. Yet the author also chalked up concerns by "parents of youth who are caught in the middle of this controversy" as an "attack by conservative forces around the world." (BOEAL_WPATH_091218). (In a separate email thread, another WPATH echoed the feeling in response to an *Economist* article examining "gender-affirming care" in the United States: "Allowing these right wing skeptics to control the narrative is a mistake." (BOEAL_WPATH_026284).) This tribalism that dismisses on political grounds all those who raise concerns about transitioning treatments has no place in evidence-based care.

104.    The author's 12-point plan is worth examining. The first point is "Endorsements." (BOEAL_WPATH_091214). The author explained: "I have no idea how it was ever said that so many medical organizations have endorsed SOC 7. This statement is made in many legal briefs and court proceedings. But is that true? How did that ever come about? My suspicion is that these organizations never formally endorsed but have referenced SOC 7 in their support for trans health

and rights. We need to find out the facts here." (BOEAL_WPATH_091215). "As we are facing so many legal battles over trans health care and rights," the author continued, "the statement that the SOC has so many endorsements has been an extremely powerful argument. We need to be able to get support of these important organizations and know how to indicate their support accurately or this argument in these court cases could be challenged." The author stated that, as of February 2023, WPATH SOC-8 had received just two endorsements: one from the World Association for Sexual Health and one from the International Society for Sexual Medicine. (BOEAL_WPATH_091214).

105.    Another point in the 12-point plan concerned guideline development. The author disclosed that the methodology of SOC-8 "evolved" during the course of SOC-8 and admitted that "we were not able to be as systematic as we could have been (e.g., we did not use GRADE explicitly)." (BOEAL_WPATH_091216). "We have been attacked for our methodology and now have found ourselves in a position of defending it," the author noted. He or she stated that WPATH needed to "figure out how to respond to critics and package that in a clear and concise manner." (BOEAL_WPATH_091216). Left unsaid by the author is that if WPATH had used GRADE or another accepted methodology for creating its guideline, it would not need to think of creative ways to justify its sui generis approach.

106.    The author also lamented: "Now that we have reviewed the evidence" for SOC-8, "we are painfully aware of the gaps in the literature and the kinds of research that are needed to support our recommendations and strengthen[] the level of evidence in support of them." (BOEAL_WPATH_091216). Though the author viewed concerns about the evidentiary gaps as political "attacks," the author suggested "articula[ting] the kinds of research that needs to be done to strengthen the evidence of our recommendations." That is indeed a reasonable response to the

CONFIDENTIAL – ATTORNEY'S EYES ONLY

"gaps in the literature" unveiled by SOC-8, but it is concerning that, apparently, the authors of SOC-8 made treatment recommendations knowing that research was still needed "to support [the] recommendations" they made. And again, it does not bode well for open inquiry and patient welfare if the organization creating public treatment guidelines internally acknowledges "gaps in the literature" but vilifies clinicians and parents who discuss those gaps publicly. It also displays an unwillingness to prioritize the safety of children and adolescent patients that fall into those gaps.

107.    Another concerning point in the plan was labeled "Parents." The author explained: "There has been quite a network of parents who have been concerned about the lack of careful evaluations, lack of involvement in decision making, and perceptions of rushed decisions which they feel account for the increased number of regret cases especially among youth. Narratives of these parents have resonated with the public and professionals. The voices of many parents who are supporting their trans and gender diverse kids have been silent. How could we facilitate support for those parents and amplify their voices?" (BOEAL_WPATH_091217). The author did not dispute that there *is* an entire "network of parents" who have concerns about "the lack of careful evaluations, lack of involvement in decision making, and perceptions of rushed decisions." Nor did the author dispute that there has been an "increased number of regret cases especially among youth." Instead, the author seemed to wish that those parents would be silent and that the microphone be given instead of parents "who are supporting their trans and gender diverse kids"—implying that the parents concerned about "the lack of careful evaluations, lack of involvement in decision making" and "rushed decisions" were *not* "supporting their trans and gender diverse kids." This vilification of *parents* concerned about irreversible transitioning treatments for their own children would have no place in a scientific medical organization that prizes patient welfare over politics and ideology.

108.    Instead, as countless examples show by now, WPATH appears to say one thing in private and another thing in public. As one leader noted in crafting a response to an inquiry from *Medscape*, making public statements for WPATH "is a balancing act between what i feel to be true and what we need to say." (BOEAL_WPATH_082675). In this case, the balancing act concerned Rapid-Onset Gender Dysphoria. What WPATH needed to say is that ROGD "is not a medical entity recognized by any major professional association" and is "nothing more than an acronym created to describe a *proposed* clinical phenomenon." (WPATH 2018). But what these members "feel to be true" is that ROGD describes a phenomenon they know all too well:

> Whenever the issue of ROGD comes up, I think it's easy to punt to the WPATH Statement on ROGD and perhaps re-state what is in that statement. I'd suggest *not* bringing up any clinical scenarios in this response (e.g. stating that every transition seems rapid-onset for parents), because it provides a one-size-fits-all response when we are always emphasizing the importance of individualized care. Some might see that as defensive when there's no reason to be defense. What Littman unfortunately did is put a name/acronym to something (after poorly studying it) that gives the right-wing a *thing* to use to justify their position that care shouldn't ever be given in adolescence. However, what is true for anyone who works with adolescents is that social factors are indeed an aspect of identity development for adolescents, and some young people are more influenced than others, which can be both positive (need to be surrounded by like-minded peers for love and support) and/or negative (can sometimes impact more vulnerable or susceptible young people to adopt an exploration process that might not be authentic for them). ***Now we don't need to say that, but I think a possible approach to ROGD questions should involve a "no duh, what else is new....of course social factors influence an adolescent's wellbeing!*** AND it is important to get treatment to those who need it" type of response.

