# EXHIBIT 17

## Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

NO. 2:22-CV-00184-LCB-CWB

BRIANNA BOE, et al.,
        Plaintiffs,
vs.

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor

vs.

STEVE MARSHALL, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE STATE OF
ALABAMA, et al.,

      Defendants

ZOOM
DEPOSITION
OF
DR. PATRICK LAPPERT
APRIL 3, 2024

Taken Before:  Krista L. Price, CCR,

## Page 2

STIPULATION

1
2    IT IS STIPULATED AND AGREED by and
3    between the parties through their
4    respective counsel that said deposition
5    may be taken before Krista L. Price,
6    Certified Court Reporter, and Notary
7    Public;
8        That the signature to and the
9    reading of the deposition by the witness
10   is NOT waived, the deposition to have
11   the same force and effect as if full
12   compliance had been had with all laws
13   and rules of Court relating to the
14   taking of depositions;
15       That it shall not be necessary for
16   any objections to be made by counsel to
17   any questions, except as to form or
18   leading questions, and that counsel for
19   the parties may make objections and
20   assign grounds at the time of trial, or
21   at the time said deposition is offered
22   in evidence, or prior thereto.
23

## Page 3

1      APPEARANCES
2
3    FOR THE PLAINTIFF VIA ZOOM:
4    LIGHTFOOT, FRANKLIN, ROSE & WHITE, LLC
5    BY: AMIE VAGUE
6    THE CLARK BUILDING
7    400 20TH STREET NORTH
8    BIRMINGHAM, ALABAMA 35203
9
10   FOR THE DEFENDANT VIA ZOOM:
11   OFFICE OF ALABAMA ATTORNEY GENERAL STEVE
12   MARSHALL
13   BY: CHARLES MCKAY
14   501 WASHINGTON AVENUE
15   MONTGOMERY, ALABAMA 36104
16
17   PRESENT VIA ZOOM:
18   BARRETT BOWDRE, DEPUTY SOLICTOR GENERAL
19
20   JASON CHEEK, ASSISTANT U.S. ATTORNEY,
21
22   RENEE WILLIAMS, CIVIL RIGHT'S DIVISION
23   FEDERAL COORDINATION

## Page 4

1      INDEX
2
3    EXAMINATION BY:      PAGE:
4    MRS. VAGUE............5
5
6    PLAINTIFF'S EXHIBIT
7    NO. 1 (Dr. Lappert's
8    Report)....      120
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Dr. Patrick Lappert                                                    4/3/2024

Page 5

1        I, Krista L. Price, a Certified
2   Reporter of Birmingham, Alabama, and a
3   Notary Public for the State of Alabama,
4   acting as Commissioner, certify that on
5   this date, pursuant to Rule 30 of the
6   Alabama Rules of Civil Procedure and the
7   foregoing stipulation of counsel, there
8   came before me via ZOOM at BIRMINGHAM
9   REPORTING, BIRMINGHAM, ALABAMA on
10  WEDNESDAY, APRIL 3, 2024, commencing at
11  9:00 A.M., DR. PATRICK LAPPERT, witness
12  in the above cause, for oral
13  examination, whereupon the following
14  proceedings were had:
15
16        DR. PATRICK LAPPERT,
17     being first duly sworn, was
18     examined and testified as follows:
19
20     COURT REPORTER:  Usual
21  stipulations?
22        MRS. VAGUE: Yes.
23        MR. MCKAY: Yes.

Page 6

1        EXAMINATION BY MRS. VAGUE:
2   Q.  Good morning, Doctor.
3   A.  Good morning.
4   Q.  We met just a few minutes ago.
5   As I said, I'm Amie Vague.  I'm here on
6   behalf of the private plaintiffs, and
7   I'm here to ask you some questions today
8   about your expert opinions that I
9   understand you're going to be giving in
10  this case.  Do you understand that?
11  A.  Yes.
12  Q.  And I know you've given a
13  deposition before.  Have you ever given
14  a deposition via Zoom or remote means?
15  A.  I have.
16  Q.  Okay.  So you know how it
17  works.  We've still got a court reporter
18  here.  She's taking down everything that
19  we say.  If you can't hear me or we lose
20  connection or something, just let us
21  know, and we'll take a pause, and then
22  we can restart.  Okay?
23  A.  Okay.

Page 7

1   Q.  All right.  With that then, I'm
2   just going to go ahead and jump in if
3   you're ready.
4   A.  I am.
5   Q.  All right.  Doctor, how many
6   minors in Alabama have undergone
7   gender-affirming surgeries?
8   A.  I don't know that number.
9   Q.  Do you know how many adults in
10  Alabama have undergone gender-affirming
11  surgeries?
12  A.  I don't.
13  Q.  Have you done any work to try
14  and figure out what those numbers are?
15  A.  I have not.
16  Q.  What about nationwide?  Do you
17  know how many minors nationwide have
18  undergone gender-affirming surgeries?
19  A.  I do not.
20  Q.  Do you know how many adults
21  nationwide have undergone
22  gender-affirming surgeries?
23  A.  I do not.

Page 8

1   Q.  Do you know what percentage of
2   transgender individuals have undergone
3   gender-affirming surgeries in the United
4   States?
5   A.  Could you reask that question?
6   Q.  Sure.  Do you know -- out of
7   all the individuals in the United States
8   who identify as transgender, do you know
9   what percentage of those people have
10  undergone gender-affirming surgeries?
11  A.  To the best of my knowledge,
12  that number is not known.
13  Q.  Okay.  Let's talk a little bit
14  about your practice.  I understand that,
15  say, for the last few years of your
16  practice, you were board certified as a
17  plastic surgeon; is that correct?
18  A.  That's correct.
19  Q.  And you hold yourself out as an
20  expert in the field of plastic and
21  reconstructive surgery, right?
22  A.  I do.
23  Q.  Do you hold yourself out as an

2  (Pages 5 to 8)

Dr. Patrick Lappert                                    4/3/2024

Page 9

1    expert in any other areas?
2         MR. MCKAY:  Object to the form.
3         A.  What other areas?
4         Q.  That's for you to tell me.  Do
5    you consider yourself an expert in any
6    other areas outside of plastic and
7    reconstructive surgery?
8         A.  Yes.
9         Q.  What other areas?
10        A.  General surgery, trauma
11   surgery, the care of chronic wounds.
12        Q.  Okay.  Anything else?
13        A.  No.
14        Q.  Okay.  And I think I know the
15   answers to these next couple of
16   questions, but I just want to go through
17   them.
18        You're not a pediatrician,
19   correct?
20        A.  Correct.
21        Q.  You don't have any specialized
22   training or expertise in pediatrics,
23   correct?

Page 11

1    pediatrics.
2         Q.  Okay.  And when you're talking
3    about developmental pediatrics, it sounds
4    to me like you're talking about the
5    physical development of the child; is
6    that correct?
7         A.  It's more than that.
8         Q.  Explain that to me.
9         A.  Well, for example, in the care
10   of children with congenital deformities
11   of the mouth, a cleft palate, it includes
12   a lot of the study of the developmental
13   processes involved in the development of
14   speech, motor processes, everything;
15   including, you know, dentition.  But
16   there's a lot of developmental things
17   related to their psychological and
18   emotional processes that enter into the
19   timing of surgery and things like that.
20        Q.  Okay.  So just if I could sum it
21   up -- and correct me if I misstate this.
22   But you do have some specialized training
23   in the care of children in pediatrics

Page 10

1         A.  I do have advanced training in
2    pediatric surgery -- pediatric
3    craniofacial surgery.
4         Q.  Okay.  Specific to that.  Other
5    than that one area, you don't have any
6    other training or specialized expertise
7    in the field of pediatrics?
8         A.  Only what I gained in my
9    training as a general surgeon and a
10   reconstructive surgeon, which involved a
11   lot of care of children, yes.
12        Q.  Specific to plastic and
13   reconstructive surgery that you were
14   performing?
15        MR. MCKAY:  Object to the form.
16        A.  Well, in those areas, there's a
17   lot of training relating to
18   development -- pediatric developmental
19   processes that are germane to congenital
20   deformities, including deformities of the
21   hand, deformities of the cranium, and
22   deformities of the mouth.  So there's a
23   lot of training in developmental

Page 12

1    specific to your work as a plastic
2    surgeon involving the development in some
3    instances of the children specific to
4    your work as a plastic surgeon.  Is that
5    fair?
6         MR. MCKAY:  Object to the form.
7         A.  I guess that's fair.  Yes.
8         Q.  Okay.  You're not an
9    endocrinologist, correct?
10        A.  I am not.
11        Q.  You don't have any specialized
12   training or expertise in endocrinology,
13   right?
14        A.  I have expertise in
15   endocrinology as it relates to the
16   practice of general surgery and plastic
17   and reconstructive surgery.
18        Q.  Okay.  What kind of expertise
19   would you have with that specificity?
20        A.  Well, in endocrinology -- as it
21   relates to endocrinology, for example, in
22   my training as a general surgeon, I had
23   to have a fairly comprehensive

3  (Pages 9 to 12)

Dr. Patrick Lappert                                          4/3/2024

Page 13

1  understanding, for example, of thyroid
2  disease, parathyroid disease, adrenal
3  disease, all of its manifestations in
4  order to diagnose those conditions or to
5  confirm the diagnosis of those conditions
6  that might lead to surgical intervention,
7  such as a thyroidectomy or
8  parathyroidectomy or things like that.
9  So there's a lot of endocrinology
10  involved in that, as is the case in
11  pediatric plastic surgery related to
12  congenital deformities and things like
13  that.
14      Q.  Okay.  I think I'm
15  understanding.  You have some training in
16  endocrinology much like in the pediatric
17  world that's specific to your care as a
18  plastic surgeon; is that right?
19      A.  Well, it isn't just specific to
20  plastic surgery.  So, for example, my
21  training in thyroid disease is the same
22  body of information that an
23  endocrinologist would use in the

Page 14

1  diagnosing and the recommended treatment
2  of particular thyroid diseases.
3      Q.  And outside of that training
4  that you received in your education for
5  general surgery and plastic surgery, you
6  haven't received any additional training
7  in the field of endocrinology; is that
8  right?
9      A.  That's right.
10      Q.  Am I correct that you're not a
11  psychologist?
12      A.  I'm not.
13      Q.  You're not a psychiatrist; is
14  that right?
15      A.  I am not.
16      Q.  You don't hold yourself out as
17  an expert in the field of mental health;
18  is that correct?
19      A.  I have expertise in areas of
20  mental health.
21      Q.  Okay.  What's your expertise in
22  the field of mental health?
23      A.  Well, an understanding of mental

Page 15

1  health issues is very important to
2  persons -- physicians who practice
3  particularly in cosmetic surgery,
4  aesthetic surgery because we have to have
5  a clear understanding of patients'
6  motivation for surgery, which can
7  sometimes be pathological and require a
8  correct diagnosis.
9      Q.  What kind of training have you
10  undergone in the field of mental health?
11      A.  Well, in addition to my training
12  and my rotations in the psychiatric
13  services when I was training as a
14  physician, we also received extensive
15  exposure to psychiatry during my plastic
16  surgery residency as it relates to
17  aesthetic surgery.
18      Q.  And outside of your -- the
19  education and training that you received
20  in your residency, have you done any
21  additional training in the field of
22  mental health?
23      A.  No.

Page 16

1      Q.  And do you treat patients for
2  mental health conditions?  I understand
3  you might see patients who have mental
4  health conditions, but do you treat those
5  patients, or do you refer them to another
6  provider?
7      A.  I refer patients to psychiatry.
8      Q.  Those specialties that we just
9  talked through -- endocrinology,
10  pediatrics, and mental health -- you're
11  not an expert in the treatment guidelines
12  that are issued within those specialties,
13  are you?
14      MR. MCKAY:  Object to the form.
15      A.  Could you ask the question
16  again?
17      Q.  Sure.  I understand that in
18  different fields of medicine, those
19  particular fields publish guidelines
20  specific to those fields, correct?
21      A.  Yes.  The different medical
22  specialties at times publish treatment
23  guidelines, that's correct.

4  (Pages 13 to 16)

Dr. Patrick Lappert                                          4/3/2024

---

Page 17

1      Q.  And my question is:  We talked
2    through a number of those fields:
3    Pediatrics, endocrinology, mental health.
4    Are you an expert in the treatment
5    guidelines for those specialties that we
6    just went through?
7      A.  I have expertise in those areas
8    as I have reviewed the treatment
9    guidelines germane to the question at
10   hand as it relates to my practice of
11   plastic and reconstructive surgery.
12     Q.  But beyond reviewing those
13   guidelines, you didn't participate and
14   prepare any of those guidelines, did you?
15     A.  I did not.
16     Q.  You're not familiar with what
17   those guidelines -- the publishers of
18   those guidelines may have reviewed or
19   relied upon in preparing those
20   guidelines, are you?
21       MR. MCKAY:  Object to the form.
22     A.  I am familiar.  As I review the
23   treatment guidelines, I make a habit of

---

Page 18

1    reviewing the literature that's offered
2    in support of the treatment guidelines.
3      Q.  I understand.  I guess my
4    question is slightly different.  You
5    don't know what articles or peer-reviewed
6    studies beyond what's cited in those
7    articles may have been considered by
8    those guidelines?
9        MR. MCKAY:  Object to the form.
10     A.  It is in the nature of treatment
11   guidelines to include the references and
12   citations in a comprehensive way since
13   patient care relies on the quality of
14   that evidence.  So I have reviewed the
15   literature.
16     Q.  Okay.  You've reviewed the
17   literature.  You've reviewed the
18   guidelines.  Is that fair?
19     A.  Yes.
20     Q.  Okay.  You're not an expert in
21   diagnosing gender dysphoria, correct?
22     A.  I have expertise in the
23   psychological processes that are

---

Page 19

1    associated with gender dysphoria and the
2    prior diagnosis of gender identity
3    disorder.
4      Q.  Let me back up.  And my question
5    is pretty specific.  Are you an expert in
6    diagnosing gender dysphoria?
7      A.  I have expertise.
8      Q.  That sounds like a distinction
9    to me.  What distinction are you making
10   there?
11     A.  That I have sufficient expertise
12   to make a diagnosis of gender identity
13   disorders.
14     Q.  Okay.  Let's break that down a
15   little bit.
16        How many patients have you
17   diagnosed for gender dysphoria?
18     A.  None.
19     Q.  Okay.  And a minute ago, you
20   were making a distinction between the
21   term "gender dysphoria" and "gender
22   identity disorder."  What is that
23   distinction?

---

Page 20

1      A.  It's a distinction that was made
2    by the authors of the Diagnostic and
3    Statistical Manual.
4      Q.  And what do you understand that
5    distinction to be?
6      A.  Gender identity disorder is the
7    more historic diagnostic term that
8    subsumes gender identity disorder as a
9    subcategory of obsessive compulsive
10   processes.  That diagnostic category was
11   renamed.  In the latest iteration of the
12   Diagnostic and Statistical Manual, it was
13   renamed gender dysphoria.
14     Q.  And other than renaming it, do
15   you understand there to be any difference
16   between the two terms?
17     A.  To my mind, there is no
18   difference.  It's the same group of
19   patients.
20     Q.  And is that based on your
21   reading of the DSM-5?
22     A.  It's based on my reading of the
23   DSM manual since edition III up through

---

Dr. Patrick Lappert                                                4/3/2024

Page 21

1    edition 5, including a review of the
2    literature that was used in support of
3    the change in nomenclature.
4        Q. Okay.  And what I'm trying to
5    understand is based on your reading of
6    the DSM-III up through the current
7    version of the DSM-5, your understanding
8    is that it's just a change in the name?
9        MR. MCKAY:  Object to the form.
10       A. In substance, that's all that it
11   is.
12       Q. Okay.  You told me you've never
13   diagnosed an individual with gender
14   dysphoria, correct?
15       A. Correct.
16       Q. And just to cover our bases,
17   have you ever diagnosed an individual
18   with gender identity disorder?
19       A. Only confirmed a diagnosis.
20       Q. Tell me about that.
21       A. A patient who had -- was seeking
22   a facial modification, facial
23   feminization who presented himself as

Page 22

1    gender dysphoric and who, on examination,
2    I found had the characteristics of gender
3    identity disorder.
4        Q. So this patient presented to you
5    and told you that he was gender
6    dysphoric?
7        A. Yes.
8        Q. Okay.  When was this?
9        A. It was some years ago.  Maybe
10   five, six years ago.
11       Q. And do you remember what it is
12   he told you specifically?
13       A. I don't.
14       Q. Do you remember if he told you
15   who had diagnosed him with gender
16   dysphoria?
17       A. I don't remember that, no.
18       Q. And you indicated that you -- he
19   was seeking a surgery.  Did you perform a
20   surgery on him?
21       MR. MCKAY:  Object to the form.
22       A. He presented to me seeking a
23   rhinoplasty.

Page 23

1        Q. And did you perform that
2    rhinoplasty?
3        A. No.
4        Q. Why not?
5        A. Because his underlying condition
6    made it unethical for me to offer him
7    that rhinoplasty.
8        Q. His underlying condition being
9    gender dysphoria?
10       A. Yes.  Gender identity disorder
11   or gender dysphoria.
12       Q. And when you told that patient
13   no, that you weren't going to perform
14   that surgery, what was his response?
15       A. I don't remember his words.  I
16   remember that we agreed that I wasn't the
17   person to offer him a surgical remedy for
18   his problem.
19       Q. Have you had any other patients
20   in your practice that have approached you
21   and requested that you perform
22   gender-affirming surgery?
23       A. No.

Page 24

1        Q. All right.  Doctor, you're not
2    an expert in the treatment of gender
3    dysphoria; is that correct?
4        MR. MCKAY:  Object to the form.
5        A. I suppose that I have to ask you
6    to clarify what you mean by "the
7    treatment of gender dysphoria."
8        Q. Have you ever treated a patient
9    for gender dysphoria?
10       A. No.
11       Q. And you don't hold yourself out
12   as an expert in treating transgender
13   individuals, do you?
14       A. What treatments do you mean?
15       Q. What treatments have you
16   provided for transgender individuals?
17       A. Laser hair removal, skin care
18   for the sequelae of high-dose sex steroid
19   prescription.
20       Q. Anything else?
21       A. No.
22       Q. And let me make sure I
23   understand.  When you say that you

6  (Pages 21 to 24)

Dr. Patrick Lappert                                              4/3/2024

Page 25

1   performed those procedures, were those
2   performed for the purpose of providing
3   gender-affirming care?
4        MR. MCKAY:  Object to the form.
5        A.  I have a couple patients who
6   come to my office and receive laser hair
7   removal treatments for facial hair, and
8   you know, that's the limit of what I
9   offer.
10       Q.  And those patients are seeking
11  laser hair removal for the purpose of
12  better aligning with their gender
13  identity?
14       MR. MCKAY:  Object to the form.
15       A.  I wouldn't claim to know the
16  fullness of their motivation.  It's
17  sufficient to me that they're seeking
18  happiness or comfort, and I can offer
19  that to them without compromising my
20  medical ethics.
21       Q.  Okay.  How do you -- about how
22  many patients do you think that you treat
23  for this kind of care?

Page 26

1        A.  I didn't hear the last of your
2   question.
3        Q.  I'm trying to determine how many
4   patients you treat for this kind of care.
5        A.  Just a handful, perhaps.
6        Q.  Okay.  Five?
7        A.  Probably less than five.
8        Q.  Okay.  Three, maybe?
9        A.  Sure.
10       Q.  Okay.  And how many years have
11  you been treating those patients?
12       A.  Gosh.  Maybe four or five years.
13       Q.  How did you know that those
14  patients were transgender individuals?
15       A.  It's fairly obvious.
16       Q.  Is this something that they
17  shared with you or just based on your
18  observation, your view?
19       MR. MCKAY:  Object to the form.
20       A.  I'm not sure I understand the
21  distinction you're making.
22       Q.  Well, I wonder if these
23  patients, when they came to treat with

Page 27

1   you, if they told you, shared with you as
2   their physician that they were
3   transgender?
4        A.  I don't remember their words,
5   but it's -- yeah, it's an evident thing.
6        Q.  How old are these patients?
7        A.  Most all of them are late,
8   middle-aged men.
9        Q.  Doctor, I understand you -- when
10  did you retire?
11       A.  I still have a medical practice.
12       Q.  Uh-huh.
13       A.  I retired from surgery in 2020.
14       Q.  Okay.  So you still see patients
15  in your clinic?
16       A.  Yes.
17       Q.  But you don't perform any
18  surgeries?
19       A.  Correct.
20       Q.  And in your private practice,
21  when you were performing surgeries, I
22  understand you performed both
23  reconstructive and cosmetic surgeries,

Page 28

1   right?
2        A.  That's correct.
3        Q.  How much of your practice would
4   you say was reconstructive surgery versus
5   cosmetic surgery?
6        A.  It would depend on at what point
7   in my career you asked that question.  So
8   for many years, I was probably about
9   80 -- 90 percent reconstructive surgery,
10  particularly trauma reconstructive
11  surgery and congenital deformities when I
12  was on active duty in the Navy, and the
13  percentage of cosmetic surgery was
14  probably somewhere about 10 percent.
15       Since I went into private
16  practice, probably about half
17  reconstructive and half cosmetic.
18       Q.  How many patients do you think
19  you've treated in private practice in
20  Alabama over the years?
21       A.  Gosh.  Just treating or surgery
22  or --
23       Q.  Let's specify it to surgery.

7  (Pages 25 to 28)

Dr. Patrick Lappert                                                    4/3/2024

Page 29

1    Thank you for that clarification.
2        A.  Surgery, probably somewhere near
3    10,000.
4        Q.  I think that we've confirmed
5    this already, but just to clarify, you've
6    never performed any gender-affirming
7    surgeries; is that correct?
8            MR. MCKAY:  Object to the form.
9        A.  That's correct.
10       Q.  And other than that one patient
11   you told me about earlier who approached
12   you about the rhinoplasty, are you aware
13   of any other of your patients that have
14   been diagnosed with gender dysphoria?
15       A.  I'm not aware of any others that
16   I can recall.
17       Q.  And in your years of practice,
18   Doctor, you've never prescribed puberty
19   blockers or cross-sex hormones for the
20   treatment of gender dysphoria; is that
21   correct?
22       A.  That's correct.
23       Q.  So you don't have any firsthand

Page 30

1    experience in advising your patients
2    about the risks and benefits of such
3    treatments, correct?
4            MR. MCKAY:  Object to the form.
5        A.  I have advised one patient very
6    recently with the potential deleterious
7    effects of their high-dose, cross-sex
8    hormone treatment.  One of my patients
9    who I described earlier who was here for
10   laser hair removal has developed some
11   cutaneous side effects from the high-dose
12   estrogen that he's been prescribed now
13   for his gender dysphoria.
14       Q.  So that patient you have
15   confirmed has been diagnosed with gender
16   dysphoria?
17       A.  Well, what I know about that
18   patient is that that they are a male
19   presenting as female on high-dose
20   estrogen who has skin problems now.  And
21   I have consulted with him about the risks
22   of -- the effects of the high-dose
23   estrogen on his skin.

Page 31

1        Q.  Okay.  And I think you told me
2    earlier that that patient is middle-aged?
3        A.  Yes.
4        Q.  And what risks did you go
5    through with him?
6        A.  We had a discussion about the
7    possible effects of the high-dose
8    estrogen as a possible cause of the skin
9    condition that he has developed.  In that
10   conversation, we touched on other
11   possible consequences, such as
12   hypertension, hypercholesterolemia,
13   difficulties in managing blood sugar,
14   heart disease, stroke, deep venous
15   thrombosis.
16       Q.  Do you know where that patient
17   is seeking treatment for gender
18   dysphoria?
19       A.  I do not.
20       Q.  Other than that one patient, do
21   you have experience advising any other
22   patients about the risks and benefits of
23   puberty blockers or cross-sex hormones?

Page 32

1            MR. MCKAY:  Object to the form.
2        A.  Not among my patients.
3        Q.  Outside of your patient base,
4    are you making recommendations and
5    advisements on the use of these
6    medications?
7            MR. MCKAY:  Object to the form.
8        A.  I've had conversations with
9    teachers, parents, pastors, all of whom
10   have been in contact with persons who are
11   suffering with gender dysphoria who have
12   asked me questions, but not in my
13   capacity as their doctor in my office.
14   Only in my capacity as a physician and a
15   friend.
16       Q.  Understood.  So more in your
17   personal capacity?
18       A.  As it touches upon my
19   professional life.
20       Q.  Understood.  But you're not
21   treating these patients.  You're not
22   reviewing their medical records, correct?
23       A.  Correct.

8  (Pages 29 to 32)

Dr. Patrick Lappert                                           4/3/2024

|  | Page 33 |
|---|---|

1        Q.  In your practice, Doctor -- I'm
2    talking about your private practice in
3    Alabama -- how many of those patients
4    were minors at the time of treatment?
5        A.  How many of my patients in my
6    practice in Alabama have been minors?
7        Q.  Yes.
8        A.  Oh.
9        Q.  And if you need to give me a
10   percentage -- however you need to break
11   that down, that's fine.
12       A.  Sure.  I would say that perhaps
13   somewhere between five and ten percent of
14   my patients.
15       Q.  Have you ever performed surgery
16   on a minor in private practice?
17       A.  Yes.
18       Q.  What were the procedures that
19   you performed on minors?
20       A.  Everything ranging from removal
21   of skin lesions to pharyngeal
22   reconstruction in a seven-year-old child
23   with a history of cleft palate.

|  | Page 35 |
|---|---|

1        In the case of children,
2    generally, the default answer to requests
3    for cosmetic surgery is no.  But there
4    are a few examples of what you could call
5    cosmetic surgery that I would perform on
6    a child.
7        Q.  Okay.  What are those?
8        A.  For example, a child who had
9    been born with a cleft lip.  When that
10   cleft lip is repaired, there are
11   virtually always deformities of the nose.
12   Those deformities are essentially
13   aesthetic because the nose is
14   functionally normal, but it's the kind of
15   surgery that I would offer to a child
16   above a certain age to get a better
17   aesthetic result in anticipation of the
18   growth of their adult face.  That would
19   be an example.
20       Q.  Okay.  Any other examples you
21   can think of?
22       A.  Deformities of the ear in boys.
23       Q.  Anything else?

|  | Page 34 |
|---|---|

1        Q.  Have you ever performed cosmetic
2    procedures on a minor?  Let me clarify
3    that question, actually.  Have you ever
4    performed a cosmetic surgery on a minor?
5        A.  Could you clarify for me what
6    you mean by "cosmetic"?
7        Q.  Well, why don't you define that
8    for me.  You've talked about
9    reconstructive surgery and cosmetic
10   surgery in your report.  So why don't you
11   define for me what you would say is a
12   cosmetic surgery.
13           MR. MCKAY:  Object to the form.
14       A.  Cosmetic surgery is surgery
15   that's offered in response to a
16   subjective issue with the patient,
17   aesthetic.  So reconstructive surgery
18   begins with an objective defect or
19   deformity that has, perhaps, functional
20   ramifications.  Cosmetic surgery is aimed
21   at improving the subjective life of the
22   patient and might not show an outward
23   objective finding.

|  | Page 36 |
|---|---|

1        A.  There may be other things, but
2    the criteria there would be that the
3    surgery doesn't put them at any risk;
4    that the likelihood of a visible
5    improvement is significant, you know.
6        Q.  All surgery carries risks,
7    right?
8        A.  That's correct.
9        Q.  Let me see if I can break this
10   down a step further.  I don't remember
11   seeing it in your expert report, but it
12   seems like you're drawing a distinction
13   between some cosmetic surgeries versus
14   surgeries that are performed for purely
15   aesthetic reasons.
16           MR. MCKAY:  Object to the form.
17       Q.  Do you draw that -- I'm just
18   trying to understand if you draw a
19   distinction between cosmetic surgeries
20   that are performed perhaps to remedy some
21   sort of defect versus cosmetic surgeries
22   that are performed for purely aesthetic
23   reasons.

9  (Pages 33 to 36)

Dr. Patrick Lappert                                      4/3/2024

Page 37

1    A. I think I understand your
2  question. The line of demarcation --
3  well, cosmetic surgery -- one of the --
4  one of the processes involved in a
5  consultation for a cosmetic surgery is
6  can this -- can I as the surgeon see the
7  defect that the patient sees.
8       So in the case of an ear
9  deformity, we both see that. Even though
10 there's no functional problem there and
11 you could consider it a cosmetic
12 operation, there's a visible defect there
13 that we can all agree on.
14      That -- that goes by degrees. A
15 hump on the top of the nose in a young
16 woman -- we can all see the hump. Again,
17 no functional deformity there, but the
18 hump might be commensurate with her
19 ethnicity. And it gets very -- it can
20 sometimes be very, very subtle, but what
21 they all have in common is changing the
22 appearance in order to improve the
23 subjective life of the patient.

