# EXHIBIT 23

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF ALABAMA
2                  NORTHERN DIVISION
3

     Rev. Paul A. Eknes-Tucker,      )
4    et al.,                         )
                                     )
5          Plaintiffs,               )      Case No.
     and                             )2:22-cv-00184-LCB-SRW
6                                    )
     UNITED STATES OF AMERICA,       )
7                                    )
          Plaintiff-Intervenor,      )
8                                    )
     v.                              )
9                                    )
     Steve Marshall, et al.,         )
10                                   )
          Defendants.                )
11
12

              REMOTE VIDEOTAPED DEPOSITION OF
13

                  ANGELA THOMPSON, M.D.
14

                  Thursday, May 2, 2024
15                9:06 a.m. to 10:03 a.m.
16                   Pages 1 to 36
17
18
19
20
21
22
23
24    JOB NO.:     ATL 6684648
25    REPORTED BY:   Merilee Johnson, RDR, CRR, CRC, RSA

Angela Thompson , M.D.                           May 2, 2024
King and Spalding - Pro Bono

---

Page 2

1        A P P E A R A N C E S
         (All appearing remotely via videoconference)
2
ON BEHALF OF THE PRIVATE PLAINTIFFS:
3
KING & SPALDING LLP
4  BY:  Abby L. Parsons, Esq.
        1100 Louisiana Street
5       Suite 4100
        Houston, Texas 77002
6       Phone: (713) 751-3200
        Email: AParsons@kslaw.com
7
   - and -
8
GLBTQ LEGAL ADVOCATES & DEFENDERS
9  BY:  Courtney Dougherty, Esq.
        18 Tremont
10      Suite 950
        Boston, Massachusetts 02108
11      Phone: (617) 426-1350
        Email: CDougherty@glad.org
12
13 ON BEHALF OF ATTORNEY GENERAL STEVE MARSHALL and
   STATE DEFENDANTS:
14
   ALABAMA ATTORNEY GENERAL'S OFFICE
15 BY:  Charles McKay, Esq.
        501 Washington Avenue
16      Montgomery, Alabama 36104
        Phone:  (334) 242-7300
17      Email: Charles.McKay@AlabamaAG.gov
18
   ON BEHALF OF THE UNITED STATES INTERVENOR-PLAINTIFF:
19
   U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION,
20 and FEDERAL COORDINATION AND COMPLIANCE SECTION
   BY:  Amie Murphy, Esq.
21      150 M Street NE
        Washington, D.C. 20002
22      Phone: (202) 353-1285
        Email: Amie.Murphy2@usdoj.gov
23
24 ALSO APPEARED:
25      Catherine O'Connor, King & Spalding

---

Page 3

1        I N D E X
2
3  WITNESS: ANGELA THOMPSON, M.D.          PAGE
4  Examination by Ms. Parsons....................... 4
5  Examination by Mr. McKay........................ 33
6  Further Examination by Ms. Parsons............... 34
7
8  CAUTION or INSTRUCTIONS NOT TO ANSWER: (None.)
9
10 SPECIAL INSTRUCTIONS or REQUESTS: (None.)
11
12       E X H I B I T S
13
14 EXHIBITS MARKED AND FIRST REFERRED TO:      PAGE
15 Exhibit 1    Expert Report of Angela C.E.      8
                Thompson, M.D., MPH, FACOG
16
           (Exhibit to be attached to transcript.)
17
18 REPORTER'S NOTE:  All quotations from exhibits are
   reflected in the manner in which they were read
19 into the record and do not necessarily indicate an
   exact quote from the document.
20
21
22
23
24
25

---

Page 4

1        (PROCEEDINGS, 05/02/2024, 9:06 a.m.)
2        COURT REPORTER:  We're on record.  If I
3  could have all the parties state their appearances
4  and who they represent for the record, please.
5        MS. PARSONS:  Good morning.  My name is
6  Abby Parsons.  I'm from the law firm of King &
7  Spalding.  I'm here on behalf of the private
8  plaintiffs.
9        MR. McKAY:  Good morning.  I'm Charles
10 McKay on behalf of Attorney General Marshall and
11 state defendant.
12       MS. MURPHY:  Good morning.  My name is
13 Amie Murphy, and I'm here on behalf of the United
14 States, intervenor plaintiff in this case.
15       ANGELA THOMPSON, M.D.
16 duly affirmed, was examined and testified as follows:
17       EXAMINATION
18 BY MS. PARSONS:
19   Q.  Good morning, Dr. Thompson.
20   A.  Good morning.
21   Q.  Can you state and spell your full name for
22 the record, please.
23   A.  Angela, A-n-g-e-l-a, Thompson,
24 T-h-o-m-p-s-o-n.
25   Q.  And where are you presently employed?

---

Page 5

1    A.  I am working with OB Hospitalist Group and
2  Mayo Clinic.
3    Q.  In what city do you reside?
4    A.  Rochester, Minnesota.
5    Q.  Is that where you're testifying from this
6  morning?
7    A.  Correct.
8    Q.  What is your role in this case, as you
9  understand it?
10   A.  As I understand it, I am an
11 obstetrician-gynecologist expert witness.
12   Q.  And in what field are you offering
13 testimony in this case?
14   A.  Gynecology and obstetrics.
15   Q.  When were you first contacted about this
16 case?
17   A.  As I recall, it was in 2023.  February, I
18 believe.
19   Q.  Do you recall who contacted you,
20 Dr. Thompson?
21   A.  I -- yes, it was Barrett Bowdre.
22   Q.  Have you ever served as an expert witness
23 in a case before?
24   A.  As an expert witness?  No.
25   Q.  Have you ever been a part of a legal case

2 (Pages 2 - 5)

Angela Thompson , M.D.                                                May 2, 2024
King and Spalding - Pro Bono

Page 6

1  other than this one?
2      A.  For a private case, yes.
3      Q.  I don't need any details, but can you just
4  generally tell us the subject matter of that
5  lawsuit?
6      A.  It was obstetrical and gynecology case
7  locally.
8      Q.  So just one prior proceeding you've ever
9  been involved in?
10     A.  Correct.
11     Q.  Did you have to testify in a court in that
12  proceeding?
13     A.  I did.
14     Q.  And did you supply a deposition?
15     A.  Yes.
16     Q.  Have you ever been deposed other than that
17  deposition?
18     A.  There was a traffic -- traffic case years
19  ago, if I recall.
20     Q.  Okay.  So you've -- so you've given two
21  depositions before this one?
22     A.  Correct.
23     Q.  I can give you just a few ground rules.  It
24  sounds like you've done this before but maybe not
25  regularly.

Page 7

1      We're here today.  Obviously you're under
2  oath, and you'd be testifying just like you would
3  if you were in a courtroom.  Do you understand
4  that?
5      A.  Yes.
6      Q.  And Merilee's here taking down what
7  everybody says.  So it helps her if you can let me
8  finish my questions, and then I'll make sure you
9  can finish your responses.  Does that make sense?
10     A.  Yes.
11     Q.  Is there any reason this morning that
12  you're aware of that you're not able to give true
13  and accurate testimony today?
14     A.  No reason.
15     Q.  If you ever need a break, please just let
16  me know.  I don't think this deposition's going to
17  be very long, but if you do need a break at any
18  time, I just ask that you finish your answer to my
19  question, and then we can take a break whenever you
20  need.  Is that okay?
21     A.  Yes.  Thank you.
22     Q.  If I've ever asked a question that's
23  unclear, you'll let me know that?
24     A.  Okay.
25     Q.  I'd like to introduce the first deposition

Page 8

1  exhibit as Exhibit 1.  And we'll pull it up on the
2  screen.  This is a copy of your expert report.
3      (Exhibit 1 was marked for
4      identification.)
5      Q.  All right, Dr. Thompson.  I'm sharing my
6  screen.  Can you see the first page of the expert
7  report you gave in this case?
8      A.  I'm able to see it, yes.
9      Q.  Okay.  And I'm going to scroll all the way
10  to your signature.  I understand this is probably
11  going to make everybody nauseous.
12      All right.  On page 61 of Exhibit 1 that
13  I've marked to the deposition, is this your
14  signature on your expert report?
15     A.  It is.
16     Q.  Okay.  And that was dated May 19th of 2023?
17     A.  Correct.
18     Q.  Great.  I'm going to go all the way back up
19  to the top.
20      All right.  I'm directing you on this
21  screen to paragraph 2 of your expert report, which
22  is marked as Exhibit 1 to this deposition.  This is
23  just to refresh your recollection, but do you think
24  this is an accurate summary of what you were asked
25  to consider in this case, Dr. Thompson?

Page 9

1      A.  Yes, that's accurate.
2      Q.  And -- so you're offering testimony about
3  fertility considerations of what you refer to as
4  "gender-affirming care," or GAC?
5      A.  Correct.
6      Q.  And I'm going to direct your attention now
7  to paragraph 5, which spans page 3 and 4 of
8  Exhibit 1.  You refer to gender-affirming care or
9  GAC as the treatment -- as this treatment in -- in
10  question for minors, right?
11     A.  As it pertains to how the literature has
12  defined it, yes.
13     Q.  And just at a very high level, that would
14  consist of using puberty blockers followed by
15  cross-sex hormones?
16     A.  Correct.
17     Q.  Have you personally provided
18  gender-affirming care or GAC to anyone?
19     A.  I have not.
20     Q.  Have you ever prescribed puberty blockers?
21     A.  I have not.
22     Q.  Ever followed --
23     A.  Sorry.  Can you clarify?
24     Q.  Have you ever written a prescription for a
25  puberty-blocking treatment?

