# EXHIBIT 4

# Protecting Transgender Health and Challenging Science Denialism in Policy

Meredithe McNamara, M.D., Christina Lepore, B.A., and Anne Alstott, J.D.

A virulent brand of science denialism is emerging in the U.S. legal system, as states enact bans on gender-affirming health care. Misused clinical research and disinformation have provided legal cover for bans on essential treatments for transgender and gender-expansive (TGE) people.[1,2] Many of these bans restrict Medicaid reimbursement of gender-affirming care for people of all ages or prohibit gender-affirming care for minors. The recent end of federal protection for abortion and the lifting of Covid-19 protections such as mask mandates may signal an expansion of this dangerous force in health policy. Deeper government interference in health care could well follow. A template for challenging science denialism could come from collaborations between medical and legal experts that have supported initiatives to protect access to gender-affirming care.

The legislation enacting bans on gender-affirming care for adolescents and the legal briefs defending such bans harbor four themes of science denialism. These themes include repudiation of the medical condition that is the target of treatment, misrepresentation of the standard of care, false claims about risks associated with treatment, and misuse of existing research. Such tactics allow policymakers with anti-transgender agendas to reject medical authority, stoke public fear, and legally codify falsehoods. Once detected and exposed, these false claims can be deconstructed with the use of robust evidence.

Legal measures that block access to gender-affirming care are riddled with falsehoods about gender dysphoria and gender-expansive people. Many contain inflammatory statements that gender dysphoria should be treated with psychotherapy alone, thereby evoking the same dangerous stereotyping that once pathologized homosexuality. Bans on gender-affirming care also reference social contagion, a theory that has been used to describe the mode by which gender dysphoria "spreads" among adolescents but has been debunked in this context.[1,2] Harmful terms such as "desistance" and "regret" have been misapplied to gloss over the suffering that TGE people experience in an overwhelmingly cisgender society. Some people who have transitioned change their gender expression for deeply personal reasons, which may include the pressures and hostilities of an increasingly anti-transgender climate. Studies of those who have undergone medical transition have typically found rates of regret of less than 1%.[2]

Government officials seeking to enact bans on gender-affirming care frequently spread disinformation about standard practice. Relying on false claims that performing genital surgery in children is common practice and that physicians push medicalized transition, the Texas attorney general issued a legal opinion in 2022 concluding that gender-affirming care is child abuse.[1] Alabama's 2022 Vulnerable Child Compassion and Protection Act stoked fears that children make final decisions regarding gender-affirming care.[1] In reality, prepubertal children are ineligible for medical treatments such as puberty blockers and exogenous sex hormones, and treatment decisions for adolescents are generally made in concert with legal guardians after thorough assessment.[3,4]

Biased policymakers often make deceptive claims about the risks associated with gender-affirming medical treatments. In 2020, the High Court of Justice of England and Wales relied on misinformation about the safety of puberty blockers to essentially ban their use in adolescents with gender dysphoria.[5] Witnesses in the case claimed that puberty blockers cause irreversible bone changes and infertility, despite their established safety for the treatment of precocious puberty.[5] Though overturned on appeal, the initial decision has been repeatedly cited as a precedent for U.S. bans. State laws banning gender-affirming care make similarly unsupported claims about risks of cardiovascular disease, thromboembolic events, and cancer associated with administration of exogenous estrogen and testosterone.[1,2] The effect of gender-affirming medications on fertility is an active area of study, and conception

The New England Journal of Medicine
Downloaded from nejm.org by Roger Brooks on May 1, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

can occur in TGE people taking hormones. The informed-consent process includes a discussion of these potential effects, and gamete preservation should be offered to TGE people seeking puberty blockers or sex hormones (although access to such services remains inequitable).[3,4]

Finally, policymakers promoting such bans often misuse scientific facts and contort evidence. To justify termination of Medicaid coverage of gender-affirming care, Florida's Agency for Health Care Administration prepared a review limited to cherry-picked studies published between 2020 and early 2022, many of which had negative findings and some of which were heavily corrected.[2] People with ties to anti-trans organizations, expertise in pedophilia (rather than transgender health), and no clinical experience in gender-affirming care testified in support of bans in Texas, Florida, and Alabama.[1,2]

A particularly flawed claim is that the absence of randomized, controlled trials (RCTs) of gender-affirming care negates any of its known benefits. There's no way to conduct such RCTs with clinical equipoise, since evidence demonstrates mental health benefits, reduced suicidality, improved body satisfaction, and healthier social functioning associated with this care. Furthermore, foundational evidence supporting the use of insulin, penicillin, and statins is derived from observational studies, yet states that use such logic to restrict gender-affirming care haven't similarly scrutinized these drugs.

