# EXHIBIT 13

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; *et al.*,

      Plaintiffs,

and

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

  v.

STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; *et al.*,

      Defendants.

Case No. 2:22-cv-00184-LCB-CWB

Honorable Liles C. Burke

## SUPPLEMENTAL EXPERT REPORT OF
## ARON JANSSEN, MD

1.  My name is Aron Janssen, M.D. I am a board-certified child and adolescent psychiatrist. I specialize in the treatment of gender dysphoria in children and adolescents. On February 10, 2023, I provided a report on the standards of care for treating individuals diagnosed with gender dysphoria. I have been asked to supplement that report based on my review of the following supplemental expert reports:

    a.  Supplemental Expert Report of James Cantor, Ph.D. (Feb. 2, 2024)

    b.  Supplemental Expert Report of Michael K. Laidlaw, M.D. (Feb. 2, 2024)

2.  The articles Cantor and Laidlaw rely on are largely systematic reviews of data that have been available for many years.  Cantor and Laidlaw use this older data to draw unfounded conclusions they wrongly suggest weigh against providing treatment options. Nothing in the articles they cite rebuts my earlier opinion regarding the efficacy of gender transition treatments when medically indicated.

3.  Cantor and Laidlaw also levy unsupported criticisms of the WPATH process for generating the Standards of Care 8 ("SOC 8"). Rather than diminishing the strength of the Delphi-approved recommendations of the SOC 8, the materials Defendants point to show the rigorous and informed debate behind the development of SOC 8. The recommendations in the SOC 8 went through a standard Delphi process that included consensus votes. Some of the recommendations were supported on the first consensus consideration. Others were discussed and debated

over time and then refined. That is part of scientific and rigorous debate and fully consistent with the Delphi process, which is designed to foster robust discussion and airing of views. Disagreements among scientists and professionals reflect the robustness of the process.

4. Finally, Defendants' experts agree that gender dysphoria is a real, serious and debilitating medical condition for adolescents. The scientific literature shows that gender transition medications can diminish or alleviate gender dysphoria, and the State's experts can point to no evidence that shows any effective alternative treatment for gender dysphoria in adolescents.

## I.   <u>**CANTOR**</u>

5. Cantor bases his opinion on isolated statements from systematic reviews suggesting a need for more evidence to strengthen what we know about the efficacy of established medical care for adolescents with gender dysphoria. There is virtually no area of medical treatment or research, if any, in which such systematic reviews would not include similar statements noting the need for further research; in fact, one of the main purposes of systematic reviews is to flag such needs. Cantor's opinion is largely based on this fundamental misreading of these isolated statements, not on any meaningful review of the substantial body of research on this area of medical care and not on any day-to-day experiences in treating transgender patients or on his clinical observations.

3

6. I would agree with Cantor that there is no one assessment tool that is guaranteed to capture internal signals that can sometimes be misread as related to gender dysphoria. Accordingly, in actual practice, assessment tools can be a component of assessment but are not the entirety of it. For example, the standard assessment for gender dysphoria includes, and has always included, an assessment of the social milieus with which the individual interacts. One must understand the social context in which an individual patient lives in order to make a diagnosis and be able to identify a patient's identity as being stable over time. This is a core tenet of gender-affirming care.

## A. Cantor's Commentary on Studies

### 1. Morandini

7. Morandini et al. (2023) use a cross-sectional sample of children and adolescents ages 4-17 to assess the mental health effects of social gender transition. The authors examine the mental health of gender dysphoric children and adolescents referred to the Gender Identity Development Service (GIDS) using clinician ratings of mental health, comparing the mental health of those who had socially transitioned to those who had not. (p. 1048). Overall, the authors generally found that children and adolescents who had socially transitioned and those who had not did not differ

with regard to narrowly defined mental health status in the short term.[1] (pp. 1052-53). In the study, the authors used anxiety, depression and suicidality measures to represent the broad category of mental health. However, specific measures of intensity of gender dysphoria and the impact on quality of life were not included in this analysis, and it is the distress from the core symptoms of Gender Dysphoria that social transition, along with the other aspects of gender affirming medical care aim to target.

