# EXHIBIT 15
# REDACTED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

|  |  |
|---|---|
| BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; *et al.*, | Case No. 2:22-cv-184-LCB-CWB |
|  | Honorable Liles C. Burke |
| Plaintiffs, |  |
| and |  |
| UNITED STATES OF AMERICA, |  |
| Plaintiff-Intervenor, |  |
| v. |  |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; *et al.*, |  |
| Defendants. |  |

**PLAINTIFF-INTERVENOR UNITED STATES' DISCLOSURE OF REBUTTAL EXPERT TESTIMONY OF DANIEL SHUMER, M.D., MPH**

I, Daniel Shumer, M.D., hereby declare and state as follows:

1.    I have been retained by counsel for the United States as an expert in connection with the above-captioned litigation.

2.    I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

1

3.     My background and qualifications, review of prior testimony, and compensation have been previously provided in my expert report. Since submission of my initial report, I have updated my curriculum vitae; the updated version attached to this report is true, correct and up to date. My updated curriculum vitae is attached to this rebuttal report as **Exhibit R.2**; it includes all my publications authored in the last ten years**.** Additionally, in the past four years, I have been retained as an expert and provided testimony in the following cases (updated and revised list): *Roe et al. v. Herrington et al*., 4:20-cv-00484 (D. Ariz.); *Dekker v. Weida*, No. 4:22-cv-00325-RH-MAF (N.D. Fla.); *Boe v. Marshall*, No. 2:22-cv-00184-LCB-CWB (M.D. Ala.); *Roe v. Utah High Sch. Activities Ass'n*, No. 220903262 (3d Jud. Dist. in and for Salt Lake County, Utah); *Menefee v. City of Huntsville Bd. of Educ*., No. 5:18-cv-01481-LCB (N.D. Ala.); *Flack v. Wis. Dep't of Health Servs*., No. 3:18-cv-00309-wmc (W.D. Wis.); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ*., No. 2:16-cv-00943-PP (E.D. Wis.); *In the Interest of Younger*, No. DF-15-09887 (Dallas County, Tex.); *Doe et al. v. Ladapo et al*., 4:23-cv-00114-RH-MAF (N.D. Fla.); *K.C. et al. v. Medical Licensing Board of Indiana*, 1:23-CV-595 (S.D. Ind.); *Koe et al. v. Noggle et al*., 1:23-cv-02904-SEG (N.D. Ga.); *Noe et al. v. Parson et al*., 23AC-CC04530 (Cole County, Mo.); and *Loe et al. v. Texas et al*., D-1-GN-23-003616 (Travis County, Tex., 201st Jud. Dist.). To the best of my knowledge, I have not met or spoken with the Private Plaintiffs in this

2

case. My opinions are based solely on my extensive background and experience treating transgender patients.

4.     I hereby provide a rebuttal report to respond to the expert reports and supplemental reports provided by the Defendants. This report is provided after my review of the original and any supplemental reports submitted by Dr. James Michael Cantor, Dr. Paul W. Hruz, Dr. Kristopher Kaliebe, Dr. Michael K. Laidlaw, Dr. Patrick W. Lappert, Dr. Geeta Nangia, Dr. Angela C.E. Thompson, and Dr. Farr Curlin; documents outlining FDA correspondence with the Research Institute for Gender Therapeutics, Inc. (HHS-0169993; HHS-0169973); and a study by Nolan, et al., 2023.

5.     In preparing this rebuttal report, I have relied on my training and years of research and clinical experience, as set out in my updated curriculum vitae and on the materials listed therein; the materials listed in the bibliography attached as **Exhibit A** to my original report; and the additional materials listed in the supplemental bibliography attached as **Exhibit R.1** to this rebuttal report. The sources cited in each of these are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications.

6.     I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the

future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise. I may also further supplement these opinions in response to information produced in discovery and in response to additional information from Defendants' or Private Plaintiffs' designated experts.

## EXPERT OPINIONS

7.     In this rebuttal report I will highlight examples of where Defendants' expert reports demonstrate a lack of understanding of the nature, evaluation, and treatment of gender dysphoria; the serious consequences of the condition if left untreated; and the strength of the evidence in support of medical management of gender dysphoria, including the efficacy and safety of these treatments. I will identify statements that are misleading or not consistent with current evidence-based standards of care or the general medical consensus.

8.     Some of the specific critiques apply in equal measure to more than one expert report.

### I.     Efficacy of Gender-Affirming Care

9.     Dr. Laidlaw and Dr. Hruz are both endocrinologists not involved in the medical treatment of gender dysphoria (Hruz Rep. ¶¶ 13, 154; Laidlaw Rep. ¶ 4)[1].

---

[1] For the purposes of this rebuttal, references to Defendants' experts' initial reports will be cited as "[Expert] Rep.," and any supplemental reports will be cited as "[Expert] Supp. Rep." Unless otherwise specified, a supplemental report citation refers to a supplemental report served in

Dr. Laidlaw states, "treatment interventions on behalf of children and adults diagnosed with gender dysphoria must be held to the same scientific standards as other medical treatments. These interventions must be optimal, efficacious, and safe." (Laidlaw Rep. ¶ 12). I agree with this statement; all medical interventions, including treatment for gender dysphoria, require rigorous study and robust evidence. The responsibility of all medical providers is to provide care for patients with a goal of promoting health and wellness while minimizing risk; this can only be done with a thorough knowledge of the patient, their disease process, and the relevant scientific literature.

10.    As a pediatric endocrinologist with vast experience in assessing and treating transgender patients, I rely on review of the entire body of evidence in my approach to gender diverse children and adolescents. This evidence suggests that hormonal treatments, including pubertal suppression and gender-affirming hormonal care, are efficacious, safe, and promote optimal health outcomes.

11.    In my expert report, I referenced several studies that demonstrate the efficacy and safety of gender-affirming care (Shumer Rep. ¶ II.1 n.18 (citing de Vries, et al., 2014; de Vries, et al., 2011; Green, et al., 2022; Smith, et al., 2005; Turban, et al., 2022)). Dr. Laidlaw states that I have not provided examples of studies

---

2024. Cross-references to other paragraphs within this rebuttal report will be cited as "Shumer Rebuttal Rep."

with longitudinal data supporting the treatment of gender dysphoria in adolescents (Laidlaw Rep. ¶ 78). De Vries, et al., 2014, follows a cohort of patients longitudinally from early adolescence to adulthood and demonstrates alleviation of gender dysphoria and improvement in psychological functioning. De Vries, et al., 2011, provides longitudinal data focused specifically on GnRHa treatment and demonstrates improvements in behavioral and emotional problems and improvement in general functioning. In this rebuttal, I also note that Chen, et al., 2023, published after the publication of current guidelines, presents longitudinal data assessing hormonal interventions and demonstrates increases in appearance congruence, positive affect, and life satisfaction, and decreases in depression and anxiety symptoms.

12.    The guidelines for the treatment of gender dysphoria were published by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society (Coleman, et al., 2022a; Coleman, et al., 2022b; Coleman, et al., 2012; Hembree, et al., 2017; Hembree, et al., 2009). Other leading medical bodies including the American Academy of Pediatrics (AAP), the American Medical Association (AMA), the American Psychological Association, the American Psychiatric Association, and American Academy of Family Physicians (AAFP) all support the tenets of these guidelines due to the rigorous nature of their review of scientific evidence in the field (Rafferty, et al., 2018 (AAP); AMA & GLMA: Health

Professionals Advancing LGBTQ Equality, 2019; American Psychological Association, 2015; Drescher, et al., 2018 (American Psychiatric Association); Klein, et al., 2018 (AAFP)). In June 2023, the Endocrine Society drafted a resolution to protect access to evidence-based care for transgender and gender diverse youth passed by the AMA, and cosponsored by, among others, the AAP, the American College of Obstetricians and Gynecologists, the American Urological Association, the American Society for Reproductive Medicine, the American College of Physicians, and the American Association of Clinical Endocrinology (GLAAD, 2023).

