# EXHIBIT 24

I. Glenn Cohen                                    May 2, 2024

                                               Page 1

 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3                 NORTHERN DIVISION

 4     CASE NUMBER:  2:22-cv-184-LCB

 5     BRIANNA BOE, et al.,

 6               Plaintiffs,

 7     UNITED STATES OF AMERICA,

 8               Intervenor Plaintiff,

 9               vs.

10     HON. STEVE MARSHALL, in his

11     official capacity as Attorney

12     General, of the State of

13     Alabama, et al.,

14               Defendants.

15

16               IT IS STIPULATED AND AGREED by

17     and between the parties through their

18     respective counsel, that the deposition of

19     I. Glenn Cohen, J.D., may be taken before

20     Angela Smith McGalliard, RPR, CRR, CCR, via

21     remote video-conference, on the 2nd day of

22     May, 2024.

23          DEPOSITION OF I. GLENN COHEN, J.D.

Page 2

1          IT IS FURTHER STIPULATED AND
2   AGREED that the signature to and the
3   reading of the deposition by the witness is
4   not waived, the deposition to have the same
5   force and effect as if full compliance had
6   been had with all laws and rules of Court
7   relating to the taking of depositions.
8          IT IS FURTHER STIPULATED AND
9   AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17         IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20         * * * * * * * * * * * * *
21
22
23  Job No. CS6671293

Page 3

1          * * * * * * * * * * * * *
2              I N D E X
3             EXAMINATION
4                    PG   LN
5   By Mr. Mills            13    5
6          DEFENDANT'S EXHIBITS
7                    PG   LN

8   Ex. 13   Cohen report         35    8
9   Ex. 9    SB 184          68    4
10  Ex. 1    CRS Off-Label Use of   82    9
11          Prescription Drugs,
12          February 23, 2021
13  Ex. 2    AMA article:      98   14
14          Off-label Prescribing
15          Among Office-Based
16          Physicians
17  Ex. 4    FDA publication:     106    1
18          Understanding
19          Unapproved Use of
20          Approved Drugs
21          "OffLabel"
22  Ex. 6    Pediatrics article:   114   16
23          Trends in Off-Label

Page 4

1          Drug Use in
2          Ambulatory Settings:
3          2006-2015
4   Ex. 7    Journal of Pharmacy    117   18
5          and Pharmacology
6          article:  Off-label
7          and unlicensed
8          medicines to
9          hospitalized children
10          in Norway
11  Ex. 34   Georgia Law Review     120    5
12          article:  Off-Label
13          Innovations, 2022
14  Ex. 38   Chapter from       129   22
15          Off-label Prescribing
16          by Cavalla
17  Ex. 28   JAMA article:       160   12
18          Association of
19          Off-label Drug Use
20          and Adverse Drug
21          Events in an Adult
22          Population
23  Ex. 30   JAMA article:       164    9

Page 5

1          Off-label Drug Use
2          and Adverse Drug
3          Events Turning up the
4          Heat on Off-label
5          Prescribing
6   Ex. 26   Frontiers in      171    9
7          Pharmacology article:
8          Recommendations on
9          Off-Label Drug
10          Use in Pediatric
11          Guidelines
12  Ex. 27   Unlicensed and      198   19
13          Off-Label Drug Use
14          Issues and
15          Recommendations,
16          Sharon Conroy
17  Ex. 33   FDA in the       202    6
18          Twenty-First Century
19  Ex. 29   MJA article:       205   11
20          Off-label use of
21          medicines:  Consensus
22          recommendations for
23          evaluating

Page 6

| | | | |
|---|---|---|---|
| 1 | appropriateness | | |
| 2 | Ex. 5   Cohen video | 214 | 5 |
| 3 | Ex. 3   The Cass Review, | 219 | 23 |
| 4 | Independent review of | | |
| 5 | gender identity | | |
| 6 | services for children | | |
| 7 | and young people | | |
| 8 | Ex. 14   44 USC 331 | 228 | 16 |
| 9 | Ex. 16   NBC News article, | 231 | 3 |
| 10 | Doctor gets 6 months | | |
| 11 | in abortion patient | | |
| 12 | death | | |
| 13 | Ex. 17   ABC News article, | 232 | 4 |
| 14 | Doctor in badly | | |
| 15 | botched abortion is | | |
| 16 | tried for | | |
| 17 | manslaughter | | |
| 18 | Ex. 15   Injury Epidemiology | 233 | 2 |
| 19 | Journal article, | | |
| 20 | Characteristics of | | |
| 21 | criminal cases | | |
| 22 | against physicians | | |
| 23 | charged with | | |

Page 7

| | | | |
|---|---|---|---|
| 1 | opioid-related | | |
| 2 | offenses reported in | | |
| 3 | the US news media, | | |
| 4 | 1995–2019 | | |
| 5 | Ex. 37   DePaul Journal of | 236 | 8 |
| 6 | Health Care Law, | | |
| 7 | Active Verification | | |
| 8 | and Vigilance:  A | | |
| 9 | Method to Avoid Civil | | |
| 10 | and Criminal | | |
| 11 | Liability when | | |
| 12 | Prescribing | | |
| 13 | Controlled Substances | | |
| 14 | Ex. 10   Alabama Act Number | 238 | 22 |
| 15 | 2005-181 | | |
| 16 | Ex. 11   Article:  State | 244 | 1 |
| 17 | Affronts to Federal | | |
| 18 | Primacy in the | | |
| 19 | Licensure of | | |
| 20 | Pharmaceutical | | |
| 21 | Products | | |
| 22 | Ex. 32   Teo, 9/5/2017, FDA | 251 | 19 |
| 23 | and the Practice of | | |

Page 8

| | | | |
|---|---|---|---|
| 1 | Medicine:  Looking at | | |
| 2 | Off-Label Drugs | | |
| 3 | Ex. 42   Science.org article: | 258 | 23 |
| 4 | Pressing regulatory | | |
| 5 | challenges for | | |
| 6 | psychedelic medicine | | |
| 7 | Ex. 19   Alabama Act Number | 271 | 22 |
| 8 | 2017-66 | | |
| 9 | Ex. 12   Forbes article: | 303 | 4 |
| 10 | England Bans Puberty | | |
| 11 | Blockers For Minors | | |
| 12 | Ex. 31   The Role of Assent in | 306 | 18 |
| 13 | the Treatment of | | |
| 14 | Transgender | | |
| 15 | Adolescents | | |
| 16 | Ex. 39   California Code, | 313 | 4 |
| 17 | Health and Safety | | |
| 18 | Code, HSC Section | | |
| 19 | 11153 | | |
| 20 | Ex. 40   AIHP article:  The | 317 | 7 |
| 21 | Development of State | | |
| 22 | Pharmaceutical Law | | |
| 23 | Ex. 41   The Pharmacy | 319 | 9 |

Page 9

| | | | |
|---|---|---|---|
| 1 | Regulatory Process, | | |
| 2 | Second Edition | | |
| 3 | Ex. 23   Cell Reports Medicine | 321 | 22 |
| 4 | article:  Legislation | | |
| 5 | restricting | | |
| 6 | gender-affirming care | | |
| 7 | for transgender | | |
| 8 | youth:  Politics | | |
| 9 | eclipse healthcare | | |
| 10 | Ex. 36   Brief of Amici Curiae | 334 | 3 |
| 11 | Biomedical Ethics and | | |
| 12 | Public Health | | |
| 13 | Scholars in Support | | |
| 14 | of | | |
| 15 | Plaintiffs-Appellees | | |
| 16 | and Affirmance, | | |
| 17 | Dekker, et al. V. | | |
| 18 | Secretary, Florida | | |
| 19 | Agency for Health | | |
| 20 | Care Administration | | |
| 21 | Ex. 35   K.C. Amicus brief | 340 | 16 |
| 22 | Ex. 25   Legislation to | 344 | 9 |
| 23 | Criminalize | | |

Page 10

1     Gender-Affirming
2     Medical Care for
3     Transgender Youth,
4     JAMA
5   Ex. 20   AEO - RIGT document,   357  10
6         Bates HHS-0169993
7   Ex. 21  AEO - Correspondence,   359   2
8         Bates HHS-0169973
9   Ex. 22  AEO - RIGT document,   360  10
10        Bates HHS-0169992
11        * * * * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23

Page 11

1       A P P E A R A N C E S
2      (All parties attended remotely.)
3   FOR THE PLAINTIFFS:
4       KAITLIN TOYOMA, ESQUIRE
5       JAMES FLETCHER, ESQUIRE
6       U.S. DEPARTMENT OF JUSTICE
7       950 Pennsylvania Avenue, N.W.
8       Washington, DC 20530
9
10      JAMES FLETCHER, ESQUIRE
11      U.S. DEPARTMENT OF JUSTICE
12      150 M Street, N.E.
13      Washington, DC 20002
14
15      CYNTHIA CHENG-WUN WEAVER, ESQUIRE
16      HUMAN RIGHTS CAMPAIGN
17      1640 Rhode Island Avenue, N.W.
18      Washington, DC 20036
19   FOR THE DEFENDANTS:
20      CHRISTOPHER MILLS, ESQUIRE
21      SPERO LAW, LLC
22      557 East Bay Street, #22251
23      Charleston, South Carolina 29413

Page 12

1         I, Angela Smith McGalliard,
2   Registered Professional Reporter, Certified
3   Realtime Reporter and Certified Court
4   Reporter, State of Alabama at large, acting
5   as Commissioner, certify that on this date,
6   as provided by the Federal Rules of Civil
7   Procedure and the foregoing stipulation of
8   counsel, there came before me via remote
9   video-conference, beginning at 8:03 a.m.,
10  I. Glenn Cohen, J.D., witness in the above
11  cause, for oral examination, whereupon the
12  following proceedings were had:
13        I. GLENN COHEN, J.D.,
14  being first duly sworn, was examined and
15  testified as follows:
16        COURT REPORTER:  Thank you.  We
17  can proceed.  Usual stipulations?
18        MR. MILLS:  Yes.
19        MS. TOYOMA:  The Department of
20  Justice is going to request a read and
21  sign.
22        MR. MILLS:  And I was also going
23  to ask, Ms. Court Reporter, if you wouldn't

Page 13

1   mind keeping time for us.
2         COURT REPORTER:  Sure.
3         MR. MILLS:  Okay.  Thanks.
4             EXAMINATION
5   BY MR. MILLS:
6     Q.    Good morning, Professor Cohen.
7     A.    Good morning.
8     Q.    Could you just provide your name
9   for the Record.
10    A.    Sure.  My legal name is Ivan
11  Glenn Cohen, but I initialized my first
12  name Ivan to I, so I usually go by I. Glenn
13  Cohen.
14    Q.    And have you given deposition
15  testimony before?
16    A.    I have.
17    Q.    Great.  So you probably don't
18  need these reminders, but if you don't
19  understand the question, just ask me.  If
20  you need a break, just let me know; I'll
21  try and take breaks regularly, but happy to
22  do it more often if you'd like.
23        If you and I could try and

Page 14

1  remember to speak slowly enough for a good
2  transcription and if you could answer
3  verbally, that would be great.
4       What did you do to prepare for
5  giving today's deposition?
6     A.   So I prepared an expert report,
7  which involved some reading, meeting with
8  DOJ counsel, and the like.
9     Q.   And did anyone assist you with
10  your report?
11    A.   No.
12    Q.   In terms of preparing for --
13  Sorry.  Scratch that.
14       Did you discuss the deposition
15  today with anyone other than your counsel?
16    A.   No.  You know, I have a colleague
17  that's writing a paper on the subject who
18  shared a draft of the paper that's up on
19  SSRN, so I read that draft at some point,
20  but it wasn't for preparation of the
21  deposition.
22    Q.   And what was that paper?
23    A.   It's by Lewis Grossman.  I'm not

Page 15

1  sure the name of it.  He recently put it up
2  on SSRN.  He had sent it to me for
3  comments, and I gave him some comments here
4  and there.  And that was basically the
5  extent of it.
6     Q.   Do you recall what that paper was
7  about?
8     A.   I think it's about the
9  criminalization -- I think it's basically
10  about the subject matter of this case, for
11  the criminalization of gender-affirming
12  care, prescribing drugs for
13  gender-affirming care.  And I think it's
14  forthcoming.  I believe the Iowa Law
15  Review, and he just posted to SSRN.
16    Q.   Okay.  Did you --
17    A.   He shared it with me after I
18  prepared the expert report, but he happened
19  to mention to me that he was working on a
20  paper on the subject and sent it to me.
21    Q.   All right.  Did you review any
22  documents, other than that article or your
23  report, in preparation for today's

Page 16

1  deposition?
2     A.   I did.  They are listed, for the
3  most part, in Appendix B.  I'm happy to
4  take you through those.  I think I've also
5  mentioned that there were a few HHS
6  documents that were shared with me as well
7  that's mentioned in the expert report
8  itself.
9     Q.   And what were those HHS
10  documents, if you recall?
11    A.   Yeah.  So I believe, and again, I
12  want to be careful here because I'm not
13  sure I know exactly what they are in this
14  litigation, but my understanding was that
15  they were a number of things that have been
16  introduced as part of discovery.  They were
17  several, I think, maybe something like two
18  hundred documents, which I didn't review
19  all of them; I looked at a couple of them
20  just to see if they were relevant.  And I
21  concluded that except for one particular
22  piece of my report, which I'm happy to talk
23  about, they weren't relevant to my report.

Page 17

1       They concerned, as far as I could
2  tell from the few that I looked at, a
3  article that had been written I think in
4  STAT News or another news source regarding
5  an interaction between FDA and people who
6  wanted to run a clinical trial in this
7  space.
8       MR. MILLS:  Okay.  And I'm just
9  going to note for the Record, to the extent
10  we discuss discovery materials that are
11  currently sealed, we would propose to
12  designate those parts of the deposition as
13  sealed as well, which may involve some of
14  those documents if we discuss them.
15    Q.   Have you read any of the
16  deposition testimony in this case?
17    A.   I don't believe I've read the
18  deposition testimony.  I've read some of
19  the expert reports, but I don't think I've
20  read any of the deposition testimony, no.
21    Q.   Did you bring any papers with you
22  today to the deposition?
23    A.   I brought a copy of my expert

Page 18

1  report and the appendix associated with
2  them, clean copies of both.
3      Q.   Okay.  Were you able to set up
4  the Exhibit Share through Veritext?
5      A.   Yes.  I'm getting a nod from my
6  counsel that it's up and running and
7  working.
8      Q.   Okay.  Great.  If I show you an
9  exhibit today, I'm going to put it on the
10  Exhibit Share, but I'm also just going to
11  screen share with you what I want you to
12  look at.  So if you want to go to the
13  Exhibit Share and look at other aspects of
14  the document, you can.  I found it's
15  usually easier, to the extent we can, just
16  to look at the screen share.  They're the
17  same documents.  But that's sort of the
18  process we'll use.
19      Your report says you're being
20  paid eight hundred fifty an hour for this
21  case; is that correct?
22      A.   That's correct.
23      Q.   Do you know how much you've

Page 19

1  already billed to the United States in this
2  case?
3      A.   You know, I don't think I have an
4  exact number.  I could look it up if it's
5  important, but I don't know it off the top
6  of my head, I'm afraid.
7      Q.   Do you know about how long your
8  report took you to produce?
9      A.   I could look it up as well.  I
10  think it's a little bit tricky because the
11  question will be what it means to produce a
12  report, there's the actually writing of the
13  report, there's all the reading, there's
14  the conversation.  So I think I would have
15  to kind of itemize in that respect, and I'd
16  be happy to do so if that's relevant.
17      Q.   Gender dysphoria is a psychiatric
18  diagnosis; is that right?
19      A.   I want to be careful here because
20  I want to always make sure that I stick
21  within the lane of my expertise.  I am
22  trained as a bioethicist and a legal
23  scholar, an expert about the FDA, rather

Page 20

1  than as a clinician, let alone a
2  psychiatrist.
3      So while that comports with my
4  understanding of the DSM and the like that
5  there is a diagnosis for this, I would
6  probably defer to the experts in the case
7  who actually have the relevant clinical
8  training on the question.
9      Q.   Sure.  How did you come to be
10  involved in this case?
11      A.   I had a reach-out from DOJ
12  counsel to say we are working on this case,
13  we think you might be a potentially --
14      MS. TOYOMA:  Objection.  Don't go
15  into any privileged conversations with us.
16      THE WITNESS:  Great.
17      Q.   How did DOJ know to contact you?
18      A.   That's not something I have any
19  information on.
20      Q.   Had you volunteered to anyone
21  that you were interested in becoming
22  involved in cases like this?
23      A.   No.

Page 21

1      Q.   When were you contacted about
2  becoming involved in this case?
3      A.   I'd have to go back to my
4  calendar to know for sure.  It was
5  definitely in 2024, I believe.  I think it
6  was early in 2024, maybe January or
7  February, but I could look at my calendar
8  to determine if it's important.
9      Q.   And did you talk to anyone other
10  than DOJ counsel about becoming involved in
11  this case?
12      A.   I think I mentioned it to my
13  husband, because it might affect our
14  vacation plans.  But otherwise, I did not
15  mention it to anybody else.
16      Q.   Have you published any articles
17  about what you've called gender-affirming
18  care?
19      A.   I have.
20      Q.   And what were those articles?
21      A.   Yeah.  So I'll just refer us to
22  Appendix A, where I have a list of, kind
23  of, all of my articles.  There's two that I

I. Glenn Cohen                                                    May 2, 2024

Page 22

1  think are relevant specifically to this.
2  One is in JAMA, the Journal of the American
3  Medical Association, the other is in Cell
4  Reports Medicine. I can get the titles if
5  that's helpful.
6      Q.   That's okay. That's sufficient.
7  And have you joined or written any Amicus
8  briefs about what you call gender-affirming
9  care?
10     A.   I have been a signatory to a few
11 Amicus briefs in the space. Just to be
12 clear what I mean by being a signatory, I
13 know it's familiar to you, Mr. Mills, for
14 the Record, when you're an author of an
15 Amicus brief, you draft the Amicus brief.
16 When you're a signatory, occasionally
17 someone comes to you and says are you
18 comfortable signing this Amicus brief and
19 participating that way, and that's the role
20 I've had in these cases.
21     Q.   Do you know about how many Amicus
22 briefs in these cases you've been a
23 signatory to?

Page 23

1      A.   I think -- And again, this is
2  from recollection, so I might be off
3  slightly. I believe there might have been
4  four circuit court Amicus briefs and one
5  district court Amicus brief. It's around
6  that number. I could be off a little up or
7  down.
8      Q.   You mentioned earlier your lane
9  as an expert, so I just want to sort of
10 make sure we're on the same page about
11 that. You are not an expert on Alabama
12 law; is that right?
13     A.   I am not an expert on Alabama
14 law.
15     Q.   And you said earlier you're not a
16 mental health professional?
17     A.   That is correct.
18     Q.   And you're not a medical doctor?
19     A.   Also correct.
20     Q.   Are you an expert in statistical
21 analysis?
22     A.   I'm not an expert in statistical
23 analysis, but I've undertaken several

Page 24

1  statistical studies over the years. So --
2  But I would say that's not the lane of
3  expertise that I particularly am associated
4  with.
5      Q.   You've never prescribed a drug
6  off or on label; is that right?
7      A.   That is correct.
8      Q.   You've never conducted a study on
9  off-label use of medicines, generally?
10     A.   I've never conducted a study
11 looking at prescriber behavior relating to
12 off-label drugs. I've written about
13 off-label drugs before, but I've never
14 actually conducted a study looking at
15 behavior of prescribers, if that's what you
16 mean.
17     Q.   And you've never conducted a
18 study on off-label use of puberty blockers?
19     A.   That is correct. I've never
20 conducted a study looking at prescriber
21 behavior relating to off-label prescription
22 of puberty blockers. But as you mentioned
23 a moment ago, and the two publications we

Page 25

1  discussed, we do discuss the practice.
2      Q.   And so you've also never
3  conducted a study on prescriber use
4  off-label of cross-sex hormones?
5      A.   I think you cut out for a second,
6  Mr. Mills. If you don't mind repeating the
7  question.
8      Q.   Sure. You've also never
9  conducted a study on prescriber use
10 off-label of cross-sex hormones?
11     A.   That is correct.
12     Q.   Have you ever published a
13 peer-reviewed article focused on off-label
14 use of medicines?
15     A.   Well, now I want to just be
16 careful here that would you include the two
17 articles we mentioned before, Cell Reports
18 Medicine and JAMA that discuss the cases
19 related to this one in your question, is
20 that what you mean by your question? Or is
21 that not included by the category as you
22 define it?
23     Q.   You'd have to tell me. Were

7 (Pages 22 - 25)

Page 26

1  those peer-reviewed articles?
2      A.   So this I want to be careful
3  about, in that, JAMA, itself, is a
4  peer-reviewed journal.  The section of JAMA
5  in which it was published through
6  viewpoints section sometimes goes out for
7  peer review and sometimes doesn't.
8          I have received peer-reviewed
9  comments, I have instances where there is
10 peer review; and I have not received peer
11 review comments because the editor is
12 satisfied they don't have to provide it to
13 me.  And I've had instances where I've been
14 a peer reviewer on the viewpoints.  And
15 that side of the process, the peer-reviewed
16 process, is one that's not exposed to me
17 always as an author.  So on this one I have
18 to be careful that I can't say for sure one
19 way or the other whether that particular
20 article was peer reviewed.
21     Q.   Would you describe that article
22 as focused on off-label use of medicine?
23     A.   I would describe the article as

Page 27

1  discussing some of the cases being
2  litigated that relate to your case.  Of
3  course that does implicate off-label use of
4  medicine.  But I don't think I would say,
5  if you asked me to look at all the words in
6  the document and say how many of these are
7  specifically about the off-label use, I'm
8  not saying I would say the majority or the
9  vast majority of them.
10     Q.   And the other article you
11 mentioned in the Cell something?
12     A.   Yeah.  That article was in Cell
13 Reports Medicine, also a peer-reviewed
14 journal.  And that one as well, I think
15 similar to the JAMA article, is an attempt
16 to characterize the current litigation
17 which, of course, implicates the off-label
18 prescribing of drugs; but, you know, is not
19 focused only on that.  And that is a piece
20 of it, but I wouldn't say the majority of
21 that article is specifically about the
22 off-label prescribing of drugs.
23          (Off-the-Record

Page 28

1             discussion held.)
2      Q.   You've never conducted a
3  systematic review of the literature on
4  off-label drug use?
5      A.   Could I ask you just for some
6  clarification what you mean by the word
7  systematic review, because people sometimes
8  use that term differently?
9      Q.   Yeah.  How would you understand
10 that term?
11     A.   Well, there is a kind of
12 statistical meta analysis sense of the
13 term, and then there is, I would say, how
14 lawyers or lay people describe systematic
15 review.  And I guess I'm curious what you
16 mean the statistical meaning of the matter.
17     Q.   So I mean the former, the
18 statistical meta analysis.
19     A.   That is correct.  I've not done
20 -- That is correct.  I have not done a
21 statistical meta analysis of the literature
22 on off-label preparing.
23     Q.   And you've never been qualified

Page 29

1  as an expert in a judicial case on
2  specifically the off-label use of medicine?
3      A.   That is correct, I have not been
4  qualified as an expert in the past on a
5  case relating to that particular topic.
6      Q.   And have you ever given testimony
7  in a judicial case about the off-label use
8  of medicine?
9      A.   I have not.
10     Q.   Let's see here.  Have you ever
11 published a peer-reviewed article focused
12 on use of criminal laws related to the
13 practice of medicine?
14     A.   Yes.  I've peer reviewed, so now
15 I'd have to go through the CV to try to
16 remember which ones were which.  But I
17 think I probably published peer-review
18 articles related to abortion and abortion
19 criminalization.  Those would be some
20 examples.  The discussion we've had just
21 now relating to the two publications in
22 JAMA and Cell Reports Medicine.
23          As I mentioned, the JAMA one, I'm

Page 30

1  a little bit shielded from the question,
2  although the particular article was peer
3  reviewed, that would be another.  And there
4  may be some others in the law review
5  literature, but that is of course not peer
6  reviewed.
7      Q.   Would you say the main topic of
8  those cases was the general use of criminal
9  laws to regulate medicine?
10     A.   In some of the cases that I'm
11 talking about, some of the publications, I
12 think that is a big piece of it.  So, for
13 example, things related to Comstock Act
14 that I've published, that would be kind of
15 pretty central.  Some of the other stuff
16 I've done, I'd have to look through to be
17 sure.  But certainly it's something that's
18 discussed and something that's pretty
19 important in many of those publications.
20     Q.   Have you conducted a systematic
21 review in the statistical meta analysis
22 sense of the use of criminal laws related
23 to the practice of medicine?

Page 31

1      A.   I have not.
2      Q.   And have you ever been qualified
3  as an expert in a judicial case on the use
4  of criminal laws related to the practice of
5  medicine?
6      A.   I have not.
7      Q.   And have you ever given testimony
8  in a judicial case about the use of
9  criminal laws related to the practice of
10 medicine?
11     A.   I have not.
12     Q.   What is the scope of your
13 disagreement with Defendants' experts in
14 this case?
15     A.   The scope of my disagreement with
16 Defendants' experts in this case I think
17 are twofold.  First, really, these are the
18 bases for my report, so maybe I can just
19 kind of state them with some particularity
20 here.
21          The first is, while Defendants'
22 experts paint the lack of an FDA-approved
23 use here, and by that I want to be very

Page 32

1  specific by what I mean, because we'll be
2  using this term consistently back and
3  forth.  So unless I say otherwise, what I
4  mean is, a licensed provider prescribing a
5  drug that has been approved by the FDA for
6  a particular use, for another use, or for
7  another population.  That's what I mean by
8  off-label prescribing or off-label use.
9          Defendants' experts, as I
10 understand them, paint the fact that that
11 off-label use is taking place as to the
12 drugs involved in this case, as
13 problematic, nefarious, or reason to
14 conclude they're experimental or subject
15 for regulation by the State.
16          And my first disagreement with
17 them is just to kind of contextualize that
18 and give an understanding to the Court and
19 to the parties that this kind of off-label
20 use is extremely common in the United
21 States, it's contemplated by the regulatory
22 structure of the FDA.  And, in particular,
23 pediatric off-label prescribing is

Page 33

1  extremely common.  So that's one piece of
2  disagreement.
3          The second piece of disagreement
4  has to do with the justifications that have
5  been offered for the statute in this case
6  as it relates to the need to protect the
7  safety of patients.
8          And here the contextualization I
9  seek to offer is just to contextualize the
10 fact that the decision to treat the
11 prescription of a drug that has been
12 approved by a licensed provider, in keeping
13 with the standard of care and their
14 specialty of medicine, is an extremely
15 rare, exceedingly rare, very, very few past
16 examples I could find, and that there are a
17 series of other interlocking mechanisms
18 that states typically look at to protect
19 the safety.
20          Maybe if I can say the third
21 piece of disagreement, although this one is
22 not the headline but is a piece of it, is I
23 think that in some of our discussion of

Page 34

1  informed consent, we disagree a little bit
2  about whether a state is in keeping with
3  bioethical principles relating to informed
4  consent, it's appropriate to make a blanket
5  determination that no one could ever give
6  informed consent on a particular kind of
7  therapy, as opposed to seeking to improve
8  or to study the quality of informed consent
9  as to a particular interaction.  So I would
10  say those are the three places where the
11  experts, as I understand them on the
12  Defendants' side, and myself disagree.
13      Q.   And that third point you were
14  just discussing, where in your report do
15  you address that third point?
16      A.   Yeah.  So let me find the exact
17  page I have in front of me, just to make
18  sure I can point to it directly.  That
19  would be on page -- It's in my informed
20  consent section.  I believe that would be
21  on pages forty-five to forty-six of my
22  expert report.
23      Q.   Okay.  Do you directly disagree

Page 35

1  with any sentence in any of the Defendants'
2  expert reports?
3      A.   I can go through the paragraph
4  line by line, and I can kind of try and
5  highlight the ones.  Would that be helpful?
6           (Defendant's Exhibit
7            13 was marked for
8            identification.)
9      Q.   We can do that a little bit
10  later.  In fact, I can look at -- We can
11  pull up your report here.  I'm going to
12  mark it as Exhibit 13.  And we're going to
13  be going to paragraph sixteen of your
14  report.
15      A.   Let me open up my report here.  I
16  can see it on the document you have, but I
17  can print it out just as easily.  You said
18  paragraph sixteen?
19      Q.   That's right.  I have on the
20  screen what I believe to be a copy of your
21  report.  If you could confirm that's what
22  it appears to be.
23      A.   That is what it appears to be.

Page 36

1      Q.   And this at the end is your
2  signature; is that right?
3      A.   That is my signature.
4      Q.   All right.  So here in paragraph
5  sixteen, starting on page eight -- I guess
6  we can just go through bullet by bullet
7  point.  This first bullet point from Dr.
8  Nangia, is anything she said there actually
9  inaccurate about off-label use?
10      A.   Let me read the paragraph so I
11  can give you a better response.
12      Q.   Sure.
13      A.   I'll say the second half of the
14  paragraph, we're perhaps exceeding my
15  expertise.  I think it's very important to
16  stay in my lane as to the reasons why
17  individual physicians prescribe.  There is
18  nothing here that looks incorrect, but I
19  just want to be careful here that I may not
20  be able to detect that kind of error.
21      Q.   Sure.  I'll just say for all of
22  these, my question is just in your capacity
23  as an expert in this case, you know, are

Page 37

1  you disagreeing with the correctness of
2  something that's said by the Defendants'
3  experts.
4           So you don't disagree with
5  something in the first bullet point?
6      A.   So I want to return to your
7  question, just to be precise here.  You
8  asked me whether there was anything about
9  the factual statements that I disagree
10  with.  That's what I said, I don't think
11  there's anything here about the factual
12  statements that I disagree with.  It's the
13  import of kind of the facts that she
14  marshals that I'm kind of refuting.
15           So the fact that none of the
16  puberty blockers are currently FDA approved
17  for use in gender dysphoria, but this is
18  part of the basis for her opinion, and
19  we'll keep going with the rest of her
20  opinion.
21           What I want to highlight is this
22  connection between the lack of FDA approval
23  for the use in question and the conclusions

10 (Pages 34 - 37)

Page 38

1 that are being drawn by the experts.
2    Q.   And is that -- Do you detect that
3 implication in this bullet point?
4    A.   Again, I'd want to read this
5 whole section of her report.  But I do
6 think, in deciding to highlight the lack of
7 FDA approval in this space, she's intending
8 to make a point about it.  If it turns out
9 she's foreswearing that, that she doesn't
10 think that actual lack of FDA approval is
11 relevant here, then I think we're in
12 agreement and I perhaps read in something
13 that's not intended to be there.
14         But My understanding from reading
15 this in the context of the larger report
16 she's offered, as many of your experts,
17 this is an important element in the claim
18 that these are inappropriate uses that
19 justify the State's action in this case.
20 If I'm wrong about that, that might be a
21 helpful clarification for the Court.
22    Q.   But your understanding that
23 that's an important element in their

Page 39

1 opinions is not based on something that's
2 at least expressed in those opinions?
3    A.   Well, I want to be careful here,
4 because, again, I want to return to the
5 question you asked, Mr. Mills.  I don't
6 believe it's necessarily directly expressed
7 in this particular paragraph of text we're
8 speaking about.
9    Q.   Sure.  And if we find something
10 that, you know, you think does express it,
11 you're welcome to flag that.
12         In the second bullet point, is
13 there anything -- why don't we say
14 factually or legally inaccurate about what
15 Dr. Nangia says in the second bullet point?
16    A.   Yes.  So I think there are a few
17 things to highlight here.  And I'm just
18 rereading the paragraph so I can crystalize
19 for you exactly what I want to disagree
20 with.
21         So I think I disagree, just to
22 start with, that the claim that informed
23 consent is not attainable in this case.  I

Page 40

1 think that's the kind of statement that --
2 I just think is incorrect and we can talk
3 about why.
4         I also want to highlight the ways
5 in which to buttress this conclusion.  She
6 says:  In my opinion due to, and then she
7 gives a list of a number of things.  She
8 said the lack of an FDA indication for
9 puberty blockers as kind of one of the
10 bases of support for her conclusion.
11 Again, that would relate to the first thing
12 you were talking about where we disagree.
13    Q.   She's correct that there is a
14 lack of FDA indication for puberty
15 blockers?
16    A.   So my understanding, and, again,
17 the word indication can be a little bit
18 misunderstood, so I want to be sure to be
19 precise here, that's the words she used.
20 My understanding is, at least for
21 gender-affirming care, the category of
22 cases that you-all are litigating about in
23 this case, FDA has not treated that as an

Page 41

1 approved use by which to say this is not a
2 use that FDA has been asked to review as
3 part of an IND or MDA process.
4    Q.   And the third bullet point is Dr.
5 Laidlaw correct that the drug he mentions
6 does not have an FDA indication for gender
7 dysphoria?
8    A.   That is my understanding.
9    Q.   And in the next bullet point, is
10 he correct when he says GnRH analogue
11 medications have not been FDA approved for
12 this use?
13    A.   So let me review the paragraph
14 just to be sure.  Well, I want to be
15 careful here because he has used the word
16 experimental, so I think I'm in
17 disagreement with him on that.  And we can
18 have a conversation about what the word
19 experimental means, what he meant by it,
20 and what I think it means.
21         But the question you asked, I
22 think the answer is he's correct in saying
23 it has not been approved, but there's other

11 (Pages 38 - 41)

Page 42

1   things in this paragraph that I would want
2   to disagree with.
3       Q.   Where in your expert report do
4   you discuss whether treatments for gender
5   dysphoria are experimental?
6       A.   I would have to go through the
7   report to see if I frame it as such.  But
8   the discussion of off-label, when I discuss
9   the idea about how it's characterized by
10  some of the Defendants' experts here,
11  questions about being nefarious, unusual,
12  and experimental, I think this is on page
13  eight, paragraph sixteen, that I mention
14  that I think that this is an important part
15  of their analysis and will make something
16  experimental, and one of the things that I
17  want to contradict.
18      Q.   So in your capacity as an expert
19  in this case, you're offering an opinion
20  about the base of evidence supporting
21  medical gender transition interventions in
22  minors?
23      A.   I'm not sure I completely

Page 43

1   understand the question, so maybe I can ask
2   you to explain it to me.
3       Q.   Sure.  You've suggested you're
4   disagreeing about the characterization of
5   experimental.  And my understanding of your
6   expert opinion in this case was not that
7   you were testifying as to the scientific
8   base of support for medical gender
9   transition interventions in minors, so I'm
10  just wondering, are you, in fact,
11  testifying on that issue in your capacity
12  as an expert in this case?
13      A.   Yes.  So let me be more precise
14  about this, if I can, Counsel.
15          There's a claim in this case, the
16  use in these cases is experimental.  That,
17  to me, is a bit of a weasel word or a
18  protean word, and I think it's quite
19  important for us to fix what's meant by it.
20  To the extent that your witnesses, or the
21  defense witnesses, are of the view that the
22  off-label prescribing of the drugs in this
23  case contribute to the conclusion that it's

Page 44

1   experimental, I'm offering relevant
2   expertise as to that question.
3       Q.   And in the bullet we were just
4   looking at, he -- Dr. Laidlaw says it is
5   experimental why?
6       A.   He says:  As there have been no
7   randomized control trials for this specific
8   use case.
9       Q.   And you don't disagree with that
10  statement?
11      A.   I don't disagree with the factual
12  claims that there's been no randomized
13  clinical trials for this specific use case.
14  I do disagree with the claim that it is the
15  connection between lack of randomized
16  clinical trials and it's experimental
17  nature.  That, to be clear, is not the
18  focus of my expert report or the opinions
19  I've been asked to form in this case, so
20  it's not what I am writing about in this
21  report.  But you asked me if there's
22  something I disagree with, I do also
23  disagree with that connection.

Page 45

1       Q.   Yeah.  So I will try and continue
2   adding the qualifier "in your capacity as
3   an expert in this case".  But that is the
4   focus of most of my questions here.
5           In the next bullet point from Dr.
6   Laidlaw, if you want to read that one.
7       A.   Sure.  I can.  Let me get a
8   second.  Would you like me to read it out
9   loud or just read it to myself?
10      Q.   You can just read it to yourself.
11  That's fine.
12      A.   Excellent.
13      Q.   Is there a factual capacity
14  you're disagreeing with in this bullet
15  point from pages nine to ten?
16      A.   There's not a factual inaccuracy.
17  But I want to, again, just highlight the
18  place where I think we disagree.  Again, if
19  we do not disagree I would be delighted to
20  find that.  But here he begins by saying:
21  Contrast the FDA approved use in males
22  versus experimental use in females.  And
23  then later on he says -- this is towards

Page 46

1   the end of the paragraph, right:  In this
2   case, the purpose, effects, and ultimate
3   outcome of the FDA approved usage of
4   testosterone for males versus the
5   experimental use for females in GAT are
6   very different.
7           So I do want to disagree with
8   him, to the extent he is connecting the
9   fact that one use is on label and the other
10  is prescribing off-label, to it being
11  experimental in a problematic pejorative
12  sense.
13      Q.   But in your capacity as an expert
14  in this case, you are not disagreeing that
15  the purpose, effects, and ultimate outcome
16  of using testosterone in males is very
17  different from using testosterone in
18  females?
19      A.   So, again, I think we want to be
20  precise here.  And I have to confess, I'm
21  not entirely sure what he means by exactly
22  that particular clause.  But it seems to me
23  it's a clinical question, and I don't want

Page 47

1   to get outside of my expertise, but it
2   doesn't seem wrong to me, at least at the
3   outset.
4       Q.   And this last bullet point from
5   Dr. Cantor, if you want to read that one.
6   And, again, my question is going to be:  In
7   your capacity as an expert in this case, is
8   there something factually or legally that
9   you disagree with in this bullet point.
10      A.   So I think on this one I don't
11  have any factual disagreement.  Perhaps a
12  slight disagreement on the question about
13  peripheral here and what is meant by
14  peripheral in this case.
15          My understanding is it's been
16  important in much of the litigation and
17  much of the expert reports that I was asked
18  to review that there is this distinction
19  between on-label and off-label use.  So I
20  wouldn't describe that disagreement as
21  peripheral, it seems to me important.  But
22  that's probably the only place I disagree
23  with this one.

