# EXHIBIT 25



# Off-Label Use of Prescription Drugs

February 23, 2021



**Congressional Research Service**

https://crsreports.congress.gov

R45792

**CRS REPORT**
Prepared for Members and
Committees of Congress

1



**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R45792

February 23, 2021

**Agata Bodie**
Analyst in Health Policy

# Off-Label Use of Prescription Drugs

When the Food and Drug Administration (FDA) approves a drug for sale in the United States, the approval includes a section entitled "Indications for Use." This section lists the one or more diseases, conditions, or symptoms for which the drug's sponsor (usually the manufacturer) has provided, to FDA's satisfaction, evidence in support of the drug's safety and effectiveness. FDA approval is also based on its review of the drug's dosage, packaging, manufacturing plan, and labeling. Before changing any of those elements, the sponsor must inform, and usually receive permission from, FDA.

In essence, FDA regulates all approval and post-approval aspects of a drug product. But FDA traditionally has not regulated the practice of medicine. Physicians, therefore, may prescribe an FDA-approved drug for indications that FDA has not reviewed for safety and effectiveness. Those uses, furthermore, are not addressed in the labeling information regarding, among other things, dosing, warnings about interactions with other drugs, and possible adverse events.

## How Are Off-Label Prescription Drugs Used?

Prescribing for so-called off-label uses can be accepted medical practice, often reflecting cutting-edge clinical expertise. For example, this is the case with oncology drug use, more than half of which is off-label. Off-label prescribing can be a reasonable choice when labeling overlooks certain populations—for example, when a drug tested in adults is prescribed to children. A drug may be used off-label when it was tested for the treatment of one disease and prescribed in an attempt to prevent or treat another, when it was tested at one dose and used at higher or lower doses, or when it was tested in an eight-week trial and prescribed for long-term use. Estimates for how common off-label prescriptions are in the United States are hardly precise. Credible researchers have estimated they make up as little as 12% and as much as 38% of doctor-office prescriptions.

## What Are the Risks of Off-Label Prescriptions?

Prescriptions for off-label uses of FDA-approved drugs are made without the benefit of an FDA-reviewed analysis of safety and effectiveness data. Physicians may resort to such prescribing to take advantage of new ideas and treatment approaches when available information to support them is inadequate. However, despite the potential risks associated with off-label uses, efforts to prohibit such uses might hurt the public. Some off-label prescribing may result because manufacturers have chosen not to invest the resources needed to have FDA add indications to the drug's approval and labeling.

A worst-case scenario for the nation's health would be the widespread acceptance of a drug for an off-label use that sufficient research would have revealed to be ineffective, unsafe, or both. Aside from the drug's direct harm, the time spent waiting to see whether it worked would have been time not spent exploring other treatment options.

Unchecked off-label prescribing may also threaten the FDA gold standard of drug approval. If clinicians had already accepted a new use into practice through off-label prescribing, a manufacturer may choose to not invest resources to go through clinical trials and the FDA process to win approval.

Although manufacturers do share information on off-label uses, courts have sometimes found they had overstepped allowable bounds. Congress has given permission for limited sharing. Are there other ways to share clinical information that do not put the public's health or FDA's authority at risk?

## What Role Can Congress Play in the Use of Off-Label Prescriptions?

How might Congress, in its legislative or oversight roles, consider the use of off-label drugs to protect the public's health? Legislators and health analysts have suggested both restrictive and permissive actions regarding off-label use. Ideas—some of which conflict with others—include

- disclosure to patients;
- data collection, availability, and analysis;
- dissemination of clinical data;
- linking reimbursement and coverage to evidence of safety and effectiveness;
- clinical research and research transparency;
- clinical guidance;
- congressional oversight through the Government Accountability Office, the Federal Trade Commission, and the Department of Health and Human Services; and
- consideration of other countries' approaches to off-label use.

Some actions would require federal legislation. Other proposals would involve actions by other entities, such as state authorities and professional organizations, which Congress could urge.

# Contents

Introduction ........................................................................................................................................ 1
Drug Labeling and Off-Label Use........................................................................................................ 2
    Labeling: History, Requirements, and Value................................................................................ 3
    Off-Label Use: Description and Examples .................................................................................. 4
Benefits and Risks of Off-Label Use.................................................................................................... 6
History of Congressional Interest and Action....................................................................................... 8
Possible Avenues of Future Congressional Interest............................................................................... 9
Concluding Comments ....................................................................................................................... 12

## Tables

Table 1. Selected Off-Label Uses ......................................................................................................... 5

Table A-1. Selected Congressional and FDA Actions to Expand Information in Drug
    Labeling.......................................................................................................................................... 15

## Appendixes

Appendix. Selected Actions to Expand Information in Drug Labeling........................................... 15

## Contacts

Author Information............................................................................................................................... 16

# Introduction

Both legislators and regulators have expressed concern about the safety and effectiveness of prescription drugs prescribed for "off-label uses"—purposes other than those for which the Food and Drug Administration (FDA) has approved their sale.[1] Two recent incidents illustrate the bases for those concerns.

The first involves a drug already on the market. Safety experts raised concerns about ketamine, a drug available as an injectable anesthetic.[2] They noted that physicians have created outpatient clinics to administer intravenous ketamine in an off-label use to treat depression and migraines.[3] FDA has not reviewed clinical data that could support the clinics' promotional claims of safety and effectiveness.[4]

In August 2018, a second incident occurred in a Texas courtroom. Astra Zeneca settled a case concerning its alleged promotion of Seroquel for uses other than those for which it had sought and obtained FDA approval for sale in the United States.[5] The core of the complaint by the state of Texas was that the company promoted the drug's use in children, although the FDA-approved labeling of the drug was for adult use. It was one of a number of settlements since 2000 resulting in payments by drug companies for the promotion of off-label uses.[6]

To help understand the issues involving off-label use, and how these issues might concern Congress, this report addresses five questions:

- What is drug labeling? What is off-label use?
- How are off-label prescriptions used in medicine today?
- What are the risks and benefits associated with off-label prescriptions?

---

[1] FDA Memorandum, "Public Health Interests and First Amendment Considerations Related to Manufacturer Communications Regarding Unapproved Uses of Approved or Cleared Medical Products" January 2017, https://www.regulations.gov/document?D=FDA-2016-N-1149-0040. See **Table A-1** for selected history of congressional concerns.

[2] Megan Thielking, "A STAT Investigation: Ketamine gives hope to patients with severe depression. But some clinics stray from the science and hype its benefits," STAT, September 24, 2018, https://www.statnews.com/2018/09/24/ketamine-clinics-severe-depression-treatment; and Melvyn W. Zhang, Keith M. Harris, and Roger C. Ho, "Is Off-label repeat prescription of ketamine as a rapid antidepressant safe? Controversies, ethical concerns, and legal implications," BMC Medical Ethics, vol. 17, no. 4, published online January 14, 2016, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4714497/pdf/12910_2016_Article_87.pdf.

[3] See, for example, Actify Neurotherapies, https://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/PsychopharmacologicDrugsAdvisoryCommittee/UCM631429.pdf.

[4] In March 2019, FDA approved a new drug application for *intranasal* esketamine for treatment-resistant depression (FDA, "FDA approves new nasal spray medication for treatment-resistant depression; available only at a certified doctor's office or clinic," News Release, March 5, 2019, https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm632761.htm?dom=prime&src=syn).

[5] Ken Paxton, Attorney General of Texas, "AG Paxton Recovers $110 Million for Texas in Medicaid Fraud Settlements," News Release, August 7, 2018, https://www.texasattorneygeneral.gov/news/releases/ag-paxton-recovers-110-million-texas-medicaid-fraud-settlements; https://www.texasattorneygeneral.gov/sites/default/files/files/epress/Seroquel_SA_Fully_Executed.pdf.

[6] For example, Department of Justice, "GlaxoSmithKline to Plead Guilty and Pay $3 Billion to Resolve Fraud Allegations and Failure to Report Safety Data," Office of Public Affairs, July 2, 2012, https://www.justice.gov/opa/pr/glaxosmithkline-plead-guilty-and-pay-3-billion-resolve-fraud-allegations-and-failure-report; and Department of Justice, "Fact Sheet: Significant False Claims Act Settlements & Judgments, Fiscal Years 2009-2016," https://www.justice.gov/opa/press-release/file/918366/download.

- What concerns, if any, does Congress have about such prescriptions?
- If Congress wanted to do something about off-label prescriptions, what would be some of the options?

# Drug Labeling and Off-Label Use

To market a prescription drug in the United States, a manufacturer needs FDA approval.[7] To obtain that approval, the manufacturer must demonstrate the drug's safety and effectiveness according to criteria specified in law and agency regulations. It must also ensure that its manufacturing plant passes FDA inspection.

Finally, it must obtain FDA approval for the drug's labeling—a term that covers all written material about the drug, including, for example, packaging, prescribing information for physicians, and patient brochures. FDA, thus, approves the drug and its labeling for a specific use. That use specifies the disease or condition, the population, and the way the drug is packaged and administered.

When a physician prescribes a drug for reasons other than those specified in the FDA approval and labeling, the medical profession considers this to be *off-label use*.

FDA regulates the drug and the manufacturer. Each state regulates clinicians and pharmacies.[8] A licensed physician may—except in highly restricted circumstances[9]—prescribe the approved drug without limitation. A prescription to an individual whose demographic or medical characteristics differ from those indicated in a drug's FDA-approved labeling is accepted medical practice.

In a 2006 study of drug prescribing by office-based physicians, 21% of prescriptions were written for off-label uses. Of those off-label prescriptions, the study's authors found that 27% were backed by strong scientific support.[10] A 2016 Canadian study of primary care clinics found an overall rate of 12% of prescriptions for off-label uses. The percentage varied, however, by therapeutic class, ranging from 5% for ear, nose, and throat medications to 25% for central

---

[7] FDA-approved drugs are designated by law into only two categories: prescription and nonprescription (also referred to as over-the-counter). No drug was prescription-only until the 1951 Humphrey-Durham amendments [P.L. 82-215, the Food, Drug, and Cosmetics Act Amendments Act, 1951], which stated, "A drug intended for use by man which ... because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug" (FFDCA §503(b)(1)). See CRS In Focus IF10463, *Regulation of Over-the-Counter (OTC) Drugs*.

