# EXHIBIT 27

# Understanding Unapproved Use of Approved Drugs "Off Label"



Has your healthcare provider ever talked to you about using an FDA-approved drug for an unapproved use (sometimes called an "off-label" use) to treat your disease or medical condition?

It is important to know that before a drug can be approved, a company must submit clinical data and other information to FDA for review. The company must show that the drug is safe and effective for its intended uses. "Safe" does not mean that the drug has no side effects. Instead, it means the FDA has determined the benefits of using the drug for a particular use outweigh the potential risks.

When you are prescribed a drug for its approved use, you can be sure:

- That FDA has conducted a careful evaluation of its benefits and risks for that use.

- The decision to use the drug is supported by strong scientific data.

- There is approved drug labeling for healthcare providers on how to use the drug safely and effectively for that use.

The approved drug labeling for healthcare providers gives key information about the drug that includes:

- The specific diseases and conditions that the drug is approved to treat.

- How to use the drug to treat those specific diseases and conditions.

- Information about the risks of the drug.

- Information that healthcare providers should discuss with patients before they take a drug.

Some drugs may also have labeling information for patients such as Medication Guides, Patient Package Inserts and Instructions for Use.

### Why might an approved drug be used for an unapproved use?

From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient.

You may be asking yourself why your healthcare provider would want to prescribe a drug to treat a disease or medical condition that the drug is not approved for.  One reason is that there might not be an approved drug to treat your disease or medical condition.  Another is that you may have tried all approved treatments without seeing any benefits.  In situations like these, you and your healthcare provider may talk about using an approved drug for an unapproved use to treat your disease or medical condition.

### What are examples of unapproved uses of approved drugs?

Unapproved use of an approved drug is often called "off-label" use. This term can mean that the drug is:

- Used for a disease or medical condition that it is not approved to treat, such as when a chemotherapy is approved to treat one type of cancer, but healthcare providers use it to treat a different type of cancer.

- Given in a different way, such as when a drug is approved as a capsule, but it is given instead in an oral solution.

- Given in a different dose, such as when a drug is approved at a dose of one tablet every day, but a patient is told by their healthcare provider to take two tablets every day.

If you and your healthcare provider decide to use an approved drug for an unapproved use to treat your disease or medical condition, remember that FDA has not determined that the drug is safe and effective for the unapproved use.

### Questions you may want to consider

If your healthcare provider is thinking about using an approved drug for an unapproved use, you may want to ask your healthcare provider questions like these:

- What is the drug approved for?

- Are there other drugs or therapies that are approved to treat my disease or medical condition?

- What scientific studies are available to support the use of this drug to treat my disease or medical condition?

- Is it likely that this drug will work better to treat my disease or medical condition than using an approved treatment?

- What are the potential benefits and risks of treating my disease or medical condition with this drug?

- Will my health insurance cover treatment of my disease or medical condition with this drug?

- Are there any clinical trials studying the use of this drug for my disease or medical condition that I could enroll in?

# Resources For You

- FDA Approved Medication Guides (/drugs/drug-safety-and-availability/medication-guides)

- Drugs@FDA Database (http://www.accessdata.fda.gov/scripts/cder/daf/index.cfm)

- DailyMed (https://dailymed.nlm.nih.gov/dailymed/index.cfm)

This exhibit contains digital media which can be accessed with the below link and password:

6671293

Password: q3AmZnNR

https://veritext.egnyte.com/fl/pVXraEx4vK





# HHS Public Access
Author manuscript

*Pediatrics*. Author manuscript; available in PMC 2020 October 01.

Published in final edited form as:
*Pediatrics*. 2019 October ; 144(4): . doi:10.1542/peds.2019-0896.

## Trends in Off-Label Drug Use in Ambulatory Settings: 2006-2015

**Divya Hoon, BA**[1], **Matthew Taylor, BA**[2,3], **Pooja Kapadia, BA**[1], **Tobias Gerhard, BSPharm, PhD**[2,4,5], **Brian L. Strom, MD, MPH**[2,6,7], **Daniel B. Horton, MD, MSCE**[2,5,8]

[1]Rutgers Robert Wood Johnson Medical School, Piscataway, NJ, USA

[2]Rutgers Center for Pharmacoepidemiology and Treatment Science, Institute for Health, Health Care Policy and Aging Research, New Brunswick, NJ, USA

[3]Sidney Kimmel Medical College, Thomas Jefferson University, Philadelphia, PA, USA

[4]Department of Pharmacy Practice and Administration, Rutgers Ernest Mario School of Pharmacy, Piscataway, NJ, USA

[5]Department of Biostatistics and Epidemiology, Rutgers School of Public Health, Piscataway, NJ, USA

[6]Rutgers Biomedical and Health Sciences, Newark, NJ, USA

[7]Department of Biostatistics and Epidemiology, Perelman School of Medicine, University of Pennsylvania, Philadelphia, PA, USA

[8]Department of Pediatrics, Rutgers Robert Wood Johnson Medical School, New Brunswick, NJ, USA

## Abstract

**Background:** Off-label drug use in children is common and potentially harmful. In most previous off-label use research, authors studied hospitalized children, specific drug classes, or non-US settings. We characterized frequencies, trends, and reasons for off-label systemic drug orders for children in ambulatory US settings.

**Methods:** Using national surveys of office-based physicians (National Ambulatory Medical Care Surveys, 2006–2015), we studied off-label orders of systemic drugs for children age <18 based on US Food and Drug Administration–approved labeling for age, weight, and indication. We

**Corresponding Author:** Daniel B. Horton, MD, MSCE, 112 Paterson St, New Brunswick, NJ 08901. Telephone: 848-932-4607. daniel.horton@rutgers.edu.

Contributor's statement:
Ms. Hoon conceptualized and designed the study, carried out the analyses, interpreted study data, drafted the initial manuscript, and reviewed and revised the manuscript.
Ms. Kapadia and Mr. Taylor carried out the analyses, interpreted study data, and critically reviewed the manuscript for important intellectual content.
Drs. Gerhard and Strom conceptualized and designed the study, interpreted study data, and critically reviewed the manuscript for important intellectual content.
Dr. Horton conceptualized and designed the study, carried out the analyses, interpreted study data, and critically reviewed and revised the manuscript.
All authors approved the final manuscript as submitted and agree to be accountable for all aspects of the work.

**Potential Conflicts of Interest:** The authors have no potential conflicts to disclose.



Exhibit
0006

characterized the top classes and diagnoses with off-label orders and analyzed factors and trends of off-label orders using logistic regression.

**Results:** Physicians ordered ≥1 off-label drug at 18.5% (95% confidence interval: 17.7%–19.3%) of visits, usually (74.6%) because of unapproved conditions. Off-label ordering was most common proportionally in neonates (83%) and in absolute terms among adolescents (322 orders out of 1000 visits). Off-label ordering was also associated with female sex, subspecialists, polypharmacy, and chronic conditions. Rates and reasons for off-label orders varied considerably by age. Relative and absolute rates of off-label orders rose over time. Among common off label classes, rates of antihistamines and several psychotropic drugs increased over time, whereas off-label orders for several classes of antibiotics were stable or declined.

**Conclusions:** US office-based physicians have ordered systemic drugs off label for children at increasing rates, most often for unapproved conditions, despite recent efforts to increase evidence and drug approvals for children. These findings can help inform education, research, and policies around effective, safe use of medications in children.

## Table of Contents Summary:

Using nationally representative survey data from 2006–2015, this study examined patterns of off-label systemic drug orders for children in ambulatory United States settings.

---

## INTRODUCTION:

Children often take drugs off-label, outside of an approved age, indication, weight, dose, formulation, or route of administration.[1–3] Off-label prescribing has been associated with higher rates of adverse effects in children.[4] However, off-label prescribing is legal and can represent best practice based on extensive clinical experience and supporting evidence of efficacy and safety, particularly when no labeled alternatives exist.[1, 5] Laws and policies including the Best Pharmaceutical for Children Act (BPCA, 2002), Pediatric Research Equity Act (PREA, 2003), and the European Pediatric Regulation (2007) have incentivized or mandated pediatric clinical trials, intending to increase the quality of evidence and number of drugs approved for children.[6–8] Nonetheless, many drugs remain off-label for children, and legislative efforts to stimulate clinical trials for both new and off-patent drugs may not yet have realized their potential.[9, 10]

Reported rates of off-label drug use in children vary widely across studies, owing to differences in definitions of off-label usage, methodology and sampling, composition of the study population (e.g., age range), number of drugs considered, geography, and settings of care (e.g., inpatient vs. ambulatory).[3] Particularly high rates of off-label pediatric drug use have been reported in inpatient settings (36–92%), especially neonatal and pediatric intensive care units (80–97%).[3, 4, 11] Nonetheless, the vast majority of children receive care and medicines exclusively in the outpatient setting.[12] Studies of off-label prescribing in outpatient settings have often focused on select drugs or drug classes (e.g., antidepressants).[13, 14] A more comprehensive study of pediatric drug utilization in ambulatory US settings was limited to 4 years of data through 2004.[15] More recent studies on outpatient off-label pediatric drug utilization have come predominantly from European countries, which have different systems of care, prescribing practices, regulations, and populations than the US.

Author Manuscript

[16–21] We sought to describe recent patterns of drugs ordered off-label in a US-representative ambulatory pediatric population, including time trends and common diagnoses with off-label orders, focusing on systemic drugs because of their greater potential for drug toxicity.

## METHODS:

### Study Design and Setting:

We conducted a retrospective utilization study of serial, cross-sectional data from the National Ambulatory Medical Care Surveys (NAMCS, 2006–2015).[22] This annual survey collects anonymous, visit-level data from US office-based physicians, including demographics, reasons for visit, diagnoses, and drugs provided or ordered at the visit, including recommended over-the-counter (OTC) drugs. NAMCS data are collected through a probability-based, complex sampling design that allows researchers to produce nationally representative estimates. This study was determined by the Rutgers IRB to be non-human subjects research (Pro20170000577).

### Study Population:

We included all visits for children under 18 years old. We focused on the 141 drugs predominantly or exclusively used in systemic formulations and ordered at least 30 times in the data set (Supplemental Methods). We used the Anatomical Therapeutic Chemical (ATC) classification to present data based on broad categories (level 1) and drug classes (level 3) corresponding to the predominant systemic use (Supplemental Methods). We excluded from consideration vaccines, vitamins, and drugs no longer FDA-approved because of withdrawal of market authorization (mostly cough medicines).

### Off-label definitions:

Our main outcomes of interest were absolute and relative prevalence rates of off-label orders of systemic drugs. Absolute prevalence was defined as the number of drugs ordered per 1000 visits; relative prevalence was defined as the percentage of off-label orders among all ordered drugs. We defined off-label usage based on US drug labeling as recorded in the Prescribers' Digital Reference and the Food and Drug Administration (FDA) website in 2018.[23, 24] Off-label status was determined using the following criteria (see also Supplemental Methods, Off-Label Definitions):

1. **Age**: drugs were considered *off-label by age* when ordered for children younger than the approved age for any indication.

2. **Weight**: drugs were considered *off-label by weight* when weight was specified in the product labeling and drugs were ordered for a child weighing less than the approved weight for any age or indication. Drugs were considered *possibly* off-label when weight was missing.

3. **Indication**: drugs were considered *off-label by indication* when ordered in visits without a documented condition corresponding to an FDA-approved indication. For each ordered drug at each visit, FDA-approved indications were compared to recorded diagnoses (up to 5 International Classification of Diseases, Ninth

Revision, Clinical Modification [ICD-9-CM] codes), chronic disease indicators (checkboxes for asthma, depression, etc.), and reasons for visit (up to 5 additional symptoms, diagnoses, or other reasons recorded in NAMCS). Each unmatched drug-visit observation was manually reviewed by two individuals, including a practicing pediatrician (DBH). Drugs were considered *possibly* off-label when ordered for nonspecific diagnoses or symptoms broader than the listed FDA-approved indication.

4.   **Overall**: a drug was considered off-label overall when it was off-label by age, weight, or indication, or was ordered for an approved indication at an unapproved age or (where applicable) weight. A drug was considered *possibly* off-label overall when deemed to be possibly off-label by indication or weight but not off-label by age.

Dose information was unavailable and not considered for off-label status determination.

**Independent variables:**

Independent variables of interest included age subgroups, sex, race/ethnicity, US geographic region, insurance status, physician specialty, number of systemic drugs ordered, presence of a chronic condition, and calendar year (Supplemental Methods).

**Data Analysis:**

We estimated absolute prevalence of systemic and off-label systemic drug orders with 95% confidence intervals (CI) by taking the mean of orders-per-visit across visits and multiplying by 1000 to produce rates per 1000 visits. We estimated relative prevalence of off-label drug orders with 95% CI by tabulating the percentage of off-label orders across all visits and visits with systemic drug orders. All estimates were repeated for drug categories, drug classes, drugs, calendar year, and age subgroups. We presented results for the drug classes most commonly ordered off-label, including the most common drugs within each class and the most common diagnoses for off-label orders at the level of 3-digit ICD-9-CM code, excluding nonspecific codes (V20 health supervision child and V67 follow-up examination). We estimated the association of calendar time and other covariates with off-label orders among visits with ≥1 systemic drug order using multivariable logistic regression. We used model-based predictive margins to estimate covariate-specific probabilities of off-label orders with 95% CI. We also used logistic regression to evaluate the relative change in off-label orders over time for more common drug classes. We performed sensitivity analyses classifying *possibly* off-label orders as off-label.

Analyses were conducted on Stata/MP 14 and 15.1, accounting for the complex sampling design to produce nationally representative estimates. All p-values were two-sided using alpha of 0.05.

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

## RESULTS:

### Prevalence of Off-Label Orders

Of the 1.74 billion ambulatory pediatric visits estimated over the 10 years of NAMCS data used in this study, 41.5% (95% CI 40.5–42.6%) of these visits resulted in ≥1 order of the 141 systemic drugs studied, totaling 108.0 (95% CI 105.2–110.9) million orders per year. 18.5% of visits (44.5% of visits with systemic drugs) included ≥1 off-label systemic drug order, or 41.2 million off-label orders per year (Table 1). An additional 1.6% of visits had possibly off-label orders due to nonspecific documentation. Of drugs considered off-label or possibly off-label, 74.6% were off-label by indication, 17.6% were off-label by age, 0.6% were off-label by weight, and 4.7% were off-label based on the combination of age, indication, and (where applicable) weight (Table 1).

In absolute terms, off-label orders were most common among adolescents (321.5 orders/ 1000 visits) and least common among neonates (52.0 orders/1000 visits), reflecting to some degree the overall prevalence of systemic drug orders (Table 2). In relative terms, the youngest age groups were most likely to receive medications off-label: approximately 83% of all neonatal visits and 49% of infant visits with ≥1 systemic drug included ≥1 off-label drug order, compared to 39–44% of visits for other age groups (Table 3). Additionally, visits for girls, offices in the South, subspecialists, and presence of polypharmacy or a chronic condition, but not race, ethnicity, or insurance type, were associated with increased relative rates of off-label orders (Table 3).

Among drug categories (ATC level 1), the absolute prevalence of off-label orders was highest for anti-infectives (75 orders/1000 visits), followed by respiratory drugs and nervous system drugs (each ~54 orders/1000 visits) (Table 4). The absolute prevalence of off-label orders for all other drug categories was less than 30 orders/1000 visits. Considerable age-related variation in rates of off-label orders existed for certain drug categories, including anti-infectives, respiratory, nervous system, and genitourinary drugs, reflecting underlying differences in overall orders by age (Table 4). Of all drug categories and all age groups, absolute rates of off-label orders were highest in nervous system drugs for adolescents (123 orders/1000 visits). The relative prevalence of off-label orders was variable across drug categories (highest overall for alimentary and genitourinary drugs) and age groups (generally highest for neonates) (Table 5).

According to drug class (ATC level 3), antihistamines were the drug class most commonly ordered off-label, followed by penicillins; macrolides plus clindamycin; antidepressants; and cephalosporins (Supplemental Table 2). Within each drug class, the drugs most commonly ordered off-label tended to reflect the prevalence of orders overall; however, the relative prevalence of off-label orders occasionally diverged for drugs within the same class (e.g., antidepressants: sertraline 93%, fluoxetine 37%; nonsteroidal anti-inflammatory drugs (NSAIDs): ibuprofen 5%; diclofenac 100%) (Supplemental Table 3). The most common diagnoses in visits with off-label orders generally corresponded to off-label indications (e.g., antihistamines for upper respiratory tract infections, antidepressants for attention deficit/ hyperactivity disorder [ADHD]) (Supplemental Table 2). However, certain more common diagnoses corresponded to indications approved for some but not all drugs within the class

(e.g., amoxicillin-clavulanate, not approved for pharyngitis) or drugs ordered off-label by age (e.g., stimulants for young children with ADHD, laxatives for children with constipation). Some diagnoses for visits with off-label drugs were related to approved indications (e.g., antihistamines for asthma) yet without documentation of the related conditions (e.g., allergic rhinitis). Age groups differed in the drug classes most commonly ordered off-label (Supplemental Tables 4–8) and the most common diagnoses for off-label ordering (Supplemental Table 9).

**Trends of Off-Label Orders**

Absolute rates of off-label drug orders increased throughout the study period, predominantly reflecting a rise in off-label orders by indication (Figure). After adjusting for other factors, relative rates of off-label ordering were also higher in later years (47.2% in 2012–2015 vs. 41.9% in 2006–2008) (Table 3). In analyses by drug class, absolute rates of off-label orders rose over time for numerous classes, including antihistamines, several classes of psychotropic drugs (antidepressants, stimulants, antiepileptics, antiadrenergics), anti-inflammatory drugs (corticosteroids, NSAIDs), and certain GI drugs (reflux drugs, antiemetics) (Supplemental Figures 1–3). Relative changes over time in class-specific off-label orders generally paralleled the observed changes in absolute rates; relative declines were seen for penicillins and antipsychotics along with a marked increase for antiemetics (Supplemental Figures 4–6).

**Sensitivity Analyses**

In sensitivity analyses, a broader definition of off-label drugs (including possibly off-label orders) produced slightly higher estimates of absolute off-label prevalence and modestly changed the order of the most commonly off-label drug classes; overall the findings were highly consistent (Supplemental Figure 7, Supplemental Tables 10–14).

## DISCUSSION:

Across 10 years of national US data, office-based physicians ordered ≥1 systemic off-label drug in nearly 1 in 5 of all pediatric visits, most commonly for an unapproved condition. In absolute terms, visits for adolescents most commonly resulted in off-label orders, but in relative terms, off-label ordering was highest among neonates, for whom roughly 5 of 6 systemic drugs ordered were off-label. Relative rates of off-label orders were also higher in visits for girls, for children with a chronic condition and multiple drug orders, for subspecialists, and in the US South. The drug classes most commonly ordered off-label were antihistamines (especially for respiratory infections and conditions), several classes of antibiotics (especially for viral infections), and antidepressants (especially for ADHD). Gastrointestinal drugs were more commonly ordered off-label for infants, while off-label psychotropic drug ordering was highest for adolescents. In both absolute and relative terms, off-label ordering has risen over time, most notably for unapproved conditions. Rates of off-label ordering have increased for antihistamines and several class of psychotropic, anti-inflammatory, and GI drugs, while off-label orders for certain antibiotic classes and antipsychotics have declined.

An older study examining pediatric off-label drug orders using the same data source (NAMCS, 2001–2004) found that over 60% of visits with prescribed drugs included off-label orders, significantly higher than our estimated 45%.[15] Despite the common data source, that study differed from ours in its inclusion of non-systemic drugs and exclusion of OTC drugs. Our study also used additional information (i.e., chronic disease checkboxes and reasons for visit) to establish concordance with labeled indications, which may have also contributed to the lower estimates of off-label orders. Other pediatric studies from US ambulatory settings focusing on antidepressants and antipsychotics have reported similar (and high) relative rates and reasons for off-label prescribing.[25, 26]

Our findings were also consistent with declining trends in antibiotic prescribing over the last 20 years, particularly for certain drug classes, including penicillins and cephalosporins.[27, 28] Our study also corroborates a recent US antibiotic utilization study showing that approximately 1/3 of antibiotics dispensed for commercially insured children were either clinically inappropriate or without documented diagnoses, while nearly half of all fills were of questionable appropriateness.[29] On the other hand, certain class-specific changes in off-label orders (e.g., for antihistamines, psychotropics) contrast with overall pediatric prescribing trends reported elsewhere.[28] These discrepancies may relate to our focus on off-label orders as well as differences in data source and exposure definitions: our study in NAMCS captured physician-reported data on prescribed and recommended OTC drugs, while a study using NHANES focused on self-reported data on prescribed (not OTC) drugs taken (not ordered) in the prior month.

Our findings show lower rates of off-label orders than in other studies from acute and critical care settings.[30] While hospitalized children are a high-risk group for drug-related adverse effects, the vast majority of children are treated exclusively in outpatient settings, where tolerance of risk is also much lower.

It is more difficult to compare our findings with pediatric studies of outpatient off-label drugs from other countries, given the differences in pediatric populations (including age ranges considered), prescribing practices, definitions of off-label usage (age alone, consideration of dose, etc.), and number and types of drugs considered.[3, 11, 17, 21, 31, 32] A recent utilization study from southwestern France also showed that indication was a more common reason for off-label prescribing than age or dose, with relatively high rates of off-label prescribing of antihistamines, antibiotics, and among children prescribed multiple drugs.[16] Overall rates of off-label prescribing were lower overall (as with multiple other European studies), but this may relate in part to their consideration of non-systemic drugs and to their assumption that antibiotics prescribed for viral infections were not off-label, along with geographic differences in prescribing.[3, 11, 16]

While prescribing and use of medicines off-label is common in pediatrics, off-label drug use is not always off-evidence.[1, 5] Certain more common indications we identified as off-label were, in fact, supported by high-quality evidence, e.g., glucocorticoids for croup and ondansetron for vomiting.[33, 34] Indeed, frequency of off-label use is only one of several aspects that should be considered when prioritizing pediatric drug research and policies, including the potential for benefit (e.g., common diseases as well as rare diseases with high

morbidity or mortality), risk of adverse effects (including from drug-drug interactions), level of uncertainty about relative risks and benefits, and availability of therapeutic alternatives. [35–37] While legislation in the US and Europe has stimulated research and approvals of drugs for children, recent studies have shown that completion of required pediatric trials have been delayed beyond the FDA-mandated times.[38–40] Additionally, the reporting of results from some required studies in trial registries (e.g., ClinicalTrials.gov) and peer-reviewed journals has been incomplete (e.g., 15–24% of completed studies without reported results) and suboptimal (e.g., missing elements about study design and reasons for study discontinuation).[38, 39] Furthermore, efforts to advance research about off-patent drugs, including the BPCA priority list and the European Pediatric Use Marketing Authorization, may be insufficient in producing all of the necessary evidence for safe and effective use of off-patent medicines in children.[10, 36, 41, 42] Our study's focus on systemic drugs (given their greater potential for toxicity) and enumeration of the most common indications with off-label orders, complement other efforts to prioritize research and policies for off-label, off-evidence medicines in children.

Our study had several strengths, including its long study period, large and nationally representative study population, and comprehensive evaluation of over 140 of the most common systemic drugs ordered for children in clinics across the US. These data enabled us to identify recent increases in off-label ordering, highlight the drugs and conditions with the most off-label orders, and identify factors associated with off-label drugs that have not been reported in smaller studies.

This study also had limitations. The cross-sectional data within NAMCS may have limited ascertainment of all relevant indications for drug orders, including historical diagnoses. We excluded less commonly ordered drugs, whose concordance with labeling may have been different than included medications. We were also unable to ascertain drug formulation or dosage, which is a common reason for off-label usage in some settings, thus resulting in a systematic underestimation in overall off-label use.[30, 43, 44] NAMCS provides data on medicines ordered by physicians, which include medicines not dispensed to or consumed by patients and do not include OTC medicines not ordered by physicians or received in other settings (e.g., inpatient). Finally, we did not formally evaluate the evidence behind off-label drugs and indications reported in this study.

## CONCLUSION:

In summary, office-based physicians commonly order systemic drugs for children off-label, particularly for unapproved conditions. Despite legislation to generate more data on the effects of drugs in children, off-label orders have risen in recent years, most notably of antihistamines and psychotropic drugs, such as antidepressants. The rates and reasons for off-label orders vary by age, with more off-label orders for GI conditions in the youngest age groups, for psychiatric conditions in older age groups, and for infections and respiratory conditions across age groups. These results can help inform ongoing education, research, and policies around efficacious, effective, and safe use of medications in children.

Author Manuscript

## Supplementary Material

Refer to Web version on PubMed Central for supplementary material.

## Acknowledgment:

Brian Cao and Matthew Del Signore assisted with manual reviews of visit data, and Edward Nonnenmacher assisted with data collection and presentation. Research reported in this publication was supported by the Rutgers Robert Wood Johnson Medical School Summer Research Fellowship and the National Institute of Arthritis and Musculoskeletal and Skin Diseases of the National Institutes of Health under Award Numbers K23-AR070286 and L40-AR070497. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health.

**Financial Disclosure:** Dr. Gerhard has received grant funding on unrelated matters from BMS and has consulted on unrelated matters for BMS and Eli Lilly. Dr. Strom has consulted on unrelated matters for AstraZeneca, Bayer, Celgene, Janssen, Lundbeck, Innovative Science Solutions LLC, and McKesson Specialty Arizona Inc. Dr. Horton has received grant funding on unrelated matters from BMS. Ms. Hoon, Ms. Kapadia, and Mr. Taylor have no financial relationships relative to this article to disclose.

**Funding Source:** Funding was provided by National Institutes of Health/NIAMS and the Rutgers Robert Wood Johnson Medical School Summer Research Fellowship.

## Abbreviations:

| | |
|---|---|
| **ADHD** | attention deficit/hyperactivity disorder |
| **ATC** | Anatomical Therapeutic Chemical |
| **BPCA** | Best Pharmaceuticals for Children Act |
| **CI** | confidence intervals |
| **FDA** | Food and Drug Administration |
| **ICD-9** | International Classification of Diseases 9th Edition |
| **NAMCS** | National Ambulatory Medical Care Surveys |
| **OTC** | over-the-counter |
| **PREA** | Pediatric Research Equity Act |

## References:

1. Neville KA, Frattarelli DAC, Galinkin JL, et al. Off-label use of drugs in children. 2014;133(3):563–567.

2. McIntyre J, Conroy S, Avery A, Corns H, Choonara I. Unlicensed and off label prescribing of drugs in general practice. Arch Dis Child. 2000;83(6):498–501. [PubMed: 11087285]

3. Pandolfini C, Bonati M. A literature review on off-label drug use in children. Eur J Pediatr. 2005;164(9):552–558. [PubMed: 15912383]

4. Turner S, Nunn AJ, Fielding K, Choonara I. Adverse drug reactions to unlicensed and off-label drugs on paediatric wards: a prospective study. Acta Paediatr. 1999;88(9):965–968. [PubMed: 10519338]

5. Ito S. Drugs for Children. Clin Pharmacol Ther. 2017;101(6):704–706. [PubMed: 28510298]

6. Rodriguez W, Selen A, Avant D, et al. Improving pediatric dosing through pediatric initiatives: what we have learned. Pediatrics. 2008;121(3):530–539. [PubMed: 18310202]

7. Roberts R, Rodriguez W, Murphy D, Crescenzi T. Pediatric drug labeling: improving the safety and efficacy of pediatric therapies. JAMA. 2003;290(7):905–911. [PubMed: 12928467]

8. Bucci-Rechtweg C. Enhancing the Pediatric Drug Development Framework to Deliver Better Pediatric Therapies Tomorrow. Clin Ther. 2017;39(10):1920–1932. [PubMed: 28818298]

9. Bourgeois FT, Hwang TJ. The Pediatric Research Equity Act Moves Into Adolescence. JAMA. 2017;317(3):259–260. [PubMed: 28114560]

10. European Commission. State of Paediatric Medicines in the EU: 10 years of the EU Paediatric Regulation. https://ec.europa.eu/health/sites/health/files/files/paediatrics/docs/2017_childrensmedicines_report_en.pdf. Published 2017. Accessed April 18, 2018.

11. Cuzzolin L, Atzei A, Fanos V. Off-label and unlicensed prescribing for newborns and children in different settings: a review of the literature and a consideration about drug safety. Expert Opin Drug Saf. 2006;5(5):703–718. [PubMed: 16907660]

12. Mohr JJ, Lannon CM, Thoma KA, et al. Learning from Errors in Ambulatory Pediatrics In: Henriksen K, Battles JB, Marks ES, Lewin DI, editors. Advances in Patient Safety: From Research to Implementation (Volume 1: Research Findings). Rockville (MD)2005.

13. Schroder C, Dorks M, Kollhorst B, et al. Outpatient antidepressant drug use in children and adolescents in Germany between 2004 and 2011. Pharmacoepidemiol Drug Saf. 2017;26(2):170–179. [PubMed: 27868277]

14. Lai LL, Koh L, Ho JA, Ting A, Obi A. Off-Label Prescribing for Children with Migraines in U.S. Ambulatory Care Settings. J Manag Care Spec Pharm. 2017;23(3):382–387. [PubMed: 28230456]

15. Bazzano AT, Mangione-Smith R, Schonlau M, Suttorp MJ, Brook RH. Off-label prescribing to children in the United States outpatient setting. Acad Pediatr. 2009;9(2):81–88. [PubMed: 19329098]

16. Palmaro A, Bissuel R, Renaud N, et al. Off-label prescribing in pediatric outpatients. Pediatrics. 2015;135(1):49–58. [PubMed: 25511119]

17. Sturkenboom MC, Verhamme KM, Nicolosi A, et al. Drug use in children: cohort study in three European countries. BMJ. 2008;337:a2245.

18. Schirm E, Tobi H, de Jong-van den Berg LT. Unlicensed and off label drug use by children in the community: cross sectional study. BMJ. 2002;324(7349):1312–1313. [PubMed: 12039826]

19. Schirm E, Tobi H, de Jong-van den Berg LT. Risk factors for unlicensed and off-label drug use in children outside the hospital. Pediatrics. 2003;111(2):291–295. [PubMed: 12563053]

20. Carnovale C, Conti V, Perrone V, et al. Paediatric drug use with focus on off-label prescriptions in Lombardy and implications for therapeutic approaches. Eur J Pediatr. 2013;172(12):1679–1685. [PubMed: 23913312]

21. Olsson J, Kimland E, Pettersson S, Odlind V. Paediatric drug use with focus on off-label prescriptions in Swedish outpatient care--a nationwide study. Acta Paediatr. 2011;100(9):1272–1275. [PubMed: 21438922]

22. National Center for Health Statistics, Centers for Disease Control and Prevention. National Ambulatory Medical Care Survey. https://www.cdc.gov/nchs/ahcd/about_ahcd.htm. Published 2017. Accessed February 27, 2017.

23. Prescribers' Digital Reference. http://www.pdr.net. Published 2018. Accessed January 2, 2018.

24. U.S. Food and Drug Administration. Drugs. https://www.fda.gov/Drugs/default.htm. Published 2018. Accessed January 3, 2018.

25. Lee E, Teschemaker AR, Johann-Liang R, et al. Off-label prescribing patterns of antidepressants in children and adolescents. Pharmacoepidemiol Drug Saf. 2012;21(2):137–144. [PubMed: 21538674]

26. Sohn M, Moga DC, Blumenschein K, Talbert J. National trends in off-label use of atypical antipsychotics in children and adolescents in the United States. Medicine (Baltimore). 2016;95(23):e3784.

27. Frenk SM, Kit BK, Lukacs SL, Hicks LA, Gu Q. Trends in the use of prescription antibiotics: NHANES 1999–2012. J Antimicrob Chemother. 2016;71(1):251–256. [PubMed: 26462985]

28. Hales CM, Kit BK, Gu Q, Ogden CL. Trends in Prescription Medication Use Among Children and Adolescents-United States, 1999–2014. JAMA. 2018;319(19):2009–2020. [PubMed: 29800213]

29. Chua KP, Fischer MA, Linder JA. Appropriateness of outpatient antibiotic prescribing among privately insured US patients: ICD-10-CM based cross sectional study. BMJ. 2019;364:k5092.

30. Magalhaes J, Rodrigues AT, Roque F, Figueiras A, Falcao A, Herdeiro MT. Use of off-label and unlicenced drugs in hospitalised paediatric patients: a systematic review. Eur J Clin Pharmacol. 2015;71(1):1–13. [PubMed: 25318905]

31. Lass J, Irs A, Pisarev H, Leinemann T, Lutsar I. Off label use of prescription medicines in children in outpatient setting in Estonia is common. Pharmacoepidemiol Drug Saf. 2011;20(5):474–481. [PubMed: 21416552]

32. Langerova P, Vrtal J, Urbanek K. Incidence of unlicensed and off-label prescription in children. Ital J Pediatr. 2014;40:12. [PubMed: 24495454]

33. Gates A, Gates M, Vandermeer B, et al. Glucocorticoids for croup in children. Cochrane Database Syst Rev. 2018;8:CD001955.

34. Marchetti F, Bonati M, Maestro A, et al. Oral Ondansetron versus Domperidone for Acute Gastroenteritis in Pediatric Emergency Departments: Multicenter Double Blind Randomized Controlled Trial. PLoS ONE. 2016;11(11):e0165441.

35. Gazarian M. Off-label use of medicines in the paediatric populations: recommendations for assessing appropriateness. World Health Organization 2007:25.

36. Czaja AS, Fiks AG, Wasserman RC, Valuck RJ, Comparative Effectiveness Research Through Collaborative Electronic Reporting C. Beyond the Label: Steering the Focus Toward Safe and Effective Prescribing. Pediatrics. 2017;139(5).

37. Feinstein JA, Morrato EH, Feudtner C. Prioritizing Pediatric Drug Research Using Population-Level Health Data. JAMA Pediatr. 2017;171(1):7–8. [PubMed: 27893067]

38. Hwang TJ, Tomasi PA, Bourgeois FT. Delays in completion and results reporting of clinical trials under the Paediatric Regulation in the European Union: A cohort study. PLoS Med. 2018;15(3):e1002520.

39. Hwang TJ, Orenstein L, Kesselheim AS, Bourgeois FT. Completion Rate and Reporting of Mandatory Pediatric Postmarketing Studies Under the US Pediatric Research Equity Act. JAMA Pediatr. 2018.

40. Hudgins JD, Bacho MA, Olsen KL, Bourgeois FT. Pediatric drug information available at the time of new drug approvals: A cross-sectional analysis. Pharmacoepidemiol Drug Saf. 2018;27(2):161–167. [PubMed: 29148107]

41. Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institutes of Health. Best Pharmaceuticals for Children Act Priority List. https://bpca.nichd.nih.gov/prioritization/priority_lists/Pages/priority_list.aspx. Published 2018. Accessed March 3, 2019.

42. Wimmer S, Rascher W, McCarthy S, Neubert A. The EU paediatric regulation: still a large discrepancy between therapeutic needs and approved paediatric investigation plans. Paediatr Drugs. 2014;16(5):397–406. [PubMed: 25056717]

43. Ballard CD, Peterson GM, Thompson AJ, Beggs SA. Off-label use of medicines in paediatric inpatients at an Australian teaching hospital. J Paediatr Child Health. 2013;49(1):38–42. [PubMed: 23279160]

44. Czarniak P, Bint L, Favie L, Parsons R, Hughes J, Sunderland B. Clinical setting influences off-label and unlicensed prescribing in a paediatric teaching hospital. PLoS ONE. 2015;10(3):e0120630.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**What's Known on This Subject:**

In past studies, pediatric off-label use was shown to be common and potentially harmful, but researchers have focused predominantly on acute care settings, specific classes of drugs, outpatient prescribing outside the United States, or older data sources.

**What This Study Adds:**

In 2006–2015, US office-based physicians ordered systemic drugs off label for children at rising rates, particularly for unapproved conditions. Updated data on common off-label drugs, classes, and unapproved conditions treated in children will help inform education, research, and policies.



**Figure.**
Yearly absolute prevalence of systemic drug orders for children in US ambulatory settings (2006–2015)
Yearly national rates of orders per 1000 ambulatory visits between 2006 and 2015 for any systemic drug (purple) and systemic drugs ordered off-label (based on age [light green], indication [medium green], or age, indication, and/or weight [dark green]). Error bars represent 95% confidence intervals.

**Table 1.**

Prevalence rates of off-label systemic drug orders in ambulatory pediatric visits in the United States (2006–2015)[1]

| Off-label characteristic | Sample N | % of total visits (95% CI) | % of visits with systemic drugs (95% CI) | % of off-label or possibly off-label drugs (95% CI) | Estimated orders, millions/year (95% CI) |
|---|---|---|---|---|---|
| Off-label for any reason | 17,064 | 18.5 (17.7–19.3) | 44.5 (43.3, 45.8) | 90.6 (89.8, 91.4) | 41.2 (39.9, 42.4) |
| Possibly off-label for any reason | 1,801 | 1.6 (1.5, 1.8) | 3.9 (3.5, 4.4) | 9.4 (8.6, 10.2) | 4.3 (3.9, 4.7) |
| Off-label by indication | 13,914 | 15.6 (15.0, 16.3) | 37.6 (36.4, 38.8) | 74.6 (73.2, 75.9) | 33.9 (32.7, 35.1) |
| Possibly off-label by indication | 2,079 | 1.8 (1.7, 2.0) | 4.4 (4.0, 4.9) | 10.2 (9.5, 11.1) | 4.6 (4.3, 5.1) |
| Off-label by age | 3,501 | 4.3 (3.9, 4.6) | 10.3 (9.6, 11.0) | 17.6 (16.5, 18.7) | 8.0 (7.4, 8.6) |
| Off-label by weight | 131 | 0.2 (0.2, 0.3) | 0.6 (0.4, 0.8) | 0.6 (0.4, 0.8) | 0.4 (0.3, 0.6) |
| Possibly off-label by weight | 419 | 0.5 (0.4, 0.6) | 1.2 (1.0, 1.5) | 1.2 (0.9, 1.5) | 0.9 (0.7, 1.1) |
| Off-label by combination of age, indication, and (where applicable) weight[2] | 893 | 1.2 (1.0, 1.4) | 2.8 (2.5, 3.3) | 4.6 (4.1, 5.3) | 2.1 (1.8, 2.4) |

[1] All rates account for sampling, clustering, and strata, reflecting nationally representative estimates

[2] Drugs that were ordered for an approved indication, an approved age (and, where applicable, weight) for a different indication, but an unapproved age or weight for the documented diagnoses and symptoms

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

**Table 2.**

Absolute prevalence of systemic drug orders for children in US ambulatory settings (2006−2015)

| Category | Orders per 1000 ambulatory visits (95% confidence intervals) | | | | | |
|---|---|---|---|---|---|---|
| | Age <1m | Age 1m−<2y | Age 2−5y | Age 6−11y | Age 12−17y | All children |
| Any drug | 64.1 (45.3, 83.0) | 406.1 (380.2, 432.0) | 635.8 (605.3, 666.3) | 731.7 (698.1, 765.3) | 759.1 (722.9, 795.2) | 620.7 (597.2, 644.2) |
| Off-label, overall | 52.0 (35.7, 68.4) | 164.0 (149.3, 178.7) | 218.7 (205.0, 232.5) | 253.7 (238.2, 269.3) | 321.5 (299.9, 343.1) | 236.5 (225.1, 247.8) |
| Off-label by indication | 28.2$^{1}$ (17.5, 39.0) | 112.4 (102.1, 122.8) | 190.0 (177.7, 202.3) | 219.3 (204.8, 233.7) | 268.0 (249.0, 287.0) | 194.6 (185.0, 204.2) |
| Off-label by age | 40.8 (26.1, 55.5) | 61.4 (53.3, 69.6) | 33.5 (28.3, 38.6) | 37.6 (32.7, 42.5) | 51.2 (44.8, 57.7) | 45.9 (42.1, 49.8) |

[1] Values based on <30 observations

**Table 3.**

Characteristics of ambulatory pediatric visits in the United States (2006–2015) with or without off-label systemic drug orders

| Characteristic | No off-label drug order, % (95% CI) (N=14,772) | Off-label drug order, % (95% CI) (N=12,833) | OR | aOR[1] (95% CI) | P-value | % of visits with off-label orders[2], (95% CI) |
|---|---|---|---|---|---|---|
| **Age group** | | | | | | |
| <1m | 0.1 (0.1–0.3) | 0.7 (0.5–1.0) | 6.1 | 9.1 (4.5–18.3) | <0.001 | 83 (73–92) |
| 1m–2y | 16.3 (15.4–17.4) | 17.5 (16.2–18.8) | 1.3 | 1.6 (1.4–1.8) | <0.001 | 48.7 (46.4–51.1) |
| 2–5y | 25.1 (24.0–26.3) | 22.4 (21.2–23.6) | 1.05 | 1.2 (1.05–1.3) | 0.005 | 42.4 (40.5–44.3) |
| 6–11y | 31.4 (30.3–32.6) | 26.7 (25.5–28.0) | Reference | Reference | - | 39.2 (37.4–41.0) |
| 12–17y | 27.0 (25.8–28.2) | 32.7 (31.2–34.3) | 1.4 | 1.3 (1.1–1.4) | <0.001 | 44.1 (42.4–45.9) |
| **Sex** | | | | | | |
| Male | 46.8 (45.6–47.9) | 49.3 (47.9–50.7) | Reference | Reference | - | 43.1 (41.6–44.5) |
| Female | 53.2 (52.1–54.4) | 50.7 (49.3–52.1) | 1.1 | 1.2 (1.1–1.3) | <0.001 | 46.3 (44.7–47.9) |
| **Race/ethnicity** | | | | | | |
| White, Non-Hispanic | 64.2 (61.6–66.7) | 64.4 (61.6–67.2) | Reference | Reference | - | 45.0 (43.6–46.4) |
| Black, Non-Hispanic | 11.1 (9.7–12.7) | 11.6 (10.1–13.2) | 1.04 | 0.95 (0.8–1.1) | 0.51 | 44.0 (41.0–46.9) |
| Hispanic | 18.8 (16.3–21.5) | 18.2 (15.7–21.1) | 0.97 | 0.9 (0.8–1.1) | 0.26 | 43.4 (40.6–46.1) |
| Other | 5.9 (5.1–6.9) | 5.8 (5.0–6.6) | 0.96 | 1.03 (0.9–1.2) | 0.72 | 45.6 (42.2–49.1) |
| **Region** | | | | | | |
| Northeast | 19.0 (16.8–21.5) | 16.6 (14.3–19.1) | Reference | Reference | - | 42.2 (39.4–45.1) |
| Midwest | 21.3 (18.3–24.7) | 19.4 (16.8–22.2) | 1.04 | 1.01 (0.9–1.2) | 0.91 | 42.4 (40.1–44.8) |
| South | 39.5 (35.7–43.5) | 44.7 (40.8–48.6) | 1.3 | 1.3 (1.1–1.5) | 0.002 | 47.4 (45.6–49.2) |
| West | 20.1 (17.0–23.7) | 19.3 (16.4–22.6) | 1.1 | 1.1 (0.9–1.3) | 0.49 | 43.6 (40.9–46.3) |
| **Insurance** | | | | | | |
| Private | 57.8 (55.0–60.7) | 55.2 (52.3–58.0) | Reference | Reference | - | 44.6 (43.1–46.0) |
| Public | 33.5 (30.7–36.5) | 35.3 (32.5–38.2) | 1.1 | 1.00 (0.9–1.1) | 0.97 | 44.5 (42.3–46.7) |
| Other/none | 8.6 (7.6–9.8) | 9.6 (8.3–11.0) | 1.2 | 1.04 (0.9–1.2) | 0.58 | 45.4 (42.5–48.4) |
| **Clinical Specialty** | | | | | | |
| Primary care | 84.8 (83.1–86.4) | 77.5 (74.7–80.1) | Reference | Reference | - | 43.0 (41.6–44.5) |
| Medical subspecialty | 11.9 (10.4–13.6) | 17.0 (14.5–19.8) | 1.6 | 1.2 (1.1–1.4) | 0.007 | 47.4 (44.4–50.3) |

Hoon et al. | Page 17

Author Manuscript

| Characteristic | No off-label drug order, % (95% CI) (N=14,772) | Off-label drug order, % (95% CI) (N=12,883) | OR | aOR[1] (95% CI) | P-value | % of visits with off-label orders[2], (95% CI) |
|---|---|---|---|---|---|---|
| Surgical subspecialty | 3.3 (2.8–3.8) | 5.5 (4.8–6.3) | 1.8 | 1.9 (1.6–2.2) | <0.001 | 57.2 (53.8–60.7) |
| Total number of systemic drugs at visit | | | | | | |
| 1 | 77.6 (76.2–79.1) | 51.2 (49.3–53.2) | Reference | Reference | - | 35.7 (34.4–37.0) |
| 2 | 18.0 (16.9–19.2) | 30.1 (28.8–31.5) | 2.5 | 2.5 (2.3–2.8) | <0.001 | 57.7 (55.5–59.9) |
| ≥3 | 4.3 (3.6–5.1) | 18.7 (17.1–20.3) | 6.6 | 6.3 (5.3–7.6) | <0.001 | 76.9 (73.6–80.2) |
| Presence of chronic disease | | | | | | |
| Not present | 65.5 (63.9–67.0) | 56.8 (55.0–58.6) | Reference | Reference | - | 43.6 (42.0–45.1) |
| Present | 34.5 (33.0–36.1) | 43.2 (41.4–45.0) | 1.4 | 1.3 (1.1–1.4) | <0.001 | 48.7 (46.9–50.5) |
| Year | | | | | | |
| 2006–2008 | 34.3 (31.5–37.2) | 28.6 (25.8–31.6) | Reference | Reference | - | 41.9 (39.9–44.0) |
| 2009–2011 | 34.1 (31.5–36.9) | 33.5 (30.3–36.8) | 1.2 | 1.1 (0.98–1.3) | 0.11 | 44.3 (42.1–46.6) |
| 2012–2015 | 31.6 (28.8–34.5) | 37.9 (34.7–41.3) | 1.4 | 1.3 (1.1–1.4) | <0.001 | 47.2 (45.3–49.0) |

[1] Multivariable logistic regression model adjusted for all covariates shown, accounting for sampling, clustering, and strata to produce nationally representative estimates

[2] Percentages based on model-based predictive margins, accounting for all other covariates

**Table 4.**

Absolute prevalence of off-label systemic drug orders by drug class and age for children in US ambulatory settings (2006−2015)

| Drug class[1] | OFF-label orders per 1000 ambulatory visits (95% confidence intervals) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Age <1m | Age 1m−<2y | Age 2−5y | Age 6−11y | Age 12−17y | All children |
| Anti-infectives | 13.7[2] (6.8, 20.5) | 60.1 (52.9, 67.2) | 88.6 (80.7, 96.6) | 78.3 (70.3, 86.2) | 79.8 (70.1, 89.5) | 74.8 (69.6, 79.9) |
| Respiratory | 0.5[2] (0, 1.6) | 48.0 (40.6, 55.4) | 63.5 (56.5, 70.6) | 61.0 (53.8, 68.[2]) | 50.1 (43.8, 56.5) | 53.8 (49.8, 57.9) |
| Nervous | 9.0[2] (1.2, 16.7) | 8.6 (4.3, 12.9) | 16.0 (12.8, 19.1) | 62.6 (54.2, 71.0) | 123.0 (108.9, 137.2) | 53.7 (47.8, 59.5) |
| Alimentary | 27.5 (15.8, 39.2) | 26.3 (21.9, 30.8) | 26.9 (22.1, 31.8) | 27.8 (23.5, 32.1) | 22.1 (18.8, 25.5) | 25.8 (23.2, 28.4) |
| Hormonal | ND[2] | 13.4 (10.5, 16.3) | 15.8 (12.8, 18.7) | 12.2 (9.1, 15.2) | 10.3 (7.8, 12.9) | 12.4 (10.9, 13.9) |
| Cardiovascular | 0[2] (0, 0.1) | 1.6[2] (0.8, 2.4) | 3.4 (2.2, 4.6) | 6.4 (4.5, 8.4) | 8.3 (6.2, 10.4) | 4.9 (4.0, 5.9) |
| Musculoskeletal | 1.3[2] (0, 3.4) | 3.8 (2.5, 5.1) | 3.3 (1.8, 4.8) | 3.4 (2.2, 4.5) | 8.5 (6.4, 10.5) | 4.7 (3.9, 5.6) |
| Genitourinary | ND[2] | 0.2[2] (0, 0.5) | 0.3[2] (0, 0.5) | 0.6[2] (0.1, 1.2) | 15.7 (12.8, 18.6) | 4.4 (3.6, 5.2) |

ND not defined

[1] Drug class according to Anatomical Therapeutic Chemical level 1 classification

[2] Values based on <30 observations

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Author Manuscript          Author Manuscript          Author Manuscript          Author Manuscript

**Table 5.**

Relative prevalence of off-label systemic drug orders by drug class and age for children in US ambulatory settings (2006–2015)

| Drug class[1] | Percentage of orders that were off-label (95% confidence intervals) | | | | | |
|---|---|---|---|---|---|---|
| | Age <1m | Age 1m–<2y | Age 2–5y | Age 6–11y | Age 12–17y | All children |
| Anti-infectives | 86.3[2] (57.2, 96.7) | 33.9 (30.6, 37.2) | 33.2 (31.0, 35.5) | 36.9 (34.1, 39.7) | 43.6 (40.5, 46.8) | 36.9 (35.2, 38.6) |
| Respiratory | 100[2] (ND) | 85.2 (80.9, 88.7) | 41.0 (37.6, 44.5) | 36.7 (33.5, 40.1) | 40.8 (37.7, 44.0) | 44.3 (42.3, 46.4) |
| Nervous | 50.5[2] (24.1, 76.6) | 11.4 (7.3, 17.4) | 19.3 (16.0, 23.1) | 31.2 (28.6, 34.0) | 49.2 (46.8, 51.6) | 35.2 (33.3, 37.2) |
| Alimentary | 98.8 (91.5, 99.8) | 72.9 (67.3, 77.8) | 84.1 (78.6, 88.5) | 73.8 (67.7, 79.1) | 52.9 (46.0, 59.7) | 70.0 (65.9, 73.7) |
| Hormonal | ND[2] | 64.9 (56.7, 72.2) | 47.4 (40.6, 54.3) | 34.7 (28.6, 41.4) | 36.1 (28.2, 44.9) | 43.5 (39.5, 47.6) |
| Cardiovascular | 100[2] (ND) | 11.1[2] (8.3, 14.8) | 5.7 (3.7, 8.7) | 6.2 (4.6, 8.5) | 11.0 (8.8, 13.6) | 8.7 (7.4, 10.1) |
| Musculoskeletal | 2.7[2] (0.1, 35.6) | 42.5 (24.1, 63.3) | 86.1 (69.5, 94.4) | 30.9 (23.4, 39.5) | 38.7 (30.3, 47.7) | 39.0 (32.8, 45.6) |
| Genitourinary | ND[2] | 100[2] (ND) | 86.5[2] (41.7, 98.3) | 42.5[2] (19.2, 69.7) | 68.8 (61.9, 74.9) | 67.7 (61.3, 73.5) |

ND not defined

[1] Drug class according to Anatomical Therapeutic Chemical level 1 classification

[2] Values based on <30 observations

**JPP**
JOURNAL OF
**Pharmacy and Pharmacology**

**JPP**
Journal of Pharmacy
And Pharmacology

ROYAL
PHARMACEUTICAL
SOCIETY

Research Paper



# Off-label and unlicensed medicines to hospitalised children in Norway

Arna Teigen[a,b], Siri Wang[c], Bich Thuy Truong[a,b] and Kathrin Bjerknes[a]

[a]Hospital Pharmacy Enterprises, South Eastern Norway, [b]School of Pharmacy, University of Oslo, and [c]Department of Medicinal Product Assessment, Norwegian Medicines Agency, Oslo, Norway

**Exhibit 0007**

**Keywords**
hospitalised children; off-label; paediatric; unlicensed medicines

**Correspondence**
Kathrin Bjerknes, Hospital Pharmacy Enterprises, Stenersgt I, Postkasse 79, 0050, Oslo, South Eastern Norway, Norway.
E-mail: kathrin.bjerknes@ sykehusapotekene.no

Received March 15, 2016
Accepted May 14, 2016

doi: 10.1111/jphp.12581

## Abstract

**Objectives** The aim of this study was to investigate the use of off-label (OL) and unlicensed (UL) medicines to hospitalised children in Norway, to add to the current knowledge on use of medicines in this vulnerable patient group.

**Methods** The study was performed as a cross-sectional prospective study. Medication was classified as on- or off-label based on the comparison with the SmPC regarding age, indication, dosage, route of administration and handling of the product. UL products were classified as imported or pharmacy produced.

**Key findings** More than 90% of children receiving medicines in our study were given OL or UL medicines. More patients received OL (83%) than UL (59%). Route of administration was the most frequently observed OL category. The vast majority of the OL prescriptions were for 'off-patent' products. One-third of products prescribed were UL.

**Conclusions** The study confirms that medicines to children in hospital to a significant degree are being used outside or without authorisation, in spite of recent paediatric regulatory initiatives. More data are still needed on efficacy and safety of medicines used in children, data to be incorporated in the SmPC. In addition, suitable formulations are needed to ensure optimal dosing and adherence without risky manipulations.

## Introduction

Authorisation of a medicinal product for a specific use intends to ensure sufficient quality, efficacy, and patient safety. Such 'labelling' is in general considered the gold standard for optimal use of medicinal products. The professional decision-making by the treating physician should always rely on best available evidence. Proper authorisation of a medicinal product for paediatric use is a vital tool in this regard. Nevertheless, for use in children it is well known that most medicinal products are neither designed, documented, nor authorised for this patient group and therefore have to be used outside this 'label'.[1,2] Prospective studies from Europe have shown increased risk of adverse drug reactions when children are using OL or UL medicines,[3–6] underpinning the need for appropriately authorised medicines also for this age group. However, OL use of medicines might also be an important instrument to optimise treatment in children and do not per se imply improper or illegal use. The challenges of such OL practice may include insufficient information on dosing, efficacy

and safety. In addition, inappropriate formulations may affect the actual dose and the need for manipulation and could have impact on safety as well as adherence of treatment. Alternatively, products might be imported or compounded by the pharmacy; however, use of such UL preparations may have other challenges such as unpredictable availability, variable quality, lack of suitable product information and high price.

Through the last 20 years, there has been an increased awareness about the lack of medicines documented for use in children. Regulatory actions have been taken worldwide to improve the situation by posing requirements to the pharmaceutical industry to develop new relevant products also for children.[7,8] In addition, work is ongoing to share the existing knowledge on authorised substances[9,10] and to push for transparency on ongoing clinical studies.[11]

In spite of the overall agreement regarding the importance of these initiatives, this work is a test of patience, and progress may seem slow.[8,12,13] It is therefore important to keep on monitoring the use of medicinal products in children both locally and globally. The current study is a part

© 2016 The Authors. *Journal of Pharmacy and Pharmacology* published by John Wiley & Sons Ltd on behalf of Royal Pharmaceutical Society **69** (2017), pp. 432–438
This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited.

of this international work to focus on the improvement in both clinical practice and the availability of drugs for children and is the first study on OL and UL drug use in hospitalised children in Norway.

## Methods

The study was performed as a cross-sectional prospective study at two hospitals in Norway, the Oslo University hospital, Ullevål, and Akershus University hospital. One neonatal and three paediatric wards with 67 beds in total were included, covering mainly gastrointestinal disorders, endocrinology, neurology, respiratory diseases and infections in patients 0–17 years. The study period at Oslo University hospital was September–October 2013 and at Akershus University hospital September–December 2014. All patients hospitalised during the study periods were evaluated for potential inclusion. Patients were eligible for inclusion if using medicines during the hospital stay, excluding standard intravenous fluids, heparin, blood products, total parenteral nutrition products, creams and ointments. Inclusion was confirmed after consent by the patient or a guardian.

Medication charts were checked regularly during the study period, starting within the first day of the hospital stay or the first day of the data collection period for patients who were already admitted. All medications were registered for the entire hospital stay within the study period. For each patient, the age and weight were recorded. In addition, gestational age was recorded for patients in the neonatal ward. For each drug prescribed, the specific route of administration, dosing and the indication for use were recorded. Additional information regarding indication was provided from the prescribing physician when needed. Information regarding the practical handling of the drug was obtained from the nurse responsible for the patient, or from guardians where relevant, as this information was often lacking in the medical records. Descriptive analyses were performed on the data structured using Microsoft Office Excel.

The following categories of medicinal products were not recorded: standard intravenous fluids, heparin, blood products, total parenteral nutrition products, creams and ointments. Medicines prescribed to be given 'on demand' were only evaluated if actually given to the patient.

Products were classified as licensed if marketing authorisation was granted in Norway. The actual use of a licensed medicine was compared to the Summary of Product Characteristics (SmPC) for five categories: age, indication, dosing, route of administration and practical handling of the drug. The following SmPC sections were evaluated: 4.1 (indication), 4.2 (posology and administration), 4.3 (contraindications), 6.2 (incompatibilities) and 6.6 (special

precautions for disposal or other handling). Each prescription was classified as on- or off-label and could be OL for more than one category. If indication or age was considered OL, dosing was not assessed.

When exact age or weight were not specified in the SmPC, the following terminology was applied: preterm born <32 weeks gestational age, neonates ≤28 days, infants ≤1 year, young children 1–4 years, children ≤12 years, adolescents 13–17 years and adults ≥18 years. For indication, focus was on the main condition and not the exact SmPC wording. Dosing was assessed as OL if deviation was observed in either dosing frequency or single or maximal daily dosing. UL medicines were classified as pharmacy produced or imported and were not further evaluated. Two pharmacists independently performed the classification of prescriptions and products as on-label, off-label or unlicensed. Regional ethics committee for medical and health research ethics found no ethical approval necessary (2013/588). The Data Protection Officer for Research at the two hospitals approved the study in advance.

## Results

Of the 400 hospitalised patients at the wards in the study periods, 179 were included in the study. Main causes for not including the remaining 221 patients were no (or only excluded) medicines prescribed (41%) or consent not obtained (59%). The age distribution in the study population is outlined in Table 1. Approximately 60% of the patients were below 2 years. A total of 205 different medicinal products were administered to the study population during the study (Table 3). Patients received on average 5.2 prescriptions. Most of the patients (91%) received OL or UL medicines (Table 1). More patients received OL compared with UL (83% vs 59%) (Table 1).

### Off-label

OL use of medicines in the study group was frequent for all age groups as outlined in Table 1. In all age groups, most patients received OL medicines (71–92%) and almost half of the prescriptions were OL (40–47%) (Tables 1 and 2).

The frequencies of the OL categories recorded regardless of age group were as follows: route of administration (31%), age (23%), dosing (19%), indication (16%) and handling (11%). No single category predominated. Distribution of the different categories within each age group is outlined in Figure 1. Overall, when correcting for number of patients per age group, similar frequency of categories was observed in all age groups except for handling of the drug. OL handling was most frequently seen in the age group of 2–5 years, and rarely seen in the preterm group. Route of administration was the most common OL

© 2016 The Authors. *Journal of Pharmacy and Pharmacology* published by John Wiley & Sons Ltd
on behalf of Royal Pharmaceutical Society **69** (2017), pp. 432–438

**Table 1** Patients receiving off-label (OL) or unlicensed (UL) medicines

| Age group | Total number of patients (n) | Patients receiving OL n (%)[a] | Patients receiving UL n (%)[a] | Patients receiving OL or UL n (%)[a] |
|---|---|---|---|---|
| 0–28 days | 50 | 43 (86) | 32 (64) | 49 (98) |
| Of these | | | | |
| Preterm | 25 | 20 (80) | 18 (72) | 25 (100) |
| Term | 25 | 23 (92) | 14 (56) | 24 (96) |
| 28 days–23 months | 55 | 45 (82) | 36 (65) | 51 (93) |
| 2–5 years | 22 | 20 (91) | 18 (82) | 22 (100) |
| 6–11 years | 28 | 23 (82) | 13 (46) | 24 (86) |
| 12–17 years | 24 | 17 (71) | 7 (29) | 17 (71) |
| Total | 179 | 148 (83) | 106 (59) | 163 (91) |

[a]Percentage of total number of patients in the age group.

**Table 2** Off-label (OL) or unlicensed (UL) prescriptions in the study group

| Age group | Number of prescriptions (n) | OL prescriptions n (%)[a] | UL prescriptions n (%)[a] | OL or UL prescriptions n (%)[a] |
|---|---|---|---|---|
| 0–28 days | 267 | 113 (42) | 100 (37) | 213 (80) |
| Of these | | | | |
| Preterm | 166 | 67 (40) | 77 (46) | 144 (87) |
| Term | 101 | 46 (46) | 23 (23) | 69 (68) |
| 28 days–23 months | 275 | 118 (43) | 70 (25) | 188 (68) |
| 2–5 years | 130 | 60 (46) | 35 (27) | 95 (73) |
| 6–11 years | 137 | 65 (47) | 22 (16) | 87 (64) |
| 12–17 years | 121 | 54 (45) | 13 (11) | 67 (55) |
| Total | 930 | 410 (44) | 240 (26) | 650 (70) |

[a]Percentage of total prescriptions in the age group.



**Figure 1** Number of off-label (OL) prescriptions per patient in the OL categories.

category in the premature group; 72% of 67 OL prescriptions were attributed to this group.

OL prescriptions by ATC groups are outlined in Figure 2. The medicines prescribed OL are spread on multiple ATC groups potentially representing a variety of indications. However, it also reflects the study patient population; for example, few products were prescribed OL in the cardiovascular group (C) and the antineoplastic group (L) and these groups of patients were under-represented in our study material.

The most frequently prescribed OL medicines are shown in Figure 3. Only a few products were used OL consistently over most age groups, as, for example, sodium chloride 9 mg/ml solution for infusion was prescribed for inhalation to almost all age groups, but is only authorised for parenteral use, and route of administration was therefore assessed as OL. However, most products had a more narrow OL age range and were often prescribed OL in only one age group. Ampicillin powder for injection or infusion is used intravenously in

© 2016 The Authors. *Journal of Pharmacy and Pharmacology* published by John Wiley & Sons Ltd on behalf of Royal Pharmaceutical Society **69** (2017), pp. 432–438

Arna Teigen *et al.*                                                              Off-label and unlicensed paediatric medicines



☐ Preterm  ☐ Term  ◪ 28 days–23 months  ■ 2-5 years  ☐ 6-11 years  ▨ 12-17 years

**Figure 2**  Number of off-label (OL) prescriptions registered by ATC in the age groups. ATC*, Anatomical Therapeutic Chemical; A, alimentary tract and metabolism; B, blood and blood-forming organs; C, cardiovascular system; H, systemic hormonal preparations; J, anti-infectives for systemic use; L, antineoplastic and immunomodulating agents; M, musculo-skeletal system; N, nervous system; R, respiratory system; S, sensory organ.



☐ Preterm  ☐ Term  ◪ 28 days–23 months  ■ 2-5 years  ☐ 6-11 years  ▨ 12-17 years

**Figure 3**  The most frequently prescribed off-label (OL) medicines.

all age groups but is only authorised as intramuscular administration for children under 40 kg; therefore, route of administration was assessed as OL for the youngest age groups. All of the most frequently prescribed OL medicines were older products, no longer covered by patent or protection.

© 2016 The Authors. *Journal of Pharmacy and Pharmacology* published by John Wiley & Sons Ltd
on behalf of Royal Pharmaceutical Society **69** (2017), pp. 432–438

**435**

**Table 3**  Number of unlicensed (UL) medicinal products administered

| Age group | Total medicinal product (n) | Unlicensed drug n (%)[a] | Imported (n) | Pharmacy produced (n) |
|---|---|---|---|---|
| 0–28 days | 63 | 18 (29) | 10 | 8 |
| Of these | | | | |
| Preterm | 35 | 12 (34) | 8 | 4 |
| Term | 28 | 6 (21) | 2 | 4 |
| 28 days–23 months | 88 | 29 (33) | 18 | 11 |
| 2–5 years | 70 | 19 (27) | 14 | 5 |
| 6–11 years | 76 | 15 (20) | 13 | 2 |
| 12–17 years | 73 | 9 (12) | 6 | 3 |
| Total number of products | 205 | 61 (30) | 41 | 20 |

[a]Percentage given as part of total medicinal product within the age group.

## Unlicensed

Approximately one-third (*n* = 61) of the prescribed products in the study group were UL (Table 3). All age groups received UL medicines, with highest proportion in the age group of 2–5 years (82%) and lowest in adolescents (29%) as outlined in Table 1. Percentage of prescriptions of UL medicine varied between the age groups (11–46%) (Table 2).

Table 3 shows the number of UL products prescribed per age group, split into imported products and products made by the hospital pharmacy. Overall, the ratio of imported vs pharmacy produced was about 2 : 1, showing that commercial alternatives are often available outside Norway.

The most frequently prescribed (≥3) UL medicines in the different age groups are listed in Table 4. Overall, racemic adrenaline solution for inhalation (30), caffeine oral solution (27), ibuprofen suppositories (18) and vitamin K oral drops (14) were the most frequently prescribed medicines in the study period regardless of age group. Apart from a few products being used in a broad range of ages (racemic adrenaline, ibuprofen), most products had age-specific use; for example, caffeine oral solution and vitamin K oral drops were only prescribed to preterm neonates, betamethasone-soluble tablets only to the age range 28 days–23 months and morphine solution for injection only to term neonates. The medicines belonged to a range of ATC groups, with group N (nervous system) and A (alimentary tract and metabolism) most frequently represented.

## Discussion

The present study showed that 91% of the included paediatric patients received at least one off-label or unlicensed

**Table 4**  The most frequently prescribed unlicensed (UL) medicines

| Age | UL product |
|---|---|
| 0–27 days | |
| Preterm | Caffeine oral solution |
| | Vitamin E oral solution |
| | Probiotic capsules (lactobacillus acidophilus, bifidobacterium bifidum) |
| | Vitamin K oral drops |
| | Multivitamin oral drops |
| | Folic acid oral solution |
| Term | Morphine 1 mg/ml solution for injection |
| | Vitamin K oral drops |
| 28 days–23 months | Ibuprofen suppositories |
| | Racemic adrenaline solution for inhalation |
| | Betamethasone-soluble tablets |
| | Gentamicin 20 mg/2 ml solution for injection |
| | Codeine oral liquid |
| 2–5 years | Racemic adrenaline solution for inhalation |
| | Ibuprofen suppositories |
| | Codeine oral solution |
| 6–11 years | Oil–glycerol enema |
| | Amoxicillin with clavulanic acid oral suspension |
| 12–17 years | Ibuprofen suppositories |

(OLUL) drug prescription. The majority (70%) of the prescriptions was OLUL. Previous studies from other European countries report patients receiving OLUL medicines in the range 42–100%, 16–87% of the prescriptions being OLUL, as summarised by Magalhaes.[14] Recent studies are in line with these findings.[15,16] The definition of OL and UL is not similar for all studies, and this might partly explain the variations reported. In addition, in our study, only patients receiving medicines during the hospital stay were included, and the results are reported on this population. The different approaches in defining the study population might not always be comparable.

Similar to other studies, the neonates remains to be one of the age groups where OLUL prescribing is seen most often;[14,17] in our study population, all the preterm infants received one or more OLUL prescription. The fact that no patients in the study group received only licensed and on-label prescriptions may not be surprising in the preterm group, but was also seen in the age group of 2–5 years. In general, the high proportions of patients receiving OLUL in this study is probably due to commonly used medicines (e.g. ampicillin, caffeine, racemic adrenaline) or scenarios (e.g. administration through enteral feeding tube) that were considered OLUL in the different age groups. As expected, fewer patients in the older age groups received OLUL medicines.

Interestingly, the frequency of OL prescriptions was similar for all age groups (40–47%), which was unexpected. We would have anticipated an increased rate of OL

© 2016 The Authors. *Journal of Pharmacy and Pharmacology* published by John Wiley & Sons Ltd on behalf of Royal Pharmaceutical Society **69** (2017), pp. 432–438

prescriptions in the younger cohorts as generally a product is more likely to be authorised in older age groups, more comparable to the adult cohort, have formulation suitable for the older age groups, etc. The same pattern, no clear age-dependent OL prescription frequency, is, however, also observed in previous reports.[16,18]

Route of administration was the most frequent OL category, and this is in contrast to most other studies, where dose, age and indication are more frequently found.[14] In one study where route of administration was the most frequently reported category,[16] buccal administration of sedatives and analgesics at the surgical ward was the main explanation. In our study, administration via enteral feeding tubes contributed significantly to the OL category route of administration. As for all other categories, administration via enteral feeding tubes was considered OL if not described in the SmPC. It is unclear whether in other studies this has been handled similarly due to lack of details in definition of the categories; nevertheless, this scenario was frequently observed in our data, and rarely described in the SmPC. This element is one factor potentially explaining the high overall fraction of patients receiving OLUL medicines in our study.

Splitting of tablets or dispersing into small volumes were the most typical OL handling. The low incidence of OL handling in neonates reflected the higher frequency of UL liquid medicines in this age group, or an overall limited number of products used. In theory, different handling procedures for each prescription could have happened without the notice of the study pharmacists; some handling considered 'on-label' at the time of recording could occasionally have been handled off-label. The numbers on prescriptions with OL handling might therefore be slightly underestimated.

We noted significant differences in the level of details of the SmPCs, newer products often having more detailed SmPC compared with older products; for example, the assessment of OL indication for newer products might require a level of details in the actual patient indication that is not feasible to obtain in this type of study. For some products, no age information was given in the SmPC, and thus, the use of the product was considered OL for all paediatric age groups. In other studies, this scenario may have been categorised as 'lack of paediatric licence/information'.[14]

Prescriptions were often classified as OL in more than one category. As mentioned above, administration via enteral feeding tube, the main reason for OL route of administration, also often implied OL handling like crushing of tablets, opening capsules and dispersing into liquid before administration. Similarly, a product not being authorised in a particular age group (OL age) would often imply OL handling. This potential covariation between OL categories

may partly explain the even distribution between OL categories.

One-third of the products prescribed to children in this study were not licensed in Norway. Being a small country in the European setting, the number of licensed paediatric products is limited, as pharmaceutical companies tend to restrict the number of products actually put on the market if the revenue is sparse. Two-third of the UL medicines in this study were imported, confirming that several commercial products are available in Europe but not marketed in Norway. The most frequently prescribed UL medicines were racemic adrenaline solution for inhalation, caffeine oral solution, ibuprofen suppositories and vitamin K oral drops. Racemic adrenaline has been imported and used extensively until a recent study documented the lack of efficacy compared with saline in the treatment of bronchiolitis.[19] A caffeine product (Peyona®, Chiesi Farmaceutici, Parma, Italy) was recently authorised in Norway, and a future reduction in use of UL caffeine is thus expected.

Most of the UL products contained active pharmaceutical ingredients for which no authorised products were available in Norway, for example caffeine and betamethasone. Only a few hospital preparations were seen when commercial products were available in other countries, which is in line with a national policy to import medicines with documentation approved by a national authority rather than produce locally.

The major limitations in our study relates to the limited size and population. Covering only one neonatal and three paediatric wards at two hospitals, the generalisability of the data is limited although it gives an indication of the OLUL use at two of the largest university hospitals in Norway. Being a cross-sectional study, the time span is limited. Previously reported therapeutic areas of frequent OLUL use like cardiology[14,20,21] and oncology[22,23] were not well represented. However, the areas where more products are authorised for children, like anti-infectives, anti-asthmatics and analgesics, are included in the study population, and thus, the overall picture of OLUL use is most likely not overestimated.

The apparently slow progress in increasing information and availability of medicines for children might have several explanations. First, there is a significant lag time from regulatory initiatives are put in place until data and products are available. More important probably, the majority of products used in children are off-patent, and therefore, many regulatory incentives have limited applications. Interestingly, in our study, all of the fifteen most frequently prescribed OL medicines were from old, well known substances and products no longer patented. More focus needs to be put on how to enforce collection of new and existing data for such products, as well as on the availability of appropriate formulations for these old substances.

## Conclusion

This study confirms that the use of medicines outside or without authorisation when treating hospitalised children is still at a significant level. This despite the initiatives taken by the European authorities to develop more medicinal products documented for children. More than 90% of the paediatric patients studied received medicines that were either not authorised in Norway or given outside authorisation with respect to age group, indication, dosing, route of administration or practical handling of the drug. While waiting for improved availability of appropriately authorised products, significant attention should be put on ensuring that tools and systems are available to best possibly inform prescribers on appropriate use of medicines for children. This is particularly important for old products where regulatory initiatives are likely to have less impact, but which are of paramount importance for children.

## References

 1. Blumer JL. Off-label uses of drugs in children. *Pediatrics* 1999; 104: 598–602.
 2. Choonara I, Conroy S. Unlicensed and Off-Label Drug Use in Children. *Drug Saf* 2012; 25: 1–5.
 3. Turner S *et al.* Adverse drug reactions to unlicensed and off-label drugs on paediatric wards: a prospective study. *Acta Paediatr* 1999; 88: 965–968.
 4. Bellis JR *et al.* Adverse drug reactions and off-label and unlicensed medicines in children: a prospective cohort study of unplanned admissions to a paediatric hospital. *Br J Clin Pharmacol* 2014; 77: 545–553.
 5. Bellis JR *et al.* Adverse drug reactions and off-label and unlicensed medicines in children: a nested case-control study of inpatients in a pediatric hospital. *BMC Med* 2013; 11: 238.
 6. Mason J *et al.* Off-label and unlicensed medicine and adverse drug reactions in children: a narrative review of the literature. *Eur J Clin Pharmacol* 2012; 68: 21–28.
 7. Commission E. *Regulation (EC) No 1901/2006 of the European Parliament and of the Council of 12 December 2006 on medicinal products for paediatric use and amending Regulation (EEC)No 1768/92, Directive 2001/20/EC, Directive 2001/83/EC and Regulation (EC) No 726/2004.* Available from: http://ec.europa.eu/health/files/eudralex/vol-1/reg_2006_1901/reg_2006_1901_en.pdf.
 8. Hoppu K *et al.* The status of paediatric medicines initiatives around the world– What has happened and what has not? *Eur J Clin Pharmacol* 2012; 68: 1–10.
 9. EMA. Submitting results of paediatric studies. [cited 2016 0403]; Available from: http://www.ema.europa.eu/ema/index.jsp?curl=pages/regulation/general/general_content_000038.jsp&mid=WC0b01ac0580925c44.
10. Saint-Raymond A *et al.* Usage of unpublished paediatric data. *Arch Dis Child* 2016; 101: 81–84.
11. EMA. European Clinical Trials Database (EudraCT) [cited 2016 4 March]; Available from: https://eudract.ema.europa.eu/.
12. Tsukamoto K. *Clin Ther*, 2016; 38: 574–581.
13. Corny J *et al.* Unlicensed and off-label drug use in children before and after pediatric governmental initiatives. *J Pediatr Pharmacol Ther* 2015; 20: 316–328.
14. Magalhaes J *et al.* Use of off-label and unlicenced drugs in hospitalised paediatric patients: a systematic review. *Eur J Clin Pharmacol* 2015; 71: 1–13.
15. Joret-Descout P *et al.* Off-label and unlicensed utilisation of medicines in a French paediatric hospital. *Int J Clin Pharm* 2015; 37: 1222–1227.
16. Lindell-Osuagwu L *et al.* Prescribing for off-label use and unauthorized medicines in three paediatric wards in Finland, the status before and after the European Union Paediatric Regulation. *J Clin Pharm Ther* 2014; 39: 144–153.
17. Kieran EA *et al.* Unlicensed and off-label drug use in an Irish neonatal intensive care unit: a prospective cohort study. *Acta Paediatr* 2014; 103: e139–e142.
18. Di Paolo ER *et al.* Unlicensed and off-label drug use in a Swiss paediatric university hospital. *Swiss Med Wkly* 2006; 136: 218–222.
19. Skjerven HO *et al.* Racemic adrenaline and inhalation strategies in acute bronchiolitis. *N Engl J Med* 2013; 368: 2286–2293.
20. Bajcetic M *et al.* Off label and unlicensed drugs use in paediatric cardiology. *Eur J Clin Pharmacol* 2005; 61: 775–779.
21. Pasquali SK *et al.* Off-label use of cardiovascular medications in children hospitalized with congenital and acquired heart disease. *Circ Cardiovasc Qual Outcomes* 2008; 1: 74–83.
22. van den Berg H, Tak N. Licensing and labelling of drugs in a paediatric oncology ward. *Br J Clin Pharmacol* 2011; 72: 474–481.
23. Conroy S *et al.* Unlicensed and off label drug use in acute lymphoblastic leukaemia and other malignancies in children. *Ann Oncol* 2003; 14: 42–47.

© 2016 The Authors. *Journal of Pharmacy and Pharmacology* published by John Wiley & Sons Ltd on behalf of Royal Pharmaceutical Society **69** (2017), pp. 432–438

1     SB184

2     216600-4

3     By Senators Shelnutt and Allen

4     RFD: Healthcare

5     First Read: 03-FEB-22

**Exhibit 0009**

1    SB184

2

3

4    <u>ENROLLED</u>, An Act,

5             Relating to public health; to prohibit the

6    performance of a medical procedure or the prescription of

7    medication, upon or to a minor child, that is intended to

8    alter the minor child's gender or delay puberty; to provide

9    for exceptions; to provide for disclosure of certain

10   information concerning students to parents by schools; and to

11   establish criminal penalties for violations; and in connection

12   therewith would have as its purpose or effect the requirement

13   of a new or increased expenditure of local funds within the

14   meaning of Amendment 621 of the Constitution of Alabama of

15   1901, as amended by Amendment 890, now appearing as Section

16   111.05 of the Official Recompilation of the Constitution of

17   Alabama of 1901, as amended.

18   BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

19            Section 1. This act shall be known and may be cited

20   as the Alabama Vulnerable Child Compassion and Protection Act

21   (V-CAP).

22            Section 2. The Legislature finds and declares the

23   following:

24            (1) The sex of a person is the biological state of

25   being female or male, based on sex organs, chromosomes, and

SB184

1    endogenous hormone profiles, and is genetically encoded into a

2    person at the moment of conception, and it cannot be changed.

3         (2) Some individuals, including minors, may

4    experience discordance between their sex and their internal

5    sense of identity, and individuals who experience severe

6    psychological distress as a result of this discordance may be

7    diagnosed with gender dysphoria.

8         (3) The cause of the individual's impression of

9    discordance between sex and identity is unknown, and the

10   diagnosis is based exclusively on the individual's self-report

11   of feelings and beliefs.

12        (4) This internal sense of discordance is not

13   permanent or fixed, but to the contrary, numerous studies have

14   shown that a substantial majority of children who experience

15   discordance between their sex and identity will outgrow the

16   discordance once they go through puberty and will eventually

17   have an identity that aligns with their sex.

18        (5) As a result, taking a wait-and-see approach to

19   children who reveal signs of gender nonconformity results in a

20   large majority of those children resolving to an identity

21   congruent with their sex by late adolescence.

22        (6) Some in the medical community are aggressively

23   pushing for interventions on minors that medically alter the

24   child's hormonal balance and remove healthy external and

SB184

1    internal sex organs when the child expresses a desire to

2    appear as a sex different from his or her own.

3         (7) This course of treatment for minors commonly

4    begins with encouraging and assisting the child to socially

5    transition to dressing and presenting as the opposite sex. In

6    the case of prepubertal children, as puberty begins, doctors

7    then administer long-acting GnRH agonist (puberty blockers)

8    that suppress the pubertal development of the child. This use

9    of puberty blockers for gender nonconforming children is

10   experimental and not FDA-approved.

11        (8) After puberty blockade, the child is later

12   administered "cross-sex" hormonal treatments that induce the

13   development of secondary sex characteristics of the other sex,

14   such as causing the development of breasts and wider hips in

15   male children taking estrogen and greater muscle mass, bone

16   density, body hair, and a deeper voice in female children

17   taking testosterone. Some children are administered these

18   hormones independent of any prior pubertal blockade.

19        (9) The final phase of treatment is for the

20   individual to undergo cosmetic and other surgical procedures,

21   often to create an appearance similar to that of the opposite

22   sex. These surgical procedures may include a mastectomy to

23   remove a female adolescent's breasts and "bottom surgery" that

24   removes a minor's health reproductive organs and creates an

SB184

1    artificial form aiming to approximate the appearance of the
2    genitals of the opposite sex.

3        (10) For minors who are placed on puberty blockers
4    that inhibit their bodies from experiencing the natural
5    process of sexual development, the overwhelming majority will
6    continue down a path toward cross-sex hormones and cosmetic
7    surgery.

8        (11) This unproven, poorly studied series of
9    interventions results in numerous harmful effects for minors,
10    as well as risks of effects simply unknown due to the new and
11    experimental nature of these interventions.

12        (12) Among the known harms from puberty blockers is
13    diminished bone density; the full effect of puberty blockers
14    on brain development and cognition are yet unknown, though
15    reason for concern is now present. There is no research on the
16    long-term risks to minors of persistent exposure to puberty
17    blockers. With the administration of cross-sex hormones comes
18    increased risks of cardiovascular disease, thromboembolic
19    stroke, asthma, COPD, and cancer.

20        (13) Puberty blockers prevent gonadal maturation and
21    thus render patients taking these drugs infertile. Introducing
22    cross-sex hormones to children with immature gonads as a
23    direct result of pubertal blockade is expected to cause
24    irreversible sterility. Sterilization is also permanent for
25    those who undergo surgery to remove reproductive organs, and

1    such persons are likely to suffer through a lifetime of

2    complications from the surgery, infections, and other

3    difficulties requiring yet more medical intervention.

4          (14) Several studies demonstrate that hormonal and

5    surgical interventions often do not resolve the underlying

6    psychological issues affecting the individual. For example,

7    individuals who undergo cross-sex cosmetic surgical procedures

8    have been found to suffer from elevated mortality rates higher

9    than the general population. They experience significantly

10   higher rates of substance abuse, depression, and psychiatric

11   hospitalizations.

12         (15) Minors, and often their parents, are unable to

13   comprehend and fully appreciate the risk and life

14   implications, including permanent sterility, that result from

15   the use of puberty blockers, cross-sex hormones, and surgical

16   procedures.

17         (16) For these reasons, the decision to pursue a

18   course of hormonal and surgical interventions to address a

19   discordance between the individual's sex and sense of identity

20   should not be presented to or determined for minors who are

21   incapable of comprehending the negative implications and

22   life-course difficulties attending to these interventions.

23         Section 3. For the purposes of this act, the

24   following terms shall have the following meanings:

SB184

1          (1) MINOR. The same meaning as in Section 43-8-1,

2    Code of Alabama 1975.

3          (2) PERSON. Includes any of the following:

4          a. Any individual.

5          b. Any agent, employee, official, or contractor of

6    any legal entity.

7          c. Any agent, employee, official, or contractor of a

8    school district or the state or any of its political

9    subdivisions or agencies.

10         (3) SEX. The biological state of being male or

11    female, based on the individual's sex organs, chromosomes, and

12    endogenous hormone profiles.

13         Section 4. (a) Except as provided in subsection (b),

14    no person shall engage in or cause any of the following

15    practices to be performed upon a minor if the practice is

16    performed for the purpose of attempting to alter the

17    appearance of or affirm the minor's perception of his or her

18    gender or sex, if that appearance or perception is

19    inconsistent with the minor's sex as defined in this act:

20         (1) Prescribing or administering puberty blocking

21    medication to stop or delay normal puberty.

22         (2) Prescribing or administering supraphysiologic

23    doses of testosterone or other androgens to females.

24         (3) Prescribing or administering supraphysiologic

25    doses of estrogen to males.

1        (4) Performing surgeries that sterilize, including

2   castration, vasectomy, hysterectomy, oophorectomy,

3   orchiectomy, and penectomy.

4        (5) Performing surgeries that artificially construct

5   tissue with the appearance of genitalia that differs from the

6   individual's sex, including metoidioplasty, phalloplasty, and

7   vaginoplasty.

8        (6) Removing any healthy or non-diseased body part

9   or tissue, except for a male circumcision.

10       (b) Subsection (a) does not apply to a procedure

11   undertaken to treat a minor born with a medically verifiable

12   disorder of sex development, including either of the

13   following:

14       (1) An individual born with external biological sex

15   characteristics that are irresolvably ambiguous, including an

16   individual born with 46 XX chromosomes with virilization, 46

17   XY chromosomes with under virilization, or having both ovarian

18   and testicular tissue.

19       (2) An individual whom a physician has otherwise

20   diagnosed with a disorder of sexual development, in which the

21   physician has determined through genetic or biochemical

22   testing that the person does not have normal sex chromosome

23   structure, sex steroid hormone production, or sex steroid

24   hormone action for a male or female.

25       (c) A violation of this section is a Class C felony.

SB184

1          Section 5. No nurse, counselor, teacher, principal,

2   or other administrative official at a public or private school

3   attended by a minor shall do either of the following:

4          (1) Encourage or coerce a minor to withhold from the

5   minor's parent or legal guardian the fact that the minor's

6   perception of his or her gender or sex is inconsistent with

7   the minor's sex.

8          (2) Withhold from a minor's parent or legal guardian

9   information related to a minor's perception that his or her

10   gender or sex is inconsistent with his or her sex.

11          Section 6. Except as provided for in Section 4,

12   nothing in this act shall be construed as limiting or

13   preventing psychologists, psychological technicians, and

14   master's level licensed mental health professionals from

15   rendering the services for which they are qualified by

16   training or experience involving the application of recognized

17   principles, methods, and procedures of the science and

18   profession of psychology and counseling.

19          Section 7. Nothing in this section shall be

20   construed to establish a new or separate standard of care for

21   hospitals or physicians and their patients or otherwise

22   modify, amend, or supersede any provision of the Alabama

23   Medical Liability Act of 1987 or the Alabama Medical Liability

24   Act of 1996, or any amendment or judicial interpretation of

25   either act.

SB184

1        Section 8. If any part, section, or subsection of

2   this act or the application thereof to any person or

3   circumstances is held invalid, the invalidity shall not affect

4   parts, sections, subsections, or applications of this act that

5   can be given effect without the invalid part, section,

6   subsection, or application.

7        Section 9. This act does not affect a right or duty

8   afforded to a licensed pharmacist by state law.

9        Section 10. Although this bill would have as its

10  purpose or effect the requirement of a new or increased

11  expenditure of local funds, the bill is excluded from further

12  requirements and application under Amendment 621, as amended

13  by Amendment 890, now appearing as Section 111.05 of the

14  Official Recompilation of the Constitution of Alabama of 1901,

15  as amended, because the bill defines a new crime or amends the

16  definition of an existing crime.

17       Section 11. This act shall become effective 30 days

18  following its passage and approval by the Governor, or its

19  otherwise becoming law.

SB184

_____

President and Presiding Officer of the Senate


_____

Speaker of the House of Representatives


SB184
Senate 23-FEB-22
I hereby certify that the within Act originated in and passed
the Senate, as amended.

                              Patrick Harris,
                              Secretary.


_____


House of Representatives
Passed: 07-APR-22


_____


By: Senator Shelnutt

1 HB152         **ACT No. 2005-181**

2 73299-15

3 By Representatives McDaniel, Brewbaker, Gipson and McMillan

4 RFD: State Government

5 First Read: 01-FEB-05



RECEIVED
MAY 16 2005
GOVERNOR'S
OFFICE

**Exhibit 0010**

HB152

1
2  ENROLLED, An Act,
3       To amend Section 20-2-190, Code of Alabama 1975, as
4  amended by Act 2004-564, to further regulate sales of certain
5  products containing ephedrine or pseudoephedrine; and to
6  provide further for penalties for violations; and in
7  connection therewith would have as its purpose or effect the
8  requirement of a new or increased expenditure of local funds
9  within the meaning of Amendment 621 of the Constitution of
10  Alabama of 1901.
11  BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:
12       Section 1. Section 20-2-190, Code of Alabama 1975,
13  as amended by Act 2004-546, is amended to read as follows:
14       "§20-2-190.
15       "(a) Any person who manufactures, sells, transfers,
16  receives, or possesses a listed precursor chemical violates
17  this article if the person:
18       "(1) Knowingly fails to comply with the reporting
19  requirements of this article;
20       "(2) Knowingly makes a false statement in a report
21  or record required by this article or the rules adopted
22  thereunder;
23       "(3) Is required by this article to have a listed
24  precursor chemical license or permit, and is a person as
25  defined by this article, and knowingly or deliberately fails

Page 1

43

HB152

1   to obtain such a license or permit. An offense under this
2   subsection shall constitute a Class C felony.

3              "(b) Notwithstanding the provisions of Section
4   20-2-188, a person who possesses, sells, transfers, or
5   otherwise furnishes a listed precursor chemical or a product
6   containing a precursor chemical commits an offense if the
7   person possesses, sells, transfers, or furnishes the substance
8   with the knowledge or intent that the substance will be used
9   in the unlawful manufacture of a controlled substance. An
10  offense under this subsection shall constitute a Class B
11  felony.

12             "(c)(1) a. ~~On and after August 1, 2004, products~~
13  Products whose sole active ingredient is ephedrine or
14  pseudoephedrine in strength of ~~60~~ 30 mg. or more per tablet
15  cannot be offered for retail sale loose in bottles, but must
16  be sold only in blister packages. ~~Also, these products cannot~~
17  ~~be offered for retail sale by self-service, but must be stored~~
18  ~~behind a counter or barrier so that it is not accessible by~~
19  ~~the public, and only accessible by a retail store employee.~~
20             On or after October 1, 2009, no product containing
21  ephedrine or pseudoephedrine shall be sold in this state
22  unless the product is manufactured in such a manner that the
23  ephedrine or pseudoephedrine cannot be extracted so as to be
24  used as an ingredient in the production of methamphetamine.

Page 2

44

HB152

1      "b. All packages of tablets containing ephedrine or

2   pseudoephedrine as the sole active ingredient shall be stored

3   by retail establishments by:

4           "1. placing the products behind a counter where the

5   public is not permitted; or

6           "2. placing the products in a locked display case so

7   that a customer wanting access to the packages must ask a

8   store employee for assistance.

9           "c. All packages of tablets containing ephedrine or

10  pseudoephedrine and other active ingredients shall be stored

11  by retail establishments by:

12          "1. placing the products behind a counter;

13          "2. placing the products under video surveillance

14  and retaining the data for 30 days; or

15          "3. placing the products in a locked display case so

16  that a customer wanting access to the package must ask a store

17  employee for assistance.

18          "(2) ~~On and after August 1, 2004, no~~ No person shall

19  deliver in any single over-the-counter sale more than ~~three~~

20  two packages, or any number of packages that contain a

21  combined total of more than 9 6 grams of any product

22  containing ephedrine or pseudoephedrine as the sole active

23  ingredient, or in combination with other active ingredients. A

24  purchase of more than 6 grams of such a product by an

Page 3

45

HB152

1    individual within a 30-day period with intent to manufacture
2    shall be unlawful.
3            "(3) Each pharmacy or retail establishment selling
4    an over the counter product in compliance with subdivision (1)
5    b. shall require the purchaser of the product or products to
6    be at least 18 years of age, to provide photographic
7    identification of himself or herself, and to sign a special
8    electronic or paper register which shall be maintained as a
9    record of such a sale for inspection by any law enforcement
10   officer or inspector of the Board of Pharmacy during normal
11   business hours. In lieu of providing a photo identification,
12   the purchaser may provide any two of the following forms of
13   identification of himself or herself: a credit card, insurance
14   card, Medicaid or Medicare card, or other government-issued
15   identification card. A copy of the special register shall be
16   maintained by the retail establishment for a minimum of 180
17   days. Any retailer maintaining the special register in
18   accordance with this subdivision shall not be civilly liable
19   as a result of any act or omission in carrying out the duties
20   required by this subsection and shall be immune from liability
21   to any third party unless the retailer has violated any
22   provision of this subsection in relation to a claim brought
23   for such violation. Any excessive or suspicious sales of such
24   a product by any wholesaler, manufacturer, or repackager as

Page 4

HB152

1   defined in Section 34-23-1 shall be reported to the Board of
2   Pharmacy.
3           "(3) (4) This subsection does not apply to the
4   following:
5           a. Pediatric products labeled pursuant to federal
6   regulation primarily intended for administration to children
7   under 12 years of age according to label instructions.
8           "b. Products that the Alabama State Board of
9   Pharmacy, upon application of a manufacturer, exempts because
10  the product is formulated in such a way as to effectively
11  prevent the conversion of the active ingredient into
12  methamphetamine, or its salts or precursors.
13          "c. Products dispensed pursuant to a legitimate
14  prescription.
15          "d. Any compound, mixture, or preparation which is
16  in liquid, liquid capsule, or gel capsule form if ephedrine or
17  pseducephedrine is not the only active ingredient.
18          "(4) (5) This subsection shall preempt all local
19  ordinances or regulations governing the possession by
20  individuals or sale by a retail distributor of
21  over-the-counter products containing ephedrine or
22  pseudoephedrine.
23          "(5) (6) A retailer who is the general owner or
24  operator of an establishment where ephedrine or
25  pseudoephedrine products are available for sale who violates

HB152

1    ~~this section~~ shall not be penalized pursuant to this section

2    for conduct of an employee if the retailer documents that an

3    employee training program was conducted by or approved by the

4    Alabama Methamphetamine Abuse Task Force pursuant to

5    subsection ~~(d)~~ (g).

6         "~~(6)~~(7) A violation of subdivision (1)a. or b. or

7    subdivision (2) of this subsection shall constitute a Class C

8    misdemeanor on a first offense and a Class ~~A misdemeanor~~ C

9    felony on subsequent offenses. The violations shall be

10   punishable as provided by law.

11        "(d) Beginning October 1, 2005, any wholesaler,

12   manufacturer, or repackager of drug products as defined in

13   Section 34-23-1, other than a wholesaler, manufacturer, or

14   repackager licensed by the Board of Pharmacy, shall obtain a

15   registration annually from the Alcoholic Beverage Control

16   Board which may promulgate and implement administrative rules

17   for the registrations. Any wholesaler, manufacturer, or

18   repackager shall keep complete records of all sales and

19   transactions involving a listed precursor chemical or a

20   product containing a precursor chemical including the names of

21   all parties involved in the transaction and amount of the

22   precursor chemical or product involved. The records shall be

23   maintained for at least 12 months and the records shall be

24   available for inspection by any law enforcement officer or

HB152

1   inspector of the Board of Pharmacy during normal business

2   hours.

3           "(e) Beginning October 1, 2005, every retailer of

4   ephedrine or pseudoephedrine, or a product containing

5   ephedrine or pseudoephedrine, other than a retailer licensed

6   by the Board of Pharmacy, is required to be registered with

7   the Alcoholic Beverage Control Board to lawfully sell

8   ephedrine or pseudoephedrine products to consumers. A retailer

9   that requests a waiver of registration stating it will sell

10  only ephedrine or pseudoephedrine products listed in

11  subsection (c)(4) a., b., or d., shall be exempt from

12  registration.

13          "(f) In addition to any other penalty that may be

14  provided, a sale of ephedrine or pseudoephedrine by a

15  wholesaler, manufacturer, repackager, or retailer without a

16  license as required by subsection (d) or (e) is a Class A

17  misdemeanor. In addition to any other penalty that may be

18  provided, a sale of ephedrine or pseudoephedrine in violation

19  of this section by a wholesaler, manufacturer, repackager, or

20  retailer who is licensed as required by subsection (d) or (e)

21  shall result in cancellation of the required registration and

22  forfeiture of the right to sell the products for at least one

23  year or longer as determined by the Alcoholic Beverage Control

24  Board.

HB152

1        "~~(d)~~ (g)(1) The Alabama Methamphetamine Abuse Task

2        Force is created to develop education and training programs

3        that will curb the abuse of methamphetamine precursors used to

4        make methamphetamine, and curb the use of methamphetamine in

5        the State of Alabama. The task force shall consist of ~~one~~

6        ~~representative from each of~~ the following ~~agencies and~~

7        ~~organizations~~:

8        "~~a. The Office of the Governor.~~

9        "~~b.~~ a. The ~~Office of the~~ Attorney General, or his or

10       her designee.

11        "~~c. The Department of Mental Health and Mental~~

12       ~~Retardation.~~

13        "~~d. The Department of Public Health.~~

14        "~~e.~~ b. The President of the Alabama State Board of

15       Pharmacy, or his or her designee.

16        "~~f. The Senate as appointed by the President Pro~~

17       ~~Tempore of the Senate.~~

18        "~~f.~~ c. The Senate as appointed by the President Pro

19       Tempore of the Senate.

20        "~~g. The House of Representatives as appointed by the~~

21       ~~Speaker of the House of Representatives.~~

22        "~~g.~~ d. The House of Representatives as appointed by

23       the Speaker of the House of Representatives.

HB152

1    "~~h. The Petroleum and Convenience Marketers of~~

2 ~~Alabama as appointed by the Governor and selected from three~~

3 ~~nominees submitted by the association.~~

4    "~~i. The Alabama Retail Association as appointed by~~

5 ~~the Governor and selected from three nominees submitted by the~~

6 ~~association.~~

7    "~~j. The Alabama Pharmacy Association as appointed by~~

8 ~~the Governor and selected from three nominees submitted by the~~

9 ~~association.~~

10    "~~k.~~ c. The Director of the Alcoholic Beverage

11 Control Board, or his or her designee.

12    "~~l. The Alabama Grocers' Association as appointed by~~

13 ~~the Governor and selected from three nominees submitted by the~~

14 ~~association.~~

15    "~~m. The District Attorney's Association of Alabama~~

16 ~~as appointed by the Governor and selected from three nominees~~

17 ~~submitted by the association.~~

18    "~~n. The Consumer Healthcare Products Association as~~

19 ~~appointed by the Governor and selected from three nominees~~

20 ~~submitted by the association.~~

21    "The representative of the Alcoholic Beverage

22 Control Board shall serve as chair.

23    "~~(2) The membership of the task force shall be~~

24 ~~inclusive and reflect the racial, gender, geographic,~~

25 ~~urban/rural, and economic diversity of the state.~~

HB152

1        "~~(2)~~ The membership of the task force shall be

2    inclusive and reflect the racial, gender, geographic,

3    urban/rural, and economic diversity of the state.

4        The board shall annually report to the Legislature

5    by the second legislative day to what extent the board is

6    complying with this diversity provision.

7        "~~(3)~~ (2) The chair of the task force ~~shall be~~

8    ~~elected by the members of the task force and~~ shall be

9    responsible for the conduct of the meetings and any

10   correspondence derived therefrom.

11       "~~(4) Other than the legislative appointees, each~~

12   ~~representative shall be appointed by his or her respective~~

13   ~~department head and shall hold the appointment for a one-year~~

14   ~~term.~~

15       "~~(5) A representative may be reappointed as deemed~~

16   ~~appropriate by his or her department head, or in the case of~~

17   ~~legislative appointees, the President Pro Tempore or Speaker~~

18   ~~of the House of Representatives.~~

19       "~~(6)~~ (3) The task force shall develop training and

20   education programs targeted for employees of establishments

21   where ephedrine or pseudoephedrine products are available for

22   sale and the programs shall be administered by the Alcoholic

23   Beverage Control Board in conjunction with its program to

24   restrict access to tobacco products by minors pursuant to

25   Chapter 11, Title 28. The task force may avail itself of any

Page 10

HB152

1     advisory information as needed to develop the training and
2     information programs. The chair of the task force shall call
3     an organizational meeting of the task force within 30 days of
4     the effective date of the act amending this section, and the
5     task force shall report its meeting schedule and procedural
6     rules to the Clerk of the House of Representatives and the
7     Secretary of the Senate within 10 days of the meeting. The
8     task force shall collect data related to the effectiveness of
9     its training and education programs and shall submit a report
10    to the Secretary of the Senate and Clerk of the House no later
11    than December 31 of each year.
12          "(4) The task force may expend any funds from any
13    source, including, but not limited to, donations, grants, and
14    appropriations of public funds received for purposes of this
15    subsection."
16          Section 2. Although this bill would have as its
17    purpose or effect the requirement of a new or increased
18    expenditure of local funds, the bill is excluded from further
19    requirements and application under Amendment 621 because the
20    bill defines a new crime or amends the definition of an
21    existing crime.
22          Section 3. This act shall become effective July 1,
23    2005, following its passage and approval by the Governor, or
24    its otherwise becoming law.

HB152

1

2

3

_____

4                Speaker of the House of Representatives

5

_____

6          President and Presiding Officer of the Senate

7    House of Representatives
8          I hereby certify that the within Act originated in
9    and was passed by the House 12-APR-05, as amended.
10
11                          Greg Pappas
12                            Clerk
13

14

| | | |
|---|---|---|
| 15  Senate | 16-MAY-05 | Amended and Passed |
| 16  House | 16-MAY-05 | Passed, as amended by Conference Committee Report |
| 17  Senate | 16-MAY-05 | Passed, as amended by Conference Committee Report |

APPROVED  5/24/05

TIME  10:30 a.m.

GOVERNOR

Alabama Secretary Of State

Act Num....: 2005-181
Bill Num...: H-152

Recv'd 05/24/05   11:21amSXH

Page 12

54



# State Affronts to Federal Primacy in the Licensure of Pharmaceutical Products

## *Lars Noah*

**University of Florida Levin College of Law**
**Legal Studies Research Paper Series Paper No. 16-24**

**Exhibit
0011**

# STATE AFFRONTS TO FEDERAL PRIMACY IN THE LICENSURE OF PHARMACEUTICAL PRODUCTS

## *Lars Noah**

### 2016 MICH. ST. L. REV. 1

#### ABSTRACT

*Do individual states have the power to prohibit the sale and use of a drug that the U.S. Food and Drug Administration (FDA) has approved? Two years ago, the Commonwealth of Massachusetts tried to do so, but a federal court issued a preliminary injunction against this action. Although criticized at the time as unprecedented, the Massachusetts ban hardly represented the first time that a state had taken such an initiative, but it did provide the occasion for considering whether the U.S. Constitution would stand in the way. This Article carefully evaluates objections based on implied preemption under the Supremacy Clause, the dormant Commerce Clause doctrine, and the Due Process Clause of the Fourteenth Amendment. As it turns out, the question does not admit of a categorical answer, but at least in some circumstances a state would violate the Constitution if it tried to nullify a federal license granted to the manufacturer of a pharmaceutical product.*

#### TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1
I.   STATE EFFORTS TO PROHIBIT WHAT THE FDA HAS
      ALLOWED .................................................................... 3
      A.  Massachusetts Takes on Zohydro® (and Loses) ................. 3
      B.  Previous Attempts to Bar FDA-Approved Drugs ............. 16
II.  ASSESSING THE CONSTITUTIONAL OBJECTIONS ....................... 27
      A.  Implied Preemption ........................................................ 27
      B.  Dormant Commerce Clause ............................................. 35
      C.  Substantive Due Process ................................................. 42
CONCLUSION ................................................................................. 53

---

* Professor of Law, University of Florida.

INTRODUCTION

Fifteen years ago, I asked: "Could a state entirely prohibit the sale of a drug approved by the FDA?"[1] The question arose in the immediate aftermath of the controversial decision of the U.S. Food and Drug Administration (FDA) to authorize the introduction of mifepristone (Mifeprex®) and the prospect that some states might try to ban the use of this abortifacient.[2] The tentative answer that I sketched at the time turned in part on peculiar aspects of that drug and its licensing process,[3] and, as it turned out, the problem remained entirely hypothetical. Subsequently, in my *Medical Technology* casebook, I posed the question somewhat more broadly: "[W]hat about other therapeutic agents that do not raise the constitutional questions in connection with procreative choices? If a state entirely prohibited sales within its borders of an FDA-approved product, . . . would the Constitution forbid such an exercise of a state's police power?"[4] Then, in 2014, one state tried to ban a drug that lacked any of the special baggage associated with mifepristone, thereby presenting the constitutional questions in a fairly straightforward fashion,[5] and a federal district court found enough merit in some of these objections to preliminarily enjoin enforcement of the state's prohibition.[6]

Part I discusses the recent effort by officials in the Commonwealth of Massachusetts to prohibit the sale of a narcotic analgesic product less than six months after the FDA approved this prescription drug. A court granted the manufacturer a preliminary injunction, though it did so on the basis of a seriously flawed preemption analysis. Part I then compares and contrasts what happened in Massachusetts with occasional attempts in other states to nullify licensing decisions by the FDA. Part II examines the

---

1. Lars Noah, *A Miscarriage in the Drug Approval Process?: Mifepristone Embroils the FDA in Abortion Politics*, 36 WAKE FOREST L. REV. 571, 600 (2001).

2. *See id.* at 599 & n.132. I also had considered whether the FDA (under new leadership) could have reversed course, *see id.* at 591-94, and whether Congress could have overridden the agency's licensing decision, *see id.* at 594-99.

3. *See id.* at 601-03. For more about mifepristone, see *infra* notes 66-71 and accompanying text.

4. LARS NOAH, LAW, MEDICINE, AND MEDICAL TECHNOLOGY 144 (Foundation Press, 3d ed. 2012).

5. *See infra* Section I.A.

6. *See* Zogenix, Inc. v. Patrick, No. 14-11689-RWZ, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014); *see also infra* notes 23-44 and accompanying text (discussing and critiquing this decision).

primary constitutional objections to such initiatives, including a more nuanced consideration of the implied preemption arguments as well as dormant Commerce Clause and substantive due process objections not considered by the court in Massachusetts. By assessing these possible obstacles in tandem, one can better identify under exactly what circumstances states must abide by the judgments of federal regulatory officials when licensing pharmaceutical products.

## I. STATE EFFORTS TO PROHIBIT WHAT THE FDA HAS ALLOWED

Although hardly unprecedented, the recent decision in Massachusetts to ban the sale of a drug shortly after FDA approval represented a stark affront to the licensing judgments of federal officials. The resulting litigation, however, left more questions than answers about the constitutionality of such efforts. Before tackling those loose ends in Part II, it helps to situate this latest case among earlier state initiatives to prohibit the sale or use of pharmaceutical products approved by the FDA.

A. Massachusetts Takes on Zohydro® (and Loses)

In 2013, the FDA approved a new drug application (NDA) submitted by Zogenix, Inc. for an extended-release hydrocodone product intended for patients with chronic severe pain that failed to respond to alternative treatment.[7] A couple of years earlier, critics had questioned the wisdom of developing this opioid analgesic,[8] and an advisory committee convened by the FDA had voted against recommending approval.[9] Nonetheless, the agency decided to allow

---

7.   *See* Matthew Perrone, *FDA Unexpectedly OK's New Hydrocodone Option*, BOS. GLOBE, Oct. 26, 2013, at B5.

8.   *See* Chris Hawley, *Hopped-up Painkiller Has Experts Worried: Pure Version of Hydrocodone, Now Being Tested, Raises Addiction Fears*, ST. LOUIS POST-DISPATCH, Dec. 27, 2011, at A1; Gary Robbins, *San Diego Drugmaker Plays Down Concerns on Painkiller; It Says Zohydro Would Not Be Abused, as Addiction Experts Fear*, SAN DIEGO UNION-TRIB., Jan. 4, 2012, at C1.

9.   *See* Perrone, *supra* note 7, at B5 ("The approval came as a surprise since the agency's own panel of outside advisers gave the drug an overwhelmingly negative review last year. The panel of pain specialists voted 11 to 2 . . . against approving the drug, questioning the need for a new form of one of most widely abused prescription drugs in the United States."); Roni Caryn Rabin, *New Painkiller Rekindles Addiction Concerns*, N.Y. TIMES, Apr. 22, 2014, at D1 ("Members of the F.D.A. committee who voted against approval acknowledged they were influenced by the drug overdoses claiming more and more lives each year. But they were also disturbed by red flags raised during the clinical trials of Zohydro."); *see also* John

the California-based company to introduce its product (marketed as Zohydro ER®), which drew howls of protest from public health experts and law enforcement officials.[10] After all, for two decades the FDA had struggled to manage widespread abuse and diversion of a similar extended-release oxycodone product (OxyContin®).[11] The agency's approval of Zohydro struck some observers as doubly perplexing insofar as it had just one day earlier recommended rescheduling combination products that included hydrocodone from Schedule III to the more restrictive Schedule II in response to escalating patterns of abuse.[12] Hydrocodone when used as the sole

---

Fauber, *Potent New Painkiller Open to Abuse: FDA's Approval of Easily Crushed Opioid Ignores Its Own Staff, Advisers*, MILWAUKEE J. SENTINEL, Oct. 28, 2013, at A1 ("A November 2012 memo from the FDA's own staff warns that the drug will be abused more than traditional hydrocodone products.").

    10.   *See* Bradley J. Fikes, *Painful Dilemma; San Diego Company's Zohydro ER Caught in Debate over Needs of Legitimate Patients Versus Potential for Drug Abuse*, SAN DIEGO UNION-TRIB., Mar. 23, 2014, at C1 (describing "a firestorm of criticism"); Sabrina Tavernise, *Pressured on Opioids, F.D.A. Takes Steps to Toughen Stance*, N.Y. TIMES, Feb. 5, 2016, at A12 ("The F.D.A. has come under fire for continuing to approve opioids. . . . Its approval in 2013 of a drug called Zohydro brought public outcry over what critics saw as yet another opioid in a market flooded with them."); *Opioid Painkillers: Fact and Myth*, WASH. POST, Nov. 11, 2014, at E3 ("[A]ttorneys general from 28 states have asked the FDA to reconsider its decision because the drug offers no clear advantages over others already on the market and its potency makes it a target for misuse and abuse. And more than a dozen Republican and Democratic members of Congress have signed a bill that would ban Zohydro ER."); *cf.* Anne E. Schweighardt & Katherine M. Juba, *Extended-Release Hydrocodone: The Devil in Disguise or Just Misunderstood?*, 48 ANNALS PHARMACOTHERAPY 1362, 1363-64 (2014) (suggesting that fears of misuse have been overblown). Indeed, a whiff of scandal surrounded the process. *See* John Fauber & Kristina Fiore, *Senators Probe FDA–Drug Firm Meetings: Letter Alleges "Pay-to-Play" on Zohydro Approval*, MILWAUKEE J. SENTINEL, Feb. 28, 2014, at A7.

    11.   *See* Lars Noah, *Product Hopping 2.0: Getting the FDA to Yank Your Original License Beats Stacking Patents*, 19 MARQ. INTELL. PROP. L. REV. 161, 171-78 (2015).

    12.   *See* Barry Meier & Eric Lipton, *F.D.A. Shift on Painkillers Was Years in the Making*, N.Y. TIMES, Oct. 28, 2013, at A1 ("[P]ublic health advocates who had cheered the agency's [long delayed rescheduling] decision the day before were dismayed when the F.D.A. approved" Zohydro.); Editorial, *FDA Undermines Campaign Against Deadly Painkillers*, USA TODAY, Sept. 30, 2014, at 8A; *see also* Drug Enforcement Admin. (DEA), Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products from Schedule III to Schedule II, 79 Fed. Reg. 49,661, 49,682 (Aug. 22, 2014) (codified at 21 C.F.R. § 1308.13(e)(1) (2015)).

active ingredient had always faced Schedule II controls,[13] which may help to explain why no company had ever before commercialized such a product.

Traditionally, hydrocodone drug products included the nonnarcotic analgesic acetaminophen (brand name Tylenol®), but that active ingredient came under increased scrutiny after reports of liver damage from prolonged use coupled with cases of excessive dosing because acetaminophen appears in numerous prescription (Rx) and over-the-counter (OTC) products.[14] A pure hydrocodone product avoided those risks,[15] though it would increase concerns about abuse and diversion, and Zohydro magnified such worries because it represented an extended-release version packing a higher dose of hydrocodone in each tablet.[16] When taken as directed, the active ingredient would diffuse more slowly in the patient's body, providing longer and more even pain relief than traditional hydrocodone products with acetaminophen (e.g., Vicodin® and Lortab®); if, however, an abuser managed to circumvent the slow-release mechanism by, for instance, crushing the tablet, then the full dose would become available for immediate absorption. Moreover, and in contrast to the currently marketed versions of OxyContin, Zohydro failed to incorporate any abuse-resistant features.[17]

---

13.     *See* David Sell, *DEA to Tighten Control of a Type of Pain Pill*, PHILA. INQUIRER, Aug. 22, 2014, at A17 ("Hydrocodone alone had been a Schedule II drug since 1970, when Congress passed the Controlled Substances Act.").

14.     *See* Melissa Dribben, *Suits Against Tylenol Maker Seek to Highlight Dangers*, PHILA. INQUIRER, Feb. 16, 2014, at G1; Deborah Franklin, *Poisonings from a Popular Pain Reliever Are on the Rise*, N.Y. TIMES, Nov. 29, 2005, at F5; Matthew Perrone, *Tylenol, Implicated in Liver Failure, Will Carry New Warning*, BOS. GLOBE, Aug. 30, 2013, at B7.

15.     *See* Harry J. Gould, III & Dennis Paul, *Hydrocodone Extended-Release: Pharmacodynamics, Pharmacokinetics and Behavioral Pharmacology of a Controversy*, 91 PHARMACOLOGICAL RES. 99, 100-01 (2015); Keith Darcé, *Late-Stage Test Brings Success for Zogenix Pain Pill; Would Be First Such Drug Without Limits of Acetaminophen*, SAN DIEGO UNION-TRIB., Aug. 18, 2011, at C1.

16.     *See* Kevin Deutsch, *It's Purer—and Potent; Experts Fear New Painkiller Will Fuel Drug Abuse; Can Be 10 Times as Strong as Current Narcotics*, NEWSDAY, Mar. 25, 2013, at A2; Bradley J. Fikes, *Consumer Reports Analysis Criticizes Overuse of Opioids; Group Also Opposes Approval of San Diego Company's Painkiller Zohydro ER*, SAN DIEGO UNION-TRIB., Aug. 1, 2014, at C1 ("[B]ecause Zohydro ER contains higher doses of hydrocodone than regular formulations, critics said it is more likely to be abused.").

17.     *See* Kristina Fiore & John Fauber, *Zohydro Lacks Abuse Deterrent: FDA Did Not Require Safeguard for Painkiller*, MILWAUKEE J. SENTINEL, Oct. 29, 2013, at A1; Peter Loftus, *Doctors Split on Benefits of Longer-Lasting New Painkiller*, WALL ST. J., May 27, 2014, at D1; *cf.* Lewis S. Nelson et al., Editorial,

The Commonwealth of Massachusetts responded aggressively to the imminent marketing of Zohydro. Although it had not encountered nearly the problems with OxyContin experienced by West Virginia and other states in the Appalachian region,[18] officials in Massachusetts knew of that drug's scourge,[19] and they seemed determined to prevent a replay. On March 27, 2014, Governor Deval Patrick issued an emergency declaration authorizing the Department of Public Health to prevent sales of the drug in Massachusetts until the manufacturer addressed concerns about abuse and diversion, which the Commissioner of Health did later that same day.[20] The FDA expressed dismay that a state would try to countermand its judgment in this fashion,[21] and Zogenix lodged various constitutional

*Addressing the Opioid Epidemic*, 314 JAMA 1453, 1453 (2015) ("New opioid medications, many of them with tamper-resistant formulations, continue to be marketed despite the lack of evidence that these preparations reduce the risk of addiction."); Alan Schwarz, *Painkillers Resist Abuse, but Experts Still Worry; Inventive Addicts Thwart Safeguards*, N.Y. TIMES, June 7, 2015, at A16 (reporting some concerns about the limitations of such features). This would come later. *See infra* note 58 and accompanying text.

18.    *See* Aron J. Hall et al., *Patterns of Abuse Among Unintentional Pharmaceutical Overdose Fatalities*, 300 JAMA 2613, 2617-19 (2008) (focusing on West Virginia); *see also* Bridget M. Kuehn, *CDC: Major Disparities in Opioid Prescribing Among States: Some States Crack Down on Excess Prescribing*, 312 JAMA 684, 685 (2014) ("[I]t's not clear why opioids and benzodiazepines are prescribed more in the South.").

19.    *See* Yasmeen Abutaleb, *State Ranks Low in Prescribing of Opioids; Long-Acting Pills an Exception*, BOS. GLOBE, July 2, 2014, at A1; Tracy Jan, *Critics' Calls for Tougher Pain Pills Are Resisted; Want Drug Makers, FDA to Act to Help Stem Opiate Abuse*, BOS. GLOBE, Feb. 19, 2014, at A1; Elizabeth Mehren, *Hooks of "Hillbilly Heroin": Abuse of Prescription Painkiller OxyContin Ravages Poor Areas in the East*, L.A. TIMES, Oct. 4, 2001, at A1 ("Since April, more than 100 Boston-area pharmacies have been robbed of OxyContin. The robbers demand nothing else: not even cash . . . ."); *see also* Brian MacQuarrie, *Governor Declares an Emergency on Opiate Abuse*, BOS. GLOBE, Mar. 28, 2014, at A1 ("Opiate overdoses in Massachusetts rose 90 percent from 2000 to 2012, the governor said.").

20.    *See* Bradley J. Fikes, *Massachusetts Bans Painkiller Zohydro ER; Zogenix Takes Issue with Action, Which Applies to All Pure-Hydrocodone Drugs*, SAN DIEGO UNION-TRIB., Mar. 29, 2014, at C1. Other states contemplated doing so as well. *See* Jon Kamp, *New Painkiller Sparks Abuse Concern*, WALL ST. J., May 24, 2014, at A3 ("Lawmakers in Ohio and New York recently proposed measures that would effectively ban Zohydro by classifying it as a drug akin to heroin or LSD."); *id.* ("The manufacturer has . . . argued against legislation for state-level bans in New York and Ohio, which legal experts said could prove hard to defend because they counter a federal agency.").

21.    *See* Fikes, *supra* note 20, at C1 ("[T]he [FDA] said state and congressional actions to unilaterally determine the legal status of various medications are 'extremely troubling.'"); *see also* Michael McCarthy, *FDA Chief*

objections to what commentators characterized as an unprecedented move.[22]

Less than one month later, the federal district court in Massachusetts sided with Zogenix, issuing a preliminary injunction against the Commonwealth.[23] Although the court's order naturally offered only a limited discussion of the constitutional issues, Judge Rya Zobel concluded that the congressional statute governing the approval of new drugs impliedly preempted the state's action.[24] She ruled that a prohibition on the sale of an FDA-approved product in a particular state probably would stand as an obstacle to the accomplishment of federal purposes, which she understood as "mak[ing] drugs available to promote . . . the public health."[25] Judge

---

*Defends Zohydro Approval as US States Rebel*, 348 BMJ g2939 (Apr. 24, 2014), http://dx.doi.org/10.1136/bmj.g2939 [https://perma.cc/VNK3-7UW4]. The FDA Commissioner later penned a commentary to this effect. *See* Margaret A. Hamburg, Opinion, *FDA Combats Opioid Abuse*, USA TODAY, Sept. 30, 2014, at 8A ("Zohydro is a very small fraction of the opioid marketplace. Singling out any individual opioid diverts the nation's focus from interventions that can make a real difference."). Her former deputy offered a somewhat less sanguine assessment. *See* Yngvild Olsen & Joshua M. Sharfstein, *Chronic Pain, Addiction, and Zohydro*, 370 NEW ENG. J. MED. 2061, 2063 (2014); *see also* Editorial, *Patrick's Drug Ban Shows Need for More Non-Opioid Painkillers*, BOS. GLOBE, Apr. 7, 2014, at A10 (applauding the state's action even while conceding that "[o]verruling the FDA—in effect, nullifying federal health policy—is no small matter").

22. *See* Travis Andersen, *Patrick Asks Ban on Drug Be Upheld: But Painkiller Zohydro Was Approved by FDA*, BOS. GLOBE, Apr. 12, 2014, at B2; Brady Dennis, *U.S. Judge Set to Rule on Drug Firm's Suit Against Massachusetts over Painkiller Ban*, WASH. POST, Apr. 14, 2014, at A4; Michael Ollove, *Fearing Abuse, States Target Painkiller: Local Limits on Zohydro Challenge the FDA on Protecting the Public*, CHI. TRIB., May 21, 2014, at N8 (calling it "perhaps the first time a state has ever tried to ban a drug approved by the FDA"); Milton J. Valencia, *State Defends Ban on New Drug; Zohydro's Maker Seeks Injunction*, BOS. GLOBE, Apr. 15, 2014, at B1 ("No other state is believed to have banned a drug that has already been approved by the" FDA.).

23. *See* Brady Dennis, *Judge Voids Ban on Painkiller in Mass.; State Claimed Zohydro's Pure Hydrocodone Is an Addiction Risk*, WASH. POST, Apr. 16, 2014, at A3; Milton J. Valencia, *US Judge Blocks State Ban on Opiate; Critics Say Zohydro Could Be Misused*, BOS. GLOBE, Apr. 16, 2014, at B1.

24. Zogenix, Inc. v. Patrick, No. 14-11689-RWZ, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014). At this point, Murray the muppet from *Sesame Street* might intone that "today's episode was brought to you by the letter Z."

25. *Id.* ("The FDA endorsed Zohydro ER's safety and effectiveness when it approved the drug. . . . If the Commonwealth were able to countermand the FDA's determinations and substitute its own requirements, it would undermine the FDA's ability to make drugs available to promote and protect the public health."). Notably, Judge Zobel never suggested finding implied conflict preemption premised instead on an impossibility of dual compliance.

Zobel distinguished cases that had rejected an implied preemption defense to inadequate warning claims in tort litigation:

> Here, the obstruction is clearer because the drug Massachusetts wants Zogenix to adopt—Zohydro ER with an "abuse-resistant formulation"— has not been approved . . . . Zogenix would be required to return to the FDA and seek approval of a drug different from the one the FDA has already deemed safe.[26]

Forecasting that Zogenix was likely to prevail on the merits, and finding the other factors for granting preliminary relief satisfied, Judge Zobel issued an injunction; she did not have to reach the plaintiff's dormant Commerce Clause and other constitutional arguments.[27]

Although Judge Zobel's instincts seem entirely correct, it takes little effort to quibble with her characterization of the purposes underlying federal law. Congress crafted the current version of the licensing scheme for new drugs in order to *prevent* the introduction of unsafe or ineffective pharmaceutical products, and, when it did so, the legislation included language that appeared to preserve state authority:

> Nothing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act [FDCA] shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments unless there is a direct and positive conflict between such amendments and such provision of State law.[28]

The federal Controlled Substances Act (CSA) contains similar language.[29] In displacing state law only to the extent that "a direct

---

26.     *Id.* (rejecting as well the defendants' argument that "federal regulation is a floor, not a ceiling; if states wish to regulate over and above federal regulations, they may do so").

27.     *See id.* at *2 n.2; *see also infra* Section II.B (elaborating on the dormant Commerce Clause doctrine).

28.     Drug Amendments of 1962, Pub. L. No. 87-781, § 202, 76 Stat. 780, 793. Even subsequently adopted express preemption provisions governing other therapeutic products regulated by the FDA provide for some flexibility. *See* 21 U.S.C. § 360k(b)(2)(A) (2012) (allowing states to seek waivers of preemption for medical devices where "required by compelling local conditions"); *id.* § 379r(b)(1) (allowing states to seek waivers for nonprescription drug products where a nonidentical requirement "protects an important public interest that would otherwise be unprotected, including the health and safety of children" and "would not unduly burden interstate commerce").

29.     *See* 21 U.S.C. § 903 (2012) (displacing state law only when "there is a positive conflict . . . so that the two cannot consistently stand together"); *see also* City of Hartford v. Tucker, 621 A.2d 1339, 1341 (Conn. 1993) (explaining that this section, "the antipreemption provision of the Controlled Substances Act, evidences

and positive conflict" exists, Congress expressed an intent that arguably forecloses implied preemption absent an impossibility of dual compliance—not because it can dictate how the federal courts apply the Supremacy Clause of the Constitution but by announcing a lack of any broader purpose to interfere with state authority. In contrast, the FDA's subsequently codified—and entirely aspirational—mission statement,[30] which Judge Zobel had quoted,[31] hardly supports her claim of an overriding federal purpose to promote patient access to approved drugs.

Congress has maintained the FDA's stringent system for new drug approval in spite of frequent complaints that these requirements erect undue barriers to the prompt introduction of valuable pharmaceuticals.[32] On occasion, it has lowered the threshold for licensure in order to serve significant unmet patient needs,[33] but these narrow exceptions only reinforce understanding the more general rules as designed to restrict rather than promote ready patient access. On even rarer occasions, the FDA has actively encouraged

---

the fact that Congress specifically considered the issue of concurrent state proceedings and decided to allow them").

30.    *See* Food and Drug Administration Modernization Act of 1997, Pub. L. No. 105-115, § 406(a), 111 Stat. 2296, 2369 (codified as amended at 21 U.S.C. § 393(b) (2012)).

31.    *See Zogenix*, 2014 WL 1454696, at *2. Even if this purpose does not animate the FDA's organic statute, Judge Zobel correctly considered issues of access for legitimate patients in assessing the other factors relevant to deciding whether to grant preliminary relief. *See id.* ("As to the equities, although the ban may prevent someone from misusing the drug, the ban prevents all in need of its special attributes from receiving the pain relief Zohydro ER offers. For the same reason, the injunction is in the public interest.").

32.    *See* Lars Noah, *Triage in the Nation's Medicine Cabinet: The Puzzling Scarcity of Vaccines and Other Drugs*, 54 S.C. L. REV. 741, 748 (2003) ("Over the years, critics have blamed the FDA's lengthy and demanding approval process for creating a 'drug lag' that delayed pharmaceutical products already approved in Europe and elsewhere from reaching the United States market."); Scott Gottlieb, Opinion, *The FDA Is Evading the Law*, WALL ST. J., Dec. 23, 2010, at A17 ("Europeans are now approving novel drugs an average of three months more rapidly than we do."); *see also* Sabrina Tavernise, *Bill to Speed Approvals for Drugs Is Cut Back*, N.Y. TIMES, May 1, 2015, at A16 (describing the latest congressional proposals to streamline the process).

33.    *See, e.g.*, 21 U.S.C.A. § 356 (West 2015) (delineating various expedited approval procedures for drugs intended to treat serious or life-threatening diseases); *id.* § 356-1 (same, for countermeasures to bioterror agents); *see also* Notice of Availability, Guidance for Industry on Expedited Programs for Serious Conditions—Drugs and Biologics, 79 Fed. Reg. 31,117 (May 30, 2014); Stephanie M. Lee, *FDA Speeds up Approval of Drug Breakthroughs*, S.F. CHRON., Aug. 4, 2014, at A1.

companies to seek approval for particular drugs, but generally the agency leaves those choices to the private sector.[34] Contrast the FDA's largely agnostic stance about the introduction of pharmaceutical products—and, even more so, the often grudging approach of the Drug Enforcement Administration (DEA) to the down-scheduling of controlled substances[35]—with the recommendations sometimes issued by the U.S. Centers for Disease Control and Prevention (CDC) favoring, for instance, the use of certain vaccines.[36]

---

34.    *See* Noah, *supra* note 1, at 578 ("Usually, the FDA reviews whatever new drug applications happen to come in the door, but, on occasion, it actively recruits companies to seek approval for a product that the agency wants to see brought to market."). In contrast, the National Institutes of Health (NIH) generously fund and license research into drugs that the government wants to see brought to market. *See* NOAH, *supra* note 4, at 1048-49; Alice Dembner, *Public Handouts Enrich Drug Makers*, BOS. GLOBE, Apr. 5, 1998, at A1 ("NIH spent at least $1 billion on drug and vaccine development in fiscal 1996, but took in only $27 million in royalties from all products.").

35.    *See* Lars Noah, *Challenges in the Federal Regulation of Pain Management Technologies*, 31 J.L. MED. & ETHICS 55, 60 (2003); *id.* at 61 ("The [DEA] also has shown less deference to medical practitioners and the regulatory prerogative of the states, instead seeming to regard them with some suspicion."); *see also id.* at 55 ("[B]oth agencies have shown a marked resistance to making narcotics available as analgesic products, though the FDA has better appreciated the value of providing patients with a wide range of options for treating pain.").

> Traditionally, the FDA has adopted a clinical (or individualistic) mindset, leaving most of the difficult risk-benefit judgments in the hands of health care professionals and patients. . . . Conversely, the DEA's law enforcement mindset goes to the opposite extreme, giving perhaps undue weight to the negative externalities associated with access to narcotics and not trusting health care professionals. A public health perspective, [as exemplified by] the Centers for Disease Control and Prevention . . . , might help to mediate between these two potentially incompatible perspectives.

*Id.* at 64; *see also id.* at 60-61 ("This distribution of regulatory authority, between a traditional law enforcement agency and one that focuses on patient health, can generate incongruities.").

36.    *See, e.g.*, Raymond A. Strikas, *Advisory Committee on Immunization Practices Recommended Immunization Schedules for Persons Aged 0 Through 18 Years—United States, 2015*, 64 MORBIDITY & MORTALITY WKLY. REP. 93 (2015). In connection with opioid drugs, however, the CDC recently sought to discourage their overuse; its new guidelines recommend, among other things, that primary care physicians first try nonopioid therapies—and then prescribe only a three- to seven-day course of opioids—when treating patients with acute pain. *See* Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, 315 JAMA (forthcoming Apr. 2016); Sabrina Tavernise, *New Standards for Painkillers Aim to Stem Overdose Deaths*, N.Y. TIMES, Mar. 16, 2016, at A1

Thus, federal drug approval requirements create a fairly stringent barrier to entry designed to guard against the marketing of worthless or unduly dangerous therapeutic agents.[37] Moreover, sponsors of genuinely promising investigational products can decide not to seek FDA approval;[38] even if they do so (and ultimately succeed), license holders generally have no obligation to commercialize their products,[39] to do so at an affordable price,[40] or in

---

(summarizing some of the controversy surrounding the issuance of these technically nonbinding guidelines, and forecasting that they will prove to be highly influential); *id.* ("The federal government has lagged the states in its response to the opioid epidemic.").

37.    In fact, incumbent firms may take advantage of such strict licensing requirements to block rivals. *See* Lars Noah, *Sham Petitioning as a Threat to the Integrity of the Regulatory Process*, 74 N.C. L. REV. 1, 5-11 (1995) (illustrating different ways of manipulating the drug approval process for anticompetitive purposes); *id.* at 19-20 (explaining that "opportunities for deterring market entry [by potential competitors] may have been part of the political bargain struck between lawmakers and regulated entities").

38.    *See* Bruce M. Psaty & Drummond Rennie, Editorial, *Stopping Medical Research to Save Money: A Broken Pact with Researchers and Patients*, 289 JAMA 2128, 2129-30 (2003) (questioning the ethics of halting clinical trials solely for commercial reasons); Kurt M. Saunders, *Patent Nonuse and the Role of Public Interest as a Deterrent to Technology Suppression*, 15 HARV. J.L. & TECH. 389, 395-96 (2002) (suggesting that Amgen had shelved a patent on a protein binding factor that would have dramatically slowed the excretion—and therefore the dosages needed—of its blockbuster anemia drug Epogen®); *id.* at 411-12 (discussing antitrust claim brought against analgesic drug manufacturer after it had acquired but then restricted the sales of a competitor's medical device used for pain relief); *see also* Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011) (affirming the denial of a preliminary injunction that would have ordered the sponsor of a completed (and unsuccessful) clinical trial of Iplex for muscular dystrophy to support a former subject's application to the FDA for a compassionate use exemption to continue taking the abandoned investigational drug).

39.    *See* William M. Janssen, *A "Duty" to Continue Selling Medicines*, 40 AM. J.L. & MED. 330, 342, 346-47, 364-66 (2014) (explaining that federal courts had summarily and correctly rejected the claim—asserted by plaintiffs in tort litigation after patients had lost access to critical drugs because of supply shortages—that FDA approval obligated license holders to continue selling their products); *id.* at 363 ("Existing law, however creatively repackaged, does not impose upon pharmaceutical manufacturers a 'duty' to keep selling their medicines."); Noah, *supra* note 32, at 747 (explaining that drug manufacturers sometimes must give the FDA advance notice of supply interruptions); *see also* Noah, *supra* note 11, at 168-70 (identifying anticompetitive reasons why manufacturers may decide to cease marketing an older FDA-approved product).

40.    *See* Lars Noah, *Governance by the Backdoor: Administrative Law(lessness?) at the FDA*, 93 NEB. L. REV. 89, 129 (2014) (explaining that "the FDA has no business trying to influence decisions about what prices companies charge for products subject to its jurisdiction").

a manner that ensures easy access.[41] Lastly, FDA approval does not invariably guarantee insurance coverage, even by the Centers for Medicare and Medicaid Services (CMS),[42] an agency housed alongside the FDA in the Department of Health and Human Services (HHS). In short, approval of a new drug application represents a necessary but hardly sufficient condition for patient access.

If, in fact, these rather different purposes underlie drug approval requirements, then the argument for obstacle preemption loses much of its force. After all, many observers had misgivings about the wisdom of the FDA's risk-benefit judgment on Zohydro, and public health officials in Massachusetts had decided to take more seriously concerns about abuse and diversion, especially in light of doubts about the need for yet another powerful opioid analgesic. Then again, to the extent that Congress intended for the FDA to make definitive and nationally uniform judgments about the safety and effectiveness of pharmaceutical products,[43] state efforts to second-guess the agency's determinations certainly would threaten to frustrate those somewhat different purposes.[44]

---

41. *See* Lars Noah, *Treat Yourself: Is Self-Medication the Prescription for What Ails American Health Care?*, 19 HARV. J.L. & TECH. 359, 360-62, 365, 383-91 (2006) (explaining that drug manufacturers generally prefer prescription status when first launching a new product, and arguing that the FDA could not switch it to nonprescription status over the license holder's objections).

42. *See* Lars Noah, *Coerced Participation in Clinical Trials: Conscripting Human Research Subjects*, 62 ADMIN. L. REV. 329, 333 & n.16 (2010).

43. *See* Peter H. Schuck, *Multi-Culturalism Redux: Science, Law, and Politics*, 11 YALE L. & POL'Y REV. 1, 39 (1993) ("For better or for worse, the FDA is the agency that the public has empowered to make authoritative judgments of this kind on its behalf."). *See generally* Patricia J. Zettler, *Pharmaceutical Federalism*, 92 IND. L.J. (forthcoming 2017) (suggesting obstacle and even field preemption).

44. *See* Ray v. Atl. Richfield Co., 435 U.S. 151, 165-68 (1978) (holding that a federal statute and implementing regulations promulgated by the Secretary of Transportation, which required vessels to secure certificates of inspection establishing compliance with those standards, impliedly preempted Washington's more stringent design requirements for oil tankers because they posed an obstacle to the accomplishment of Congress's goal of uniformity); *id.* at 164 ("Congress did not anticipate that a vessel found to be in compliance with the Secretary's design and construction regulations and holding a Secretary's permit, or its equivalent, to carry the relevant cargo would nevertheless be barred by state law from operating in the navigable waters of the United States on the ground that its design characteristics constitute an undue hazard."). For unanimous Supreme Court decisions holding similarly in later cases, see United States v. Locke, 529 U.S. 89, 108-16 (2000) (invalidating Washington's revised limits on oil tanker operation and personnel); Barnett Bank of Marion Cty. v. Nelson, 517 U.S. 25, 31-38 (1996) (invalidating a Florida statute that prohibited national banks from selling insurance in small towns where a federal statute had authorized such conduct); and California v. FERC, 495

Rather than continue litigating the case to secure a decision on the merits and possibly appeal (which might have allowed the courts to better assess these and other nuances), Massachusetts issued new rules that focused instead on the behavior of medical professionals licensed by the state: Before prescribing Zohydro, physicians would, among others things, have to check patient records for any evidence of substance abuse, and they then would have to prepare a letter of medical necessity (attesting, for instance, that other pain management treatments had failed) without which pharmacists could not dispense the drug.[45] In an amended complaint, Zogenix characterized these new rules as amounting to "a *de facto* ban," and the federal district court found even some of these more limited restrictions problematic.[46]

Judge Zobel explained that the letter of medical necessity requirement suffered from various ambiguities and could mean that, contrary to the labeling approved by the FDA, physicians should use Zohydro only as a drug of last resort.[47] Finding a probability of implied preemption because such an interpretation would frustrate the federal decision to make this product available for health professionals to use whenever they deemed it appropriate, she preliminarily enjoined enforcement of this rule pending clarification from the defendants.[48] As for the company's challenge to a related state rule that allowed only licensed pharmacists to handle Zohydro

---

U.S. 490, 506-07 (1990) ("[A]llowing California to impose the challenged [minimum stream flow] requirements would be contrary to congressional intent regarding the Commission's licensing authority and would constitute a veto of the [dam] project that was approved and licensed by FERC."). Section II.A further elaborates on such arguments.

45.   *See* Bradley J. Fikes, *Zogenix Fights New Restrictions; S.D. Biotech to Ask Court to Stop Mass. Rules for Painkiller Zohydro ER*, SAN DIEGO UNION-TRIB., June 10, 2014, at C2; Milton J. Valencia, *State Limits Use of Potent Painkiller; Addiction Concerns Raised on Zohydro*, BOS. GLOBE, Apr. 23, 2014, at B1; *see also* Ollove, *supra* note 22, at N8 ("[Gov.] Patrick responded to his loss in court by slapping other restrictions on Zohydro, beyond those mandated by the federal government. . . . Next door in Vermont, Democratic Gov. Peter Shumlin has already taken similar steps.").

46.   *See* Zogenix, Inc. v. Patrick, No. 14-11689-RWZ, 2014 WL 3339610, at *3-5 (D. Mass. July 8, 2014), *vacated in part*, 2014 WL 4273251 (D. Mass. Aug. 28, 2014).

47.   *See id.* at *4.

48.   *See id.* at *5. Strangely, apart from finding a probability of success on the merits, Judge Zobel said nothing about the other three prerequisites for granting preliminary relief even though her brief discussion of these factors when initially enjoining the outright prohibition would hardly apply with equal force to the prescribing restrictions.

(thereby barring pharmacy technicians or interns from doing so), Judge Zobel found insufficient evidence to justify a preliminary injunction on grounds of implied preemption.[49] She also summarily rejected an equal protection claim asserted by Zogenix, which had alleged that the defendants lacked any rational basis for singling out their drug from all of the other long-acting opioids.[50] Less than two months later, after the defendants issued revised rules clarifying what should appear in the medical necessity letter, Judge Zobel vacated her previous order: Instead of having to declare that other pain management options had "failed," now physicians simply would have to refer to the "inadequa[cy]" of alternatives for a particular patient, which essentially mimicked the FDA-approved labeling and therefore avoided implied preemption.[51]

Even more so than her preemption analysis when preliminarily enjoining the outright ban, Judge Zobel offered a questionable explanation of how the prescribing and dispensing restrictions might conflict with federal law. She properly conceded that uncertainty about how state officials might interpret these rules made it difficult to discern whether they genuinely would frustrate federal purposes,[52] but, even absent any such contingency (in short, assume that Massachusetts unmistakably had narrowed the circumstances of use

---

49. *See id.* (concluding that Zogenix had failed to "provide sufficient detail that pharmacies will not carry Zohydro").

50. *See id.* at *2 n.3 (explaining that the Supreme Court has reserved so-called "class-of-one" equal protection claims for situations where clear standards exist against which to measure individual departures made by regulatory classifications rather than discretionary judgments that depend on particularized assessments). Judge Zobel also again declined to reach the plaintiff's Contract Clause and dormant Commerce Clause objections. *See id.* (calling these "undeveloped arguments"); *see also* Zogenix, Inc. v. Baker, No. 14-11689-RWZ, 2015 WL 1206354, at *4-8 (D. Mass. Mar. 17, 2015) (declining to dismiss the plaintiff's third amended complaint insofar as it again claimed implied preemption of the pharmacist-only handling restrictions, but granting the defendants' motion to dismiss the equal protection, Contract Clause, and dormant Commerce Clause objections to that rule).

51. *See* Zogenix, Inc. v. Patrick, No. 14-11689-RWZ, 2014 WL 4273251, at *2-3 (D. Mass. Aug. 28, 2014). Having back-pedaled twice in response to preliminary injunctions, Massachusetts officials evidently now plan to rely on better prescription monitoring of all opioids. *See* Stephanie Ebbert, *New AG Seeks Tighter Prescription Monitoring: Drug Fight Is Top Healey Priority*, BOS. GLOBE, Jan. 5, 2015, at A1; *cf.* Christopher Rowland, *Groups Unite Against Curbing Painkillers; Industry, Doctors, Patients Lobby over Opiate Laws*, BOS. GLOBE, Dec. 29, 2014, at A1 (reporting some resistance to such initiatives).

52. *See* Zogenix, Inc. v. Patrick, No. 14-11689-RWZ, 2014 WL 3339610, at *5 (D. Mass. July 8, 2014).

or otherwise imposed conditions on prescribing above and beyond those of federal law), it would not create nearly the same conflict as had the original prohibition on use. No doubt, as Judge Zobel explained, a tradition of state regulation of the medical profession does not exclude the possibility of preemptive federal involvement in the field,[53] but she failed to recognize that Congress repeatedly had offered assurances that the FDA's authority to license therapeutic products would not interfere with the practice of medicine.[54]

Thus, and entirely apart from doubts about Judge Zobel's view of the FDA's licensing requirements as designed to "promote" the availability of approved pharmaceuticals,[55] Congress evidently did not intend any such purpose to intrude upon the well-accepted powers of the states to regulate the activities of health care professionals. This legislative guidance seemingly renders obstacle preemption inapt,[56] unless, of course, a state rule purporting to regulate drug prescribing or dispensing in fact represented a veiled prohibition on use of an approved product.[57] In spite of its setbacks in the litigation, the Massachusetts Department of Public Health could

---

53. *See id.* at *4.

54. *See* Lars Noah, *Ambivalent Commitments to Federalism in Controlling the Practice of Medicine*, 53 U. KAN. L. REV. 149, 166 n.74, 173 (2004); *see also id.* at 155 ("Congress repeatedly has announced its intention that federal officials take care not to interfere with the practice of medicine."); *id.* at 171, 175-76, 180, 191 n.179 (explaining that the FDA and the DEA defer to state decisions about who enjoys prescribing privileges). That article addressed the flipside of the problem considered here—namely, asking whether the Constitution might bar restrictive federal decisions in connection with therapeutic product licensure for posing an affront to state primacy in regulating health professionals.

55. *See supra* notes 28-42 and accompanying text. In contrast, when the Commonwealth of Massachusetts decided to boycott most companies doing business with Burma (Myanmar), it plainly threw a monkey wrench into the flexibility that Congress thought the President needed in using economic sanctions in response to human rights abuses in that country, resulting in a unanimous decision from the Supreme Court in an implied preemption case. *See* Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373-88 (2000); *id.* at 388-91 (Scalia, J., concurring in the judgment) (taking issue only with the majority's repeated references to legislative history).

56. *See* Noah, *supra* note 54, at 166 ("[C]ourts have cited this provision [appearing in the Medicare statute] as evidence that Congress did not intend to preempt state laws related to the delivery of health care services to the elderly or the disabled."); *cf. id.* at 167-68 (conceding that the inclusion of a "savings" clause would do so more clearly).

57. *Cf.* Wos v. E.M.A. *ex rel.* Johnson, 133 S. Ct. 1391, 1398 (2013) ("A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect.").

find some solace in the fact that the FDA subsequently approved abuse-resistant versions of the pure hydrocodone product.[58]

B. Previous Attempts to Bar FDA-Approved Drugs

Although the actions taken against Zohydro by officials in Massachusetts were unusual, the effort to restrict the availability of a pharmaceutical product licensed by the federal government was hardly unprecedented. On rare occasions, states have tried to ban or limit access to FDA-approved drugs ranging from contraceptives to controlled substances, and jurors applying state tort law have imposed liability on manufacturers for marketing dangerous pharmaceuticals notwithstanding the fact that expert regulatory officials had decided to license their sale. These various illustrations differ, however, from permissive state laws—such as those purporting to authorize the medical use of marijuana—in the face of federal prohibitions against the sale or possession of a drug.

One of the FDA's most prominent licensing decisions, now more than half a century ago, prompted resistance from state officials. After the agency approved the first oral contraceptive in 1960,[59] some states attempted to limit or entirely bar access by enforcing longstanding prohibitions against the use of contraceptives.[60] The United States Supreme Court invalidated these

---

58.   *See* Thomas M. Burton, *Painkiller Maker Tries to Curb Abuse*, WALL ST. J., Oct. 2, 2014, at B9 (reporting that Zogenix had filed a supplemental approval application for such a formulation); Bradley J. Fikes, *Painkiller Unit Sold for $100M Upfront; San Diego-Based Zogenix to Use Proceeds for Other Drug Trials*, SAN DIEGO UNION-TRIB., Mar. 11, 2015, at C1; *see also* Lisa Girion, *Powerful Painkiller Approved*, L.A. TIMES, Nov. 21, 2014, at A8 (reporting that Purdue Pharma, the manufacturer of OxyContin, had secured FDA approval for its abuse-resistant extended-release hydrocodone product Hysingla ER®).

59.   *See* Melissa Bell, *On the Pill for Half a Century; Oral Contraceptives Have Had Broad Social Impact, but Some Women Now Seek Alternatives*, WASH. POST, May 11, 2010, at E1 ("It is hailed as one of the 10 greatest public-health accomplishments of the 20th century."); Gardiner Harris, *It Started More Than One Revolution*, N.Y. TIMES, May 4, 2010, at D1 ("The pill's role in the maturing of the F.D.A. has often been overlooked . . . .").

60.   *See* Justin Driver, *Constitutional Outliers*, 81 U. CHI. L. REV. 929, 971 (2014) ("While Connecticut and Massachusetts were alone in prohibiting all sale and distribution of contraceptives, more than half of the states in the nation joined them with statutes forbidding advertisements for contraceptives. Nearly one-third of the states, moreover, had laws permitting only certain authorized medical professionals to distribute contraceptives." (footnotes omitted)); Peter Smith, Comment, *The History and Future of the Legal Battle over Birth Control*, 49

*Federal Primacy in Licensing Pharmaceuticals*       17

restrictions.[61] Decades later, after the FDA approved an emergency contraceptive product in 1999, some states balked,[62] partly because of suspicions that it may work by blocking implantation of a fertilized egg.[63] Then, as federal officials grudgingly expanded nonprescription availability of this drug,[64] some states sought to restrict access to it.[65]

---

CORNELL L.Q. 275, 278 (1964) (counting half a dozen other states with complete bans at that time).

61.     *See* Griswold v. Connecticut, 381 U.S. 479, 485-86 (1965) (invalidating state law as infringing marital right of privacy); *see also* Carey v. Population Servs. Int'l, 431 U.S. 678, 686-91 (1977) (invalidating New York law that allowed only pharmacists to dispense OTC contraceptives); *id.* at 691-99 (plurality opinion) (invalidating provision that barred almost all contraceptive access for individuals under sixteen years of age); Eisenstadt v. Baird, 405 U.S. 438, 447-55 (1972) (invalidating Massachusetts law that prohibited distribution to unmarried individuals as irrational under the Equal Protection Clause); *infra* notes 178-80 and accompanying text (elaborating on the basis for these decisions). *See generally* Ryan C. Williams, *The Paths to* Griswold, 89 NOTRE DAME L. REV. 2155 (2014). Although the introduction of oral contraceptives may have provided some of the impetus for challenging the old state laws, none of the cases decided by the Supreme Court focused on these powerful new hormonal agents (as opposed to older products such as condoms, diaphragms, and spermicides). *Cf. Eisenstadt*, 405 U.S. at 463-64 & n.4 (White, J., concurring in judgment) (contrasting FDA prescription requirements for the pill with state prescription requirements that would apply even to vaginal foam dispensed to a married person); *id.* at 469-71 & n.4 (Burger, C.J., dissenting) (discussing same); Mary L. Dudziak, *Just Say No: Birth Control in the Connecticut Supreme Court Before* Griswold v. Connecticut, 75 IOWA L. REV. 915, 936 (1990) ("The [New Haven] clinic served a heavy load of clients, and prescribed a variety of contraceptives, including the new birth control pills.").

62.     They did so indirectly by enacting "conscientious objector" laws that allowed pharmacists and other health care professionals to refuse to dispense or prescribe such drugs. *See, e.g.*, MISS. CODE ANN. § 41-107-3 & -5 (2015); S.D. CODIFIED LAWS § 36-11-70 (2015); Angela K. Brown, *Lawsuit Protection Helps South Dakota Druggists Bring Beliefs to Work*, CHI. TRIB., May 14, 1998, at C2; Monica Davey & Pam Belluck, *Pharmacies Balk on After-Sex Pill and Widen Fight*, N.Y. TIMES, Apr. 19, 2005, at A1; *see also* Marcia D. Greenberger & Rachel Vogelstein, *Pharmacist Refusals: A Threat to Women's Health*, 308 SCIENCE 1557, 1558 (2005) ("Since 1997, 28 states have introduced legislation that would permit pharmacists to refuse to dispense, and sometimes to refer or transfer, drugs on the basis of moral or religious grounds.").

63.     *See* Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2762-63, 2765-66 (2014); Marc Kaufman, *Plan B Battles Embroil States; Proposals Mirror Red-Blue Divide*, WASH. POST, Feb. 27, 2006, at A1; *see also* Pam Belluck, *No Abortion Role Seen for Morning-After Pill*, N.Y. TIMES, June 6, 2012, at A1 (reporting that concerns of an arguably abortifacient mechanism of action lack any scientific foundation).

64.     *See* Tummino v. Hamburg, 936 F. Supp. 2d 198, 201 (E.D.N.Y. 2013) (declining to tolerate any further "agency filibuster"), *stay granted in part*, No. 13-

In 2000, the FDA approved the controversial abortifacient drug mifepristone (Mifeprex®).[66] Initially, it seemed that some states would try to forbid its sale.[67] Although outright prohibitions never materialized, several states decided to impose restrictions on use of the drug,[68] which have triggered challenges in the courts.[69] Insofar as

---

1690, 2013 WL 2435370 (2d Cir. June 5, 2013); *id.* at 208-09 (reiterating that the FDA's decision was tainted by political interference, and calling the government's arguments "frivolous and . . . taken for the purpose of delay"); Lisa Heinzerling, *The FDA's Plan B Fiasco: Lessons for Administrative Law*, 102 GEO. L.J. 927, 938-58 (2014); Michael D. Shear & Pam Belluck, *Obama to Drop Limit on Selling a Contraceptive*, N.Y. TIMES, June 11, 2013, at A1 ("The fight to make emergency contraceptives universally available without a prescription is more than a decade old.").

65.    *See* Samantha Harper, Note, *"The Morning After": How Far Can States Go to Restrict Access to Emergency Contraception?*, 38 COLUM. HUM. RTS. L. REV. 221, 222, 235-36 (2006); John Schwartz, *Oklahoma: Birth Control Limit Halted*, N.Y. TIMES, Aug. 20, 2013, at A11 ("The Oklahoma Legislature subsequently passed a law that required purchasers to show identification and, if age 17 or under, to have a prescription.").

66.    *See* Gina Kolata, *U.S. Approves Abortion Pill; Drug Offers More Privacy, and Could Reshape Debate*, N.Y. TIMES, Sept. 29, 2000, at A1; *see also* David Crary, *Abortion Pill Remains Controversial*, WASH. POST, Oct. 3, 2010, at A3 (reporting that almost 1.4 million women in the U.S. have taken mifepristone in the first decade of availability, now accounting for about 15% of all abortions); Marc Kaufman, *Abortion Foes Want RU–486 Pill Pulled; Deaths of Several Women Are Cited*, WASH. POST, May 17, 2006, at A3 (reporting that opponents have lobbied Congress and petitioned the FDA to withdraw approval).

67.    *See* Charles Ornstein, *Abortion Pill's Foes Shift Focus—Restrictions, Ban to Be Sought in States*, DALL. MORNING NEWS, Sept. 30, 2000, at 1A; Charles Ornstein, *Lawmakers Urge Restrictions on Abortion Pill*, DALL. MORNING NEWS, Feb. 2, 2001, at 8A (reporting that a bill had been introduced in Oklahoma to ban sales); Stephanie Simon, *Abortion Rights Group Challenges Mich. Law*, L.A. TIMES, Feb. 27, 2001, at A12 ("16 states have introduced legislation to restrict the use of RU-486."). A few states still have old laws on the books making it a crime to distribute abortifacient drugs. *See, e.g.*, LA. STAT. ANN. § 14:88 (2015); N.Y. PENAL LAW § 125.60 (McKinney 2015).

68.    *See* Laurah J. Samuels, Note, *Mifepristone Protocol Legislation—The Anti-Choice Movement's Disingenuous Method of Attack on the Reproductive Rights of Women and How Courts Should Respond*, 26 COLUM. J. GENDER & L. 316, 325-30 (2014) (discussing statutes from Arizona, North Dakota, Ohio, Oklahoma, and Texas); *see also* Sandhya Somashekhar, *Abortion Pills Prescribed via Net Targeted*, WASH. POST, Dec. 31, 2010, at A2 ("State legislators in Iowa and Nebraska have announced their intention to try to ban telemedicine abortions . . . .").

69.    *See, e.g.*, Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 748 F.3d 583, 600-05 (5th Cir. 2014) (rejecting constitutional objections to Texas statute); Planned Parenthood Ariz., Inc. v. Humble, 753 F.3d 905, 907-10, 915-18 (9th Cir.) (concluding that plaintiffs were entitled to a preliminary injunction to block Arizona's law), *cert. denied*, 135 S. Ct. 870 (2014); Planned Parenthood Sw. Ohio Region v. DeWine, 696 F.3d 490, 513-18 (6th Cir. 2012) (affirming

these states simply mandated strict adherence to the directions for use specified in the labeling approved by the FDA, even though the agency itself does not do so,[70] they at least managed to avoid a direct confrontation with the federal licensing decision.[71]

Miscellaneous other drugs approved by the FDA have encountered state-imposed limitations. For instance, in 1978, Illinois moved the analgesic pentazocine (Talwin®) from Schedule IV to the far more restrictive Schedule II.[72] More than a dozen states added the muscle relaxant carisoprodol (Soma®) to their schedules of controlled substances before the federal government decided to

---

summary judgment granted to Ohio officials); Planned Parenthood Sw. Ohio Region v. DeWine, 64 F. Supp. 3d 1060, 1069-70 (S.D. Ohio 2014) (rejecting a motion to dismiss the plaintiffs' sole remaining constitutional objection related to the lack of a health exception in Ohio's law); *see also* Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med., 865 N.W.2d 252, 265-69 (Iowa 2015) (invalidating rule barring telemedicine to dispense mifepristone). These challenges claimed an undue burden on the abortion decision but did not raise any preemption arguments.

70.    *See* Marc Kaufman, *Death After Abortion Pill Reignites Safety Debate; Opponents Renew Drive to Ban Drug Woman Took*, WASH. POST, Nov. 3, 2003, at A3; *see also* Eric A. Schaff et al., *Vaginal Misoprostol Administered 1, 2, or 3 Days After Mifepristone for Early Medical Abortion*, 284 JAMA 1948, 1952 (2000) ("A regimen that requires misoprostol to be given in an office setting 2 days after mifepristone, followed by 4 hours of observation, . . . is unnecessarily restrictive and creates scheduling and additional cost barriers to women."); Sarah Lueck, *Groups Offer Abortion-Drug Variations*, WALL ST. J., Oct. 30, 2000, at B2. *See generally* Lars Noah, *Informed Consent and the Elusive Dichotomy Between Standard and Experimental Therapy*, 28 AM. J.L. & MED. 361, 397-99 (2002) (discussing the FDA's recognition of the legitimacy of "off-label" use).

71.    In contrast, any more onerous restrictions would have confronted serious preemption (among other) objections:

> To the extent that recent Supreme Court [decisions] have reinvigorated implied preemption in cases where state law stands as an "obstacle" to the achievement of federal purposes, one could argue that any state efforts to prohibit or restrict distribution of mifepristone would create an impermissible conflict with federal law. After all, the Clinton administration actively encouraged the introduction of mifepristone in the U.S. market, and it took some unprecedented steps to facilitate FDA approval. It would not necessarily matter that the new administration fails to share the goals that inspired the agency's earlier licensing decision.

Noah, *supra* note 1, at 601 (footnote omitted).

72.    *See* May Annexton, *Pentazocine Reclassified in Illinois*, 240 JAMA 2234, 2234 (1978); *see also* Steve Sternberg, *Growing Alarm over Migraine Drug's Addictive Potential*, USA TODAY, June 16, 1997, at 6D (reporting that ten states had listed the migraine headache drug butorphenol tartrate (Stadol®) as a controlled substance while the DEA had not yet done so even though its manufacturer and the FDA belatedly recommended such a classification).

follow suit in 2011.[73] In 2006, responding to its use in cooking methamphetamine, Congress demanded that pseudoephedrine, an active ingredient previously found in numerous OTC cough-cold products, remain in an intermediate "behind-the-counter" status.[74] A pair of states now require a prescription for pseudoephedrine,[75] and Alabama went so far as to prohibit the sale of any products containing this ingredient unless they had incorporated abuse-resistant features, though the state repealed this restriction four years later just before it would have taken effect.[76]

---

73.   *See* Schedules of Controlled Substances: Placement of Carisoprodol into Schedule IV, 76 Fed. Reg. 77,330, 77,358 (Dec. 12, 2011) (codified as amended at 21 C.F.R. § 1308.14(c)(6) (2015)); *id.* at 77,342, 77,358 app. A (identifying seventeen states that had classified the drug as a controlled substance); Jennifer A. Fass, *Carisprodol Legal Status and Patterns of Abuse*, 44 ANNALS PHARMACOTHERAPY 1962, 1963 & tbl.1 (2010) (identifying eighteen states that had done so). Classification as a controlled substance would only amount to a ban if the drug gets assigned to Schedule I.

74.   *See* Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177, § 711(b)(1), 120 Stat. 192, 258-61 (2006) (codified at 21 U.S.C. § 830(e) (2012)); *see also id.* § 711(g), 120 Stat. at 263 (savings clause); Note, *Cooking up Solutions to a Cooked up Menace: Responses to Methamphetamine in a Federal System*, 119 HARV. L. REV. 2508, 2519, 2524-29 (2006) (applauding Congress's decision not to preempt more restrictive state laws).

75.   *See* Abby Goodnough, *States Battling Meth Makers Look to Limit Ingredients: Unable to Stop the Illicit Use of Decongestants, Officials Weigh Requiring Prescriptions*, N.Y. TIMES, Mar. 29, 2011, at A19 ("Faced with a surging methamphetamine problem, a number of states are weighing contentious bills this spring that would require a doctor's prescription for popular decongestants like Sudafed. . . . Two states, Mississippi and Oregon, already require prescriptions . . . ."). Wholly apart from the operation of the express preemption clause for OTC drugs, such a requirement appears to represent a fairly direct conflict with federal law. *See* Noah, *supra* note 41, at 368 & n.53, 381-82.

76.   *See* 2005 Ala. Laws 181 (H.B. 152) (codified at ALA. CODE § 20-2-190(c)(1)(a) (2008)) ("On or after October 1, 2009, no product containing ephedrine or pseudoephedrine shall be sold in this state unless the product is manufactured in such a manner that the ephedrine or pseudoephedrine cannot be extracted so as to be used as an ingredient in the production of methamphetamine."), *repealed by* 2009 Ala. Laws 283 (S.B. 47). Thus, like the invalidated hydrocodone rule in Massachusetts, the state had sought to force manufacturers to reformulate products that satisfied FDA requirements. It would take a few years more before abuse-resistant pseudoephedrine products (e.g., Nexafed® to replace Sudafed®) became available. *See* Albert W. Brzeczko et al., *The Advent of a New Pseudoephedrine Product to Combat Methamphetamine Abuse*, 39 AM. J. DRUG & ALCOHOL ABUSE 284, 289 (2013); Christine Byers, *Drug Firm Sees Profit in Meth Bill: Missouri Measure Would Exempt Product Resistant to Meth Cooks' Methods*, ST. LOUIS POST-DISPATCH, Mar. 29, 2012, at A1; *see also* Jennifer Corbett Dooren, *Decongestants Get Makeover to Keep Them over the Counter*, WALL ST. J., May 9, 2006, at D3 (explaining that incentives created by other restrictions had prompted

In some cases, states may legislate in anticipation of federal approval; for instance, with controversial new drugs intended for use in food-producing animals pending before the FDA, a few states enacted prohibitions.[77] In other cases, states may act in anticipation of federal withdrawal of a previously issued license; for instance, just one week before the FDA decided to rescind approval,[78] the Florida board of medicine severely restricted the use of the diet drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux®).[79] In sharp contrast, Tennessee's board had entirely prohibited the use of these drugs starting in 1991, though the state legislature overrode that ban just months prior to the FDA's withdrawal.[80] In 2014, the Minnesota

---

some manufacturers to replace pseudoephedrine with the somewhat less effective ingredient phenylephrine).

77.     *See* Lars Noah, *Whatever Happened to the "Frankenfish"?: The FDA's Foot-Dragging on Transgenic Salmon*, 65 ME. L. REV. 606, 614 (2013) (explaining that "some states already have acted preemptively against transgenic fish: a few banned their use in aquaculture within state borders"); Gregory D.L. Morris, *Two States Enact BST Moratoria*, CHEMICAL WK., May 9, 1990, at 10 (reporting that Wisconsin and Minnesota barred the use of recombinant bovine somatotropin (rbST) "for one year from the day of FDA approval"); Keith Schneider, *U.S. Approves Use of Drug to Raise Milk Production*, N.Y. TIMES, Nov. 6, 1993, § 1, at 1 ("Thousands of farmers in the Upper Middle West joined with [activist Jeremy] Rifkin in a grass-roots campaign that succeeded in persuading the state legislatures of Wisconsin and Minnesota three years ago to enact temporary moratoriums on the use of the drug in the event it was approved. The state moratoriums have since expired."); *see also* Dan L. Burk, *The Milk Free Zone: Federal and Local Interests in Regulating Recombinant BST*, 22 COLUM. J. ENVTL. L. 227, 264 (1997) ("[L]egislation hostile to rbST might take the form of a ban on the hormone . . . . Although no such legislation is currently in force, some states enacted bans during the pendency of Monsanto's application for FDA approval of rbST, and various states and localities have contemplated bans since approval was obtained."); Lars Noah, *Managing Biotechnology's [R]evolution: Has Guarded Enthusiasm Become Benign Neglect?*, 11 VA. J.L. & TECH. 4, ¶ 40 (2006) (discussing rbST).

78.     *See* Gina Kolata, *2 Top Diet Drugs Are Recalled Amid Reports of Heart Defects*, N.Y. TIMES, Sept. 16, 1997, at A1; *see also* Steven R. Salbu, *The FDA and Public Access to New Drugs: Appropriate Levels of Scrutiny in the Wake of HIV, AIDS, and the Diet Drug Debacle*, 79 B.U. L. REV. 93, 124-32 (1999).

79.     *See* Mark Maremont, *Florida Moves to Restrict Use of Diet Drugs*, WALL ST. J., Sept. 9, 1997, at B12; *see also* Bill Bergstrom, *State Ban of Fen-Phen to Become Permanent*, MIAMI HERALD, Sept. 30, 1997, at 5B. In contrast to Zohydro, however, this action came in response to emerging safety concerns not fully appreciated by the FDA when it originally had approved these drugs. *See* Gregory D. Curfman, Editorial, *Diet Pills Redux*, 337 NEW ENG. J. MED. 629 (1997) (summarizing these newly appreciated risks). In a sense, Florida simply beat the FDA to the punch.

80.     *See* TENN. COMP. R. & REGS. 0880-02-.14(3)(C) (1992), *superseded in part by statute*, 1997 Tenn. Pub. Acts 236, § 3 (codified at TENN. CODE ANN. § 63-6-

legislature enacted a statute banning most uses of the antibacterial agent triclosan because of emerging safety concerns, but it specifically excluded products approved by the FDA for consumer use,[81] which represents either a concession to the inability of a state to override a federal licensing decision or an overabundance of caution to avoid confronting an issue that might prompt litigation.

In short, states have on occasion attempted to nullify FDA decisions to approve a product. The obverse situation—namely, state efforts to disregard federal *nonapproval* decisions—has attracted far more attention in recent years. In particular, nearly half of the states have adopted laws authorizing the medical use of marijuana notwithstanding its continued status as a Schedule I (illicit) drug under federal law,[82] much less the failure of the FDA to approve its use.[83] Similarly, after the FDA acted against amygdalin (Laetrile) in

---

214(m)-(n) (2015)); Ann Hardie, *The Diet Drug Debate: Weighing the Risks—Millions Helped, but Worry Grows as Use Expands*, ATLANTA J.-CONST., June 5, 1997, at C1 ("[T]he Tennessee Legislature [just] lifted a six-year ban on phen-fen because Tennessee residents were going to other states to get the pills."). Because the 1991 regulation also had covered any derivative forms of fenfluramine, it prevented the prescribing of Redux immediately upon the FDA's approval of that drug in 1996.

81.    *See* 2014 Minn. Laws ch. 277, § 8(2) (May 16, 2014) (codified at MINN. STAT. § 145.945(2) (2015)); Megan Gannon, *Cancer Tied to Common Antibacterial Ingredient*, WASH. POST, Nov. 25, 2014, at E5 ("Minnesota became the first state to pass a law banning triclosan, though that rule won't go into effect until 2017."); Brian Palmer, *Ban on an Antimicrobial Ingredient Raises Questions*, WASH. POST, June 3, 2014, at E6 ("It was a bold move, because the [FDA] is currently reviewing the safety and efficacy of triclosan. By acting now, Minnesota lawmakers effectively preempted the FDA."). In 1997, the FDA had approved the use of triclosan in Colgate's Total® toothpaste with a claim that it can help fight gingivitis. *See* Matthew Perrone, *Popular Chemical Under FDA Review*, BOS. GLOBE, May 3, 2013, at B9.

82.    *See* Kevin P. Hill, *Medical Marijuana for Treatment of Chronic Pain and Other Medical and Psychiatric Problems: A Clinical Review*, 313 JAMA 2474, 2475 (2015) ("23 states and the District of Columbia have enacted medical marijuana laws to facilitate access to marijuana as a treatment for a variety of medical conditions."); *id.* at 2476-77 tbl.1 (summarizing these various laws); *see also* Todd Grabarsky, *Conflicting Federal and State Medical Marijuana Policies: A Threat to Cooperative Federalism*, 116 W. VA. L. REV. 1, 10-20 (2013). Congress recently (and only partially) relented. *See* Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014) (providing that appropriations for the Department of Justice cannot be used to prevent the implementation of medical marijuana laws in thirty-two listed states and the District of Columbia).

83.    *See* Gonzales v. Raich, 545 U.S. 1, 28 (2005) ("[T]he dispensing of new drugs, even when doctors approve their use, must await federal approval."); Deepak Cyril D'Souza & Mohini Ranganathan, Editorial, *Medical Marijuana: Is the Cart*

the 1970s, numerous states legalized the use of this purported treatment for cancer.[84] Like marijuana, amygdalin can be produced locally, typically by using apricot kernels; unlike marijuana, the drug does not qualify as a controlled substance, so mere possession would not violate federal law.[85]

"Right to try" laws represent the most recent example of state legislation attempting to stake out a more permissive policy than has the federal government. Enacted in two dozen states and under consideration in several others, these laws purport to allow desperately ill patients to access investigational drugs not yet approved by the FDA.[86] Although it has become somewhat more flexible about allowing terminally ill patients not enrolled in clinical trials to request supplies from manufacturers,[87] the agency rejected broader initiatives that would routinely allow patient access before

---

*Before the Horse?*, 313 JAMA 2431, 2431 (2015) ("For most of the conditions that qualify for medical marijuana use, the evidence fails to meet FDA standards."); Noah, *supra* note 35, at 60 ("[U]nlike chemicals synthesized by pharmaceutical companies, the FDA could not effectively exercise its regulatory authority to demand proof of safety and efficacy over a raw product with variable composition that individuals can grow in their homes."); Claire Frezza, Note, *Medical Marijuana: A Drug Without a Medical Model*, 101 GEO. L.J. 1117, 1134-38 (2013); Serge F. Kovaleski, *Medical Marijuana Research Hits Wall of U.S. Law*, N.Y. TIMES, Aug. 10, 2014, at A4 ("[I]t does not see much potential for developing marijuana in smoked form into an approved prescription drug.").

84.    *See* United States v. Rutherford, 442 U.S. 544, 554 n.10 (1979); *see also* Charles G. Moertel et al., *A Clinical Trial of Amygdalin (Laetrile) in the Treatment of Human Cancer*, 306 NEW ENG. J. MED. 201, 201 (1982).

85.    *See* Noah, *supra* note 54, at 187 n.162; *see also* Barrie Cassileth, *Beyond the Mainstream: Laetrile by Any Other Name Is Still Bogus*, L.A. TIMES, Jan. 1, 2001, at F1; Marc Kaufman, *FDA Is Moving to Halt Online Sales of Laetrile; Sites Promote Unapproved Cancer Therapy*, WASH. POST, Sept. 7, 2000, at A2; *cf.* Donald G. McNeil, Jr., *A New Strain of Yeast Can Produce Narcotics*, N.Y. TIMES, Aug. 14, 2015, at A18 (reporting that, in spite of the latest advances in genetic engineering to allow for the production of the hydrocodone and other opioids in the laboratory rather than deriving them from opium poppies, there is no imminent danger of "home-brewed heroin" and the like).

86.    *See* Naomi Lopez Bauman, Opinion, *Cancer Moonshot Needs FDA to Get out of the Way*, USA TODAY, Feb. 5, 2016, at 7A; *see also* Rebecca Dresser, *The "Right to Try" Investigational Drugs: Science and Stories in the Access Debate*, 93 TEX. L. REV. 1631, 1640-47 (2015) (summarizing the debate over these measures); Kelly Servick, *"Right to Try" Laws Bypass FDA for Last-Ditch Treatments*, 344 SCIENCE 1329, 1329 (2014).

87.    *See, e.g.*, Notice of Availability, Individual Patient Expanded Access Applications: Form FDA 3926; Draft Guidance for Industry, 80 Fed. Reg. 7318, 7319 (Feb. 10, 2015); Expanded Access to Investigational Drugs for Treatment Use, 74 Fed. Reg. 40,900, 40,942-45 (Aug. 13, 2009) (codified at 21 C.F.R. pts. 312 & 316 (2015)).

approval.[88] Moreover, pharmaceutical companies sponsoring clinical trials of investigational drugs would violate federal law if they supplied such products to patients without first securing a waiver from the FDA, so these state laws seem to represent little more than symbolic gestures.[89] In practice, the agency routinely grants such requests, but manufacturers may have entirely valid reasons not to seek waivers.[90] Although these various more permissive state laws also demonstrate a lack of respect for the judgments of federal officials, the constitutional assessment developed in Part II focuses on the conflicts that arise when states opt for a more (as opposed to less) restrictive approach than the FDA.[91]

---

88.   *See* Abigail All. for Better Access to Developmental Drugs v. von Eschenbach, 495 F.3d 695, 699-700 (D.C. Cir. 2007) (en banc); *see also* Seema Shah & Patricia Zettler, *From a Constitutional Right to a Policy of Exceptions:* Abigail Alliance *and the Future of Access to Experimental Therapy*, 10 YALE J. HEALTH POL'Y L. & ETHICS 135, 174-89 (2010) (critiquing proposals to further expand access).

89.   *See* Patricia J. Zettler & Henry T. Greely, *The Strange Allure of State "Right-to-Try" Laws*, 174 JAMA INTERNAL MED. 1885, 1885 (2014); *id.* at 1886 (drawing a parallel to the Zohydro dispute in Massachusetts); *see also* Jessie Hellmann, *Bills Would Give Terminally Ill Access to Experimental Drugs*, CHI. TRIB., Mar. 8, 2015, at A6 ("[E]ven backers of the idea say they don't know of anyone who has benefited from recent [state] attempts to expand access."); Julie Turkewitz, *Patients Seek "Right to Try" New Drugs*, N.Y. TIMES, Jan. 11, 2015, at A16 ("The laws do not seem to have helped anyone obtain experimental medicine, as the drug companies are not interested in supplying unapproved medications outside the supervision of the F.D.A. But that seems almost beside the point to the Goldwater Institute, the libertarian group behind legislative efforts to pass Right to Try laws."); *id.* (explaining that a new law in Colorado "does not require companies to provide the treatment, nor does it mandate that insurance companies cover it").

90.   *See* Brady Dennis & Ariana Eunjung Cha, *In 3 States, Dying Patients Will Soon Get the "Right to Try" Unproven Drugs*, WASH. POST, May 17, 2014, at A3 ("It's unclear how many drugmakers might be willing to make use of the state laws at the risk of angering federal regulators."); Peter Loftus & Dan Frosch, *States Open to Drug Options—Expanding Experimental Therapies to the Dying Gains Traction Among Lawmakers*, WALL ST. J., May 19, 2014, at A3 ("Drug makers and the FDA have expressed concerns about the state proposals."); *id.* ("Providing early access to experimental drugs poses a dilemma for companies and federal regulators who don't want to jeopardize patient safety or the integrity of clinical trials needed to get new drugs on the market."); Katie Thomas, *Company Creates Panel for Access to Trial Drugs*, N.Y. TIMES, May 7, 2015, at A1 ("The F.D.A. typically signs off on use of unapproved drugs, but not until the company agrees. But [for a variety of reasons] saying yes is not so simple . . . .").

91.   Interestingly, one scholar who has focused on marijuana laws viewed this mirror-image problem as relatively uncomplicated. *See* Robert A. Mikos, *On the Limits of Supremacy: Medical Marijuana and the States' Overlooked Power to Legalize Federal Crime*, 62 VAND. L. REV. 1421, 1422 (2009) ("When Congress

Products liability litigation offers another illustration of this problem.[92] Under state tort law, a few courts have allowed juries to find that an FDA-approved drug suffered from a defective design, which amounts to a conclusion that the manufacturer should never have marketed this particular pharmaceutical product notwithstanding the favorable judgment of an expert regulatory agency.[93] For instance, in *Tobin v. Astra Pharmaceutical Products, Inc.*,[94] a pregnant woman developed serious cardiac problems while taking ritodrine (Yutopar®). The plaintiff prevailed at trial on her design defect and failure-to-warn claims, after her experts identified numerous methodological flaws in the clinical trials submitted to the FDA, which members of the agency's advisory committee also had criticized. The federal appellate court in *Tobin* affirmed, concluding that, notwithstanding the fact of FDA approval (and the absence of any evidence of fraud in securing that approval or contrary postapproval data), the jury could have decided that the manufacturer should never have marketed the drug because it had no good evidence of effectiveness in improving neonatal outcomes.[95]

---

legalizes a private activity that has been banned by the states, the application of the Supremacy Clause is relatively straightforward: barring contrary congressional intent, such state laws are unenforceable . . . ."); *id.* at 1426 (emphasizing the need "to distinguish between (1) federal laws authorizing conduct banned by the states (under which state power is significantly constrained), and (2) federal laws banning conduct authorized by the states (under which states wield considerably more power)"); *id.* at 1480 (elaborating on this distinction); *see also* Ernest A. Young, *Modern-Day Nullification: Marijuana and the Persistence of Federalism in an Age of Overlapping Regulatory Jurisdiction*, 65 CASE W. RES. L. REV. 769, 791 (2015).

92. More typically, nullification refers to the power of jurors to disregard applicable law as instructed by a judge. *See* Lars Noah, *Civil Jury Nullification*, 86 IOWA L. REV. 1601, 1603-06 (2001); *cf.* Sanford Levinson, *The Twenty-First Century Rediscovery of Nullification and Secession in American Political Rhetoric: Frivolousness Incarnate or Serious Arguments to Be Wrestled with?*, 67 ARK. L. REV. 17, 43-44 (2014) (contrasting jury nullification with efforts by state officials to resist federal law). In the cases discussed here, however, state law expressly invites jurors to disregard the licensing decisions of federal agency experts.

93. *See* Lars Noah, *This Is Your Products Liability Restatement on Drugs*, 74 BROOK. L. REV. 839, 852 (2009) ("A conclusion that a prescription drug has a design defect may well amount to a command that would deprive other patients of access to the product."); *see also id.* at 851 ("One central objection to the recognition of a broader form of 'product category' liability is that it would allow courts to decide that lawfully marketed products should not be available to consumers.").

94. 993 F.2d 528 (6th Cir. 1993) (applying Kentucky law).

95. *See id.* at 537-40; *see also* Wimbush v. Wyeth, 619 F.3d 632, 641-46 (6th Cir. 2010) (reversing summary judgment granted to the defendant on the basis of implied preemption of a negligence claim under Ohio law brought on behalf of a

Somewhat remarkably, the *Products Liability Restatement* cited *Tobin* with approval.[96]

Indeed, if a patient experienced a side effect while taking Zohydro that the manufacturer had adequately warned about, then (under the tort law of Massachusetts as elsewhere) he or she could claim a defective design in this drug given the availability of safer substitutes.[97] The prospect that such a claim might succeed, and that it could lead to the imposition of a hefty fine (i.e., an award of damages),[98] would make manufacturers think twice before marketing an FDA-approved drug—in fact, that is precisely the stated goal of those who favor allowing jury scrutiny in such circumstances.[99] In

---

patient who died from primary pulmonary hypertension asserting that the manufacturer should never have brought the diet drug Redux® (dexfenfluramine) to market notwithstanding receipt of FDA approval with labeling that warned of precisely this risk); *id.* at 645 (favorably citing *Tobin* as involving a case of "pre-approval design defect"). For my detailed critique of *Tobin*, see Noah, *supra* note 93, at 869-71 (concluding that the court "turned a complex risk-utility judgment, using data from less than ideal clinical trials, into a no-brainer by allowing the jury to conclude that the drug was totally ineffective").

96.    *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 6 cmt. f & illus. 1 (1998); *see also id.* cmt. b, at 146 ("[U]nqualified deference to these regulatory mechanisms is considered by a growing number of courts to be unjustified. An approved prescription drug or medical device can present significant risks without corresponding advantages."); James A. Henderson, Jr., *Prescription Drug Design Liability Under the Proposed* Restatement (Third) of Torts*: A Reporter's Perspective*, 48 RUTGERS L. REV. 471, 492 (1996) (conceding that section 6(c) "allows courts to second-guess the FDA on the . . . question of whether a drug approved by the FDA and marketed by a defendant should *not* have been approved and marketed," though trusting that that would occur "only in relatively rare cases"); James A. Henderson, Jr. & Aaron D. Twerski, Essay, *Drug Designs Are Different*, 111 YALE L.J. 151, 174 (2001) ("By countenancing a finding that a defendant's drug is, essentially, worthless, section 6(c) tacitly assumes that the FDA will occasionally approve (or fail to order withdrawal of) a drug that should not be allowed on the market.").

97.    *See* Richard C. Ausness, *The Role of Litigation in the Fight Against Prescription Drug Abuse*, 116 W. VA. L. REV. 1117, 1123-24 (2014); Noah, *supra* note 93, at 844-48, 862-63.

98.    *See* Lars Noah, *Rewarding Regulatory Compliance: The Pursuit of Symmetry in Products Liability*, 88 GEO. L.J. 2147, 2159 (2000) ("The [U.S. Supreme] Court recognized that damage awards predicated on a manufacturer's departure from the common-law standard of reasonable care potentially have as much of a regulatory effect as positive law requirements reflected in state statutes or rules.").

99.    *See id.* ("Critics of the regulatory compliance defense respond that a tort judgment does not dictate any alteration of primary conduct, but in the next breath they emphasize the need to retain the threat of liability to serve a deterrent function

that case, state law appears to pose much the same conflict as if opposition to the sale of an FDA-approved product had emanated from the executive or legislative branch.[100] Although the Supreme Court has decided that manufacturers of medical devices may invoke an express preemption clause as a defense to tort claims so long as their product has secured a full license from the FDA,[101] it has not extended similar protection to manufacturers of approved drug products given Congress's failure to so specify in statute.[102]

## II. ASSESSING THE CONSTITUTIONAL OBJECTIONS

Although it continues to make references back to the Zohydro litigation, this Part considers more generally the potential constitutional obstacles to state efforts at banning FDA-approved drug products: implied preemption, the dormant Commerce Clause doctrine, and principles of substantive due process. In a handful of cases addressing challenges to state laws applied to the sale and use of pharmaceuticals, the United States Supreme Court has offered some guidance that may help to clarify the extent to which state officials can attempt to countermand FDA licensing judgments.

### A. Implied Preemption

As explained previously, Judge Zobel's implied preemption analysis in the Zohydro litigation suffered from any number of

---

given the often inconsequential administrative sanctions. They can't have it both ways.").

100.   *See id.* at 2160 ("[J]uries indirectly—and inconsistently—but unmistakably do set product safety standards in this country. Once we accept the notion that jurors effectively regulate with their verdicts, one may ask whether this arrangement makes sense."); Noah, *supra* note 93, at 851-52 (elaborating).

101.   *See* Riegel v. Medtronic, Inc., 552 U.S. 312, 322-30 (2008); *see also* Noah, *supra* note 93, at 913 (suggesting that preemption "may better define those contexts where courts should decline to engage in duplicative design defect review—namely, those devices that have undergone full premarket review and approval, at least where the FDA has made a particular judgment about a feature challenged by the plaintiff").

102.   *See* Wyeth v. Levine, 555 U.S. 555, 567-81 (2009); *see also* Ashutosh Bhagwat, Wyeth v. Levine *and Agency Preemption: More Muddle, or Creeping to Clarity?*, 45 TULSA L. REV. 197, 210-17, 220-30 (2009); Douglas G. Smith, *Preemption After* Wyeth v. Levine, 70 OHIO ST. L.J. 1435, 1458-80 (2009); David C. Vladeck, *Deconstructing* Wyeth v. Levine*: The New Limits on Implied Conflict Preemption*, 59 CASE W. RES. L. REV. 883, 904-18 (2009). Section II.A discusses an important exception.

weaknesses.[103] Nonetheless, the Supremacy Clause may still operate to erect a constitutional barrier against state efforts to prohibit the sale of FDA-approved products. Article VI of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[104] Congress sometimes expressly preempts state law. Alternatively, courts may find that federal law on a subject impliedly preempts state law, either because Congress has entirely occupied a field or in the event of a conflict between federal and state law; the latter category of implied preemption may arise either by virtue of an impossibility of dual compliance or insofar as state law would stand as an obstacle to the accomplishment of the purposes underlying federal law.[105]

The U.S. Supreme Court has offered important guidance about the application of implied preemption principles in its latest decision involving tort claims brought against drug manufacturers. In *Mutual Pharmaceutical Co. v. Bartlett*,[106] the plaintiff suffered a devastating injury after using sulindac, a nonsteroidal anti-inflammatory drug (NSAID).[107] The product that she had ingested came from a generic rather than a brand-name drug manufacturer, and the Supreme Court previously had recognized an implied preemption defense to inadequate warning claims against such defendants because, unlike brand-name companies, generic sellers lacked the power to revise

---

103.   *See supra* notes 28-44, 53-57 and accompanying text.

104.   U.S. CONST. art. VI, cl. 2.

105.   *See* Lars Noah, *Reconceptualizing Federal Preemption of Tort Claims as the Government Standards Defense*, 37 WM. & MARY L. REV. 903, 907 (1996). For more recent discussions of this increasingly convoluted subject, which include references to the latest case law and commentary, see Gregory M. Dickinson, *An Empirical Study of Obstacle Preemption in the Supreme Court*, 89 NEB. L. REV. 682 (2011); Daniel J. Meltzer, *Preemption and Textualism*, 112 MICH. L. REV. 1 (2013); and David S. Rubenstein, *The Paradox of Administrative Preemption*, 38 HARV. J.L. & PUB. POL'Y 267, 274-82 (2015).

106.   133 S. Ct. 2466 (2013).

107.   *See id.* at 2471-72. The FDA had approved Clinoril® (sulindac) in 1978, more than a quarter of a century before Ms. Bartlett ingested a generic version. *See id.* at 2471. Just one year after the plaintiff suffered her injury, the agency decided to strengthen information in the product's labeling about the possibility of serious skin reactions. *See id.* at 2472. Thus, although a substantial amount of time had elapsed since original approval (during which time more risk information came to light and newer substitutes became available), shortly before this case went to trial the FDA had expressed its continued endorsement of the drug's relative safety and efficacy.

their FDA-approved labeling unilaterally.[108] In *Bartlett*, the plaintiff had asserted both failure-to-warn and design defect claims; the federal district court granted summary judgment to the defendant on the former theory, however, because the plaintiff's physician admitted that he had not consulted the product's labeling.[109] The jury returned a sizeable verdict on the design defect claim, but, in the end, a bare majority of the Supreme Court found this theory preempted as well.[110]

Writing for the majority, Justice Alito concluded that the plaintiff's design defect claim represented nothing more than a preempted failure-to-warn claim in disguise.[111] He reasoned that the seller of an FDA-approved drug enjoyed no flexibility to modify the composition of the product without seeking a new license from the agency.[112] According to the majority, this meant that the plaintiff's design defect claim amounted instead to an objection to the product's labeling, and, because it sold a generic rather than brand-name

---

108.    *See* PLIVA, Inc. v. Mensing, 131 S. Ct. 2567, 2574-82 (2011). I do not believe that this parsing of the relevant labeling regulations genuinely distinguishes the case from *Wyeth v. Levine*, 555 U.S. 555 (2009). *See* NOAH, *supra* note 4, at 557 ("The four dissenters pointed out that the same contingency had existed in *Levine* (insofar as the CBE regulation allowed innovator companies to make unilateral revisions to risk labeling only during an interim period before the FDA decided whether or not to allow it) without the Court in that case finding any conflict between federal and state law."); *id.* ("Notwithstanding the Court's effort to distinguish *Levine*, does the similarity between the two cases noted by the dissenters mean that a bare majority of the justices (three of whom had, after all, dissented in *Levine*) already doubts the continuing viability of *Levine*'s holding?"). For a sampling of the generally negative scholarly reception that *Mensing* has received, see Stacey B. Lee, PLIVA v. Mensing*: Generic Consumers' Unfortunate Hand*, 12 YALE J. HEALTH POL'Y L. & ETHICS 209, 235-45 (2012); Daniel Kazhdan, Note, Wyeth *and* PLIVA*: The Law of Inadequate Drug Labeling*, 27 BERKELEY TECH. L.J. 893, 901-07, 913-26 (2012); and Fabian Nehrbass, Comment, *Save Now, Pay Later: The Unfortunate Reality of* PLIVA v. Mensing, 73 LA. L. REV. 1155, 1166-82 (2013).

109.    *See Bartlett*, 133 S. Ct. at 2472.

110.    *See id.* at 2472, 2480.

111.    *See id.* at 2470, 2475-76; *id.* at 2474 ("Since Mutual did not have the option of changing sulindac's design, New Hampshire law ultimately required it to change sulindac's labeling.").

112.    *See id.* at 2475 ("[W]ere Mutual to change the composition of its sulindac, the altered chemical would be a new drug that would require its own NDA to be marketed in interstate commerce. . . . [B]ecause of sulindac's simple composition, the drug is chemically incapable of being redesigned.").

product, the defendant would violate federal law if it strengthened the warnings without first securing FDA approval.[113]

Justice Alito did not, however, view state tort law as impliedly preempted because it would stand as an obstacle to—or otherwise frustrate the purposes underlying—federal law; instead, he thought that the defendant would have found it impossible to comply with both federal and state law.[114] Plaintiff had argued that the defendant could have declined to market its FDA-approved version, but the majority regarded this option as plainly preempted.[115] Plaintiff also had argued that the defendant could have continued marketing the drug with the understanding that it might have to pay damages for any injuries that resulted, but again the majority saw such an obligation as impermissibly flying in the face of FDA approval.[116]

---

113.   *See id.* at 2479-80; *id.* at 2476 ("[F]ederal law prohibited Mutual from taking the remedial action required to avoid liability under New Hampshire law."); *id.* at 2479 ("[S]tate-law design-defect claims like New Hampshire's that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling."); *id.* (arguing that "the dissent is reduced to fighting a rearguard action against [*PLIVA v. Mensing*'s] reasoning").

114.   Indeed, the majority had not even mentioned obstacle preemption in its summary of basic preemption doctrine. *See id.* at 2473; *see also* Meltzer, *supra* note 105, at 4-6 & n.28 (making the same observation about the plurality opinion in *Mensing*, and suggesting that they had taken a cue from Justice Thomas' concurrence in *Levine*). In previously elaborating on his objections to obstacle preemption, *see* Wyeth v. Levine, 555 U.S. 555, 594-604 (2009) (Thomas, J., concurring in the judgment), Justice Thomas noted a preference for a somewhat broader inquiry into whether a "direct conflict" existed than suggested by the "physical impossibility" test, *see id.* at 589-90 ("For example, if federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior.").

115.   *See Bartlett*, 133 S. Ct. at 2477 ("We reject this 'stop-selling' rationale as incompatible with our pre-emption jurisprudence. Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability."); *id.* ("The incoherence of the stop-selling theory becomes plain when viewed through the lens of our previous cases. In every instance in which the Court has found impossibility pre-emption, the 'direct conflict' between federal- and state-law duties could easily have been avoided if the regulated actor had simply ceased acting."); *id.* at 2470 ("[A]dopting the . . . stop-selling rationale would render impossibility pre-emption a dead letter and work a revolution in this Court's pre-emption case law."); *id.* at 2478 (It would mean that "the vast majority—if not all—of the cases in which the Court has found impossibility pre-emption, were wrongly decided.").

116.   *See id.* at 2477 n.3 (noting that *PLIVA v. Mensing* "forecloses any argument that impossibility is defeated by the prospect that a manufacturer could 'pa[y] the state penalty' for violating a state-law duty"); *see also id.* at 2479 ("[T]he

The majority left open the possibility that a plaintiff could assert a "parallel" claim in the event that significant new risk information "not before the FDA" triggered an obligation under the FDCA to unilaterally withdraw a still approved product.[117]

At the outset of his dissent, Justice Breyer explained as follows:

> It is not literally impossible here for a company . . . to comply with conflicting state and federal law. A company can comply with both either by not doing business in the relevant State or by paying the state penalty, say damages, for failing to comply with, as here, a state-law tort standard.[118]

Nonetheless, Breyer conceded that obstacle preemption might come into play in such circumstances,[119] and he imagined that "the more medically valuable the drug, the less likely Congress intended to permit a State to drive it from the marketplace,"[120] but he concluded that the parties had made no such showing.[121] The government had filed an amicus brief arguing in favor of implied preemption in this case; for a variety of reasons, however, Breyer declined to defer to the agency's apparently inconsistent litigating positions, though immediately thereafter (and without any hint of irony) he quoted with approval from an amicus brief filed on behalf of two *former* FDA commissioners.[122]

---

distinction between common law and statutory law is irrelevant to the argument at hand: In violating a common-law duty, as surely as by violating a statutory duty, a party contravenes the law."); *id.* at 2474 n.1 ("[M]ost common-law causes of action for negligence and strict liability do not exist merely to spread risk, but rather impose affirmative duties."); Steven A. Schwartz, Note, *"A Distinction Without a Difference"?: Bartlett Going Forward*, 84 FORDHAM L. REV. 325, 347-66 (2015) (discussing disagreement among lower courts on the question of whether different tests of design defect under state law might alter the preemption analysis, and concluding that it should have no impact).

117.   *See Bartlett*, 133 S. Ct. at 2477 n.4.

118.   *Id.* at 2480-81 (Breyer, J., joined by Kagan, J., dissenting).

119.   *See id.* at 2481 ("[S]tate law that requires a company to withdraw from the State or pay a sizable damages remedy in order to avoid the conflict between state and federal law may nonetheless stan[d] as an obstacle to the accomplishment of the federal law's objective, in which case the relevant state law is pre-empted.").

120.   *Id.*

121.   *See id.* at 2482 ("I have found no convincing reason to believe that removing this particular drug from New Hampshire's market, or requiring damage payments for it there, would be so harmful that it would seriously undercut the purposes of the federal statutory scheme.").

122.   *See id.* at 2481-82. At no point, however, did the majority make reference to the government's brief.

In a far lengthier dissenting opinion, Justice Sotomayor elaborated on many of the same points made by Justice Breyer.[123] She emphasized that the receipt of a federal license to market a product did not itself require any particular conduct by the license-holder that might conflict with state law; indeed, sellers of FDA-approved drugs occasionally withdraw them from the marketplace unilaterally (and a separate provision of the FDCA may obligate them to do just that),[124] so design defect claims that might create added incentives to take precisely such a step would in no sense conflict with federal law: "Impossibility does not exist where the laws of one sovereign permit an activity that the laws of the other sovereign restricts or even prohibits."[125]

Approved NDAs represent more than simply federal permission to market a pharmaceutical product, however; they amount to licenses, which qualify as a form of intangible property entitled to constitutional recognition.[126] Indeed, one of the Supreme Court's very first conflict preemption decisions involved a federal shipping permit that the State of New York inappropriately had declined to recognize in issuing a steamboat monopoly to someone else.[127] For similar reasons, a state could not decline to recognize a

---

123.   *See id.* at 2482 (Sotomayor, J., joined by Ginsburg, J., dissenting).

124.   *See id.* at 2491-92 & n.9; *id.* at 2484 ("[T]he FDA's permission to market a drug has never been regarded as a final stamp of approval of the drug's safety.").

125.   *Id.* at 2486; *see also id.* ("[I]f federal law permitted (but did not require) a labeling practice that state law prohibited, there would be no irreconcilable conflict; a manufacturer could comply with the more stringent regulation."); *id.* at 2492 ("New Hampshire's design-defect cause of action thus does no more than provide an impetus for an action that is permitted and sometimes encouraged or even required by federal law."); *id.* ("Congressional intent to pre-empt . . . cannot be gleaned from the existence of federal specifications that apply to the product if it is sold.").

126.   *See* Noah, *supra* note 1, at 594-99 (evaluating procedural due process and regulatory takings objections to proposed federal efforts to revoke or limit the scope of an approved NDA); Noah, *supra* note 41, at 385-91 (same). The FDA occasionally permits the sale of pharmaceutical products without issuing a license, *see id.* at 368, 370 (discussing the monograph system used for many nonprescription drugs), which seemingly would make an implied preemption argument against state prohibitions on the sale of such drugs more difficult, but an express preemption clause sometimes applies in this situation, *see id.* at 382 & n.122.

127.   *See* Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211-12, 221, 240 (1824); *id.* at 210 (framing the question as "whether the laws of New-York . . . have, in their application to this case, come into collision with an act of Congress, and deprived a citizen of a right to which that act entitles him"); *see also* Joseph F. Petros III, Note, *The Other War on Drugs: Federal Preemption, the FDA, and Prescription Drugs*

controversial patent issued by the U.S. Patent and Trademark Office on the ground that it viewed the subject matter as inappropriate for protection as intellectual property.[128]

Justice Sotomayor also argued that New Hampshire's recognition of design defect claims did not dictate any particular change in the conduct of defendants,[129] and the opportunity to either pay compensatory damages or exit the market would defeat any claim of impossibility.[130] Although conceding that obstacle preemption nonetheless might exist even in such circumstances,[131] she doubted that it would ever frustrate federal purposes to allow tort

*After* Wyeth v. Levine, 25 NOTRE DAME J.L. ETHICS & PUB. POL'Y 637, 648-49 (2011) ("The similarities between *Gibbons* and the modern question of FDA preemption for prescription drugs are striking. . . . [They both] involve some sort of 'license' granted by the federal government to carry on in a venue of interstate commerce."). *See generally* Norman R. Williams, Gibbons, 79 N.Y.U. L. REV. 1398 (2004) (offering a thorough account of this litigation, and explaining at length why Chief Justice Marshall opted for a contrived reading of the Federal Navigation Act of 1793 as preempting the monopoly granted by New York rather than resting the decision on his detailed exposition of the dormant Commerce Clause doctrine).

128.    *See* Jacobs Wind Elec. Co. v. Fla. Dep't of Transp., 919 F.2d 726, 728 (Fed. Cir. 1990) (noting that "a state court is without power to invalidate an issued patent"); Camilla A. Hrdy, *State Patents as a Solution to Underinvestment in Innovation*, 62 U. KAN. L. REV. 487, 535-36 (2013) ("Once a U.S. patent is issued to an inventor pursuant to the Patent Act, states are generally bound by the Supremacy Clause to respect and uphold that right."); *see also* Adam Mossoff, *Patents as Constitutional Private Property: The Historical Protection of Patents Under the Takings Clause*, 87 B.U. L. REV. 689, 700-14 (2007); *cf.* Biotech. Indus. Org. v. District of Columbia, 496 F.3d 1362, 1374 (Fed. Cir. 2007) (holding that the Patent Act impliedly preempted a local drug price control law). *But cf.* Biotech. Indus. Org. v. District of Columbia, 505 F.3d 1343, 1350 (Fed. Cir. 2007) (Dyk, J., dissenting from denial of rehearing en banc) ("[P]atent law does not preempt or conflict with state and federal statutes regulating or prohibiting the sale of patented products."); NOAH, *supra* note 4, at 877 ("What if D.C. officials regarded the sale of an FDA-approved product as posing a serious danger to the public health—could they ban its local sale, notwithstanding the resulting interference with the patent-holder's ability to generate a profit?").

129.    *See Bartlett*, 133 S. Ct. at 2486-91 (Sotomayor, J., dissenting); *id.* at 2488 ("New Hampshire law imposed no duty on Mutual to change sulindac's chemical composition."); *id.* at 2489 ("[Its] design-defect law did not require Mutual to do anything other than to compensate consumers who were injured by an unreasonably dangerous drug.").

130.    *See id.* at 2491 ("[T]he manufacturer may still choose between exiting the market or continuing to sell while knowing it may have to pay compensation to consumers injured by its product.").

131.    *See id.* at 2492-93; *see also id.* at 2486 ("Courts may find that state laws that incentivize what federal law discourages or forbid what federal law authorizes are pre-empted for reasons apart from impossibility . . . .").

claims against the sellers of FDA-approved drugs.[132] Sotomayor accused the majority of relying on "an implicit and undefended assumption that federal law gives pharmaceutical companies a right to sell a federally approved drug free from common-law liability,"[133] and she cited the government's amicus brief as conceding "the absence of textual support in the FDCA for the idea that an approved drug must be made available in any particular State."[134] In the end, of course, the dissenters' various arguments lost out in this case.

Whatever one may think about its implied preemption analysis on the failure-to-warn claim (or whether sellers can warn their way out of duties to redesign products under the risk-utility test), the majority's treatment of the plaintiff's design defect claim portends far broader consequences. First, it seemingly would apply with equal force to sellers of brand-name drug products,[135] thereby putting an end to peculiar decisions such as *Tobin*.[136] Second, entirely beyond tort litigation, the majority's analysis suggests that FDA drug approval would impliedly preempt state positive law as well.[137] For

---

132.  *See id.* at 2493-94.

133.  *Id.* at 2483; *see also id.* at 2490 ("Though the majority insists otherwise, . . . it appears to rely principally on an implicit assumption about rights conferred by federal premarket approval under the FDCA."); *id.* at 2491 ("Because the majority does not rely on obstacle pre-emption, it must believe that a manufacturer that received FDA premarket approval has a right . . . to keep its drug on the market unless and until the FDA revokes approval . . . .").

134.  *Id.* at 2494.

135.  *See id.* at 2471 (majority opinion) ("Once a drug—whether generic or brandname—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.' 21 C.F.R. § 314.70(b)(2)(i)."); *id.* at 2494-95 (Sotomayor, J., dissenting) ("[P]remarket review, by definition, prevents manufacturers from unilaterally changing their products' designs. That is true, for example, of the designs (*i.e.*, the chemical composition) of brand-name drugs under the FDCA no less than it is for generic drugs." (footnote omitted)); *see also* Noah, *supra* note 93, at 861-63 (explaining that pharmaceutical manufacturers cannot readily modify the designs of their products).

136.  Tobin v. Astra Pharm. Prods., Inc., 993 F.2d 528, 537-40 (6th Cir. 1993) (sustaining a judgment for the plaintiff premised on the claim that a defect existed in the design of ritodrine from the moment that the FDA approved this drug); *see also supra* notes 94-96 and accompanying text (discussing this decision).

137.  *See Bartlett*, 133 S. Ct. at 2478 n.5 (suggesting that the imposition of tort liability is akin to a state "directly prohibiting the product's sale"); *id.* at 2479 ("[S]tatutory 'mandate[s]' do precisely the same thing [as the threat of adverse tort judgments]: They require a manufacturer to choose between leaving the market and accepting the consequences of its actions (in the form of a fine or other sanction)."). Then again, to the extent that such decisions reflect the conservative wing's hostility toward tort law, perhaps those Justices would express greater sympathy for states'

some reason, however, Judge Zobel had not cited *Bartlett* to buttress her sense that federal law preempted Massachusetts's effort to ban Zohydro, perhaps because she thought that the case before her raised questions of implied preemption based solely on frustration of purposes rather than impossibility of dual compliance.[138] Even so, if the relatively more attenuated command of design defect scrutiny in tort law created an actual conflict with federal law governing FDA-approved drugs, then surely an outright sales prohibition imposed by state officials would do so.

## B. Dormant Commerce Clause

The U.S. Constitution has no "dormant commerce clause" as such. Instead, this judicially crafted doctrine springs by negative implication from the power of Congress "[t]o regulate Commerce with foreign Nations, and among the several States."[139] The doctrine bears some similarity to preemption, with Article I's enumeration of the power to regulate interstate commerce itself arguably triggering the Supremacy Clause even if Congress has not yet acted pursuant to that authority or has done so in a way that does not have preemptive effect.[140] In recent years, however, the dormant Commerce Clause

---

rights when positive law comes into conflict with FDA approval. Conversely, the four members of the Court's liberal wing seemed somewhat more open to the idea that state positive law might trigger impossibility preemption. *See, e.g.*, *id.* at 2485 (Sotomayor, J., dissenting) (hypothesizing a conflict related to ingredient disclosure requirements even though a company could comply with both federal and state law by not selling in the state with the more restrictive approach); *id.* at 2488 (contrasting the threat of liability with "a legal mandate . . . to take (or refrain from taking) a specific action"); *id.* at 2491 n.8 (same). The Court unanimously found obstacle preemption in several comparable earlier cases. *See supra* note 44.

138.   Instead, she distinguished *Wyeth v. Levine*, which the Commonwealth had relied upon. *See* Zogenix, Inc. v. Patrick, No. 14-11689-RWZ, 2014 WL 1454696, at \*2 (D. Mass. Apr. 15, 2014) ("*Wyeth* is a drug labeling [tort] case, and defendants present no evidence or persuasive argument that its reasoning should control in this different context.").

139.   U.S. CONST. art. I, § 8, cl. 3. *See generally* Brannon P. Denning, *Reconstructing the Dormant Commerce Clause Doctrine*, 50 WM. & MARY L. REV. 417 (2008); Barry Friedman & Daniel T. Deacon, *A Course Unbroken: The Constitutional Legitimacy of the Dormant Commerce Clause*, 97 VA. L. REV. 1877 (2011).

140.   *Cf.* Garrick B. Pursley, *Dormancy*, 100 GEO. L.J. 497, 561-65 (2012) (drawing comparisons to preemption doctrine); *id.* at 501 ("Dormancy holdings mean that state power to take the action is constitutionally precluded ex ante, while preemption holdings mean that action otherwise within states' constitutional power is *contingently* unconstitutional because of a conflict with federal law.").

doctrine has played a somewhat more limited role in displacing state authority than has preemption.

During the mid-twentieth century, Supreme Court decisions in this area spoke of ensuring the free flow of trade throughout the country.[141] Nowadays, the dormant Commerce Clause doctrine consists of a pair of inquiries. First, does a state or local law expressly discriminate against foreign businesses? If out-of-state commercial actors face greater barriers than comparable entities situated within the state, then a court will subject the law to heightened scrutiny.[142] Only rarely will a facially discriminatory law survive such scrutiny.[143] Second, assuming that the challenged law draws no distinction between local and out-of-state businesses, does it nonetheless unduly interfere with interstate commerce? If a state burdens commercial activity with entities in other states, then a court will subject the law to a milder form of scrutiny, asking whether the particular local purpose served by the restriction outweighs its

---

141.   *See* H. P. Hood & Sons, Inc. v. DuMond, 336 U.S. 525, 539 (1949) ("Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation . . . ."); McLeod v. J. E. Dilworth Co., 322 U.S. 327, 330 (1944) ("The very purpose of the Commerce Clause was to create an area of free trade among the several States."); Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 527 (1935) ("[T]he police power may [not] be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state . . . ."); *see also* Norman R. Williams, *The Foundations of the American Common Market*, 84 NOTRE DAME L. REV. 409, 423-37, 447-51 (2008).

142.   *See, e.g.*, Granholm v. Heald, 544 U.S. 460, 472-76, 489-93 (2005) (invalidating Michigan and New York laws that made it hard or impossible for out-of-state wineries to ship directly to customers); Gen. Motors Corp. v. Tracy, 519 U.S. 278, 307 n.15 (1997) ("[I]f a State discriminates against out-of-state interests by drawing geographical distinctions between entities that are otherwise similarly situated, such facial discrimination will be subject to a high level of judicial scrutiny even if it is directed toward a legitimate health and safety goal."); Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994) ("As we use the term here, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually *per se* invalid.").

143.   *See* Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 582 (1997) (noting that such scrutiny "is an extremely difficult burden, so heavy that facial discrimination by itself may be a fatal defect"). For a rare exception, see Maine v. Taylor, 477 U.S. 131, 148-52 (1986) (sustaining a state's prohibition on the importation of live baitfish because it represented the only way of protecting local waters and fish populations from the threat posed by invasive species and parasites).

*Federal Primacy in Licensing Pharmaceuticals*        37

adverse impacts on foreign businesses.[144] Although this basic framework has become relatively well established over the last half century, the doctrine routinely gets criticized for its fluid and unpredictable application.[145]

The pharmaceutical industry has tried on more than one occasion to use the dormant Commerce Clause doctrine to fend off local regulation.[146] In 2003, the Supreme Court unanimously rejected

---

144. *See* Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is *clearly excessive* in relation to the putative local benefits." (emphasis added)); *see also* Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 472-73 (1981) (upholding a state ban on the sale of milk in nonreturnable plastic containers because it imposed a "relatively minor" burden on interstate commerce, insofar as it continued to allow for the free flow of milk products and cartons across the state's borders, but produced substantial benefits in terms of "promoting conservation of energy and other natural resources and easing solid waste disposal problems"); Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 441-48 (1978) (invalidating under this test Wisconsin restrictions on the length of trucks). Thus, unlike obstacle preemption, with its focus on federal purposes, balancing under the dormant Commerce Clause doctrine inquires about state purposes and their weightiness.

145. *See, e.g.*, Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 360 (2008) (Scalia, J., concurring in part) (calling on the Court to "abandon the *Pike*-balancing enterprise altogether and leave these quintessentially legislative judgments with the branch to which the Constitution assigns them"); Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n, 545 U.S. 429, 439 (2005) (Thomas, J., concurring in the judgment) ("[T]he negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application, . . . and, consequently, cannot serve as a basis for striking down a state statute."); W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 210 (1994) (Scalia, J., concurring in the judgment) (referring to it as a "'quagmire'"); *id.* at 217 (Rehnquist, C.J., dissenting) (complaining of a "messianic insistence on a grim sink-or-swim policy of laissez-faire economics . . . under the dormant Commerce Clause, a policy which bodes ill for the values of federalism which have long animated our constitutional jurisprudence"); Earl M. Maltz, *How Much Regulation Is Too Much—An Examination of Commerce Clause Jurisprudence*, 50 GEO. WASH. L. REV. 47, 48-64, 85-87 (1981).

146. The industry's trade association, the awkwardly named Pharmaceutical Research and Manufacturers of America (PhRMA), brought several of these lawsuits. *See, e.g.*, PhRMA v. Cty. of Alameda, 768 F.3d 1037, 1041-46 (9th Cir. 2014) (rejecting constitutional challenge to an ordinance that required companies selling pharmaceuticals in the county to establish drug take-back programs for the purpose of guarding against improper consumer disposal of products potentially harmful to the environment or subject to abuse); PhRMA v. Thompson, 362 F.3d 817, 827 (D.C. Cir. 2004) (rejecting objection to a special rebate requirement adopted in Michigan); *see also* Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 311-13 (1st Cir. 2005) (rejecting challenge to a Maine law that imposed special

such an effort, upholding the State of Maine's program that threatened to offer less favorable Medicaid coverage for drugs unless companies also granted rebates on those products when used by uninsured patients not eligible for Medicaid.[147] The industry had argued, for instance, that the law impermissibly impacted company pricing decisions in other states, but the Court found nothing problematic about such an alleged extraterritorial effect.[148] Efforts to control drug prices through state payment decisions differ, of course, from laws that bar pharmaceutical products at the border and prevent patients with private insurance coverage (or personal means) from making use of them.

Even state laws that do not discriminate on their face may founder if the balancing inquiry reveals that a restriction serves no purpose other than to protect local businesses.[149] In this vein, one should note that state prohibitions on the sale of pharmaceuticals—products that typically originate outside of a state—sometimes will work to the benefit of local suppliers of competing services.[150] Thus, if a powerful new drug threatened established providers (e.g., surgeons or hospitals) of nonpharmaceutical treatments for the same

---

duties of disclosure on pharmacy benefit managers in their dealings with health insurers).

147.    *See* PhRMA v. Walsh, 538 U.S. 644, 670 (2003); *see also id.* at 684 (O'Connor, J., concurring in part and dissenting in part). In a far more fractured aspect of the case, the Court also rejected an implied preemption challenge. *See id.* at 662-68 (plurality opinion); *id.* at 670 (Breyer, J., concurring in part and concurring in the judgment); *id.* at 674 (Scalia, J., concurring in the judgment); *id.* at 675 (Thomas, J., concurring in the judgment).

148.    *See id.* at 669-70 (majority opinion); *see also* Brannon P. Denning, *Extraterritoriality and the Dormant Commerce Clause: A Doctrinal Post-Mortem*, 73 LA. L. REV. 979, 990-92 (2013) (arguing that *PhRMA v. Walsh* marked the Court's abandonment of a freestanding rule against extraterritorial regulation under the dormant Commerce Clause doctrine); Peter Felmly, Comment, *Beyond the Reach of the States: The Dormant Commerce Clause, Extraterritorial State Legislation, and the Concerns of Federalism*, 55 ME. L. REV. 467, 483-514 (2003) (arguing that courts should keep the extraterritoriality principle distinct).

149.    *See* Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 350-54 (1977).

150.    *Cf.* Gen. Motors Corp. v. Tracy, 519 U.S. 278, 298 (1997) ("[A]ny notion of discrimination assumes a comparison of substantially similar entities." (footnote omitted)); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 473-74 (1981) ("A nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry [i.e., plastic resins used to make nonreturnable milk jugs] to a predominantly in-state industry [i.e., pulpwood used to make paperboard milk cartons].").

disease or condition, then a state prohibition might violate the doctrine's antiprotectionism principle. For instance, psychologists might fear losing business after the introduction of a remarkably effective new antidepressant,[151] even if psychiatrists would relish the prospect; cosmetic surgeons might worry that they would get fewer customers if physicians could prescribe an amazing new wrinkle-reducer;[152] or any gynecologists who make a living from performing abortions might regard FDA approval of abortifacient drugs as siphoning away potential patients. Even if these illustrations seem far-fetched as likely grounds for a state ban on a particular drug, they do point up the fact that some (invariably local) health professionals may stand to benefit from such a prohibition and their advocacy of such action might disclose a protectionist purpose should lawmakers concur.

How would Massachusetts's effort to ban Zohydro fare under the dormant Commerce Clause doctrine? As noted previously, Judge Zobel had declined to reach this question,[153] and it seemed at least slightly misplaced in that case because, as it turned out, the financial consequences of the Commonwealth's prohibition would have fallen most heavily on an in-state company.[154] On its face, the emergency

---

151. This may help to explain why psychologists in some states have sought limited prescribing privileges. *See* Brent Pollitt, *Fool's Gold: Psychologists Using Disingenuous Reasoning to Mislead Legislatures into Granting Psychologists Prescriptive Authority*, 29 AM. J.L. & MED. 489, 512 (2003) ("Psychologists seeking prescriptive authority appear blinded by their own self-interest associated with prescribing medication . . . ."); *id.* at 521 ("[T]he psychologists seeking prescriptive authority view the situation as a 'turf' war . . . . They recognize that psychopharmaceutical treatment continues to gain in popularity with insurance companies and patients, and they want to ensure their place in the future of mental health treatment."); James E. Long, Jr., Note, *Power to Prescribe: The Debate over Prescription Privileges for Psychologists and the Legal Issues Implicated*, 29 LAW & PSYCHOL. REV. 243, 250 & n.54 (2005); *id.* at 244-56 (discussing new laws in Louisiana and New Mexico).

152. *See* James F. Peltz, *Botox Maker Adds Wrinkle to Lineup; Allergan Agrees to Buy Kythera, Developer of Kybella, Which Treats Double Chins*, L.A. TIMES, June 18, 2015, at C1 (reporting that Botox generates revenues of more than $2 billion annually, adding that the FDA recently approved an injectable drug to eliminate submental fat).

153. *See supra* note 27 and accompanying text.

154. *See* Yvonne Abraham, *Fighting, Then Fueling, Drug Abuse*, BOS. GLOBE, Apr. 10, 2014, at A1 ("Out front in all of this controversy has been a company called Zogenix, out of San Diego. But Zogenix has only a license to market the drug. The actual outfit behind Zohydro is a Waltham company named Alkermes . . . . Zogenix markets the drug and takes heat from critics, but Alkermes owns Zohydro, manufactures it, and stands to make mountains of money from it.");

regulation applied to all extended-release pure hydrocodone products that lacked abuse-resistant features, whether sold by a local or foreign manufacturer, though Zogenix objected that (at least initially) only Zohydro fell into this narrowly defined class.[155] Nothing suggested that this public health regulation served merely as pretext to favor local interests.

Under the balancing test utilized for restrictions that have only an incidental effect on interstate commerce, the interest asserted by Massachusetts would, however, confront the conflicting judgment of federal regulatory officials. True, particular states may experience higher-than-average problems with the misuse of prescription drugs,[156] and the FDA's licensing decisions may focus too narrowly on just the risks and benefits to patients while failing to fully consider societal consequences, but the DEA's scheduling choices presumably would have taken that broader view.[157] On the other side of the ledger, the FDA's approval decision suggests that depriving

---

Barry Meier, *Addiction Specialists Wary of New Painkiller*, N.Y. TIMES, Nov. 16, 2013, at B3. In contrast, imagine that Connecticut, home of the companies' chief rival Purdue, had taken a similar step.

155.    Similarly, although the regulation clearly sought to encourage Zogenix to seek FDA approval for a reformulated product that incorporated abuse-resistant features, it did not appear to operate in an impermissibly extraterritorial fashion. *Cf.* Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation*, 85 MICH. L. REV. 1865, 1899-900 (1987) (explaining that, although Michigan would have the power to prohibit smoking within the state notwithstanding adverse effects on an out-of-state industry, it could not prohibit cigarette manufacturing in North Carolina in an effort to guard against blackmarket sales).

156.    *See* Leonard J. Paulozzi et al., *Vital Signs: Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines—United States, 2012*, 63 MORBIDITY & MORTALITY WKLY. REP. 563, 564 (2014); *cf.* Darlena Cunha, *Chronic Pain Meets Worries About Opioid Addiction*, WASH. POST, Feb. 2, 2016, at E1 ("The United States uses 80 percent of the world's opioids, . . . yet it makes up less than 5 percent of the world's population."). Apart from undoubted demographic variations, states may take different approaches to law enforcement, supervision of physicians, and treatment of addiction.

157.    *See supra* note 35. Strangely enough, in objecting to the FDA's approval of rbST, which promised to increase milk production in dairy cows, some critics evidently worried about human misuse of this non-scheduled drug. *See* Burk, *supra* note 77, at 290 ("[P]ossible substance abuse of rbST by bodybuilders and athletes has been cited as a concern. . . . A legislative ban on rbST itself might be rationally related to such a concern, provided once again that some evidence can be produced of the likelihood of abuse.").

*Federal Primacy in Licensing Pharmaceuticals*        41

legitimate patients of access would represent something of a hardship to them.[158]

Courts have offered little guidance on how to value the adverse consequences of a state effort to restrict commerce.[159] In one recent decision, a federal appellate court sustained a county ordinance that obligated pharmaceutical manufacturers to establish a program to take back and safely dispose of unused drugs. In rejecting the industry's dormant Commerce Clause challenge, the court emphasized the relatively trivial financial burden imposed by such a requirement: At most, it would cost little more than 0.1% of the revenues generated by those companies in that county.[160] A sales prohibition would, of course, represent a far more onerous restriction: The manufacturer(s) of a banned drug would face what amounts to a 100% tax in that jurisdiction.[161] Even if viewed from the

---

158.  *Cf.* Noah, *supra* note 93, at 855 (warning of "the twin dangers of tunnel-vision (risk-utility judged solely from a [tort] plaintiff's perspective) and preference aggregation (risk-utility evaluated from a societal perspective), both of which might unduly sacrifice the needs of a minority of patients for whom the risk-utility balance differs from either the particular victim or the norm" (footnote omitted)); *id.* at 872-73 (illustrating with the infamous teratogen thalidomide).

159.  *Cf.* Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 353-55 (2008); Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 346-48 (1977) (rejecting the petitioner's objection that the respondent had failed to demonstrate that any of its members satisfied the $10,000 amount-in-controversy prerequisite for exercising jurisdiction); *id.* at 347 ("[The] object [of this litigation] is the right of the individual Washington apple growers and dealers to conduct their business affairs in the North Carolina market free from the interference of the challenged statute. The value of that right is measured by the losses that will follow from the statute's enforcement."); Pike v. Bruce Church, Inc., 397 U.S. 137, 145-46 (1970) (concluding that the $200,000 it would cost one grower to construct a new packing facility was a burden that outweighed the state's asserted interest in protecting the reputation of Arizona producers).

160.  *See* PhRMA v. Cty. of Alameda, 768 F.3d 1037, 1045 (9th Cir. 2014) ("The county compares the cost of running the disposal program ($530,000–$1,200,000 per year) to the manufacturers' revenue-stream in Alameda County (approximately $950 million per year) to conclude that the burden is minimal."); *cf.* Noah, *supra* note 41, at 389-90 & n.155 (explaining that projected health system savings from prematurely switching prescription drugs to OTC status would translate into hundreds of millions of dollars in financial losses suffered by the manufacturers of those products).

161.  *Cf.* Dean Foods Co. v. Wis. Dep't Agric., 478 F. Supp. 224, 231-32 (W.D. Wis. 1979) (calling a statute that appeared to prohibit the sale of an imitation chocolate milk product "the most burdensome, gross, and radical of the alternative means available," and granting a preliminary injunction on dormant Commerce Clause grounds), *after reargument*, 504 F. Supp. 520, 528-29 (W.D. Wis. 1980) (conceding that this may have represented a misinterpretation of the statute as applied to the plaintiff's product); Maltz, *supra* note 145, at 77 ("The hypothetical

perspective of aggregate sales around the country, a prohibition in one state would entail an average loss of 2% of projected revenue,[162] which for a "blockbuster" drug (defined as a product generating sales exceeding $1 billion annually[163]) would come to over $20 million each year; to a giant pharmaceutical manufacturer such as Pfizer,[164] such a loss might amount to little more than petty cash, but smaller companies with only a handful of products could not so easily shrug it off. Like the vast majority of FDA-approved drugs, Zohydro would not have reached blockbuster status, but it represented the only product in the portfolio of Zogenix.

## C. Substantive Due Process

In its Fourteenth Amendment, the U.S. Constitution includes the following language:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.[165]

Like the parallel clause demanding that federal actors ensure due process, the United States Supreme Court has interpreted this language as offering both procedural and substantive protections.[166]

---

contemplates the severest possible interference with a person's right to sell goods in interstate commerce—a total interdiction.").

162.   The 2% figure reflects one state out of fifty. Although states range dramatically in size, Massachusetts happens to account for approximately 2% of the nation's population. *See* U.S. CENSUS BUREAU, STATISTICAL ABSTRACT OF THE UNITED STATES: 2012, at 18 tbl.13, http://www.census.gov/prod/2011pubs/12stat ab/pop.pdf [https://perma.cc/95J6-7B8T].

163.   *See* Stacy Lawrence, *Billion Dollar Babies—Biotech Drugs as Blockbusters*, 25 NATURE BIOTECH. 380, 380 (2007); Jonathan D. Rockoff, *The Next Blockbuster: Drug Scouts Chase Hot Prospects*, WALL ST. J., Mar. 10, 2014, at A1.

164.   *See* Robert Weisman, *Pfizer Gets an Open Vibe; New Kendall Square Research Center Fosters Collaborative Approach to Drug Development*, BOS. GLOBE, June 15, 2014, at G1 ("Part of the challenge is Pfizer's sheer size—its market value exceeds $187 billion. That means the pharma giant, in order to grow, must constantly bring out new drugs, particularly so-called blockbusters that ring up annual sales of $1 billion or more . . . .").

165.   U.S. CONST. amend. XIV, § 1.

166.   *See* Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion) ("We have long recognized that the [Fourteenth] Amendment's Due Process Clause, like its Fifth Amendment counterpart, guarantees more than fair process. . . . The Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and

*Federal Primacy in Licensing Pharmaceuticals*      43

If, for instance, a state actor summarily confiscated a patient's supply of lawfully dispensed drug products, then notions of procedural due process typically would entitle that individual to an official explanation and some sort of hearing, among other potential remedies. (In addition, selective enforcement may trigger an affiliated objection on equal protection grounds.) Here, however, the question focuses on state efforts to bar (across the board) pharmaceutical access before dispensing, so the due process question would arise primarily in its substantive dimension.

Normally, state laws challenged as violating notions of substantive due process enjoy a presumption of regularity and need only satisfy extremely deferential judicial review. So long as a legislative choice passes the "rational basis" test, judges must not superimpose their own views of sensible public policy.[167] Indeed, courts need not even find that state actors in fact invoked plausible grounds for making a particular choice—it suffices that the legislature could have had such purposes in mind. Only if a law burdens some "fundamental right," which springs from the reference to "life, liberty, or property" in the text (or if, under equal protection, it uses a "suspect classification" such as race), must courts engage in more searching constitutional scrutiny.[168] For purposes of triggering heightened—whether intermediate or strict—scrutiny, courts have struggled in deciding what qualifies as a fundamental right.[169]

---

liberty interests.''); *cf.* Ryan C. Williams, *The One and Only Substantive Due Process Clause*, 120 YALE L.J. 408, 509-12 (2010) (concluding that originalism would assign divergent meanings to the due process clauses in the Fifth and Fourteenth Amendments, with only the latter having a substantive dimension). In any event, the focus here shifts from the rights of sellers to the rights of buyers.

   167.   *See* FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313-16 (1993); Heller v. Doe, 509 U.S. 312, 319-21 (1993).

   168.   *See* Reno v. Flores, 507 U.S. 292, 301-02 (1993); *see also* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1273-74, 1283-84, 1293-94, 1298-301 (2007) (summarizing the different modern tiers of constitutional review and their use in early substantive due process cases); Stephen A. Siegel, *The Origin of the Compelling State Interest Test and Strict Scrutiny*, 48 AM. J. LEGAL HIST. 355, 358-61 (2006) (same); *id.* at 393-94, 397-98, 406 (discussing the different functions potentially served by strict scrutiny); Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 VAND. L. REV. 793, 815 (2006) (finding that, in recent years, restrictions on fundamental rights survive 24% of the time); *id.* at 862-66 (elaborating).

   169.   *Compare, e.g.*, Obergefell v. Hodges, 135 S. Ct. 2584, 2602 (2015) (extending a fundamental right of marriage to same-sex couples), *with id.* at 2616-23 (Roberts, C.J., dissenting) (lambasting the majority's due process analysis), *and id.* at 2632-41 (Thomas, J., dissenting) (same). *See generally* Daniel O. Conkle, *Three Theories of Substantive Due Process*, 85 N.C. L. REV. 63 (2006); Stephen Kanter,

In connection with therapeutic products, the Supreme Court has rejected the argument that physicians or patients enjoy a fundamental right of access to pharmaceuticals for uses not approved by the FDA. Although it previously had recognized that patients enjoyed a fundamental right to decline life-saving interventions,[170] the Court found no affirmative right of access for those seeking physician-assisted suicide.[171] It seemed, however, that five of the Justices would have recognized a right to obtain medication for palliative purposes even if the use of such drugs might hasten death,[172] which at least suggests the possibility of a comparable right of access for patients without a terminal illness if appropriate use of the drugs would not pose any likelihood of fatality.[173]

Similarly, lower courts have rejected claims to a constitutional right of access to potentially life-saving drugs not (yet) approved by

---

*The Griswold Diagrams: Toward a Unified Theory of Constitutional Rights*, 28 CARDOZO L. REV. 623 (2006); Brian Hawkins, Note, *The* Glucksberg *Renaissance: Substantive Due Process Since* Lawrence v. Texas, 105 MICH. L. REV. 409 (2006).

170.   *See* Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 279 (1990) ("[F]or purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition."); *id.* at 287-89 (O'Connor, J., concurring).

171.   *See* Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (concluding that the claimed right was neither "deeply rooted in this Nation's history and tradition" nor "implicit in the concept of ordered liberty"); *id.* at 735 (holding that the state's prohibition survived review under the rational basis test); *see also* Vacco v. Quill, 521 U.S. 793, 800-01, 808-09 (1997) (rejecting an equal protection challenge to a New York statute that prohibited anyone from assisting suicide notwithstanding the fact that another statute had authorized competent patients to decline resuscitation efforts); Lars Noah, *Turn the Beat Around?: Deactivating Implanted Cardiac-Assist Devices*, 39 WM. MITCHELL L. REV. 1229, 1260-67 (2013) (discussing these decisions in the context of patient requests to discontinue the use of life-sustaining medical devices).

172.   *See, e.g.*, *Glucksberg*, 521 U.S. at 792 (Breyer, J., concurring in the judgment) (suggesting that the Court might hold it unconstitutional "were state law to prevent the provision of palliative care, including the administration of drugs as needed to avoid pain at the end of life"); *see also* Robert A. Burt, *The Supreme Court Speaks: Not Assisted Suicide but a Constitutional Right to Palliative Care*, 337 NEW ENG. J. MED. 1234, 1234-35 (1997); Yale Kamisar, *On the Meaning and Impact of the Physician-Assisted Suicide Cases*, 82 MINN. L. REV. 895, 908-09 (1998).

173.   *See* Beth Packman Weinman, *Freedom from Pain: Establishing a Constitutional Right to Pain Relief*, 24 J. LEGAL MED. 495, 528 (2003) ("While [Justice Breyer] does not explicitly state that barriers to adequate pain treatment in nonterminal patients also would potentially represent a constitutional violation, such a conclusion seems implicit in his reasoning."); *id.* at 529 ("It seems logical to imply from Justice Stevens' argument that he would support a constitutional right to pain treatment that does not hasten death for nonterminal pain.").

the FDA,[174] much less to drugs not even undergoing clinical trials in the hopes of eventually securing a license from the agency.[175] What, however, about patients seeking access to a federally licensed pharmaceutical product for life-saving or other approved uses in a state that has decided to prohibit its distribution; would that not substantially burden patients' rights to make sometimes profound or sensitive decisions about their medical care?[176] Note that this does not amount to claiming an affirmative right of government-subsidized availability but only demanding that state officials not stand in the way of a patient's freedom—typically with a physician's assent—to make use of a product that has satisfied requirements for federal licensure.[177]

---

174.    *See* Abigail All. for Better Access to Developmental Drugs v. von Eschenbach, 495 F.3d 695, 701, 711-13 (D.C. Cir. 2007) (en banc) (focusing on investigational drugs that have successfully completed Phase I trials sought by terminally ill patients lacking other options); *id.* at 701 ("We do not address the broader question of whether access to medicine might ever implicate fundamental rights."); CareToLive v. von Eschenbach, 525 F. Supp. 2d 952, 965-66 (S.D. Ohio 2007) (rejecting constitutional objections to the FDA's delay in approving an active cellular immunotherapy (Provenge®) for metastatic prostate cancer); Smith v. Shalala, 954 F. Supp. 1, 3-4 (D.D.C. 1996) (antineoplastons for use in cancer); *supra* notes 86-90 and accompanying text (discussing these issues in connection with state "right to try" laws); *see also* Lars Noah, *Too High a Price for Some Drugs?: The FDA Burdens Reproductive Choice*, 44 SAN DIEGO L. REV. 231, 248 (2007) ("[C]ourts consistently ha[ve] rejected claims that persons had any special right of access to pharmaceutical products. Although patients enjoyed an interest in making choices about their medical care, the government could decline to allow the sale of drugs until the manufacturer proved their safety and effectiveness.").

175.    *See* Raich v. Gonzales, 500 F.3d 850, 864-66 (9th Cir. 2007) (marijuana); Carnohan v. United States, 616 F.2d 1120, 1122 (9th Cir. 1980) (amygdalin); Rutherford v. United States, 616 F.2d 455, 457 (10th Cir. 1980) (same); Pearson v. McCaffrey, 139 F. Supp. 2d 113, 123 (D.D.C. 2001) (marijuana); Seeley v. State, 940 P.2d 604, 612-19, 622 (Wash. 1997) (same); *see also supra* notes 82-85 and accompanying text (elaborating on these issues); *cf.* Kulsar v. Ambach, 598 F. Supp. 1124, 1125-26 (W.D.N.Y. 1984) (rejecting a claimed right of access to adrenal cortex extract, a purported treatment for hypoglycemia withdrawn from market by the FDA).

176.    The Court has offered various descriptions of the requisite threshold before a burden suffices to trigger heightened scrutiny. *See, e.g.*, Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 876-77 (1992) (plurality opinion) ("placing a substantial obstacle in the path" of exercising rights creates an "undue burden"); Norman v. Reed, 502 U.S. 279, 288-89 (1992) ("severe restriction"); Zablocki v. Redhail, 434 U.S. 374, 386-87 (1978) ("significantly interfere").

177.    *See* John A. Robertson, *Embryo Culture and the "Culture of Life": Constitutional Issues in the Embryonic Stem Cell Debate*, 2006 U. CHI. LEGAL F. 1, 7-16; *id.* at 9 ("It would be surprising if state action that diminished the ability to stay alive did not receive the same scrutiny as infringement of the more particular

The Supreme Court has treated choices about procreation as central aspects of a person's liberty and associated rights to privacy.[178] As noted previously, it long ago invalidated state laws barring the use of contraceptive products after the FDA had authorized their sale.[179] In those cases, the Court rejected the claim that guarding against promiscuous behavior qualified as a compelling governmental interest.[180] Along similar lines, its recognition of a fundamental right to abortion presumably would prevent a state from entirely barring access to mifepristone, the abortifacient drug that gets used exclusively before viability.[181] Conversely, medical interventions such as fertility drugs designed to

---

rights which being alive makes possible."); *id.* at 10 ("[T]he right to use safe and effective medical treatments could also be grounded in liberty rights to be free of pain or disability."); *id.* at 17-18 (conceding that the FDA could act to ensure the safety and effectiveness of therapies derived from embryonic stem cells (ESCs)); *id.* at 31 (concluding that "the state could not ban safe and effective [i.e., FDA approved] ESC treatments").

178.   *See, e.g.*, Lawrence v. Texas, 539 U.S. 558, 564-66, 573-74 (2003); Hodgson v. Minnesota, 497 U.S. 417, 434 (1990) ("A woman's decision to conceive or to bear a child is a component of her liberty that is protected by the Due Process Clause . . . ."); Carey v. Population Servs. Int'l, 431 U.S. 678, 685 (1977) ("The decision whether or not to beget or bear a child . . . holds a particularly important place in the history of the right of privacy . . . . [D]ecisions whether to accomplish or to prevent conception are among the most private and sensitive.").

179.   *See, e.g.*, Griswold v. Connecticut, 381 U.S. 479, 485-86 (1965); *see also* Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2779-80 (2014) (citing *Griswold* for the proposition that, "[u]nder our cases, women (and men) have a constitutional right to obtain contraceptives"); *Casey*, 505 U.S. at 852 (reading *Griswold* and its progeny as protecting "the decision to use contraception"); *supra* notes 60-61 and accompanying text (elaborating); *cf.* Heinzerling, *supra* note 64, at 965 & n.271 (asserting incorrectly that "contraception is the only category of drug product regulated by the FDA that has constitutional stature," citing as support for the negative part of her claim only the unsuccessful litigation that asserted a right of access to *investigational* drugs).

180.   *See, e.g.*, *Carey*, 431 U.S. at 694-96 (plurality opinion); *Griswold*, 381 U.S. at 498-99 (Goldberg, J., concurring); *id.* at 505-06 (White, J., concurring in judgment). This has not kept good Catholics from continuing to try and justify such prohibitions. *See, e.g.*, Patrick A. Shrake, Comment, Griswold *at 40: The State's Compelling Interest in Banning Contraceptives*, 2 U. St. Thomas L.J. 475, 485-507 (2005) (arguing that products designed to impair fertility induce (by definition) an unhealthy condition, non-barrier contraceptives carry the risk of serious side effects, and all contraceptives facilitate promiscuous behavior, which purportedly threatens the institution of marriage, increases divorce rates, and promotes the spread of sexually transmitted diseases).

181.   *See* Noah, *supra* note 1, at 602-03; *see also supra* note 69 and accompanying text (revealing that the lower courts presently are divided over lesser state restrictions on the use of mifepristone).

facilitate childbearing also seemingly would enjoy some constitutional protection.[182]

Outside of the realm of procreative rights, however, guidance becomes harder to find. For instance, could state lawmakers ban a pharmaceutical product known to cause serious birth defects because they feared that its accidental use during pregnancy would necessitate abortions?[183] What about drugs other than contraceptives that some worry may promote undesirable behaviors, such as pharmaceutical products that guard against the consequences of certain sexually transmitted diseases (STDs)? Surely no one would consider banning HIV treatments on this ground,[184] but what if a state such as Kansas decided to prohibit the use of Gardasil®—a vaccine approved by the FDA to prevent the STD human papillomavirus (HPV), which sometimes causes cervical cancer—out of fears that it might promote sexual promiscuity among teenagers?[185] As suggested

---

182.  *See* Lars Noah, *Assisted Reproductive Technologies and the Pitfalls of Unregulated Biomedical Innovation*, 55 FLA. L. REV. 603, 659-65 (2003) (discussing scholarly debates about the right to make use of fertility treatments); *cf. id.* at 664 ("[C]onstitutional regard for procreative liberties should not stand as an obstacle to the withdrawal of fertility drugs if the FDA decides that they no longer represent safe and effective products, just as it would not prevent the agency from denying a marketing application for a new fertility drug that failed to satisfy normal criteria for approval.").

183.  *Cf.* Noah, *supra* note 174, at 250-52 (discussing the possibility of such moral objections to the use of FDA-approved teratogens that would necessitate the concomitant use of contraception); Robertson, *supra* note 177, at 17-31 (explaining that interests in protecting preimplantation embryos and fears of descending the slippery slope toward human cloning could not justify a state prohibition on the use of FDA-approved ESC treatments); *id.* at 24 ("If moral repugnance is not an acceptable basis for denying a person sexual intimacy or reproductive freedom, it should not justify denying the right to life and health on which sexual freedom and the exercise of other liberties depend.").

184.  *Cf.* Eryn Brown & Adolfo Flores, *HIV/AIDS; A Dose of Dispute; Truvada Reduces the Chances of HIV, but Some in the Gay Community Call It a "Party Drug" That Encourages Risky Behavior*, L.A. TIMES, Dec. 3, 2014, at AA1 (reporting that proponents of pre-exposure prophylaxis (PrEP) object that critics are "engaging in what they call a shaming exercise similar to the disapproval unmarried women faced 50 years ago when they demanded access to the birth control pill"); John Ritter, *Ads Linked to Rise in Rate of HIV Infections: City Considers Ban on Drug Billboards*, USA TODAY, Apr. 6, 2001, at 4A (reporting that San Francisco considered prohibiting any print advertisements in bus shelters of drugs for the treatment of AIDS because of concerns that they conveyed an overly optimistic message about their safety and effectiveness and might undermine efforts to encourage safer sex).

185.  *See* Rob Stein, *Cervical Cancer Vaccine Gets Injected with a Social Issue; Some Fear a Shot for Teens Could Encourage Sex*, WASH. POST, Oct. 31,

previously, the fact that the CDC has recommended such immunizations would bolster an obstacle preemption argument,[186] but the question here asks whether individuals wishing to use this vaccine would enjoy any constitutional right to do so. What if a state such as Florida banned erectile dysfunction drugs out of concerns that they promoted promiscuity and the spread of STDs among aging Baby Boomers?[187]

In *Whalen v. Roe*,[188] the Supreme Court rejected a substantive due process challenge to New York legislation that had required the use of triplicate prescription forms (with a copy sent to state officials) for purposes of monitoring the use and abuse of Schedule II drugs.[189] These recordkeeping requirements plainly exceeded those

---

2005, at A3; *see also* Jonathan T. Scott, Note, *The Difficult Road to Compelling Vaccination for Sexually Transmitted Diseases—How Gardasil and Those to Follow Will Change the Way That States Require Inoculation*, 97 KY. L.J. 697, 710 (2008-2009) ("[B]ecause many religious groups believe in celibacy before marriage, the issue of abstinence will likely become a decisive issue in the Gardasil debate."); *id.* at 711 ("To many, STD vaccination may encourage the breaking of the Seventh Commandment and undermine the institution of marriage. Similarly, STD vaccination could threaten religious teachings from other religious groups concerning the sanctity of marriage."). In fact, several states had considered mandating the use of Gardasil, which triggered an outcry from some corners. *See* R. Alta Charo, *Politics, Parents, and Prophylaxis—Mandating HPV Vaccination in the United States*, 356 NEW ENG. J. MED. 1905, 1906 (2007); Jason L. Schwartz & Laurel A. Easterling, *State Vaccination Requirements for HPV and Other Vaccines for Adolescents, 1990-2015*, 314 JAMA 185, 186 (2015) ("Why HPV vaccine requirements have not been more widely implemented is unclear, but may reflect reluctance among states to revisit the contentious political climate surrounding requirement proposals in 2006-2007.").

186. *See* Rob Stein, *Routine HPV Vaccination Recommended for Boys*, WASH. POST, Oct. 26, 2011, at A2 (reporting that the CDC had issued its recommendation for use in pre-teen girls shortly after the FDA approved the drug in 2006). Thus, the fact that the CDC added Gardasil to its recommended vaccine schedule seems far more relevant for preemption purposes than the mere fact of FDA approval. *See supra* note 36 and accompanying text.

187. *See* Barbara Marshall, *Sex and the Single Senior*, PALM BEACH POST (Fla.), Oct. 23, 2010, at 1D, 2010 WLNR 21377442; *see also* Diedtra Henderson, *Sex Drugs Called Avenue to HIV*, BOS. GLOBE, Sept. 26, 2005, at E1 (reporting that the FDA had scheduled a public meeting to discuss such concerns); Sabin Russell, *San Francisco Doctor Wants Viagra to Be Controlled Substance*, S.F. CHRON., Aug. 24, 2004, at B1 (reporting that the director for STDs at the City's health department had petitioned the FDA to restrict such drugs); *cf.* Anupam B. Jena et al., *Sexually Transmitted Diseases Among Users of Erectile Dysfunction Drugs: Analysis of Claims Data*, 153 ANNALS INTERNAL MED. 1, 1, 5-6 (2010) (finding that such concerns are overstated).

188. 429 U.S. 589 (1977).

189. *See id.* at 597-604.

imposed by Congress, but they did not in any way appear to conflict with or frustrate the purposes of the federal Controlled Substances Act.[190] Plaintiffs did not, however, make any argument under the Supremacy Clause, relying instead on the Fourteenth Amendment and claiming, among other things, that the reporting requirement would interfere with patients' privacy-based rights to make independent decisions about the use of drugs.[191] The Court held that the reporting mechanism imposed no serious burden on such choices.[192]

In further explaining this decision, Justice Stevens remarked: "Although the State no doubt could prohibit entirely the use of particular Schedule II drugs, it has not done so. This case is therefore unlike those in which the Court held that a total prohibition of certain conduct was an impermissible deprivation of liberty."[193] Although the Court had no particular product before it, any members of the class of Schedule II drugs that New York might have decided to ban—i.e., reclassify as Schedule I—presumably would have had approval from the FDA (on top of its classification under the federal Controlled Substances Act as a Schedule II drug), putting aside the

---

190.   *Cf. supra* note 29 and accompanying text (discussing the CSA's savings clause). Indeed, the federal government has encouraged all states to establish such prescription drug monitoring systems. *See* Cynthia Billhartz Gregorian, *Addiction to Painkillers Is a Growing Problem: How to Kick It*, WASH. POST, Dec. 5, 2010, at A13 ("Forty-three states have passed legislation to do just that, although only 33 states have money to fund them."); *see also* Ashley Dutko, Note, *Florida's Fight Against Prescription Drug Abuse: Prescription Drug Monitoring Program*, 34 NOVA L. REV. 739, 747-54 (2010); Melody Petersen & Barry Meier, *Few States Track Prescriptions as Way to Prevent Overdoses*, N.Y. TIMES, Dec. 21, 2001, at A1 (reporting that doctors and drug companies had opposed such efforts in the past).

191.   *See Whalen*, 429 U.S. at 598-600.

192.   *See id.* at 602-04; *id.* at 606 ("[T]his record does not establish an invasion of any right or liberty protected by the Fourteenth Amendment.").

193.   *Id.* at 603 (footnote omitted); *see also id.* at 603 n.30 ("It is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions."). The decisions cited by the Court as support for the first quoted sentence stand for the unremarkable proposition that states can sanction drug abusers and enjoy primary authority in regulating medical professionals, but they did not suggest any power to ban the use of pharmaceutical products in treating legitimate patients. *See id.* (citing Robinson v. California, 370 U.S. 660, 664-65 (1962); Barsky v. Bd. of Regents, 347 U.S. 442, 449 (1954); and Minn. *ex rel.* Whipple v. Martinson, 256 U.S. 41, 45 (1921)). Although *Martinson* arguably came closest to supporting the *Whalen* Court's point, that decision long predated any sort of federal licensing system for drugs, and *Robinson*'s extended quotation of the relevant passage from *Martinson* in the same year that the FDA initiated its modern system for drug approval represented nothing but dicta.

possibility that state lawmakers sought only to make a symbolic gesture or acted preemptively in anticipation of FDA approval.[194] In order to pose the question more concretely, did *Whalen* foreclose the possibility that patients in Massachusetts might have enjoyed a constitutional right of access to the Schedule II drug Zohydro?[195] Does the Supreme Court's dictum go so far as to suggest that a state could altogether bar access to a drug without particularly good reason (as implied by the first sentence quoted above),[196] or did the Court instead mean that a state might well have good reasons for doing so (as implied by reading the second sentence quoted above as a limitation on the first and in view of the fact that, by definition, Schedule II drugs carry a high potential for abuse)?[197] Only rarely have courts or commentators referenced this passage from *Whalen*, much less tried to make sense of it.[198]

---

194.    The fact that a drug substance appears in Schedule II does not invariably mean that the FDA has approved a product with that active ingredient. After all, pure hydrocodone carried such a classification for more than forty years before the agency approved Zohydro. *See supra* note 13 and accompanying text. Of course, the only Schedule II drugs possibly affected by the more limited state law upheld in *Whalen* must have had FDA approval because otherwise a physician would have been unable to prescribe them.

195.    Judge Zobel had cited *Whalen* only for the basic proposition that "the Commonwealth's police powers permit it to regulate the administration of drugs by the health professions." Zogenix, Inc. v. Patrick, No. 14-11689-RWZ, 2014 WL 3339610, at *4 (D. Mass. July 8, 2014), *vacated in part*, 2014 WL 4273251 (D. Mass. Aug. 28, 2014).

196.    *See* People v. Privatera, 591 P.2d 919, 923 (Cal. 1979) ("If the state has the power to ban a drug with a recognized medical use because of its potential for abuse, then—given a rational basis for doing so—the state clearly has the power to ban a drug [amygdalin] not recognized [by the FDA] as effective for its intended use."). Laetrile did not, however, qualify as a controlled substance much less one in Schedule II. *See supra* notes 84-85 and accompanying text.

197.    *See* Elizabeth G. Patterson, *Health Care Choice and the Constitution: Reconciling Privacy and Public Health*, 42 RUTGERS L. REV. 1, 29-30 n.149 (1989) ("[T]his dictum appears to reflect a perception that the public interest behind such a prohibition would be strong, rather than that the right to privacy would not be implicated."); *see also Whalen*, 429 U.S. at 592-93 ("Our concern is limited to Schedule II which includes the most dangerous of the legitimate drugs.").

198.    *See, e.g.*, Borucki v. Ryan, 827 F.2d 836, 841 n.7 (1st Cir. 1987) ("Additional factors apparently underlying the Court's ruling were that the State could have proscribed use of the drugs entirely . . . ."); State v. Wiedeman, 835 N.W.2d 698, 709 (Neb. 2013); Doe v. Axelrod, 527 N.Y.S.2d 385, 401 (App. Div. 1988); Margaret B. Hoppin, Note, *Overly Intimate Surveillance: Why Emergent Public Health Surveillance Programs Deserve Strict Scrutiny Under the Fourteenth Amendment*, 87 N.Y.U. L. REV. 1950, 1968 & n.89 (2012); *see also* B. Jessie Hill, *The Constitutional Right to Make Medical Treatment Decisions: A Tale of Two Doctrines*, 86 TEX. L. REV. 277, 304 (2007) (recognizing that "the Court's

The freedom to make choices about medical interventions seems to differ constitutionally from other choices in the marketplace of consumer goods and services.[199] Thus, the Supreme Court held that the State of Nebraska could not ban one of two recognized methods of late-term abortion without including an exception when necessary to protect a woman's health,[200] while only a few years later it decided that Congress could conclude otherwise.[201] Although such medical procedures do not undergo any form of federal licensure,[202] this pair of decisions might help to explain what makes a state

statements about outlawing certain drugs were pure dicta"); Note, *Last Resorts and Fundamental Rights: The Substantive Due Process Implications of Prohibitions on Medical Marijuana*, 118 HARV. L. REV. 1985, 1996 n.61 (2005) (suggesting why "this point should be treated with care").

199.   *See Whalen*, 429 U.S. at 603 ("Nor can it be said that any individual has been deprived of the right to decide independently, with the advice of his physician, to acquire and to use needed medication."); Hill, *supra* note 198, at 305-13, 329-32, 341-45 (discussing the Supreme Court's treatment of autonomy in making choices about medical care); Eugene Volokh, *Medical Self-Defense, Prohibited Experimental Therapies, and Payment for Organs*, 120 HARV. L. REV. 1813, 1827 (2007) ("[T]o impose a substantial burden on the patient's right to protect her life through medical procedures, the government should have to show that it has an extremely powerful reason for burdening the right and that the burden is genuinely necessary because the government's goals can't be achieved in less burdensome ways." (footnote omitted)).

200.   *See* Stenberg v. Carhart, 530 U.S. 914, 930-38 (2000); *see also* Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 327-28, 331 (2006) (holding that state restriction on minors' access to abortion required a health exception); Hill, *supra* note 198, at 310, 319-20, 322-25 (finding a more limited recognition of this exception in the Court's subsequent rejection of a challenge to the federal prohibition on this same abortion procedure); Volokh, *supra* note 199, at 1826 ("Postviability abortions cannot be distinguished on the ground that they involve the woman's reproductive choice. After viability, the time for that choice has passed, and the right to get a therapeutic abortion is a consequence of the woman's medical self-defense right, not her abortion-as-choice right."). Commentators invoking the health exception required by the Supreme Court for abortion restrictions do so in order to claim a substantive due process right of terminally ill patients without other options to access *investigational* drugs; surely such a constitutional claim more readily embraces a right of access to therapeutic products that already have received FDA approval.

201.   *See* Gonzales v. Carhart, 550 U.S. 124, 161-67 (2007). For a vague parallel in the context of pharmaceuticals, consider methaqualone, which the FDA had approved for the treatment of insomnia but Congress later overrode and dictated its placement in Schedule I. *See* Pub. L. No. 98-329, 98 Stat. 280 (1984); *see also* Noah, *supra* note 35, at 59 ("Congress concluded that methaqualone offered no advantages over other products that posed less of a risk of abuse.").

202.   *See* Lars Noah, *Medicine's Epistemology: Mapping the Haphazard Diffusion of Knowledge in the Biomedical Community*, 44 ARIZ. L. REV. 373, 447-49 (2002).

prohibition on an FDA-approved pharmaceutical product problematic. If the agency has not approved a particular drug (or has withdrawn such an approval), then generally no one in the country can secure access to it;[203] if, however, the agency has issued a license but one state acts to disregard it, then persons in that state (and only that state) cannot take advantage of a pharmaceutical product even though it has received official sanction. In short, upon FDA approval the baseline shifts from nonavailability to availability for patients, which a particular state's prohibition then would unsettle in a way that restricted the freedom to make potentially critical medical choices.

The act of federal licensure, even if not enough to trigger implied preemption under the Supremacy Clause, seems to make the state's burden of justification nearly impossible in the event that some form of heightened scrutiny applies.[204] Under what circumstances might a state have a substantial (much less a compelling) interest in barring access to a drug that the FDA just approved, and could it not typically serve any such interest by means more narrowly tailored than an outright prohibition on sale?[205] Massachusetts plainly disagreed with the agency's risk-benefit judgment when it licensed Zohydro, but how seriously could a reviewing court take the contrary views of state officials in light of that approval,[206] and did not the state—as amply revealed by the steps that it took after issuance of the preliminary injunctions—have more

---

203. Similarly, once Congress banned partial birth abortion, Nebraska presumably could resurrect its earlier prohibition (carrying more draconian penalties than imposed under federal law) without running afoul of the Fourteenth Amendment.

204. *See* Sarah Ricks, *The New French Abortion Pill: The Moral Property of Women*, 1 YALE J.L. & FEMINISM 75, 90-92, 99 (1989) (arguing that FDA approval would make it impossible for individual states seeking to prohibit use of the drug to invoke safety rationales if challenged as burdening the right to privacy).

205. *Cf.* Carey v. Population Servs. Int'l, 431 U.S. 678, 687-88 (1977) ("A total prohibition against sale of contraceptives, for example, would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use. Indeed, . . . since more easily and less offensively enforced, [it] might have an even more devastating effect . . . .").

206. If courts could freely disregard the FDA's risk-benefit judgment, then, because prescription drugs invariably carry a risk of serious side effects, state officials wanting to ban a pharmaceutical product could simply point to the risk labeling approved by the agency as the basis for asserting a safety rationale for their action. *See* Shrake, *supra* note 180, at 488-89; *id.* at 492 ("Because these admittedly adverse health consequences [of hormonal contraceptives] are conceded, there would be no need for a state even to prove its case.").

nuanced mechanisms of control at its disposal?[207] Then again, Zohydro hardly qualifies as a life-saving drug, and patients in severe pain would still have any number of long-acting opioid analgesic substitutes available to them.[208]

## CONCLUSION

Not surprisingly, the question posed at the outset does not admit of an easy answer. In certain circumstances, states may enjoy the authority to prohibit the sale of an FDA-approved pharmaceutical. The constitutional analysis—whether framed in terms of implied preemption, dormant Commerce Clause doctrine, or substantive due process—may depend on answers to several subsidiary questions: Did the federal government actively encourage the introduction or use of the product; how much time has elapsed since the FDA licensed it (and has new information emerged that might alter the agency's original risk-benefit judgment); does the product offer significant benefits to patients who find themselves in dire straits (or wish to exercise their recognized rights in making procreative choices); does it pose significant risks to patients or others (reflected, for instance, with a Schedule II designation); and

---

207.   *See supra* notes 45-51 and accompanying text. When the State of Florida faced an epidemic of opioid abuse, it successfully tackled unscrupulous suppliers (so-called "pill mills") rather than the drug products themselves. *See* Hal Johnson et al., *Decline in Drug Overdose Deaths After State Policy Changes—Florida, 2010-2012*, 63 MORBIDITY & MORTALITY WKLY. REP. 569 (2014); *see also* Barry Meier & Sabrina Tavernise, *States Push to Curb Painkiller Overuse*, N.Y. TIMES, Mar. 12, 2016, at B1 ("[T]he pace of activity in states has grown so intense that experts are having difficulty keeping track. Currently, there are about 375 proposals in state legislatures that would regulate pain clinics and several aspects of prescribing painkillers," and Massachusetts just enacted legislation that allows physicians to prescribe no more than a seven-day supply of such drugs after an injury or surgery.).

208.   *Cf.* Noah, *supra* note 93, at 865 ("[A]re powerful analgesics properly dismissed as merely 'lifestyle' drugs? Contraceptives sometimes get trivialized in this fashion."); *id.* at 866 ("In the final analysis, all drugs are, to one degree or another, lifestyle drugs."). If, however, some patients could not tolerate any of the alternatives, *see id.* at 849 & n.39, 855-56 (explaining the flaws in assuming therapeutic substitutability), then a state prohibition would deprive them of access to palliative care in seeming contravention of the Court's guidance in the physician-assisted suicide cases, *see supra* note 173 and accompanying text; *see also* Stenberg v. Carhart, 530 U.S. 914, 934 (2000) ("A rarely used treatment might be necessary to treat a rarely occurring disease that could strike anyone—the State cannot prohibit a person from obtaining treatment simply by pointing out that most people do not need it.").

does the state's contrary judgment reflect special local conditions or concerns? Because pharmaceuticals run the gamut on these various measures, a state's decision to deprive patients of access to a drug licensed by the FDA would not invariably run afoul of the Constitution, unless, of course, one takes seriously the Supreme Court's expansive approach to implied preemption in its latest tort decision, *Mutual Pharmaceutical Co. v. Bartlett*.[209] The recent experience with Zohydro in Massachusetts nicely posed the relevant questions, but the resolution of the resulting litigation unfortunately offered little in the way of persuasive answers.

---

209.    133 S. Ct. 2466 (2013); *see also supra* Section II.A (elaborating).

4/26/24, 11:19 AM                                           England Bans Puberty Blockers For Minors

FORBES > BUSINESS

**BREAKING**

# England Bans Puberty Blockers For Minors

**Ty Roush** Forbes Staff

*I cover breaking news.*

 Follow

Mar 12, 2024, 02:55pm EDT

Updated Apr 18, 2024, 01:11pm EDT

**TOPLINE** Puberty blockers will no longer be prescribed to minors under age 18 in England outside of regulated clinical trials, the country's National Health Service announced Tuesday, following an earlier review by the agency, the latest development in the controversial treatment that has sparked protests in the U.S., as well, over gender-affirming care in children.



An earlier review by England's National Health Service found a "lack of consensus and open dialogue" ... [+]  GETTY IMAGES

Exhibit
0012

**KEY FACTS**

- Puberty blockers—used to delay the effects of puberty—will no longer be available to anyone under age 18 being treated by the state-funded NHS, a decision junior health minister Maria Caulfield said would "ensure care is based on evidence, expert clinical opinion" that is "in the best interests of the child."

- The NHS called for an independent review of gender identity treatments for minors in 2020 amid a "significant increase" in referrals to the Gender Identity Development Service, which is scheduled to close at the end of March.

- The agency released an interim report from its review in February 2022, which indicated a "lack of consensus and open dialogue" about gender dysphoria while questioning how medical professionals should respond.

- There are fewer than 100 children on puberty blockers who will continue their treatment at Leeds and University College London Hospital.

**WHAT TO WATCH FOR**

Former Prime Minister Liz Truss called for the British government to support a bill proposed last week that would prevent the **private** sale of puberty blockers. The NHS said it hopes to have a study about the long-term effects of puberty blockers by December.

**BIG NUMBER**

5,986. That's how many minors were referred to the Gender Identity Development Service from 2020 to 2022, compared to just over 500 between 2011 and 2013.

**SURPRISING FACT**

Billionaire Elon Musk reacted to the agency's decision by referring to puberty blockers as "sterilization drugs," suggesting they were banned "due to potentially severe negative effects."

**KEY BACKGROUND**

The NHS is one of several European health agencies to open a review into gender-affirming services over a lack of evidence supporting hormonal treatment for minors. Dr. Hilary Cass, who authored the agency's review, expressed concern over what she said was insufficient evidence supporting gender-affirming services as the number of minors requesting access rapidly increased. Only one facility in the U.K. provided access to gender-affirming services at the time, which Cass noted was "not sustainable." Cass also questioned whether children were supported by medical professionals if they decided against transitioning.

**TANGENT**

Other countries have debated access to gender-affirming care for minors in recent years. Shortly after the NHS review, Sweden's healthcare agency updated its healthcare guidelines preventing minors from accessing gender-affirming care, suggesting evidence for "hormonal interventions" for minors is "of low quality" and that treatments may present risks. Several states in the U.S. have sought to ban or restrict access to certain types of gender-affirming care for minors, despite opposition by organizations including the American Medical Association and American Academy of Pediatrics. Former President Donald Trump said last year he would assign federal agencies to "stop" healthcare providers from giving gender-affirming care if reelected, suggesting the treatments were "child abuse" and "child sexual mutilation."

---

**Forbes Daily: Join over 1 million Forbes Daily subscribers and get our best stories, exclusive reporting and essential analysis of the**

**day's news in your inbox every weekday.**

Email address                                    **Sign Up**

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates'
offerings, our **Terms of Service** (including resolving disputes on an individual basis via arbitration), and
you acknowledge our **Privacy Statement**. Forbes is protected by reCAPTCHA, and the Google **Privacy
Policy** and **Terms of Service** apply.

**FURTHER READING**

[Hormone Therapy Lessened Depression, Lowered Suicide Risk
Among Transgender Adults, Study Says](#) (*Forbes*)

*CORRECTION (4/18): This story has been updated to clarify
where the ban applies.*

*Follow me on* Twitter. *Send me a secure* tip.

 **Ty Roush**                                    **Follow**

I cover breaking news for Forbes. Before Forbes, I worked as a reporter for
USA Today in Asheville and Black Mountain, North Carolina. I... **Read More**

Editorial Standards                                    Reprints & Permissions

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; *et al.*, | Case No. 2:22-cv-184-LCB-CWB |
| Plaintiffs, | Honorable Liles C. Burke |
| and | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Intervenor, | |
| v. | |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; *et al.*, | |
| Defendants. | |

## PLAINTIFF-INTERVENOR UNITED STATES' DISCLOSURE OF
## REBUTTAL EXPERT TESTIMONY OF
## I. GLENN COHEN, JD

I, I. Glenn Cohen, JD, hereby declare and state as follows:

1.      I have been retained by counsel for the United States as an expert in

connection with the above-captioned litigation.

**Exhibit
0013**

2.     I have actual knowledge of the matters stated in this report. If called to testify in this matter, I would testify truthfully and based on my expert qualifications.

## I.     CREDENTIALS, MATERIALS, AND PRIOR EXPERT WITNESS WORK

3.     I am the James A. Attwood and Leslie Williams Professor of Law at Harvard Law School. I also serve as a Deputy Dean of the Law School. I am also the Faculty Director of the Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics at Harvard Law School.

4.     I joined the Harvard Law School as a fellow in health law policy, bioethics, and biotechnology in 2006 and joined the faculty as an assistant professor in 2008. Prior to joining the Harvard Law School, from 2004 to 2006 I worked as an appellate attorney at the Civil Division of the Department of Justice, where my cases included representing the U.S. Food and Drug Administration (FDA) in litigation concerning its regulation of pharmaceuticals. After graduating law school in 2003, I clerked for then-Chief Judge Michael Boudin, on the U.S. Court of Appeals for the First Circuit, from 2003 to 2004. I am licensed to practice law in the state of New York.

5.     I have been teaching subjects related to health law, bioethics, and food and drug law at the Harvard Law School for 17 years. I have also co-taught courses and guest lectured at the Harvard Medical School and guest lectured at the Harvard

T.H. Chan School of Public Health. I have also given guest lectures on these subjects at universities across the world. I have been invited to speak as an expert before national advisory bodies such as the National Academies of Science Engineering and Medicine (NASEM). I have served on numerous NASEM committees as an expert, as well as the committees of other national organizations in the medical and scientific arena such as the Ethics Committee for the American Congress of Obstetricians and Gynecologists (ACOG) and Organ Procurement and Transplantation Network/United Network for Organ Sharing Ethics Committee as well as the ethics advisory boards of companies such as Illumina and Bayer. I have been asked to speak at meetings at the White House chaired by the Vice President regarding the impact of the Supreme Court's decision on the constitutional protection for abortion in *Dobbs v. Jackson Women's Health Organization*.[1]

6.     I am the author, co-author, editor, or co-editor of more than 20 books on health law, bioethics, food and drug law and biotechnology. These include one of the leading treatises on these subjects,[2] one of the leading casebooks on these subjects,[3] and the books *FDA in the Twenty-First Century*[4] and *Human Subjects*

---

[1] 597 U.S. 215 (2022).

[2] THE OXFORD HANDBOOK OF U.S. HEALTH LAW (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

[3] MARK HALL, MARY ANNE BOBINSKI, DAVID ORENTLICHER, I. GLENN COHEN, NICHOLAS BAGLEY, NADIA SAWICKI, HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 10th ed. 2024).

[4] FDA IN THE TWENTY-FIRST CENTURY: THE CHALLENGES OF REGULATING DRUGS AND NEW TECHNOLOGIES (I. Glenn Cohen & Holly Fernandez Lynch, eds Columbia University Press, 2015).

*Research Regulation*.[5] I am the author or co-author of more than 200 articles in the leading peer-reviewed scientific (such as Science, Nature Genetics, Cell), medical (such as the New England Journal of Medicine, JAMA, Nature Medicine), bioethics (such as the American Journal of Bioethics, the Hastings Center Report) journals as well as leading law reviews (such as the Harvard and Stanford Law Reviews). In addition, I was named to the Greenwall Foundation Faculty Scholars Program in Bioethics, through which, over the subsequent decade, I met numerous times with a community of leading scholars in bioethics and health law. I was also named as a fellow of the Hastings Center, one of the leading bioethics think tanks in the world.

7.     This report presents my independent, expert opinions based on my study, training, and experience as a law professor and bioethicist; my review of relevant scholarly literature; and my discussions over the years with colleagues in law, medicine, and bioethics. Through this report, I do not speak herein for or otherwise represent the views of Harvard Law School nor for any other organization with which I have been affiliated.

8.     My most recent curriculum vitae, which lists my publications, is provided as **Appendix A** to this Report.

---

[5] HUMAN SUBJECTS RESEARCH REGULATION: PERSPECTIVES ON THE FUTURE (I. Glenn Cohen & Holly Fernandez Lynch, eds MIT Press, 2014).

9.      In preparing this report, I have reviewed the text of the Alabama Senate Bill 184 (Vulnerable Child Compassion and Protection Act, VCAP), reports from Defendants' experts, and some of the documents produced by the U.S. Department of Health and Human Services (HHS) as part of discovery. I also relied on my legal and bioethical education, training, and experience, my research experience, and my knowledge of the scientific literature in the pertinent fields. The materials I have relied upon in preparing this report are the same types of materials that experts in my field of study regularly rely upon when forming opinions on these subjects. The documents I reviewed and relied on throughout this report are listed in **Appendix B**. I may wish to supplement these opinions or the bases for them due to new research or publications or in response to statements and issues that may arise in my area of expertise.

10.      In the past four years, I have been retained as an expert in cases and deposed in cases unrelated to the subject matter of this one: *Brown v. John Boyd Coates*, Case No. 2:21-cv-00157-cr·5 (D. Vt.); *Doe v. Medstar*, Case No 24-C-20-000591 OG (Circuit Court for Baltimore City, Maryland); and *Doe v. Virginia Mason Medical Center*, Case No. 19-2-26674-1 SEA (Superior Court of the State of Washington in and for the County of King).

11.      I am being compensated at an hourly rate for the actual time that I devote to this case, at the rate of $850 per hour for any review of records,

preparation of reports, declarations, and deposition and trial testimony. My

compensation does not depend on the outcome of this litigation, the opinions that I

express, or the testimony that I provide.

12.     I reserve the right to revise and supplement the opinions expressed in

this report or on the bases for them if any new information becomes available in

the future, including new scientific research or publications in response to the

statements and issues that may arise in my area of expertise. I may also further

supplement these opinions in response to information produced in discovery and in

response to additional information from Defendants' or Private Plaintiffs'

designated experts.

13.     Through this report, I am not speaking on behalf of HHS or the U.S.

Food and Drug Administration (FDA). All opinions are my own.

## II.     SUMMARY OF CONCLUSIONS

14.     To briefly summarize my conclusions relevant to this litigation, the

reasons for which are described in-depth below:

- Contrary to the intimations of Defendants' experts, there is nothing

    nefarious or unusual about the fact that drugs relevant to this case are

    being prescribed "off-label." Prescribing FDA-approved drugs "off-

    label" – that is for uses other than the ones FDA reviewed and approved –

    is extremely common. HHS's Agency for Health Care Research and

Quality, for example, estimates that 20% of all prescriptions in the U.S. are for off-label use.[6] In some disease and/or drug categories, an even larger share of prescribing is for off-label use.

- More specifically, off-label prescribing is very common in pediatric populations. In all the studies I have reviewed there is a significant amount of off-label prescribing in pediatric populations. Indeed, one study discussed below estimated that "sixty-two percent of outpatient pediatric visits included off-label prescribing," with the percentage even higher in some medical categories.[7]

- Defendants' experts have defended the Alabama statute in this case as essential to protect the safety of patients and ensure informed consent. In fact, the healthcare systems in all states, including Alabama, have a series of interlocking mechanisms to protect patients from these kinds of concerns. These mechanisms include physician licensure and discipline, hospital accreditation, medical malpractice liability, and liability for breach of informed consent.

---

[6] AHRQ, *Off-Label Drugs: What You Need to Know*, https://www.ahrq.gov/patients-consumers/patient-involvement/off-label-drug-usage.html (last viewed Feb 19, 2024).
[7] Alicia T. F. Bazzano et al., *Off-Label Prescribing to Children in the United States Outpatient Setting*, 9 ACAD. PEDIATR. 81 (2009).

- The use of criminal law relating to a licensed practitioner prescribing an FDA-approved drug is exceedingly rare. Indeed, with the possible exception of state attempts to criminalize the prescribing of mifepristone for abortions, I am not aware of any instance where a state has sought to criminalize a physician's prescribing of an FDA-approved drug as Alabama has done here.

## III.   FAR FROM BEING UNUSUAL, OFF-LABEL USE OF FDA APPROVED DRUGS IS GENERALLY ACCEPTED, INCLUDING IN PEDIATRIC POPULATIONS

15.     In this declaration, unless otherwise noted, when I use the term "off-label use," I refer to a licensed healthcare professional prescribing an approved prescription drug for an unapproved use for a patient under their care.

16.     In several instances, Defendants' witnesses intimate that there is something nefarious or unusual about the fact that drugs are being prescribed and used off-label to treat the minors relevant in this case, often by framing the use as "experimental" and pointing to insufficient randomized clinical trials in these populations. For example:

- Dr. Nangia emphasizes as part of her opinion that "None of the puberty blockers are currently FDA-approved for use in gender dysphoria" and that "[i]n gender dysphoria, puberty blockers are given 'off-label' to postpone the changes that occur with puberty. The clinical reasoning behind this is that proponents say that it gives youth time to decide whether to 'fully' transition, through a trajectory of cross-sex hormones

and then surgeries, while preventing changes that may cause distress. (Delemarre-van de Waal 2006)." Expert Report of Geeta Nangia, M.D., ¶¶41-42.

- In explaining why she believes that "Informed Consent Is Not Attainable" in this case for any minor, Dr. Nangia again returns to the lack of FDA approval for this indication writing: "In my opinion, due to a lack of full neurologic, psychosocial, and cognitive developmental maturation, adolescents are unable to understand, reason through, appreciate, and comprehend the impact of the shortcomings of the present data, the lack of FDA indication for puberty blockers, the long-term risks and consequences of transition, and the low-grade rating of studies that have been used to support medical and surgical transition. Hence, they lack decision-making capacity." Expert Report of Geeta Nangia, M.D., ¶ 154.

- In analyzing the medical record of a particular patient, Dr. Laidlaw makes particular note of the fact that Aygestin, a drug prescribed, "does not have an FDA indication for the diagnosis of gender dysphoria." Supplemental Confidential Expert Report of Michael K. Laidlaw, M.D., ¶ 30.

- Dr. Laidlaw writes that "In this case the condition of hypogonadotropic hypogonadism described above (a medical disease) is induced by medication and is an iatrogenic effect of treating the psychological condition of gender dysphoria. GnRH analogue medications have not been FDA approved for this use. The use of GnRH analogue medication for this purpose in adolescents is experimental as there have been no randomized controlled trials for this specific use case." Expert Report of Michael K. Laidlaw, M.D., ¶ 77.

- Dr. Laidlaw also opines: "Contrast the FDA approved use of testosterone in males versus its experimental use [sic] females. Testosterone is FDA approved for use in adult men as well as the pediatric male population aged 12 and older (Actavis, 2018). There is no FDA approved usage of testosterone for women or pediatric aged females. The prescribing indications for adult males and pediatric males are identical and are to treat the conditions of low testosterone caused by either primary hypogonadism or secondary hypogonadism (Id.). The intent of testosterone for women and pediatric aged females in GAT is to cause severe hyperandrogenism. In this case the purpose, effects, and ultimate

outcome of the FDA approved usage of testosterone for males versus the experimental use for females in GAT are very different. Therefore, the low-quality evidence guidelines of the Endocrine Society/WPATH are not an acceptable substitute for proper scientific studies including randomized controlled trials (Malone et al., 2021; Hembree et al., 2017)." Expert Report of Michael K. Laidlaw, M.D., ¶ 122.

- Dr. Cantor writes that "Dr. Antommaria's defence [sic] of using off-label, non-FDA-approved uses of drugs is entirely peripheral. Treatment safety and effectiveness do not have a one-to-one correspondence with FDA-approval. The fact that some other drugs are used widely and safely for some other off-label indications does not imply in the least that off-label use of this drug (puberty blockers) for this use (preventing normal, healthy puberty in children) is safe." Expert Report of James Cantor, Ph.D., ¶ 275.

17.    To the contrary, there is nothing nefarious or unusual about the fact that drugs are being prescribed off-label by licensed healthcare providers to treat the minors in this case. While such off-label prescribing may seem surprising, in the United States, as discussed below, within some therapeutic categories, many (or potentially, the majority) of prescriptions for approved drugs are for off-label uses. This context is helpful to assess Defendant's experts' claims about the safety and efficacy for minors of the drugs at issue in this case.

18.    Let me first briefly explain how FDA reviews drugs and what is meant by off-label prescribing of an approved drug, before discussing the data suggesting that off-label prescribing of approved drugs is widespread, including in pediatric populations. I will also discuss Congressional efforts to increase the amount of clinical trials of drugs in pediatric populations.

## A. How FDA Reviews and Approves Drugs for a Particular Use (or Uses).

19.    FDA is charged by Congress with reviewing and potentially approving new drugs. That process follows a regimented scientifically-rigorous process. The D.C. Circuit, sitting en banc, gave a good concise summary of that process in *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*:

> The Food, Drug, and Cosmetic Act ("FDCA" or "Act"), however, generally prohibits access to new drugs unless and until they have been approved by the Food and Drug Administration ("FDA"). *See* 21 U.S.C. § 355(a). Gaining FDA approval can be a long process. First, an experimental drug's sponsor (e.g., a drug company) must submit an application for approval. *See id.* § 355(a). Because no drug may be approved without a finding of "substantial evidence that the drug will have the effect it purports or is represented to have," *id.* § 355(d)(5), an application must contain "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use," *id.* § 355(b)(1)(A). Such reports rely in large measure on clinical trials with human subjects.[8]

Indeed, before a sponsor may even begin that human testing:

> it must submit for the FDA's approval an investigational new drug application ("IND"), *see id.* § 355(i)(1); *see also* 21 C.F.R. pt. 312, containing detailed information establishing that human testing is appropriate, *see* 21 C.F.R. § 312.23. Once the application for human testing has been approved, *see id.* § 312.20, several phases of clinical testing begin. [Plaintiff's] amended complaint alleges that this testing process is an extremely lengthy one, requiring nearly seven years for the average experimental drug.[9]

---

[8] 495 F.3d 695, 697 (D.C. Cir. 2007) (en banc).

[9] *Id.* at 697-698.

Clinically testing a drug to ensure its safety and efficacy requires three (and occasionally four) phases:

> Phase I involves the initial introduction of a new drug into human subjects. A Phase I study usually consists of twenty to eighty subjects and is "designed to determine the metabolism and pharmacologic actions of the [new] drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." *Id.* § 312.21(a)(1). Although gathering data on effectiveness may be part of Phase I, its primary focus is to determine whether the drug is safe enough for continued human testing. *See id.* Phase II studies are "well controlled" and "closely monitored" clinical trials of no more than several hundred subjects, used to evaluate both the "effectiveness of the drug for a particular indication" and its "common short-term side effects and risks." *Id.* § 312.21(b).

> Phase III studies are expanded clinical trials of several hundred to several thousand subjects designed to "gather ... additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id.* § 312.21(c).[10]

20.     Drugs sponsors are required to notify FDA if, at any time during the clinical trial there is "'[a]ny adverse experience associated with the use of the drug that is both serious and unexpected,' *id.* § 312.32(c)(1)(A), and the FDA may order a 'clinical hold' halting the trials if it determines that safety concerns so warrant, *id.* § 312.42."[11] To guide this process of evaluating drugs, "Congress has directed the FDA to establish '[s]cientific advisory panels' to 'provid[e] expert scientific advice and recommendations to the Secretary regarding a clinical investigation of a

_____

[10] *Id.* at 698.
[11] *Id.* at 698.

drug or the approval for marketing of a drug.' 21 U.S.C. § 355(n)(1). These panels must include scientists from a variety of disciplines. *See id.* § 355(n)(3)."[12]

21.     For a drug sponsor to make its way through these regulatory and scientific hurdles is extremely expensive, especially since most drugs fail somewhere along this pathway.[13] Although the exact numbers are contested, the "most recent estimates peg new drug development capitalized costs at between $1,395 million and $2,558 million."[14] It is in part because of this exorbitant cost that many pharmaceutical companies get FDA approval for a particular use captured in its approved labeling, rather than to seek approval for multiple separate uses for the same drug. [15] In general, this approach does not limit the ability of physicians to prescribe the approved drug for other uses that they deem appropriate for an individual patient based on their own medical judgment, as discussed more below.

---

[12] *Id.* at 698.
[13] *See, e.g.*, Joseph A. DiMasi, Henry G. Grabowski & Ronald W. Hansen*, Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J HEALTH ECON. 20, 23 (2016) (estimating an 11.83% overall probability that a drug that enters clinical testing will eventually be approved).
[14] David A. Simon, *Off-Label Innovation*, 56 GA. L. REV. 701, 719 (2022).
[15] For more discussion of what is included in an approved drug labeling and thus what constitutes "off-label" promotion, see, e.g., PETER HUTT ET AL., FOOD AND DRUG LAW 225-226, 1161-1165 (5th ed. 2022).

22. At multiple stages of the drug development and approval process, it is common for a drug sponsor to meet with FDA to receive feedback.[16] As FDA itself has described the purpose of such meetings in one of its guidance documents:

> FDA believes that the timely review of IND submissions with appropriate feedback to sponsors can result in greater efficiency of the drug development process. At the sponsor's request, FDA will, if possible, provide advice on specific matters relating to an IND. Examples include providing advice on the adequacy of technical data to support an investigational plan, the design of a clinical trial, and whether proposed investigations are likely to produce the data and information needed to meet requirements for a marketing application.[17]

23. As FDA writes:

---

[16] 21 C.F.R. § 314.102(a) ("During the course of reviewing an application or an abbreviated application, FDA shall communicate with applicants about scientific, medical, and procedural issues that arise during the review process. Such communication may take the form of telephone conversations, letters, or meetings, whichever is most appropriate to discuss the particular issue at hand. Communications shall be appropriately documented in the application in accordance with § 10.65 of this chapter. Further details on the procedures for communication between FDA and applicants are contained in a staff manual guide that is publicly available."); 21 C.F.R. § 314.102(e) ("Other meetings between FDA and applicants may be held, with advance notice, to discuss scientific, medical, and other issues that arise during the review process. Requests for meetings shall be directed to the director of the division responsible for reviewing the application or abbreviated application. FDA will make every attempt to grant requests for meetings that involve important issues and that can be scheduled at mutually convenient times. However, 'drop-in' visits (i.e., an unannounced and unscheduled visit by a company representative) are discouraged except for urgent matters, such as to discuss an important new safety issue."). *See* Katharine A. Van Tassel, *Filing the New Drug Application*, 1 FOOD AND DRUG ADMIN. § 13:26 (2023-2) ("The next stage of FDA approval of the process begins with meetings preparatory to the filing of the NDA. The FDA should meet with the drug firm and examine the IND evidence to identify special problems and additional testing which is needed. When the FDA has a research program in mind, it will usually negotiate with the firm at this stage for additional testing. By the time of the pre-NDA meeting, the firm should have completed Phase I, basic human studies, and Phase II, studies in patients for whom the drug will be expected to produce a therapeutic result.")

[17] FDA, *Best Practices for Communication Between IND Sponsors and FDA During Drug Development: Guidance for Industry and Review Staff: Good Review Practice*, 4 (Dec. 2017), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-communication-between-ind-sponsors-and-fda-during-drug-development.

During the life cycle of drug development, sponsors routinely solicit feedback from FDA on both scientific and regulatory issues. The breadth and frequency of advice sought can vary according to the experience of the sponsor, as well as the novelty and development stage of the proposed drug. During the IND phase of drug development, sponsors often solicit advice at critical junctures in their development programs.[18]

### 1. FDA Can, Where Appropriate, Place Post-Approval Restrictions on Drugs and Use Other Post-Approval Powers to Ensure Safety

24.   Congress empowered FDA to impose risk management plans as part of its approval process when necessary to ensure the benefits of a drug outweigh the risks. As part of the Food and Drug Administration Amendments Act of 2007 ("FDAAA"), FDA was given the authority to impose a "Risk Evaluation and

---

[18] *Id*. at 8. The Guidance further notes:
These topics include, but are not limited to the following:

- Regulatory (e.g., plans for submission of proprietary name requests, plans to defer or waive specific studies, development plans with other FDA centers (e.g., the Center for Devices and Radiological Health for combination products), applicability of an expedited program)
- Clinical/statistical (e.g., planned clinical trials to support effectiveness compared to a placebo or to demonstrate noninferiority to an active control, validity of outcomes and endpoints, trial size, enrichment designs)
- Safety (e.g., safety issues identified in nonclinical studies and early clinical trials, immunogenicity, size of the overall safety database, concerns related to particular populations, postapproval pharmacovigilance plans, risk evaluation and mitigation strategies (REMS), plans for human factors studies, issues related to evaluation of abuse potential)
- Clinical pharmacology and pharmacokinetics (e.g., dose selection and population, use in specific populations, drug-drug interactions)
- Nonclinical pharmacology, pharmacokinetics, and toxicology (e.g., genetic toxicology, reproductive and developmental toxicology, carcinogenicity, mechanism of action)
- Product quality (e.g., analytical similarity assessment, proposed shelf life and stability studies, delivery systems, characterization of drug substance/product, facility compliance with good manufacturing practices, comparability of lots used in clinical trials and commercial lots)
- Pediatrics (e.g., proposed pediatric development plan, dosing)

*Id*. at 8-9.

Mitigation Strategy" (REMS). There are currently about 60 approved REMS (some REMS cover more than one drug) currently in place.[19] Under the statute, FDA considers potential restrictions on the use of that drug that pertain to six factors enumerated by the statute:

> (A) The estimated size of the population likely to use the drug involved.
> (B) The seriousness of the disease or condition that is to be treated with the drug.
> (C) The expected benefit of the drug with respect to such disease or condition.
> (D) The expected or actual duration of treatment with the drug.
> (E) The seriousness of any known or potential adverse events that may be related to the drug and the background incidence of such events in the population likely to use the drug.
> (F) Whether the drug is a new molecular entity.[20]

25.     It is up to the FDA to determine whether a REMS is necessary, at which point the NDA-holder must propose a plan to FDA. FDA reviews that plan and determines whether to approve it. The sponsor of the product subject to the REMS also must "periodically" assess the REMS to ensure it is meeting its goals.[21] A REMS can include Elements to Assure Safe Use (ETASU), which:

> shall include 1 or more goals to mitigate a specific serious risk listed in the labeling of the drug and, to mitigate such risk, may require that—

---

[19] 21 U.S.C. § 355-1; Peter Grossi & Daphne O'Connor, *FDA Preemption of Conflicting State Drug Regulation and the Looming Battle over Abortion Medications*, 10 J.L. & BIOSCIENCES 1, 6 (2023). For the most up to date list of currents REMS, s*ee* FDA, *Approved Risk Evaluation and Mitigation Strategies*, (REMS), https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm (last accessed March 27, 2024).
[20] 21 U.S.C. § 355-1(a)(1)(A-F). *See also* FDA, *REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary, Guidance for Industry* (April 2019), https://www.fda.gov/media/100307/download.
[21] 21 U.S.C. § 355-1(d), Grossi & O'Connor, *supra* note 19, at 7.

(A) health care providers who prescribe the drug have particular training or experience, or are specially certified (the opportunity to obtain such training or certification with respect to the drug shall be available to any willing provider from a frontier area in a widely available training or certification method (including an on-line course or via mail) as approved by the Secretary at reasonable cost to the provider);

(B) pharmacies, practitioners, or health care settings that dispense the drug are specially certified (the opportunity to obtain such certification shall be available to any willing provider from a frontier area);

(C) the drug be dispensed to patients only in certain health care settings, such as hospitals;

(D) the drug be dispensed to patients with evidence or other documentation of safe-use conditions, such as laboratory test results;

(E) each patient using the drug be subject to certain monitoring; or

(F) each patient using the drug be enrolled in a registry.[22]

26.    REMS restrictions can and have been changed over time to reflect the most current data. Moreover, FDA may impose a REMS on a drug post-approval "if the Secretary becomes aware of new safety information and makes a determination that such a strategy is necessary to ensure that the benefits of the drug outweigh the risks of the drug."[23]

27.    Beyond the REMS authority, FDA also has other robust post-marketing authorities including adverse event reporting, the authority to impose post-marketing studies and clinical trials to assess certain safety risks, the authority

---

[22] 21 U.S.C. §§ 355-1(f)(3)(A)-(F)).
[23] 21 U.S.C. § 355-1(a)(2)(A).

to require safety labeling changes and, ultimately, the authority to withdraw a drug from the market altogether, although this power has infrequently been used.[24]

## B. What is Off-Label Prescribing?

28.    Importantly, FDA approves drugs for a particular use or uses. "Drugs can be marketed only when approved by FDA, and a drug [is] approved for a specific intended use or uses. However, once a drug is approved for a single intended use – no matter how narrow or rare – it can be prescribed freely for *any* intended use," subject to a possible REMS restriction, discussed above.[25] The result is so-called "off-label prescribing".

29.    On its own website, FDA provides the following explanation for off-label prescribing:

> From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient.

> You may be asking yourself why your healthcare provider would want to prescribe a drug to treat a disease or medical condition that the drug is not approved for.  One reason is that there might not be an approved drug to treat your disease or medical condition.  Another is that you may have tried all approved treatments without seeing any benefits.  In situations like these,

---

[24] 21 U.S.C. §§ 355(k), (o); 21 C.F.R. § 314.80; 21 C.F.R. § 314.510. *See, e.g.*, Holly Fernandez Lynch, Rachel E Sachs, Seijin Lee, et al., *Extending the US Food and Drug Administration's Postmarket Authorities*, 4 JAMA HEALTH FORUM e231313 (2023); Daniel G. Aaron, I. Glenn Cohen, Eli Y. Adashi, *The FDA Struggle to Withdraw Makena: Problems with the Accelerated Approval Process*, 328 JAMA 2394 (2022).
[25] ADAM L. MUCHMORE, FOOD AND DRUG REGULATION: A STATUTORY APPROACH 363 (2021).

you and your healthcare provider may talk about using an approved drug for an unapproved use to treat your disease or medical condition. . . .

Unapproved use of an approved drug is often called "off-label" use. This term can mean that the drug is:

- Used for a disease or medical condition that it is not approved to treat, such as when a chemotherapy is approved to treat one type of cancer, but healthcare providers use it to treat a different type of cancer.
- Given in a different way, such as when a drug is approved as a capsule, but it is given instead in an oral solution.
- Given in a different dose, such as when a drug is approved at a dose of one tablet every day, but a patient is told by their healthcare provider to take two tablets every day.[26]

30.    A different instance of off-label prescribing, and the kind that is more central to this case, is prescribing for use for a different population – including using a drug approved in an adult population for a pediatric population. As noted by authors in the *Oxford Handbook of U.S. Health Law*, far from being something nefarious or unusual, "[s]uch off-label use is older than the FDA regime itself" and "it is widespread" (more on that below).[27]

31.    Or as put by Prof. Lewis Grossman, one of the leading scholars of food and drug law and coauthor of one of the field's main casebooks:

---

[26] FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label (last updated Feb 5, 2018).
[27] Peter Grossi & Keri Arnold, *Drug Product Liability at the Crossroads*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 444, 461 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

Critically, however, the FDA does not limit the uses for which a physician may prescribe a drug, regardless of the content of the labeling. Since the early 1970s, the agency has foresworn any regulation of the practice of medicine through restrictions on off-label prescribing. [While] the FDA today occasionally shapes prescribing practices through mandatory Risk Evaluation and Mitigation Strategies (REMS) that restrict approved drugs' distribution and use (for example, by requiring that prescribing doctors have particular training or experience). Nonetheless, the fact remains that most physicians can prescribe most of the FDA-approved armamentarium for any purpose.[28]

32.    The U.S. Court of Appeals for the Eighth Circuit made a similar point

in *Weaver v. Reagen*:

In the present case, defendants argue that their reliance on the FDA's approval statement in limiting coverage of AZT to only those patients who meet certain medical criteria is a reasonable exercise of their discretion to

---

[28] Lewis A. Grossman, *Drugs, Biologics, and Devices: FDA Regulation, Intellectual Property, and Medical Products in the American Healthcare System*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 637, 641 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016) (citing Legal Status of Approved Labeling for Prescription Drugs; Prescribing for Uses Unapproved by the FDA: Notice of Proposed Rulemaking, 37 Fed. Reg. 16,503 (Aug. 15, 1972)). The U.S. Supreme Court made similar points in *Buckman Company v. Plaintiffs' Legal Committee*, although it was discussing FDA's attitude to off-label use of *medical devices* rather than off-label use of *drugs*:

Similarly, "off-label" usage of medical devices (use of a device for some other purpose than that for which it has been approved by the FDA) is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine. See, *e.g.*, Beck & Azari, FDA, Off–Label Use, and Informed Consent: Debunking Myths and Misconceptions, 53 Food & Drug L.J. 71, 76–77 (1998) (noting that courts, several States, and the "FDA itself recogniz[e] the value and propriety of off-label use"). Indeed, a recent amendment to the FDCA expressly states in part that "[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." 21 U.S.C. § 396 (1994 ed., Supp. V). Thus, the FDA is charged with the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals.

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).

place limitations on covered services based on medical necessity and utilization controls. We do not find this argument persuasive.

Contrary to defendants' assertions, FDA approved indications were not intended to limit or interfere with the practice of medicine nor to preclude physicians from using their best judgment in the interest of the patient. Instead, the FDA new drug approval process is intended to ensure that drugs meet certain statutory standards for safety and effectiveness, manufacturing and controls, and labeling, 21 C.F.R. § 314.105(c) (1988), and to ensure that manufacturers market their drugs only for those indications for which the drug sponsor has demonstrated "substantial evidence" of effectiveness. Id. at § 314.126.

. . .

Thus, the fact that FDA has not approved labeling of a drug for a particular use does not necessarily bear on those uses of the drug that are established within the medical and scientific community as medically appropriate. It would be improper for the State of Missouri to interfere with a physician's judgment of medical necessity by limiting coverage of AZT based on criteria that admittedly do not reflect current medical knowledge or practice.[29]

33.    There are a myriad of reasons why pharmaceutical companies, having received approval for a particular use of a drug, do not run clinical trials to get FDA approval of another use. The Congressional Research Service captured a good many of those reasons in a recent report:

For new drugs and new uses of already approved drugs, the sponsor receives a period of market protection, in the form of regulatory exclusivity for the sale of the drug for those uses. Payors—such as private health insurers or Medicare—benefit from FDA-approved labeling in their evaluation of whether to pay for a drug's use.

---

[29] Weaver v. Reagan, 886 F.2d 194, 198 (8th Cir. 1989).

But use of a drug evolves as clinicians (and the manufacturer) share their experiences regarding off-label uses, which, by definition, were not part of the premarket clinical studies used to obtain FDA approval. Off-label use can benefit patients. In some instances, such as in the treatment of rare diseases, clinical practice may use drugs approved for other indications. A manufacturer may choose not to invest in trials for such a small patient group. A patient whose physician is already prescribing the drug off-label may not want to enroll in a clinical trial where there is a chance he or she may be assigned to the placebo group. Once drugs are well-established in off-label uses, manufacturers rarely design studies to determine or verify the safety and effectiveness of such uses. Individuals and groups wanting to conduct such studies may find it hard to obtain funding.[30]

34.     While, as a policy matter, some might prefer a regulatory regime that takes a different position as to at least some subset of off-label use, as the next sections show, off-label use is not only well-accepted but widespread in the U.S. Indeed, the majority of prescriptions in some therapeutic categories are for off-label uses.

### C. Off-Label Prescribing Is Widespread in the U.S.

35.     As the prior section indicates, off-label use of approved prescription drugs is widespread in the U.S. The Congressional Research Service gave some examples of "FDA-approved drugs widely prescribed for off-label uses," such as: ketamine, whose labeled use is for anesthesia, being used off-label for depression and migraines; antipsychotics like risperidone, olanzapine and quetiapine, whose

---

[30] Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs*, 6 (Feb. 23, 2021), https://sgp.fas.org/crs/misc/R45792.pdf.

labeled uses are for schizophrenia and bipolar disorder are used off-label for sleep aid, behavioral symptoms of dementia, obsessive compulsive disorder, posttraumatic stress syndrome, and anxiety disorders.[31] It is worth emphasizing that these are all quite serious drugs with significant safety risks and yet they are routinely used off-label, for uses FDA has not approved.

36.     Let me give a sense of just how pervasive off-label use under the direction of a health care professional (that is, off-label prescribing) is generally, before turning to how common it is in the pediatric context, specifically. In what is perhaps the most frequently discussed study in the literature, David Radley and co-authors "used nationally representative data from the 2001 IMS Health National Disease and Therapeutic Index (NDTI) to define prescribing patterns by diagnosis for 160 commonly prescribed drugs."[32] They found that:

> In 2001, there were an estimated 150 million (95% confidence interval, 127-173 million) off-label mentions (21% of overall use) among the sampled medications. Off-label use was most common among cardiac medications (46%, excluding antihyperlipidemic and antihypertensive agents) and anticonvulsants (46%), whereas gabapentin (83%) and amitriptyline hydrochloride (81%) had the greatest proportion of off-label use among specific medications.[33]

---

[31] *Id.* at 5.
[32] David C. Radley. Stan N. Finkelstein, Randall S. Stafford, *Off-Label Prescribing Among Office-Based Physicians*, 166 ARCH. INTERNAL MED. 1021, 1021 (2006).
[33] *Id.*

37.     In the oncology space, Pfister reports that "in 2005 the National Comprehensive Cancer Network estimated that 50% to 75% of drug or biologic therapy used to treat cancer in the United States was off label."[34]

38.     One of the leading casebooks on FDA law notes that "[s]ome studies suggest as many as 20 percent of all prescriptions are for unapproved uses . . . and in some fields (especially oncology) off-label use may be not only frequent but even the standard of care," and that "[c]linical practice guidelines prepared by medical associations or academic medical institutions, or even government agencies, may recommend off-label uses of approved drugs."[35]

39.     While my focus is on off-label use in the U.S., such off-label use is also very prevalent outside the U.S. as well.[36] I discuss some of the data regarding off-label use in pediatric populations outside the U.S. below.

### a.  Off-Label Prescribing is Widespread for Pediatric Populations in the U.S.

40.     Using a drug approved for adult populations for *pediatric* populations is one of the most common types of off-label prescribing.[37] This has been a long-

---

[34] D. Pfister, *Off-Label Use of Oncology Drugs*, 30 J. CLINICAL ONCOLOGY 584 (2012).

[35] HUTT ET AL., *supra* note 15, at 1162.

[36] *See* DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 4 (2015).

[37] *See, e.g.*, DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 4 (2015) ("There are three main areas of therapy where off-label medicines are most widely used. The first is the use of products licensed for adults, on the basis of clinical trials in adults, for children. The second is of psychiatric medicines, and the third is in oncology treatment.")

standing reality in American health care. A 1997 U.S. Senate report captured well

both the extent of off-label use in pediatric populations in the U.S. and the reasons

why many pharmaceutical companies do not seek approval for pediatric uses,

observing at the time:

> Currently, less than 20 percent of the prescription medications on the United States market are approved for use in the pediatric population and labeled for pediatric use. Pediatricians using drugs developed with adults in mind but which may also be effective or be the only option for treating the same illnesses and diseases in children must estimate dosages from dosages found to be safe and effective in adults. Such estimates are uncertain because children, and particularly those under 2 years of age, often metabolize drugs differently than do adults. Further, some drugs have different side effects and/or toxicities in children than in adults even when appropriate doses are used.

> For these reasons, pediatricians have long had an active interest in promoting clinical studies of drugs in pediatric populations so that the drugs may be labeled for pediatric use. However, there is little incentive for drug sponsors to perform studies for medications which they intend to market primarily for adults and whose use in children is expected to generate little additional revenue. Pediatric studies pose ethical and moral issues relating to using new unapproved drugs in young patients. Second, there are substantial product liability and medical malpractice issues. Third, pediatric patients are more difficult to attract into studies. Fourth, for some drugs, pediatric use represents more difficult issues of drug administration and patient compliance than adult use.[38]

    41.    In response to this reality, Congress amended the statute to contain

mechanisms (including incentives in the form of additional months of market

---

[38] S. Rep. 105-43, 51 (1997).

exclusivity for drug manufacturers) to increase the number of pediatric clinical trials.[39]

42.   For example, under the Food and Drug Administration Modernization Act of 1997 (FDAMA) "[a]s a reward for conducting pediatric trials specifically requested by the FDA, drug sponsors holding approved applications and existing patents or other exclusivity were offered a six-month extension of market exclusivity for all of their drug products with the same active ingredient as the one studied," and "[d]uring this six-month period, the FDA could not approve an abbreviated new drug application for generics relying on the safety and efficacy data from the original sponsor's new drug application (NDA)," giving "a lucrative economic incentive for sponsors to perform the requested research because they could delay generic competition."[40]

43.   Congress reauthorized this statutory incentive of market exclusivity with a similar design in subsequent statutory amendments, including permanent reauthorization in the Food and Drug Administration Safety and Innovation Act of

---

[39] *See* Cong. Rsch. Serv., *supra* note 30, at 8, 15-16.
[40] Holly Fernandez Lynch, *Give Them What They Want? The Permissibility of Pediatric Placebo-Controlled Trials Under the Best Pharmaceuticals for Children Act*, 16 ANNALS HEALTH L. 79, 93 (2007).

2012 (FDASIA).[41] This incentive is commonly called the Best Pharmaceuticals for

Children Act, or BPCA, after the name of one such amendment.[42]

44.    While BPCA provides a "carrot" to drug companies to do more

pediatric clinical trials, the Pediatric Research Equity Act, first passed by Congress

in 2003 and also made permanent in FDASIA, serves as a sort of "stick."[43] As one

author described its major provisions:

> This rule "empowered the FDA to require pediatric testing of already
> marketed drugs and instituted a presumption favoring pediatric testing and
> labeling for new drugs," thus creating a non-voluntary correlate to the
> FDAMA/BPCA pediatric incentive. The PREA requires adequate data to
> assess safety and efficacy of a drug or biologic for the claimed indications of
> an NDA in all relevant pediatric subpopulations, even if the sponsor has not
> specifically claimed any pediatric uses. The statute also requires data to
> support dosing and administration for any pediatric subpopulations in which
> the drug is found to be safe and effective.
>
> The PREA is not all-inclusive and does recognize several waivers that
> exempt NDAs from pediatric testing when sponsors make certain showings.
> The requirements can be deferred if pediatric studies should be delayed until
> additional safety or efficacy data have been collected in adult subjects.
> Additionally, where evidence strongly suggests the drug would be
> ineffective or unsafe in all pediatric age groups, the requirements can be
> waived entirely. The requirements can also be waived if the drug does not
> represent a meaningful therapeutic benefit over existing therapies for
> pediatric patients and is not likely to be used in a substantial number of such
> patients.
>
> The FDA can also require pediatric data for drugs already approved and thus
> not covered by the requirements surrounding NDAs. This occurs if the drug

_____

[41] Food and Drug Administration Safety and Innovation Act, Pub. L. No. 112-144, 126 Stat. 993
(2012) (codified at 21 U.S.C. § 355a).
[42] Best Pharmaceuticals for Children Act, Pub. L. No. 107-109, 115 Stat. 1408 (2002).
[43] Pediatric Research Equity Act, Pub. L. No. 108-155, 117 Stat. 1936 (2003). *See* 21 U.S.C.
§ 355c.

is used for a substantial number of pediatric patients for its labeled indications, or if there is reason to believe the drug would represent meaningful therapeutic benefit over existing therapies for pediatric patients. Both of these situations must be accompanied by a finding that the absence of adequate labeling could pose significant risks to pediatric patient.[44]

45.    Despite significant Congressional efforts, much of, and in some drug categories the majority or vast majority of, prescriptions for pediatric use are off-label. To illustrate let me share some studies of the phenomenon in the U.S.

46.    A 2018 systematic review study looked at the "published incidence of off-label medication use in children from the past 10 years" and conducted a "retrospective chart review to determine the incidence of off-label prescriptions for children seen in the O[klahoma University] Physicians clinics."[45] In terms of published studies, they found 31 studies that met their selection criteria, and they reported that "the rate of off-label prescriptions varied widely in the 31 reviewed studies and was reported to be between 3.2% and 95%" and that "[s]even studies in our literature review specifically evaluated the use of off-label medications in the neonate population, with off-label drug use ranging from 26% to 95%."[46] Their retrospective chart review looked at 32 "understudied" drugs administered to children and found that 22 of the 32 "drugs of interest were prescribed as a new

---

[44] Lynch, *supra* note 4040, at 95-97 (quoting Lauren Hammer Breslow, *Note, The Best Pharmaceuticals for Children Act of 2002: The Rise of the Voluntary Incentive Structure and Congressional Refusal to Require Pediatric Testing*, 40 HARV. J. ON LEGIS. 133, 160 (2003)).
[45] H. Christine Allen et al., *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. OKLA STATE MED. ASSOC. 776 (2018).
[46] *Id.*

prescription in 2017, resulting in a total of 1,323 prescriptions for 1079 patients" and of the "1,323 prescriptions, 504 prescriptions were off-label (38.1%) and 819 prescriptions were on-label."[47]

47.    Yoon et al. conducted a retrospective utilization study using data from the National Ambulatory Medical Care Surveys (NAMCS, 2006–2015), which is an annual survey that "collects anonymous, visit-level data from US office-based physicians, including demographics, reasons for visit, diagnoses, and drugs provided or ordered at the visit, including recommended over-the-counter (OTC) drugs" and uses a sampling methodology that "allows researchers to produce nationally representative estimates."[48] They found that Physicians ordered one or more off-label systemic drug at almost 1 out of every 5 (18.5%) visits with patients, that 74.6% of the time it was an off-label use for unapproved conditions, and that "[o]ff-label ordering was most common proportionally in neonates (83%) and in absolute terms among adolescents (322 orders out of 1000 visits)."[49]

48.    An earlier study by Bazzano et al. used data from the same survey, the National Ambulatory Medical Care Surveys, looking at the time period 2001 through 2004 yielding "a sample of 7901 outpatient visits by children aged 0

---

[47] *Id.*
[48] Divya Yoon et al., *Trends in Off-Label Drug Use in Ambulatory Settings: 2006-2015*, 144 PEDIATRICS e20190896, at 2.
[49] *Id.* at 1.

through 17 years in which prescriptions were given, representative of an estimated 312 million visits" across the time period. They found that 62% "of outpatient pediatric visits included off-label prescribing," including approximately "96% of cardiovascular-renal, 86% of pain, 80% of gastrointestinal, and 67% of pulmonary and dermatologic medication prescriptions" being off-label.[50]

49.     Another study used data from the same survey and focused specifically on outpatient migraine care for pediatric populations. Looking at the 1.2 million pediatric outpatient visits for migraine that took place in 2011 and 2012, they analyzed the "approximately 800,000 patients (66.7%) [who] received at least 1 migraine drug" during a visit, and found that "off-label or age-inappropriate drugs were prescribed 1.5 times more frequently than FDA-approved medications for children (60.34% vs. 39.65%)."[51]

50.     Switching to inpatient care, a 2007 *JAMA Pediatrics* article looked at "clinical prescribing practice in major children's hospitals in the United States," and found that "[a]t least 1 drug was used off-label in 297 592 (78.7%) of 355 409 patients discharged during the study."[52]

---

[50] Alicia T.F. Bazzano AT, *Off-Label Prescribing to Children in the United States Outpatient Setting*, 9 ACAD. PEDIATR. 81, 81 (2009).
[51] L. Leanne Lai, *Off-Label Prescribing for Children with Migraines in U.S. Ambulatory Care Settings*, 23 J. MANAG. CARE SPEC PHARM. 382, 384 (2017).
[52] Samir S. Shah et al., *Off-label Drug Use in Hospitalized Children*, 161 ARCH. PEDIATR. ADOLESC. MED. 282, 282 (2007).

51.     While my focus is off-label use among U.S. pediatric populations, the

practice is also widespread outside the U.S. as well. As David Cavalla summarizes

some of the data:

> a review of international studies in ambulatory care reports rates of 13.2%
> and 29%, in paediatric wards between 18% and 60% and in neonatal units
> between 14% and 63%. Another international literature review reports that
> rates for off-label medicine use vary between 11% and 80%. A study from
> the Netherlands reports that 44% of all prescriptions in a paediatric ward are
> off-label. In Germany, around 40% of under 18s were prescribed at least one
> off-label medicine among a study of 17 000, with no significant differences
> according to region, urbanity, migrant background and social class. . . .
> Three-quarters of marketed prescription drugs have no labelling indications
> for children, although their inclusion in clinical trials is enlarging. Among
> medicines which were newly licensed by the European Medicines
> Evaluation Agency (EMA) between 1995 and 2005, only one-third was
> specifically licensed for children. Thus, off-label use is particularly
> widespread in paediatric situations, and over half of children in Europe who
> are prescribed medicines in hospital receive a medication that is either
> 'unlicensed' or 'off-label'. Other studies put the figure at 40%, 45% or 76%,
> and the area has been comprehensively reviewed.[53]

---

[53] DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 4, 9 (citing J.
Boos, *Off Label Use – Label Off Use?,* 14 ANN. ONCOL. 1 (2003); L. Cuzzolin, A. Atzei, and V.
Fanos, *Off-Label and Unlicensed Prescribing for Newborns and Children in Different Settings: A
Review of the Literature and a Consideration About Drug Safety*, 5 EXPERT OPIN. DRUG SAF. 703
(2006); C. Pandolfini and M. Bonati, *A Literature Review on Off-Label Drug Use in Children*,
164 EUR. J. PEDIATR. 522 (2005); G.W. 't Jong, I.A. Eland, M.C.J.M. Sturkenboom, et al.,
*Unlicensed and Off-label Prescription of Respiratory Drugs to Children*, 23 EUR. RESPIR. J. 310
(2004); H. Knopf, I-K. Wolf, G. Sarganas, et al., *Off-label Medicine Use in Children and
Adolescent: Results of a Population-Based study in Germany*, 13 BMC PUBLIC HEALTH 631
(2013); T. Hampton, *Experts Weigh in on Promotion, Prescription of Off-Label Drugs*, 297
JAMA 683 (2007); A.R. Smyth, A. Barbato, N. Beydon, et al., *Respiratory Medicines for
Children: Current Evidence, Unlicensed Use and Research Priorities*, 35 EUR. RESPIR. J. 247
(2010); L. Lindell-Osuagwu, M.J. Korhonen, S. Saano, et al, *Off-Label and Unlicensed Drug
Prescribing in Three Paediatric Wards in Finland and Review of the International Literature*, 34
J. CLIN. PHARM. THER. 277; E. Kimland, V. Odlind, *Off-Label Drug Use in Pediatric Patients*, 91
CLIN PHARMACOL THER. 796 (2012)).

52.     Without purporting to comprehensively survey all the existing literature, I will discuss just a few examples of studies documenting off-label pediatric use in some of the countries that I understand have come up as comparisons in this litigation.

53.     In their study of off-label drug use in the Netherlands, t'Jong and colleagues note that: "Previous research by the [authors] revealed that 70% of available respiratory drugs in the Netherlands are not fully licensed for use in children, and many of these (80%) are registered only for specific age/weight group."[54] They constructed a "random sample from all children aged 0–16 yrs who were registered with a general practitioner in 1998," and in their study population of 13,426 patients of whom "2,502 (19%) received 5,253 prescriptions for respiratory drugs in 1999," they found that "1,947 prescriptions (37.1%), 882 (16.8%) were unlicensed for use in children, and 1,065 (20.3%) were prescribed off-label."[55]

54.     In their study of off-label use in pediatric populations in Norway, Teigen and colleagues conducted "a cross-sectional prospective study at two hospitals in Norway" that included one neonatal and three pediatric wards "covering mainly gastrointestinal disorders, endocrinology, neurology, respiratory

---

[54] G.W. 't Jong, I.A. Eland, M.C.J.M. Sturkenboom, et al., *Unlicensed and Off-label Prescription of Respiratory Drugs to Children*, 23 EUR. RESPIR. J. 310, 311 (2004).
[55] *Id*. at 310.

diseases and infections in patients 0–17 years."[56] They found that "[m]ost of the patients (91%) received" off-label or unlicensed medicines, that 83% of the patients received off-label medicines, and that "almost half of all the prescriptions," 40-47% of the prescriptions, were off-label.[57]

55.     In their study of off-label use in pediatric populations in France, Joret-Descout and colleagues conducted a "cross-sectional study lasting 1 day on new prescriptions issued over the previous 24 h by departments using electronic prescribing" at a "475 bed maternity-paediatric university hospital."[58] In the single 24 hour period they studied, a total of 315 prescription medicines were issued to 120 pediatric patients, and they found that the "majority of the medicines were prescribed as licensed (190/60.3 %), followed by off-label medicine use (115/36.5 %) and unlicensed employment (10/3.2 %)" and that "a total of 54 % of children received at least one off-label or unlicensed medicine."[59]

56.     In their study of off-label use in pediatric populations in Finland, Lindell-Osuagwu and colleagues conducted a prospective study on prescriptions provided for "all patients below 18 years of age treated in three paediatric wards;

---

[56] Arna Teigen, Siri Wang, Bich Thuy Truong, et al., *Off-label and Unlicensed Medicines to Hospitalised Children in Norway*, 69 J. PHARM. PHARMACOL. 432 (2017).
[57] *Id*. at 433.
[58] Perrine Joret-Descout, Sonia Prot-Labarthe, Françoise Brion, et al., *Off-Label and Unlicensed Utilisation of Medicines in a French Paediatric Hospital,* 37 INT. J. CLIN. PHARM. 1222, 1222 (2015).
[59] *Id.* at 1224.

neonatal intensive care unit (NICU), general paediatric ward and paediatric surgical ward of KUH during a 2-week study period" in April and May 2011.[60] Of the 119 patients that received at least one prescription during the study period, 79% (97 patients) received "at least one prescription for off-label use or for an unauthorized medicine," with 71% (87 patients) receiving at least one prescription for off-label use.[61] The authors noted that "the prescriptions were more likely to be off-label for the following reasons: outside the dosage recommendations ($n = 182$) and approved age range ($n = 104$); and in 2001: no directions for use in children ($n = 87$) and administration by an alternative route ($n = 77$[])" and that "the medicines most commonly prescribed for off-label use were fentanyl ($n = 50$), paracetamol ($n = 41$), salbutamol ($n = 35$) and midazolam (n = 31)."[62]

57.     In their study of off-label use in pediatric populations in Sweden, Kimland and colleagues looked at prescribing data over a 48-hour period in May and October 2008 from 34 pediatric hospitals in Sweden and seven non-pediatric hospitals that also treat children, resulting in data from 2947 pediatric patients.[63] They found that "41% of all authorized drugs were given off-label and the highest

---

[60] L. Lindell-Osuagwu, M. Hakkarainen, K. Sepponen, et al., *Prescribing for Off-Label Use and Unauthorized Medicines in Three Paediatric Wards in Finland, the Status Before and After the European Union Paediatric Regulation*, 39 J. CLIN. PHARM. THER. 144, 144-145 (2013).
[61] *Id*. at 146.
[62] *Id*. at 146.
[63] E. Kimland, P. Nydert, V. Odlind, et al., *Paediatric Drug Use with Focus on Off-Label Prescriptions at Swedish Hospitals – A Nationwide Study*, 101 ACTA PAEDIATRICA 772, 772-773 (2012).

proportion of off-label prescriptions occurred in neonates and infants," that "[a]t least one off-label drug was prescribed to 60% of the study population, whereas 17% received at least three, and 6% at least five off-label drug prescriptions," and that a "stated lack of paediatric data [] and indication [] were the most common reasons for off-label classification among adolescents" while "[i]n children, age [] and indication [] were among the most common reasons for off-label classification."[64]

58.     In their study of off-label use in pediatric populations in Scotland, Ekins-Daukes and colleagues assessed prescriptions made to "167,865 children aged 0–16 years during the period November 1999 to October 2000 using data from 161 general practices using the national Scottish primary care computer system."[65] They found that a "total of 17,715 (26.1% of children issued with a prescription) children aged 0–16 years were prescribed at least one off-label medicine in the study year" and that the "extent of off-label prescribing was similar in all three age bands with 5420 (24.4%) 0- to 4-year olds, 6856 (27.9%) 5- to 11-year olds and 5439 (26.0%) 12- to 16-year olds prescribed at least one off-label medicine during the study year."[66]

---

[64] *Id.* at 774-776.
[65] Suzie Ekins-Daukes, Peter J. Helms, Colin R. Simpson, et al., *Off-Label Prescribing to Children in Primary Care: Retrospective Observational Study*, 60 EUR. J. CLIN. PHARMACOL. 349, 349 (2004).
[66] *Id.* at 350.

59.     In sum, while Defendants' experts intimate that there is something nefarious or unusual about the prescribing of off-label drugs for pediatric populations in this case, to the contrary off-label prescribing is extremely common in the United States. More particularly, off-label prescribing is particularly common in pediatric populations. In all the studies I have reviewed there is a significant amount of off-label prescribing for pediatric populations. The same is true in peer countries outside the United States.

IV.     **STATES HAVE ROBUST MECHANISMS TO REIGN IN UNSAFE MEDICAL PRACTICES WITHOUT RESORTING TO THE EXTREME STEP OF CRIMINALIZING THE PRESCRIBING OF AN FDA-APPROVED DRUG**

60.     Protecting patients, including pediatric patients, is a core concern in health law and its regulation. In several instances, Defendants' expert witnesses point to the need to protect pediatric patient safety as a reason to restrict the prescription of the FDA-approved drugs at issue in this case and as a core justification for the Alabama law. For example:

- Dr. Curlin writes that: "[I]t is not at all clear that meaningful informed consent for administration of MGT to minors can be obtained. There are strong reasons to doubt that minors can adequately appreciate and appropriately weigh the lifetime implications of sterilization, loss of sexual response, impaired neural development, and the other potential health and relational impacts identified in the literature, nor is it apparent that doctors possess (much less consistently disclose) adequate scientific information about these risks to enable anyone to make meaningfully informed decisions. Nor do ethical principles give parents unfettered power to provide effective consent on behalf of their children for medical

interventions that pose such severe risks of irreversible harm to the bodily health of the child (including sterilization) in the absence of a countervailing and imminent threat of bodily harm from a medical condition to be treated. No such imminent threat exists in the case of minors who experience gender dysphoria." Expert Report of Dr. Farr Curlin, M.D., ¶ 19.

- Dr. Curlin further opines that: "Doctors do not possess and are not providing information sufficient to enable children or parents to make 'informed' decisions. The absence of well-designed and controlled studies makes it impossible to give minors and their parents information sufficient to consider their consent duly informed, and the plaintiffs' experts by their own admission are misinforming patients regarding that fact. 'Caveat emptor' does not meet the bar required for consent to be duly informed within clinical medicine and clinical research. It is not enough to say 'we don't know' without doing the careful, incremental research to generate information needed for a consent to be duly informed." Expert Report of Dr. Farr Curlin, M.D., ¶ 71.

- Dr. Cantor writes: "As I have explained, any conclusion about safety requires knowledge about and balancing of both risks and benefits.

  In concluding that safety has not been established (see Section V above), national health authorities, authors of systematic reviews, and researchers have identified a number of harms which are either known to result from administration of puberty blockers and cross-sex hormones to children and adolescents, or can be reasonably anticipated but have not been sufficiently studied to reach any conclusion as to the likelihood or severity of harm." Expert Report of James Cantor, Ph.D., ¶¶ 202-203.

- Dr. Laidlaw writes: "In my opinion, there is not sufficient evidence to conclude that the use of puberty blockers to block natural puberty is safe when administered as part of gender affirming therapy. Nor is there sufficient evidence to conclude that the effects of puberty blockers when used in this manner are reversible." Expert Report of Michael K. Laidlaw, M.D., ¶¶ 81. Dr. Laidlaw also spends a significant portion of his report explaining why he believes that "[t]here are a number of serious health consequences that occur as the result of blocking normal puberty," and that "[i]n my opinion, there is insufficient evidence to conclude that any benefit of such treatment would outweigh the harm." Expert Report

of Michael K. Laidlaw, M.D., ¶¶ 90, 176. He ultimately justifies the need for the SB 184 on these beliefs, writing: "There exists insufficient evidence of benefit, but serious concerns for risk of harm. Therefore, I believe that the Alabama Vulnerable Child Compassion and Protection Act is based on sound medical principles for the protection of minors." Expert Report of Michael K. Laidlaw, M.D., ¶ 250.

- Dr. Nangia expresses her belief that "SB184 Appropriately Protects Minors." Expert Report of Geeta Nangia, M.D., p. 87. To support this belief, she opines that: "while parental consent and adolescent assent is possible for other medical interventions, it is insufficient in the matter of gender transition in minors. First, the risks to the growing adolescent are remarkable, including infertility, irreversible changes to secondary sex characteristics, potential issues with bone density, cardiovascular risks, metabolic function, endocrine function, reproductive capacity, psychological and medical health, and brain maturation. Second, a parent is unable to determine whether their child will realign with his or her natal sex. This presents inherent risk. Third, the present data supporting the benefit of transition in adolescence is rated 'very low quality.' There is no reliable long-term data on safety or efficacy of these treatments. For this reason, I believe that parental consent with adolescent assent for medical gender transition is problematic and can result in long-term detriment to the adolescent that later cannot be reversed." Expert Report of Geeta Nangia, M.D., ¶¶ 157-158.

61.    As I explain in this section, states have many regulatory mechanisms for protecting patient safety. These mechanisms include physician licensure and discipline, hospital accreditation, fraud and abuse laws, medical malpractice liability, and tort liability for breach of informed consent.

62.    While these regulatory mechanisms are commonly used to ensure patient safety, attaching criminal penalties to the actions of physicians is uncommon. The examples that come readily to mind including the sexual abuse of minor patients or unlawfully intentionally ending the life of a patient, where

physicians are not practicing medicine but acting in a way that is contrary to their professional obligations and criminal law. When it comes to states attaching criminal penalties to physicians *prescribing an FDA-approved drug*, it is rarer still. Indeed, with the possible exception of states which have enacted criminal penalties for abortion that may sweep in the FDA-approved drug mifepristone, now active in the wake of *Dobbs v. Jackson Health Organization*,[67] I am not aware of any instance where a state has sought to criminalize a physician's prescribing of an FDA-approved drug as Alabama has done here. While it is possible there are instances that exist with which I am not familiar, at the very least I can confidently say that applying criminal state-law penalties to the prescribing and use of FDA-approved drugs by licensed practitioners is exceedingly rare.

### A. States Have Robust Regulatory Mechanisms for Protecting Patient Safety Outside of Criminalizing the Prescribing of FDA-Approved Drugs

63.     For the past half-century, it has been common to think of health law and health care reform as seeking to balance the "iron triangle" (a term coined by William Kissick in 1994) of (1) access to, (2) the quality of, and (3) the costs of medical care.[68] The conception of quality involves not only protecting patients

---

[67] 597 U.S. 215 (2022).
[68] WILLIAM L. KISSICK, MEDICINE'S DILEMMA'S: INFINITE NEEDS VERSUS FINITE RESOURCES 2-3 (1994); see, e.g., Lindsay F. Wiley et. al., *Health Reform Reconstruction*, 55 U.C. DAVIS L. REV. 657, 667 (2021).

from harm, but also providing them benefit. As with FDA's consideration of whether to approve a drug for a particular use, the key question more generally for regulating medicine is ensuring an appropriate balance of risk and benefit.

64.     In this section I will just very briefly highlight some of the regulatory tools available for states to help regulate the practice of medicine to ensure that patients' interests are protected. This list is far from exhaustive.

65.     _Licensure and Discipline of Health Care Providers_. The power to license and discipline health care providers is a key way in which the state ensures that appropriate care is provided. "All 50 states (as well as US territories) have empowered professionally run licensing boards to regulate the practice of various professionals within their borders," regulating the practice of medicine, the practice of nursing, etc.[69] Alabama is, of course, no exception. "The Alabama Board of Medical Examiners and the Medical Licensure Commission of Alabama are jointly responsible for promulgating rules to protect the health and safety of Alabama citizens as they relate to the practice of medicine by physicians and physician assistant."[70] The disciplinary authority of these boards is particularly important for rooting out health care providers who are putting patients at

---

[69] Isaac D. Buck, _Regulation of Professionals and Facilities in the United States_, _in_ THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 293, 296 (David Orentlicher and Tamara K. Hervey eds 2020-2021).

[70] _E.g._, Amber M. Parish, _A Better Guide to Prescribing, Particularly During Public Health Emergencies: Legislation & Policy Governing Prescribing to Self & Family_, 6 LOY. U. CHI. J. REG. COMPLIANCE 109, 120 (2021).

significant risk. As one author puts it in the *Oxford Handbook of Comparative Health Law*:

> Boards also are responsible for imposing disciplinary sanctions against those who violate various state statutes that govern their practice. Once a violation is alleged—which can be reported by patients—the alleged violation is investigated by the boards, and the board makes a decision. For serious allegations, the board will hold hearings before meting out a penalty against the professional.

> Sanctions can include a host of various penalties, from letters of concern to competency evaluations, to fines or restrictions. The most serious penalty can include suspension or revocation of the professional's license. This, for a healthcare professional, can be seen as the equivalent of a professional "death penalty" because revocation of one's license ends the professional's ability to see patients or otherwise practice medicine. And even though this regulatory regime is state-centric, professionals cannot simply relocate: at least regarding medical doctors, states communicate with one another through the Federation of State Medical Board Physician Data Center by sharing physician disciplinary actions with other states.[71]

66.     Through so-called "scope of practice" rules, the "state regulatory board for each of the licensed healthcare professions has some degree of authority to define the legitimate boundaries of that profession and to exclude others."[72]

67.     *Accreditation of Hospitals and Other Health Care Facilities*. The state power of licensure of facilities is another powerful tool in ensuring safe and effective care:

---

[71] Buck, *supra* note 69, at 296-297

[72] Sandra Johnson, Structure of Governmental Oversight of Quality in Healthcare, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 489, 506 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

Facilities must be licensed by the state in which they are located. In order to be licensed under state law, hospitals and other healthcare facilities must certify that they offer a number of services and treatments. These requirements ensure that healthcare facilities are adequately staffed and resourced to promote patient health. A state agency board, made up of a number of healthcare experts, is empowered to certify and license many different types of healthcare facilities. . . . Boards are empowered to set and enforce regulations to ensure that the healthcare facilities are safe for their patients.[73]

68.    *Health Care Fraud and Abuse Laws*. At both the federal and state levels there are a series of laws that police fraud ("activities undertaken with the intent to deceive, coupled with another's detrimental reliance on the misrepresentation") and abuse ("self-interested behavior done without the intent to deceive, such as creative interpretation of payment rules or other instances of profligate spending on medical care that is at the margin of fraudulent practice") by health care providers.[74] The relevant laws here include the federal Civil False Claims Act (FCA), Medicare and Medicaid Anti-Kickback Statute (AKS), Ethics in Patient Referrals Act of 1989 (often called the "Stark Law"), and state Medicaid fraud statutes.[75]

69.    *Medical Malpractice Liability*. The state law of medical malpractice also protects patient safety when faced with unreasonable physician conduct. A

---

[73] Buck, *supra* note 69, at 305 (internal quotation marks omitted).
[74] Joan H. Krause, *Fraud and Abuse Law in the United States*, *in* THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 375, 377 (David Orentlicher and Tamara K. Hervey eds 2020-2021).
[75] *See generally* HALL ET AL., *supra* note 3, Chap. 4.

patient injured by the action of a physician, including as to provision of gender affirming care to a minor patient, may sue in medical malpractice. Proving medical malpractice follows the regular rules of tort liability, requiring proof of duty, breach, causation (proximate cause and cause in fact) and damages.[76] Traditionally, one important divergence between medical malpractice and ordinary negligence law is that under medical malpractice claims, the standard of care is determined in reference to professional custom, local or national, as opposed to the duty of reasonable care familiar in other negligence torts.[77] In fact, as it currently exists across the states we see a myriad of approaches:

> In many states, it is unclear whether professional custom determines breach or whether a broader "reasonable physician" test is used. Other states are split between one of these two tests, but the boundaries between them are blurred. States appealing to professional custom may expand the scope of evidence to be considered or allow the opposing party to prove that competent practice sometimes does, or should, depart from prevailing practice. On the other hand, almost all states following a reasonableness standard still regard it as a professionally-determined standard and thus look predominantly to expert testimony about what other medical professionals regard as reasonable.[78]

70.     Another important variation in medical malpractice law is that some jurisdictions recognize a "two schools of thought" or "respectable minority" rule,

---

[76] *E.g.,* DAN B. DOBBS, PAUL T. HAYDEN AND ELLEN M. BUBLICK, THE LAW OF TORTS § 283 (2d ed. 2023 update).
[77] *See id.*; HALL ET AL., *supra* note 3, at 198-211.
[78] HALL ET AL., *supra* note 3, at 222.

which precludes "liability if the defendant can show that physicians are divided over the appropriate treatment course and the defendant picked one of the acceptable options," with "[s]ome courts requir[ing] the plaintiff to show that a 'considerable number' of physicians have adopted the defendant's choice, while others simply require that those in the minority be regarded as 'respectable' by their peers" and still others requiring both.[79]

71.    While I am not an expert on Alabama law, my understanding is that Alabama has codified the applicable duty for physicians by statute as follows:

> In performing professional services for a patient, a physician's, surgeon's, or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill, and diligence used by hospitals generally in the community.[80]

72.    _Liability for Breach of Informed Consent_. Several of Defendants' experts express concern that the informed consent process for gender-affirming care is inadequate and offer that in part as a justification for Alabama's approach to criminalize the prescribing of FDA-approved drugs in the relevant cases. For example:

---

[79] Anna B. Laakmann, _When Should Physicians Be Liable for Innovation?_, 36 Cardozo L. Rev. 913, 925 (2015) and cases cited therein.
[80] Ala. Code § 6-5-484.

- Dr. Curlin writes that "Doctors do not possess and are not providing information sufficient to enable children or parents to make 'informed' decisions. The absence of well-designed and controlled studies makes it impossible to give minors and their parents information sufficient to consider their consent duly informed, and the plaintiffs' experts by their own admission are misinforming patients regarding that fact. 'Caveat emptor' does not meet the bar required for consent to be duly informed within clinical medicine and clinical research. It is not enough to say 'we don't know' without doing the careful, incremental research to generate information needed for a consent to be duly informed." Expert Report of Dr. Farr Curlin, M.D., ¶ 71. He ultimately concludes that: "Doctors do not possess and are not providing information sufficient to enable children or parents to make 'informed' decisions." Expert Report of Dr. Farr Curlin, M.D., p. 18.

- Dr. Cantor states his belief that "[t]here does not exist—indeed, there cannot exist—an age-appropriate way to equip a child who has not gone through puberty to make an informed decision about age-inappropriate issues, such as their future sex life, choices of sexual partners, sex-bonded relationships including marriage, and sacrificing ever experiencing orgasm." Expert Report of James Cantor, Ph.D., ¶ 236.

- Dr. Nangia suggests her ultimate conclusion is that "Informed Consent Is Not Attainable for Medical or Surgical Transition" because "Minors lack decision-making capacity for medical and surgical transition.  In my opinion, due to a lack of full neurologic, psychosocial, and cognitive developmental maturation, adolescents are unable to understand, reason through, appreciate, and comprehend the impact of the shortcomings of the present data, the lack of FDA indication for puberty blockers, the long-term risks and consequences of transition, and the low-grade rating of studies that have been used to support medical and surgical transition.  Hence, they lack decision-making capacity." Expert Report of Geeta Nangia, M.D., p. 80, ¶ 154. Indeed, this impossibility of informed consent is the central claim of both her primary and supplemental expert reports. *See* Expert Report of Geeta Nangia, M.D., ¶¶71-170; Supplemental Expert Report of Geeta Nangia, M.D., pp 16-18, 21-22, 31-32, 34-35, 45-47, 50-51, 54-55.

73.     Of course, the determination of whether informed consent has been appropriately given should always be done at the level of the particular patient (and in this case patient and parent). For this reason, it is my opinion that, contrary to Defendants' experts, the ethical doctrine of informed consent cannot justify a blanket omnibus criminalization of an FDA-approved therapy for *every* potential minor patient in Alabama.

74.     In any event, state law currently polices the quality of informed consent by providing a tort cause of action for breach of informed consent. Beginning in the 1960s, the law begins to attach liability in cases where a physician did not adequately inform the patient of the risks and benefits of the proposed treatment or nontreatment. The tort typically requires the plaintiff to demonstrate four elements:

> (1) failure to disclose a specific risk in violation of the governing standard; (2) materialization of that risk; (3) "causation"--that is, if the risk been disclosed, the patient, or a prudent person in the patient's position, would not have proceeded as she did; and (4) that no exception, like emergency, excuses the failure to disclose.[81]

75.     My understanding is that the Supreme Court of Alabama has specified the tort's elements under Alabama law as follows:

> The elements of a cause of action against a physician for failure to obtain informed consent are: (1) the physician's failure to inform the plaintiff of all

---

[81] Robin Fretwell Wilson, *The Promise of Informed Consent*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 213, 217 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

material risks associated with the procedure, and (2) a showing that a reasonably prudent patient, with all the characteristics of the plaintiff and in the position of the plaintiff, would have declined the procedure had the patient been properly informed by the physician.[82]

76.     If a patient receives gender-affirming care and later comes to regret it and feel as though the risks were inadequately conveyed to them or that the physician should have known that patient was incapable of giving consent, the patient could potentially seek a remedy under this tort. Such an approach would better distinguish patients who have and have not given informed consent than the blanket approach adopted by the state of making the care wholly unavailable.

77.     In sum, like all states Alabama has a robust set of laws that help protect patients, including pediatric patients. In this case it has taken the extremely rare step of choosing to criminalize the prescribing of an FDA-approved drug.

## V.     CONCLUSION

78.     In sum, for the reasons set forth above I conclude: (1) contrary to the suggestion of some of Defendants' experts, there is nothing unusual or nefarious that can be gleaned from the fact that the drugs relevant to this case are being prescribed for "off-label" use. In fact, off-label prescribing is extremely common,

---

[82] Phelps v. Dempsey, 656 So. 2d 377, 380 (Ala. 1995). Some states limit tort actions relating to informed consent to cases involving surgery. Without purporting to be an expert on Alabama law, in my initial review of its case law I have not seen any authority suggesting such a limitation and have seen some cases involving the tort and a non-surgical fact pattern. See Nolen v. Peterson, 544 So. 2d 863 (Ala. 1989) (psychiatric medication); Stone v. Alza Corp., No. CV-06-CO-4892-S, 2007 WL 9717749 (N.D. Ala. Mar. 15, 2007) (Duragesic patch).

particularly for pediatric populations; (2) the use of criminal law relating to prescribing an FDA-approved drug by licensed practitioners is exceedingly rare. Defendants' experts have defended Alabama's extraordinary actions in this case as essential to protect the safety of patients and ensure informed consent. In fact, the state's regulation of healthcare systems in all states, including Alabama, have a series of interlocking mechanisms to protect patients from these kinds of concerns. These mechanisms include physician licensure and discipline, hospital accreditation, medical malpractice liability, and liability for breach of informed consent. The propriety of Alabama's decision to criminalize prescribing of an FDA-approved drug should be evaluated with this background in mind.

Executed April 1, 2024

I. Glenn Cohen

# Appendix A

HARVARD LAW SCHOOL

I. GLENN COHEN

DEPUTY DEAN
JAMES A. ATTWOOD AND LESLIE WILLIAMS PROFESSOR OF LAW
FACULTY DIRECTOR, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY,
BIOTECHNOLOGY, AND BIOETHICS
Griswold Hall 503, Harvard Law School
Cambridge, MA  02138
(617) 496-2518~ igcohen@law.harvard.edu ~Twitter: @CohenProf

## CURRENT POSITION

HARVARD LAW SCHOOL,

       Deputy Dean, 2020 - present
       James A. Attwood and Leslie Williams Professor of Law, 2017 - present
       Professor, 2013-2017
       Assistant Professor, 2008-2013

HARVARD LAW SCHOOL, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY, BIOTECHNOLOGY, AND BIOETHICS,     Faculty Co-Director, 2009 - 2014
       Faculty Director, 2014 - present

THE BROAD INSTITUTE OF MIT AND HARVARD, Associate Member, 2013 - present

## EDUCATION

HARVARD LAW SCHOOL, J.D., *magna cum laude*, 2003
       Sears Prize, 2001 (awarded to the two 1L students with the highest GPA)
       *Harvard Law Review*, Primary Editor
       Hewlett Fellow in Law and Negotiation, Harvard Law School Program on Negotiation, 2001-2003
       Derek Bok Center Award of Distinction in Teaching and nominee for the Joseph R. Leven Memorial Teaching Prize as Teaching Fellow for Michal Sandel's "Justice" course at Harvard College

UNIVERSITY OF TORONTO, Hon. B.A. Bioethics (Philosophy) and Psychology, *High Distinction* (GPA 3.99), 2000
       Alumni Association Scholar (awarded to five graduating students)
       Cressy Award for Student Leadership
       Theses: *The Ethics of Deception in Psychological Research; The Janus Problem: Insanity, Automatism, and the Problem of Disposition in Anglo-American Criminal Law.*

## PUBLICATIONS

### (1) REPRODUCTIVE TECHNOLOGY/REPRODUCTION/GENETICS

**Books**

CONSUMER GENETIC TECHNOLOGIES: ETHICAL AND LEGAL CONSIDERATIONS (Cambridge University Press, 2021) (co-editor with Nita A. Farahany, Henry T. Greely, Carmel Shachar)

REPRODUCTIVE TECHNOLOGIES AND THE LAW (Carolina Academic Press, 3rd ed. 2022) (co-author with Judith Daar, Seema Mohapatra, Sonia Suter)

**Law Journals**

*The Constitution and the Rights Not to Procreate*, 60 STANFORD L. REV. 1135 (2008) (reprinted in Brazil *in* MEI AMBIENTE, DIREITO E BIOTECNOLOGIA (Thiago Pires Oliveira ed. 2010))

*The Right Not to Be a Genetic Parent?*, 81 S. CAL. L. REV. 1115 (2008) (selected for the 2008 Stanford-Yale Junior Faculty Forum)

*Intentional Diminishment, The Non-Identity Problem, and Legal Liability*, 60 HASTINGS L. J. 347 (2008) (Solicited) (reprinted in BIOETHICS AND THE LAW (Ramkistaiah Jillaed. 2009-2010)

*Trading-Off Reproductive Technology and Adoption: Does Subsidizing IVF Decrease Adoption Rates and Should It Matter?* 95 MINN. L. REV. 485 (2010) (co-authored with Daniel Chen) (selected for the 2010 Stanford-Yale Junior Faculty Forum)

*Regulating Reproduction: The Problem with Best Interests*, 96 MINN. L. REV. 423 (2011)

*Rethinking Sperm Donor Anonymity: Of Changed Selves, Non-Identity, and One Night Stands,* 100 GEO. L. J. 431 (2012)

*Beyond Best Interests*, 96 MINN. L. REV. 1187 (2012)

*Can you Buy Sperm Donor Identification? An Experimen*t, 10 J. EMPIRICAL LEG. STUDIES 715 (2013) (co-authored with Travis Coan)

*What (If Anything) Is Wrong with Human Enhancement? What (If Anything) Is Right with It?*, 49 TULSA L. REV. 645 (2014) (festschrift honoring Einer Elhauge)

*Complexifying Commodification, Consumption, ART, and Abortion*, 43 J. L. MED. & ETHICS 307 (2015) (solicited commentary)

*My Body, My Bank*, 93 TEXAS L. REV. 953 (2015) (Book Review) (Solicited)

*Sperm Donor Anonymity and Compensation: An Experiment with American Sperm Donors*, 3 J. L. & BIOSCIENCES 468 (2016) (co-authored with Travis Coan, Michelle Ottey, and Christina Boyd)

*Germ-Line Gene Editing and Congressional Reaction in Context: Learning from Almost 50 Years of Congressional Reactions to Biomedical Breakthroughs*, 30 J.L. & HEALTH 20 (2017) (co-authored with Russell Spivak and Eli Y. Adashi)

*Moratoria and Innovation in the Reproductive Sciences: Of Pretext, Permanence, Transparency, and Time-Limits*, 15 J. HEALTH. & BIOMED. L. 5 (2018) (co-authored with Russell Spivak and Eli Y. Adashi)

*The Lumbering Crawl Toward Human Germline Editing*, 46 J. L. MED. & ETHICS 1010 (2018) (co-authored with Eli Y. Adashi)

*Gene Editing Sperm and Egg (Not Embryos): Does it Make a Legal or Ethical Difference?*, 48 J. L. MED. & ETHICS 619 (2020) (co-authored with Eli Y. Adashi and Jacob S. Sherkow)

**Medical, Science and Bioethics Journals**

*Prohibiting Anonymous Sperm Donation and the Child Welfare Error*, 41 HASTINGS CTR. REP, Sept-Oct, 13 (2011)

*When Potential Does Not Matter: What Developments in Cellular Biology Tell Us About the Concept of Legal Personhood*, 13 AM. J. BIOETHICS 38 (2013) (co-authored with Jonathan Will and Eli Adashi)

*Of Modest Proposals and Non-Identity: A Comment on The Right to Know Your Genetic Parents*, 13 AM. J. BIOETHICS 45 (2013) (peer- reviewed)

2

*Made-to-Order Embryos for Sale – A Brave New World?*, 368 N. ENGL. J. MED. 2517 (2013) (co-authored with Eli Adashi)

*Plan B: Access to Emergency Contraception in the Legal and Political Cross Hairs*, 88 CONTRACEPTION 477 (2013) (co-authored with Eli Adashi and Lisa Sullivan)

*When Religious Freedom Clashes with Access to Care*, 370 N. ENG. J. MED. 596 (2014) (co-authored with Holly Fernandez Lynch and Gregory D. Curfman)

*Transatlantic Lessons in Regulation of Mitochondrial Replacement Therapy: prospect of disease-free children for women carriers through MRT*, 348 SCIENCE 178 (2015) (co-authored with Julian Savulescu & Eli Y. Adashi)

*Going Germline: Mitochondrial Replacement as a Guide to Genome Editing*, 164 CELL 832 (2016) (co-authored with Eli Y. Adashi)

*Preventing Mitochondrial DNA Diseases: One Step Forward, Two Steps Back*, 315 JAMA 273 (2016) (co-authored with Eli Y. Adashi)

*Embryo Disposition Disputes: Controversies and Case Law*, 46 HASTINGS CTR. REP. 13 (2016) (co-authored with Eli Y. Adashi)

*The FDA is prohibited from Going Germline,* 353 SCIENCE 545 (2016) (co-authored with Eli Y. Adashi) (peer-reviewed)

*Mitochondrial Replacement Therapy: The IOM Report and Its Aftermath*, 17 NATURE REVIEWS GENETICS 189 (2016) (co-authored with Eli Y. Adashi)

*Embryo Disposition Disputes: Controversies and Case Law*, 46 HASTINGS CTR. REP., July-Aug. 2016, at 13.

*Disruptive Reproductive Technologies,* 9 SCIENCE TRANS. MED. eaag2959 (2017) (Jan 11, 2017) (co-authored with George Q. Daley and Eli Y. Adashi)

*Preventing Mitochondrial Disease: A Path Forward*, 131 OBSTETRICS & GYNECOLOGY 553 (2018) (co-authored with Eli Y. Adashi)

*Building Capacity for a Global Genome Editing Observatory: Conceptual Challenges*, 36 TRENDS IN BIOTECHNOLOGY 639 (2018) (co-authored with Krishana Sahu et al.)

*Building Capacity for a Global Genome Editing Observatory: Institutional Design*, 36 TRENDS IN BIOTECHNOLOGY 641 (2018) (co-authored with Krishana Sahu et al.)

*Personhood and the Three Branches of Government*, 378 N. ENG. J. MED. 2453 (2018) (co-authored with Eli Y. Adashi)

*Losing Embryos, Finding Justice: Life, Liberty, and the Pursuit of Personhood*, 169 ANN. INTERN. MED. 800 (2018) (co-authored with Eli Y. Adashi and Dov Fox)

*The Ethics of Heritable Genome Editing New Considerations in a Controversial Area*, 320 JAMA 2531 (2018) (co-authored with Eli Y. Adashi)

*Commentary, The Lumbering Crawl Toward Human Germline Editing*, 46 J. LAW, MED. AND ETHICS 1010 (2019) (co-authored with Eli Y. Adashi)

*Stem Cell-Derived Human Gametes: The Public Engagement Imperative*, 25 TRENDS IN MOLEC. MED. 165 (2019) (co-authored with Eli Y. Adashi, Jacob H. Hanna, Azim M. Surani, and Katsuhiko Hayashi)

*A Troubling Court Decision for Reproductive Rights: Legal Recognition of Fetal Standing to Sue*, 322 JAMA 23 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*Heritable Genome Editing: Is a Moratorium Needed?*, 322 JAMA 104 (2019) (co-authored with Eli Y. Adashi)

*How Bans on Germline Editing Deprive Patients with Mitochondrial Disease,* 37 NATURE BIOTECH. 589 (2019) (co-authored with Eli Y. Adashi and Vardit Ravitsky)

*Genetic Testing, Insurance Discrimination, and Medical Research: What the US Can Learn from Peer Countries*, 1198 NATURE MED. 1198 (2019) (co-authored with Jean-Christophe Bélisle-Pipon, Effy Vayena and Robert C Green)

*Fertility Fraud, Legal Firsts, and Medical Ethics*, 134 OBSTETRICS & GYNECOLOGY 918 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*Heritable Genome Editing—Edited Eggs and Sperm to the Rescue?,* 322 JAMA 1754 (2019) (co-authored with Eli Y. Adashi)

*Reproduction Reimagined*, 1 F & S REPORTS 7 (2020) (co-authored with Eli Y. Adashi)

*Commentary on 'Gestation, Equality and Freedom: Ectogenesis as a Political Perspective'*, 46 J. MED. ETHICS 87 (2020) (solicited)

*Heritable Genome Editing: The International Commission Report,* 324 JAMA 1941 (2020) (co-authored with Eli Y. Adashi)

*The Regulation of Mitochondrial Replacement Techniques Around the World*, 21 ANN. REV. GENOMICS & HUM. GEN. 565 (2020) (co-authored with  Eli Y. Adashi, Sara Gerke, César Palacios-González, and Vardit Ravitsky)

*Disruptive Synergy: Melding of Human Genetics and Clinical Assisted Reproduction*, 1 CELL REP. MED. 100093 (2020) (co-authored with Eli Y. Adashi)

*Heritable Human Genome Editing: The Public Engagement Imperative*, 6 CRISPR J. 434 (2020) (co-authored with Eli Y. Adashi et al.)

*The Case for Remedial Germline Editing – the Long-Term View*, 323 JAMA 1762 (2020) (co-authored with Eli Y. Adashi)

*Therapeutic Germline Editing: Sense and Sensibility*, 36 TRENDS IN GEN. 315 (2020) (co-authored with Eli Y. Adashi)

*What Would Responsible Remedial Human Germline Editing Look Like?*, 38 NATURE BIOTECHNOLOGY 398 (2020) (co-authored with Eli Y. Adashi)

*Assisted Same-Sex Reproduction: The Promise of Haploid Stem Cells?,* 29 STEM CELLS AND DEVELOPMENT 1417 (2020) (co-authored with Eli Y. Adashi)

*Legal and Ethical Issues in the Report Heritable Human Genome Editing*, 51 HASTINGS CTR. REP. 8 (2021) (co-authored with Eli Y. Adashi)

4

*Governing Human Germline Editing Through Patent Law*, 326 JAMA 1149 (2021) (co-authored with Jacob S. Sherkow and Eli Y. Adashi)

*Mitochondrial Disease: Replace or Edit?*, 373 SCIENCE 1200 (2021) (co-authored with Eli Y. Adashi, Donald S. Rubenstein, Jim A. Mossman, and Eric A. Schon)

*CRISPR Immunity: A Case Study for Justified Somatic Genetic Modification?* 48 J. MED. ETHICS 83 (2022) (co-authored with Eli Y. Adashi)

*Handle with Care: The WHO Report on Human Genome Editing*, 52 HASTINGS CENTER REPORT 10 (2022) (co-authored with Eli Y. Adashi and Jake Sherkow)

*Who Will Oversee the Ethical Limits of Human Embryo Research?*, 40 NATURE BIOTECH. 463 (2022) (co-authored with Eli Y. Adashi)

*The Enduring Allure of Person-Affecting Arguments for Reproductive Technologies*, 22 AM. J. BIOETHICS 44 (2022) (co-authored with Eli Y. Adashi)

*The End of Anonymous Sperm Donation in Colorado: A Step Forward to a New Fertility Future in the US?* 328 JAMA 1903 (2022) (co-authored with Seema Mohapatra and Eli Y. Adashi)

*Borrowed Wombs: On Uterus Transplants and the "Right to Experience Pregnancy"*, 2022 U. CHI. L. F. 127 (2023)

*Maternal Mortality Crisis and Extension of Medicaid Postpartum Coverage*, 330 JAMA 911 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Assisted Reproduction Post-Dobbs: The Prospect of Legislative Protection*, 4 F & S REPORTS 128 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Misplaced Embryo: Legal Parenthood in 'Embryo Mix-Up' Cases*, _ J. MED. ETHICS _ (2023) (co-authored with Vardit Ravitsky & Shelly Simana)

*Preimplantation Sex Selection Via In Vitro Fertilization: Time for a Reappraisal*, 4 F & S REPORTS 241(2023) (co-authored with Vitaly A. Kushnir and Eli Y. Adashi)

*CRISPR Therapy of Sickle Cell Disease: The Dawning of the Gene Editing Era*, _ AM. J. MED. _ (2024) (co-authored with Eli Y. Adashi and Philip A. Gruppuso)

*Ethical and Legal Challenges in Assisted Same-Sex Conception Through In Vitro Gametogenesis*, 30 NATURE MED. 322 (2024) (co-authored with Eli Y. Adashi and Katsuhiko Hayashi)

*The Alabama Embryo Decision—The Politics and Reality of Recognizing "Extrauterine Children,"* _ JAMA _ (2024) (co-authored with Rebecca S. Feinberg and Michael S. Sinha)

## Book Chapters

*Las Recientes Controversias sobre la Tecnología Reproductiva en los Estados Unidos, in* I. GLENN COHEN & ESTER FARNOS AMORÓS, DERECHO Y TECNOLOGÍAS REPRODUCTIVAS, FUNDACIÓN COLOQUIO JURÍDICO EUROPEO, MADRID 11 (2014) (trans. Pablo de Lora).

*Sperm and Egg Donor Anonymity: Legal and Ethical Issues*, in THE OXFORD HANDBOOK OF REPRODUCTIVE ETHICS (Leslie Francis ed., 2015-2016)

5

*Religion and Reproductive Technology*, *in* LAW, RELIGION, AND HEALTH IN THE UNITED STATES 360 (Holly Fernandez Lynch, I. Glenn Cohen, and Elizabeth Sepper eds., Cambridge University Press, 2017)

*Gestational Surrogacy Agreements: Enforcement and Breach*, in HANDBOOK OF GESTATIONAL SURROGACY 85 (E. Scott Sills ed., Cambridge University Press, 2016) (co-authored with Katherine Kraschel)

*The Regulation of Reproduction and Best Interests Analysis*, in THE OXFORD HANDBOOK OF CHILDREN AND THE LAW 19 (James G. Dwyer, ed., Oxford University Press, 2019)

*The Right(s) to Procreate and Assisted Reproductive Technologies in the United States*, in THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 1009 (Tamara K. Hervey and David Orentlicher eds., Oxford University Press, 2021)

*MRT in the United States*, *in* REPRODUCTION REBORN 129 (Diana M. Bowman, Karinne Ludlow, and Walter G. Johnson eds., Oxford University Press, 2023) (co-authored with Priyanka Menon & Eli Y. Adashi)

*Reproductive Technologies and Embryo Destruction After Dobbs*, in ROE V. DOBBS: THE PAST, PRESENT AND FUTURE OF A CONSTITUTIONAL RIGHT OF ABORTION _ (Geoffrey R. Stone and Lee Bolinger eds., 2024)

*Bioethics, Reproduction, and Extending Life*, *in* LAW AND THE 100 YEAR LIFE _ (Abbe Gluck, Anne Alstott & Eugene Rusyn eds., 2024)

**Online Law Review Contributions**

*Trading-Off Reproductive Technology and Adoption: A Response to Appleton and Pollak*, 96 MINN. L. REV. HEADNOTES 1 (2012) (co-authored with Daniel Chen) (Responding to Susan Appleton and Robert A. Pollak, *Exploring the Connections Between Adoption and IVF: Twibling Analyses*, 95 MINN L. REV. HEADNOTES 60 (2011), responding to our earlier article)

*Burying Best Interests of the Resulting Child: A Response to Professors Crawford, Alvaré, and Mutcherson*, 97 MINN. L. REV. HEADNOTES 1 (2012) (Responding to Bridget J. Crawford, *Authentic Reproductive Regulation*, 96 MINN. L. REV. HEADNOTES 31 (2012), Helen M. Alvaré, *A Response to Professor I. Glenn Cohen's* Regulating Reproduction: The Problem with Best Interests, 96 MINN. L. REV. HEADNOTES 8 (2012), and Kimberly M. Mutcherson, *In Defense of Future Children: A Response to Cohen's* Beyond Best Interests, 96 MINN. L. REV. HEADNOTES 46 (2012)).

*The Science, Fiction, and Science Fiction of Unsexed Motherhood, Online Symposium*, HARV. J. L. & GENDER ONLINE (2012)

**(2) MEDICAL TOURISM/GLOBALIZATION OF HEALTH CARE**

**Books**
THE GLOBALIZATION OF HEALTH CARE: LEGAL AND ETHICAL CHALLENGES (Oxford University Press 2013) (editor, and contributing introduction and chapter)

PATIENTS WITH PASSPORTS: MEDICAL TOURISM, LAW, AND ETHICS (Oxford University Press, 2014)

**Law Journals**

*Protecting Patients with Passports*: *Medical Tourism, Medical Tourism and the Patient-Protective Argument*, 95 IOWA L. REV. 1467 (2010) (selected by the American Society of Law, Medicine, and Ethics for the Health Scholar Award Program)

6

*Medical Tourism, Access to Health Care, and Global Justice*, 52 VA J. INT'L L. 1 (2011) (reprinted with a new introduction in 1 CAN. J. COMP. & CONTEMP. L 1 (2015))

*Circumvention Tourism*, 97 CORNELL L. REV. 1309 (2012)

*Transplant Tourism: The Ethics and Regulation of International Markets for Organs,* 41 J. L. MED. & ETHICS 269 (2013) (solicited)

*Medical Tourism, Medical Migration, and Global Justice: Implications for Biosecurity in a Globalized World*, 25 MED. L. REV. 200 (2017) (solicited)

**Medical, Public Health and Bioethics Journals**

*Medical Tourism: The View from Ten Thousand Feet*, 40 HASTINGS CTR. REP., Mar.-Apr. 2010, at 11-12.

*Medical Tourism, Consumer-Driven Healthcare, and Patient Protection*, 17 LAHEY CLINIC MED. ETHICS J. 4 (Spring 2010)

*How to Regulate Medical Tourism (and Why Bioethicists Should Care?)*, 12 J. DEVELOPING WORLD BIOETHICS 9 (2012)

*S.H. and Others v. Austria and Circumvention Tourism,* REPRODUCTIVE BIOMEDICINE ONLINE (2012) (solicited) (available at http://www.sciencedirect.com/science/article/pii/S1472648312004531)

*Ethical and Legal Implications of the Risks of Medical Tourism for Patients: A Qualitative Study of Canadian Health and Safety Representatives' Perspectives,* 3 BRITISH MED. J. OPEN e002302 (2013) (co-authored with Valorie A. Crooks, Leigh Turner, Janet Brister, Jeremy Snyder, Vicky Casey, Rebecca Whitmore)

*Navigating Physicians' Ethical and Legal Duties to Patients Seeking Unproven Interventions Abroad*, 61 CANADIAN FAMILY PHYSICIAN 584-586 (2015) (co-authored with Jeremy Snyder, Krystyna Adams, Y.Y. Chen, Daniel Birch, Valorie A. Crooks, Judy Illes, and Amy Zarzeczny)

*Inbound Medical Tourism to Barbados: A Qualitative Examination of Local Lawyers' Prospective Legal and Regulatory Concerns*, 15 BMC HEALTH SERVICES RESEARCH 291 (2015) (co-authored with Valorie A. Crooks, Krystyna Adams, Rebecca Whitmore and Jeffrey Morgan)

*Circumvention Medical Tourism and Cutting Edge Medicine: The Case of Mitochondrial Replacement Therapy*, 25 INDIANA J. GLOB. L. STUD. 439 (2018) (Invited as the George P. Smith Lecture)

*Regulation of Stem Cell Therapy Travel*, 4 CURRENT STEM CELL REPORTS 220 (2018) (co-authored with Shelly Simana)

*Traveling Across States for Prohibited Treatments: Medical Aid in Dying and Looming Battles Over Abortion*, 38 J. GEN. INTERN. MED. 517 (2022) (co-authored with Thaddeus M. Pope and Eli Y. Adashi)

**Book Chapters**

*Medical Outlaws or Medical Refugees? An Examination of Circumvention Tourism*, *in* RISKS AND CHALLENGES IN MEDICAL TOURISM: UNDERSTANDING THE GLOBAL MARKET FOR HEALTH SERVICES CONTROVERSIES IN THE EXPLODING INDUSTRY OF GLOBAL MEDICINE 207 (Jill Hodges et al eds., Praeger, 2012).

7

*Las Fronteras del Derecho Sanitario: Globalización y Turismo Médico*, *in* LAS FRONTERAS DEL DERECHO BIO-SANITARIO, ANUARIO DE LA FACULTAD DE DERECHO DE LA UNIVERSIDAD AUTÓNOMA DE MADRID 21 (Pablo de Lora y Blanca Mendoza eds. 2014) (trans. Pablo de Lora).

*Medical Tourism: Bioethical and Legal Issues, in* ROUTLEDGE COMPANION TO BIOETHICS (John D. Arras et al. eds, Routledge 2014)

*Medical Tourism for Services Legal in the Home and Destination Country: Legal and Ethical Issues, in* BODIES ACROSS BORDERS: THE GLOBAL CIRCULATION OF BODY PARTS, MEDICAL TOURISTS AND PROFESSIONALS (Brownyn Parry et al. eds, Ashgate, 2015).

*Medical Tourism for Services Illegal in Patients' Home County*, *in* HANDBOOK ON MEDICAL TOURISM AND PATIENT MOBILITY (Neil Lunt et al. eds, 2015)

*Traveling for Assisted Suicide*, *in* EUTHANASIA AND ASSISTED SUICIDE: GLOBAL VIEWS ON CHOOSING TO END LIFE 373 (Michael J. Cholbi ed., Praeger 2017)

**(3) ORGAN TRANSPLANTATION**

**Law Journals**

*Regulating The Organ Market: Normative Foundations for Market Regulation*, 77 LAW AND CONTEMP. PROB. 71 (2014) (symposium)

*Organs Without Borders? Allocating Transplant Organs, Foreigners, and the Importance of the Nation State (?)*,77 LAW AND CONTEMP. PROB. 175 (2014) (symposium)

**Medical, Economics, and Bioethics Journals**

*Selling Bone Marrow – Flynn v. Holder*, 366 N. ENG. J. MED. 296 (2012)

*Can the Government Ban Organ Sale? Recent Court Challenges and Future of U.S. Law on Selling Human Organs and Other Tissue*, 12 AM. J. TRANSPLANTATION 1983 (2012)

*A Fuller Picture of Organ Markets*, 14 AJOB 19 (2014)

*On Repugnance, Distribution, and the Global Kidney Exchange*, 75 J. INST. THEOR. ECON. 20 (2019)

**(4) ABORTION, CONTRACEPTION, AND STEM CELLS**

**Law Journals**

*Fetal Pain, Abortion, Viability and the Constitution*, 39 J. L. MED. & ETHICS 235 (2011) (co-authored with Sadath Sayeed)

*Are all Abortions Equal? Should there be Exceptions to the Criminalization of Abortion for Rape and Incest?*,  43 J. L. MED. & ETHICS 87 (2015) (solicited)

*Personhood Seeking New Life with Republican Control*, 93 INDIANA L. J. 499 (2018) (co-authored with Jonathan Will and Eli Adashi)

**Medical, Philosophy, Public Health and Bioethics Journals**

*Balancing Religious Freedom and Health Care Access*, LAHEY CLINIC MED. ETHICS J. 7 (Fall 2015)

(co-authored Holly Fernandez Lynch)

*Human Embryonic Stem-Cell Research Under Siege — Battle Won but Not the War*, 364 N. ENG. J. MED. e48 (2011) (co-authored with Eli Adashi)

*Sherley v Sebelius and the Future of Stem Cell Research*, 308 JAMA 2087 (2012) (co-authored with Eli Adashi and Jeremy Feigenbaum)

*Balancing Religious Freedom and Health Care Access*, LAHEY HEALTH JOURNAL OF MEDICAL ETHICS 7 (Fall 2015) (co-authored with Holly Fernandez Lynch)

*Artificial Wombs and Abortion Rights*, 47 HASTINGS CTR. REP, July 2017, Back Cover

*The Law and Ethics of Fetal Burial Requirements for Reproductive Health Care*, 322 JAMA 1347 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*June Medical Services v Russo—The Future of Abortion Access in the U.S.*, 1 JAMA HEALTH FORUM e201107 (2020) (co-authored with Eli Y. Adashi and Dov Fox)

*The Supreme Court, the Texas Abortion Law (SB8), and the Beginning of the End of Roe v Wade?*, 326 JAMA 1473 (2021) (co-authored with Eli Y. Adashi and Lawrence O. Gostin)

*The Supreme Court Ruling on the Texas Abortion Law: Beginning to Unravel Roe v. Wade,* 327 JAMA 621 (2022) (co-authored with Rebecca Reingold and Lawrence O. Gostin)

*The Next Two Decades of Mifepristone at FDA: History as Destiny*, 109 CONTRACEPTION 1 (co-authored with Eli Y. Adashi, Rohit S. Rajan, & Daniel P. O'Mahony)

*The End of Roe v Wade and New Legal Frontiers on the Constitutional Right to Abortion*, 328 JAMA 325 (2022) (co-authored with Lawrence O. Gostin and Melissa M. Murray)

*Travel to Other States for Abortion After Dobbs*, 22 AM. J. BIOETHICS 42 (2022) (peer commentary)

*What Overturning Roe v Wade May Mean for Assisted Reproductive Technologies in the US.* 328 JAMA 15 (2022) (co-authored with Eli Y. Adashi and Judith Daar)

*EMTALA After Dobbs: Emergency Reproductive Health Care in the Balance*, 176 ANN. INTERN. MED. 268 (2022) (co-authored with Eli Y. Adashi)

*Alliance for Hippocratic Medicine v. FDA-Dobbs's Collateral Consequences for Pharmaceutical Regulation*, 388 N. ENGL J. MED. e29 (2023) (co-authored with Patti J. Zettler and Eli Y. Adashi)

*The Mifepristone Litigation: Untangling the Implications of the Fifth Circuit's Decision for Abortion Access and the U.S. Food and Drug Administration*, 176 ANN. INTERN. MED. 1666 (2023) (co-authored with Patti J. Zettler, Lewis A. Grossman, and Eli Y. Adashi)

*The New Threat to Abortion Access in the United States—The Comstock Act*, 330 JAMA 405 (2023) (co-authored with Eli Y. Adashi and Mary Ziegler)

*The FDA Declares Levonorgestrel a Nonabortifacient-A 50-Year Saga Takes a Decisive Turn*, 4 JAMA HEALTH FORUM e232257 (2023) (co-authored with Eli Y. Adashi and Allen J. Wilcox)

*The New Threat to Medical Travel for Abortion*, _ J. AM. FAM. MED. _ (2023) (co-authored with Eli Y. Adashi and Mary Ziegler)

9

*Paying for Over-the-Counter Contraception: The Opill Quandary*, 137 J. AM. FAM. MED. 200 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

## (5) RESEARCH ETHICS

### Books

HUMAN SUBJECTS RESEARCH REGULATION: PERSPECTIVES ON THE FUTURE (co-editor with Holly Fernandez Lynch) (MIT Press, 2014)

SPECIMEN SCIENCE: ETHICS AND POLICY IMPLICATIONS (MIT Press, 2017) (co-editor with Holly Fernandez Lynch, Barbara E. Bierer, and Suzanne M. Rivera)

### Medical, Philosophy, Science Public Health and Bioethics Journals

*In the Wake of Guatemala: The Case for Voluntary Compensation and Remediation,* 102 AM. J. PUB. HEALTH e4 (2012) (co-authored with Eli Adashi)

*Streamlining Review by Accepting Equivalency*, 14 AJOB 11 (2014) (co-authored with Holly Fernandez Lynch) (peer commentary)

*Clinical Trials and the Right to Remain Silent*, 174 JAMA INTERNAL MEDICINE E1 (co-authored with Michelle Mello)

*Confronting Biospecimen Exceptionalism in Proposed Revisions to the Common Rule*, 46 HASTINGS CENTER REPORT 4 (2016) (co-authored with Holly Lynch and Barbara Bierer)

*When Clinical Trials Compete: Prioritising Study Recruitment,* 43 J. MED. ETHICS 803 (2017), (co-authored with Luke Gelinas, Holly Fernandez Lynch, and Barbara Bierer)

*Institutions as an Ethical Locus of Research Prioritisation,* 43 J. MED. ETHICS 816 (2017), (co-authored with Luke Gelinas, Holly Fernandez Lynch, and Barbara Bierer)

*Public Engagement, Notice-and-Comment Rulemaking, and the Common Rule*, 39 IRB: ETHICS & HUM. RES. (January/February 2017) (co-authored with Holly Fernandez Lynch and Barbara E. Bierer)

*Using Social Media as a Research Recruitment Tool: Ethical Issues and Recommendations,* 17 AM. J. BIOETHICS 3 (2017) (co-authored with Luke Gelinas, Robin Pierce, Sabune Winkler, Holly Fernandez Lynch, and Barbara Bierer)

*Nonexceptionalism, Research Risks, and Social Media: Response to Open Peer Commentaries on "Using Social Media as a Research Recruitment Tool: Ethical Issues and Recommendations,* 17 AM. J. BIOETHICS W1 (2017) (co-authored with Luke Gelinas, Robin Pierce, Sabune Winkler, Holly Fernandez Lynch, and Barbara Bierer)

*Stakeholder Perspectives and Ethical and Regulatory Oversight Issues in Patient-Centered Outcomes Research*, 40 IRB: ETHICS & HUMAN RES. 7 (2018) (co-authored with Emily A. Largent, Holly Fernandez Lynch, Melissa Abraham, Ronen Rozenblum, Avni Gupta, and Joel S. Weissman)

*A Framework for Ethical Payment to Research Participants*, 378 N. ENGL. J. MED. 766 (2018) (co-authored with Luke Gelinas, Emily A. Largent, Susan Kornetsky, Barbara Bierer, and Holly Fernandez Lynch)

*On Scarcity and the Value of Clinical Trials*, 4 AJOB 71 (2018) (co-authored with Luke Gelinas, Barbara Bierer, and Holly Fernandez Lynch) (peer commentary)

*Truth in Advertising: Disclosure of Participant Payment in Research Recruitment Materials*, 52 THERAP. INN. & REG. SCI 68 (2018) (co-authored with Luke Gelinas, Holly Fernandez Lynch, Emily A. Largent, Carmel Shachar, and Barbara Bierer)

*Patient-Centered Outcomes Research: Stakeholder Perspectives and Ethical and Regulatory Oversight Issues*, ETHICS AND HUM. RES. 7 (Jan/Feb 2018) (co-authored with Emily Largent, et al.,)

*IRB Oversight of Patient-Centered Outcomes Research: A National Survey of IRB Chairpersons*, 13 J. EMP. RES. ON HUM. RES. ETHICS 421 (2018) (co-authored with Joel Weissman, et al.)

*Oversight of Patient-Centered Outcomes Research: Recommendations from a Delphi Panel*, 169 ANN. INTERN. MED. 559 (2018) (co-authored with Luke Gelinas, et al.)

*Organ Donor Intervention Trials and Risk to Bystanders: An Ethical Analysis*, 16 CLIN. TRIALS 463 (2019)

*Overcoming Obstacles to Experiments in Legal Practice*, 367 SCIENCE 1078 (2020) (co-authored with Holly Fernandez Lynch and Jim Greiner)

*Observational Studies must be Reformed before the Next Pandemic*, 29 NATURE MED. 1903 (2023) (co-authored with Emily E. Ricotta, Annette Rid & Nicholas G. Evans)

*Ethically Cleared to Launch?*, 381 SCIENCE 1408 (2023) (co-authored with Vasiliki Rahimzadeh et al.)

**Book Chapters**

*From Medical Experimentation to Non-Medical Experimentation: What Can and Cannot be Learned from Medicine as to the Ethics of Legal and Other Non-Medical Experiments?, in* MEDICAL EXPERIMENTATION: PERSONAL INTEGRITY AND SOCIAL POLICY, NEW EDITION (Oxford University Press 2016) (co-authored with James D. Greiner)

**(6) BIOETHICS AND HEALTH CARE IN SPORTS**

**Reports/Law Journals**

*Protecting and Promoting the Health of NFL Players: Legal and Ethical Analysis and Recommendations* (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch) (reprinted in 7 HARV. J. SPORTS & ENT. L. 1 (2016))

*Evaluating NFL Player Health and Performance: Legal and Ethical Issues*, 165 U. PENN. L. REV. 227 (2017) (co-authored with Jessica L. Roberts, Christopher R. Deubert, and Holly Fernandez Lynch)

*Comparing Health-Related Policies and Practices in Sports: The NFL and Other Professional Leagues* (2017) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch) (reprinted in 8 HARV. J. SPORTS & ENT. L. 1 (2017))

*The NFL as a Workplace: The Prospect of Applying Occupational Health and Safety Law to Protect NFL Workers*, 60 ARIZ. L. REV. 291 (2018) (co-authored with Adam M. Finkel, Christopher R. Deubert, Orly Lobel, and Holly Fernandez)

**Bioethics, Medical, and Other Journals**

*NFL Player Health: A Proposal to Address NFL Club Doctors' Conflicts of Interest and to Promote Player Trust*, 46 HASTINGS. CTR. REP. S2 (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch)

*NFL Player Health: A Response to Commentaries*, 46 HASTINGS. CTR. REP. S45 (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch)

*The Legality of Biometric Screening of Professional Athletes*, 17 AM. J. BIOETHICS 65 (2016) (co-authored with Jessica L. Roberts, Christopher R. Deubert, and Holly Fernandez Lynch) (peer commentary)

*Life on an Emotional Roller Coaster: NFL Players and Their Family Members' Perspectives on Player Mental Health*, 12 J. CLIN. SPORTS PSYCH. 404 (2018) (co-authored with Sarah A. McGraw, Christopher R. Deubert, and Holly Fernandez Lynch, Alexandra Nozzolillo, and Lauren Taylor)

*NFL or 'Not For Long'? Transitioning Out of the NFL*, 42 J. SPORT BEHAV. 461 (2019) (co-authored with Sarah A. McGraw, Christopher R. Deubert, and Holly Fernandez Lynch, and Alixandra Nozzolillo)

**(7) HEALTH LAW, HEALTH POLICY, AND BIOETHICS GENERALLY**

**Books**

HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 10th ed. 2024) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, Nicholas Bagley, and Nadia Sawicki)

COVID-19 AND THE LAW: DISRUPTION, IMPACT AND LEGACY (Cambridge University Press 2023) (co-edited with Abbe R. Gluck, Katherine Kraschel, and Carmel Shachar)

READINGS IN COMPARATIVE HEALTH LAW AND BIOETHICS (Carolina Academic Press, 3[d] ed. 2020) (co-author with Nathan Cortez and Tim Jost)

HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 9th ed. 2018) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, and Nicholas Bagley)

BIOETHICS AND PUBLIC HEALTH LAW (Wolters Kluwer, 4th ed. 2018) (co-author with Mary Anne Bobinski, David Orentlicher, and Mark A. Hall)

MEDICAL LIABILITY AND TREATMENT RELATIONSHIPS (Wolters Kluwer, 4th ed. 2018) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, and Nicholas Bagley)

THE OXFORD HANDBOOK OF U.S. HEALTH CARE LAW (Oxford University Press, 2015-2016) (co-editor with Bill Sage and Allison Hoffman)

NUDGING HEALTH: HEALTH LAW AND BEHAVIORAL ECONOMICS (John Hopkins University Press, 2016) (co-editor with Holly Fernandez Lynch and Christopher Robertson)

**Medical, Philosophy, Public Health and Bioethics Journals**

*The Constitutionality of the ACA's Medicaid-Expansion*, 366 N. ENG. J. MED. 103 (2012) (co-authored with Jim Blumstein)

*The Taxing Power and the Public's Health*, 367 N. ENG. J. MED. 1777 (2012) (co-authored with Michelle Mello)

12

*Conscientious Objection, Coercion, the Affordable Care Act, and U.S. States*, 19 ETHICAL PERSPECTIVES 163 (2013) (solicited)

*Private Rights and the Public Interest in Drug and Medical Device Litigation*, 180 JAMA INT. MED. 299 (2019) (co-authored with Nicholas Bagley)

*Medical Crowdfunding for Unproven Medical Treatments: Should Gofundme Become a Gatekeeper?*, 49 HASTINGS CTR. REP. 32 (2019)

*Potential Legal Liability for Withdrawing or Withholding Ventilators During COVID-19: Assessing the Risks and Identifying Needed Reforms*, 323 JAMA 1901 (2020) (co-authored with Andrew M. Crespo and Douglas B. White)

*A Legislative Blueprint for the Next Pandemic,* 1 JAMA HEALTH FORUM e e200882 (2020) (co-authored with Eli Y. Adashi)

*Universal Masking in the United States: The Role of Mandates, Health Education, and the CDC*, 323 JAMA 837 (2020) (co-authored with Lawrence O. Gostin & Jeffrey P. Koplan)

*The Interstate Medical Licensure Compact: Attending to the Underserved*, 325 JAMA 1607 (2021) (co-authored with Eli Y. Adashi and Winston L. McCormick)

*Industry-Sponsored Speaker Programs-End of the Line?*, 325 JAMA 1835 (2021) (co-authored with Eli Y. Adashi)

*An Overdue Executive Order: Reinstating the National Bioethics Commission*, 21 AM. J. MED. S0002 (2021) (co-authored with Eli Y. Adashi)

*Legislation to Criminalize Gender-Affirming Medical Care for Transgender Youth*, 325 JAMA 2251 (2021) (co-authored with Jack L. Turban and Katherine L. Kraschel)

*The American Rescue Plan Act of 2021: A Historic if Transitory Expansion of the ACA*, 326 JAMA 27 (2021) (co-authored with Eli Y. Adashi)

*Enforcement of the Physician Payments Sunshine Act: Trust and Verify*, 326 JAMA 807 (2021) (co-authored with Eli Y. Adashi)

*Antiviral Therapeutics: Key to Curbing the COVID-19 Pandemic*, 135 AM. J. MED. 411 (2022) (co-authored with Eli Y. Adashi)

*The Biden Administration's Proposal for an Advanced Research Projects Agency for Health (ARPA-H)*, 2 JAMA HEALTH FORUM e212972 (2021) (co-authored with Eli Y. Adashi)

*When Failure Is Not an Option: The Independent Panel Pandemic Report*, 135 AM. J. MED. 131 (2021) (co-authored with Eli Y. Adashi)

*The Affordable Care Act Resurrected: Curtailing the Ranks of the Uninsured*, 326 JAMA 1797 (2021) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Pandemic Preparedness Program: Reimagining Public Health*, 327 JAMA 219 (2022) (co-authored with Eli Y. Adashi)

*Health Care Fraud: The Leading Violation of the False Claims Act*, 135 AM. J. MED. 558 (2022) (co-authored with Eli Y. Adashi)

13

*The CMS Vaccine Mandate at the Supreme Court: A Hippocratic Imperative*, 135 AM. J. MED. 1035 (2022) (co-authored with Eli Y. Adashi)

*Stamping Out the Medicaid Coverage Gap: An ACA Imperative*, 135 AM. J. MED. E225 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*And Then There Were Three: The Decimation of the Affordable Care Act (ACA) CO-Ops*, 35 *J. Am. Bd. Fam. Med.* 867 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Legislation Restricting Gender-Affirming Care for Transgender Youth: Politics Eclipse Healthcare,* 3 CELL REP. MED. 100719 (2022) (co-authored with Katherine L. Kraschel, Alexander Chen, Jack L. Turban)

*Criminalizing Medical Errors Will Undermine Patient Safety*, 11 NATURE MED. 2241 (2022) (co-authored with Eli Y. Adashi)

*Failing Grade: The Pandemic Legacy of HHS*, 64 AM. J. PREVENTATIVE MED. 142 (2022) (co-authored with Eli Y. Adashi)

*The Nursing Home Crisis: Prognosis Guarded*, 135 AM. J. MED 1130 (2022) (co-authored with Eli Y. Adashi)

*The PREVENT Pandemics Act: A National Road Map*, 64 AM. J. PREVENTATIVE MED. 298 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Mounting Violence in Health Care: Is It Time to Harden the Sanctuary?*, 135 AM. J. MED 1391 (2022) (co-authored with Eli Y. Adashi)

*Transparency and the Doctor-Patient Relationship - Rethinking Conflict-of-Interest Disclosures*, 386 N. ENGL. J MED. 300 (2022) (co-authored with Eli Y. Adashi and Jacob T. Elberg)

*Persistent Inpatient Harm: The Unremitting Challenge of Patient Safety*, 38 J. GEN. INTERN. MED. 1532 (2023) (co-authored with Eli Y. Adashi)

*Should the Administration for Strategic Preparedness and Response Lead the National Response to a Public Health Emergency?* 4 JAMA HEALTH F. e224824 (2023) (co-authored with with Eli Y. Adashi and Daniel P. O'Mahony)

*Persistent Inpatient Harm: The Unremitting Challenge of Patient Safety*, 38 J. GEN. INTERN. MED. 1532 (2023) (co-authored with Eli Y. Adashi)

*Workplace Violence in Health Care: Protective Federal Legislation Must not be Delayed*, 136 AM. J. MED. 611 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Inflation Reduction Act: Recasting the Medicare Prescription Drug Plans*, 64 AM. J. PREVENTATIVE MED. 936 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*State Approaches to Stopping Violence Against Health Care Workers*, 331 JAMA 825 (2024) (co-authored with Rebekah J. Ninan and Eli Y. Adashi)

*The Pregnant Workers Fairness Act—a Bipartisan Step Forward*, 5 JAMA HEALTH F. e235386 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Medicare Advantage: Growth Amidst Mounting Scrutiny*, 36 J. AM. BD. FAM. MED. 1062 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

14

**Book Chapters**

*Was the Medicaid Expansion Coercive?*, *in* THE AFFORDABLE CARE ACT DECISION: PHILOSOPHICAL AND LEGAL IMPLICATIONS 253 (Fritz Allhoff and Mark Hall, eds. 2014)

*The Relationship Between Bioethics and U.S. Health Law*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH CARE LAW (I. Glenn Cohen et al eds., 2015-2016)

*Health Law and Ethics*, in HEALTH SYSTEMS SCIENCE (Susan Skochelak, ed.; 2d edition, Elsevier 2019) (co-authored with Bill Sage and Allison Hoffman)

*Vaccine Tourism, Federalism, Nationalism*, *in* COVID-19 AND THE LAW: DISRUPTION, IMPACT AND LEGACY (I. Glenn Cohen, Abbe R. Gluck, Katherine Kraschel, and Carmel Shachar eds. 2023)


**(8) FOOD, DRUG, AND DEVICE LAW**

**Books**

DIGITAL HEALTH CARE OUTSIDE OF TRADITIONAL CLINICAL SETTINGS: ETHICAL, LEGAL, AND REGULATORY CHALLENGES AND OPPORTUNITIES (Cambridge University Press, 2024) (co-authored with Daniel B. Kramer, Julia Adler-Milstein, and Carmel Shachar)

FDA IN THE TWENTY-FIRST CENTURY: THE CHALLENGES OF REGULATING DRUGS AND NEW TECHNOLOGIES (Columbia University Press, 2015) (co-editor with Holly Fernandez Lynch)

**Law Journals**

*Make it Work! Breyer on Patents in the Life Sciences*, 128 HARV. L. REV. 481 (2014) (festschrift for Justice Breyer)

**Medical, Philosophy, Public Health, Bioethics and other Journals**

*FDA Regulation of Mobile Health Technologies* 371 N. ENG. J. MED. 372 (2014) (co-authored with Nathan Cortez and Aaron Kesselheim)

*Reconsideration of the Lifetime Ban on Blood Donation by Men Who Have Sex With Men*, 311 JAMA 337 (2014) (co-authored with Eli Y. Adashi and Jeremy Feigenbaum)

*Influence, Integrity, and the FDA: An Ethical Framework*, 357 SCIENCE 876 (2017) (co-authored with Spencer Hey, Eli Y. Adashi, and Aaron Kesselheim)

*When Science and Politics Collide: Enhancing the FDA*, 364 SCIENCE 628 (2019) (co-authored with Eli Y. Adashi and Rohit Rajan)

*Pharmaceutical Companies, Human Rights, and the Alien Tort Statute*, 49 J LAW., MED. & ETHICS 500 (2021) (co-authored with Eli Y. Adashi and Tyler Giannini)

*A Divisive Ruling on Devices — Genus Medical Technologies v. FDA*, 385 N. ENG. J. MED. 2409 (2021) (co-authored with Eli Y. Adashi and Patricia J. Zettler)

*Deadly Legacy—The 510(k) Path to Medical Device Clearance*, 157 JAMA SURG. 185 (2022) (co-authored with Eli Y. Adashi and Katina M. Robison)

15

*At-Home Diagnostics and Diagnostic Excellence Devices vs General Wellness Products*, 327 JAMA 523 (2022) (co-authored with David Simon and Carmel Shachar)

*SARS-CoV-2 Laboratory-Developed Tests: Integrity Restored*, 327 JAMA 1229 (2022) (co-authored with Eli Y. Adashi)

*Expanding the Blood Pool: The Limitations of the FDA's Current MSM Blood Deferral*, 97 Mayo Clinic Proc. 1424 (2022) (co-authored with Winston McCormick & Eli Y. Adashi)

*The FDA Struggle to Withdraw Makena: Problems With the Accelerated Approval Process*, 328 JAMA 2394 (2022) (co-authored with Daniel Aaron and Eli Y. Adashi)

*Assessing—and Extending—California's Insulin Manufacturing Initiative*, 329 JAMA 533 (2023) (co-authored with Jake Sherkow and Eli Y. Adashi)

*The FDA Modernization Act 2.0: Drug Testing in Animals is Rendered Optional*, 9 Am. J. Med. 853 (2023) (co-authored with with Eli Y. Adashi and Daniel P. O'Mahony)

*The FDA Initiative to Assure Racial and Ethnic Diversity in Clinical Trials*, 36 J. Am. B. Fam. Med. 366 (2023) (co-authored with Eli Y. Adashi)

*Patient-Assistance Programs, Kickbacks, and the Courts*, 388 N. Engl. J. Med. 2407 (2023) (co-authored with Jacob. T. Elberg and Eli Y. Adashi)

*Lawsuits Over the Price of Insulin—State Efforts for Insulin Access*. 184 JAMA Intern Med. 9 (2024) (co-authored with Daniel G. Aaron and Eli Y. Adashi)

**(9) Psychedelics and the Law**

**Law Journals**

*Patents on Psychedelics: The Next Legal Battlefront of Drug Development*, Harv. L. Rev. F. (Feb 20, 2022), https://harvardlawreview.org/2022/02/patents-on-psychedelics-the-next-legal-battlefront-of-drug-development/ (co-authored with Mason Marks)

*Microdosing Psychedelics Under Local, State, and Federal Law*, 103 B.U. L. Rev. 573 (forthcoming 2023) (co-authored with Mason Marks, David Angelatos, & Jonathan Perez-Reyzin)

**Medical, Philosophy, Public Health, Bioethics and other Journals**

*Psychedelic Therapy: A Roadmap for Wider Acceptance and Utilization*, 27 Nature Med. 1669 (2021) (co-authored with Mason Marks)

*Pressing Regulatory Challenges for Psychedelic Medicine*, 380 Science 347 (2023) (co-authored with Amy L. McGuire, Holly Fernandez Lynch, and Lewis A. Grossman)

*How Should the FDA Evaluate Psychedelic Medicine?*, 389 N. Engl. J. Med. 389 (2023) (co-authored with Mason Marks)

*Introducing Psychedelics to End-Of-Life Mental Healthcare*, 1 Nature Mental Health 920 (2023) (co-authored with Mason Marks, Brent Kious and Carmel Shachar)

**(10) AI/Digital Health/Big Data**

**Books**

BIG DATA, HEALTH LAW, AND BIOETHICS (Cambridge University Press, 2018) (co-edited with Holly Fernandez Lynch, Effy Vayena, and Urs Gasser)

RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW (Elgar Publishing, 2024) (co-edited with Barry Solaiman)

**Law Journals**

*Cops, Docs, and Code: A Dialogue Between Big Data in Health Care and Predictive Policing*, 51 U.C. DAVIS L. REV. 437 (2017) (co-authored with Harry Graver)

*Informed Consent and Medical Artificial Intelligence: What to Tell the Patient?*, 108 GEORGETOWN L. J. 1426 (2020) (symposium)

*The Algorithmic Explainability "Bait and Switch,"* 108 MINN L. REV. 857 (2023) (co-authored with Boris Babic)

*Locating Liability for Medical AI*, 73 DEPAUL L. REV. 339 (2024) (co-authored with W. Nicholson Price II) (invited as part of Clifford Tort Symposium 2023)

*Towards Responsible Quantum Technology: Safeguarding, Engaging and Advancing Quantum R&D*, 15 HASTINGS SCI. & TECH. L.J. 63 (2024) (co-authored with Mauritz Kop, Mateo Aboy, Eline De Jong, Urs Gasser, Timo Minssen, Mark Brongersma, Teresa Quintel, Luciano Floridi, and Raymond Laflamme)

**Medical, Bioethics and Other Journals**

*The Legal and Ethical Concerns That Arise From Using Complex Predictive Analytics In Health Care*, 33 HEALTH AFF. 1139 (2014) (co-authored with Bernard Lo, Ruben Amarasingham, and Anand Shah)

*Consensus Statement on Electronic Health Predictive Analytics: A Guiding Framework*, eGEMS Vol. 4, Issue 1 (2016) (co-authored with Ruben Amarasingham, Anne-Marie J. Audet, and many others)

*Your Money or Your Patient's Life? Ransomware and Electronic Health Records*, 167 ANNALS OF INT. MED. 587 (2017) (co-authored with Sharona Hoffman and Eli Y. Adashi)

*HIPAA and Protecting Health Information in the 21st Century*, 320 JAMA 231 (2018) (co-authored with Michelle Mello)

*The Ethics of Smart Pills and Self-Acting Devices: Autonomy, Truth-Telling, and Trust at the Dawn of Digital Medicine*, 9 AJOB 38 (2018) (co-authored with Craig M. Klugman, Laura B. Dunn, and Jack Schwartz)

*Response to Open Peer Commentaries on "The Ethics of Smart Pills and Self-Acting Devices: Autonomy, Truth-Telling, and Trust at the Dawn of Digital Medicine"*, 9 AJOB W4 (2018) (co-authored with Craig M. Klugman, Laura B. Dunn, and Jack Schwartz)

*Machine Learning in Medicine: Addressing Ethical Challenges*, 15 PLOS MED e1002689 (2018) (co-authored with Effy Vayena and Alessandro Blasimme)

*Privacy in the Age of Medical Big Data*, 25 NATURE MED. 37 (2019) (co-authored with W. Nicholson Price II)

*Big Data, Big Tech, and Protecting Patient Privacy*, 322 JAMA 1141 (2019) (co-authored with Michelle Mello)

*Ethical and Legal Issues of Ingestible Electronic Sensors*, 2 NATURE ELECTRONICS 329 (2019) (co-authored with Sara Gerke, Helen Yu & Timo Minssen)

17

*How Does Emerging Patent Case Law in the US and Europe Affect Precision Medicine?*, 37 NATURE BIOTECH. 1118 (2019) (co-authored with Mateo Aboy, Kathleen Liddell, Cristina Crespo, Johnathon Liddicoat, Sara Gerke & Timo Minssen)

*Potential Liability for Physicians Using Artificial Intelligence*, 322 JAMA 1765 (2019) (co-authored with W. Nicholson Price II and Sara Gerke)

*Algorithms on Regulatory Lockdown in Medicine*, 366 SCIENCE 1202 (2019) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Ethical and Legal Aspects of Ambient Intelligence in Hospitals*, 323 JAMA 601 (2020) (co-authored with Serena Yeung and Sara Gerke)

*The European Artificial Intelligence Strategy: Implications and Challenges for Digital Health*, 7 LANCET DIGITAL HEALTH e376 (2020) (co-authored with Theodoros Evgeniou, Sara Gerke, and Timo Minssen)

*Digital Smartphone Tracking for COVID-19: Public Health and Civil Liberties in Tension,* 323 JAMA 2371 (2020) (co-authored with Lawrence O. Gostin and Daniel J. Weitzner)

*The Need for a System View to Regulate Artificial Intelligence/Machine Learning-Based Software as Medical Device*, 3 NPJ DIGITAL MED. 53 (2020) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Regulatory, Safety, and Privacy Concerns of Home Monitoring Technologies During COVID-19*, 26 NATURE MED. 1176 (2020) (co-authored with Sara Gerke, Carmel Shachar, and Peter R. Chai)

*Regulatory Responses to Medical Machine Learning*, 7 J. LAW & BIOSCI. Isaa002 (2020) (co-authored with Timo Minssen, Sara Gerke, Mateo Aboy, and Nicholson Price)

*Ethical and Legal Aspects of Remote Monitoring of Medical Devices*, 98 MILBANK Q. 1257 (2020) (co-authored with Sara Gerke and Daniel B. Kramer)

*Invited Perspective: How Much Can Potential Jurors Tell Us about Liability for Medical AI?*, 62 J. NUCL. MED. 15 (2020) (co-authored with W. Nicholson Price II and Sara Gerke)

*When Machine Learning Goes Off the Rails*, HARVARD BUSINESS REVIEW (Jan-Feb 2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Artificial Intelligence and Liability in Medicine: Balancing Safety and Innovation*, 98 MILBANK Q. 629 (2021) (co-authored with Sara Gerke, George Maliha, and Ravi Parikh)

*Digital Health Passes in the Age of COVID-19: Are "Vaccine Passports" Lawful and Ethical?*, 325 JAMA 1933 (2021) (co-authored with Lawrence O. Gostin & Jana Shaw)

*Beware Explanations from AI in Health Care*, 373 SCIENCE 284 (2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Direct-to-Consumer Medical Machine Learning and Artificial Intelligence Applications*, 3 NATURE MACHINE INTELLIGENCE 283 (2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Beyond Security Patches: Fundamental Incentive Problems in Health Care Cybersecurity*, 2 JAMA HEALTH FORUM e212969 (2021) (co-authored with Genevieve P. Kanter and Jack Kufhal)

18

*Sharing Clinical Notes: Potential Medical-Legal Benefits and Risks*, 327 JAMA 717 (2021) (co-authored with Charlotte Blease & Sharona Hoffman)

*Emerging Ethical Considerations for the Use of Artificial Intelligence in Ophthalmology*, 2 OPHTHALMOLOGY SCI. 100141 (2022) (co-authored with Nicholas G. Evans, Danielle M. Wenner, Duncan Purves, Michael F. Chiang, Daniel S.W. Ting, and Aaron Y. Lee)

*How NFTs Could Transform Health Information Exchange*, 375 SCIENCE 500 (2022) (co-authored with Kristin Kostick-Quenet, Kenneth D. Mandl, Timo Minssen, Urs Gasser, Isaac Kohane, and Amy McGuire)

*Mitigating Racial Bias in Machine Learning*, 50 J. LAW, MED. & ETHICS 50, 92 (2022) (co-authored with Kristin M. Kostick-Quenet, Sara Gerke, Bernard Lo, James Antaki, Faezah Movahedi, Hasna Njah, Lauren Schoen, Jerry E. Estep,and J.S. Blumenthal-Barby)

*The Hospital-At-Home Presents Novel Liabilities for Physicians, Hospitals, Caregivers, and Patients*, 28 NATURE MED. 438 (2022) (co-authored with David A. Simon, Celynne Balatbat & Anaeze C. Offodile II)

*Ethics-By-Design: Efficient, Fair and Inclusive Resource Allocation Using Machine Learning*, 9 J. L. & BIOSCI. (2022) (co-authored with Theodore P Papalexopoulos, Dimitris Bertsimas, Rebecca R Goff, Darren E Stewart, and Nikolaos Trichakis)

*"I'd Feel Like Someone Was Watchin' Me… Watching for a Good Reason": Perceptions Of Data Privacy, Access, And Sharing in the Context of Real-Time Prep Adherence Monitoring Among HIV-Negative MSM with Substance Use*, 26 AIDS & BEHAV. 2981 (2022) (co-authored with Georgia R. Goodman, Anna Kikut, Maria J. Bustamante, Lizette Mendez, Yassir Mohamed, Carmel Shachar, Sara Gerke, Edward W. Boyer, Rochelle K. Rosen, Kenneth H. Mayer, Conall O'Cleirigh and Peter R. Chai)

*When Is a Change Significant? The Update Problem of Apps in Medical and Behavioral Research*, 44 ETHICS & HUM. RES. 2 (2022) (co-authored with Carmel Shachar, Sara Gerke, Walker Morrell, Aaron Kirby, and Barbara E. Bierer)

*Skating The Line Between General Wellness Products and Regulated Devices: Strategies and Implications,* 9 J. L. & BIOSCI. (2022) (co-authored with David A Simon and Carmel Shachar)

*Should Alexa Diagnose Alzheimer's?: Legal and Ethical Issues with At-Home Consumer Devices*, 3 CELL REP. MED. 100692 (2022) (co-authored with Barbara Evans, David A Simon and Carmel Shachar)

*Unsettled Liability Issues for "Prediagnostic" Wearables and Health-Related Products*, 328 JAMA 1391 (2022) (co-authored with David A Simon and Carmel Shachar)

*Hospital-at-Home: Multistakeholder Considerations for Program Dissemination and Scale*, 100 MILLBANK Q. 673 (2022) (co-authored with Kushal T. Kadakia, Celynne A. Balatbat, Albert L. Siu, Consuelo H. Wilkins, Victor J. Dzau and Anaeze C. Offodile)

*Navigating a Path Toward Routine Recording in the Operating Room*, 278 ANN. SURG. e474 (2023) (co-authored with Alexander Langerman et al.)

*HIPAA is a Misunderstood and Inadequate Tool for Protecting Medical Data*, 29 NATURE MED. 1900 (2023) (co-authored with Carmel Shachar, Romain Cadario, and Carey K. Morewedge)

*The Challenges for Regulating Medical Use of ChatGPT and Other Large Language Models*. 330 JAMA 315 (2023) (co-authored with Timo Minssen and Effy Vayena)

19

*How AI Can Learn from the Law: Putting Humans in the Loop Only on Appeal*, 6 NPJ DIGITAL MED. 160 (2023) (co-authored with Boris Babic, Sara Gerke, Qiong Xia, Theodoros Evgeniou & Klaus Wertenbroch)

*AI as a Mental Health Therapist for Adolescents*, 177 JAMA PEDIATR. 1253 (2023) (co-authored with Doug J Opel & Brent M Kious)

*Navigating the New Risks and Regulatory Challenges of GenAI*, HARV. BUS. REV. (2023) (co-authored with Theodoros Evgeniou & Martin Husovec)

*Using Digital Technologies to Diagnose in the Home: Recommendations from A Delphi Panel*, 7 NPJ DIGITAL MED. _ (2024) (co-authored with David A. Simon, Sara Raza & Carmel Shachar)

## Book Chapters

*Is There a Duty to Share Health Care Data?*, *in* BIG DATA, HEALTH LAW, AND BIOETHICS 209 (I. Glenn Cohen, Holly Fernandez Lynch, Effy Vayena, and Urs Gasser eds., Cambridge University Press 2018)

*A Doctor's Touch: What Big Data in Health Care Can Teach Us About Predictive Policing, in* POLICING AND ARTIFICIAL INTELLIGENCE (John L.M. McDaniel and Ken G. Pease eds., Routledge, 2020) (co-authored with Harry Graver)

*Ethical and Legal Challenges of Artificial Intelligence-Driven Healthcare, in* ARTIFICIAL INTELLIGENCE IN HEALTHCARE 295 (Adam Bohr & Kaveh Memarzadeh eds., Elsevier 2020) (co-authored with Sara Gerke and Timo Minssen)

*The Ethics and Laws of Medical Big Data, in* THE CAMBRIDGE HANDBOOK OF LIFE SCIENCE, INFORMATION TECHNOLOGY AND HUMAN RIGHTS 48 (Marcello Ienca et al. eds., Cambridge University Press 2021) (co-authored with Hrefna D. Gunnarsdóttir, Timo Minssen and Sara Gerke)

*Liability for Use of Artificial Intelligence in Medicine, in* RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW (Barry Solaiman & I. Glenn Cohen eds, forthcoming) (co-authored with W. Nicholson Price II & Sara Gerke)

*The Development, Implementation, and Oversight of Artificial Intelligence in Health Care: Legal and Ethical Issues, in* I HANDBOOK OF BIOETHICAL DECISIONS 441 (Erick Valdés & Juan Alberto Lecaros eds., Springer 2023) (co-authored with Sara Gerke & Jenna Becker)

*Assessing Public and Private Rights of Action to Police Health Data Sharing, in* THE LAW AND ETHICS OF DATA SHARING IN HEALTH SCIENCES 33 (Marcelo Corrales Compagnucci et al. eds 2024) (co-authored with Carmel Shachar & David Simon)

## (10) OTHER PROJECTS

### Books

H20 FREE CIVIL PROCEDURE TEXTBOOK, available at **http://brk.mn/cohencivpro**

IDENTIFIED V. STATISTICAL LIVES: ETHICAL, LEGAL, AND MEDICAL PERSPECTIVES (co-editor with Nir Eyal and Norman Daniels and contributing a chapter, Oxford University Press, 2015)

LAW, RELIGION, AND HEALTH IN THE UNITED STATES (co-editor with Holly Fernandez Lynch and Elizabeth Sepper, Cambridge University Press, 2017)

20

TRANSPARENCY IN HEALTH AND HEALTH CARE IN THE UNITED STATES (co-editor with Holly Fernandez Lynch, Carmel Shachar, Barbara J. Evans, Cambridge University Press, 2019)

DISABILITY, HEALTH, LAW, AND BIOETHICS (co-editor with Carmel Shachar, Anita Silvers, Michael Ashley Stein, Cambridge University Press, 2020)

**Law Journals**

*Making Residency Work Hour Rules Work,* 41 J. L. MED. & ETHICS 310 (2013) (co-authored with Charles A. Czeisler and Christopher P. Landrigan)

*Rationing Legal Services,* 5 J. L. ANALYSIS 221 (2013)

*This is Your Brain on Human Rights: Moral Enhancement and Human Rights*, 9 LAW AND ETHICS OF HUMAN RIGHTS 1 (2015) (symposium, Human Rights and Human Minds)

**Medical, Philosophy, Public Health and Bioethics Journals**

*Physicians, Medical Ethics, and Execution by Lethal Injection,* 311 JAMA 2375 (2014) (co-authored with Robert Truog and Mark Rockoff)

*Hospital-Based Active Shooter Incidents: Sanctuary Under Fire*, 313 JAMA 1209 (2015) (co-authored with Eli Y. Adashi and Hans Gao)

*Effect of Patient and Therapist Factors on Suicide Risk Assessment*, 39 DEATH STUD. 433 (2015) (co-authored with NC Berman, A. Stark, A. Cooperman, and S. Wilhelm)

*Clinical Decision Making Regarding Suicide Risk: Effect of Patient and Clinician Age*, 40 DEATH STUD. 269 (2016) (co-authored with NC Berman, ES Tung, N Matheny, and S. Wilhelm)

*Effect of a Legal Prime on Clinician's Assessment of Suicide Risk,* 40 DEATH STUD. 61 (2016) (co-authored with NC Berman, A Sullivan, and S. Wilhelm)

*Designing Development Programs for Non-Traditional Antibacterial Agents*, 10 NATURE COMM. 3416 (2019) (co-authored with John H. Rex, Holly Fernandez Lynch, Jonathan J. Darrow and Kevin Outterson)

*Preventing Female Genital Mutilation in the United States: The Legal Threat to Effective Action*, 110 AM. J. PUB. HEALTH 813 (2020) (co-authored with Nikolas Bowie, Megan Jones, and Eli Y. Adashi)

*Honoring the Public Trust: Curbing the Bane of Physician Sexual Misconduct*, 9 J. L. & BIOSCI. (2022) (co-authored with Kunal K. Sindhu, Adam C. Schaffer, Rebecca Haw Allensworth, and Eli Y. Adashi)

*Hospital at Home Receives a New Lease on Life: A Promising if Uncertain Future*, 136 AM. J. MED. 958 (2023) co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Affirmative Action Ruled Unconstitutional: Options for Building a Diverse Health Care Workforce*, 330 JAMA 1031 (2023) (co-authored with Eli Y. Adashi and Philip A. Gruppuso)

*Remote Patient Monitoring: A Leading Anchor of the 'Hospital-at-Home' Paradigm* 137 AM. J. MED. 81 (2024) co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

**Book Chapters**

*Litigation and the Statistical v. Identified Lives Issue: On Standing, Ripeness, and Class Actions*, IN IDENTIFIED V. STATISTICAL LIVES: ETHICAL, LEGAL, AND MEDICAL PERSPECTIVES (I. Glenn Cohen, Nir Eyal, and Norman Daniels eds., 2015)

*On the Human Right to Health: Statistical Lives, Contingent Persons, and Other Difficult Questions*, IN HUMAN RIGHTS, DEMOCRACY, AND LEGITIMACY IN A WORLD OF DISORDER (Silja Voeneky & Gerald Neuman eds., Cambridge University Press, 2018)

**(11) PRE-FELLOWSHIP WORK**

Case Comment, *Supreme Court of New Jersey Holds that Preembryo Disposition Agreements Are Not Binding When One Party Later Objects*, *J.B. v. M.B.*, 115 HARV. L. REV. 701 (2001)

*Note, Gore, Gibson, and Goldsmith: The Evolution of Internet Metaphors in Law and Commentary*, 16 HARV. J. L. TECH. 265 (2002) (co-authored with Jonathan Blavin)

*Note, The Price of Everything, the Value of Nothing: Reframing the Commodification Debate*, 117 HARV. L. REV. 689 (2003)

*Therapeutic Orphans, Pediatric Victims? The Best Pharmaceuticals for Children Act and Existing Pediatric Human Subject Protection*, 58 FOOD & DRUG L. J. 661 (2003)

*Negotiating Death: ADR and End of Life Decision-making*, 9 HARV. NEGOTIATION L. REV. 253 (2004) (awarded a CPR Institute for Dispute Resolution Award of Excellence)

*Negotiating in the Shadow of Death*, DISPUTE RESOLUTION MAGAZINE 12 (Fall 2004)

**OP-EDS AND WRITING FOR PUBLIC AUDIENCES**

*Mississippi's Ambiguous Personhood Amendment*, New York Times, Oct 31, 2011, available at http://www.nytimes.com/2011/10/31/opinion/mississippis-ambiguous-personhood-amendment.html (co-written with Jonathan Will)

*Guatemalans Used in Experiments Deserve Compensation,* New York Times, July 4, 2011, available at http://www.nytimes.com/2012/07/05/opinion/guatemalans-used-in-experiments-deserve-compensation.html?_r=1&adxnnl=1&adxnnlx=1345907160-K8WS0SLJalIknr/t6qtBmg (co-written with Holly Lynch)

*The Flawed Basis Behind Fetal-pain Abortion Laws*, Washington Post, Aug 1, 2012, available at http://www.washingtonpost.com/opinions/the-flawed-basis-behind-fetal-pain-abortion-laws/2012/08/01/gJQAS0w8PX_story.html?hpid=z4

*It is Time for the U.S. to Cover IVF (for Gays and Lesbians too)*, Huffington Post, March 18, 2013, available at http://www.huffingtonpost.com/dov-fox/it-is-time-for-the-us-to-_b_2900323.html

*Some Insurance Companies Ask Their Customers to Cross the Border for Care*, The New Republic, July 7, 2014 (co-authored with Adam Teicholz), available at http://www.newrepublic.com/article/118546/some-insurance-companies-ask-customers-cross-border-care

*Nudging the FDA*, The American Interest, Vol. 10, No. 2, October 17, 2014 (co-authored with William Nicholson Price II), available at http://www.the-american-interest.com/2014/10/17/nudging-the-fda/

22

*New Blood Donor Policy, Same Gay Stigma,* New York Times, May 21, 2015 (co-authored with Eli Y. Adashi), available at http://www.nytimes.com/2015/05/21/opinion/new-blood-donor-policy-same-gay-stigma.html?ref=opinion&_r=1)

*The Non-Spaces of Medical Tourism*, 40 Harvard Design Magazine, Spring 2015, available at http://www.harvarddesignmagazine.org/issues/40/the-non-spaces-of-medical-tourism

*How is it Even Possible For Sofia Vergara's Embryos to Sue Her? A Harvard Law Prof Weighs In*, Refinery 29, Dec. 8, 2016, available at http://www.refinery29.com/2016/12/132368/sofia-vergara-embryo-lawsuit-explained

*When NFL Calls the Doctor*, Boston Globe, Nov. 17, 2016 (co-authored with Holly Fernandez Lynch and Chris Deubert), available at https://www.bostonglobe.com/opinion/2016/11/17/when-nfl-calls-doctor/ZXmx9C3zAFBScgXGZb22gL/story.html

*Artificial Wombs are Coming. They Could Completely Change the Debate over Abortion*, Vox, Aug. 23, 2017, available at https://www.vox.com/the-big-idea/2017/8/23/16186468/artificial-wombs-radically-transform-abortion-debate

*Smart Pills Can Transmit Data to Your Doctors, But What About Privacy?*, New Scientist, Sept.19, 2018 (co-authored with Alex Pearlman), available at https://www.newscientist.com/article/2180158-smart-pills-can-transmit-data-to-your-doctors-but-what-about-privacy/

*Creating Eggs and Sperm From Stem Cells: The Next Big Thing in Assisted Reproduction?*, Stat News, June 5, 2019 (co-authored with Alex Pearlman), available at https://www.statnews.com/2019/06/05/creating-eggs-sperm-stem-cells/

*Protect the Doctors and Nurses Who Are Protecting Us,* New York Times, April 1, 2020, (co-authored with Andrew M. Crespo and Douglas B. White), available at https://www.nytimes.com/2020/04/01/opinion/coronavirus-ventilators-doctors.html

*Maximizing Use Of Claims Data To Address COVID-19: We Need to Revisit Gobeille v. Liberty Mutual,* Health Affairs Blog, Aug 8, 2020 (co-authored with Carme Shachar and Sara Gerke), available at https://www.healthaffairs.org/do/10.1377/hblog20200805.788636/full/

*Can AI Fairly Decide Who Gets an Organ Transplant?*, Harvard Business Review, December 1, 2020 (co-authored with Boris Babic, Sara Gerke, Theodoros Evgeniou, and Nikos Trichakis), available at https://hbr.org/2020/12/can-ai-fairly-decide-who-gets-an-organ-transplant

*'Authorization' Status is a Red Herring when it Comes io Mandating Covid-19 Vaccination*, STAT News, April 5, 2021 (co-authored with Dorit R. Reiss and Carmel Shachar), available at https://www.statnews.com/2021/04/05/authorization-status-covid-19-vaccine-red-herring-mandating-vaccination/

*Can Your Employer Require that You Get Vaccinated? It Depends Where You Live*, TIME, Aug 2, 2021, available at https://time.com/6086537/covid-19-vaccine-employer-required/

*Cruise Ship Vaccine Mandates are Great. The Latest Ruling for Them Wasn't*, The Washington Post, Aug 11, 2021, available at https://www.washingtonpost.com/outlook/2021/08/11/cruise-ship-vaccine-mandate-decision-first-amendment/  (co-authored with Christopher Robertson)

*The Danger of the Supreme Court Undercutting Biden's Vaccination Rules*, TIME, Jan. 10, 2022, available at https://time.com/6138247/supreme-court-bidens-vaccination-rules/ (co-authored with Carmel Shachar)

23

*What The Supreme Court's Abortion Reversal Means for In Vitro Fertilization*, THE BOSTON GLOBE, June 30, 2022, available at https://www.bostonglobe.com/2022/06/30/opinion/what-supreme-courts-abortion-reversal-means-vitro-fertilization/ (co-authored with Judith Daar and Eli Y. Adashi)

*The Family Glitch, Premium Stacking, and the Need to Revisit Health Care Reform*, HEALTH AFFAIRS FOREFRONT, Nov. 17, 2022, available at https://www.healthaffairs.org/content/forefront/family-glitch-premium-stacking-and-need-revisit-health-care-reform (co-authored with Carmel Shachar James René Jolin and Eli Y. Adashi)

*Beyond HIPAA: The FTC's Increasing Focus On Protecting Health Data*, HEALTH AFFAIRS FOREFRONT, Aug 31, 2023, available at https://www.healthaffairs.org/content/forefront/beyond-hipaa-ftc-s-increasing-focus-protecting-health-data (co-authored with Carmel Shachar and Eli Y. Adashi)

*With the National Uninsured Rate at a Record Low, Focus on Maintaining the Gains*, HEALTH AFFAIRS FOREFRONT, Oct 19, 2023, available at https://www.healthaffairs.org/content/forefront/national-uninsured-rate-record-low-focus-maintaining-gains (co-authored with Carmel Shachar and Eli Y. Adashi)

*Preimplantation Polygenic Risk Score Testing Is Unvalidated and Unregulated*, HEALTH AFFAIRS FOREFRONT, Oct 30, 2023, available at https://www.healthaffairs.org/content/forefront/preimplantation-polygenic-risk-score-testing-unvalidated-and-unregulated (co-authored with Daniel P. O'Mahony and Eli Y. Adashi)

*For Physician-Assisted Suicide In Massachusetts, Uncertainty Remains Post-Kligler*, HEALTH AFFAIRS FOREFRONT, Dec 20, 2023, available at https://www.healthaffairs.org/content/forefront/physician-assisted-suicide-massachusetts-uncertainty-remains-post-kligler (co-authored with Konstantin Tretyakov and Eli Y. Adashi)

*Congress' Failure To Address Violence Against Health Care Workers*, HEALTH AFFAIRS FOREFRONT, Feb 2, 2024, available at https://www.healthaffairs.org/content/forefront/health-care-violence-epidemic-and-congress-s-failure-act?utm_medium=social&utm_source=twitter&utm_campaign=forefront&utm_content=o%27mahony (co-authored with Daniel P. O'Mahony and Eli Y. Adashi)

## LAW SCHOOL COURSES

Reproductive Technology and Genetics: Legal and Ethical Issues (Spring '08, Spring '09, Spring '10, Spring '11, Spring '17, Spring '21)

Civil Procedure (Fall '08, Fall '09, Fall '10, Fall '11, Fall '13, Fall '14, Fall '15, Fall '16, Fall '17, Fall '18, Fall'19, Fall '20, Fall '21, Fall '22, Fall '23, Fall '24)

Health Law Policy, Biotechnology, and Bioethics Workshop (Fall/Spring '09-'10, '10-'11. '11-'12, '12-'13, '13-'14, '14-'15, '16-'17, Fall '17, Fall '18, Fall '19, Fall '20, Fall '21, Fall '22, Fall '23, Fall '24) (co-taught with others in some years)

Bioethics and Health Law: Selected Topics (Winter Term '19, Winter Term '20, Winter Term '21)

Writing Group: Health Law, Bioethics, FDA Law (Spring '21, Fall/Spring '21-22, Fall/Spring '22-23; Fall/Spring '23-24)

Psychedelics and the Law (Spring '24) (co-taught with Mason Marks)

Lawyers, Doctors, Ethics, and Professionalism (Spring '14, '15) (co-taught with Dr. Rebecca Brendel)

Freshman Seminar: Bioethics through Film: An Exploration of the Law and Ethics of Medicine (Fall '16)

24

**ASYNCHRONOUS ONLINE COURSES**

Introduction to American Civics: Presented by Zero- L, available at https://www.edx.org/course/zero-l-presents-introduction-to-american-civics (course creator for free online course launched Summer '20)

Zero- L, available at https://online.law.harvard.edu/ (course creator for online course launched wide in Summer '20 has been used at over 120 law schools)

Bioethics: The Law, Medicine, and Ethics of Reproductive Technologies and Genetics, available at https://www.edx.org/course/bioethics-law-medicine-ethics-harvardx-hls4x (free online course launched Fall '16 which has educated more than 97,000 students)

**JUDICIAL CLERKSHIP**

HON. MICHAEL BOUDIN, U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT, Law Clerk, 2003-2004

**LEGAL WORK EXPERIENCE**

HARVARD LAW SCHOOL, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY, BIOTECHNOLOGY, AND BIOETHICS, Academic Fellow & Lecturer On Law, 2006-2008
> Conducted and presented research relating to health law and bioethics.  Taught a seminar at law school in the spring of 2008 on legal and ethical issues related to reproductive technology and genetics.

UNITED STATES DEPARTMENT OF JUSTICE, ATTORNEY GENERAL'S HONORS PROGRAM, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., Attorney, 2004-2006
> Briefed and argued cases in the Circuit Courts defending the United States and acts of Congress.  Drafted briefs in the U.S. Supreme Court in conjunction with the Solicitor General's Office.  Advised the Attorney General, the Solicitor General, and other units of the Justice Department on numerous legal matters.

DAVIS, POLK & WARDWELL, New York, Summer Associate, Summer 2002

U.N., INTERNATIONAL CRIMINAL TRIBUNAL FOR RWANDA, Tanzania & Rwanda, Legal Intern, Summer 2001

**LITIGATION EXPERIENCE**

Served as amicus counsel in:

> Whole Woman's Health v. Hellerstedt, 579 U.S. 582 (2016) (brief with Melissa Murray and Jessie B. Hill)
> Association for Molecular Pathology v. Myriad Genetics, Inc., 569 U.S. 576 (2013), brief on behalf of Dr. Eric Lander (discussed extensively at oral argument by the Justices)

Served as lead counsel in the following cases before the U.S. Courts of Appeals while at the Justice Department:
> Doe v. FAA, 432 F.3d 1259 (11th Cir. 2005)
> Landes v. Tartaglione, 153 Fed. Appx. 131 (3d Cir. 2005)
> Branham v. Snow, 392 F.3d 896 (7th Cir. 2005) (rehearing petition only)
> Avalos-Galvan v. Gonzales, 170 Fed. Appx. 501 (9th Cir. 2006)
> Goodin v. U.S. Postal Inspection Service, 444 F.3d 998 (8th Cir. 2006)
> Luna Tech, Inc. v. Bureau of Alcohol, Tobacco and Firearms, 183 Fed. Appx. 863 (11th Cir. 2006)
> Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C. Cir. 2006)
> Silva v. Gonzales, 463 F.3d 68 (1st Cir. 2006)
> Strolberg, et al., v. Akal Securities, Inc., et al., 210 Fed. Appx. 683 (9th Cir. 2006)
> Wilson, et al. v. MVM, et al., 475 F.3d 166 (3d Cir. 2007)
> In re Reynoso, 477 F.3d 1117 (9th Cir. 2007)

25

Frahm v. United States, 492 F.3d 258 (4th Cir. 2007)

Served as counsel in the following cases before the U.S. Courts of Appeals and U.S. Supreme Court while at the Justice Department:

City of Rancho Palos Verdes v. Abrams, 544 U.S. 113 (2005)
Cobell v. Norton, 428 F.3d 1070 (D.C. Cir. 2005)
In re Kempthorne, 449 F.3d 1265 (D.C. Cir. 2006)
Cobell v. Kempthorne, 455 F.3d 301 (D.C. Cir. 2006)
Cobell v. Kempthorne, 455 F.3d 317 (D.C. Cir. 2006)
U.S. ex rel. Battle v. Board of Regents for Georgia, 468 F.3d 755 (11th Cir. 2006)
Walton v. U.S. Marshals Service, et al., 476 F.3d 723 (9th Cir. 2007)
Abigail Alliance v. Eschenbach, 495 F.3d 695 (D.C. Cir. 2007) (rehearing petition only)

I have also been a signatory to many amicus briefs and served as an expert witness or advisor in several cases.

## BAR

Admitted to the New York Bar in January 2004.  Admitted to practice in the First, Third, Fourth, Fifth, Seventh, Eighth, Ninth, and D.C. Circuits.

## FELLOWSHIPS

Radcliffe Institute for Advanced Studies Fellowship, 2012-2013 (awarded to 50 out of 950 applicants from across the world and all disciplines and professions)

Greenwall Faculty Scholar in Bioethics, 2012-2015 ($400,000 in funding to devote time to research, awarded to two leading young scholars in bioethics).

Pierre Elliot Trudeau Foundation Fellow, 2020-2023 (one of our fellows selected by one of Canada's leading foundations to act as "outstanding public educators, dynamic professors and intellectual guides to Scholars over a three-year program cycle" focused on technology and ethics)

Hastings Center, Fellow, 2016-Present (recognition of the leading bioethics scholars in the world by the Hastings Center)

## MAJOR GRANTS AND GIFTS

Project Co-Lead, Football Players Health Study at Harvard (multi-year multi-million dollar study on the health of NFL Players including concussions) (2012-2017)

Project Co-Lead, Ethics and Law, Regulatory Foundations, Ethics, and Law Program of Harvard Catalyst | The Harvard Clinical and Translational Science Center (multi-million dollar multi-year NIH funded project to improve translational research and ethically reduce barriers to research), (2013-present)

Co-Investigator, Patient-Centered Outcomes Research Oversight Study (PCOROS) (aims to understand Key ethical barriers to the oversight of patient-centered outcomes research through mixed methods empirical research with investigators, IRBs, and patient groups.) (2015-2018)

Co-Investigator, Advancing Collaborative Genetic Research: Ethical and Policy Challenges (seeks to develop appropriate ethical frameworks and regulatory parameters for research with biospecimens by publishing a book based on a conference of national thought leaders) (2015-2018)

Project Lead, Precision Medicine, Artificial Intelligence, and the Law (PMAIL) (provides a comparative analysis of the law and ethics of black-box personalized medicine, explaining the shortcomings of the current innovation

policy landscape in Europe and the US, and providing a comprehensive examination of various policy options to better harness the potential of black-box medicine, supported by a Novo Nordisk Foundation-grant for a Collaborative Research Programme grant agreement number NNF17SA027784) (2018-2023).
Work expanded to included polygenic risk scores, advanced medical computing, quantum technology as part of International Collaborative Bioscience Innovation & Law Programme (Inter-CeBIL), supported by a Novo Nordisk Foundation-grant for a Collaborative Research Programme grant agreement number NNF23SA0087056 (2023-2028)

Project Lead, Diagnosing in the Home: The Ethical, Legal, and Regulatory Challenges and Opportunities of Digital Home Health (develop scholarship, guidelines, and proposed regulations for the ethical implementation of digital products that support clinical diagnosis in patients' homes, supported by a grant from the Gordon and Betty Moore Foundation (grant agreement number 9974) (2020-2024)

Project Lead, The Project on Psychedelics Law and Regulation (POPLAR) (Three-year project will promote safety, innovation, and equity in psychedelics research, commerce, and therapeutics, supported by a generous gift from the Saisei Foundation) (2021-present)

Project Lead, Gracias Family Psychedelics Research Initiative and Bootcamp in Ethics Regulation Fund at Harvard Law School (Three-year project to study how the therapeutic use of psychedelics interfaces with law and ethics and support training for emerging leaders in the space) (2023-2026)

**JOURNALS AND AFFILIATIONS**

Co-Editor in Chief, The Journal of Law and the Biosciences, an Oxford University Press peer-reviewed journal (2013-present)

Editorial Board of the American Journal of Bioethics (2015-present)

Editorial Board of the Lancet, Digital Health (2020-present)

Peer reviewer for the American Society for Bioethics and Humanities, the New England Journal of Medicine, The Lancet, The Hastings Center Report, The American Journal of Bioethics, Law and Contemporary Problems, Law and Philosophy, the American Journal of Public Health and Bioethics

Committee Member, OPTN/UNOS Ethics Committee (2018-2023)

Committee Member, National Academies of Medicine, Committee on Emerging Science, Technology, and Innovation in health and medicine (2019-present)

Committee Member, National Academies of Science, Engineering, and Medicine, Committee on Issues in Organ Donor Intervention Research Committee on Emerging Science, Technology, and Innovation in health and medicine (2016-2017)

Committee Member, Ethics Committee for the American Congress of Obstetricians and Gynecologists (ACOG) (2016-2020)

Committee Member, Steering Committee for Ethics for the Canadian Institutes of Health Research (CIHR) (2015-2018)

Board Member of the American Association of Law Schools, Law, Medicine, and Health Care Section Executive Committee (2009-2012)

Board member of the Institutional Review Board for Fenway Community Health (2007-2010)

27

NY and Massachusetts Civil Procedure Bar Review lecturer for Themis bar review (2011-2017)

**BLOGGING, TWEETING, Etc**

I tweet @CohenProf

I have done month-long blogging stints at Prawfsblawg (http://prawfsblawg.blogs.com/ ) and Concurring Opinions (http://www.concurringopinions.com/) , and am the founder of and blogger at Bill of Health (http://blogs.law.harvard.edu/billofhealth/).  The Greenbag Publication "The Post" has selected my 2012 blogging on abortion and personhood amendments for its "exemplary legal writing" award in the blog category http://journaloflaw.us/5%20The%20Post/The%20Post%20home.html.

I gave a Tedx talk.

[This CV is current as of March 28, 2024]

# Appendix B

## Works Relied Upon in Forming My Expert Opinion

Statutes and Regulations

21 U.S.C. §§ 355(k), (o)

21 U.S.C. § 355

21 U.S.C. § 355-1

21 U.S.C. § 355-1(d)

21 U.S.C. § 355-1(a)(1)(A-F).

21 U.S.C. § 355-1(a)(2)(A).

21 U.S.C. §§ 355-1(f)(3)(A)-(F))

Best Pharmaceuticals for Children Act, Pub. L. No. 107-109, 115 Stat. 1408 (2002)

Food and Drug Administration Safety and Innovation Act, Pub. L. No. 112-144, 126 Stat. 993 (2012)

Pediatric Research Equity Act, Pub. L. No. 108-155, 117 Stat. 1936 (2003)

21 C.F.R. § 314.80

21 C.F.R. §§ 314.102(a), (e)

21 C.F.R. § 314.510

ALA. CODE § 6-5-484

Cases

Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach, 495 F.3d 695 (D.C. Cir. 2007) (en banc)

Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341 (2001)

Dobbs v. Jackson Health Organization, 597 U.S. 215 (2022)

Nolen v. Peterson, 544 So. 2d 863 (Ala. 1989)

Phelps v. Dempsey, 656 So. 2d 377 (Ala. 1995)

Stone v. Alza Corp., No. CV-06-CO-4892-S, 2007 WL 9717749 (N.D. Ala. Mar. 15, 2007)

Weaver v. Reagen, 886 F.2d 194, 198 (8th Cir. 1989)

Secondary Sources

Daniel G. Aaron, I. Glenn Cohen, Eli Y. Adashi, *The FDA Struggle to Withdraw Makena: Problems with the Accelerated Approval Process*, 328 JAMA 2394 (2022)

H. Christine Allen et al., *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. OKLA STATE MED. ASSOC. 776 (2018)

AHRQ, *Off-Label Drugs: What You Need to Know*, https://www.ahrq.gov/patients-consumers/patient-involvement/off-label-drug-usage.html (last viewed Feb 19, 2024)

Alicia T. F. Bazzano et al., *Off-Label Prescribing to Children in the United States Outpatient Setting*, 9 ACAD. PEDIATR. 81 (2009)

Isaac D. Buck, *Regulation of Professionals and Facilities in the United States*, *in* THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 293 (David Orentlicher and Tamara K. Hervey eds 2020-2021)

DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 4 (2015)

Cong. Rsch. Serv., Off-Label Use of Prescription Drugs 4 (Feb. 23, 2021), https://sgp.fas.org/crs/misc/R45792.pdf

Joseph A. DiMasi, Henry G. Grabowski & Ronald W. Hansen*, Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J HEALTH ECON. 20, 23 (2016)

Suzie Ekins-Daukes, Peter J. Helms, Colin R. Simpson, et al., *Off-Label Prescribing to Children in Primary Care: Retrospective Observational Study*, 60 EUR. J. CLIN. PHARMACOL. 349 (2004)

FDA, *Approved Risk Evaluation and Mitigation Strategies*, (REMS), https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm (last accessed March 27, 2024)

FDA, *Best Practices for Communication Between IND Sponsors and FDA During Drug Development: Guidance for Industry and Review Staff: Good Review Practice* 4 (Dec. 2017), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-communication-between-ind-sponsors-and-fda-during-drug-development

FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label (last updated Feb 5, 2018)

FDA, *REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary, Guidance for Industry* (April 2019), https://www.fda.gov/media/100307/download

Peter Grossi & Keri Arnold, *Drug Product Liability at the Crossroads*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 444 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016)

Peter Grossi & Daphne O'Connor, *FDA Preemption of Conflicting State Drug Regulation and the Looming Battle over Abortion Medications*, 10 J.L. & BIOSCIENCES 1 (2023)

Holly Fernandez Lynch, *Give Them What They Want? The Permissibility of Pediatric Placebo-Controlled Trials Under the Best Pharmaceuticals for Children Act*, 16 ANNALS HEALTH L. 79 (2007)

Holly Fernandez Lynch, Rachel E Sachs, Seijin Lee, et al., *Extending the US Food and Drug Administration's Postmarket Authorities,* 4 JAMA HEALTH FORUM e231313 (2023)

E. Kimland, P. Nydert, V. Odlind, et al., *Paediatric Drug Use with Focus on Off-Label Prescriptions at Swedish Hospitals – A Nationwide Study*, 101 ACTA PAEDIATRICA 772 (2012)

L. Leanne Lai, *Off-Label Prescribing for Children with Migraines in U.S. Ambulatory Care Settings*, 23 J. MANAG. CARE SPEC PHARM. 382 (2017)

WILLIAM L. KISSICK, MEDICINE'S DILEMMA'S: INFINITE NEEDS VERSUS FINITE RESOURCES (1994)

Lewis A. Grossman, *Drugs, Biologics, and Devices: FDA Regulation, Intellectual Property, and Medical Products in the American Healthcare System*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 637 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016)

MARK HALL, MARY ANNE BOBINSKI, DAVID ORENTLICHER, I. GLENN COHEN, NICHOLAS BAGLEY, NADIA SAWICKI, HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 10th ed. 2024)

PETER HUTT ET AL., FOOD AND DRUG LAW (5th ed. 2022)

Sandra Johnson, *Structure of Governmental Oversight of Quality in Healthcare*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 489 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

Joan H. Krause, *Fraud and Abuse Law in the United States*, *in* THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 375 (David Orentlicher and Tamara K. Hervey eds 2020-2021)

L. Lindell-Osuagwu, M. Hakkarainen, K. Sepponen, et al., *Prescribing for Off-Label Use and Unauthorized Medicines in Three Paediatric Wards in Finland, the Status Before and After the European Union Paediatric Regulation*, 39 J. CLIN. PHARM. THER. 144 (2013)

Anna B. Laakmann, *When Should Physicians Be Liable for Innovation?*, 36 CARDOZO L. REV. 913 (2015)

Amber M. Parish, *A Better Guide to Prescribing, Particularly During Public Health Emergencies: Legislation & Policy Governing Prescribing to Self & Family*, 6 LOY. U. CHI. J. REG. COMPLIANCE 109 (2021)

Perrine Joret-Descout, Sonia Prot-Labarthe, Françoise Brion, et al., *Off-Label and Unlicensed Utilisation of Medicines in a French Paediatric Hospital,* 37 INT. J. CLIN. PHARM. 1222 (2015)

ADAM L. MUCHMORE, FOOD AND DRUG REGULATION: A STATUTORY APPROACH 363 (2021)

D. Pfister, *Off-Label Use of Oncology Drugs*, 30 J. CLINICAL ONCOLOGY 584 (2012)

David C. Radley. Stan N. Finkelstein, Randall S. Stafford, *Off-Label Prescribing Among Office-Based Physicians*, 166 ARCH. INTERNAL MED. 1021 (2006)

Samir S. Shah et al., *Off-label Drug Use in Hospitalized Children*, 161 ARCH. PEDIATR. ADOLESC. MED. 282 (2007)

David A. Simon, *Off-Label Innovation*, 56 GA. L. REV. 701, 719 (2022)

S. REP. 105-43 (1997)

Katharine A. Van Tassel, *Filing the New Drug Application*, 1 FOOD AND DRUG ADMIN. § 13:26 (2023-2)

G.W. 't Jong, I.A. Eland, M.C.J.M. Sturkenboom, et al., *Unlicensed and Off-label Prescription of Respiratory Drugs to Children*, 23 EUR. RESPIR. J. 310 (2004)

Arna Teigen, Siri Wang, Bich Thuy Truong, et al., *Off-label and Unlicensed Medicines to Hospitalised Children in Norway*, 69 J. PHARM. PHARMACOL. 432 (2017)

Lindsay F. Wiley et. al., *Health Reform Reconstruction*, 55 U.C. DAVIS L. REV. 657 (2021)

Robin Fretwell Wilson, *The Promise of Informed Consent*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 213 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016)

Divya Yoon et al., *Trends in Off-Label Drug Use in Ambulatory Settings: 2006-2015*, 144 PEDIATRICS e20190896