(BOEAL_WPATH_082680) (emphasis added).

109.    This episode is just another example of WPATH members acknowledging privately the validity of concerns clinicians have about "gender-affirming care," while publicly the organization proclaims an entirely different message.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

110.    One more example. In May 2022, Fox News asked WPATH about comments Admiral Levine made "suggesting that there is 'no argument' among medical experts regarding gender-affirming care for young people." (BOEAL_WPATH_062624). In WPATH's internal discussion about how to respond, one WPATH leader acknowledged that Levine was creating a "narrative" and that "there is subtlety that they would love to hear," apparently referencing the fact that there is in fact an "argument" among medical professionals regarding gender-affirming care for young people. (BOEAL_WPATH_062623). Another leader responded: "I would definitely not engage with this reporter.… I would also not do anything to debate what Dr. Levine has said, she's our best cheerleader." (BOEAL_WPATH_062623). The first person agreed: "Absolutely not. We can regain the narrative later in other ways, not undermining her credibility." (BOEAL_WPATH_062622). This episode shows that WPATH leaders know that what Admiral Levine has said—that there is "no argument" about transitioning treatments among medical experts—is not true. Indeed, in other documents, leaders and SOC-8 authors acknowledge that "a global consensus on 'puberty blockers' does not exist." (BOEAL_WPATH_022878). Yet WPATH does not acknowledge that "subtlety" publicly because doing so would undermine their "best cheerleader." The misinformation spread by Admiral Levine helps their "narrative," so WPATH remains silent. Instances like this is precisely why WPATH is untrustworthy and shows that its ideology trumps science and patient welfare whenever the two conflict.

### POLITICAL ADVOCACY INFLUENCES SCIENTIFIC INQUIRY AT THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

111.    American citizens depend on the United States Department of Health and Human Service. According to its website, "The mission of the U.S. Department of Health and Human Services (HHS) is to enhance the health and well-being of all Americans, by providing for effective

CONFIDENTIAL – ATTORNEY'S EYES ONLY

health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services." (HHS 2023).

112.    It could reasonably be expected that HHS uses best practices when formulating policy. As with WPATH, internal HHS documents display the opposite, at least when it comes to treating gender dysphoric youth. HHS has conducted an ideologically and politically driven campaign to enshrine affirming care as clinical practice, whether or not the facts fit its narrative. In a debated sphere of legal, medical, and social policy, if HHS followed best practice to craft balanced and evidence-based policy, HHS would include a full range of stakeholders and explore varied viewpoints. This did not occur.

### A.   HHS solicits the views and listens to requests of ideologically aligned political advocacy organizations that promote "gender-affirming care"

113.    Within HHS, the Sexual and Gender Minority Research Office (SGMRO) "coordinates research on populations whose sexual orientation, gender identity or expression, or reproductive development is characterized by non-binary constructs of sexual orientation, gender, and/or sex." The SGMRO has hosted various "listening sessions" to "gather comments, concerns, and suggestions about SGM-related health research and related activities at the NIH from community stakeholders, in particular, representatives from SGM-focused health and health advocacy organizations." This would include gender dysphoric youth.

114.    HHS appears to have excluded from its various listening sessions youth whose gender dysphoria naturally desisted, gender non-conforming children and adolescents harmed by medicalized transitioning interventions, detransitioners, and parents of these children. Nor did HHS include LGB groups concerned about excesses of medicalization, internalized homophobia, and harms toward LGB individuals that can accompany transgender activism. And it did not include legal or law enforcement groups, professional scientific or medical organizations such as SEGM

CONFIDENTIAL – ATTORNEY'S EYES ONLY

or FAIR that question the WPATH narrative of care, scientists or clinicians who have raised concerns, think-tanks that are not viewed with favor by the Biden Administration, parent groups, feminists groups, or others who could provide alternative viewpoints. Like WPATH, HHS has been in a bubble about whom it listens to regarding transitioning treatments for youth.

### 1.  First Listening Session: Stakeholders Invited

115.    On October 22, 2019, the SGMRO hosted its first "Health Research Listening Session." According to SGMRO, the "insight and feedback provided by community stakeholders" invited to the event "helped inform the development of the NIH FY 2021–2025 Strategic Plan to Advance Research on the Health and Well-being of Sexual and Gender Minorities." (SGMRO 2019).