Page 38

1    Q. Okay. And beyond those
2  instances where there's some sort of
3  defect that you're able to see, are there
4  reasons that patients might undergo a
5  cosmetic surgery for purely aesthetic
6  reasons? They just want to change
7  something about their body or their face?
8       MR. MCKAY: Object to the form.
9    A. Yes. That would be the more
10 common presentation for cosmetic surgery.
11   Q. Okay. And so just for purposes
12 of today -- and I'm trying to talk
13 through these issues with you -- do you
14 draw a distinction between purely
15 aesthetic surgery versus cosmetic
16 surgery, or do you consider it all the
17 same?
18   A. Aesthetic and cosmetic are terms
19 that are often used interchangeably, but
20 there's a distinction that I would make
21 in the sense that cosmetic simply speaks
22 about the details of the change in form.
23 Aesthetic takes in the bigger picture of

Page 39

1  not only the change in form, but the
2  effect that it has on the subjective life
3  of the patient since that's what
4  aesthetic means. Aesthetic is about the
5  subjective response of the patient to the
6  surgery. So --
7    Q. So I know you indicated a couple
8  of limited scenarios where you might
9  perform a cosmetic procedure on a minor.
10 Would you ever perform a cosmetic
11 procedure on a minor that was for purely
12 aesthetic reasons?
13   A. Well, the cases I gave you --
14 the examples I gave you -- for example,
15 the correction of an ear deformity in an
16 adolescent boy, that would be cosmetic.
17 I can measure the differences between his
18 one ear and the other. There are actual,
19 you know, demonstrable cosmetic issues
20 that can be corrected that can be
21 discussed with the patient and their
22 parents. But the surgery is aesthetic
23 because it's having an affect --

Page 40

1  hopefully, if I have planned it well and
2  executed it well, it will have a positive
3  effect on the subjective life of the
4  young -- of the boy.
5    Q. Doctor, let's talk about the law
6  that we're here about today a little bit.
7  I know you're familiar with SB184. You
8  advocated for its passage in the
9  legislature, right?
10   A. That's correct.
11   Q. How did you come to speak before
12 the legislature on the topic?
13      MR. MCKAY: Object to the form.
14   A. I was made aware of the
15 effort -- I don't remember who told me
16 about it, and I don't remember who
17 invited me down to address the
18 legislature in Montgomery. And I -- it
19 may have been one of the people from
20 Eagle Forum. I don't remember who
21 contacted me first.
22   Q. Did you have a connection with
23 one of the individuals in Eagle Forum

Dr. Patrick Lappert                                        4/3/2024

<table>
<tr><td>

Page 41

1  prior to this?
2      A.  No.
3      Q.  Do you know how they would have
4  known to contact you?
5          MR. MCKAY:  Object to the form.
6      A.  I would be speculating that they
7  might have heard that I was making public
8  presentations on the subject.
9      Q.  And in this case, do you know
10 which aspect of the law that the
11 plaintiffs are challenging?
12     A.  I'm sorry.  Could you ask me
13 that question again?
14     Q.  Yeah.  In this case, do you know
15 what aspects of the law the plaintiffs
16 are challenging?
17     A.  My understanding is that
18 plaintiffs are challenging the
19 restriction on social affirmation -- I'm
20 sorry.  Puberty-blocking and cross-sex
21 hormones.
22     Q.  You understand -- I know you put
23 this in your report, so I know you do

</td><td>

Page 43

1  that had passed law that was being
2  challenged.  This was the case in
3  Arkansas.  It's also the case in Florida.
4          I have offered a professional
5  opinion in North Carolina in their
6  defense of an administrative policy.
7  I have offered a similar professional
8  opinion in -- I believe in Florida, it
9  started out as an executive decision, and
10 it has now morphed into a legislation
11 much like Alabama and Arkansas.
12     Q.  Okay.  So I've got Arkansas,
13 Florida, North Carolina.  Anywhere else?
14     A.  In terms of public law?
15     Q.  Yes.  And let me specify.  I'm
16 talking about laws that are similar to
17 the one here in Alabama that are seeking
18 to restrict medical treatment --
19 gender-affirming treatment for
20 transgender individuals.
21     A.  I have also offered written
22 professional testimony in Missouri now.
23     Q.  And it sounds like, if I'm

</td></tr>
<tr><td>

Page 42

1  understand it.  But plaintiffs are not
2  challenging the section of the law
3  pertaining to surgeries, correct?
4      A.  That's my understanding.
5      Q.  What other states have you
6  lobbied in for passage of similar laws?
7          MR. MCKAY:  Object to form.
8      A.  I haven't lobbied in any other
9  states that I can recall.
10     Q.  Okay.  So you haven't traveled
11 to any other states and spoken in favor
12 of laws that are similar to the one here
13 in Alabama?
14         MR. MCKAY:  Object to form.
15     A.  I haven't traveled to other
16 states to lobby for the passage of laws.
17     Q.  Okay.  It looks like you're
18 drawing a distinction there.  What have
19 you done in support of laws in other
20 states?
21     A.  I have offered my professional
22 opinion to other states who are in
23 situations similar to Alabama, states

</td><td>

Page 44

1  understanding you correctly, in each of
2  these states, what you did is similar to
3  what you're doing here.  You offered your
4  opinions as an expert witness in those
5  cases?
6      A.  Yes.
7      Q.  And in how many of those cases
8  did you sit for deposition?
9      A.  I was deposed in the North
10 Carolina case, Arkansas.  I cannot
11 remember if I had a pretrial deposition
12 in the Florida case.
13     Q.  Okay.  So the two you can
14 remember are Arkansas and North Carolina?
15     A.  Yes.
16     Q.  And have you given trial
17 testimony in any of those cases?
18     A.  I have in --
19     Q.  In which ones?
20     A.  In Arkansas and in Florida.
21     Q.  In this case, Doctor, do you
22 know who the plaintiffs are?
23     A.  My understanding is that one of

</td></tr>
</table>

11  (Pages 41 to 44)

Page 45

1    the plaintiffs is an endocrinologist from
2    Birmingham whom I met.
3        Q. Who is that?
4        A. That was -- I think it's
5    Dr. Ladinsky.
6        Q. Okay.
7        A. Is that correct?
8        Q. I'm just curious your knowledge.
9    I want to know what you know about this
10   case.
11       So you think Dr. Ladinsky is one
12   of the plaintiffs in this case?
13       A. I remember seeing her name on
14   one of the -- one of the documents that I
15   was reviewing when I was preparing for
16   this and --
17       Q. Okay. And you think that
18   Dr. Ladinsky is an endocrinologist?
19       MR. MCKAY: Object to the form.
20       A. My understanding is Dr. Ladinsky
21   works with an endocrinologist, and they
22   operate a clinic at the University of
23   Alabama.

Page 46

1        Q. All right. Do you know -- who
2    else do you think is a plaintiff in this
3    case? And if you don't know, that's
4    fine. I'm just trying to get an
5    understanding of what you know about this
6    case.
7        A. I don't know. I mean, I have
8    some conjecture. I may have met -- but I
9    don't -- I don't know the -- I don't know
10   the plaintiffs by name.
11       Q. And I'm not -- let me ask you
12   this. I'm not asking you to give me
13   names, just sort of a general
14   description. You think there's a doctor
15   involved. Do you think there are any
16   other individuals involved?
17       MR. MCKAY: Object to form.
18       A. My understanding is there's at
19   least one minor involved and the parent,
20   uh-huh.
21       Q. Okay. Have you reviewed any of
22   those minor's medical records in this
23   case?

Page 47

1        A. I don't remember.
2        Q. You're not planning to talk or
3    give any opinions about the specific care
4    that the minors in this case have
5    received, correct?
6        A. Correct.
7        Q. Doctor, do you know what the
8    standard of care in Alabama is for the
9    treatment of gender dysphoria?
10       MR. MCKAY: Object to the form.
11       A. I would need you to explain to
12   me what you mean by the term "standard of
13   care."
14       Q. Well, how would you define the
15   standard of care?
16       A. Standard of care is a very
17   specific term, in my professional
18   experience. Standard of care means that
19   a particular model of diagnosis and
20   treatment is so well supported in the
21   medical literature that alternatives to
22   that model of care should only be used if
23   there is -- if there isn't a significant

Page 48

1    risk to the patient.
2        So standard of care suggests
3    that a deviation can be expected to be
4    harmful with such high probability that
5    it should -- most likely, an alternative
6    to the standard of care should not be
7    entertained contrasted with a treatment
8    guideline.
9        [technical difficulties]
10       (Whereupon, deposition
11   interrupted due to technical difficulties
12   at 9:49 a.m. to 9:52 a.m.)
13       Q. All right. Doctor, we're going
14   back on the record. We just had a little
15   bit of technical difficulty. So I
16   apologize, but I have to revisit some
17   questions.
18       I understand where we left off
19   we were talking about the standard of
20   care for treatment of gender dysphoria in
21   Alabama, and you were going to define
22   what you understand the term "standard of
23   care" to mean. So could you please give

12  (Pages 45 to 48)

Dr. Patrick Lappert                                          4/3/2024

Page 49

1  us that definition again?
2      A.  Yes.  The use of the term
3  "standard of care" implies that there is
4  a body of evidence that is so compelling,
5  a body of evidence of what we would call
6  level three or high quality evidence that
7  would suggest that there is a certainty
8  of harm or a high likelihood of harm to
9  the patient if that model of care isn't
10  adhered to.  I know of no such body of
11  evidence to support gender affirmation
12  care.
13      Q.  So is it your position then that
14  based on that definition, there is not a
15  standard of care for the treatment of
16  gender dysphoria in Alabama?
17      A.  There is a treatment model
18  that's being used in the state of Alabama
19  that calls it itself a standard of care.
20  But upon my examination of that treatment
21  model, it is not a standard of care.
22      Q.  Okay.  And when you say it calls
23  itself a standard of care, what do you

Page 50

1  mean by that?  Who calls it that?
2      MR. MCKAY:  Object to form.
3      A.  The clinics that offer gender
4  affirmation care virtually always refer
5  to the WPATH document as a standard of
6  care and describe their own treatment of
7  patients as adhering to that standard of
8  care.
9      So thereby, the claim is made
10  that the gender affirmation treatments
11  offered to children in Alabama is a
12  standard of care.  But the treatment
13  document that -- the treatment -- the
14  standard of care from WPATH is not a
15  standard of care because it does not meet
16  the criteria of level three evidence or
17  better in order to guide treatment
18  decisions.  So by definition, it is not a
19  standard of care.
20      Q.  When did you first become
21  familiar with the WPATH standard of care?
22      A.  I think the first time I read it
23  was in 2014 or 2015.

Page 51

1      Q.  And what prompted you to read
2  it?
3      A.  A desire on my part to be
4  familiar with what gender affirmation
5  treatments are about.
6      Q.  And other than reading through
7  the WPATH standard of care yourself, what
8  other additional training have you sought
9  out specific to those standards of care?
10      MR. MCKAY:  Object to the form.
11      A.  In addition to reviewing the
12  standard of care document itself, I also
13  reviewed the literature that is appended
14  or cited in the document, and then I also
15  attended a plastic surgery conference in
16  California, part of which was dedicated
17  to gender affirmation surgery.
18      Q.  What conference was that?
19      A.  That was California Society of
20  Plastic Surgery which on that occasion
21  met in San Francisco.
22      Q.  What year was that?
23      A.  I would be guessing.  Perhaps

Page 52

1  2017 or 2018.  I would have to look in my
2  travel records.
3      Q.  Okay.  How much of that
4  presentation was dedicated to discussing
5  gender affirmation care?
6      A.  An entire half day.
7      Q.  And do you remember who any of
8  the speakers were?
9      A.  I believe one of them was
10  Dr. Marci Bowers.  Another one -- I
11  cannot remember his name.  He's a very
12  prominent gender affirmation surgeon in
13  San Francisco.  I can see his face, but I
14  can't remember his name.
15      Q.  All right.  Other than reading
16  the standards of care, reading the
17  literature that's cited, and attending
18  this conference, have you done anything
19  else to educate yourself about the
20  WPATH's standards of care?
21      MR. MCKAY:  Object to form.
22      A.  I have had long conversations
23  with medical colleagues who have

13  (Pages 49 to 52)

Dr. Patrick Lappert                                          4/3/2024

Page 53

1    expertise in endocrinology, psychiatry,
2    developmental pediatrics. So
3    professional colloquium, I suppose. It's
4    been a running conversation for many
5    years now.
6        Q. And you spoke with those
7    colleagues specifically about the WPATH
8    standards of care?
9        A. It commonly enters into our
10   conversation.
11       Q. Okay. Any of those individuals
12   provide gender-affirming care?
13           MR. MCKAY: Object to the form.
14       A. Not to my knowledge.
15       Q. Do you know if any of those
16   individuals treat patients with gender
17   dysphoria at all?
18           MR. MCKAY: Object to form.
19       A. I believe at least one of the
20   psychiatrists does in adults.
21       Q. Other than that one patient
22   that -- one of the psychiatrists that you
23   spoke to, you're not aware of any others

Page 54

1    that treat patients with gender
2    dysphoria?
3           MR. MCKAY: Object to form.
4        A. I do not know the scope of their
5    practice. Is your question do they treat
6    them with gender affirmation?
7        Q. Well, my question -- I asked you
8    initially about gender affirmation, and I
9    think you told me that you don't think
10   any of them do. And then I asked more
11   broadly do you know if they treat any of
12   them for gender dysphoria. And you told
13   me about one individual, the
14   psychologist, I think, or psychiatrist
15   who treats one individual, an adult, who
16   does have gender dysphoria. Is that
17   correct?
18       A. No, I didn't say one patient. I
19   said one colleague who --
20       Q. Oh, okay.
21       A. -- I believe treats gender
22   dysphoric adults.
23       Q. Okay. And do you know how big

Page 55

1    his practice is for gender dysphoria?
2        A. I don't.
3        Q. Are you aware of any of those
4    colleagues that you've spoken to that
5    treat gender dysphoria in minors?
6        A. No, I'm not aware.
7        Q. And I know you disagree with it,
8    and I'm not trying to get you to agree
9    with it, but I just want to run through
10   some questions for you about the WPATH
11   standard of care.
12       Do you know if the WPATH
13   standard of care requires all individuals
14   diagnosed with gender dysphoria to
15   receive gender-affirming medications?
16       A. My reading of the WPATH
17   standards of care is it doesn't make
18   requirements like that.
19       Q. What does it do instead?
20       A. It insists on affirmation and
21   describes a process of care that includes
22   affirmation psychological support that
23   includes affirmation endocrinological

Page 56

1    treatments and surgical treatments, all
2    of them affirming in nature that none of
3    those steps being required other than the
4    requirement for affirmation broadly.
5        Q. Okay. So your reading of it is
6    that it requires affirmation and then
7    provides physicians with treatment
8    options available?
9           MR. MCKAY: Object to the form.
10       A. Yes. My reading of the standard
11   of care is that the document begins with
12   wording in its introduction that
13   essentially does not refer to itself as a
14   standard of care because it speaks about
15   broad options of care. So that would fit
16   into the category of what we call a
17   treatment guideline. And that's really
18   how the standard of care presents itself
19   is a treatment guideline, which, by
20   definition, implies options of care being
21   offered, but the document itself does not
22   offer options of care. It offers
23   affirmation care, which, when followed,

14  (Pages 53 to 56)

Dr. Patrick Lappert                                          4/3/2024

---

Page 57

1   is a continuum from social affirmation
2   with psychological supporting processes,
3   hormonal affirmation, and surgical
4   affirmation.
5          The document does not present
6   alternatives of care.  So it doesn't even
7   meet the criteria that is necessary for
8   it to be called a treatment guideline.
9      Q.  Okay.  I want to make sure I'm
10  being clear about this.  And I think
11  we're on the same page.  But your
12  understanding and reading of the WPATH
13  standards of care is that it provides
14  gender-affirming treatment options to
15  physicians, but none of those treatment
16  options are required?
17         MR. MCKAY:  Object to form.
18     A.  My reading of the standard of
19  care is -- in fact, on the introductory
20  page, it speaks of the document as being
21  nonbinding apart from the overarching
22  principle of affirmation.  So it -- it's
23  not binding in terms of particular

---

Page 58

1   treatments other than the fact that all
2   treatments must be affirmation.  It
3   doesn't -- yeah.
4      Q.  Okay.  So the answer is yes, it
5   doesn't require any of those treatments?
6          MR. MCKAY:  Object to form.
7      A.  It does not require, which is
8   one of the striking things about the
9   document.
10     Q.  Okay.  Is it your understanding,
11  Doctor, that all transgender persons want
12  to receive gender-affirming care?
13     A.  No, it is not.
14     Q.  All right.  Is it your
15  understanding that all -- let me clarify
16  that question.  Is it your understanding
17  that all transgender persons want to
18  receive gender-affirming medications?
19     A.  It is not.
20     Q.  Is it your understanding that
21  all transgender persons want
22  gender-affirming surgeries?
23     A.  It is not.

---

Page 59

1      Q.  When a minor presents to UAB for
2   gender dysphoria, what is UAB's treatment
3   protocol for treating that patient?
4          MR. MCKAY:  Object to the form.
5      A.  To the degree to which the UAB
6   group adheres to the WPATH standard of
7   care and depending on the age at which
8   the child presents, social affirmation is
9   their standard treatment.  Social
10  affirmation.
11     Q.  Have you spoken with any
12  providers at UAB to try and determine how
13  they go about treating patients with
14  gender dysphoria?
15     A.  I have.
16     Q.  Who have you spoken with?
17     A.  Dr. Ladinsky.
18     Q.  When did you speak with her?
19     A.  I spoke with her when we were
20  both testifying before the state
21  legislature on the issue of the law in
22  question.
23     Q.  Tell me about that conversation.

---

Page 60

1      A.  It was an informal conversation
2   there in the well during a break, and she
3   was explaining to me the process in the
4   gender affirmation clinic.  The bulk of
5   the conversation included her being
6   adamant that surgery was not being
7   offered in the clinic, but
8   endocrinological manipulation and social
9   affirmation were.
10     Q.  About how long did that
11  conversation last?
12     A.  Perhaps ten minutes.
13     Q.  Anything else you can remember
14  about that conversation?
15     A.  I remember that Dr. Ladinsky was
16  adamant that surgery wasn't being offered
17  to minors in the state of Alabama, which
18  I found to be an interesting distinction.
19     Q.  Why do you say that?
20     A.  I say that because the gender
21  affirmation model leaves open the whole
22  progression from social affirmation,
23  medical affirmation, and surgical

---

15  (Pages 57 to 60)

Dr. Patrick Lappert                                          4/3/2024

Page 61

1  affirmation.  And I found it curious
2  why -- since all of those steps are based
3  on the same diagnostic model, why she
4  wouldn't feel it important to be an
5  advocate for surgical affirmation.  I
6  wondered why she made the distinction.
7      Q.  And did you ask her that
8  question?
9      A.  I did.
10     Q.  And what did she say?
11     A.  She did not answer.
12     Q.  Did you ask her any other
13  questions?
14     A.  I don't remember.  That was some
15  years back.  I don't remember that to --
16     Q.  Anything else you recall about
17  that conversation?
18        MR. MCKAY:  Object to the form.
19     A.  Not right now that I can recall.
20     Q.  Any other providers at UAB that
21  you've spoken to try and determine
22  about -- determine how they go about
23  treating their patients with gender

Page 62

1  dysphoria?
2      A.  I don't remember conversations
3  with other particular providers.  I
4  remember reviewing their web page,
5  reviewing the documents, and reviewing
6  the information that they post there.
7  That was a couple of years ago.
8      Q.  When you say reviewing their
9  documents and posts, you mean on --
10  that's available on their website?
11     A.  Right.
12     Q.  Okay.  Do you remember any
13  specific documents that you would have
14  reviewed?
15     A.  I remember reviewing the web
16  page and finding that it was fairly
17  typical of such clinical -- clinic web
18  pages in terms of the wording, the
19  references to WPATH, the words that they
20  used to describe the condition of gender
21  dysphoria, the treatment model that they
22  offer in the clinic, the fact that the
23  treatment model includes the progression

Page 63

1  from social affirmation to medical
2  endocrinological affirmation steps.
3  Yeah.
4      Q.  Anything else you remember
5  about -- remember from reviewing their
6  website?
7      A.  I seem to remember that it
8  emphatically didn't discuss surgical
9  affirmation, but that may have changed.
10  I don't remember a particular -- I
11  remember that in speaking, for example,
12  to Dr. Ladinsky that she was adamant that
13  the clinic was not offering surgical
14  affirmation, and I found that remarkable.
15     Q.  And do you have any reason to
16  dispute what she told you?
17        MR. MCKAY:  Object to the form.
18     A.  What would you mean by
19  "dispute"?
20     Q.  In other words, do you have
21  reason to believe that UAB does provide
22  gender-affirming surgeries to minors?
23     A.  I have no reason to believe that

Page 64

1  they're offering gender affirmation
2  surgeries to minors.
3      Q.  Okay.  Do you know UAB's
4  position on prescribing gender-affirming
5  medications to minors?
6      A.  My understanding is that they
7  are -- they follow the WPATH guidelines
8  in the treatment model for what they
9  diagnose as gender dysphoria.
10     Q.  What do you base that
11  understanding on?
12     A.  Having visited their web page a
13  couple years -- well, perhaps last year,
14  and my conversation with Dr. Ladinsky.
15     Q.  Does their website indicate that
16  they provide gender-affirming medications
17  to minors?
18     A.  I don't know if the website
19  includes that information or not.
20     Q.  Does it include reference to the
21  WPATH standard of care?
22     A.  The last time I reviewed that
23  web page, I believe it does, yes.

16  (Pages 61 to 64)

Dr. Patrick Lappert                                    4/3/2024

Page 65

1      Q.  When is the last time you
2    reviewed that web page?
3      A.  Perhaps a year ago.
4        MRS. VAGUE:  Doctor, we've been
5    going a little over an hour.  It's
6    probably a good time to take a break, if
7    that's good with everyone.
8        THE WITNESS:  That's fine with
9    me.  Thank you.
10       MR. MCKAY:  Do you want to do
11   like five, ten minutes?
12       MRS. VAGUE:  Five minutes should
13   be good.
14       THE COURT REPORTER:  Okay.
15   We're off the record.
16       (Whereupon a brief recess was
17   taken from 10:14 a.m. to 10:24 a.m.)
18     Q.  Doctor, we're back on the
19   record, and I wanted to revisit something
20   just real quickly to make sure I
21   understood.
22       I've looked back in my notes,
23   and you told me earlier about an

Page 66

1    individual patient of yours that came to
2    you seeking -- I think you had told me a
3    rhinoplasty for the purpose of providing
4    gender-affirming care, and you declined
5    to perform that surgery; is that right?
6      A.  That's correct.
7      Q.  And just to clarify, why did you
8    decline to perform that surgery?
9      A.  To my recollection, there were
10   two reasons to decline the surgery.  One
11   was the physical expectation of a
12   feminized nose, which is a hard thing to
13   gauge in a cosmetic patient.  But the
14   level of feminine refinement that they
15   were seeking I thought was -- if -- if it
16   was -- if there were no other factors
17   involved, I would have considered it to
18   be a very difficult operation to promise
19   success in.
20       And the second reason was my
21   understanding of their motivation for
22   surgery put the patient in the category
23   of patients that we describe as having a

Page 67

1    body dysmorphic disorder of which gender
2    identity disorder is a subcategory.
3      Q.  Okay.  Let's break that down a
4    little bit.  What were his motivations
5    for surgery?
6      A.  A very feminine-appearing face.
7      Q.  Okay.  And based on that
8    description to you, you decided that that
9    was not a valid or good reason to proceed
10   with the surgery?
11       MR. MCKAY:  Object to the form.
12     A.  The goals of facial feminization
13   are sometimes really evident and easily
14   reached, and other times so remote as to
15   be considered technically very, very
16   difficult.
17       Regardless of the patient's
18   presentation, whether it be for gender
19   issues or otherwise, if they have a very
20   masculine looking nose that they want to
21   make look feminine or if they have a very
22   feminine looking face that they want to
23   make look masculine, those can be very

Page 68

1    much out of technical reach.  So there
2    were two reasons for declining the
3    surgery.
4      Q.  Yeah.  And I'm trying to focus a
5    little bit more on that second reason.  I
6    understand the first reason that you
7    gave.  And the second reason was his
8    motivation indicated to you that he
9    wasn't a proper candidate for surgery.
10     A.  Right.
11     Q.  And just a couple more questions
12   on that.  You indicated that he was
13   seeking a more feminine nose, a more
14   feminine face.  Are those things he told
15   you?
16     A.  This is the impression I get.  I
17   don't have his records at hand, and this
18   was a couple of years back.  But
19   definitely looking for a
20   feminine-appearing nose.
21     Q.  You can't recall if he used
22   those words or not?
23     A.  I know that in the course of our

Dr. Patrick Lappert                                          4/3/2024

Page 69

1  conversation, it was evident that he was
2  looking for feminization of his face.
3  What particular words he used, I don't
4  recall.
5       Q. And you indicated that based on
6  your conversation with him, you suspected
7  that he perhaps had body dysmorphic
8  disorder?
9       A. Yes.
10      Q. Tell me what body dysmorphic
11 disorder is.
12      A. Body dysmorphic disorder is a
13 psychological condition that afflicts
14 patients who have been emotionally
15 wounded in some way in a way that they do
16 not wish to examine. So what the patient
17 does is ascribes their sorrows to their
18 physical appearance.
19      Q. Is there anything more to it?
20 Any other aspects of it?
21      MR. MCKAY: Object to the form.
22      A. As far as the psychological
23 processes go, the search for an

Page 70

1  explanation for the patient's sorrow they
2  ascribe to a physical appearance,
3  something about their physical
4  appearance -- it may be their weight. It
5  may be the shape of their nose. It may
6  be their sex appearance. Whatever it is,
7  they're ascribing their interior sorrows
8  to their physical appearance.
9       And as I recall from this
10 patient, that was the case, that he was
11 ascribing his sorrows to the appearance
12 of his nose, which, to my recollection,
13 his nose was quite normal looking.
14      Q. And you indicated that it's your
15 understanding that gender identity
16 disorder is a subset of body dysmorphic
17 disorder?
18      A. Yes.
19      Q. What is that based on?
20      A. It's based on an obsessive
21 process of thought that leads to
22 compulsive behaviors that seek to manage
23 the anxiety that's produced by that

Page 71

1  obsessive thinking. So by --
2       Q. I guess my question is more when
3  you say that -- and you're using the term
4  "gender identity disorder." When you say
5  gender identity disorder is a subset of
6  body dysmorphic disorder, is that based
7  on your reading of the DSM, or where are
8  you getting that understanding?
9       MR. MCKAY: Object to the form.
10      A. In part, it's from my reading of
11 the DSM over the years and reading of
12 psychiatric literature, plastic surgery
13 literature relating to body dysmorphic
14 disorder. It's a subject that we get
15 extensive training in.
16      Q. And you were trained
17 specifically to understand that gender
18 identity disorder is a subset of body
19 dysmorphic disorder?
20      MR. MCKAY: Object to the form.
21      A. That body dysmorphic disorder is
22 the overarching category, but gender
23 identity disorder is a subset of that

Page 72

1  where the content of the obsessive
2  thought has to do with the sex appearance
3  of a patient.
4       Q. Is it your understanding that
5  the current DSM-5 categorizes them in
6  that same way?
7       MR. MCKAY: Object to the form.
8       A. DSM-5 has dropped the diagnostic
9  category of gender identity disorder and
10 now names it gender dysphoria.
11      Q. Okay. Is it your understanding
12 that gender dysphoria in the DSM-5 is in
13 the same category as body dysmorphic
14 disorder?
15      A. DSM-5 has stated name of
16 depathologizing gender identity disorder,
17 and in doing that, removed it from the
18 prior categorization as a -- that would
19 have subsumed it under obsessive
20 compulsive disorder as body dysmorphic
21 disorder. It's now been removed into its
22 own category as gender dysphoria.
23      Q. Okay. The patient that came to

18  (Pages 69 to 72)

Dr. Patrick Lappert                                          4/3/2024

Page 73

1   you that you believe had body dysmorphic
2   disorder, did you refer him to another
3   health care provider to help treat that?
4       A. As I recall, they refused the
5   referral, but I don't know.  This has
6   been a couple of years ago.
7       Q. You think you referred him, but
8   you're not sure?
9       A. My recollection is that the
10  patient left dissatisfied with the visit.
11      Q. Any other patients that have
12  come to you seeking gender-affirming
13  surgeries?
14      A. Surgeries, no.
15      Q. And if you had a patient that
16  approached you for gender-affirming
17  surgeries, would you consider performing
18  that surgery?
19      A. No.
20      Q. Why not?
21      A. I consider it unethical.
22      Q. Why would you consider it
23  unethical?