3 (Pages 6 - 9)

Angela Thompson , M.D.                                    May 2, 2024
King and Spalding - Pro Bono

1    A.  Are you speaking specifically to --
2        (Court reporter requested
3        clarification.)
4    A.  -- GnRH analog medication?  Colloquially,
5    those are termed as puberty blockers, but the
6    medication can be used in adult patients for other
7    indications.  I just -- I would -- I just need
8    clarification on the specifics of the question, if
9    that's okay.
10   Q.  Absolutely.  And thank you for raising that
11   clarification.  Let me try another question.
12       Have you ever prescribed GnRHa medication
13   for an adolescent?
14   A.  For an adolescent, no.
15   Q.  Have you ever attempted to preserve the
16   fertility of a child in early puberty seeking
17   gender-affirming care?
18   A.  No.
19   Q.  I know you asked for a clarification on my
20   prior question.  Can you tell us when you've ever
21   prescribed GnRHa medication?
22   A.  In females, this medication can be used to
23   treat certain conditions of the female reproductive
24   tract, such as endometriosis and uterine myomas,
25   which are also known as fibroids.

1    Q.  And in any of those cases that you
2    prescribed GnRHa medication, none of those patients
3    had gender dysphoria?
4    A.  I don't treat gender dysphoria.  I'm -- I'm
5    not aware.
6        (Courtney Dougherty joined the
7        proceedings.)
8    Q.  Okay, Dr. Thompson.  I'd like to turn to
9    paragraph 14 of your report.  Scroll there now.
10       All right.  In paragraph 14 you describe
11   the types of patients that you normally treat.  Is
12   that fair?
13   A.  Correct.
14   Q.  And I -- I'll show you the whole paragraph.
15   Can you see the entire 14 on my --
16   A.  Yes.  Yes.
17   Q.  Okay.  And at any point, if you need me to
18   scroll up or down so can you see something, just
19   let me know.  Okay?
20       At the beginning of paragraph 14 in
21   Exhibit 1, I'd like to ask you -- you say, "I
22   provide care, including medical and surgical care,
23   for female patients at all areas of the
24   reproductive life span, from early puberty to
25   postmenopausal."

1        Did I read that correctly?
2    A.  That's correct.
3    Q.  So your practice does include female
4    children; is that fair?
5        MR. McKAY:  Object to the form.
6    BY MS. PARSONS:
7    Q.  Dr. Thompson, from time to time your
8    counsel can object.  Unless he instructs you not to
9    answer, you're still obligated to give me an answer
10   to my question if you understand it.
11   A.  Okay.  My practice currently is taking care
12   of patients in the acute hospital setting.  But,
13   yes, I have provided care to early pubertal
14   adolescents.
15   Q.  Okay.  So you've -- you're presently not
16   treating early pubertal females, but at some point
17   in your career you have; is that fair?
18   A.  Yes.  And I do still treat adolescents,
19   yes.
20   Q.  What do those -- what have those
21   adolescents come to you for treatment for?
22   A.  Gynecologic emergencies, pregnancy.
23   Q.  In your practice, what percentage would you
24   estimate are nonadult patients?
25   A.  I would say, you know, a substantial

1    portion.  If I had to ascertain the prevalence
2    of -- or the proportion of nonadults would be maybe
3    25 to 30 percent.
4    Q.  And what definition of "nonadult" were you
5    applying in answering that question?  What was your
6    age range?
7    A.  Under the age of 18.
8    Q.  And from your report, paragraph 14, when
9    you say "early puberty," what age range are you
10   thinking in that?
11   A.  Early puberty is defined as entering into
12   Tanner Stage 2.  That can occur between the ages of
13   8 years in females up to early adolescence -- 13,
14   14 years of age.
15   Q.  All right.  So applying that -- that
16   concept of entering Tanner Stage 2, what percentage
17   of your patient population are you treating in that
18   age range?
19   A.  At any time or just currently?
20   Q.  Let's start with currently.
21   A.  Currently -- I can't recall.
22   Q.  You can't recall any -- any current
23   patients that are of the Tanner Stage 2 age range?
24       MR. McKAY:  Object to form.
25   A.  Yeah, I can't recall.

4 (Pages 10 - 13)

Angela Thompson , M.D.
King and Spalding - Pro Bono

Page 14

1    Q.   Would it be less than the 25 to 35 percent
2  estimate you gave me before for that whole range?
3    A.   Yeah.  Yes, it would.  That's correct.
4    Q.   Okay.  And then I think we started with
5  your current patient population.  But I think you
6  said, you know, over the course of your -- your
7  career, what percentage of the patients that you've
8  treated fall into that entering-Tanner-Stage-2 age
9  range?
10    A.   It's pretty small.  I would say it's a
11  small proportion.  I can't say off the top of my
12  head what it would be, but it's small just because
13  it overlaps a lot with the pediatric care.
14    Q.   Is it fair to say it would also be smaller
15  than that 25 to 35 percent range that you gave me
16  before?
17    A.   Yes, that's correct.
18    Q.   All right.  I'd like to look a little
19  further down in the same paragraph 14 of Expert
20  Report Exhibit 1 that we've been looking at.  Part
21  of the patient population you identified is you've
22  treated females with differences in sex
23  development.
24       Do you see that?
25    A.   Yes.

Page 15

1    Q.   What do you mean by that?
2    A.   There are certain conditions that occur
3  during the developmental processes in utero that
4  lead to differences in the sexual differentiation
5  of the embryo and fetus.
6    Q.   So you're referring to physical differences
7  in the person's body?
8    A.   It can be physical.
9    Q.   What else can they include?
10    A.   They can include differences in genes that
11  are expressed.  They can include chromosomal
12  differences.  They can include -- that nature.
13    Q.   Okay.  When you say "females with
14  differences in sex development," this is not those
15  patients that have undergone gender-affirming care;
16  is that correct?
17    A.   That's correct.
18    Q.   Do you treat men of any kind?
19    A.   Can you clarify?
20    Q.   Do you have any patients who are men?
21    A.   How are you defining "men"?
22    Q.   Well, I'll say that their gender assigned
23  at birth was male.
24    A.   I'm -- I guess I'm just not understanding
25  the question.  If you could clarify.  I don't know

Page 16

1  the...
2    Q.   Sorry.  It's not intended to be a trick
3  question.  Paragraph 14, you say you provide care
4  for female patients.
5    A.   Yes.
6    Q.   I'm just making sure you don't provide care
7  for male patients in any way.
8    A.   Male patients.  Okay.  So sex at birth is
9  male?
10    Q.   Correct.
11    A.   I would say I have treated male
12  sex-at-birth patients in the past.  A single.
13    Q.   So just one -- one patient that was -- sex
14  at birth was male; is that right?
15    A.   Correct.
16    Q.   I'm going to turn to your report, which
17  we've marked as Exhibit 1, to paragraph 15.  Do you
18  see that on your screen, Dr. Thompson?
19    A.   Yes.
20    Q.   I'd like to ask you about the first
21  sentence in paragraph 15.  And I'll read it.  "I
22  have treated patients who identify as transgender
23  in the context of pregnancy and birth."
24       Did I read that correctly?
25    A.   That's correct.

Page 17

1    Q.   How many patients have you treated that
2  fall within this sentence?
3    A.   Two.
4       MR. McKAY:  Object to form.
5  BY MS. PARSONS:
6    Q.   All right.  Can you give me an approximate
7  date range when you were treating these two
8  patients that were -- that identified as
9  transgender in the context of pregnancy and birth?
10    A.   As far as I recall -- let's see -- 20- --
11  with -- I would say three to six years ago.
12    Q.   What hospital or medical practice were you
13  affiliated with when you were treating these two
14  patients?
15       MR. McKAY:  Object to form.
16  BY MS. PARSONS:
17    Q.   Let me -- let me try again.  I'll ask --
18  I'll try to ask you a clearer question.
19       Where did you work when you were treating
20  these two patients?
21       MR. McKAY:  I don't think she's ever
22  said there were two patients.  That was the
23  objection, if you're trying to clarify.
24  BY MS. PARSONS:
25    Q.   I'll ask the question again.  I think I

5 (Pages 14 - 17)

Angela Thompson , M.D.                                    May 2, 2024
King and Spalding - Pro Bono

Page 18

1  asked the question.  I think I got an answer, but
2  let me -- let me just make sure so the record's
3  clear.
4          So, Dr. Thompson, first sentence of
5  paragraph 15, which reads, "I have treated patients
6  who identify as transgender in the context of
7  pregnancy and birth."
8          Did I read that right?
9      A.  Yes.
10     Q.  And how many patients were you referring to
11  in that sentence of the first -- of paragraph 15?
12     A.  So there are patients who have disclosed
13  it, but I can't speak to the number of patients who
14  have not disclosed it.  The patients who have
15  disclosed it are two.
16     Q.  Okay.  How many patients have disclosed to
17  you that they identify as transgender in the
18  context of pregnancy and birth that you were
19  treating?
20     A.  At the time?
21     Q.  Yes.
22     A.  Two.
23     Q.  Okay.  Are there any others that you're
24  familiar with or that you're referring to that I'm
25  not asking about specifically?

Page 19

1      A.  Oftentimes patients have discomfort
2  disclosing their gender identity, and I am not
3  aware of other patients who I may have treated that
4  have identified as a gender minority who didn't
5  want to disclose it for whatever reason.  So I
6  can't speak to that.
7      Q.  All right.  So when you wrote this sentence
8  in paragraph 15 of your expert report, when you say
9  "I have treated patients who identify as
10  transgender in the context of pregnancy and birth,"
11  you're referring specifically to those two patients
12  that disclosed it to you, right?
13     A.  The ones who disclosed it to me, that's
14  correct.
15     Q.  And those two patients, each of them were
16  sex-at-birth female; is that correct?
17     A.  Correct.
18     Q.  And let's take them one at a time.  So the
19  first patient.  Do you have that patient in your
20  mind?
21     A.  In my mind, yes.
22     Q.  All right.  And that patient, had that
23  patient ever undergone any gender-affirming care,
24  to your knowledge?
25     A.  I can't recall.