Innovation and research in the area of gender-affirming care is robust. The newly released eighth version of the World Professional Association for Transgender Health Standards of Care cites the largest and most generalizable studies on this topic.[4] Federally funded, prospective observational studies involving adolescents with gender dysphoria are under way. Defenders of medical bans claim that gender-affirming care is "experimental" because the field is actively growing, but scientific consensus is ever evolving. The first hormone treatments for gender dysphoria were administered in the 1930s when estrogen and testosterone became commercially available, and the first use of puberty blockers for gender dysphoria was reported more than 20 years ago.[4] Transgender health isn't a nascent field, but it is an evolving one that shouldn't be hamstrung by biased laws.

In litigation, lawyers and scientists have begun consolidating their expertise to expose and rebut science denialism at the policy level. This type of interdisciplinary collaboration consists of written reports and expert testimony that summarize clinical research for judges, regulators, and the public. As of October 2022, courts had temporarily blocked legal measures that would have prohibited gender-affirming care for minors in Arkansas, Alabama, and Texas. These initial successes reflect the coordinated efforts of legal organizations defending the rights of TGE people, including the American Civil Liberties Union, GLBTQ Legal Advocates and Defenders, and others. These preliminary victories face further adjudication.

National medical societies, which traditionally haven't intervened in state politics, are now mobilizing. Twenty organizations filed an amicus brief in a 2022 lawsuit challenging Alabama's law. The court's opinion in this case acknowledged the importance of scientific expertise and consensus, noting that "medical providers have used transitioning medications for decades to treat medical conditions other than gender dysphoria" and that the defendants provided "no credible evidence to show that transitioning medications are 'experimental.'"

We have written rapid-response, in-depth rebuttals of science-denialist claims that have been cited in litigation and provided material for direct intervention in legal processes in the form of amicus briefs and regulatory comments.[1,2] Reports such as these are composed by subject-matter experts without conflicts of interest and made publicly available to inform members of the media, the medical community, and legal organizations seeking to understand these quickly evolving issues. Scientists, clinicians, and legal experts who face science denialism in its many forms may consider similar undertakings.

Bans on gender-affirming care are grounded in science denialism, harm the health of marginalized people, and degrade medical authority. Collaboration between lawyers and scientists is critical to defeating such bans in the courts. The U.S. Supreme Court's recent ruling in *Dobbs v. Jackson Women's Health Organization* signals a new legal era in which states may attempt to restrict reproductive autonomy, marriage equality, and the right to same-sex intimacy. The combined powers of medicine and law could safeguard the credibility of sci-

The New England Journal of Medicine
Downloaded from nejm.org by Roger Brooks on May 1, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

ence and civil liberties in health policy.

Disclosure forms provided by the authors are available at NEJM.org.

From the Yale School of Medicine (M.M., C.L.) and Yale Law School (A.A.) — both in New Haven, CT.

This article was published on November 19, 2022, at NEJM.org.

**1.** Boulware S, Kamody R, Kuper L, et al. Biased science: the Texas and Alabama measures criminalizing medical treatment for transgender children and adolescents rely on inaccurate and misleading scientific claims. April 28, 2022 (https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/report%20on%20the%20science%20of%20gender-affirming%20care%20final%20april%2028%202022_442952_55174_v1.pdf).
**2.** McNamara M, Abdul-Latif H, Boulware SD, et al. A critical review of the June 2022 Florida Medicaid report on the medical treatment of gender dysphoria. July 8, 2022 (https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/florida%20report%20final%20july%208%202022%20accessible_443048_284_55174_v3.pdf).
**3.** Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an Endocrine Society clinical practice guideline. J Clin Endocrinol Metab 2017;102:3869-903.
**4.** World Professional Association for Transgender Health. Standards of care for the health of transgender and gender diverse people, version 8. September 15, 2022 (https://www.wpath.org/soc8).
**5.** Bell v. Tavistock and Portman NHS Foundation Trust, 2020 EWHC 3274. December 1, 2020 (Eng.).

DOI: 10.1056/NEJMp2213085
*Copyright © 2022 Massachusetts Medical Society.*

The New England Journal of Medicine
Downloaded from nejm.org by Roger Brooks on May 1, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.