8. By virtue of the cross-section research design—and by the authors' own admission—the study captures some aspects of mental health at one specific point in time: upon the children and adolescents' first contact with GIDS, at which time clinicians assessed mental health. Because the study focuses on a snapshot in time, it does not support a conclusion that there are no mental health benefits of social transition over a longer time horizon. While the study adds to the field in important ways, it does so modestly, and the authors caution:

> "Our data suggest that social gender transition *may not render immediate and dramatic alleviation of mental health difficulties* for all or most children/adolescents suffering with gender dysphoria. If it did, we would expect to have found some lower prevalence of anxiety or depression in our socially transitioned group. Perhaps our study hints that *social gender transition alone, at least in the short term, is no panacea to mental health struggles of young people with gender dysphoria* and that clinicians and parents should not expect immediate

---

[1] They did find that mood disorders were more common among children and adolescents assigned male at birth who did not transition but express that the finding may be spurious.

symptom alleviation specific to gender dysphoria or related to mental health more generally." (p. 1057).

Furthermore, the study is specific to social transitioning and does not support any negative inferences with regard to the efficacy of gender transition medications. If patients have an adjustment disorder in which their depression or anxiety or suicidality is a direct result of gender dysphoria, we often see individualized improvements from social transition. But the long-term positive effects of social transition alone, without gender transition medications, are often limited.

This study demonstrated merely that social transition in and of itself is not a cure-all for gender dysphoria in all cases and may not improve co-occurring psychiatric conditions. That said, as the authors acknowledge, "[i]t is possible that although our socially transitioned patients did not demonstrate superior well-being compared to their non-transitioned counterparts, they were nevertheless functioning better (either in terms of mood/anxiety or gender dysphoria severity, or both) than their own prior functioning pre-social transition." (p. 1057). This is an important caveat as this study provides no way to assess whether social transition improved the mental health of these patients relative to their mental health before socially transitioning.

9.   In my opinion, Dr. Cantor overstates the conclusions from this study, and does so in ways the authors themselves expressly caution against. Some patients with

gender dysphoria also have independent mental health diagnoses such as depression or anxiety. Social transition is treatment for gender dysphoria. It may not alleviate other independent mental health conditions from which a patient suffers. That does not mean that it is not effective at alleviating gender dysphoria.

10.   It is also unrealistic to conduct a randomized control trial for social transition as a patient cannot be blinded from the treatment.

### 2.  Glintborg et al. 2023 and Kaltiala (2023)

11.   Glintborg et al. (2023) investigates mental health outcomes for a large sample of Danish transgender individuals after initiation of gender-affirming care. The authors examined longitudinal outcomes for mental and behavioral disorders and prescription of psychopharmacological agents in almost 4,000 individuals following their initial diagnosis of gender incongruence. (p. 338-39). They found that the risk for mental and behavioral disorder in transgender persons increased rapidly during the first year of their diagnosis and, as compared to age-matched same and opposite sex controls, remain elevated throughout the study's follow-up period relative to two years prior to diagnosis. (p. 342). Correspondingly, the proportion of transgender individuals prescribed psychopharmacological agents increased significantly from baseline diagnosis. (p. 342).  Notably, the odds ratio for mental and behavioral disorders increased after the index date and then gradually decreased or plateaued for transgender individuals when compared to the control population.

(p. 342). As the authors observe, "[t]his finding supports that systematic psychological evaluation after referral to a center of gender identity will increase awareness of mental health disorders in transgender individuals." (p. 342). Finally, the authors found that odds ratios were stable for mental health outcomes after initiation of gender-affirming hormone treatment. (p. 342).

12. Similar to Glintborg et al. (2023), Kaltiala (2023) used data from the general population of Finland as a control to compare the mental health outcomes for individuals with gender dysphoria. Kaltiala found that, whether or not they received medical intervention, all patients with gender dysphoria engaged with mental health services more than the cisgender controls.

13. In general, Glintborg and Kaltiala are well-done studies with reputable results, and rates of co-occurring diagnoses in these studies are aligned with previous published literature. What they show, however, is that when a person with a mental health condition initiates treatment for it, that increases the number of mental health-related visits they have. It also shows that a person who receives a mental health diagnosis will have continued treatment for that condition over time. That individual may also have other mental health diagnoses that are identified through the process of assessment and for which they will also receive treatment. Those facts do not show lack of efficacy of gender transition treatments. They simply show that when a person begins treatment for a condition, continued treatment is likely.

14. Additionally, the results must be contextualized within the broader understanding of mental health risk factors and diagnostic tends. Gender-affirming treatment does not eliminate or reduce the social stigma or bias that a person faces. We should not anticipate that outcomes for transgender individuals, even those receiving affirming treatment, will have the same baseline prevalence as the general population used for control purposes in the studies. It is also crucial to recognize that people seeking gender-affirming care are required to have full psych evaluations, thus identifying more underlying diagnoses as a part of the assessment process. If the general population were similarly subjected to a full psych evaluation, it too likely would result in a greater number of diagnoses. The best interpretation of the data, in my opinion, is that they represent the natural trajectory for diagnosis upon first contact with a full mental health evaluation. The authors agree, as discussed in the quoted language above.