13.    Defendants' experts attempt to undermine the WPATH standards of care by characterizing WPATH as an "advocacy" organization in their expert reports (Laidlaw Rep. ¶ 178; Hruz Rep. ¶ 104). Dr. Cantor suggests guidelines should be written by "experts at arm's length from those services" (Cantor Supp. Rep. ¶ 102). WPATH is a longstanding and well-respected standard-setting organization whose mission is "[t]o promote evidence based care, education, research, public policy, and respect in transgender health" (WPATH Mission and Vision, 2023). As a practicing physician in the field, I rely on WPATH's multidisciplinary expertise when considering best practices in the treatment of transgender patients. Defendants' experts are highlighting a concern that a potential conflict of interest can exist when clinical experts in a particular field participate in the development of clinical practice

guidelines for that field. The value of WPATH is the inclusion of experience and expertise from across a wide array of clinical specialties from around the world. Putting a body of evidence in appropriate clinical context is important, and this is most effectively done by providers who treat the patient population in consideration. Moreover, the endorsement of major leading medical bodies as outlined in the previous paragraph, who are less closely related to these services, lend credence to the conclusions of the WPATH Standards of Care.

14.    Dr. Laidlaw and Dr. Hruz also criticize the Endocrine Society guidelines, specifically referring to the quality of evidence used in making the recommendations therein (Laidlaw Rep. ¶ 196, Hruz Rep. ¶ 152). The Endocrine Society utilized the Grading of Recommendations, Assessment, Development and Evaluations (G.R.A.D.E.) framework that assigns quality scores to evidence based on the type of studies performed, the size of those studies, and other factors. According to G.R.A.D.E., the Endocrine Society gender-dysphoria guidelines relied on low-quality and very-low-quality evidence in developing its recommendations. It must be understood that "low-quality" does not mean incorrect evidence or bad evidence. It does not mean that the studies relied upon were designed or carried out poorly. What it *does* mean that there were no randomized controlled trials (RCTs) studying gender-affirming care.

15.     Defendants' experts discuss their concern regarding a lack of RCTs (Hruz Rep. ¶ 121, Cantor Rep. Section III). While randomized control trials are an excellent study design in some contexts, for many complex medical problems RCTs are not feasible and/or are not ethical. If the only medicine practiced was that based on results of RCTs, the list of treatable medical conditions would be extremely short. Note that the majority of the Endocrine Society Clinical Practice Guidelines for conditions *other* than gender dysphoria *also* rely on "low" or "very-low-quality evidence" according to the G.R.A.D.E. framework.

16.     For example, the Endocrine Society published a Clinical Practice Guideline (CPG) in 2017 titled *Pediatric Obesity – Assessment, Treatment, and Prevention: An Endocrine Society Clinical Practice Guideline* (Styne, et al., 2017). This guideline proposes 30 recommendations and uses the G.R.A.D.E. framework to grade these recommendations. Of the 30 recommendations in the pediatric obesity CPG, 25 are based on "low" or "very-low-quality evidence." For example, recommendations outlining when bariatric surgery should and should not be considered are based on "low-quality" or "very-low-quality" evidence based on the G.R.A.D.E. framework. This recommendation is not graded higher because there is no randomized control trial regarding bariatric surgery in youth, but yet there is enough data through other methods of study to make these recommendations, nonetheless. This is the nature of complex medical problems. If a problem was

simple enough to study with an RCT, it would not likely need a Clinical Practice Guideline to catalog and organize the literature and create best-practice recommendations for providers in the field.

17.    Specific to the study of the management of gender dysphoria, RCTs measuring the most meaningful outcome – long-term quality of life – are not feasible and not ethical. Because the goal of the provision of gender-affirming care in adolescents is long term reduction in gender dysphoria and improvement in quality of life and well-being, in order to conduct a meaningful RCT, patients would have to be randomized to treatment versus no treatment, and quality of life would have to be measured many years later in adulthood. The study could not be blinded since patients and families would immediately ascertain which group they were randomized to based on the progression or non-progression of puberty. In addition, due to the current evidence supporting gender-affirming care, it would be unethical to propose a study randomly assigning patients (Ashley, et al., 2023). Patients/families desiring treatment with GnRHa or hormones would be unlikely to consent to such a study for fear of being placed in the placebo group. Therefore, researchers in this field must rely on other types of study design, such as longitudinal cohort studies, which monitor change in symptoms over the course of treatment (de Vries, et al., 2014), or cross-sectional studies comparing treated and untreated persons (Turban, et al., 2022).

10

18.     A recent article by Nolan, et al. highlights this point (Nolan, et al., 2023). In this study, authors *do* conduct a randomized control trial assessing testosterone therapy for transgender and gender-diverse adults (ages 18-70). In this study participants were randomized to receive testosterone at the start of the study or after a three-month period. The participants receiving the testosterone had improvement in gender dysphoria relative to the participants waiting to receive testosterone during the three-month waiting period. This study is quite limited by the fact that it was not blinded, and the time period measured was very short. However, blinding patients to testosterone versus placebo is not practical (the effect of testosterone are obvious to observe) and the withholding of testosterone longer than three months was not attempted as the authors stated that this "design ensured no individuals would be waiting longer than standard care" (the clinic has a three-month waiting list). This study design pushes the boundary of what is possible with RCTs in gender medicine but is not designed to assess long-term benefits of testosterone therapy.

19.     Dr. Laidlaw chooses to highlight several studies as examples of lack of evidence of effectiveness of gender-affirming treatments. In his discussion of Dhejne, et al.'s study published in 2011 (Laidlaw Rep. ¶¶ 208-211), Dr. Laidlaw is correct that, among other things, this study demonstrates that even after receiving appropriate gender-affirming care, transgender individuals are still at higher risk for

negative mental health outcomes than the general population. However, Dr. Laidlaw ignores that stigma around transgender identity (Bränström & Pachankis, 2021), both 13 years ago in Sweden and in Alabama today, makes life more challenging for transgender individuals. Further, the Dhejne study did *not* measure the difference in mental health between transgender individuals who received evidence-based care, and those who were unable to receive this care. In fact, the takeaway of Dhejne is *not* that gender-affirming care is inappropriate, but rather that transgender people require additional support during and after the process of transition.

20.    Dr. Laidlaw also describes the efforts undertaken by himself and colleagues to discredit the results of a Swedish study (Bränström & Pachankis, 2020a) that aimed to investigate rates of mood and anxiety disorder health care visits and antidepressant and anxiolytic prescriptions in patients receiving hormonal or surgical interventions (Laidlaw Rep. ¶ 212). Ultimately, while the authors of the Swedish study conceded in a letter to the editor that their conclusion that "'the longitudinal association between gender-affirming surgery and lower use of mental health treatment lends support to the decision to provide gender-affirming surgeries to transgender individuals who seek them' is too strong," (Bränström & Pachankis, 2020b) they maintained that the study "serves an important purpose and fills an important knowledge gap" (Bränström & Pachankis, 2020c). The study "lends

support for expecting a reduction in mental health treatment as a function of time since completing such treatment" (Bränström & Pachankis, 2020c).

21.    Dr. Hruz takes a similar approach to Dr. Laidlaw, arguing that studies of gender-affirming care have "major methodological limitations" and attempting to discredit individual studies (Hruz Rep. ¶ 130). What Dr. Hruz ignores is that all scientific studies have limitations. In fact, including a limitation section is critical when publishing any manuscript in scientific journals (American Journal Experts (AJE), updated Aug. 2023). That a study has limitations does not mean that the study is dismissed out of hand. To the contrary, each study contributes to the collective knowledge base and health care providers look at the entire body of evidence – as well as their own clinical experience and that of their colleagues – to inform their approach to treatment.

22.    For example, Dr. Hruz critiques 2011 and 2014 studies by de Vries, et al., which demonstrated that patients with gender dysphoria had improved behavioral and emotional outcomes and depressive symptoms after receiving medical treatment for their gender dysphoria. Dr. Hruz suggests that because the participants were also receiving psychological support, it is not possible to know if it was medical treatment or psychological support that caused the improvement in mental health symptoms. He misunderstands that gender-affirming care does not mean medications alone, but rather a constellation of medical treatment and

13

psychosocial support. Separating these aspects of care does not make sense clinically. In my view, the findings in these two studies provide strong evidence in favor of gender-affirming treatment. It should also be emphasized that if a patient receiving mental health support has resolution of gender dysphoria as a result of this support, that patient would not require or be a candidate for a medical intervention.