Page 48

1       Q.   And you -- His last sentence in
2   this bullet point, you agree that that's --
3   Sorry.  I'll rephrase.
4           In your capacity as an expert in
5   this case, you aren't disagreeing with the
6   last sentence?
7       A.   Well, I think I'm disagreeing
8   with the first sentence, the question of
9   peripheral.  As to the last, the fact that
10  some of the drugs are used widely and
11  safely for some other off-label indications
12  is not implying in the least that off-label
13  use of this drug, puberty blockers, for
14  this use, preventing normal, healthy
15  puberty in children, is safe.
16          What I would say is, it is
17  factually correct that one cannot go
18  directly from one to the other, that is
19  correct.
20      Q.   Okay.  So is it fair to say you
21  are disagreeing with the tone of the
22  Defendants' experts discussions of
23  off-label use?

Page 49

1       A.   I think it is fair to say I am
2   disagreeing with the tone, but not only to
3   say that I am disagreeing with the tone, is
4   what I would say; that there is more to it
5   than that.
6       Q.   What else are you disagreeing
7   with?
8       A.   I'm disagreeing with any attempt
9   to characterize the fact that these drugs
10  are used off-label as being particularly
11  relevant for the attention of the State,
12  and for that reason and kind of the way
13  that that's been characterized, and the
14  connection of the off-label nature of these
15  drugs they're prescribing in this
16  particular case to the affixing the label
17  experimental and problematic in a
18  pejorative way.  Those are probably the
19  places where we disagree.
20      Q.   If we could go to paragraph sixty
21  of your report.  It's on page thirty-six.
22          Here we have several more bullet
23  points.  I'm going to have the same

I. Glenn Cohen                                                    May 2, 2024

Page 50

1  questions for these, which is:  In your
2  capacity as an expert in this case, is
3  there something legally or factually that
4  you are disagreeing with in these bullet
5  points.
6          So if you want to read the first
7  one, Dr. Curlin's first bullet point.
8      A.   Sure.  So I think I probably --
9  With Dr. Curlin's first bullet point, I
10  probably disagree with -- Well, I guess I
11  want to say I think we have a disagreement
12  as to the first sentence.  He says:  It's
13  not at all clear that meaningful informed
14  consent or administration for MGT to minors
15  can be obtained.
16          I think if he means to say it
17  cannot be obtained, then I think we are in
18  heated disagreement on that.  If instead he
19  means to say there's particular instances
20  where it may be a problem or may not be a
21  problem, I'd be in more agreement.
22      Q.   Sorry.  Is it your view in this
23  case that it is clear that meaningful

Page 51

1  informed consent for administration of
2  medical gender transitioning to minors can
3  be obtained?
4      A.   It is my opinion that it is clear
5  that a blanket prohibition on providing a
6  particular service, because of the view
7  that there may be some instances where
8  informed consent is a problem, that that's
9  the wrong solution and the wrong connection
10  to draw.
11          So as to say, if Dr. Curlin is
12  implying that informed consent is not
13  possible here, we are in disagreement.
14      Q.   If we knew that a particular
15  medical intervention would have bad
16  outcomes in every case, should it be
17  offered?
18      A.   Well, I think it might depend.
19  And here I want to be careful by what you
20  mean bad outcome, so maybe I can ask you to
21  clarify, in particular just to show why I'm
22  tripping a little bit about your question.
23      Q.   Okay.

Page 52

1      A.   Go ahead.
2      Q.   I'll try and be more specific.
3  Do you think a blanket ban on lobotomies
4  violates the ethics of informed consent
5  that you're using?
6      A.   So lobotomies is an example.
7  Right?  So here I think we have to be a
8  little bit careful because, for example, we
9  have a number of states that have
10  authorized assisted medical assistance in
11  dying.  So those are examples where we
12  believe informed consent is possible to
13  give consent to die.  I think that's -- I
14  can't remember the number of states now,
15  but a number of states have reached that
16  conclusion.
17          To me, that's a reason I would
18  hedge a little bit on the example you gave
19  me of lobotomies.  That's a method perhaps.
20  There may also be instances -- I don't know
21  the modern state of lobotomies, but that
22  might also be something that I would have
23  to learn more about whether there are any

Page 53

1  instances where that is standard of care as
2  some of the procedures in this case are.
3      Q.   So I'm not sure I fully
4  understand that.  In states that have not
5  permitted physician-assisted suicide, would
6  your opinion be that those states are wrong
7  to ban physician-assisted suicide because
8  an individual person cannot provide
9  informed consent?
10      A.   My own view is that that would --
11  Again, just to be clear, we're going
12  outside what I've asked -- my expertise on,
13  now we're asking my views about assisted
14  suicide, which is perfectly fine, just want
15  to be clear that I'm now speaking outside
16  of what I was asked to opine on in this
17  case, and I haven't formed an opinion on
18  the question you've asked me, I'm doing it
19  now on the spot.
20          My own view is that the strongest
21  arguments for criminalizing assisted
22  suicide are not related to informed
23  consent, they are related to other things.

14 (Pages 50 - 53)

Page 54

1    Q.   But you'd agree that if a -- if a
2 treatment is prohibited, then informed
3 consent is irrelevant because no one can
4 consent to the treatment?
5        MS. TOYOMA:  Object to the form.
6    Q.   And you're not testifying in your
7 capacity as an expert in this case as to
8 whether medical gender transition in minors
9 should be prohibited?
10    A.   I think that's not the ultimate
11 question I've been asked to answer in this
12 case, so I think that's a fair kind of
13 thing to say.
14    Q.   Okay.  The next bullet point here
15 from Dr. Curlin, again, my same question,
16 which I can repeat after you've read it.
17    A.   Sure.  So I think I do disagree
18 with Dr. Curlin here.  And now maybe let me
19 try to explain why and also how the two
20 parts of my expert report kind of connect
21 in this respect.
22        His last sentence:  It is not
23 enough to say we don't know, without doing

Page 55

1 the careful, incremental research to
2 generate information needed for a consent
3 to be duly informed.
4        If it was the case that that is
5 the criteria for determining what is
6 informed consent in this instance, as the
7 other material I reviewed suggested, the
8 fact that the vast majority of pediatric
9 prescribing in some instances is off-label
10 in some categories, would seem to suggest
11 that all of those instances are instances
12 where his version of informed consent has
13 been failed.
14        So I don't know that that's an
15 implication he actually wants to get
16 behind, but it seems to be something
17 implied by this last sentence where I think
18 we disagree.
19    Q.   And I'm sorry.  Where are you
20 getting this last sentence that he views
21 all off-label uses as lacking sufficient
22 research or information?
23    A.   He's saying:  It's not enough to

Page 56

1 say we don't know, without doing the
2 careful, incremental research to generate
3 information needed for a consent to be duly
4 informed.  Then earlier on he says:  The
5 absence of well-designed and controlled
6 studies make it impossible to give minors
7 and their parents information sufficient to
8 consider their consent duly informed, so
9 it's the connection between those two
10 sentences.
11    Q.   I guess I'm not understanding the
12 connection to off-label uses.  From my
13 understanding of your report, some
14 off-label uses are supported by significant
15 quality research and perhaps a manufacturer
16 has simply never chosen to try to obtain
17 FDA approval.  So I guess I'm just not
18 understanding the connection between what
19 he says in this bullet point and off-label
20 usage.
21    A.   So that is helpful.  So let me be
22 more precise.  Right?
23        You are correct that there is

Page 57

1 some off-label prescribing that probably
2 does involve well-designed and controlled
3 studies and others that does not.  And I
4 guess I am referring now to the swaths of
5 off-label prescribing without well-designed
6 and controlled research studies that involve
7 incremental research to generate
8 information in the way he has in mind.
9        So you are correct, though it's
10 not the entire category of all off-label
11 prescribing.  So I was imprecise and that's
12 a helpful position.
13    Q.   And you're not testifying, in
14 your capacity as an expert in this case,
15 that poorly supported off-label uses should
16 always be provided as an option to
17 patients, are you?
18    A.   I think that's not within the
19 scope of what I was asked to provide my
20 expertise to and form an opinion on.
21    Q.   How about the next bullet point
22 from Dr. Cantor?
23    A.   Let me reread it.  So here I want

15 (Pages 54 - 57)

I. Glenn Cohen                                                    May 2, 2024

Page 58

1  to draw a distinction.  I think there's
2  probably things in this that I disagree
3  with.  But in terms of the scope of my
4  expertise as offered in this case, and what
5  I've been asked to opine upon, I think that
6  we are -- there is not a factual
7  disagreement we have as to this paragraph.
8     Q.   Okay.  How about the next one
9  from Dr. Laidlaw?  This is the one that
10  goes from thirty-seven to thirty-eight.
11     A.   So here, once again, I want to
12  say that there are things I probably
13  disagree with that are outside the scope of
14  my expertise in this case.  I can stop
15  repeating that or I can repeat it in brief
16  so that we don't have to get that in the
17  Record each and every time.
18        But it's probably this question
19  as a connection between these harms and
20  justification for SB 184 where I think we
21  have a disagreement.  And the nature of
22  that disagreement is whether the
23  appropriate way to deal with the kinds of

Page 59

1  concerns identified, or the usual way,
2  would be to criminalize the prescribing by
3  a licensed prescriber of an FDA-approved
4  drug as opposed to some of the other
5  mechanisms discussed elsewhere in this
6  report.
7     Q.   But in this bullet point, Dr.
8  Laidlaw, unless I missed it, doesn't talk
9  about criminalization; is that right?
10     A.   I mean, towards the end he
11  discusses that the Alabama Vulnerable
12  Children Compassion and Protection Act is
13  based on sound medical principles, and my
14  understanding of the act is that it does
15  involve criminalization.
16     Q.   Of course, Dr. Laidlaw is a
17  medical doctor; correct?
18     A.   Correct.
19     Q.   So do you read his report as
20  opining as to the differences between
21  criminal penalties and other types of legal
22  regulations?
23     A.   I'd have to go through the

Page 60

1  entirety of the report.  This is not a
2  question to which I've applied my mind.  I
3  can go through it again.  Certainly in
4  these particular bits that I've excerpted,
5  this distinction between criminal penalties
6  versus civil penalties is not something he
7  addresses.
8     Q.   And you're not aware of that
9  distinction being addressed in any of the
10  expert -- Defendants' expert reports?
11     A.   I think I would have to go
12  through them, to be perfectly honest, to be
13  able to say.  I don't think I read them
14  with a nod to that question.  I'll be happy
15  to do so, but I don't think it's something
16  off the top of my head that I can say one
17  way or other for sure.
18     Q.   But you haven't seen that in one
19  of the bullet points we've read so far?
20     A.   I think the distinction between
21  criminal versus civil penalties is not
22  something that appears in any of the bullet
23  points we've read, correct.

Page 61

1     Q.   Okay.  The next bullet point from
2  Dr. Nangia, on page thirty-eight.
3     A.   Great.  Let me read it.
4        So here I think Dr. Nangia and I
5  disagree on the blanket nature of the
6  intervention here, that she justifies SB
7  184 by essentially saying it is
8  insufficient in the matter of gender
9  transition in minors, period.  Right?  The
10  idea that it applies -- Her conclusion is
11  that it is inappropriate for this entire
12  class.  And my own view is, that's not the
13  proper way bioethicists should think about
14  informed consent.
15     Q.   Once, again, is that an opinion
16  on SB 184 you're providing or -- I'm just a
17  bit puzzled by this.  You seemed okay
18  allowing states to prohibit medical
19  interventions that would be harmful, which
20  would necessarily preclude parental consent
21  and adolescent assent as something they
22  could not obtain.
23        So I guess I'm wondering, again,

16 (Pages 58 - 61)

Page 62

1  you're not opining, in your capacity as an
2  expert in this case, that she's wrong about
3  the risks -- the risk/benefit weighing of
4  these treatments?
5       MS. TOYOMA:  I'm sorry.  Could
6  you repeat the question?  I was having
7  trouble following it.
8       Q.   Sure.  In your capacity as an
9  expert in this case, you're not testifying
10  that Dr. Nangia is incorrect about the
11  risk/benefit weighing of the interventions?
12      A.   So I would say I don't think that I'm
13  qualified, because I'm not a clinician, to
14  discuss the risks or benefits of these
15  particular interventions.  I've read the
16  secondary literature, but I think that
17  would exceed my expertise to give an answer
18  on that.
19      Q.   So if -- Assuming that she is
20  right, that the risks outweigh the
21  benefits, is it also then correct, in your
22  view, that parental consent with adolescent
23  assent is problematic?

Page 63

1       MS. TOYOMA:  Object to the form.
2  You can answer if you understand the
3  question.
4       A.   Yeah.  Maybe another time would
5  be helpful, too, Counsel.
6       Q.   Sure.  So if she's correct that
7  the risks of these treatments outweigh the
8  benefits, would you agree with the
9  follow-up statement parental consent with
10  adolescent assent is problematic?
11      MS. TOYOMA:  Objection to form.
12  But you can answer the question if you
13  understand.
14      A.   I think part of what I'm tripping
15  on, Counsel, is that we might have a
16  disagreement on one of the premises of the
17  question.  Let me just surface it, and if
18  not, we can move on.
19      Which is to say, risk/benefit
20  analysis at the level of a particular
21  patient, to me, versus the question about
22  whether you could make a conclusion, that
23  there does not exist a single patient for

Page 64

1  which benefits outweigh the risks.
2       So I'm a little bit tripping up
3  by which of the two you mean.
4       Q.   In your capacity as an expert in
5  this case, you're not testifying that the
6  benefits ever outweigh the risks of these
7  interventions, are you?
8       A.   So I think that I can tell you,
9  again, I'm not a clinician; therefore, I
10  think that probably that would exceed my
11  expertise.
12      That said, you asked me as a lay
13  person are there ever instances -- I'm
14  happy to answer that question, are there
15  ever instances where I believe that the
16  treatments discussed in this case actually
17  benefit patients more than the risk to
18  them, my answer would be certainly, yes.
19      Q.   So that was not my question.  My
20  question is -- You keep coming back to the
21  question of informed consent as an ethical
22  matter.  When a state prohibits an
23  intervention, informed consent is

Page 65

1  impossible; is that right?
2       A.   If you have criminalized a
3  procedure then the informed consent is
4  immaterial, because there's no way that a
5  physician will deliver that service.  So in
6  that respect, it is immaterial, informed
7  consent.
8       Q.   That would be equally true,
9  presumably, if instead there were a civil
10  penalty?
11      A.   I'd have to think about it, and I
12  need to look at little bit what the civil
13  penalty is in question.  We know that in
14  other areas of medicine there have been
15  instances where, even though there's a
16  civil penalty, physicians have decided to
17  continue to practice, notwithstanding that.
18  So there might be instances like that.  I'd
19  just want to take a look at exactly the
20  civil penalty we're talking about.
21      Q.   There could also be instances
22  with criminal penalties where a physician
23  would continue practicing?

17 (Pages 62 - 65)

Page 66

1    A.   That seems plausible to me.
2  Again, not subject of my expertise in this
3  case or the expert testimony I provided,
4  but that seems plausible to me.
5    Q.   If we could go to page forty-five
6  of your report.  This is paragraph
7  seventy-two, it really starts on page
8  forty-four but the bullet points are on
9  page forty-five.
10       I have the same basic set of
11  questions.  I think some of the bullet
12  points are sort of overlapping at this
13  point.
14       But if you could just look at
15  these and tell us whether, in your capacity
16  as an expert in this case, you are
17  disagreeing with the factual or legal
18  correctness of something that's said in one
19  of these bullet points?
20    A.   So I think I am.  I'm happy to go
21  through them one by one.  It may be easier
22  to start with the omnibus objection, which
23  appears on paragraph seventy-three, on page

Page 67

1  forty-six, where I write:  The
2  determination of whether informed consent
3  has been appropriately given should always
4  be done at the level of the particular
5  patient, and in this case, the patient and
6  the parent.
7       It's my opinion that contrary to
8  Defendants' experts, the ethical doctrine
9  of informed consent cannot justify a
10  blanket omnibus criminalization for every
11  potential minor patient in Alabama.  That's
12  the nub of my disagreement with these
13  paragraphs.
14    Q.   Is there any treatment that you
15  think minors cannot provide sufficient
16  consent to obtain?
17    A.   I don't think that one can make a
18  blanket determination about that, because
19  risks and benefits are always
20  particularized to a particular patient.  An
21  ethically sensitive and bioethically
22  appropriate form of informed consent would
23  look to the risk and benefit to a

Page 68

1  particular patient.
2              (Defendant's Exhibit
3               9 was marked for
4               identification.)
5    Q.   All right.  I would like to mark
6  the Alabama law here as Exhibit 9.  And
7  I'll pull that up here on the screen.
8       Can you see it?
9    A.   I'm going to try to pull it up on
10  Veritext Exhibit Share.  I just have a
11  feeling that might be helpful for myself to
12  be able to scan through it.
13    Q.   Sure.
14    A.   Is it okay if I ask counsel to
15  help me with the tech for a second to
16  figure out how to do this?
17    Q.   Sure.
18    A.   Yeah.  Great.
19    Q.   All right.  So you'd agree this
20  is the Alabama law SB 184 that we're
21  discussing in this case?
22    A.   Yes.
23    Q.   And have you reviewed it before?

Page 69

1    A.   I have looked at it, yes.
2    Q.   I was hoping you could start on
3  the second page of the PDF, which is
4  labeled page one, Section 2:  The
5  Legislature finds and declares the
6  following:  And read those following --
7  those findings.  It might -- There's
8  sixteen of them.  My question is going to
9  be, so you can think about it as you read
10  them, whether, in your capacity as an
11  expert in this case, you are disagreeing
12  with the correctness of any of those
13  findings.
14    A.   Great.  I'll take a second to
15  reread them, and I'll let you know when I
16  come up for air.
17    Q.   Okay.
18    A.   My eyes are not what they used to
19  be.
20       All right.  So can you repeat the
21  question now?  I'll be able to answer it.
22    Q.   Yeah.  In your capacity as an
23  expert in this case, are you disagreeing

18 (Pages 66 - 69)

Page 70

1  with the correctness of any of these
2  findings?
3      A.   So I think that -- Just to be
4  clear, many things I disagree with here.
5  I'm talking about now the scope of the
6  expertise that I've been asked to offer in
7  this case and the questions I've been asked
8  to formulate an opinion on.  As to those, I
9  think there's just two things that I would
10 highlight, let me just find them again, in
11 the document.
12     I think the first is in finding
13 (7):  This use of puberty blockers for
14 gender nonconforming children is
15 experimental and not FDA approved.  I think
16 it's the connection between those two
17 things and this is a question about how to
18 understand it.  But I think my
19 understanding of experimental, I would
20 disagree with this statement, and that's
21 related to the expertise I offered in this
22 case.
23     The other element I would point

Page 71

1  to is in paragraph (16) of this document.
2  I'll let you scroll there so we read it
3  together.  Right?
4      And that is to say, for minors
5  who are incapable of comprehending the
6  negative complications and life course
7  difficulties attending to these
8  interventions, if that is again meant to
9  say minors, as a whole, are incapable and
10 it's a class-wide determination or it's
11 appropriate to apply that class-wide
12 determination to every instance, this, I
13 think, relates to the disagreement we had a
14 informed moment ago regarding informed
15 consent.
16     So those would be the two places
17 where I think I may have some disagreements
18 with the findings of fact related
19 specifically to my own expert report here.
20     Q.   No others, though, in your
21 capacity as an expert in this case?
22     A.   You know, I read through it
23 relatively quickly, but I think that's

Page 72

1  probably right.  There's many things I
2  disagree with, those seem to be -- you
3  know, I would say perhaps just to be
4  careful about this, the extent to which
5  these particular findings support the
6  decision and the actions taken might be
7  another place where we have some
8  disagreements relating to my report.  And
9  those would be the disagreements relating
10 to whether criminally prohibiting a
11 licensed provider operating under the
12 standard of care to prescribe an
13 FDA-approved drug is the kind of thing that
14 is justified on these findings, given other
15 opportunities available to the State to
16 regulate.
17     Now, that's not in this section
18 specifically, but I think it's fair to say
19 these are the findings that are being
20 offered to justify the course of action
21 taken here.
22     Q.   You've referred a couple times to
23 the standard of care.  I didn't understand

Page 73

1  your expert report to focus on the validity
2  or evidence base of the existing treatments
3  or standards of care.
4      Are you saying that you're
5  providing an expert opinion on those
6  issues?
7      A.   What I would say is I'm not
8  offering an expert opinion as to what the
9  standard of care is in this case.  But I
10 am, instead, speaking to when a treatment
11 is standard of care and when prescribers
12 are acting in accordance with standard of
13 care, how that should be thought of in
14 terms of the analysis; not what the content
15 is, but what the implications of there
16 being a standard of care that is not being
17 followed in this case.
18     Q.   And is it your opinion that there
19 is a standard of care for these
20 interventions?
21     A.   So this is a place where I want
22 to be careful not to exceed my own
23 expertise and what I've been asked to opine

19 (Pages 70 - 73)

Page 74

1  on this case, and I am not a clinician.
2      Q.   So in your capacity in this case,
3  you're not testifying that there is a
4  standard of care for these interventions?
5      A.   I think what I -- perhaps what I
6  can say is, as a nonclinician, I've seen
7  the many medical bodies and medical reports
8  and the like that have suggested there is a
9  clinical standard of care.  But I think it
10 would be inappropriate for me, as a
11 nonclinician, to state what the standard of
12 care and whether it's being followed.
13 That's a question that will be directed
14 instead to the expert witnesses that have
15 clinical training in this case.
16     Q.   Have you seen any evidence
17 suggesting that that standard of care is
18 not, in fact, a standard of care?
19     A.   I'm not sure I completely
20 understood the question.  So if you could
21 say it again, maybe that would be helpful.
22     Q.   Sure.  Have you seen any evidence
23 suggesting that what the -- that medical

Page 75

1  organizations disagree as to the
2  appropriate standard of care for these
3  interventions?
4      A.   So, here again, I want to be
5  careful not to exceed the scope of my
6  expertise here as a nonclinician.  So I
7  don't know that I could testify to what the
8  standard of care is, as to gender-affirming
9  care or not, because I'm not a clinician
10 who sees these kinds of patients.
11     Q.   Sure.  If we could go back to
12 paragraph seven of the findings, that last
13 sentence that you flagged.
14     A.   Right.
15     Q.   Is your disagreement between a --
16 what you perceive as a connection between
17 the fact that they are not FDA approved for
18 this use and the description of them as
19 experimental?
20     A.   That is probably the primary
21 disagreement relating to my report.  But I
22 want to just be clear here, and be careful,
23 that I'm not entirely sure what is meant by

Page 76

1  experimental in this sentence.  And as a
2  result, I want to just be careful here that
3  I think I might disagree regarding other
4  parts characterized as experimental, beyond
5  the fact that it's not FDA approved.
6      Q.   So if -- But in your capacity as
7  an expert in this case, setting aside the
8  fact that it's not FDA approved for this
9  use, are you offering an expert opinion as
10 to whether these treatments are
11 experimental?
12     A.   So I think it's fair to say that
13 my expert report is not directed at that
14 question.  I could easily give my expertise
15 on that question, I have views about the
16 question.  But I think it is fair to say
17 that my expert report is about the
18 connection between something being FDA
19 approved and not FDA approved and how to
20 understand it.
21     Q.   Okay.  You have no evidence that
22 any legislator who voted for SB 184
23 disbelieved any of these findings, do you?

Page 77

1      A.   So it is the case that I don't
2  know any of the legislators that have voted
3  for SB 184, so I don't have evidence one
4  way or the other what's in their head.
5      Q.   That's the same for the governor
6  who signed SB 184?
7      A.   That is correct.
8      Q.   So you're not testifying about
9  the intent of the Alabama Legislature in
10 enacting SB 184?
11     A.   Well, here, Counselor, I think
12 we've got to be precise.  Because I
13 believe, and I just want to be clear just
14 to understand it, you shifted from the
15 first two questions which were about what
16 was in the head of the individuals and what
17 they believed as a subjective matter to a
18 second question which was about the intent
19 of the Legislature which, for different
20 purposes, might be thought of as somewhat
21 of a subjective matter as well.
22         So if you're talking about
23 intent, this is now -- I want to be careful

Page 78

1  not to get over my skis, I'm not a
2  constitutional lawsuit expert. But this
3  might be an important distinction that I
4  could imagine coming up in the litigation.
5      Q.   But in your capacity as an expert
6  in this case, you're not testifying as to
7  either of those questions, are you?
8         MS. TOYOMA: Object to the form.
9  Sorry. Can you -- Which two questions are
10  you referring to in your question?
11        MR. MILLS: If the witness
12  doesn't understand, he can ask me.
13     A.   If you wouldn't mind explaining,
14  that would be great.
15     Q.   You just referred to the
16  subjective intent of a particular
17  legislator or the objective intent of the
18  overall legislature. And I'm asking: In
19  your capacity as an expert in this case,
20  are you testifying about either of those
21  issues?
22     A.   So what I would say as to the
23  first, no; as to the second, I'm offering

Page 79

1  information that may be relevant to the
2  constitutional adjudication related to
3  questions of that. I'm happy to explain
4  more about that. But I think that's some
5  of what I'm talking about, the context here
6  may be important in understanding what was
7  intended or not as an objective matter.
8      Q.   I guess I don't really understand
9  your answer.
10     A.   Sure. Yeah. If you would like
11  me to say more, I'm happy to do so.
12     Q.   Yeah. As I understood your
13  report, it was about off-label use and
14  criminal prescriptions. I didn't
15  understand you as testifying really
16  anything about the intent of the
17  legislature in Alabama.
18        And I'm asking, is that accurate
19  or are you offering an expert opinion on
20  that intent?
21        MS. TOYOMA: Object to the form.
22     Q.   You can answer.
23     A.   Great. So let me kind of try to

Page 80

1  be precise here. In the ultimate
2  Constitution adjudication of this piece of
3  litigation, one thing that will be relevant
4  will be to examine how the Legislature
5  selected certain courses of action versus
6  others.
7         And my report is kind of, I
8  think, relevant in pointing out in the
9  second half of the report the number of
10  noncriminalization of FDA approved actions
11  FDA approved prescribing, FDA approved
12  drugs by licensed prescribers in the form
13  of standard of care that were available to
14  the State in selection of this particular
15  method of dealing with the problem.
16        And it may also be relevant to
17  look at the decision to criminalize this
18  particular form of off-label prescribing
19  and not others.
20        So my report is helpful in
21  offering those contexts, but I, myself, am
22  not testifying to the intent of the
23  Legislature.

Page 81

1      Q.   You're not testifying about the
2  history of Alabama's regulations, including
3  laws that may affect LGBT persons?
4      A.   That is not the subject of my
5  expert report. There will be other experts
6  in the litigation who are doing so, but
7  that's not subject to my expertise.
8      Q.   And you're not testifying about
9  the procedures the Alabama Legislature used
10  in enacting SB 184?
11     A.   That is correct.
12     Q.   You are not testifying about the
13  ethics of conducting studies or trials
14  involving medical gender transition
15  interventions in minors; is that right?
16        MS. TOYOMA: Object to the form.
17     Q.   You can answer.
18     A.   I think to say there may be some
19  language or some elements of my report that
20  speak, perhaps, kind of peripherally to
21  that, but that is not the subject of my
22  expert report. I believe there are other
23  experts in the case that are addressing

21 (Pages 78 - 81)

Page 82

1  that directly.
2         MR. MILLS:  I'm happy to take a
3  break now if you would like or we can keep
4  going.
5             (Recess taken.)
6         MR. MILLS:  We can go back on.
7             (Defendant's Exhibit
8             1 was marked for
9             identification.)
10    Q.   I'm going to show you what I'm
11  marking as Exhibit 1.  This is a report
12  that you cite in your report -- I will pull
13  it on the screen here -- from the
14  Congressional Research Service, titled
15  Off-Label Use of Prescription Drugs, from
16  February 2021.
17         You cited this in your report; is
18  that right?
19    A.   I believe that is correct, yes.
20         MS. TOYOMA:  I don't think it's
21  on the Veritext Exhibit Share yet.
22         MR. MILLS:  It should be.  It's
23  still thinking about it.

Page 83

1         MS. TOYOMA:  It's got the spiral
2  of doom.
3         MR. MILLS:  Yeah.  It's almost
4  there.  Okay.  It should be there now if
5  you refresh.
6         MS. TOYOMA:  Yeah.  It's there.
7  Thank you.
8    A.   If you don't mind, I'll have you
9  bring it up here.
10         We have it now in front of us.
11  Thank you.
12    Q.   Great.  We're going to go to the
13  PDF page six, which is page two of the
14  report.  I wanted you to read this first
15  paragraph under drug labeling.  You can
16  just read it to yourself.
17    A.   Okay.
18    Q.   I wanted to ask if you agree with
19  that description.
20    A.   I do agree with this description,
21  yes.
22    Q.   Okay.  And then the second
23  paragraph, the same question, starting

Page 84

1  with:  Finally, it must obtain FDA
2  approval.
3    A.   Yes.  Although it's one of the
4  caveats, here they're talking about
5  marketing a drug.  That's how I understand
6  this paragraph to be, the right to try law,
7  for example, which has come into existence
8  since this particular statute.
9    Q.   And then the next sentence, after
10  the highlighted portion:  When a physician
11  prescribes a drug for reasons other than
12  those specified in the FDA approval and
13  labeling, the medical profession considers
14  this to be an off-label use.
15         Is that consistent with your
16  understanding of off-label use?
17    A.   It is.  But I want to make sure
18  to be precise here that some people draw
19  distinctions between different kinds of
20  off-label use.  And the one that's at issue
21  in this case is sometimes referred to as
22  off-label prescribing, that is a licensed
23  prescriber prescribing an FDA-approved drug

Page 85

1  for a use other than the one or the
2  population for which FDA had approved it.
3  And the reason why I'm just drawing that
4  distinction here is that there are also
5  truly off-label uses some people include
6  that for drugs that are unapproved, for
7  example, for other things.
8         So I think we're in agreement,
9  but I just want to be a little bit precise
10  here about the terms and the way the FDA
11  uses them sometimes.
12    Q.   Sorry.  The second category,
13  you're saying --
14    A.   Yeah.  Sometimes people
15  colloquially refer to use of unapproved
16  drugs or a drug that's never been approved
17  as off-label use as well.  So I just wanted
18  to be precise here.  This is, I think, a
19  better definition.  And then sometimes
20  people do further subdivide the category of
21  off-label use between unapproved uses
22  versus unapproved populations for uses that
23  have been approved.  So this is a decent

22 (Pages 82 - 85)

Page 86

1  omnibus definition. Just want to kind of
2  be clear that there might be levels of
3  being off-label use.
4      Q.   Sure. But the way you're using
5  it, and the way I think I'm going to use
6  it, is off-label use of an FDA-approved
7  drug?
8      A.   Right. And FDA tends to refer to
9  that as off-label prescribing, that's kind
10 of their term of art for it, as I
11 understand it.
12     Q.   Okay. If we could go to PDF page
13 two of this document, which is in the
14 summary, under the heading: What Are the
15 Risks of Off-Label Prescriptions? The
16 first sentence there says --
17     A.   Give me one second. I want to
18 make sure I'm looking at the same page you
19 are on -- You said page two of the actual
20 PDF? Off-label.
21         Yes. We're on the same page.
22 Excellent.
23     Q.   This first highlighted sentence

Page 87

1  says: Prescriptions for off-label uses of
2  FDA-approved drugs are made without the
3  benefit of an FDA-reviewed analysis of
4  safety and effectiveness data.
5         Do you agree with that statement?
6      A.   Just rereading it. I agree that
7  such prescribing, to the extent there is
8  benefit from an FDA-reviewed analysis
9  safety of effectiveness data. Yes, I agree
10 that prescriptions for off-label uses are
11 made without that benefit.
12     Q.   And an off-label use then means
13 that a manufacturer has not submitted
14 satisfactory evidence to the FDA of a
15 drug's safety and efficacy for that
16 specific use; is that right?
17     A.   Yes. But just to be precise
18 here, it's not necessarily -- I think there
19 was just a slight ambiguity about the
20 question satisfactory. It can be instances
21 where they have submitted, but it has not
22 proven satisfactory or instances where they
23 have not submitted at all. Right? So I

Page 88

1  think you meant to include both, but I just
2  wanted to be precise on that.
3      Q.   Sure. This next highlighted
4  section says: A worst-case scenario for
5  the nation's health would be the widespread
6  acceptance of a drug for an off-label use
7  that sufficient research would have
8  revealed to be ineffective, unsafe, or
9  both. Aside from the drug's direct harm,
10 the time spent waiting to see whether it
11 worked would have been time not spent
12 exploring other treatment options.
13         Do you agree with that statement?
14     A.   I agree with that statement, in
15 terms of what would be -- So by worst-case
16 scenario, I think they're either talking
17 about the difficult question for a
18 regulator about how to think about it and
19 what's bad about off-label use. But, of
20 course, in the rest of the report there's
21 many discussions about what's good about
22 off-label use as well.
23         So I'm not exactly sure I

Page 89

1  understand the use of worst-case scenario
2  what they mean here, but I definitely agree
3  that these are things that are negative
4  things about off-label use.
5      Q.   The next highlighted portion,
6  right under that: Unchecked off-label
7  prescribing may also threaten the FDA gold
8  standard of drug approval. If clinicians
9  had already accepted a new use into
10 practice through off-label prescribing, a
11 manufacturer may choose not to invest
12 resources to go through clinical trials and
13 the FDA process to win approval.
14         Do you agree with that statement?
15     A.   I agree that it is possible that
16 there are some instances where that
17 situation might arise. And to the extent
18 the FDA is merely saying that that's
19 possible that situation can arise, I'm not
20 in disagreement.
21     Q.   All right. I'm going to go to
22 PDF page eight. This is page -- the bottom
23 page number is labeled four of the

Page 90

1    document.  Under the heading: Off-Label
2    Use:  Description and Examples.
3        A.   Uh-huh.  I think I see it.  Let
4    me reread this -- Just to save you having
5    to take a pause, give me a second to reread
6    this, if that's all right, Mr. Mills?
7        Q.   Yep.
8        A.   Great.  Great.
9        Q.   So this highlighted portion says:
10   Without the backing of carefully designed
11   clinical trials and expert analysis, it
12   remains unknown whether the drug is, in
13   fact, safe and effective for the off-label
14   use.
15       Do you agree with that statement?
16       A.   I think it's badly worded, and I
17   think it might suggest the opposite or an
18   incorrect kind of premise.  So I'm not sure
19   whether I disagree or if it's just badly
20   worded, but let me just kind of explain why
21   I'm just being careful here.  Right?
22       I understand this to mean that
23   without the backing of carefully run

Page 91

1    clinical trials and expert analysis, it's
2    not known whether it meets FDA standards
3    for safety and effectiveness in approving a
4    drug.
5        That's a different question than,
6    say, without those kind of clinical trials,
7    whether it's known to be safe and effective
8    because, as other parts of the document
9    reference, kind of allude to, many uses are
10   treated as safe and effective by the
11   medical community, even if they are not yet
12   given evidence to the extent that FDA
13   approves it.
14       Q.   So is it your testimony that they
15   can be known that a drug is safe and
16   effective in the absence of clinical trials
17   or expert analysis?
18       A.   So if we're using safe and
19   effective under the statutory meaning of
20   the Food, Drug and Cosmetics Act and the
21   way in which FDA approves it, without the
22   submission of those documents showing the
23   kinds of clinical trials the FDA requires,

Page 92

1    I don't think we can say the FDA would
2    conclude that they were safe and effective.
3        Q.   That was not my question,
4    actually, as I don't read this paragraph as
5    to be limited to the statutory language.
6        So my question is:  Is it your
7    testimony that a -- that it can be known
8    whether a drug is safe and effective --
9    Sorry.  I'll restart.
10       Is it your testimony that it can
11   be known that a drug is safe and effective
12   in the absence of either clinical trials or
13   expert analysis?
14       MS. TOYOMA:  Object to the form.
15       Q.   You can answer.
16       A.   And here I want to emphasize that
17   this is now outside the scope of what I was
18   asked to opine about in terms of my expert
19   testimony, by which is to say, ways of
20   knowing in a medical community that things
21   are safe and effective, that is to say,
22   randomized clinical trials of this kind are
23   one ways of demonstrating safety and

Page 93

1    efficacy, but there are many other ways
2    that are accepted in clinical communities
3    and the clinical community of medicine for
4    showing that something is safe and
5    effective.  And that's why I read this
6    language as pertaining to the way FDA
7    reviews the drug, which is the subject of
8    the rest of the Congressional report.
9        Q.   This sentence doesn't, and I
10   didn't say, randomized controlled clinical
11   trials, does it?
12       A.   Correct.  So I also think outside
13   of carefully designed clinical trials there
14   could be other ways of knowing if something
15   is safe and effective.
16       Q.   So to go back to my question, it
17   was, whether it can be known that a drug
18   was safe and effective in the absence of
19   either clinical trials or expert analysis.
20       MS. TOYOMA:  Objection to the
21   form.  Go ahead.
22       Q.   You can answer.
23       A.   So I think I want to kind of be

24 (Pages 90 - 93)

Page 94

1  clear here in what we mean by expert
2  analysis.  So I consider, for example --
3  and I'm not sure whether you intend to
4  include this, a review by expert bodies as
5  a form of expert analysis.
6      Q.   That sounds like a form of expert
7  analysis.
8      A.   Yeah.  So I think that, to me, if
9  -- Again, I want to be just precise here
10  and careful, so let me think about how I
11  can kind of explain this the best way that
12  I can.
13          There is a standard that FDA
14  approves for safety and efficacy for
15  on-label uses to approve it.  That standard
16  does not exhaust all the ways which we may
17  know something is safe or effective.
18          One way of demonstrating safety
19  and efficacy is carefully designed clinical
20  trials and expert analysis.  I'm not of the
21  view that that is the exhaustive way of
22  letting us know that something is safe and
23  effective.