[8] The FFDCA does not give FDA authority to regulate the practice of medicine; that responsibility generally rests with the states and medical professional associations.

[9] FDA may place restrictions on prescribing or dispensing as "elements to assure safe use" (ETASU) as part of a risk evaluation and mitigation strategy (REMS) that the agency may require (see FFDCA §505-1(f)).

[10] David C. Radley, Stan N. Finkelstein, and Randall S. Stafford, "Off-label Prescribing Among Office-Based Physicians," Archives of Internal Medicine, vol. 166, May 8, 2006. The authors note, "[a]n indication was considered to be scientifically supported if, according to DRUGDEX, its effectiveness has been shown in controlled trials or observed in clinical settings."

nervous system medications.[11] An econometric model from the National Ambulatory Medical Care Survey estimated a 38% rate of off-label use.[12]

Research has shown that more than half of oncology drug use is off-label. A 2018 study examined 43 FDA-approved cancer drugs and compared their 99 labeled uses with the acceptable uses published by a national compendium Medicare relies on to make coverage decisions.[13] Of the 451 compendium-accepted uses, 56% were off-label. Of the off-label uses, the authors deemed 91% as "well-accepted off-label use."[14]

## Labeling: History, Requirements, and Value

**History.** Drug labeling has been central to FDA's role as a protector of the public's health since 1906. That year, Congress (1) required that sellers state on a drug's label the "quantity or proportion of any alcohol [or] opium" contained, and (2) considered as "misbranded" any drug whose label was "false or misleading." Requirements that drugs be safe were not established until 1938. Congress did not require they be effective until 1962.[15]

**Requirements.** Today, a drug's labeling is more than the sticker the pharmacy places on the amber vial it dispenses to a customer.[16] The Federal Food, Drug, and Cosmetics Act (FFDCA) and associated FDA regulations[17] require and describe a product's labeling as "a compilation of information about the product, approved by FDA, based on the agency's thorough analysis of the new drug application (NDA) or biologics license application (BLA) submitted by the applicant. This labeling contains information necessary for safe and effective use."

---

[11] Tewodros Eguale, David L. Buckeridge, Aman Verma, Nancy E. Winslade, Andrea Benedetti, James A. Hanley, Robyn Tamblyn, "Association of Off-label Drug Use and Adverse Drug Events in an Adult Population," *JAMA Internal Medicine*, vol. 176, no. 1, January 2016, https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/ 2467782.

[12] W. David Bradford, John Turner, and Jonathan W. Williams, "Off-Label Use of Pharmaceuticals: A Detection Controlled Estimation Approach," presentation at the Innovation and Behavior in Health Markets Conference, 2016, revised May 24, 2018, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2230976.

[13] Michael B. Shea, Mark Stewart, Hugo Van Dyke, Linda Ostermann, Jeff Allen, and Ellen Sigal, "Outdated Prescription Drug Labeling: How FDA-Approved Prescribing Information Lags Behind Real-World Clinical Practice," *Therapeutic Innovation & Regulatory Science*, vol. 52, issue 6 (first published online March 5, 2018; issue published November 1, 2018), https://www.focr.org/sites/default/files/pdf/FOCR-Labeling-Research-Article.pdf?eType= EmailBlastContent&eId=067b86ca-de59-4767-86ab-8a4ad95a7978; abstract at https://journals.sagepub.com/doi/full/ 10.1177/2168479018759662.

[14] The authors (Shea et al.) defined "well-accepted off-label drug use" if the National Comprehensive Cancer Network (NCCN) Drugs and Biologics Compendium graded the use in its top two categories of evidence.

[15] Federal Food and Drug Act of 1906 (F&DA), P.L. 59-384, 1906; Federal Food, Drug, and Cosmetic Act (FFDCA), P.L. 75-717, 1938; and Kefauver-Harris Drug Amendments to the FFDCA, P.L. 87-781, 1962.

[16] For examples of labeling, search for a drug at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/).

[17] FFDCA Section 201(m), 21 C.F.R. Part 201—Labeling, and FDA, "[Docket No. 2000N–1269] (formerly Docket No. 00N–1269) RIN 0910–AA94, Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products," *Federal Register*, vol. 71, no. 15, January 24, 2006, pp. 3922-3997, http://www.gpo.gov/fdsys/ pkg/FR-2006-01-24/pdf/06-545.pdf.

FDA requires that labeling begin with a highlights section that includes, if appropriate, black-box warnings, so called because their black borders signify importance.[18] The regulations list the required elements of labeling:[19]

| | | |
|---|---|---|
| • indications and usage | • drug interactions | • nonclinical toxicology |
| • dosage and administration | • use in specific populations | • clinical studies |
| • dosage forms and strengths | • drug abuse and dependence | • references |
| • contraindications | • overdosage | • how supplied/storage and handling |
| • warnings and precautions | • description | |
| • adverse reactions | • clinical pharmacology | • patient counseling information |

**Value.** Labeling plays a major role in the presentation of safety and effectiveness information. For clinicians, it is a primary source of prescribing information. The manufacturer submits the approved labeling for publication in the widely used *Physician's Desk Reference*. That labeling also serves as the basis for several patient-focused information sheets that manufacturers, pharmacy vendors, and many web-based drug information sites produce.[20]

## Off-Label Use: Description and Examples

Off-label prescribing can reflect cutting-edge clinical expertise. It can also be a response to price: a physician may choose to prescribe a lower-priced drug instead of a specifically labeled higher-priced one. Or a physician may prescribe off-label in an attempt to try a different treatment approach when other options have failed.

Sometimes an off-label use becomes so widespread that it becomes accepted practice. However, without the backing of carefully designed clinical trials and expert analysis, it remains unknown whether the drug is, in fact, safe and effective for the off-label use. Also unknown are dosing details and systematically evaluated associated adverse events.

Examples of off-label use include

- a drug tested for the treatment of one disease prescribed in an attempt to prevent or treat another;
- a drug tested at one dose used at higher or lower doses;
- a drug tested in adults prescribed to children; and
- a drug tested in an eight-week trial prescribed for long-term use.

**Table 1** lists several examples of FDA-approved drugs widely prescribed for off-label uses.

---

[18] "Boxed warning. Certain contraindications or serious warnings, particularly those that may lead to death or serious injury, may be required by the FDA to be presented in a box" (21 C.F.R. 201.57(c)(1)).

[19] 21 C.F.R. 201.56(d). For older drugs, labeling content requirements are listed in 21 C.F.R. 201.56(e).

[20] PDR Network, http://www.pdr.net/about-pdr-network/. Examples of consumer medication information materials include those by Wolters Kluwer Health, Inc. (used, for example, with Target dispensing, http://www.consumerreports.org/health/best-buy-drugs/prescription-labels/patient-instructions/index.htm); First Databank, Inc. (provides FDA Medication Guides, http://www.fdbhealth.com/solutions/retail-pharmacy-dispensing/); and American Society of Health-System Pharmacists Consumer Medication Information (http://www.ahfsdruginformation.com/products_services/ahfs_cmi.aspx).

## Table 1. Selected Off-Label Uses

| Drug | Labeled Uses | Off-Label Uses |
|---|---|---|
| gabapentin | post-herpetic pain; epilepsy seizures | peripheral diabetic neuropathy; menopausal hot flashes; attention deficit disorder; bipolar disorder |
| ketamine | anesthesia | depression, migraines |
| fentanyl | "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate"[a] | less severe or chronic pain; for individuals who are not opioid-tolerant |
| | "management of breakthrough pain in cancer patients … who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain"[b] | |
| antipsychotics (e.g., risperidone, olanzapine, quetiapine) | schizophrenia; bipolar disorder | sleep aid; behavioral symptoms of dementia; obsessive compulsive disorder, posttraumatic stress syndrome, anxiety disorders[c] |
| methylphenidate | attention deficit disorders in children; narcolepsy[d] | attention deficit disorders in adults, depression, autism spectrum disorder |
| Avastin | certain non-squamous non-small cell lung cancer; glioblastoma, renal cell carcinoma, cervical cancer, epithelial ovarian, fallopian tube, or primary peritoneal cancer | wet age-related macular degeneration; colorectal cancer |

**Source:** Labeled uses excerpted from FDA-approved labeling posted at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/). Examples of off-label uses compiled by CRS based on clinical databases and news accounts.

a.   Labeling for Duragesic (transdermal), a brand-name fentanyl product.

b.   Labeling for Subsys (sublingual), a brand-name fentanyl product.

c.   "Off-Label Use of Atypical Antipsychotics: An Update," Comparative Effectiveness Review No. 43, John M. Eisenberg Center for Clinical Decisions and Communications Science, August 1, 2012, http://www.effectivehealthcare.ahrq.gov/offlabelantipsych.cfm.

d.   Labeling from Ritalin, a brand-name methylphenidate product.

Although FDA materials do not list off-label uses, several drug compendia include both labeled and off-label uses. For Medicare coverage, for example, the Social Security Act defines "medically accepted indication" as those, in addition to uses approved by FDA, that have been evaluated and supported and listed in one of several compendia, or for which there is "supportive clinical evidence in peer reviewed medical literature."[21]

---

[21] Social Security Act §1861(t)(2)(B) [42 U.S.C. 1395x]. Compendia—available by subscription—include the American Hospital Formulary Service's Drug Information, National Comprehensive Cancer Network Drug and Biologics Compendium, and Thomson Micromedex DrugDex.

# Benefits and Risks of Off-Label Use

Why has Congress given FDA the authority to regulate whether a drug may be on the U.S. market? Two key reasons: to protect patients and to encourage research in a competitive pharmaceutical industry.[22]

By statute and regulation, FDA now approves a drug for a specific use once its sponsor (usually the manufacturer) has provided sufficient evidence that the drug is safe and effective for that use. FDA has developed procedures for the review of that evidence. The FDA-approved labeling, which informs the clinician about dosing and likely and unlikely adverse events, helps protect the individuals for whom the drug is prescribed.

Labeling also helps protect the interests of the manufacturers who invest in the clinical trials that demonstrate safety and effectiveness. For new drugs and new uses of already approved drugs, the sponsor receives a period of market protection, in the form of regulatory exclusivity for the sale of the drug for those uses. Payors—such as private health insurers or Medicare—benefit from FDA-approved labeling in their evaluation of whether to pay for a drug's use.