116.    For this event, the SGMRO invited 12 stakeholders: Advocates for Youth, Center for American Progress, Fenway Health, GLSEN, Human Rights Campaign, InterACT, National Center for Lesbian Rights, SAGE, Southern AIDS Coalition, Trevor Project, "UCSF Center for Transgender Excellence" [*sic*], and Whitman-Walker Health. (HHS-161116). These stakeholders represent just one sliver of the discussion concerning care for gender dysphoric youth.

117.    Advocates for Youth operates "youth advocacy programs" to "work with transgender, gender expansive, and cisgender youth activities fighting for transgender rights." (Advocates).

118.    The Center for American Progress (CAP) is a self-described progressive policy institute. (CAP a). The think tank characterizes "attempts to ban gender-affirming health care" as "targeting the rights of LGBTQI+ people." (CAP b).

119.    Fenway Health is an advocacy and medical organization that provides and promotes medicalized gender-affirming care for children and adolescents. Its #TransYouthMatter campaign

CONFIDENTIAL – ATTORNEY'S EYES ONLY

refers to legislative efforts "that seek to limit access to health care for transgender and gender diverse youth" as "bad faith bills"—not "created in response to a societal problem." (Fenway).

120.    The Gay, Lesbian and Straight Education Network (GLSEN) is an advocacy and research group that was founded with the aim of "creating affirming learning environments for LGBTQ youth." (GLSEN).

121.    The Human Rights Campaign (HRC) describes itself as the "nation's largest LGBTQ civil rights organization." (HHS_0136413). HRC characterizes the current debate over "gender-affirming care" in the following manner: "In a coordinated push led by national anti-LGBTQ+ groups, legislators across the country have overridden the recommendations of the American medical establishment and introduced hundreds of bills that target transgender and non-binary youth's access to age-appropriate, medically-necessary care. The attack on gender affirming care is relentless and changing every day." (HRC 2023). HRC is counsel for Plaintiffs in this lawsuit.

122.    interACT: Advocates for Intersex Youth is an advocacy organization that "uses innovative legal and other strategies to advocate for the human rights of children born with intersex traits." (interACT).

123.    The National Center for Lesbian Rights (NCLR) is a legal organization that claims to represent the interests of "the entire LGBTQ population." (HHS_0136412). "NCLR engages in a wide range of advocacy, including litigation, policy, and legislation, to improve access to and eradicate discrimination in health care, especially with respect to gender-affirming care for transgender people." (NCLR). NCLR is counsel for Plaintiffs in this lawsuit.

124.    SAGE is an "organization dedicated to serving and advocating for LGBT older adults." (HHS_136416).

125.    The Southern AIDS Coalition is an organization founded "to end the southern HIV epidemic." (Southern AIDS). Its spokesperson at the listening session was "the lead organizer for the National Trans Visibility March [NTVM]." (HHS_0136418). NTVM is a political advocacy organization that exists "to reaffirm that Trans rights are human rights and call for the abolition of anti-LGBTQ+ laws." (NTVM).

126.    The Trevor Project is an advocacy organization that "supports gender-affirming care as an evidence-based practice to support TGNB youth." (Trevor Project a). Last year, the organization published a press release calling gender-affirming hormone therapy "one of the best choices trans youth and their families can make to reduce gender dysphoria and promote well-being." (Trevor Project b).

127.    The "UCSF Center for Transgender Excellence" refers to the "UC San Francisco Center of Excellence in Transgender Health." "The Center of Excellence for Transgender Health (CoE) envisions a safe and affirming world, free from all oppressions, where trans and gender non-binary communities are healthy and thriving." (UCSF). The representative for the Center at the listening session, Dr. Maddie Deutsch, became president of USPATH in 2023.

128.    Whitman-Walker Health is "a community health center based in Washington, D.C." (HHS_136411). The representative for Whitman-Walker at the listening session, Sandy James, PhD, served on the board of directors at the health center at "FreeState Justice." (HHS_136411). FreeState Justice "is a legal advocacy organization that seeks to improve the lives of low-income lesbian, gay, bisexual, transgender, and queer ("LGBTQ") Marylanders." (Free-State).

129.    There is nothing wrong with any of these organizations being invited to share their thoughts with HHS to help inform HHS's future research agenda. HHS should hear from such

groups. The problem is that *only* those groups were invited, and *only* those groups were heard. HHS did not ask any stakeholder with a different viewpoint to come. HHS did not hear from any parents of gender dysphoric teenagers wrestling with their child's rapid onset of gender dysphoria. It did not hear from any clinicians who saw their patients do worse after transitioning treatments. It did not hear from any organizations studying the literature and concluding, as health departments in other countries have done, that the evidence for transitioning treatments in youth is low-quality. This is a problem for an organization developing a research agenda, because the insular world of its listening sessions would likely skew its understanding of what research is necessary. What these stakeholders said—discussed next—confirm these concerns.

### 2. First Listening Session: Perspectives Provided

130.    The stakeholders' remarks represented an echo chamber that asserted additional research on gender-affirming care would establish its benefits and that dissenting or skeptical perspectives arose from anti-LGBT bias. For instance, the first stakeholder to speak was the representative from Whitman-Walker Health. She described her work with "the National Center for Transgender Equality," (HHS_0136411), a group that asserts "Trans kids know who they are," "transition-related care is safe," "transition-related care is lifesaving care," and "'regret' about transition is extremely rare." (Transgender Equality).