Page 74

1       A. Because the underlying diagnosis
2   is a psychiatric diagnosis, and surgery
3   is not a proven remedy for psychiatric
4   disturbances.
5       Q. Let's talk a little bit more
6   about body dysmorphic disorder.  When is
7   the physical onset of -- and do you care
8   if refer to it as BDD to kind of shorten
9   it?
10      A. That's fine.
11      Q. Do you know when the typical
12  onset of BDD is?
13      A. I don't off the top of my head.
14      Q. Do you know how common it is in
15  the general population?
16      A. I don't.
17      Q. How many patients in your
18  practice over the years presented with
19  BDD?
20      A. Many.  I don't have a particular
21  number for you.  Over --
22      Q. Yeah.  If you had to give me a
23  percentage, what would you say?

Page 75

1       A. Over 30 years' time?
2       Q. Yes.
3       A. Plastic surgery, perhaps one or
4   two percent.  More in recent years as
5   more of my practice became aesthetic.
6       Q. In your experience, are there
7   degrees of body dysmorphia?
8       A. Yes.
9       Q. And how does that impact whether
10  a patient is a candidate for cosmetic
11  surgery?
12      A. Because you're dealing in the
13  subjective life of the patient since
14  aesthetic surgery aims itself at
15  improving the subjective life of a
16  patient, the potential benefit of it can
17  be hard to estimate.  And it always
18  requires a conversation with the patient
19  to understand what their motivation for
20  the surgery is.
21          So, for example, breast
22  augmentation surgery is a very common
23  cosmetic operation, aesthetic operation.

Page 76

1   And depending on the patient's
2   presentation, it can be a very routine
3   visit or it can -- it could become a very
4   almost pastoral visit in the sense
5   that the most common patient would be a
6   woman who has had children already
7   seeking to improve her appearance
8   following breastfeeding.  That's a very
9   common presentation.
10          If in the course of that
11  presentation the patient starts talking
12  about her failing marriage that she
13  thinks will be remedied by breast
14  augmentation, then that patient has moved
15  into the category of body dysmorphic
16  disorder.  She's seeking to explain an
17  interior wound by her external
18  appearance.  So the very same patient in
19  the course of a single visit can go from
20  a routine cosmetic patient to body
21  dysmorphic disorder.
22      Q. Okay.  And in a situation like
23  that, would that candidate -- would

Dr. Patrick Lappert                                    4/3/2024

Page 77

1    patient be a candidate for cosmetic
2    surgery?
3         MR. MCKAY:  Object to the form.
4         A.  That would depend on a lot of
5    conversation and probably a return visit
6    where we could kind of get an
7    understanding of what her actual
8    difficulties are.  Because it's very
9    important in consenting patients for
10   aesthetic surgery that their expectations
11   be understood because the worst and most
12   broadly known complication of aesthetic
13   surgery is disappointment.
14        Q.  So then is it fair to say that
15   there are patients who might suffer from
16   mild or moderate BDD who would be the
17   perfect candidates for cosmetic surgery?
18        MR. MCKAY:  Object to the form.
19        A.  Yes, perhaps.
20        Q.  And how do you go about making
21   that determination whether a patient is
22   an appropriate candidate or not?
23        A.  In the process of consultation

Page 78

1    for aesthetic surgery, one of the key
2    parts of the conversation is
3    understanding the patient's motivation
4    for the surgery, what their expectations
5    are.  And sometimes it requires a little
6    additional probing, but you want to
7    understand their motivation, what their
8    expectation is because I have to have
9    some certainty that their -- that their
10   expectations will be met.
11        Q.  Do you ever consult a
12   psychologist or psychiatrist to help you
13   determine whether a patient is an
14   appropriate candidate for surgery?
15        A.  Yes, I have.
16        Q.  In what situations would you
17   consult a mental health care provider?
18        A.  If the patient in the course of
19   the consultation expresses profound
20   grief, if they associate their grief with
21   their outward appearance, particularly if
22   their outward appearance is for the most
23   part normal, then that is a circumstance

Page 79

1    where I would have -- probably on a
2    return visit with me have a discussion
3    about psychological support and an
4    examination for the patient's sorrow.
5         Q.  Are there times where you
6    recommended that a patient seek
7    psychological support in conjunction with
8    the cosmetic procedure that you're going
9    to perform as well?
10        MR. MCKAY:  Object to the form.
11        A.  I don't remember ever offering
12   them in parallel where the patient is
13   undergoing psychiatric support while
14   cosmetic surgeries are being done.
15        I have done it in the case of
16   reconstructive surgeries.  Combat trauma
17   patients, for example; reconstructive
18   surgery patients, simultaneous
19   psychological support for those patients
20   is quite common.  In the case of a
21   cosmetic surgery patient, it's far less
22   common.
23        Q.  The patient that you told me

Page 80

1    about earlier, the rhinoplasty example
2    that you gave me, the individual that you
3    declined to perform surgery on, if that
4    same patient went down the street to
5    another plastic surgeon and told him the
6    same facts and that surgeon opted to
7    perform the surgery, would that be
8    medically appropriate?
9         MR. MCKAY:  Object to the form.
10        A.  If that surgeon and I were
11   having a private conversation about it, I
12   would probably challenge them on it.  I
13   don't -- I'm not in the habit of
14   second-guessing other surgeons in terms
15   of how they -- how they evaluate their
16   patients.  And it may be that that
17   surgeon might feel that the wishes and
18   desires of the patient to be within reach
19   of their technical skills.
20        Q.  So it wouldn't be your position
21   that necessarily the other surgeon has
22   breached some sort of ethical,
23   professional conduct in performing that

20  (Pages 77 to 80)

Dr. Patrick Lappert                                          4/3/2024

Page 81

1   surgery?
2       A. Depending on the operation we're
3   talking about.
4       Q. I'm talking about the
5   rhinoplasty example.
6       A. Well, I can think of examples
7   where there might be a breach of
8   ethics --
9       Q. I'm saying necessarily under no
10  circumstances would it be appropriate,
11  and it sounds like that's not your
12  position.
13      A. It's not my position in terms of
14  the facial aesthetic surgeries.
15      Q. Okay. I take it then that it
16  wouldn't be your position that that
17  surgeon committed malpractice by deciding
18  to perform that rhinoplasty?
19          MR. MCKAY: Object to the form.
20      A. No.
21      Q. And I take it that you would not
22  think criminal penalties would be
23  appropriate for a surgeon in that

Page 82

1   scenario; is that right?
2           MR. MCKAY: Object to the form.
3       A. Criminal penalties for
4   rhinoplasty?
5       Q. Correct.
6       A. No.
7       Q. Doctor, have you ever had a
8   patient express regret about a cosmetic
9   procedure that you performed?
10      A. Yes.
11      Q. How many times has that
12  happened?
13      A. Over 30 years of practice,
14  perhaps 2 or 3 times.
15      Q. Do you remember what the
16  procedures were?
17      A. The one that stands out in my
18  mind is a rhinoplasty on a male.
19      Q. Did you stop performing
20  rhinoplasties after that?
21      A. No.
22      Q. Did you recommend to any other
23  surgeons that they not perform

Page 83

1   rhinoplasties?
2       A. No.
3       Q. Let's talk a little bit about
4   breast augmentation. You mentioned it
5   earlier, and I know you talk about in
6   your report. How many breast
7   augmentation surgeries have you performed
8   over the years?
9       A. I would be guessing. At some
10  number about 500.
11      Q. And are those -- if you had to
12  divide them between reconstructive versus
13  cosmetic, how would you quantify those?
14      A. Reconstructive breast surgery
15  and breast augmentation are separate
16  categories.
17      Q. Okay. Thank you for that
18  clarification. So how would you describe
19  breast augmentation?
20      A. Breast augmentation is the
21  enlargement of the breast either using a
22  prosthesis or the patient's own fat to
23  improve the aesthetic appearance of the

Page 84

1   breast.
2       Q. So would you describe all of
3   those procedures as cosmetic procedures?
4       A. I'm sorry. I thought I was
5   describing cosmetic breast augmentation.
6       Q. Yeah. And that's what I'm
7   asking you about. And you seem to be
8   drawing a distinction between that --
9   between breast augmentation versus
10  reconstructive breast surgery, correct?
11      A. Correct.
12      Q. And I'm just trying to clarify
13  for my own knowledge. I recognize I'm
14  not nearly as experienced as you. So I'm
15  sorry if I misuse the language
16  occasionally.
17          But breast augmentation as you
18  described it is cosmetic in nature; is
19  that correct?
20      A. For the most part, yes.
21      Q. Are there scenarios where it's
22  not cosmetic in nature?
23      A. Yes. So, for example -- so a

21  (Pages 81 to 84)

Dr. Patrick Lappert                                      4/3/2024

Page 85

1  girl who is in adolescent development has
2  a massive development of one breast and
3  little development of the other.
4  Essentially, what she has there is a
5  congenital deformity or a developmental
6  deformity.  The correction of which could
7  be considered cosmetic because it's not
8  producing a functional improvement or a
9  functional restoration.
10       And this is what we were talking
11  about earlier goes by degrees.  So in
12  this case, you could make the case that
13  it's a reconstructive operation, but in
14  fact, it's a unilateral breast
15  augmentation.
16       Q.  Okay.
17       A.  But it would be perhaps in the
18  category of reconstructive.
19       Q.  Okay.  But you would consider it
20  cosmetic, or how do you classify it?
21       A.  In the case of a woman with what
22  I just described to you, Poland's
23  Syndrome, it's considered a

Page 86

1  reconstructive operation.
2       Q.  So the majority of breast
3  augmentations, though, are for cosmetic
4  reasons?
5       A.  Yes.
6       Q.  Got it.  Thank you for helping
7  me work through that.
8       What qualifies as a good reason
9  in your mind to undergo a breast
10  augmentation for cosmetic reasons?
11       MR. MCKAY:  Object to the form.
12       A.  So to begin with, the routine
13  breast augmentation would be in the
14  category of aesthetic surgery in the
15  sense that the operation aims itself at
16  improving the subjective life of the
17  patient.  The examination of the patient
18  would reveal, typically, the evolutional
19  changes in a woman who has breastfed
20  babies and has now lost her shape.
21       And the most common aim of the
22  operation is to make the upper part of
23  the body confident with the lower part of

Page 87

1  the body, bring balance there, and to
2  make it easier for the patient to dress
3  for the day, prepare for the day, and not
4  worry about what she looks like.
5       So it's an aesthetic operation
6  that has measurable outcomes when the
7  patient's expectations of benefit are
8  reasonable.
9       Q.  Who determines whether the
10  expectations are reasonable?
11       A.  Me.
12       Q.  How do you make that
13  determination?
14       A.  In the course of the
15  consultation, the kind of questions that
16  are a part of the conversation, which I
17  try to keep as informal and positive as I
18  can, seeking to understand the patient's
19  motivation.  And most typically, that's a
20  fairly easy thing to understand.
21       Q.  Have you ever performed a breast
22  augmentation surgery for cosmetic reasons
23  on a person under the age of 19?

Page 88

1       A.  I believe I did a unilateral
2  breast augmentation on a girl who was, I
3  think, a senior in high school at the
4  time, but I think she was about 18 years
5  old.  She had an asymmetry that we
6  augmented to one side.
7       Q.  Do you remember when that was?
8       A.  I believe that was while I
9  was -- for some reason, I -- it must have
10  been in the late 1990s.  I'm not positive
11  about that date.
12       Q.  Anyone else under the age of 19
13  that you recall performing a cosmetic
14  breast augmentation on?
15       A.  There may have been another -- I
16  seem to recall that -- you know, massive
17  asymmetry patients or significant
18  asymmetry patients, there was probably
19  more than 1.  Perhaps more than 3.  I
20  don't remember specifically.  But over
21  the course of 30 years, I know I've done
22  it more than once.
23       Q.  And these individuals that you

22  (Pages 85 to 88)

Dr. Patrick Lappert                                    4/3/2024

Page 89

1   performed the breast augmentation on,
2   were these all individuals that you would
3   say had a breast defect in some way?
4       A.  Asymmetry, yes.
5       Q.  Any patients under the age of 19
6   that you've performed a breast
7   augmentation on who did not have some
8   sort of breast deformity?
9       A.  No.
10      Q.  Is it your opinion that it would
11  be appropriate for a surgeon to perform a
12  breast augmentation on an individual
13  under the age of 19 for reasons other
14  than a breast deformity?
15      A.  I would definitely not recommend
16  doing that.
17      Q.  Why not?
18      A.  Issues of consent and issues of
19  motivation, emotional maturity.
20      Q.  I want to look at your report
21  really quick.  And you told me you have a
22  copy there, right?
23      A.  I do.

Page 90

1       Q.  I'm looking at page 17,
2   paragraph 35.
3       A.  Okay.
4       Q.  About halfway down through that
5   paragraph, I'm starting with the
6   sentence, Cosmetic breast augmentation.
7   Do you see that?
8       A.  Right.
9       Q.  Cosmetic breast augmentation for
10  anything other than congenital breast
11  deformity such as Poland's Syndrome in
12  minors is not considered ethical,
13  professional conduct.  Did I read that
14  correctly?
15      A.  Yes.
16      Q.  So is it your position then that
17  to perform a breast augmentation on an
18  individual under the age of 19 for
19  reasons other than a breast deformity
20  would be unethical?
21      A.  To my mind, I would consider
22  that ethically questionable, yes.
23      Q.  And you cited an article here

Page 91

1   for that proposition:  Considerations in
2   Breast Augmentation in the Adolescent
3   Patient.
4       A.  Yes.
5       Q.  Where in that article does it
6   say that it is unethical to perform those
7   procedures?
8       A.  I don't have the article in
9   front of me.  So I can't answer your
10  question.
11      Q.  Okay.  You're confident that it
12  does -- to make that proposition, though,
13  that it is unethical to perform those
14  procedures?
15          MR. MCKAY:  Object to the form.
16      A.  I think that the -- I don't have
17  the article in front of me.  So I can't
18  recollect that detail.
19      Q.  Do you have a copy of that
20  article anywhere where you could get it
21  in your building?  I don't know where you
22  are.
23      A.  I don't.

Page 92

1       Q.  Okay.  If a surgeon opted to
2   perform a breast augmentation on an
3   individual under the age of 19 for reason
4   others than breast deformity, do you
5   think that would be considered
6   malpractice?
7           MR. MCKAY:  Object to the form.
8       A.  I think that calling it
9   malpractice would be based in evidence of
10  harm to the patient.
11      Q.  So it would be a case by case
12  scenario?
13      A.  Right.  I think ethical
14  judgments about patient selection does
15  allow some discretion on the part of the
16  surgeon, but to call it malpractice, you
17  would have to have evidence of harm.
18          MRS. VAGUE:  Let's go off the
19  record for just a minute.
20          THE COURT REPORTER:  We're off
21  the record.
22          (Whereupon a brief recess was
23  taken from 10:57 a.m. to 11:01 a.m.)

23  (Pages 89 to 92)

Dr. Patrick Lappert                                      4/3/2024

Page 93

1      Q.  Doctor, I have pulled up on the
2  screen here the article that you have
3  cited in support of this proposition that
4  it is not ethical to perform breast
5  augmentation on minors other than for
6  breast deformities.  Do you see that
7  there on the screen?
8      A.  I do.
9      Q.  Okay.  And I just want to look
10  at a couple of sections in here.  I'm not
11  going to make you read the whole thing on
12  the computer screen.  But let's look here
13  in this first paragraph, and I have it
14  highlighted for ease of reference there.
15      It says, Nearly 32,000 breast
16  augmentations were performed -- sorry.
17  Let me reread that.  320,000 breast
18  augmentations were performed in 2011 with
19  adolescents, those individuals under 18
20  years of age accounting for 4,830
21  procedures for 1.5 percent.  Reasons for
22  surgery were evenly divided between
23  purely cosmetic augmentation and in

Page 94

1  corrections of deformity such as severe
2  asymmetry to the breast deformity and
3  Poland Syndrome.  Did I read that
4  correctly?
5      A.  Yes.
6      Q.  And it's not your position,
7  Doctor, that those that were for purely
8  cosmetic reasons were necessarily
9  violations of ethical, professional
10  conduct, correct?
11      MR. MCKAY:  Object to the form.
12      A.  Is your question with regard to
13  the evidence in this paper?
14      Q.  Yes.
15      A.  Well -- so in the paper, it's
16  talking about those surgeries in a
17  specific age group between 18 and 19
18  years of age, a subcategory of patients
19  very much limited to that one age range
20  of 18 to 19 that excludes the congenital
21  deformities.  So that would put it in the
22  category, I guess, of very limited age
23  demographic.

Page 95

1      Q.  Well, let's back up and make
2  sure we're talking about the same thing.
3  Because the highlighted section I just
4  read to you said that it was referring to
5  individuals under 18 years of age
6  accounting for 4,830 of those procedures.
7      A.  Right, of which half of those --
8      Q.  Were for cosmetic reasons?
9      A.  -- were cosmetic.  Yes.  So --
10      Q.  Correct.
11      And is it your opinion that
12  those half that were for cosmetic reasons
13  only were violations of ethical,
14  professional conduct?
15      A.  No.
16      Q.  All right.  I want to look
17  now -- I'm looking at page -- just for
18  the record, page 68, the second column,
19  last paragraph.  And it says, In a
20  general statement regarding plastic
21  surgery in teenagers, the ASPC, which I
22  understand is the American Society for
23  Aesthetic Plastic Surgery, suggests that

Page 96

1  the best outcomes are achieved when the
2  following are true:
3      Number one:  The teenage patient
4  initiates the request and repeats this
5  request.
6      The teenage patient has
7  realistic goals and expectations.
8      And number three:  The teenage
9  patient has sufficient emotional
10  maturity.
11      Did I read that correctly?
12      A.  Yes.
13      Q.  And do you agree with those
14  three statements there?
15      A.  Not entirely, no.
16      Q.  What's your disagreement?
17      A.  I have difficulty with such
18  statements as teenagers with realistic
19  goals and expectations and teenagers with
20  sufficient emotional maturity.  That
21  being a very difficult and at the same
22  time broad category of possibilities.
23      Q.  You have -- and I want to make

24  (Pages 93 to 96)

Dr. Patrick Lappert                                    4/3/2024

Page 97

1    sure I understand what you're saying.
2    You have difficulty thinking that
3    teenagers can have realistic goals and
4    expectations?
5            MR. MCKAY:  Object to the form.
6        A.  I'm not ruling out that
7    teenagers can have realistic goals and
8    expectations.  I'm saying the
9    consultation has to be very careful and
10   focused on that because of the higher
11   likelihood that a teenager would have
12   unrealistic goals and expectations.
13   So --
14       Q.  I see.  Okay.
15           So you agree with the
16   proposition so long as the physician who
17   is doing the consultation is being very
18   thorough to make sure that they
19   understand what the expectations are?
20           MR. MCKAY:  Object to the form.
21       A.  Correct.  Rigor and
22   understanding the motivations of the
23   cosmetic patients are paramount.

Page 98

1        Q.  And I guess the same would be
2    true for number three.  You would want to
3    make sure that the practitioner is being
4    thorough to make sure that they can
5    confirm that the patient has sufficient
6    emotional maturity?
7        A.  Yes.
8        Q.  Skipping down to page 69.  And I
9    have it highlighted here in the first
10   column, the end of the last -- the first
11   paragraph.  Although the adolescent
12   patient is not legally empowered to give
13   informed consent, empirical -- empiric
14   studies suggest that by the age of 14
15   years the adolescent is cognitively
16   similar to her adult counterpart in
17   making rational health-related decisions.
18           Did I read that correctly?
19       A.  You read that correctly.
20       Q.  I think that's sufficient so
21   that I don't make you read the entire
22   article as we go through.  And we can
23   move on.

Page 99

1        Doctor, next, I want to talk to
2    you about another issue that you talk
3    about in your report, and that's watchful
4    waiting.  What do you understand watchful
5    waiting to mean?
6        A.  Watchful waiting, that term is
7    used to describe a number of
8    therapeutic -- well, diagnostic and
9    therapeutic approaches to children who
10   evidence gender discordance.
11       Q.  When did you first hear that
12   term?
13       A.  Watchful waiting?
14       Q.  Yes.
15       A.  I think it was probably 2014,
16   most likely.
17       Q.  Do you remember where you heard
18   about it?
19       A.  I do not.
20       Q.  And after you heard that term,
21   what did you do to educate yourself about
22   what watchful waiting is?
23       A.  I sought to understand if it was

Page 100

1    just a passive process or if there was
2    active intervention that was part of
3    watchful waiting.
4        Q.  And how did you go about
5    determining that?
6        A.  Well, in reading the literature
7    related to gender identity disorder, one
8    of the things that stood out to me was
9    that the historic demographic was
10   preadolescent prepubertal children
11   expressing cross-sex self-identification,
12   over 80 percent of them being boy, and
13   that the natural history of that
14   condition demonstrates resolution of
15   cross-sex self-identification by the time
16   puberty is underway; and that if followed
17   into young adulthood, over 90 percent
18   resolution.
19           And the term "watchful waiting"
20   was used, but as I examined that term, I
21   came to understand that watchful waiting
22   includes cognitive behavioral processes;
23   very importantly, family therapy for the

25  (Pages 97 to 100)

Dr. Patrick Lappert                                                    4/3/2024

Page 101

1  children; and the practitioner trying to
2  gain an understanding of the family
3  dynamics that might have caused the
4  gender discordance in the child. Play
5  therapy depending on the age of the
6  patient. Watchful waiting is a
7  therapeutic process that aims at the
8  resolution of the gender discordance.
9      Q. And your understanding is that
10 the goal at the end is that the patient
11 no longer experiences this discordance
12 with their gender identity and their
13 cross-sex?
14     A. I think the overarching goal is
15 the happiness of the child and that the
16 least invasive approach to that that can
17 achieve that is the preferred approach.
18 And it's based in the understanding that
19 as opposed to the adult presentation of
20 gender discordance, in the child, the
21 child most often expresses gender
22 discordance on the basis of a
23 misinterpretation of something in their

Page 102

1  family dynamic, some misunderstanding.
2  And so helping the child
3  understand that dynamic better,
4  particularly as their understanding grows
5  while their body evidences their sex --
6  secondary sex characteristics -- this is
7  my understanding of where the resolution
8  of the gender discordance happens. The
9  combination of two things: An
10 understanding of the subjective process
11 and then a recognition of their --
12 physical evidence of their sex.
13     Q. And I appreciate that
14 description. I think that was very
15 helpful. One thing I do want to
16 understand, though, is how you went about
17 educating yourself about it. In other
18 words, what studies did you read? Did
19 you talk to anybody? How did you learn
20 about watchful waiting?
21     MR. MCKAY: Object to form.
22     A. I don't remember particular
23 volumes I may have read or particular

Page 103

1  articles that I may have read. I know an
2  article by a Dr. Zucker out of -- I think
3  it's Toronto or McGill. I don't remember
4  where Dr. Zucker is. Was very helpful in
5  understanding the processes of
6  resolution. But beyond Dr. Zucker, I
7  can't recall particular articles or
8  particular textbooks or particular
9  conversations that I had with
10 psychologist or psychiatrists. But --
11     Q. Have you talked to any health
12 care providers that are following this
13 model of watchful waiting?
14     A. I'm sure I have. I don't
15 remember them by name. I cannot remember
16 a particular conversation with a
17 particular clinician.
18     Q. Okay. And you mentioned the
19 article by Dr. Zucker that you read. You
20 don't remember any other articles at this
21 time that you read about watchful
22 waiting?
23     A. I'm sure that reading

Page 104

1  Dr. Zucker's article and particular --
2  reading of the citations in support of
3  that article, I must have read other
4  papers that he cited in that paper -- he
5  and his colleagues have cited in that
6  paper, but I can't cite them for you now.
7      Q. And do you know if Dr. Zucker's
8  study was focused on prepubescent
9  children or adolescents?
10     A. That particular study was, I
11 think, based in the historic demographic
12 that favored prepubertal children, the
13 majority of which were boys.
14     Q. Have you been to any conferences
15 or seminars where they have talked about
16 watchful waiting?
17     A. No.
18     Q. Have you, yourself, performed
19 any studies?
20     A. No.
21     Q. Do you know if there is a
22 difference in the treatment protocol for
23 gender dysphoria in prepubescent children

26  (Pages 101 to 104)

Dr. Patrick Lappert                                    4/3/2024

Page 105

1    versus adolescents?
2        A.  My understanding is that the
3    later presentation in adolescents is more
4    likely to be -- it's 30 percent likely to
5    be associated with an underlying
6    diagnosis of autism spectrum disorder; a
7    40 percent likelihood of a diagnosable
8    major depression, evidence of self-harm
9    associated with that.  So it's a -- it's
10   a much more complex issue, and the
11   presentation is more likely to be
12   associated with actual episodes of
13   trauma.
14       Q.  Under the watchful waiting model
15   as you understand it, are there
16   recommendations for treatment of
17   prepubescent children versus adolescents?
18       MR. MCKAY:  Object to the form.
19       A.  Well, in the adolescents, the
20   component of family therapy is likely
21   going to be less important; although,
22   still germane.  Because we still find
23   evidence of processes in the family

Page 106

1    dynamic that would probably be important.
2    I'm sorry.  Could you ask that question
3    again?
4        Q.  Yeah.  What I'm trying to get at
5    is you've indicated the article you read
6    by Dr. Zucker focused on prepubescent
7    children.  So I'm trying to understand if
8    you have an understanding that under the
9    watchful waiting model, as you described
10   it, if there is a different way that you
11   would treat prepubescent children with
12   gender dysphoria versus adolescents?
13       A.  Well, my expectation is that it
14   would be different, but I think there's
15   presently a poverty of literature because
16   of the tremendous pressure to affirm.
17   So I -- I would expect that there would
18   be a difference in therapeutic approach
19   to someone presenting in adulthood than
20   there is somebody presenting as a child.
21       Q.  Let me ask it to you this way:
22   Is it your position that watchful waiting
23   is appropriate for both prepubescent

Page 107

1    children and adolescents until they reach
2    adulthood?
3        A.  I don't have sufficient
4    expertise to answer your question, I
5    don't think.
6        Q.  Okay.  Is it your understanding
7    that under the watchful waiting model as
8    you described it there are some
9    individuals who are going to be
10   persistent in gender dysphoria through
11   adolescence and into adulthood?
12       A.  That is a historic fact.
13       Q.  And for those individuals who do
14   persist into adulthood, is it your
15   position that then it would be
16   appropriate for them to receive
17   gender-affirming care?
18       MR. MCKAY:  Object to the form.
19       A.  That would not be my position.
20       Q.  What would be your position once
21   they reached adulthood?
22       A.  My position is that the
23   underlying diagnosis is still not a

Page 108

1    medical or surgical diagnosis.  It's
2    still a psychiatric diagnosis.
3        The difficulty of care is
4    certainly greater in someone who has
5    persisted into adulthood, and it would
6    suggest a more profound interior wounding
7    event in the life of that person.
8        But it would still be my opinion
9    that hormonal manipulation with all of
10   its intended harms and certainly surgical
11   interventions with their known harms
12   would preclude me from offering that as
13   an option.
14       Q.  Okay.  So your position is that
15   gender-affirming care is never
16   appropriate for either minors or adults?
17       MR. MCKAY:  Object to the form.
18       A.  I think the main difference
19   between general-affirming care for minors
20   versus adults is the insurmountable issue
21   of consent.
22       Q.  But my question is different
23   than that one.  My question is whether

27  (Pages 105 to 108)

Dr. Patrick Lappert                                    4/3/2024

Page 109

1    it's your position that gender-affirming
2    care is appropriate once that patient
3    reaches the age of adulthood?
4        A. I consider gender-affirming care
5    in adults to be unsupported by scientific
6    literature.
7        Q. Okay. I think what I'm
8    understanding you to say -- and you
9    clarify me if I'm wrong. I think what
10   I'm hearing you say is that it's your
11   position and your opinion that it is
12   never appropriate to provide
13   gender-affirming care whether the
14   individual is a minor or whether the
15   individual is an adult. Is that correct?
16       MR. MCKAY: Object to the form.
17       A. The present model of care that
18   uses high dose raw sex hormones and
19   surgical, what I would consider, genital
20   mutilation is not -- those harms are not
21   outweighed by a demonstrated benefit, and
22   therefore, I would consider them
23   unethical.