Page 20

1      Q.  How about the second patient?  Had that
2  patient ever undergone gender-affirming care?
3      A.  I can't recall.
4      Q.  Both of those patients that we were
5  referring to in paragraph 15, were they -- were
6  they pregnant at the time you were treating them?
7      A.  They were.
8      Q.  And did each of them have a live birth?
9      A.  The one I know of, yes.  The other one
10  was -- care was taken over by their private
11  physician.
12     Q.  Dr. Thompson, do you plan to serve any
13  supplemental expert report in this case?
14     A.  I'm sorry.  Can you clarify?
15     Q.  Are you -- are you working on or do you
16  have plans to serve any other written reports in
17  this case?
18     A.  Not to my knowledge.
19     Q.  I'd like to take a look at your CV that you
20  attached to your expert report, which is Exhibit 1.
21  I'll direct us to -- I think it's page 72 of the
22  PDF, but I've got it up on the screen here.
23          Do you see what I'm showing you on the
24  screen --
25     A.  Yeah.

Page 21

1      Q.  -- for Exhibit 1?
2      A.  Yes.
3      Q.  Does this look like a copy of the
4  curriculum vitae that you attached to your expert
5  report in this case last May?
6      A.  Yes.
7      Q.  I know this was about a year ago.  The
8  first -- the first page that I'm showing you -- I
9  guess it's PDF page 72 of Exhibit 1 -- is this
10  still your present academic rank and position?
11     A.  That's correct.
12     Q.  Okay.  So you are an OB hospital -- OB
13  hospitalist at the Mayo Clinic Department of
14  Obstetrics and Gynecology in Rochester, Minnesota?
15     A.  Yes.  And I also cover -- the OB
16  Hospitalist Group covers other hospitals around the
17  country, and I provide care in those sites as
18  well -- have provided, yes.
19     Q.  Has anything changed about your current
20  employment as it pertains to your curriculum vitae
21  that you attached to your expert report about a
22  year ago?
23     A.  No.
24     Q.  I'm going to talk about your educational
25  background, so I'm going to scroll down here to the

Angela Thompson , M.D.                    May 2, 2024
King and Spalding - Pro Bono

Page 22

1    second page of your CV.  There's a section titled
2    "Education."
3          Do you see that?
4    A.  Yes.
5    Q.  Okay.  So you -- you did your undergrad at
6    the University of Utah?  No.  University of
7    Wisconsin.  I'm sorry.
8    A.  At University Wisconsin-Madison, yes.
9    Q.  Okay.  During your undergrad studies, did
10   you complete any coursework on psychology?
11   A.  Psychology?
12   Q.  Mm-hmm.
13   A.  No.
14   Q.  Psychiatry?
15   A.  As an undergraduate?
16   Q.  Yep.
17   A.  Psychiatry is a branch of -- it's a field
18   of medical specialty.  So that wouldn't -- I didn't
19   have any psychiatry training as an undergraduate.
20   Q.  Okay.  Did you have any classes where you
21   learned anything about gender dysphoria?
22   A.  At UW-Madison?
23   Q.  Right.
24   A.  No.
25   Q.  All right.  And then you went on to get

Page 23

1    your medical degree from the University of Utah
2    School of Medicine; is that right?
3    A.  That's correct.
4    Q.  Okay.  I'm sorry.  I think -- I think I
5    might have led you astray there.
6          After -- after you went -- got your
7    undergrad at Wisconsin, what was the next degree
8    you got?
9    A.  That was the MPH at Yale.
10   Q.  Okay.  And during your MPH at Yale, did you
11   do any studies there on -- on psychology?
12   A.  No.
13   Q.  Did you have any coursework on gender
14   dysphoria?
15   A.  No.
16   Q.  Okay.  After you obtained your MPH, then
17   you went to medical school?
18   A.  Correct.
19   Q.  Okay.  And in medical school, did you have
20   any training on psychology or psychiatry?
21   A.  So there's a psychiatry education component
22   to the curriculum, that's correct.
23   Q.  And did you do any study of gender
24   dysphoria in medical school?
25   A.  At the time, the diagnosis in the DSM-IV

Page 24

1    was gender identity disorder.  That definition was
2    changed in 2013 to gender dysphoria.
3    Q.  I'm sorry.  I think maybe my internet cut
4    out a little bit.  I'm just going to ask that
5    question again because I didn't hear your full
6    answer.
7    A.  Okay.
8    Q.  When you were in medical school, did you do
9    any -- any study of gender dysphoria?
10   A.  So at the time I was in medical school, the
11   DSM-IV had the diagnosis of gender identity
12   disorder.  After I completed medical school is when
13   the DSM-5 changed the definition to gender
14   dysphoria.
15   Q.  I understand.  Thanks for the
16   clarification.
17         So when you were in medical school, did you
18   do any study about gender identity disorder, as it
19   was named at the time?
20   A.  There was a psychiatry requirement for
21   obtaining the medical degree and that fell in with
22   the psychiatry portion of the training in medical
23   school.
24   Q.  Okay.  So can you describe, you know,
25   what -- was that one class during a semester, or

Page 25

1    was that a particular -- can you describe the
2    extent of that training?
3    A.  So the curriculum in the first two years is
4    classroom instruction.  And we did have a portion
5    of education in the field of psychiatric specialty
6    in that component of the curriculum.  And then for
7    the clinical years, there was a requirement to
8    treat -- to be on the wards with the clinical
9    service within psychiatry.
10   Q.  So you -- you did coursework in a
11   classroom, and you did clinic work at a practice;
12   is that fair?
13   A.  To complete the curriculum, yes, to obtain
14   the medical degree.
15   Q.  So after medical school, you went on to --
16   I think on your CV it calls it a medical fellow at
17   the University of Minnesota; is that right?
18   A.  That's correct.
19   Q.  Okay.  Is that -- this is just my lack of
20   understanding, but is that -- is that akin to a
21   residency or is that a fellowship?
22   A.  It's a residency.
23   Q.  Okay.  All right.  During -- during your
24   residency at the University of Minnesota, what kind
25   of practice did you have from 2004 to 2008?

7 (Pages 22 - 25)

Page 26

1     A.   So that followed the standard residency
2  requirements to complete the specialty training in
3  obstetrics and gynecology.  So that included
4  clinical coursework.  It included didactic
5  training.  It included, you know, work in the
6  hospitalized setting, taking care of medical and
7  surgical patients and performing surgical
8  procedures.
9     Q.   During that residency, did you complete any
10  specialized training for -- for people diagnosed
11  with gender dysphoria?
12     A.   Specialized training?  No.
13     Q.   Any training?
14     A.   Again, at the time, the diagnos- -- the
15  diagnostic category was -- was gender identity
16  disorder.  It wasn't gender dysphoria.
17     Q.   Okay.  But during your medical residency
18  from 2004 to 2008, were you aware of treating any
19  patients that had gender identity disorder?
20     A.   I can't recall.
21     Q.   All right.  On your CV you also list some
22  peer-reviewed papers that you've authored.  I want
23  to look at those next.
24        All right.  I have them up on the screen.
25  These come from page -- the last page of your CV

Page 27

1  and your expert report, which is Exhibit 1.  Do you
2  see them up on the screen, Dr. Thompson?
3     A.   I do.
4     Q.   Okay.  So there's four publications listed
5  here.  I want to look at them one at a time.
6        So the first one, the title is "Optimizing
7  Post-Cesarean Opioid Prescription Practices at
8  Mayo Clinic:  A Quality Improvement Initiative."
9        Do you see that?
10     A.   Yes.
11     Q.   And that was in 2022 you published that?
12     A.   Yes, that's when it was published.
13     Q.   Does this -- this publication is unrelated
14  to gender dysphoria and treatment of those with
15  gender dysphoria; is that fair?
16        MR. McKAY:  Object to form.
17        And you can always answer the question
18  unless I instruct you not to answer, Dr. Thompson.
19        THE WITNESS:  Okay.  Okay.
20     A.   You know, again, as I mentioned earlier,
21  you know, many patients don't feel comfortable
22  disclosing their gender identity status, so I can't
23  speak to that.
24     Q.   The purpose of that paper was not trying to
25  understand gender dysphoria better, was it?

Page 28

1     A.   It was to optimize postcesarean opioid
2  prescription practices.
3     Q.   All right.  And you aren't relying in any
4  way on this publication for purposes of issuing
5  your expert opinions in this case, are you?
6     A.   No.
7     Q.   This one is from 2020.  Can you still see
8  my screen?
9     A.   Yes.
10     Q.   Okay.  This one's from 2020.  And the title
11  of this one -- this is the MOGGE Foundation
12  practice guidelines for prelabor rupture of
13  membranes.
14        Do you see that?
15     A.   Yes.
16     Q.   This paper, like the first one, not --
17  directed to the treatment of gender dysphoria; is
18  that fair?
19     A.   It is specifically regarding prelabor
20  rupture of membranes.
21     Q.   Okay.  And you didn't -- you haven't relied
22  on this publication in any way to support your
23  expert opinions in this case; is that fair?
24     A.   Could you explain?
25     Q.   Sure.  You haven't -- you haven't cited

Page 29

1  this publication in particular to support any of
2  your expert opinions in this case; is that fair?
3     A.   In terms of citation?  No, I have not cited
4  this study, no.
5     Q.   Did your work on the prelabor rupture of
6  membranes have any impact in you formulating your
7  expert opinions in this case.
8        MR. McKAY:  Object to form.
9     A.   I'm sorry.  Can you explain again the
10  question?
11     Q.   Just trying to understand if the work you
12  did to support your peer-reviewed article of
13  prelabor rupture of membranes does anything to
14  support your expert opinions about fertility
15  considerations for gender-affirming care in
16  adolescents in this case?
17     A.   There's much we do not know about female
18  patients who receive medications consistent within
19  the definition of gender-affirming care, especially
20  if they carry pregnancies.
21        In this specific case, it very well could
22  have relevance to the treatment of individuals with
23  gender dysphoria who receive both GnRH analogs and
24  testosterone.  And that's why I can't really say
25  that it wouldn't be relevant.