15. By ignoring these critical contexts and the authors' own analysis of their data, Cantor misstates or misunderstands the clinical implications of Glintborg and Kaltiala. Cantor interprets both to support the proposition that medicalized transition is not followed by improvement in mental health. As discussed, above, improvements are not absent simply because treatment and diagnoses continue; the goal is diminishment of symptoms and improved quality of life which we see in clinical practice and which is not rebutted by this study.

16.   These findings are not surprising to those of us in the medical community who interact with patients with socially stigmatized identities. Dr. Cantor's assessment that individuals that received medically affirming interventions are suffering because they continue to receive mental health services is the opposite of what I find in practice. Continued receipt of mental health services does not indicate poor mental health. Indeed, I want my patients to have access to mental health care that alleviates suffering and improves functioning. In fact, in my experience, patients who do not commit to continued care fare worse than those Cantor concludes—from his review of population-level data—are "worse off" or unwell. Treating continued care as a negative ignores the reality that mental health often requires a long term, sustained investment of time and patient participation.

17. Cantor also inappropriately interprets the studies as applicable to adolescents and children. There is little support for extrapolating to this population. While Glintborg includes adolescents and children in the sample, the authors do not analyze the data for that subset of the population separately. What the authors actually do is exclude youth from their analysis to determine if their inclusion impacts results; it does not, but this may be because the results for adults are so well powered. The exercise tells us nothing about the youth population in isolation.

18.  The sample in Kaltiala is adult. Cantor discusses the difference between childhood-onset gender dysphoria and adolescent onset gender dysphoria, but he has

no first-hand knowledge of the difference. Rapid Onset Gender Dysphoria (ROGD) is a term Cantor has broadly assigned to a large group of patients he has neither seen nor assessed, and so possesses no understanding of each individual patient's time course for treatment. ROGD is not established or recognized in peer-reviewed medical literature.

### 3. Thompson

19. Thompson is a descriptive paper – a systematic review aimed at characterizing how care is provided. Key takeaways from the study are that (1) nothing in the study or Thompson's interpretation indicates the mental health of patients receiving gender-affirming care worsened because of care; (2) these types of studies provide only a point-in-time reference; and (3) more studies are needed to provide a more comprehensive understanding of this population and how to provide the most effective care, as is true for many other conditions.  Thus, Cantor overstates the implications of the article.

20.  Ultimately, Dr. Thompson's findings and recommendations are that more studies need to be conducted—not that treatment should be banned.

21.  Notably, Cantor criticizes the quality of evidence regarding gender-affirming care in adolescents based on mental and physical health outcomes because "no randomized controlled trials (RCTs) yet exist" and that Thompson "included no indication that RCTs could not be conducted." (Cantor, p. 9). As with his comments

on Morandini and social transition, Cantor does not explain how he would ethically or practically conduct an RCT on medically transitioning adolescents. The selection process itself would never pass an institutional review board nor ethical muster, as patients desperately in need of and seeking care would be denied care by design. Furthermore, such a study would be impossible to blind as the physical changes associated with transitioning would be impossible to hide or disguise. Accordingly, Cantor's criticism that the evidence for providing medical treatment for transitioning adolescents is lacking because no RCTs have been conducted further demonstrates his bias and lack of experience and understanding of actual practice in the treatment of those receiving treatment for gender dysphoria.

### 4. Christiansen

22.  Christiansen identifies factors in reducing suicidality in transgender and gender diverse youth. Transgender and gender diverse youth have higher rates of self-harm and suicide. Christiansen conducted a systematic review of 17 studies studying intervention domains: (1) crisis intervention; (2) safety and connectedness; (3) gender-affirming medical care; (4) online media; (5) family systems. As all of these studies have found, there is a developing body of literature on the impact of gender-affirming care, and many of the studies reviewed showed significant positive effects on mental and physical health. Christiansen's review points to a critical need for safety, connectedness, and acceptance from multiple systems. Cantor does not

address how targeted legislation such as the Vulnerable Child Compassion Act would meet those needs. Neither does he address the fact that Christiansen's findings indicate such legislation would further stigmatize and alienate transgender and gender diverse youth, thereby increasing the risk of suicide and self-harm. Instead, Cantor again suggests RCTs would provide high-quality studies to prove medical transition reduces suicidality. Again, Cantor's suggestion of an RCT on suicide prevention in transitioning youth raises serious questions of ethical and practical execution of such a study. By design, such a study would require withholding care from suicidal youth. As with the other RCTs suggested by Cantor, such a study would be impossible to blind. As such, Cantor's criticism of the evidence regarding the impact on the risk of suicide and self-harm in transgender youth is without merit.