23.      Dr. Hruz also claims that the 2020 Turban, et al. study is cited as "proof that pubertal blockade prevents suicide in transgender youth" (Hruz Rep. ¶ 131). As I described in my prior report, there are a number of studies supporting the benefits of GnRHa treatment (Shumer Rep. ¶ IV.3 n.30). While Dr. Hruz points out that the rate of suicidality is high in both the group treated with GnRHa and the group that did not receive the treatment, that does not mean that the treatment was unhelpful. The Turban article is not claiming that pubertal blockade prevents suicide but does show an important and meaningful finding: a reduction in suicidality (Turban, et al., 2020).

24.      Hruz also unfairly discounts the 2015 U.S. Transgender Survey (2015 USTS) and studies based on data from this survey (Hruz Rep. ¶ 131). The 2015 USTS serves as the "largest survey examining the experiences of transgender people in the United States" with 27,715 respondents from all fifty states, D.C., American Samoa, Guam, Puerto Rico, and U.S. military bases overseas (James, et al., 2016). While extremely large population studies are logistically challenging, the USTS

14

clearly and transparently outlines the recruitment methodology in Chapter 2 of its full report. Its main outreach objective was "to provide opportunities to access the survey for as many transgender individuals as possible in different communities across the U.S. and its territories" (James, et al., 2016). Thus, it was appropriate for the survey to use convenience sampling to achieve its goals. While there are inherent limitations to studies that use this method to reach a large sample, in reviewing any data derived from the 2015 USTS, it is important to consider not only limitations of population-based survey data, but also the significant strengths of being able to capture data from such a large cohort of individuals.

25.    While previously faulting studies due to lack of a control group, Dr. Hruz discounts (Hruz Rep. ¶ 131) the findings of a study with a control group (van der Miesen, et al., 2020) on the basis that the group of patients assessed before treatment with GnRHa are younger than the group of patients assessed after treatment. But of course, any pre-GnRHa group will be younger than a post-GnRHa group since GnRHa treatment is started in early puberty and discontinued in later adolescence. Again, Dr. Hruz ignores the inherent limitations of conducting research in clinical medicine.

26.    Dr. Cantor's supplemental report attempts to demonstrate that "[n]ew research, employing methods superior to prior investigations, reports that transition failed to improve mental health indicators" (Cantor Supp. Rep. ¶¶ 3-31) (bolding in

original omitted). His report falls short of proving this assertion. He presents two literature reviews (Thompson, et al., 2023; Christensen, et al., 2023), which are summaries of research without new data; one article reporting *improved* mental health scores (McGregor, et al. [in press]); one article concerning social transition (Morandini, et al., 2023) not directly related to pubertal suppression or gender-affirming hormone care; and finally two original articles outlining persisting mental health burden in transgender individuals after medical transition (Glintborg, et al., 2023; Kaltiala, et al., 2023). Critically important and not outlined by Dr. Cantor is that neither the Glintborg study nor the Kaltiala study are specifically investigating the direct effect of gender-affirming care on mental health.

27.     In sum, Defendants' experts describe well-designed studies investigating the effect of gender-affirming care as "low-quality" while simultaneously presenting the conclusions of other studies in misleading ways to fit their perspective.

## II.     <u>Sex, Gender Identity, and Gender Dysphoria</u>

28.     Defendants' experts ignore the role of gender identity when describing sex and gender (Hruz Rep. ¶¶ 14-22). Sex is a concept used to distinguish male from female, but as outlined in my report (Shumer Rep. ¶ I.1), sex involves many elements that can, at times, be discordant from one another. Chromosomes, anatomy, and hormones most often are concordant with one another (male or female), but this is

not the case in individuals with differences in sex development, making sex determination challenging at times. Similarly, gender identity is not always concordant with other elements of one's sex. In a review of this topic, Ristori, et al. (2020) describe that "[t]he evidence suggests that the sexual dimorphic brain could be the anatomical substrate of psychosexual development, on which gonadal hormones may have a shaping role during prenatal and pubertal periods" and that "according to several heritability studies, genetic components may have a role." These biological inputs that shape gender identity help explain the concept of "brain sex." That while not as observable as anatomic sex, or measurable as chromosomal sex or hormonal sex, gender identity is a real and biologically based element of sex. In my initial report (Shumer Rep. ¶ I.1), I cited the Institute of Medicine when including gender identity as a component of sex. Dr. Cantor (Cantor Rep. ¶ 299) accurately cites the Institute of Medicine with: "*[s]ex* is understood here as a biological construct, referring to the genetic, hormonal, anatomical, and physiological characteristics on whose basis one is labeled at birth as either male or female." My assertion is that by presenting the biological foundation of gender identity, gender identity is accurately included as a component of sex.

29.     Despite Dr. Hruz's assertion that sex is not "assigned at birth," it is a fact that the majority of infants leave the hospital classified as either male or female based on the appearance of their sexual anatomy. Whether or not this assignment or

17

classification will match future gender identity is uncertain. Dr. Thompson uses a phrase I have not heard before when she states, "[t]he phrase 'gender assigned at birth' is a misnomer" (Thompson Rep. ¶ 25). While sex *is* assigned at birth (based most often on anatomic sex), gender identity is the one element of sex that is not knowable until the child is able to describe it for themself. While Dr. Hruz acknowledges that when the sexual anatomy is ambiguous, other elements of sex including chromosomes and hormones can be evaluated to better understand the infant's sex, he refuses to recognize that gender identity is another component of sex with biological underpinnings (*see* Shumer Rep. ¶¶ I.5-8 and Ristori, et al., 2020). Thus, Dr. Hruz correctly explains that in cases of ambiguity, "[c]urrent practice is to defer sex assignment until the etiology of the disorder is determined and, if possible, a reliable prediction can be made on likely biologic and psychologic outcomes" (Hruz Rep. ¶ 19). This means that when there is discordance is some elements of sex (anatomic, hormonal, chromosomal), the best practice is to delay sex assignment until we feel we can choose a sex for the infant with the highest likelihood of promoting a happy and healthy life, which includes attempting to match sex assignment with future gender identity. Implicit in Dr. Hruz's statement is that sometimes we are wrong; the sex assigned at birth does not match future gender identity. In children with differences in sex development (DSD), one may then state, "we tried our best to assign sex, but we were wrong; now that the child can express

18

themselves, the other sex assignment would have been correct." When considering children with gender dysphoria *not* born with a DSD, this same statement would be appropriate. The difference is that there were no clues at birth alerting us to discordant elements of sex. Herein lies the reason that I outlined the biological underpinnings of gender identity (*see* Shumer Rep. ¶¶ I.5-8): while not as obvious as in cases of DSD, a transgender person's sex assigned at birth was equally not correct.

30.    Dr. Hruz states that "[t]he scientific and clinical measurement of sex is done with highly reliable and valid objective methodologies" (Hruz Rep. ¶ 15). He asserts this to differentiate gender identity from other elements of sex, in that gender identity is based on self-report. While gender identity is subjective rather than objective, this does not make gender identity less valid as a true and real phenomenon, just as other elements of sex are true and real. There actually is a test that can be used to discover someone's gender identity: ask them. It is a human characteristic that is ascertained through a conversation rather than a lab test. Gender identity is a real human characteristic rooted in biology[2].

---

[2] In my initial report I stated, "In one such study, the volume of the bed nucleus of the *stria terminalis* (a collection of cells in the central brain) in transgender women was equivalent to the volume found in non-transgender women." I cited a study by WC Chung, et al. This assertion should be attributed instead to a study by Zhou, et al. (1995). This citation has been added to the bibliography in this supplemental report.

19

31.     Dr. Laidlaw and Dr. Hruz suggest that because gender dysphoria is in some ways different from other endocrine conditions that they are more comfortable treating, it should not be treated with medication (Laidlaw Rep. ¶¶ 20-21; Hruz Rep. ¶¶ 35, 55-58). While I disagree with their discomfort with classification of gender dysphoria as an endocrine disorder, this debate is mere semantics and not pertinent to the appropriate assessment and management of the condition. They argue that most endocrine disorders involve hormones made in excess, hormone deficiencies, or structural abnormalities of endocrine glands. Whether or not Dr. Laidlaw and Dr. Hruz would like to classify gender dysphoria as an endocrine condition, several pertinent facts remain clear. First, there *is* ample scientific evidence that gender identity has a strong biological foundation (Shumer Rep. ¶¶ I.5-8). Second, endocrinologists are uniquely suited to treat gender dysphoria due to familiarity with prescribing and monitoring medications such as GnRHa, testosterone, and estrogen. Third, countless medical conditions are diagnosed with clinical observation and questioning rather than with a laboratory test, an imaging test, or examination of cells under a microscope (e.g., migraines, neuropathic pain, irritable bowel syndrome, fibromyalgia), but are no less actual medical diagnoses that improve with medical interventions. Fourth, the American Board of Internal Medicine requires knowledge of gender dysphoria and its management in order to become certified as an Endocrinologist (American Board of Internal Medicine, 2023).