Page 95

1          And actually common observation
2  of clinical practice over a long period of
3  time, for example, would be a way in which
4  we might know something is safe and
5  effective without either carefully designed
6  clinical trials or expert analysis.
7      Q.   But you are not offering an
8  opinion on that question in your capacity
9  as an expert in this case?
10      A.   That's correct.  I answered it
11  because you asked me to, and I caveated,
12  but it is not the subject of my expert
13  analysis in this case.
14      Q.   Right.  So to the extent we are
15  focused on your capacity as an expert in
16  this case, reading this sentence as an
17  ordinary definition of safe and effective,
18  not about the FDA's statutory mandates, you
19  are not disagreeing with this sentence?
20      A.   So, yeah.  I'm a little perplexed
21  by the question, Counsel.  Maybe you can
22  help me through it just by telling I'm
23  perplexed.  Right?

Page 96

1          So I think I say why I disagree
2  with it.  The reasons why I disagree with
3  it, or my opinion on this question
4  entirely, is not contained in my expert
5  report.  So I think that one answer would
6  be, actually, I've not been asked to offer
7  expertise on this question at all.
8          Now, if you asked me to offer my
9  view of the matter, I will offer it.  But
10  because I haven't used it in the expertise,
11  if you say offered your view without going
12  outside your expert report, I'm not sure if
13  I can do that.
14      Q.   Sure.  So just to summarize, in
15  your capacity as an expert in this case,
16  you are not disagreeing with this sentence?
17      A.   In my capacity as an expert in
18  the case, the question you've asked me
19  about this sentence is not part of what
20  I've been asked to opine about in this
21  case.
22      Q.   Okay.  The next sentence:  Also
23  unknown are dosing details and

Page 97

1  systematically evaluated associated adverse
2  events.
3          Do you agree with that statement?
4      A.   Those may not be known, I think I
5  would kind of reference back to the
6  conversation we had a moment ago, which
7  would be to say, we will not know
8  information about details and
9  systematically evaluated associated adverse
10  events in the way that FDA requires
11  reporting event, if a drug has never been
12  approved.
13          Now, actually in the case of
14  off-label use, there are instances where
15  you might actually learn about dosing
16  details and systematically evaluated
17  adverse events from the on-label uses.
18  Right?  And so you might actually learn
19  some of this and FDA might learn some of
20  this as well.
21      Q.   For a different use, that's what
22  you're saying?
23      A.   What I'm saying is, some of those

Page 98

1  -- so dosage is a good example. And,
2  again, I want to be careful that I'm not an
3  epidemiologist and not a clinician here.
4  But there are instances where, for example,
5  the likelihood that a particular side
6  effect might manifest based on a particular
7  weight class of the individual is something
8  that might be common for the off-label and
9  on-label use, and you might gain
10 information about that from research on the
11 on-label use.
12         (Defendant's Exhibit
13             2 was marked for
14             identification.)
15    Q.   All right.  I'm going to be
16 introducing what I'm marking as Exhibit 2.
17 And it should be there now.  This is
18 another article --
19    A.   Right.
20    Q.   -- that you cite in your report;
21 is that right?
22    A.   Yes.
23    Q.   The title is:  Off-label

Page 99

1  Prescribing Among Office-Based Physicians.
2  Just this highlighted section -- sentence
3  on the first page:  Despite sufficient
4  evidence justifying some off-label
5  practices, lack of FDA approval means that
6  off-label uses are not given the same
7  degree of scientific scrutiny as labeled
8  indications.
9         Do you agree with that statement?
10    A.   I agree with both parts of the
11 sentence.  So despite sufficient evidence
12 justifying some off-label practices, the
13 lack of FDA approval means the off-label
14 uses are not scrutinized scientifically as
15 closely as the labeled indications, because
16 we don't have a regulator reviewing
17 clinical trials, that is correct.
18    Q.   Next sentence says:  Scientific
19 evidence documenting the efficacy of
20 off-label uses in routine practice settings
21 commonly falls short of what the drug's
22 manufacturer would be required to provide
23 the FDA to receive approval for that

Page 100

1  indication.
2         Do you agree with that sentence?
3    A.   Let me just read the entire
4  paragraph just to make sure that I have the
5  context correct.
6         I think this is correct.  And
7  just to explain why it is correct, what FDA
8  requires for drug approval is typically
9  clinical trials and, particularly,
10 randomized clinical trials, and has a whole
11 list of things it requires and done a
12 certain way and negotiation in phase one,
13 phase two, phase three.
14         It is the case that routine
15 practice settings, by definition, don't
16 meet the standards that FDA approves for a
17 new drug approval.
18    Q.   If we could scroll down to page
19 three of this article.
20    A.   Okay.  I'm just going to scroll
21 too.
22    Q.   Under the heading Results, the
23 second column, this highlighted portion

Page 101

1  says:  Off-label prescription with limited
2  or no scientific support was more common
3  than supported off-label use in all
4  therapeutic classes except diabetes
5  therapies.  The gravity disparity between
6  supported and unsupported off-label
7  prescription occurred among psychiatric, 4
8  percent strong support versus 96 percent
9  limited or no support, and allergy
10 therapies, 11 percent strong support versus
11 89 percent limited or no support.
12         Do you have any reason to
13 disagree with this finding?
14    A.   I would like to just kind of go
15 back just to get a sense of what the term
16 support is meant, and just to offer the
17 context.  So give me a second to reread
18 portions of the article before I get back
19 to you.
20    Q.   Sure.
21    A.   So what I just want to draw
22 attention to is the particular definition
23 of supporting evidence that's offered on

I. Glenn Cohen                                                    May 2, 2024

Page 102

1  page 1022 of this analysis. And I have no
2  reason to think that they are incorrect in
3  applying that particular definition of
4  support here. There's nothing in their
5  analysis to suggest to me they're doing it
6  incorrectly. But I want to be precise by
7  what we mean by the word support here.
8      Q.   Sure. So you'd agree that based
9  on the definition of support that they use,
10 96 percent of off-label uses of psychiatric
11 therapies had limited or no scientific
12 support; right?
13     A.   This is the finding that they
14 reported. Having not reviewed the dataset
15 and the like, I can't speak to it, but I
16 have no reason to believe that the findings
17 they reported and the methods they used are
18 incorrect.
19     Q.   Okay. Then scrolling up to the
20 first page again, the abstract under
21 conclusions. It says: Off-label
22 medication use is common in outpatient care
23 and most occurs without scientific support.

Page 103

1  Efforts should be made to scrutinize
2  underevaluated off-label prescribing that
3  compromise patient safety or represents
4  wasteful medication use.
5          Do you agree with that statement?
6      A.   So do I agree that he made the
7  statement or do I agree with the opinion
8  and the viewpoint that they have kind of
9  endorsed here?
10     Q.   Do you agree with their
11 viewpoint?
12     A.   I think it will turn in what we
13 mean by scrutinize underevaluated off-label
14 prescribing. So, for example, if what we
15 mean is that we should have an opportunity
16 to generate more information by funding
17 clinical trials or giving incentives, as
18 Congress has done in the Best
19 Pharmaceuticals for Children Act, that
20 would be good. It would be a matter of
21 more reporting, I think that would probably
22 be good as well.
23         And, again, these are not things

Page 104

1  I've been asked to opine as an expert in my
2  report on, these are just views that I
3  hold. So I could imagine there would be
4  some initiatives as to off-label uses that
5  would be good to undertake.
6          They wrote in 2006, since then
7  we've had both at the Congressional and
8  other levels some action on this particular
9  question, in some instances.
10     Q.   Okay. And is there anything else
11 in that statement you disagree with or
12 would clarify?
13     A.   So I agree that its use is common
14 in outpatient care. I don't know the most
15 question is, I think -- I don't know that I
16 could say from their dataset, that this
17 would be true in other datasets, that we
18 look at other kinds of datasets and also
19 different definitions of support. But I
20 agree, at least, that in the dataset that
21 they use, the definition of support that
22 they use, I have no reason to disagree with
23 their methods.

Page 105

1          And with the kind of nuances that
2  I've attached to the word scrutinize and
3  underevaluated, I think that that's
4  important.
5          And finally, I think that there
6  is some ambiguity about the word "that" and
7  how it's used in this sentence. To say
8  whether they're intending "that" to limit
9  what they want to have scrutinizing
10 underevaluated off-label, only that
11 prescribing the compromises patient safety
12 or represents wasteful medication use or
13 all off-label prescribing, and then I think
14 that we probably would have to have some
15 discussion of what we mean by compromising
16 patient safety or being wasteful.
17         So these are all, I think, terms
18 that we could kind of explore about my own
19 views about the matter. But just to be
20 clear, they all exceed kind of what I was
21 asked to give an expert report upon.
22             (Defendant's Exhibit
23             4 was marked for

27 (Pages 102 - 105)

Page 106

1          identification.)
2     Q.   I've just marked as Exhibit 4
3  another article you cited in your report.
4  This is an FDA publication:  Understanding
5  Unapproved Use of Approved Drugs
6  "Off Label".
7          Do you recognize this article?
8     A.   I do.  This is a public-facing
9  document from FDA, yes.
10    Q.   That's right.
11         Here on page two, it's explaining
12 the definition of "safe" that the FDA uses.
13 And the highlighted portion says:  Safe
14 means the FDA has determined the benefits
15 of using the drug for a particular use
16 outweigh the potential risks.
17         You agree with that description
18 of how the FDA assesses whether a drug is
19 safe?
20    A.   I think.  I think it's a decent
21 public-facing kind of description of what
22 they do.  There are, of course, details
23 behind it, but I think it is largely

Page 107

1  correct.
2     Q.   So an off-label use would mean
3  that the FDA has not determined that the
4  benefits of using the drug for a particular
5  use outweigh the potential risks; is that
6  right?
7          MS. TOYOMA:  Object to the form.
8     A.   That is correct, insofar as you
9  mean the FDA has not been asked to
10 determine whether for that particular use,
11 the risks and the benefits are aligned in a
12 certain way.  As opposed to, kind of just
13 to be clear, it is not the case that the
14 FDA has determined that they are not
15 aligned in that certain way.  The FDA
16 hasn't been asked because the manufacturer
17 has not submitted the requisite requests
18 for FDA to consider approving for that use.
19    Q.   And does FDA make this
20 determination ever in the absence of a
21 manufacturer request for approval?
22    A.   I may need you to say a little
23 bit more about that question, because I

Page 108

1  wasn't completely sure I understood it.
2     Q.   Sure.  So you said -- You sort of
3  changed my statement from whether the FDA
4  has or has not determined something to
5  whether the FDA has or has not been asked
6  something.
7          I'm asking:  Does the FDA make
8  the safety determination for a particular
9  use absent a manufacturer request?
10    A.   So FDA only considers approving a
11 drug, which is what we're talking about
12 here, when a manufacturer has submitted an
13 NDA.  So if the manufacturer has not
14 submitted a new drug application, FDA would
15 not have reason to look at a particular
16 drug or particular compound.
17    Q.   Okay.  So the next portion says:
18 When you are prescribed a drug for its
19 approved use, you can be sure that FDA has
20 conducted a careful evaluation of its
21 benefits and risks for that use.  The
22 decision to use the drug is supported by
23 strong scientific data.  And there is

Page 109

1  approved drug labeling for healthcare
2  providers on how to use the drug safely and
3  effectively for that use.
4          A patient could not be sure of
5  these three points when they are prescribed
6  a drug for an off-label use; is that right?
7          MS. TOYOMA:  Objection to form.
8     A.   So what I would say, Counsel, is
9  that we might need to break up the three
10 bullet points here to answer your question.
11         So it's certainly true that the
12 first bullet point would be something a
13 patient could not be assured of, because
14 the FDA has not conducted a careful
15 evaluation of its benefits and risks for
16 that use.  The second one, the decision to
17 use the drug is supported by strong
18 scientific evidence or data.  It's possible
19 that a patient could be assured that is
20 true, even in the absence of an FDA
21 approval.
22         And there is approved drug
23 labeling for healthcare providers on how to

Page 110

1  use the drug safely and effectively for
2  that use, that one would be more like the
3  first bullet point -- I'm slowing down now,
4  to try to not tax our court reporter too
5  much.  That would be more like the first
6  bullet point in that the fact that FDA has
7  not approved that use by definition, we
8  can't say that there is an approved drug
9  label.
10      So I would say the first and
11 third bullet point, treated one way; the
12 middle bullet point might be treated
13 differently.
14    Q.   On the middle bullet point, you
15 rather changed the qualifier to say:  It is
16 possible that the patient could be sure
17 that the drug -- the decision to use the
18 drug is supported by strong scientific
19 data.
20      So that's not what the document
21 says.  The document says:  You can be sure.
22 So I guess my question is, is it still
23 correct to say when a patient is prescribed

Page 111

1  a drug for an off-label use, they cannot be
2  sure that the decision to use the drug is
3  supported by strong scientific data?
4    A.   I think that's an incorrect
5  statement, to say that they cannot be sure.
6  There can be instances where they can be
7  sure that it is supported by strong
8  scientific evidence.
9    Q.   When a patient is prescribed a
10 drug for an off-label use, they cannot be
11 sure in every case that the decision to use
12 the drug is supported by strong scientific
13 data, can they?
14    A.   Now I think -- With that helpful
15 clarification, I think we are now in
16 agreement, Counsel, that it is not the case
17 that without knowing more, that I can say
18 every single case it has been supported by
19 strong scientific data.  That's correct.
20    Q.   And that's different from an
21 on-label use; is that right?
22    A.   It is different, insofar as an
23 on-label use does carry with it the simple

Page 112

1  majeure, the FDA review for this particular
2  use.
3      Now, that said, I want to just be
4  careful here, that even FDA approved uses,
5  right, because clinical trials, for
6  example, are conducted with particular
7  populations that might be quite different
8  from the patient in question.
9      Even in off-label use, there are
10 instances where you might say:  Will this
11 work for me?  I'm different from some of
12 the clinical trial populations and the
13 like.
14      So it's not the case that the FDA
15 approval is always perfect in letting us
16 know that the drug is going to work for
17 you, won't have side effects, and the like.
18 There's a lot of heterogeneity about
19 patients.  And it's also the case that the
20 kinds of things the FDA look for are
21 necessarily limited.
22      You know, drug approval is an
23 all-things-considered kind of analysis by

Page 113

1  FDA, and I just don't want to leave us with
2  the impression that the FDA approval
3  process is always perfect.
4    Q.   But this document doesn't say it
5  is supported by perfect scientific data,
6  it's supported by strong scientific data.
7  You would agree that's true for an on-label
8  use?
9    A.   The kind of strong scientific
10 data that FDA asks for from drug
11 manufacturers, correct.
12    Q.   The next page, the last page of
13 the document, under Questions You May Want
14 to Consider, it says:  If your healthcare
15 provider is thinking about using an
16 approved drug for an unapproved use, you
17 may want to ask your healthcare provider
18 questions like these.  And I won't read
19 them all; you can read them if you like.
20    A.   Okay.
21    Q.   So the FDA believes that a
22 patient could reasonably ask these
23 questions about off-label drug uses; is

29 (Pages 110 - 113)

Page 114

1  that right?
2      A.   So again, I want to be clear, I'm
3  not speaking for FDA here.  But this
4  document, what FDA has signaled in this
5  document, these are the kinds of questions
6  and things that are appropriate for a
7  patient to ask a physician in the case of
8  an off-label use.
9      Q.   That's because, according to the
10  preceding sentence, FDA has not determined
11  that the drug is safe and effective for the
12  unapproved use?
13     A.   That is correct.
14                 (Defendant's Exhibit
15                  6 was marked for
16                  identification.)
17     Q.   I'd like to show you what I'm
18  going to mark as Exhibit 6, which is
19  another article.
20     A.   Give me a second to bring it up.
21     Q.   Yes.
22     A.   Refresh the Veritext.  Okay.
23  There we go.  Yep.

Page 115

1      Q.   Do you recognize this article?
2      A.   I do.
3      Q.   So on page two of this document,
4  the highlighted sentence under the
5  Introduction says:  Off-label prescribing
6  has been associated with higher rates of
7  adverse events in children.
8          Do you disagree with that
9  sentence?
10     A.   I guess I'm -- I'm going to query
11  what the comparison the authors intended to
12  make was.  A quick look also at what
13  they've cited to, I would just want to take
14  a look at a document they in turn cite to,
15  what country it is, and whether it's U.S.
16  based or something like that.  I think it's
17  "adverse drug reactions unlicensed and
18  off-label drugs on paediatric wards", but
19  the spelling of pediatric wards in this
20  case suggests to me that actually they're
21  referencing to a non-U.S. publication in
22  this particular instance.
23          So I'd want to look back just to

Page 116

1  take a look a little bit at that particular
2  document.
3      Q.   And I guess I'll phrase it a
4  little bit differently.  Do you have any
5  reason to think that in the United States,
6  off-label prescribing has not been
7  associated with higher level of adverse
8  events in children?
9      A.   Actually, on this one, I don't
10  think I have the expertise to answer the
11  question one way or the other.
12     Q.   But you'd agree that this article
13  you rely on says that off-label prescribing
14  has been associated with higher levels of
15  adverse events in children?
16     A.   I agree that that's a statement
17  in the text.  So I'm not going to disagree
18  with what's in front of my eyes, what I
19  read.  What I want to just emphasize is,
20  I'm not quite sure I understand the
21  comparison they're intending to make.  So
22  higher rates of adverse effects in children
23  as compared to what?

Page 117

1          And then I'd want to have a look
2  at the dataset they're referencing, because
3  the article mentioned is one that involves
4  non-U.S. populations that I believe might
5  be more than -- It's quite old, I think it
6  might be from 1999.  So twenty-five years
7  ago.
8      Q.   Your expert report here relies on
9  several articles involving non-U.S.
10  countries?
11     A.   That's correct.  And when I do,
12  I'm very careful to kind of distinguish the
13  two just to be clear about what speaks to
14  the U.S. population and what takes a
15  broader view.
16                 (Defendant's Exhibit
17                  7 was marked for
18                  identification.)
19     Q.   I'm going to introduce as Exhibit
20  7 another article you cited in your report.
21  This is one of those articles:  Off-label
22  and unlicensed medicines to hospitalized
23  children in Norway.

30 (Pages 114 - 117)

Page 118

1    A.   Right.
2    Q.   Do you recognize this source?
3    A.   I do.  Give me a second to bring
4  it up on the Veritext.  I do recognize it,
5  yes.
6    Q.   So here under the Abstract, do
7  you see they use OL to mean off-label and
8  UL to mean unlicensed.
9        Under the Introduction, toward
10 the bottom of the first column, this
11 highlighted portion:  Prospective studies
12 from Europe have shown increased risk of
13 adverse drug reactions when children are
14 using OL or UL medicines, underpinning the
15 need for appropriately authorized medicines
16 for this age group.
17       So once again, you'd agree that
18 this source you relied on indicates an
19 increased risk of adverse drug reactions
20 when children are using off-label or
21 unlicensed medicines?
22   A.   Just to be a little bit clear
23 about the comparison that's being drawn,

Page 119

1  it's a little unclear to me from the
2  sentence whether it's the comparison
3  between on-label versus off-label or
4  between off-label use for pediatric
5  populations versus or off-label use for
6  adult populations, for example.  But I do
7  think that that's kind of what they've
8  stated here.  You've read it correctly, the
9  statement that they've made.
10   Q.   Which of those do you think they
11 are studying?
12   A.   I'm going to just read the
13 paragraph to see if I can get a hint of the
14 context here.
15       So I think it's somewhat
16 ambiguous.  My best guess is that they
17 intend to draw the comparison between on
18 label versus off label versus unlicensed;
19 that is to say, pediatric on label on the
20 one side versus pediatric off label and
21 unlicensed on the other.  That's my best
22 guess, but it is a little bit ambiguous.
23 If I look through the citations that might

Page 120

1  be -- If I read through the citations they
2  reference that might disambiguate it.
3            (Defendant's Exhibit
4            34 was marked for
5            identification.)
6    Q.   All right.  I'm going to be
7  showing you what I'm marking as Exhibit 34.
8    A.   Great.
9    Q.   This is an article by David Simon
10 entitled Off-Label Innovations.  This is
11 another source I believe you cited in your
12 report; is that right?
13   A.   I did.
14   Q.   And it's written by a fellow at
15 the center that you oversee at Harvard; is
16 that right?
17   A.   He's actually a law professor
18 now.  He wrote it I think while -- He
19 started the writing, so he credited it for
20 us, but he's currently a law professor at
21 Northeastern.
22   Q.   Okay.  But were you overseeing
23 the center where he was a fellow when he --

Page 121

1    A.   I was, although I was not
2  overseeing his work on this particular
3  project.
4    Q.   Sure.  So page three of the PDF,
5  which is the first page of the article, the
6  abstract, the highlighted portion says:
7  The problem of off-label uses on the other
8  hand is one of safety and efficacy:
9  Off-label uses are risky because they are
10 not supported by the same level of evidence
11 as approved uses.
12   A.   Uh-huh.
13   Q.   Do you agree with that statement?
14   A.   I think I agree with it,
15 insofar -- again, it's an abstract, which
16 often is a way of kind of simplifying an
17 argument that's being made.
18       If I understand the statement to
19 be off-label uses may involve more risk
20 because there has not been the same
21 approval process involved with on-label
22 uses that is looked at safety and efficacy
23 by FDA, I think I agree with the statement.

31 (Pages 118 - 121)

I. Glenn Cohen                                                    May 2, 2024

Page 122

1    Q.   So if you took an off-label use
2  at random and an on-label use at random,
3  which is likely to be more risky?
4    A.   Actually, I think the answer is:
5  It's hard to know.  And let me explain why.
6  As you'll remember, for on-label uses, we
7  balance risk and benefits.  And there can
8  be instances where actually the on-label
9  use you've picked at random is extremely
10 risky, but there's an overwhelming amount
11 of benefit to doing so.
12       Whereas, the off-label use you've
13 picked actually has very low risk but even
14 if it also has relatively low benefit.  So
15 I'm not sure that just sampling some random
16 one can make the conclusion that the
17 off-label use is necessarily obscure.
18   Q.   Sure.  So let's take a proportion
19 of risk and benefit -- risk/benefit ratio,
20 and taking a random off-label use and a
21 random on-label use.  Which is likely to
22 have a higher risk/benefit ratio?
23   A.   Yeah.  So now I'm operating a

Page 123

1  little bit outside of the kind of confines
2  of the expert report I provided, so I'm
3  forming a new opinion here, not one I was
4  asked to provide information or form or
5  apply my expertise to.
6        But I still think one can't say
7  one is more likely than the other.  And the
8  reason is because the on-label uses, that
9  category, what makes the universe of
10 on-label uses are the uses that the
11 manufacturer has pursued labeling approval
12 from.  And conditional on knowing that
13 fact, they have decided this to be their
14 pioneer, their first indication which they
15 sought use.
16       It doesn't tell me whether that
17 is the most beneficial, the most risky, or
18 what.  It doesn't really tell me where that
19 falls in the pool of all possible uses.
20 Such that it's quite hard for me to know
21 what the distribution of benefit and risk
22 is as to the off-label uses, which are a
23 much larger population of the universe.

Page 124

1    Q.   I guess I don't really understand
2  that answer.  The question for on label is
3  not simply whether a manufacturer asks, but
4  whether the FDA approves.
5        So I guess it would be:  Are you
6  saying that you think the overall -- that a
7  random off-label use could have a lower
8  risk/benefit ratio than a random on-label
9  use?
10   A.   I am.  And let me just explain
11 why.  So I'm sorry if I've not been
12 communicating it clearly, but let me try
13 again.
14       It's not the case of the
15 population of on-label uses are themselves
16 a randomized population of all possible
17 uses in the world.  Instead, they're the
18 ones for which the manufacturer has
19 themselves sought authorization, sought FDA
20 approval.
21       And as such, there may be reasons
22 related to why they sought approval that
23 might be relevant.  Let me just give you

Page 125

1  one as to why I think they might be more
2  risky.  Insurance reimbursement often
3  hinges on FDA approval.  And it could be
4  that if you are seeking, as a
5  pharmaceutical company, to make a
6  significant amount of money, you pick a
7  space where you can -- where the drug will
8  be priced at a high level, and one of the
9  places a drug would be placed at high level
10 is something like oncology, for example,
11 where risks are also quite high to begin
12 with.  Right?
13       So the problem is that the
14 population of the on-label uses might
15 itself be skewed by manufacturer incentives
16 in the system, and that's what makes
17 drawing the comparison in the random a
18 little bit tricky for me to do.
19   Q.   How about the level of evidence,
20 a random off-label use and a random
21 on-label use, which is likely to have, as
22 Professor Simon said, a higher level of
23 evidence?

32 (Pages 122 - 125)

Page 126

1    A.   So if picked at random, we know
2  that all on-label uses have received a
3  review by FDA of their efficacy and safety.
4  Right?  So the entire population of
5  on-label use is that it's true.
6       The off-label uses might be
7  heterogenous in the evidence space between
8  them, therefore, by definition, a random
9  draw.  I think if they scored each unit in
10 the set, which might be a better way of
11 thinking about it than a random draw, it is
12 the case that the on-label use population
13 would be favored.
14   Q.   If we could go to page
15 twenty-five of this PDF, which is page 723
16 of the article.  This first highlighted
17 portion says:  Off-label use increases the
18 chance of adverse events, these risks
19 increase as evidence for the relevant use
20 thins out.  One reason for this is that
21 drug effects are hard to predict.  Even the
22 same dose of a drug can have wildly
23 different effects in disparate patient

Page 127

1  populations.  Children, for example,
2  metabolize drugs differently than adults,
3  complicating attempts by physicians to
4  extrapolate dosage from one to the other.
5       Is there anything there you agree
6  with in your capacity as an expert in this
7  case?
8    A.   I don't think I do.  Let me read
9  it one more time to be safe.
10      No.  I think this is a fair
11 statement of the literature.
12   Q.   Then the second highlighted
13 portion says:  In psychiatry, where
14 off-label use is prevalent, the risk is not
15 merely using a drug with limited evidence
16 but failing to treat the underlying
17 behavioral problem.  Because of these
18 risks, and the costs associated with
19 improper prescriptions, almost every
20 commentator discussing that topic is
21 concerned with the relative safety and
22 efficacy of off-label uses.
23      Anything there you disagree with?

Page 128

1    A.   Yeah.  The latter sentence about
2  every commentator discussing, I think I'd
3  probably have to read the literature that
4  Professor Simon is citing to with more
5  thoroughness in order to be able to speak
6  to that one.  But I think it's fair to say,
7  again, that his characterization, and,
8  again, outside the bounds of the expert
9  report I've been asked to kind of offer in
10 this case, but it doesn't seem to me
11 incorrect to say that in psychiatry, we
12 have the additional question about whether
13 the underlying behavioral, as he puts it,
14 problem, the failing to treat that is
15 something to think about that in an
16 all-things-considered judgment about
17 off-label use.
18   Q.   And then the next portion that's
19 highlighted:  Because off-label uses
20 generally are not supported by the same
21 evidence as approved uses, patients taking
22 a drug off-label may be exposed to risks
23 without knowing whether a drug is safe and

Page 129

1  effective.
2       Anything there you disagree with?
3    A.   Only -- I don't think I disagree
4  with it, but only because I think because
5  we're putting a lot of worth on the word
6  "may", may be exposed to risk without
7  knowing whether a drug is safe and
8  effective.  And to return to a colloquy we
9  had earlier, I want to kind of indicate
10 that in some instances we may have other
11 evidence outside of FDA approval that a
12 drug is safe and effective.  Right?
13      So it is true that there are
14 instances where some off-label use might
15 expose people to risks without knowing
16 whether a drug is safe and effective, and
17 other instances where actually the
18 off-label use we have evidence for it
19 outside of FDA approval.
20           (Defendant's Exhibit
21            38 was marked for
22            identification.)
23   Q.   I'm introducing what I'm marking

33 (Pages 126 - 129)

I. Glenn Cohen                                    May 2, 2024

Page 130

1   as Exhibit 38, which should be on the share
2   now.  This is a book chapter that you cited
3   in your report from a book called Off-Label
4   Prescribing.
5         Do you recognize this book?
6   A.   Yes.  I believe it might be a
7   Ph.D. thesis or something like that from
8   Mr. Cavalla.
9   Q.   This is the Kindle version.  The
10  work was somewhat hard to obtain.
11        The PDF page four, from chapter
12  five of the book, says:  As far as safety
13  is concerned, a variety of studies have
14  shown an increase in risk associated with
15  off-label prescriptions as opposed to
16  licensed alternatives, see Table 5.1.  As
17  far as the overall relative risk is
18  concerned, a series of studies have
19  identified greater proportion of ADRs in
20  pediatric patients prescribed off-label
21  medicine, as opposed to products used in
22  accordance with the approved status.
23        Do you disagree with anything in

Page 131

1   that portion?
2   A.   I would just add the
3   clarification that Table 5.1 he's
4   referencing are studies in the United
5   Kingdom, Brazil, France, and the United
6   Kingdom.  I'd want to take a look at the
7   definition of off label versus unlicensed
8   use used in those particular studies.  And,
9   also, just to kind of caveat in that
10  respect, but I have no reason to think that
11  he's incorrect in characterizing these
12  studies.
13        The question about the safety of
14  off-label use is outside the expert
15  opinions I was asked to formulate in this
16  particular case as to pediatric
17  populations.
18  Q.   You're not aware of any study in
19  the United States finding that there is no
20  increase in risk associated with off-label
21  prescriptions as opposed to on-label
22  prescriptions?
23  A.   You know, I think there's no

Page 132

1   study of which I'm aware, although, I don't
2   know that I have seen studies either way in
3   the United States that I could pull out
4   from the top of my head, unfortunately.
5   Q.   So the next sentence, which
6   crosses over to the next page is:  The
7   relative risk varies from 1.53 to 3.44,
8   with the average roughly equating to more
9   than a doubling of risk for such patients.
10        MS. TOYOMA:  I believe it says:
11  To slightly more than a doubling of risk
12  for such patients.
13  Q.   Sorry.  Yes.  Missed a word.  To
14  slightly more than a doubling of risk for
15  such patients.
16        You agree that's an accurate
17  description of the evidence he presents in
18  Table 5.1?
19  A.   So to the extent I'm reading
20  Table 5.1 and reading the column about
21  relative ADRs, he's correctly reporting
22  this column that the relative ADR that he's
23  presented in Table 5.1.  But these are not

Page 133

1   studies that I've reviewed, so I can't
2   speak to it specifically.
3   Q.   And you have no reason to think
4   that the true increase in relative risk is
5   something else?
6   A.   You know, it's sort of outside my
7   expertise, to be perfectly honest, as a
8   nonclinician in this space.  So I don't
9   know that I have a reason -- If you ask me
10  to form a prior belief on the question, I'm
11  not sure what prior belief I would have, so
12  I'm not sure this is in contravention or in
13  support of it.
14  Q.   The next highlighted portion in
15  the second column on that page:  It seems
16  that more of the ADRs associated with
17  off-label medicine are serious compared to
18  approved drug treatments.
19        Again, do you have any reason to
20  disagree with that assessment?
21  A.   To me, it strikes me as actually
22  a hard assessment to make, because we have
23  such a huge amount of off-label use.

34 (Pages 130 - 133)

Page 134

1  Again, I'm happy to reread this portion of
2  his book to tell you a little bit more
3  about what is the basis for that opinion.
4  But I think that, to me, I don't think I
5  have a prior belief one way or the other,
6  that the ADRs involved here with off-label
7  medicine are more serious compared to an
8  approved drug.
9      Q.   Go ahead.
10     A.   I'll just say --
11     Q.   Just to go back to my question,
12  so you have no reason to disagree with this
13  sentence?
14     A.   I don't have a belief one way or
15  the other on its truth value.
16     Q.   If we could go to page seven, the
17  highlighted portion.  I'll just let you
18  read it since it's a bit long.  Again, the
19  question is just going to be, do you have
20  any reason to disagree with what he says
21  here?
22     A.   Great.  So I think he states it
23  generally.  I don't have any reason to

Page 135

1  disagree with what he said in this
2  particular paragraph.
3      Q.   The next page, page eight, so
4  he's discussed some use of depression
5  treatments, and then he says, in the
6  highlighted portion:  These and other
7  histories teach numerous lessons
8  individually.  Considered as a group,
9  however, they make it clear that safe and
10  rational prescribing of drugs to children
11  requires controlled studies of drugs in
12  children.
13         In your capacity as an expert in
14  this case, are you disagreeing with that
15  statement?
16     A.   So let me be clear here and try
17  to get some clarity from you.  As an expert
18  in this case, I wasn't asked to form an
19  opinion on this question.  So I'm happy to
20  form an opinion now on the question you
21  asked, but this is not a question I was
22  asked to form an opinion on for this case.
23     Q.   Okay.  That's fine.  Page nine,

Page 136

1  the first highlighted sentence:  Nobody has
2  reported specifically on how many of the
3  fatal ADRs are due to off-label medicine,
4  but let's see if we can produce an
5  estimate.  And then later on, after
6  explaining how he calculated it:  We can
7  calculate that between one in three and
8  three in seven drug-related deaths occur as
9  a result of this practice; namely,
10  thirty-five thousand to forty-five thousand
11  per year in the United States.
12         Do you have any reason to
13  disagree with that calculation?
14     A.   I want to kind of get a little
15  bit more context here, to how the
16  calculation is being generated and what
17  he's using as the data source, to
18  understand a little bit the claims being
19  made here.
20     Q.   I guess my question is just:  In
21  your capacity as an expert in this case,
22  are you going to testify that this is
23  wrong?

Page 137

1      A.   Well, he has mentioned here:
2  From page seventy-one adverse events run at
3  around, so he's referencing a prior page in
4  the book.  And I would kind of want to be
5  able to take a look at that prior page and
6  see how his calculations are calculated,
7  even to determine whether this is outside
8  my expertise.
9      Q.   Did you consider this calculation
10  when you were writing your expert report?
11     A.   So the question you were asking
12  me about this calculation is not one that's
13  relevant to the questions I was asked to
14  opine upon as an expert.  As a result, they
15  were not ones that I addressed in my expert
16  report.
17     Q.   On page ten, the first
18  highlighted section under Quality of
19  Evidence:  The fallacy of the argument for
20  use of a drug outside regulatory approval
21  is widely appreciated when the evidence for
22  its efficacy is poor.  Off-label medicine
23  can only really be appropriate in these

35 (Pages 134 - 137)

Page 138

1  circumstances if the patient is seriously
2  ill and there is no alternative treatment.
3  Where evidence is poor, the safety of the
4  drug also needs to be concomitantly
5  greater.
6        Do you disagree with that
7  statement?
8     A.   I do.
9     Q.   Why is that?
10    A.   Well, I think -- And, you know,
11 here we can look at the Congressional
12 Research Service, we can look up what FDA
13 has said, and we can look at what Congress
14 has said, for example, that there are
15 instances where physician use of off-label
16 prescribing is appropriate, even in
17 circumstances where the patient is not
18 seriously ill.
19        Just to give you an example,
20 there's huge amounts of off-label
21 prescribing in the United States, as the
22 report details.  By some studies, more than
23 69 percent by some of the studies I've

Page 139

1  mentioned, certainly more than 15, 20
2  percent in many of the other studies.
3        My view is not that the entirety
4  of that kind of prescribing is used for
5  serious illness, and I don't believe it's
6  inappropriate in every instance.
7     Q.   The next sentence is a quotation
8  from a professor of medicine at Harvard,
9  Jerry Avorn:  If there is not evidence
10 presented to the FDA about a given
11 indication, it certainly is a user-beware
12 situation.
13        Do you agree with that statement
14 by Professor Avorn?
15    A.   I think I probably disagree with
16 it.  And I'm happy to say more about that.
17    Q.   Sure.
18    A.   So I think that here, beware
19 tells patients that essentially they should
20 avoid a particular use because FDA has not
21 approved it.  I think that is an incorrect
22 assumption.  And, indeed, it's also not
23 reflected by the widespread common use of

Page 140

1  off-label use in the United States, both in
2  adult populations and pediatric
3  populations.
4     Q.   All right.  On page eleven, the
5  first highlighted paragraph says:
6  Off-label medicine has sometimes been
7  characterized as a long-standing medical
8  practice that has, for commercial reasons,
9  not been subjected to high-quality -- not
10 been subjected to high-quality clinical
11 trials and consequent regulatory scrutiny;
12 however, according to this
13 characterization, that deficit should not
14 detract from its rightful place in medical
15 practice.
16        Yet we have also seen how some
17 long-established off-label uses have been
18 shown to be either ineffective or harmful
19 when subjected to proper evaluation, such
20 as the deaths associated with
21 chloramphenicol use in pediatric care.
22 Examples such as these are called medical
23 reversals.