But use of a drug evolves as clinicians (and the manufacturer) share their experiences regarding off-label uses, which, by definition, were not part of the premarket clinical studies used to obtain FDA approval. Off-label use can benefit patients. In some instances, such as in the treatment of rare diseases, clinical practice may use drugs approved for other indications. A manufacturer may choose not to invest in trials for such a small patient group.[23] A patient whose physician is already prescribing the drug off-label may not want to enroll in a clinical trial where there is a chance he or she may be assigned to the placebo group. Once drugs are well-established in off-label uses, manufacturers rarely design studies to determine or verify the safety and effectiveness of such uses. Individuals and groups wanting to conduct such studies may find it hard to obtain funding.

Examples of adverse events (AEs) associated with the use of drugs for specific off-label uses include heart valve damage from the use of fenfluramine and phentermine (fen-phen) for weight loss, and seizures from the use of tiagabine hydrochloride for depression.[24] Using a Canadian primary care database that captured all prescriptions, the reason for each prescription, and adverse events, researchers looked at the rate of AEs for on-label use, off-label use associated with "strong scientific evidence," and off-label use without such evidence. They found more AEs for off-label prescriptions than for on-label prescriptions. However, off-label use associated with strong scientific evidence had similar rates of AEs as did on-label uses. The increased risk of AEs for off-label use was concentrated in those uses without strong scientific evidence.[25]

---

[22] FDA statement at https://www.fda.gov/AboutFDA/Transparency/Basics/ucm194877.htm; and FFDCA §1003 [21 U.S.C. 393].

[23] See, for example, testimony to FDA by the National Organization for Rare Disorders, November 9, 2016, https://rarediseases.org/wp-content/uploads/2014/11/2016-11-09.-NORD-Statement-at-FDA-Off-Label-Public-Hearing.pdf.

[24] Tewodros Eguale, David L. Buckeridge, Aman Verma, Nancy E. Winslade, Andrea Benedetti, James A. Hanley, Robyn Tamblyn, "Association of Off-label Drug Use and Adverse Drug Events in an Adult Population," *JAMA Internal Medicine*, vol. 176, no. 1, January 2016, https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2467782.

[25] Tewodros Eguale, David L. Buckeridge, Aman Verma, Nancy E. Winslade, Andrea Benedetti, James A. Hanley, Robyn Tamblyn, "Association of Off-label Drug Use and Adverse Drug Events in an Adult Population," *JAMA Internal Medicine*, vol. 176, no. 1, January 2016, https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2467782.

Manufacturers benefit from sales for off-label uses. However, they risk losing that market should a competitor complete studies to obtain FDA approval and labeling for those uses. Researchers who are not supported by the manufacturer who try to assess the safety and effectiveness of off-label uses are hampered by the inexact nature of secondary data sources: the standard clinical trial data collection in preparation for an FDA application is not available for off-label uses. What may begin as hopeful and intermittent off-label use may gain momentum and offer opportunities for planned studies.

Drug and device companies argue that current regulations prevent them from distributing important information to physicians and payors about unapproved, off-label uses of their products.[26] In November 2016, FDA held a two-day public meeting to hear from various groups regarding off-label uses of approved or cleared medical products.[27] In June 2018, FDA issued final guidances explaining the agency's policy about medical product communications that include data and information not contained in FDA-approved labeling.[28]

One FDA guidance document, in particular, described the types of information that a manufacturer could provide payors and formulary committees about unapproved uses of approved products.[29] FDA made two points especially relevant to off-label uses.

First, FDA differentiates among its audiences in its presentation of information. The material it allows in product labeling is directed to a clinical audience. FDA staff have reviewed the information and require that it be presented in a way that is understandable by individual clinicians, who often do not have the statistical sophistication or data analysis skills or resources to fully evaluate the claims of manufacturers. This guidance notes, though, that payors and formulary committees do have such expertise and resources. FDA also acknowledges that it is useful for payors to have information in their decisions on coverage, but it wants to ensure that the information manufacturers provide is not misleading.

Second, the FDA guidance describes what harm could come from allowing more sharing of information about off-label use.

> Some firm communications regarding unapproved products or unapproved uses of approved/cleared/licensed medical products may potentially undermine substantial government interests related to health and safety. These interests include motivating the development of robust scientific data on safety and efficacy; maintaining the premarket review process for safety and efficacy of each intended use in order to prevent harm, to protect against fraud, misrepresentation, and bias, and to develop appropriate instructions for use for medical products; protecting the integrity and reliability of promotional

---

[26] STAT, "FDA to hold long-awaited meeting to review off-label marketing," August 31, 2016, https://www.statnews.com/pharmalot/2016/05/27/fda-hhs-free-speech-patient-safety/.

[27] FDA, Docket No. FDA-2016-N-1149, https://s3.amazonaws.com/public-inspection.federalregister.gov/2016-21062.pdf. All prescription drugs must receive FDA approval for marketing. About 1% of medical devices go through a comparable approval process; most devices receive FDA clearance for marketing. For a description of FDA medical device regulation, see CRS Report R42130, *FDA Regulation of Medical Devices*.

[28] FDA, "Guidance for Industry: Medical Product Communications That Are Consistent With the FDA-Required Labeling—Questions and Answers," Center for Drug Evaluation and Research, Center for Biologics Evaluation and Research, Center for Devices and Radiological Health, Center for Veterinary Medicine, and Office of the Commissioner, June 2018, https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm537130.pdf.

[29] FDA, "Guidance for Industry and Review Staff: Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities—Questions and Answers," Center for Drug Evaluation and Research, Center for Biologics Evaluation and Research, Center for Devices and Radiological Health, and Office of the Commissioner, June 2018, https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM537347.pdf.

information regarding medical product uses; and preventing the diversion of health care resources toward ineffective treatments.

The concerns FDA raised in the June 2018 final guidance documents might explain why Congress may be interested in exploring the issue of off-label use further.

# History of Congressional Interest and Action

Congress has developed a system to protect the public by ensuring that drugs sold in the United States have met clinical and manufacturing standards of safety and effectiveness. Labeling is the mechanism that bridges the regulated drug and the use of that drug in clinical practice. The labeling establishes the uses for which the manufacturer has demonstrated safety and effectiveness to FDA's satisfaction. Congress and the FDA have tried several approaches, using labeling as a tool, to reduce the risk to patients. **Table A-1** includes examples of congressional and FDA actions to expand the information provided in a drug's labeling. The actions have addressed topics such as

- content labeling,
- directions for use,
- permissible and prohibited advertising,
- research incentives to support labeling specific to population subgroups (e.g., children),
- criteria for Medicare coverage,
- required and permissible labeling changes, and
- balance of benefit and risk information in labeling and advertising.

Manufacturers, meanwhile, want to be able to provide information to insurers and other entities (such as the Centers for Medicare and Medicaid Services [CMS] and hospital pharmacy and therapeutics committees) that decide whether to cover a drug in a policy and whether to limit reimbursement for specific uses. Congress has provided some leeway relative to its earlier prohibition on promotional activities. For example, in 2016, it broadened the types of health care economic information drug and device manufacturers could provide to payors (e.g., insurance companies).[30] Although the underlying FFDCA section continues to exclude information related only to an off-label use, it now requires "a conspicuous and prominent statement describing any material differences between the health care economic information and the labeling approved for the drug." Several bills concerning off-label use have been introduced that would have expanded the information that manufacturers could provide about off-label uses. For example, the Subcommittee on Health of the House Committee on Energy and Commerce marked up H.R. 2026 (115th Congress), the Pharmaceutical Information Exchange Act, in January 2018, which would have allowed the provision of *scientific information* to payors, in addition to health care economic information.[31] Then-Subcommittee Chair Michael Burgess, in commenting on the bill's effort to clarify how manufacturers can share "if it is based on competent and reliable evidence," expressed strong support for the bill. He noted "the importance of cutting edge information in

---

[30] Sec. 3037 of P.L. 114-255, the 21st Century Cures Act.

[31] Subcommittee on Health, House Committee on Energy and Commerce, mark-up of H.R. 2026, January 17, 2018, https://energycommerce.house.gov/committee-activity/markups/markup-of-hr-over-the-counter-monograph-safety-innovation-and-reform-act.

medicine and science to optimize patient care and outcomes … and [how the bill] could have the potential to save patients' lives."[32]

Then-Ranking Member (now, Chair) Frank Pallone, Jr., though, argued that the ability to communicate about off-label use "had great potential to undermine" FDA's approval process and to "hamstring" its enforcement efforts.[33] H.R. 2026 passed the subcommittee, although it did not reach the floor in the 115th Congress.

# Possible Avenues of Future Congressional Interest

Off-label use presents both opportunities and risks to clinicians, patients, manufacturers, and researchers. At times, those interests clash. Academics, public health organizations, and journals have suggested what actions Congress might take based on their particular concerns regarding off-label prescriptions.[34] These actions include both direct legislation and oversight activities to encourage action by other entities. The 116th Congress might consider some of these varied approaches, summarized in the issues described below.

**Disclosure to patients.** Most individuals, unaware of the nuances of FDA regulation, may not know that physicians may prescribe drugs for uses that FDA has not reviewed for safety and effectiveness. Several potential opportunities for providing this information exist. Congress could require or work with the states to require that

- the prescriber inform the patient about the off-label use and describe the meaning of off-label use;
- the prescriber note in the prescription why the drug is being prescribed; or
- the pharmacist inform the patient that the use is off-label.

**Data collection and availability.** FDA, under federal law, determines whether a drug requires a prescription. The states, under their individual laws, determine what information the prescription order contains. Because clinicians do not need to note on the prescription order why they are prescribing a drug (e.g., simvastatin for high cholesterol or citalopram for depression), the information in pharmacy, administrative, and clinical databases often cannot directly identify off-label uses. Therefore, as Congress and other public policy groups consider whether and how to address off-label drug prescribing, they do not have adequate information on the scope and details of the practice. Congress could require or work with the states to encourage

---

[32] Subcommittee on Health, House Committee on Energy and Commerce, mark-up of H.R. 2026, January 17, 2018, https://energycommerce.house.gov/committee-activity/markups/markup-of-hr-over-the-counter-monograph-safety-innovation-and-reform-act.