131.    The NCLR representative, a lawyer, urged HHS to conduct research that would advance her organization's partisan litigation goals. One such goal was to help resolve parental custody disputes in favor of "affirming" parents —research "for courts to evaluate … to show that the affirming parent is actually acting in the best interest of the child." (HHS_0136412-13). The advocate continued: "if affirming parents are providing care that is the standard of care to their

kids, it's helpful have data to show that they are, in fact, doing the right thing for their children." (HHS_0136413).

132.    The Human Rights Campaign Foundation representative stated that the populations of "Bs" and "Ts" are "ignored in healthcare settings and in research all too often." (HHS_0136414). She urged HHS to study "the impact of early medical treatment for transgender youth and to reject the politically based anti-science attacks on this type of research." (HHS_0136414). Similarly, Fenway Health's representative called for research on "pro- and anti-LGBT policies." (HHS_0136416).

133.    The Trevor Project representative emphasized that there are "more than 100 different terms … used by youth to self-identify their gender and urged HHS to expand the scope of its research "beyond LGB and T" to other gender identities as well. (HHS_0136414-15). The representative also asked HHS to study "conversion therapy, asserting that "60 percent of transgender youth who had received conversion therapy will attempt suicide this year alone." (HHS_0136415). In the context of transgender identifying youth, activists often include in the moniker "conversion any counseling or psychotherapy that explores (rather than unquestioningly affirms) the patient's gender identity.

134.    The medical director at the UCSF Center gave "a strong echoing of other comments," criticizing the "non-evidence-based kind of media coverage of some people who are in opposition to" research on gender-affirming care for youth. (HHS_0136417-18).

135.    The Southern AIDS Coalition representation, a former organizer for the National Trans Visibility March, urged HHS to consider that "[m]any of the black trans population will never have opportunities to be at these particular tables"—referring to the listening session.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

(HHS_0136418). She told her "colleagues at the table to stop silencing the voices of trans people."

(HHS_0136419).

136.    The SAGE representative advocated for "the NIH [to] fund more research projects

which center the diverse circumstances of LGBT *older* adults and specifically assess health dis-

parities among *older* adults of color and individuals who identify as transgender and bisexual."

(HHS_0136419) (emphasis added).

137.    As the last stakeholder to speak, the representative from the Center for American

Progress stated:

> So, are there ways in which the Sexual and Gender Minority Research Office can
> help us as advocates, in particular, know what's out there and be able to use it? The
> progress of science can be very slow, and the process of doing policy work can be
> very slow, until it is not, and I think advocates could really use pathways into know-
> ing the great work that's already in existence at a range of institutions across the
> country for us to use.

She concluded, "this Office could be a way to help [CAP] combat the misuse of science to harm

LBGTQ populations." (HHS_0136422).

138.    The group as a whole demonstrates the bias of motivated reasoning, which is the

human tendency to interpret facts to protect valued beliefs. The group's members all appeared to

believe, from the beginning, that pro-LGBT policies are good and that access to medicalization

and blanket affirmation of gender identity are pro-LGBT policies. Though numerous stakeholders

appeared to acknowledge the need for more research on gender diverse populations, they either

implicitly assumed (in the case of the NCLR lawyer) or explicitly asserted (as with the Trevor

Project) the virtue of an "affirmative" therapy model.

139.    Many advocates asserted that "B's" and "T's," older LGBT populations, or black

trans females were ignored or silenced by the medical community, but gender-nonconforming

youth harmed by the gender-affirming "care" they received, such as detransitioners, were *actually* absent from the listening session and their perspectives were never presented.

140.    Likewise, the health professionals from Fenway Health and UCSF displayed the increased tribalization of academic medicine by asserting that diverging opinions on GAC (not heard in the listening session) were "anti-LGBT" or based on "non-evidence-based media coverage." Though it included concerns about "misinformation," SGMRO's first listening session suffered from the type of extreme ideological homogeneity that contributes to irrational beliefs and the spread of misinformation. (Kaliebe Report ¶ 60 et seq.).

### 3.  Excluded Stakeholder Perspectives

141.    A week prior to SGMRO's first listening session, the Kelsey Coalition emailed SGMRO to ask to participate and share its perspective "to inform the development of the FY 2021-2025 SGM Research Strategic Plan." (HHS_132964). As explained in the email to SGMRO, the organization's "mission is to promote policies and laws that protect gender nonconforming young people from medical and psychological harms." (HHS_0132964). The Coalition was formed by parents of "gender nonconforming children" who had been harmed by "gender-affirming" care. (HHS_0132965). The email also stated that the organization worked with "detransitioners — young people who have experienced tragic regret over the consequences of powerful hormones and drastic surgeries that they received well before their brains reached maturity — whose experiences of irreversible regret must be considered for future research." (HHS_0132965).

142.    An HHS official responded that SGMRO was no longer extending invitations to the event but would "be sure to keep the Kelsey Coalition in mind" if it held "listening sessions in the future." (HHS_0132964).