Page 110

1        Q. So even for adults, you would
2    consider providing gender-affirming care
3    unethical professional conduct?
4        MR. MCKAY: Object to the form.
5        A. Until such surgeries can be
6    demonstrated in valid high quality
7    evidence, then I would consider it
8    unethical if only on the basis of lack of
9    consent.
10       Q. Even for adults?
11       A. Yes.
12       Q. So what alternative would you
13   offer to adults suffering from gender
14   dysphoria to gender-affirming care?
15       A. Well, certainly persons who
16   experience gender discordance or gender
17   dysphoria have a lot of options open to
18   them. But as far as what I would offer
19   them --
20       Q. What would you recommend?
21       A. My recommendation is psychiatric
22   support, psychological support, other
23   therapeutic approaches to managing the

Page 111

1    underlying psychological processes.
2        Q. Do you think Alabama should
3    impose laws banning or restricting access
4    to gender-affirming care for adults?
5        A. No.
6        Q. Why not?
7        A. Because there's a level of
8    autonomy that one should expect. I think
9    that issue is better examined in terms of
10   outcomes, and let the outcome evidence
11   speak for itself, I think.
12       Q. Doctor, I want to circle back to
13   one more thing we talked about earlier.
14   You mentioned to me some of the other
15   states where you have offered your expert
16   services with respect to laws that are
17   similar to the one here in Alabama. Do
18   you remember that conversation?
19       A. Yes.
20       Q. And I think you told me about
21   four states that you have testified in,
22   correct?
23       A. Yes.

Page 112

1        Q. What were your motivations for
2    providing expert opinions in those cases?
3        MR. MCKAY: Object to the form.
4        A. I think my professional
5    motivation is to protect people from
6    harm.
7        Q. Can you explain a little bit
8    more what you mean by that?
9        A. My knowledge of plastic and
10   reconstructive surgery, my lifetime of
11   treating wounded people, my understanding
12   of the suffering that people endure based
13   on different circumstances, my
14   understanding of people's motivations for
15   aesthetic surgery led me to essentially
16   begin speaking out against this. In the
17   course of speaking out against it, I was
18   invited into this more public issue of
19   public law.
20       Q. Where have you spoken out
21   against it?
22       A. Conferences over the years.
23       Q. Which conferences in particular?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Dr. Patrick Lappert                                    4/3/2024

---

Page 113

1    A. Primarily church, educational
2  bodies, school administrators, teachers,
3  counselors, pastors. I've also spoken --
4  I gave two presentations to Alliance
5  Defending Freedom. I've given
6  presentations to private schools,
7  presentations to high school students in
8  those private schools.
9    Q. How did you learn about the
10  Alliance Defending Freedom?
11    A. I don't remember how I received
12  the invitation. I was invited down to
13  give a presentation on my understanding
14  of gender affirmation surgery.
15    Q. What's your understanding of
16  what Alliance Defending Freedom is?
17    MR. MCKAY: Object to form.
18    A. My understanding is that the
19  Alliance Defending Freedom is a Christian
20  legal advocacy organization.
21    Q. Okay. Any other places that
22  you've given a speech that you were
23  telling me about?

---

Page 114

1    MR. MCKAY: Object to the form.
2    A. I've given presentations on --
3  well, a version of it on -- for
4  publication on websites. Video recorded
5  presentations.
6    Q. Do you know what websites that's
7  available on?
8    A. One of them is on the Person and
9  Identity Project. EWTN television
10  network.
11    Q. What is that network?
12    A. I'm sorry?
13    Q. What is that network? I don't
14  think I'm familiar with it.
15    A. EWTN is in Birmingham, Alabama.
16    Q. Okay. Is it just a local
17  station, or what is it?
18    A. EWTN stands for Eternal Word
19  Television Network. It's a global
20  catholic network.
21    Q. Okay. Gotcha.
22    Anywhere else that you've given
23  this presentation other than what we've

---

Page 115

1  already talked about?
2    A. To my recollection, that's it.
3    Q. And you mentioned that in your
4  report, it sounds like around 2014, you
5  developed this interest in health care of
6  transgender individuals, and we've spoken
7  a little bit about that. But I'm
8  interested in what sparked that in 2014.
9    MR. MCKAY: Object to the form.
10    A. What sparked that was -- it was
11  actually a request. There was a request
12  from a catholic priest who wanted me to
13  put together a presentation that could
14  be -- that would be helpful in educating
15  people who were in pastoral situations on
16  the scientific medical realities of
17  transgender, gender affirmation, gender
18  discordance, all of it.
19    Q. And why did this priest reach
20  out to you to prepare that, if you know?
21    MR. MCKAY: Object to the form.
22    A. It happened because I was
23  involved in a public conversation. It

---

Page 116

1  was a part of what's called the Courage,
2  Courage apostolate, which is the catholic
3  apostolate. And there was a seminar, a
4  conversation, a working group of priests
5  and pastors in general. And that
6  conversation became rather wily and
7  heated, and it evidenced a lot of
8  misunderstanding of the condition of
9  gender discordance. And the priest
10  thought that I might be able to present
11  more fully on the medical issues -- the
12  historical medical issues that pertain to
13  gender identity disorder, gender
14  discordance, transgender, all of that.
15    Q. Gotcha.
16    MRS. VAGUE: Okay. I think
17  we've been going about another hour. So
18  why don't we take another break, if
19  that's good with y'all.
20    MR. MCKAY: Yeah. Do you think
21  we're going to need to break for lunch at
22  some point? How much longer do you think
23  you have?

---

Dr. Patrick Lappert                                      4/3/2024

---

Page 117

1        MRS. VAGUE:  Let me look at my
2    notes, and let's come back and chat after
3    my -- after the break, if that's okay.
4        MR. MCKAY:  Perfect.
5    Five-minute break?
6        MRS. VAGUE:  Yeah.  That's good.
7        THE COURT REPORTER:  We're off
8    the record.
9        (Whereupon a brief recess was
10   taken from 11:30 a.m. to 11:42 a.m.)
11       Q.  Doctor, we're back on the
12   record, and I wanted to talk to you now
13   about your expert report that you
14   prepared in this case.  And you told me
15   you've got a copy there with you in the
16   room.
17       A.  That's right.
18       Q.  When did you prepare this
19   document?
20       A.  Let's see what the date is on
21   that.  The date on it is -- is that where
22   it is?
23       Okay.  I'm sorry.  It's May 18th

---

Page 118

1    of 2023.
2        Q.  Okay.  That's your signature
3    there on that page?
4        A.  I believe that's when we
5    completed the preparation of the
6    document.
7        Q.  Okay.  And that's your signature
8    there on that page?
9        A.  Yes.
10       Q.  When you say we completed
11   preparation of the document, who are you
12   referring to?
13       A.  Me.
14       Q.  Do you remember about how long
15   you worked on this report?
16       A.  There are elements of it that
17   reach back a couple of years, but the
18   document itself from start to finish -- I
19   would have to look in my files to see
20   when I started and when I stopped.
21       Q.  Okay.  Do you have sort of a
22   guess of when you would have started on
23   it?

---

Page 119

1        A.  I would guess I probably started
2    on it about a month before.
3        Q.  Okay.  And you mentioned that
4    there were aspects of it that date back
5    several years.  What do you mean by that?
6        A.  Discussions of particular
7    aspects of my opinion, there are elements
8    in there that I've been thinking about
9    and writing about for years now that I
10   ultimately condensed into the document
11   that you have.
12       Q.  Understood.
13       And did you pull any sections or
14   portions from prior reports that you
15   prepared in those other cases we
16   discussed?
17       A.  Probably.
18       MRS. VAGUE:  And just so we have
19   a clear record, I'll mark this as Exhibit
20   1.  And I'll send you a copy, send a copy
21   to the court reporter and to y'all as
22   well afterwards.  But just so we have a
23   copy for the record.

---

Page 120

1        (Whereupon, Plaintiff's
2    Exhibit 1 was retained by
3    counsel to be marked for
4    identification.)
5        Q.  And this opinion, Doctor, I
6    assume you approved it before it got
7    served in this case, correct?
8        A.  Correct.
9        Q.  And it contains all of the
10   opinions you intend to offer in this
11   case, correct?
12       A.  Correct.
13       Q.  I don't want to go through every
14   paragraph.  I won't make us spend time
15   doing that, but there are a few
16   paragraphs that I wanted to go through in
17   here.
18       The first paragraph I want to
19   look at is paragraph 23, which is on page
20   9.
21       A.  Paragraph 23?
22       Q.  Yes.
23       A.  Okay.

---

Dr. Patrick Lappert                                          4/3/2024

Page 121

1    Q.  And I'm going to read you this
2  first sentence.  It says, Since 2014, I
3  have made a concerted effort to examine
4  the medical literature pertaining to the
5  care of self-identified transgender
6  persons, including children and adults.
7  What do you mean by the term
8  "self-identified transgender persons"?
9    A.  It's a statement about the
10  reality of the diagnostic process
11  involved in what -- the diagnosis that is
12  now gender dysphoria or transgender.
13    Q.  Okay.  Help me understand that a
14  little bit more.  Are you saying that
15  these people -- are you drawing a
16  distinction between a self-identified
17  transgender person and a person with
18  gender dysphoria?
19    A.  No.
20    Q.  Okay.  So your position then
21  would be that a person who has been
22  diagnosed by a health care provider with
23  gender dysphoria -- you would describe

Page 122

1  that person as a self-identified
2  transgender person?
3    A.  The distinction I'm making is
4  that there's no professional anywhere
5  along the chain of care who actually
6  makes the diagnosis.  It's the patient
7  who makes the diagnosis.
8    Q.  How does patient go about making
9  the diagnosis?
10    A.  Well, it's -- there's a number
11  of different ways that it seems to be
12  happening depending on the age at which
13  the patient presents.
14    So, you know, a child with
15  cross-sex self-identification who is
16  considered insistent, consistent, and
17  persistent about their cross-sex
18  self-identification, this constitutes the
19  entirety of the diagnostic process that
20  brings children into gender affirmation
21  clinics.
22    Likewise, when adults present
23  with gender -- what's called gender

Page 123

1  dysphoria, they are the ones who identify
2  themselves as being the opposite gender,
3  the gender opposite to their natal sex.
4    So there's no diagnostic process
5  on the part of the social worker, the
6  psychologist, the psychiatrist, the
7  endocrinologist, the pediatrician, or the
8  surgeon.  It's the patient who presents
9  as gender dysphoric or transgender.
10    Q.  Okay.  Is it your position that
11  gender dysphoria is a real diagnosis?
12    A.  No -- well, let me qualify that,
13  if I might.  It is a real diagnosis in
14  the sense that the patient is dysphoric,
15  unhappy about things relating to their
16  gender presentation.  That is a reality
17  people suffer with.  I don't doubt that
18  in the least having had considerable
19  contact with people who suffer with this.
20  But as far as a medical or a surgical
21  diagnosis, there's no such thing in this
22  treatment model.
23    Q.  Okay.  So you would agree that

Page 124

1  transgender individuals can suffer from a
2  distress that you would qualify as
3  dysphoria, but your position is that
4  medical professionals don't make that
5  diagnosis?
6    MR. MCKAY:  Object to the form.
7    A.  I would state it this way:  That
8  medical professionals recognize the
9  suffering of the patient.  They recognize
10  the patient is suffering and that the
11  patient ascribes their suffering to their
12  gender presentation.  So it's a
13  recognizable suffering that the
14  professional can recognize, but it's not
15  a medical diagnosis, and it's not a
16  surgical diagnosis.
17    Q.  How would that presentation be
18  different than other mental health
19  disorders?
20    A.  Well, it has -- it shares a very
21  common feature that -- those mental
22  health disorders, whatever they may be --
23  to my knowledge, there isn't a single

31  (Pages 121 to 124)

Dr. Patrick Lappert                                          4/3/2024

---

Page 125

1   mental health disorder that presents
2   medical hormonal manipulation -- body
3   modification, I should say, as a remedy.
4       Q.  And my question is different.
5   I'm talking about the diagnosis of it.
6   How is that presentation different than
7   other mental health disorders?
8           MR. MCKAY:  Object to the form.
9       Q.  And where the patient is
10  reporting their subjective beliefs and
11  feelings to the health care provider?
12          MR. MCKAY:  Object to the form.
13      A.  I don't know that I understand
14  your question.  I'm proposing that
15  they're similar.  I'm not sure how I
16  could present differences.  How is it
17  different?
18      Q.  Well, I'm just trying to
19  understand the distinction that you're
20  making about a diagnosis for gender
21  dysphoria -- and maybe you're not drawing
22  one.  Maybe I'm misunderstanding you.
23  But is it your position that other mental

---

Page 126

1   health disorders can be diagnosed by a
2   health care professional?
3       A.  Oh, yes.  It's incumbent upon
4   mental health professionals to diagnose
5   psychological disturbances like that.
6   It's incumbent upon all medical
7   professionals.
8       Q.  So what's the distinction
9   between those diagnoses and the diagnosis
10  of gender dysphoria?
11      A.  In the case of gender dysphoria,
12  there's no criterion of confirmation or
13  reputation of the diagnosis.
14      Q.  Okay.  I want to look back at
15  paragraph 23, the second sentence there.
16  I'm going to pick up there.  I had an
17  eight-year long running discussion on
18  these issues with family practitioners,
19  pediatricians, pediatric and adult
20  psychologists and psychiatrists,
21  pediatric endocrinologists, as well as
22  PhDs who specialize in the evaluation of
23  the validity of scientific publications.

---

Page 127

1           Did I read that correctly?
2       A.  Yes.
3       Q.  And we talked earlier about
4   those individuals that you spoke with,
5   right?
6           MR. MCKAY:  Object to the form.
7       A.  Yes.
8       Q.  So it sounds like based on this
9   paragraph that you educated yourself on
10  the care of transgender persons in two
11  ways.  One, reviewing the medical
12  literature, and two, talking to health
13  care providers and PhDs; is that right?
14          MR. MCKAY:  Object to the form.
15      A.  Yes.
16      Q.  Anything else that you did to
17  educate yourself on the health care
18  treatment of transgender individuals?
19      A.  Well, we've talked already about
20  the conference of the California Society
21  of Plastic Surgery.
22      Q.  Correct.  Yeah.  Anything other
23  than that conference?

---

Page 128

1       A.  Well, the -- certainly, in this
2   case, it's the review of the literature
3   that is offered in support of gender
4   affirmation care and presented by the
5   professionals offering their opinion in
6   support of this case.  So -- which is a
7   review of, I guess, the best literature
8   available in support of gender
9   affirmation care.
10      Q.  Have you undergone any formal
11  training regarding the treatment of
12  gender dysphoria?
13      A.  No.
14      Q.  And I know you cite a number of
15  articles in your expert report.  Are
16  there additional articles or literature
17  that you've reviewed beyond what's cited
18  in your report that you plan to rely upon
19  in this case?
20      A.  There are other recent
21  publications in the World Literature that
22  have come to my attention in the last
23  several weeks and months, particularly

---

32  (Pages 125 to 128)

Dr. Patrick Lappert                                    4/3/2024

---

Page 129

1   from Finland and France now; other
2   documents from the World Literature that
3   I may refer to, but I can't refer to
4   right now off the top of my head.  These
5   are papers that have come to my attention
6   that I've begun reviewing.
7       Q.  Anything else you can think of
8   that you might rely upon?
9       A.  Not that comes to mind right
10  now.
11      Q.  And the health care providers
12  and PhDs that you reference here in
13  paragraph 23, where would you speak to
14  these kind of individuals?
15      A.  E-mails, perhaps the -- you
16  know, e-mails or sometimes text messages,
17  things like that, I suppose.
18      Q.  I'm curious how you got
19  connected with these individuals.  Are
20  they people that are in your medical
21  community in Decatur, or are they people
22  that you've met at conferences?  How do
23  you know these people?

---

Page 130

1       MR. MCKAY:  Object to form.
2       A.  Well, for example, Dr. Hruz, a
3   pediatric endocrinologist.  I don't
4   remember where I met him, but he's become
5   a very helpful colleague.
6       Dr. Quentin Vanmeter, I actually
7   met him when I was an intern back in
8   1983, and it turns out that he's working
9   in this same area now as a pediatric
10  endocrinologist.
11      Who else?  Pediatrician -- a
12  family practitioner, Dr. Andre Van Mol,
13  for example.  I don't remember where I
14  met him, but he -- he keeps a list of
15  publications relating to gender
16  affirmation care and reviews those
17  publications.  He's been a very helpful
18  resource.  Uh-huh.
19      Q.  Anyone else that you remember
20  speaking to about these issues?
21      A.  There have been others.  I can't
22  remember one of their names because I
23  haven't spoken to them in a number of

---

Page 131

1   years.  He's a -- he's a medical
2   evidence -- he has a PhD in medical
3   evidence, and he's at the University of
4   California, San Francisco.  His name is
5   on the tip of my tongue, but I cannot
6   remember.
7       Q.  Well, if it comes to you, you
8   can tell me.  Okay?
9       A.  Okay.
10      Q.  Anyone else that you can recall
11  speaking to about these issues?
12      A.  Well, I remember speaking to a
13  general surgeon, now a plastic surgeon in
14  San Francisco when I was with the
15  California Society of Plastic Surgery.
16  He and I were in general surgery
17  residency at the same time in San
18  Francisco.  And I remember having a long
19  conversation with him at that conference
20  in San Francisco where we discussed the
21  confidence one can have in medical
22  evidence, for example, you know.
23      Q.  Did y'all speak about

---

Page 132

1   gender-affirming care?
2       A.  Yes.
3       Q.  Does he provide gender-affirming
4   care?
5       A.  He does.
6       Q.  And what did he tell you about
7   his position or view on gender-affirming
8   care?
9       MR. MCKAY:  Object to form.
10      A.  Well, he's a strong advocate of
11  it.  He was one of the presenters at that
12  California Society meeting.  And we just
13  had a free ranging conversation about our
14  experience with medical evidence.
15      Q.  Anyone else you can recall
16  speaking to about these issues?  I'm
17  talking specifically about the health
18  care providers and PhDs you reference in
19  paragraph 23.
20      A.  Nothing comes to mind right now.
21      Q.  Okay.  Dr. Hruz that you
22  referenced, where did you meet him?
23      A.  I met Dr. Hruz in Phoenix,

---

                          33  (Pages 129 to 132)

Page 133

1    Arizona.  He was -- I was a presenter,
2    and he was a presenter at the -- at a
3    conference convened by the Alliance
4    Defending Freedom.
5         Q.  What about Quinten Vanmeter?
6    Where did you meet him?
7         A.  I met Quinten Vanmeter when I
8    was a newly minted doctor, and he was my
9    intern advisor at the Naval Hospital
10   Oakland.  And I hadn't seen him in 35
11   years, and there he was in Phoenix
12   presenting on pediatric endocrinology.
13        Q.  That is the same ADF conference?
14        A.  Yes, ma'am.
15        Q.  And then the other individual
16   you named -- I think his name was Andre
17   Van Mol?
18        A.  That's right.
19        Q.  And where did you meet him?
20        A.  The same meeting.
21        Q.  And the PhD from California, did
22   you meet him at the same meeting too?
23        A.  Yes.  And as it happens, I just

Page 134

1    remembered his name.
2         Q.  Oh, okay.  I thought it might
3    come to you.  What is it?
4         A.  His name is Hacsi, H-A-S-C-I
5    (sic), last name Horvath, H-O-R-V-A-T-H.
6         Q.  And then you mentioned to me the
7    plastic surgeon in California that you
8    spoke to at the conference that you went
9    to in California.  Anyone else other than
10   this list that we've run through that you
11   remember talking to as it relates to
12   paragraph 23?
13        A.  None that comes to mind.
14        Q.  Okay.  So if I'm understanding
15   you correctly, when you say in here that
16   you have an eight-year long running
17   discussion on these issues with family
18   practitioners, pediatricians, pediatric
19   and adult psychologists and
20   psychiatrists, pediatric
21   endocrinologists, as well as PhDs, other
22   than the plastic surgery -- surgeon in
23   California, these other individuals are

Page 135

1    all people you met at the ADF conference?
2         MR. MCKAY:  Object to the form.
3         A.  No.  There are others that I --
4    whose names I can't remember.
5    Conversations that might have been in a
6    surgeons' lounge or in a physicians'
7    lounge in a hospital.  You know, other
8    physicians that I meet that I might have
9    this discussion with probing their
10   experience to understand the condition
11   better.  It's just an ongoing interest
12   that I've had and that I keep me eyes and
13   ears open for.  So the people we have
14   discussed is not a comprehensive list.
15        Q.  Understood.
16        And those other individuals that
17   you've had these passing conversations
18   with, you can't remember any of those
19   names?
20        MR. MCKAY:  Object to the form.
21        A.  Not just now.  I can't remember
22   them.
23        Q.  These individuals that we went

Page 136

1    through that you met at the ADF
2    conference, do any of those treat
3    patients for gender dysphoria?
4         A.  Not to my knowledge.
5         Q.  Okay.  I want to flip over now
6    and look at paragraph 28 on page 12.
7         Are you ready?
8         A.  Yes.
9         Q.  Okay.  I'm going to start with
10   that first sentence, and I'm going to
11   read that first line there.  If the
12   complete and successful transition of the
13   minor is the goal -- who are you
14   referring to there?  Whose goal are you
15   referring to?
16        A.  The goal of gender affirmation
17   care.
18        Q.  Okay.  So your understanding is
19   that the goal of gender-affirming care
20   and the people who provide it is to
21   complete -- is to provide a complete and
22   successful transitioning of minors?
23        A.  No.  I say that, if -- if the

Dr. Patrick Lappert                                              4/3/2024

Page 137

1    complete and successful transition of the
2    minor is the goal.
3        Q.  Okay.  So you don't know if
4    that's their goal or not?
5        A.  I assume that the goal is the
6    happiness of the patient.  And if the
7    happiness of the patient requires further
8    intervention in the mind of the
9    clinician -- I don't think that the goal
10   needs to be the transition.  I think the
11   goal may become the transition if the
12   happiness of the patient is not yet
13   satisfied.
14       Q.  Okay.  So your understanding
15   then is under the gender affirmation
16   model, that it's still a case by case
17   basis depending on the patient what type
18   of care and ultimate transition is
19   appropriate for that patient?
20       MR. MCKAY:  Object to the form
21       A.  That's how it's presented in the
22   gender affirmation health care model.
23       Q.  Okay.  And I want to skip down a

Page 138

1    little bit then, and I'll read it just so
2    we have completeness, and then I'll ask
3    you a question.
4        So it says, If the complete and
5    successful transition of the minor is the
6    goal and if the supporting documents
7    which plaintiffs proffer, such as the
8    WPATH standard of care, consider the
9    surgical transition of minors to be
10   proven safe and effective, WPATH standard
11   -- and must examine the issue of
12   affirmation surgery given the fact that
13   so many minor patients undergo or will
14   undergo or will in the future undergo
15   surgery.
16       Did I read that correctly?
17       A.  Yes.
18       Q.  And we talked about this
19   earlier.  You say here, Given the fact
20   that so many minor patients undergo or
21   will in the future undergo surgery, you
22   don't know how many minors have undergone
23   surgery in Alabama or nationwide,

Page 139

1    correct?
2        MR. MCKAY:  Object to the form.
3        A.  Those numbers have not been
4    published anywhere.
5        Q.  And you've done nothing to try
6    and determine those numbers; is that
7    correct?
8        MR. MCKAY:  Object to form.
9        A.  I rely on published information
10   where patient privacy is involved.  Those
11   are issues that I -- that cannot be
12   accessed unless it appears in a published
13   report which has not been forthcoming in
14   the state of Alabama.
15       Q.  All right.  And when you say
16   that minor patients undergo or will in
17   the future undergo surgery, do you mean
18   when those patients are adults?
19       A.  Let me reread that sentence,
20   please.
21       Q.  Okay.
22       A.  Right.  Minor patients who go on
23   and choose surgery in adulthood, I

Page 140

1    suppose, is what I was speaking about
2    there.
3        Q.  Okay.  And as we talked about
4    earlier, you agree that adults can
5    consent to plastic surgery procedures?
6        MR. MCKAY:  Object to form.
7        A.  I would say that consent in the
8    adult is a more meaningful thing in --
9    yeah.
10       Q.  In other words, you don't -- and
11   I think you told me this earlier.  You
12   don't think that Alabama, for example,
13   should restrict or ban gender-affirming
14   surgery for adults?
15       MR. MCKAY:  Object to the form.
16       A.  The law that's at issue here
17   pertains to minors.  That's where I'm
18   offering my opinion here.
19       Q.  That's correct.  But my question
20   is -- and I think we already talked about
21   this -- you don't think that Alabama
22   should impose a law that would restrict
23   or ban surgeries for adults -- gender

35  (Pages 137 to 140)

Dr. Patrick Lappert                                    4/3/2024

Page 141

1  affirming surgeries for adults?
2       MR. MCKAY: Object to the form.
3       A. My feeling on that is that the
4  professional bodies have a role to play
5  in this rather than the public law,
6  particularly areas of consent like this
7  and levels of evidence and the
8  liabilities that are experienced by
9  persons who are offering these
10  treatments. I think that's where this is
11  going to be decided in the case of
12  adults.
13       Q. And right now, are you aware of
14  any law in Alabama that would preclude an
15  adult from seeking gender-affirming
16  surgeries?
17       A. I am not aware of such a law.
18       Q. If I skip down a little bit
19  further in that paragraph, starting with,
20  The fact that general surgery -- do you
21  see that?
22       A. Yes.
23       Q. The fact that general surgery is

Page 142

1  routinely performed on minors is
2  evidenced by the fact that the WPATH
3  standards of care are described as part
4  of the affirmation surgery guidance.
5       Did I read that correctly?
6       A. Yes.
7       Q. When you say "routinely
8  performed," how often is it performed?
9       A. I don't have a number.
10       Q. Fair to say you don't know if
11  it's routine or not?
12       MR. MCKAY: Object to the form.
13       A. I'm saying it's routine enough
14  to have been included in the WPATH
15  standards of care.
16       Q. So you were just guessing based
17  on your reading of the WPATH standards of
18  care?
19       MR. MCKAY: Object to the form.
20       A. Yes.
21       Q. Is it your understanding that
22  WPATH standards of care 8 recommend
23  surgery for minors with gender dysphoria?

Page 143

1       A. My reading of the document is
2  that there's nothing in the standards of
3  care version 8 that excludes such
4  surgeries in minors, and there are
5  examples in the document that speak of
6  such surgeries in minors.
7       Q. Okay. I want to skip over to
8  paragraph 45 on page 22.
9       A. Okay.
10       Q. Okay. About halfway down that
11  paragraph, it starts, The most essential
12  criteria. Do you see that?
13       A. I do.
14       Q. The most essential criteria in
15  selecting patients for cosmetic surgery
16  is that it be offered only if the
17  physical change is reasonable, does not
18  involve harm or loss of function, and is
19  likely to result in subjective
20  improvement.
21       Did I read that correctly?
22       A. You did.
23       Q. Let's break that down a little

Page 144

1  bit. What is a reasonable physical
2  change?
3       A. A physical change within the
4  spectrum of a human variation, I suppose,
5  or something that is accessible to the
6  surgical technique itself.
7       Q. So can you help me understand
8  that first part a little bit more? You
9  said -- can you just maybe rephrase your
10  answer and help me understand that a
11  little?
12       MR. MCKAY: Object to the form.
13       A. Okay. So in speaking about
14  cosmetic surgery -- again, we're speaking
15  about aesthetic surgery. So a surgery
16  that begins and is aimed at the
17  subjective life of the patient. If the
18  patient is seeking a physical
19  modification that is mutilating or
20  unreasonable somehow, that would not be a
21  reasonable thing to do. If such surgery
22  that the patient asks for involves a harm
23  to the patient or a loss, then that would

                        36 (Pages 141 to 144)

Dr. Patrick Lappert                                          4/3/2024

Page 145

1  be unacceptable in a case of an aesthetic
2  or a cosmetic operation.
3      Q.  Okay.  And I want to focus just
4  on that first part, the reasonable
5  physical change.  And you indicated, for
6  example, that if the procedure is
7  mutilating in some way, then that
8  wouldn't be reasonable.  What would be an
9  example of mutilation?
10     A.  If, for example, the patient
11 wanted to -- I don't know -- change the
12 appearance of his nose to make it look
13 like the nose of a dog or something like
14 that, that would be outside the range of
15 the human face and would very likely
16 compromise the function of the nose.  But
17 it's beginning in the subjective -- the
18 subjective life of the patient and
19 resulting in a disfigurement that results
20 in a functional loss.
21     Q.  Would you consider
22 gender-affirming surgeries to be
23 mutilating?

Page 146

1      A.  Depending on which operation we
2  are talking about, yes.
3      Q.  Which operations would you
4  consider mutilating?
5      A.  Chest masculinization involves
6  the removal of the native breast and the
7  loss of a human function.
8          Inversion vaginoplasty involves
9  the destruction of the genitalia, the
10 loss of a human function.
11         The metoidioplasty less so
12 because that can be recovered, but the
13 free-flap phalloplasty would be a
14 mutilation.
15     Q.  Any others that you consider
16 mutilating?
17     A.  Well, all of the vaginoplasty
18 operations like colporrhaphy position
19 because it's preceded by castration and
20 penectomy is a mutilating surgery.
21 Proximal five vaginoplasty because it's
22 preceded by castration and penectomy is a
23 mutilating surgery.