8 (Pages 26 - 29)

Angela Thompson , M.D.                    May 2, 2024
King and Spalding - Pro Bono

Page 30

1    Q.  You haven't issued any written opinions in
2   this report, Exhibit 1, that relies specifically on
3   this paper; is that fair?
4       A.  I have not cited this paper in my report.
5       Q.  Okay.  Let's look at your third
6   peer-reviewed article, also published in 2020.
7   This one titled, "Creating a model to predict time
8   intervals from induction of labor to induction of
9   anesthesia and delivery to coordinate workload."
10          Do you see that?
11      A.  Yes.
12      Q.  This paper does not involve the study of
13  gender dysphoria, fair?
14      A.  It specifically looks at -- you know, the
15  management of labor and providing analgesia to
16  patients.
17      Q.  And the last peer-reviewed article listed
18  on your CV, which is attached to Exhibit 1 of this
19  deposition, was a paper from 2005, and this one's
20  titled "Differences Between Hospitals in Cesarean
21  Rates for Term Primigravidas with Cephalic
22  Presentation."
23          Is that right?
24      A.  That's correct.
25      Q.  And that paper also does not appear to be

Page 31

1   directed to the treatment of gender dysphoria,
2   fair?
3       A.  It specifically studies the differences
4   between cesarean rates.
5       Q.  All right.  I'd like to look on your CV.
6   You also have some presentations.
7       A.  Yes.
8       Q.  Dr. Thompson, do you see the list of
9   presentations?
10      A.  Yes, sorry.  Sorry.  My audio isn't
11  working.  Yes.
12      Q.  Do you have any other additional
13  presentations or anything to add to your CV as you
14  sit here today?
15      A.  Not that I recall.
16      Q.  Okay.  And just going back to your
17  peer-reviewed articles, have you issued any other
18  peer-reviewed articles since the CV was published a
19  year ago?
20      A.  Not that I recall.
21      Q.  Okay.  Just looking at this list that I've
22  got up here of presentations from your CV, have
23  you -- have you given any presentations about the
24  treatment of gender dysphoria?
25          (Court reporter requested clarification

Page 32

1   due to distorted/muted audio.)
2       Q.  Doctor, did you hear the question?
3       A.  I did, yes.  Thanks.
4           I have not given specific presentations
5   regarding gender dysphoria.  But I'm not a mental
6   health provider.
7       Q.  Dr. Thompson, what -- what training or
8   experience do you rely on to offer expert opinions
9   in this case about the fertility considerations for
10  gender-affirming care for adolescents?
11      A.  So I rely on my training and education as
12  an obstetrician-gynecologist who is board
13  certified.
14      Q.  Anything else?
15      A.  As well as keeping up with the literature.
16          MS. PARSONS:  Okay.  I don't have any
17  further questions for Dr. Thompson, so I'll pass
18  the witness.
19          MR. McKAY:  And if we could get just a
20  five-minute break, I don't anticipate having much
21  either, if anything.
22          MS. PARSONS:  Sure, we can go off the
23  record.
24          MR. McKAY:  All right.  Thank you.
25          (Break:  9:44 a.m. to 9:52 a.m.))

Page 33

1               EXAMINATION
2   BY MR. McKAY:
3       Q.  Earlier, counsel asked you about your
4   research on obstetrics and gynecology.  Do you
5   remember that?
6       A.  I do.
7       Q.  And could you explain how research on
8   pregnancy complications is relevant to your
9   opinions on gender-affirming care?
10          MS. PARSONS:  Objection.  Outside the
11  scope of direct.
12  BY MR. McKAY:
13      Q.  You can answer, Dr. Thompson.
14      A.  So at present, there are no long-term or
15  even, really, short-term data about some of the
16  pregnancy outcomes and risks to the uterus and
17  subsequent pregnancy to individuals who have been
18  exposed to GnRHa analogs and testosterone.
19          We do know, and what I have put in my
20  report, that females who have been exposed to
21  testosterone at the doses used to achieve
22  gender-affirming care in these individuals -- so
23  trans men who have received testosterone at these
24  doses -- it has been shown that they're at
25  increased risk for hypertension.

9 (Pages 30 - 33)

Angela Thompson , M.D.                    May 2, 2024
King and Spalding - Pro Bono

Page 34

1      And it is unknown if that hypertensive risk
2  is going to remain as a chronic state.  And if
3  entering a pregnancy with -- and if these
4  individuals choose to become pregnant -- and I'm
5  speaking specifically about trans men who have
6  already undergone a stage of development where
7  their gametes are mature and then receiving
8  testosterone.  But we do not know if -- if that
9  hypertensive risk is going to remain.
10      And if they enter pregnancy or choose to
11  become pregnant at any time with that background
12  risk of chronic hypertension, that's -- we know any
13  pregnant patient who has chronic hypertension
14  entering pregnancy is a much higher risk of
15  developing very serious conditions, such as
16  preeclampsia with severe features, placental
17  abruption, fetal growth restriction.
18      And so it is concerning that the
19  testosterone that is given to individuals could
20  play a part in increasing their perinatal risks.
21      Q.   Thank you, Dr. Thompson.  I have no more
22  questions.
23          FURTHER EXAMINATION
24  BY MS. PARSONS:
25      Q.   Just one follow-up.  Dr. Thompson, the long

Page 35

1  narrative you just gave, that's -- your information
2  is purely based on reading the literature and not
3  treating patients in your clinical experience; is
4  that fair?
5          MR. McKAY:  Object to form.
6      A.   I -- can you -- can you clarify?  I do
7  treat patients with chronic hypertension.
8      Q.   Right.  But you've already testified today
9  that you've never -- you've never treated anyone
10  with gender-affirming care, right?
11      A.   Personally, no.  That's correct.
12          MS. PARSONS:  No further questions.
13          MR. McKAY:  No questions from me.
14          MS. MURPHY:  No questions from me
15  either.
16          MS. PARSONS:  Thank you for your time
17  today, Dr. Thompson.
18          Thanks, everyone.
19          MR. McKAY:  And we would like to read
20  and sign the deposition transcript.  And if we can
21  get it expedited as well.  By Monday.
22          MS. PARSONS:  Regular delivery.
23          MS. MURPHY:  Yeah, we'd like a copy
24  too, please.  Regular.
25          (Time Noted:  10:03 a.m., May 2, 2024.)

Page 36

1          REPORTER'S CERTIFICATE
2
   STATE OF MINNESOTA   )
3                       ) ss.
   COUNTY OF HENNEPIN   )
4
      I hereby certify that I reported the remote
   deposition of Angela Thompson, on May 2, 2024, and
5  that the witness was by me first duly affirmed to
6  tell the whole truth;
7      That the testimony was transcribed by me and
   is a true record of the testimony of the witness;
8
      That the cost of the original has been
9  charged to the party who noticed the deposition,
   and that all parties who ordered copies have been
10  charged at the same rate for such copies;
11      That I am not a relative or employee of any
   attorney or counsel of any of the parties, or a
12  relative or employee of such attorney or counsel;
13      That I am not financially interested in the
   action and have no contract with the parties,
14  attorneys, or persons with an interest in the
   action that affects or has a substantial tendency
15  to affect my impartiality;
16      That the right to read and sign the
   deposition by the witness was preserved.
17
18      WITNESS MY HAND AND SEAL THIS 6th day of
   May, 2024.
19
20
21
22
23
     _____
     Merilee J. Johnson, RDR, CRR, CRC, RSA
24   Notary Public, Hennepin County, Minnesota
     My commission expires January 31, 2026
25

Page 37

1  Charles McKay, Esq.
2  Charles.McKay@AlabamaAG.gov
3      May 6, 2024
4  RE: Eknes-Tucker, Rev. Paul A.  v. Marshall, Steve
5  5/2/2024, Angela Thompson , M.D. (#6684648)
6   The above-referenced transcript is available for
7  review.
8   Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-southeast@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25

10 (Pages 34 - 37)

Angela Thompson , M.D.                                        May 2, 2024
King and Spalding - Pro Bono

Page 38

1  Eknes-Tucker, Rev. Paul A.  v. Marshall, Steve
2  Angela Thompson, M.D. (#6684648)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Angela Thompson, M.D.            Date
25

Page 39

1  Eknes-Tucker, Rev. Paul A.  v. Marshall, Steve
2  Angela Thompson, M.D. (#6684648)
3        ACKNOWLEDGEMENT OF DEPONENT
4     I, Angela Thompson , M.D., do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Angela Thompson, M.D.            Date
13 *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

11 (Pages 38 - 39)

Angela Thompson , M.D.
King and Spalding - Pro Bono

May 2, 2024

**[& - affirming]**

Page 1

| & | | | |
|---|---|---|---|
| **&**   2:3,8,25 4:6 | | | |

**0**

**00184**   1:5
**02108**   2:10
**05/02/2024**   4:1

**1**

**1**   1:16 3:15 8:1
  8:3,12,22 9:8
  11:21 14:20
  16:17 20:20
  21:1,9 27:1
  30:2,18
**10:03**   1:15
  35:25
**1100**   2:4
**13**   13:13
**14**   11:9,10,15
  11:20 13:8,14
  14:19 16:3
**15**   16:17,21
  18:5,11 19:8
  20:5
**150**   2:21
**17950**   36:23
**18**   2:9 13:7
**19th**   8:16