**B. "Lack of Science supporting the medicalized transition of minors"**

23.   In another attempt to argue there is no robust evidence supporting medical care for transitioning youths, Cantor turns away from peer-reviewed literature and to Twitter posts and Wall Street Journal opinion pieces. I do not consider those tweets and opinion pieces reliable sources that I would look to or rely on in forming my expert opinion.

24.  Cantor also points to statements from the World Health Organization ("WHO") and the American Academy of Pediatrics ("AAP") as further "evidence" that his assessments are correct. Cantor misstates the WHO's reasoning for only

13

including adults by stating that minors were excluded "specifically because of the insufficient and inconsistent evidence." (Cantor, p. 28). The WHO guidance actually continues the pattern of the other studies and indicates further studies focused on long-term outcomes will assist in refining treatment guidelines and clinical practice. Nothing in the WHO's statement indicates banning gender-affirming care will provide the evidence base needed to include adolescents in the guideline.

25. Cantor's reliance on the guidance from the UK Council for Psychotherapy also is misplaced as it states the obvious to those of us actually practicing in this field: patients seeking medical interventions for gender dysphoria must be apprised of the risks associated with this treatment. Informed consent is a tenet of my practice and an ethical obligation of all medical providers. It is best practice that our patients understand to the best of their abilities at their cognitive level the risks, benefits, and potential issues associated with any course of treatment. As part of the informed consent process, I have individualized conversations with each patient—and their legal guardians, if they are younger than 18—regarding multiple aspects of treatment. Ultimately, I would like my patients to understand what they are taking, why they are taking it, and what can happen if they take it, and effort is made in practice to achieve that with each patient.

26. Cantor next criticizes the American Academy of Pediatrics' reaffirming its 2018 policy statement, despite Cantor's apparent criticism. As noted by Cantor,

the AAP has not responded to his criticisms now or in the past. It is not my place to provide an opinion as to why the AAP has not responded to Cantor's critiques, but the lack of a response from an organization such as the AAP does not strike me as evidence that it supports Cantor's position.

27. I have seen nothing in the literature I have reviewed or that Cantor reviewed that suggests banning care completely would improve outcomes. Indeed, my day-to-day experience of providing care to transitioning youth shows the opposite. In response to one of the recent bans, a patient said to me, "Why do they hate me so much?" Other patients of mine that had been in states where transition-related medical care was banned expressed fear, disappointment and a deep since of despondency that the care they have found great benefit from has been singled out to be banned.

## C. WPATH SOC 8 and Appendix A

28. Cantor claims several internal communications reveal that WPATH Guideline Development Group members are concerned that young patients are being treated and harmed by "sloppy," "inexperienced," and "sometimes dangerous" providers. First, internal communications are not science and should not form the "evidence-based" opinions of a supposed expert. Second, there always is a range of quality-of-care delivery; that is why guidelines are established in order to help set the standard of care.

29.  In addition, Cantor's statement that "there was no room for dissent" is the opposite of what these emails show. In my opinion, these discussions show providers engaged in a robust, transparent, and responsible discussion of how to provide the most informed and effective care patients with gender dysphoria, including consideration of divergent viewpoints, disagreements with respect to specific issues, and concerns. This is a normal, and critical, part of the scientific process and the development of practice guidelines.

## II.   <u>CONCLUSION</u>

30.  I have seen nothing in the literature I have reviewed or in the State's experts' commentary that suggests banning care would improve outcomes. Instead, nearly all of the studies and commentary I have reviewed indicates banning treatment is the opposite of what is needed in this field. Additional studies, including long-term effects and impacts of medical treatment for gender dysphoria, would provide the robust evidence the State's experts claim is so desperately lacking, while banning treatment would prevent any of those desired additional studies from occurring.

31.  While these studies are ongoing, rigorous debate regarding standards of care will continue. Robust debate and advocacy are essential to ensuring our patients receive the highest standards of care. I further note that, despite the States' experts' apparent dislike of it, advocacy by medical professionals on behalf of patients is not

a bad thing. Indeed, as psychiatrists, we are ethically required to advocate for our patients, and we must do the most advocacy for our distressed patients. It is self-evident that precise and careful discussions about how language of the SOC will be used in the future were not malfeasance, but prescience. To argue that such advocacy and careful deliberations about the use of language are somehow nefarious demonstrates a lack of understanding of how clinical practice actually works and of clinicians' responsibilities to their patients.

Executed this 25th day of March, 2024.


_____

Aron Janssen, M.D.