32.    Defendants' experts attempt to discredit my assertion that gender identity has a biological foundation. My initial report (Shumer Rep. ¶¶ I.5-8) presents evidence of biological underpinnings of gender identity. However, like all complex human characteristics, gender identity is not neatly explained by a single gene; biological inputs are not completely understood. Dr. Thompson attempts to refute this when she states, "[b]iological phenomena are tangible, immutable" (Thompson Rep. ¶ 123). While gender identity is not able to be determined by a simple blood test, there are tangible and immutable facts linking gender identity to biology including anatomic differences in the brain (Zhou, et al., 1995), and strong evidence of hormonal and genetic influences (Ristori, et al., 2020). Dr. Laidlaw (Laidlaw Rep. ¶ 23) asserts that because not all identical twins are concordant in gender identity, this somehow undermines my assertion. He is clearly misrepresenting the purpose of twin studies. Twin studies allow us to demonstrate that there is a genetic component *contributing* to a phenomenon under investigation. For some human characteristics there is a clear inheritance pattern whereby a particular gene is responsible for the presence or absence of the characteristic and people with identical DNA (such as identical twins) will always be concordant with the characteristic. These characteristics are called Mendelian traits. For example: the presence or absence of freckles or a chin dimple; having medical conditions such as Huntington's disease or Duchenne muscular dystrophy; these are Mendelian traits

and identical twins will be concordant with these characteristics 100% of the time (Klug, et al., 2012). Other human characteristics are not at all genetically based (non-heritable), and in these cases identical twins would be no more likely to be concordant in having or not having the characteristic than fraternal twins or siblings. An example of a non-heritable condition is a cancer caused by a mutation that occurs after fertilization (Forsberg, et al., 2013) Clearly gender identity is not a Mendelian trait, but the fact that more identical twins are concordant for gender identity than fraternal twins does in fact suggest a genetic contribution.

33.     Dr. Hruz states that the goal of endocrinology is to restore health (Hruz Rep. ¶ 51). I would offer that this is a goal not only in endocrinology but all of medicine. In my experience and in review of the literature, when I prescribe gender-affirming care, consistent with the Endocrine Society's clinical practice guidelines and WPATH SOC, I am helping to restore health to my patient.

34.     Dr. Laidlaw correctly points out that the number of young people being referred to the Gender Identity Development Service in the United Kingdom has increased significantly over time (Laidlaw Rep. ¶ 221) but wrongly suggests this increase may be due in part to "social contagion" and "social media/internet use." Dr. Kaliebe asserts the same (Kaliebe Rep. ¶¶ 26-55). I would suggest an alternative explanation that is not only more likely, but also supported by research. As transgender individuals face less cultural stigma than in previous generations, young

22

people understand that they will be supported and valued by their family and community and are more likely to explore and discuss gender identity openly (Zhang, et al., 2020). Two unrelated examples may make this concept more understandable. First, in some countries, homosexuality is criminalized. In these countries, there are very few openly gay citizens; however, actual rates of homosexuality are not different from other countries (Shaeer O & Shaeer K, 2010). Second, in many societies left-handed people have been historically encouraged as children to use their right hands for writing and other fine-motor skills. However, in the late 20th century, left-handedness became less stigmatized and the percentage of left-handed people rose from about four percent in 1920 to 12 percent after 1950, roughly the same percentage as today (McManus, 2009).

35.     Defendants' experts also suggest that the disproportionate increase in transmasculine adolescents means that gender identity is not biological, but social (Hruz Rep. ¶ 128; Laidlaw Rep. ¶¶ 220-223; Kaliebe Rep. ¶ 42). While they point to research by Dr. Lisa Littman, that research has been heavily criticized, and her conclusions have been called into question. For example, Dr. Littman's recruitment of parents for participation was biased in that her study relied heavily on three specific websites popular among parents opposed to their children's transgender identity (Restar, 2020). What is more, the experts' logic is flawed. There is no reason why we would necessarily expect the rates of transmasculine people and

transfeminine people to be equal. Furthermore, it would make sense for those rates to change over time as cultural attitudes towards transmasculine people and transfeminine people change. So long as a cultural bias against transgender people remains, we might not know the true prevalence of transmasculine and transfeminine people. As Dr. Hruz focuses on the increase in prevalence of gender dysphoria among adolescents assigned female at birth (Hruz Rep. ¶¶ 127-128) it should be noted that adolescence is a common time for transmasculine people to present to care due to the onset of breast development and menstruation. Transfeminine patients present more commonly younger or older than the mid-adolescent phase (Urquhart, 2017), which may be in part due to the extreme difficulty for transfeminine adolescents to be accepted and supported by peers. Furthermore, the focus on transmasculine adolescents ignores that the percentage of individuals who identify as transgender is higher today than in the past across all age groups and for both individuals assigned male and female at birth (James, et al., 2016; Coleman, et al., 2022a; Herman, et al., 2017).

### III.   <u>Desistance</u>

36.     Dr. Laidlaw and Dr. Hruz assert that rates of "desistance" are very high and therefore treatments as outlined by current standards of care will cause serious and irreversible harm to children and adolescents (Laidlaw Rep. ¶¶ 224-225; Hruz Rep. ¶¶ 62, 153). This fallacy is repeated by many opponents of gender-affirming

care, including when Dr. Hruz cites Singh, et al. 2021 (Hruz Rep. ¶ 62), but this misrepresents the data completely. It is true that the majority of prepubertal gender diverse children exploring their gender do not develop gender dysphoria and are not expected to become transgender adolescents or adults, but that is because they are not transgender or meet the current definition of gender dysphoria in the first place. Karrington reviews that much of the literature pertaining to desistance is discussing changes in gender identity but not specific to a diagnosis of gender dysphoria (Karrington, 2022). While Dr. Laidlaw cites data from studies of children across wide age groups, ages 3-12 for example, he does not attempt to parse out important clinical information such as the age and pubertal stage of so-called "desisters" in these studies. Lastly, because prepubertal children are not treated with GnRHa or hormonal medications for gender dysphoria, studies that look at prepubertal children, such as those Dr. Laidlaw has cited, have no relevance to the question of how to treat adolescents. Dr. Laidlaw again ignores the fact that children whose gender dysphoria persists into adolescence are highly likely to be transgender (van der Loos, et al., 2022).

37.    Karrington (2022) performed a systematically guided review of the topic and concluded that the word "desistance" itself does not lend itself to the nuance of gender identity and gender exploration in childhood. The author writes: "[t]he idea of desistance creates a false dichotomy (persistence or desistence) that

only hinders provision of care by suggesting a possibility to predict future gender identity. In addition, desistance does not take into consideration the myriad of societal influences that can prevent a person from expressing their gender. Clinicians can move beyond attempting to predict gender outcomes to focusing on ways to support [transgender and gender expansive] youth as they discover themselves" (internal footnote omitted).

38.    Dr. Laidlaw also wrongly suggests that the use of "gender affirmative therapy" alters the natural course of "desistance," whereby patients prescribed pubertal suppression are very likely to be prescribed gender-affirming hormones later in adolescence (Laidlaw Rep. ¶¶ 56, 225). Dr. Hruz similarly claims that GnRHa must influence the gender identity trajectory of treated patients given the high percentage of patients proceeding from GnRHa to hormonal interventions later in adolescence (Hruz Rep. ¶ 71). Here the experts are making a causal theory error – making a claim of causation based on correlational evidence. Children with persisting gender dysphoria into puberty (1) are very likely to have persisting gender dysphoria into adulthood, and (2) are eligible for treatment with GnRHa. Patients prescribed pubertal suppression are very likely to later be prescribed gender-affirming hormones simply because gender dysphoria tends to persist if present at the onset of puberty.