Page 141

1        Would you agree that some
2  long-established off-label uses have been
3  shown to be either ineffective or harmful?
4     A.   I would agree that there are some
5  that have been shown to be that, as there
6  have been some on-label uses that have been
7  shown to be that.
8     Q.   A recent study -- In the next
9  paragraph -- looked at 363 articles in New
10 England Journal of Medicine, in particular
11 analyzing situations in which new studies
12 contradict current practice.  The study
13 found that only a minority, 38 percent, of
14 current practices were affirmed by this
15 analysis, compared with 40 percent that
16 were shown to be ineffective and a further
17 22 percent where the evidence was
18 inconclusive.  This tells us the danger of
19 accepting arguments about, quote, standard
20 of care, end quote, without formal proof
21 and of course raises some concern for the
22 majority of off-label prescriptions, for
23 which there is little or no scientific

36 (Pages 138 - 141)

Page 142

1  support.
2       Do you disagree with that
3  statement?
4     A.   I want to take a look at the
5  article being cited.  And in particular one
6  piece of information not contained in this
7  excerpt about it, whether what is being
8  studied is on-label and off-label
9  prescribing or whether it's all medical
10  practices, including surgical practices and
11  other practices.
12       I also want to emphasize this is
13  outside the questions I've been asked to
14  provide my expertise to.  But I would be
15  happy to look at the study and form an
16  opinion about it.
17     Q.   On page twelve he says:  The
18  point has been made that off-label
19  prescriptions should not be viewed as
20  scientifically or ethically unsound when
21  there are good clinical data to support a
22  particular therapeutic indication.  The
23  trouble is that there are only good data in

Page 143

1  about 25 percent of off-label use,
2  suggesting that the other 75 percent should
3  be regarded as ethically unsound.
4       Do you disagree with that
5  statement?
6     A.   Again, I want to be clear,
7  outside what I've been asked to provide my
8  expertise on.  I would want to know a
9  little bit more about his definition here
10  about, just to use his term of art, good
11  clinical data to support a particular
12  therapeutic indication and whether the
13  study he's referencing, how it defines that
14  and how this 25 and 75 percent numbers are
15  being generated.
16     Q.   I'm a bit confused.  You keep
17  going back to the scope of your expert
18  opinion in this report.  And you said you
19  were rebutting Defendants' tone, more or
20  less, suggestions, that off-label use could
21  be problematic.
22       So is your expert opinion in this
23  case only -- about on off-label use.  On

Page 144

1  off-label use, is your expert opinion only
2  that off-label use is relatively common?
3     A.   I think that's a central part of
4  my expert report, and the idea that mere
5  fact that a use is off-label does not mark
6  it as nefarious, problematic, or
7  experimental as such.
8     Q.   I guess I'm confused as to how
9  you came to the second aspect of that
10  opinion, if you weren't considering the
11  types of things discussed in this
12  paragraph.
13       In other words, if, in fact, most
14  often we'll use this should be regarded as
15  ethically unsound, then I'm confused how
16  you could conclude that the Defendants'
17  expert's tone was improper?
18     A.   It is not the case that I view
19  most off-label prescribing as ethically
20  unsound.
21     Q.   Right.  But my question was not
22  that.  You said you wouldn't opine on this
23  question because it was outside your expert

Page 145

1  view.
2       So how did you come to a
3  conclusion that the Defendants' expert's
4  tone was incorrect if you have no opinion
5  as to whether most off-label uses are safe
6  or sound or appropriate?
7       MS. TOYOMA:  Object to the form.
8     Q.   You can answer.
9     A.   Just to repeat the answer, my
10  view is that most off-label uses are
11  ethically appropriate.  And I can tell you
12  the sorts of things that I think make them
13  ethically appropriate, but I'm not sure
14  that that was clear, that I think -- My
15  disagreement here with the paragraph you
16  asked me about relates to the fact that I
17  haven't reviewed the particular study in
18  question or his definition here about what
19  scientific support would look like in this
20  particular instance, and what clinical data
21  in this instance would look like.
22       Certainly, I could go through --
23  I could be asked to go through various

Page 146

1  kinds of evidence bases. I'm not sure I
2  would be the best expert to do so.
3      But, to me, the question is, am I
4  in agreement with the vast majority of how
5  he puts it, that the 75 percent should be
6  regarded as ethically unsound. To reach
7  that conclusion, I need to know a little
8  bit more about the basis for his opinion to
9  be able to offer my own opinion.
10     Q.  I guess I don't understand the
11  basis for your opinion that most off-label
12  uses are sound.
13     A.  All right. So this is helpful.
14  So let me clarify. And, again, my own view
15  here, and this relates a little bit to the
16  other part of my report, and let me put it
17  precisely: In instances where patients,
18  where physicians who operate under
19  licensure, under a standard of care, and
20  parents, agree and come into kind of
21  alignment on the idea that prescribing a
22  particular drug, including a drug that is
23  being prescribed off-label, is in the best

Page 147

1  interest of that patient, my view is that
2  is an ethically sound practice.
3      Q.  No matter what the drug is?
4      A.  Well, here I think it's important
5  for me to kind of say, when I'm talking
6  about physicians operating in the scope of
7  their expertise and their standard of
8  practice and all the sorts of things that
9  help inform clinical judgment. And what
10  the drug is and a risk profile might be the
11  kind of things that inform that clinical
12  judgment.
13     Q.  And it would not matter whether
14  the FDA had approved that drug for any use;
15  is that right?
16     A.  So, no, that is not correct.
17     Q.  I guess I'm confused, then, as to
18  -- Let's see if I can phrase it a little
19  bit differently.
20     So you think it's permissible for
21  the FDA to take away the ability of
22  individual patients and providers and
23  parents to use a particular drug?

Page 148

1      A.  I don't think that's something
2  I've said or taken a position on in this
3  litigation. That would be the question
4  about using a drug that is entirely
5  off-label, a drug that's never been
6  approved, such as Ivermectin or something
7  like that, or hydroxychloroquine. So I'm
8  not sure that's something I've been asked
9  to render an opinion on.
10     Q.  I guess I don't understand. So
11  how could you -- I guess I'm just not
12  understanding.
13     A.  Yeah.
14     Q.  You say that an off-label use
15  should always be available to individual
16  physicians and providers, and yet you seem
17  to be relying on the FDA as a gatekeeper to
18  decide which of those uses be
19  available. So, again, I'm just not
20  understanding the basis. If you could
21  clarify.
22     A.  Yeah. Let me try to clarify.
23  First of all, I want to just kind of

Page 149

1  correct an incorrect premise in your
2  question. I have not said that all
3  off-label uses, as an ethical matter, ought
4  to be available for all patients. I want
5  to start there to clear that brush out of
6  the way.
7      Q.  Sorry. You think that some
8  off-label uses that a physician and a
9  patient want to use should not be available
10  to that patient?
11     A.  What I would say is, it's
12  important -- And, again, I'm glad you
13  brought in that last thing because it's an
14  important element of it. When we have a
15  drug that is, A, approved by FDA, is found
16  to be safe and effective, we have a drug
17  that an individual physician is licensed,
18  under State licensure law, including the
19  possibility of having licensure proceedings
20  against them, licensed to prescribe.
21     We have a parent that has decided
22  it is in the best interest of the child to
23  have as it will further the child's health.

38 (Pages 146 - 149)

I. Glenn Cohen                                                    May 2, 2024

Page 150

1  The parent who we ordinarily think is the
2  best judge of the best interest of their
3  child.
4        We have a child who has assented
5  and consented to the -- assented or
6  consented, depending on their age, to the
7  use.  We have a valid, informed consent
8  process.
9        To me, it would be an exceedingly
10 small number of cases, but I don't want to
11 say impossible, where my view would be that
12 that would be an ethically inappropriate
13 thing for a physician to prescribe in that
14 instance.
15    Q.   And why, in your opinion, does it
16 matter whether it is the FDA that has
17 simply not approved a drug at all, versus a
18 State disapproving a particular use of a
19 drug?
20    A.   Because we know that at least for
21 the on-label use in this instance, the
22 on-label use has been found to be safe and
23 effective.  And let me give you an example

Page 151

1  that we might not know if the on-label use
2  had not been reviewed.  We know, for
3  example, the drug was poisonous to the
4  human system or had significant negative
5  immune systems, we're all human beings,
6  that is the kind of thing we screen out as
7  part of the FDA process, among many other
8  things.
9        We know generally better how to
10 characterize the physiological effects of
11 the drug, not perfectly because clinical
12 trials don't always have exactly the same
13 population in which they're deployed, kind
14 of for whom the label is approved.
15       But we learn a whole bunch of
16 things from the FDA approval process that
17 gives me some security about the safety and
18 efficacy of the drug.
19    Q.   Earlier you testified, though,
20 that the FDA process was not perfect.  So I
21 guess I'm confused as to why simple FDA
22 approval for some use is an acceptable
23 limitation on a drug, whereas, a State's

Page 152

1  limitation on a use is not?
2     A.   So to be clear here, you're now
3  adding a second part of the question.  You
4  might want to take them in compound form,
5  which is about whether it's appropriate or
6  inappropriate for the State to act in a
7  certain way here.
8        If you'll permit me, Counsel, let
9  me just park that for a second just to
10 return to the first thing.
11       It is true, your question was, if
12 FDA is not 100 percent perfect all the
13 time, why is the information generated by
14 it helpful for you in thinking about what's
15 safe and effective?  And my answer is:  I
16 don't know of any decision-maker who is
17 perfect 100 percent of the time.
18       But if you offer me the guidance
19 of an expert decision-maker who
20 occasionally makes mistakes and say would
21 you rather have that information or not
22 when making a determination of safety and
23 efficacy, I would rather have that

Page 153

1  information.
2     Q.   And so you believe the FDA, but
3  not necessarily the State of Alabama?
4     A.   So just to be clear here, I
5  haven't been asked to form an opinion on
6  the State of Alabama's motives in this case
7  or why it has adopted the policy that it
8  has.
9        When it comes to the State of
10 Alabama, I'm happy to talk about the kinds
11 of things the State ordinarily does when
12 it's concerned about patients' safety.  But
13 I'll also say, and this is important,
14 Congress has vested the drug approval
15 process as a matter of our federalism in
16 the FDA.
17       There is an expert agency that is
18 appointed so it operates by certain kinds
19 of particulars, involving the expertise of
20 people who are experts in the field of
21 medicine in question, advisory committees,
22 and the like, I discuss this in some depth
23 in my report.

39 (Pages 150 - 153)

Page 154

1        And that is the kind of thing
2    that gives me confidence about how FDA
3    reaches its determinations.
4        Q.    And so is it your view that, as
5    you just said, the FDA's determination is
6    helpful to you, but the State of Alabama's
7    determination is not helpful?
8        A.    So helpful or not helpful to what
9    question, Counsel?  If I could get some
10   clarification.
11       Q.    You used the term helpful, you
12   know, in responding to my question about
13   the FDA not being perfect.  You said:
14   Well, FDA approval of a drug is helpful
15   even if they're wrong some of the time.
16       A.    Yeah.
17       Q.    So my question is:  If you're
18   fine with the starting assumption being,
19   well, it was approved by FDA for some use,
20   so we know that it -- there's some baseline
21   of, you know, it's going to be okay.  Why
22   is that not true when the State of Alabama
23   makes a determination about a drug?

Page 155

1        A.    So the fact that FDA has reviewed
2    a drug for safety and efficacy, in the way
3    that its experts kind of require the
4    demonstration of the evidence that its
5    experts require, is what gives me
6    confidence that the on-label use of the
7    drug is safe and efficacious.  Knowing
8    information about the on-label use of the
9    drug is helpful in thinking about the
10   off-label use.
11          Or another way of putting it is:
12   I have more confidence in the safety and
13   efficacy of an off-label use, in the
14   average case, than a completely never
15   reviewed drug whatsoever, that nobody has
16   looked at at all.
17       Q.    So my question was comparing
18   FDA's approval of a drug with the State of
19   Alabama's assessment of a drug.  Is the
20   State of Alabama's assessment of a drug
21   also potentially helpful?
22       A.    I think that there could be ways
23   that a State could assess a drug that could

Page 156

1    generate information and be helpful for
2    prescribers in that state.
3          Again, I want to be clear here
4    that when we're talking about the ethics of
5    prescribing as a clinician, while the
6    existence of randomized clinical trials and
7    FDA approval is a helpful source of
8    information, it is not an exhaustive source
9    of information for a physician in making a
10   determination about whether to prescribe a
11   particular drug.
12       Q.    Have you written in your
13   publications about the FDA's politicization
14   over the last fifty years?
15          MS. TOYOMA:  Object to the form.
16       Q.    You can answer.
17       A.    I think I have a publication on
18   this question about how FDA has been
19   designed as an agency and whether there are
20   alternative designs of the FDA agency that
21   would better insulate it.  I think it was
22   in reflection or in response to statements
23   by some of the FDA commissioners.

Page 157

1        Q.    Have you written about the FDA's
2    approval process as to contraceptives and
3    abortion medications in regard to its
4    politicization?
5          MS. TOYOMA:  Object to the form.
6        A.    I'll answer, which is to say --
7    and again, to be clear, this is not
8    something that I was asked to form an
9    opinion for in this case, or apply my
10   expertise in this case.  But I do have a
11   publication regarding the history of FDA's,
12   kind of, review of contraceptions and other
13   drugs, yes.
14       Q.    And you determined in that
15   publication that the FDA has been
16   influenced by political pressures?
17       A.    I want to reread the publication
18   to be able to give you more context and
19   more nuance about what we say.  And I'm
20   happy to take a look at it and kind of give
21   you a view about the matter.  It's several
22   years ago that I wrote that particular
23   publication.

Page 158

1    Q.   You don't know whether it's your
2  view that the FDA is subject to political
3  pressures?
4         MS. TOYOMA:  Object to the form.
5    Q.   You can answer.
6    A.   Thank you, Counsel.
7         My own view is that all agencies
8  are subject to political, kind of, forces
9  and that is part of the design of the
10 administrative agencies of the United
11 States.  And in that particular opinion, we
12 are describing a particular historical
13 episode relating to FDA and particular
14 drugs.
15        And I do think that there are
16 instances where FDA has been influenced
17 both by that, by patient advocacies, by
18 other terms and topics as well.
19   Q.   If we can go to page thirteen of
20 this PDF, which is under footnote 1, it
21 says:  Interestingly, in March 2014, the
22 House of Representatives of the U.S. State
23 of Oklahoma voted overwhelmingly in favor

Page 159

1  of a bill to ban the off-label use of drugs
2  to induce abortions.  Oklahoma is one of
3  five states, the others are Arizona, North
4  Dakota, Ohio, and Texas, that have sought
5  to restrict medical abortions by limiting
6  or banning off-label uses of drugs.
7         So you'd agree that some states
8  have banned off-label uses?
9    A.   I agree that some states --
10 Sorry.  Please finish your question,
11 Counsel.  I didn't mean to cut you off.
12   Q.   Sorry.  It was sort of
13 superfluous.  I was just going to say, you
14 agree that some states have banned
15 off-label uses of FDA-approved drugs?
16   A.   So my expert opinion, as I noted,
17 the one place we see efforts in this
18 regard, has been around the abortion drug
19 mifepristone, some of which have been
20 post-Dobbs and some of which have been
21 pre-Dobbs.  In the Oklahoma case, I'd have
22 to go back and think, but I seem to have a
23 memory that the Oklahoma State Supreme

Page 160

1  Court actually overturned or read the
2  statute in such a way that it didn't have
3  this effect.  But I'd have to go back and
4  look at the case.
5         MR. MILLS:  I know we've been
6  going for a while.  I don't know if a break
7  would be helpful.
8         (Recess taken.)
9         MR. MILLS:  Let's go back on.
10        (Defendant's Exhibit
11            28 was marked for
12            identification.)
13   Q.   I'd like to show you what I'm
14 marking as Exhibit 28, which is -- it's not
15 quite there yet, sorry -- journal article.
16   A.   Yes.  I see it in Exhibit Share.
17 All right.
18   Q.   All right.  So this is a journal
19 article in the JAMA publication, The
20 Journal of Internal Medicine, entitled
21 Association of Off-Label Drug Use and
22 Adverse Drug Events in an Adult Population.
23        Does that look correct to you as

Page 161

1  a description of what this is?
2    A.   Yes.  That looks like what it
3  says here.  JAMA Internal Medicine from
4  2016.  Correct.
5    Q.   Okay.  So under Results in the
6  first page, the highlighted sentence says:
7  Off-label use lacking strong scientific
8  evidence had a higher ADE, adverse drug
9  event, rate, 21.7 per ten thousand
10 person-months, compared with on-label use,
11 AHR, 1.54; 95 percent CI.
12   A.   Yeah.  Before we read this, this
13 one does not look familiar to me.  This is
14 not one that I've cited in my report.
15 Right?
16   Q.   I don't believe so.  It may have
17 been cited in some of the articles that you
18 cite, but I don't believe it was directly
19 cited.
20   A.   I should probably give it a read,
21 then, before I answer questions on it, I
22 would think.
23   Q.   I -- If you could just listen to

41 (Pages 158 - 161)

Page 162

1  my question and then decide -- tell me if
2  you need to see other aspects.  My
3  questions are intended to be fairly narrow
4  in this section, but, you know, if you need
5  to see other aspects, that's fine.
6       So this article found, what looks
7  like to me, higher ADE rate on the -- about
8  a fourteen time higher ADE rate off-label
9  use lacking strong scientific evidence as
10 compared with on-label use.  Would you
11 agree that that's what the result says?
12     A.   Yeah.  I probably will need to
13 read the article, unfortunately, Counsel,
14 to make sure that's kind of the correct
15 characterization, particularly to see how
16 the ADE rate is calculated and also to kind
17 of look at what their definition for
18 on-label, off-label, strong scientific
19 evidence, and the like is.  If you want to
20 give me a minute or two, I'm happy to try
21 to read through it.
22     Q.   That's okay.  We don't need to do
23 that.

Page 163

1      A.   Okay.
2      Q.   On PDF page six, this highlighted
3  portion says, in the first column:  We
4  found that four in five off-label
5  prescriptions lacked strong scientific
6  evidence, and this group had higher rates
7  of ADEs.
8       Do you see that?
9      A.   I do see it, yes.
10     Q.   And then on page seven to eight,
11 under Conclusions:  Off-label drug use, and
12 particularly off-label use without strong
13 scientific evidence, is a risk factor for
14 ADEs.  Hence, physicians and physician
15 organizations should recognize the enormity
16 of the problem and be active participants
17 in the promotion of cautious prescribing of
18 drugs for off-label uses lacking strong
19 scientific evidence.
20      Do you see that that was their
21 conclusion?
22     A.   I do see that they've written
23 that.

Page 164

1      Q.   And you didn't consider this
2  article in writing your report; is that
3  right?
4      A.   It's not one that I reviewed as
5  part of my report.  As we said, it may be
6  cited in something else.
7           (Defendant's Exhibit
8            30 was marked for
9            identification.)
10     Q.   Okay.  I'm now going to show you
11 what I'm marking as Exhibit 30.
12     A.   It looks like -- Just to be
13 clear, this one you just cited to me is
14 from Quebec, Canada; right?  Primary care
15 clinics in Quebec, Canada; right?  The one
16 you just read to me?
17     Q.   I believe that -- If that's what
18 it says, that's correct.
19     A.   Okay.  Just to be clear.  But,
20 yeah, from primary care clinics in Quebec,
21 Canada, that was what the dataset they're
22 referring to.  I don't know whether the
23 recommendations are also meant to be --

Page 165

1  Again, you just asked me to read what they
2  said, so we read that.  I wanted to be
3  clear.
4      Q.   All right.  Looking at Exhibit
5  30.
6      A.   I wanted to figure that on our
7  part.
8          MS. TOYOMA:  It was Exhibit 30?
9          MR. MILLS:  That's right.
10 Hopefully.  Yes.
11     A.   Great.  I have it in front of me.
12     Q.   So this appears to be a
13 commentary on the article we just read,
14 also published in JAMA Internal Medicine in
15 January 2016.
16      Would you agree with that?
17     A.   It looks like it was in JAMA
18 Internal Medicine, which is a slightly
19 different journal than JAMA, but JAMA
20 Internal Medicine, January 2016.
21     Q.   This highlighted portion of this,
22 on the second page, the second column of
23 page two, would you mind just reading that

Page 166

1  highlighted portion for me and then I'm
2  basically going to ask whether in your
3  capacity as an expert you disagree with
4  anything in that statement.
5      A.   So I've read this paragraph.
6      Q.   Okay.  And is there anything in
7  that paragraph, in your expert opinion in
8  this case, that you're disagreeing with?
9      A.   Well, so they refer back to the
10 prior study you showed me, 28, and I think
11 I'd probably have to read the prior study,
12 Exhibit 28, to be able to figure out
13 whether I agree or not.  Because it's to
14 say they've documented that this scenario
15 occurs infrequently.  As I mentioned, it
16 appears in my thirty seconds of looking at
17 document 28 that was a study of Quebec,
18 Canada, and so I'd want to read and learn a
19 little bit more about the definition to be
20 able to figure out if I agreed or
21 disagreed.
22     Q.   Putting aside that sentence, what
23 about the rest of the paragraph?  Is there

Page 167

1  anything you disagree with in your capacity
2  as an expert in this case?
3      A.   Let me just read through, if I
4  can, just the context of the paragraph
5  before and after to make sure I understand
6  their point accurately.
7      Q.   Sure.
8      A.   Give me just a second.  All
9  right.  So maybe we'll go sentence by
10 sentence now if that's okay.
11     Q.   Sure.
12     A.   Physicians can rightfully assume
13 the labeled indications are supported by
14 evidence of safety and efficacy based on
15 careful review by the FDA.
16     I think that's correct.
17     When clinicians expand
18 prescribing beyond the carefully devised
19 confines of the labeled indication, they
20 enter an area of the unknown in many cases.
21     Here, I might disagree about the
22 question about many cases.  And,
23 importantly, it appears earlier in the

Page 168

1  article, a couple of paragraphs before,
2  that they talk about how appropriate
3  off-label uses exist, and off-label use of
4  a drug may be standard of care in some
5  instances.  So that might be just -- I'm
6  not sure whether in this sentence they're
7  thinking if those are cases of the unknown.
8      There are certainly cases that
9  are unknown, and so I just want to be clear
10 that I think off-label uses are not all of
11 a piece as they do distinguishing the
12 standard of care when that is a standard of
13 care in a field from other things.
14     The next sentence:  Although in
15 some clinical circumstances, the off-label
16 prescribing is clearly within the best
17 interests of the patients.  Eguale and
18 colleagues have documented that this
19 scenario occurs infrequently.
20     As I mentioned, I would have to
21 review their study to form an opinion on
22 that question.
23     Even in situations where an

Page 169

1  off-label indication has been studied
2  pharmacokinetics, drug-disease
3  interactions, and other safety
4  considerations are unlikely to have been
5  studied systematically to the level
6  required during the FDA drug approval
7  process.
8      I think this is, in general,
9  probably a true statement.  And just to be
10 clear about it, it's because this is the
11 kind of information that's been reviewed by
12 FDA.  So even if these studies have been
13 undertaken, they may not have been designed
14 quite to the level of FDA and the like.  So
15 I think that this is a fair statement,
16 overall, although there may be particular
17 instances actually where they have been
18 studied systematically beyond what FDA
19 would require, they just haven't submitted
20 an NDA.
21     Likewise, few clinicians have the
22 time or the motivation to review evidence
23 for those off-label indications to arrive

43 (Pages 166 - 169)

I. Glenn Cohen                                                    May 2, 2024

Page 170

1  at a balanced assessment of the risks and
2  benefits to support the appropriate use of
3  that drug.
4       This one, I think, is about how
5  clinicians behave in real-life practice.
6  As a nonclinician, I'm a little reluctant
7  to be able to speak one way or the other to
8  this sentence.
9       Because clinicians are frequently
10  in error regarding approved drug
11  indications, patients are unlikely to be
12  advised when they are prescribed
13  medications for off-label use in most
14  situations.
15       So here they've cited to another
16  report by Chen, DT from 2009.  I think I'd
17  probably have to read that to be able to
18  evaluate whether I agree with what they're
19  saying here.
20       These circumstances threaten the
21  safe, effective, and informed use of
22  medications by patients.
23       So I think that it is true that

Page 171

1  there are instances of off-label use that
2  do involve noninformed use by patients that
3  might be unsafe or ineffective, that is
4  true; although, I don't think I would be as
5  quick as they seem to be to characterize
6  this at a homogenous level.
7            (Defendant's Exhibit
8             26 was marked for
9             identification.)
10  Q.   Thanks.  I'd like to show you now
11  what I've marked as Exhibit 26, which is an
12  article entitled Recommendations on
13  Off-Label Drug Use in Pediatric Guidelines
14  published in Frontiers in Pharmacology in
15  2022.
16       Do you know if you've seen this
17  article before?
18  A.   I can double-check.  It doesn't
19  look particularly familiar to me.
20  Q.   I don't believe you've cited it
21  in your report directly.
22  A.   Okay.
23  Q.   I'm going down to PDF page eight.

Page 172

1  The highlighted paragraph says:  Treatment
2  of psychiatric disorders in children is
3  often based on evidence from adults and
4  only case reports are often available for
5  rare diseases.  As a result, strong
6  recommendations are for consensus.  And
7  indirect evidence of similar diseases, as
8  well as based on conclusions from disease
9  features and clinical practice guidelines.
10       MS. TOYOMA:  Sorry, Counsel.  I
11  think you were breaking up a little bit.
12  Q.   Yeah.  My computer did something
13  weird.  I'll start at the sentence "as a
14  result" again.  Can you hear me now?
15  A.   Yes.
16  Q.   Great.  As a result, strong
17  recommendations are sometimes generated
18  based on expert consensus and indirect
19  evidence of similar diseases, as well as
20  based on conclusions from disease features
21  and clinical practice experience.
22       However, the inconsistency
23  between the quality of the evidence and the

Page 173

1  strength of the recommendation may
2  contradict the clinical principles of
3  evidence-based medicine, creating a danger
4  to clinical practice.  As a result, it is
5  critical that recommendations on the
6  off-label use of drugs in pediatric
7  guidelines are based on a reliable
8  methodological pathway or framework.
9       However, there is currently no
10  standardized framework for creating
11  recommendations for the use of off-label
12  drugs in children.
13       Do you agree that there's
14  currently no standardized framework for
15  creating recommendations for off-label
16  drugs in children?
17  A.   So I know that the question about
18  the recommendations and how they're
19  formulated is one that many of the other
20  experts in this case have opined upon.
21  Truthfully, this is outside of my area of
22  expertise to tell you about how
23  pediatricians formulate their guidelines.

44 (Pages 170 - 173)

Page 174

1  So it's not something I know about one way
2  or the other.
3     Q.    And would you agree that
4  inconsistency between the quality of
5  evidence and the strength of recommendation
6  may contradict principles of evidence-based
7  medicine?
8     A.    Again, I think I want to be
9  careful here because each of these words
10 could be unpacked and explained in a way
11 and I want to understand what was meant
12 here and meant by the citations.  Because
13 I'm not an expert on formulation of
14 recommendations by physician groups and
15 what they look at and what they don't look
16 at, I think, for me, I'd be over my skis to
17 answer this question.
18    Q.    Do you think a physician not
19 using evidence-based medicine can obtain
20 valid informed consent?
21    A.    I think we have to be careful
22 here by what we mean by the words
23 evidence-based medicine.  If we're talking

Page 175

1  about a patient's conception of the
2  concept, which involves many things
3  including experience of prior patients
4  versus a narrower construction, for
5  example, only randomized clinical trials.
6        So it may be if I answer the
7  question what I think is evidence-based
8  medicine you mean something slightly
9  different.
10    Q.    I mean it in the broad sense.
11    A.    So the broad sense?
12    Q.    That's right.
13    A.    Yeah.  So, to me, when you talk
14 to a patient about a procedure and discuss
15 -- it's always -- just to emphasize this,
16 it's a back and forth of informed consent;
17 it's patient centered, but always a back
18 and forth by asking questions about
19 reaching a level which the person's
20 understanding is.
21        When you do so, it would be
22 helpful and important, I think, to
23 basically use evidence as part of that,

Page 176

1  evidence as understood in the broad swath
2  of it, which includes things like prior
3  experience to patients, statements by
4  medical groups, standard of care treatment,
5  textbooks, recommendations, as well as
6  randomized clinical trials, information
7  from the label, et cetera, et cetera.
8     Q.    So if someone is not using an
9  evidence-based medicine framework, can that
10 person obtain valid informed consent?
11    A.    So I think as part of the
12 informed consent process, when one
13 discusses risks and benefits, which is an
14 important piece of the informed consent
15 process, those risks and benefits you must
16 refer to something when you're explaining
17 what the risks and benefits are, and the
18 things that you are referring to are
19 evidence, broadly construed.
20    Q.    And if a person fails to do that,
21 they would not be obtaining valid informed
22 consent?
23    A.    I think if you failed to -- If

Page 177

1  there was information on benefits and risks
2  and you failed to kind of bring those
3  forward, there's evidence available and you
4  failed to discuss that evidence with a
5  patient, again, in this iterative process,
6  where patients can decide how much they
7  want to know, where to stop, that is part
8  of the informed consent process.
9        But if there is evidence and you
10 don't use any of the evidence in discussing
11 the question with the patient, that does
12 strike me as the kind of thing that would
13 violate at least the bioethical norms of
14 informed consent.  We're talking about a
15 legal tort informed consent, we'd have to
16 look a little bit about questions about
17 materiality and the like.
18    Q.    What about if there is not
19 evidence?
20    A.    So the absence of evidence?
21    Q.    That's right.  If there is not
22 evidence, can valid informed consent be
23 obtained?

45 (Pages 174 - 177)

I. Glenn Cohen                                          May 2, 2024

Page 178

1    A.   I think it is possible to tell a
2  patient where there are uncertainties in
3  the literature or lack of evidence, that
4  can be part of the informed consent
5  process, yes.
6    Q.   I guess my question was a little
7  bit different.  If what you're telling them
8  is there is -- we do not know, we do not
9  know the risks, and we do not know the
10 benefits, can valid informed consent be
11 obtained?
12   A.   So I think the answer -- Again, I
13 want to be somewhat nuanced here.  And
14 again, just to be clear, regarding a little
15 bit about what I've been asked to opine
16 about in this case, I'm giving you my
17 reaction now to the question you've asked,
18 which is to say medicine is a science
19 that's full of uncertainties, both
20 uncertainties about what the risks are, so
21 even like the -- the sometimes called
22 Knightian uncertainty, which is the
23 distribution of risks and benefits, as well

Page 179

1  as whether you are likely to be one of the
2  people who has X risk or X benefit.
3       And I think it's perfectly
4  appropriate, as part of a conversation of
5  informed consent, to engage a patient on
6  those questions, to be honest and open
7  about places where one does not know the
8  answer because there is not good evidence,
9  either because one does not know the
10 distribution of risk or one does not know
11 whether that particular patient is likely
12 to risk it.
13      But to be clear, I'm not a
14 clinician, I don't conduct informed consent
15 with patients, and I would defer to the
16 experts that do, on exactly how this is
17 discussed typically in an informed consent
18 encounter.
19   Q.   But you're testifying in this
20 case that informed consent should be an
21 option that should not be precluded by
22 state law; correct?
23   A.   What I would -- So the scope of

Page 180

1  my expert claim in this point, let me try
2  to put it as precisely as possible, if the
3  justification for a law is the
4  impossibility of informed consent, that is
5  a very tough justification to rely upon.
6  Because informed consent is always thought
7  of as the level of a particular patient,
8  whether informed consent is possible with
9  them.
10      And even if one was concerned
11 that the informed consent were ineffective,
12 for example, there have been instances
13 where other states, in the abortion setting
14 for example, have mandated a particular set
15 of informed consent statements, and those
16 would be the kinds of things that I think
17 would be responsive to this particular
18 concern.
19   Q.   Is it ever the case that informed
20 -- that obtaining an informed consent could
21 be impossible?
22   A.   Certainly, if you had a patient
23 in a coma, for example, that would be an

Page 181

1  example where I think informed consent from
2  that patient themselves would be
3  impossible.  So there are definitely
4  instances where it's impossible.
5    Q.   Is it ever the case that
6  obtaining valid informed consent for a
7  treatment would be impossible?
8    A.   I mean, there are treatments we
9  provide to people who are in comatose
10 instances, so I think, yes, the answer is
11 may be impossible in that instance, as
12 another example.
13   Q.   Is there -- Putting aside people
14 in comas.  Is there any treatment for
15 children that it is not possible to obtain,
16 in your view, valid informed consent?
17   A.   So in my view, we would need to
18 do a very specific analysis about this
19 particular child.  And the reason is,
20 because we do not, either in medicine or in
21 law, essentially rule out entire swaths of
22 medicine because some children may have
23 difficulty with the informed consent.

46 (Pages 178 - 181)

Page 182

1      Instead, the appropriate attitude
2  and approach is to look case by case and to
3  ask ourselves, in this particular case,
4  could there be --
5      Q.   Well, I --
6      A.   I was going to finish my thought,
7  but go ahead if you want to --
8      Q.   Nope.  Go ahead.
9      A.   I was going to say, it may be
10  possible that there are instances with
11  particular children, because of
12  neurocognitive disabilities, for example,
13  and the like, where we have particular
14  doubts about informed consent as to that
15  case, and we'd want to examine what
16  interventions might be possible before we
17  want to rule out the idea.
18      The philosophy here of bioethics
19  is that we want to enhance the autonomy of
20  decision-makers whenever possible rather
21  than take away their decision making.
22      Q.   So when you say it should always
23  be case by case, you don't think that as to

Page 183

1  drugs that are not approved by the FDA for
2  any use?
3      A.   I need you to repeat the
4  question.  I was with you until the last
5  little bit.
6      Q.   You say that informed consent
7  should always be case by case.  But if the
8  FDA does not approve a drug for any use,
9  then you do not think it should be case by
10  case?
11      A.   So if you decided to prescribe a
12  nonapproved drug, you would be in violation
13  of the FDCA.
14      Q.   But I'm asking you -- My question
15  is a bit different.  You say that it should
16  be left to the individuals.  And the FDA
17  prohibiting or not approving a drug would
18  take away that choice from the individuals;
19  is that right?
20      A.   So here I want to be careful
21  about what we mean by informed consent in
22  particular in this instance, about ethical
23  informed consent or not.

Page 184

1      Let me just give you an example
2  just to try to tease this out a little bit
3  for you.
4      Suppose a future administration
5  decided to revoke the approval of drug like
6  mifepristone, so an abortion drug.  Now it
7  is no longer valid to prescribe it, period.
8  Right?  You have a physician who is willing
9  to break the law and still prescribe it.
10  And the question is in that encounter with
11  the patient, explain to the patient I want
12  you to do this, I think you should do this,
13  is it possible to have a valid informed
14  consent process relating to that?
15      Is that kind of in the ballpark
16  of the kind of question you're asking,
17  Counsel?  Is that kind of what you're
18  thinking?
19      Q.   Sure.
20      A.   Yeah.  So one is a question about
21  informed consent, what's required by the
22  ethical requirements of informed consent.
23  And that disclosure of benefits and risks

Page 185

1  and to try to understand the patient's goal
2  and alignment, those are the kinds of
3  things one would look at.
4      So I don't think the mere fact
5  that the drug has been rendered illegal
6  might render invalid the informed consent
7  piece of it.  But, of course, the fact that
8  the drug is illegal is itself a violation
9  of the FDCA or itself a violation of a
10  criminal statute.
11      Q.   I guess my question is, as you
12  put it in your report, you say here in
13  paragraph seventy-three:  The ethical
14  doctrine of informed consent cannot justify
15  a blanket omnibus criminalization of an
16  FDA-approved therapy for every potential
17  minor patient in Alabama.
18      So, again, to go back to my
19  original question, is there any treatment
20  that you think informed consent is
21  sufficiently hard to obtain that would
22  justify a blanket prohibition of any sort
23  on a -- on that treatment?