[33] Subcommittee on Health, House Committee on Energy and Commerce, mark-up of H.R. 2026, January 17, 2018, https://energycommerce.house.gov/committee-activity/markups/markup-of-hr-over-the-counter-monograph-safety-innovation-and-reform-act.

[34] For example: Zachary Brennan, "New Report Investigates Drivers of Off-Label Prescribing in the EU," *Regulatory Focus*, March 3, 2017; Christine Fukada, Jillian Clare Kohler, Heather Boon, Zubin Austin, and Murray Krahn, "Prescribing gabapentin off label: Perspectives from psychiatry, pain and neurology specialists," *CPJ/RPC*, vol. 145, no. 6, November/December 2012; Megan Thielking, "A STAT Investigation: Ketamine gives hope to patients with severe depression. But some clinics stray from the science and hype its benefits," STAT, September 24, 2018, https://www.statnews.com/2018/09/24/ketamine-clinics-severe-depression-treatment; and Joshua D. Wallach and Joseph S. Ross, "Gabapentin Approvals, Off-Label Use, and Lessons from Postmarketing Evaluation Efforts," *JAMA*, vol. 319, no. 8, February 27, 2018.

- clinicians to note on prescriptions the reason for medication use (e.g., the specific condition, disease, or symptom), thereby allowing that information to appear in pharmacy databases, which would enable focused analysis of off-label uses;

- the establishment of confidential registries of off-label prescribing and follow-up information that FDA (or other designated scientifically appropriate agencies) could use in its electronic surveillance systems to identify associated adverse events and other drug use problems; or

- FDA to increase its surveillance of available data sources, such as registries and administrative and clinical databases, to identify patterns of off-label use and evidence suggesting effectiveness and associated adverse events.

**Dissemination.** Because some information may be valuable to clinicians and entities that influence prescribing decisions (such as insurers and pharmacy and therapeutics committees), Congress could allow manufacturers to disseminate information about off-label uses that they have developed or of which they are aware, perhaps subject to certain limitations or accompanying reporting requirements. Possibilities include

- broader sharing of clinical analyses of off-label use with coverage deciders (e.g., CMS, insurers, pharmacy and therapeutics committees) to support requests that they cover a particular use of the drug; and

- dissemination of clinical analyses of off-label use at clinical and pharmaceutical conferences.

**Oversight.** With an estimated 12% to 38% of all prescriptions' (and 56% of oncology prescriptions') being written for uses not listed on FDA-approved labeling,[35] valid information on the extent of off-label use and the effect of such use on manufacturer, insurer, and clinician behavior could potentially better inform debate on how to best protect the public's health. Congress could direct

- the Government Accountability Office (GAO) to study the extent of off-label use in government-provided care (e.g., Department of Veterans Affairs, Bureau of Prisons, and Indian Health Service) and in government-funded care (e.g., Medicare and Medicaid);

- the Secretary of Health and Human Services (HHS) to contract with the National Academy of Medicine or a similar organization to assemble management or industrial policy experts to study the costs and rewards to industry of off-label prescriptions; or

---

[35] David C. Radley, Stan N. Finkelstein, and Randall S. Stafford, "Off-label Prescribing Among Office-Based Physicians," Archives of Internal Medicine, vol. 166, May 8, 2006; Tewodros Eguale, David L. Buckeridge, Aman Verma, Nancy E. Winslade, Andrea Benedetti, James A. Hanley, Robyn Tamblyn, "Association of Off-label Drug Use and Adverse Drug Events in an Adult Population*," JAMA Internal Medicine*, vol. 176, no. 1, January 2016, https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2467782; W. David Bradford, John Turner, and Jonathan W. Williams, "Off-Label Use of Pharmaceuticals: A Detection Controlled Estimation Approach," presentation at the Innovation and Behavior in Health Markets Conference, 2016, revised May 24, 2018, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2230976; Michael B. Shea, Mark Stewart, Hugo Van Dyke, Linda Ostermann, Jeff Allen, and Ellen Sigal, "Outdated Prescription Drug Labeling: How FDA-Approved Prescribing Information Lags Behind Real-World Clinical Practice," Therapeutic Innovation & Regulatory Science, vol. 52, issue 6 (first published online March 5, 2018; issue published November 1, 2018), https://www.focr.org/sites/default/files/pdf/FOCR-Labeling-Research-Article.pdf?eType=EmailBlastContent&eId=067b86ca-de59-4767-86ab-8a4ad95a7978; abstract at https://journals.sagepub.com/doi/full/10.1177/2168479018759662.

- FDA and the Federal Trade Commission to investigate drugs whose off-label prescriptions account for a particularly high percentage of all prescriptions or that generate a particularly high percentage or high dollar value of sales.

**Pricing.** The decision to use a drug off-label based solely or primarily on price introduces a new element to study. For example, the pricing difference between Avastin and Lucentis, both made by the same manufacturer with the same active ingredient, is so large that many ophthalmologists use the lower priced Avastin in their treatment of macular degeneration, despite its being an off-label use.[36] The manufacturer included the treatment of macular degeneration in its application to FDA for Lucentis. To explore the ramifications of a traditionally nonclinical element in prescribing decisions, Congress could require

- the HHS Secretary to study the relationship among pricing, access, and prescribing and its effect on patient safety.

**Reimbursement.** Although FDA approval of a drug—not for each use of a drug—is a requirement for sale in the United States, the decision to reimburse a physician or patient for a drug is made by entities such as the CMS and private insurers. Such decisions, therefore, influence what drugs are prescribed and, in part, for what uses drugs are prescribed. Congress could direct

- the HHS Secretary to study such coverage decisions or to contract with the National Academy of Medicine or a similarly equipped entity to do so; or
- HHS to form a task force to include CMS and FDA, along with private insurers and others involved in coverage decisions, and patient and clinician groups representing those affected by coverage decisions, to identify areas in need of action and to recommend steps in those directions.

Congress also could encourage

- payors to require safety and effectiveness evidence before covering off-label uses.

**Research.** The traditional path toward adding an indication (reason for use) to the labeling of a drug already approved for other uses has been for the sponsor of the drug to conduct clinical trials and submit a supplemental new drug application (NDA) to FDA. The widespread extent of off-label use suggests that relying on that model is not helping prescribers get better information. Congress could consider

- assigning responsibility (and funding) to the National Institutes of Health and the Patient-Centered Outcomes Research Institute for safety and effectiveness evaluations of off-label uses; or
- requiring, for a drug that has substantial (to be defined) off-label sales, that the manufacturer[37] fund studies, such as clinical trials, to assess the safety and effectiveness of the drug for the off-label use and submit evidence to the HHS Secretary. Depending on the Secretary's assessment of the evidence, the Secretary could request that the manufacturer amend the drug's labeling either to

---

[36] Kierstan Boyd, "What Is Avastin?" American Academy of Ophthalmology, May 17, 2018, https://www.aao.org/eye-health/diseases/amd-macular-degeneration.

[37] For drugs on patent, this would be the brand-name sponsor of the new drug application (NDA). For drugs no longer on patent that are only marketed as generic products, this would be the holder of the abbreviated NDA. For a description of the regulation of generic drugs, see CRS Report R44703, *Generic Drugs and GDUFA Reauthorization: In Brief.*

add the off-label use to the label as an approved use or to add a statement that clinical evidence does not support the safety and effectiveness of the drug for the off-label use.

**Research transparency.** FDA regulations describe standards for the design and analysis of clinical trials that a sponsor uses in an NDA. Studies done by or for the manufacturer or by other groups or individuals are not always made public, in which case their findings cannot be reviewed and evaluated. Because the results of such studies may be used in support of off-label uses, by providing positive and negative incentives, Congress could consider requiring or encouraging

- prospective posting of the designs and statistical plans of studies of off-label uses; or
- public reporting of studies of off-label use.

**Clinical guidance.** Professional societies and other clinical groups often supplement the information available to prescribers from FDA-approved labeling, medical journals, and information from manufacturers. They can issue guidelines and recommend best practices. Congress could engage such groups and encourage

- professional societies to develop evidence-based clinical guidelines and training regarding off-label use.

**Precedents from other countries.** The United States is not alone in facing the health care and economic implications of off-label use. For example, the member countries of the European Union have addressed measures involving reimbursement, guidance for prescribers, professional standards, and informed consent.[38] Congress could require

- HHS to contract with the National Academy of Medicine or a similarly equipped entity to review measures taken by the European Union and other regulatory bodies and recommend legislative or administrative actions as appropriate.

# Concluding Comments

Concerns over off-label use overlap with questions raised by some legislators and regulators in other contexts. In addition to clearly related issues such as what is allowable information in direct-to-consumer advertising, promotion to clinicians, and material shared with payors and insurers, off-label use also affects the entire basis of FDA regulation of drugs through its authority to approve drugs. That means it directly or indirectly affects research, clinical innovation, transparency, patents and exclusivities, pricing, and access.

Changes in law or regulation in any one area may have benefits in some areas and drawbacks in others. For example, FDA's initiative to encourage research in drugs used traditionally but never reviewed and approved by FDA—so-called legacy drugs—stems from its desire for evidence of safety and effectiveness.[39] Such evidence helps protect patients from possible use of ineffective,

---

[38] Zachary Brennan, "New Report Investigates Drivers of Off-Label Prescribing in the EU," Regulatory Focus, March 3, 2017.

[39] FDA, Unapproved Drugs Initiative, https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/SelectedEnforcementActionsonUnapprovedDrugs/ucm118990.htm Guidance for FDA Staff and Industry, and FDA "Marketed Unapproved Drugs—Compliance Policy Guide Sec. 440.100 Marketed New Drugs without Approved NDAs or ANDAs," September 19, 2011, https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm070290.pdf.

16

unsafe, or misdosed drugs. That initiative, in turn, helps enable sponsors to conduct the clinical trials, submit new drug applications, obtain regulatory exclusivity with the new drug approval—and then raise the price of the new branded product while expecting FDA to honor the exclusivity and block the sale of the drug by others. For example, clinicians had been prescribing a compounded version of progestin for use in preventing preterm delivery. Such use had never been adequately tested in clinical trials. One company conducted those trials, and FDA approved its new drug application. The initial price for the new drug, Makena, was $30,000 for a 20-week course; patients had been paying pharmacists $200-$400 for the same course.[40] Unanticipated price increases can also arise from the apparent following of FDA procedures. For example, a new owner of the FDA-approval of an old antiparasitic generic drug raised the price from $14 per tablet to $750, Daraprim's initial price.[41] Such sudden and large price increases become a barrier to patient access and, therefore, a potential threat to health.