143.    A detransitioner also emailed SGMRO a week before the event. (HHS_0137649). He stated that he was the founder of an online community of over 2,000 detransitioners and wanted to participate in the first listening session. (HHS_0137649-50). He explained: "We are an emergent and quickly growing population of gender-nonconformists, most of whom are also same-sex oriented, all of whom have experienced mistreatment and neglect by the status quo of gender-specializing healthcare professionals." (HHS_0137649).

144.    The Director of SGMRO responded: "We are no longer sending invitations for the Listening Session scheduled for next week." (HHS_0137649). She added that the listening session would not "have a representative from the detransitioning community." (HHS_0137649). She also promised to keep the detransitioner "[s]hould we hold listening sessions in the future." (HHS_0137649).

145.    Immediately after the first listening session, Dr. James Cantor emailed SGMRO to express his concern that not all stakeholders were represented. He suggested that the agency should "seek out explicitly the experiences of 'desisters'" who identify as transgender in childhood and desist as they grow older. He explained that, because desisters "do not seek services for transition, they are often left invisible to care providers and researchers." (HHS_0137394). This is an incredibly important population to highlight, as the vast majority of childhood onset gender dysphoria remits after puberty. These individuals often grow up to be same-sex attracted adults, and thus, Dr. Cantor is highlighting concerns about homophobia, internalized or externalized, that may be driving the early medicalization of this population.

146.    In my initial report, I mentioned attribution substitution, whereby a simple, related moral judgment, i.e. trans rights or "pro-LGBT," is substituted for various conceptually complex

CONFIDENTIAL – ATTORNEY'S EYES ONLY

decisions, i.e. evidence of outcome for medical interventions to treat gender dysphoria in adolescents. (Kaliebe Report ¶ 67). By my count, "discrimination" was mentioned 12 times in the first listening session by various advocates. The one-sided atmosphere SGMRO created supported a tribal us vs. them narrative in the participants. This allowed the participants to cling to grand theories based on discrimination rather than nuanced discussion of multifaceted issues facing gender non-conforming youth. The participation of the Kelsey Coalition, detransitioners, those who had their childhood gender dysphoria remit or a medical professional familiar with desistance would have better reflected the complexity of medicalizing "gender-affirming care" in adolescents.

### 4.  Subsequent listening sessions: No Broadening of Perspectives

147.    The SGMRO held a second listening session on November 19, 2020. (SGMRO 2019). It did not involve a wider range of perspectives than the first. The invitees included the Bisexual Resource Center; GLMA: Health Professionals Advancing LGBTQ Equality; Howard Brown Health Center; Intersex Justice Project; Los Angeles LGBT Center; National Black Justice Coalition; ZAMI NOBLA-National Association of Black Lesbians on Aging; Transgender Law Center; The Houston Intersex Society; a Two-Spirit Activist & AI/AN Community Member; the Williams Institute; and WPATH.

148.    SGMRO thus heard the perspectives of, among others, two-spirit indigenous persons, Black Lesbians 40 and older, and intersex children "harmed by the medical establishment" whose surgeries were "medically unnecessary," "painful," "irreversible," and "nonconsensual." (SGMRO 2020 Tr.). The challenge of how to clinically care for intersex patients and the poor care they often receive is legitimate and important. Yet that issue only tangentially relates to gender affirming care and the political activism that is reflected in the documents I reviewed. SGMRO

did not hear the perspectives of the Kelsey Coalition or the detransitioners that had asked to participate.

149.    Unsurprisingly, then, not one of the invited "stakeholders" even alluded to concerns about desisters, detransitioners, or the known health risks of medicalized interventions for gender dysphoric youths. Rather than avoiding the "spiral of silence" that forms when a small moralizing group dominates the discussion, SGMRO appears to have embraced it. (Kaliebe Report ¶ 64). It is the obligation of health professionals and researchers to foster a diversity of perspectives. HHS intentionally failed to do that when it held its listening sessions to determine a future research agenda.

150.    The WPATH representative was the only invitee to suggest that HHS should research "the longitudinal health risks of gender-affirming therapies." (SGMRO 2020 Tr., p.16). He also asked for "the NIH to support more research on transgender and gender-diverse youth, especially on mental and medical health outcomes and fertility preservation." (*Id.*) Thus, of the two Sexual and Gender Minority Research Office listening sessions for which I have transcripts, a past-president of WPATH was the only invitee to hint at the risks of gender-affirming therapies, and he did so without specifying the risks posed to minors.

151.    The day after the second listening session, Gender Health Query requested information on how it and other LGBT organizations could have their perspectives heard. (HHS_0130129). GHQ is a "group of lesbian, gay, bisexual and transgender people, and allies, who want to ensure that all gender nonconforming youth—with or without gender dysphoria—are cared for and protected." (GHQ). GHQ's board is composed entirely of persons whose "sexual orientation" is bi, gay, or lesbian. (Id.). Without explaining how GHQ could secure an invitation,

an NIH official responded that GHQ should "reconnect" when the event was closer. (HHS_0130127).