Page 147

1      Q.  Who makes the decision of what
2  a reasonable physical change is?
3          MR. MCKAY:  Object to the form.
4      A.  Ultimately, it's the
5  responsibility of the physician surgeon.
6      Q.  Does the patient get a say in
7  what is reasonable for them?
8      A.  Certainly.
9      Q.  All right.  Next, you mentioned
10 that cosmetic surgery is appropriate if
11 it does not involve harm or loss of
12 function.  And I know you've touched on
13 that briefly, but what do you mean by
14 "harm"?
15     A.  Well, all surgery involves some
16 level of harm because we make incisions.
17 We make penetrations into the body and
18 things like that.  And those harms, if
19 the surgery is conducted properly, are
20 comparatively trivial assuming that you
21 can conceal the scars or the scars will
22 become acceptable or otherwise invisible
23 to casual observers.

Page 148

1          By harm, I mean loss of a human
2  faculty, for example.  A loss of the
3  capacity to breathe through the nose,
4  loss of vision, loss of the ability to
5  taste, loss of the ability to breastfeed,
6  loss of erotic provokability from the
7  nipple caused by breast surgery, loss of
8  your reproductive faculties.
9      Q.  And is that sort of a sliding
10 scale?  You know, there are some
11 procedures that there will be maybe a
12 slight loss in function, but it's still
13 appropriate to proceed as the patient
14 thinks that's reasonable for them?
15         MR. MCKAY:  Object to the form.
16     A.  Generally, in the field of
17 aesthetic surgery, any loss of function
18 is considered a bad outcome.
19     Q.  You said there are risks of
20 decreased success rate for breastfeeding
21 for women who have undergone breast
22 augmentation?
23     A.  That's correct.  That's not a

Dr. Patrick Lappert                                                    4/3/2024

---

Page 149

1    cosmetic -- oh, breast augmentation. I'm
2    sorry. Yes. The loss of nipple
3    sensibility from breast augmentation is
4    considered a bad outcome.
5        Q. But it's a risk of those types
6    of procedures, correct?
7        A. That's correct.
8        Q. As is a risk of decreased
9    success rates for breastfeeding, correct?
10       A. Correct.
11       Q. Okay. Then the last kind of
12   aspect that you put here of what's
13   appropriate for cosmetic surgery is if it
14   is likely to result in subjective
15   improvement. How do you as a surgeon
16   measure that?
17       A. That's the most challenging part
18   of aesthetic cosmetic surgery. And
19   that's where -- that's the real heart of
20   the consultation. In addition to
21   assessing the patient's desires for the
22   outcome, what the actual measurable
23   change is, like take away the hump from

---

Page 150

1    my nose or, you know, make my breasts
2    look younger or whatever it is, the
3    likelihood of succeeding in that positive
4    affect as compared to the possibility of
5    harm, that's the heart of the aesthetic
6    consultation.
7        So the harms -- the potential
8    for harms has to be very, very small, and
9    the likelihood of subjective improvement
10   has to be high. And that's the most
11   difficult part of the equation, and
12   that's where experience is particularly
13   valuable.
14       Q. And in making that
15   determination, do you take into account
16   input from the patient's other health
17   care providers, like mental health
18   professionals?
19       A. If the patient presents with a
20   preventous mental health diagnosis, that
21   becomes a very important part of the
22   aesthetic consultation.
23       Q. As part of your determination,

---

Page 151

1    would you consult with that mental health
2    care professional to determine whether
3    this is an appropriate candidate for
4    cosmetic surgery?
5        A. If a patient is under the care
6    of a psychiatrist, then that becomes a
7    very important part of the conversation.
8        Q. Then my question is just
9    slightly different. It's whether you --
10   that patient who presents to you that is
11   under the care of a mental health
12   professional, do you consult with that
13   mental health care professional in
14   determining whether -- whether that
15   patient is an appropriate candidate for
16   surgery?
17       A. If a patient presents to me
18   seeking aesthetic surgery and is under
19   the care of a psychiatrist, then
20   depending on what they are asking to have
21   done, if it's something minor, something
22   comparatively trivial, then perhaps
23   consulting with their psychiatrist might

---

Page 152

1    not be as important. But if they're --
2    if they're seeking a surgery that is big
3    and massively changing of them and they
4    have an expectation of a life-changing
5    result, then, yeah, that becomes a
6    psychiatric referral or an extended
7    conversation with the psychiatrist.
8        Q. You're not saying that any
9    patient that presents to you that is
10   under the care of a mental health care
11   professional is not an appropriate
12   candidate for surgery, right?
13       A. Correct. I'm not saying that.
14       Q. In your experience and in your
15   opinion, is a case by case analysis based
16   on the patient?
17       A. There are some things that
18   are -- yeah, case by case. Some of the
19   simpler procedures, certainly case by
20   case. But a large surgery that involves
21   a radical change to the person, it
22   becomes a much graver matter that --
23   where psychiatry becomes the most

---

Dr. Patrick Lappert                                          4/3/2024

---

Page 153

1    important treatment.
2        Q.  I'm going to ask you about an
3    article that you have cited in your
4    report.  It's on page 18, Footnote 17.
5        A.  Okay.
6        Q.  And it's written by Abigail
7    Shrier, Why Mercy Matters.  Do you see
8    that?
9        A.  I do.
10       Q.  Who is Abigail Shrier?
11       A.  Abigail Shrier is a writer -- a
12   freelance writer.  My understanding is
13   she writes for, among other outlets, The
14   Wallstreet Journal.  She's published a
15   book on the issue of gender dysphoria in
16   young ladies, young women.
17       Q.  Is she a medical doctor?
18       A.  No.
19       Q.  Do you know what her educational
20   background is?
21       A.  I don't have the details, no.
22       Q.  Do you know if she's performed
23   any studies on gender affirmation care or

---

Page 154

1    the treatment of transgender individuals?
2        A.  I only know that in her capacity
3    as a writer, she has examined the issue
4    in depth and detail deeply enough to
5    consult with professionals who are in the
6    business of offering these surgeries or
7    reviewing with professionals.
8        Q.  Do you know what studies that
9    she reviewed to draw her conclusions?
10       MR. MCKAY:  Object to the form.
11       A.  As I recall, her book that she
12   published some years ago is heavily
13   footnoted and has a bibliography that
14   includes her references and citations.
15       Q.  What is Substack?
16       A.  I think that's an online
17   reference that she maintains.  I think
18   it's a collection of references and
19   publications that she's offered in
20   support of her writing.
21       Q.  Is that publication generally
22   accepted in the medical community as
23   authoritative and reliable?

---

Page 155

1        MR. MCKAY:  Object to the form.
2        A.  I don't know the answer to that.
3        Q.  In that same footnote, you
4    reference an article about Libby Emmons.
5    Who is Libby Emmons?
6        A.  I think it may be another writer
7    who, in that article, to the best of my
8    recollection -- I would have to look at
9    the article again.  This was her
10   reporting on a conversation or an
11   interview with Dr. Marci Bowers.
12       Q.  Is Libby Emmons a medical
13   doctor?
14       A.  I don't think so.
15       Q.  Do you know her educational
16   background?
17       A.  I do not.
18       Q.  Do you know what Post Millennial
19   is -- postmillennial.com?
20       A.  I don't.
21       Q.  Is that a publication that is
22   generally accepted in the medical
23   community as authoritative and reliable?

---

Page 156

1        MR. MCKAY:  Object to the form.
2        A.  I don't know.
3        Q.  Doctor, I know we talked about
4    the -- I'm switching gears on us a little
5    bit.  You can put the report to the side
6    for a minute.  I know we talked about the
7    other cases -- the four other cases where
8    you've offered your opinions as an expert
9    with respect to the laws that are similar
10   to the one here in Alabama.  Other than
11   those depositions that we talked about in
12   those cases, have you given any other
13   depositions before?
14       A.  North Carolina, Arkansas, now
15   Alabama.  I don't believe I was deposed
16   in the Florida case.  So I think that's
17   all of it.
18       Q.  Okay.  And aside from those
19   cases, I'm talking about over the course
20   of your career, have you ever acted as an
21   expert in, for example, a medical
22   malpractice case?
23       A.  No.

Dr. Patrick Lappert                                    4/3/2024

Page 157

1    Q. Have you ever been a defendant
2  in a medical malpractice case?
3    A. Never.
4    Q. In those other cases involving
5  laws similar to the one here in Alabama,
6  do you know whether your expert testimony
7  has ever been precluded or limited?
8    A. It's my understanding that in
9  the North Carolina case, I was, I
10  guess -- I don't know what the legal term
11  is for it, but my testimony was not
12  brought into the case. In Florida, I
13  believe that -- well, I actually
14  testified in that case, but it was a very
15  brief event. So --
16    Q. Are there any other states where
17  you -- we've talked about the four
18  already. Are there others that you
19  haven't given a deposition for or
20  testified for, but you've been consulting
21  in those cases?
22    A. Yes. As I said earlier, there's
23  a new case in Missouri now.

Page 158

1    Q. Oh, Missouri. That's right.
2    Okay. Any others besides
3  Missouri?
4    A. Not relating to laws as we're
5  discussing here, but in -- what's
6  developing as private litigation for a
7  harms medical malpractice.
8    Q. Tell me more about that.
9    A. I don't know a lot of details
10  yet. I know just know that it's been
11  discussed with me. I believe that's in
12  Minnesota. But I don't have a lot of
13  details for you. That's sort of a
14  forthcoming thing.
15    Q. Is it an individual patient who
16  is considering medical malpractice type
17  actions against the health care provider?
18    A. That's correct.
19    Q. And have you just been
20  approached by one individual about that?
21    A. A legal -- a legal -- a law
22  office has approached me about it and
23  asked me to review confidential patient

Page 159

1  records.
2    Q. Okay. Have you been contacted
3  by anyone else for similar cases?
4    A. Not that I can recall, no.
5    Q. I saw your rate listed in your
6  report. I think you have indicated that
7  you're being paid $400 an hour. Does
8  that sound right?
9    A. Yes.
10    Q. Is that still your rate today?
11    A. Yes.
12    Q. Do you know how much you've
13  billed to date on this case?
14    A. I don't. Off the top of my
15  head, I don't know.
16    Q. Okay. Do you have an estimate?
17    A. I would be guessing at somewhere
18  between 3 and $4,000 for the preparation
19  of the written opinion. That's a guess.
20    Q. And in preparing your opinions
21  in this case, I assume that you talked
22  with the -- with the attorney general's
23  office. But is there anyone else that

Page 160

1  you've spoken to that has helped you form
2  your opinions in this case?
3    A. No.
4    Q. Do you have an estimate of how
5  much you've billed in all of the cases
6  where you're acting as an expert witness
7  on issues similar to the law here in
8  Alabama?
9    A. It would be a wild guess, but --
10  it would be a wild guess. I think in the
11  Arkansas case, it was somewhere around
12  $26,000 or something like that. In the
13  Florida case, less than that. Plus the
14  time to appear in court and all of that.
15    MRS. VAGUE: Okay. I think if
16  we take just a quick five-minute break
17  and let me check my notes, I think we
18  might be reaching the end here, if y'all
19  can just bear with me.
20    THE WITNESS: Okay.
21    THE COURT REPORTER: We're off
22  the record.
23    (Whereupon a brief recess was

Dr. Patrick Lappert                                    4/3/2024

Page 161

1    taken from 12:38 p.m. to 12:45 p.m.)
2        Q.  Doctor, just a couple more
3    questions, and then I'll let you get out
4    of here for today.
5            You mentioned earlier when we
6    were talking about your report that there
7    are some additional articles that you
8    read out of Finland and France.  Do you
9    remember that discussion?
10       A.  Yes.
11       Q.  Do you remember when those
12   articles came out, when that literature
13   was released?
14       A.  I think in the last couple of
15   months, a publication by the Finnish -- I
16   believe she's a pediatrician or a
17   pediatric endocrinologist.  Her name is
18   Riitakerttu Kaltiala from Finland.  A
19   very public discussion of the experience
20   in Finland with puberty blocking and
21   cross-sex hormones.
22       Q.  And did your review of that
23   article change your opinions in any way

Page 162

1    that you've given here today?
2        A.  No.  It only further
3    strengthened the position that it's a
4    huge controversy in the medical
5    literature that it's not -- that gender
6    affirmation is most definitely not
7    settled science by any means.
8        Q.  And the article out of France,
9    what was that article?
10       A.  That's an article that I read,
11   but I haven't looked through the
12   references of it yet.  It was a public
13   statement from the health professionals
14   in France essentially discussing the lack
15   of scientific evidence in support of the
16   gender affirmation of minors, the medical
17   and surgical transition of minors.
18       Q.  And just because I don't want to
19   be surprised at trial, do you think you
20   could spend a couple minutes for me
21   looking for those articles and you could
22   share them with me?
23       A.  Certainly.

Page 163

1        Q.  We can take a little break if
2    you think you would be able to find them
3    now.
4        A.  Okay.  I'll give it a shot.  I
5    can't promise you I'll find them, but --
6        MR. MCKAY:  We can disclose
7    those afterwards, but do we -- are you
8    going to look on your computer?  Do you
9    have them in your office?
10       THE WITNESS:  It would require a
11   search on the computer for those
12   articles, yeah.
13       MR. MCKAY:  And are these being
14   relied -- just to clarify for the record,
15   are you relying on them for the opinions
16   provided in your report?
17       THE WITNESS:  I am not.
18       Q.  And to further clarify, are you
19   going to rely on those articles in your
20   testimony at trial?
21       A.  No.
22       Q.  Okay.  All right.  Well, if
23   you're not going to rely upon them, I

Page 164

1    won't be surprised at trial.  So that's
2    fair, and we don't have to spend time
3    searching for them.  Save everyone some
4    time.  Thank you for that.
5            Okay.  Well, then I think with
6    that, I appreciate your time today.
7            You've told me about all the
8    opinions you intend to offer in this
9    case; is that correct?
10       MR. MCKAY:  Object to the form.
11       A.  Those we've discussed and those
12   that are contained in my opinion -- in my
13   report.
14       Q.  That's fair.  So everything is
15   either in your report or what we've
16   discussed today; is that correct?
17       A.  That's correct.
18       Q.  Any other opinions you intend to
19   offer that are either not in your report
20   or were not discussed here today?
21       A.  Not that I can think of.
22       MRS. VAGUE:  Okay.  Well, then
23   that's all I have.  If others have

41  (Pages 161 to 164)

Dr. Patrick Lappert                                           4/3/2024

Page 165

1    questions.
2            MR. MCKAY:  I have no questions.
3            MR. CHEEK:  Nothing from the
4    United States.
5            MRS. VAGUE:  Doctor, thank you
6    for your time.  I appreciate it.
7            THE WITNESS:  Thank you.
8            MR. MCKAY:  We would like to
9    read and sign.  We don't need a rush.
10   Just normal time on it.
11           MRS. VAGUE:  I think we only
12   marked one thing, which was Dr. Lappert's
13   report.  So I will send that with a copy
14   to everybody, to our court reporter here.
15           AND FURTHER DEPONENT SAYETH NOT
16
17
18
19
20
21
22
23

Page 167

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 166

1
2        CERTIFICATE
3    STATE OF ALABAMA   )
     COUNTY OF JEFFERSON )
4
        I hereby certify that the above and
5
     foregoing deposition was taken down by me
6
     in stenotype and the questions and
7
     answers thereto were transcribed by means
8
     of computer-aided transcription and that
9
     the foregoing represents a true and
10
     correct transcript of the testimony given
11
     by said witness upon said deposition.
12
        I further certify that I am neither
13
     of counsel nor of kin to the parties to
14
     the action, nor am I in anywise
15
     interested in the result of said cause.
16
        I further certify that I am duly
17
     licensed by the Alabama Board of Court
18
     Reporting as a certified court reporter
19
     as evidenced by the ACCR number following
20
     my name below.
21
22
        KRISTA PRICE, CCR
23      Certified Court Reporter

42  (Pages 165 to 167)

Dr. Patrick Lappert

4/3/2024

**A**

**a.m** 5:11 48:12
48:12 65:17,17
92:23,23
117:10,10
**Abigail** 153:6,10
153:11
**ability** 148:4,5
**able** 38:3 116:10
163:2
**acceptable**
147:22
**accepted** 154:22
155:22
**access** 111:3
**accessed** 139:12
**accessible** 144:5
**account** 150:15
**accounting**
93:20 95:6
**ACCR** 166:19
**achieve** 101:17
**achieved** 96:1
**acted** 156:20
**acting** 5:4 160:6
**action** 166:14
**actions** 158:17
**active** 28:12
100:2
**actual** 39:18
77:7 105:12
149:22
**adamant** 60:6
60:16 63:12
**addition** 15:11
51:11 149:20
**additional** 14:6
15:21 51:8
78:6 128:16
161:7
**address** 40:17
**ADF** 133:13
135:1 136:1
**adhered** 49:10
**adheres** 59:6

**adhering** 50:7
**administrative**
43:6
**administrators**
113:2
**adolescence**
107:11
**adolescent**
39:16 85:1
91:2 98:11,15
**adolescents**
93:19 104:9
105:1,3,17,19
106:12 107:1
**adrenal** 13:2
**adult** 35:18
54:15 98:16
101:19 109:15
126:19 134:19
140:8 141:15
**adulthood**
100:17 106:19
107:2,11,14,21
108:5 109:3
139:23
**adults** 7:9,20
53:20 54:22
108:16,20
109:5 110:1,10
110:13 111:4
121:6 122:22
139:18 140:4
140:14,23
141:1,12
**advanced** 10:1
**advised** 30:5
**advisements**
32:5
**advising** 30:1
31:21
**advisor** 133:9
**advocacy**
113:20
**advocate** 61:5
132:10
**advocated** 40:8

**aesthetic** 15:4
15:17 34:17
35:13,17 36:15
36:22 38:5,15
38:18,23 39:4
39:4,12,22
75:5,14,23
77:10,12 78:1
81:14 83:23
86:14 87:5
95:23 112:15
144:15 145:1
148:17 149:18
150:5,22
151:18
**affect** 39:23
150:4
**affirm** 106:16
**affirmation**
41:19 49:11
50:4,10 51:4
51:17 52:5,12
54:6,8 55:20
55:22,23 56:4
56:6,23 57:1,3
57:4,22 58:2
59:8,10 60:4,9
60:21,22,23
61:1,5 63:1,2,9
63:14 64:1
113:14 115:17
122:20 128:4,9
130:16 136:16
137:15,22
138:12 142:4
153:23 162:6
162:16
**affirming** 56:2
141:1
**afflicts** 69:13
**age** 35:16 59:7
87:23 88:12
89:5,13 90:18
92:3 93:20
94:17,18,19,22
95:5 98:14

101:5 109:3
122:12
**ago** 6:4 19:19
22:9,10 62:7
65:3 73:6
154:12
**agree** 37:13 55:8
96:13 97:15
123:23 140:4
**agreed** 2:2 23:16
**ahead** 7:2
**aim** 86:21
**aimed** 34:20
144:16
**aims** 75:14
86:15 101:7
**al** 1:8,14
**Alabama** 1:2,14
3:8,11,15 5:2,3
5:6,9 7:6,10
28:20 33:3,6
42:13,23 43:11
43:17 45:23
47:8 48:21
49:16,18 50:11
60:17 111:2,17
114:15 138:23
139:14 140:12
140:21 141:14
156:10,15
157:5 160:8
166:2,17
**aligning** 25:12
**Alliance** 113:4
113:10,16,19
133:3
**allow** 92:15
**alternative** 48:5
110:12
**alternatives**
47:21 57:6
**AMERICA** 1:10
**American** 95:22
**Amie** 3:5 6:5
**analysis** 152:15
**Andre** 130:12

133:16
**answer** 35:2
58:4 61:11
91:9 107:4
144:10 155:2
**answers** 9:15
166:7
**anticipation**
35:17
**anxiety** 70:23
**anybody** 102:19
**anywise** 166:14
**apart** 57:21
**apologize** 48:16
**apostolate** 116:2
116:3
**appear** 160:14
**appearance**
37:22 69:18
70:2,4,6,8,11
72:2 76:7,18
78:21,22 83:23
145:12
**appears** 139:12
**appended** 51:13
**appreciate**
102:13 164:6
165:6
**approach**
101:16,17
106:18
**approached**
23:20 29:11
73:16 158:20
158:22
**approaches** 99:9
110:23
**appropriate**
77:22 78:14
80:8 81:10,23
89:11 106:23
107:16 108:16
109:2,12
137:19 147:10
148:13 149:13
151:3,15

152:11
approved 120:6
APRIL 1:21
   5:10
area 10:5 130:9
areas 9:1,3,6,9
   10:16 14:19
   17:7 141:6
Arizona 133:1
Arkansas 43:3
   43:11,12 44:10
   44:14,20
   156:14 160:11
article 90:23
   91:5,8,17,20
   93:2 98:22
   103:2,19 104:1
   104:3 106:5
   153:3 155:4,7
   155:9 161:23
   162:8,9,10
articles 18:5,7
   103:1,7,20
   128:15,16
   161:7,12
   162:21 163:12
   163:19
ascribe 70:2
ascribes 69:17
   124:11
ascribing 70:7
   70:11
aside 156:18
asked 28:7
   32:12 54:7,10
   158:23
asking 46:12
   84:7 151:20
asks 144:22
ASPC 95:21
aspect 41:10
   149:12
aspects 41:15
   69:20 119:4,7
assessing 149:21
assign 2:20

ASSISTANT
   3:20
associate 78:20
associated 19:1
   105:5,9,12
assume 120:6
   137:5 159:21
assuming
   147:20
asymmetry 88:5
   88:17,18 89:4
   94:2
attended 51:15
attending 52:17
attention 128:22
   129:5
attorney 1:14
   3:11,20 159:22
augmentation
   75:22 76:14
   83:4,7,15,19
   83:20 84:5,9
   84:17 85:15
   86:10,13 87:22
   88:2,14 89:1,7
   89:12 90:6,9
   90:17 91:2
   92:2 93:5,23
   148:22 149:1,3
augmentations
   86:3 93:16,18
augmented 88:6
authoritative
   154:23 155:23
authors 20:2
autism 105:6
autonomy 111:8
available 56:8
   62:10 114:7
   128:8
AVENUE 3:14
aware 29:12,15
   40:14 53:23
   55:3,6 141:13
   141:17

| B |
| --- |

babies 86:20
back 19:4 48:14
   61:15 65:18,22
   68:18 95:1
   111:12 117:2
   117:11 118:17
   119:4 126:14
   130:7
background
   153:20 155:16
bad 148:18
   149:4
balance 87:1
ban 140:13,23
banning 111:3
BARRETT 3:18
base 32:3 64:10
based 20:20,22
   21:5 26:17
   49:14 61:2
   67:7 69:5
   70:19,20 71:6
   92:9 101:18
   104:11 112:12
   127:8 142:16
   152:15
bases 21:16
basis 101:22
   110:8 137:17
BDD 74:8,12,19
   77:16
bear 160:19
beginning
   145:17
begins 34:18
   56:11 144:16
begun 129:6
behalf 6:6
behavioral
   100:22
behaviors 70:22
beliefs 125:10
believe 43:8
   52:9 53:19

54:21 63:21,23
   64:23 73:1
   88:1,8 118:4
   156:15 157:13
   158:11 161:16
benefit 75:16
   87:7 109:21
benefits 30:2
   31:22
best 8:11 96:1
   128:7 155:7
better 25:12
   35:16 50:17
   102:3 111:9
   135:11
beyond 17:12
   18:6 38:1
   103:6 128:17
bibliography
   154:13
big 54:23 152:2
bigger 38:23
billed 159:13
   160:5
binding 57:23
Birmingham
   3:8 5:2,8,9
   45:2 114:15
bit 8:13 19:15
   40:6 48:15
   67:4 68:5 74:5
   83:3 112:7
   115:7 121:14
   138:1 141:18
   144:1,8 156:5
blockers 29:19
   31:23
blocking 161:20
blood 31:13
board 8:16
   166:17
bodies 113:2
   141:4
body 13:22 38:7
   49:4,5,10 67:1
   69:7,10,12

70:16 71:6,13
   71:18,21 72:13
   72:20 73:1
   74:6 75:7
   76:15,20 86:23
   87:1 102:5
   125:2 147:17
BOE 1:8
book 153:15
   154:11
born 35:9
BOWDRE 3:18
Bowers 52:10
   155:11
boy 39:16 40:4
   100:12
boys 35:22
   104:13
breach 81:7
breached 80:22
break 19:14
   33:10 36:9
   60:2 65:6 67:3
   116:18,21
   117:3,5 143:23
   160:16 163:1
breast 75:21
   76:13 83:4,6
   83:14,15,19,20
   83:21 84:1,5,9
   84:10,17 85:2
   85:14 86:2,9
   86:13 87:21
   88:2,14 89:1,3
   89:6,8,12,14
   90:6,9,10,17
   90:19 91:2
   92:2,4 93:4,6
   93:15,17 94:2
   146:6 148:7,21
   149:1,3
breastfed 86:19
breastfeed
   148:5
breastfeeding
   76:8 148:20

149:9
**breasts** 150:1
**breathe** 148:3
**BRIANNA** 1:8
**brief** 65:16
92:22 117:9
157:15 160:23
**briefly** 147:13
**bring** 87:1
**brings** 122:20
**broad** 56:15
96:22
**broadly** 54:11
56:4 77:12
**brought** 157:12
**building** 3:6
91:21
**bulk** 60:4
**business** 154:6

---

**C**

**C** 3:1
**California** 51:16
51:19 127:20
131:4,15
132:12 133:21
134:7,9,23
**call** 35:4 49:5
56:16 92:16
**called** 57:8
116:1 122:23
**calling** 92:8
**calls** 49:19,22
50:1
**candidate** 68:9
75:10 76:23
77:1,22 78:14
151:3,15
152:12
**candidates**
77:17
**capacity** 1:13
32:13,14,17
148:3 154:2
**care** 9:11 10:11
11:9,23 13:17

18:13 24:17
25:3,23 26:4
47:3,8,13,15
47:16,18,22
48:2,6,20,23
49:3,9,12,15
49:19,21,23
50:4,6,8,12,14
50:15,19,21
51:7,9,12 52:5
52:16,20 53:8
53:12 55:11,13
55:17,21 56:11
56:14,15,18,20
56:22,23 57:6
57:13,19 58:12
59:7 64:21
66:4 73:3 74:7
78:17 103:12
107:17 108:3
108:15,19
109:2,4,13,17
110:2,14 111:4
115:5 121:5,22
122:5 125:11
126:2 127:10
127:13,17
128:4,9 129:11
130:16 132:1,4
132:8,18
136:17,19
137:18,22
138:8 142:3,15
142:18,22
143:3 150:17
151:2,5,11,13
151:19 152:10
152:10 153:23
158:17
**career** 28:7
156:20
**careful** 97:9
**Carolina** 43:5
43:13 44:10,14
156:14 157:9
**carries** 36:6

**case** 6:10 13:10
35:1 37:8 41:9
41:14 43:2,3
44:10,12,21
45:10,12 46:3
46:6,23 47:4
70:10 79:15,20
85:12,12,21
92:11,11
117:14 120:7
120:11 126:11
128:2,6,19
137:16,16
141:11 145:1
152:15,15,18
152:18,19,20
156:16,22
157:2,9,12,14
157:23 159:13
159:21 160:2
160:11,13
164:9
**cases** 39:13 44:5
44:7,17 112:2
119:15 156:7,7
156:12,19
157:4,21 159:3
160:5
**castration**
146:19,22
**casual** 147:23
**categories** 83:16
**categorization**
72:18
**categorizes** 72:5
**category** 20:10
56:16 66:22
71:22 72:9,13
72:22 76:15
85:18 86:14
94:22 96:22
**catholic** 114:20
115:12 116:2
**cause** 5:12 31:8
166:15
**caused** 101:3

148:7
**CCR** 1:23
166:22
**certain** 35:16
**certainly** 108:4
108:10 110:15
128:1 147:8
152:19 162:23
**certainty** 49:7
78:9
**CERTIFICA...**
166:1
**certified** 2:6 5:1
8:16 166:18,23
**certify** 5:4 166:4
166:12,16
**chain** 122:5
**challenge** 80:12
**challenged** 43:2
**challenging**
41:11,16,18
42:2 149:17
**change** 21:3,8
38:6,22 39:1
143:17 144:2,3
145:5,11 147:2
149:23 152:21
161:23
**changed** 63:9
**changes** 86:19
**changing** 37:21
152:3
**characteristics**
22:2 102:6
**CHARLES** 3:13
**chat** 117:2
**check** 160:17
**CHEEK** 3:20
165:3
**Chest** 146:5
**child** 11:5 33:22
35:6,8,15 59:8
101:4,15,20,21
102:2 106:20
122:14
**children** 10:11