**2**

**2**   1:14 8:21
  13:12,16,23
  14:8 35:25
  36:5
**20**   17:10 39:15

**20002**   2:21
**2004**   25:25
  26:18
**2005**   30:19
**2008**   25:25
  26:18
**2013**   24:2
**202**   2:22
**2020**   28:7,10
  30:6
**2022**   27:11
**2023**   5:17 8:16
**2024**   1:14
  35:25 36:5,18
  37:3
**2026**   36:24
**242-7300**   2:16
**25**   13:3 14:1,15
**2:22**   1:5

**3**

**3**   9:7
**30**   13:3 37:16
**31**   36:24
**33**   3:5
**334**   2:16
**34**   3:6
**35**   14:1,15
**353-1285**   2:22
**36**   1:16
**36104**   2:16

**4**

**4**   3:4 9:7
**4100**   2:5

**426-1350**   2:11

**5**

**5**   9:7 24:13
**5/2/2024**   37:5
**501**   2:15

**6**

**6**   37:3
**61**   8:12
**617**   2:11
**6684648**   1:24
  37:5 38:2 39:2
**6th**   36:18

**7**

**713**   2:6
**72**   20:21 21:9
**751-3200**   2:6
**77002**   2:5

**8**

**8**   3:15 13:13

**9**

**950**   2:10
**9:06**   1:15 4:1
**9:44**   32:25
**9:52**   32:25

**a**

**a.m.**   1:15,15
  4:1 32:25,25
  35:25
**abby**   2:4 4:6
**able**   7:12 8:8
**above**   37:6
  39:7

**abruption**
  34:17
**absolutely**
  10:10
**academic**   21:10
**accuracy**   37:9
**accurate**   7:13
  8:24 9:1
**achieve**   33:21
**acknowledge...**
  39:3
**acknowledg...**
  37:12
**action**   36:13,14
**acute**   12:12
**add**   31:13
**additional**
  31:12
**additions**   39:6
**adolescence**
  13:13
**adolescent**
  10:13,14
**adolescents**
  12:14,18,21
  29:16 32:10
**adult**   10:6
**advocates**   2:8
**affect**   36:15
**affects**   36:14
**affiliated**   17:13
**affirmed**   4:16
  36:5
**affirming**   9:4,8
  9:18 10:17

Angela Thompson , M.D.
King and Spalding - Pro Bono

**[affirming - cdougherty]**                                          Page 2

15:15 19:23
20:2 29:15,19
32:10 33:9,22
35:10
**age**   13:6,7,9,14
13:18,23 14:8
**ages**   13:12
**ago**   6:19 17:11
21:7,22 31:19
**akin**   25:20
**al**   1:4,9
**alabama**   1:1
2:14,16
**alabamag.gov**
2:17 37:2
**allotted**   37:19
**america**   1:6
**amie**   2:20 4:13
**amie.murphy2**
2:22
**analgesia**   30:15
**analog**   10:4
**analogs**   29:23
33:18
**anesthesia**   30:9
**angela**   1:13 3:3
3:15 4:15,23
36:5 37:5 38:2
38:24 39:2,4
39:12
**answer**   3:8
7:18 12:9,9
18:1 24:6
27:17,18 33:13

**answering**   13:5
**anticipate**
32:20
**aparsons**   2:6
**appear**   30:25
**appearances**
4:3
**appeared**   2:24
**appearing**   2:1
**appended**   39:7
**applicable**   37:8
**applying**   13:5
13:15
**approximate**
17:6
**areas**   11:23
**article**   29:12
30:6,17
**articles**   31:17
31:18
**ascertain**   13:1
**asked**   7:22 8:24
10:19 18:1
33:3
**asking**   18:25
**assigned**   15:22
**astray**   23:5
**atl**   1:24
**attached**   3:16
20:20 21:4,21
30:18 37:11
**attempted**
10:15
**attention**   9:6

**attorney**   2:13
2:14 4:10
36:11,12 37:13
**attorneys**   36:14
**audio**   31:10
32:1
**authored**   26:22
**available**   37:6
**avenue**   2:15
**aware**   7:12
11:5 19:3
26:18

**b**

**b**   3:12
**back**   8:18
31:16
**background**
21:25 34:11
**barrett**   5:21
**based**   35:2
**beginning**
11:20
**behalf**   2:2,13
2:18 4:7,10,13
**believe**   5:18
**better**   27:25
**birth**   15:23
16:8,12,14,23
17:9 18:7,18
19:10,16 20:8
**bit**   24:4
**blockers**   9:14
9:20 10:5
**blocking**   9:25

**board**   32:12
**body**   15:7
**boston**   2:10
**bowdre**   5:21
**branch**   22:17
**break**   7:15,17
7:19 32:20,25

**c**

**c**   2:1
**c.e.**   3:15
**calls**   25:16
**care**   9:4,8,18
10:17 11:22,22
12:11,13 14:13
15:15 16:3,6
19:23 20:2,10
21:17 26:6
29:15,19 32:10
33:9,22 35:10
**career**   12:17
14:7
**carry**   29:20
**case**   1:5 4:14
5:8,13,16,23,25
6:2,6,18 8:7,25
20:13,17 21:5
28:5,23 29:2,7
29:16,21 32:9
**cases**   11:1
**category**   26:15
**catherine**   2:25
**caution**   3:8
**cdougherty**
2:11

Angela Thompson , M.D.                                      May 2, 2024
King and Spalding - Pro Bono

**[cephalic - cv]**                                        Page 3

| | | | |
|---|---|---|---|
| **cephalic** 30:21 | **clarify** 9:23 | **conditions** | **correctly** 12:1 |
| **certain** 10:23 | 15:19,25 17:23 | 10:23 15:2 | 16:24 |
| 15:2 | 20:14 35:6 | 34:15 | **cost** 36:8 |
| **certificate** 36:1 | **class** 24:25 | **consider** 8:25 | **counsel** 12:8 |
| **certified** 32:13 | **classes** 22:20 | **considerations** | 33:3 36:11,12 |
| **certify** 36:4 | **classroom** 25:4 | 9:3 29:15 32:9 | 37:14 |
| **cesarean** 27:7 | 25:11 | **consist** 9:14 | **country** 21:17 |
| 30:20 31:4 | **clear** 18:3 | **consistent** | **county** 36:3,24 |
| **change** 38:4,7 | **clearer** 17:18 | 29:18 | **course** 14:6 |
| 38:10,13,16,19 | **clinic** 5:2 21:13 | **contacted** 5:15 | **coursework** |
| **changed** 21:19 | 25:11 27:8 | 5:19 | 22:10 23:13 |
| 24:2,13 | **clinical** 25:7,8 | **context** 16:23 | 25:10 26:4 |
| **changes** 37:10 | 26:4 35:3 | 17:9 18:6,18 | **court** 1:1 4:2 |
| 39:6 | **colloquially** | 19:10 | 6:11 10:2 |
| **charged** 36:9 | 10:4 | **contract** 36:13 | 31:25 |
| 36:10 | **come** 12:21 | **coordinate** | **courtney** 2:9 |
| **charles** 2:15 | 26:25 | 30:9 | 11:6 |
| 4:9 37:1 | **comfortable** | **coordination** | **courtroom** 7:3 |
| **charles.mckay** | 27:21 | 2:20 | **cover** 21:15 |
| 2:17 37:2 | **commission** | **copies** 36:9,10 | **covers** 21:16 |
| **child** 10:16 | 36:24 | 37:14 | **crc** 1:25 36:23 |
| **children** 12:4 | **complete** 22:10 | **copy** 8:2 21:3 | **creating** 30:7 |
| **choose** 34:4,10 | 25:13 26:2,9 | 35:23 | **cross** 9:15 |
| **chromosomal** | 39:8 | **correct** 5:7 | **crr** 1:25 36:23 |
| 15:11 | **completed** | 6:10,22 8:17 | **cs** 37:15 |
| **chronic** 34:2,12 | 24:12 37:16 | 9:5,16 11:13 | **current** 13:22 |
| 34:13 35:7 | **compliance** | 12:2 14:3,17 | 14:5 21:19 |
| **citation** 29:3 | 2:20 | 15:16,17 16:10 | **currently** 12:11 |
| **cited** 28:25 | **complications** | 16:15,25 19:14 | 13:19,20,21 |
| 29:3 30:4 | 33:8 | 19:16,17 21:11 | **curriculum** |
| **city** 5:3 | **component** | 23:3,18,22 | 21:4,20 23:22 |
| **civil** 2:19 | 23:21 25:6 | 25:18 30:24 | 25:3,6,13 |
| **clarification** | **concept** 13:16 | 35:11 39:8 | **cut** 24:3 |
| 10:3,8,11,19 | **concerning** | **corrections** | **cv** 1:5 20:19 |
| 24:16 31:25 | 34:18 | 39:6 | 22:1 25:16 |

Angela Thompson , M.D.
King and Spalding - Pro Bono

May 2, 2024

**[cv - endometriosis]**

Page 4

26:21,25 30:18
31:5,13,18,22

**d**

**d** 3:1
**d.c.** 2:21
**data** 33:15
**date** 17:7 38:24
  39:12
**dated** 8:16
**day** 36:18
  39:15
**days** 37:16
**declare** 39:4
**deemed** 39:6
**defendant** 4:11
**defendants**
  1:10 2:13
**defenders** 2:8
**defined** 9:12
  13:11
**defining** 15:21
**definition** 13:4
  24:1,13 29:19
**degree** 23:1,7
  24:21 25:14
**delivery** 30:9
  35:22
**department**
  2:19 21:13
**deponent** 37:13
  39:3
**deposed** 6:16
**deposing** 37:13
**deposition** 1:12
  6:14,17 7:25