26

39.     Dr. Hruz describes two "approaches" for treating children with gender dysphoria: "watchful waiting" and "gender affirming" (Hruz Rep. ¶¶ 59-64). Gender exploration in childhood is expected and healthy. Of course, parents of a child exploring their gender identity should not push the child to become transgender – this makes no sense and would work just as poorly as parents pushing their children to identify with their sex assigned at birth (referred to as reparative therapy), which is both ineffective and harmful. Unlike the gender-affirming approach, which is well supported by research and the experience of clinicians, including my own, there is no evidence to support the "watchful waiting" approach Dr. Hruz describes.

40.     Moreover, it is not clear how this "watchful waiting" approach is supposed to work as a practical matter. When a child asks their parents to use a different name or pronouns, the parent can either reject this request or accept this request, there is no "neutral" response. If honoring a child's chosen name and pronouns is gender-affirming and rejecting the request is reparative therapy, what does the watchful waiter do? If asked, I would suggest that parents allow their child to safely explore gender identity, making it clear that whatever the future outcome, the child will receive unconditional love, support, and respect. If using a different name or pronoun would be helpful in the process of gender exploration, parents should consider honoring that request.

41.     Furthermore, at the start of puberty, a child with persistent and/or intensifying gender dysphoria is much more likely to be transgender (van der Loos, et al., 2022) and will begin to exhibit secondary sex characteristics. In these situations, it appears Dr. Hruz would categorize the use of GnRHa as part of the "gender affirming" approach, and no medical intervention as "watchful waiting." However, the use of GnRHa in children exploring their gender identity was first described by Delemarre-van de Waal and Cohen-Kettenis (2006) as a reversible intervention allowing for delayed decision-making regarding hormone therapy, a cautious strategy.

42.     I do not agree with Dr. Hruz that providers of gender-affirming care are presuming that development of "natural sex characteristics interfere with the 'exploration' of gender identity" as an impetus to offer GnRHa (Hruz Rep. ¶ 71). Rather, GnRHa can prevent intensification of dysphoria during puberty while enhancing the future ability of the patient to present to the world in a gender congruent manner.

43.     I agree with Dr. Hruz that providers should use caution when "interfering with the normal process of sexual maturation" (Hruz Rep. ¶ 72). He takes issue with describing GnRHa as "reversible" and speculates on other potential risks of GnRHa treatment (Hruz Rep. ¶¶ 72-73). He mentions the increased intracranial pressure as a rare side effect of GnRHa. It should be noted that this

28

treatable complication of GnRHa is so rare that no cases were identified in patients treated with GnRHa for gender dysphoria in Sweden over a 10-year period (Karamanis, et al, 2023). Notwithstanding, my report does not assert that GnRHa treatment has no potential risk and that suppressing a normally timed puberty is a decision made lightly. That said, providers in this field *are* using caution when prescribing GnRHa and gender-affirming hormones in adolescence, weighing potential benefits against potential risks with each individual patient, in candid communication with parents, and with the best intentions for the wellbeing of the adolescent in question.

### IV.   <u>Side Effects of Puberty Suppression and Hormone Treatment</u>

44.   Defendants' experts' reports are at times unbalanced or misleading when presenting potential risks and benefits of gender-affirming care.

45.   Dr. Laidlaw frames evidence-based treatments for gender dysphoria as causing medical conditions, rather than acknowledging the similarity in how these medications are used in different contexts. The underlying premise of Dr. Laidlaw's opinions seems to be that gender dysphoria is not a legitimate diagnosis worthy of medical treatment.

46.   For example, Dr. Laidlaw conflates the goal of therapy (suppression of sex hormone production) with causing a medical condition (*hypogonadotropic hypogonadism*). Dr. Laidlaw correctly defines a medical condition,

29

*hypogonadotropic hypogonadism*, as a condition in which the pituitary fails to send signals to the gonads (Laidlaw Rep. ¶ 82). Dr. Laidlaw then describes gender-affirmative therapy (specifically, pubertal suppression) as deliberately causing the medical condition *hypogonadotropic hypogonadism* (Laidlaw Rep. ¶ 89). In his report, Dr. Laidlaw described the use of GnRHa in treatment of prostate cancer and precocious puberty. In his discussion of these examples, he did not frame GnRHa as causing the medical condition *hypogonadotropic hypogonadism* in those patients but described the use of GnRHa as effective treatment for these other conditions. GnRHa is also an effective treatment for gender dysphoria.

47.     Dr. Laidlaw's report repeats this same wordplay tactic in describing the administration of testosterone as inducing *hyperandrogenism* in transgender men (Laidlaw Rep. ¶¶ 130-147), and administration of estrogen as inducing *hyperestrogenism* in transgender women (Laidlaw Rep. ¶¶ 149-156). In his May 2023 supplemental confidential report, he describes the gender-affirming treatments received by Plaintiffs as causing these medical problems. He also presents in his original report an alarming appearing graphic demonstrating that transgender men have testosterone levels in a range similar to women with endocrine tumors (Laidlaw Rep. Fig. 4). He is omitting the fact that the range represented by the orange bar in Figure 4 labeled "FTM Transition" is also the normal male range of testosterone, the goal range when treating transgender men with testosterone. By omitting this fact

and presenting data in a misleading manner, Dr. Laidlaw is providing an unbalanced description of risk.

48.     In reality, when testosterone is prescribed for gender dysphoria to transgender boys and men, the goal is to achieve a normal male testosterone level based on age, meaning a testosterone level that is consistent with the normal testosterone levels for cisgender males of similar age; when estrogen is prescribed for gender dysphoria as it is for transgender females, the goal is to achieve a normal female estrogen level based on age, meaning an estrogen level that is consistent with the normal estrogen levels for cisgender females of similar age (Coleman et al., 2022a; Hembree et al., 2017). These goals mirror what an endocrinologist would aim for when treating low testosterone or ovarian failure in cisgender individuals.

49.     Dr. Laidlaw's Figure 4 depicts the testosterone range for transgender men in an alarming way, equating it to the range expected when cisgender women have an endocrine tumor. I have included the figure from Dr. Laidlaw's report for reference:



Figure 1: Dr. Laidlaw's Figure 4

The goal range for testosterone for transgender men appears much less alarming when visually depicted alongside the normal range for cisgender men. Here in Figure 2, I have updated the chart designed by Dr. Laidlaw but

included the normal range for testosterone in males in order to clarify:



Figure 2: A version of Dr. Laidlaw's Figure 4 which also includes the normal

male testosterone range.

50.     Defendants' reports also misconstrue the effect of GnRHa on fertility.

Dr. Thompson misrepresents my discussion on this topic by stating that GnRHa

followed by gender-affirming hormones may impact fertility, which is not in dispute

(Thompson Rep. ¶ 125). Dr. Laidlaw correctly explains that giving GnRHa to a four-

year-old with precocious puberty will not impair fertility (Laidlaw Rep. ¶ 97). Dr.

Thompson argues that GnRHa, "[i]f administered at Tanner stage 2, before gametes

are mature, continuous administration of GnRHa makes the full maturation of the

gametes impossible." (Thompson Rep. ¶ 59) (bolding and italics in original omitted).

She leaves out that withdrawal from GnRHa would result in full maturation of gametes. (Thompson Rep. ¶ 59).

51.     Dr. Laidlaw and Dr. Thompson cannot claim that GnRHa cause infertility; they can only correctly point out that progression through puberty – at some point – is needed for maturation of sperm and eggs. Dr. Laidlaw posits that gender-affirming hormones could possibly damage immature gonads (Laidlaw Rep. ¶¶ 98, 141) without providing supportive data. So long as gonads remain in place, there remains fertility potential. To be sure, this would require progression through the puberty associated with the sex assigned at birth.

52.     In the context of gender-affirming care, concerns about fertility are discussed with adolescent patients and their families when receiving both GnRHa as treatment and/or gender-affirming hormones. Indeed, SOC 8 recommends that "health care professionals working with transgender and gender diverse adolescents requesting gender-affirming medical or surgical treatments inform them, prior to initiating treatment, of the reproductive effects including the potential loss of fertility and available options to preserve fertility within the context of the youth's stage of pubertal development." (Coleman, et al., 2022a).

53.     What is more, egg retrieval and cryopreservation can be offered after a brief cessation of GnRHa treatment but before testosterone (Martin, et al., 2021) and has also been successful during GnRHa treatment (Rothenberg, et al., 2019).