Page 186

1    A.   I think I'd want to be satisfied
2  that we could not exhaust other ways to try
3  to improve the informed consent
4  opportunity.  And only once I've been
5  satisfied that it was completely impossible
6  would be that would be the kind of thing
7  that would be recommended.  So to me --
8    Q.   How does that --
9    A.   I'm sorry.  Go ahead.
10   Q.   How does that view square with
11  the FDA -- the existence of the FDA
12  approval process?
13        Doesn't the fact that FDA fails
14  to approve a drug or fails to approve a use
15  mean that the FDA's view is that no one
16  should be able to offer -- to obtain
17  informed consent to the use of that drug?
18   A.   No.  And this is important.
19  Right?  The FDA's determination is the drug
20  is not safe and effective for use.  That's
21  not a determination whether the informed
22  consent process that the drug had been
23  labeled safe or approved or someone was

Page 187

1  violating the FDCA.  It's not speaking to
2  the quality of the informed consent
3  encounter.  One is --
4    Q.   You would --
5    A.   Yeah.
6    Q.   You would oppose the FDA's
7  ability to prohibit that because it would
8  be a blanket omnibus prohibition of a use
9  that individuals could offer informed
10  consent to?
11   A.   Well, I want to just back out of
12  the question, the fact that FDA does not
13  regulate the practice of medicine.  And the
14  question of informed consent and how
15  informed consent is conducted is typically
16  thought of as the practice of medicine
17  within the state authority.
18   Q.   Sure.  Let's take elective
19  hysterectomies for fifteen-year-olds.  Do
20  you think states could prohibit that?
21   A.   So I want to be clear here --
22   Q.   Because of the impossibility of
23  obtaining informed consent?

Page 188

1    A.   So I don't know enough about the
2  clinical medicine around hysterectomies.
3  I'd be happy to learn more if you want to
4  say more about what makes this case and
5  what distinguishes this case.  I'll stop
6  there.  Maybe you can tell me a little more
7  about it.  I want to be careful because I'm
8  not a clinician.
9    Q.   I'm just asking, do you think
10  informed consent is possible from girls
11  under fifteen years old to consent to an
12  elective hysterectomy?
13   A.   So, in part, because my view
14  about judgments about whether informed
15  consent is appropriate and done
16  appropriately is a heavily particularized
17  judgment that has to be looked at case by
18  case.  I probably -- This may be
19  unsatisfying to you, Counsel, I need to
20  know a little bit more, I need to know more
21  about this minor, her maturity.  For
22  example, when it comes to research ethics,
23  we have rules about mature minors and how

Page 189

1  they're done, same is true with the
2  abortion law.  I need to know more about
3  the risks involved, and I need to know
4  about what is being disclosed.
5        But I want to distinguish the
6  question about whether the informed concept
7  is appropriate versus whether this is a
8  treatment that should be allowed under law,
9  period, simpliciter.
10   Q.   I'm asking whether the ethical
11  doctrine of informed consent could justify
12  a blanket prohibition of elective
13  hysterectomies for girls under fifteen
14  years old?
15   A.   To me, the answer to that would
16  depend on more particulars of the case that
17  I don't know.
18   Q.   I don't understand that answer.
19  You gave the testimony as to the Alabama
20  law opposing it in full.  You didn't ask
21  for any particulars of Alabama treatments.
22        So, again, could the ethical
23  doctrine of informed consent justify a

48 (Pages 186 - 189)

Page 190

1  blanket, omnibus prohibition of elective
2  hysterectomies for girls under fifteen
3  years old?
4         MS. TOYOMA:  Object to the form.
5     Q.  You can answer.
6     A.  Yeah.  So I think where we're
7  kind of -- let me see if I can be precise
8  about this, Counsel.  To me, to answer that
9  question, one of the things I would need to
10 know is what other options are available to
11 the State in terms of informed consent what
12 are the deficits of informed consent that
13 are kind of at issue here.
14        But my own views in general, I
15 would say, blanket prohibitions are not the
16 way to go, and I assume that it would
17 extend to this case.  But it may be there's
18 something special about this case that I
19 haven't thought about.
20    Q.  When you say you would need to
21 know the other options, the other evidence,
22 was that true in this case also, before you
23 gave the paragraph seventy-three opinion?

Page 191

1     A.  Not quite.  Because in this case,
2  I know what option Alabama has elected and
3  what option Alabama has not elected.
4     Q.  So are you saying the distinction
5  is between criminalization and civil
6  penalties?
7     A.  Not just that, Counsel, but other
8  things as well.  Again, I want to be
9  careful here in that it's not my job to
10 kind of speak to the Constitutionality of
11 this law or make a determination that's for
12 the finder of fact and for the Court.
13 Right?
14        But to me, in determining whether
15 concerns about informed consent justify a
16 blanket prohibition, I would be concerned
17 and want to look at what were the other
18 interventions that could have been sought
19 here, including, for example, mandating
20 particularly text of informed consent,
21 documenting deficits of informed consent,
22 improving training on informed consent.
23 These are the kinds of things that I think

Page 192

1  would be relevant that I would try before
2  blanket prohibition.
3         And there may be other reasons to
4  have blanket prohibition, to be clear.  But
5  if your reason for prohibiting something is
6  your concern about the informed consent, it
7  would seem to me logical to start by
8  looking at how you can improve the informed
9  consent before moving all the way to a
10 blanket prohibition.
11    Q.  So when you say you would prefer
12 starting with other options, that's a
13 personal preference or a principle of
14 bioethics?
15    A.  I think I could talk to most
16 bioethicists.  If you said to them, there
17 are deficits that we are concerned about in
18 informed consent in this case.  If you ask
19 them should our next step be to have a
20 blanket prohibition on this particular
21 thing, I think the consensus view, and,
22 again, I mean representing what I think is
23 the consensus view in the field would be to

Page 193

1  say let's consider a series of other
2  interventions, we might preserve the
3  autonomy of the individual and approve
4  their autonomy rather than an intervention
5  that cut off the autonomy.
6         The reason why, just to emphasize
7  this, is because the whole reason we have
8  informed consent is about autonomy and
9  about enabling the autonomy of individuals.
10        So it would be a strange decision
11 to try to enable the autonomy of
12 individuals by removing that autonomy if
13 there were -- if you hadn't considered
14 intermediate steps that might enable and
15 enhance the autonomy of the individuals.
16    Q.  You don't think prohibiting
17 elective hysterectomies for girls under
18 fifteen years old promotes their autonomy?
19    A.  Again, I would need to know a
20 little bit more about hysterectomies.  And
21 I want to be careful here, in that is not
22 an area of clinical medicine that I do.
23 But, for me, certainly a blanket

Page 194

1  prohibition on hysterectomies, without
2  considering alternative attempts, such as
3  improving informed consent, improving the
4  informed consent process, to me that is not
5  the most autonomy enhancing and autonomy
6  protecting measure you can adopt.
7      Q.   Let's say a state had already
8  done those other things and physicians
9  continue not to give whatever level of
10  informed consent you would desire.
11          MS. TOYOMA:  Object to the form.
12     A.   Yeah.
13     Q.   You can answer.
14     A.   So certainly a state that had
15  exhausted all of these other opportunities
16  to improve the quality of the informed
17  consent, if they had done so and they had
18  studied it and determined that the
19  alternative measures were not successful or
20  could not do this, and they determined that
21  the risks here involved in this case, to
22  these individuals, was so great and the
23  benefit to the individuals in this case

Page 195

1  were so small, that it justified kind of an
2  outright prohibition, it seems to me, then,
3  there would be the appropriate case where
4  you might say let's think about a
5  prohibition.
6          Although, again, here, I would
7  expect before we went to the
8  criminalization which has a necessary kind
9  of moralizing tendency to it, we would also
10  consider noncriminal measures to discourage
11  a particular intervention.
12     Q.   Does it matter for your view of
13  informed consent that informed consent in
14  minors is actually obtained from their
15  parents, with assent by the child?  Does
16  that make any difference?
17     A.   It doesn't change my opinion in
18  the case of the answers that I've given
19  you, in the sense that we think of parents
20  here as kind of representatives and in the
21  best interest of the children and their
22  assent.
23          In some ways, to be perfectly

Page 196

1  honest, it's a stronger case because now we
2  have two individuals who are kind of -- and
3  a physician on one side, we have the State
4  on the other.
5          So I'm not sure it makes a
6  difference, but it makes a difference in
7  some ways, I might think of a pediatric
8  case as a case that deserves more
9  protection, in part because of our notion
10  about family privacy and parents are the
11  best custodians of their children.
12     Q.   You agree that sometimes parents
13  are not the best custodians of their
14  children?
15     A.   I think there are definitely
16  instances of that.  We have people who
17  confuse their children, absolutely.
18     Q.   And you agree that sometimes
19  physicians don't act in the best interest
20  of their patients?
21     A.   I think it's entirely possible
22  that they don't, in some instances, sure.
23     Q.   I'm going to show you, going back

Page 197

1  to Exhibit 26 that we were discussing on
2  page nine, the highlighted portion.  In the
3  Conclusion, it says:  Recommendations on
4  off-label drug use are commonly given in
5  pediatric guidelines, despite the
6  substantial risk of clinical practice being
7  misled. The quality of the evidence
8  supporting the recommendations does not
9  however always match the strength of the
10  recommendations; the recommendations were
11  often based on expert opinion and lacked a
12  declaration of the methodology; and the
13  content and extent of the information
14  reported for recommended off-label drugs
15  varied greatly between the guidelines.
16  Most recommendations involving off-label
17  drug use did not explicitly state that the
18  recommended administration is off-label,
19  which may easily lead to inappropriate
20  off-label use of drugs in children.
21          Is there anything in that portion
22  that you're disagreeing with in your
23  capacity as an expert here?

Page 198

1    A.   Yeah.  So in my capacity as an
2   expert, I haven't been asked to review the
3   guidelines in this case, the medical
4   guidelines in general.  So I think I would
5   have to review it.  I would want to review
6   the ones referred to and reviewed in this
7   particular study to understand what the
8   basis of their opinion is.  And those are
9   the kinds of things I'd probably need to do
10  first.
11        But I'm also not sure whether I'm
12  not qualified as an expert on the formation
13  of recommendations and how they're formed.
14  There are other experts in this case who
15  are and I want to kind of be humble about
16  my expertise.
17             (Defendant's Exhibit
18             27 was marked for
19             identification.)
20    Q.   I'd like to go to Exhibit 27,
21  which I've marked, which is this article
22  Entitled Unlicensed and Off-Label Drug Use.
23    A.   Let me bring it up.  Give me one

Page 199

1   second.
2    Q.   Yep.  It would appear it was
3   published in Pediatric Drugs in 2002.  You
4   would agree that's what it appears to be?
5    A.   Pediatric Drugs 2002.  Yes.
6    Q.   So if we could go down to PDF
7   page four.  It starts under 5.3, Adverse
8   Drug Reactions.  The articles says:
9   Probably the greatest concern created by
10  the use of unlicensed and off-label drugs
11  is that of unanticipated adverse drug
12  reactions, ADRs.
13        And then the last sentence in the
14  paragraph says:  Drugs tested in clinical
15  trials are likely to have ADRs detected at
16  an early stage due to close monitoring of
17  patient responses.  Drug use in the
18  everyday clinical setting is unlikely to be
19  monitored to this extent; ADRs may be
20  missed or observed too late.
21        Do you agree that when they say
22  drug use in the everyday clinical setting
23  is unlikely to be monitored to the same

Page 200

1   extent as drugs in clinical trials?
2    A.   So I haven't read this article,
3   and I might want to read a little bit more
4   of it.  So even in the abstract, I could
5   see some things that might be relevant to
6   this case.  But let me just kind of discuss
7   how that portion first, let me just reread
8   it really quickly.
9        So I think I agree, just to
10  restate my agreement.  In clinical trials,
11  we have the most intense monitoring
12  possible of kind of all patients because
13  that's the design of clinical trials used
14  to support FDA approval.  You know, large,
15  widespread common usage of off-label
16  medications in pediatric populations, we
17  don't have that.  Instead, we have the
18  observation of clinical practice,
19  day-to-day, which is not nearly as kind of
20  -- how shall I put it -- as intensive as
21  the one in the clinical trial.
22    Q.   And the next highlighted portion
23  in the second column, under Lack of

Page 201

1   Postmarketing Surveillance, says:  Drugs
2   undergo extensive postmarketing
3   surveillance in order to detect ADRs, which
4   may only become apparent on widespread use.
5   This relies on spontaneous reporting by
6   prescribers who may be inhibited to report
7   when using unlicensed or off-label drugs.
8        Do you agree that the lack of
9   postmarketing surveillance is a potential
10  risk of off-label drugs?
11        MS. TOYOMA:  Just a quick
12  clarification, it was unlicensed and
13  off-label drugs.
14    A.   Yeah.  That clarification may be
15  important in that certainly much more of a
16  concern for unlicensed than off label in
17  this instance.  I do think that it is the
18  case that it is the case that adverse reporting, you want
19  more data on adverse reporting as possible.
20  Sometimes the postmarketing surveillance of
21  the on-label use will get you lots of
22  information about the off-label use.  But
23  it is the case that there are adverse

51 (Pages 198 - 201)

Page 202

1  events that without widespread
2  postmarketing surveillance may not be
3  detected for a while.  That is true.
4            (Defendant's Exhibit
5            33 was marked for
6            identification.)
7      Q.   I'm showing you now what I'm
8  marking as Exhibit 33, which is an excerpt
9  from a book that you edited called FDA in
10 the Twenty-First Century.  I believe you
11 cited this book in your report.
12     A.   Happy to go back.  I did want to
13 just bring up, Counsel, in the abstract of
14 a prior one you had, there's a statement
15 that says that:  The terms unlicensed and
16 off-label should not be taken to imply
17 disapproval, nor incorrect or improper use
18 of drugs.  It is essential because the
19 gold-standard randomized clinical trials
20 supporting adult medicine are often
21 unavailable for children's treatment, and
22 goes from there.
23       So I do want to -- although I

Page 203

1  think the snippets you've given me are
2  characterized correctly, the overall thrust
3  of the article, which I haven't read, I'm
4  not sure about that.  So I did just want to
5  mention that.
6      Q.   Okay.  Exhibit 33.  This is the
7  book you edited, FDA in the Twenty-First
8  Century?
9      A.   Correct.  I need to hit refresh.
10     Q.   I only have some excerpts here,
11 not the whole book, obviously.
12     A.   I do have the whole book on my
13 shelf if we need to look at something.
14     Q.   So we're in chapter ten, which is
15 this --
16     A.   Who is the author of chapter ten,
17 just so I know?  That would give me some
18 context.
19     Q.   It's here on the screen,
20 Kesselheim.
21     A.   Great.
22     Q.   So I've got two pages on PDF
23 pages four to five that start:  However

Page 204

1  off-label uses, and ending before heading
2  II, Commercial Speech.
3      A.   Okay.
4      Q.   And I was just wondering if you
5  could read those two pages.  And my
6  question is:  Are you testifying in this
7  case that any of these points are
8  incorrect?
9      A.   Let me read it, and I'll give you
10 my read.
11     Q.   Okay.
12     A.   So what I'll say is, I don't
13 think there's anything here that I disagree
14 with.  But there's actually been some
15 developments, including legal developments
16 in the First Amendment here, beyond what
17 they were writing about at the time.  So
18 this decision -- Not this decision.  This
19 book is from 2015.  There have been some
20 developments there, including what FDA's
21 attitudes and approaches to off-label
22 promotion is.
23       So I don't know whether what

Page 205

1  they've characterized here as kind of the
2  widespread nature of off-label promotion to
3  be clear here, not off-label prescribing,
4  promotion, which is when a manufacturer
5  promotes this.  I'm less sure whether what
6  they've characterized as being true at the
7  time they wrote this continues to be the
8  state of the art today.
9            (Defendant's Exhibit
10           29 was marked for
11           identification.)
12     Q.   Okay.  I'd like to go to Exhibit
13 29, which is an article entitled Off-Label
14 Use of Medicines:  Consensus
15 Recommendations for Evaluating
16 Appropriateness.  This was in the MJA
17 article -- journal, which I don't know
18 offhand what it stands for.  And published
19 in 2006.
20       You'd agree that's what it
21 appears to be?
22     A.   Yes.
23     Q.   So the first highlighted portion

52 (Pages 202 - 205)

I. Glenn Cohen                                                    May 2, 2024

Page 206

1  on page one says:  In most cases, adequate
2  research evidence to support off-label
3  prescribing is lacking.  A recent survey of
4  a hundred fifty million off-label
5  prescriptions in the United States found
6  that 73 percent had little or no scientific
7  support, even when sources other than the
8  product information were searched.  Thus,
9  only a small proportion of off-label
10  prescribing may be justified by scientific
11  evidence.
12       Do you have any reason to
13  disagree with that statement?
14    A.   Yes.  Perhaps I'll just read this
15  page, if that's all right, Counsel, just
16  make sure I have the full context.  I don't
17  think I've seen it before.
18    Q.   Sure.
19    A.   Excellent.  Okay.  I've read it
20  now.
21       So the question, in this first
22  paragraph, is there anything I disagree
23  with; is that right?

Page 207

1    Q.   That's right.
2    A.   Yeah.  So I want to be clear here
3  that footnote 12 refers to a particular
4  article.  It may actually even be one we
5  looked at before that has a particular
6  definition of scientific support, so that's
7  what they're referencing for.
8       So to the extent they are saying
9  this particular survey of a hundred fifty
10  million off-label prescriptions found that
11  73 percent had little or no scientific
12  support, it's by the definition, given in
13  that article.
14       And I want to take a look at that
15  definition just to be a little more
16  precise.
17    Q.   You have no reason to disagree
18  with the conclusion here, only a small
19  proportion of off-label prescribing may be
20  justified by scientific evidence?
21    A.   If we understand to be scientific
22  evidence and by the definition of citation
23  12, which I haven't looked at, and I'm

Page 208

1  happy to take a look at, it seems to be
2  correct.  If you conclude 73 percent have
3  little or no scientific support, you would
4  say only a small proportion can be
5  justified.
6    Q.   That was a bit different from my
7  question --
8    A.   Okay.
9    Q.   -- which was, using whatever
10  definition of scientific evidence you would
11  like, are you aware of a study that finds
12  something other than -- or do you believe
13  something other than only a small
14  proportion of off-label prescribing may be
15  justified by scientific evidence?
16    A.   I do think it may depend.  Again,
17  I'd want to look at it and look carefully
18  at the evidence.  I do think it depends op
19  the definition of what we mean by
20  scientific evidence.
21       So for example, if we need --
22  This relates to a question we had before on
23  colloquy, about evidence based and what

Page 209

1  counts as evidence based.  If we include,
2  for example, guidelines from professional
3  organizations and prior experience with
4  patients as the kind of thing we mean by
5  scientific evidence, perhaps one answer; if
6  we're excluding those, perhaps a different
7  answer.
8    Q.   And which study would you point
9  to that says something other than only a
10  small proportion of off-label prescribing
11  may be justified by scientific evidence?
12    A.   I'd have to look to see again
13  whether there are studies on this.  This is
14  not something to which I've applied in my
15  mind in the past to see what the definition
16  of scientific evidence and how often people
17  have tried to characterize literature in
18  this way.
19       You asked if I have any reason to
20  be doubtful or worried about this, and I
21  just wanted to put my prior here that it
22  may depend on what we mean by scientific
23  evidence.

I. Glenn Cohen                                              May 2, 2024

Page 210

1    Q.   Okay.  This third highlighted
2   portion says:  Most clinicians perceive
3   off-label prescribing as appropriate and
4   believe that the benefits outweigh the
5   risks.  However, their awareness of
6   consequences appears to be minimal, with a
7   low level of concern about risk of side
8   effects, unevaluated efficacy, and issues
9   surrounding informed consent.
10       Are you testifying in this case
11   that anything in those two sentences is
12   incorrect?
13       A.   Let me just reread them.
14       So I think this is an area of the
15   literature in which I have not spoken about
16   in my expert report, and I don't know that
17   I can speak to whether they're correct or
18   incorrect.  Does seem to be plausible that
19   most clinicians perceive off-label
20   prescribing as appropriate and believe the
21   benefits outweigh the risks.  That seems
22   like a plausible statement.
23       When I track back to what they've

Page 211

1   cited to for footnote 23, it looks like
2   it's a British Medical Journal, and I'd
3   want to take a look at what the evidence
4   base is for those claims.
5    Q.   Do you also agree it's plausible
6   that most clinicians' awareness of
7   consequences appears to be minimal?
8    A.   You know, on this one I don't
9   think I have a prior belief one way or the
10   other.  If you had asked me before showing
11   me this piece of paper do I think that most
12   clinicians know the consequences of
13   prescribing a drug for a patient, I would
14   have said yes, I do think most physicians
15   know the consequences for prescribing a
16   drug on label or off label.
17       But, again, I haven't studied the
18   literature on this.  I want to kind of
19   spend some time looking at it to form a
20   conclusion.  I haven't formed a conclusion
21   on this or been asked to do so for the
22   purposes of my expertise in this case.
23    Q.   If we can go back to Exhibit 1,

Page 212

1   which was the Congressional Research
2   Service publication that you cited in your
3   report.  I'm going to be on PDF page
4   thirteen, which is page nine of the
5   internal pagination.
6    A.   Okay.  One sec.  Okay.  I've got
7   it in front of me.
8    Q.   It says:  Most individuals,
9   unaware of the nuances of FDA regulation,
10   may not know that physicians may prescribe
11   drugs for uses that FDA has not reviewed
12   for safety and effectiveness.
13       Do you agree with that statement?
14    A.   I'm actually not sure whether
15   it's true or not.  So most individuals,
16   unaware of the nuances, so this is
17   individuals in the general population, may
18   not know that physicians may prescribe
19   drugs for uses that FDA has not reviewed
20   for safety and effectiveness.
21       Probably, my own sense is that
22   the general population has a relatively low
23   knowledge about FDA in general, so I'm not

Page 213

1   sure that they would have firm views one
2   way or the other.  Doesn't strike me as
3   implausible, but it seems to be about
4   general population of the United States.
5   And of that, I really don't have any good
6   evidence one way or the other.
7    Q.   Do you agree that minors would be
8   particularly unlikely to know that
9   physicians may prescribe drugs for uses
10   that FDA has not reviewed for safety and
11   effectiveness?
12    A.   So here I want to be precise,
13   whether we're talking about minors who are
14   part of an informed consent process about
15   the prescription of one of these drugs or
16   minors off the street.  I think if I went
17   to the local elementary school and asked
18   them the question, I would make certain to
19   get an answer that they would first look at
20   me like I was crazy, and second I think
21   that they would say to me what is FDA?  Can
22   you tell me more about that?
23       Minors in general, I think it's

54 (Pages 210 - 213)

Page 214

1  fair to say that they won't know the
2  nuances of these regulations.
3            (Defendant's Exhibit
4            5 was marked for
5            identification.)
6      Q.   I'd like to show you what I'm
7  marking as Exhibit 5, which is a video.  I
8  will try and show it on my screen as that
9  may be --
10     A.   Let me reposition things so we
11 can actually see your screen.  Give me one
12 sec, if you don't mind, Mr. Mills.
13     Q.   Okay.
14     A.   I think you're good.
15     Q.   This is a video interview you
16 gave a couple of years ago.  I can play the
17 segment.
18     A.   Sure.
19          (Video played).
20     Q.   So it goes on.
21     A.   It's about bleach next, if I
22 remember correctly, yeah.
23     Q.   Yes.  So this was an interview

Page 215

1  you gave; is that right?
2      A.   That is correct.
3      Q.   And do you still agree that there
4  are a lot of risks involved in taking a
5  drug that has not been approved by the FDA
6  or by others for a particular use?
7      A.   So I want to be careful here
8  about the context.  As the first few
9  seconds of the clip suggests, the context
10 involves the President of the United States
11 recommending a particular drug.  I view
12 that to be -- that was the context of which
13 I was speaking.  I view that to be a
14 different contextual question than doing so
15 under the advice of a physician.  With a
16 physician who is learned in the art, a
17 physician who is operating under what
18 standard of practice is, and a drug that
19 has been FDA approved.  There I'm talking
20 about unapproved drugs, whereas, here
21 you're talking, I believe, about
22 FDA-approved drugs being prescribed for use
23 other than the one for which FDA has

Page 216

1  approved.
2      Q.   So I believe --
3      A.   Sorry.  Go ahead.
4      Q.   We can go back to the video.  I
5  believe you said:  There are a lot of risks
6  involved in taking a drug that has not been
7  approved by FDA or by others for a
8  particular use.  And I'm just asking
9  whether you still agree with that
10 statement?
11     A.   Certainly, there are risks
12 involved in that.  I would think I would
13 agree with it.  But I want to just make
14 sure that we understand the context of
15 which those comments were met and how those
16 comments may be different than the context
17 we're talking about today.
18     Q.   Do you still agree that improper
19 promotion to off-label uses can lead to
20 tragic results?
21     A.   If we're talking about promotion,
22 to be clear what promotion is, which is
23 when drug companies, sponsors of a drug,

Page 217

1  promote that drug, I think there can be
2  instances where it may result in tragic
3  occurrences.
4      Q.   Can improper physician promotion
5  of off-label uses lead to tragic results?
6      A.   We don't use the word -- I want
7  to be clear what you mean by the term
8  promotion here.  Are you talking about
9  promotion in sense of the Food Drug and
10 Cosmetics Act?
11     Q.   No.  I'm asking in the sense --
12 the normal sense of the term.
13     A.   Okay.
14     Q.   Can an improper physician
15 promotion of off-label uses lead to tragic
16 results?
17     A.   Just to be clear, my prior
18 answer, I was using the term promotion as
19 the Food and Drug Administration does, now
20 we're shifting to a slightly different use
21 of the term.  You might say recommendation
22 or something like that.  Am I getting --
23 Maybe clarify, just to make sure I'm

55 (Pages 214 - 217)

I. Glenn Cohen                                                    May 2, 2024

Page 218

1  understanding it correctly.
2     Q.   That's right.  I'm not sure in
3  the video that you were using that, given
4  that your treatments there were being
5  promoted by individual physicians.
6        But in any event, my question is,
7  not using the FDCA term of promotion, do
8  you still agree -- Do you agree that
9  improper physician promotion of off-label
10  uses can lead to tragic results?
11    A.   I think there can be instances
12  where it does result in a negative
13  consequence, a serious adverse event for a
14  patient, and that would be tragic.
15    Q.   All of these sources that we've
16  been going through, including the ones you
17  relied on, talks about how off-label uses
18  have increased risks, yet your report does
19  not mention that fact a single time.  Why
20  not?
21        MS. TOYOMA:  Objection to form.
22    Q.   You can answer.
23    A.   Yeah.  So I want to first just be

Page 219

1  clear that my -- that that claim I don't
2  think is quite correct, it's not mentioned
3  a single time.  For example, let me just go
4  through it to kind of show you some places,
5  right, where it does.
6        I think, you know, some of the
7  quotations I have from FDA, and I can look
8  at this a bit, some of the quotations from
9  the Congressional Research Service, so I
10  want to go through this carefully to see
11  whether the idea it's not mentioned at all
12  is correct or not.  The other is even when
13  I describe the FDA process risks are
14  mentioned.  So I'd be happy to go through.
15  I take it in good faith you've thumbed
16  through, then, and it's true that risks are
17  not mentioned at all.  But I just want to
18  go through that just to be a little bit
19  careful about it.
20    Q.   That's okay.  We can move on.
21        (Defendant's Exhibit
22           3 was marked for
23           identification.)

Page 220

1     Q.   I'm now introducing what's marked
2  as Exhibit 3.
3     A.   Okay.  We're going to bring this
4  up.  Give us one sec.
5     Q.   I think it's thinking about it.
6  It's going to be thinking about it for a
7  long time.  We'll wait on Exhibit 3 for a
8  moment.  Is it your understanding that
9  puberty blockers are not generally used in
10  adults?
11    A.   So here this is like now a
12  question I think of clinical medicine that
13  I think I want to be careful not to get
14  over my skis on this question.  I don't
15  think I have the expertise to kind of
16  characterize their usage in the adult
17  population.
18    Q.   All right.  Is criminal law a
19  regulatory mechanism that can protect
20  citizens' health and safety?
21    A.   It certainly can be used in that
22  way in some instances, yes.
23    Q.   You'd agree that passing criminal

Page 221

1  laws is a power embedded within the State's
2  police power to regulate behavior?
3        MS. TOYOMA:  Object to the form.
4     Q.   You can answer.
5     A.   I do agree.
6     Q.   And while the tools available to
7  regulate behavior are several, states are
8  not generally required to rely on one tool
9  before using another; is that right?
10        MS. TOYOMA:  Object to the form.
11    Q.   You can answer.
12    A.   Yeah.  So here I want to just
13  kind of understand better what you mean by
14  generally.  Are you asking as a matter of
15  constitutional law?
16    Q.   That's right.
17    A.   So I want to start by just kind
18  of confessing while I took con law many
19  years ago, I'm not a scholar of
20  constitutional law.  A little out of my
21  expertise.  I do write, sometimes, a
22  section of public health law and
23  constitutional law, but I'm not an expert.

56 (Pages 218 - 221)

Page 222

1   Q.   Sure.
2   A.   But it does seem to me that when
3   you are evaluating a particular law's
4   constitutionality, particularly for equal
5   protection or substantive process purposes,
6   the fact that a state has elected to make
7   it a criminal law is a relevant fact.
8   Q.   Well, that wasn't my question --
9   A.   Yes.
10  Q.   -- but we'll move on.  Have
11  doctors that have harmed patients been
12  criminally liable under state law?
13  A.   Doctors who have harmed patients
14  who may be criminally liable under state
15  law?  It may depend on the kind of harm.
16  But, for example, intentional infliction of
17  an injury would be something that might
18  constitute battery under state law, yes.
19  Q.   And to your knowledge, has a
20  doctor that has harmed a patient ever been
21  criminally liable under state law?
22  A.   Certainly there are examples of
23  this.  I think about an, unfortunately,

Page 223

1   tragic cases involving sexual abuse of
2   individuals, for example, while they're
3   under sedation or the like.  Those are
4   examples where criminal law has been
5   marshaled for this purpose.
6   Q.   And abortion?
7   A.   Certainly, an abortion, we have
8   some states that have now sought to, I
9   think, impose criminal penalties on
10  providers.  Now, the question you're asking
11  about the adverse -- on the basis of an
12  adverse effect on a patient, I think these
13  laws are a little bit different in that
14  regard, that they're not about the adverse
15  effects of a patient or a patient has been
16  harmed.  They're instead acting to prevent
17  providing an abortion.
18  Q.   We can go back to Exhibit 3 now,
19  which hopefully is available.
20  A.   Cass Review Final.  Okay.
21  Q.   Have you seen this report?
22  A.   I don't think I have, no.
23  Q.   The slide is labeled The Cass

Page 224

1   Review.  The date on it is April 2024.  I
2   wanted to go to PDF page 231.
3   A.   I'll say right off the bat, page
4   231, I've read none of this report and I
5   may need to have some time to read some of
6   it.  You're doing the go-to here.
7   Q.   I'll read you the quote.
8   A.   We're still getting there.  I'm
9   sorry.  Page 231.  Still scrolling to get
10  to the relevant page.  I think it's always
11  helpful for me to see what you're saying at
12  the same time that what I'm looking at.
13  231 of 388.
14       I think we are -- Wider System
15  Learning.  Yes.  I think we're in the right
16  place.
17  Q.   Okay.  So 20.12, the heading
18  says:  In the case of use of puberty
19  blockers, there was another system weakness
20  in that an off-label use went beyond the
21  usual level of permissiveness in extending
22  use to a very different indication.
23       So you would agree that this

Page 225

1   found that the off-label use of puberty
2   blockers in treating gender dysphoria in
3   England went beyond the usual level of
4   permissiveness?
5       MS. TOYOMA:  Object to the form.
6   Q.   You can answer.
7   A.   I've never seen this report
8   before or looked through it.  I think I can
9   tell you that that's what the words on the
10  page say.  But if you want me to form an
11  opinion about it, I'd probably need to read
12  more of the report to be able to do that.
13  Q.   That's okay.  That's what the
14  words say?
15  A.   That is the words that the words
16  say, yeah.  I'll read the words in the
17  Record just to make sure there's no mistake
18  whatsoever about it.  The words on this
19  page say, quote:  In the case of use of
20  puberty blockers, there was another system
21  weakness in that an off-label use went
22  beyond the usual level of permissiveness in
23  extending use to a very different

I. Glenn Cohen                                                    May 2, 2024

Page 226

1 indication.
2    Q.   Thank you.  Have doctors that
3 have improperly prescribed drugs been
4 criminally liable under state law?
5    A.   I'd have to think about examples
6 of this.  Let me just take the question
7 step by step.  You said -- Maybe you'll say
8 it again, say it again more slowly, I just
9 want to break out the various pieces of
10 what you said.
11    Q.   I'll rephrase slightly.  Has a
12 doctor ever been criminally liable under
13 state law, based on their prescription of a
14 drug?
15    A.   Based on their prescription of
16 the drug?  So this is any drug whatsoever;
17 right?
18    Q.   That's right.
19    A.   So there have been instances, I
20 can imagine drugs that are -- ones that
21 come to mind, examples, are drugs that are
22 under the CSA, so drugs that are kind of
23 scheduled drugs.  That's an example of an

Page 227

1 instance where if you prescribe a scheduled
2 drug for an improper purpose, the criminal
3 law relating to drug trafficking and the
4 like may apply to you.  I can think that
5 that example comes to mind.
6    Q.   Before the FDCA, did states
7 impose criminal liability for harmful uses
8 of medicinal substances?
9    A.   So on this one I think I'd want
10 to review preFDCA.  The FDCA has been
11 around for a long period of time, it has
12 evolved.  So I'm talking about preFDCA.
13 I'm having vague memories about what the
14 drug regulation in the colony is.  There's
15 an excellent book by Lewis Grossman on this
16 subject, that shows that actually preFDA
17 there were certainly state attempts to
18 restrict certain kinds of practices of
19 medicine.  But I think I would have to do a
20 more in-depth, historical study to be able
21 to say that.
22    Q.   Is one of the purposes of the
23 FDCA to protect patients' safety?

Page 228

1    A.   Certainly that's a purpose of the
2 FDCA, yes.
3    Q.   You're generally familiar with
4 the FDCA?
5    A.   I would say I'm generally
6 familiar with it.  There may be some
7 provisions we get into, I will have to
8 reread the statute of C.F.R. and the like.
9 But as a general matter, I am familiar with
10 it.
11    Q.   This is not a congressional
12 tricky one, got-you effort.
13    A.   I appreciate that.
14              (Defendant's Exhibit
15              14 was marked for
16              identification.)
17    Q.   This is Exhibit 14 I'm
18 introducing.
19    A.   We'll bring it up on our side.
20    Q.   It's 44 USC Section 331.
21    A.   All right.
22    Q.   Looking at 331, these are -- Is
23 it right to characterize these as

Page 229

1 substantive prohibitions under the FDCA?
2    A.   Let me just reread it for a
3 second to make sure that we're talking
4 about the same thing.
5         I've read the first couple pages.
6 I can stop there.
7    Q.   I'm not asking beyond --
8    A.   No.  No.  I think it's fair to
9 say that this is kind of a good enumeration
10 of some of the substantive prohibitions in
11 the FDCA.
12    Q.   The last page of this document,
13 section 333 (a)(1) says that any person who
14 violates a provision of section 331 of this
15 title shall be imprisoned for not more than
16 one year, or fined not more than one
17 thousand dollars, or both.
18         So you'd agree that the FDCA
19 imposes criminal punishments for certain
20 violations?
21    A.   I think that is correct.  But
22 there can be violation of the FDCA that
23 would give rise to this kind of liability,

58 (Pages 226 - 229)

Page 230

1   yes.
2      Q.   All right.  So you would agree
3   that the federal government uses criminal
4   penalties to, in part, protect patient
5   safety in prescription drugs?
6      A.   What I would say, and here I want
7   to be a little bit careful here, we might
8   have to reread the statute a little bit
9   more carefully, just to see when 331
10  applies to physicians as opposed to those
11  who promote or drug sponsors or the like.
12       But certainly as a drug company,
13  there are things you could do with
14  off-label promotion, for example,
15  alteration of the like, that might subject
16  you to criminal liability.
17     Q.   And you would agree that one of
18  the purposes of those prohibitions on
19  mislabeling or improper promotions is to
20  protect patient safety?
21     A.   I think it's fair to say that
22  that is part of the -- of Congress's scheme
23  that was envisioned here, yes.

Page 231

1           (Defendant's Exhibit
2            16 was marked for
3            identification.)
4      Q.   I'd like to show you now what I'm
5   going to mark as Exhibit 16.  It's not
6   quite there.  Give me one second.
7      A.   Okay.
8      Q.   It should be there now.  This is
9   an NBC News article.
10     A.   Great.
11     Q.   You would agree this appears to
12  be an NBCnews.com report from 2012?
13     A.   Yes, it does appear to be that.
14  Maybe I can quickly read it.
15     Q.   You can.  I'm not going to ask
16  detailed questions about it, but you can if
17  you like.
18     A.   Yeah.  Let me just do that.
19          Okay.  Great.  I think I've read
20  enough.  Go ahead, Counsel.
21     Q.   So this involves a state using
22  criminal law to regulate the practice of
23  medicine; is that right?