In the case of off-label prescribing, actions in any direction—whether by Congress, FDA, or the courts—could have both intended and unanticipated effects. Actions to limit off-label prescribing could have the intended effects of reducing safety risks and the economic cost of using drugs ineffective for their prescribed purposes. Such limits, however, could also stifle informed clinical exploration. Similarly, incentives to mount clinical trials needed to add an indication to the label could help identify and disseminate information on dosing and contradictions. Such incentives, however, could also hurt. For example, a brand drug that added a new indication to its labeling could prevent, through exclusivities, generics from similarly modifying their labeling. Patients could need to pay more.

The recent debates over the right-to-try movement regarding use of investigational drugs by terminally ill patients[42] may preview discussion about any proposed restrictions on off-label use. The Goldwater Institute, considered a key impetus to development and passage of the 2018 enactment of a right-to-try act,[43] looks to diminish government's role in an individual's choice and has supported dissemination of off-label information.[44]

---

[40] Joanne Armstrong, "Unintended Consequences—The Cost of Preventing Preterm Births after FDA Approval of a Branded Version of 17OHP," *New England Journal of Medicine,* online March 16, 2011; and Gardiner Harris, "Drugs' Cost and Safety Fuel a Fight," *New York Times*, April 4, 2011, https://www.nytimes.com/2011/04/05/health/05FDA.html?rref=collection%2Fbyline%2Fgardiner-harris&action=click&contentCollection=undefined&region=stream&module=stream_unit&version=search&contentPlacement=1&pgtype=collection. The compounded version of the drug continues to be available for indications other than prevention of prematurity. FDA has not actively sought to stop sales. See Yesha Patel and Martha M. Rumore, Controversies in Practice "Hydroxyprogesterone Caproate Injection (Makena) One Year Later: To Compound or Not to Compound—That Is the Question," P&T, vol. 37 no. 7, July 2012, pp. 405-411, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3411212/pdf/ptj3707405.pdf, and FDA, "Questions and Answers on Updated FDA Statement on Compounded Versions of hydroxyprogesterone caproate (the active ingredient in Makena)," Press Announcement, Page Last Updated: 06/29/2012, http://wayback.archive-it.org/7993/20170113105722/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm310215.htm.

[41] Andrew Pollack, "Drug Goes From $13.50 a Tablet to $750, Overnight," *New York Times*, September 20, 2015, https://www.nytimes.com/2015/09/21/business/a-huge-overnight-increase-in-a-drugs-price-raises-protests.html.

[42] CRS Report R45414, *Right to Try: Access to Investigational Drugs*.

[43] See, for example, ADI News Services, "Goldwater Institute's Right To Try Bill Signed By California Governor," Arizona Daily Independent, September 29, 2016, https://arizonadailyindependent.com/2016/09/29/goldwater-institutes-right-to-try-bill-signed-by-california-governor/; and Marie McCullough, "For the terminally ill, are 'right-to-try' laws offering a lifeline, or false hope?" *The [Philadelphia] Inquirer*, April 4, 2017, https://www.philly.com/philly/health/Do-Right-To-Try-laws-offer-a-lifeline-or-false-hope-to-the-terminally-ill.html.

[44] Naomi Lopez Bauman, "Restoring Free Speech in Medicine," Goldwater Institute, June 6, 2017, https://goldwaterinstitute.org/article/restoring-free-speech-in-medicine; and Starlee Coleman, "Arizona becomes first state to allow pharmaceutical companies to legally communicate off-label treatment uses to medical professionals," Goldwater Institute, March 23, 2017, https://goldwaterinstitute.org/article/arizona-becomes-first-state-to-allow-

Congress has built a process in which a robust FDA can regulate drugs to protect the public's health. Is there cause for concern that perhaps a third[45] of prescriptions are for off-label uses and that, in at least one study, three-quarters of those had minimal or no accepted scientific evidence to support their use?[46]

Policy tension exists over the line between wanting to ensure individuals' freedom to take drugs for off-label uses and wanting to protect the public from the risk of unsafe or ineffective drugs. Where to draw that line—and how to know when it may be time to move the line—is of continuing interest to regulators and legislators.

---

pharmaceutical-companies-legally-communicate-off-label-treatment/.

[45] W. David Bradford, John Turner, and Jonathan W. Williams, "Off-Label Use of Pharmaceuticals: A Detection Controlled Estimation Approach," presentation at the Innovation and Behavior in Health Markets Conference, 2016, revised May 24, 2018, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2230976.

[46] David C. Radley, Stan N. Finkelstein, and Randall S. Stafford, "Off-label Prescribing Among Office-Based Physicians," *Archives of Internal Medicine*, vol. 166, May 8, 2006.

# Appendix. Selected Actions to Expand Information in Drug Labeling

## Table A-1. Selected Congressional and FDA Actions to Expand Information in Drug Labeling

| Date | Topic | Law or Agency Action |
|---|---|---|
| 1906 | Required that sellers state on a drug's label the "quantity or proportion of any alcohol, opium, …" contained; and considered as "misbranded" any drug whose label was "false or misleading." | Federal Food and Drug Act of 1906 (F&DA), P.L. 59-384 |
| 1938 | Required that labeling include adequate directions for use and evidence of safety of their labeled use. | Federal Food, Drug, and Cosmetic Act (FFDCA), P.L. 75-717 |
| 1962 | Would declare as misbranded a prescription drug whose advertising did not adhere to required labeling information. | Kefauver-Harris Drug Amendments to the FFDCA, P.L. 87-781. Sec. 131 added FFDCA Sec. 502(n). |
| 1975 | Prohibited manufacturers from advertising and otherwise promoting off-label uses of approved drugs. | 21 CFR 202.1, Prescription drug advertisements [40 FR 14016, March 27, 1975] |
| 1977–2003 | FDA issued a 1977 guidance and a 1998 rule, and Congress took up related efforts in 2002 and 2003 to both require and encourage manufacturers to conduct the research to support adequate labeling concerning the use for children of approved drugs. | FDA, "Guidance for Industry: General Considerations for the Clinical Evaluation of Drugs in Infants and Children," September 1977, http://www.fda.gov/downloads/Drugs/ GuidanceComplianceRegulatoryInformation/ Guidances/ucm071687.pdf; FDA, "Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients; Final rule," Federal Register, vol. 63, no. 231, December 2, 1998, pp. 66632-66672; Best Pharmaceuticals for Children Act (BPCA, P.L. 107-109); and Pediatric Research Equity Act (PREA, P.L. 108-155). |
| 1993 | Added Medicare coverage of off-label cancer drug use, by defining "medically accepted indication" as, for an FDA-approved drug, a use included in a cited compendia or other Secretary-defined compendia or which the carrier determines is acceptable based peer-reviewed supportive clinical evidence according to guidance from the Secretary. | P.L. 103-66 amended the Social Security Act Sec. 1861(t)(2)(B) [42 U.S.C. 1395x]. |
| 1993–2007 | FDA issued "Guideline for the Study and Evaluation of Gender Differences in the Clinical Evaluation of Drugs." Directed the Secretary of Health and Human Services to review and develop guidance on including women and minorities in clinical trials, which would make appropriate labeling possible. | FDA, "Guideline for the Study and Evaluation of Gender Differences in the Clinical Evaluation of Drugs," Federal Register, Vol. 58, No. 139, July 22, 1993. FDA Modernization Act of 1997 [FDAMA], P.L. 105-115 |
| 2006 | Required that labeling include highlights of prescribing information to help health care providers use the information. | "Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products," referred to as the "Physician Labeling Rule," 71 FR 3922, January 24, 2006, 21 CFR 201.56 and 201.57. |

| Date | Topic | Law or Agency Action |
|------|-------|----------------------|
| 2007 | Authorized the Secretary, upon learning of new relevant safety information, to require a labeling change. | FDA Amendments Act of 2007, P.L. 110-85. See FFDCA 505(o). |
| 2012 | Directed the Secretary of Health and Human Services to assess the extent to which demographic subgroups (to include sex, age, race, and ethnicity) participate in clinical trials and are included in safety and effectiveness data submitted in marketing applications. It also required the Secretary to publish an action plan with recommendations to improve the completeness, quality, and inclusion of subgroup data in various analyses. Such information could then be reflected in a drug's labeling. | FDA Safety and Innovation Act (FDASIA), P.L. 112-144 |
| 2014 | Required that labeling include a summary of the risks of using a drug during pregnancy and lactation | "Content and Format of Labeling for Human Prescription Drug and Biological Products; Requirements for Pregnancy and Lactation Labeling," referred to as the "Pregnancy and Lactation Labeling Rule," 79 FR 72063, December 4, 2014. |
| 2016 | Required FDA to establish a program to evaluate the use of real world evidence (RWE) to support approval of a new indication for an already approved drug. | Section 3022 of the 21st Century Cures Act, P.L. 114-255 |

**Source:** Compiled by CRS.

# Author Information

Agata Bodie
Analyst in Health Policy

# Acknowledgments

Susan Thaul, retired CRS Specialist in Drug Safety and Effectiveness, was the original author of this report.

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

ORIGINAL INVESTIGATION

# Off-label Prescribing Among Office-Based Physicians

*David C. Radley, MPH; Stan N. Finkelstein, MD; Randall S. Stafford, MD, PhD*

**Background:** Unlike medicines prescribed for Food and Drug Administration–approved indications, off-label uses may lack rigorous scientific scrutiny. Despite concerns about patient safety and costs to the health care system, little is known about the frequency of off-label drug use or the degree of scientific evidence supporting this practice.

**Methods:** We used nationally representative data from the 2001 IMS Health National Disease and Therapeutic Index (NDTI) to define prescribing patterns by diagnosis for 160 commonly prescribed drugs. Each reported drug-diagnosis combination was identified as Food and Drug Administration–approved, off-label with strong scientific support, or off-label with limited or no scientific support. Outcome measures included (1) the proportion of uses that were off-label and (2) the proportion of off-label uses supported by strong scientific evidence. Multivariate analyses were used to identify drug-specific characteristics predictive of increased off-label use.