152.    On May 17, 2021, GHQ reconnected with another remail request to participate in the listening session scheduled for the summer. (HHS_0130127-28). GHQ explained that it "doubt[ed] any other group" HHS invited would discuss concerns regarding children "undergoing experimental medical treatments that sterilize them and have other very serious health impacts." (HHS_0130128). An SGMRO official responded that "SGMRO decided to change the format" to receive public comment through a yearly "Request for Information" instead. (HHS_0130127).

153.    Through its listening sessions, SGMRO appears to have welcomed exclusively stakeholders who saw gender medicine in terms of civil rights or actively supported medicalized gender transitioning for minors. Then, when other stakeholders—indisputably sexual and gender minorities—with a different perspective sought inclusion in the discussion, SGMRO changed the format.

**B.  HHS refuses to conduct a systematic evidence review of treatments it endorses**

154.    Given HHS's interest in transitioning treatments for gender dysphoric youth, one would hope that it would conduct a systematic evidence review as other countries' health systems have done to determine whether those treatments are beneficial. Yet when asked to do so, it refused.

155.    On August 18, 2020, Christine Chang, an Associate Director at the Agency for Healthcare Research and Quality at HHS, emailed Karen Robinson, the Johns Hopkins researcher whom WPATH commissioned to lead the Evidence Review Team for SOC-8 (SOC-8 S248), to inquire about the systematic evidence reviews she and her team completed for WPATH. Chang

CONFIDENTIAL – ATTORNEY'S EYES ONLY

explained that her agency had received a request from the American Academy of Family Physicians to conduct a systematic review of transitioning treatments for adolescents. (HHS_0153487). The Academy posed three research questions:

> "KQ1: For children and adolescents who identify as transgender and have not initiated puberty, what are the benefits and harms of offering/prescribing pubertal suppression compared to not offering/prescribing pubertal suppression?"

> "KQ2: For adolescents who identify as transgender and have initiated puberty, what are the benefits and harms of prescribing medical affirmation with hormone therapy as compared to no intervention or social affirmation alone?"

> KQ3: "For adolescents who identify as transgender and have initiated puberty, what are the benefits and harms of surgical affirmation as compared to no intervention or social affirmation without or without medical affirmation?"

(Effective Health Care Program 2020).

156.    Chang wrote to Robinson "to see if there is duplication" with the review Robinson completed for WPATH and asked about when Robinson would complete the review. (HHS_0153487). Robinson replied that her team had "completed and submitted reports of reviews (dozens!) to WPATH" and were working on manuscripts for publication. (HHS_0153486). Chang followed up to see whether the systematic review by the Johns Hopkins teams for WPATH would make it unnecessary for AHRQ to conduct a review. (HHS_0153485). Robinson replied:

> I'm sorry I failed to get back to you. I have been distracted and I am not sure what we will end up publishing in a timely manner as *we have been having issues with this sponsor [WPATH] trying to restrict our ability to publish*.

> I don't think any of the planned manuscripts would be an overlap. This is not because the review questions were different but *we found little to no evidence about children and adolescents*.

(HHS_0153484) (emphasis added).

157.     To this, Chang replied:

Oh wow, sorry to hear about the issues with the sponsor. It sounds like the sole way of disseminating the work is through manuscripts? The reviews will not be otherwise made available? That's disappointing.

Knowing that there is little/no evidence about children and adolescents is helpful.

(HHS_0153484).

158.     That was September 1, 2020. Four months later, AHRQ issued its determination that it would not conduct a systematic review to answer the questions posed by the Academy. (AHRQ 2021). Though the Academy of Family Physicians had asked specifically about the effect of puberty blockers, cross-sex hormones, and surgeries on children and adolescents, AHRQ found a protocol for a systematic review that had been published that stated it would conduct literature reviews to determine effect of puberty blockers on gender dysphoric adolescents and the effect of hormones and surgeries for "transgender people" generally—not adolescents specifically. The protocol AHRQ relied on was Robinson's, which was registered as her team began work for WPATH SOC-8. (Sharma et al. 2018). This was curious given that Robinson told Chang that, based on her completed literature reviews, she did not think there would be any "overlap" with an AHRQ review since her team "found little to no evidence about children and adolescents. Plus, as Robinson noted, WPATH was "trying to restrict" her team's "ability to publish," so it was not clear that those reviews would ever see the light of day.

159.     The month after AHRQ issued its determination, Robinson's team did in fact publish a systematic review: "Hormone Therapy, Mental Health, and Quality of Life Among

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Transgender People: A Systematic Review." (Baker et al. 2021).[2] That publication appeared to combine results from some undisclosed number of the "dozens" of literature reviews Robinson's team conducted for WPATH. It discussed three studies focused on puberty blockers, and otherwise generally discussed findings for adolescents as part of its findings for adults.

160.    The episode raises a number of questions and concerns. Why was WPATH "trying to restrict" its Evidence Review Team for SOC-8 from publishing the systematic reviews it conducted for SOC-8? Was WPATH successful in burying some of the reviews, such that Robinson's publication was incomplete? WPATH claims in SOC-8 that there are so "few outcome studies that follow youth into adulthood" that "a systematic review regarding outcomes of treatment in adolescents is not possible." (SOC-8 S46). Does that mean Robinson's team did not conduct a systematic literature review regarding adolescents, or (more consistent with Robinson's statement to Chang) that it conducted one and just found "found little to no evidence about children and adolescents"?