11:10,23 12:3
35:1 50:11
76:6 99:9
100:10 101:1
104:9,12,23
105:17 106:7
106:11 107:1
121:6 122:20
**choose** 139:23
**Christian**
113:19
**chronic** 9:11
**church** 113:1
**circle** 111:12
**circumstance**
78:23
**circumstances**
81:10 112:13
**citations** 18:12
104:2 154:14
**cite** 104:6
128:14
**cited** 18:6 51:14
52:17 90:23
93:3 104:4,5
128:17 153:3
**Civil** 3:22 5:6
**claim** 25:15 50:9
**clarification**
29:1 83:18
**clarify** 24:6 29:5
34:2,5 58:15
66:7 84:12
109:9 163:14
163:18
**CLARK** 3:6
**classify** 85:20
**clear** 15:5 57:10
119:19
**cleft** 11:11 33:23
35:9,10
**clinic** 27:15
45:22 60:4,7
62:17,22 63:13
**clinical** 62:17
**clinician** 103:17

Dr. Patrick Lappert                                                    4/3/2024

137:9
**clinics** 50:3
123:21
**cognitive** 100:22
**cognitively**
98:15
**colleague** 54:19
130:5
**colleagues** 52:23
53:7 55:4
104:5
**collection**
154:18
**colloquium** 53:3
**colporrhaphy**
146:18
**column** 95:18
98:10
**Combat** 79:16
**combination**
102:9
**come** 25:6 40:11
73:12 117:2
128:22 129:5
134:3
**comes** 129:9
131:7 132:20
134:13
**comfort** 25:18
**commencing**
5:10
**commensurate**
37:18
**Commissioner**
5:4
**committed**
81:17
**common** 37:21
38:10 74:14
75:22 76:5,9
79:20,22 86:21
124:21
**commonly** 53:9
**community**
129:21 154:22
155:23

**comparatively**
147:20 151:22
**compared** 150:4
**compelling** 49:4
**complete** 136:12
136:21,21
137:1 138:4
**completed** 118:5
118:10
**completeness**
138:2
**complex** 105:10
**compliance** 2:12
**complication**
77:12
**component**
105:20
**comprehensive**
12:23 18:12
135:14
**compromise**
145:16
**compromising**
25:19
**compulsive** 20:9
70:22 72:20
**computer** 93:12
163:8,11
**computer-aided**
166:8
**conceal** 147:21
**concerted** 121:3
**conclusions**
154:9
**condensed**
119:10
**condition** 23:5,8
31:9 62:20
69:13 100:14
116:8 135:10
**conditions** 13:4
13:5 16:2,4
**conduct** 80:23
90:13 94:10
95:14 110:3
**conducted**

147:19
**conference**
51:15,18 52:18
127:20,23
131:19 133:3
133:13 134:8
135:1 136:2
**conferences**
104:14 112:22
112:23 129:22
**confidence**
131:21
**confident** 86:23
91:11
**confidential**
158:23
**confirm** 13:5
98:5
**confirmation**
126:12
**confirmed** 21:19
29:4 30:15
**congenital** 10:19
11:10 13:12
28:11 85:5
90:10 94:20
**conjecture** 46:8
**conjunction**
79:7
**connected**
129:19
**connection** 6:20
40:22
**consent** 89:18
98:13 108:21
110:9 140:5,7
141:6
**consenting** 77:9
**consequences**
31:11
**consider** 9:5
37:11 38:16
73:17,21,22
85:19 90:21
109:4,19,22
110:2,7 138:8

145:21 146:4
146:15
**considerable**
123:18
**Considerations**
91:1
**considered** 18:7
66:17 67:15
85:7,23 90:12
92:5 122:16
148:18 149:4
**considering**
158:16
**consistent**
122:16
**constitutes**
122:18
**consult** 78:11,17
151:1,12 154:5
**consultation**
37:5 77:23
78:19 87:15
97:9,17 149:20
150:6,22
**consulted** 30:21
**consulting**
151:23 157:20
**contact** 32:10
41:4 123:19
**contacted** 40:21
159:2
**contained**
164:12
**contains** 120:9
**content** 72:1
**continuum** 57:1
**contrasted** 48:7
**controversy**
162:4
**convened** 133:3
**conversation**
31:10 53:4,10
59:23 60:1,5
60:11,14 61:17
64:14 69:1,6
75:18 77:5

78:2 80:11
87:16 103:16
111:18 115:23
116:4,6 131:19
132:13 151:7
152:7 155:10
**conversations**
32:8 52:22
62:2 103:9
135:5,17
**COORDINA...**
3:23
**copy** 89:22
91:19 117:15
119:20,20,23
165:13
**correct** 8:17,18
9:19,20,23
11:6,21 12:9
14:10,18 15:8
16:20,23 18:21
21:14,15 24:3
27:19 28:2
29:7,9,21,22
30:3 32:22,23
36:8 40:10
42:3 45:7 47:5
47:6 54:17
66:6 82:5
84:10,11,19
94:10 95:10
97:21 109:15
111:22 120:7,8
120:11,12
127:22 139:1,7
140:19 148:23
149:6,7,9,10
152:13 158:18
164:9,16,17
166:10
**corrected** 39:20
**correction** 39:15
85:6
**corrections** 94:1
**correctly** 44:1
90:14 94:4

Dr. Patrick Lappert                                              4/3/2024

96:11 98:18,19
127:1 134:15
138:16 142:5
143:21
**cosmetic** 15:3
27:23 28:5,13
28:17 34:1,4,6
34:9,12,14,20
35:3,5 36:13
36:19,21 37:3
37:5,11 38:5
38:10,15,18,21
39:9,10,16,19
66:13 75:10,23
76:20 77:1,17
79:8,14,21
82:8 83:13
84:3,5,18,22
85:7,20 86:3
86:10 87:22
88:13 90:6,9
93:23 94:8
95:8,9,12
97:23 143:15
144:14 145:2
147:10 149:1
149:13,18
151:4
**counsel** 2:4,16
2:18 5:7 120:3
166:13
**counselors**
113:3
**counterpart**
98:16
**COUNTY** 166:3
**couple** 9:15 25:5
39:7 62:7
64:13 68:11,18
73:6 93:10
118:17 161:2
161:14 162:20
**Courage** 116:1,2
**course** 68:23
76:10,19 78:18
87:14 88:21

112:17 156:19
**court** 1:1 2:6,13
5:20 6:17
65:14 92:20
117:7 119:21
160:14,21
165:14 166:17
166:18,23
**cover** 21:16
**craniofacial**
10:3
**cranium** 10:21
**criminal** 81:22
82:3
**criteria** 36:2
50:16 57:7
143:12,14
**criterion** 126:12
**cross-sex** 29:19
30:7 31:23
41:20 100:11
100:15 101:13
122:15,17
161:21
**curious** 45:8
61:1 129:18
**current** 21:6
72:5
**cutaneous** 30:11

─────────────
### D
**D** 4:1
**date** 5:5 88:11
117:20,21
119:4 159:13
**day** 52:6 87:3,3
**dealing** 75:12
**Decatur** 129:21
**decided** 67:8
141:11
**deciding** 81:17
**decision** 43:9
147:1
**decisions** 50:18
98:17
**decline** 66:8,10

**declined** 66:4
80:3
**declining** 68:2
**decreased**
148:20 149:8
**dedicated** 51:16
52:4
**deep** 31:14
**deeply** 154:4
**default** 35:2
**defect** 34:18
36:21 37:7,12
38:3 89:3
**defendant** 3:10
157:1
**Defendants** 1:15
**Defending** 113:5
113:10,16,19
133:4
**defense** 43:6
**define** 34:7,11
47:14 48:21
**definitely** 68:19
89:15 162:6
**definition** 49:1
49:14 50:18
56:20
**deformities**
10:20,20,21,22
11:10 13:12
28:11 35:11,12
35:22 93:6
94:21
**deformity** 34:19
37:9,17 39:15
85:5,6 89:8,14
90:11,19 92:4
94:1,2
**degree** 59:5
**degrees** 37:14
75:7 85:11
**deleterious** 30:6
**demarcation**
37:2
**demographic**
94:23 100:9

104:11
**demonstrable**
39:19
**demonstrated**
109:21 110:6
**demonstrates**
100:14
**dentition** 11:15
**depathologizing**
72:16
**depend** 28:6
77:4
**depending** 59:7
76:1 81:2
101:5 122:12
137:17 146:1
151:20
**DEPONENT**
165:15
**deposed** 44:9
156:15
**deposition** 1:18
2:4,9,10,21
6:13,14 44:8
44:11 48:10
157:19 166:5
166:11
**depositions** 2:14
156:11,13
**depression**
105:8
**depth** 154:4
**DEPUTY** 3:18
**describe** 50:6
62:20 66:23
83:18 84:2
99:7 121:23
**described** 30:9
84:18 85:22
106:9 107:8
142:3
**describes** 55:21
**describing** 84:5
**description**
46:14 67:8
102:14

**desire** 51:3
**desires** 80:18
149:21
**destruction**
146:9
**detail** 91:18
154:4
**details** 38:22
153:21 158:9
158:13
**determination**
77:21 87:13
150:15,23
**determine** 26:3
59:12 61:21,22
78:13 139:6
151:2
**determines** 87:9
**determining**
100:5 151:14
**developed** 30:10
31:9 115:5
**developing**
158:6
**development**
10:18 11:5,13
12:2 85:1,2,3
**developmental**
10:18,23 11:3
11:12,16 53:2
85:5
**deviation** 48:3
**diagnosable**
105:7
**diagnose** 13:4
64:9 126:4
**diagnosed** 19:17
21:13,17 22:15
29:14 30:15
55:14 121:22
126:1
**diagnoses** 126:9
**diagnosing** 14:1
18:21 19:6
**diagnosis** 13:5
15:8 19:2,12

21:19 47:19
74:1,2 105:6
107:23 108:1,2
121:11 122:6,7
122:9 123:11
123:13,21
124:5,15,16
125:5,20 126:9
126:13 150:20
**diagnostic** 20:2
20:7,10,12
61:3 72:8 99:8
121:10 122:19
123:4
**difference** 20:15
20:18 104:22
106:18 108:18
**differences**
39:17 125:16
**different** 16:18
16:21 18:4
106:10,14
108:22 112:13
122:11 124:18
125:4,6,17
151:9
**difficult** 66:18
67:16 96:21
150:11
**difficulties**
31:13 48:9,11
77:8
**difficulty** 48:15
96:17 97:2
108:3
**disagree** 55:7
**disagreement**
96:16
**disappointment**
77:13
**disclose** 163:6
**discordance**
99:10 101:4,8
101:11,20,22
102:8 110:16
115:18 116:9

116:14
**discretion** 92:15
**discuss** 63:8
**discussed** 39:21
119:16 131:20
135:14 158:11
164:11,16,20
**discussing** 52:4
158:5 162:14
**discussion** 31:6
79:2 126:17
134:17 135:9
161:9,19
**Discussions**
119:6
**disease** 13:2,2,3
13:21 31:14
**diseases** 14:2
**disfigurement**
145:19
**disorder** 19:3,22
20:6,8 21:18
22:3 23:10
67:1,2 69:8,11
69:12 70:16,17
71:4,5,6,14,18
71:19,21,23
72:9,14,16,20
72:21 73:2
74:6 76:16,21
100:7 105:6
116:13 125:1
**disorders** 19:13
124:19,22
125:7 126:1
**dispute** 63:16,19
**dissatisfied**
73:10
**distinction** 19:8
19:9,20,23
20:1,5 26:21
36:12,19 38:14
38:20 42:18
60:18 61:6
84:8 121:16
122:3 125:19

126:8
**distress** 124:2
**DISTRICT** 1:1
1:2
**disturbances**
74:4 126:5
**divide** 83:12
**divided** 93:22
**DIVISION** 1:3
3:22
**doctor** 6:2 7:5
24:1 27:9
29:18 32:13
33:1 40:5
44:21 46:14
47:7 48:13
58:11 65:4,18
82:7 93:1 94:7
99:1 111:12
117:11 120:5
133:8 153:17
155:13 156:3
161:2 165:5
**document** 50:5
50:13 51:12,14
56:11,21 57:5
57:20 58:9
117:19 118:6
118:11,18
119:10 143:1,5
**documents**
45:14 62:5,9
62:13 129:2
138:6
**dog** 145:13
**doing** 44:3 72:17
89:16 97:17
120:15
**dose** 109:18
**doubt** 123:17
**Dr** 1:20 4:7 5:11
5:16 45:5,11
45:18,20 52:10
59:17 60:15
63:12 64:14
103:2,4,6,19

104:1,7 106:6
130:2,6,12
132:21,23
155:11 165:12
**draw** 36:17,18
38:14 154:9
**drawing** 36:12
42:18 84:8
121:15 125:21
**dress** 87:2
**dropped** 72:8
**DSM** 20:23 71:7
71:11
**DSM-5** 20:21
21:7 72:5,8,12
72:15
**DSM-III** 21:6
**due** 48:11
**duly** 5:17 166:16
**duty** 28:12
**dynamic** 102:1,3
106:1
**dynamics** 101:3
**dysmorphia**
75:7
**dysmorphic**
67:1 69:7,10
69:12 70:16
71:6,13,19,21
72:13,20 73:1
74:6 76:15,21
**dysphoria** 18:21
19:1,6,17,21
20:13 21:14
22:16 23:9,11
24:3,7,9 29:14
29:20 30:13,16
31:18 32:11
47:9 48:20
49:16 53:17
54:2,12,16
55:1,5,14 59:2
59:14 62:1,21
64:9 72:10,12
72:22 104:23
106:12 107:10

110:14,17
121:12,18,23
123:1,11 124:3
125:21 126:10
126:11 128:12
136:3 142:23
153:15
**dysphoric** 22:1
22:6 54:22
123:9,14

**E**

**E** 3:1,1 4:1
**e-mails** 129:15
129:16
**Eagle** 40:20,23
**ear** 35:22 37:8
39:15,18
**earlier** 29:11
30:9 31:2
65:23 80:1
83:5 85:11
111:13 127:3
138:19 140:4
140:11 157:22
161:5
**ears** 135:13
**ease** 93:14
**easier** 87:2
**easily** 67:13
**easy** 87:20
**edition** 20:23
21:1
**educate** 52:19
99:21 127:17
**educated** 127:9
**educating**
102:17 115:14
**education** 14:4
15:19
**educational**
113:1 153:19
155:15
**effect** 2:11 39:2
40:3
**effective** 138:10

effects 30:7,11
30:22 31:7
effort 40:15
121:3
eight-year
126:17 134:16
either 83:21
108:16 164:15
164:19
elements 118:16
119:7
Emmons 155:4
155:5,12
emotional 11:18
89:19 96:9,20
98:6
emotionally
69:14
emphatically
63:8
empiric 98:13
empirical 98:13
empowered
98:12
endocrinologi...
55:23 60:8
63:2
endocrinologist
12:9 13:23
45:1,18,21
123:7 130:3,10
161:17
endocrinologi...
126:21 134:21
endocrinology
12:12,15,20,21
13:9,16 14:7
16:9 17:3 53:1
133:12
endure 112:12
enlargement
83:21
enter 11:18
enters 53:9
entertained 48:7
entire 52:6

98:21
entirely 96:15
entirety 122:19
episodes 105:12
equation 150:11
erotic 148:6
essential 143:11
143:14
essentially 35:12
56:13 85:4
112:15 162:14
estimate 75:17
159:16 160:4
estrogen 30:12
30:20,23 31:8
et 1:8,14
Eternal 114:18
ethical 80:22
90:12 92:13
93:4 94:9
95:13
ethically 90:22
ethics 25:20
81:8
ethnicity 37:19
evaluate 80:15
evaluation
126:22
evenly 93:22
event 108:7
157:15
everybody
165:14
evidence 2:22
18:14 49:4,5,6
49:11 50:16
92:9,17 94:13
99:10 102:12
105:8,23 110:7
111:10 131:2,3
131:22 132:14
141:7 162:15
evidenced 116:7
142:2 166:19
evidences 102:5
evident 27:5

67:13 69:1
evolutional
86:18
EWTN 114:9,15
114:18
examination 4:3
5:13 6:1 22:1
49:20 79:4
86:17
examine 69:16
121:3 138:11
examined 5:18
100:20 111:9
154:3
example 11:9
12:21 13:1,20
35:8,19 39:14
63:11 75:21
79:17 80:1
81:5 84:23
130:2,13
131:22 140:12
145:6,9,10
148:2 156:21
examples 35:4
35:20 39:14
81:6 143:5
excludes 94:20
143:3
executed 40:2
executive 43:9
Exhibit 4:6
119:19 120:2
expect 106:17
111:8
expectation
66:11 78:8
106:13 152:4
expectations
77:10 78:4,10
87:7,10 96:7
96:19 97:4,8
97:12,19
expected 48:3
experience 30:1
31:21 47:18

75:6 110:16
132:14 135:10
150:12 152:14
161:19
experienced
84:14 141:8
experiences
101:11
expert 6:8 8:20
9:1,5 14:17
16:11 17:4
18:20 19:5
24:2,12 36:11
44:4 111:15
112:2 117:13
128:15 156:8
156:21 157:6
160:6
expertise 9:22
10:6 12:12,14
12:18 14:19,21
17:7 18:22
19:7,11 53:1
107:4
explain 11:8
47:11 76:16
112:7
explaining 60:3
explanation
70:1
exposure 15:15
express 82:8
expresses 78:19
101:21
expressing
100:11
extended 152:6
extensive 15:14
71:15
external 76:17
eyes 135:12

―――――――
F
―――――――
face 35:18 38:7
52:13 67:6,22
68:14 69:2

145:15
facial 21:22,22
25:7 67:12
81:14
fact 57:19 58:1
62:22 85:14
107:12 138:12
141:14 141:20
141:23 142:2
factors 66:16
facts 80:6
faculties 148:8
faculty 148:2
failing 76:12
fair 12:5,7 18:18
77:14 142:10
164:2,14
fairly 12:23
26:15 62:16
87:20
familiar 17:16
17:22 40:7
50:21 51:4
114:14
family 100:23
101:2 102:1
105:20,23
126:18 130:12
134:17
far 69:22 79:21
110:18 123:20
fat 83:22
favor 42:11
favored 104:12
feature 124:21
FEDERAL 3:23
feel 61:4 80:17
feeling 141:3
feelings 125:11
female 30:19
feminine 66:14
67:21,22 68:13
68:14
feminine-appe...
67:6 68:20
feminization

21:23 67:12
69:2
**feminized** 66:12
**field** 8:20 10:7
14:7,17,22
15:10,21
148:16
**fields** 16:18,19
16:20 17:2
**figure** 7:14
**files** 118:19
**find** 105:22
163:2,5
**finding** 34:23
62:16
**fine** 33:11 46:4
65:8 74:10
**finish** 118:18
**Finland** 129:1
161:8,18,20
**Finnish** 161:15
**first** 5:17 40:21
50:20,22 68:6
93:13 98:9,10
99:11 120:18
121:2 136:10
136:11 144:8
145:4
**firsthand** 29:23
**fit** 56:15
**five** 22:10 26:6,7
26:12 33:13
65:11,12
146:21
**five-minute**
117:5 160:16
**flip** 136:5
**Florida** 43:3,8
43:13 44:12,20
156:16 157:12
160:13
**focus** 68:4 145:3
**focused** 97:10
104:8 106:6
**follow** 64:7
**followed** 56:23

100:16
**following** 5:13
76:8 96:2
103:12 166:19
**follows** 5:18
**footnote** 153:4
155:3
**footnoted**
154:13
**force** 2:11
**foregoing** 5:7
166:5,9
**form** 2:17 9:2
10:15 12:6
16:14 17:21
18:9 21:9
22:21 24:4
25:4,14 26:19
29:8 30:4 32:1
32:7 34:13
36:16 38:8,22
39:1 40:13
41:5 42:7,14
45:19 46:17
47:10 50:2
51:10 52:21
53:13,18 54:3
56:9 57:17
58:6 59:4
61:18 63:17
67:11 69:21
71:9,20 72:7
77:3,18 79:10
80:9 81:19
82:2 86:11
91:15 92:7
94:11 97:5,20
102:21 105:18
107:18 108:17
109:16 110:4
112:3 113:17
114:1 115:9,21
124:6 125:8,12
127:6,14 130:1
132:9 135:2,20
137:20 139:2,8

140:6,15 141:2
142:12,19
144:12 147:3
148:15 154:10
155:1 156:1
160:1 164:10
**formal** 128:10
**forthcoming**
139:13 158:14
**Forum** 40:20,23
**found** 22:2
60:18 61:1
63:14
**four** 26:12
111:21 156:7
157:17
**France** 129:1
161:8 162:8,14
**Francisco** 51:21
52:13 131:4,14
131:18,20
**FRANKLIN** 3:4
**free** 132:13
**free-flap** 146:13
**Freedom** 113:5
113:10,16,19
133:4
**freelance** 153:12
**friend** 32:15
**front** 91:9,17
**full** 2:11
**fullness** 25:16
**fully** 116:11
**function** 143:18
145:16 146:7
146:10 147:12
148:12,17
**functional** 34:19
37:10,17 85:8
85:9 145:20
**functionally**
35:14
**further** 36:10
137:7 141:19
162:2 163:18
165:15 166:12

166:16
**future** 138:14,21
139:17

----

**G**

**gain** 101:2
**gained** 10:8
**gauge** 66:13
**gears** 156:4
**gender** 18:21
19:1,2,6,12,17
19:21,21 20:6
20:8,13 21:13
21:18 22:1,2,5
22:15 23:9,10
23:11 24:2,7,9
25:12 29:14,20
30:13,15 31:17
32:11 47:9
48:20 49:11,16
50:3,10 51:4
51:17 52:5,12
53:16 54:1,6,8
54:12,16,21
55:1,5,14 59:2
59:14 60:4,20
61:23 62:20
64:1,9 67:1,18
70:15 71:4,5
71:17,22 72:9
72:10,12,16,22
99:10 100:7
101:4,8,12,20
101:21 102:8
104:23 106:12
107:10 110:13
110:16,16
113:14 115:17
115:17 116:9
116:13,13
121:12,18,23
122:20,23,23
123:2,3,9,11
123:16 124:12
125:20 126:10
126:11 128:3,8

128:12 130:15
136:3,16
137:15,22
140:23 142:23
153:15,23
162:5,16
**gender-affirm...**
7:7,10,18,22
8:3,10 23:22
25:3 29:6
43:19 53:12
55:15 57:14
58:12,18,22
63:22 64:4,16
66:4 73:12,16
107:17 108:15
109:1,4,13
110:2,14 111:4
132:1,3,7
136:19 140:13
141:15 145:22
**general** 1:14
3:11,18 9:10
10:9 12:16,22
14:5 46:13
74:15 95:20
116:5 131:13
131:16 141:20
141:23
**general's** 159:22
**general-affir...**
108:19
**generally** 35:2
148:16 154:21
155:22
**genital** 109:19
**genitalia** 146:9
**germane** 10:19
17:9 105:22
**getting** 71:8
**girl** 85:1 88:2
**give** 33:9 46:12
47:3 48:23
74:22 98:12
113:13 163:4
**given** 6:12,13

44:16 113:5,22
114:2,22
138:12,19
156:12 157:19
162:1 166:10
**giving** 6:9
**global** 114:19
**go** 7:2 9:16 31:4
59:13 61:22
69:23 76:19
77:20 92:18
98:22 100:4
120:13,16
122:8 139:22
**goal** 101:10,14
136:13,14,16
136:19 137:2,4
137:5,9,11
138:6
**goals** 67:12 96:7
96:19 97:3,7
97:12
**goes** 37:14 85:11
**going** 6:9 7:2
23:13 48:13,21
65:5 79:8
93:11 105:21
107:9 116:17
116:21 121:1
126:16 136:9
136:10 141:11
153:2 163:8,19
163:23
**good** 6:2,3 65:6
65:7,13 67:9
86:8 116:19
117:6
**Gosh** 26:12
28:21
**Gotcha** 114:21
116:15
**graver** 152:22
**greater** 108:4
**grief** 78:20,20
**grounds** 2:20
**group** 20:18

59:6 94:17
116:4
**grows** 102:4
**growth** 35:18
**guess** 12:7 18:3
71:2 94:22
98:1 118:22
119:1 128:7
157:10 159:19
160:9,10
**guessing** 51:23
83:9 142:16
159:17
**guidance** 142:4
**guide** 50:17
**guideline** 48:8
56:17,19 57:8
**guidelines** 16:11
16:19,23 17:5
17:9,13,14,17
17:18,20,23
18:2,8,11,18
64:7

---

**H**

**H-A-S-C-I**
134:4
**H-O-R-V-A-T...**
134:5
**habit** 17:23
80:13
**Hacsi** 134:4
**hair** 24:17 25:6
25:7,11 30:10
**half** 28:16,17
52:6 95:7,12
**halfway** 90:4
143:10
**hand** 10:21
17:10 68:17
**handful** 26:5
**happened** 82:12
115:22
**happening**
122:12
**happens** 102:8

133:23
**happiness** 25:18
101:15 137:6,7
137:12
**hard** 66:12
75:17
**harm** 49:8,8
92:10,17 112:6
143:18 144:22
147:11,14,16
148:1 150:5
**harmful** 48:4
**harms** 108:10
108:11 109:20
147:18 150:7,8
158:7
**head** 74:13
129:4 159:15
**health** 14:17,20
14:22 15:1,10
15:22 16:2,4
16:10 17:3
73:3 78:17
103:11 115:5
121:22 124:18
124:22 125:1,7
125:11 126:1,2
126:4 127:12
127:17 129:11
132:17 137:22
150:16,17,20
151:1,11,13
152:10 158:17
162:13
**health-related**
98:17
**hear** 6:19 26:1
99:11
**heard** 41:7
99:17,20
**hearing** 109:10
**heart** 31:14
149:19 150:5
**heated** 116:7
**heavily** 154:12
**help** 73:3 78:12

121:13 144:7
144:10
**helped** 160:1
**helpful** 102:15
103:4 115:14
130:5,17
**helping** 86:6
102:2
**high** 48:4 49:6,8
88:3 109:18
110:6 113:7
150:10
**high-dose** 24:18
30:7,11,19,22
31:7
**higher** 97:10
**highlighted**
93:14 95:3
98:9
**historic** 20:7
100:9 104:11
107:12
**historical**
116:12
**history** 33:23
100:13
**hold** 8:19,23
14:16 24:11
**hopefully** 40:1
**hormonal** 57:3
108:9 125:2
**hormone** 30:8
**hormones** 29:19
31:23 41:21
109:18 161:21
**Horvath** 134:5
**hospital** 133:9
135:7
**hour** 65:5
116:17 159:7
**Hruz** 130:2
132:21,23
**huge** 162:4
**human** 144:4
145:15 146:7
146:10 148:1

**hump** 37:15,16
37:18 149:23
**hypercholeste...**
31:12
**hypertension**
31:12

---

**I**

**identification**
120:4
**identify** 8:8
123:1
**identity** 19:2,12
19:22 20:6,8
21:18 22:3
23:10 25:13
67:2 70:15
71:4,5,18,23
72:9,16 100:7
101:12 114:9
116:13
**III** 20:23
**impact** 75:9
**implies** 49:3
56:20
**important** 15:1
61:4 77:9
105:21 106:1
150:21 151:7
152:1 153:1
**importantly**
100:23
**impose** 111:3
140:22
**impression**
68:16
**improve** 37:22
76:7 83:23
**improvement**
36:5 85:8
143:20 149:15
150:9
**improving**
34:21 75:15
86:16
**incisions** 147:16

**include** 18:11
  64:20
**included** 60:5
  142:14
**includes** 11:11
  55:21,23 62:23
  64:19 100:22
  154:14
**including** 10:20
  11:15 21:1
  121:6
**incumbent**
  126:3,6
**indicate** 64:15
**indicated** 22:18
  39:7 68:8,12
  69:5 70:14
  106:5 145:5
  159:6
**individual** 21:13
  21:17 54:13,15
  66:1 80:2
  89:12 90:18
  92:3 109:14,15
  133:15 158:15
  158:20
**individuals** 8:2
  8:7 24:13,16
  26:14 40:23
  43:20 46:16
  53:11,16 55:13
  88:23 89:2
  93:19 95:5
  107:9,13 115:6
  124:1 127:4,18
  129:14,19
  134:23 135:16
  135:23 154:1
**informal** 60:1
  87:17
**information**
  13:22 62:6
  64:19 139:9
**informed** 98:13
**initially** 54:8
**initiates** 96:4