8:13,22 30:19
35:20 36:5,9
36:16
**deposition's**
  7:16
**depositions**
  6:21
**describe** 11:10
  24:24 25:1
**details** 6:3
**developing**
  34:15
**development**
  14:23 15:14
  34:6
**developmental**
  15:3
**diagnos** 26:14
**diagnosed**
  26:10
**diagnosis** 23:25
  24:11
**diagnostic**
  26:15
**didactic** 26:4
**differences**
  14:22 15:4,6
  15:10,12,14
  30:20 31:3
**differentiation**
  15:4
**direct** 9:6 20:21
  33:11
**directed** 28:17
  31:1

**directing** 8:20
**disclose** 19:5
**disclosed** 18:12
  18:14,15,16
  19:12,13
**disclosing** 19:2
  27:22
**discomfort**
  19:1
**disorder** 24:1
  24:12,18 26:16
  26:19
**distorted** 32:1
**district** 1:1,1
**division** 1:2
  2:19
**doctor** 32:2
**document** 3:19
**doses** 33:21,24
**dougherty** 2:9
  11:6
**dr** 4:19 5:20
  8:5,25 11:8
  12:7 16:18
  18:4 20:12
  27:2,18 31:8
  32:7,17 33:13
  34:21,25 35:17
**dsm** 23:25
  24:11,13
**due** 32:1
**duly** 4:16 36:5
**dysphoria** 11:3
  11:4 22:21
  23:14,24 24:2

24:9,14 26:11
26:16 27:14,15
27:25 28:17
29:23 30:13
31:1,24 32:5

**e**

**e** 2:1,1 3:1,12
  4:23 38:3,3,3
**earlier** 27:20
  33:3
**early** 10:16
  11:24 12:13,16
  13:9,11,13
**education** 22:2
  23:21 25:5
  32:11
**educational**
  21:24
**either** 32:21
  35:15
**eknes** 1:3 37:4
  38:1 39:1
**email** 2:6,11,17
  2:22
**embryo** 15:5
**emergencies**
  12:22
**employed** 4:25
**employee** 36:11
  36:12
**employment**
  21:20
**endometriosis**
  10:24

Angela Thompson , M.D.
King and Spalding - Pro Bono

May 2, 2024

**[enter - give]**

Page 5

enter  34:10
entering  13:11
   13:16 14:8
   34:3,14
entire  11:15
errata  37:11,13
   37:16
especially
   29:19
esq  2:4,9,15,20
   37:1
estimate  12:24
   14:2
et  1:4,9
everybody  7:7
   8:11
exact  3:19
examination
   3:4,5,6 4:17
   33:1 34:23
examined  4:16
exhibit  3:15,16
   8:1,1,3,12,22
   9:8 11:21
   14:20 16:17
   20:20 21:1,9
   27:1 30:2,18
exhibits  3:14
   3:18
expedited
   35:21
experience  32:8
   35:3
expert  3:15
   5:11,22,24 8:2

8:6,14,21
   14:19 19:8
   20:13,20 21:4
   21:21 27:1
   28:5,23 29:2,7
   29:14 32:8
expires  36:24
explain  28:24
   29:9 33:7
exposed  33:18
   33:20
expressed
   15:11
extent  25:2

**f**

facog  3:15
fails  37:18
fair  11:12 12:4
   12:17 14:14
   25:12 27:15
   28:18,23 29:2
   30:3,13 31:2
   35:4
fall  14:8 17:2
familiar  18:24
far  17:10
features  34:16
february  5:17
federal  2:20
feel  27:21
fell  24:21
fellow  25:16
fellowship
   25:21

female  10:23
   11:23 12:3
   16:4 19:16
   29:17
females  10:22
   12:16 13:13
   14:22 15:13
   33:20
fertility  9:3
   10:16 29:14
   32:9
fetal  34:17
fetus  15:5
fibroids  10:25
field  5:12 22:17
   25:5
financially
   36:13
finish  7:8,9,18
firm  4:6
first  3:14 5:15
   7:25 8:6 16:20
   18:4,11 19:19
   21:8,8 25:3
   27:6 28:16
   36:5
five  32:20
follow  34:25
followed  9:14
   9:22 26:1
follows  4:16
foregoing  39:5
form  12:5
   13:24 17:4,15
   27:16 29:8

35:5
formulating
   29:6
foundation
   28:11
four  27:4
full  4:21 24:5
further  3:6
   14:19 32:17
   34:23 35:12

**g**

g  4:23
gac  9:4,9,18
gametes  34:7
gender  9:4,8,18
   10:17 11:3,4
   15:15,22 19:2
   19:4,23 20:2
   22:21 23:13,23
   24:1,2,9,11,13
   24:18 26:11,15
   26:16,19 27:14
   27:15,22,25
   28:17 29:15,19
   29:23 30:13
   31:1,24 32:5
   32:10 33:9,22
   35:10
general  2:13
   4:10
general's  2:14
generally  6:4
genes  15:10
give  6:23 7:12
   12:9 17:6

Angela Thompson , M.D.
King and Spalding - Pro Bono

May 2, 2024

**[given - know]**

Page 6

**given** 6:20
31:23 32:4
34:19 39:9
**glad.org** 2:11
**glbtq** 2:8
**gnrh** 10:4
29:23
**gnrha** 10:12,21
11:2 33:18
**go** 8:18 32:22
**going** 7:16 8:9
8:11,18 9:6
16:16 21:24,25
24:4 31:16
34:2,9
**good** 4:5,9,12
4:19,20
**great** 8:18
**ground** 6:23
**group** 5:1
21:16
**growth** 34:17
**guess** 15:24
21:9
**guidelines**
28:12
**gynecologic**
12:22
**gynecologist**
5:11 32:12
**gynecology**
5:14 6:6 21:14
26:3 33:4

**h**

**h** 3:12 4:24
38:3
**hand** 36:18
**head** 14:12
**health** 32:6
**hear** 24:5 32:2
**helps** 7:7
**hennepin** 36:3
36:24
**hereto** 39:7
**high** 9:13
**higher** 34:14
**hmm** 22:12
**hormones** 9:15
**hospital** 12:12
17:12 21:12
**hospitalist** 5:1
21:13,16
**hospitalized**
26:6
**hospitals** 21:16
30:20
**houston** 2:5
**hypertension**
33:25 34:12,13
35:7
**hypertensive**
34:1,9

**i**

**identification**
8:4
**identified**
14:21 17:8
19:4

**identify** 16:22
18:6,17 19:9
**identity** 19:2
24:1,11,18
26:15,19 27:22
**impact** 29:6
**impartiality**
36:15
**improvement**
27:8
**include** 12:3
15:9,10,11,12
**included** 26:3,4
26:5
**including** 11:22
**increased**
33:25
**increasing**
34:20
**indicate** 3:19
**indications**
10:7
**individuals**
29:22 33:17,22
34:4,19
**induction** 30:8
30:8
**information**
35:1
**initiative** 27:8
**instruct** 27:18
**instruction**
25:4
**instructions**
3:8,10

**instructs** 12:8
**intended** 16:2
**interest** 36:14
**interested**
36:13
**internet** 24:3
**intervals** 30:8
**intervenor** 1:7
2:18 4:14
**introduce** 7:25
**involve** 30:12
**involved** 6:9
**issued** 30:1
31:17
**issuing** 28:4
**iv** 23:25 24:11

**j**

**january** 36:24
**job** 1:24
**johnson** 1:25
36:23
**joined** 11:6
**justice** 2:19

**k**

**keeping** 32:15
**kind** 15:18
25:24
**king** 2:3,25 4:6
**know** 7:16,23
10:19 11:19
12:25 14:6
15:25 20:9
21:7 24:24
26:5 27:20,21

Angela Thompson , M.D.
King and Spalding - Pro Bono
May 2, 2024

**[know - nature]**

Page 7

29:17 30:14
33:19 34:8,12
**knowledge**
19:24 20:18
**known** 10:25
**kslaw.com** 2:6

**l**

**l** 2:4 4:23
**labor** 30:8,15
**lack** 25:19
**law** 4:6
**lawsuit** 6:5
**lcb** 1:5
**lead** 15:4
**learned** 22:21
**led** 23:5
**legal** 2:8 5:25
37:23
**level** 9:13
**life** 11:24
**line** 38:4,7,10
38:13,16,19
**list** 26:21 31:8
31:21
**listed** 27:4
30:17
**literature** 9:11
32:15 35:2
**little** 14:18 24:4
**live** 20:8
**llp** 2:3
**locally** 6:7
**long** 7:17 33:14
34:25

**look** 14:18
20:19 21:3
26:23 27:5
30:5 31:5
**looking** 14:20
31:21
**looks** 30:14
**lot** 14:13
**louisiana** 2:4

**m**

**m** 2:21 4:24
**m.d.** 1:13 3:3
3:15 4:15 37:5
38:2,24 39:2,4
39:12
**made** 39:5
**madison** 22:8
22:22
**make** 7:8,9
8:11 18:2
**making** 16:6
**male** 15:23
16:7,8,9,11,14
**management**
30:15
**manner** 3:18
**marked** 3:14
8:3,13,22
16:17
**marshall** 1:9
2:13 4:10 37:4
38:1 39:1
**massachusetts**
2:10

**matter** 6:4
**mature** 34:7
**mayo** 5:2 21:13
27:8
**mckay** 2:15 3:5
4:9,10 12:5
13:24 17:4,15
17:21 27:16
29:8 32:19,24
33:2,12 35:5
35:13,19 37:1
**mean** 15:1
**medical** 11:22
17:12 22:18
23:1,17,19,24
24:8,10,12,17
24:21,22 25:14
25:15,16 26:6
26:17
**medication**
10:4,6,12,21,22
11:2
**medications**
29:18
**medicine** 23:2
**membranes**
28:13,20 29:6
29:13
**men** 15:18,20
15:21 33:23
34:5
**mental** 32:5
**mentioned**
27:20