34

54.     Even if gender-affirming hormones were introduced following use of GnRHa, these hormones could be discontinued with a goal of progression through internal puberty and achieving fertility. Withdrawal of hormones in adulthood often is successful in achieving fertility when it is desired (Light, et al., 2014; Knudson, et al., 2017). Defendants' experts are skeptical that a patient who received GnRHa followed by hormones would have any fertility potential (Laidlaw Rep. ¶ 157; Hruz Rep. ¶ 91). While this would likely require discontinuation of all medication and progression through puberty, there has been a study aiming to investigate this question. Caanen, et al. demonstrated that transgender men have similar ovarian morphology to cisgender women, even when treated with GnRHa followed by testosterone. These treatments did not cause the ovarian changes which are seen in hyperandrogenic women with polycystic ovarian syndrome and infertility (Caanen, 2017). This lends credence to the expectation that the sequence of GnRHa to testosterone does not cause permanent infertility.

55.     That said, the topic of fertility is critically important to discuss with patients and families considering any gender-affirming intervention. It should be made clear that endogenous puberty is necessary for fertility potential. It is also critical to understand that the value placed on fertility and the subsequent weight given to the risk for infertility may not be the same for all persons. While fertility may be more important than all other considerations for some transgender youth

35

and their parents, the same may not be true for others. Persky, et al. 2020 explored these topics with youth and parents, finding that few youth (20%) and parents (13%) found it important to have biological children or grandchildren, and 3% of youth and 33% of parents would be willing to delay gender-affirming treatments for fertility preservation. Clearly a person's individual attitudes on fertility can and do change. That said, individual values and priorities affect the weight given to potential risks and benefits in all areas of medicine, including gender-affirming care. In my practice, our multidisciplinary team works with every patient and family to identify their values and priorities and how these priorities affect the weight given to potential risks and benefits of medical intervention in the context of the patient's gender dysphoria.

56.     Dr. Laidlaw also raises concerns about future sexual function in patients prescribed GnRHa (Laidlaw Rep. ¶¶ 98-100). In my experience, it is essential to have open, age-appropriate discussions around sex and sexuality while respecting that all persons, including transgender people, are diverse in terms of sexual orientation and desires. Sexuality and sexual function should be considered and maximized as transgender patients reach adulthood. However, it should not be underestimated how a positive body image is also associated with better sexual function and satisfaction (Nikkelen & Kreukels, 2018). Additionally, research

clearly shows that persons with untreated gender dysphoria may have significant challenges with sexuality and sexual function (Holmberg, et al., 2019).

57.    Defendants' experts' concerns about bone density in patients prescribed GnRHa are likewise exaggerated and misleading (Laidlaw Rep. ¶¶ 101-112; *see also* Hruz Rep. ¶ 79). It is accurate to state that pubertal hormones (either testosterone or estrogen) contribute to bone density accrual. A person who never was exposed to any sex hormones for their entire life would be at high risk of osteoporosis. It is not surprising that the Carmichael study referenced (Laidlaw Rep. ¶ 105) found that there is a reduction in Z-scores in adolescents on GnRHa aged 12-15 during the time of treatment when compared to age-matched controls. What is misleading, however, is that these patients will be transitioned off GnRHa when a decision is made regarding treatment with gender-affirming hormones or to resume puberty consistent with their birth-assigned sex. After exposure to sex hormones (i.e. treatment with gender-affirming hormones, or withdrawal of GnRHa treatment and resumption of endogenous puberty), bone density accrual will rise. In practice, risk of lower bone mineral density is mitigated by screening for, and treating, vitamin D deficiency when present, and by limiting the number of years of treatment with GnRHa based on a patient's clinical course (Rosenthal, 2014).

58.    Dr. Nangia (Nangia Rep. ¶ 44) and Dr. Laidlaw raise a hypothetical concern regarding brain development, suggesting that somehow use of GnRHa has

"unknown, but likely negative, consequences … with respect to brain development" (Laidlaw Rep. ¶ 113). I have heard this argument from opponents of GnRHa used before but have difficulty understanding its basis. For example, when considering children with naturally occurring delayed puberty, I find no published evidence of negative consequences to brain development compared with children with normally timed puberty. Likewise, Dr. Laidlaw can point to no published evidence in support of this concern in transgender adolescents prescribed GnRHa.

59.     Dr. Thompson is concerned with the use of GnRHa in patients assigned female at birth due to the fact that the menstrual cycle can be used as a "vital sign" and aberrations to the cycle can be a sign of an underlying disease (Thompson Rep. ¶ 60). While she does not submit an example, I would respond that competent clinicians evaluate the health of transgender boys on pubertal suppression with the knowledge that the menstrual cycle is being suppressed, and I find no literature or case reports highlighting a missed diagnosis of an important condition due to the absence of the ability to use the menstrual cycle as a vital sign.

60.     Dr. Laidlaw also misrepresents the risks of using the hormone *testosterone* to treat gender dysphoria (Laidlaw Rep. ¶¶ 120-129). He correctly explains that when treating men with testosterone deficiency, the dose of testosterone "must be carefully considered and monitored to avoid excess levels" (Laidlaw Rep. ¶ 121). This is equally true when using testosterone for treatment of

gender dysphoria. He mentions that some individuals abuse testosterone by taking more than prescribed (Laidlaw Rep. ¶ 123), but it is unclear if he is implying that transgender men would be more likely to do this than others, which I would not expect and find no data to support. All of the adverse effects of excessive testosterone that endocrinologists like Dr. Laidlaw avoid by carefully monitoring their cisgender patients with low testosterone (e.g., overtreatment can cause excessive libido, headache, erythrocytosis) are similarly avoided by careful monitoring in transgender men.

61.    Dr. Laidlaw discusses the risk that transgender men may have in developing erythrocytosis (elevation in the red blood cell measurement, hematocrit) while being treated with testosterone (Laidlaw Rep. ¶¶ 143-147). Dr. Laidlaw is using the female reference range for hematocrit to make this assertion, again considering these patients as females with *hyperandrogenism* rather than transgender men receiving evidence-based care for gender dysphoria. This is inappropriate; the male reference range for hematocrit should be used for transgender patients on testosterone treatment (Deutsch, 2016).

62.    Similarly, Dr. Hruz suggests that testosterone administration to a person assigned male at birth may have different effects than when given to a person assigned female at birth since there are thousands of sex-differentially expressed genes (Hruz Rep. ¶ 48). While this speculation could be potentially true, Dr. Hruz

does not provide a clinical example of how this could be of concern, and I am not aware of any research elaborating on this suggestion.

63.     Dr. Laidlaw makes parallel arguments regarding estrogen (Laidlaw Rep. ¶¶ 148-156) by pointing out the elevated estrogen can be associated with health problems, while ignoring that the goal of treatment with estrogen in gender dysphoria is maintenance of estrogen levels in the normal female range. Risk for the health concerns he highlights are avoided by careful monitoring of estrogen levels in transgender women.

64.     Dr. Laidlaw states that the risk for breast cancer increases when a "male" is treated with "high dose estrogen" (Laidlaw Rep. ¶ 155). This misrepresents the risks. It is of course not surprising that transgender women with breasts are at higher risk for breast cancer than men without breasts. What Dr. Laidlaw leaves out of his discussion is the complete findings of the Christel article referenced. That article found that despite an increased risk of breast cancer in transgender women compared with cisgender men, there was a lower risk when comparted to cisgender women. The article concluded the study's results suggested that "breast cancer screening guidelines for cisgender people are sufficient for transgender people using hormone treatment" (Christel, et al., 2019).

65.     Drs. Laidlaw and Hruz argue that risks of gender-affirming care outweigh the benefits. They are overrepresenting the description of risk while

discounting the benefits of treatment. Gender-affirming care when prescribed appropriately to patients with gender dysphoria improves long-term quality of life and reduces risk for depression, anxiety and suicidality (de Vries, et al., 2014; de Vries, et al., 2011; Green, et al., 2022; Smith, et al., 2005; Turban, et al., 2022).