Page 232

1      A.   It appears, so yes.
2           (Defendant's Exhibit
3            17 was marked for
4            identification.)
5      Q.   Okay.  I'd like to show you
6   Exhibit 17, which is an ABC News article --
7      A.   All right.
8      Q.   -- from May 2018.  Headline is:
9   Doctor in badly botched abortion is tried
10  for manslaughter.
11     A.   Uh-huh.  I'll quickly just scan
12  it.  I think it will be a similar question,
13  but let me just skim it real quick.
14     Q.   Yeah.  It's the same question.
15     A.   All right.  Go ahead.
16     Q.   This also involves a state using
17  criminal law to regulate the practice of
18  medicine?
19     A.   Yes.  The practice of medicine in
20  a case involving a patient who almost bled
21  to death because of actions of the surgeon,
22  I think, in this case.
23          (Defendant's Exhibit

Page 233

1            15 was marked for
2            identification.)
3      Q.   I'd like to you look at what I
4   marked as Exhibit 15.
5      A.   Okay.  Give me a second.  Okay.
6      Q.   This is an article in the Injury
7   Epidemiology Journal entitled
8   Characteristics of Criminal Cases Against
9   Physicians Charged With Opioid-Related
10  Offenses Reported in the U.S. News Media
11  1995 to 2019.
12          Here on page one, just in the
13  Abstract under Results it says:  The annual
14  number of criminal cases against physicians
15  charged with opioid-related offenses
16  reported in the U.S. news media increased
17  from zero in 1995 to forty-two in 2019.
18          Then a little bit farther down it
19  lists the specific crimes, drug trafficking
20  was the most common, followed by fraud,
21  money laundering, and manslaughter.  And
22  then it lists the prison terms.
23          So these cases involved efforts

Page 234

1    to use criminal law based on a prescription
2    of an FDA-approved drug; is that right?
3       A.   For this one it's important to
4    add the nuance we're talking about
5    something that's regulated by the
6    Controlled Substances Act.  So that is
7    correct, but I would just add that
8    additional fact there.
9       Q.   Okay.  And you wouldn't say that
10   prosecutions -- Well, I can ask, would you
11   say that prosecutions against physicians
12   for opioid misuse is extremely rare?
13      A.   So I think what we're talking
14   about, just to be clear here, we're talking
15   about prescribing or in some ways
16   prescribing in error or in a way that's
17   inappropriate, outside of standard of care,
18   a drug that is FDA approved, but it is
19   under the Controlled Substances Act.
20         Unfortunately as this data
21   suggests, it's happened, to some extent, in
22   the United States and I would kind of --
23   you know, I'd have to think a little bit

Page 235

1    about whether the numbers represent rare or
2    unrare, but certainly these kind of
3    criminal prosecutions in this context of
4    the opioid epidemic do happen.
5       Q.   So relatedly, are you aware that
6    most -- Is it your understanding that many
7    states have state controlled substance laws
8    regulating how physicians dispense certain
9    FDA-approved drugs?
10      A.   So on this one, I'll just say
11   that I'm not sure that I have a lot of
12   knowledge about state Controlled Substances
13   Act, I have specific knowledge about the
14   federal one.  But it seems to me, I think
15   what I've seen, for example, as to some
16   drugs in Massachusetts, I'm kind of vaguely
17   aware, but it's not an area of my
18   expertise.
19      Q.   Do you know whether any of these
20   laws have criminal penalties?
21      A.   In the states?  Since I'm not
22   really that familiar with all the state
23   laws of the subject, I'm not sure that I

Page 236

1    can speak to them.  But it seems probable
2    to me that if you have a general drug
3    trafficking law, for example, and it sweeps
4    in FDA-approved drugs in some instances
5    that it might carry criminal penalties.
6            (Defendant's Exhibit
7             37 was marked for
8             identification.)
9       Q.   I'd like to show you what I've
10   marked as Exhibit 37.  This is an article
11   in DePaul Journal of Health Care Law?
12      A.   Still getting it up.  Sorry.
13   Give us one moment.  Great.  We have it in
14   front of us now.
15      Q.   Okay.  You'd agree this is an
16   article from 2015 in the DePaul Journal of
17   Health Care Law?
18      A.   There seems to be a little bit of
19   a disagreement on the title page about
20   whether it's fall 2013 or October 2015, I
21   see both there.  So we'll say it's one or
22   the other.  And that's fine, I can certify
23   to that.

Page 237

1       Q.   That's fine.  On PDF page twelve,
2    which is page 103 of the article, it says
3    -- let me know --
4       A.   I think so.  In addition to the
5    CSAs, that paragraph?
6       Q.   That's right.
7       A.   We're there.
8       Q.   Each state has statutes that
9    regulate physicians' ability to prescribe
10   controlled substances.  Such statutes
11   typically fall under the state's own
12   Controlled Substances Act which are usually
13   modeled after the CSA.
14         And then further down it says:
15   Many state courts apply their own
16   Controlled Substances Acts to determine
17   criminal liability based on a three-step
18   test.
19         You don't have any reason to
20   disagree with this author's finding that
21   there are statutes in most states that
22   regulate physicians' ability to prescribe
23   controlled substances, do you?

Page 238

1    A.   It's a little bit outside of my
2 expertise, but I have a lot of faith in the
3 subciting process of most of the journals,
4 so I -- there's no reason for me to think
5 that what they've stated here is incorrect.
6    Q.   Okay.  Are you familiar with the
7 Combat Methamphetamine Act of 2005?
8    A.   Not off the top of my head, I'm
9 not, I'm afraid.
10    Q.   Okay.  I'd like to show you what
11 I'm -- Actually, sorry.  Scratch that.
12    MS. TOYOMA:  I'll just note we've
13 been going for about an hour and fifteen,
14 if folks want to take a break sometime
15 soon.
16    MR. MILLS:  Yeah.  Whenever is
17 fine with me.  I'm happy to break now or
18 later.
19        (Recess taken.)
20        (Defendant's Exhibit
21         10 was marked for
22         identification.)
23    Q.   I'd like to show you what I'm

Page 239

1 marking as Exhibit 10.  This is an Alabama
2 Act number 2005-181.
3    A.   Let me bring it up.  Okay.  We
4 have it in front of us.
5    Q.   All right.  On the bottom of PDF
6 page four, or page three of the internal
7 document, under subsection two --
8    A.   Is that page four?  Sorry.  Say
9 it again.
10    Q.   Yeah.  Last paragraph of PDF page
11 four, it begins with some marked out on and
12 after August 1, 2004.  And then starts:  No
13 person shall deliver.
14    A.   Okay.
15    Q.   Have you got that?
16    A.   I do, yes.
17    Q.   Okay.  I'll just let you read
18 that paragraph in subsection two.
19    A.   I'll just read a little bit ahead
20 of that just to get a sense of more.  It's
21 not one I've seen before, so I'll just take
22 a second.
23    Q.   Yep.

Page 240

1    A.   Okay.  I'm up to that paragraph
2 starting with on or after August 1, 2004.
3 So I've read that much, at least.
4    Q.   You can go ahead and read that
5 subsection two, if you will.
6    A.   Okay.  Great.  Correct.
7    Q.   All right, sir.  You'd agree that
8 was an Alabama law imposing additional
9 restrictions on FDA-approved medications?
10    A.   Just to be precise, it appears to
11 me, and I've read it quickly, that it
12 restricts the over-the-counter sale rather
13 than prescribing.  But it does appear -- So
14 I think the subject of the prohibition may
15 be pharmacists or people who are selling.
16    Q.   Uh-huh.  Yes.  So my question
17 was, is this an Alabama prohibition on
18 selling medications that have been approved
19 by the FDA?
20    A.   It appears so.  Again, I think
21 that these -- It's referring to grams --
22 any product containing ephedrine or
23 pseudoephedrine.  I'm actually not entirely

Page 241

1 sure what those drugs are.  I presume --
2 I'll take it kind of -- Let's just assume
3 that those apply to drugs that are FDA
4 approved.  I'm not quite sure what the CSA
5 status of those drugs are, so that's a
6 question I have.  But assuming that they
7 are approved by FDA, this does prohibit the
8 selling over-the-counter of more than two
9 packages of those drugs.
10    Q.   You've mentioned the CSA a couple
11 of times.  What is the significance of the
12 CSA, in your analysis?
13    A.   The CSA is a series -- It's a
14 law, the Controlled Substances Act, that
15 imposes additional requirements and
16 additional restrictions on the buying and
17 selling of certain substances beyond what
18 the Food and Drug and Cosmetics Act does.
19 So I just want to kind of be careful here
20 just to say that there may be a category of
21 drugs that we haven't been talking about in
22 this case that are CSA regulated, on top of
23 drugs that are merely regulated by the FDA.

61 (Pages 238 - 241)

Page 242

1    Q.   But CSA drugs are also regulated
2  by the FDA?
3    A.   That's a good question.  It
4  actually -- The answer, it turns out,
5  Counsel, is it depends.  There are some
6  things that are only regulated by the CSA,
7  then there are things that are regulated by
8  both.
9    Q.   And do state CSA laws regulate
10  any drugs that are also regulated by the
11  FDA?
12    A.   So here, I, again, will return
13  just to say that I'm not familiar enough to
14  state CSA laws.  Although we've talked
15  about them as a class, it's not something
16  that I've actually examined in my work.
17    Q.   Okay.  So as far as you know,
18  these state CSA laws may impose regulations
19  on drugs that were approved by the FDA?
20    A.   I don't know anything to the
21  contrary.  There's nothing I know that says
22  the opposite.
23    Q.   Okay.  And then if you scroll

Page 243

1  down to PDF page seven of this document,
2  which is subsection seven.
3    A.   Let me get it in front of me.
4  Give me a sec.  Okay.
5    Q.   It starts with:  A violation of
6  subdivision (1)a. or b., or subdivision (2)
7  of this subsection shall constitute a Class
8  C misdemeanor on a first offense and a
9  Class C felony on subsequent offenses.
10       So you would agree that the
11  provision in subsection (2) that you just
12  read about six grams of a product
13  containing ephedrine or pseudoephedrine,
14  that provision is subject to a criminal
15  penalty for a violation?
16    A.   I would.  I just want to
17  emphasize that subdivision (2) refers to
18  over-the-counter sale, and I think that's
19  in contrast to prescription sale.  I'm not
20  sure whether that's meant to capture
21  nonprescription sale by over the counter.
22       (Defendant's Exhibit
23       11 was marked for

Page 244

1       identification.)
2    Q.   Okay.  I'd now like you to take a
3  look at what I'm marking as Exhibit 11.
4    A.   Great.  I have it in front of me.
5    Q.   This is an article from State of
6  Michigan State Law Review entitled State
7  Affronts to Federal Primacy in the
8  Licensure of Pharmaceutical Products.
9       Would you agree?
10    A.   Yes.
11    Q.   If we could go down to PDF page
12  four, which is page three of the article
13  itself.
14    A.   Yes, I have it in front of me.
15    Q.   The highlighted sentence says:
16  Although hardly unprecedented the recent
17  decision in Massachusetts to ban the sale
18  of a drug shortly after FDA approval
19  represents a stark affront to the licensing
20  judgments of federal officials.
21       You'd agree that this author says
22  that a state's ban of a drug after FDA
23  approval is hardly unprecedented?

Page 245

1    A.   So I kind of recognize that he
2  has said that.  But I'd like to know more
3  about the basis for which he's reached that
4  conclusion.  I don't see anything cited for
5  that.
6    Q.   All right.  If we could go to PDF
7  page twenty, which is page nineteen of the
8  article itself.
9    A.   All right.
10    Q.   This is a paragraph highlighted
11  beginning:  Miscellaneous other drugs
12  approved by the FDA have encountered
13  state-imposed limitations.  And then it
14  says:  For instance, in 1978, Illinois
15  moved the analgesic pentazocine from
16  Schedule IV to the far more restrictive
17  Schedule II.  More than a dozen states
18  added the muscle relaxant carisoprodol,
19  Soma, to their schedules of controlled
20  substances before the federal government
21  decided to follow suit in 2023.
22       Would these be examples of states
23  imposing additional restrictions on

62 (Pages 242 - 245)

Page 246

1  FDA-approved drugs?
2        MS. TOYOMA:  Quick clarification,
3  I think it says followed suit in 2011, is
4  that right, on page twenty?
5        MR. MILLS:  Yes.
6     Q.   Would these be additional --
7  Would these be examples of states imposing
8  additional requirements on FDA-approved
9  drugs?
10    A.   In terms of additional
11  requirements, yes.  But I just want to
12  emphasize, these are not prohibitions,
13  they're additional requirements.
14    Q.   And additional requirements act,
15  in some cases, as prohibitions; correct?
16    A.   Well, they never act as criminal
17  prohibitions.  They're never the
18  criminalization of the action of a licensed
19  prescriber in the scope of their practice
20  for medications that have been approved by
21  the FDA.  That's not what it is.
22    Q.   If a state added, for example,
23  this muscle relaxant to their schedule of

Page 247

1  controlled substances, a physician who
2  lacked a controlled substance authorization
3  from the state could not prescribe it;
4  correct?
5     A.   Let me just take that in piece.
6  Maybe I'll ask you to repeat that.  I was
7  with you until the very end, so I'll have
8  you say it one more time, if you don't
9  mind, Counsel.
10    Q.   Sure.  It talks about more than a
11  dozen states added Soma to their schedules
12  of controlled substances, which would mean,
13  and you can correct me if I'm wrong, that a
14  physician who did not have a controlled
15  substance license from the State would not
16  be able to prescribe it?
17    A.   Yeah.  So I'm not entirely that
18  familiar with the Controlled Substances Act
19  of the various states.  But typically that
20  is one of the implications for controlled
21  substances, one of the things you could
22  require as part of the controlled substance
23  schedule is that a physician have a special

Page 248

1  licensure or special certification to go
2  ahead and prescribe this.
3        In this particular case, I don't
4  think Noah says one way or the other
5  whether that was the implication moving it
6  from one schedule to another.
7     Q.   You aren't suggesting that there
8  would be no implication of moving the drug
9  to a schedule of controlled substances, are
10  you?
11    A.   No.  I think changing the
12  scheduling has an effect on the
13  availability.  I just want to be clear that
14  not all changes to the schedule change
15  whether an individual can prescribe it or
16  not.  And I need to look at what Schedule
17  IV, Schedule II, what schedules they put
18  Soma on to determine what restrictions they
19  would put in place are.
20    Q.   Sure.  Scrolling down to PDF page
21  twenty-two, this is twenty-one of the
22  article itself, the highlighted section
23  says:  One week before the FDA decided to

Page 249

1  rescind approval, the Florida Board of
2  Medicine severely restricted the use of the
3  diet drugs fenfluramine and
4  dexfenfluramine.  In sharp contrast,
5  Tennessee's board had entirely prohibited
6  the use of these drugs starting in 1991.
7     A.   Yes.
8     Q.   So these are also examples of
9  states imposing additional restrictions on
10  FDA-approved drugs.
11    A.   Let me read these paragraphs for
12  context for a second just to make sure that
13  I completely grasp Professor Noah's point
14  here.
15    Q.   Okay.
16            (Off-the-Record
17             discussion held.)
18    A.   Great.  Now I think I'm ready to
19  answer your question.
20    Q.   These are examples of states
21  imposing additional restrictions on
22  FDA-approved drugs; is that right?
23    A.   I would want to be slightly more

Page 250

1  precise about this.  This is examples of
2  states using their power over their Board
3  of Medicine licensure and the like to
4  restrict elements of the practice of
5  medicine.  They're not actually
6  restrictions on the FDA-approved drugs
7  themselves.
8      Q.   The article says:  Tennessee's
9  board had entirely prohibited the use of
10  these drugs starting in 1991.  Did I read
11  that correctly?
12      A.   That is correct.  About action
13  about the board and kind of what the board
14  of Tennessee has done, in terms of practice
15  of medicine.
16      Q.   And the Board of Medicine in
17  Tennessee is acting --
18      A.   Yeah.  Go ahead.
19      Q.   -- acting pursuant to State
20  statutory authority?
21      A.   That would be my understanding.
22  Again, I'd have to look a little bit at
23  this case to learn a little bit more about

Page 251

1  this particular instance.
2          But one of the points that
3  Professor Noah makes above is that these
4  actions are an attempt to avoid a direct
5  confrontation with the FDA approval.  But
6  this is something separate.
7      Q.   So the State of Tennessee,
8  exercising its State power, had entirely
9  prohibited the use of an FDA-approved drug
10  in 1991?
11      A.   I believe this is something the
12  State of Tennessee has attempted to do.  It
13  sounds like it wasn't actually litigated
14  because it was in anticipation in a federal
15  approval and things changed.  That's what
16  I'm gathering from this paragraph.
17          (Defendant's Exhibit
18           32 was marked for
19           identification.)
20      Q.   I'd like to show you now what I'm
21  marking as Exhibit 32.
22      A.   Okay.  Wendy Teo, Harvard Law
23  School graduate and looks like she thanked

Page 252

1  me for comments.  Which is great.
2      Q.   This appears to be a article in
3  Seton Hall Legislative Journal; is that
4  right?
5      A.   Correct.
6      Q.   And it's entitled FDA and the
7  Practice of Medicine:  Looking at Off-Label
8  Drugs?
9      A.   Correct.
10      Q.   If we could go to PDF page
11  twenty, which is page 324 of the article.
12      A.   Page 320?
13      Q.   324 of the article.
14      A.   One second.  All right.  I'm on
15  the right page, I think.
16      Q.   Okay.  So she says:  Since
17  regulating the practice of medicine is a
18  space that has always been reserved for
19  states, states should be involved in
20  examining off-label prescribing practices.
21          Do you agree with her?
22      A.   I think probably as stated, her
23  statement is not quite correct.

Page 253

1      Q.   What's incorrect about it?
2      A.   The idea that it's been reserved
3  for the states.  Actually, the line between
4  when federal government kind of might kind
5  of do stuff that's connected to this is a
6  little bit fuzzier when it comes to FDA.
7          Actually, one of the examples you
8  gave earlier related to Zohydro, it was a
9  Massachusetts case, are an example, which
10  is to say the scope of FDA preemption of
11  state actions in this space is a little bit
12  more nuanced than perhaps the way she
13  framed it here is.
14      Q.   Okay.  So you would agree that
15  the practice of medicine -- So regulating
16  the practice of medicine is a space that
17  states have traditionally occupied?
18      A.   They have traditionally been in
19  the space in terms of occupied, but not
20  occupied in the sense of excluding others,
21  just to be clear.
22      Q.   Sure.
23      A.   Yeah.

Page 254

1    Q.   So that's fine.  And so the
2  second half of the sentence:  States should
3  be involved in examining off-label
4  prescribing practices, do you agree with
5  her on that?
6    A.   I think it probably turns on what
7  we mean by examining.  In that I think,
8  that, for example, a way of examining an
9  off-label practice, such as a medical
10  malpractice action, that would seem to me
11  consistent with past practice and the like.
12  Examining it in terms of requiring a scope
13  of practice that only certain people can
14  prescribe and not others, for sure.
15        But, for example, if the
16  suggestion is that a state -- Let's just
17  say, be involved in examining, absolutely.
18  But I want to be clear there might be
19  practices that I think are problematic.  I
20  also want to just clarify that my
21  understanding, the way she's wording this,
22  is she's not asking as a constitutional
23  matter whether that's permissible.  There

Page 255

1  might be instances that are
2  unconstitutional and other instances that
3  are constitutional.
4        So I just want to be a little bit
5  careful about endorsing this, because I
6  think she's appropriately in large making a
7  sentence, but as applied to this case, I
8  can already see some of the nuances we
9  might have to get into.
10    Q.   So I'm not sure I fully
11  understood that answer.  You seemed fine
12  with medical malpractice.  Are you saying
13  you're not fine with state criminal
14  regulations related to the practice of
15  medicine?  I guess I'm just not
16  understanding.
17    A.   Let me start by just kind of
18  putting forward probably what is most
19  central to this case, that there could be
20  instances of state examination of off-label
21  prescribing practices.  And by examination
22  I mean, I presume she means action rather
23  than merely examination in the sense of

Page 256

1  looking through a magnifying glass.  So I
2  think that's the intended meaning, and I'm
3  going to give that to her.
4        If we are talking about instances
5  of state action for off-label prescribing
6  practices, I would want to just be clear
7  there could be instances of that that, for
8  example, might be viewed unconstitutional
9  in a particular setting.
10    Q.   Would you agree that criminal
11  sanctions can result in greater deterrence
12  than noncriminal sanctions?
13    A.   I think there are definitely
14  instances where criminal sanctions result
15  in greater deterrence than noncriminal
16  sanctions.  I think that's a fair
17  statement.
18    Q.   Going to prison may deter more
19  conduct than an administrative sanction?
20    A.   In some instances that certainly
21  seems plausible to me.
22    Q.   Violations of SB 184 are
23  characterized as a Class C felony under

Page 257

1  Alabama law.  Do you know what that means?
2    A.   I have a broad sense of it, but
3  I'm not a criminal law specialist, let
4  alone a specialist of the criminal law of
5  Alabama.  So I'd be happy to be educated on
6  the subject.
7    Q.   Would you characterize the
8  punishment for a Class C felony in Alabama
9  as severe?
10    A.   So I think I'd probably need to
11  know a little bit more and understand a
12  little bit more about how it compares to
13  other kinds of punishments in Alabama.
14  Certainly charging anybody with a felony is
15  a serious matter.
16    Q.   So you didn't consider the
17  severity of the actual punishment in
18  offering an opinion that the punishment
19  here is rare?
20    A.   No.  And there was no need to do
21  so in this instance.  Because any criminal
22  penalty, whatsoever, is rare.  So I didn't
23  need to get into the severity of the

65 (Pages 254 - 257)

Page 258

1  punishment in question here.
2      Q.   Are some civil punishments more
3  severe than some criminal punishments?
4      A.   I think that's a very
5  philosophical question, Counsel.  As
6  follows, you might ask -- there's a
7  question relating as to what the actual
8  statute does to an individual, in terms of
9  dollars or time in prison or the like.
10  Then there are also the collateral
11  consequences that in some instances the
12  collateral consequences are much worse for
13  the individual of a criminal case, for
14  example, for immigration cases, loss of
15  licensure, et cetera.
16          I think that there are certainly
17  instances, many of which means criminal
18  penalties more severe than civil penalties.
19  But I just want to be careful not to say
20  it's always the case.
21              (Defendant's Exhibit
22                42 was marked for
23                identification.)

Page 259

1      Q.   I'd like to show you what I'm
2  marking as Exhibit 42.
3      A.   Great.  Let me bring it up.
4  Excellent.
5      Q.   This is an article you cowrote in
6  Science, entitled Pressing Regulatory
7  Challenges for Psychedelic Medicine; is
8  that right?
9      A.   That is correct.
10      Q.   And if you could scroll to the
11  second page, the first column, about
12  two-thirds of the way down.
13      A.   I think it's the first column,
14  right, not the second column?
15      Q.   Right.  Second page, first
16  column.
17      A.   Just wanted to have my facts.
18  All right.
19      Q.   And so two-thirds of the way
20  through that paragraph it says:  Yet FDA
21  traditionally regulates drug products and
22  their labeling and marketing, not the
23  circumstances of their prescription,

Page 260

1  administration, and use.  These elements
2  have been traditionally viewed as part of
3  the practice of medicine, an area left to
4  state regulation.
5          Do you still agree with that
6  description?
7      A.   Yes.  As long as we're kind of
8  just going to be careful here, that I think
9  traditionally, when we're talking about
10  this, for the most part as state
11  regulation, we don't mean to suggest
12  exclusively the state regulation.
13          Indeed, in the next several
14  paragraphs we discuss the REMS power, which
15  is an instance where actually the federal
16  government and FDA is influencing
17  prescribing behavior and restricting
18  prescribing.
19      Q.   Criminal charges generally
20  involve more procedural protection than
21  other types of regulatory actions; is that
22  right?
23      A.   I believe that's correct.  I

Page 261

1  teach criminal procedure, not civil
2  procedure.  My understanding is that
3  certainly more members of the Constitution
4  for example give rights in the criminal
5  context than in the civil context.
6      Q.   So physicians charged with a
7  violation of SB 184 may receive more
8  procedural protections than they would, for
9  example, in an administrative proceeding?
10      A.   So I want to be careful here,
11  because email not sure that I know exactly
12  what procedural protections are provided in
13  Alabama administrative proceedings before a
14  board.  So I don't know, for example, about
15  rights of counsel, I don't know about the
16  rules of evidence and the like.
17          I probably would need to know a
18  little bit more.  But certainly what I
19  would say, I think it's fair to say in
20  criminal proceedings in general, affording
21  more procedural protections in terms of
22  constitutional rights than in
23  administrative board proceedings.

66 (Pages 258 - 261)

Page 262

1    Q.   In your capacity as an expert in
2   this case, you do not dispute that the
3   potential negative consequences of medical
4   gender transition interventions in minors
5   are sufficiently severe that a state could
6   reasonably elect to impose criminal law
7   penalties, do you?
8    A.   If you'll read that one more
9   time, Counsel, I want to just make sure
10   that I understood the question.
11    Q.   Yep.  In your capacity as an
12   expert in this case, you do not dispute
13   that the potential negative consequences of
14   medical gender transition intervention in
15   minors are sufficiently severe that a state
16   could reasonably elect to impose criminal
17   law penalties?
18    A.   And so I want clarification about
19   the word -- what you mean by the words
20   could reasonably elect.  Do you mean as a
21   constitutional matter?  Do you mean as a
22   matter, I don't know, ethics or political
23   morality?  Tell me a little bit more about

Page 263

1   what you mean by reasonably elect here.
2    Q.   A reasonable person could
3   support.
4    A.   Could a reasonable person believe
5   that the concerns related to
6   gender-affirming care in this instance
7   justify criminal prohibitions?
8    Q.   That's right.
9    A.   I want to be careful about my
10   expertise here, because I don't think I've
11   done any polling about the populous or what
12   reasonable people in the world is.  I'm
13   very aware when I construct what a
14   reasonable person believes I think about
15   myself, if I ask myself, as a reasonable
16   person what do I believe.  I think the
17   answer would be that I don't think this is
18   a reasonable action that Alabama has taken.
19    Q.   And so you can't say whether a
20   reasonable person could believe that?
21    A.   So, again, I think our -- So, to
22   me, when I think about reasonable people
23   text, I think about all the people out

Page 264

1   there in the world, and I think about how I
2   figure out who a reasonable person is.
3        I think about people I talk to
4   and the like.  For them, I think if we had
5   a conversation about this and I said here's
6   the problem, here's the evidence base,
7   should we jump to a criminal prohibition,
8   is that the right thing to do?  Most of
9   them would disagree with that proposition.
10    Q.   And that tells you that no
11   reasonable person could think otherwise?
12    A.   So, again, I think I want to be
13   careful here, because I don't have data on
14   the views of people and what's meant by a
15   reasonable person.
16        Do I think that there could not
17   exist somebody who could persuade me or
18   reason through this in a different way?  I
19   think it's possible there's someone who
20   could reason through this a different way.
21   I'll stop there.
22    Q.   Are you aware that twenty-four
23   states have enacted laws like SB 184?

Page 265

1    A.   Counsel, I think you should be
2   precise here by what you mean by like SB
3   184, in that do you mean twenty-four states
4   have enacted laws that criminally prohibit
5   the activity of prescribing in this case?
6    Q.   I mean laws that prohibit the
7   activity of prescribing.  I'm not focused
8   on the type of punishment.  They are
9   prohibitions.  It is unlawful to provide
10   medical gender transition interventions in
11   minors in twenty-four states.
12    A.   So there are a number --
13    Q.   Are you aware of that?
14    A.   There are a number of states, I'm
15   aware, have enacted law in this space.  I
16   could review the precise details and how
17   they've done so.  I'm not sure whether all
18   twenty-four have actually attached a
19   penalty to prescribing specifically.  But
20   if you tell me they have, I believe it.
21        Some of them, I think, are
22   slightly a little bit different, in terms
23   of how they're intervening in this space.

67 (Pages 262 - 265)

I. Glenn Cohen                                                      May 2, 2024

Page 266

1    Q.   And the fact that twenty-four
2  states have taken some action in this space
3  still does not let you conclude that a
4  reasonable person might conclude that the
5  consequences of medical gender transition
6  interventions in minors are sufficiently
7  severe to warrant a criminal penalty?
8         MS. TOYOMA:  Object to the form.
9    Q.   You can answer.
10   A.   Yeah.  So, to me, when I think
11 about what a reasonable person would
12 believe in this instance, I kind of think
13 about their reasoning, I think about the
14 conversations we have.  I imagine the best
15 arguments on one side, the best arguments
16 on the other.
17        To me, the line between criminal
18 and civil is important.  The second time
19 you read the question, I think you put the
20 word criminal, or maybe not.  Let me get
21 clarification whether you're asking me
22 whether a reasonable person could believe
23 that a criminal penalty is warranted?

Page 267

1    Q.   That's what I'm asking.
2    A.   That's fine.  I continue to
3  think -- And, again, I think that the
4  construction of a reasonable person, we
5  have to be careful about how we construct
6  it.  But if you ask me whether it is
7  reasonable to jump to a criminal penalty in
8  this case, I don't think it's reasonable.
9    Q.   You don't think permanent
10 sterilization of a minor is a severe
11 consequence?
12   A.   So that's a slightly different
13 question.  Is that the question you'd like
14 me --
15   Q.   That is my question.
16   A.   That's your question.  Do I think
17 that the permanent sterilization of a minor
18 is a significant consequence?
19   Q.   Yes.
20   A.   I think whenever permanent
21 sterilization is involved, that is a
22 significant consequence for an individual,
23 yes.

Page 268

1    Q.   Do you think permanent
2  disfigurement of a minor is a severe
3  consequence?
4    A.   So here I think I'd want a little
5  bit of clarification by what you mean by
6  disfigurement.  So are you talking about
7  what the state of Alabama might regard as
8  disfigurement or what the minor regards as
9  disfigurement.
10   Q.   Do you think a permanent
11 inability to attain an orgasm is a severe
12 consequence?
13   A.   I think it's a significant
14 consequence and one that should be
15 considered, yes.
16   Q.   In your capacity as an expert in
17 this case, you are not testifying that
18 Alabama's law here would violate the Eighth
19 Amendment; is that correct?
20   A.   I think as an expert witness on
21 the question of off-label prescribing and
22 what is available to a state regarding the
23 ability to deal with questions about

Page 269

1  safety, it's a question about malpractice,
2  questions about informed consent and the
3  like, I haven't been asked to form an
4  opinion on the constitutionality of the
5  statute to begin with, let alone the Eighth
6  Amendment, nor do I know whether it would
7  be an appropriate role for me as an expert
8  to speak about the constitutionality of the
9  statute.  That's a matter for the fact
10 finder and for the courts.
11   Q.   Are you aware that your employer
12 in this case, the U.S. government, is not
13 challenging SB 184's prohibition on
14 surgical interventions in minors?
15   A.   I believe that I've heard that.
16 And my understanding, it's in part related
17 to the fact that actually there have been
18 instances where this has been occurring in
19 the state.
20   Q.   How did you understand that?
21   A.   I think I asked the question at
22 one point from my colleagues at the DOJ.  I
23 asked them a little bit about that --

68 (Pages 266 - 269)

Page 270

1    MS. TOYOMA:  I don't think he's
2  asking you about conversations between you
3  and counsel.
4    Q.   And you believe that -- You
5  believe the only reason not to challenge
6  the surgical prohibition is that one hasn't
7  happened yet?
8    A.   Now that's a different question
9  you're asking me, Counsel.  Do you want me
10  to answer this?
11    Q.   Yes.
12    A.   The only reason not to do that?
13    Q.   No.  I'm asking do you believe
14  that, do you believe that that's the reason
15  the surgical intervention ban is not being
16  challenged?
17    A.   Honestly, I have no basis for
18  knowing why it's been challenged or not
19  other than my conversations with counsel,
20  which I think --
21    Q.   You would agree that criminal law
22  sanctions can express society's view of the
23  culpability of the conduct?

Page 271

1    MS. TOYOMA:  Object to the form.
2    Q.   You can answer.
3    A.   Would you repeat the question.
4  I'm sorry.
5    Q.   Would you agree that criminal law
6  sanctions can express society's view of the
7  culpability of the conduct?
8    A.   I do think that when attached as
9  criminal sanctions, that is a reason to do
10  so, yes.
11    Q.   Your report discusses state
12  Medicaid fraud laws.  Do any of those laws
13  involve criminal punishment?
14    A.   Some of them might.  I would have
15  to go through some of them.  But I can
16  imagine there are instances of the False
17  Claims Act or something like that where
18  conduct would be so egregious as to be
19  criminally prohibitive.
20          (Defendant's Exhibit
21            19 was marked for
22            identification.)
23    Q.   I'd like to show you what I'm

Page 272

1  going to mark as Exhibit 19.  So this is
2  Alabama Act Number 2017-66.  The date on
3  the top is February 2017; received by the
4  governor's office March 2017.
5      Do you see this document?
6    A.   I do, yes.
7    Q.   Okay.  And on page two, Enrolled,
8  An Act, would you just read that sort of
9  summary of the act.
10    A.   Yes.  Give me one moment.  On
11  page two.  I'm sorry.  An act to amend
12  Section 22-1-11, Code of Alabama 1975,
13  relating to false statements or claims on
14  applications for payment of medical
15  benefits from the Medicaid Agency to
16  provide that a person must knowingly
17  engage --
18    Q.   You don't have to read it out
19  loud.  You can.
20    A.   No.  No.  I'll just read it
21  privately to myself.  My apologies.
22    Q.   No.  You're fine.
23    A.   Okay.  I've read that paragraph

Page 273

1  now.
2    Q.   Sure.  So does it sound like from
3  that paragraph that Alabama uses criminal
4  penalties to regulate the practice of
5  medicine within Medicaid?
6    A.   Well, I think actually to be more
7  precise, what Alabama does is it regulates
8  false claims for payment of medical
9  benefits under the State Medicaid Act.
10    Q.   And would you consider that to be
11  part of the practice of medicine?
12    A.   It's a little bit complicated in
13  that it's a question about billing rather
14  than the actual practice of medicine on a
15  day-to-day matter.  So I think indirectly,
16  in the sense that when one is reimbursed or
17  not reimbursed, may affect the decisions
18  one makes in terms of medical practice.
19  But this I would not describe as a direct
20  regulation of the practice of medicine.
21    Q.   Sure.  Your report discusses tort
22  actions.  Tort actions depend on a
23  plaintiff bringing a lawsuit; is that

69 (Pages 270 - 273)

Page 274

1  right?
2      A.   That is correct.  Most tort
3  actions.  There may be some unusual
4  exceptions, including ones where a state is
5  given the ability bring a tort action.  But
6  certainly medical malpractice, which is the
7  main one we're talking about, private
8  litigants, for the most part.
9      Q.   Those cases also depend on the
10  private litigant proving their case?
11     A.   Well, if you're willing to be
12  careful here in terms of getting money
13  damages penalty at the end of the day, it
14  requires you to prove the case.  Cases are
15  sometimes settled or even bringing the case
16  may have an effect on practice of medicine
17  in some instances.
18         So it's not the case that every
19  effect on practice of medicine requires
20  that a case actually proceed to jury trial
21  and resolve with the proving of evidence of
22  the claim.
23     Q.   If no plaintiff brings a lawsuit,

Page 275

1  the provider faces no tort liability?
2      A.   In a typical medical malpractice
3  action, that is correct.  It would require
4  a plaintiff to sympathize with many tort
5  nor to initiate an action.
6      Q.   And tort liability does not
7  involve the threat of jail time; is that
8  right?
9      A.   Now, that's -- I want to be
10  careful here because I do not teach torts
11  as an expert.  It is possible that there
12  are tort actions that might, it would be
13  highly unusual.  I think as far as I know,
14  no tort actions involve imposing criminal
15  penalties unless something attendant to it,
16  like contempt in a tort action or something
17  like that.
18     Q.   State tort suits are generally
19  subject to statutes of limitations; is that
20  your understanding?
21     A.   That is correct.  There are
22  statute of limitations sometimes with the
23  discovery rules.  There are other kinds of

Page 276

1  ways, equitable tolling and the like.
2      Q.   Do you know what the medical
3  malpractice statute of limitations in
4  Alabama is?
5      A.   I don't know off the top of my
6  head.  Right.
7      Q.   Would it be reasonable for a
8  state to regulate conduct if found
9  objectionable and wanted to prevent,
10  regardless of whether victims wanted to
11  sue, using the criminal law?
12     A.   So if it is the case that we're
13  talking about conduct, the state believes
14  is offensive, even though the people
15  involved think it benefits them.  Right?
16  The state was of the view that this was
17  problematic and ought to be criminalized
18  for that reason and that being the reason
19  underlying it, that would be not an
20  atypical use to the criminal law.
21     Q.   If receiving a medical gender
22  transition intervention itself changes the
23  course of a child's gender development, the

Page 277

1  fact that the child may not regret those
2  interventions does not preclude the
3  possibility that they would have been
4  better off not having received the
5  interventions in the first place, does it?
6         MS. TOYOMA:  Object to the form.
7      A.   That one was a little complicated
8  too, Counsel.  I might need you to kind of
9  break it up to me in pieces, I'm afraid.
10     Q.   So the first question, if
11  receiving the medical gender transition --
12  If receiving medical gender transition
13  interventions itself changes the course of
14  a child's gender development, the fact that
15  the child may not regret those
16  interventions does not preclude the
17  possibility that they would have been
18  better off not having received the
19  interventions in the first place; is that
20  right?
21         MS. TOYOMA:  Object to the form.
22     A.   So I think I want to be precise
23  here.  That part of your question involves

Page 278

1  the subjective assessment of their welfare,
2  and part of the question I think is
3  intending to specify an objective analysis
4  of their welfare, whether they are better
5  off or worse off; is that what you mean?
6      Q.   I don't intend this question to
7  focus on subjective versus objective. But
8  if you'd like to answer the question that
9  way, that would be fine.
10     A.   Yeah.  So let me just kind of
11 reason through this.  Because, again, it's
12 a complicated question and I want to make
13 sure I'm getting it right and understanding
14 this.  Right?
15     It does seem to be possible that
16 someone might say, you got pregnant, you
17 had a child, you love that child, and you
18 are subjectively happy that you had that
19 child, and you think your life has gone
20 well.  And yet there may be a perspective,
21 that says objectively, had you not had that
22 child, had you not gotten pregnant, your
23 life would have gone better.  So it seems

Page 279

1  to be that's a possible thing to believe,
2  philosophically speaking describing a set
3  of events.  And if that's true in
4  pregnancy, I think it's true in all things
5  in life as well.
6      Now, what weight we should attach
7  to that objective assessment and how we
8  think about it is another question.  If
9  you're really asking me is it possible, my
10 example of pregnancy is just an example
11 where it's possible.
12     Q.   Okay.  In your opinion, do
13 existing federal and state laws about
14 prescription drugs provide the perfect
15 balance of patient safety, access,
16 efficacy, and innovation?
17     A.   I think that I would never
18 describe anything the federal government or
19 any government has done as completely
20 perfect.  Right?  I think perhaps if you
21 ask me, as a policy maker, there may be
22 tweaks that I would make here and there, so
23 I don't think I would say it is the perfect

Page 280

1  balance.
2      Q.   How did you arrive at your
3  opinion about the frequency of criminal law
4  statutes regulating prescription drugs?
5      A.   I reviewed existing material in
6  the legal literature to get a sense of the
7  answer.  And, again, I want to be careful
8  about that I was kind of -- I tried to be
9  very precise about the way I framed the
10 conclusion regarding, just to be clear
11 here, FDA-approved drugs being prescribed
12 by a licensed provider, for these purposes
13 that I kind of tried to find examples where
14 actually states had criminalized that.
15     And I found fleeting, if any,
16 examples.  The main ones that came up,
17 potentially the applications for
18 mifepristone based on some of the current
19 abortion laws we're seeing go into place.
20     Q.   And that framing let you exclude
21 preFDA state laws?
22     A.   So ones before the formation of
23 FDA?