**Results:** In 2001, there were an estimated 150 million (95% confidence interval, 127-173 million) off-label mentions (21% of overall use) among the sampled medications. Off-label use was most common among cardiac medications (46%, excluding antihyperlipidemic and antihypertensive agents) and anticonvulsants (46%), whereas gabapentin (83%) and amitriptyline hydrochloride (81%) had the greatest proportion of off-label use among specific medications. Most off-label drug mentions (73%; 95% confidence interval, 61%-84%) had little or no scientific support. Although several functional classes were associated with increased off-label use (*P*<.05), few other drug characteristics predicted off-label prescription.

**Conclusions:** Off-label medication use is common in outpatient care, and most occurs without scientific support. Efforts should be made to scrutinize underevaluated off-label prescribing that compromises patient safety or represents wasteful medication use.

*Arch Intern Med. 2006;166:1021-1026*

**Author Affiliations:** Center for Evaluative Clinical Sciences, Dartmouth Medical School, Hanover, NH (Mr Radley); Program on the Pharmaceutical Industry, Sloan School of Management, Massachusetts Institute of Technology, Cambridge (Dr Finkelstein); and Program on Prevention Outcomes and Practices, Stanford Prevention Research Center, Stanford, Calif (Dr Stafford). Dr Finkelstein is now additionally with Harvard Medical School, Boston, Mass.

THE FOOD AND DRUG ADMINistration (FDA) focuses on market entry for prescription drugs rather than regulating physicians' prescribing practices, allowing off-label use of medications for indications beyond those formally evaluated by the manufacturer. Off-label prescribing of medications is legal,[1] often thought to be supported by scientific evidence,[2] and common in certain clinical settings.[3,4] Although this practice provides a pathway to innovation in clinical practice, it raises key concerns about risks to patients and costs to the health care system.[5-7]

Despite sufficient evidence justifying some off-label practices, lack of FDA approval means that off-label uses are not given the same degree of scientific scrutiny as labeled indications. Scientific evidence documenting the efficacy of off-label uses in routine practice settings commonly falls short of what the drug's manufacturer would be required to provide the FDA to receive approval for that indication. Although regulation in this area is evolving, FDA policy prohibits direct-to-consumer promotion of drugs for un-approved uses and restricts such promotion to physicians.

Previously published studies of off-label prescribing typically consider this practice in the context of narrowly defined clinical populations, including those with psychiatric disorders,[3,8] those with human immunodeficiency virus and AIDS,[9] children,[10,11] pregnant women,[12] and others commonly underserved by FDA-approved medicines.[4,13] None of these studies have systematically described the overall magnitude of off-label prescribing or the consequences of prescribing drugs for unevaluated or underevaluated indications. A study published in 1985 examined the 100 most common uses of marketed medicines and found that 31 were for indications not initially approved by the FDA, of which 18 were not subsequently scrutinized.[14]

Using a nationally representative sample documenting physician prescribing by diagnosis, we examined the overall frequency and clinical circumstances of off-label prescription among commonly prescribed medications as a function of the strength of scientific support for those practices.

**Exhibit 0002**

©2006 American Medical Association. All rights reserved.

22

| METHODS |
| --- |

We used a nationally representative survey of physician prescribing practices to examine off-label prescribing among office-based physicians in the United States. Observed drug uses were identified by clinical indication and determined to be labeled (FDA approved), off-label (lacking FDA approval) with scientific evidence of therapeutic efficacy, or off-label without supporting evidence. Our analytic goals were to estimate the magnitude of off-label use, the most frequent conditions and drug classes contributing to off-label use, and whether observed off-label uses were supported by scientific evidence and to identify medication-specific characteristics predictive of this practice.

## DATA SOURCE

Data for this analysis come from the 2001 National Disease and Therapeutic Index (NDTI).[15] The NDTI is a continuing survey of US office-based physicians conducted by IMS Health (Plymouth Meeting, Pa). The NDTI contains nationally representative diagnostic and treatment data similar to that contained in the National Ambulatory Medical Care Survey.[16,17] A panel of office-based physicians is selected through random stratified sampling from the master lists of the American Medical Association and the American Osteopathic Association (both in Chicago, Ill) to participate in quarterly samplings of their clinical activity. Each quarter, approximately 3500 physicians report on each patient encounter during 2 randomly selected consecutive weekdays. In 2001, there were 403 975 sampled patient-physician encounters with recorded medication therapy. For each patient encounter, physicians are instructed to record all diagnoses and indicate drug therapy specifically used to treat each diagnosis. Each patient encounter can generate multiple diagnoses, and there is direct correspondence between the recorded diagnosis and prescribed drug therapy. Physician-reported drug uses include new medications prescribed during that encounter or continued drug therapy that was previously ordered, even if no specific action was taken during that encounter. Drug uses are weighted to reflect national utilization patterns and referred to as drug mentions.

## SAMPLED MEDICATIONS AND OBSERVED DIAGNOSES

The NDTI provided data for the top 500 medications in rank order by frequency of NDTI drug mentions in 2001. This analysis considered commonly used medications, including the top 100 by number of NDTI mentions, plus 60 additional randomly selected medications. Medications with over-the-counter availability in 2001 were excluded from this study. This strategy captured prescription medicines from a wide range of therapeutic contexts, but with a preponderance of antibiotics, hypertension therapies, and analgesics because of their prevalence as top sellers. The medications identified in this sample accounted for approximately 56% of all estimated prescription drug use in 2001. Medications were identified by their chemical name, and drug mentions for proprietary and generic versions were combined to give the total mentions for that chemical when at least 1 version was in the original 160-medication sample.

The NDTI lists drug mentions stratified by the top 40 diagnoses associated with each medication. Diagnoses, coded using the *International Classification of Diseases, Ninth Revision, Clinical Modification*,[18] were grouped into 1 of the following 3 categories: FDA approved, off-label with strong scientific support, or off-label with limited or no scientific support. Diagnoses were considered FDA approved if they could be matched to the therapeutic indications reported in the drug's package insert (as compiled in the *Physicians' Desk Reference: 2002*[19]) and assumed to be well supported by scientific evidence. Any diagnosis that could not be matched to a labeled indication was considered off-label.

The degree of supporting evidence was assessed for each off-label indication treated with the medicines in our sample. We used the DRUGDEX system (Thomson Micromedex, Greenwood Village, Colo), a nationally recognized pharmaceutical compendium that describes the efficacy and scientific documentation for labeled and off-label uses of prescription drugs[20] and that has been used to approve payment for off-label uses by Medicaid,[21] to create a database of scientifically supported but off-label indications for each drug in our sample. An indication was considered to be scientifically supported if, according to DRUGDEX, its effectiveness has been shown in controlled trials or observed in clinical settings.[22] All other indications that lacked FDA approval or that did not meet the criteria for having scientific support were considered to be off-label with little or no scientific support.

To give added confidence in our use of DRUGDEX, we independently evaluated the type of evidence used by DRUGDEX in its differentiation of levels of evidence for off-label indications in a subsample of medications. We found that indications our method classified as evidence-based were always supported by clinical trials, whereas those indications with little or no scientific support tended to rely on observational data or case reports. The **Figure** shows the strategy used to classify drug mentions by their level of scientific support.

We were unable to separate patterns of use by the presence of comorbidities that might alter our assessment of whether the drug mention was for an off-label use. Because we were concerned that this might result in misclassification, we examined the comorbidities associated with congestive heart failure to gauge the magnitude of such misclassification. In this example, the concern is that substantial misclassification of angiotensin-converting enzyme inhibitors would result if congestive heart failure were to be reported frequently with other diagnoses for which angiotensin-converting enzyme inhibitors are often prescribed. In 2001, 47% of patients with congestive heart failure were reported to have at least 1 comorbidity, although in only 10% that comorbidity was hypertension or coronary artery disease, the 2 conditions most likely to have an angiotensin-converting enzyme inhibitor reported as therapy. Although we acknowledge this shortcoming, it seems unlikely to dramatically affect our findings.

Drug-specific characteristics including therapeutic class, age, degree of promotion, use as a long- vs short-term therapy, form, and manufacturer were evaluated for their ability to predict off-label use. Medications were assigned to 1 of 13 mutually exclusive functional classes based on the therapeutic intent of its labeled indications. Duration of use was considered long-term (continued use >4 weeks) or short-term (use ≤4 weeks). Approval date and patent exclusivity dates for each drug were obtained from the FDA's *Electronic Orange Book, 2003 Vol: Food and Drug Administration*[23] and used to calculate the drug's age and generic availability in year 2001. For medications available in multiple formulations, only that most commonly used in ambulatory settings was considered. Drugs were considered to have a high degree of promotion if they were among the 20 most heavily direct-to-consumer promoted drugs in 2000.[24] Manufacturers represented by fewer than 5 medications among the sampled drugs were grouped, as were manufacturers with similar patterns of off-label use among the sampled medications, and generically available medications were considered to be represented by a single, nonspecific manufacturer. Breadth of therapeutic definition was measured as the total number of approved indications reported in the *Physicians' Desk Reference*.[19]

©2006 American Medical Association. All rights reserved.

23



**Figure.** Assessment of scientific support for each drug-diagnosis combination. Drug mentions are weighted estimates of national prescription drug occurrences based on observed medication use. CI indicates confidence interval; FDA, Food and Drug Administration; *ICD-9-CM, International Classification of Diseases, Ninth Revision, Clinical Modification*[18]; NDTI, National Disease and Therapeutic Index; and *PDR, Physicians' Desk Reference.*[19]

## STATISTICAL ANALYSIS

The unit of analysis was the drug mention; the principle outcome measures were proportion and frequency of off-label prescription among sampled medications. We used multivariate regression to evaluate the ability of specific drug characteristics to predict off-label prescription. This allowed us to test several hypotheses: for example, that increased off-label prescription is associated with particular functional classes, use as a long-term therapy, older drug age, generic availability, a high degree of direct-to-consumer promotion, or manufacturer. The dependent variable was the counted number of drug mentions for off-label uses, and was transformed using a natural logarithm to normalize the distribution. Drugs from the same chemical class share many physical and therapeutic characteristics and, therefore, are not independent with regard to likelihood of prescription. To account for this lack of independence, models were fit clustering on the chemical class with robust variance estimates for the standard error.[25,26] Reported risk ratios (RRs) represent the independent likelihood of that characteristic predicting increased off-label prescription. Data analysis was performed using STATA software, version 8 (StataCorp, College Station, Tex).