161.    What is clear is that individuals and leaders at both WPATH and HHS seem to know that evidence supporting the safety and efficacy of transitioning treatments for gender dysphoric youth is lacking.

Executed this 2nd day of February, 2024.

_____
Kristopher E. Kaliebe, M.D.

_____

[2] Robinson's team also published one other systematic review from the WPATH review: "Effects of antiandrogens on prolactin levels among transgender women on estrogen therapy: A systematic review." (Wilson et al. 2020).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

# REFERENCES

Advocates for Youth.  Transgender Young People's Health and Rights. https://www.advocatesforyouth.org/issue/transgender-young-peoples-health-and-rights/, last accessed Feb. 1, 2024.

AHRQ 2021. Topic Brief: Treatments for Gender Dysphoria in Transgender Youth. Agency for Healthcare Research and Quality. Jan. 8, 2021. Retrieved from https://effectivehealthcare.ahrq.gov/system/files/docs/topic-brief-gender-dysphoria.pdf.

Ault, A. (2021, Nov. 18). Transgender Docs Warn About Gender-Affirmative Care for Youth. *Medscape*. Retrieved from https://www.medscape.com/viewarticle/963269#vp_2.

Bailey, J.M. & Diaz, S. (2023). Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. *Archives of Sexual Behavior*. 52(3):1031-1043. doi: 10.1007/s10508-023-02576-9.

Bailey Letter 2023. Retrieved from https://segm.org/sites/default/files/2023-06/Springer%20Nature%20Appeal_25%20May_MJB.pdf, last accessed Feb. 1, 2024.

Bailey Retraction Note (2023). Retraction Note: Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. *Springer Nature*. Retrieved from https://link.springer.com/article/10.1007/s10508-023-02576-9.

Baker, K. et al. (2021). Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review. *Journal of Endocrine Society*, Volume 5, Issue 4, April 2021, bvab011, https://doi.org/10.1210/jendso/bvab011.

CAAPS Statement. CAAPS Position Statement on Rapid Onset Gender Dysphoria (ROGD). Coalition for the Advancement & Application of Psychological Science. July 26, 2021. Retrieved from https://www.caaps.co/rogd-statement.

CAP

A – Center for American Progress. About Us. Retrieved from https://www.americanprogress.org/about-us/, last accessed Feb. 1, 2024.

B – Center for American Progress. LGBTQI+ Rights. Retrieved from https://www.americanprogress.org/topic/lgbtq-rights/, last accessed Feb. 1, 2024.

Canadian Press. (2018, Oct. 7). CAMH Reaches Settlement with Former Head of Gender Identity Clinic" *CBC News*. Retrieved from https://www.cbc.ca/news/canada/toronto/camh-settlement-former-head-gender-identity-clinic-1.4854015.

Edwards-Leeper, L. & Anderson, E. (2021, Nov. 24). The mental health establishment is failing trans kids. *The Washington Post*. Retrieved from https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Effective Health Care Program 2020. Treatments for Gender Dysphoria in Transgender Youth. July 17, 2020. Retrieved from https://effectivehealthcare.ahrq.gov/get-involved/nominated-topics/treatments-gender-dysphoria-transgender-youth.

FAIR Letter (2023). Open Letter in Support of Dr. Kenneth Zucker and the Need to Promote Robust Scientific Debate. May 5, 2023. Retrieved from https://www.fairforall.org/open-letters/archives-of-sexual-behavior/.

Fenway Health. #TransYouthMatter. Retrieved from https://fenwayhealth.org/the-fenway-institute/health-policy/transyouthmatter/, last accessed Feb. 1, 2024.

Florida Dep't of Health 2022. Treatment of Gender Dysphoria for Children and Adolescents. April 20, 2022. Retrieved from https://www.floridahealth.gov/newsroom/2022/04/20220420-gender-dysphoria-guidance.pr.html.

FreeState Justice. Mission & History. Retrieved from https://freestate-justice.org/who-we-are/mission/, last accessed Feb. 1, 2024.

GLSEN. Gay, Lesbian and Straight Education Network. About Us. Retrieved from https://www.glsen.org/about-us#snt--1, last accessed Feb. 1, 2024.

GHQ. Gender Health Query. About. Retrieved from https://www.genderhq.org/about, last accessed Feb. 1, 2024.

HHS 2023. About HHS. United States Dep't of Health and Human Services. Retrieved from https://www.hhs.gov/about/index.html, last accessed Feb. 1, 2024.

HRC 2023. Human Rights Campaign Foundation, Map: Attacks on Gender Affirming Care by State, Human Right Campaign, Nov. 13, 2023, https://www.hrc.org/resources/attacks-on-gender-affirming-care-by-state-map.

interACT. interACT: Advocates for Intersex Youth. Mission and History. Retrieved from https://interactadvocates.org/about-us/mission-history/, last accessed Feb. 1, 2024.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS One 13(8):  e0202330. https://doi.org/10.1371/journal.pone.0202330.