**input** 150:16
**insistent** 122:16
**insists** 55:20
**instances** 12:3
  38:2
**insurmountable**
  108:20
**intend** 120:10
  164:8,18
**intended** 108:10
**interchangeably**
  38:19
**interest** 115:5
  135:11
**interested** 115:8
  166:15
**interesting**
  60:18
**interior** 70:7
  76:17 108:6
**intern** 130:7
  133:9
**interrupted**
  48:11
**intervention**
  13:6 100:2
  137:8
**interventions**
  108:11
**interview**
  155:11
**introduction**
  56:12
**introductory**
  57:19
**invasive** 101:16
**Inversion** 146:8
**invisible** 147:22
**invitation**
  113:12
**invited** 40:17
  112:18 113:12
**involve** 143:18
  147:11
**involved** 10:10
  11:13 13:10

37:4 46:15,16
  46:19 66:17
  115:23 121:11
  139:10
**involves** 144:22
  146:5,8 147:15
  152:20
**involving** 12:2
  157:4
**issue** 34:16
  59:21 99:2
  105:10 108:20
  111:9 112:18
  138:11 140:16
  153:15 154:3
**issued** 16:12
**issues** 15:1
  38:13 39:19
  67:19 89:18,18
  116:11,12
  126:18 130:20
  131:11 132:16
  134:17 139:11
  160:7
**iteration** 20:11
  _____
  **J**
**JASON** 3:20
**JEFFERSON**
  166:3
**Journal** 153:14
**judgments**
  92:14
**jump** 7:2
  _____
  **K**
**Kaltiala** 161:18
**keep** 87:17
  135:12
**keeps** 130:14
**key** 78:1
**kin** 166:13
**kind** 12:18 15:9
  25:23 26:4
  35:14 74:8
  77:6 87:15

129:14 149:11
**know** 6:12,16,21
  7:8,9,17,20 8:1
  8:6,8 9:14
  11:15 18:5
  25:8,15 26:13
  30:17 31:16
  36:5 39:7,19
  40:7 41:3,9,14
  41:22,23 44:22
  45:9,9 46:1,3,5
  46:7,9,9 47:7
  49:10 53:15
  54:4,11,23
  55:7,12 64:3
  64:18 68:23
  73:5 74:11,14
  83:5 88:16,21
  91:21 103:1
  104:7,21 114:6
  115:20 122:14
  125:13 128:14
  129:16,23
  131:22 135:7
  137:3 138:22
  142:10 145:11
  147:12 148:10
  150:1 153:19
  153:22 154:2,8
  155:2,15,18
  156:2,3,6
  157:6,10 158:9
  158:10,10
  159:12,15
**knowledge** 8:11
  45:8 53:14
  84:13 112:9
  124:23 136:4
**known** 8:12 41:4
  77:12 108:11
**Krista** 1:23 2:5
  5:1 166:22
  _____
  **L**
**L** 1:23 2:1,5 5:1
**lack** 110:8

162:14
**ladies** 153:16
**Ladinsky** 45:5
  45:11,18,20
  59:17 60:15
  63:12 64:14
**language** 84:15
**LAPPERT** 1:20
  5:11,16
**Lappert's** 4:7
  165:12
**large** 152:20
**laser** 24:17 25:6
  25:11 30:10
**late** 27:7 88:10
**latest** 20:11
**law** 40:5 41:10
  41:15 42:2
  43:1,14 59:21
  112:19 140:16
  140:22 141:5
  141:14,17
  158:21 160:7
**laws** 2:12 42:6
  42:12,16,19
  43:16 111:3,16
  156:9 157:5
  158:4
**lead** 13:6
**leading** 2:18
**leads** 70:21
**learn** 102:19
  113:9
**leaves** 60:21
**led** 112:15
**left** 48:18 73:10
**legal** 113:20
  157:10 158:21
  158:21
**legally** 98:12
**legislation** 43:10
**legislature** 40:9
  40:12,18 59:21
**lesions** 33:21
**let's** 8:13 19:14
  28:23 40:5

67:3 74:5 83:3
92:18 93:12
95:1 117:2,20
143:23
**level** 49:6 50:16
66:14 111:7
147:16
**levels** 141:7
**liabilities** 141:8
**Libby** 155:4,5
155:12
**licensed** 166:17
**life** 32:19 34:21
37:23 39:2
40:3 75:13,15
86:16 108:7
144:17 145:18
**life-changing**
152:4
**lifetime** 112:10
**LIGHTFOOT**
3:4
**likelihood** 36:4
49:8 97:11
105:7 150:3,9
**Likewise** 122:22
**limit** 25:8
**limited** 39:8
94:19,22 157:7
**line** 37:2 136:11
**lip** 35:9,10
**list** 130:14
134:10 135:14
**listed** 159:5
**literature** 18:1
18:15,17 21:2
47:21 51:13
52:17 71:12,13
100:6 106:15
109:6 121:4
127:12 128:2,7
128:16,21
129:2 161:12
162:5
**litigation** 158:6
**little** 8:13 19:15

40:6 48:14
65:5 67:4 68:5
74:5 78:5 83:3
85:3 112:7
115:7 121:14
138:1 141:18
143:23 144:8
144:11 156:4
163:1
**LLC** 3:4
**lobbied** 42:6,8
**lobby** 42:16
**local** 114:16
**long** 52:22 60:10
97:16 118:14
126:17 131:18
134:16
**longer** 101:11
116:22
**look** 52:1 67:21
67:23 89:20
93:9,12 95:16
117:1 118:19
120:19 126:14
136:6 145:12
150:2 155:8
163:8
**looked** 65:22
162:11
**looking** 67:20,22
68:19 69:2
70:13 90:1
95:17 162:21
**looks** 42:17 87:4
**lose** 6:19
**loss** 143:18
144:23 145:20
146:7,10
147:11 148:1,2
148:4,4,5,6,7
148:12,17
149:2
**lost** 86:20
**lot** 10:11,17,23
11:12,16 13:9
77:4 110:17

116:7 158:9,12
**lounge** 135:6,7
**lower** 86:23
**lunch** 116:21

─────────
**M**
**ma'am** 133:14
**main** 108:18
**maintains**
154:17
**major** 105:8
**majority** 86:2
104:13
**making** 19:9,20
26:21 32:4
41:7 77:20
98:17 122:3,8
125:20 150:14
**male** 30:18
82:18
**malpractice**
81:17 92:6,9
92:16 156:22
157:2 158:7,16
**manage** 70:22
**managing** 31:13
110:23
**manifestations**
13:3
**manipulation**
60:8 108:9
125:2
**manual** 20:3,12
20:23
**Marci** 52:10
155:11
**mark** 119:19
**marked** 120:3
165:12
**marriage** 76:12
**MARSHALL**
1:13 3:12
**masculine** 67:20
67:23
**masculinization**
146:5

**massive** 85:2
88:16
**massively** 152:3
**matter** 152:22
**Matters** 153:7
**maturity** 89:19
96:10,20 98:6
**McGill** 103:3
**MCKAY** 3:13
5:23 9:2 10:15
12:6 16:14
17:21 18:9
21:9 22:21
24:4 25:4,14
26:19 29:8
30:4 32:1,7
34:13 36:16
38:8 40:13
41:5 42:7,14
45:19 46:17
47:10 50:2
51:10 52:21
53:13,18 54:3
56:9 57:17
58:6 59:4
61:18 63:17
65:10 67:11
69:21 71:9,20
72:7 77:3,18
79:10 80:9
81:19 82:2
86:11 91:15
92:7 94:11
97:5,20 102:21
105:18 107:18
108:17 109:16
110:4 112:3
113:17 114:1
115:9,21
116:20 117:4
124:6 125:8,12
127:6,14 130:1
132:9 135:2,20
137:20 139:2,8
140:6,15 141:2
142:12,19

144:12 147:3
148:15 154:10
155:1 156:1
163:6,13
164:10 165:2,8
**mean** 24:6,14
34:6 46:7
47:12 48:23
50:1 62:9
63:18 99:5
112:8 119:5
121:7 139:17
147:13 148:1
**meaningful**
140:8
**means** 6:14 39:4
47:18 162:7
166:7
**measurable**
87:6 149:22
**measure** 39:17
149:16
**medical** 16:21
25:20 27:11
32:22 43:18
46:22 47:21
52:23 60:23
63:1 108:1
115:16 116:11
116:12 121:4
123:20 124:4,8
124:15 125:2
126:6 127:11
129:20 131:1,2
131:21 132:14
153:17 154:22
155:12,22
156:21 157:2
158:7,16 162:4
162:16
**medically** 80:8
**medications**
32:6 55:15
58:18 64:5,16
**medicine** 16:18
**meet** 50:15 57:7

132:22 133:6
133:19,22
135:8
**meeting** 132:12
133:20,22
**men** 27:8
**mental** 14:17,20
14:22,23 15:10
15:22 16:2,3
16:10 17:3
78:17 124:18
124:21 125:1,7
125:23 126:4
150:17,20
151:1,11,13
152:10
**mentioned** 83:4
103:18 111:14
115:3 119:3
134:6 147:9
161:5
**Mercy** 153:7
**messages** 129:16
**met** 6:4 45:2
46:8 51:21
78:10 129:22
130:4,7,14
132:23 133:7
135:1 136:1
**metoidioplasty**
146:11
**MIDDLE** 1:2
**middle-aged**
27:8 31:2
**mild** 77:16
**Millennial**
155:18
**mind** 20:17
82:18 86:9
90:21 129:9
132:20 134:13
137:8
**Minnesota**
158:12
**minor** 33:16
34:2,4 39:9,11

46:19 59:1
109:14 136:13
137:2 138:5,13
138:20 139:16
139:22 151:21
**minor's** 46:22
**minors** 7:6,17
33:4,6,19 47:4
55:5 60:17
63:22 64:2,5
64:17 90:12
93:5 108:16,19
136:22 138:9
138:22 140:17
142:1,23 143:4
143:6 162:16
162:17
**minted** 133:8
**minute** 19:19
92:19 156:6
**minutes** 6:4
60:12 65:11,12
162:20
**misinterpreta...**
101:23
**Missouri** 43:22
157:23 158:1,3
**misstate** 11:21
**misunderstan...**
102:1 116:8
125:22
**misuse** 84:15
**model** 47:19,22
49:9,17,21
60:21 61:3
62:21,23 64:8
103:13 105:14
106:9 107:7
109:17 123:22
137:16,22
**moderate** 77:16
**modification**
21:22 125:3
144:19
**Mol** 130:12
133:17

**Montgomery**
3:15 40:18
**month** 119:2
**months** 128:23
161:15
**morning** 6:2,3
**morphed** 43:10
**motivation** 15:6
25:16 66:21
68:8 75:19
78:3,7 87:19
89:19 112:5
**motivations**
67:4 97:22
112:1,14
**motor** 11:14
**mouth** 10:22
11:11
**move** 98:23
**moved** 76:14
**mutilating**
144:19 145:7
145:23 146:4
146:16,20,23
**mutilation**
109:20 145:9
146:14

_____
**N**
_____
**N** 2:1 3:1 4:1
**name** 21:8 45:13
46:10 52:11,14
72:15 103:15
131:4 133:16
134:1,4,5
161:17 166:20
**named** 133:16
**names** 46:13
72:10 130:22
135:4,19
**natal** 123:3
**nationwide** 7:16
7:17,21 138:23
**native** 146:6
**natural** 100:13
**nature** 18:10

56:2 84:18,22
**Naval** 133:9
**Navy** 28:12
**near** 29:2
**nearly** 84:14
93:15
**necessarily**
80:21 81:9
94:8
**necessary** 2:15
57:7
**need** 33:9,10
47:11 116:21
165:9
**needs** 137:10
**neither** 166:12
**network** 114:10
114:11,13,19
114:20
**never** 21:12 29:6
29:18 108:15
109:12 157:3
**new** 157:23
**newly** 133:8
**nipple** 148:7
149:2
**nomenclature**
21:3
**nonbinding**
57:21
**normal** 35:14
70:13 78:23
165:10
**North** 3:7 43:5
43:13 44:9,14
156:14 157:9
**NORTHERN**
1:3
**nose** 35:11,13
37:15 66:12
67:20 68:13,20
70:5,12,13
145:12,13,16
148:3 150:1
**Notary** 2:6 5:3
**notes** 65:22

117:2 160:17
**number** 7:8 8:12
17:2 74:21
83:10 96:3,8
98:2 99:7
122:10 128:14
130:23 142:9
166:19
**numbers** 7:14
139:3,6

_____
**O**
_____
**O** 2:1
**Oakland** 133:10
**Object** 9:2 10:15
12:6 16:14
17:21 18:9
21:9 22:21
24:4 25:4,14
26:19 29:8
30:4 32:1,7
34:13 36:16
38:8 40:13
41:5 42:7,14
45:19 46:17
47:10 50:2
51:10 52:21
53:13,18 54:3
56:9 57:17
58:6 59:4
61:18 63:17
67:11 69:21
71:9,20 72:7
77:3,18 79:10
80:9 81:19
82:2 86:11
91:15 92:7
94:11 97:5,20
102:21 105:18
107:18 108:17
109:16 110:4
112:3 113:17
114:1 115:9,21
124:6 125:8,12
127:6,14 130:1
132:9 135:2,20

137:20 139:2,8
140:6,15 141:2
142:12,19
144:12 147:3
148:15 154:10
155:1 156:1
164:10
**objections** 2:16
2:19
**objective** 34:18
34:23
**observation**
26:18
**observers**
147:23
**obsessive** 20:9
70:20 71:1
72:1,19
**obvious** 26:15
**occasion** 51:20
**occasionally**
84:16
**offer** 23:6,17
25:9,18 35:15
50:3 56:22
62:22 110:13
110:18 120:10
164:8,19
**offered** 2:21
18:1 34:15
42:21 43:4,7
43:21 44:3
50:11 56:21
60:7,16 111:15
128:3 143:16
154:19 156:8
**offering** 63:13
64:1 79:11
108:12 128:5
140:18 141:9
154:6
**offers** 56:22
**office** 3:11 25:6
32:13 158:22
159:23 163:9
**OFFICIAL** 1:13

**oh** 33:8 54:20
126:3 134:2
149:1 158:1
**okay** 6:16,22,23
8:13 9:12,14
10:4 11:2,20
12:8,18 13:14
14:21 18:16,20
19:14,19 21:4
21:12 22:8
25:21 26:6,8
26:10 27:14
31:1 35:7,20
38:1,11 42:10
42:17 43:12
44:13 45:6,17
46:21 49:22
52:3 53:11
54:20,23 56:5
57:9 58:4,10
62:12 64:3
65:14 67:3,7
72:11,23 76:22
81:15 83:17
85:16,19 90:3
91:11 92:1
93:9 97:14
103:18 107:6
108:14 109:7
113:21 114:16
114:21 116:16
117:3,23 118:2
118:7,21 119:3
120:23 121:13
121:20 123:10
123:23 126:14
131:8,9 132:21
134:2,14 136:5
136:9,18 137:3
137:14,23
139:21 140:3
143:7,9,10
144:13 145:3
149:11 153:5
156:18 158:2
159:2,16

160:15,20
163:4,22 164:5
164:22
**old** 27:6 88:5
**once** 88:22
107:20 109:2
**ones** 44:19 123:1
**ongoing** 135:11
**online** 154:16
**onset** 74:7,12
**open** 60:21
110:17 135:13
**operate** 45:22
**operation** 37:12
66:18 75:23,23
81:2 85:13
86:1,15,22
87:5 145:2
146:1
**operations**
146:3,18
**opinion** 42:22
43:5,8 89:10
95:11 108:8
109:11 119:7
120:5 128:5
140:18 152:15
159:19 164:12
**opinions** 6:8
44:4 47:3
112:2 120:10
156:8 159:20
160:2 161:23
163:15 164:8
164:18
**opposed** 101:19
**opposite** 123:2,3
**opted** 80:6 92:1
**option** 108:13
**options** 56:8,15
56:20,22 57:14
57:16 110:17
**oral** 5:12
**order** 13:4 37:22
50:17
**organization**

113:20
**outcome** 111:10
148:18 149:4
149:22
**outcomes** 87:6
96:1 111:10
**outlets** 153:13
**outside** 9:6 14:3
15:18 32:3
145:14
**outward** 34:22
78:21,22
**outweighed**
109:21
**overarching**
57:21 71:22
101:14

**P**

**P** 2:1 3:1,1
**p.m** 161:1,1
**page** 4:3 57:11
57:20 62:4,16
64:12,23 65:2
90:1 95:17,18
98:8 118:3,8
120:19 136:6
143:8 153:4
**pages** 62:18
**paid** 159:7
**palate** 11:11
33:23
**paper** 94:13,15
104:4,6
**papers** 104:4
129:5
**paragraph** 90:2
90:5 93:13
95:19 98:11
120:14,18,19
120:21 126:15
127:9 129:13
132:19 134:12
136:6 141:19
143:8,11
**paragraphs**

120:16
**parallel** 79:12
**paramount**
97:23
**parathyroid**
13:2
**parathyroidec...**
13:8
**parent** 46:19
**parents** 32:9
39:22
**part** 51:3,16
71:10 78:23
84:20 86:22,23
87:16 92:15
100:2 116:1
123:5 142:3
144:8 145:4
149:17 150:11
150:21,23
151:7
**participate**
17:13
**particular** 14:2
16:19 47:19
57:23 62:3
63:10 69:3
74:20 102:22
102:23 103:7,8
103:8,16,17
104:1,10
112:23 119:6
**particularly**
15:3 28:10
78:21 102:4
122:3 141:6
150:12
**parties** 2:3,19
166:13
**parts** 78:2
**passage** 40:8
42:6,16
**passed** 43:1
**passing** 135:17
**passive** 100:1
**pastoral** 76:4

115:15
**pastors** 32:9
113:3 116:5
**pathological**
15:7
**patient** 18:13
21:21 22:4
23:12 24:8
29:10 30:5,14
30:18 31:2,16
31:20 32:3
34:16,22 37:7
37:23 39:3,5
39:21 48:1
49:9 53:21
54:18 59:3
66:1,13,22
69:16 70:10
72:3,23 73:10
73:15 75:10,13
75:16,18 76:5
76:11,14,18,20
77:1,21 78:13
78:18 79:6,12
79:21,23 80:4
80:18 82:8
86:17,17 87:2
91:3 92:10,14
96:3,6,9 98:5
98:12 101:6,10
109:2 122:6,8
122:13 123:8
123:14 124:9
124:10,11
125:9 137:6,7
137:12,17,19
139:10 144:17
144:18,22,23
145:10,18
147:6 148:13
150:19 151:5
151:10,15,17
152:9,16
158:15,23
**patient's** 67:17
70:1 76:1 78:3

79:4 83:22
87:7,18 149:21
150:16
**patients** 16:1,3,5
16:7 19:16
20:19 23:19
25:5,10,22
26:4,11,14,23
27:6,14 28:18
29:13 30:1,8
31:22 32:2,21
33:3,5,14 38:4
50:7 53:16
54:1 59:13
61:23 66:23
69:14 73:11
74:17 77:9,15
79:17,18,19
80:16 88:17,18
89:5 94:18
97:23 136:3
138:13,20
139:16,18,22
143:15
**patients'** 15:5
**PATRICK** 1:20
5:11,16
**pause** 6:21
**pediatric** 10:2,2
10:18 13:11,16
126:19,21
130:3,9 133:12
134:18,20
161:17
**pediatrician**
9:18 123:7
130:11 161:16
**pediatricians**
126:19 134:18
**pediatrics** 9:22
10:7 11:1,3,23
16:10 17:3
53:2
**peer-reviewed**
18:5
**penalties** 81:22

82:3
**penectomy**
146:20,22
**penetrations**
147:17
**people** 8:9 40:19
112:5,11,12
115:15 121:15
123:17,19
129:20,21,23
135:1,13
136:20
**people's** 112:14
**percent** 28:9,14
33:13 75:4
93:21 100:12
100:17 105:4,7
**percentage** 8:1,9
28:13 33:10
74:23
**perfect** 77:17
117:4
**perform** 22:19
23:1,13,21
27:17 35:5
39:9,10 66:5,8
79:9 80:3,7
81:18 82:23
89:11 90:17
91:6,13 92:2
93:4
**performed** 25:1
25:2 27:22
29:6 33:15,19
34:1,4 36:14
36:20,22 82:9
83:7 87:21
89:1,6 93:16
93:18 104:18
142:1,8,8
153:22
**performing**
10:14 27:21
73:17 80:23
82:19 88:13
**persist** 107:14

**persisted** 108:5
**persistent**
107:10 122:17
**person** 23:17
87:23 108:7
114:8 121:17
121:17,21
122:1,2 152:21
**personal** 32:17
**persons** 15:2
32:10 58:11,17
58:21 110:15
121:6,8 127:10
141:9
**pertain** 116:12
**pertaining** 42:3
121:4
**pertains** 140:17
**phalloplasty**
146:13
**pharyngeal**
33:21
**PhD** 131:2
133:21
**PhDs** 126:22
127:13 129:12
132:18 134:21
**Phoenix** 132:23
133:11
**physical** 11:5
66:11 69:18
70:2,3,8 74:7
102:12 143:17
144:1,3,18
145:5 147:2
**physician** 15:14
27:2 32:14
97:16 147:5
**physicians** 15:2
56:7 57:15
135:8
**physicians'**
135:6
**pick** 126:16
**picture** 38:23
**places** 113:21

**persisted** 108:5
**plaintiff** 3:3
46:2
**Plaintiff's** 4:6
120:1
**Plaintiff-Inter...**
1:11
**plaintiffs** 1:9 6:6
41:6,11,15,18
42:1 44:22
45:1,12 46:10
138:7
**plan** 128:18
**planned** 40:1
**planning** 47:2
**plastic** 8:17,20
9:6 10:12 12:1
12:4,16 13:11
13:18,20 14:5
15:15 17:11
51:15,20 71:12
75:3 80:5
95:20,23 112:9
127:21 131:13
131:15 134:7
134:22 140:5
**play** 101:4 141:4
**please** 48:23
139:20
**Plus** 160:13
**point** 28:6
116:22
**Poland** 94:3
**Poland's** 85:22
90:11
**policy** 43:6
**population**
74:15
**portions** 119:14
**position** 49:13
64:4 80:20
81:12,13,16
90:16 94:6
106:22 107:15
107:19,20,22
108:14 109:1
109:11 121:20

123:10 124:3
125:23 132:7
146:18 162:3
**positive** 40:2
87:17 88:10
150:3
**possibilities**
96:22
**possibility** 150:4
**possible** 31:7,8
31:11
**post** 62:6 155:18
**postmillennial...**
155:19
**posts** 62:9
**potential** 30:6
75:16 150:7
**poverty** 106:15
**practice** 8:14,16
12:16 15:2
17:10 23:20
27:11,20 28:3
28:16,19 29:17
33:1,2,6,16
54:5 55:1
74:18 75:5
82:13
**practitioner**
98:3 101:1
130:12
**practitioners**
126:18 134:18
**preadolescent**
100:10
**preceded** 146:19
146:22
**preclude** 108:12
141:14
**precluded** 157:7
**preferred**
101:17
**preparation**
118:5,11
159:18
**prepare** 17:14
87:3 115:20

117:18
**prepared**
117:14 119:15
**preparing** 17:19
45:15 159:20
**prepubertal**
100:10 104:12
**prepubescent**
104:8,23
105:17 106:6
106:11,23
**prescribed**
29:18 30:12
**prescribing** 64:4
**prescription**
24:19
**present** 3:17
57:5 109:17
116:10 122:22
125:16
**presentation**
38:10 52:4
67:18 76:2,9
76:11 101:19
105:3,11
113:13 114:23
115:13 123:16
124:12,17
125:6
**presentations**
41:8 113:4,6,7
114:2,5
**presented** 21:23
22:4,22 74:18
128:4 137:21
**presenter** 133:1
133:2
**presenters**
132:11
**presenting**
30:19 106:19
106:20 133:12
**presently**
106:15
**presents** 56:18
59:1,8 122:13

123:8 125:1
150:19 151:10
151:17 152:9
**pressure** 106:16
**pretrial** 44:11
**pretty** 19:5
**preventous**
150:20
**Price** 1:23 2:5
5:1 166:22
**priest** 115:12,19
116:9
**priests** 116:4
**Primarily** 113:1
**principle** 57:22
**prior** 2:22 19:2
41:1 72:18
119:14
**privacy** 139:10
**private** 6:6
27:20 28:15,19
33:2,16 80:11
113:6,8 158:6
**probability** 48:4
**probably** 26:7
28:8,14,16
29:2 65:6 77:5
79:1 80:12
88:18 99:15
106:1 119:1,17
**probing** 78:6
135:9
**problem** 23:18
37:10
**problems** 30:20
**procedure** 5:6
39:9,11 79:8
82:9 145:6
**procedures** 25:1
33:18 34:2
82:16 84:3,3
91:7,14 93:21
95:6 140:5
148:11 149:6
152:19
**proceed** 67:9

148:13
**proceedings**
5:14
**process** 55:21
60:3 70:21
77:23 100:1
101:7 102:10
121:10 122:19
123:4
**processes** 10:19
11:13,14,18
18:23 20:10
37:4 57:2
69:23 100:22
103:5 105:23
111:1
**produced** 70:23
**producing** 85:8
**professional**
32:19 42:21
43:4,7,22
47:17 53:3
80:23 90:13
94:9 95:14
110:3 112:4
122:4 124:14
126:2 141:4
151:2,12,13
152:11
**professionals**
124:4,8 126:4
126:7 128:5
150:18 154:5,7
162:13
**proffer** 138:7
**profound** 78:19
108:6
**progression**
60:22 62:23
**Project** 114:9
**prominent**
52:12
**promise** 66:18
163:5
**prompted** 51:1
**proper** 68:9

**properly** 147:19
**proposing**
125:14
**proposition** 91:1
91:12 93:3
97:16
**prosthesis** 83:22
**protect** 112:5
**protocol** 59:3
104:22
**proven** 74:3
138:10
**provide** 53:12
63:21 64:16
109:12 132:3
136:20,21
**provided** 24:16
163:16
**provider** 16:6
73:3 78:17
121:22 125:11
158:17
**providers** 59:12
61:20 62:3
103:12 127:13
129:11 132:18
150:17
**provides** 56:7
57:13
**providing** 25:2
66:3 110:2
112:2
**provokability**
148:6
**Proximal**
146:21
**psychiatric**
15:12 71:12
74:2,3 79:13
108:2 110:21
152:6
**psychiatrist**
14:13 54:14
78:12 123:6
151:6,19,23
152:7

psychiatrists
53:20,22
103:10 126:20
134:20
psychiatry
15:15 16:7
53:1 152:23
psychological
11:17 18:23
55:22 57:2
69:13,22 79:3
79:7,19 110:22
111:1 126:5
psychologist
14:11 54:14
78:12 103:10
123:6
psychologists
126:20 134:19
puberty 29:18
31:23 100:16
161:20
Puberty-block...
41:20
public 2:7 5:3
41:7 43:14
112:18,19
115:23 141:5
161:19 162:12
publication
114:4 154:21
155:21 161:15
publications
126:23 128:21
130:15,17
154:19
publish 16:19,22
published 139:4
139:9,12
153:14 154:12
publishers
17:17
pull 119:13
pulled 93:1
purely 36:14,22
38:5,14 39:11

93:23 94:7
purpose 25:2,11
66:3
purposes 38:11
pursuant 5:5
put 36:3 41:22
66:22 94:21
115:13 149:12
156:5

**Q**

qualifies 86:8
qualify 123:12
124:2
quality 18:13
49:6 110:6
quantify 83:13
Quentin 130:6
question 8:5
16:15 17:1,9
18:4 19:4 26:2
28:7 34:3 37:2
41:13 54:5,7
58:16 59:22
61:8 71:2
91:10 94:12
106:2 107:4
108:22,23
125:4,14 138:3
140:19 151:8
questionable
90:22
questions 2:17
2:18 6:7 9:16
32:12 48:17
55:10 61:13
68:11 87:15
161:3 165:1,2
166:6
quick 89:21
160:16
quickly 65:20
Quinten 133:5,7
quite 70:13
79:20

**R**

R 3:1
radical 152:21
ramifications
34:20
range 94:19
145:14
ranging 33:20
132:13
rate 148:20
159:5,10
rates 149:9
rational 98:17
raw 109:18
reach 68:1 80:18
107:1 115:19
118:17
reached 67:14
107:21
reaches 109:3
reaching 160:18
read 50:22 51:1
90:13 93:11
94:3 95:4
96:11 98:18,19
98:21 102:18
102:23 103:1
103:19,21
104:3 106:5
121:1 127:1
136:11 138:1
138:16 142:5
143:21 161:8
162:10 165:9
reading 2:9
20:21,22 21:5
51:6 52:15,16
55:16 56:5,10
57:12,18 71:7
71:10,11 100:6
103:23 104:2
142:17 143:1
ready 7:3 136:7
real 65:20
123:11,13