**merilee** 1:25
36:23
**merilee's** 7:6
**middle** 1:1
**mind** 19:20,21
**minnesota** 5:4
21:14 25:17,24
36:2,24
**minority** 19:4
**minors** 9:10
**minute** 32:20
**mm** 22:12
**model** 30:7
**mogge** 28:11
**monday** 35:21
**montgomery**
2:16
**morning** 4:5,9
4:12,19,20 5:6
7:11
**mph** 3:15 23:9
23:10,16
**murphy** 2:20
4:12,13 35:14
35:23
**muted** 32:1
**myomas** 10:24

**n**

**n** 2:1 3:1 4:23
4:24
**name** 4:5,12,21
**named** 24:19
**narrative** 35:1
**nature** 15:12

Angela Thompson , M.D.
King and Spalding - Pro Bono
May 2, 2024

**[nauseous - pdf]**                                                        Page 8

| | | | |
|---|---|---|---|
| **nauseous**  8:11 | **obstetrical**  6:6 | **ones**  19:13 | **parsons**  2:4 3:4 |
| **ne**  2:21 | **obstetrician** | **opinions**  28:5 | 3:6 4:5,6,18 |
| **necessarily** | 5:11 32:12 | 28:23 29:2,7 | 12:6 17:5,16 |
| 3:19 | **obstetrics**  5:14 | 29:14 30:1 | 17:24 32:16,22 |
| **necessary**  39:6 | 21:14 26:3 | 32:8 33:9 | 33:10 34:24 |
| **need**  6:3 7:15 | 33:4 | **opioid**  27:7 | 35:12,16,22 |
| 7:17,20 10:7 | **obtain**  25:13 | 28:1 | **part**  5:25 14:20 |
| 11:17 | **obtained**  23:16 | **optimize**  28:1 | 34:20 |
| **never**  35:9,9 | **obtaining** | **optimizing** | **particular**  25:1 |
| **nonadult**  12:24 | 24:21 | 27:6 | 29:1 |
| 13:4 | **obviously**  7:1 | **ordered**  36:9 | **parties**  4:3 36:9 |
| **nonadults**  13:2 | **occur**  13:12 | **original**  36:8 | 36:11,13 |
| **normally**  11:11 | 15:2 | **outcomes**  33:16 | **party**  36:9 |
| **northern**  1:2 | **offer**  32:8 | **outside**  33:10 | **pass**  32:17 |
| **notary**  36:24 | **offering**  5:12 | **overlaps**  14:13 | **past**  16:12 |
| 39:13,19 | 9:2 | | **patient**  13:17 |
| **note**  3:18 37:10 | **office**  2:14 | **p** | 14:5,21 16:13 |
| **noted**  35:25 | **oftentimes**  19:1 | | 19:19,19,22,23 |
| 39:7 | **okay**  6:20 7:20 | **p**  2:1,1 4:24 | 20:1,2 34:13 |
| **noticed**  36:9 | 7:24 8:9,16 | **page**  3:3,14 8:6 | **patients**  10:6 |
| **number**  18:13 | 10:9 11:8,17 | 8:12 9:7 20:21 | 11:2,11,23 |
| | 11:19 12:11,15 | 21:8,9 22:1 | 12:12,24 13:23 |
| **o** | 14:4 15:13 | 26:25,25 38:4 | 14:7 15:15,20 |
| **o**  4:24,24 | 16:8 18:16,23 | 38:7,10,13,16 | 16:4,7,8,12,22 |
| **o'connor**  2:25 | 21:12 22:5,9 | 38:19 | 17:1,8,14,20,22 |
| **oath**  7:2 | 22:20 23:4,10 | **pages**  1:16 | 18:5,10,12,13 |
| **ob**  5:1 21:12,12 | 23:16,19 24:7 | **paper**  27:24 | 18:14,16 19:1 |
| 21:15 | 24:24 25:19,23 | 28:16 30:3,4 | 19:3,9,11,15 |
| **object**  12:5,8 | 26:17 27:4,19 | 30:12,19,25 | 20:4 26:7,19 |
| 13:24 17:4,15 | 27:19 28:10,21 | **papers**  26:22 | 27:21 29:18 |
| 27:16 29:8 | 30:5 31:16,21 | **paragraph** | 30:16 35:3,7 |
| 35:5 | 32:16 | 8:21 9:7 11:9 | **paul**  1:3 37:4 |
| **objection**  17:23 | **one's**  28:10 | 11:10,14,20 | 38:1 39:1 |
| 33:10 | 30:19 | 13:8 14:19 | **pdf**  20:22 21:9 |
| **obligated**  12:9 | | 16:3,17,21 | |
| | | 18:5,11 19:8 | |
| | | 20:5 | |

Angela Thompson , M.D.
King and Spalding - Pro Bono
May 2, 2024

**[pediatric - purposes]**

Page 9

| | | | |
|---|---|---|---|
| **pediatric** 14:13 | **point** 11:17 | **prescription** | **provided** 9:17 |
| **peer** 26:22 | 12:16 | 9:24 27:7 28:2 | 12:13 21:18 |
| 29:12 30:6,17 | **population** | **present** 21:10 | **provider** 32:6 |
| 31:17,18 | 13:17 14:5,21 | 33:14 | **providing** |
| **people** 26:10 | **portion** 13:1 | **presentation** | 30:15 |
| **percent** 13:3 | 24:22 25:4 | 30:22 | **psychiatric** |
| 14:1,15 | **position** 21:10 | **presentations** | 25:5 |
| **percentage** | **post** 27:7 | 31:6,9,13,22,23 | **psychiatry** |
| 12:23 13:16 | **postcesarean** | 32:4 | 22:14,17,19 |
| 14:7 | 28:1 | **presently** 4:25 | 23:20,21 24:20 |
| **performing** | **postmenopau...** | 12:15 | 24:22 25:9 |
| 26:7 | 11:25 | **preserve** 10:15 | **psychology** |
| **perinatal** 34:20 | **practice** 12:3 | **preserved** | 22:10,11 23:11 |
| **person's** 15:7 | 12:11,23 17:12 | 36:16 | 23:20 |
| **personally** 9:17 | 25:11,25 28:12 | **pretty** 14:10 | **pubertal** 12:13 |
| 35:11 | **practices** 27:7 | **prevalence** | 12:16 |
| **persons** 36:14 | 28:2 | 13:1 | **puberty** 9:14 |
| **pertains** 9:11 | **predict** 30:7 | **primigravidas** | 9:20,25 10:5 |
| 21:20 | **preeclampsia** | 30:21 | 10:16 11:24 |
| **phone** 2:6,11 | 34:16 | **prior** 6:8 10:20 | 13:9,11 |
| 2:16,22 | **pregnancies** | **private** 2:2 4:7 | **public** 36:24 |
| **physical** 15:6,8 | 29:20 | 6:2 20:10 | 39:19 |
| **physician** | **pregnancy** | **probably** 8:10 | **publication** |
| 20:11 | 12:22 16:23 | **procedures** | 27:13 28:4,22 |
| **placental** 34:16 | 17:9 18:7,18 | 26:8 | 29:1 |
| **plaintiff** 1:7 | 19:10 33:8,16 | **proceeding** 6:8 | **publications** |
| 2:18 4:14 | 33:17 34:3,10 | 6:12 | 27:4 |
| **plaintiffs** 1:5 | 34:14 | **proceedings** | **published** |
| 2:2 4:8 | **pregnant** 20:6 | 4:1 11:7 | 27:11,12 30:6 |
| **plan** 20:12 | 34:4,11,13 | **processes** 15:3 | 31:18 |
| **plans** 20:16 | **prelabor** 28:12 | **proportion** | **pull** 8:1 |
| **play** 34:20 | 28:19 29:5,13 | 13:2 14:11 | **purely** 35:2 |
| **please** 4:4,22 | **prescribed** | **provide** 11:22 | **purpose** 27:24 |
| 7:15 35:24 | 9:20 10:12,21 | 16:3,6 21:17 | **purposes** 28:4 |
| | 11:2 | | |

Angela Thompson , M.D.
King and Spalding - Pro Bono

**put**  33:19

**q**

**quality**  27:8
**question**  7:19
7:22 9:10 10:8
10:11,20 12:10
13:5 15:25
16:3 17:18,25
18:1 24:5
27:17 29:10
32:2
**questions**  7:8
32:17 34:22
35:12,13,14
**quotations**  3:18
**quote**  3:19

**r**

**r**  2:1 38:3,3
**raising**  10:10
**range**  13:6,9,18
13:23 14:2,9
14:15 17:7
**rank**  21:10
**rate**  36:10
**rates**  30:21
31:4
**rdr**  1:25 36:23
**read**  3:18 12:1
16:21,24 18:8
35:19 36:16
37:9 39:5
**reading**  35:2
**reads**  18:5

**really**  29:24
33:15
**reason**  7:11,14
19:5 37:11
38:6,9,12,15,18
38:21
**recall**  5:17,19
6:19 13:21,22
13:25 17:10
19:25 20:3
26:20 31:15,20
**receipt**  37:17
**receive**  29:18
29:23
**received**  33:23
**receiving**  34:7
**recollection**
8:23
**record**  3:19 4:2
4:4,22 32:23
36:7
**record's**  18:2
**refer**  9:3,8
**referenced**  37:6
**referred**  3:14
**referring**  15:6
18:10,24 19:11
20:5
**reflected**  3:18
**refresh**  8:23
**regarding**
28:19 32:5
**regular**  35:22
35:24

**regularly**  6:25
**relative**  36:11
36:12
**relevance**
29:22
**relevant**  29:25
33:8
**relied**  28:21
**relies**  30:2
**rely**  32:8,11
**relying**  28:3
**remain**  34:2,9
**remember**  33:5
**remote**  1:12
36:4
**remotely**  2:1
**report**  3:15 8:2
8:7,14,21 11:9
13:8 14:20
16:16 19:8
20:13,20 21:5
21:21 27:1
30:2,4 33:20
**reported**  1:25
36:4
**reporter**  4:2
10:2 31:25
**reporter's**  3:18
36:1
**reports**  20:16
**represent**  4:4
**reproductive**
10:23 11:24
**requested**  10:2
31:25