66.     Dr. Lappert, who is a retired surgeon, cites my expert report where I suggested GnRHa could obviate the need for surgery (e.g. transgender men would not require mastectomy, transgender women would not require facial feminization surgery if they never completed an endogenous puberty). He argues that testosterone use in transgender men increases the likelihood of hysterectomy because "it produces the conditions of polycystic ovary syndrome, uterine atrophy, and vaginal atrophy" (Lappert Rep. ¶ 30). The citation he provides after this assertion does not include any studies supporting the notion that testosterone use increases the likelihood of hysterectomy, nor am I familiar with data making this direct connection. Rather, adult transgender men who are treated with testosterone have gender dysphoria, and are electing to have hysterectomy as part of a gender-affirming treatment, not because testosterone has caused a medical problem.

## V.     Informed Consent

67.     Defendants' experts argue that it is not possible for parents and adolescents to make truly informed assent and consent decisions regarding gender-affirming care. The suggestion is that this decision is somehow different from other

41

complex medical decisions that parents and guardians make regarding the health and wellness of their children every day (Nangia Rep. ¶¶ 61-114). Dr. Nangia is underestimating the capacity of parents and guardians to understand and balance information pertaining to the health of their children. Pediatricians are trained to discuss topics that are challenging, to explain medical options at an age-appropriate level, to assess for patient and family understanding, to review patient and family values and priorities, and to make shared decisions about complex medical problems every day. WPATH SOC 8 clearly outlines criteria for how providers obtain assent and consent for medical intervention (Coleman, et al., 2022a).

68.     Dr. Hruz considers these treatments "experimental," and as a result, patients and their parents cannot provide informed consent (Hruz Rep. ¶¶ 106, 113). However, gender-affirming care is not experimental – it is based on significant scientific research and clinical experience and is supported by every major medical association in the country (Shumer Rebuttal Rep. ¶ 12). As a provider of gender-affirming care, it is my opinion that *withholding* gender-affirming care would violate the basic tenets of medicine. Gender dysphoria has treatment options that are supported by evidence; therefore, withholding those treatment options is harmful.

69.     In my initial report I wrote, "[a]ttempts to 'cure' transgender individuals by forcing their gender identity into alignment with their birth sex has been found to be both harmful and ineffective" (Shumer Rep. ¶ I.4) Dr. Thompson

42

suggests I "[do] not describe what this means" (Thompson Rep. ¶ 124), but on the contrary, I explained that attempts at this type of therapy have been associated with higher rates of suicidality, suicide attempt, and running away from home (Turban, et al., 2020; Campbell & Rodgers, 2022[3]).

70.     Dr. Hruz further claims that parents cannot provide informed consent because providers often threaten parents that "failure to allow a gender dysphoric child to medically transition will result in suicide" (Hruz Rep. ¶ 114). Dr. Hruz provides no support for this assertion, and I personally have never considered making this kind of statement to patients or their families; this is not common practice nor is it suggested in the SOC. In contrast, consistent with the SOC, I am always clear with patients and parents that I consider every perspective in the room valid and rooted in the intention to make the best decision for the health of the adolescent. Any complete assessment of an adolescent's gender identity includes vital information from parents, who have much more knowledge of their child than their health care providers could ever have. Most often, careful exploration of the desires, fears, questions, and concerns of both patients and parents leads to better understanding and improves collaboration and the ability to make sound medical decisions together.

---

[3] In my prior report the citation to Campbell & Rodgers indicated the year as 2002. The correct year of publication is 2022 as indicated in this report.

71.     Unfortunately, the rates of suicidal ideation and attempt in this patient population are significantly elevated compared to the general population (Reisner, et al., 2015). Dr. Hruz discusses that rates of suicidal ideation and attempt in transgender adolescents are similar to rates for adolescents referred for psychiatric care for other reasons (Hruz Rep. ¶ 115). This is correct and alarming, a point which only supports the notion that comprehensive evidence-based care, including hormonal interventions when indicated, is so critical.

72.     Dr. Hruz then references Dr. S. B. Levine in stating that informed consent in this context fails with respect to discussion of the natural history of gender dysphoria in adolescents, the quality of evidence regarding gender-affirming care, and the handling of the question of suicide (Hruz Rep. ¶ 116). In my own practice, consistent with the SOC, I am careful to review the evidence pertaining to the treatment of gender-affirming care with patients and families and reject the claim that the consent process is limited by "'erroneous professional assumptions'" or "'poor quality of the initial evaluations'" (Hruz Rep. ¶ 116). As a provider well-connected with others in the field, I submit that providers across the country take the same care when describing potential risks and benefits of gender-affirming care. Dr. Cantor cites Bisno, et al. (2023) to claim that endocrinologists do not require psychosocial evaluations prior to the initiation of gender-affirming hormones (Cantor Supp. Rep. ¶¶ 71-73). The article cited did not include any pediatric

endocrinologists and psychosocial evaluation is a critical component of assessment

and treatment of gender dysphoria in youth as recommended by both WPATH and

the Endocrine Society (Coleman, et al., 2022a; Hembree, et al., 2017).

73.　█████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

      Executed this 25th day of March 2024.

_____

Daniel Shumer, M.D.

## EXHIBIT R.1: SUPPLEMENTAL BIBLIOGRAPHY

American Board of Internal Medicine: Endocrinology, Diabetes, and Metabolism Certification Examination Blueprint. (2024). https://www.abim.org/Media/wxbjt5o3/endocrinology-diabetes-metabolism.pdf.

American Journal Experts (AJE). How to write limitations of the study (with examples). https://www.aje.com/arc/how-to-write-limitations-of-the-study/ (updated Aug. 24, 2023).

American Medical Association (AMA) and GLMA: Health Professionals Advancing LGBTQ Equality (2019). Health Insurance Coverage for Gender-Affirming Care of Transgender Patients. https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf

American Psychological Association. (2015). Guidelines for psychological practice with transgender and gender nonconforming people. American Psychologist, 70, 832-864.

Ashley F, Tordoff DM, Olson-Kennedy J, Restar AJ. (2023) Randomized-controlled trials are methodologically inappropriate in adolescent transgender healthcare. International Journal of Transgender Health.

Bränström R, Pachankis K. (2020a). Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study. Amer. J. of Psychiatry. 177(8).

Bränström R, Pachankis K. (2020b). Correction to Bränström and Pachankis. Am J Psychiatry. 177(8):734.

Bränström R, Pachankis K. (2020c). Toward rigorous methodologies for strengthening causal inference in the association between gender-affirming care and transgender individuals' mental health: Response to letters. Am J Psychiatry. 177(8):769-772.

Bränström R, Pachankis K. (2021). Country-level structural stigma, identity concealment, and day-to-day discrimination as determinants of transgender people's life satisfaction. Soc Psychiatry Pschiatr Epidemiol. 56(9), 1537-45.

Caanen MR, et al. (2017). Effects of long-term exogenous testosterone administration on ovarian morphology, determined by transvaginal (3D) ultrasound in female-to-male transsexuals. Hum Reprod. 32(7):1457-1464.

Campbell T, Rodgers Y. (2022). Conversion therapy, suicidality, and running away: an analysis of transgender youth in the U.S. SSRN. 2022 Nov. Available at http://dx.doi.org/10.2139/ssrn.4180724.

Chen D, et al. (2023). Psychological functioning in transgender youth after 2 years of hormones. N Engl J Med. 2023 Jan 19;388(3):240-250.

Christel JM de Block, Wiepjes CM, Nota NM, et al. (2019). Breast cancer risk in transgender people receiving hormone treatment: nationwide cohort study in the Netherlands. BMJ 2019;365.

Christensen JA, Oh J, Linder K, et al. (2023). Systematic review of interventions to reduce suicide risk in transgender and gender diverse youth. Child Psychiatry and Human Development.

Coleman E, Radix AE, Bouman WP, et al. (2022a). Standards of care for the health of transgender and gender diverse people, version 8. Int J Transgend Health 2022 Sep 6;23 (suppl 1): S1-S259.

Coleman E, Radix AE, Bouman WP, et al. (2022b). Correction. Int J Transgend Health 2022; 22(Suppl 1): S259-S261.

Coleman E, Bockting W, Botzer M., et al. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. Int J Transgenderism. 13(4). 165-232.

De Vries ALC, McGuire JK, Steensma, T.D., et al. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics. 2014 Oct; 134(4):696-704.

De Vries, A. L. C., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. J Sex Med. 8(8), 2276–2283.

Delemarre-van de Waal HA, Cohen-Kettenis PT. (2006). Clinical management of gender identity disorder in adolescents: a protocol on psychological and paediatric endocrinology aspects. European J of Endocrinology. 155:S131-S137.