Page 281

1      Q.   Right.
2      A.   Because I focused only on that
3  which has been FDA approved, I think by
4  definition I didn't look at things before
5  the FDA existed, yes.
6      Q.   And what review of state laws did
7  you perform in arriving at the conclusion
8  you just gave?
9      A.   So I read through, I reviewed
10 treatises about FDA law, law review
11 articles about federalism in the space and
12 the like.  So I read through a number of
13 things to try to just get a sense of it and
14 look for examples.  And as I said, these
15 were the examples that people mentioned in
16 the literature.
17     Q.   How many state codes did you look
18 at directly?
19     A.   I probably -- Well, as to this
20 question or in the course of doing entire
21 research for the expert report?
22     Q.   Just this question.
23     A.   Just this question, probably

I. Glenn Cohen                                                    May 2, 2024

Page 282

1   maybe one or two, but not more than that.
2       Q.   What would you say the error rate
3   of your search for state criminal laws
4   regulating FDA-approved drugs is?
5       A.   Low.
6       Q.   And how could other scholars
7   replicate that search?
8       A.   Other scholars could replicate
9   that search by beginning, again, with the
10  like meeting treatises in the field, by
11  FDA's own statements, by law review
12  articles on this, and they could try to
13  replicate it that way.
14      Q.   On most occasions, the FDA
15  generally leaves the decision to seek
16  approval for particular drugs to the
17  private sector; is that right?
18      A.   That is correct.  Typically, drug
19  approval begins with an NDA from a drug
20  sponsor, that's typically a private
21  organization.
22      Q.   So sponsors of promising drugs
23  could decide not to seek FDA approval?

Page 283

1       A.   It is true that sponsors of
2   promising drugs could seek or could choose
3   not to seek FDA approval.  Probably would
4   be unusual if a drug is kind of -- Well,
5   I'll just stop there.
6       Q.   Even if the license holders of
7   the drug seek FDA approval for the drug and
8   succeed, they have no obligation to
9   commercialize their products, do they?
10      A.   That is the case.  If you are
11  successful at getting a license to use to
12  get FDA approval, you're not obligated to
13  commercialize your products.
14          That said, it's extremely rare
15  because the drug approval process is so
16  expensive that somebody would undertake
17  without an attempt to commercialize it, I
18  can't think of any instances actually.
19      Q.   They don't have an obligation to
20  commercialize their products at an
21  affordable price; is that right?
22      A.   In terms of the pricing of
23  pharmaceuticals, the FDA approval is

Page 284

1   separate from the question of the pricing
2   of pharmaceuticals.
3       Q.   So they don't have an obligation
4   to commercialize their products at an
5   affordable price; right?
6       A.   As a drug, just to make sure I
7   understand the unstated part of the
8   sentence, maybe you could repeat the
9   question, including the stuff at the very
10  beginning about who we're talking about
11  exactly.
12      Q.   So we're continuing the same line
13  of so now we're talking about a license
14  holder of a drug who has FDA approval and
15  they've decided to commercialize the
16  product.  They don't have to commercialize
17  that product at an affordable price, do
18  they?
19      A.   Certainly, there's no obligation,
20  when it comes to at least the open market.
21  Now, when we're talking about drugs that
22  are listed for Medicaid and kind of
23  negotiation, and the like, there may be

Page 285

1   some other rules.  But certainly, the price
2   setting is not something that they are
3   obligated by the FDA approval to adopt a
4   particular price.
5       Q.   And they also don't need to
6   commercialize that product in a manner that
7   might ensure easy access; is that right?
8       A.   They are not required -- So now I
9   think it's a little bit tricky, because we
10  need to talk about whether you're talking
11  about things that are in the label or
12  outside the label.  Right?
13          So are you saying -- Well, I'll
14  let you clarify for me what you mean by
15  this.
16      Q.   I'm not distinguishing those two.
17  I'm saying, they don't need to
18  commercialize the product in a manner that
19  ensures easy access by patients?
20      A.   Just I want to be precise here.
21  We're imagining a case where FDA has
22  approved a drug with their particular
23  label, this is why I'm asking this

72 (Pages 282 - 285)

1  question, as opposed to what they seek for
2  the approval. You're talking about a drug
3  that's received a particular label and the
4  question about access?
5       Q.  Sure.
6       A.  That's the frame of the question;
7  is that right?
8       Q.  Yeah. But, again, I'm not
9  specifying whether someone is seeking it
10 for an on-label use or an off-label use.
11 I'm just saying, they don't have to
12 commercialize that drug in a manner that
13 ensures easy access; is that right?
14      A.  I think that, typically, the drug
15 sponsor, once the drug has been approved,
16 not been approved through REMS or something
17 like that, pricing condition and pricing,
18 typically, it's not they who are kind of
19 doing a lot of restriction to access beyond
20 that. If there have been restrictions,
21 they'll more often come in as a REMS or an
22 ETSU or something like that.
23      Q.  My question is a bit different.

1  The FDA is not -- and no agency is
2  requiring them to commercialize the product
3  in a way that ensures easy access; is that
4  right?
5       A.  Well, now you've added other
6  agencies. Here I think I --
7       Q.  Okay. You can answer FDA first,
8  and then if you'd like to specify other
9  agencies, that's fine. I don't think the
10 answer is any different, but: Is there any
11 FDA requirement that a manufacturer
12 commercialize an FDA-approved drug in a
13 manner that ensures easy access?
14      A.  So once a label has been
15 approved, if there are questions that are
16 within the discretion of the drug sponsor
17 so to whether they make access easy or more
18 difficult, I don't think it's FDA that
19 dictates that for the drug sponsor. The
20 drug sponsor reaches that conclusion
21 themselves.
22      Q.  And FDA approval of a drug does
23 not necessarily guarantee insurance

1  coverage, does it?
2       A.  Here, it's a little bit
3  complicated, Counsel. And there's work on
4  linkage. So it turns out that actually
5  once FDA approves, there's some payers that
6  automatically reimburse. So it's a little
7  bit more complicated than that is what I
8  would say.
9       Q.  Well, I -- My question was fairly
10 clear, I think. I asked: Does it
11 necessarily guarantee insurance coverage?
12      A.  So, again, here, there are -- I
13 want to be careful -- I probably need to
14 look this up when it comes to Medicare and
15 Medicaid, there are requirements about
16 linkage, that once something has been
17 approved by FDA that might get triggered
18 which as to those kinds of categories might
19 guarantee it. For private payers it might
20 not. It's a slightly more complicated and
21 nuanced question.
22      Q.  But even for Medicare and
23 Medicaid, that would not be universally

1  true for every FDA-approved drugs?
2       A.  So I think typically there's a
3  process after FDA approves the drug of
4  review for public payers that would make a
5  determination whether to cover, I think
6  that's fair to say.
7       Q.  So is it fair to say that FDA
8  approval of a drug does not necessarily
9  ensure public access to the drug?
10      A.  It is true that when FDA approves
11 a drug, it is not the case that the next
12 day every single person will have access to
13 it who might want to have access to it.
14      Q.  As you use the term -- You refer
15 to the term of ethical doctrine of informed
16 consent. As you use that term, does the
17 ethical doctrine of informed consent
18 incorporate a notion of individual
19 autonomy?
20      A.  I believe that it's rooted in
21 individual autonomy, yes.
22      Q.  Can the ethical doctrine of
23 informed consent justify a blanket

I. Glenn Cohen                                    May 2, 2024

Page 290

1  prohibition on sterilization of the
2  mentally handicapped?
3      A.   So now I think we might need to
4  define the term mentally handicapped and
5  what you mean.  If you mean people lacking
6  in decision-making capacity, totally
7  lacking in decision-making capacity, then
8  we'd have questions about guardianships and
9  next friends and the like and how we
10  resolve that.  That's the way ethicists
11  usually view the question.
12     Q.   That would be fine.  You can
13  answer it that way.
14     A.   Yeah.  So in the instance, for
15  example, of somebody who has -- and I want
16  to try to use the right terminology here to
17  be respectful of the community.  People who
18  have significant developmental disorders,
19  typically there would be determinations
20  related to capacity and what the capacity
21  of the individual is as to making this
22  particular decision.  The steps would be,
23  and bioethical conception and informed

Page 291

1  consent, do everything possible for us to
2  increase that capacity to enable this
3  person to make a decision.  If that
4  decision was -- they were incapable of that
5  decision, so we reach this conclusion, then
6  there would typically be a question about
7  guardianship, or the like, in that person.
8      And then we'd have questions,
9  depending on the state, about substitutive
10  decision making versus best interest
11  standards and how they're applied.
12      That's typically the way it goes,
13  my understanding, when it comes to
14  sterilization questions for people with
15  mental deficiencies.
16      It's very important that we not
17  treat them as a class that's completely
18  unable to make decisions.  Instead we have
19  this very individualized capacity-based
20  analysis.  That's what bioethics teaches
21  us.
22     Q.   So I'll ask my question again.
23  Can the ethical doctrine of informed

Page 292

1  consent justify a blanket prohibition on
2  sterilization of, let's say, the severely
3  mentally handicapped?
4      A.   So I think if the question is
5  blanket prohibition, any inquiry as to
6  attempts to whether it's possible to
7  augment this person's decision making so
8  that they can make a decision with
9  capacity, then I think the answer is no.
10     Q.   What if the person cannot make
11  the decision with capacity?
12     A.   So now I think we're closer to my
13  case involving -- again, specifics matter
14  here, and that's going to be a recurring
15  theme that I'm going to emphasize here.
16      Now we're looking more like my
17  case about somebody, for example, who is in
18  a coma.  I would say in such an instance --
19  So that seems more analogous to that.  Now,
20  maybe there's some space between the two,
21  but I want to think about what that case
22  looks like when you're talking about
23  somebody with no capacity whatsoever.

Page 293

1      Q.   So can the ethical doctrine of
2  informed consent justify a blanket
3  prohibition on sterilization of mentally
4  persons who cannot provide -- who do not
5  have capacity to provide consent?
6      A.   So no capacity whatsoever to
7  provide consent?  I think now typically we
8  would look to see whether there are
9  individuals in their life who are
10  appropriate substantive decision-makers or
11  best interest, that that's what the
12  doctrine would tell us to do.
13     Q.   So the answer -- Your answer to
14  my question is no.  Is that your answer?
15     A.   So the blanket prohibition?  So a
16  straight-up blanket prohibition when you
17  tell me nothing else.  Right?  I think that
18  for -- So I'm resisting a little bit.  I
19  don't mean to be difficult, Counsel, so let
20  me try to be helpful if I can.  Right?
21      When you tell me that you are
22  opting for a blanket prohibition, there are
23  a series of questions I would ask you

74 (Pages 290 - 293)

Page 294

1  before we got to blanket prohibition, and
2  those are the kinds of things that I would
3  imagine that the bioethical principal of
4  informed consent and autonomy would tell
5  you to do.
6        If you tell me you exhausted all
7  those and none are available because of the
8  hypothetical you're giving me.
9        So there is nobody who is a
10 substantive decision-maker, nobody with
11 best interest, and the person is completely
12 incapable of making a decision, now I think
13 blanket prohibition may be something that
14 we would think about.  But even here I
15 would want to know a little bit more about
16 what the need for the sterilization in a
17 particular case is.
18       So I could imagine, and there are
19 some really terrible examples from history,
20 there are instances of individuals who are
21 kept in, kind of, inpatient facilities
22 where rape is a real concern or something
23 like that, where I could imagine that

Page 295

1  actually maybe would resist blanket
2  prohibition.
3        So I just want to be, kind of,
4  very specific here and very careful, and I
5  think that's the way bioethicists see this
6  question as a matter of bioethical
7  principles of informed consent.
8     Q.   So you would say -- Assume the
9  regulation, whether it's federal or state,
10 it hinges only on whether the individual
11 can provide capacity, and it applies only
12 when the individual cannot provide capacity
13 and there are no other -- it doesn't matter
14 about a guardian.
15       Would, in that case, the ethical
16 doctrine of informed consent justify a
17 blanket prohibition on sterilization of a
18 mentally handicapped person?
19    A.    Just to be clear on construction,
20 to get to your clarification:  When you say
21 it doesn't matter with regard to a
22 guardian, is it that there is no guardian
23 or that we're disregarding what the

Page 296

1  guardian has said?
2     Q.   We're disregarding -- The state
3  law doesn't care what the guardian has
4  said.  The state law is, if the person is
5  mentally handicapped and does not have
6  capacity to provide consent, no
7  sterilization.
8     A.    Irrespective of what guardians,
9  parents, or other people say?
10    Q.   That's right.
11    A.    How would I think about the
12 statute at that.  I'm sorry, I'm really not
13 trying to be difficult here, Counsel, but
14 how I would think about it as a
15 constitutional matter, how would I think
16 about it as a matter of bioethics?
17    Q.   Do you think that would violate
18 your ethical conception of the doctrine of
19 informed consent?
20    A.    I think it might depend on
21 whether our conclusions about the best
22 interest of the patient and how we reached
23 those conclusions.  That might be the best

Page 297

1  way to ask.
2     Q.   When you say our, who do you
3  mean?
4     A.    The decision-maker in the case,
5  and whether we might need to have a
6  proceeding that makes that determination,
7  for example.
8        So, for example, I could imagine
9  an instance where this is the kind of thing
10 that we decide we have to have a court
11 order or court procedure to determine what
12 the results should be in this case.
13    Q.   Again, that's not my
14 hypothetical.  It's a blanket prohibition
15 on sterilization of a mentally handicapped
16 person who does not have capacity to
17 consent.
18       So my question is:  Does that
19 violate your notion of the ethical doctrine
20 of informed consent?
21    A.    I think the ethical doctrine of
22 informed consent, as I stated out, would
23 prefer all of the things I said up until

75 (Pages 294 - 297)

I. Glenn Cohen                                                    May 2, 2024

Page 298

1  now, to the blanket prohibition.  You can
2  tell me all the things I said up until now
3  are not available and the choice is blanket
4  prohibition, yes or no.  Right?  Then I
5  think we're in a different kettle of fish
6  and I think it's hard for me to imagine
7  what that world looks like, to be perfectly
8  honest.
9     Q.   So you're saying the ethical
10  doctrine of informed consent cannot justify
11  a blanket prohibition on sterilization of
12  mentally handicapped individuals who cannot
13  provide consent?
14    A.   Not when these other options are
15  available.  In a world where these options
16  are not available, I think it's a different
17  kettle of fish.
18    Q.   Can the ethical doctrine of
19  informed consent justify a blanket
20  prohibition on female genital mutilation in
21  minors?
22    A.   I believe that it can.  I can say
23  more.

Page 299

1     Q.   Sure.  Go ahead.
2     A.   So in this instance, and we're
3  talking about female genital cutting.  And
4  again, I want to be clear that what we mean
5  by female genital cutting, because the WHO
6  has several levels of female genital
7  cutting.  And I'm assuming you're referring
8  to the most severe like clitorectomy or
9  something like that, as part of this;
10  right?
11    Q.   Right.
12    A.   So I think here, first of all,
13  the first thing to narrow it, it is
14  prohibited in the United States.  Right?
15  So we've reached a conclusion this is a
16  prohibited act in the United States.
17        The next set of questions, so
18  that's interesting and relevant, but maybe
19  not dispositive in and of itself.  Right?
20        I think the kinds of concerns
21  involved in the case of female genital
22  cutting involve instances where we have
23  reason to believe that both -- that the

Page 300

1  patient has not consented or not assented
2  or that their consent or assent is
3  problematic, in part, because of the ways
4  in which this is being presented by
5  parents.  And we have reason to believe
6  that parents' interest have, shall we say,
7  are misaligned to the best interest of the
8  patient.
9        I want to emphasize, this is not
10  the basis for my opinion in this case.
11  I've not been asked to form an opinion on
12  this question in this case.  I'm answering
13  the question, right, because you've asked
14  it, but it's not the basis for my opinion
15  or anything I've said in this case.
16    Q.   I guess I don't understand, why
17  do you assume that every parent in a case
18  involving a request for female genital
19  mutilation would be -- could not provide
20  adequate informed consent?
21        MS. TOYOMA:  Object to the form.
22    Q.   You can answer.
23    A.   Did you mean to say -- Would you

Page 301

1  repeat the question.  Was it parent or
2  child?
3     Q.   Well, I asked parent.  But
4  because we're talking about minors, so the
5  question parental informed consent
6  generally.
7     A.   Yeah.  So I want to emphasize
8  here that our conclusion about whether
9  female genital cutting should be available
10  or unavailable might be separate from the
11  informed consent process.  That's one thing
12  I want to flag here.  That the defect and
13  problem with female genital cutting and why
14  states have decided to criminalize it or
15  prohibit it may be unrelated to the
16  question of the priority of informed
17  consent in this case.
18    Q.   But you -- When I asked can the
19  ethical doctrine of informed consent
20  justify a blanket prohibition on female
21  genital mutilation in minors you said yes.
22  So I guess I'm trying to understand the
23  difference.  Why is a blanket

76 (Pages 298 - 301)

I. Glenn Cohen                                                    May 2, 2024

Page 302

1 prohibition --
2     A.   Yeah.
3     Q.   -- here, notwithstanding any
4 individual circumstance, any individual
5 capacity, any individual consent?
6     A.   Yeah.  And I appreciate the
7 opportunity to clarify and make it a little
8 bit clearer, Counsel.  Because I think
9 perhaps my initial answer was a little
10 imprecise, so I'll try to be a little bit
11 more precise.
12         My own view is that prohibitions
13 on female genital cutting can be justified
14 by bioethical principles.
15         Now that you've asked me about
16 it, to be more precise, whether it is the
17 doctrine of informed consent that does the
18 work that justifies the prohibition or in
19 other docs in bioethics or other bioethics
20 elements, I think is an open question and
21 probably I think it's less about the
22 informed consent, per se, being
23 problematic, and more about other aspects

Page 303

1 of the analysis.
2             (Defendant's Exhibit
3             12 was marked for
4             identification.)
5     Q.   All right.  I'd like to show you
6 what I'm marking as Exhibit 12.
7     A.   Okay.
8     Q.   This is an article from Forbes,
9 dated March 12, 2024, entitled England Bans
10 Puberty Blockers For Minors.
11         Are you aware of this
12 development?
13     A.   I think I've seen the headline,
14 but I'm not sure that I've kind of in-depth
15 examined the English kind of experience,
16 recent English changes, to be frank.
17     Q.   Do you have any understanding why
18 England took this action?
19     A.   Fairly vague.  I think that they
20 are kind of -- that they've undertaken more
21 reviews and they've come to a different
22 conclusion, is kind of my headline
23 understanding, but I'm not sure that I can

Page 304

1 say more than that.
2     Q.   Do you think England's action is
3 contrary to bioethical principles of
4 informed consent?
5         MS. TOYOMA:  Object to the form.
6     Q.   You can answer.
7     A.   I think I'd have to know a little
8 bit more about what England had done and
9 the reasons why England has done it to be
10 able to answer that question.
11     Q.   Why would it matter the reasons
12 England has done it?
13     A.   Because I think that the question
14 about there are motivations and reasons
15 that are consistent with bioethics and
16 there are motivations and reasons that are
17 inconsistent with bioethics.  So I need to
18 know which ones were the ones that
19 motivated them.
20     Q.   So you're saying this action
21 could be consistent with bioethical
22 principles even though it removes the
23 ability of individuals to consent to

Page 305

1 puberty blocker use as a minor?
2     A.   I think, as I said, it's not a
3 case that I've reviewed, so I'd need to
4 look more closely at it to be perfectly
5 honest to be able to say very much about
6 it.
7     Q.   I guess my question was more
8 general.  Is it possible for this action to
9 be consistent with bioethical principles,
10 even though it removes the ability of some
11 minors to consent to puberty blockers?
12         MS. TOYOMA:  Object to the form.
13     Q.   You can answer.
14     A.   I think it might be possible, but
15 let me just try to be precise here.  And
16 again, I want to be clear, this is outside
17 what I've been asked to opine on as an
18 expert in this case.  I'm being brought on
19 as an expert on off-label use and about
20 what's available to the state.  There are
21 other individuals in the case who are
22 particular experts on informed consent and
23 bioethics, and that's their role in this

77 (Pages 302 - 305)

Page 306

1  case. But here's how I'll tell you how I
2  think about it.
3       I think about cases where
4  patient, parent, and the physician are all
5  in agreement that something is in the best
6  interest of a child, this will promote that
7  child's welfare, and this also comports
8  with the autonomy of that child. There's a
9  very narrow sliver of cases where I could
10  imagine the state had good reason to
11  overcome that. But I can't say that's a
12  zero set from bioethicists, and I think it
13  also -- some bioethicists might find that
14  space to be larger than smaller, to be
15  frank.
16            (Defendant's Exhibit
17               31 was marked for
18               identification.)
19     Q.   I'd like to show you now what I'm
20  going to mark as Exhibit 31. It should be
21  there now. This is an article written by
22  Daniel Shumer and others. Dr. Shumer is
23  also an expert witness for the United

Page 307

1  States in this case. The title is: Role
2  of Assent in the Treatment of Transgender
3  Adolescents, published in the International
4  Journal of, I believe it's, Transgender
5  Medicine.
6       Do you agree that that's what
7  this document is?
8     A.   That's what it says it is, yes.
9     Q.   If we could scroll down to PDF
10  page five. And the first full paragraph,
11  starting with: There may be clinical
12  situations.
13       Just let me know when you're
14  there.
15     A.   I think I'm at the right
16  paragraph, yes.
17     Q.   He says: There may be clinical
18  situations where patients with carefully
19  diagnosed general dysphoria who otherwise
20  meet eligibility and readiness criteria,
21  are not able to provide meaningful consent
22  due to cognitive or verbal disability. In
23  other medical conditions, such as cancer or

Page 308

1  diabetes, medical interventions would never
2  be withheld from these patients provided
3  parents or guardians are available to make
4  proxy medical decisions. This comparison
5  requires acknowledgment that treatment of
6  gender dysphoria with pubertal suppression
7  and cross-sex hormones continues to remain
8  controversial is the subject of continued
9  research and requires careful
10  individualized assessment, whereas, the
11  decision to treat of cancer or diabetes
12  with medical interventions is typically not
13  controversial.
14       Do you disagree with Dr. Shumer's
15  assessment in this statement?
16     A.   So on this one, I'm going to want
17  to be careful to stay within my lane of
18  expertise, since I'm neither a clinical
19  oncologist nor clinical pediatric
20  endocrinologist or the like. I'm not sure
21  that I can say -- I could talk about the
22  differences regarding the informed consent
23  processes or how they're regarded in these

Page 309

1  two specialties.
2     Q.   Do you agree with Dr. Shumer that
3  reasonable people might view medical gender
4  transition interventions in minors as
5  different in time from other healthcare
6  interventions?
7          MS. TOYOMA: Object to the form.
8     A.   I certainly think, given the
9  national attention to gender-affirming
10  care, for example, that people, when you
11  ask them about it, it may elicit a
12  different set of reactions than cancer
13  care. So to that extent, if the question
14  is whether people think about them
15  differently, I think it's entirely possible
16  they do.
17     Q.   Are you aware that major medical
18  organizations in the United States,
19  including the AAP, support medical gender
20  transition interventions in minors?
21     A.   I believe that I'm aware that
22  there's a series of medical organization
23  that have supported it, yes.

78 (Pages 306 - 309)

I. Glenn Cohen                                              May 2, 2024

Page 310

1    Q.   Even though the AAP has not
2 conducted a systematic review of the
3 evidence; is that right?
4    A.   So on the question of systematic
5 review, I know that there are other experts
6 who are better aware of the formation, what
7 is the basis of the various medical
8 associations in this case.  And I probably
9 would defer to their expertise.  I don't
10 know that I could speak to specifically
11 what the AAP has or has not looked at.
12    Q.   Could you name another off-label
13 pediatric intervention of which you're
14 aware --
15    A.   I -- Sorry.  I thought you were
16 finished.  You might want to specify more.
17    Q.   Yeah.  Yeah.  I'm not done yet.
18       It's a bit of a long question, so
19 I'll try to go slowly.
20    A.   That's fine.
21    Q.   Could you name another off-label
22 pediatric intervention whose standard
23 course of treatment results in permanent

Page 311

1 sterility, whose treatment is recommended
2 by the AAP and whose treatment is banned in
3 Europe?
4    A.   In part because I'm not aware of
5 exactly what the AAP does and does not
6 recommend, I don't think I'm the expert
7 best suited to answer that question.
8    Q.   So you can't name another
9 pediatric intervention?
10    A.   So the question is -- If you
11 would repeat it once again, maybe I can.
12 But that was the part that I got stuck on a
13 little bit, Counsel.
14    Q.   I'm sorry.  Are you saying you're
15 confused about whether medical transition
16 -- gender transition interventions in
17 minors are recommended by the AAP?
18    A.   I think that I maybe got stuck on
19 the question when you mentioned that part.
20 Will you repeat the question?
21    Q.   Could you name another off-label
22 pediatric intervention whose standard
23 course of treatment results in permanent

Page 312

1 sterility, whose treatment is endorsed by
2 the AAP, and whose treatment is banned in
3 European countries?
4    A.   Yeah.  So the part where I'm
5 having trouble, Counsel, is the part about
6 endorsed by the AAP.  I don't know the full
7 scope of procedures, prescriptions, and the
8 like, outside of this case, where the AAP
9 has endorsed it.  Just because I'm not a
10 clinician, I'm not that familiar with what
11 the AAP endorses.
12    Q.   Are you testifying that you don't
13 know whether the AAP has endorsed the
14 medical gender transition interventions in
15 minors?
16    A.   No.  It's the comparison you've
17 asked me for, Counsel.  You said could I
18 name another.  Right?
19    Q.   So the answer is no, you can't
20 name another?
21    A.   The answer is that because I'm
22 not aware of the full scope of what the AAP
23 endorses, I can't give an answer to that

Page 313

1 question.
2              (Defendant's Exhibit
3               39 was marked for
4               identification.)
5    Q.   Okay.  I'd like to show you what
6 I'm going to mark as Exhibit 39.  And this
7 is a provision of the California Health and
8 Safety Code.
9    A.   Okay.  Thank you, Counselor.  You
10 can go ahead.
11    Q.   Sure.  So the first sentence of
12 this, you'd agree this appears to be
13 California Health and Safety Code, Section
14 11153?
15    A.   It does so appear, yes.
16    Q.   And you see in Section (a) it
17 says:  A prescription for a controlled
18 substance shall only be issued for a
19 legitimate medical purpose by an individual
20 practitioner acting in the usual course of
21 his or her professional practice, with some
22 additional limitations after that?
23    A.   I do see that, yes.

79 (Pages 310 - 313)

Page 314

1    Q.   And you see in subsection (b)
2  that a violation of this section is
3  punishable by imprisonment under the penal
4  code or a fine?
5    A.   I do see that, yes.
6    Q.   So you would agree, this is
7  another state law that criminalizes a
8  physician's prescribing of an FDA-approved
9  drug in certain circumstances?
10   A.   So I want to be careful here.  It
11 refers to a prescription for controlled
12 substances.  And I presume, as California
13 defines the term controlled substances,
14 some of them are FDA approved.  That's
15 actually not something I can state because
16 it's not something I've reviewed myself.
17   Q.   So on that assumption, you would
18 agree that this is a state law that
19 criminalizes a physician's prescribing of
20 an FDA-approved drug in certain
21 circumstances?
22   A.   I'm just reading it more
23 carefully just to make sure.  So I am

Page 315

1  getting a little bit wrapped up in the
2  language here, Counsel.  I'll just narrate
3  a little bit what's tripping me up.  The
4  second sentence says: The responsibility
5  for the proper prescribing and dispensing
6  is upon the prescribing practitioner but a
7  corresponding responsibility rests with the
8  pharmacist who fills the prescription.
9        I would just want to make sure
10 that this is a provision about physician
11 behavior rather than pharmacist behavior.
12 I'm having a little trouble kind of doing
13 that, from this statute in part, because
14 (c) refers to expanding the scope of
15 practice of a pharmacist.  So I might need
16 to see a little bit more of the statutory
17 scheme.
18   Q.   Is it your testimony that on your
19 reading of the statute, this subsection (a)
20 only results the pharmacist?
21   A.   I think I need to look to see
22 more.  That does say any person who only
23 violates this section, but I just want to

Page 316

1  read it carefully to get a sense and to
2  read the code provisions before and after
3  to get a better sense whether this is meant
4  to reach prescribing physicians,
5  pharmacists, or both.
6    Q.   You think there's some ambiguity
7  in the phrase the responsibility for the
8  proper prescribing and dispensing of
9  controlled substances is upon the
10 prescribing practitioner?
11   A.   It's actually the rest of the
12 sentence, Counselor.  But a corresponding
13 responsibility rests with the pharmacist
14 who fills the prescription.  And the fact
15 that (c) refers to the scope of practice of
16 a pharmacist but doesn't refer to the scope
17 of practice of a physician.
18        And, again, I'm not trying to be
19 difficult here.  It may very well be this
20 is a code provision that does apply to
21 both, I just need to take a closer look and
22 read the statute more carefully.
23   Q.   You didn't look at it before you

Page 317

1  wrote your report in this case?
2    A.   This is not a statute that I
3  reviewed as part of my report, that's
4  correct.
5             (Defendant's Exhibit
6              40 was marked for
7              identification.)
8    Q.   All right.  I'd like to show you
9  what I'm going to mark as Exhibit 40.
10   A.   Okay.  I believe we have it.
11 David L. Cowen.
12   Q.   That's right.
13   A.   1994.
14   Q.   That's right.  This appear to be
15 entitled Development of State
16 Pharmaceutical Law published in the
17 Pharmacy and History Journal in 1995; is
18 that right?
19   A.   It does appear to be that,
20 exactly.
21   Q.   If you could go to the second
22 page of the article, page fifty of the
23 article.

80 (Pages 314 - 317)

I. Glenn Cohen                                                    May 2, 2024

Page 318

1    A.   Okay.
2    Q.   In the middle of the first
3  column, he says:  It is worth noting that
4  even before the passage of pharmacy
5  practice acts, that is before 1870, under
6  the police power, at least twenty-five
7  states or territories had some statutory
8  provisions against drug alteration, over
9  twenty-five had legislation regulating the
10 sale of poisons and over twenty-five had
11 laws on abortion, some specifically
12 prohibiting the sale of abortifacients by
13 pharmacists.
14       You don't disagree with that
15 historical account, do you?
16   A.   Here I want to be careful,
17 because I'm not an expert on the preFDA
18 regime or the history of pharmaceutical
19 regulation in America.  So I don't know
20 that I could speak one way or the other
21 whether this is an accurate statement or
22 complete statement.
23   Q.   And today, you have no reason to

Page 319

1  disagree with that statement?
2    A.   Today, there's nothing that gives
3  me a reason to disagree with it.  But as I
4  said, I don't want to exceed my own
5  competency and my own expertise on these
6  matters.
7           (Defendant's Exhibit
8            41 was marked for
9            identification.)
10   Q.   If I could show you Exhibit 41,
11 which should be available.
12   A.   Great.  We're going to bring that
13 up.
14   Q.   This is a publication entitled
15 The Pharmaceutical Regulatory Process,
16 Second Edition, Volume 185.
17       Is that consistent with what you
18 see?
19   A.   That's what I see on the screen.
20 Exactly.
21   Q.   Okay.  And it looks like, based
22 on later material, it was published in
23 2008?