**RESULTS**

The NDTI reported an estimated 725 million total drug mentions among the sampled drugs for year 2001. Although most (575 million [79%]) were for FDA-approved indications, many drug mentions (150 million [21%]) lacked FDA approval for the condition they were used to treat. Therapeutic activity among these medicines was largely supported by scientific evidence, with 85% of all drug mentions (616 million) being FDA-approved or evidence-based off-label uses; 15% of drug mentions reported herein lacked scientific evidence for the indication they were used to treat. Among off-label mentions, most (73%) lacked evidence of clinical efficacy, and less than one third (27%) were supported by strong scientific evidence (Figure).

Substantial variation in off-label use was observed across functional classes. Considering medication uses with strong and limited or no scientific support together, off-label prescription was rare among medications for glycemic control in diabetes mellitus (<1%) and infrequent among analgesics (6%) and medications to lower lipid levels (7%). Off-label prescription was most common among cardiac medications (antianginals, antiarrhythmics, and anticoagulants) (46%; 95% confidence interval [CI], 39%-53%), anticonvulsants (46%; 95% CI, 39%-53%), and antiasthmatics (42%; 95% CI, 35%-48%) (**Table 1**). Off-label prescription with limited or no scientific support was more common than supported off-label use in all therapeutic classes except diabetes therapies. The greatest disparity between supported and unsupported off-label prescription occurred among psychiatric (4% strong support vs 96% limited or no support) and allergy therapies (11% strong support vs 89% limited or no support).

High volumes of off-label prescription were correlated with high number of total drug mentions for specific drugs (*P*<.001). This is evident in **Table 2**, which shows the top 5 medications by volume of off-label mentions, 3 of which (albuterol sulfate, amoxicillin, and azithromycin) were among the top 5 medications by overall use. Gabapentin had the highest proportion of off-label prescription (83%), followed by amitriptyline hydrochloride (81%) and dexamethasone (79%). Among medications with the highest proportions of off-label use, most lacked evidence of clinical efficacy. This is especially true for gabapentin, where only 20% of its off-label use had strong support compared with 80% with

©2006 American Medical Association. All rights reserved.

**Table 1. Off-label Prescription and Degree of Scientific Support by Functional Class**

| Functional Class (No. in Class) | Estimated No. of Mentions in Millions | % of Off-label Mentions* per Class | Off-label Use | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Strong Scientific Support | | Little or No Scientific Support | |
| | | | No. of Mentions in Millions | % of Off-label Mentions* | No. of Mentions in Millions | % of Off-label Mentions* |
| Cardiac therapies† (4) | 9.5 | 46 | 3.8 | 39 | 5.8 | 61 |
| Anticonvulsants (4) | 6.6 | 46 | 1.1 | 17 | 5.4 | 83 |
| Antiasthmatics (9) | 17.7 | 42 | 8.3 | 47 | 9.4 | 53 |
| Allergy therapies (9) | 14.7 | 34 | 1.7 | 11 | 13.1 | 89 |
| Psychiatric therapies‡ (16) | 18.0 | 31 | 1.0 | 6 | 17.0 | 94 |
| Peptic ulcer and dyspepsia therapies (7) | 7.0 | 30 | 1.2 | 17 | 5.8 | 83 |
| Antimicrobials (28) | 35.5 | 23 | 11.6 | 33 | 23.9 | 67 |
| Other§ (15) | 13.4 | 23 | 3.0 | 23 | 10.4 | 77 |
| Antihypertensives (30) | 16.8 | 14 | 6.8 | 41 | 10.0 | 59 |
| Women's health therapies‖ (8) | 2.3 | 11 | 0.5 | 23 | 1.7 | 77 |
| Agents to lower lipid levels (6) | 2.0 | 7 | 0.8 | 40 | 1.2 | 60 |
| Analgesics (15) | 6.2 | 6 | 1.3 | 21 | 4.9 | 79 |
| Diabetes therapies (8) | 0.3 | 1 | 0.2 | 54 | 0.1 | 46 |
| **Total** | **150.0** | **21** | **41.2** | **27** | **108.7** | **73** |

*Drug mentions are weighted estimates of national prescription drug occurrences based on observed medication use.
†Includes antianginals (2), antiarrhythmics (1), and anticoagulants (1).
‡Includes antidepressants (9), anxiolytics (5), and antipsychotics (2).
§Includes noninhaled corticosteroids (5), thyroid agents (1), ophthalmologic preparations (2), impotence therapy (1), osteoporosis therapy (1), stimulants (1), antigout therapy (1), antiglaucoma therapy (1), antiemetics (1), and bladder/prostate treatment (1).
‖Includes hormone therapy (6) and oral contraception (2).

**Table 2. Top 5 Medications by Volume and Proportion of Off-label Prescription***

| Top 5 Medications | No. of Off-label Drug Mentions† in Thousands | Off-label Mentions, %† | | |
| --- | --- | --- | --- | --- |
| | | All | With Strong Scientific Support | With Little or No Scientific Support |
| **No. of off-label mentions** | | | | |
| Albuterol sulfate | *10 087* | 53 | 36 | 18 |
| Amoxicillin | *8180* | 25 | 13 | 11 |
| Digoxin | *4423* | 66 | 25 | 41 |
| Methylprednisolone | *3822* | 54 | 7 | 47 |
| Azithromycin | *3700* | 22 | 16 | 5 |
| **Proportion of total mentions that were off-label** | | | | |
| Gabapentin | 3561 | *83* | 17 | 66 |
| Amitriptyline hydrochloride | 837 | *81* | 21 | 60 |
| Dexamethasone (oral) | 2355 | *79* | 23 | 56 |
| Isosorbide mononitrate | 1532 | *75* | 48 | 27 |
| Risperidone | 1821 | *66* | <1 | 66 |
| Digoxin | 4423 | *66* | 25 | 41 |
| **Proportion of total mentions with strong scientific support** | | | | |
| Isosorbide mononitrate | 1532 | 75 | *48* | 27 |
| Albuterol | 10 087 | 53 | *36* | 18 |
| Famotidine | 911 | 61 | *30* | 31 |
| Digoxin | 4423 | 66 | *25* | 41 |
| Ipratropium bromide | 1200 | 47 | *25* | 22 |
| **Proportion of total mentions with limited/no scientific support** | | | | |
| Gabapentin | 3561 | 83 | 17 | *66* |
| Risperidone | 1821 | 66 | <1 | *66* |
| Temazepam | 346 | 63 | <1 | *63* |
| Ciprofloxacin hydrochloride (optic solution) | 2104 | 64 | 2 | *62* |
| Amitriptyline | 837 | 80 | 21 | *60* |
| Nortriptyline hydrochloride | 343 | 65 | 5 | *60* |

*Each section of the table represents the top 5 medications using different metrics to capture varying facets of off-label medication use. Italics represent the numeric metric used to produce the given ranking.
†Drug mentions are weighted estimates of national prescription drug occurrences based on observed medication use.

©2006 American Medical Association. All rights reserved.

25

limited or no support. Conversely, off-label use for several medications was supported by a high degree of scientific evidence. Among the 24 medications for which most (>50%) of the off-label uses were scientifically supported, hypertension therapies were most common (7/21), followed by antimicrobials (4/21) and medications to lower lipid levels (3/21). It is not surprising, then, that 3 hypertension therapies (losartan potassium, atenolol, and a combination of hydrochlorothiazide and metoprolol tartrate) were among those medications with the highest degree of scientifically supported off-label use.

Few drug-specific characteristics were associated with off-label prescription (**Table 3**). Relative to analgesics, diabetes medications (RR, 0.04) were associated with less likelihood of off-label prescription, whereas anticonvulsants (RR, 5.7), psychiatric agents (RR, 4.1), allergy therapies (RR, 4.8), antiasthmatics (RR, 3.4), medications for peptic ulcer and dyspepsia (RR, 4.6), and cardiac medications (RR, 6.8) were associated with increased likelihood of off-label prescription. Other drug characteristics, including age, long-term use, combination therapies, formulation, dosing frequency, direct-to-consumer promotion, and manufacturer, showed few meaningful associations with off-label prescription.

### Table 3. Drug-Specific Characteristics Associated With Off-label Prescription

| Characteristic | RR (95% CI) | |
| --- | --- | --- |
| | Unadjusted | Adjusted* |
| Analgesics | 1.00 | 1.00 |
| Allergy therapies | 4.64 (2.80-7.69) | 4.83 (2.19-10.62) |
| Antiasthmatics | 3.33 (1.89-5.88) | 3.44 (1.60-7.46) |
| Anticonvulsants | 3.54 (1.98-6.31) | 5.67 (2.49-12.91) |
| Antimicrobials | 1.94 (1.02-3.72) | 1.96 (1.09-3.54) |
| Cardiac therapies | 6.80 (3.29-14.05) | 6.75 (2.66-17.11) |
| Diabetes therapies | 0.02 (0.00-0.11) | 0.04 (0.01-0.16) |
| Peptic ulcer and dyspepsia therapies | 3.04 (2.14-4.33) | 4.58 (2.17-9.76) |
| Psychiatric therapies | 3.18 (2.04-4.96) | 4.08 (1.99-8.36) |
| Tablet | 1.00 | 1.00 |
| Capsule | 1.09 (0.61-1.94) | 0.61 (0.41-0.93) |
| Other medication forms† | 0.10 (0.01-0.82) | 0.33 (0.14-0.78) |
| No. of approved indications identified in *PDR* | 1.05 (1.02-1.07) | 1.03 (1.01-1.05) |

Abbreviations: CI, confidence interval; *PDR*, Physicians' Desk Reference; RR, relative risk.

*Only drug-specific characteristics with a statistically significant association with off-label prescription are presented here. Adjustments were made for manufacturer, functional class, drug age, degree of direct-to-consumer promotion, use as a long-term therapy, medication form, frequency of use, and generic availability.

†Includes solution/suspension and injectable medication.