Matte, N. et al. (2009). Nomenclature in the World Professional Association for Transgender Health's Standards of Care: Background and Recommendations. 11 International Journal of Transgenderism 42, https://onlineacademiccommunity.uvic.ca/ahdevor/wp-content/uploads/sites/2247/2016/12/Nomenclature.pdf.

NTVM. National Trans Day Visibility March. Retrieved from https://nationaltransvisibilitymarch.org/, last accessed Feb. 1, 2024.

NCLR. National Center for Lesbian Rights. Discrimination, Healthcare. Retrieved from https://www.nclrights.org/our-work/discrimination/healthcare/, last accessed Feb. 1, 2024.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Open Letter (2023). Open Letter re: Archives of Sexual Behavior. May 5, 2023. Retrieved from https://asbopenletter.com.

SGMRO 2019. SGM Health Research LISTENING SESSION. Division of Program Coordination, Planning, and Strategic Initiatives. Retrieved from https://dpcpsi.nih.gov/sgmro/listening-session, last accessed Feb. 1, 2024.

SGMRO 2020 Tr. Sexual and Gender Minority Health Research Listening Session. Retrieved from https://dpcpsi.nih.gov/sites/default/files/SGMRO_Webinar_11-19-2020_Transcript_508.pdf, last accessed Feb. 1, 2024.

SGMRO 2023. Final Workshop Summary. Retrieved from https://dpcpsi.nih.gov/sites/default/files/2023-10/SGMRO%20GAC%20Workshop%20Summary.pdf, last accessed Feb. 1, 2024.

SGMRO 2024. About SGMRO. Division of Program Coordination, Planning, and Strategic Initiatives. Retrieved from https://dpcpsi.nih.gov/sgmro, last accessed Feb. 1, 2024.

Sharma, R. et al. (2018). Effects of hormone therapy in transgender people. National Institute for Health and Care Research. PROSPERO 2018 CRD42018115379. Retrieved from https://www.crd.york.ac.uk/prospero/display_record.php?ID=CRD42018115379.

Shrier, Abigail. (2021, Oct. 4). Top Trans Doctors Blow the Whistle on "Sloppy" Care. *The Free Press*. Retrieved from https://www.thefp.com/p/top-trans-doctors-blow-the-whistle.

SOC-8. Coleman, E., et al. (2022). Standards of care for the health of transgender and gender diverse people, version 8.  International Journal of Transgender Health, 23, S1–S258.

SOC-7. Coleman, E. et al. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. International Journal of Transgenderism, 13(4).

Southern AIDS Coalition. Retrieved from https://southernaidscoalition.org/, last accessed Feb. 1, 2024.

Transgender Equality. Get the Facts: The Truth About Transition-Related Care for Transgender Youth. Feb. 28, 2023. https://transequality.org/blog/get-the-facts-the-truth-about-transition-related-care-for-transgender-youth.

Trevor Project

A – The Trevor Project (2020, Jan. 29). Gender-Affirming Care for Youth. Retrieved from https://www.thetrevorproject.org/research-briefs/gender-affirming-care-for-youth/.

B – Sylvester, Elliot (2023, Feb. 10). The Trevor Project Opposes Proposed Rule Banning Transgender Medical Care for Youth in Florida. Retrieved from

CONFIDENTIAL – ATTORNEY'S EYES ONLY

https://www.thetrevorproject.org/blog/the-trevor-project-opposes-proposed-rule-banning-transgender-medical-care-for-youth-in-florida/.

UCSF. University of California San Francisco – Center of Excellence for Transgender Health. Retrieved from https://prevention.ucsf.edu/transhealth, last accessed Feb. 1, 2024.

Wilson, L. et al. (2020). Effects of antiandrogens on prolactin levels among transgender women on estrogen therapy: A systematic review. Int J Transgender Health. 2020; 21(4): 391–402, doi: 10.1080/15532739.2020.1819505.

WHO FAQ. (2024, Jan. 15). FAQ: WHO development of a guideline on the health of trans and gender diverse people.  World Health Organization.  Retrieved from https://cdn.who.int/media/docs/default-source/hq-hiv-hepatitis-and-stis-li-brary/tgd_faq_16012024.pdf?sfvrsn=79eaf57f_1.

WPATH (2018, Sep. 8). WPATH POSITION ON "Rapid-Onset Gender Dysphoria (ROGD)." WPATH Global Board of Directors. Retrieved from https://www.wpath.org/me-dia/cms/Documents/Public%20Policies/2018/9_Sept/WPATH%20Position%20on%20Rapid-On-set%20Gender%20Dysphoria_9-4-2018.pdf.

WPATH/USPATH 2022. WPATH/USPATH Denounce Florida Department of Health for Harmful Guidelines Targeting Trans Youth. April 21, 2022. Retrieved from https://www.wpath.org/media/cms/Documents/Newsroom/US-WPATH/WPATHUSPATH%20Statement%20re%20Flor-ida%20Apr%2021%202022.pdf?_t=1650576534.