149:19
realistic 96:7,18
97:3,7
realities 115:16
reality 121:10
123:16
really 56:17
67:13 89:21
reask 8:5
reason 63:15,21
63:23 66:20
67:9 68:5,6,7
86:8 88:9 92:3
reasonable 87:8
87:10 143:17
144:1,21 145:4
145:8 147:2,7
148:14
reasons 36:15
36:23 38:4,6
39:12 66:10
68:2 86:4,10
87:22 89:13
90:19 93:21
94:8 95:8,12
recall 29:16 42:9
61:16,19 68:21
69:4 70:9 73:4
88:13,16 103:7
131:10 132:15
154:11 159:4
receive 25:6
55:15 58:12,18
107:16
received 14:4,6
15:14,19 47:5
113:11
recess 65:16
92:22 117:9
160:23
recognition
102:11
recognizable
124:13
recognize 84:13
124:8,9,14

recollect 91:18
recollection
66:9 70:12
73:9 115:2
155:8
recommend
82:22 89:15
110:20 142:22
recommendat...
110:21
recommendat...
32:4 105:16
recommended
14:1 79:6
reconstruction
33:22
reconstructive
8:21 9:7 10:10
10:13 12:17
17:11 27:23
28:4,9,10,17
34:9,17 79:16
79:17 83:12,14
84:10 85:13,18
86:1 112:10
record 48:14
65:15,19 92:19
92:21 95:18
117:8,12
119:19,23
160:22 163:14
recorded 114:4
records 32:22
46:22 52:2
68:17 159:1
recovered
146:12
refer 16:5,7 50:4
56:13 73:2
74:8 129:3,3
reference 64:20
93:14 129:12
132:18 154:17
155:4
referenced
132:22

references 18:11
  62:19 154:14
  154:18 162:12
referral 73:5
  152:6
referred 73:7
referring 95:4
  118:12 136:14
  136:15
refinement
  66:14
refused 73:4
regard 94:12
regarding 95:20
  128:11
Regardless
  67:17
regret 82:8
related 11:17
  13:11 100:7
relates 12:15,21
  15:16 17:10
  134:11
relating 2:13
  10:17 71:13
  123:15 130:15
  158:4
released 161:13
reliable 154:23
  155:23
relied 17:19
  163:14
relies 18:13
rely 128:18
  129:8 139:9
  163:19,23
relying 163:15
remarkable
  63:14
remedied 76:13
remedy 23:17
  36:20 74:3
  125:3
remember
  22:11,14,17
  23:15,16 27:4

36:10 40:15,16
  40:20 44:11,14
  45:13 47:1
  52:7,11,14
  60:13,15 61:14
  61:15 62:2,4
  62:12,15 63:4
  63:5,7,10,11
  79:11 82:15
  88:7,20 99:17
  102:22 103:3
  103:15,15,20
  111:18 113:11
  118:14 130:4
  130:13,19,22
  131:6,12,18
  134:11 135:4
  135:18,21
  161:9,11
remembered
  134:1
remote 6:14
  67:14
removal 24:17
  25:7,11 30:10
  33:20 146:6
removed 72:17
  72:21
renamed 20:11
  20:13
renaming 20:14
RENEE 3:22
repaired 35:10
repeats 96:4
rephrase 144:9
report 4:8 34:10
  36:11 41:23
  83:6 89:20
  99:3 115:4
  117:13 118:15
  128:15,18
  139:13 153:4
  156:5 159:6
  161:6 163:16
  164:13,15,19
  165:13

reporter 2:6 5:2
  5:20 6:17
  65:14 92:20
  117:7 119:21
  160:21 165:14
  166:18,23
reporting 5:9
  125:10 155:10
  166:18
reports 119:14
represents
  166:9
reproductive
  148:8
reputation
  126:13
request 96:4,5
  115:11,11
requested 23:21
requests 35:2
require 15:7
  58:5,7 163:10
required 56:3
  57:16
requirement
  56:4
requirements
  55:18
requires 55:13
  56:6 75:18
  78:5 137:7
reread 93:17
  139:19
residency 15:16
  15:20 131:17
resolution
  100:14,18
  101:8 102:7
  103:6
resource 130:18
respect 111:16
  156:9
respective 2:4
response 23:14
  34:15 39:5
responsibility

147:5
restart 6:22
restoration 85:9
restrict 43:18
  140:13,22
restricting
  111:3
restriction
  41:19
result 35:17
  143:19 149:14
  152:5 166:15
resulting 145:19
results 145:19
retained 120:2
retire 27:10
retired 27:13
return 77:5 79:2
reveal 86:18
review 17:22
  21:1 128:2,7
  158:23 161:22
reviewed 17:8
  17:18 18:14,16
  18:17 46:21
  51:13 62:14
  64:22 65:2
  128:17 154:9
reviewing 17:12
  18:1 32:22
  45:15 51:11
  62:4,5,5,8,15
  63:5 127:11
  129:6 154:7
reviews 130:16
revisit 48:16
  65:19
rhinoplasties
  82:20 83:1
rhinoplasty
  22:23 23:2,7
  29:12 66:3
  80:1 81:5,18
  82:4,18
right 7:1,5 8:21
  12:13 13:18

14:8,9,14 24:1
  28:1 36:7 40:9
  46:1 48:13
  52:15 58:14
  61:19 62:11
  66:5 68:10
  82:1 89:22
  90:8 92:13
  95:7,16 117:17
  127:5,13 129:4
  129:9 132:20
  133:18 139:15
  139:22 141:13
  147:9 152:12
  158:1 159:8
  163:22
RIGHT'S 3:22
Rigor 97:21
Riitakerttu
  161:18
risk 36:3 48:1
  149:5,8
risks 30:2,21
  31:4,22 36:6
  148:19
role 141:4
room 117:16
ROSE 3:4
rotations 15:12
routine 76:2,20
  86:12 142:11
  142:13
routinely 142:1
  142:7
Rule 5:5
rules 2:13 5:6
ruling 97:6
run 55:9 134:10
running 53:4
  126:17 134:16
rush 165:9

S

S 2:1 3:1
safe 138:10
San 51:21 52:13

Dr. Patrick Lappert

4/3/2024

Page 185

131:4,14,17,20
satisfied 137:13
Save 164:3
saw 159:5
SAYETH
  165:15
saying 81:9 97:1
  97:8 121:14
  142:13 152:8
  152:13
says 93:15 95:19
  121:2 138:4
SB184 40:7
scale 148:10
scars 147:21,21
scenario 82:1
  92:12
scenarios 39:8
  84:21
school 88:3
  113:2,7
schools 113:6,8
science 162:7
scientific 109:5
  115:16 126:23
  162:15
scope 54:4
screen 93:2,7,12
search 69:23
  163:11
searching 164:3
second 66:20
  68:5,7 95:18
  126:15
second-guessing
  80:14
secondary 102:6
section 42:2
  95:3
sections 93:10
  119:13
see 16:3 27:14
  36:9 37:6,9,16
  38:3 52:13
  90:7 93:6
  97:14 117:20

118:19 141:21
143:12 153:7
seeing 36:11
  45:13
seek 70:22 79:6
seeking 21:21
  22:19,22 25:10
  25:17 31:17
  43:17 66:2,15
  68:13 73:12
  76:7,16 87:18
  141:15 144:18
  151:18 152:2
seen 133:10
sees 37:7
selecting 143:15
selection 92:14
self-harm 105:8
self-identificat...
  100:11,15
  122:15,18
self-identified
  121:5,8,16
  122:1
seminar 116:3
seminars 104:15
send 119:20,20
  165:13
senior 88:3
sense 38:21 76:4
  86:15 123:14
sensibility 149:3
sentence 90:6
  121:2 126:15
  136:10 139:19
separate 83:15
sequelae 24:18
served 120:7
services 15:13
  111:16
settled 162:7
seven-year-old
  33:22
severe 94:1
sex 24:18 70:6
  72:2 102:5,6

102:12 109:18
123:3
shape 70:5
  86:20
share 162:22
shared 26:17
  27:1
shares 124:20
shorten 74:8
shot 163:4
show 34:22
Shrier 153:7,10
  153:11
sic 134:5
side 30:11 88:6
  156:5
sign 165:9
signature 2:8
  118:2,7
significant 36:5
  47:23 88:17
similar 42:6,12
  42:23 43:7,16
  44:2 98:16
  111:17 125:15
  156:9 157:5
  159:3 160:7
simpler 152:19
simply 38:21
simultaneous
  79:18
single 76:19
  124:23
sit 44:8
situation 76:22
situations 42:23
  78:16 115:15
six 22:10
skills 80:19
skin 24:17 30:20
  30:23 31:8
  33:21
skip 137:23
  141:18 143:7
Skipping 98:8
sliding 148:9

slight 148:12
slightly 18:4
  151:9
small 150:8
social 41:19 57:1
  59:8,9 60:8,22
  63:1 123:5
Society 51:19
  95:22 127:20
  131:15 132:12
SOLICTOR
  3:18
somebody
  106:20
sorrow 70:1
  79:4
sorrows 69:17
  70:7,11
sorry 41:12,20
  84:4,15 93:16
  106:2 114:12
  117:23 149:2
sort 36:21 38:2
  46:13 80:22
  89:8 118:21
  148:9 158:13
sought 51:8
  99:23
sound 159:8
sounds 11:3
  19:8 43:23
  81:11 115:4
  127:8
sparked 115:8
  115:10
speak 40:11
  59:18 111:11
  129:13 131:23
  143:5
speakers 52:8
speaking 63:11
  112:16,17
  130:20 131:11
  131:12 132:16
  140:1 144:13
  144:14

speaks 38:21
  56:14 57:20
specialize
  126:22
specialized 9:21
  10:6 11:22
  12:11
specialties 16:8
  16:12,22 17:5
specific 10:4,12
  12:1,3 13:17
  13:19 16:20
  19:5 47:3,17
  51:9 62:13
  94:17
specifically
  22:12 53:7
  71:17 88:20
  132:17
specificity 12:19
specify 28:23
  43:15
spectrum 105:6
  144:4
speculating 41:6
speech 11:14
  113:22
spend 120:14
  162:20 164:2
spoke 53:6,23
  59:19 127:4
  134:8
spoken 42:11
  55:4 59:11,16
  61:21 112:20
  113:3 115:6
  130:23 160:1
standard 47:8
  47:12,15,16,18
  48:2,6,19,22
  49:3,15,19,21
  49:23 50:5,7
  50:12,14,15,19
  50:21 51:7,12
  55:11,13 56:10
  56:14,18 57:18

Dr. Patrick Lappert                                                    4/3/2024

59:6,9 64:21
138:8,10
**standards** 51:9
52:16,20 53:8
55:17 57:13
142:3,15,17,22
143:2
**stands** 82:17
114:18
**start** 118:18
136:9
**started** 43:9
118:20,22
119:1
**starting** 90:5
141:19
**starts** 76:11
143:11
**state** 1:14 5:3
49:18 59:20
60:17 124:7
139:14 166:2
**stated** 72:15
**statement** 95:20
121:9 162:13
**statements**
96:14,18
**states** 1:1,10 8:4
8:7 42:5,9,11
42:16,20,22,23
44:2 111:15,21
157:16 165:4
**station** 114:17
**Statistical** 20:3
20:12
**stenotype** 166:6
**step** 36:10
**steps** 56:3 61:2
63:2
**steroid** 24:18
**STEVE** 1:13
3:11
**STIPULATED**
2:2
**stipulation** 5:7
**stipulations**

5:21
**stood** 100:8
**stop** 82:19
**stopped** 118:20
**street** 3:7 80:4
**strengthened**
162:3
**striking** 58:8
**stroke** 31:14
**strong** 132:10
**students** 113:7
**studies** 18:6
98:14 102:18
104:19 153:23
154:8
**study** 11:12
104:8,10
**subcategory**
20:9 67:2
94:18
**subject** 41:8
71:14
**subjective** 34:16
34:21 37:23
39:2,5 40:3
75:13,15 86:16
102:10 125:10
143:19 144:17
145:17,18
149:14 150:9
**subset** 70:16
71:5,18,23
**Substack** 154:15
**substance** 21:10
**subsumed** 72:19
**subsumes** 20:8
**subtle** 37:20
**succeeding**
150:3
**success** 66:19
148:20 149:9
**successful**
136:12,22
137:1 138:5
**suffer** 77:15
123:17,19

124:1
**suffering** 32:11
110:13 112:12
124:9,10,11,13
**sufficient** 19:11
25:17 96:9,20
98:5,20 107:3
**sugar** 31:13
**suggest** 49:7
98:14 108:6
**suggests** 48:2
95:23
**sum** 11:20
**support** 18:2
21:2 42:19
49:11 55:22
79:3,7,13,19
93:3 104:2
110:22,22
128:3,6,8
154:20 162:15
**supported** 47:20
**supporting** 57:2
138:6
**suppose** 24:5
53:3 129:17
140:1 144:4
**sure** 8:6 16:17
24:22 26:9,20
33:12 57:9
65:20 73:8
95:2 97:1,18
98:3,4 103:14
103:23 125:15
**surgeon** 8:17
10:9,10 12:2,4
12:22 13:18
37:6 52:12
80:5,6,10,17
80:21 81:17,23
89:11 92:1,16
123:8 131:13
131:13 134:7
134:22 147:5
149:15
**surgeons** 80:14

82:23
**surgeons'** 135:6
**surgeries** 7:7,11
7:18,22 8:3,10
27:18,21,23
29:7 36:13,14
36:19,21 42:3
58:22 63:22
64:2 73:13,14
73:17 79:14,16
81:14 83:7
94:16 110:5
140:23 141:1
141:16 143:4,6
145:22 154:6
**surgery** 8:21 9:7
9:10,11 10:2,3
10:13 11:19
12:16,17 13:11
13:20 14:5,5
15:3,4,6,16,17
17:11 22:19,20
23:14,22 27:13
28:4,5,9,11,13
28:21,23 29:2
33:15 34:4,9
34:10,12,14,14
34:17,20 35:3
35:5,15 36:3,6
37:3,5 38:5,10
38:15,16 39:6
39:22 51:15,17
51:20 60:6,16
66:5,8,10,22
67:5,10 68:3,9
71:12 73:18
74:2 75:3,11
75:14,20,22
77:2,10,13,17
78:1,4,14
79:18,21 80:3
80:7 81:1
83:14 84:10
86:14 87:22
93:22 95:21,23
112:10,15

113:14 127:21
131:15,16
134:22 138:12
138:15,21,23
139:17,23
140:5,14
141:20,23
142:4,23
143:15 144:14
144:15,15,21
146:20,23
147:10,15,19
148:7,17
149:13,18
151:4,16,18
152:2,12,20
**surgical** 13:6
23:17 56:1
57:3 60:23
61:5 63:8,13
108:1,10
109:19 123:20
124:16 138:9
144:6 162:17
**surprised**
162:19 164:1
**suspected** 69:6
**switching** 156:4
**sworn** 5:17
**Syndrome** 85:23
90:11 94:3

_____

**T**

**T** 2:1,1
**take** 6:21 65:6
81:15,21
116:18 149:23
150:15 160:16
163:1
**taken** 1:23 2:5
65:17 92:23
117:10 161:1
166:5
**takes** 38:23
**talk** 8:13 38:12
40:5 47:2 74:5

83:3,5 99:1,2
102:19 117:12
**talked** 16:9 17:1
34:8 103:11
104:15 111:13
115:1 127:3,19
138:18 140:3
140:20 156:3,6
156:11 157:17
159:21
**talking** 11:2,4
33:2 43:16
48:19 76:11
81:3,4 85:10
94:16 95:2
125:5 127:12
132:17 134:11
146:2 156:19
161:6
**taste** 148:5
**teachers** 32:9
113:2
**technical** 48:9
48:11,15 68:1
80:19
**technically**
67:15
**technique** 144:6
**teenage** 96:3,6,8
**teenager** 97:11
**teenagers** 95:21
96:18,19 97:3
97:7
**television** 114:9
114:19
**tell** 9:4 21:20
59:23 69:10
131:8 132:6
158:8
**telling** 113:23
**ten** 33:13 60:12
65:11
**term** 19:21 20:7
47:12,17 48:22
49:2 71:3 99:6
99:12,20

100:19,20
121:7 157:10
**terms** 20:16
38:18 43:14
57:23 62:18
80:14 81:13
111:9
**testified** 5:18
111:21 157:14
157:20
**testifying** 59:20
**testimony** 43:22
44:17 157:6,11
163:20 166:10
**text** 129:16
**textbooks** 103:8
**thank** 29:1 65:9
83:17 86:6
164:4 165:5,7
**therapeutic** 99:8
99:9 101:7
106:18 110:23
**therapy** 100:23
101:5 105:20
**thereto** 2:22
166:7
**thing** 27:5 66:12
87:20 93:11
95:2 102:15
111:13 123:21
140:8 144:21
158:14 165:12
**things** 11:16,19
13:8,12 36:1
58:8 68:14
100:8 102:9
123:15 129:17
147:18 152:17
**think** 9:14 13:14
25:22 28:18
29:4 31:1
35:21 37:1
45:4,11,17
46:2,14,15
50:22 54:9,9
54:14 57:10

66:2 73:7 81:6
81:22 88:3,4
91:16 92:5,8
92:13 98:20
99:15 101:14
102:14 103:2
104:11 106:14
107:5 108:18
109:7,9 111:2
111:8,11,20
112:4 114:14
116:16,20,22
129:7 133:16
137:9,10
140:11,12,20
140:21 141:10
154:16,17
155:6,14
156:16 159:6
160:10,15,17
161:14 162:19
163:2 164:5,21
165:11
**thinking** 71:1
97:2 119:8
**thinks** 76:13
148:14
**thorough** 97:18
98:4
**thought** 66:15
70:21 72:2
84:4 116:10
134:2
**three** 26:8 49:6
50:16 96:8,14
98:2
**thrombosis**
31:15
**thyroid** 13:1,21
14:2
**thyroidectomy**
13:7
**time** 2:20,21
33:4 50:22
64:2 65:1,6
75:1 88:4

96:22 100:15
103:21 120:14
131:17 160:14
164:2,4,6
165:6,10
**times** 16:22
67:14 79:5
82:11,14
**timing** 11:19
**tip** 131:5
**today** 6:7 38:12
40:6 159:10
161:4 162:1
164:6,16,20
**told** 21:12 22:5
22:12,14 23:12
27:1 29:11
31:1 40:15
54:9,12 63:16
65:23 66:2
68:14 79:23
80:5 89:21
111:20 117:14
140:11 164:7
**tongue** 131:5
**top** 37:15 74:13
129:4 159:14
**topic** 40:12
**Toronto** 103:3
**touched** 31:10
147:12
**touches** 32:18
**trained** 71:16
**training** 9:22
10:1,6,9,17,23
11:22 12:12,22
13:15,21 14:3
14:6 15:9,11
15:13,19,21
51:8 71:15
128:11
**transcribed**
166:7
**transcript**
166:10
**transcription**

166:8
**transgender** 8:2
8:8 24:12,16
26:14 27:3
43:20 58:11,17
58:21 115:6,17
116:14 121:5,8
121:12,17
122:2 123:9
124:1 127:10
127:18 154:1
**transition**
136:12 137:1
137:10,11,18
138:5,9 162:17
**transitioning**
136:22
**trauma** 9:10
28:10 79:16
105:13
**travel** 52:2
**traveled** 42:10
42:15
**treat** 16:1,4
25:22 26:4,23
53:16 54:1,5
54:11 55:5
73:3 106:11
136:2
**treated** 24:8
28:19
**treating** 24:12
26:11 28:21
32:21 59:3,13
61:23 112:11
**treatment** 14:1
16:11,22 17:4
17:8,23 18:2
18:10 24:2,7
29:20 30:8
31:17 33:4
43:18,19 47:9
47:20 48:7,20
49:15,17,20
50:6,12,13,17
56:7,17,19

Dr. Patrick Lappert                                                4/3/2024

Page 188

57:8,14,15
59:2,9 62:21
62:23 64:8
104:22 105:16
123:22 127:18
128:11 153:1
154:1
**treatments**
24:14,15 25:7
30:3 50:10
51:5 56:1,1
58:1,2,5
141:10
**treats** 54:15,21
**tremendous**
106:16
**trial** 2:20 44:16
162:19 163:20
164:1
**trivial** 147:20
151:22
**true** 96:2 98:2
166:9
**try** 7:13 59:12
61:21 87:17
139:5
**trying** 21:4 26:3
36:18 38:12
46:4 55:8 68:4
84:12 101:1
106:4,7 125:18
**turns** 130:8
**two** 20:16 44:13
66:10 68:2
75:4 102:9
113:4 127:10
127:12
**type** 137:17
158:16
**types** 149:5
**typical** 62:17
74:11
**typically** 86:18
87:19

_____
**U**

**U** 2:1
**U.S** 3:20
**UAB** 59:1,5,12
61:20 63:21
**UAB's** 59:2 64:3
**uh-huh** 27:12
46:20 130:18
**ultimate** 137:18
**ultimately**
119:10 147:4
**unacceptable**
145:1
**undergo** 38:4
86:9 138:13,14
138:14,20,21
139:16,17
**undergoing**
79:13
**undergone** 7:6
7:10,18,21 8:2
8:10 15:10
128:10 138:22
148:21
**underlying** 23:5
23:8 74:1
105:5 107:23
111:1
**understand** 6:9
6:10 8:14 16:2
16:17 18:3
20:4,15 21:5
24:23 26:20
27:9,22 36:18
37:1 41:22
42:1 48:18,22
68:6 71:17
75:19 78:7
87:18,20 95:22
97:1,19 99:4
99:23 100:21
102:3,16
105:15 106:7
121:13 125:13
125:19 135:10
144:7,10
**understanding**

13:1,15 14:23
15:5 21:7
41:17 42:4
44:1,23 45:20
46:5,18 57:12
58:10,15,16,20
64:6,11 66:21
70:15 71:8
72:4,11 77:7
78:3 97:22
101:2,9,18
102:4,7,10
103:5 105:2
106:8 107:6
109:8 112:11
112:14 113:13
113:15,18
134:14 136:18
137:14 142:21
153:12 157:8
**understood**
32:16,20 65:21
77:11 119:12
135:15
**underway**
100:16
**unethical** 23:6
73:21,23 90:20
91:6,13 109:23
110:3,8
**unhappy** 123:15
**unilateral** 85:14
88:1
**United** 1:1,10
8:3,7 165:4
**University**
45:22 131:3
**unrealistic**
97:12
**unreasonable**
144:20
**unsupported**
109:5
**upper** 86:22
**use** 13:23 32:5
49:2

**uses** 109:18
**Usual** 5:20

_____
**V**

**vaginoplasty**
146:8,17,21
**Vague** 3:5 4:4
5:22 6:1,5 65:4
65:12 92:18
116:16 117:1,6
119:18 160:15
164:22 165:5
165:11
**valid** 67:9 110:6
**validity** 126:23
**valuable** 150:13
**Van** 130:12
133:17
**Vanmeter** 130:6
133:5,7
**variation** 144:4
**venous** 31:14
**version** 21:7
114:3 143:3
**versus** 28:4
36:13,21 38:15
83:12 84:9
105:1,17
106:12 108:20
**Video** 114:4
**view** 26:18
132:7
**violations** 94:9
95:13
**virtually** 35:11
50:4
**visible** 36:4
37:12
**vision** 148:4
**visit** 73:10 76:3
76:4,19 77:5
79:2
**visited** 64:12
**volumes** 102:23
**vs** 1:9,12

_____
**W**

**waiting** 99:4,5,6
99:13,22 100:3
100:19,21
101:6 102:20
103:13,22
104:16 105:14
106:9,22 107:7
**waived** 2:10
**Wallstreet**
153:14
**want** 9:16 38:6
45:9 55:9 57:9
58:11,17,21
65:10 67:20,22
78:6 89:20
93:9 95:16
96:23 98:2
99:1 102:15
111:12 120:13
120:18 126:14
136:5 137:23
143:7 145:3
162:18
**wanted** 65:19
115:12 117:12
120:16 145:11
**WASHINGT...**
3:14
**wasn't** 23:16
60:16 68:9
**watchful** 99:3,4
99:6,13,22
100:3,19,21
101:6 102:20
103:13,21
104:16 105:14
106:9,22 107:7
**way** 18:12 69:15
69:15 72:6
89:3 106:10,21
124:7 145:7
161:23
**ways** 122:11
127:11

**we'll** 6:21
**we're** 40:6 48:13
  57:11 65:15,18
  81:2 92:20
  95:2 116:21
  117:7,11
  144:14 158:4
  160:21
**we've** 6:17 29:4
  65:4 114:23
  115:6 116:17
  127:19 134:10
  157:17 164:11
  164:15
**web** 62:4,15,17
  64:12,23 65:2
**website** 62:10
  63:6 64:15,18
**websites** 114:4,6
**WEDNESDAY**
  5:10
**weeks** 128:23
**weight** 70:4
**went** 17:6 28:15
  80:4 102:16
  134:8 135:23
**weren't** 23:13
**WHITE** 3:4
**wild** 160:9,10
**WILLIAMS**
  3:22
**wily** 116:6
**wish** 69:16
**wishes** 80:17
**witness** 2:9 5:11
  44:4 65:8
  160:6,20
  163:10,17
  165:7 166:11
**woman** 37:16
  76:6 85:21
  86:19
**women** 148:21
  153:16
**wonder** 26:22
**wondered** 61:6

**Word** 114:18
**wording** 56:12
  62:18
**words** 23:15
  27:4 62:19
  63:20 68:22
  69:3 102:18
  140:10
**work** 7:13 12:1
  12:4 86:7
**worked** 118:15
**worker** 123:5
**working** 116:4
  130:8
**works** 6:17
  45:21
**world** 13:17
  128:21 129:2
**worry** 87:4
**worst** 77:11
**wouldn't** 25:15
  61:4 80:20
  81:16 145:8
**wound** 76:17
**wounded** 69:15
  112:11
**wounding** 108:6
**wounds** 9:11
**WPATH** 50:5
  50:14,21 51:7
  53:7 55:10,12
  55:16 57:12
  59:6 62:19
  64:7,21 138:8
  138:10 142:2
  142:14,17,22
**WPATH's**
  52:20
**writer** 153:11,12
  154:3 155:6
**writes** 153:13
**writing** 119:9
  154:20
**written** 43:21
  153:6 159:19
**wrong** 109:9

### X

**X** 4:1

### Y

**y'all** 116:19
  119:21 131:23
  160:18
**yeah** 27:5 41:14
  58:3 63:3 68:4
  74:22 84:6
  106:4 116:20
  117:6 127:22
  140:9 152:5,18
  163:12
**year** 51:22 64:13
  65:3
**years** 8:15 22:9
  22:10 26:10,12
  28:8,20 29:17
  53:5 61:15
  62:7 64:13
  68:18 71:11
  73:6 74:18
  75:4 82:13
  83:8 88:4,21
  93:20 94:18
  95:5 98:15
  112:22 118:17
  119:5,9 131:1
  133:11 154:12
**years'** 75:1
**young** 37:15
  40:4 100:17
  153:16,16
**younger** 150:2

### Z

**Zoom** 1:17 3:3
  3:10,17 5:8
  6:14
**Zucker** 103:2,4
  103:6,19 106:6
**Zucker's** 104:1
  104:7

### 0

### 1

**1** 4:7 88:19
  119:20 120:2
**1.5** 93:21
**10** 28:14
**10,000** 29:3
**10:14** 65:17
**10:24** 65:17
**10:57** 92:23
**11:01** 92:23
**11:30** 117:10
**11:42** 117:10
**12** 136:6
**12:38** 161:1
**12:45** 161:1
**120** 4:8
**14** 98:14
**17** 90:1 153:4
**18** 88:4 93:19
  94:17,20 95:5
  153:4
**18th** 117:23
**19** 87:23 88:12
  89:5,13 90:18
  92:3 94:17,20
**1983** 130:8
**1990s** 88:10

### 2

**2** 82:14
**2:22-CV-0018...**
  1:6
**2011** 93:18
**2014** 50:23
  99:15 115:4,8
  121:2
**2015** 50:23
**2017** 52:1
**2018** 52:1
**2020** 27:13
**2023** 118:1
**2024** 1:21 5:10
**20TH** 3:7
**22** 143:8
**23** 120:19,21
  126:15 129:13

132:19 134:12
**26,000** 160:12
**28** 136:6

### 3

**3** 1:21 5:10
  82:14 88:19
  159:18
**30** 5:5 75:1
  82:13 88:21
  105:4
**32,000** 93:15
**320,000** 93:17
**35** 90:2 133:10
**35203** 3:8
**36104** 3:15

### 4

**4,000** 159:18
**4,830** 93:20 95:6
**40** 105:7
**400** 3:7 159:7
**45** 143:8

### 5

**5** 4:4 21:1
**500** 83:10
**501** 3:14

### 6

**68** 95:18
**69** 98:8

### 7

### 8

**8** 142:22 143:3
**80** 28:9 100:12

### 9

**9** 120:20
**9:00** 5:11
**9:49** 48:12
**9:52** 48:12
**90** 28:9 100:17