**requests**  3:10
**required**  39:13
**requirement**
24:20 25:7
**requirements**
26:2
**research**  33:4,7
**reside**  5:3
**residency**
25:21,22,24
26:1,9,17
**responses**  7:9
**restriction**
34:17
**return**  37:13,16
**rev**  1:3 37:4
38:1 39:1
**review**  37:7
**reviewed**  26:22
29:12 30:6,17
31:17,18
**right**  8:5,12,20
9:10 11:10
13:15 14:18
16:14 17:6
18:8 19:7,12
19:22 22:23,25
23:2 25:17,23
26:21,24 28:3
30:23 31:5
32:24 35:8,10
36:16
**rights**  2:19
**risk**  33:25 34:1
34:9,12,14

Angela Thompson , M.D.
King and Spalding - Pro Bono
May 2, 2024

**[risks - support]**

Page 11

| | | | |
|---|---|---|---|
| **risks** 33:16 34:20 | **seeking** 10:16 | **small** 14:10,11 14:12 | **stage** 13:12,16 13:23 14:8 34:6 |
| **rochester** 5:4 21:14 | **semester** 24:25 | **smaller** 14:14 | **standard** 26:1 |
| **role** 5:8 | **sense** 7:9 | **solutions** 37:23 | **start** 13:20 |
| **rsa** 1:25 36:23 | **sent** 37:14 | **sorry** 9:23 16:2 20:14 22:7 23:4 24:3 29:9 31:10,10 | **started** 14:4 |
| **rules** 6:23 | **sentence** 16:21 17:2 18:4,11 19:7 | | **state** 2:13 4:3 4:11,21 34:2 36:2 |
| **rupture** 28:12 28:20 29:5,13 | **serious** 34:15 | **sounds** 6:24 | **states** 1:1,6 2:18 4:14 |
| **s** | **serve** 20:12,16 | **southeast** 37:15 | **status** 27:22 |
| **s** 2:1 3:12 4:24 36:23 38:3 | **served** 5:22 | **spalding** 2:3,25 4:7 | **steve** 1:9 2:13 37:4 38:1 39:1 |
| **says** 7:7 | **service** 25:9 | **span** 11:24 | **street** 2:4,21 |
| **school** 23:2,17 23:19,24 24:8 24:10,12,17,23 25:15 | **setting** 12:12 26:6 | **spans** 9:7 | **studies** 22:9 23:11 31:3 |
| **scope** 33:11 | **severe** 34:16 | **speak** 18:13 19:6 27:23 | **study** 23:23 24:9,18 29:4 30:12 |
| **screen** 8:2,6,21 16:18 20:22,24 26:24 27:2 28:8 | **sex** 9:15 14:22 15:14 16:8,12 16:13 19:16 | **speaking** 10:1 34:5 | **subject** 6:4 |
| **scroll** 8:9 11:9 11:18 21:25 | **sexual** 15:4 | **special** 3:10 | **subscribed** 39:14 |
| **seal** 36:18 | **sharing** 8:5 | **specialized** 26:10,12 | **subsequent** 33:17 |
| **second** 20:1 22:1 | **sheet** 37:11 | **specialty** 22:18 25:5 26:2 | **substantial** 12:25 36:14 |
| **section** 2:20 22:1 | **short** 33:15 | **specific** 29:21 32:4 | **suite** 2:5,10 |
| **see** 8:6,8 11:15 11:18 14:24 16:18 17:10 20:23 22:3 27:2,9 28:7,14 30:10 31:8 | **show** 11:14 | **specifically** 10:1 18:25 19:11 28:19 30:2,14 31:3 34:5 | **summary** 8:24 |
| | **showing** 20:23 21:8 | | **supplemental** 20:13 |
| | **shown** 33:24 | **specifics** 10:8 | **supply** 6:14 |
| | **sign** 35:20 36:16 37:12 | **spell** 4:21 | **support** 28:22 29:1,12,14 |
| | **signature** 8:10 8:14 36:23 | **srw** 1:5 | |
| | **signed** 37:19 | **ss** 36:3 | |
| | **single** 16:12 | | |
| | **sit** 31:14 | | |
| | **sites** 21:17 | | |
| | **six** 17:11 | | |

Angela Thompson , M.D.
King and Spalding - Pro Bono

May 2, 2024

**[sure - understand]**

Page 12

| | | | |
|---|---|---|---|
| **sure**  7:8 16:6 18:2 28:25 32:22 | **thank**  7:21 10:10 32:24 34:21 35:16 | **title**  27:6 28:10 | 35:3 |
| **surgical**  11:22 26:7,7 | **thanks**  24:15 32:3 35:18 | **titled**  22:1 30:7 30:20 | **treatment**  9:9,9 9:25 12:21 27:14 28:17 29:22 31:1,24 |
| **sworn**  39:14 | **think**  7:16 8:23 | **today**  7:1,13 31:14 35:8,17 | **tremont**  2:9 |

**sure**  7:8 16:6
18:2 28:25
32:22
**surgical**  11:22
26:7,7
**sworn**  39:14

**t**

**t**  3:12 4:24 38:3
38:3
**take**  7:19 19:18
20:19
**taken**  20:10
**talk**  21:24
**tanner**  13:12
13:16,23 14:8
**tell**  6:4 10:20
36:6
**tendency**  36:14
**term**  30:21
33:14,15
**termed**  10:5
**terms**  29:3
**testified**  4:16
35:8
**testify**  6:11
**testifying**  5:5
7:2
**testimony**  5:13
7:13 9:2 36:7,7
37:9,17 39:8
**testosterone**
29:24 33:18,21
33:23 34:8,19
**texas**  2:5

**thank**  7:21
10:10 32:24
34:21 35:16
**thanks**  24:15
32:3 35:18
**think**  7:16 8:23
14:4,5 17:21
17:25 18:1
20:21 23:4,4
24:3 25:16
**thinking**  13:10
**third**  30:5
**thompson**  1:13
3:3,15 4:15,19
4:23 5:20 8:5
8:25 11:8 12:7
16:18 18:4
20:12 27:2,18
31:8 32:7,17
33:13 34:21,25
35:17 36:5
37:5 38:2,24
39:2,4,12
**three**  17:11
**thursday**  1:14
**time**  7:18 12:7
12:7 13:19
18:20 19:18
20:6 23:25
24:10,19 26:14
27:5 30:7
34:11 35:16,25
37:18
**timeframe**  37:8

**title**  27:6 28:10
**titled**  22:1 30:7
30:20
**today**  7:1,13
31:14 35:8,17
**top**  8:19 14:11
**tract**  10:24
**traffic**  6:18,18
**training**  22:19
23:20 24:22
25:2 26:2,5,10
26:12,13 32:7
32:11
**trans**  33:23
34:5
**transcribed**
36:7
**transcript**  3:16
35:20 37:6,19
39:5,8
**transgender**
16:22 17:9
18:6,17 19:10
**treat**  10:23
11:4,11 12:18
15:18 25:8
35:7
**treated**  14:8,22
16:11,22 17:1
18:5 19:3,9
35:9
**treating**  12:16
13:17 17:7,13
17:19 18:19
20:6 26:18

35:3
**treatment**  9:9,9
9:25 12:21
27:14 28:17
29:22 31:1,24
**tremont**  2:9
**trick**  16:2
**true**  7:12 36:7
39:8
**truth**  36:6
**try**  10:11 17:17
17:18
**trying**  17:23
27:24 29:11
**tucker**  1:3 37:4
38:1 39:1
**turn**  11:8 16:16
**two**  6:20 17:3,7
17:13,20,22
18:15,22 19:11
19:15 25:3
**types**  11:11

**u**

**u.s.**  2:19
**unclear**  7:23
**under**  7:1 13:7
**undergone**
15:15 19:23
20:2 34:6
**undergrad**
22:5,9 23:7
**undergraduate**
22:15,19
**understand**  5:9
5:10 7:3 8:10

Angela Thompson , M.D.
King and Spalding - Pro Bono
May 2, 2024

**[understand - yep]**                                              Page 13

| | | |
|---|---|---|
| 12:10 24:15 27:25 29:11 | **w** | 35:23 |

12:10 24:15
27:25 29:11
**understanding**
15:24 25:20
**united**   1:1,6
2:18 4:13
**university**   22:6
22:6,8 23:1
25:17,24
**unknown**   34:1
**unrelated**
27:13
**usdoj.gov**   2:22
**used**   10:6,22
33:21 37:19
**using**   9:14
**utah**   22:6 23:1
**uterine**   10:24
**utero**   15:3
**uterus**   33:16
**uw**   22:22

**v**

**v**   1:8 37:4 38:1
39:1
**verify**   37:9
**veritext**   37:14
37:23
**veritext.com**
37:15
**videoconfere...**
2:1
**videotaped**
1:12
**vitae**   21:4,20

**w**

**want**   19:5
26:22 27:5
**wards**   25:8
**washington**
2:15,21
**way**   8:9,18 16:7
28:4,22
**we've**   14:20
16:17
**went**   22:25
23:6,17 25:15
**wisconsin**   22:7
22:8 23:7
**witness**   3:3
5:11,22,24
27:19 32:18
36:5,7,16,18
37:8,10,12,18
**work**   17:19
25:11 26:5
29:5,11
**working**   5:1
20:15 31:11
**workload**   30:9
**written**   9:24
20:16 30:1
**wrote**   19:7

**x**

**x**   3:1,12

**y**

**yale**   23:9,10
**yeah**   13:25
14:3 20:25

35:23
**year**   21:7,22
31:19
**years**   6:18
13:13,14 17:11
25:3,7
**yep**   22:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.