Deutsch, MB (ed.). Guidelines for the primary and gender-affirming care of transgender and gender nonbinary people (2nd ed.) 2016. University of California, San Francisco, Department of Family and Community Medicine, Center of Excellence for Transgender Health.

https://transcare.ucsf.edu/sites/transcare.ucsf.edu/files/Transgender-PGACG-6-17-16.pdf

Dhejne C, Lichtenstein P, Boman M, et al. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PloS One. 2011 Feb 22;6(2):e16885.

Drescher, J., Haller, E., & Yarbrough, E. (2018). Position statement on access to care for transgender and gender diverse individuals. Caucus of LGBTQ Psychiatrists. American Psychiatric Association.

Forsberg LA, Absher D, Dumanski JP. (2013). Non-heritable genetics of human disease: spotlight on post-zygotic genetic variation acquired during lifetime. J Med Genet. 2013;50:1-10.

GLAAD (2023, June 21). *Medical Association Statements in Support of Health Care for Transgender People and Youth.* Retrieved March 24, 2024, from https://glaad.org/medical-association-statements-supporting-trans-youth-healthcare-and-against-discriminatory/#:~:text=On%20June%2012%2C%202023%2C%20The,support%20of%20evidence%2Dbased%20care

Glintborg, D., Kjer Møller, J.-J., Hass Rubin, K., Lidegaard, Ø., T'Sjoen, G., Ørsted Larsen, M.-L. J., Hilden, M., & Skovsager Andersen, M. (2023). Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study. Eur J Endocrinol. 189(3), 336–345.

Green AE, DeChants JP, Price MN, et al. (2022). Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth. J Adolesc Health. (2022) 70(4), 643-649.

Hembree, W.C., Cohen-Kettenis, P.T., Gooren, L., et al. (2017). Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline,  J Clin Endocrinol Metab. 102(11): 3869–3903.

Hembree W.C., Cohen-Kettenis P, Delemarre-van de Waal HA, et al. (2009). Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. J Clin Endocrinol Metab. 94(9):3132-54.

Herman JL, Flores AR, Brown TNT, et al. (2017). Age of individuals who identify as transgender in the United States. Los Angeles, CA: The Williams Institute.

Holmberg M., Arver S., Dhejne C. (2019). Supporting sexuality and improving sexual function in transgender persons. Nat Rev Urol. 2019 Feb;16(2):121-139.

James SE, Herman JL, Rankin S, et al. (2016). The report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality.

Kaltiala, R., Holttinen, T., & Tuisku, K. (2023). Have the psychiatric needs of people seeking gender reassignment changed as their numbers increase? A register study in Finland. Euro Psychiatry. 66(1), e93, 1–8.

Karamanis G., et al. (2023). Incidence of idiopathic intracranial hypertension in individuals with gonadotropin-releasing hormone analogue treatment for gender dysphoria in Sweden. JAMA Pediatr. 2023 Jul; 177(7): 726-727.

Karrington B. (2022). Defining desistance: exploring desistance in transgender and gender expansive youth through systematic literature review. Transgender Health. June 2022; 7(3): 189-212.

Klein, D.A., Paradise, S.L., and Goodwin, E.T. (2018). Caring for Transgender and Gender-Diverse Persons: What Clinicians Should Know. Am Fam Physician. 2018;98(11):645-653.

Klug WS, et al. (2012). Essentials of Genetics. Pearson.

Knudson G, De Sutter P. (2017). Fertility options in transgender and gender diverse adolescents. Acta Obstetricia et Gynecologica Scandinavia. 2017 July; 96(10): 1269-1272.

Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. (2014). Transgender men who experienced pregnancy after female-to-male gender transitioning. Obsetet Gynecol. 2014 Dec; 124(6):1120-1127.

Martin CE, Lewis C, Omurtag K, (2021). Successful oocyte cryopreservation using letrozole as an adjunct to stimulation in a transgender adolescent after GnRH agonist suppression. Fertil and Steril. 2021, 116(2): 522-27.

McGregor, K., McKenna, J. L., Williams, C. R., Barrera, E. P., & Boskey, E. R. (in press). Association of pubertal blockade at Tanner 2/3 with psychosocial benefits in transgender and gender diverse youth at hormone readiness assessment.

Journal of Adolescent Health. doi: 10.1016/j.jadohealth.2023.10.028

McManus IC. (2009). The history and geography of human handedness. In: *Language Lateralization and Psychosis.* Edited by Sommer I, Kahn RS. Cambridge University Press. 2009: 37-58.

Morandini JS et al. (2023). Is social gender transition associated with mental health status in children and adolescents with gender dysphoria? Arch Sex Behav. 52;1045-1060.

Nikkelen SWC, Kreukels BPC. (2018). Sexual Experiences in Transgender People: The Role of Desire for Gender-Confirming Interventions, Psychological Well-Being, and Body Satisfaction. J Sex Marital Ther. 2018 May 19; 44(4):370-381.

Nolan BJ, Zwickl S, Locke P, Zajac JD, Cheung AS. (2023). Early access to testosterone therapy in transgender and gender-diverse adults seeking masculinization: a randomized clinical trial. JAMA Netw Open. 2023;6(9):e2331919.

Persky, et al. (2020). Attitudes toward fertility preservation among transgender youth and their parents. J Adolesc Health. 2020 Oct;67(4):583-589.

Rafferty J, Yogman M, Baum R, et al. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. Pediatrics (2018) 142 (4).

Reisner SL, Vetters R, Leclerc M et al. (2015). Mental health of transgender youth in care at an adolescent urban community health center: a matched retrospective cohort study. J Adolesc Health. 2015 Mar;56(3):274-9.

Restar AJ. (2020). Methodological critique of Littman's (2018) parental-respondents accounts of "rapid-onset gender dysphoria." Arch Sex Behav. 2020:49(1):61-66.

Ristori J, et al. (2020). Brain sex differences related to gender identity development: genes or hormones? Int J Mol Sci. 2020 Mar; 21(6): 2123.

Rosenthal SM. (2014). Approach to the Patient: Transgender Youth: Endocrine Considerations. J Clin Endocrinol Metab. 2014 Dec;99(12):4379-89.

Rothenberg, SS et al. (2019). Correspondence: Oocyte Cryopreservation in a Transgender Male Adolescent. N Engl J Med. 380(9): 886-887.

Shaeer O, Shaeer K. (2014). The Global Online Sexuality Survey (GOSS): Male homosexuality among Arabic-speaking internet users in the Middle East – 2010. J Sex Med. Volume 1, Issue 10, October 2014, 2414-2420.

Smith, Y. L., Van Goozen, S. H., Kuiper, A. J., & Cohen-Kettenis, P. T. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. Psychol Med.35(1), 89–99.

Styne DM, et al. (2017). Pediatric obesity – Assessment, treatment, and prevention: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. March 2017, 102(3):709-757.

Thompson L, Sarovic D, Wilson P, et al (2023). A PRISMA systematic review of adolescent gender dysphoria literature: 3) treatment. PLOS Global Public Health, 3, e30001478.

Turban JL, Beckwith N, Reisner SL. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. JAMA Psychiatry.77(1):68-76

Turban JL, King D, Kobge J, et al. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS One. 17(1):e0261039.

Urquhart E. Why Are Trans Youth Clinics Seeing an Uptick in Trans Boys? Slate. (Sep. 13, 2017). https://slate.com/human-interest/2017/09/trans-youth-clinics-are-seeing-more-trans-boys-than-before-why.html

Van der Loos MA, Hannema SE, Klink DT, et al. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. The Lancet Child  Adolesc Health. (2022), 6(12) 869-875.

Van der Miesen AIR et al. (2020). Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers. J Adolesc Health. 66(6):699 (2020).

WPATH Mission and Vision (2023). https://www.wpath.org/about/mission-and-vision#:~:text=Mission%3A%20To%20promote%20evidence%20based,social%20services%2C%20justice%20and%20equality.

Zhang Q, Goodman M, Adams N, et al. (2020). Epidemiological considerations in transgender health: A systematic review with focus on higher quality data. Int J Transgend Health. 2020; 21(2): 125-137.

Zhou JN, Hofman MA, Gooren LJ, Swaab DF. (1995). A sex difference in the human brain and its relation to transsexuality. Nature. 1995 2;378(6552):68-70.