Page 320

1    A.   That's correct.  2008 by
2  International Regulatory Business
3  Consultant and another consultant.
4    Q.   All right.  Give me just one
5  second.  If you would scroll down to page
6  one of the document.
7    A.   Okay.  Actual one or Roman one?
8  Sorry.
9    Q.   Actual one.
10   A.   Let me just make it a little bit
11 bigger on my screen, if that's okay.
12   Q.   Yep.
13       MS. TOYOMA:  Actual one, which is
14 PDF page?
15   Q.   Page 1 of 492.  Anyway it's this
16 page that I have on the screen.
17       Do you see that?
18   A.   I do.
19   Q.   The highlighted section says:  By
20 the turn of the 20th century, Connecticut,
21 Georgia, Illinois, Iowa, the Oklahoma
22 territory, California, and most other
23 states had outlawed drug adulteration

Page 321

1  and/or failure to label a medicine that had
2  morphine, cocaine, digitalis, nux vomica,
3  chloroform, cantharides, strychnine, ergot,
4  or a host of other substances.  Typically
5  violations were considered as misdemeanors
6  and were penalized accordingly.
7           Once again, sitting here today,
8  you have no reason to disagree with this
9  historical account, do you?
10   A.   That is correct.  I'm not an
11 expert on the history of FDA so I don't
12 think I can speak one way or the other.
13 But I know of nothing that would suggest
14 that this is wrong at the moment.
15       MR. MILLS:  Okay.  I know we've
16 been going for a little while, would y'all
17 like a break?
18       COURT REPORTER:  Sure.
19           (Recess taken.)
20           (Defendant's Exhibit
21            23 was marked for
22            identification.)
23   Q.   All right.  I'd like to show you

81 (Pages 318 - 321)

Page 322

1  what I'm marking as Exhibit 23.  And this
2  is an article you mentioned earlier that
3  you cowrote in the Cell Reports Medicine
4  journal entitled Legislation Restricting
5  Gender-Affirming Care for Transgender
6  Youth:  Politics Eclipse Healthcare.
7        Do you see that?
8     A.   Still getting it up.  I think we
9  have it up now, yes.
10    Q.   All right.  This is an article
11 you cowrote; is that right?
12    A.   That is correct.
13    Q.   And how did this article come
14 about?
15    A.   So for this one, I believe we had
16 done an article already in JAMA, the
17 Journal of the American Medical
18 Association, and I believe it might have
19 been the editor of Cell Reports Medicine,
20 or an editor, reached out to us saying they
21 were interested in having us write about
22 this, because there have been some
23 legislative changes since we wrote the JAMA

Page 323

1  piece.  That's my recollection.  I could go
2  back to my emails to be 100 percent sure,
3  but I think that's how this one came about.
4     Q.   Who approached you about writing
5  it?
6     A.   I believe it was the editor in
7  charge of the commentary section in JAMA
8  Cell Reports Medicine, but I have to go
9  back to double-check, but that's my
10 recollection.
11    Q.   And were you paid for authoring
12 this article?
13    A.   I was not.
14    Q.   Do you know if anyone -- any
15 peers reviewed this article, other than the
16 coauthors?
17    A.   So for this one, I have to say, I
18 have to go back and look to see what the
19 peer review process was for Cell Reports
20 Medicine, whether we got peer review
21 comments or not.  Unlike JAMA, where I do a
22 lot of articles for them, so I'm very
23 familiar with their editorial process and I

Page 324

1  know a little bit more about whether the
2  category as a whole is peer reviewed or
3  not.  This one -- I think I've only done
4  one article ever for this journal, so I'm
5  not sure the question about whether it went
6  through peer review or not.  I could find
7  out the answer, but I don't know it off the
8  top of my head.
9     Q.   Here on the bottom of page four,
10 the bottom of the second column, you
11 wrote --
12    A.   Maybe you want to put it up on
13 the screen so the reporter can pronounce
14 it.  Page four, bottom of the second
15 column.
16    Q.   Here you're referring
17 specifically to the Alabama and Arkansas
18 laws.  And you say:  First, these laws
19 violate the rights of transgender minors
20 under the 14th Amendment's Equal Protection
21 Clause because, and then you explain your
22 argument.
23        So before becoming involved in

Page 325

1  this case, you already believed that the
2  Alabama law violated the federal
3  Constitution?
4     A.   So let me be a little precise
5  here, Counsel.  If we could move to the
6  paragraph before the paragraph you started
7  with.  Right?  It begins:  Transgender
8  minors, their parents, their healthcare
9  providers have brought several legal
10 challenges.
11        So I think part of what we're
12 doing here is just documenting the legal
13 challenges that have been brought and the
14 claim that are being made here.
15    Q.   Are you testifying that a
16 suggestion of this article is not that you
17 agree with that argument under the 14th
18 Amendment the Equal Protection Clause?
19    A.   I'm happy to kind of discuss my
20 views about the matter, because as a strict
21 matter here, in part because also I have
22 three coauthors, and I want to just be
23 careful about what we've actually written

82 (Pages 322 - 325)

Page 326

1  here.  Right?  This paragraph -- Go ahead.
2      Q.   I guess I'm confused.  Because in
3  the third column you say:  Third, these
4  laws likely violate the Equal Protection
5  rights of physicians, so that strikes me as
6  an unusual way to describe the arguments
7  that others are making, the fact it makes
8  it appear that your first, second, and
9  third are really your own views on these
10  claims.
11         So could you clarify that?
12      A.   Yeah.  So it may be that here our
13  language is a little bit loose.  I want to
14  be careful here, so I'm very happy to
15  represent my own views about these laws; I
16  want to be careful about my coauthors and
17  not speak for them.  I think we are doing
18  some reportage here about the various
19  statutes that have been brought and
20  reporting from the cases and kind of
21  suggesting where we think the cases are
22  correctly decided and the like, that that
23  much is true.  But I also want to be clear

Page 327

1  here that we are also doing a recounting
2  function of the claims that have been
3  brought.
4      Q.   But you would agree that before
5  becoming involved in this case, you
6  believed that the Alabama law violates the
7  federal Constitution?
8         MS. TOYOMA:  Objection to form.
9      Q.   You can answer.
10      A.   I again want to be clear here
11  that this is not the question I've been
12  asked to offer my expert view on.  I also
13  just want to be clear here that you're
14  asking me for my views about what the law
15  is on the matter.  Right?  So I'm happy to
16  do that.  An unusual thing for an expert to
17  do.  I'm happy to offer my views on the
18  matter, but I do have views on the matter.
19      Q.   Yes.  I'm asking your personal
20  view.  Do you believe that Alabama's law --
21  Did you believe, before becoming involved
22  in this case, that Alabama's law violates
23  the federal Constitution?

Page 328

1      A.   My view was that based on the
2  case law, up until that point in what I
3  read about the case law and what I've read
4  about Constitution law and the like, that
5  there are strong arguments that Alabama's
6  law violates the Constitution, yes.
7      Q.   My question was not whether there
8  are strong arguments.  Did you believe that
9  Alabama's law violates the federal
10  Constitution?
11      A.   So I want to be careful here,
12  because -- and, again, I'm sorry to be a
13  law professor at this moment.  Right?
14  There's a predictive question.  So the
15  question you've asked susceptible to two
16  meanings and we should be clear about
17  which.  One is predictive matter, what I
18  think the courts will do, what the U.S.
19  Supreme Court will do; the other is my best
20  understanding that the Constitution
21  requires.  Maybe you're asking both, maybe
22  you're asking one, maybe you're asking the
23  other.

Page 329

1      Q.   I'm asking the latter.
2      A.   So what I think the right answer
3  is, should the law be declared
4  unconstitutional?
5      Q.   That's right.
6      A.   I do believe that.
7      Q.   And you believed that before
8  becoming involved in this case; correct?
9      A.   That's correct.
10      Q.   And you publicly stated that
11  position?
12      A.   Well, here I think it's a little
13  bit careful about what's been publicly
14  stated in terms of this particular article.
15  But I think in this particular article, we
16  are, for the most part, either describing
17  the claims that have been brought and our
18  view that these laws likely violate
19  the Equal Protection Rights position, I
20  think we'll stand behind that.
21         So everything you see on this
22  page, I think we'll stand behind.  But
23  whether to characterize it in the way

83 (Pages 326 - 329)

Page 330

1  you're characterizing it, I'm not quite
2  sure I would agree.
3      Q.   Are you saying in no article did
4  you advance your own position that the
5  Alabama law violates the federal
6  Constitution?
7      A.   I want to be careful because
8  you're asking about this article here and
9  just the way we phrased it here, and I want
10 to look at the language I've used in the
11 other just to be very precise about it,
12 Counsel.
13     Q.   I'm not asking about this
14 article.  I'm asking anywhere else publicly
15 did you state your view that the Alabama
16 law violates the federal Constitution
17 before you became involved in this case?
18     A.   So here I want to just say
19 here -- just to be very precise here, all
20 the statements we make in this article, I
21 stand behind.  You've interpreted those
22 arguments in a particular way.  I'm
23 perfectly happy to say they are what I

Page 331

1  believe.  But whether they amount to
2  stating publicly that we think the law is
3  unconstitutional, I think is a little bit
4  matter of interpretation here, and I want
5  to be careful because I have coauthors
6  here, and I don't want to speak for them.
7      Q.   Again, I'm not asking about this
8  article in particular now.  I'm asking did
9  you publicly state, before becoming
10 involved in this case, that you believed
11 Alabama's SB 184 violates the federal
12 Constitution?
13     A.   And to be clear, you mean outside
14 of this article or do you mean including
15 this article?
16     Q.   Anywhere, whether including this
17 article or not.
18     A.   Okay.  So, again, not trying to
19 be difficult here, Counsel, but I think
20 what we've said here, you've interpreted
21 that, my understanding, as a statement to
22 the effect that we believe the law is
23 unconstitutional.  Right?

Page 332

1      Q.   I don't think the question is
2  really that complicated.  Whether here or
3  anywhere else, did you say publicly that
4  Alabama's law violates the federal
5  Constitution?
6      A.   I think we've said here and
7  elsewhere that we think there's strong
8  argument it should be declared
9  unconstitutional.  My own view is it should
10 be declared unconstitutional.  Be happy to
11 look at language elsewhere involved just to
12 be precise of what we said.
13         My own view is that probably I
14 think there is interpretation of what we
15 said here.  If that is the case, I agree
16 that I think at the time when I wrote this,
17 I believed the law should be struck down as
18 unconstitutional.
19     Q.   This article in Cell Reports
20 magazine ignores every systematic review of
21 the evidence in this field, including the
22 European reviews; is that right?
23         MS. TOYOMA:  Object to the form.

Page 333

1      Q.   You can answer.
2      A.   Yeah.  So as with much coauthored
3  work, this paper was coauthored.  As the
4  lawyer, I'm one of the lawyers on the team,
5  my primary responsibility was that portion
6  of the article.  The individual with
7  medical expertise, Dr. Turban, was
8  responsible primarily for reviewing the
9  medical documents and the statements by
10 various organizations.  I can't speak
11 directly to what he reviewed or didn't
12 review or what he ignored or didn't ignore.
13 So I think that's probably the best answer
14 I can give you on that.
15     Q.   Is a systematic review of the
16 evidence in this field included in your
17 references in this article?
18     A.   I do not believe that is the
19 case, but I'd have to look over the
20 references in the article.  As I said, when
21 it comes to reviewing what the evidence
22 was, that was not particularly my primary
23 responsibility in the article.

Page 334

1          (Defendant's Exhibit
2           36 was marked for
3           identification.)
4     Q.   I'd like to show you now what
5 I've marked as Exhibit 36.
6     A.   Great.  I have it in front of me.
7     Q.   Okay.  And this appears to be an
8 Amicus brief you signed that was filed
9 November of 2023, in the 11th Circuit in a
10 case called Dekker versus Secretary.  Would
11 you agree?
12    A.   Yes.  That was what it is.  I'm a
13 signatory to this Amicus brief.
14    Q.   How did this brief come about?
15    A.   The authors of the Amicus brief
16 approached me and a number of other
17 scholars and bioethics public health law to
18 consider signing as a signatory to this
19 brief.
20    Q.   By the authors, do you mean the
21 lawyer authors?
22    A.   I believe they're the ones who
23 reached out to me, yes, that sounds

Page 335

1 correct.
2     Q.   And did anyone else reach out to
3 you about joining this brief?
4     A.   Not that I can recollect.
5     Q.   I see there are several
6 professors who joined this brief with you.
7 And this is in the appendix, starting on
8 PDF page thirty-six, if you want to look at
9 it, but I'm not asking specific
10 questions --
11    A.   There were about a hundred and
12 ninety of us, it looks like.  I'm sorry.
13 I'm looking at the wrong place.
14    Q.   Yeah.  That's everybody.
15    A.   That would be a long one.  It's
16 towards the end of the day, excuse me.  On
17 page fifty-three and fifty-four, yes,
18 you're right.
19    Q.   So were you all -- To your
20 knowledge, were these other professors also
21 contacted by the law firm?
22    A.   You know, I actually don't know
23 about how they were contacted.  That would

Page 336

1 be my guess, if you asked me to guess about
2 it.  But I don't think I have any knowledge
3 about the matter.
4     Q.   So you weren't all on a list
5 together and received one email?
6     A.   You know, I could go back and
7 look.  I'm not sure the answer to that,
8 whether they emailed us individually or if
9 there was a group list.  I honestly don't
10 know off the top of my head.
11    Q.   You've been involved in a number
12 of Amicus efforts, both in this area and
13 other types of cases; is that right?
14    A.   That is correct.  Yes.
15    Q.   And typically, when you join
16 these scholars briefs, is it a list of
17 professors who sign on to -- who consider
18 signing on to briefs or are you approaching
19 it individually?
20    A.   It's varied.  So in my experience
21 -- And again, it's somewhat limited
22 experience.  But in my experience, they
23 have a list of individuals to who they will

Page 337

1 reach out.  But whether they email us one
2 by one or email us in a larger number,
3 practices vary.  I'm not sure there's a
4 standard practice.
5     Q.   Who paid for this brief?
6     A.   That is not something I could
7 tell you.  I'm not aware of who -- whether
8 it was done pro bono by the law firm or
9 what.  I participated without pay, I can
10 tell you.
11    Q.   I'm sorry.  What did you say?
12    A.   I was not paid for my
13 participation, just to be clear.
14    Q.   What input did you provide on
15 this brief?
16    A.   So this is a series of briefs
17 regarding these cases that have been
18 percolating a number of circuits.  And I'd
19 have to kind of go back to determine
20 whether I gave input at the initial first
21 one that was filed and carried over or
22 whether, in fact, I gave input on this
23 particular one and where it was in the

Page 338

1    sequence.
2        What I can typically tell you
3    about how these signatories to Amicus brief
4    is, you're invited to join, there's a
5    period of time where they will consider
6    feedback.  You can provide feedback as a
7    law professor.  That feedback is accepted,
8    rejected as all the authors of the Amicus
9    brief determine, and you're given a final
10   sign-off on the brief and your decision
11   whether to join or not.
12       Q.   Why did you join this brief?
13       A.   I joined this brief because I
14   believed in the arguments being made.
15       Q.   And you didn't receive any
16   benefits from joining the brief?
17       A.   Not as far as I know.
18       Q.   I want to look at page seventeen
19   of this brief.  The highlighted portion,
20   which I've put on the screen, here.
21       A.   Great.  Let me just find
22   seventeen.  Give me a moment.  Okay.  I
23   have it in front of me.  Let me just look

Page 339

1    at it quickly here.  Great.
2        Q.   You say here:  A drug cannot be
3    marketed for a use different from its
4    FDA-approved use.
5        You still agree with that
6    description?
7        A.   Yeah.  To be clear, these are the
8    words of the authors of the Amicus brief.
9    I signed on to these words.  I might have
10   phrased it slightly differently.
11       I think by marketed, they're
12   referring here to promotion, for example,
13   in the FDCA sense.  But I agree with the
14   general way that that's binded.
15       Q.   If you could look at page twelve
16   of the Amicus brief.
17       A.   Let me find that.
18       Q.   It says:  Under the GRADE system,
19   which is often used for presenting
20   summaries of scientific evidence and making
21   clinical practice recommendations.  Do you
22   still agree that the GRADE system is often
23   used for presenting summaries of scientific

Page 340

1    evidence and making clinical practice
2    recommendations?
3        A.   So here I want to be a little bit
4    careful.  And this is an area of a case
5    where I know many of your experts have
6    opined and many of those people have
7    greater expertise than I do, in terms of
8    the GRADE system and how it's used.
9    There's nothing in this statement that
10   strikes me as erroneous, but I also want to
11   recognize we're reaching the edge of my
12   expertise in this case and not getting over
13   my skis.
14           (Defendant's Exhibit
15            35 was marked for
16            identification.)
17       Q.   All right.  I'd like to show you
18   what I'm going to mark as Exhibit 35.
19       A.   K.C. Amicus?
20       Q.   Yes.
21       A.   This is the 7th Circuit.  Great.
22       Q.   This is an Amicus brief you
23   signed in the 7th Circuit in a case called

Page 341

1    K.C. versus individual members filed
2    September 27, 2023; right?
3        A.   That's correct.
4        Q.   You said there was a line of
5    Amicus briefs.  Is this a prior brief in
6    that line?
7        A.   I believe that's correct.  I
8    believe it comes prior to the 11th Circuit
9    one.  I'd have to check about the dates,
10   because many of them were tightly connected
11   in time.  But this is another one that I
12   believe was part of the series.
13       Q.   And so this brief came about in
14   the same way as the one we just talked
15   about?
16       A.   Correct.  Now, it may be that,
17   again, where it is in sequence, probably
18   the way they got people onboard to write
19   the first Amicus brief might look a little
20   different than the subsequent one because
21   those evolved.  You already signed onto
22   this one, we have a new one, would you like
23   to think about it, et cetera, et cetera,

Page 342

1  I'd like to acknowledge they may be
2  slightly different from one another, but I
3  think in substance and in terms of how
4  we're discussing it, relatively the same.
5      Q.   Sure.  And, again, you weren't
6  given any money or other benefits for
7  joining this brief?
8      A.   That is correct.
9      Q.   And did anyone other than the
10 signatories and the lawyers listed as
11 counsel for Amici on the brief offer input
12 to this brief or the other briefs in this
13 line of Amicus briefs?
14     A.   I can only speak to the input
15 that I gave.  I don't know that I can speak
16 to what input was given by others one way
17 or the other.
18     Q.   You didn't see any input given by
19 others?
20     A.   I don't think I saw input given
21 by anyone other than people who were
22 approached to be Amici by the lawyers.
23 That's my recollection.

Page 343

1      Q.   You didn't file an Amicus brief
2  in the 11th Circuit in this case involving
3  SB 184, did you?
4      A.   I think that's right, I don't
5  think I did.  It had a different name, I
6  believe, when it was up in front of the
7  11th Circuit.  Right?
8      Q.   That's right.  It was called
9  Eknes-Tucker.  So why didn't you file a
10 brief in the 11th Circuit in this case?
11     A.   I'd have to go back to my records
12 to look at the time of the filings to
13 determine.  Do you know what the date of
14 the filing of the Amicus brief was?  That
15 would help me try to remember the
16 circumstances.
17     Q.   I don't know that there was an
18 Amicus brief, actually.
19     A.   Okay.  So that may be the answer
20 to the question, is that the group that
21 organized the Amici had approached me not
22 to file the Amicus brief.  If that's the
23 case, there would be no reason to approach

Page 344

1  me.
2      Q.   So you don't know why a version
3  of this Amicus brief wasn't filed in
4  Eknes-Tucker?
5      A.   I don't have any information
6  about that.
7                   (Defendant's Exhibit
8                    25 was marked for
9                    identification.)
10     Q.   I'd like to show you what I'm
11 marking as Exhibit 25.
12     A.   Great.  We'll bring it up.
13     Q.   I believe this was the JAMA,
14 perhaps, predecessor article that we were
15 just referring to that you coauthored; is
16 that right?
17     A.   Yes.  Right.  This is correctly
18 that.  I'll name what it is.  It's an
19 article from 2021, Volume 325, Number 22,
20 from June 2021.  The JAMA Legislation to
21 Criminalize Gender-Affirming Medical Care
22 For Transgender Youth, coauthored by Jack
23 L. Turban, Katherine L. Kraschel, and I.

Page 345

1  Glenn Cohen.
2      Q.   Okay.  How did this article come
3  about?
4      A.   In this one I think I was
5  approached by either Dr. Turban, or now
6  Professor Kraschel, back then she was the
7  director of the Solomon Center, to consider
8  coauthoring a viewpoint on the subject with
9  either one or the other of them.  They may
10 have also both jointly approached me.  I
11 can look it up if it's important, but I
12 can't quite remember off the top of my
13 head.
14     Q.   Why do you understand that they
15 approached you?
16     A.   I think it's because I'm probably
17 the leading scholar in health law and
18 bioethics in America, or, if not, one of
19 the leading scholars.
20     Q.   Who paid for this article?
21     A.   My participation was not paid for
22 in this article.
23     Q.   Do you know if anyone's

I. Glenn Cohen                                                May 2, 2024

Page 346

1  participation was paid for?
2      A.   There's typically a conflict of
3  interest statement at the end of these
4  articles.  So I can look to see what it
5  states about the other authors.
6          It looks like -- I can read it if
7  you'd like me to.
8      Q.   That's okay.  It doesn't include
9  a conflict of interest for you?
10     A.   That's correct.  Because it says:
11  No other disclosures reported, so that's
12  the reason when you basically don't have a
13  conflict to disclose, that's what they say.
14     Q.   Okay.  It doesn't disclose
15  anything about financial incentive for this
16  particular article?
17     A.   So I speak to my own financial
18  incentives, that I didn't have one.  It
19  doesn't disclose that I have one because I
20  don't.
21     Q.   Did the journal solicit this
22  article?
23     A.   This one, I don't believe was

Page 347

1  solicited by the journal.  I'd have to go
2  back and look, but I think it was that
3  instead we initiated the initial submission
4  to the journal.
5      Q.   And do you know who reviewed this
6  article before it was published?
7      A.   I don't.  So typically, when
8  there is peer review, the peer reviewer
9  identities are hidden from view from the
10  authors.  And as I mentioned before, with
11  JAMA Viewpoints, in some instances they
12  share the peer review comments without
13  disclosing the names of the peer reviewers;
14  in other instances, they don't share the
15  peer review comments because of the nature
16  of the comments; and in some instances some
17  of the JAMA Viewpoints may not go through a
18  full peer view and they get reviewed at the
19  editor level.
20          It's changed a little bit over
21  time, and it's a practice that I'm not
22  exactly clear on because I'm on the other
23  side of the process.

Page 348

1      Q.   I'd like to look at page two of
2  the article, the first highlighted at the
3  scene of the accident says:  -- after
4  you've summarized some of the legal
5  arguments, I guess, laws like this, you
6  say:  The uncertainty over success
7  heightens the need for advocacy now, to
8  keep proposed legislation from becoming
9  law.
10          So before Alabama enacted SB 184,
11  you were calling for advocacy against it;
12  is that right?
13     A.   I think it's fair to say that I
14  was calling for -- We, as coauthors, were
15  calling for advocacy against this approach
16  to the problem, yes.
17     Q.   The next highlighted portion
18  says:  Physicians and mental health experts
19  in states considering these bills should
20  consider contacting their state
21  representatives to provide them with
22  evidence-based information about
23  transgender youth, their medical care, and

Page 349

1  how physicians can best support these
2  patients.
3          So you and your coauthors were
4  telling people to contact state
5  representatives to oppose laws like SB 184;
6  is that right?
7      A.   So just to be a little bit
8  precise here, Counsel, we talked about
9  providing evidence-based information about
10  transgender youth, their medical care, and
11  how the physicians can best support these
12  patients.  It's possible that someone could
13  do that in support of the law as well.
14          I think it's fair to characterize
15  our views as represented by the paragraph
16  above, that the goal would be to try to
17  prevent the passing of these kinds of laws.
18  The call in the last paragraph is actually
19  for people to share information that's
20  relevant to legislators.
21     Q.   Could one piece of that
22  evidence-based information be a systematic
23  review of the evidence in this field?

88 (Pages 346 - 349)

Page 350

1    A.   I think that would be an example
2  of evidence-based information, yes.
3    Q.   But that's not a piece of
4  information that you cite as a reference in
5  this article, is it?
6    A.   So I'd have to go through the
7  citations with some more fine-tooth comb
8  here.  As I said, first part of the article
9  regarding the state of the medicine, I
10  appropriately deferred to my medical
11  colleagues in terms as the first author on
12  that, although there was nothing I saw that
13  was wrong about it.
14       If I go through and just like
15  spot read them right now, I don't think he
16  cited to any systematic review on the
17  question.
18    Q.   Have you been paid for services
19  by any pharmaceutical companies?
20    A.   I have been paid as an ethics
21  consultant in various capacities.  So as an
22  ethics consultant for OxaCo as a bioethics
23  advisor to and part of the bioethics

Page 351

1  advisory committee for Illumina.  And I'm
2  on Bayer bioethics committee, that's not
3  just pharmaceuticals, that's crop sciences,
4  consumer products, and the like, those are
5  some examples of instances where I've
6  worked with pharmaceutical companies.
7    Q.   Are there any others?
8    A.   You know, I'd have to go through
9  and think whether there are any others that
10  come to mind.  None jump to mind at the
11  outset.
12       I've occasionally given talks to
13  organizations that are kind of on the
14  border of traditional Pharma, so for
15  example they're in the big data or
16  healthcare space and the likes, but not
17  traditional pharmaceutical companies.
18  Those are the three main instances that
19  come to mind, but I could definitely do a
20  more searching review.
21    Q.   Do you know if you've been paid
22  for services by any companies that make
23  drugs used in medical gender transition?

Page 352

1    A.   So here I'm not sure I'm aware of
2  every generic and every branded drug that's
3  involved in every accessed care in United
4  States.  My short answer is, I don't
5  believe I've been paid by any of the
6  organizations I've worked with and been
7  paid in this way do make the drugs in
8  question.  But it's something I could
9  definitely look at if I'm wrong about that.
10    Q.   Have you had any communications
11  with -- Sorry.  Scratch that.
12       Do you know what WPATH is?
13    A.   I've seen WPATH referred to in
14  the literature, including some of the
15  expert reports, so I have a vague kind of
16  awareness of who they are.
17    Q.   And have you had any
18  communications with them?
19    A.   Not as far as I know.
20    Q.   Have you had any communications
21  with the AAP about the medical gender
22  transition of minors?
23    A.   Not as far as I know, no.

Page 353

1    Q.   Have you had any communication
2  with the Endocrine Society about medical
3  transition interventions in minors?
4    A.   Not that I can recall, no.
5    Q.   Have you ever communicated with
6  any individual Plaintiffs in this case?
7    A.   I would want to review the full
8  list of Plaintiffs.  But as far as I know,
9  the answer is no.
10    Q.   Have you had any communications
11  with the Plaintiffs' lawyers in these cases
12  -- in this case?  Sorry.
13    A.   I think while intervenor counsel,
14  I've had plenty of communications with the
15  DOJ, I can't recall an instance where I've
16  had communication with Plaintiffs' counsel
17  in this case.  I'm not even sure I know who
18  Plaintiffs counsel in this case is, to be
19  honest.
20    Q.   Have you had any communications
21  with the ACLU about medical gender
22  transition interventions in minors?
23    A.   I believe I might have been

Page 354

1  retweeted by the ACLU for some of the
2  publications I've done in this particular
3  case.  That's kind of what I can recollect.
4  I don't know if that's a communication or
5  not in the means that you mean.  My guess
6  is that's not what you have in mind, but I
7  can't think of an instance where the ACLU
8  and I directly connected about this case.
9      Q.   What about the National Center
10  For Lesbian Rights?
11      A.   I don't -- I cannot recall any
12  instance where I communicated with them
13  about this case.
14      Q.   What about with GLAD?
15      A.   I also can't recall any instance
16  where I've communicated with them about
17  this case.
18      Q.   I guess my question was really
19  communicated with them about medical gender
20  transition of minors.
21      A.   Yeah.
22      Q.   Is the answer any different for
23  ACLU, National Center For Lesbian Rights,

Page 355

1  or GLAD?
2      A.   I don't think so.  It's possible
3  that when we published the paper, I might
4  have got an email one way or the other from
5  them, kind of, you know, criticizing our
6  word choice or saying this is a very
7  helpful article or very interesting.  But I
8  don't have any recollection of myself
9  communicating with them in any way that's
10  like substantive.
11      Q.   What about with Lambda Legal?
12      A.   No recollection of any
13  communication with them about this
14  particular case.
15      Q.   Are you a registered Democrat?
16      A.   I'm not quite sure what my
17  registration is at the moment.  Whether I'm
18  registered as an Independent or a Democrat
19  or whether I'm unregistered.
20      Q.   Have you ever voted for a
21  Republican in a presidential election?
22      A.   I only became a citizen somewhere
23  along the way, so I'd have to think back

Page 356

1  how many elections I voted in.  But the
2  answer is, no, I have not voted for a
3  registered Republican in any of the past
4  two, or maybe three presidential elections
5  where I've been able to vote.
6      Q.   And how many Republicans have you
7  voted for at any federal level?
8      A.   So, again, I've only voted in a
9  few elections, and I don't recall voting
10  for a federal candidate in Massachusetts at
11  the federal level.  So that would be where
12  I would have made the votes.
13      Q.   Do you agree that medical
14  organizations like the AAP are subject to
15  biases?
16      A.   I think we're all subject to
17  biases, as human beings.  I think FDA is
18  subject to biases.  I think everybody is
19  subject to biases, and in that inclusion of
20  everybody, I would include medical
21  organizations.
22      Q.   You agree that they could be
23  ideologically biased?

Page 357

1      A.   I don't know enough about who
2  sits as part of the organization to be able
3  to say in their particular case.  But my
4  view is that it's possible for any
5  organization to be susceptible to
6  ideological biases among other kinds of
7  biases.
8              (Defendant's Exhibit
9               20 was marked for
10               identification.)
11      Q.   I'd like to show you what I'm
12  going to mark as Exhibit 20.  I will let
13  you know when it's ready.  Give me just a
14  minute.
15      A.   We'll refresh.  HHS-016
16  something; is that right?
17      Q.   Yes.
18      A.   Great.
19      Q.   Do you recognize this document?
20      A.   I don't.
21      Q.   You haven't seen it before?
22      A.   It's possible it was somewhere in
23  the Record, but I don't think I've -- It

I. Glenn Cohen                                      May 2, 2024

Page 358

1  doesn't look familiar to me.
2     Q.   So earlier you had said you had
3  reviewed HHS productions in this case, of
4  which this is one.  I'm starting with Bates
5  stamped HHS-0169993, related to a STAT News
6  article.
7        Do you know what those documents
8  were?
9     A.   I could try to look up the Bates
10  numbers relating to them.  I believe it was
11  a news article that was a part of the
12  production.  And then there was some
13  materials related to the news article and
14  requests and the like here.
15        I don't know -- It's possible
16  that this was part of that production.  It
17  doesn't ring a bell, it doesn't look
18  familiar.  As I said, I quickly determined
19  that the whole set of production was not
20  something that was particularly relevant
21  for my expert reports, therefore, I didn't
22  spend time reviewing it.
23              (Defendant's Exhibit

Page 359

1              21 was marked for
2              identification.)
3     Q.   Okay.  If you could look at 21 --
4        MS. TOYOMA:  Briefly, I want to
5  mention, this document is labeled
6  confidential, attorney's eyes only, so
7  we'll take a look at redacting or
8  protecting it later on.
9        MR. MILLS:  Okay.
10        MS. TOYOMA:  Which exhibit did
11  you want us to look at?
12        MR. MILLS:  21.
13        MS. TOYOMA:  It looks like this
14  document is also confidential, attorney's
15  eyes only, and same thing applies.
16     Q.   That's right.  Bates stamp here
17  starts with HHS-01699973.
18        Have you seen this document
19  before?
20     A.   This document also doesn't look
21  familiar to me.  I could read through it to
22  try to determine to be sure, but it doesn't
23  look like something that I've actually

Page 360

1  focused on or read.
2        Would you like me to have a
3  closer read?
4     Q.   No.  That's okay.
5     A.   Okay.
6     Q.   If you'll give me just a minute.
7     A.   Of course.
8              (Defendant's Exhibit
9              22 was marked for
10              identification.)
11     Q.   Okay.  If we can go to Exhibit
12  22.  And this one is also going to be
13  labeled confidential, attorney's eyes only.
14  And it begins -- It's Bates stamped
15  HHS-0169992.
16        And have you seen this document
17  before?
18     A.   Similar to the others, it doesn't
19  look particularly familiar to me as a
20  document that I kind of spent any time
21  with.  Possible, as I was thumbing through
22  to figure out whether there was anything in
23  the production that was relevant, I might

Page 361

1  have glanced upon it, but not something I
2  spent time on.
3        MR. MILLS:  Okay.  If it would be
4  possible to take a five-minute break, that
5  would be great.
6        MS. TOYOMA:  Can we please get a
7  time check before we break?
8        COURT REPORTER:  We are at five
9  hours and thirty-six minutes.
10              (Recess taken.)
11        MR. MILLS:  Professor, I have no
12  further questions for you.
13        THE WITNESS:  Thank you very
14  much, Mr. Mills.
15        MS. TOYOMA:  No questions for the
16  United States.
17  (The deposition was concluded at 2:58 p.m.,
18  May 2, 2024.)
19
20
21
22
23

Page 362

1    REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4    I, Angela Smith McGalliard,
5  Registered Professional Reporter, Certified
6  Realtime Reporter, Certified Court Reporter
7  and Commissioner for the State of Alabama
8  at Large, do hereby certify that the above
9  and foregoing proceeding was taken down by
10  me by stenographic means, and that the
11  transcript was produced by computer aid
12  under my supervision, and that the
13  foregoing represents a true and correct
14  transcript of the proceedings occurring on
15  said date and at said time.
16    I further certify that I am neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
       Signed on May 3, 2024.
20
21        _/s/Angela Smith McGalliard_
22    ANGELA SMITH MCGALLIARD, RPR, CRR,
       AL CCR Lic. No. 98, Expires 9/30/2024
23    Notary Expiration 8/13/2027

Page 363

1  Kaitlin Toyama Esq.
2  kaitlin.toyama@usdoj.gov
3        May 15, 2024
4  RE:  Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.
5    5/2/2024, I. Glenn Cohen (#6671293)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 364

1  Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.
2  I. Glenn Cohen (#6671293)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  I. Glenn Cohen                    Date
25

Page 365

1  Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.
2  I. Glenn Cohen (#6671293)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, I. Glenn Cohen, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  I. Glenn Cohen                    Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

I. Glenn Cohen                                                    May 2, 2024

Page 363

1    Kaitlin Toyama Esq.

2    kaitlin.toyama@usdoj.gov

3                        May 15, 2024

4    RE:  Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.

5         5/2/2024, I. Glenn Cohen (#6671293)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18      If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

I. Glenn Cohen                                          May 2, 2024

```
                                                   Page 364

 1    Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.

 2    I. Glenn Cohen (#6671293)

 3                  E R R A T A   S H E E T

 4    PAGE_11___ LINE_4____ CHANGE_"Toyoma" to "Toyama"___

 5    _(error occurs throughout)_____

 6    REASON_Misspelled_____

 7    PAGE_35___ LINE_17___ CHANGE_"print it out" to "look

 8    _at the print out"_____

 9    REASON_Typographical error_____

10    PAGE_41___ LINE_3____ CHANGE_"MDA" to "NDA"_____

11    _____

12    REASON_Misspelled_____

13    PAGE_77___ LINE_21___ CHANGE_"subjective" to_____

14    _"objective"_____

15    REASON_Typographical error_____

16    PAGE_78___ LINE_2____ CHANGE_"lawsuit" to "law"_____

17    _____

18    REASON_Typographical error_____

19    PAGE_103__ LINE_12___ CHANGE_"in" to "on"_____

20    _____

21    REASON_Typographical error_____

22    Continuation of Errata Sheet on page 364a.

23    _Ivan Glenn Cohen_____     ___06/13/2024_____

24    I. Glenn Cohen                          Date

25
```

Page 365

1    Boe, Brianna, Et Al. v. Marshall, Steven T., Et Al.

2    I. Glenn Cohen (#6671293)

3              ACKNOWLEDGEMENT OF DEPONENT

4       I, I. Glenn Cohen, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   *Ivan Glenn Cohen*                    06/13/2024
     _____              _____

12   I. Glenn Cohen                             Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15              13th  DAY OF      June         , 20 24 .
               _____           _____       ___

16

17

18              Echard bien-aime
                _____

19              NOTARY PUBLIC

20              ECHARD BIEN-AIME
                Notary Public - State of Florida

21              Commission # HH 153738
                Expires on July 14, 2025

22

23              Notarized remotely online using communication technology via Proof.

24

25

```
Page 364a
Errata Sheet – Continued
```

PAGE: 78 LINE: 2
CHANGE: "lawsuit" to "law"
REASONS: Typographical error

PAGE: 103 LINE: 12
CHANGE: "in" to "on"
REASONS: Typographical error

PAGE: 157 LINE: 12
CHANGE: "contraceptions" to "contraceptives"
REASONS: Misspelled

PAGE: 177 LINE: 14
CHANGE: "We're" to "If"
REASONS: Typographical error

PAGE: 186 LINE: 23
CHANGE: "or" to "for"
REASONS: Typographical error

PAGE: 189 LINE: 6
CHANGE: "concept" to "consent"
REASONS: Typographical error

PAGE: 191 LINE: 20
CHANGE: "particularly" to "particular"
REASONS: Typographical error

PAGE: 193 LINE: 3
CHANGE: "approve" to "improve"
REASONS: Typographical error

PAGE: 196 LINE: 17
CHANGE: "confuse" to "abuse"
REASONS: Typographical error

PAGE: 198 LINE: 12
CHANGE: Delete "not"
REASONS: Typographical error

PAGE: 208 LINE: 18
CHANGE: "op" to "on"
REASONS: Typographical error

PAGE: 213 LINE: 18
CHANGE: "make" to "be"
REASONS: Typographical error

*Ivan Glenn Cohen*

_____
I. Glenn Cohen, JD

06/13/2024
_____
Date

Page 364a
Errata Sheet – Continued

PAGE: 216 LINE: 15
CHANGE: "met" to "made"
REASONS: Typographical error

PAGE: 221 LINE: 21-22
CHANGE: "a section" to "at the intersection"
REASONS: Typographical error

PAGE: 222 LINE: 5
CHANGE: "substantive process" to "substantive due process"
REASONS: Missing word

PAGE: 228 LINE: 8
CHANGE: "of" to "or"
REASONS: Typographical error

PAGE: 261 LINE: 1-2
CHANGE: "teach criminal procedure, not civil procedure" to "teach civil procedure, not criminal procedure"
REASONS: Typographical error

PAGE: 261 LINE: 3
CHANGE: "members" to "elements"
REASONS: Typographical error

PAGE: 261 LINE: 11
CHANGE: "email" to "I'm"
REASONS: Typographical error

PAGE: 263 LINE: 23
CHANGE: "text" to "test"
REASONS: Typographical error

PAGE: 269 LINE: 18
CHANGE: "instances" to "no instances"
REASONS: Missing word

PAGE: 276 LINE: 19-20
CHANGE: "an atypical" to "a typical"
REASONS: Typographical error

PAGE: 282 LINE: 10
CHANGE: "like meeting" to "leading"
REASONS: Typographical error

PAGE: 325 LINE: 14
CHANGE: "claim" to "claims"
REASONS: Typographical error

_Ivan Glenn Cohen_                                        06/13/2024
_____                              _____
I. Glenn Cohen, JD                                        Date

Page 364a
Errata Sheet – Continued

PAGE: 328 LINE: 15
CHANGE: "asked" to "asked is"
REASONS: Missing word

PAGE: 334 LINE: 17
CHANGE: "and" to "in"
REASONS: Typographical error

PAGE: 350 LINE: 22
CHANGE: "OxaCo" to "Otsuka"
REASONS: Misspelled

PAGE: 337 LINE: 18
CHANGE: "a" to "in a"
REASONS: Missing word

PAGE: 339 LINE: 14
CHANGE: "binded" to "worded"
REASONS: Typographical error

PAGE: 352 LINE: 3
CHANGE: "in" to "in the"
REASONS: Missing word

*Ivan Glenn Cohen*
_____
I. Glenn Cohen, JD

06/13/2024
_____
Date