### COMMENT

Using data from a nationally representative survey of office-based physicians, we found that about 21% of all estimated uses for commonly prescribed medications were off-label, and that 15% of all estimated uses lacked scientific evidence of therapeutic efficacy. We believe that ours is the first study to systematically characterize the extent of off-label prescribing in general outpatient care. The magnitude of off-label use varied widely among specific medications and drug classes, exceeding 50% for some anticonvulsants, psychiatric medications, and antiasthmatics. No more than 30% of the off-label practices we observed were supported by strong scientific evidence.

Many of the observed off-label drug mentions, particularly among medications frequently used off-label, represent a logical extension of the FDA-approved indication. For example, current unapproved uses of antibiotics could be justified by laboratory studies demonstrating that the disease-causing organism responds to drug therapy. Albuterol, which is approved to treat asthma, is a clinically accepted off-label therapy for physiologically similar chronic obstructive pulmonary disease. Other medications are seen to exhibit a "class effect," such as the use of a particular angiotensin-converting enzyme that lacks approval for congestive heart failure.

In contrast, some of the observed off-label uses were as therapy for indications distinctly different from those for which the drug was approved. Examples include the use of metformin hydrochloride, approved for glycemic control in type 2 diabetes, as a therapy for relatively few patients with polycystic ovary syndrome and gabapentin, labeled for use as an anticonvulsant, as a widely used therapy for chronic nonspecific pain. Substantial heterogeneity remains in the degree to which many off-label practices, even those that seem to represent logical extensions of the labeled indication, are supported by scientific evidence.

Our findings echo those of an earlier study conducted 2 decades ago that considered the degree of evidence supporting a drug's efficacy for a limited number of specific drug-indication pairs.[14] Both studies indicate a need for more extensive postmarketing surveillance to identify non–evidence-based prescribing practices that lacked FDA approval. We suggest that policy makers confront these issues by asking the following questions: (1) What kinds of data could inform our understanding of the clinical and economic implications of off-label and non–evidence-based prescribing? (2) How can such data be collected or accessed once a drug has entered the market? and (3) Should decisions to "sanction" additional therapeutic uses without regulatory scrutiny consider the evidence or be left to market forces?

Differentiating off-label situations that are clinically reasonable from those that may be of concern is an essential first step. Such issues are at the forefront of prescription drug policy in Europe, where various systems have been established to monitor medication use after initial approval by regulatory authorities.[27] Regulators in Britain may label new drugs with a black triangle, signaling physicians to exercise caution when prescribing them; they can also monitor outcomes through a voluntary database of physicians' prescribing experiences. In France, pharmacovigilance centers track postapproval prescribing of drugs, whereas the European Medicines Agency can require drug manufacturers to collect and analyze postapproval surveillance data and mandate license renewal at shorter time intervals. These examples are designed primarily to protect patient safety, although simi-

©2006 American Medical Association. All rights reserved.

26

lar strategies could be used to inform judicious, evidence-based, and cost-effective prescribing choices.

We need to know more about the factors that produce off-label medication use. Gabapentin drew substantial media attention, because its manufacturer was investigated and convicted for inappropriate marketing of off-label uses of the drug.[28] Although our data do not allow us to link off-label medication use to promotional activities for specific off-label indications, the high degree of off-label use observed for gabapentin suggests the need to better understand the determinants of off-label medication use, including the potential influence of pharmaceutical marketing.

Several limitations of this analysis should be noted. The sampled medications accounted for slightly more than half of all drug mentions in 2001. Patterns of use among these common medications may not be indicative of those for other drugs. Comorbidities, which were not accounted for in our analysis, could potentially explain some off-label uses, although the potential for misclassification bias remains small given the direct correspondence between diagnosis and medication. Similarly, we were unable to verify the use of many antibiotics as off-label without the results of supporting laboratory tests. Although these limitations may cause us to overestimate some off-label uses, others could cause off-label practices to be underestimated. For example, off-label uses defined by patient population were likely missed because these data were unable to account for patient characteristics such as age, sex, or pregnancy. Finally, we were limited in our ability to capture the gradient of evidence that exists for most off-label uses of the drugs in this sample. By establishing a high threshold for what is termed scientific support, the drug uses we identified as unsupported may have varying degrees of scientific evidence that fall short of this threshold. As is often the case with retrospective studies, we had to rely on data collected by others, primarily for different purposes. In these situations, we attempted to make conservative assumptions and consider how our results might have varied with somewhat different assumptions. Our main findings remained robust following such considerations.

<hr>

## CONCLUSIONS

The ability to prescribe medicines off label brings greater latitude to turn scientific knowledge into innovative clinical practice. Although attention should be given to the situations where evidence-based off-label use is clinically beneficial, policy makers must begin to consider strategies for mandatory postapproval surveillance that focus on curtailing underevaluated off-label practices that jeopardize patient safety or represent economically wasteful prescribing practices.

**Accepted for Publication:** November 22, 2005.
**Correspondence:** Randall S. Stafford, MD, PhD, Stanford Prevention Research Center, Program on Prevention Outcomes and Practices, Hoover Pavilion, 211 Quarry Rd, Stanford, CA 94305 (rstafford@stanford.edu).
**Financial Disclosure:** None.
**Funding/Support:** This study was supported by research grant R01-HS013405 from the Agency for Healthcare Re-search and Quality. Merck and Company, Inc, and IMS Health provided access to the data used in this analysis.
**Role of the Sponsor:** None of the 3 supporting organizations played a role in the design and conduct of the study, analysis and interpretation of the data, or the preparation and approval of the manuscript.

<hr>

## REFERENCES

1. Appler WD, McMann GL. View from the nation's capital: "off-label" uses of approved drugs: limits on physicians' prescribing behavior. *J Clin Psychopharmacol.* 1989;9:368-370.
2. Chavey WE II, Blaum CS, Bleske BE, Van Harrison R, Kesterson S, Nicklas JM. Guideline for the management of heart failure caused by systolic dysfunction, II: treatment. *Am Fam Physician.* 2001;64:1045-1054.
3. Chen H, Deshpande AD, Jiang R, Martin BC. An epidemiological investigation of off-label anticonvulsant drug use in the Georgia Medicaid population. *Pharmacoepidemiol Drug Saf.* 2005;14:629-638.
4. Loder EW, Biondi DM. Off-label prescribing of drugs in specialty headache practice. *Headache.* 2004;44:636-641.
5. Hoo GW. Off label, on target? *Chest.* 2004;126:1022-1025.
6. Nightingale SL. Off-label use of prescription drugs. *Am Fam Physician.* 2003;68: 425-427.
7. Pomerantz JM, Finkelstein SN, Berndt ER, et al. Prescriber intent, off-label usage, and early discontinuation of antidepressants: a retrospective physician survey and data analysis. *J Clin Psychiatry.* 2004;65:395-404.
8. Stone KJ, Viera AJ, Parman CL. Off-label applications for SSRIs. *Am Fam Physician.* 2003;68:498-504.
9. Brosgart CL, Mitchell T, Charlebois E, et al. Off-label drug use in human immunodeficiency virus disease. *J Acquir Immune Defic Syndr Hum Retrovirol.* 1996; 12:56-62.
10. Choonara I, Conroy S. Unlicensed and off-label drug use in children: implications for safety. *Drug Saf.* 2002;25:1-5.
11. McIntyre J, Conroy S, Avery A, Corns H, Choonara I. Unlicensed and off label prescribing of drugs in general practice. *Arch Dis Child.* 2000;83:498-501.
12. Rayburn WF, Turnbull GL. Off-label drug prescribing on a state university obstetric service. *J Reprod Med.* 1995;40:186-188.
13. Donofrio PD, Busis NA. Regulatory and reimbursement issues in treating patients with immune-mediated neuropathies. *Neurology.* 2002;59:S41-S45.
14. Strom BL, Melmon KL, Miettinen OS. Post-marketing studies of drug efficacy: why? *Am J Med.* 1985;78:475-480.
15. IMS HEALTH. *National Disease and Therapeutic Index, Medication Reference File, 2001.* Plymouth Meeting, Pa: IMS Health; 2001.
16. Stafford RS, Radley DC. The underutilization of cardiac medications of proven benefit, 1990 to 2002. *J Am Coll Cardiol.* 2003;41:56-61.
17. Zell ER, McCaig LF, Kupronis BA, Besser RE, Schuchat A. A comparison of the National Disease and Therapeutic Index and the National Ambulatory Medical Care Survey to evaluate antibiotic usage. Available at: http://amstat.org/sections/srms /Proceedings. Accessed February 27, 2006.
18. *International Classification of Diseases, Ninth Revision, Clinical Modification.* Washington, DC: Public Health Service, US Dept of Health and Human Services; 1988.
19. Medical Economics Co. *Physicians' Desk Reference: 2002.* 56th ed. Montvale, NJ: Medical Economics Co; 2002.
20. Healthcare Series MICROMEDEX. *MICROMEDEX Healthcare Series.* Greenwood Village, Colo: MICROMEDEX; 2002.
21. *Payment for Covered Outpatient Drugs and Biologicals,* 69 *Federal Register* 55763 (2004) (codified at 42 CFR §405, 410, 411, 414, 418, 424, 484, 486).
22. Healthcare Series Quarterly Editorial Updates MICROMEDEX. *What's New In Vol 113.* Greenwood Village, Colo: MICROMEDEX Healthcare Series; 2002.
23. Center for Drug Evaluation and Research. Electronic Orange Book, 2003 Vol: Food and Drug Administration. Available at: http://www.fda.gov/cder/ob. Accessed February 27, 2006.
24. Rosenthal MB, Berndt ER, Donohue JM, Frank RG, Epstien AM. Promotion of prescription drugs to consumers. *N Engl J Med.* 2003;346:498-505.
25. Liang K, Zeger S. Longitudinal data analysis using generalized linear models. *Biometrika.* 1986;73:13-22.
26. Long J, Ervin L. Using heteroscedasticity: consistent standard errors in the linear regression model. *Am Stat.* 2000;54:217-224.
27. Wilde Mathews A. US gets dose of ideas on drug safety tactics from developed nations: in Europe and elsewhere, vigilance remains high in postapproval stage. *Wall Street Journal Europe.* December 31, 2004;22(234):1.
28. Larkin M. Warner-Lambert found guilty of promoting Neurontin off label. *Lancet Neurol.* 2004;3:387.

<hr>

©2006 American Medical Association. All rights reserved.

27